1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3                   _____

4    **In Re: Bard IVC Filters**            ) MD-15-02641-PHX-DGC
     Products Liability Litigation          )
5                                           )
                                            ) Phoenix, Arizona
6                                           ) October 29, 2015
                                            )
7    _____)

8

9

10

11

12        BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

13           REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                  SCHEDULING CONFERENCE

15

16

17

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257

24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2

 3    Plaintiffs' Co-Lead/Liaison Counsel and State/Federal Liaison
      Counsel:
 4
              Gallagher & Kennedy
 5            By: ROBERT W. BOATMAN, ESQ.
              2575 East Camelback Road, Suite 1100
 6            Phoenix, AZ  85016

 7            Lopez McHugh
              By: RAMON ROSSI LOPEZ, ESQ.
 8            100 Bayview Circle, Suite 5600
              Newport Beach, CA  92660
 9

10    Plaintiffs' Steering Committee Counsel:

11            Gallagher & Kennedy
              By: SHANNON CLARK, ESQ.
12                PAUL LINCOLN STOLLER, ESQ.
                  MATTHEW R. BOATMAN, ESQ.
13                C. LINCOLN COMBS, ESQ.
                  MARK STEPHEN O'CONNOR, ESQ.
14            2575 East Camelback Road, Suite 1100
              Phoenix, AZ  85016
15
              Karon & Dalimonte
16            By: JOHN A. DALIMONTE, ESQ.
              85 Devonshire Street, Suite 1000
17            Boston, MA  02109

18            Brenes Law Group
              By: TROY ALEXANDER BRENES, ESQ.
19            16A Journey
              Aliso Viejo, CA  92656
20
              Babbitt & Johnson
21            By: JOSEPH R. JOHNSON, ESQ.
              1641 Worthington Road, Suite 100
22            W Palm Beach, FL  33409

23            Heaviside Reed Zaic
              By: JULIA REED ZAIC, ESQ.
24                LAURA ELIZABETH SMITH, ESQ.
              312 Broadway, Suite 203
25            Laguna Beach, CA  92651
```

```
1    For the Plaintiffs (continued):

2

3            The Nations Law Firm
             By: HOWARD L. NATIONS, ESQ.
4            3131 Briarpark Drive, #208
             Houston, TX  77042
5
             Baron & Budd
6            By: RUSSELL W. BUDD, ESQ.
                 LAURA J. BAUGHMAN, ESQ.
7            3102 Oak Lawn Avenue
             Dallas, TX  75219
8
             Wagstaff & Cartmell
9            By: THOMAS P. CARTMELL, ESQ.
                 DAVID C. DEGREEFF, ESQ.
10           4740 Grand Avenue, #300
             Kansas City, MO  64112
11
             Branch Law Firm
12           By: TURNER W. BRANCH, ESQ.
                 ADAM T. FUNK, ESQ.
13               MARGARET M. BRANCH, ESQ.
             2025 Rio Grande Blvd. NW
14           Albuquerque, NM  87104

15           Lieff, Cabraser, Heimann & Bernstein
             By: WENDY R. FLEISHMAN, ESQ.
16           250 Hudson Street, 8th Floor
             New York, NY  10013
17
             Motley Rice
18           By: DONALD A. MIGLIORI, ESQ.
             321 South Main Street, 2nd Floor
19           Providence, RI  02903

20           Freese & Goss
             By: SHEILA M. BOSSIER, ESQ.
21           1520 North State Street
             Jackson, MS  39202
22
             Goldenberg Law
23           By: STUART L. GOLDENBERG, ESQ.
                 MARLENE GOLDENBERG, ESQ.
24           800 Lasalle Avenue, #2150
             Minneapolis, MN  55402
25
```

```
1    For the Plaintiffs (continued):

2
             Provost Umphrey Law Firm
3            By: CHRISTOPHER T. KIRCHMER, ESQ.
             490 Park Street, P.O. Box 4905
4            Beaumont, TX  77704

5            Walkup Melodia Kelly & Schoenberger
             By: MICHAEL A. KELLY, ESQ.
6                DOUGLAS S. SAELTZER, ESQ.
             650 California Street
7            San Francisco, CA  94108

8            Fears Nachawati Law Firm
             By: MATTHEW McCARLEY, ESQ.
9            4925 Greenville Avenue, Suite 715
             Dallas, TX  75206
10
             Faraci Lange
11           By: HADLEY L. MATARAZZO, ESQ.
             28 East Main Street, Suite 1100
12           Rochester, NY  14614

13           TorHoerman Law
             By: ERIC M. TERRY, ESQ.
14           101 West Vandalia
             Edwardsville, IL  62025
15

16   For the Plaintiffs Duffie:

17           Childers, Schlueter & Smith
             By: M. BRANDON SMITH, ESQ.
18           1932 N. Druid Hills Road
             Atlanta, GA  30319
19

20   For the Plaintiff Leus:

21           Montee Law Firm
             By: JAMES P. CANNON, ESQ.
22           10200 Holmes
             Kansas City, MO  64131
23

24

25
```

1    For the Plaintiffs (Continued):

2
     For the Plaintiffs Deserio-Mintz and Hough:
3
             Alonso Krangle
4            By: **DAVID B. KRANGLE**, ESQ.
             445 Broad Hollow Road
5            Melville, NY  11747

6

7    For the Plaintiffs:

8            Rueb & Motta, PLC
             By: **GREGORY D. RUEB**, ESQ.
9            1401 Willow Pass Rd. Ste. 880
             Concord, CA  94520
10

11           Kenneth S. Nugent, P.C.
             By: **LAURA L. VOGHT**, ESQ.
12           1355 Peachtree Street N.E., Suite 1000
             Atlanta, GA  30309
13
             Osborne & Associates
14           By: **ROBBY BELL**, ESQ.
             Mizner Park
15           433 Plaza Real Blvd., Ste. 271
             Bocca Raton, FL  33432
16

17           Bailey & Greer, PLLC
             By: **R. SADLER BAILEY**, ESQ.
18           6256 Poplar Ave.
             Memphis, Tennessee  38119
19

20           Miller Weisbrod LLP
             By: **LES WEISBROD**, ESQ.
21           11551 Forest Central Drive, Ste 300
             Dallas, TX 75243
22

23

24

25

```
 1    Telephonically for the Plaintiffs:

 2

            Pittman Dutton & Hellums
 3          By: JONATHAN S. MANN, ESQ.
            2001 Park Place, Suite 1100
 4          Birmingham, Alabama  35203

 5          Curtis Law Group
            By: WILLIAM CURTIS, ESQ.
 6          7557 Rambler Road, Suite 1050
            Dallas, Texas  75231
 7
            Bernstein Liebhardt, LLP
 8          By: JESSICA KELLER, ESQ.
            10 East 40th Street
 9          New York, NY  10016

10
            Toriseva Law
11          By: JOSHUA MILLER, ESQ.
                TERESA TORISEVA, ESQ.
12          1446 National Road
            Wheeling, WV 26003
13
            Schneider Hammers
14          By: PHILLIP PENDERGRASS, ESQ.
15             JASON T. SCHNEIDER, ESQ.
            5555 Glendridge Connector, Suite 975
16          Atlanta, Georgia  30342

17
            Perdue and Kidd
18          By: BRIAN WINEGAR, ESQ.
            510 Bering Drive, Suite 550
19          Houston, Texas  77057

20
            Branch Law Firm
21          By: MARY LOU BOELCKE, ESQ.
            2025 Rio Grande Boulevard, NW
22          Albuquerque, New Mexico  87104

23          Hank Pardo

24          Jaclyn Anderson

25
```

1    For the Defendants:

2            Nelson Mullins Riley & Scarborough
             By: **RICHARD B. NORTH, JR.,** ESQ.
3                **MATTHEW B. LERNER,** ESQ.
             201 17th Street NW, Suite 1700
4            Atlanta, GA  30363

5            Snell & Wilmer
             By: **JAMES R. CONDO,** ESQ.
6                **AMANDA CHRISTINE SHERIDAN,** ESQ.
             400 East Van Buren
7            Phoenix, AZ  85004

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

09:12:12  1

2

3            THE COURTROOM DEPUTY:  MDL case 2015-2641, Bard IVC

4    Filters Products Liability Litigation, on for scheduling

09:12:33  5    conference.

6            Will the parties --

7            THE COURT:  I'll take care of that.

8            Good morning, everybody.

9            MULTIPLE VOICES:  Good morning, Your Honor.

09:12:38 10           THE COURT:  Nice to have all of you with us,

11   including those who are on the phone.

12           I don't want to have everybody here state your

13   appearance; it would take us a half hour.

14           We have a list of everybody who's on the phone and

09:12:49 15   has appeared in the courtroom.  We will put it in the docket

16   so there's a record of everybody who is here.

17           What I'd like to do is just have counsel at the

18   tables introduce yourselves.

19           And anybody else who wishes to speak during the

09:13:02 20   course of this conference, when you do, stand up, identify

21   yourselves and who you represent and we'll just have you

22   identified in that way.  But otherwise the list will be on the

23   docket so there's a record of everybody who was here.

24           But let's start with counsel at the table, please.

09:13:21 25           MR. BOATMAN:  Good morning, Your Honor.  Bob Boatman

09:13:22  1    from Gallagher & Kennedy representing the plaintiffs.

2                    THE COURT:  Good morning.

3                    MR. LOPEZ:  Morning, Your Honor.  Ramon Lopez, Lopez

4    McHugh, also representing the plaintiffs.

09:13:31  5                    MR. STOLLER:  Morning, Your Honor.  Paul Stoller,

6    Gallagher & Kennedy, representing the plaintiffs.

7                    MR. NORTH:  Your Honor, Richard North on behalf of

8    the defendants C.R. Bard and Bard Peripheral Vascular.  Good

9    morning.

09:13:46  10                   MR. CONDO:  Morning, Your Honor.  Jim Condo from

11   Snell and Wilmer on behalf of the Bard defendants.

12                   THE COURT:  Good morning.

13                   MR. NORTH:  Your Honor, if I may, I would like to

14   introduce to the Court Mr. Greg Dadika, the associate

09:13:57  15  counsel -- I mean the associate general counsel for C.R. Bard

16   who is visiting us today here.

17                   THE COURT:  All right.  Good morning.

18                   What I'd like to do is just work our way through the

19   agenda.  I'm sure there's matters folks here want to raise and

09:14:26  20  I'm happy to have you raise them as we get to a related

21   subject in the agenda.

22                   I have read the joint submission that you all made, a

23   couple of times.  I have looked over the cases on the docket

24   but not in great detail, just to get a sense for what cases

09:14:44  25  are there.  I've read the applications for appointment of

09:14:47  1    plaintiffs' counsel and for designation of a leadership

2    structure for plaintiffs.  And, as you all know, I produced an

3    agenda on October 19th identifying issues to talk about today.

4    So I think we ought to dive in and just talk through the

09:15:06  5    agenda.

6         My intention is to decide as much as I can as a

7    result of this conference, probably not all of it on the

8    record today, but I will get orders out after today within a

9    day or two, a workday or two after today, that addresses

09:15:27 10    virtually all of the issues, hopefully, that we're going to

11    address or sets a schedule under which we're going to brief

12    and decide the issues that require more careful attention.

13        So let's talk through the agenda.  Many of these

14    things I'll take under advisement.  It may be at the end of

09:15:43 15    the conference I'll come back and give you concrete decisions

16    on some of them.  But in any event, within a few days of the

17    conference I'll get orders out that cover most of what's in

18    the agenda.

19        The first matter in the agenda is the identification

09:16:01 20    and selection of parties' leadership.  Obviously the defendant

21    has chosen its counsel for the case, so this focuses primarily

22    on what we do on the plaintiff side of the case.

23        I have seen the applications for co-lead counsel for

24    Mr. Lopez, which is at Docket 175, and Mr. Boatman which is at

09:16:22 25    Docket 177.

09:16:24   1               I have not seen any other applications to be lead or

2        liaison counsel.  Have I missed any?

3               MR. BOATMAN:  No, Your Honor.

4               THE COURT:  I think this may be the most -- well, not

09:16:41   5        the most, but one of the most important decisions I make in

6        the case is who I designate as lead counsel.  I want to do a

7        bit of due diligence before I make that decision.

8               Mr. Lopez, do you have a couple of judges you could

9        recommend I call who you've worked with in the past in

09:16:58  10        comparable settings?

11               MR. LOPEZ:  Yes, Your Honor.  You want me to give the

12        names now?

13               THE COURT:  Please.

14               MR. LOPEZ:  Judge Michael Davis.

09:17:09  15               Judge Michael Davis, Minneapolis, Minnesota, who is

16        an MDL judge.  Judge Herndon, also an MDL judge.

17               THE COURT:  Herndon?

18               MR. LOPEZ:  Herndon.  Southern District of Illinois.

19        I can give you more, if you like.

09:17:27  20               THE COURT:  I'll start with those.

21               Mr. Boatman, how about you?

22               MR. BOATMAN:  Your Honor, I'm not -- I'm a product

23        liability attorney primarily.  I don't have extensive

24        experience in MDL proceedings.  As I mentioned in our

09:17:43  25        submitting papers, the part of our team that fills that role

09:17:46  1    better is Paul Stoller, who is with me at counsel table, so if

        2    I could defer to him on that.

        3          THE COURT:  Well, I know Mr. Stoller.  He's appeared

        4    in cases in front of me before.  Just a couple of judges that

09:17:59  5    you've worked with in other cases.  They don't need to be MDL

        6    or even large multi-party cases.

        7          MR. BOATMAN:  Dan Barker, who's now in the Court of

        8    Appeals, I tried a case with Mr. Condo.

        9          THE COURT:  Actually, Dan Barker is now retired.  But

09:18:17 10    I know him; I can check with him.

       11          MR. BOATMAN:  Gosh, what do I have --

       12          THE COURT:  Why don't you think about it for a minute

       13    and you can let me know before the end of today.  I just think

       14    this is a critical decision and I want to make sure I've

09:18:32 15    touched all the bases I need to to ensure that the plaintiffs

       16    have the best possible leadership for purposes of the case.

       17    You can give me a name before the end of the day, that's fine.

       18          Does anybody on the plaintiff side wish to oppose or

       19    make any comments on the application submitted by Mr. Lopez

09:18:54 20    and Mr. Boatman?  Starting with counsel in the courtroom.

       21          I see no hands.

       22          How about anybody on the telephone?

       23          Okay, hearing nothing, I will assume that all of the

       24    plaintiffs counsel are in agreement.

09:19:14 25          And my understanding, Counsel, from what you've

09:19:17   1   submitted is there's an interim agreement among plaintiffs'

2   counsel for purposes of the conference, the gentlemen at the

3   counsel table can speak and represent the plaintiffs' views.

4   Is that accurate?

09:19:30   5          MR. BOATMAN:  Yes, Your Honor.

6          THE COURT:  Okay.  We'll proceed with that basis.  As

7   I said, I'll get a decision out pretty quickly that talks

8   about this plaintiffs leadership structure.

9          Let's talk for a minute about the steering committee

09:19:55   10  you have proposed.  I have heard very experienced MDL judges

11  say it is a grave mistake to put more than 12 people on a

12  steering committee.  We have 22 people in this proposed

13  steering committee.  Can you explain to me why it is in this

14  MDL you feel we need a committee that large to steer this

09:20:13   15  litigation.

16         MR. LOPEZ:  May I be seated, Your Honor, when I

17  address the Court?

18         THE COURT:  Yeah, that's fine.  Pull the mic right in

19  front of you so folks on the phone can hear you.

09:20:20   20         MR. LOPEZ:  I actually, before I submitted this and

21  before we had a discussion amongst plaintiffs lawyers, I

22  looked at more recent MDL's -- Pradaxa, Incretin, which is in

23  San Diego, and Lipitor, which is in South Carolina -- just to

24  see what the structure looked like.  And I agree with Your

09:20:42   25  Honor, in the past the number was around 12 or 15.  But the

09:20:47  1  number seems to have grown in recent times to 18, 20 different

2  members.

3          Let me just say for this case, because of the number

4  of cases I think that we're going to have in this MDL and the

09:20:59  5  number of issues we're dealing with and the resources we need,

6  I mean, just to have this many people engaged and committed to

7  the litigation, we've worked very well thus far, as I hope the

8  court saw in what we filed yesterday, in a very organized,

9  cohesive way.  And everybody that's on that list.  It was

09:21:19  10  difficult to say you shouldn't be one of the members of

11  leadership assisting in some of the very critical things we

12  have going on.

13          So it was just a matter of we had a lot of people

14  step up to commit and to become fully engaged in this case and

09:21:33  15  it was like where do you draw the line.

16          I've got three or four other firms that I've had to

17  say, you know, the number is large enough now and if you want

18  to make application, you have to do so directly with the

19  court.  So --

09:21:49  20          THE COURT:  Let me ask a related question.  I have

21  seen case management orders in class action or MDL cases that

22  are quite specific in setting forth how a plaintiffs'

23  leadership organization is to function and who makes

24  assignments for work to be done and provides that folks on the

09:22:14  25  plaintiff side don't do at least common-benefit work absent

09:22:19  1    assignment from the leadership in order to make it efficient,

2    to avoid duplication.  I didn't see anything like that in the

3    case management order that you all proposed for designating

4    the leadership structure.  What are your thoughts on that

09:22:36  5    subject?

6          MR. LOPEZ:  Again, there's a lot of examples of that.

7    They usually look the same.  We're drafting one now.

8    Especially with a structure this large, the protocol and

9    procedures and things like that, we've already had discussions

09:22:53  10   about that.

11         You see a large number of lawyers here.  They realize

12   they shouldn't be coming to all these hearings unless they're

13   going to present something or have something that they're

14   going to contribute to that hearing.  So you're not going to

09:23:04  15   see 40 lawyers here filling common-benefit time every hearing.

16         It is a very large document, it will probably be the

17   next CMO or petition for CMO that we'll provide to the Court

18   which will have very detailed protocols and procedures about

19   what will be considered common-benefit time, what will be

09:23:24  20   considered common-benefit expenses and how we intend to audit

21   that.

22         Mr. Boatman and I had an appointment with an ethics

23   person from -- a professor who deals with these kinds of

24   issues.  We were actually going to bring that person in as a

09:23:38  25   consultant who would help us monitor this so it's not just on

09:23:42  1    Mr. Boatman and I, or others in a leadership role, to make

2    those decisions.

3               THE COURT:  Who is that?

4               MR. LOPEZ:  We want to ensure it's a fair process.

09:23:50  5               MR. BOATMAN:  Professor Rapoport from Las Vegas, Your

6    Honor.  And we've also talked about former Arizona Supreme

7    Court Justice Tom Zlacket to assist us in that process.  So

8    we're in the interviewing process and decision-making process.

9               Our intention is to have, we hope, monthly audits,

09:24:12  10   strict rules on what can be billed, and to have experienced

11   people involved in monitoring those billings.

12              THE COURT:  So I understand you to be in the process

13   of creating a document for the entire plaintiffs' side that

14   will specifically address these issues?

09:24:31  15              MR. LOPEZ:  Yes, Your Honor.  It will be -- it will

16   be very detailed about what is and is not to be considered

17   common benefit, and then the rules as they apply to

18   simultaneous or spontaneous billing on a daily basis and how

19   it gets audited and when they're due, things like that.

09:24:49  20              THE COURT:  How soon do you think you'll be in a

21   position --

22              MR. LOPEZ:  I told Mr. Boatman we should probably

23   file that next week.

24              If you want it Monday, we'll have it Monday, Judge.

09:25:04  25              MR. BOATMAN:  It may not have the person we would be

09:25:06   1   proposing to use as the auditor by then because we have some

       2   interviews to do on that issue.

       3          THE COURT:  Well, I want to make sure it's complete

       4   and carefully done, so I don't want to rush you on it.

09:25:26   5          When you said next week, Mr. Lopez, is that when you

       6   really think it can be done reasonably, or do you need a

       7   little more time than that?

       8          MR. LOPEZ:  I think if you give us until the end of

       9   next week.  We're trying to model it after the best one that

09:25:41  10   exists today, so we're comparing and contrasting between two

      11   or three more recent orders that have been entered in other

      12   MDL's, and we just want to make sure this is the one that

      13   captures the best of all of those.  So I would say we should

      14   be able to file a petition with the proposed order by Friday

09:26:00  15   of next week.

      16          THE COURT:  Is it your thought that that order would

      17   replace the proposed case management order you submitted, or

      18   would it be Case Management Order Number 2?

      19          MR. LOPEZ:  Traditionally, Your Honor, it would be

09:26:13  20   its own case management order.  So I would say it would be the

      21   next case management order in line in the docket.

      22          THE COURT:  All right.  That's fine.

      23          What kind of work-product issues, if any, do you see

      24   arising from a document that goes into some detail as to how

09:26:29  25   the plaintiffs' organization is to function?

09:26:32  1        MR. LOPEZ:  You know, for the most part, that

2  document is so detailed that if you have someone who's not

3  vested in it, who's actually the one auditing it, there should

4  not be issues.  Every once in a while you will have an issue

09:26:48  5  where someone maybe is billing for things they shouldn't be

6  billing for or putting time in for time they shouldn't -- I've

7  been on a few committees in the past.  To have to do all that

8  at the end of the case and look back on time is a nightmare.

9        The way things have been done more recently in other

09:27:06 10  MDL's, and I can name three or four that are ongoing now, is

11  to have these monthly audits so when you get to the end you

12  have a third party that's already gone through the process,

13  and if there are any issues, they come up on a monthly basis.

14        So right now I don't foresee there being a problem if

09:27:26 15  we were to follow a protocol like that.

16        THE COURT:  Are these monthly audits submitted to the

17  court?

18        MR. LOPEZ:  Usually not until we get to the end.  But

19  I would say if the Court would like us to do that, there would

09:27:39 20  be no problem doing that.

21        THE COURT:  I assume -- well, are you thinking you're

22  going to designate an auditor in addition to this ethics

23  consultant?

24        MR. LOPEZ:  No.  I think -- well, let me say I think

09:27:55 25  it could be and should be the same person.  That could be an

09:27:57  1    expensive process for us, so we want to make sure it's

      2    someone -- this professor was recommended to us that might be

      3    someone -- we're going to interview probably Professor

      4    Rapoport and maybe one or two others.  Mr. Boatman provided me

09:28:11  5    with the name of a more local person we might want to talk to.

      6    So we're taking this very seriously, Your Honor.

      7           THE COURT:  Is it your anticipation that this order

      8    you submit is a public document, goes in the court's docket?

      9           MR. LOPEZ:  As far as -- I've never seen that

09:28:27  10   document sealed, let's just say that.

      11          THE COURT:  Okay.  Let's have you submit that by

      12   November 6th, which is a week from Friday.

      13          I will get Case Management Order 1 out before that

      14   that just identifies the plaintiffs' leadership and covers the

09:28:51  15   basic issues that you propose, such as who gets service of

      16   orders and things like that.  And I'm going to do a bit of

      17   revising of what you've submitted, but not substantial.

      18          And then after I get that order, if there are issues

      19   that I want to talk to you about, I'll probably set a phone

09:29:11  20   call.  Otherwise, I will issue it pretty quickly.  Within --

      21   let me think of my schedule.  Probably within a week of

      22   getting it.

      23          In connection with that, I'm sure you're already

      24   thinking about all this, I think it does need to be fairly

09:29:38  25   detailed.  Not only in terms of how the leadership of the

plaintiff side works, but also detailed in terms of what
expenses are reimbursable, coach airfare for travel, how you
bill travel time, record keeping requirements.  And I would
ask that on that point you make sure that it's real-time
record keeping and that it is task-based billing not block
billing, as required by our local rules.

        I think there ought to be some addressing of staffing
limitations, making clear 15 plaintiffs lawyers at a
deposition are -- is not appropriate.  Not that you would do
that.  But I just think we need to be very specific up front
so that there are not surprises at the end of the case as to
what is reimbursable and what is not.

        And I don't know if it ought to be monthly, but I
think at least quarterly for the time being you ought to be
submitting a report to the Court.  Since it will address the
work of the plaintiff side, perhaps that is something that
needs to be submitted ex parte.  But that tells me what's
happening with the functioning of the plaintiff side, the
budgeting that's been done, auditing that's been done.  Just
so I can discharge my duty of making sure we're running the
case in an efficient way and not setting ourselves up for big
fights or surprises at the end.

        And as you all well know, these issues are addressed
in the manual on complex litigation.

        I am going to appoint this leadership structure for

09:31:28  1    plaintiffs for a one-year term.  That doesn't mean in a year

       2    we're going to necessarily appoint new leadership, but I want

       3    to have built into it some review process just to make sure

       4    I'm doing my job of ensuring that the plaintiff side and

09:31:43  5    common-benefit work is being done as efficiently as possible.

       6         Are there other comments from folks from plaintiffs'

       7    counsel on this subject?  How about plaintiffs' counsel in the

       8    courtroom, anybody wish to be heard on this?

       9         No hands.

09:32:16  10        How about on the phone?

       11        All right.

       12        Mr. North, Mr. Condo, you don't have a dog --

       13        MR. NORTH:  Your Honor, I don't believe we have

       14    standing on this.

09:32:26  15        THE COURT:  All right.  Let me make a note here.

       16        Let's move on to Item II in the agenda, which is

       17    protective and 502 orders.  I did see the supplement that was

       18    filed last night.

       19        With respect to 502 orders, my understanding is

09:33:16  20    there's been a form that's been used in a number of the cases;

       21    is that correct?

       22        MR. NORTH:  Your Honor, Richard North.

       23        There has been a protective order that had a 502,

       24    Rule 502 provision in it, and I think we're essentially in

09:33:28  25    agreement, but we're going to propose or we're discussing

09:33:31  1  extracting the 502 portion of the protective order and having

2  them as two separate orders.

3  THE COURT:  Is there a reason we need two separate

4  orders as opposed to one?

09:33:42  5  MR. NORTH:  We could collapse it.  Because the

6  Court's agenda talked about them separately, we thought maybe

7  the Court wanted that.

8  THE COURT:  No, I don't.  If you want to put them in

9  one order, that's fine.

09:33:53  10  When do you all -- Mr. Stoller.

11  MR. STOLLER:  I was going to say, Your Honor, if

12  that's the case and one of the issues is what should be in the

13  502 order since you identified it in particular and in some

14  MDL's you'll have fairly complicated 502 orders that will

09:34:06  15  address things like protocols or how do you address it when

16  somebody redacts something that's being privileged and what

17  should be in the privilege logs and how to dispute resolution

18  about privilege issues as well as clawback issues, some of the

19  longer and more complicated ones are that way.

09:34:24  20  If you're just looking for the sort of standard

21  502(d) language as part of the -- that, I believe, was in the

22  form of an agreed protective order already.  We have

23  essentially a form that if that's all you're -- if you're not

24  looking for something that's more complicated, I think we've

09:34:41  25  got agreement, then, on the form of protective order that has

09:34:44   1    agreed 502 language in it already.

2            And it looks like I've posed a question to you you

3    might want to consider.

4            THE COURT:  Well, I'm not coming to this with a

09:34:56   5    preconceived notion about what you ought to put in your 502

6    order to protect yourselves.

7            If you all are satisfied that the kind of 502

8    provision you've got in your protective order is sufficient

9    for this case, I'll be more than happy to look at it in that

09:35:12  10    form.  If I think there's something important missing, I'll

11    tell you.  But I don't have a particular form of order in

12    mind.

13            MR. STOLLER:  If that's the case, Your Honor, I think

14    we can probably submit something early next week, then.  We've

09:35:26  15    basically got an agreed form of confidentiality order that has

16    clawback language in it that's been agreed upon by the parties

17    in the past and we don't need to do something new and

18    different.

19            THE COURT:  Does that sound right?

09:35:38  20            MR. NORTH:  Yes, Your Honor, that's correct.

21            THE COURT:  Okay.  Let's just set the same date.

22    Let's say by November 6th you all will submit a protective

23    order with 502(d) provisions in it, or 502 provisions in it,

24    and I will take a look at that as well.

09:36:02  25            Anything else we need to address on protective orders

09:36:05   1   or 502 issues?

2              MR. STOLLER:  I don't think so, Your Honor.

3              MR. NORTH:  Nothing for the defendants, Your Honor.

4              THE COURT:  Okay.

09:36:11   5          Folks who are in the courtroom, if I'm moving past an

6   issue you want to address, jump on your feet and throw

7   something at me.

8          Folks on the phone, speak up so we make sure we get

9   your points as we move along.

09:36:24  10          All right.  Let's talk about what I labeled ESI

11  protocol.

12          You indicated that you were working on an order that

13  deals with format of production.  Is that an order that you

14  can have submitted by November 6th as well, or are there

09:36:44  15  issues on that that need to be addresses?

16             MR. STOLLER:  Maybe I can address this broadly.  We

17  had talked in the joint briefing about an ESI protocol, not

18  just form of production.  At least in my mind or my experience

19  the ESI orders can cover a number of things, not just form of

09:37:00  20  production.  And this is where I think you'll see today some

21  of the -- I'm not going to -- maybe I'm not going to gain any

22  friends, but old guard versus new guard --

23             THE COURT:  You looked at Mr. Lopez as you said that,

24  Mr. Stoller.

09:37:12  25             MR. LOPEZ:  Most people do, Your Honor.

09:37:15   1            MR. STOLLER:  But Gallagher and Kennedy to some
        2    extent has come in as one of the new kids on the block, for
        3    lack of a better term, with newer cases that don't have the
        4    background and experience that some of these older cases have,
09:37:26   5    and you've noted in your initial request in a couple points
        6    you pointed out there are some mature cases, and you saw from
        7    these defendants that they talk about the things that they've
        8    done to produce ESI and information in those cases.
        9            And part of my goal on behalf of the new folks, the
09:37:48  10    folks who don't have that background and experience and have
       11    the newer cases, is to get an understanding before we can come
       12    to a formal protocol of what's been done.  Because what has
       13    been proposed by the Bard defendants in this case is, look,
       14    we've done a lot of this ESI work, we want you to basically
09:38:06  15    sort of accept what we've done thus far, accept the form that
       16    we've done thus far, the searches we've done thus far.
       17            And I have said, and I had a conversation with
       18    Mr. Lerner earlier this week, I said, look, I'm not saying no,
       19    but I have to get a better understanding what's happened
09:38:21  20    before.  I need an understanding before I talk about ESI
       21    protocol of what is your system's architecture?  Where is your
       22    information kept?  How's it stored?  To the extent you all
       23    have done searches, how did you identify the custodians that
       24    you picked?  What custodians weren't picked?  Were there
09:38:42  25    shared drives part of the collection?  What did you do to

09:38:44  1    gather up information in the first place?  And once you

       2    collected it, what did you do to search it to produce?

       3            My understanding, and you've hit on this some in your

       4    questions, Your Honor, there were key-term searches done.

09:38:57  5            I will tell you and confess I'm not a big fan of

       6    key-term searches, and I think I'm probably not the only one.

       7    That being said, it doesn't mean it's a terrible way to do

       8    things.  And particularly where some water has already passed

       9    under the bridge, I think sort of on behalf of the new folks,

09:39:11 10    we need to have an understanding how were the key terms

      11    selected to do those searches?  Why were other potential key

      12    terms not used?  And what were the results of that among -- as

      13    it was run across the data?  Was there testing done?

      14    Responsive information and non-responsive information to see

09:39:28 15    that this was a reasonable process in order to try to identify

      16    responsive and relevant documents?

      17            That conversation, to me, I think takes a bit.  It's

      18    going to be an information exchange.  Once we have a better

      19    understanding, I can either say -- and obviously consult with

09:39:43 20    the folks on our side of the aisle who are dealing with ESI

      21    issues, we can sit down and say we're okay with that or we

      22    think it needs to be tweaked this way, and then start dealing

      23    with the formal issues of what I would characterize as ESI

      24    protocol.  Does that make sense?

09:40:03 25            THE COURT:  I understand what you've said so far.  So

09:40:05  1    therefore what?

2         MR. STOLLER:  So therefore I think it's a process

3    of -- we've got a phone conference set up next week to start

4    that process of talking about the information.  And depending

09:40:12  5    upon how quickly we're able to exchange information and then

6    understand what's been done, I think we'll be able -- my

7    proposal would be, Your Honor, if you asked what would you

8    propose, I would say, Your Honor, give us 30 days to see if we

9    can come up with an agreed ESI protocol.  It will require some

09:40:30  10   work on behalf of the parties, frankly, because I think

11   there's a fair amount of learning.

12        I have read some of the materials that have happened

13   in earlier cases and where there have been disputes what

14   happened there.  But I don't have that sort of baseline

09:40:40  15   understanding to get to the next step of, okay, let's craft a

16   joint document that we'll use for this case on a go-forward

17   basis in a somewhat different setting with all these different

18   people in the room and a lot of different plaintiffs that's

19   going to be acceptable on our side.

09:40:57  20        THE COURT:  Okay.

21        Do folks on the defense side want to address what

22   Mr. Stoller's just described?

23        MR. NORTH:  Your Honor, Richard North.

24        We had previously, since the Court's initial order

09:41:08  25   setting this conference, been in discussions with other

09:41:11  1    representatives of the plaintiffs group who were speaking to

2    us on these issues and we thought at that time we were close,

3    if not having actually achieved agreement on an ESI protocol.

4         This is no criticism, but Mr. Stoller has recently

09:41:24  5    gotten involved and, as he just mentioned, is raising a number

6    of other issues.

7         We're happy to accommodate him and discuss those

8    things with him if that's the Court's preference.

9         THE COURT:  Do you have a view on what Mr. Stoller

09:41:47  10   said that as part of this discussion you should be sharing

11   with plaintiffs' counsel basic information about your ESI

12   systems and how they're configured and how custodians are

13   chosen and what kind of word searches you've done, things such

14   as that?

09:42:03  15        MR. NORTH:  Absolutely, Your Honor.  There have been

16   those discussions with other counsel in the plaintiffs group

17   in the past.  There's actually been litigated disputes about

18   that in the case in Reno that the magistrate considered, and

19   there were lengthy declarations from ESI experts on both

09:42:19  20   sides.  We're happy to share that information and continue the

21   dialogue and be as transparent as possible.

22        THE COURT:  Okay.  Well, since we have a new MDL with

23   some new cases, I think it makes sense to do that, to go

24   through that discussion.  See if you all can agree upon an ESI

09:42:44  25   protocol that hopefully addresses the relevant issues and

09:42:46 1    forestalls or avoids future disputes.

2         I will tell you my view generally on ESI is, and this

3    is not new to anybody in this room, but, you know, in the old

4    days when a document production request came in, the party

09:43:03 5    receiving it reviewed all the documents and found the ones

6    that were responsive.  In the day of ESI, that's impossible.

7    And so what we do is come up with surrogates to take the

8    places of that, in the form of word searches or predictive

9    coding or some method.  And it seems to me when a party with a

09:43:21 10   lot of documents is saying to the opponents and to the courts,

11   "I have employed a technique that reasonably finds all

12   responsive information," it's incumbent upon that party to

13   explain the technique so that the Court and opposing party can

14   say, yes, that is a reasonable approximation or reasonable

09:43:39 15   effort to find relevant documents.

16        I've had some folks who have said, Well, how our

17   systems work and what we've done is work product.  And the

18   problem with that is if they're not going to tell anybody

19   about it, there's no way for me or the opposing party to know

09:43:54 20   that a reasonable effort has been made to search ESI.

21        So you mention transparency.  I think that's really

22   important, Mr. North, in terms of your discussions about

23   what's been done, how documents have been located.  And if

24   there's disagreements, I'll be happy to weigh in and make a

09:44:12 25   decision.  But I think that should be part of the discussion.

09:44:15  1        MR. NORTH:  Your Honor, we're happy to do so and we

       2   know a lot of those issues are already matters of public

       3   record in other cases.

       4        THE COURT:  Okay.

09:44:22  5        All right.  Now, we're going to talk in a bit about

       6   discovery issues.  I want to leave until then the discussion

       7   about the issue raised in your joint submission where the

       8   plaintiffs think there may have been a failure to preserve,

       9   the defendant strongly disagreed.  The plaintiffs want some

09:44:47 10   discovery, the defendants say let's not do discovery about

      11   discovery.  We're going to come to that later.  We'll leave

      12   that on the table for a minute.

      13        But what I'm going to do is ask that you all submit

      14   your joint ESI protocol to me by -- I don't want to make you

09:45:31 15   work over Thanksgiving weekend, so I'm reluctant to say

      16   November 30th.  Do you think you can do it by November 23rd or

      17   is that something we need to push to December 4th?

      18        MR. STOLLER:  My phone's off, I can't see my

      19   calendar.  I was wondering why it wasn't responsive.

09:45:51 20        THE COURT:  The 24th would be -- the 23rd would be

      21   two days short of four weeks.  If we push it to the 4th, it's

      22   five.

      23        MR. STOLLER:  Your Honor, I would rather be more

      24   aggressive and push the parties to work, so we'll make that

09:46:10 25   work and either have a joint proposal to you by that time or

09:46:15  1    competing submissions or something to the Court explaining --

2         THE COURT:  All right, we'll set November 23rd.  But

3    this is what I want you to do on that date:  Either submit a

4    joint ESI protocol or, if you are unable to agree upon one,

09:46:28  5    don't file briefs, file a joint report on what's been agreed

6    upon, what is disagreed upon, and I will look at that report

7    and then I will get you in the court or on the phone to talk

8    through how we resolve those issues.  So one of those two

9    ought to be presented by November 23rd.

09:46:49 10         Any questions on that?

11         MR. STOLLER:  No, Your Honor.

12         MR. NORTH:  None, Your Honor.

13         THE COURT:  Okay.

14         Let's talk about scope of discovery.  But what I want

09:47:24 15    to do first is talk about discovery other than common-benefit

16    discovery.  I know there's disagreement on what common-benefit

17    discovery ought to be done and I want to hold off and talk

18    about that in a bit.  Let's talk first about a few specific

19    issues.

09:47:43 20         The joint report indicated that the plaintiff side

21    already has a document depository and that it would be up and

22    running by October 12th.  Did you meet that date?

23         MR. LOPEZ:  Actually, Your Honor, the depository has

24    been in effect for a long time and we're actually looking for

09:48:03 25    other options now that the case has gotten to the point where

09:48:07   1    it's gotten where we may bring in other consultants to deal

2    with that.  But we have a document depository with all of the

3    documents that have been produced to date at a third-party

4    vendor, and we've been actively using that up to this day.

09:48:24   5         THE COURT:  So what were you referring to, Mr. Lopez,

6    in your application when you said you intend to have the

7    document depository live, in quotes, and accessible by October

8    12th?

9         MR. LOPEZ:  By that I meant available to everyone who

09:48:38  10    had not previously had access to it.  We now have people who

11    have signed the appropriate documents that allow them to now

12    have access to those documents.

13         In addition, Your Honor, we've created a work-product

14    website that has all the prior depositions, what we call hot

09:48:59  15    documents, things of that nature, deposition page, lines,

16    briefing.  Everything that existed that would be considered

17    attorney work product from other cases is now, in addition to

18    the depository which are just documents, we now have that as a

19    separate secure site that everyone here now has access to.

09:49:23  20         THE COURT:  So is it accurate to say that all

21    plaintiffs' counsel that have appeared in the MDL have access

22    to the website and depository?

23         MR. LOPEZ:  Yes, Your Honor.  In fact we've had a

24    webinar already with respect to both those issues.

09:49:41  25         I don't know whether there are other lawyers who have

09:49:43   1   come to this case, whether they filed one or two cases, I've

2   tried to keep up with that, but to the extent they want access

3   to it, as long as they file the appropriate protective order

4   and joint prosecution agreements that we have that everyone

09:50:00   5   else has signed, they'll have ready access to it.

6          THE COURT:  All right.  Is there anything I need to

7   do with respect to the document depository?

8          MR. LOPEZ:  I don't think so, Your Honor.  It's been

9   up and running a long time now and everyone has access to it.

09:50:15  10          THE COURT:  All right.  Does anybody on the plaintiff

11  side in the courtroom want to say anything on that issue?

12          How about on the phone?

13          Okay.

14          Let me raise an issue that may jump the gun a bit --

09:50:52  15  well, we might as well take it up now.

16          The question is, during the course of this MDL what

17  do we do with discovery that is not common-benefit discovery

18  in the many cases that are currently part of this MDL?

19          Before we even go there, let me pause and ask a

09:51:13  20  different question.

21          Mr. Lopez, you have indicated in a couple of your

22  filings that you anticipate there will be hundreds more cases,

23  I think is the phrase that's been used.

24          MR. LOPEZ:  Yes, Your Honor.

09:51:25  25          THE COURT:  Give me your best sense what's coming and

09:51:27  1   why you think it's coming.

2            MR. LOPEZ:  Your Honor, again, I apologize for

3   sitting down.  If I move back, I hit the person behind me, so

4   if it's okay --

09:51:35  5            THE COURT:  That's fine if you stay --

6            MR. LOPEZ:  I notice everybody standing up.  I don't

7   want to look like I have less respect for the Court sitting

8   down.

9            THE COURT:  No.

09:51:44 10            MR. LOPEZ:  This is always a moving target, and I

11   know the filings in the beginning of an MDL does not reflect

12   what might be coming.  I can just tell you based on meetings

13   we've had and conference calls we've had and just what I've --

14   I've done kind of an audit of this.  I mean, I think the

09:52:01 15   number's going to hit a thousand for sure.  I mean, this

16   involves 300,000 or more devices with literature suggesting

17   that it could be a 40 percent failure rate.  So I hope there's

18   not 180,000 or 140,000, whatever 40 percent is of that.

19   120,000.

09:52:28 20            Best I can tell you is it looks like there's going to

21   be at least a thousand cases that will be filed within the

22   next 60, 90, 120 days.  I don't know.  I mean, sometimes these

23   cases after 90 days there's 100 cases and all of a sudden

24   you're in discovery six, seven months down the road and

09:52:47 25   there's 2,000 cases on file.

09:52:50  1      But I know that just in this group of lawyers that

2      are here, the number of cases that are under review go well

3      above a thousand.  Maybe closer to 2,000.

4           THE COURT:  How about from the defense side, have you

09:53:16  5      got any projection on what's going to happen?

6           MR. NORTH:  Your Honor, we obviously don't have very

7      much information on that.  We have noted a real uptick in

8      attorney advertising, which, obviously, will generate more

9      cases.  But our best prediction has been 3 to 500.  But,

09:53:33 10     again, we're sort of at a disadvantage in trying to make that

11     prediction.

12          I will say, Your Honor, I've noted in a couple of

13     past MDL's that some judges have thought it best to wait two

14     or three months after the MDL gets going to get a better sense

09:53:47 15     of how many cases are coming in or going to come in before

16     establishing a bellwether process.  Some judges don't like to

17     do that, but some have.

18          THE COURT:  Yes, sir.  Let's have you identify

19     yourself.

09:54:01 20          MR. DALIMONTE:  Your Honor, John Dalimonte on behalf

21     of plaintiffs.

22          I have some information that might be helpful with

23     regard to the numbers that might be coming.

24          One of the reasons why there haven't been a whole

09:54:15 25     number of cases filed within the last couple of months is

09:54:19  1    because a number of us had tolling agreements with defense

2    counsel that just had terminated.

3         One of the issues that this Court has on its agenda

4    is the filing of a master complaint in a direct-filing system

09:54:35  5    or short-form complaint. So a lot of us are waiting for that

6    so we don't overburden the courts throughout the country in

7    all the other jurisdictions only to have them transferred

8    here. So once that happens, I think you'll see a number of

9    cases to be filed.

09:54:53 10         For instance, just in our tolling agreement I think

11   we have about 60, 70 cases we're about to file. So those will

12   be coming into the docket itself.

13         THE COURT: What do you mean by short-form complaint?

14         MR. DALIMONTE: So, Your Honor, normally in MDL's,

09:55:11 15   there's a system of direct filing. So we have one master

16   complaint that incorporates all of the claims throughout all

17   of the jurisdictions. So it helps facilitate the process.

18   It's more judicially economic to do so. All the filings will

19   be here in Arizona so that we'll have a form, for instance,

09:55:33 20   that will incorporate by reference the master complaint.

21         I know my colleague here, Julia Reed Zaic and I have

22   been working on a master complaint.

23         This has been done in the companion case that was

24   filed in Indiana in Cook IVC Filter products liability matter.

09:55:53 25   It has been done in a number of MDL's throughout the country.

09:55:57  1  I know I've done this with a gadolinium litigation --

2       THE COURT:  I understand the idea of a master

3  complaint.  What I'm not understanding is what would the

4  short-form complaint say?  I incorporate by reference what's

09:56:12  5  in the master complaint?

6       MR. DALIMONTE:  Correct and will identify the name of

7  the plaintiff, jurisdiction, the originating jurisdiction.  It

8  will identify the type of product, the type of claim.  It may

9  have a list of the causes of action.  Such as, for instance,

09:56:31 10  breach of warranty, wrongful death if there's a death.  It

11  will be little boxes.  It's just maybe two or three pages

12  long.

13       THE COURT:  Well, is that different from what you all

14  called the -- I can't remember.  You called it the simple

09:56:46 15  profile, I think, in your joint submission.

16       MR. DALIMONTE:  That is different, yes.

17       THE COURT:  This is the pleading, the Rule 8

18  complaint you're talking about?

19       MR. DALIMONTE:  Correct.

09:56:57 20       THE COURT:  Where would it be filed?

21       MR. DALIMONTE:  Here.  Arizona.  This court.

22       THE COURT:  Why would it be filed here?

23       MR. DALIMONTE:  Because under the complex litigation

24  rules for multidistrict litigation, I don't know if Your Honor

09:57:09 25  has the pocket guide on this, if you look at page 30 at the

09:57:14    1    very bottom it allows for direct filing in a system of

2    short-form complaints with reference to a master complaint.

3    Also allows the court, the managing clerk and docket, to use

4    the funds where all the funds will be filed here for filing

09:57:31    5    fees and then they can use the fund to hire additional

6    staffing or whatever is needed by Your Honor in this court to

7    further manage the docket.

8         THE COURT:  And where, if a short-form complaint is

9    filed here and there is no settlement, where does that case

09:57:46   10    ultimately get tried?

11         MR. DALIMONTE:  Well, that is reserved usually until

12    the point of remand.  So after we go through bellwether

13    selections, assuming *Lexecon* -- if *Lexecon*'s waived, it would

14    be here.  Otherwise it would be transferred to or remanded to

09:58:03   15    the jurisdiction where the plaintiff would otherwise be

16    entitled to file the complaint.

17         So, for instance, if the plaintiff was a citizen of

18    the state of Massachusetts, where I'm from, then the matter

19    would be transferred to the United States District Court in

09:58:20   20    Massachusetts in Boston.

21         THE COURT:  So the short-form complaint, although

22    filed in Arizona, is deemed as though it were filed in

23    Massachusetts for purposes of remand?

24         MR. DALIMONTE:  Correct.

09:58:34   25         MR. NORTH:  Your Honor, I would just note that not

09:58:36  1    all MDL judges have agreed with that.  We're aware of some

2    where the Court said you are welcome to file in my district,

3    but if you do so I have jurisdiction of the case and I can try

4    the case here if I would like.

09:58:49  5         THE COURT:  Well, if we don't do the direct filing

6    you're talking about, then presumably you file in

7    Massachusetts, you probably -- I don't know if you can file a

8    short-form complaint in Massachusetts --

9         MR. DALIMONTE:  No.

09:59:00  10         THE COURT:  -- probably not.  But that case then

11    needs to go through the transfer process to get here.

12         MR. DALIMONTE:  That's correct.

13         THE COURT:  And we all know it's coming here any way.

14    So there's not a lot of point going through that process if

09:59:12  15    it's understood that that case is deemed to have originated in

16    Massachusetts.

17         I'm assuming you're not disagreeing with that idea,

18    Mr. North?  That is, to avoid the whole filing and transfer

19    process we could file here with the understanding that that

09:59:28  20    doesn't change the *Lexecon* issue, unless I decide it ought to.

21         MR. NORTH:  Well, Your Honor, I was just noting some

22    MDL judges do say that changes the *Lexecon* issue.

23         I think we've already indicated our willingness to

24    consider waiving *Lexecon*, but it's probably premature to

09:59:47  25    address that.

09:59:48  1        We have no objection to direct filing per se, we just
          2    question whether that doesn't submit the plaintiffs to the
          3    jurisdiction of this court.
          4        THE COURT:  I'm assuming that both sides would like
10:00:47  5    me to make a decision before we go down that road on whether
          6    the filing in Arizona is deemed to be an Arizona case for
          7    purposes of trial.  Am I right about that?  That's an issue
          8    you'd want to have decided before we adopt a sort of short
          9    form direct filing in Arizona?
10:01:05 10        MR. DALIMONTE:  Well, Your Honor, this Court can
         11    enter a direct-filing ruling reserving the jurisdiction
         12    allowing it to remand back to the originating courts.  Because
         13    otherwise --
         14        THE COURT:  I understand I can do that.  But I think
10:01:20 15    Mr. North's point is some judges say it isn't going to be
         16    remanded back; you file it here, it stays here.
         17        I'm assuming you want to know my view on that before
         18    we go down the road of direct filing.
         19        MR. DALIMONTE:  Well, absolutely.  Right.
10:01:35 20        THE COURT:  Is there circuit case law on whether
         21    short form direct filing in a district gives that district
         22    jurisdiction for purposes of trial that you all are aware of?
         23        MR. DALIMONTE:  I'm not aware of any case law like
         24    that, but I can say the majority of multidistrict litigation
10:01:51 25    consolidations do allow the cases to remand back to the

10:01:55   1   originating jurisdiction even after direct filing.  Because
           2   otherwise, you know, plaintiffs would just simply file around
           3   the country and it would sort of miss the point of judicial
           4   economy by allowing all the cases to be filed directly here
10:02:14   5   and allowing the court to use the filing fees as well as
           6   better manage the overall docket.
           7              THE COURT:  Well, let's -- we're going to come back
           8   to where I was headed when we started down this road, but I
           9   want to talk a bit more about this idea.
10:02:59  10              I do have on the agenda the question of filing a
          11   master complaint in this case.  That's Item V-D.
          12              It sounds as though the plaintiffs are in agreement
          13   with the notion that a master complaint makes sense; is that
          14   correct?
10:03:28  15              MR. LOPEZ:  Yes, Your Honor.
          16              THE COURT:  And it sounds like there's one being
          17   drafted.
          18              MR. DALIMONTE:  That's correct, Your Honor.
          19              THE COURT:  How about from the defense side?
10:03:38  20              MR. NORTH:  Yes, Your Honor, we're in agreement.  We
          21   would then, of course, come up with a master answer.
          22              THE COURT:  Right.
          23              MR. NORTH:  In some -- if I could add, we can
          24   probably work this out with Mr. Lopez, in some MDL's, once the
10:03:51  25   master complaint and answer are on file, the defendant simply

10:03:54  1    files a notice of appearance which constitutes the denial of

2    all claims and refers to the master answer in each particular

3    case.

4          THE COURT:  Sort of like the short-form complaint.

10:04:08  5          MR. NORTH:  Right.

6          THE COURT:  What is the plaintiffs' view of the

7    effect the master complaint has on individual cases that are

8    already filed and that may not include all of the claims that

9    are in the master complaint?

10:04:33  10          MR. LOPEZ:  Well, we actually haven't thought of

11   that.  That's another -- I know the Court wants to talk about

12   that in a broader way about some cases.  You know, is

13   discovery done?  Those cases now they've become part of this

14   MDL, can they take advantage of any additional discovery

10:04:53  15   that's been done?

16          So we haven't vetted that, Your Honor, but I would

17   say just generally our position is that now that those cases

18   are part of this process, we would advocate that those

19   plaintiffs, despite where their cases might be, should have an

10:05:15  20   opportunity to take advantage of what other additional

21   discovery and effort that happens here, recognizing that those

22   cases would probably be the ones that we would have more ready

23   for a bellwether.  It doesn't even have to be part of the

24   bellwether process, it frankly can be remands back to the

10:05:36  25   judge who had these cases at various stages.

10:05:39  1          I mean, we have one case where the judge was waiting

2      to have a hearing on motions in limine.  That case was ready

3      for trial.  In fact, it probably would have been tried but for

4      the fact the Court's calendar kicked it, not the parties.

10:05:50  5          I mean, again, our general position on all cases that

6      have been transferred here, with maybe some exceptions, is

7      those litigants are now part of this process.  And there's a

8      good reason why this process is here, because we had a small

9      group of lawyers handling a very complex and complicated and

10:06:09  10     massive litigation and now those people are in this process

11     with 25 more law firms helping us.

12          THE COURT:  Well, in that case where you were ready

13     to file motions in limine and go to trial, if the master

14     complaint includes a claim that hasn't been in the complaint

10:06:29  15     in that case, you're in effect saying that that plaintiff

16     should be granted leave to amend even though they've been

17     through *Daubert*, they've been through summary judgment,

18     they're on the eve of trial.

19          MR. LOPEZ:  To use your language, that would be a

10:06:42  20     tough sell, Judge.  I mean, I get it.

21          THE COURT:  The reason I put that in is I wanted to

22     at least signal the idea that it seems to me if there are

23     cases well down the road where judges have made informed

24     decisions, it doesn't make sense to undo all of that and say

10:06:58  25     we're starting from scratch in every case.  And I don't know

10:07:01   1   where we draw the line as to what remains decided in those

2   cases and what is opened up in those cases, but I'm just

3   concerned about saying we're wiping a clean slate and all of

4   the decisions made by all these knowledgeable judges in all

10:07:16   5   these cases are now moot and we're going to redecide them all

6   here as though I know more than they do.

7           MR. LOPEZ:  We generally agree with that on a number

8   of these cases.

9           Again, your question was with respect to additional

10:07:31   10  cause of action when it may be a master complaint.  We hadn't

11  talked about that.  I don't want to speak on behalf of every

12  litigant who might have a pleading where they wish they may

13  have added a cause of action.  So I don't know whether it's a

14  case-by-case consideration, Judge, or whether or not it's just

10:07:50   15  a general order that applies to all those cases.  But I think

16  for the most part the cases that we think are ready for remand

17  sometime mid next year -- I haven't heard anyone come up to me

18  and say, by the way, if there's a master complaint we would

19  like to adopt an additional cause of action.  That's the best

10:08:11   20  I can report to the Court at this time.

21          THE COURT:  Okay.

22          Do defendants have thoughts on this?

23          MR. NORTH:  Your Honor, I do think we would object to

24  the use of -- the incorporation of a master complaint in those

10:08:21   25  cases where discovery is nearly completed or dispositive

10:08:25   1   motions have been filed or dispositive motions have been ruled

2   upon.  And there are, I think, three cases where dispositive

3   motions have been ruled upon and there are probably four or

4   five more where they're pending or were pending at the time of

10:08:39   5   transfer, and we believe it would be unfair to let the

6   plaintiffs expand the scope of their claims at this point by

7   adopting a master complaint.

8          THE COURT:  So how do we draw the line as to cases

9   where the master complaint becomes the pleading and cases

10:08:54  10  where it does not and we rely upon the original complaint?

11         MR. NORTH:  Your Honor, certainly all those cases

12  where dispositive motions have been ruled upon, the three

13  cases there, and also all cases where dispositive motions have

14  been filed.  I think that would be the starting place.

10:09:16  15         The more nebulous area is those cases where discovery

16  is very advanced and was nearing completion, if not completed,

17  but dispositive motions had not been filed at the time of

18  transfer.

19         And if the Court was interested, we could come up

10:09:35  20  with a list of those cases.  I think it's really the 13.  All

21  three of those categories, it's the 13 cases we identified as

22  trial ready or close to trial ready in our submission.

23         MR. BOATMAN:  Your Honor --

24         THE COURT:  Just one second.

10:11:01  25         Go ahead.

1   MR. BOATMAN:  I was just going to say that if the

2   Court would give us a week, we can check with our attorneys

3   and see if anybody has any objection to the line that

4   Mr. North has proposed.  I don't think we do, but we'd like to

5   check that.

6   THE COURT:  Well, what I was going to suggest --

7   thank you for that comment.  What I was going to suggest were

8   two things.  One is let's set a date for the master complaint

9   to be filed and, number two, let's on that same date see if

10   the parties are in agreement as to the cases as to which the

11   master -- or in which the master complaint becomes the

12   operative pleading, versus those where it does not.  And on

13   that date I'd like to get the master complaint filed but I

14   think I'd also like to get a stipulation, if there is one, or

15   at least a joint report on cases to which -- on more than that

16   issue.  Cases as to which it applies to the operative

17   pleading.  Also on the direct filing of a short-form complaint

18   in Arizona.

19   It seems to me I need to make a decision pretty

20   quickly on what the effect of a direct filing in Arizona is in

21   terms of remand.  Because if there are plaintiffs who don't

22   want this to become an Arizona trial and I'm saying direct

23   filing in Arizona creates an Arizona trial, those plaintiffs

24   are going to file in their home states and will go through the

25   transfer process.  So I think I ought to make a decision on

10:12:49  1    that issue sooner rather than later.  And I don't think that

       2    affects the drafting of the common complaint.  That's going to

       3    state what it states.  It's really a question of what

       4    procedures we apply after that's on file.

10:13:15  5         MR. DALIMONTE:  The only thing is in the master

       6    complaint we would incorporate some language that specifically

       7    addresses where the complaint is going to go.

       8         So, for instance, it may have some broad language in

       9    there that specifically provides that the case would remand

10:13:35 10    back to the originating jurisdiction where the plaintiff would

      11    otherwise be entitled to file.

      12         THE COURT:  Are you saying that would be in place of

      13    venue allegations in the complaint?

      14         MR. DALIMONTE:  Correct.

10:14:04 15         THE COURT:  Well, let me tell you my view on this,

      16    and I'll give the defendants an opportunity to respond before

      17    I make a decision.  My view is this:  It makes a lot of sense

      18    to come up with a procedure that gets cases directly in this

      19    court and not go through the full transfer process.

10:14:20 20         It makes a lot of sense to have a short-form

      21    complaint and short-form answer so that you're not spending

      22    time crafting answers to new complaints that are filed or

      23    considering whether a 12(b)(6) motion should be made with

      24    respect to a particular complaint.

10:14:37 25         It makes a lot of sense to get the filing fees in

10:14:40 1   this court to -- especially if the case is going to grow, to

2   fund any staffing that might be needed to deal with this

3   issue.

4        That's not going to work if I say you file here, you

10:14:56 5   try your case here.  I don't think it's going to work.  It may

6   be there will be some who will still file here, but there will

7   be a lot still going through the transfer process.

8        It seems to me plaintiffs have a right to file in

9   their own district, get it transferred here and go back to

10:15:11 10   that district for trial and I shouldn't be depriving them of

11   that right in the interest of coming up with an expedient

12   process.

13        What we ought to do is say the filing of a short-form

14   complaint in Arizona does not subject you to Arizona

10:15:25 15   jurisdiction for trial, it can go to the district where you're

16   from.  But down the road we will make decisions on bellwether

17   trials; we will seek *Lexecon* waivers; we'll find the most

18   efficient way to resolve this case as we would in MDL, but

19   you're not forfeiting your right to go home up front by filing

10:15:44 20   a short-form complaint.

21        That leaves the case exactly where it would be if we

22   went through the transfer process, but we've saved the

23   complexity of transfer, we've adopted a short-form complaint

24   and answer process, and we're getting funds in this court, so

10:15:59 25   we're getting all the benefits of it.

10:16:02   1         MR. NORTH:  Your Honor, I can't disagree with

2   anything you say.  The only concern we have is that direct

3   filing provides some plaintiffs opportunity -- an opportunity

4   to manipulate venue for the case ultimately, and we will want

10:16:14   5   to build in to this process, probably into the case management

6   order, regarding the short-form complaint and master complaint

7   some protections for the defendant so they cannot use that

8   process to manipulate the venue where it will ultimately be

9   tried.

10:16:32 10         THE COURT:  Well, I have already had at least one

11   instance since I got this MDL where somebody from out of state

12   sought to file in this court alleging venue based upon the

13   fact that the Bard entity was here or had done business here,

14   and I rejected it.  I said, no, we're going to go through the

10:16:51 15   MDL process; file in the state you normally would.  For just

16   that reason.

17         It seems to me that if a plaintiff thinks they've got

18   a really good argument as to why a case ought to remain in

19   Arizona, we ought to preserve their ability to make it, but

10:17:04 20   preserve the defendants' ability to say, no, this case really

21   should go back to Massachusetts.

22         I'm guessing you all can work that out, either in the

23   language of the complaint and answer or in the case management

24   order that gets filed.

10:17:16 25         MR. NORTH:  Yes.

10:17:17  1          THE COURT:  All right.  So let's then -- what I will
       2   say in the order that comes out from today is that we're going
       3   to get a master complaint filed, we're going to pick a date in
       4   a minute, we're going to get a master answer filed, the
10:17:29  5   parties are going to develop a short-form complaint and
       6   short-form answer that plaintiffs can use for direct filing in
       7   Arizona, but that the direct filing in Arizona does not
       8   subject them to a trial in Arizona.  The case will be remanded
       9   as if it were filed in its original district, unless there's
10:17:50 10   basis upon which a party should argue it really was an Arizona
      11   case to begin with.
      12          Any objection to that procedure?
      13          MR. LOPEZ:  Not on plaintiff side.
      14          THE COURT:  How about on the phone?
10:18:02 15          Okay.  Let me make a couple of notes here for what's
      16   going to go in the order.
      17          Okay.  Was there a question in the back or was
      18   somebody stretching?
      19          UNIDENTIFIED VOICE:  Stretching, Your Honor.
10:19:29 20          THE COURT:  All right.
      21          When can you have a master complaint?
      22          MR. LOPEZ:  We just had a meet and confer, Your
      23   Honor, while you were addressing something else.  The master
      24   complaint can probably be done next week, but I think we
10:19:38 25   probably, in fairness, should circulate that among the

10:19:41  1    plaintiffs' counsel who have got cases, give those lawyers two

2    or three days to vet it and get -- let me give you the short

3    answer.  Two weeks from Friday.  From this Friday.

4         THE COURT:  All right.  We'll say the master

10:19:56  5    complaint will be filed on November 13th.

6         Master answer, how long do you need for that?

7         MR. NORTH:  Two weeks after that, Your Honor.

8         THE COURT:  All right.  That's the day after

9    Thanksgiving, so I'll say Monday, November 30th.

10:20:12 10        MR. NORTH:  Okay.

11        THE COURT:  I think what I'd like to do, when you

12   file the master complaint -- well, we still need to reach

13   agreement among the parties on the cases to which -- in which

14   the master complaint becomes the operative pleading.  So I

10:20:53 15   think what I would like to do is this.  This is my thought,

16   and you all can tell me if you disagree with it.  I think -- I

17   think, to make sure that we don't generate confusion by this

18   pleading procedure, what we ought to do is have plaintiffs

19   send to defendants the master complaint by November 13th, but

10:22:45 20   don't file it.  Defendants, draft your master answer, get it

21   to them two weeks later.  And then on November 30th, have the

22   parties file a document that says this is the master complaint

23   we've agreed to, this is the master answer that will be filed

24   in response.  This is the short-form complaint we've agreed

10:23:09 25   to, this is the short-form answer that will be filed in

10:23:12    1    response, and these are the cases in which the master

            2    complaint becomes the operative pleading.

            3            I can look at all of that, see if I have any issues

            4    with it.  If not, then I will enter in effect a pleading case

10:23:27    5    management order that says master complaint is filed, master

            6    answer is filed, from now on parties should file directly in

            7    Arizona using the short-form complaint, short-form answer can

            8    be filed in response.  I will say in my order after this

            9    hearing that that doesn't deprive a party of the right to

10:23:50   10    remand.  And these are the cases in which the master complaint

           11    is not the operative pleading, but that the original complaint

           12    remains the operative pleading.  So that's done one time, one

           13    place, and parties can start filing here.

           14            Now, that will delay until the first week of December

10:24:07   15    the filing in Arizona short-form complaints.  Does that create

           16    a problem for any plaintiffs?

           17            MR. LOPEZ:  Only to the extent there are statutes

           18    that may run.  Those are --

           19            THE COURT:  There will be a handful.

10:24:23   20            MR. LOPEZ:  We'll continue to file those, and I think

           21    we get a short tolling agreement from counsel.

           22            THE COURT:  I'll hear from you in just a minute,

           23    Mr. North.

           24            MR. DALIMONTE:  The only issue that I would have is

10:24:35   25    the pleadings are plaintiffs pleadings.  They're plaintiffs

10:24:38   1    allegations.  And whether defense counsel agrees to them or

2    not shouldn't have -- other than the short-form complaint,

3    obviously, to proceeded with them with fair notice of

4    complaint.  But it's the master complaint that is our

10:24:54   5    pleading.

6          THE COURT:  I agree with that.  The reason I said you

7    ought to share it with them and submit it all together is if

8    you were to put a defamation claim in there, which you

9    wouldn't do, and they're going to say we want to file a

10:25:09   10   12(b)(6) motion on this, I'd like to know that and we can talk

11   about what to do with that.  I'm guessing that won't happen.

12   Everybody knows what the claims are.  I'm not giving them the

13   right to force amendments of your complaint.  But I think we

14   ought to make sure that both sides have seen both pleadings

10:25:25   15   and there aren't issues before I say this is the master

16   complaint in the case.  That's my only thought.

17         MR. NORTH:  Your Honor, just a couple things.

18         From past MDL's, we've actually prepared case

19   management orders that do what the Court is saying and talks

10:25:39   20   about the effect of all these.  If we could possibly agree

21   with Mr. Lopez and on the 30th give you a proposed case

22   management order that attaches all of that.

23         THE COURT:  That would be great.

24         MR. NORTH:  One other thing, Your Honor.  When I said

10:25:51   25   we could do the answer within two weeks, we certainly can.  I

10:25:55  1   can't envision we would want file any 12(b)(6) motions, but if

2   we did, could we have a little bit longer to do that?

3          THE COURT:  Well, yeah.  If you think you need to

4   file one on the master complaint, note it in what you submit

10:26:06  5   on the 30th.

6          MR. NORTH:  Okay.

7          THE COURT:  And the fact you gave me a master answer

8   with the master complaint will not be deemed as having

9   forfeited your right to bring a 12(b)(6) motion because it

10:26:17  10  will be identified in that pleading.

11         MR. NORTH:  Okay.  Thank you.

12         THE COURT:  Mr. Stoller, did you have --

13         MR. STOLLER:  I was going to make what I think is an

14  efficiency suggestion.  You indicated noting in the filing the

10:26:26  15  cases to which the master complaint is going to file and also

16  later those to which it's not.  New cases are coming in all

17  the time --

18         THE COURT:  It should be those where it is not the

19  operative pleading.  Every other one the master complaint

10:26:42  20  controls.

21         All right, let me make a few more notes.

22         Okay.  November 30th work as the date for that

23  submission?

24         All right.

10:28:09  25         MR. LOPEZ:  Your Honor, before we move on on that

10:28:10  1    issue, it's been brought to my attention there's a service of

2    process issue we should probably discuss, too.  Whether or not

3    they can be deemed served on the defendant when filed or

4    whether or not there has to be actual formal service.

10:28:24  5              THE COURT:  Good point.

6              Defendants have a view on that?

7              MR. NORTH:  Yes, Your Honor.  I'm a little concerned

8    about that because with the wave of filings and ECF notices

9    we'll be getting, I'm afraid we might overlook that if just

10:28:37 10    the fact an ECF notice came constituted that.

11              In other MDL's a process that has worked very well,

12    and we can memorialize in a CMO, is at the time they file it

13    they e-mail it to my office.  And I would give them two or

14    three people.  And if they would e-mail it to us that would

10:28:55 15    constitute service at that time.

16              MR. LOPEZ:  That's fine, Your Honor.

17              THE COURT:  Okay.  That makes sense.

18              MR. LOPEZ:  Your Honor, I could just -- I'm sorry.

19              THE COURT:  Just one second.

10:29:22 20              MR. LOPEZ:  I would like to ask the Court if counsel

21    would be agreeable to those issues that are pending now, the

22    service issue.  Because there's been some denial of service of

23    process in some of the current cases that are on file.  So, in

24    other words, if we could now put into play that he'll get

10:29:40 25    e-mail copies of those and it will start the process of having

10:29:43   1   an answer be filed?

2          MR. NORTH:  Your Honor, we would ask -- it's only

3   been one or two cases where they were just e-mailed to me out

4   of the blue.  We would ask we wait until we get the formal CMO

10:29:54   5   entered for that.

6          THE COURT:  And what about those cases where you've

7   said there hasn't been service of process, would you still

8   want regular service of process?

9          MR. NORTH:  I'm just a little worried about allowing

10:30:09  10   that before we have a formal CMO in place.

11          THE COURT:  Well, how about if we do this:  How about

12   if we toll any service of process issues between now and

13   November 30th so that, once I adopt this procedure, we can

14   take care of these cases where there's an issue of service by

10:30:26  15   just agreeing e-mail counts.

16          And if for some reason you think that's

17   inappropriate, you can note it on what you file on November

18   30th, but it seems to me there's no reason to be fighting a

19   service of process issue while we're trying to work out this

10:30:41  20   streamlined procedure.

21          MR. NORTH:  That is agreeable, Your Honor.

22          MR. STOLLER:  Your Honor, the only concern I have

23   about that is if we agree it's going to now be tolled and then

24   they come back and say it's not and we don't act in the

10:30:53  25   interim, that can create prejudice --

10:30:57 1          THE COURT:  Are you worried about the 120 days in

2      Rule 4(m)?

3          MR. STOLLER:  Potentially.  But I don't --

4          THE COURT:  It's filed; right?

10:31:02 5          MR. STOLLER:  -- been filed --

6          THE COURT:  The cases have been filed, so there's no

7      statute of limitations issue, it's just a 4(m) issue of 120

8      days?

9          MR. STOLLER:  Correct.

10:31:10 10          THE COURT:  That won't prejudice any plaintiff.

11          MR. LOPEZ:  Let me ask, because of interim period and

12      tolling, would those cases have an opportunity to adopt the

13      master complaint in lieu of the complaint they may have

14      already filed that's been transferred here?

10:31:23 15          THE COURT:  Well, yeah.  I mean, it makes sense.

16      Because what we're going to say is newly filed cases are going

17      to be governed by the master complaint anyway.

18          Any other questions on that issue?

19          MR. LOPEZ:  No, Your Honor.

10:31:41 20          THE COURT:  Okay.

21          We're going to take a break for the benefit of the

22      court reporter.  We will resume in 15 minutes at quarter to.

23          (Recess was taken from 10:32 to 10:46.)

24          THE COURT:  All right, Counsel, let's talk about what

10:46:34 25      is Item IV-C on the agenda.

10:46:41   1          It appears to me from reading the joint submission

           2     that both sides are thinking that we should at some point have

           3     bellwether trials.  The difference in the parties' proposals

           4     really concerns how much discovery should be done between now

10:46:59   5     and when we get to the bellwether phase.  Is that generally

           6     accurate?

           7          MR. LOPEZ:  Yes, Your Honor.

           8          MR. NORTH:  Yes, Your Honor.

           9          THE COURT:  And I understood from the parties'

10:47:13  10     proposals that for non-bellwether cases, the parties would

          11     develop what I think you called simple profile forms that

          12     would have basic information disclosed in non-bellwether

          13     cases.  But that other non-common-benefit discovery would not

          14     go forward in those cases during the MDL.  Is that accurate?

10:47:47  15          MR. LOPEZ:  I think so.

          16          MR. NORTH:  I think so, Your Honor.  A process where

          17     we would have the profile forms first and then that would give

          18     us sufficient information to choose a bellwether pool at some

          19     point.  And then there would be regular fact sheets and full

10:48:00  20     blown discovery on non-common issues in that bellwether pool.

          21          MR. LOPEZ:  Mr. North and I talked about the fact

          22     that we've got to sit down and meet and confer about what that

          23     process would look like.  There's a lot of history and some

          24     other cases, but I think we're in general agreement we're not

10:48:18  25     going to use our resources on cases -- case-specific issues

10:48:23  1    that may never be important other than maybe settlement some

2    day.

3             THE COURT:  Have you started working yet on these

4    profile forms that would be submitted?

10:48:47  5             MR. LOPEZ:  I would say -- go ahead.

6             MR. NORTH:  We actually circulated a draft profile

7    form, plaintiff profile form for them to consider a couple

8    weeks ago.

9             MR. LOPEZ:  So you're working -- may I address

10:49:00 10   counsel, Your Honor?

11            THE COURT:  Yeah.

12            MR. LOPEZ:  You're working on the profile form you're

13   going to submit to us?

14            MR. NORTH:  We already have.

10:49:06 15            MR. LOPEZ:  You have.  Okay.

16            We have it, we're looking at it, and I'll make sure

17   whatever individual or team's working on it will meet and

18   confer and come to -- that should be a simple resolution,

19   Judge.

10:49:19 20            THE COURT:  And then is that something you want me to

21   look at and approve, or do you all just proceed on the basis

22   of your agreed upon profile form?

23            MR. LOPEZ:  I think to the extent there's no dispute

24   about what it should look like and the information requested,

10:49:33 25   I don't think the Court needs to look at it unless the Court

10:49:36    1    wants to.

            2            THE COURT:  I have no interest in doing work I don't

            3    have to do.

            4            Well, maybe what we ought to do in the case

10:49:44    5    management order, then, is just set a date by which you will

            6    have an agreed upon profile form, you'll start using it at

            7    that point.  If there's an issue, some disagreement about it,

            8    then on that date you'll notify me.  But otherwise that

            9    process will go into effect.

10:50:01   10            What is the date by which you think you all can have

           11    that profile form process under way?

           12            MR. LOPEZ:  I'm told by next week, Your Honor.  We

           13    can maybe use that November 4th where you have other things --

           14    I think it was the 4th.  6th.

10:50:20   15            THE COURT:  6th.

           16            MR. NORTH:  That's agreeable, Your Honor.

           17            THE COURT:  Okay, let me make a note.

           18            So I have a question, Mr. Lopez, for your side.  On

           19    page 21 of your joint submission, which is Docket 174, you

10:51:38   20    say, starting at line 18, "There is a consensus among both

           21    state and federal court plaintiffs' counsel to adopt a

           22    significant amount of prior discovery, which would include a

           23    significant number of corporate, third party and expert

           24    witnesses depositions.  The establishment of the plaintiffs'

10:52:00   25    leadership group in the MDL will facilitate this

10:52:04   1   coordination."

2            How is it you anticipating through that process and

3   in effect deciding upon which common-benefit discovery that's

4   already been done applies in newly filed cases?

10:52:19   5            MR. LOPEZ:  We're a victim of having a lot of volume

6   but the beneficiary of that volume as well.  I mean, I hate to

7   say it's a witness-by-witness issue, but it probably is.  And

8   we're going through that process now.

9            And I think the general census -- consensus here and

10:52:43  10   what we can submit to the Court, is we're not going to make

11   work -- do any work over.  We're going to adopt as much of

12   this prior work as we can.  And if we have -- if you tell us

13   we have to meet and confer with counsel about anything

14   additional we want to do, it will be as efficient as we can

10:53:02  15   possibly make it.

16            There's some depositions we may not have to take

17   again.  There may be some we only need two hours or three

18   hours.  So I can't give you just, like, a short answer because

19   it's really going to be a deponent-by-deponent issue.  And I

10:53:17  20   think counsel might agree that we're talking about maybe ten

21   to 15 that are the primary corporate witnesses who have been

22   deposed in the past.  There are some issues with some of those

23   depositions that we may have to bring to the Court's attention

24   should they repeat themselves.

10:53:35  25            But, again, I just -- I can give you my best

10:53:39  1    estimate.  I think it's going to shorten this MDL by probably

       2    a third of what you would normally require if we were starting

       3    this case over.  I just can't tell you, you know, witness by

       4    witness how that's going to happen.

10:53:54  5            But I've certainly built into the scheduling order

       6    that I proposed that fact, that this -- instead of a two-year

       7    process this could be a 15-, 16-month process.  I think it's

       8    because we have experts that have done Rule 26 reports that

       9    just need to be supplemented with any additional discovery; we

10:54:13 10    have depositions that have been taken that may only need to be

      11    supplemented with additional documents and things that we

      12    might receive.

      13            So I wish I could be more specific than that, Your

      14    Honor, but I think I built that into the scheduling order that

10:54:27 15    we've proposed.

      16            THE COURT:  Well, and I think I understand why you

      17    can't be more specific.  The thing I'm puzzling over is this:

      18    Let's say we have a plaintiff's lawyer who has just come into

      19    the case, we go forward with the agreed upon discovery

10:54:49 20    schedule, we get through motions, I don't know if we do

      21    bellwether trials, but at some point we say the MDL is over

      22    and that plaintiff's lawyer says, wait a minute, I wasn't at

      23    these 80 depositions, I'm not bound by them, they can't be

      24    used in my case, I want to take them over again.

10:55:08 25            Maybe the reality is nobody would do that, but I'd

10:55:11  1   like to try, if it can be done and I don't know if it can, to

2   figure out a process to assure that, as we go along, parties

3   are buying into the notion that this MDL effort and discovery

4   that is being done again, if it needs to be in small part, or

10:55:28  5   new discovery that's done really will apply to all cases.

6        Any thoughts on that?

7        MR. LOPEZ:  Only thing I can say to that is maybe we

8   ought to have some kind of procedure in place for later-filed

9   cases with new counsel where we have to have that discussion,

10:55:44 10   get them -- because I know I can't make an agreement on behalf

11   of another lawyer who might come into this case 14 months down

12   the road and we're all done and we've had *Daubert* motions and

13   they look at everything and say "we want to start over."  I

14   can't imagine anyone wanting to do that in this court.

10:56:02 15        But I've never seen that happen, Judge, in doing this

16   for as long as I've been doing it.  I don't anticipate it

17   happening.  But I imagine that's something that you would have

18   to deal with.  I mean, I can't make an agreement on behalf of

19   a future attorney or his client about what discovery he or she

10:56:25 20   would like to conduct.  And I don't know how to preempt that,

21   I guess I'm saying.

22        THE COURT:  Any thoughts from the defense side on

23   this?

24        MR. NORTH:  Yes, Your Honor.  This is, I think

10:56:37 25   hopefully it was clear from our submission, a matter of great

concern to us.  There has been ten years of litigation

involving this product and extensive discovery already.

We're certainly willing to sit down with Mr. Lopez

and consider any redos of previous depositions he believes are

necessary for specific reasons.  We're not saying

categorically you can't redepose anybody or shouldn't be able

to.  But here's or concern.  Over the years there have been 82

depositions involving this product of either Bard employees or

consultants hired by Bard to develop the product.  56

individual deponents.  One gentlemen has been deposed ten

times.  Three people have been deposed four times.  Eight

people have been deposed twice.  There have been seven Rule

30(b)(6) witness depositions taken already.

We're willing to wholesale stipulate that all of that

discovery can be used here.

I understand the Court raised a question in the

agenda and just now about subsequent parties, whether they can

be bound.  That's actually an issue, Your Honor, we think

might be worthy of some very short briefing.

Our research indicates there's a Ninth Circuit case

from 1982 that raised that very question but declined to

answer.  And since this time there has been a lot of scholarly

discussions, particularly in the MDL context, about whether

people can be bound even if they didn't participate in a

deposition by previous depositions where the cross-examiner

10:58:05  1    had the same motive.  So we would like the opportunity to

2    brief that.

3          Again, we would certainly be willing and happy to sit

4    down with Mr. Lopez and discuss any repeat depositions he

10:58:18  5    believes are necessary.  But we're very concerned about a

6    wholesale repeat of the extensive discovery that's taken

7    place.

8          And I would note most of this discovery has been

9    conducted by Mr. Lopez and four other law firms that have been

10:58:32  10   associated together working in this litigation for the last

11   three years.  Of the 61 cases presently pending in this court,

12   those five law firms appear on behalf of the plaintiff in 53

13   of the 61.  So these are the same lawyers, at least as this

14   MDL is constituted right now, who have conducted the vast

10:58:55  15   majority of this discovery in the first place.  We're

16   concerned about exposing our corporate witnesses and

17   employees, former employees, again and again to repeat

18   depositions under those circumstances.

19         THE COURT:  Well, Mr. North, if we do this briefing,

10:59:08  20   what is the order you are going to be asking me to enter?

21         MR. NORTH:  The order would be, Your Honor, all prior

22   depositions can be used in this MDL, regardless whether a

23   plaintiff's individual attorney participated in the previous

24   deposition.

10:59:27  25         THE COURT:  Well, saying that they can be used is a

10:59:31  1   bit different from saying "and nobody can do any further

2   discovery on those subjects."  Would you be asking for both?

3          MR. NORTH:  We would ask for the first order, they

4   can be used.

10:59:42  5          The second question, Your Honor, I think would depend

6   whether we have a disagreement with Mr. Lopez.  If he comes to

7   me and says, "I want to depose these ten people that have

8   already been deposed, I want to limit them and just want to --

9   I promise it won't be over things that have been questioned

11:00:01 10   about before," we may agree on that.

11          But if we don't agree and there becomes an argument

12   about the scope of deposing people who have already been

13   deposed, then we would present that to the Court as a separate

14   issue.  But that issue would depend upon -- or that

11:00:17 15   presentation would depend on whether the Court addressed the

16   fist issue, or how it ruled, as far as whether these

17   plaintiffs can be bound by the previous depositions.

18          THE COURT:  "Bound by" means it can be used in their

19   case; is that right?

11:00:35 20          MR. NORTH:  Right.  So that they would --

21          THE COURT:  That's what you mean by "bound by"?

22          MR. NORTH:  Yes, Your Honor.  So they would have no

23   need to redepose the same witness.

24          THE COURT:  I'm not -- I'm not concerned about the

11:01:04 25   depositions where plaintiffs leadership says we should get

11:01:10   1   this witness again for four hours and the defendants say no.

2   We'll resolve those issues like we do any discovery issues

3   going forward.  And maybe my concern is just a reality of MDL

4   cases and the fact that plaintiffs' counsel don't represent

11:01:27   5   parties like class counsel does, but it's that we've got folks

6   who aren't plaintiffs' counsel who are going to say I get to

7   do discovery in my case on common issues and I'm not willing

8   to accept what's been done by plaintiffs' leadership.

9        I'm sure this bridge has been crossed a hundred

11:01:47   10   times, but I guess the question is can we do something up

11   front that minimizes any potential problems arising from that

12   issue?

13        MR. LOPEZ:  Only thing I can think of, Your Honor, is

14   maybe an order to show cause kind of issue.  I can't -- you're

11:02:04   15   talking about litigants that come after we've done all the

16   work that we're going to do in this MDL and then we have a new

17   lawyer that comes --

18        THE COURT:  Well, or some who are here now and

19   haven't been part of those 80 depositions.

11:02:19   20        MR. LOPEZ:  Mr. Boatman is going to speak to that,

21   but there's one thing I want to bring to the Court's

22   attention.  Even before this consolidated proceeding there

23   were other lawyers, not me or my colleagues that we're working

24   with, who had individual cases where this was happening, where

11:02:33   25   there were additional depositions that were being taken.  And

11:02:36   1    Mr. North is well aware of that.  The same witnesses that we

           2    were deposing were being deposed all over again.  And they

           3    didn't ask for a consolidation, we did.

           4         Now they can avoid one lawyer in Georgia, one lawyer

11:02:51   5    in North Carolina, Washington, all over the country asking --

           6    because they have the right to do that, all over the country

           7    to say "I want to take my depositions over.  I'll adopt some

           8    of that."  Now we can do it in one procedure.  So I think this

           9    is less of a burden on the defense than what they previously

11:03:10  10    experienced in having individual cases being litigated across

          11    the country.

          12         So, again, to the point I think that concerns the

          13    Court about later-filed cases, I think that might be an order

          14    to show cause kind of issue for the Court to have litigants to

11:03:29  15    come in here and deal with that at that time.  But I've never

          16    seen that happen, Your Honor.  I don't anticipate it happening

          17    here.  This is a fairly visible case right now nationally.  I

          18    would think that people we're going to -- we're going to see

          19    in this case we're probably going to see either now or

11:03:44  20    shortly.

          21         THE COURT:  Mr. Boatman, did you want to say

          22    something on this?

          23         MR. BOATMAN:  Yes, Your Honor.  On the last point

          24    first, I think one of the things we can do is use the

11:03:55  25    documents and the information we've gathered to perhaps make

11:03:58 1   it a condition that anybody who wants the benefit of our work

2   would be bound by an agreement that we could make that those

3   attorneys couldn't take their own depositions.  So there's

4   sort of maybe something we can do to help make sure that

11:04:17 5   doesn't occur, and we'd be willing to do that.

6        As far as the issue of us binding attorneys that were

7   not part of the prior case, to allow, for example, Bard to use

8   a deposition they like in those cases, I think we need to

9   brief that because I'm not aware of the ability for the Court

11:04:38 10  to rule that that would make that the case.  So I would

11  welcome Mr. North's suggestion that we brief it to see if it's

12  even possible for the Court to do something along that lines.

13        And then the separate and I think the most important

14  issue goes back to the scope of discovery and the core debate

11:05:01 15  we have here, which is Mr. North saying basically it's all

16  done.  And as Mr. Stoller suggested earlier, we're the voice

17  for the new plaintiffs, the new attorneys that weren't party

18  to that and we're learning as quickly as we can, and we have a

19  great deal of respect for the work that's been done, and it's

11:05:22 20  sort of like the but Mr. Stoller had earlier, the new

21  plaintiffs, and we now believe there's going to be hundreds if

22  not thousands of them, and the new lawyers, which are going to

23  be in the dozens or more, should have an opportunity to assure

24  themselves that this case has been properly discovered.  And

11:05:45 25  there's two broad areas that we need to address.

11:05:49   1        The first is subject matters for which there's been

2   no discovery.  And that's the FDA warning letter that came out

3   this summer.

4        THE COURT:  Mr. Boatman, let me interrupt you.  We're

11:06:01   5   going to come to the topic of what additional discovery needs

6   to be done.  It sounds like you're starting down that road.

7   Let's wait a minute on that.  We'll come to that.

8        MR. BOATMAN:  All right.  Thank you.

9        THE COURT:  Let me make a note on what we've talked

11:06:14  10   about so far.

11        Okay.  What I want to do on this issue, I think, are

12   two things.  One is I'm going to ask plaintiffs to address in

13   the case management order you're submitting on November 6th

14   that describes the functioning of the plaintiffs' organization

11:08:12  15   this issue of getting buy-in from new parties and not redoing

16   all the discovery in this case and Mr. Boatman's idea of

17   saying if you want access to the joint materials, you've got

18   to agree not to try to redo all the joint discovery.  Makes

19   sense, but why don't you talk about that and include that in

11:08:29  20   your case management order that you submit on the 6th.

21        On the question of whether new parties can be bound

22   by depositions previously taken, I do think we need briefing.

23   That's not something I want to decide without looking at the

24   briefing.  But we'll come back to that and set a briefing

11:08:48  25   scheduling by the end of this conference, because there are

11:08:51   1    other issues on which we may decide -- other issues on which

           2    we need some briefing, so we'll come back to that issue.

           3           Before talking about discovery generally, let's talk

           4    about a few specifics.  There's a Lehmann report.  Is that

11:09:24   5    pronounced "lee-man"?  "Lay-man"?

           6           MR. NORTH:  "Lay-man," Your Honor, yes.

           7           THE COURT:  Lehmann.  My understanding is that this

           8    is a document that has been the subject of motion practice in

           9    other cases as to whether or not it constitutes work product,

11:09:38   10   that there have been decisions going both ways, that it was

           11   used in the Nevada trial but there are other judges who said

           12   that it's work product, and that the parties want to get that

           13   issue decided for purposes of the MDL, which is fine.

           14          I understand there was evidentiary hearing held in

11:09:59   15   the Alexander case in Texas, that there was some evidence,

           16   apparently, on this issue in *Phillips* trial in Nevada.

           17          It seems to me that in light of the fact there was a

           18   full evidentiary hearing held on this in Texas and some

           19   evidence in Nevada, we don't need to have another evidentiary

11:10:20   20   hearing in this case.  What we could do is have the parties

           21   brief it and have each side submit whatever evidentiary

           22   material from those hearings you think bears on the question

           23   of whether it's protected or not.  But that's the question I

           24   want to put to you:  Do you agree with that or do you think we

11:10:38   25   need to do an evidentiary hearing on this report in this case?

11:10:42   1        MR. NORTH:  Your Honor, it would be our motion for

2  protective order and we do not believe a second evidentiary

3  hearing is necessary.

4        The two principal people, the consultant who did the

11:10:52   5  report and the in-house attorney who commissioned the report,

6  both testified at length and Mr. Dalimonte actually

7  cross-examined them, along with another member that's here

8  today of the plaintiffs' group, and I think that's sufficient

9  for the purposes.

11:11:06 10        MR. STOLLER:  Your Honor, I'm going to speak on

11  behalf of the new plaintiffs.

12        I would ask, if you were asking me, I would ask for

13  an evidentiary hearing.  Similar along the lines of the

14  conversations you're going to have about discovery, I think

11:11:19 15  the new folks who have not had an opportunity yet to brief

16  this issue should have that opportunity to, as if it were any

17  new case I file to go take that -- if they're going to claim a

18  privilege over a document that has at least in Lehmann been

19  adjudicated to be not work product put on trial in front of a

11:11:38 20  jury and subsequently been published publicly, I believe on

21  Nightline and is out in the public atmosphere today, I would

22  have an opportunity to come in to you in a new case and say,

23  Judge, I get an opportunity to challenge this claim that

24  they're now saying I don't get to use that and to do that on

11:11:55 25  an evidentiary basis.

11:11:56   1          I will admit, Your Honor, I don't know what testimony

2     was put on in the trial in Nevada nor in the Texas court where

3     these issues were adjudicated in the past, to different

4     results if I understand correctly, but my first argument to

11:12:12   5     you, Your Honor, if we were dealing with this fresh, which we

6     are, would be, Judge, I get an opportunity to question -- I

7     believe I have an opportunity to question those witnesses and

8     I'd like that opportunity in this case.

9          I do think -- my proposal would be, Your Honor, is

11:12:28  10     that we have an evidentiary hearing, that you hear the

11     testimony that apparently has resulted in different

12     conclusions from different judges from the witnesses

13     themselves and that we have simultaneous briefing afterwards.

14     I think we could do simultaneous initial briefs after the

11:12:44  15     hearing and responsive ones and put them 15 and seven days out

16     and you'd have everything in front of you to make a decision.

17          But there's the follow-up question, one I think you

18     asked in your notes here, about how do we apply it to old

19     cases and what's the effect of it once you rule on it here.

11:13:01  20     I'm happy to discuss that if you want or can wait and talk

21     about that later.

22          THE COURT:  Well, the specific question on that point

23     is I think, if I remember correctly, in the Texas case in

24     *Alexander* the judge said it was work product; is that right?

11:13:18  25          MR. DALIMONTE:  That's correct.

11:13:19  1            THE COURT:  So the question is, if I do this hearing

        2    over again, why should that change the result in *Alexander*?

        3            MR. STOLLER:  I'm not sure it should.  If you ask me,

        4    and I think I can speak for the group here, our position would

11:13:30  5    be that it's prospective for those cases that have not.  You

        6    would issue a ruling on whether or not you believe it's work

        7    product, it applies to the cases where there has been, and in

        8    those cases where there's been a decision, the parties, either

        9    side, whoever thinks they got the better result of it for

11:13:45 10    their case, could take it back to the judge in their case and

       11    say that Judge Campbell took a really hard look at this in

       12    Phoenix in the MDL in the broad context of all these cases and

       13    here's the decision he rendered based on evidence that he

       14    heard, and have an opportunity to go back to that judge and

11:14:01 15    say that we think you should reconsider what you've done.

       16            I think you're right, it can create some issues in

       17    cases, and I think those judges who made those decisions and

       18    who are going to try the cases should have the opportunity to

       19    determine whether that changes it.

11:14:14 20            To give an example, I think it's *Tillman* that a judge

       21    ruled it's admissible and witnesses have apparently been

       22    questioned on it.  That case is ready to go to trial.

       23            I think if you were to rule against us on that, that

       24    judge should have the opportunity to say either "I agree with

11:14:30 25    Judge Campbell" and figure out how you redact those things

11:14:33  1    that are already in the record out at trial or to say, "no, I

2    don't agree; I made a decision I'm sticking with it."

3              THE COURT:  All right.  I understand your point.

4              MR. NORTH:  I was going to go back to the question of

11:14:43  5    an evidentiary hearing --

6              THE COURT:  Before do you that, what is your -- are

7    you of the view that in cases where this is decided it remains

8    decided?  And that any decision I make applies only in cases

9    where it has not been decided?

11:14:57 10              MR. NORTH:  Your Honor, there's actually -- the

11    *Tillman* case he references is the only federal pending case

12    where it's been ruled admissible.  There are nine other cases

13    pending in this court where it's been ruled inadmissible.

14              As far as how that ruling would apply to those cases,

11:15:11 15    whichever way the ruling went, I think it's up to this court.

16    There's ample authority, as I understand it, that a transferee

17    court has the authority to modify or revise orders from the

18    transferor courts, and I think it would be a matter of the

19    court's discretion as to how any ruling in the MDL would apply

11:15:31 20    to those cases ten cases where it's already been decided.

21              THE COURT:  Your comment on evidentiary hearing?

22              MR. NORTH:  I would say this is tantamount to many

23    judges' practices in a *Daubert* context where they get the

24    briefing, look at the briefing, look at whatever depositions

11:15:45 25    have been submitted, and then decided whether or not they want

11:15:48  1   an evidentiary hearing.

2        I would respectfully suggest that that might work

3   here, where we go through the briefing process, we all submit

4   the evidence that we have, and then the Court could determine

11:15:58  5   whether an evidentiary hearing would be beneficial.

6        THE COURT:  Well -- okay, thank you.  That's what I

7   was going to suggest.

8        It seems to me, Mr. Stoller, particularly if you

9   haven't seen the evidence, we ought to brief it and have the

11:16:09 10   parties submit the evidence that exists.  And if you believe,

11   after going through the transcript from *Alexander*, that we

12   need a fresh evidentiary hearing, then you can explain why in

13   the briefing on this, and the defense can explain why not, and

14   I can make that decision in the context of knowing what

11:16:27 15   evidence is already in hand.

16        I would rather do that than just say, yes, we're

17   going to schedule an evidentiary hearing now.

18        MR. STOLLER:  I'm certainly amenable to that and I

19   think it makes sense.  If we were to go through the hearings

11:16:41 20   and transcripts and decide we didn't need anything further --

21        THE COURT:  Right.

22        MR. STOLLER:  -- then certainly that would be a

23   logical way to proceed.  I do think it makes sense to do

24   simultaneous briefing.  I think it --

11:16:52 25        THE COURT:  All right.  Thank you.

11:16:53   1          What I'd like to do is have this briefing address

           2   three issues:  One is whether the Lehmann report is work

           3   product, obviously.  A second is whether any further

           4   evidentiary hearing is required.  And the third is what effect

11:17:08   5   my ruling should have on cases where the issue is already

           6   resolved.

           7          And I'm thinking the second and third points will

           8   take couple of pages each, that's not something we need a lot

           9   of time on.

11:17:21  10          We will come back and set that schedule in a minute

          11   when we set the schedule that we've already identified on the

          12   question of parties being bound by discovery done to date.

          13   Let me just make a note.

          14          MR. STOLLER:  Your Honor, can I make a practical

11:18:24  15   suggestion --

          16          THE COURT:  Please.

          17          MR. STOLLER:  -- on point 2?

          18          It may be that I review these transcripts and I come

          19   up with an idea that, well, maybe there's only two or three

11:18:31  20   items.  It would be possible, I think, maybe to have a

          21   conversation with Mr. North and say, look, we take some short

          22   discovery so that ultimately alleviates that problem in terms

          23   of Issue Number 2 because we could say, look, the parties

          24   agreed they'll take a short deposition of Person A --

11:18:48  25          THE COURT:  You're always welcome to work out those

11:18:51   1   kinds of time-saving agreements and present them to me.

2   Okay.  The second specific topic -- I'm in Section V

3   of the agenda.  We've talked about A.  The second is privilege

4   logs.

11:19:12   5   We have the defense of the view this issue has been

6   litigated heavily and decided and ought not to be consuming

7   further time.  We have plaintiff saying this is a big issue

8   and I should appoint a special master to deal with it.

9   I looked at, I didn't read, the magistrate judge's

11:19:41  10   report from Nevada just to get a sense for what he did decide.

11   And I looked at the order sections of that report, both in the

12   original and the motion to reconsider.

13   I'm interested from plaintiff side, describe for me

14   the process you envision if we appoint a special master.  Are

11:20:08  15   we going to ask that special master to go through 1,350

16   documents on the privilege log in camera and decide if they're

17   properly withheld or not?

18   MR. BRENES:  Troy Brenes, Brenes Law Group.  Good

19   morning Your Honor.

11:20:25  20   I think there is going to need to be substantial

21   briefing and sampling going forward.  This is very common in

22   MDL's.  Often they do it by category approach which, in the

23   *Phillips* case, the order you're referring to, that magistrate

24   judge wasn't comfortable with that approach, he said it had to

11:20:45  25   be document by document -- every single document had to be

11:20:47  1    reviewed.

2    If you look at a lot of the orders off MDL, they

3    usually go by, you know, here's this category of documents,

4    all those type of documents should come off, things like that.

11:20:57  5    But what we do know is there's been two samplings so

6    far.  In the *Phillips* order and then there was a sampling

7    after that.

8    In the *Phillips* order the net result was 58 percent

9    of the documents had been inappropriately designated.  In the

11:21:11 10    *Giordano* case that came later, it was a smaller sampling but

11    about a third of those documents had been inappropriately

12    designated.

13    So we know there's, if you extrapolate those results,

14    there's likely hundreds if not thousands of documents that are

11:21:26 15    still inappropriately on that privilege log, and we need to

16    resolve that issue.  Whether it's a magistrate judge or

17    yourself.  We're looking for some guidance for you as well,

18    what's the best way to get this done going forward.  We want

19    to let you know it will be a burden.  It probably will be time

11:21:43 20    consuming.  And I think the only way it gets done is either by

21    establishing those categories that should come off and

22    sampling the documents to make sure they're actually in

23    compliance with the orders.

24    And even if you don't want to do the category

11:21:57 25    approach, we just look at the law that we have, we understand

11:22:00  1   what the law is, and we need to actually sample the privilege

       2   log to make sure the defendants are in compliance with the

       3   law.  If you look at the privilege log right now, you can't

       4   really tell what the document is or isn't.  Someone has to go

11:22:13  5   and look at that document.

       6        MR. NORTH:  I think we stated our position in this

       7   submission.  We feel like we've vigorously litigated this

       8   issue for five years.  We understand the Court's comment.

       9   It's hard to bind this MDL with those decisions.

11:22:32 10        What I would suggest, before we involve the Court,

      11   before we involve a magistrate judge, before we involve a

      12   special master, that we try, the parties, to work on our own

      13   sampling process.  I've seen this work very well in other

      14   litigations where the parties agree that the plaintiffs will

11:22:48 15   identify, let's say ten documents, and this would be on a

      16   rolling basis, and there would be an agreement perhaps

      17   memorialized by a court order that's invoking something

      18   similar to 502(d), that the defendants sharing of those

      19   documents with the plaintiff, if the defendant was willing to

11:23:05 20   do so because they weren't too sensitive or something, just to

      21   show why they're privileged.  Just a small sampling.  And see

      22   if the parties can't work out some agreements there, as

      23   opposed to invoking the Court's intervention at the outset.

      24        THE COURT:  So are you suggesting they would identify

11:23:23 25   documents, you would give them to -- you would give copies to

11:23:27   1   them under some appropriate order, and then you talk to

           2   decide --

           3           MR. NORTH:  And see if we can't resolve.

           4           We were able to do that in another context, Your

11:23:37   5   Honor, with some plaintiffs attorneys.  It's a process that

           6   went on for about three or four months and we were able to

           7   resolve it without ever once approaching the court.  So it

           8   seems to me it's something the parties ought to try before we

           9   invoke the Court's jurisdiction on that.

11:23:54  10           MR. BRENES:  Your Honor, the concern there becomes

          11   time and if some documents later come off, we have to maybe

          12   retake depositions we have already taken.  Or do we hold off

          13   taking depositions?  I think with how we've briefed this in

          14   the past, and I know their understanding of the scope of

11:24:09  15   privilege and work product is different than ours, I think

          16   these are issues that are going to have to be briefed for the

          17   Court and I think we should set a schedule that starts getting

          18   this issue resolved, starts getting sampling done, different

          19   things like that.

11:24:25  20           THE COURT:  What would you be addressing if I said

          21   okay, brief it?

          22           MR. BRENES:  What I propose is we establish what the

          23   law is in this case.  And a lot of that work has already been

          24   done through the *Phillips* order, that was a district court

11:24:41  25   case within the Ninth Circuit.  But I think we need to start

11:24:44   1     sampling the documents and making sure they're in compliance

           2     with the law.  And if that sampling shows they're not, they

           3     need to go back, address that privilege log, and then we can

           4     sample it again and see where at.  If they keep -- if they're

11:24:59   5     not in compliance and keep up that behavior, then, you know,

           6     there needs to be some consequences.

           7             THE COURT:  Do the defendants disagree with the law

           8     on work product that's set out in the *Phillips* order?

           9             MR. NORTH:  No, Your Honor, we do not.  We litigated

11:25:13  10     that.  The *Phillips* case is based on Ninth Circuit law, as

          11     Mr. Brenes said, and we think we agree with that order.

          12             THE COURT:  Well, so, Mr. Brenes, if the parties can

          13     apply the law in the *Phillips* magistrate judge's order, what's

          14     wrong with the suggestion of defense counsel to at least have

11:25:34  15     the parties go through some sampling and see if that solves

          16     the issue?

          17             MR. BRENES:  Two parts.  One, it's a similar theme

          18     you've hard so far.  When we met as a group with the rest of

          19     the plaintiffs attorneys now involved, everybody has fairly

11:25:51  20     said, look, I want input into this process, the briefing, meet

          21     and confers on what the law is and so I think we may need to

          22     take another look at the law and make sure everybody's had

          23     input into it and chance to brief it.

          24             For example, criminal conduct exception wasn't

11:26:11  25     something raised in that brief and I think it would be

11:26:13   1    something people raise now given what came out in the NBC

2    story and different things we've become aware of.

3          THE COURT:  Are you saying you don't agree with the

4    law as stated by the magistrate judge in *Phillips*?

11:26:28   5          MR. BRENES:  I wouldn't say I disagree with it.  What

6    I would say is I want the rest of the group to have a chance

7    to look at it, make sure everybody's on board with it before

8    we make a decision whether we're just going to accept that

9    wholesale.  So --

11:26:40  10          THE COURT:  You said there were two problems --

11          MR. BRENES:  Oh, the other goes back to timing issue.

12    Especially if we're talking about ten documents at a time.  At

13    the very least that sampling would need to be bigger, probably

14    like 50.  And then I'm just concerned about the time delay

11:26:56  15    there because we built a pretty aggressive schedule and for

16    our plan going forward.

17          THE COURT:  The privilege logs that I think you said

18    include 5,000 documents, how long have plaintiffs counsel had

19    those?  How long have they been in your hands?

11:27:18  20          MR. BRENES:  They've gone -- so Your Honor knows, I'm

21    now at a different firm.  Lopez and McHugh had those.  They've

22    gone through various firms.

23          How this started was in about 2011 in a San Diego

24    case, we start the meet-and-confer process.  That lasted

11:27:32  25    several months.

11:27:34  1          THE COURT:  Before, Mr. Brenes, describing the whole

       2    process, the question I have is, are the logs you're talking

       3    about now the same as the logs that were in this process in

       4    2011?

11:27:46  5          MR. BRENES:  I don't know because we don't know which

       6    ones they're going to go with.  I'm assuming they'll adopt the

       7    same one, but I don't know yet.  Probably since about 2013

       8    these current ones have been in place.

       9          Richard, correct me if I'm wrong.

11:28:00 10          THE COURT:  Okay.  I'll hear from him in a minute.

      11          One of the issues you all raised in the joint report

      12    was the need to update privilege logs.  What was that

      13    referring to?

      14          MR. BRENES:  That means as new ESI is collected.  As

11:28:11 15    new custodians are collected, naturally the defendants are

      16    going to say some of this information is privileged and it

      17    will need --

      18          THE COURT:  That's just for discovery in the future?

      19          MR. BRENES:  Yes.

11:28:21 20          THE COURT:  Okay.

      21          Are you going to be standing by privilege logs that

      22    have been out since 2013, Mr. North?

      23          MR. NORTH:  I don't know that there's been any

      24    subsequent production since then, so, yes, I think those logs

11:28:34 25    are still valid.

11:28:35  1          After the *Phillips* court ruling, we went back and

2      looked at the privilege log.  We removed, de-designated, a

3      large number of documents, produced those and gave a revised

4      privilege log.  And I believe that's still the valid one.  The

11:28:50  5      current one.

6          MR. BRENES:  Just addressing that point, my

7      understanding is there was never this large reduction in the

8      privilege log.  They mentioned 660 documents.  First time I'm

9      aware of that.

11:29:01  10          Part of the problem is the documents, if they were

11      completely withheld in the privilege log, there's no Bates

12      number so there's no way for us to verify what documents came

13      off the privilege log.  I have asked them to identify the

14      production date so I can verify that.

11:29:14  15          I will note that then the sampling in the San Diego

16      case came after that and there's certainly no massive

17      reduction after that.

18          THE COURT:  What is on your privilege log, Mr. North,

19      in terms of categories of information?  On a given document

11:29:29  20      what do you say on the privilege log?

21          MR. NORTH:  Your Honor, I hate to say, but it's been

22      a while, probably 2013, since I've looked at that.  It's

23      fairly comprehensive.  I know two courts have ruled it is

24      adequate under the circumstances.  But I just don't have a

11:29:46  25      copy of it here with me.  It's pretty thorough.

11:29:49  1          THE COURT:  Do you agree it doesn't include Bates

       2    numbers?

       3          MR. NORTH:  Let me ask -- it has control numbers that

       4    we utilize, Your Honor, but we don't Bates stamp numbers

11:30:05  5    that -- documents that are not being produced, so it does not

       6    have a Bates stamp number, only a control number, I'm told.

       7          THE COURT:  Okay.  What I'd like to do is this:  I'm

       8    going to have the parties go through three steps on this

       9    privilege log issue, and we will set a schedule for this when

11:32:27 10    we come back to all of the scheduling.

      11          The first is I want the parties to confer and agree

      12    what the current version of the privilege log is.  That may

      13    mean for purposes of the MDL you just reproduce it, Mr. North.

      14    But so everybody's working off the same set of privilege logs.

11:32:42 15          Second, I am going to set a period of about 30 days

      16    to engage in the sort of informal sampling you talked about,

      17    Mr. North, applying the legal standards in the *Phillips*

      18    magistrate judge decision, and see if that advances the ball

      19    on the privilege log disagreement.

11:33:03 20          And, third, at the end of that process I'm going to

      21    have you file a joint report to tell me where you are on the

      22    privilege log issues.  Do we have the same rift we think we

      23    have in the courtroom today?  Has it been narrowed?  If issues

      24    need to be briefed, what are they?  And what each side's

11:33:20 25    proposal is for what happens in this case, whether it's a

11:33:23   1   sampling procedure or some other set of briefs that we need to

           2   consider.

           3          But I'd like you -- before we decide that we need to

           4   bring in a special master or need to start scheduling hearings

11:33:34   5   on this, I'd like to make sure we're all talking about the

           6   same privilege log and that you have at least talked and done

           7   some exchange of selected documents to see if that helps reach

           8   agreement or at least narrow the area of dispute.

           9          And we'll set a date for that when we come back to

11:33:53  10   scheduling in a minute.

          11          MR. LOPEZ:  Your Honor, on that point, before the

          12   Court moves on, there's still this issue out there about the

          13   Bates -- how to identify the documents that are on the

          14   privilege log.  They reference control numbers and Bates

11:34:21  15   numbers.  I don't think those are the numbers that actually

          16   are reflected on the documents that get produced.  We're not

          17   going to know which comes on or -- comes off or stays on.

          18          THE COURT:  It seems to me that a very relevant fact

          19   for the defendants to share with the plaintiffs, if you

11:34:37  20   haven't yet, are what documents have you produced that were

          21   formerly on the log as a result of the magistrate judge's

          22   order.  And maybe there's just a chart that says heres the

          23   control number on the log and here's the Bates number we

          24   produced it to you under.  Absolutely I want to make sure both

11:34:54  25   sides know what came off the logs before we start down the

11:34:57   1   road of fighting over whether they're adequate.

2             MR. NORTH:  Certainly.

3             MR. LOPEZ:  Thank you, Your Honor.

4             THE COURT:  Okay.  Item V-C on the agenda is remand

11:35:35   5   and jurisdiction issues.

6             In your joint submission you identified the *Saviour*

7   case, which apparently has a non-diverse defendant.  The

8   defendants removed saying there was fraudulent joinder.  That

9   issue has apparently not been briefed.

11:35:53  10             MR. NORTH:  There's a short answer to that question,

11  Your Honor.  That case has not been transferred yet.  The

12  plaintiff's attorney in that case filed an objection with the

13  judicial panel and it's my understanding, and they've moved to

14  vacate the transfer order, and they've also simultaneously

11:36:07  15  filed for remand in Pennsylvania, Philadelphia federal court.

16  So I don't think it's going to be transferred here until after

17  January's hearing.

18             THE COURT:  Okay.

19             MS. BOSSIER:  Your Honor, Sheila Bossier for the

11:36:19  20  plaintiffs.

21             That is correct, and we also understand that there's

22  been a subsequent removal of another state court matter in

23  Delaware, *Frasier Johnson* case just recently removed this week

24  and motion to remand is going to be filed in district court of

11:36:34  25  Delaware asserting there's no federal court jurisdiction.  So

11:36:39  1    I believe CTO –- objection to the CTO will be filed in that

2    case as well.  So it's probably premature for this Court to

3    set a briefing scheduling for either --

4            THE COURT:  If they're not here I shouldn't be making

11:36:53  5    decisions on them, so I absolutely agree.

6            So are there any remand or jurisdiction issues in the

7    MDL now that we need to address?

8            MS. BOSSIER:  Not that I'm aware of.

9            MR. NORTH:  None, Your Honor.

11:37:06  10            THE COURT:  Okay.  And we've already talked about

11    filing of a master complaint and answer, which was V-D.

12            Item VI.  We've talked about, I think, VI-A, and that

13    is whether discovery should be reopened.  There's the

14    common-benefit discovery, but I think we're in agreement

11:37:29  15    non-common discovery will be dealt with through these

16    simplified profiles we're going to have you produce.

17            We touched on it but I'm interested in any thoughts

18    you wish to share on Item VI-B, which is if we have a case

19    where *Daubert* motions or motions for summary judgment have

11:37:50  20    been decided, does anybody believe we should revisit those

21    decisions in this case?

22            MR. LOPEZ:  I'll speak on behalf of the plaintiffs,

23    Your Honor.  I would say we're willing to accept those rulings

24    as previously issued by those courts on both summary judgment

11:38:08  25    and *Daubert* motions.

11:38:11  1          This is a different issue, but we're going to have an

2      issue with some of these cases that didn't quite get there

3      where we have expert reports.  I know the Court's going to

4      address that later, whether those could be supplemented before

11:38:22  5      we get to *Daubert* hearings and things of that nature and

6      whether the *Daubert* hearings happen here or they get sent back

7      to the transfer court.

8              THE COURT:  Okay.

9              Any views from defense counsel?

11:38:33  10             MR. NORTH:  As I indicated earlier, there are three

11      cases where the motions have been decided and we certainly

12      don't want those or believe those need to be reopened.

13             There are motions pending that have been fully

14      briefed.  One in one case for more than a year the *Daubert*

11:38:47  15      motions and summary judgment motions have been pending, and so

16      those are an issue that I think we're all going to have to

17      grapple with.

18             THE COURT:  Well, that gets to the issue of whether

19      expert reports can be supplemented; right?

11:39:02  20             MR. NORTH:  Yeah.

21             THE COURT:  Okay.  We'll come to that.

22             I asked a question in VI-C that I want to give you a

23      chance to comment on, although I think I know your answers,

24      which is if we have these cases ready for trial why shouldn't

11:39:20  25      we remand them and let them be tried --

11:39:23   1          MR. LOPEZ:  I can answer --

           2          THE COURT:  -- and let them be treated as

           3   bellwethers?

           4          MR. LOPEZ:  As I said earlier, broadly these cases

11:39:31   5   have now become part of this process.  Because they are, they

           6   ought to have the opportunity for any additional discovery

           7   that might happen here as a result of your orders.

           8          But at the very least, our position would be, and

           9   counsel may agree with some of this, and that is to the extent

11:39:47  10   we would have had the right in those lower -- not lower courts

          11   but in the transferor courts to reopen discovery based on some

          12   of this evidence that's come to light -- the FDA warning

          13   letter, NBC Nightly News issue, this witness was revealed

          14   then -- I would think at a fair minimum those -- that that

11:40:07  15   type of discovery should happen here.  Didn't have to happen

          16   in the courts that transferred the cases here.  And to the

          17   extent that there might even be Rule 26 reports that have been

          18   exchanged, that those experts should be able to at least

          19   supplement their reports for that limited purpose.

11:40:26  20          So my answer is I think I'm going to advocate on

          21   behalf of all the plaintiffs who are now here no matter what

          22   state you're in, to be able to take as much -- have the

          23   opportunity to take advantage of the discovery that maybe

          24   wasn't done that's going to happen here.  But at least have an

11:40:43  25   opportunity to do discovery and deal with whatever we learn

11:40:47  1    from that discovery from these recently -- these recent

2    events.

3             MR. NORTH:  Your Honor, as we indicated in the

4    submission, we do not favor immediate remand.  Ideally we

11:41:02  5    would like to see these cases remain here so that one court

6    can control them all, as opposed to subjecting us to different

7    schedules from different courts.  We have proposed that we

8    waive *Lexecon* and that we treat these 13 cases that are trial

9    ready or close to trial ready as the bellwether pool for this

11:41:23 10    process.

11             As far as additional discovery in those cases, Your

12    Honor, we've already by agreement said we will produce a

13    30(b)(6) witness, as the Court knows, December 2nd concerning

14    the FDA warning letter, and we're also producing all the

11:41:37 15    communications with the FDA back and forth about the

16    inspection process and the warning letter itself.  We believe

17    that's all the additional discovery that is necessary.

18             We certainly do not believe a media exposè, so to

19    speak, where plaintiffs attorneys appeared and their clients

11:41:53 20    appeared somehow forms a basis for additional discovery at

21    this point.

22             THE COURT:  I understand that.  We'll be talking

23    about additional discovery in a minute.

24             Sounds like nobody favors immediate remand of these

11:42:07 25    cases for trial, so we won't do that.  And we'll talk about

11:42:15  1    what additional discovery should be done.

2         Item VI-D.  Has any case gone to trial besides

3    *Phillips*, which I know settled ten days in?

4         MR. NORTH:  Yes, Your Honor, there's been one

11:42:31  5    additional case.  And that was in 2012.  Mr. Condo and I tried

6    the case here in the Superior Court of Maricopa County in

7    front of Judge Hugh Hegyi.  It was as four-week trial in May

8    and June of 2012.  It involved the first generation filter,

9    the Recovery filter, and a fracture of that device, and at the

11:42:52 10    conclusion of the trial the jury returned a defense verdict

11    finding no defect in the product.

12         THE COURT:  What was the filter?  Recovery --

13         MR. NORTH:  The Recovery filter.  The first

14    generation.

11:43:12 15         THE COURT:  Okay.

16         Any disagreement --

17         MR. LOPEZ:  Yes.  The only comment I would make, Your

18    Honor, that was -- those lawyers are not part of this MDL

19    process, PSC.  It was old, old school.  I mean, that was

11:43:22 20    before the depositions we're looking at here to adopt; those

21    depositions didn't exist at the time of that trial.  So I

22    wouldn't call that a representative bellwether.

23         THE COURT:  I didn't think you would.

24         Okay.  I don't want to talk about the discovery

11:43:43 25    schedule just yet, I want to jump to Item VIII, which is

11:43:46  1    coordination with state court litigation.

2             You've talked about the common document depository.

3     Do you anticipate -- well, first I ought to ask, are there

4     plaintiffs lawyers who have state court cases but do not have

11:44:04  5    any cases in this MDL?  And, if so, are you going to be giving

6     them access to the document depository and the website?

7             MR. LOPEZ:  I think Mr. North might be in a better

8     position to answer the first part of your question because I'm

9     not aware -- although I did see his list of state court cases

11:44:22 10    filed by lawyers that I know have not been involved in this

11     process.  So I can't answer the first part.

12             The second part is anyone who wants access to the

13     discovery we do here and wants to coordinate here, as long as

14     they agree to the traditional idea that this is common benefit

11:44:41 15    and whatever order the Court may issue with respect to the

16     expense and fee relationships to those, they're going to have

17     open access like anybody else and we're going to encourage

18     they do coordinate with us to the extent they can.  But I'm

19     not aware of other state court litigants that haven't been

11:45:00 20    involved here other than what counsel's put in his -- in our

21     joint statement.

22             MR. NORTH:  Your Honor, there are at least three or

23     four firms that have some cases, particularly in Alabama and

24     New Jersey in the state courts that are not part of this MDL

11:45:15 25    at present.

11:45:18   1          MR. LOPEZ:  I will reach out to them, Your Honor.  I

       2    haven't done that yet.  I meant to before we got here, but

       3    we've had a lot of things to do.  I will reach out to them.

       4    If you would like me to give you a report about that, I'm

11:45:28   5    happy to do so.

       6          THE COURT:  That would be fine.  And helpful.

       7          I guess the question I have is, other than reaching

       8    out to them and saying we have these collections of

       9    information you can have access to providing you'll abide by

11:45:44  10    governing orders, are there other steps we should be taking to

      11    try to coordinate with state cases?  And I don't know that

      12    there are, but I've heard of MDL's where there are states that

      13    have aggregated cases in front of a single judge and where the

      14    MDL judge and the state judge will actually coordinate and

11:46:08  15    make sure that their schedules aren't creating problems.

      16    Doesn't look like we've got anything like that here, so I'm

      17    just wondering if you have ideas on other things we should do

      18    to minimize any potential conflicts between state cases and

      19    this case?

11:46:23  20          MR. LOPEZ:  May I just address that quickly, Your

      21    Honor.  I would say this:  There could be over the next few

      22    weeks consolidated action that appears.  I think there's some

      23    talk about that happening.  And I'll report to the Court

      24    should that happen.

11:46:38  25          There doesn't seem to be a large number of state

11:46:40  1    court cases right now, but an example that is often utilized
2    in state and federal coordination between the judges this idea
3    about -- they're calling it a science day.  It may not be
4    technically that.  But for the judges to sit together during
11:46:55  5    that process so that the presentation doesn't have to be given
6    more than once.  That's happening in a lot of cases right now.
7         Where there's maybe disputes about issues as they
8    relate to depositions, you know, I mean the parties usually
9    work those out, Your Honor.  But as far as -- again, it's
11:47:16  10   going to be a case-by-case, judge-by-judge issue about trial
11   dates.  Some judges want to say "Leave my docket alone.  I
12   want this case to go to trial in June, I don't care what's
13   happening in Phoenix, Arizona with a thousand other cases."
14   But to the extent there's coordination and cooperation with
11:47:35  15   other plaintiffs' lawyers, I think we can commit to that for
16   sure.
17         MR. NORTH:  Your Honor, just couple of points.
18         There are no -- is no aggregated group of cases in
19   the state cases, as the Court mentioned.  There are several
11:47:53  20   here in Maricopa County but they're not aggregated as of now.
21   There is only one trial date set in 2016 in any state court
22   case.  To that extent, as far as trial is concerned I don't
23   think the state court litigation is going to get ahead of this
24   litigation.
11:48:12  25         I will say the defendants have a real concern about

11:48:14  1  some of the state court cases for this reason:  There are

2  several people that are proposed to be members of the

3  plaintiffs' steering committee in this litigation, this MDL,

4  who are actively pursuing state court cases right now and

11:48:28  5  pursuing some of the same issues that are going to be resolved

6  in front of this court.  Such as Lehmann.  They've been

7  pushing for FDA depositions before December 2nd, although they

8  have backed off of that.

9         There's not much we can do about it, but it seems to

11:48:44  10  me it ought to be a condition of a plaintiff's attorney's

11  participation on the steering committee of this MDL that they

12  are coordinating state court cases with this proceeding.

13         MR. LOPEZ:  I'm going to make a general comment about

14  that, Your Honor.  We can't -- those of us that represent a

11:49:02  15  federal court case and state court case, we can't all of a

16  sudden decide that we're going to give more deference to one

17  of our clients more than another.  If we have a client in

18  state court where there's a unique issue there that can only

19  be resolved there, or we think should be resolved there for

11:49:18  20  the benefit of that client, we can't be forced to do that

21  here.

22         But the perfect example how we've operated thus far,

23  Mr. North mentions this deposition that we wanted to take in

24  November.  We've already resolved that issue.  We got together

11:49:35  25  with the state court attorney, who is now a member of this

11:49:39  1    PSC, and we had a meet and confer with Mr. North and agreed to

      2    move that date so it can be coordinated between this MDL and

      3    that state court litigant.  There's not an issue there.

      4         I understand the difficulties sometimes of having to

11:49:52  5    coordinate, especially on their side when they have a state

      6    court case, but I just don't -- I think we have to give

      7    that -- those courts the deference and respect that they need

      8    to move their own docket and for those particular litigants.

      9         THE COURT:  Mr. North, are you suggesting there's

11:50:10 10    something I do on that issue?

     11         MR. NORTH:  I have seen other judges, Your Honor -- I

     12    certainly don't know of anything specific other than I've seen

     13    other MDL judges strongly encourage people that if they want

     14    to participate in the MDL steering committee and leadership

11:50:28 15    that they cooperate and not work at cross-purposes in state

     16    court litigation.

     17         THE COURT:  All right.  I understand the issue.  I

     18    think everybody believes we ought to be efficient in this

     19    litigation.

11:50:44 20         I'm not going to do anything on the issue now, but if

     21    it becomes a problem, the parties are free to raise it with

     22    me.

     23         I am, I think, in the case management order going to

     24    require some form of periodic reporting from the plaintiff

11:50:57 25    side, and I will include in that coordination efforts with

11:51:00    1    state court.  We're also going to have periodic status

            2    conferences, and one of the issues we'll address in those

            3    status conferences is, are there problems arising in state

            4    court cases, so that we'll keep our eye on that issue.

11:51:20    5            For purposes of item VIII-B, I am going to lift the

            6    stay of discovery so that the November 10th document

            7    production and the December 2nd deposition of the corporate

            8    representative can go forward.  It makes sense to have that

            9    occur.  We'll talk in a bit about how that fits into other

11:51:40   10    discovery that we're doing.

           11            VIII-C.  There was an issue raised in the joint

           12    report about a coordination of subpoena to Hill and Knowlton.

           13    Is that an issue that needs to be addressed or has that

           14    coordination been accomplished?

11:52:03   15            MR. LOPEZ:  That -- the MDL plaintiffs want to be

           16    involved in that process too.  There's an objection that has

           17    been filed to the notice of that deposition and the

           18    plaintiffs' counsel filed a motion to deal with that objection

           19    just this past Tuesday.

11:52:21   20            THE COURT:  Where?  Where was that filed?

           21            MR. LOPEZ:  It's in Florida.  I don't know --

           22            MR. NORTH:  Broward County.

           23            THE COURT:  It's a state court case?

           24            MR. LOPEZ:  Yes.  I'm sorry, it's a state court case.

11:52:34   25            THE COURT:  Okay.  So what is it you want to do,

11:52:35  1    Mr. Lopez?

2              MR. LOPEZ:  I -- let me just say that I don't --

3         whatever -- however that's resolved and whenever that

4         deposition gets taken, we will coordinate with that state

11:52:48  5    court litigant.  In other words, it's probably not something

6         we have to deal with here but we're willing to adopt.  I know

7         counsel is going to have to agree to that, too.  But we want

8         to keep that moving.  We think it's a pretty important piece

9         of our discovery.  So to the extent that gets resolved and

11:53:03 10    things get ordered to happen in that state court and the

11        deposition happens and documents get produced, we'll

12        coordinate with the state court lawyers and have that taken on

13        behalf of the MDL litigants as well.

14             THE COURT:  That make sense to you, Mr. North?

11:53:16 15         MR. NORTH:  Absolutely.

16             THE COURT:  Okay.

17             With respect to VIII-D, the parties have suggested

18        that a state-federal liaison be identified as part of the

19        proposal.  That's certainly what I will do when I rule on all

11:53:45 20    of those issues.

21             There was a reference on page 19 of your joint

22        submission.  You say on lines 10 and 11, this is the

23        plaintiffs' position:  The parties in any related state court

24        cases agree to request stays of any dispositive motions until

11:54:14 25    the proposed discovery period is completed.

11:54:18   1          I'm assuming, Mr. Lopez, you mean any state court

           2     cases that lawyers in this MDL have pending?

           3          MR. LOPEZ:  That's correct, Your Honor.

           4          THE COURT:  Okay.  And is that still the case?

11:54:29   5          MR. LOPEZ:  It is.

           6          THE COURT:  That's going to be requested?

           7          MR. LOPEZ:  Yes.

           8          THE COURT:  I assume defendants are in agreement with

           9     that?

11:54:34  10          MR. NORTH:  Oh, yes, Your Honor.

          11          THE COURT:  You don't think that's a bad idea, I

          12     assume?

          13          MR. NORTH:  No, that's fine.

          14          THE COURT:  Okay.  And we talked about what else we

11:54:55  15     can do to discover -- I'm sorry, to coordinate.  So I think

          16     VIII-F has been covered.

          17          All right.  Let me tell you what I want to do after

          18     lunch on the scope of discovery.  I don't know if I can make a

          19     full decision on this today.  I want to make sure I'm fully

11:55:19  20     informed.  But I've read the joint submission twice.  I've

          21     made my own little chart where I've listed the plaintiffs'

          22     position and the defendants' position on these various

          23     categories of discovery.  So I understand what the plaintiffs

          24     are saying they should be permitted to do and what the

11:55:38  25     defendants are disagreeing with.

11:55:41    1        I want, after lunch, to hear more about those, and I

2    think the best way for me to do it is talk through them with

3    you and ask some specific questions that I've identified.

4        If I can make decisions on scope of discovery issues

11:55:54    5    today, I will.  If I think we need some focused briefing to

6    make sure it's advised, I will ask for that.  But the other

7    thing I'm going to be considering is what can we get started

8    on now in terms of the sort of first phase of discovery and

9    get under way, with the scope of the second phase to be

11:56:17   10    decided either through briefing or after we see what's in the

11    first phase so we don't delay the start of discovery generally

12    until we have the scope perfectly defined.  So why don't we

13    plan to take those issues up after the lunch hour.

14        I'll also come back to the agenda.  We'll talk about

11:56:35   15    Item 9, which is settlement efforts.  There's a few other

16    issues I've got that I want to raise.

17        Are there other general categories of subjects you

18    all are going to want to take up when we come back together?

19        MR. NORTH:  None for the defendants.

11:56:53   20        MR. BOATMAN:  No, Your Honor.

21        MR. LOPEZ:  No, Your Honor.

22        THE COURT:  Okay.  We will reconvene at 1 o'clock.

23    Thank you.

24        MR. STOLLER:  Thank you, Your Honor.

11:57:05   25      (Recess taken from 11:57 to 1:01.)

13:00:56  1        THE COURT:  Thank you.  Please be seated.

       2        Let's talk about discovery.  And I think the best way

       3   to do it is rather than me just have you talk generally is to

       4   ask some specific questions about where you're in disagreement

13:01:40  5   so I can begin to get a sense of the parties' positions and

       6   the issues.  So what I'm going to do is go down items that I

       7   identified in the joint report where the plaintiffs want some

       8   discovery the defendants object to and make sure I understand

       9   more fully the parties' positions on these issues.

13:02:01 10        On page 12 of the joint submission, Item Number 1

      11   identified by the plaintiffs is updated complaint files for

      12   the Recovery, G2, G2X, G2 Express files and also for the Simon

      13   Nitinol, N-I-T-I-N-O-L, Nitinol, Eclipse, Meridian, and Denali

      14   filters.  Here's the question I would first like to ask the

13:02:39 15   plaintiffs.  According to the chart that's in the joint

      16   report, there are no cases currently based on the Denali

      17   filter, I'm sure I'm mispronouncing it, but Simon Nitinol or

      18   Nitinol filter.  My question is, is that correct?  And if that

      19   is correct, why is it you want discovery on filters that are

13:03:06 20   not at issue in the case?

      21        MR. LOPEZ:  On the Denali, Your Honor, we were

      22   advised yesterday there was a Denali case filed.  It's not yet

      23   been transferred here.  So this is supposed to cover the

      24   entire family of these devices beginning with the Recovery.

13:03:27 25   I'm not aware -- I'm sorry, I misspoke.  There a Denali filing

13:03:34  1    that was identified in our plaintiffs meeting yesterday but

       2    has not been filed but is going to be filed.

       3             THE COURT:  Even still, why are you seeking discovery

       4    on devices that are not currently part of this MDL?

13:03:49  5             MR. LOPEZ:  Because we anticipate that people have

       6    these cases and are going to file them.  If you want to table

       7    that, Your Honor, and focus on the cases that are going to be

       8    here, we're fine with that.

       9             Let me just add this.  These are all iterations going

13:04:05 10    back to the Simon Nitinol filter, which will be the answer

      11    I'll give you about the question about the Simon Nitinol

      12    filter, these are all generations of filter that started with

      13    Simon Nitinol.  A lot of these have to do with change of

      14    design, change of testing, and things of that nature.  So even

13:04:25 15    if there's not a Denali case that's been filed, the design

      16    issues, manufacturing issues, the materials issues that go

      17    into the design of a more recent device, it's our position

      18    that that becomes relevant even going all the way back to the

      19    Recovery filter.

13:04:45 20             THE COURT:  Am I correct that the Simon Nitinol is

      21    first?

      22             MR. LOPEZ:  The Simon Nitinol filter was the first --

      23    it's -- I can't think of the name.  Predicate.  Predicate

      24    device.  I've said that 4,000 times in discovery.

13:04:59 25             THE COURT:  If that's true and this litigation has

13:05:01   1    been pending for ten years in a variety of courts, is it

           2    correct no judge has concluded before now that you should get

           3    discovery of that predicate device complaint file?

           4           MR. LOPEZ:  I'm not sure we've actually asked for it.

13:05:19   5    Maybe Mr. Brenes can address some of these.  I know that we've

           6    been restricted in some instances because it did not involve

           7    that device but we were able to get, for example, in a G2 case

           8    we got all the previous devices including the Recovery.  I'm

           9    going to anticipate your next question, why is the Simon

13:05:40  10    Nitinol filter important because --

          11           THE COURT:  Especially if you haven't requested it in

          12    ten years.  Why now?  Why is it becoming relevant and should

          13    be the focus of discovery now?

          14           MR. LOPEZ:  One of the biggest issues in the case is

13:05:54  15    this 510k process and whether or not the Recovery filter was

          16    as safe and effective as its predicate device.

          17           THE COURT:  Hasn't that been true from the beginning

          18    that --

          19           MR. LOPEZ:  It has.  It has.  If I was in front of

13:06:08  20    you with a case I'd been litigating three years and we're

          21    ready to go to trial I'd be concerned, but it would be wrong

          22    to suggest for other litigants that date is not important for

          23    their data based on discovery we've done thus far.  Maybe

          24    Mr. Brenes can address this.  I'm not sure we've asked for it

13:06:26  25    or whether or not we've gotten adverse rulings on that, but I

13:06:29  1    can just tell the Court that the relevance of that data and

2    the relevance of the history of that device, I can't imagine

3    anything more important and it would be wrong of me to suggest

4    all of these other lawyers now have cases that they ought to

13:06:45  5    be looking at that device and its history, and it's still on

6    the market.

7         THE COURT:  Hold on just a minute, Mr. Brenes.

8         Mr. Lopez, are you aware of any case in this MDL that

9    concerns that device?

13:07:03  10        MR. LOPEZ:  Not -- I'm not.  You mean where someone's

11   claiming injury as a result of that device?

12        THE COURT:  Right.

13        MR. LOPEZ:  No.  Our position is it's a safer

14   alternative device in fact.  So, no, Your Honor, there may be

13:07:18  15   an injury claim because of it, I can't foresee whether or not

16   that's going to happen, but I'm not aware of one.

17        THE COURT:  All right.

18        Mr. Berens, you wanted to address this issue.

19        MR. BRENES:  Your Honor, I was going to echo what

13:07:33  20   Mr. Lopez said with respect to why we need it.

21        THE COURT:  I'm not sure that's on.  Would you tap

22   it.  On top.

23        That's better.

24        MR. DALIMONTE:  One of the arguments we're making in

13:07:47  25   litigation is this was a safer alternative design that should

13:07:50  1   have been available to the plaintiffs and the company knew

2   they made design trade offs in trying to make these devices

3   retrievable that made them more dangerous and they never told

4   anybody.  When I've taken multiple depositions a lot of the

13:08:06  5   arguments I get from witnesses, corporate witnesses, well, the

6   Simon Nitinol filter had other failure modes that were worse

7   than the devices you're dealing with.  That's one of the

8   reasons we need these adverse events so we can verify those

9   claims and test them.

13:08:24  10       In the San Diego case, I honestly don't recall

11   whether I requested it, I think I did, Simon Nitinol complaint

12   files.  But in that case, you know, the judge was really

13   worried about balancing that specific case, the cost involved

14   versus the amount of, you know, the value of that one

13:08:44  15   individual case.  Maybe Mr. Lerner recalls.

16       THE COURT:  All right.  Let me get the defense

17   response and then I have a question for you.

18       MR. NORTH:  Certainly, Your Honor.  I would note,

19   first of all, we have already provided all complaint files for

13:09:03  20   all of the devices except Simon Nitinol and Denali through

21   February of this year.  And we are willing, ready willing and

22   able to update those, of course, at any time and periodically,

23   and provide the data from newer complaints.

24       We will also agree, Your Honor, to do the Denali just

13:09:23  25   because it's simple to do.  It's almost a computer function to

13:09:27  1    add that.  We do not believe the Denali is yet at issue.

2              In all candor, I was just apprised of the first

3    Denali filing in the Central District of California, I

4    believe, and there's a transfer order pending but it's not to

13:09:41  5    this court yet.  But at most we're going to have one case in

6    the near future regarding Denali.

7              But anyway, we would be willing to go on and add the

8    Denali complaint files because that's really no burden for us

9    to do so.

13:09:54  10   Simon Nitinol is a different issue.  That's been sold

11   since the early 1990s.  Bard didn't even buy the product from

12   its predecessor company that was manufacturing it until 2002.

13   We have never had one Simon Nitinol case.

14             The judge in San Diego, which is the only forum

13:10:15  15   Mr. Lopez and Mr. Brenes have raised this issue before, he

16   specifically ruled that they could get all of the complaint

17   files for all of the models except the Simon Nitinol and the

18   Denali.  And we have never produced the Simon Nitinol.  I

19   think it's going to be difficult because we didn't even have

13:10:35  20   custody of a lot of those prior to 2002.  But we just don't

21   believe that's relevant in this case.

22             MR. DALIMONTE:  Your Honor --

23             THE COURT:  Just one minute.

24             All right.  Go ahead.

13:11:19  25             MR. DALIMONTE:  Your Honor, John Dalimonte.  Just for

13:11:24   1    clarification, Bard, the C.R. Bard actually had the exclusive

2    distribution contract for the sale of the Simon Nitinol

3    filters in 1992.  2002 -- it wasn't until the 2002 purchase

4    and sale -- asset agreement went through to buy it outright to

13:11:45   5    start manufacturing it.  So they had an exclusive distribution

6    contract with Nitinol medical technology out of Boston as of

7    1992, from the documents that we have.

8              THE COURT:  Okay.

9              All right.  I'm going to go through these and get

13:12:00  10    your thoughts and we'll come back and I'll tell you what I

11    think I can rule on now.

12              A second request on page 12 by the plaintiffs is for

13    updated versions of Bard's adverse event tracking system.  Is

14    that different from Number 1?

13:12:17  15              MR. LOPEZ:  It is.  That's a computer data input of

16    information that tracks these devices.  Number 1 are the

17    actual support documents, the backup documents, the source

18    documents that are produced to the company to analyze and

19    review and put into this database.  So we want the actual

13:12:42  20    data.  They've been giving it to us, where medical records are

21    sent, where there's communication with the physician or

22    patient whose reported.  There's a lot of things in that file

23    that don't get put into this database, Your Honor.

24              THE COURT:  Are complaints in Number 1 different from

13:12:59  25    adverse events in Number 2?

13:13:05  1              MR. LOPEZ:  They're the same.

       2              THE COURT:  So when --

       3              MR. LOPEZ:  They're supposed to be the same.  Let's

       4  say that.

13:13:11  5              THE COURT:  When you get a complaint filed under

       6  Number 1 for the G2, what's different in the adverse event

       7  tracking system with respect --

       8              MR. LOPEZ:  That's one of the reasons we want both,

       9  because we don't know.  In other words, that's a human

13:13:26 10  interpretation of what to put in a database versus information

      11  that may be in the medical records or any source document.

      12  And, again, they're supposed to put it in the database and

      13  that's subject to whose ever in charge of putting that

      14  information in that database.

13:13:45 15              It's like when we track our cases, we have medical

      16  records and files that are the source documents and what gets

      17  put in our database is just a summary of that.  So they're

      18  called backup documents, source documents.  They've been

      19  called different things.

13:14:03 20              THE COURT:  Item Number 2, updated versions of Bard's

      21  adverse event tracking system.  Is your position --

      22              MR. NORTH:  I understand it's the same thing.

      23              THE COURT:  So your position on that, like on Number

      24  1, is that you are willing to update for all filters except

13:14:20 25  Simon Nitinol?

13:14:22   1            MR. NORTH:  Yes, Your Honor.

           2            THE COURT:  Okay.

           3            Item Number 3 is the plaintiffs asking for updates

           4     for previously searched custodians, and the defendants saying

13:14:46   5     that is essentially seeking a redo of all previously searched

           6     custodians.  Could you explain that, Mr. North, how an update

           7     in your view would be a redo.

           8            MR. NORTH:  I'm sorry, I did not hear, Your Honor.

           9            THE COURT:  How, in your view, is an update on

13:15:04  10     previously searched custodians a redo of the discovery of

          11     those custodians?

          12            MR. NORTH:  First of all, Your Honor, with the

          13     exception of Denali all of these filters were developed some

          14     time ago.  The review of the ESI or the ESI was collected and

13:15:24  15     searched and produced after the Recovery filter was developed

          16     and sold, after the G2 was developed and first sold, and more

          17     recently in a production in the Utah case -- I mean, I'm

          18     sorry, Nevada case, the plaintiffs named 20 more custodians, I

          19     believe, I have the number here somewhere, and ran search

13:15:44  20     terms that included Eclipse and Meridian.  The latest version.

          21     And those were only two years ago.  So most of this search has

          22     been done.  To go back and take 80 custodians, many of whom

          23     are no longer with the company, of course, and redo all of the

          24     searches that have been done seems to us to be a redo.

13:16:05  25            THE COURT:  Well, I assume by update it just means a

13:16:09    1    search of electronic information since the last production

            2    with respect to that custodian.  Do you understand it

            3    differently?

            4          MR. NORTH:  I'm sorry, I did not understand the

13:16:21    5    question.

            6          THE COURT:  Well, let's say you searched Custodian

            7    Number 23 --

            8          MR. NORTH:  Right.

            9          THE COURT:  -- in 2012 and you produced all of the

13:16:32   10    documents you found as a result of your search.  I think the

           11    plaintiffs are saying we want you to update it by searching

           12    that custodian from 2012 to the present.  Are you objecting to

           13    doing that?

           14          MR. NORTH:  I'm having to think about how that plays

13:16:51   15    out, Your Honor, with some of these filters.  Like the

           16    Recovery filter was last sold ten years ago last month.  I

           17    think that would be reasonable with a more well-defined set of

           18    search terms.  But the broad search terms they have seem to me

           19    to be sort of overly pervasive for a subsequent update search

13:17:13   20    like that.

           21          THE COURT:  Am I correct in my assumption, Mr. North,

           22    that technologically you could go into a custodian's ESI and

           23    search only information generated after 2012?  So in other

           24    words you wouldn't have to run it against all of the data you

13:17:31   25    had previously searched?

13:17:33   1          MR. NORTH:  Your Honor, if I could, Mr. Lerner is my

       2    technical guru here.

       3          THE COURT:  That's great.

       4          MR. LERNER:  Your Honor, I think I need to talk to

13:17:42   5    our ESI vendor to get you the precise answer, but I think the

       6    part of the process is when you collect the data itself, I'm

       7    not sure if it can just collect materials from 2012 forward.

       8    Whatever date it is, you might have to do a collection of the

       9    entire thing and process it.  It costs -- as part of that

13:18:03  10    process.  I would want to talk to my ESI vendor to figure that

      11    out.

      12          MR. STOLLER:  I was going to suggest a couple of

      13    these issues, 3 and 4 in particular.  To abide by

      14    discussions -- not to kick the can too far down the road, to

13:18:21  15    discussions about ESI, that is part of the larger discussion I

      16    would have with them about what they have, what have they

      17    collected, how they selected the custodians, and get an

      18    understanding of what they had done and what we think needs to

      19    be done in addition to that.

13:18:37  20          THE COURT:  Okay.  Thank you.

      21          Mr. North, let me just ask you about the fourth one.

      22    Well, you don't have my chart, so it doesn't matter.  It is

      23    Item 4 on page 12.  Custodians for later generation filter

      24    devices or employed at later times.  My understanding would be

13:18:55  25    those are custodians whose records haven't been searched

13:18:58  1    before because they're later generation devices or they came

2    on board later.  Are you seeing that differently?

3              MR. NORTH:  I think that's true in part, Your Honor.

4    In 2012 and 2013 there were an additional 20 custodians

13:19:14  5    searched.  And many of those people would have had active

6    involvement in these later generation filters.  Probably those

7    20 did not include everyone that did, of course, but they did

8    include people and the terms Eclipse and Meridian, the two

9    later generation filters that were at issue, were in fact

13:19:32 10    included as search terms in that search.

11             THE COURT:  Let me ask this general question.  If we

12    have, hypothetically speaking, an engineer who, let's say,

13    works on the Meridian device and you last searched the ESI

14    related to that engineer in 2013, is there a basis upon which

13:19:57 15    you object to producing relevant ESI from that engineer for

16    2014 and 2015?

17             MR. NORTH:  No, Your Honor.  In that particular

18    scenario, no.  What I think I would object to is if they want

19    us to go search 50 custodians when, according to my breakdown,

13:20:18 20    as of now we only have four Meridian cases.

21             I think within reasonable limitations that would be

22    acceptable to us, but we would object to some very expensive

23    search of multiple, numerous, dozens, of custodians based upon

24    a situation where we have so few cases.

13:20:38 25             THE COURT:  Okay.  Give me just a minute to make a

13:20:40  1    note or two.

2         Having made it just a little ways down this path, let

3    me tell you what my thinking is.  It seems to me what we ought

4    to do or think about as we go through the rest of these is

13:22:03  5    dividing them into at least two categories.  One category

6    would be things that the defendants will produce, and we'll

7    pick a reasonable time.  For example, on Number 1, as the

8    defendant indicated, updating the production of complaint

9    files for all of the devices except Simon Nitinol, and we can

13:22:24 10    address later what we do with that.

11         Number 2, update any adverse events files for the

12    same.

13         Three and 4, it seems to me that we ought to have the

14    parties confer about what custodians the plaintiffs think

13:22:39 15    should be searched on what subjects.  And my general view,

16    pretty obvious, would be we shouldn't duplicate previous

17    discovery, but to the extent that there is relevant

18    information on a device at issue in this case that has not

19    previously been searched, it's subject to discovery, assuming

13:23:01 20    it isn't unduly burdensome for some other reason or

21    inaccessible ESI.  And you ought to confer about what

22    additional discovery needs to be done on which custodians.

23    See if you can reach agreement.

24         If not, that's the second phase.  I'm thinking have

13:23:21 25    you confer, we'll get together with you and I will decide

13:23:24  1    among those issues what requires my decision and production.

2    But at least it seems to me we can get going on some things

3    going forward and put the second in the category of conferring

4    and resolving them in the near future.

13:23:37  5        We've talked about updated -- we haven't talked about

6    updated privilege logs.  We talked about privilege logs.  What

7    I'd like to do with that item is put it in the same category

8    we put privilege logs in before, which is you are going to

9    talk about it, you're going to have some discussion of

13:23:56  10   informal sampling and as part of that you ought to address

11   updating of privilege logs which I'm going to add to the list.

12        Item Number 6 is all documents related to the FDA

13   inspection and warning letter.  I understand there's some

14   production that the parties have agreed will be made on

13:24:28  15   November 10th.  I'm interested in the scope of that.  The

16   defendants have -- and my understanding is that's

17   communications with the FDA.  But the defendants are objecting

18   to all documents related to the FDA and inspection letters

19   from any potential custodian because that could include every

13:24:49  20   person in the company and any e-mail they ever got that

21   mentioned FDA inspection.

22        Do you want to tell me if I've got a correct

23   understanding of your objection?

24        MR. NORTH:  Sure.  We are prepared as of November

13:25:04  25   10th, if not sooner, to produce -- first of all, as a way of

13:25:08  1    background, the warning letter was issued in July and it was

2    the culmination of about a ten -- nine- to ten-month process

3    which initiated in October of 2014 when the FDA did surprise

4    inspection at two various facilities at Bard, those lasted off

13:25:27  5    and on for about 60 days.  They then issued what are called

6    Rule 483 letters, which are letters citing observations they

7    have made about things they think need to be addressed by the

8    company.

9          We did a number of responses and there was an ongoing

13:25:42 10    dialogue between the FDA and Bard until July and the warning

11    letter came out.  What we're proposing --

12          THE COURT:  Before you make a proposal, what is the

13    gist of the warning letter?

14          MR. NORTH:  The warning letter has several different

13:25:55 15    aspects of it.  The first part of it is it addressed the

16    Recovery Cone, which is a separate device used to remove these

17    filters.  It said -- the FDA said that we had failed to obtain

18    proper clearance for that device, which we started selling in

19    2005 and have since then, because we treated it as a Class I

13:26:18 20    surgical device and the FDA disagreed ten years later with

21    that classification and said it should have gone through the

22    formal 510k process even though the Recovery Cone is cited as

23    a Class I device in the Recovery filter submission.

24          Any way, they disagreed with that, declared it

13:26:37 25    misbranded and adulterated, the regulatory term, because of

13:26:42   1    that classification disagreement with us.

            2          We have now submitted a 510k, the FDA has given

            3    enforcement discretion and is allowing us to continue to sell

            4    the Recovery Cone while it is completing that process.  That

13:26:55   5    is the first and probably biggest issue in the warning letter.

            6          The other issues in the warning letter primarily had

            7    to do with complaint handling.  There were several complaints

            8    regarding deployment issues that we did not report to the FDA

            9    based upon medical advice from experts that it did not cause

13:27:16  10    any injury or suggest any potential harm.  We had not reported

           11    those four or five.  The FDA said we should.

           12          There were several other complaint files the FDA took

           13    umbrage with how we did not list certain information.  Said we

           14    should have listed the weight of the complainant or the

13:27:35  15    patient, we should have listed the birth date.

           16          All of these things were questions that we had asked

           17    in our investigation process.  The FDA said, well, you should

           18    have noted that you asked them and explained why you didn't

           19    give the information.

13:27:48  20          I don't mean to downplay this, Your Honor, because

           21    the company takes any sort of thing like this very seriously

           22    and is aggressively working with the FDA here, but many of

           23    these issues were very technical disagreements about how the

           24    complaint investigation process should be memorialized.

13:28:06  25          There were others that we called malfunctions that

13:28:10   1   they believed we should have classified as serious injuries in

           2   the characterization.

           3            The fact of the matter is none of the issues with

           4   regard to complaint investigation had to do with a failure to

13:28:25   5   report something to the FDA except for those few deployment

           6   issues.  All they had to do was the content of the complaints

           7   that were submitted.

           8            There were a couple of other things about the Denali

           9   manufacturing process because Denali's actually manufactured

13:28:42  10   by a third-party vendor and the FDA was complaining about some

          11   of the audit and quality assurance procedures upon receipt of

          12   the part from the vendor.

          13            But, in a nutshell, that's sort of an overview of

          14   them.

13:28:56  15            What we're going to produce to them by November 10th

          16   is the original 483 letters, I think they already have those,

          17   all of the communications --

          18            THE COURT:  What are 483 letters?

          19            MR. NORTH:  Those were the observation letters the

13:29:11  20   FDA gave us back in January, I believe, as a result of their

          21   inspections.  They listed observations they thought we needed

          22   to address.  We've given them those letters.  There were

          23   monthly, if not biweekly almost, communications with the FDA

          24   between then and July when the warning letter came out where

13:29:30  25   we were doing all sorts of things to try to remediate the

concerns expressed by the agency.

All of that communication's coming in as part of this package.  We have the FDA letter, which I've given to the plaintiffs, we have our response which is going to be a part of this.  We have ongoing communications with the FDA where they gave us the enforcement discretion to continue selling the Recovery Cone.  That's all coming.  So they're getting a complete set of a communications back and forth between Bard and the agency beginning the with the issuance of the 483 letters in January up to the present date.

We're producing a 30(b)(6) witness who has been in the forefront of handling all these issues with the FDA and he will be provided on December 2nd.

What we're objecting to, Your Honor, is the notion of all documents and ESI relating to the FDA inspections and warning letter.  This essentially would require us to talk to every single person in the company at two different facilities, and probably beyond.

I mean, the corporate headquarters of Bard is in New Jersey.  The manufacturing facility that was inspected is in Glens Falls, New York, and here in Tempe is the division that actually designs and sells the products.

Numerous employees from all three sites have had some involvement if not -- I mean, many times just providing the FDA -- the FDA spent weeks at Glens Falls looking through I

13:31:03   1   understand 50 bankers boxes worth of documents.  People are

2   trotting things out to them all the time.  There's got to be a

3   wealth of material there that would be very -- have very

4   little relevance to these issues, would be an extraordinary

13:31:17   5   burden, and we believe a good starting point for them, and I

6   mentioned this to Mr. Lopez, to look at the documentation that

7   we're going to provide, which we believe is fully complete,

8   take this deposition and then come see me and let's talk and

9   see if there are other materials or other avenues, and we'll

13:31:34  10   certainly listen.  It's not a categorical no.  But I said

11   let's do this in a processed view, or stage, or phase, as

12   opposed to running around three facilities and checking with

13   every single person to see what they have that might, quote,

14   relate, unquote to these issues.

13:31:55  15          THE COURT:  Who would like to address this from the

16   plaintiffs?

17          MR. LOPEZ:  I think probably myself and Mr. Stoller

18   because I think the last issue that he just discussed about

19   the burden could be relatively easy thing for them to do if

13:32:07  20   we're talking about ESI search, predictive coding type thing.

21   That would find that without having to run around from

22   facility to facility.  If they could do a broad search of

23   their ESI, if we can have a negotiation with them about how

24   you might go about that and then I think it might be -- it

13:32:28  25   might simplify that process.

13:32:29  1          I understand you can't go door to door like in the

      2   old days and go through people's files, but there might be an

      3   easy way to do that, Your Honor.

      4          I would just say we want more than just their

13:32:42  5   communications with the FDA.  We want their internal

      6   communications about this process as well.  I understand that

      7   that should be limited to a certain degree, and I'll let

      8   Mr. Stoller talk about how we might be able to do that on a

      9   ESI basis.

13:32:59 10          Now, one of the things that concerns us a great deal

     11   about this warning letter is the fact that we want to find out

     12   it was this company got this device on the market.  One of our

     13   theories, one of the things we allege in this case and have

     14   expert support for, is that these very devices, forget the

13:33:20 15   Recovery Cone for a second, were in fact adulterated and

     16   misbranded per the regulations.  So we'd like to look at how

     17   it was when the FDA just looked at the Recovery Cone how they

     18   came to that conclusion to see if there's some support for the

     19   findings that would apply to these other devices.

13:33:36 20          The other thing is in the complaint handling, the

     21   biggest thing there is it's not -- we have an issue here

     22   whether or not the complaints in this case for this device,

     23   the severity of the adverse events are significantly different

     24   and -- or increased over other devices, including their Simon

13:33:59 25   Nitinol.  I mean the Simon Nitinol filter.  So what they have

13:34:03    1    here is not just a simple clerical thing, we have a company

            2    doing a small sampling of their adverse events.  I can't

            3    remember the numbers, in the 30s, but they found they reported

            4    a very serious event, it was a death, it was a very serious

13:34:22    5    adverse event that was reported as a malfunction.

            6            If we were to look at the raw database or their

            7    track-wise, we might have missed a death in the case.  We need

            8    to investigate how that happened to see if whether or not

            9    that's a random sampling that might proliferate through the

13:34:41   10    entire process for these past ten years of these devices being

           11    on the market.

           12            So I understand what the Court's concern would be and

           13    we understand counsel's concern, but to say we only get FDA

           14    communications where they're negotiating with FDA versus the

13:35:00   15    type of information that they're discovering through this

           16    process, I just think is not giving the plaintiffs in this

           17    case a fair benefit to investigate what they admit is a very

           18    serious charge by FDA in a number of areas.

           19            THE COURT:  Did you want somebody else to make a

13:35:21   20    comment on this?

           21            MR. LOPEZ:  If anyone -- we're all familiar with this

           22    issue.  We have had a lot of discussions about it.  If someone

           23    else wants to make a comment about it, they can.  For the ESI

           24    part of it I'll let Mr. Stoller address it if he wants to.

13:35:36   25            MR. STOLLER:  I would only say, Your Honor, to me

13:35:38  1  this is like any other discovery issue.  The defense has

2  admitted essentially this information is relevant, and thus

3  the question becomes what are they going to do in order to

4  search their ESI and produce the relevant information.  I do

13:35:53  5  think it has what the other ESI is going to, there's going to

6  need to be conversation and transparency on their side about

7  where are they going to get the information, what are they

8  going to do to search it if there's a dispute on that.  We

9  bring it back to you and say, Judge, we think they need to do

13:36:11  10  more.  It strikes me sort of a 10,000 foot level we agree the

11  information is relevant so then the question becomes how much

12  material are they going to produce.

13          THE COURT:  Okay.  I understand the parties'

14  positions.

13:36:44  15          Item VIII on page 2 -- I'm jumping over 7 because

16  it's really the same as 6, it's the topic we've just talked

17  about.  Item VIII is documents withheld on later generation

18  devices such as Eclipse, Meridian, and Denali.  Is there an

19  issue here that isn't covered by 1 and 2?

13:37:11  20          MR. STOLLER:  I think, Your Honor, 8 is broader.  The

21  numbers 1 and 2 are just the complaint files and the adverse

22  events tracking system documents, and 8 would be the other

23  related documents on their system to those devices.

24          THE COURT:  What's the defendants' position on that

13:37:27  25  issue?

13:37:29   1          MR. NORTH:  To be honest with you, our position is we

           2   don't really understand what they're asking for.  On Eclipse,

           3   what they mean by what we withheld.  With regarding the

           4   Eclipse, they've received history files, design review files,

13:37:43   5   defect failure modes and effects analyses, 510k submissions

           6   with all correspondence to the FDA, Dear Customer letters,

           7   hazard eval with a corrective action plan, remedial action

           8   plans, failure investigation reports, product hold materials,

           9   instructions for use.  And the litany is about the same for

13:38:05  10   the Meridian also.

          11          They've received a great deal of information

          12   concerning these, so I'm not sure what they're saying.

          13   They've also used with 20 custodians the search terms Eclipse,

          14   Meridian, and I believe Denali.  As a consequence, I'm not

13:38:22  15   sure what they're saying we withheld.

          16          THE COURT:  Mr. Brenes.

          17          MR. BRENES:  This is Troy Brenes.  This is part and

          18   parcel of the earlier part we talked about.  The collections

          19   themselves need to be updated and there need to be additional

13:38:41  20   custodians the ESI is collected from.  It's not really an

          21   issue ripe yet.  We're just informing the Court this is

          22   something that's going to come up.  We want to meet and confer

          23   with the defense about it and figure exactly where this

          24   information is and come out with something that is fair and

13:38:56  25   reasonable for both sides.

13:38:58   1          THE COURT:  Okay.

2          All right.  The next item is Number 9 on page 13.

3    Documents related to the Recovery Cone removal system.  The

4    defendants' response is there's no case that alleges any

13:39:16   5    injury related to the Recovery Cone system.  Why don't we get

6    plaintiffs' thoughts first on what it is you want and why it's

7    relevant.

8          MR. LOPEZ:  Well, the Recovery Cone, one of the big

9    issues in this case is whether or not these devices can be

13:39:36  10    removed as they were represented they could be removed.  I

11    think you're here to see, Your Honor, a lot of cases where the

12    injury is that they cannot be removed.  And we have a device

13    that physicians -- we don't know about -- what Mr. North just

14    said about the FDA's position on the Recovery Cones, we

13:39:58  15    haven't seen that.  I don't know.  We haven't looked at those

16    documents.

17          All I know is as of this warning letter, we have

18    several hundred thousand people who have this device in them

19    who the FDA is saying you need to be evaluated to have them

13:40:12  20    removed.  The company's saying that you should only use our

21    Recovery Cone removal system to have it removed.  And is that

22    the reason why they're not being removed?  So that's a fairly

23    significant matter if you've got these things in you and

24    they're close to causing more harm either in the artery or

13:40:36  25    breaking or they're fractured and can't be removed, because I

13:40:40   1   don't know what doctors are doing under those circumstances

2   when the company is saying you can only use our recovery

3   system to remove them and the FDA's saying you can't use them

4   for removal, or it's an adulterated product and you should

13:40:56   5   have never marketed this product for removal of these devices.

6   So I don't know where that's going to lead, but it is a

7   relevant issue and we want to do discovery on it.

8          THE COURT:  What discovery?

9          MR. LOPEZ:  Well, I mean, we set forth in our joint

13:41:13  10   statement things that go into the design.  The design changes,

11   whatever corrective actions that need to be taken, reasons why

12   the design changes were made.  Your Honor, obviously we want

13   to follow this back to why it was that this company was able

14   to sell a product that did not receive appropriate FDA

13:41:37  15   clearance.  We do know, as you heard earlier today, Mr. North

16   was the one who brought it up, I think, we're going to test

17   whether or not the Recovery filters should have ever been on

18   the market because one of the documents that helped get it on

19   the market was a forged document.

13:41:53  20          If you would like us to spell that out more

21   specifically in a discovery document before you rule on how

22   much we can get, we'll do that.  I understand maybe the way

23   we've listed it there is broad.  And this could be an issue we

24   deal with in the ESI issues that Mr. Stoller and others are

13:42:12  25   going to be dealing with to see if we can narrow the scope of

13:42:15  1    that.

2        But, again, Mr. Stoller's argument position on that

3    was this is certainly relevant.  And I guess the issue for you

4    is whether or not this -- what the scope should be with

13:42:26  5    respect to the kind of discovery we should have on it.

6        And, by the way, the 30(b)(6) deposition we're taking

7    will cover some of that.  We'll ask those kinds of questions.

8    We're going to learn a lot more about this Recovery Cone and

9    its history and why it was able to be sold for ten years and

13:42:41  10    later declared to be adulterated and misbranded.

11        THE COURT:  Any comments on that subject, Mr. North?

12        MR. NORTH:  Your Honor, I would just state there's

13    not a single case, as the Court mentioned, pending in this MDL

14    where there is any indication of injury related to the

13:42:58  15    Recovery Cone.  In this ten years of this product and product

16    line there has never been a single case of personal injury

17    because of Recovery Cones.

18        I understand the hypothetical Mr. Lopez is proposing

19    about inability to get devices out of people.  That might be

13:43:15  20    an issue down the line if we were not allowed to continue

21    selling this product, but we are at the present time and the

22    FDA is reviewing our 510k to clear it.

23        Now, I would also note in our basic productions over

24    the years we've given them all the design documents.  They're

13:43:33  25    part of the design history file for the Recovery filter

13:43:37  1  itself, includes all of these sorts of documents regarding the
        2  Recovery Cone.  They have a core set of key documents
        3  regarding that device.  We don't believe it's at issue in this
        4  MDL.  We believe this 30(b)(6) deposition is going to give the
13:43:53  5  plaintiffs a proper perspective and understanding of what
        6  transpired with FDA and there's no need for additional
        7  discovery on that issue right now.
        8       MR. LOPEZ:  Your Honor, we have to assume, when the
        9  FDA comes in and issues a warning letter such as this, that
13:44:16 10  the FDA's concerned about patient safety, efficacy, handling
       11  of a product.  We have to assume that.  They wouldn't do it
       12  unless there was a patient safety issue involved.
       13       I have no idea why the FDA is letting them continue
       14  to sell it, nor do we know at the end of this period that
13:44:32 15  they're in right now as the FDA's going through this process
       16  whether they're going to find problems with that Recovery Cone
       17  and they have to redesign it.
       18       So we do know just by the fact that the FDA says it's
       19  misbranded, adulterated, that it has to involve patient safety
13:44:51 20  and efficacy issues.  Obviously relevant in this case, and we
       21  wanted the ability to be able to do some discovery on that.
       22  Again, for me to tell Your Honor what's the scope of that, we
       23  don't know.  I mean, this just happened in July.
       24       And that's one of the reasons why -- it was the day
13:45:14 25  after, I think, we got that warning letter, I sent Mr. North

13:45:17  1   an e-mail saying this is obviously a 30(b)(6) issue we want

2   you to start preparing, telling us who that witness might be,

3   and let's meet and confer about the kind of documents that we

4   should have.

13:45:28  5        So this is an important issue and I think we have to

6   get it resolved sooner rather than later and this could be a

7   situation where we have to come back to you after we've done

8   some of this preliminary stuff and tell you the scope is this

9   narrow or because of the information we've learned it's a much

13:45:47 10  broader scope of discovery we need to do.  But I don't want to

11  be handcuffed with respect to being able to explore that and

12  find out where it leads us now.

13       THE COURT:  All right.  I understand your positions.

14       Item 10 on page 13.  Custodian files of sales

13:46:05 15  hierarchy for all filter lines.  Defendants object that this

16  is a request that would cover hundreds of past and present

17  employees over 15 years.

18       Let's hear plaintiffs' thoughts first.

19       MR. LOPEZ:  Okay.  Simple reason for this is we are

13:46:23 20  now going to have not just a case in Nevada and Reno and not

21  just a case in Atlanta and a certain county, this MDL is now

22  going to cover the universe of states, or where these people

23  have had these devices put in, and we've been restricted in

24  prior cases to just do discovery on that salesperson or that

13:46:44 25  territory person in that particular case.  And we just -- we

13:46:49  1    now know this is going to be a broader scope of plaintiffs and

2    consumers who have these products.

3         It's now time to open the thing up so we can do a

4    broader type of marketing and sales type of discovery that

13:47:05  5    goes beyond just that one case and that sales representative.

6    So that's the purpose of that.  It's obviously an important

7    part of our case the manner in which this company marketed

8    this device.

9         MR. NORTH:  Your Honor, as Mr. Dalimonte said, we

13:47:25 10    started distributing this Nitinol filter in the early 1990s.

11    So on its face this request dates back more than 20 years.

12    Actually, we're talking about hundreds of people that have

13    been with the company as salespeople, whether it's in the

14    territory, whether it's as the district manager, whether it's

13:47:45 15    just the Phoenix representative, the local representative.

16    They don't propose search terms even.  They just basically

17    want all ESI from probably what exceeds a thousand employees.

18    Certainly several hundred.

19         It may be that the ESI of an individual sales rep

13:48:06 20    with certain search terms might become relevant in a

21    particular bellwether case, but at the outset of the MDL, to

22    suddenly ask us to search 20 years worth of hundreds of

23    employees' electronically stored information is an enormous

24    multi-million dollar burden I suspect, and we would ask the

13:48:26 25    Court not order that at this stage of the proceeding.

13:48:32   1          MR. LOPEZ:  May I clarify one thing?  I know the

       2    Simon Nitinol filter goes back to 1992.  We said that's not

       3    likely going to be a device in this litigation for which

       4    someone's claiming an injury.  The devices here are 2003

13:48:46   5    through the present.

       6          Even though the device may have only been sold for

       7    two years, they remain in these people.  And a lot of them

       8    were sold.  They weren't recalled or taken off the market even

       9    after they were declared to be not safe.  And because they had

13:49:02  10    a safer alternative, doctors still had an opportunity to put

      11    these devices in other people.

      12          So I'm at a disadvantage.  I don't know whether that

      13    is 50 people or 500 people.  What I do know is the way we've

      14    designated them here, we want to be able to take the

13:49:21  15    depositions or at least see -- I take that back, we can't take

      16    the depositions of all these people.  We want to see the

      17    custodial files.  Maybe it's the national marketing director

      18    or national salesperson who has all of the information we need

      19    on marketing and sales.  We don't know.  And maybe you want us

13:49:39  20    to wait and see whether or not it's a bellwether case for us

      21    to be able to get the territory manager.  I would understand

      22    that.  We don't want to do more than we have to do.  But there

      23    has to be a general body of all of the marketing and sales

      24    material that we just haven't gotten because we've been

13:49:54  25    restricted to the case that we're litigating at the time.  By

13:49:58   1   the way, it was only about four or five cases we're working to

          2   trial.

          3          So I can work -- if counsel's concerned about the

          4   scope of this, I'm more than happy to sit down with him and

13:50:10   5   lay this out and see if we can narrow the scope from whatever

          6   number he's saying it is to some number that's smaller than

          7   that to make it less burdensome.

          8          THE COURT:  Well, let me ask Mr. North this question

          9   to make sure I understand your position.

13:50:26  10          Let's assume hypothetically that this MDL case will

         11   cover plaintiffs in 30 states, I'm just making that number up,

         12   in most if not all of the regional sales territories of the

         13   defendants.  Is it your position that a plaintiff in Georgia

         14   who wants information about how his or her device was marketed

13:51:03  15   and sold as opposed to a plaintiff in Oregon who wants the

         16   same information should get that information in discovery

         17   after the MDL is over and the case has been remanded to those

         18   districts, as opposed to trying to coordinate and get whatever

         19   marketing information is relevant on the table as part of the

13:51:29  20   MDL?

         21          MR. NORTH:  I had not thought of it in those terms as

         22   far as avenue, Your Honor, I thought it more in terms of

         23   limited perhaps to any bellwether candidates that are being

         24   worked up here.  I had not thought further down the line.

13:51:45  25          I do want the Court to understand, too, they have

13:51:49  1   already received tons of documents about marketing and sales.

2   They have -- Mr. Lopez took an eight-hour deposition of the

3   woman who was in charge of marketing the Recovery filter

4   throughout the time it was on the market.  They have a lot of

13:52:04  5   data.

6          Now, for an individual plaintiff, it takes some work

7   to figure out who was the sales representative at that time

8   with that doctor.  Territories, definitions of territories

9   change in the corporate structure constantly.  People who are

13:52:19  10   working in these jobs move on.  There may be one salesperson

11   in Georgia there may be three regions in Georgia for all I

12   know.  There may be one salesperson in the Atlanta area in

13   2003, another in 2006.  It is a very case-specific thing.

14   What they're suggesting isn't for specific cases I suspect it

13:52:46  15   seems to be a broad blanket let's get the ESI of everyone who

16   sold this product.

17          I believe if they're entitled to ESI of a sales

18   representative it should be tied to the specific case; the

19   sales representative that was selling the product to the

13:53:05  20   implanting doctor at that time, or the implanting facility.

21   And that very easily could be done after remand, if necessary.

22          THE COURT:  Same question, Mr. Lopez, to you.  Do you

23   want in this case to do discovery of the representations that

24   related to the device implanted in Georgia and to the device

13:53:27  25   implanted in Oregon?  Do you want --

13:53:31   1          MR. LOPEZ:  I think so.  I mean, one of the things

           2   I've seen in these cases, they're going to claim that the

           3   salesperson that made a representation or off-label promoted

           4   it, it was a renegade rogue salesperson.

13:53:43   5          THE COURT:  But, if that's true, why isn't this a

           6   very case specific kind of discovery?

           7          MR. LOPEZ:  Well, it is and it isn't.  We want to see

           8   if there's consistency in the messaging by this company in the

           9   way they represented safety and efficacy, number one.

13:54:00  10          Number two, Your Honor, the point I didn't make that

          11   I should have made is you'll find out when we deal with the

          12   Lehmann document they knew there was lawsuits coming with the

          13   Recovery device and their position is they had anticipation of

          14   litigation in 2004.  I would think that beginning during that

13:54:20  15   time period they sent out preservation order to an

          16   identifiable number of people who were selling that device and

          17   that preservation order stayed in place because this

          18   litigation, as Mr. North has said, is ten years old.

          19          So could we at least find out, Your Honor maybe can

13:54:40  20   order this, could we have a list of who those people are?  Do

          21   we know who -- was it the same sales manager, national sales

          22   manager for two years?  Was it the same guy?  We don't know

          23   what the scope of this is.

          24          And if it's not that burdensome, if there are only

13:54:57  25   five territory managers in the entire country and two regional

13:55:02  1    managers and one national sales manager, then we're talking

       2    about ten custodial files.  I know there's more than that, but

       3    I don't know the scope.  He's saying hundreds and hundreds and

       4    hundreds, and I would like to see what that data actually is

13:55:16  5    and see whether or not, per their preservation orders and

       6    responsibilities, whether or not that stuff is all isolated

       7    somewhere that can be easily searched.  We don't know.  We

       8    don't have an answer to that.

       9          THE COURT:  Well, one other question to you, Mr.--

13:55:36 10          MR. LOPEZ:  One more issue.

      11          THE COURT:  Go ahead.

      12          MR. LOPEZ:  I'm sorry, Judge.

      13          There was -- there's not an absolute duty on

      14    physicians to report adverse events.  And oftentimes, and

13:55:51 15    you'll see that this case is about the difference between the

      16    risk and dangers to these products versus other products on

      17    the market and how it was represented.  And a lot of these

      18    sales reps have their own laptops and they get reported from

      19    physicians adverse events and we want to see whether or not

13:56:14 20    that was reported to the company.

      21          I'll give you one example that concerns us.  One of

      22    the witnesses that we took, a very important salesperson in

      23    one of our cases but he's also a regional manager, we got no

      24    documents from him.  They weren't preserved.  But for the fact

13:56:29 25    he kept his own laptop and the material on his laptop, we

13:56:32  1    would not have gotten documents from him.  I know that comes

       2    under a different category, but it's something on our radar

       3    screen.  That's why it's in one of the top things we want the

       4    Court to address in way of discovery.

13:56:46  5          THE COURT:  The question I was going to ask is if --

       6    if in a particular case you want to argue to a jury that the

       7    defendants knowingly marketed the product in a way they knew

       8    was dangerous, it seems to me the evidence you'll present in

       9    that case will be very specific to what was said in that

13:57:14 10    region and to that doctor.  Is this -- and it seems to me it

      11    could be the kind of discovery that would be -- at least have

      12    some components that are unique to each case.  Is that

      13    discovery you think we should do for all cases in the MDL or

      14    just for the bellwethers?  Or do you know at this point?

13:57:38 15          MR. LOPEZ:  I would say that in addition to what was

      16    being said, what was not being said?  I think we can establish

      17    through these depositions, and I've seen in cases that we've

      18    gotten close to trial where we take the sales reps depositions

      19    it's what they didn't know that becomes important.

13:57:59 20          I don't know that I answered your question, Judge.

      21          THE COURT:  I don't think you did either.

      22          MR. LOPEZ:  Would you mind asking it again?

      23          THE COURT:  The question is should we say this kind

      24    of marketing-specific discovery really should be in the

13:58:10 25    bellwethers?  It's relevant in those cases, but rather than do

```
13:58:14   1   it in all 61 cases or 600 cases, whatever it becomes, let's
           2   reserve those resources to focus on the issue in the
           3   bellwethers.
           4           MR. LOPEZ:  I would agree when you get down to the
13:58:27   5   sales rep and that doctor.  But I think we need to at least
           6   get the top tier of where we can get common messaging and what
           7   are being said at sales meetings and what the director of
           8   marketing or director of sales is actually sending to those
           9   people.  And I think what you're suggesting, we don't need to
13:58:51  10   go down to that level until we get to the bellwether process.
          11   I think we can agree about that.
          12           MR. BOATMAN:  Your Honor, I think there is a
          13   component that is a common-to-all-cases element, and that is
          14   discovery about what was communicated internally in the
13:59:10  15   company to the marketing people in light of what we view is
          16   knowledge they had that their product was dangerous and needed
          17   to be taken off the market and new product replacing it and
          18   whether they continued to, as it were, misrepresent to their
          19   own salespeople or how they instructed their salespeople to
13:59:30  20   deal with the problems they were having.  I think that
          21   discovery is a common issue for discovery.
          22           MR. NORTH:  Your Honor, I agree with Mr. Boatman.
          23   That sort of documentation has already been produced.  All the
          24   communiques from Janet Hudnall, the marketing manager, to the
13:59:51  25   sales staff.  She sent out many of them.  Mr. Lopez has
```

13:59:55  1    questioned her at length about all those communiques.  They

2    have all of that common distribution of information already.

3    And therefore that's why we believe this is unnecessary.

4           THE COURT:  All right.  Well --

14:00:11  5           MR. DALIMONTE:  Your Honor --

6           THE COURT:  Go ahead.  Use the mic because folks on

7    the phone won't hear you otherwise.  And I'm not going to

8    decide this concretely today, but if you want to educate me

9    briefly, that's okay.

14:00:25 10           MR. DALIMONTE:  Communication about what the company

11    knew goes both ways.  It's not what is communicated to the

12    sales folks, but what the sales reps communicated back to

13    corporate, because they were the liaison.  If there was an

14    issue with the product, the doctors communicated that to the

14:00:41 15    sales reps who in turn passed that on to corporate.

16           Perfect example:  Bard sold and was looking to expand

17    the market to a new patient population, bariatric patient

18    community.  And what was happening or occurring within that

19    population group were all kinds of adverse events.  The device

14:01:04 20    was migrating, it was fracturing, it was causing death.

21           Their regional sales manager shot an e-mail to the

22    corporate executives at Bard saying, "My biggest customer is

23    experiencing all kinds of problems in the bariatric community.

24    What should I do?"  And of course they in turn gave a side

14:01:27 25    remark to tell them to stay away from the buffet line.

14:01:31  1          But the fact there was an issue in the bariatric

2     community is important.  And that came from one sales rep, and

3     there are many others out there because they also expanded it

4     to other areas that were nontraditional, such as orthopedic

14:01:45  5     surgery use.  Cancer patients.  These are all areas that only

6     had a prophylactic need which was off label, and this is being

7     communicated from the medical community through the sales reps

8     directly to the corporation.  That's why we need that

9     information.  That's why it's important.

14:02:04  10          THE COURT:  That's why you need what information?

11          MR. DALIMONTE:  The discovery on the sales reps.

12          THE COURT:  But are you disagreeing with what

13     Mr. Lopez said a minute ago that we could focus on the sort of

14     top tier general communications of the company and then wait

14:02:18  15     until the bellwethers to get into the specifics about what a

16     particular patient's doctor was told?

17          MR. DALIMONTE:  Not necessarily because what might be

18     communicated from one region -- for instance, you used the

19     example of the sales rep in Georgia versus the sales rep up in

14:02:36  20     Oregon.  Whatever communication was made from the sales rep in

21     Georgia may be applicable to the case in Oregon because it

22     involves the same type of patient group or the same type of

23     adverse event.  Particularly if there's an issue on what was

24     known and when.

14:02:58  25          THE COURT:  It sounds like you are suggesting that we

14:03:00  1    should, as part of the MDL, do full discovery into what every

       2    sales rep in the country was told.

       3         MR. DALIMONTE:  I think we should start off as

       4    Mr. Lopez was suggesting.  But I'm just pointing out the

14:03:13  5    reason why it's important to have this information.

       6         THE COURT:  Okay.

       7         There are four categories of 30(b)(6) depositions

       8    addressed on pages 22 and 23 of the report.  That includes

       9    post market surveillance and reporting, FDA communications,

14:03:47 10   sales and marketing.  And then regulatory affairs, labeling,

       11   safety alerts, communications with doctors and patients.  And

       12   at least in the joint communication, it seemed that you were

       13   distinguishing between these four depositions and the one

       14   that's going to occur December 2nd, although it looks like

14:04:10 15   there's overlap on one of them because of the four

       16   communications with the FDA.

       17        MR. NORTH:  One of those had to do with the FDA

       18   warning letter, and that is the one going forward on the 2nd,

       19   as I understand it.

14:04:22 20        MR. LOPEZ:  This is different --

       21        MR. NORTH:  That's separate.  I'm sorry.

       22        THE COURT:  These are, I take it, notices that were

       23   issued in cases before the consolidation in MDL.  Is that

       24   right, Mr. Lopez?

14:04:36 25        MR. LOPEZ:  That's correct, Your Honor.

14:04:37  1          THE COURT:  Is it your position today that you want

2     to go forward with those four depositions or are you going to

3     strategize and decide what 30(b)(6) depositions you want to

4     take?

14:04:52  5          MR. LOPEZ:  I think part of the purpose of these is

6     to see -- to give other lawyers an opportunity but also us to

7     see where we can narrow the scope.  That's why we want to do

8     30(b)(6) depositions first, because a lot of these are going

9     to be about what did the Lopez firm or other firms miss?  You

14:05:07 10    know, what are other issues that maybe we didn't cover in

11    depositions.  And we thought the best way to do that was to

12    actually take 30(b)(6) depositions so we can get a better idea

13    of what the scope of that evidence is.

14          THE COURT:  So are you saying you do want to go

14:05:25 15    forward --

16          MR. LOPEZ:  They may have been noticed in the state

17    court, I'm not sure about that, Your Honor, but we would

18    certainly want to coordinate that with the state court.  I

19    have spoken to some state court attorneys who have gotten

14:05:39 20    cases there who definitely want to do this and they would

21    agree -- they don't call them 30(b)(6) sometimes.  PMK.

22    Whatever the state statute is.  I think it's important.  I

23    think it would actually help the process and make this more

24    efficient and narrow the scope of some of the things we want

14:05:59 25    to do.

14:05:59  1          MR. NORTH:  Your Honor, with all due respect to the

       2   plaintiffs, I believe it's perhaps the most clear example of

       3   duplication of discovery.  There have already been seven

       4   30(b)(6) depositions taken of my client.

14:06:17  5          What is particularly surprising to me, or I do not

       6   understand, is one of these four notices having to do with

       7   post market surveillance is identical, identical, to a notice

       8   of depositions that was served in the *Phillips* case and was

       9   cross-noticed in other cases, and we presented the vice

14:06:38 10  president of quality assurance at the division as our 30(b)(6)

      11   deponent two years ago and they took a very lengthy deposition

      12   of him on the precise topics set forth in that deposition

      13   notice.  And we are simply trying to understand, I think, at

      14   this point why we now have to repeat that, repeat that process

14:07:01 15  in this MDL, when it was the plaintiffs' lead counsel firm

      16   that actually served that notice and conducted that

      17   deposition.

      18          Now, the other three are not identical in terms, but

      19   they're largely duplicative of depositions that had been taken

14:07:15 20  in the other six 30(b)(6) depositions that have been taken

      21   over the years.  So at a minimum they need to look back at

      22   those depositions and see how these can be narrowed before

      23   they proceed.

      24          THE COURT:  Well, this sounds like a topic on which

14:07:33 25  you ought to confer.

14:07:36   1          MR. LOPEZ:  That's not an issue where we want to

2     retake a deposition.  This is -- again, this is a joint

3     submission, Your Honor.  We met and conferred with others and

4     the topics that others think was important for them,

14:07:48   5     especially the new litigants, was for us to cover the

6     30(b)(6).  It's going to help them to determine whether or not

7     they're going to adopt some of the discovery we've already

8     done.

9          And there's been some new developments, Your Honor,

14:08:01  10     since we took maybe the first 30(b)(6).  FDA documents we have

11     never seen before that were handed to us literally while we

12     were in Reno.  Therefore, that explains why we want to do a

13     30(b)(6) on FDA communications.

14          THE COURT:  The next category I've listed is the

14:08:25  15     statement on page 24 that plaintiffs want to take up to 25

16     additional depositions of corporate and third-party witnesses,

17     and the defense response is that you've already had 80, we

18     don't need more.

19          That seems to me a subject on which you need to

14:08:42  20     confer as well.

21          MR. NORTH:  Yes.

22          THE COURT:  It looks like these are just estimate

23     numbers.  You need to get down to specifics on who the

24     plaintiffs think need to be deposed and whether the defendants

14:08:52  25     disagree.

14:08:53  1          Is there any more detail we ought to try to cover

2    today?

3          MR. LOPEZ:  I don't think so.

4          THE COURT:  Okay.  The next category I've written

14:09:04  5    down is Rule 26 disclosures.  This is addressed on page 24 as

6    well.

7          It seems relatively clear to me from page 26

8    paragraph (i) that the defendants' view is that what we ought

9    to do with experts is we ought to wait until the bellwether

14:09:28  10   trials, we ought to look at those cases and if 26 reports were

11   previously disclosed, they should be supplemented.  If

12   plaintiffs in those bellwether cases want to use a new expert,

13   they should seek leave of court.

14         The plaintiffs lists Rule 26 disclosures on page 24

14:09:53  15   as though it's going to be done again wholesale.  I guess what

16   I need is more clarity from plaintiffs on exactly what you

17   think needs to be done in Rule 26.

18         Now, this is really only an issue where there are no

19   Rule 26 disclosures -- where there are previous 26

14:10:12  20   disclosures.  In cases where there haven't been any, you get

21   the right to depose them.  But what about cases where there

22   are already Rule 26 disclosures?  Are you proposing to do them

23   over again?  To supplement them?

24         MR. NORTH:  If that case gets remanded back to trial,

14:10:33  25   I would say supplement.  We don't need to do reports in

14:10:36  1   depositions that, if there had been depositions taken, limit

2   the depositions wherever that expert my have supplemented his

3   or her report.  Obviously in this MDL, whether it be that

4   expert or another expert, as I think as part of this

14:10:54  5   bellwether process that expert's report in that deposition is

6   going to be set back -- set back whether we're to go try the

7   case and your rulings on *Daubert* are going to fall with that

8   expert no matter where that expert goes, I would say this:

9   With respect to any expert we adopt as an MDL benefit --

14:11:14 10   common-benefit expert, sure, we would not want to redo the

11   report, but we want to supplement it and want them to agree

12   that the deposition will only cover areas not revealed yet in

13   a Rule 26 report.

14        I will say this, Your Honor.  There will be more

14:11:36 15   experts because there are more litigants and we don't know yet

16   what the Court's going to do with respect to remand,

17   bellwether, whether we're going to try cases back to back.

18   But we understand that we need to expand the list of our

19   experts, and every discipline, probably two to three deep.

14:11:57 20   And we're in the process of doing that.

21        THE COURT:  Let me give a general thought and let

22   both sides react.

23        It seems to me there will be categories of experts

24   that cut across a large number of cases, if not all of them.

14:12:16 25   Design defect experts.  Maybe experts about problems in the

14:12:21  1    FDA process.  Maybe experts about marketing.  I think part of

        2    the purpose of the MDL would be to get those experts on the

        3    table and issues on the table and address *Daubert* before they

        4    go back to the states.

14:12:34  5         I would suspect there could also be experts in

        6    particular cases that are plaintiff specific.  Maybe damages

        7    expert.  But from the defense there may be a causation expert

        8    saying their problem has nothing to do with our product.  I

        9    don't think those kind of experts should be dealt with at the

14:12:50 10    MDL.  Those would have to be dealt with at the states or in

       11    the bellwether that would have to be put on the table.

       12         Does anybody disagree with that sort of very general

       13    observation?

       14         MR. NORTH:  Not at all, Your Honor, unless we're

14:13:06 15    working up for bellwethers in trial in this particular

       16    jurisdiction.

       17         THE COURT:  Well, yeah, then we obviously have to get

       18    specific.  I agree.

       19         And it seems to me since we have lots that have no 26

14:13:24 20    disclosures, at least some of the plaintiffs, probably most,

       21    will be able to make full disclosures on those common expert

       22    issues and what we ought to do is work toward a process to get

       23    those experts on the table, on both sides, and decide the

       24    *Daubert* issues and what effect those expert opinions on common

14:13:43 25    issues have on cases where experts are already disclosed.  I

14:13:47  1    think it's like some of the issues we've already talked about,

2    we can decide down the road what effect they have in a

3    particular case.  But there's no avoiding the fact we've got

4    to get the common-issue experts on the table and get them

14:14:02  5    disclosed and deposed and *Daubert* issues decided if we're

6    going to do our job in the MDL.

7        So it seems to me we ought to set aside this debate

8    whether the full common issue expert report can be used in the

9    *Tillman* case and figure out a procedure to get the full common

14:14:22 10    reports on the table and *Daubert* issues teed up.

11        I see heads nodding.  Anybody disagree?

12        MR. LOPEZ:  No.  That makes -- we talked about it and

13    we would have proposed that.

14        THE COURT:  Okay.  Let me make a note here.

14:16:11 15        The last category that I have down is ESI

16    preservation discovery.  It's discussed on pages 34 and 35 of

17    the joint report with the plaintiff stating they believe there

18    has been failure to preserve in some areas and they would like

19    to investigate through discovery, and the defendant saying

14:16:30 20    they oppose discovery on discovery and there has been no

21    failure to preserve.

22        A question I think I alluded to in the agenda is why

23    should we try to tackle that issue up front?  I recognize the

24    plaintiffs feel they should do it and defendants don't, but it

14:16:51 25    doesn't seem to me that ought to be our first order of

14:16:55   1    business to jump into discovery on what might become

2    spoliation issues.

3         No matter when we do it, the new Rule 37(e) that's

4    becoming effective on December 1 is going to govern what steps

14:17:10   5    I take.

6         What I'm inclined to do with this issue is since I'm

7    thinking we ought to have at least two phases in the

8    discovery, not try to do anything on this in the first phase,

9    get through the additional ESI discussions you all are going

14:17:31  10    to have, and then at a relatively close case management

11    conference talk about exactly what we think needs to be done

12    on that issue.  But I'm not thinking we need to slay this

13    dragon now.  What do you all think?

14         MR. STOLLER:  Your Honor, I think that makes sense

14:17:49  15    and I think a lot of this will get teased out, for a lack of a

16    better term, between back and forth with the plaintiff and

17    defense as we go over the ESI issues in general.

18         MR. NORTH:  Your Honor, I think that makes perfect

19    sense.  I want the Court to understand my client issued its

14:18:05  20    first legal hold in December 2004 concerning this line of

21    products and there had been legal holds in place.  It may

22    become an issue later down the line if those worked in a

23    certain instant, but I believe the Court's proposal is

24    agreeable.

14:18:25  25         THE COURT:  What discovery issues have I missed?

14:18:29   1          MR. BOATMAN:  Your Honor, I can only think of one.

        2    It's you didn't miss it, it wasn't in our submittal.

        3          If the idea is there's certain discovery we have to

        4    do in Phase One to determine the scope of reopening prior

14:18:42   5    depositions of work that's already been done, I think

        6    Kay Fuller would fall within Phase One depositions.  She's the

        7    woman who was the subject of the NBC exposè that alleges her

        8    signature was forged on the FDA submittal.  So I think we need

        9    that deposition because that's one of the depositions that may

14:19:08  10    play a role determining which people we need to go back to and

       11    supplement.

       12          MR. NORTH:  Your Honor, let me be totally candid.  We

       13    certainly object generally to reopening discovery for business

       14    reasons.  This is one instance my client would agree.  Court

14:19:26  15    made an offhand comment about defamation.  My client believed

       16    it has counterclaim and/or defamation in light of that NBC

       17    broadcast.  We believe the truth with this witness needs to be

       18    gotten on the record quickly, and it might prevent a lot of

       19    discovery down the line.  So we would be amenable to that

14:19:44  20    limited.

       21          THE COURT:  Kay Fuller is the name?

       22          MR. NORTH:  Yes.

       23          THE COURT:  Spelled just like it sounds?

       24          MR. NORTH:  Yes.  K-A-Y.

14:20:06  25          THE COURT:  Okay.  Give me just a minute to look over

14:20:08   1    my notes and we'll come back and talk about discovery and

2    about briefing schedules.

3                    Okay.  Let me summarize what I'm seeing that we

4    agreed to and what we need to do.

14:21:53   5                    By November 6th you are going to get me the

6    protective order, including 502 provisions.

7                    By November 6th you're going to agree upon profile

8    forms that will be used for parties who file short-form

9    complaints.

14:22:18  10                    By November 30th you are going to -- and, Traci, this

11   is all going to be changed in a minute so you don't need to

12   take these notes too diligently.  Not all changed, but it's

13   not final.

14                    By November 30th you're going to get me the -- I'm

14:22:45  15   sorry.  Before we go there.  By November 6th, the plaintiffs

16   are going to get me their case management order on plaintiff

17   structure and reimbursement and all those issues we talked

18   about.

19                    So there are at least three deliverables for November

14:23:01  20   6th.

21                    By November 30th, you all are going to go through the

22   process of drafting the master complaint, the master answer,

23   the short-form complaint, short-form answer, and you are going

24   to see if you can reach agreement on which cases will not be

14:23:35  25   governed by the master complaint.

14:23:40   1            MR. LOPEZ:  I'm sorry, say that one more time.

            2            THE COURT:  You're going to try to reach agreement

            3 which cases will not be controlled by the master complaint.

            4 Or, in other words, cases in which it will not supersede the

14:23:51   5 existing complaint.

            6            And that submission on the 30th is going to include a

            7 provision that e-mail will suffice for service.  And you're

            8 going to talk about whether the issues -- the cases where

            9 service issues have arisen so far can be subsumed on that.

14:24:18 10            That is all due on the 30th.

          11            I had previously, earlier in the day, suggested on

          12 the 23rd you ought to get me the ESI protocol or joint report.

          13 I don't want to have too many dates in here, so I'd like to

          14 just make that the 30th as well.

14:24:33 15            So the two big deliverables on the 30th would be the

          16 pleading-related matters and the ESI protocol.

          17            And then I see that we have three matters that we

          18 need to set a briefing schedule for:  One is the Lehmann

          19 report; the second is the privilege, we need to set a schedule

14:25:09 20 for this privilege log process that I outlined that we're

          21 going to go through; and the third is briefing on whether new

          22 parties can be bound by depositions taken before they were in

          23 the case.

          24            Those are the three issues I show where we have

14:25:29 25 briefing.

14:25:32  1          When I look at discovery, it seems to me that there
       2      are four categories of discovery that can go forward in what
       3      we'll call Phase One that I think is only a two- or
       4      three-month period.  Those are the updating of complaint files
14:25:53  5      for all of the devices except Simon Nitinol which we'll
       6      address later in the litigation, updating the adverse event
       7      tracking system for the same, the production of the FDA
       8      communications on November 10th and the 30(b)(6) deposition on
       9      December 2nd, and the deposition of Kay Fuller.  Those can all
14:26:16 10      go forward, it seems to me, immediately.
      11          And then there's everything else on the list, it
      12      seems to me, needs to be put into the pot of discussing it in
      13      light of what you learn in this coming discovery and seeing
      14      where you can agree and disagree, and then us getting together
14:26:35 15      again to talk about what happens in the next phase of the
      16      discovery.
      17          And it seems to me that we probably ought to postpone
      18      to that conference where we're talking about Phase Two any
      19      detailed discussion about what we do with bellwethers because
14:26:52 20      we'll have a better sense then for how the case is working,
      21      how many parties we've got in the case.  I'll certainly know a
      22      lot more.
      23          So, the question for you all is if we need to set a
      24      schedule to brief those issues and we need to set a schedule
14:27:12 25      to do that first phase of discovery and for the parties to

14:27:14  1    confer and then have a conference about the second phase of

2    discovery, what are your thoughts on a schedule for those

3    things and when they ought to occur, keeping in mind we've got

4    deliverables on November 6th and November 30th already coming

14:27:33  5    in.

6                MR. LOPEZ:  I guess we should do these -- you want to

7    go through the Lehmann report, privilege, and new parties

8    bound by -- you want to do those first, Your Honor?  As far as

9    when you want to schedule?  Because you haven't ordered any of

14:27:54 10    those to be briefed yet.

11                THE COURT:  Right.  Right.  I'm assuming -- maybe I

12    ought to ask some general questions.  I'm assuming we can get

13    that briefing done while doing this first phase of discovery.

14    Both agree with that?

14:28:07 15                MR. LOPEZ:  Yes.

16                THE COURT:  Let's start with the question of how

17    much -- do we need more time than through the end of the year

18    to do this first phase of discovery that I just outlined?

19                MR. LOPEZ:  If it wasn't for the holidays, yes.  The

14:28:30 20    issue is whether or not your schedule, maybe others' schedules

21    are going to affect that.  I will say this, we've -- we

22    anticipated we were going to be busy the first three months.

23    It's unfortunate it's during the holiday season, but we want

24    to get it done before the end of the year, Judge.  Maybe we

14:28:50 25    can talk about that now, when we can get some of these done.

14:28:56   1        As you saw from what we submitted to the Court

2    yesterday, we have a lot of people working various aspects of

3    the case.  Some of the same, but a lot of different people.

4    We anticipated you were going to push this thing, especially

14:29:07   5    the first phase.  So it's easy for me to say yes we can get it

6    done by the end of the year because I'm going to make sure

7    everybody gets it done.  I'm probably not going to do a lot of

8    this work other than make sure it happens.

9        THE COURT:  Okay.

14:29:23  10        MR. LOPEZ:  That's my position.

11        MR. NORTH:  Your Honor, normally I would say 60 days

12    are fine, but from past experience it seems like every

13    December 31 deadline I've ever seen in a case people need the

14    first couple weeks of January because of the holiday.  I would

14:29:36  15    say let's try to finish this by January 15th in case

16    Ms. Fuller's not available because of the holidays or

17    something of that nature.

18        MR. LOPEZ:  I would probably agree with that, Your

19    Honor.

14:29:58  20        THE COURT:  Okay:  Just a minute.

21        (The Court and the courtroom deputy confer.)

22        THE COURT:  What I'd like to do is say the first

23    phase of discovery will be finished by January 15th, and that

24    you will have talked through the issues you need to confer

14:31:12  25    about related to discovery by then so that you can file a

14:31:16  1   joint report on these other issues the following week.

2        The following week I'm in trial.  It goes into the last

3   week of January.  But I am available January 29th, which is a

4   Friday, and I'm thinking I'd like to hold the next status

14:31:33  5   conference on January 29th to decide what the next phase of

6   discovery will include.

7        So I will need from you by this report that comes in the

8   week before that, your thoughts, having talked through all of

9   these issues we talked about that I'm going to identify in my

14:31:51 10   case management order and I can talk through again.

11        So my thought is you're not just doing discovery by

12   January 15th, there's going to be a lot of meeting and

13   conferring on ESI, on other issues where you have

14   disagreements so that your positions can be laid out fairly

14:32:06 15   clearly in a status report that comes in probably on January

16   20th probably, so that we have time to look it over before the

17   29th.

18        And then the intent on the 29th will be for me to make

19   concrete discovery decisions on these other issues that are in

14:32:25 20   dispute and set another fairly tight discovery period to get

21   the additional discovery done, probably three more months, so

22   that we keep the case moving.

23        And whether we need any additional discovery beyond that

24   we can address at the time, when and how we approach

14:32:42 25   bellwethers or expert disclosures, all of those issues, we can

14:32:46  1    address at the time.

2    I guess part of my thought is if we could do the

3    additional discovery in the next three-month phase, then the

4    discovery phase that would occur after that would be expert

14:32:58  5    disclosures and depositions, followed by *Daubert* reports.  And

6    somewhere along the way we would be choosing bellwethers.

7    So let's set January 29th at 9 a.m. for the next status

8    conference.  And let's say that you are going to submit to me

9    the discovery report by Friday -- I'm sorry, Wednesday,

14:33:21  10   January 20th.  Wednesday, January 20th.

11   And what I will do in the case management order is I'm

12   going to list the topics that I want you to address in that

13   status report that we've talked about today, just so that

14   we've got a clean list, and it's basically all these other

14:33:51  15   discovery issues that we've talked through.  And I may put an

16   observation or two in there to inform your discussions.

17   So, with that schedule in mind and the fact that we're

18   going to be together on the 29th, let's come back to the

19   briefing.

14:34:24  20   I would like to have the privilege log issue fully

21   briefed by the 29th, and the issue of whether parties can be

22   bound by depositions taken before they were in the case fully

23   briefed by the 29th.  And I think I'd also like to have the

24   Lehmann report fully briefed by the 29th.  Is all of that

14:34:56  25   doable?

14:35:03   1          MR. STOLLER:  Of January, Your Honor?

           2          THE COURT:  Yes.

           3          MR. STOLLER:  Yes.

           4          THE COURT:  So we'll take all those things up on the

14:35:12   5   29th of January.

           6          Let me give you a schedule for that.

           7          All right.  This is the schedule I would propose for

           8   the briefing:  It seems to me on the privilege log issue what

           9   I'm looking for is a joint report from the parties on what

14:37:34  10   agreement you've reached, if any, on privilege logs and what

          11   each side's view is of the issues that remain and how they

          12   ought to be resolved.  This is really a practical issue.  It's

          13   not a legal issue.  It doesn't require case citations and

          14   legal arguments, it's really what is the best way to solve

14:38:01  15   this problem, and so it seems to me we don't need to have

          16   responses and replies, we just need a joint report that sets

          17   out everybody's positions.

          18          I want to give you enough time to talk through that

          19   issue thoroughly, and to engage in this 30-day or so period of

14:38:18  20   sort of informal production of selected privilege log items to

          21   see if it works.  So my inclination would be to say that that

          22   joint report will be due on January 20th, along with the

          23   overall discovery report.  Is that doable?  Does it make

          24   sense?

14:38:54  25          MR. LOPEZ:  Yes, Your Honor.

14:38:59   1          THE COURT:  In terms of the issue of who will be

2    bound by depositions, that's, I think, more a legal argument.

3    What the law says.  What I would be inclined to do is say each

4    party can file a ten-page memoranda by December 18th on that

14:39:13   5    issue and five-page replies by January 8th.

6          And the simple issue is what effect -- well, I guess

7    the question is do I have the power to say that parties in

8    this case are bound by depositions that occurred before they

9    arrive?  And, if so, should I say that?  Those would be the

14:39:32  10    two issues.

11          On the Lehmann brothers -- so that will be December

12    18th for ten-page memoranda from each side and January 8th for

13    five-page replies.

14          On the Lehmann brothers issue, I think we ought to

14:39:49  15    make that a motion for protective order from the defense filed

16    on November 30th, if you can do that.

17          MR. NORTH:  Yes.

18          THE COURT:  There are other deliverables that date,

19    but you know the issues, you briefed it.  So the defendants'

14:40:03  20    motion for protective order with supporting evidentiary

21    materials would be due on November 30th.

22          The plaintiffs' response with supporting evidentiary

23    materials would be due December 18th.

24          And the plaintiffs -- I'm sorry, defendants' reply

14:40:18  25    would be due on January 8th.

14:40:22    1            And then all those issues will be teed up for

            2    discussion on January 29th.

            3            Any questions or comments about that?

            4            MR. LOPEZ:  Your Honor, on the buy-in of other

14:40:35    5    attorneys, I'm wondering if maybe Mr. North and I can get

            6    together -- I mean, that's a legal issue that he and I -- I

            7    don't understand why that would be an opposing view --

            8            THE COURT:  If you reach the same agreement, that's

            9    great.  I had understood there to be a suggestion from the

14:40:53   10    defense that there is authority for the proposition that new

           11    arrivals in the case can be bound by depositions already done,

           12    and I thought I heard some concern with that view expressed on

           13    the plaintiff side.  But talk about it.  If you can reach

           14    agreement on how that ought to be dealt with in the case, I'm

14:41:10   15    more than happy to get your two-page memo saying we've agreed

           16    on the following than two ten-page memoranda.

           17            MR. LOPEZ:  The weird thing about this one is the

           18    reply would be by people who aren't here yet, if anyone was

           19    going to oppose it.  So I'm thinking maybe he and I can get

14:41:28   20    together on this one and see if we can come to a mutual

           21    agreement that protects us both.

           22            THE COURT:  I'm all for that.  That's great.

           23            MR. LOPEZ:  But we'll still keep the schedule in

           24    place in case we have opposing views?

14:41:46   25            THE COURT:  Yeah, I'll put it in the case management

order.

MR. GOLDENBERG:  Your Honor, Stuart Goldenberg.

One bit of clarification on the deadlines that we're going to have to meet, and I apologize if you did rule on this, but did you rule that all of the members of the PSC were going to be appointed?

THE COURT:  Not yet.  But I'll get you a decision on that within a couple of days.

MR. GOLDENBERG:  Okay.  That's important because how we divide up the work.  So thank you.

THE COURT:  If I don't get it to you tomorrow, I'll get it to you probably on Monday.  That's not one I'm going to leave hanging.

MR. LOPEZ:  Your Honor, on that issue -- oh, I'm sorry.

THE COURT:  Go ahead, Mr. Lopez.

MR. LOPEZ:  On that issue you caught me by surprise this morning.  Can I submit to you or to your clerk the names of judges with their contact information?  Because you wanted to contact -- I had actually mentioned Judge Herndon --

THE COURT:  And Judge Davis.

MR. LOPEZ:  -- and Judge Davis.

Judge Herndon, I actually had more contact with his special master.  Judge Davis -- I'm sorry, Judge Herndon would only know me through his special master, so I would probably

14:43:01  1   want to give you his name, but I have a couple other judges.

2   Those were the two first names that came into my head.

3            THE COURT:  Yeah.  If you all want to send an e-mail

4   to my office tomorrow morning, I'm going to -- because I want

14:43:13  5   to do this quickly, I'd like to get that information sooner

6   rather than later.

7            MR. LOPEZ:  And it doesn't have to be an MDL judge?

8   Because I should have mentioned Judge Jones, I just tried a

9   case in front of him six months ago.

14:43:24 10            THE COURT:  And I know Clive Jones.  In fact, I

11   already have a call in to him about you.  He hasn't called me

12   back yet.

13            MR. LOPEZ:  I made him laugh, Judge.

14            THE COURT:  That's not an easy thing to do.

14:43:35 15            MR. LOPEZ:  It was not.

16            MR. NORTH:  Your Honor, I wanted to alert the Court

17   when we do file the motion for protective order with regard to

18   Dr. Lehmann, we will also be submitting a motion to seal based

19   on our assertion, of course, that it's a privileged document.

14:43:48 20            THE COURT:  That's fine.  That's fine.  Local Rule

21   5.6, as Mr. Condo knows, is the sealing procedure.

22            MR. LOPEZ:  It's a public document.  Was it the

23   Lehmann report, Your Honor?  It's a public document.  I don't

24   know how we seal a public --

14:44:02 25            THE COURT:  But I think the point is, maybe I'm

14:44:05   1   inferring too much, they think it's protected work product.

       2   They don't want to waive that position by filing it as a

       3   public document.

       4           MR. LOPEZ:  Oh.  I see.  For purposes of these

14:44:15   5   proceedings.

       6           THE COURT:  Yeah.  They're preserving their

       7   work-product argument.

       8           MR. LOPEZ:  Okay.

       9           THE COURT:  I'm not -- if I decide it's not work

14:44:23  10   product, we'll not keep it sealed throughout the case,

      11   obviously.

      12           Okay.  Were there any other questions on what we've

      13   covered so far?

      14           Couple of other matters.  Let me make sure -- yeah,

14:44:35  15   let me make sure I'm not leaving out anything we need to

      16   cover.

      17           Okay, just a few other small matters, and then I want

      18   to talk to you about settlement discussions.

      19           If you have discovery disputes, don't file anything.

14:45:37  20   Let's have lead counsel get together on the phone and call my

      21   office, and we'll get you on the phone, on the record, and

      22   talk through discovery issues.  And if I can make a decision

      23   on the phone, I'll do it.  If not, we'll set a very focused

      24   briefing schedule to get it decided within a week or so.  So

14:45:54  25   we're not going to have lengthy discovery disputes that drag

14:45:57  1   the case out.  We'll get those decided quickly.  I'm not going

      2   to use a magistrate judge.  Well, I say that now.  Maybe if we

      3   have 2,000 cases I'll change my mind.  But I don't use

      4   magistrate judges in case management, so I'll plan to deal

14:46:12  5   with those discovery issues myself.

      6        I'm going to include in the case management order

      7   what will become -- I probably don't even need to.  On

      8   December 1st, as you probably know, Rule 34 is being amended

      9   to require different kinds of responses.  Those will apply in

14:46:31 10   the case.

     11        Please make sure things you file comply with the

     12   court's local rules in terms of formatting.  Rule 7.1.

     13        I don't think we need to schedule a science day now.

     14   I think that will become more relevant if I get into more

14:46:51 15   detailed discovery disputes, or particularly if I need it in

     16   connection with expert issues.  So let's not try to schedule

     17   that now.

     18        I won't set any further status conferences since we

     19   have January 29th set, but I'm going to have them every two or

14:47:09 20   three months to make sure we're dealing with issues currently.

     21        And if a matter comes up that you need my decision

     22   on, just get together from the two sides and call and we'll

     23   deal with it quickly.

     24        So let's talk about item 9 on the agenda.  What

14:47:29 25   has -- what has happened to date in terms of settlement talks,

14:47:33  1    and have there been any global settlement discussions?

       2              MR. LOPEZ:  I'm going to stand up for this one,

       3    Judge.

       4              One of the reasons we're here is because that hasn't

14:47:45  5    happened.  And I can just tell you with respect to our cases

       6    no case has settled unless we're in trial, at the courthouse

       7    steps, or well down -- well in the process.

       8              Over the past three years, Bard has invited us to

       9    engage in global settlements and we provided them all the

14:48:02 10    documents and medical records, and then, not because of

      11    anything we did, it got canceled.  That's happened three

      12    times.

      13              We're told after the *Phillips* case that we would have

      14    another discussion just about our cases and other cases where

14:48:16 15    we're counsel of record, and the next thing I know I'm getting

      16    hit with Rule 26 deadlines.

      17              The last time we settled cases, there were five cases

      18    set for trial.  I wanted to add two small value damage cases

      19    to it and because they didn't have trial dates, and they had

14:48:36 20    all the information on it, I was told it would disrupt the

      21    entire process of settling my five trial cases to add two more

      22    cases that they had for two years on a tolling agreement and

      23    had enough information to evaluate.

      24              I'm just giving you the history of where we are to

14:48:52 25    date on this.  So insofar as our case, we've been very

14:48:56  1    successful settling cases after spending 11 days with Judge

        2    Jones or being here with the state court judge, we had right

        3    before we were going to seat a jury.  And cases where we've

        4    gone pretty far down the road.  Frankly, the reason we have an

14:49:12  5    MDL is because the three invitations what we got to settle

        6    what were then about 100 cases were just rejected by Bard

        7    despite the fact they invited those discussions.

        8          That's the history of where we've been the last two

        9    or three years on this case.

14:49:32 10          THE COURT:  Well, I'll hear the response from the

       11    defendant on a minute -- in a minute on that.  Where do you

       12    think we should go on this subject?

       13          MR. LOPEZ:  This is obviously a different situation.

       14    I mean, there's no longer just four or five law firms getting

14:49:47 15    pretty scorched on working the case out, and maybe things will

       16    be different.  We've got 25 firms that will be able to move

       17    this case.

       18          I think there's been some recent developments in the

       19    case.  We saw a case go to trial in front of Judge Jones that

14:50:04 20    settled on Day 11.  We've got this warning letter issue.

       21          I mean as plaintiffs lawyers, I think I speak on

       22    behalf of all of us, it's always in our best interest to

       23    explore the possibility of early resolution of a case based on

       24    the merits and based on having a reasonable discussion with

14:50:27 25    the defense.  So we're always going to be open for that kind

14:50:30  1    of process, Your Honor.  But I don't know where Bard, C.R.

        2    Bard is on that issue because all of a sudden they've gone

        3    from having my hundred cases and John's 65 cases and Ben's 30

        4    cases to maybe thousands of cases.  So this is, I think, more

14:50:49  5    an issue for them because if they tell us they want to engage

        6    in a process, we'll put together a settlement team tomorrow.

        7         And we know what these cases are about.  It's not

        8    like you have to wonder in these cases, was this liver failure

        9    caused by this drug or cause by a long-time exposure to

14:51:11 10    alcohol or because you have a family history of liver failure.

       11    In these cases you can see what the damages are in these

       12    cases.  They're on CT scans, they're on angiograms.  This

       13    product is either broken or not broken.  It's either

       14    perforated a vena cava or not.  It's either migrated to the

14:51:27 15    heart or not.  It's either embedded in the side of the vena

       16    cava and can't be removed by snaring it, or they have to go to

       17    Dr. Kuo in Stanford for a 25 or $30,000 procedure to have it

       18    removed.

       19         The issues here are so much simpler from the

14:51:43 20    standpoint of evaluating damages.  Number one, we've had a

       21    trial and eight or nine settlements of injury cases.  Our firm

       22    has.  We have a history with them.  Obviously, we thought

       23    those were reasonable values to settle the cases, but there's

       24    been no interest other than us getting to the courthouse steps

14:51:59 25    to settle the next case.  With 85 cases on a tolling

14:52:02  1    agreement, it would be 2023 before I got to settle my last

2    case.

3              Now we have a process here, consolidated process here

4    where maybe my fatigue is not going to weigh into the

14:52:15  5    decisions that have to be made about the resolution of the

6    cases.

7              I'm sure Your Honor has been through this process

8    before.  There may be a mediator here, a special master.  I

9    talked to Mr. Boatman and his partners about this.

14:52:34 10          I will sit down by just telling you that if you

11    direct us to start this process, we will start it.  And -- but

12    the problem is I don't know how many cases we're going to

13    have.  All of a sudden this is -- MDL's are like field of

14    dreams; if you build it, they will come.  And they're coming.

14:52:51 15    And so I don't know whether this is something we put in the

16    process now, whether or not we wait and see what happens after

17    we get direct filing and the number of cases and how we vet

18    those cases.

19              But anyway, Your Honor, thank you.

14:53:06 20          MR. NORTH:  Your Honor, with all due respect to

21    Mr. Lopez, I do not agree with a number of statements he made,

22    but I don't think now is the time to sort of rehash past

23    history.

24              I would note that I've been handling this litigation

14:53:18 25    for Bard for ten years this month.  Over that 10-year period,

14:53:24  1  we had 120 plus cases settle.  We had a global settlement two

2  years ago with two attorneys, the attorneys we tried the case

3  against in Maricopa County, and settled a package of 40 cases

4  with them at that point.

14:53:37  5        Bard is always amenable to settlements of reasonable

6  values of these cases.

7        With Mr. Lopez, I'd settled the package of five cases

8  in May.  Yes some of those or most had trial settings.  But

9  many didn't have trial settings until late this year or early

14:53:54  10  next year.

11        I've settled a number of cases with Mr. Dalimonte and

12  particularly his co-counsel Ms. Toriseva.  I've settled cases

13  with Mr. Martin.  We're always willing to settle cases.

14        Unfortunately, I believe the dynamic has changed a

14:54:09  15  little bit right now.  Since the petition before the judicial

16  panel and the creation of this MDL, attorney advertising for

17  these cases has skyrocketed.  According to a firm we've

18  consulted with, more than a million dollars in advertisements

19  for these cases are being spent each month.  A large number of

14:54:27  20  cases may come in as a consequence.  Many of these cases may

21  have no value and just be people responding to advertisements.

22  It's changed the landscape and we believe it's a landscape we

23  need to sort of analyze a little bit further.

24        And while we're certainly amenable to discussing

14:54:45  25  settlement of individual cases at any time, we do believe it

14:54:48  1   may be premature to talk about global settlement given the new

2   environment we find ourselves in.

3            THE COURT:  Give me a sense, Mr. North, of what you

4   think -- I know there's some guesswork in this answer, but

14:55:03  5   what you think needs to happen before you would be in a

6   position to evaluate risk and talk global settlement?

7            MR. NORTH:  Several factors, Your Honor.  I think we

8   need to have a better sense of the number of cases that are

9   going to appear.

14:55:22 10           We've heard reported today maybe as many as 2,000.

11  I've been hearing for several years that there would be

12  several hundred at any moment, and we now have 60 in this

13  court and I think 12 in state courts, which is by far the

14  highest number we've ever had.

14:55:38 15           Secondly, I think we need to do a little bit of this

16  FDA discovery.  I think the plaintiffs need to understand and

17  see how that does not really apply to the cases they have.  I

18  think that's important.

19           Also, I think that we need to come up with a

14:55:54 20  process -- and this is something I wanted to mention anyway.

21  As we're looking at these cases, particularly a lot of the

22  newer cases coming in, many of them have statute of

23  limitations issues.  Serious statute of limitations issues.

24  Some of these products allegedly malfunctioned 12, 13 years

14:56:13 25  ago.  We believe we need to come up with a process to cull out

14:56:17   1    these cases that are really barred by the statute of

2    limitations or otherwise lacking in merit.

3           We have been looking and found a couple good models,

4    or potentially good models, from other MDL's that have been

14:56:34   5    implemented, and we'd like to propose to the Court in the near

6    future some sort of process to allow us to address statute

7    issues sooner rather than later.

8           I think we just need to go through this process a

9    little bit to cull these cases out.

14:56:46  10           A lot of the literature, I think even some of the

11   writings by former MDL judges recognize a risk and a problem

12   with MDL's is they often generate many cases that do not have

13   merit and it's hard to cull those cases out because of the

14   mass number of filings.  And we believe we need to go through

14:57:09  15   the process a little bit here with mechanisms such as

16   examination of statute of limitations to sort of separate

17   those cases lacking in merit, and then we can focus on the

18   cases that do deserve to be settled, and I know my client will

19   come to the table, as it has for ten years, and try to settle

14:57:26  20   those cases.

21           THE COURT:  Am I correct in assuming, Mr. North,

22   those statute of limitations questions will be state law

23   issues?

24           MR. NORTH:  I'm sorry, what about that?

14:57:36  25           THE COURT:  They will be state law issues?

14:57:37  1          MR. NORTH:  Yes.

        2          THE COURT:  Including state discovery rules for

        3  triggering the statute of limitations?

        4          MR. NORTH:  Yes, Your Honor.  But we have seen a

14:57:45  5  couple of MDL judges that came up with models to give the

        6  parties guidance how those would apply that we'd at least like

        7  for the Court to look at.

        8          THE COURT:  Okay.

        9          All right.  I don't think it makes sense at this

14:58:02 10  stage for me to order the parties to start having global

       11  settlement talks.  I think this MDL is new.  The parties need

       12  to get a better sense for its scope.  But I'm not going to

       13  wait a long time before I lean on you to get some process

       14  under way, even if it's getting somebody identified who can

14:58:20 15  work with you over time and become very familiar with the case

       16  and help you reach, or try to help you reach, settlements.

       17          But, you know, if that doesn't work, we can get

       18  bellwether trials teed up and get the case moving in that way.

       19          Do the plaintiffs have other matters that we need to

14:58:37 20  take up today?

       21          MR. BOATMAN:  No.

       22          MR. LOPEZ:  We talked about this.  Very first thing

       23  we talked about.  Your Honor, may I tell other lawyers that

       24  are seeking roles either -- there's been no one who says they

14:59:01 25  want to be co-leader, but other lawyers who want to be on the

14:59:05  1    PSC.  May I make you the fall guy?

          2              THE COURT:  Yeah.  Blame it on me.  22 is more than

          3    enough.  Tell them I said that.

          4              MR. LOPEZ:  I'll tell them.  That's what I needed.

14:59:18  5              THE COURT:  Anything from the defendants?

          6              MR. NORTH:  Nothing further.

          7              THE COURT:  Okay.  I'll get -- I'll get several

          8    orders out.  Thank you.

          9              MULTIPLE VOICES:  Thank you, Your Honor.

14:59:31  10             (End of transcript.)

          11                             *  *  *  *  *

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1                       **C E R T I F I C A T E**

2

3              I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7              I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14             DATED at Phoenix, Arizona, this 6th day of November,

15   2015.

16

17

18

19

20                                s/ Patricia Lyons, RMR, CRR
                                  Official Court Reporter
21

22

23

24

25