James R. Condo (#005867)
Amanda C. Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
Telephone:  602.382.6000
Facsimile:  602.382.6070
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street, NW / Suite 1700
Atlanta, GA  30363
Telephone: (404) 322-6000
Telephone: (602) 382-6000
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

Attorneys for Defendants C. R. Bard, Inc. and
Bard Peripheral Vascular, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation, | No. 2:15-MD-02641-DGC<br><br>**DEFENDANTS' MOTION AND INCORPORATED MEMORANDUM FOR PROTECTIVE ORDER REGARDING REPORT OF DR. JOHN LEHMANN** |

Pursuant to Federal Rule of Civil Procedure 26(c)(1), Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively "Bard") hereby move for a protective order to prevent the plaintiffs from using the December 15, 2004, report of Dr. John Lehmann during discovery and/or trial.  Bard addresses the issues that the Court identified in Case Management Order No. 2 as follows:

<u>Is Dr. Lehmann's Report Protected Work Product</u>?  Yes, Bard submits that Dr. Lehmann's report is protected work product without exception or waiver.

The most direct evidence possible proves that Dr. Lehmann's report was created

"in anticipation of litigation," and therefore is protected work product:

- Sworn testimony of C. R. Bard, Inc.'s Assistant General Counsel, Donna Passero, that she would not have hired Dr. Lehmann to create his report absent threats of litigation that Bard had received.

- Sworn testimony of Dr. Lehmann that he was hired to conduct extensive work for Bard's Law Department after Donna Passero told him that she thought there would be lawsuits following reports of death associated with Bard's Recovery Filter.

- The actual contract to create Dr. Lehmann's report, which was directly between Dr. Lehmann and Bard's Law Department, which specifically says that Dr. Lehmann is being retained in anticipation of litigation, and which provides that Dr. Lehmann is to receive instructions from, and report directly to, Donna Passero.

- The actual December 15, 2004, report that Dr. Lehmann submitted directly to Donna Passero, which is consistent with the terms of the contract and Ms. Passero's sworn testimony. Every page of the report also contains a header that reads "Privileged and confidential Attorney work product -- Pursuant to contract."

- Dozens of documents showing that, in the time leading up to the creation of Dr. Lehmann's report, Bard was receiving threats of litigation from patients and their lawyers; Bard was receiving reports of several deaths and other alleged bodily injuries allegedly related to the Recovery Filter; and Bard informed its insurer of these threats and reports.

Moreover, the plaintiffs have numerous sources of discoverable and substantially equivalent information as contained in Dr. Lehmann's report, including the exact same data that Dr. Lehmann used to create his report, and therefore they cannot meet their burden of proof of undue hardship and substantial need for the document.

Finally, the plaintiffs cannot meet their burden of proof that Bard somehow waived

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

the work-product protection by distributing the report to approximately one dozen high-level employees at Bard because such distribution does not substantially increase the likelihood that an adversary will come into possession of the report. And even though Dr. Lehmann's report was entered into evidence over Bard's repeated objections during a trial earlier this year, black-letter law provides that a compelled production of a document in one court does not waive protection of the document in another court even when the document is in the public domain.

For these reasons, Dr. Lehmann's report is protected work product without exception or waiver.

Is an evidentiary hearing needed? A second evidentiary hearing is not necessary. In June 2014, both Dr. Lehmann and Donna Passero were examined and cross examined at an evidentiary hearing in federal court for approximately three hours about the genesis of Dr. Lehmann's report. The witnesses were cross examined by a member of the PSC who was intimately familiar with, and who raised during his cross examination, every argument that plaintiffs across the country have made and continue to make about the discoverability of Dr. Lehmann's report. No new factual issues require exploring, and the record is more developed and voluminous than Bard can find in any reported case concerning the work-product protection.

What effect should the Court's ruling have in cases where the issue has already been decided? U.S. Supreme Court and Ninth Circuit precedent concerning the law-of-the-case doctrine limits modifying or vacating preexisting orders of transferor courts to certain "exceptional circumstances" that are not present here. Thus, the Court's ruling on Bard's motion should have no effect on the preexisting transferor court orders concerning Dr. Lehmann's report.

## PROCEDURAL HISTORY

Since early 2013, after Dr. Lehmann's report was inadvertently produced by an ESI vendor during discovery and then expeditiously clawed back, Bard has been forced to defend its work-product claim regarding Dr. Lehmann's report in state and federal courts

across the country.   In June 2014, the United States District Court for the Northern District of Texas in *Alexander v. C. R. Bard, Inc.*, held an evidentiary hearing at which Dr. Lehmann and Bard's Assistant General Counsel, Donna Passero, testified and were cross examined about the creation of Dr. Lehmann's report.   At the evidentiary hearing, the plaintiff was represented by John Dalimonte and Ben Martin, who currently are members of the MDL Plaintiffs' Steering Committee.   During the evidentiary hearing, Bard also submitted approximately sixty documents in support of its work-product claim.   After considering the testimony and exhibits, the *Alexander* Court, applying the most restrictive work-product test in the country (the "primary motivating purpose" test), found as follows:

> Based on the evidence before the Court, the undersigned finds that at the time Defendants hired Dr. Lehmann and during the time that he was preparing his Report, "the primary motivating purpose behind the creating of the document was to aid in possible future litigation." There is simply no evidence from which the Court can conclude that the Lehmann Report would have been created without regard to whether litigation was expected or in progress.

(*Alexander* Order, Aug. 20, 2014, at 13, attached as Exhibit A (quoting *United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982)).   After considering the same evidence, two other courts applying the same restrictive "primary motivating purpose" standard found likewise. (*Jones v. C. R. Bard, Inc.*, 3:13-cv-00599-K (N.D. Tex. Sept. 15, 2014); *Peterson v. C. R. Bard, Inc.*, 3:13-cv-00528-JJR-RLB (M.D. La. Mar. 3, 2015).)

In all, thirteen federal and state courts have ruled that Dr. Lehmann's report is protected work product.[1]   Only three judges have ruled that Dr. Lehmann's report is discoverable,[2] but none of these judges considered the testimony and all of the evidence

---

[1] *Alexander, supra*; *Jones, supra*; *Peterson*, *supra*; *Barkley v. C. R. Bard, Inc., et al.*, Case No. CV2011-021250 (Ariz. Super. Ct.); *Carr v. C. R. Bard, Inc., et al.*, 297 F.R.D. 328 (N.D. Ohio 2014); *Cason v. C. R. Bard, Inc., et al*., Civil Action No. 1:12-CV-1288-MHS (N.D. Ga.); *Ebert v. C. R. Bard, Inc., et al.*, Civil Action No. 5:12-cv-01253-LS (E.D. Pa.); *Kilver v. C. R. Bard, Inc., et al.*, Civil Action No. 1:13-cv-01219-MMM-JEH (C.D. Ill.); *Leus v. C. R. Bard, Inc.*, Case No. 13-00585-CV-W-GAF (W.D. Mo.); *Phillips v. C. R. Bard, Inc., et al.*, 290 F.R.D. 615 (D. Nev. 2013) (Cobb, M.J.); *Rackliff v. C. R. Bard, Inc., et al.*, Case No. CV2011-021206 (Ariz. Super. Ct.); *Stesney v. C. R. Bard, Inc., et al.*, Case No. CV2012-006103 (Ariz. Super. Ct.); *Towlson v. C. R. Bard, Inc., et al.*, Case No. CV2011-022334 (Ariz. Super. Ct.).

[2] *Giordano, et al. v. C. R. Bard, Inc., et al.*, Case No. 37-2011-00069363-CU-PO-EC (Cal. Super Ct.) (denying clawback of inadvertently produced report without providing any

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

submitted during the *Alexander* evidentiary hearing.   Conversely, every court to have considered the testimony and exhibits submitted during the *Alexander* evidentiary hearing has found that Dr. Lehmann's report is protected work product.

## FACTUAL BACKGROUND

*In re: Bard IVC Filters Products Liability Litigation* concerns every generation of Bard's line of retrievable IVC filters, including the Recovery®, G2®, G2® Express, G2® X, Eclipse®, Meridian® and Denali® Filters.   Dr. Lehmann's December 2004 report concerns only an analysis of the Recovery Filter, which is the first generation of Bard's retrievable filters.   Each subsequent generation of filter incorporated changes to the previous generation's design.

Beginning in February 2004, Bard received threats of litigation from patients or their lawyers who allegedly experienced an adverse event with the Recovery Filter.   For example, on February 3, 2004, a patient sent a letter to Bard demanding that Bard "make reparations for your actions, or lack of action" concerning an alleged adverse event involving his Recovery Filter. (Ltr. to Bard, Feb. 3, 2004, BPV-COMP-00004343-45, attached as Exhibit B).   Bard's Assistant General Counsel, Donna Passero, was called on to respond to the letter. (Ltr. from D. Passero, Esq., July 19, 2004, BPV-COMP-00004450, attached as Exhibit C.)   Similarly, on June 7, 2004, Ms. Passero received notice that parents of a minor patient allegedly treated with a Bard Recovery Filter were "discussing litigation" against Bard. (E-mail from B. Barry to D. Passero, Esq. June 7, 2004, attached as Exhibit D.)   On June 15, 2004, an attorney contacted Bard on behalf of a patient's estate "in regards to a potential medical malpractice/product liability claim." (Ltr. to Bard, June 15, 2004, attached as Exhibit E.)   Again, Ms. Passero was called on to respond. (Ltr. from D. Passero, Esq., June 24, 2004, attached as Exhibit F.)   By July 2004, Bard had notified its insurer of claims related to its inferior vena cava filter, including "a

comment or analysis); *Tillman v. C. R. Bard, Inc., et al.*, Case No. 3:13-cv-222-J-34JBT (M.D. Fla.); *Payne v. C. R. Bard, Inc., et al.*, Case No. 6:11-cv-1582-Orl-37GJK (M.D. Fla.); *Phillips v. C. R. Bard, Inc., et al.*, Civil Action No. 3:12-cv-00344-RCJ-WGC (D. Nev.) (Jones, J.).   Both *Tillman* and *Payne* were decided in a single opinion by the same Magistrate Judge.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

letter from an attorney demanding compensation" and another "letter from an attorney representing the decedent" that the company had received. (E-mail and attachment from J. Gallagher to S. Lowry, July 15, 2004, attached as Exhibit G.)

Aside from threatened litigation, Bard was also receiving reports of alleged injury and death associated with the Recovery Filter, making litigation likely if not certain. Between April 2004 and September 2004, Bard received seven reports of alleged deaths potentially involving its Recovery Filters.[3]  And throughout 2004, Bard was receiving reports that the Recovery Filter allegedly fractured in a number of patients, migrated in a number of patients, and perforated the inferior vena cava in a number of patients.[4]

In this context, Ms. Passero has testified as follows:

> At the beginning of November 2004, I – in conjunction with Bard's Law Department – retained Dr. John Lehmann for the purpose of providing outside consultation services to the Law Department regarding anticipated and ongoing product liability litigation.  Specifically, Dr. Lehmann was retained for the purpose of conducting an independent investigation and drafting a report concerning Bard's Recovery Filter, which I – in conjunction with Bard's Law Department – requested for the purpose of providing Bard with legal advice concerning the Recovery Filter and to prepare for and assist with anticipated and ongoing litigation.

(Passero Aff. ¶6, Feb. 12, 2013, attached as Exhibit P.)  During the evidentiary hearing in *Alexander*, Ms. Passero further explained that the reports of injury, particularly the reports of death, "would have immediately raised my concern . . . you would almost expect to have a lawsuit out of a death." (*Alexander* Hr'g Tr., 23:5-9, June 11, 2014, attached as Exhibit Q.)  Ms. Passero explained that after consulting with the General Counsel of Bard, the Law Department needed to advise senior management and the board of directors

---

[3] Bard Complaint File 5104020023, Feb. 9, 2004, BPV-COMP-00004516-24, attached as Exhibit H; Bard Complaint File 5992, Apr. 15, 2004, BPV-COMP-00000173-78, attached as Exhibit I; Bard Complaint File 9742, May 20, 2004, BPV-COMP-00000310-14, attached as Exhibit J; Bard Complaint File 12431, June 16, 2004, BPV-COMP-00000593-98, attached as Exhibit K; Bard Complaint File 16867, July 29, 2004, BPV-COMP-00000900-05, attached as Exhibit L; Bard Complaint File 19214, Aug. 23, 2004, BPV-COMP-00001040-44, attached as Exhibit M; Bard Complaint File 21832, Sept. 17, 2004, BPV-COMP-00001193-99, attached as Exhibit N.

[4] Complaint File numbers 5103090034, 5103100026, 5103120005, 5103120044, 5104020049, 2688, 2936, 3086, 5284, 6971, 6970, 7285, 10435, 10523, 11158, 11492, 11596, 12647, 13830, 14843, 15374, 16312, 18468, 18998, 19827, 20308, 21621, 24046, 24244, 25351, 25608, 26181, 26286, attached as consolidated Exhibit O.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

regarding what risk to the company the reported adverse events represented, "and we needed somebody to help us do that.  So we asked Dr. Lehmann to do a number of tasks to help us understand that." (*Id.* at 26:6-13.)

Thus, in November 2004, Bard's Law Department entered into a consulting agreement with Dr. John Lehmann through his consulting company, Lehmann Thomas LLC.  The consulting agreement, which Bard will provide for the Court's in-camera review, makes clear that Dr. Lehmann's retention was in anticipation of litigation. (Contract between Bard's Law Department and Dr. Lehmann, Nov. 2004, at 1, attached as Exhibit R.)  Ms. Passero was asked at the evidentiary hearing, "Would you have retained Dr. Lehmann to prepare this report in December 2004 if you had not had threats of litigation at that time?"  Her answer:  "No." (Ex. Q, Hr'g Tr., 32:16-19.)

Dr. Lehmann was contracted by the Bard Law Department to analyze the medical literature concerning IVC filters, analyze the complaints that Bard had received regarding the Recovery Filter, analyze the FDA's adverse event reporting database (MAUDE database) to attempt to compare rates of adverse events seen with other manufacturers' IVC filters, and to prepare a written report with his findings. (*See* Ex. Q, Hr'g Tr., 91:19 to 92:11; Ex. R, Lehmann Contract, at 7.)  The contract was signed by Dr. Lehmann and Bard's General Counsel. (Ex. R, Lehmann Contract, at 6.)  Dr. Lehmann was instructed to relay his findings only to Bard's Law Department or to those whom Bard's Law Department directed. (Ex. P, Passero Aff. ¶9.)  Dr. Lehmann, who was a former employee of Bard in the 1990s and later performed some non-legal general consulting services for Bard in late 2003 and early 2004 by filling the role of interim medical director for the company, testified at length about how the work that he did for Bard's Law Department (a large project that involved analyzing numerous types of expansive data) was substantially different from the non-legal work that he had done for Bard that began in late 2003 and ended in early 2004 (analysis of single incidents, completing FDA-mandated reports, and other duties as an interim medical director). (Ex. Q, Hr'g Tr., 88:9 to 92:11; 103:19 to 104:8.)

On December 15, 2004, Dr. Lehmann conveyed his written report directly to Ms. Passero in Bard's Law Department. (Lehmann Report, Dec. 15, 2004, attached as Exhibit S.)  The report was also stamped with the legend "Privileged and confidential Attorney work product -- Pursuant to contract" at the top of each page. (*Id.*)

Ms. Passero distributed the report to five Bard employees, one of whom was the General Counsel, and four of whom were high-level employees outside of the Law Department. (Ex. P, Passero Aff. ¶11; Ex. Q, Hr'g Tr., 30:19-25.)  Each of the employees received instructions that the report and associated materials were confidential and that any further distribution of the report should be limited to only those at Bard who needed the report to perform their proper job functions. (Ex. P, Passero Aff. ¶11.)  After its initial distribution to the four Bard employees outside of the Law Department, the substance of Dr. Lehmann's report was shared only with employees who needed the information to perform their job functions. (*Id.*)  When asked why she distributed Dr. Lehmann's report outside of the Law Department, Ms. Passero responded:

> I have an obligation when someone says in a report certain things that lead to a conclusion that says words to the effect of 'immediate follow-up is recommended' or 'is urgently recommended,' something like that.  So the people that I distributed it to would have been people who need to know about this, need to know about the information that's in there.  I couldn't sit on it.
>
> And I, you know, thought about this a little bit, and I thought about what happened to the lawyers at GM.  We can't sit on information that can be harmful to the public, to patients.  So I gave it to people who would know what to do with that information once – once they saw it.

(Ex. Q, Hr'g Tr., 31:1-18.)

After Dr. Lehmann performed his analysis, Bard acted swiftly.  A team at Bard called the Product Assessment Team (a team of five high-level employees at Bard) was permitted to review Dr. Lehmann's report. (*Id.* at 71:9-19.)  In fact, several days before the Dr. Lehmann's report was finalized, the Product Assessment Team was given a draft of the report that contained Dr. Lehmann's findings, allowing the Team to quickly formulate its final Action Plan for further investigation. (Recovery Filter Migration Remedial Action Plan SPA-04-12-01, Jan. 4, 2005, BPVE-01-01019773-84, at 79, 82,

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

attached as Exhibit T.)  Likewise, Bard's Medical Director was permitted to review Dr. Lehmann's report to prepare a Health Hazard Evaluation to identify a frequency category for serious injury for potential further action. (Health Hazard Evaluation, Dec. 17, 2004, BPVE01-01019821, attached as Exhibit U.)  Including Ms. Passero, approximately twelve high-level employees at Bard were shown Dr. Lehmann's report. (Carr. Aff., Feb. 3, 2014, attached as Exhibit V.)

## ARGUMENT

**A. Dr. Lehmann's Report is protected work product without exception or waiver.**

   **1. Sworn testimony and overwhelming documentary evidence proves that Dr. Lehmann's report was created "because of" anticipated litigation.**

Federal law governs the application of the work-product doctrine in this case. *Bickler v. Senior Lifestyle Corp.*, 266 F.R.D. 379, 382 (D. Ariz. 2010) (Campbell, J.) (citations omitted).  The work-product doctrine, as codified in Federal Rule of Civil Procedure 26(b)(3), protects documents and tangible things prepared by or for a party or that party's representative, including by a consultant, "in anticipation of litigation or for trial." *See Phillips v. C. R. Bard, Inc.*, 290 F.R.D. 615, 634 (D. Nev. 2013) (same, citing *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 907 (9th Cir. 2004)); *Bickler*, 266 F.R.D. at 382-83.[5]  Documents created by a consultant working for an attorney are also protected by the work-product doctrine as long as the documents were prepared in anticipation of litigation. *Phillips*, 290 F.R.D. at 634 (citing *Torf*, 357 F.3d at 907 (citing *United States v. Nobles*, 422 U.S. 225, 239 (1975))).  Indeed, the U.S. Supreme Court has noted that one of the realities of the adversarial system is that "attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial.  It is therefore necessary that the doctrine protect material prepared by agents for the agents for the attorney . . . ." *Id.* at 635 (quoting *Nobles*, 422 U.S. at 238-39).

---

[5] Regarding matters of procedural law, the MDL transferee court applies the law of the circuit in which the court sits. *See, e.g., In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1178 (D.C. Cir. 1987), *aff'd*, 490 U.S. 12 (1989).

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

In the Ninth Circuit, courts apply the "because of" litigation test to determine whether a document was created "in anticipation of litigation," and documents are entitled to work-product protection if, "in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." *United States v. Richey*, 632 F.3d 559, 568 (9th Cir. 2011) (quotation omitted). Thus, litigation need not be a certainty for work-product protection to arise under the "because of" test, as long as the document "would not have been created in substantially similar form but for the prospect of litigation" when considering the totality of the circumstances. *Id.* (quotation omitted); *Bickler*, 266 F.R.D. at 383.

Courts in the Ninth Circuit routinely find that documents prepared by non-lawyers at the request of counsel are work product with far less evidence than Bard has submitted. For example, in *Bickler v. Senior Lifestyle Corp.*, 266 F.R.D. 379 (D. Ariz. 2010), a resident of a skilled nursing home was allegedly pushed to the ground, and an investigation of the incident then was conducted by non-lawyers at the direction of in-house counsel. Your Honor found that the investigation material amounted to work product because of the following evidence: the family of the resident alleged that the resident could have died, the family demand that an arrest be made for "assault," several days later the family "appeared angry" when meeting with the nursing home staff, and the non-lawyer executive director for the facility avowed that she feared that the facility would be sued. *Id.* at 383. Your Honor further rejected arguments that the investigation material was created "in the ordinary course of business" even though the investigation results were later submitted to the Department of Health Services, which regulated the skilled nursing home, because the non-lawyer averred that she discussed the incident with in-house counsel, counsel instructed that the investigation take place, and the investigation was more extensive than those made routinely after other incidents at the nursing home. *Id.*; *see, e.g., Folz v. Union Pacific R.R. Co.*, No. 13-CV-00579-GPC-(PCL), 2014 WL 357929 (S.D. Cal. Jan. 31, 2014) (finding that a photo log was work product based on

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

assertions in briefing that the log was "made at the direction of an attorney in preparation for trial"); *Mendez v. Saint Alphonsus Reg. Med. Ctr., Inc.*, No. 1:12-cv-26-EJL-CWD, 2014 WL 3406016 (D. Idaho July 10, 2014) (employment investigative report conducted by non-lawyers at the direction of counsel entitled to work-product protection because the report concerned allegations of "unlawful harassment" and "hostile work environment," and counsel produced a sworn declaration that she anticipated litigation and needed the investigative report to enable her to provide legal advice); *Pittman v. County of San Diego*, No. 09-CV-1952-WQH(WVG), 2010 WL 4570252 (S.D. Cal. Nov. 3, 2010) (finding that a sheriff's report was protected work product because of the following evidence:  the sheriff's report was prepared by non-lawyers at the request of a non-lawyer at the county counsel's office; a lieutenant declared that the report would not have been created absent the request from counsel's office; the request was made upon receipt of a claims letter from plaintiffs' counsel after the plaintiffs' "confrontation" with police officers; and although all claims are investigated, the claim letter mentioned that if the claim was denied, the plaintiffs would seek more than $1,000,000 "when" the claim was filed in court).

Here, Bard has submitted substantially more evidence in support of its work-product claim than was available in *Bickler* and the other cited cases, and therefore has far exceeded its burden of showing that Dr. Lehmann's report "can be fairly said to have been prepared or obtained because of the prospect of litigation."  In fact, Bard has submitted the most direct evidence possible to prove its work-product assertion.  This direct evidence demonstrates that Dr. Lehmann's report was created in response to threats of litigation, at the request of Bard's Law Department, and would not have been created without the threats of litigation, even if Dr. Lehmann's report was also used at a later point for a non-litigation purpose in aiding the subsequent development of a Remedial Action Plan and for the preparation of a subsequent Health Hazard Evaluation:

- <u>Dr. Lehmann's contract</u>:  Dr. Lehmann was contracted directly by Bard's Law Department; the contract specifically provides that Dr. Lehmann was to

prepare a report in anticipation of litigation; and the contract provides that Dr. Lehmann is to receive instructions from, and report directly to, the Assistant General Counsel to Bard, Donna Passero. (Ex. R, Lehmann Contract, at 1, 5.)

- Sworn testimony from Donna Passero:  Ms. Passero testified that because there were several deaths allegedly related to the Recovery Filter, she and Bard's General Counsel were concerned about the exposure/risk to the company. (Ex. Q, Hr'g Tr., 25:8 to 26:13.)  Indeed, throughout 2004, Ms. Passero was called on to respond to numerous threats of lawsuits made by patients or their lawyers. (*See* Exs. B-G (letters to Bard from patients and their lawyers threatening litigation, response letters from Bard's in-house counsel, and Bard's notification to its insurer of threatened claims.)  In this context, Ms. Passero testified that to understand the risk to the company of anticipated litigation, she asked Dr. Lehmann to prepare a report concerning the Recovery Filter (Ex. Q, Hr'g Tr., 26:14 to 27:14), and she testified that Bard's Law Department hired Dr. Lehmann specifically for this purpose. (*Id.* at 25:8 to 26:13.)  Ms. Passero testified that Dr. Lehmann's report "was for us to evaluate the – the potential litigation that was – that was believed was going to happen, and, from what I understand, has happened." (*Id.* at 32:12-15.)  Ms. Passero was asked directly, "Would you have retained Dr. Lehmann to prepare this report in December of 2004 if you had not had threats of litigation at the time?"  Her answer:  "No." (*Id.* at 32:16-19.)

- Dr. Lehmann's actual report:  Dr. Lehmann's report was submitted directly to Donna Passero, which is consistent with the contract and Ms. Passero's sworn testimony.  Every page contains a header that reads "Privileged and confidential Attorney work product -- Pursuant to contract."  Although Dr. Lehmann's report does not contain legal analysis, the U.S. Supreme Court and courts in the Ninth Circuit have recognized that attorneys need the

"assistance of experts to prepare an effective legal defense" and that material produced in the course of that assistance is protected by the work-product doctrine. *Phillips*, 290 F.R.D. at 634 (citing *Torf*, 357 F.3d at 907 (citing *United States v. Nobles*, 422 U.S. 225, 239 (1975))).

- Sworn testimony of Dr. Lehmann:  Dr. Lehmann testified that Donna Passero contacted him "and said that with the deaths that we experienced, she thought there might be lawsuits," and that Ms. Passero hired him directly in November 2004 to assess the risks associated with the Recovery filter. (Ex. Q, Hr'g Tr., 87:21-23; 90:4-12.)  Dr. Lehmann testified at length about how the work that he did for Bard's Law Department (a large project that involved analyzing numerous types of expansive data) was substantially different from the work that he had done for Bard that began in late 2003 and ended in early 2004 (analysis of single incidents, completing FDA-mandated reports, and other duties as an interim medical director). (*Id.* at 88:9 to 92:11; 103:19 to 104:8.)  In fact, Dr. Lehmann's report is significantly more extensive both in scope and detail than any other report that he or anyone else at Bard has created either before or after; and in the millions of pages of documents that Bard has produced in cases around the country, neither Bard nor the plaintiffs have been unable to identify anything similar to Dr. Lehmann's report.

These facts and sworn testimony are indisputable, and they easily meet Bard's burden of proving that Dr. Lehmann's report "can be fairly said to have been prepared or obtained because of the prospect of litigation." *United States v. Richey*, 632 F.3d 559, 568 (9th Cir. 2011).  Accordingly, Dr. Lehmann's report is protected work product that the plaintiffs should not be permitted to use in their cases.

**2. Plaintiffs cannot carry their burden of proof that they have "substantial need" for Dr. Lehmann's report, and that they will have "undue hardship" in obtaining "substantially equivalent" information.**

Plaintiffs have the burden of proof to overcome work-product protection, and must prove both a "substantial need" for the information and "undue hardship" in obtaining "substantially equivalent" material by other means. Fed. R. Civ. Pro. 26(b)(3) (work product can be overcome "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means"); *Admiral Ins. Co. v. U.S. District Court for the District of Arizona*, 881 F.2d 1486, 1494 (9th Cir. 1989) (noting that work product may be overcome only "upon an adverse party's demonstration of substantial need or inability to obtain the equivalent without undue hardship") (citing *Upjohn v. United States*, 449 U.S. 383, 401 (1981)). The Advisory Committee Note to Rule 26 makes clear that a "special showing" must be made to satisfy this requirement. *Bickler v. Senior Lifestyle Corp.*, 266 F.R.D. 379, 384 (D. Ariz. 2010) (Campbell, J.) (citing Fed. R. Civ. P. 26(b)(3) advisory committee's note (1970)). Here, the plaintiffs cannot meet the high bar to show "substantial need" for Dr. Lehmann's report and "undue hardship" in obtaining "substantially equivalent" material.

All courts to consider this issue in the context of Dr. Lehmann's report have uniformly held that the plaintiffs have fallen well short of meeting this burden, and for good reason—there are numerous alternative sources of discoverable information that the plaintiffs can use in their cases, including *the exact same data* that Dr. Lehmann used to prepare his report. (Ex. A, *Alexander* Or., at 14 (finding that "Plaintiff has access to the same data as Dr. Lehmann; thus they can obtain the substantial equivalent of the Lehmann Report by other means and without undue hardship," and citing numerous other federal district courts that found the same); *Ebert v. Bard*, No. 5:12-cv-01253-LS, 2014 WL 1632155 (E.D. Pa. Apr. 24, 2014) (finding that "plaintiff claims that even the most rigorous analysis of the same data used by Dr. Lehmann in preparing his report by the plaintiff's own experts would not be sufficient because he would have no other way to establish Bard's actual knowledge of the IVC filter's dangers without undue hardship. This is just not the case."), attached as Exhibit W; *Carr v. Bard*, 297 F.R.D. 328, 334

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

(N.D. Ohio 2014) (finding that "Carr goes on to assert that 'there is no other way for Plaintiff to establish that Bard's quality control and management employees were on notice of design defects in the Recovery Filter' except through production of the Lehmann Report.  Not so."), attached as Exhibit X; *Phillips v. Bard*, 290 F.R.D. 615, 671 (D. Nev. 2013) (same), attached as Exhibit Y.)

In fact, in several cases pending in this MDL that have proceeded through discovery (e.g., *Ebert* and *Keen*), the plaintiffs' counsel have hired an expert, Michael Freeman, to purportedly conduct the exact same analysis that Dr. Lehmann performed, purportedly using the exact same data that Dr. Lehmann used. (*See, e.g.,* Rule 26 Report of Michael Freeman, Feb. 25, 2014, produced in *Ebert v. C. R. Bard, Inc.*, attached as Exhibit BB).  Thus, the plaintiffs cannot meet the burden of proving substantial need or undue hardship, and their actions have proven that they have substantially equivalent information readily available. *See, e.g., Fletcher v. Union Pac. R.R. Co.*, 194 F.R.D. 666 (S.D. Cal. 2000) (an allegedly injured plaintiff sought work-product protected surveillance tapes of himself to prove his injuries, claiming that the tapes had an "utter uniqueness" and "nothing plaintiff can obtain on his own will ever approach the probative value and evidentiary power of films taken secretly of the plaintiff by plaintiff's opponent in this very litigation" and arguing that "there simply is—and never will be—any substantial equivalent which plaintiff can ever obtain"; the court found that the plaintiff did not meet his burden of "substantial need" because there was other evidence that could be used to show that he was injured, and mere corroborative evidence is rarely "necessary").

**3.  Plaintiffs cannot carry the burden of proof that Bard waived the work-product protection.**

**a.  Distribution of Dr. Lehmann's report to approximately twelve high-level Bard employees does not waive the work-product protection.**

Work-product protection is waived when protected materials are disclosed in a way that substantially increases the opportunity for potential adversaries to obtain the information. *Bickler v. Senior Lifestyle Corp.*, 266 F.R.D. 379, 384 (D. Ariz. 2010)

(Campbell, J.); 8 Charles Alan Wright, et al., *Federal Practice & Procedure* § 2024 (2d ed. 2010) (noting that disclosure to third persons does not waive work-product protection unless "it has substantially increased the opportunities for potential adversaries to obtain the information."). The plaintiffs cannot meet this burden that Bard substantially increased the risk that an adversary will come into possession of Dr. Lehmann's report.

Although the plaintiffs can claim that distribution of Dr. Lehmann's report internally at Bard waived the work-product protection, Dr. Lehmann's report was sent only to approximately twelve high-level employees. (Ex. V, Carr Aff.) Moreover, Donna Passero testified that as a matter of Bard policies and procedures, internal communications are kept confidential. (Ex. P, Passero Aff., ¶ 5.) Thus, there is no evidence that disclosure of Dr. Lehmann's report to a small number of senior employees within Bard substantially increased the likelihood that an adversary would come into possession of the document.[6] *See, e.g., Bickler*, 266 F.R.D. at 384 (Campbell, J.) (finding no waiver when documents at issue were disclosed *outside* the company to a federal agency).

### b. Compelled production of Dr. Lehmann's report during a recent trial does not waive the work-product protection.

In February 2015, *Phillips v. Bard* was tried in the United States District Court for the District of Nevada before the Honorable Judge Robert Jones. During the trial, Judge Jones admitted Dr. Lehmann's report into evidence over Bard's repeated objections. Judge Jones held a short argument on the work-product issue that lasted approximately ten minutes, but he would not consider briefing of the issue, nor would he permit Bard to submit the *Alexander* evidentiary hearing testimony and approximately sixty exhibits submitted during the hearing.

The plaintiffs cannot meet their burden of proof that Judge Jones' ruling waives Bard's work-product protection in the cases pending in the MDL. *See, e.g., In re*

---

[6] Indeed, a lawyer for an automotive manufacturer was recently fired, according to press reports, for having received reports of a defective ignition part and not telling anyone at the company. In contrast, Dr. Lehmann's report recommended further analysis of the Recovery filter, which obligated Donna Passero to distribute the report to employees who needed the information to take appropriate action. (Ex. Q, Hr'g Tr. at 124:15 to 125:5.)

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

*Convergent Tech. Second Half 1984 Sec. Litig.*, 122 F.R.D. 555, 565 (N.D. Cal. 1988) (noting that the burden of proof regarding waiver of the work-product protection is on the party asserting waiver).   To the contrary, black-letter law from around the country provides that compelled production of a protected document in one case (*Phillips*) does not waive the document's protection in other cases (the cases pending in the MDL).

As this Court has noted previously, courts "have been willing to preserve the work-product protection over documents in circumstances where the disclosure to a potential adversary was compelled." *Bickler v. Senior Lifestyle Corp.*, 266 F.R.D. 379, 384 (D. Ariz. 2010) (quotation omitted).   Indeed, courts around the country recognize that a document can even be in the public domain and still be protected by the attorney-client privilege or work-product doctrine if the production of the document was compelled. *See, e.g., Transamerica Computer Co., Inc. v. Int'l Bus. Machines Corp.,* 573 F.2d 646, 651 (9th Cir. 1978) (preserving privilege claims, finding that an expedited production of 17 million documents over a three-month period amounted to a "de facto compulsion" and also discussing general acceptance of the principle that waiver of protection cannot result from compelled production, and discussing historical context); *Hynix Semiconductor Inc. v. Rambus, Inc.*, No. 500CV20905, 2008 WL 1903388 (N.D. Cal. Jan. 31, 2008) (noting that as long as a party objects to compelled discovery of documents, the fact that documents were available on the internet and chat rooms did not waive the documents' protection in the instant case); *Aronson v. McKesson HBOC, Inc.,* No. 99-CV-20743, 2005 WL 934331, at *7 (N.D. Cal. Mar. 31, 2005) (finding that the work-product doctrine protected documents from discovery, and noting that "[c]ompelled disclosure of work product in one court is not a waiver in another"); *see also, e.g., Shields v. Sturm, Ruger & Co.,* 864 F.2d 379, 382 (5th Cir. 1989) (affirming the exclusion on the basis of work-product protection of a document used at another trial over the party's objection, noting that "[w]hen a party is compelled to disclose privileged work product and does so only after objecting and taking other reasonable steps to protect the privilege, one court's disregard of the privileged character of the material does not waive the privilege before

another court"); *Hamilton County v. Hotels.com, L.P.,* No. 3:11 CV 15, 2011 WL 3289274, at \*3 (D. Ohio July 19, 2011) (explaining that memoranda ordered produced in compliance with a Georgia state court's order and subsequently circulated among the Florida legislature and the media was not a voluntary disclosure and therefore did not waive work-product protection or attorney-client privilege); *Int'l Union of Operating Engineers, Local No. 132 v. Philip Morris, Inc.*, No. Civ.A. 3:97-0708, 1999 WL 33659387 (S.D. W.Va. June 28, 1999) (finding that compelled production of documents to Congress did not waive the attorney-client privilege or work-product protection because "the involuntary or compelled production of privileged or protected documents does not waive otherwise applicable claims of privilege or protection so long as the privilege holder objects and takes reasonable steps to protect its claims of privilege and protection").[7]

In *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379 (5th Cir. 1989), which this Court has cited with approval, the Fifth Circuit addressed the identical issue before this Court:

- In *Shields*, the defendants' lawyers hired a consultant to prepare a report drafted in anticipation of litigation. *Id.* at 382.  Likewise, in this case, Bard's Assistant General Counsel hired Dr. Lehmann to prepare a report in anticipation of litigation.

- In *Shields*, over the defendants' objection that the litigation consultant's report was protected work product, the trial court in California allowed the report to be introduced at trial. *Id.* at 381-82.  Likewise, in *Phillips*, over

---

[7] *See also, e.g., Gov't Guar. Fund of Repub. Of Finland v. Hyatt Corp.,* 182 F.R.D. 182 (D.V.I. 1998) (noting that "[t]he attorney client privilege is not destroyed by disclosure of protected information to an outside party which is done only under the compulsion of a court order," and that "production of privileged materials in one action pursuant to a court order does not constitute waiver of privilege for other lawsuits"); *Leonen v. Johns-Manville,* 135 F.R.D. 94, 99 n.3 (D.N.J. 1990) (finding that Illinois court order compelling production does not vitiate protection for subsequent New Jersey proceeding); Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 412 (5th ed. 2007); Paul R. Rice, *Attorney-Client Privilege in the United States* § 9:26, 9-78 (2d ed. 2007 rev.); *Attorney-Corporate Client Privilege* § 7:63 (3d ed. 2015) (discussing that "compelled disclosure of work product in one court may not be held to be a waiver in another").

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Bard's numerous objections, the court allowed Dr. Lehmann's report to be introduced at trial.

- In *Shields*, the defendants moved in limine to protect the litigation consultant's report from subsequent use before a trial in the Southern District of Mississippi (that was later appealed to the Fifth Circuit). *Id.* at 381.   Likewise, in this case, Bard has moved for a protective order to preclude Dr. Lehmann's report from use in cases in the MDL.

In *Shields*, the Fifth Circuit affirmed that there had been no waiver of the defendants' work-product assertion.  The Court found that "[w]hen a party is compelled to disclose privileged work product and does so only after objecting and taking other reasonable steps to protect the privilege, one court's disregard of the privileged character of the material does not waive the privilege before another court." *Id.* at 382; *see also* cases cited *supra*.  The Fifth Circuit reasoned that because the defendants were compelled to produce the work-product protected consultant's report in the California case, and the defendants objected and took reasonable steps to protect the consultant's report, they had not waived the work-product protection in either the California court or in the District of Mississippi.

Throughout the litigation involving Bard's IVC filters, Bard has consistently objected to the use of Dr. Lehmann's report and has filed motions for protective order in cases across the country, including the instant motion.  During the *Phillips* trial, Bard objected to the document's use at trial, argued the issue during a hearing in the middle of trial, and objected again to its introduction before it was offered into evidence. *Phillips* Tr., Feb. 2, 2015, attached as Exhibit Z; *Phillips* Tr., 308:10 to 309:23, Feb. 5, 2015, attached as Exhibit AA.  In short, Bard has done everything within its power to assert and maintain its work-product claim to protect Dr. Lehmann's report.  Therefore, for the same reasons that courts in the Ninth Circuit, the Fifth Circuit in *Shields*, and numerous other courts from around the country have articulated, this Court should find that the compelled production of Dr. Lehmann's report during the *Phillips* trial does not waive Bard's work-

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

product claim in the cases in the MDL.

**B.  No evidentiary hearing is necessary to resolve Bard's work-product claim.**

For numerous reasons, an evidentiary hearing in the MDL is not necessary to resolve Bard's work-product claim.  First, an evidentiary hearing was already held about this precise issue in June 2014 in *Alexander v. C. R. Bard, Inc.*, which was pending in the United States District Court for the Northern District of Texas.  At the hearing, both Dr. Lehmann and Donna Passero testified and were cross examined for approximately three hours about the reasons for the creation of Dr. Lehmann's report.  As exhibits to the instant motion, Bard has included both the transcript of the evidentiary hearing and the exhibits that it submitted during the evidentiary hearing, all of which are available for the MDL plaintiffs in challenging Bard's work-product claim.

Second, at the evidentiary hearing, the plaintiff was represented by two members of the MDL Plaintiffs' Steering Committee, John Dalimonte and Ben Martin.  Since December 2013, Mr. Dalimonte and Mr. Martin have been litigating whether Dr. Lehmann's report is work product.  Thus, by the time of the evidentiary hearing in June 2014, counsel were well-versed in the arguments that plaintiffs had made to challenge Bard's work-product assertion, and counsel addressed all of the arguments when cross examining the witnesses:  whether Bard waived work-product protection by dissemination of Dr. Lehmann's report inside of Bard and purportedly outside of Bard; whether Bard was required to prepare Dr. Lehmann's report because of federal regulations; whether Dr. Lehmann's analysis for the Law Department in his December 2004 report was the same as his analysis performed while working as interim medical director for Bard in early 2004; and whether the use of Dr. Lehmann's findings by the Product Assessment Team before Dr. Lehmann's report was finalized indicates that it was created for business purposes.

Third, since the evidentiary hearing in June 2014, the plaintiffs have not identified any new factual issues that warrant re-examining Dr. Lehmann or Donna Passero.  In fact, the arguments that the plaintiffs made in *Alexander* are the same arguments that plaintiffs continue to make to this day, including in their most recent state-court filings in October

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

2015 in *Austin v. C. R. Bard, Inc*.

Fourth, in all of the research that counsel for Bard has done litigating this issue over the past two years, counsel for Bard have never seen a case where a party asserting work-product protection has produced as comprehensive and voluminous evidence in support of their claim as Bard has produced here.  In this context, requiring Bard to attempt to produce Dr. Lehmann and its former Assistant General Counsel—neither of whom is an employee of Bard anymore and neither of whom resides in Arizona—for a second evidentiary hearing would be unprecedented.

**C. The Court's ruling should have no effect in cases where the work-product status of Dr. Lehmann's report has already been decided.**

As a general matter, a transferee court may vacate or modify an order of a transferor court. *See Manual for Complex Litigation* § 20.132, at 222 (4th ed. 2004); *In re Upjohn Co. Antibiotic Cleocin Prods. Liab. Litig.*, 664 F.2d 114 (6th Cir. 1981).  But U.S. Supreme Court precedent concerning the "law of the case" appears to limit the transferor court's authority in this regard to extraordinary circumstances where the initial decision was clearly erroneous or would make a manifest injustice.  Because no such extraordinary circumstances exist in the context of previous work-product rulings on Dr. Lehmann's report, the Court's ruling on Bard's instant motion should have no impact in cases where the transferor court already decided the matter.

In *Arizona v. California*, 460 U.S. 605, 618 (1983), the U.S. Supreme Court discussed the law-of-the-case doctrine, noting that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."   The law-of-the-case doctrine applies equally in the MDL setting where transferor courts entered orders before the case was transferred to the MDL. *See, e.g., In re Pharmacy Benefit Managers Antitrust Litig. (MDL 1782)*, 582 F.3d 432 (3d Cir. 2009) (vacating MDL court's order where MDL court vacated transferor court's order without the finding of extraordinary circumstances needed under the law-of-the-case doctrine); Wright & Miller, 15 *Fed. Prac. & Proc. Juris.* § 3867 (4th ed. 2015) ("Rulings made by

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

the transferor court remain in effect in the transferee court. The transferee court respects those rulings under the 'law of the case' doctrine . . . .").

The Supreme Court explained the scope of a district court's discretion in changing prior decisions as follows:

> A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would make a manifest injustice.

*Christianson v. Colt Indus. Operating Corp.* 486 U.S. 800, 817 (1988) (quotation omitted); *see Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1036 (9th Cir. 2015) (discussing the Ninth Circuit's adherence to the law-of-the-case doctrine and guidance by *Christianson*).  In *Christianson*, the Federal Circuit decided that it lacked jurisdiction in an antitrust case with embedded questions of patent validity, and the court transferred the case to the Seventh Circuit. 486 U.S. at 803-07.  The Seventh Circuit then concluded that the Federal Circuit was "clearly wrong" about the jurisdictional issue, and transferred the case back. *Id.* at 806.  The U.S. Supreme Court, applying the law-of-the-case doctrine, held that the Seventh Circuit erred in failing to adhere to the Federal Circuit's jurisdictional determination because the determination was "plausible," and thus was not "clearly erroneous" or amounting to "manifest injustice." *Id.* at 819; *Microsoft*, 795 F.3d at 1037 (finding no "clear[] error" or "manifest injustice" requiring it to depart from the Federal Circuit's determine about jurisdiction).

The Ninth Circuit has identified three exceptional circumstances that warrant deviating from the law of the case:  (1) the decision is clearly erroneous and its enforcement would work a manifest injustice; (2) intervening controlling authority; or (3) substantially different evidence was adduced at a subsequent trial. *Gonzalez v. Arizona*, 624 F.3d 1162, 1186-87 (9th Cir. 2010) (quotation omitted).  None of these situations apply in the context of previous decisions regarding Dr. Lehmann's report where the parties presented their evidence and the courts reached their "plausible" conclusions.  Accordingly, applying the law-of-the-case doctrine, previous orders regarding Dr.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1   Lehmann's report should remain in effect despite the Court's ruling on Bard's instant

2   motion.

3                               **CONCLUSION**

4          The Court should grant Bard's Motion for Protective Order and find that Dr.

5   Lehmann's report is protected work product without exception or waiver.   Bard has

6   submitted overwhelming evidence in support of its work-product assertion regarding Dr.

7   Lehmann's December 15, 2004, report—sworn testimony of the author of the report and

8   the Assistant General Counsel who hired him that the document was prepared in

9   anticipation of litigation; the contract between Dr. Lehmann and Bard's Law Department,

10  which provides that the report was being prepared in anticipation of litigation; the report

11  itself, which is identified as "Privileged and confidential Attorney work product --

12  Pursuant to contract"; and voluminous evidence that Bard anticipated litigation at the time

13  that Dr. Lehmann's report was prepared.  This direct evidence meets Bard's burden of

14  proof that Dr. Lehmann's report was prepared "because of" litigation and is protected

15  work product.  Moreover, the plaintiffs have numerous sources of substantially equivalent

16  information, including the actual data used in preparing Dr. Lehmann's report, and

17  therefore cannot meet their burden of "undue hardship" and "substantial need" for Dr.

18  Lehmann's report.  Finally, the plaintiffs cannot meet their burden of proof that Bard

19  waived the work-product protection.

20         Moreover, the Court should not conduct another evidentiary hearing.   An

21  evidentiary hearing was conducted in June 2014 where Dr. Lehmann and Donna Passero

22  testified and were cross examined by a member of the PSC who was intimately familiar

23  with, and who raised, every argument that plaintiffs across the country have made and

24  continue to make about the discoverability of Dr. Lehmann's report.  No new factual

25  issues require exploring, the record is more developed and voluminous than Bard can find

26  in any reported case concerning the work-product protection, and neither Dr. Lehmann

27  nor Donna Passero are employees of Bard.

28         Finally, applying the law-of-the-case doctrine, transferor courts' previous orders

regarding Dr. Lehmann's report should remain in effect despite the Court's ruling on Bard's instant motion.

DATED this 30th day of November, 2015.

SNELL & WILMER L.L.P.

By: s/ _____
    James R. Condo
    Amanda C. Sheridan
    One Arizona Center
    400 E. Van Buren, Suite 1900
    Phoenix, Arizona  85004-2202

    Richard B. North, Jr. (admitted *pro hac vice*)
    Georgia Bar No. 545599
    Matthew B. Lerner (admitted *pro hac vice*)
    Georgia Bar No. 446986
    Nelson Mullins Riley & Scarborough LLP
    201 17th Street, NW / Suite 1700
    Atlanta, GA  30363

    Attorneys for C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2015, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

s/ _____

23008512