James R. Condo (#005867) – jcondo@swlaw.com
Amanda C. Sheridan (#027360) – sheridan@swlaw.com
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
Telephone:  602-382-6000

Richard B. North, Jr. – richard.north@nelsonmullins.com
Georgia Bar No. 545599 – (admitted *pro hac vice*)
Matthew B. Lerner – matthew.lerner@nelsonmullins.com
Georgia Bar No. 446986 – (admitted *pro hac vice*)
NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street, NW / Suite 1700
Atlanta, GA  30363
Telephone: 404-322-6000

Attorneys for Defendants


Robert W. Boatman (#009619) - rwb@gknet.com
Paul L. Stoller (#016773) - paul.stoller@gknet.com
Shannon L. Clark (#019708) – slc@gknet.com
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:  602-530-8000

Ramon Rossi Lopez - rlopez@lopezmchugh.com
California Bar Number 86361 – (admitted *pro hac vice*)
LOPEZ MCHUGH LLP
100 Bayview Circle, Suite 5600
Newport Beach, California 92660
Telephone:  949-812-5771

Co-Lead/Liaison Counsel for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation, | No. 2:15-MD-02641-DGC<br><br>**JOINT REPORT ON PRIVILEGE LOG EFFORTS** |

Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively "Bard") and Plaintiffs hereby jointly report on the parties' privilege log efforts as ordered by the Court on October 30, 2015 as follows:

**A. Joint Review of Entries on the Privilege Logs**

1. On November 13, 2015, Bard provided Plaintiffs with the current version of its privilege logs and identified all documents that had been withdrawn from the privilege logs at any point in the pre-MDL litigation.

2. The Court entered a joint request for a 502(d) Order and a Stipulation regarding the privilege logs. Pursuant to that Order, the parties accomplished the following:

   a. Plaintiffs selected 278 entries from Bard's privilege logs to challenge (approximately 5% of the entries on Bard's privilege logs). As a part of the meet-and-confer process, the parties discussed every document.

   b. Bard identified 29 entries from Bard's privilege logs that captured the categories discussed in subparagraph 2.e below.

   c. The parties then conducted an in-person review of approximately 60 entries selected by Plaintiffs' counsel. Bard withheld five documents identified by Plaintiffs for in-person review, but those were discussed by counsel.[1] All other documents were reviewed and discussed.

   d. Bard agreed to withdraw 57 entries from its privilege log and to produce 48 entries with redactions.[2] Plaintiffs agreed to withdraw challenges as to 45 challenged entries and, after having reviewed the redacted documents, further agreed to withdraw challenges as to 13 of the 48 entries produced redacted.

   e. Plaintiffs also identified certain categories of documents that they thought were per se discoverable. To identify any potential documents falling within these categories, Bard performed an electronic word search and manual search for each category and responded to Plaintiffs on those categories as follows:

---

[1] Pursuant to the agreement of the parties, Bard withheld those documents because they contained sensitive work product.

[2] Bard does not concede that all of the documents it is producing and removing from the log are not privileged, but produced them in an effort to resolve the dispute.

      i. Bard confirmed that there are no documents relating to Corporate Management Committee Notes listed on the privilege logs.

      ii. Bard confirmed that there are no communications to or from employees of Hill and Knowlton, or that reference material prepared by Hill and Knowlton on the privilege logs.

      iii. Bard confirmed that documents collected for Bard's lead counsel, Richard North, prior to 2006 were produced and that no such documents are listed on the privilege log.

      iv. Bard confirmed that there are no documents analyzing the costs of performing a study on the safety or efficacy of the Recovery Filter during the time period agreed to by the parties.

      v. Bard provided Plaintiffs with a list of entries on the privilege logs regarding draft Health Hazard Evaluations or Remedial Action Plans.

      vi. Bard provided Plaintiffs with a list of the communications to/from two former Bard consultants, Dr. John Kaufman and Mr. Richard Bliss, on the privilege logs, and the parties discussed each of those entries.

**B. Areas of Agreement and Disagreement and Proposals Going Forward**

The parties still disagree on a number of documents and whether certain types of documents are privileged or protected work product. As such, the parties submit the following positions and proposals for resolving the remaining areas of disagreement:

**1. <u>Plaintiffs' Position and Proposal</u>**

At the October 29, 2015, Case Management Conference, Plaintiffs informed the Court that prior sampling efforts in pre-MDL litigation, as well as the face of Bard's privilege logs, indicated that Bard is improperly withholding several thousand relevant documents pursuant to claims of attorney-client privilege and the work product doctrine. Multiple pre-MDL sampling efforts by Plaintiffs found that anywhere from one-third to one-half of the

documents being sampled had been inappropriately withheld pursuant to claims of attorney-client privilege or work product.

In response, Bard asserted that it had resolved all issues with the adequacy of its privilege claims. Bard represented to the Court that after the pre-MDL sampling efforts and the rulings in *Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615 (D. Nev. 2013), it reviewed its logs, amended them to bring them in compliance with the *Phillips* ruling, and produced all inappropriately withheld documents.

The sampling procedure that the parties completed in the last two months establishes that these statements were mistaken. Bard's privilege logs still contain substantial improper privilege claims and further investigation beyond the 5% that has been sampled is necessary.

- For 62.5% (192 of 307) of the sampled privilege log entries, the parties could not agree on the propriety of Bard's privilege claims even after several telephonic and in-person meet and confer discussions, including in some cases reviewing unredacted versions of the actual document. These entries remain inappropriate.

- For 18.56% (57 of 307), Bard produced the document in full, albeit taking the position it was producing some number of those only as a compromise to avoid further dispute. And for 15.63% (48 of 307) Bard produced redacted versions as a meet and confer compromise, such as producing emails but withholding attachments or vice versa. Thus, in total, 34.2% of the sampled documents were produced by Bard in whole or in part after being challenged.

- Of the 48 privilege log entries subsequently produced in redacted form, Plaintiffs have accepted the redactions as to 13, but the remaining 35 have inappropriate privilege claims.

- For 14.65% (45 of 307), Plaintiffs were able to withdraw their challenge to the documents, but only after further discussion and description from Bard beyond what was provided in the privilege log.

Thus, despite good faith meet and confer efforts by both sides, the existing process did not resolve many of the parties disputes.  A majority, 74% (192 remaining challenged entries + 35 entries where redactions are challenged = 227 of 307), of the sampled documents still have their privilege designation disputed by Plaintiffs even after substantial further discussion. Even where Plaintiffs were able to withdraw their challenges (45 of 307 or 14.65%), this determination could only be made after Defendants provided a more adequate description of the entry because the descriptions in Bard's privilege logs often do not accurately reflect the actual documents. For example, when dealing with long email chains, Bard typically only provides information for the final email in the chain. And Bard's privilege logs continue to claim documents as giving or rendering legal advice even though identical or nearly identical documents were ordered released in the *Phillips* case. As even Bard is forced to acknowledge, the result of phase one is that substantial further work will be required to address Bard's remaining approximately 5,400 claims of attorney-client and work product privilege.

Consistent with the Court's Order, the parties had discussed and agreed that a second phase of privilege log evaluation would follow if the phase one sampling process revealed problems with Bard's logs and could not be resolved by the parties.  The Court's Order required the parties to propose methods for phase two to validate Bard's claims of privilege and to ensure the logs are brought into compliance with governing law.

Addressing Bard's remaining outstanding privilege and work product claims requires balancing the following interests: (1) Plaintiffs' need for all discoverable and unprivileged information; (2) Defendants' right to have privilege and work product claims upheld where properly designated; (3) the potential burden on the Court from adjudicating thousands of individual privileged entries; and (4) the need to expeditiously resolve these matters within a reasonable amount of time so that discovery can proceed. The extensive sampling and review procedure adopted thus far, which has taken three months and hundreds of hours, is not feasible to address the remaining 95% of Bard's privilege log entries. Moreover, while the

parties informally resolved their disputes as to some of the reviewed documents, of the 5% sampled in phase one 74% still need to be ruled on by the Court (or a special master). A more expedient process is needed.

Plaintiffs propose that the Court employ the use of categorical privilege rulings modeled after those used in comparable mass tort multi-district litigations. *E.g, In re Vioxx Products Liability Litig.,* 501 F. Supp. 2d 789 (E.D. La. 2007). By making categorical rulings, the Court can minimize the burden on the judicial system while providing a fair and expeditious adjudication for the parties. Moreover, Bard is afforded an extra layer of protection under the process Plaintiffs propose because Bard can move for reconsideration and *in camera* review, either by the Court or by a special master appointed for the purpose, of any individual document it feels falls within a categorical order of production but still warrants privileged status.

Plaintiffs propose that the Court adopt an order that Bard has failed to establish privilege as to the following categories of documents.[3]

- Entries where no legal personnel are listed as either an author or recipient of a communication.
- Entries where both the author and the recipient are non-lawyers and an attorney was merely "cc'd" on the communication.
- Entries that do not identify the author or recipient of the communication.
- Entries describing an attachment that was not authored by a lawyer and that was sent to a group of both non-lawyers and lawyers for review.
- Entries describing an attachment that was not drafted by or sent to an attorney but that merely references an attorney.

---

[3] The principles reflected in these categories apply to claims of work product as well as attorney-client privilege. Documents prepared in the course of ordinary business, that were not primarily motivated by litigation, or that consist of non-legal data (even if forwarded for review by in-house counsel) are not work product. Indeed, the magistrate judge in the *Phillips* case appears to have adopted a similar approach to assessing both attorney-client and work product privilege claims. *See Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 629, 635-36 (D. Nev. 2013).

- Entries that do not reflect that any legal advice was given or requested.
- Entries where a non-party is an author, recipient, or listed as receiving a copy of the communication so as to have waived any attorney-client privilege.

Both sides have worked hard and in good faith over the last three months to address the propriety of Bard's privilege logs, including approximately 20-25 hours of telephonic and in-person meet and confer sessions and hundreds of hours of privilege log review by Plaintiffs' counsel. All of that work over the last three months was only to vet 5% of the privilege log entries. It is simply not practical to, as Bard proposes, apply that same laborious process to the remaining 5,400 or so privilege log entries. Doing so would cause substantial delay and would be unfair to Plaintiffs. Bard offers no legal authority for the laborious procedure it proposes, and no MDL or any other court has adopted such a procedure because it is impractical, burdensome, and cannot work on a large scale.

Plaintiffs are continuing to meet and confer with Bard on privilege log issues even after the filing of this joint report and hope to reach further agreement on both the categories of documents listed above and the issues Bard raises in its position statement below. Plaintiffs are optimistic that at the upcoming Case Management Conference next week the parties will be able to report additional agreement(s) on resolving privilege log issues.

**2. Bard's Position and Proposal**

As reported in The Parties' Proposed Agenda and Discussion of Issues Submitted Pursuant to the Court's September 15, 2015 Order Setting Initial Case Management Conference filed on October 9, 2015, Bard has extensively litigated the sufficiency of its privilege logs before the formation of the Bard IVC Filter MDL. In fact, Troy Brenes, who is leading the MDL Plaintiffs' privilege team, also led the privilege log challenge against Bard in *Phillips v. C. R. Bard., Inc.*

In *Phillips v. C. R. Bard, Inc.*, 290 F.R.D. 615, 638 (D. Nev. 2013), the Court issued a 67-page ruling applying Ninth Circuit law, and held that "Bard's privilege logs, which

identify much of the information outlined in *In re Grand Jury Investigation*, 974 F.2d 1068 (9th Cir. 1992) and *Dole v. Milonas*, 889 F.2d 885 (9th Cir. 1989) satisfy the requirements of Federal Rule of Civil Procedure 26(b)(5)." Both before and after the *Phillips* decision, Bard spent hundreds of hours revising its privilege logs to address Mr. Brenes' challenges and concerns. While Bard recognizes that previous rulings are not binding in this proceeding, Bard believes that the *Phillips* decision establishes that its privilege logs, which are the product of extensive review, revision, and previous litigation, are sufficient under Federal Rule of Civil Procedure 26(b)(5)(A) and Ninth Circuit law.

Despite already extensively litigating the adequacy of Bard's privilege logs in *Phillips*, Mr. Brenes and the MDL Plaintiffs seek to re-litigate this exact same issue in the MDL. During the recent meet and confer, Bard continued to work with Plaintiffs in good faith to address and resolve as many of the Plaintiffs' outstanding issues with Bard's privilege logs as possible. Given Plaintiffs' rigid stance on the substantial majority of the documents challenged, however, even after lengthy discussions about why particular documents are protected under Ninth Circuit law, Bard is concerned that Plaintiffs are principally attempting to create a costly and burdensome dispute for Bard, both by re-litigating issues that have been thoughtfully addressed by other courts and by challenging privilege claims that are routinely upheld by virtually all courts considering such issues—indeed, Plaintiffs take the incredulous position in this report that they are challenging every single privilege log entry.

For example, Plaintiffs have included the following items in their challenges:

- Documents that the *Phillips* court already ruled are privileged;
- Work product relating to specific lawsuits;
- Work product where a paralegal in Bard's Law Department, rather than a lawyer, authored the communication regarding litigation; and
- Numerous documents relating to intellectual property advice that is clearly legal in nature (as well as wholly unrelated to the issues in the consolidated cases).

Bard reviewed every document that Plaintiffs identified as part of the parties' recent meet-and-confer sessions, provided Plaintiffs further information and explanation as to these documents, and produced numerous documents under the 502(d) Order in a good-faith attempt to resolve Plaintiffs' issues. Moreover, counsel for Bard traveled from Atlanta to Phoenix as a courtesy to the Plaintiffs to meet for the in person review and discussion.

Plaintiffs' position throughout the meet and confer, however, was that the process was simply an "interim step," and that the adequacy of Bard's privilege logs needs to be litigated again despite previous rulings, finding the privilege logs to be sufficient. Thus, Plaintiffs remain unsatisfied by Bard's efforts during the meet-and-confer process. Indeed, Plaintiffs claim that what Bard considers the standard meet-and-confer process that the parties undertook, as defined by the Federal Rules of Civil Procedure, is "impractical" and "laborious."

In a further effort to bridge the present divide, rather than the sweeping approach Plaintiffs advocate, which is not tailored to the individual privileged communications at issue, Bard proposes a "hybrid" individualized-category review approach to resolving Plaintiffs' privilege challenges. Bard believes that if all of the parties are involved and invested in this hybrid process, a meaningful meet-and-confer process will result that should be able to resolve many of Plaintiffs' issues. For issues that cannot be resolved through the meet-and-confer process, Bard's hybrid approach attempts to present the remaining issues to the Court (or its designee) in an organized fashion to minimize any burden on the Court. The hybrid approach that Bard proposes is as follows:

1. Plaintiffs have been inconsistent about exactly how many of Bard's privilege log entries they seek to challenge. In this report, Plaintiffs claim that they are challenging every single privilege log entry. During the meet-and-confer process, however, Plaintiffs said that they are not challenging every entry on the privilege logs, albeit without identifying any privilege log entries that they acknowledge are sufficient (other than the entries resolved

   in the recent meet and confer). As such, under Bard's approach, Plaintiffs should first review the privilege logs and identify every entry that they do <u>not</u> challenge, so as to allow the parties to focus only on the entries in dispute.[4]

2. Once Plaintiffs identify the privilege log entries in dispute, the parties should each identify 100 documents at a time (for a total of 200 documents) and meet and confer to attempt to resolve Plaintiffs' dispute.

3. For documents where the parties are able to resolve Plaintiffs' dispute, the parties should categorize the documents in such a way that the categories can apply to other disputed documents on the privilege log. (For example, Plaintiffs may eventually agree that "work product relating to a specific case" is a protected category of documents. The parties can then use this category to classify other entries on the privilege log falling into the same category, thereby reducing the number of documents for future meet and confer sessions.)

4. If the parties cannot resolve Plaintiffs' dispute, then the parties should jointly group the disputed documents from among the 200 documents being discussed into categories for the Court (or its designee). Joint categorizations of these documents will require the parties to work together, and alleviate the burden on the Court (or its designee) in resolving the dispute.

5. The Court can then determine how (and who) it wants to address the remaining issues through, for example, briefing and/or in-camera review.

6. After the Court (or its designee) rules on the remaining documents in dispute, the parties can apply the ruling to future meet-and-confer sessions

---

[4] Until Plaintiff identifies the entries at issue, under either party's proposed approach, Bard will be chasing a moving target. Plaintiffs can simply add entries or categories of dispute requiring additional review of the privilege logs.

of 200 documents (100 chosen by each party).

Bard believes that this staggered approach of successive rounds of meet-and-confer sessions with some Court involvement balances both the need for individualized review of documents and also expeditiously resolving Plaintiffs privilege challenges. Bard also thinks that Plaintiffs' broad "category" approach taken from the *Vioxx* litigation is inappropriate for this MDL for several reasons:

1. Plaintiffs' principal stated reason for wanting to employ a "category" approach is that the first round of meet-and-confers took "three months" and "hundreds of hours." In fact, however, the parties only met and conferred for five weeks between the dates of December 1 and January 7 (through several major holidays), and were able to individually review 278 documents.[5] The substantially majority of the workload fell to Bard in providing additional detail about each of the documents to Plaintiffs, and it did not take anywhere near "hundreds of hours" to do so. Thus, Plaintiffs' principal argument for a "category approach" is premised on a straw-man argument. Bard believes that with the parties working in good faith, its hybrid approach can be accomplished in a matter of months without causing any prejudice to Plaintiffs.

2. Bard's approach requires both parties to be engaged in the meet-and-confer process to resolve Plaintiffs' disputes. The process ought to resolve many of Plaintiffs' issues and will continuously tailor the remaining issues to the entries and documents that are relevant in this MDL. By contrast, Plaintiffs' approach quickly puts every privilege log entry into rudimentary categories, and puts the burden on the Court, rather than the parties, to resolve what should be a cooperative resolution of a discovery issue.

---

[5] The Court entered Case Management Order No. 2 until October 30, 2015 and Bard produced the privilege logs on November 13, 2015. The 502(d) Order was entered on December 1, 2015 and the parties started their meet and confer.

3. The percentages that Plaintiffs cite concerning the outcome of the parties' recent meet-and-confer process that they claim necessitates a *Vioxx*-like "category" approach are not particularly meaningful. The documents that remain at issue are largely documents that other courts in the IVC filter litigation and federal courts generally have found to be protected.

4. Plaintiffs' "category" approach does not ultimately resolve their privilege log disputes. Rather, Plaintiffs' position is that the Court should make rulings on several broad-sweeping categories, and then Bard should justify exceptions to those categories by proposing subcategories or by seeking document-by-document exceptions, all of which will require further briefing and burden on the Court and Bard.

5. None of the broad categories that Plaintiffs proposed are appropriately susceptible to a blanket ruling because each relates to an individual assertion of privilege in the context of a specific entry on the log.[6] Bard's proposed meet-and-confer hybrid approach, however, aims to balance the need for individualized review with the desire to expeditiously resolve Plaintiffs' challenges by clarifying the issues and narrowing the documents at issue for judicial resolution.

6. The Plaintiffs' proposed categories are those identified in the *Vioxx* case, many of which are not applicable to the Bard privilege logs. For example, "Entries that do not reflect that any legal advice was given or requested" is not an issue in this litigation. Bard's logs specifically identify if legal advice

---

[6] For example, in Plaintiffs' first category "Entries where no legal personnel are listed as either an author or recipient of a communication ," the court in *In re: Vioxx Products Liability Litigation*, 501 F.Supp.2d 789, 798 (E.D. La. 2007), found that the attorney-client privilege "protects communications between those employees and corporate legal counsel on matters within the scope of their corporate responsibilities, **as well as communications between corporate employees in which prior advice received is being transmitted to those who have a need to know in the scope of their corporate responsibilities**." (Emphasis added) Thus there will have to be a review of each and every document in that broad category.

was implicated in each entry, and the *Phillips* court found the log entries to be adequate.

7. Plaintiffs are not committing that the categories they have identified in their proposal are inclusive of all potential categories, and thereby leave open the possibility that additional categories will be identified as the process evolves. Such an approach creates a continuous "moving target" both for Bard and for the Court that will not promote an ultimate resolution of these issues.

8. Plaintiffs' proposal places the burden on Bard to identify which documents fall into the broad *Vioxx* categories. This approach will necessarily lead to disputes over whether documents were properly categorized. Such a procedure also would increase the burden on the Court, which the parties should be able to avoid if they follow Bard's proposed approach.

9. Plaintiffs' broad-sweeping proposal is also ill-suited for this MDL because Bard's privilege logs contain only approximately 5400 privilege log entries. These logs are in stark contrast to the significantly longer privilege log in *Vioxx* that contained 30,000 entries. Given that far fewer documents are at issue in the Bard MDL, the risk that privileged documents could be ordered to be produced in bulk without any individual review far outweighs any perceived initial benefit from making rulings on broad categories of documents. The relative short length of Bard's privilege logs can be more efficiently addressed in a more streamlined and individualized manner that Bard's approach aims to accomplish.

DATED this 21st day of January, 2016.

| GALLAGHER & KENNEDY, P.A. | NELSON MULLINS RILEY & SCARBOROUGH LLP |
|---|---|
| By: s/Robert W. Boatman<br>Robert W. Boatman<br>Paul L. Stoller<br>Shannon L. Clark<br>2575 E Camelback Road<br>Phoenix, Arizona 85016-9225<br><br>Ramon Rossi Lopez<br>(admitted *pro hac vice*)<br>Lopez McHugh LLP<br>100 Bayview Circle, Suite 5600<br>Newport Beach, CA 92660<br><br>Co-Lead/Liaison Counsel for Plaintiffs | By: s/Richard B. North, Jr.<br>Richard B. North, Jr.<br>(admitted *pro hac vice*)<br>Georgia Bar No. 545599<br>Matthew B. Lerner (admitted *pro hac vice*)<br>Georgia Bar No. 446986<br>201 17th Street, NW / Suite 1700<br>Atlanta, GA 30363<br><br>James R. Condo<br>Amanda C. Sheridan<br>One Arizona Center<br>SNELL & WILMER L.L.P.<br>400 E. Van Buren, Suite 1900<br>Phoenix, Arizona 85004-2202<br><br>Attorneys for C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. |

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 21, 2016, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

    s/Richard B. North, Jr.
    Richard B. North, Jr.