# Exhibit B

Chad Michael Modra

```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF ARIZONA

3

4

     IN RE: BARD IVC FILTERS PRODUCTS    )
5    LIABILITY LITIGATION,               ) MD No.: 02641

     _____)

6

7

8

9

10

11

12

13

14        VIDEOTAPED DEPOSITION OF CHAD MICHAEL MODRA

15                   Phoenix, Arizona

                   December 15, 2015

16                     9:06 a.m.

17

18

19

20

21

22

23   REPORTED BY:

24   Robin L. B. Osterode, RPR, CSR

25   AZ Certified Reporter No. 50695
```

Golkow Technologies, Inc.                          Page 1

Chad Michael Modra

1      Q.    Okay.  And when you say you re -- you

2   reviewed those documents, precisely what are you

3   speaking about?

4      A.    Well, I was involved in writing pretty much

5   all of them.  So it was more of a refreshing my

6   memory on those.

7      Q.    Okay.

8      A.    On the warning letter response, the warning

9   letter, and the responses since that time.

10     Q.    Okay.  I'm going to come back to this list

11  on Exhibit B as we get a little farther, so I can

12  make sure that you and I are on the same page with

13  respect to what's requested here.

14           Have you had your deposition taken in the

15  past?

16     A.    I have.

17     Q.    About how many times?

18     A.    Twice.

19     Q.    All right.  And you have, from that

20  experience, some understanding of the process, that

21  is, the question-and-answer process?

22     A.    Yes, I do.

23     Q.    It's -- let me just offer a couple

24  thoughts.  It's important that you answer only

25  questions that you understand.  Okay?

Chad Michael Modra

1   Q.   Who was the vice president immediately

2   before you?

3   A.   Ms. Gin Schulz.

4   Q.   Where is Ms. Schulz now, in terms of

5   corporate employment?

6   A.   She is the vice president of quality at our

7   corporate offices.  She's my boss.

8   Q.   And in terms of your own organizational

9   chart, immediately below you on the org chart, who is

10  immediately below you, your direct report?

11  A.   I have three directors.

12  Q.   Who are they?

13  A.   Scott Neal, our director of quality

14  engineering.  Ms. Maureen Uebelacker, director of

15  quality assurance.  And Elliott Doppelt, director of

16  quality systems.

17  Q.   How is Elliott's last name spelled?

18  A.   D-o-p-p-e-l-t.

19  Q.   Did Ms. Uebelacker, then, take the

20  director's job which you vacated in order to become

21  the vice president?

22  A.   No.  No.

23  Q.   Who filled the spot you vacated?

24  A.   There wasn't a spot vacated; it was changed

25  from a director position to a vice president

EXHIBIT B
Page 3

Chad Michael Modra

```
1       A.    Yes.

2       Q.    And in the middle of that, in July, is this

3  warning letter?

4       A.    That's correct.

5       Q.    Okay.  And do I understand that you, by the

6  nature of your job, your title, your responsibility,

7  are kind of smack dab in the middle of responding to

8  the 483s, all the way up through whatever's going on

9  at present?

10      A.    I am very much involved in all of it.

11      Q.    Is there anybody who knows more about the

12 process than you?  And I'm talking subjectively, in

13 your own mind?

14      A.    Subjectively, I don't think so.

15      Q.    Okay.  And that's not -- we're not denying

16 the fact that there might be somebody who thinks they

17 do?

18      A.    Yeah, that might be their opinion.

19      Q.    Those people are everywhere, in all walks

20 of life.

21      A.    Yes.

22      Q.    Okay.  Then back to the not very good

23 question I asked a moment ago.  You come here to

24 Arizona; you're changing the focus of your job.

25 Right?
```

EXHIBIT B
Page 4

Chad Michael Modra

```
 1              (Interruption of proceedings.)

 2   BY MR. KELLY:

 3       Q.     That's how scintillating my question is.

 4   The first person has dropped off, Mr. Modra.  There's

 5   a pool at the end of the table of how many will be

 6   gone within the next 30.

 7              MR. NORTH:  I'm sorry to interrupt, but

 8   there have been a lot of people join since we gave

 9   the instructions on e-mailing for appearances.  It

10   might be helpful if you repeated that, Ramon.

11              MR. STOLLER:  It went out to the group.

12              MR. NORTH:  It did?

13              MR. LOPEZ:  Yeah, we sent an e-mail out to

14   the group.

15              MR. NORTH:  Thank you.

16   BY MR. KELLY:

17       Q.     Now, with respect to the -- the group --

18   and I'm assuming something here I don't want to do

19   that.

20              So in your job, do you work as a team?  Do

21   you have a team?

22       A.     Yes.

23       Q.     Okay.  And on your team whose focus is

24   quality assurance, including post-market surveillance

25   and trending, investigation, et cetera, who's on the
```

EXHIBIT B
Page 5

Chad Michael Modra

1   team?

2       A.    That would be my director of quality

3   assurance and her reports, the managers for the

4   investigation of the complaints, complaint handling.

5       Q.    All right.  And so I know you gave me that

6   name earlier.  Does it begin with a U?

7       A.    Maureen Uebelacker.

8       Q.    Uebelacker?

9       A.    U-e-b, elacker.

10      Q.    I've got it phonetically.

11      A.    Yeah.

12      Q.    And her managers are whom?

13      A.    John Wheeler and Judy Ludwig.  Yeah.

14      Q.    And I will tell you that I've reviewed some

15  of the materials that have been produced from the 483

16  notice forward, and those are names which appear more

17  than once, so --

18      A.    Yes.

19      Q.    -- how is it that some part of the

20  investigation and analysis and response of the

21  notification from the FDA and the correspondence

22  that's gone back and forth fell into their areas of

23  responsibility?

24      A.    Under my direction, you know, we have to

25  have people working on smaller bits to certainly

Chad Michael Modra

```
 1        Q.     All right.  And as the vice president of
 2   quality, you had the responsibilities and continue to
 3   have the responsibilities for complaint
 4   investigation, for trending, for compliance with FDA
 5   regulations, for making sure that you are correctly
 6   tracking and monitoring injuries, deaths, et cetera?
 7               MR. NORTH:  Objection to the form.
 8               THE WITNESS:  I do for the manufacturing
 9   facilities that now report to me.  The divisional
10   responsibilities as of two weeks ago report to a new
11   person.
12   BY MR. KELLY:
13        Q.     Okay.  But as of two weeks ago --
14        A.     Yes.
15        Q.     -- you had those responsibilities I just
16   outlined?
17        A.     That is correct.
18        Q.     And had them throughout the time of the
19   various periodic responses?
20        A.     Yes, that's correct.
21        Q.     Who's taken that responsibility?  Who's
22   moved into that job?
23        A.     Garth Conrad.
24        Q.     And where is Mr. Conrad from,
25   geographically?
```

EXHIBIT B
Page 7

Chad Michael Modra

1    Q.    Right.  And had you seen one of these

2  before, that is, one of these forms, the 483 reports?

3    A.    I have seen them before.

4    Q.    And she, on the very last page, has a

5  number of days listed here, dates of inspection.  If

6  I'm understanding an earlier answer, she was not

7  actually at your facility each of these days; is that

8  what you're telling us?

9    A.    That's correct.

10    Q.    And this documents the days, apparently,

11  she spent at whatever location looking at these

12  complaint files?

13    A.    Yes.

14    Q.    All right.  In addition to complaint files,

15  was she given access to other information, including

16  did she request standard operating procedures, work

17  instructions, quality systems guides, et cetera?

18    A.    Yes, she did.

19    Q.    And so, again, in terms of that list, who

20  is she dealing with to get that information?

21    A.    It would either be myself and/or Scott or

22  Maureen, primarily.

23    Q.    And so for some of the time that she was at

24  your facility, were you back from Glens Falls?

25    A.    Upon her arrival, I immediately booked a

EXHIBIT B
Page 8

Chad Michael Modra

```
 1      A.    Well, with Observation 1, she's citing,

 2  one, the incorrect completion of the form, and then

 3  on the other ones she's citing that those, in her

 4  opinion, as an FDA representative, should have been

 5  reported as serious injury versus a malfunction, both

 6  of which are reportable events, but in either case,

 7  as far as our trending and tracking, those -- that's

 8  important information, but we're conducting that

 9  tracking and trending, regardless of whether it's

10  reportable or not.

11      Q.    Let me just ask about this particular first

12  one, 562535, the -- among the things that the

13  investigator tells you, and I'm going to make sure I

14  have this right, this is a file that got closed?

15      A.    Correct.

16      Q.    And it got closed with the FDA being told

17  the patient had a serious injury?

18      A.    I believe so, yes.

19      Q.    Right.  And the FDR gets -- the FDR --

20      A.    FDA.

21      Q.    By the way, he will not be attending this

22  deposition.

23            The FDA gets a two-page form; is that

24  right?

25      A.    Yeah, Form 3500A.
```

Chad Michael Modra

1       A.      I believe so, yes.

2       Q.      Okay.  And -- and their respective titles

3    are --

4       A.      Field assurance -- senior field assurance

5    manager and director of quality assurance.

6       Q.      And the senior field person is Maureen?

7       A.      It is Judy.  I'm sorry.

8       Q.      All right.  And the director is Maureen?

9       A.      That's correct.

10       Q.      And do they actually have responsibility

11    for teaching people how to correctly do complaint

12    investigation and fill out the forms?

13       A.      That's correct.

14       Q.      All right.  So if we could just go to the

15    second page under B, again, in the 483 form, and just

16    so we're clear, ultimately, these individual

17    examples -- you understand these are examples?

18       A.      Yes.

19       Q.      All right.

20               -- are ultimately referenced as well in the

21    July letter; is that right?

22       A.      I believe they are, yes.

23       Q.      In fairness to you, it's not a trick

24    question, the one we just mentioned.  So if you go

25    to -- would you tell me what number that is?

Chad Michael Modra

1    bottom of this, who were the best people that you put

2    together on your team?

3         A.   I involved those involved in preparing

4    those files as well as, you know, K&S, King &

5    Spalding.

6         Q.   No, no.  I mean, I'm limiting myself here.

7    You have a team of people who are working with you

8    day by day in field assurance and quality assurance.

9    Correct?

10        A.   Correct.

11        Q.   King & Spalding is not working with you

12   daily on field assurance and quality assurance?

13        A.   No.

14        Q.   And neither is Hogan and Lovells?

15        A.   No.

16        Q.   Or any other lawyers or law firms?

17        A.   No.

18        Q.   So I'm focused here on, okay, we're here in

19   Tempe; I want my best people on the ground looking at

20   this; I'm going to assemble a group.  Did you do

21   that?

22        A.   Yeah.

23        Q.   And did you have, actually, physical

24   meetings and take notes and make minutes and have

25   e-mail correspondence back and forth about here's how

Golkow Technologies, Inc.                          Page 134

Chad Michael Modra

1    we're going to approach this?

2        A.    We opened up a CAPA, a corrective action --

3    corrective and preventative action document, and

4    we -- it's all documented in there, brainstormed,

5    thought of, you know, reviewed other regulatory

6    documents, reviewed other literature, tried to

7    understand not just this particular situation, but

8    was there anything else where we were -- that we

9    needed to improve on.  And we documented it in the

10   CAPA.

11       Q.    Okay.  I get all that.  And the team of

12   people that you put together to do that --

13       A.    Uh-huh.

14       Q.    -- did you appoint yourself as the head

15   person or did you appoint someone else to direct and

16   oversee the CAPA root cause analysis, et cetera?

17       A.    I ultimately have to agree with it, and

18   help guide it, make sure that we're capturing all

19   possible root causes, and primarily Maureen, Judy,

20   and others were involved.

21       Q.    And when you say "and others," were there

22   others at the management level who were involved?

23       A.    Not in particular.

24       Q.    Okay.

25       A.    These were field assurance-related, so I

Chad Michael Modra

1   independent medical knowledge when they take the job.

2   True?

3       A.    True.   That isn't true of all of them.   We

4   do employ nurses and others and we have, again, the

5   clinical oversight in that group to provide that

6   knowledge to them.

7       Q.    And so any time they see that there's a

8   broken piece of one of these IVC filters that's

9   lodged in a place other than where it's supposed to

10  be, they're supposed to go and figure out, from the

11  information you gave them, what the potential

12  consequences to human health would be; is that what

13  you're telling us?

14      A.    That's part of the review.

15      Q.    A mandatory part of the review?

16      A.    Yes.

17      Q.    Because you want them to have complete,

18  full, and thorough understanding of whether this is a

19  serious injury?

20      A.    Yes.

21      Q.    And whether it's a serious injury is going

22  to depend upon how it's going to be retrieved,

23  whether it poses a risk to life or permanent injury,

24  et cetera, as per 803?

25      A.    Yes.   But whether it's a serious injury or

Chad Michael Modra

1   a malfunction, it's -- they're all required to be

2   investigated, and we do that.  We trend them and

3   they're based on the failure event, like the code

4   that's designated as part of the event, not -- not

5   just because it's a serious injury or not; it's

6   independent of that.

7        Q.    All right.  And that actually wasn't the

8   question I asked, but I'm happy to ask it.  If

9   something is a malfunction, are they supposed to

10  determine whether or not this poses a potential risk?

11  They think it's a malfunction; are they supposed to

12  determine is this a potential risk to a human being's

13  well-being?

14            MR. NORTH:  Objection to the form.

15            THE WITNESS:  To go through the checklist

16  and determine the impact on the patient --

17  BY MR. KELLY:

18       Q.    I'm not asking about the checklist.  I'm

19  asking whether they are supposed to access this

20  encyclopedia of information you described earlier.

21  Are they supposed to go and find that out?

22            MR. NORTH:  Objection to the form,

23  argumentative.

24            THE WITNESS:  The checklist, as I

25  referenced, was the decision process with which they

Golkow Technologies, Inc.                          Page 145

Chad Michael Modra

```
 1    BY MR. KELLY:

 2        Q.    Do you have that in writing?

 3        A.    Yeah, I have it in meeting minutes and

 4    writing.

 5        Q.    And that came in the December 8th letter?

 6        A.    No.

 7        Q.    You received a letter just recently from

 8    FDA, didn't you?

 9        A.    Yeah.  Yesterday.

10        Q.    And yesterday did they tell you it's all

11    right not to report failure to deploy?

12        A.    They made no mention of disagreeing with

13    those.  They're not going to say until they come back

14    for a reinspection.

15        Q.    Did they say you don't have to report a

16    failure to deploy in the December 8 letter?

17        A.    They did not say that in the letter, but

18    they did say it in correspondence with our medical

19    director.

20        Q.    Did they say it in their July 2015 letter,

21    you don't have to report a failure to deploy?

22        A.    No, what -- what they -- we've come to

23    realize is what they were saying here was not that

24    they have to report failure to deploy, but that they

25    wanted more information and justification why we did
```

Chad Michael Modra

 1    not report these.

 2         Q.    Whatever they said is what they said in the

 3    paper.  Correct?  I mean, they were clear about what

 4    they said?

 5         A.    By definition.

 6         Q.    All right.  And they were clear enough so

 7    that you spoke multiple times with various law firms

 8    about what your appropriate response should be.

 9    Correct?

10         A.    Uh-huh.

11               MR. NORTH:  Objection to the form.

12    BY MR. KELLY:

13         Q.    How many times do you think you've talked

14    to lawyers about what your response should be with

15    respect to the individual responses given between

16    January 1, 2015 and August of 2015?

17         A.    I don't know the exact number.

18         Q.    Please give us your best estimate.  Would

19    it be in the hundreds of times?

20         A.    I don't know about hundreds of times, but

21    yeah, numerous times.

22         Q.    What does "numerous" mean?

23         A.    Two dozen, three dozen, probably.

24         Q.    Okay.  Would it have been more than one

25    time for each letter?

EXHIBIT B
Page 16

Chad Michael Modra

```
 1        A.     No.

 2        Q.     Okay.  So is it fair to say nobody who is

 3   copied on this letter or to whom the letter was

 4   directed was a member of the quality assurance

 5   department here in Tempe?

 6        A.     Not a direct member, no.

 7        Q.     Okay.  Well, do you report at all to

 8   Mr. Walaska?

 9        A.     No.

10        Q.     As you were preparing your periodic

11   updates, were you looping in Gin Schulz?

12        A.     I was -- in some cases, yes; some cases,

13   no.

14        Q.     And how would you do that?  Would you send

15   her an e-mail to let her know what was going on?

16        A.     I would typically call her.

17        Q.     Okay.  Do you believe there's also e-mail

18   correspondence between you and Ms. Schulz regarding

19   any of the periodic updates or the responses to FDA?

20        A.     I'm sure there are some.

21        Q.     And, similarly, with respect to trying to

22   find out what are best practices for the company,

23   talking to various folks, would you have brought her

24   up to date on what you were learning?

25        A.     They have experience, with Bard certainly,
```

EXHIBIT B
Page 17

Chad Michael Modra

1   but then other companies, so I may have sought their

2   advice.

3        Q.    But in terms of bringing her up to date on

4   what you were learning --

5        A.    Uh-huh, yes.

6        Q.    -- is that something you would have brought

7   her up to date on?

8        A.    Yeah.  Yeah.

9        Q.    Let me -- so for each of these items under

10  so-called Observation 1, A, B, C, D, E, F, G, H, for

11  each of these, was, in fact, it determined that they

12  should have been reported as a serious injury?

13       A.    That is what they state.

14       Q.    And on -- on your end, when you looked at

15  this, as people interested in quality and patient

16  safety, did you determine, upon seeing these, that

17  these should have been reported as a serious injury?

18       A.    That is how we responded, yes.

19       Q.    But regardless of how you responded, did

20  you look at these and say, you know what, they're

21  right; these were serious injuries that should have

22  been reported?

23       A.    In their understanding, yeah.

24       Q.    In your understanding?

25       A.    Uh-huh.

Chad Michael Modra

1      Q.     Yes?

2      A.     Yes.

3             MR. NORTH:  Objection to the form.

4   BY MR. KELLY:

5      Q.     And so when you got this at the closeout

6   meeting, and saw that, you know what, it looks like,

7   one, two, three, four, five, six, seven, is it eight,

8   is that right, A, B, C, D, E, F, G -- we've got eight

9   things that were not reported as serious injuries out

10  of 43, were you upset by that?

11            MR. NORTH:  Objection to the form.

12            THE WITNESS:  I was very concerned.

13  BY MR. KELLY:

14     Q.     And were you very concerned, why?

15     A.     Because I wanted to make sure that we're

16  meeting expectations of FDA, and that we're filing

17  these in accordance with those expectations.

18     Q.     And were you also concerned that the

19  mischaracterization, whether serious injury or

20  malfunction, would, in fact, impact your risk

21  analysis for whether people were getting hurt?

22     A.     No.

23            MR. NORTH:  Objection to the form.

24  BY MR. KELLY:

25     Q.     And why not?

Chad Michael Modra

```
 1        A.    Because the FMEA and -- reportability is,
 2   in some cases, independent of the risk analysis that
 3   we do.  The trending that we do, whether or not we
 4   would take an action, a field action, or even, you
 5   know, correction, a recall on a device, it's -- it's
 6   based on the event code, which is the event that's
 7   reported, and the severity that's tied to FMEA, not
 8   whether or not they're reported or not.
 9        Q.    So did you tell the FDA for each one of
10   these we've actually done an FMEA risk analysis where
11   we decided in-house that these were serious injuries,
12   but we did not tell you?
13             MR. NORTH:  Objection to the form.
14             THE WITNESS:  It wasn't that -- you make it
15   sound underhanded, and that wasn't the case at all.
16   These were reported to FDA, and we had done the
17   analysis; they're included in trending.  We've
18   evaluated each and every one of those for its impact
19   on the patients.
20   BY MR. KELLY:
21        Q.    So even though you didn't tell FDA it was a
22   serious injury for complaint A, had you trended it
23   in-house as a serious injury for part of FMEA
24   analysis?
25             MR. NORTH:  Objection to the form.
```

EXHIBIT B
Page 20

Chad Michael Modra

```
1              THE WITNESS:  You wouldn't trend it just
2    based on serious injury.  You trend it based on the
3    actual event.  So whether it's characterized as a
4    serious injury or a malfunction or something else,
5    they're evaluated by the severity of the event, so
6    regardless of what they're reported as, they are
7    trended and tracked and actions are taken
8    accordingly.
9    BY MR. KELLY:
10       Q.    Okay.  Even though you told FDA that
11   complaint A was a malfunction, did you trend it
12   internally as a serious or severe injury?
13              MR. NORTH:  Objection to the form.
14              THE WITNESS:  Yes.
15   BY MR. KELLY:
16       Q.    You did?
17       A.    Well, there -- it's not trended on just
18   because you check the box and it's serious injury;
19   you trend it on the event, the code that's associated
20   with the event.
21       Q.    So you had a code that told you internally,
22   in case A, this is a severe injury.  Correct?
23       A.    At the start, but then when it was trended
24   to, or I'm sorry, when we got more information and it
25   was changed to death, then it would have been
```

Chad Michael Modra

1      Q.    I'm talking here about physical injuries.

2   I'm not talking about malfunctions.  You certainly

3   want to track and trend physical injuries, yes?

4            MR. NORTH:  Objection to the form.

5            THE WITNESS:  I want to track and trend all

6   complaints, not just physical injuries, because I

7   want to understand all of them.

8   BY MR. KELLY:

9      Q.    I understand that, sir.

10     A.    Sometimes you take action, not just based

11  on whether they harm somebody, but whether there's

12  the potential to.  There may be never an injury,

13  but we might take action --

14     Q.    Exactly.  Exactly.  Sometimes you take

15  action before anybody gets hurt.  Right?

16     A.    Sometimes.

17     Q.    And, really, that's ideally what you'd like

18  to do, prevent the first person from getting hurt.

19  Correct?

20     A.    Yes.

21     Q.    And once you find out people are getting

22  hurt, you want to be even more vigilant in trying to

23  prevent it.  Correct?

24     A.    I don't know if it's any less or more

25  vigilant.  It's the same level of vigilance.

Chad Michael Modra

1    spreadsheet?

2       A.    No.

3       Q.    All of this work was done by you and your

4    team with the aim of trying to produce a good, safe,

5    and efficacious product.  Correct?

6             MR. NORTH:  Objection to the form.

7             THE WITNESS:  With the purpose of making

8    sure that we were compliant in the eyes of FDA, as

9    they cited us in the 483.

10   BY MR. KELLY:

11      Q.    Sir, first and foremost, this is all about

12   making sure that the product is safe, isn't it?

13      A.    This -- this reporting here, what's about

14   making the product safe is the tracking and training

15   we do regardless of whether it's reportable or not.

16   If we only relied on the assumption that it's only

17   the FDA that can catch somebody from doing something

18   with a device, that's a -- that's a bad assumption.

19      Q.    It's a horrible assumption, because the

20   primary responsibility to track and trend is on you

21   and Bard?

22      A.    That's correct.  And independent of the

23   filing of these, we tracked and trended --

24      Q.    Exactly.

25      A.    -- based on the code.

Chad Michael Modra

1    Q.    It's the same definition that we're using

2  for all of these?

3    A.    Yes.  It includes --

4    Q.    And now we have brand-new,

5  never-discovered-before 38 new serious injuries?

6          MR. NORTH:  Objection to the form.

7          THE WITNESS:  They were reported as serious

8  injury.

9  BY MR. KELLY:

10   Q.    And you have to believe at this point in

11 time, after the FDA has been there, folks are being

12 careful in what they're reporting.  Correct?

13   A.    Yes.

14   Q.    They're being precise and they're doing it

15 right by the book.  Correct?

16   A.    They were doing it based on their

17 understanding of the book prior to that.

18   Q.    Well, but by now, you're absolutely making

19 sure that the reports are correct and accurate.  Can

20 we agree on that?

21   A.    Well, as part of this review, we also

22 expanded the definition of what we would consider or

23 what anyone would reasonably consider serious injury.

24 So we did go ahead and file those as serious injury,

25 and we've -- based on the OSB meetings we've had

Chad Michael Modra

1  recently, have come to understand that FDA has told

2  us that they would not file those as serious injury.

3      Q.    How many of those 38 would the FDA have not

4  filed as serious injury, sir?

5      A.    I don't know.

6      Q.    Well, how would you figure that out?

7      A.    We would have to go back and look and see

8  which ones, based on the OSB comments that we had,

9  would no longer be reported as serious injury.

10     Q.    We would have to walk through each one of

11  those complaint files together.  Correct?

12     A.    I'd want to do it with a -- one of our

13  clinical specialists.

14     Q.    Would you want to do it with one of the

15  lawyers from Hogan and Lovells or from King &

16  Spalding?

17     A.    No, because we have now we have guidelines

18  that we agreed to with OSB, so they're -- they

19  provided us greater clarification on what they want

20  reported.

21     Q.    Now, sir, with respect to these 44 new

22  ones, did anyone go through those files with eyes on

23  and determine whether they were correctly coded, in

24  terms of the event codes internally?

25     A.    It doesn't state that in this memo.

Chad Michael Modra

1      A.    Correct.

2      Q.    All right.  But you've not done that and

3  you can't tell us here how many in that time period,

4  how many MDR serious injury reports were filed for

5  this batch of complaints?

6      A.    I don't know offhand, no.

7      Q.    In real life, if you wanted to get the

8  answer to that, not that this is not real life, but

9  in practice, sitting in your office, is that

10  something that you would delegate to somebody else

11  who is more facile with the database in terms of

12  being able to query it and search it?

13         MR. NORTH:  Objection to the form.

14         THE WITNESS:  I would ask one of the

15  specialists or engineers.

16  BY MR. KELLY:

17      Q.    Okay.  And who is the person that you would

18  most likely ask?

19      A.    One of the engineers, it could be Ryan

20  Brunet or Judy.  I might just ask Judy, because she's

21  the supervisor, so then she can delegate it to who --

22  who has time.

23      Q.    Now, if I'm understanding this correctly,

24  the search was done on that part of the complaint

25  file that's described -- oh, what the heck did I do

Golkow Technologies, Inc.                    Page 225

Chad Michael Modra

1   records, doctors' information would have been queried

2   with these search terms?

3       A.    Not directly, because those are attachments

4   to the file.

5       Q.    Correct.

6       A.    They're often quite large, so the narrative

7   of those, I know we spend a lot of time bringing that

8   narrative into the parent record of the complaint,

9   and then that's part of the search.

10      Q.    And do I understand from that that if the

11  individual complaint reviewer inputted some data or

12  summarized data out of the medical records into the

13  investigation file, that's the way it gets there, in

14  terms of this search query?

15      A.    We have the clinical specialists are the

16  ones that do the medical record review.

17      Q.    Okay.  Now, having turned up this number of

18  29 percent that required modification or -- and a

19  supplemental report or a brand-new report, was there

20  any discussion about, hey, let's query some more

21  search terms?

22      A.    There wasn't, because many of those events

23  that you're noting there included things that -- that

24  hadn't reported any sort of injury; it was for the

25  potential to cause the injury.

Chad Michael Modra

1      Q.    Okay.  Sir --

2      A.    And in some cases I know that they said

3   there was no relationship to the device itself, but

4   we cast a pretty wide net.

5      Q.    But I'm wondering when you had 29 percent

6   inaccuracy for which you made the change -- you would

7   not have made changes if it wasn't authorized, would

8   you?

9      A.    In the interest of casting a wide net and

10  being overly reporting, which we've come to find out

11  we have been over reporting.

12     Q.    So have you cut back on your reporting?

13     A.    No.  No.  With OSB, after those discussions

14  again, we, I guess, after they told us that those --

15  a number of those would not be reportable, going

16  forward we'll report those as OSB has stated.

17     Q.    So with respect to these search terms, I

18  note, for instance, you certainly -- actually, let me

19  go back, when you did these search terms, did you

20  look at the individual complaint files identified by

21  Ms. Perkins to see if in the selection of these

22  search terms you had identified all of the actual or

23  potential patient injuries in the file sheet you

24  looked at?

25     A.    We did.

Chad Michael Modra

1    where you have, in response to another issue, under

2    the heading "Completed actions."  Do you see that?

3        A.    Yes.

4        Q.    I'm at the bottom of the page, in the

5    middle paragraph?

6        A.    Yes.

7        Q.    It says "We opened CAPA, VT-CAPA-15-002, on

8    January 23, 2015 to the issues raised in the Form 83

9    observations."  Some questions about the CAPA

10   process?

11       A.    Yes.

12       Q.    Is this a -- the acronym is corrective

13   action?

14       A.    Corrective and preventative actions.

15       Q.    Corrective and presentative actions.

16             And this -- the decision to open this

17   corrective and preventative actions plan was whose

18   decision?

19       A.    Ultimately mine, but that -- that's

20   expected as part of the response.

21       Q.    But this was not intended to be an idle act

22   on your part, was it?

23       A.    No.

24       Q.    And it wasn't simply intended to placate

25   the FDA?

Golkow Technologies, Inc.                          Page 261

Chad Michael Modra

1   your recent promotion; in other words, was that

2   consistently true?

3       A.    True, and even beyond that.

4       Q.    Okay.  I'm looking for a moment here at

5   March 26, 2015 periodic update.  Actually, you know

6   what, let's do February and March, and do them in

7   chronological order since that makes more sense.

8   Yeah, so there's two -- let me put this down -- I

9   guess we need to print these, so they're going to

10  print them.

11          Let me ask you a couple of other things

12  from when we began this morning.  In the -- in the

13  exhibits to today's deposition, there was a list of

14  things, and I'd like to walk through them, if I

15  might, with you.  I think that was the Exhibit Number

16  1.  And when we look at category number 2, the

17  communications with the FDA relating to the warning

18  letter, and that contemplates from the 483 up until

19  the present.

20          Who are the folks that have had

21  communications with FDA from Bard?

22      A.    Myself, folks from GFO.

23      Q.    Which folks from GFO?

24      A.    Jason Gaede, Gin -- no, I don't think she

25  has.  Patty Christian.

Chad Michael Modra

1   process.

2        Q.    My question is, who are those people?

3        A.    It isn't just one particular person.

4        Q.    That's why I asked who are those people?

5        A.    Okay.  It's part of the management review

6   process --

7        Q.    Who are --

8        A.    -- of the facility.

9        Q.    Who are the people in the management review

10  process at the facility who are analyzing and making

11  the decisions about the significance or

12  insignificance of the trending?

13       A.    It's the management board, myself, the head

14  of regulatory, the head of operations, marketing,

15  sales, international finance.

16       Q.    And in that group, is there an

17  epidemiologist?

18       A.    I don't believe any of them are

19  epidemiologists.

20       Q.    Is there a statistician?

21       A.    I don't think so.

22       Q.    Is there a physician?

23       A.    No.

24       Q.    And do the people who head up marketing and

25  sales have any training as doctors or health

Chad Michael Modra

1       A.    But that's not the entirety of all the

2   folks that look at that information.

3       Q.    But in terms of on whose desk the buck

4   stops for decision making, it's a board call?

5       A.    It's part of the management review process,

6   so yes.

7       Q.    And the board meets with what frequency?

8       A.    At least once a month.

9       Q.    And when you meet, do you traditionally

10  meet in person or on the phone or a combination?

11      A.    Typically, in person, but occasionally on

12  the phone.

13      Q.    And the meetings typically are where?

14      A.    Here in Tempe.

15      Q.    Do you still have a board-level position

16  with your new job?

17      A.    No.  Because I'm not associated with a -- a

18  division.

19      Q.    So you're going off the board?

20      A.    That's correct.

21      Q.    Okay.  Now, with respect to the person who

22  is taking your place, they're coming onto the board

23  or not?

24      A.    Yes, they are.

25      Q.    And with respect to how the trending data

Chad Michael Modra

1    is circulated, is it done, for lack of a better term,

2    automatically?  That is, each month it's just

3    generated or each week or each day to each of these

4    people on the board?

5        A.    I -- we compile a packet of information and

6    I take the time and walk through it, and describe

7    what we've seen, discussing the results, answering

8    questions, taking actions.

9        Q.    Now, you have multiple products besides IVC

10   filters?

11       A.    That's right.

12       Q.    And, therefore, there is trending

13   information to be shared about all of the products;

14   is that right?

15       A.    Yes.

16       Q.    And do you actually walk through the

17   trending information on all products at each meeting?

18       A.    Yes.

19       Q.    And is it your custom and practice to send

20   out a report, whether -- a report in connection with

21   the trending for each meeting?

22       A.    I don't know about "send out."  I do print

23   copies for each person.

24       Q.    You print copies?

25       A.    (No audible response.)

EXHIBIT B
Page 33

Chad Michael Modra

```
 1   approximately 5:42 p.m.

 2

 3                 E X A M I N A T I O N

 4   BY MR. LOPEZ:

 5      Q.    All right.  Well, I hear we've got 20

 6   minutes left.  Ramon Lopez, I also represent the

 7   plaintiffs.  I've been designated to deal with the

 8   portions of this warning letter that basically have

 9   not been covered much, if at all yet, and that is

10   violation -- and these are violations.  Right?

11           MR. NORTH:  Objection to the form.

12   BY MR. LOPEZ:

13      Q.    In the warning letter?

14      A.    They're stated as violations in the warning

15   letter.

16      Q.    Right.  The fact that it says "these

17   violations include, but are not limited to the

18   following" and number 1 is the -- deals with the

19   Recovery Cone and the adulteration and misbranding

20   violations at the Tempe, Arizona facility.  Correct?

21           MR. NORTH:  Objection to the form.

22           THE WITNESS:  That's what it states.

23   BY MR. LOPEZ:

24      Q.    And then violation number 4 is "A quality

25   system regulation violation at the," excuse me,
```

Chad Michael Modra

```
 1    "Queensbury, New York facility.  Failure to validate

 2    with high degree of assurance and approved according

 3    to established procedures and manufacturing process

 4    that cannot be fully verified by subsequent

 5    inspection and testing, to ensure the process will

 6    continue to meet specifications as required by 21

 7    CFR 820.75(a)."  Correct?

 8        A.    Correct.

 9        Q.    Do you want a copy of the warning letter

10    just to have it in front of -- do you have it in

11    front of you there?

12        A.    No, they took the copy.

13            THE REPORTER:  I didn't take it.  It's

14    right there.

15            THE WITNESS:  Oh, okay, sorry.

16            MR. LOPEZ:  Those are the extra copies, the

17    five copies that Karen brought down.  Yeah, I just

18    want to give one to the witness.  Thanks.

19        Q.    Yeah, I'm on page --

20        A.    Does this need to be a number?

21        Q.    No, no, go to page 5 of the warning letter.

22        A.    Okay.

23        Q.    And that's, what I just read, that's

24    violation number 4.  Do you see that?  That's the one

25    I just read.
```

Chad Michael Modra

1    A.    That's correct.

2    Q.    Okay.  Then if you go to two pages beyond

3    that, page 7 of the warning letter.  You see

4    violation number 5?

5    A.    I see number 5, correct.

6    Q.    "Failure to establish and maintain

7    procedures for acceptance of incoming product and to

8    inspect, test, or otherwise verify incoming product

9    as conforming to specified requirements as required

10   by 21 CFR 820.80(b)."  Right?  That's the violation

11   number 5?

12   A.    Correct.

13         MR. NORTH:  Objection to the form.

14   BY MR. LOPEZ:

15   Q.    And then I won't read number 6, because we

16   don't have time, but then you see violation number 6

17   is another failure that deals with procedures to

18   ensure that all purchased or otherwise received

19   products conform to specified requirements, et

20   cetera.  Correct?

21   A.    Correct.

22   Q.    Now, going back to violation number 1, that

23   deals with the Recovery Cone.  The first thing I

24   should ask you is, do you think you're the

25   appropriate person at Bard to speak on behalf of the

EXHIBIT B
Page 36

1    was the approval, or I'm sorry, clearance.

2    BY MR. LOPEZ:

3        Q.    It was -- I mean, I guess I can keep

4    reading this over and over again, but FDA, again,

5    its position is that that really didn't happen.  It

6    should have been -- it was not marketed with the

7    required clearance or approval.  Right?

8        A.    That is what they state.

9        Q.    Who else?  How about Susan Alpert, Susan

10   Alpert was involved back in the day, right, when this

11   thing was going through its testing and when the

12   Recovery Cone first got on the market?

13       A.    I haven't seen her name on it or been aware

14   of her involvement in this.

15       Q.    Now, let me ask you, is this device still

16   being marketed or not in the United States today?

17       A.    It is, in an agreement with FDA, because of

18   its necessity for removal.

19       Q.    Explain that to me?

20       A.    We work very closely with FDA, answered a

21   number of their questions related to clarifications

22   on it, and they agreed with the assessment that it's

23   important to, while the 510(k) is being reviewed, to

24   keep it on the market for removals.

25       Q.    Now, what does that mean keep it on the

EXHIBIT B
Page 37

Chad Michael Modra

```
 1      A.    It is.

 2      Q.    And in other words, it's not part of -- if

 3  somebody gets a Recovery Cone or a G2 or an Eclipse

 4  or whatever filter device that this is intended to

 5  remove, that -- this particular device is not

 6  included in that kit.  True?

 7      A.    True.  Because the person removing it may

 8  not be the person placing it.

 9      Q.    Exactly.  In other words, this is its own

10  device?

11      A.    Correct.

12      Q.    And it has its own IFU?

13      A.    Correct.

14      Q.    Right?  And it has its own warning

15  section -- on the left -- it has potential com --

16  there you go, warning section, precautions, and then

17  on the other side it has potential complications

18  listed.  Those all apply to this device?

19      A.    Correct.

20      Q.    All right.  So you think a device that has

21  all of these potential warnings and precautions and

22  potential complications should have ever been

23  considered a Class I device by you, by Bard?

24            MR. NORTH:  Objection to the form.

25            THE WITNESS:  It was determined as a -- or
```