# EXHIBIT 13

**To Plaintiffs' Memorandum Re Relevancy and Discoverability of FDA Inspection and Warning Letter and Recovery Cone Removal System**

K032426

OCT 3 1 2003

# 510(k) SUMMARY

| | |
|---|---|
| **Submitted By:** **Contact:** | Cook Incorporated<br>Jennifer Bosley, MBA<br>Regulatory Affairs Coordinator<br>Tel: (812) 339-2235<br>Fax: (812) 332-0281 |
| **Date Prepared:** | October 31, 2003 |

**Device:**

| | |
|---|---|
| Trade Name: | Günther Tulip™ Vena Cava Filter and Retrieval Set |
| Common/Usual Name | Inferior Vena Cava Filter and Retrieval Set |
| | |
| Proposed Classification: & Product Code | Filter, Intravascular, Cardiovascular<br>21 CFR §870.3375, Class II, DTK—Cardiovascular |

**Intended Use:**

Filter Set:

The Günther Tulip™ Vena Cava Filter Set is indicated for the prevention of recurrent pulmonary embolism via placement in the vena cava in the following situations:

- Pulmonary thromboembolism when anticoagulant therapy is contraindicated;
- Failure of anticoagulant therapy in thromboembolic diseases;
- Emergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced; and
- Chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated.

The Günther Tulip™ Vena Cava Filter may be retrieved according to the instructions supplied in the section labeled: Optional Retrieval Procedure.

Retrieval Set:

The Günther Tulip™ Vena Cava Filter Retrieval Set has been designed for retrieval of an implanted Günther Tulip™ Vena Cava Filter in patients who no longer require a filter. Retrieval of the filter can be performed only by jugular approach.

**Predicate Devices:**

The subject devices are substantially equivalent to predicate devices: Günther Tulip™ Vena Cava MR*eye*® Filter, #K000855 (Cook Incorporated); Amplatz Goose Neck Snare, #K972511 (Microvena Corp.); and the Radius Microsnare, #K022201 (Radius Medical Technologies).



EXHIBIT NO. 174
1/20/16
C. Modra

*X032406*

**Device Description:**
The Günther Tulip™ Vena Cava Filter and Retrieval Set is an inferior vena cava filter with a radiopaque band at the tip, which can be introduced via either femoral or jugular vein. The radiopaque retrieval catheter has a braided platinum loop at the distal end.

**Substantial Equivalence:**
The subject device is similar with respect to intended use, materials and functional characteristics of commercially available predicate devices in terms of section 510(k) substantial equivalence; any differences that may exist do not significantly affect the safety and effectiveness of the device.

**Test Data:**
The Günther Tulip™ Vena Cava Filter and Retrieval Set have been subjected to and have passed the following tests to ensure reliable design and performance under the specified testing parameters:

Filter Set:
- Biocompatibility
- Material and stress analysis tests
- Clinical experience

Retrieval Set:
- Biocompatibility
- Tensile
- Clinical evaluation

**Clinical Experience:**
To evaluate the safety of retrieving the Günther Tulip™ Vena Cava Filter, a clinical study was conducted in which 41 patients [female (n=19); male (n=22)] were enrolled for possible retrieval of the filter. Indications for placement of retrievable filter in the study included: bleeding while anticoagulated (n=2), recent bleeding not anticoagulated (n=0), prophylactic pre-op (n=12), prophylactic post-op (n=3), failure of anticoagulation resulting in recurrent PE (n=1), failure of anticoagulation resulting in extension of DVT (n=0), prophylaxis following PE (n=3), prophylaxis with extensive DVT (n=3), trauma (n=13) and other (n=4).

Retrieval was not attempted in 15 patients due to the continued need for permanent implantation of the filter. A total of 26 attempted retrievals in 26 patients were successful. [n= number of filters retrieved] Retrieval of filter immediately after deployment at Day 0 (n=1), Day 2 (n=1), Day 7 (n=1), Day 9 (n=3), Day 10 (n=6), Day 11(n=2), Day 12 (n=1), Day 13 (n=4), Day 14 (n=6), Day 20 (n=1). No adverse events were reported in the retrieved filter group. 23 patients in whom a filter was retrieved were followed for three months post retrieval with no abnormalities reported. Results from the clinical study showed that the filter could be safely retrieved up to 14 days or longer in patients who no longer required an inferior vena cava filter. Time to retrieval ranged from 2-20 days with a mean implantation time of 11.4 days.

2



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

OCT 3 1 2003

Food and Drug Administration
9200 Corporate Boulevard
Rockville MD 20850

Cook Incorporated
c/o Ms. Jennifer J. Bosley
Regulatory Affairs Coordinator
P.O. Box 489
Bloomington, IN 47402-0489

Re: K032426
    Günther Tulip™ Vena Cava MR*eye*® Filter and Retrieval Set
    Regulation Number: 21 CFR 870.3375
    Regulation Name: Cardiovascular intravascular filter
    Regulatory Class: Class II
    Product Code: DTK
    Dated: August 5, 2003
    Received: August 6, 2003

Dear Ms. Bosley:

We have reviewed your Section 510(k) premarket notification of intent to market the device
referenced above and have determined the device is, substantially equivalent (for the indications
for use stated in the enclosure) to legally marketed predicate devices marketed in interstate
commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to
devices that have been reclassified in accordance with the provisions of the Federal Food, Drug,
and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA).
You may, therefore, market the device, subject to the general controls provisions of the Act. The
general controls provisions of the Act include requirements for annual registration, listing of
devices, good manufacturing practice, labeling, and prohibitions against misbranding and
adulteration.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA), it
may be subject to such additional controls. Existing major regulations affecting your device can
be found in the Code of Federal Regulations, Title 21, Parts 800 to 898. In addition, FDA may
publish further announcements concerning your device in the Federal Register.

Page 2 – Ms. Jennifer J. Bosley

Please be advised that FDA's issuance of a substantial equivalence determination does not mean that FDA has made a determination that your device complies with other requirements of the Act or any Federal statutes and regulations administered by other Federal agencies.  You must comply with all the Act's requirements, including, but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part 801); good manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.
This letter will allow you to begin marketing your device as described in your Section 510(k) premarket notification. The FDA finding of substantial equivalence of your device to a legally marketed predicate device results in a classification for your device and thus, permits your device to proceed to the market.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801), please contact the Office of Compliance at (301) 594-4646. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21CFR Part 807.97).  You may obtain other general information on your responsibilities under the Act from the Division of Small Manufacturers, International and Consumer Assistance at its toll-free number (800) 638-2041 or (301) 443-6597 or at its Internet address http://www.fda.gov/cdrh/dsma/dsmamain.html

Sincerely yours,

Bram D. Zuckerman, M.D.
Director
Division of Cardiovascular Devices
Office of Device Evaluation
Center, for Devices and
  Radiological Health

Enclosure

**Indications for Use Statement**

**510(k) Number (if known):** _____ K032426 _____.

**Device Name:**     Günther Tulip™ Vena Cava Filter and Retrieval Set

**Filter Set**

The Günther Tulip™ Vena Cava Filter Set is indicated for the prevention of recurrent pulmonary embolism via placement in the vena cava in the following situations:

- Pulmonary thromboembolism when anticoagulant therapy is contraindicated;
- Failure of anticoagulant therapy in thromboembolic diseases;
- Emergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced; and
- Chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated.

The Günther Tulip™ Vena Cava Filter may be retrieved according to the instructions supplied in the section labeled: Optional Retrieval Procedure.

**Retrieval Set**

The Günther Tulip™ Vena Cava Filter Retrieval Set has been designed for retrieval of an implanted Günther Tulip™ Vena Cava Filter in patients who no longer require a filter. Retrieval of the filter can be performed only by jugular approach.

PLEASE DO NOT WRITE BELOW THIS LINE—CONTINUE ON ANOTHER PAGE IF NEEDED

_____

Concurrence of CDRH, Office of Device Evaluation (ODE)

Prescription Use____/_____          OR          Over-The-Counter Use_____
(Per 21 CFR 801.109)                                        (Optional Format 1-2-96)

_____
(Division Sign-Off)
Division of Cardiovascular Devices

510(k) Number _K0324 26_____

# EXHIBIT 14

**To Plaintiffs' Memorandum Re Relevancy and Discoverability of FDA Inspection and Warning Letter and Recovery Cone Removal System**

K034050

MAR 2 2 2004

## 510(k)

### Summary of Safety and Effectiveness

**Submitter:**   Donna Marshall
Regulatory Affairs Associate II
Cordis Corporation
7 Powderhorn Drive
Warren, NJ 07059
Telephone:       908-412-3844
Fax              908-412-3915
e-mail address   dmarshal@crdus.jnj.com

**Date Prepared:**   December 29, 2003

**General Provisions:**

Trade Name:            Cordis OptEase™ Vena Cava Filter
Common Name:           Vena Cava Filter and Introduction Kit
Classification Name:   Cardiovascular Intravascular Filter (per 21 CFR 870.3375)
Device-classification: Class II

**Predicate Devices:**   The subject Cordis OptEase Vena Cava Filter is substantially equivalent to:

- Cordis OptEase Permanent Vena Cava Filter and Introduction Kit (#K023116)
- Cordis TrapEase Permanent Vena Cava Filter and Introduction Kit (#K000062 and #K020316)
- Recovery Filter System, Bard Peripheral Vascular, C.R. Bard, Inc. (#K031328)
- Günther Tulip™ Vena Cava Filter and Retrieval set, Cook Incorporated (#K032426)
- Cordis VISTA BRITE TIP® Guiding Catheter (#K965211)



EXHIBIT NO. 177
1/20/16
C. Modra

177

| **Performance Standards** | As per 21 CFR 870.3375, the following special controls were established for cardiovascular intravascular filters: |
|---|---|

- Use of International Standards Organization's ISO-10993 'Biological Evaluation of Medical Devices Part I: Evaluation and Testing,
- FDA's Updated 510(k) Sterility Review Guidance (K90-1); Final Guidance for Industry and FDA, August 30, 2002, and
- FDA's Guidance for Cardiovascular Intravascular Filter 510(k) Submissions, dated November 26, 1999.

**Indications for Use for Filter:**

The Cordis OptEase Vena Cava Filter is indicated for the prevention of recurrent pulmonary embolism via percutaneous placement in the inferior vena cava in the following situations:

- Pulmonary thromboembolism when anticoagulants are contraindicated,
- Failure of anticoagulant therapy in thromboembolic diseases,
- Emergency treatment following massive pulmonary embolism where anticipated,
- Chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated.

The OptEase Filter may be removed according to the instructions supplied in the Section labeled:  Optional Procedure for Filter Retrieval.

The Angiographic Vessel Dilator is designed to provide angiographic visualization and linear measurement of the vasculature when combined with the delivery of radiopaque contrast media to the Vena Cava.

**Indications for Use for Retrieval Catheter:**

The Cordis OptEase Retrieval Catheter is indicated for the retrieval of the Cordis OptEase Vena Cava Filter from the inferior vena cava.  Retrieval of the OptEase Filter is possible only from the femoral vein approach.

**Device Description**

The subject OptEase Filter is identical to the predicate OptEase Permanent Vena Cava Filter with the exception of the addition of the retrievability option to the labeling.  The OptEase Vena Cava Filter is packaged with a filter introduction kit that includes the Angiographic Vessel Dilator, a directional filter storage tube, catheter sheath introducer and obturator for safe and accurate deployment of the filter.

The subject OptEase Filter is substantially equivalent to the predicate devices (i.e., OptEase Permanent Vena Cava Filter, TrapEase Permanent Vena Cava Filter, Recovery Filter System, and Günther Tulip™ Vena Cava Filter and Retrieval Set).

B-002

| | |
|---|---|
| **Device Description** (continued) | The subject OptEase Retrieval Catheter is an 80 cm long, 10F catheter with radiopaque tip.  The subject device is packaged separately and is intended for the percutaneous retrieval of the OptEase Filter from the inferior vena cava when used with an appropriate Endovascular snare.  The subject device is substantially equivalent to the predicates devices (i.e., the Günther Tulip™ Vena Cava Filter and Retrieval Set and the VISTA BRITE TIP® Guiding Catheter). |
| **Performance Data:** | The safety and effectiveness of the Cordis OptEase Vena Cava Filter and the OptEase Retrieval Catheter have been demonstrated via data collected from *in-vitro*, animal and clinical testing and analyses.  The safety of retrieval of the OptEase Filter was evaluated in a prospective clinical study (n = 21 retrieval patients) and in a retrospective clinical experience (n = 40 retrieval patients).   In the prospective clinical study, the time to retrieval ranged from 5 – 14 days (mean implantation time of 11.1 ± 1.8 days).  In the retrospective clinical experience, the time to retrieval ranged from 3 – 48 days in 29 patients (mean implantation time of 16.4 ± 7.2 days).  Eleven patients in the retrospective clinical experience had their filter captured from the vessel wall and then redeployed at the different location within the inferior vena cava (capture time ranged from 4 – 30 days, mean of 13.8 ± 6.1 days).  The OptEase Filter was subsequently retrieved from this subset of patients. |
| **Summary of Substantial Equivalence** | The design, material, components, and fundamental technology featured with the Cordis OptEase Vena Cava are substantially equivalent to those featured with the predecessor Cordis OptEase Permanent Vena Cava Filter and Introduction Kit and the Cordis TrapEase Permanent Vena Cava Filter and Introduction Kit.  In addition, the intended use for the OptEase Vena Cava Filter is substantially equivalent with the Recovery Filter System and the Günther Tulip Vena Cava Filter and Retrieval Set.

The design and materials of the OptEase Retrieval Catheter are substantially equivalent to the VISTA BRITE TIP Guiding Catheter.  The intended use for OptEase Retrieval Catheter is substantially equivalent to the Günther Tulip Vena Cava Filter and Retrieval Set. |



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Food and Drug Administration
9200 Corporate Boulevard
Rockville MD 20850

MAR 2 2 2004

Cordis Corporation
c/o Ms. Donna Marshall
Regulatory Affairs Associate II
7 Powder Horn Drive
Warren, NJ  07059

Re: K034050
        Trade Name:  Cordis OptEase™ Vena Cava Filter and Optease ™ Retrievable Catheter
        Regulation Number: 21 CFR 870.3375
        Regulation Name:  Cardiovascular Intravascular Filter
        Regulatory Class:  II (two)
        Product Code:  DTK
        Dated:  December 29, 2003
        Received:  December 30, 2003

Dear Ms. Marshall:

We have reviewed your Section 510(k) premarket notification of intent to market the device
referenced above and have determined the device is substantially equivalent (for the indications
for use stated in the enclosure) to legally marketed predicate devices marketed in interstate
commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to
devices that have been reclassified in accordance with the provisions of the Federal Food, Drug,
and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA).
You may, therefore, market the device, subject to the general controls provisions of the Act. The
general controls provisions of the Act include requirements for annual registration, listing of
devices, good manufacturing practice, labeling, and prohibitions against misbranding and
adulteration.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA), it
may be subject to such additional controls. Existing major regulations affecting your device can
be found in the Code of Federal Regulations, Title 21, Parts 800 to 898. In addition, FDA may
publish further announcements concerning your device in the Federal Register.

Page 2 – Ms. Donna Marshall

Please be advised that FDA's issuance of a substantial equivalence determination does not mean that FDA has made a determination that your device complies with other requirements of the Act or any Federal statutes and regulations administered by other Federal agencies. You must comply with all the Act's requirements, including, but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part 801); good manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050. This letter will allow you to begin marketing your device as described in your Section 510(k) premarket notification. The FDA finding of substantial equivalence of your device to a legally marketed predicate device results in a classification for your device and thus, permits your device to proceed to the market.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801), please contact the Office of Compliance at (301) 594-4646.  Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21CFR Part 807.97).  You may obtain other general information on your responsibilities under the Act from the Division of Small Manufacturers, International and Consumer Assistance at its toll-free number (800) 638-2041 or (301) 443-6597 or at its Internet address http://www.fda.gov/cdrh/dsma/dsmamain.html

Sincerely yours,

Bram D. Zuckerman, M.D.
Director
Division of Cardiovascular Devices
Office of Device Evaluation
Center for Devices and
  Radiological Health

Enclosure

# Indications for Use

510(k) Number (if known):  K034050

Device Name:  Cordis OptEase™ Vena Cava Filter and OptEase™ Retrieval Catheter

Indications For Use:

The **OPTEASE** Filter is indicated for use in the prevention of recurrent pulmonary embolism (PE) via percutaneous placement in the vena cava in the following situations:

- Pulmonary thromboembolism when anticoagulants are contraindicated,
- Failure of anticoagulant therapy for thromboembolic disease,
- Emergency treatment following massive pulmonary embolism where anticipated,
- Chronic, recurrent pulmonary embolism where anticoagulant therapy has failed, or is contraindicated

The OPTEASE Filter may be retrieved according to the instructions supplied in the Section labeled:  **Optional Procedure for Filter Retrieval.**

The Angiographic Vessel Dilator is designed to provide angiographic visualization and linear measurement of the vasculature when combined with the delivery of radiopaque contrast media to the vena cava.

Prescription Use __X____          AND/OR          Over-The-Counter Use _____
(Part 21 CFR 801 Subpart D)                                    (21 CFR 807 Subpart C)

  (PLEASE DO NOT WRITE BELOW THIS LINE-CONTINUE ON ANOTHER PAGE IF NEEDED)

---

Concurrence of CDRH, Office of Device Evaluation (ODE)

_Donna R. Lochner_
(Division Sign-Off)
Division of Cardiovascular Devices

510(k) Number _K034050_

Page 1 of _1

# EXHIBIT 15

**To Plaintiffs' Memorandum Re Relevancy and Discoverability of FDA Inspection and Warning Letter and Recovery Cone Removal System**

## (FILED UNDER SEAL)

# EXHIBIT 16

**To Plaintiffs' Memorandum Re Relevancy and Discoverability of FDA Inspection and Warning Letter and Recovery Cone Removal System**

1 | Robert W. Boatman (009619) - rwb@gknet.com
Paul L. Stoller (016773) - paul.stoller@gknet.com
2 | Shannon L. Clark (019708) - SLC@gknet.com
**GALLAGHER & KENNEDY, P.A.**
3 | 2575 East Camelback Road
Phoenix, Arizona 85016-9225
4 | Telephone: (602) 530-8000

5 | Ramon Rossi Lopez (CA Bar No. 86361)
(admitted *pro hac vice*)
6 | **LOPEZ McHUGH LLP**
100 Bayview Circle, Suite 5600
7 | Newport Beach, California 92660
rlopez@lopezmchugh.com
8 |

9 | *Co-Lead/Liaison Counsel for Plaintiffs*

10 | **IN THE UNITED STATES DISTRICT COURT**

11 | **FOR THE DISTRICT OF ARIZONA**

12 | IN RE:  **BARD IVC FILTERS**                MD No. 02641
**PRODUCTS LIABILITY LITIGATION**
13 |                                            **PLAINTIFFS' NOTICE OF**
**DEPOSITION PURSUANT TO**
14 |                                            **FEDERAL RULE OF CIVIL**
**PROCEDURE 30(b)(6) and**
15 |                                            **RELATED REQUESTS FOR**
**PRODUCTION OF DOCUMENTS**

16 |      YOU ARE HEREBY NOTIFIED that, in accordance with Rule 30(b)(6), Fed. R.

17 | Civ. P., Plaintiff will depose the representative of C R Bard Incorporated and Bard

18 | Peripheral Vascular Incorporated ("BARD") who is the most knowledgeable regarding the

19 | following matters set forth in Exhibit A.

20 | DATE/TIME OF DEPOSITION:  December 15, 2015, 10 a.m.

21 | LOCATION OF DEPOSITION:   Gallagher & Kennedy, P.A.
                          2575 East Camelback Road, Suite 1100
22 |                           Phoenix, Arizona  85016

23 |      The deposition will be taken upon oral examination before a stenographic court

24 | reporter or some other officer duly authorized by law to take oaths and acknowledgements

25 | in the State of Arizona.  The deposition will continue day to day until completed and will

26 | be videotaped.  This deposition is being taken for the purpose of discovery, for use at trial

27 | or both of the foregoing, or for such other purposes as permitted under the applicable rules

28 | and governing law.

*(left margin, vertical)* Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

EXHIBIT NO. 101
12/15/15
C. Modra

1      PLEASE TAKE FURTHER NOTICE that, pursuant to Rule 34, Fed. R. Civ. P.,

2    BARD is to produce by November 10, 2015 the documents and tangible things identified

3    in Exhibit B attached hereto.

4          DATED this 5th day of November 2015.

5                                    GALLAGHER & KENNEDY, P.A.

6

7                                    By:_____

8                                        Robert W. Boatman
                                         Paul L. Stoller
9                                        Shannon L. Clark
                                         2575 East Camelback Road
10                                       Phoenix, Arizona  85016-9225

11                                   LOPEZ McHUGH LLP
                                         Ramon Rossi Lopez (CA Bar No. 86361)
12                                       (admitted *pro hac vice*)
                                         100 Bayview Circle, Suite 5600
13                                       Newport Beach, California 92660

14                                   *Co-Lead/Liaison Counsel for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2   I hereby certify that on November 5th, 2015 a true and correct copy of the

3   foregoing was sent via U.S. Mail and/or Electronic Mail to:

4
                                James R. Condo
5                              Snell & Wilmer LLP
                              One Arizona Center
6                          400 East Van Buren Street
                                   Suite 1900
7                            Phoenix, Arizona 85004
                             *Attorneys for Defendants*

8                            Richard B. North, Jr.
                    Nelson Mullins Riley & Scarborough LLP
9                              Atlantic Station
                        201 17th Street NW, Suite 1700
10                          Atlanta, Georgia 30363
                             *Attorneys for Defendants*
11

12              *Counsel for Plaintiffs will be served in accordance
                 with the Court's Case Management Order No. 1

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

**EXHIBIT A**

**Definitions**

The following definitions apply to this Notice of Deposition, including those matters set forth in Exhibit A hereto, and are deemed to be incorporated into each subject and request for documents listed below:

1.      "Identify" or "identity" with respect to persons, means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment.

2.      BARD means defendants C.R. BARD INC. and BARD PERIPHERAL VASCULAR. INC., and any of its subsidiaries, affiliates, officers, agents, attorneys, employees, representatives, or others acting on its behalf.

3.      "Person" means natural person, as well as corporate and/or governmental entity.

4.      "IVC Filter" means all IVC Filters manufactured or distributed by BARD or its predecessors prior to assignment or sale of such filters to BARD. Also included is any device intended to retrieve any filter or to introduce any filter into the body.

5.      "Relating to," "relate to," "referring to," "refer to," "reflecting," "reflect," "with regard to," "concerning," or "concern" shall mean evidencing, regarding, concerning, discussing, embodying, describing, summarizing, containing, constituting, showing, mentioning, reflecting, pertaining to, dealing with, relating to, referring to in any way or manner, or in any way logically or factually, connecting with the matter described in that paragraph of these demands, including documents attached to or used in the preparation of or concerning the preparation of the documents.

6.      "Documents" as used in this Request is coextensive with the meaning of the terms "documents" and "tangible things" in FRCP 34, and shall have the broadest possible meaning and interpretation ascribed to the terms "documents" and "tangible things" under FRCP 34. Consistent with the above definition, the term document shall include, without limitation, any written, printed, typed, photostatic, photographed,

4

1   recorded, computer-generated, computer- stored, or otherwise maintained or reproduced

2   communication or representation, any data  compilation in any form, whether comprised of

3   letters, words, numbers, pictures, sounds, bytes,  e-mails, electronic signals or impulses,

4   electronic data, active files, deleted files, file fragments,  or any combination thereof

5   including, without limitation, all memoranda, notes, records, letters,  envelopes, telegrams,

6   messages, studies, analyses, contracts, agreements, projections, estimates,  working papers,

7   accounts, analytical records, reports and/or summaries of investigations,  opinions or

8   reports of consultants, opinions or reports of experts, opinions or reports of accountants,

9   other reports, trade letters, press releases, comparisons, books, diaries, articles,  magazines,

10  newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, forecasts,

11  drawings, diagrams, instructions, minutes of meetings or communications of any type,

12  including inter- and intra-office communications, questionnaires, surveys, charts, graphs,

13  photographs, phonographs, films, tapes, discs, data cells, drums, printouts, all other

14  compiled data which can  be obtained (translated, if necessary, through intermediary or

15  other devices into usable forms),  documents maintained on, stored in or generated on any

16  electronic transfer or storage system,  any preliminary versions, drafts or revisions of any

17  of the foregoing, and other writings or documents of whatever description or kind, whether

18  produced or authorized by or on behalf of you or anyone else, and shall include all non-

19  identical copies and drafts of any of the foregoing now in the possession, custody or

20  control of you, or the former or present directors, officers, counsel, agents, employees,

21  partners, consultants, principals, and/or persons acting on your behalf.

22      7.      "Or" and "and" will be used interchangeably.

23                      **Deposition Subject Matter**

24      Pursuant to Rule 30(b)(6), BARD shall designate and produce for deposition one or

25  more of its officers, directors, managing agents, or other persons who consent to testify on

26  its behalf concerning the following subject matters:

27  / / /

28  / / /

5

1    FDA WARNING LETTER DATED JULY 13, 2015:

2        1.      All communications with FDA officials regarding the subject matter and

3    content of the warning letter issued by FDA on July 13, 2015 including but not limited to

4    communications described in the letter.

5        2.      The identity of BARD's corporate officers and other employees (including

6    but not limited to their titles, duties and dates of such responsibility) who were and are

7    responsible for communicating with regulatory officials with the FDA and related

8    regulatory bodies concerning the subject matter and content of the warning letter issued

9    by FDA on July 13, 2015.

10       3.      The visits/inspections from/by the FDA to Bard facilities on the dates listed

11   in the warning letter issued by the FDA on July 13, 2015.

12       4.      The failure to establish and maintain procedures for receiving, reviewing

13   and evaluating complaints associated with Bard's IVC filters and Bard IVC filter removal

14   products as described in the warning letter issued by the FDA on July 13, 2015.

15       5.      Determination of lot numbers subject to the failure to establish and maintain

16   procedures for acceptance of incoming product as described in paragraph 5 of the warning

17   letter issued by the FDA on July 13, 2015.

18       6.      The failure to submit reports as described in paragraph 7 of the warning

19   letter issued by the FDA on July 13, 2015 and the responses submitted by Bard to the

20   FDA listed as inadequate.

21       7.      Actions taken by defendants since the issuance of the warning letter issued

22   by FDA on July 13, 2015.

23

24

25

26

27

28

**EXHIBIT B**

**DOCUMENTS TO BE PRODUCED**

1.      An unredacted and final copy of the warning letter issued by FDA on July 13, 2015 to Bard.

2.      All communications with FDA related to the subject matter of the warning letter issued by the FDA on July 13, 2015.

3.      All documents which reflect a regulatory log of contacts with the FDA regarding the warning letter issued by FDA on July 13, 2015.

4.      All complaint files referenced in the warning letter issued by FDA on July 13, 2015.

5.      All complaint files provided to and/or reviewed by FDA as part of the investigation and inspections that resulted in the warning letter issued by FDA on July 13, 2015.

6.      All documents and material provided to FDA during the course of its inspection and investigation that resulted in the warning letter issued by FDA on July 13, 2015.

7.      All internal communications relating to the subject matter of the warning letter issued by FDA on July 13, 2015.

8.      Communications with FDA and internally at BARD since the issuance of the warning letter issued by FDA on July 13, 2015 which pertain to the subject matter and content of said warning letter.

9.      Documents reflecting actions taken by defendants as a result of the warning letter issued by FDA on July 13, 2015.

10.      Observations noted on FDA Forms 483, Lists of Inspectional Observations that were issued to you at the close of the FDA's inspections that are referenced in the warning letter issued by FDA on July 13, 2015.

5117670v1/26997-0001

# EXHIBIT 17

**To Plaintiffs' Memorandum Re Relevancy and Discoverability of FDA Inspection and Warning Letter and Recovery Cone Removal System**

Robert W. Boatman (009619) - rwb@gknet.com
Paul L. Stoller (016773) - paul.stoller@gknet.com
Shannon L. Clark (019708) - SLC@gknet.com
**GALLAGHER & KENNEDY, P.A.**
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone: (602) 530-8000

Ramon Rossi Lopez (CA Bar No. 86361)
(admitted *pro hac vice*)
**LOPEZ McHUGH LLP**
100 Bayview Circle, Suite 5600
Newport Beach, California 92660
rlopez@lopezmchugh.com

*Co-Lead/Liaison Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: BARD IVC FILTERS PRODUCTS LIABILITY LITIGATION | MD No. 02641 |
| | **PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS** |

Plaintiffs, by and through undersigned counsel and pursuant to Fed. R. Civ. P. 34, hereby request that Defendants CR Bard Incorporated and Bard Peripheral Vascular Incorporated produce the documents identified in the following Requests for Production of Documents within thirty (30) days of this Request. Production shall be made at the offices of Gallagher & Kennedy, P.A., 2575 East Camelback Road, Phoenix, Arizona 85016.

## INSTRUCTIONS FOR REQUESTS FOR PRODUCTION

1. The response to each Request shall include all documents within your possession, custody, or control, including, but not limited to, documents in the possession, custody, or control of your investigators, consultants, attorneys, or other agents. Any reference to "you" shall include your consultants, attorneys, or other agents.

2. As used herein, the term "document" means all written, recorded, and graphic and electronically stored matter of every type and description encompassed by

1   Fed. R. Civ. P. 34(a)(1), including, but not limited to, writings, graphs, charts,

2   photographs, sound recordings, images, drawings, notes, contracts, agreements,

3   correspondence, letters, memoranda, appointment books, calendars, all forms of

4   communication (including physical documents, e-mail, instant messaging, texts, tweets,

5   social-media postings and communications), and all electronically stored information in

6   any medium from which information can be obtained either directly or, if necessary, after

7   translation by the responding party into a reasonably usable form.

8          3.      You shall produce any and all documents responsive to each Request unless

9   an objection is stated to a Request.  If you object to all or any part of a Request, you shall

10  state the reasons for the objection.  If objection is made to part of an item or category, the

11  part shall be specified.  If you object to only part of an item or category, you shall produce

12  any and all documents responsive to the part or parts of the item or category to which you

13  do not object.

14         4.      If you contend that an identified document would be excludable from

15  production, state the reasons for such objection or grounds for exclusion and identify each

16  person having knowledge of the factual basis, if any, on which the privilege or other

17  ground is asserted.

18         5.      You should produce documents for inspection as they are kept in the usual

19  course of business or, alternatively, organize and label them to correspond with the

20  categories in the request.

21         6.      Production of Electronically Stored Information (ESI).

22                 a.      Production of Native Form.  ESI should be produced in native form

23                         with all metadata intact unless such form would not be reasonably

24                         usable by third parties (such as ESI from legacy or proprietary

25                         systems).

26                 b.      Production in Non-Native Form for ESI not Reasonably Usable.  If

27                         ESI would not be reasonably usable by third parties, it should be

28                         produced as follows:

2

Conversion to TIFF.  ESI should be converted into *.tif image format with single-page files at 300 DPI, Group IV compression, with original orientation maintained.  All available fielded metadata and text-searchable information shall be extracted from the native document and produced with the ESI as part of the document.  Any bates labeling on the *.tif images should be done in a consistent font and should not obscure any visible text, image, or portion of the original file.

Extracted Full Text.  The producing party should produce the full extracted text in the form of a single *.txt file for each non-native file. The text file name shall correspond to the bates label of the associated document.

Production of Metadata.  The producing party should provide the following metadata (as applicable by file type) for all ESI: begdoc, enddoc, begattach, endattach, custodians, recordtype, doctype, emailsubject, docauthor, to, cc, bcc, docdate, parentdate, datesent, timesent, datercvd, timercvd, datelastmod, timelastmod, datelastprint, timelastprint, filename, title, attachname, docext, filesize, md5hash, numattach, pgcount, nativefile, textfile, organization, comments, lastauthor, revision, and locations.

Production of Load File.  For all Non-native productions, the producing party should produce an appropriate data load file in Concordance (.dat) format (DAT files should be produced in UTF8) and image load file in Opticon (.opt) format.

Preservation of Document Relationships.  In the production of TIFF format images, the producing party should preserve all relationships, such as parent-child, between documents by producing relating documents sequentially.  For parent documents with

3

attachments (or exhibits), the attachments should be produced as independent files immediately following the main/parent document. Likewise, embedded files should be produced as separate files as attachments to the file in which they were embedded.

    c.  ESI with Links to other ESI or Database(s).  For any ESI files that contain links to other documents, files, ESI, web addresses, or to database information, the producing party should ensure that the relationship between the files is preserved and that such links remain active.  Where the form of production precludes the ability to have active links, the producing party should produce copies of the linked documents, files, ESI, or web addresses as related documents.  If produced ESI includes a link to a database or information in a database, the producing party should provide reasonable access to the database or to the database information in such a way that Plaintiffs can reasonably access or determine the linked information.

    d.  ESI requiring Proprietary Software.  If proprietary software unavailable to Plaintiffs is required to review the producing party's ESI in native form, the producing party should provide reasonable access to the proprietary software for purposes of review of ESI by Plaintiffs or their representatives.

7.  For each document requested which you are unable to produce and which was at any time in your possession, custody or control or which you had access to, specify in detail:

    a.  The nature and author of the document;

    b.  All recipients of the document and any copies thereof;

    c.  A summary of the information contained in the document;

    d.  The date and manner in which you lost possession, custody or control of the document;

4

1    e. Identify all persons who had access to the document while it was

2     within your possession, custody or control; and,

3    f. Identify all persons who have knowledge of the contents of the

4     document.

5      **DEFINITIONS**

6  1. "Bard" means C.R. Bard, Inc. and Bard Peripheral Vascular, Inc.

7  2. "BPV" means Bard Peripheral Vascular, Inc.

8  3. "C.R. Bard" means C.R. Bard, Inc.

9  4. "FDA" means the federal Food and Drug Administration.

10  5. "IVC" means inferior vena cava.

11     **REQUEST FOR PRODUCTION**

12 **Request for Production No. 9:**

13   Complete complaint files from 1998 to the present for all Bard IVC filter products,

14 including all information related to any IVC filter complaints or adverse events on Bard's

15 Trackwise systems as well as the format of such files that predate the adoption of

16 Trackwise.

17

18 **Request for Production No. 10:**

19   All internal policies and procedures in place at any time from 2003 to the present

20 relating to:

21  a. quality assurance,

22  b. corrective or preventative actions,

23  c. design controls,

24  d. design testing,

25  e. field assurance,

26  f. post-market surveillance,

27  g. complaint evaluation, investigation, or handling,

28  h. risk management,

1       i.      risk evaluation,

2       j.      process for making a determine of malfunction versus serious injury,

3       k.      acceptance of incoming product, and

4       l.      inspection, testing, or other verification of incoming products as conforming

5               to specified requirements.

6   This request includes all current and former policies and procedures relating to the

7   foregoing subjects.

8

9   **Request for Production No. 11:**

10      All training materials that have been used at any time from 2003 to the present for

11  quality assurance or complaint handling, including but not limited to materials in the form

12  of procedures, standard operating procedures, forms, work instructions, training logs,

13  training requirements, and testing or quizzes

14

15  **Request for Production No. 12:**

16      All documents that evince, relate, or refer to communications with King &

17  Spalding regarding Bard's response to the FDA's inspections of Bard facilities in October

18  2014 through January 2015 and the FDA's findings of violations, including the FDA's

19  issuance of Form FDA-483s to C.R. Bard and BPV, dated respectively November 25,

20  2014 and January 5, 2015, and the "Warning Letter" to C.R. Bard, dated July 13, 2015,

21  including but not limited to any and all drafts of communications to the FDA, emails or

22  other communications relating to such drafts, as well as final communications in any form

23  to the FDA.

24

25  **Request for Production No. 13:**

26      All documents that evince, relate, or refer to communications with Hogan Lovells

27  regarding Bard's response to the FDA's inspections of Bard facilities in October 2014

28  through January 2015 and the FDA's findings of violations, including the FDA's issuance

6

1  of Form FDA-483s to C.R. Bard and BPV, dated respectively November 25, 2014 and

2  January 5, 2015, and the "Warning Letter" to C.R. Bard, dated July 13, 2015, including

3  but not limited to any and all drafts of communications to the FDA, emails or other

4  communications relating to such drafts, as well as final communications in any form to

5  the FDA.

6

7  **Request for Production No. 14:**

8       All documents that evince, relate, or refer to any communications by King &

9  Spalding on behalf of Bard with the FDA regarding Bard's response to the FDA's

10  inspections of Bard facilities in October 2014 through January 2015 and the FDA's

11  findings of violations, including the FDA's issuance of Form FDA-483s to C.R. Bard and

12  BPV, dated respectively November 25, 2014 and January 5, 2015, and the "Warning

13  Letter" to C.R. Bard, dated July 13, 2015.

14

15  **Request for Production No. 15:**

16       All documents that evince, relate, or refer to any communications by Hogan

17  Lovells on behalf of Bard with the FDA regarding Bard's response to the FDA's

18  inspections of Bard facilities in October 2014 through January 2015 and the FDA's

19  findings of violations, including the FDA's issuance of Form FDA-483s to C.R. Bard and

20  BPV, dated respectively November 25, 2014 and January 5, 2015, and the "Warning

21  Letter" to C.R. Bard, dated July 13, 2015.

22

23  **Request for Production No. 16:**

24       All documents, files, or drafts that relate to the monthly reports provided to the

25  FDA by Bard in 2015 relating to the FDA's inspections of Bard facilities in October 2014

26  through January 2015 and the FDA's findings of violations, including the FDA's issuance

27  of Form FDA-483s to C.R. Bard and BPV, dated respectively November 25, 2014 and

28  January 5, 2015, and the "Warning Letter" to C.R. Bard, dated July 13, 2015, including

7

1    but not limited to the native files of the "periodic updates" to the FDA on which Chad

2    Modra worked with King & Spalding or Hogan Lovells.

3

4    **Request for Production No. 17:**

5        The documents that reflect the personnel at King & Spalding in addition to Mr.

6    Niedelmann who worked with Chad Modra in responding to the FDA arising out of the

7    FDA's inspections of Bard facilities in October 2014 through January 2015 and the

8    FDA's findings of violations, including the FDA's issuance of Form FDA-483s to C.R.

9    Bard and BPV, dated respectively November 25, 2014 and January 5, 2015, and the

10    "Warning Letter" to C.R. Bard, dated July 13, 2015.

11

12    **Request for Production No. 18:**

13        All files for or communications with Dr. Shane Gad and/or Dr. Scott Terratola,

14    relating to the FDA's inspections of Bard facilities in October 2014 through January 2015

15    and the FDA's findings of violations, including the FDA's issuance of Form FDA-483s to

16    C.R. Bard and BPV, dated respectively November 25, 2014 and January 5, 2015, and the

17    "Warning Letter" to C.R. Bard, dated July 13, 2015, or Bard's responses thereto.

18

19    **Request for Production No. 19:**

20        All communications with Dr. Shane Gad regarding IVC filter issues, including but

21    not limited to any analysis or reports by or from Dr. Gad regarding IVC filters.

22

23    **Request for Production No. 20:**

24        All communications with Dr. Scott Terratola regarding IVC filter efficacy, safety,

25    or performance, including but not limited to any analysis or reports by or from Dr.

26    Terratola regarding IVC filters.

27

28

**Request for Production No. 21:**

All internal information and reports by Bard regarding tracking, trending, or analysis with respect to any and all Bard IVC filters from 2003 through the present, including but not limited to:

       a.     modes of failure,

       b.     impact on patients,

       c.     patient outcomes,

       d.     the types or severity of events,

       e.     failure, severity, or event codes,

       f.     FDA codes, and/or

       g.     the nature of events.

This request includes any and all reports generated on routine or irregular bases

**Request for Production No. 22:**

All documents relating to any and all annual internal audits of Bard's quality systems from 2003 through the present.

**Request for Production No. 23:**

All documents relating to any and all external audits of Bard's systems, processes, devices, or files that include files relating to IVC filters, its quality systems, or its complaint files.

**Request for Production No. 24:**

All Failure Mode Effect Analyses (FMEAs) for Bard IVC filters from 2003 through the present.

**Request for Production No. 25:**

All clinical severity checklists relating to IVC filters that have been in effect from any time from 2003 through the present.

**Request for Production No. 26:**

The complete employment files at Bard for:

a.   Chad Modra,

b.   Maureen Uebelocker,

c.   John Wheeler, and

d.   Judy Ludwig.

**Request for Production No. 27:**

All job descriptions for the positions held by Chad Modra, Maureen Uebelocker, John Wheeler, and Judy Ludwig in 2014 and 2015.

**Request for Production No. 28:**

All information packets, agendas and "output action items" for the meetings of the "management board" responsible for the management review process.

**Request for Production No. 29:**

Chad Modra's file of notes and related materials for the meetings or actions of the "management board" responsible for the management review process.

**Request for Production No. 30:**

The notes or files of any other Bard employee relating to the meetings or actions of the "management board" responsible for the management review process.

1    **Request for Production No. 31:**

2        All documents that reflect or embody or have as any part of their subject matter the

3    management board's guidelines or rules regarding injury frequency or severity for any

4    Bard IVC filters.

5

6    **Request for Production No. 32:**

7        All documents relating to any and all Corrective and Preventative Actions (CAPA)

8    relating to any Bard IVC filter.

9

10   **Request for Production No. 33:**

11       Any and all documents that demonstrate communications from the FDA regarding

12   whether the failure of an IVC filter to deploy is a reportable event to the FDA, including

13   but not limited to any correspondence from the FDA to Bard's medical director and any

14   "meeting minutes" as testified to by Chad Modra.

15

16   **Request for Production No. 34:**

17       All documents that evince, relate, or refer to FDA guidance given to Bard

18   regarding the classification of events for purposes of reporting adverse events to the FDA,

19   including but not limited to all communications and correspondence with the FDA as well

20   as internal Bard communications such as memoranda, emails, notes, and agendas.

21

22   **Request for Production No. 35:**

23       All internal communications (including all emails) of Bard employees and agents

24   regarding the FDA's inspections of Bard facilities in October 2014 through January 2015

25   and the FDA's findings of violations, including the FDA's issuance of Form FDA-483s to

26   C.R. Bard and BPV, dated respectively November 25, 2014 and January 5, 2015, and the

27   "Warning Letter" to C.R. Bard, dated July 13, 2015, or Bard's responses thereto.  This

28   request specifically includes but is not limited to all communications regarding the

11

1   retrospective review of IVC filter complaint records and the reclassification of

2   reportability status for such records.

3

4        DATED this 4th day of January 2016.

5                                          **GALLAGHER & KENNEDY, P.A.**

6

7                                          By: _____

8                                              Robert W. Boatman
                                               Paul L. Stoller
                                               Shannon L. Clark
9                                              2575 East Camelback Road
                                               Phoenix, Arizona  85016-9225

10

11                                         **LOPEZ McHUGH LLP**
                                               Ramon Rossi Lopez (CA Bar No. 86361)
12                                             (admitted *pro hac vice*)
                                               100 Bayview Circle, Suite 5600
13                                             Newport Beach, California 92660

14                                         *Co-Lead/Liaison Counsel for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# CERTIFICATE OF SERVICE

2          I hereby certify that on January 4, 2016, a true and correct copy of the foregoing

3    was sent via U.S. Mail and/or Electronic Mail to:

4                                      James R. Condo
                                     Snell & Wilmer LLP
5                                    One Arizona Center
                                  400 East Van Buren Street
6                                        Suite 1900
                                   Phoenix, Arizona 85004
7                                  *Attorneys for Defendants*

8                                   Richard B. North, Jr.
                            Nelson Mullins Riley & Scarborough LLP
9                                     Atlantic Station
                                201 17th Street NW, Suite 1700
10                                  Atlanta, Georgia 30363
                                   *Attorneys for Defendants*

11
                          *Counsel for Plaintiffs will be served in accordance
12                          with the Court's Case Management Order No. 1

13

14

15                                   Nancy Jo Koenes

16    5178716v1/26997-0001

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 18

**To Plaintiffs' Memorandum Re Relevancy and Discoverability of FDA Inspection and Warning Letter and Recovery Cone Removal System**

| | |
|---|---|
| **From:** | Hudnall, Janet [/O=BARD/OU=TPE AG/CN=RECIPIENTS/CN=JHUDNALL] |
| **Date:** | 7/15/2004 11:24:56 PM |
| **To:** | TPE-Interventional Sales-DG [/O=BARD/OU=MHL AG/cn=Recipients/cn=TPE-Interventional Sales-DG], Coutanche, Monica [/O=BARD/OU=MHL AG/cn=Recipients/cn=MCoutanche], Lawson, Matthew [/O=BARD/OU=SYD AG/cn=Recipients/cn=MLawson], Ruggiero, Roberto [/O=BARD/OU=ROM AG/cn=Recipients/cn=RRuggiero], Borremans, Frank [/O=BARD/OU=OLN AG/cn=Recipients/cn=FBorremans] |
| **CC:** | McDermott, John [John.McDermott@crbard.com], Shifrin, Kevin [Kevin.Shifrin@crbard.com], Edwards, Mary [/O=BARD/OU=TPE AG/CN=RECIPIENTS/CN=MEdwards], Uelmen, Doug [Doug.Uelmen@crbard.com], Carr, Robert [Robert.Carr@crbard.com], DeCant, Len [/O=BARD/OU=TPE AG/CN=RECIPIENTS/CN=LDeCant] |
| **Subject:** | Vena Cava Filter Complications Q&A |
| **Attachments:** | Vena Cava Filter Complications 3.doc |

All,

Attached is a document that details some frequently asked questions regarding Recovery complications. This document contains verbiage that has been corporate-reviewed and approved. Please do not deviate from this script and please do not distribute--this document is strictly for internal use only.

Please feel free to contact me with any questions/concerns.

Regards,
Janet

Confidentiality Notice: The information contained in this email message is privileged and confidential and intended only for the use of the individual or entity to whom it is addressed. If the reader of this message is not the intended recipient, please inform the sender and note that any dissemination, distribution, or copy of this message is strictly prohibited.





**Vena Cava Filter Complications – FAQs**

Q: What is the migration rate for Recovery® Filter?

A: It is difficult to determine actual rates. Acceptable statistical ranges cannot be reliably calculated from available data. However, estimates based on MAUDE and sales data suggest that there is no significant difference in the rates of these complications between competitive devices, including the Recovery® Filter.

The following table shows the number of incidents reported to the MAUDE database for period beginning Q2, 2003 through Q2,2004:

| Complication Type | Recovery | Total for All Filters (includes Recovery) |
|---|---|---|
| Migration | 9 | 39 |
| Central Migration (Subset of Migration) | 7 | 23 |
| Caval Penetration | 1 | 2 |
| Caval Perforation | 0 | 12 |
| Caval Thrombosis | 0 | 10 |
| PE | 4 | 5 |
| Filter Fracture | 1 | 13 |
| Death | 5 | 16 |

*Reporting period: April 2003 - June 2004*

Q: What were the circumstances surrounding the deaths?

A: In all cases of migration-related deaths, the filter was reportedly placed appropriately; however, a massive thrombus burden overwhelmed the filter. The diameter of the thrombus distended the vena cava to the point where its diameter exceeded the physical limits of the filter.

Q: Why did the new complaints not prompt a product hold?

A: The initial hold was an internal action. The FDA was never involved in the decision to put the product on hold. It was a conservative step that allowed us the time to determine if our overall complication rates were comparable to those reported in the literature and the MAUDE database for other IVC filters.

Every reported complication is treated with the utmost care and seriousness. Although the new reported migrations are unfortunate, they still fall within our expected parameters.

**FOR INTERNAL USE ONLY**          **CONFIDENTIAL**          **DO NOT DISTRIBUTE**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

Q: Why didn't you tell us about the complications before the MAUDE database update?

A: It is inappropriate to discuss reported complications prior to the completion of the investigation.  For each case reported, we conduct a thorough investigation according to our established, systematic process which can take a great deal of time and resources.

Q: Is Recovery® Filter a safe device?

A: The Recovery Filter was rigorously tested for all physical performance characteristics according to our established test methods and protocols and was found to meet all test specifications and requirements.

As stated previously, Recovery® Filter's overall complication rates are comparable to those reported in the literature and the MAUDE database for other IVC filters.

**FOR INTERNAL USE ONLY**          **CONFIDENTIAL**          **DO NOT DISTRIBUTE**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

# EXHIBIT 19

**To Plaintiffs' Memorandum Re Relevancy and Discoverability of FDA Inspection and Warning Letter and Recovery Cone Removal System**

**(part 1)**

MAY. 11. 2004  2:02PM    CORP SA QA RA MA FAC                    NO. 7782   P. 1

**C. R. BARD, INC.**
**730 CENTRAL AVENUE**
**MURRAY HILL, NJ  07974**

**Fax# 908-277-8087**
**Tel # 908-277-8341**
**E-Mail: paula.pizzi@crbard.com**



# FAX

---

**TO:**      Mary Edwards

**FROM:**  Paula Pizzi for Paul Kowalczyk

**DATE:**   May 11, 2004

**NUMBER OF PAGES INCLUDING COVER SHEET:   56**

*If transmission is not complete, please notify sender at (908) 277-8341.*

**COMMENTS:**

The information contained in this facsimile message is legally privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this facsimile is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone and return the original message to us at the address above via the United States Postal Service. Thank You

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BPV-17-01-00164733

MAY. 11. 2004  2:03PM    CORP SA QA RA MA FAC                    NO. 7782   P. 2
Message                                                          Page 1 of 2

## Church, Nikki

| From: | Barry, Brian |
|---|---|
| Sent: | Monday, May 10, 2004 4:05 PM |
| To: | 'Kimberly Ocampo'; Church, Nikki |
| Cc: | Ganser, Christopher; Kowalczyk, Paul |
| Subject: | RE: Latest Bard Filter Plan and Q&As |

Kimberly:

Hi, per my discussion with Chris Ganser, this piece will need to go through the standard Bard approval process for external pieces.

To that end, per copy of this email I am forwarding this piece to Nikki Church of our law Department, who coordinates such reviews. Nikki, please log and route per standard procedure.

Thanks

Brian


Brian R. Barry
V.P. Corporate Regulatory & Clinical Affairs
C.R. Bard Inc.
730 Central Avenue
Murray Hill NJ 07974

908-277-8062
908-277-8087 (fax)
908-472-5177 (cell)
        -----Original Message-----
        **From:** Kimberly Ocampo [mailto:kocampo@HillandKnowlton.com]
        **Sent:** Monday, May 10, 2004 11:24 AM
        **To:** Barry, Brian
        **Subject:** FW: Latest Bard Filter Plan and Q&As

        Hello Brian. Please see below. I'm not sure if I was given the correct spelling of your last name. Thank you.
        -----Original Message-----
        **From:** Kimberly Ocampo
        **Sent:** Monday, May 10, 2004 11:19 AM
        **To:** 'brian.berry@crbard.com'
        **Cc:** Lee Lynch; 'Glass, Holly'; 'jlehmann@lehmannthomas.com'; Passero, Donna; 'Hudnall, Janet';
        'john.mcdermott@crbard.com'; 'christopher.ganser@crbard.com'; 'doug.uelmen@crbard.com'
        **Subject:** Latest Bard Filter Plan and Q&As

        Dear Brian:

        On behalf of the Bard Team currently involved with development of the crisis plan and associated materials in support of the Recovery Filter, please review the attached draft communications plan, internal Q&A and external Q&A. These drafts incorporate the comments from the following: Dr. John Lehmann, Donna Passero, Janet Hudnall, John McDermott, Chris Ganser, Doug Uelmen and Holly Glass.

        Could you please provide your edits and comments to Hill & Knowlton (Lee Lynch at llynch@hillandknowlton.com or 571.214.8799 or myself) by close of business, Wednesday, May 12? If you have any questions about these documents, please contact Holly Glass, Lee

5/10/2004
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
BPV-17-01-00164734

MAY. 11. 2004   2:03PM      CORP SA QA RA MA FAC                                    NO. 7782   P. 3
**Message**                                                                        Page 2 of 2

or myself.

Once we incorporate your changes, we will distribute the latest drafts to the entire team and
schedule a call to discuss further edits next week.

Thank you.

Regards,

Kimberly Ocampo

---

Kimberly Ocampo
Senior Account Supervisor
Hill & Knowlton Washington, D.C.
p: (202) 944 1905
c: (202) 997 4420
f: (202) 944 1970
kimberly.ocampo@hillandknowlton.com



"Best in International PR -
-- Thomas L. Harns/Impulse Research

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

5/10/2004

MAY. 11. 2004  2:03PM    CORP SA QA RA MA -AC                    NO. 7782  P. 4

PRIVILEGED AND CONFIDENTIAL



# HILL&KNOWLTON

## MEMO

To:        **Holly Glass, Chris Ganser, Janet Hudnall, Donna Passero and
           Brian Berry**

From:      **Lee Lynch and Kimberly Ocampo**

Date:      **May 10, 2004**

Subject:   **Recovery Filter Crisis Communications Plan**

---

This document provides a step-by-step guide for implementing an immediate
communications strategy to ensure C.R. Bard is prepared for any news coverage that
may result from pending investigations surrounding the Recovery Vena Cava Filter.

The information presented in this plan is privileged and confidential and is for internal
use only.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BPV-17-01-00164736

MAY. 11. 2004 2:03PM CORP SA QA RA MA FAC NO. 7782 P. 5

**RECOVERY® FILTER CRISIS COMMUNICATIONS PLAN** 5/10/04

**OVERVIEW**

As with previous crisis plans Hill & Knowlton has prepared for C. R. Bard, this guide will
help Bard's Corporate Communications Team prepare for and properly manage
controversial or negative stories surrounding the Recovery® Vena Cava Filter.

The proliferation of unfavorable press in top-tier media outlets can cause an onslaught
of negative activity: a company's employee morale may suffer, stock prices may
plummet, analysts may downgrade the affected company's rating, and longstanding
reputations may be ruined temporarily or even permanently. Extensive preparation is
critical to help prevent the spread of damaging coverage.

Currently, Bard is investigating the reported migration of the Recovery Vena Cava Filter
in two separate incidences.

The first reported incident under investigation took place at Baptist Hospital of Miami,
Fl. following bariatric surgery. The coroner's report states that filter migration is the
cause of death. Bard is conducting its own investigations to research the validity of this
claim and hired Dr. Luke Brennecke of Pathology Associates in Frederick, MD to
conduct a subsequent pathological evaluation of the thrombus surrounding the vena
cava filter removed during the autopsy.

The summary provided in the CMP12933 PATH Report signed by Dr. Brennecke
follows:

*The clot formation was an ante mortem event; it had most likely been deposited around the
device over a period of a couple of days. The location of the device during clot deposition could
not be determined. The bacterial colonizing the clot most likely represents post mortem growth
of normal saprophytic bacteria. Because extensive (destructive) sampling of the clot was
prohibited (telephonic instructions), no tissue was sampled from around the hooks that were still
embedded within the clot. Should they be sampled, it is possible that segments of the mural
architecture (IVC or elsewhere) might be present.*

It is important to note that, according to hospital records, the patient was a morbidly
obese male weighing between 450 – 500 lbs. The filter was placed in a normal sized
vena cava and there were no immediate complications. According to a Pathology
Associates report, the filter was found to be intact, and the large thrombus surrounding
the filter was approximately 10 cm long X 3 cm in diameter. To date, no formal lawsuit
from the family of the deceased has been filed.

HILL & KNOWLTON     600 New Hampshire Avenue, NW     T 202 333-7400     2
                    Suite 601                        F 202 333-1638
                    Washington, DC 20037

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BPV-17-01-00164737

MAY. 11. 2004  2:03PM    CORP SA QA RA MA FAC                    NO. 7782  P. 6

The second incident took place in Grand Rapids, MI. From the information available to date, we know that the Recovery Filter was placed in a female patient for deep vein thrombosis. The filter had been placed approximately 13 days prior to death, March 31, 2004. The patient was then released from the hospital on April 6, 2004 and expired on April 13, 2004. The medical examiner's report states that the cause of death is cardiac rupture as a result of a puncture to the right ventricle by an inferior vena cava filter.

The size of the clot at the time of the autopsy was approximately 3 cm in diameter by 5 cm in length. There were no design or manufacturing defects found to be associated with the filter. The BPV Product Assessment Team has concluded that the Recovery Filter captured a large embolic load with resulting increase in venous pressure that lead to inferior vena cava dilation greater than 28 mm resulting in migration. Final autopsy report will be available during the week of May 4.

The attached pages provide recommendations and critical information relating to the following components of your crisis communications program:

- I. Re-distributing Bard's Communications Policy
- II. Media Monitoring
- III. Message Approval
- IV. Establishing A Core Response Team
- V. Audience Outreach Team
- VI. Top Media Interview Dos and Don'ts
- VII. External Allies/Experts
- VIII. Key Studies
- IX. News Breakdown
- X. Newsmaker's Bill of Rights
- XI. Proactive Media Outreach
- XII. Step-by Step Management of Most Likely Scenarios:
- XIII. H&K Team Contact Information
- Addendum:
    - A. Key Messages – Recovery Vena Cava Filter:  General Messages
    - B. Key Messages for Specific Incidents:
        - Specific to Miami Incident
        - Specific to Grand Rapids, MI Incident
        - Specific to Both Incidents
    - C. Draft General Letter-To-The-Editor
    - D. Draft Miami Letter-To-The-Editor
    - E. Draft Miami Letter-To-The-Editor
    - F. Media Lists
    - G. Recent Sample Article:  Bariatric Surgery in General

HILL & KNOWLTON          600 New Hampshire Avenue, NW       T 202 333-7400          3
                         Suite 601                         F 202 333-1638
                         Washington, DC  20037

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BPV-17-01-00164738

MAY. 11. 2004  2:04PM     CORP SA QA RA MA -AC                          NO. 7782   P. 7

## I. Re-distributing Bard's Communications Policy

To prevent any Bard employee from speaking with members of the media, it would be wise to redistribute Bard's communications policy company-wide twice each year beginning with 2Q 2004. If Bard is notified that a lawsuit has been filed, dissemination of the communications policy *again* specifically to the Bard Peripheral Vascular Division as well as C.R. Bard Corporate employees, should be considered.

Anyone who may be most likely to receive phone calls from members of the media (e.g., administrative staff for corporate executives and field sales representatives who sell vena cava filters) must have copies of the communications policy and should be required to sign a confirmation form that they have read and understand these guidelines.

All Bard employees must know to direct any media inquiries directly to Holly Glass. With the communications guidelines redistributed several times each year, employees will have this information top-of-mind.

HILL & KNOWLTON          600 New Hampshire Avenue, NW       T 202 333-7400          4
                         Suite 601                         F 202 333-1638
                         Washington, DC  20037

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BPV-17-01-00164739

MAY. 11. 2004  2:04PM     CORP SA QA RA MA -AC                    NO. 7782   P.  3

## II. Media Monitoring

H&K has begun monitoring regularly for any print, broadcast and online news coverage related to the company or the Recovery Vena Cava Filter.  To do this effectively, H&K is using the Factiva database, Google News and Video Monitoring Services (VMS). Particular emphasis is placed on news generated from the following markets: greater New York City (Bard Corporate HQ); Tempe, Arizona (Bard Peripheral Vascular HQ); Miami, Florida (location of case under investigation) and Grand Rapids, Michigan (location of case under investigation).

We are searching for the following terms.
- C.R. Bard
- Bard Peripheral Vascular
- Recovery Vena Cava Filter
- Vena cava filter
- Pulmonary embolism
- Baptist Hospital (Miami, FL)

- Miami Cardiac & Vascular Institute (MCVI)[NA1]
- [NAME OF LAW FIRM FILING SUIT IF SUIT IS FILED]
- Any filter mentions in Grand Rapids, MI

## III. Message Approval

Key messages (see appendix; still to be reviewed and finalized) serve as the foundation for responding during any media interviews that may arise as a result of the pending investigations.  It is critical that this messaging be updated as new details arise.

The approved messaging will be incorporated into external materials that will be distributed to Bard's sales force, customers, physicians, employees, suppliers and others, as needed.  Bard is then prepared to handle any media inquiries.  Furthermore, H&K's on-camera Q&A Training will help prepare spokespeople for any local or trade press inquiries that are posed; additional "on-the-spot" training and messaging discussions should be considered prior to responding to national top-tier press inquiries.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BPV-17-01-00164740

MAY. 11. 2004  2:04PM     CORP SA QA RA MA -AC                    NO. 7782   P. 9

## IV. Establishing A Recovery Core Vena Cava Filter Response Team

The following Bard and H&K employees should comprise the Core Response Team (CRT) for the Recovery Vena Cava Filter product.  These individuals will receive notification when a press inquiry is received or when a negative article requiring action appears.  This group will convene within several hours to approve response strategy, review specific messaging and determine next steps.

| Core Response Team: | Phone Numbers: | E-mail Address: |
|---|---|---|
| Holly Glass | Office-703-754-2848<br>Cell-571-243-1952<br>Home-571-261-1425 | holly.glass@crbard.com |
| Janet Hudnall | Office-480-303-2630<br>Cell-602-881-1331 | janet.hudnall@crbard.com |
| Donna Passero | Office-908-277-8335<br>Cell-908-803-9346<br>Home-973-394-0052 | donna.passero@crbard.com |
| Chris Ganser | Office-908-277-9338<br>Cell-908-568-9411<br>Fax-908-277-8087 | christopher.ganser@crbard.com |
| Doug Uelmen | Office-480-303-2629<br>Cell-TBD<br>Home-TBD | doug.uelmen@crbard.com |
| John McDermott | Office: 480-303-2673<br>Cell: 602-684-7309 | john.mcdermott@crbard.com |
| Rob Carr | Office: 480-303-2684<br>Cell: 480-220-2322 | robert.carr@crbard.com |
| Brian Berry | Office:<br>Cell: | brian.berry@crbard.com |
| *Adjunct –*<br>John Lehmann, MD | Office-617-489-7080<br>Cell-508-341-8942<br>Home-508-358-5365 | jlehmann@lehmannthomas.com |
| Frank Mankewicz | Office-202-944-5141<br>Cell-202-258-9020<br>Home-202-462-7202 | fmankiewicz@hillandknowlton.com |
| Lee Lynch | Office-202-944-5186<br>Cell-571-214-8799 | llynch@hillandknowlton.com |
| Kimberly Ocampo | Office-202-944-1905<br>Cell-202-997-4420 | kocampo@hillandknowlton.com |

HILL & KNOWLTON          600 New Hampshire Avenue, NW        T 202 333-7400              6
                         Suite 601                          F 202 333-1638
                         Washington, DC  20037

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BPV-17-01-00164741

MAY. 11. 2004  2:04PM    CORP SA QA RA MA -AC                            NO. 7782   P. 0

*CRT Conference Calls*
The following telephone line is available 24 hours a day, seven days a week for the CRT to use for conference calls.
- Toll Free Dial-In Number: 1-888-453-5732
- Participant Passcode: 500965

## V. Recovery Vena Cava Filter Audience Outreach Team

Depending on the situation, the CRT may determine that there is a critical need to contact other key audiences outside of this immediate response group. To facilitate effective and efficient communications among the various company divisions and appropriate external audiences, a point-of-contact has been designated to conduct this outreach. They are:

| Audience Outreach Team: | Phone Numbers: | E-mail Address: |
| --- | --- | --- |
| *Additional Media:*<br>Holly Glass | Office-703-754-2848<br>Cell-571-243-1952<br>Home-571-261-1425 | holly.glass@crbard.com |
| *CEO and Board of Directors:*<br>Holly Glass | Office-703-754-2848<br>Cell-571-243-1952<br>Home-571-261-1425 | holly.glass@crbard.com |
| *Recovery Filter Field Sales Reps:*<br>Janet Hudnall<br>Carol Stone | Janet:<br>Office-480-303-2630<br>Cell-602-881-1331<br><br>Carol:<br>Office-908-277-8301<br>Cell-908-507-6574<br>Home-908-526-5579 | janet.hudnall@crbard.com<br><br><br><br>carol.stone@crbard.com |
| *Recovery Filter Physicians:*<br>Janet Hudnall | Office-480-303-2630<br>Cell-602-881-1331 | janet.hudnall@crbard.com |
| *Customers and Field Reps:*<br>Janet Hudnall | Office-480-303-2630<br>Cell-602-881-1331 | janet.hudnall@crbard.com |
| *All Other Employees:*<br>Diana McHugh | Office-908-277-8191<br>Cell-908-571-2841<br>Home-908-835-0107 | diana.mchugh@crbard.com |
| *Suppliers/Operations:*<br>Frank Maloit | Office-908-277-8177<br>Cell-908-528-3537<br>Home-610-330-9082<br>Home-781-837-9530 | frank.maloit@crbard.com |
| *Shareholders and Wall Street:*<br>Eric Shick | Office-908-277-8413<br>Cell-908-256-4238<br>Office- 908-277-8265 | eric.shick@crbard.com |

HILL & KNOWLTON          600 New Hampshire Avenue, NW       T 202 333-7400          7
                         Suite 601                          F 202 333-1638
                         Washington, DC 20037

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BPV-17-01-00164742

MAY. 11. 2004  2:05PM    CORP SA QA RA MA -AC                                NO. 7782   P. 11

## VI. Top Media Interview Dos and Don'ts

Following is a list of general dos and don'ts for interviews with major top media outlets.

*Dos*
- Offer a physician spokesperson for comment.
- Offer a researcher, patient or corporate executive for further insight.
- Offer medical studies validating Recovery Vena Cava Filters or retrievable vena cava filters in general.
- Ask for a list of questions, parameters of the story and permission to record your own video of the interview or any interviews with Bard employees, patients or physicians.
- Offer video of Bard's headquarters, if you already have a tape available.
- Manage the story.  Draw the line at non-company spokespersons, "trial witnesses", salespersons, product designers, etc.
- Stay focused on the success rate and clinical effectiveness of the products, rather than the claims.  Stick to your key messages.
- Include day-before and day-of key audience notification in your communications strategy.  Assume key audiences such as employees, physicians, shareholders, customers and field sales reps will see the story.  Be prepared to notify them about when the segment will air or has just aired, and provide a clear, convincing cover letter with your key messages, as well as a breakdown of comments made in the story matched with corresponding facts.

*Don'ts*
- Play favorites with the members of the media.
- Answer a question with "No Comment."
- Don't try to minimize the problem.
- Don't release sensitive or proprietary information.

HILL & KNOWLTON          600 New Hampshire Avenue, NW      T 202 333-7400                    8
                         Suite 601                        F 202 333-1638
                         Washington, DC  20037

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BPV-17-01-00164743

MAY. 11. 2004  2:05PM    CORP SA QA RA MA FAC                    NO. 7782   P.  2

## VII. External Allies/Experts

*Physician Spokespeople*
If a reporter calls for comment, Bard should have reputable physicians confirmed to
participate in interviews to attest to the product's success rate and the value it provides
to patients.

The below physician has been identified to serve as a spokesperson who can speak to
the value of the filter.

Gary S. Cohen, MD
Chief, Interventional Radiology
Temple University Medical Center
3401 N. Broad St.
Philadelphia, PA 19140
(215) 707-3951
*cohenator@aol.com*



*Third Party Industry Organizations and Potential Allies*
Board members and other prominent leaders from ally organizations may be able to
lend their credibility to Bard by providing ally spokespersons who can speak to the value
of the retrievable Recovery Vena Cava Filter products (or retrievable vena cava filters in
general) and Bard's position as a leader both in terms of innovation and customer
care/safety. Allies may include representatives from the following organizations:

- Society of Interventional Radiology
- Association for the Advancement of Medical Instrumentation
- Medical Device Manufacturers Association
- Society for Vascular Surgeons

We currently are researching whether these organizations would be willing to speak to
the media if an inquiry arises. For regional or local media outlets, it may be necessary
to provide local sources. As the scenario develops, we may work with other third-party
associations to determine local spokespeople.

In addition, Bard may want to consider either securing the partnership of a general
medical device or consumer organization that can speak broadly about the value of
Bard's products for consumers, such as:
- The Medical Device Manufacturers Association
- Center for Consumer Affairs or
- American Council on Consumer Interests (ACCI)

HILL & KNOWLTON          600 New Hampshire Avenue, NW      T 202 333-7400          9
                         Suite 601                        F 202 333-1638
                         Washington, DC  20037

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BPV-17-01-00164744

MAY. 11. 2004  2:05PM    CORP SA QA RA MA -AC                              NO. 7782   P. 13

Finally, another consideration is for Bard to create a third-party organization that
focuses on the enormous benefit of medical progress for consumers to override the
negative perceptions created through a few (often frivolous) lawsuits.

HILL & KNOWLTON          600 New Hampshire Avenue, NW      T 202 333-7400         10
                         Suite 601                        F 202 333-1638
                         Washington, DC 20037

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BPV-17-01-00164745

## VIII. Key Studies

Two studies are available specific to the Recovery Filter.

The Recovery Filter has been used in Canada by a single investigator and two colleagues at six Toronto area hospitals in 58 subjects, under the Special Access regulations.  Although essentially only one physician used the device, removal was performed by three physicians with different support staff and imaging equipment.

Of the 58 filters implanted, a total of 46 have been retrieved, 8 remain in place, and 4 [NA2]patients have died with filters in place of causes unrelated to filter placement or retrieval (leukemia, cancer, polyarteritis and pulmonary aspergillosis, and hemorrhagic stroke).  Time to removal ranged from 1 to 161 days, average 60 days.

In addition, the Recovery Filter underwent testing (bench top or animal studies or a combination of both) according to FDA guidelines to obtain FDA concurrence.

[NEED ABSTRACTS FOR THE ABOVE AND ADDITIONAL HUMAN STUDIES]

Summaries of key medical studies highlighting the success rate of Bard's Recovery Vena Cava Filter products and other vena cava filters can be found in the appendix.  We have produced three separate sections of summarized studies: one focuses on the success of (permanent) [NA3]vena cava filters in general; the second focuses on retrievable vena cava filters as a whole; and the third details studies on Bard's Recovery Vena Cava Filter specifically.  These summaries will serve as handouts and references for the media.


## IX. News Breakdown

There are many various forms a news story can take and often one precedes another.  To understand how news stories are originally generated and often end up featured on weekly news magazine shows, an explanation of how the media generally works is provided below.  Please note there are always exceptions to the standards.

Wires – Associated Press, Bloomberg, Dow Jones, Reuters
National Dailies – *USA Today, New York Times, Wall Street Journal*
Top Market Dailies – *Los Angeles Times, Boston Globe, Washington Post*
Trades – *The Gray Sheet, MDDI, Medical Device Litigation Reporter*
News Magazine – *U.S. News & World Report, Time, Newsweek*
Daily News Program – Dateline, World News Tonight
Weekly News Program – 60 Minutes, 60 Minutes II, 48 Hours Investigates, 20/20

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BPV-17-01-00164746