Robert W. Boatman (009619) - rwb@gknet.com
Paul L. Stoller (016773) - paul.stoller@gknet.com
Shannon L. Clark (019708) - SLC@gknet.com
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
602-530-8000

Ramon Rossi Lopez - rlopez@lopezmchugh.com
(California Bar Number 86361; admitted *pro hac vice*)
Lopez McHugh LLP
100 Bayview Circle, Suite 5600
Newport Beach, California 92660
949-812-5771

*Co-Lead/Liaison Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC<br><br>**MOTION TO COMPEL AS TO CLAIMS OF ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE** |

## I.  INTRODUCTION

Plaintiffs, by and through counsel undersigned, hereby move the Court for an order compelling the production of documents improperly withheld as privileged by Defendants. The attorney-client privilege only protects confidential communications between attorneys and clients that are made for the purpose of obtaining or giving legal advice. *Upjohn Co. v. United States,* 449 U.S. 383, 394 (1981); *United States v. Richey*, 632 F.3d 559, 568 (9th Cir.

2011).[1] Plaintiffs challenge 133 entries on Bard's privilege logs because (1) the communications do not contain a request for or the advice of an attorney, (2) the primary purpose of the communications were not to obtain or provide legal advice, or (3) the communication was not intended to be and kept confidential. Plaintiffs also challenge Bard's work product claims as to some privilege log entries because the withheld documents were not prepared in anticipation of litigation or for trial.

## II. PROCEDURAL HISTORY

In its initial submission of issues to the Court in this MDL, Bard said that its privilege logs were completely compliant with applicable privilege law, and in fact had been vetted and approved by multiple courts including the Nevada district court's detailed ruling in *Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615 (D. Nev. 2013). *See* The Parties' Proposed Agenda and Discussion of Issues Submitted Pursuant to the Court's September 15, 2015, Order Setting Initial Case Management Conference, Doc. 174, at 32-33. In their portion of the initial joint submission and at the October 29, 2015, initial Case Management Conference, Plaintiffs disputed this assertion and told the Court that they believed Bard was improperly withholding several thousand relevant documents pursuant to claims of attorney-client privilege and the work product doctrine. *Id.* at 29-30. Previous sampling efforts had revealed that Bard was improperly shielding between 33% to 50% of the entries, and the *Phillips* ruling actually

---

[1] Although courts sitting in diversity jurisdiction apply state law regarding attorney-client privilege claims, "[f]ive elements are common to all definitions of the attorney-client privilege: (1) an attorney, (2) a client, (3) a communication, (4) confidentiality anticipated and preserved, and (5) legal advice or assistance being the purpose of the communication." *In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 789, 785 (E.D. La. 2007); *accord Admiral Ins. Co. v. United States Dist. Court*, 881 F.2d 1486, 1492 (9th Cir. 1989) (setting forth the "essential elements" of attorney-client privilege).

found that, after Bard withdrew seven (7) of the fifty (50) sampled entries, eighteen (18) of the remaining forty-three (43) sampled entries were improper. The Bard defendants responded that, since *Phillips*, they had reviewed their privilege logs and produced more documents, and that this effort removed improperly listed entries such that in the MDL privilege issues should be minimal.

Plaintiffs contend that Bard is mistaken. As the Court is aware from the parties' joint reports on privilege log issues, the parties engaged in a substantial meet and confer and sampling process to test Bard's assertion as to the propriety of the privilege log. After dozens of hours of telephonic conferences and one in-person meeting in Phoenix with defense counsel, Plaintiffs maintain a substantial number of challenges to Bard's privilege log designations. Out of 307 privilege log entries sampled by Plaintiffs, the parties could not agree on 133. Those disputed entries are individually listed in the spreadsheet attached at Exhibit A,[2] and can be grouped into categories of different types of defects that defeat privilege. Those categories are discussed in Section IV, below.

### III.   THE REGULATORY DUTIES OF MEDICAL DEVICE MANUFACTURERS

To put Bard's privilege claims in their proper context, *i.e.*, that the communications and documents Bard asserts are privileged were actually made for business and not legal purposes, discussion of Bard's mandated business and regulatory activities is appropriate.

---

[2] Due to the number of privilege log entries currently in dispute, individual streamlined challenges to the entries are set forth in Exhibit A. It is hoped that this mechanism can easily be transitioned into a matrix-style summary of the dispute similar to what the Court has requested the parties to prepare for other discovery dispute issues.

-3-

**A.     Medical device manufacturers must investigate potential device safety problems and take corrective action to prevent further device failures.**

Bard obtained clearance to market all of its IVC Filter devices through the 510(k) premarket notification process.  As part of that process, the FDA requires all manufactures to establish and maintain minimum industry safety standards known as the current "good manufacturing practice requirements" (GMPR).  *See* 21 CFR § 820.1.  The GMPR requires that medical device manufacturers establish and maintain procedures for investigating causes of device failures and methods for correcting those problems to prevent failures from recurring.  *See* 21 CFR § 820.100.  Such activities include analyzing quality audits, complaints, returned product, and other sources of data to determine why the device failed, and implementing statistical methodology to detect recurring quality problems.

**B.     Bard's internal procedures also require investigations of device failures and corrective action to prevent recurrence of device failures.**

Bard adopted a remedial action procedure for the investigation and correction of product problems.  *See* Bard's RA-STD-002 procedure, attached at Exhibit B.  The procedure requires a division-level team to evaluate product problems that could lead to remedial action and to develop action plans to address such problems.  *Id.* at BPVE-17-01-00024668.  The team, at a minimum, must include the department heads of Regulatory Affairs, Marketing, Manufacturing, R&D, Quality Assurance, and a Corporate Medical Director.  *Id*.  The Corporate Medical Director is required to help consult with the team to create the remedial action plan and to create a health hazard evaluation, which must be included with the remedial action plan.  *Id.* at BPVE-17-01-00024669.  Remedial action plans are internal investigative reports into product complaints, which include the following: information about

-4-

the device; numbers of the complications; potential causes of the complaints; investigations into complaints, *i.e.*, literature reviews, bench testing, and communications with physicians; conclusions about the root cause of the complaint; and recommendations about what should be done, if anything, to reduce the risk of harm going forward.

The remedial action plan is then forwarded to the Corporate Product Assessment Team ("PAT"), which consists of representatives from Corporate Regulatory Affairs, Medical Affairs, Operations, Law and the Corporate VP of Quality Assurance. *See id.* at BPVE-17-01-00024669. The Corporate PAT reviews the proposed remedial action then forwards its recommendations regarding the remedial action plan to the VP of Corporate Regulatory Science, who makes the final determination. *Id.* The health hazard evaluation is used to help evaluate the proposed remedial action plan.

### C. Quality Audits.

Pursuant to 21 C.F.R. § 820.22 ("Quality Audit"), Bard was required to establish procedures for conducting quality audits and to actually conduct such audits. "A report of the results of each quality audit, and reaudit(s) where taken, shall be made and such reports shall be reviewed by management having responsibility for the matters audited." *Id.* These reports on the quality audits must be documented per the regulation. *Id.*

## IV. ANALYSIS

### A. The party asserting privilege has the burden of proof.

The party asserting attorney-client privilege has the burden of showing that the privilege protects the information that the party intends to withhold. *In re Grand Jury Investigation*, 974 F.2d 1068, 1070 (9th Cir. 1992). Similarly, the party asserting the work-

product rule has the burden of establishing, for each document, the rule's application. *Conoco Inc. v. United States Dept. of Justice*, 687 F.2d 724, 728 (9th Cir. 1982).

### B.     Attorney-Client Privilege.

#### 1.     Attorney-client privilege does not apply to communications that are not a request for or rendering of advice from an attorney.

For the attorney-client privilege to apply, the communication has to be made for the purpose of obtaining or giving legal advice. *Upjohn,* 449 U.S. at 394; *Richey*, 632 F.3d at 568. One category of Bard's improper privilege log entries consists of communications that provide no evidence that a lawyer was ever asked to render advice. The majority of these entries are Bard internal communications between non-lawyers and other Bard employees in the "Bard Legal Department" with titles such as "contract managers," "litigation managers," "trademark managers," and "paralegals." There is no legal authority for Bard's stated position that these types of Bard employees may give legal advice independent of actual attorneys. *Cf. Richey*, 632 F.3d at 566 n. 3 ("What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining *legal* advice *from the lawyer.*" (quoting *United States v. Gurtner*, 474 F.2d 297, 299 (9th Cir. 1973), emphasis in original, quotation marks omitted)). Many entries simply claim legal advice was given but do not mention what lawyer gave the advice. These allegedly privileged documents thus fail to satisfy even the most preliminary requirement of attorney-client privilege.

While Bard has agreed to remove the majority of the most blatant examples from the sampled documents, it continues to refuse to withdraw numerous entries and has specifically refused to address these violations on the remainder of its logs. *See* March 2, 2016, email

from Bard counsel Kate Helm, Exhibit C ("In making this production, as with the prior production, Bard does not agree that the documents are non-privileged."). Indeed, there are at least 30 cases within the challenged documents where Bard claims a non-lawyer is giving legal advice or fails to identify the lawyer who allegedly gave the legal advice.[3]

Entry No. 193 from Log 6, illustrates Bard's improper assertion of privilege for this category of documents. The entry involves an October 11, 2005, communication from Kellee Jones (Executive Administrative Assistant) to Rich Bliss (third party consultant) allegedly communicating independent legal advice of Sabina Downing (non-lawyer) "about potential adverse events." Bard asserts attorney-client privilege and work product. Both claims should be denied.

First, Bard has failed to establish that the communication involves a request for legal advice from a lawyer. Without the direction of counsel, a non-lawyer may not independently give legal advice. Second, the communication involves a normal business activity that Bard would have been required to conduct regardless of litigation, *i.e.* investigation of adverse events and, if and what type of corrective action is necessary. Further any claims of attorney-client privilege has been waived and work product cannot apply as Bard has not established any facts supporting that Mr. Bliss was retained by Bard's lawyers to help prepare for litigation or that he was merely helping Bard's lawyers interpret already privileged material.

---

[3] *See* Exhibit A, Log 2, Nos. 221, 244, 362, 522, 797, 809; Log 3 Nos. 126, 1096, 1766, 1801, 2082, 2244, 2249, 2295, 2321, 2445, 2529, 2625, 2626, 2828, 3184, 3271, 3757; Log 4 No. 29; Log 5 No. 41; and Log 6 Nos. 08, 128, 191, 193, 251.

### 2. Bard's attorney-client privilege claims over communications with outside counsel fail where the attorney was not acting as a lawyer.

Defendants claim privilege over numerous communications involving outside counsel even though the communications do not involve the attorney acting as a lawyer. But communications are only privileged "if the attorney is 'acting as a lawyer'—giving advice with respect to the legal implications of a proposed course of conduct. . . ." *In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 789, 798 (E.D. La. 2007) (quoting *Hercules Inc. v. Exxon Corp.,* 434 F. Supp. 136, 147 (D. Del. 1977)). Thus, business communications are not protected merely because they are directed to an attorney, *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) (citing *United States v. Chen* 99 F.3d 1495, 1501 (9th Cir. 1996)), and communications at meetings attended or directed by attorneys are not automatically privileged as a result of the attorney's presence. *See Super Tire Engineering Co. v. Bandag, Inc.,* 562 F. Supp. 439, 441 (E.D. Pa. 1983). Entries from the sampled documents falling within this category include Log 2, No. 486; Log 3 Nos. 1413, 1569, 1685, 1694, 1697, 2017, 3465, and Log 6 Nos. 28 and 330. *See* Exhibit A.

Log 3 Nos. 1413, 1569, 1685, 1694 and 1697 are all good examples of why some of Bard's communications with outside counsel are not protected. Each of these communications relate to Bard's negotiations to purchase a safer alternative design IVC Filter from another company. Despite being copied on emails, these documents evidence that it was Carl Rickenbaugh, a non-lawyer, who was doing the negotiating and circulating his plans for moving forward. *See* Exhibit A, Log 3, No. 1697. None of these documents reflect a request for or rendering of legal advice. Additionally, while Log 3, No. 1685 may be a letter

drafted by counsel, it is simply a business letter explaining why a business deal fell through; no legal strategy or advice is asserted.

Likewise, Log 6, No. 330 contains multiple communications, including the disclosed communication between Dr. Kaufman and Ms. Barton, as well multiple undisclosed attached communications between Dr. Kaufman and non-lawyers from Bard.  Bard has failed to establish that that Dr. Kaufman was merely helping Bard's lawyers interpret already privileged material.  Instead he appears to be providing his own advice and working on non-legal matters.  The multiple communications between Dr. Kaufman and non-legal employees were clearly made for a business purpose.

> **3.     Attorney-client privilege must be denied where Bard failed to establish that the primary purpose of the communication was to obtain or render legal advice.**

In the Ninth Circuit, the "primary purpose" of an attorney-client communication must be to obtain or provide legal advice for the communication to be privileged.  *See Phillips*, 290 F.R.D. at 628-29 ("[T]he court will adhere to the 'primary purpose' test as other judges in this district have done.").[4]  Bard's approach to privilege for communications with both a business and alleged legal purpose, also known as dual purpose documents, is inconsistent with this rule.  Specific types of communications are further discussed below and in Exhibit A.

---

[4] This is not to be confused with the "because of" standard for dual purpose business and legal documents as to *work product privilege*, which the Court has previously noted.  Order, February 11, 2016 (Doc. 699), at 4 ("Courts in the Ninth Circuit use the 'because of' test to determine whether dual purpose documents *were prepared in anticipation of litigation. . . .*" (emphasis added)).

### a. Privilege does not attach if the business purpose would have provided sufficient cause for the communication.

Bard has sought to assert attorney-client privilege over documents that would have been created for business purposes by involving its in-house counsel in nearly every aspect of its business. Courts have caught on to the "practice of businesses who may try to 'immunize internal [business] communications from discovery by placing legal counsel in strategic corporate positions and funneling documents through counsel.'" *In re Seroquel Products Liab. Litig.*, 2008 WL 1995058, at *4 (M.D. Fla. May 7, 2008) (*quoting* 1 Paul R. Rice, ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES § 7:2.). As the court in *United States v. Chevron Texaco Corp.*, explained, the primary purpose rule applies with even greater force to in-house attorneys who may be providing business as well as legal advice:

> In-house counsel may be involved intimately in the corporation's day to day business activities and frequently serve as integral players in business decisions or activities. Accordingly, communications involving in-house counsel might well pertain to business rather than legal matters. The privilege does not protect an attorney's business advice. Corporations may not conduct their business affairs in private simply by staffing a transaction with attorneys. Because in-house counsel may operate in a purely or primarily business capacity in connection with many corporate endeavors, the presumption that attaches to communications with outside counsel does not extend to communications with in-house counsel.

241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2001). Thus with respect to communications with in-house counsel, corporate litigants "must make a 'clear showing' that the 'speaker' made the communications for the purpose of obtaining or providing legal advice." *Id.* Defendants

-10-

have failed this test for the challenged documents involving communications with in-house counsel.

### b. Business-related communications addressing technical, scientific, promotional, management, marketing, or regulatory compliance issues are not privileged.

Courts have generally found that the routine inclusion of attorneys in business-related matters does not support the inference that the underlying communications were created and transmitted primarily to obtain legal advice. *See, e.g*. *In re Seroquel*, 2008 WL 1995058, at *5 (rejecting broad claim of privilege by corporate defendant over communications regarding "legal analysis of safety, scientific, technical, and regulatory matters"); *In re Vioxx*, 501 F. Supp. 2d at 811-12. This is because there are typically sufficient business reasons for these communications to have taken place regardless of any perceived additional interest in securing legal advice. *In re Vioxx*, 501 F. Supp. at 803.[5]

As discussed above, Bard cannot shield communications that had a sufficient business motivation by including in-house counsel on communications or in meetings or using them as a conduit for redistribution of communications. For example, Log 3, Nos. 175, 505.01, 519, 520.01, 521, 523 are multiple versions of an email chain that begins with John McDermott emailing Judith Reinsdorf (Vice President, Secretary, and General Counsel of C.R. Bard) on October 10, 2006, and copying Brian Barry, Dr. Ciavarella, Christopher Ganser, Shari Allen, Janet Hudnall, and Gin Schulz with the subject line "G2." *See* Exhibit A. The email apparently contained an attached "action and communication" plan prepared by

---

[5] Professor Rice's analysis as special master in the *Vioxx* litigation is particularly cogent and insightful regarding corporate privilege claims for in-house lawyers. *See id.* at 795-813.

Mr. McDermott. Ms. Reinsdorf replies on October 12 to Mr. McDermott and copies John Weiland and Brian Barry. She notes that she has reviewed Mr. McDermott's action and communication plan with Brian Barry and John Weiland and they are in agreement on a number of issues regarding the plan, which she goes on to identify. The entire email is then forwarded four more times and is seen by multiple different employees, including, for example, Cindi Walcott (Field Assurance Manager), who is responsible for investigating adverse events.

Bard's privilege claim should be denied as it has failed to establish that the communication was made for the primary purpose of soliciting legal advice or that confidentiality was expected or maintained. First, there is nothing that appears to be of legal significance to the communications. This is simply a marketing communication, which is certainly not the type of traditional legal document discussed in the Vioxx case. *See In re Vioxx Prods. Liab. Litig.,* 501 F. Supp. 2d at 801-03 (finding lawyers review and editing of traditional business matters such as scientific reports, articles, study proposals, or marketing matters is not legal advice). Further, while Ms. Reinsdorf is a lawyer, she also held the positions of Vice President and Secretary for C.R. Bard. Thus, she was not necessarily acting in her role as a lawyer. The initial email was also sent out for simultaneous review and comment to other non-lawyers. Indeed, Ms. Reinsdorf makes it clear that she did in fact review the plan with other non-lawyers and that her suggestions were reached jointly with the non-lawyers. This strongly indicates that the primary purpose was business related. Finally, Bard has not established why the numerous employees who were provided with this email chain needed it to fulfill the purpose for why the lawyer was consulted.

### c. Communications sent to lawyers and non-lawyers for simultaneous review or that merely copy a lawyer are not solicitations for legal advice.

Many of the documents listed on Bard's privilege logs are listed as being simultaneously sent to both attorneys and non-attorneys. Courts have generally found that when a communication is sent to both non-attorneys and attorneys soliciting further review and comment that the communication was not sent for the primary purpose of obtaining legal advice. *See e.g., In re Seroquel*, 2008 WL 1995058 at *9; *In re Vioxx,* 501 F. Supp. 2d at 805; *United States v. Int'l Bus. Machines Corp.,* 66 F.R.D. 206, 213 (S.D.N.Y. 1974); *cf. Phillips*, 290 F.R.D. at 629 (recognizing the position of some courts but declining to make a *per se* ruling). The *Vioxx* court concluded that the inclusion of non-lawyers on a communications with lawyers meant it was "far more probable" that the communication was for a business purpose than a solicitation of legal advice:

> We accept the possibility that addressing communications to both lawyers and non-lawyers could reflect the seeking of legal advice from the lawyers and that the non-lawyers were simply being notified about the nature of the legal services sought. Facially, however, it appears far more probable that the non-lawyers were being sent the communications for separate business reasons. Therefore, it was the burden of the [Defendant] to overcome the logical inference [of no primary legal purpose] created by the pattern of distribution.

501 F. Supp. 2d at 809. Similarly, merely copying legal counsel on a communication is, in and of itself, insufficient to trigger the protection of the attorney-client privilege. *Phillips,* 290 F.R.D. at 629; *Chevron Texaco Corp.*, 241 F. Supp. 2d at 1075. Rather, the party seeking to shield the communication must still establish each element of the privilege. *Id.*

-13-

Some of the more egregious examples of Bard's misapplication of privilege to communications including non-lawyers and for business reasons include examples seen at Log 2, Nos. 816 and 859.

### d. Internal communications between non-lawyers not specifically seeking or forwarding legal advice are not privileged.

To establish attorney-client privilege over communications between non-lawyer employees, Bard must establish that "the non-attorneys were seeking or forwarding legal advice to non-attorneys who needed it to fulfill the purpose for which the lawyer was consulted and/or that disclosure to other non-lawyer employees was reasonably necessary for the transmission of the communication." *Phillips*, 290 F.R.D. at 631. Bard, however, has failed to establish that communications between non-lawyer employees actually evidence a confidential communication with a lawyer made with the primary purpose of obtaining legal advice. Bard has further failed to explain why disclosure to other non-lawyers was reasonably necessary to fulfill the purpose for which the lawyer was consulted.

### e. Disclosure to consultants destroys confidentiality and thus privilege.

In addition to demonstrating the elements required to initially establish the privilege, Bard must show that there has been no waiver of any properly-assert privilege. *Chevron Corp.*, 1996 WL 264769 at *4 (citing *Weil v. Investment/Indicators*, 647 F.2d 18, 25 (9th Cir.1991)). Plaintiffs challenge a number of documents on the basis that Defendants waived the privilege by disclosing the documents to outside consultants. There is no indication that these consultants are helping Defendants' lawyers interpret already privileged material so as to render a legal opinion. *Cf. United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961). Rather,

-14-

these consultants appear to be providing their own advice and working on non-legal matters. Examples include disclosures made to Richard Bliss, John Kaufman, M.D., and Margo Underwood. In each case, Defendants have failed to establish that disclosure did not constitute waiver of privilege. Examples of responsive challenges are seen at Exhibit A, Log 2, Nos. 339, 336, 494, 502, 766, 1220 and Log 3, Nos. 326, 335, 347 and 522.

### C.   Work Product.

The work-product rule is not a privilege but an immunity protecting documents prepared by a party or its representative in anticipation of litigation from discovery. *Admiral Ins. Co. v. United States Dist. Ct., for Dist. of Az.,* 881 F.2d 1486, 1494 (9th Cir. 1989). To qualify for protection against discovery under the work product doctrine, documents must: (1) "be 'prepared in anticipation of litigation or for trial,' and (2) be prepared 'by or for another party or by or for that other party's representative.'" *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 907 (9th Cir. 2004). Thus, the party asserting work product protection must demonstrate the threat of litigation was impending. "Most courts which have confronted the issue conclude that some remote prospect of litigation is not sufficient." *Phillips*, 290 F.R.D. at 635.

The Court has long been familiar with the "because of" test to determine whether dual purpose documents are entitled to work product protection. Order, Feb. 11, 2016 (Doc. 699) at 4 (citing *Richey*, 632 F.3d at 567-68). But that rule does not allow the unfettered application of work product to dual purpose documents Bard seeks here. In *Richey*, 632 F.3d at 568, the court determined that work product protection did not apply to materials prepared by a consultant hired by the client's attorney because the documents would have been created

-15-

regardless of litigation and there was no evidence that document would have been prepared differently in the absence of litigation. Similarly, in *United States v. Frederick*, 182 F.3d 496, 501 (7th Cir. 1999), the court found that although the disputed materials were prepared by attorney while there was a pending investigation, work product did not apply because the documents "had a readily separable purpose from litigation preparation . . . ."

The factual background for the documents in Exhibit A for which Bard seeks work product protection are analogous to the facts of *Richey* and *Frederick*. Relevant examples include Log 2, Nos. 195, 583, 756, 837 and Log 3, No. 131. Because Bard has not met its burden to establish that these documents would not have been prepared in the absence of actual or threatened litigation, the work product privilege does not shield the subject documents from discovery.

V. <u>**CONCLUSION**</u>

Plaintiffs request that the Court review *in camera* the documents listed in Exhibit A to evaluate Bard's privilege claims and confirm, as set forth above, that the 133 challenged documents are not subject to the asserted privileges. An *in camera* review of the disputed entries and rulings on the propriety of Bard's assertion of privilege as to those entries will also guide the parties in their evaluation of the rest of the over 5,000 entries on Bard's privilege logs.

For the foregoing reasons, the Court should order *in camera* production of the documents listed in Exhibit A, find that Bard has improperly withheld as privileged those documents therein, and order their production to Plaintiffs.

RESPECTFULLY SUBMITTED this 25th day of March, 2016.

                    GALLAGHER & KENNEDY, P.A.

                    By:   */s/ Robert W. Boatman*
                         Robert W. Boatman
                         Paul L. Stoller
                         Shannon L. Clark
                         2575 East Camelback Road
                         Phoenix, Arizona  85016-9225

                    LOPEZ McHUGH LLP
                       Ramon Rossi Lopez (CA Bar No. 86361)
                       (admitted *pro hac vice*)
                       100 Bayview Circle, Suite 5600
                       Newport Beach, California 92660

                    *Co-Lead/Liaison Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of March, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

                                      */s/  Gay Blakesley*

5340249/26997-0001