Robert W. Boatman (009619) – rwb@gknet.com
Paul L. Stoller (016773) – paul.stoller@gknet.com
Shannon L. Clark (019708) – SLC@gknet.com
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona  85016-9225
602-530-8000

Ramon Rossi Lopez - rlopez@lopezmchugh.com
(California Bar Number 86361; admitted *pro hac vice*)
Lopez McHugh LLP
100 Bayview Circle, Suite 5600
Newport Beach, California  92660
949-812-5771

*Co-Lead/Liaison Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| In Re Bard IVC Filters Products Liability Litigation | No. 2:15-MD-02641-DGC |
|---|---|
| | **PLAINTIFFS' REPONSE IN OPPOSITION TO DEFENDANTS' NOTICE OF SUBMISSION REGARDING PROPRIETY, NECESSITY, AND PROCEDURE FOR EARLY RESOLUTION OF APPLICABILITY OF PLAINTIFFS' CLAIM OF EQUITABLE TOLLING DUE TO FRAUDULENT CONCEALMENT** |

Bard's request for early resolution of equitable tolling (Doc. 1146) is essentially a request for permission to file summary judgment motions on any individual case in this MDL.  Bard's proposal is both premature and inefficient because there simply cannot be a universal determination on the application of equitable tolling.  Indeed, even assuming that the issue of equitable tolling applied to a substantial number of cases, Bard's proposal could result in hundreds of individual motions before the Court which would consume

GALLAGHER & KENNEDY, P.A.
2575 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-9225
(602) 530-8000

1   large amounts of both the parties' and the Court's time and likely would resolve a very

2   small number of cases.  The proposal is contrary to the goals of the MDL process.

3                              **BACKGROUND**

4          Bard seeks to limit the number of cases currently filed in this MDL and to ward off

5   future filings based on what it asserts will be a pileup on the "super-highway" of litigation

6   generated by the mere creation of this MDL.  Defs. Mem. at 7.  But Bard offers no

7   meaningful examples of what it considers meritless cases filed after the creation of this

8   MDL.  It also ignores that the viability of an individual action is a case-specific, fact-

9   intensive inquiry not traditionally addressed in multidistrict litigation (with the possible

10  exception of a bellwether process).

11         More problematically, in its rush to impose legally-unsupported and practically

12  untenable parameters on cases in this MDL, Bard ignores the "discovery rule" adopted in

13  many jurisdictions to toll the running of a statute of limitations until a plaintiff reasonably

14  could have discovered his or her cause of action and instead advocates a prophylactic

15  substantive rule that injury alone triggers accrual of the statute of limitations.  It would be

16  improper for this Court to adopt Bard's analysis and deny plaintiffs substantive rights they

17  have under the law of their forum state.

18         It is no answer that some plaintiffs learned of their cause of action after seeing or

19  reviewing ads in the media.  First, courts have recognized that media exposure of product

20  defects is relevant to the factual inquiry of when a plaintiff discovered his or her cause of

21  action.  *See, e.g., Anson v. Am. Motors Corp.*, 155 Ariz. 420, 423, 747 P.2d 581, 584

22  (App. 1987) (finding that plaintiffs who discovered cause of action relating to defective

23  Jeep by watching a report on *60 Minutes* could assert product liability claim because, in

24  the absence of information communicated in the report, the plaintiffs could not be

25  expected to initiate and investigate the research needed to establish the link between the

26  Jeep's defects and the death of their son).  This is particularly true where, as here, the

27  defendant has endeavored to conceal the problems with its product.  *Compare* Master

28  Long-Form Complaint at ¶ 162 *with Anson*, 155 Ariz. at 425, 747 P.2d at 586 (noting that

1  plaintiff alleged that defendants fraudulently concealed information about problems with

2  its Jeep from the public).

3         As explained below, Bard's one-size-fits-all approach is premature and anathema

4  to the goals of this MDL.  Case-specific issues like when a plaintiff reasonably could have

5  discovered his or her cause of action should be adjudicated on remand to transferor courts

6  after completion of common issue discovery.

7                                   **ARGUMENT**

8  **I.     This Court Should Determine Summary Judgment Issues That Involve
          Common Issues to the MDL, But Not Issues That Pertain to Only a Few
9          Cases or That Rest on State Law Issues Particular to Individual Cases.**

10         While this Court possesses authority to preside over summary judgment motions

11 on each case in the MDL, this is far from a requirement.  As set forth in the Manual for

12 Complex Litigation, "[i]f the summary judgment motion pertains to one or few cases, or

13 rests on application of the transferor court's conflicts-of-law and *substantive law rules*, the

14 transferor judge may be able to decide the motions most efficiently.  If the summary

15 judgment motions involve issues common to all the cases centralized before the MDL

16 court, however, the transferee judge may be in the best position to rule."  Manual for

17 Complex Litigation, Fourth, § 22.36 (emphasis added).  Here, Bard seeks resolution of the

18 issue of equitable tolling and its application to individual claims.  That issue is a question

19 of state law, which varies across a variety of jurisdictions, and likely applies only to a

20 limited number of cases in this MDL.

21         While Bard purports to propose a simple and streamlined procedure, the proposed

22 case management order would be anything but streamlined.  Outside of the solitary

23 litigation cited by Bard in its Notice (*In re Mirena*), such a practice is unprecedented in a

24 case where plaintiffs hail from nearly every state in the country.  Indeed, Bard was only

25 able to cite one instance in which an order like this one has been previously adopted.

26 And, as discussed below, the process there ultimately was not efficient and resolved only

27 a very small percentage of cases in that MDL.

28

3

**II.      Resolution of Equitable Tolling Rests on Individual Issues of Law and Fact That Are Not Generally Applicable to This MDL.**

Where applicable, the equitable tolling doctrine tolls the statute of limitations in an individual case.  Bard's premature request for this Court's intervention on the issue of equitable tolling is based on the faulty premise that the doctrine of equitable tolling and the law on the statute of limitations are identical in every state.  It also fails to acknowledge the existence of the discovery rule, which many states have incorporated into their statute of limitations analyses and which must be assessed based on the individual facts of the individual cases.

        A.      Equitable tolling involves issues of state law that vary from case to case.

"Under the doctrine of *Erie Railroad Co. v. Tompkins*, and its progeny, where a claim is derived from state law, state law governs the applicable statute of limitations." *In re Norplant Contraceptive Products Liab. Litig.*, 961 F. Supp. 163, 165 (E.D. Tex. 1997).  As all the claims in this MDL arise out of state law, the laws of the states where venue would be appropriate in the absence of this MDL apply to the plaintiffs' individual claims.  As a result, all questions as to statutes of limitations, including the doctrine of equitable tolling, are issues of state law.

"When considering questions of state law . . . the transferee court must apply the state law that would have applied to the individual cases had they not been transferred for consolidation." *In re Korean Air Lines Co., Ltd.,* 642 F.3d 685, 699 n.12 (9th Cir. 2011) (quoting *Toll Bros. v. Dryvit Sys., Inc.,* 432 F. Supp. 2d 564, 568 n.4 (4th Cir. 2005)).  The doctrines of fraudulent concealment, equitable tolling (including unclean hands), and the discovery rule are defined, adopted, and interpreted differently in each state.  The authorities referenced in the attached table at Exhibit 1 provide only a glimpse into the differences existing among each state's discovery rules and doctrines of fraudulent concealment and equitable tolling.  *See* Representative Case Table 1, Ex. 1.

1              B.       <u>Application of the discovery rule will necessarily vary from case to case.</u>

2          Application of the discovery rule will depend in each case on the individual

3  plaintiff's discovery of his or her injury and the ability to link that injury causally to the

4  defendant's conduct.  Not only do the injuries of the plaintiffs in this MDL vary from case

5  to case, but clearly the timing of when they should have discovered their claims against

6  Bard will vary based on facts unique to those cases.  The effects of the failure modes of

7  the medical devices in this MDL – tilt, perforation, fracture, and migration – had different

8  effects on different plaintiffs.  Moreover, the symptoms that individual plaintiffs

9  experienced based on the failures also differ from plaintiff to plaintiff and give rise to

10  potentially different results in terms of discovery.

11          Moreover, as the citations in Table 1 demonstrate, many states' statutes of

12  limitations are not triggered by the injury itself, but rather by the plaintiff's *knowledge*

13  that the injury was caused by the defendant's tortious conduct.  The fact that a filter

14  migrated, tilted, perforated, or otherwise malfunctioned is not by itself evidence of Bard's

15  tortious conduct.  Indeed, Plaintiffs' Master Complaint alleges, among other things:

16          Plaintiffs' ignorance of the defective and unreasonably dangerous nature of

17          the Bard IVC Filters, and the causal connection between these defects and
        Plaintiffs' injuries and damages, is due in large part to Bard's acts and

18          omissions in fraudulently concealing information from the public and
        misrepresenting and/or downplaying the serious threat to public safety its

19          products present.

20  Master Long-Form Complaint, ¶ 162.  Plaintiffs further alleged that Bard's

21          conduct includes intentional concealment from Plaintiffs, Plaintiffs'
        prescribing health care professionals . . . of material information that Bard

22          IVC Filters had not been demonstrated to be safe or effective, and carried
        with them the risks and dangerous defects described [in the Master

23          Complaint.]

24  *Id.* at ¶ 164.  In light of Bard's continuing representations that its IVC Filters had low risk

25  rates and were highly efficacious, and given the extensive effort Bard and its Crisis

26  Communications Team invested in ensuring physicians and their patients did and do not

27  suspect problems,  any client who did experience an injury as a result of the filter likely

28  would not have thought that the failure was anything other than a fluke (and even then

would not necessarily know that these problems give rise to a cause of action).  Although *Bard* learned is that its filters were failing at rates far greater than what was communicated to physicians, Bard took active steps to ensure these events were not "exposed" publicly.

> Dr. Lehmann, As you may be aware, *I am working with Hill and Knowlton to prepare a comprehensive crisis communications plan in the event the Recovery® issue is "exposed" in the media.* We have formed a team of the H&K reps, myself, Donna Passero, and Janet Hudnall to work on the components of the plan. From time to time, it will be imperative to have the medical expertise represented on the team and wanted to ask if you are willing to help us on an as-needed basis?

*Phillips* Tr. Ex. 1128, Email from Lehmann to Glass, March 19, 2004 (emphasis added), Ex. 3.

Instead of promptly notifying the medical community and patients of the danger of its filters, Bard hired a public relations firm to spin this information if ever asked by doctors of the media.  As Dr. Lehmann, a member of the Crisis Communication Team, recommended, Bard's carefully-worded "messaging" if asked about filter-related deaths was to be: "Bottom line: good filter, severe case, bad outcome, deep regret.  This is the simple story we should repeat again and again.  *Comparison with other filters is problematic in many ways and we should avoid/downplay as much as possible*."  Phillips Tr. Ex. 682, Email from Lehmann to Passero (emphasis added), Ex. 4.

Bard's strategy was successful.  Crisis Communication Team member Janet Hudnall remarked on the success of the PR campaign in keeping quiet the news about the problems with Bard's filters:

> I was thinking how far we've come in a year as far as filter problems. I know we are having a few problems but do you freaking remember what it was like a year ago? Do you remember what it was like 2 years ago? I don't know if it can ever get any worse. You weathered the storm as well as anyone, anyone could have . . . . I don't think there are many better business case studies for a terrible situation that was held together with scotch tape, smoke, mirrors, crying, etc."

*Phillips* Trial Ex. 748, Email from Greer to Hudnall, March 16, 2006, Ex. 5.

6

1       Given Bard's success at conveying one message of safety to the public while

2  concealing its own internal knowledge of the alarming failure rates leading to injury and

3  death of its line of retrievable filters, Bard can hardly argue that plaintiffs should have

4  earlier suspected or discovered the link between their filters and Bard's conduct.  At a

5  minimum, Bard's role in concealing material facts is part of the overall statute of

6  limitations factual inquiry.

7       In addition, just because an injury occurs does not necessarily put a patient or his or

8  her family on notice of a possible defect with a medical product.  As one Court explained

9  in a similar context:

> [I]t is reasonable for a person to initially assume that side effects of a
> prescription drug are either unavoidable or acceptable by medical
> standards—such an assumption derives from the reality of medical
> treatment. . . . [M]edications can have side effects, a patient is often willing
> to bear some side effects in order to realize the curative effects of the drug,
> and the patient relies on a physician to properly weigh the medical benefits
> and risks (both known and unknown) when prescribing the medication.
> Thus, mere knowledge of the causal link between the drug and the injury is
> often insufficient to alert the patient that there may be a cause of action
> against the manufacturer—as far as the patient can tell, the drug worked as
> best as the patient and doctor could expect.

*Esposito v. Novartis Pharm. Corp.,* 2015 WL 5474339, at *5 (D.R.I. Sept. 18, 2015)

(citations and quotation marks omitted).

       Bard's attempt to distinguish its medical devices from prescription drugs falls flat.

In most cases, it will be for the jury to determine if a plaintiff, through the exercise of

reasonable diligence, reasonably should have (or could have) discovered whether pains,

soreness, or difficulty breathing are the effect(s) of a product malfunction as distinct from

foreseeable side effects of the plaintiff's existing condition or of having a foreign object in

his or her body.  Similarly, even when the patient can determine that the device is the

cause of the injury, the patient does not necessarily understand that the adverse symptoms

are not unavoidable or foreseeable side effects.  Precisely when a plaintiff was on

reasonable notice of both his or her injury and the connection between injury and tortious

conduct will depend on the facts in each individual case.

Moreover, Bard's proposal also presumes that each plaintiff knew that he or she had a Bard filter implanted at the time any injuries may have been diagnosed and knew immediately when the filter may have caused an injury.  Defs.' Mem. at 2.  While each plaintiff presumably knew that a Bard filter was used at the time his or her case was filed, Bard has provided no evidence to support that plaintiffs knew which filter was implanted either at the time of implantation or at the time at which an injury occurred.  And, such evidence simply cannot be developed, if ever, without substantial discovery in each individual case in which there is a claim of tolling of the statute of limitations.

Bard's use of an example plaintiff who had several attempts to remove a filter to argue that the court can make sweeping determinations regarding the statute of limitations is ill-fitting.  First, Bard makes no showing that its example case is representative of any other cases in this MDL.  While Plaintiffs cannot know for certain at this point, they are reasonably confident in saying that the number of cases involving multiple unsuccessful attempts to remove a filter is relatively small.  Moreover the determination of when the particular plaintiff in Bard's example knew or reasonably should have known that she had a defective filter that caused her injury is still dependent on facts specific to her case.  Indeed, the answer is not even clear from the limited facts Bard presents in their filing.  This is particularly so given the false and misleading information that Bard presented physicians and patients regarding their IVC filters.

**III.    Under the Discovery Rule or the Doctrines of Fraudulent Concealment And Equitable Tolling, the Question of When a Client Knew or Should Have Known of Either an Injury or the Existence of a Cause of Action Is a Factual Inquiry Reserved for the Jury.**

While Bard seeks preemptive summary judgment on equitable tolling at an early stage, there is a fact dispute on the issue.  Moreover, fact discovery has only begun in this MDL; plaintiffs have only begun to gather the evidence that would address this issue.

Summary judgment "is appropriate if the evidence, viewed in the light most favorable to the nonmoving party shows 'that there is no genuine issue as to any material fact . . . .'"  *Long v. TRW Vehicle Safety Sys., Inc.,* 796 F. Supp. 2d 1005, 1008 (D. Ariz.

8

2011) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).  The core dispute here is already evident: did Bard fraudulently conceal the true safety and efficacy profile of its various IVC Filters from physicians and consumers like the plaintiffs?  Unsurprisingly, the parties disagree on the answer to this question.  *See e.g.,* Master Answer [Doc. 366], ¶¶ 102-06, 160-65 (denying Plaintiffs' factual allegations).  That disagreement is another reason Bard's request should be denied.

Under the laws of the various states governing the claims, the fact-intensive inquiries of what a plaintiff knew and when the statute of limitations began to run under the doctrines of fraudulent concealment, the discovery rule, and equitable tolling are decided by the trier of fact.  *See* Representative Case Table 2, Ex. 2.  Because of this, it is not only premature, but counterproductive for the parties to invest considerable MDL time and effort – likely to the delay of other universally common issues.[1]

Moreover, the cases cited in Table 2 demonstrate that the statute of limitations analysis is not only a factual inquiry but one that must be done on a case-by-case basis. Bard's proposed procedure of using an exemplar case simply does not resolve this issue. Addressing the statute of limitations in one case will at best only resolve the issue in that single case.  There is simply no means to apply such a ruling across multiple cases in this MDL.[2]

Rather, this Court would have to resolve dozens and potentially hundreds of individual case determinations.  It would have to resolve the applicable law for each forum state and, at a minimum, require Bard to file a summary judgment motion on each individual case based on facts specific to those cases.[3]  That would not advance the interest of the MDL and would likely result in dozens (if not hundreds) of case-specific,

---

[1] As observed by the Court at the March 31, 2016, status conference, non-case-specific discovery for the first phase of discovery will run through at least this summer.

[2] For example, neither the short-form complaint nor the Plaintiff Profile Form contains information from which statute of limitations determinations can be made.

[3] Again, it is unclear how Bard would obtain the individual facts necessary to resolve the individual case issues for all of the hundreds of cases in this MDL.

state-law-specific motions that must be heard by the Court after individual case-specific discovery is conducted.  Such a procedure is unnecessary and inefficient.

**IV.    The Mirena IUD MDL Demonstrates Why Bard's Proposal Is Not Efficient.**

Bard holds up the procedure used in *In re Mirena IUD Product Liability Litigation* as the example of the process it advocates here.  Aside from being the only MDL that has ever used the procedure for which Bard advocates, the actual procedure and its results demonstrate precisely why it is not effective and why it should not be used in this case.

In the Mirena IUD MDL, unlike what Bard appears to propose here, the defendants moved to dismiss the claim of a single plaintiff on statute of limitations grounds.  *In re Mirena IUD Prod. Liab. Litig. (Truitt v. Bayer, 13-CV-7811)*, 29 F. Supp. 3d 345, 348 (S.D.N.Y. 2014) (noting that "Plaintiff is a resident and citizen of Indiana" and describing specific MDL plaintiff's medical course from 2009 to 2011).  In that particular case, at an emergency room visit, the plaintiff learned that her IUD device had perforated her uterus and migrated into her abdomen; she further learned that she had developed ovarian cysts; and she underwent surgery to remove the device.  *Id.*  Two years and two months later, plaintiff filed her suit which the defendants moved to dismiss based on the statute of limitations.  *Id.* at 349.

Under the laws of Indiana and Texas, *id.* at 351, the court found that the statute of limitations was triggered for that particular plaintiff "at the latest, . . . when Plaintiff learned that the Mirena perforated her uterus and would have to be removed," *id.* at 354.  Its analysis of the equitable tolling of the statute of limitations was that the plaintiff's knowledge that the IUD had perforated her uterus "also defeats Plaintiff's argument that Defendants' purported fraudulent concealment tolls the statute of limitations."  *Id.*  As a result, the court found that the plaintiff's claim accrued on the date she learned of her injury and there was no further tolling of the statute of limitations after that date.

In terms of procedures in the MDL, the Court then issued a case management order that required the defendants to serve a short-form motion to dismiss any individual plaintiff based on the court's summary judgment ruling in *Truitt*; individual plaintiffs then

had the option to dismiss their claims or to submit a short-form response to the motion(s). *In re Mirena IUD Prod. Liab. Litig.*, Order No. 22 (Aug. 6, 2014), available at http://www.nysd.uscourts.gov/file/mdl/799.  In all, this process resulted in the dismissal of 32 cases (including the initial plaintiff).  *See In re Mirena IUD Prod. Liab. Litig.*, S.D.N.Y. Case No. 13-MD-2434, Opinion & Order (Jan. 9, 2015), available at http://business.cch.com/plsd/InreMirena-1-9-2015.pdf.  This is of the 1339 cases that are presently on file in that MDL.[4]  Thus, the entire process resulted in the disposition of less than three percent of all the cases.  There is no reason to believe that the result would be any better here even if it were possible to follow a similar procedure.

## V.    Bard's Concerns about Bellwether Cases Are Already Addressed in the Proposed Bellwether Process.

Bard's proposal would be exceedingly time-consuming for both parties as well as the Court and would require a state-by-state analysis of each individual statute of limitations for each individual case (as evidenced above), thereby defeating the purpose of having an MDL.  *See In Re: Bard IVC Filters Prods. Liab. Litig., MDL No. 2641,* [Doc. No. 63], Aug. 17, 2015 (transferring cases to "conserve the resources of the parties, their counsel and the judiciary").  Indeed, the proposed bellwether process (see Doc. 923) is designed to allow both parties to assess the strengths and weaknesses of all claims and defenses in this case, including the relevant statutes of limitations.  As Judge Scheindlin from the Southern District of New York explained, "bellwether trial[s] also allow a court and jury to give the major arguments of both parties due consideration without facing the daunting prospect of resolving every issue in every action."  *In re: Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 2007 WL 1791258, *2 (S.D.N.Y. June 15, 2007).  Further, the bellwether process is currently structured to allow for substitution of cases, should any of the bellwether picks prove to be insufficient for any reason.

As of March 31, 2016, there were more than 377 cases filed in the MDL.  The Initial Plaintiff Pool called for in the proposed bellwether selection process would be

---

[4] Case count as of April 3, 2016.  *See* http://www.nysd.uscourts.gov/mdl/13MD02434.

1   comprised of 48 cases, only six of which will ultimately be fully prepared for trial.  *See*

2   Doc. 923 at 2.  The process further calls for each of the 48 plaintiffs to submit additional

3   information to Bard in the form of Plaintiff Fact Sheets and complete sets of medical

4   records.  *Id.* at 4-5.  The group will then be cut down to 20 cases and then to 12 cases by

5   agreement of the parties.  The information exchanged in this part of the process should

6   inform both parties as to whether there are any cases that may present statute of

7   limitations issues, and that stage in the process is a more appropriate point at which to

8   address this issue.

9                                   **<u>CONCLUSION</u>**

10          Engaging in the cumbersome and time-intensive case and state-law specific

11  discovery and motion practice necessary to resolve statute of limitations challenges

12  thwarts the centralization and common benefit discovery and pretrial process for which

13  this MDL was formed.  There is no good reason to engage in Bard's novel (for an MDL)

14  procedure because, under the law of virtually every jurisdiction, assessing when a plaintiff

15  reasonably should have discovered their cause of action (the fault and the harm), and

16  whether a defendant's actions in fraudulently concealing material information tolls the

17  statute of limitations are questions for the jury.

18          At bottom, tolling of the statute of limitations simply is not a common issue that

19  should be addressed early in the MDL process.  Nor is the process that Bard proposes

20  likely to apply to more than a very small number of cases.  Case-specific issues like the

21  statute of limitations and its tolling are best addressed in individual cases, including at the

22  bellwether stage, if necessary.

23          For these reasons, Plaintiffs respectfully request that the Court deny Bard's request.

24

25

26

27

28

RESPECTFULLY SUBMITTED this 4th day of April, 2016.

GALLAGHER & KENNEDY, P.A.

By:___/s/ Robert W. Boatman_____
      Robert W. Boatman
      Paul L. Stoller
      Shannon L. Clark
      2575 East Camelback Road
      Phoenix, Arizona  85016-9225

LOPEZ McHUGH LLP
      Ramon Rossi Lopez (CA Bar No. 86361)
      (admitted *pro hac vice*)
      100 Bayview Circle, Suite 5600
      Newport Beach, California 92660

*Co-Lead/Liaison Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of April, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

*/s/ Deborah Yanazzo*_____

5351463/26997-0001

13