James R. Condo (#005867)
Amanda C. Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street, NW / Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

Attorneys for Defendants C. R. Bard, Inc. and
Bard Peripheral Vascular, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation, | No. 2:15-MD-02641-DGC<br><br>**DEFENDANTS' MEMORANDUM IN RESPONSE TO THE PLAINTIFFS' PRIVILEGE LOG CHALLENGE** |

Pursuant to Case Management Order 10, Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. hereby submit their response to the plaintiffs' privilege log challenge. In applying the following points and principles to the documents at issue, the Court should uphold Bard's assertions of attorney-client privilege and work-product protection:

- Plaintiffs mistakenly argue throughout their Motion to Compel as to Claims of Attorney-Client and Work Product Privilege (Doc. 1214) that the *Vioxx* and *Seroquel* federal common law decisions direct the scope of the attorney-client privilege in the Bard IVC Filter MDL. Rather, the Federal

Rules of Evidence and choice-of-law principles instruct that Arizona attorney-client privilege law applies.

- Arizona has adopted a broad attorney-client privilege for corporations.
- Contrary to the plaintiffs' position that such advice can never be privileged, courts have found that advice regarding compliance with federal regulations often amounts to protected legal advice, and requires document-by-document analysis rather than a categorical approach to resolve privilege disputes.
- The Arizona attorney-client privilege statute explicitly protects communications involving paralegals.
- Courts have found that communications solely between non-lawyers that reflect previously provided legal advice are privileged.
- Courts have found that communications involving the "functional equivalent" of a corporate client are privileged.
- As the Court has already recognized in its Order regarding Dr. Lehmann's report, the Ninth Circuit protects documents prepared "because of" the prospect of litigation as work product.

## FACTS AND PROCEDURAL HISTORY

Even before the formation of the Bard IVC Filter MDL, Bard's privilege logs were the subject of dispute. Troy Brenes, who is leading the MDL plaintiffs' privilege challenge, also led privilege challenges in *Phillips v. C. R. Bard, Inc.* and *Giordano v. C. R. Bard, Inc.* In both cases, the courts upheld the vast majority of the challenged documents. *See Phillips v. C. R. Bard, Inc.*, 290 F.R.D. 615 (D. Nev. 2013) (attached as Exhibit A); Or., *Giordano v. C. R. Bard, Inc.*, No. 37-2011-00069363-CU-PO-EC, (Cal. Super. Ct. Nov. 5, 2013) (attached as Exhibit B). As a result of the meet-and-confer process in *Phillips* and *Giordano*, and after guidance from the courts, Bard undertook two significant revisions of its privilege logs. In total, Bard spent over 500 hours of attorney time to revise and produce previously withheld documents. On November 13,

2015, Bard provided the MDL plaintiffs with these revised privilege logs, and identified all documents that had been withdrawn from the privilege logs at any point in the pre-MDL litigation. (Joint Report on Privilege Log Efforts (Doc. 450), Jan. 21, 2016, at 2.)

Bard's revised privilege logs reflect its substantial efforts to parse each communication in attempting to ensure that all non-privileged documents are produced. Bard has asserted the attorney-client privilege and/or work-product doctrine for fewer than 1.4% of the relevant documents in this litigation, and Bard has produced more than 75% of all communications involving Bard's Law Department.[1]

Despite Bard's efforts, the small percentage of documents withheld, and the plaintiffs' previous privilege challenges, the MDL plaintiffs have notified Bard and the Court of their intent to challenge <u>every single entry</u> on Bard's revised privilege logs, including the documents that the *Phillips* and *Giordano* courts previously found to be protected. (Joint Rep. on Privilege Log Efforts (Doc. 450), Jan. 21, 2016, at 5, 7 of Plaintiffs' Position and Proposal). For the initial phase of their privilege challenge, the plaintiffs selected 307 documents (a 5% sampling) listed on the privilege log. Regarding 133 documents on which the parties could not reach agreement during meet-and-confer sessions, the plaintiffs filed a Motion to Compel (Doc. 1214). The Court subsequently suspended briefing on the Motion. (CMO-10 (Doc. 1319), Apr. 1, 2016.)

The Court then ordered the plaintiffs to "identify the specific legal issues addressed in Plaintiffs' motion to compel," and to identify three exemplar documents concerning each legal issue. (*Id.*) The plaintiffs' produced a letter with categories and example documents. (Ltr. from Counsel for Pls. to Counsel for Bard, Apr. 4, 2016, attached as Exhibit C.) The categories of documents in the plaintiffs' letter, however, are different than the categories in their Motion to Compel.[2] Counsel for Bard discussed

---

[1] Bard has produced over 370,000 documents to the plaintiffs, its privilege logs contain approximately 5200 entries, and Bard has produced more than 15,000 documents where Bard's Law Department appears on the communication.

[2] The categories appear to be those decided by the Court in *In re Vioxx Products Liability Litigation*, 501 F. Supp. 2d 789 (E.D. La. 2007). As discussed below, the *Vioxx* court's approach and the categories does not apply in this case.

these differences with counsel for the plaintiffs, and received an explanatory e-mail attempting to clarify the plaintiffs' position.[3] (E-mail from Counsel for Pls. to Counsel for Bard, Apr. 5, 2016, attached as Exhibit D.)

In its Case Management Order, the Court also ordered Bard to file the instant memorandum responding to the plaintiffs' legal arguments, and to identify two additional documents concerning each of the plaintiffs' identified categories (for a total of five documents concerning each category), which Bard has identified in Exhibit E in the Court's preferred matrix format. (CMO-10.)

Pursuant to the Court's Order, in this memorandum of law, Bard discusses the overall legal framework applicable to Bard's attorney-client privilege and work-product claims in the MDL, and addresses any specific factual issues concerning the documents at issue in Exhibit E. Bard also submits three declarations in support of its attorney-client privilege and work-product claims, attached as Exhibits G to I.

## ARGUMENT

**A. Arizona Attorney-Client Privilege Law Governs in the MDL.**

In their motion, the plaintiffs incorrectly rely on federal common law[4] and Nevada state law[5] for their attorney-client privilege arguments. Federal Rule of Evidence 501

---

[3] Several of the plaintiffs' categories in the April 4 letter, however, seem to focus on factual issues concerning the privilege log entries themselves, as opposed to the substance of Bard's privilege claim. (*See, e.g.,* Ex. C, Ltr. from Counsel for Pls., paras. 1.b ("Entries where . . . Defendants fail to identify the lawyer asked to give legal advice . . . ."); 2 ("Entries that do not reflect any legal advice was given or requested."); 7 ("Entries that do not describe the author or recipient of the communication, including attachments").) In the plaintiffs' clarifying e-mail, counsel assured Bard that the items listed in the letter correspond to headings in their Motion to Compel. (Ex. D, E-mail from Counsel for Pls.) To be sure, during the numerous meet-and-confer sessions preceding the plaintiffs' Motion to Compel, counsel for Bard individually discussed each document subject to the plaintiffs' challenge. (Decl. of Elizabeth Helm, Apr. 18, 2016, at ¶ 4, attached as Exhibit F.) Counsel for Bard answered the plaintiffs' questions about each document, particularly about who participated in each protected communication. (*Id.*) Counsel for the plaintiffs often took notes and asked follow-up questions. (*Id.*) And, for some documents, counsel for Bard would show or read portions to counsel for the plaintiffs, subject to the Court's Rule 502(d) Order. (*Id.*) Thus, to the extent that the plaintiffs have factual questions specific to privilege log entries, Bard believes that counsel can discuss and resolve these questions without burdening the Court.

[4] The plaintiffs principally cite *In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 789 (E.D. La. 2007) and *In re Seroquel Prods. Liab. Litig.*, 2008 WL 1995058 (M.D. Fla. May 7,

- 4 -

and conflict-of-law principles, however, instruct that Arizona state law governs Bard's attorney-client privilege assertions.

Federal Rule of Evidence 501 provides that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Because every plaintiff's claim in the MDL is governed by state law, state law governs Bard's assertions of attorney-client privilege.

This MDL is comprised of cases transferred from federal courts around the country and cases filed directly in the MDL. When factual connections involve more than one state, federal courts exercising diversity jurisdiction apply the choice of law rules from the state in which they sit; and when a case is transferred to an MDL, the transferee court applies the choice of law rules of the state in which the transferor courts sit. *See Chang v. Baxter Healthcare Corp.*, 599 F.3d 728, 732 (7th Cir. 2010). Thus, the plaintiffs' privilege challenge poses a choice-of-law issue involving multiple states.

The Chief Judge of the Southern District of Illinois thoroughly addressed this precise choice-of-law issue in an MDL setting in *In re Yasmin and Yas (Drospirenone) Marketing, Sales Practices and Products Liability Litigation*, No. 3:09-md-02100-DRH-PMF, 2011 WL 1375011 (S.D. Ill. Apr. 12, 2011) ("*In re Yasmin*"). Like in this MDL, the plaintiffs in *In re Yasmin* challenged the defendants' privilege assertions. After reviewing the legislative history and advisory committee notes to Rule 501, the court concluded that state privilege law must apply. *Id.* at **2-5. The court rejected the plaintiffs' argument that the *Vioxx* decision (which was also the law applied in *In re Seroquel* that the plaintiffs in this MDL rely on heavily) should apply because the *Vioxx* privilege ruling was incorrectly premised on federal common law. *Id.* at *6.

---

2008) throughout their brief, both of which incorrectly and without explanation applied federal common law regarding the attorney-client privilege.

[5] The plaintiffs cite *Phillips v. C. R. Bard, Inc.*, 290 F.R.D. 615 (D. Nev. 2013) to argue that the "primary purpose" test for attorney-client privilege applies. *Phillips*, however, applied Nevada law, not Arizona law.

Given the breadth of the *In re Yasmin* litigation, the court analyzed the choice-of-law principles of all fifty states, the District of Columbia, and Puerto Rico. The court found that the vast majority of states explicitly or implicitly apply the "most significant relationship" test to conflict-of-law issues concerning the attorney-client privilege which is found in section 139 of the *Restatement (Second) Conflict of Laws* (1971); and that the remaining small minority of states apply the *Restatement (First) of Conflict of Laws* (1934), which does not specifically address how privilege choice-of-law matters should be resolved. *Id.* at **8-9. The court, therefore, directed the parties to apply section 139 of the *Restatement (Second) Conflict of Laws* to determine which state's privilege law should apply to the plaintiffs' privilege challenge. *Id.* at *9.

Like in the *In re Yasmin* litigation, the "most significant relationship" test of section 139 of the *Restatement (Second) Conflict of Laws* should apply in the Bard IVC Filter MDL to determine which state's privilege law governs Bard's attorney-client privilege assertions. The state with the most significant relationship to Bard's privileged communications is Arizona, where Bard Peripheral Vascular is located. Arizona is where the communications central to this MDL occurred: intellectual property of the filters, regulatory compliance of the warnings/instructions that accompanied the filters; communications concerning the FDA and Bard's filters; regulatory compliance of the marketing material for the filters; regulatory compliance of training the sales force; and regulatory compliance of development and maintenance of a quality and post-market surveillance system regarding the filters. Because Arizona has the "most significant relationship" to the communications, Arizona law regarding the attorney-client privilege should govern.

Regarding certain aspects of attorney-client privilege law for which Arizona law is silent, however, the Court should look to persuasive legal authority in the Ninth Circuit and more broadly. *See Takahashi v. Loomis Armored Car Serv.*, 625 F.2d 314, 316 (9th Cir.1980) (citations omitted) ("In the absence of controlling forum state law, a federal court sitting in diversity must use its own best judgment in predicting how the state's

highest court would decide the case. In so doing, a federal court may be aided by looking to well-reasoned decisions from other jurisdictions."). Bard's citations to attorney-client privilege law outside of Arizona throughout this brief, therefore, are limited to instances in which Arizona courts have not addressed the issue discussed. Given Arizona's policy of affording broad protection to the corporate attorney-client relationship, federal common law should serve as the floor for the scope of protection that Arizona courts most likely would afford.

### B. Arizona Has Adopted a Broad Attorney-Client Privilege for Corporations

#### 1. Generally

Arizona recognizes that "[t]he attorney-client privilege is the oldest of privileges for confidential communications and is 'rigorously guarded 'to encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'"" *State v. Sucharew*, 205 Ariz. 16, 21, 66 P.3d 59, 64 (Ct. App. 2003) (*quoting State v. Towery*, 186 Ariz. 168, 177, n.6, 920 P.2d 290, 299, n.6 (1996)).

Arizona's corporate attorney-client privilege is codified at A.R.S. section 12-2234. By its terms, A.R.S. section 12-2234 is more expansive than the corporate attorney-client privilege applicable in federal courts (such as the scope of the privilege discussed in *In re Vioxx* and *In re Seroquel*) and other states' courts. *Roman Catholic Diocese of Phoenix v. City of Maricopa*, 204 Ariz. 225, 231 n.7, 62 P.3d 970, 976 n.7 (Ct. App. 2003). A.R.S. section 12-2234 provides:

> A. In a civil action an attorney shall not, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment. An attorney's paralegal, assistant, secretary, stenographer or clerk shall not, without the consent of his employer, be examined concerning any fact the knowledge of which was acquired in such capacity.
>
> B. For purposes of subsection A, any communication is privileged between an attorney for a corporation, governmental entity, partnership, business, association or other similar entity or an employer and any employee, agent or member of the entity or employer regarding acts or

- 7 -

> omissions of or information obtained from the employee, agent or member if the communication is either:
>
> > 1. For the purpose of providing legal advice to the entity or employer or to the employee, agent or member.
> >
> > 2. For the purpose of obtaining information in order to provide legal advice to the entity or employer or to the employee, agent or member.
>
> C. The privilege defined in this section shall not be construed to allow the employee to be relieved of a duty to disclose the facts solely because they have been communicated to an attorney.

Since its passage in 1994, A.R.S. section 12-2234 has not been amended. The Arizona Court of Appeals has noted that the Arizona Legislature "may create or expand privileges by statute, and courts 'will recognize [such] rules when they are 'reasonable and workable.''" *Roman Catholic Diocese of Phoenix v. City of Maricopa*, 204 Ariz. 225, 231, 62 P.3d 970, 976 (Ct. App. 2003) (*quoting Readenour v. Marion Power Shovel*, 149 Ariz. 442, 445, 719 P.2d 1058, 1061 (1986)). In recognizing the statutory privilege embodied in A.R.S. section 12-2234, the Court of Appeals further noted that it would strictly construe the language in the statute. *Id.* at 229, 62 P.3d at 974. The Court of Appeals reiterated that it would "not look beyond [A.R.S. section 12-2234's] plain language to determine its meaning," and that it "will strictly construe a privilege granted by statute." *Salvation Army v. Bryson*, 229 Ariz. 204, 210-11, 273 P.3d 656 (Ct. App. 2012); *see Roman Catholic Diocese of Phoenix*, 204 Ariz. at 228, 62 P.3d at 973 ("If the statute's language is clear and unambiguous, we give to that language and do not apply any other rule of statutory construction." (quotation omitted)). Therefore, this Court also should strictly construe A.R.S. section 12-2234 in applying its terms to Bard's attorney-client privilege assertions.

/ / /

/ / /

/ / /

/ / /

## 2. Advice Regarding Compliance with Federal Regulations Is Protected Legal Advice and Whether a Particular Communication Amounts to Protected Legal Advice Is a Document-Specific Inquiry

In arguing that Bard has failed to prove that its attorneys provided the company with "legal advice," the plaintiffs take the position that communications concerning federally regulated issues can never be protected legal advice because Bard is required to comply with federal regulations. The implication of the plaintiffs' argument is that no company in a regulated industry can seek or obtain legal advice regarding any regulated issue. The plaintiffs' position is contrary to the law. *Upjohn Co. v. United States*, 449 U.S. 383, 392 (1981) ("In light of the vast and complicated array of regulatory legislation confronting the modern corporation, corporations, unlike most individuals, constantly go to lawyers to find out how to obey the law, particularly since compliance with the law in this area is hardly an instinctive matter.") (quotation omitted).

Although Arizona courts have not directly addressed the scope of the corporate attorney-client privilege in the context regulated industries, federal courts around the country that have addressed the issue have made clear that "legal advice is often necessary to ensure compliance with statutory and regulatory requirements," *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Products Liab. Litig.*, No. 3:09-MD-02100-DRH, 2011 WL 2462033, at *5 (S.D. Ill. June 17, 2011), and that FDA regulations are "an inherently legal process . . . virtually necessitating legal representation . . . requir[ing] close supervision by legal counsel." *In re CV Therapeutics, Inc. Sec. Litig.*, 2006 WL 1699536, at *5 (quotation omitted) (noting additionally that communications pertaining to submissions to the FDA "occur in an inherently legal context, and the need for and importance of legal advice can fairly be implied."); *Phillips v. C. R. Bard, Inc.*, 290 F.R.D. 615, 630-31 (D. Nev. 2013) (noting that government regulation of the medical device industry does not preclude protected legal advice about compliance with the regulations); *In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 789, 800 (E.D. La. 2007) (noting that "we have come to appreciate how services that initially

appear to be non-legal in nature, like commenting upon and editing television ads and other promotional materials could, in fact, be legal advice . . . . Without question, the pervasive nature of governmental regulation is a factor that must be taken into account"); *cf. United States v. Chen*, 99 F.3d 1495, 1500 (9th Cir. 1996) ("Lawyers are constantly called upon to tell people, in advance of action or developed controversy, what their duties are to other people and to the government . . . . In the case of tightly defined requirements, such as the return and payment of taxes, this may call for close, meticulous guidance. For the most part, however, what are involved are prohibitions. Safe-side counselling is commonly the lawyer's task. When a continuing course of conduct is in question, this may require not only an informed appraisal of risk but the preparation of a plan of action to minimize it.") (quotation omitted).

Thus, the issue is not whether advice of counsel in a regulated industry can be privileged, but whether particular communications are "legal advice" or "business advice." In addressing this issue in the past, the Ninth Circuit has presumed that an attorney's involvement in a communication is for the purpose of rendering legal advice. *See U.S. v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) ("It is not easy to frame a definite test for distinguishing legal from nonlegal advice . . . the most that can be said by way of generalization is that a matter committed to a professional legal adviser is prima facie so committed for the sake of the legal advice which may be more or less desirable for some aspect of the matter, and is therefore within the privilege unless it clearly appears to be lacking in aspects requiring legal advice") (*quoting* 8 Wigmore, *Evidence* § 2296, at 566-67 (McNaughton rev. ed. 1961)) (emphasis in original).

More recently, courts have coined different phrases to define whether requests to, and advice from, counsel are business or legal in the context of regulated industry. The *Vioxx* Court used a "primary purpose" standard, finding that "[t]he lawyer's role as a lawyer must be primary to her participation" in a communication, as opposed to primarily providing business advice. 501 F. Supp. 2d 789, 798 (E.D. La. 2007). The Northern District of California has used a "because of" standard, finding that a lawyer's

role in the communication must be "because of" legal advice. *In re CV Therapeutics, Inc. Sec. Litig.*, No. C-03-3709 SI(EMC), 2006 WL 1699536, at *3 (N.D. Cal. June 16, 2006), *as clarified on reconsideration*, No. C-03-3709 SI (EMC), 2006 WL 2585038 (N.D. Cal. Aug. 30, 2006). The "primary purpose" and "because of" standards are functionally identical, however, and this Court in applying Arizona corporate privilege law has looked past the phrases "primary purpose" and "because of" to examine the context of the communications at issue to determine whether legal advice was sought or conveyed. *S.G.D. Eng'g, Ltd. v. Lockheed Martin Corp.*, No. CV-11-02493-PHX-DGC, 2013 WL 2297175, at *2 (D. Ariz. May 24, 2013) (Campbell J.) (adopting Special Master's Report and Recommendations regarding privilege challenge, *citing* Edna S. Epstein, *The Attorney-Client Privilege and the Work Product Doctrine* 210 (5th ed. Supp. 2012) ("[M]ost of the standards courts apply to determine the primary purpose for production of a document, using concepts such as 'because of' and 'primary motivation,' do not advance the analysis substantially.")).

Among the facts available to the Court in applying the broad protections afforded by Arizona's corporate attorney-client privilege are the following:

- The breadth of the recipient list in assessing the centrality of potential legal advice generated by the communication.
- Whether a communication explicitly seeks legal advice and comment.
- Whether the communication requests or reflects information sought by an attorney.
- Whether legal advice is implicit in the communication, taking into account the facts surrounding the creation of the document and the nature of the document.
- Whether the legal purpose of the communication with the attorney so permeates any non-legal purpose with the attorney that the two purposes cannot be discretely separated.

- Whether the information sent to the attorney may have been sent to keep the attorney apprised of ongoing business developments with the expectation that the attorney would respond in the event that the matter raises important legal issues.

*See In re Yasmin and Yas (Drospirenone) Marketing, Sales Practices and Prods. Liab. Litig.*, No. 3:09-md-02100-DRH-PMF, 2011 WL 2462033, at *3 (S.D. Ill. June 17, 2011); *In re CV Therapeutics, Inc. Sec. Litig.*, No. C-03-3709 SI(EMC), 2006 WL 1699536, at *4 (N.D. Cal. June 16, 2006), *as clarified on reconsideration*, No C-03-3709 SI (EMC), 2006 WL 2585038 (N.D. Cal. Aug. 30, 2006); *In re Buspirone Antitrust Litig.*, MDL No. 1413, 2002 U.S. Dist. LEXIS 23463, at *12 (S.D.N.Y. Dec. 10, 2002); *Picard Chem., Inc. Profit Sharing Plan v. Perrigo Co*., 951 F. Supp. 679, 685-86 (W.D. Mich. 1996) ("The mere fact that business considerations are weighed in the rendering of legal advice does not vitiate the attorney-client privilege.") (*quoting Coleman v. Am. Broad. Co.*, 106 F.R.D. 201, 206 (D.D.C. 1985)).

This Court has looked to these types of factors to analyze whether documents identified as privileged and involving communications with an attorney are protected, and noting that "[i]t is only through in camera review and supplemental detail from Lockheed that SGD's [privilege] objections can confidently be ruled upon." *S.G.D. Engineering, Ltd. v. Lockheed Martin Corp., Inc.*, No. CV-11-2493-PHX-DGC, 2013 WL 2297175, at *3 (D. Ariz. May 24, 2013). Thus, whether attorney involvement in a communication concerns "legal advice" or "business advice" is a fact-specific, document-specific inquiry that cannot, contrary to the plaintiffs' argument, confidently be parsed along categorical lines.

The plaintiffs seek a categorical ruling that no advice of counsel regarding regulations can be privileged, but their reasoning is based on *In re Vioxx* and *In re Seroquel*, two cases that are inapposite to the facts of this MDL. Based on the facts of *Vioxx* and *Seroquel*, the plaintiffs argue that Bard has tried "to immunize internal [business] communications from discovery by placing legal counsel in strategic

corporate positions and funneling documents through counsel." (Mot. to Compel (Doc. 1214), Mar 25, 2016, at 10 (*quoting In re Seroquel Prods. Liab. Litig.*, 2008 WL 1995058, at *4 (M.D. Fla. May 7, 2008) (internal quotation omitted and alteration in original))). The plaintiffs claim that Bard is trying to "conduct [its] business affairs in private simply by staffing a transaction with attorneys." (*Id*. at 10) (*quoting United States v. Chevron Texaco Corp*., 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2001)). These allegations are simply not the case. Bard has not withheld a suspiciously high percentage of documents on its privilege logs. Rather, Bard has asserted protection over fewer than 1.4% of relevant documents, and Bard has produced more than 75% of communications involving Bard's Law Department. Thus, the evidence shows that Bard was not trying to "conduct [its] business affairs in private simply by staffing a transaction with attorneys." (Mot. at 10) (*quoting United States v. Chevron Texaco Corp*., 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2001)).

For these reasons, the Court should deny the plaintiffs' request for a categorical ruling consistent with its past practice, and should uphold Bard's privilege assertions involving legal advice about regulatory matters.

### 3. Arizona Corporate Attorney-Client Privilege Protects Communications Involving Paralegals

A.R.S. section 12-2234(A) expressly extends the attorney-client privilege to communications to and from an attorney's paralegals and other assistants. A.R.S. § 12-2234(A) ("An attorney's paralegal, assistant, secretary, stenographer or clerk shall not, without the consent of his employer, be examined concerning any fact the knowledge of which was acquired in such capacity."); *see Salvation Army v. Bryson*, 229 Ariz. 204, 210-11, 273 P.3d 656, 662-63 (Ct. App. 2012) ("Based on its express terms, the statute protects from disclosure communications between a corporation's attorney—or his 'paralegal, assistant, secretary, stenographer or clerk' . . . ."); *Roman Catholic Diocese of Phoenix v. Superior Court ex rel. Cty. of Maricopa*, 204 Ariz. 225, 231 n.7, 62 P.3d 970, 976 n.7 (Ct. App. 2003) (A.R.S. section 12-2234 "defined the privilege differently,

extended it to entities other than corporations, and expressly applied it to an attorney's paralegals and assistants"). Thus, communication between Bard's employees and a paralegal (with titles such as Litigation Manager or Trademark Manager) or other assistants outside the presence of a Bard lawyer does not impact whether a communication otherwise is privileged under A.R.S. section 12-2234.

### 4. Communications Solely Between Non-Lawyers that Reflect Previously Provided Legal Advice Are Privileged

In-house counsel cannot communicate legal advice directly to everyone within the corporation who needs the advice to perform his or her job functions. Thus, although Arizona courts have not addressed the issue, black-letter law provides that internal confidential communications between non-attorneys of a corporation that reveal the substance of a privileged communication do not waive the attorney-client privilege, and therefore are protected communications. *See United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1077 (N.D. Cal. 2002) (finding that communications between two or more nonlegal employees who discuss or transmit legal advice given by counsel "obviously reveal privileged communications"); *see also In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 789, 796 (E.D. La. 2007) (The privilege protects "communications between corporate employees in which prior advice received is being transmitted to those who have a need to know in the scope of their corporate responsibilities"); *Broessel v. Triad Guar. Ins. Corp.*, 238 F.R.D. 215, 219 (W.D. Ky. 2006) ("[T]he privilege extends to communications among corporate employees that reflect legal advice rendered by counsel to the corporation."); *Urban Box Office Network, Inc. v. Interfase Managers*, No. 01 Civ. 8854, 2006 WL 1004472, *3 (S.D.N.Y. Apr. 17, 2006) ("[C]ommunications which reflect advice given by counsel to a corporation do not lose their privileged status when they are shared among corporate employees who share responsibility for the subject matter of the communication.") (quotation omitted); *Royal Surplus Lines Ins. v. Sofamor Danek Group*, 190 F.R.D. 463, 500-01 (W.D. Tenn. 1999) ("the communication

does not lose its protected status simply because a corporate employee conveys the attorney's advice to other protected employees") (citation omitted).

### 5. Otherwise Privileged Communications that Include "Functionally Equivalent" Employees of Bard Are Privileged

Consultants who serve as a "functional employee" or "functional equivalent" of an employee amount to an employee for purposes of the attorney-client privilege. In *In re Bieter Co.*, 16 F.3d 929, 939-40 (8th Cir. 1994), the Eighth Circuit held that an independent contractor, not an agent or employee of the client, was so intimately involved with a real estate development project that disclosure to him of otherwise privileged documents in the course of confidential communications with counsel did not destroy the privilege. In *United States v. Graf*, 610 F.3d 1148, 1157 (9th Cir. 2010), the Ninth Circuit adopted the Eighth Circuit's decision, reasoning that too narrow a definition of whose communications the privilege protects in the corporate context "will lead to attorneys not being able to confer confidentially with nonemployees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely." *Id.* at 1158 (*quoting In re Bieter Co.*, 16 F.3d 929, 937-38 (8th Cir. 1994)). In *Graf*, the Ninth Circuit also listed exemplar cases throughout the Circuit in which district courts were already applying the "functional equivalent" test, including the District of Arizona in *ASU Students for Life v. Crow*, No. CV-06-1824-PHX-MHM, 2007 WL 2725252 (D. Ariz. Sept. 17, 2007) (extending the attorney-client privilege between attorneys and members of student groups involved in the project that was the subject of the attorney-client communication); *see also Residential Constructors, LLC v. Ace Prop. & Cas. Ins. Co.*, No. 2:05–cv–01318–BES–GWF, 2006 WL 3149362, at *12–16 (D. Nev. Nov. 1, 2006) (protecting as privileged communications between an insurer's counsel and an independent insurance adjuster performing the same functions performed by an "in-house" claims employee); *see, e.g., Jones v. Nissan N. Am., Inc.*, No. 3:07-0645, 2008 WL 4366055, at *7 (M.D. Tenn. Sept. 17, 2008) (finding that the

inclusion of a non-employee medical director on communications with the company's in-house and outside trial counsel did not waive the attorney-client privilege).

The plaintiffs have challenged communications involving Dr. John Kaufman, a non-Bard employee who amounted to the functional equivalent of a Bard employee during his consultations on a major clinical study involving Bard's G2 Filter, which began August 11, 2005. Dr. Kaufman served as the principal investigator of the clinical trial, a role in which he was regularly and intimately involved and communicating with Bard about the progress, details, and outcomes of the trial.

The plaintiffs have also challenged communications involving Richard Bliss, who entered into a consulting agreement with Bard in 2004 to 2005. During that time, Mr. Bliss amounted to the functional equivalent of a Bard employee because he worked full time in Bard Peripheral Vascular's facilities in Arizona where he was issued a company computer and office, and served as interim Head of Quality and Regulatory while Bard searched for a permanent employee to fill the position. Thus, during his consultancy, he was treated like a Bard employee. (*See* Ex. H, Decl. of Robert Carr ¶ 5, Apr. 15, 2016.)

Accordingly, communications involving Dr. Kaufman or Richard Bliss do not destroy an otherwise privileged communication.

## C. The Ninth Circuit Protects Documents Prepared "Because of" the Prospect of Litigation as Work Product

Federal courts apply federal common law to the work-product doctrine, and Federal Rule of Civil Procedure 26(b)(3)(A) provides that "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent." Courts in the Ninth Circuit use the "because of" test, and the document at issue is "deemed prepared because of litigation if in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." *United States v. Richey,* 632 F.3d 559, 567-68 (9th Cir. 2011) (quotation and

citation omitted). Litigation need not be a certainty for work-product protection to arise under the "because of" test, as long as the document "would not have been created in substantially similar form but for the prospect of litigation" when considering the totality of the circumstances. *Id.* (quotation omitted); *Bickler v. Senior Lifestyle Corp.*, 266 F.R.D. 379, 383 (D. Ariz. 2010). Throughout their challenges, the plaintiffs conflate attorney-client privilege and the work-product doctrine.

As this Court has already found, Bard's Law Department retained Dr. John Lehmann in November 2004, and the consulting agreement provided that his services under the contract were being provided in "anticipation of litigation." (Or. (Doc. 699) Feb. 11, 2016, at 2.) The consulting agreement detailed the tasks that Dr. Lehmann was to perform. The Court found that Dr. Lehmann's December 15, 2004, report to Donna Passero, which was performed under the contract, was protected work product. (*Id.* at 4.)

Dr. Richard Holcomb was also retained to assist Dr. Lehmann with preparing the December 15, 2004, report. (Ex. G, Decl. of Donna Passero, Esquire ("Passero Aff."), at ¶ 13, Feb. 12, 2013.) At the time that Drs. Lehmann and Holcomb were retained, they were not employees of Bard. (*See id.* at ¶ 8, 14.) Both signed consulting agreements with Bard's Law Department, and both were made aware that the purpose of their consultation services was to confidentially assist the Law Department in giving legal advice to Bard and to confidentially assist with the litigation. (*See id.* at ¶ 8-9, 15-16.)

Following the submission of Dr. Lehmann's report, Drs. Lehmann and Holcomb continued to provide consultation services to the Law Department, pursuant to their respective contracts with the Law Department. (*See id.* at ¶ 12, 18.) These additional services were limited to follow-up items related to, and which arose from, Dr. Lehmann's report. (*See id.*)

Because Drs. Lehmann and Holcomb were retained by Bard's Law Department as consultants in order for the Law Department to provide legal advice to the corporation in anticipation of litigation, their work, and communications between them and Bard's employees in furtherance of such work, constitutes protected work product. *See, e.g.,* Or.

(Doc. 699) Feb. 11, 2016; *In re Grand Jury Subpoena, Mark Torf/Torf Envt'l Mgmt. ("Torf")*, 357 F.3d 900, 908 (9th Cir. 2004).

## CONCLUSION

For the foregoing reasons and the reasons set forth in the matrix attached as Exhibit E, Bard's attorney-client privilege and work-product assertions should be upheld.

DATED this 18th day of April, 2016.

        NELSON MULLINS RILEY &
        SCARBOROUGH LLP

By: s/Richard B. North, Jr.
    Richard B. North, Jr.
    (admitted *pro hac vice*)
    Georgia Bar No. 545599
    Matthew B. Lerner
    (admitted *pro hac vice*)
    Georgia Bar No. 446986
    201 17th Street, NW / Suite 1700
    Atlanta, GA 30363

James R. Condo
Amanda C. Sheridan
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

Attorneys for C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2016, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

        s/Richard B. North, Jr.
        Richard B. North, Jr.