1                   **UNITED STATES DISTRICT COURT**

2                  **FOR THE DISTRICT OF ARIZONA**

3                    _____

4    **In Re: Bard IVC Filters**          )  MD-15-02641-PHX-DGC
     Products Liability Litigation        )
5                                          )
                                           )  Phoenix, Arizona
6                                          )  March 31, 2016
                                           )
7    _____)

8

9

10

11

12          **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

13             **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

14                     **STATUS HEARING**

15

16

17

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257

24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2

 3    Plaintiffs' Co-Lead/Liaison Counsel and State/Federal Liaison
      Counsel:
 4
              Gallagher & Kennedy
 5            By: ROBERT W. BOATMAN, ESQ.
              2575 East Camelback Road, Suite 1100
 6            Phoenix, AZ  85016

 7            Lopez McHugh
              By: RAMON ROSSI LOPEZ, ESQ.
 8            100 Bayview Circle, Suite 5600
              Newport Beach, CA  92660
 9

10    Plaintiffs' Steering Committee Counsel:

11            Gallagher & Kennedy
              By: PAUL LINCOLN STOLLER, ESQ.
12                C. LINCOLN COMBS, ESQ.
              2575 East Camelback Road, Suite 1100
13            Phoenix, AZ  85016

14
      Also on behalf of Plaintiffs:
15
              Karon & Dalimonte
16            By:  JOHN A. DALIMONTE, ESQ.
              85 Devonshire St., Ste. 1000
17            Boston, MA  02109

18            Brenes Law Group
              By:  TROY A. BRENES, ESQ.
19            16A Journey
              Aliso Viejo, CA  92656
20

21

22

23

24

25
```

1                    **A P P E A R A N C E S   (CONTINUED)**

2

3    For the Defendants:

4              Nelson Mullins Riley & Scarborough
               By: **RICHARD B. NORTH, JR.,** ESQ.
5                  **BRANDEE J. KOWALZYK,** ESQ.
                   **MATTHEW B. LERNER,** ESQ.
6              201 17th Street NW, Suite 1700
               Atlanta, GA  30363
7

8              Snell & Wilmer
               By: **JAMES R. CONDO,** ESQ.
9              400 East Van Buren
               Phoenix, AZ  85004
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  In the matter of MDL
2015-2641, Bard IVC Filters Products Liability litigation, on
for scheduling conference.

Will the parties please announce.

MR. BOATMAN:  Good morning, Your Honor.  Bob Boatman,
Ramon Lopez, and Paul Stoller for the plaintiffs.

MR. LOPEZ:  Good morning, Your Honor.

MR. STOLLER:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. NORTH:  Good morning, Your Honor.  Richard North,
Brandee Kowalzyk, Matthew Lerner, and Jim Condo for the
defendants.

THE COURT:  Good morning.

And good morning everybody else, including those on
the phone.

Counsel, let me mention at the start something I
think you all are aware of.  We had originally suggested that
we should hear argument today on the motion to remand the
Ruden, R-U-D-E-N, case, as well as the motion to dismiss by
California Pacific Medical Center, but counsel were not
available for that argument, so we have postponed it.

I know, Mr. Dalimante, you have a similar motion to
remand pending, and my thought is what we ought to do is find

10:02:43   1   a time in the next few weeks when we can get counsel on all of

2   those motions on the phone for the argument after the other

3   motion to remand is fully briefed, and we can just deal with

4   them all at once, if that makes sense.

10:03:01   5          MR. DALIMANTE:  I have no objection to that.  It is a

6   matter of coordinating time.  I'm not sure what the Court had

7   in mind as far as its calendar.

8          THE COURT:  I'm not either.  I start a three-week

9   trial on Monday.  So it will probably be -- well, either the

10:03:14  10  last week of April or the first week of May when we find time.

11  We'll communicate with you to make sure it works with your

12  calendar.

13         MR. DALIMANTE:  Either of those dates work for me.

14         MR. NORTH:  That's fine, Your Honor.

10:03:27  15         THE COURT:  That all right with plaintiffs' lead

16  counsel, as well?

17         MR. BOATMAN:  It is, Your Honor.

18         THE COURT:  Okay.

19         While we're on the subject of motions, there's

10:03:42  20  another motion to dismiss that was filed by defendant with

21  respect to the Noterman case on the basis that the plaintiff

22  was deceased.  According to our docket, a response was due

23  three days ago and we haven't received one.  Have defense

24  counsel seen a response to that motion to dismiss, or have you

10:04:03  25  talked to the plaintiffs's counsel in that case?

10:04:05  1          MR. NORTH:  I have not, Your Honor.  I did see some

2   notice of appearance or substitution of counsel, I believe, in

3   that case earlier this week, because I believe the clerk's

4   office issued some sort of deficiency on it, but that's the

10:04:17  5   only thing I have seen.

6          THE COURT:  Have you talked to the plaintiffs'

7   counsel in --

8          MR. NORTH:  I have not.

9          THE COURT:  So you have no idea what they're

10:04:23  10  intending to do?

11          MR. NORTH:  No.

12          THE COURT:  How about plaintiffs' lead counsel?

13          MR. BOATMAN:  Your Honor, we're not familiar with

14  that case.

10:04:29  15          THE COURT:  Okay.

16          Well, it is the motion to dismiss that is at Docket

17  1072, and the basis for dismissal is that the plaintiff is

18  deceased.  What I'll do is have my staff get ahold of the

19  plaintiff's counsel and find out if they're going to respond

10:04:47  20  to the motion, and we will then deal with it.

21          The other pending motions all relate to case

22  management issues that we're going to be talking about, so

23  we'll come to those.

24          What I would like to do is start with the FDA warning

10:05:14  25  letter issue between counsel, because I've just finished this

10:05:19  1    morning reading the materials on that, so it's fresh on my

2    mind.

3              Let me tell you my initial reaction and give you an

4    opportunity to respond.

10:05:37  5              The briefs talk past each other a little bit.  It's

6    clear to me that the defendants are of the view that there

7    should be no additional discovery on the FDA warning letter.

8    Plaintiffs are of the view there should be substantial

9    additional discovery.  Most of the disagreement appears to be

10:05:57 10   with respect to the aspect of the warning letter that dealt

11   with underreporting of events.  Although the Recovery Cone

12   issue is also a part of it.

13             I have attached to the defendants' -- I'm sorry, the

14   plaintiffs' submission as Exhibit 16, the Rule 30(b)(6) notice

10:06:19 15   that lists 10 categories of documents to be produced in

16   connection with the 30(b)(6) deposition, and it appears to me

17   that many of those were, in fact, produced, although I don't

18   know that for sure.

19             And I have attached as Exhibit 17, a Request for

10:06:39 20   Production of Documents from plaintiffs that covers 26

21   categories of documents, and there's no discussion in the

22   briefs about the specifics of either the 30(b)(6) list or the

23   new request for production.  There's talk about general

24   categories, every now and then there's a mention of a

10:06:59 25   particular category.  But I can't go through document request

10:07:05   1   by document request and tell precisely what the parties'

       2   positions are other than the general disagreement that exists.

       3          So I'm not sure that I'm going to be able today to

       4   make a ruling on specific document requests.  What I'd like to

10:07:21   5   do is give you an initial reaction and let you respond to it,

       6   and then get your thoughts on how to resolve it.  We may need,

       7   once I've given you my initial reaction, to have you confer

       8   again and maybe do a matrix that goes through each of those

       9   document requests so that I can tell precisely what the areas

10:07:39  10   of disagreement are.  We'll talk about that in a minute.

      11          Let me tell you my general reaction after having read

      12   the briefs.

      13          My general reaction is that the underreporting

      14   portion of the FDA letter is clearly relevant to this case.

10:08:02  15   It seems to me that the rate of failure and the kind of

      16   failure for the Bard products is directly relevant to the

      17   negligence and product defect claims in the case.  The

      18   reporting of those failure rates is directly relevant to the

      19   fraud and misrepresentation allegations made in the case.

10:08:28  20          And I don't think the discovery is disproportionate

      21   under Rule 26(b)(1).  If you go through the proportionality

      22   factors in that rule, this discovery, in my view, is clearly

      23   concerning important issues at stake in the action.  Given the

      24   scope of the MDL, the amount in controversy in this case

10:08:59  25   doesn't suggest it's disproportionate.

10:09:02    1          The parties' relative access to information is

            2     clearly relevant because the plaintiffs don't have this

            3     information.  The importance of this discovery in resolving

            4     the issues, again, I think this is very relevant to almost all

10:09:18    5     of the plaintiffs' claims in the case.  So I can't conclude

            6     that it's disproportionate under Rule 26(b)(1).

            7          And so my initial reaction is that the plaintiffs

            8     should be able to conduct discovery into the underreporting

            9     that was noted in the FDA letter, and I didn't find myself

10:09:40   10     disagreeing with much of what they were suggesting they should

           11     be able to do, although, again, I haven't been able to focus

           12     on specifics because they weren't really discussed.

           13          I come to the opposite conclusion on the Recovery

           14     Cone issue.  I have difficulty seeing why this is an important

10:09:56   15     issue in the case.

           16          It appears to me that the Recovery Cone has always

           17     been available on the market for retrieval of the filters.

           18     The fact that it didn't have FDA approval doesn't mean it

           19     wasn't there.  It was there to be purchased and used.

10:10:13   20          As I understand it, there's no claim in this case

           21     that there was a defect in the Recovery Cone or that the

           22     Recovery Cone was the cause of the plaintiffs' injury.  And so

           23     I have -- I have trouble understanding why significant

           24     discovery into the Recovery Cone is relevant.  Clearly, it's

10:10:38   25     publicly known that it wasn't FDA approved, that the FDA

10:10:43  1    thought -- I shouldn't say approved.  Permitted.  The FDA

       2    thought it should be permitted and has now said it can be

       3    used.  If that's a relevant fact, certainly the plaintiffs can

       4    propose to present that at trial.

10:10:56  5         But I have trouble understanding why discovery in

       6    this issue really bears on any of the claims in the case.

       7         So with those general observations, what I'd like to

       8    do is give you an opportunity to address my general

       9    conclusions and help me understand what I might not be

10:11:11 10    understanding about your positions.  And then we can talk

      11    about, in light of my view on those issues, how we resolve

      12    specifics in the discovery disputes.

      13         So why don't we let the plaintiffs go first with any

      14    thoughts on these issues.

10:11:37 15         MR. BOATMAN:  Good morning, Your Honor.

      16         THE COURT:  Good morning.

      17         MR. BOATMAN:  I think I agree with you.  As you

      18    noted, we think probably the underreporting is, if not the

      19    most important evidence in the case, one of the most important

10:11:49 20    issues and evidence in the case, and it sounds like you're in

      21    agreement so I'm not going to address all of the reasons why

      22    it is so important.

      23         On the Recovery Cone, I think you're also right, it's

      24    much less significant.  I think the only point that we want to

10:12:07 25    make out of that is that it sort of reflects upon the rush to

10:12:11   1    the market by Bard, their willingness to cut corners and do

           2    anything to get it to the market, including failing to submit

           3    it through the 510(k) process like the other manufacturers

           4    did.

10:12:26   5            So it's really a culture of noncompliance, the rush

           6    to market, and cutting corners.  I don't think we need a lot

           7    of discovery on that.  I think we have Mary Edwards scheduled.

           8    She's the one that has a one-sentence memo in the file that

           9    says, We decided we don't need to submit this.  And the little

10:12:46  10    bit of discovery we need on the Recovery Cone, I think we can

          11    probably cover in her deposition.

          12            THE COURT:  Okay.  Thanks, Mr. Boatman.

          13            Mr. North, do you agree to the deposition of

          14    Mary Edwards?

10:13:10  15            MR. NORTH:  Yes, we agreed to that last time,

          16    Your Honor, specifically as a follow up on the Kay Fuller

          17    allegations, but obviously it's no problem if they ask

          18    questions about the Recovery Cone at that deposition.

          19            THE COURT:  Okay.

10:13:24  20            MR. NORTH:  Your Honor, with regard to the

          21    underreporting of events, we certainly understand the Court's

          22    comments.  It's a sort of difficult issue for us because when

          23    we analyze it and know and talk to our people, we really don't

          24    think this is the issue they think it is, but we understand

10:13:38  25    that in a briefing situation and at this stage of the

10:13:42  1    litigation, it's more of a he said, she said.

2              So we understand that it's hard to make the point

3    it -- that it's just not relevant, as we think it will prove

4    to be at the end of the line.

10:13:54  5              So I think the real concern here is not so much given

6    our recognition that there's got to be some discovery, it's

7    the breadth of discovery they're asking for.  It's the fact

8    that they've already deposed the single most knowledgeable

9    person who spearheaded all of the work, all of the responses

10:14:12  10   to the FDA warning letter, all of the retrospective reviews of

11   complaint files.  And they've already deposed him for ten

12   hours.  And now they're wanting to depose the people that

13   report to him, that he supervised in doing that.  They want to

14   depose the person who he reports to, who had much more

10:14:29  15   peripheral involvement in events than he did.

16              He has testified without equivocation, Mr. Modra,

17   that he was the point person for the companies in both the

18   initial inspections by the FDA, all the responses over the

19   months, the FDA warning letter.  He drafted the letters that

10:14:50  20   went back to the FDA.  Although signed by the presidents of

21   the company, he drafted the response letters.  He's been

22   deposed.

23              Does that mean they shouldn't be able to depose

24   anybody else?  We're not saying that, Your Honor, but we do

10:15:06  25   believe it is somewhat overkill what they're proposing to do,

10:15:09  1  to depose three people that report to him that he supervised,

2  to depose his direct report, even though her involvement was

3  much more peripheral.

4  And the document requests are another issue that we

10:15:22  5  have problems with because it essentially asks for every

6  single e-mail communication in the entire company that may

7  have referenced the FDA inspection.

8  It seems to me that where we ought to go from here

9  is, with the Court's guidance, maybe Mr. Boatman and I can get

10:15:39  10  together and see if we can go through those requests

11  specifically and submit something to the Court in the next few

12  days or a week or so in a matrix form, as the Court indicated.

13  THE COURT:  All right.  Let me -- let me ask you

14  another question, Mr. North.  You mentioned the depositions.

10:15:58  15  One of the things I understand the plaintiffs want to do is to

16  go back in time beyond the two-year examination that the

17  company did to look at whether there was underreporting of the

18  kind that was discovered during that two-year period.

19  That seems relevant to me.  It seems relevant to me

10:16:20  20  because if, in fact, the company was underreporting before

21  2013, again, I think that bears on their claims of negligence

22  and product defect, and it bears on their claims of

23  misrepresentation.

24  What is your reaction to that kind of discovery?  And

10:16:42  25  I'm not saying this to discourage you from disagreeing with

10:16:46   1   me.  If I'm wrong in your view, I want to know why so that I

           2   make the correct decision.  So don't feel you need to be

           3   deferential, but it just really appears quite relevant to me

           4   in the case, and I want to make sure I understand your view if

10:16:58   5   you think it's not.

           6              MR. NORTH:  Well, in that particular issue,

           7   Your Honor, I'm not certain I understand what they want from

           8   us.  We have already produced all of the complaint files for

           9   all of the filters except the Simon Nitinol filter.  They have

10:17:14  10   all those complaint files effective through December of 2015.

          11              So they have that data.  We produced to them all of

          12   the information about the retrospective reviews that were done

          13   over the previous two-year periods.  I mean, are they asking

          14   us to go now and affirmatively conduct an additional

10:17:33  15   retrospective review beyond those two years?  If we haven't

          16   done it, I'm just not sure what they're expecting us to

          17   produce, other than the underlying data, which we've already

          18   given to them.

          19              THE COURT:  All right.  Okay.

10:17:48  20              MR. NORTH:  Thank you, Your Honor.

          21              THE COURT:  Mr. Boatman, can you address that?

          22              MR. BOATMAN:  Yes, Your Honor.

          23              On that narrow point, if, in fact, they have produced

          24   everything that we're seeking, it shouldn't be very difficult

10:18:04  25   for them to say here's our production because it's complete.

10:18:09   1              I have to confess I don't know all of the details of

       2      everything that's been produced as far as TrackWise and

       3      complaint files.  We have a committee that is putting together

       4      our own database and trying to track that.  If it is, in fact,

10:18:26   5      true they've produced everything, then there is no burden upon

       6      them, of course.

       7              We think that's not the case.  We think that there is

       8      additional documents we need about what's really gone on, the

       9      policies that led to the 500 percent failure-to-report rate in

10:18:44  10      the two years audited, and we want to go back and take a good,

      11      hard look at that.

      12              And I agree that with the benefit of the people that

      13      have been studying that issue, working with me and sitting

      14      with Mr. North, we may be able to narrow, to determine if, in

10:19:04  15      fact, they've produced some or all of what we need.

      16              But, you know, as just one example, they're objecting

      17      to producing the communications concerning the warning letter.

      18      All they gave us, Your Honor, was what has been cleansed and

      19      approved and written with the assistance of counsel that was

10:19:26  20      sent to the FDA and what the FDA sent back.  So we have a --

      21      really the tip of the iceberg.  We have what -- how they want

      22      to present it as approved by counsel.

      23              We'd like to see what's really going on.  What was

      24      going on internally to determine how did we get to the point

10:19:45  25      that we're failing to report literally hundreds, and if you

10:19:49   1   project it over the full term of the filters, thousands of

2   injuries and deaths as simple malfunctions.

3        And so the idea that they, for example, produced the

4   documents to the FDA, that is something we could have gotten,

10:20:06   5   I presume, through the Freedom of Information Act.  They have

6   to date withheld anything about what they have done

7   internally, what they've been -- the thought processes they

8   went through, the memorandum is this appropriate or is this

9   not appropriate, how they came up with their policies and

10:20:23  10   procedures.

11        So we think we need substantial discovery on how --

12   what we've now found out they did as far as underreporting

13   came about and was it intentional?  Was it part of a fraud to

14   make their devices look safer than they really were?  Was it

10:20:45  15   simple negligence?  And if it was negligence, who made these

16   mistakes?  Who -- how did this slip through the cracks?

17        THE COURT:  A question on this issue, Mr. Boatman.

18        In your brief, you indicate that you want complaint

19   files from 1998 to the present.  Not in your complaint, but in

10:21:20  20   your document production request.

21        When you shift to other categories such as training

22   materials, you ask for 2003 to the present.

23        Same thing with annual internal audits.  The quality

24   systems, 2003 to the present.  And other categories.

10:21:52  25        Two questions.  One is, what, as far as you know, is

10:21:55   1   the earliest date in this MDL where a product was implanted?

  2            MR. BOATMAN:  2003, Your Honor.

  3            THE COURT:  Okay.  If that's true, why do you need

  4   information going back to 1998?

10:22:17   5            MR. BOATMAN:  I think we probably don't.  I think

  6   2003 is when the retrievable filters were put on the market.

  7   I think, if I had to guess, it was to -- designed to capture

  8   the SNF data that preceded the Recovery filters.

  9            THE COURT:  Mr. Lopez wants to add a thought here.

10:22:41 10            MR. LOPEZ:  I might be able to help.  There was

11   actual clinical trial work commencing in about the '98, '99

12   period.  We know at least one clinical trial that was

13   happening in Canada.  We don't know whether there were others.

14   I know this device is sold all over the world.  So we were

10:22:53 15   hoping to catch the clinical trial.  We know there was some

16   adverse consequences in clinical trials.  We have a 1999, for

17   example, clinical trial report of a migration.

18         So we just want to make sure -- they're supposed to

19   report those.  So we want to make sure if there are complaint

10:23:11 20   files that go back to when they are doing premarketing, when

21   they're doing clinicals, that we're getting those complaint

22   file, as well.

23            THE COURT:  Well, Mr. Lopez, it sounds as though

24   you're characterizing an incident in a clinical trial as a

10:23:26 25   complaint file.  Is that true?

10:23:29  1          MR. LOPEZ:  Yeah.  I mean, if there is an adverse

          2    event, even if it's in a clinical trial, it's a reportable

          3    event.  And certainly, even if it's not a reportable event,

          4    it's still notice to the company that they knew early on that

10:23:43  5    they had some problems with the design of their product that

          6    they launched however many years later.

          7          They started the process of trying to get this device

          8    on the market in about 1997.  I have a document showing 1997.

          9          THE COURT:  Help me understand what you would do at

10:24:04 10    trial with an event in 1998 that wasn't reported or was

         11    underreported.  How does that become relevant to the cases in

         12    this MDL?

         13          MR. LOPEZ:  Well, there's two things.  I mean,

         14    obviously the FDA cleared this device based on representations

10:24:26 15    of it being as safe and effective as a predicate device, which

         16    is the Simon Nitinol filter, which we'll be talking about

         17    later.

         18          If there's evidence that in clinical trial subjects

         19    it was breaking and migrating and tilting and perforating,

10:24:41 20    then we have just preliminarily FDA not -- maybe not having

         21    that information and therefore not clearing it, number one.

         22          Number two is that the company would have notice of

         23    design defects -- it's a different design than the

         24    predicate -- prior to it even being introduced into the

10:25:01 25    commercial market in the United States, of fracture, however

10:25:06  1   number of complications, and not making design changes to fix

2   that.  We know some instances where that happened.  We

3   don't -- we don't know the full scope of it.

4         For example, we have in a report the description of a

10:25:20  5   migration in a clinical trial, but we don't have the medical

6   records, we don't have the background information.  We don't

7   have the investigation, the complaint file, what was reported,

8   how it was reported to FDA or any other authority.  It was

9   done in Canada, so it may have been reported to the Canadian

10:25:37 10   authorities.

11         THE COURT:  Well, do you disagree with Mr. North's

12   assertion that the defendants have turned over all of the

13   complaint files?

14         MR. LOPEZ:  Yes.

10:25:50 15         THE COURT:  Explain why.

16         MR. LOPEZ:  Because we don't have complaint files for

17   a lot of their clinical trials, their clinical trial subjects.

18         THE COURT:  Okay.  Other than the clinical trial

19   subjects, do you agree that the defendants have turned over

10:26:02 20   all of the complaint files?

21         MR. LOPEZ:  I'm probably not the best person -- I

22   know there's been a supplemental production of their TrackWise

23   complaint files.  Maybe one of my colleagues could address

24   that.  I don't want to answer that if I don't know the answer.

10:26:17 25         THE COURT:  All right.  That's fine.

10:26:18  1          Were you going to say anything else, Mr. Boatman?

2          MR. BOATMAN:  No, Your Honor.  I thought you had two

3     questions.

4          THE COURT:  Yeah.  The second question was the

10:26:23  5     relevancy that was just addressed.

6          Thanks.

7          Mr. North.

8          MR. NORTH:  Couple of things, Your Honor.

9          I should have noted this when I first stood up.

10:26:35 10     Mr. Stoller on behalf of the plaintiffs and my colleague

11     Mr. Lerner have been talking a lot in the past about these

12     requests for production, and by agreement we are responding to

13     a large number of those.  In fact, in a pleading that will go

14     out today in a production that's going out today.

10:26:49 15          So some of the things the Court's mentioning, like

16     quality, policies, audits, and things like that, to the extent

17     we have those, are being produced, which I think would

18     respectfully suggest makes it imperative that once they see

19     that production after today, Mr. Boatman and I sit down and

10:27:04 20     see if we can't really hone in on what's remaining that they

21     want in that regard.

22          With regard to the complaint files, Your Honor, with

23     the exception of Simon Nitinol complaints, we have produced

24     all that Bard has.  We have confirmed that through December of

10:27:25 25     2015.

10:27:26  1            Whether those include something from a clinical trial

       2       in '98 or '99, which was three years before we even bought the

       3       Recovery filter, I'm not sure.  But we've produced -- we have

       4       confirmed over and over again, we've produced all they have.

10:27:43  5            Lastly, Your Honor, if I could just for the record,

       6       and I know this is now not the time to make this argument, but

       7       we're all talking in terms of underreporting, and I understand

       8       that's the argument that the plaintiff makes.

       9            But I just want the record to be clear, and I think

10:27:57 10       the evidence will show this as it develops, that the FDA's

      11       issues were not with underreporting.  The only complaints they

      12       alleged that we failed to report had to do with deployment,

      13       failed deployment where there was no real injury.

      14            All of the other complaints they had concerned how we

10:28:15 15       characterized it.  Not whether we submitted the report to the

      16       FDA in the first place.  And again, I don't think that affects

      17       the calculus of what we're doing here, but I think it's an

      18       important distinction for this litigation going forward.

      19            THE COURT:  Well, since you raised it, let me ask you

10:28:31 20       a couple of questions on that.  What about the 44 that were

      21       found in the retrospective that weren't -- as I understood it,

      22       weren't reported?

      23            MR. NORTH:  44.

      24            THE COURT:  Yeah.  There were 230 that I think the

10:28:44 25       conclusion was they were reported as a malfunction, and you

10:28:48  1    reclassified them as a serious injury or a death, and there

2    were 44 that weren't even reported as a malfunction that you

3    concluded should have been reported.  Maybe I misread the

4    briefs.

10:28:59  5          MR. NORTH:  My understanding, Your Honor, is the FDA

6    warning letter cited about four or five deployment related

7    complaints that were not actually reported to the FDA.

8    Instances where there was a difficulty in deploying the

9    device, but no real injury.

10:29:14 10          And then in our retrospective review, I believe we

11   found 44 that fit that similar criteria, where it was a

12   deployment difficulty, but no injury, and under what we

13   understood at the time the FDA to be saying, we should have

14   reported those as a malfunction, and we did not.

10:29:35 15          THE COURT:  By a deployment difficulty, are you

16   meaning they tried to put it in and they couldn't?

17          MR. NORTH:  Right.  You know, it's released from a

18   catheter, Your Honor, the actual filter is released from a

19   catheter into the IVC, and there was some difficulty in the

10:29:51 20   release.

21          Now, since -- as Mr. Moder testified, since that time

22   there had been informal meetings with the FDA, and that's now

23   been documented in e-mails between the agency and the company,

24   where we had overreacted in our retrospective review of even

10:30:09 25   those failure-to-deploy cases.  And the FDA has said your real

10:30:13  1    problem was you didn't explain your rationale in the complaint

2    file as opposed to whether you should have reported or not.

3         But I think it's important that those are the only

4    category of complaints that the FDA said we failed to report

10:30:28  5    in the initial warning letter or later, and that only dealt

6    with no injury failure to deploy.

7         THE COURT:  Okay.  The second question.  If Bard

8    reports an event and calls it a malfunction rather than a

9    serious injury, my understanding is that's a matter of

10:30:47 10    checking a box or marking a field, does the MAUDE --

11    M-A-U-D-E, all in caps -- does the MAUDE database then report

12    to the world that as a malfunction rather than as a serious

13    injury?

14         MR. NORTH:  Your Honor, I must be frank, I don't

10:31:05 15    think -- I'm not positive of this, but I don't think you can

16    go on the MAUDE database and search based on that

17    characterization.  I could be mistaken, but I've never heard

18    that you can do that.

19         Now, in the body of the complaint discussion on the

10:31:18 20    database, it will say what the injury or event was.  So it's

21    just a matter of characterization.  I don't believe that it

22    really affects any interpretation.

23         THE COURT:  Okay.  Thank you.  I know the plaintiffs

24    disagree on that.

10:31:33 25         MR. LOPEZ:  That's wrong, Your Honor.  I mean, if

10:31:35  1   there's a category in MAUDE for malfunction, there's a

2   category for serious injury.

3          THE COURT:  I saw your footnote on that.  I didn't

4   have time to go to the website you cited, but I understand

10:31:46  5   there's a disagreement on that.

6          Well, I think what we ought to do is this, I think we

7   should have you meet and confer, and where you disagree on

8   the -- what I call the underreporting issue, discovery, create

9   a matrix for me.  The plaintiffs' precise discovery request,

10:32:09 10   the defendants' precise response, why the plaintiff thinks

11   it's appropriate, why the defendant thinks it's inappropriate.

12   That will ensure that everybody is talking about the same

13   issues.

14          I will go through the matrix and issue rulings.  If I

10:32:23 15   need to get you on the phone to clarify things, I'll do that.

16          My view with respect to the depositions is that the

17   three or four employees under Mr. Modra that have been

18   identified should be deposed.  I think that's appropriate

19   given what I view as the central nature of this issue.

10:32:41 20          I don't know about the fellow he reports to or

21   others.  If you have a disagreement on that, put it in the

22   matrix and I will be happy to look at those.

23          What I would suggest is that -- well, why don't you

24   give me your thoughts on how long you think it will take to

10:33:12 25   meet and confer and work this out and put together a matrix.

10:33:19  1            MR. BOATMAN:  Your Honor, we need to get going on our

        2   discovery, so I would hope we could do it in -- by a week from

        3   Monday.

        4            MR. NORTH:  I think that's reasonable, Your Honor.

10:33:33  5   Like I said, they will be getting the discovery responses,

        6   those will be served today, and I think that will give the

        7   background to have this meet and confer.

        8            THE COURT:  All right.  I will tell you that I'm in

        9   trial the entire week of the 11th, so even if you get it in on

10:34:02 10   Monday, I won't be able to look at it.  It's a particularly

       11   difficult trial that's going to absorb all available time.

       12            Why don't we have you submit it by the 15th just to

       13   make sure you've got enough time.  My trial should end the

       14   following week, and hopefully I'll be able to then look at the

10:34:18 15   matrix.

       16            And by the way, my view is that the issue we're

       17   dealing with is the underreporting issue.  It sounds as though

       18   the Recovery Cone issue will be addressed through the

       19   deposition of Ms. Edwards, and I think that is appropriate,

10:34:57 20   but I don't think its relevancy justifies further discovery.

       21            Okay.  Let's talk next about the Simon Nitinol issue.

       22            I've looked at the matrix you all have presented.

       23            I think I'd like to start with some questions of

       24   defense counsel, whoever is going to be addressing this.

10:36:31 25            Is it you, Mr. North?

10:36:33   1          MR. NORTH:  Yes.

           2          THE COURT:  Actually, let me start with the

           3   plaintiffs, Mr. North.

           4          MR. NORTH:  Okay.

10:36:49   5          THE COURT:  Mr. Lopez, give me three minutes of the

           6   closing argument you will be making to a jury where you're

           7   talking about the Simon Nitinol filter.

           8          MR. LOPEZ:  Only just three minutes.

           9          THE COURT:  I'm looking for a summary, but, again, I

10:37:10  10   think I understand your relevancy arguments, but I want to

          11   make sure I do.  And so what I want to understand is how does

          12   this play out in front of the jury.  What are the points

          13   you're going to be making to the jury about Simon Nitinol?

          14          MR. LOPEZ:  Your Honor, I actually have some

10:37:26  15   documents that -- about ten documents that span a period of

          16   about ten years, and two or three excerpts from depositions

          17   that I was going to show to the Court.  Now, obviously it will

          18   take me longer than three minutes to do that.  But -- I think

          19   the first thing we have to do is dispel you of the notion that

10:37:48  20   this is a marginally relevant issue.

          21          It's my turn to say, as Mr. Boatman said, this is the

          22   most important evidence in the case.  Because I think it is

          23   and always have thought it was.  But I'll do what you've asked

          24   me to do first, but I really want an opportunity --

10:38:04  25          THE COURT:  If you'd rather do it another way, feel

10:38:05   1   free.  I just want to understand your view of why it's highly

           2   relevant.  I think I understand it from the brief and the

           3   matrix, but I don't know this case well enough to be confident

           4   I've got it right, and that's why I want to hear your

10:38:18   5   description.

           6          MR. LOPEZ:  Thank you.  I will do that now, but I

           7   just want the Court to know I actually have evidence and

           8   documents, and it's not counsel, plaintiffs' counsel's

           9   argument.  These are actually documents and testimony of the

10:38:32  10   defendant that I think will show the significant relevance of

          11   the Simon Nitinol filter.

          12          Every device that is the subject of this case, the

          13   safety and effectiveness of that device, it all goes back to

          14   the Simon Nitinol filter.  I mean, none of these devices get

10:38:51  15   on the market unless the company establishes through some

          16   means to FDA, through bench testing and other testing, that

          17   the Recovery filter, the G2 or the G2X, the Eclipse, the

          18   Meridian, the Denali are all as safe and effective as the

          19   Simon Nitinol filter that had been on the market for ten

10:39:12  20   years.

          21          And they represent, by the way, not only to FDA, but

          22   they represent afterwards and to doctors -- well, before I get

          23   to that, clinically that proved not to be true.  In other

          24   words, they knew within months of all of those devices being

10:39:29  25   on the market that when you compared the risk, the

10:39:33  1   complications, the serious injuries to the devices they were

2   selling, we're nowhere near the Simon Nitinol filter.  Well,

3   under the regulations and based on testimony that we've

4   already seen from some experts in this case, including some of

10:39:47  5   the defense experts in prior cases and including some of their

6   internal clinical affairs directors and things like that, you

7   are now selling an adulterated and misbranded product because

8   you're no longer selling -- I mean, a substantially equivalent

9   safe and effective device, and therefore you should remove it

10:40:06 10   from the market.

11        In addition, in one of the documents I have, the

12   official messaging that they give to their sales force, the

13   official Q and A or frequently asked questions that they know

14   they're going to get hit with as these things are starting to

10:40:22 15   reveal themselves in the open market, is the answer is we are

16   as good as or better than our Simon Nitinol filter.  In fact,

17   their sales brochures, which are two of the documents I have,

18   say that.

19        In reality, the internal documents show that -- I'll

10:40:39 20   just give you an example.  The Simon Nitinol filter, in ten

21   years, had two fractures in 50,000 units.  In the first year,

22   the first six months that the Recovery filter was on the

23   market, it had 17 fractures in the first 10,000 units.  The

24   Recovery filter had no migratory deaths, meaning where the

10:41:01 25   device actually left the vena cava and went into the heart.

10:41:03   1    None.

2            THE COURT:  Recovery?

3            MR. LOPEZ:  No.  The Simon Nitinol filter had no

4    deaths from migration.  In the first year that the Recovery

10:41:10   5    was on the market, it had nine deaths of the Recovery filter

6    migrating into people's hearts because it was not staying

7    where it was supposed to stay.  The device is supposed to stay

8    where you put it and it's not supposed to break, it's not

9    supposed to perforate, it's not supposed to tilt.

10:41:26   10        And the Simon Nitinol filter did not have those

11   problems of any real significance over a period of nine years.

12   In the first nine months the Recovery filter's on the market,

13   it is breaking, it's moving, and it's literally resulting in

14   people's deaths.

10:41:39   15        The G2, in the first few months it's on the market,

16   had fractures that exceeded the entire history of the

17   Simon Nitinol filter.

18           One of the documents I have, and if we get to that

19   today, I know as counsel mentioned that the predicate device

10:41:54   20   is the Simon Nitinol -- I mean is the Recovery filter for the

21   G2.  Well, I have a document that shows that that is not true.

22   They actually are comparing the G2 to the Simon Nitinol filter

23   and saying that we must be substantially equivalent or as safe

24   as and as good as the Simon Nitinol filter.

10:42:12   25           So this notion that you can -- you have -- create a

10:42:15   1    bad device after the Simon Nitinol filter and that becomes a

           2    new measure of safety is ludicrous.  I mean, every expert will

           3    tell you that once you start with the Simon Nitinol filter as

           4    the predicate device, the entire line of devices that get

10:42:30   5    cleared after that all have to revert back to the

           6    Simon Nitinol filter as a minimum standard of safety and

           7    effectiveness.

           8           So that's -- I know it's longer than three minutes,

           9    but there's a lot to say about that.  Like I said, I have a

10:42:48  10    ten-year history of documents here where the company is doing

          11    those internal comparisons.

          12           THE COURT:  I understand what you've said.  What are

          13    you going to say to the jury?  Are you going to say what you

          14    just said?  Let's say you're talking about, you know, an

10:42:57  15    injury from the G2 filter.

          16           MR. LOPEZ:  Two things.  I mean, two or three things.

          17    Number one is the minimum standard of safety and effectiveness

          18    for this device is the Simon Nitinol filter.  They represented

          19    to the world this device was actually better.  Was actually

10:43:12  20    safer and more effective.

          21           Internally, in doing their own analysis, they did

          22    their own analysis in comparing the Simon Nitinol filter to

          23    the Recovery filter to the G2 to the Eclipse and so on, and

          24    they knew it wasn't.  Yet their official messaging to the

10:43:29  25    company -- I mean to the world, was false and misleading.

10:43:32  1    Their own -- one of the experts in this case from a year or so

       2    ago is no longer an expert because she agreed at her

       3    deposition that their sales brochure and their sales material,

       4    based on the comparisons that were done to the Simon Nitinol

10:43:45  5    filter and all the other devices, was false and misleading.

       6    And if false and misleading, you are selling a device that you

       7    shouldn't be selling.  You should be taking it off the market.

       8    You are selling a misbranded and adulterated product.

       9          I mean, it -- to put it in a nutshell, their

10:44:03 10    representations, not just in their testing to FDA, I mean we

      11    know that that was false when they represented it was

      12    equivalent, I've got those test results here that show all of

      13    their devices were substantially lower than -- even in bench

      14    testing and animal testing to the Simon Nitinol filter.  But

10:44:20 15    in the real clinical world, I know the Lehmann report's not in

      16    this case, but the Lehmann report is filled with the

      17    comparisons to the Simon Nitinol filter and the substantial

      18    statistically significant differences, and every single risk

      19    between the Simon Nitinol filter, the Recovery -- it wasn't

10:44:41 20    the G2 then, it was the Recovery -- but consistently

      21    throughout the course of all of these devices are all these

      22    comparisons to the Simon Nitinol filter because they know

      23    that's the minimum safety and effectiveness standard.

      24          THE COURT:  All right.  So here's my question.  I

10:45:00 25    understand that you're going to be arguing that the later

10:45:04  1    removable filters were not as good as the Simon Nitinol, even

2    though it was the original predicate device and even though

3    you will assert the defendants themselves were saying publicly

4    it's as good as the Simon Nitinol.  Sounds like you're going

10:45:20  5    to hold Simon Nitinol up as a good product that was safe and

6    all these others were bad in comparison and the company was

7    defrauding the public when it said otherwise.

8        Assuming that's all true, why do you need, then,

9    discovery into the testing and the development of the

10:45:39 10    Simon Nitinol?  You've already got that as your standard.

11    What is it -- you want to make it better?  What is it you hope

12    to do with these various categories of discovery you want to

13    undertake?

14        MR. LOPEZ:  Well, Your Honor, let me give you two

10:45:53 15    examples.  Two of the documents I have.  One is from their

16    director of clinical affairs and medical director, and I think

17    we quoted it in our matrix.  It says, Why are we using the G2

18    when have the Simon Nitinol filter that's safer, that has no

19    complications?  These are both permanent devices.  Why in the

10:46:11 20    world are we selling the G2 that's -- it's already showing

21    that it's got all these complications.

22        Dr. Ciavarella testified at his deposition that he

23    assumed the people he wrote that to would have answered that

24    e-mail and that they would have gathered the information he

10:46:27 25    requested.  We don't have any of that.

10:46:30   1          In other words, we don't have the chain of events

2     that would have -- that occurred after the director, vice

3     president of clinical affairs, says, Why are we using the G2

4     when we have a safer device, the Simon Nitinol filter, and he

10:46:45   5     asks for comparative data to compare the Simon Nitinol filter

6     to the G2.  That's where it stops.

7          And I assume that the people he sent that to are the

8     people -- you know, when you get a letter or e-mail like that

9     from the only medical person in the whole company, that there

10:47:04  10     might have been a meeting about that, there might be meeting

11     minutes, there might be a lot of e-mails that have gone up and

12     down the chain.  All's I know is they have not done a thorough

13     production that we can see.

14          There's another area where a sales representative,

10:47:20  15     actually he's a district manager, in 2006 asks the same

16     questions.  He says, you know, Why are we -- we should be

17     selling the Simon Nitinol filter.  It's the filter that has no

18     complications.  We have nothing but problems with the G2.

19          THE COURT:  So what you're arguing, I think,

10:47:36  20     Mr. Lopez, is it's very relevant for you to have documents

21     from within Bard saying Simon Nitinol's better.

22          Why, though, why are you after design documents for

23     the Simon Nitinol?  Why are you after testing?  If you already

24     think that's the better product, why do you want to dig into

10:47:54  25     its history and how it was designed and tested?

10:47:57  1          MR. LOPEZ:  You know, I agree with you -- I would

        2    sacrifice all of that for their marketing materials.  I want

        3    to see how this company, when they knew they had a product

        4    that was safer than every other product they were marketing

10:48:09  5    for the same indication was representing in another -- in

        6    their G2 and Recovery and other devices, that that device was

        7    better than every other device it ever made before, what are

        8    they saying about the Simon Nitinol filter to the world in

        9    their marketing?  What are they saying internally in their

10:48:29 10    marketing meetings when they're asked those same -- when

       11    doctors are asking the same, you know, why are you selling me

       12    the G2 as a permanent device when you have the Simon Nitinol

       13    filter?  What are your comparisons and your safety and

       14    effectiveness between those two.

10:48:54 15          VOICE ON PHONE:  I wasn't sure if you were listening

       16    in or not.

       17          MR. LOPEZ:  And we've seen some of that, Judge, where

       18    the official position of the company is tell the world that

       19    we're as good or better than the Simon Nitinol filter.  I want

10:49:01 20    to know how they're -- what kind of discussions they're

       21    having, how they come to that conclusion.

       22          (Voice on phone indistinct talking.)

       23          MR. LOPEZ:  Marketing meetings, brochures, things

       24    like that.  We have no marketing materials for the Simon

10:49:11 25    Nitinol filter.

10:49:13  1           THE COURT:  Okay.  I understand that.  Thanks.

       2           Counsel on the phone, we have somebody on the phone,

       3  a woman's voice, talking that we can hear, and it's kind of

       4  interfering with what we're saying.  So if you all could mute

10:49:26  5  your phones or just not talk, we'd appreciate it.

       6           Mr. North, you want to make your opposing jury

       7  argument, probably?

       8           MR. NORTH:  I'm sorry, what's that, Your Honor?

       9           THE COURT:  You want to make your opposing jury

10:49:41  10  argument?  You don't have to, but give me your response to

      11  what Mr. Lopez said.

      12           MR. NORTH:  Your Honor, this is not a situation where

      13  we're taking an all-or-nothing stand.  We recognize that there

      14  is some relevance to the Simon Nitinol filter.  We recognize

10:49:54  15  that they are entitled to some documents.

      16           What we're saying is they have a wealth of documents

      17  already.  They've asked for the design materials.  We've given

      18  them the design history file and the fact books.  They've

      19  asked for the testing.  We've given them those two large sets

10:50:14  20  of documents with the testing materials and the 510(k)

      21  submission, which has all of the testing and summaries of the

      22  testing in it.

      23           We've given them most all, we think, of the

      24  regulatory submissions over the years regarding the

10:50:28  25  Simon Nitinol filter, and we have agreed to go back and see if

10:50:31   1   there's anything that we have that we haven't given them so

2   that they have the entire history.

3        Mr. Lopez mentions marketing materials.  We're

4   happy —— and I think we already have given them some

10:50:43   5   representative materials.  We're happy to give them

6   representative materials, but their request as phrased would

7   essentially ask us to give every shred of paper we can find,

8   looking wherever, whenever, however over a 25-year period that

9   that product's been on the market, and we think that that is

10:51:02  10   overly burdensome given what we think is the marginal

11   relevance of the Simon Nitinol filter.

12        They've asked for comparative materials in very broad

13   strokes that would basically ask for every communication or

14   internal mention of the Simon Nitinol filter.  We have given

10:51:23  15   them hundreds and hundreds of pages of internal calculations,

16   computations, comparing the complication rates, reported

17   complication rates of each of our filters with a Simon Nitinol

18   filter, as well as with competitive filters.

19        We put in our submission in the matrix the numerous

10:51:41  20   Bates numbers for all of those they've been given.

21        And then their last request, number 6, asks for all

22   internal communications regarding the Simon Nitinol filter.

23   All.

24        No limitations as to custodians.  No limitations as

10:51:55  25   to time frame.  No limitations as to the division.

10:51:59  1          It overlooks the fact that SNF, the acronym, in

2    Simon Nitinol were previously used as search terms in the ESI

3    searches that were conducted.  It overlooks the fact that the

4    same team of people involved with the retrievable filters also

10:52:15  5    had functional responsibility for the Simon Nitinol filter

6    over the years.

7          To respond to that request would require us

8    essentially to sweep the electronically stored information of

9    hundreds of employees over a 25-year period.

10:52:31 10          So that's where our objection is.  Not that there is

11    no relevance at all to the Simon Nitinol filter, but what

12    they're asking for is simply far beyond what the relevance is.

13    And in that point I would -- or in that regard I would point

14    out, Your Honor, yes, the Simon Nitinol filter was identified

10:52:49 15    to the FDA as the predicate device for the Recovery filter,

16    and only the Recovery filter.

17          Now, predicate device is a term of art.  The FDA does

18    not require the predicate device to be identical in technical

19    function.  And in this instance, there are very different uses

10:53:08 20    of these filters, as the Court alluded to.  The Simon Nitinol

21    is strictly a permanent filter.  Once implanted, there's no

22    way to get it out except extraordinarily invasive surgery.

23          The Recovery filter and all later generations of the

24    filters are retrievable, so they necessarily have different

10:53:30 25    design characteristics.  So while there may be some relevance

10:53:33   1    in the fact that the Simon Nitinol was the predicate filter, a

2    lot of this is apples and oranges in the comparisons.

3            And, Your Honor, I'm not sure if this thing works

4    here or --

10:53:43   5            THE COURTROOM DEPUTY:  It does.

6            MR. NORTH:  Your Honor, these are some statistics of

7    the case count, and of course this is changing daily,

8    particularly since there seems to be a rush to get cases on

9    file prior to April 1, but this is the case count through

10:54:06  10    Tuesday, March 29th.  At that point there were 336 cases in

11    the MDL, according to our records.  Only one of those cases,

12    and that was only filed in the last ten days, has to do with

13    the Simon Nitinol filter.

14            Only 39, just a little over 10 percent of the cases,

10:54:27  15    have to do with the Recovery filter, which is the only filter

16    that Bard represented to the FDA had the Simon Nitinol as the

17    predicate filter.

18            This litigation, and the center of gravity of this

19    litigation, is clearly moving towards the G2 and the Eclipse

10:54:47  20    and even the Meridian.  And we would submit that the amount of

21    documentation we have produced, which is extensive regarding

22    the Simon Nitinol filter, is more than ample for the purposes

23    given the relevance in this litigation.

24            THE COURT:  Mr. North, my understanding from the

10:55:06  25    briefs is that the way you have found the Simon Nitinol

10:55:18   1    communications that you've produced has been through ESI

2    searches of custodians that were identified for other filters.

3              MR. NORTH:  Right.

4              THE COURT:  You've said a moment ago that the same

10:55:35   5    people responsible for the retrievable filters are responsible

6    for the Simon Nitinol.  Are you saying there's 100 percent

7    overlap?  That there's nobody in the company responsible for

8    Simon Nitinol that is not also responsible for the retrieval

9    filters?

10:55:51   10             MR. NORTH:  That is my understanding, Your Honor.  In

11   that regard, keep in mind there's very little activity with

12   the Simon Nitinol.  It's part of the product line and it's out

13   there, but as we pointed out in it the matrix, the last 510(k)

14   regarding this device -- and you go on the FDA website and

10:56:07   15   see -- was in the late '90s.  Long before we bought the rights

16   to the device in 2001.

17             There has been no design development work on the

18   device since we bought it.  There was a design verification

19   which resulted in the design history file when we first

10:56:23   20   acquired the product.  That's been produced to the plaintiffs.

21             So there really has not been any development design

22   work on this device over the years.  There's been marketing,

23   and the same person who is the marketing manager for this

24   device is the marketing manager for the others.  His or her

10:56:40   25   title over the years has been marketing director for filters.

10:56:43   1    All filters.  It's just part of the product line.  There have

           2    been no separate employees involved, and there really was no

           3    work at the company other than comparisons with the other

           4    filters, which we produced to them.

10:56:59   5                 THE COURT:  All right.  Thank you.

           6                 Mr. Lopez.

           7                 MR. LOPEZ:  Yes, Your Honor.

           8                 I meant to do this originally.  We're going to hear,

           9    and I think we've seen in a lot of the briefings and certainly

10:57:13  10    when we have these hearings about how Bard had this nebulous

          11    relationship with the Simon Nitinol filter until it bought the

          12    company in 2001.

          13                 One of the documents I have is a 1997 document, July,

          14    and one of the reasons I brought it -- I'm going to show it to

10:57:33  15    the Court -- was it's called a line extension document, which

          16    is a 36-page document which does a complete comparison between

          17    the Simon Nitinol filter and what they call the trademark

          18    device which was going to become the Recovery filter, because

          19    they had to do that.  They had to show this equivalence.

10:57:50  20                 On page 36, this -- again, this is July 17, 1997,

          21    "Currently there are two divisions of C.R. Bard, Inc.

          22    responsible for worldwide distribution of the original

          23    Simon Nitinol filter and the modified trademark filter

          24    systems."

10:58:05  25                 That's the Recovery.  They're already involved with

the Recovery filter in 1997.

"Each of these two divisions is required to be on the label to satisfy European and U.S. labeling requirements.  The European distributor has been placed first on the label under the distributor section of the label to facilitate the identification of the authorized representative."

Under "Product Labels."  "The content and layout of labels are the responsibility of NMT."  That's the company that Bard purchased.  "Label specifications are generated by NMT according to internal system procedures and mutually approved by NMT and the distributor, C.R. Bard, Inc."

So I think it's important for the Court to understand that when they say that Bard was not really involved in this product until 2001 or whatever it was that they took over, they were involved with every aspect of both the Simon Nitinol and the Recovery.

The part I want to address, we had discussions with Mr. North.  We don't want -- we don't need all that marketing material for the first eight, nine, ten years.  We want the marketing material once they start marketing the devices that are subject of this litigation, just to see the comparisons between the representations that are being made to the outside world about those two devices versus what they might be representing to each other internally about those devices.

And, again, Mr. North says, We did a search.  We

10:59:36  1    don't know what he produced.  We don't know whether or not he

        2    thought he was doing us a favor by giving us some

        3    Simon Nitinol filter based on his notion of the relevance of

        4    that device.  I think that -- and I think Mr. Stoller will

10:59:51  5    address how we might be able to get electronically through

        6    some of those searches that we would like to them to do, but I

        7    think its fair to say based on the evidence that I have and

        8    that I've already discussed, and everything I've said is

        9    either in a document or in a deposition I was prepared to show

11:00:07 10    the Court today, there are misrepresentations and

       11    misrepresentations regarding the Simon Nitinol filter and all

       12    of the other devices.

       13         And Mr. North keeps sayings that the predicate device

       14    is the device before.  Again, I have a document that says all

11:00:24 15    of these are supposed to be comparable or equal to or better

       16    than the Simon Nitinol filter.  All of them.  Not just the

       17    Recovery.

       18         I'm just trying to think if there are any other

       19    issued he raised.  I think not, but if the Court has any

11:00:41 20    questions at this point, I'd be happy to answer them.

       21         THE COURT:  Well, there are five categories --

       22    actually six, addressed -- wait a minute.

       23         Six categories addressed in the matrix.  One,

       24    regulatory communications, there's no dispute on.  You've

11:01:10 25    indicated that defendant has agreed to search for those.

11:01:16   1          Another two are the design materials and the testing

           2   materials.  And, as I've indicated, I have trouble

           3   understanding how that's very relevant to what the plaintiffs

           4   want to show in this case.

11:01:28   5          MR. LOPEZ:  As long as -- I can deal with that real

           6   quick.

           7          THE COURT:  Yeah.

           8          MR. LOPEZ:  We do have some comparative testing.

           9   Obviously we want comparative testing if there's --

11:01:35  10          THE COURT:  I'm going to get to comparative in a

          11   minute.  Because the other three categories are sales and

          12   marketing, comparative information, and internal

          13   communications.  But it's a very broad internal communications

          14   request.  It's internal communications regarding the other

11:01:51  15   five subjects and efficacy, performance, and safety.  And I

          16   think the word "all" is used.  All internal communications.

          17   That is a very broad request.

          18          It seems to me that sales and marketing is relevant

          19   because part of the plaintiffs' case will be an allegation

11:02:11  20   that Bard was misrepresenting the safety of the retrievable

          21   filters by comparison to Simon Nitinol.

          22          It seems to me the comparative information is

          23   relevant.  That is, how Simon Nitinol really compared to the

          24   other retrievable filters.

11:02:29  25          And it seems to me that some internal communications

11:02:32  1   on those subjects are relevant.  But the problem is how do you

       2   put those into a manageable scope?  I don't pretend to have

       3   the ability to do that, and I don't want to venture out and

       4   start drawing lines because I know less than you all do about

11:02:49  5   it.

       6       What I think I would recommend, and I'll get your

       7   reaction, is that you address those three subjects, sales and

       8   marketing, comparative information, and internal

       9   communications, and plaintiffs be very precise and reasonable

11:03:05 10   in what it is you want.  Defendants can respond.  And if you

      11   can't agree, put it in the matrix that you're going to give me

      12   on April 15th, and I'll give you a decision.

      13       MR. LOPEZ:  Let me address this, because I think

      14   Mr. North said something that I think is worth focusing on,

11:03:20 15   and that there is really not a lot of activity going on with

      16   the Simon Nitinol filter during this period of time.

      17       I guess the issue here, and we haven't heard any of

      18   that, I don't know what the burden is.  I don't know whether

      19   or not they've done a search of everything that's

11:03:37 20   Simon Nitinol related and it's in a -- it's one gigabyte or --

      21   a small volume.

      22       THE COURT:  That's exactly what you ought to be

      23   talking about.  I mean, in my earlier case management order on

      24   ESI generally, I said you got to communicate, and the

11:03:53 25   defendants need to tell the plaintiff your system location,

11:03:56   1   your system architecture, what exactly you got from the people

2   you interviewed back in 2005, so that you can have an

3   intelligent discussion about what the discovery requests are

4   to be.  That's exactly the kind of discussion you should have

11:04:08   5   about the Simon Nitinol information.

6          MR. LOPEZ:  I think the reason I brought it up is

7   because you were asking me to define documents more

8   specifically than a broad category and I -- that would be like

9   me knowing what documents they might have where they're doing

11:04:25   10   these comparisons or they're responding to Dr. Ciavarella, and

11   where that takes -- and I would ask we start with what is the

12   burden.  And I think we've all seen the significant relevance

13   of the Simon Nitinol filter to all of the devices that are

14   part of this case.

11:04:42   15          THE COURT:  When you say "what is the burden," you

16   mean how burdensome is it?

17          MR. LOPEZ:  In other words, do they already have

18   these set aside?  I mean, is the volume either 1 percent of

19   the entire production?  We don't know.

11:04:53   20          THE COURT:  It seems to me, Mr. Lopez, that it's

21   pretty obviously burdensome.  If you want all communications

22   during the life of the Simon Nitinol filter regarding this

23   range of subjects, that, to me, is vast.  I'll be willing to

24   bet you a doughnut that they don't have a file sitting over

11:05:13   25   there labeled "All communications about Simon Nitinol filter

11:05:17  1    for the last 25 years."

2             MR. LOPEZ:  I'll take your doughnut and raise you a

3    doughnut.  I think they probably do.

4             THE COURT:  Why do you think they do?

11:05:24  5    MR. LOPEZ:  They know how significant the

6    Simon Nitinol filter device is in this case.  I mean, I have a

7    feeling they've seen everything we want to see and they've

8    analyzed it, and that's why we're getting the resistence we're

9    getting to getting any more than they've already given us.

11:05:40 10             THE COURT:  Well, I'm not so suspicious as you are.

11             MR. LOPEZ:  Okay.

12             THE COURT:  I think simply my blessing your request

13    for all communications is unreasonable because that sounds to

14    be to me very broad and burdensome.  Same thing for all sales

11:05:52 15    and marketing materials.

16             Now, neither do I agree that the defendants should be

17    able to identify and decide on the representative sample

18    they're going to produce.  It's not a matter of the defendants

19    picking and choosing what information they're going to

11:06:07 20    disclose.

21             But I think you have to have a discussion about

22    what's been done to find this material.  Plaintiffs, fashion

23    your best request.  Defendants, if you disagree, give me the

24    disagreement, and then I can make a decision.  But until we

11:06:19 25    have that discussion, I think any decision I make is bound to

11:06:23  1   be wrong in one direction or the other.

2        MR. LOPEZ:  Okay.  I understand, Your Honor.

3   Something we -- we have depositions that are starting maybe

4   the same timetable.  I can actually get this done by a week

11:06:34  5   from tomorrow, maybe, to get this done by Friday and have --

6        THE COURT:  I understand that.  My only problem is

7   going to be I'm unavailable basically for the next three weeks

8   because of this other case that starts Monday morning.  I

9   really am not even on evenings or weekends going to have time

11:06:53  10  to look at your matrix.  I think I will, as I indicated,

11  during the week of April 18th, because the trial -- I think

12  the trial will end during that week.

13       MR. LOPEZ:  Well, just as a practical matter, may I

14  suggest -- and we're going to try to do this with some other

11:07:09  15  issues, too -- to the extent Mr. North and we can agree on

16  what additional things he agrees to produce, maybe have him

17  produce those now --

18       THE COURT:  Sure.

19       MR. LOPEZ:  -- and then make the issue what is left

11:07:21  20  that we want that he doesn't want to give us.

21       THE COURT:  I absolutely agree we ought to be moving

22  ahead with discovery where there's agreement.

23       All right.  So just to summarize, the three

24  categories that I think are relevant are sales and marketing,

11:07:36  25  comparative information, and internal communications that

11:07:40  1    relate primarily to those subjects.  I cannot see much

2    relevance in the design and testing of Simon Nitinol for the

3    reasons I've stated.  So focus on those three in your

4    discussions.

11:07:52  5        MR. LOPEZ:  Okay.  Thank you, Your Honor.

6        THE COURT:  I'd like to talk next about the privilege

7    log issue.

8        Let me get the right materials.

9        I want to talk to you first about the supplemental

11:10:35  10   joint report that you filed on February 12th about the

11   privilege log efforts.  It's Docket 705.  It's the document

12   where you describe the procedures you had agreed upon.

13       I appreciate the efforts you've been making on this

14   issue.

11:10:53  15       I want to make sure I understand your procedure.  In

16   this report from February 12th, on page 2 in paragraph A, you

17   talk about the fact that you have been continuing to work on

18   the documents that were the prior sampling, and you proposed a

19   briefing schedule and the first motion has been filed, as was

11:11:24  20   suggested on March 25th.  And I've read that.  I want to talk

21   to you about that in a minute.

22       But part B on page 2 is a little confusing to me.

23   You have two lists of categories on pages 3 and 4.  One is the

24   plaintiffs' proposed categories.  The second is Bard's

11:11:55  25   proposed categories.  And you say that by April 29th, Bard

11:12:04  1   will produce a list of the entries responsive to each of its

2   categories, and plaintiffs will do the same with respect to

3   their categories.  And then after you do this, you'll randomly

4   select 25 entries from each category.

11:12:21  5          I don't understand the categories.  When I look at

6   the plaintiffs' list, I understand, or think I understand what

7   the plaintiffs are suggesting.  For example, in category I,

8   entries where no legal personnel are listed as either author

9   or recipient of the communication.  I'm assuming plaintiffs

11:12:42 10   are saying there's a bunch of that category in the privilege

11   logs, we think it's not privileged because there's no legal

12   personnel listed; therefore we want to test some of it.

13          I don't understand Bard's categories.  Why is Bard

14   coming up with categories?  I mean, for example, Bard has a

11:13:05 15   category of documents -- well, communications to and from

16   outside counsel.  Isn't that evident from the privilege log?

17   Why are you creating a category to put documents into, and

18   then why are we sampling those documents?  You're not

19   contending they're not privileged?  They're not identifying

11:13:26 20   that category.  I'm --

21          MR. NORTH:  I must admit I have not been directly

22   participating in that.  Mr. Combs, on behalf of the

23   plaintiffs, has been dealing with my partner, Kate Helm.

24          My understanding -- and Mr. Combs can correct me if

11:13:43 25   I'm wrong, but my understanding is the -- those are categories

11:13:47   1    that they are challenging that we believe are indeed

2    privileged or subject to work product protection --

3    protection.  And that that was just to help provide a

4    framework for the future meet and confer that's going to go on

11:14:02   5    for the next two months.  And that's my understanding.

6    Subject to any correction we have here.

7              MR. COMBS:  Your Honor.  Yeah, I think that's right,

8    Judge.  The idea was that each side would come up with some

9    categories as a way to then either reach some resolution among

11:14:25  10    us from some sampling of those categories, or get -- more

11    likely, unfortunately, because we've already had extensive --

12    dozens of hours of meet and confer, and as you see what we

13    left with in our motion to compel, get some categorical

14    rulings from you that will then help us evaluate the rest of

11:14:45  15    the privilege log.

16              And I can speak as to why they picked those

17    categories, but that was just the deal, that we would do

18    categories and they would do categories.

19              I think their thought was if we can get clarity on

11:14:56  20    our categories, those would be kind of off the table for

21    further challenge from plaintiffs.  But I don't want to speak

22    too much for defense counsel.

23              Thank you.

24              THE COURT:  All right.  And it's Mr. Combs; right?

11:15:08  25              MR. COMBS:  Yes, Your Honor.

11:15:09   1          THE COURT:  Just we didn't identify you at the

           2   beginning.

           3          MR. COMBS:  Yeah, Lincoln Combs, Your Honor,

           4   Gallagher & Kennedy.

11:15:17   5          THE COURT:  Right.  Mr. Combs, I'm still not

           6   understanding the defendants' categories.  You have category 1

           7   that I just described, documents -- actually, it wasn't

           8   category 1 that I just described.

           9          Let's use that.  Bard's category, documents created

11:15:36  10   directing actions to be taken or describing actions taken as a

          11   result of the threat of or filing of lawsuits.

          12          And Bard is going to identify the documents in that

          13   category, not plaintiffs --

          14          MR. COMBS:  Correct.

11:15:57  15          THE COURT:  -- right?

          16          But then we're going to pick at random 25 of them

          17   to -- if they're not in one of your categories of what's not

          18   privileged, why are we having Bard create a category and

          19   having Bard put documents in that category?

11:16:13  20          MR. COMBS:  That was the way my colleague Kate Helm,

          21   Mr. North's partner, wanted to do it, Your Honor, and that

          22   came from extensive meet and confer discussions, and that was

          23   the deal she wanted.

          24          THE COURT:  But how does it help -- I mean, if you're

11:16:26  25   not -- well, are you -- maybe this is the question.  Are you

11:16:30  1    contending that documents created -- "created" may be a

2    typo -- documents directing actions to be taken or describing

3    actions taken as a result of the threat of or filing of

4    lawsuits, are you claiming those are not privileged or work

11:16:49  5    product?

6          MR. COMBS:  They could be, Your Honor.  I think the

7    testing, at least on our end, would be to make sure that's

8    what they truly are.  The sampling, and then more extensive

9    discussion of those.

11:17:03 10        THE COURT:  Well, is there -- are you working off a

11    list of everything you dispute?  Is that what we're doing?

12    There's this long list of everything you dispute and Bard is

13    going to pick some of those and put it into this category?  Or

14    are they just going to go to their privilege log and say

11:17:21 15    everything in our privilege log that's in this category, we'll

16    identify.  Well, maybe 75 percent of that you don't dispute.

17    So why are we putting that into a category to be sampled?

18        MR. COMBS:  You'd have to ask those questions of

19    defense counsel.  But, like I said, this was the procedure

11:17:34 20    that we agreed to to get through -- try to get through this.

21        And it actually is the latter, Your Honor.  It's the

22    entire privilege log we're going to try to categorize this

23    way.

24        THE COURT:  Can you help me, Mr. North?

11:17:48 25        MR. NORTH:  As I understand what's going on, these

11:17:50  1    are categories we picked because we think they are clearly

        2    privileged, but there have been -- they are contesting

        3    virtually every entry on the privilege log, as I understand

        4    it.  And we're trying our best to come up with broad

11:18:03  5    categories that we think are clearly privileged that ought to

        6    be -- ought to be taken off the table, and this is just trying

        7    to provide a framework for this meet and confer that's being

        8    scheduled.

        9        THE COURT:  Well, so there are seven Bard categories.

11:18:20 10    Are you going to put every document listed on your privilege

       11    log into one of those seven categories?

       12        MR. NORTH:  No, Your Honor.

       13        THE COURT:  What's the set you're going to start with

       14    before you start assigning them to categories?

11:18:36 15        MR. NORTH:  My understanding is that each side is

       16    going to pick 25 documents that they believe --

       17        THE COURT:  That's after it's in the categories, as I

       18    read this.

       19        MR. NORTH:  Right.

11:18:46 20        THE COURT:  You're going to categorize them, and then

       21    somehow you'll pick 25 from each category to discuss.

       22        MR. NORTH:  Right.

       23        THE COURT:  Well, so are you starting with everything

       24    in the log and putting that into your seven categories?  And

11:18:58 25    if not, what is the subset you're going to put into the seven

11:19:00  1    categories?

2         MR. NORTH:  I don't think everything in the privilege

3    log will necessarily fit just within those seven.  But those

4    are the seven ones for this sampling process, major categories

11:19:15  5    we were going to utilize.

6         THE COURT:  Go ahead.

7         MR. LERNER:  Your honor, I think that the

8    categories -- my understanding is that the categories on the

9    defense side are things that the plaintiffs have challenged,

11:19:23  10   so they're not things we're picking out.  They're based on

11   documents they have challenged themselves, so we made these

12   broad categories.  That's my understanding.

13        THE COURT:  That's Mr. Lerner; right?

14        MR. LERNER:  Yes, Your Honor.

11:19:37  15        THE COURT:  Is it your understanding, Mr. Lerner,

16   that -- let's say, just to pick a number, there are 140

17   documents that the plaintiffs are disputing.  I know it's a

18   much higher number.  But let's say the total universe is 140.

19   Is it your understanding that the 140 will be taken and

11:19:52  20   assigned to the seven categories you've identified and every

21   one of them will wind up in some category?

22        MR. LERNER:  That's --

23        MR. COMBS:  I don't think that's correct, Your Honor.

24   Plaintiffs have not said we're challenging every entry on the

11:20:11  25   privilege log.  This was just a means to try and organize the

11:20:15  1    privilege log so that challenges could be further vetted.

          2          And as a practical matter from our perspective,

          3    Your Honor, we wanted our categories -- we want to do sampling

          4    on our categories.  This was what defense counsel wanted in

11:20:28  5    return for us having that procedure.  We said fine.  There's

          6    some categories there that, if that can clarify things and get

          7    either more meet and confer discussions or rulings from you

          8    that help us, great.  But obviously we were more focused on

          9    our categories, which we do want to divvy up the privilege log

11:20:48 10    and challenge.

         11          THE COURT:  Well, that's not what I'm understanding.

         12    Why are we going to be sampling and evaluating anything other

         13    than what you want to put in a category?  That's the stuff you

         14    care about in this challenge.  Aren't we just creating more

11:21:00 15    work for ourself if we're --

         16          MR. LERNER:  Your Honor, I think the documents

         17    they've challenged individually would fill in those buckets.

         18    So the defense bucket, my understanding, were created based on

         19    documents they said they were challenging.  So it's not like

11:21:13 20    we're picking documents necessarily.  We're picking documents

         21    that they have challenged, and we're creating those buckets.

         22    That's what the defense side buckets are.

         23          THE COURT:  Well, so are we going to have the same

         24    document in a defense bucket and a plaintiff bucket?  And if

11:21:28 25    so, aren't we duplicating our work?

11:21:31  1          MR. COMBS:  Could be, Your Honor.

2          THE COURT:  Well, let me ask this question,

3  Mr. Combs.  The seven categories you've got on page 3, is that

4  the universe of issues you've identified in terms of your

11:21:44  5  concerns about the privilege log?

6          MR. COMBS:  I wouldn't say it's the entire universe,

7  but it could be.  Once we get through those, maybe that will

8  resolve everything.  But there may be -- obviously there could

9  be a specific unique category or document, but that's going to

11:21:58 10  be -- the vast majority, yes.

11          THE COURT:  Okay.  So it includes the vast majority.

12  Why don't we just deal with those categories, then?  Let's

13  forget the Bard categories.  Let's have -- let's take the

14  plaintiffs' seven categories, put the disputed documents into

11:22:13 15  those categories, sample them, see if you can reach agreement.

16  If not, I can rule on the seven categories.  But why deal with

17  another seven categories?

18          MR. NORTH:  Your Honor, I don't see a problem with

19  that.  It was just a mechanism, rightly or wrongly, that was

11:22:34 20  attempting to take broad groups of documents off the table.

21          THE COURT:  And I'm all for that, I just worry if

22  we're overstating the start, we're going to be overstating the

23  end, and we'll be creating more work than we need to.  You

24  understand my issue on that.

11:22:49 25          MR. NORTH:  Right.  Why don't we proceed as the Court

11:22:52  1   suggests, just focusing on the plaintiffs' categories, and

2   then we can come back to the Court if there's a problem after

3   that.

4       THE COURT:  Well, and if it's true there's another 5

11:23:00  5   or 10 percent of the privilege log disputed documents that

6   aren't in those categories, we can deal with those after.  But

7   let's start with these seven categories and deal with them.

8       MR. COMBS:  That obviously would be fine for

9   plaintiffs, Your Honor.

11:23:14  10      THE COURT:  Okay.  Now, I'm not done on the privilege

11  log.  You can go ahead and have seat.  There's another

12  question I want to ask, but let me make a note first.

13      All right.  The other -- well, let me read my notes

14  to make sure I'm right before I say it.

11:24:45  15      I have a question on the motion to compel, which is

16  Docket 1214.  Attached to the motion to compel is this exhibit

17  that identifies documents, gives their date, author,

18  recipient, et cetera, a description of the communication, and

19  then a paragraph basis for the challenge, which is presumably

11:25:18  20  plaintiffs' challenge to the document.

21      MR. COMBS:  Correct, Your Honor.

22      THE COURT:  You say in footnote 2 of your brief it is

23  hoped that this mechanism can easily be transitioned into a

24  matrix style summary of the dispute.  But you filed the motion

11:25:33  25  to compel.  So are you wanting me to get the motion briefed

11:25:36  1    and ruled, or do you want to not do it by motion, do it by

2    matrix?  I wasn't understanding what that meant.

3              MR. COMBS:  I think the idea was both, Your Honor, is

4    to have legal argument in the motion, and then have the

11:25:48  5    matrix.  I've communicated with my colleague, Ms. Helm, this

6    morning and sent her a copy of that Excel spreadsheet so they

7    can add their paragraph response, and then, if necessary, we

8    can add a paragraph reply and -- but I think there's

9    generally -- obviously there's somewhat of a categorical

11:26:06 10    approach in the brief, and there's case law and citations and

11    authority and argument that will help guide the individual

12    determination.

13              MR. BRENES:  And, Your Honor, this is Troy Brenes for

14    the plaintiff.  I helped brief the motion.

11:26:22 15              Obviously we're dealing with a large number of

16    documents, I think it came out to 132, and my thought was the

17    spreadsheet was -- it was probably the method that made the

18    most sense so you could get a quick and easy snapshot of what

19    the document was.

11:26:37 20              So the information provided is everything that was

21    listed on the privilege log, and then just a quick paragraph

22    of why we're challenging the document.

23              THE COURT:  All right.  Well, here's the concern I

24    have about the motion.  I've read the motion.  The motion

11:26:54 25    identifies several categories of documents that you think are

not privileged.  For example, on page 6, documents that are not a request for or the rendering of legal advice from an attorney.

On page 8, communications with outside counsel where the attorney was not acting as a lawyer.

Page 9, documents where the primary purpose of the communication was not to obtain or render legal advice, et cetera.

And there's several categories.

The spreadsheet at the end doesn't track those categories directly.  There's arguments in the argument section that aren't in the categories, and there's 133, by my understanding, documents.  I have trouble with the notion that I'm supposed to read this brief, and then sit down and review 133 documents that would likely be thousands of pages and make a ruling.  Both because we don't have complete correlation between the arguments in the brief and what's in the attachment, the spreadsheet, and because of 133 documents.

So this is the question that -- or the idea that I wanted to address.

If what you're looking for is guidance from me on what I think is or is not privileged, I don't think I need to review and rule on 133 documents to give you guidance.

What if we were to take these six or seven categories, and you can do the legal briefing on why you think

11:29:01  1    that category is or is not privileged or work product, and

2    then identify five documents in each of the categories that I

3    can review out of the 133.  And then I can read the legal

4    arguments, I can look at the five documents, I can give you my

11:29:19  5    ruling and make it specific to those five documents.  You'll

6    get rulings on 25 or 30 different documents and on the

7    categories in the brief that you could then use in your

8    further discussions.

9         I guess my question is would that advance the ball?

11:29:34  10   I'm concerned about a couple of things.

11        One is it looks like this is headed toward somebody

12   ultimately reviewing several hundred, maybe more, documents to

13   make a privilege call.  If that's going to be the task, if

14   we're going to get to 3- or 400, I don't have time to do that

11:29:51  15   and my law clerks don't have time, so we'll probably need to

16   get a special master on board sooner rather than later.  Maybe

17   you'll make decisions in light of the guidance I give.

18        And I'm also concerned that under the schedule that's

19   in Docket 705, we're not even going to finish briefing on the

11:30:07  20   second round until sometime in July.  So we're really sort

21   of -- if I rule in August, we're -- we've only got a few

22   months left in the discovery period at that point.

23        So I guess I'm wondering if we should sort of cut to

24   the chase, have me get through and rule on these five, have

11:30:27  25   you discuss if there's still wide divergence, let's get a

11:30:32  1    special master in, give them the guidance I've given, give

2    them all the disputed documents, and you all can pay that

3    special master, him or her, to go through and say what is or

4    is not privileged.  And get it done by the end of May rather

11:30:44  5    than waiting until August.

6          I'm interested in your reactions.

7          MR. COMBS:  Your Honor, I wholeheartedly agree with

8    everything you said.  I think the exercise in briefing the 133

9    was still useful.  It's something we'd probably have to do at

11:31:02 10   some point anyway, but that guidance and your plan sounds

11   great.  It would have been great to hear it a couple of weeks

12   ago so Troy and I wouldn't have had to have been up all night.

13         But, no, I think that's an excellent plan,

14   Your Honor.  And I certainly agree -- our main concern at this

11:31:17 15   point is expediency and not overly delaying discovery of these

16   privileged materials to the extent that they are discoverable.

17         THE COURT:  Thoughts from defense counsel.

18         MR. NORTH:  Your Honor, I think that makes sense.  I

19   would suggest that if they define those categories and -- I

11:31:37 20   like the Court's idea of five in each, but I think the defense

21   ought to be able to, from that 130 that they're still

22   challenging, choose maybe two of the five for each category so

23   that they're not able to bias their best five.

24         THE COURT:  I understand.

11:31:53 25         Well, okay.  What I'm going to do on this, I think,

11:31:57   1    is -- in my order, I will lay out this procedure.  I'm going

           2    to identify the categories I see in the plaintiffs' brief so

           3    you know exactly what you're going to be responding to on

           4    behalf of the defendants.

11:32:29   5         The defendants' brief on this issue is scheduled for

           6    April 8th, which is middle of next week.  I will get you an

           7    order on this tomorrow so that you can recraft your brief to

           8    make sure it's addressing those categories.  And all it needs

           9    to do is address the categories.  It doesn't need to talk

11:32:49  10    about specific documents.  Unless you can get the documents

          11    picked before April 8th.

          12         And the reply brief on April 22nd can probably be

          13    done in a little less time than that, it seems to me.

          14         MR. COMBS:  Your Honor, would it help if we -- we can

11:33:14  15    do it by tomorrow, pick five entries for each category and

          16    submit a supplemental brief just listing for those six or

          17    seven subsections in the brief, here are the five examples.  I

          18    mean, there's one or two examples, I think, for most of them

          19    already.  And then plaintiffs can -- I mean defendants can

11:33:33  20    respond next week in their response brief.

          21         Just the idea being to move this along, the concern

          22    Your Honor raised, which plaintiffs certainly share.

          23         THE COURT:  Hold on just a minute.

          24         MR. COMBS:  Your Honor, may I make one point before

11:36:53  25    you finish?

11:36:55  1          THE COURT:  Yeah.  Hold on a minute.

       2          MR. COMBS:  Sure.

       3          THE COURT:  Go ahead, Mr. Combs.

       4          MR. COMBS:  While you were writing, Mr. Boatman

11:38:12  5   raised a good point with me.  They want to submit two of their

       6   documents I guess are the most privileged in each category.  I

       7   don't think that's proper, Your Honor, since they've

       8   designated these as privileged, all of them, so they should

       9   all have proper bases.  They shouldn't be allowed to pick and

11:38:30 10   choose.

      11          And I feel pretty good about all of 130 or whatever

      12   of our challenges.  We tried to get as low we could.  But I

      13   don't think they should be allowed to pick and choose their

      14   most privileged documents from that list.

11:38:42 15          THE COURT:  Okay.  I understand.  I disagree.

      16          Let me tell you what I'd like us to do, see if you

      17   see any problem with this.

      18          By Monday, April 4th, I would like plaintiffs to do

      19   two things.  You can do it in one communication.  Send to

11:39:00 20   defendants, number one, your description of the legal

      21   categories you've briefed in the motion.  That way I don't

      22   have to bother putting it in an order.

      23          So just make clear -- and they're in the headings of

      24   your motion -- what are the five or six legal categories

11:39:16 25   you've briefed so that defendants know exactly what to respond

11:39:19  1   to.

2        And number two, three documents in each of those

3   categories from the 133 that are still in dispute.  So give to

4   defendants the categories of arguments and the three

11:39:33  5   documents.  That's communication just to the defendants.

6        Then by April 11th, a week later, and I think it can

7   be done in a week since you're already working on this brief,

8   I assume, the plaintiffs do three things:  One is you file a

9   memorandum addressing the legal categories.  Two, you send to

11:40:02  10   plaintiff your list of two other documents in each of those

11   categories.  So plaintiff gets the two other documents.

12        MR. STOLLER:  Your Honor, you said plaintiffs do

13   three things.

14        MR. COMBS:  Defendants --

11:40:18  15        THE COURT:  Sorry.  Defendants do three things.

16        So you file your brief on the legal categories,

17   number one.  Number two, you identify two more documents in

18   each category and tell the defendants what they are.  And

19   number three, you give to defendants a draft matrix that

11:40:31  20   addresses all five documents in all of the categories with

21   your summary -- I don't want the argument restated -- of why

22   this document satisfies your argument on the legal categories.

23        That happens on the 11th.

24        Then, on the 22nd, the defendants file a reply on the

11:40:52  25   legal issues --

11:40:55   1          MR. COMBS:  Plaintiffs, Your Honor?

           2          THE COURT:  I'm sorry.  The plaintiffs file a reply

           3   on the legal issues and give me the completed matrix that has

           4   the summary of each side's arguments for the five documents in

11:41:07   5   each of the categories.

           6          And then I can read the legal arguments and I can

           7   review the five documents in each category and get you my

           8   ruling.  And you'll have an indicative ruling on the

           9   categories that have been briefed so far.

11:41:26  10          And then I think what I'm going to do is require you

          11   to meet and confer for a period of time, and then get me a

          12   report on how much is still in dispute, and if it's hundreds,

          13   we're going to get a discovery master in here.  A special

          14   master to go through the rest of the documents with legal

11:41:44  15   guidance.

          16          And if there's a couple more categories to rule on,

          17   I'll do it, but I don't want this process to drag out through

          18   the summer.  I think we need to resolve it more quickly.

          19          Any problems from the plaintiff side on that?

11:41:55  20          MR. COMBS:  No.  That sounds great for plaintiffs,

          21   Your Honor.

          22          THE COURT:  How about from defense?

          23          MR. NORTH:  That's fine, Your Honor.

          24          THE COURT:  Okay.  Let me make just another note or

11:42:02  25   two here.

11:42:04   1          Mr. Duarte, are you having a slow morning?

           2          MR. DUARTE:  Your Honor, I want to identify myself as

           3   participating as observer as opposed to full participant, but

           4   thank you, Your Honor.

11:42:19   5          THE COURT:  Nice to have you here.

           6          Okay.  I'll reflect this in the order that comes out.

           7          Thanks, Mr. Combs.

           8          MR. COMBS:  Thank you, Your Honor.

           9          All right.  I want to talk next about the ESI process

11:43:50  10   and the new custodians.

          11          The report that you filed indicates that with respect

          12   to the ESI process that was outlined in Case Management Order

          13   Number 8, Section 3, the defendants have provided

          14   interrogatory responses on their ESI collection efforts that

11:44:23  15   happened in late February.  The defendants have provided

          16   interrogatory responses on corporate culture.  There was a

          17   30(b)(6) deposition on corporate -- on corporate structure,

          18   not culture.  There was a 30(b)(6) deposition on corporate

          19   structure in mid March.  There was an interview on

11:44:44  20   defendants's information systems scheduled for April 15th.

          21   And a 30(b)(6) deposition on information systems for the

          22   entities and departments likely to have discoverable

          23   information set for April 27th.

          24          Is that still all correct?

11:45:09  25          MR. STOLLER:  Yes, Your Honor.

11:45:11  1          MR. LERNER:  Yes, Your Honor.

         2          THE COURT:  With respect to the new custodians that

         3  we were going to include in the same matrix as the ESI issues,

         4  I learned from your report that there was an interrogatory

11:45:21  5  answer provided in late February.

         6          Has anything else happened on the new custodians

         7  issue?  This is the -- part 4 of my order.

         8          MR. STOLLER:  The short answer to your question,

         9  Your Honor, is no, there's nothing more that's happened on

11:45:41 10  that.  We wanted to complete the other parts of the process

        11  before we turned to those issues because they, to some extent,

        12  rely on -- having discussions about those rely on what we

        13  determine in the first part.

        14          THE COURT:  Okay.  And my understanding is that the

11:45:54 15  interrogatory response that was provided in late February on

        16  new custodians identified employees who were involved in

        17  Eclipse, Meridian, and Denali, and whose ESI has not yet been

        18  searched; is that correct?

        19          MR. LERNER:  Yes, Your Honor.

11:46:13 20          THE COURT:  And the next step on new custodians that

        21  you say, Mr. Stoller, is waiting until you learn more about

        22  the systems, is for you to identify the specific custodians

        23  from whom you want ESI discovery with respect to those

        24  filters.

11:46:26 25          MR. STOLLER:  The idea from our perspective,

11:46:27  1    Your Honor, would be us to have the ability to identify

2    additional custodians and --

3           From plaintiffs' perspective, Your Honor, the idea is

4    that once we go through the next step of our ESI discovery

11:46:46  5    process, hopefully we'll be able to identify whether we have

6    any issue as to whether there are additional custodians from

7    whom we think ESI should be collected.

8           I don't think there's anything, and I don't know

9    whether defendants have taken steps yet to begin collecting

11:47:02  10   ESI from those that they've already identified.

11          THE COURT:  Okay.

12          All right.  Well, you filed the joint motion, which

13   is at Docket 1151, to extend some of the deadlines related to

14   these two subjects.  And specifically you want me to set

11:47:33  15   May 16th as the new deadline when any disagreements on these

16   issues will be presented to me in a matrix.

17          I'm going to grant the motion, but I think it's

18   really important that we finish it by that date.  We've got to

19   get the ESI issues resolved and the discovery underway because

11:47:54  20   that typically takes time and involves lots of back and forth,

21   and I don't want to be starting mid summer.  We need to get

22   that underway.

23          So I will grant the motion at Docket 1151, but please

24   understand we really do need to push this fast enough to get

11:48:14  25   it resolved by that May 16th date.  And I formed that concern

11:48:18  1   just because it's evident to me that there's been some delay

2   in what you've been trying to do just scheduling things such

3   as the 30(b)(6) deposition that can't happen until late April,

4   but let's do whatever we need to so that you can get those

11:48:30  5   issues to me by May 16th.

6            Is there anything else we need to talk about on ESI

7   and the new custodians?

8            MR. STOLLER:  Not at this time, Your Honor.

9            MR. LERNER:  Your Honor, the only other issue I -- I

11:48:42  10  think the initial protocol that we submitted right after the

11  last conference may not have been entered yet.  The ESI

12  protocol and format.

13           THE COURT:  I thought that did get entered.  Have you

14  not seen it in the docket?

11:48:58  15           MR. LERNER:  I may have missed it, but I don't know

16  if I have seen it.

17           THE COURT:  Did you see it, Mr. Stoller?

18           MR. STOLLER:  I'll be honest, Your Honor, I don't

19  know one way or the other, but I can find the answer by the

11:49:02  20  time I get back to my office this afternoon.  If we haven't

21  seen it, I can alert your judicial assistant that we haven't

22  seen it, and submit another Word version of it to make sure

23  you guys have it.

24           THE COURT:  Yeah.  I reviewed it and approved it.  If

11:49:14  25  it didn't get filed, let us know and we'll get it filed.

11:49:20  1          MR. LERNER:  Thank you, Your Honor.

          2          THE COURT:  Let's talk next about the mature cases.

          3  You filed a stipulation which is at Docket 914.  You have

          4  removed three cases from the mature case list, that's Conn,

11:50:15  5  C-O-N-N, Milton, and Mintz, M-I-N-T-Z, cases.

          6          Is my understanding correct that those three cases

          7  just go back into the general group of MDL cases?

          8          MR. BOATMAN:  Yes, Your Honor.

          9          MR. NORTH:  Yes, Your Honor.

11:50:32 10          THE COURT:  Okay.  Do we need to do anything special

         11  with those with respect to things that other cases in the MDL

         12  have been doing in terms of information exchanges, or is it

         13  enough to just say they're off the mature case list?

         14          MR. LOPEZ:  I think that's probably enough,

11:50:53 15  Your Honor.

         16          THE COURT:  Okay.

         17          And then you indicate that the other ten which will

         18  remain on the mature case list, as I understand it, may be

         19  ready for remand after the FDA warning letter and the

11:51:21 20  Kay Fuller discovery is done.  Is that accurate?  Is that what

         21  we're waiting for on the other ten mature cases?

         22          MR. BOATMAN:  I think that was the idea, Your Honor.

         23          MR. NORTH:  Yes, Your Honor.  Mr. Boatman and I, I

         24  think, are going to talk in the near future about whether case

11:51:38 25  specific discovery, because there's a few little minor things

11:51:41  1    on some of those cases, ought to be completed now or after

2    remand.  But he and I will discuss that and report back.

3              THE COURT:  Okay.

4              What I'm going to do before we leave today is set

11:51:54  5    another case management conference, and I'll provide in my

6    order that you should get a status report on those mature

7    cases in connection with the next case management conference.

8              Let's talk about the bellwether selection process.

9              I've read it.  I think it is a reasonable approach,

11:52:25 10    but I have some questions.

11             There was a -- at the beginning of this stipulation,

12    you indicated that the initial plaintiff pool will consist of

13    all of the cases filed as of today.

14             And the plaintiffs are going to provide profile forms

11:52:56 15    by May 1st.  It said defendants will provide profile forms

16    within 30 days after that unless there are more than 350

17    cases.  There are now more than 350 cases.  I don't know what

18    today's count is, but as of two days ago it was 376.

19             So how much time do you think you need, Mr. North, to

11:53:17 20    provide the plaintiff profile forms?

21             MR. NORTH:  Your Honor, I would say just another week

22    unless we have a huge deluge this afternoon at the closing

23    bell, so to speak.  But --

24             THE COURT:  We have one more --

11:53:31 25             MR. NORTH:  We may be able to get them all done

11:53:33  1    within the month.  We'll try our best.  I just wanted to put a

2    safety valve that Mr. Stoller and I talked in there because I

3    didn't know if we could have 350, 600, or what we were going

4    to have at this point.

11:53:46  5         THE COURT:  Okay.  Let's say 40 days instead of 30

6    for you.

7         MR. NORTH:  Okay.

8         THE COURT:  And what I'm going to do, by the way, is

9    we're going to talk through and make a few tweaks.  I'm going

11:53:56 10    to have you then submit to me a form of order on the

11    bellwether reflecting the stipulation that's in here so we can

12    just enter it, and having attached to it the fact sheets.

13    That way we don't have to create the order.  I'm just going to

14    have you submit it in light of the changes we made.

11:54:15 15         MR. NORTH:  Yeah, and we actually discussed doing

16    that, wanting to go to through this process with Your Honor

17    today to figure out what you wanted for the bellwether and

18    perhaps submitting a combined CMO on the bellwether and the

19    fact sheets.

11:54:26 20         THE COURT:  Right.  That's what I'm looking for after

21    we finish today.

22         You then provide that 20 days after the plaintiff

23    has -- I'm sorry, the defendants have provided their profile

24    form, you will exchange lists of 24 to identify this, what you

11:55:02 25    call the PFS/DFS group of --

11:55:08  1           MR. NORTH:  Group 1.

2           THE COURT:  -- of 48 cases.

3           And then plaintiffs, within 30 days of that exchange,

4      will provide the plaintiff fact sheets, and defendants 30 days

11:55:23  5      later will provide the defendants' facts sheets.  That all

6      sounds fine.

7           Well, we'll come back to the fact sheets in a minute.

8           But here's a question that occurred to me.  You don't

9      say anything in the stipulation about *Lexecon* waivers.

11:55:45 10           Are we going to start down this road of identifying

11     these 48 cases only to find when it comes to actual selection

12     of bellwethers that 70 percent of them won't get *Lexecon*

13     waivers, and so we can't do a bellwether trial?

14           When do we clear that hurdle?  I mean, we're going to

11:56:04 15     be doing a lot of work on cases that may not be subject to a

16     bellwether if we don't know there's a *Lexecon* waiver.  Unless

17     I'm missing how you intend to do these bellwether trials.

18           MR. STOLLER:  Your Honor, we had not discussed

19     *Lexecon* waivers as part of the bellwether process.  And

11:56:25 20     obviously -- I'll tell you the plaintiffs' perspective, it was

21     if we try cases in individual jurisdictions that have gone

22     through the process with Your Honor, we'd obviously prefer to

23     have cases tried here, but we can't commit individual

24     plaintiffs and individual attorneys to those waivers, unless,

11:56:41 25     of course, they're going to be part of the process, we could

11:56:44  1    require that.

2              But the thought being that we could -- some of those

3        could still be tried in their home jurisdictions and still

4        serve as bellwethers, but the other thing that happens in the

11:56:55  5    process that the parties have devised, Your Honor, is that

6        we're going to get down to a pool of 48, and then down to

7        12 -- or down to -- yeah, down to 12 and down to six, and as

8        part of that, you can winnow out cases, I suspect, where if

9        what Your Honor says is, Look, I'm only going to include in

11:57:13 10    the bellwether process those who waive *Lexecon*, we would end

11       up winnowing out those cases as part of that process.

12             THE COURT:  Well, my concern is if we don't get

13       *Lexecon* waivers -- well, let me start somewhere else.

14             I view the bellwether process as part of the MDL.  It

11:57:32 15    is part of trying to resolve the MDL.  We do the bellwether

16       trials precisely so we can see if that helps resolve the

17       collection of cases, so that it ought to occur before remands

18       go back to all of the home districts.

19             If we're sending them home for the trials, I lose

11:57:46 20    complete control over when that trial occurs.  I can say,

21       Okay, here's our five bellwethers, we'll send them home, and

22       the judges say, Great, we'll get to them in a year and a half.

23       I don't want that to happen.

24             If we're going to want to have bellwether trials, I

11:57:59 25    want to do it on my schedule as part of the MDL.

11:58:03  1          Now, I know there's a procedure sometimes where I can

       2   get cross-designated to go try it in the home district.   That

       3   sounds complicated.

       4          But if we're doing bellwether trials as part of the

11:58:16  5   MDL, I think they need to be tried by me on the schedule we

       6   set so that we do it as part of getting the MDL resolved, and

       7   I see *Lexecon* waivers as being an obstacle.   So it may be in

       8   other MDLs you've had experience with this not being a

       9   problem, but I see it as an issue that we're going to do all

11:58:39 10   this preparation on all these cases without knowing whether

      11   any one of them will really be able to be a bellwether trial.

      12          MR. STOLLER:   And I think, Your Honor, creates a

      13   significant issue at the outset because we all will have fact

      14   sheets from how many of our cases we have, and each side is

11:58:56 15   going to be selecting from those, and we would have to have in

      16   advance of that selection affirmative waivers for anyone to be

      17   considered.

      18          Probably less of an issue for plaintiffs in a sense

      19   than it is for defendants.

11:59:12 20          THE COURT:   Are you're going to be doing -- the fact

      21   sheets are a lot of work, but you're going to be collecting

      22   documents, you know, for each of these plaintiffs from their

      23   medical providers.   You're going to be doing a lot of work on

      24   cases that maybe won't be a bellwether because the plaintiff

11:59:27 25   won't waive *Lexecon*.

11:59:29  1          MR. STOLLER:  Well, and that's the point, Your Honor,

2      is that it seems to me, based upon what you're saying, if your

3      view is that the complications with plaintiffs or cases going

4      back to the original jurisdictions is not something you want

11:59:42  5      as part of the bellwether process, that you want only those

6      cases in which *Lexecon*'s going to be waived, I think we have

7      to have that at the very first step, because we're going to be

8      selecting the pool of 24 each or the original pool of 48 from

9      whatever we have, 360, 370, let's call it 400 cases that are

12:00:04 10      filed by close of business tomorrow.  We can't even begin to

11      pick the first 24 on each side without knowing whether those

12      individual cases are going to opt in or opt out.  And that

13      process is going to take more time than we have built into the

14      schedule.

12:00:23 15          THE COURT:  What do defense counsel think?

16          MR. NORTH:  Your Honor, I think it's a very

17      perplexing problem, and I'm also always concerned about it

18      because I believe that if you condition a case's participation

19      in the bellwether process, condition that on a prior *Lexecon*

12:00:38 20      waiver by the plaintiff, then you have a situation where it is

21      easy for the plaintiffs to manipulate the bellwether pool to

22      those cases they want.

23          So it's a very perplexing problem if you try to limit

24      it in that regard.  I mean, I have not conducted a survey as

12:00:57 25      to how other judges have handled this problem.  I'm sure there

```
12:01:01   1   are other ways.  The only experience I've had with that
           2   particular issue is one judge in a large MDL said that he
           3   would travel anywhere to try the case with that
           4   cross-designation thing, and then when the time came to try
12:01:12   5   it, he made everybody know just how much happier he would be
           6   if he tried it on his home turf.  The *Lexecon* issue went away
           7   there.  That's the only experience I've had.
           8        But I am concerned and think it could be very
           9   prejudicial to the defendants if the plaintiffs have the
12:01:30  10   option -- if the plaintiffs are required to waive *Lexecon* or
          11   not waive *Lexecon* before being designated in the pool, then
          12   they have sole control over who goes into that pool.
          13        THE COURT:  Right.  Let's do this.  We've reached the
          14   noon hour.  Tricia has been working for two hours.  I have, on
12:01:46  15   my chair in my office -- my mic is no longer working.
          16        I have on my chair in my office a stack of half a
          17   dozen bellwether case management orders from other MDLs.  I'm
          18   going to look at those over the lunch hour and see what they
          19   did with *Lexecon*.  Why don't you all think about it.  Let's
12:02:06  20   take up this topic again at 1 o'clock.  There's legitimate
          21   issues on both sides.  But I think we need to do something in
          22   connection with it rather than just postpone this issue until
          23   later.
          24        So we'll see you at 1 o'clock.
12:02:21  25        MR. NORTH:  Thank you, Your Honor.
```

13:02:23   1          MR. STOLLER:  Thank you, Your Honor.

           2       (Recess taken from 12:02 to 12:55.)

           3          THE COURT:  Thank you.  Please be seated.

           4          All right.  Counsel, did any of you have additional

13:00:50   5    thoughts on this *Lexecon* issue over the lunch hour?

           6          MR. STOLLER:  I don't think anything beyond what we

           7    raised before, Your Honor.

           8          MR. NORTH:  Nothing further, Your Honor.

           9          THE COURT:  I looked at several different case

13:01:05  10    management orders, and there have been a variety of approaches

          11    applied.  Some simply say that the only cases eligible for the

          12    bellwether pool are cases where *Lexecon* has been waived.

          13          Some set a date by which a plaintiff that's assigned

          14    to the bellwether pool must affirmatively say they are not

13:01:47  15    waiving *Lexecon*, and the order says if they don't

          16    affirmatively say it by that date, then they're deemed to have

          17    waived *Lexecon*.

          18          And the orders go on to say that if a party asserts

          19    *Lexecon* and the defendant agrees that it has the right to do

13:02:06  20    it, then the defendant picks a replacement case for the pool.

          21    I saw two orders that did that.

          22          There was one where plaintiffs' lead counsel agreed

          23    to waive *Lexecon* with respect to all of the cases where they

          24    were counsel.  And agreed to try to persuade other plaintiffs'

13:02:40  25    counsel to waive *Lexecon*, and the order said something like,

13:02:43  1  The Court strongly urges counsel to waive *Lexecon*.  So the
2  Court was weighing in.

3       And it went on to say that when the pool was created,
4  plaintiffs could only put cases in the pool where *Lexecon* had
13:03:01  5  been waived.  Defendants could pick whatever cases it chose,
6  and if *Lexecon* became a problem in one of those later and the
7  judge couldn't persuade them to waive *Lexecon*, then the
8  defendants could pick a replacement.

9       There is a statute, 28 U.S.C. Section 292(d), that
13:03:23  10  allows a district judge to be designated to try a case in
11  another circuit.  But it requires the approval of the chief
12  judge of that circuit and the chief justice of the
13  United States.

14       But there are some orders where the Court said I'll
13:03:41  15  obtain an approval to try the case in the transferor district,
16  if necessary.

17       There are a couple of others that obviously looked
18  like they were cases with thousands or tens of thousands,
19  where they said the bellwether cases will be chosen from cases
13:04:03  20  filed in this state, and there was apparently a large enough
21  pool they could pick a good sample of bellwethers out of that.

22       Those were the alternatives I saw in the various
23  orders I looked over.

24       Any thoughts on how we ought to proceed in light of
13:04:23  25  that information?

13:04:26  1          MR. STOLLER:  Your Honor, Paul Stoller.  My only

       2    thought is it seems to me there are only two, from my

       3    perspective, options that I think are workable and appealing.

       4    And one is that *Lexecon* is not an issue, in which case you

13:04:39  5    avail yourself of the ability under 18 U.S.C. 292(d) to be

       6    designated and try cases in other jurisdictions; or if we're

       7    going to require that bellwether cases be those that are tried

       8    here and wai*v*e *Lexecon*, then it needs to be very early in the

       9    process.

13:04:56 10          I think it becomes very difficult to get far down the

      11    road into a bellwether process and then have a deadline or a

      12    date by which *Lexecon* is going to be waived, and then lose

      13    certain cases that we've put into the process.  The work

      14    product that went to them becomes wasted, and then you get

13:05:14 15    into a situation of potentially having, if you take the

      16    scenario that you talked about where if the plaintiff doesn't,

      17    defendant gets to choose.  It skews the balance of what we

      18    tried to put together in the proposed bellwether process of

      19    having representative cases that are put forth by each side.

13:05:35 20          So my proposal would only be whatever you do, Judge,

      21    is that we either don't make *Lexecon* an issue, which I think

      22    would be our preference, but obviously deferential to your

      23    needs and your schedule, or that if we do so, it is something

      24    that happens early, that plaintiffs would need to do early

13:05:54 25    *Lexecon* waivers to be considered to be part of the process so

13:05:57  1    that we don't get into it and have to make changes along the

        2    way.

        3             MR. NORTH:  Your Honor, we would certainly support if

        4    the Court was interested in taking that first approach, which

13:06:08  5    is to designate -- or go through the cross-designation

        6    procedure, if necessary, to ensure that you try the cases.

        7             I agree with Mr. Stoller that whatever's done needs

        8    to be done early in the process.  I just don't believe it can

        9    be a situation where the plaintiff unilaterally gets to decide

13:06:27 10    who is waiving *Lexecon* and who's not, and therefore determine

       11    the pool of eligible cases by their *Lexecon* decisions at the

       12    outset.

       13             If we're going to go down that road of somehow having

       14    *Lexecon* waiver as a criteria, I think it needs to be done far

13:06:47 15    enough along the process, maybe a month or so after the

       16    initial 48 are chosen, so that there's a real penalty to the

       17    plaintiffs if they tried to skew the pool at that point with a

       18    procedure like the Court mentioned a couple of cases had where

       19    there's a presumptive date and if you don't object *Lexecon*'s

13:07:07 20    deemed waived, and if do you object and stand upon *Lexecon*

       21    rights, then the defendant has the right to replace that.

       22             THE COURT:  A number of the orders noted that

       23    defendants have to waive *Lexecon*, too.

       24             I've never looked at the case law to know if that's

13:07:31 25    true.

13:07:31  1           Do you know, Mr. North?

        2           MR. NORTH:  I'm sorry, I did not hear --

        3           THE COURT:  Some of the orders say defendants have to

        4  waive *Lexecon*, as well.

13:07:39  5           MR. NORTH:  The defendants are prepared.  My clients

        6  and I have had that discussion, and their experience in MDLs

        7  is they prefer to waive *Lexecon* and have the judge that's

        8  presided over the proceedings try the cases.

        9           THE COURT:  Okay.  Mr. Stoller.

13:07:56 10           MR. STOLLER:  I was going to agree that the

       11  defendants have the right to waive *Lexecon*.

       12           In response to Mr. North's statement, the decision to

       13  waive *Lexecon* is not a decision that the three of us are going

       14  to make.  It's an individual plaintiff's choice.  We've got

13:08:09 15  some plaintiffs who can't travel for -- they're wheelchair

       16  bound and things of that nature.  And it's always going to be

       17  a plaintiff-by-plaintiff issue.

       18           Again, I'd prefer to resolve that early because I

       19  don't want to get into a situation where somebody chooses a

13:08:26 20  plaintiff for inclusion, whether it's the initial 48 or the

       21  first 12, which would be for discovery, which I think would be

       22  very problematic, but that that -- we get down the road into

       23  that case a bit, and then what happens is we now reach a

       24  deadline and we lose some number of plaintiffs for reasons

13:08:44 25  that aren't obvious in the first instance to the case, that

13:08:47   1    they can't travel, that they won't travel, and those sorts of

           2    things.

           3                And then, again, to the extent we've tried to create

           4    system that has balance to it, it becomes unbalanced.  I think

13:08:57   5    if we're going to have *Lexecon* waivers required as part of the

           6    bellwether process, it needs to be before we get into the

           7    selection process.

           8                THE COURT:  What is your response to Mr. North's

           9    concern that if we only put into the pool plaintiffs who have

13:09:10  10    waived *Lexecon*, the plaintiffs get to pick the pool?

          11                MR. STOLLER:  Well, plaintiffs always get to

          12    self-select, whether they waive *Lexecon* or not.  And that's

          13    not an issue, again, that I can control.

          14                To the point that he said that we would organize and

13:09:26  15    orchestrate something where only the best cases waive *Lexecon*

          16    and others do not, I think that puts a little of a nefarious

          17    spin on what we do, but I also understand that that's a

          18    concern that people in the defense chair would have in that

          19    position.  And that's why some judges don't go that route.

13:09:44  20                But I think it becomes an unfair proposition when you

          21    push us into a process and say, well, the *Lexecon* waiver comes

          22    later, and now we're going to start changing what has been

          23    attempted to be a fair and balanced process.

          24                So to me, it either needs to be something we handle

13:10:00  25    right at the beginning or it doesn't take place at all.  And

13:10:03  1    we're amenable to whichever you choose, but I think if we

2    start putting dates in the middle, that becomes a big problem.

3              MR. LOPEZ:  Your Honor, unfortunately, we're in a

4    state where one of the defendants is, so we -- the Arizona

13:10:20  5    plaintiffs are basically -- you know, I mean, that would be

6    ideal.  And I've been involved in many bellwether processes,

7    Your Honor.  But the real issue is getting your client who is

8    in Oklahoma to go anywhere.  Especially people that are

9    elderly or ill or for whatever reason.

13:10:38  10        Maybe there's a way for us to solve the Arizona

11   residence issue with the defense.  I think maybe give us an

12   opportunity to have a discussion with them about that, where

13   we can at least find some folks that are local, where it might

14   be a little easier.  At least if that's going to be the reason

13:10:58  15   we're going to get resistence from our clients to not want to

16   try their cases in Phoenix, Arizona.

17        But I think what we're saying is we endorse the idea

18   that you should be trying the bellwether cases.  And to the

19   extent we can control that process, with not only the lawyers

13:11:12  20   we have to deal with, but the clients, wherever they may be,

21   in their desire.  We understand that we've got to figure out a

22   way to do that.

23             THE COURT:  Well, why don't we do this.  I would like

24   you to take the bellwether stipulation and submit it as a case

13:11:47  25   management order with the fact sheets attached.  Let's say

13:11:51  1   you'll do that by a week from tomorrow.  And confer between

       2   now and then and see if you can agree upon how to address this

       3   issue.  If you can't agree, just note in the case management

       4   order, have a paragraph that deals with *Lexecon* waivers, and

13:12:08  5   just say the parties disagree and state your disagreement.

       6         I'm going to talk with a couple of judges who I know

       7   have dealt with this issue before in the meantime, get their

       8   thoughts.

       9         And when I enter that order, I will either adopt a

13:12:25 10   procedure that you all have agreed to, or, if you haven't

      11   agreed to, one that I think is fairest to both parties, and it

      12   may include using 28 -- or 292(d).

      13         My concern about 292(d), frankly, is that my ability

      14   to try a case in Oklahoma depends upon both the chief judge of

13:12:45 15   that circuit and the chief justice.  I think the chief justice

      16   would agree if it's part of an MDL, but if the chief judge of

      17   the district has a plaintiff in Oklahoma saying no, I want it

      18   to be tried by a local judge, I don't know if they'd agree.

      19   So we don't fully control that either.  But at least it gives

13:13:10 20   us some greater measure of control.

      21         So why don't you talk, see if you can find a way to

      22   do it.  And include it in that proposed order, which I'll look

      23   over when it gets filed.

      24         MR. NORTH:  Your Honor, I'm not trying to be

13:13:23 25   difficult and I agree with the procedure, but I just want to

13:13:25   1    make one point for the record.

2             I stand by the notion that my client is willing to

3    waive *Lexecon*.  I just don't want that to be construed as an

4    irrevocable waiver right now, because if we were to develop a

13:13:38   5    situation where this just simply -- we choose the bellwether

6    pool at the outset only from those cases that where *Lexecon*

7    has been waived and they have that power to determine, my

8    client might want to retain that power, too, and not waive it.

9             THE COURT:  All right.  That's on the record.

13:13:58  10             Let me talk about a couple other matters related to

11    this bellwether process.

12             You indicated in Docket 923 that you are going to get

13    me by March 15th a stipulation on joint records collection,

14    which we did not receive, that I've been able to see.  Do you

13:14:17  15    know where that stands?

16             MR. DALIMANTE:  I can address that, Your Honor.

17    John Dalimante.

18             I've been putting together an agreed upon order.  We

19    seem to be in agreement on everything.  The only reason why it

13:14:38  20    hadn't been submitted is my last conversation that I had with

21    Taylor Daly from defense counsel's office was that she wanted

22    to wait for the defendant -- the plaintiff fact sheet order to

23    come down so that we can then work something out on the order.

24    There was just tweaking it a little bit.  We can probably have

13:14:57  25    something filed by next Friday.  We're 99 percent of the way

13:15:02  1   there.

2   THE COURT:  Okay.  I'll just say in my order that

3   that will come in by next Friday.

4   MR. DALIMANTE:  Thank you, Your Honor.

13:15:22  5   THE COURT:  I want to make sure I understand the

6   procedure.

7   So there's this initial plaintiff pool, which is all

8   cases as of April 1st.  You then exchange lists of 24 to come

9   up with a group of 48.  You provide the initial sheets of

13:15:44 10   disclosure to each other for those within the next 60 days.

11   And it sounds like you then go collect records for all 48

12   people in the pool.  You think that will take potentially

13   until December 1st.

14   Then it says that on December 10th, you exchange

13:16:08 15   lists of ten.  So there will be 20 of the 48 to pick, half by

16   the plaintiffs, half by the defendants.  Each side picks four

17   cases from the other side's list of ten.  So that gives us

18   eight.

19   And then you say you meet and confer to see if you

13:16:30 20   can pick another four.  I'm assuming from the remaining 12 in

21   that list of 20; is that right?

22   MR. STOLLER:  Correct, Your Honor.

23   THE COURT:  And if you can't, then I pick those four

24   in the procedure you've described.  And that 12 becomes

13:16:47 25   discovery group one, which you anticipate will need a couple

13:16:52  1    of months of discovery.

2              And then the bellwether cases are picked from that

3         discovery group of 12; is that correct?

4              MR. NORTH:  Yes, Your Honor.

13:17:16  5         THE COURT:  You say out of those 12, each side will

6         present a list of six.

7              MR. DALIMANTE:  That's assuming, Your Honor, we don't

8         agree.  In theory, we could come out of the 12 and say we

9         agree on four, and then we would just submit the last two to

13:17:28 10    you.

11             THE COURT:  Okay.  The way it's read now -- the way

12        it reads now, I believe, is on March 1st, you exchange lists

13        of six, and then you meet to see if you can agree on six from

14        the list.  Well, if each present lists of six, that's the 12

13:17:46 15    in the group.  I suppose you --

16             MR. STOLLER:  In theory, we could have overlap.

17             THE COURT:  If there's overlap.  Okay.

18             A couple of questions on the actual stipulation that

19        you filed, which is at Docket 1153.  It's the one you filed on

13:19:15 20    March 18th.  It's titled Stipulation and Filing Regarding

21        Proposed Procedure for Party Fact Sheets.

22             In paragraph 2(A)(3)(d) on page 3, it says,

23        "Plaintiffs shall sign the PFS," which is the plaintiff fact

24        sheet, "and provide an executed affidavit attesting that the

13:19:58 25    information contained therein is true and correct."

13:20:03  1          Is that affidavit somehow different from the

       2    verification that you've actually put at the end of the fact

       3    sheet?

       4          MR. LOPEZ:  No, Your Honor.

13:20:12  5          THE COURT:  I just think that might be confusing.

       6    You might want to revise that in the standard order you

       7    provided because you've got a verification right there at the

       8    end of the fact sheet and saying an executed affidavit sounds

       9    like a separate document.

13:20:29 10          In paragraph 2(A)(4) on page 4 of your submission,

      11    you talk about what happens if deficiencies in the fact sheet

      12    have not been cured, and you say on lines 6 and 7, "The

      13    parties will submit the dispute to the Court in a manner to be

      14    prescribed by the Court."

13:20:58 15          When you submit this, just revise that to say, "The

      16    parties shall place a joint conference call to the Court," and

      17    we'll talk through how we can how most quickly get it resolved

      18    rather than you asking me at that point how to resolve it.

      19          And do the same thing on lines 21 and 22 on page 4.

13:21:23 20          On page 5, paragraph C(1), you say that, "Plaintiffs

      21    will execute and provide defendants with the record

      22    authorizations agreed upon by the parties."

      23          Have you agreed upon the authorizations?

      24          MR. DALIMANTE:  Your Honor, those are the

13:21:39 25    authorizations that we're working on that I mentioned earlier.

13:21:42  1    We hope they have those all taken care of by next week.

2              THE COURT:  So is that what you're going to include

3    in what you called the stipulation on joint records

4    collection?

13:21:54  5             MR. DALIMANTE:  Yes.

6              THE COURT:  Okay.  That's fine.

7              In the fact sheet itself, page 5 of the fact sheet

8    that's attached to Document 1153, it's titled Claim

9    Information Section 2, paragraph 1, I saw on the chart earlier

13:22:45 10   that there's now one that's Simon Nitinol filter case, so I

11   don't know if you want to add that to the list, or maybe put

12   that in as "other."  But since we've now got a case on that,

13   you might just want to put it in the list.

14             Page 10, paragraph 10(B).  Is it clear that all of

13:23:11 15   the plaintiffs counsel working with their clients on this will

16   understand what filter struts are?

17             MR. STOLLER:  The lawyers certainly will, Your Honor.

18             THE COURT:  Okay.

19             Page -- if you look at Page 6 of the fact sheet,

13:23:48 20   question 6, and you look at page 22, question 11, they're

21   really the same, it appears to me.  They're both asking if

22   you've had any other filters implanted.  Just seems to me a

23   little duplication.  Maybe I'm missing the distinction, but

24   you may want to combine those into a single question.

13:24:23 25             MR. STOLLER:  We wouldn't disagree, Your Honor.  This

13:24:25   1   is the form proposed by the defendants, and we are agreeable

2   to it.  If they're agreeable to take out one of those, it's

3   certainly fine with us.

4          MR. NORTH:  We'll clean that up, Your Honor.

13:24:38   5          THE COURT:  Okay.  On the defendants' fact sheet, at

6   the bottom of page 1, you require that any documents that

7   you're producing responsive to a question should be identified

8   with a Bates stamp number.  Do you want to do the same on the

9   plaintiffs'?  I didn't see it on the plaintiffs'.  It's just a

13:24:56  10   thought.  Might be helpful to have them identify it by Bates

11   number.  Maybe that would happen anyway.

12          MR. STOLLER:  I think the difference is, Your Honor,

13   in terms of the defendants -- or plaintiffs, there's going to

14   be a finite number of documents for each plaintiff.  You know,

13:25:09  15   they'll be John Smith 1 through 100, and whereas for the

16   defendants, they've been using consecutively numbered --

17          THE COURT:  I understand that.  But my only point is

18   to avoid any confusion, even if it's only 100 documents, you

19   may want to identify them by Bates number if you're referring

13:25:26  20   to them in the fact sheet.

21          MR. STOLLER:  We don't have a problem with that.

22          MR. DALIMANTE:  Your Honor, the only issue on that is

23   that the joint collection of records.  So we've agreed to use

24   the defendants' vendor to collect those records.  So the Bates

13:25:47  25   numbers that those documents presumably -- just in my dealing

13:25:52   1   with them historically -- they're going to assign a Bates

2   number to them that will be the defense Bates number, and when

3   we get them, we may reproduce them or attach certain portions

4   of them, but they will have that same reference.

13:26:06   5        THE COURT:  That's fine.  I guess my only point is if

6   you're talking about a document in an answer, it should be

7   identified by Bates number, whoever affixed it to it.  And I

8   just didn't see that on the --

9        MR. DALIMANTE:  We can do that to the extent we

13:26:19  10   already have the records and just produce it.  In addition,

11   too, we can assign the number, too.

12        THE COURT:  Okay.  A similar question for you to

13   consider.  At the end of the defendants' sheet, Page 8, it

14   says at the top, "Please ensure that the production of

13:26:43  15   documentation includes specific reference to the question to

16   which the document is provided in response."

17        Consider whether you want plaintiffs to do the same

18   thing.  It's just a thought.  I don't have a strong feeling on

19   it.

13:27:06  20        Those are my thoughts on the fact sheet and the

21   bellwether procedure.  What I'd like you to do, then, is

22   submit to me the stipulated order setting the bellwether

23   procedures and, if necessary, identify your disagreement on

24   *Lexecon* waiver in the paragraph.

13:27:24  25        And submit to me, I assume as a separate order, a

13:27:28  1   stipulated order on the fact sheets that includes the

      2   stipulations at the beginning of Document 1153, with the fact

      3   sheets attached, and I'll just enter those two orders so that

      4   we've got that in place.

13:27:42  5          MR. STOLLER:  And we had discussed, Your Honor,

      6   merging those into a single order, if that's okay.

      7          THE COURT:  Yeah.

      8          MR. STOLLER:  I don't think it will be a problem for

      9   you.

13:27:50 10          THE COURT:  No, it's not a problem for me.  It will

     11   be a fairly long order.  The order itself will be 12 or 15

     12   pages, and then have all of the fact sheets attached.  But if

     13   it's easier to do it that way, that's fine.

     14          MR. STOLLER:  They had originally been one, but then

13:28:09 15   we separated them into two for timing differences in terms of

     16   the filing of different orders --

     17          THE COURT:  That's fine.

     18          Okay.  Let me make a note here.

     19          All right.  Let's talk for a minute about a couple of

13:29:02 20   other subjects.  My Case Management Order Number 8 in

     21   Section 10 established a procedure for you to address

     22   depositions of previously deposed witnesses and to come up

     23   with any additional detailed procedures.

     24          You said in your joint report that you would have a

13:29:20 25   stipulated deposition protocol to me before today, but I

13:29:23  1    didn't see one.

2              MR. STOLLER:  We're still in the process of

3    negotiating that, Your Honor.  We had a meeting on it and a

4    couple of discussions.  I anticipate we'll have something in

13:29:33  5    the next week or ten days.  We want to get that done because

6    depositions are going to be starting relatively soon.

7              THE COURT:  Shall we say April 15th?

8              MR. STOLLER:  That's fine with us, Your Honor.

9              THE COURT:  Okay.

13:29:58 10         I'm assuming from your joint report that after you

11   met and talked about preservation issues, you were both

12   satisfied that what needs to be preserved is being preserved.

13   Is that fair?

14             MR. STOLLER:  In terms of ESI, Your Honor?

13:30:16 15             THE COURT:  Right.

16             MR. STOLLER:  I think we knocked down the process

17   there.  It's part of the understanding what they have, it's

18   hard to understand whether it's been preserved until we know

19   what they had and then what they did to collect --

13:30:25 20             THE COURT:  Well, what you said in the joint report

21   was that you met and conferred and decided an order was not

22   necessary given the common law duty that exists.

23             MR. STOLLER:  Sorry.  Different issue, then, that I

24   was trying to address there.  We didn't -- we met and decided

13:30:36 25   we didn't think we needed to have a separate preservation

13:30:39  1   order in this case to address preservation issues, and that

2   the existing common law obligations and obligations under the

3   Rules of Civil Procedures as developed in the case law are

4   sufficient to cover the parties in this lawsuit.  And we

13:30:52  5   didn't think we needed a separate protocol on it.

6           THE COURT:  All right.

7           Agreed?

8           MR. NORTH:  Yes, Your Honor, agreed.

9           THE COURT:  All right.  I've seen that the defendant

13:31:05  10  has filed a memorandum about the propriety of addressing

11  equitable tolling.  I'm assuming that will just get briefed in

12  the normal course and plaintiffs are planning to respond?

13          MR. STOLLER:  That's correct, Your Honor.

14          THE COURT:  Okay.  After that's fully briefed, I'll

13:31:25  15  look at it.  And if I think we need argument, I'll let you

16  know and get you on the phone.

17          By the way, while I'm thinking about it, I started

18  this morning by mentioning the case that involved

19  Ms. Noterman, the deceased plaintiff.  My judicial assistant

13:31:42  20  called her counsel, and her counsel indicated that her husband

21  has been designated as the executor of the estate.  The

22  plaintiff wants to move to amend to name the estate as the

23  plaintiff in this case, and they'll get that motion to amend

24  filed within the next two weeks.

13:32:11  25          It seems to me in light of that, what we ought to do

13:32:13  1    is -- we'll make sure it gets filed; if it doesn't we'll call

2    them back -- just have you respond to the motion to amend.  If

3    the defendants think the estate is not a proper plaintiff, you

4    can oppose the motion to amend.

13:32:32  5         I'll keep on file the motion to dismiss for now, so

6    that if I deny the motion to amend and she's an improper

7    plaintiff, we can dismiss the case.  But it seemed to me just

8    having you respond to the motion to amend and getting it

9    briefed in that way was the easiest way to deal with it.

13:32:51 10         MR. NORTH:  That's fine, Your Honor.

11         THE COURT:  Okay.

12         In terms of depositions, you indicated in your joint

13    report that three depositions had been scheduled for late May

14    and early June, you're in the process of scheduling 12 months,

13:33:34 15    you have a dispute regarding Brian Berry that you're talking

16    about.

17         Has that been resolved, Mr. North?

18         MR. NORTH:  I think we have resolved that, at least

19    for the present time, Mr. Boatman and I have.  And we now have

13:33:47 20    seven scheduled, at least that are being scheduled fairly

21    quickly.

22         THE COURT:  Okay.  Well, the question I wanted to

23    raise, I was a little concerned there were only three

24    scheduled and that those were already stretching into June.

13:34:00 25    And I was going to ask do we need to block out deposition

13:34:02  1    weeks in the summer and double or triple track it to make sure

      2    we get everybody deposed?  And it's really up to you as to

      3    whether that's necessary or you think you can get things

      4    scheduled.  Recognizing we've got an October 28th fact

13:34:16  5    discovery deadline.

      6            MR. NORTH:  Your Honor, we only received the list

      7    from them three weeks ago.  We're getting these scheduled as

      8    fast as possible.  In concept, what the Court proposes sounds

      9    good, but the problem is of the initial 16 I think they've

13:34:30 10    named, only two are presently employed by the company.  So 14

     11    of them are scattered to the winds, and obviously if we had

     12    say-so, we would try to get them all once at one location.

     13    But many of these people left the company five, eight, ten

     14    years ago, and we just don't have that sort of influence.

13:34:50 15            THE COURT:  Well, are you confident, Mr. North,

     16    you'll be able to get the sufficient -- get the depositions

     17    scheduled sufficiently in advance of the discovery deadline

     18    not to create problem?

     19            MR. NORTH:  I think all of the depositions they've

13:35:02 20    requested thus far, we'll have dates for them between now and

     21    the end of June, definitely.

     22            There's one problem I think, and I just mentioned

     23    this to Mr. Boatman, we just discovered one witness is leaving

     24    today for six weeks in Europe.  We had a hard time reaching

13:35:17 25    her.  She hadn't been with the company for seven years.  We

13:35:20  1   finally found her yesterday, only to learn she's going to

2   Europe for six weeks today.

3        But other than that, we are in touch with all of

4   them, and we think we'll have dates for the remaining six or

13:35:30  5   seven that we haven't given them, and those dates will take

6   place between now and the end of June.

7        THE COURT:  All right.  At the next case management

8   conference, if you think we need to do some block scheduling

9   let me know and we'll get it in place so there's time to get

13:35:46  10   the depositions done.

11        The only other issue I have is -- well, just two

12   matters.  One is to set the next case management conference,

13   but also to just get a report on what, if anything, is

14   happening in the state court litigation.

13:36:12  15        Can you give me a sense for what's happening with

16   those cases?  On either side.

17        MR. LOPEZ:  Well, I know there's a case called

18   *Austin*, that we may have mentioned before, that is -- has a

19   case management order, a scheduling order, and we're

13:36:28  20   coordinating with counsel.  Plaintiff's counsel in that case

21   are also on the plaintiffs' leadership committee.  And that's

22   the -- maybe Mr. North knows differently because there might

23   be other cases, but that's probably the most active state

24   court case.  And we are trying to coordinate with that case

13:36:50  25   from the standpoint of, you know, if we notice something,

13:36:52  1    they're going to coordinate with us.  If they want to pursue a

          2    certain kind of discovery, because of their deadline we'll

          3    figure out a way to fit it into our schedule at the same time,

          4    even though theirs is probably a little more ambitious than

13:37:05  5    what we have here, Your Honor.

          6          That's the only state court case I'm aware of that

          7    has an ongoing scheduling order that's marked -- moving

          8    towards trial.

          9          MR. DALIMANTE:  We have two.  We have two in the

13:37:17 10    Maricopa County Superior Court.  Those two cases, we have met

         11    with the judge and have agreed to track what is happening with

         12    this court.  So that's all been coordinated.

         13          MR. NORTH:  I think that's accurate.  There's only

         14    one case that any discovery is occurring in, that's the case

13:37:40 15    Mr. Lopez mentioned.  We are seeing an uptick in filings.

         16    We'll see where this leads us.  We saw a case filed a couple

         17    of weeks ago in Missouri with ten plaintiffs joined from

         18    throughout the country in an effort to defeat diversity.

         19          So we're seeing some uptick in state court cases, but

13:37:58 20    as far as activity in them, that's the only one right now.

         21    And most of the others have agreed to sort of backseat what

         22    happens in the MDL.

         23          THE COURT:  Okay.  My thought was that we ought to

         24    have the next case management conference in June.  Does that

13:38:22 25    make sense to people?  Anybody see a need to do it earlier

13:38:25  1    than June?

2              MR. BOATMAN:  Your Honor, we have depositions

3    starting in May.  To the extent we have issues on deposition

4    protocol, it's the only thing -- and we can handle that by

13:38:38  5    phone.

6              THE COURT:  Right.

7              MR. BOATMAN:  But that's the only issue I can think

8    of that we would need to have resolved before.  I think the

9    first deposition's May 2nd.

13:38:51 10              THE COURT:  Yeah.  Okay.  That's fine.  I don't think

11    it makes sense to set a case management conference before

12    May 2nd.  But if you have a disagreement, just call me and

13    we'll get you on the phone within a few days so we can get

14    those resolved.

13:39:10 15         (The Court and the courtroom deputy confer.)

16              THE COURT:  Counsel, how does Wednesday, June 22nd,

17    look to you all?

18              MR. NORTH:  Your Honor, that could not be more

19    perfect for me.  We've got a deposition the day after that

13:40:49 20    here.

21              THE COURT:  All right.  Let's set the next case

22    management conference, then, for 10 a.m. on Wednesday,

23    June 22nd.  But, as indicated, if issues come up, feel free to

24    call me before then.

13:41:09 25              What other matters do we need to address from

13:41:12  1  plaintiffs?

2        MR. NORTH:  Your Honor, one mea culpa.  Just when we

3  have gotten to the Court and the Court has entered the amended

4  case management order correcting the short-form complaint

13:41:25  5  because of the omission of the jury demand, my client raised

6  the fact with me -- which none of us had realized -- that the

7  checkmarks for the -- which filter it is in the short-form

8  complaint conflate into one line, G2X and G2 Express, even

9  though they are different models of filters.

13:41:44  10        And so we're going to -- Ms. Kowalzyk from my office

11  is working with Mr. Clark from their office to get a corrected

12  short-form complaint that differentiates between the two, and

13  we'll be submitting that soon.

14        THE COURT:  Okay.

13:41:56  15        MR. NORTH:  And I apologize for the confusion.

16        THE COURT:  Okay.  This is your last chance.

17        Any other issues we need to talk about?

18        MR. STOLLER:  Not from plaintiffs, Your Honor.

19        MR. NORTH:  None from defendants.

13:42:09  20        THE COURT:  Okay.  Thank you all.  Travel safely.

21      (End of transcript.)

22                        *  *  *  *  *

23

24

25

1                        **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14         DATED at Phoenix, Arizona, this 11th day of April,

15   2016.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25