1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3                    _____

4    **In Re: Bard IVC Filters**          ) MD-15-02641-PHX-DGC
     Products Liability Litigation        )
5                                         )
                                          ) Phoenix, Arizona
6                                         ) June 21, 2016
                                          )
7    _____)

8

9

10

11

12         BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

13              REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                  FOURTH SCHEDULING CONFERENCE

15

16

17

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2


3    Plaintiffs' Co-Lead/Liaison Counsel and State/Federal Liaison
     Counsel:
4
             Gallagher & Kennedy
5            By: **ROBERT W. BOATMAN**, ESQ.
             2575 East Camelback Road, Suite 1100
6            Phoenix, AZ  85016

7            Lopez McHugh
             By: **RAMON ROSSI LOPEZ**, ESQ.
8            100 Bayview Circle, Suite 5600
             Newport Beach, CA  92660
9

10   Plaintiffs' Steering Committee Counsel:

11           Gallagher & Kennedy
             By: **PAUL LINCOLN STOLLER**, ESQ.
12               **C. LINCOLN COMBS**, ESQ.
             2575 East Camelback Road, Suite 1100
13           Phoenix, AZ  85016

14

15   Also on behalf of Plaintiffs:

16           Faraci Lange, LLP
             By:  **HADLEY L. MATARAZZO**, ESQ.
17           28 E. Main St., Ste. 1100
             Rochester, NY  14614
18

19

20

21

22

23

24

25

1                    **A P P E A R A N C E S   (CONTINUED)**

2

3    For the Defendants:

4            Nelson Mullins Riley & Scarborough, LLC
             By: **RICHARD B. NORTH, JR.,** ESQ.
5                **MATTHEW B. LERNER,** ESQ.
                 **ELIZABETH C. HELM,** ESQ.
6            201 17th Street NW, Suite 1700
             Atlanta, GA  30363
7

8            Snell & Wilmer
             By: **JAMES R. CONDO,** ESQ.
9                **AMANDA C. SHERIDAN,** ESQ.
             400 East Van Buren
10           Phoenix, AZ  85004

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

10:01:31   1

2

3          THE COURTROOM DEPUTY:  MDL case 15-2641, Bard IVC

4     Filters Products Liability Litigation, on for the Fourth

10:01:44   5     Scheduling Conference.

6               Will the parties please announce.

7               MR. BOATMAN:  Good morning, Your Honor.  Bob Boatman,

8     Ramon Lopez, and Paul Stoller for the plaintiffs.  We have

9     other members of the PLC that will be speaking today and I'll

10:01:56  10     introduce them as their issue comes up.

11               THE COURT:  All right.  Good morning.

12               MR. LOPEZ:  Good morning, Your Honor.

13               MR. STOLLER:  Morning, Your Honor.

14               MR. NORTH:  Good morning, Your Honor.  Richard North

10:02:03  15     on behalf of the defendants.  And with me today from my office

16     at Nelson Mullins is Kate Helm, and then we have Mr. Condo and

17     Amanda Sheridan from Snell & Wilmer, and then Matthew Lerner,

18     my partner.

19               THE COURT:  All right.  Good morning.

10:02:19  20               Counsel, I'd like to start by addressing the

21     privilege issue that I asked you all to provide additional

22     briefing on.

23               I've read your supplemental memoranda that were filed

24     yesterday, and I've read the exhibits to the memoranda.  I'm

10:02:40  25     interested in additional thoughts you have now that you've

10:02:44   1   seen each other's memoranda.  This is all in support of the

2   plaintiffs' motion to compel, so why don't we start with

3   plaintiffs' counsel.

4         MR. COMBS:  Good morning, Your Honor.  Lincoln Combs

10:03:03   5   for the plaintiffs.

6         I don't think anything in the briefing changed our

7   position, Your Honor.  It's admittedly a close call and

8   difficult choice, I think, between the two, but I think at the

9   end of the day it's only logical that New Jersey, the Bard

10:03:19  10   headquarters where all of the legal advice emanates from and

11   where all the corporate decisions are ultimately made,

12   controls the privilege log issue.  And that's certainly the

13   only law that was ever debated by the parties.

14         If you look at Bard's privilege logs, they actually

10:03:40  15   reference some of the language from the kind of general

16   federal common law in Vioxx that mirrors New Jersey law on,

17   for example, disseminating communications.  They talk about

18   two employees who needed this for their job description.  That

19   almost exactly parallels the Vioxx language.

10:04:02  20         So I think all along it's been the presumption that

21   it was federal common law, which is basically the same as New

22   Jersey law.  And so this Arizona law kind of came as a curve

23   ball when Bard filed its response.  So I think that really

24   goes to the heart of the issue that really it's been an

10:04:21  25   attempt by Bard to kind of shoehorn in new law they think is

10:04:26   1   favorable to them.  So I don't think our position has changed,

2   Your Honor.

3          THE COURT:  Let me ask you a couple of questions,

4   Mr. Combs.

10:04:52   5          The inquiry under Section 139, Comment (e), that is

6   most relevant, in my view, is where or if a prior relationship

7   existed between the parties to the communication.  It's not

8   between Bard and its corporate parent, it's not between Bard

9   and the plaintiff, it's the parties to the allegedly

10:05:29  10   privileged communication.

11          And I guess the question is what do I do in a case

12   where there's 133 communications with different parties?  Do

13   we really try to do a communication-by-communication

14   determination?  Which, to me, is problematic.  I mean the

10:05:58  15   notion that in a single case the law that applies could change

16   from e-mail to e-mail depending on who happens to be cc'd or

17   is writing or responding sounds real difficult to apply, and

18   impossible for parties to predict ahead of time.

19          So I'm interested in whether you think that's what

10:06:20  20   you think I ought to be able to be doing, literally a

21   communication-by-communication determination.

22          And the second question is, if I'm not going to do

23   that, where is it that you think the parties to the

24   communication -- well, do you think there was a prior

10:06:34  25   relationship between the parties to the communication?  And,

10:06:37  1   if so, where do you think it was centered?

2   MR. COMBS:  I'll answer the second question first.  I

3   think obviously the Bard employees, the moment they're hired

4   they have a relationship with Bard's attorneys.  And it's

10:06:51  5   not -- I think --

6   THE COURT:  You mean the moment the attorneys are

7   hired the employees have a relationship?

8   MR. COMBS:  Either/or, yeah.  Certainly prior to any

9   communications.  At the moment the attorney is hired -- and

10:07:03 10   I'm -- I was thinking of it more in the context of in-house

11   counsel communicating with the employee.  When the employee is

12   hired, he forms a relationship with Bard legal department.

13   It would be the same analysis for hiring outside

14   counsel.

10:07:16 15   But most of the communications at issue, especially

16   in the sampling, are with in-house counsel or dissemination of

17   in-house counsel's legal advice.

18   So I think when I read the Restatement comment,

19   Comment (e), on that factor it seemed like they were trying to

10:07:31 20   get at somebody going out of state to talk to a lawyer or

21   accountant or whatever.  In the corporate context, it seems

22   like that's obvious that there's a prior relationship between

23   the corporation's legal department and their in-house lawyers

24   and their employees.

10:07:49 25   THE COURT:  Assuming that's true, where is it

10:07:54  1    centered?

2            MR. COMBS:  In New Jersey, Your Honor.  The

3    headquarters of Bard where all the legal advice emanates from

4    and where all the decisions are ultimately made, and where the

10:08:08  5    lawyers were reasonably relying on and advising.  We cited

6    some case law to that effect.

7            So I don't think Bard is giving different legal

8    advice on privilege and acting differently depending upon

9    where its subsidiaries are.

10:08:23 10            To the extent a wholly owned subsidiary in even this

11    sense is really a separate entity, which we would argue is not

12    the case and Bard should be treated as one attorney and one

13    client, one entity, for this purpose.

14            To answer your other question about individualized

10:08:39 15    analysis, I agree, Your Honor, that there should be a

16    presumption of which law applies, or one forum has the

17    significant relationship to this litigation, to the

18    communications at issue.  However, Section 139(2) does require

19    an individualized analysis of certain types of communications

10:08:59 20    because there's situations where New Jersey law is going to

21    govern but Arizona law, which has in some areas a narrower

22    privilege, should still apply because 139 favors

23    admissibility.  And those factors, especially materiality, are

24    going to have to be on individualized basis.

10:09:17 25            So we'd argue, for example, like, two Arizona Bard

10:09:21  1   employees communicating with each other, that's definitely not

2   privilege under Arizona law which requires communication

3   between an attorney or their staff communicating the

4   attorney's advice, and there's no reasonable expectation two

10:09:35  5   Bard employees in Arizona communicating with each other

6   wouldn't be subject to Arizona's law.  There's no strong

7   countervailing consideration, I think is the language of the

8   Restatement, to not apply Arizona law in that situation.

9            So there is somewhat of an individualized

10:09:52 10   determination under the second part of the analysis,

11   Subsection 2 of 139.

12            THE COURT:  Do you agree that Bard Peripheral

13   Vascular is a separate corporation from the parent?  It is its

14   own corporation?

10:10:11 15            MR. COMBS:  It is an Arizona corporation, yes.  It's

16   a business entity filed with the Arizona Corporation

17   Commission, yes.

18            THE COURT:  And you agree that its principal place of

19   business is Arizona?

10:10:24 20            MR. COMBS:  Yes, Your Honor.  I just -- we would

21   argue for this purpose, this analysis, it should be -- Bard

22   should be treated as one entity.  And there's a case that we

23   cited that goes through -- there's lots of context where a

24   parent and wholly subsidiary entity -- wholly owned subsidiary

10:10:44 25   are treated basically as one entity in different legal

10:10:47   1   contexts.

2              THE COURT:  Okay.   Thank you.

3              MR. NORTH:  Your Honor, Ms. Helm will address the

4   issue on behalf of the defendants.

10:11:01   5              THE COURT:  Okay.

6              MS. HELM:  Thank you, Your Honor.

7              We have an interesting situation where once --

8              THE COURT:  Pull both mics in front of you, would

9   you.  Thanks.

10:11:18  10              MS. HELM:  Is that better?

11              THE COURT:  Yes.

12              MS. HELM:  Thank you.  Apologize.

13              We have an interesting situation where the internet

14   and technology has once again gotten ahead of the law in this

10:11:27  15   case.  Neither side located or was able to point to any cases

16   that specifically address the issue before the Court where you

17   have two clients located in two different geographic

18   locations.

19              But I will address the two questions that the Court

10:11:46  20   asked right off the bat.  And the first question was, was

21   there a prior relationship?  And the answer is yes.

22              And under the Restatement, the Court should look to

23   the state that has the most substantial relationship to that,

24   those communications.  That is Arizona.  BPV is not only an

10:12:07  25   Arizona corporation with its principal place of business in

10:12:10    1    Arizona, the communications at issue relate to activities that

            2    took place in Arizona.  The privilege log relates to issues

            3    relating to the design, the marketing, the monitoring, and

            4    even lawsuits relating to the IVC filters at issue.

10:12:29    5         The undisputed evidence before the Court through the

            6    declaration of Mr. Carr and in his deposition is that those

            7    activities all took place in Arizona.  There were Bard BPV

            8    employees in Arizona that were responsible for that.  In fact,

            9    Mr. Carr testified in a 30(b)(6) deposition that Bard, C.R.

10:12:52   10    Bard, provided quality processes, regulatory processes, but

           11    the decisions were made in Arizona.  The communications with

           12    the FDA came from Arizona.  The 132 entries on the sampling of

           13    the privilege log relate directly to those specific activities

           14    that are at issue in the lawsuit and occurred in Arizona.

10:13:19   15         The fact that the communications came from New Jersey

           16    is not the standard.  That would be like saying I provided

           17    advice to a client in Arizona so Georgia law applies.  And the

           18    Restatement in Section (e) clearly looks at where it was

           19    received.  But for purposes of the prior relationship, it is

10:13:42   20    centered around activities in Arizona.  Even the

           21    communications that were between, for example, an in-house

           22    lawyer in New Jersey and another employee in New Jersey relate

           23    directly to the activities and the events and the actions of

           24    BPV in Arizona.

10:14:10   25         And Mr. Combs mentioned that in the privilege logs we

10:14:15   1    didn't refer to Arizona law and they made a comment in their

2    brief that in the meet and confer we didn't refer to Arizona

3    law.

4           I would remind the Court in Case Management Order

10:14:31   5    Number 2 you gave the parties instruction how to handle the

6    privilege log issues, and I'm paraphrasing your order but you

7    said follow the work product of the Nevada case that had

8    previously addressed a number of privilege log issues, and

9    then you specifically said that this does not preclude the

10:14:47  10    parties from arguing that different legal standard or

11    different law applies should the privilege log issues get

12    before the Court.  That's exactly what has happened.

13           We met and conferred.  We discussed document by

14    document.  Frankly, we didn't have a whole lot of discussion

10:15:03  15    about the law other than the ruling in the *Phillips* court in

16    Nevada until we started the briefing on the motion to compel

17    and we saw that the court -- the plaintiffs had not addressed

18    the conflict of law, choice of law issue required under 501.

19           So the fact that I didn't specifically address

10:15:21  20    Arizona law or that we discussed different topics is not

21    dispositive, and, frankly, I don't even think should be

22    considered because the court recognizes 501 requires a choice

23    of law analysis.

24           So I believe, again, our position is no different

10:15:39  25    than it was, just like the plaintiffs', in the papers.  These

10:15:43   1   communications are centered around activities and events and
       2   decisions being made in Arizona.  The information is coming to
       3   Arizona employees who are ultimately having to make decisions
       4   based on legal advice.
10:15:59   5           There is no question the attorneys are in New Jersey.
       6   None whatsoever.  We don't dispute that.  We also don't
       7   dispute there are a small handful of communications that,
       8   based on the documents currently before the Court, are
       9   limited, did not appear to come to New Jersey -- I mean to
10:16:16  10   Arizona.  Excuse me.  But, again, they address activities
       11   specifically relating to BPV's actions, BPV's work, the claims
       12   against BPV.
       13           THE COURT:  Question about Subsection (e), or Comment
       14   (e).  By using the phrase "prior relationship," it appears to
10:16:42  15   me what the drafters of the Restatement are referring to is a
       16   relationship that existed prior to the communication in
       17   question.  And the relationship is not, as I mentioned,
       18   between Bard Peripheral Vascular and Bard Incorporated, which
       19   is the relationship you addressed in your supplemental
10:17:05  20   memorandum, it's between the parties to the communication.
       21           So if we assume for a minute that many or maybe even
       22   most of these communications are between a BPV employee in
       23   Arizona and a Bard corporate lawyer in New Jersey, where do
       24   you think the relationship existed or was centered between
10:17:29  25   those people before the communication in question?

10:17:34  1          MS. HELM:  It was centered in Arizona.

       2          THE COURT:  Why?

       3          MS. HELM:  Because the BPV employee in Arizona is

       4    responsible for the actions.  All of the events for which

10:17:47  5    they're seeking legal advice are occurring in Arizona.  The

       6    actors are in Arizona.  BPV is an Arizona resident.

       7          So if I have a relationship with a client in South

       8    Carolina and I physically sit in Georgia, the fact that I'm in

       9    Georgia is not a determining factor.  The privilege belongs to

10:18:13 10    the client, not to the lawyer.  And the fact that the

      11    lawyer -- I can't imagine the chaos it would create if you

      12    said the privilege is triggered by where the lawyer sits as

      13    opposed to where the client is and where the actions are going

      14    to take place.

10:18:30 15          And as a resident of the State of Arizona, BPV's

      16    activities are clearly centered here and BPV is subject to the

      17    laws of the State of Arizona.

      18          THE COURT:  Where do you think the law of New Jersey

      19    and the law of Arizona are different that is relevant to the

10:18:53 20    issues we're addressing in this motion to compel?

      21          MS. HELM:  The law of the State of Arizona, as the

      22    Court is already familiar with, has, I would use the term

      23    broader approach to the attorney-client privilege, has

      24    recognize a broader approach, although you have to strictly

10:19:12 25    construe it to the privilege, where New Jersey takes a more

10:19:17  1    limited approach to the privilege.

2             I read a case, albeit an old one from the '80s, that

3        basically said New Jersey has not yet addressed and the way

4        their law is set up doesn't really address the attorney-client

10:19:31  5    relationship in an in-house situation where you have a

6        combined communication that is in part privileged and in part

7        could be construed business.  I think Arizona has looked at

8        that and has said we recognize in-house counsel, we recognize

9        communications in the corporate context on a broader basis

10:19:51 10    than New Jersey.

11            THE COURT:  So of the specific issues where the

12       parties are in disagreement that have been briefed, where do

13       you think choice of law makes a difference?

14            MS. HELM:  I think the plaintiffs take the

10:20:06 15    position -- I'll use an example they continue to raise, and

16       that is communications by a paralegal.  They take the position

17       those are not recognized.  We take the position that the

18       Arizona statute specifically addresses communi- -- I mean it

19       specifically talks about communications by a paralegal.  So

10:20:21 20    that would be an example where I think it would make a

21       significant difference.  Although I want to be careful,

22       because I believe the plaintiffs conflate and I don't want to

23       conflate work product and attorney/client privilege.

24            And a lot of -- not all of them, but a lot of the

10:20:37 25    communications from paralegals that are on the privilege log

10:20:40   1   are in, our position, they're in the work product context

2   because they're communications relating to events that

3   occurred because a lawsuit had been filed.  But there are some

4   that are still at issue that aren't in that context.

10:21:08   5        THE COURT:  What is your response to the question of

6   whether this will need to boil down to a

7   communication-by-communication choice of law determination?

8        MS. HELM:  I think the Restatement addresses that and

9   says the Court should apply the law of the state with the most

10:21:27  10   substantial relationship or most substantial contact.  I think

11   the communication -- if you follow the Restatement, you put

12   the umbrella of one state over -- state's law over the

13   communications, I think that's what the Court should do.  I

14   think particularly in a situation where you're not just the

10:21:46  15   forum in an MDL, Arizona is the home state of the main named

16   defendant, the actor about whom actions are at issue in this

17   case.  And so this is not just a situation in MDL where you

18   are the forum, you also have an Arizona resident as a

19   defendant, as the main defendant, in the lawsuit.

10:22:13  20        THE COURT:  Okay.  Did you have other points you

21   wanted to make?

22        MS. HELM:  No, Your Honor.  Thank you.

23        THE COURT:  All right.  Thanks.

24        Mr. Combs, any other thoughts?

10:22:23  25        MR. COMBS:  Just to respond to a couple of Ms. Helm's

10:22:26   1   points, Your Honor.

2   Ms. Helm just admitted something we've said all along

3   is that Bard has always acted in reliance on New Jersey law.

4   And as she just said, it wasn't until briefing this issue to

10:22:41   5   the Court in March or April of this year where they started

6   looking at Arizona law.  And that's one of the factors in the

7   Restatement on which law should apply is whether somebody had

8   relied on -- relied on a particular state's jurisdiction and

9   it would be unfair to apply another law.

10:23:02   10   THE COURT:  Well, but isn't that reliance referring

11   to reliance at the time of the communication?

12   MR. COMBS:  Correct, Your Honor.  Yes.  Reliance at

13   the time of the communication.  Everybody was relying on New

14   Jersey law.  That's what Ms. Helm --

10:23:17   15   THE COURT:  You're saying in each of the

16   communications that are at issue, they're clearly relying on

17   New Jersey law?

18   MR. COMBS:  Bard's legal department, when they're

19   acting -- conveying legal advice, the privilege law they're

10:23:33   20   relying is New Jersey law.

21   THE COURT:  What's the basis for that assertion?

22   MR. COMBS:  Because Ms. Helm just said, and we said

23   all along --

24   THE COURT:  She's shaking her head, so I don't think

10:23:41   25   she agrees --

10:23:43  1        MR. COMBS:  She can certainly rebut me.

2        THE COURT:  Let's not cite her as the source.  What

3  is your source for saying that the --

4        MR. COMBS:  Bard did not --

10:23:50  5        THE COURT:  -- Bard legal department --

6        MR. COMBS:  Bard's privilege --

7        THE COURT:  -- relies on New Jersey --

8        MR. COMBS:  -- logs were constructed.  Their

9  communications going back throughout this -- they never

10:23:58  10  discovered Arizona law until --

11        THE COURT:  Those are all -- those are all post

12  communication communications.  Those are after the privilege

13  log communications occurred in the context of this case.

14        MR. COMBS:  Right.  So how could they be saying they

10:24:11  15  relied on Arizona law in making these communications?

16        THE COURT:  Well, no.  I'm not sure we're talking

17  about the same thing.

18        It seems to me that when I am looking at reliance for

19  purposes of Section 139, the reliance I'm focusing on is not

10:24:27  20  your reliance or these attorneys' reliance in this litigation,

21  or even in the litigation that preceded the MDL.  It's the

22  reliance of the lawyer and the person receiving the

23  communication that is at issue at the time the communication

24  occurred.

10:24:42  25        My question is what is your basis for saying that all

10:24:45  1   of those communications relied on New Jersey law?

2       MR. COMBS:  Because they didn't even discover the

3   Arizona privilege law until March or April of this year --

4       THE COURT:  These lawyers --

10:24:59  5       MR. COMBS:  -- started briefing this issue.

6       THE COURT:  -- may not have.  What's your basis for

7   saying the in-house attorney in New Jersey who is writing to

8   the director in Arizona was relying on -- I should make the

9   assumption that they were relying on New Jersey law?

10:25:12 10       MR. COMBS:  That's the presumption in the case law,

11   Your Honor, where New York corporations are advising on

12   privilege.  We cited couple of those cases.  And New York

13   corporations are presumed to have applied New Jersey law when

14   advising their clients about privilege and communicating

10:25:28 15   privilege.

16       THE COURT:  Those cases, I think, say that if a

17   lawyer is communicating with a New York corporation, the

18   presumption is the lawyer is talking about New York law.  I

19   think that's what the case says.

10:25:40 20       MR. COMBS:  I think they're communicating with

21   people -- okay.

22       THE COURT:  Am I wrong about that?  I mean, I think

23   the -- let me pull up those cases that you cite.

24       It says, for example, in the *Compuware*,

10:25:58 25   C-O-M-P-U-W-A-R-E, *Corp* case, which is from Michigan, it holds

10:26:07  1    that a New York company's lawyers advising on privilege surely

2    relied on the protections of New York law.

3              Next case.  Holding that attorneys for New York

4    corporate defendant probably would have consulted New York

10:26:23  5    law.  So it's saying we're presuming they applied the law of

6    the state in which the corporation was based.

7              Bard Peripheral Vascular is an Arizona corporation

8    with headquarters in Arizona.  So wouldn't these cases say I

9    should presume that the lawyers were applying Arizona law?

10:26:43 10             MR. COMBS:  Well, the distinction is that's where the

11   lawyers are in those cases.  I think we're looking at it two

12   different ways, Your Honor.  But that's where the lawyers

13   were.  I think that's a fair presumption.  And I think --

14             THE COURT:  Well, so are you saying --

10:26:57 15             MR. COMBS:  I --

16             THE COURT:  -- I should presume that when you're

17   advising an Idaho corporation, you're going to be advising

18   that corporation on the basis of Arizona law because you're

19   based in Phoenix?

10:27:09 20             MR. COMBS:  I think that gets to my second point I

21   was going to make, Your Honor, is that this analogy of outside

22   counsel, you know, what Nelson Mullins might advise the client

23   doesn't fit the corporate context of a parent in a wholly

24   owned subsidiary where all their in-house lawyers, basically

10:27:24 25   the same corporation, are in New Jersey.  That model doesn't

10:27:28  1    fit the outside counsel.  And that would mean that Bard -- all

2    of Bard's lawyers were practicing Arizona law?  I don't think

3    that's -- I don't think that's how it works.  I don't think

4    that's how the Arizona bar would see it.  These are New Jersey

10:27:43  5    lawyers advising a New Jersey corporation and communicating to

6    a New Jersey based corporation and its employees.

7              THE COURT:  Well, you're asserting, then, I should

8    view Bard Peripheral Vascular as New Jersey based corporation?

9              MR. COMBS:  Correct.  Because that is where its

10:28:03 10    in-house counsel is located, that's where all its final

11    corporate decisions are made, and that's the real center of

12    the relationship.

13              THE COURT:  Do you have any basis for disagreeing

14    with the defendants' assertion in Mr. Carr's affidavit that

10:28:22 15    all of the decisions regarding product design, product

16    testing, marketing, communications with the FDA, et cetera,

17    were based in Arizona?

18              MR. COMBS:  I'm sure we can find examples in the

19    record if we conducted an exhaustive search where that's not

10:28:44 20    true, Your Honor, but I don't have a specific example to cite.

21              But I did want to just make one other point on

22    Ms. Helm's characterizations of, you know, this is actions --

23    it all involved actions in Arizona about Bard.  This involved

24    actions in all 50 states.  IVC filters were manufactured out

10:29:03 25    of state.  Sales and marketing happened out of state.  So to

10:29:06  1    centralize all this in Arizona is, I believe, incorrect, Your

2    Honor.

3            THE COURT:  All right.  Did you have other points you

4    wanted to make?

10:29:13  5            MR. COMBS:  That's it for now, Your Honor.

6            THE COURT:  All right.  Thank you.

7            All right.  I will take this issue under advisement.

8            Obviously, once I make the choice of law decision,

9    I've got to apply it to the 133 documents that are at issue in

10:29:28 10    this motion to compel.  So this is not an order I'm going to

11    get out tomorrow.

12            But this additional briefing has been helpful.

13            MR. COMBS:  Your Honor, if I may just correct you

14    slightly on that point.  And Ms. Helms can correct me if I'm

10:29:43 15    wrong, but we did narrow it from 132 to maybe there were five

16    examples --

17            THE COURT:  You're right.  Five times the number of

18    issues.  You're right.

19            MR. COMBS:  Right.  A little bit less onerous burden

10:29:58 20    for you.

21            THE COURT:  Good point.  Excellent point.

22            Let's talk about the other issues that are addressed

23    in your joint status report.  And I'd like to start with ESI

24    discovery issues.

10:30:22 25            There is a matrix that you all provided at Docket

10:30:27  1    1756 that addresses a number of -- well, I shouldn't say a

2    number.  It addresses an issue regarding whether regional

3    sales manager e-mail should be subject to discovery.  You

4    indicate in Docket 1756 that there are no other ESI discovery

10:30:52  5    issues that I need to resolve.  Is that still the case?

6         MR. STOLLER:  Your Honor, at the moment there are

7    not.  We're obviously engaged in ongoing conversations about a

8    number of issues relating to ESI.  I think we laid out in our

9    filing the plan, for lack of a better word, in terms of

10:31:12  10   handling ESI, both on a go-forward basis and sort of as issues

11   come up, and we've continued to do that.  We're engaged in

12   ongoing conversations.

13        There are issues that are percolating, and if they

14   rise to the point of an actual dispute, our thought process is

10:31:28  15   to, as we have in the past, file a matrix with the Court on

16   those issues.  But at present there's no issue that is ready

17   to come before the Court.  Other than what's already in the

18   papers.

19        THE COURT:  All right.  That's fine.

10:31:42  20   I would request something of you.  If issues come up

21   and you do file a matrix, would you please call my office and

22   tell us that you've filed a matrix.

23        We are watching what's coming in in this case, but as

24   you've seen from the docket, sometimes we get 50 new docket

10:31:58  25   entries a day.  And I don't want to miss a matrix and

10:32:01   1   discover, as I did preparing for today's hearing, that one

2   came in two months ago that I didn't focus on at the time.  So

3   just call us, tell us you filed a matrix, that will get my

4   attention on it sooner than the next status conference.

10:32:15   5        MR. STOLLER:  Absolutely, Your Honor.

6        MR. NORTH:  Your Honor, I was going to point out the

7   parties have now agreed upon 21 previous custodians whose

8   materials is being refreshed and 34 new custodians and that

9   process is well under way.  We're producing those on a rolling

10:32:32   10   basis and the collection and processing is occurring.

11        THE COURT:  Okay.  Thank you.

12        Let's talk about the regional sales manager issue

13   that is addressed in the matrix that you all submitted.

14        The plaintiffs are of the view that these regional

10:32:46   15   sales managers are really national managers akin to assistant

16   vice presidents of sales.

17        The defendants make a number of assertions and I want

18   to ask you if you agree with them, Mr. Stoller.

19        The defendants assert that there is a separate sales

10:33:07   20   department that creates marketing materials, and that -- well,

21   I should say there's a marketing department that creates

22   materials separate from the sales department and that there is

23   ESI from the marketing department being searched.

24        That in addition to ESI from the marketing

10:33:33   25   department, you seek ESI from 11 people in the sales

10:33:39  1   department that are at the national level and not the regional

2   sales managers.  So I think the assertion is there's this ESI

3   being produced from sales that writes all the marketing

4   materials, there's 11 people within the actual sales

10:33:57  5   department that are being searched now, and defendants'

6   position is let's get that done and then decide if the

7   regional sales managers are necessary, because you want nine

8   additional individuals to be searched as part of the regional

9   position.

10:34:13  10       Do you agree that that's an accurate description of

11   the search that's under way?

12            MR. STOLLER:  May I approach the podium?

13            THE COURT:  Yeah.  Yeah.

14            MR. STOLLER:  I'm going to agree and disagree, and

10:34:28  15   give you some context for this.

16            There is a separate marketing department.  It is

17   headed by a separate person.  From that marketing department,

18   my list indicates they are producing records from, I think,

19   seven people over a 14 year period.

10:34:51  20            The number of people that they have agreed to produce

21   records from, from the sales department, is, in addition to

22   the people, the three people who have served in the position

23   of vice president of sales, they are one, two, three, four,

24   five people.

10:35:11  25            To me, Your Honor, this isn't an issue of number of

10:35:14  1    people, it's positions.  It's a 14 year time period we're

2    talking about with respect to both of these departments and

3    the people in them.  And the way in which we went about

4    suggesting custodians for collections is we went to their org

10:35:30  5    charts and we said, what positions in their national org

6    charts are those that are most likely to have information

7    relating to IVC filters, and as it related to the national

8    sales practices of IVC filters what people in those org charts

9    are most likely going to have that type of information?

10:35:53  10          If I can approach, Your Honor, I have some copies of

11   those org charts I'd sort of like to walk through with you.

12          THE COURT:  That's fine.

13          MR. STOLLER:  What I have given you, Your Honor,

14   indirectly, is a series of individual pages from org charts

10:36:22  15   from the years 2004 through January of this year.  There's

16   nothing for 2015, but it's my approximate for that year.

17          But at any rate, the point being is that this comes

18   from their org.  These are their org charts.  This is their

19   organizational structure for the sales department on an annual

10:36:44  20   basis.

21          I will tell you, because of the way, manner, in which

22   the documents were produced, they're not same month every

23   year.  Some years they give us monthly, some years we just

24   have annual.  For the first, I don't know, 2012, they're

10:36:58  25   middle of the year for the most part, June, July, August.  We

could get them sometimes earlier, sometimes later.  But the idea is they're a snapshot in time of what's going on in the sales department.

But let me start very simply with the very first one, which is July 1 of 2004.  And there you'll see the organization of their sales department.  At the very top is Mr. DeJohn who was their vice president of sales.  He had six people who reported to him.  One, if you look at the far left side, is their regional sales manager for surgery.  Not somebody we would be concerned with.

Then we have two regional managers, east and west.  Mr. Cortelezzi and Mr. DeLeon, who are regional sales managers.  Those are two of the people we're talking about here.  Then you have Mr. Kumming, who was director of professional development; Mr. Schmidt, director of national accounts; and Ms. Everett who was the customer service manager.

I'm going to use this as proxy and I'll show you some other examples as we go through.  But that's a generally consistent structure of their org chart.  Sometimes there's more boxes under here, sometimes less.

What they have said to us in terms of going through this, it's a number of people, whatever the number is I've read you, but really what they said is we'll give you Mr. DeJohn's position, the vice president of sales, and the

10:38:22   1   person who sits in Mr. Kummings position -- or Kummings

2   position, however you pronounce that name -- who apparently is

3   in this case director of professional development.  In other

4   years, as we go through you can see it's the person in charge

10:38:35   5   of training.

6          Those are the two roles in each year they're willing

7   to give.  What we've said is, look, we don't need, obviously,

8   people who have to do with surgery and we don't need the

9   customer service manager.  But the people at the top of the

10:38:49   10   food chain who are dealing with the sales reps and the

11   regional people and interfacing with them and making those

12   decisions about what are the sales reps going to do nationally

13   are going to be the people who sit in those two positions.

14          Normally I would expect in an organizational --

10:39:06   15          THE COURT:  What two positions?

16          MR. STOLLER:  I'm sorry.  The positions of the

17   regional managers.  Here it's east and west.

18          Often you would expect to see, Your Honor, in these

19   kind of organizational charts somebody who held the position

10:39:20   20   of director of sales or something along those lines.  In fact,

21   for one year, if you flip back, I think four pages from the

22   end, in December of 2013 they in fact have a director of

23   sales.  Mr. Hans Yentz.  It bears the Bates label in the

24   bottom corner of 4561.  December of 2013.  That's the one year

10:39:49   25   they have a director of sales.

10:39:51   1        But if you go to the very next page, you'll see, Your

           2   Honor, who is reporting to him and that one year are these

           3   regional managers.  But in no other year is there somebody who

           4   holds that role.

10:40:02   5        Effectively that position, the people who are making

           6   the national decisions, according to their org charts, and the

           7   ones dealing with sales reps, not training, not creating

           8   materials, but making decisions about how the sales reps are

           9   going to do things and the national communications are going

10:40:21  10   to be the people sitting in those two roles.  In some years

          11   it's three, Your Honor.  This, we have an eastern and western.

          12   Most years there's only two.

          13        If you look at the second page of what I've given

          14   you, this handout from 2005, you'll see there, and it's very

10:40:37  15   difficult to read and I apologize, this is the best I could do

          16   with it, but you'll see that those two regional sales

          17   managers, you'll see underneath them, that's the whole sales

          18   force.  And everybody in that sales force is reporting up to

          19   those two positions.

10:40:52  20        And that's consistent, Your Honor, from year to year,

          21   and you can see -- I'm not going to spend time going through

          22   this year by year with you, but you can see as you make your

          23   way through the org charts that what they've given us from

          24   their sales department is the vice president of sales, to whom

10:41:08  25   everyone reports, and on an annual basis the person who is

10:41:11  1   responsible for the training or professional development.  No

2   one who's dealing with the sales force.

3        That's why we think, despite the designation of these

4   positions as regional, they're national positions.  Somebody's

10:41:28  5   got to be doing the job.

6        The number of names is whatever we've got on our

7   list, Your Honor.  I believe it's nine.  But that's a product

8   of time.  It's just, again, year by year going through these

9   org charts and saying who holds those positions?  And those

10:41:41 10   are the names we've asked for because those are the people who

11   are going to be responsible for dealing with the sales force.

12        We understood, Your Honor, when you directed us in

13   Case Management Order Number 8 to start with national sales

14   and marketing practices and not to go to regional.  That is

10:41:58 15   not our goal here.  Our goal is to identify and has been to

16   identify those folks involved in the national sales practices.

17   These org charts are the single best piece of evidence of

18   who's doing that.  That there is not again in particular

19   somebody who is the national director of sales in any year but

10:42:15 20   one tells us that the people who are filling that role are

21   these people.  There's nobody else on these charts who's

22   responsible for that sales force.

23        Unless you have any questions, I'll take a seat.

24        THE COURT:  Okay.  Thank you.

10:42:40 25        MR. NORTH:  Your Honor, with due respect to

10:42:44  1    Mr. Stoller, I believe he is misconstruing the significance of

2    an organizational chart.  The organizational charts

3    demonstrate lines of reporting.  They do not demonstrate

4    positions of authority or decision making; only lines of

10:42:59  5    reporting.  The plaintiffs are attempting to turn these

6    organization charts into somehow the creation of national

7    management boards, which they are not.

8         We have already -- and I would also note that the

9    exemplary organizational chart, the one on the top, is from

10:43:17  10   2004.  And it's probably the most simplistic organizational

11   chart of all of them.  Over the years, the department became

12   much more, in most years, larger; more people involved.  And

13   we have already agreed to produce the ESI of multiple people

14   in the sales department at the national level.

10:43:39  15        We have agreed to produce the ESI of I believe three

16   different vice presidents or directors of sales over the

17   years.  We have agreed to produce the ESI of the directors of

18   professional development, too, I believe.  We agreed to

19   produce the ESI for the national sales training manager, two

10:44:01  20   different people that held that role, which they asked for.

21   We have agreed to produce the ESI of the director of sales

22   training and development at the national level.

23        We have agreed to anybody that has a national role in

24   the decision making and oversight and assistance of the sales

10:44:21  25   force in general.

10:44:22   1          What we're asking is we've already agreed to 34 new

2    custodians, we've already agreed to a refresh of 21, and we at

3    this point do it in a tiered process.  Let's get through that,

4    let's let them look at that, and then see what they need

10:44:41   5    beyond that.  But if we add nine more here, then we're up to

6    sixty-something.  And then there are a number of others that

7    we're still discussing.

8          My concern is that this is becoming like an

9    avalanche, and I believe this is one place that we can at

10:44:55  10    least for now draw a line and say let's go through the

11   national discovery and all these sales trainers, development

12   people, vice president of sales at the national level, and

13   also the marketing people.

14         They're getting the ESI of several directors of

10:45:13  15   marketing over the years, the vice presidents of marketing,

16   the senior manager of marketing communications.  In other

17   words, developing the marketing brochures, websites, things of

18   that nature for use by the sales department.

19         And all together, I don't have the exact number here

10:45:33  20   but there are probably between 15 and 20 custodians that had

21   been agreed upon in the national marketing department or

22   national sales department.  And we would just ask that let's

23   get through that first and then make a decision as to whether

24   further ESI is needed from people who had responsibility for

10:45:55  25   managing sales representatives in the field on a regional

basis.

THE COURT:  Okay.  Thanks.

Mr. Stoller.

MR. STOLLER:  Let me address two points.  And I think the org charts are instructive about what we're talking here.  Mr. North talked about we're giving them from this position, that position and the other position.  They're different names for the same thing.

Every year for every org chart, every one of these we've given you -- and I'll give you a couple examples.  Again, the first year, 2004, they're talking about the position of the vice president of sales they're giving us.  There's three people who held that position.  It's not a product of people, it's the same position.  It's a product of time; right?  This is a case that spans 14 years.  They've had turnover.  Different people are going to have touched that position.

With respect to their other position, whether it's the development or training or whomever, it's effectively the same position.  If you go forward, say -- I'm just going to pick something randomly -- 2006, two years ahead, which is the fourth page in your exhibit.  The positions they're talking about are Mr. DeJohn again and Mr. Kumming.  That's it for that entire year.

If we skip ahead, let's go to 2009, which is -- I'm

10:47:18   1    not sure how many pages in.  I'm randomly skipping through.

2    The position they're talking about producing documents from

3    there is Mr. Doherty, a new vice president of sales, and

4    Mr. Wilson, the senior manager of training and development.

10:47:31   5    It's one position.  And that's consistent.  We're now five

6    years in and it's no different.

7         If we go to 2012, a more complicated org chart,

8    there's now eight or nine people below Mr. Doherty, but the

9    positions they're talking about producing are the training

10:47:51  10    managers on the far right and their marketing director in the

11    middle.  None of these people are dealing with the sales

12    force.  And that's our point, Your Honor.  No matter what you

13    call the position, they're not talking about producing

14    documents for people responsible for and dealing with the

10:48:07  15    sales forces.  And the only people doing that on the national

16    level are the folks who hold the title "regional."  Their

17    regions are half the country.  I don't disagree when we've

18    tried to do things, frankly, in an incremental process on most

19    of this stuff, but there is nobody holding that role in terms

10:48:26  20    of dealing with the national sales forces here.

21         While Mr. North said these are only lines of

22    reporting, I don't necessarily disagree with that except for

23    the fact that people the who are responsible that they're

24    producing out of the sales department are not responsible for

10:48:38  25    that sales force.  And that's the information we're trying to

10:48:40  1    get.

2         I understand the numbers.  But it's a product of

3    their own turnover and 14 years.

4         THE COURT:  Okay.  I think I understand both sides'

10:48:48  5    positions.

6         MR. STOLLER:  Thank you, Your Honor.

7         THE COURT:  All right.  Thank you.

8         Let's talk about the FDA warning letter issues.  This

9    was filed at Docket 1471.  I should have gotten you a decision

10:49:04 10   earlier on this but this was one of those that I wasn't aware

11   of until I started preparing for this hearing.  We're going to

12   start internally making sure we pay closer attention to when

13   they come in, but, again, call us, if you would, when a matrix

14   is filed and that way I'll be able to focus on it.

10:49:27 15        This matrix focuses on communications that are

16   related to the FDA warning letter and Items 1, 2, and 4 in the

17   matrix seem to be essentially the same things.  It's internal

18   communications.

19        I guess my first question is whether you've made any

10:49:46 20   progress on this since the matrix was filed.

21        MR. NORTH:  Your Honor, that's why I stood up.  I

22   think a lot of that is moot for the reason that the day before

23   we submitted this matrix the plaintiffs came back with a

24   proposal for 17 custodians and 11 of those 17 are on the list

10:50:02 25   that we've already agreed upon.  There's kind of wrinkles with

10:50:08  1  some of the other six, but I believe on that issue perhaps

2  Mr. Stoller and I need to talk about the six because just as a

3  part of the regular ESI discussions, 11 of those are included.

4  And this is a running dialogue Mr. Stoller and I have had, I

10:50:22  5  think in a productive fashion, which was the defendants really

6  thought it necessary to identify ESI custodians on a global

7  basis, as opposed to finding people on various specific

8  sub-issues, and I think we've done that here effectively by

9  agreeing on 11 of the 17, and I would suggest we confer on the

10:50:42  10  remaining six.

11  MR. STOLLER:  That's correct, Your Honor.  This is

12  one of the wait-and-see approaches where we said, all right,

13  we'll take what you give us first, see what we get there, then

14  move on and see if we need the others.

10:50:53  15  THE COURT:  Okay.  So is it correct that I do not

16  need to rule on Items 1, 2, 4 of the matrix?

17  MR. STOLLER:  I don't have the matrix in front of me,

18  Your Honor.  If you tell me what those are, I can confirm -- I

19  believe most of everything in the matrix has been mooted by --

10:51:09  20  THE COURT:  Item 1 is Request Number 7, which is all

21  internal communications relating to the subject matter of the

22  warning letter.

23  Item 2 is Request Number 8.  These are in the notices

24  of deposition.  And it's communications with the FDA and

10:51:27  25  internally since issuance of the warning letter related to the

10:51:32   1    contents of the warning letter.

2         And the fourth item is request for production 35,

3    which is all internal communications of Bard employees related

4    to the FDA's inspection, the 483s, the warning letter.

10:51:50   5    Including retrospective views of reporting.

6         MR. STOLLER:  I believe, Your Honor, as Mr. North

7    indicated, those are part of our ongoing discussion and

8    they've agreed to produce certain information materials, we'll

9    receive that and then have further discussion.

10:52:06  10         THE COURT:  Mr. Lopez.

11         MR. LOPEZ:  Yes, Your Honor.  This might be a good

12   point to bring up something that deals with the warning letter

13   and maybe even a broader discovery, that is TrackWise database

14   that I understand is ready for production.  But the point is

10:52:21  15   the TrackWise database is where Bard would have now reported

16   the way the warning letter suggests they should have reported

17   certain of those MDR's.  We want to make sure that we have

18   that which was reported to FDA the way the FDA said it should

19   have been reported, and that would be in this database that

10:52:44  20   needs to be updated that we haven't had.  It was suppose to be

21   produced last Friday.  I just want to make sure it's being

22   produced.

23         THE COURT:  Is there an issue you need to address

24   with me, or is this a discussion you should be having with

10:52:56  25   Mr. North?

10:52:58  1          MR. LOPEZ:  It's a discussion we've had with

2     Mr. North.  I understand it's going to be produced tomorrow.

3          MR. NORTH:  It's a discussion Mr. Boatman and I have

4     had, been having, frequently about technical glitch between

10:53:07  5     the vendor and the division and downloading some stuff.

6     Mr. Lopez must not have been privy to that.

7          MR. LOPEZ:  I was.  The issue, because you brought it

8     up with the warning letter, I just want to make sure what

9     we're getting in the database will include all of the updated

10:53:20  10    reporting that needs to be done --

11          THE COURT:  That sounds, Mr. Lopez, like a question

12    you shouldn't be asking me, but you should be asking defense

13    counsel.

14          MR. LOPEZ:  I understand.

10:53:30  15          THE COURT:  If there's a disagreement, I'll be happy

16    to address it.

17          MR. LOPEZ:  I bring it up because it's part of your

18    order that hasn't come out yet with respect to the warning

19    letter.  I would like that to be addressed as well.  I will

10:53:41  20    address it with Mr. North to make sure that's included --

21          THE COURT:  I don't intend in my order to address

22    anything that's not in dispute.  If you're still talking

23    about, keep talking about it.  If you reach an impasse -- and

24    incidentally, if you reach an impasse on a specific issue, you

10:53:55  25    don't have to file a matrix.  You can call and just ask for a

10:53:58  1   conference call.  And if I can't take the call there, I will

2   within a day or two and we can talk through it.  So if that

3   becomes an issue, absolutely you can bring it to my attention.

4          MR. LOPEZ:  I didn't want to be remiss in not

10:54:09  5   bringing it up today.

6          THE COURT:  That's all right.  That's been flagged.

7          So I'm not going to rule on the first, second, or

8   fourth items in the matrix.

9          The third item in this the matrix was the employment

10:54:21 10   files of four employees.  Is that still an issue in dispute?

11          MR. STOLLER:  I think it is.

12          THE COURT:  I see Mr. North nodding.

13          Let me tell you my understanding what the dispute is

14   and then hear your comments.

10:54:36 15          This concerns the plaintiffs' request for the

16   complete employment files for employees Modra, M-O-D-R-A,

17   Uebelocker, U-E-B-E-L-O-C-K-E-R, Wheeler, and Ludwig.

18   Plaintiffs assert Mr. Modra was in charge of quality assurance

19   during the period of alleged underreporting or nonreporting

10:55:11 20   raised by the FDA and that these other three individuals

21   reported to him.  And plaintiffs assert that discipline of

22   these employees -- reprimands, demotions other kinds of

23   discipline -- would be relevant to this issue.

24          The defendants assert that there are privacy

10:55:30 25   concerns.  They cite cases about employment files.  They

10:55:35   1    assert there would be a burden in producing them, which isn't

2    described, and I'm not sure I understand what the burden is.

3    I assume these are fairly discrete employment files.

4           Let me give you my initial reaction and get your

10:55:49   5    thoughts.

6           I do agree that if an employee was disciplined

7    because of something the FDA found to be a problem, it could

8    be relevant to the case.  But employee files contain far more

9    than disciplinary actions, and so I'm not understanding why

10:56:11  10    complete employee files need to be produced because that -- 95

11    percent of that could be unrelated to disciplinary actions, if

12    there's anything disciplinary in them.

13           On the other hand, as I've already indicated,

14    defendants assert burdensomeness, but I don't know how

10:56:27  15    burdensome it is to pull an employee's file from the HR

16    department and produce it.  And defendants assert privacy

17    concerns, but we have a protective order in place.

18           So those are my issues going both directions.  My

19    inclination is to conclude disciplinary information could be

10:56:45  20    relevant, but I'm hard pressed to see what else is relevant in

21    those files.  So I'm interested in your thoughts.

22           MR. NORTH:  Your Honor, we would be willing to look

23    for disciplinary action related to the FDA reporting and

24    warning and certainly produce all of that.  It's my

10:57:02  25    understanding there is no such thing, but I will certainly

10:57:05  1    confirm that.  And if there is such a thing, if I'm mistaken,

2    produce that.

3            As far as the burden goes, Your Honor, these do

4    contain a lot of very personal information: salary, health

10:57:18  5    issues, things like that.  And even if we have a protective

6    order in place, I believe there would be a need to do some

7    extensive redaction of things like that that are clearly

8    irrelevant and clearly very personal to these individuals.

9            And as far as the second part of the burden goes,

10:57:35  10   you're right, for four it's not hard.  But down the line, if

11   we start doing this on a frequent basis it does become quite a

12   burden.

13            MR. STOLLER:  Your Honor, might I approach?

14            THE COURT:  Sure.

10:57:51  15            MR. STOLLER:  The -- let me start with the following,

16   which is that we were told to pound sand on these, so I don't

17   have a feel for what's in their employment files.  I have a

18   general feel for what's in the employment files and there's

19   obviously a lot of personal information and information we're

10:58:07  20   not going to need.

21            In terms of the stuff beyond -- my concern is the

22   term "discipline."  That can have -- can be interpreted in

23   different ways.  Some employers do annual reviews and you

24   might get downgraded and that might reference -- "downgraded"

10:58:24  25   might not even be the right term, depending upon the company,

10:58:26    1    but I think you understand my meaning.  There may be

2    references to poor performance, particularly when you have an

3    issue of this magnitude where people weren't doing their job

4    and doing things correctly.  They may not have been strictly

10:58:39    5    disciplined, but there may be references in those things to

6    downgrade to, whether it's a negative performance review or

7    change in -- it may not be strictly construed as disciplinary

8    action, but maybe a job reassignment.  Those sorts of things.

9           There's also potentially in there issues relating to

10:58:59   10    the qualifications of the employees who are doing these roles,

11    performing these roles.  Those sorts of things we would expect

12    to be in there.

13           It seems to me the logical way to proceed is for

14    defendants to give us a general description of what's in the

10:59:13   15    employee files for each of these four discrete employees, and

16    we can talk about what makes sense for them to produce and

17    what makes sense for them not to produce given the Court's

18    guidance that you believe some of the information in there is

19    relevant and discoverable.

10:59:28   20           I think with that guidance, they now have an

21    understanding they need to produce stuff, we can probably sit

22    down and talk through what's in those.  And if there are

23    redaction issues that need to be addressed, discuss those

24    through counsel.  But I think the starting point of these are

10:59:43   25    discoverable to some degree as an important step in resolving

10:59:47  1    the dispute.

2        THE COURT:  Okay.  I understand both parties'

3    positions.

4        What I will include in the order that comes out after

10:59:54  5    this hearing is the following resolution:  I'm going to

6    require defendants to produce under the protective order

7    documents from these four employment files relating to any

8    internal discipline, reprimands, adverse consequences,

9    negative employment reviews, or comparable information based

11:00:15 10    on the underreporting or nonreporting addressed in the FDA

11    letter.  And I think that targets exactly the most relevant

12    information.

13        If after you receive it, Mr. Stoller, you conclude

14    there may be more that's relevant, talk through it with

11:00:30 15    defendants and raise it with me.

16        Certainly as to qualifications, I'm assuming that's

17    thoroughly covered in the depositions of these four

18    individuals.  So I don't think the disclosure of the

19    employment files generally are warranted for that basis.

11:00:44 20        So that will be my resolution of this issue.

21        The fifth issue that is raised in the matrix concerns

22    the request for the files of employees Ring, R-I-N-G,

23    Williamson, and Gaede, G-A-E-D-E.

24        These are higher level executives who received the

11:01:05 25    FDA communications and signed the company's responses to the

11:01:11  1    communications.  Is this still at issue between the parties?

2         MR. NORTH:  I would say in part, Your Honor.

3         We have already agreed as a part of the overall ESI

4    custodian discussions to produce the ESI from Mr. Williamson

11:01:27  5    and Mr. Gaede.  I believe they're on the list.  We've been in

6    discussions about Mr. Ring.  He's been previously produced in

7    the litigation.  There's some question -- we're talking about

8    a protocol for a refresh on him because of the number of

9    privileged documents.  But as far as ESI goes, I believe the

11:01:46 10    issue is moot.

11         But they have phrased this term in the broad wording

12    of "files" without definition.  We're certainly handling the

13    ESI, but we object to this broad and sort of undefined request

14    for, quote, files, unquote, without some specification in

11:02:05 15    discussion with us as to what they're looking for.

16         THE COURT:  Defense counsel.  I'm sorry.  Plaintiffs'

17    counsel.

18         MR. STOLLER:  Thank you, Your Honor.

19         I think that's something we can figure out amongst

11:02:17 20    ourselves.  That's news to me.  But we can certainly be

21    more --

22         THE COURT:  Well, it's in the matrix.  I mean the

23    ambiguity of "files."

24         MR. STOLLER:  I guess my point is I didn't understand

11:02:29 25    it to be something beyond -- and I think our response is

11:02:32   1    fairly clear on this and I'm happy to have further discussion

           2    with them on it, but obviously if Mr. Ring has in his office,

           3    like I have in my office, a file that relates to this and says

           4    "FDA warning letter," we would expect that to be produced.

11:02:46   5        I don't think this is a difficult or in any way

           6    overbroad request.  I think it's fairly straightforward.  We

           7    identified the individuals whose files we seek.  I don't think

           8    their lives are any different than mine, which is if they've

           9    got files of their own that relate to those issues, we should

11:03:07  10    be entitled to them.  It's not that different than the ESI

          11    we're getting.  One happens to be on the computer, one happens

          12    to be in a desk drawer.

          13        THE COURT:  Well, I thought when you started your

          14    comment on that, Mr. Stoller, you were going to say I don't

11:03:22  15    need to make ruling.  But at the end, it sounds like you're of

          16    the view I should rule on your request for the files of these

          17    three individuals.

          18        MR. STOLLER:  My point is I don't -- I don't -- I'm

          19    not quite understanding their position why they think it's

11:03:36  20    ambiguous at all.  I don't think it's ambiguous.  If we have a

          21    dispute over what I've just said, perhaps you need to rule,

          22    but I don't think there should be a dispute over that.

          23        THE COURT:  All right.  I understand.

          24        My conclusion on this issue is that the ESI related

11:03:53  25    to the FDA warning letters I think is relevant.  Granted these

11:03:57  1    individuals may have been high-level persons, but if they

2    received ESI that's related to the FDA warning letters, I

3    think that's relevant for the plaintiffs to discover.

4         I'm also of the view "files" is ambiguous.  To say

11:04:13  5    you want the files related to the warning letter, I think it

6    needs to be more specific than that.  If there are specific

7    categories of documents that you think you should get from

8    these individuals in addition to ESI, then by all means be

9    precise, raise them with defense, and if there's a

11:04:29  10   disagreement I'll rule, but "files," to me, is a very general

11   term and I can understand why defendants would have a

12   difficulty determining what is or is not in the, quote, files

13   of a vice president that has two or three assistants and lots

14   of computers among the assistants and other things that could

11:04:45  15   be included or not included.

16        MR. STOLLER:  Happy to work on that, Your Honor.  My

17   question to you is, because what seems self-evident to me is

18   clearly not self-evident to you or defense counsel, so in

19   terms of specificity what are you looking at from plaintiffs

11:05:03  20   in terms of --

21        THE COURT:  I'm confident you can come up with a more

22   specific request, Mr. Stoller.

23        Okay.  Let's talk about the deposition protocol for a

24   minute that you all submitted.  I want to make sure I

11:05:31  25   understand a couple of issues on it.  This is the protocol

11:05:40  1    that was filed at Docket 1472.

2           My understanding of paragraph H3 is that when you're

3    deposing former Bard employees, the agreement is that

4    plaintiffs get six hours and defendants get two, unless

11:06:12  5    there's an agreement between the parties for more.  Is that a

6    correct reading of the paragraph?  It wasn't entirely clear to

7    me.

8           MR. STOLLER:  It is.

9           MR. NORTH:  And they've been proceeding well, I

11:06:25  10    think, Your Honor, with that.

11           THE COURT:  Okay.  When you say for paragraph 4, "For

12    all other fact witnesses, both sides shall have equal time,"

13    do you mean three and a half hours, assuming you're going to

14    take a full deposition?  Or is that something you're working

11:06:38  15    out?

16           MR. STOLLER:  The short answer is it's both.  We're

17    working it out and it is sort of a presumption.  If we go a

18    full day and it's seven hours, then we'll go three and a half,

19    three and a half, in terms of division.  But, frankly, the

11:06:50  20    depositions have been working out such that we cooperate.  If

21    we need to go longer, there's discussion.  But I don't think

22    we've even had that discussion yet.

23           The idea behind it was, look, if we think one side

24    ends up needing four hours and everybody's agreeing, including

11:07:05  25    the witness, then the other side would get four hours.  But

11:07:08  1    it's been -- we've worked through everything thus far and --

2    the anticipation was we just wanted to be fair with

3    third-party witnesses.

4            MR. NORTH:  That actually happened with the

11:07:15  5    deposition of Kay Fuller, Your Honor.  It became clear -- we

6    were splitting that three and a half hours each, and it became

7    clear we needed a little extra time on both sides and with the

8    permission of Ms. Fuller's attorney I think we added one

9    additional hour.  But the parties worked that out.

11:07:32  10           THE COURT:  Okay.

11           In paragraph I, you state each party not present or

12    represented at a deposition can request permission to conduct

13    a supplemental deposition.  My question is does that even

14    apply if the party had notice of the deposition and chose not

11:07:48  15    to attend?  Or is this only parties who didn't have notice

16    because they weren't in the case yet?

17           MR. STOLLER:  It's the latter, Your Honor.  That was

18    the intention, was the people who aren't parties could come in

19    after the fact and say, look, I didn't have an opportunity to

11:08:05  20    participate in the deposition, and upon a showing, then take a

21    supplemental deposition.

22           THE COURT:  It seems to me, to be clear of that, and

23    I just don't want a rush at the end where people are trying to

24    do additional questioning of witnesses who were deposed while

11:08:21  25    they were in the case, we ought to be a little more specific

11:08:23   1   and say each party not present or represented at a deposition

2   because they were not part of the case at the time may seek to

3   reopen.  And that would, of course, include the parenthetical

4   that follows about parties added afterwards.

11:08:38   5          Does anybody see a problem with that clarification?

6          MR. STOLLER:  Could you give your suggested language

7   again?

8          THE COURT:  It would say something like:  Each party

9   not present or represented at a deposition because they were

11:08:49  10   not a party in the litigation at the time of the deposition

11   may seek to reopen it later.

12          If that's the intent, I think --

13          MR. STOLLER:  That sounds fine to us, Your Honor.

14          MR. NORTH:  That sounds fine, Your Honor.

11:09:04  15          THE COURT:  Okay.

16          There's a small typo in that paragraph that I'll

17   change as well when we do that.

18          Those were my only questions.  Sounds like

19   depositions are proceeding well.  So I'll go ahead and get the

11:09:14  20   protocol filed with that clarification.

21          You all raised in your joint report a question about

22   confidentiality designations.  I understand these to be

23   documents the defendants are designating as confidential under

24   the protective order and plaintiffs want a method for, as I

11:09:41  25   understand it, challenging and getting a ruling on the

11:09:44 1    propriety of the confidential claim now.  Defendants are

2    saying that is premature, it will really only become relevant

3    when evidence is submitted in summary judgment or for trial

4    and there will be different standards that apply at that

11:10:00 5    point.

6            And I guess the questions I have is -- are the

7    following:  Is this a problem now?  Is it creating

8    difficulties in the litigation that the plaintiffs don't

9    currently have a procedure for challenging?  And if it is,

11:10:19 10   what's your proposal as to how we resolve it?

11           MR. BOATMAN:  Your Honor, Ms. Matarazzo is going to

12   be addressing that on behalf of the plaintiffs.  She's been

13   handling that for us.

14           THE COURT:  That's fine.

11:10:37 15          MS. MATARAZZO:  There is actually a procedure for

16   challenging it.  It's laid out in paragraph 22 of the

17   protective order.  And it involved us providing in writing our

18   challenge to any document being marked confidential, and then

19   within 10 days the party that marked the document has to

11:10:52 20   initiate a meet and confer.  And then at some point, if the

21   parties reach an impasse, within 30 days of the party that's

22   challenging the confidentiality, that party provides a written

23   notice that the impasse has been reached and then the

24   designating party has to file a motion with the court.  So

11:11:11 25   that's the procedure laid out in paragraph 22.

11:11:14  1        We've been going through that process with documents

2        that were marked confidential following -- with exhibits

3        following the depositions of two Bard employees.  We now have,

4        I believe, six letters laying out confidential designations of

11:11:34  5        exhibits from six different depositions.  We're up to 96

6        designations of exhibits at this point.  And I guess we're

7        seeking the Court's guidance today as to whether or not the

8        Court wants to address that now or address that under

9        paragraph 22 or whether the Court would prefer to address that

11:11:54  10       at the time that we're dealing with dispositive motions.

11             We did have an issue, I believe, with the privilege

12       log motion where we had a document that we wanted to include

13       but we would have then to have made arrangements to file it

14       under seal and follow the procedures under paragraph 25 of the

11:12:10  15       protective order, so we chose not to file it.

16             We anticipate that a lot of these documents are going

17       to be exhibits to dispositive motions, and we anticipate a lot

18       of dispositive motions.  So we're really just trying to gauge

19       the Court's preference.  Does the Court want to deal with the

11:12:24  20       motion now or deal with the motion at the time that the

21       Court's dealing with all of the dispositive motions?

22             THE COURT:  Well, let me ask you this question:  As

23       I'm sure you know, under Ninth Circuit law there's a different

24       standard for desig- -- well, protective order based on just

11:12:42  25       its production in discovery and a protective order for

11:12:44   1    confidentiality if it's going to be used for dispositive

           2    motion, and there's a higher standard in order to keep it

           3    confidential at the dispositive motion stage.  There has to be

           4    some compelling reason to keep it confidential.

11:13:02   5              My initial reaction, and I'm inviting your

           6    disagreement with this if you think it's creating a problem,

           7    is that if the primary concern is what will be filed at the

           8    time of dispositive motions, we ought to postpone it until

           9    then for two reasons:  One is I shouldn't, and you shouldn't,

11:13:18  10    be spending time on documents now that ultimately may not

          11    prove to be all that relevant to a dispositive motion.  And,

          12    secondly, that compelling reason standard I think is better

          13    applied in the context of a motion where I understand what the

          14    issues are.

11:13:34  15              And the whole reason behind the Ninth Circuit

          16    standard is what does the public need to know to understand

          17    the Court's ruling.  Well, to make that decision, I think I

          18    need to have a better sense of what the issues are in the

          19    motion and how central this particular document might be to a

11:13:49  20    ruling I make.

          21              So my instinct would be to say let's deal with that

          22    where it's really going to matter, at dispositive motions

          23    stage.  But if it's creating problems now, I don't want it to.

          24              So I'm interested in your thoughts.

11:14:06  25              MS. MATARAZZO:  No, at this point it's not -- I

11:14:08  1   wouldn't -- you guys can speak to that a little more than I

2   could.  I wouldn't say it's creating large problems at this

3   point.

4         We have gone through -- there were 50 some odd

11:14:16  5   documents that were marked coming out of those two

6   depositions.  We've narrowed them down to -- we've disagreed

7   with the vast majority.  Not all, but the vast majority of the

8   designations.

9         We have gone through and narrowed that to the 26 we

11:14:28  10  think will likely -- has the potential to be involved in

11  dispositive motions practice and we believe that that good

12  cause standard, that lower standard can't be met.  It's not --

13  it's not -- it's still not a low bar because there's a strong

14  presumption in the Ninth Circuit in favor of access for the

11:14:49  15  public to those documents should they be filed.  So to the

16  extent the Court wanted to address it early, we believe it

17  wouldn't then have to be addressed later on.  But, really, we

18  leave it to the Court's discretion to decide because the

19  Court's the one who's going to have to decide all these

11:15:04  20  motions at once.

21         THE COURT:  Right.  I think we should do it later.

22  But let me tell you something I intend to do when we get to

23  the dispositive motion stage.  I intend to have what I will

24  call a pre-motion conference.  The way I'm going to do that is

11:15:21  25  I'm going to require each side that is planning to file a

11:15:25  1   dispositive motion to provide the other side with a two-page

2   letter description of what the motion will be, and have the

3   other side provide a two-page letter description of the

4   response, on every motion that's going to be filed.  And then

11:15:35  5   you're going to give me those letters, I'm going to read them,

6   and we'll talk about how we brief dispositive motions, what

7   statements of fact are needed, to try to really focus things.

8        I have found that parties in dispositive motions

9   often brief lots of issues that don't really need to be

11:15:54  10  briefed because they don't know ahead of time what the other

11  side will or will not be contesting.  The idea is to focus us

12  on the issues that will be addressed.  But at the same time

13  we'll be talking about evidence.  And if at that point you say

14  to me, look, we've got 90 documents we want you to consider,

11:16:10  15  let's set up a procedure to get that resolved before we file

16  the motions, or in connection with it.  We can figure out the

17  most efficient way to do it.

18        So it won't be a situation where you've had no

19  guidance whatsoever before you actually file your motions for

11:16:29  20  summary judgment, or similar motions.

21        MS. MATARAZZO:  Thank you.

22        THE COURT:  Anything from defendants?  Okay.

23        We will deal with that issue.

24        Let me say again, though, if a confidentiality

11:16:44  25  designation becomes a problem in discovery, by all means call

11:16:49 1  me and we'll address that so it doesn't interfere with

2  discovery.

3          MS. MATARAZZO:  Thank you, Your Honor.

4          THE COURT:  There was a note in your joint report

11:16:59 5  that you wanted to discuss some modification to the bellwether

6  selection procedure.

7          MR. STOLLER:  It was more a placeholder in case we

8  needed to, Your Honor.  There was some delay on the side of

9  the plaintiffs as a whole of getting all of the profile forms

11:17:16 10  to the defendants by our original due date.  They hustled and

11  have gotten most, if not all, of theirs done.

12          Mr. North and I spoke this morning.  His numbers are

13  a bit different than mine, but I'll go back and confirm.  I

14  think we're both in agreement that everything should be fine.

11:17:32 15  If something different happens and I conclude for some reason

16  we don't have what Mr. North has told us that's come in, I'll

17  confer with him again, and if we need to make some

18  modifications we'll get on the phone with the Court.  But I

19  don't think either side at this point anticipates making any

11:17:47 20  changes.

21          THE COURT:  Okay.

22          MR. NORTH:  Agreed, Your Honor.

23          THE COURT:  Okay.  In Case Management Order Number

24  10, I had asked you to give me an update today on where the

11:18:02 25  ten mature cases stand and when you're anticipating we'll be

11:18:08  1    at a point of remand.  I didn't see that addressed in the

       2    joint report.  Are you able to give me an oral report on where

       3    those ten cases stand and what we ought to be planning for

       4    them?

11:18:20  5         MR. NORTH:  Your Honor, I raised this issue with

       6    Mr. Boatman about two or three weeks ago and he said that he

       7    needed to talk to the various attorneys involved in those

       8    cases.

       9         My biggest concern is that we come to some sort of

11:18:31 10    agreement because the chart we gave the Court earlier

      11    indicates there are little bits of discovery, case-specific

      12    discovery, that still need to be accomplished in those, and I

      13    thought Mr. Boatman and I need to have a discussion as to

      14    whether that fact specific discovery should proceed now or

11:18:48 15    upon remand.

      16         THE COURT:  Mr. Boatman, what is -- or Mr. Lopez,

      17    what are your thoughts on this?

      18         Could you pull the mic over, Mr. Lopez.

      19         MR. LOPEZ:  Mr. Boatman and I have been conferring

11:19:03 20    with this, and he's been the one discussing it with Mr. North.

      21         I think the issue has always been how much of the

      22    warning letter and the Kay Fuller issue can be used to

      23    supplement either discovery in those cases or expert reports.

      24    We still -- I think once we get to that point, we can probably

11:19:20 25    meet and confer, and I'm thinking all of these cases can be

11:19:23    1    submitted to Your Honor to be remanded.

           2         So we still have depositions that are pending that

           3    are -- where that issue of the warning letter and the

           4    Kay Fuller issue are still relevant.  It comes up in virtually

11:19:37    5    every deposition now.  So if we can just defer this, Your

           6    Honor, to the next CMC, we can give the Court a more detailed

           7    report on where we are with respect to that discovery.

           8         I will say this:  That in speaking with some of the

           9    lawyers, some of them are going to say that they want their

11:19:59   10    case remanded maybe after one more deposition.  So they may

          11    not be like all ten are ready to go.  It could be -- because,

          12    as Mr. North indicated, some of these are farther along than

          13    others.  There's some where we're at motions in limine.  But

          14    we're not quite there yet in getting the lawyers who have

11:20:19   15    these cases to say, yes, I'm ready to remand.  But I suspect

          16    by the next CMC we may have three or four that may be ready to

          17    say that.

          18         THE COURT:  Okay.  Then I'll include in the order

          19    after today that you'll address that in the joint report to be

11:20:33   20    provided before the next case management conference.  And

          21    specifically when you think they'll be ready for remand.

          22         We have a discovery cutoff deadline for fact

          23    discovery of October 28th.  I saw in your joint report the

          24    list of depositions that have been taken and that are

11:20:55   25    scheduled through August 20th.  I raised at the last status

11:20:59  1   conference whether we need to do any special deposition

2   scheduling to make sure we get it all done by October 28th,

3   such as blocking out weeks or double tracking or anything such

4   as that.  I guess my question to you is the same:  Are you

11:21:15  5   feeling all right with the pace we're proceeding and the

6   October 28th deadline or do we need to be thinking some

7   special scheduling to get things done by then?

8          MR. STOLLER:  On behalf of plaintiffs, Your Honor, we

9   think we're on pace.  I think if we get to a point where we're

11:21:28  10  going to have -- we think there's a problem, if the parties

11  can't work it out we'll get on the phone with you.  But at the

12  moment we're definitely on pace.

13         THE COURT:  Okay.

14         MR. NORTH:  I agree, Your Honor.

11:21:38  15  THE COURT:  Okay.

16         All right.  Other than scheduling the next status

17  conference, those are the only issues I noted that we need to

18  address.

19         Do the plaintiffs have other matters you all want to

11:21:55  20  raise?

21         MR. LOPEZ:  Well, I think we still have the Simon --

22  I may be wrong about this.  Has --

23         MR. NORTH:  We worked that out.

24         MR. LOPEZ:  Simon Nitinol.  Okay.  Wanted to make

11:22:08  25  sure.

11:22:09   1          THE COURT:  Anything else, Mr. Lopez?

           2          MR. LOPEZ:  No, Your Honor.

           3          THE COURT:  Mr. North.

           4          MR. NORTH:  Your Honor, the only thing is there has

11:22:15   5   recently been filed in this court a medical monitoring class

           6   action.  It was assigned to Your Honor, but I don't believe

           7   it's technically been made a part of the MDL.  And, of course,

           8   you don't do a tag-along to the JPML when it's filed in the

           9   court where the MDL is already pending.

11:22:32  10          It seems to me, and I believe the plaintiffs, I've

          11   had some correspondence with the people on the plaintiffs'

          12   camp handling that, that it ought to be brought in under the

          13   umbrella of this MDL.  Right now it's standing, as I

          14   understand it, as a separate case.  I think the Court's

11:22:47  15   typical case management order issued about a week ago

          16   requiring filings and perhaps even a conference in August.

          17   And if Your Honor is willing, it seems to me this ought to be

          18   just brought in under the umbrella of this MDL and then we can

          19   discuss at the appropriate time any separate scheduling for

11:23:07  20   that.

          21          MR. LOPEZ:  We're fine with that, Your Honor.  Our

          22   anticipation was that that was exactly what was going to

          23   happen when we filed it, that ultimately it would come under

          24   the umbrella of this MDL.

11:23:24  25          THE COURT:  I haven't seen this case yet.  Is this

11:23:25  1   counsel who are part of the plaintiffs' steering committee

2   that have filed it?

3           MR. LOPEZ:  Yes, Your Honor.

4           THE COURT:  Anybody know the case number?

11:23:34  5           MR. NORTH:  I can promptly find it --

6           THE COURT:  Actually, Traci found it.  16-1374.

7   *Barraza versus Bard*.

8           Is that right, *Barraza versus Bard*?

9           MR. NORTH:  Yes.

11:23:52 10           THE COURT:  When you say bring it in under the

11   umbrella of the MDL, are you suggesting that I just enter a

12   standard order consolidating cases like I can in any civil

13   case and consolidate it with the MDL?  Is that the procedure

14   you think ought to be followed?

11:24:12 15           MR. LOPEZ:  Speaking on behalf of the plaintiffs,

16   yes, Your Honor.  Coordinating discovery and whatever happens

17   to that case will happen here.

18           THE COURT:  Is this a nationwide class action?

19           MR. LOPEZ:  It is, but involves, I think, 13 states.

11:24:31 20           THE COURT:  Meaning you have named plaintiffs --

21           MR. LOPEZ:  We have named plaintiff --

22           THE COURT:  -- 13 states?  But is the class defined

23   as nationwide or just those 13 --

24           MR. LOPEZ:  Just those 13 states.  Please don't ask

11:24:48 25   me to name them all.

11:24:54  1          THE COURT:  So are you lead counsel, Mr. Lopez?

2          MR. LOPEZ:  I and counsel from Lieff Cabraser firm

3     are on the complaint, but it is going to be a PSC undertaking.

4          THE COURT:  Okay.  So you are authorized, I take it,

11:25:12  5     to stipulate on the record that that be consolidated with the

6     MDL?

7          MR. LOPEZ:  Yes, Your Honor.

8          THE COURT:  And I'm assuming it's the same defendants

9     named, Mr. North?

11:25:21 10          MR. NORTH:  Yes, Your Honor, we would agree to that.

11          THE COURT:  All right.  I will look at that file.

12          I guess a question I have is it sounds like what my

13     staff did is what we do in all civil cases, to get a case

14     management conference scheduled.  Do we need to have a case

11:25:42 15     management conference with respect to that class action or

16     does it simply get blended into the case management orders

17     that we have already entered in this case?  And if it's the

18     latter, do we need a date for a motion to certify the class?

19     Do we need any class-specific procedures that need to be

11:26:08 20     adopted?

21          MR. NORTH:  It would seem to me, Your Honor, the

22     discovery that's ongoing on the merits in the MDL would

23     probably have application to the class action, so there would

24     not be a need for a specific case management order at this

11:26:23 25     point.  But down the line as we go further along on that

11:26:27  1    discovery, it would probably be appropriate at that point to

2    get a separate order with a class certification schedule.

3         THE COURT:  What do plaintiffs think?

4         MR. LOPEZ:  I would say this, Your Honor.  From a

11:26:42  5    discovery standpoint we would not ask the Court to have -- to

6    give us a different discovery track.  I think the depositions

7    that we've got scheduled we will address issues relevant to

8    the medical monitoring.  We may ask for one or two additional

9    depositions that are specific to the medical monitoring class.

11:27:00  10   I would guess no more than that.  But as Mr. North said, I

11   think there's going to be a different -- we're going to have

12   to find someplace in the schedule that we have for the

13   underlying cases how we deal with certification and things

14   like that.  Experts.  It will be a different -- potentially

11:27:24  15   different group of experts, too.

16        THE COURT:  Well, that's what I was about to ask

17   about.  Under Case Management Order 8 for the MDL we've got an

18   October 28th deadline for fact discovery, December 16th

19   deadline for plaintiffs' expert disclosures, February 3rd for

11:27:40  20   defense experts, March 3rd for rebuttal experts, May 19th for

21   the close of expert depositions.  And then, of course, we have

22   the bellwether selection process that's laid over that.

23        On those discovery dates, the fact and expert dates,

24   are those workable for the class action?

11:28:02  25        MR. LOPEZ:  We plan to make those workable for the

11:28:04  1    class action.  I think we can.  I mean, from the plaintiffs

2    perspective we're not asking for you to give us a different

3    scheduling order with respect to those issues.

4           THE COURT:  Well, let me ask this question:

11:28:18  5    Oftentimes in class actions where certification is a

6    legitimate issue, you put off things like merits expert

7    disclosures until you find out if the class is certified to

8    save parties money in the event class isn't certified.  Should

9    we do that in this case?  Or do you want to launch into merits

11:28:40 10   experts in a class action that hasn't been certified?

11          MR. LOPEZ:  Well, my spontaneous response to that is

12    I think because the certification may be too intertwined in

13    some of the expert issues, so my feeling is we're going to

14    need to at least do -- maybe we can parse that so you don't

11:29:05 15   have to go beyond and start talking about the type of injuries

16    or damages or what the class looked like.  But to qualify as a

17    medical monitoring class and to get certified as a medical

18    monitoring class may require at least the report and the

19    deposition of an expert on each side.

11:29:27 20          THE COURT:  Well, I would think so, but I guess the

21    question is do you want me to have a deadline that requires

22    disclosure of all experts by that date that will be used in

23    the class action?

24          MR. LOPEZ:  I would say I'm not anticipating on the

11:29:43 25   plaintiff side more than probably two experts, so we're

1   comfortable staying within the scheduling order that we have.

2   And I'm talking about medical experts, staying within the

3   confines of the scheduling order you have to complete that

4   expert discovery.  Or if you ask us to expedite it, we can

5   maybe front load those experts.  These are issues medically

6   for us, I think, to deal with.

7           MR. NORTH:  Your Honor, I'm not sure we have to

8   stretch all of this in a class certification hearing up until

9   next June --

10          THE COURT:  Mic please.

11          MR. NORTH:  -- which would be under the present

12  schedule.

13          I would suggest, off the top of my head, that we

14  finish fact discovery here in October and maybe, the more I

15  think about it, we do need a separate scheduling order as far

16  as we will need to depose sooner rather than later the named

17  putative class representatives to determine their adequacy to

18  serve in that role.  And we'll need to depose them and that

19  will need to be done.  So we've got some different

20  circumstances, the more I think about it, and therefore I

21  think a separate order may be necessary.

22          THE COURT:  So how do you propose we proceed from

23  today?

24          MR. NORTH:  What I would suggest, upon reflection, is

25  maybe we have 30 days to come up with a proposed order to see

11:31:11  1    if we can negotiate a proposed order and submit it to the

2    Court.  And if not, we can put the dispute in a matrix form.

3            MR. LOPEZ:  That seems like the right thing to do,

4    Your Honor.

11:31:22  5            THE COURT:  I don't want a matrix on a case

6    management issue.  We can resolve those more easily.

7            MR. LOPEZ:  Except for the matrix part.

8            THE COURT:  Let me pause and just ask a different

9    question.  I just noticed it.  I was just handed the

11:31:36 10    complaint.  I see Elizabeth Cabraser is named as a member of

11    the steering committee.  I want to disclose to you I know

12    Ms. Cabraser pretty well.  She and I have served for the last

13    six years or longer on the Advisory Committee on the Federal

14    Rules of Civil Procedure.  We've spent a lot of time working

11:31:58 15    on those issues.  I'm going to continue working with her.  I'm

16    not on that committee, but I'm sharing a related committee

17    now.  It's that kind of relationship.  But I've had lots of --

18    I've been in lots of meetings and had lots of conversations

19    with Ms. Cabraser.  Do you see that as a problem, Mr. North?

11:32:16 20            MR. NORTH:  I do not, Your Honor.

21            THE COURT:  All right.

22            I'm taking it from your comments, Mr. Lopez, that you

23    think the fact discovery in the MDL is essentially the fact

24    discovery you need for the class action, maybe with the

11:32:37 25    exception of one or two additional depositions?

11:32:39  1          MR. LOPEZ:  Yes, Your Honor.

          2          THE COURT:  How about from your side, Mr. North?  Are

          3    you anticipating that there's discovery you'll need to do for

          4    the class action that is different than the discovery you

11:32:50  5    would do for the MDL?

          6          MR. NORTH:  Only, Your Honor, that we'll need to

          7    depose the 13 named plaintiffs who seek to be class

          8    representatives.  And then any experts on the certification

          9    issue.

11:33:06 10          THE COURT:  Right.  Is that something you think you

         11    can comfortably do by October 28th?

         12          MR. NORTH:  I think we can, Your Honor, certainly.

         13          THE COURT:  Okay.  Maybe what we ought to do is this,

         14    and if I'm missing something, by all means tell me.  Maybe we

11:33:24 15    ought to simply enter the order consolidating the class action

         16    with this case, stating that the fact discovery deadline of

         17    October 28th will apply in the class action, and then asking

         18    the parties before the next status conference, which will

         19    occur either in August or September, to confer about what

11:33:48 20    should happen beyond the October 28th fact discovery deadline.

         21    Should we focus on class certification experts and class

         22    certification hearing before we proceed to other experts?

         23    Should we just adopt the schedule in the MDL for the purposes

         24    of experts in the class action?  And you can address that,

11:34:10 25    and, if you have different views, set forth your different

11:34:12 1    views in the joint report for the next status conference.  And

2    at that point we can address it.  You will have had a couple

3    of months working with both cases as part of one by that time.

4    And we can then decide whether we go straight to class

11:34:27 5    certification before merits experts or whether we do something

6    else.

7                Does that sound like a reasonable approach?

8                MR. LOPEZ:  Yes, Your Honor.

9                MR. NORTH:  Yes, Your Honor.  One clarification.

11:34:37 10   Would it be the Court's expectation that we proceed with those

11   13 depositions --

12                THE COURT:  Yes.

13                MR. NORTH:  -- during the fact period?

14                THE COURT:  Yes.

11:34:48 15                MR. NORTH:  Okay.

16                THE COURT:  Okay.  Is this a 23(b)(3) class?

17                MR. LOPEZ:  I'm sorry, Your Honor?

18                THE COURT:  23(b)(3) class you're alleging?

19                MR. LOPEZ:  Yes.

11:35:03 20                THE COURT:  Okay.

21          Okay.  Are there other matters that you need to

22   raise, Mr. North?

23                MR. NORTH:  Nothing further, Your Honor.

24                THE COURT:  Okay.  Let's talk -- first, I want to

11:35:14 25   circle back.  My conclusion on the ESI discovery issue is that

11:35:24   1   the defendants should produce the ESI from the regional sales

2   managers.  I think, having looked at the organizational

3   charts, that they're going to be important discovery sources

4   for purposes of relevant allegations in this case.  I'd rather

11:35:40   5   get it done now because I'm virtually sure it would happen

6   later given their position in the organization.

7            So my resolution of that issue is that the defendants

8   should include those nine individuals in the ESI searches.

9   And I'll reflect that in the order that comes out after today.

11:35:58   10           As far as the next conference is concerned, my

11  inclination would be to set it for September 21st, which is a

12  Wednesday, unless you think we need to meet earlier in which

13  event we could do it during -- we could do it on August 23rd.

14  I'm happy to do it either time.  I just can't judge from your

11:36:20   15  perspective how soon you think we need to be talking again.

16           MR. NORTH:  I don't mean to be difficult but I'm

17  actually scheduled to be in Europe on a vacation from I think

18  the 15th through the 25th.

19           THE COURT:  Of which month?

11:36:34   20           MR. NORTH:  September.

21           MR. STOLLER:  Your Honor, might I suggest something?

22  I actually think we're probably better off doing it in August

23  anyway.  I mean, September 21's only a month until close of

24  fact discovery.

11:36:44   25           MR. NORTH:  Yes.

11:36:45  1          MR. STOLLER:  If those are the two options, I think

2    we prefer August even if it is a shorter case management

3    conference like we've had today.

4          THE COURT:  Is that agreeable?

11:36:52  5          MR. NORTH:  Yes, Your Honor.

6          THE COURT:  Okay.  We will set it for -- does that

7    look okay to you, Traci?

8          THE COURTROOM DEPUTY:  August 23rd.

9          THE COURT:  August 23, 10 a.m.  I'll call for the

11:37:00 10   same joint report beforehand.  I'll include that in the order

11   that comes out after today.

12          Are there any other matters we need to address?

13          MR. BOATMAN:  No, Your Honor.

14          THE COURT:  Okay.  Thanks very much.

11:37:14 15       (End of transcript.)

16                          *  *  *  *  *

17

18

19

20

21

22

23

24

25

1                          **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4     appointed and qualified to act as Official Court Reporter for

5     the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8     a full, true, and accurate transcript of all of that portion

9     of the proceedings contained herein, had in the above-entitled

10    cause on the date specified therein, and that said transcript

11    was prepared under my direction and control, and to the best

12    of my ability.

13

14         DATED at Phoenix, Arizona, this 5th day of July,

15    2016.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25