**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  BARD IVC FILTERS PRODUCTS LIABILITY LITIGATION | MDL No. 15-2641 PHX DGC |
| This Order Relates to:  All Actions | |

This dispute concerns documents withheld from discovery under the attorney-client privilege and the work-product doctrine by Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. ("Bard").   Plaintiffs challenge a substantial number of documents on Bard's privilege log.  Plaintiffs sampled 307 documents on the log, which represents five percent of the total.  After meeting and conferring, the parties reached agreement on all but 133 of the sampled documents.  The resolution of this discovery dispute will be used to guide the parties as they attempt to resolve the overall privilege dispute in this multi-district litigation ("MDL").

On March 25, 2016, Plaintiffs moved to compel production of the 133 disputed documents.  Doc. 1214.  On March 31, 2016, the Court held a third case management conference where the issue was discussed (Doc. 1246), and the Court provided additional guidance in the ensuing case management order (Doc. 1319 at 5-6)  The issues have now been fully briefed (Docs. 1476, 1590, 1976, 2219, 2222), and the Court heard oral arguments on June 21, 2016.  The Court has also reviewed the representative sample documents submitted by the parties.  For the following reasons, the Court will grant in part and deny in part Plaintiffs' motion to compel.

## I.      Choice of Law.

The parties agree that the work-product doctrine is governed by federal law, but disagree on which law should govern the attorney-client privilege.  The parties' briefing suggests four possibilities: (1) generally applicable common law, (2) Arizona law, (3) New Jersey law, or (4) the law of each transferor district.

### A.      Choice of Law Approaches.

Federal Rule of Evidence 501 provides that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501.  "Rule 501, however, does not tell us which state law the forum state should apply."  *KL Grp. v. Case, Kay & Lynch*, 829 F.2d 909, 918 (9th Cir. 1987). Commentators have suggested several methods of resolving this choice-of-law issue: (1) use the privilege law of the state whose substantive law provides the rule of decision; (2) apply the privilege law of the state in which the federal court sits; or (3) apply the conflict-of-law doctrine of the state in which the federal court sits.  *Id.* (citing 23 C. Wright & K. Graham, Jr., Federal Practice and Procedure § 5435, at 865-69 (1980); 2 Weinstein's Federal Evidence § 501[02] (1986)).

The issue is complicated in the MDL context, where cases originate in many different states.  In *In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Products Liability Litigation*,  MDL No. 2100, 2011 WL 1375011, at *1 (S.D. Ill. Apr. 12, 2011), the court addressed a privilege challenge to 330 documents, a representative sample of the 12,857 documents withheld as privileged.  Consistent with Rule 501, the Court found that "privilege matters that are relevant to an element of a claim or defense for which state law supplies the rule of decision will be governed by state privilege law." *Id.* at *7.  The court recognized that "a federal court sitting in diversity applies the choice of law rules emanating from the state in which it sits," and that, in the MDL context, "the transferee court applies the choice of law rules of the state in which the transferor court sits."  *Id.* at *4.  After surveying the choice of law principles of every state, the court decided to apply the "most significant relationship" test found in Restatement (Second) of

Conflict of Laws § 139 (Am. Law Inst. 1971).  The court found that in most states, "the law of the state with the most significant relationship to the communication will govern the existence and scope of attorney-client privilege."  *Id.* at *9.[1]

Other cases have adopted different approaches.  *See In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 501 F. Supp. 2d 789, 791-92 (E.D. La. 2007) (applying generally-known principles of the attorney-client privilege); *In re Baycol Prods. Litig.*, MDL No. 1431, 2003 WL 22023449, at *1-2 (D. Minn. Mar. 21, 2003) (applying the choice-of-law rules of the state where the transferee court sits); *U.S. Surety Co. v. Stevens Family Ltd.*, No. 11-C-7480, 2014 WL 902893, at *1 (N.D. Ill. Mar. 7, 2014) (applying the privilege law of state that supplies the substantive rule of decision).

After considering these various approaches, the Court agrees with *Yasmin*, which looked to the transferor states' choice of law rules to determine which privilege law to apply.  This approach comports with the Supreme Court's instruction that federal courts should look to state conflict laws as well as substantive laws.  *See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496-97 (1941).  The Court also agrees with *Yasmin*'s selection of the Restatement's most significant relationship test as best representative of the choice of law rules applied by the various states.  2011 WL 1375011, at *7.  The parties also agree.  Docs. 1476 at 6; 1590 at 2.  Thus, the Court will use Restatement § 139 to identify the privilege law to be applied in this case.

### B.      Section 139 Analysis.

Part 1 of § 139 provides:  "Evidence that is not privileged under the local law of the state which has the most significant relationship with the communication will be admitted, even though it would be privileged under the local law of the forum, unless the admission of such evidence would be contrary to the strong public policy of the forum."

---

[1] The court also concluded that cases filed directly in the MDL pursuant to its direct-filing order should be treated "as if they were transferred from a judicial district sitting in the state where the case originated."  2011 WL 1375011, at *5-6.  This approach comports with the fourth case management order in this MDL.  *See* Doc. 1485 at 3-4.  Thus, directly-filed cases in this MDL will be treated as if they were transferred from the forum where the case otherwise would have been filed – typically, the state where the plaintiff resides or where the Bard filter was implanted.

Restatement (Second) of Conflict of Laws § 139 (Am. Law Inst. 1971).  Part 2 provides: "Evidence that is privileged under the local law of the state which has the most significant relationship with the communication but which is not privileged under the local law of the forum will be admitted unless there is some special reason why the forum policy favoring admission should not be given effect."  *Id.*  Thus, § 139 applies only when the privilege law of the forum differs from that of the state with the most significant relationship to the allegedly privileged communication.

To determine which state has the most significant relationship, Comment e to § 139 provides this guidance:

> The state which has the most significant relationship with a communication will usually be the state where the communication took place, which, as used in the rule of this Section, is the state where an oral interchange between persons occurred, where a written statement was received or where an inspection was made of a person or thing. . . .  The state where the communication took place will be the state of most significant relationship in situations where there was no prior relationship between the parties to the communication.  If there was such a prior relationship between the parties, the state of most significant relationship will be that where the relationship was centered unless the state where the communication took place has substantial contacts with the parties and the transaction.

*Id.*

In the case of written communications (the only kind of communication at issue in this order), the comment suggests that the state where the communication was "received" has the most significant relationship.  This suggestion, made by the ALI in 1971, is problematic in a day of electronic communications.  Email communications – which represent most of the communication at issue in this motion – usually go back and forth between the communicating parties several times in a single email string, resulting in virtually everyone being the "receiving" party for at least some of the communications.  Email communications can also be "received" by many people in many states simultaneously.  Thus, it may be impossible to determine which party "received" the communication.  Commentators have noted this difficulty with the Comment e approach.

*See* Graham C. Lilly & Molly Bishop Shadel, *When Privilege Fails: Interstate Litigation and the Erosion of Privilege Law*, 66 Ark. L. Rev. 613, 643 (2013) ("determining the state with the 'most significant relationship' may prove problematic with electronic communication").

This case provides an apt example.  The first communication at issue in this motion (Log 2, Control 809) is just over one page long, and yet it includes an initial email between two people on July 15, 2005; a response copied to three more people on July 17, 2005; a forwarding of the email to still another person on July 18, 2005; and a response from the recipient of the forwarded email that is addressed to five new individuals and copied to one new individual, in addition to those already in the email chain.  Three communications, among a total of 12 people, over the course of four days render it virtually impossible to determine where this communication was "received."  To make matters more difficult, the parties have not provided the Court with the roles and locations of many of the people on this email, and this is just one of dozens the Court must review.  Many of the documents at issue in this motion include the same kind of back-and-forth among many persons over the course of several days.

The Court concludes that it would make little sense to find that the state with the most significant relationship – and therefore the applicable privilege law – varies from email to email, or maybe even within a single email string, depending on whom happens to be copied and whom the Court deems to be the primary recipient.  The Court finds that the "received" test for written email communication is simply not workable in this case.[2]

The Court need not dwell longer on this issue, however, because the other part of Comment e suggests that if the parties to the communication in question had a prior relationship, then the state where that relationship was "centered" will usually be the state with the most significant relationship.  This approach provides a workable solution for this case.  The communications in question appear primarily to be among Bard in-house

_____

[2] The Court notes that Comment e says the place where the written communication is received will "usually" be the state with the most significant relationship, leaving room for other approaches.

lawyers, based at C.R. Bard headquarters in New Jersey, and managers and employees of Bard Peripheral Vascular ("BPV"), located in Arizona.  The subject of this litigation is the design and performance of filters made and sold by BPV, as well as the marketing and compliance efforts of BPV.  Thus, although lawyers and paralegals for Bard may be based in New Jersey, it appears their client for purposes of these communications, as well as the subject of their communications, is primarily BPV and its activities in Arizona.

This appearance is confirmed by the evidence.  BPV is a wholly-owned subsidiary of C.R. Bard.  Doc. 2219-1 at 2, ¶ 3.  BPV is headquartered in Arizona, *id.*, and "is the company that was and is primarily responsible for all activities related to" the filters at issue in this case, *id.*, ¶ 4.

> From its headquarters in Tempe, Arizona, [BPV] had and continues to have principal responsibility in designing the filters, testing the filters, directing the manufacturing of the filters, developing contents of the instructions for use that accompanies the filters, communicating with the FDA regarding the filters, developing marketing material for the filters, training the sales force regarding interacting with physicians about [the] filters, developing written communications to physicians related to the filters, developing and maintaining a quality and post-market surveillance system regarding the filters, and deciding when each new generation of filter is first marketed and the previous filter stops being marketed.

*Id.*, ¶ 5.  BPV is responsible for managing its own day-to-day operations.  Doc. 2219-2 at 3-4.  C.R. Bard is responsible for setting "corporate quality standards or guidance[] that the divisions would need to follow at a global level," *id.* at 4, but the divisions act as "their own business that reports back up to Bard corporate or C.R. Bard," *id.* at 5.  C.R. Bard's legal department acts as "a full functioning legal department" covering "[a]ll matters of legal breadth," and the legal work for BPV.  *Id.* at 6.

Given these facts, and the reality that lawyers advise clients on the clients' activities and issues, not the lawyers' activities and issue, the Court concludes both that there was a preexisting relationship between the Bard in-house lawyers and BPV, and that the relationship can most accurately be described as "centered" in Arizona.  That is where products are developed, marketing materials are written, FDA communications

1   originate, training occurs, testing is done, and legal advice is needed, received, and acted

2   upon.

3          The authors of the law review article cited above reach a similar conclusion.  They

4   note that "[s]ince privileges primarily benefit their holders – such as a client or patient –

5   identifying the holder should be an important indication of which state has the most

6   significant relationship to the communication."  Lilly & Shadel, 66 Ark. L. Rev. at 649.

7   The privilege holder's "affiliation with competing states is of paramount importance" and

8   "should be a primary factor in determining which state has the most significant

9   relationship to a communication."  Id.

10         The Court concludes that the preexisting relationship between the parties to the

11   communications at issue in this case was centered in Arizona, and that Arizona therefore

12   has the most significant relationship to the communications.[3]  As a result, the Court will

13   apply the privilege law of Arizona.  Because Arizona also is the forum where this Court

14   is located, the Court need not further apply the conflict resolution principles set forth in

15   parts 1 and 2 of § 139.[4]

16         **C.      Plaintiffs' Arguments.**

17         Plaintiffs argue that New Jersey is the state with the most significant relationship

18   to the communications, but the evidence does not support this conclusion.  It is true that

19   C.R. Bard's corporate center, including its legal department, is located in New Jersey.

---

20

21         [3] Comment e says the state of the preexisting relationship controls "unless the state
22   where the communication took place has substantial contacts with the parties and the
   transaction."  Restatement § 139, cmt. e.  Because the state where the communication
23   took place is so difficult to identify given the nature of the electronic communications at
   issue, the Court does not view this part of the comment as helpful or controlling.

24         [4] The Court notes that if the Court adopted Plaintiffs' argument that New Jersey
   has the most significant relationship, and if New Jersey privilege law provided that a
25   particular communication was not privileged, the Court likely would nonetheless apply
   Arizona law if it would hold the communication privileged.  Section 139(1) provides that
26   the forum's law governs if admission of the evidence in question would be contrary to the
   strong public policy of the forum.  The Court views A.R.S. § 12-2234 – the Arizona
27   statute that governs the corporate attorney-client privilege – as a strong public policy.
   The statute was passed by the Arizona Legislature and signed by the Governor in
28   response to an Arizona Supreme Court decision that weakened the corporate privilege,
   and has remained unchanged for more than 20 years.  *See Roman Catholic Diocese of
   Phx. v. Super. Ct.*, 62 P.3d 970, 974 (Ariz. Ct. App. 2003).

But the evidence shows that C.R. Bard was not involved in the management of day-to-day operations of BPV and, as discussed above, virtually all of the relevant conduct and events occurred at BPV.  The fact that Bard's legal department is located in New Jersey is not dispositive, particularly when the relevant client, BPV, is located in Arizona.

Plaintiffs argue that "in the intra-corporate context, the parent and wholly-owned subsidiary should be treated as one entity."  Doc. 2222 at 4.  Plaintiff cite *Teleglobe Communications Corp. v. BCE Inc.*, 493 F.3d 345 (3d Cir. 2007), but that case addressed the effect of disclosing an otherwise privileged attorney-parent communication to the parent's subsidiary, *see id.* at 369-74.  It did not address the complicated choice-of-law issue presented in this case.

Plaintiffs argue that "it is reasonable to presume that Bard's lawyers relied on New Jersey law" when advising BPV.  Doc. 2222 at 4-5.  The Court does not agree.  Plaintiffs' own cases suggest that lawyers typically apply the laws of their client's state when providing guidance.  *See, e.g.*, *Compuware Corp. v. Moody's Investors Servs., Inc.*, 222 F.R.D. 124, 133 (E.D. Mich. 2004) (holding that New York company's lawyers advising on privilege "surely relied on the protections of New York law").

Plaintiffs assert that Bard's litigation counsel never mentioned Arizona law in the parties' meet and confer process, involving "claims going back several years" in related cases.  Doc. 2222 at 5.  While this may support an estoppel argument, which Plaintiffs have not made, it is does not address the choice of law issue.

Plaintiffs assert that Bard "is hardly a major employer in Arizona" and that BPV "does not specifically market in Arizona, has no retail locations here, and some of its products including IVC filters are manufactured elsewhere."  Doc. 2222 at 5.  But Plaintiffs do not dispute that BPV is an Arizona corporation with its principal place of business here.  The relevant question is not the significance of BPV's presence in Arizona, but where the relationship between BPV and its lawyers was centered.  For reasons discussed above, the Court concludes that the relationship was centered in Arizona, the location of the activities for which the legal advice was provided.

## II.      Legal Standard.

### A.      Attorney-Client Privilege.

The attorney-client privilege "is rigorously guarded to encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *State v. Sucharew*, 66 P.3d 59, 64, ¶ 10 (Ariz. Ct. App. 2003) (citing *State v. Towery*, 920 P.2d 290, 299 n.6 (Ariz. 1996) (internal quotation marks omitted)). "The privilege belongs to the client and encompasses communication between the attorney and client made in the course of the attorney's professional employment." *Id.* (citing *State v. Holsinger*, 601 P.2d 1054, 1058 (Ariz. 1979)). "The burden of showing the relationship, the confidential character of the communication, and other necessary facts, is that of the party claiming the privilege." *State v. Sands*, 700 P.2d 1369, 1374 (Ariz. Ct. App. 1985) (citation omitted).

In Arizona, the corporate attorney-client privilege is codified at A.R.S. § 12-2234:

A.      In a civil action an attorney shall not, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment. An attorney's paralegal, assistant, secretary, stenographer or clerk shall not, without the consent of his employer, be examined concerning any fact the knowledge of which was acquired in such capacity.

B.      For purposes of subsection A, any communication is privileged between an attorney for a corporation, governmental entity, partnership, business, association or other similar entity or an employer and any employee, agent or member of the entity or employer regarding acts or omissions of or information obtained from the employee, agent or member if the communication is either:

1.      For the purpose of providing legal advice to the entity or employer or to the employee, agent or member.

2.      For the purpose of obtaining information in order to provide legal advice to the entity or employer or to the employee, agent or member.

C.      The privilege defined in this section shall not be construed to allow the employee to be relieved of a duty to disclose the facts solely because they have been communicated to an attorney.

1  "Based on its express terms, the statute protects from disclosure communications between

2  a corporation's attorney – or his 'paralegal, assistant, secretary, stenographer or clerk' –

3  and 'any employee, agent or member of the entity or employer regarding acts or

4  omissions of or information obtained from the employee agent or member'" if it is "'[f]or

5  the purpose of obtaining information in order to provide legal advice to the entity or

6  employer or to the employee, agent or member.'"  *Salvation Army v. Bryson*, 273 P.3d

7  656, 662-63 (Ariz. Ct. App. 2012) (citations omitted).

8          **B.      Work-Product Doctrine.**

9          "Ordinarily, a party may not discover documents and tangible things that are

10  prepared in anticipation of litigation or for trial by or for another party or its

11  representative (including the other party's attorney, consultant, surety, indemnitor,

12  insurer, or agent)."  Fed. R. Civ. P. 26(b)(3)(A).   Courts in the Ninth Circuit use the

13  "because of" test to determine whether dual-purpose documents were prepared in

14  anticipation of litigation:

15          In circumstances where a document serves a dual purpose, that is, where it
         was not prepared exclusively for litigation, then the "because of" test is
16          used.  Dual purpose documents are deemed prepared because of litigation if
         in light of the nature of the document and the factual situation in the
17          particular case, the document can be fairly said to have been prepared or
         obtained because of the prospect of litigation.  In applying the "because of"
18          standard, courts must consider the totality of the circumstances and
         determine whether the document was created because of anticipated
19          litigation, and would not have been created in substantially similar form but
20          for the prospect of litigation.

21

22  *United States v. Richey*, 632 F.3d 559, 567-68 (9th Cir. 2011) (quotation marks and

23  citations omitted).   The party invoking work-product protection bears the burden of

24  proof.  *Conoco Inc. v. U.S. Dep't of Justice*, 687 F.2d 724, 728 (9th Cir. 1982).

25  **III.   Application.**

26          The parties have identified several categories of documents that are in dispute, and

27  have submitted for *in camera* review a binder of sample documents selected by the

28  parties (*see* Doc. 1319) and a matrix addressing the samples.  The categories have been

1    identified by Plaintiffs, and are described in a letter dated April 4, 2016, from Plaintiffs'

2    counsel to Bard's counsel.   *See* Doc. 1476-3.   This order will follow the category

3    numbering from the letter.

4        **A.    Category 1a.**

5        Plaintiffs' first category involves communications "where Defendants have failed

6    to establish [that] the communication evidences a request made to or from a lawyer for

7    the purpose of obtaining or providing legal advice of the lawyer," specifically, "[e]ntries

8    where non-attorney employees are alleged to have given legal advice independent of a

9    lawyer." Doc. 1476-3 at 2.   Plaintiffs make three general arguments: (1) there is no

10   lawyer involved in the communications; (2) Bard has failed to provide facts suggesting

11   how the matter being discussed is of legal importance; and (3) any privilege that may

12   have attached was waived by the presence of a third party.

13       Arizona's corporate attorney-client privilege protects a communication by an

14   attorney's "paralegal, assistant, secretary, stenographer or clerk" if it would otherwise be

15   privileged.  A.R.S. § 12-2234(A), (B); *see also Salvation Army*, 273 P.3d at 662-63.  To

16   be protected, a communication must be made for the purpose of providing legal advice or

17   obtaining information to provide legal advice.  A.R.S. § 12-2234(B)(1), (2).  The fact that

18   a communication includes a party's agent does not destroy the privilege.  A.R.S. § 12-

19   2234(B); *Salvation Army*, 273 P.3d at 662-63.

20       Bard provided an affidavit from Candace Camarata, who serves as Bard's assistant

21   general counsel for litigation.[5]   The affidavit establishes the following.   Bard's Law

22   Department routinely provides BPV's employees with legal advice, including advice

23   about ongoing litigation.   Doc. 1476-9 at 2, ¶¶ 2-3.   Bard's lawyers often utilize

24   paralegals, referred to as either a "Litigation Manager" or a "Trademark Manager," to

25   facilitate these communications.  *Id.*, ¶ 3.  Due to Bard's size, these messages must often

26   _____

27   [5] Plaintiffs object to the Court's reliance on Ms. Camarata's affidavit because she
     lacks personal knowledge of any communications to which she was not a party.   The
     Court views Ms. Camarata's affidavit as attesting to procedures of Bard's Law
28   Department in general, such as the general types of legal advice given and how paralegals
     are utilized by in-house counsel.  Ms. Camarata has personal knowledge of these facts.

be forwarded to others within the company who need the information to perform their jobs. *Id.* at 3. ¶ 7.

The parties have provided the Court with five Category 1a documents. Each communication involves at least one Bard paralegal.

The first disputed Category 1a communication – Log 2, Control 809 – is an email string containing four separate messages. In the first message, an employee emails a litigation paralegal about a pending case. The paralegal responds, while adding additional legal personnel, including another paralegal and an in-house lawyer. The paralegal asks the initial author of the email to forward her message to other individuals in the author's department. The message is then forwarded twice, and a consultant is copied on the final message. The consultant, Richard Bliss, is a former Bard employee who worked full time at BPV in Arizona under a consulting contract, serving as Head of Quality and Regulatory while Bard searched for a permanent employee to fill that position. Doc. 1476-8 at 3, ¶ 5. The Court concludes that Bliss constituted an agent within the meaning of § 12-2234(B). Because this email string consists of communications between Bard employees or agents and a paralegal, concerning ongoing litigation, the Court concludes that it falls within the protection of A.R.S. § 12-2234. *Salvation Army*, 273 P.3d at 662-63 ("the statute protects from disclosure communications between a corporation's attorney – or his paralegal, assistant, secretary, stenographer or clerk – and any employee, agent or member of the entity or employer . . . [f]or the purpose of obtaining information in order to provide legal advice to the entity or employer or to the employee, agent or member.") (quotation marks omitted).

Log 6, Control 8 consists of two cells from a larger spreadsheet apparently tracking specific complaints regarding Bard filters. The cells include a "comments" section in which various employees make dated entries regarding facts or events related to the complaint. Bard redacted two entries that reflect communications from paralegals regarding litigation and investigation of a complaint. Because the redacted portions contain internal communications from Bard's legal personnel, the Court concludes that

they are protected by Arizona's attorney-client privilege.

Upon review of the other Category 1a documents – Log 6, Control 193; Log 3, Control 3184; and Log 3, Control 2244 – the Court concludes that they are privileged under the Arizona statute.  They reflect communications to or from Bard paralegals seeking information needed for legal advice.  The Court therefore denies Plaintiffs' motion to compel production of documents in Category 1a.

**B.      Category 1b.**

Plaintiffs' second category involves communications "where Defendants have failed to establish the communication evidences a request made to or from a lawyer for the purpose of obtaining or providing legal advice of the lawyer," including "[e]ntries where both the author and recipient are non-lawyers and Defendants" failed to provide key information, such as the lawyer asked to provide legal advice, the legal purpose for which the lawyer was consulted, or why disclosure to a non-lawyer was necessary to fulfill that purpose.  Doc. 1476-3 at 2.

Plaintiffs challenge the Category 1b documents on many of the same grounds as the Category 1a documents.  These communications all generally involve a paralegal, as in Category 1a.  The Court concludes that two communications – Log 3, Control 2295, and Log 4, Control 29 – are privileged for the reasons discussed above in Category 1a.  They reflect communications to or from Bard paralegals seeking information needed for legal advice.  *See Salvation Army*, 273 P.3d at 662-63.

Defendants produced the email at Log 3, Control 3028, but not the attached memorandum.  The Court rejects Plaintiffs' argument that the privilege does not apply because the memorandum would not "be deemed a traditionally legal document."  The memorandum is addressed to two Bard lawyers, and two others at BPV, and reports on reviews of literature, data bases, and other sources to obtain information regarding risks and complications of particular filters.  It also includes a list of known risks.  The information contained in the memorandum clearly is of a type that lawyers would consider in advising the company on legal risks, and the Court finds that the

memorandum is covered by Arizona's attorney-client privilege.  A.R.S. § 12-2234(B).

Log 6, Control 191 is a communication between an ESI vendor and Bard employees regarding ESI searches to be done on behalf of Bard's outside counsel in this case, for witnesses that have been mentioned in motions in this case.  It is a document prepared in connection with ongoing litigation, and is protected work product.  Fed. R. Civ. P. 26(b)(3)(A).  As the Court has noted in a previous order, the fact that a document is prepared by non-lawyers and does not include legal advice does not mean that it was not prepared in anticipation of litigation for purposes of Rule 26(b)(3)(A).  Doc. 699 at 8.

Log 3, Control 57 contains redactions in an email chain.  The Court has reviewed the redacted communications.  They include a request for legal advice from an in-house attorney and the attorney's response, and are privileged.

The Court denies Plaintiffs' motion to compel as it pertains to Category 1b.

**C.     Category 2.**

This category involves communications that do not show "that any legal advice was given or requested.  In other words, where Defendants have failed to establish that a lawyer was being asked to act as a lawyer – giving advice with respect to the legal implications of a proposed course of conduct."  Doc. 1476-3 at 2.

With respect to Log 2, Control 403, the redacted portion of the email was from Donna Passero, one of Bard's in-house lawyers.  The redacted email language, and the attachment that was withheld, include communications to and from Ms. Passero regarding directions given to Bard sales representatives on statements they could or could not make in their sales activities.  Such communications have important legal implication for Bard, and the communication is privileged.

Log 3, Control 1697 is a redacted email to Tom Conniff, one of Bard's in house lawyers.  It concerns terms of an agreement being drafted, and is privileged.

With respect to Log 6, Control 65, Bard states that it has previously produced the cover email but not the attachment.  The attachment is a spreadsheet titled "Trade Complaints Tracker."  It contains a number of rows and columns, including a column

titled "Status Summary: (Briefly Describe)."  This column sometimes includes questions from specific Bard personnel, as denoted by their initials, to other individuals, also denoted by their initials.  Some of the communications in this column are to or from in-house attorney Gina Dunsmuir.  Bard's arguments with respect to this document do not attempt to show that entire spreadsheet is privileged or created for a privileged purpose. The portions that reflect internal communications to or from counsel appear to be privileged, but not other portions that reflect facts such as event dates, identities of competitors, and event summaries.  Nor does the Court find that descriptions of counsel's communications with persons outside of Bard are privileged (such as event 3d, column titled "Event Summary").  If Bard has withheld the entire spreadsheet, it should produce a redacted version that redacts only those portions reflecting privileged communications.[6]

Log 3, Control 1694 is an email from outside counsel attaching a draft letter to opposing counsel relating to contract negotiations.  The email requests feedback on the letter, and a response provides feedback.  The communications are privileged.

Log 2, Control 741 is a communication between BPV personnel and at least two Bard lawyers, Gary Mitchell and Gina Dunsmuir.  These communications involve legal advice or the obtaining of information in order to provide legal advice.   They are privileged.

The Court concludes that the four communications in Category 2 are protected by the attorney-client privilege.  The fifth document – Log 6, Control 65 – is only protected to the extent it contains communications covered by the privilege, but not otherwise, and unprivileged portions should be produced.  The Court therefore grants in part and denies in part Plaintiffs' motion to compel as it pertains to Category 2.

**D.      Category 3.**

Category 3 involves "[e]ntries where a business purpose would have provided a sufficient cause for the communications."  Doc. 1476-3 at 2.  For the attorney-client privilege to attach, the communication must have been for the purpose of providing legal

---

[6] Bard did not invoke the work-product doctrine as to this document.

advice or for obtaining information in order to provide legal advice.   A.R.S. § 12-2234(B).

The Court already concluded that Log 2, Control 403 is privileged.   Three of the remaining four communications also are clearly privileged.   Log 3, Control 334 is a communication redacted to remove advice received from Bard's legal department.   Log 2, Control 794 communicates legal advice of Donna Passero, one of Bard's in-house lawyers.   Log 5, Control 203 conveys information to Ms. Passero, a lawyer, from Dr. Richard Lehmann, Bard's consultant retained by the legal department, regarding a patient death.   Each of these communications involves either the relaying of legal advice or the providing of information to in-house attorneys in connection with risks faced by the company.   A.R.S. § 12-2234(B).   The attorney-client privilege applies.

The fifth document, Log 1, Control 115, is a communication from Dr. Lehmann, a consultant retained by Bard's legal department.   The Court has previously found that the legal department retained Dr. Lehmann in 2004 in anticipation of litigation after Bard received notice of adverse events associated with the Recovery Filter.   Doc. 699 at 5. The communication concerns analysis performed by Dr. Lehmann in accordance with Schedule A (Doc. 335 at 9) of his contract with the legal department, and Dr. Richard Holcomb, another consultant to the legal department.   Because Lehman and Holcomb were agents of Bard in performing this work, and the result was communicated to Bard attorney Donna Passero, among other Bard personnel, the Court concludes that it is privileged under the Arizona statute:   "any communication is privileged between an attorney for [an] . . . entity . . . and any . . . agent . . . of the entity . . . [f]or the purpose of obtaining information in order to provide legal advice to the entity."   A.R.S. § 12-2234(B)(2).

The Court also finds this document protected by the work-product doctrine.   As noted, the Court previously held that Dr. Lehmann was retained in anticipation of litigation.   Doc. 699.   Plaintiffs argue that this communication also had a business purpose, but a dual purpose document is still protected if it "would not have been created

in substantially similar form but for the prospect of litigation." *Richey*, 632 F.3d at 567-68.  The Court cannot conclude that this work would have been done in substantially the same form solely for business reasons.  Nor is the Court persuaded by Plaintiffs' citation to *Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 652-53 (D. Nev. 2013).  The cited pages of that case concern a different email that did not include any legal counsel.  *Id.*

The Court denies Plaintiffs' motion to compel production of Category 3 documents.

### E.     Category 4.

This category involves "[e]ntries where in-house counsel was being asked to edit or comment on non-traditional legal documents (technical, scientific, public relations, management, and marketing) versus traditional legal instruments (contracts for a study, retention of experts, patent applications)."  Doc. 1476-3 at 2.  Arizona courts have not directly addressed the scope of the corporate attorney-client privilege in the context of heavily-regulated industries.  The Court must therefore "use its own best judgment in predicting how [the Arizona Supreme Court] would decide the case," and, in doing so, "may be aided by looking to well-reasoned decisions from other jurisdictions."  *Takahashi v. Loomis Armored Car Serv.*, 625 F.2d 314, 316 (9th Cir. 1980) (citations omitted).

In the heavily-regulated industry context, "services that initially appear to be non-legal in nature, like commenting upon and editing television ads and other promotional materials, could, in fact, be legal advice."  *In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. at 800.  Some courts use the "primary purpose" standard, which protects communications in which lawyers provide both legal and business services if "counsel was participating in the communications primarily for the purpose of rendering legal advice or assistance."  *Id.* at 798.  Other courts employ the "because of" standard, which was developed in the work-product context.  *Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 628 (D. Nev. 2013).  Regardless of which standard is employed, the Court must conduct a document-by-document, fact-specific inquiry.  *See S.G.D. Eng'g, Ltd. v. Lockheed Martin Corp.*, No.

1  CV-11-02493-PHX-DGC, 2013 WL 2297175, at *3 (D. Ariz. May 24, 2013) (adopting
2  special master's report and recommendation).

3        As an initial matter, Plaintiffs argue that several documents are not privileged
4  because they would not "be deemed a traditionally legal document."  This argument is
5  not supported by Arizona's corporate attorney-client privilege, which applies broadly to
6  "any communication."  A.R.S. § 12-2234(B).

7        Four of the five communications – Log 2, Control 293; Log 3, Control 1965;
8  Log 3, Control 423; and Log 4, Control 4 – were made for the primary purpose of
9  providing legal advice or assistance.  Each of these communications involves a Bard
10  lawyer providing comments.  Although the comments arguably serve both a business and
11  a legal purpose, they appear to be for the primary purpose of providing legal advice.
12  Log 2, Control 293, for example, involves edits by two Bard lawyers, Donna Passero and
13  Judith Reinsdorf, to a communication to the sales force.  The communication concerns
14  FDA regulation and adverse events, both of which strongly implicate legal issues, as do
15  the sales force's public representations concerning such matters.   Ms. Reinsdorf
16  specifically states that "[w]ith these edits, this email can serve as 'legal's approval.'"  The
17  other three documents similarly involve edits of Bard's lawyers on matters implicating
18  legal issues.

19        Plaintiffs contend that Log 3, Control 1965 cannot be privileged because Bard had
20  an independent duty to produce the documents under 21 C.F.R. § 820.100 and under
21  Bard's own policies and procedures.   Even if this is true, it does not lead to the
22  conclusion that Plaintiffs are entitled to communications in which Bard receives legal
23  advice in the document's preparation.

24        Log 6, Control 54 includes an email chain in which a Bard in-house attorney
25  provides comments on a letter to a doctor apparently affiliated with the Agency for
26  Health Care Research and Quality.  The redacted portions of the emails are privileged, as
27  they reflect the attorney's recommendations, and the attorney's suggested edits to the
28  letter are privileged for the same reason.  The Court cannot conclude that the attorney

was merely performing a business function.  Communications with an agency regarding studies of Bard products certainly could have legal implications, and review by counsel of such communications would clearly involve potential legal issues.

The Court denies Plaintiffs' motion to compel production of Category 4 documents.

### F.     Category 5.

Category five involves "[e]ntries where both the author and the recipient are non-lawyers and an attorney was merely copied on the communication."  Doc. 1476-3 at 3. Arizona's corporate attorney-client privilege law protects communications made for the purpose of providing legal advice or information in order to provide legal advice.  A.R.S. § 12-2234(B).

Four of the five communications – Log 2, Control 859; Log 2, Control 816; Log 3, Control 3987; and Log 3, Control 3161 – involve communications where a lawyer is involved primarily for the purpose of rendering legal advice or assistance.  The redacted portions of Log 2, Control 859, for example, explicitly reference revisions from discussions with outside products liability counsel.  Log 2, Control 816 consists of internal Bard communications about draft materials to be sent to the FDA, with an in-house lawyer as a party to the communications.  As the communications provide information to a lawyer for the purpose of obtaining legal advice, they fall within A.R.S. § 12-2234(B)(2).  Log 3, Control 3987 is a draft of a communication to a regulator, copied to a lawyer.  Log 3, Control 3161 involves communications between Bard's lawyers and BPV personnel regarding a research grant request.  These communications are privileged because they involve lawyers in the preparation of documents that have potential legal significance.  Involving lawyers in such communications provides them with the information needed to provide legal advice on the issues of legal significance. A.R.S. § 12-2234(B).

Log 1, Control 114 is a memo from Dr. Lehmann and Richard Holcomb to Bard's medical director, copied to Donna Passero.  As noted above, the Court has previously

found that the legal department retained Dr. Lehmann in anticipation of litigation after Bard received notice of adverse events associated with the Recovery Filter.  Doc. 699 at 5.  The communication concerns analysis performed by Dr. Lehmann in accordance with his contract with the legal department, and Dr. Holcomb, another consultant to the legal department.  Indeed, this document is closely related to Log 1, Control 115, discussed above, and includes some of the same materials.  Because Lehman and Holcomb were agents of Bard in performing this work, and the result was communicated to Bard attorney Donna Passero, among other Bard personnel, the Court concludes that it is privileged under the Arizona statute:  "any communication is privileged between an attorney for [an] . . . entity . . . and any . . . agent . . . of the entity . . . [f]or the purpose of obtaining information in order to provide legal advice to the entity."  A.R.S. § 12-2234(B)(2).

The Court also finds this document protected by the work-product doctrine.  Dr. Lehmann was retained by the Bard legal department in anticipation of litigation.  Doc. 699.  Plaintiffs argue that the communication also had a business purpose, but a dual purpose document is protected if it "would not have been created in substantially similar form but for the prospect of litigation."  *Richey*, 632 F.3d at 567-68.  The Court cannot conclude that this work would have been done in substantially the same form solely for business reasons.  Nor is the Court persuaded by Plaintiffs' citation to *Phillips*, 290 F.R.D. at 652-53.  The cited pages concern an email on a different subject that did not include any legal counsel.  *Id.*

The Court denies Plaintiffs' motion to compel production of Category 5 documents.

### G.    Category 6.

This category involves "[e]ntries describing a communication to non-lawyers and attorneys seeking simultaneous review and comment."  Doc. 1476-3 at 3.   Three of the five examples do not require the Court's attention.  Plaintiffs have withdrawn their challenge to Log 3, Control 809, Bard has produced Log 6, Control 251, and the Court

1    determined above that Log 2, Control 816 is privileged.

2            The redacted portions of Log 3, Control 175 are privileged.  The redacted portions

3    appear in an email from Judith Reinsdorf, one of Bard's in-house lawyers, to several Bard

4    personnel.  Ms. Reinsdorf is providing substantive feedback on a plan to assess clinical

5    issues relating to the G2 filter.  Ms. Reinsdorf's comments appear to be for the purpose of

6    providing legal advice.

7            The redacted portions of Log 3, Control 2099 are privileged.  The redacted

8    portions appear in an email to Gina Dunsmuir, one of Bard's lawyers, and others, and

9    seek comments on draft talking points to Bard's sales force.  Communications with sales

10   force, as noted above, can have significant legal implications, as illustrated by Plaintiffs'

11   claim in this case that Bard's sales force made misrepresentations concerning its

12   products.  Because the communication solicits input from a lawyer on these issues, it falls

13   within A.R.S. § 12-2234(B).

14          The Court denies Plaintiffs' motion to compel production of Category 6

15   documents.

16          **H.     Category 7.**

17          This category involves "[e]ntries that do not describe the author or recipient of the

18   communication, including attachments."  Doc. 1476-3 at 3.   Two of the five examples

19   do not require the Court's attention.  The Court found above that Log 2, Control 403 is

20   privileged, and Bard has produced Log 6, Control 330.

21          Two of the remaining three documents are clearly privileged.  Log 3, Control 224

22   contains legal advice of Bard's in-house and outside counsel.   Log 6, Control 115

23   involves talking points from Bard's in-house counsel with respect to an earnings call that

24   will address ongoing litigation.

25          The final document, Log 3, Control 3089, is privileged.  It involves an email

26   communication among Bard personnel, including both in-house and outside counsel,

27   attaching a draft document.  In Category 1b, above, the Court concluded that the final

28   version of the attachment was privileged.  The draft attachment is addressed to an in-

1    house Bard lawyer, and others at BPV, and reports on reviews of literature, data bases,

2    and other sources to obtain information regarding risks and complications of particular

3    filters.   It also includes a list of known risks.   The information contained in the

4    memorandum clearly is of a type that lawyers would consider in advising the company on

5    legal risks, and the Court finds that the memorandum is covered by the attorney-client

6    privilege.

7         The Court denies Plaintiffs' motion to compel production of Category 7

8    documents.

9    **I.     Category 8.**

10        This category involves "[e]ntries where a non-party is an author or listed as

11   receiving a copy of the communication so as to have waived any attorney-client privilege

12   or work product."  Doc. 1476-3 at 3.  Arizona's corporate attorney-client privilege covers

13   "any employee, agent, or member."  A.R.S. § 12-2234(B).

14        One of these examples does not require the Court's attention.  Bard has already

15   produced Log 2, Control 1220.  Plaintiffs object that they cannot verify this assertion

16   because Bard has not provided a bates number for the document.   Bard is directed

17   promptly to provide Plaintiffs with the bates number of the unredacted version of Log 2,

18   Control 1220 it produced.

19        The remaining four documents all appear to be privileged.  Log 2, Control 502

20   involves legal communications made by paralegals similar to the examples discussed in

21   Category 1a above.   The Court concluded that those and similar communications are

22   privileged.  Log 3, Control 335 and Log 3, Control 326 both involve Bard's intellectual

23   property counsel and a draft patent application.   Log 2, Control 336 passes along

24   information received from Bard's lawyers for litigation purposes.  The attorney-client

25   privilege applies to these documents unless it was waived.

26        The presence of consultants does not waive the privilege.   As already noted,

27   Arizona's corporate privilege covers communications involving a corporation's "agents."

28   A.R.S. § 12-2234(B).   What is more, the Court concludes that the Arizona Supreme

Court would likely adopt the "functional equivalent" test adopted by the Ninth Circuit, which provides that consultants who act as the functional equivalent of an employee are treated as an employee for purposes of the attorney-client privilege. *See United States v. Graf*, 610 F.3d 1148, 1157-59 (9th Cir. 2010). Bard has provided evidence that both Richard Bliss and John Kaufmann functioned as employees. *See* Doc. 1476-9 at 3, ¶¶ 5, 7. Under either the plain terms of A.R.S. § 12-2344(B) or the functional equivalent doctrine, the presence of consultants did not result in waiver of an otherwise privileged document.

The Court denies Plaintiffs' motion to compel as it pertains to Category 8.

**IV.    Remaining Issues.**

The Court expects that the parties will use this ruling as a guide to resolve remaining privilege disputes. The parties shall update the Court as to their progress on privilege issues in their joint submission for the next case management conference. In that submission, the parties shall address whether they believe it would be helpful to appoint a special master to resolve any additional privilege disputes.

**IT IS ORDERED** that Plaintiffs' motion to compel (Doc. 1214) is **granted in part** and **denied in part** as set forth above.

Dated this 25th day of July, 2016.

David G. Campbell
United States District Judge

- 23 -