Robert W. Boatman (009619)
Paul L. Stoller (016773)
Shannon L. Clark (019708)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone: (602) 530-8000
rwb@gknet.com
paul.stoller@gknet.com
SLC@gknet.com

Ramon Rossi Lopez (CA Bar No. 86361)
(admitted *pro hac vice*)
LOPEZ McHUGH LLP
100 Bayview Circle, Suite 5600
Newport Beach, California 92660
rlopez@lopezmchugh.com
*Co-Lead/Liaison Counsel for Plaintiffs*

James R. Condo (#005867)
Amanda C. Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
Telephone:  602.382.6000
Facsimile:  602.382.6070
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street, NW / Suite 1700
Atlanta, GA  30363
Telephone: (404) 322-6000
Telephone: (602) 382-6000
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com
*Attorneys for Defendants C. R. Bard, Inc. and
Bard Peripheral Vascular, Inc.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation, | No. 2:15-MD-02641-DGC **THE PARTIES' JOINT STATUS REPORT FOR THE AUGUST 23, 2016 CASE MANAGEMENT CONFERENCE** |

In accordance with Paragraph H of Case Management Order No. 13 [Doc. 2238], the Parties hereby submit their Joint Status Report for the August 23, 2016 Case Management Conference.

### A.     Fact Discovery

Fact discovery is proceeding efficiently without any impediments thus far.   The Parties have scheduled the depositions of all witnesses requested by Plaintiffs with the exception of three witnesses who are presently being scheduled and one witness (Jim Beasley) who is addressed at Section F below.

The following depositions have already been completed:

| | |
|---|---|
| May 3, 2016 | Dr. Murray Asch |
| May 11, 2016 | Carol Vierling |
| May 17, 2016 | Anne Bynon |
| May 24, 2016 | Len DeCant |
| June 2, 2016 | John DeFord |
| June 9, 2016 | Bret Baird |
| June 16, 2016 | Robert DeLeon |
| June 17, 2016 | Joe DeJohn |
| July 18, 2016 | Abithal Raji-Kubba |
| July 27, 2016 | Bill Little |
| July 27, 2016 | Judy Ludwig |
| July 29, 2016 | John Wheeler |
| August 9, 2016 | Maureen Uebelacker[1] |

The following depositions have been scheduled:

| | |
|---|---|
| August 19, 2016 | Mary Edwards |
| August 24, 2016 | Cindi Walcott |

---

[1] In the interests of coordinating state and MDL discovery, Plaintiffs have also cross noticed the depositions of Bard employees proceeding in related state court actions so that any relevant testimony may be used in the MDL.

| | |
|---|---|
| August 30, 2016 | 30(b)(6) Representative re REACH program |
| September 7, 2016 | Steve Williamson |
| September 7, 2016 | 30(b)(6) Representative re Sales/Marketing |
| September 7, 2016 | Kevin Shifrin |
| September 14, 2016 | Holly Glass |
| September 16, 2016 | Jack Sullivan |
| September 19, 2016 | Brian Doherty |
| September 29, 2016 | John Van Vleet |
| October 11, 2016 | Chris Ganser |

**B.**     **Bellwether Process: "Show Cause" Hearing**

The Parties have been following the process for bellwether selection set forth in CMO No. 11 [Doc. 1662].  Pursuant to Paragraph II of that order, both sides have identified 24 cases to comprise the PFS/DFS Group I (of 48 cases).  The Defendants have waived Lexecon in all 48 cases.  Plaintiffs waived Lexecon in all but four of the initial 48 cases.

The Parties met and conferred regarding those four plaintiffs and their individual reasons for declining to consent to having their cases tried in the District of Arizona.  As a result of those discussions, the Defendants agreed to substitute other plaintiffs in three cases because of the evidence they provided of health conditions making travel difficult or impossible.  Two of those three substitute plaintiffs then waived Lexecon, but a third did not.  Thus, of the current 48 selections for PFS/DFS Group 1, there are two plaintiffs who have not waived Lexecon (Dodi Froelich and Ruth Delbrugge).

1.     Defendants' position:

The Defendants question the sufficiency of the justification proffered by these two plaintiffs and have insisted that, in accordance with Paragraph II.C of CMO 11, these plaintiffs show cause why a waiver may not be made in their particular case.

/ / /

CMO 11 states as follows:

> If a plaintiff in a case selected for inclusion in PFS/DFS Group 1 by Defendants does not provide a Lexecon Waiver, the plaintiff or his/her counsel shall show cause why a Lexecon Waiver is not being made … Any party required to show cause must appear in person or by telephone before the Court to explain why a Lexecon Waiver may not be made in the particular case.

Case Management Order No. 11 (Dkt. 1662) at Paragraph II.C.  The Defendants believe that, under that provision, it is for the Court to determine (and not for the Plaintiffs to unilaterally decide) whether a Plaintiff in question should appear (and whether in person or by telephone), or whether the representations of counsel are sufficient.  The Defendants of course defer to the Court to make those determinations but do not believe the Plaintiffs can dictate how the hearing is conducted.

The Defendants are also concerned with what appears to be a cavalier approach by the Plaintiffs to the Lexecon waiver issue, and the ramifications of that approach for the continued feasibility of the bellwether process devised by the parties and approved by the Court.  Under that process, a Plaintiff can be required to show "good cause" if he or she declines to waive Lexecon.  That requirement is consistent with the approach taken by a number of other MDL courts across the country.  The Plaintiffs, however, appear to be redefining the showing set out in the order.  The Plaintiffs now claim that a Plaintiff can waive Lexecon "for any reason" as long as his or her counsel makes an untested representation to the Court that there is no strategic purpose in the decision.  The Defendants respectfully suggest that such an evisceration of the "good cause" requirement previously ordered by the Court gives the Plaintiffs' attorneys unfettered discretion to control the bellwether selection process.

### 2.   Plaintiffs' position:

Plaintiffs contend that they made a comprehensive effort to secure Lexecon waivers from all plaintiffs selected by either side for inclusion in PFS/DFS Group 1, and specifically that Plaintiffs did not utilize an individual plaintiff's rights under Lexecon to "deselect" cases chosen by Defendants on the merits or otherwise.  Rather, Lead Counsel requested all

counsel with plaintiffs selected for inclusion in PFS/DFS Group 1 to secure waivers of Lexecon from their clients in every case and without regard to the merits the case. Plaintiffs contend that each plaintiff has his or her own rights under Lexecon and can exercise those rights for any reason as long as it was not for an improper purpose of deselecting cases based on their merits. In three cases (each of which Defendants have agreed to replace), the individual plaintiffs have medical or physical limitations that effectively preclude them from traveling to Arizona for trial. And, the two plaintiffs at issue made their own independent decisions as to whether to waive Lexecon.

Plaintiffs believe this Court's Case Management Order 11 is clear that either "plaintiff or his/her counsel" shall make the showing required by the Court and that such showing may be made "in person or by telephone." Counsel in each of the two at-issue cases is prepared to address the show-cause issue at the Case Management Conference.

### 3.   Joint request that show cause hearing be conducted at the CMC

Subject to the Court's approval, Defendants and counsel for the plaintiffs propose that the show cause inquiry be conducted as a part of the August 23rd Case Management Conference.

## C.   ESI Discovery: Status and Disputes

### 1.   Background

The Parties filed a Joint Report and Dispute Matrix Regarding ESI Discovery and Custodians [Doc. 1756] on May 16, 2016. In that report, the Parties identified a general course of action with respect to ESI that included identifying particular sources and locations for collection of ESI and then using keywords or Boolean searches run across all collected data to cull that data to a smaller set; the parties were then to meet and confer regarding whether and what additional search methodologies will be used for production of ESI documents and files.

At the June 21, 2016 Case Management Conference, the Court addressed a dispute between the Parties regarding collection from certain custodians within the Sales and Marketing department at BPV.

The Parties continued to have discussions regarding ESI issues, including the custodians and locations from which ESI should be collected and the manner and methodology by which such ESI should be searched for production in this suit.  The Parties have identified some specific issues of dispute with respect to collection from locations or custodians.

                    2.     <u>Plaintiffs' position:</u>

For several months, Plaintiffs have been working cooperatively with Defendants to (1) obtain information to identify the locations from which ESI should be collected, and (2) work on coming to an agreement as to the methodology by which Defendants would search collected ESI for production.  During that process, although the parties agreed on the collection of "custodial" ESI, Defendants have wavered about what and how they would collect ESI from "shared" locations.  At times, Defendants indicated that they were considering collecting all the ESI from certain shared locations; at other times, Defendants indicated that they want to do more targeted collections within those locations.[2]

Plaintiffs have consistently told Defendants that they are fine with Defendants collecting all the ESI from shared locations and then running agreed key-term or Boolean searches against the collected ESI in order to eliminate the large quantities of ESI that would not be relevant or responsive (thereafter, there would be additional search methodology applied to the culled set for purposes of production).  Indeed, that is almost precisely the search methodology laid out in the Parties' Joint Report and Dispute Matrix Regarding ESI Discovery and Custodians [Doc. 1756], filed on May 16.  Plaintiffs have also indicated that they are amenable to more targeted ESI collections if Defendants would provide the information about the locations from which they would collect ESI and those from which they would not.  But, the latter information has not yet been provided.  Indeed, as recently as two weeks ago, Plaintiffs were under the impression that

---

[2] To that end, Defendants have provided some "screen shots" of some software interface for several programs (but not the underlying ESI data structure) as well as for the top level folders of three servers at BPV.  Unfortunately, none of those provided information as to what ESI Defendants proposed to collect or not collect.  Significantly, Bard provided numerous pages for the user interface (UI) of Master Control but ultimately concluded that the UI was not a sufficient way to search for and to identify relevant ESI.

Defendants had determined to collect all ESI from common locations and then to use agreed key terms to cull that ESI

Defendants recently provided Plaintiffs with key term "hits" reports that identified the number of times certain key terms appeared across an unidentified set of collected ESI.  Plaintiffs understood the purpose of this key-term list to be to agree upon the terms that would be run against the large collection of ESI to cull it down to a smaller set for subsequent review or application of search methodology.[3]

Last Friday, however, Defendants notified Plaintiffs that they are working with a new ESI vendor and intend to propose a different search methodology than the general path that the Parties had previously discussed.  In response to questions about what shared location ESI they would propose to collect, Defendants indicated that they did not know and needed to receive the report of their vendor as to proposed search methodology and costs before they could address the issue.  Defendants have indicated that they should have a general proposal for search methodologies before the August 23 case management conference.

Plaintiffs are amenable to using a search methodology that is efficient and effective in producing relevant ESI.  That being said, at the time of this filing, there are only two and one-half months before fact discovery is set to close in this matter.  Plaintiffs believe that all relevant ESI should have been collected by this point and should be produced in the near term so that Plaintiffs have the documents, files, and information with the meaningful opportunity to examine witnesses regarding them.  Plaintiffs are concerned that Defendants' decision to change their methodology for collection, search, and

---

[3] In their position statement on this issue, Defendants suggest that Plaintiffs "only recently provided specific requests to change the keywords."  In fact, what Plaintiffs recently provided Defendants was a list of competitor product names to use as key terms.  Plaintiffs, however, suggested the use of competitor products as key terms months ago.  Similarly, Defendants contention that Plaintiffs "explicitly requested that Bard not collect data from certain non-individual sources until the keyword search terms had been agreed to by the parties" is not quite accurate.  Plaintiffs certainly did not tell Bard not to collect ESI; rather, Plaintiffs agreed that it made sense to determine from where Bard would collect its ESI before commencing collection.  Indeed, as discussed above, a large portion of the discussions between counsel for the last two months has been precisely about from where Bard would collect ESI.

production will result in further delay in the production of ESI and will have a material adverse impact on Plaintiffs' ability to complete discovery by October 28.

Plaintiffs request that the Court take up the issue of ESI and the methodology and the timing of Defendants' production at the Case Management Conference.

3.     Defendants' position:

Following the June 21, 2016 MDL status conference, the Court noted that "the parties [had] made considerable progress in agreeing on custodians to be searched or revisited, and the development of search terms." (Case Management Order No. 13 [Dkt. No. 2238], Section A, p. 1).  Following that conference, Bard's counsel has proactively followed up with Plaintiffs' counsel to ensure that the parties would timely complete the identification, collection, search methodology, and production of ESI, and Bard anticipates having the ESI production process substantially completed by the end of September 2016.  Throughout this period, Defendants and their counsel have been struggling with and attempting to navigate the hurdles posed by the massive amount (terabytes) of data involved on virtually a daily basis, with Plaintiff providing inconsistent input while at the same time demanding to micromanage every aspect of Bard's collection efforts.

Following the June 21 MDL status conference, counsel for the parties engaged in several calls to further discuss (a) potential keyword search terms, including exchanging various analyses regarding those keywords so the parties could better assess the usefulness of those keywords, and (b) numerous non-individual custodian systems (e.g., "shared" drives, network drives, etc.), including extensive discussions regarding how those systems and software operated, the information contained within them, and how those systems could be searched—Bard also provided screenshots for several of those systems and folder structures.

During those discussions, and contrary to Plaintiffs' claims here, Plaintiffs' counsel explicitly requested that Bard **not** collect data from certain non-individual sources until the keyword search terms had been agreed to by the parties.  Bard followed Plaintiffs'

counsel's request because doing so was reasonable given that the keywords themselves would ultimately need to be run against some of the non-individual custodian sources of data, particularly shared drives that have **terabytes** of data and tens of millions of pages of documents.  If these sources were collected and reviewed before the keywords were agreed to and those keywords later changed (and as noted below, Plaintiffs' counsel only recently provided specific requests to change the keywords used in this litigation), Bard would likely have had to redo things, resulting in gross inefficiencies.

The approach the parties have taken regarding keywords is also consistent with CMO No. 5, under which the parties were required to meet and confer as to keyword terms.  Following the June 21, 2016 status conference, Bard's counsel made repeated requests to Plaintiffs' counsel that they provide Bard with Plaintiffs' requested additional keywords (e.g., on June 22, June 27, and July 15, in addition to multiple telephone calls). However, it was not until August 11, 2016, a few days before this submission was due, that Plaintiffs provided Bard with a list of 13 additional keywords they wished Bard to consider and confirmed their agreement to withdraw 4 existing keyword terms. Now that Bard has received Plaintiffs' proposed keyword search terms and terms they have agreed can be eliminated, and consistent with Plaintiffs' counsel's request that Bard not collect data from certain non-individual custodian sources, Bard is prepared to expeditiously test those keywords and then either collect, review, and produce the voluminous ESI that Plaintiffs are requesting or promptly propose alternative approaches if the sampling suggests the keywords are not identifying targeted, relevant documents in a cost-efficient manner.

Of note, at the suggestion of Bard's counsel, Bard continued to proceed with producing ESI for individual custodians based on the existing keyword terms so as not to delay discovery and so that Plaintiffs would have an individual's ESI before his or her deposition. In fact, besides the millions of pages of documents that Bard has previously produced, Bard has, over the last few months, produced over 94,000 additional documents (totaling more than 350,000 pages) from ESI.  Further, during that timeframe, Bard has

produced extensive "hard copy" documents, including documents in response to Plaintiffs' various requests for production. These documents include over 30,000 pages of materials and include voluminous Denali® documents (e.g., design history files, post-market surveillance materials, DFMEAs, testing, clinical trial material, and regulatory submissions and correspondence, etc.), quality management board review documents, RGLs, standard operating procedures, audit materials, health hazard evaluations, fracture reports, Simon Nitinol materials, Bard REACH documents, and updated materials concerning the FDA Warning Letter and Inspections. In addition, Bard has provided to Plaintiffs detailed indices of these productions. Finally, Bard is currently in the process of reviewing and producing approximately 20,000 pages of additional hard copy documents related to Bard's sales and marketing of its IVC Filters

As Bard has been reviewing and processing ESI relating to individual custodians, Bard has found that the existing keyword search terms are inefficient and that, if Bard continued to use those terms, Bard's ESI costs could easily balloon into the tens of millions of dollars.  Besides the approximate $25,000 cost per custodian average that Bard is incurring thus far (which, if extrapolated over the approximate 67 new and refresh custodians, could easily exceed over $1.5 million), Bard has become increasingly concerned that the non-individual sources of ESI (such as shared drives) that have terabytes of data and millions of pages of documents, would result in Bard incurring excessive and substantially disproportionate ESI costs.  As a consequence of those increasing costs, Bard proactively sought out and engaged an <u>additional</u> ESI consultant that specializes in ESI analytics. This additional ESI consultant has been and is analyzing—now with Plaintiffs' newly changed and eliminated keywords—more effective strategies to collect, identify, and review the voluminous amounts of ESI that Plaintiffs have requested to ensure that both parties have access to documents which are of particular relevance to the parties' claims and defenses in the litigation, while at the same time reining in the escalating and disproportionate costs of ESI.

Bard expects to have a proposal to Plaintiffs regarding more efficient ways to complete the ESI in the near future -- hopefully by August 19.  Given the tremendous resources Bard has invested and continues to invest in ESI for this litigation, Bard anticipates that it will be able to substantially complete ESI review and production by the end of September.

4.      Other ESI Issues

a.      The collection and production of ESI for Bard IVC filter activities outside the United States.

Through discovery relating to Defendants' corporate organization and its information systems, Defendants have disclosed the existence of certain C. R. Bard, Inc. subsidiaries that are involved in the sale and distribution of IVC filters outside the United States.  Plaintiffs have requested information relating to the sales, marketing, regulatory, and reporting activities of these companies.  Plaintiffs have also asked Defendants to collect ESI from two individuals who work or have worked with IVC filters, but whose positions relate to international activities.  These individuals are Tony Siciliano, who previously held the title of International Marketing Manager, and Connie Dominguez, who previously held the title of Senior International Regulatory Affairs Program Manager.

Plaintiffs understand and believe that both of these individuals and the non-U.S. corporations were engaged in the sale and marketing as well as reporting to and dealing with foreign regulatory agencies relating to the very Bard IVC filters that are at issue in this litigation.  There is no question as to whether these people or these companies were involved with IVC filters: they were.  Bard draws a line that its marketing, representations, and regulatory actions with regard to those filters outside the United States' borders are irrelevant.  But, of course, that is not true.  To the extent that Bard has different marketing materials and makes different representations about the safety or effectiveness of its products to different people, such representations and statements are

relevant in this suit over the safety and effectiveness of those products.[4]  The statements and reporting that Bard makes to foreign regulatory agencies about these same products is relevant for the very same reason.

Defendants' position is that documents and information related to the international sales of IVC filters should be outside the scope of discovery. Specifically, Defendants believe that such discovery is neither relevant to the claims and defenses in this case nor proportional to the needs of this case.  As an initial consideration, the requested discovery is irrelevant to the claims in this case because, to the best of the defendants' knowledge, none of the claims made by the plaintiffs involve injuries or actions in foreign countries. The proposed discovery is of even less relevance given the recent deposition testimony of Robert Carr, Vice President – International, at Bard Peripheral Vascular, Inc. (BPV).  Mr. Carr testified that the actual development of Bard IVC filters, as well as sales and marketing strategy and activity, took place in the United States at BPV, not at any of the foreign entities.  Mr. Carr testified that, in essence, Bard's foreign entities were merely commercial sales structures that liaised with entities and individuals in their respective countries per the materials and protocols established in the United States by BPV. In short, as Mr. Carr explained, all of the major decision-making concerning filter design, manufacturing, marketing, and sales occur in the United States.  Accordingly, any documents obtained from foreign Bard entities regarding foreign sales or marketing practices in those countries would not provide any relevant information regarding the sales and marketing practices that Plaintiffs allege affected them and, therefore, are irrelevant to this case.

Moreover, to the extent the requested foreign sales and marketing discovery is somehow relevant to the claims and issues in this case, it is only tangentially so, and such discovery should not be permitted because it is not proportional to the needs of the case. At best, the requested discovery is of very limited importance to the resolution of the

---

[4] Plaintiffs disagree with Defendants' characterization of Mr. Carr's testimony below; Mr. Carr testified that some of the sales and marketing materials, including the Instructions For Use for IVC filters, were different in certain countries, in part, because of dealings with different regulatory entities in different countries.

wholly domestic issues raised in this case. The substantial cost of obtaining and processing the requested documents, and collecting the requested ESI from international employees, would greatly outweigh any marginal benefit such discovery could provide. Therefore, even if the Court were to somehow determine that the requested discovery regarding foreign sales entities is relevant, Bard contends that it is not proportional to the needs of the case and, therefore, outside the scope of permissible discovery under Rule 26 of the Federal Rules of Civil Procedure.

Bard proposes that the parties simultaneously file a five-page brief on this issue by August 31, 2016.

b.  <u>Custodial files of Timothy Ring and John Weiland</u>

Mr. Ring is the CEO and Chairman of C. R. Bard; Mr. Weiland is President and COO of C. R. Bard.  Prior to the MDL, Defendants collected and produced ESI from both of these individuals for the purposes of the prior IVC filter lawsuits.  Plaintiffs have requested that Defendants take updated collections from each of them.  Defendants have indicated that they need to receive the recommendations from their new ESI vendor as to any search methodology before they can agree to undertake these collections.  Plaintiffs believe that these witnesses are sufficiently important to justify their collection and production now, and that there should not be further delay in their collection and production.  Bard believes that the vast majority of filter-related documents involving these high-level executives will be privileged.  As a consequence, Bard is working with its ESI consultant to come up with a search methodology to "filter" out the privileged documents and avoid excessive review costs associated with the privileged documents.

\*\*\*

The parties would like to discuss with the Court at the Case Management Conference its preferred method to resolve the above-referenced disputes.

**D.**     **<u>Status of Mature Cases</u>**

On March 1, 2016, the Parties filed a Stipulation Regarding Status of Mature Cases [Doc. 914].  That filing identified 10 cases that will be ready for early remand.

With fact discovery set to close on October 28, 2016, the remaining general issues impacting the mature cases will be the designation and use of experts, if any, to talk about new issues raised since the creation of this MDL (such as the FDA warning letter and the allegations of Kay Fuller).  Lead Counsel for Plaintiffs believes that most plaintiffs in the mature cases will want to avail themselves of the expert testimony that is going to arise out of the new issues.  The Parties therefore intend to continue with open communications regarding the readiness of the cases for remand, and will advise the Court if (or when) any cases are deemed ready for remand prior to the close of expert discovery in the MDL.

In addition, the parties seek the Court's guidance as to the timing of the case-specific discovery remaining to be accomplished in each of the mature cases.  As previously memorialized in Exhibit "A" to the parties' Stipulation Regarding Status of Mature Cases [Doc. 914], there remains at least some outstanding discovery to be conducted in most of those cases.  The parties ask for the Court's direction as to whether the parties should commence with that discovery now or following remand.

### E.     Class Action Schedule

As set forth in Case Management Order 13, Section G, and as discussed at the June 21, 2016 Case Management Conference, the parties previously agreed that the MDL deadline for common fact discovery of October 28, 2016, would also apply to the *Barraza* case for pre-class certification fact discovery.  As a result of delays despite diligent efforts in obtaining medical and other authorizations from the Plaintiffs, the collection of medical and other records has likewise been delayed, and the parties do not believe they can meet the deadline.  The parties therefore request an extension for the pre-class certification fact discovery in *Barraza*.

In addition, Plaintiffs served their discovery responses on August 15, 2016, and the parties met and conferred on August 17, 2106, about some of the objections asserted by Plaintiffs.  The parties are optimistic that they will be able to resolve many of their disputes, and Plaintiffs have agreed to supplement their responses on a rolling basis over the next thirty days and to produce certain key information identified by Defendants

within the next two weeks.  The parties are committed to try to resolve any remaining issues.  Based upon the foregoing, the parties request an additional 70 days to complete pre-certification fact discovery[5]. The parties include as Exhibit 1, a proposed Case Management Order setting forth the proposed new deadline for fact discovery, as well as other proposed deadlines for the pre-certification stage and certification briefing.

### F.   Deposition of Former BPV President Jim Beasley

Jim Beasley was the President of BPV from 2007 through 2012; he is currently a Group President at C.R. Bard.  Plaintiffs have requested Mr. Beasley's deposition. Defendants have objected based on the contention that he is currently a senior executive at C.R. Bard and, as a high-level executive, this Court may exercise its discretion to limit apex depositions.

1.  Plaintiffs' position:

Plaintiffs disagree with Defendants' contention that this is an "apex" deposition or that Mr. Beasley is somehow protected from deposition with respect to his prior acts by virtue of his current position.  Mr. Beasley was an active decision maker with respect to IVC filters as the President of BPV from 2007 to 2012.  In that role, he would have been advised of, consulted, and in many instances may have been the ultimate decision maker concerning reports of injury and death for the G-2 filter (the filter Plaintiffs believe is involved with the most suits in the MDL) and later generation filters.  He was involved in the decisions on everything from evaluating the safety of the filter, determining necessary changes to design and warnings for Bard IVC filters, and Bard's messaging of the safety and dangers of filters in marketing.  It appears Mr. Beasley was also the decision maker in deciding to continue selling the G-2 while it sold another filter it has asserted was safer, the Eclipse.  Plaintiffs contend this decision resulted in unwarranted injuries solely so Bard could profit.

As recently as Tuesday, August 16, 2016, a Bard employee (Mr. Orms) referred

---

[5] The parties agree that an additional 60 days is warranted for the reasons set forth herein; however, 60 days beyond the current deadline falls within the Holidays, thus the parties have agreed to request the deadline be extended by 70 days.

counsel to Mr. Beasley to answer questions regarding Bard documents authored by Mr. Beasley.  While Defendants assert Mr. Beasley raises an apex issue, Plaintiffs believe it is his position at BPV for five years, and not his current work as an officer at the parent company, that controls the analysis of this issue.  Plaintiffs would further point out that Bard has acknowledged that all other Presidents of BPV were appropriate for deposition in this litigation; indeed, Mr. Beasley's predecessor, John McDermott, was deposed on two previous occasions.

2.     Defendants' position:

Bard disagrees entirely with the plaintiffs' position.  As Bard has always maintained regarding Mr. Beasley and his predecessor, John McDermott, the President of BPV is the quintessential "apex" witness.  In his role as President of BPV beginning in 2007, Mr. Beasley had responsibilities concerning not only Bard's line of IVC filters, but also for every other medical device manufactured by BPV.  When Mr. Beasley was promoted to Group Vice-President of BPV and Bard Access Systems in 2009, his responsibilities increased to include hundreds of additional products.  As current Group President of these companies, Mr. Beasley has global responsibilities for the companies, and his responsibilities continue to include oversight of nearly 1200 products.  Mr. Beasley's role at BPV and Bard Access Systems was and is to ensure that the companies operate pursuant to Bard's overall objectives.

Given the breadth of products that he oversaw and oversees, all knowledge that Mr. Beasley possesses regarding Bard's line of IVC filters is also known by one or more of BPV's vice-presidents and other employees who report to them.  These employees have significantly more hands-on, day-to-day experience and knowledge about Bard's line of IVC filters than Mr. Beasley has, particularly given the breadth of Mr. Beasley's responsibilities.  To date, counsel for the plaintiffs have not questioned a single witness about knowledge that Mr. Beasley may solely possess.

Although the plaintiffs point to a deposition that occurred on Tuesday of a former Bard employee (a district manager and later regional manager) who referred counsel to

Mr. Beasley, the Court should understand the context of the testimony.  The witness was shown a Monthly Management Report that he had never seen before that was sent from Mr. Beasley to Tim Ring, the Chairman and C.E.O. of C. R. Bard.  When the witness could not substantively address questions about the document that he had never seen, counsel for the plaintiff asked:  "We would need to ask Mr. Beasley these questions, correct?"  The monthly report itself, however, appears to be a compilation of information prepared by others that Mr. Beasley put into memo format.  Counsel for the plaintiffs have not tried to discover what unique knowledge, if any, Mr. Beasley may have about the content of the management report.

Lastly, Defendants believe the Plaintiffs have not adequately met and conferred to see if this issue can be resolved without the Court's intervention.  Four months ago, Defendants' counsel asked Plaintiffs' counsel to identify any issues uniquely known to this witness, so Defendants could assess the applicability of the apex doctrine.  Defendants also asked Plaintiffs to consider and discuss less intrusive means to obtain the same information.  Plaintiffs did not respond to that request.  As a consequence, it is premature to bring this matter to the Court's attention.

                                                    ***

Due to the deadlines in this case and related state court actions, Plaintiffs believe that this issue needs to be resolved particularly promptly.  Plaintiffs propose simultaneous five-page briefs by each side filed on August 26, 2016 and the parties be available by phone for any telephonic conference the following week (August 29) at the Court's convenience if it desires additional input or argument from the parties.  As this issue is of great importance to the Defendants, they agree that briefs should be filed setting forth the Parties' legal positions and discussing the considerable authority concerning this issue.

**G.    Dispute Regarding Plaintiffs' Objections to Defendants' Discovery Requests**

The Parties presently have a discovery dispute regarding discovery requests served by the Defendants and seek the Court's guidance regarding that dispute.

On May 27, 2016, Bard served its First Interrogatories and Requests for Production of Documents to all plaintiffs.  Bard requested three items:  (1) communications that the plaintiffs and/or their counsel have had with the FDA from January 1, 2013, to the present; (2) communications that the plaintiffs and/or their counsel have had with the news media concerning five NBC news stories that have aired about Bard's IVC filters; and (3) any sources of third-party funding that the plaintiffs or their counsel may have secured to pursue this litigation.[6]  On June 29, 2016, Lead Counsel for Plaintiffs served responses to these discovery requests.  Therein, Plaintiffs objected to the discovery as being improper case-specific discovery in violation of Case Management Order No. 8, which precluded "case-specific issues to be resolved in individual cases after remand."  Plaintiffs also objected to the requests as seeking information not relevant to any issue in dispute and outside the scope of discovery under Federal Rule of Civil Procedure 26(b).

The Parties met and conferred and have been unable to resolve the dispute.

The Defendants believe that the discovery sought by these requests falls squarely within the scope of CMO-8 and Rule 26.  (1) The Court has already allowed discovery regarding the FDA Warning Letter.  Thus, if the FDA Warning Letter falls within the scope of discovery, then so are the sources of potential biases, improper motivation, and trustworthiness regarding the FDA Warning Letter, such as plaintiffs' direct contact with the FDA that precipitated the Warning Letter.  (2) During recent depositions, counsel for the plaintiffs have questioned numerous witnesses about several of the same NBC news stories that they are now claiming are beyond the scope of discovery in the MDL— plaintiffs' counsel have even played portions of the NBC news stories during several depositions, after which they ask the witness on the record questions about the claims of Plaintiff Dodi Froehlich, who appeared in the segment of the NBC news piece that was

---

[6] As the Court is likely aware, alternative litigation financing has become a "hot" topic in recent years, with third party investors increasingly becoming involved in the financing of litigation and seeking a return on their investment. These financing arrangements have come under scrutiny by state bar ethics committees, legal scholars, and have even been discussed in the media. *See, e.g.,* ABA Comm'n on Ethics 20/20, Draft *White Paper on Alternative Litigation Finance* (Oct. 19, 2011), *available at*
http://www.americanbar.org/content/dam/aba/administrative/ethics_2020/20111019_draft_alf_white_paper_posting.authcheckdam.pdf.

shown.  Therefore, at the same time that the plaintiffs claim that discovery about the NBC news stories is irrelevant and beyond the scope of discovery, they are using the NBC news stories to prosecute their claims.[7]  (3) Litigation funding can involve combinations of multiple plaintiffs, all cases filed by a particular plaintiffs' firm, and/or cases filed by multiple plaintiffs' firms, the discovery necessarily cuts across multiple cases.  Discovery about these sources of funding is necessary to assess damages calculations and fair settlement values, as well as to identify any sources of bias or conflicts of interest that plaintiffs' counsel may have in entering good faith settlement negotiations.

Bard believes these issues are highly important to its defense in this litigation, and requests the opportunity to brief the issue for the Court.  Contrary to the Plaintiffs' dismissive view of the relevance of these requests, there are authorities that specifically address the discoverability of some of the information and significant arguments supporting the relevance of all of the information sought.  Bard would therefore propose that each side simultaneously file five (5) page briefs on or before August 31st  to provide the Court with the background and authorities applicable to this dispute.

Plaintiffs contend that these discovery requests are case-specific discovery that this Court has directly precluded in CMO 8.  The discovery requests ask questions that can only be answered by individual plaintiffs on a case-by-case basis.  Defendants have also failed to demonstrate how the requested information is relevant to a single claim by a single plaintiff, let alone all of the cases in this MDL.  Plaintiffs believe that the Court can readily determine at the August 23 Case Management Conference that Defendants' discovery requests to each plaintiff regarding their contacts with the media or the FDA and their litigation funding is "case specific" discovery and precluded by CMO 8.

/ / /

/ / /

---

[7] In state court cases where Bard has sought discovery concerning any communications that the plaintiff had with the FDA or NBC, plaintiffs have refused to respond, necessitating motion practice.  When multiplied across numerous cases, pursuing such discovery on a case-by-case basis is highly inefficient and wastes the judiciary's and the parties' resources.]

**H.**     **Dispute Regarding Defendants' Objections to Plaintiffs' Discovery**

1.     Plaintiffs' position:

Plaintiffs served document requests to Bard requesting documents relevant to 30(b)(6) depositions on Bard's Sales and Marketing of filters and on Bard's REACH program in April of this year.  Bard formally responded in May, indicating that it agreed to produce some documents and objecting to many of the requests.  However, to date, responsive documents have not been produced.

These depositions are scheduled for August 30 and September 7.  Plaintiffs and Bard are in the meet-and-confer process regarding both the timing of production by Bard and clarification on whether Bard is standing on any of its objections to the document requests.  In the absence of agreement on these issues and in light of the time available before these depositions, Plaintiffs request that Bard's objections to the discovery either be resolved at the CMC or that an expedited briefing schedule to resolve the dispute be set.

2.     Defendants' position:

In April 2016, Plaintiffs served 37 separate requests for production regarding Bard's REACH program, and 46 separate requests for production regarding Bard's sales and marketing of IVC filters. Notwithstanding the Court's prior instruction that similar requests for "any and all documents" concerning a given topic are "unreasonable" and "very broad and burdensome," see Transcript of Hearing on March 31, 2016, at page 46, Plaintiffs' requests were extremely broad and include requests such as "all documents that relate to advertising and promotional statements made by Defendants regarding the safety, efficacy, or performance of any Bard IVC Filters," or "all documents discussing the REACH Program."

In May 2016, Bard responded to Plaintiffs' requests and, consistent with Federal Rule of Civil Procedure 34, articulated objections specifically tailored to Plaintiffs' requests. Consistent with the rules, and in an effort to be fully transparent with Plaintiffs, Bard identified by Bates number voluminous documents that Bard previously produced to

Plaintiffs that are responsive to each request. Where applicable, Bard stated that it would make reasonable efforts to identify, collect, review, and produce additional responsive documents. For instance, in response to Plaintiffs' requests for "all documents that relate to advertising and promotional statements made by Defendants regarding the safety, efficacy, or performance of any Bard IVC Filters," Bard stated that, aside from the voluminous responsive documents identified by Bard by Bates number in its response, it would search for and produce additional official sales and marketing materials that are contained within Bard's official marketing and sales approval folders. Similarly, in response to Plaintiffs' demands for REACH related documents, Bard stated that it would make reasonable efforts to search for and produce any official materials related to the REACH Program. Said REACH documents have been produced to Plaintiffs on a rolling basis, and Bard completed its production of REACH documents on August 17, 2016. Where applicable, after identifying with specificity the documents that Bard previously produced or was committed to search for and produce in response to each request, Bard stated that it would not search for and produce additional responsive documents.

Aside from the voluminous previously-produced documents are responsive to these requests (which Bard identified by Bates numbers for Plaintiffs in Bard's responses), Bard is in the process of reviewing and producing additional and voluminous "hard copy" sales and marketing documents from Bard's official marketing and sales approval folders which Bard stated in its responses it would identify and produce. Bard anticipates producing those additional documents by August 26, 2016. Bard further notes that responsive documents likely exist from non-individual custodian searches (e.g., shared drives), and documents from those non-individual custodian sources will be produced consistent with Bard's commitment to produce ESI over the timeframes discussed above in Section C regarding ESI discovery.

Even though Bard served its responses to these discovery requests in May 2016, Plaintiffs waited until the evening of August 16, 2016 (the night before this joint report was originally due to be filed) to raise, for the first time,  general concerns with Bard's

1   responses and productions.  Contrary to Plaintiffs' contention, Bard has produced
2   responsive documents, as outlined above.  Moreover, Bard is actively working to complete
3   its production of documents as Bard stated it would do in its responses, well in advance of
4   the scheduled depositions.  However, given that the plaintiffs have just raised these
5   concerns for the first time this week and the fact that the parties have not yet engaged in
6   any meaningful meet and confer process (as the rules require), the Defendants believe it is
7   premature for the parties to address this issue at the upcoming status conference.

8         **I.**     **<u>Multi-Plaintiff Cases</u>**

9        A single case involving multiple plaintiffs (including one non-diverse plaintiff) has
10  recently been transferred to this Court.  The case is *Oma Hardwick, et al. v. C. R. Bard,*
11  *Inc.* (case number CV-16-01953-PHX-DGC).  The case was originally filed in the
12  Missouri Circuit Court in St. Louis.  None of the plaintiffs are residents of Missouri, and
13  they come from seven different states.  The plaintiffs included one Arizona plaintiff, in an
14  obvious effort to defeat diversity, given that Bard Peripheral Vascular, Inc. is an Arizona
15  resident.  Bard removed the case based on fraudulent joinder and fraudulent misjoinder,
16  and simultaneously filed a motion to dismiss (based on the absence of personal
17  jurisdiction under *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014)).  That motion is still
18  pending, although the plaintiffs failed to respond to the motion.

19       Bard is aware of at least one other case raising the same issues that will soon be
20  transferred to this Court.  The second case is *Angela Novy et al. v. C. R. Bard, Inc.*[8]  It
21  involves more than 40 plaintiffs (the overwhelming majority of whom are non-Missouri
22  residents) joined in a single action, and was also filed in a Missouri state court.  Bard
23  likewise removed that case and filed a motion to dismiss.  The plaintiffs filed a motion to
24  remand.  However, the district court judge has stayed the case pending its transfer to the

25

---

26  [8] Lopez McHugh, LLP is counsel for some of the plaintiffs who were included in this state court complaint because,
27  *inter alia*, they are not diverse from Defendants if filed in the MDL.  Given his role in this MDL as Co-Lead counsel
    for Plaintiffs, and his role in coordinating all such state court efforts by Plaintiffs with those related to this MDL,
    Ramon Lopez of Lopez McHugh is also on the complaint and noted "for *pro hac vice* consideration," along with two
28  other associates that intend to assist with Plaintiffs' state court efforts in St. Louis, should the Court grant Plaintiffs'
    Motion to Remand, and ensuring they are coordinated with the MDL.

MDL, in deference to this Court.  Although the plaintiffs have filed an opposition to the J.P.M.L.'s Conditional Transfer Order transferring the case to the MDL, Bard anticipates that the second case will be promptly transferred to this Court after the next hearing of the Judicial Panel on Multidistrict Litigation in late September.

Plaintiffs contend that the jurisdictional issues are not unique as these types of cases have repeatedly been remanded for lack of subject matter jurisdiction/diversity by the judges in the District Court for the jurisdiction in which they were filed, and the Missouri state court system has repeatedly found joinder to be proper.

Bard believes that these multi-plaintiff cases present unique jurisdictional issues, completely different from the scenario previously addressed by this Court where diversity was defeated by the joinder of a non-diverse health care provider.  Bard respectfully requests that the Court devise a schedule for addressing these issues.

## J.      Privilege Disputes

By order dated July 25, 2016 [Doc. 2813], the Court ruled on the plaintiffs' challenges to a number of privilege claims asserted by Bard.  The Court directed the parties to use the ruling "as a guide to resolve remaining privilege disputes."  The parties are discussing those issues, and the parties anticipate being able to resolve most or all remaining issues.  The parties will either inform the Court that all challenges to the privilege logs are resolved or submit any remaining challenges to the Court by September 28, 2016.  The parties submit that the appointment of a special master would be premature at this time.

## K.      Duplicative Filings

The defendants have identified a growing number of instances where a single plaintiff has two different lawsuits pending in this MDL, represented by different counsel in each action.  The defendants have notified all counsel involved in the duplicate actions and asked that one of the lawsuits be dismissed in each instance.  The defendants believe that the duplicate actions should either be consolidated into a single action or the second

case filed for each plaintiff should be dismissed under the "first filed" rule.  See, e.g., Pacesetter Systems, Inc. v. Medtronic, Inc., 678 F.2d 93, 95 (9th Cir. 1982).

Most of the plaintiffs' attorneys involved in these situations have not responded to the Defendants' requests to dismiss one of the actions.  Although the plaintiffs' counsel evidently do not consider the pendency of duplicate cases to be a problem, duplicate cases filings create a number of problems in the mass tort context.  First, they skew the case count.  Perhaps of greater significance, duplicate pending cases often pose an impediment to the ultimate resolution of the litigation, as they foster confusion and discord as to who represents a particular plaintiff.

The defendants are prepared to file formal motions in the impacted cases, but believe such an approach could create unnecessary inefficiencies.  The defendants therefore seek the Court's guidance concerning the situation.  Lead Counsel for Plaintiffs suggests that, to the extent the Court is inclined to take action in these duplicate cases, the better course is to consolidate the cases rather than to dismiss later-filed ones as neither Lead Counsel for Plaintiffs nor the Court is in a position currently to determine where the present attorney-client relationship lies in those cases.

DATED this 18th day of August, 2016.

GALLAGHER & KENNEDY, P.A.          SNELL & WILMER L.L.P.

By: s/ Paul L. Stoller                          By: s/ Matthew B. Lerner
    Robert W. Boatman (009619)          James R. Condo
    Paul L. Stoller (016773)                 Amanda C. Sheridan
    Shannon L. Clark (019708)           One Arizona Center
    2575 East Camelback Road           400 E. Van Buren, Suite 1900
    Phoenix, Arizona 85016-9225        Phoenix, Arizona 85004-2202

    Ramon Rossi Lopez                       Richard B. North, Jr. (admitted *pro hac*
    (admitted *pro hac vice*)               *vice*)
    CA Bar No. 86361                          Georgia Bar No. 545599
    LOPEZ McHUGH LLP                     Matthew B. Lerner (admitted *pro hac*
    100 Bayview Circle, Suite 5600       *vice*)
    Newport Beach, California 92660     Georgia Bar No. 446986
                                                          Nelson Mullins Riley & Scarborough
    Attorneys for Plaintiffs                  LLP
                                                          201 17th Street, NW / Suite 1700
                                                          Atlanta, GA 30363

                                                          Attorneys for C. R. Bard, Inc. and Bard
                                                          Peripheral Vascular, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2016, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

                                                  s/ Deborah Yanazzo

5576706/26997-0001

- 25 -