1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3                 _____

4   **In Re: Bard IVC Filters**          ) MD-15-02641-PHX-DGC
    Products Liability Litigation        )
5                                        )
                                         ) Phoenix, Arizona
6                                        ) August 23, 2016
                                         )
7   _____)

8

9

10

11

12       **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

13           REPORTER'S TRANSCRIPT OF PROCEEDINGS

14              FIFTH SCHEDULING CONFERENCE

15

16

17

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

```
 1                      A P P E A R A N C E S

 2

 3     Plaintiffs' Co-Lead/Liaison Counsel and State/Federal Liaison
       Counsel:
 4
               Gallagher & Kennedy
 5             By: ROBERT W. BOATMAN, ESQ.
               2575 East Camelback Road, Suite 1100
 6             Phoenix, AZ  85016

 7             Lopez McHugh
               By: RAMON ROSSI LOPEZ, ESQ.
 8             100 Bayview Circle, Suite 5600
               Newport Beach, CA  92660
 9

10     Plaintiffs' Steering Committee Counsel:

11             Gallagher & Kennedy
               By: PAUL LINCOLN STOLLER, ESQ.
12                 C. LINCOLN COMBS, ESQ.
               2575 East Camelback Road, Suite 1100
13             Phoenix, AZ  85016

14

15     Also on behalf of plaintiffs:

16             Driscoll Firm, PC
               By: PHILIP SHOLTZ, ESQ.  (telephonic)
17             211 N. Broadway, Ste., 4050
               St. Louis, MO  63102
18

19             Babbitt & Johnson, PA
               By: JOSEPH R. JOHNSON, ESQ.
20             1641 Worthington Rd., Ste. 100
               W. Palm Beach, FL  33409
21

22             Lief Cabraser Heimann & Bernstein, LLP
               By: DANIEL E. SELTZ, ESQ.
23             250 Hudson St., 8th Fl.
               New York, NY  10013
24

25
```

1                     **A P P E A R A N C E S   (CONTINUED)**

2

3     Also on behalf of plaintiffs:

4             Brenes Law Group
              By: **TROY A. BRENES,** ESQ.  (telephonic)
5             16A Journey, Ste. 200
              Aliso Viejo, CA  92656

6

7             Toriseva Law
              By: **TERESA C. TORISEVA,** ESQ.  (telephonic)
8             1446 National Rd.
              Wheeling, WV  26003

9

10

11    For the Defendant:

12            Nelson Mullins Riley & Scarborough, LLC
              By: **RICHARD B. NORTH, JR.,** ESQ.
13                **MATTHEW B. LERNER,** ESQ.
                  **TAYLOR T. DALY,** ESQ.
14            201 17th Street NW, Suite 1700
              Atlanta, GA  30363

15

16            Snell & Wilmer
              By: **JAMES R. CONDO,** ESQ.
17            400 East Van Buren
              Phoenix, AZ  85004

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  MDL 15-2641, In The Bard IVC
Filters Products Liability Litigation, on for scheduling
conference.  Will the parties please announce.

MR. BOATMAN:  Good morning, Your Honor.

Bob Boatman, Ramon Lopez, and Paul Stoller for the
plaintiffs.  We also have several other attorneys either
appearing by phone or perhaps here personally, depending upon
the issues the Court wants to address this morning.  Thank
you.

THE COURT:  All right.  Good morning.

MR. LOPEZ:  Good morning.

MR. STOLLER:  Good morning, Your Honor.

MR. NORTH:  Morning, Your Honor.  Richard North on
behalf of the defendants, and I have with me Jim Condo and
Matthew Lerner, and also from my office Ms. Taylor Daly.

THE COURT:  All right.  Good morning.

Counsel, I've been through your joint status report
and I just want to talk through the issues that are
identified, and I think we can resolve virtually all of the
issues in the joint status report this morning.

So I think we should dive right in.  The update that
you provided on fact discovery is helpful.  It looks like
you've made progress on depositions.  I didn't see any issues

10:02:08  1    that you need me to address on general fact discovery.  Are
        2    there any items besides those raised later in the report that
        3    we need to address?
        4            MR. LOPEZ:  As far as deposition, Your Honor, there's
10:02:24  5    someone that the plaintiffs need to depose by a certain date.
        6    Mr. North and I had a -- we were hoping that maybe you could
        7    weigh in on this, but Mr. North and I have had a conversation
        8    that this particular corporate witness I guess might have some
        9    health problems so I agreed to take three or four hours.  So
10:02:42 10    as long as we can get this before a date at the end of
       11    September when an expert is being deposed in a case that we're
       12    coordinating with the MDL, which may likely be the first
       13    trial.  That's Natalie Wong.  We just want to bring that to
       14    the Court's attention.  Hopefully we won't have to bother you
10:03:02 15    with it again.  But it is someone we've been seeking since
       16    early July and it's now almost the end of August.  This
       17    expert's being deposed at the end of September.  We were not
       18    offered a date until October.  So we wanted to bring that to
       19    the Court's attention.  Hopefully, Mr. North and I can work
10:03:17 20    that out.  If so, we won't have to bother the Court again.  If
       21    not, we may have to involve you in a telephone call to maybe
       22    give some encouragement to have this witness produced before
       23    September 29th.
       24            THE COURT:  Mr. North, any comments?
10:03:29 25            MR. NORTH:  Your Honor, I would just state for the

10:03:30   1    record that it was only 12 days ago that they gave us the

2    showing required by CMO 8 to take a deposition, new

3    deposition, of someone who's already been deposed before.

4    I've been asking for that for several weeks.

10:03:43   5         They've given me that showing.  We're working with

6    Mr. Lopez and seeing if we can work that out.

7         THE COURT:  All right.  If there's an issue that

8    comes up, call me.  If when you call you need a decision

9    literally within a day or two -- well, don't put it off.  But

10:03:58  10    if you get to that point, tell my staff that when you call and

11    I'll make sure we get you on the phone and we'll resolve it.

12         MR. LOPEZ:  Your Honor, that brings up an issue,

13    though, with respect to that witness.  This was a witness that

14    was deposed six years ago, not by anyone that's on the PLC.

10:04:19  15    It falls within the purview of your order about prior

16    depositions, showing good cause.  She was deposed for two

17    hours with two documents.  We asked for the deposition July

18    9th.

19         I just -- it would be nice if we can get some

10:04:32  20    guidance from the Court that in a circumstance like that,

21    there shouldn't be a dispute that the plaintiffs have a right

22    to depose someone, especially someone who has been involved in

23    this case or with this product for five, ten, 15 years.

24         Again, July 9th we said we wanted her deposition.  I

10:04:55  25    guess they've been waiting for us to show them good cause.

10:04:58  1   But I think that if they would have just checked the

2   transcript, they would have seen she was deposed for 90 pages,

3   two documents, and a very confined period of time, where she's

4   been involved for over a decade on the product.

10:05:12  5         THE COURT:  Well, Mr. Lopez, I'm reluctant to weigh

6   in on what will be fact-specific issues with respect to

7   particular witnesses.  What you say makes it sound like good

8   cause, but that's also a very easy thing to show when you

9   request the deposition.

10:05:26  10        So if there's a disagreement, I would ask you

11  communicate promptly.  If defendants don't think the showing

12  has been made, make a showing.  And if there's then a

13  disagreement as to whether the showing is insufficient, call

14  me.  But that seems to me to be a very fact specific issue and

10:05:45  15  I ought not to try to draw lines now based on it.  You ought

16  to just communicate quickly about those issues.

17        MR. LOPEZ:  Yes, Your Honor.

18        MR. NORTH:  For the record, so I can make this clear,

19  once they provided us the showing we requested, we agreed and

10:05:56  20  there is no issue about putting her up.  We agreed three days

21  after they made that showing.  And the only issue right now is

22  timing.

23        THE COURT:  Okay.  Let me know if there's a timing

24  issue on that witness.

10:06:07  25        Let's talk next about the bellwether selection issue

10:06:10  1   that is on page 3 or begins on page 3 of the report.  I do

2   want to resolve this issue today.

3          As you've all noted under Case Management Order

4   Number 11, which, incidentally, contains language that you all

10:06:30  5   stipulated to, if a plaintiff declines to give a *Lexecon*

6   waiver, then it says on the bottom of page 2 and the top of

7   page 3, that plaintiff or his/her counsel shall show cause why

8   a *Lexecon* waiver is not being made and I'm to address it at

9   that point.

10:06:59 10          So I think we ought to hear from counsel for those

11   two plaintiffs as to why the *Lexecon* waiver is not being made.

12   And I understand the plaintiffs are Froelich, F-R-O-E-L-I-C-H,

13   and Delbrugge, D-E-L-B-R-U-G-G-E.

14          Who is the plaintiffs counsel who wishes to address

10:07:18 15   that?

16          MR. STOLLER:  Let me step up, Your Honor.  May I take

17   the podium?

18          THE COURT:  Please.

19          MR. STOLLER:  I believe on the phone you've got both

10:07:28 20   Troy Brenes, who is counsel for Ms. Froelich, and Teresa

21   Toriseva, who is counsel for Ms. Delbrugge.

22          What I would like to give you, Your Honor, is a bit

23   of the background before each of them speak.

24          I was responsible on behalf of the plaintiffs team

10:07:41 25   for organizing the bellwether process.  Probably not a

surprised to you since I'm the person who's spoken about that

mostly in this courtroom to date.

What we did, Your Honor, is we told literally every

plaintiffs lawyer and every counsel who had a case that was

selected by either side, we want you to waive bell- -- we want

you to waive *Lexecon* no matter what, if you can.  If your

client is asking questions about merits, should they, we want

you to encourage them to waive.

I think we were highly successful in that in the

first go-round from the defense selections.  I think they made

24.  We had 20 waivers out of the 24.  And of the four

remaining, three of them, they agreed that the *Lexecon* waivers

were for good cause, in particular because those plaintiffs

had health issues.  It came down to -- they then selected

three replacements.  Two of those waived.

I can avow to this Court, Your Honor, we've made

every effort as leadership to ask folks to waive and not to

use *Lexecon* as a tool to select cases, which was one of the

concerns we had, I think universally, when we talked about the

bellwether process several months ago.

If you'll recall, I advocated strongly that we needed

to try to get bellwether -- excuse me, *Lexecon* waivers done

either before we started picking cases or at the end, but not

in the middle where there would be some accusations of

self-selection and trying to game the process.  I didn't want

10:09:08   1    those accusations.

2          It seems to me that that's what's really at issue

3    here is whether we're trying to game the system to try to

4    remove cases that we think are bad for us, either because

10:09:19   5    they're -- on the merits they have some problems or there's

6    some valuation issue there.  I can assure you, Your Honor,

7    that's not what happened here.

8          Whatever the reasons, whether for personal --

9    personal problems, inability to travel, or just because they

10:09:38  10    didn't want to come to Arizona to have their trial, that's not

11    what happened here.  Whatever reasons those plaintiffs have,

12    they're not about merits at all.  I can assure you that.  I

13    talked to every lawyer involved, and I requested specifically,

14    if you can get your clients to waive, please waive.  We don't

10:09:52  15    want to have an issue.

16          And with that, unless you have any questions of me, I

17    just wanted to give you the overarching framework.  I think we

18    were very successful.  Very high percentage of waivers.  If

19    you ask anybody who has MDL experience, when you get 80

10:10:07  20    something percent of people who are waiving *Lexecon*, that's a

21    pretty high number.

22          THE COURT:  Okay.  Thank you.

23          Do we have counsel for Plaintiff Froelich on the

24    phone?

10:10:19  25          MR. BRENES:  Yes, Your Honor.  This is Troy Brenes

10:10:21  1   for Ms. Froelich.  Following up on what Mr. Stoller said, the

2   plaintiff in this case lives in Florida.  She's a relatively

3   young mother with a child that lives at home with her.  It

4   would be extremely difficult for her to fly up to Arizona for

10:10:33  5   three, four weeks and arrange care for her son.

6        The other issue, she's extremely distraught

7   emotionally about what happened with the filter and just

8   generally it's still affecting her.  And exposing her to a

9   trial, obviously she is concerned about the stress and the

10:10:52  10  additional stress that that's going to cause and she really,

11  if this thing is going to go to trial, needs her support

12  network around her.  Friends, family.  And that's really the

13  reason.  It's the emotional distress, the emotional toll it's

14  going to take to do this trial.  She needs to have her support

10:11:12  15  network around her.  Aside from the child care issues.

16        THE COURT:  Okay.  Thank you.

17        MR. BRENES:  Your Honor, I would add, defense counsel

18  has a large number of other cases in mind as well where I'm

19  sure they see issues and I have plenty of other plaintiffs who

10:11:28  20  would not be opposed to waiving *Lexecon*.  It's just this one

21  plaintiff has particular concerns.

22        THE COURT:  Okay.  Thank you, Mr. Brenes.

23        Do we have counsel for Plaintiff Delbrugge?

24        MS. TORISEVA:  Yes, Your Honor.  This is Teresa

10:11:47  25  Toriseva for that plaintiff.

10:11:47   1          THE COURT:  All right.

2          MS. TORISEVA:  Your Honor, she -- my client in this

3   situation has three primary reasons.  Really one is the

4   primary and the second and third are truly not as important

10:11:59   5   from her perspective.

6          I want to let the Court know that I have six other

7   clients that were selected in the bellwether process who were

8   asked to waive their *Lexecon* rights and did do that.  And I

9   offer that to the Court, frankly, I guess, as a showing of

10:12:19  10   good faith from counsel, to be candid.

11          But, Your Honor, with regard to Ms. Delbrugge, she is

12   from Hawaii.  She is 72 years old.  Her main concern, and this

13   is my surmising, Your Honor, but the first and second kind of

14   go hand in hand.  She has two great grandchildren for whom she

10:12:40  15   is primary caretaker when their both parents work.  When their

16   parents are at work.  They're in a two-parent home, but both

17   parents work outside of the home to pay bills and support the

18   family.

19          And in addition to that, Ms. Delbrugge works

10:12:56  20   part-time at Wal-Mart locally there and has a schedule.  When

21   she isn't working, she's with her great grandchildren.  And

22   vice versa.

23          She's very fearful that if she's gone out of the area

24   and not able to take any shifts for a three- or four-week

10:13:10  25   period she would, one, lose her job, and, not just the time,

10:13:15  1    she understands that that could happen, the time loss, no

2    matter where the trial is, but she is fearful she would lose

3    her job at Wal-Mart and she's also fearful about the primary

4    care situation for her two great grandchildren who are ages 3

10:13:32  5    and 8.

6         She does have some health problems, Your Honor,

7    but -- and she hasn't traveled since 2002.  But when you ask

8    her about that she really comes back to the main reason she

9    doesn't travel and can't is her family commitment and her

10:13:46 10    work.

11         She is prediabetic and takes some -- couple

12    medications to manage a couple conditions.  But for 72

13    generally does do -- does okay.  Certainly has some

14    limitations.  And that would be her third consideration, Your

10:14:05 15    Honor, although really incidental compared to one and two when

16    you talk with her, which I have personally on several

17    occasions to go through this.  Including going back to her

18    after speaking with Mr. Stoller and sort of urging her and

19    making sure, talking it through, and she just really is

10:14:23 20    struggling to get past her concern for her great grandchildren

21    combined with her job.

22         THE COURT:  Okay.  Thank you.

23         MS. TORISEVA:  Thank you, Your Honor.

24         THE COURT:  Mr. North, you want to address this?

10:14:40 25         MR. NORTH:  Yes.  May I approach, Your Honor?

10:14:41   1        THE COURT:  Yes.  Pull the mic over a bit, would you.

           2   Thanks.

           3        MR. NORTH:  Turning first to Ms. Froelich, I think

           4   it's very important to note at the outset, Your Honor, that

10:14:49   5   she was the patient featured in the two NBC broadcasts that

           6   came out last September.

           7        She also, as way of background, had her filter

           8   implanted 12 years ago.  She had her filter removed 12 years

           9   ago, according to the medical records we've seen.  She had a

10:15:08  10   strut that fractured and had that removed 12 years ago,

          11   according to what we've heard.

          12        Your Honor, based on the evidence we've seen, it

          13   appears to us that the reasons she states for not waiving

          14   *Lexecon* may be somewhat pretextual.  And I say that because of

10:15:29  15   this:  She cites the fact she is a single mother of children.

          16   According to the information we have, she has two children.

          17   The youngest is either 15 or 16 and lives with her.  The

          18   oldest is 22 or 23 and lives nearby.  We understand her

          19   ex-husband lives in the same city and nearby.

10:15:49  20        As far as the justification that she has severe

          21   emotional distress, we question that only because, Your Honor,

          22   all of this happened 12 years ago and, according to the

          23   records and information we've been given, and we've been given

          24   some medical records by the plaintiffs concerning this

10:16:04  25   particular case, we haven't seen evidence yet of any

10:16:07  1  complication, and I would suspect there isn't one since the

2  filter and the strut itself were removed 12 years ago.

3      In this particular case, Your Honor, we're very

4  concerned that the decision not to waive *Lexecon* has strategic

10:16:23  5  reasons behind it.  Perhaps from Ms. Froelich herself.

6      We know from a fact from looking at her medical

7  records that we do have that many of the representations she

8  made to NBC and that were aired throughout the country are

9  simply not true.  And those that are true are exaggerated.

10:16:42  10     We also are concerned because, as the Court knows and

11  will address as another issue, we've been trying to obtain

12  discovery about the contacts of the plaintiffs' counsel with

13  NBC.  If Ms. Froelich is a bellwether, that's going to come

14  out.  And we're concerned that that is another reason that she

10:17:00  15  has not waived *Lexecon*, to try to keep the veil on the

16  plaintiffs' contacts -- plaintiffs' attorneys' contacts with

17  NBC.

18     And lastly, Your Honor, as I said, all this happened

19  12 years ago.  We have tried to pick two or three

10:17:14  20  representative cases out of our 24 that we think have clear

21  statute of limitations issues to raise before the court and we

22  believe she is -- her case is a very clear example of a

23  statute of limitations issue.

24     So for those reasons, Your Honor, we are concerned

10:17:33  25  that the decision not to waive *Lexecon* in this case is being

10:17:37  1    made by -- for strategic reasons.

2         Turning to Ms. Delbrugge, I will say quite candidly,

3    Your Honor, we don't have any reason to believe that her

4    reasons for not waiving *Lexecon* are manufactured or are a

10:17:58  5    pretext. The reason we originally decided to contest that and

6    ask for a good cause showing was, unlike the three people that

7    we readily agreed to because of severe health problems,

8    Ms. Delbrugge's reasons for not wanting to appear are reasons

9    that just about any potential bellwether will have: family

10:18:19  10   obligations, travel, things -- jobs, things of that nature.

11   And to some extent, and I will admit candidly this may be a

12   slightly different situation since she is in Hawaii, but

13   candidly we believe that if that's sufficient to exempt

14   somebody from the *Lexecon* requirement here, then that will

10:18:42  15   apply to virtually every plaintiff in the bellwether pool.

16   That's our position.

17        THE COURT: Let me -- let me ask you this question,

18   Mr. North.

19        As I read the *Lexecon* case itself, I have no

10:18:55  20   authority to require either of these plaintiffs to have their

21   cases tried in Arizona. The mandatory language of the statute

22   says that I shall remand it back to their home district after

23   the pretrial services. Now -- after the pretrial litigation.

24        Now, that can be waived by a party. But if a party

10:19:15  25   doesn't waive it, I have no authority to order that party to

10:19:19   1   try their case in Arizona.

2          So when I'm faced with a situation where a party says

3   I'm not waiving, and they provide a colorable explanation,

4   even if the colorable explanation is disputed by you, what

10:19:32   5   authority do have I have to say, no, I don't accept your

6   explanation, I'm ordering to you try your case in Arizona?

7          MR. NORTH:  Your Honor, that's the conundrum.

8   Absolutely.  You do not apparently have the authority under

9   *Lexecon*.  I think there are many of us on my side of the V who

10:19:49  10   hope the Supreme Court changes that rule at some point.  But

11   as it stands, I agree.

12          Now, a number of the judges, however, have exacted a

13   price or penalty for not waiving *Lexecon*.  In some instances,

14   you know, the defendants were allowed to substitute one person

10:20:06  15   in for the plaintiff's picks and remove one of the plaintiff's

16   picks if good cause hasn't been shown.

17          In this particular case, Your Honor, I think I would

18   ask for an unusual request.  I would ask we be allowed to take

19   a deposition of Ms. Froelich.  Because her decision to waive

10:20:24  20   *Lexecon* is depriving us of some information that my client

21   very much wants to know about this NBC broadcast and what

22   prompted all of this publicity.  And if she's decided not to

23   waive *Lexecon* and try to shield herself, for whatever reason,

24   from that, we would ask permission to take a deposition of

10:20:44  25   her.

10:20:45   1          THE COURT:  For what purpose?  You mean to revisit

2     the issue of whether I'm going to accept or force her to waive

3     *Lexecon*?  Or just for discovery purposes?

4          MR. NORTH:  For discovery purposes about her role in

10:20:56   5     the NBC --

6          THE COURT:  That's a different issue we're going to

7     address today.  I don't want to link that somehow to her

8     *Lexecon* waiver because, frankly, if I were of the view that

9     the plaintiffs were, to use Mr. Stoller's words, gaming the

10:21:13  10     system and they were trying to use their *Lexecon* waiver in a

11     way that would skew the bellwether pool, then perhaps it would

12     be appropriate for me to be exacting some price.  But where 20

13     of the original 24 and now, it appears, total of 22

14     plaintiffs, have waived *Lexecon*, it's hard for me to conclude

10:21:37  15     they're trying to skew the pool.

16          So I want to address the NBC issue separately, not as

17     part of the *Lexecon* waiver context.

18          But my conclusion is that both Plaintiff Froelich and

19     Plaintiff Delbrugge have provided colorable reasons for not

10:21:59  20     waiving *Lexecon*, and I don't think I have power to order them

21     to waive *Lexecon* under the statute.  And I can't conclude that

22     plaintiffs are gaming the system.  And so I'm not going to

23     order them to waive *Lexecon*.

24          The question then is what do we do with those two

10:22:15  25     remaining spots.  I assume the right procedure is to follow

10:22:19   1    what the case management order says, Case Management Order 11,

2    and have you designate two more.

3              MR. NORTH:  Yes, we have substitute candidates ready

4    to designate, Your Honor.  We still have three or four months

10:22:31   5    to collect medical records, so timing is not an issue.

6              THE COURT:  All right.  So let's continue down that

7    road until we get those two slots filled, and then we'll have

8    the initial bellwether pool we need.

9              MR. NORTH:  I understand, Your Honor.  I would just

10:22:43  10    note that if we get to the place in this particular MDL of

11    selecting a second group of bellwethers, the defense may want

12    to relook at the *Lexecon* waiver issue and look at perhaps

13    other mechanisms to do it in a second round.  But we can

14    address that at that time.

10:23:02  15              THE COURT:  We'll cross that bridge when we get to

16    it.

17              MR. NORTH:  Thank you, Your Honor.

18              THE COURT:  Okay.  Thank you.

19              Let's talk about the next issue in the report, which

10:23:10  20    is the ESI issue.

21              Frankly, Counsel, I thought that ESI production would

22    be done by now and it's very concerning to me we are in late

23    August and there's still substantial volumes of ESI to be

24    produced.  Particularly since our deadline in the fact

10:23:30  25    discovery phase is October 28th, and I entered the orders

10:23:37  1    governing these matters in February, early March.  So we've

2    had months to get this problem solved.

3        My understanding is there are three categories of

4    issues on ESI.  One concerns ESI that's located in shared

10:23:56  5    space in the defendant's computers.  A second is the question

6    of ESI related to international operations.  And the third is

7    ESI from two individuals, Ring and Weiland, W-E-I-L-A-N-D.

8        Let's talk first about the shared space ESI.  You

9    indicated in the report that you're still talking about this.

10:24:24 10    Why don't you give me an update on where we are today on that

11    issue.

12        MR. STOLLER:  Your Honor -- Paul Stoller, for the

13    record.

14        Your Honor, I had a conversation with Mr. North and

10:24:39 15    Mr. Lerner yesterday.  They asked me to hold two hours

16    tomorrow morning at which point they're going to come to my

17    office with their expert and present to me what they've

18    articulated as a fairly comprehensive proposal with

19    explanation of what they propose and, if I understood it

10:24:58 20    correctly, and we were on the phone yesterday for about half

21    hour addressing things in terms of where they propose -- from

22    where they propose to collect the information.

23        One of the issues, Your Honor, and to the extent if

24    it's not clear in our briefing, there are these shared

10:25:13 25    locations where they have in different, depending on the

10:25:17   1   shared location, substantial -- differing volumes of

2   substantial ESI.  And the question from the get-go has been

3   are they going to collect and search everything from those

4   shared locations or are they going to take parts of it and say

10:25:31   5   we're just going to gather the information that's here in this

6   server and not the other information.

7        And as part of that, if you'll recall when we were

8   back here, I want to say January or February talking about

9   that, as I said to Your Honor, I need to understand what the

10:25:44  10   locations are from which they're going to collect it and from

11   where they're not going to collect it.

12        So there's been an ongoing debate between the sides

13   about whether they're going to collect everything or collect

14   just a portion of it.

10:25:54  15        My understanding is tomorrow they're going to tell me

16   what their proposal is in terms of the portion, if it is a

17   portion, of those different locations from which they're going

18   to collect and then how they propose to use search terms, and

19   actually it sounds like a combination or combinations of

10:26:11  20   search terms, in a formulaic way or Boolean search through

21   those to locate responsive documents.

22        My concern is as yours is, Your Honor.  I said to

23   them I'm fine to do anything that's -- frankly, fine to do

24   anything that's reasonable but I've got two months left.  And

10:26:30  25   at the time this conversation came up two weeks ago when they

10:26:34   1   said they wanted to do it this way, I said that's fine but I

2   would have liked to have had this conversation six months ago.

3          We need documents.  We need to get moving.

4          They have been producing on a rolling basis the

10:26:44   5   custodial documents but, at least according to their report,

6   they've got a ton of stuff at least that's potentially to be

7   searched in the common locations and we don't have it.

8          We've taken, I don't know, a dozen, maybe somewhere

9   between 12 and 18 depositions already.  We've got another 15

10:27:00  10   or 20 scheduled.  What I really need are deadlines and I need

11   stuff as soon as possible.  That's my big concern.  I don't

12   want to push deadlines for discovery.  We want to stay on the

13   schedule this Court ordered originally and get these cases

14   ready for expert discovery and then bellwether trials next

10:27:15  15   year.

16          THE COURT:  All right.  Mr. North.

17          MR. NORTH:  Thank you, Your Honor.

18          I understand the Court's frustration, I understand

19   Mr. Stoller's frustration, and I share that frustration.  We

10:27:29  20   have been working very, very hard.  We have spent hundreds of

21   thousands of dollars and we are looking -- but we face an

22   intractable problem.  That is that these shared drives are

23   huge.  One of them alone has over 500 million documents.

24          And I'm going to be very candid with Your Honor.  We

10:27:48  25   have worked with our vendor and worked with our vendor to try

10:27:50  1    to find some logical ways to hone in on that and to produce

2    the information that needs to be produced.  We have finally

3    thrown up our hands with our vendor and we have hired a

4    analytics consulting firm, BDO, Bard has.  We have been

10:28:06  5    working extensively with them in the last two or three weeks

6    and they have come up with a workable solution, we believe, to

7    allow this to now be completed in a very expeditious manner.

8    And so we have talked to Mr. Stoller.  We are bringing these

9    folks down -- in tomorrow.  One of the BDO people is

10:28:27 10    recognized as one of the ESI gurus in the country, as I

11    understand it.  We're doing all we can.

12        As we indicated in the joint submission, our

13    expectation is we're making every effort to get everything

14    produced by the end of September, and a lot of it much sooner.

10:28:46 15        I would note, too, Your Honor, that for every single

16    person that has been deposed, they have had that custodian's

17    ESI prior to that deposition and we are -- shared drives have

18    been the biggest obstacle.  We're still working through the

19    custodians, but we have a massive review team that's trying to

10:29:05 20    complete that right now.

21        Again, I share everybody's frustration.  I want the

22    Court to know that I and my client have been doing all we can

23    to make this happen and we think that we have finally come

24    upon somebody that's going to show us the way out of the

10:29:18 25    morass we've been in, given the amount of data involved.

10:29:22  1    THE COURT:  What is this new vendor's name?

2    MR. NORTH:  BDO.  B as in boy, D as in dog, O as in

3  Oliver.

4    THE COURT:  And who's the guru?

10:29:35  5    MR. NORTH:  What's his name?

6    I have not met him.  I'm meeting him this afternoon

7  for the first time and he's new to them.  It's George —

8    MR. LERNER:  George Socha, S-O-C-H-A.

9    THE COURT:  Okay.  I want to come back to this.

10:29:54 10  Let's talk for a minute about the other two areas of ESI.

11    Mr. Stoller, on the international front, what exactly

12  is it that you're seeking?  I couldn't understand from the

13  report exactly the scope and the custodians and information

14  that you're seeking on the international front.

10:30:14 15    MR. STOLLER:  Let me give you a little bit of

16  background.  Recall when we were here months ago and started

17  this process we talked about doing a phased approach to

18  understanding how their information systems were organized,

19  and one of the first things we did was, and I'll call it

10:30:29 20  informal interview, with Mr. Carr about how the Bard

21  organizational structure is.  What are their various

22  divisions, what are the subsidiaries, what do those various

23  companies do.

24    In the context of that interview, Mr. Carr, who was

10:30:48 25  the person they put up for the interview, identified a number

10:30:52  1    of companies whose function is to sell products

2    internationally.  And they sell IVC filters internationally.

3    Those companies by and large, he said, use the same sales and

4    marketing materials and the same IFUs.  IFU's being

10:31:11  5    instructions for use, which are the instructions to the doctor

6    in terms of using the product.  The -- as are used in America.

7           To the extent those are the same, that's not what

8    we're looking for.  But he did identify some of them had

9    different sales and marketing materials and different

10:31:26 10    instructions for use and different dealings with different

11    regulatory agencies in those other countries.  That's the

12    information we're looking for.

13           What are they saying to other people outside of the

14    United States that might be different from what they're

10:31:38 15    telling people inside the United States?  Much like any

16    statement to a third party about something that's at issue

17    would be relevant here, we believe those outside the U.S.

18    communications and information, particularly to the extent

19    they're different than what's being told doctors and

10:31:54 20    regulators in the United States, are reasonably relevant for

21    us to try to learn if they're saying things there that --

22    again, the issue here is safety and efficacy of these products

23    and how they should be used.  If they're saying different

24    things to different people, we believe that is discoverable

10:32:11 25    information.

10:32:12   1           THE COURT:  Why?  Give me an example.

2           MR. STOLLER:  So, for example, let's start with an

3    early product.  The recovery here to the instructions for use

4    say, for example, that -- if I recall correctly.  Don't hold

10:32:24   5    me to the precise numbers.  They say, look, these devices,

6    Doctor, are good for implantation in an inferior vena cava

7    that is up to 28 centimeters wide.

8           One of the things that happens early with the

9    recovery filter is that they tend to dislodge and they had for

10:32:43  10    a period of time, over 12 months, maybe nine deaths.  Again,

11   don't hold me quite to the numbers.  But right after rollout

12   they had a period of time where they had a significant number

13   of deaths associated with the filter dislodging and traveling

14   to the heart and killing the patient.

10:33:00  15           What they said internally at the time was, oh, you

16   know what, we didn't realize this but a vena cava can expand

17   and can expand well beyond 30 centimeters.  When that

18   happens -- I said centimeters.  I mean millimeters.  At any

19   rate, when that happens it no longer holds in place and it

10:33:17  20   moves.

21           If they're giving different instructions for use, say

22   in Japan or in Germany or wherever, and in the U.S. it says,

23   hey, you can put them in 28 and in other places it says you've

24   got to be smaller than that, say it says you have to be 24 or

10:33:34  25   26 because the expansion of vena cave may be such it can

10:33:38  1    dislodge and so you have to -- you can only use it in certain

2    smaller ones.  That is significant in terms of what they're

3    selling in the U.S., telling doctors in the U.S. that it's

4    safe to do it -- use it this way and someplace else telling

10:33:48  5    them something different or more restrictive.

6            Does that -- am I making sense?

7            THE COURT:  I understand what you're saying.  How

8    many of these international companies and how many countries

9    are you talking about?

10:34:03 10            MR. STOLLER:  I don't have the number in front of me,

11   Your Honor.  My recollection is they probably -- there are

12   probably a dozen to two dozen of them.  My recollection,

13   though, in terms of at least the ones that Mr. Carr identified

14   as having different IFUs and different literature because of

10:34:19 15   whatever reasons, regulatory or otherwise, is more like five

16   or six.

17            THE COURT:  And how would you describe what you want

18   from those companies?

19            MR. STOLLER:  I would like their sales and marketing

10:34:32 20   literature and their IFUs to the extent they're different from

21   what's been provided to doctors and patients in the United

22   States, and I would like their communications with regulatory

23   officials in those other countries.

24            THE COURT:  For what period of time?

10:34:49 25            MR. STOLLER:  The relevant time period from when

10:34:52   1   these products came on the market, Your Honor, which is 2004.

2            THE COURT:  What's the possible volume of this

3   discovery?

4            MR. STOLLER:  Your Honor, I have no idea.

10:35:02   5            THE COURT:  Are you only asking for materials that

6   are different or are you asking --

7            MR. STOLLER:  Yeah, I don't --

8            THE COURT:  You're asking them to decide what's

9   different and just give you the things that they decide are

10:35:11  10   different or do you want to look at it all so you can decide

11   what's different?

12            MR. STOLLER:  I think I have to -- well, I have to

13   make decisions about what we're going to do and not do.  I

14   think if -- I don't know what the form or format of those, but

10:35:23  15   if the information is the same, if they're identical -- I just

16   want non-identical.  I don't know how to answer that question

17   other than -- because I don't know what I'm talking about.

18   I'm working in a vacuum.

19            In theory, if the literature is the same, if they're

10:35:35  20   identical sales pamphlets and those sorts of things, I don't

21   need a different copy from England than I have, or Canada,

22   than I have in the United States.  On the other hand, if there

23   are differences in those, then we'd like to see what the

24   differences are.

10:35:50  25            But to answer your question, Your Honor, I don't know

10:35:52   1   the volume because I don't know what they have.

2       The conversation didn't get past go when I said we'd

3   like the international stuff and they said we're not producing

4   outside the U.S.

10:36:07   5       If you are amenable to us having those conversations

6   because you believe like we do that these are discoverable,

7   I'm happy to have those conversations with counsel about

8   volume and get this moving.

9       THE COURT:  Hold on just a minute.

10:36:21  10       MR. STOLLER:  Sure.

11       THE COURT:  When did you raise this issue with

12   defense counsel?

13       MR. STOLLER:  The outside the U.S.?

14       THE COURT:  Yes.

10:36:42  15       MR. STOLLER:  I don't recall the first time.  I know

16   that Mr. Lerner and I talked about it couple weeks ago when we

17   were talking about the issues of dispute.  We've got --

18   there's a fair amount of back and forth.  I couldn't tell you

19   when it first came up.  It's been part of the conversation.

10:36:58  20       THE COURT:  Was it raised before a couple of weeks

21   ago?

22       MR. STOLLER:  I'm almost positive, Your Honor.  This

23   has been a subject of conversation for quite some time because

24   it's been part of the custodial conversation if no place else.

10:37:15  25   We talked about the custodians, boy, months ago.  In

10:37:21  1    particular, we identified two of the custodians and they said

2    we're not producing international materials.  And my

3    recollection is that conversation was more than two months

4    ago.

10:37:36  5         THE COURT:  And is that Siciliano and Dominguez?

6         MR. STOLLER:  Yes, Your Honor.

7         THE COURT:  Okay.  Let me hear from defense counsel.

8         MR. NORTH:  Your Honor, as a threshold matter I think

9    it's important to note that there, to our knowledge, is not a

10:37:55  10   single international based plaintiff in the more than 7 or 800

11   plaintiffs who have now filed suit.  There are certainly not

12   any in the 46, soon to be 48, potential bellwether cases.

13        But Rob Carr's testimony, Your Honor, we believe,

14   made it very clear why the information they're seeking is not

10:38:15  15   relevant for this particular litigation.

16        As he testified, these filters are designed here in

17   the United States.  In Tempe.  They're manufactured in the

18   United States at a plant in Glens Falls, New York.  All of

19   them.  No matter where they're being sold.  All marketing

10:38:34  20   materials are prepared in Tempe.

21        In fact, on page 57 of his deposition, Mr. Carr

22   testified that international entities may not develop their

23   own marketing materials.

24        All of the adverse event reporting, all of the

10:38:51  25   complaint investigation of adverse events is done in Tempe.

10:38:55    1    These are sales centers.  The regulatory submissions are

            2    generally developed here in Tempe and sent to the

            3    international sales distribution centers or, as Mr. Carr

            4    called them, commercial sales structures, to deliver to the

10:39:13    5    local regulatory authority as necessary.

            6         Your Honor, Mr. Stoller focused principally on the

            7    IFUs, instructions for use, and the ones used in other

            8    countries.  I would respectfully point out that he has those.

            9         The IFU from Bard is in, I don't know, 15, 20

10:39:35   10    different languages.  When you get the entire IFU it's just a

           11    package.  It starts with English, I think Spanish is second,

           12    and it goes on and on for the different versions.

           13         If he has not located that, we'll certainly find that

           14    for him in the production.  Or if for some reason it hasn't

10:39:51   15    been given to him in the materials he has, we'll get him a

           16    copy of that.

           17         But those IFUs are developed here.  And they're

           18    not -- there are not people in Shanghai or Brazil or Peru who

           19    are doing separate IFUs.  They're getting the IFU from here

10:40:10   20    that's developed by the international regulatory people, and

           21    then they're using that with their products there.

           22         These products are packaged and manufactured here, so

           23    the IFUs are all done here.

           24         Your Honor, we believe that this is simply not

10:40:27   25    relevant to this case.  He has the materials he would need to

10:40:31  1  see the IFUs.  All the marketing materials are generated here.

2  And we see no need to go to -- I don't have the exact number,

3  but it's at least 15 to 20 sales commercial structures.  I

4  know there's one in Germany.  I know there's one in Great

10:40:49  5  Britain.  I know there's one in the Netherlands, Spain,

6  France.  I've seen one in Brazil, Mexico, Japan, Shanghai,

7  Singapore.  The list goes on.

8          We're talking about an incredibly involved

9  undertaking to try to go to all these different places and

10:41:08  10  find some needle in a haystack when all of this material is

11  prepared here in Tempe and then used by these folks as they

12  sell the product in these other countries.

13          So for that reason, we're objecting to the attempt to

14  expand discovery into the international realm.

10:41:29  15          THE COURT:  All right.

16          Mr. Stoller, a brief comment on that, and then I'll

17  ask you about Ring and Weiland.

18          MR. STOLLER:  And, Your Honor, I think that Ring and

19  Weiland is a non-issue.  I think that's going to be part of

10:41:38  20  their proposal to me tomorrow in terms of what they want to do

21  there.

22          I think, my understanding was, the concern was how

23  they're going to address the privilege issues with them.  They

24  only -- that only ended up in the joint report I think because

10:41:51  25  when Matthew and I were talking on Friday of -- Thursday or

10:41:54  1    Friday of last week that they thought it might be an issue, so

       2    we flagged it there.  But I think, based on conversations

       3    yesterday and today, I think that's not an issue we need you

       4    to touch on today.

10:42:06  5              THE COURT:  Do you agree with that, Mr. North?

       6              MR. NORTH:  Yes, Your Honor.

       7              THE COURT:  Okay.

       8              MR. STOLLER:  Let me make two points and then I'll

       9    sit down.

10:42:13 10         The first is I don't know what we have in terms of

      11    those sort of things and whether we have all of the IFUs.  I

      12    certainly know we've got different language IFUs, but I don't

      13    know and have not been told, and today's the first I've heard

      14    of it, that they think they've given us some or maybe all but

10:42:31 15    they don't know.  The conversation on this has been sort of a

      16    pound sand one.  They're not -- they don't think the

      17    outside-the-U.S. information is relevant so they haven't --

      18    they're not willing to produce it or discuss it.  This is the

      19    first I've heard they think they've given us some, it hasn't

10:42:46 20    been identified to me, and those relate to the foreign

      21    countries.

      22         Secondly, the one thing you did not hear from

      23    Mr. North is about their regulatory communications there.

      24    Again, it's the same issue.  What are they telling the

10:42:57 25    regulators in those companies -- excuse me, in those other

10:42:59  1   countries about these very devices?  We're not talking about

2   different devices manufactured in different places.  You heard

3   it here from Mr. North, these are the very same devices that

4   are manufactured here in the U.S., that are used here in the

10:43:10  5   U.S., and they're communicating with regulators in -- I won't

6   say third world countries, but in other countries about these

7   very devices and their safety and efficacy, which is at issue

8   in this lawsuit, Your Honor.  These are statements by the

9   defendants to a regulatory company about the safety and

10:43:29  10   efficacy of these products.  We believe we're entitled to

11   access to them.

12              Would you like me to sit down?

13              THE COURT:  Yes.  Thanks.

14              Mr. North, what about the -- Mr. Lopez?

10:43:43  15              MR. LOPEZ:  Yes, Your Honor.  Can I add -- I'll come

16   to the podium.

17              One of the issues with the foreign countries that are

18   selling these, they all have a responsibility to prepare --

19   and every country is a little different -- adverse event

10:44:01  20   reports.  And you know that's a big issue in this case.

21              We are involved in another case where a company that

22   was having foreign adverse events because they changed the

23   product number were not reporting those foreign events to our

24   U.S. FDA.

10:44:17  25              Our concern, we don't know whether that's happened

10:44:20  1    here or not, and maybe the only way for us to find out -- and

2    they're required to report all adverse events whether they

3    happen domestically or they happen in any other country if it

4    relates to a product being sold here.

10:44:33  5        Mr. North just advised you the same product they sell

6    here, they're selling in I don't know how many other

7    countries.  But if there are deaths or serious injuries being

8    reported in those countries to those federal regulators that

9    are not being reported here, that's a big issue for us.  And

10:44:51  10   if the only way for us to find that out is to conduct

11   discovery on those foreign entities -- I don't know how

12   they're set -- I don't know whether they're just a pass

13   through to Tempe or some other Bard office here, but I think

14   that each one of those countries requires that company to

10:45:10  15   be -- that company that is a subsidiary of Bard to report to

16   the foreign regulators adverse events.

17        I just -- if those exist in foreign subsidiary files

18   and those aren't being reported to the FDA and not being given

19   to us in a -- in their adverse event files or TrackWise

10:45:34  20   database, I think that at the very least is something that I

21   think we need to have and is relevant and we should have.

22        THE COURT:  Thank you.

23        Counsel on the phone, we're picking up noise from

24   office activities.  Would all of you please make sure you mute

10:45:58  25   the phone on your end because we're getting interference with

10:46:00   1    things you're doing in your office.  Thank you.

2              Go ahead, Mr. North.

3              MR. NORTH:  Thank you, Your Honor.  As I indicated

4    previously, all of the complaints are investigated and the

10:46:12   5    reports are prepared here.  And we have already produced to

6    the plaintiffs the entire TrackWise database with all of the

7    complaints, including dozens, if not hundreds, of foreign

8    complaints.

9              With all due respect to the plaintiffs, if the

10:46:28  10    attorneys would sit down and look at those complaints, they'll

11    see the foreign complaints.  And we don't believe that is a

12    reason to launch this sort of massive international search

13    they're now talking about.

14             Thank you, Your Honor.

10:46:40  15             THE COURT:  What is your response on the question of

16    when this was raised with you, because that's a concern you

17    expressed in the report, that this is a late-breaking

18    development in the case.  That is, the international

19    discovery.  When do you think it was raised by plaintiffs?

10:46:57  20             MR. NORTH:  Well, we had some preliminary discussions

21    about it earlier and then we presented Mr. Carr for a

22    deposition, and I think that was in May, perhaps.  Late April

23    or May.  He was there to talk about the company's corporate

24    structure and what these various entities did.  And when he

10:47:14  25    started testifying and explaining how everything is done in

10:47:19  1    Tempe, including marketing materials and adverse event

2    reporting, all of that, we assumed that there was really no

3    issue at that point.  And then I believe Mr. Stoller's correct

4    that it came back up a couple weeks ago.

10:47:33  5              THE COURT:  What is your response to Mr. Stoller's

6    point that there are communications, not adverse event

7    reporting but communications, with foreign regulators that may

8    be different than communications with the FDA?

9              MR. NORTH:  I don't believe that really exists, Your

10:47:52 10    Honor, except perfunctory enclosed please find the regulatory

11    submission approval for such and such.  Because if they'll go

12    through the ESI they have and the materials we've produced for

13    years, you're going to see many, many instances where a

14    salesperson in Great Britain or Dublin will get some inquiry

10:48:14 15    from the British regulatory authority.  They immediately call

16    the regulatory folks here in Tempe because they are the ones

17    that generate the substantive responses.  They're the ones

18    that do the submissions for those regulatory agencies.  So

19    their U.S.-based discovery is going to sweep all of this up

10:48:37 20    except the most perfunctory, as I understand it, types of

21    communications.

22              THE COURT:  Do you want to add a comment?

23              MR. LERNER:  He beat me to it.

24              THE COURT:  Okay.

10:48:50 25              Give me just a second, Counsel.

10:50:56   1          Mr. Stoller, a question for you.  Do you have any

2     basis to dispute the defendant's assertion that Mr. Carr

3     testified that all marketing materials are prepared in Tempe;

4     all regulatory communications, whether national or

10:51:15   5     international, are prepared in Tempe; IFUs are prepared in

6     Tempe; products are developed and manufactured in the United

7     States and not abroad?  Do you disagree with any of that?

8          MR. STOLLER:  Your Honor, as we had proposed to brief

9     this and as I said, all I wound up getting prior to this was a

10:51:38  10     blanket "we're not producing that" rather than the explanation

11     I've gotten here -- you've gotten here today.

12          I cannot off the top of my head recall the specifics

13     of what Mr. Carr said in his deposition, so I can't tell you I

14     have a specific recollection that he testified differently

10:51:52  15     than that.  What I can tell you is that I have a general

16     recollection that he said that there are different dealings --

17     different documents in the different countries.  In some of

18     them, not all of them.  And that there were specifically

19     differences in the materials because of, in some cases,

10:52:12  20     regulatory issues and dealing with regulators.  If I recall

21     correctly, he identified specifically Japan, if I recall

22     correctly.  But, Your Honor, in all candor I haven't reviewed

23     that deposition in several months and I simply can't say one

24     way or the other.

10:52:29  25          THE COURT:  I think Mr. North's response would be

10:52:31  1    even if he said there may be unique regulatory requests in

2    Japan, those would be answered out of Tempe, so you would get

3    that in the discovery.

4         MR. STOLLER:  I can't answer that one way or the

10:52:44  5    other except to say I'm not sure how many fluent people they

6    have in Japanese here, or Danish, or German or those sort of

7    things.  I mean, I have -- let me say this.  I have healthy

8    scepticism that there isn't somebody who is being an interface

9    in those countries, particularly since they have companies --

10:53:01  10   they're not selling this stuff from America.  They're not

11   selling it from BPV America.  These are separate, independent

12   legal entities, and therefore there are people there working

13   for those entities and interfacing through those entities with

14   those other countries.

10:53:16  15        I can't answer the question as to whether -- what

16   Mr. Carr said, but healthy scepticism and logic would say to

17   me that's probably not the full story.  And, again, I'm not --

18   while Mr. North has characterized this as a gargantuan task,

19   we're asking for stuff that's different.  If that is

10:53:35  20   gargantuan, seems to me that's a problem.  On the other hand,

21   I think it's probably more discrete.  And we're asking for the

22   discrete stuff.  Whether produced here in Tempe or Japan or

23   the Netherlands or wherever shouldn't really matter.

24        The dispute, to me, is not about who made it, it's

10:53:51  25   about do we get it.  And, from my perspective, if they say,

10:53:57  1    look, you get it and you get all of it, whether it's produced

2    out of Tempe or Japan is not the significant point here.  I've

3    been told, again, to pound sand on these issues.

4             THE COURT:  Okay.  Thank you.

10:55:08  5             All right.  Talking about the international issue, I

6    have my doubts this is relevant.  Healthy scepticism, in my

7    view, is not a basis to determine relevancy.  And Bard did

8    quote -- not quote, but describe Mr. Carr's testimony in the

9    joint report, so I think plaintiffs were on notice that was

10:55:25 10    going to be discussed today.  But just to be sure I'm making a

11   decision on the basis of complete information, what I'm going

12   to do, Mr. Stoller, is ask that you provide me by the close of

13   business on Thursday the 25th your information from the Carr

14   deposition, or otherwise, that causes you to believe that the

10:55:44 15   assertions of the defendants here today are wrong.  Namely,

16   that the relevant information is all created and generated in

17   the United States and will be discovered.

18             I will look at that.  If I think I need a response

19   from the defense, then I'll get a text-only order out on

10:56:00 20   Friday and give you till the close of business on Monday to

21   file your response so we can decide this issue early next

22   week.  I do want to give you a chance to making that showing.

23             But I'll tell you now my view is that the possibility

24   that Bard might not be reporting an adverse event in the U.S.

10:56:18 25   that was reported in France, to me, is not grounds for

10:56:21  1    discovery in France.  The mere possibility.  Healthy

        2    scepticism isn't a basis for international discovery.

        3         The standard under Rule 26(b)(1) is it has to be

        4    relevant to a claim.  And so I think there needs to be a

10:56:34  5    showing that there is reason to believe that discovery from

        6    these international entities would produce something different

        7    than what is being produced from the U.S. discovery. So if you

        8    could do that by the close of business Thursday.

        9         MR. STOLLER:  Certainly can do that, Your Honor.  Let

10:56:49 10    me ask a question, which is how could I possibly contest

       11    Mr. Carr's testimony without this discovery?  I mean, it seems

       12    to me what they've said is we put up a witness and he said

       13    this, and we have no opportunity to challenge it.

       14         THE COURT:  You questioned him.  Presumably you

10:57:09 15    questioned him.  I'm assuming he testified truthfully.  I

       16    don't have a basis to think he didn't.  And if he was deposed

       17    in May, there's been a couple months to work this issue.

       18         So, to me, the notion that we're going to go to

       19    international discovery in a case where we've got no

10:57:26 20    international plaintiffs on the possibility that there may be

       21    something said abroad that's inconsistent with something said

       22    locally and therefore will impeach the credibility of the

       23    witness, that's just getting very far afield from what the

       24    case is about.  And so I think there needs to be some good

10:57:40 25    reason to think that there's true value in that discovery

10:57:43  1    before I'm going to allow it.

2         MR. STOLLER:  And I'm not disagreeing with you on

3    that point, Your Honor.  My question to you, I guess, is to

4    the extent -- let's assume for a moment there are

10:57:52  5    communications between Bard and the foreign regulators in

6    these foreign countries, which I think they would concede

7    there are, that those things exist.  I think my concern is it

8    sounds like and Mr. North has articulated this as us asking

9    for substantial volumes.  I don't believe we are asking for

10:58:15  10   substantial volumes.

11         I think it's a fairly narrow request when we talk

12   about what communications have you had with those foreign

13   regulators about these particular products.  It should not be

14   a large volume of documents.

10:58:28  15        And to that extent, if those statements are

16   inconsistent, just as the statements they've made with the

17   FDA, if they're -- I don't -- apologize for stuttering over

18   myself.  But the core issue here is if they're making

19   statements about the safety and efficacy of their product,

10:58:47  20   that seems to me to be corely relevant to the claims in this

21   case.  We're not asking for every communication with the world

22   by those foreign entities, it's what are you telling the

23   regulators about this?  What are telling in your discrete

24   sales and marketing that is any different from what you're

10:59:05  25   telling people in the U.S.?

10:59:06   1        Again, maybe I'm confused about the volume, but your

2      question to me suggests you think it's a giant volume of

3      documents out there.  It seems to me that would be a very

4      discrete volume of documents out there in the world and not

10:59:18   5      impose a substantial --

6           THE COURT:  Well, what I'm relying on, on that point,

7      Mr. Stoller, is Mr. North's assertion that there are 15 to 20

8      commercial sales organizations doing business around the

9      world.

10:59:31  10           MR. STOLLER:  And what I'm --

11           THE COURT:  To go and get what those organizations

12      have said to regulators in all those countries where they

13      sell, to look at those communications and then decide is there

14      anything in them that's inconsistent with everything we've

10:59:43  15      said to the FDA doesn't sound to me like a very narrow,

16      discrete kind of discovery.

17           MR. STOLLER:  What I'm relying on is Mr. Carr's

18      testimony that most of those are consistent statements --

19           THE COURT:  Somebody is still going to have to go

10:59:56  20      through the haystack to find the needles of inconsistent

21      statement, which is what you're asking for.  Maybe there's

22      only four or five needles, but you can't say that is discrete

23      discovery when you have to go through a haystack to find them.

24      That's my concern.

11:00:09  25           So I have to have some reason to think that there

11:00:13  1  really is value in the discovery before I'm going to permit

2  it.  So I'll give you a chance to make that showing by the end

3  of Thursday.

4        MR. STOLLER:  All right.  Thank you.

11:00:21  5        MR. NORTH:  Your Honor, one thing.  I want to be very

6  candid with the Court.  I was just looking through Mr. Carr's

7  transcript as the Court was talking --

8        THE COURT:  Mic, please.

9        MR. NORTH:  Sorry.

11:00:32  10  He said exactly what I did say.  He did add one

11  caveat that I had forgotten about.  Couple pages later he says

12  that in those instances where another country's regulatory

13  body approves a device for an indication where it can't be

14  used for that indication here in the United States, that in

11:00:48  15  that circumstance the local body may add to the IFU on that

16  novel indication, but that all the information and data comes

17  from Tempe still.

18        I just wanted to be sure I was clear on the record

19  there.

11:01:04  20        THE COURT:  Are you saying, Mr. North, that the

21  indication would be one that isn't used in the United States

22  and therefore wouldn't be relevant in any of the plaintiffs'

23  cases?

24        MR. NORTH:  That's my understanding, Your Honor.

11:01:21  25        THE COURT:  All right.  You're free to address that

11:01:22  1    as well, Mr. Stoller, in what you submit.

         2            MR. STOLLER:  We will, Your Honor.  Thank you.

         3            THE COURT:  With respect to the shared space

         4    discovery, we've got to move this along, so this is what I

11:01:30  5    want to do.  I'll give you a chance to tell me if it's a bad

         6    idea.  What I want to do is require the parties to reach

         7    agreement on this issue by a week from today, August 30th, on

         8    the basis of the meeting that will occur tomorrow, and

         9    presumably the plaintiffs need an opportunity to talk to their

11:01:45 10    experts about what they hear from the defense experts.  And if

        11    you don't have an agreement by August 30th, then we'll talk by

        12    phone and I will appoint a special master immediately with

        13    directions to meet with the parties and make a decision by

        14    September 16th.  Two weeks.

11:02:03 15            So I'm going to have to find a special master who can

        16    dive right in, meet with the parties and their experts, and

        17    discuss what shared space discovery is appropriate.  All so we

        18    can get this discovery done by the end of September, which is

        19    still only a month before the close of discovery.

11:02:21 20            That's the schedule I want to follow.  So what I'm

        21    going to ask you to do is to -- well, actually, let me look at

        22    the calendar and pick an actual time.

        23            I'd like to set 10:00 o'clock August 31st, a week

        24    from tomorrow, for telephone conference.  If you reach

11:03:23 25    agreement, just call my office and tell us you've reached

11:03:27  1    agreement and we can cancel that telephone conference.  But if

2    you are in disagreement on the discovery of the shared space,

3    then we will talk at 10:00 o'clock on the 31st and I will

4    designate a special master to dive in and get this thing

11:03:43  5    resolved in the next few weeks.  I see no other way to ensure

6    we're going to get this done within the schedule we've set for

7    the case.

8         Any comments on that or questions or concerns?

9         MR. STOLLER:  No.  Thank you, Your Honor.

11:03:55  10         MR. NORTH:  Nothing, Your Honor.

11         THE COURT:  Okay.

12         Okay, let's talk next about the mature cases.  You

13    indicated in your joint report that you don't think we should

14    remand those cases until the expert discovery is done in this

11:05:54  15    case because some of those cases, or all of them, may want to

16    rely on the expert discovery here.  That's reasonable.

17         You then ask the question what, if any, case-specific

18    discovery should occur on those mature cases.  My answer is

19    none.  That's not the purpose of the MDL.  If it's truly

11:06:13  20    case-specific discovery, that should happen after remand.  So

21    I don't think we ought to spend time in this case doing

22    case-specific discovery.

23         Any questions or comments on that?

24         MR. LOPEZ:  No, Your Honor.

11:06:27  25         THE COURT:  Okay.

1    Let's talk about the class action schedule.

2    I could not fully understand from what you all

3    submitted why an additional 70 days is needed for fact

4    discovery.  Could you explain that, please.

5    MR. NORTH:  Your Honor, the reason we're requesting

6    that is we're trying to conduct discovery of the

7    representative plaintiffs that have been named to see if they

8    adequately represent the proposed class, and all the criteria

9    of a class action.  Immediately following the last conference,

10   within a week, we made informal requests to the plaintiffs if

11   they could expedite and get us medical authorizations because

12   the medical condition of these plaintiffs will be important to

13   see if they're representative of the proposed class.

14   We made that request on June 30th of 2016.  We

15   repeated it on July 5th, July 7th.  On July 20th we repeated

16   it again.  For the first time the plaintiffs said that they

17   would try to obtain that information.

18   On July 26th they then came back to us, a month after

19   we made the request, and said we have some concerns about

20   providing the authorizations.  Even though they're the

21   identical authorizations we had agreed upon for the bellwether

22   plaintiffs.

23   Finally we got those authorizations, the first couple

24   ones, on August 2nd, and we didn't get the last one until

25   August 15th.  Last week.

11:08:09   1        Now, in the meantime, Your Honor, we have served

2    basic discovery requests on the plaintiffs.  We got the

3    responses to those I think ten days ago or so.  For the most

4    part, on many different things there were just objections.

11:08:25   5    Many of the answers said things like, well, we will provide

6    that information about the plaintiffs when we are briefing the

7    class certification issue.

8        In other words, you can't have discovery on it was

9    the basis of the objection, apparently.  We'll show what you

11:08:41  10    our cards are once we start briefing.

11        We are in the meet and confer process on that and

12    they have indicated some flexibility to help us and provide

13    the information we think we're entitled to, so we're not ready

14    to go to the Court on that as a discovery dispute.  But, Your

11:08:59  15    Honor, we're just now being able to turn to the medical

16    records vendor to start the process.  And here we are at the

17    end of August.  And through no fault of the defense, we

18    believe we, there's no way we can get the records and then

19    take meaningful depositions of these 13 or so people by the

11:09:18  20    end of October.

21        We had some -- my team that's working on the class

22    action had some lengthy discussions with the plaintiffs'

23    attorneys last week and I think in recognition of the fact

24    they had, probably inadvertently, delayed that process they

11:09:34  25    agreed to that proposal.

11:09:36   1          We were seeking a 60 days extension and everybody

        2     realized 60 days was going to put us somewhere between

        3     Christmas and New Year's, which is why it went to 70, as I

        4     understand it.

11:09:48   5          And I understand the Court's desire that the

        6     discovery schedules stick.  We've done everything we can,

        7     knowing there was a short time fuse, to get this discovery

        8     going, and we just got the authorizations we need to get that

        9     started, many of them, just last week or in the last ten days.

11:10:08  10     So for that reason we would request the Court enter the

       11     revised schedule.

       12          THE COURT:  Plaintiffs counsel.

       13          MR. SELTZ:  Good morning, Your Honor.  Daniel Seltz

       14     from Lieff Cabraser Heimann & Bernstein.  I'm going to address

11:10:28  15     the schedule on behalf of the class plaintiffs.

       16          I would take issue with Mr. North's characterization

       17     of the sequence of events.  But where we have arrived is that

       18     the plaintiffs have every interest and we share the

       19     defendant's interest in moving the case forward as quickly as

11:10:45  20     possible.

       21          We did get a request for -- informal request for

       22     these medical authorizations in early July.  There are 11

       23     plaintiffs who are scattered around the country.  They have

       24     different relationships with different of the firms and we

11:11:03  25     moved forward as quickly as we could once we agreed to provide

11:11:07  1   these.  The first of these we got to Bard in early August.

2   They now have all of them.

3        Mr. North mentioned we had raised some concerns about

4   providing them, but once we decided to get these

11:11:25  5   authorizations to Bard, we moved forward as quickly as we

6   could.  That process never slowed.  So we've -- the -- they

7   have all the authorizations, which were an informal request.

8        In terms of the formal discovery, we responded, I

9   think it was August 15th, to two sets of interrogatories,

11:11:52 10   several dozen document requests, several dozen requests for

11   admission.  Many of them, as Your Honor might expect, we had

12   questions about.  Many of them were, in our view, overbroad.

13   And so we served the combination of responses and objections.

14   And I believe it was the next day when we heard that as a

11:12:18 15   result of these objections, Bard wanted to move right away to

16   extending the discovery schedule.

17        We initiated a meet and confer that happened the next

18   day.  It was a lengthy meet and confer.  I believe that aside

19   from one or two discrete issues, we either have agreement or

11:12:41 20   we'll be continuing to discuss these -- some of these topics

21   over the next couple of weeks.

22        None of these discussions I think are ripe for Your

23   Honor's attention, but because Mr. North raised it I just

24   wanted to quickly mention that, you know, some of the requests

11:13:02 25   that he mentioned concerning class certification were -- they

11:13:10  1   were phrased in terms of show us -- put forward your theory of

2   class certification, give us all facts that go to each element

3   of Rule 23.  And, you know, that's something that courts in

4   this circuit have held is premature.  It's not a proper use of

11:13:30  5   Rule 33.

6          So we had discussions about that and I think, you

7   know, we've been able to come to an agreement about how we're

8   going to approach that.

9          But all that is to say that we share the defendant's

11:13:44 10   interest in moving forward and we're now in a position to do

11   so.

12          The schedule that we've agreed to, it sort of keeps

13   the class case roughly in line with the progress of the MDL.

14   I think we also have an interest in not getting behind and not

11:14:04 15   getting ahead because there's going to be some overlap in

16   proof and so we want to realize efficiencies where possible.

17   Although this schedule extends the dates out by 60 or 70 days,

18   it keeps -- it keeps the cases moving along the same place

19   along the tracks.

11:14:26 20          THE COURT:  What is the number of named plaintiffs?

21          MR. SELTZ:  There are 11 named plaintiffs.

22          THE COURT:  What experts, Mr. Seltz, do you think

23   plaintiffs are likely to use in connection with class

24   certification?

11:15:01 25          MR. SELTZ:  Well, we're still working with at least a

11:15:07   1   couple of different experts, but it's certainly one or two of

2   the experts will opine as to the -- as to the notice -- as to

3   the monitoring program that we've alleged is necessary in

4   this -- in this case.

11:15:25   5        THE COURT:  How many experts are you thinking you're

6   going to need?

7        MR. SELTZ:  I'm just not in a position to say whether

8   it's going to be two -- I don't think it's going to be more

9   than four.  But I don't -- it may well be one or two.  It's

11:15:44  10   just -- I'm not -- I'm not in a position to say today.

11        THE COURT:  Does -- does the complaint seek relief

12   other than medical monitoring?

13        MR. SELTZ:  It also calls for a notice program to go

14   out to doctors and patients.

11:16:00  15        THE COURT:  In support of medical monitoring, I

16   presume?

17        MR. SELTZ:  Yes.  But essentially what the complaint

18   seeks is injunctive relief in the form of this medical

19   monitoring program.  So I should add, Your Honor, in the

11:16:19  20   interests of trying to compress these dates, we had proposed

21   initially that the plaintiffs make their disclosures of their

22   expert reports in connection with their opening brief on class

23   certification and there would be a period of perhaps 60 days

24   for Bard to both respond to that, to the opening brief, and to

11:16:46  25   also depose our experts.  They would then disclose their

11:16:51 1    rebuttal experts in connection with their opposition to class

2    certification.

3         Bard didn't want to proceed that way so we have --

4    we're doing it the way that these cases also often go, which

11:17:04 5    is to have a period of expert discovery leading up to class

6    cert briefing.

7         THE COURT:  Okay.  Thanks.

8         Mr. North, or whoever on the defense --

9         MR. NORTH:  I don't think I have anything to add

11:17:29 10   unless the Court has questions.

11        THE COURT:  What experts do you think are going to be

12   needed?

13        MR. NORTH:  Well, I was at this point tentatively

14   thinking of two.  But if they're going to have as many as

11:17:40 15   four, I may need to rethink that.  I'm not sure what

16   disciplines they would be in.  But we would probably have

17   certainly an interventional radiologist and maybe a

18   cardiologist.

19        THE COURT:  To talk about what?  Generally.  I'm just

11:17:57 20   trying to get a sense for how significant the expert discovery

21   in this case is going to be.

22        MR. NORTH:  To talk about what we perceive as there's

23   no consistency, first of all, in what sort of medical

24   treatment needs to be given to individual patients, making it

11:18:14 25   inappropriate for class treatment.

11:18:16  1          THE COURT:  You mean medical monitoring?  You said

2     medical treatment.

3          MR. NORTH:  Right.  I'm sorry.  For medical

4     monitoring.  There are -- would not be consistency among the

11:18:25  5     class members and so we'll have experts to talk about that.

6     We'll have experts to talk about whether there is a need for

7     medical monitoring in the first instance and issues of that

8     sort.

9          THE COURT:  Well, I've assumed, without diving into

11:18:46  10    this case deeply at all, that the issue with class

11    certification will be whether individual issues will

12    predominate or not.  I'm assuming that's -- is this a (b)(3)

13    class, Mr. Seltz?

14         MR. SELTZ:  It's a (b)(2) and (b)(3) class and we've

11:19:03  15    also alleged it could also take the shape of a (c)(4) class in

16    which the court certifies particular issues for class

17    treatment.

18         THE COURT:  Am I right, though, that the primary

19    battleground is likely to be whether individual issues

11:19:20  20    predominate, whether it's suitable for class treatment or

21    whether it will devolve into a series of individual trials?

22         MR. NORTH:  Yes.

23         THE COURT:  Is that likely to be the primary

24    battleground?

11:19:30  25         MR. SELTZ:  That is often the battleground in these

11:19:32  1    cases.   This case is like others in that way.

          2            THE COURT:  Okay.  Give me just a minute.

          3            Okay, let me give you the schedule I'd like us to

          4    follow.  I'm shortening up the class discovery and class

11:25:45  5    certification -- I'm sorry, the expert discovery and the class

          6    certification schedule some because I don't think we need to

          7    stretch it out as far as you have.

          8            I will adopt your proposal that we allow fact

          9    discovery in the class case until January 9th of 2017, as well

11:26:07 10    as your proposal that plaintiffs' experts be disclosed on

         11    January 13th.

         12            I'm going to require defense experts by February

         13    24th.

         14            Any rebuttal experts from plaintiffs by March 24th.

11:26:25 15            Expert depositions to be completed by April 28th.  So

         16    there will be a little over a month for the class experts to

         17    be deposed.

         18            The motion for class certification by May 12th.

         19            The response by June 9th.

11:26:43 20            The reply by June 30th.

         21            With a class certification hearing to be held on July

         22    14th at 2:30 p.m.

         23            I think that is a reasonable amount of time to get it

         24    briefed and get discovery finished.  And that will get us to

11:27:02 25    class certification in July, whereas under your schedule we

11:27:05  1   wouldn't finish the briefing until August and I don't want to

2   drag it out that long.  We're going to be picking bellwethers

3   in the spring.  I'd like this case to be moving along at a

4   reasonable pace about the same time.

11:27:17  5         And since class certification is an important

6   milestone in this case and in the overall settlement picture

7   that undoubtedly will be on parties' minds as we're getting

8   bellwethers teed up, I think we need to accelerate it a little

9   faster.  So that is the schedule we will adopt.

11:27:34 10         Let's talk about the Beasley deposition.  Is that

11   still at issue?

12         MR. BOATMAN:  It is, Your Honor.

13         THE COURT:  Let me tell you what I want to do on

14   this.  I think Mr. Beasley does constitute an apex deponent as

11:27:52 15   the cases have described apex depositions.

16         As you know, the general factors that are considered

17   in deciding whether an apex deposition should be permitted is

18   whether the executive has unique first-hand non-repetitive

19   knowledge of the facts at issue in the case and whether the

11:28:23 20   party seeking to depose that executive has exhausted other

21   less intrusive discovery methods.

22         That is language, actually, that I'm quoting from a

23   couple of cases, but it's summarized in a case called

24   *Klungvedt*, K-L-U-N-G-V-E-D-T, *versus Unum Group*, which is 213

11:28:44 25   Westlaw 551473.  It's a decision from this court from 2013.

11:28:52  1          So I think the burden is on plaintiffs to show those

2     two things.  Namely that Mr. Beasley possesses unique

3     firsthand non-repetitive knowledge of the facts at issue in

4     the case, and, secondly, that you have exhausted other

11:29:08  5     less-intrusive discovery methods to obtain the information

6     that he might possess.

7          So does somebody from plaintiffs' side want to

8     address those two factors?

9          Mr. Boatman.

11:29:21  10          MR. BOATMAN:  Your Honor, the way this was set up was

11     that we had -- we weren't sure that the Court was going to

12     adopt the apex approach and requirements, so the point today

13     to was try to determine, I think, if the Court was going to

14     require that and, if it was, our proposal was we would submit

11:29:47  15     a brief on the factual issues the Court wanted briefed by

16     Friday and have it heard next week.

17          THE COURT:  I know that was the proposal.  I'd prefer

18     to decide it today.  Are you just not ready to address it?

19          MR. BOATMAN:  We're not ready to address it today,

11:30:01  20     Your Honor.

21          THE COURT:  All right.  Then let's have the parties

22     submit simultaneous three-page briefs.  It doesn't need to be

23     long because you don't need to address the law.  I think the

24     law is pretty clear in this area.

11:30:19  25          Really the question is what does Mr. Beasley have

11:30:22   1    that's unique that you can't get elsewhere?  And have you

2    exhausted efforts to get it?  That's the test I've seen

3    applied in every apex deposition issue I've had to address,

4    and that's what I want the parties to address.  So I think

11:30:36   5    they can be simultaneous since you know exactly what the

6    target is you're shooting at.

7         Why don't you get three-page memoranda filed by the

8    close of business Friday and I'll get you a decision early

9    next week.

11:30:48  10         MR. BOATMAN:  Thank you, Your Honor.

11         THE COURT:  Okay.

12         All right.  I want to address now the plaintiffs'

13    objections that have been identified in the report as creating

14    issues between the parties.  I don't want to brief this if we

11:31:31  15    can avoid it.  It seems to me these are fairly straightforward

16    issues.  I would like to talk through the three areas and then

17    we'll talk about defendant's objections.

18         The first category, as I understand it, is defendants

19    have sought to discover plaintiffs' communications with the

11:31:51  20    FDA from January 1st of 2013 to the present.  My understanding

21    is the reason defendants want it is because it relates to the

22    FDA warning letter that is at issue in the case and the

23    defendants want to know what input plaintiffs provided on that

24    subject.

11:32:09  25         MR. NORTH:  Yes, Your Honor.

11:32:11  1          THE COURT:  So I think I want to start with

2      plaintiffs addressing why that's not relevant.  Why is it that

3      I should say discovery on that subject should be foreclosed?

4          MR. LOPEZ:  Well first of all, Your Honor, if you

11:32:35  5      look at the discovery, I mean it's clearly case-specific

6      discovery, so let's start with that.  In other words, are all

7      850 plaintiffs going to be subjected to this discovery?  So I

8      think the first decision that has to be made is is this

9      case-specific discovery?

11:32:52  10         I -- I'm not really prepared today to address the

11     merits of these.  I mean, we can talk about them, but this is

12     something that we'd like to brief.  And our position -- we

13     have a very strong position on relevance.  What's the

14     relevance of whether or not a plaintiff somehow prompted FDA

11:33:13  15     to conduct a 15-month investigation?

16         Now, if the question is did a plaintiff aid in that

17     investigation, there may be a different issue.  But that --

18     once you open up the FDA process, you're opening up a process

19     that -- no one can really do any discovery.  We cannot take

11:33:31  20     the deposition of anyone at FDA.  I mean, it's just off

21     limits.  You can't take depositions of FDA officials.  Best

22     you can do is get documents about that.  And even that, those

23     are protected.

24         So our position on that, number one, is this is

11:33:48  25     case-specific discovery.

11:33:49  1          And number two, what is defense going to argue in

2       defense of their case?  How is that going to even come into

3       evidence that some plaintiff may have contacted an official at

4       FDA that prompted a full-scale investigation?  I mean, that's

11:34:06  5      not something we're going to put into evidence.

6               What is that -- are they casting doubt on the

7       credibility of the -- of that investigation and the findings?

8       I mean, if they are, how does a contact by a plaintiff

9       contacting FDA and telling FDA, hey, by the way, I think you

11:34:27 10     ought to investigate Bard because of the following -- and FDA

11      engages on that full-scale investigation and they come up with

12      their findings that we've litigated here, that we've talked

13      about, and that's been the subject of many depositions.  I

14      mean, I'm -- I just -- I'm just at a loss to, you know, find

11:34:48 15     out why this is something that they would even want to bring

16      up at trial in defense of their case.

17              It's not something -- certainly we're going to use

18      the warning letter, but we're not going to champion into the

19      courtroom and say look what we did, we woke the FDA up to an

11:35:03 20     issue they should have been woken up to ten years ago.  We're

21      not going to do that.  You wouldn't allow us to do that.

22              So let's start with that.  There's just a significant

23      issue here of relevance.  We want to be able to brief that.

24              So do you want me to address any other issues?

11:35:20 25          THE COURT:  Not yet.

11:35:23  1          Mr. North.

        2          MR. NORTH:  Your Honor, as Mr. Lopez indicated, and

        3    as we all know, the plaintiffs intend to affirmatively use the

        4    FDA warning letter, to the extent they can establish

11:35:38  5    admissibility, against the defendants.  And in turn we believe

        6    that we are -- should be entitled to discovery about sources

        7    of potential bias or motivation leading to the FDA

        8    investigation in the first instance.

        9          And in fact, Your Honor, there are a number of cases

11:35:56 10    that have addressed this situation.  And one case called it

        11    the, quote, well-traveled route, close quote, of persuading

        12    government entities to take action against a party for the

        13    purposes of gaining a tactical advantage in litigation.  And

        14    in that case, which is 1993 Westlaw 277182, the court allowed

11:36:20 15    discovery about contacts that one of the parties and/or their

        16    attorneys had had with a government agency that then conducted

        17    an investigation.

        18          Another case is *Reed versus Advocate Health Care,* at

        19    2007 Westlaw 2225901.

11:36:40 20          And we believe that we're entitled to see if the

        21    plaintiffs -- particularly, let's be honest, their

        22    attorneys -- and I think under *Hickman versus Taylor* it's

        23    clear that the scope of discovery includes information held

        24    not only by the party but by their attorneys.  I think we're

11:36:58 25    entitled to see if the plaintiffs had some sort of instigating

11:37:02 1   role in the FDA investigation, and whether that then

2   demonstrates or undermines their use of that particular

3   investigation and the warning letter at trial.

4        THE COURT:  From all 800-plus plaintiffs in the case?

11:37:23 5        MR. NORTH:  Your Honor, I admit that is an unwieldy

6   proposition.  What we would suggest as a compromise is either

7   the 48 plaintiffs that have been named as the potential

8   bellwethers or on behalf of the attorneys that make up the

9   plaintiffs' steering committee.

11:37:44 10       THE COURT:  Let's assume we're starting trial this

11   morning, Mr. North, in the bellwether case of Mrs. Jones, and

12   you've got no evidence that Mrs. Jones or her attorney had any

13   communications with the FDA.  What are you going to say in

14   your opening statement, that you think I will allow, about

11:38:04 15   attorney X's contact with the FDA two years before on behalf

16   of another client?

17       MR. NORTH:  Would say, Your Honor, the plaintiffs

18   place great stock before this jury on the warning letter and

19   what it is supposed to indicate concerning my client's alleged

11:38:19 20   failures, and what the plaintiffs don't tell you is the fact

21   that one of their fellow colleagues in the plaintiff's bar

22   went to the FDA in the first instance and gave the FDA

23   documents and tried to inspire that particular investigation

24   in the first instance.  And this is an FDA that has inspected

11:38:40 25   my client's complaint files repeatedly, as they do, over the

11:38:44  1    years, and the same files that they have lauded the company in

2    the past as being exemplary of complaint tracking and adverse

3    event reporting, this time, having gotten this, quote, tip,

4    unquote, from the plaintiffs' attorney or a plaintiff's

11:39:02  5    attorney, they then had a different result.

6              And at the same time, they're under pressure, the

7    FDA, to do something because NBC News, who the plaintiffs also

8    went to, had published or broadcast reports about this

9    product, with many untrue claims.  And in those reports, they

11:39:25 10    have said repeatedly, NBC, they've contacted the FDA to no

11    avail and with no comment, and we believe we can show this is

12    part of a scheme for the plaintiffs' attorneys to manufacture

13    evidence to put political pressure on the FDA to try to

14    crucify this product when otherwise it would not have been.

11:39:50 15              THE COURT:  Okay.

16              MR. NORTH:  Thank you.

17              THE COURT:  Mr. Lopez.

18              MR. LOPEZ:  Your Honor, if there was -- I mean, this

19    was a 15, 16, 17 -- I'm not even sure that investigation is

11:40:06 20    over.  If there was one exchange between FDA and Bard that

21    would any way call into question the credibility of this

22    investigation by FDA, the exchange of information that Bard

23    gave FDA, the challenges that Bard had -- part of this

24    investigation was Bard having to go back in their own files

11:40:29 25    and they found that 30 percent of their adverse events for

11:40:32 1    severe injuries were not reported properly to FDA and another

2    10 percent were not reported at all.  And they used those

3    adverse events in their marketing and in establishing -- in

4    touting the safety and efficacy of their product.

11:40:47 5        If Mr. North showed up with a document, these

6    thousands and thousands of documents of exchanges that show

7    that somehow or other the FDA was influenced outside of their

8    own unique motivation to do what they did, then maybe, maybe

9    there's something relevant about that.  But how the FDA got

11:41:09 10   jump started to do an investigation has no relevance in this

11   case.

12       FDA -- like I said, if they there's some kind of

13   evidence this was an unfair investigation or that it was

14   somehow being influenced by a party in the case, then maybe

11:41:25 15  there's something to talk about, but this is just -- it's like

16   Mr. Boatman gave me an analogy of someone reporting a crime

17   next door and you find out the crime actually occurred and

18   somehow or other the person that reported the crime gets

19   castigated and there's some relevance to the fact that he had

11:41:47 20  a vendetta against the next door neighbor.

21       I mean, the reality is that whatever the motivation

22   may have been by the reporting of it, what happened was what

23   was reported was, in fact, true.

24       So I'm not saying that to suggest to you there was

11:42:02 25  any influence by anybody, whether a plaintiff or plaintiffs'

11:42:06  1   lawyer or anyone in the PLC that caused this warning letter to

       2   be instigated.  I'm just telling you I'm protecting right now

       3   the relevance of that.  The fact is that it's not relevant, it

       4   is not probative of anything in any part of this case

11:42:20  5   whatsoever.

       6         And we'll get to the point of whether or not that

       7   actually happened, but, again, this is case specific -- these

       8   are case-specific issues.  Unless counsel can show there's

       9   some kind of relevant information that can be gained by

11:42:33  10  finding out who may have been the champion that caused FDA to

       11  find out a lot of bad stuff about this company, I just think

       12  it's off limits for discovery.  And we'd like to brief that if

       13  the Court is -- thinks there's a dispute here that -- if

       14  you're leaning towards making us do that, so we'd like to

11:42:55  15  brief it.

       16         THE COURT:  Okay.  For the benefit of the court

       17  reporter, we need to take a ten-minute break.  I'm going to

       18  just push into the noon hour so we can get this hearing done.

       19  So let's plan to resume at five minutes to the hour and we'll

11:43:09  20  continue this discussion.

       21         (Recess taken from 11:43 to 11:55.)

       22         THE COURT:  Thank you.  Please be seated.

       23         Let's talk about discovery of plaintiffs'

       24  communications with NBC.

11:56:05  25         The question I have for plaintiffs counsel -- there's

11:56:10   1    really two of them.  One is do you agree with the defendant's

2    assertion that plaintiffs' attorneys in various depositions

3    have been asking witnesses questions about portions of the NBC

4    reports?  And, secondly, do the plaintiffs intend to use the

11:56:27   5    NBC reports at trial in any way?

6             MR. LOPEZ:  The answer to the first question, Your

7    Honor, yes, portions of it.  I used a portion myself.  There

8    was a Dr. Kuo, who is a former key opinion leader, who was

9    brought up during the deposition and I showed his interview to

11:56:46  10    the witness and I asked questions following that.

11             We have no intention of using that NBC news story.

12    First of all, even if we did I doubt whether it will pass any

13    evidentiary requirements that you or any other judge might

14    have.

11:57:03  15             Now, having said that, there's always the idea of

16    impeachment issues that might come up.

17             But, again, we don't intend to make -- to show any

18    interview part of our case in chief.  I don't know how that

19    gets into evidence.  We've taken the depositions of the

11:57:24  20    individual, Kay Fuller, as you know from prior hearings we've

21    had.  The plaintiffs -- one of the plaintiffs that was

22    interviewed was a plaintiff who was brought up today earlier.

23    I mean, she could be deposed.

24             So a very long answer to a short -- to a question

11:57:44  25    that requires a short answer, but we have no intentions of

11:57:47   1   using those NBC news pieces in our case in chief.

2            THE COURT:  All right.  What else do you want to say

3   on this issue about discoverability?

4            MR. LOPEZ:  Only thing, number one, we said in our

11:58:01   5   brief we think it's a case-specific issue, and, number two,

6   there's just no probative value unless those pieces somehow

7   become part of our proof or if the defense intends to use that

8   in defending the case.  We don't see any relevance.

9            The motivation for finding that out is something

11:58:24  10   other than finding probative, usable, admissible evidence in

11   the case.  And, again, it's something we'd want to brief, Your

12   Honor, if Your Honor can't deal with it today.

13            THE COURT:  Okay.  Thank you.

14            Defense counsel.

11:58:44  15            MR. NORTH:  Your Honor, first of all, as Mr. Lopez

16   recognized, they have been affirmatively using the NBC

17   broadcast in challenging at least one of our company witnesses

18   with it.  Secondly, while he says they do not intend to use it

19   in their case in chief, he does not foreclose the possibility

11:59:00  20   that they will use it for impeachment or rebuttal.

21            But more important, Your Honor, we believe if there

22   is bias and if plaintiffs' attorneys help to instigate the NBC

23   broadcast, which we're fairly certain they did since NBC had

24   confidential documents of the company, then we think we're

11:59:22  25   entitled to know that for a number of reasons.

11:59:25    1        For example, Kay Fuller.  Kay Fuller appeared on NBC,

            2   made some statements, which the reporter then took well beyond

            3   what Ms. Fuller had even said, to make allegations against the

            4   company.  We have deposed Ms. Fuller, and I believe that a

11:59:44    5   fair reading of her deposition will convince most jurors that

            6   what she's telling is not the truth.  And I think that we

            7   ought to be able to show and undermine a lot of the evidence

            8   the plaintiffs are going to rely on by noting that in essence

            9   they have helped to manufacture some of this evidence.  And I

12:00:05   10   think it goes to the bias underlying that evidence.

           11        But most important, given the fact they're

           12   affirmatively using this as evidence, despite any

           13   representations they may –– they don't intend now to use it in

           14   their case in chief at trial, I think we're entitled to show

12:00:25   15   the connection and discover the connection under –– behind the

           16   plaintiffs' attorneys, we believe, going to NBC and starting

           17   this investigation in the first instance.  And it's also tied

           18   in to the FDA investigation because of the way that the FDA

           19   did this investigation, the way –– the timing of it, and the

12:00:49   20   fact that, Your Honor, one of our employees told us that when

           21   the investigator showed up in Tempe, he –– or she, I think,

           22   said that they got a tip from someone and that's what prompted

           23   the investigation.

           24        But all this is tied up together in timing and in

12:01:09   25   scheme, and a lot of this they may try to bring this out when

12:01:12   1   the case goes to trial, and we believe we ought to be able to

2   fully discover this.  And it's not very onerous what we're

3   asking for.  We're just asking whether the plaintiffs'

4   attorneys, principally, have had contact with NBC and copies

12:01:31   5   of their communications.  And so we would ask the Court

6   require them to produce that.

7               THE COURT:  And, again, you want that for all

8   800-plus cases?

9               MR. NORTH:  In a perfect world, of course.  I do

12:01:45  10   recognize that is unwieldy.  We would, as a compromise,

11   suggest for the 48 plaintiffs who are part of the potential

12   bellwether pool.  Or, alternatively, for the attorneys that

13   that are on the plaintiffs' steering committee.

14               THE COURT:  Okay.

12:02:01  15               While you're at the lectern, Mr. North, what is the

16   relevancy of third-party financing, if any exists in the case?

17               MR. NORTH:  Your Honor, I think it could be relevant

18   in the case in a number of ways, and I will be honest with the

19   Court, I think of the three issues that are subject to this

12:02:25  20   general discussion, this is probably the one that is the most

21   case specific, in my view.

22               But litigation funding can go to several issues.

23   First of all, it can go to the real party in interest.  I

24   believe that, depending on the structure of litigation

12:02:41  25   funding, whether it's a hedge fund or some other private

12:02:44  1    group, the jury may need to be qualified as to any

2    relationship.  It may go to the real party in interest type

3    issues.

4              Secondly, Your Honor, as the courts are discovering

12:02:59  5    in the --

6              THE COURT:  Before you go on, when you say the jury

7    may need to be qualified, that would be only true if the jury

8    was going to know that there's a third party funding source;

9    right?

12:03:11 10              MR. NORTH:  Your Honor, I've always been under the

11    impression that the jury needed to be qualified for any

12    relationship with someone who had a financial stake in the

13    verdict.

14              THE COURT:  What if they don't know that somebody has

12:03:22 15    a financial stake?  It can't influence their verdict; right?

16              MR. NORTH:  Well, as a defense lawyer, Your Honor, I

17    have often thought that ought to be the case when insurance

18    companies -- juries are often qualified as to insurance

19    companies, and that's the first instance they will hear the

12:03:39 20    involvement.

21              THE COURT:  In 13 years I've never had a lawyer in a

22    trial ask me to qualify the jury on the basis of an insurance

23    company that's involved.  Because insurance companies aren't

24    mentioned during trial so the jurors don't -- it can't

12:03:52 25    influence the juror.

12:03:55  1          MR. NORTH:  I wish you would write a treatise about

2     that in Georgia courts because that is a common practice

3     there, Your Honor.

4          THE COURT:  Okay.  I interrupted you.  You were going

12:04:03  5     to go on and say other things.

6          MR. NORTH:  In some cases I also believe litigation

7     funding can go to damages.  Evidence has been uncovered in the

8     pelvic mesh litigation that some litigation funding groups are

9     pressuring plaintiffs to have unnecessary surgery, there have

12:04:21  10    been several, to boost the damages.  And then they take a cut

11    of the amount of damages.  Very unseemly relationships.

12          I don't have any evidence that's occurring here, but

13    it is very disturbing because it does appear to be occurring

14    in the pelvic mesh litigation where litigation funding -- some

12:04:45  15    groups are actually getting involved in the medical care of

16    the patients.  Judge Cheryl Eifert up at the Southern District

17    of West Virginia has handled a couple of motions to compel

18    filed by various manufacturers and has granted them and made a

19    number of comments about how disturbing this is.  It's going

12:05:04  20    on out there.  You can see there's some discussions of this in

21    the legal press.

22          And I believe in an individual case it could go very

23    much to damages as to why did the person get the surgery in

24    the first place?  If it's not necessary, were they influenced

12:05:23  25    by a litigation funding company?  Because as hard as it is to

12:05:26  1   accept, we believe that's happening and there's increasing

2   evidence it is.

3          Again, I have no evidence it is here.  But it's going

4   on in other mass tort circumstances in this country.  That

12:05:37  5   seems to be certain.  And we believe we have the right to

6   determine that here to make sure that the damages claims are

7   medically indicated.

8          THE COURT:  All right.

9          Plaintiffs counsel.

12:06:01  10   MR. LOPEZ:  Should I address the NBC issue as well,

11   Your Honor, or are we done with that?

12          THE COURT:  I thought we were done.  If you had other

13   points, I'm happy --

14          MR. LOPEZ:  No, I -- again, I think the use of that,

12:06:14  15   that will be case -- well, I think the main point there,

16   there's nothing that happened in those stories that has not

17   been part of a full-scale discovery deposition.

18          In other words, anything that may have been on those

19   NBC stories, there's been deposition after deposition and the

12:06:31  20   one thing I took issue with is he called these confidential

21   documents.  What I saw on that story were all public

22   documents.  So the source of that is independent.  All of

23   those documents that were shown have been the source of

24   cross-examination, direct examination, experts on both sides

12:06:49  25   using those.  There's just no reason to have a media story or

12:06:54   1    the source of that be part of this case.

           2           THE COURT:  Well, here's the issue in my mind,

           3    Mr. Lopez.  If there is the possibility that the NBC story is

           4    going to be mentioned at trial, even as impeachment evidence,

12:07:08   5    it seems to me that there is a reason that the defendants

           6    would want to be able to explain to the jury how the story

           7    came about.  And my concern is I understand you've said that

           8    you have no intention of affirmatively introducing it --

           9           MR. LOPEZ:  Right.

12:07:28  10           THE COURT:  -- in the bellwether cases.  You have

          11    reserved the possibility of impeachment.  But we have 850 or

          12    more cases here which, theoretically, will go back to their

          13    home districts.  And I'm assuming you're not speaking for all

          14    lawyers in saying they won't try to use the NBC story.

12:07:48  15           And the question will be if I addressed it and denied

          16    the discovery in the MDL, I'm sure in those home districts the

          17    argument in those courts will be this was addressed in the MDL

          18    and discovery was denied and we get to go to trial without the

          19    defendants getting that discovery and we do want to use the

12:08:07  20    NBC story.  What's your thought on that?

          21           MR. LOPEZ:  My thought on that -- it is a

          22    case-specific issue.  I think we're not there.

          23           I would say this about the NBC story.  You're right,

          24    I can't speak for every lawyer in America, but I think every

12:08:21  25    lawyer in America has a right to say we have no -- we are not

12:08:24  1    going to use the NBC story in our case, and if there's a part

2    of it that we want to use, for example if we're deposing

3    Dr. Kuo and Dr. Kuo says something contrary to what he said on

4    TV and someone wants to show that little finite piece to

12:08:39  5    either refresh his recollection or to impeach him, I don't see

6    any problem -- I don't see why that's a problem.  And whether

7    or not he -- how he got there is not -- he has the right to

8    explain it.  They can ask Dr. Kuo how it was he got on TV and

9    said what he said.  That is something that can be addressed at

12:08:57 10   a deposition of Dr. Kuo.

11            Now, right now, I mean, there's no basis or purpose

12   or intention on at least my part on behalf of my clients to

13   introduce any part of the NBC story.  I'm very happy with the

14   discovery we've conducted with respect to all of those issues.

12:09:17 15           Now, I assume that some of the plaintiffs that were

16   shown on that, if they're probably going to -- Mr. North

17   already said we're going to impeach Dodi Froelich with what

18   she said on TV.  So there's stuff like that, Judge, where it

19   becomes evidentiary.  I mean, it's a true evidentiary issue.

12:09:34 20   But how the story developed and how it was reported, who got

21   an opportunity to be heard, there's -- that's not going to be

22   something that's going to be in front of a jury.

23           So I would say that every case needs to be challenged

24   and every plaintiff and every plaintiff's lawyer has to be

12:09:53 25   challenged:  Do you intend to use any part of the NBC story?

12:09:58  1   If my answer is yes I intend to potentially use it, if Dr. Kuo

2   gets deposed and he says something differently or I need it to

3   use for his recollection, that's evidence.  And then if that's

4   the case, then maybe you have a right -- they have a right to

12:10:13  5   know how it was Dr. Kuo -- I still don't think it's relevant

6   as to whether or not Dr. Kuo got prompted to go to NBC by some

7   lawyer or some plaintiff.  He can be asked that at his

8   deposition.  So it is a case-specific issue.

9        You're right, I can't speak for every lawyer in

12:10:29  10  America.  But I can speak -- but then again, it doesn't mean

11  you open up this whole thing if 95 percent of us have no

12  intention of using that story or making it relevant.

13        THE COURT:  Why don't you address third-party

14  financing.

12:10:45  15        MR. LOPEZ:  Here's the thing with third -- I still

16  haven't heard -- first of all, I take issue with the fact that

17  in some other case there's pressure being put on by somebody

18  in another case to another plaintiff's lawyer to another

19  plaintiff.  That's not happening here.  I don't -- I actually

12:11:02  20  took offense to hearing him say that to influence you that

21  somehow or other the funding -- there's no evidence of that.

22        If Mr. North had evidence that I just took the

23  deposition of a plaintiff and the plaintiff said, "I really

24  didn't want to have my device removed by Dr. Kuo in Stanford

12:11:20  25  with a $25,000 procedure except for the fact some third-party

12:11:25  1   funder was paying for that" -- there's none of that.  That's,

2   again, another case-specific issue.

3          To try to taint all of us by one or two things that

4   may have happened against his client or some other client in

12:11:37  5   another case is unfair and I take issue with the fact that

6   there was even an implication that any of that was going on

7   here.  I can assure you it's not going on here.  So that's

8   number one.

9          Number two is this idea about a third party in

12:11:52  10   interest, how is that going to come up in trial?  Unless

11   there's some evidence that that third party is somehow

12   influencing evidence, influencing what's being admitted,

13   influencing a witness.  There's no evidence of that.

14          The other thing that Mr. North references, that

12:12:11  15   somehow or other has something to do with motivation to

16   settle.  That there's pressure because of some third party

17   that may have -- I mean, just think for the moment if we were

18   bringing this motion and we said, you know, we want to know

19   every penny that Mr. North's firm has made in defending Bard

12:12:29  20   for the next ten years and particularly over the last year or

21   two, because we suspect that what's keeping them from settling

22   the case is the millions of dollars that the defense firm is

23   making and want to find that out.  That's what he's asking of

24   us.

12:12:45  25          He's asking whether or not there's financial

incentive by someone outside of the plaintiff and the
plaintiffs' lawyers, and there is no evidence of that.  That
somehow it's having an effect on us settling the cases.  First
of all, there's been no overture of settlement.  But I've got
to address it because it was in his brief.  He's suggesting
somehow or another -- that's keeping the plaintiffs away from
the settlement or mediation table.  It's not.  Or somehow or
another it's going to influence whether or not these cases
settle for X amount versus another amount.  It won't.

        So for him to even suggest that that somehow or other
is going to influence me or any of my colleagues that are
working on this case, again, is another thing I take issue
with.  There's no evidence of it.  If he has evidence of it he
can put it in front of the Court.

        So, again, case-specific issue, no probative value,
and if the Court would like, we would appreciate briefing this
issue because it's important and we vehemently oppose having
to give that up.

        Thank you, Your Honor.

        THE COURT:  Okay.  Hold on just a minute, Mr. Lopez.

        Let's talk about the next category, which is you made
request for -- maybe there's somebody else on your side to
address this, but it's the request for production plaintiffs
made with respect to the marketing 30(b)(6) deposition and the
REACH, R-E-A-C-H all in caps, program.  And the allegation in

12:14:07  1   the report was no documents have been produced.  The

2   defendant's response was yes, documents have been produced and

3   plaintiffs raise this issue for the first time on August 16th.

4          MR. LOPEZ:  That's Mr. Stoller.  I can address the

12:14:22  5   multi-plaintiff issue, Your Honor.

6          THE COURT:  We'll come back to that.

7          Mr. Stoller.

8          MR. STOLLER:  Your Honor, I believe this issue has

9   been resolved between the filing of that joint report and

12:14:30  10   today.  I confirmed again this morning with Mr. North and

11   Mr. Lerner that they subsequently have produced to us what

12   they contend is all of the REACH documents and they're

13   producing this week the sales and marketing documents.

14          THE COURT:  You agree, Mr. North?

12:14:45  15          MR. NORTH:  Yes, Your Honor.

16          THE COURT:  Okay.  Let's talk about the

17   multi-plaintiff cases.

18          What you indicate in the joint report is that a

19   multi-plaintiff case was recently transferred to this court.

12:14:58  20   You cited Oma Hardwick, O-M-A Hardwick, as the plaintiff and

21   gave me the case number as 16-1953, but when I went to the

22   docket, that's a short-form complaint filed by single

23   plaintiff as it came up on CM/ECF.

24          MR. NORTH:  Your Honor, that was our mistake.

12:15:19  25   Ms. Hardwick was actually one of the people who had duplicate

12:15:23  1    complaints, and I guess we put the number in for the duplicate

       2    as opposed to the multi-plaintiff.  I will get that correct

       3    number for you.

       4         THE COURT:  There was no motion to dismiss pending in

12:15:34  5    16-1953.

       6         And you've indicated that there's another

       7    40-plaintiff case coming our way, potentially, after the MDL

       8    panel meets in September.

       9         So I guess the questions I have are the following:

12:15:55 10    And actually, Mr. Lopez, I think Mr. North was the one I want

      11    to ask these questions of initially.

      12         What is -- what is, Mr. North, the nature of the

      13    motion to dismiss you are filing or have filed in these

      14    multi-plaintiff cases?  What's the --

12:16:15 15         MR. NORTH:  Your Honor, it's based on the absence of

      16    personal jurisdiction under the Supreme Court -- U.S. Supreme

      17    Court's 2014 decision in *Daimler versus Bauman*, B-A-U-M-A-N, I

      18    believe it is, where the court sort of further defined

      19    personal jurisdiction over a manufacturer when a out-of-state

12:16:36 20    plaintiff is using that state's federal or state courts to try

      21    to sue someone.  They've ruled -- the courts ruled, as I

      22    understand it, there are limitations on, let's say, what a

      23    Missouri court, state or federal, can do as far as exercising

      24    jurisdiction over a company like Bard even though it may sell

12:17:00 25    products in that jurisdiction if its conduct in that

12:17:05   1    jurisdiction is not related to the injuries to that particular

2    plaintiff.

3            And, for example, in the Oma Hardwick case, which I

4    think we have to rename because she yesterday dismissed

12:17:16   5    herself from just that multi-plaintiff case, but there's still

6    six or seven other plaintiffs there.  Not a single one of them

7    is a resident of Missouri and therefore that case being filed

8    in Missouri, we believe, under the *Bauman* decision is

9    improper.  There are a number of other courts throughout the

12:17:36   10   country now that have reached rulings to that effect.  There's

11   a growing body of precedent that would support that argument.

12   And that's the reason for the motion to dismiss.

13           THE COURT:  The argument as I understand it from the

14   description just given me would be a plaintiff who lives in

12:17:56   15   Florida can't sue Bard in Missouri if nothing related to the

16   plaintiff's surgery or injury occurred in Missouri.

17           MR. NORTH:  Yes.

18           THE COURT:  And if the case was dismissed, that

19   plaintiff could immediately refile the case in Florida, and

12:18:12   20   then it would get transferred here and they would be here.  In

21   other words, the only consequence is where do I send the case

22   back afterward.  Do you agree with that?

23           MR. NORTH:  I think that's the major consequence, and

24   I think you're right.  And I think the same thing could be

12:18:28   25   accomplished by severance and then sending them back to the

12:18:31  1   appropriate jurisdiction, as opposed to Missouri afterwards.

2   But there is one other wrinkle, Your Honor.  The

3   plaintiffs attempted to defeat diversity in that case because

4   they named -- they didn't name a Missouri plaintiff but they

12:18:41  5   named one Arizona plaintiff.  And BPV, Bard peripheral in

6   Tempe, is an Arizona corporation.  So vis-a-vis that one

7   plaintiff, there is no diversity.

8   The plaintiffs did not file a motion to remand in

9   that case, but there is a motion to remand pending in the

12:18:59  10   40-plus plaintiff case that's coming your way.  And we have

11   certainly reviewed the Court's rulings on the other motions to

12   remand and we're no longer removing cases, Your Honor, where

13   there is a non-diverse health care provider on that argument.

14   But we believe, and a number of courts have

12:19:15  15   recognized, that this is a totally different situation of

16   fraudulent joinder and misjoinder when you combine multiple

17   plaintiffs with no other relationship to each other, other

18   than an alleged injury from the same group of products, that

19   it's inappropriate to join those and it's a fraudulent attempt

12:19:36  20   to defeat diversity jurisdiction.  And that is a separate line

21   of cases that I believe we will end up briefing in front of

22   Your Honor in the 40-plus plaintiff case.  But even though the

23   plaintiffs haven't moved to remand in what was the Oma

24   Hardwick case, that issue is pending there, too, as far as

12:19:56  25   subject matter jurisdiction.

12:19:57  1        THE COURT:  Well, are you saying in the Hardwick case

2  that I do have, there is an Arizona plaintiff?

3        MR. NORTH:  Yes.  One.

4        THE COURT:  So you're going to make two arguments;

12:20:07  5  right?  One is going to be the Arizona plaintiff should be

6  dismissed on the grounds of fraudulent joinder --

7        MR. NORTH:  Yes.  I mean, ultimately --

8        THE COURT:  -- and also on the grounds of there's no

9  subject matter jurisdiction in Missouri with respect to that

12:20:20 10  plaintiff.

11        MR. NORTH:  Yes.

12        THE COURT:  And all the other plaintiffs who aren't

13  from Missouri should be dismissed for lack of subject matter

14  jurisdiction?

12:20:27 15        MR. NORTH:  Right.

16        THE COURT:  And they all should go to their home

17  states, and the five who aren't Arizona plaintiffs should sue

18  there and then get it transferred here.  Is that the route

19  we're going --

12:20:39 20        MR. NORTH:  Yes, Your Honor, I believe that's

21  correct.  We believe the same result could be accomplished --

22  now that it's transferred to the MDL, the same result could be

23  accomplished by simply severing the plaintiffs.  And there are

24  a number of cases where courts have severed plaintiffs in this

12:20:53 25  circumstance so that each plaintiff has an individual case.

12:20:56  1    And at that point the court to could determine to send those

2    cases back to different jurisdictions at that point or --

3         THE COURT:  How do I do that under the language of

4    the statute which says that "Each action so transferred shall

12:21:13  5    be remanded by the panel at or before the conclusion of such

6    pretrial proceedings to the district from which it was

7    transferred."  Statute says it has to go back to Missouri.

8    How can I say, no, I'm going to send this one to California?

9         MR. NORTH:  Well, that being the case, Your Honor,

12:21:31  10   the Court could dismiss them for lack of jurisdiction and they

11   could refile.

12        THE COURT:  But it seems severance wouldn't be a

13   solution.  I mean, even if I severed them I'd have to send

14   them all back to Missouri under the statute, which you say has

12:21:43  15   no jurisdiction over them.  Right?

16        MR. NORTH:  You're right, Your Honor.  I had not

17   thought of that provision of the judicial panel rules.

18        THE COURT:  Okay.  Thank you.

19        Mr. Lopez.

12:22:05  20        MR. LOPEZ:  Actually, Your Honor, the last point you

21   made was the point I was going to stress, and that is this

22   deals with a unique venue jurisdiction procedural law in the

23   state of Missouri.  And there are -- it just happens to be a

24   place where you can consolidate cases, just like you

12:22:24  25   consolidate cases in Phoenix that are all around the country.

12:22:28  1           And traditionally, those cases, sometimes they go to

2     the district court and the district court will look at them

3     and apply that law, and I can tell you that I'm not aware of

4     any instance where they've not all got sent back to the state

12:22:45  5     court from which they came based on Missouri law.

6           Once in while, as here, the case went to the district

7     court and then there was a motion to make it go to the JPML,

8     which, of course, ended up here.

9           But I think this is a unique Missouri District Court

12:23:03 10     issue as to whether or not different plaintiffs from different

11     states can defeat diversity there and allow other

12     plaintiffs -- we can do that in California.  If you have a

13     venue plaintiff in California in state court, you don't -- and

14     you have a defendant and you bring in another plaintiff who's

12:23:23 15     a plaintiff in the state where the defendant's doing business,

16     you can file 50, 60 different plaintiffs from different

17     states.  Missouri has the same process, Your Honor.

18           And the -- if you want me to address my clients

19     there --

12:23:41 20           THE COURT:  You're talking, I think, about the

21     fraudulent joinder issue --

22           MR. LOPEZ:  Right.

23           THE COURT:  -- right?

24           MR. LOPEZ:  I am.  And I'm also talking about the

12:23:50 25     fact you couldn't really sever these cases unless we determine

whether or not remand to the state court and how that process happens before you sever the cases.

THE COURT:  Well, what about -- what about the defendant's argument that regardless of fraudulent joinder, under Supreme Court law Missouri can't exercise personal jurisdiction over a defendant when the plaintiff's injuries had nothing to do with Missouri?

MR. LOPEZ:  Best I can tell you about that is a 2014 case I haven't read, Your Honor.  I know that since -- in 2015 and 2016 the city and county of St. Louis has a number of pharmaceutical and medical device cases where multi-plaintiffs cases were removed to federal court and they all got remanded, and nothing else has happened of them other than to stay in state court and to be litigated as a state court consolidated action.

So I don't know whether that case doesn't apply or says that if a state court has its own venue or jurisdictional issues that the state has the right to determine whether or not they're going to accept other plaintiffs from other states to file as long as they've satisfied the procedural requirements of that state.

I can tell you in Missouri, in that city and that county, since 2014 there have been a number of cases that have been filed there and have stayed there that postdate this *Daimler* case.

12:25:25  1        So my recommendation would be to maybe send it back

2    to the district court to even hear the remand or the motion.

3            THE COURT:  Hold on just a moment.

4        I have just had Traci pull up the motion in the other

12:26:37  5    Hardwick case which appears to be at 16-2442.  And this motion

6    was filed July 8th, so six weeks ago or so.  It's a motion to

7    dismiss.

8        The question I was going to ask is whether the

9    plaintiffs intend to respond to that motion.  It's pending.

12:27:00 10   It's in a case that's been transferred here.

11           MR. NORTH:  Your Honor, the plaintiffs in this

12   particular case are represented by The Driscoll Firm out of

13   St. Louis and not any of the attorneys here.

14       There is a gentleman by the name of Mr. Phil Sholtz,

12:27:11 15   S-C-H-O-L-T-Z [sic], from The Driscoll Firm who I talked with

16   yesterday, I believe he's on the phone, and I believe he

17   intends to file an opposition and had not done so because it

18   got transferred at the time the motion was pending.

19           THE COURT:  Mr. Sholtz, are you on the phone?

12:27:29 20           MR. SHOLTZ:  Yes, Your Honor.  This is Philip Sholtz

21   for plaintiff in the Hardwick case.

22       At the time of the transfer, the response to the

23   motion was not due yet, and then the case did get transferred

24   and closed, and I -- my understanding was there would be a new

12:27:43 25   briefing schedule in this court, and so I would like to

12:27:46  1   respond to the motion.

2         THE COURT:  Was there an argument made to the MDL

3   panel, by either side, that before this case is transferred

4   the federal district court in Missouri should decide whether

12:27:57  5   or not it has jurisdiction?

6         MR. NORTH:  Your Honor, we just filed a tag-along

7   action it's and sort of self-executing, the tag-along notice

8   with the panel, and they did not object to the notice and so

9   it was automatically transferred after a week.

12:28:15 10         THE COURT:  All right.

11         Mr. Sholtz, when is it that you're planning to

12   respond?

13         MR. SHOLTZ:  We could have our response together

14   fairly quickly, Your Honor.  I mean ten days from today would

12:28:25 15   be fine.

16         THE COURT:  All right.  Let's say by September 2nd,

17   Friday, September 2nd.  Does that work?

18         MR. SHOLTZ:  That works for me, Your Honor.

19         THE COURT:  We have a woman's voice coming through on

12:28:45 20   the phone, if somebody doesn't have their phone muted.

21         Mr. North, when is it that your reply can come in if

22   you get the response on September 2nd?

23         MR. NORTH:  Is the 12th a Monday, Your Honor?

24         THE COURT:  Yes.

12:29:06 25         MR. NORTH:  Could we have to the 13th?

12:29:09  1          THE COURT:  Yes.  That's fine.

        2          We'll look for the response on September 2nd, reply

        3   on September 13th.

        4          Just scanning this motion, it looks as though the

12:29:22  5   *Daimler* case turned on the distinction between general and

        6   specific jurisdiction and that Missouri has no general

        7   jurisdiction over, the argument is, over Bard because they

        8   don't have, presumably, a continuous and systematic presence

        9   there.  And there is no specific jurisdiction because the

12:29:41 10   events related to the plaintiff's injury didn't occur there.

       11          And I'll look at the briefing on that issue and rule

       12   when it comes in.

       13          As for the 40-plaintiff case that is headed this way,

       14   obviously I can't do anything with that until the case is

12:30:00 15   here.

       16          Have you already filed a motion to dismiss in that

       17   case?

       18          MR. NORTH:  Yes, Your Honor.  We filed a motion to

       19   dismiss and the motion to stay proceedings, and that's why we

12:30:10 20   know it's coming to you.  The district court judge stayed all

       21   proceedings until the transfer of the case to you.

       22          They had filed a motion to remand on the very day

       23   that the judge stayed the case, so we have not filed a

       24   response to that under those circumstances.

12:30:26 25          THE COURT:  Okay.  Let's -- I'm going to be setting

12:30:29  1   another case management conference in mid October.  Let's plan

2   to talk then about where the briefing is on that case and what

3   issues need to be resolved.  But I'll go ahead and address

4   this motion to dismiss after we get the briefing done.

12:30:43  5           Okay.  Let's talk for a moment about the other

6   issues.  You mentioned privilege disputes and you thought you

7   could get the issues resolved by September 28, and if not,

8   you'd let me know.  I think that's fine.  I will note in the

9   order that comes out after today that you ought to get those

12:31:02  10  resolved by the 28th.  And if there are outstanding issues

11  remaining as of that date, you should call me so we don't have

12  those interfering with the close of discovery.

13          The next issue is the duplicative filings where it's

14  indicated some plaintiffs are in more than one case in this

12:31:24  15  MDL.  The defendants suggest that one of the cases should be

16  dismissed under the first-filed rule.  The plaintiffs indicate

17  you're not sure it's a problem now, but if it is we should

18  just consolidate it.

19          The question I have is whether you're talking about a

12:31:43  20  situation where one plaintiff is in two cases represented by

21  two different lawyers or you're talking about one lawyer

22  having filed the same case twice.

23          MR. NORTH:  Two different lawyers, Your Honor.  I

24  would note that in advance of this conference and before we

12:31:56  25  included this, I sent a letter out to every attorney involved

12:32:00  1   in one of those cases saying if they didn't dismiss one of

2   those cases and work out this conflict, I intended to raise it

3   with the Court.  I'm happy to report half of them have since

4   been dismissed.  So there are only three of those cases

12:32:15  5   pending.  But there are separate lawyers representing the

6   plaintiff in each case for those three plaintiffs.

7           THE COURT:  Okay.  What I want to do with those three

8   is this:  I would like to direct the plaintiffs steering

9   committee to have a conversation with the lawyers in those

12:32:27  10  three cases.

11          Obviously, it has to be resolved one way or the

12  other.  We can't go forward with two cases represented by two

13  different lawyers.  And consolidation isn't the answer, in my

14  view, because then you've still got two lawyers purporting to

12:32:42  15  each represent the plaintiff.  Unless they want to team up and

16  jointly represent them in a single case, in which event just

17  dismiss one and have the lawyer appear in the other.  But I

18  don't think we ought to continue on with two cases with two

19  different lawyers.

12:32:56  20          So let's have somebody on the plaintiffs steering

21  committee designated to talk to those three and I'll ask you

22  to give a status report in mid October as to what's happened

23  with them.  And if we have a situation where two plaintiffs

24  lawyers won't agree, then I'll allow a motion to be filed and

12:33:09  25  I'll decide what ought to happen with those.

12:33:20   1          Let's come back, then, for a moment to the objection

2     issues that we talked about.  Those are the plaintiffs'

3     objections with respect to FDA related discovery, NBC related

4     discovery, and third-party financing.

12:33:43   5          I think it probably does make sense to get you to

6     brief this issue fairly quickly.  I want to make sure I

7     consider the cases that have been decided in these areas.  I

8     don't think the briefing needs to be extensive.  It seems to

9     me for the three issues nine page memoranda ought to do it on

12:33:59  10     each side.  You don't have to describe cases.  Cite them and

11     I'll read them.  And my intent would be, unless it's

12     unreasonable, to have you file simultaneous nine page

13     memoranda by Friday on this issue.  If you've got things and

14     you can't get to it, we can push it back a week.  But I don't

12:34:19  15     want this to linger too long.

16          MR. STOLLER:  As much as we'd like a prompt

17     resolution on this, Your Honor, I think we'll need the time

18     until next week on our side.

19          THE COURT:  All right.  Let's say simultaneous nine

12:34:31  20     page memoranda by a week from Friday.  September 2nd.

21          Okay.  Let me raise just a couple of other issues and

22     then I'll let you raise others that you want to.

23          We have received notices of the deaths of plaintiffs

24     in three cases.  The first was filed in late June, another at

12:35:13  25     the end of July, another just a couple of days ago.  All we

12:35:19  1   have gotten are the notices.  What is it that you all are

2   expecting we should do with those three cases?  I guess that's

3   a question directed to plaintiffs' counsel.

4        MR. BOATMAN:  Your Honor, I think it's going to be

12:35:36  5   the situation where each plaintiff's counsel is going to have

6   to determine if the death is either related to the filter, in

7   which case the claim would turn into a wrongful death claim,

8   or, if, under the applicable state law, a claim survives the

9   death of the plaintiff and make the appropriate amendment to

12:35:56  10  the complaint or a dismissal of the complaint, depending upon

11  the state law.

12        THE COURT:  Any disagreement with that from the

13  defense counsel?

14        MR. NORTH:  None, Your Honor.

12:36:10  15       THE COURT:  All right.  Then what I would like to do

16  is this:  Again, I would like to task the plaintiffs' steering

17  committee with communicating with the plaintiffs' lawyers for

18  these three plaintiffs and ask them to make a decision and

19  take a position in a filing with the court on that issue

12:36:27  20  before the next status conference in mid October.

21        The three plaintiffs are John L Kuhn, K-U-H-N,

22  Junior; Olan, O-L-A-N, Jones; and Anthony C. Docimo.

23  D-O-C-I-M-O.

24        So if the steering committee could communicate to

12:36:53  25  those plaintiffs' counsel that I would like them, by the next

12:36:56  1    status conference, to file something with the court indicating

        2    whether or not this becomes a wrongful death claim or they

        3    believe under the state law they have a surviving claim for

        4    damages, then we'll at least know where those stand.  And I

12:37:10  5    will ask the parties in their joint report to address that.

        6         Okay.  Plaintiffs counsel, do you have other matters

        7    besides setting that next conference that we ought to address

        8    today?

        9         MR. LOPEZ:  Your Honor, at the end of September we're

12:37:52  10   supposed to report to you on the state of our PLC, PSC, and

        11   give you a report on that.  September is a crazy month and we

        12   want to make sure that that report is detailed.  Mr. Boatman

        13   and I consulting with consultants on the time and billing and

        14   all that sort of stuff.  If we could put it off until October

12:38:12  15   31st, 30 days, it will allow us to give you a more detailed

        16   report.

        17        I can just report to you everything's going

        18   splendidly within our PLC.  People are cooperating, people are

        19   paying their assessments, people are stepping up and doing

12:38:29  20   whatever it is we need and ask them to do on discovery,

        21   experts, covering, things like that.  So I can tell you

        22   generally things are going quite well over the last 11-plus

        23   months.

        24        THE COURT:  That's fine.  We'll have the report due,

12:38:42  25   then, by October 31st, and I'll put that in the order.

12:38:46   1                MR. LOPEZ:  Thank you.

2                THE COURT:  Anything else you all want to raise from

3      the plaintiff side?

4                MR. STOLLER:  No, Your Honor.

12:38:51   5                THE COURT:  Okay.

6                How about from the defense?

7                MR. NORTH:  Nothing further, Your Honor.

8                THE COURT:  Okay.

9                Let's set a date for the next conference.

12:39:47  10                How about Friday, October 14th at 10 a.m.?  Does that

11      work?

12                MR. LOPEZ:  We were hoping that would be one of the

13      dates.

14                MR. STOLLER:  Perfect, Your Honor.

12:39:59  15                MR. NORTH:  Your Honor, that's fine.  I'm presently

16      set for trial in an unrelated matter in Georgia on October

17      10th.  My hope would be that the case would be finished by

18      then and I can be here.  I certainly can send team members if

19      I can't.

12:40:22  20                THE COURT:  Okay.  Why don't we do that.  The next

21      week I can't do it.  I want to have it at least a week or two

22      before the close of discovery deadline.  So let's go ahead,

23      and if you can't make it, we'll have other counsel cover it.

24                MR. NORTH:  Thank you, Your Honor.

12:40:35  25                THE COURT:  We'll set it for October 14th at 10 a.m.

12:40:39  1             All right.  I will get an order out reflecting what

          2    we've discussed.  Thank you all.

          3             ALL:  Thank you, Your Honor.

          4        (End of transcript.)

12:40:47  5                           *  *  *  *  *

1                        **C E R T I F I C A T E**

2

3           I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7           I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14          DATED at Phoenix, Arizona, this 1st day of September,

15   2016.

16

17

18

19

20                             s/ Patricia Lyons, RMR, CRR
                               Official Court Reporter
21

22

23

24

25