# EXHIBIT D

**DRAFT  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.**

# AMERICAN BAR ASSOCIATION
# COMMISSION ON ETHICS 20/20

## White Paper on Alternative Litigation Finance

## I.    Introduction.

Alternative litigation finance ("ALF") refers to the funding of litigation activities by entities other than the parties themselves, their counsel, or other entitles with a preexisting contractual relationship with one of the parties, such as an indemnitor or a liability insurer. These transactions are generally between a party to litigation and a funding entity and involving an assignment of an interest in the proceeds from a cause of action.  These activities have become increasingly prominent in recent years, leading to significant attention in the legal[1] and popular[2] press, scrutiny by state bar ethics committees,[3] and scholarly commentary.[4]  The

---

[1]  *See, e.g.*, Terry Carter, *Cash Up Front: New Funding Sources Ease Strains on Plaintiffs' Lawyers*, 90 A.B.A. J. 34 (Oct. 2004); Lazar Emanuel, *An Overall View of the Litigation Funding Industry*, N.Y. PROF. RESP. REP., Feb. 2011; Leigh Jones, *Litigation Funding Begins to Take Off*, NAT'L L.J., Nov. 30, 2009; Eileen Libby, *Whose Lawsuit Is It?: Ethics Opinions Express Mixed Attitudes About Litigation Funding Arrangements*, 89 A.B.A. J. 36 (May 2003); Holly E. Louiseau, et al., *Third Party Financing of Commercial Litigation*, 24 IN-HOUSE LITIGATOR no. 4 (Summer 2010) & 25 IN-HOUSE LITIGATOR no. 1 (Fall 2010); Nate Raymond, *More Attorneys Exploring Third-Party Litigation Funding*, N.Y. L.J., June 4, 2010; Louis M. Solomon, *Third-Party Litigation Financing:  It's Time to Let Clients Choose*, N.Y. L.J., Sept. 13, 2010.

[2]  *See, e.g.*, Binyamin Appelbaum, *Investors Put Money on Lawsuits to Get Payouts*, N.Y. TIMES, Nov. 14, 2010; Binyamin Appelbaum, *Lawsuit Loans Add New Risk for the Injured*, N.Y. TIMES, Jan. 17, 2011; Binyamin Appelbaum, *Lawsuit Lenders Try to Limit Exposure to Consumer Rules*, N.Y. TIMES, Mar. 9, 2011; Jonathan D. Glater, *Investing in Lawsuits, for a Share of the Awards*, N.Y. TIMES, June 3, 2009); Roger Parloff, *Have You Got a Piece of This Lawsuit?*, FORTUNE, June 13, 2011, *available at* http://features.blogs.fortune.cnn.com/2011/06/28/have-you-got-a-piece-of-this-lawsuit-2/; *see also* Richard A. Epstein et al., Room for Debate, *Investing in Someone Else's Lawsuit*, N.Y. TIMES ONLINE, Nov. 15, 2010, *available at* http://www.nytimes.com/roomfordebate/2010/11/15/investing-in-someone-elses-lawsuit

[3]  *See, e.g.*, Ky. Bar Ass'n Ethics Comm., Formal Op. E-432 (2011); N.Y.C. Bar Ass'n Comm. on Prof'l and Judicial Ethics, Formal Op. 2011-2 (2011); N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Advisory Op. 769 (2003).

[4]  *See, e.g.*, Courtney R. Barksdale, *All That Glitters Isn't Gold: Analyzing the Costs and Benefits of Litigation Finance*, 26 REV. LITIG. 707 (2007); Paul Bond, Comment, *Making Champerty Work: An Invitation to State Action*, 150 U. PA. L. REV. 1297 (2002); Andrew Hananel & David Staubitz, *The Ethics of Law Loans in the Post-Rancman Era*, 17 GEO. J. LEGAL ETHICS 795 (2004); Jason Lyon, *Revolution in Progress:  Third-Party Funding of American Litigation*, 58 UCLA L. REV. 571 (2010); Susan Lorde Martin, *Litigation Financing: Another Subprime Industry That Has a Place in the United States Market*, 53 VILL. L. REV. 83 (2008); Susan Lorde Martin, *The Litigation Financing Industry: The Wild West of Finance Should Be Tamed Not Outlawed*, 10 FORDHAM J. CORP. & FIN. L. 55 (2004); Susan Lorde Martin, *Financing Litigation On-Line: Usury and Other Obstacles*, 1 DEPAUL BUS. & COM. L.J. 85 (2002); Julia H. McLaughlin, *Litigation Funding: Charting a Legal and Ethical Course*, 31 VT. L. REV. 615 (2007); James E. Moliterno, *Broad Prohibition, Thin Rationale: The "Acquisition of an Interest and Financial Assistance in Litigation" Rules*, 16 GEO. J. LEGAL ETHICS 613 (2003); Jon T. Molot, *A Market in Litigation Risk*, 76 U. CHI. L. REV. 367 (2009); Douglas R. Richmond, *Other People's Money: The Ethics of Litigation Funding*, 56 MERCER L. REV. 649 (2005); Mariel Rodak, Comment, *It's About Time: A Systems Thinking Analysis of the Litigation Finance Industry and Its Effect on Settlement*, 155 U. PA. L. REV. 503 (2006); Anthony J. Sebok, *The Inauthentic Claim*, 64 VAND. L. REV. 61 (2011); Maya Steinitz, *Whose Claim is This Anyway, Third Party Litigation Funding*, 95 MINN. L. REV. 1268 (2011).  Northwestern Law School hosted a public policy roundtable on Third

continuing globalization of the market for legal services makes alternative litigation finance available to clients in markets such as the United Kingdom, Australia, Germany and Spain, where it is legally permitted and generally available.

At least some forms of alternative litigation finance are permitted in many U.S. states as well, but many lawyers are unfamiliar with the ethical issues presented by these transactions. The American Bar Association Commission on Ethics 20/20 therefore formed a Working Group on Alternative Litigation Finance to study the impact of these emerging transactional structures on the client-lawyer relationship and the professional responsibilities of lawyers. The Working Group was directed to limit its consideration to the duties of lawyers representing clients who are considering or have obtained funding from alternative litigation finance suppliers. It did not consider social policy or normative issues such as the desirability of this form of financing, or empirical controversies, such as the systemic effects of litigation financing on settlements (except insofar as this has an impact on the ethical obligations of lawyers), or the effect that alternative litigation finance may have on the incidence of litigation generally, or unmeritorious ("frivolous") lawsuits specifically.[5]  Nor did the Working Group consider legislative or regulatory responses to perceived problems associated with alternative litigation finance in the consumer sector, such as excessive finance charges or inadequate disclosure. However, to the extent a lawyer is representing a client and advising or negotiating with respect to an ALF transaction, the duties considered in this White Paper are applicable.

One theme of this White Paper is that it is difficult to generalize about the ethical issues for lawyers associated with alternative litigation finance across the many differences in transaction terms, market conditions, relative bargaining power of the parties to the transactions,

---

Party Financing of Litigation in September 2009. For a list of participants and paper topics, and links to papers presented at the conference, see
http://www.law.northwestern.edu/searlecenter/conference/roundtable/Searle_Third_Party_Financing_Agenda.pdf.
[5]  The Working Group received comments from groups expressing various opinions about the effect of alternative litigation finance on the civil justice system. Critics of ALF predict that it will drive up the filing of lawsuits, without regard to their legal and factual merit, because suppliers will consider only the expected value of the investment, not the substantive merits of the claim. *See, e.g.*, Comments of the Am. Tort Reform Ass'n to the Am. Bar Ass'n Working Group on Alternative Litig. Fin. (Feb. 15, 2011) (on file with author); Comments of the Prod. Liab. Advisory Council to the Am. Bar Ass'n Working Group on Alternative Litig. Fin. (Feb. 15, 2011) (on file with author); Comments of the U.S. Chamber Inst. for Legal Reform to the Am. Bar Ass'n Working Group on Alternative Litig. Fin. (Feb. 15, 2011) (on file with author). Proponents suggest there is some evidence that although the availability of alternative litigation finance is correlated with an increase in claim filing, its suppliers tend to fund strong claims, not frivolous ones. *See, e.g.* Martin, *supra* note 4; Moliterno, *supra* note 4; Molot, *supra* note 4; Rodak, *supra* note 4. Scholars also offer various views. For an empirical study, see Daniel L. Chen & David S. Abrams, *A Market for Justice: The Effect of Third Party Litigation Funding on Legal Outcomes*, Duke Law Sch., Working Paper, 2011), *available at* http://www.duke.edu/~dlc28/papers/MktJustice.pdf. Other scholars assert that alternative litigation finance better aligns the incentives of attorneys and clients, and also provides a strong signal of claim quality, suggesting that meritorious claims, not weak ones, attract third-party funding. *See* MAX SCHANZENBACH & DAVID DANA, HOW WOULD THIRD PARTY FINANCING CHANGE THE FACE OF AMERICAN TORT LITIGATION? THE ROLE OF AGENCY COSTS IN THE ATTORNEY-CLIENT RELATIONSHIP (2009), *available at* http://www.law.northwestern.edu/searlecenter/papers/Schanzbach_Agency%20Costs.pdf (paper presented at Northwestern Law School public policy roundtable on alternative litigation finance). An evaluation of the competing empirical assertions in these submissions and in the scholarly literature – e.g. that ALF tends to increase the filing of non-meritorious claims – is beyond the mandate and expertise of the Commission on Ethics 20/20, which was not intended to engage in social scientific research.

DRAFT  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

and type of legal services being financed.  Regulation that might be appropriate in one sector of the market, such as products aimed at relatively unsophisticated one-off litigants such as individual personal-injury plaintiffs, may be inappropriate in a different segment of the market, such as investments by hedge funds or high net worth individuals in commercial litigation. Moreover, this is a still-evolving industry, and new forms of financing may be developed that raise new concerns.  Nevertheless, the Commission believes it may be helpful to the profession to consider some of the types of problems that lawyers may encounter as a result of their own, or their clients', interaction with alternative litigation finance.

## II.     The Working Group on Alternative Litigation Finance.

### A.     Members of the Working Group.

Philip H. Schaeffer (Co-chair)
Jeffrey B. Golden (Co-chair)
Professor Stephen Gillers
Olav A. Haazen
John C. Martin, Section of Litigation
The Honorable Kathryn A. Oberly
Herman J. Russomanno
Charles D. Schmerler, Section of International Law.

Reporters

Professor Anthony Sebok
Professor W. Bradley Wendel

ABA Staff

Ruth Woodruff, Counsel

### B.     Process.

As part of its consideration of the impact of globalization and technology on the legal profession, the American Bar Association Commission on Ethics 20/20 formed a Working Group to study the legal ethics issues arising from lawyers' involvement in alternative litigation financing ("ALF" – also commonly known as "third-party litigation finance") by individuals and entities other than parties to the action, their respective lawyers or insurers.  The Commission identified numerous issues upon which it sought public comment, and prepared an Issues Paper, which was made available on November 23, 2010.  Comments were received until February 15, 2011.  In addition, the Commission heard public testimony at the American Bar Association Midyear Meeting in Atlanta, Georgia, on February 11, 2011.

Written submissions were provided by lawyers whose clients had used ALF, who provide ALF to the consumer or commercial market, or who, in one case, provide loans to lawyers. In addition, there were submissions from various organizations and groups, including the American Tort Reform Association, the American Insurance Association, the Product Liability Advisory Council, the United States Chamber of Commerce, and from Alan B. Morrison, Associate Dean for Public Interest & Public Service, George Washington University Law School.

The Commission also heard from witnesses who provided oral statements concerning ALF and answered questions posed to them by the Working Group. They were: Douglas Richmond, AON Global Profession Practice; Harvey Hirschfeld, American Litigation Finance Association (ALFA); John Beisner, Skadden Arps, on behalf of U.S. Chamber Institute for Legal Reform; and Gary Chodes, Oasis Legal Finance.

To obtain further public comments, the Commission released a draft of this White Paper in September 2011.

## III. Executive Summary.

The general conclusion of this White Paper is that attorneys must approach transactions involving alternative litigation finance with care, mindful of several core professional obligations. An attorney must always exercise independent professional judgment on behalf of a client, and not be influenced by financial or other considerations. *See* MODEL RULES OF PROF'L CONDUCT R. 2.1 (2009) [hereinafter MODEL RULE xx]. Moreover, an attorney must not permit a third party to interfere with the exercise of independent professional judgment. Numerous specific provisions in the Model Rules, including conflicts of interest rules and rules governing third-party payments of fees, reinforce the importance of independent professional judgment. *See* MODEL RULE 1.7(a)(2) (representation materially limited by lawyer's responsibilities to a third party or the lawyer's own interests); MODEL RULE 1.8(e) (with limited exceptions, lawyers may not provide financial assistance to client); MODEL RULE 1.8(f) (lawyer must not accept compensation for representation from third party without informed consent of client and unless it will not interfere with independent professional judgment); MODEL RULE 1.8(i) (lawyers may not acquire proprietary interest in subject matter of representation); MODEL RULE 5.4(c) (lawyer may not permit fee payor to direct or regulate lawyer's professional judgment).

In addition, attorneys must be vigilant to prevent disclosure of information protected by Model Rule 1.6(a), and to use reasonable care to safeguard against waiver of the attorney-client privilege. Any infringement on rights that clients would otherwise have, resulting from the presence of alternative litigation finance, requires the informed consent of the client after full, candid disclosure of all of the associated risks and benefits.

Finally, lawyers must fully explain the terms of funding transactions and ensure that clients are aware of the risks these transactions present. If they are not experienced in dealing with these funding transactions, lawyers who advise clients in connection with alternative litigation finance must become fully informed about the risks and benefits of these transactions, in order to provide competent advice to clients. Because this is a new and highly specialized

4

**DRAFT**  **The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.**

area of finance, it may be necessary for a lawyer to undertake additional study or associate with experienced counsel when advising clients who are entering into these transactions.

## IV.     Overview of Alternative Litigation Finance (ALF).

All litigation, even *pro se* litigation, requires some degree of monetary funding.  Most entity clients, at least on the defendants' side, pay on an ongoing basis for the work of their attorneys, out of their operating budgets or from existing sources of credit.  This is true whether the client is paying for litigation expenses itself or the expenses are paid under the contractual obligations of a liability insurance policy by its insurer.  However, certain plaintiffs' claims, particularly individual personal injury tort claims, are funded by the plaintiff's attorney advancing the value of the attorney's time, and sometimes also the expenses of litigation to the client.  These advances are subsequently repaid out of the proceeds of a judgment or settlement, if the claim is successful, pursuant to the terms of the contingency fee agreement entered into between the attorney and client.

In some cases, however, litigants are unable to finance the cost of legal services from their operating budgets or existing lines of credit, or would prefer to access different sources of capital to finance their lawyers' bills.  This may be the case for both plaintiffs and defendants, generally in large, complex, litigated matters.  In addition, some litigants find themselves in urgent need of funds to pay living or medical expenses as they are accrued.  Individual plaintiffs in tort actions may find themselves in this predicament.[6]  They may not have access to other sources of capital, such as bank loans or credit cards, and may discover that the most valuable asset against which they can obtain capital is a contingent share in an eventual judgment or settlement.  Thus, while these transactions are not intended to fund litigation expenses, they are occasioned by an injury that is the subject of ongoing litigation, and the cause of action arising out of the injury is used as security for the funding.

Following the suggestion in Steven Garber's 2009 RAND paper,[7] this White Paper will adopt the term "alternative litigation finance" ("ALF") to describe the universe of contracts which is the subject of the paper.  Defined most generally, ALF refers to mechanisms other than paying the expense of litigation out of the current operating budgets or lines of credit of either the lawyer or the client.  Individuals or organizations who provide capital used to support litigation-related activities, or to support clients' ordinary living expenses during the pendency of litigation, are referred to here as ALF suppliers.[8]  There is a spectrum of transactions by ALF suppliers that ranges, for example, from sophisticated investments in major cases such as critical patent litigation, with the investors seeking returns akin to venture capital returns, to support of personal injury litigation.  Both plaintiffs and defendants can make use of ALF, although as discussed below, the market is segmented to some extent according to the sophistication of

---

[6]  For example, the plaintiff in *Echeverria v. Lindner*, No. 018666/2002, 2005 WL 1083704 (N.Y. Sup. Ct. Mar. 2, 2005), was an undocumented worker injured in a construction-site accident.  In order to pay for necessary back surgery, he sold a share of his personal-injury claim to a company called LawCash for $25,000, or borrowed $25,000 from LawCash – whether to construe the transaction as a loan or a sale was one of the issues considered by the court.

[7]  *See* STEVEN GARBER, RAND INST. FOR CIVIL JUSTICE LAW, FIN., AND CAPITAL MKTS. PROGRAM, ALTERNATIVE LITIGATION FINANCING IN THE UNITED STATES:  ISSUES, KNOWNS, AND UNKNOWNS (2010) (Occasional Paper series).

[8]  Compare the definition in GARBER, *supra* note 7, at 7.

**DRAFT**  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

clients/borrowers.  ALF is presently characterized by spreading the risk of litigation to investors via various methods, including, predominately, nonrecourse or limited recourse financing.

ALF is relatively new in the United States but appears to be evolving as a method of providing financial support to litigants.  It characteristically takes the form of nonrecourse financing, secured solely by a claim.  Investors, both traditional and nontraditional financers, provide funding either as a lump sum or as periodic payments to a claimant in exchange for a share of the proceeds of the judgment on, or settlement of, the financed claim.  The business model requires that the ALF supplier assume the risk that if the claim is unsuccessful, in whole or in part, the ALF supplier may not recover any or a part of the sums so advanced.  A variation of ALF may be an investor's acquisition of a full or partial interest in a claim where the investors become one of the parties in interest.  Information obtained by the Working Group shows that, at present, investors in ALF are primarily financing the claimant, though defense side financing is also possible.[9]  Funding on the defense side obviously does not involve taking a percentage interest in the claim, but often does involve the ALF supplier taking all or a percentage interest in the liability facing the defendant.  As discussed below, ALF transactions between large law firms and defendants are generally negotiated individually between the parties, with the method of calculating the supplier's payment being one of the most important terms in the contract.

## A.    A Typology of ALF.

The ALF market is apparently fairly strongly differentiated.  A large number of ALF suppliers serves the consumer sector, marketing to personal-injury plaintiffs, and to other individual clients with relatively small legal claims.  Consumer ALF suppliers are distinguishable from settlement factoring companies; the former take a partial assignment in a claim that has not yet been settled or reduced to judgment, while the latter purchases a claim that has been reduced to judgment, typically as a result of a judicially approved settlement   A considerably smaller number of entities funds large, complex commercial litigation.  These companies conduct extensive due diligence on individual cases and make sizeable financial investments.  Finally, commercial lenders and some specialized ALF companies make loans directly to lawyers, as opposed to purchasing claims or parts of claims from clients.

## 1.    Consumer Legal Funding.

The sector of the ALF industry that has attracted the most attention, in both the popular media and in scholarly commentary, is that which provides money to consumers with pending lawsuits, most often personal-injury claims but including other individual-client causes of action

---

[9]  *See*, *e.g.*, Comments of Burford Group to the Am. Bar Ass'n Working Group on Alternative Litig. Fin. 4 (Feb. 15, 2011) (on file with author) ("Burford is willing to finance plaintiffs and defendants with equanimity."); Comments of Juridica Capital Mgmt. Ltd. to the Am. Bar Ass'n Working Group on Alternative Litig. Fin. 2 (Feb. 17, 2011) (on file with author) ("To date we have been involved mainly in claims by plaintiffs in major commercial litigation but we – and we understand at least one of our peers – are working on products for defendants as well.").

such as employment discrimination and securities fraud,[10] who are generally already represented by counsel.  For the purposes of this discussion, it will be assumed that the transaction involves a tort plaintiff represented by a lawyer pursuant to a standard contingency fee agreement.  In a typical transaction, the ALF supplier agrees to pay a given amount of money to the plaintiff (say, $25,000) in exchange for a promise by the plaintiff to pay the ALF supplier that amount plus additional fees specified in the contract in the event of a positive outcome in the suit (usually defined as a judgment or settlement in excess of the amount forwarded, net the lawyer's fees and costs).[11]  As Steven Garber's RAND report notes, "[t]hese financing fees seem typically to increase with the elapsed time from the provision of the funds to the date on which the consumer pays the supplier, but the contracted fees do not depend on the total recovery in the underlying lawsuit or the amount of the recovery received by the consumer plaintiff."[12]  The transactions are also nonrecourse, meaning that if the plaintiff recovers nothing by way of judgment or settlement, the plaintiff has no obligation to repay the amount to the supplier.

Comments received by the Working Group from entities in the ALF industry indicate that the purpose of these transactions is generally to provide funds for living expenses during the pendency of litigation.  *See*, *e.g*., Comments of Oasis Legal Finance/Alliance for Responsible Consumer Legal Funding to the Am. Bar Ass'n Working Group on Alternative Litig. Fin. (Apr. 5, 2011) (on file with author) (indicating that purpose of consumer-sector ALF is to "enable these consumers to pursue their legal claims without worrying about how they are going to pay for basic living expenses").  Injured plaintiffs are often disabled or at least unable to work at their previous job, and may lack access to conventional sources of capital, such as bank loans and credit cards.  They may therefore have a pressing need to make mortgage or rent payments, or to pay medical expenses.  On the other hand, plaintiffs may not have an urgent need for funds, but may instead be interested in monetizing the contingent value of their legal claim.[13]

In some cases lawyers will be involved in the process of negotiating a consumer-sector ALF transaction, but in other cases the client – either prior to or subsequent to the beginning of the representation – will obtain financing without the involvement of the lawyer.  *See*, *e.g*., *Fausone v. U.S. Claims, Inc*., 915 So. 2d 626, 627-28 (Fla. Dist. Ct. App. 2005), *aff'd*, 931 So. 2d 899 (Fla. 2006) ("In fairness to U.S. Claims, it should be emphasized that there is no evidence that it solicited Ms. Fausone.  How or why she contacted them is not contained in the record.").  Because this White Paper focuses on the duties of lawyers when representing clients in connection with ALF transactions, some potential problems relating to consumer protection are beyond its scope.  Many ALF suppliers in the consumer sector advertise to generate customers.[14]  A person with a cause of action may respond to these advertisements and approach an ALF

---

[10] *See* Barksdale, *supra* note 4, at 715.

[11] Some ALF suppliers in the consumer sector made their contracts available to the Working Group.  *See*, *e.g*., Oasis (Nebraska) Form Purchase Agreement.  Other information concerning transaction terms and the interaction between ALF suppliers and lawyers was gleaned from judicial decisions and media reports.

[12] GARBER,, *supra* note 7, at 9.

[13] *See Id.* at 10.

[14] *See Id* at 12.  As Garber notes, running a Google search using terms like "lawsuit cash" or "litigation funding" generates pages of hits, with links to websites with names like LawMax Legal Finance, My Legal Advance, Fast Funds, LawCash, Ca$eCa$h, Legal Advance Funding, Funding Cash, LawLeaf, and Advance Cash and Settlement Funding.

**DRAFT**  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

supplier without the knowledge of a lawyer.  In some cases, if the claimant is already represented by counsel, a lawyer may be involved in the process of obtaining financing, in which case the duties discussed in this White Paper are applicable.  Other problems that may arise in connection with consumer ALF transactions, however, such as misleading advertising, inadequate disclosure of financing terms, and excessive financing charges, do not fall within the client-lawyer relationship and are therefore best addressed by legislation or regulation apart from the regulation of the legal profession.

## 2.  Investing in Commercial Litigation.

A very different segment of the ALF market involves public and private funds that seek to invest in large, complex commercial lawsuits, including contract, intellectual property, and antitrust litigation.  Two public companies in this industry, Juridica and Burford, primarily invest in claims owned by large corporate litigants represented by major law firms; their investments are reportedly in the range of $500,000 - $15 million.[15]  Other funds are private and therefore less is known about the nature and scope of their investments.

The terms of agreements between suppliers in this sector and recipients of funding are generally confidential.  When these contracts have been publicly disclosed, they appear to be "bespoke" documents negotiated between the recipient of funding and the ALF supplier, as opposed to the standard-form contracts employed in the consumer funding sector.[16]  Many users of ALF in this sector of the market are sophisticated, repeat-player litigants, generally with in-house legal representation.  Thus, it is likely that attorneys have been involved in the process of negotiating the terms of the agreement.

## 3.  Loans to Lawyers and Law Firms.

Commercial lenders and some specialized ALF suppliers provide loans or lines of credit directly to law firms.  These loans are typically secured by assets of the firm, such as furniture and fixtures or the firm's accounts receivable.[17]  As two Canadian lawyers noted, regarding the difficulty of funding complex litigation:

> We suspect it is very difficult for most Canadian counsel to wrap their minds around the concept of financing $2.6 million of disbursements.  How many of us can claim an "Uncle Pete" relationship with our bankers that will support a million dollar loan to finance a single case?  How many of us can finance the balance of $1.6 million from our "war chest" left over from our successful cases?[18]

---

[15] Garber,, *supra* note 7, at 16.  *See also* Lyon, *supra* note 4, at 574 (reporting that "corporate litigants may now routinely borrow up to $15,000,000, on cases valued at $100,000,000 or more").

[16] *See, e.g.*, Parloff, *supra* note 2 (discussion of the contract between the Ecuadorian plaintiffs and Burford).

[17] Garber,, *supra* note 7, at 13.

[18] James H. MacMaster & Ward K. Branch, Financing Class Actions 2 (2002), *available at* http://www.branchmacmaster.com/storage/articles/classactions_financing.pdf.

A similar problem, of finding funds to pay for millions of dollars in disbursements, faces lawyers in the United States as well.  Law firms representing plaintiffs and defendants may seek financing to support ongoing expenses of litigation.  It may be the case, however, that firms representing plaintiffs are more likely to make use of nontraditional lenders as a source of financing.[19]  In the case of loans to law firms representing plaintiffs, security for the loan may be a portion of the attorney's contingent share of the proceeds of the lawsuit.

## B.   Common-Law Doctrines Historically Affecting ALF.

### 1.   Maintenance and Champerty.

Maintenance, champerty and barratry are closely related but are not identical.  "[P]ut simply, maintenance is helping another prosecute a suit; champerty is maintaining a suit in return for a financial interest in the outcome; and barratry is a continuing practice of maintenance or champerty.'" *Osprey, Inc. v. Cabana Ltd. P'ship*, 532 S.E.2d 269, 273 (S.C. 2000) (*quoting In re Primus*, 436 U.S. 412, 424 n.15 (1978)).

#### a.   Historical Background.

Champerty is considered a type of maintenance.  The historical justifications for prohibiting any form of maintenance was that third-party funding of litigation encouraged fraudulent lawsuits.  The wealthy and powerful would "buy up claims, and, by means of their exalted and influential positions, overawe the courts, secure unjust and unmerited judgments, and oppress those against whom their anger might be directed." *Casserleigh v. Wood*, 59 P. 1024, 1026 (Colo. Ct. App. 1900).  As one contemporary scholar put it, "[b]arons abused the law to their own ends and . . . bribery, corruption, and intimidation of judges and justices of the peace [was] widespread."[20]  Whether this historical story was true or not, American courts held that the risk that third parties would engage in what is today known as abuse of process had disappeared with the advent of modern reforms.  *See, e.g. Thallhimer v. Brinckerhoff*, 3 Cow. 623 (N.Y. Sup. Ct. 1824) ("In modern times, and since England has enjoyed a pure and firm administration of justice, these evils are little felt, and champerty and maintenance are now seldom mentioned . . . as producing mischief in that country.").

Limitations on maintenance can come from two sources:  common law and statutes.  There are currently two states with statutes that follow the early English common law's approach and prohibit any form of maintenance (even maintenance that is not for profit).  Here, for example, is Mississippi's law:

> It shall be unlawful for any person . . . either before or after proceedings commenced: (a) to promise, give, or offer, or to conspire or agree to promise, give, or offer, (b) to receive or accept, or to agree or conspire to receive or accept, (c) to solicit, request, or donate,

---

[19]   GARBER, *supra* note 7, at 13.
[20]   Damian Reichel, Note, *The Law of Maintenance and Champerty and the Assignment of Choses in Action*, 10 SYDNEY L. REV. 166, 166 (1983).

**DRAFT**  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

> any money . . . or any other thing of value, or any other assistance as an inducement to any person to commence or to prosecute further, or for the purpose of assisting such person to commence or prosecute further, any proceeding in any court or before any administrative board or other agency.[21]

This language would, in theory, prohibit one neighbor from gratuitously providing something of value (information, law books, etc.) to another.  American common law restrictions on maintenance, in those states where they were recognized, refused to follow early English common law and were limited to restricting champerty.

In the early Twentieth Century some courts interpreted the principle of maintenance to permit third-party support only under the most narrow of circumstances.  In *In re Gilman's Administratrix*, 167 N.E. 437 (N.Y. 1929), Judge Cardozo said that "maintenance inspired by charity or benevolence" could be legal but not "maintenance for spite or envy or the promise or hope of gain." *Id.* at 440.  Gilman itself involved maintenance by the party's own lawyer, which may have made it especially obnoxious to Cardozo. This, of course, would be permitted today in every jurisdiction under the practice of the contingency fee, which had, by the mid-1930's, become generally accepted as industrialization brought more and more claims for legal representation.[22]  It is worth noting that 65 years later the New York Court of Appeals held that an offer by a personal injury litigant to give another party 15% of his net recovery from his lawsuit in exchange for certain personal services could constitute an "enforceable assignment of funds" that created a lien on the proceeds of the lawsuit.  *See Leon v. Martinez*, 638 N.E.2d 511, 514 (N.Y. 1994).

Other courts in the same period took a broader view of maintenance in cases involving a third party who was not the party's own attorney.  These courts have come to view maintenance between two laypersons as permissible regardless of whether it was done for charity or profit, or whether the supplier was the client's lawyer or a stranger.  *See*, *e.g.*, *L. D. Brown v. John Bigne et al.*, 28 P. 11 (Ore. 1891).

## b.    Contemporary Views.

---

[21]  MISS. CODE ANN. § 97–9–11 (2009).  Illinois' law sweeps slightly less broadly:

> If a person officiously intermeddles in an action that in no way belongs to or concerns that person, by maintaining or assisting either party, with money or otherwise, to prosecute or defend the action, with a view to promote litigation, he or she is guilty of maintenance and upon conviction shall be fined and punished as in cases of common barratry. It is not maintenance for a person to maintain the action of his or her relative or servant, or a poor person out of charity.

720 ILL. COMP. STAT. 5/32–12 (2009).  Illinois allows selfless maintenance when the recipient of the support is either one's family or a person who is poor.

[22]  *See* Max Radin, *Maintenance By Champerty*, 24 CAL. L. REV. 48, 70-71 (1936).  *See also* Richard W. Painter, *Litigating on a Contingency: A Monopoly of Champions or a Market for Champerty?*, 71 CHI.-KENT L. REV. 625, 639–40 (1995) (discussing how contingent fees were eventually excepted from the doctrine of champerty).

In the twentieth century an increasing number of state supreme courts have explicitly announced that their common law permits champerty. In some states, such as Arizona, California, Connecticut, Missouri, New Jersey, New Hampshire, New Mexico and Texas, the courts have held that the early common law prohibitions on champerty were never adopted from England.[23] In other states, such as Colorado, champerty laws, if they had been adopted from England, were later abandoned. *Fastenau v. Engel*, 240 P.2d 1173 (Colo. 1952) ("Common-law maintenance and champerty no longer exist in Colorado."). The Massachusetts Supreme Court struck down Massachusetts' champerty laws in 1997. The court stated that "the decline of champerty, maintenance, and barratry as offences [sic] is symptomatic of a fundamental change in society's view of litigation – from 'a social ill, which, like other disputes and quarrels, should be minimized,' to 'a socially useful way to resolve disputes.'" *Saladini v. Righellis*, 687 N.E.2d 1224, 1226 (Mass. 1997). *See also Osprey, Inc. v. Cabana Ltd. P'ship*, 532 S.E.2d 269, 273 (S.C. 2000) (abolishing champerty under South Carolina law). In Florida, the common law prohibition of champerty was discarded by an appellate court, which held in a case involving litigation funding that no claim of champerty exists unless a stranger to a lawsuit "officiously intermeddles" in the suit.[24] In New York, the *Leon* case established that the courts would enforce the partial assignment of the proceeds of a lawsuit resulting from an exchange of the assignment for something of value, such as services (in that case, home health care). *Leon v. Martinez*, 638 N.E.2d 511 (N.Y. 1994).

According to the one recent survey on the topic, 29 out of 51 jurisdictions, including the District of Columbia, permit some form of champerty, subject to the sort of limits described as follows.[25] In these jurisdictions champerty is generally permissible as long as supplier is not:

(1) clearly promoting "frivolous" litigation (e.g. a lawsuit that the party that does vindicate a genuine legal interest of the party bringing the law suit);

(2) engaging in "malice champerty", which is the support of meritorious litigation motivated by an improper motive. (e.g. prima facie tort in NY);

(3) "intermeddling" with the conduct of the litigation (e.g. determining trial strategy or controlling settlement).

Given the somewhat ancient status of the decisions in the remaining jurisdictions that prohibit champerty, there may be more states in which champerty is tolerated or where, if the issue were raised again in a modern context, a contemporary court would have little reason to preserve the doctrine of maintenance, either as a matter of common law or public policy. Some

---

[23] *In re Cohen's Estate*, 152 P.2d 485 (Cal. Dist. Ct. App. 1944); *Polo by Shipley v. Gotchel*, 542 A.2d 947 (N.J. Super. Ct. Law Div. 1987); *Anglo-Dutch Petroleum Int'l, Inc. v. Haskell*, 193 S.W.3d 87, 103–04 (Tex. App. 2006).
[24] Officious intermeddling means "offering unnecessary and unwanted advice or services; meddlesome, esp. in a highhanded or overbearing way." Mere provision of financing to a plaintiff is not enough. *Kraft v. Mason*, 668 So. 2d 679, 682 (Fla. Dist. Ct. App. 1996).
[25] Sebok, *supra* note 4, at 98-99.

**DRAFT**  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

states have recently reversed the common law prohibition of champerty through legislation.[26] However, other states have reaffirmed these doctrines, noting the "the potential ill effects that a champertous agreement can have on the legal system."[27]

## 2.    Usury.

Usury is the taking of interest at a rate that exceeds the maximum rate provided by law for the particular category of lender involved in the transaction. There is considerable variation from state to state in the interest rates that constitute usury and in the extent to which different rates may be specified for different types of lenders (e.g., banks, insurance companies, merchants, etc.).

Discussions of ALF often refer to the funding provided as a loan.  *See*, *e.g.*, N.Y.C. Bar Ass'n Comm. on Prof'l and Judicial Ethics, Formal Op. 2011-2 (2011) ("This opinion addresses non-recourse litigation loans, *i.e.* financing repaid by a litigant only in the event he or she settles the case or is awarded a judgment upon completion of the litigation.").  ALF suppliers, on the other hand, assert that they are making an investment or purchasing a share of a claim, not making a loan.  *See*, *e.g.*, Comments of Augusta Capital, LLC to the Am. Bar Ass'n Working Group on Alternative Litig. Fin. (Feb. 7, 2011) (on file with author) ("The funding that Augusta Capital provides is entirely contingent - the lawyer is not obligated to repay any portion of the funding provided by Augusta Capital - nor to pay any fee to Augusta for the funding - for a particular case unless and until a recovery is made in that particular case."); Comments of Oasis Legal Finance, LLC to the Am. Bar Ass'n Working Group on Alternative Litig. Fin. (Jan. 18, 2011) (on file with author) ("This product does not fall into a traditional 'loan product' category as it is non-recourse.").  Whether these transactions are characterized as a loan or an investment may determine whether state usury provisions apply to the rate of return specified in the contract.

Generally speaking, debt, at least in the context of consumer usury law, involves a transaction in which the borrower has an absolute obligation to repay the sum advanced. [28]

---

[26]  *See, e.g.,* Me. Rev. Stat. Ann. tit. 9–A, §§ 12–101 to  –107 (2009) (partially amending Me. Rev. Stat. Ann. tit. 17–A, § 516(1) (2009)); Ohio Rev. Code Ann. § 1349.55 (West 2009) (superseding *Rancman v. Interim Settlement Funding Corp.*, 789 N.E.2d 217 (Ohio 2003)).

[27]  *Johnson v. Wright*, 682 N.W.2d 671, 680 (Minn. Ct. App. 2004)*; see Wilson v. Harris*, 688 So. 2d 265, 270 (Ala. Civ. App. 1996), *quoting Lott v. Kees*, 165 So. 2d 106 (Ala. 1964) ("The doctrine of champerty is directed against speculation in lawsuits and to repress the gambling propensity of buying up doubtful claims.").

[28]  *See Odell v. Legal Bucks, LLC*, 665 S.E.2d 767, 777 (N.C. Ct. App. 2008) (citations omitted) ("[A] transaction in which the borrower's repayment of the principal is subject to a contingency is not considered a loan because the terms of the transaction do not necessarily require that the borrower repay the sum lent or return a sum equivalent to that which he borrow[ed].");  1-6 Consumer Credit Law Manual § 6.08 (2011) ("The second element of a traditional usury case is the debtor's absolute obligation to repay the principal amount of the money transferred to him or her."); Cynthia Bulan, *A Small Question in the Big Statute: Does Section 402 of Sarbanes-Oxley Prohibit Defense Advancements?*, 39 Creighton L. Rev. 357, 374-75 (2006) ("A handful of courts have addressed the definition of 'loan' . . . . [I]t appears that the large majority of courts, both federal and state, that have considered the issue have held that an advancement of funds that comes with only a conditional obligation to repay would not constitute a 'loan'").

Some courts have relied upon this understanding of the definition of debt to state that ALF is not lending. *See, e.g.*, *Dopp v. Yari*, 927 F. Supp. 814 (D.N.J. 1996); *Kraft v. Mason*, 668 So. 2d 679 (Fla. Dist. Ct. App. 1996); *Nyquist v. Nyquist*, 841 P.2d 515 (Mont. 1992); *Anglo-Dutch Petroleum Int'l, Inc. v. Haskell*, 193 S.W.3d 87, 96 (Tex. Ct. App. 2006). However, some may argue that notwithstanding the absence of any judicial precedent applicable to ALF, such advances from a supplier are in reality "nonrecourse loans." Consistent with this perspective some courts have characterized ALF transactions as loans, potentially triggering state law usury limitations. *See, e.g.*, *Lawsuit Financial, LLC v. Curry*, 683 N.W.2d 233 (Mich. Ct. App. 2004); *Echeverria v. Estate of Lindner*, No. 018666/2002, 2005 WL 1083704 (N.Y. Sup. Ct. Mar. 2, 2005).[29]  In 2010, two of the major national consumer-sector ALF providers sued the Colorado Attorney General to obtain a declaratory judgment holding that their activities are not loans and are not in violation of Colorado's Uniform Consumer Credit Code. Recently the trial judge hearing this suit held that under Colorado's Uniform Consumer Credit Code, debt need not be recourse and therefore consumer ALF transactions made with an "expectation of repayment" may not charge more than the interest rate set by that state's usury law.

### 3.      Unconscionability.

ALF may also be vulnerable to a challenge based on unconscionability. *See, e.g.*, *Fausone v. U.S. Claims, Inc.*, 915 So. 2d 626, 630 (Fla. Dist. Ct. App. 2005), *aff'd*, 931 So. 2d 899 (Fla. 2006). The plaintiff in *Fausone* raised unconscionability as a defense to an action by an ALF supplier to enforce its contract, but essentially defaulted on this argument by withdrawing a motion to vacate an arbitration award entered against her. The appellate court observed that "a person who is the victim of an accident should not be further victimized by loan companies charging interest rates that are higher than the risks associated with the transaction." *Id.* at 630. On the record before the court, however, it was not possible to make findings concerning the risks to the ALF supplier associated with the transaction. The court speculated that "a company that only loaned money when it was secured by high-grade personal injury claims would seem to be able to charge a lower interest rate than some of the rates described in this opinion, even when the arrangement is a nonrecourse loan." *Id.* In the absence of any kind of evidentiary record, it would be inappropriate to read *Fausone* as standing for the proposition that the transactions described in the opinion in fact involved usurious rates. The court also did not consider the issue described above, in Section IV.B.2, of whether these transactions should be characterized as loans or investments.

---

[29]  The same ALF contract that was at issue in *Echeverria* (where the ALF supplier, not being a party, did not have the opportunity to brief the court on New York law), was later declared to be valid and not covered by New York's usury statues in a suit for declaratory judgment brought by the ALF supplier. Plaintiff Funding Corporation d/b/a LawCash v. Echeverria, No. 10140/2005 (N.Y. Sup. Ct. 2005). In Ohio, the lower courts in the *Rancman* case characterized an ALF transaction as a loan, but the Ohio Supreme Court invalidated the contract with the supplier on a different ground, concluding that it violated state law prohibitions on champerty. *See Rancman v. Interim Settlement Funding Corp.*, 789 N.E.2d 217 (Ohio 2003). The Ohio legislature subsequently overruled *Rancman* and permitted transactions of the sort involved in that case. In North Carolina, the Court of Appeals held that, although the ALF supplier had not provided a loan for the reasons explained supra, it had provided an "advance," which did fall under North Carolina's usury statute, even though an advance was not a loan. *Odell v. Legal Bucks, LLC*, 665 S.E.2d 767, 778 (N.C. Ct. App. 2008).

**DRAFT**  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

### C.    Some Typical ALF Transactions.

The following hypothetical scenarios illustrate some of the ways in which lawyers may be involved when they represent clients receiving funds from ALF suppliers.  The hypothetical cases also suggest some of the ethical issues confronting lawyers.

Case 1.  Plaintiff was injured in a car accident and his injuries have rendered him unable to perform his job involving physical labor at a factory.  Plaintiff has many financial obligations, including rent payments and other bills coming due, but is unable to borrow money from traditional lenders or to take out further cash advances on his credit card.  Lawyer is a personal injury lawyer representing Plaintiff in the accident litigation.  Lawyer believes Plaintiff's case has a reasonable likelihood of settling for $100,000, but due to a slow state court docket, Lawyer expects it will take 18 months or more to settle the case.  Plaintiff tells Lawyer that he has seen late-night television ads run by Supplier offering "cash for lawsuits," and asks Lawyer whether he should sell a portion of his claim to Supplier.  Lawyer is unfamiliar with the terms of the financing contracts entered into between Supplier and its customers.  What should Lawyer advise Plaintiff?

Variation:  Lawyer has represented personal-injury clients in other cases who have sold portions of their claims to Supplier.  Based on this experience Lawyer knows that Supplier does not request to inspect confidential documents, but relies for its due diligence on filed pleadings and other publicly available information.  Lawyer also reasonably believes that Supplier clearly discloses the terms of the financing contract with its customers.  Based on other agreements Lawyer has seen between Supplier and its customers, Lawyer reasonably believes that Supplier will not require Plaintiff to agree to convey any decision-making authority with respect to the representation to Supplier.

Case 2.  Plaintiff enters into a contract with a funding company, Supplier, which advertises extensively with slogans such as "quick cash today!"  The contract terms provide that, in exchange for $25,000, Plaintiff agrees to repay Supplier the principal amount of $25,000 plus financing charges computed at a monthly rate of 3.85% of the principal amount, compounded monthly, plus various charges denominated "case review" and "case servicing" fees.  The obligation to repay Supplier has priority over Plaintiff receiving any proceeds from a settlement or judgment in the litigation, and Plaintiff and Plaintiff's lawyer are required to hold any proceeds in trust until the obligation to repay Supplier has been satisfied.  In addition, under the agreement Plaintiff permits Supplier to inspect any pleadings, reports, memoranda or other documents relating to the lawsuit, and agrees to waive any duty of confidentiality that would restrict Plaintiff's lawyer from disclosing this information to Supplier.  Plaintiff also agrees to prosecute the lawsuit vigorously and in good faith, and to give Supplier notice of any termination or substitution of counsel.  Finally, Plaintiff agrees not to accept any offer of settlement without giving written notice to Supplier and obtaining Supplier's consent to the settlement.

Plaintiff has retained Lawyer to represent him in a personal-injury lawsuit. After Plaintiff and Lawyer signed a retention agreement, Plaintiff told Lawyer about the contract with Supplier. After reviewing the contract, Lawyer became concerned about her ability to represent Plaintiff effectively. What should Lawyer do now?

Case 3. Plaintiff, an inventor, approaches Lawyer, an intellectual property lawyer, about pursuing a patent infringement action against a large manufacturing company. The matter will be complex and likely take several years to complete, and the prospective defendant is notorious for using delaying tactics to drive up the litigation costs of its adversaries. Lawyer does not have sufficient capital on hand to represent Plaintiff on a contingent fee basis. Lawyer therefore recommends that Plaintiff approach Supplier, a company that buys shares in causes of action asserted in complex commercial disputes. Lawyer has dealt with Supplier in the past in connection with the representation of other clients, but does not receive compensation for referring clients to Supplier.

In the course of negotiating the agreement between Plaintiff and Supplier, numerous issues have arisen. Supplier has insisted that its claim have priority in the proceeds of any judgment or settlement recovered, so that Plaintiff does not receive anything until Supplier is paid in full. That is, Supplier would get paid after Lawyer, but before Plaintiff. Supplier also seeks unrestricted access to all documents in Lawyer's possession, including those that may be protected by the attorney-client privilege or work product doctrine. Supplier asks Lawyer to agree not to withdraw or associate with co-counsel without the express written consent of Supplier. Finally, Supplier proposed a contract term requiring Plaintiff to seek Supplier's agreement before accepting any offer of settlement.

How should Lawyer proceed in the negotiations with Supplier on behalf of Plaintiff?

Case 4. Lawyer is a personal-injury attorney specializing in class action and non-class aggregate litigation. Product liability lawsuits have recently been filed against a pharmaceutical company, asserting that the manufacturer knew but failed to warn of dangerous side effects of a prescription drug. Lawyer believes it would be possible to attract numerous clients with potential claims against the manufacturer, but is concerned that the litigation will be lengthy, vigorously contested by the manufacturer, and therefore expensive. Lawyer does not have sufficient capital on hand in her firm's account to finance the case herself, with the aim of recouping the expenses through a contingency fee obtained after a judgment or settlement. Lawyer therefore approaches a commercial lender about establishing a line of credit to be used for the purpose of financing the case. The lender agrees to make a loan, secured by Lawyer's office fixtures and accounts receivable. The interest rate is at fair market value for this type of loan. Lawyer subsequently is retained by hundreds of clients in a non-class aggregate lawsuit against the manufacturer. The clients agree to pay Lawyer one-third of the amount of any judgment or settlement received, plus expenses advanced by Lawyer on their behalf, and sign a contingent fee agreement that complies with Model Rule 1.5(c) except that it does not mention the possibility of borrowing funds and passing along interest expenses. After recovery is obtained for the clients, may Lawyer charge the clients a pro rata share of the borrowing costs Lawyer incurred to finance the litigation?

16

**DRAFT**  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

## V.      Professional Responsibility Issues.

### A.      Independent Professional Judgment and Conflicts of Interest.

The conflicts of interest provisions in the Model Rules, principally Model Rules 1.7 through 1.11, protect clients from having to assume the risk that their interests will be harmed because of the attorney's relationship with another client, a former client, or a third party, or the lawyer's own financial or other interests.  Protected interests of clients include the confidentiality of information shared with their lawyers, the reasonable expectation of loyalty of counsel, and the interest in receiving candid, unbiased advice.  Conflicts rules regulate prophylactically, prohibiting lawyers from representing clients while subject to a conflict of interest, without obtaining the informed consent of their clients (where permitted).  In a sense the conflicts rules provide a second layer of protection, beyond rules directly regulating conduct such as the disclosure of confidential information (MODEL RULE 1.6) or the exercise of independent professional judgment and the provision of candid legal advice (MODEL RULE 2.1).

### 1.      Conflicts of Interest.

The involvement of ALF has the potential to create conflicts of interest if the lawyer participates directly in or benefits financially from the ALF transaction, as opposed to simply advising the client in connection with the transaction.

Numerous provisions in the Model Rules of Professional Conduct regulate the conflicts of interest that may be created or exacerbated by the presence of ALF.  In addition to the general material-limitation conflicts rule (MODEL RULE 1.7(a)(2)), and the regulation of business transactions with clients (MODEL RULE 1.8(a)), two non-waivable conflicts rules prohibit a lawyer from providing financial assistance to a client (MODEL RULE 1.8(e)) and acquiring a proprietary interest in the client's cause of action (MODEL RULE 1.8(i)).  Although it is not denominated a conflicts rule, the principles governing withdrawal from representation require that a client be free to terminate the representation without restriction.  An agreement between an ALF supplier and a client, permitting the ALF supplier to have veto power over the selection of counsel, may limit the client's right to terminate counsel in a manner that is inconsistent with Model Rule 1.16(a).  Finally, a hybrid conflicts/confidentiality rule governs the provision of evaluations to someone other than the client.  *See* MODEL RULE 2.3.

The analysis of conflicts of interest here assumes that an client-lawyer relationship exists only between the attorney and the client seeking the services of an ALF supplier.  If the attorney also has a professional relationship with the ALF supplier, then a conventional concurrent conflict of interest arises, which must be analyzed under the principles of Model Rule 1.7.  A professional relationship with the supplier may arise by express contract or by implication from the conduct of the parties.  *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14 (2000) [hereinafter  RESTATEMENT § xx].  For example, in *Leon v. Martinez*, 638 N.E.2d 511

17

(N.Y. 1994), the New York Court of Appeals held that the allegations in the supplier's complaint were sufficient to support a cause of action for legal malpractice against the lawyer who had been representing the plaintiff in personal-injury litigation.  In particular, the lawyer had performed legal services for the supplier in the past, suggesting it was permissible to infer that the lawyer had intended to represent both the plaintiff and the supplier in the funding transaction.

### a.       Material Limitation Conflicts:  Model Rule 1.7(a)(2).

A conflict of interest under Model Rule 1.7(a)(2) may arise if a lawyer has a relationship with an ALF supplier that creates a financial interest for the lawyer that may interfere with his or her obligation to provide impartial, unbiased advise to the client.  For example, an attorney may have an agreement with an ALF supplier that it will pay the lawyer a referral fee for clients who use the supplier's services.  Attorneys are prohibited from paying others for referrals of clients, Model Rule 7.2(b), but there is no explicit prohibition in the Model Rules on receiving referral fees.  Nevertheless, the acceptance of referral fees very likely constitutes a material limitation on the representation of the client, resulting from a personal interest of the lawyer.[30]  Under Model Rule 1.7(a)(2), therefore, the lawyer would be required to obtain the informed consent of the client to the referral-fee arrangement.  Even in the absence of an explicit agreement to refer clients, a lawyer with a long-term history of working with a particular ALF supplier may have an interest in keeping the supplier happy, which would create a conflict under Rule 1.7(a)(2).

A more subtle material limitation conflict could arise from the lawyer's involvement in negotiating a contract with an ALF supplier.  In **Case 3**, above, the lawyer representing the inventor is negotiating with the funding company, but the terms of the agreement may have an impact on the lawyer's own financial interests.  For example, a contract term that requires the attorney's fees to be paid prior to the client obtaining a share of the proceeds favors the interests of the lawyer over the interests of the client.[31]  This could constitute a material limitation conflict, and a court or disciplinary authority is also likely to treat the contract with the supplier, which affects the lawyer's financial interests as well as the client's, as a business transaction with the client (see below).  *See*, *e.g.*, *Passante v. McWilliam*, 62 Cal. Rptr. 2d 298 (Cal. Ct. App. 1997).

In the case of a contract negotiation over the structure of a financing arrangement, the conflict arises because the lawyer may have incentives to act in ways that are not in the client's best interests.  A conflict of interest exists if any interest of the lawyer:

---

[30]  In some jurisdictions these fees are prohibited outright, presumably because the risk that they will interfere with the lawyer's independent professional judgment is too great.  *See infra* note ___.

[31]  Even a requirement that the lawyer hold funds for payment to the supplier, in effect putting the lawyer in the role of escrow agent, may create a conflict of interest under Model Rule 1.7(a)(2).  At common law the duty of an escrow agent is to serve as a neutral fiduciary with respect to all of the parties to the escrow.  An attorney, on the other hand, may be permitted to assert non-frivolous arguments on behalf of a client that the client is entitled to disputed funds in an escrow.  These differential obligations may give rise to a conflict between the attorney's role as escrow agent and as a zealous advocate for the client's interests.  *See*, *e.g.*, *Splash Design, Inc. v. Lee*, 103 Wash. App. 1036, 2000 WL 1772519 (Wash. Ct. App. Dec. 4, 2000).

**DRAFT**  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

would materially impair the lawyer's ability to consider alternative courses of action that otherwise would be available to a client, to discuss all relevant aspects of the subject matter of the representation with the client, or otherwise to provide effective representation to the client.

RESTATEMENT § 125 cmt. c.  A lawyer may be able to disregard these incentives, give the client impartial advice, and provide competent representation.  Nevertheless, the client is entitled to know about the *risks* presented by the lawyer's financial and other incentives created by the contract, and to have an opportunity to provide or decline informed consent.  The risks include the possibility that some term of the agreement may adversely affect the client's financial interests relative to those of the lawyer.  For example, the ABA Standing Committee on Ethics and Professional Responsibility has concluded that an attorney may acquire an ownership interest in the stock of a corporate client, but that the client must give informed consent to the investment and the transaction must satisfy the requirements of Model Rule 1.8(a).  ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 00-418 (2000); *see also* D.C. Bar Legal Ethics Comm., Ethics Op. 300 (2000); N.Y.C. Bar Ass'n Comm. on Prof'l and Judicial Ethics, Formal Op. 2000-3 (2000).  The concern in these stock-for-fees transactions is that the lawyer might structure the transaction in some way that is unfair to the client.  Thus, in a situation like **Case 3**, the lawyer must ensure that the client is adequately informed of the risk that the agreement negotiated between the lawyer and the ALF supplier may favor the lawyer's financial interest over those of the client.

As a result, the lawyer must obtain the client's informed consent, confirmed in writing, to the conflict presented by the lawyer's role in the funding contract.  Informed consent means the client's agreement "after the lawyer has communicated adequate information and explanation about the material risks and reasonably available alternatives to the proposed course of conduct." MODEL RULE 1.0(e).  Thus, the lawyer in Case 3 would be required to explain to the client the ways in which the contract terms proposed by the ALF supplier could adversely affect the client's interests.  For example, the schedule of payments from the proceeds of the lawsuit may be structured in a way that favors the lawyer's interests over the interests of the client.  There may be a good reason to do this – for example, it may be a way for the client to obtain the services of his or her choice of counsel – but the risks and benefits of this option must be explained fully to the client.  The lawyer should also discuss reasonably available alternatives to the suggested contract terms, and suggest available alternatives to ALF funding, if they would be in the client's best interests.

### b.    Business Transactions with Clients:  Model Rule 1.8(a).

A lawyer may enter into a business transaction with a client, or knowingly acquire "an ownership, possessor, security or other pecuniary interest adverse to a client" only after giving the client clearly understandable written disclosure of the terms of the transaction, written advice to consult independent legal counsel and a reasonable opportunity to do so, and obtaining the client's informed consent to the terms of the transaction and the lawyers role in it, in a writing

signed by the client. *See* MODEL RULE 1.8(a). The terms of the transaction must be substantively fair and reasonable to the client.

Many ALF transactions are negotiated between the client and the supplier, with no involvement of the lawyer. Some transactions, however, are like the hypothetical one described in **Case 3**, where the lawyer represents the client in negotiations with the ALF supplier, and where the terms of the agreement may affect the rights the lawyer and client have, *vis-à-vis* one another, in the proceeds of any recovery. Such a case likely involves the lawyer acquiring a "pecuniary interest adverse to a client," triggering the requirements of Model Rule 1.8(a). In Case 3, in addition to satisfying the requirement of obtaining informed consent to the material limitation conflict (MODEL RULE 1.7(a)(2)),[32] the lawyer must ensure compliance with Model Rule 1.8(a), by:

- Ensuring that the contract terms negotiated by the lawyer, respecting the interests of the lawyer, the client, and the ALF supplier, are substantively fair and reasonable from the client's point of view.
- Fully disclosing the terms of the transaction and transmitting them in writing, in terms that can be reasonably understood by the client.
- Advising the client in writing of the desirability of seeking independent legal advice, and providing a reasonable opportunity for the client to obtain separate representation in the transaction.
- Obtaining the client's informed consent, in writing, to both the substantive terms of the transaction and the lawyer's role in it (i.e. that the lawyer is also an interested party, as well as acting as the client's representative).

As discussed below (Section V.C.2), some state bar ethics opinions have suggested that the requirements of Model Rule 1.8(a) are applicable when a lawyer obtains a loan from a commercial lender and seeks to recoup the interest expenses from clients.

### c. Financial Assistance to Clients – Model Rule 1.8(e).

Model Rule 1.8(e) provides as follows:

A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:

(1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and

---

[32] *See* MODEL RULE 1.8 cmt. [3] (lawyer must comply with Model Rule 1.7 as well as Model Rule 1.8(a) when the lawyer's financial interest in the transaction "poses a significant risk that the lawyer's representation of the client will be materially limited by the lawyer's financial interest in the transaction").

**DRAFT**  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

(2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client.[33]

The policy underlying the rule is set out in Comment [10]:  "Lawyers may not subsidize lawsuits or administrative proceedings brought on behalf of their clients, including making or guaranteeing loans to their clients for living expenses, because to do so would encourage clients to pursue lawsuits that might not otherwise be brought and because such assistance gives lawyers too great a stake in the litigation."  The Comment distinguishes prohibited financial assistance from lending court costs and litigation expenses, "because these advances are virtually indistinguishable from contingent fees and help ensure access to the courts."

The primary focus of this White Paper is the duties of lawyers when dealing with ALF suppliers who are independent of the lawyer.  When lawyers themselves become the suppliers, except through the established mechanism of contingency fee financing, this rule may be implicated.  If the rule applies, there is no provision for waiver with the informed consent of the client.  Depending on the structure of the transaction, a lawyer may also acquire an interest in the client's cause of action, which is prohibited by a separate rule, Model Rule 1.8(i).

### d.      Acquisition of an Interest in the Client's Cause of Action – Model Rule 1.8(i).

Model Rule 1.8(i) provides as follows:

A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may:

(1) acquire a lien authorized by law to secure the lawyer's fee or expenses; and

(2) contract with a client for a reasonable contingent fee in a civil case.

The rationale for this rule is explained in Comment [16].  The rule is intended primarily to reinforce the lawyer's capacity to exercise independent judgment in the representation of the client, which might be impaired if the lawyer has too great a personal interest in the representation.  The Comment also notes that if the lawyer has a proprietary interest in the cause of action, the client will have a difficult time discharging the lawyer if the client is dissatisfied.  The client's right to terminate the professional relationship is almost absolute (MODEL RULE 1.16(a)(3)), subject only to the requirement of obtaining court permission in litigated matters (MODEL RULE 1.16(c)).[34]

---

[33]  Limited financial assistance by lawyers to clients is permitted in the District of Columbia and Texas.  *See* D.C. RULES OF PROF'L CONDUCT R. 1.8(d)(2) (2007); TEXAS DISCIPLINARY RULES OF PROF'L CONDUCT R. 1.08(d)(1) (2005).

[34]  Lawyers have occasionally been permitted to assert claims for retaliatory discharge.  *See* RESTATEMENT § 32 cmt. b & Reporter's Note.

Even in states that have abolished the common law prohibition on champerty, lawyers may not engage in champertous transactions with their clients in violation of Model Rule 1.8(i). Although this rule is grouped with other conflicts of interest rules that may be waived upon the informed consent of the client, there is no provision in Model Rule 1.8(i) for informed consent. Thus, the rule stands as an absolute prohibition on attorneys acquiring a proprietary interest in their clients' causes of action.

Both the prohibition on acquiring an interest in the client's cause of action, Model Rule 1.8(i), and the prohibition on providing financial assistance to clients, Model Rule 1.8(e), if applied literally would call into question the propriety of contingency fee financing. Both rules therefore contain a kind of carve-out or saving clause for contingency fees. *See* MODEL RULE 1.8(e)(1); MODEL RULE 1.8(i)(2). Comments to Model Rule 1.8 acknowledge the similarity between prohibited transactions and contingent fees. *See* MODEL RULE 1.8 cmts. [10], [16]. As Comment [16] notes, the prohibitions in these rules are rooted in the common law of champerty and maintenance. Because these doctrines evolved to take account of the development of contingent-fee financing, the provisions of state rules of professional conduct preserved the distinction between prohibited assistance or acquisition of an interest in the client's cause of action, on the one hand, and permitted contingent-fee financing on the other. In substance, however, the permitted and prohibited transactions are similar – a non-party provides financial assistance to a party, or acquires an interest in the party's cause of action. Nevertheless, contingent fees are permitted, subject to the disclosure requirements of Model Rule 1.5(c).

### e.        Withdrawal and Substitution of Counsel.

Funding agreements may purport to restrict the client's right to terminate a lawyer or to retain substitute counsel. For example, a Michigan state bar ethics opinion refers to a contract with an unnamed ALF supplier under which a tort plaintiff agrees not to terminate an existing lawyer-client relationship or substitute a different lawyer without the express written consent of the ALF supplier. *See* Mich. State Bar Standing Comm. on Prof'l Ethics, Advisory Op. RI-321 (2000); *cf. Abu-Ghazaleh v. Chaul*, 36 So. 3d 691, 693 (Fla. Dist. Ct. App. 2009) (supplier "controlled the selection of the plaintiffs' attorneys"). As between lawyer and client, the client retains the right to terminate the lawyer-client relationship at any time, with no requirement of showing good cause, subject only to the requirement of obtaining court approval if the lawyer has entered an appearance for the client in pending litigation. MODEL RULE 1.16(a)(3), 1.16(c); RESTATEMENT § 32(1). Under principles of agency law applicable to the lawyer-client relationship, a client and lawyer cannot validly agree to a contract term that prohibits the client from discharging the lawyer. *See* RESTATEMENT § 31 cmt. d. Provisions in retention agreements between lawyers and clients purporting to limit the right of clients to discharge lawyers have been set aside as interfering with what should be the client's unrestricted right to terminate the relationship at any time. *See* RESTATEMENT § 32 cmt. b & Reporter's Note. Thus, the provision described in the Michigan opinion would likely be deemed void as a matter of public policy.

### f.        Third-Party Evaluations.

22

**DRAFT** The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

Lawyers are frequently requested to provide opinion letters to various third parties, attesting to their clients' compliance with legal requirements. For example, lenders often seek assurances that they will have a valid security interest in property the client is using as collateral for a loan.[35] Lawyers are permitted to provide an evaluation to a third party of a matter affecting the lawyer's client, as long as doing so is compatible with other aspects of the lawyer-client relationship. MODEL RULE 2.3(a). If there is a significant risk that the client's interests will be affected materially and adversely by providing the evaluation, the lawyer must first obtain the client's informed consent. MODEL RULE 2.3(b). If there is no significant risk to the client, the lawyer is impliedly authorized (by the client's direction to provide the third-party evaluation) to disclose information that would otherwise be protected by the duty of confidentiality. MODEL RULE 2.3 cmt. [5].

An ALF supplier may seek information about a client's case as part of the funding process.[36] As discussed below, there may be a significant risk that any information disclosed to an ALF supplier will no longer be covered by the attorney-client privilege. Thus, the client's informed consent is required before disclosure is permitted. In order to obtain informed consent, the lawyer must explain the risk of waiver of the privilege, advise the client whether the benefits of disclosure outweigh this risk, and advise the client of reasonably available alternatives. *See* MODEL RULE 1.0(e).

Simply paying a portion of the proceeds of a judgment or settlement to an ALF supplier holding a valid lien does not create a conflict of interest. *See, e.g., Leon v. Martinez*, 638 N.E.2d 511 (N.Y. 1994). A lawyer is required to deliver to a client or third party any funds in which the client or third party has an interest. MODEL RULE 1.15(d). The *Leon* case confirms that a lawyer does not violate the obligation of undivided loyalty to a client when paying funds to a third party which the third party is entitled to receive under a valid agreement. *See* 638 N.E.2d at 514. In a different case, the client might object to the lawyer disbursing the funds. In that instance, the lawyer's obligation is stated in Model Rule 1.15(e), which requires the lawyer to hold the disputed funds separately until the dispute is resolved.[37] There may a conflict of interest under Model Rule 1.7(a)(2) if the lawyer's financial interest in obtaining a share of the disputed funds materially limits the lawyer's ability to advocate effectively for the client's rightful share of the funds; in that case, full disclosure and informed consent by the affected client would be required.

## 2.      Interference with Lawyers' Professional Judgment.

The presence of ALF has the potential to interfere with the lawyer's exercise of candid, objective, independent judgment on behalf of the client. *See* MODEL RULE 2.1. Arguably the

---

[35] *See, e.g., Greycas, Inc. v. Proud*, 826 F.2d 1560 (7th Cir. 1987) (legal malpractice case).
[36] *See, e.g.,* Emanuel, *supra* note 1, at 8 (quoting application and disclosure form provided by LawCash, a consumer ALF supplier, which informs the claimants lawyer that "[w]e might ask you to provide . . . information about the current status of the litigation, and any other details that would help us to make our decision").
[37] *See, e.g., Fausone v. U.S. Claims, Inc.*, 915 So. 2d 626, 629 n.4 (Fla. Dist. Ct. App. 2005) (attorney followed the procedure outline in Rule 1.15 and deposited the funds with the court until the dispute was resolved).

rules safeguarding a lawyer's independence can be seen as reinforcing the prohibition on representing a client in circumstances in which there is a significant risk that a personal interest of the lawyer will materially limit the lawyer's representation of the client. *See* MODEL RULE 1.7(a)(2). Protecting professional independence is a significant rationale underlying the conflict of interest rules. *See*, *e.g*., MODEL RULE 1.7 cmt. [8]. Because the rules treat independence in a number of separate rules, however, it is important to consider how ALF may affect the lawyer's professional independence, and how these rules are implicated in ALF transactions.

ALF suppliers are businesses, operated with the goal of maximizing return on investments. The investments are in legal claims, acquired in whole or in part. The interests of a supplier in any given transaction, therefore, will be to maximize the expected value of a legal claim. In order to protect their investments and to maximize the expected value of claims, suppliers may seek to exercise some measure of control over the litigation, including the identity of lawyers pursing the claims, litigation strategy to be employed, and whether to accept a settlement offer or refuse it and continue to trial. The efforts of suppliers to maximize the return on their investment may create incentives and effects that differ from what would be expected in a similar case in which ALF funding was not present.[38]

An ALF supplier may, as part of the financing documentation, require the lawyer to acknowledge a duty to pay over the proceeds recovered by judgment or settlement or a part thereof to the ALF supplier. Executing such an acknowledgment may appear to compromise the lawyer's position later on, but as discussed previously, the lawyer may simply end up in the position of having custody over funds over which there is a dispute; in that case the lawyer's obligation is to keep the funds separate until the dispute is resolved. MODEL RULE 1.15(e). It may be the case, however, that the lawyer's own financial interests create a conflict of interest given the duty of loyalty owed to the client. Furthermore, ALF suppliers may also seek the right to advise on, or even veto, decisions made by lawyers during the course of litigation. In one Florida case, for example, the supplier had the right "to approve the filing of the lawsuit; controlled the selection of the plaintiffs' attorneys; recruited fact and expert witnesses; received, reviewed and approved counsel's bills; and had the ability to veto any settlement agreements." *Abu-Ghazaleh v. Chaul*, 36 So. 3d 691, 693 (Fla. Dist. Ct. App. 2009). The court deemed this control sufficiently extensive to warrant treating the supplier as a "party" for the purposes of a fee-shifting statute.[39] Case 2 presents a hypothetical scenario of a client entering into a contract with an ALF supplier that obligates the client to do various things, such as permitting the supplier to inspect pleadings, waiving confidentiality, and giving the supplier a say in the hiring and firing of counsel and the decision whether to settle. While cast in extreme terms, this hypothetical raises the important and general problem of whether certain professional duties owed by lawyers to clients are non-delegable. For example, courts frequently state that the

---

[38] *See*, *e.g*.,. *Weaver, Bennett & Bland, P.A. v. Speedy Bucks, Inc.*, 162 F. Supp. 2d 449, 451 (W.D.N.C. 2001) (alleging that a supplier keeping tabs on its investment caused a plaintiff to reject a reasonable settlement offer).
[39] It does not necessarily follow that the supplier would be deemed a "client" for other purposes, such as the application of concurrent or successive client conflicts rules. There is an extensive body of law, beyond the scope of this White Paper, governing the formation of the attorney-client relationship. *See generally* RESTATEMENT § 14 & Reporter's Note; GEOFFREY C. HAZARD, JR., ET AL., THE LAW AND ETHICS OF LAWYERING ch. 6 (5th ed. 2010), ("Who Is the Client?").

**DRAFT**  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

client's right to discharge a lawyer is virtually absolute.[40]   As between the lawyer and client, this means that a lawyer may not include a provision in a retainer agreement restricting the client's right to discharge the lawyer; any such provision would not be enforceable.  *See* RESTATEMENT § 31 cmt. d.  Similarly, as between the lawyer and client, the client retains the authority to decide whether to settle a civil lawsuit.  MODEL RULE 1.2(a).  In both of these cases, it is clear that, *as between the lawyer and client*, the lawyer may not do anything to interfere with the client's rights.  But does it follow that the client cannot agree by contract with a third party ALF supplier to cede these rights to the ALF supplier?  The fiduciary nature of the client-lawyer relationship is the reason for the unenforceability of a client-lawyer contract provision interfering with certain client rights.  In an arm's-length transaction, however, these fiduciary considerations are absent.  There would seem to be no reason, as a matter of contract law, to regard these contractual provisions as unenforceable, absent some facts establishing a defense such as duress or unconscionability.

Regardless of whether the provisions delegating decision-making authority to the ALF supplier would be enforceable as a matter of contract law, they may create such a limitation on an attorney's professional judgment that a reasonable lawyer might conclude that it is impossible to provide competent representation to that client.  A lawyer and client may agree among themselves to limit the scope of the lawyer's duties, but these limitations must be reasonable under the circumstances (and the client must give informed consent to the limitation).  MODEL RULE 1.2(c).  A contract between a would-be client and an ALF supplier may create such onerous duties on the part of the client that a lawyer would be unable to represent the client, even in a limited-scope representation.  For example, a provision in a contract may permit the supplier to refuse further funding if the lawyer makes decisions in the course of the representation with which the supplier has a fundamental disagreement.  The lawyer, on the other hand, has an obligation to act with reasonable competence and diligence in the representation of the client, and may reasonably believe that the funder's second-guessing of decisions made in the representation of the client is an unreasonable interference with the lawyer's professional judgment.

While it is outside the scope of this White Paper, it should be noted briefly that state common law doctrines of champerty and maintenance may bear on the degree of control an ALF supplier is permitted to exercise over the representation.[41]   Even in states permitting an ALF supplier to obtain an interest in a party's cause of action, retention by the supplier of control over the decision-making of the party and its counsel, via a contractual provision between the supplier and the party, may be deemed unlawful as champerty or maintenance.[42]

---

[40]  *See, e.g., Balla v. Gambro, Inc.*, 584 N.E.2d 104 (Ill. 1991) (citing the client's near-absolute right to terminate counsel as the principal reason for not recognizing a cause of action for retaliatory discharge).

[41]  *See* Sebok, *supra* note 4, at 109-12.

[42]  *See, e.g., Am. Optical Co. v. Curtiss*, 56 F.R.D. 26, 29–32 (S.D.N.Y. 1971) (agreement limiting litigant's control over whether to sue violated Fed. R. Civ. P. 17(a) requirement of suit brought by real party in interest); *Kraft v. Mason*, 668 So. 2d 679, 682 (Fla. Dist. Ct. App. 1996) ("officious intermeddling" is an element of champerty); *Huber v. Johnson*, 70 N.W. 806, 808 (Minn. 1897) (voiding contract that required plaintiff to pay funder a penalty if plaintiff sued without funder's consent).

On the other hand, some ALF suppliers disclaim any control over the decision-making of lawyers, stating that they are in an entirely passive role.  *See*, *e.g.*, Comments of Burford Group, LLC to the Am. Bar Ass'n Working Group on Alternative Litig. Fin. 5 (Feb. 15, 2011) (on file with author) ("Burford does not hire or fire the lawyers, direct strategy or make settlement decisions.  Burford is a purely passive provider of non-recourse financing to a corporate party."); Comments of Juridica Capital Mgmt. Ltd. to the Am. Bar Ass'n Working Group on Alternative Litig. Fin. 6 (Feb. 17, 2011) (on file with author) ("We do not seek to control any of the decisions regarding the conduct of any litigation that we finance, nor are we aware of any other supplier in this market segment who does.").  Some reported cases note that the ALF supplier exercised no control over the lawyer's representation of the client.  *See*, *e.g.*, *Anglo-Dutch Petroleum Int'l, Inc. v. Haskell*, 193 S.W.3d 87, 104 (Tex. Ct. App. 2006) ("[T]here is no evidence that [the ALF suppliers] maintained any control over the Halliburton lawsuit.  The agreements do not contain provisions permitting [the ALF suppliers] to select counsel, direct trial strategy, or participate in settlement discussions, nor do they permit [the ALF suppliers] to look to Anglo–Dutch's trial counsel directly for payment.").

Where an ALF transaction is otherwise lawful, an attorney must exercise care to ensure that the arrangement does not run afoul of Model Rule 5.4(c)'s prohibition against compromising the lawyer's independent professional judgment.  Situations can be foreseen (and perhaps some cannot) in which the interests of the ALF supplier conflicts with what the lawyer perceives to be in the best interest of the client. The existence of the financing arrangement may sow confusion about who actually owns the claim, who controls the lawsuit, the role (if any) of the ALF supplier participating in significant decision-making during the litigation, and how to resolve conflicts between the client's directive, the ALF supplier's financial expectations, and the lawyer's assessment of the client's best interests.

### a.      Referring Clients to ALF Suppliers.

Numerous state ethics opinions have considered the issue of whether a lawyer may provide information to clients about the availability of ALF, or refer clients to ALF suppliers. The majority of opinions concludes that it is permissible to inform clients about funding companies,[43] or to refer clients to ALF suppliers.[44]  If it is legal for a client to enter into the transaction, there would appear to be no reason to prohibit lawyers from informing clients of their existence.  A more difficult question is whether lawyers should evaluate the terms of the transaction for their fairness or to advise the client whether to accept the funding.  As with any subject on which a lawyer offers an opinion, a lawyer should ensure his or her competence to

---

[43]   *See*, *e.g.*, Fla. State Bar Prof'l Ethics Comm., Formal Op. 00-3 (2002); S.C. Bar Ethics Advisory Comm., Advisory Op. 94-04 (1994).

[44]   *See*, *e.g.*, Ariz. State Bar Comm. on the Rules of Prof'l Conduct, Formal Op. 91-22 (1991); D.C. Bar Legal Ethics Comm., Ethics Op. 196 (1989); Md. State Bar Ethics Comm., Advisory Op. 89-15 (1988); Nev. State Bar Standing Comm. on Ethics and Prof'l Responsibility, Formal Op. 29 (2003); N.J. Supreme Court Advisory Comm. on Prof'l Ethics, Advisory Op. 691 (2001); N.Y.C. Bar Ass'n Comm. on Prof'l and Judicial Ethics, Formal Op. 2011-02 (2011); N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Advisory Op. 769 (2003); N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Advisory Op. 666 (1994); Phila. Bar Ass'n Prof'l Guidance Comm., Advisory Op. 91-9 (1991).

**DRAFT**  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

evaluate the ALF transaction.  *See* MODEL RULE 1.1.  At a minimum the lawyer should become familiar with the terms of the transaction and explain the risks and benefits of the transaction to the client in terms the client can understand.  *See* MODEL RULE 1.4.  Competent representation and reasonable communication may also require the lawyer to compare the proposed transaction with other available means of obtaining funding, and possibly to recommend alternatives.  If the lawyer is not competent to evaluate the risks and benefits of the transaction, the lawyer should refer the client to a competent advisor.

Many state bar ethics opinions permitting referrals to ALF suppliers include qualifications, reflecting other ethical obligations owed by lawyers to their clients.  Typical limitations include:  Lawyers may not disclose confidential information to an ALF supplier without the client's informed consent[45]; lawyers should warn clients about the risk of waiver of the attorney-client privilege (often as part of obtaining informed consent to disclose confidential information)[46]; lawyers may not have an ownership interest in the ALF supplier to which the client is referred[47]; lawyers may not receive referral fees or otherwise benefit financially as a result of referring the client to the ALF supplier.[48]  Some opinions include the proviso that the lawyer must be satisfied that the funding arrangement is in the client's best interests,[49] which implicates the concerns, discussed in Section V.D, below, about the lawyer's competence to make this assessment.  Many opinions admonish lawyers in general terms to avoid any interference with their professional judgment as a result of involvement in the ALF transaction.[50]  A South Carolina opinion even requires the lawyer to inform the ALF supplier in writing that the client, not the funding company, retains the right to control all aspects of the litigation.[51]

The prevalence of these qualifications in state bar opinions shows that the interference with independent professional judgment is one of the principal perceived risks associated with ALF.  The opinions also suggest, however, that this risk can be managed, by full disclosure to the client, complying with the obligation to obtain the client's informed consent to any potential

[45]  *See, e.g.*, Phila. Bar Ass'n Prof'l Guidance Comm., Advisory Op. 2003-15 (2003); Md. State Bar Ethics Comm., Advisory Op. 00-45 (2000).
[46]  *See, e.g.*, Conn. State Bar Comm. on Prof'l Ethics, Informal Op. 99-42 (1999); Md. State Bar Ethics Comm., Advisory Op. 92-25 (1991); N.J. Supreme Court Advisory Comm. on Prof'l Ethics, Advisory Op. 691 (2001); N.Y.C. Bar Ass'n Comm. on Prof'l and Judicial Ethics, Formal Op. 2011-02 (2011); Phila. Bar Ass'n Prof'l Guidance Comm., Advisory Op. 99-8 (2000).
[47]  *See, e.g.*, N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Advisory Op. 769 (2003); N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Advisory Op. 666 (1994).  *Contra* Tex. Supreme Court Prof'l Ethics Comm., Advisory Op. 483 (1994) (permitting lawyer to have ownership interest in company that makes loans to the lawyer's clients); Tex. Supreme Court Prof'l Ethics Comm., Advisory Op. 465 (1991) (same).
[48]  *See, e.g.*, Md. State Bar Ethics Comm., Advisory Op. 94-45 (1994); N.J. Supreme Court Advisory Comm. on Prof'l Ethics, Advisory Op. 691 (2001); N.Y.C. Bar Ass'n Comm. on Prof'l and Judicial Ethics, Formal Op. 2011-02 (2011) (referral fee prohibited if it would compromise lawyer's independence of judgment); Ohio Supreme Court Bd. of Comm'rs on Grievances and Discipline, Advisory Op. 2002-2 (2002).
[49]  *See, e.g.*, Fla. State Bar Prof'l Ethics Comm., Formal Op. 00-3 (2002).  *Contra* Hawaii Supreme Court Disciplinary Bd., Formal Op. 34 (1994) (lawyer not required to determine whether the arrangement is fair to the client).
[50]  *See, e.g.*, Md. State Bar Ethics Comm., Advisory Op. 00-45 (2000).
[51]  S.C. Bar Ethics Advisory Comm., Advisory Op. 94-04 (1994).

interference with a client's interests (such as confidentiality), and also awareness on the part of the lawyer of risky contract provisions.

**Case 1**, above, does not appear at the outset to involve any potential interference with the lawyer's professional judgment. The client has asked his lawyer whether it is advisable to sell a portion of his tort claim to an ALF supplier. In the variation on Case 1, the lawyer has acquired expertise in this area and is likely competent to advise the client on the risks and benefits of the ALF transaction. If the lawyer did not have this experience and could not evaluate the potential risks and benefits, the lawyer may honestly answer "I don't know" or, in the alternative, the lawyer might do sufficient research to be in a position to render competent legal advice to the client. *See* MODEL RULE 1.1, and see the discussion below, Section V.D, on the lawyer's duty of competence in advising on ALF transactions. In either case, the ethical obligation here is primarily one of rendering competent legal advice. The mere referral of the client to an ALF supplier does not implicate the lawyer's independent professional judgment.

### b.      Effect on Settlement.

### i.      Express Contract Provisions.

A client may agree, in a contract with an ALF supplier, to seek the consent of the ALF supplier before entering into any settlement of the client's cause of action. The Working Group reviewed numerous contracts submitted by ALF suppliers that expressly disclaim any control by the supplier over the settlement decision.[52] Nevertheless, reported cases reveal instances in which ALF suppliers have attempted to influence the decision whether or not to settle a claim.[53]

An agreement to obtain the consent of the ALF supplier to any settlement may interfere with the ability of the attorney to exercise independent professional judgment in the representation of the client. Although the decision to settle is ultimately one for the client, Model Rule 1.2(a), attorneys have a duty to provide competent advice regarding settlement, evaluating the offer from the standpoint of the client's best interests in light of the terms of the offer and the risk of proceeding with the litigation.[54] The attorney's advice should be based

---

[52] For example, Oasis Legal Funding submitted its standard Nebraska purchase contract, which in a prominent disclosure states:

> **PURCHASER OASIS LEGAL FINANCE, LLC, AS THE COMPANY AGREES THAT IT SHALL HAVE NO RIGHT TO AND WILL NOT MAKE ANY DECISIONS WITH RESPECT TO THE CONDUCT OF THE UNDERLYING LEGAL CLAIM OR ANY SETTLEMENT OR RESOLUTION THEREOF AND THAT THE RIGHT TO MAKE THOSE DECISIONS REMAINS SOLELY WITH YOU AND YOUR ATTORNEY IN THE CIVIL ACTION OR CLAIM.**

Oasis Form Purchase Agreement, at 7.

[53] *See, e.g.*, *Abu-Ghazaleh v. Chaul*, 36 So. 3d 691, 694 (Fla. Dist. Ct. App. 2009) (deeming ALF supplier a "party" liable for opposing party's attorney's fees where, *inter alia*, supplier had the right to approve any settlement entered into by the recipient of funds).

[54] Although there is a split of authority, many courts hold lawyers to the general standard of reasonable care under the circumstances when advising a client whether or not to accept an offer of settlement. *See, e.g.*, *Ziegelheim v. Apollo*, 607 A.2d 1298 (N.J. 1992). The relevant "circumstances" include the inherent uncertainty involved in these

**DRAFT**  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

solely on what is best for the client, without regard to extraneous considerations such as the lawyer's interests or the interests of third parties.  On the other hand, considerations of freedom of contract suggest that clients should be permitted to delegate some authority over the handling of their cases to third parties, in exchange for some valuable consideration.

As a matter of agency law, the authority to settle a claim initially belongs to the client, but the client may delegate *revocable* settlement authority to the lawyer.  *See* RESTATEMENT § 22(1), (3) & cmt. c.  In principle there would appear to be no reason why the client could not delegate revocable settlement authority to other agents.[55]  Under general agency law principles, any delegation of authority can be revoked by the principal.  The more difficult question is whether a user of ALF financing may contractually agree to make an *irrevocable* authorization to the ALF supplier to approve or reject a settlement offer.  Contractual limitations on the client's authority to accept or reject settlement offers have been invalidated where the contract is between the attorney and client.  *See* RESTATEMENT § 22 & Reporter's Note.  As discussed in Section V.A.2, above, as a matter of contract law a client may be able to enter into an enforceable provision in a contract with an ALF supplier, giving the supplier the right to accept or reject a proposed settlement.  It is a significant open question whether that contractual delegation is such a significant limitation on the lawyer's representation of the client – because it interferes with the lawyer's exercise of independent professional judgment – that the lawyer must withdraw from the representation of a client who has agreed to such a contract provision.  *See* MODEL RULE 1.2(c) (only reasonable limitations on scope of representation are permissible); MODEL RULE 1.16(a)(1) (withdrawal required where representation would result in violation of the rules of professional conduct).

### ii.  Implicit Interference and the Parties' Incentives.

Apart from an express contractual grant to an ALF supplier of the right to approve a settlement offer, the terms of an ALF transaction may affect the calculus of plaintiffs considering whether to settle a claim.  A plaintiff may be reluctant to accept what would otherwise be a reasonable settlement offer because of a contractual obligation to repay a supplier a substantial portion of the proceeds of the settlement.  For example, in the *Rancman* case, the Ohio Supreme Court was worried about the effect on settlement of the supplier's right to receive the first $16,800 of settlement proceeds, in exchange for having previously provided the plaintiff with $6,000.[56]  The court noted that, assuming the plaintiff was also obligated to pay her attorney a 30% contingency fee, she would be indifferent between a settlement offer of $24,000 and nothing at all, because if she received nothing she would be permitted to keep the $6,000 advanced by the supplier.[57]  Thus, the plaintiff would have an absolute disincentive to settle for

---

decisions, but an attorney should provide the client with an informed judgment concerning the factors that go into making a decision whether to settle or proceed to trial.  *See generally* 4 RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 31:42 (2009).

[55]  *See generally* Grace M. Giesel, *Enforcement of Settlement Contracts:  The Problem of the Attorney Agent*, 12 GEO. J. LEGAL ETHICS 543 (1999).

[56]  *Rancman v. Interim Settlement Funding Corp.*, 789 N.E.2d 217 (Ohio 2003).

[57]  *Id.* at 220.

anything less than $24,000.  (Compounding the disincentive is the fact that the nonrecourse nature of ALF means that there is no downside for the plaintiff in going to trial, because settling for less than the amount owed to the ALF supplier yields the plaintiff nothing, while losing at trial means owing nothing to the ALF supplier, so the plaintiff still receives nothing.)  On the assumption that $24,000 would otherwise be a reasonable settlement offer, the presence of ALF seems to have an adverse impact on the salutary goal of terminating litigation by settlement.[58]

Ironically, depending on the specifics of a funding agreement, ALF may also over-incentivize settlements if plaintiffs who are recipients of ALF funding are concerned about the escalating obligation to repay.  While some ALF contracts tie the amount owed to the amount of the judgment or settlement, other agreements set the repayment amount with reference to the time elapsed since the funding was made.  *See, e.g.*, the transaction described in *Fausone v. U.S. Claims, Inc.*, 915 So. 2d 626 (Fla. Dist. Ct. App. 2005); *cf.* the court's concern in *Echeverria v. Estate of Lindner*, No. 018666/2002, 2005 WL 1083704 (N.Y. Sup. Ct. Mar. 2, 2005).  A plaintiff may therefore have an incentive to accept an early but low settlement, rather than going to trial or waiting for a better settlement offer, because the plaintiff's net recovery after repaying the supplier would be higher in the early stages of litigation.

The ethical issue for attorneys is how such disincentives on the part of their clients affects their exercise of independent professional judgment.  Not all situations that are unpleasant *ex post* are the result of decisions that were unreasonable *ex ante*.  Assuming the client had been fully informed of all the material terms of the ALF transaction and that the client had sought legal advice before entering into the transaction, a reasonable attorney appropriately exercising independent judgment might have advised the client in the above example to accept the $6,000 in funding in exchange for an obligation to repay the first $16,800 out of settlement proceeds.  If the client were short of cash and facing an emergency such as eviction or the urgent need for a medical procedure, the client's short-term need for funds may have been a more important consideration than the *ex post* disincentive to accept what would otherwise be a reasonable settlement offer.  Perhaps the client's receipt of short-term funds enabled the client to persist in the litigation and receive a better settlement offer than would have been available if the client were forced to settle prematurely.  Similarly, a client who agreed to an early settlement offer because it maximized the client's net recovery may have acted reasonably, given the client's presumed desire to receive payment up front in exchange for some of the value of the cause of action.

An attorney's duty is to provide competent advice to the client considering an offer of settlement.[59]  The attorney should consider what is best for the client, all things considered.  If, in the attorney's judgment, the client would be better off rejecting a settlement offer and going to trial, then the attorney should inform the client of this judgment, although the authority to accept or reject the settlement offer remains with the client.  *See* Model Rule 1.2(a).  One of the factors relevant to the client's decision might be the obligation to pay the fee charged by the ALF

---

[58]  *See also Weaver, Bennett & Bland, P.A. v. Speedy Bucks, Inc.*, 162 F. Supp. 2d 449 (W.D.N.C. 2001) (plaintiff refused settlement offer of $1,000,000 because repayment obligations to suppliers made it a losing proposition to settle for anything less than $1,200,000).

[59]  *See generally* 4 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice § 31:42 (2009).

**DRAFT**  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

supplier.  Other factors unrelated to the merits of the lawsuit may be present as well, such as the client's risk tolerance, discount rate, need for funds, and preferences regarding a public trial. The presence of ALF is not different in kind from the other factors that are part of virtually any decision to settle; thus, they do not present distinctive ethical issues, beyond the duty of competence and the client's authority to make settlement decisions.  All fee arrangements create conflicts of interest to some extent.  *See* RESTATEMENT § 35 cmt. b.  For example, an early settlement may result in the lawyer obtaining a higher effective hourly rate, as compared with pursuing the case through trial.[60]  These conflicts do not rise to the level of a material limitation, requiring disclosure and informed consent under Model Rule 1.7(a), without some financial interest of the lawyer above and beyond the pervasive interest in obtaining compensation.  If the lawyer does have some kind of extraordinary interest beyond the fee, such as a financial investment in the ALF supplier, the lawyer must also comply with the requirements of Model Rules 1.7 (conflicts created by lawyer's financial interest) and 1.8(a) (business transactions with clients).

### c.        Fee-splitting:  Model Rule 5.4(a).

With certain enumerated exceptions, none of which are relevant here, a lawyer may not share legal fees with a nonlawyer.  MODEL RULE 5.4(a).  This prohibition is intended to protect the lawyer's professional independence of judgment.  MODEL RULE 5.4, cmt. [1].

A few state ethics opinions have addressed the fee-splitting rule in connection with ALF transactions.[61]  These opinions state that a lawyer may not agree to give an ALF supplier a share of or a security interest in the fee the lawyer expects to receive under a contingency fee agreement with the client.  Some cases, however, have reached the opposite conclusion.  In *Core Funding Group v. McDonald*, No. L-05-1291, 2006 WL 832833 (Ohio Ct. App. Mar. 31, 2006), the Ohio Court of Appeals stated that it is not inappropriate for a lender to take a security interest in an attorney's accounts receivable, to the extent permitted by commercial law.  This is an ordinary secured transaction and does not violate the prohibition on sharing fees with a nonlawyer, the court concluded.  Following these principles, no prohibited fee splitting would be involved if the lawyer repays interest on a loan taken out by the lawyer to fund the litigation.

### d.        Third-party payment of fees: Model Rules 1.8(f) and 5.4(c).

Two provisions of the Model Rules seek to limit the influence of third-party payors of attorneys' fees.  Model Rule 1.8(f) prohibits lawyers from accepting compensation from a third party for the representation of a client unless the client gives informed consent, there is no

---

[60] *See* HAZARD, *supra* note 39, at 798-801 (discussion of the implicit conflicts of interest created by differences in effective hourly contingency fee rates).

[61] *See, e.g.*, Ohio Supreme Court Bd. of Comm'rs on Grievances and Discipline, Advisory Op. 2004-2 (2004); Utah State Bar Ethics Advisory Opinion Comm., Advisory Op. 97-11 (1997); Va, State Bar Standing Comm. on Legal Ethics, Advisory Op. 1764 (2002).

interference with the lawyer's exercise of independent professional judgment, and confidential information is protected as required by Model Rule 1.6.  Model Rule 5.4(c) reinforces the protection of independent professional judgment by directing lawyers not to "permit a person who . . . pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such services."  These rules overlap with, and reinforce, the lawyer's general obligation stated in Model Rule 2.1 to "exercise independent professional judgment and render candid advice."  As noted previously, in connection with the decision to settle, many ALF suppliers disclaim any effort to regulate the decision-making of lawyers.  Even without this disclaimer by the suppliers, however, Model Rules 1.8(f), 2.1, and 5.4(c) require lawyers to, in effect, insist that suppliers not attempt to regulate the professional judgment of lawyers.  If the If the supplier attempts to interfere with the lawyer's professional judgment, a lawyer would have no choice but to withdraw from the representation.  *See* MODEL RULE 1.16(a)(1) (withdrawal mandatory where representation would result in violation of the rules of professional conduct).

These rules do not apply to purely passive investments.  Model Rule 1.8(f) is not applicable to ALF transactions that do not involve the payment of "compensation for representing a client."  If a tort plaintiff, for example, receives $10,000 in exchange for a promise to repay the supplier out of the proceeds of a judgment or settlement, the lawyer is not receiving compensation from the supplier.  Similarly, Model Rule 5.4(c) applies only to attempts to direct the lawyer's exercise of judgment by "a person who . . . pays the lawyer."  The same hypothetical supplier who obtains an assignment of a share of a tort plaintiff's claim for $10,000 is not paying the lawyer.  Nevertheless, the lawyer always has a duty under Model Rule 2.1 to ensure that she is exercising independent professional judgment solely for the benefit of the client.

## B.    Confidentiality, Privilege, and Work Product.

As part of their underwriting process, ALF suppliers often require the lawyer to release information or to provide a litigation assessment referencing such information.  *See, e.g.*, *Fausone v. U.S. Claims, Inc*., 915 So. 2d 626, 628 (Fla. Dist. Ct. App. 2005), *aff'd*, 931 So. 2d 899 (Fla. 2006) ("[tort plaintiff's] attorneys also provided [the supplier] with information about her claim to assist [the supplier] in deciding whether to advance her funds").[62]  That information is manifestly relevant to the decision of the ALF supplier.  Such disclosures also clearly involve potential waivers of confidentiality and privilege that require the client's consent.  A lawyer must exercise reasonable care to preserve the confidentiality of information protected by Model Rule 1.6, and to safeguard against inadvertently waiving the protection of the attorney-client privilege and the work product doctrine.  *See* MODEL RULE 1.6, cmts. [16]–[17].

---

[62]  *See also* Emanuel, *supra* note 1, at 8 (quoting application and disclosure form provided by LawCash, a consumer ALF supplier, which informs the claimants lawyer:  "We might ask you to provide medical reports, emergency room reports, accident reports, expert testimony, insurance information, information about the current status of the litigation, and any other details that would help us to make our decision.").  Some of the information sought here may be covered by the attorney-client privilege (e.g. "current status of the litigation" if it revealed confidential attorney-client communications); other information might be protected by the work product doctrine (e.g. expert reports).  All of it would be subject to the duty of confidentiality in Model Rule 1.6(a).

**DRAFT**  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

In public comments, many ALF suppliers stated that they do not seek access to information covered by the attorney-client privilege.  *See, e.g.*, Comments of Juridica Capital Mgmt. Ltd. to the Am. Bar Ass'n Working Group on Alternative Litig. Fin. 2 (Feb. 17, 2011) (on file with author) ("Our experience is that ALF funders generally do not need access to privileged or confidential information in order to make financing decisions.  We perform our due diligence by relying primarily on publicly-filed pleadings and memoranda and other non-privileged materials.  We do not seek attorney-client privileged information."); Comments of Oasis Legal Finance/Alliance for Responsible Consumer Legal Funding to the Am. Bar Ass'n Working Group on Alternative Litig. Fin. 4 (Apr. 5, 2011) (on file with author) ("By and large, consumer legal funding companies have no need to request privileged information from attorneys regarding their clients.").  On the other hand, some agreements between ALF suppliers and clients have provided for the supplier to have a right to inspect all documents, including those covered by the attorney-client privilege.  *See, e.g.*, Mich. State Bar Standing Comm. on Prof'l Ethics, Advisory Op. RI-321 (2000) (discussing an agreement between a civil tort plaintiff and an unnamed ALF supplier in which the supplier is "entitled to inspect all records, including all privileged attorney-client records, relating to the collateral") (internal quotation marks omitted).

Lawyers considering disclosure of information to ALF suppliers must be aware of three distinct but overlapping legal doctrines:  The duty of confidentiality (as provided for by the Model Rules and agency law), the evidentiary attorney-client privilege, and the work-product doctrine (with its common law origin and codification in the rules of civil procedure).  Questions of the scope of duty, client consent, and particularly waiver of protection vary subtly among these confidentiality-related doctrines.

## 1. Duty of Confidentiality:  Model Rule 1.6.

A lawyer must not disclose "information relating to the representation of a client" without the client's informed consent, unless the disclosure is impliedly authorized in order to carry out the representation.  MODEL RULE 1.6(a).  The scope of the duty of confidentiality is significantly broader than the attorney-client privilege (see below), which protects only communications made in confidence between attorney and client, for the purpose of obtaining legal assistance.[63]  The duty of confidentiality imposes duties on lawyers to safeguard

---

[63]  There is considerable jurisdictional variation with respect to the definition of confidential information.  For example, the District of Columbia and New York retain the Model Code's distinction between confidences (communications protected by the attorney-client privilege) and other information to which the duty of confidentiality is applicable.  The definition of non-privileged protected information is narrower than the expansive Model Rule 1.6 term, "information relating to the representation."  "Secrets" in the D.C. rules include "other information gained in the professional relationship that the client has requested be held inviolate, or the disclosure of which would be embarrassing, or would be likely to be detrimental, to the client." D.C. RULES OF PROF'L CONDUCT R. 1.6(b).  New York similarly defines protected confidential information as follows:

"Confidential information" consists of information gained during or relating to the representation of a client, whatever its source, that is (a) protected by the attorney-client privilege, (b) likely to be embarrassing or detrimental to the client if disclosed, or (c) information that the client has requested be kept confidential.  "Confidential information" does not ordinarily include (i) a lawyer's legal knowledge or

information (MODEL RULE 1.6 cmt. [16]), but it does not create an evidentiary privilege that may be asserted in response to an official demand for information, such as a subpoena or a question at trial or in a deposition.  However, competent representation does require an attorney to exercise reasonable care to ensure that the attorney-client privilege and work product protection are not inadvertently waived.  *Cf.* RESTATEMENT § 79 cmt. h (no waiver if the client or lawyer took reasonable precautions to safeguard against inadvertent disclosure).  Thus, attorneys representing clients in connection with ALF transactions must exercise reasonable care to ensure that confidential client information is protected.

A client may give informed consent to the disclosure of confidential information.  MODEL RULE 1.6(a).  As noted in connection with conflicts of interest, informed consent means the client's agreement "after the lawyer has communicated adequate information and explanation about the material risks and reasonably available alternatives to the proposed course of conduct." MODEL RULE 1.0(e).  One of the risks of disclosing confidential information to an ALF supplier is that the disclosure will cause a waiver of the attorney-client privilege or (less likely) the protection of the work product doctrine.  The following section discusses the law governing the assertion and waiver of the attorney-client privilege.  Because there is considerable uncertainty with respect to some aspects of this law, such as the applicability of the common-interest exception to the principle that voluntary disclosure waives the privilege, a client's informed consent to share confidential information with an ALF supplier must be predicated upon full disclosure of the risk of a loss of privilege.

In **Case 2**, the client has come to the lawyer subject to a pre-existing contractual obligation to share all relevant information with an ALF supplier and to waive any applicable duty of confidentiality.  The client may or may not appreciate the significance of these contract terms.  Thus, an attorney should explain the risks associated with sharing confidential information with the ALF supplier and should obtain the client's informed consent to the attorney providing this information to the supplier.

## 2. Attorney-Client Privilege.

The attorney-client privilege is an evidentiary doctrine with deep roots in the common law.  It protects confidential communications from discovery by opposing parties in litigation. Because it is a matter for case-by-case development, there is considerable variation in the

---

legal research or (ii) information that is generally known in the local community or in the trade, field or profession to which the information relates.

N.Y, RULES OF PROF'L CONDUCT R. 1.6(a).  Finally, California Business and Professions Code § 6068(e) (incorporated by reference into proposed California Rule 1.6(a)) requires lawyers to protect the confidences and secrets of clients.  The scope of protected information has been defined as "information gained by virtue of the representation of a client, whatever its source, that (a) is protected by the lawyer-client privilege, (b) is likely to be embarrassing or detrimental to the client if disclosed, or (c) the client has requested be kept confidential."  *See* proposed CAL. RULES OF PROF'L CONDUCT R. 1.6 cmt. [3].

Some disclosures of information relating to representation, which would be prohibited under Model Rule 1.6(a), would not violate the duty of confidentiality in jurisdictions such as New York, D.C., or California, which preserve the Model Code's narrower definition of protected information.

**DRAFT**  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

specific contours of the privilege, both in terms of prerequisites for coverage and waiver doctrines.  This White Paper will discuss privilege and waiver in general terms, but attorneys must be mindful of differences among jurisdictions, and also of the fact-specific nature of many privilege and waiver cases.  It is also important to emphasize that the attorney-client privilege is an aspect of state and federal evidence law, and develops independently of the duty of confidentiality recognized in state rules of professional conduct.

### a.      Scope.

The attorney-client privilege covers communications made between privileged persons, in confidence, for the purpose of obtaining or providing legal assistance for the client.  RESTATEMENT § 68.  "Privileged persons" include the attorney, the client, and agents of the lawyer who facilitate the representation.  RESTATEMENT § 70.  Experts retained by the lawyer to facilitate the representation, such as accountants and economists, may be considered privileged persons if they facilitate the client-lawyer communication – in effect acting as translators of technical material.  *See*, *e.g.*, *U.S. v. Kovel*, 296 F.2d 918 (2d Cir. 1961).

The definition of privileged persons is related to the issues considered below, regarding the common interest doctrine, which functions as an exception to the rule of waiver by voluntary disclosure.  For example, the disclosure by an attorney of privileged communications to a liability insurer, pursuant to a cooperation clause in an insurance policy, may not waive the privilege with respect to third parties.  The conclusion of non-waiver may be based upon the premise that the insurer is also a privileged person, along with the attorney and client.  *See* RESTATEMENT § 70 cmt. f & Reporter's Note.  Alternatively, it may be based upon the premise that the client and the insurer are either jointly represented clients (*see* RESTATEMENT § 75) or have a common interest (*see* Restatement § 76) in the litigated matter.[64]

### b.      Waiver by Voluntary Disclosure.

Disclosure of privileged communications to anyone other than another privileged person waives the privilege and the communication is subject to discovery.[65]  Because the privilege protects *confidential* communications between attorney and client, conduct by either party that is inconsistent with the ongoing confidentiality of the communication destroys the rationale for the privilege.  Courts generally take a strict approach to privilege waivers, finding that any voluntary disclosure of private communications will waive the privilege.  Some courts have recognized a doctrine of "limited waiver," permitting disclosure to some parties (generally government agencies) without waiving the privilege with respect to other parties (such as private litigants).[66]

---

[64] *See* PAUL R. RICE, ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES § 9:64 (2d ed. & Supp. 2010).

[65] *See generally Id.* § 9:28.

[66] As is often the case with respect to the attorney-client privilege, courts use terminology inconsistently.  *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289 (6th Cir. 2002) uses the term "selective waiver" to refer to the attempt by a party to share confidential communications with the government but continue to assert the privilege to thwart discovery of the communications by a private litigant.  A leading treatise on the attorney-client privilege, however, uses the term "selective waiver" to refer to disclosure of one part of a privilege

*See, e.g., Diversified Indus. v. Meredith*, 572 F.2d 596 (8th Cir. 1978).  The considerable majority of courts, however, do not recognize limited waiver; thus, any disclosure of confidential communications will waive the privilege that otherwise would have protected the communications from discovery.  *See, e.g., In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289 (6th Cir. 2002) (citing cases, and finding waiver as to all parties resulting from disclosure of documents by privilege-holder to the Department of Justice).  This is the case even if the selective or limited disclosure is made subject to a confidentiality agreement.

Thus, under privilege law in most jurisdictions, sharing of privileged communications with an ALF supplier is a voluntary disclosure that may effect a waiver of the attorney-client privilege.  A court reaching the contrary conclusion of non-waiver may reason that the supplier is another privileged party, along with the attorney and client, or that the supplier and the client have a common interest in the litigated matter.

c.       **Common Interest Exception.**

The common interest exception is not, strictly speaking, an expansion of the attorney-client privilege.  Rather it is a rule of non-waiver that stands as an exception to the general principle that disclosure of privileged communications to a non-privileged party waives the privilege.  *See* RESTATEMENT § 76(1).  The common interest exception is closely related to the privilege for jointly represented co-parties (*see* RESTATEMENT § 75), with the difference being that parties may have a common interest even if they are not represented by the same lawyer.  Courts and lawyers sometimes use the term "joint defense" privilege to refer to these situations, but the common interest doctrine is not limited to defendants, to formal parties to litigation, or to litigated matters.  *See* RESTATEMENT § 76 cmt. b & Reporter's Note.  The most important predicate for the application of this doctrine is that the multiple parties have a common interest in the matter and agree to share confidential information concerning the matter.

There is a significant unresolved question of whether disclosure of privileged communications to an ALF supplier waives the privilege – that is, whether the ALF supplier and the client have interests sufficiently in common to fall within the rule of non-waiver.  One case has held that materials protected under the attorney-client privilege provided to an ALF firm *do not* fall within the common interest exception.  *Leader Techs. v. Facebook, Inc.,* 719 F. Supp. 2d 373 (D. Del. 2010).  The court stressed that, for the common-interest doctrine to apply, there must be a commonality of legal, not merely business interests.  719 F. Supp. 2d at 376.  It suggested that the test to be applied is whether the disclosures would have been made, but for the sake of securing or providing legal representation.  *Id.*  Because the party seeking discovery failed to satisfy this burden, the district court concluded that the magistrate judge's order was not clearly erroneous.

---

communication, while seeking to assert the privilege as to the remainder of the communication.  *See* RICE, *supra* note 64, § 9:80.  This kind of partial subsequent disclosure is related to the idea of "subject matter" waivers – i.e. that the partial disclosure of a communication waives the privilege with respect to all communications on the same subject matter.  *See* RESTATEMENT § 79 cmt. f.  This White Paper adopts the term "limited waiver," *see* RICE, *supra* note 64, § 9:88, to refer to what the *Columbia/HCA* court calls "selective waiver," which is the context in which waiver issues would arise in connection with ALF transactions.

**DRAFT**  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

Another case is sometimes cited for the proposition that materials may be provided to investors without waiver, because the disclosure falls within the common-interest exception. *Mondis Tech. v. LG Electronics*, Nos. 2:07–CV–565–TJW–CE, 2:08–CV–478–TJW, 2011 WL 1714304 (E.D. Tex. May 4, 2011).  It is important to note, however, that this case involved disclosure of documents protected by the work product doctrine.  As discussed below, the work product doctrine is subject to a different waiver standard, as compared with the attorney-client privilege.  The privilege may be lost through the public disclosure of confidential communications.  Protection of the work product doctrine, by contrast, is lost only where the disclosure increases the likelihood that the adversary will come into possession of the documents.  The district court in *Mondis* concluded that the disclosure to prospective investors of documents reflecting the plaintiff's litigation strategy and licensing plan "did not substantially increase the likelihood that the adversary would come into possession of the materials." *Id.* at *3.  This reasoning does not invoke the idea of a commonality of interests between the plaintiff and the investors, and therefore this case should not be relied upon in support of a conclusion of non-waiver of the attorney-client privilege.

### 3.        Work Product Doctrine.

The work product doctrine has common law origins, *see Hickman v. Taylor*, 329 U.S. 495 (1947), but it has been codified in the Federal Rules of Civil Procedure and most state rules of procedure, *see*, *e.g.*, Fed. R. Civ. P. 26(b)(3).  The purpose of the work product doctrine is to protect the thoughts, mental impressions, and strategies of attorneys from being discovered by opposing parties in litigation.  As Justice Jackson put it in his concurring opinion in Hickman, "discovery was hardly intended to enable a learned profession to perform its functions on wits borrowed from the adversary."  329 U.S. at 516 (Jackson, J., concurring) (internal alterations omitted).  This well-known quote also shows that the work product doctrine is justified with reference to the functioning of the adversary system of litigation, not privacy concerns generally.  Thus, work product protection is narrower in scope than either the attorney-client privilege or the duty of confidentiality.  It extends to:

> documents and tangible things otherwise discoverable . . . prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) . . . .

Fed. R. Civ. P. 26(b)(3).  "Ordinary" work product, which is to say material other than an attorney's mental impressions, theories, and opinions, may be discovered upon a showing of substantial need and an inability by the party to obtain the equivalent by other means.  "Opinion" work product, on the other hand, is hardly ever discoverable.

Because work product protection focuses on the privacy of the attorney's strategies and mental impressions, and is also tightly linked with the process of litigation, the analysis of waiver of work product protection differs somewhat from the rules governing waiver of the

attorney-client privilege.  Generally only disclosures that substantially increase the likelihood of documents falling into the hands of an adversary in litigation are deemed to waive the protection of the work product doctrine.  *See* 8 CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2024.  As discussed above, in connection with the common-interest rule of non-waiver of the attorney-client privilege, the district court in *Mondis Tech. v. LG Electronics*, Nos. 2:07–CV–565–TJW–CE, 2:08–CV–478–TJW, 2011 WL 1714304 (E.D. Tex. May 4, 2011), concluded that a party could share documents prepared by a lawyer, containing information about legal strategy, with investors without waiving the work-product protection that applied to the documents.  The reason for not finding waiver in this case was that the presentation to investors did not substantially increase the likelihood that the documents would come into possession of the plaintiff's adversary in litigation.

### C.     Fees.

#### 1.     Reasonableness:  Model Rule 1.5(a).

An attorney may not charge an unreasonable fee, or an unreasonable amount for expenses arising out of the representation.  MODEL RULE 1.5(a).[67]  The reasonableness of fees and expenses is evaluated using an eight-factor test, *see* MODEL RULE 1.5(a)(1)-(8), but judicial decisions tend to focus on two factors:  (1) Did the client make a free and informed decision to enter into the contract with the lawyer, and (2) does the contract provide for a fee within the range commonly charged by other lawyers in similar circumstances?  *See* RESTATEMENT § 34 cmt. c.  Any fees for representing a client, including contingency fees and, as discussed below, financing charges passed through by the lawyer to the client as a result of the lawyer obtaining funding for the representation, must satisfy the reasonableness standard of Rule 1.5(a).  Concern has also occasionally been expressed that lawyer involvement as principals in ALF transactions may be a way of covertly increasing lawyers' contingency fees.  *See, e.g., Fausone v. U.S. Claims, Inc.*, 915 So. 2d 626, 630 (Fla. Dist. Ct. App. 2005).  There are many other restrictions on lawyers participating personally in ALF transactions, including the prohibitions in Model Rule 1.8 on providing financial assistance to a client and on acquiring a proprietary interest in the client's cause of action.  If the structure of a funding transaction were in compliance with these rules, however, a lawyer's total compensation for providing legal services would still need to meet the reasonableness requirement of Rule 1.5(a).

#### 2.     Passing Along Borrowing Costs to Clients.

Law firms representing clients on a contingency fee basis typically advance the cost of professional services provided firm lawyers and support staff, as well as out-of-pocket expenses such as filing fees, expert witnesses, and court reporters.  In some cases, the projected cost of a protracted lawsuit exceeds the firm's ability to finance these expenditures out of its ordinary operating budget.  In these circumstances, firms have sought loans or lines of credit from

---

[67]  The ABA Committee on Ethics and Professional Responsibility has concluded that the reasonableness standard applies to both fees and expenses.  *See* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 93-379 (1993), at 7 ("we believe that the reasonableness standard explicitly applicable to fees under Rule 1.5(a) should be applicable to [disbursements and expenses] as well").

**DRAFT**  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

commercial lenders.  In some cases lawyers have also sought to pass along the interest charges to the client as an expense, as opposed to absorbing these borrowing costs as part of the firm's overhead that would be reflected in the fee for services portion of the recovery owed to the firm.

It is generally permissible to pass along the cost of disbursements made by lawyers on behalf of clients in connection with representation in a matter.  "[T]he actual amount of disbursements to persons outside the office for hired consultants, printers' bills, out-of-town travel, long-distance telephone charges, and the like ordinarily are charges in addition to the lawyer's fee."  *See* RESTATEMENT § 38 cmt. e.  However, it is improper for a lawyer to add a surcharge to these disbursements, or to charge the client for general overhead expenses. Numerous state ethics opinions have considered this question and concluded that it is permissible to pass on to the client interest charges on funds borrowed in order to finance the costs and expenses of litigation, provided the lawyer fully discloses the terms of the loan and the interest rate is reasonable.[68]  The Kentucky opinion adds the requirement that the transaction be treated as a business transaction between the lawyer and client, subject to all of the requirements of Rule 1.8(a).  Although not citing Rule 1.8(a), the Maine opinion imposes similar requirements – full disclosure of the terms of the transaction and the informed consent of the client, and fairness to the client of the substantive terms of the transaction.  In no event may the lawyer surcharge the client by charging more than the amount of interest actually paid to the lender.

In **Case 4**, the lawyer incurred substantial borrowing costs to finance the litigation on behalf of the plaintiffs.  Ethics opinions in several states indicate that the lawyer may permissibly charge these costs to the plaintiffs, assuming two requirements are satisfied.  First, the total fee must be reasonable, under the standards of Rule 1.5(a).  Second, because the lawyer represented the plaintiffs on a contingent fee basis, the lawyer was required to clearly disclose, in a writing signed by the client, whether the client would be liable for interest expenses, whether these expenses would be deducted from the recovery, and whether this deduction would occur before or after the lawyer's fee was calculated.  *See* MODEL RULE 1.5(c).  The hypothetical states that the lawyer did not clearly disclose in the retainer agreement that the lawyer may incur interest expenses and subsequently pass them along to the client.  Thus, the lawyer may lose the entitlement to charge these expenses to the client, due to non-compliance with the disclosure requirements of Rule 1.5(c).  If clear, understandable written disclosure had been made, however, there is no reason in principle why these expenses could not be charged to the clients. Fact issues may of course arise concerning the adequacy of the disclosure.

### D.      Competence and Communication:  Advising in Connection with ALF Transactions.

---

[68]  *See* Ariz. State Bar Comm. on the Rules of Prof'l Conduct, Formal Op. 01-07 (2001); Ky. Bar Ass'n Ethics Comm., Formal Op. E-420 (2002); Me. Bd. Of Overseers of the Bar Prof'l Ethics Comm'n, Formal Op. 177 (2001); Mich. State Bar Standing Comm. on Prof'l Ethics, Advisory Op. RI-336 (2005); N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Advisory Op. 754 (2002); N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Advisory Op. 729 (2000); N.Y.C. Bar Ass'n Comm. on Prof'l and Judicial Ethics, Formal Op. 1997-1 (1997); N.C. State Bar Ethics Comm., Formal Op. 2006-12 (2006); Pa. Bar Ass'n Comm. on Legal Ethics and Prof'l Responsibility, Formal Op. 2003-18 (2003); Utah State Bar Ethics Advisory Opinion Comm., Advisory Op. 02-01 (2002).

A lawyer must communicate with a client regarding matters material to the representation. MODEL RULE 1.4. A client who wishes to enter into a funding transaction with an ALF supplier incurs financial risks that must be adequately explained by a lawyer representing the client in connection with that transaction.

A party to litigation, whether a plaintiff or defendant, may have entered into or considered entering into an ALF transaction without the knowledge of that party's lawyer. The lawyer may subsequently be called upon to advise the client about the implications of the transaction or contemplated transaction. **Case 1** presents an example of a client asking the lawyer for advice concerning whether to sell a portion of his personal-injury claim to an ALF supplier. Lawyers must provide competent representation, using the "legal knowledge, skill, thoroughness and preparation reasonably necessary to the representation." MODEL RULE 1.1. If the lawyer is unfamiliar with transactions of this nature, he or she must either acquire the appropriate knowledge through reasonable study and preparation,[69] associate with an experienced lawyer, or refer the client to another lawyer with established competence. *See* MODEL RULE 1.1 cmts. [1], [2], [4]. The variation on Case 1 is intended not only to show that a lawyer may have acquired the relevant expertise through experience with similar transactions, but also the kinds of issues a lawyer should be aware of when advising a client. The extent of control sought by the supplier, whether the supplier seeks access to confidential information, and the material terms of the financing transaction are all relevant to the advise the lawyer should give the client.

**Case 2** illustrates some of the risks that unsophisticated users of ALF products face. One problem for the lawyer representing this plaintiff, however, is that the agreement was entered into without legal counsel, prior to the plaintiff's retention of the lawyer. If a reasonable lawyer would conclude that the terms of the financing are substantively unfair and unreasonable from the plaintiff's point of view, the lawyer may advise the client to attempt to renegotiate the transaction. On the other hand, a reasonable lawyer may conclude that the transaction was not unfair from the plaintiff's point of view, given the difficulty the plaintiff would otherwise have in obtaining funds and the riskiness of this investment, from the point of view of the ALF supplier.

In both Case 1 and Case 2, competent advising requires, at a minimum, that a lawyer be aware of potential risks to the client associated with ALF transactions, such as the possibility of waiver of the attorney-client privilege. Other risks may be present depending on the terms of the transaction. For example, a client who sells a portion of a cause of action in exchange for periodic investments by an ALF supplier may be exposed to the risk of the subsequent insolvency of the supplier.

## VI.    Conclusion.

---

[69] Although a lawyer may be able to satisfy the duty of competence through study and preparation, it may not be reasonable to bill the client for the time spent acquiring this new expertise. *See* MODEL RULE 1.5(a); *see also In re Fordham*, 668 N.E.2d 816 (Mass. 1996) (attorney's fee charged by a civil litigator unreasonable where, *inter alia*, he spent considerable time learning criminal law and procedure in order to provide competent representation to a client in a driving-under-the-influence case).

DRAFT  The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

The market for alternative litigation finance involves suppliers and customers who demand this form of financing.  Because of this demand, and because of the complexity of regulation in various states, the specific form of ALF transactions will undoubtedly continue to evolve.  The Commission on Ethics 20/20 has accordingly set out to define general principles of professional responsibility that are applicable to lawyers representing clients and are involved in ALF funding.  Lawyers must adhere to principles of professional independence, candor, competence, undivided loyalty, and confidentiality when representing clients in connection with ALF transactions.  In the event that the lawyer's involvement in the funding process significantly limits the lawyer's capacity to carry out these professional obligations, the lawyer must fully disclose the nature of this limitation, explain the risks and benefits of the proposed course of action, and obtain the client's informed consent.