Robert W. Boatman (009619)
Paul L. Stoller (016773)
Shannon L. Clark (019708)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone: (602) 530-8000
rwb@gknet.com
paul.stoller@gknet.com
SLC@gknet.com

Ramon Rossi Lopez (CA Bar No. 86361)
(admitted *pro hac vice*)
LOPEZ McHUGH LLP
100 Bayview Circle, Suite 5600
Newport Beach, California 92660
rlopez@lopezmchugh.com
*Co-Lead/Liaison Counsel for Plaintiffs*

James R. Condo (#005867)
Amanda C. Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
Telephone:  602.382.6000
Facsimile:  602.382.6070
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street, NW / Suite 1700
Atlanta, GA  30363
Telephone: (404) 322-6000
Telephone: (602) 382-6000
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com
*Attorneys for Defendants C. R. Bard, Inc. and
Bard Peripheral Vascular, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation, | No. 2:15-MD-02641-DGC<br><br>**THE PARTIES' JOINT STATUS REPORT FOR THE OCTOBER 14, 2016 CASE MANAGEMENT CONFERENCE** |

In accordance with Paragraph L of Case Management Order No. 15 [Doc. 3214], the Parties hereby submit their Joint Status Report for the October 14, 2016 Case Management Conference.

**I.      Fact Discovery**

The following depositions have been completed:

| | |
|---|---|
| December 15, 2015 | 30(b)(6) re FDA Warning Letter |
| January 11, 2016 | Kay Fuller |
| January 20, 2016 | Continued 30(b)(6) re FDA Warning Letter |
| March 18, 2016 | 30(b)(6) re corporate structure |
| April 27, 2016 | 30(b)(6) re ESI systems structure |
| May 3, 2016 | Dr. Murray Asch |
| May 11, 2016 | Carol Vierling |
| May 17, 2016 | Anne Bynon |
| May 24, 2016 | Len DeCant |
| June 2, 2016 | John DeFord |
| June 9, 2016 | Bret Baird |
| June 16, 2016 | Robert DeLeon |
| June 17, 2016 | Joe DeJohn |
| July 18, 2016 | Abithal Raji-Kubba |
| July 27, 2016 | Bill Little |
| July 27, 2016 | Judy Ludwig |
| July 29, 2016 | John Wheeler |
| August 9, 2016 | Maureen Uebelacker |
| August 16, 2016 | Daniel Orms[1] |
| August 19, 2016 | Mary Edwards |

---

[1] Mr. Orms was deposed in the state court action Austin v. C.R. Bard, et al., in Broward County, Florida, and cross-noticed in the MDL for coordination purposes.

|  |  |
|---|---|
| August 24, 2016 | Cindi Walcott |
| August 30, 2016 | 30(b)(6) re REACH program |
| September 7, 2016 | Steve Williamson |
| September 7, 2016 | 30(b)(6) re Sales/Marketing |
| September 7, 2016 | Kevin Shifrin |
| September 16, 2016 | Jack Sullivan[2] |
| September 19, 2016 | Brian Doherty |
| September 23, 2016 | Holly Glass |
| September 29, 2016 | John Van Vleet |

The following depositions have been scheduled:

|  |  |
|---|---|
| October 11, 2016 | Chris Ganser |
| October 18, 2016 | Natalie WongOctober 28, 2016 |
| Dr. David Peeler | |

## II.   ESI Discovery Status

The Court held conference calls with the parties on August 31 and September 7 regarding the status of Defendants' production of ESI. The Parties subsequently filed a Joint ESI Status Report [Doc. 3494] on September 23, 2016. Defendants further updated the Court regarding the timing of their productions in a conference call on October 3.

Since receiving Plaintiffs' revised agreed upon keyword and fuzziness search terms on September 14, 2016, Bard has produced about 2.2 million pages. Since the last Case Management Conference on August 21, 2016, Bard has produced over 2.4 million pages. Overall, in this MDL, Bard has produced a total of about 2.9 million new pages beyond the more than 2.5 million pages Bard produced in prior litigation.

Bard has now essentially completed its document production. The only exceptions are any potential documents subsequently determined not to be privileged (from a subset of documents undergoing privilege review) and approximately 5,000 documents that are

---

[2] The parties have agreed to resume Mr. Sullivan's deposition for an additional two hours of examination by Plaintiffs.

primarily being reviewed for redaction of highly sensitive non-filter data and are otherwise related to quality control. Those small tasks should be completed in the next several days.

At Plaintiffs' request, the parties have agreed on a procedure by which they will test the pool of documents and files that were not identified for collection by their agreed search process (the "non-responsive pool"), now that the production is nearly complete.[3] The purpose of that testing is to determine whether the parties' agreed search process performed consistently with their expectations with respect to the identification of relevant documents. If the parties learn through that testing that their search methodology did not perform consistently with their expectations for the identification of relevant documents, they will meet and confer regarding additional search or searches through the non-responsive pool to identify relevant documents. In that event, there may be additional production(s) of relevant ESI.

III.    **Extension of Discovery Schedule**

As a result of the timing and size of Defendants' production of ESI, Plaintiffs request an extension of the current discovery deadlines. In particular, Plaintiffs believe that they will need approximately six weeks to complete their review of the millions of pages of newly produced documents and then 10-12 weeks (including the intervening year-end holidays) to complete discovery.

The Defendants recognize that the timing of the ESI production may justify a brief extension of the fact discovery period. However, the Defendants believe that, given the extensive scope of discovery already completed and significant proportionality concerns

---

[3] Defendants contend that the Plaintiffs' late demand for a post-production sampling exercise is but a further example of the Plaintiffs' delaying Bard's document production and why the volume of the ESI production in this case has been so substantial. At every decision point, the plaintiffs have repeatedly pressed to expand the scope of ESI production as much as possible. The defendants have ultimately acceded to those demands in large part, in an effort to meet the Court's deadline of September 30 to complete the ESI production. It is ironic that the plaintiffs now complain about the timing and the volume of the production when their positions are largely responsible for that timing and volume.

about the massive amount of additional discovery the plaintiffs are now suggesting, any further discovery during a limited extension must be narrow and focused.  The Defendants believe that an extension of 2-3 weeks, at most, is all that is warranted.

The parties' respective positions are as follows:

A.    Plaintiffs' Position

Due to the timing and size of Defendants' ESI production, Plaintiffs request that the remaining deadlines for discovery in CMO 8, including the deadline for completion of fact discovery, be extended approximately four months.  In the last few weeks, Defendants have produced literally millions of pages of new documents; these come a mere two weeks before the close of a nine-month deposition schedule.  Plaintiffs have in place an aggressive plan to review and analyze the new productions but anticipate, given their volume, that it will take approximately six weeks to get through that process and then to determine the witnesses who need to be deposed (or re-deposed) based on the documents.  Thereafter, and in light of the intervening Thanksgiving and year-end holidays, Plaintiffs believe a period of approximately 10-12 weeks for deposition discovery is appropriate.

Accordingly, Plaintiffs propose the following schedule:

Deadline for completion of fact discovery:     February 28, 2017

Plaintiffs' expert disclosure:     April 14, 2017

Defendants' expert disclosure:     May 26, 2017

Plaintiffs' rebuttal expert disclosure:     June 16, 2017

Deadline for completion of expert discovery:     August 31, 2017

Plaintiffs believe this schedule is reasonable and should not unduly delay prosecution and resolution of the cases in the MDL.  Significantly, this proposed extended schedule should not affect (or will only minimally affect) the timing of bellwether trials. Case-specific discovery (both fact and expert) for Discovery Group 1 cases could and should run contemporaneously with the extended common fact and expert discovery. Under CMO 11, the 12 Discovery Group 1 cases will likely not be determined until late

December 2016 or January 2017, at which time, the parties and this Court will determine a scheduling and case management order for those cases.  Case-specific fact and expert discovery in those cases will likely run through July and into August 2017.[4]  Thus, Plaintiffs' proposed extended schedule should not affect the timing of bellwether trials by much, in any, amount.

      B.    Defendants' position

Defendants do not believe that anything other than a brief 2-3 week extension of the discovery period is warranted for several reasons.  First, the delay in the production of additional documents and the volume was caused by the plaintiffs.  Second, the plaintiffs have long known about almost every witness that they now seek to depose.  Third, the majority of the witnesses who the plaintiffs seek to depose have knowledge about only the Recovery Filter or G2 Filter, not the later-generation products that the plaintiffs argue is the impetus for extending discovery.

## IV.  Dispute Regarding Additional Depositions

Plaintiffs have requested the depositions of the following Bard corporate representatives, employees, and/or consultants:

- Kevin Boyle, current BPV VP of Research & Development
- Mike Randall, current BPV lead engineer for IVC filters;
- Scott Randall, former BPV R&D project manager over IVC filters;
- Kim Romney, current BPV program manager for IVC filters;
- Mark Wilson, former BPV national training manager;
- John Kaufman, M.D., a Bard consultant and key opinion leader on IVC filters;
- Scott Trerotola, M.D., a Bard consultant and key opinion leader on IVC filters;
- Anthony Venbrux, M.D., a Bard consultant and key opinion leader on IVC filters;

---

[4] This assumes 12 to 16 weeks for individual case fact discovery for all 12 cases; followed by 8 weeks of expert disclosures and 6 weeks of expert depositions (all of which may actually be overly ambitious given the case-specific discovery to be taken).

- S. William Stravropolous, M.D., a Bard consultant and key opinion leader on IVC filters;
- Frank Lynch, M.D., a Bard consultant and key opinion leader on IVC filters;
- Gary Cohen, M.D., a Bard consultant and key opinion leader on IVC filters;
- John Lehmann, M.D., the former acting and appointed chief medical officer of BPV and a consultant and "principal investigator" of the EVEREST study regarding the G2 IVC filter;
- John McDermott, former president of BPV;
- 30(b)(6) deposition relating to Meridian and Denali filters;
- 30(b)(6) deposition relating to failure rate thresholds; and
- 30(b)(6) relating to sales and key opinion leaders.

Defendants have objected to these depositions on three grounds. First, Defendants contend that the overall number of depositions is disproportionate to the needs of discovery and, thus, object overall to the number of these depositions in addition to those that have already been taken or scheduled in the MDL. Second, as to certain witnesses (Drs. Kaufman, Venbrux, Trerotola, Stravropolous, and Lehmann), Defendants object that their depositions have previously been taken outside of the MDL and that Plaintiffs have not made the requisite showing under CMO 8 to depose these individuals again. Third, as to Mr. McDermott, there are distinct issues that the parties address below. Finally, with respect to the 30(b)(6) deposition notices, the Defendants contend that the notices are extraordinarily broad, disproportionate to the needs of the case, and would significantly delay discovery.

The parties address these disputes in the following sections/matrices.

A.   Proportionality

1.   Plaintiffs' Proportionality Position

At the outset, Plaintiffs note that they have been cognizant of the requirements of proportionality under Rule 26 and mindful that depositions were taken prior to the formation of this MDL. Plaintiffs have been judicious in the selection of witnesses for

deposition; they have not requested to depose every possible person involved with IVC filters or even most people so involved; nor have they asked to depose again the vast majority of individuals who were deposed prior to the MDL.  Rather, except for the early depositions focusing on the FDA Warning Letter and whistleblower Kay Fuller, Plaintiffs have sought depositions of individuals who held key positions as to IVC filters at BPV.  However, at any given time, there were between 12 and 15 key positions at BPV responsible for filters; and, more than 40 different people have held those positions over the last 14 years.  Additionally, Defendants consulted with multiple outside professionals regarding IVC filters during that time.  All of this is compounded by the fact that Defendants marketed and sold seven different devices over that period of time (Recovery, G2, G2 Express, G2x, Eclipse, Meridian, and Denali).  Thus, each person in the key roles had distinct responsibility for a distinct product or products.

In this MDL, Plaintiffs have focused their deposition discovery on the responsible positions within Bard.  Those include senior positions within the departments at BPV (Research & Development (R&D), Marketing, Sales, Quality, Regulatory/Clinical) as well as key positions vis-à-vis IVC filters within those departments.  As demonstrated by the chart attached at Appendix A to this Report (which is based on Defendants' organization charts), those positions have had significant turnover over the past 14 years.  During that time, BPV has had three Presidents; four Vice Presidents (or equivalent) in R&D; three Vice Presidents in Marketing; three Vice Presidents in Sales; four Vice Presidents in Quality; and three Vice Presidents in Regulatory.  Within R&D, there have been six engineers who have had primary or high-level responsibility for IVC filters; Marketing has had at least four separate IVC filter product managers; in Sales, at least seven people have held the national position for training sales representatives, and at least 10 individuals have held one of the two or three Regional Manager positions.[5]

---

[5] As discussed at the June 21 CMC and in the Joint Report and Dispute Matrix Regarding ESI Discovery and Custodians (Doc. 1756), the Regional Managers have been part of the small number of direct reports to the Vice President of Sales and part of the senior

1  Additionally, C.R. Bard has had another ten individuals who have held positions

2  responsible for IVC filters.

3    Plaintiffs have focused depositions on the people who held the responsible

4  positions, particularly those who held the positions earlier in the relevant time period.  The

5  chart at Appendix A identifies which holders of the positions have been deposed (and

6  whether the deposition was in the MDL or before it).  In most cases, Plaintiffs have

7  deposed the person or persons who held the responsible position during the time periods

8  of the earlier devices.  This is, in part, a product of how Defendants have produced their

9  documents and ESI in this MDL.

10    Earlier in this litigation, Defendants produced documents and ESI they had

11  collected and produced in prior suits.  Those documents were collected years ago –

12  between 2004/2005 and 2011.  As a result, the produced documents related primarily to

13  Defendants' older devices.  Thus, Plaintiffs focused discovery and depositions on the

14  early devices and the individuals who were involved with them.

15    Plaintiffs have largely been waiting on Bard's new productions to take depositions

16  of individuals involved with later-generation devices.  Now that Defendants have finally

17  produced their more recent documents, this is the time to depose those individuals who

18  held the key positions when the later devices were developed, manufactured, marketed,

19  and sold.

20    Defendants' delay in production of their ESI and documents is not cause to limit

21  Plaintiffs' discovery from relevant individuals involved with the later devices.  If

22  anything, it should justify granting Plaintiffs greater opportunity for depositions, including

23  potentially re-opening depositions of some individuals previously deposed for questioning

24  on the newly produced documents.[6]

25  _____

26  national sales staff for BPV.  They are effectively national sales personnel; for this reason, the Court ordered collection and production of their custodial files.

27  [6] In all candor, it is virtually impossible for Plaintiffs to know at this time what

28  depositions they will actually need based on the new productions; Plaintiffs are processing those collections and have not yet been able to commence their review.

1       Defendants' proportionality argument ignores virtually all the factors relevant to

2  proportionality.  Here, the factors favor discovery from the key position holders for each

3  device.  There are now more than 1,000 filed cases and multiple cases for each of the

4  seven devices.  The case as to each device requires a different set of proof based on facts

5  specific to that device.  Because of BPV's turnover at key positions, there is a distinct set

6  of witnesses in the BPV departments for almost every device.  It is simply not the case

7  that the deposition of the Vice President of R&D and lead engineer for the Recovery filter

8  can provide the relevant design and engineering evidence for the G2x, Eclipse, Denali, or

9  Meridian filters.  Plaintiffs have to depose different people to obtain the relevant

10  information for each device. This is true across virtually all departments.

11       The depositions that Plaintiffs seek, including those identified in this Report, are

12  proportional to the needs of the case.  Plaintiffs do not seek to depose every, or even most,

13  Bard employees with relevant information.  Their requested witnesses have been targeted

14  based on their positions within Bard as being the people most likely to possess

15  information relevant to a particular device at issue in this MDL. Plaintiffs have deposed

16  very few people who were involved at all with later-generation filters. They seek now to

17  take those depositions.

18       2.     Defendants' Proportionality Position

19       According to the plaintiffs, the principal justification for the formation of this

20  MDL, and one of the primary reasons for the plaintiffs to conduct additional discovery,

21  was that the prior decade's worth of discovery focused on older generation filters, and the

22  plaintiffs needed discovery related to Bard's newer generation IVC filters.  Instead of

23  pursuing discovery related to the newer generation filters, the plaintiffs admit that they

24  have used the vast majority of the preceding eight months' of discovery to focus, again,

25  on older generation filters. Now, with less than three weeks before discovery is set to

26  close in this MDL, the plaintiffs claim they need substantial time and discovery related to

27  these newer generation filters. However, the plaintiffs' position poses two problems: (1)

28  the plaintiffs' eleventh-hour discovery requests *still* focus primarily on older generation

filters, and (2) the plaintiffs have had relevant documents and the identities of witnesses involved with newer generation filters in their possession since the beginning of this MDL, if not *years* earlier for the members of the PSC involved in prior litigation. Simply put, they chose to use their time re-hashing discovery about Bard's Recovery Filter and G2 Filter, which was their strategic choice and decision.[7]  But this is not sufficient reason to extend discovery at Bard's expense.

The plaintiffs, only very recently, provided notice of their intent to take an additional 16 depositions, including 13 current of former Bard employees and outside consultants and 3 extensive 30(b)(6) depositions. The 16 depositions that the plaintiffs have requested with roughly a month before the close of discovery are in addition to the 31 depositions that have been or are set to be taken in this MDL, and in addition to the more than 80 depositions that were taken of Bard corporate witnesses (primarily by members of the PSC) before the MDL was even formed. The plaintiffs base their need for these additional depositions in large part on their claimed need for additional discovery regarding Bard's later generation filters.  However, the plaintiffs' "justification" is readily belied by the fact that roughly 10 of the 16 depositions they have requested at the eleventh hour are *still* focused on earlier generation filters rather than the most recent devices.

On February 26, 2016, Bard produced an interrogatory response pursuant to CMO-8 and as directed by the Court, identifying with great detail 20 employees who had significant involvement with Bard's later generation filters (the Eclipse, the Meridian, and the Denali), as well as another 25 employees having  a lesser involvement with those filters.[8] Despite being notified more than 7 months ago of the identity of 45 potential witnesses involved with later generation filters, and despite 30 current or former employee

---

[7] Indeed, a review of the transcripts of the 28 depositions of Bard corporate employees (past and present) taken thus far in this MDL shows that the plaintiffs' counsel asked about the Recovery Filter 2,636 times and the G2 Filter 1,276 times.  By contrast, the plaintiffs' attorneys referenced the Eclipse Filter only 293 times, the Meridian Filter only 132 times, and the Denali Filter only 176 times. And 93% (242 of 260) of the exhibits used during the depositions concern the Recovery Filter or G2 Filter.

[8] A copy of Bard's written interrogatory responses are attached as Appendix C.

depositions being taken or scheduled since the inception of this MDL, the plaintiffs have made no effort to obtain deposition testimony from 34 of those 45 employees.

For the plaintiffs to now insist they need more time to conduct discovery regarding later generation filters based on the timing of ESI production is not persuasive, given their past lack of significant focus on witnesses or evidence regarding those products during the previous 9 months of discovery. Moreover, although the plaintiffs attempt to blame their delay on the timing of Bard's most recent document productions, they fail to acknowledge that they did not provide Bard their revised agreed upon keyword and fuzziness search terms until *three weeks ago*, on September 14, 2016. The recent productions apply to lesser priority custodians (the vast majority of whom were not involved with newer generation filters), software data, and voluminous shared drive data that the plaintiffs requested.  Bard produced all of the deponents' custodian files prior to their depositions, and any delay in finalizing the most recent productions is the plaintiffs' own doing, both through their delay in finalizing their search parameters and their choice of deponents.

The plaintiffs' suggestion that they lack significant information regarding the later generation filters is also belied by the fact that they have had an enormous amount of documents regarding those devices for many months, if not years prior to the MDL.  The plaintiffs have had thousands of design, testing, regulatory, adverse event, and other "core" documents for Eclipse, Meridian, and Denali in their possession for six months or more. On March 31, 2016, and April 5, 2016, Bard also produced over 25,000 pages of Denali materials and other materials in response to plaintiff's second requests for production, including Design History Files, DFMEAs, testing documents, FDA submissions and correspondence, corrective and remedial action plans, health hazard evaluations, clinical study materials, audit materials, customer letters, complaint tracking analyses, and a 26-page index describing those materials. Corresponding "core" materials for Eclipse and Meridian were produced well before the formation of the MDL, and some updated and additional materials were produced with the Denali materials on April 5, 2016.  Finally, Bard's adverse event tracking system with reports for all generations of

Bard's IVC filters was produced on January 15, 2016, and an updated collection was produced on June 29, 2016, and July 1, 2016.  Despite this, the plaintiffs deposed only 9 of these 45 employees, and asked them only about the Recovery and G2 Filters (including 3 witnesses who were already deposed on the Recovery and G2 Filters).

The plaintiffs have had the opportunity for more than sufficient discovery.  To date, the plaintiffs have taken or noticed 30 depositions of Bard corporate witnesses in the MDL where they have elicited 140 hours of testimony.  And the plaintiffs have available to them more than 80 additional depositions of Bard corporate witnesses that were taken primarily by members of the PSC before the start of the MDL. The plaintiffs now seek to expand this considerably, mostly with witnesses who know only about the Recovery and G2 Filters.

Further, the plaintiffs' new Rule 30(b)(6) deposition requests are so vast that they encompass the entire history of Bard's IVC Filters:  the plaintiffs identified approximately 140 topics and subtopics covering a span of over 14 years on issues relating to design, testing, regulatory affairs, sales, and quality systems for each of Bard's filters.[9] Deciphering what information these notices are attempting to seek, gathering that information, and preparing witnesses to respond to these notices, which may require multiple witnesses per notice, would take months for the witnesses to be adequately prepared to testify on these overbroad topics.  The plaintiffs could have sought all of this discovery eight months ago, but chose not to do so.  They should not be permitted to extend the discovery period, and the expense and burden to the defendants, merely because of the strategic choices that they made earlier in this litigation.

B.     Previously Deposed Witnesses

| 1. General Statement | |
|---|---|
| Plaintiffs' Position | Defendants' Position |
| The following individuals are important witnesses involved with the design, testing, and/or clinical trials as consultants | The plaintiffs have known about these witnesses for many months, and they chose not to seek their depositions until |

_____

[9] A copy of the three 30(b)(6) deposition notices are attached as Appendix D.

| | |
|---|---|
| working for Bard. They were hired by Bard as key opinion leaders (KOLs) to lecture and teach other doctors about Bard IVC filters. Most have been identified by Bard as witnesses they intend to call at trial. In all but one instance, these individuals were deposed five or six years ago by lawyers that are not part of this MDL. These depositions were often limited in scope, were relatively brief, and failed to address issues of critical importance to the 1,000 new MDL plaintiffs. Plaintiffs believe that the knowledge of what is important to these cases, developed by the additional thoughts and analysis of dozens of new attorneys (and the insights of new experts) is dramatically different now than the knowledge base that existed five or six years ago. It would be extremely prejudicial for all of the new MDL plaintiffs, and their attorneys, to not be given the opportunity to examine these witnesses using new information, exhibits, and medical and scientific literature that did not exist at the time of their prior depositions. | now. This is an insufficient reason to extend discovery. Although the plaintiffs claim that they need additional discovery about later-generation products, 7 of the 13 individual witnesses whose depositions they seek have knowledge only about the Recovery and G2 Filters. The plaintiffs have already noticed or deposed 31 witnesses in the MDL almost exclusively about the Recovery and G2 Filters. Voluminous ESI regarding the basis for deposing many of these witnesses, such as the EVEREST G2 clinical study, was produced to members of the PSC years before the MDL was formed, and the plaintiffs waited until the close of discovery to request their depositions. The plaintiffs provide little to no specific basis for requesting these depositions. Finally, the consultant physicians the plaintiffs have requested have active medical practices, and should not be burdened with questioning regarding topics that they have already been deposed about and which have been covered elsewhere extensively. |

## 2. Dr. Kaufman

| Plaintiffs' Position | Defendants' Position |
|---|---|
| Dr. Kaufman was deposed on October 28, 2010, by Dean Hartley, who has never been in the PSC or any of its firms. The deposition lasted four hours and discussed 15 exhibits. Dr. Kaufman was a key figure in the filter litigation, having served as a Key Opinion Leader (KOL) for Bard, working on the design of the G2 (he holds a patent for his work), testifying about Bard filters, and serving as the principal investigator in the EVEREST Study. Just last week, a Bard Vice-President testified he wanted Dr. Kaufman fired for his work on the EVEREST Study. In state court disclosures, Bard has listed Dr. Kaufman as one of the witnesses it intends to call at trial – demonstrating the importance of this witness and his information. | The plaintiffs have known about Dr. Kaufman, his work with Bard, and his previous deposition for many months. Although the plaintiffs claim that they need additional discovery about later-generation products, their stated reason for wanting to take Dr. Kaufman's deposition relates to the G2 Filter. Dr. Kaufman maintains an active clinical practice and has not had any role with Bard's later generation filers. Moreover, contrary to the plaintiffs' statement, John VanVleet, the Vice President referenced by the plaintiffs, did not testify that he wanted Dr. Kaufman fired for his work on the G2 EVEREST study that was conducted in the mid-2000s. Instead, Mr. VanVleet explained |

that Bard chose to no longer use a contracting research group to manage the EVEREST study.  He explicitly disagreed with the use of term "fired," and the research group, other than also being involved with the EVEREST study, had no connection whatsoever with Dr. Kaufman.

Given the extensive document and witness discovery that has already been taken of witnesses relating to the Recovery and G2 Filters, both before and during the MDL, Bard contends that taking yet another deposition of a witness, such as Dr. Kaufman, focused on Bard's early generation filters is not proportional to the needs of the case and should not be permitted.

## 3. Dr. Venbrux

| Plaintiffs' Position | Defendants' Position |
|---|---|
|    Dr. Venbrux was deposed on January 28, 2011, by Jack Davis, a non-MDL attorney. The deposition lasted just over three hours, and discussed 5 exhibits.<br>   Dr. Venbrux has been a KOL and paid expert for Bard since 2003, has lectured for Bard since 2003, and has lectured for Bard about IVC filters, as well as conducting animal studies for Bard. As of 2011, he was still working for Bard. His prior deposition was primarily focused on filter fractures, the only failure at issue in the case at issue at that time.  He has never been deposed regarding later generation filters.<br>   Additionally, in state court disclosures, Bard has listed Dr. Venbrux as one of the witnesses it intends to call at trial – demonstrating the importance of this witness and his information. | The plaintiffs have known about Dr. Venbrux, his work with Bard, and his previous deposition for many months.<br><br>Although the plaintiffs claim that they need additional discovery about later-generation products, their stated reason for wanting to take Dr. Venbrux's deposition relates to the Recovery and G2 Filters<br><br>Given the extensive document and witness discovery that has already been taken of witnesses relating to the Recovery and G2 Filters, both before and during the MDL, Bard contends that taking yet another deposition of a witness, such as Dr. Venbrux, focused on Bard's early generation filters is not proportional to the needs of the case and should not be permitted. |

## 4. Dr. Trerotola

| Plaintiffs' Position | Defendants' Position |
|---|---|
|    Dr. Trerotola was deposed on November 15, 2010, by Jack Davis, a non-MDL attorney, for approximately 3 hours. Eight exhibits were discussed.<br>   Dr. Trerotola continues to be listed as a witness Bard intends to call at trial. He has worked as a consultant for Bard since at least 2001 and serves as a KOL for Bard.<br>   Additionally, in state court disclosures, Bard has listed Dr. Trerotola as one of the | The plaintiffs have known about Dr. Trerotola, his work with Bard, and his previous deposition for many months.<br><br>In response to the plaintiffs' request for all communications between Bard and Dr. Trerotola, Bard referred the plaintiffs to certain communications on March 31, 2016, and produced additional communications to and from Dr. Trerotola |

| | |
|---|---|
| witnesses it intends to call at trial – demonstrating the importance of this witness and his information. | on June 20, 2016. Dr. Trerotola was listed in Bard's initial disclosures, and in some members of the PSC's initial disclosures, in non-MDL cases as one of many potential witnesses which the parties reserved the right to call at trial, and the plaintiffs provide no other justification for his second deposition. |

## 5. Dr. Stravropolous

| Plaintiffs' Position | Defendants' Position |
|---|---|
| Dr. Stavropoulos was deposed on April 13, 2011, by Bard and cross-examined by Dean Hartley (a non-PSC attorney) for approximately one half hour, and as an expert witness for Bard in a personal injury filter case by William Garver (also a non-PSC attorney) on October 16, 2012, for 2 hours and 15 minutes. Both depositions were case-specific depositions.<br><br>Dr. Stavropoulos is still listed as a witness Bard intends to call in trials. Dr. Stavropoulos worked for Bard as a KOL and on the EVEREST Study. He has worked with several of Bard's consulting team of Drs. Kaufman, Venbrux, and Trerotola in writing papers concerning Bard IVC filters. No MDL attorney has ever deposed Dr. Stavropoulos and his prior depositions were extremely limited. | Both of Dr. Stavropolous's prior depositions were produced to members of the PSC on September 4, 2012. Again, his involvement with Bard's IVC filters has been known by members of the PSC for years prior to the MDL. Dr. Stavropolous was listed on Bard's initial disclosures, and in some members of the PSC's initial disclosures, in non-MDL cases as one of many potential witnesses which the parties reserved the right to call at trial, and the plaintiffs provide no other justification for his third deposition. |

## 6. Dr. Lehmann

| Plaintiffs' Position | Defendants' Position |
|---|---|
| Dr. Lehmann was deposed on August 7, 2014, by Wayne Grant (a non-MDL attorney) for approximately 4 hours and by Mr. Lopez on April 2, 2013, for approximately 7 hours.<br><br>As the Court is aware, Dr. Lehmann has been at the heart of the Bard Filter Litigation, serving as a consultant and the medical director of Bard. He was involved in critical evaluation of early filter performance and the necessity of reporting injuries and deaths.<br><br>Plaintiffs believe the information and evidence developed since 2013 require further deposition of Dr. Lehmann. The new MDL Plaintiffs and their attorneys have not had the opportunity to question Dr. Lehmann concerning critical new evidence concerning matters such as Bard's misrepresentation of filter | Dr. Lehmann was deposed by Mr. Lopez of the PSC for 7 hours, questioned by Mr. Lopez's co-counsel, Mr. Grant, in a Georgia case for 4 hours, and questioned by a different member of the PSC live at a hearing in Texas federal court.<br><br>Dr. Lehmann has no new information. Moreover, voluminous documents relating to his involvement with the EVEREST study regarding the G2 Filter were produced years before the MDL was formed, and other than vaguely describing "new evidence" related to their general claims, the plaintiffs do not provide any basis for deposing Dr. Lehmann again. Dr. Lehmann has had no role with the later generation filters. For these reasons, Bard opposes the plaintiffs' request to depose Dr. Lehmann yet again. |

| | |
|---|---|
| performance, migration failure results, and the safety and efficacy of Bard filters.<br><br>    Additionally, other Bard witnesses have identified Dr. Lehmann as a key participant in the EVEREST study, a study unrelated to the Lehmann Memo that was the subject of a discovery dispute earlier in this MDL. | |

**7. John McDermott**

| Plaintiffs' Position | Defendants' Position |
|---|---|
|     The prior deposition of Mr. McDermott (the President of BPV from 2003 to early 2007) presents a unique problem.  The MDL attorneys are willing to accept the prior deposition as to content, but not as to its form.  Specifically, the acrimonious nature of the questioning and answers of the videotape deposition make the video unusable in the opinion of the MDL PSC.  Plaintiffs have proposed resolving this issue by a stipulation with Defendants that the McDermott deposition would only be read at any trial.  Defendants rejected this proposal.<br><br>    It is the position of the MDL attorneys, therefore, that there is no deposition that can be used by the MDL attorneys and that the MDL attorneys should be allowed to retake this deposition.  Alternatively, Plaintiffs request an order of the Court that the deposition can only be read at any trial. | Mr. McDermott was deposed in 2010 by non-MDL counsel, and was deposed again by Mr. Lopez in 2014 for over 7 hours.  The "acrimonious nature of the questioning" refers to Mr. Lopez's questioning of Mr. McDermott.  Magistrate Judge Cobb in the *Phillips* case threatened to revoke Mr. Lopez's *pro hac vice* admission for the very questioning that the plaintiffs reference. *See Phillips v. Bard*, 3:12-cv-00344-RCJ-WGC, March 26, 2014 Minute Entry of Proceeding ((Doc No. 152) where Judge Cobb "expressed concern regarding plaintiff counsel's decorum and professionalism at the February 5, 2014, deposition of John McDermott. The court cautions counsel to adhere and comply with the standards of professional conduct required of the members of the bar of this court."). Bard is prepared to submit video excerpts so the Court can fully understand the nature and context of the examination. Allowing another deposition of Mr. McDermott because of Mr. Lopez's "acrimonious" questioning is not a sufficient reason to subject Mr. McDermott to another deposition.<br><br>Moreover, Mr. McDermott is the former President of Bard Peripheral Vascular, which is the same role that Mr. Beasley fills.  The Court already denied the plaintiff's request to depose Mr. Beasley on apex grounds (*see* Doc No. 3272).  For the same reasons, the Court should deny the plaintiffs' request to take Mr. McDermott's deposition.<br><br>Mr. McDermott's time at Bard shows that he necessarily has no knowledge of Bard's later-generation filters, which is the stated reason that the plaintiffs give for needing to extend discovery. |

A

|  | Finally, Mr. McDermott is presently the President of Endologix, a publically traded company.  He has already given two depositions in this litigation while serving as President of Endologix. |

C.     New Proposed Witnesses

**1. General**

| Plaintiffs' Position | Defendants' Position |
|---|---|
| As Plaintiffs articulate above, by and large, they have sought to depose those individuals who have held the key positions within the responsible departments at BPV. With regard to the specific Bard employees at issue at this time, each of them has held a key IVC filter position at Bard, and most of them held it at a time relevant to the later devices on which little discovery has taken place to date. With respect to the outside consultants and advisors, Bard has identified these individuals as key advisors to Bard with respect to IVC filters. They are among a small handful of people that Bard held out to physicians as experts with respect to Bard's IVC filters. | As discussed above, Bard's position is that any alleged lack of discovery regarding newer generation filters is the plaintiffs' own doing, both with respect to the plaintiffs' chosen deponents so far, and the timing of Bard's recent document productions. If the plaintiffs request a very limited number of depositions actually related to newer generation filters, to be completed in a short time frame, and limit their questioning to the newer generation filters, Bard will not oppose those depositions. But, currently, the overall scope and number of the plaintiffs' requested depositions is excessive, particularly given their almost exclusive focus on Recovery and G2 Filters, and the timing of their requests. |

**2. Kevin Boyle**

| Plaintiffs' Position | Defendants' Position |
|---|---|
| Mr. Boyle is the current Vice President of Research & Development; he has held that position since 2013.  As such, he has been the decision maker and responsible person in that department during the research and development of the Meridian and Denali filters. | Based on the fact that the Denali was cleared by the FDA in May 2013, Bard believes that Mr. Boyle will have little to no information that is not available from other sources. He was not identified in Bard's February 26, 2016, interrogatory response. |

**3. Scott Randall**

| Plaintiffs' Position | Defendants' Position |
|---|---|
| Scott Randall was a Program Director in the Research & Development department; he was a direct report to the Vice President of the department and responsible for IVC filters.  In 2012, he was the highest authority in the department while there was no Vice President in place. He was, thus, the decision maker and responsible person at the time for the research and development of the Meridian filter. | Mr. Randall was identified by Bard on February 26, 2016, as having a lesser role with later generation filters. The plaintiffs provide no basis for requesting his deposition nearly at the close of discovery. |

**4. Mike Randall**

| Plaintiffs' Position | Defendants' Position |
|---|---|
| Mike Randall has been one of the key engineers for IVC filters since 2009. Steve Williamson, BPV's current president, testified that Mike Randall taught him about IVC filters when Mr. Williamson joined the company. Although there have been teams of anywhere from six to eight engineers who have worked on IVC filter, Mike Randall has held a position of responsibility for them, including particularly the Eclipse, Meridian, and Denali filters. | Mr. Randall was identified by Bard on February 26, 2016, as having a principal role with later generation filters. The plaintiffs provide no basis for requesting his deposition nearly at the close of discovery. |

**5. Mark Wilson**

| Plaintiffs' Position | Defendants' Position |
|---|---|
| Mr. Wilson was the Senior Manager of Training and Development from 2008 to 2010. He is one of the various individuals who have held the position over time that is responsible for the national training of sales representatives. He held the position during the time period of various G2 family of devices. He is the first training manager whose deposition Plaintiffs have requested in this MDL. | The plaintiffs admit that Mr. Wilson was only involved with the G2 Filter for two years. The plaintiffs already questioned Ms. Romney for several hours as a 30(b)(6) witness which covered multiple topics regarding sales and training, including "[t]he procedures and practices for the education and training of sales representatives regarding the sales, marketing or promotion of Bard IVC Filters." The plaintiffs provide no justification for requesting to depose Mark Wilson at this late stage, particularly given the fact that his role was almost exclusively focused on early generation filters. |

**6. Kim Romney**

| Plaintiffs' Position | Defendants' Position |
|---|---|
| Defendants have identified Ms. Romney as being a "previously deposed" witnesses; however, Ms. Romney was not deposed prior to the MDL; nor has she been deposed in her individual capacity as a witness in this MD.  Rather, Defendants put her up as the representative on two separate 30(b)(6) topics.<br><br>Ms. Romney is the current senior product manager for IVC filters at BPV. Plaintiffs believe that she has held that position since 2014 and previously was project manager for IVC filters beginning in approximately 2011.  Defendants have held her out as being a most knowledgeable person with respect to | Ms. Romney was deposed twice in 30(b)(6) roles for a total of almost 12 hours and including hours of testimony on sales and marketing. The plaintiffs asserted that they were entitled to ask Ms. Romney questions outside the scope of the deposition based on her own personal knowledge, and did in fact question her in that regard. During those depositions, the plaintiffs already established that that she began working for Bard in June of 2011 as an associate product manager, and questioned her extensively on the organizational charts Bard produced, and which employees held what positions during different timeframes. The |

| | |
|---|---|
| filters at BPV. To Plaintiffs' understanding, she has been the IVC filter project manager for at least the Denali and Meridian filters. | plaintiffs' professed ignorance regarding Ms. Romney's role with Bard's IVC filters, much like their Appendix regarding "key" witnesses who still need to be deposed, is inconsistent with the discovery completed in this MDL. |

**7. Dr. Lynch**

| Plaintiffs' Position | Defendants' Position |
|---|---|
| Dr. Lynch has been an outside consultant and KOL for Bard with respect to its filters for a number of years.  He is a KOL with respect to the Denali filter, and is identified by Bard in documents as being involved in the investigation and studies that led to the Denali filter. | Members of the PSC have been aware of Dr. Lynch's involvement with Bard's IVC filters for years prior to the MDL, and have been using documents related to him as deposition exhibits for the same amount of time. They provide no basis for requesting his deposition on the eve of the close of discovery, and provide no specific information as to why his deposition is necessary. |

**7. Dr. Cohen**

| Plaintiffs' Position | Defendants' Position |
|---|---|
| Dr. Cohen has been an outside consultant and KOL for Bard with respect to its filters for a number of years.  He is a KOL with respect to the Denali filter, and is identified by Bard in documents as being involved in the investigation and studies that led to the Denali filter. | Members of the PSC have been aware of Dr. Cohen's involvement with Bard's IVC filters for years prior to the MDL, and have been using documents related to him as deposition exhibits (primarily related to the Recovery Filter) for the same amount of time. They provide no basis for requesting his deposition on the eve of the close of discovery, and provide no specific information as to why his deposition is necessary. |

    D.    Additional Rule 30(b)(6) depositions

Plaintiffs have requested three additional Rule 30(b)(6) depositions: one relating specifically to Bard's later IVC filter devices (Eclipse, Meridian, and Denali); one relating to certain sales and marketing practices for all Bard IVC Filters, and another relating to failure rate thresholds for all of Bard's IVC filters.[10]  Defendants have preliminarily objected to both the proportionality and the scope of these notices.  Defendants' position is, based on the current overbreadth of these notices, which may require multiple witnesses per notice, that it would take months for the witnesses to be prepared to testify on these roughly 140 topics.  The parties will need to further meet and confer in advance

---

[10] A copy of the three 30(b)(6) deposition notices are attached as Appendix D.

1    regarding these depositions; however, if they do not reach an agreement, the timing of any

2    such disputes will become significant in light of the current October 28 discovery

3    deadline.

4    **V.      Plaintiffs' Request for a Special Master for Depositions**

5           As the parties discussed with the Court during the telephonic hearing on October 3,

6    Plaintiffs request the appointment of a special master for depositions taken in this MDL.

7    Defendants do not agree that a special master is necessary.  The parties' respective

8    positions and arguments are set forth below:

9           A.      Plaintiffs' Position

10          Plaintiffs contend that a Special Master is necessary at selected depositions going

11   forward.  In an effort to secure agreement for a Special Master who could appear

12   telephonically at depositions, Plaintiffs even offered to pay the cost.  Nonetheless, Bard

13   refused.  Plaintiffs' position is that a Special Master is necessary to avoid the following:

14          1.      Diminishment of Plaintiffs' allotted time for questioning:

15          Many of Bard's witnesses (current and former employees represented by Bard's

16   counsel) engage in the practice of evasive answers when responding to Plaintiffs'

17   questions.  Particularly problematic has been the recitation of facts not elicited by and

18   unresponsive to questions posed, and unnecessary explanations that are lengthy and non-

19   responsive.  Examples of Bards' witnesses' unresponsive answers and Plaintiffs' attorneys

20   attempts to rectify the situation in order to prevent the depletion of the agreed shortened

21   time for questioning that the parties stipulated to at the outset of the litigation are set forth

22   in the matrix attached as Appendix B.  At times a question must be repeated and/or

23   rephrased 6-7 before any progress can be made.  (*See, e.g.*, Appendix B, citations to

24   testimony of M. Uebelacker (157:3-165:3), J. Sullivan (165:20-169:19).)  There are also

25   examples of additional non-responsive information unnecessarily supplied to responses

26   that call for concise answers that remain relevant to the question asked.  (*See, e.g.*,

27   Appendix B, Little (226:16-227:5; 229:18-230:19; 230:24-231:21); Raji-Kubba (28:8-17;

28   51:10-24).)  These sorts of responses diminish Plaintiffs' allotted time for questioning and

are responses that Bard can elicit during its allotted time.  On the contrary, when the same witnesses are on direct examination their responses are on point, concise, and do not take up unnecessary amounts of time.  (*See, e.g.*, Appendix B, J. Sullivan (394:3-409:5); Little (432:1-442).)

The Federal Rules prohibit tactics that impede, delay, frustrate and/or prolong depositions.  Fed. R. Civ. P. 30(d)(1); Adv. Comm. Notes, 1993 Amendments, Subdiv. (d).  The Rules are also clear that a deponent may not delay or frustrate a deposition, and that even a nonparty deponent may be sanctioned for same.  Advisory Comm. Notes, 2000 Amendments, Subdivision (d); *see also* Adv. Comm. Notes, 1993 Amendments, Subdiv. (d) ("The rule also explicitly authorizes the court to impose the cost resulting from obstructive tactics that unreasonably prolong a deposition on the person engaged in such obstruction. This sanction may be imposed on a non-party witness as well as a party or attorney.").  Although Plaintiffs are not seeking sanctions at this juncture, the request for a Special Master is warranted in light of the of citations attached from depositions taken thus far exemplifying the exact conduct prohibited by the Rules which could be remedied in real time with a Special Master.

2.    Inappropriate instructions not to answer:

At a recent deposition (Sullivan) Bard's counsel instructed the witness not to answer on two bases.  Plaintiffs' counsel vigorously disputed both purported justifications and offered temporary solutions (*e.g.*, sealing the deposition for later review by the Court) in order to allow the deposition to continue; defense counsel refused.  Access to or the presence of a Special Master would have resolved these issues on the spot rather than forcing the parties now to reconvene the deposition that, at the time of this filing, will be at the Plaintiffs' expense and will require further involvement of the court.

The bases for which Bard instructed the witness are as follows:

*a.    The 2005 Remedial Action Plan ("RAP")*

Plaintiffs attempted to question Mr. Sullivan on the 2005 RAP, a document that

- 22 -

1   quotes directly from the Lehmann Report.[11]  Counsel instructed the witness not answer on

2   the basis that the copy Plaintiffs' counsel used did not redact the quotes from the

3   Lehmann Report.  The Court's Order regarding the Lehmann Report is clear; it only

4   pertains to the Lehmann Report, not to any other document and certainly not to a publicly

5   filed document (Doc. 306-1, Ex. T) created in the usual course of business.  Bard sent a

6   letter "clawing back" the RAP despite never having sought a protective order based on

7   privilege and claiming that it had never been produced in the MDL.

8                    b.    *Documents "deemed" produced in the MDL*

9           Bard instructed Mr. Sullivan not to answer questions regarding the RAP claiming

10  that an unredacted copy has not been produced in the MDL and that a pre-MDL decision

11  controls the use of the unredacted 2005 RAP. Bard's assertions notwithstanding, the

12  January 2005 RAP (BPVE-01-01019773-BPVE-01-01019874) has been produced in the

13  MDL, and it has been filed in (Doc. 306-1, Ex. T) and cited by both parties and the Court.

14  (Doc. 699, at 7).  Plaintiffs' position is that anything produced prior to this MDL to the

15  original consortium lawyers is deemed produced in this MDL. Plaintiffs previously

16  requested a global index of documents to avoid such situations: Bard refused.  Also, Bard

17  has refused to reproduce certain deponents deposed prior to the MDL; yet, the exact copy

18  of the RAP Bard claims was not produced in the MDL is attached to an exhibit to a

19  deposition of a witness Bard refuses to produce again.

20          Bard has since retracted its attempt to clawback the RAP, but has not clarified the

21  basis: Is it not privileged? Is it deemed produced in the MDL?  Or both?  Although the

22  immediate issues with Mr. Sullivan's deposition has been resolved, if Bard intends to take

23  positions on documents and their potentially different iterations based on how and when

24  they were produced prior to the MDL, this will be an ongoing issue.  Moreover, if Bard

25  intends to assert privileges in the face clear court orders, a Special Master would be useful

26

27  [11] This Court granted Bard's Protective Order re: the Lehmann Report; attorney work
    product (Doc. 699). No other documents were submitted or subjected to the Protective
28  Order Bard sought.

- 23 -

1   to address these and related issues (such as who will be shouldering the expense for the

2   second deposition of witnesses such as Mr. Sullivan) as they arise.

3              3.      State/Federal Coordination:

4          The parties have agreed to coordinate state and federal matters and discovery

5   where possible. A Special Master would be beneficial in resolving issues related to this

6   coordination.  For example, Bard has taken the position that depositions cross-noticed in

7   state court cases are under the direction of this court's Case Management's Orders as to

8   time limitations, with no flexibility or reasonable accommodations allowed.  At the

9   Sullivan deposition, Plaintiffs' counsel requested, but were denied, ten (10) additional

10  minutes of time to ask questions that were relevant to the upcoming *Austin* trial.  Also,

11  Bard's counsel refused to allow State court counsel to ask even a single follow-up

12  question after Bard's counsel had questioned Mr. Sullivan, a former employee of Bard.

13  (Appendix B, Sullivan (388:20-389:21; 413:20-414:17).). Bard's position is that Plaintiffs

14  intentionally ran out their time in order to have additional time under the guise of the state

15  court caption. Plaintiffs deny this vehemently considering the utterly frustrating

16  experience counsel has experienced with evasive and non-responsive answers, instructions

17  not to answer without court order and with a clear court order indicating the contrary.

18         The Rules specifically counsel that "a refusal to agree to a reasonable request for

19  some additional time to complete a deposition" may constitute sanctionable conduct.

20  Advisory Comm. Notes, 1993 Amendments, Subdivision (d).  The Advisory Committee

21  further clarified in 2000 that "[i]t is expected that in most instances the parties and the

22  witness will make reasonable accommodations to avoid the need for resort to the court."

23  Advisory Comm. Notes, 2000 Amendments, Subdivision (d).  The Committee explained

24  that circumstances where additional time is warranted and should be agreed to without

25  resorting to the court include multi-party cases where various parties (like Austin's

26  counsel) may need to examine the witness, where the lawyer for the witness may want to

27  examine the witness, where the deponent has information regarding a long period of time,

28  and where a large volume of documentary evidence is relevant to deponent's testimony,

all of which are applicable here. *Id.*

### B.   Defendants' Position

After having taken 28 depositions of Bard corporate employees (past and present) since the commencement of this MDL,[10] and at the eve of the close of discovery, the plaintiffs now raise for the first time with this Court the suggestion that a special master should be employed to oversee any remaining depositions.  The defendants strongly oppose the appointment of a special master because such appointment is both unnecessary and contrary to the efficiency this MDL was created to promote. The plaintiffs raise three reasons for wanting a special master at depositions:  (1) diminishment of Plaintiffs' allotted time for questioning (by lengthy answers); (2) inappropriate instruction not to answer questions by Bard's counsel; and (3) state/federal coordination.  None of these reasons warrants the cost of a special master.

First, this litigation does not lend itself to "yes" or "no" answers generally.[12]  Bard's witnesses have answered questions to the best of their ability given that they are often asked about documents that they have never seen, about actions of departments that they do not work in, about the intent or motivations underlying someone else's words or actions, and about highly-scientific and/or highly regulated issues far outside their known and stated areas of education, expertise, or job functions.  In response to certain of the plaintiffs' questions, to which they demand a "yes or no" answer, some witnesses have explained that they cannot respond simply "yes" or "no."  For example, in Mr. Sullivan's deposition, at one point after having been repeatedly urged to respond "yes or no" to get through the deposition quickly, Mr. Sullivan explained his reluctance to do

---

[10] Attorneys serving as PSC members in this MDL took over 40 depositions of current and former Bard employees during the years leading up to the inception of this MDL.

[12] Bard's preliminary research supports its position that witnesses are entitled to fairly explain their answers and that questioner instructions or demands in the manner a witness must respond is improper, and has in certain instances been considered an intimidation tactic.  *See e.g., Howard v. Offshore Liftboats, LLC*, 2015 WL 965976 (E.D. La. Mar. 4, 2015).

so with certain questions, explaining that "I just have to be careful that I'm – that those are my words, right?"  Another witness, Holly Glass, testified that she could not answer certain questions "yes or no" because "[she didn't] have the background or the clinical experience or basis to say yes or no to that question truly."  Ms. Glass further explained her reluctance at answering hypothetical questions because "[she didn't] have enough information to give you [the questioner] an informed opinion."  Another deponent, Kevin Shifrin, declined to answer a question "yes or no" because "[The question] is a complex one, so a yes-or-no answer I don't think is representative of my experience in medical device business."[13]

Second, the plaintiffs' primary justification for the appointment of a special master readily demonstrates the fact they have no legitimate basis for such a request.  In particular, they rely principally on events that occurred related to a single document at a single deposition (Jack Sullivan). At that deposition, a misunderstanding arose about the privileged nature of a Remedial Action Plan that counsel reasonably believed was protected work product related to the highly-litigated Lehmann Report.  The defendants' counsel, acting in good faith but under a mistaken belief, instructed a witness not to answer questions about that one document they thought was privileged.  In the "meet and confer" discussions following the deposition, the defendants acknowledged their mistake

---

[13] Rather than unnecessarily burdening the Court with lengthy rebuttal excerpts to put the plaintiffs' Appendix A in context, which Bard is prepared to compile if it would be helpful to the Court, Bard is not providing any excerpts at this time. The parties have reached an agreement with respect to resolution of any issues arising from the Sullivan deposition.  The minute order of Oct. 3, 2016, gives the parties instruction with respect to the only deposition occurring before the parties will have an opportunity to discuss these matters with the Court.  If the Court wishes for Bard to submit a rebuttal in advance of the upcoming Case Management Conference, Bard stands ready and willing to do so. Bard believes that a fair reading of the depositions in their entirety demonstrate that lay witnesses were responding to the best of their ability even when asked in detail and at length about documents with which they had no personal knowledge, or areas far beyond their area of expertise and experience.  This is supported by the fact that, thus far, no party has sought this Court's input or guidance regarding the manner in which the deponents are responding.

and acceded to the plaintiffs' demands to "cure" the situation.  For the plaintiffs to now rely on a single mistake, frankly acknowledged and readily corrected in a professional manner, as a global justification for a special master at all future depositions, is not supportable.

Third, at this late stage in discovery, the cost and burden of a special master is not warranted.  A special master at this late stage would only delay the completion of discovery and overcomplicate matters.  The deposition process would require that all depositions be coordinated with not only the schedules of counsel for the parties and the witnesses themselves, which has proven challenging by itself, but then also require that all depositions be coordinated with and scheduled around the special master's calendar, which will serve only to further complicate and delay the completion of discovery.

Additionally, the issues, themes, and defenses that pervade these cases involve highly complex concepts of medical science and regulatory interpretation that cover a fifteen-year time period, with many different individuals and entities at play.  The time and resulting expense that would follow should a special master now attempt to delve into these issues would be immense.  This is not the kind of litigation where even the most experienced litigator could oversee a fact witness deposition without a great deal of preparation.

Finally, although the plaintiffs say that they are willing to bear the cost of a special master themselves, the prospect of the plaintiffs alone incurring this significant and unnecessary cost raises many of the same concerns the defendants had with the plaintiffs' initial proposal related to their common benefit fund – it is reasonable to expect that such costs will be ultimately passed off to the defendants by way of increasing settlement requirements.

Rather than appoint a special master, Bard respectfully requests that if issues arise during a deposition, the parties first take those issues up with this Court to resolve (which the plaintiffs have not done to date despite allegations of continuous deposition misconduct), as the Court has suggested in the past.  If and when the Court is called upon

1   to resolve disputes relating to a specific deposition, the parties can then apply the Court's

2   rulings as guidelines to future depositions, without burdening the Court or undertaking the

3   cost and burden of a special master.

4          DATED this 10th day of October 2016.

5   GALLAGHER & KENNEDY, P.A.          SNELL & WILMER L.L.P.

6

7   By: s/ Paul L. Stoller                      By: s/   Richard B. North, Jr.
       Robert W. Boatman (009619)              James R. Condo
8      Paul L. Stoller (016773)                Amanda C. Sheridan
       Shannon L. Clark (019708)               One Arizona Center
9      2575 East Camelback Road                400 E. Van Buren, Suite 1900
       Phoenix, Arizona 85016-9225             Phoenix, Arizona  85004-2202

10     Ramon Rossi Lopez                       Richard B. North, Jr. (admitted *pro hac*
       (admitted *pro hac vice*)               *vice*)
11     CA Bar No. 86361                        Georgia Bar No. 545599
       LOPEZ McHUGH LLP                        Matthew B. Lerner (admitted *pro hac*
12     100 Bayview Circle, Suite 5600          *vice*)
       Newport Beach, California 92660         Georgia Bar No. 446986
13                                             Nelson Mullins Riley & Scarborough
       Attorneys for Plaintiffs                LLP
14                                             201 17th Street, NW / Suite 1700
                                               Atlanta, GA  30363
15                                             Attorneys for C. R. Bard, Inc. and Bard
16                                             Peripheral Vascular, Inc.

17                        **<u>CERTIFICATE OF SERVICE</u>**

18          I hereby certify that on October 10, 2016, the foregoing was electronically filed with

19   the Clerk of Court using the CM/ECF system which will automatically send email

20   notification of such filing to all attorneys of record.

21

22                                             s/  Deborah Yanazzo

23

24

25

26

27

28   5648120/26997-0001