1              **UNITED STATES DISTRICT COURT**

2             **FOR THE DISTRICT OF ARIZONA**

3             _____

4  **In Re: Bard IVC Filters**      ) MD-15-02641-PHX-DGC
    Products Liability Litigation  )

5                            )
                            ) Phoenix, Arizona

6                            ) October 14, 2016
                            )

7  _____)

8

9

10

11

12     **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

13         **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

14           <u>**SIXTH SCHEDULING CONFERENCE**</u>

15

16

17

18

19

20

21  Official Court Reporter:
    Patricia Lyons, RMR, CRR

22  Sandra Day O'Connor U.S. Courthouse, Ste. 312
    401 West Washington Street, SPC 41

23  Phoenix, Arizona  85003-2150
    (602) 322-7257

24

25  Proceedings Reported by Stenographic Court Reporter
    Transcript Prepared with Computer-Aided Transcription

1                          **A P P E A R A N C E S**

2

3    Plaintiffs' Co-Lead/Liaison Counsel and State/Federal Liaison
     Counsel:
4
                 Gallagher & Kennedy
5                By: **ROBERT W. BOATMAN**, ESQ.
                 2575 East Camelback Road, Suite 1100
6                Phoenix, AZ  85016

7                Lopez McHugh
                 By: **RAMON ROSSI LOPEZ**, ESQ.
8                100 Bayview Circle, Suite 5600
                 Newport Beach, CA  92660
9

10   Plaintiffs' Steering Committee Counsel:

11               Gallagher & Kennedy
                 By: **PAUL LINCOLN STOLLER**, ESQ.
12               2575 East Camelback Road, Suite 1100
                 Phoenix, AZ  85016
13

14

15   For Defendants:

16               Nelson Mullins Riley & Scarborough, LLC
                 By: **MATTHEW B. LERNER**, ESQ.
17                   **TAYLOR T. DALY**, ESQ.
                 201 17th Street NW, Suite 1700
18               Atlanta, GA  30363

19               Snell & Wilmer
20               By: **JAMES R. CONDO**, ESQ.
                     **AMANDA SHERIDAN**, ESQ.
21               400 East Van Buren
                 Phoenix, AZ  85004
22

23

24

25

**P R O C E E D I N G S**

10:01:31    1

2

3          THE COURTROOM DEPUTY:  MDL case 2015-2641, Bard IVC

4    Filters Product Liability Litigation on for 6th case

10:01:28    5    management conference.

6          Will the parties please announce.

7          MR. BOATMAN:  Good morning, Your Honor.  Bob Boatman,

8    Ramon Lopez, and Paul Stoller for the plaintiffs.

9          THE COURT:  Good morning.

10:01:39   10          MR. LERNER:  Morning, Your Honor.  Matthew Lerner,

11    Taylor Daly, Jim Condo, and Amanda Sheridan for the

12    defendants.

13          THE COURT:  Good morning.

14          And welcome to folks who are on the phone and in the

10:01:49   15    courtroom.

16          Counsel, I've read the joint status report that you

17    all provided, and want to talk through the issues in there.  I

18    have a question and an observation first.

19          Did you all work out the additional bellwether cases?

10:02:12   20    The issue we addressed last time?  Has that been resolved?

21          MR. STOLLER:  Your Honor, the defense made additional

22    selections of bellwether cases.  Those are proceeding.  We

23    have our full slate of 48.

24          THE COURT:  Okay.

10:02:29   25          I also wanted to note for plaintiffs' counsel that

10:02:34  1    there have been some, not very many, but a few attorneys who

2    have been admitted for purposes of the MDL and have access to

3    the docket who have been filing short-form complaints just by

4    entering them in the docket without opening a new case, as

10:02:51  5    they're required to do.  And so what we've done, I don't know

6    if it's actually happened, but I talked to my staff about

7    striking those complaints and instructing the attorneys they

8    have to file those as a case and then they'll be transferred

9    in to the MDL, rather than just filing them as a new docket.

10:03:08  10   I think those who have done it have gotten that word or will

11   shortly.

12       If you could be just aware of that.  Obviously, they

13   need to file that as if it's a complaint even though it's only

14   a short form.

10:03:20  15       MR. STOLLER:  Your Honor, we can send out an e-mail

16   to at least everybody of whom we're aware, those who have

17   filed, and those who are in the PLC, reminding them of the

18   procedure.  Obviously, we can't avoid the new folks, but we're

19   certainly happy to do that.

10:03:32  20       THE COURT:  Okay.

21       All right.  There are four issues that I see that

22   you've all raised in the joint status report, and one is the

23   plaintiffs' request to extend discovery schedule.  The second

24   is the additional depositions that are reviewed in the matrix

10:03:49  25   in the joint report.  The third are the 30(b)(6) depositions.

10:03:52  1   And the final issue is the plaintiffs' request for a special

2   master.

3           Why don't we start with the 30(b)(6) depositions.

4   You all indicated there were additional discussions occurring

10:04:12  5   on that issue.  Has any progress been made on the 30(b)(6)

6   issue?

7           MR. BOATMAN:  Your Honor, the way we left it, I

8   believe, is that we're going to wait the judge's ruling on

9   both the extension of time and the additional depositions that

10:04:32 10   will be allowed.  To the extent there's no extension or no

11   additional depositions, it's sort of a moot point.

12           And then beyond that, but assuming they are, that the

13   depositions are allowed, then we had -- we're going to sit

14   down and work through the process.  They were going to give us

10:04:56 15   a list of what they thought was reasonable or what the proper

16   scope would be of the 30(b)(6).  We were going to try to work

17   through that following this hearing.

18           THE COURT:  So, Mr. Boatman, I'm assuming from that

19   you don't think I need to rule on the 30(b)(6) issue today.

10:05:13 20           MR. BOATMAN:  No.  We haven't really met and

21   conferred on that, yet, Your Honor.

22           THE COURT:  Do defense counsel agree?

23           MR. LERNER:  Your Honor, I think that's correct.  I

24   think part of your rulings today may impact 30(b)(6)

10:05:22 25   depositions, and once we have those rulings we can further

10:05:25  1    discuss.

2         THE COURT:  Okay.  All right.  I will not take any

3    action on that.  If an issue does arise, you can let me know.

4         Let's talk next about the additional depositions.

10:05:41  5    I've looked -- I've read the matrix that you all submitted,

6    which begins on page 13 of the joint status report which is at

7    Docket 3636.

8         I think we just need to talk about each one so I make

9    sure I understand the parties' views.

10:06:14  10        Is that us or --

11        THE COURTROOM DEPUTY:  No.  That's them.  I'm going

12   to mute them so they can still hear us.

13        THE COURT:  That's fine.

14        Starting with Dr. Kaufman, the plaintiffs note that

10:06:25  15   he was deposed for four hours in 2010 by an attorney who was

16   not a part of the plaintiffs' steering committee and states

17   that they want to depose him because he's a principal

18   investigator in the EVEREST study.  I understand, or I'm

19   assuming, inferring, perhaps, from reading the matrix that the

10:06:45  20   EVEREST study related to the G2 filter; is that correct?

21        MR. BOATMAN:  That's correct, Your Honor.

22        THE COURT:  And the plaintiffs note that he's listed

23   by Bard in state court cases as a witness Bard is going to

24   call.

10:07:00  25        Bard's view is you have known about Dr. Kaufman since

10:07:03  1   before the MDL, or at least since their discovery responses

2   many months ago, this isn't the later-generation filters, this

3   is the G2, and so it's just late in the process to be seeking

4   to redepose Dr. Kaufman.

10:07:20  5        Would plaintiffs' counsel address that.

6        MR. BOATMAN:  Yes, Your Honor.  We -- Dr. Kaufman --

7   we aren't -- they seem to suggest throughout their brief that

8   we're seeking to extend discovery to take these depositions,

9   and that isn't the case.

10:07:43 10        What we did with -- a little -- right around a month

11   to go is we said, Bard, we've worked through our list, here

12   are the final people -- here are the people that we've

13   identified.

14        We'd been doing depositions on a rolling basis in a

10:08:00 15   way that seemed logical to us based upon the documents we had,

16   the information we had.  And so this is a critical witness and

17   he was someone we wanted to depose, and we told them that with

18   a month left in discovery.  And for this witness, and

19   effectively every witness, they just said kind of unilaterally

10:08:19 20   "We're done."

21        And so it's not the basis -- we're not saying we need

22   to extend discovery for this.  We're saying we had time left

23   in discovery, and this is one of the witnesses we wanted to

24   depose within that time.  And at that point Bard just said,

10:08:37 25   We're not agreeing to any further depositions and that, you

10:08:40  1    know, we'll take it up here.

2         THE COURT:  All right.  Since I've got you at the

3    lectern, let me ask about the other seven, or the other six

4    reopened depositions.

10:08:54  5         The position on Dr. Venbrux, V-E-N-B-R-U-X, is

6    essentially the same arguments on both sides that I just

7    described for Dr. Kaufman.  Is your response the same with

8    respect to him?

9         MR. BOATMAN:  It is, Your Honor.  There's a little

10:09:15 10   bit of witness-specific differences, but generally speaking

11   these are all people that are working for Bard either in the

12   design, the testing, the promotion of their materials.  And

13   most importantly, Your Honor, they're listing these people as

14   witnesses.

10:09:33 15        One other point I would add to these witnesses is

16   these are people that are sort of like reliance on the advice

17   of counsel.  They are witnesses in the case, have been saying

18   either documents they generated or conversations with them

19   were part of the decision-making process to not -- to continue

10:09:56 20   marketing products that we contend were defective.  And so

21   part of the inquiry that we need to ask that's never been

22   asked is, you know, did they really hold these opinions, and

23   if they held these opinions, would they still hold those

24   opinions if they knew what we believe is the whole story, and

10:10:14 25   did in fact Bard give them the whole story regarding the

10:10:17  1   problems that they knew internally but were not sharing with

2   the world.

3        And so there's -- the EVEREST study is a very

4   important study, Your Honor.  It's -- the FDA put pressure on

10:10:30  5   the manufacturers to actually study the failure rates and it

6   kind of blew up on Bard.  They had some conflict with some of

7   their key opinion leaders, including Dr. Kaufman.  We think

8   that's probably why they're trying to fight so hard on having

9   some of these people that were on Bard's side not be deposed;

10:10:49  10  we suspect they're no longer on Bard's side.

11       THE COURT:  Dr. Terotola -- no.  Trerotola.

12  T-R-E-R-O-T-O-L-A.

13       MR. BOATMAN:  Yes, Your Honor.  Same thing.  He's a

14  key opinion leader, has worked as a consultant at Bard since

10:11:08  15  2001.  He's listed as a witness they intend to call at trial.

16       One of the conversations we had with the defendants

17  is asking them to agree, especially since they're asking us --

18  or saying we don't get to take their depositions, that they

19  stipulate that none of the transcripts or documents or -- and

10:11:25  20  they won't be calling these witnesses at trial, and they would

21  not make that stipulation.  So it seems fundamentally unfair

22  that they have these witnesses that they list as witnesses

23  that they agree are important witnesses that they may be

24  calling at trial, and nobody in MDL is going to have the

10:11:41  25  opportunity to ever depose them.

10:11:43  1          THE COURT:  Dr. Stavropoulos.

2    S-T-R-A-V-R-O-P-O-L-O-U-S [sic].

3          MR. BOATMAN:  Yes, Your Honor, same deal.  Except in

4    that case, he had a half-hour examination in 2011 as a

10:11:58  5    fact-specific witness.  So we know very little about the

6    substance.  Again, he's part of the EVEREST study, part of the

7    Kaufman, Venbrux, Trerotola team.  And there's really been no

8    substantive deposition of him, even by a non-MDL attorney.

9          And, of course, Your Honor, one of the main points

10:12:19  10    that we've made regarding all of these is their objection to

11    these is that they've been previously deposed.  And they were

12    very limited, often case-specific depositions, five or six

13    years ago, and the world has changed dramatically as far as

14    the information base and theories that the plaintiffs have as

10:12:43  15    far as questions they would have for these witnesses.

16          THE COURT:  Dr. Lehmann seems to be in a different

17    category.  He's been deposed for 11 hours, for seven hours in

18    2013 by Mr. Lopez.  He was also subject to cross-examination

19    in the Texas action.  What's the reason that you think you

10:13:02  20    need to redepose him in light of that discovery that's

21    occurred?

22          MR. BOATMAN:  Your Honor, two reasons.  One is that

23    there's new information that's came up, especially concerning

24    the EVEREST study.  And secondly, there's been new documents

10:13:19  25    and new understanding of documents that occurred since his

10:13:24   1   last deposition that we would want -- I don't think we need a

           2   full deposition, but we need a few hours with him to cover

           3   these new materials, the EVEREST study, and some of the new

           4   information that's come to light, especially through

10:13:42   5   Dr. Kessler has issued a report in one of the state court

           6   cases going to trial early next year, and there's some very

           7   significant issues and opinions in that report that

           8   Dr. Lehmann's never been questioned about.

           9           THE COURT:  John McDermott, M-C-D-E-R-M-O-T-T, is in

10:14:06  10   a bit of a different situation.  You don't want to redepose

          11   him for discovery purposes, as I understand it, it's that you

          12   think the video of the deposition is not usable in a jury

          13   trial because of what you described as the acrimonious nature

          14   of the questioning and answers.  And so you suggested that it

10:14:32  15   be used only in written form, not in video.  The defendants

          16   disagreed.

          17           The defendants' response was that the acrimonious

          18   questions were Mr. Lopez's and, in fact that the magistrate

          19   judge took umbrage at the manner in which the questioning was

10:14:50  20   done.

          21           Could you address that.

          22           MR. BOATMAN:  Yes, Your Honor.  I believe Mr. Lopez

          23   identified this problem, this issue, early on in the case, and

          24   that is the issue before us now.  Interestingly --

10:15:03  25           THE COURT:  I'm sorry, early on in our case?

10:15:06  1        MR. BOATMAN:  In our case, yes.  I don't know if the

2    Court remembers, but Mr. --

3            THE COURT:  I don't.

4        MR. BOATMAN:  -- Lopez, I believe, raised this issue

10:15:11  5    and this problem before.

6            THE COURT:  Okay.  I don't remember that.

7        MR. BOATMAN:  But in any event, the defendants, I

8    think, are in agreement with us that the tape is a tape that

9    is as described.  And so we've tried to work through it.  We

10:15:27 10   don't particularly want to have to redepose Mr. McDermott, and

11   we said our compromise was let's read it to take away the

12   emotion and the inflammatory portions of it.  And they won't

13   agree to that.  I think it's so that we have a video that we

14   can't use and in effect can't call him.

10:15:56 15       So our position is we'd either like the Court --

16   either agreement of the parties or the Court to rule that if

17   they're going to limit us to the pre-MDL deposition, that it

18   only be read.  Or, if they aren't going to agree to that, that

19   we be allowed to take a deposition that can be used by the

10:16:16 20   thousand new plaintiffs and the 50 new law firms that would

21   otherwise be prejudiced by the nature of the acrimony in the

22   videotaped deposition.

23           THE COURT:  Okay.  Let's hold off on talking about

24   the new witnesses.  Let me hear from defense counsel on these.

10:16:35 25       MR. LOPEZ:  Your Honor, I feel almost compelled to

10:16:37  1  address the Court on the McDermott issue.  May I?

2        THE COURT:  You may.  This sounds like a presidential

3  debate where somebody says, "I have to respond to that point."

4        MR. LOPEZ:  I do because I wasn't expecting to see

10:16:48  5  this in the pleading.  And it looks like -- you know, we had a

6  full hearing on this with Judge Jones.

7        THE COURT:  Pull the mic over, would you.

8        MR. LOPEZ:  I'm sorry.

9        What happened -- I wasn't even at this hearing.  We

10:17:02  10  got blindsided by it and there are -- I did bring this to the

11  Court's attention.  There are one or two depositions that

12  because of the nature of the video or the way the deposition

13  was taken, I wouldn't expect some of my colleagues to have

14  deal with that.

10:17:18  15        For the most part the deposition is okay.  We read

16  the deposition at the *Phillips* trial in front of Judge Jones.

17  There are certain parts of it I'm not particularly proud of.

18  But the only thing that the magistrate judge saw in the

19  *Phillips* case was my reaction to about 20 minutes of maybe the

10:17:36  20  reasons why this had built up because of the nature of the

21  deposition.

22        So I just don't want the Court to be left with the

23  impression that I showed up at a seven-hour deposition and I

24  was nothing but acrimonious and not respectful.  I was.  I

10:17:52  25  mean, for the most part, but -- and there are sections of that

1   deposition I'm not particularly proud of, and I brought that

2   to the attention of the Court.

3          And it's an important deposition.  He was the

4   president of Bard Peripheral Vascular during a very critical

5   time, during the recovery period, and then when it

6   transitioned to the G2.  He's someone that, frankly, we

7   probably could have redeposed.

8          The testimony is fine.  It's that -- it's a major

9   distraction in about 15 percent of it, of important testimony,

10  where I wouldn't want to play because I'm not proud of my

11  tone, I'm not proud of the way the witness and I are going

12  back and forth on certain issues, and I don't think my

13  colleagues or people I represent -- I don't represent, should

14  be burdened with the jury having an adverse reaction to the

15  plaintiffs' lawyer not being very professional, to be quite

16  frank.

17         I'm proud to say that the deposition I took on

18  Tuesday, which was a seven-hour deposition of a very key

19  witness, at the end of the deposition the witness said to me,

20  "Thank you, Mr. Lopez, for being so professional."

21         So, I mean, this just happens to be one of those

22  depositions where the witness and I did not get along very

23  well at various parts and I didn't get an opportunity to show

24  Judge Jones or you, I'm just looking at the fact that the

25  judge said tell Mr. Lopez to behave.

10:19:22   1          But I just thought it was important for my

2    relationship with you for you to understand that that was an

3    exception and not the rule during the deposition.  But there

4    are parts that are important to present to cases in the

10:19:36   5    future, and I think it's not fair they're not allowed to be

6    read.

7          If we could just get a stipulation that the

8    deposition can be read, I mean, this whole -- we don't need to

9    redepose Mr. McDermott.  We're happy with the transcript.

10:19:51  10          THE COURT:  Why was it read in the *Phillips* trial, as

11   opposed to being played?

12          MR. LOPEZ:  We were getting near the end of the case

13   and we had planned to read it anyway and it was just one of

14   those depositions that we read.  I mean, it was -- I chose not

10:20:06  15   to play the video because there were certain parts of it that

16   I would have had to remove.  I would have taken out important

17   substantive testimony because I didn't want the jury to be

18   distracted by me arguing and going back and forth with the

19   witness or, frankly, my tone in dealing with the witness at

10:20:23  20   about the five-and-a-half-hour mark of the deposition where I

21   granted -- I mean, given I was frustrated and I was not as

22   professional as I should have been under those circumstances.

23          But, again, this is about just doing what's right for

24   everybody and to make sure that the focus is on testimony and

10:20:46  25   not on whether or not a plaintiffs' lawyer had ten minutes of

10:20:50  1   not his finest moment in his 35-year career.  So I just wanted

2   to have an opportunity to express that to the Court, and I

3   appreciate it.

4            THE COURT:  Okay.  Thank you.

10:21:01  5            Let's hear from defense counsel on these seven.

6            MR. LERNER:  Your Honor, Matthew Lerner for the

7   defense.  Would you like me to start with Mr. McDermott first?

8            THE COURT:  Your choice.

9            MR. LERNER:  Okay.  Just for Mr. McDermott,

10:21:16  10  obviously, after experiencing that deposition, he didn't want

11  to be deposed again.  It's acrimonious.  He's also the

12  president of a publicly traded company.  He's now been deposed

13  twice while he had that position with another company, and

14  he's also -- it's an apex deposition.  You previously

10:21:41  15  prevented or -- I've forgotten whose motion it was, Bard's

16  current or former president Jim Beasley, you granted our

17  motion to not have that deposition go forward on apex grounds.

18  So Mr. McDermott fought on that same grounds.

19            And then outside of that, just to address the

10:21:59  20  deposition issue, Mr. Lopez talks about 15 percent of the

21  deposition not being able to played.  That's only 15 percent

22  of the entire deposition.  In order to appreciate the answers

23  and responses, you really need to have the video to have

24  context.  It's not fair to play the deposition or play -- to

10:22:16  25  have the deposition read to the jury without having the video

10:22:19   1   and the full context of the deposition to appreciate the

2   answers and the questioning.

3                THE COURT:  Why?

4                MR. LERNER:  Because it gives context.  Just reading

10:22:28   5   the plain language without having the context of the actual

6   deposition helps explain the answers and questioning.  It --

7   just -- reading versus seeing it live is a different

8   experience, and it's more helpful for the jury to see the

9   experience that actually occurred.

10:22:49  10                THE COURT:  Well, I think what you're saying,

11   Mr. Lerner, is that video depositions are better than read

12   depositions for a jury.  Which I agree with.

13                The question I guess I have is if 15 percent of the

14   deposition contains behavior that could be prejudicial to the

10:23:20  15   plaintiffs, why is it better to show that 15 percent by video

16   than to read it?

17                MR. LERNER:  Are you suggesting that you play some of

18   the deposition and you play the 15 percent that we can agree

19   with, the 15 percent?

10:23:38  20                THE COURT:  Well, I have had cases where portions are

21   played and portions are read, in part because you can be a bit

22   more strategic and focused in what you read.  It's harder

23   sometimes to edit a video and keep it in context.

24                But I guess my thought is if, as Mr. Lopez has

10:23:54  25   acknowledged, he behaved during portions of that deposition in

10:23:58  1    a way that he thinks could be prejudicial to the plaintiff and

2    that he is not saying was a good thing, and if it's true,

3    those portions of the deposition would be distracting because

4    of the behavior of the witness and/or the lawyer, don't we

10:24:15  5    solve that problem and eliminate the need for Mr. McDermott to

6    be deposed again if we say let's read the portions where

7    there's the distraction so we eliminate that prejudice, and

8    play whatever other portions you all think the jury should

9    hear?

10:24:33  10        MR. LERNER:  I think that sounds like a reasonable

11    solution.  My only concern, without reviewing what the

12    portions are, is it could take that out of context, the

13    behavior -- how the appearance of the witness/questioner being

14    taken out, in excerpts like that, but I guess in some ways

10:24:45  15    when you're playing a deposition at trial, you're not playing

16    the entire thing, so --

17        THE COURT:  Yeah, I mean, we never play them

18    beginning to end.  And I'll tell you, I put time limits in

19    civil cases.  I give lawyers specific numbers of hours.  I

10:24:56  20    tell them at noon and at the end of the day how much time

21    they've used so they can budget it, and it really causes

22    everybody to be efficient and cut to the chase and just put

23    the stuff that the jury needs to hear in front of them.  So

24    there's a lot of editing of depositions that goes on.

10:25:11  25        And I think the way to resolve this is to say, number

10:25:16 1   one, we won't redepose Mr. McDermott.

2           Number two, when we get to the first bellwether trial

3   where he's going to be used, the parties will work to agree on

4   what portions should be read and what portions should be

10:25:28 5   viewed.

6           Number three, if you can't agree, I'll make that call

7   as to what portions will be read and what portions will be

8   viewed.

9           And the goal will be to give the jury a fair

10:25:39 10  presentation of his testimony and not prejudice the jury with

11  some other thing that happened in the deposition.  To try to

12  do it in a way so that the jury fairly understands what he had

13  to say.  And I think that solves the redeposition issue and

14  the plaintiffs' prejudice issue going forward.

10:26:00 15          MR. LERNER:  That sounds like a reasonable solution,

16  Your Honor.

17          THE COURT:  Okay.  So that's what we'll do on

18  McDermott.  Let me just make a note here.

19          Okay.  Let's hear your thoughts on the other six

10:26:56 20  we've talked about.

21          MR. LERNER:  Your Honor, I'll go through each of

22  these individually, but I'll note the various doctors have

23  been known to the plaintiffs even before this litigation, MDL,

24  was started.  They primarily focused on Recovery and G2.

10:27:17 25  Within the last few weeks before close of discovery, we

10:27:19   1   received subpoenas and notices that several depositions were

2   going to be noticed for October, I think it was 13th or 14th,

3   with various doctors who, as I said, it was long ago known to

4   the parties relating to the Recovery and G2.  Many of those

10:27:34   5   doctors have objected to the subpoenas.  The subpoenas have

6   document requests with them as well that are very broad in

7   their questioning and requests, and several of the doctors, I

8   believe Dr. Cohen, Dr. Trerotola, Dr. Stavropoulos have filed

9   motion to quash in the Eastern District of Pennsylvania.  I

10:27:55   10   believe Dr. Venbrux has filed objection.  So some of those

11   disputes --

12         THE COURT:  Which -- which doctors have moved to

13   quash?

14         MR. LERNER:  I believe it's Cohen, Dr. Trerotola,

10:28:07   15   Dr. Stavropoulos.

16         THE COURT:  I don't see a Dr. Cohen.

17         MR. LERNER:  He's number 7 on page 20 of this

18   submission.

19         THE COURT:  Number 7 in our list is John McDermott.

10:28:24   20         MR. LERNER:  Page 20 --

21         THE COURT:  Well, I'm not talking yet about new

22   witnesses, I'm just talking about the six that Mr. Boatman

23   discussed.  So those are the -- they're now 2 through 6 on

24   pages 14 through 16.  Those are the ones that I think

10:28:45   25   Mr. Boatman discussed so far.  And I'll hear you on the others

10:28:52   1   in a moment, but I think what we ought to do is focus on the

2   ones Mr. Boatman discussed.

3   MR. LERNER:  That's just to point out those issues

4   may be resolved.  There's motions going on with some of these

10:29:04   5   witnesses that may further delay things.

6   THE COURT:  You mean the motion to quash may?

7   MR. LERNER:  Motion to quash may.  Filed in Eastern

8   District of Pennsylvania by their attorneys.

9   THE COURT:  How long ago were they filed?

10:29:17   10   MR. LERNER:  I think they were filed --

11   MR. LOPEZ:  There was a deadline, so we spoke to the

12   lawyers and I think they had to file it by last Friday.

13   MS. DALY:  October 7.

14   THE COURT:  I will tell you, as you probably know, we

10:29:36   15   amended Rule 45 two years ago that put a transfer provision in

16   Rule 45(f), that now says that a judge who get a motion to

17   quash in the Eastern District of Pennsylvania can transfer the

18   motion to me for ruling.  That was done specifically to deal

19   with situations like this where there's a nationwide case,

10:29:56   20   lots of litigation going on, the thought being that one judge

21   ought to decide what's happening.

22   So if there are motions to quash on witnesses that I

23   think ought to be deposed, what I would probably be inclined

24   to do is call the judge and say why don't you transfer that

10:30:13   25   motion to me so you don't have to worry about it, and I'll do

10:30:16   1   it consistent with the MDL.

2        I only mention that -- it used to be the rule that

3   the motion -- well, there was a split in the district courts,

4   actually.  But there was a lot of case law that said the judge

10:30:30   5   in Pennsylvania had to rule on the issue even if the judge in

6   California who was presiding over the case knew a lot more and

7   was better situated, and so 45(f) was adopted specifically to

8   address that situation.

9        So my point is I'm not sure that it's out of my hands

10:30:47  10   on these witnesses and that we just have to wait for the

11   motion to quash to be decided.

12        MR. LERNER:  Understood, Your Honor.

13        Then going through each of these witnesses, I think

14   the primary background context of why we're objecting --

10:31:03  15        THE COURT:  I'm sorry, Mr. Lerner.

16        As to the six we've talked about so far, which are

17   Kaufman, Venbrux, Terotola -- Trerotola, and -- Strav- -- how

18   do you say that?  Stravropoulos.

19        MR. LERNER:  Stavropoulos.

10:31:23  20        THE COURT:  Strav- -- there's an R after the T.

21   Stavropoulos?  Or is that R a misspelling?

22        MS. DALY:  It's a misspelling.

23        THE COURT:  So it's just Stavropoulos.  Okay.

24        As to those four, have there been motions to quash

10:31:39  25   filed somewhere?

10:31:41   1        MR. LERNER:  There's been a motion to file for

           2   Dr. Venbrux, Dr. Trerotola, Dr. Stavropoulos.  I'm not sure of

           3   the status of Dr. Kaufman.

           4        MS. DALY:  Hasn't been served.

10:31:52   5        THE COURT:  So the motions to quash are pending for

           6   whom?

           7        MR. LERNER:  Dr. Trerotola, Dr. Stavropoulos, and

           8   Dr. Venbrux.  I think he filed a letter objection but not

           9   actually filed a motion.

10:32:10  10        THE COURT:  Okay.  And where is the motion to quash

          11   for Dr. -- is Trerotola misspelled as well or is that correct?

          12   Is there an R after the T?

          13        MS. DALY:  That's correct.

          14        THE COURT:  Okay.  So where is the motion to quash

10:32:28  15   for Trerotola?

          16        MR. LERNER:  Both filed in Eastern District of

          17   Pennsylvania.

          18        THE COURT:  Okay.  For Stavropoulos and Trerotola.

          19        Okay.  And where is Venbrux located?

10:32:43  20        MR. LERNER:  Washington, D.C.

          21        THE COURT:  Okay.  Okay.  I've interrupted you

          22   enough.  Why don't you give me your thoughts on these doctors.

          23        MR. LERNER:  Well, I think for Dr. Kaufman and

          24   Dr. Venbrux, along with the other discovery they're seeking,

10:33:04  25   they've been deposed, there hasn't been -- they were primarily

10:33:08  1   involved in Recovery and G2.  They've been -- so they were

2   well-known to the folks on plaintiffs' side for a long time.

3   They're medical doctors and busy practitioners as well.  So

4   that's the primary objection to those two people.

10:33:29  5               THE COURT:  How about Trerotola and Stavropoulos?

6               MR. LERNER:  Those two doctors have been involved

7   with later-generation products.  Our main concern, with these

8   depositions as a whole, is the number of depositions that came

9   in late.  So we don't have necessarily objections to them

10:33:48  10  because of their past depositions, but it's more for focus as

11  a whole for all the discovery that's been requested on the eve

12  of close of discovery.

13              THE COURT:  So let me make sure I understand.  As to

14  Trerotola and Stavropoulos, if there were more time you would

10:34:09  15 agree they could be redeposed, you're just concerned there's

16  too many depositions being crowded in at the end of discovery?

17              MR. LERNER:  Yes, Your Honor.

18              THE COURT:  Okay.

19              MR. LERNER:  That brings us to Dr. Lehmann.  He's

10:34:28  20 been deposed, as you noted, seven hours by Mr. Lopez, another

21  four hours in a case that Mr. Lopez was co-counsel to.  He had

22  the examination in federal court in Texas.  He was involved in

23  Recovery and G2 days.  Documents and materials relating to

24  Dr. Lehmann have been produced even before the MDL began.  So

10:34:52  25 there's really no justification at this late stage to depose

10:34:56  1  Dr. Lehmann yet again.

2            THE COURT:  Okay.  All right.  Thanks.

3            Let's hear from plaintiffs' counsel on the seven

4  new -- I guess it's six new proposed witnesses on pages 18

10:35:18  5  through 20.

6            MR. BOATMAN:  Thank you, Your Honor.

7            Can I make a comment about the -- as far as the

8  subpoena process and where we are on the previously deposed

9  witnesses?  I wanted the Court to have the full background.

10:35:34  10           Bard, a few months ago, asked me to instead of

11  serving subpoenas, to run them through Bard.  And Bard has

12  been very much in contact with these witnesses.  Some, they've

13  turned out not being -- they've been unable to accept the

14  subpoena.  For most of them, they have.  We believe that Bard

10:35:58  15  is behind the effort to quash the subpoena, the subpoenas,

16  that have been filed.

17           We have talked to the attorney that filed the motion

18  to quash, I did, and I suggested that the motion be filed with

19  you for the reasons you discussed.  I thought it would end up

10:36:17  20  here anyway and it was more appropriate for you to decide it.

21           We also agreed to try to work through it, and the way

22  we left that is we have a conference with the attorneys that

23  filed the motion to quash next week if we get past the

24  threshold where the court is going to allow the depositions.

10:36:37  25  We figured there's no point briefing where it should be

10:36:40   1   briefed and briefing the merits of their motion if the court

2   wasn't going to allow those depositions.  So that's what's

3   going on as far as the subpoenas and motion to quash.

4          THE COURT:  Is that true as to both Trerotola and

10:36:56   5   Stavropoulos?

6          MR. BOATMAN:  It is, Your Honor.

7          THE COURT:  One lawyer for both?

8          MR. BOATMAN:  One lawyer for both.

9          THE COURT:  Okay.

10:37:10  10          MR. BOATMAN:  As far as the new witnesses, they're

11   the six listed on pages 18 and 19.  As will become apparent

12   when Mr. Stoller speaks about the volume of the documents that

13   were produced and when they were produced, these are the

14   witnesses that we've identified as the key people on the

10:37:36  15   later-generation devices that need to be deposed.  They've

16   never been deposed.  And almost entirely all of the documents

17   relating to them have been produced very recently.  And so

18   that was the reason we were going forward with all of the

19   depositions that we could, that we had the documents for,

10:37:58  20   which were primarily the earlier generation Recovery and G2.

21          Your Honor, I think by our count, the Recovery and

22   the G2 make up the majority of our cases, and also a lot of

23   the issues, even with the later-generation devices, flow from

24   the problems with those earlier generations.  So those are at

10:38:22  25   issue in even the later generation cases.

10:38:24  1          But in any event, as to these witnesses, again, as we

2     were looking at the work to be completed before the close of

3     discovery, we said now that we're either getting the documents

4     or are being promised to get the documents, many of these

10:38:44  5     documents for these witnesses still are only produced in the

6     last week or two.  We identified these five or six people as

7     the people and the discovery we needed for the

8     later-generation devices.

9          On some of them, as I understand it, I think, Bard

10:39:03  10    did not have a disagreement that they were people that had

11    relevant information and should be deposed.  I think they have

12    a couple of differences on that.

13         But generally speaking, it goes back to the overall

14    objection that, as you articulated earlier, we're trying to

10:39:22  15    get too many depositions done in the remaining month.  And on

16    that point, Your Honor, I would simply point out they have two

17    very big, good law firms and we have double track depositions

18    in this case and we've got the resources on the plaintiffs'

19    side to do likewise.

10:39:42  20         The only witness that arguably has been deposed is

21    Kim Romney.  Kim Romney was not deposed by us as the filter

22    manager for later-generation devices, but as the person Bard

23    put up as a 30(b)(6) designee, and our work in those cases was

24    focused upon the 30(b)(6) subject matter.

10:40:06  25         THE COURT:  What about the assertion in Bard's

10:40:09  1    portion of the matrix that you, plaintiffs' counsel, asserted,

2    that you were entitled to ask Ms. Romney questions outside the

3    scope of the 30(b)(6) deposition based on her own personal

4    knowledge, and, in fact, asked those questions?

10:40:23  5         MR. BOATMAN:  I'm sure there were instances,

6    Your Honor, where we were trying to debate -- you would debate

7    whether a question was within the scope of the 30(b)(6) or

8    not, and so I imagine if we went through the transcript there

9    would be instances where that may have occurred.  I can't

10:40:43  10   represent that it didn't.

11         But I can tell you by and large they weren't taken by

12   me and I sat in on part of one, but they were on the subject

13   matter of the 30(b)(6) depositions.  One was very narrow, the

14   REACH Program.  One I think was -- I can't remember, maybe

10:41:02  15   sales and marketing.

16         But the point is, is that we did not treat those

17   depositions, we did not prepare for or treat those depositions

18   as the depositions that we would take as the product manager.

19         THE COURT:  Okay.  Did you have other points you

10:41:29  20   wanted to make on this group of witnesses?

21         MR. BOATMAN:  No, Your Honor.

22         MR. STOLLER:  Actually, Your Honor, if I might.  I

23   hate to tag team, but I think this overlaps with

24   proportionality issues in the case.

10:41:41  25        We have supplied you, Your Honor, with appendix A to

10:41:45  1   the joint report, a list of people who held various positions

2   at the corporation -- at the two corporate entities here over

3   the years, and the folks that we identified in these latter

4   categories and mostly those later generation -- if you don't

10:42:01  5   mind, I'd like to approach.  I've updated that chart a bit to

6   include information in terms of the documents that have been

7   produced for these later-generation folks.

8           What you have here, Your Honor, is I've added a

9   column to what we previously submitted on the right that is

10:42:24  10  about documents, and it's New, slash, Old, and you'll see

11  numbers next to the various folks.

12          As you note on what we submitted earlier, we

13  identified the key positions within these organizations that

14  related to filters and identified the people who held those

10:42:40  15  various positions over the years.

16          As you know, we're dealing with 14 years, seven

17  products, and there's been a fair amount of turnover in those

18  positions.  It's not as if we're talking about a two-year span

19  of just the Recovery, where they had one president, one VP of

10:42:54  20  R and D, and one VP of the various departments of the company.

21  They've had -- because of the number of devices and the number

22  of years, they've had a number of different people who held

23  those positions.

24          And as you probably saw from the appendix we

10:43:05  25  originally provided, we've gone back and started the

10:43:09  1   depositions with the earlier folks, and not deposed the later

2   folks primarily because we didn't have the documents for the

3   later devices.

4        What I've given here, Your Honor, and I've

10:43:18  5   highlighted those folks who are primarily later-generation

6   devices and primarily and -- with very few exceptions, not --

7   well, none of them have been deposed in the MDL.  Some had

8   been deposed pre-MDL on earlier devices.  For example, towards

9   the bottom of the page, you'll see I've highlighted

10:43:37 10   Mr. Chanduszo, who was deposed prior to the MDL on earlier MDL

11   devices.  On the other hand, he's been in that same position

12   throughout, where he's been one of the primary engineers for

13   the projects throughout.  So he hasn't been deposed on things

14   like the Meridian and Denali.

10:43:54 15        What I've indicated in the far column, Your Honor,

16   you'll see are the documents that we recently received on

17   these folks --

18        THE COURT:  What do you mean by "recently"?

19        MR. STOLLER:  Primarily starting September 15th.  If

10:44:04 20   it is not noted otherwise, those documents happened and I

21   can't tell you because we're still processing.  I mean, if you

22   get into the volume of what we've received -- and this, again,

23   is spilling over into the other issues about what happened

24   with ESI -- but we received between September 15 and

10:44:22 25   September 30 approximately -- and I've got the numbers over

10:44:25  1  there -- but let's call it 1.5 million pages of documents,

2  about 360-, -75,000 documents that we've been able to

3  determine in that pile.

4  We then received between October 4 and up through

10:44:40  5  yesterday approximately 1.8 million pages of documents, and we

6  simply haven't been able to process all of those, I can't give

7  you precise document counts, but it's in excess of 4- or

8  500,000 documents. So we have, in total in that period of

9  time, approximately 3.3 to 3.4 million pages of documents, and

10:45:03  10  somewhere between 8- and 900,000 new documents.

11  In comparison, Your Honor, in the prior nine months

12  of this MDL, we had received -- and I don't have document

13  counts on that -- but about 177,000 documents.

14  So we received in the last 20-something days, and

10:45:23  15  five times as much as what we received in the entire MDL

16  before that, and even if you compare it to what had been

17  produced prior to the MDL, the prior to the MDL was about

18  433,000 pages -- excuse me, 433,000 documents that had been

19  produced over the course of years. The last collection for

10:45:40  20  those, I believe, was 2011.

21  About $600,000 -- or excuse me, 600,000 documents in

22  total what was produced before the MDL and in the MDL versus

23  8- to 900,000 documents produced in the last 20-something

24  days.

10:45:56  25  So we haven't deposed these folks. What you'll see

10:45:58  1    in the last column is --

2    THE COURT:  Well, but, to get to my question, are you

3    saying that everything in the column on the right has been

4    since September 15?

10:46:07  5    MR. STOLLER:  If you look -- and I was going to

6    explain.  So let me give you an example.  The first one is

7    Mr. Randall, 9,147 documents produced in this last period.

8    Slash means divides it between old.  Nothing before.

9    Same for Mr. --

10:46:20  10    THE COURT:  Before September 15?

11    MR. STOLLER:  Before September 15.

12    If you go down, you can see an example for Mr. Modra,

13    who has been around for a while and was the 30(b)(6)

14    representative for the FDA warning letter, there was

10:46:35  15    production for him, about 8,000 documents, but he's since had

16    another 4363 documents that have been produced by him since

17    September 15.

18    Many of the witnesses, if there's no indication, have

19    had nothing produced before.  You'll see a lot of zeros for

10:46:48  20    folks that -- where nothing was produced.

21    If you go to the second page, Ms. Romney, there is

22    the exception I noted, that she had a large amount of

23    documents produced, but not until August.  56,000 documents

24    produced in August of this year, just before this bigger

10:47:05  25    production started.

10:47:06   1          And then you see large numbers for a whole bunch of

2     folks where thousands, if not tens of thousands of documents,

3     have been produced for those folks in the last 20-something

4     days.

10:47:17   5          In terms of proportionality issues as to these

6     witnesses --

7               THE COURT:  Well --

8               MR. STOLLER:  I'm sorry.

9               THE COURT:  -- let's come back to the six witnesses

10:47:23  10    Mr. Boatman was talking about.

11              MR. STOLLER:  And that's where I was going to head,

12    Your Honor.

13              The point was on those witnesses, where you're

14    talking about the corporate folks, what we did is we --

10:47:32  15    candidly and admittedly, we front-loaded the stuff we knew and

16    the stuff we had depositions -- stuff we had documents about,

17    which is Recovery and G2.  Most of the depositions in this

18    case -- and we're unabashed about it -- have been Recovery and

19    G2, because that's what we had.  Those 377,000 documents I

10:47:51  20    mentioned pre-MDL, all Recovery and G2.  The majority of what

21    we received in the next smaller bit in the MDL, mostly

22    Recovery and G2.

23              The documents we got now, mostly Meridian, Denali,

24    and Eclipse.  We've not taken depositions on those devices

10:48:11  25    precisely because we didn't have the materials to do so.

10:48:15    1    Certainly we had some, I'm not going to tell you we had none.

2    I think they note somewhere in their brief that we had

3    something along the lines of 25,000 pages of documents related

4    to the Meridian and G2.  I suggest that pales in comparison to

10:48:29    5    the 3.3 million we just got.

6         Didn't make a lot of sense to go out and start

7    deposing folks on Meridian and G2 knowing that we didn't have

8    the vast majority of those documents, because then we'd be in

9    here coming back to the Court and saying, Your Honor, we need

10:48:40   10    to redepose those folks because look at all the documents we

11    got that we didn't have when we went and deposed them.

12         We tried to be efficient about it, which was we had

13    the documents on the folks -- on the old devices.  We deposed

14    the people who were involved in the old devices where we

10:48:54   15    needed -- where we had pre-MDL depositions.  Where we didn't

16    need to redepose them, we didn't redepose them.

17         As you can see from the highlighting, the folks we

18    haven't deposed here are later-generation device folks, and a

19    number of the folks on the list there are later-generation

10:49:09   20    device folks, and that's why they're there.

21         THE COURT:  Okay.  Thanks.

22         Mr. Lerner.

23         MR. LERNER:  Your Honor, would you like me to address

24    from the ESI issues or the witnesses?

10:49:22   25         THE COURT:  Whatever they have just talked about, you

10:49:24  1    can address.

2        MR. LERNER:  Okay.

3            Specifically for some of these witnesses, and then

4    I'll talk about some ESI issues that Mr. Stoller raised.

10:49:34  5        For some of these witnesses, several of them relate

6    to Recovery and G2.  The whole premise of this MDL being

7    formed was because of the need for affirmative discovery after

8    ten years of litigation related to Recovery and G2, for

9    additional discovery related to later generation filters.

10:49:52 10        We gave them names of individuals back in February,

11    pursuant to the Court's order, relating to those later

12    generation filters.  They've never said a word to us that they

13    were waiting for documents before they started taking those

14    depositions.

10:50:05 15        And also, before depositions had been taken in this

16    case, we made those custodians that they've requested do ESI

17    for those custodians and witnesses produced.  So this is the

18    first time we're hearing that they've waited on documents

19    before -- and that's the whole reason why they haven't taken

10:50:23 20    later generation depositions even the though the whole focus

21    of the MDL has been focused on that.

22        In addition, the depositions that have been taken of

23    witnesses that actually had knowledge of Meridian and Denali,

24    they still focused on Recovery and G2.  So 30 days before

10:50:41 25    close of discovery, they start bombarding us with all this

10:50:46  1    discovery they want to do about later generation filters.  So

       2    that's kind of an overarching issue.

       3                THE COURT:  Let me ask you a question on the

       4    overarching issue you mentioned just now and in previous

10:50:54  5    comments, that you were concerned about the number of

       6    witnesses they want to depose in the last 30 days.

       7                I think we've all known that the last 30 days would

       8    be busy.

       9                On September 28, how many witnesses did they say they

10:51:07 10   wanted to depose in the last 30 days that you felt was too

      11    many?

      12                MR. LERNER:  Well, of the 16 plus the 30(b)(6)

      13    depositions?  I thought the 30(b)(6) depositions would take

      14    months to prepare people --

10:51:18 15                THE COURT:  That's a different issue.

      16                So there were -- it's these 16 are the ones that they

      17    identified on September 28?

      18                MR. LERNER:  Yes, Your Honor.  Those 16 included

      19    three 30(b)(6) depositions.

10:51:30 20                THE COURT:  Okay.  So it was 13 witnesses and the

      21    30(b)(6)'s that they wanted to depose in the last 30 days.

      22                Were you surprised they wanted to depose 13 more

      23    witnesses in the last 30 days?  If somebody just asked me how

      24    many depositions do I think will occur in the last 30 days, I

10:51:49 25   probably would have said more than 13 given the fact this is a

10:51:52  1    big case and we're coming to the close of discovery.

2                   MR. LERNER:  Your Honor, I was surprised -- we were

3        surprised by the fact that, over time, to coordinate all these

4        depositions with plaintiffs' counsel and defense counsel and

10:52:02  5    the witnesses, to get all those depositions coordinated within

6        a 30-day time frame, especially for doctors that were outside

7        and had their own attorneys, to get that all accomplished in

8        30 days, we thought that would be a challenge.

9                   THE COURT:  Okay.

10:52:22  10                  MR. LERNER:  Then, I guess, turning to an additional

11       point about needing the documents that they said they didn't

12       have.  Earlier on in the litigation, even before the MDL,

13       there were documents that were produced relating to the

14       later-generation filters.

10:52:36  15                  In 2013, we added the words Denali and Meridian.

16       Eclipse had already been a key word term.  We had additional

17       custodians in 2013 that were part of the ESI.  Before the MDL

18       and as part of responses to discovery in the MDL, from

19       plaintiffs we produced core materials relating to design,

10:52:55  20    quality documents, our tracking, TrackWise, database that had

21       the adverse event report for all the filters.  We produced

22       some marketing materials, design files, regulatory filings,

23       the official correspondence files.  So they had a lot of

24       information and materials available to them to start taking

10:53:12  25    depositions early on in the case.

10:53:15   1          THE COURT:  Well, Mr. Stoller asserts that since

2      September 15, they have received something on the order of 8-

3      or 900,000 documents, most of which relate to these

4      later-generation filters.

10:53:33   5          Do you disagree with that?

6          MR. LERNER:  I agree they've received a lot of

7      documents over the last -- since September 14.  I'm not sure

8      of the breakdown.  I don't think there -- there's all sorts of

9      documents in there relating to all generation of filters given

10:53:48  10      the wide spectrum that we had to go through to collect.

11          And if I can give some context for that, Your Honor?

12      If I may?

13          THE COURT:  Yeah, I mean -- I think I know where

14      you're going on the context and this being shared space.  I

10:53:58  15      know you've been working on discovery terms.

16          What I'm really interested in is, is Mr. Stoller's

17      assertion that -- and I think I read 25,000 in the report --

18      that you've asserted there were 25,000 documents, or maybe it

19      was pages, produced with respect to the later-generation

10:54:18  20      filters, and his assertion is now there's been hundreds of

21      thousands of documents and millions of pages produced on those

22      filters.  How do you respond to that comparison?

23          MR. LERNER:  Your Honor, that is a bit of a

24      difference, but I think that part of what's happened here,

10:54:38  25      too, is, and this is all with the MDL, we talked about ESI

10:54:44  1   from the start and they were critical of everything we did in

2   the MDL -- before the MDL.  They were critical of the

3   custodians we chose, they were critical of the keywords we

4   chose.  Every part of the process they were critical of.

10:54:55  5            So we cannot just by ourselves just pick custodians,

6   get key words, and start processing ESI, because the

7   plaintiffs were opposed to that.  We spent time negotiating on

8   the key terms.  We finally got -- agreed upon keyword terms on

9   September 14.  So -- and as a compromise, plaintiffs requested

10:55:15 10   that we produce those documents by not doing -- primarily no

11   eyes-on review -- review of those documents.  So there's not a

12   relevance review.

13            So we're getting huge volumes of documents from a

14   wide spectrum of different sources of data that plaintiffs

10:55:28 15   requested, and that we acceded to that large volume because

16   the plaintiffs requested that.

17            So we got their key words very late in the process

18   finalized.  We immediately worked around the clock, went

19   through six terabytes of data, and processed and produced all

10:55:45 20   of this information, some of which is going to be irrelevant

21   because there's not a relevance review.

22            And now, after acceding to what the plaintiffs

23   actually requested us to do, because they were critical of our

24   process in the past, now they're using the volume that's being

10:55:59 25   produced that they requested and demanded, and they still are

10:56:02   1   requesting that we produce more volumes through more testing,

2   to produce more volumes from the shared drive, now they're

3   using that against us when they requested that information and

4   provided us the final key words mid-September.

10:56:16   5       So I think it's a little unfair just to say, Well,

6   they didn't have some of the this data available when they

7   were part of the problem in causing that delay.

8       And also, when a deposition was requested of a

9   specific custodian, they knew later-generation custodians back

10:56:33  10   in February of this year, if they would have made a request

11   for those custodians, we would have prioritized those

12   individuals and produced data for them.

13       So why they waited and focused directed entire

14   discovery -- and, frankly, we were surprised how much they

10:56:47  15   focused on Recovery and G2, even with deponents that had later

16   generation knowledge, they were not being asked questions.  As

17   the footnote in our submission, I think 90 percent of exhibits

18   that had been used were related to Recovery and G2.  The vast

19   amount of questioning when it relates to a specific filter

10:57:02  20   relates to Recovery and G2, even with witnesses that had later

21   generation knowledge.  So they've decided to use their time

22   for the last eight, nine months on the early generation

23   filters.

24       So that's just kind of -- I'm telling you that's kind

10:57:22  25   of the response to why we are where we are right now.

10:57:26   1        Do you want me to address some of these specific

2   individuals?

3        THE COURT:  Yes.

4        MR. LERNER:  So the plaintiff requested Kevin Boyle

10:57:35   5   and Scott Randall.  Frankly, before I got their list, I didn't

6   even know who they were offhand.  I spoke to Mike Randall, who

7   has been one of the lead engineers on the filters, I think

8   since 2008, and he told me that Kevin Boyle and Scott Randall

9   had very little to do with filters and they wouldn't get much

10:57:57   10   information from those individuals.  So I'm not -- I don't

11   quite understand why they're requesting those depositions.

12        From Mark Wilson, we -- so then Mike Randall, he does

13   have information related to later-generation filters, and

14   we're not opposing his deposition on that ground.  We were

10:58:14   15   opposing doing all the depositions based on the number.

16        Mark Wilson, he was primarily concerned with the

17   early-generation filters, and that's the reason why we were

18   objecting to him.

19        Kim Romney, we produced her ESI before her 30(b)(6)

10:58:32   20   depositions.  She's been well-known to the plaintiffs for a

21   long time.  She does have later generation information, and

22   she was, like I said, deposed twice in a 30(b)(6) capacity.

23   It was still the focus, the questioning was still on Recovery

24   and G2, even though they could have asked more about

10:58:49   25   later-generation filters.

10:58:51   1          For Dr. --

           2          THE COURT:  Hold on just a minute.  Let me make some

           3   notes here.

           4          The last statement you made is that when they deposed

10:59:25   5   Ms. Romney, they could have asked about later-generation

           6   filters, but she was a 30(b)(6) deponent on earlier generation

           7   things; right?

           8          MR. LERNER:  She was a 30(b)(6) deponent for all

           9   generation filters.  The notices, sales and marketing notices,

10:59:41  10   applied to all generation filters.

          11          THE COURT:  Okay.  Well, what you're saying is that

          12   when they deposed her as a 30(b)(6) repres- -- deposition,

          13   they should have also, when they -- when they deposed her as a

          14   30(b)(6) witness, they should also have deposed her in her own

10:59:59  15   right?

          16          MR. LERNER:  I'm saying they had an opportunity to

          17   ask her questions about that and they didn't.  To give you an

          18   example of her and many other witnesses, I have a list of

          19   about ten other witnesses that were later generation people,

11:00:10  20   that they still focused on the Recovery and G2.

          21          THE COURT:  Well, I guess my concern is if they had

          22   gone for five hours and said, Okay, now we're going to depose

          23   Ms. Romney about her own personal knowledge, we're ending the

          24   30(b)(6) deposition and starting her personal deposition, I

11:00:24  25   bet a doughnut that you would have objected.

11:00:28  1          MR. LERNER:  You are probably correct.

        2          Those depositions lasted all day, you know.

        3          THE COURT:  Okay.

        4          MR. LERNER:  For Dr. Lynch, he's been another doctor

11:00:41  5   that's been known throughout this litigation from the early

        6   days of Recovery, I believe that his counsel filed objections

        7   to the subpoena.  He's also --

        8          THE COURT:  You say you believe they have or they

        9   will?

11:00:52 10          MR. LERNER:  I think they filed letter objections.  I

       11   don't think they filed a formal motion.

       12          THE COURT:  Okay.

       13          MR. LERNER:  Then Dr. Cohen.  Dr. Cohen also filed a

       14   motion in the Eastern District, but in reviewing Dr. Cohen

11:01:14 15   last night, I'm somewhat confused because the plaintiffs, in

       16   their submission, note that he's part of the KOL with respect

       17   to Denali.

       18          There's a Dr. Cohen that plaintiffs have used

       19   exhibits from, from the Recovery filter days relating to

11:01:29 20   Temple, and that Dr. Cohen was not involved in the Denali

       21   investigation, and plaintiffs gave that as a basis for wanting

       22   to take his deposition.

       23          The Dr. Cohen from Temple that they're talking about

       24   is not a KOL -- recent origin for Bard, and was not involved

11:01:44 25   in Denali as -- as a Denali investigator, as far as I know.

11:01:49   1          So I'm somewhat confused by their request for
           2     Dr. Cohen and the basis that it's because of his involvement
           3     with the he Denali filter.
           4          Your Honor, I would also like to note that all the
11:01:58   5     doctors that we've talked about, with the exception of
           6     Dr. Kaufman, have independent counsel that were not hired by
           7     Bard.  So you have that context for them.
           8          THE COURT:  Right.  Well, as to Drs. Lynch and Cohen,
           9     am I correct in my understanding that neither has been
11:02:17  10     deposed, at least Dr. Lynch has relevant information about
          11     later-generation filters, the objection you've got is that
          12     it's just too late in the process to be trying to depose him?
          13          MR. LERNER:  Yes, Your Honor.
          14          THE COURT:  And Cohen you think, at least if it's the
11:02:36  15     Cohen at Temple, doesn't have information about
          16     later-generation filters?
          17          MR. LERNER:  Yes, Your Honor.  Not as far as any kind
          18     of relationship he had with Bard.  Whether he used Denali
          19     filter I don't know offhand, but he was not -- the Cohen
11:02:49  20     they're referring to I think is a different Dr. Cohen.  The
          21     Dr. Cohen that I think they want to depose and maybe use
          22     exhibits from the ESI from Dr. Cohen is somebody who was
          23     involved in what they call the Temple memo from early 2000
          24     relating to Recovery filter.
11:03:05  25          THE COURT:  Okay.

11:03:05  1        MR. LERNER:  Your Honor, going back to your question

2  earlier, you said did I expect to have this many depositions

3  done.  You know, there's been 30 depositions in the MDL over

4  the last eight, nine months.  So now they're wanting to take

11:03:17  5  16 depositions, three of which, as I've talked about, are

6  30(b)(6), are extremely broad and would probably take months

7  to prepare for.  That's about a third of the depositions in

8  this case being taken within the last 30 days.  So that's why

9  we were surprised about that.

11:03:33  10        We were also surprised about how much time had been

11  taken through all those depositions focusing on Recovery and

12  G2, when the whole premise of the MDL, as I said beforehand,

13  was they needed discovery, over ten years of discovery, on the

14  Recovery and G2 to focus on later-generation filters.

11:03:52  15        THE COURT:  Okay.  Thanks.

16        Mr. Stoller, it does appear from the interrogatory

17  answer you received in February that you knew folks who were

18  involved in the later-generation filters.  Why couldn't you

19  have said, We want to treat them as custodians, we want to get

11:04:15  20  all of the information quickly that went back and forth

21  between them because we've got to do discovery about

22  later-generation filters, and we want to depose them after we

23  get those documents?

24        MR. STOLLER:  Your Honor, there's always a tradeoff;

11:04:26  25  right?  If I could have my cake and eat it too, I would.

11:04:29  1          I will tell you this, that I don't think anybody who

2     has been in this courtroom in the five or six case management

3     conferences here so far would say I was not pushing actively

4     to get the ESI done in this case.

11:04:41  5          The process we went through was a logical and

6     efficient process, which was we had a large history of

7     documents that told us about Recovery and G2, and we noticed

8     up people on those depositions.

9          We sat down and had extensive meet and confers and

11:04:56 10     conversations with the defense about custodians and

11     identifying custodians, and exchanged lists that had -- we

12     started with a large number of custodians, they started with a

13     small number of custodians, and we sat and had a number of

14     meet and confers, and all sorts of people who were on those

11:05:12 15     lists were on our original lists, and people came off of our

16     lists and people went onto their lists until we came up with a

17     set of custodians on which the parties agreed.

18          As you'll recall, we had a dispute, not at the last

19     case management conference but I believe the one before that,

11:05:27 20     which I think was in June, was in June, about certain

21     custodians where they would not agree, and you ordered them to

22     produce those custodians.  We didn't get those custodians

23     until just recently.  In fact, we haven't gotten all of those

24     custodians based on the review I did yesterday with our

11:05:42 25     vendor.

1        Nonetheless, the point being that, yeah, we had a

2    list of people who were involved, but if we don't have the

3    core and underlying documents, simply going and saying, I'm

4    going to depose Mr. Smith about the Meridian filter and what

5    he knows about the Meridian, based solely on the documents I

6    have from his production, is not the way you would you ever

7    conduct depositions in a case where you have large

8    repositories of other information about it.

9        You need to -- I mean, I know you practiced, and

10   practiced well for a long period of time, Your Honor, and if

11   you knew the defense had, Look, they've got a bunch of

12   documents here on this issue, I'm not going to just forge

13   ahead and go depose people on an issue where I haven't gotten

14   from them the vast majority of their documents, because I

15   might find stuff in there that doesn't show up in that

16   witness's custodial file that I'm going to ask him about.  But

17   I'm going to challenge him.  It's corporate knowledge that

18   they knew these things happened about these, even if doesn't

19   show up in his e-mails.

20       And different folks have different levels and numbers

21   of documents you get.  Sometimes they actively deleted their

22   e-mails or whatever and so you get a small number of documents

23   from somebody.

24       It's not an efficient way to go about it because if

25   we had gone ahead and said, I'm going to notice up -- and

11:06:52 1    let's pick somebody from the list -- let's pick Mr. Boyle,

2    who, by the way, is and has been the vice president of

3    research and development for the last three years, over

4    filters, okay?  So he's somebody who would have been involved.

11:07:06 5    If I had said, Produce us Mr. Boyle's custodial file, in July,

6    and gone ahead and deposed him -- well, let's take a better

7    example, because they haven't produced anything for him.

8         Let's take Mr. Conrad.  If I had deposed Mr. Conrad,

9    who is the vice president of quality, in July, they would have

11:07:27 10   given me 574 documents.  I suggest and I submit that without

11   the other 800,000 documents, that's not a very effective

12   deposition.  I would have deposed him for a few hours, and

13   then come back and said, Boy, you know what, I got somewhere

14   at the end of September and beginning of October 800,000

11:07:47 15   documents, many of which relate to the Meridian filter.  I now

16   need to go back and depose Mr. Conrad because I didn't get

17   very much from him in the first instance.

18         THE COURT:  Conrad's not on the list.

19         MR. STOLLER:  He's not on that list.  I'm using him

11:08:02 20   as an example of somebody on the corporate structure thing.

21         Your Honor, part of it is we don't know what we have

22   about folks.  I mean, while they identify -- I agree they

23   identified a number of people, and they have not agreed to

24   produce custodial files for all of those folks.  They have not

11:08:17 25   agreed to produce as deponents everybody on the list.

11:08:22   1          We have tried to be efficient, and to use a word you

2     used before, proportional.  There are departments and then

3     heads of departments and people under them.  We've identified

4     over the years five or six engineers who we think are the key

11:08:34   5     people at different points in time on these filters.

6          There have been, Your Honor, 12, 18, 24 engineers who

7     have been responsible in some way, shape, or form for filters.

8     We're not seeking to depose them all.  We've been efficient.

9     We've tried to look at where is the information going to flow?

11:08:51  10     It's going to flow to the vice presidents who are in charge of

11     the various departments.  It's going to flow to those folks,

12     the product managers who are in charge of the product over the

13     years in the marketing departments.  It's going to flow

14     through those folks at the heads of the pyramid on these

11:09:06  15     various things, and depose those things.  Not everybody on the

16     list.

17          Their argument seems to be, Your Honor, they've done

18     too much and they've done too little; we gave them this list

19     of names and they didn't go notice all of those folks up for

11:09:18  20     depositions and demand all their custodial files.

21          But we asked for a lot of them.  But, again, we

22     focused.  We didn't say, Look, everybody who has ever touched

23     the filter, give us their custodial file.  We had long meet

24     and confers about these issues.

11:09:29  25          We have approached discovery in this case in what we

11:09:32  1    think is the most logical and efficient manner possible, which

2    is the information we had, the historical documents they've

3    given us have been Recovery and G2.  Unabashedly, we've --

4    that's the stuff we focused on because that's what we've had.

11:09:46  5    And we have been pushing, as you know and as has everybody who

6    sat in this courtroom, have been pushing for months on this

7    other stuff to get it done.  But it's not the case where they

8    said, Well, we can just produce everything at once.

9              I will say this in response to a couple things that

11:09:58 10    Mr. Lerner said:  The focus of this MDL is not on the new

11    devices.  All -- I know that I was not involved in the JPML

12    stuff, and you know that as well.  What I know since we have

13    been here, we've tracked the case filings, and the case

14    filings in this case are more Recovery and G2 cases than

11:10:17 15    Eclipse, Denali, and Meridian.  There are 50 -- I don't know

16    what the number is, but 55-plus percent of the cases in this

17    MDL are early-generation devices.  It's close to half and

18    half, but not quite.  It's a little more in favor of those.

19              We pursued discovery on -- we've been pursuing, and

11:10:36 20    it is our intention to pursue discovery on all of the devices.

21    But we haven't been able to do that as to the later generation

22    devices because we simply have not had the documents and the

23    files.  And I would note it is on page 27 of the submission --

24    I'm sorry, I looked in the wrong place.  That's a different

11:11:02 25    plaintiff.  It's page 12 of the joint report.  It's 25,000

11:11:05  1    pages of –– that they produced related to Meridian and Denali.

2    It's not close.

3         I would like to respond to one other thing, which was

4    the statement that somehow I was delinquent or we were

11:11:17  5    delinquent in giving them our list of key terms.

6         THE COURT:  Is it true that the key words weren't

7    finalized until September 14?

8         MR. STOLLER:  I believe that's probably true.  But if

9    you'll recall, Your Honor, what happened was, when we were

11:11:30  10   here on August 23, the last case management conference,

11   Mr. North came up here and stood at this podium and told you

12   that he was frustrated, and he was frustrated with their

13   vendors because they weren't able to get done what they wanted

14   to get done.

11:11:46  15        I had had a conversation with Mr. Lerner and

16   Mr. North the day before that conference, and I related to

17   you, from this podium, that they had come to me and said,

18   Look, we've hired a new outside vendor, and they identified

19   him in this courtroom as BDO, and they have a better idea

11:12:00  20   about the way to deal with the ESI in this MDL, and they think

21   that there's different terms that have better strengths in

22   different departments.  So if you look at the sales marketing

23   department, we should use these terms, and if we go to the

24   quality assurance department we should use these terms.  And

11:12:17  25   if we worked with management, we should use these terms.

1    Rather than having one set that we apply to everything, we

2    think we can be more focused.

3         I said, Great.  I wish we had this conversation six

4    months ago, but let's talk about it.  And I met with them and

5    their vendor the very next day, August 24, after the last case

6    management conference.  And at that meeting they showed me --

7    they didn't give me handouts, but they showed me on their

8    computers, Look, we have these graphs that show all these

9    things and these different strengths, and they didn't -- I

10   said, Great, make me a proposal.  Tell me what it is you're

11   proposing and let's talk about it, but we to have get rolling.

12        I didn't get that proposal until the weekend.  And at

13   that time they said, You know what, we don't want to do

14   department by department anymore, we want to do this key term

15   list where we say, A plus B plus C plus D, up to I think they

16   wanted 14 key terms or something along those lines.

17        I said, Wait a minute.  What happened to the

18   departmental by departmental?  You were selling me on this is

19   going to be more efficient, we're going to be more focused.

20        And I was told, No, the vendor's changed their mind,

21   they don't want to do that anymore.

22        I said, Okay.  Well, then tell me what are the

23   efficiencies of these -- now you're making a proposal.  You're

24   giving me a proposal.  Tell me what the efficiencies of these

25   terms are because it looks to me by the way you have in that

11:13:37 1    list of 14 some pretty inefficient terms, like venous.  If you

2    pick 14 terms, venous is not one of the 14 I would pick.

3           For disclosure, Your Honor, venous, I think, was a

4    product name for one of the later-generation filters.

11:13:52 5           But based on the information they gave me, and they

6    did it additively, they said if you add this term you get this

7    many more responsive documents out this many more total that

8    are pulled in by it.

9           And I said, Some of these, based on your own

11:14:04 10   calculations, the numbers you're giving me look like they're

11   bad terms and they're not doing what you want them to do, tell

12   me why you're doing this.

13          And we had that -- and that conversation happened

14   between, I would say, between September 2 and September 14.

11:14:16 15   In that period of time we agreed they could reduce collections

16   on a number of different areas and said you don't need to

17   collect from these areas at all.  We agreed you don't need

18   to -- in terms of e-mail addresses, that you don't have to

19   collect anything that has these domains.  You know, something

11:14:31 20   that comes from @costco.  How do we help reduce what you all

21   have to do?

22          And at the same time, we had several discussions back

23   and forth.  And ultimately, although previously I think that

24   the number of key terms had been something in the order of

11:14:43 25   neighborhood of 40 to 45 key terms, we said, Here, we'll take

11:14:48  1    your original 14, substitute out a couple that looked bad, add

2    in these and we'll just go with this.

3          Why?  Because we need documents.  It's -- this

4    process has been inefficient.  What we're going to get is a

11:15:02  5    lot of documents that we now -- we have to sift through.  I

6    have been talking and suggesting and proposing since the

7    outset of this that we go and do a cull using some predefined

8    key terms, and then we apply predictive coding to it and come

9    up with a set.

11:15:17 10          I proposed that months ago, at the outset of this

11   litigation.  We're now nine months in or whatever we are now,

12   and we're going to do it on our end.  Basically I said just

13   get me the stuff, and we'll run it on our end.  We'll incur

14   the cost and do it just in order to get things as quickly as

11:15:33 15   possible.

16          The implication that the delay has been on our side

17   is -- I will characterize it as frustrating from my

18   perspective, Your Honor.  I have been trying everything

19   possible to get this done as quickly and efficiently as

11:15:45 20   possible.

21          We are now in a position where I am nine months into

22   the litigation and I've had 100,000, 150,000 documents

23   produced up to ten days or 12, 14, 21 days ago, and I now have

24   900,000 documents I've got to get through, most of which have

11:16:02 25   to do with these later generation folks.  Necessarily.

11:16:05  1   Because the collections we did for custodians were two things:

2   Refreshes of people who had previously been collected -- in

3   other words, their stuff had been collected in the past, now

4   we're getting the new stuff for folks who have been there or

11:16:17  5   folks who left and there hadn't been collections after they

6   had left.

7         Or new custodians.  And primarily the new custodians

8   are the folks that are on those lists of people who have been

9   dealing with the new devices.  That's what we're getting now

11:16:31 10   is all the stuff -- the idea that, Well, we should have just

11   gone out --

12         The third thing is the shared -- the shared drives.

13   I don't know what's there, Your Honor.  I'll tell you we've

14   only begun to process it.  We -- it takes our vendor a number

11:16:44 15   of steps we have to get to before we can even start laying

16   eyes on stuff.  I don't know what's there.

17         They have claimed that they made this -- productions

18   from those shared drives in the past.  I asked that the stuff

19   be de-duped.  My assumption, then, is what I'm getting is

11:17:01 20   primarily new materials.

21         We haven't deposed those folks later in the list,

22   later in time simply because it -- it never made sense to do

23   so.  It would not have made sense to just start randomly

24   identifying folks and saying, Give us these folks, give us

11:17:14 25   their custodial files, because there's a whole host of

11:17:17  1  underlying documents relating to these devices that we didn't

2  get until just the last -- you know, in some cases yesterday,

3  and we're still receiving some of that stuff I think in the

4  mail today.

11:17:28  5        THE COURT:  Let me ask you a couple of questions,

6  Mr. Stoller, that relate more to your request for more time

7  than to the specific witnesses we've been talking about.

8        And these questions are in response to the specific

9  proposal you've made for extending the schedule in this

11:17:57  10  litigation, which is on page 5.

11        You indicate that once you get through the documents

12  you're going to need ten to 12 weeks to conduct depositions.

13  Are those depositions in addition to these 13 we've been

14  talking about today?

11:18:22  15        MR. STOLLER:  Your Honor, I'm going to tell you I

16  don't know what I don't know.

17        THE COURT:  I know you don't.  But is that -- are you

18  setting aside the ten or 12 weeks for other witnesses besides

19  these 13?

11:18:33  20        MR. STOLLER:  I think some of these 13 can go

21  relatively quickly.  Some of those folks have, for example,

22  the doctor -- and I'll -- Mr. Boatman can speak more to this,

23  but I think -- and this is not in my bucket, but I think that

24  something like Dr. Venbrux or Dr. Kaufman, perhaps to some

11:18:54  25  degree Trerotola and Stavropoulos might be able to go sooner.

I think somebody -- some of these other folks, though, if you look at like Kevin Boyle or Scott Randall or Mike Randall, who have been in the trenches and dealing with the later-generation devices, look, if you put -- if you put a gun to my head and say, Paul, you got to depose them, I'll do whatever anybody tells me to do.  I think it would be inefficient to go depose those folks in the 20 days, and then --

THE COURT:  That's not really what I'm asking.

MR. STOLLER:  Okay.  Apologize.

THE COURT:  What do you need ten to 12 weeks for?

MR. STOLLER:  Well, let me start at the outset what I need to do.  We're now processing --

THE COURT:  Why do you need ten to 12 weeks for depositions?  That's my specific question.

MR. STOLLER:  It's -- for some of these folks and for the unknown.  It's the unknown, Your Honor.  I don't know what I'm going to get until I get into it.  The idea there was, look -- and let me tell you how I came up with the proposal as the architect of the proposal.  I said -- I just -- this is like getting a new case.  Any time you get this many documents, it's like the start of a new case.

If you said, Paul, you've got to figure out your discovery on these devices as of today and go depose witnesses based on almost a million documents, what are you going to do?

11:20:06  1    And I'm going to put you on short schedule.  I would say,

2    Judge, I'm going to do exactly what I proposed here:  I'm

3    going to go out and I'm going to rapidly get through those

4    documents as quickly as possible, and then start scheduling

11:20:17  5    depositions in a short period after.

6         How long I would need, and if -- if this were

7    something different, I'd be talking months and months.  What I

8    did, though, was I looked at the bellwether schedule,

9    Your Honor, and I said assume none of this happened, when are

11:20:28  10   we going to be trying cases in the bellwether cases so that if

11   none of this happened, we were just going to go forward with

12   that schedule.

13        And under the bellwether schedule, Your Honor, we are

14   due to exchange our ten picks each out of the 48 on the 9th of

11:20:45  15   December.  We are due to submit to this court on the 16th of

16   December a list of 12, if we can.  If not, it will be each

17   side picks four, and then we'll submit to you four.

18        You'll then pick those cases that are going to be the

19   Discovery Pool 1.  And at the same time we're supposed to put

11:21:04  20   in place -- and I say "we."  I mean we collectively -- a

21   scheduling order for those cases for the individual case

22   discovery.

23        And I looked at that and said, Okay, if we're start

24   of discovery January 1, let's assume things go smoothly and we

11:21:19  25   have our 12 discovery pool cases starting January 1, and we're

11:21:22   1   going to start discovery on them, we're probably going to do

          2   four months of case-specific --

          3           THE COURT:  Well, but the schedule you proposed has a

          4   us picking the bellwether trials on March 1st.

11:21:35   5           MR. STOLLER:  Has us --

          6           THE COURT:  Picking the six bellwether cases to go to

          7   trial on March 1st.

          8           MR. STOLLER:  In the existing bellwether order?

          9           THE COURT:  Yeah.

11:21:43  10           MR. STOLLER:  I'm sorry, I don't have it in front of

         11   me.

         12           THE COURT:  It's Section 5.  Comes right after the

         13   discovery group.  We pick the -- we -- the language you

         14   proposed says the initial bellwether cases for trial will be

11:21:54  15   selected from Discovery Group 1, and by March 1st, you give

         16   them to me.  By March 5th, you get some additional

         17   information, and I then pick the cases for trial.

         18           So I've been operating the under the assumption that

         19   we're picking cases to go to trial in March, which is very

11:22:13  20   different from the schedule you just talked about.

         21           MR. STOLLER:  But it won't be necessarily -- and I

         22   think that's one of the things we'll have to work out, is that

         23   doesn't necessarily mean we won't still be taking discovery in

         24   those cases.  You're going to have fact-specific cases --

11:22:27  25           THE COURT:  How are we going to pick bellwether cases

11:22:30  1    when discovery hasn't finished?  I thought the whole idea of

2    the discovery group was you can figure out the cases so you

3    can decide which ones you want to try.

4              MR. STOLLER:  Your Honor, I don't disagree with you,

11:22:40  5    and all I can say is that perhaps Mr. North and I didn't think

6    this through, but let me tell you where I think the reality

7    is.  Let's talk about what it would look like.  Pretend for a

8    moment they didn't exist here.

9              If we're at December 31, January 31, and we've got 12

11:22:53  10   cases and we've got to take discovery in those cases, I'm

11   going to suggest that given the number of witnesses, you're

12   going to have planning physicians, ex-planning physicians,

13   treating physicians, plaintiff, perhaps family members if they

14   want to take those depositions.  Then you'll have potentially

11:23:12  15   sales reps from the -- that dealt with the particular doctors.

16   And what we've seen in state court cases is let's call it six

17   to 12 depositions in each case during the fact discovery

18   period.  Over 12 cases at the same time.

19             THE COURT:  So what were you all thinking when you

11:23:31  20   said we'd be picking the six for trial in March?

21             MR. STOLLER:  I'll be honest, Your Honor, I don't

22   remember it.  I'm not going to throw Mr. North under the bus

23   because he's not here, but it was their proposal.  It seemed

24   reasonable to me at the time.  I honestly didn't think this

11:23:46  25   through in that sense of what we're going to have to do for

11:23:49   1   discovery in these cases.

2   My sense is, again, we're going have to six to 12

3   individual depositions in each of the 12 cases.  We're going

4   to have case-specific experts in each of the cases.  To me,

11:23:59   5   that schedule runs you out to the end of July or August in

6   terms of discovery and expert disclosure in those individual

7   cases.

8   THE COURT:  Well, I understand what you're saying.

9   It just seems quite inconsistent with Case Management Order

11:24:14  10   Number 11 --

11   MR. STOLLER:  I don't disagree with you,

12   Your Honor --

13   THE COURT:  -- that we have entered in the case.

14   MR. STOLLER:  -- and I'll fall on my own sword here

11:24:22  15   and say I don't remember thinking about this issue.  I didn't

16   think -- I can say I didn't.  I didn't think about this.  I

17   didn't think about what does the discovery schedule look like

18   in those cases.  And we kind of punted on it because I was

19   more focused on the selection process of getting us down to

11:24:37  20   discovery pool.

21   I will tell you in my own mind I hadn't gone back and

22   looked at that portion of the order.  But I've been thinking

23   for several months we would be looking at trials in October or

24   November because my anticipation was it was going to take you

11:24:49  25   us six, seven, eight months of case-specific discovery on

11:24:53   1   those cases just by virtue of the number of witnesses you're

2   going to have.  And we'll have 12 going at the same time, and

3   your minimum number of witnesses is probably five or six.  And

4   depending upon how many treaters they've had and how many

11:25:05   5   folks were involved in the sales rep side.

6          Again, experience of the state court cases we have

7   that have been going on contemporaneously is that you're going

8   to have six to 12 depos per case, then you're going to have

9   individual case-specific experts to talk about their damages

11:25:21  10   and particular physical issues.

11          THE COURT:  Okay.  I understand what you've said.

12          MR. STOLLER:  So my perspective on it, Your Honor,

13   was working back --

14          THE COURT:  I know what your perspective is, you've

11:25:29  15   explained it in the memo as to how you then came up with the

16   four months of additional general discovery.  So I understand

17   that.

18          MR. STOLLER:  Okay.  I'll sit down unless you have

19   specific questions for me.

11:25:40  20          THE COURT:  No.  That's fine.  Thanks.

21          MR. STOLLER:  Thank you, Your Honor.

22          THE COURT:  Let's hear from defense counsel.

23          We need to wrap this up by noon, and I want to make

24   sure we have time to talk about the special master, too.

11:25:50  25          MR. LERNER:  Your Honor, do you have any questions

11:25:52  1    for the bellwether process at all?

2         THE COURT:  Well, yeah, you might be able to tell.

3    What is your thinking for us picking the Discovery Group 1 in

4    December and the six bellwether trial cases in March, which is

11:26:07  5    the proposal I thought looked pretty efficient and I adopted.

6         MS. DALY:  Your Honor, I think we're on target to be

7    able to do the narrowing from the 48 to the 12 by December the

8    9th.  The only thing we agreed to do for discovery to narrow

9    the 48 to the 12 was to get medical records.

11:26:23 10         THE COURT:  Right.  I know that's done.  I'm looking

11    at the December to March period when you were going to get

12    from the 12 in the discovery group to the six bellwether

13    trials.

14         MS. DALY:  I was very involved in the discussions of

11:26:34 15    the bellwether.  It was not our impression that we were going

16    to have to do a scorched earth discovery on every treating

17    doctor, spouses, and everything else in the 12 cases to be

18    able to pick six.  That we would go to six and we would have

19    some remaining discovery to do that was case specific, but

11:26:53 20    that was fully accomplishable --

21         THE COURT:  What did you think would be done --

22         MS. DALY:  -- to get from the 12 to the six.

23         THE COURT:  What did you think would be done on the

24    12 between mid-December and March 1st?

11:27:03 25         MS. DALY:  Likely an implanting doctor, the plaintiff

11:27:06  1    herself or himself.  If there was an unusual medical condition

2    for that -- for that particular plaintiff we might take a

3    hematologist, for example.  And, really that's what my

4    expectation was.

11:27:20  5          Our expectation was not, for example, that we would

6    have case-specific medical experts in the 12 cases deposed

7    yet, but that would wait until we got to the final six, and we

8    would be able to accomplish this on the schedule that we've

9    provided.

11:27:36  10         THE COURT:  Okay.  Thank you.

11         MR. STOLLER:  Your Honor, might I note just in

12    response to that, I don't know that we would be averse to

13    that, but it doesn't change the timing, because whatever the

14    six are that are going to be picked for trial, they're still

11:27:47  15   going to have to undergo full discovery even after that.

16         THE COURT:  It does change the timing.  If we pick

17    those in March, we can have them ready for trial by June.

18         MR. STOLLER:  If we picked six cases in March and had

19    to do individual fact discovery and individual expert

11:28:06  20   discovery, do you think we'd be ready for trial in June?

21         THE COURT:  I think you could.

22         Did you ever practice in Judge Bilby's court?

23         MR. STOLLER:  Despite the little gray I have and the

24    very little hair I have, that would -- I did not.  I heard

11:28:23  25   stories.

11:28:24  1        THE COURT:  If you had, you would know it was doable.

          2        MR. STOLLER:  Let me add this, Your Honor --

          3        THE COURT:  I understand your point.  I'm not trying

          4    to make light of it.  But I learned from Judge Bilby, as a

11:28:37  5    lawyer in his court, that things can happen much more quickly

          6    than lawyers usually think, and can happen well and a fair

          7    trial can occur.

          8        All right.  Let's go back to defense counsel.  I want

          9    your thoughts on what Mr. Stoller said in response to the

11:28:54 10    assertion from defendants that the problem has come because

         11    the plaintiffs didn't get you their search terms until

         12    September 14.

         13        MR. LERNER:  Your Honor, throughout the process we've

         14    talked about various keyword terms and other processes

11:29:13 15    pre-ESI.  But everything that we were proposing, we weren't

         16    getting anywhere.  So by September 14, we got their keywords

         17    they would agree to, plus they added a bunch of what they call

         18    fuzzy words, and we finally had a list that we could use to

         19    start producing from all the ESI.

11:29:34 20        THE COURT:  You do agree, I assume, some of delay and

         21    the problem was as a result of your change of vendors when you

         22    discovered in August that your first vendor wasn't doing

         23    things right.

         24        MR. LERNER:  I agree with that, Your Honor.

11:29:51 25        THE COURT:  Okay.

11:29:52  1      All right.  What I want to do on the schedule issue,

2  and that will affect my decision on the depositions, is I want

3  to think about what you all have told me.  I want to go back

4  and look at the overall schedule and the bellwether schedule

11:30:08  5  and make a decision about what adjustments ought to be made in

6  light of what all has been said.  I think I understand the

7  parties' positions.

8      Mr. Boatman, was there something else you wanted to

9  raise?

11:30:25  10     MR. BOATMAN:  No, Your Honor.

11     THE COURT:  Okay.  On the special master issue, I

12  will tell you that I have seen a special master in a

13  deposition one time when I was a summer associate in 1978 in

14  New York City.  And in 20 years of practice and 13 years on

11:30:46  15  the bench, I've never seen it done again.  So it's -- at least

16  from that limited sampling, it's a pretty rare event.

17     I guess a question I have so that I can give this

18  fair consideration is I couldn't tell from your papers whether

19  you want a special master who is in Phoenix, or some other

11:31:13  20  city, that you can call in the middle of a deposition if you

21  have a problem, or if you want a special master sitting in

22  every deposition and ruling on problems as they come up.

23     MR. LOPEZ:  Well, the short answer, Your Honor, would

24  be anything that helps the process.  And I know it's unusual

11:31:38  25  that we've taken this many depositions and now we're bringing

to the Court's attention some of the issues we've had and the need for a special master.

I will say this:  The deposition that happened on Tuesday of a very important witness, and I mentioned that deposition earlier, I think that the mere fact that both sides knew that Judge Campbell was available at noon, and then again at 3 o'clock or whenever it was you gave us the time, seemed to help a lot.

So we don't want to have to incur the costs of a special master.  I would say my experience is different than Your Honor's in that in most MDLs, at least that I've been involved in, and we've had the special master that attends depositions, even if we have to pay the expense of that special master going to Amsterdam, London, or wherever it is these depositions are being taken.

I think Your Honor will see from the transcripts that we showed what some of our concerns are.  Our concerns are we just want to be able to get responsive testimony from witnesses.  And if there's disagreement about that, and I know there are disagreements about that, I don't want to have -- we don't want to have to come and say, Judge, we didn't get a fair shake at taking this witness' deposition, we would like you to give us another two hours, sanction the other side, and then we come in here and fight.  I mean, I know that's something Your Honor doesn't want us to do, and I think we've

11:33:10   1    avoided that to this point, and I think we want to continue to

2    avoid those issues.

3            So, you know, would it be preferential to have

4    someone travel around with us?  Probably.  Practical?

11:33:26   5    Probably not.  Especially now that we're near the end and we

6    are already trying to squeeze, I think, a lot of discovery and

7    depositions into the last whatever time Your Honor's going to

8    give us.

9            We're looking for ideas and maybe options that you

11:33:37  10    can give us to have someone available who is not Your Honor,

11    because we know you have a busy docket and -- and, you know,

12    we're at deposition in New Jersey and you're in the middle of

13    a trial and we and we need something to be resolved because

14    we've -- you know, we've got an example like some of the

11:33:53  15    examples we have shown Your Honor, that we'll ask a question

16    nine times and we don't get an answer, would you please -- and

17    we've done that before.  I've done that before in one-off case

18    and in MDLs where we've called the judge and got him on the

19    phone, or called a special master, spent ten minutes having

11:34:11  20    the court reporter read the transcript, and the judge or the

21    special master says, That's okay, the witness can do that, or

22    Mr. or Mrs. Witness, stop doing that, I'm going to sanction

23    you if you continue to do that.

24            So if there's a process like that that works, where

11:34:30  25    we can have someone available, I think just the threat of that

helps both sides.

In other words, if they think certain lawyers are not behaving or we think a witness is not appropriately responding to questions, we want to be able to use these for trial. These are -- almost all of them are trial witnesses that are going to be used in video or read or -- you know, trials all over -- in here. I mean, some of these witnesses are not Arizona witnesses. I mean, they're witnesses and they plan to play some and we plan to play some.

And I'll just be frank, we don't think we're getting a fair opportunity in the time we're allotted to get full and complete and accurate and responsive testimony in many instances. It's not every witness. But it's a lot of them, and it seems to be a pattern of what we get.

In other words, you ask a simple question and we hear kind of the same theme that resonates in some of what we call speeches. We hear about all devices have problems. Or all of a sudden the FDA will enter into an answer. Or that, you know, I know that Bard did everything they were supposed to do. Just -- you know, I mean, we've shown you some examples. And those are not isolated examples. They happen at every deposition at various degrees.

It happened on Tuesday with this witness. But it didn't happen enough where I thought we needed to call you. We worked through it, and I stayed on -- on some of the

11:36:07   1    questions until I got an answer, and it wasn't time after time

       2    after time.

       3         So long answer to a short question, but -- and I

       4    guess my response to it is whatever we can do to ensure that

11:36:24   5    future depositions, including the many experts we have to

       6    take, maybe even some of the treaters in the bellwether

       7    process and certainly some of the additional witnesses we want

       8    to depose, we just get good, clean testimony like we would if

       9    we were here.  If you were sitting there and the witness was

11:36:40  10    there and we were here asking questions.  Because that's the

      11    way depositions are supposed to go, and we just don't believe

      12    they have been.  And this has been happening, at least prior

      13    to the -- prior to this MDL.

      14         Your Honor, if you don't mind, while I've got the

11:36:56  15    opportunity, I know you want -- the one thing I want to make

      16    sure the Court has perspective of is how we are state, federal

      17    coordinating this MDL and what we're doing.  There's a case

      18    that's going to trial, probably in the first quarter of next

      19    year.  It's a G2 case.  And we've coordinated these

11:37:16  20    depositions.  So the focus has necessarily been on the

      21    Recovery and G2 time period.  And -- because, first of all,

      22    about 60 or 70 percent of the cases in this MDL are Recovery

      23    and G2 cases, but more importantly, we're coordinating with

      24    the state court litigant and lawyers in getting that case

11:37:37  25    ready for trial.  So the focus has been in depositions on the

11:37:40  1   Recovery and G2.

2        And I'm glad Mr. Boatman made the point.  The

3   Recovery and G2 history, from the standpoint whether or not

4   there should have even been these later devices, is all

11:37:53  5   relevant to the later devices.  It's not like we were only

6   getting testimony in the Recovery and G2 and those are only

7   going to be important in the Recovery or G2 case.

8        I mean, what happened with those cases as predicate

9   devices and the process they went through to reach the later

11:38:08  10   iterations are all going to be relevant in the later cases.

11        In the state court case that we're dealing with now,

12   we just had Dr. David Kessler's deposition taken a week ago,

13   former commissioner of the FDA, and his focus was on the

14   Recovery and G2.  His report only covers that.

11:38:32  15        So I just want Your Honor know that there's a lot of

16   reasons beyond the fact we don't have all the documents that

17   the plaintiffs' lawyers in this case have been focused on

18   that, because all of the earlier remands that are before you,

19   the ten cases, all Recovery and G2 cases.

11:38:46  20        The state court cases are -- likely have trial dates,

21   maybe even before we get to the bellwether process here, all

22   Recovery and G2 cases.

23        I may have misspoke.  There may be one Eclipse case

24   in the early remands.  I can't remember.  But we did -- we

11:38:58  25   have covered the Eclipse cases in some of these depositions.

11:39:01  1          So I just think it's important for Your Honor to have

2     a report on the fact that we are state and federal

3     coordinating these the best we can.  And we want to continue

4     to do that.  We don't want the state court litigants to say,

11:39:15  5     Well, you're not getting the kind of discovery I want at the

6     MDL, I'm going to go off and do my own.  I don't think they

7     want that either.  But they certainly have the right to do

8     that.

9          As a matter of fact, before the MDL, every state

11:39:26 10     court case or federal court case that was filed independent of

11     each other, they got to do their discovery over again.  That's

12     why there are some of these depositions.

13          One final point.  They keep talking about 80

14     depositions.  16 witnesses before the MDL were deposed, not

11:39:39 15     80.  Because they keep saying most were taken by MDL lawyers.

16          My law firm and other law firms that were involved in

17     this litigation for the four years, three or four years before

18     this MDL, 16 corporate depositions, witness depositions, were

19     taken.  So I wanted Your Honor to be aware of that as well.

11:39:59 20          Thank you.

21          THE COURT:  Okay.  Thank you.

22          MS. DALY:  Your Honor, with respect to the special

23     master issue that you inquired about, just to put this a

24     little bit in perspective for you, the witnesses that are

11:40:14 25     being deposed, most of those witnesses have never given a

deposition before.  None of them are professional witnesses.

Some of them are former employees that haven't worked for Bard

as far as back as 2002.  They're looking at documents they

haven't seen in a decade.  At depositions, they'll be handed

30-page documents and asked to focus on one paragraph.  But

being careful people, they're taking time to look at

depositions.

        The plaintiffs then asked not simple questions,

actually.  They ask multipart questions that include

assumptions or hypotheticals or references to documents of

nonprofessional witnesses.  It does take the witnesses

sometimes a period of time to get through it, to ask for

clarification, sometimes they answer in a lengthy narrative.

        But the fact is they're not being asked yes or no

simple questions.  And I was glad to see the appendix that the

plaintiffs submitted to you because even their appendix, which

I assume they were trying to show bad nonresponsiveness, in my

review of it, the answers are very often very responsive from

the witnesses who were trying to do their best.

        I have a couple of thoughts, having talked to my

group about ways we might deal with this.  The first way is

simple.  Both sides manages their attorneys and educates their

attorneys better about what the problems have been.

        The second opportunity is that we do an appendix with

some clips -- the video clips are very important -- that are

11:41:46  1   similar to what they've done, and we sit down and meet and

2   confer with a group of senior attorneys.

3       I've been taking depositions in this litigation both

4   before and since the MDL for years, and I'm happy to be part

11:41:59  5   of that team.  I think we can meet and confer and have a

6   discussion about what really is a nonresponsive question, what

7   really is a good objection.  There are lots of us who

8   understand that, and I think we could do that.

9       Failing that being an acceptable way to do it, we

11:42:17  10   could, in fact, pick a limited number of clips and excerpts

11   from depositions and submit that to a special master to look

12   at on his own time, soon, and to give us instruction via

13   telephone before the next group of depositions.  That would

14   also be a way that we could do it.

11:42:34  15       I think the cost of having a special master sit

16   there, somebody who has not seen the history of it, I think

17   that is unwieldy and I think it's expensive, and I think we

18   can as a group do better than that.

19       THE COURT:  Okay.

11:42:49  20       MS. DALY:  Thank you.

21       THE COURT:  All right.  As indicated, I want to think

22   about these issues a bit.  I will get an order out, if not

23   today, probably on Monday.

24       Are there other points or issues people want to make

11:43:11  25   or raise before we adjourn?

11:43:21  1          MR. STOLLER:  No, Your Honor.

2          MR. LERNER:  No, Your Honor.

3          THE COURT:  Okay.  All right.  I'll get an order out.

4          We do need to schedule the next case management

11:43:31  5   conference, I think.

6          MR. LOPEZ:  I'm sorry, I --

7          THE COURT:  That's all right.

8          MR. LOPEZ:  -- I thought you were asking about issues

9   we've covered.  There are a couple issues, if you don't mind.

11:43:40  10          THE COURT:  All right.

11          MR. LOPEZ:  As you know, we had an issue with a

12   deposition that we -- I think we're resolving, it's

13   Mr. Sullivan's deposition, and that was an issue where a

14   document that was -- may or may not have been related to the

11:43:58  15   Lehmann report was clawed back, and then we've since resolved

16   that.  You're aware of that.

17          The thing that's concerning us is that not happening

18   again maybe with some other documents in the future, and one

19   of the things that the defense said was that that document was

11:44:16  20   not deemed produced in the MDL.  In other words, that somehow

21   or other it got -- it seeped into the MDL through some side

22   door.

23          So I guess -- I think we need to have -- we've asked

24   them for this, we need them to give us a list, and I'm sure

11:44:35  25   they have it, so we don't run into this problem, of all

documents that they -- that were previously produced, in other
words prior to the MDL, that they, quote, deem produced in the
MDL.

          If they would do that, I think it might have solved a
lot of problems, especially at that last deposition, because
that particular document was deemed produced in the MDL, but
they took a different position about that.

          So we've asked them for it.  I don't know whether
Your Honor thinks that's a good idea or whether or not you
want to order they do it, but it would certainly help avoid
this potential problem in the future if the plaintiffs knew
exactly what it was that Bard was claiming are documents that
were previously produced that were deemed produced in this
litigation, because there were a lot of cases that were being
litigated before this MDL.

          That was the only point I wanted to bring to the
Court's attention.

          THE COURT:  Hold on just a minute.

          We addressed this issue early in the case.  And in
Case Management Order Number 2 after our initial case
management conference, I said the parties will discuss whether
agreement can be reached on the binding effect of already
completed discovery and what effect it will have in cases
filed after the date of the discovery.  If the parties are
unable to reach agreement they will -- are able, they will

11:47:17   1   jointly file a stipulation.  If they're unable to reach they

2   will each file 10-page memoranda.

3        Those memoranda were filed at dockets 375, 376, 411,

4   and 415.  And I assume I ruled on that issue.  I don't have

11:47:33   5   the order in my book addressing that specific issue, but does

6   anybody here recall whether we talked about what was the

7   effect of documents produced before the MDL?

8        MR. LOPEZ:  Well, I think that's correct, and I think

9   the issue is that they were deemed -- they would be deemed

11:47:56  10   produced in the MDL.  But there's an issue -- we're kind of

11   working in somewhat in a vacuum because we're not sure whether

12   or not our deemed produced is the same as their deemed

13   produced, and I think we ought to figure that one out.

14        I mean, I don't want to show up at a trial with a

11:48:16  15   document that we decided not to use at a deposition because we

16   think it is a great impeachment document, and then I find out

17   that that thing was never deemed produced prior to the MDL or

18   in the MDL, and I've got to have a day hearing with you or

19   another judge overseeing the case as to whether or not it

11:48:33  20   violated some CMO or whether or not the document should have

21   never been in my hands.

22        So, again, that happened at a deposition.  So I want

23   to avoid that problem occurring in the future, whether it be

24   at a trial, at a deposition, filing a document in opposition

11:48:52  25   or in support of a motion.  I just think it should be

11:48:57  1  something both sides should have the exact same understanding

2  as what documents -- and if there's an issue, then that's

3  something we can bring before Your Honor, that -- you know, by

4  the way, Judge, we have 50 exhibits or documents that are not

11:49:10  5  on their list, and we'd like --

6       THE COURT:  Well, that will happen when we prepare a

7  final pretrial order.  Each side will have its marked

8  exhibits, so there will be objections.

9       But let's hear defense counsel's thoughts on this.

11:49:29  10      MR. LERNER:  Your Honor, I think the issue that arose

11  with that one document was this confusion as it related to the

12  Lehmann report.  So the attorneys at the deposition, there was

13  some confusion about, well, that document was part of the

14  privilege, the privileged document as part of the Lehmann

11:49:45  15  report that you had ruled upon.

16       So that's one document in one deposition that has

17  happened.  That issue, I think, is clarified, and I can

18  work -- make sure we're on the same page related to that one

19  document.  But otherwise, I don't think there has been any

11:50:01  20  problems, nor do I expect there to be any problem.  I think

21  there was just that one problem of them having that document

22  in the format it was, unredacted.  I believe there was some

23  confusion at the time about whether it was privileged or not.

24       THE COURT:  Well, is it defendants' position that

11:50:18  25  there are documents that were produced before the MDL that are

11:50:21   1    not deemed produced in this MDL, and therefore that plaintiffs

2    cannot use in this MDL?

3           MR. LERNER:  Your Honor, I do not know of any such

4    documents.  I think the only documents we would say is -- I

11:50:35   5    can't think of anything.  Only thing that comes to mind was

6    the Lehmann report that was inadvertently produced.  Other

7    than that, I cannot think of any documents that are corporate

8    documents that have been produced before the MDL that we would

9    say are somehow not deemed produced in this MDL.  I think that

11:50:51  10    that was a unique circumstance relating to a privileged

11    document, that there was some confusion about at the

12    deposition.

13           THE COURT:  Okay.  I think that answers your

14    question, doesn't it, Mr. Lopez?

11:51:01  15           MR. LOPEZ:  I think so, Your Honor.  I think there

16    was an issue as to whether or not they were clawing it back

17    because it wasn't deemed produced previously or they were

18    clawing it back because of the Lehmann ruling.

19           So I'm happy with what I just heard, so let's just

11:51:12  20    put it that way.

21           THE COURT:  Okay.

22           You know, as far as the next conference goes, I think

23    I want to pick that after I decide what we're doing with the

24    schedule.  I'm not sure where to set it today because I'm not

11:51:28  25    sure what we're going to do with the schedule.  So it will be

11:51:30 1   in the next two or three months in any event, but I think I

2   want to look at whether there are milestones we ought to cross

3   before we hold it.  So I will just include that in the final

4   order that comes out.

11:51:43 5        Okay.

6        MR. STOLLER:  Might I make a suggestion on that,

7   Your Honor?

8        THE COURT:  Yeah.

9        MR. STOLLER:  Regardless, it probably makes sense to

11:51:49 10   have one in December.  I know it's a tough time.

11        THE COURT:  Oh, we'll definitely have one before the

12   end of the year.

13        MR. STOLLER:  Okay.

14        THE COURT:  Okay.  Thank you all.

11:51:57 15      (End of transcript.)

16                          *  *  *  *  *

17

18

19

20

21

22

23

24

25

1              **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion

9   of the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control, and to the best

12  of my ability.

13

14         DATED at Phoenix, Arizona, this 24th day of October,

15  2016.

16

17

18

19

20                             s/ Patricia Lyons, RMR, CRR
                               Official Court Reporter
21

22

23

24

25