1                    **UNITED STATES DISTRICT COURT**

2                      **FOR THE DISTRICT OF ARIZONA**

3                        _____

4    **In Re: Bard IVC Filters**          ) MD–15–02641–PHX–DGC
     Products Liability Litigation    )
5                                      ) Phoenix, Arizona
                                       ) **December 9, 2016**
6    _____)

7

8

9

10

11           **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

12             **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

13             <u>**SEVENTH SCHEDULING CONFERENCE**</u>

14

15

16

17

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003–2150
     (602) 322–7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer–Aided Transcription

```
 1                    A P P E A R A N C E S

 2    Plaintiffs' Co-Lead/Liaison Counsel and State/Federal Liaison
      Counsel:
 3
              Gallagher & Kennedy
 4            By: ROBERT W. BOATMAN, ESQ.
              2575 East Camelback Road, Suite 1100
 5            Phoenix, AZ  85016

 6            Lopez McHugh
              By: RAMON ROSSI LOPEZ, ESQ.
 7            100 Bayview Circle, Suite 5600
              Newport Beach, CA  92660
 8

 9    Plaintiffs' Steering Committee Counsel:

10            Gallagher & Kennedy
              By: PAUL LINCOLN STOLLER, ESQ.
11            2575 East Camelback Road, Suite 1100
              Phoenix, AZ  85016
12

13    Also for Plaintiffs:

14            Lieff Cabraser Heimann & Bernstein, LLP
              By: WENDY R. FLEISHMAN, ESQ.
15            By: DANIEL E. SELTZ, ESQ.
              250 Hudson St., 8th Fl.
16            New York, NY  10013

17            Rueb & Motta
              By: GREG RUEB, ESQ.
18            1401 Willow Pass Rd., Ste. 880
              Concord, CA  94520
19

20    For Defendants:

21            Nelson Mullins Riley & Scarborough, LLC
              By: RICHARD B. NORTH, JR., ESQ.
22            BY: BRANDEE J. KOWALZYK, ESQ.
              201 17th Street NW, Suite 1700
23            Atlanta, GA  30363

24            Snell & Wilmer
              By: JAMES R. CONDO, ESQ.
25            400 East Van Buren
              Phoenix, AZ  85004
```

**P R O C E E D I N G S**

10:01:31   1

2

3          THE COURTROOM DEPUTY:  MDL 2015-2641, Bard IVC

4     Filters Product Litigation Liability, on for the seventh

15:00:37   5     scheduling conference.

6          Will the parties please announce.

7          MR. BOATMAN:  Good afternoon, Your Honor.  Bob

8     Boatman, Ramon Lopez, Paul Stoller, and Wendy Fleishman for

9     the plaintiffs.

15:00:48  10          THE COURT:  Good afternoon.

11          MR. NORTH:  Good afternoon, Your Honor.  Richard

12     North, Brandee Kowalzyk, and Jim Condo on behalf of the

13     defendants.

14          THE COURT:  All right.  Good afternoon.

15:01:00  15          For folks who are on the phone, we have you muted so

16     we can't hear you because, as you may understand, somebody on

17     the phone has their hold music on.  Maybe it's stopped by now.

18     We hope so for the benefit of everybody else on the phone.

19     But it's 3 o'clock so we're going to move ahead.

15:01:18  20          Counsel, let's just run through the joint report that

21     you've provided and then I have a few additional matters that

22     I want to bring up at the end.

23          As far as the ESI discovery status is concerned, is

24     there any additional information that you want to share that

15:01:37  25     wasn't included in that report?

15:01:40  1    MR. STOLLER:  Your Honor, this is Paul Stoller.  In

       2  terms of reporting, I don't think there's anything else to

       3  say.  We have some issues, as indicated, with respect to

       4  custodians and that not all the custodians we understood were

15:01:53  5  going to be collected and produced have been collected and

       6  produced.  I have received an e-mail from Mr. North last

       7  night giving me some explanation of those.  I think there

       8  were nine custodians on our list, and I can't remember out of

       9  the total number but it's somewhere around between 60 and 80

15:02:11 10  I believe.  But at any rate, I think there were nine.

       11    The explanation I got last night was three of those

       12  they do not have documents for because they were not retained.

       13  I think we'll have some further conversations with defendants

       14  about that and about whether we need to bring that issue of

15:02:26 15  spoliation to the Court.  I just don't know yet until we get

       16  more information about what happened, what litigation holds

       17  were in place at the time and those sort of things.

       18    Other 6 were -- and I sent Mr. North an e-mail to

       19  that effect this afternoon -- custodians that we understood

15:02:43 20  and in fact that they have confirmed in e-mails that they were

       21  going to -- custodians who had had collections prior to

       22  litigation that they had agreed they would collect -- refresh

       23  and collect and produce.  And to our understanding that hasn't

       24  happened.  I assume they will do so because they said

15:03:03 25  previously they would.  That will result in, presumably, some

15:03:06  1   additional productions, maybe later this year or early the

2   next.  I don't know the timing of that.  But I would

3   characterize those issues as fairly nascent because those just

4   came up.

15:03:17  5              THE COURT:  Mr. North.

6              MR. NORTH:  Those issues are very minor in --

7              THE COURT:  Pull the mic over, would you.

8              MR. NORTH:  Those issues are very minor, in our

9   view.  We have provided an explanation to Mr. Stoller.  I

15:03:26  10  don't think I was clear enough on a couple of points.  I

11  think there are only three people where we don't have any

12  data.  But we're going to meet and confer this week, and I

13  think once we discuss that further we will either be able to

14  eliminate any further issue or make it very narrow.

15:03:42  15             THE COURT:  Well, are there -- are there custodians

16  for whom you have data that you promised to search that you

17  have not searched?

18             MR. NORTH:  There are two custodians that we do have

19  data that our notes internally indicated that Mr. Stoller had

15:03:58  20  withdrawn those when we were negotiating which custodians

21  would be searched and which ones would not.  There apparently

22  was a miscommunication on our part.  We have agreed to go and

23  search those now that he said he has in fact not withdrawn

24  those two.

15:04:15  25             THE COURT:  So there are two of them?

15:04:16  1          MR. NORTH:  Yes.

2          THE COURT:  When do you anticipate that happening?

3          MR. NORTH:  Oh, I think it can happen this week,

4    Your Honor.  They're not central players, so I don't think

15:04:25  5    they're going to be very voluminous in the amount of material

6    produced.

7          THE COURT:  And when you say "this week," are you

8    anticipating you can search and produce this week?

9          MR. NORTH:  Unless I'm mistaken in the volume, I

15:04:37 10    think that's correct, Your Honor.  I have not seen a report

11    on the volume.  Mr. Stoller just clarified for me earlier

12    today that he indeed wanted those two searched and that our

13    records were wrong that he had withdrawn those.  So I don't

14    have the count on the volume yet.  I can't fathom they have a

15:04:56 15    lot, knowing what their positions were.  We will try our

16    best.  If we can't do it next week, we'll report to the Court

17    or report to Mr. Stoller.

18          THE COURT:  And so there's two you say you haven't

19    searched because of the miscommunication and three you agreed

15:05:13 20    to search but as to whom you have no data; is that right?

21          MR. NORTH:  Yes, Your Honor.  Two of those were

22    sales representatives who left the company in September of

23    2008.  At that particular time we only had about ten -- had

24    had maybe ten cases over the years and there was not a mass

15:05:34 25    litigation and the company's legal hold practice at that

15:05:36  1   point was to send out an individual legal hold notice for

2   each newly filed case, and it would always designate the

3   sales representative at issue in that case.  It was only

4   later when the litigation began expanding that the legal hold

15:05:53  5   notice was sent to the entire sales force.  So that's the

6   issue with two of them.

7        The third one, we can't figure out what's going on.

8   I've asked my vendor to further investigate this.  That person

9   was subject to the legal hold.  They left the company in 2011.

15:06:09  10  At the time right before they left the company, we had our ESI

11  vendor do a complete sweep of everybody associated or on the

12  legal hold.  This would have been late 2010 bleeding over into

13  2011.  But our vendor is now telling us they don't have any

14  data for this person.  And so we've asked them to please go

15:06:30  15  back and investigate why, because their instructions were to

16  include that person and they should have data on that person.

17  So I hope to find out an answer to that question early next

18  week.

19        THE COURT:  And are those five, as far as you're

15:06:46  20  concerned, the only ones at issue?

21        MR. NORTH:  There are three others that we have

22  produced materials for that we collected in 2005 or early

23  2006 when we did not do -- when we did the first major

24  collection.  They left between 2006 and 2008.  And it appears

15:07:10  25  that while everything that was collected in 2005 has been

15:07:14  1   searched and produced, that data may not have -- additional

2   data may not have been retained, or all of the data may not

3   have been retained in 2008 or '7 when they left.  So there's

4   a potential gap of two to three years for those three people.

15:07:35  5            THE COURT:  All right.  Thanks.

6            Mr. Stoller.

7            MR. STOLLER:  Just a few corrections, Your Honor.

8            My list is four people -- John McDonald, Brian Barry,

9   Joe DeJohn, and Mark Kumming -- that fall into that last

15:07:48 10  category.  Again, all witnesses we identified as refresh

11  custodians and they agreed, I believe, in August, if not

12  earlier, to search, to go back and search and produce those.

13           The two that I understand they have identified that

14  they haven't collected were -- I don't understand them to be

15:08:09 15  sales associates, they were the regional sales managers who we

16  were in here some time ago contesting about whether or not we

17  should get access to those and you ordered their production.

18           And the third thing I think I would correct, Your

19  Honor, is that the two that they indicated they understood we

15:08:28 20  withdrew were actually -- they weren't on our list, they were

21  on their beginning list.  So I'm not sure where the

22  miscommunication came in, but my understanding is they're now

23  going to go back and get them and produce them, presumably.

24           MR. NORTH:  Just a couple of additional points, Your

15:08:46 25  Honor.  He's correct those two were on one of our lists, but

15:08:49  1    our notes reflect they were withdrawn.  It's obviously just

2    miscommunication, and we will work that out.

3              The other thing is there really are only three and

4    not four, as Mr. Stoller's suggesting.  John McDermott is one

15:09:03  5    he puts in that category.  Mr. McDermott left the company in

6    October of 2007 and at the time of his departure his ESI was

7    collected at the moment of departure.  And all of his ESI had

8    previously been processed and produced in the productions of

9    2010 and 2012, so there were very few additional documents

15:09:24 10    that came up.  But all of his materials have been collected

11    and processed.

12              THE COURT:  All right.

13              MR. STOLLER:  Just one -- Richard, that's not

14    consistent with the e-mail I have directly in front of me.

15:09:36 15              THE COURT:  Mr. Stoller, let's not have you talk to

16    him directly during the hearing.

17              MR. STOLLER:  I apologize.

18              THE COURT:  Mr. North, I'm going to provide in the

19    order after this that additional production from searches of

15:09:49 20    these individuals will be made by the 22nd --

21              MR. NORTH:  Okay.

22              THE COURT:  -- at the latest.  Earlier if possible.

23              And if you have discussions or concerns about lost

24    ESI and you're thinking about bringing it to my attention,

15:10:10 25    please keep in mind that we have a new rule of procedure that

15:10:14  1   deals with that specifically, Rule 37(e).  That is what I will

2   apply if there's an issue raised about lost ESI.

3   Okay.  Anything else we need to discuss on the ESI

4   front?

15:10:28  5   MR. STOLLER:  No, Your Honor.

6   THE COURT:  Anything from you, Mr. North?

7   MR. NORTH:  Nothing, Your Honor.

8   THE COURT:  Okay.

9   With respect to the bellwether selection process

15:10:42 10   governed by Case Management Order 11, paragraph number 4, you

11   all were to, by today, exchange your lists of four bellwether

12   cases and to have discussions about the other four that you

13   want to go into what we've designated Discovery Group 1.

14   MR. NORTH:  Your Honor, we are and have been

15:11:04 15   prepared --

16   THE COURT:  Please speak into the mic --

17   MR. NORTH:  We are and have prepared to do that.

18   One wrinkle has developed since we submitted the report.

19   Just last night Mr. Stoller advised us that two of the pool

15:11:15 20   from which we're drawing are -- they're going to dismiss

21   those.  Those were two of the ten we intended to name today.

22   And we're concerned about this because both of those

23   people -- one is deceased.  Or has recently died.  I believe

24   a Suggestion of Death was filed earlier this week.  We

15:11:37 25   understand to some extent him.  We don't understand the

15:11:39   1   second.

2          It's not a strong case for the plaintiff and we put

3   it in there because we think a few cases, not all of them but

4   a few cases that have no or little damage need to be part of

15:11:51   5   this process.  And this is one where they now claim that she's

6   discovered she did not have a claim, and they say she recently

7   went to the doctor.  The records show she went to the doctor

8   in September, and this is the doctor's visit they're talking

9   about.

15:12:06  10          So we find ourselves in a situation the night before

11   we exchange these, one of our picks and one of our important

12   picks, we think, for how we've tried to give representative

13   choices in various categories, is no longer on the table based

14   upon information they have had or should have had for three

15:12:25  15   months.

16          What we're concerned about, and this is the first

17   instance of this, but in MDL after MDL after MDL throughout

18   the country, there are growing concerns about plaintiffs

19   manipulating the bellwether pool.

15:12:40  20          I don't have enough information to know if that's

21   what's going on here, but I'm concerned about it when they had

22   this information two or three months ago, or should have,

23   their client did, on which they based the decision to dismiss.

24   And now we are the night before we're supposed to choose.

15:12:56  25          If they had told us three months ago, we wouldn't

15:12:58  1   have paid the price to get all the medical records.  We

2   wouldn't have assessed them.  But now we're in a position

3   where two of our ten choices are off the table.  And we think

4   it's a very unfair situation.

15:13:10  5           Mr. Condo and I were talking a lot today trying to

6   figure out how do we address what we think is the unfairness

7   here, or what do we request?  I mean, I think there would be

8   some justification for giving us time to add two more.  But

9   that just slows down the cog completely.

15:13:27 10           So given the fact that they're withdrawing two people

11   that were on our list of ten, we would suggest that a fair

12   resolution would be for the Court to randomly just choose two

13   names off of their ten so we submit eight names and they

14   submit eight names.  And that way it would be more of a fair

15:13:45 15   and even playing field.

16           And one last thing, Your Honor, I'd mention is if

17   this develops, as happened in other MDL's like the Zimmer MDL

18   and the judge there has expressed a lot of frustration, if

19   there's continuing problems with bellwether pool and possible

15:14:06 20   manipulation, we're going to approach the Court about a

21   possible Lone Pine order, but that would be down the line.

22           MR. STOLLER:  Your Honor, Mr. Flora died.  I don't

23   think his claim survives death.  It's my understanding his

24   death was not related to the filter.  I'm not sure how he

15:14:26 25   could continue to be a plaintiff.

15:14:28  1           THE COURT:  When did he die?

       2           MR. STOLLER:  I don't know the answer to that, Your

       3  Honor.

       4           MS. KOWALZYK:  It was October 15th.  October 15th,

15:14:33  5  Your Honor.

       6           THE COURT:  And do you have any reason to dispute he

       7  died on October 15th?

       8           MR. STOLLER:  I don't, Your Honor, sitting here

       9  today.

15:14:41 10           THE COURT:  When did you notify plaintiffs one of

      11  the bellwethers had died?

      12           MR. STOLLER:  I believe a Suggestion of Death was

      13  filed in this case earlier this week.

      14           MS. KOWALZYK:  December 7th.

15:14:52 15           MR. STOLLER:  Okay.

      16           THE COURT:  So why the seven-week delay between him

      17  passing away and you letting them know that one of the

      18  bellwethers had died?

      19           MR. STOLLER:  I don't know why it took seven weeks

15:15:05 20  to put -- to get a Suggestion of Death out, Your Honor.  I

      21  don't know the answer to that.  It's not our case, it's not a

      22  PLC, it's not a case that belongs to a member of the PLC.

      23           THE COURT:  It's a bellwether.  I mean, it's in the

      24  pool.

15:15:19 25           MR. STOLLER:  I understand.

15:15:20  1        THE COURT:  It's a pretty important case to keep

2    track of.

3        MR. STOLLER:  I understand that, Your Honor.  I

4    don't have an answer to that question.

15:15:26  5        THE COURT:  What were you going to say about the

6    next one?

7        MR. STOLLER:  The next case is Patricia Levy.  I

8    spoke with -- she's a Gallagher & Kennedy client.  I spoke

9    with her last night as we were getting information on the

15:15:41 10    various cases in the last week for purposes of making

11    selections.  Talked with her at that time about what she

12    wanted to do with her case.  She indicated to me she wanted

13    to dismiss.  Her case has not been dismissed.  I thought in

14    fairness I should let plaintiffs counsel -- excuse me,

15:15:57 15    defense counsel know before they made their selections that's

16    what she intended to do so if it was going to affect it they

17    could raise the issue today.  But I brought it, Your Honor,

18    literally as timely as I knew that that's what she intended

19    to do.  I brought it to their attention the same day.

15:16:13 20        My concern was exactly that they picked her and then

21    we did it the next day and it sounds like sleight of hand.  I

22    didn't want it to look like that.  It is not sleight of hand.

23    She went and saw her doctor.  She got a scan earlier this

24    year.  We talked to her after that.  I don't know the date, I

15:16:30 25    don't recall the date when we spoke with her after that.  We

15:16:33  1    spoke with her a couple sometimes asking if she intended to

2    pursue the claim or not.  The conversation yesterday, I was on

3    the phone with her for about 30 minutes.  She said she did not

4    want to pursue her claim.

15:16:44  5            I did not seek a stipulation for dismissal.  I wanted

6    to notify them that that's what she intended to.  She's filed,

7    they've answered.  They have a right to pick her case.  They

8    have a right to put her into the next set of the discovery

9    pool if that's what they choose to do.  Her case is still on

15:16:59 10    file.  She doesn't have a right to dismiss as of right.

11    They've answered.  I thought it was information they needed to

12    know as timely as we knew it.

13            THE COURT:  So what is your intention with respect

14    to Ms. Levy?

15:17:12 15            MR. STOLLER:  Well, if it's their true contention

16    that she's one of their final 10, then my guess is she goes

17    into the discovery group.  I think it's a bit of a waste of

18    time to take a plaintiff who -- and, Your Honor, let me be

19    clear about this.  I stood here in this courtroom when we

15:17:30 20    talked about *Lexecon* waivers.  We've known -- she's our

21    client.  We've known her for, boy, a year maybe.  We asked

22    her to waive *Lexecon*.  We asked her to bring -- if we were

23    trying to keep her out of the pool, which we've not done with

24    anyone, Your Honor, we've not tried to keep anybody out of

15:17:47 25    the pool.

15:17:49  1      We've tried at every step to make sure every case is

2      eligible to go on.  We wouldn't have -- we wouldn't have let

3      it get to this step.  We did, with many of our clients, go

4      back, get a scan, talk to your doctor, decide your next steps.

15:18:03  5      That's what she did.

6          If she goes on to the next phase in the discovery

7      pool, the bellwether order has a provision in there that says,

8      look, if somebody drops -- if a plaintiff drops out of the

9      bellwether -- out of Discovery Group 1, sorry, they get to

15:18:17 10      pick another case to replace it.  That would be their remedy.

11      But I thought it made much more sense to raise the issue now

12      than to wait to see if they picked it and then have her say

13      I'd like to dismiss them.  I think in fairness letting them

14      know sooner rather than later was the right thing to do.

15:18:35 15          THE COURT:  What is your response to Mr. North's

16      proposal?

17          MR. STOLLER:  I think that's not fair, Your Honor.

18      I don't know what their top four are, but their top four is

19      whatever their top four our.  Each side has a right to pick

15:18:47 20      four cases to move on.

21          You indicated a moment ago the exchange today was top

22      four and discuss eight.  The actual deadline today is a list

23      of ten with our presumptive four to go -- I shouldn't say

24      presumptive.  Our actual picks to go into the discovery pool.

15:19:03 25          We're then to meet and confer over the next week

15:19:04  1  about the next four to go in, see if we can come to agreement

2  on those, and if not, file next Friday competing -- I'm not

3  sure they're motions, but at any rate competing position

4  papers on who this Court should select as the remaining four.

15:19:18  5       I don't think anything changes in that analysis given

6  what's happened.  I mean, we don't control, particularly as to

7  Mr. Flora, we don't control that he died.  That's not -- and,

8  again, what would happen if we were -- next week or two weeks

9  from now is they would have a right to pick two cases.  If

15:19:36  10  they're their picks, which they've said they are, they have a

11  right to pick two cases and to replace them.

12       THE COURT:  Well, let's pause for a minute on the

13  procedure that you've just described.

14       Section IV A.1 of Case Management Order 11 says that

15:19:59  15  by today you exchange lists of ten cases selected from the

16  PFS/DFS Group 1, and the parties each designate four cases on

17  those lists for automatic inclusion in Discovery Group 1.

18       My understanding is that you each provided the list

19  of ten, but you also identify the four you're picking for

15:20:24  20  automatic inclusion.

21       MR. STOLLER:  That's correct, Your Honor.

22       THE COURT:  Okay.  I thought you were suggesting

23  that doesn't happen today.

24       MR. STOLLER:  No.  My understanding what you said

15:20:30  25  earlier, Your Honor, was we were supposed to have engaged in

15:20:34   1    the conversation about the next four by today, where we would

2    be down to the four/four and then the final four.

3         And, Your Honor, both sides are prepared -- we have

4    not yet exchanged those lists, but we had agreed we would do

15:20:49   5    so at this hearing.

6         THE COURT:  So Mr. North, are you saying these two

7    cases that have now disappeared were going to be on your list

8    of ten or list of four or both?

9         MR. NORTH:  They would have been in the list of 10,

15:21:01  10    Your Honor.  Not the list of four.

11         THE COURT:  So you picked four for automatic

12    inclusion that do not include those two?

13         MR. NORTH:  Right.  But those two were part of the

14    six we then were going to enter into this discussion process

15:21:15  15    with Mr. Stoller.

16         And I'm not attempting or suggesting the Court

17    deprive them of two of their four because our four are intact

18    too.  But it seems to me one remedy would be for the Court to

19    randomly pick two of their remaining six to take off the table

15:21:29  20    and then we would work out the other four from the eight that

21    are left, as opposed to the 12 that are left.

22         THE COURT:  What's wrong with that, Mr. Stoller?

23         MR. STOLLER:  Well, our -- I don't know how they

24    composed their list, Your Honor, but our list is composed of

15:21:45  25    cases to give the Court options.  We're not sure how you're

15:21:49  1    going to want to stack the six you're going to set for trial.

2    We have included in our ten different devices on the idea

3    that Your Honor's going to want perhaps a Meridian case or

4    Eclipse case.  If you were to randomly clip people off on

15:22:05  5    ours, you might clip off our Eclipse case or our Meridian

6    case, for example.  And then we wouldn't have -- you would

7    have only one choice for what the -- it's the later devices

8    that are going to be smaller represented ones in this MDL at

9    this point, particularly the Meridians, to some degree the

15:22:22  10   Eclipse.  I don't have my numbers with me, but last time I

11   looked at it, which was, candidly, a couple months ago, I

12   think two-thirds of the MDL, if not more, is Recovery, G2,

13   G2X, G2 Express.  The latter three are essentially the same

14   device.  So your latter two -- latter three devices are the

15:22:40  15   relatively small represented.  And I'm sure if you want to go

16   with purely representative given there's multiple devices and

17   multiple injuries, but we wanted you to have that option so

18   if your thought process is when you pick cases you want to

19   have that sort of a makeup of it, to have representative

15:22:58  20   devices.

21        If we randomly strike those from our six, you could

22   take out one of those cases and leave yourself with only one

23   potential option for -- I'll just use an example, for an

24   Eclipse case.  Because we --

15:23:11  25        THE COURT:  But I don't have that option unless you

15:23:13  1   all put it on the list of 12; right?  I mean we're going to

2   winnow this group of 20 down to 12, hopefully by agreement.

3   If not, I'll pick four of the 12.  There's no guarantee those

4   12 are going to cover all devices.  You can pick all the 12

15:23:30  5   without my involvement.

6          MR. STOLLER:  We could.  But we could also get to

7   the point where we don't agree and we have four and four and

8   you look at those and say I've got a Recovery, I've got some

9   G2s, I want Eclipse as one of those four, I want a Meridian

15:23:42 10   as one of those four, and are choosing between different

11  cases.

12         THE COURT:  But what you're suggestion, I think, is

13  that I choose those four, if you can't agree, from a

14  remaining group of ten, six of which you've picked and four

15:23:54 15  of which the defendants have picked.

16         MR. STOLLER:  Well, I would submit that they add two

17  other cases into it so that we're at -- you have a full 12.

18         THE COURT:  Haven't you been doing some looking into

19  these cases?  I don't want to delay the process.  Doesn't it

15:24:10 20  become difficult for them to pick out two more cases that

21  they haven't looked into?

22         MR. STOLLER:  I would tell you, if you said to me,

23  Paul, we're going to take two of your cases out, I would

24  within an hour tell you the replacement two.

15:24:21 25         I mean, we went through all 48 cases, and I will tell

15:24:24  1    you we ranked them with precision.  But we spent a lot of time

2    on this, figuring out what we thought are the best cases for

3    this Court to try, and we didn't just go here's ten and then

4    not look at the others.  We looked at every case.  We did

15:24:38  5    extensive analysis of every case.

6         Again, if you said to me, Paul, I'm going to randomly

7    take out two cases and you have to replace them, I know what

8    my next two are.  At least, you know, I would have to in some

9    cases look at, okay, if you took out Eclipse now I've got to

15:24:53 10    go down and look for another Eclipse and where does that fall

11    in our tiering.  But it is not the case, and I don't think it

12    would be the case for them either, that they said we only

13    looked at 10 cases.  I suspect they know another two, three,

14    four cases that would be next on their list.

15:25:08 15         THE COURT:  Mr. North.

16         MR. NORTH:  Your Honor, he's correct.  Of course we

17    would go back to the well and find two more cases.  We've

18    looked at all 48 ourselves.  Our point is we don't believe

19    it's fair because we now have two less to choose from through

15:25:20 20    no fault of our own, and therefore we've got to get what was

21    our 11th and 12th choice as opposed to our first ten.

22    Through no fault of our own.

23         I would also say we are in the same boat when it

24    comes to representative cases among the different filter

15:25:37 25    types.  I understand the risk he's talking about.  We're

15:25:40   1   facing that risk.  The one Denali case we had in our ten is

2   now gone.

3            One thing I would point out, Your Honor, is we did an

4   analysis as of the inventory through Wednesday in this MDL.

15:25:55   5   Filter type, other than Simon Nitinol, with the least number

6   of cases in this MDL is now the Recovery filter at 10 percent.

7   There are more Denali cases, more Meridian cases, double the

8   number of Eclipse cases than there are of Recovery.  And G2

9   is, of course, far and away the largest with 41 percent of the

15:26:16   10   entire inventory.

11            THE COURT:  Okay.  Give me just a minute.

12            Mr. North, are you saying that before you learned of

13   these two, you had put them on your list of ten?

14            MR. NORTH:  Yes, Your Honor.

15:34:25   15            THE COURT:  All right.  Well, here are my thoughts

16   on this.  It does not appear to me that the elimination of

17   these two names from Discovery Group 1, is that what we're

18   calling it?  From -- no.  I lose track of all these names.

19            MR. STOLLER:  Yes, Your Honor, Discovery Group 1.

15:34:47   20            THE COURT:  PFS/DFS Discovery Group 1.

21            MR. STOLLER:  Okay.  I'm wrong.

22            THE COURT:  It doesn't appear to me it was a

23   deliberate effort or calculated effort to manipulate the

24   pool, but it has decreased the number of choices the

15:35:04   25   defendants otherwise would have made in their group of ten.

15:35:07   1          I think in fairness -- well, and at the same time, I

2   would like -- if you put the question to me to pick four

3   bellwethers, I would like to have 12 cases to pick from rather

4   than eight.  So simply knocking two off the plaintiffs' list

15:35:24   5   of ten and having each side submit lists of eight to me isn't

6   as optimal.

7          So what I propose to do is this:  Have you identify

8   your ten for me, Mr. Stoller.  Well, have you identify for me

9   the six of your ten who are not in your list of four choices.

15:35:38  10          MR. STOLLER:  Okay.

11          THE COURT:  And I'll knock out two of them at

12   random.  And then you each will compile your list of ten

13   again.

14          So you still get to put in ten names, you get to put

15:35:49  15   in ten names but, in effect, you're each making your choices

16   from 22 cases rather than 24 as we had at the beginning.

17          That doesn't interfere with your first four choices.

18   It doesn't limit the number I have to choose from if you are

19   unable to make a pick.  It does allow the parties to take into

15:36:08  20   account what filters are at issue in which cases when you come

21   up with your final list of ten.  The loss of two is as

22   fortuitous to you as it was to defendants, and it seems to me

23   to balance the tables and everybody just ends up picking from

24   a list of 22 rather than a list of 24.

15:36:28  25          MR. STOLLER:  Understood.  How would you like to us

15:36:29  1    get you those names?

2         MR. NORTH:  Do you have it here?  Maybe you can just

3    give it to him.

4         MR. STOLLER:  I do, but not written out in a way

15:36:40  5    that makes it really easy.  Our names are alphabetical, so I

6    don't have them segregated by here's top four, here's bottom

7    four -- bottom six or whatever.

8         THE COURT:  But you've got your four identified;

9    right?

15:36:50  10        MR. STOLLER:  I do.  And I'm happy --

11        THE COURT:  I'm not going to interfere with your

12    four.  You've got those four.  It's the remaining six I'm

13    going to knock two out of.  And you can replace them with

14    others that you didn't put on your original list of ten.

15:37:03  15        MR. STOLLER:  One of the things I was going to

16    suggest, Your Honor, and maybe a way to help expedite this a

17    bit, my understanding is that Mr. North said their only

18    Meridian case got knocked out.

19             Is that right?

15:37:16  20        MR. NORTH:  No, it was Denali.

21        MR. STOLLER:  Denali.  I apologize.  I'm wrong.

22        THE COURT:  Okay, so if you have a list of ten, I

23    just want to know the four I'm not supposed to knock out.  So

24    identify those.

15:37:28  25        MR. STOLLER:  Circle those?

15:37:29  1          THE COURT:  That's fair.

2          You haven't shown it to Mr. North yet; right?

3          MR. NORTH:  If I could propose this, I think this

4     would work.  It's going to do what you're saying, and then

15:37:50  5     with those two knocked out, you can tell us what those two

6     names are, and then both sides can go back and do a new list

7     of ten and exchange it Monday morning.

8          THE COURT:  That's my thought.  Or even later today

9     if it's easy.  But, yeah, that's my thought.

15:38:01 10          Why don't you bring that up, Mr. Stoller.

11          MR. STOLLER:  I've circled the ones that are the

12     protected four.

13          THE COURT:  Right.  Okay.  So I'm not going to knock

14     off the protected four.  I'm going to knock off Mary Duffie

15:38:20 15     and Nicole Gross.  It's a 2015 and 2016 case.  Those are off

16     your list of ten.  You can replace them with others that are

17     in the -- whatever that long name we gave them -- PFS/DFS

18     Group 1.  So when you exchange it, your list will have ten,

19     the defendants' list will have ten, and we're not encumbering

15:38:46 20     our ability to have maximum options when we pick the four

21     bellwethers if you all can't agree on them.

22          So what we need to have done, then -- I need to make

23     sure you're hearing this, Mr. Stoller, to agree.

24          By next Friday you're either going to give me an

15:39:09 25     agreed upon list of 12 or you're going to give me an

15:39:14  1    even-numbered agreed upon list with either my having to pick

2    two or four that you can't agree on, plus memoranda from each

3    side as to whom I should pick to fill those slots.  That's

4    what I think the order calls for.

15:39:27  5        And then by a week from Friday, which will be the

6    22nd, you're going to get response memorandums explaining why

7    the other side's memorandum is wrong as to whom I should pick.

8    And I'll read those and I'll pick the rest of the bellwether

9    pool.

15:39:43  10       So if you all want to do that later today or wait

11   till Monday to do it, that's fine with me.  If you need time

12   to figure out who the two additions will be, that's fine.

13       MR. STOLLER:  Monday?  We can do it today --

14       MR. NORTH:  Let's see what time we get done.

15:39:58  15      MR. STOLLER:  Okay.

16       THE COURT:  When we were here last, I had indicated

17   in Case Management Order 18 that by today you would have a

18   proposal for me on how the bellwether discovery was going to

19   proceed.  I didn't see that in your joint report.

15:40:13  20      What I'm referring to is a sentence on page 4 of my

21   Case Management Order 18 which said, "The parties should be

22   prepared at the next case management conference to propose

23   the nature and timing of discovery to occur during this

24   period," meaning between now and the actual bellwether

15:40:29  25   selection.

15:40:30  1    MR. NORTH:  Your Honor, candidly, I just realized

2    last night we had omitted that.  I do apologize.

3    The parties have planned two meet and confer sessions

4    over the next week to see if we can reach agreement as to the

15:40:45  5    final bellwether pool people.  So I think we could also come

6    up with some plan to submit to the Court next Friday as a part

7    of that process, if that works for the Court.

8    MR. STOLLER:  I was just going to reiterate what

9    Richard said, Your Honor.

15:41:01  10    THE COURT:  Okay.  So by the 16th, then, you will

11    get me not only your bellwether selections and any memos on

12    people I need to select, if any, but you'll also get me a

13    proposed case management schedule for the discovery of the

14    bellwether cases.  And I'll reflect that in the order that

15:41:21  15    comes out.

16    Okay.  Anything else we need to address on bellwether

17    selection?

18    MR. NORTH:  Nothing, Your Honor.

19    MR. LOPEZ:  Your Honor, on the selection, if we

15:41:35  20    don't agree what you're going to pick -- we should probably

21    have an agreement this is a two-page summary, one-page

22    summary of each case.  I don't know that we've done that.  I

23    mean, you don't want a trial brief with tabbed medical

24    records.

15:41:47  25    THE COURT:  You are exactly right.  I guess I

15:41:52  1   didn't -- let me see if we specified that in the order.

2       It just says with a memorandum in support of their

3   selection.

4       Let's say three-page memorandum per plaintiff

15:42:10  5   advocating why you think I should pick the person you're

6   advocating for.

7       MR. LOPEZ:  Thank you, Your Honor.

8       THE COURT:  And with responses that come in a week

9   later, three pages per plaintiff as well.

15:42:41  10       Okay.  Lets talk about the mature cases for a minute.

11   I have a question for plaintiffs counsel on this.

12       Well, let me ask you first, defense counsel.  My

13   understanding from what you've submitted is that you plan to

14   produce expert reports that address the FDA warning letter and

15:43:09  15   the Kay Fuller allegations as part of the expert disclosures

16   in the MDL.

17       MR. NORTH:  Absolutely, Your Honor.  We've been

18   working extensively with our experts on that.

19       THE COURT:  Okay.  I just need to know the answer is

15:43:22  20   yes.

21       It seems to me that in terms of remanding the mature

22   cases, and I want to do that at the first opportunity that

23   it's available, if there is the possibility, as it seems to me

24   there is, that those mature cases will include the FDA warning

15:43:40  25   letter and the Kay Fuller allegations and the parties' experts

15:43:43  1    on them, then we ought to get through those expert disclosures

2    and discovery and *Daubert* motions, if any, before we remand

3    them.

4          If they're not going to involve the FDA warning

15:43:55  5    letter or Kay Fuller allegations, then perhaps we can send

6    them back for trial now.  But I'm assuming those aren't parts

7    of the case the plaintiffs want to drop out and therefore, I

8    hate to hang on to them longer than necessary but it seems to

9    me it is necessary to get that expert disclosure done.

15:44:14 10          MR. LOPEZ:  I don't disagree, Your Honor.  Some of

11   these have experts that have already been disclosed.  I think

12   part of the issue was the ability for them to supplement

13   their reports with anything that developed from the

14   Kay Fuller and the warning letter discovery.

15:44:33 15          So I would say that -- I mean, there's couple ways to

16   do that.  I mean, we could -- we could still remand these

17   cases sooner than when those -- when we currently have those

18   experts prepared pursuant to the schedule you have here, and

19   maybe in some of these cases where there's already been

15:44:55 20   experts that have developed, we're talking about just

21   supplementing their report and our reports and maybe a follow

22   up deposition.

23          So at least maybe give us an opportunity to on maybe

24   some of these cases if there are some -- some of these were in

15:45:10 25   motion in limine.  I mean, we were literally ready to have the

15:45:14   1   judge -- in the Tillman case, for example, in Jacksonville,

2   motions in limine were pending.  Experts had been exchanged

3   and deposed.  There may be instances like that.

4        I mean, I think the point here is the sooner we start

15:45:28   5   getting cases ready for trial here, whether it's the

6   bellwether process, we have a state court case, which I was

7   going to report to the Court today that's scheduled, we just

8   found out, a week -- I guess it was last week that we have a

9   March 20 trial date, which is in a lot of ways a bellwether

15:45:44  10   case.  This PLC has been very actively involved even though

11   it's a state court case with counsel from Florida.

12        So maybe -- I think generally for most of these cases

13   that's correct, because I think most of them did not get to

14   the stage where we had expert reports exchanged, but allows us

15:46:04  15   opportunity to submit to the Court something that might be a

16   hybrid of that in one or two of these cases.

17        THE COURT:  Well, what I would suggest, Mr. Lopez,

18   is that you confer with defense counsel about whether there

19   is a case where the experts were sufficiently advanced that

15:46:22  20   there's a discrete way to supplement and move to trial, and

21   I'm more than happy to consider that.  It just occurs to me

22   that in this MDL there's been a lot of discovery that I think

23   primarily the plaintiffs have wanted related to the FDA

24   letter, Kay Fuller allegations on both sides.  That discovery

15:46:43  25   is undoubtedly going to be something one side or the other

15:46:47   1   wants to use in these cases when they get back.  That

2   discovery may have an effect upon any *Daubert* motions that

3   are made on the experts.  I don't see it makes much sense to

4   send them back to those courts incomplete and say, you know,

15:47:02   5   either you follow along with what we're doing in the MDL or

6   you decide, Judge, if you want to go the same way we do in

7   the MDL, that sort of defeats the whole notion of the MDL.

8         But absolutely, if there's a clean way to carve off a

9   case and get it back and get it tried, I'm happy to do that.

15:47:17  10   I just think we've got these issues that are MDL issues that

11   are likely to arise.  But I'm happy to consider proposals as

12   we move forward.

13         MR. LOPEZ:  I don't disagree, Your Honor.  Thank

14   you.

15:47:28  15         THE COURT:  Okay.  So for now we're going to hold on

16   to the mature cases.

17         With respect to depositions of plaintiffs counsel, I

18   think I do need briefing on this issue.  It's an important

19   decision whenever a lawyer's going to be deposed.

15:47:48  20         It appeared to me, defense counsel, that you had

21   essentially briefed it in your portion of the joint report.

22   You laid out authorities, you attached exhibits.  What I would

23   be inclined to do is let the plaintiffs file a response and

24   you a reply on those same issues, rather than start the

15:48:06  25   briefing over.

15:48:07  1        MR. NORTH:  That's fine, Your Honor.

       2        THE COURT:  Okay.  How much time do plaintiffs

       3   counsel need to put together a brief on the deposition of

       4   those lawyers?

15:48:17  5        MR. BOATMAN:  A week, Your Honor.

       6        THE COURT:  That's fine.  So let's say that the

       7   plaintiffs brief will be due on the 16th.

       8        And can we get the defendants reply a week later on

       9   the 22nd?

15:48:30 10        MR. NORTH:  Yes, Your Honor.

      11        THE COURT:  Okay.  When I get those in, if I think I

      12   need to hear from you, I'll let you know, get you on the

      13   phone for argument.  Otherwise I'll rule, probably in early

      14   January.

15:48:47 15        Okay.  With respect to the 30(b)(6) deposition, I

      16   have read what's in the report.  I have not had time to go

      17   through the matrix that you've submitted.  And I guess my

      18   first question is whether you've made any other progress on

      19   this matter?  And, if not, whether you want me to rule on the

15:49:10 20   basis of the matrix.

      21        MS. FLEISHMAN:  We've -- Wendy Fleishman on behalf

      22   of the plaintiffs, Your Honor.  Yes, we've made a lot of

      23   progress.  I think we've resolved all but one issue now.  And

      24   the one issue has to do with deposition number 15 which

15:49:26 25   appears at page 22 of the report, Your Honor.

15:49:34  1          We've asked Bard to identify a witness who could

2    identify the safety status of Bard's IVC filters for and

3    indwell times in excess of two months.  What we're actually

4    asking --

15:49:45  5          THE COURT REPORTER:  Excuse me, Counsel --

6          THE COURT:  Hold on just a minute.

7          The word was indwell, I-N-D-W-E-L-L.  Which I assume

8    means the amount of time it's in the body.

9          MS. FLEISHMAN:  Exactly, Your Honor.  It's Bard's

15:49:58  10   term of art.  It goes to their analysis.  Whether or not

11   they've made any kind of analysis of that issue.  Not an end

12   point in any of their studies because we've looked through

13   all their studies and we know it was not an end point, but we

14   think it was -- it was  a point of analysis.  We wanted to

15:50:17  15   depose someone who will address that.

16         THE COURT:  Address whether it has occurred or, if

17   it occurred, what the result was?

18         MS. FLEISHMAN:  Whether anybody analyzed that the

19   longer it stays in the body, the greater the risk of danger.

15:50:32  20   Which is exactly what is in the FDA notice of 2014.

21         THE COURT:  But my question is, do you want a

22   witness who can say, yes, we looked at it, or do you want a

23   witness who can say we looked at it and this is what we

24   found?

15:50:49  25         MS. FLEISHMAN:  We looked at it and this is what we

15:50:51  1    thought.  Or we didn't look at it at all.

2                    THE COURT:  Okay.

3                    MS. KOWALZYK:  Your Honor, Brandee Kowalzyk on

4         behalf of the defendants.

15:51:03  5                    As you saw by reading the joint report, obviously

6         there were a number of topics that we were pretty far apart on

7         in terms of what we deemed was feasible.  And this was the one

8         that sort of befuddled me the most because -- and we've had

9         extensive meet and confers, four, five lengthy phone

15:51:27  10        conversations and e-mails back and forth.

11                    And just by way of background, Your Honor, I've been

12        involved in this litigation since pretty much the beginning,

13        for 11 years.  So I'm pretty familiar with the types of

14        studies that have been done and analyses that have been done

15:51:44  15        and that sort of thing.  This is one where I just couldn't

16        determine any kind of parameters on what the plaintiffs meant,

17        but for everything.

18                    On our last phone conversation I asked them, do you

19        mean analysis with the primary purpose of determining whether

15:52:04  20        there's a correlation between indwell time and complication,

21        and I was told in no uncertain terms no, it is not limited to

22        that.  It would include that, but it would include

23        anything -- I think it was -- Ms. Fleishman used the term any

24        tertiary finding, any secondary finding, any incidental

15:52:21  25        finding.

15:52:22  1      And based on what I know about Bard's R and D efforts

2      and trending efforts and everything that they do with respect

3      to Recovery filters in both developing and then trending after

4      they're on the market, this is the quintessential back the

15:52:39  5      truck up discovery request.  This -- that would implicate

6      fatigue testing, it would implicate animal testing, other

7      certain types of bench testing.  It would implicate the

8      Everest study and the Asch study and the Denali study.  And

9      when I pointed that out to the plaintiffs' counsel, they told

15:53:00 10      me that's what we want.

11          And so given that and their, you know, sort of

12      refusal to sort of limit this to terms that not only comply

13      with the scope of Rule 26 but are within the bounds of sort of

14      what's doable, that's why this is still one that's remaining,

15:53:25 15      I guess.

16          It strikes me that -- I don't know the total number

17      of depositions that have been taken, I know we were in the 80s

18      before, 82 or something, at the beginning of the MDL, and

19      we're probably in the 120s or 130s at this point, and all of

15:53:41 20      the millions of pages of documents that have been produced, in

21      a way this request implicates everything that's already ever

22      been done.  And so we just don't think that it's even feasible

23      for us to comply.  We don't think that the topic as a

24      articulated complies with rule 30(b)(6), which requires the

15:54:05 25      topic be stated with reasonable particularity.

15:54:09   1          THE COURT:  Okay.  Give me just a minute before I

          2     hear from plaintiffs' counsel just to read what you've

          3     written here.

          4          All right.  Ms. Fleishman.

15:56:06   5          MS. FLEISHMAN:  Yes, Your Honor.

          6          In May 2014 the FDA issued a safety alert that said,

          7     among other things, that if the patient's transient risk of

          8     pulmonary embolism has passed, the risk/benefit profile begins

          9     to favor removal of the IVC filter between 29 and 54 days

15:56:31  10     after implantation.

         11          The FDA came to this position based on conversations

         12     with Bard and review of the literature.  This is central to

         13     the case, what the indwell time is, what is that safe indwell

         14     time, and at what point is the patient supposed to have the

15:56:51  15     filter taken out.  And it is central the medical monitoring

         16     case because in order to determine that you have to monitor

         17     the patient.

         18          So we're asking what information or analysis Bard has

         19     made in connection with that exact question.  I don't think

15:57:05  20     that we're asking for the moon, as counsel has suggested to

         21     the Court.

         22          THE COURT:  What is that exact question?

         23          MS. FLEISHMAN:  The question is what analysis did

         24     Bard do in connection with whether the safety of the filter

15:57:21  25     increases or decreased over time during the time it's

15:57:25  1    implanted.

2          So at some point the safety of the filter decreases

3    over time, is our analysis, what we believe, based upon that

4    time that it's dwelling in the body.  And indwell is the

15:57:38  5    language that they use.

6          THE COURT:  Well, so, are you saying that the only

7    thing that you want in this deposition is any analysis Bard

8    did of the correlation between safety and indwell time?

9          MS. FLEISHMAN:  Yes.

15:57:53  10          THE COURT:  So if they've got 50 reports that touch

11    on the safety of the product, not correlated to indwell time

12    but would include periods that were after two months, that is

13    not what you're after.  You want to know whether there was

14    any analysis of a correlation between indwell time and

15:58:11  15    safety?

16          MS. FLEISHMAN:  Yes, Your Honor.

17          MS. KOWALZYK:  I guess I would ask for clarification

18    because when I asked if they meant analysis or studies with

19    the primary purpose of determining if there was a

15:58:30  20    correlation, I was told absolutely no, it was not limited to

21    that.  Is that the limitation?

22          THE COURT:  Ms. Fleishman, I understood you to just

23    say it is limited to that; you want studies of the

24    correlation, if any.

15:58:46  25          MS. FLEISHMAN:  Analysis of the correlation.  They

15:58:47   1    didn't study -- Your Honor, they didn't study indwell time as

2    being the end point of the study.  And counsel -- and this is

3    where I think our confusion was.  Counsel had asked me

4    whether we want any studies in which the indwell -- safety of

15:59:02   5    indwell time was in fact the end point of the study.  And we

6    know that that wasn't studied in that way.  But what happened

7    was they looked at the study -- they looked at the studies

8    and realized, whether or not they realize over time, that

9    there is this sort of scale of remaining in place and

15:59:20  10    increasing danger.  So we wanted -- a risk.  We want to know

11    whether that analysis was done.

12         THE COURT:  Does that help?

13         MS. FLEISHMAN:  No -- I'm sorry.

14         MS. KOWALZYK:  It doesn't, Your Honor.  I'm sorry.

15:59:36  15    I'm trying to frame this in terms that would make this doable

16    for us.  Like do they mean did a team -- Bard was all about

17    putting together teams.  You've heard lots about lots of

18    them.  Was there a team conveyed?  Was there a project

19    undertaken?  Was there something -- something that would

15:59:56  20    allow us -- allow me to understand what they're looking for,

21    because it just doesn't.

22         THE COURT:  Well, let me ask it this way,

23    Ms. Fleishman.  Let's assume hypothetically that in 2011 a

24    Bard engineer sitting at his desk thought maybe there's a

16:00:12  25    correlation, thought about it, maybe talked to somebody in

16:00:17  1    the next cubicle and maybe jotted down a few handwritten

2    notes.  You're after that, according to the way you've

3    defined it; right?  I mean, that's analysis of the

4    correlation.

16:00:30  5         MS. FLEISHMAN:  The engineer sitting at his cubicle

6    jotted down a few notes, sent it down the hall to John via

7    e-mail and they discussed it among their group to see whether

8    or not they should analyze it further or is this a secondary

9    finding that we're seeing, and they discussed it, certainly

16:00:49 10    that would be -- that would be the kind of thing we want to

11    know about.

12         And do the -- and let's say those two -- those two

13    and then three engineers spoke about it and they said, well,

14    should we take it to whomever in the company to do further

16:01:03 15    analysis?  They take it to whomever in the company and the

16    person in the company says no, we don't want to look at that.

17         THE COURT:  So here's -- here's, I think, the issue

18    I'm hearing from the defense: how do they find that, that

19    memo or that e-mail, without going through every study

16:01:19 20    they've done, all of their e-mails?  How do they find whether

21    any person within Bard ever analyzed that in response to your

22    question?

23         MS. FLEISHMAN:  Well, because the people that would

24    have looked at the studies is a finite group.  It's not this

16:01:32 25    big, diverse group.

16:01:34  1          THE COURT:  But you said "the studies."  You mean

2      over the last decade?

3          MS. FLEISHMAN:  Well, actually there's only three

4      studies they themselves have undertaken and they have looked

16:01:44  5      at about, at most, 17 other studies in the medical

6      literature.  So there's not -- we're not looking -- we're not

7      looking at a world of studies that's so extensive.  So it's

8      very -- it's a small universe.

9          THE COURT:  Well, so are you going to limit the

16:01:59 10      analysis to those studies?

11          MS. FLEISHMAN:  It has to be limited to those

12      studies, Your Honor, because that's all we have.

13          THE COURT:  Okay, but you said earlier you wanted

14      analysis not studies.

16:02:09 15          MS. FLEISHMAN:  I'm not looking for studies at the

16      end point because it doesn't exist.

17          THE COURT:  Well, but are you saying the analysis

18      you want is limited to those three studies?

19          MS. FLEISHMAN:  No, it would be limited to that set

16:02:21 20      of literature of studies of IVC filters.  So there's --

21      there's studies they did, Bard sponsored, and then there's

22      studies that were done by competitors or scientists on these

23      IVC filters.

24          THE COURT:  Let's assume hypothetically my engineer

16:02:38 25      at his desk isn't looking at any studies when he does this

16:02:42 1    analysis, or what we can call analysis.  Do you want that?

2            MS. FLEISHMAN:  Yes, I guess I do.

3            MR. LOPEZ:  Can I say something?

4            THE COURT:  Yeah.  I mean, I do see Bard's problem

16:02:53 5    that if you want every instance where the question of is

6    there a correlation crossed the mind of somebody at Bard, how

7    do you find that?  That, to me, is a legitimate question.

8    What I'm trying to do is figure out do you really want them

9    to go through everything that could possibly contain that, or

16:03:12 10   is there a more focused inquiry that you were asking for.

11            MR. LOPEZ:  I think the focused inquiry -- it

12   doesn't have to be analysis.  If they just have data that

13   exists that shows, for example, someone just looked at data

14   and they say five years, 40 percent fracture rate of our G2

16:03:30 15   filter.  We don't know what they have.  And I understand what

16   you're saying --

17            THE COURT:  Again, Mr. Lopez, how does that exclude

18   the guy sitting at his desk who thought about that?

19            MR. LOPEZ:  It shouldn't.  It should not.

16:03:40 20            THE COURT:  So how do they find that?

21            MR. LOPEZ:  Well, I mean, we're doing predictive

22   coding right now on four and a half million pages of

23   documents.  That's one way to do it, predictive coding on

24   indwell time and risk over time.

16:03:56 25            THE COURT:  You can do that; right?

16:03:58   1           MR. LOPEZ:  Pardon me?

           2           THE COURT:  You can do that on their four and a half

           3    million pages.

           4           MR. LOPEZ:  We could.  We are.  But the point is

16:04:04   5    that's on -- that's on -- on this finite amount of

           6    information you're talking -- or the type of information

           7    which may be just one guy sitting at his desk having that

           8    discussion, we could do that.  I think what we're looking for

           9    in the 30(b)(6) deposition is someone to speak on behalf of

16:04:20  10    the company as to what the company's official position was

          11    based on their analysis of what the FDA came out with in 2014

          12    and SIR in 2016 and Health Canada in 2016 that the longer

          13    these devices stay in people, the more dangerous they are and

          14    the risk/benefit flip-flops; there's too much risk and not

16:04:41  15    enough benefit.  That's a huge issue in this case, not just

          16    for medical monitoring but for every device we're litigating

          17    here.  So it may take an extra effort here, Judge.  I

          18    understand.  I should say "Your Honor."

          19           THE COURT:  You can call me Judge.

16:04:56  20           MR. LOPEZ:  Usually when you're on the bench I'll

          21    say Your Honor.  Used to doing that.  Old school.

          22           THE COURT:  In Africa they say Your Worship.  If you

          23    want to use that, that would be okay.

          24           MR. LOPEZ:  I have a son that works for me.  He

16:05:11  25    calls me Dad.  That's pretty good, too.

16:05:14   1          I understand this may take a little bit of extra

2    effort than maybe finding a study that they did or finding a

3    spreadsheet of analyses they did over time.  We have all that.

4    But this issue is so central, not just to the medical

16:05:32   5    monitoring case but to what two government agencies are

6    saying, what the SIR, which is the Society of Interventional

7    Radiologists, the doctors that put these in, have said in 2016

8    the risk/benefit of these devices do not exist after a certain

9    period of time.

16:05:50  10          So we want to know what the company has on that.  In

11    other words, does the company have that kind of data or did

12    the company just sit back and wait for Health Canada, the FDA,

13    and SIR to come to that conclusion?

14          So I think there's a way to do it.  Whether it be

16:06:05  15    them doing predictive coding and finding who might be the

16    best person there to come and talk to us about that.  It's

17    probably someone in clinical -- I forget what they call it.

18    Clinical trials or clinical department.  There's got to be

19    one person in the company right now who can gather all of

16:06:23  20    that information, get educated like the 30(b)(6) rule

21    requires, and talk to us on behalf of the company as to what

22    they did as they were learning about something FDA learned

23    about, Health Canada learned about, and the Society of

24    Interventional Radiologists learned about over time.

16:06:43  25          I think that's the point, we just need somebody to

16:06:46   1   speak to us on behalf of the company and for them to give us

2   everything they have that shows what they did or don't do on

3   what is the most important issue, at least with two government

4   agencies and the society who puts these in.

16:07:33   5          THE COURT:  Any other comments?

6          MS. KOWALZYK:  I guess a general comment.  To the

7   extent that -- it seemed to me as if maybe Mr. Lopez was

8   suggesting we need to give them information that they don't

9   already have, and I would certainly think that they have any

16:07:55  10   information that would be responsive to this.  The only way

11   to find that, we would have to do, I guess, what they're

12   doing, search all of the ESI.  Like Mr. North has been

13   saying, this would require us to interview hundreds of

14   employees.  So a lot of witnesses have been asked questions

16:08:19  15   about the 2010 and 2014 FDA notices.

16          I just -- unless you have any specific questions, I

17   think you understand our position.

18          THE COURT:  Okay.  Thank you.  Hold on just a

19   minute.

16:11:51  20          Well, here's the problem I see.  I think the topic is

21   clearly relevant to both the MDL and the class action.

22   30(b)(6) depositions are useful for accumulating information

23   generally known to an entity but become, in my view,

24   unworkable and overburdensome if they're used to collect the

16:12:18  25   kind of granular information that you would normally get

through document production or through depositions of

individual witnesses.

So oftentimes in cases where somebody proposes what

would be a very demanding 30(b)(6) topic for a company or an

entity to collect, it happens early enough in the case where

my response is that's really not an appropriate 30(b)(6).  Ask

that in your depositions, include that in your document

production, search for it as you go.

Here we've got the problem of completing over 100

depositions and closing in on the close of discovery and now

having the 30(b)(6) topic identified.  So that avenue isn't

available, to say do it as you go.  Presumably this has been

an issue known to plaintiffs so you've been doing it as you've

gone along to some extent.

And so it seems to me that to avoid what I think

would be an overly burdensome task of literally trying to

identify every instance within the company where any employee

ever thought about or talked with somebody about whether

there was a correlation, which I don't think is feasible, or

requiring defendants to do predictive coding of the 4 million

and a half documents that the plaintiffs now have in their

possession, it seems to me we necessarily need to approach

this at a somewhat higher level where the plaintiffs can get

some general information about it, but Bard doesn't have the

burden of interviewing every employee who may have ever had

16:13:54  1    this cross his or her mind.

        2            So it seems to me something like this could at least

        3    get toward that.  The topic could be did the defendants ever

        4    conduct any studies, formulate any company position, or adopt

16:14:09  5    any policies addressing whether there was a correlation

        6    between indwell times and safety risks.

        7            That, to me, is something that the company could get

        8    their arms around, and it would provide plaintiffs with

        9    helpful information.

16:14:27 10            I mean, if the answer is no, that helps you in your

       11    argument.  If the answer is yes, you can focus in and look at

       12    what was done there.  And it eliminates the burden of doing

       13    the document-by-document or person-by-person search.

       14            I'm interested in your reactions.

16:14:46 15            MS. FLEISHMAN:  I think that's great, Your Honor.

       16            MS. KOWALZYK:  I think that would be acceptable to

       17    us, too.  And I didn't get it --

       18            THE COURT:  Okay.  This is the way I wrote it.  I'll

       19    put it in the order.  And you're free to tweak the language

16:15:00 20    if you want.  But what I put is "Did defendants conduct any

       21    studies, formulate any company positions, or adopt any

       22    policies addressing whether there was a correlation between

       23    indwell times and safety risks?"

       24            MS. KOWALZYK:  That's fine, Your Honor.

16:15:18 25            MR. LOPEZ:  So we're talking about this will be a

16:15:21  1    formal interrogatory --

2                THE COURT:  No, this will be 30(b)(6) topic.

3                MR. LOPEZ:  Oh, oh, oh.  Okay.

4                THE COURT:  This will replace Topic Number 15.  And

16:15:29  5    the rest have been agreed upon, so you can do your 30(b)(6)

6    deposition.

7                MR. LOPEZ:  Plaintiffs are in agreement, Your Honor.

8                THE COURT:  Okay.  All right.  I'll include that in

9    the order.

16:15:43  10             The other matters I wanted to take up with you

11   briefly before I hear whatever you have, I just want to -- I

12   don't know if you'll be conscious of these.

13             We have a stipulated notice to strike a second

14   amended short-form complaint that was filed at the end of

16:15:58  15   November on behalf of Nash Zehnder, Z-E-H-N-D-E-R, indicating

16   a short-form complaint was filed without Bard's consent or

17   leave of court.  I'm assuming you don't object to our letting

18   them strike that short-form complaint and then either approach

19   you or me to amend?

16:16:17  20             MR. NORTH:  No, Your Honor.  We're just getting more

21   and more instances where people are filing amended complaints

22   without checking with us first or moving the Court.  We're

23   just bringing that to their attention, we're not trying to

24   stand in the way.

16:16:30  25             THE COURT:  All right.  There's a motion for leave

16:16:33 1   to file an amended short-form complaint.  This concerns

2   Florence Edwards, who is deceased.  The case apparently was

3   initially brought by her husband.  They want to amend to

4   substitute her sister-in-law as the plaintiff in the

16:17:03 5   short-form complaint.  Is there any objection to that?

6           MR. NORTH:  That's not the one where another

7   deceased person filed a complaint, is it?  There's one like

8   that somewhere.

9           THE COURT:  No.  This is one where apparently -- I'm

16:17:20 10  sorry.  It wasn't -- it wasn't the deceased's husband, it was

11  the deceased's son who was plaintiff and he wants to

12  substitute the deceased's daughter as a plaintiff.

13          MR. NORTH:  No objection to that, Your Honor.

14          THE COURT:  Okay.  That's at Docket 4136.  We'll

16:17:36 15  grant that.

16          The striking of the complaint is at Docket 4137.

17  We'll grant that.

18          There's a motion to dismiss that was filed by

19  defendants back on November 14th and this concerns an

16:17:54 20  individual named Aron Aldridge who was deceased at the time

21  the complaint was filed.  The motion indicates there have been

22  several letters written, e-mails sent, both to the counsel for

23  this plaintiff but also to plaintiff steering committee

24  counsel, without response, so they filed a motion to dismiss

16:18:17 25  and it's now over time with no response.  It's been on file

16:18:21  1    for almost a month.

       2              Apparently David Matthews is shown as the plaintiff's

       3    attorney.

       4              I'm inclined to just grant the motion because it's

16:18:34  5    long overdue and there doesn't appear to be any dispute the

       6    fellow was deceased when it was filed, but I am concerned

       7    about what appears to be lack of response, both from

       8    Mr. Matthews and from PSC members who letters and e-mails were

       9    addressed to, and the motion says we couldn't get a response

16:18:51 10    as to what was going to happen.

      11              MR. LOPEZ:  I'm equally concerned.  I know

      12    Mr. Matthews well, so I'll certainly look into that, Your

      13    Honor.  Figure out how that happened, why it happened, and

      14    rectify it.

16:19:02 15              THE COURT:  All right.  I'm going to grant the

      16    motion to dismiss.  This motion is at Docket 4007.  I'm

      17    granting it for the same reason that I granted the motion to

      18    dismiss the Noterman, N-O-T-E-R-M-A-N, a complaint back in

      19    May at Docket 1978.

16:19:20 20              And for purposes of talking it over, Mr. Lopez, this

      21    is Doc 4007 that includes the motion and attachments.

      22              All right.  Those are all of the issues I wanted to

      23    raise.  Do plaintiffs counsel have other matters you'd like to

      24    raise?

16:19:37 25              MR. LOPEZ:  Not at this time, Your Honor.

16:19:39   1          THE COURT:  How about defense counsel?

           2          MR. NORTH:  Nothing, Your Honor.

           3          THE COURT:  Okay.  What we need to do is set the

           4     next case management conference, then.

16:20:56   5          Does Friday, February 17th at 10:00 in the morning

           6     work for you all?

           7          MR. NORTH:  Yes, Your Honor.

           8          MR. LOPEZ:  Yes, Your Honor.

           9          THE COURT:  Traci, that look okay?

16:21:07  10          THE COURTROOM DEPUTY:  Yes, sir.

          11          THE COURT:  Okay.  We'll plan to have you back here

          12     on February 17th at 10 a.m.

          13          Anything else we need to address?

          14          MR. LOPEZ:  The 17th is fine.  We thought it

16:21:30  15     conflicted with an annual convention that we have, but it's

          16     actually the Friday after that, so we're good.

          17          THE COURT:  Okay.  You all have a nice holiday.

          18     Thank you.

          19          (End of transcript.)

16:21:40  20                        *  *  *  *  *

          21

          22

          23

          24

          25

1                    **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14         DATED at Phoenix, Arizona, this 16th day of December,

15   2016.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25