1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ARIZONA

3          _____

4   **In Re: Bard IVC Filters**          ) MD-15-02641-PHX-DGC
    Products Liability Litigation         )
5                                         ) Phoenix, Arizona
                                          ) **February 17, 2017**
6   _____)

7

8

9

10

11      BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

12        REPORTER'S TRANSCRIPT OF PROCEEDINGS

13          EIGHTH SCHEDULING CONFERENCE

14      (Excluding Sealed Ex-Parte Discussion)

15

16

17

18

19

20

21  Official Court Reporter:
    Patricia Lyons, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Ste. 312
    401 West Washington Street, SPC 41
23  Phoenix, Arizona  85003-2150
    (602) 322-7257
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared with Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2    Plaintiffs' Co-Lead/Liaison Counsel and State/Federal Liaison
     Counsel:

3

4            Lopez McHugh
             By: **RAMON ROSSI LOPEZ,** ESQ.
             100 Bayview Circle, Suite 5600

5            Newport Beach, CA  92660

6    Plaintiffs' Steering Committee Counsel:

7            Gallagher & Kennedy
             By: **PAUL LINCOLN STOLLER,** ESQ.

8            By: **MARK S. O'CONNOR,** ESQ.
             2575 East Camelback Road, Suite 1100

9            Phoenix, AZ  85016

10   Also for Plaintiffs:

11           Lieff Cabraser Heimann & Bernstein, LLP
             By: **DANIEL E. SELTZ,** ESQ.

12           250 Hudson St., 8th Fl.
             New York, NY  10013

13

14           Heaviside Reed Zaic
             By: **JULIA REED ZAIC,** ESQ.
             312 Broadway, Ste. 203

15           Laguna Beach, CA  92651

16           Goldenberg Law PLLC
             By: **STUART GOLDENBERG,** ESQ. (telephonic)

17           800 LaSalle Ave., Ste. 2150
             Minneapolis, MN  55402

18

19   For Defendants:

20           Nelson Mullins Riley & Scarborough, LLC
             By: **RICHARD B. NORTH, JR.,** ESQ.

21           201 17th Street NW, Suite 1700
             Atlanta, GA  30363

22

23           Snell & Wilmer
             By: **JAMES R. CONDO,** ESQ.
             By: **AMANDA C. SHERIDAN,** ESQ.

24           400 East Van Buren
             Phoenix, AZ  85004

25

**P R O C E E D I N G S**

10:01:31  1

2

3          THE COURTROOM DEPUTY:  MDL 2015-2641, Bard IVC

4    Filters Products Liability litigation on for scheduling

10:01:52  5    conference.

6              Will the parties please announce.

7          MR. LOPEZ:  Morning, Your Honor.  Ramon Lopez,

8    Lopez McHugh, on behalf of the plaintiffs' Leadership Council.

9          THE COURT:  Good morning.

10:02:00 10          MR. STOLLER:  Morning, Your Honor.  Paul Stoller,

11   Gallagher & Kennedy, on behalf of plaintiffs.

12          THE COURT:  Good morning.

13          MS. REED ZAIC:  Good morning, Your Honor.

14   Julia Reed Zaic on behalf of the plaintiffs.

10:02:07 15          MR. O'CONNOR:  Morning, Your Honor.  Mark O'Connor,

16   Gallagher & Kennedy, on behalf of the plaintiffs.

17          THE COURT:  Good morning.

18          MR. NORTH:  Good morning, Your Honor.  Richard North

19   on behalf of the defendants.

10:02:16 20          MR. CONDO:  Judge, good morning.  Jim Condo,

21   Snell & Wilmer, on behalf of the defendants.

22          MS. SHERIDAN:  Amanda Sheridan, Snell & Wilmer, on

23   behalf of defendants.

24          THE COURT:  Okay.  Good morning.

10:02:25 25          All right.  And Mr. Goldenberg, I understand you are

10:02:34  1   on the phone and wish to speak as well this morning?

2          MR. GOLDENBERG:  That is correct, Your Honor.

3          THE COURT:  Okay.

4          I've been through the joint status report that you

10:02:44  5   provided to me, and I just want to take those issues one by

6   one and make sure I'm fully apprised of the parties'

7   positions.

8          The first issue you raised is defendants' desire to

9   file a motion for summary judgment on preemption.

10:03:00  10          MR. NORTH:  Yes, Your Honor.

11          THE COURT:  And, Mr. North or Mr. Condo, or whomever,

12   you indicate in your discussion that the basis upon which

13   you're going to argue these facts in this case differ from the

14   *Lohr* case, L-O-H-R, is that the statutory and regulatory

10:03:23  15   framework of the 510(k) review process has evolved

16   significantly since the time of *Lohr*, and that extensive

17   special controls that the FDA imposed in this case, as well as

18   clinical studies required by the agency, make this a different

19   case from *Lohr*.

20          My question is:  How do you intend to present in your

10:03:47  21   summary judgment motion the evidence that the 510(k) process

22   is different and that this case had controls and tests that

23   distinguish it from *Lohr*?

24          MR. NORTH:  Your Honor, primarily through a factual

10:04:07  25   showing of all of the evidence of what the FDA has required of

10:04:14  1   Bard over the years, the various correspondence, the various

2   rules.  There's a special guidance document that the FDA has

3   developed for filters.  There were certain requirements for

4   clinical studies which have evolved over the years.  All

10:04:28  5   filters nationwide now are subject to a requirement by the FDA

6   for ongoing clinical studies.  It's just a very lengthy

7   factual record that starts in about 2002 and is ongoing today,

8   that we believe will show the heavy involvement of the agency

9   to the level that it constitutes a requirement -- and I put

10:04:52  10  that in quotes because I believe that is the term in the

11  express preemption clause of the medical devices amendment

12  that the Supreme Court was interpreting in *Lohr*.

13       *Lohr*, by contrast, involved a device that was, even

14  though the decision was in the mid '90s, the device was

10:05:10  15  cleared in the early 1980s.  There have been amendments to the

16  rules since that time.  There have also been a lot of

17  pronouncements by the FDA since that time evolving on the

18  nature of their 510(k) review, and so there's a lengthy

19  factual record, both from the FDA's legal pronouncements or

10:05:36  20  agency pronouncements and from the factual issues with regard

21  to filters, and Bard's filters in particular.

22       THE COURT:  Are those factual assertions that you're

23  going to be making disputed by the plaintiffs?

24       MR. NORTH:  Well, I hate to predict what they're

10:05:58  25  going to say, Your Honor.  I suspect --

10:05:59   1          THE COURT:  But you have a pretty good idea.

2          MR. NORTH:  I suspect what's going to be disputed

3     mostly is the legal implication of those facts.  Do they

4     rise -- I mean, there's no disputing the fact there is a

10:06:11   5     guidance document with regard to filters.  Everybody

6     recognizes that.  There is no disputing the fact that the FDA

7     required us to conduct some clinical studies.  They dispute on

8     what the significance of that is, and they claim that's

9     limited in scope.

10:06:26  10          But the facts of what the FDA has done are basically

11     fairly clear.  I think the real point of dispute is going to

12     be what's the legal implication?  Does that rise to the level

13     of a requirement under the Act, express preemption clause, and

14     does that distinguish this case, this device, from what was

10:06:47  15     addressed in *Lohr*.

16          THE COURT:  Okay.  Thanks.  I understand that.

17          Defense counsel, why do you need an expert to address

18     those issues?

19          MS. REED ZAIC:  Your Honor, the guidance documents

10:07:00  20     Mr. North referred to are not law.

21          THE COURT:  I'm sorry?

22          MS. REED ZAIC:  Are not law, Your Honor.

23          And the current state of the law is that 510(k)

24     devices, devices cleared via the 510(k) process, are not

10:07:13  25     preempted.  They've cited no new law.  Boiling it down to the

10:07:16   1    facts, they cite to the extensive special control the FDA

2    imposed.  Those come directly from -- that quote comes

3    directly from the guidance documents they would like to put

4    forward, including reports from the FDA, which are subject to

10:07:28   5    interpretation.  I'd like to hear what their experts have to

6    say about those guidance documents and those reports, as well

7    as their own experts.

8        We have no issue, obviously, with them bringing it

9    for a motion for summary judgment.  We just feel it is

10:07:40   10   premature at this time.

11       THE COURT:  Mr. North, are you going to rely on

12   experts at all in this presentation?

13       MR. NORTH:  Your Honor, we are not, because we

14   believe the meaning of these various documents are for the

10:07:53   15   Court to determine.  It's a legal conclusion as to what the

16   significance of these FDA pronouncements are.

17       We understand their contention that they need expert

18   testimony.  We personally don't believe that is necessary, but

19   one thing we were talking about ourselves is we're not afraid

10:08:10   20   to put our cards on the table, we can go on and file this

21   motion if the Court permits it, and then give them two weeks

22   to look at it and tell us if they need time to do expert

23   rebuttal.  And get an extension to respond, if necessary.

24       Our thought was to go in and get this in the hopper

10:08:27   25   because it's a very important issue, and I think it is a

10:08:30  1   developing issue under the law, and to put this in the hopper

2   as soon as we can, as opposed to waiting right at the end of

3   discovery before we're getting ready for trial.

4        But if they think they need an expert, why don't they

10:08:43  5   look at our motion, and then we can all convene in a telephone

6   conference and discuss what's necessary at that point.

7        MS. REED ZAIC:  Your Honor, guidance documents are

8   not law.  The quote from the FDA website with regard to the

9   definition of guidance is that the documents represent FDA's

10:08:59 10   current thinking on a topic.  I can't cross-examine the FDA.

11   The guidance documents and reports from them are subject to

12   interpretation.  I'd like to have our experts review that.  If

13   they're not going to put up an expert, that's fine, but expert

14   interpretation is essential to looking at these guidance

10:09:13 15   documents.  They're not law to be interpreted.

16        THE COURT:  Give me a sense for what you think an

17   expert would say in response to the factual assertions that

18   Mr. North has described.

19        MS. REED ZAIC:  Well, they've described facts --

10:09:25 20   their factual assertions include the extensive special

21   controls the FDA imposed on Bard's filters.  That is a quote

22   from the guidance and the reports.  I think an expert would

23   have to look at those facts and interpret to what extent were

24   they reviewed, and special controls put in place.

10:09:44 25        THE COURT:  I'm not understanding what you're saying.

10:09:46  1      MS. REED ZAIC:  Well, the -- they're claiming that

2    there were extensive controls put in place with regard to

3    these particular products.  Extensive review comes down to

4    what kind of review did the FDA follow through with and

10:10:03  5    implement.  We have FDA experts to interpret that.

6          THE COURT:  And what argument would you make on the

7    basis of your experts' statements?

8          MS. REED ZAIC:  I'm unsure what my experts would

9    actually say with regard to these guidance documents.  That's

10:10:18 10    why I believe we need expert discovery with regard to this

11    issue.

12         THE COURT:  If they're not planning to use an expert,

13    why doesn't Mr. North's proposal make sense to have them file

14    the motion, you can look at it.  There's a tool in Rule 56,

10:10:33 15    56(d), if you think in fairness you need more discovery to

16    respond, which would be expert discovery, and that way we're

17    talking about something specific and not sort of making

18    assumptions.

19         In fact, it seems to me that would be better for you

10:10:48 20    because if you don't have the motion in hand and you're

21    working with your FDA experts, you don't have as clear a

22    picture of the target they're shooting at.

23         MS. REED ZAIC:  Makes sense.

24         The reason why I'm sort of anticipating which

10:11:02 25    documents they're going to use is that two Mondays ago, we

10:11:06  1    were arguing dispositive motions in Florida on G2.  So I have

2    a sense of the documents they would use.

3         If the Court is inclined to allow that to go forward,

4    again, we're not here to say there's no motion to be brought.

10:11:15  5    It's just we feel it is premature at this time considering how

6    far we are into the process.  We didn't just start fact

7    discovery, we're headed into expert discovery now with reports

8    due in a matter of weeks.

9         THE COURT:  When are you thinking you would file this

10:11:32  10   motion, Mr. North?

11        MR. NORTH:  Your Honor, we are aiming for

12   approximately a month.  By the end -- by March 17.  It's a

13   Friday.

14        THE COURT:  So it would be after the disclosure --

10:11:41  15   the initial disclosure of plaintiffs' experts, so it doesn't

16   sound like it would interfere with your ability to get that

17   work done.

18        Is that correct?

19        MS. REED ZAIC:  I apologize.  I was verifying the

10:11:53  20   deadline that our reports are due --

21        THE COURT:  March 3rd they're due.  And if he's going

22   to file it two weeks later, then working on this motion and

23   your experts wouldn't --

24        Well, but I suppose, Mr. North, you will be taking

10:12:05  25   the position that whatever they can use in response to your

10:12:10   1   motion is limited to what they disclosed on March 3rd; right?

2   MR. NORTH:  If there is something additional,

3   specific to that motion.  I mean, this motion is important to

4   us.  I don't think I would object to that necessarily.  I'm

10:12:33   5   having a hard time fathoming what that could be, because we

6   have seen their regulatory expert's opinions in another case,

7   and it is close to 300 pages long.  He certainly has looked at

8   virtually everything we're going to be submitting anyway.  So

9   I find it difficult to believe there's going to be anything

10:12:48  10   that is not covered already.  But if there is something

11   specific, if they want to add on that one specific thing, I'm

12   not going to stand in the way of that.

13   MR. LOPEZ:  Your Honor, if I may --

14   THE COURT:  Pull the mic over, would you, please.

10:13:04  15   MR. LOPEZ:  We're talking about -- may I just step up

16   here?

17   THE COURT:  Sure.

18   MR. LOPEZ:  We're talking about a guidance document

19   that is, I think, dated 2015.  The devices involved in this

10:13:17  20   case went through 510(k) processes between 2002 and 2013.

21   Our experts -- though they haven't looked at that

22   guidance document, our experts, when we talked to them about

23   it, agree that the guidance document, doesn't matter when, the

24   guidance document is not law, it's a suggestion by FDA as to

10:13:40  25   better practices that a company can or cannot follow.  They

10:13:45  1    don't have to follow.  In fact, they're encouraged that that

2    is a minimum standard.

3         So if this -- I mean, I think this is the mini trial

4    if you read the *Sisson* case, Your Honor, I know it is

10:13:57  5    premature maybe to talk about that in the *Husky* case, the

6    Fourth Circuit case on why the 510(k) --

7         THE COURT:  I have not -- I have not read them

8    recently.

9         MR. LOPEZ:  Those are the only two appellate court

10:14:08  10   cases that exist where the Fourth Circuit -- and this is

11   recent, in fact it involves Bard in the TBN litigation, where

12   both of those courts, citing *Lohr* and other cases, have said

13   the 510(k) process itself is not relevant.  It's not what FDA

14   did or didn't do.  That process is not admissible in a medical

10:14:31  15   device case.

16        And now we want to go from that to whether or not a

17   single document that did not exist in any time when these

18   devices were cleared for marketing now becomes a preemption

19   case.  Now, that's point one.

10:14:45  20        Point two --

21        THE COURT:  Point one, you're arguing the merits,

22   Mr. Lopez.

23        MR. LOPEZ:  Sorry?

24        THE COURT:  You're arguing the merits in that point

10:14:52  25   one, and I'm not here to try to figure out who is right on the

10:14:55 1    merits; I'm trying to figure out the most efficient way to tee

2    up a motion that the defendants have a right to bring.

3         MR. LOPEZ:  I understand.  And I didn't mean to do --

4    I did that for a purpose.  I was leading up to why --

10:15:06 5         THE COURT:  Okay --

6         MR. LOPEZ:  -- this process is not just -- they file

7    a motion, we go to our experts, and our experts file some kind

8    of counter-report or declaration.

9         This is an intensive factual issue.  In other words,

10:15:19 10   Mr. North just said, we are going to pile up documents of what

11   happened at FDA, and that's going to be the factual record.

12        And what I want to bring to the Court's attention, we

13   don't have a factual record of what happened at FDA.  They

14   only have their version of what happened.  We cannot -- under

10:15:34 15   the regulations, we can't do discovery on FDA.  So -- and it

16   could be that if we're going to go the distance with this

17   issue, that we're going to have to ask the Court to contact

18   someone at FDA to see if they'll waive their right to

19   basically ignore subpoenas for us to take depositions.

10:15:56 20        If we're going to do that for 12 years of 510(k)s and

21   about 11 of 510(k)s in this case, we might have to take 20 FDA

22   official depositions -- officials' depositions.

23        So did the -- the factual record is what we have with

24   Bard, and the other part is we don't have.  We will have to

10:16:15 25   develop that factual record to see whether or not, in fact,

10:16:20   1   all of the things that Mr. North is going to allege through

2   their facts in fact happened at FDA.

3          So I just want to bring that to the Court's

4   attention.  This is going to be an intensive process if we go

10:16:31   5   down this road.  We're going to want due process.  We're going

6   to want a fair hearing.  And the only way for us to get a fair

7   hearing is to find out what really happened at FDA, and we

8   have not been able to do that because of the statute that says

9   we can't.

10:16:44  10          THE COURT:  I hear what you're saying, but I'm not

11   understanding what you're proposing.

12          Wouldn't it make sense for to us have this discussion

13   after Bard's motion is on the table and we can see what

14   they're arguing and what they're using to support it, and then

10:16:58  15   we can talk about do we need experts, do we need -- I don't

16   want to suggest I'm inclined to do it, but do we need some

17   additional discovery.

18          Right now, you may know what's going to be in it, but

19   I don't have any sense without looking it over.  So I guess

10:17:14  20   I'm not understanding why we shouldn't get them to file it,

21   and then have an informed decision about what you need to do

22   to fairly respond to it.

23          MR. LOPEZ:  I understand the practicality of that,

24   Your Honor.  I just wanted to forewarn the Court that whenever

10:17:27  25   that happens, it is going to be fairly intensive -- it's going

10:17:30  1    to be another section of this MDL, that additional discovery

2    that's going to have to happen.

3         But I understand what you're saying.  You don't want

4    to know about that right now.  You want to know about it after

10:17:40  5    they file their motion and we file our opposition to it to

6    bring to the Court's attention the enormity and extensiveness

7    of what we need to do to counter it.  I get it.

8         THE COURT:  I understand that.  I don't want you to

9    leave today thinking I'm in agreement with the notion we're

10:17:57  10   going to do extensive FDA discovery.  That's clearly an

11   undecided issue.

12         MR. LOPEZ:  We don't want to do it.

13         THE COURT:  Right.  But this issue is one that's

14   coming.  You know it's coming in the case.

10:18:07  15         MR. LOPEZ:  Correct.

16         THE COURT:  There's going to be a preemption

17   argument.  That's been apparent from the day you filed it, I'm

18   sure, and we just need to figure out the most efficient way to

19   deal with it.

10:18:16  20         MR. LOPEZ:  I hear Your Honor.  Thank you.

21         THE COURT:  Anything else from the plaintiffs' side?

22         MS. REED ZAIC:  I wanted to clarify the exchange

23   there.  My understanding is that they will file a brief, and

24   then we'll have a conversation --

10:18:26  25         THE COURT:  Well, we're going to actually set some

10:18:27  1   dates for that, yeah.

2          MS. REED ZAIC:  Okay.  But I think Mr. Lopez said

3   we'll be filing an opposition --

4          THE COURT:  No.  Not until we talk.

10:18:35  5          MS. REED ZAIC:  Okay.  Wanted to clarify.

6          THE COURT:  You think a month, March 17th?  Does that

7   work for you, Mr. North?

8          MR. NORTH:  Yes, Your Honor.

9          THE COURT:  Okay.  We'll call this the preemption

10:18:50 10   motion for summary judgment to be filed by March 17th.

11          I haven't looked at the order.  When's our next

12   status conference?

13          MR. NORTH:  We don't have one, Judge.

14          MS. REED ZAIC:  We don't have one.

10:19:06 15          THE COURT:  Okay.  We'll be setting one.  But I'm

16   guessing it will be farther out than the end of March.

17          MR. LOPEZ:  Your Honor --

18          THE COURT:  Yeah?

19          MR. LOPEZ:  -- just I'll bring the Court's attention,

10:19:18 20   we're starting our first bellwether trial, and it's a state

21   court case, not a federal court case, on March 20th, and I'm

22   sure Mr. North and others, I know virtually everybody at this

23   table is going to be involved in that trial from about

24   March 20th to probably April 10th.  So if we can set -- if we

10:19:38 25   can take that into consideration as we schedule things and as

10:19:41 1    we schedule the next CMC, that would be terrific.

2          THE COURT:  All right.  I've been looking at the

3    calendar.  I'd like to hold another status conference on

4    Wednesday, May 3rd.  That's really about the only available

10:23:21 5    date in late April or early May.

6          I'm scheduled to be in trial.  I don't know for sure

7    if the case is going to go, but if it does, we'll probably

8    have to do it at about 4 o'clock and just push through it.  So

9    let's set it for -- let's set it for 3:00 p.m., but you may

10:23:39 10    get a notice we're moving it to 4:30, probably, if the case is

11    actually going to go to trial.

12          And I think since you're going to be in trial in the

13    state case, what would make sense would be after you're done

14    with that trial to look over the motion, to confer, to file

10:23:58 15    before this May 3rd status conference a joint report.  And if

16    the plaintiffs are of the view that you need expert testimony

17    or other factual information to respond, then lay it out in

18    that report, and we can talk about that on May 3rd and decide

19    if I'm just going to require a response or, if not, what

10:24:19 20    exactly needs to be done to get a response filed.

21          Any questions about that?

22          MR. NORTH:  Nothing, Your Honor.

23          MR. LOPEZ:  No, Your Honor.

24          MS. REED ZAIC:  No, Your Honor.

10:24:32 25          THE COURT:  Okay.

10:24:43  1          The next topic is the plaintiffs' request to defer

2    expert disclosures on the Meridian and Denali devices.  As you

3    all know, we've already extended the expert disclosure

4    deadline from December 6th to March 3rd.  And when I did that,

10:25:00  5    I said in the order that I was not inclined to grant

6    additional extensions.

7          I understood from what the plaintiffs said in the

8    joint report the points about how Meridian and Denali are not

9    in the bellwether group, they could be -- the disclosures

10:25:16 10    related to those products could be deferred without

11    interfering with our bellwether process.

12          What I couldn't understand, however, is why you need

13    to defer them.  Why you don't think you can meet the March 3rd

14    date.  There was a reference to unresolved privilege issues,

10:25:32 15    but I didn't see what the reason was that you don't think you

16    can produce those experts by March 3rd.

17          MR. LOPEZ:  Thank you.

18          Let me give you just a little bit of background.  One

19    thing we didn't add is that the early remands, the ten early

10:25:50 20    remands that we've talked about, also none of those are

21    Meridian or Denali.  I think the docket will reflect that I

22    would guess the majority, if not all of the early-filed cases,

23    are either Recovery, G2, or Eclipse.

24          THE COURT:  On that point, Mr. Lopez, do you agree

10:26:08 25    with the defendants' assertion that between Meridian and

10:26:11  1    Denali, it accounts for about 25 percent of the cases in the

        2    MDL?

        3         MR. LOPEZ:  Yeah.  I have no reason to dispute that.

        4    I'm sure if that's the data, that they would accurately report

10:26:21  5    that to the Court.  I haven't verified it, but I'm not going

        6    to dispute it.

        7         So what we have, Your Honor, just to refresh your

        8    recollection a little bit about this process, is that we had

        9    this 4.6 million pages of documents that all of a sudden

10:26:39 10    got -- we got produced upon us between September 15 and

       11    December 1, and we did a really good job of getting those

       12    documents reviewed.  We haven't reviewed them all, there's

       13    some metadata there that still has not been looked at.  We

       14    took depositions.  We have depositions that involve these

10:27:06 15    products that just finished whenever the discovery cutoff was,

       16    February 3rd.  So we're talking two weeks ago.

       17         The record -- and then, of course, we have these 3300

       18    redacted documents, as well as I think it was 28,000 documents

       19    that are now in a privilege log, and for the most part these

10:27:32 20    deal with Denali and Meridian time periods.

       21         So I guess the issue -- the real issue is for the

       22    next year, Meridian and Denali, for purposes of any trials,

       23    whether it be bellwether trials, early remands, or even the

       24    state court cases that are currently filed that will have

10:27:54 25    trial dates are not going to involve these two devices.

10:27:56  1          Now, I'll just tell you that we -- our main expert,

2     Dr. David Kessler, our regulatory expert, former commissioner

3     of FDA, is now being given about two weeks because he's

4     been -- we just haven't been -- he's been working on another

10:28:10  5     case to put together what took him four months to put together

6     for a Recovery and G2, he's got two weeks now to figure out

7     what he's going to say about the Denali and the Meridian.  He

8     can do that.

9          I mean, don't get me wrong, I think we -- we have

10:28:26  10    evidence that will show breaches and liability as to those two

11    devices.  But I think the idea that we can have a thorough

12    complete report with the fact that this discovery only ended

13    at the end of -- at the beginning of February, only because we

14    got these documents so late, is just something I don't think

10:28:50  15    we can do.

16         Now, my thought was maybe allow at least that portion

17    of our experts' reports, meaning the Denali and the Meridian,

18    to at least give us an extra month, or at least allow us to

19    resolve some of these redaction and privilege log issues if we

10:29:13  20    can.  At least leave open the idea that, at no fault of ours,

21    we've received a lot of the evidence as it respects those two

22    devices very late, evidence we probably should have gotten

23    much sooner.

24         You know, it took us about five years to develop the

10:29:34  25    case, going back to some of the early depo- -- the reason we

10:29:37   1   were able to take so many depositions in this case in a

2   relatively short period of time, because, as Your Honor knows,

3   we took a lot of depositions before this MDL, and we haven't

4   repeated those depositions.  But that was another two-year

10:29:49   5   process.

6            So now we're -- we basically have two weeks, two or

7   three weeks to put together expert testimony or expert reports

8   on two devices that probably will not see a trial date until

9   2018.

10:30:08  10            And so that's essentially it, Judge.  I mean, look --

11   could we have something in these reports by March 3rd that

12   will give the defendants at least notice of plaintiffs'

13   position as to why the Denali and the Meridian are defective

14   and why they didn't warn appropriately, or why they failed to

10:30:28  15   meet the substantial equivalence of the predicate device?  We

16   can do that, and there will be some evidence in there, but it

17   will not be a fully developed report because our experts

18   simply don't have time to either go through the evidence that

19   exists now -- I don't know how many depositions, I think we

10:30:45  20   took 12 or 13 depositions in January.  We're still getting

21   final drafts of those now.

22            So maybe there's an in-between position here,

23   Your Honor, where we can maybe have the right to supplement

24   these as some of these additional things develop with respect

10:31:02  25   to privilege log and redaction documents that still are not

10:31:05   1    resolved, and that these experts be given an opportunity to

2    supplement their reports at some time beyond March 3rd.

3            There's no reason to depose them on those right now

4    because there are no trials this year in either state or

10:31:21   5    federal or any of the bellwether cases, or in any of the early

6    remands that involve either one of those two devices.

7            So that's our position on that, Your Honor.  I just

8    think we're at a point where we can provide something, but

9    there's no way our experts can provide a thorough report based

10:31:38  10    on the current state of the evidence in the time they have.

11           THE COURT:  You mentioned one expert, and then after

12    that you used the phrase "experts."  Are you going to have

13    more than one expert on defects in Meridian and Denali?

14           MR. LOPEZ:  We are.

10:31:51  15           THE COURT:  How many?

16           MR. LOPEZ:  Well, we have two regulatory experts and

17    we have -- I'm counting as I'm thinking about it.

18           THE COURT:  That's fine.  Really, my question is a

19    bit different.  Will the experts on Meridian and Denali be the

10:32:11  20    same people who are doing the reports on the earlier versions

21    of the filters?

22           MR. LOPEZ:  Oh, yes.  Yes.  Yes.

23           THE COURT:  Okay.  One of my concerns is I think an

24    important point in this case will be *Daubert* motions.  It

10:32:25  25    seems to me that's one of the principle issues that an MDL can

10:32:29   1    help resolve.  And you mentioned a moment ago we don't need to

2    depose these folks until next year.  Well, that might be true

3    for a bellwether trial, but it seems to me one thing we

4    absolutely should do is have all experts on the table when we

10:32:44   5    get to *Daubert* motions so that I can rule and not have a

6    situation where I'm ruling in part and we're having to come

7    back to it later with respect to other filters.

8          So I am going to want everybody deposed, all the

9    reports on the table before we get to that point in time.

10:32:59  10          But I do understand what you've said about the

11    situation.  I want to hear from defense counsel.  Did you have

12    other points you wanted to make?

13          MR. LOPEZ:  No, that it was, Your Honor.  Thank you.

14          THE COURT:  Okay.

10:33:14  15          MR. NORTH:  Thank you, Your Honor.

16          If it would be of any help, and maybe just of

17    interest, if I could approach, Traci.

18          I've got copy of this for the plaintiffs.

19          Your Honor, this is a breakdown of the filter cases

10:33:37  20    in the MDL by filter type, according to our database, as of

21    February 7, 2017.  And that's where we drew the numbers we had

22    in our submission.

23          Your Honor, with all due respect to the plaintiffs,

24    we suggest that this request comes too late.  We are literally

10:33:56  25    two or three weeks away from expert disclosures.  And they are

10:34:01  1   raising this for the first time.

2        It is an issue they could have raised much earlier.

3   They could have raised this in December at the status

4   conference.  They could have raised this even earlier when

10:34:12  5   they asked for an extension of fact discovery.  They never

6   raised it.

7        We are very concerned about this because what we

8   think it in effect does is bifurcates this proceeding into two

9   MDL's.  And if they were to get their request to indefinitely

10:34:30  10  delay these depositions or these disclosures, what we would

11  have is one MDL proceeding with the early generation filters,

12  which I believe are the filters they want to try.  And then

13  they would create an entirely second MDL that, under their

14  scenario, wouldn't even really get geared up until next year

10:34:51  15  at the earliest on the later generation filters, which I will

16  say conversely are filters we would like to try.

17       And I think what this does is create two separate

18  proceedings, and they're asking for this at the eleventh hour

19  with only three weeks to go.

10:35:05  20      Now, they raised the privilege log, for example,

21  Your Honor.  I spoke with Ms. Helm in my office this morning,

22  who spearheads privilege issues for us, and she's been working

23  with Mr. Combs from the Gallagher & Kennedy firm on these

24  issues.  Mr. Combs had some questions about the privilege log.

10:35:25  25  She provided some additional information, and there's no issue

10:35:28  1    on the table right now.  He's supposed to get back to us if

2    there are questions.

3         These are things that, if they really believe this

4    was essential before they could do their experts, they needed

10:35:39  5    to have pushed this faster and harder.  Because there is no

6    issue on the table.  They've mentioned this redaction issue,

7    and we've provided them with a log of that, as required by the

8    ESI protocol.  But the ESI protocol says we are entitled,

9    particularly when we started doing this no-eyes review, we're

10:35:59 10    entitled to redact nonresponsive portions of documents that

11    had commercial or propriety information about other products.

12    And my understanding is now they have a log about this.

13         I don't believe these are justifications.  And we're

14    working out any further questions they may have and stand

10:36:16 15    ready to do so, and to do so on an expedited basis.  But I

16    don't believe these are justifications for prolonging what

17    everybody had expected to be expert disclosures coming up on

18    March 3rd.

19         And what I'm concerned about also is even if we were

10:36:32 20    to extend this 30 or 60 days, we're still duplicating efforts

21    here.  It's going to require two different reports from these

22    experts, the same experts.  It's going to require two

23    different depositions from the same experts.  It even may

24    require two different *Daubert* hearings, as the Court

10:36:52 25    questioned, of these experts.

10:36:53  1          And we believe this is very inefficient.  If -- and

2      we propose this as a protection for them.  If they were to

3      find something in their discussions on the privilege log, or

4      if they were to find something regarding a redacted document

10:37:11  5      that somehow later gets produced after agreement, that they

6      believe impacts an expert's opinion, necessitating a very

7      limited and targeted supplement in the next month or six

8      weeks, we're not going to stand in the way of that.

9          But absent that, we believe that we should proceed as

10:37:31 10      planned and as envisioned for over the last year to have

11      expert disclosures as to all filters at the same time, as

12      planned.

13          THE COURT:  Do you disagree at all, Mr. North, with

14      the assertion that there were 4.6 million documents produced

10:37:51 15      between September and December?

16          MR. NORTH:  The numbers I've been given are less than

17      that.  Probably three to three and a half million, but I don't

18      have the exact count, to be candid, Your Honor.

19          THE COURT:  Okay.

10:38:14 20          MR. NORTH:  Oh.  If I could add one more thing,

21      Your Honor.  It's not like this was the first time documents

22      concerning these filters had ever been produced.  In the past

23      litigation, Meridian and Denali had been key words that had

24      been used in a lot of the ESI that Mr. Lopez's firm had asked

10:38:33 25      for.

10:38:34  1          THE COURT:  Okay.

2          All right.  I absolutely do not want this to become

3     two MDL's.  I don't want an expert deposed twice.  And we

4     don't want two rounds of *Daubert* motions.

10:39:10  5          I do think you all have been working hard, you've

6     covered a lot of ground, and I think you're all to be

7     commended for having done that.  There's a lot to absorb.  So

8     I'm going to extend somewhat the experts, but they're going to

9     be within the overall expert schedule.

10:39:25  10          So with respect to Meridian and Denali, the

11     plaintiffs' report will be due on April 7th, which is a month

12     and three days extension.

13          Defendants will have the same amount of time to

14     respond, so May 12th will be the deadline for the defendants'

10:39:41  15     response.

16          June 9th for the plaintiffs' rebuttal.

17          And that still leaves more than a month before the

18     July 14th expert deposition cutoff date to depose these

19     experts once.  So make sure that these experts are scheduled

10:40:00  20     in -- well, between June 9th and July 14th.  That way we still

21     finish all of the expert depositions at once, we're teed up

22     for *Daubert*, we're not dividing the case into two MDL's, but

23     it gives plaintiffs a little breathing room on Meridian and

24     Denali.

10:40:18  25          All right.  The next issue is the deposition of

10:40:22  1  Mr. Randall.  I've read what you've submitted -- well, I've

2  read what you submitted in the joint report, and I read

3  portions of the deposition excerpts you have submitted.  I

4  didn't read all 40 pages the plaintiffs asked me to or all

10:40:37  5  of -- well, I think I might have read all the defendants'

6  because it was much shorter.

7         Is there anything that wasn't said in the joint

8  report that you want to say on this issue?

9         MR. STOLLER:  No, Your Honor, I don't think so.

10:40:55  10         MR. NORTH:  Nothing, Your Honor.

11         THE COURT:  Okay.

12         As I read that deposition, I did not believe

13  Mr. Randall was being evasive.  I didn't believe he was trying

14  to prolong the deposition.  He was being careful.  But I

10:41:09  15  didn't think there was anything improper.  I think seven hours

16  is enough for him.  I think when it's added to the seven hours

17  that's happened on the 30(b)(6) for a total of 14 this man's

18  been in the witness chair, that's enough, so I'm not going to

19  grant an additional period of time for the Randall deposition.

10:41:31  20         The next issue is the production of documents related

21  to these employees who may have been disciplined or fired for

22  off-label promotion.

23         My question to -- were you going to say something?

24         MR. STOLLER:  I was going to say, Your Honor, this is

10:41:45  25  the issue that Mr. Goldenberg is handling.

10:41:49   1          THE COURT:  Okay.  That's fine.

        2          My question to plaintiffs' counsel is:  What's wrong

        3    with defendants' proposal, which is on page 16 of the joint

        4    report, to produce the portions of the employment files that

10:42:03   5    relate to this issue?  As opposed to turning over the entire

        6    employee files for these six individuals.

        7          MR. GOLDENBERG:  Well, thank you, Your Honor.  This

        8    is -- obviously --

        9          Can everybody hear me okay?

10:42:17  10          THE COURT:  Yes, we can.

       11          MR. GOLDENBERG:  This is the first time we actually

       12    were given this proposal, and certainly we would accept that.

       13    The problem with it is, is that there's more information that

       14    would be relevant that is part of this request.

10:42:33  15          Each of these employees signed elaborate separation

       16    agreements that related to how they were terminated or let go.

       17    And none of them could, quote, remember what was in those

       18    agreements when we took their depositions.  None of them had

       19    these documents, and these are all part and parcel, like what

10:42:54  20    we're requesting here, because it is -- it is almost a clean

       21    sweep of all of these people when 2008 comes along, Jason

       22    Greer is fired for off-label promotion, and this scheme is

       23    finally put aside by the new -- apparently by the new

       24    president.

10:43:17  25          So this is why we're requesting that information, and

10:43:20  1    it's incredibly important and relevant to what we're proving

2    in the off-label promotion.

3             THE COURT:  Well, let me ask you a question.  What

4    the defendants proposed to produce were essentially what I had

10:43:40  5    required on the FDA warning letter, so it would be, for

6    example, I'm now reading on line 15 of page 16, documents from

7    the files relating to any internal discipline, reprimands,

8    adverse consequences, negative employment reviews or

9    comparable information taken against any of these individuals

10:44:05 10    on the basis of off-label promotion of Bard's filters.

11             What's missing from that description?

12             MR. GOLDENBERG:  Okay.  Here's -- here's what I'm

13    concerned about.  When they're saying off- -- they're not

14    really saying off- -- I guess I'm looking at this last line

10:44:24 15    here.

16             THE COURT:  Look at line 21, and they're proposing to

17    do this for off-label promotion of Bard IVC filters.

18             MR. GOLDENBERG:  Okay.  The concern is whether or not

19    that includes this -- these elaborate separation agreements

10:44:40 20    that are related to that.

21             THE COURT:  Well, my view is that if there's anything

22    in those separation agreements that refers to internal

23    discipline, reprimands, adverse consequences, negative

24    employment reviews or comparable information about off-label

10:44:56 25    promotion, they have to produce it.

10:45:01  1          MR. GOLDENBERG:  Okay.

        2          THE COURT:  With that understanding, are you

        3   comfortable with that?

        4          MR. GOLDENBERG:  I am, Your Honor.

10:45:07  5          THE COURT:  Okay.

        6          Any comments, Mr. North?

        7          MR. NORTH:  No.  That's fine, Your Honor.

        8          THE COURT:  So I will reflect that in the order that

        9   comes out after today.

10:45:20 10          You had a Section 6 titled Other Issues Not Yet Ripe

       11   for the Court, and it listed five that you're discussing.

       12   Defendants note that these were raised on February 8th.

       13          My question is:  What is your best estimate on timing

       14   as to when you're either going to have them resolved or be at

10:45:42 15   an impasse?  Because what I don't want to do, and I know you

       16   don't either, is have this resurface in three months.  We need

       17   to deal with it while it's on the table.

       18          MR. NORTH:  Your Honor, if I may, I know, for

       19   example, that we have set up a second meet and confer phone

10:45:57 20   call on the last two items on that list for Wednesday with the

       21   team of the plaintiffs' attorneys that are handling that.

       22   They were unaware of some things that had happened in

       23   discovery since they served those requests back in October,

       24   and we've pointed them to where a lot of that information has

10:46:12 25   been divulged.  So I'm confident we ought to be able to work

10:46:17  1   that out next week, I would hope.  If for some reason they

2   think there's still an impasse, they can come to the Court on

3   that point.

4          On the first point with regard to the placeholders

10:46:28  5   that Mr. Stoller has mentioned, we are working on that.

6   That's required us to go consult with both of our vendors.  We

7   hope to be able to have a meaningful dialogue with Mr. Stoller

8   early next week.  And I think we're going to be able to

9   satisfy him, but if we don't, I think the impasse will be next

10:46:46  10  week.

11          And as far as privilege issues are concerned, if

12  there is an issue, they need to tell us about it, because

13  right now we're waiting to hear back from them since we gave

14  them the additional information they requested.

10:46:58  15         THE COURT:  Well, what if we were to say that by

16  March 10th the parties will present a matrix to me of any

17  outstanding issues.  Outstanding discovery issues.  That will

18  give you about three weeks to work through things, get

19  hopefully everything resolved, but anything that can't be

10:47:12  20  resolved, you know how to do one of those matrices that I've

21  been requesting, and you can submit it by that date so I can

22  rule.

23         MR. NORTH:  I think that's fine, Your Honor.

24         MR. LOPEZ:  That works, Your Honor.

10:47:23  25         THE COURT:  Okay.  That's what we'll do with Item 6,

10:47:26   1    then.

2              Do plaintiffs have any objection to the

3    recommendation in part 7 from defendants that for future joint

4    reports, drafts get exchanged four business days before the

10:47:44   5    deadline with responses two business days?

6              MR. LOPEZ:  Well, I mean, as a hard and fast rule,

7    I'd say yes, only because this is -- we're real-time every day

8    something -- I think we -- so far it's been okay.  We get --

9    we usually get our stuff to them by the Wednesday before the

10:48:01  10    Monday.  And I know it's hard.  I mean, they're three hours --

11    you know, they're in Atlanta and we have that time zone.  But

12    we usually bring -- there's a lot of things happening, Judge,

13    so because our CMC's are sometimes two months apart, I mean --

14    I would say we will start the process there, but just leave

10:48:19  15    open the idea that it could be even 24 hours before an issue

16    comes up that might be something that we'd like the Court to

17    deal with at the hearing.  But I think as far as imposing at

18    least starting that process four business days before,

19    certainly, we're more than willing to do that.

10:48:37  20              THE COURT:  Well, what I will do is I'm going to

21    adopt this in my order, and I will say there will be an

22    exception for exceptional circumstances.  But it does seem to

23    me that it's likely that every issue you could identify the

24    day before, you could identify four days before.  But we'll

10:48:51  25    have an escape clause if there's something that really does

10:48:54   1    pop up in the last couple of days.

2            MR. LOPEZ:  Thank you, Your Honor.

3            THE COURT:  All right.

4            Mr. Lopez had contacted our office and indicated

10:49:09   5    plaintiffs' counsel would like to confer with me ex parte

6    about plaintiffs' side budgeting and auditing and accounting

7    stuff, so I'm happy to do that.  We'll do it on the record.

8    But it's consistent, I assume, with the reports you've been

9    submitting that I've reviewed.  So we'll have to do that

10:49:27 10    before we break.

11            Are there other matters the plaintiffs want to raise?

12            MR. LOPEZ:  No, Your Honor.

13            THE COURT:  How about from defendants?

14            MR. NORTH:  Nothing further, Your Honor.

10:49:36 15            THE COURT:  Okay.  So May 3rd at 3:00 p.m. will be

16    our next status conference.  I'll reflect these other rulings

17    in the order that comes out.

18            And we can excuse the defense counsel, and we'll go

19    ahead and address those plaintiff budgeting issues.  If we

10:49:54 20    have defense counsel on the phone, they should hang up at this

21    point.

22            And thank you all for being here.

23            MR. NORTH:  Thank you, Your Honor.

24            MR. LOPEZ:  Thank you, Judge.

10:50:02 25            (The sealed ex-parte discussion between The Court and

10:50:02   1   plaintiffs was reported but not transcribed herein.)

2          (End of partial transcript.)

3                              *  *  *  *  *

1                        **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion

9   of the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control, and to the best

12  of my ability.

13

14         DATED at Phoenix, Arizona, this 28th day of February,

15  2017.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25