James R. Condo (#005867)
Amanda C. Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2204
Telephone: (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

*Attorneys for Defendants*
*C. R. Bard, Inc. and*
*Bard Peripheral Vascular, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation | No. 2:15-MD-02641-DGC<br><br>**DEFENDANTS' MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO DISQUALIFY THOMAS KINNEY, M.D. AS AN EXPERT FOR PLAINTIFFS**<br><br>(Assigned to the Honorable David G. Campbell) |

**MOTION**

Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively "Bard") respectfully move this Court to disqualify the plaintiffs' expert witness, Thomas Kinney, M.D. This motion is supported by Defendants' Memorandum of Points and Authorities, which is filed herewith.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     Introduction**

The plaintiffs' production of an expert report by Dr. Robert Kinney presents a classic "side-switching" scenario: Before Dr. Kinney was a plaintiffs' expert, he was an expert for Bard in two IVC filter products liability cases. He was also a paid consultant to Bard for several years concerning IVC filter design issues and alleged complications that are now central to this MDL. To maintain the integrity of the adversary process, protect privileges that may be breached and to promote public confidence in the legal system, the Court should use its inherent power to disqualify Dr. Kinney under either of the "side-switching" tests for expert disqualification. Dr. Kinney's report was jointly written by him and two other interventional radiologists, and therefore disqualifying Dr. Kinney will result in no prejudice to the plaintiffs. Accordingly, Bard respectfully requests that this Court enter an order disqualifying Dr. Kinney from serving as the plaintiffs' expert in this MDL proceeding.

**II.    Factual and Procedural Background**

**A. Bard's Attorneys Previously Retained Dr. Kinney As An Expert In Two Products Liability IVC Filter Litigation Matters**

In June 2006, the law firm of Nelson Mullins Riley & Scarborough LLP ("Nelson Mullins") retained Dr. Kinney as an expert for Bard in the case of *Scott Mattes v. C. R. Bard, Inc., et al.*, Case No. 1:05-cv-01960, U.S. District Court for the District of Colorado. The plaintiff in *Mattes* asserted product liability claims against Bard concerning his Recovery® IVC Filter and alleged injuries relating to complications from his filter, including perforation. During the course of Dr. Kinney's expert work for Bard,

counsel for Bard disclosed confidential and attorney work-product information to Dr. Kinney relating to Bard's views of the parties' theories of liability and damages, Bard's potential defenses, and the role that Dr. Kinney and the plaintiff's experts would play for IVC filter litigation. After these discussions, Dr. Kinney drafted an expert report and spoke to counsel for Bard about it. Bard, through Nelson Mullins, paid Dr. Kinney $3,400.00 for his services as Bard's expert in *Mattes*. (*See* July 17, 2006 check from Nelson Mullins to Dr. Kinney, attached as Exhibit A.)

In February 2007, Dr. Kinney worked with Nelson Mullins as an expert for Bard in a second IVC filter case, *Jordan Ennis v. Hospital of the University of Pennsylvania, et al.*, Case No. 2422, which was pending in the Philadelphia Court of Common Pleas. The *Ennis* case also involved product liability claims against Bard relating to the plaintiff's Recovery Filter, and the plaintiff alleged injuries from the filter-related complications of tilt and fracture. During his work as an expert for Bard in this case, Dr. Kinney continued his discussions with counsel for Bard about Bard's strategies and defenses for the case. After reviewing documents selected by Bard's counsel, Dr. Kinney orally discussed his opinions with counsel, and was paid an additional $400.00 for his expert services. (*See* February 14, 2007 check from Nelson Mullins to Dr. Kinney, attached as Exhibit B.)

**B. Dr. Kinney Had An Extensive Consulting Relationship With Bard Over A Number Of Years On The Development, Testing, And Use Of Bard's IVC Filters**

From April 2005 through 2008, Dr. Kinney was a paid consultant for Bard regarding the development and use of the Recovery, G2, G2 Express, and G2X IVC filters. In this capacity, Dr. Kinney signed five consulting agreements, each of which contained confidentiality provisions preventing Dr. Kinney from disclosing Bard's confidential information. (*See* April 27, 2005, July 8, 2005, October 31, 2006, March 19, 2007, and August 8, 2007 Agreements, attached as Exhibits C-G to Bard's contemporaneously filed Motion to Seal.) As a paid consultant, Dr. Kinney was involved in several different areas of work relating to Bard's IVC filters, including analyzing filter

- 2 -

adverse event reports, working with other physicians on behalf of Bard to troubleshoot filter-related medical issues, conducting animal studies to test the design of Bard's IVC filters concerning potential complications [1], and working with Bard management, scientists, and engineers to analyze filter complication rates and determine how Bard should categorize and respond to reporter filter complications. For example, on August 16, 2006, Dr. Kinney met with Bard management as part of its Remedial Action Plan to discuss Recovery and G2 Filter fractures and whether those fractures warranted a notification to physicians. (*See* Remedial Action Plan, SPA 04-04-01, pp. 5-6, attached to Bard's Motion to Seal as Exhibit H.)

### C. Dr. Kinney's Role As Plaintiffs' Disclosed Expert

On March 6, 2017, the MDL plaintiffs disclosed an expert report of Dr. Kinney that was jointly written by two additional interventional radiologists, Dr. Anne Roberts and Dr. Sanjeeva Kalva. (*See* Expert Report of Thomas Kinney, M.D., M.S.M.E., Anne Christine Roberts, M.D., and Sanjeeva Kalva, M.D., attached as Exhibit I to Bard's Motion to Seal.) In the expert report, Dr. Kinney acknowledges his consulting relationship with Bard pertaining to IVC filters, but fails to mention his litigation expert work for Bard. (*See id.* at ¶¶ 23-24.) The report offers opinions relating to the plaintiffs' design defect and failure-to-warn claims, which were also the primary claims against Bard in the *Mattes* and *Ennis* cases where Dr. Kinney was Bard's expert. More specifically, Dr. Kinney opines that Bard did not perform adequate testing on its IVC filters and failed to respond adequately to reports of filter complications. (*See id.* at pp. 42-74.) As a consultant for Bard, Dr. Kinney was directly involved in testing of Bard's IVC filters and discussions with Bard management on the company's response to complaints of complications.

On March 22, 2017, Bard notified the plaintiffs of Dr. Kinney's prior work as Bard's litigation expert and requested that they withdraw Dr. Kinney as their expert. (*See*

---

[1] *See* Exhibit G, pp. 4-6 of Test Protocol 07-07-07.

- 3 -

March 22, 2017 letter from Richard North to Ramon Lopez and Mark O'Connor, attached as Exhibit J.) Plaintiffs responded on April 3 and requested further documentation to support Bard's position (*See* April 3, 2017 letter from Messrs. Lopez and O'Connor to Mr. North, attached as Exhibit K.), which Bard provided on April 13. (*See* April 13, 2017 letter from Mr. North to Messrs. Lopez and O'Connor, attached as Exhibit L to Bard's Motion to Seal.) To date, the plaintiffs have refused to withdraw Dr. Kinney as their expert which has necessitated Bard's instant motion for disqualification.

**III.     Argument and Citation to Authority.**

    **A.     Legal Standard For Disqualifying Experts**

"Federal courts have the inherent power to disqualify expert witnesses to protect the integrity of the adversary process, protect privileges that otherwise may be breached, and promote public confidence in the legal system." *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1092 (N.D. Cal. 2004) (citing *Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir.1980)). The rules governing expert disqualification are designed to protect against the potential threat that the moving party's confidences may be disclosed; a showing of actual breach is not required. *Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588, 591 (D. Minn. 1986).

There are two tests that federal courts apply to determine whether a party's expert should be disqualified, the bright-line test and the two-part test. "Under the bright-line rule, when it is undisputed that an expert, who was previously retained by the adverse party in the same litigation and received confidential information as part of that earlier retention, is now blatantly side-switching, disqualification is clear." *Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248 (E.D. Va. 1991).

Courts will apply the two-part test when the expert was not involved in blatant "side-switching." First, did the moving party have an objectively reasonable expectation of a confidential relationship with the expert it is seeking to disqualify? *Rhodes v. E.I. Du Pont De Nemours & Co.*, 558 F. Supp. 2d 660, 667 (S.D. W. Va. 2008). To answer this question, courts may consider whether:

> whether the relationship was one of long standing and involved frequent contacts ..., whether the expert is to be called as a witness in the underlying case, whether the moving party funded or directed the formation of the opinion ... whether the parties entered into a formal confidentiality agreement, whether the expert was retained to assist in the litigation, ... whether work product was discussed or documents were provided to the expert, whether the expert was paid a fee, ... and whether the expert derived any of his specific ideas from work done under the direction of the retaining party.

*Id.* Second, did the expert receive or have reasonable access to the moving party's confidential information that is sufficiently related to the instant litigation to merit disqualification. *See Rhodes*, 558 F. Supp. 2d at 667. Under this analysis, confidential information is considered "information of either particular significance or that which can be readily identified as either attorney work product or within the scope of the attorney-client privilege." *Hewlett-Packard Co.*, 330 F. Supp. 2d at 1094 (citation and internal punctuation omitted). This could include information such as the moving party's theories of liability and damages, its potential defenses, and the role both sides' experts could play in the litigation. *See id.*

If the answer to each question in the two-part test is "yes," then disqualification is warranted as long as the competing policy objectives also favor disqualification. *Id.* at 1092-1093. The policy objectives in favor of disqualification include the court's interest in preventing conflicts of interest and in maintaining judicial integrity. The policy objectives weighing against disqualification include maintaining accessibility to experts with specialized knowledge and encouraging experts to pursue their professions. *See Rhodes,* 558 F. Supp. 2d at 667-668. The court should also consider the availability of other experts and whether the nonmoving party will be unduly burdened by disqualification. *See id.*

### B. Dr. Kinney Should Be Disqualified as Plaintiffs' Expert Using The Bright-Line Test For Disqualification

In the leading case involving disqualification of "side-switching" experts, the Eastern District of Virginia summarized its reasoning for disqualifying an expert using the

bright-line test as follows: "[N]o one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention." *Wang Labs., Inc.*, 762 F. Supp. at 1248. Such is the case with Dr. Kinney.

In *Mattes* and *Ennis*, Dr. Kinney was an expert witness for Bard in cases involving product liability claims about Bard's Recovery Filter where the plaintiffs alleged injuries as a result of the filters' fracture, perforation, and tilt. In the Bard IVC Filter MDL, Dr. Kinney is now an expert witness for the plaintiffs in cases involving product liability claims relating to Bard's IVC filters and alleging injuries as a result of filters' fracture, perforation, tilt, and other complications. *See Rhodes*, 558 F. Supp. 2d at 670-671 (finding disqualification using the bright-line test where the expert was previously an expert for the opposing party in another case five years earlier involving the same water-contamination issues, and noting, "where, as here, an expert plainly switches sides in what is essentially the same case, the maintenance of judicial integrity requires disqualification"); *In re C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, No. MDL 2187, 2014 WL 6960396 (S.D. W. Va. Dec. 8, 2014) (disqualifying expert using the bright-line test where the expert was previously an expert for Bard in non-MDL cases before switching sides to be an expert for the MDL plaintiffs).

Dr. Kinney also received confidential information from counsel for Bard as part of his earlier retention in *Mattes* and *Ennis*. Counsel for Bard discussed Bard's views of the parties' theories of liability and damages, Bard's potential defenses, and how Dr. Kinney fit into the cases. Counsel for Bard also selected documents for Dr. Kinney to review. Dr. Kinney drafted an expert report, and discussed the details of both cases with counsel for Bard. As part of the back-and-forth discussions with Dr. Kinney, counsel for Bard conveyed mental impressions about the cases, liability and damages issues, and about Dr. Kinney's written expert report. Thus, during all of these interactions with counsel for Bard, Dr. Kinney received confidential and attorney work-product information. *See Wang*

1  *Labs., Inc.*, 762 F. Supp. at 1249 ("While the value of the disclosures is debatable, their essential work-product nature is not. No experienced litigator would freely disclose these materials to opposing counsel."); *In re C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2014 WL at *10 (disqualifying plaintiffs' expert and noting that during his prior expert relationship with Bard's counsel he received "confidential information such as litigation strategy, mental impressions regarding the strengths and weaknesses of the pelvic mesh cases."); *Rhodes*, 558 F. Supp. 2d at 671 ("Courts acknowledge that the document selection process represents the mental impressions of the party's counsel and is protected work product.") (internal quotations and punctuation omitted).

In sum, Dr. Kinney was previously retained by Bard in nearly identical litigation as his current retention for the plaintiffs in the Bard IVC Filter MDL, and he received confidential information from Bard's counsel as part of his earlier retention. This is precisely the type of "side-switching" that the bright-line test for disqualifying experts was meant to prevent. *Wang Labs., Inc.*, 762 F. Supp. at 1248. Therefore, the Court should disqualify Dr. Kinney using the bright-line test.

**C.  Dr. Kinney Should Be Disqualified Under The Two-Part Test For Disqualification**

Given Dr. Kinney's role as Bard's expert in two prior IVC filter litigation matters, the bright-line rule applies and he should be disqualified from serving as Plaintiffs' expert. But, even if this Court applies the two-part test, the outcome remains the same. During both his work with Bard's attorneys as a litigation expert and his activities as Bard's paid consultant on the development, testing, and use of Bard's IVC filters, Dr. Kinney formed a confidential relationship with Bard and had access to Bard's confidential information of particular significance to the instant litigation. Thus, under the two-part test, both of Dr. Kinney's roles independently merit his disqualification.

**1.  Bard Had An Objectively Reasonable Expectation Of A Confidential Relationship With Dr. Kinney**

During the time when Dr. Kinney was retained as Bard's expert in two separate

- 7 -

1  IVC filter litigation matters, Bard had an objectively reasonable expectation of a
2  confidential relationship.  As set forth in Sections II(A) and III(B), *supra*, over the course
3  of Dr. Kinney's expert work on two IVC filter cases, Dr. Kinney spoke to counsel for
4  Bard several times about the theories of the cases, liability, and damages issues.  Counsel
5  for Bard also provided Dr. Kinney with selected documents to review and analyze.
6  Finally, Dr. Kinney also drafted an expert report in the *Mattes* case.  These interactions
7  are protected from discovery and gave Bard an objectively reasonable expectation of a
8  confidential relationship with Dr. Kinney while he was Bard's litigation expert.  *Compare*
9  *Rhodes*, 558 F. Supp. 2d at 667 (stating that courts have declined to find that a
10 confidential relationship existed "in cases where the expert met only once with counsel,
11 was not retained, was not supplied with specific data relevant to a case, and was not
12 requested to perform any services.")  (citation and internal punctuation omitted)).

13     Dr. Kinney's work as Bard's IVC filter consultant spanned multiple years and
14 covered a breadth of topics relating to the development, testing, and use of Bard's IVC
15 filters.  *See* Section II(B), *supra*.  Throughout his years consulting for Bard, Dr. Kinney
16 had frequent contact with Bard employees and signed five contracts with Bard, each of
17 which contained confidentiality provisions. (*See* Exhibit C, ¶¶ 1-2; Exhibit D, ¶ 5; Exhibit
18 E, ¶ 8; Exhibit F, ¶ 5; and Exhibit G, ¶ 8.)  In addition, Bard paid Dr. Kinney for his
19 consulting services. (*See*, e.g., Exhibit D, ¶ 2.)  Courts have found this type of evidence
20 sufficient to establish that Bard had an objectively reasonable expectation that its
21 consulting relationship with Dr. Kinney was confidential.  *See Oracle Corp. v.*
22 *DrugLogic, Inc.*, 2012 WL 2244305, at *6 (N.D. Cal. June 15, 2012) (finding that plaintiff
23 had an objectively reasonable expectation of confidential relationship with defendant's
24 named expert because he previously consulted with the plaintiff for a number of years and
25 signed multiple agreements with confidentiality provisions); *Lake Cherokee Hard Drive*
26 *Techs., LLC v. Bass Computers, Inc.*, 2012 WL 708354, at *2 (E.D. Tex. Mar. 5, 2012)
27 (finding a reasonable expectation of a confidential relationship under step one of the two-
28 part test because the expert in question signed a confidentiality agreement; *Rhodes*, 558 F.

1  Supp. 2d at 671 (same); *see also AstraZeneca Pharmaceuticals, LP v. Teva Pharm. USA, Inc.*, 2007 WL 4292384, at *2 (D.N.J. Dec. 4, 2007) (explaining that the "objectively reasonable belief" standard is not a high hurdle).

### 2. Dr. Kinney Received And Had Access To Bard's Confidential Information Related To The Instant Litigation

As outlined in Sections II(A) and III(B), *supra*, during Dr. Kinney's work as Bard's expert on two IVC filter litigation cases, *Mattes* and *Ennis*, he was exposed to Bard's confidential and attorney work-product information, mental impressions, and hand-selected documents. *See Hewlett-Packard Co.*, 330 F. Supp. 2d at 1094 (noting that in the second prong of the two-part test confidential information could include a party's view of the strengths of weaknesses of each side's case, its potential defenses, its litigation strategy, or the role of both sides' experts in the litigation).

Likewise, during Dr. Kinney's IVC filter consulting work, he was exposed to and had access to Bard's confidential information of particular significance to the claims and defenses in this MDL and the opinions Dr. Kinney has provided on behalf of the plaintiffs. For example, pursuant to an August 8, 2007, research agreement[2] between Dr. Kinney and Jim Beasley, former president of Bard Peripheral Vascular, Inc. ("BPV"), Dr. Kinney was the co-lead clinical investigator for animal testing with one of Bard's IVC filters, which was performed to develop a filter design with improved caudal migration, tilt, and perforation resistance as compared to the G2 Filter. (*See* Exhibit G, pp. 4-6 of Test Protocol.) In this role, Dr. Kinney would not only have access to Bard's internal confidential documents, but he also would have had conversations with Bard's management, engineers, and scientists where they disclosed confidential data and information not reflected in the documents. For example, one of BPV's then Senior Research and Development Engineers, Stephanie Klocke, was Dr. Kinney's primary company contact (*See* Exhibit G, p. 2 of Test Protocol.), and Dr. Kinney would have had

---

[2] This agreement, like all of the contracts between Dr. Kinney and Bard, contained a confidentiality provision. *See* Exhibit G, ¶ 8.

- 9 -

multiple interactions with Ms. Klocke.  Another example of Dr. Kinney's exposure to Bard's confidential information of particular significance to the instant litigation is his meeting and discussions with BPV management on August 16, 2006, to discuss the Recovery Filter's fracture rates and Bard's internal adverse event categorization and response. (*See* Exhibit H, pp. 5-6.)

The confidential information that Dr. Kinney received during his consulting with Bard and through his interactions with Bard's management and employees is of particular significance to the MDL plaintiffs' design defect and negligence claims and the opinions that Dr. Kinney offers regarding the inadequacy of Bard's response to Recovery Filter fractures, testing, and other activities to improve certain characteristics of the G2 Filter. (Exhibit I, pp. 42-74).  Thus, there is significant danger that confidential information Dr. Kinney acquired affected his opinions or may affect his opinions in the future, which warrant disqualification under the two-step analysis. *See, e.g., Auto-Kaps, LLC v. Clorox Co.*, 2016 WL 1122037, at *5 (E.D.N.Y. Mar. 22, 2016) (disqualifying plaintiff's expert who previously consulted with the defendant on similar products to the one at issue and noting that it is impossible for the expert to segregate the confidential information he acquired as defendant's consultant because "[a]n expert cannot build a Chinese wall in his own mind, despite his best efforts to do so.").

**D.     Policy Considerations Weigh In Favor Of Dr. Kinney's Disqualification**

Disqualification of Dr. Kinney is in accordance with this Court's policy objectives, including preventing conflicts of interest, maintaining judicial integrity, and allowing a party to access experts.  First, Dr. Kinney's work for Bard as a litigation expert on two IVC filter cases and as a paid consultant concerning IVC filters creates a clear conflict of interest now that Dr. Kinney has switched sides to criticize Bard's actions regarding IVC filters and to criticize the filters themselves.  Second, allowing an expert to blatantly side-switch threatens judicial integrity and chills companies' willingness to engage private physicians as consultants if the consultants are then free to leverage their insider knowledge as expert witnesses against these companies to further their own monetary

1  gain.  Third, disqualifying Dr. Kinney will not prejudice the plaintiffs' access to expert
2  witnesses.  Dr. Kinney's report was jointly written by two other interventional
3  radiologists, which gives the plaintiffs numerous experts to opine about the same topics at
4  trial.  And there are thousands of board certified interventional radiologists in the United
5  States who have neither consulted with, nor been an expert for, Bard in IVC filter
6  litigation; the plaintiffs were free to retain any of them in this litigation.  Instead, the
7  plaintiffs retained Dr. Kinney, even being aware of his prior relationship with Bard, which
8  Dr. Kinney describes in his report (*See* Exhibit I, ¶¶ 23-24.)  For each of these reasons,
9  policy considerations weigh strongly in favor of Dr. Kinney's disqualification.

## IV. Conclusion.

For each of these reasons, Defendants request that this Court grant Defendants' Motion and disqualify Dr. Kinney as an expert for the plaintiffs.

RESPECTFULLY SUBMITTED this 26th day of April, 2017.

s/Richard B. North, Jr.
Richard B. North, Jr.
Georgia Bar No. 545599
Matthew B. Lerner
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW / Suite 1700
Atlanta, GA  30363
PH: (404) 322-6000
FX: (404) 322-6050
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

James R. Condo (#005867)
Amanda Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2204
PH: (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

**Attorney for Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of April 2017, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

s/Richard B. North, Jr.<br>
Richard B. North, Jr.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000