Ramon Rossi Lopez – rlopez@lopezmchugh.com
(California Bar Number 86361; admitted *pro hac vice*)
Lopez McHugh, LLP
100 Bayview Circle, Suite 5600
Newport Beach, California 92660
949-812-5771

Mark S. O'Connor (011029) – mark.oconnor@gknet.com
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
602-530-8000

*Co-Lead/Liaison Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISQUALIFY THOMAS KINNEY, M.D. AS AN EXPERT FOR PLAINTIFFS** |

**I.      Introduction.**

Thomas Kinney, M.D. is a qualified interventional radiologist who has authored an expert report on behalf of Plaintiffs that addresses a number of relevant, important issues in the litigation from the perspective of interventional radiologists—the primary end-users of IVC filters. Defendants have moved to disqualify Dr. Kinney, contending he previously worked for Bard as a consultant and expert from 2005 to 2008. They argue he has "switched sides" in the litigation. Defendants, however, failed to make a showing sufficient to meet any test for disqualification. As Dr. Kinney attests subject to penalty of perjury, in his prior work for Bard nearly a decade ago, he received no confidential information relevant to the instant litigation and his work was on issues distinct from his opinions provided in this litigation. In his prior work, Dr. Kinney was not privy to Defendants' theories of liability, damages, or potential defenses, or even to the documents and information on which he relies and opines in this suit.

Disqualification is a drastic remedy that should be reserved for clear instances of blatant side-switching by an expert. That is simply not the case here. Additionally, considering the lateness of Defendants' request, the prejudice to Plaintiffs would be exacerbated by having this important witness stricken at this late stage of discovery. For those and the following reasons, this Court should deny Defendants' Motion to Disqualify Thomas Kinney, M.D. as an Expert for Plaintiffs [Doc. 5677] ("Mot.").

**II.  Background**

On March 6, 2017, Dr. Kinney coauthored an expert report in his capacity as practicing physician and member of the Society of Interventional Radiologists (SIR). *See* Kinney Decl. [Ex. 1] ¶ 2; *see* Expert Report of Thomas Kinney, M.D., M.S.M.E., Anne Christine Roberts, M.D., and Sanjeeva Kalva, M.D. [Defs.' Ex. I] ¶¶ 16, 23. In that report, Drs. Kinney, Roberts, and Kalva opined on multiple issues concerning Bard's IVC Filters—including a lack of adequate data, misrepresentations of sales and marketing materials, information withheld from physicians, significant design failures, and improper use of SIR's *Quality Improvement Guidelines*—applying not only on their expertise as a interventional radiologists and physicians, but also for Dr. Kinney, his insight as a mechanical engineer. *See generally* Defs.' Ex. I. The report was a collaborative effort among the authors, similar to the methodology employed had the authors been contributing to a medical article or presentation to the medical community. *Id.* ¶ 280. As part of the collaboration, Dr. Kinney contributed significant, unique expertise concerning engineering and design issues given his educational background in physics and mechanical engineering, as well as concerning compliance with SIR guidelines given his service as a SIR member. *Id.* ¶¶ 13, 17, 19, 23.

As Dr. Kinney disclosed in his report, he served as a paid consultant for Bard from 2005 to 2008. *Id.* ¶¶ 23–24. Dr. Kinney signed six agreements consultant for Bard during that time:

1. February 4, 2005: Dr. Kinney signed an agreement to work as a trainer for Bard, instructing other physicians on how to insert the Recovery filter and retrieve it. *Id.* ¶ 23; *see* Consulting Agreement [Ex. 2].

2

2. April 27, 2005: Dr. Kinney signed an agreement to act as a consultant for Bard relating to IVC filters and stent grafts. *See* Confidential Information Agreement [Defs.' Ex. C].

3. July 8, 2005: Dr. Kinney signed an agreement to perform an animal study and provide feedback to Bard. *See* Consulting Agreement [Defs.' Ex. D].

4. October 31, 2006: Dr. Kinney signed a 12-month agreement to provide medical advice and consultation regarding the use of Bard products to physicians who had requested additional assistance by contacting Bard Medical Services & Support. *See* Consulting Agreement [Defs.' Ex. E].

5. March 19, 2007: Dr. Kinney signed a 12-month agreement to perform an animal study and provide feedback to Bard. *See* Consulting Agreement [Defs.' Ex. F].

6. August 8, 2007: Dr. Kinney signed a 12-month agreement to provide research services to Bard related the G3 Feasibility Chronic Animal Study Protocol. *See* Research Agreement [Defs.' Ex. G].

In addition to this consulting work, Dr. Kinney has reviewed medical records for Bard twice in relation to legal cases: first in June 2006 in *Mattes v. C.R. Bard, Inc.*, and again in February 2007 in *Ennis v. Hospital of the University of Pennsylvania*. Kinney Decl. ¶¶ 12–13. Plaintiffs and Dr. Kinney admit that he worked as an expert and in a medical-consultant capacity and for Bard between 2005 and 2008.  Defendants, however, overstate and mischaracterize not only the work that was done, but also the nature of the confidential relationship between Bard and Dr. Kinney.

Crucially, as set forth in Dr. Kinney's Declaration, Dr. Kinney received absolutely no confidential information *relevant to this litigation* as part of his consulting and expert work a decade ago, nor did he have discussions regarding the liability theories or defense theories of the litigation at bar, or any of the issues addressed in his Rule 26 Report. *Id.* His consulting was limited to narrow pre-clinical, medical, and training issues, and his expertise was limited to case-specific medical review of two plaintiffs' medical records, all unrelated to claims or defenses in this MDL. Dr. Kinney's case-specific medical reviews did not involve sharing of Bard's counsel's liability theories or mental impressions, and he did not draft or have served Rule 26 or similar expert reports. There exists nothing in this prior work by Dr. Kinney that even remotely relates to the issues and subject matter of Dr. Kinney's expert report in this MDL.

3

**III.     Bard's Motion Lacks Merit; This Court Should Deny It.**

   A.     <u>Disqualification Should Be Evaluated by the "Bright-Line" Test, the "Two-Part" Test, Policy Considerations, and Standards of Fundamental Fairness.</u>

"Federal courts have the inherent power to disqualify experts." *Wright v. United States*, 2007 WL 3049074, at *1 (D. Ariz. Oct. 18, 2007) (citing *Koch Ref. Co. v. Jennifer L. Boudreaux MV*, 85 F.3d 1178, 1181 (5th Cir. 1996) (citing *Campbell Ind. v. M/V GEMINI*, 619 F.2d 24, 27 (9th Cir. 1980))). A district court can exercise that power "to prevent a conflict of interest and to maintain the integrity of the judicial process." *Id.* In rare cases, disqualification may be appropriate in the instance of a "'switching sides' expert—an expert who is initially retained by one party, dismissed, and employed by the opposing party in the same or related litigation." *Erickson v. Newmar Corp.*, 87 F.3d 298, 300 (9th Cir. 1996).

Federal courts have developed two tests for evaluating whether an expert should be disqualified for alleged side-switching: the bright-line test and two-part test. *See Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246 (E.D. Va. 1991); *Rhodes v. E.I. Du Pont De Nemours & Co.*, 558 F. Supp. 2d 660 (S.D.W. Va. 2008). *See generally* K. Coffey, *Inherent Judicial Authority and the Expert Disqualification Doctrine*, 56 Fla. L. Rev. 195, 202–08 (2004).[1] The bright-line test, first announced in *Wang*, declared that "no one

---

[1] No opinion issued by the Ninth Circuit or the District of Arizona appears to have explicitly addressed which standard applies to a motion to disqualify an expert for alleged side-switching. However, in *Erickson*—which "does not involve an expert who changed sides and used confidential information"—the Ninth Circuit mentioned in dicta that "in 'switching sides' cases, courts may grant the original hiring party's motion to disqualify the expert when it is determined that the expert is in possession of confidential information received from the first client." 87 F.3d at 300–01 (citing *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 278 (S.D. Ohio 1988)).

The two-part test applied in *Paul* considers "first, whether the attorney or client acted reasonably in assuming that a confidential or fiduciary relationship of some sort existed [between an attorney or client and an expert] and, if so, whether the relationship developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate" after the expert began working for an attorney or client adverse to the original attorney or client. *Paul*, 123 F.R.D. 271, 278 (S.D. Ohio 1988). "Since Paul was decided, lower courts, and even as many as two circuit courts, have largely adopted its test and reasoning for determining whether to disqualify experts who have allegedly 'switched sides.'" *Bray v. Husted*, 2013 WL 6164536, at *4 (E.D. Ky. Nov. 21, 2013). By citing to *Paul*, the Ninth Circuit suggests its agreement with the approach fashioned by *Paul* and its progeny, such as *Wang* and *Rhodes*.

would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation <u>and had received confidential information from the adverse party pursuant to the earlier retention</u>." 762 F. Supp. at 1248 (emphasis added); *see also Rhodes*, 558 F. Supp. 2d at 664–66 (discussing and adopting the bright-line test from *Wang*). Where disqualification is not so clearly warranted, however, courts apply a two-part test, asking: "First, was it objectively reasonable for the first party who claims to have retained the consultant ... to conclude that a confidential relationship existed? Second, was any confidential or privileged information disclosed by the first party to the consultant?" *Wang*, 762 F. Supp. at 1248; *see also Rhodes*, 558 F. Supp. 2d at 667; *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1092–93 (N.D. Cal. 2004).

Only where both questions are answered in the affirmative <u>may</u> disqualification be appropriate. *Rhodes*, 558 F. Supp. 2d at 667; *Hewlett-Packard*, 330 F. Supp. 2d at 1093; *Wang*, 762 F. Supp. at 1248. Even then, however, the Court's inquiry is not at an end; courts "should also 'balance the competing policy objectives' in determining expert disqualification." *Rhodes*, 558 F. Supp. 2d at 667–68 (quoting *Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575, 580 (D.N.J. 1994)). Finally, courts "also should consider issues of fundamental fairness ... and whether any prejudice might occur if an expert is or is not disqualified." *Hewlett-Packard*, 330 F. Supp. 2d at 1094 (internal citation omitted).

Under all circumstances, "the party seeking disqualification bears a high standard of proof to show that disqualification is warranted." *Rhodes*, 558 F. Supp. 2d at 664 (quotation marks omitted). As discussed below, no matter which test the Court applies, the conclusion is clear: Defendants have not met their heavy burden.

B.   <u>Defendants Have Not Met the Bright-Line Test.</u>

The bright-line test exists as a matter of judicial economy, to address instances where an expert so clearly and blatantly switches sides that "all parties would agree that the maintenance of judicial integrity mandates disqualification." *Id.* at 666. Thus, the rule only applies where "it is <u>undisputed</u>" both that an expert (1) had worked previously in the

5

same litigation for the party against which the expert is now an adversary and (2) received confidential information as part of that prior work tainting the expert's now-adversarial role. *Wang*, 762 F. Supp. at 1248 (emphasis added). Where, however, "the parties <u>dispute</u> whether the earlier retention and passage of confidential information occurred[,] . . . courts should undertake a two-step inquiry." *Id.* (emphasis added). Plaintiffs and Dr. Kinney dispute any claim that Bard's earlier retention of Dr. Kinney resulted in a confidential relationship through which he received any confidential information concerning this litigation. That dispute alone requires application of the two-part test—not the bright-line test. However, Plaintiffs' and Dr. Kinney's dispute is not merely rhetorical; even if the Court were to fully apply the bright-line test, Dr. Kinney's sworn Declaration demonstrate that Defendants' arguments fail.

      Defendants point to Dr. Kinney's prior retention as an expert by Bard in the *Mattes* and *Ennis* cases as basis for disqualification under the bright-line test,. Mot. at 5–7.[2] They argue that because Dr. Kinney worked as an expert for Bard on cases involving allegations of filter fracture, perforation, and tilt, he should now be disqualified from cases involving allegations of fracture, perforation, and tilt. *Id.* at 6. That argument, however, oversimplifies the significant differences between Dr. Kinney's work for Bard ten years ago and his work for Plaintiffs today.

      Plaintiffs and Dr. Kinney do not dispute that he provided a medical review in *Mattes* and *Ennis* or that a confidential relationship existed concerning his work in those cases. However, Dr. Kinney did not receive any confidential information relevant to the current litigation in his role in those cases. In both cases, <u>Dr. Kinney provided case-specific medical reviews only</u>; he based those reviews solely on medical records provided to him and his experience as an Interventional Radiologist. In *Mattes*, Dr. Kinney completed a written medical review of the injuries suffered by the recipient of a Bard

---

[2] Defendants do not mention Dr. Kinney's other consulting work as justification for his disqualification under the bright-line test. *See* Mot. at 5–7. Nonetheless, Plaintiffs stress that none of Dr. Kinney's consulting work should merit such disqualification. None of that work related to the issues discussed, subject matter, or bases of the opinions rendered in his report in this MDL. *See* discussion *infra* Part III.C.

filter. Kinney Decl. ¶ 12.[3] *Mattes* settled before experts were disclosed. *See* Stipulated Notice of Dismissal [Ex. 3]. In *Ennis*, Dr. Kinney's review was even more cursory, involving only one hour of medical-record review. Kinney Decl. ¶ 13. *Ennis* settled shortly thereafter, before a case management order was even issued. *See* Order [Ex. 4].

In both cases, Dr. Kinney <u>did not</u> discuss or receive any confidential information concerning Bard's theories of liability, damages, or potential defenses in this MDL, or how Dr. Kinney—or any other expert or expert opinion—might fit into this MDL. Nor was he privy to Bard's internal documents while performing that limited work—documents upon which he now largely relies to form the bases of his opinions in his report. This case is therefore distinct from both cases Defendants cite to demonstrate where a side-switching expert should be disqualified under the bright-line rule. *See* Mot. at 6 (citing *Rhodes*, 558 F. Supp. 2d at 670–71; *In re C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, No. MDL 2187, 2014 WL 6960396, at *1 (S.D.W. Va. Dec. 8, 2014)).

In *Rhodes*—a class action against a manufacturing plant alleging that the plant contaminated a community's drinking water—the Court disqualified an expert for switching sides where the expert's involvement on both sides of substantially similar cases "exposed her to" both sides' "strategy with respect to methodology" and "principles of risk assessment" concerning the plaintiffs' risk of contamination. 558 F. Supp. 2d at 670. Understandably, the court did not permit the expert to switch sides where the expert would betray confidences by calling upon the same expertise used previously. *Id.*

In *In re C.R. Bard*—a separate MDL against Bard involving pelvic mesh—the court disqualified an expert for switching sides where the expert adverse to Bard previously worked on pelvic mesh issues for Bard, "had a close working relationship with Bard's counsel, and in the course of that relationship received confidential information such as litigation strategy, mental impressions regarding the strengths and weaknesses of

---

[3] Dr. Kinney possesses a copy of the medical review he authored in *Mattes*, which supports his assertions that, as compared with the Rule 26 report prepared in this MDL, his expert consulting for Bard was extremely limited. Dr. Kinney can provide his *Mattes* review for *in camera* inspection at the Court's discretion. Kinney Decl. ¶ 12.m.

7

the pelvic mesh cases, the role of experts at trial, and Bard's anticipated defenses." 2014 WL 6960396, at *10.

Dr. Kinney's work for Bard in *Mattes* and *Ennes* was significantly different and more limited than the work of the experts in either *Rhodes* or *In Re C.R. Bard*. In both cases, Dr. Kinney performed medical reviews; they were narrow, case-specific consultations to Bard that have no bearing whatsoever on the broad, more far-reaching opinions he offers in this MDL. No attorney for Bard shared legal ideas or impressions with him about either case, nor did he receive any confidential documents, theories of liability, or strategies for the case. Kinney Decl. ¶¶ 12–13. Whatever confidential information Dr. Kinney received in 2006 and 2007 as an expert in *Mattes* and *Ennis* was restricted to those cases and has nothing to do with the opinions he has formed today.

Indeed, Dr. Kinney's opinions in this MDL are not on the same subject matter as his work in *Mattes* and *Ennes*. His opinions in this MDL are based entirely on discovery produced in this MDL as well as Dr. Kinney's own independent knowledge, experience, and expertise. *Id.*; Defs.' Ex. I ¶ 25. And, a significant number of the documents, articles, other expert reports, data, and references considered by Dr. Kinney in forming his opinions in this litigation simply did not exist 9–12 years ago when he last provided professional advice to Bard. Thus, his prior opinions could not have related to them.

Dr. Kinney's prior work for Bard is far removed both in time and substance from his work for Plaintiffs in this MDL. Therefore, the "bright-line" test does not support disqualification of Dr. Kinney.

C.   The Two-Part Test Does Not Support Disqualification of Dr. Kinney.

The first prong of the two-part test considers whether there was an objectively reasonable expectation of a confidential relationship between the expert who has allegedly switched sides and the party that initially retained that expert. *Wang*, 762 F. Supp. at 1248. To determine whether such a relationship exists, courts examine "whether there was a relationship that would permit the litigant reasonably to expect that any communications would be maintained in confidence." *Hewlett-Packard Co.*, 330 F. Supp. 2d at 1093.

8

Plaintiffs and Dr. Kinney do not dispute that he maintained a confidential relationship with Bard stemming from his paid consulting and expert work between 2005 and 2008. *See* Ex. 2; Defs.' Exs. C–G. But Dr. Kinney's confidential relationship between 2005 and 2008 has absolutely nothing to do with the issues and causes of action in this MDL.

The second prong of the two-part test considers whether confidential information passed between the party that initially retained the expert who has allegedly switched sides. *Wang*, 762 F. Supp. at 1248.

> In the specific context of expert disqualification, confidential information essentially is information of either particular significance or that which can be readily identified as either attorney work product or within the scope of the attorney-client privilege. Confidential information in this context includes, among other things: discussions of the retaining party's strategies in the litigation, the kinds of experts the party expected to retain, the party's views of the strengths and weaknesses of each side, the role of each of the party's witnesses to be hired, and anticipated defenses.

*Rhodes*, 558 F. Supp. 2d at 667 (internal citations, quotation marks, and alterations omitted). Crucially, even where confidential information is exchanged, that information "must ... be sufficiently related to the instant litigation to merit disqualification" of the expert to whom it is communicated. *Id.* Here, the information Dr. Kinney received during his consulting and expert work for Bard is not related to this litigation; consequently, it cannot merit disqualification.

In support of their argument, Defendants again point to Dr. Kinney's expert work on *Mattes* and *Ennis*, arguing generally that he was "exposed to Bard's confidential and attorney work-product information, mental impressions, and hand-selected documents." Mot. at 9. But, as Dr. Kinney attests in his Declaration, the specific facts and circumstances of his engagement and work do not bear that out. *See* Kinney Decl. ¶¶ 12–13. Even if it *were* true that Dr. Kinney received work product, impressions, and documents in those cases, they are so far removed in time and substance from the current litigation that they would have had nothing to do with Bard's current litigation strategies. As discussed *supra* Part III.B., Dr. Kinney's work in *Mattes* and *Ennis* was narrowly

9

focused, restricted to case-specific medical opinions, and had nothing to do with the opinions he has formed today or the litigation in this MDL.

Defendants next point to Dr. Kinney's consulting work, through which they contend generally "he was exposed to and had access to Bard's confidential information of particular significance to the claims and defenses in this MDL and the opinions Dr. Kinney has provided on behalf of the plaintiffs." Mot. at 9. But, again, the specific facts and circumstances of his engagement do not bear that out. Kinney Decl. ¶¶12–35. "[I]f, despite a relationship conducive to [confidential] disclosures, no significant disclosures were made, disqualification is inappropriate." *English Feedlot, Inc. v. Norden Laboratories, Inc.,* 833 F. Supp. 1498, 1502 (D. Colo. 1993) (citing *Paul*, 123 F.R.D. at 278). Such is the case here; despite the existence of six formal confidentiality and consulting agreements, Defendants made no significant disclosures of confidential information to Dr. Kinney relevant to this litigation.[4]

First, on February 4, 2005, Dr. Kinney began work as a trainer for Bard, instructing other physicians on how to insert the Recovery filter and retrieve it. Ex. 2.[5] That physician training has nothing to do with the product-liability claims at issue in this MDL and involved no confidential information relevant to the MDL. Kinney Decl. ¶ 6.

Second, on April 27, 2005, Dr. Kinney began work as a consultant for Bard relating to IVC filters and stent grafts. *Id.* ¶ 7; Defs.' Ex. C. As part of that consulting work, Dr. Kinney provided commentary to Bard on August 15, 2006 "regarding the Recovery Fracture Rates," which was Bard mentioned in an October 2006 Remedial Action Plan (RAP). Recovery Filter Fractures Remedial Action Plan (BPVEFILTER-01-00215491) [Defs.' Ex. H], at 5. Defendants make much of that commentary, arguing that this consulting work "is of particular significance to the MDL plaintiffs' design defect and negligence claims and the opinions that Dr. Kinney offers regarding the inadequacy of

---

[4] Indeed, had Bard made any such disclosures while Dr. Kinney was consulting for Bard, he would have terminated his consulting work. *See* Ex. C ¶ 26 ("Had I been aware of this evidence I would not have used the early Bard devices (RNF and G2), nor would I have agreed to act as a paid consultant for Bard.").

[5] Defendants do not mention or discuss this agreement in their motion. *See* Mot. at 9–10.

10

Bard's response to Recovery Filter fractures," Mot. at 10, but Defendants overstate the significance of Dr. Kinney's consulting concerning filter fracture.

In August 2006, Dr. Kinney met with Bard's John McDermott and Janet Hudnall for a few hours one morning. At this meeting, Bard posed general questions related to IVC filter fractures, including non-specific questions about whether fractured fragments could cause issues and whether loss of filter arms or legs could lead to less effective filtering, result in greater mechanical loading on the remaining filter arms/legs, or lead to fractures. This meeting did not involve discussions about any legal matter or pending litigation. Bard did not share any statistics or internal documents with Dr. Kinney about fractures rates. Dr. Kinney was not asked to work on or offer advice for a RAP, nor was he even aware that his name appeared in the RAP until he was presented with the instant motion. Kinney Decl. ¶¶ 15–22. In short, Dr. Kinney's involvement in the October 2006 RAP was extremely limited, had nothing to do with litigation or defenses, and did not involve access to confidential information relevant to this MDL. This conclusion is buttressed by the fact that Bard first began to develop this RAP as early as July 2004— more than two years before Dr. Kinney's brief and fleeting involvement. *See* Remedial Action Plan, Recovery Filter Detached Limbs (BPV-17-01-00022335) [Ex. 5].

Third, on July 8, 2005, Dr. Kinney began work as a consultant to perform an animal study and provide feedback to Bard. Kinney Decl. ¶ 8; Defs.' Ex. D. Defendants make no specific argument in their motion with respect to this particular consulting work, but rather only make vague assertions that Dr. Kinney must have been privy to confidential information as a result. *See* Mot. at 9–10. Such "vague assertions" that a challenged expert "received or had reasonable access to confidential information" are insufficient to support disqualification. *Mays v. Reassure Am. Life Ins. Co.*, 293 F. Supp. 2d 954, 957 (E.D. Ark. 2003). In actuality, Dr. Kinney neither received nor had access to any such information. Rather, he was asked to evaluate various performance characteristics of IVC filters, specifically retrieval for IVC filters. On two occasions, Bard asked Dr. Kinney to lecture on his review of IVC filters with a focus on retrievable filters

11

at Barrow Neurological Institute, located within St. Joseph's Hospital and Medical Center in Phoenix, Arizona. After the lectures, the participating physicians were directed to the animal lab (using swine models) to insert and retrieve filters with supervision of instructors such as Dr. Kinney. Dr. Kinney did not receive or have access to confidential information relevant to this MDL during this time period. Kinney Decl. ¶ 8.

Fourth, on October 31, 2006, Dr. Kinney began work as a consultant to provide advice and consultation regarding the use of Bard products to Bard customers. *Id.* ¶ 9; Defs.' Ex. E. Under this agreement, Dr. Kinney, along with Dr. David W. Trost of Weill-Cornell Medicine, assisted the Bard sales force with clinical calls received to their filter line. During this time period, Dr. Kinney received only approximately two or three calls per year. Once more, Defendants make only vague assertions that Dr. Kinney must have been privy to confidential information with respect to this consultancy and provide no evidence that Dr. Kinney ever had access to confidential material. *See* Mot. at 9–10. And, Dr. Kinney confirms in his Declaration that he did not receive or have access to confidential information relevant to this MDL during this time period. Kinney Decl. ¶ 9.

Fifth, on March 19, 2007, Dr. Kinney began work as a consultant to perform an animal study and provide feedback to Bard. Kinney Decl. ¶ 10; Defs.' Ex. F. Yet again, Defendants make only vague and general assertions that Dr. Kinney must have been privy to confidential information with respect to this consultancy but provide not actual evidence of such. *See* Mot. at 9–10. Here, Dr. Kinney, along with Dr. John Kaufman, assisted in an IVC filter animal study (swine models) performed in Mountain View, California. Dr. Kinney was tasked with evaluating various performance characteristics of the RNF, G2, and G2x filters, specifically as to ease of retrieval. Drs. Kinney and Kaufman also evaluated angioplasty balloons during this study. Dr. Kinney had no input in the design of the filters, the design of the experiments, or the analysis of the resulting data.  Dr. Kinney did not receive or have access to any confidential information relevant to this MDL as part of this assignment or during this time period. Kinney Decl. ¶ 10.

Finally, on August 8, 2007, Dr. Kinney began work as a consultant to provide research services to Bard related the G3 Feasibility Chronic Animal Study Protocol. *Id.* ¶ 11; Defs.' Ex. G. Defendants argue that during this work, Dr. Kinney would have been privy to significant confidential disclosures from "Bard's management, engineers, and scientists" concerning the development of "a filter design with improved caudal migration, tilt, and perforation resistance as compared to the G2 Filter." Mot. at 9. They further claim this consulting work "is of particular significance to the MDL plaintiffs' design defect and negligence claims and the opinions that Dr. Kinney offers regarding ... testing[] and other activities to improve certain characteristics of the G2 Filter." *Id.* at 10. Again, Defendants' general contentions overstate the significance of Dr. Kinney's consulting regarding testing and improving the G2. In reality, Dr. Kinney, again with Dr. John Kaufman, assisted in an IVC filter animal study (swine models) performed in Mountain View, California. The doctors evaluated various performance characteristics of the "G3" filter, specifically concerning insertion and retrieval. The study was brief— approximately 20 weeks long—and Dr. Kinney had no input in the design of the filters, the design of the experiments, or the analysis of the resulting data. And, again, Dr. Kinney did not receive or have access to confidential information relevant to this MDL during this time period. Kinney Decl. ¶ 11.

While it may be true that "[a]n expert cannot build a Chinese wall in his own mind" around information that could pose a conflict of interest, *Auto-Kaps, LLC v. Clorox Co.*, 2016 WL 1122037, at *5 (E.D.N.Y. Mar. 22, 2016), *quoted in* Mot. at 10, there is no need to construct such a wall in this case. Dr. Kinney in no way relies on, and in no way received—nor have Defendants actually identified—any confidential information relevant to this litigation during his prior consulting work. Defendants have failed to demonstrate that Dr. Kinney should be disqualified under the two-part test.

D.   <u>Policy Considerations Do Not Support Disqualification.</u>

In addition to the two prongs of the two-part test, courts "should also 'balance the competing policy objectives' in determining expert disqualification, which include

13

'preventing conflicts of interest,' 'maintaining the integrity of the judicial process,' maintaining accessibility to experts with specialized knowledge, and encouraging experts to 'pursue their professional calling.'" *Rhodes*, 558 F. Supp. 2d at 667–68 (quoting *Cordy*, 156 F.R.D. at 580). Those policy objectives uniformly augur against disqualification in this case.

First, there is no conflict of interest because Dr. Kinney received no confidential information during his prior work for Bard relevant to this litigation; there is simply nothing of interest over which Dr. Kinney could be conflicted. Second, the integrity of the judicial process is not affected because Dr. Kinney is not blatantly switching sides and leveraging knowledge gained from an adverse party for monetary gain. Third, allowing Dr. Kinney to remain involved in this case ensures that Plaintiffs maintain access to an expert with highly specialized knowledge; as discussed *infra* Part III.E., restricting that access would significantly prejudice Plaintiffs. Finally, allowing Dr. Kinney to remain involved in this case ensures that he may freely and responsibly pursue his professional calling. Policy goals would therefore be best served by permitting Dr. Kinney to continue to serve as an expert witness in this case.

### E. Disqualifying Dr. Kinney Would Prejudice Plaintiffs and Violate Principles of Fundamental Fairness.

Finally, courts should also "consider issues of fundamental fairness ... and whether any prejudice might occur if an expert is or is not disqualified." *Hewlett-Packard*, 330 F. Supp. 2d at 1094–95 (N.D. Cal. 2004) (internal citations omitted). "[A]n important factor in making this determination is whether the moving party can show any 'demonstrable prejudice,' or that he was 'unduly disadvantaged' by allowing the expert witness to testify under the circumstances. *Bray*, 2013 WL 6164536, at *3 (quoting *Paul*, 123 F.R.D. at 278). Here, Defendants can make no such showing. Dr. Kinney was <u>not</u> made aware of Defendants' legal theories or potential defenses to this litigation. He bases his opinions wholly on discovery produced in this MDL, as well as his own independent knowledge, experience, expertise, research, and review of peer-reviewed medical literature. Kinney

Decl. ¶¶ 12–35. It would be patently unfair to disqualify an expert who imposes no prejudice on the opposing party.

Courts should also consider "whether the opposing party will be unduly burdened" by disqualification of their expert. *Hewlett-Packard*, 330 F. Supp. 2d at 1095. Plaintiffs would be significantly disadvantaged and burdened should Dr. Kinney be disqualified. Although Dr. Kinney co-authored his expert report along with Drs. Anne Christine Roberts and Sanjeeva Kalva, Drs. Roberts and Kalva cannot simply opine in Dr. Kinney's stead. Their report was collaborative, not redundant. The coauthors relied on each other's opinions and expertise such that the report would be rendered less viable without full participation of each author as this litigation progresses. Specifically, Plaintiffs would be burdened by the loss of Dr. Kinney's particular expertise concerning design issues and medical articles he has authored, given his educational background in not only medicine but also engineering. Further, Dr. Kinney's membership in SIR lends credulity, credibility, competency, and cogency to his opinion—unique attributes that would be lost if Dr. Kinney were disqualified. The prejudice to Plaintiffs from his disqualification would be significant and immediate; Dr. Kinney's opinions and report have already been referenced and relied upon in a number of bellwether depositions. Finally, Plaintiffs have no opportunity to replace Dr. Kinney in light both of his unique qualifications as a physician and engineer and because of the timing of expert disclosures in the MDL – there is simply no time in the schedule for Plaintiffs to find someone to replace Dr. Kinney.

On balance, the total lack of prejudice to Defendants should Dr. Kinney remain, coupled with the significant burden that disqualification of Dr. Kinney would place upon Plaintiffs, demonstrates that fundamental fairness would be best served by permitting Dr. Kinney to remain qualified as an expert in this MDL.

**IV.     Conclusion.**

"Disqualification is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Chamberlain Grp., Inc. v. Interlogix, Inc.*, 2002 WL 653893, at *2 (N.D. Ill. Apr. 19, 2002) (quotation marks omitted). Defendants have not

met their substantial burden under either the bright-line or two-part test to support disqualification. Additionally disqualification of Dr. Kinney would run contrary to important policy concerns and would significantly prejudice Plaintiffs. For all of the foregoing reasons, this Court should deny Defendants' Motion.

RESPECTFULLY SUBMITTED this 10th day of May 2017.

GALLAGHER & KENNEDY, P.A.

By: */s/ Mark S. O'Connor*
  Mark S. O'Connor
  2575 East Camelback Road
  Phoenix, Arizona  85016-9225

LOPEZ McHUGH LLP
  Ramon Rossi Lopez (CA Bar No. 86361)
  (admitted *pro hac vice*)
  100 Bayview Circle, Suite 5600
  Newport Beach, California 92660

*Co-Lead/Liaison Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of May 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

*/s/ Deborah Yanazzo*