1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

**In Re: Bard IVC Filters**            ) MD-15-02641-PHX-DGC
Products Liability Litigation          )
                                       ) Phoenix, Arizona
                                       ) **May 3, 2017**
_____)

**BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**NINTH SCHEDULING CONFERENCE**

Official Court Reporter:
Patricia Lyons, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Ste. 312
401 West Washington Street, SPC 41
Phoenix, Arizona  85003-2150
(602) 322-7257

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared with Computer-Aided Transcription

```
1                      A P P E A R A N C E S

2    Plaintiffs' Co-Lead/Liaison Counsel and State/Federal Liaison
     Counsel:
3
             Lopez McHugh
4            By: RAMON ROSSI LOPEZ, ESQ.
             100 Bayview Circle, Suite 5600
5            Newport Beach, CA  92660

6    Plaintiffs' Steering Committee Counsel:

7            Gallagher & Kennedy
             By: PAUL LINCOLN STOLLER, ESQ.
8            By: MARK S. O'CONNOR, ESQ.
             By: C. LINCOLN COMBS, ESQ.
9            2575 East Camelback Road, Suite 1100
             Phoenix, AZ  85016
10

11   Also for Plaintiffs:

12           Heaviside Reed Zaic
             By: JULIA REED ZAIC, ESQ.
13           312 Broadway, Ste. 203
             Laguna Beach, CA  92651
14
             Lieff Cabraser Heimann & Bernstein, LLP
15           By: WENDY R. FLEISHMAN, ESQ.
             250 Hudson St., 8th Fl.
16           New York, NY  10013

17           Babbitt & Johnson, PA
             By: JOSEPH R. JOHNSON, ESQ.
18           1641 Worthington Rd., Ste. 100
             W. Palm Beach, FL  33409
19

20   For Defendants:
             Nelson Mullins Riley & Scarborough, LLC
21           By: RICHARD B. NORTH, JR., ESQ.
             201 17th Street NW, Suite 1700
22           Atlanta, GA  30363

23           Snell & Wilmer
             By: JAMES R. CONDO, ESQ.
24           By: AMANDA C. SHERIDAN, ESQ.
             400 East Van Buren
25           Phoenix, AZ  85004
```

**P R O C E E D I N G S**

10:01:31   1

2

3          THE COURTROOM DEPUTY:  MDL 2015-2641, Bard IVC

4    Filters Product Liability Litigation.

16:13:27   5          Will the parties please announce.

6          MR. LOPEZ:  Good afternoon, Your Honor.  Ramon Lopez,

7    Lopez McHugh, on behalf of Plaintiffs Leadership Council.

8          MARK O'CONNOR:  Good afternoon, Your Honor.  Mark

9    O'Connor, Gallagher & Kennedy, on behalf of Plaintiffs

16:13:41  10   Leadership.

11         MR. STOLLER:  Afternoon, Your Honor.  Paul Stoller,

12   Gallagher & Kennedy, on behalf of plaintiffs.

13         MS. REED ZAIC:  Afternoon, Your Honor.  Julia Reed

14   Zaic, Heaviside Reed Zaic, on behalf of Plaintiffs Leadership

16:13:51  15   Council.

16         MR. NORTH:  Afternoon, Your Honor.  Richard North on

17   behalf of the Bard defendants.

18         MR. CONDO:  Good afternoon, Judge.  Jim Condo, Snell

19   & Wilmer, on behalf of the Bard defendants.

16:14:01  20         MR. LERNER:  Afternoon, Your Honor.  Matthew Lerner

21   on behalf of the Bard defendants.

22         MS. SHERIDAN:  Amanda Sheridan on behalf of

23   defendants.

24         THE COURT:  All right.  Good afternoon, everybody.

16:14:10  25   And to those who may be listening in on the phone, if we have

16:14:14  1    anybody today.

2            It is late in the day so I want to get through these

3     issues as efficiently as we can.  I'm going to go through the

4     issues in the order that they were in your joint report.

16:14:27  5            The first issue you raised was extending the expert

6     deposition -- it's starting to do it again -- expert

7     deposition deadline to March -- I'm sorry, July 31st.  I'm

8     going to approve that.  That will be in the order that comes

9     out after today.  So that will be extended.

16:14:48  10           The next item that you raised concerned bellwether

11    selection, and -- let me fix this mic.

12           I'll work with this one.

13           I have been through all of the materials that you

14    provided on bellwether selection.  I think maybe the most

16:15:24  15   efficient way to do this is for me to give you some initial

16    reactions and some tentative thoughts about it and let you

17    respond to those and shoot at any views I'm holding you think

18    are inappropriate.

19           Are you having a hard time hearing me?

16:15:43  20           MR. STOLLER:  No, Your Honor.

21           THE COURT:  Okay.

22           Let me walk through some initial reactions with

23    respect to the individuals who are potential candidates for

24    bellwether trials.

16:16:00  25           There are some that seemed to me to fairly clearly

16:16:02   1   fall out of the mix.  A few of them.  One is plaintiff King,

2   K-I-N-G.  Both because the defendants have a concern about

3   involvement by some plaintiffs attorneys in the treating

4   physician who became involved in that individual's treatment

16:16:24   5   and because there was a non-Bard recovery device used in the

6   recovery attempt.

7        I will tell you, I do not fault plaintiffs lead

8   counsel for what happened with the expert.  It does appear to

9   me that some of the information regarding the treatment by

16:16:45  10   this doctor, who apparently had been retained in some form by

11   the plaintiffs' expert, was known when King was selected, such

12   as the fact that there were images that hadn't been found or

13   identified.  I don't find any improper conduct on the part of

14   plaintiffs MDL counsel that would justify striking another

16:17:06  15   bellwether plaintiff from the group.  But I do believe that

16   that issue plus the use of a non-Bard device in recovery

17   suggests to me that King should not be a bellwether trial.

18        I also conclude that DeWitt should not be a

19   bellwether trial because I think there's too much that is not

16:17:30  20   known at this point about what's going to happen with

21   Mr. DeWitt.  He has surgery apparently planned for May.  It's

22   not clear what the outcome will be, how long lingering effects

23   from that could come, and I don't want to put somebody in for

24   a bellwether trial where there are still significant issues,

16:17:51  25   or significant information to be produced.

16:17:53   1          I'm also of the view that Mr. Mixson should not be a
           2   bellwether trial simply because I don't believe that that
           3   would be a fair representation of what the bellwether cases
           4   are.  He is an extremely sympathetic plaintiff being a double
16:18:10   5   amputee war veteran.  I think it would be hard for a jury to
           6   assess his case in the same way they would assess other cases.
           7   So I'm not of the view that that would be representative.  And
           8   I therefore think he should be excluded.
           9          There are several that I think probably should be
16:18:34  10   included.  Let me give those to you and then I'll identify the
          11   ones that I'm less certain about.
          12          Mulkey is one.  Both parties agree Mulkey should be a
          13   bellwether plaintiff.
          14          Hyde, I think, is another.  I know there is an issue
16:18:49  15   about the doctors' lawyers and how they handled the
          16   depositions.  Before ruling that the plaintiffs can redepose
          17   the doctors, I would want to look at those depositions and
          18   understand the arguments.  But Hyde appears to me to be fairly
          19   representative.
16:19:05  20          Incidentally, Mulkey is an Eclipse filter.  Hyde is a
          21   G2X filter.
          22          It appears to me that Jones is a fairly
          23   representative plaintiff with fairly representative problems
          24   with the device, as well as the fact that the filter remains
16:19:30  25   in place in the pulmonary artery, that it was installed

16:19:35  1    because of preexisting medical conditions.  So I feel Jones is

       2    fairly representative.

       3              I also view Kruse as a potential representative

       4    bellwether.  That is a G2 filter.

16:19:51  5              Of the three I mentioned so far -- Mulkey, Hyde, and

       6    Jones -- we would have two Eclipse and one G2X.  G2 is the

       7    filter Kruse received.  I think there's some benefits in Kruse

       8    in that Kruse is older, age 70.  I think it would be good to

       9    have a bellwether trial that includes an older plaintiff.

16:20:12  10             And I'm interested in your thoughts on this, but I

      11    think it might be helpful to have a bellwether trial where

      12    punitive damages are not in the mix.  I think that would help

      13    give us a fix on actual damages assessments when a jury isn't

      14    also weighing punitives.  And apparently Kruse would

16:20:30  15    potentially be governed by Nebraska law which doesn't allow

      16    punitive damages.

      17             I'm of the view that Booker is a representative

      18    candidate.  Booker, again, has similar problems that developed

      19    with the filter.  Booker is an open surgery plaintiff.  But I

16:21:01  20    think there should be at least one.  If the statistics are

      21    right that 6 percent of the MDL involved open surgery, I think

      22    it would be appropriate to have at least one.

      23             And that, if we were to go with those folks, would

      24    give us five individuals:  Mulkey, Hyde, Jones, Kruse, and

16:21:23  25    Booker.

16:21:24   1         And the ones that would be remaining to choose from,

       2    the three individuals, would include Nelson.  I shy away from

       3    Nelson a bit because Nelson is, it seems to me, very close to

       4    Jones in terms of what Nelson would bring to a bellwether

16:21:42   5    trial.  You know, it's an Eclipse filter, it was removed,

       6    they're about the same age, a strut remains.  Very similar to

       7    Jones.  So I'm not sure it would make sense to have Nelson

       8    included if we include Jones.

       9         There is Peterson, who I think is a candidate.  Now,

16:22:06  10    again, that's an open surgery case, but I think otherwise

      11    quite representative.

      12         Tinlin is another candidate who I think is

      13    representative.  Although, frankly, I have concerns just

      14    reading what you've all written about Ms. Tinlin and the

16:22:25  15    condition of her health.  She seems to have more health

      16    problems than any of the other individuals.

      17         There's apparently travel limitations on what she can

      18    do.  She apparently had difficulty in the deposition.

      19    Frankly, it concerns me requiring Ms. Tinlin to travel here

16:22:41  20    from out of state and sit through a trial, and I worry about

      21    whether she would be up to it given all of the rather serious

      22    health problems she has, so that is why I've been pausing

      23    there.

      24         Those are my initial reactions.  I'm interested in

16:22:56  25    your reactions to my reactions.  Why don't we start with

16:22:59   1   plaintiffs counsel.

2        MR. LOPEZ:  May I approach?

3        THE COURT:  Yeah.

4        MR. LOPEZ:  Your Honor, what I've given you is a

16:23:28   5   document that is actually Bard's filter case rating matrix.

6   In other words, this is how they broke down cases for purposes

7   of categorizing them for settlement purposes.  This is

8   something we've had for some time.

9        It's not that the plaintiffs agree with the way --

16:23:50  10   this is the way the cases should be broken down, but this

11   certainly shows you that the way Bard looks at these cases for

12   settlement purposes, that they have these separated by device

13   and by different categories of injury.

14        And it appears Your Honor has agreed with us on a

16:24:11  15   couple of these, that is that Nelson and Jones are basically

16   the same.

17        To understand my color coding, yellow are the cases

18   that were chosen by the defendants and the orange that is

19   highlighted were on the plaintiffs' original list.  Of course

16:24:27  20   I have King out there on the side because it does not fit into

21   the matrix.  I think Your Honor has already recognized that.

22        Hyde and Mulkey I circled as cases where both sides

23   have basically agreed, with the asterisk, of course, on Hyde,

24   which we can maybe talk about some other time.

16:24:47  25        I think my main concern, and I think Your Honor's

16:24:50  1   done a really good job in kind of parsing through what would

2   be representative cases, I understand your concern about

3   Mrs. Tinlin, but I can tell you this:  One of the main

4   purposes we do bellwether cases is -- those verdicts are never

16:25:09  5   what ultimately is paid.

6        For example, you know, I know that Bard had a case in

7   the TVM litigation that was a defense pick.  In other words,

8   they chose that to be their case to try.  So it was a case

9   where facts were favorable to Bard, and verdict was

16:25:27  10   $5 million.

11        Now, those cases do not settle for $5 million.  In

12   other words, sometimes you have to look at what is going to

13   motivate the parties to settle.

14        And I can just tell you my experience has been the

16:25:43  15   plaintiffs are always ready to settle cases, Your Honor.  The

16   question is how motivated is the defense to settle cases.

17        I think not only should they be representative, but

18   there should be some cases here that provide the plaintiffs an

19   opportunity to put on their best case.  The Recovery --

16:26:03  20   there's no Recovery filters represented in here except for

21   Mrs. Tinlin.  I understand Your Honor's concerned about

22   Mrs. Tinlin.  I think we can probably deal with that.  In

23   other words, if she can't travel, even if she can't testify, I

24   know we have the ability and I've seen cases tried where

16:26:19  25   doctors and even corporate witnesses go to a federal court

16:26:23  1   outside of where the MDL is and we have trial and they're on

2   videotape, live videotape, giving their examination as if they

3   were in trial.  Maybe we have to do that with Mrs. Tinlin.

4            All I can do is assure you that if Mrs. Tinlin has to

16:26:41  5   travel that the plaintiffs counsel and our committee will make

6   sure that she is as comfortable here as she would be if she

7   were home.

8            And, again, if health issues become something where

9   she can't be here every day, we can resolve that.

16:26:56  10            My main concern is we have to try a Recovery filter.

11   Plaintiff's case -- all of these devices -- just so Your Honor

12   understands, all of the devices that come after the Recovery

13   filter are all -- the Recovery filter is the predicate device

14   for all of these.

16:27:15  15            Whether or not the Recovery filter should have been

16   released or put on the market or stayed on the market becomes

17   very important for whether or not the subsequent devices

18   should have ever been released or cleared for marketing.

19            The other thing is that it's been our position, and

16:27:33  20   so far judges have agreed with us, that in every subsequent

21   quick case, whether it be a G2 or Eclipse, I can't speak to

22   Denali or Meridian because we haven't had that come up yet, is

23   that all evidence that relate to the Recovery case come into

24   evidence because of the history where you progress through all

16:27:53  25   of these different iterations of the devices.  And there's no

16:27:59   1    question that the case that would cause the defendants the

2    most pause would be the Recovery case.  I mean, the evidence

3    in that case, conduct in that case, the quality of the design

4    in that case is one that would be very concerning, I think, to

16:28:18   5    Bard.  We've tried one of those in Reno.  We never went to

6    verdict, but, you know, I don't want to go into issues

7    surrounding that case.  But if, as you look at this chart and

8    as you look at how Bard has actually -- they actually evaluate

9    these cases by not only the type of injury but whether or not

16:28:39  10    it involved a Recovery filter or G2 filter.

11         In the end, Your Honor, for these cases to

12    successfully resolve, we've got to find out the value that a

13    jury would put on those hundred, whatever the number ends up

14    being, of the Recovery cases because those are the cases that

16:29:00  15    are going to require the most amount of money, I think, to

16    resolve or those cases are all going to opt out of settlement

17    and try.

18         THE COURT:  Let me ask you a question on that point,

19    Mr. Lopez.  If it's true, as you just said, that all of the

16:29:11  20    evidence about Recovery will come in in the other trials, and

21    if it's true, as you have asserted other times in this case,

22    that Recovery is essentially the same thing as Eclipse, why is

23    it so necessary to try a Recovery case?

24         MR. LOPEZ:  It's actually the G2 that essentially --

16:29:29  25    the G2 --

16:29:30   1          THE COURT:  I meant G2.  Right.  The next one.  The

         2   next iteration.

         3          MR. LOPEZ:  Because the Recovery case is its own

         4   unique case.  I mean, the evidence surrounding the Recovery

16:29:41  5   case and what the value of that case would be is completely

         6   different from all of the subsequent iterations.  They got a

         7   little better as they went on.

         8          Again, if this is ten percent of the cases, I mean,

         9   there's kind of a rule of thumb that, you know, 20 percent of

16:29:58 10   the cases represent 80 percent of the value in a mass tort.

        11   And that usually happens.

        12          In other words, in order for us to determine what

        13   amount of money should Bard pay to settle these cases, we

        14   better have a good handle on what the values are of the

16:30:16 15   Recovery cases or global settlement will never happen in this

        16   case.  I mean, it's vitally important that a Recovery case go

        17   to trial and that we determine what a jury will do with that

        18   evidence without getting into the transition to the G2.

        19          THE COURT:  Okay.  Did you want to make any other

16:30:33 20   points?

        21          MR. LOPEZ:  That's it for now, Your Honor.

        22          THE COURT:  Okay.  Thanks.

        23          MR. NORTH:  Thank you, Your Honor.

        24          If I could just focus on the three that the Court is

16:30:47 25   still considering.  And I think we're willing to accept the

16:30:52  1    first five the Court indicated, without further argument or

2    discussion.  But on the other three, for the sixth position,

3    if I could take them first with Ms. Tinlin.

4         Your Honor, as the Court indicated and as the papers

16:31:05  5    demonstrated, I hope, Ms. Tinlin has very, very debilitating

6    multiple sclerosis.  And that's important not only because of

7    the inconvenience and travel factors that the Court mentioned

8    and that Mr. Lopez referenced, but it's also very important,

9    we submit, as a sympathy factor.  Because it is certainly

16:31:24 10    different than Mr. Mixson, what he brings to the table as far

11    as sympathy.  But the poor Ms. Tinlin is so *in extremis* from

12    her MS that I believe it's going to be hard for a jury to

13    reach a decision unbiased by that.  And we would submit that

14    that's not a good selection for a bellwether case given that

16:31:45 15    unusual factor.

16         There are also some very unusual medical issues that

17    we've never seen before that would have to be focused on in

18    her case.  And that's the fact that she claims that a number

19    of symptoms and problems she's had since the surgery are

16:32:02 20    related to the filter that has now been removed, where we

21    believe that it has to do -- there's sequelae from her

22    multiple sclerosis.  So we're going to have to have unusual

23    medical experts that are going to produce a number of issues

24    in front of the jury that no other case will.

16:32:22 25         Also, if you added Tinlin to the mix that will be the

16:32:25  1    second open surgery case out of six bellwethers.  In addition

       2    to the Booker case, which the Court has already mentioned as a

       3    probable selection.

       4            As we indicated in our papers, only six percent of

16:32:38  5    all of the cases are surgery of any sort in this MDL.  But a

       6    more telling statistic is that only two percent of the 1330

       7    cases that we were able to analyze as of March 29th, two

       8    percent were open heart surgery.  If we had both Ms. Booker

       9    and Ms. Tinlin, that would be two.  One-third of the

16:33:03 10    bellwether selections representing the two percent in the MDL

      11    who had the most extreme result, open heart surgery.

      12            The last point, and one raised by Mr. Lopez, is the

      13    need for a Recovery filter case.

      14            I understand his point, but the fact of the matter is

16:33:23 15    we have tried two Recovery filter cases, albeit outside of the

      16    context, of course, of this MDL.  I tried one in Maricopa

      17    County approximately four years ago against other counsel.

      18    Mr. Lopez and I tried a Recovery filter case in Reno, Nevada

      19    in front of -- Nevada in front of Judge Jones for

16:33:42 20    approximately a little over two weeks before the case settled.

      21            We have some experience.  My client has some

      22    experience with evaluating Recovery filter cases.  What we

      23    don't have is any experience in evaluating the other

      24    later-generation filters.  None whatsoever.  And as the

16:34:00 25    statistics show, as of March 29th, Recovery filters made up

16:34:06  1    only 10 percent of this MDL and the subsequent generations

2    make up 90 percent.

3              For all of those reasons, Your Honor, we would submit

4    that Tinlin is not an appropriate sixth bellwether pick.

16:34:22  5              If I could turn to Nelson for a moment, Your Honor.

6    And if I could respectfully submit I disagree a bit that it's

7    identical to Jones for one reason.  It's a different filter.

8              In many ways, the configuration of the Eclipse and G2

9    were identical.

16:34:39  10             THE COURT:  I show Jones and Nelson both having

11   Eclipse.

12             MR. LOPEZ:  That's what I have.

13             MR. STOLLER:  That's what we have.  Both Eclipse.

14             MR. NORTH:  I'm sorry, Your Honor, my data must be

16:34:49  15   wrong here.

16             I apologize for that, Your Honor.  I had a chart that

17   had the wrong filter.

18             THE COURT:  That's fine.

19             MR. NORTH:  Nelson is not a surgery case.  Peterson

16:35:04  20   is a surgery.  And it's an unusual surgery.  It's an open

21   abdominal surgery, which does occur in a number of these

22   cases, but the only particular complication in that case is

23   perforation.  Or the principle one.

24             THE COURT:  In which case?  Peterson?

16:35:20  25             MR. NORTH:  Peterson.

16:35:20  1          So it is unusual.  And also, if we add Peterson to

2     the mix, we have two percent -- I mean we have two, still, of

3     the six cases with any sort of open surgery when only six

4     percent of the entire MDL is open surgery.

16:35:36  5          There's no question that in the inventory of these

6     cases the open surgery, I think from both sides' perspectives,

7     are the most valuable cases just as to settlement value and

8     potentially verdict value.  But to skew the bellwether pool

9     when only six percent are on that extreme with one-third of

16:35:57  10    the bellwether pool would not be helpful, in our view, and we

11    believe in that circumstance it would be better to take

12    Nelson, even with a similarity to Jones, because Eclipse and

13    G2 together represent over 60 percent in this inventory.  And

14    then also they're both fractures, which represent 25 percent

16:36:17  15    of the cases.

16          So we would submit that that's a better selection

17    because they're average run-of-the -- not run-of-the-mill, of

18    course, but average representative complications involving the

19    most represented filters, as opposed to the outlier of a

16:36:35  20    second surgery.

21          Thank you, Your Honor.

22          THE COURT:  Okay.  Thanks.

23          MR. LOPEZ:  I know it's late in the day.  Can I make

24    just one point I forgot?

16:36:41  25          THE COURT:  Yes.

16:36:42  1          MR. LOPEZ:  Main reason I gave you that chart, and I

       2     didn't even point it out, if you look at this chart, again,

       3     this is the way Bard has assessed these.  You can see right

       4     now that these cases, including the ones that Your Honor

16:36:53  5     believe should be on here, are weighted way towards the Level

       6     3 and 4 cases.  The only case that is on the Level -- solidly

       7     Level 2 and Level 1 case right now is Booker.

       8          I mean, Tinlin is the only case -- I agree with

       9     Peterson.  We've got two Eclipse cases, we don't need a third

16:37:14 10     Eclipse case.  But I think we need a Recovery case.  And,

      11     again, I think it's important, it's one of the things that we

      12     see in the complex manual and in other areas where judges have

      13     looked at bellwether cases.  You have to look at a range.  If

      14     Tinlin is a high-range case, we ought to find out what that

16:37:34 15     value is.

      16          And, again, according to Bard's own matrix it's the

      17     only Level 1 case on here that's not an Eclipse case.  So I

      18     think that is very important.

      19          Again, if you look at this chart, it is very much

16:37:47 20     weighted already on the low-level cases.  We just want to put

      21     two out of the six, maybe, on the higher level.  So that means

      22     in Level 1 and one that straddles between Level 1 and Level 2.

      23          Thank you, Your Honor.

      24          THE COURT:  Okay.  Thanks.

16:38:03 25          Give me just a minute here, Counsel.

16:39:07 1        Okay.  What I want to do is think about this a bit

2    more.  I understand your positions.  I want to give this some

3    additional thought.  It's one of the more important decisions

4    I'll make in the case.  But in the order that comes out from

16:39:21 5    today I'll indicate the choices for the bellwether trials.

6        In terms of the order of the bellwether trials, I

7    guess the question I have is how critical in your view it is

8    that we pick the order now?  I mean, we're going to do the

9    discovery in all of them, we're going to do the expert work in

16:39:41 10   all of them.

11        It seems to me we may have a better sense, once we're

12   through that, as to how long each trial will take.  And my

13   view is we're going to try these six.  Certainly we want to be

14   representative up front, but I don't know how to rank them in

16:40:01 15   terms of which should go first now.  I think I'll know that

16   better when we've been through the expert work and the

17   discovery.  Do you all have any disagreement with that?

18        MR. LOPEZ:  No, Your Honor no.

19        MR. NORTH:  No, Your Honor.  Sounds good.

16:40:14 20        THE COURT:  I think what I want to do is block out

21   some trial time on the calendar, and we'll fill it in with a

22   trial.  I guess the question I have for you both is how long

23   these trials are going to take?  Recognizing that I usually

24   give parties about half the amount -- well, I shouldn't tell

16:40:32 25   you that now.

16:40:34   1        We will run a very efficient trial.  It will be --

       2   I'll give you enough time, but we're going to get through five

       3   and a half hours of trial time a day and really get this thing

       4   tried and not have it --

16:40:46   5        MR. LOPEZ:  I'm all for hour restrictions.

       6        THE COURT:  I will do that.  I mean, you just heard

       7   me give the time to the other counsel.  I do that in every

       8   civil case.  I'll put you on a clock because that does wonders

       9   for efficiency of examination.

16:41:03  10        Generally, what are you thinking in terms of length

      11   of trial in these cases?

      12        MR. LOPEZ:  I'm not going high --

      13        THE COURT:  Okay.  That's fine.

      14        MR. LOPEZ:  I'm telling you what I know it takes to

16:41:11  15   try these cases.

      16        THE COURT:  Mic, please.

      17        MR. LOPEZ:  Oh.  Sorry.  Thirty-five hours.  I know

      18   it will take us 35 hours at a minimum to put on our case.

      19        THE COURT:  Just the plaintiff?

16:41:23  20        MR. LOPEZ:  Just the plaintiff case.

      21        THE COURT:  How do you get there?

      22        MR. LOPEZ:  I mean just basing it on where we were in

      23   our case in front of Judge Jones.  Judge Jones, he does not --

      24   he was pushing us, pushing us, pushing us.  And we got to day

16:41:40  25   11 and we probably had three or four more days left.  But we

16:41:45  1    were getting probably six, at least six hours a day in with

2    the jury.  We were there at 9 o'clock sharp, our breaks were

3    short, our lunch was short.  We were probably getting six

4    hours of jury time a day.  So we were already 66 hours into

16:42:03  5    that trial by the end -- we tried it for ten straight days

6    with a weekend in between.  So we were about 60 to 65 hours

7    into that trial by the end of day 2.  I think we had --

8    Richard could probably tell you better than I.  I think the

9    defense had at least another two or three days left in the

16:42:21 10    trial.

11         MR. NORTH:  Your Honor, I'm having troubles with the

12    math to figure out what's 35 hours each side would be.

13         THE COURT:  Thirty-five hours each side would be

14    about six and a half trial days.  I'm sorry, would be twice

16:42:37 15    that much.  Thirteen trial days.

16         MR. NORTH:  I was going to say three weeks, Your

17    Honor.  I was thinking in terms of weeks, which is, I believe,

18    equivalent there.

19         THE COURT:  Okay.  That gives me a sense.  Thank you.

16:42:48 20         Let's talk about other matters that you all raised.

21    With respect to the Bard motion for summary judgment that has

22    been filed, my understanding, this is a side issue initially,

23    but my understanding is plaintiffs want to respond to the

24    motion to seal.  Is that right?

16:43:09 25         You filed a document saying we want a date to file a

16:43:12  1   response to the motion to seal that was filed with the motion

2   for summary judgment.

3          MS. REED ZAIC:  I think what we requested, Your

4   Honor -- Julia Reed Zaic, for the record.

16:43:20  5          I think what we requested is to put the briefing

6   schedule on the same track as CMO 22, because initially when

7   it was filed, according to the rules, we would have had to

8   respond right away.  I mean, in accordance with the rules.

9   But rather than -- put it on the same track --

16:43:34  10         THE COURT:  Do you want to respond to the motion to

11  seal?

12         MS. REED ZAIC:  I believe we do.  I think we can do a

13  meet and confer and probably come to agreement, as we have in

14  other cases, as to the documents we agree on that would be

16:43:45  15  under seal.

16         THE COURT:  Let's do that.  Let's have you confer.

17         MS. REED ZAIC:  We can do that.

18         THE COURT:  That's something you ought to be able to

19  agree on, what's sealed and what's not.  Anything that needs

16:43:55  20  to be redacted can be redacted, but we need -- I can't

21  remember if you filed a motion in the public docket or not.

22  Was your motion filed on the public docket with redactions?

23         MR. NORTH:  Public document.  My understanding is we

24  lodged the documents under seal.

16:44:10  25         THE COURT:  But you didn't file a redacted version of

16:44:12   1    your motion in the public docket?

         2              MR. NORTH:  No.

         3              THE COURT:  We need to do that.  But that ought to

         4    happen after you confer and decide what is and is not sealed.

16:44:22   5    As much as the public can see, it needs to see of a motion for

         6    summary judgment in the Ninth Circuit.

         7              MR. NORTH:  Okay.  Thank you.

         8              THE COURT:  Now, as to the motion, as long as you're

         9    standing, what's wrong with the plaintiffs' suggestion that we

16:44:38  10    first address whether you would be entitled to prevail if all

        11    of your facts were taken as true?  They seem to think on the

        12    law you lose even if your facts are true.

        13              I know that's a little more of a lengthy process

        14    because if I say no, I think they win on the law if their

16:44:54  15    facts are true, then they want to be able to controvert your

        16    facts and we arguably do it again.  But if the alternative is

        17    an overall longer process, I guess I'm interested in your

        18    thoughts what's wrong with that notion.

        19              MR. NORTH:  Your Honor, first of all, we would submit

16:45:11  20    that that is essentially -- if I could come to the podium.

        21              THE COURT:  Yeah.

        22              MR. NORTH:  For them to prevail on a preliminary

        23    motion that's based -- premised on the notion that all of our

        24    facts are accepted as true, we believe would require a

16:45:29  25    categorical ruling that there can be no preemption,

16:45:32 1   essentially, in a 510(k) device.  We believe the law's already

2   fairly clear on that to the contrary, that the Ninth Circuit

3   has held, for example -- it was later vacated, but in the

4   *Degelman* case they held that the 510(k) product could be the

16:45:51 5   subject of federal preemption.

6        Justice Breyer, in his concurrence in *Medtronic*

7   *versus Lohr*, and he was the fifth vote on the preemption -- no

8   preemption for the medical devices.  In that particular vote

9   he said specifically in his concurrence that of course there

16:46:08 10  can be preemption in a 510(k) situation.

11       We believe that decision has already -- or the law is

12  already clear on that fact, that they cannot establish that

13  categorically there's no preemption in 510(k) devices.

14       So then the question is, okay, why would we not agree

16:46:29 15  to go forward with that, because we believe we would prevail.

16  What we're concerned about, Your Honor, now, is extending this

17  whole process an undue amount of time, because if they brief

18  that and the Court decides that, we're talking about a couple

19  of months, I would suspect, at a minimum to go through the

16:46:50 20  briefing on their motion, that schedule, and then for the

21  Court to rule, and that's being optimistic.  Then we're two

22  months down the line.

23       At that point, if we were to prevail on that issue,

24  in other words that you can't say categorically no preemption

16:47:06 25  in a 510(k) process, then they would want to then controvert

16:47:11   1   our facts.

2              They then would be coming to court, as they have at

3   this point already, saying we need to do all of this

4   discovery.  That's going to take additional time.  And then

16:47:21   5   they're going to file their brief and the briefing's going to

6   be complete.

7              We believe this particular schedule and track needs

8   to be in line with the way the rest of this MDL is proceeding,

9   which appears to be toward a trial in the fall.  And for that

16:47:36  10   to happen, we believe the sequencing that they're proposing

11   with two separate motions is going to make that virtually

12   impossible and put us in a situation where either we have to

13   delay a trial until the preemption schedule completes, or else

14   we're going to have to go to trial with the question of

16:47:56  15   whether this -- these claims preempted still unresolved.

16             So we believe the most efficient track is to do it

17   all at once in one motion.  We file it, they can respond,

18   complete briefing, and then proceed to a decision so that

19   everything remains on schedule and on track.

16:48:15  20             THE COURT:  Okay.

21             Mr. Lopez.

22             MR. LOPEZ:  I think I understood him, Mr. North, to

23   say that if we do this in the manner in which we suggested in

24   which the Court has asked about that, if we win preemption all

16:48:35  25   of a sudden we're going to have some factual issues --

16:48:38   1          THE COURT:  I don't think that's what he's saying.

2          MR. LOPEZ:  I didn't understand.

3          THE COURT:  Let's say we go your way and I look at

4   the briefing and I say, no, Mr. Lopez, I can't rule in your

16:48:46   5   favor based solely on the law.  Which is what you think I

6   might be able to do, assuming we get there.

7          Then I think your understanding is, or your argument

8   is, I shouldn't grant their motion at that point, I should

9   then give you a chance to respond on the facts.  And my point

16:49:00  10   is we then do the briefing over again, which will be after

11   some -- if I agree with your 56(d) affidavit, it will be after

12   some form of discovery and we're going to push this thing out

13   into the fall before we get it resolved.

14          MR. LOPEZ:  I hear you.

16:49:16  15          I think I understand -- I think in both instances, in

16   other words, if you say we're going to do our factual

17   discovery and then we'll be able to counter their facts and

18   also maybe cross-notices as a legal issue, it's still going to

19   extend this time out for us to do that additional discovery.

16:49:34  20   And I know it's -- I'm not sure it extends it out any more

21   than if we were to allow Your Honor to look at this from a

22   legal perspective based on the current record and then you say

23   you can't make this ruling without facts so now do your

24   factual discovery.  I -- I don't know that that extends the

16:49:54  25   time period out any greater.

16:49:57  1        In other words, we either do the discovery now, we do

2   our briefing, and then three months from now you rule on this

3   motion based on these additional facts or maybe on the law, or

4   maybe you rule as a matter of law in the next six weeks.  And

16:50:14  5   if we win, plaintiffs win, there's no preemption, we never

6   have to do that factual discovery.

7        THE COURT:  Is Mr. North right that the argument you

8   would be making on the law is that 510(k) can never result in

9   preemption?

16:50:37  10        MS. REED ZAIC:  We'll tag team, Your Honor, with the

11   Court's indulgence.  That would not be our position.  The

12   cases Mr. North has cited, or the defense has cited, in their

13   briefing, there are some cases, very few, that have held there

14   is preemption for 510(k) cleared devices.  We think those

16:50:52  15   cases are clearly distinct from the situation before the

16   Court.

17        THE COURT:  So you would say that there can be no

18   510(k) preemption given the facts that Bard has presented?

19        MS. REED ZAIC:  Well, the issue is the special

16:51:08  20   controls, which they brought to the -- they've put at issue.

21   There's -- could go both ways.  The interpretation of special

22   control we would need expert discovery on.  I don't think it

23   would extend briefing out if those additional facts were

24   needed or evidence would be required by the Court because

16:51:24  25   we're doing that discovery anyway, and presumably we're going

16:51:27   1    to have, at the end of this hearing or the next one, a

           2    schedule to do dispositive motions, and that's what this is.

           3            I might also add, to close the loop on the other

           4    cases that have found for preemption, the ones where the

16:51:40   5    motion papers were done on a motion for summary judgment, it

           6    was at the end of discovery, including expert discovery.

           7            THE COURT:  Okay.  A second question for defense

           8    counsel, whichever of you wants to respond on this.  I'm

           9    sorry.  For plaintiffs' counsel.

16:52:00  10            In the joint status report, the plaintiffs indicated

          11    that you would want discovery, including expert disclosures,

          12    to address the PMA and 510(k) process, to discuss special

          13    controls, to address Bard's interaction with the FDA, and the

          14    actual FDA clearance process for Bard's IVC filters.

16:52:29  15            Here's the question.  I was a bit surprised when I

          16    read that because it's been evident, I think, from the start

          17    of this case that preemption is going to be a big argument

          18    Bard's going to make.  We finished fact discovery.  At least

          19    some of this sounds like fact discovery.

16:52:47  20            Are plaintiffs saying we want to do additional fact

          21    discovery on preemption that we didn't do during the fact

          22    discovery period?

          23            MS. REED ZAIC:  I think Mr. Lopez's declaration

          24    states that the two individuals -- the additional discovery,

16:53:01  25    if we go that route, would be the two declarants.  They have

16:53:05   1    been deposed previously.  However, not necessarily in this

       2    capacity.

       3              THE COURT:  So that's the only factual discovery

       4    you're saying would be needed if I were to grant --

16:53:18   5              MS. REED ZAIC:  Well --

       6              THE COURT:  -- factual discovery?

       7              MS. REED ZAIC:  Yes, Your Honor.  The total package

       8    of discovery, if we were to continue on that route, would be

       9    the two declarants and to finish expert discovery.

16:53:29  10              THE COURT:  And is the expert discovery that's

      11    already planned going to be addressing the preemption issue?

      12              MS. REED ZAIC:  Yes.  I'm going to defer that to

      13    Mr. Lopez and his declaration.

      14              MR. LOPEZ:  First of all, the issue of preemption for

16:53:45  15    the last six or seven years that we've been litigating this

      16    case has never come up.

      17              As a matter of fact, none of the experts that Bard's

      18    retained has ever addressed this issue in any report or

      19    suggested that there's something special about this 510(k)

16:53:59  20    that makes it look more like a PMA and gives it -- raises it

      21    to that level.  Never.  In fact, it's not in any of the expert

      22    reports from the defense now.

      23              So, I mean, this has really been raised for the first

      24    time at this level by the defense.  I mean, the battleground

16:54:16  25    here, Your Honor, has always about the *Cisson* and the *Huskey*

16:54:21  1    issue, and that is whether or not that process can even come

       2    into trial because of all the things the *Huskey* and *Cisson*

       3    courts say as to why it should not.

       4           So I think Ms. Reed Zaic is correct.  These two

16:54:37  5    deponents have never been deposed on the issues they raise in

       6    their declaration.  At the very least, we would want to have

       7    the opportunity, if we were going to do fact discovery, to

       8    take their depositions.  And certainly we have experts,

       9    Dr. David Kessler, a former commissioner at FDA, as well as

16:54:53 10    Dr. Suzanne Parisian, who used to work in this division.  Not

      11    that we'd use both, but we'd certainly have both available to

      12    us to address the issue.

      13           Again, there are issues that are mentioned in the

      14    defense expert reports about special controls but nothing in

16:55:13 15    an expert report, including the ones that were just served, I

      16    don't know, within weeks, two or three weeks ago, raises this

      17    issue that somehow or other this 510(k) process is different

      18    than a 510(k) process as discussed and addressed in *Lohr*,

      19    L-O-H-R.

16:55:49 20           THE COURT:  Am I correct, Mr. Lopez, that your expert

      21    deposition -- I'm sorry, expert designation deadline was back

      22    in March and you didn't address this in those experts?  Right?

      23           MR. LOPEZ:  That we --

      24           THE COURT:  You've not put forward any experts yet on

16:56:04 25    this issue; is that --

16:56:05  1          MR. LOPEZ:  Well, I mean, we have to the extent that

       2   there's a distinction between a 510(k) and PMA.  But the issue

       3   as to whether or not this 510(k) somehow or another makes us

       4   different than what *Lohr* stands for, no.  This issue's never

16:56:23  5   come up.  Ever.

       6          THE COURT:  So you'd be asking for additional expert

       7   disclosure opportunities besides those that have already been

       8   set?

       9          MR. LOPEZ:  Well, we would want an expert to address

16:56:35 10   what the factual declarations, and, frankly, some of the

      11   opinions by some of these witnesses, by the two witnesses, in

      12   opposition to this motion, sure.

      13          THE COURT:  Okay.  Thanks.

      14          Mr. North, did you want to say anything else on this

16:56:52 15   issue?

      16          MR. NORTH:  Yes, Your Honor, if I could briefly.

      17          I don't think I addressed the -- what discovery would

      18   be necessary.  We were talking about filing a preliminary

      19   motion.

16:57:02 20          THE COURT:  Right.

      21          MR. NORTH:  I would point out, Your Honor, it's our

      22   belief, based on all the law we've read, that this is not a

      23   matter for expert testimony or expert opinions or expert

      24   reports.  We have filed our motion without any expert opinion

16:57:17 25   support.  It is based on two employees of Bard who set forth

16:57:21  1    the facts of what the FDA --

2              THE COURT:  Let me interrupt you, Mr. North, to ask a

3    question on that since it's two minutes to 5:00.

4              There's no basis upon which I can preclude them from

16:57:33  5    offering an expert report in response to a motion that doesn't

6    have an expert, is there?  I mean, setting aside discovery

7    scheduling issues.  There's no basis upon which I can say,

8    well, they didn't use an expert in their motion so you can't

9    use one in your response.

16:57:48  10             MR. NORTH:  Not framed that way, Your Honor.  But in

11   this particular context I believe you can, for this reason.

12   What they want to put in front of you is an expert report as

13   to whether there should be preemption, and that's a legal

14   conclusion.  We cited a number of cases.  There's an on-point

16:58:04  15   case from a district court Judge in New Jersey --

16             THE COURT:  I don't disagree they can't give legal

17   conclusions.  But I'm betting their view is that's not what

18   they're going to use these experts for.  They're going to

19   address the 818 paragraphs that you -- of factual statements

16:58:21  20   that you attached to your motion.  Which I think might be a

21   record.  I'm not sure.

22             MR. NORTH:  I assume the courts --

23             THE COURT:  What I forgot to do in this case that I

24   typically do in standard cases is a ten-page limit on factual

16:58:34  25   statements.

16:58:37  1        MR. NORTH:  We've got 13 years, Your Honor, six

2    devices --

3        THE COURT:  I know.

4        MR. NORTH:  -- and hours and hours of work.

16:58:43  5        THE COURT:  Well, so your basis for saying I can tell

6    them now no experts is that you are convinced that they would

7    be inadmissible legal opinions?

8        MR. NORTH:  Right.  Because this is a question of

9    law.

16:58:54 10        And then on the factual basis they point out deposing

11   those two witnesses, you know, they're correct they haven't

12   deposed them on those subjects specifically.  But the fact of

13   the matter is that's really not what Rule 56(d) is for.  It's

14   when you did not get the opportunity.  When the motion is

16:59:10 15   filed premature.  And there are a number of Ninth Circuit

16   cases that say once discovery's closed, you can't go back and

17   reopen it.

18        THE COURT:  Well, but what about Mr. Lopez's point

19   that they have not seen you make this preemption argument

16:59:23 20   before, so there wouldn't have been a reason for them to ask

21   those witnesses those questions.

22        MR. NORTH:  Your Honor, my response to that would be

23   we have made preemption arguments before.  Not on this global

24   level, I concede that.  But we have made preemption arguments

16:59:39 25   in a number of cases over the years, depending on the facts

16:59:42  1    and circumstances.

2              But, secondly, this is just -- would be discovery

3        about the facts of the interaction between the FDA and Bard.

4        And that's been at issue from the beginning.  Whether anybody

16:59:57  5    claimed it's preemptive or not is another matter, but --

6              THE COURT:  Well, have you ever in the cases that

7        preceded the MDL argued for summary judgment on the basis of

8        preemption, based on the 510(k) process?

9              MR. NORTH:  I believe we have as to a warning claim

17:00:14  10   in one or two cases, but I don't believe it was in a case

11       handled by these particular individuals.  I'd have to go back

12       and check over the 12 years we've had cases, Your Honor.

13             THE COURT:  Okay.

14             MR. NORTH:  Thank you.

17:00:27  15   THE COURT:  All right.

16             I want to think about this issue as well.

17             I will include my ruling on this in the order that

18       comes out.

19             By the way, before we leave, remind me to come back

17:00:41  20   to the fact that today I think you submitted your discovery

21       protocol for Bellwether Group 1, so I've not read that, but I

22       want to find out what's -- if there are disagreements there.

23             You talked about a potential schedule for *Daubert* and

24       Discovery Group 1 motions for summary judgment.  You seemed, I

17:01:07  25   think, maybe I was misreading it, to suggest there's going to

17:01:10   1   be motions for summary judgment with respect to everybody in

2   Discovery Group 1.  If that's what you suggested, I didn't

3   understand that.  It seems to me what we do is do summary

4   judgment briefing on the bellwethers.  Are you seeing it

17:01:21   5   differently?

6           MR. NORTH:  On the bellwethers only, Your Honor.  I'm

7   sorry.  We may have misspoke on that.

8           THE COURT:  Give me your best guess, I know it's a

9   guess but I'm interested in the guess, of the number of

17:01:38   10   *Daubert* motions I'm going to be having to deal with in this

11   case.  I looked and I saw 20-plus experts that have been

12   designated, so I really want to get an idea.  Are we going to

13   be dealing with twenty *Daubert* motions or are we going to be

14   dealing with three or four?  That will have a lot of effect

17:01:54   15   upon when I can schedule this stuff because I'm not going to

16   have you brief it and then sit on it for months.  I want to

17   get them decided when I can.

18           MR. NORTH:  Your Honor, it's obviously difficult to

19   say with certainty because we have yet to depose a lot of

17:02:25   20   these witnesses, but I would suspect between five and eight

21   right now.  I think they have 14 or -- 12 or 14 experts.

22           THE COURT:  Okay.

23           Mr. Lopez, what do you think?

24           MR. LOPEZ:  I would say based on the reports that

17:02:43   25   I've seen from the defense, there's probably not one we won't

17:02:47  1    file some kind of motion that's related to *Daubert*.  Maybe not

2    to knock the witness out but to deal with some of the *Daubert*

3    issues that form the basis of some of their opinions to get

4    some of the opinions knocked out.  I would say right now it

17:03:02  5    looks like we've got grounds to file in all their cases.

6              THE COURT:  How many witnesses?

7              MR. LOPEZ:  I don't know.  Twelve.  Is it 12?

8              THE COURT:  So you think you'll be filing 12 *Daubert*

9    motions?

17:03:13  10             MR. LOPEZ:  Well, it looks that way, Your Honor.

11             THE COURT:  Okay.

12        I'm going to put that into the mix when I give you my

13   ruling after this hearing.

14        I'm going to set the science day at some point before

17:03:31  15   we're going to hear arguments on those motions, and it will be

16   closer in time rather than farther away.  I want to have that

17   stuff in mind when I hold the hearings.  We might even do it

18   as the first day of a couple of days of hearings on all of the

19   motions, depending what can be scheduled.

17:03:48  20             MR. LOPEZ:  Your Honor, just one point.  I think we

21   may have underestimated the amount of time we probably would

22   need.  I think we said 90 minutes.  I think that's going to be

23   a longer day.  I'm thinking maybe three hours each side.

24             THE COURT:  All right.  Well, I thought your

17:04:12  25   estimates were a little light when I read it.

17:04:15  1          MR. LOPEZ:  I can tell you the Cook MDL was a full

       2   day, and they only have two devices.

       3          THE COURT:  All right.  On remanding the mature

       4   cases, I don't see a reason to decide that now.  It should

17:04:33  5   happen post *Daubert*, clearly.  And if I'm really looking at 20

       6   *Daubert* motions, given what else I've already got scheduled in

       7   the fall, I don't know when we're going to get post *Daubert*,

       8   so I don't know when we're going to be remanding those cases,

       9   so that will remain on the to-do list we'll talk about at the

17:04:55  10   next status conference.

      11          But one other question.  Are you anticipating, on

      12   either side, that you're going to request an evidentiary

      13   hearing in connection with a *Daubert* motion?  Or are you

      14   expecting that I can rule on the briefing?

17:05:12  15          MR. LOPEZ:  Well, Your Honor, one of the -- we've

      16   been going back and forth about when this issue would be ripe.

      17   I mean, we've got -- one of the issues I think we've got to

      18   resolve, and this may have something to do with *Daubert*, and

      19   maybe not.  It will deal with the scope of some of the

17:05:32  20   experts' testimony, and that is how Your Honor is going to

      21   rule on plaintiffs' motion per *Cisson* and *Huskey*.  And that

      22   is, how much of that process, that 510(k) process, is even

      23   relevant in the case and how much of it needs --

      24          THE COURT:  What is your motion going to argue?

17:05:53  25          MR. LOPEZ:  The motion's going to argue that the

17:05:57   1   510(k) process -- this is, I think, a quote from *Cisson*, is

2   not -- the burden -- I'm sorry.  The probative value is

3   outweighed by its relevance, its tendency to confuse, its

4   misleading nature --

17:06:13   5          THE COURT:  But you're going to argue no 510(k)

6   evidence should come in?

7          MR. LOPEZ:  Or any FDA evidence should come in.

8          THE COURT:  Now explain to me why that links to the

9   *Daubert* stuff?

17:06:24  10          MR. LOPEZ:  Well, because a lot of their experts deal

11   with that issue.  Maybe that's not a *Daubert* issue.  I thought

12   you asked me about evidentiary hearing.

13          THE COURT:  Well, I'm thinking about *Daubert* hearings

14   where experts come and testify about whether a methodology

17:06:42  15   used by an expert is or is not generally accepted and does or

16   does not satisfy the Rule 702 requirements.

17          MR. LOPEZ:  We've not done it.  I don't anticipate

18   it.  There's nothing that screamed at me from looking the

19   reports, history of the experts.  Most of these experts are

17:06:59  20   experts we've dealt with before, so I would say not likely

21   from the plaintiffs perspective.

22          MR. NORTH:  Your Honor, on behalf of defendants, as

23   of today I don't anticipate requesting a hearing.  We may

24   change our mind on one or two experts after we take their

17:07:14  25   depositions because they have named a number of new experts

17:07:18  1    we've never seen before.  But my present belief is that we

2    would not be requesting a hearing.  Of course, unless the

3    Court desired one.

4          THE COURT:  That is not what I was suggesting.  But

17:07:29  5    thanks for thinking of that.

6          All right.  The motion to disqualify Kinney is being

7    briefed.  We'll let that get briefed in the normal course.

8          The scheduling of the deposition of Dr. Desai in

9    *Barraza*, I can't remember from yesterday what the issue was.

17:07:48 10    Do I need to decide something or are you simply letting me

11    know that's something you're going to do?

12          MR. NORTH:  Your Honor, we're frustrated because

13    they've named an expert, rebuttal expert.  Discovery, expert

14    discovery, concludes May 19th in *Barraza*, and they say they

17:08:10 15    cannot produce him, Dr. Desai, for a deposition until June,

16    approximately three weeks after close of discovery.  We think

17    that is prejudicial to us and our attempts to brief, prepare

18    any *Daubert* motions that need to be prepared with regard to

19    *Barraza* and to keep that schedule on line we believe if they

17:08:30 20    name him as an expert, they ought to be able to give us a date

21    prior to close of discovery.

22          MS. FLEISHMAN:  Wendy Fleishman, Your Honor, on

23    behalf of the plaintiffs.

24          Dr. Desai and Dr. Vogelzang are both disclosed in the

17:08:45 25    rebuttal reports.  Dr. Desai was disclosed for the first time

17:08:49   1    in the rebuttal reports and Dr. Vogelzang is being deposed

           2    June 5th and we asked Dr. Desai, who is his colleague at

           3    Northwestern University, be proposed do June 6.

           4           Dr. Desai has a full practice at Northwestern.  He

17:09:06   5    has a huge clinical practice and he's an associate professor

           6    of the medical school.  He simply didn't have the time to give

           7    us for a deposition between now and June 6th, but he offered

           8    June 5th or June 6th.

           9           THE COURT:  Is June 6th available for him?

17:09:19  10           MS. FLEISHMAN:  Yes.

          11           THE COURT:  Do you have a conflict on that date,

          12    Mr. North?

          13           MR. NORTH:  We don't have a conflict, Your Honor, but

          14    we're worried about the lateness of it with the briefing

17:09:29  15    schedule --

          16           THE COURT:  I understand that.  But the date you

          17    proposed for *Daubert* motions is August 21st.

          18           MR. NORTH:  That raises a different question, which I

          19    don't think has been addressed.  Are we going to be on the

17:09:42  20    same track for *Daubert* motions for *Barraza* versus everything

          21    else?

          22           THE COURT:  Well, it's not going to be earlier.  So

          23    it seems to me you're not seriously prejudiced if you take it

          24    in June and the motion isn't due until August, so I'm going to

17:09:57  25    permit it to happen on June 6th.

17:10:01  1          MS. FLEISHMAN:  Thank you, Your Honor.

       2          MR. NORTH:  Thank you, Your Honor.

       3          THE COURT:  I want to -- for purposes of the motions

       4   report, I've granted all of the motions to seal other than the

17:10:11  5   one we talked about which is in connection with a motion for

       6   summary judgment.  So the motions to seal that were filed as

       7   part of the bellwether submission, those have been granted.

       8          Is there any objection from plaintiffs to the

       9   defendant's motion to file some of the exhibits in support of

17:10:32 10   the motion for summary judgment in nonelectronic form?

      11          MR. LOPEZ:  No, Your Honor.

      12          THE COURT:  Okay, we will grant that motion as well.

      13          What that will leave, then, in terms of pending

      14   motions in the case, is the summary judgment motion on

17:10:54 15   preemption, the sealing motion connected to it, the motion to

      16   disqualify Dr. Kinney.

      17          Oh, a second question.  Is there any objection to

      18   Bard's motion to seal the documents that were submitted with

      19   the motion to disqualify Dr. Kinney?

17:11:17 20          MR. LOPEZ:  No, Your Honor.

      21          THE COURT:  Okay.  So I will grant that one as well.

      22          And that will take care of all of the pending

      23   motions.

      24          So, Traci, I think most of these have been granted,

17:11:34 25   but the others can be.

17:11:37  1          THE COURTROOM DEPUTY:  Okay.

2          THE COURT:  Let's talk for a minute about the joint

3  submission on the bellwether discovery protocols.  As

4  indicated I haven't looked at this.

17:11:52  5          MR. STOLLER:  Your Honor, if it might be helpful, I

6  can walk you through where we are and the issues that are

7  really there for you.

8          We've negotiated back and forth, made a lot of

9  progress.  There are only three issues in dispute.  We did not

17:12:05  10 flag them in the cover, but the way we did it was we gave you

11 both proposals -- plaintiffs' proposal is Exhibit A,

12 defendant's proposal is Exhibit B -- and we have underlined in

13 each of those respective proposals where the differences are.

14         So if you will look, for example, Your Honor, in

17:12:23  15 Exhibit A on page 1 under Roman IIA you will see that the

16 number six is underlined in ours.  The difference there is

17 defendants would like a limit of five depositions per case in

18 this phase and we would like six.

19         The next thing you'll see there is the underlined

17:12:44  20 word "relevant."

21         THE COURT:  Do I really need to decide the difference

22 between five and six?

23         MR. STOLLER:  I would hope not, Your Honor, but --

24         THE COURT:  That's not a big disagreement.

17:12:54  25         MR. STOLLER:  I don't disagree with you, Your Honor.

17:12:55   1          THE COURT:  All right.  I'm going to order one of you

         2   to concede that point.

         3          MR. STOLLER:  I think it's defense turn to concede,

         4   Your Honor.

17:13:04   5          THE COURT:  You guys can agree on that.

         6          What are the other issues?

         7          MR. STOLLER:  The other issues are -- these are

         8   fine-point issues, but I think the language doesn't

         9   necessarily convey where the dispute lies.

17:13:14  10          The next issue, Your Honor, you'll see is the

        11   depositions of case relevant -- excuse me.  Case relevant fact

        12   witnesses versus a term that the defendants use, case

        13   specific.  To tee up the issue there, I'll tell you what the

        14   difference is in the meaning as between the parties, and

17:13:31  15   Mr. North and Mr. Lerner will correct me if I'm wrong.

        16          Judge, I'll tell you our position and Mr. Lopez will

        17   correct me if I'm wrong as well.

        18          We would like the opportunity to treat these

        19   bellwether trials as if they're trials.  Meaning we don't --

17:13:50  20   we feel like if we have a limit of six depositions, we should

        21   pick who we're going to depose.  They've got to have

        22   information relevant to the case, but they're not necessarily

        23   always going to be people who have information specific to the

        24   plaintiff.  They need to be relevant to the device, to the

17:14:06  25   time, to the complication at issue, and I'm sure Mr. Lopez can

17:14:10  1    give you a couple examples from trial where, for example, they

2    brought in Dr. Altanoga who did not get deposed in this MDL

3    but has been deposed and testified in prior cases about

4    specific facts, about the specific device, about the specific

17:14:26  5    complication at issue.  That's the distinction we draw there,

6    Your Honor.

7             Obviously, if we've got a limit on the number of

8    depositions, we're not going to be willy-nilly taking people.

9    We'd like the opportunity, though, to conduct these bellwether

17:14:39 10    trials as if they're real trials.

11             THE COURT:  I understand that point.  What's the

12    third issue?

13             MR. STOLLER:  The third issue, Your Honor, is not

14    indicated in ours.  If you go to theirs, which is Exhibit B.

17:14:57 15             THE COURT:  Paragraph D?

16             MR. STOLLER:  Paragraph 2D, which they've invoked a

17    process which we think, Your Honor, is, frankly, we don't

18    think is necessary.  If there's dispute between the parties,

19    we'll meet and confer and we'll bring them to you.  That's

17:15:10 20    been the way it's proceeded always in this litigation.

21             And I'll sit down unless you have further questions.

22             THE COURT:  Okay.  I'm just reading this.

23             All right.

24             MR. NORTH:  Your Honor, we are concerned about the

17:15:37 25    way they have defined for us this case relevant as opposed to

17:15:43   1   case specific, and we're very concerned about that.  They've

2   given us several examples of perhaps taking Bard engineers or

3   other corporate witnesses on a deposition particular to a

4   device or something of that nature.

17:15:58   5        We believe this is never to extend fact discovery

6   beyond over a year of fact discovery we've had where they've

7   deposed dozens and dozens and dozens of Bard employees.  For

8   them now to come back and under the guise of the six

9   bellwether cases say they can take six depositions -- and

17:16:19  10   that's six per side is what they're proposing, in each case,

11   that as long as it's case relevant and that can include

12   corporate engineers or witnesses, people who have already been

13   deposed in some instances during fact discovery -- it's

14   essentially extending the general fact discovery period for

17:16:41  15   another three months.

16        We have always envisioned this bellwether discovery

17   process focusing on case-specific witnesses, whether that be

18   physicians, family members, employers.  For example, with

19   Discovery Group 1 they deposed a self-representative in each

17:17:00  20   case specific to that case but that would have had interaction

21   with the doctors involved.

22        But to use this to go and take generic depositions of

23   corporate witnesses we believe is just extending the

24   corporate -- the corporate -- I'm sorry.  General fact

17:17:16  25   discovery, period.

17:17:17  1    And that's why we also -- really, our proposal for

2    paragraph IID in our proposal is essentially reflecting that

3    same concern.  We just wanted it clear that this isn't carte

4    blanche to take six depositions per side in any -- in every

17:17:36  5    single case as long as you can say it's somehow case relevant.

6    There may be an instance where it's just not proportionate,

7    whether it's a bellwether case or not, to take six depositions

8    per side.  We wanted to make it clear that in those instances

9    we had the right to meet and confer first, of course, as we

17:17:53 10    always have, and then come to the Court if there's a dispute.

11        THE COURT:  All right.

12        MR. LOPEZ:  Your Honor, can I -- it's easier.

13        THE COURT:  That's fine.

14        MR. LOPEZ:  Let's put this in perspective.  Before

17:18:07 15    the deposition -- before the MDL we took depositions of

16    certain corporate folks for seven hours, and in many of those

17    they were case specific.  We were able to focus on a

18    particular time period, particular product, particular

19    complication.

17:18:23 20        And we had seven hours in many of these instances,

21    for example the medical director who was there for five or six

22    years as president, to get as much generic information as we

23    could get.  We determined that for purposes of the generic and

24    the general liability part of this case we got enough

17:18:43 25    information.  We didn't retake those depositions.  While we

17:18:46  1    were not retaking those depositions, every state court

2    plaintiff who files a new lawsuit can take that deposition

3    over again on the case specifics, take advantage of all the

4    depositions we took from a generic and a general standpoint

17:18:57  5    and now spend another three or four hours, however much time

6    they want to, honing in on that case, that time period, that

7    device and the documents and liability as relates to that

8    specific case.  We haven't done that in any deposition,

9    corporate deposition, that's been taken in this case.  We've

17:19:18  10   got six hours in some, seven hours in others where we've done

11   this broad, general deposition.

12         In the meantime, there's a state court case in

13   Philadelphia, San Francisco, where there's a particular

14   injury, they could retake all those depositions for that trial

17:19:34  15   on those issues.

16         Now, we have case specific cases -- cases getting

17   ready to go to trial.  It could be that Dr. Ciavarella or

18   someone else or someone in charge of a particular department

19   for that particular period of time, for that particular

17:19:50  20   injury, no questions were asked.

21         Your Honor, believe me, we're not going to use this

22   as an opportunity to say, oh, well, we should have taken more

23   liability testimony from these people or gone to Your Honor,

24   said we need an extra day.  I think some of this has to be

17:20:07  25   just trust that you have.

17:20:07  1    We don't want to waste time.  But we want to have the

2    opportunity to prepare these case-specific plaintiffs for

3    their trials.  It could be there's something unique about

4    their case where we may have to take Dr. Ciavarella -- who was

17:20:23  5    never deposed in this case, only deposed once, who was on a

6    lot of important documents -- on one or two areas that are

7    pretty relevant to this case.  And we don't want to be

8    hamstrung by having to take a global deposition of these

9    people while the state court litigants who've got cases are

17:20:41  10   allowed to do exactly what we're asking you to do.

11   We're not asking to retake these depositions from

12   generically or generally or to do something, geez, we wish we

13   had done.  But we'd like to be able to take depositions of

14   people -- we may not do it at all.  We want to al least have

17:20:59  15   the opportunity to look at the cases and say, you know what,

16   there's five documents that have never used in this case that

17   are relevant to Mrs. Tinlin's case, or whoever's case is

18   getting ready to go to trial, that no one ever asked questions

19   of, or time period or something, that we may want to spend two

17:21:17  20   hours or three hours with the witness.  We're not going to

21   abuse that.  There's no reason to abuse it.

22   We didn't re-take those depositions because we're

23   okay from a general standpoint, I'm starting to repeat myself

24   now, but we just want to have a opportunity without having to

17:21:30  25   explain why we want these depositions.  I think this just has

17:21:35  1    to be a matter of Your Honor trusting that we're not going to

2    do anything that's abusive and that we're only going to ask

3    questions of any additional witnesses we may want to depose

4    because we want to be properly prepared for that particular

17:21:52  5    trial.

6              THE COURT:  Okay.  This is what I'm going to do on

7    this issue.  And I'm going to have you resubmit a form of

8    order.

9              I'm going to allow five depositions per side.  I'm

17:25:36  10   going to use the word "relevant" rather than "specific."  But

11   at the end of that sentence I'm going to have you put in the

12   following sentence:  "These depositions may include Bard

13   present or former employees only if the deposition will likely

14   produce probative evidence that could not reasonably have been

17:26:22  15   obtained during general discovery."

16             And I'm putting "reasonably" in there so that when

17   this issue comes up, if it does, that is going to be the

18   question.  Given what the plaintiffs had an opportunity to do

19   in the general discovery and how things were going, did they

17:26:40  20   reasonably have a chance to get this?  If so, they shouldn't

21   re-depose this witness.  If they didn't, for some of the

22   reasons you articulated, Mr. Lopez, then I'll probably allow

23   it to happen.

24             My point is I don't think we should just throw open

17:26:52  25   the door again to Bard employee depositions.  But I can't say

17:26:56   1   now that for a bellwether trial I should preclude the

2   plaintiffs from deposing a witness where they really couldn't

3   have gotten relevant evidence reasonably under the prior

4   discovery.  And, in fairness, they ought to be able to do that

17:27:09   5   for the trial.

6           And then I'm going to leave in paragraph IID.

7           You all can confer about it.  If you can't reach

8   agreement, you can call me.  Hopefully you'll be able to work

9   most of these out and we'll just make judgment calls as we go

17:27:23   10   along, I will, if there's a disagreement on deposing a

11   particular witness.

12           So did you all get that language to be added?  Let me

13   read it again.  "These depositions may include Bard present or

14   former employees only if the depositions will likely produce

17:27:44   15   probative evidence that could not reasonably have been

16   obtained during general discovery."

17           So if one of you will resubmit that with that change,

18   five depositions and the word "relevant" instead of

19   "specific," then we'll get that protocol.  I'll look it over.

17:28:04   20   If I have any other issues, I'll let you know.  But submit it

21   in the form of a Word document.

22           Okay.  The other thing we need to do is set the next

23   status conference in this case.  I'm thinking I would like to

24   do it probably early July.  It will be past expert

17:28:39   25   disclosures.  You'll be nearing the end of expert depositions

17:28:42   1    at that time.  We'll be a month out from *Daubert* motions,

2    depending what schedule I set.

3              Mr. North.

4              MR. NORTH:  Your Honor, I was going to ask somewhat

17:28:51   5    selfishly if we could avoid the first week of July, the week

6    of July 4th, because I think that may affect others, too, with

7    travel plans that week.  Maybe the second week or on.

8              THE COURT:  Well, how about -- if that first week

9    isn't available, and we can avoid that for those reasons, the

17:29:35  10    next week I'm going to have to do it again after a day of

11    trial because I'm going to be in trial that week.  I would say

12    Thursday, July 13th, at 4 p.m.  Does that work?

13              MR. NORTH:  Yes, Your Honor.

14              MR. LOPEZ:  Can I just look real quick?

17:29:54  15              THE COURT:  Yeah.

16              That's the day before close of expert depositions.

17    Would that be a good day to set a status conference?

18              MR. STOLLER:  We just extended, Your Honor, expert

19    depositions to the end of that month, so it probably won't --

17:30:18  20              THE COURT:  Oh, yeah, I did, didn't I.

21              MR. LOPEZ:  I can do it then.

22              THE COURT:  Okay.  We'll set it for July 13th,

23    4:00 p.m.

24              Plaintiffs, do you have other matters you want to

17:30:29  25    raise today?

17:30:32  1            MR. LOPEZ:  I think we're good.

          2            MR. STOLLER:  No, Your Honor.

          3            MR. LOPEZ:  Thank you for accommodating us today.

          4            MR. NORTH:  Nothing, Your Honor.

17:30:37  5            THE COURT:  Okay.  Thank you all.

          6        (End of transcript.)

          7                        *  *  *  *  *

          8

          9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1                    **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14         DATED at Phoenix, Arizona, this 15th day of May,

15   2017.

16

17

18

19

20                           s/ Patricia Lyons, RMR, CRR
                             Official Court Reporter
21

22

23

24

25