# EXHIBIT A

# Excerpts of Deposition of David Henry, M.D.

David Henry, M.D. Deposition 04.06.17, (Pages 28:11 to 29:4)

28

Q. Doctor, going back to your state of mind in 2011 when you were making the decision about which IVC filter to implant in Ms. Hyde, if an IVC filter carried with it a significant potential for serious injury or death, that would be important information for you to know as a clinician?

MR. LEIB: Yeah, and I think that does call for an expert opinion, and I would instruct him not to answer. And I would invite you to re-frame the question to avoid invading the privilege and --

MS. DALY: Join in the objection.

BY MR. SAELTZER:

Q. So Doctor, I want to go -- again, we'll go back, we time travel back to your thought

29

process in exercising your clinical judgment back to 2011 regarding Ms. Hyde. Do you have that time period in mind?

A. Sure.

David Henry, M.D. Deposition 04.06.17, (Pages 29:5 to 32:11)

29

Q. Okay. And if the IVC filter, the G2X that you implanted in Ms. Hyde in February of 2011, carried with it a significant potential for serious injury or death, and the company knew about that, you would have wanted them to tell you that, fair to say?

MR. LEIB: Let me object --

MS. DALY: Object.

MR. LEIB: -- I do think --

MS. DALY: Object to the form.

MR. LEIB: Yeah, I think it's a hypothetical question, and I think it does draw upon his expertise to be able to -- to know what or

what isn't significant, what -- you know, what knowledge was known. And because he doesn't recall this patient, to be able to apply it to a patient is calling for -- it's a hypothetical question and I think it does invade a privilege in that regard. So I would instruct him not to answer.

MR. SAELTZER: Well, my question -- this jury's going to hear evidence in this case and is

going to wonder what doctors rely upon, not lawyers arguing in a court of law. But they're going to have to determine in this case, with this doctor, what type of information was important or not important to that doctor based on the way this doctor applies his clinical judgment.

And so I'm asking this doctor, who implanted this filter, for his state of mind as to the type of information at that time he considered relevant to his clinical judgment. He's the only one who made the decision to implant this filter, and so his state of mind, not his opinion, but his state of mind and custom and practice at that time is -- isn't an expert opinion, it's very relevant to what happened.

MR. LEIB: And --

MS. DALY: I'm going to object to the leading nature of the question. And if you just want to ask him what did he rely on at that time, that would probably be a nonleading question.

MR. LEIB: Okay. And just so we understand my role here, my only purpose is to instruct him regarding privilege and representing the witness; I can't assert or argue leading, foundational, or anything else. But his

decision-making regarding this patient, we know he doesn't remember the patient, and if the question is what was your custom and practice regarding what information you would use to make decisions regarding this patient, that I don't have a problem

with, as long as it's asked in that form.

And if you recall, then you should indicate you recall. And if you don't recall, you should indicate you don't. He doesn't want you to guess at what the answers are. So -- so you gotta listen closely to the question. So could I ask that you ask the question within a context so I don't have an issue with privilege on it?

BY MR. SAELTZER:

Q. Doctor, based on your custom and practice, if the company, Bard, knew that the G2X filter that you implanted in Ms. Hyde carried a significant risk of injury or death, that is the type of information, based on your custom and practice, you would have wanted to know about?

MS. DALY: Objection, leading, and a hypothetical.

MR. LEIB: It's definitely a hypothetical question, and the expertise that's required is to know what you're talking about as to what's

32

significant or not. And unless he has some recollection of 2011 and can state the answer historically as opposed to giving a new opinion now -- 'cause a new opinion now is privileged in this. So unless you can answer that question historically as to what your thought process was in 2011, if this would be giving a new opinion as of today, then I would instruct you not to answer.

THE WITNESS: If the product is FDA approved and I'm comfortable with it, I don't usually hesitate.

David Henry, M.D. Deposition 04.06.17 (Pages 34:8 to 35:12)

34

Q. Getting to your custom and practice in 2011, was it your practice to inform the patient of all known risks, meaning risks you knew about that were associated with an IVC filter you were recommending be implanted in that patient?

MR. LEIB: Let me just object, it's not the proper standard under which the doctor would have been practicing in 2011. So I guess I'll let him go ahead and answer the question as long as it isn't construed presently, or at some later date, as some waiver of a privilege. Is that acceptable to you?

MR. SAELTZER: Sure.

MR. LEIB: Taylor, is that acceptable to you?

MS. DALY: Yes.

MR. LEIB: Go ahead.

THE WITNESS: Could you repeat the

35

question?

MR. SAELTZER: Let me have the reporter read it back to you, Doctor.

COURT REPORTER: "Getting to your custom and practice in 2011, was it your practice to inform the patient of all known risks, meaning risks you knew about that were associated with an IVC filter you were recommending be implanted in that patient?"

THE WITNESS: No, we don't -- we customarily talk about common things. We don't want to be excessively burdening with all risks.

David Henry, M.D. Deposition 04.06.17, (Pages 54:20 to 56:18)

54

Q. Doctor, if the initial author of that report had believed that the results of the Everest G2 trial demonstrated that the G2 filter and safety profile was not consistent with similarly marketed IVC filters, is that the type of information, based on the way you practiced medicine back in 2011, you

55

would have wanted Bard to let you know about?

MR. LEIB: Yeah, let me object --

MS. DALY: Object to the -- object to the form and lack of foundation.

MR. LEIB: Yeah, and I believe it invades privilege, and I'll instruct him not to answer.

MR. SAELTZER: Again, Counsel, I'm asking for his state of mind.

MR. LEIB: No, I understand. But he'd have to review the article in order to determine whether or not it contains information that would be important to him in 2011. And I'm not going to have him review the article.

MR. SAELTZER: The foundation can be proven whether or not the article says that.

MR. LEIB: Doesn't matter. You're --

MR. SAELTZER: Can I --

MR. LEIB: -- using --

MR. SAELTZER: Can I please finish? Whether or not or what the article says I'm not asking for his testimony about. I'm asking this treating doctor for the way he practiced medicine and what information he considered, the type of information he considered, back in 2011. And I'm asking him if that type of information had existed,

that would have been something he would have factored into his clinical judgment.

MR. LEIB: You've tethered it to the article, that's the problem. The form of the question invades his privilege, and that's why I'm instructing him not to answer.

BY MR. SAELTZER:

Q. If Bard knew that the G2X filter you implanted in Ms. Hyde was not performing as well as the other competitors' IVC filters, and it knew that before February of 2011, is that the type of information you would have considered if Bard had brought that to your attention?

MS. DALY: Same objection.

THE WITNESS: I don't particularly pay attention to everything that's published or comes my way. And so if I had read the article, I -- I may or may not have been swayed by its contents.

David Henry, M.D. Deposition 04.06.17 (Pages 60:15 to 62:16)

60

MR. SAELTZER: Okay. Just before we get to the questions, Doctor, I did want to put on the record: It's my understanding, Counsel, I had told you that I presented a confidentiality agreement, and I had some documents, HHEs, fracture studies, internal Bard documents that I was going to review with the witness. But it's my understanding that you're instructing the witness not to answer those type of questions?

MR. LEIB: Yes. Unless those were documents that he reviewed in the care and

61

treatment of this patient. And I understand that they were not -- these things were not available. So yes, I'm instructing him not to answer. I believe it's calling for an expert opinion.

MR. SAELTZER: You threw one thing in there which I want to clarify, which is they're not available to him. They're certainly not part of his care and treatment. They're records that predate the Bard documents that predate his care and treatment. So they existed, but I don't think he saw them.

MR. LEIB: Okay. I mean --

MR. SAELTZER: So you would instruct him not to answer?

MR. LEIB: Yes.

MR. SAELTZER: I just wanted to make the record clear, because I had a bunch of documents here I was going to go through with him, but I don't want to waste our time.

MR. LEIB: It will be the same for defense counsel.

MS. DALY: The documents he's speaking of are all internal Bard documents. Would not have gone external.

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

* * * * * * * * * * * * * * *

In Re Bard IVC Filters Products Liability Litigation

No. MD-15-02641-PHX-DGC

* * * * * * * * * * * * * * *

DO NOT DISCLOSE - SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

VIDEOTAPED DEPOSITION OF DAVID HENRY, M.D.

TAKEN AT: Leib Knott Gaynor
LOCATED AT: 219 North Milwaukee Street
Milwaukee, WI

April 6, 2017
10:07 a.m. to 12:28 p.m.
REPORTED BY ANITA K. FOSS
REGISTERED PROFESSIONAL REPORTER

* * * * * * * * * * * * * * *

A P P E A R A N C E S

WALKUP, MELODIA, KELLY & SCHOENBERGER, P.C.
Douglas S. Saeltzer, Esquire
650 California Street, 26th Floor
San Francisco, CA 94108
415-981-7210
dsaeltzer@walkuplawoffice.com
Appearing on behalf of the Plaintiffs.

LEIB KNOTT GAYNOR, LLC
Samuel J. Leib, Esquire
219 North Milwaukee Street, Suite 710
Milwaukee, WI 53202
414-276-2102
sleib@lkglaw.net
Appearing on behalf of Dr. Henry.

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP
Taylor Tapley Daly, Esquire
201 17th Street NW, Suite 1700
Atlanta, GA 30363
404-322-6156
taylor.daly@nelsonmullins.com
Appearing telephonically on behalf of Defendants.

I N D E X

| Examination by | Page |
|---|---|
| Mr. Saeltzer. . . . . . . . . . . . . . . . | 4 |
| Ms. Daly. . . . . . . . . . . . . . . . . . | 85 |

E X H I B I T S

| Exhibit No. | Description | Page Identified |
|---|---|---|
| 2128 | Journal article. . . . . . . . . . . | 51 |
| 2129 | Dr. Henry's records of patient. . . | 62 |

inferior vena cava?
A. Yes.
Q. Did you also visualize the inferior vena cava when you were implanting IVC filters?
A. Yes.
Q. Is the -- well, why don't you describe for the jury the main function or what function the inferior vena cava performs.
A. If -- the inferior vena cava is a vein that helps blood from our lower extremities and our pelvis recirculate back in our body.
Q. Can it expand with varying pressures?
A. Yes.
Q. Does it expand with varying pressures?
A. Yes.
Q. Is that well known within the medical community?
MR. LEIB: Well, let me just interject. At this point he's being called as a fact witness, he's not being called as an expert witness. It's asking him to render an opinion as to what is or isn't known within the medical community. I view that as calling for an expert opinion beyond the scope of his care and treatment of this patient.
And he has a privilege under

Wisconsin law, it's called -- referred to as the Alt, A-L-T, privilege. And therefore, I'll instruct him not to answer as to any questions that are asked here today and -- you know, we'll obviously take them one by one. But he has not agreed to present himself here today as an expert witness. So I'll be instructing him if I feel the question invades that privilege.

BY MR. SAELTZER:

Q. Okay. Doctor, based on your training and experience as of February 2011, was it your understanding that the inferior vena cava expands and contracts with normal respiratory and -- and heart function?

A. Yes.

Q. Moving to February of 2011, when Ms. Hyde was your patient, what hospitals did you have privileges at or were you practicing in?

A. Franklin Hospital and St. Francis Hospital.

Q. Back in the time period of February 2011, do you recall who made the decision to use the Bard G2X IVC filter as to a different Bard filter or a competitor's Bard filter?

A. No.

Q. Do you know, based on the custom and practice of the medical group and hospitals where you were practicing at that time, if you would have had input into that decision or if you would have been directed by somebody else which filter to use?

A. I was comfortable with the product, and it was available.

Q. Fair to say, as the implanting treating physician, that you had the discretion to use the IVC filter you believed was the safest and most effective for your patient?

A. Yes.

Q. Am I also correct that you would never put in an IVC filter unless you believed it was the best performing, most effective filter for your patient?

A. No.

MR. LEIB: You're asking him --

MS. DALY: Object to the form.

MR. LEIB: Yeah, you're asking him in regard to your client, Ms. Herd?

MR. SAELTZER: I was asking about his practice as of the time period of February 2011, and the thought process he goes through when selecting which filter to use.

Do Not Disclose - Subject to Further Confidentiality Review

MR. LEIB: Okay.

MS. DALY: Object to the form.

BY MR. SAELTZER:

Q. At least that was the hope of what I was trying to ask. Sometimes when I'm asked that, I say that's what I was trying to ask. I'm not sure I succeeded. So what I'm getting at, or want the jury to understand, is the thought process, the judgment, the clinical judgment and how you exercised that clinical judgment back in February of 2011. Are you following me, Doctor?

A. Sure.

Q. Okay. Because you're presented with a history from a patient; right?

A. Uh-huh.

Q. Is that correct?

A. Yes.

Q. You can review medical records and imaging studies about the patient's condition; right?

A. Yes.

Q. You want to gain an understanding, to the extent you feel is necessary, of the patient's condition to make treatment recommendations?

A. Yes.

Q. And then you also apply your knowledge as to what possible procedures or devices are available to treat that condition; right?

A. Yes.

MS. DALY: Objection. Objection, leading.

BY MR. SAELTZER:

Q. And Doctor, in coming and exercising your clinical discretion, do you perform a risk-benefit analysis?

A. I get an informed consent, which includes risks, benefits, and alternatives.

Q. When you are choosing which IVC filter to implant in a patient, can you describe for me what thought process you go to as to which filter you select from the various options that are out there in the marketplace?

MR. LEIB: We're talking about in or around 2011 as a custom and practice pertaining to your client, Lisa Herd?

MR. SAELTZER: Yes, in and around February of 2011.

THE WITNESS: I look for any filter that's FDA approved, that I'm familiar with placing.

BY MR. SAELTZER:

Q. Back in February of 2011, was it your understanding that all FDA-cleared IVC filters had the same performance? They all performed the same?

MS. DALY: Object to the form, it's an expert -- it's an expert question.

MR. LEIB: Frankly, I didn't hear it that way, and I want to be evenhanded on it. And he's not here as an expert, and he's not presenting himself, but can you elaborate why you felt that was an expert question so I can consider whether or not he should exercise his privilege on it?

MS. DALY: Yes. The way that I heard the question was he's being asked about his opinion about various filters that were in the market at the time. To me, that's an expert question.

MR. LEIB: Maybe we could hear the question back.

COURT REPORTER: "Back in February of 2011, was it your understanding that all FDA-cleared IVC filters had the same performance? They all performed the same?"

MR. LEIB: Yeah, I -- I don't think it's privileged because it was tethered to 2011, and I viewed the question as pertaining to generally his

custom and practice at the time that he implanted on Mr. Saeltzer's patient -- client. So I didn't view it as invading privilege. It was historical as to his thought process. So that's why I didn't assert a privilege, and I wouldn't instruct him.

MS. DALY: I'm sorry, just again note my objection.

MR. LEIB: Yeah, okay. And Taylor, I just didn't want to -- the reason why I asked you to elaborate because I -- you know, I assume that you're going to be asking some questions, and I want to be, as I say, evenhanded as to asserting the privilege to make sure that I understand what your objection is so if other objections come down the pike during your questioning, you know, I'll instruct him evenly between both parties.

MS. DALY: Thank you.

BY MR. SAELTZER:

Q. Do you have the question in mind, Doctor? Would you like it read back to you?

A. I'm sorry, what am I being asked?

Q. That tells me we should probably read you the question. So we'll have the question read to you, Doctor.

COURT REPORTER: "Back in February of

2011, was it your understanding that all FDA-cleared IVC filters had the same performance? They all performed the same?"

THE WITNESS: I think that they -- they were -- they were all very comparable.

BY MR. SAELTZER:

Q. Did you believe that they were all comparable in terms of risk of complications, such as migrations or fractures?

A. Yes.

Q. Doctor, going back to your state of mind in 2011 when you were making the decision about which IVC filter to implant in Ms. Hyde, if an IVC filter carried with it a significant potential for serious injury or death, that would be important information for you to know as a clinician?

MR. LEIB: Yeah, and I think that does call for an expert opinion, and I would instruct him not to answer. And I would invite you to re-frame the question to avoid invading the privilege and --

MS. DALY: Join in the objection.

BY MR. SAELTZER:

Q. So Doctor, I want to go -- again, we'll go back, we time travel back to your thought

process in exercising your clinical judgment back to 2011 regarding Ms. Hyde. Do you have that time period in mind?

A. Sure.

Q. Okay. And if the IVC filter, the G2X that you implanted in Ms. Hyde in February of 2011, carried with it a significant potential for serious injury or death, and the company knew about that, you would have wanted them to tell you that, fair to say?

MR. LEIB: Let me object --

MS. DALY: Object.

MR. LEIB: -- I do think --

MS. DALY: Object to the form.

MR. LEIB: Yeah, I think it's a hypothetical question, and I think it does draw upon his expertise to be able to -- to know what or what isn't significant, what -- you know, what knowledge was known. And because he doesn't recall this patient, to be able to apply it to a patient is calling for -- it's a hypothetical question and I think it does invade a privilege in that regard. So I would instruct him not to answer.

MR. SAELTZER: Well, my question -- this jury's going to hear evidence in this case and is

going to wonder what doctors rely upon, not lawyers arguing in a court of law. But they're going to have to determine in this case, with this doctor, what type of information was important or not important to that doctor based on the way this doctor applies his clinical judgment.

And so I'm asking this doctor, who implanted this filter, for his state of mind as to the type of information at that time he considered relevant to his clinical judgment. He's the only one who made the decision to implant this filter, and so his state of mind, not his opinion, but his state of mind and custom and practice at that time is -- isn't an expert opinion, it's very relevant to what happened.

MR. LEIB: And --

MS. DALY: I'm going to object to the leading nature of the question. And if you just want to ask him what did he rely on at that time, that would probably be a nonleading question.

MR. LEIB: Okay. And just so we understand my role here, my only purpose is to instruct him regarding privilege and representing the witness; I can't assert or argue leading, foundational, or anything else. But his

decision-making regarding this patient, we know he doesn't remember the patient, and if the question is what was your custom and practice regarding what information you would use to make decisions regarding this patient, that I don't have a problem with, as long as it's asked in that form.

And if you recall, then you should indicate you recall. And if you don't recall, you should indicate you don't. He doesn't want you to guess at what the answers are. So -- so you gotta listen closely to the question. So could I ask that you ask the question within a context so I don't have an issue with privilege on it?

BY MR. SAELTZER:

Q. Doctor, based on your custom and practice, if the company, Bard, knew that the G2X filter that you implanted in Ms. Hyde carried a significant risk of injury or death, that is the type of information, based on your custom and practice, you would have wanted to know about?

MS. DALY: Objection, leading, and a hypothetical.

MR. LEIB: It's definitely a hypothetical question, and the expertise that's required is to know what you're talking about as to what's

significant or not. And unless he has some recollection of 2011 and can state the answer historically as opposed to giving a new opinion now -- 'cause a new opinion now is privileged in this. So unless you can answer that question historically as to what your thought process was in 2011, if this would be giving a new opinion as of today, then I would instruct you not to answer.

THE WITNESS: If the product is FDA approved and I'm comfortable with it, I don't usually hesitate.

BY MR. SAELTZER:

Q. What knowledge, if any, do you have of how the Bard G2X filter received FDA clearance?

A. I do not know.

Q. At the time you implanted this filter, did you believe it had gone through full clinical trials to obtain FDA approval?

A. I'm guessing, yes.

Q. At least that was your state of mind back then?

A. Yes.

Q. Are you aware of an alternate FDA approval process called a 510(k) clearance?

A. No.

Q. Are you aware of an FDA process that allows an abbreviated clearance if the company proves the product is substantially similar to a prior product that's already been cleared?

A. No.

Q. Fair to say your state of mind when you implanted this G2X filter is that it was as safe and effective as the competitors' filters that were on the market at that time?

MS. DALY: Object to the form, leading.

MR. LEIB: I think you already asked and answered that, actually. As of 2011, when this was --

THE WITNESS: Yes. My answer's yes.

BY MR. SAELTZER:

Q. Part of your responsibilities as the physician who implanted this filter in Ms. Hyde was to explain to her the risks associated with the filter; am I correct?

A. Yes.

MS. DALY: Objection, leading.

BY MR. SAELTZER:

Q. Did you receive training on that obligation in medical school, your residency, and also in your fellowship?

A. Yes.

Q. Is part of obtaining informed consent included in the training to become an interventional radiologist?

A. Yes.

Q. And to become a doctor?

A. Yes.

Q. Getting to your custom and practice in 2011, was it your practice to inform the patient of all known risks, meaning risks you knew about that were associated with an IVC filter you were recommending be implanted in that patient?

MR. LEIB: Let me just object, it's not the proper standard under which the doctor would have been practicing in 2011. So I guess I'll let him go ahead and answer the question as long as it isn't construed presently, or at some later date, as some waiver of a privilege. Is that acceptable to you?

MR. SAELTZER: Sure.

MR. LEIB: Taylor, is that acceptable to you?

MS. DALY: Yes.

MR. LEIB: Go ahead.

THE WITNESS: Could you repeat the

MR. SAELTZER: Yes.

MR. LEIB: Yeah, that wasn't your question, though. You're asking him for a present opinion as to whether or not something would have been helpful to him in the past. That is calling for an expert opinion. If you --

MS. DALY: Which --

MR. LEIB: Hold on.

MS. DALY: -- which -- which -- let me -- if I could add for the record, which also related to a filter that was a predecessor to the filter in the Hyde case.

MR. LEIB: Yeah, I'm not apprised of the different filters, so I'll leave those objections to counsel. But I'd invite you to rephrase the question. But I think the way you phrased it, it is invading his privilege, that's why I instructed him not to answer.

BY MR. SAELTZER:

Q. Is the information that Bard determined its Recovery filter migrated three times more than the industry average the type of information you would have found useful when you were making your decisions about which filter to implant back in 2011?

THE WITNESS: Oh.

MR. LEIB: -- whether the instructions -- the question is whether or not the instructions state that or whether or not he was aware of that as of 2011? I'm sorry, I lost the question.

BY MS. DALY:

Q. Whether he believed it was within the instructions for use precaution.

MR. LEIB: If you know.

THE WITNESS: I believe it was.

BY MS. DALY:

Q. All right. Thank you. Has any manufacturer of an IVC filter provided you with any information, over time, that showed alleged comparative rates of complications among IVC filter models on the market?

A. Probably.

Q. Do you recall any particular filter product that that was done for -- done with?

A. I do not recall.

Q. Do you know if the FDA has any limitations or restrictions on what a filter manufacturer may provide by way of information about complications to doctors?

MR. LEIB: Well, I think maybe that's

calling for an expert opinion, but I think if you rephrase it as of 2011, when he did this care and treatment, was he aware of that, then I wouldn't have a problem with the question.

THE WITNESS: I don't specifically --

MS. DALY: Let me --

THE WITNESS: I don't --

BY MS. DALY:

Q. Let me go ahead and rephrase it, Doctor, to cure that. Were you aware in 2011, at the time you were placing Ms. Hyde's filter, what limitations or restrictions, if any, the FDA had on information a filter manufacturer can provide to doctors?

A. No.

Q. And you were asked about the type of regulatory process that Bard filters go through, and the 510(k) process was mentioned to you by plaintiff's counsel; do you recall?

A. Yeah, that happened within the last hour.

Q. Okay. Do you have any information, or did you -- let me put it this way. Did you have any information, at the time that you placed Mrs. Hyde's filter, about what those regulations under 510(k) process required Bard to provide to

# EXHIBIT C

James R. Condo (#005867)
Amanda C. Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street, NW / Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

*Attorneys for Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| In re Bard IVC Filters Products Liability Litigation | NO. MD-15-02641-PHX-DGC<br><br>**DEFENDANTS' AMENDED NOTICE OF VIDEOTAPED DEPOSITION DUCES TECUM OF DAVID L. GARCIA, M.D.** |
|---|---|

PLEASE TAKE NOTICE THAT, pursuant to F.R.C.P. Rules 26 and 30, and for all purposes authorized by the Federal Rules of Civil Procedure and all other purposes allowed by law, commencing at **9:00 a.m. P.S.T.** on **June 21, 2017,** at the offices of **Williams Kastner** located at **601 Union Street, Suite 4100, Seattle Washington 98101-2380, Conference Call-in dial 866-509-4812, Code 308978**, the defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. in the above-captioned action, will take the videotaped deposition of **David L. Garcia, M.D.**

The deposition will be taken before a videographer and court reporter duly authorized to administer oaths and will continue from day to day until the examination is complete.

The deponent is asked to bring to the deposition the documents described in Exhibit "A" regarding the above-referenced case.

DATED this 6th day of May, 2017.

Richard B. North, Jr.
Georgia Bar No. 545599
Matthew B. Lerner
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW / Suite 1700
Atlanta, GA 30363
PH: (404) 322-6000
FX: (404) 322-6050
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

James R. Condo (#005867)
Amanda Sheridan (#005867)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2204
PH: (602) 382-6000
JCondo@swlaw.com
ASheridan@swlaw.com

**Attorney for Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the above and foregoing has been served by email and First Class postage prepaid U.S. Mail on May 6, 2017, to the following:

Mark S. O'Connor, Esq.
Paul L. Stoller, Esq.
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, AZ 85016-9225

Ramon Rossi Lopez, Esq.
LOPEZ McHUGH LLP
100 Bayview Circle, Suite 5600
Newport Beach, CA 92660

Matthew B. Lerner
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW / Suite 1700
Atlanta, GA 30363
PH: (404) 322-6000
FX: (404) 322-6050
matthew.lerner@nelsonmullins.com

# EXHIBIT A

1. Your current resume or Curriculum Vitae.

2. Your COMPLETE AND ENTIRE FILE in the matter *In Re: Bard IVC Filters Products Liability Litigation*, United States District Court for the District of Arizona, No. 2:14-MD-02641-DGC (the "Case") including, without limitation,

   (a) All materials and documents provided to you or received by you in connection with the Case, including, without limitation,

      (i) all materials and documents provided to you by Plaintiffs' counsel,

      (ii) all articles, sources, references, treatises, guidelines, standards, and regulations,

      (iii) all deposition or trial transcripts and exhibits,

      (iv) all government guidances, regulations, and policies,

      (v) all medical records, imaging, notes, reports, correspondence, and test results, relating to any plaintiff in the Case, and

      (vi) all communications and emails between you and any fact or expert witness in the Case;

      (vii) all communications and emails between you and Dr. Michael Streiff that relate in any way to the Case or the expert reports you and Dr. Streiff submitted in the Case;

      (viii) all notes or summaries of any communications between you and Dr. Michael Streiff that relate in any way to the Case or the expert reports you and Dr. Streiff submitted in the Case.

   (b) All materials and documents you relied upon and/or may rely upon in reaching your opinions in the Case;

   (c) All research done by you, at your direction or provided to you in connection with your involvement in the Case;

   (d) A list of all persons and background sources, if any, that you consulted and/or rely upon in connection with your review of or opinions in the Case; and

   (e) Communications and emails between you and attorneys representing plaintiff in the Case that relate to

      (i) your compensation,

      (ii) any facts or data that were provided to you by the attorney, and

      (iii) any assumptions that were provided to you by the attorney and upon which you rely in forming your opinions. See FRCP 26(b)(4)(C).

3. All documents concerning your inspection of or experimentation upon any medical device or material at issue in the Case, including documents sufficient to identify:

      (a)      The date and location of the inspection or experimentation;

      (b)      The persons present during the inspection or experimentation;

      (c)      The protocol(s) followed for the inspection or experimentation, including details concerning (i) the make/model of the equipment used during the inspection or experimentation and the corresponding settings, (ii) the manner in which the device or material was preserved both before and after testing, and (iii) the method of preparation of the device or material prior to testing;

      (d)      Any photographs, micrographs and/or videos (in their original form, at their original resolution, and with all associated metadata) taken during the inspection or experimentation, including the identification of all devices depicted in the photographs or videos;

      (e)      The findings, results, and conclusions from the inspection or experimentation, including without limitation, (i) the raw data files native, electronic format, (ii) any and all data collected in any form; and

      (f)      Chain of custody information for any devices that were subject to your inspection and/or experimentation.

4.      All invoices, bills, billing records, time records, and expense records connected with your involvement in the Case, including information sufficient to identify

      (a) your hourly rate;

      (b) the amount of time you have spent in connection with your involvement in the Case;

      (c) the nature of the activity or work your performed in connection with your involvement in the Case, and

      (d) the dates on which such activity or work was performed.

James R. Condo (#005867)
Amanda C. Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street, NW / Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

*Attorneys for Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re Bard IVC Filters Products Liability Litigation | NO. MD-15-02641-PHX-DGC<br><br>**DEFENDANTS' NOTICE OF VIDEOTAPED DEPOSITION DUCES TECUM OF KUSH DESAI, M.D.** |

PLEASE TAKE NOTICE THAT, pursuant to F.R.C.P. Rules 26 and 30, and for all purposes authorized by the Federal Rules of Civil Procedure and all other purposes allowed by law, commencing at **9:00 a.m. C.S.T.** on **June 6, 2017,** at **McCorkle Court Reporters** located at **200 N. LaSalle Dr. #2900, Chicago IL 60601**, the defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. in the above-captioned action, will take the videotaped deposition of **Kush Desai, M.D.** The deposition will be taken before a videographer and court reporter duly

authorized to administer oaths and will continue from day to day until the examination is complete.

The deponent is asked to bring to the deposition the documents described in Exhibit "A" regarding the above-referenced case.

DATED this 18th day of  May, 2017.

Richard B. North, Jr.
Georgia Bar No. 545599
Matthew B. Lerner
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW / Suite 1700
Atlanta, GA  30363
PH: (404) 322-6000
FX: (404) 322-6050
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

James R. Condo (#005867)
Amanda Sheridan (#005867)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2204
PH: (602) 382-6000
JCondo@swlaw.com
ASheridan@swlaw.com

**Attorney for Defendants C. R. Bard, Inc.
and Bard Peripheral Vascular, Inc.**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the above and foregoing has been served by email and First Class postage prepaid U.S. Mail on May 18, 2017, to the following:

Mark S. O'Connor, Esq.
Paul L. Stoller, Esq.
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, AZ 85016-9225

Ramon Rossi Lopez, Esq.
LOPEZ McHUGH LLP
100 Bayview Circle, Suite 5600
Newport Beach, CA 92660

Matthew B. Lerner
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW / Suite 1700
Atlanta, GA 30363
PH: (404) 322-6000
FX: (404) 322-6050
matthew.lerner@nelsonmullins.com

# EXHIBIT A

1. Your current resume or Curriculum Vitae.

2. Your COMPLETE AND ENTIRE FILE in the matter *In Re: Bard IVC Filters Products Liability Litigation*, United States District Court for the District of Arizona, No. 2:14-MD-02641-DGC (the "Case") including, without limitation,

   (a) All materials and documents provided to you or received by you in connection with the Case, including, without limitation,

      (i) all materials and documents provided to you by Plaintiffs' counsel,

      (ii) all articles, sources, references, treatises, guidelines, standards, and regulations,

      (iii) all deposition or trial transcripts and exhibits,

      (iv) all government guidances, regulations, and policies,

      (v) all medical records, imaging, notes, reports, correspondence, and test results, relating to any plaintiff in the Case,

      (vi) all communications and emails between you and any fact or expert witness in the Case,

      (vii) all communications and emails between you and other physicians at Northwestern or Interventional Cardiologist's LLC that relate in any way to the Case, the Report of Robert L. Vogelzang, M.D. (signed March 2, 2017), or the Medical Monitoring (Morris) Rebuttal Report of Kush R. Desai, M.D. and Robert L. Vogelzang, M.D. (signed April 19, 2017),

   (b) All materials and documents that you have reviewed at any time and from any source that relate to inferior vena cava filters, C.R. Bard's inferior vena cava filters, or inferior vena cava filters designed, manufactured or distributed by any other entity;

   (c) All materials and documents you relied upon and/or may rely upon in reaching your opinions in the Case;

   (d) All research done by you, at your direction or provided to you in connection with your involvement in the Case;

   (e) A list of all persons and background sources, if any, that you consulted and/or rely upon in connection with your review of or opinions in the Case; and

   (f) Communications and emails between you and attorneys representing plaintiff in the Case that relate to

      (i) your compensation,

      (ii) any facts or data that were provided to you by the attorney, and

      (iii) any assumptions that were provided to you by the attorney and upon which you rely in forming your opinions. See FRCP 26(b)(4)(C).

3.      All documents concerning your inspection of or experimentation upon any medical device or material at issue in the Case, including documents sufficient to identify:

   (a)     The date and location of the inspection or experimentation;

   (b)     The persons present during the inspection or experimentation;

   (c)     The protocol(s) followed for the inspection or experimentation, including details concerning (i) the make/model of the equipment used during the inspection or experimentation and the corresponding settings, (ii) the manner in which the device or material was preserved both before and after testing, and (iii) the method of preparation of the device or material prior to testing;

   (d)     Any photographs, micrographs and/or videos (in their original form, at their original resolution, and with all associated metadata) taken during the inspection or experimentation, including the identification of all devices depicted in the photographs or videos;

   (e)     The findings, results, and conclusions from the inspection or experimentation, including without limitation, (i) the raw data files native, electronic format, (ii) any and all data collected in any form; and

   (f)     Chain of custody information for any devices that were subject to your inspection and/or experimentation.


4.      All invoices, bills, billing records, time records, and expense records connected with your involvement in the Case, including information sufficient to identify

   (a) your hourly rate;

   (b) the amount of time you have spent in connection with your involvement in the Case;

   (c) the nature of the activity or work your performed in connection with your involvement in the Case, and

   (d) the dates on which such activity or work was performed.


5.      All invoices, bills, billing records, time records, and expense records connected in any way with Interventional Cardiologist's LLC (or any of its members) involvement in the Case, the Report of Robert L. Vogelzang, M.D. (signed March 2, 2017), or the Medical Monitoring (Morris) Rebuttal Report of Kush R. Desai, M.D. and Robert L. Vogelzang, M.D. (signed April 19, 2017), including information sufficient to identify

   (a)     hourly rates;

   (b)     the amount of time each member of Interventional Cardiologists LLC spent in connection with the Case;

   (c)     the nature of the activity or work performed in connection with Interventional Cardiologists LLC's (or any of its members) involvement in the Case; and

   (d)     the dates on which such activity or work was performed and by whom.