1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3                  _____

4  **In Re: Bard IVC Filters**        )  MD-15-02641-PHX-DGC
   Products Liability Litigation     )
5                                     )  Phoenix, Arizona
                                      )  **July 13, 2017**
6  _____)

7

8

9

10

11      BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

12          REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                  STATUS HEARING

14

15

16

17

18

19

20

21  Official Court Reporter:
    Patricia Lyons, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Ste. 312
    401 West Washington Street, SPC 41
23  Phoenix, Arizona  85003-2150
    (602) 322-7257
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared with Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2     Plaintiffs' Co-Lead/Liaison Counsel and State/Federal Liaison
      Counsel:

3
              Lopez McHugh
4             By: **RAMON ROSSI LOPEZ**, ESQ.
              100 Bayview Circle, Suite 5600
5             Newport Beach, CA  92660

6     Plaintiffs' Steering Committee Counsel:

7             Gallagher & Kennedy
              By: **PAUL LINCOLN STOLLER**, ESQ.
8             By: **MARK S. O'CONNOR**, ESQ.
              2575 East Camelback Road, Suite 1100
9             Phoenix, AZ  85016

10

11    For Defendants:

12            Nelson Mullins Riley & Scarborough, LLC
              By: **RICHARD B. NORTH, JR.**, ESQ.
13            By: **MATTHEW LERNER**, ESQ.
              201 17th Street NW, Suite 1700
14            Atlanta, GA  30363

15            Snell & Wilmer
              By: **JAMES R. CONDO**, ESQ.
16            400 East Van Buren
              Phoenix, AZ  85004

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

10:01:31   1

2

3          THE COURTROOM DEPUTY:  MDL case 2015-2641, Bard IVC

4    Filters Product Litigation, on for status hearing.

16:01:58   5          Will the parties please announce.

6          MR. LOPEZ:  Good afternoon, Your Honor.  Ramon Lopez,

7    Lopez McHugh, on behalf of Plaintiffs' leadership counsel.

8          MR. O'CONNOR:  Afternoon, Your Honor.  Mark O'Connor,

9    Gallagher & Kennedy, on behalf of plaintiffs leadership.

16:02:11  10          MR. STOLLER:  Afternoon, Your Honor.  Paul Stoller

11    for plaintiffs.

12          MR. NORTH:  Good afternoon, Your Honor.  Richard

13    North on behalf of the defendants.

14          MR. CONDO:  Your Honor, good afternoon.  James Condo

16:02:20  15    on behalf of the defendants.  And with the Court's permission,

16    with me is a summer associate here in our office, Rubi

17    Bujanda.

18          MR. LERNER:  Afternoon, Your Honor.  Matthew Lerner

19    for the defendants.

16:02:35  20          THE COURT:  All right.  Good afternoon, everybody,

21    and other folks here in the courtroom and on the phone.

22          Counsel, let's start with the issues that you raised

23    in your Joint Status Report.  Section 1, which begins on page

24    2 and goes through top of page 9, is really just an update,

16:02:57  25    which I appreciate.  You all have covered a lot of ground, and

16:03:02  1    that's good.  That's a helpful update.

2           The first issue is presented in Part 2, starting page

3    9, and the question concerns the trial deposition of Dr. Henry

4    in the Booker case.  Let me -- let me share with you a few

16:03:19  5    thoughts and get your reaction on this issue.

6           I read the excerpts both sides provided from the

7    Henry deposition in which Dr. Henry was instructed not to

8    answer questions which asked him whether a particular fact

9    that is disclosed in a Bard document or plaintiffs believe is

16:03:45  10   disclosed or is true would have mattered to him or would have

11   been important to him at the time he implanted the filter

12   in -- I can't remember if it's Mr. or Mrs. Booker, but

13   Plaintiff Booker --

14           MR. LOPEZ:  It's actually Mrs. Hyde.

16:04:02  15           THE COURT:  Oh, Mrs. Hyde.  So it's not the Booker

16   case?

17           MR. LOPEZ:  It's not.

18           THE COURT:  So the caption is wrong on page 9?  It

19   says Dr. Henry in the Booker case.

16:04:16  20           MR. STOLLER:  That's correct, Your Honor.  It's

21   definitely the Hyde case.

22           THE COURT:  All right.

23           MR. LOPEZ:  The rest of it says Hyde.  We missed the

24   caption.

16:04:24  25           THE COURT:  Well, I only read the caption.  Actually,

16:04:26  1    I did read the rest.

2              In any event, the doctor would be asked whether a

3    particular fact would have mattered to him or would have been

4    important to him or did he wish it would have been disclosed,

16:04:37  5    and his counsel objected on the basis of a privilege

6    recognized in Wisconsin law that was referred to as the *Alt*

7    case, and it's a case that is cited on page 10 of the joint

8    report.

9              My mic is conking out.

16:05:07 10    (The Court and the courtroom deputy confer, switch mics.)

11             THE COURT:  So here are the thoughts I wanted to

12    share with and you get your reaction.

13             As you know, federal rule of evidence 501 says that state

14    law governs privilege in cases where state law provides the

16:05:35 15    rule of decision.  And the cases generally have interpreted

16    501 to mean that in diversity cases where state claims are

17    being asserted, the federal court applies the privilege

18    recognized in the law of the state that creates those claims.

19             In this case, I understand that the claim arises in

16:06:00 20    Wisconsin.  Is that true for Ms. Hyde?

21             MR. LOPEZ:  Yes, Your Honor, although there is a

22    question-of-law issue in this case whether Wisconsin law

23    applies or whether or not Nevada, potentially California law

24    applies.  Granted, the doctor was in Wisconsin.

16:06:20 25             THE COURT:  Well, I'll hear your thoughts on that in

16:06:23   1   a minute, but it seems to me a question that I would need to

2   address before deciding whether or not the lawyer's

3   instruction was inappropriate would be whether the Wisconsin

4   privilege applies to Dr. Henry's deposition because the claim

16:06:42   5   of Mrs. Hyde is brought, presumably, based on Wisconsin law

6   and all of the claims in the master complaint are common law

7   state law claims, there's no federal claims in the master

8   complaint.

9        And although the questions were phrased in terms of

16:07:03  10   what would have been important to you or what would have

11   mattered to you, that doesn't seem to me to be much different

12   from asking Dr. Henry whether a particular fact would have

13   been medically significant, which would have been close to the

14   kind of objection that the *Alt* case said is appropriate under

16:07:21  15   Wisconsin law and that an instruction not to answer is

16   appropriate in that setting.

17        So it seems to me there's at least a question of

18   whether or not the lawyer in the Henry deposition was giving

19   correct instructions to Dr. Henry.

16:07:39  20        And certainly before I would order a redeposition of

21   Dr. Henry on the basis that he was not allowed to answer those

22   questions, we need to decide whether or not it was proper to

23   not allow it, otherwise we're going to repeat the same thing

24   in the deposition.

16:07:52  25        So I wanted to share those thoughts, get your

16:07:55  1    reaction whether you think I'm off base, whether I just missed

2    something.  And if not, if these are issues, don't we need to

3    resolve those before we decide whether there's any basis for

4    re-deposing Dr. Henry?

16:08:10  5            MR. LOPEZ:  May I be heard?

6            I think --

7            THE COURT:  Pull both mics in front of you, would

8    you.  Thank you.

9            MR. LOPEZ:  Sorry, Your Honor.

16:08:31 10            I think the law is important here, and I can tell you

11    that I don't know whether Wisconsin law is going to apply,

12    Nevada or California, that's something we haven't briefed yet,

13    and we're getting there, but what's clear to me is if

14    Wisconsin law does apply, and, I think, even if Nevada law

16:08:49 15    does apply, the learned intermediary doctrine is alive and

16    well.  That is a defense pled by the defendants in this case.

17            Without us having the opportunity to test the

18    learnedness of this witness based on information, data, facts,

19    evidence that he did not have at the time that he had his

16:09:17 20    informed consent discussions withs Mrs. Hyde does not allow us

21    to appropriately address that defense.  I mean, that is really

22    the crux of why someone like Dr. Henry becomes maybe the most

23    important witness in the case.

24            I brought -- one of the things I brought with me is I

16:09:37 25    brought the cross -- actually the direct examination of

16:09:40   1   Dr. Hanson in the Reno case where he was on direct examination

2   for three hours.  I didn't count the number of documents, but

3   we were able to show Dr. Hanson a lot of Bard corporate

4   documents about information, data, safety profiles,

16:10:00   5   comparative analysis that he did not have at his disposal when

6   he chose to use what was then a Recovery filter, the Bard

7   Recovery filter, and said that had he been aware of that

8   information he not only -- he said, "I would not have warned

9   Mrs. Hyde about that, I would have not used the product."

16:10:21  10           Now, we have a lot of doctors that have said that

11   once you start showing them documents about information that

12   they did not have.  Some doctors have said, "Certainly would

13   have been my duty to have that conversation with Mrs. Hyde."

14   We never got there.

16:10:40  15           If he was in trial, Dr. Henry were to testify in

16   trial, we would have the right in countering the learned

17   intermediary defense to see how learned he really was at the

18   time he thought he had all the information he needed to

19   determine to use the Bard product at the time.

16:11:01  20           We can't really -- we can't do that without using

21   solid, competent evidence that exists in Bard documents.

22           It's clear this lawyer was not going to allow us to

23   use -- he said it two or three times, we provided that

24   transcript, that he was not going to allow us to show any

16:11:21  25   internal corporate documents to this defendant.  That would

16:11:23  1  not have been true in trial.

2        The ACR which is the American College of Radiologists

3  and the Society of Interventional Radiologists have what's

4  called a practice parameter form for informed consent for

16:11:39  5  image-guided procedures, which includes this device.  And the

6  standard here is that all this -- this is instruction to their

7  society members, like Dr. Henry.  All that should be expected

8  is that the practitioner will follow a reasonable course of

9  action based on current knowledge, available resources, and

16:12:05 10  the trends of the patient to deliver effective and safe

11  medical care.

12        More importantly, the Society establishes two general

13  recognized legal standards for informed consent.  This is a

14  quote from this document:  The first is measured by what a

16:12:23 15  reasonable physician in his or her professional judgment

16  believes is appropriate to disclose to the patient.  The

17  degree of disclosure depends on the perceptions of the

18  physician in this case -- in each case.  The second legal

19  standard is based on what a reasonable patient would want to

16:12:42 20  know in the same or similar circumstances.

21        Those are the standards.  That might even be the jury

22  instruction in one or more of these states that we're talking

23  about, Judge.

24        So I think the real issue here is for the first time

16:12:58 25  in six years we've been litigating these cases -- and they've

16:13:03  1   never objected to us using these documents.  Bard never has.

2   First time we had objections for using documents with treating

3   doctors was a treating doctor's assigned physician to defend

4   him at a deposition.

16:13:17  5           This was not about opinion testimony.  We weren't

6   asking him to be an expert.  We wanted to test his knowledge

7   and his perception about the risks and benefits of this device

8   that are revealed throughout the number of documents that we

9   intended to show to him in which -- I'm not here to advocate

16:13:34  10  the case, Judge.  I'm not trying to over-hyperbolize this

11  issue, but I can tell you 90-plus percent of the time when we

12  show the treating doctors what they did not know and what Bard

13  knew, all of a sudden they say, "Yes, that's something I

14  should have shared with my patient."  And more often than not,

16:13:53  15  they say "Had I known that and had that information, I would

16  not have used this device."

17          This is a bellwether case.  How do we defeat the

18  learned -- their position is going to be he knew all he needed

19  to know to provide informed consent.  We told Dr. Henry

16:14:10  20  everything he needed to know about the risks and benefits, the

21  complications and everything we knew about this device in

22  order to properly warn and give Mrs. Hyde informed consent.

23  And the truth is he didn't.

24          Let's just say this.  We didn't get the opportunity

16:14:28  25  to prove that wrong by being able to show him evidence that --

16:14:34  1   they've seen the evidence.  We used the same evidence almost

2   in every single case.  The learned intermediary doctrine is

3   alive and well.  We have to deal with that.

4         Maybe it's a justice balance here.  Maybe there's a

16:14:48  5   conflict on what Wisconsin law says we should or shouldn't be

6   able to do with respect to examining a lay witness.  He's not

7   really a lay witness, he's an expert.  But he's not a party

8   and he's not been designated as an expert.  But, my goodness,

9   we should be able to use the documents that maybe would -- I

16:15:07  10  don't know what his answers are going to be.  He may say "I

11  don't care about that, I don't care about that."

12         But, you know what, even if he doesn't care, that

13  evidence should still come in through the doctor because he

14  didn't tell those things to Mrs. Hyde, if he satisfied his

16:15:25  15  learned intermediary requirements to give informed consent.

16         You can see that one of the standards by this

17  doctor's own society is what would a reasonable patient want

18  to know.  And we ask those questions all the time.  "Doctor,

19  don't you think a reasonable patient would want to know that

16:15:38  20  Bard had determined that the device you implanted in her, they

21  had determined two years earlier posed unacceptable risk of

22  harm and it needed to be redesigned?"  I mean, we should be

23  able to ask those questions and show him documents that prove

24  that.  And we weren't given that opportunity.

16:15:58  25         THE COURT:  Mr. Lopez, I understand everything you've

16:15:59  1    said, but nothing you've said has caused me to conclude that I

2    was wrong in my initial reaction that I need to figure out,

3    number one, do I look to Wisconsin law for this privilege?

4    And, number two, if I do, would Wisconsin law support what the

16:16:16  5    lawyer instructed Dr. Henry at the deposition?  That seems to

6    me to be where I have to look for the answer.

7         I just can't say your equitable arguments are very

8    strong so I'm going to disregard what may or may not be in

9    Wisconsin law, assuming that's the right law.

16:16:36  10        MR. LOPEZ:  I don't disagree, Your Honor.  We're just

11   telling you the first time about the fact that there's a

12   learned intermediary doctrine.  In fact, there's an MDL in

13   Wisconsin now, I think it's one of the hip cases, where

14   there's been some rulings on the learned intermediary doctrine

16:16:49  15   being applicable in that medical device case.

16        I understand what Your Honor -- I just -- but we want

17   to have a full opportunity to see -- to have that briefed, I

18   guess.  This dep -- we only need two or three hours.  I mean,

19   I'm going to treat it just like he was going to testify in the

16:17:08  20   trial.  We don't need to learn anything from this doctor, we

21   just need to be able to do a direct examination, or whether

22   you could consider that a cross-examination, to test his

23   perceptions and his knowledge.

24        THE COURT:  I understand that.  I'm pretty confident

16:17:23  25   he'll be represented by the same lawyer and the same

16:17:27  1   instruction will be given and at some point a judge is going

2   to have to say that's a correct instruction or it's not.  And

3   that, I think, under Rule 501, will turn on what the

4   applicable state law says.

16:17:40  5            MR. LOPEZ:  Okay.  And we want to be able to make the

6   argument, if that law applies, maybe we ought to not allow

7   learned intermediary defense in the case.  I know that these

8   are issues that go beyond what we have in three pages in this

9   joint report, but I just thought it was important for Your

16:17:58  10  Honor to fully understand why we're doing this and why it's an

11  important issue in the Hyde case.

12            THE COURT:  I understand.  Okay.  Thank you.

13            Defense counsel.

14            MR. NORTH:  Your Honor, I do believe there is a

16:18:16  15  choice-of-law issue that needs to be addressed.  I thought of

16  that this morning, to be honest with you, and a little too

17  late, and started to have someone look at it.

18            I have seen reference to a couple of cases that

19  suggest to me that the choice of law here may not be the law

16:18:32  20  of the state -- or the state's law that might ultimately apply

21  to Ms. Hyde's case, but it may be the residence of the third

22  party.

23            THE COURT:  Which is Wisconsin?

24            MR. NORTH:  Which would be Wisconsin.

16:18:47  25            THE COURT:  Isn't Ms. Hyde in Wisconsin?

16:18:49   1          MR. NORTH:  Yes, but there is a complication here in

2     that she had the implant in Wisconsin and she had

3     subsequent -- injury may have occurred in either Nevada or

4     California.  And, as Mr. Lopez said, I think both parties

16:19:01   5     during discovery are trying to sort out the conflicts issue

6     there.  It would be a lot simpler if it's true that the law of

7     the state of the residence of the third-party witness applied.

8          I would suggest, Your Honor, perhaps --

9          THE COURT:  Let me ask one other question.  Where did

16:19:17  10     she -- where did she bring her claim?  What court?

11          MR. STOLLER:  Nevada, Your Honor, where she lives

12     now.

13          MR. NORTH:  My suggestion, Your Honor, would be we

14     each submit a two-page something to the Court by maybe next

16:19:32  15     Friday on the choice-of-law issue because I agree with you,

16     that is our biggest concern, that we get up to Wisconsin, if

17     this Court were to order a redeposition of Dr. Henry, only to

18     have the same circumstance apply.  And it seems to me that

19     what would help is for the parties to provide the Court with

16:19:52  20     authority which law applies, and then the Court can make a

21     determination on that basis.

22          THE COURT:  All right.  Hold on for just one minute.

23          Let me point out one thing that I just thought about.

24     As you think ahead on this issue, keep in mind federal rule of

16:20:30  25     civil procedure 45(f) which says that if we were to reconvene

16:20:36 1    the deposition of Dr. Henry, and if it were to be Wisconsin

2    because that's where he is located, and if somebody wanted to

3    raise an issue during the deposition, although under tradition

4    it would go to the Wisconsin court under Rule 45(f), it can be

16:20:56 5    sent to me.  That was a change made two or three years ago.

6    And I would request it be sent to me so we can at least be

7    consistent in all of our rulings.

8        So, I mean, the Wisconsin judge wouldn't have to

9    agree with that, but I've never known a judge to keep a matter

16:21:10 10   he didn't have to or she didn't have to.  So I'm guessing it

11   would come here.

12       My point is I don't think we'd end up at the end of

13   the day with a Wisconsin judge making this decision, I think

14   it can be made here in light of Rule 45(f).

16:21:24 15            MR. NORTH:  I completely agree, Your Honor.

16            THE COURT:  Well, let me identify what I think are

17   the issues that ought to be addressed by the parties.  And

18   they don't need to be addressed at length if you're in

19   agreement.  But one question is whether Rule 501 applies here.

16:21:48 20       The second question would be if Rule 501 applies,

21   then what is the law of the state that provides the rule of

22   decision within the meaning of Rule 501?  Is it Wisconsin?  Is

23   it Nevada?  Is it California?

24       Number three would be does the law of the state that

16:22:18 25   you believe applies recognize a privilege that would support

16:22:25   1      the instruction given by the lawyer to Dr. Henry?

           2              And Question Number 4 would be if the answer to

           3      Number 3 is yes, that the state law does support the

           4      instruction, is there a basis for arguing that the instruction

16:22:50   5      was nonetheless inappropriate in light of the learned

           6      intermediary doctrine?

           7              Am I missing any issues?

           8              Okay.

           9              What's a reasonable amount of time for you all to

16:23:13  10      produce those memoranda?

          11              MR. LOPEZ:  Two weeks, Your Honor.

          12              THE COURT:  Okay.  Let's say two weeks from tomorrow

          13      which will be July 28th, if you can file them.  I think 12

          14      pages per side should be sufficient to address these issues.

16:23:45  15              When I look at them, if I think we need to have

          16      argument or need any additional briefing, I'll let you know

          17      that.

          18              All right.  The next issue is on page 11 of the joint

          19      report.  It is the plaintiffs' request to depose Dr. Altonaga,

16:24:22  20      A-L-T-O-N-A-G-A.  I've read each side's position.  Is there

          21      anything else you wanted to say on that issue?

          22              MR. LOPEZ:  May I, Your Honor?

          23              THE COURT:  Yeah.

          24              MR. LOPEZ:  As Your Honor knows, in the beginning of

16:24:41  25      this MDL there was an issue about the fact that a number of

16:24:45   1   fairly significant corporate witnesses had already been

2   deposed and we were to treat those differently and to focus

3   maybe on new witnesses and whether or not we wanted to

4   redepose some of these other witnesses.

16:25:01   5          I think it's worth noting that the *Phillips* trial,

6   which we tried in front of Judge Jones two years ago, we

7   either called as a witness or played 13 corporate witness

8   depositions.  And we've not re-deposed any of them.  We've

9   been true to our focusing on other aspects of the case knowing

16:25:27  10   that this was a broader case that involved many more devices

11   over -- expanding over a longer period of time.

12          Dr. Altonaga becomes relevant because he was the

13   medical director at the time we're talking about in these five

14   bellwether cases.

16:25:50  15          Dr. Ciavarella was the medical director before

16   Dr. Altonaga.  His deposition's been taken once.  I think

17   maybe twice.  But we're fine with his deposition because his

18   really predated the relevant period of time that we're dealing

19   with here.

16:26:08  20          Dr. Altonaga's deposition was noticed in one state

21   court case, and I can tell you this:  When the defense went

22   around the country when we wanted more documents, we always

23   had a deal with the balance of the amount of money it would

24   cost -- always forget that phrase.  Every time.

16:26:31  25          THE COURT:  Proportionality.

16:26:32  1      MR. LOPEZ:  Proportionality.  So if it's -- that's

2  not the excuse for why we didn't do more with Dr. Altonaga,

3  it's just that his deposition was taken in that case and we

4  also knew that it was going to be a deposition we were going

16:26:45  5  to take generically in some other cases that we had pending at

6  the time.

7      He's never been asked questions specific to the time

8  period that we're dealing with here or the products we're

9  dealing with here.  Not specifically.  And I saw that counsel

16:27:03  10  for the defense said he doesn't know anything about the

11  plaintiff's devices.  I assume he means about the specific

12  device that was used in that particular patient.  But what he

13  does know as the medical director -- and we were circumspect

14  about who we chose because he's the medical director.  If

16:27:23  15  there is anyone who has a broadbased knowledge about those

16  periods of time when Mrs. Hyde, maybe others, received their

17  product, the device, and after, it would be Dr. Altonaga.

18      We're not going to cover that whole ground.  He was

19  deposed for seven hours, but on very generic -- as you saw in

16:27:42  20  our papers, very generic topics and, frankly, time periods

21  that predated the G2, the G2X, and the Eclipse filters.

22      I just think that on balance, considering how

23  respectful we were about not bothering 12 other witnesses who

24  we felt were pretty important enough for us to play their

16:28:04  25  videos or read his deposition, you know, take his deposition

16:28:10  1    for, you know, another four hours, we can cover all five of

       2    these bellwether cases within that four hours.  We just don't

       3    think on balance it's an unreasonable request.  Again, he's

       4    never been deposed specifically on the issues that surround

16:28:27  5    each of the five devices that make up these five bellwether

       6    cases.

       7              THE COURT:  All right.  Thanks.

       8              Mr. North.

       9              MR. NORTH:  Your Honor, we would submit, of course,

16:28:40 10    as we mentioned, this is governed by CMO 23 when the Court

      11    addressed this issue sort of globally and said these

      12    depositions in the bellwether cases may include Bard present

      13    or former employees only if the depositions will likely

      14    produce probative evidence that could not have reasonably been

16:28:58 15    obtained during general discovery.

      16              We believe Dr. Altonaga's deposition could have been

      17    reasonably obtained during general discovery.  They chose not

      18    to request him to be re-deposed.

      19              Seven witnesses, by my count, had previously been

16:29:14 20    deposed prior to this MDL, and we permitted them to redepose

      21    them during the general fact discovery.  They easily could

      22    have asked for Dr. Altonaga's at that point.

      23              They claim, well, we do not -- did not know which

      24    cases were going to be bellwethers, and we now want to depose

16:29:35 25    him particular to the time frame the bellwethers are involved

16:29:39  1   with.

2           Well, that would be true for every single corporate

3   witness.  And the purpose of more than 12 months of general

4   fact discovery was for them to cover the gamut of these things

16:29:49  5   for people who had general knowledge.

6           It is undisputed that Dr. Altonaga has no information

7   or knowledge specific to these plaintiffs themselves.

8           They requested other corporate depositions as a part

9   of the bellwether discovery process that do have specific

16:30:09  10  knowledge regarding these bellwether cases.  That includes

11  sales personnel and field assurance personnel who did

12  complaint investigations regarding these plaintiffs.  We

13  haven't opposed those.  But the rationale they're giving to

14  try to justify the deposition of Dr. Altonaga here would apply

16:30:26  15  to every single fact witness out there who does not have

16  general knowledge, because none of these people were deposed

17  at a time we knew specifically which bellwether cases would be

18  chosen.

19          But all of these witnesses -- I mean all of these

16:30:42  20  bellwether cases involve either the G2, some variation of the

21  G2 filter, or the Eclipse filter.  Those are the two filters

22  most represented in the inventory of this MDL, as we discussed

23  at the last hearing, and they had to have known that those

24  filters could be at issue in these particular cases, the

16:31:02  25  bellwether cases.

16:31:04    1        So we believe that this testimony could reasonably

        2   have been obtained during general fact discovery if they had

        3   simply requested it.  And under rule CMO 23, we think this

        4   deposition should not go forward.  Thank you.

16:31:19    5        THE COURT:  Okay.

        6        MR. LOPEZ:  Can I just -- I forgot to state one

        7   thing.

        8        THE COURT:  That's fine.

        9        MR. LOPEZ:  I said it last time.  I wanted to remind

16:31:27   10   the Court of this.  There are state court cases that have G2

       11   products that are -- one's in Philadelphia, one in San

       12   Francisco.  We're trying to track where people are doing

       13   discovery outside of the MDL.  Dr. Altonaga is free game for

       14   those depositions to take his deposition for seven hours.

16:31:48   15        One of the things I would propose that we do is maybe

       16   coordinate with them and allow us a set period of time within

       17   the confines of that -- I know they want to take

       18   Dr. Altonaga's deposition because they involve G2 and I think

       19   G2X product and one might be an Eclipse, to at least allow us

16:32:12   20   the opportunity to participate in those depositions.  I mean,

       21   he's going to have to be produced for deposition in those

       22   cases anyway.  It could be part of the state coordination

       23   principles that we've espoused to here, that that might be

       24   reasonable compromise to allow us to be able to depose

16:32:29   25   Dr. Altonaga on issues he's never been deposed on before.

16:32:34     1          THE COURT:  Mr. North.

             2          MR. NORTH:  Just one last statement, Your Honor.  The

             3     Philadelphia case he references, discovery is closed in that

             4     case.  Dr. Altonaga's deposition was never requested.  There

16:32:47     5     is a pretrial conference in that case set for August 17.  He's

             6     not being deposed in that case and his deposition has not been

             7     requested in a single other case.

             8          THE COURT:  All right.  Well, I want to go back and

             9     look at CMO 24 I think it is.  You referred to 23, but I think

16:33:05    10     24 was the bellwether CMO, and I haven't reread that.  I will

            11     look at it and include a decision in the order that comes out

            12     after the hearing.  I understand both sides' positions.

            13          The next issue is on page 14, Item Number 4, concerns

            14     discovery of communications between plaintiffs' experts.  And,

16:33:28    15     frankly, I cannot tell if there's an issue here.  When I look

            16     at page 17 beginning on line 15, plaintiffs say that they have

            17     not objected to the production of communications by and

            18     between their experts except to the extent those

            19     communications are work product between plaintiffs' counsel

16:33:48    20     and the experts, and then down on line 22 through 24 they said

            21     they have not objected to communications between experts and

            22     others on which counsel were merely copied.

            23          So it sounds like plaintiffs are agreeable to

            24     producing communications among experts even if counsel was

16:34:11    25     simply copied, provided it wasn't a communication with

16:34:14  1    counsel.

2              Am I correctly understanding plaintiffs' position?

3              MR. O'CONNOR:  I think I can address, and Mr. Stoller

4    can help me.

16:34:25  5            THE COURT:  Pull the mic over in front of you, would

6    you.

7              MR. O'CONNOR:  Sure, Your Honor.  Would you like me

8    to step up there, Your Honor?

9              THE COURT:  Either way.  Just so you're talking into

16:34:34 10   a mic.

11             MR. O'CONNOR:  But I think the issue -- certainly any

12   communications between counsel and the experts would be

13   protected, as well as the draft reports.

14             The issue, or one issue, that may arise here is when

16:34:54 15   they asked for the draft communications between joint authors

16   of the report regarding the drafting or contents of the draft

17   report, which may well be part of the draft report itself.

18   And that's what we have to look at in terms of to what extent

19   that would be protected under the work-product doctrine.

16:35:28 20            THE COURT:  So are you saying there's an issue?

21             MR. O'CONNOR:  Well, I'm saying we are collecting all

22   of -- we're going to look at the issue and look at the

23   communications and review them again.  While a communication

24   between the experts that has nothing to do with, other than

16:35:48 25   communication with us or anything to do with the contents of

16:35:50   1   their report, certainly we would consider that, but if it has

2   to deal with the actual content or process or thought process

3   that was given to them by us or that's something that's going

4   to be included in the report and a discussion of how to

16:36:09   5   prepare the draft and what should go in the draft, then we

6   would take the position that that would be protected.

7        THE COURT:  Well, I think you're modifying what you

8   said in your joint report because you said we don't have a

9   problem with communications among experts.  You're now saying

16:36:28  10   you may if they are communicating about the content of

11   reports?

12        MR. O'CONNOR:  Well, where we're taking issue, if you

13   look page 17, Your Honor, beginning line 4 where Bard has

14   expanded their request, which we take position as contrary to

16:36:48  15   Federal Rules of Civil Procedure, specifically 26(b)(4)(B),

16   which precludes discovery of drafts of an expert report.

17        THE COURT:  Well --

18        MR. O'CONNOR:  And our position that the request

19   ignores that communication between joint authors of the report

16:37:08  20   regarding the drafting of the contents of the report

21   essentially asks for drafts of the reports themselves.

22        THE COURT:  Okay.  Let me hear from defense counsel.

23        MR. LERNER:  Your Honor, I think one of the

24   difficulties here is kind of dealing with a very unique

16:37:35  25   situation where you have multiple experts doing joint reports.

16:37:40  1   So we've asked for any production of any communications

2   between or among those joint experts.  And so at deposition,

3   sometimes they raised objection if counsel was copied on those

4   that that was protected.  So there's one area of just

16:38:00  5   communication with joint experts.  I'm not aware if there are

6   communications or not.  They haven't been produced if there

7   are.  Some of the experts have talked about e-mailing one

8   other another.  But so far I've not seen any communications

9   between these joint experts produced.  So that's one area.

16:38:16  10  And it sounds to me, based on the joint report, that is not an

11  area of dispute.

12        So that leaves -- if that's true -- the second thing

13  is if there are communications where they're claiming the

14  work-product protection for those joint experts, I think that

16:38:35  15  the easiest thing to do in that situation is produce a

16  privilege log asserting what their claims are and logging

17  those claims if they're asserting protection, because it's a

18  unique situation where you have the joint experts

19  communicating with each other.

20        THE COURT:  Okay.  Well, let me -- let me -- it

16:38:54  20

21  sounds like what we need to do is have plaintiffs counsel look

22  at the communications and decide what to produce.  But let me

23  make a couple of observations.

24        I am familiar with this because I chaired the

16:39:08  25  committee that developed this change to Rule 26.  We spent a

16:39:12  1   lot of time on this.  It was very much an effort to reduce

2   litigation costs, as the introductory paragraphs from the 2010

3   note concerns.  And you all remember the days when lots of

4   money was spent chasing draft reports or spent avoiding the

16:39:27  5   creation of draft reports and having even second sets of

6   experts involved so you didn't -- it was just a waste of time.

7   And the effort was just to cut out that cost, and so we drew a

8   fairly bright line:  You don't get draft reports, you don't

9   get communication with counsel except on three topics.

16:39:44  10   Everything else remains fair game.

11       And we specifically said, I'm now reading from a

12   paragraph under subdivision (b)(4) in the 2010 advisory note.

13   You guys have already quoted this, but it says, "Inquiry about

14   communications the expert had with anyone other than the

16:40:01  15   party's counsel about the opinions expressed is unaffected by

16   the rule."

17       That means that if an expert is communicating with

18   another expert about opinions expressed in the report, that is

19   fair game for discovery.  That's not work product.

16:40:17  20       Now, if the expert attaches a draft of the report and

21   says to the co-expert, "I've revised the draft, it's

22   attached," that's a draft report.  That's not discoverable

23   under Rule 26(b), but the communication between the experts

24   is.  That was a line that was drawn.  And there was a lot of

16:40:36  25   debate, do we extend this work product protection between the

16:40:41  1    lawyer and the expert to experts and experts or to experts and

       2    others who might be providing input, and the decision was, no,

       3    that's fair game, that goes into the formation of the expert's

       4    opinion.

16:40:51  5         We were trying to eliminate this gamesmanship, this

       6    charade that we all were engaging in as litigators to try to

       7    avoid the creation of a discoverable draft.  It was just a big

       8    waste of money.

       9         So my view is if you have communications among your

16:41:09  10    experts about the opinions that are going into a report, that

      11    is discoverable.

      12         MR. STOLLER:  Can I ask a clarification, Your Honor?

      13         THE COURT:  Sure.

      14         MR. STOLLER:  I engaged in the meet and confer and I

16:41:20  15    reviewed a number of these communications.  As I see it, there

      16    are five buckets in which they fall in.  There are

      17    communications between the experts and the lawyers that don't

      18    fall within the three exceptions, and I think those are

      19    clearly out.

16:41:35  20         There are reports.  Those are clearly out.

      21         THE COURT:  You mean draft reports?

      22         MR. STOLLER:  Yeah, draft reports.

      23         On one side of the spectrum.

      24         On the other side of the spectrum, there are, or at

16:41:45  25    least theoretically are, communications back and forth between

16:41:48  1    the experts that aren't regarding the -- that are -- well, let

2    me make my way down the spectrum.

3        The next possibility is that there are communications

4    between counsel and the experts, and then the experts

16:42:00  5    conveying that work-product communication from one retained

6    expert to another.  It would be our position that we have not

7    waived and that is not discoverable, even though it happens to

8    be in the form of an e-mail from one expert to another expert,

9    both of whom are retained experts by us.

16:42:18  10       Another bucket is Expert A and Expert B working on a

11   joint report send an e-mail which is effectively a draft of

12   the report or portion of the draft of the report.  Here's a

13   paragraph taken from it, I've rewritten it, and sends it to

14   the other.  That is effectively a draft.  We cited some cases,

16:42:36  15   and for some reason the Republic of Ecuador seems to come up a

16   lot in these cases.  But nonetheless, it's our position that

17   those types of communications also fall within the protections

18   of 26(b)(4)(B).

19       But everything else, the cover communication

16:42:51  20   conveying a draft, we think the cover e-mail falls in the

21   bucket of discoverable even though the draft is not.

22       I think the dispute is are there communications that

23   fall within those middle two buckets?  Because we're certainly

24   in agreement this discoverable over here on the far ends, and

16:43:10  25   I think both sides are in agreement that drafts and

16:43:13  1    communications with lawyers are not.

2         What we've done is gone out and asked all of our

3    experts who have been involved in drafting joint reports to

4    get us all their communications to figure out whether we have

16:43:26  5    any that fall in the middle buckets where there may be a

6    dispute.  I'm not clear from the defendants whether they

7    dispute our contention that those would be privileged.  But

8    what we've done is gather them.  I'm happy to put together a

9    privilege log that says from A to B and here's -- I think it

16:43:38  10   falls in this bucket or this bucket, and then we can just

11   determine whether or not there's a dispute that needs to come

12   back to the court.

13        MR. LERNER:  Your Honor, that makes sense.  One thing

14   I want to note --

16:43:50  15        THE COURT:  Hold on a minute.  You said that makes

16   sense?

17        MR. LERNER:  I did.  I think we have to -- he has to

18   go through the e-mails and figure out what the communications

19   are and figure out if we have a dispute.  But I think one part

16:44:03  20   of the dispute that may arise is whether the communication is

21   a draft report or not.

22        Judge Zapata recently, here in the District of

23   Arizona on June 19th issued an opinion talking about what

24   is -- what constitutes a draft report.  He provided some

16:44:25  25   guidance in his opinion about that on this very issue.

16:44:29   1    Because sometimes it's so ambiguous whether it relates to a

2    draft report or not.  So that's why I think it comes with

3    fact-intensive exercise.  And once they do a privilege log, we

4    can look at that and further meet and confer on the issue.

16:44:44   5         THE COURT:  On your third bucket, if -- if a lawyer

6    talks to Expert A, Expert B who's working on the report is

7    unavailable, he's in the OR, and the lawyer says here are my

8    thoughts, pass them on to Expert B and Expert A does that,

9    that's a lawyer communication, in my view.

16:45:06  10         It's less clear to me on what should happen when

11   Expert A and Expert B are talking about the opinions or even

12   about the draft report.

13        If there were no case law since 2010, I would say

14   that falls on the discoverable line.  But I recognize courts

16:45:25  15   have spoken on it.  I'll look at those cases before I make a

16   decision.  I haven't -- I haven't read Judge Zapata's

17   deposition, I haven't read the Ninth Circuit decision that's

18   mentioned.

19        So what I would say is go ahead and make your

16:45:37  20   production, establish your privilege log.  Instead of saying

21   work product, say Bucket 4.  That way everybody will know

22   exactly what the issue is.  And if you're in disagreement,

23   call me and we can talk about what the issue is.  I might even

24   look at it in camera and you can identify cases I need to look

16:45:58  25   at.  But we may not have to do that if there's no issue.

16:46:02   1            Does that make sense?

          2            MR. STOLLER:  Yes, Your Honor.

          3            MR. LERNER:  Yes, Your Honor.  Thank you.

          4            THE COURT:  Okay.

16:46:15   5            All right.  Let's talk for a minute about Item 5 on

          6    page 18 of your report.

          7            We overlooked in my office the filing that was made

          8    at Docket 5872.  That was our error.  I had intended when I

          9    entered the last Case Management Order to get a schedule out

16:46:39  10    to you in mid-May and we just missed it.

         11            And let me make a comment on that.  If you submit

         12    something to our office that requires action and you don't get

         13    a response within a week, call us and tell us.  That won't

         14    hurt our feelings, won't make us feel bad.  We're missing some

16:46:59  15    stuff in this case because there's so much coming in.  We're

         16    going to try to not do that, but it's inevitable something

         17    will be missed, so don't hesitate to call us.

         18            I have looked through what's at Docket 5872.  I've

         19    looked at the modification you all made in Docket 6477.  I've

16:47:18  20    read the different views on whether the plaintiff should get

         21    an extra week on their preemption experts, whether the

         22    defendants should get a preemption expert.

         23            Let me tell you what I think we should do, and I'll

         24    let you react to it.

16:47:35  25            I think we should establish this schedule:  The

16:47:38  1   plaintiffs' preemption experts will be disclosed July 21st.

2        The date for the defense experts, if there are any,

3   will be August 4th.  And if there are experts and you all talk

4   about what they're going to say and you disagree, call me and

16:47:57  5   I'll decide whether they're going to be permitted.

6        That call may be unnecessary and the date may be a

7   nonevent if the defendants don't produce an expert, which

8   you've already said, Mr. North, you think is unlikely in the

9   brief.  We'll have the schedule accommodating it, but I'm not

16:48:19  10  making the decision today it's permitted, I want to hear from

11  you after the plaintiffs' experts are on the table and find

12  out exactly what it is the defendants think they need to

13  address.

14       Expert depositions.  I would still set them off by

16:48:29  15  August 11.  Now, that would mean the plaintiffs' experts need

16  to be disclosed between July 21st and August 11.  And I would

17  say the defendants, if you're going to call experts, get on

18  their calendar for a date between August 4 and August 11 and

19  we can still stick with the overall schedule.  But, again,

16:48:50  20  that will be irrelevant if there are no defense preemption

21  experts.

22       We would then have the response from the plaintiffs

23  on the preemption issue by September 1st, the reply by

24  September 22nd.  So we'd be within a week of what both sides

16:49:07  25  have proposed for the close of briefing.

16:49:11   1          MR. LOPEZ:  I missed the reply date.

2          THE COURT:  September 22nd.

3          MR. LOPEZ:  Thank you.

4          THE COURT:  Thoughts?

16:49:19   5          MR. NORTH:  Your Honor, I would just make the

6     observation that Mr. Lopez and I had some informal discussions

7     about their expert, and assuming that it is still the person

8     they talked to me about last week, we're deposing that person

9     on July 31st anyway, so that should not be a difficulty.

16:49:38  10          THE COURT:  How about from plaintiffs' side, what do

11     you think of this approach?

12          MR. LOPEZ:  I think it's doable, Your Honor.  I have

13     to -- could we put on hold the deposition for August 11.  I

14     should probably meet and confer with Mr. North if that's going

16:50:00  15     to be enough time for you to address those issues, along

16     with --

17          THE COURT:  Well, it will be you deposing their

18     expert that you will have gotten on August 4.  If you think

19     that's too short, we can make it August 18th, but I'd still

16:50:17  20     like to require the response to the motion by September 1st so

21     we stay on the overall schedule.  It seems to me you'll be

22     drafting your response before long, before you start deposing

23     their expert in any event.

24          MR. LOPEZ:  I thought you said the depositions of the

16:50:33  25     experts would be between August 4 and August 11.

16:50:36   1            THE COURT:  Only the defense expert, if one is

2      offered and I allow it.

3            So does that schedule work?

4            MR. STOLLER:  Could we have to the 18th, Your Honor?

16:50:48   5            THE COURT:  Yeah.  I'll say the 18th for the

6      deposition, if it happens, and we'll leave the rest of that

7      schedule in place.

8            So just to recap, plaintiffs' expert due on

9      July 21st.

16:51:01  10            Defense experts, if they choose to use one, will be

11      due by August 4th.  But if there's a dispute whether it's

12      allowed, you'll call me and I'll make a decision on whether

13      it's allowed.

14            Expert depositions by August 18th.

16:51:16  15            Response to the preemption motion by September 1st.

16            Reply by September 22nd.

17            As to the motion to seal, I think what you proposed

18      in Docket 6477 makes sense.  We'll say the defendant's amended

19      motion to seal will be due on July 28th; plaintiffs' response

16:51:36  20      August 28th; and defendant's reply September 13th.  Which is

21      what you all had proposed.

22            Okay.  Let's talk about a few other issues that you

23      raised in your joint report.

24            You asked about procedures for the medical monitoring

16:51:55  25      class certification hearing.  I do not want evidence at the

16:51:59  1    hearing.  I don't think I'll need it.  It is set for 2:30 p.m.

2    August 11.  My intent was to allow 45 minutes per side for

3    oral argument, and then I'll undoubtedly have questions, so it

4    will probably end up being a two-hour hearing.

16:52:21  5              Any concerns about that?

6              Okay.  That's what we'll plan on.

7              MR. NORTH:  Nothing, Your Honor.

8              MR. LOPEZ:  No, Your Honor.

9              THE COURT:  As for the science day, I appreciate your

16:52:28 10    suggestion of August 10th, but if we hold it August 10, I will

11    have forgotten most of it by October when I actually turn to

12    the Daubert motions and the motions for summary judgment.

13              I am also bringing on a third law clerk who is going

14    to help with the MDL from here on out because of the volume of

16:52:50 15    work that will come with these motions and the bellwether

16    trials.  I would like that person to be on board.

17              I would like to set the science day for sometime the

18    first half of October.  I don't have a particular preference

19    on a day.  I don't know if you do.  I understand you want two

16:53:07 20    hours per side, which sounds fine.  We can even try to link it

21    to another status conference so that we don't make you travel

22    here more than once.  But I don't think I want to do it on

23    August 10th just because it won't stick and I don't want to

24    have to go reread a four hour transcript in October.  I'd

16:53:27 25    rather hear it fresh when I've got questions.

16:53:31   1          MR. LOPEZ:  We'll do it twice.

           2          THE COURT:  That's very generous.

           3          Okay.  If you don't have a preference, let me look

           4     at -- well, let's think for a minute about status conferences.

16:53:59   5          I guess the question I have is whether we need to

           6     have a status conference before the first part of October.

           7          MR. NORTH:  Your Honor, I was thinking about that

           8     earlier.  It seems to me, since discovery's going to be

           9     essentially concluded by mid-August that there probably is not

16:54:16  10     a need for a status conference, unless something comes up, at

          11     which point we can always call the Court.

          12          MR. LOPEZ:  We don't disagree with that, Your Honor.

          13          THE COURT:  Okay.  Let me look at the calendar for a

          14     minute.

16:54:35  15          MR. LOPEZ:  First date after it's under 100 degrees

          16     in Phoenix.

          17          MR. O'CONNOR:  That won't be October.

          18          THE COURT:  That's late October.

          19        (The Court and the courtroom deputy confer.)

16:57:14  20          THE COURT:  How about Thursday, October 5th as a date

          21     for the next status conference as well as the science day.

          22     Does that work for you all?

          23          MR. LOPEZ:  That's far enough out, Your Honor, we'll

          24     make it work.

16:57:28  25          MR. NORTH:  Yes, Your Honor.

16:57:30  1          THE COURT:  Okay.  Let's then -- I was going to say
       2     let's set it for 10:00 a.m., with the understanding that we
       3     will need to not only hold the status conference but then have
       4     two hours per side for the science discussion, and leave some
16:57:56  5     time at the end for questions.  So we'll plan that for
       6     October 5th.
       7          I recognize that there's a pending motion to
       8     disqualify Dr. Kinney that I have not gotten to yet.  You've
       9     indicated that the defendants will be filing another motion to
16:58:17 10     disqualify two experts.  A question I have is whether it makes
      11     sense to talk about all three of those motions -- well, I
      12     guess there will be two motions, one at Dr. Kinney, the other
      13     at the other two experts -- whether it makes sense to deal
      14     with them at one time.  I know the factual issues are a bit
16:58:40 15     different, but it seems to me the law on when a court
      16     disqualifies an expert is going to be relevant to both.  So
      17     part of my thought is to hold the Kinney motion until the
      18     other one is fully briefed and deal with them together, but
      19     I'm interested in your thoughts.
16:58:57 20          MR. NORTH:  Your Honor, that's fine with us.  I would
      21     just note, too, we did file the second motion yesterday
      22     afternoon.  So the briefing schedule has started on that one.
      23          THE COURT:  All right.
      24          Any thoughts from plaintiffs' counsel?
16:59:10 25          MR. LOPEZ:  That's fine with us, Your Honor.

16:59:12    1          THE COURT:  All right.  Then I will hold Kinney until

            2    the other motion is fully briefed and deal with them at the

            3    same time.

            4          MR. LOPEZ:  Could we have 20 seconds on that, Your

16:59:23    5    Honor?

            6          THE COURT:  Sure.

            7          MR. STOLLER:  Here's the issue -- go ahead.

            8          MR. LOPEZ:  So we'd be remiss in not explaining that

            9    two of these experts, Vogelzang and Desai, are both medical

17:00:01   10    monitoring class experts and liability experts.  So I don't --

           11    the hearing is August 11th.

           12          THE COURT:  Yes, that's very relevant.

           13          MR. LOPEZ:  I would say if it's a time issue, we

           14    wouldn't have any problem, even though it's filed after, if

17:00:47   15    you needed to deal with that one first.  In other words, if

           16    there was a problem dealing with both that soon.

           17          THE COURT:  You wanted to say something, Mr. North?

           18          MR. NORTH:  Yes, Your Honor.  I was going to say I'm

           19    not sure that that changes, at least from our perspective, the

17:02:44   20    schedule.  I don't believe the class action decision is going

           21    to rise or fall on those two experts, particularly they go

           22    more to the merits.  But in any event, it seems to me we could

           23    proceed with the hearing as scheduled and the briefing as

           24    scheduled, and they will be ripe for consideration about the

17:03:04   25    same time.

17:03:04  1        THE COURT:  All right.  Well, what I was going to --

2    I was just looking at what's feasible between now and when I'm

3    pulling that hearing.

4        I think what I'd like to do, if it works, is have the

17:03:19  5    plaintiffs file your response to the motion to disqualify that

6    was filed yesterday by two weeks from tomorrow, which will be

7    the 28th of July, and have the defendant's file their reply by

8    a week later, August 4.  That way the motion to disqualify is

9    fully briefed before the class certification hearing on

17:03:40 10    August 11 and we can review that briefing preparation for the

11    class certification hearing.  Is that workable for you all?

12        MR. NORTH:  Yes, Your Honor.

13        MR. LOPEZ:  Yes, Your Honor.

14        THE COURT:  Okay.  We'll get it fully briefed and I

17:04:01 15    will do my best to be prepared on the class certification

16    issue as well as the disqualification matter.  But it helps to

17    know that they're not at least completely central to the class

18    certification decision.

19        Let me just make a note here.

17:04:34 20        All right.  On page 21, plaintiffs indicated that you

21    wanted to talk about timing and procedure leading up to the

22    bellwether trials and a number of issues.  Tell me

23    specifically what would be helpful for you.

24        MR. STOLLER:  Your Honor, we primarily want to start

17:04:58 25    getting in place the process of getting whatever cases, and

you've indicated you want to do Booker and/or Jones as the
first two cases, let's start the process of figuring out when
we're going to have motions in limine due, dealing with
counsel on both sides in determining our witness lists and
filings for joint pretrials and those sort of things, because
it is going to be somewhat a cumbersome process, and knowing
you're putting us on a chess clock, we can be efficient and
the sooner we can start working ourself towards --
understanding what the scheduling is going to be, we can work
towards those things that we're going to need to do to prepare
for trial rather than -- the concern is if we wait, we may
cause delays in the trial itself or burden ourselves at the
end by trying to do a lot at the end.  Not knowing when you're
looking at setting trials and having pretrial conferences, at
this point it is hard for us to gauge what we're going to be
doing between now and then.

THE COURT:  All right.  Well, I understand.

I'll tell you what I don't know now that's a big
question, and that is how long it's going to take me to decide
the *Daubert* motions and the motions for summary judgment.

If it's true, as you said at the last status
conference, that I could be getting between 17 and 20 *Daubert*
motions, plus five motions for summary judgment, if there's a
lot of overlap, it's possible, in my view, we could get those
decided by the end of the year.  If there's not, if we're

17:06:26   1    truly dealing with potentially 25 very substantive motions, I

2    won't be able to get those done by the end of the year.

3         So I just don't know whether we'll be in a position

4    to start these bellwether trials in the first quarter of 2018

17:06:43   5    or not.  And I don't think I'll know until I have a sense of

6    those motions.

7         When we do get to setting them, my practice is to

8    pick a firm trial date, that I don't move, set a final

9    pretrial conference a week or two before it, and get all of

17:07:04  10    the motions in limine briefed in advance of the final pretrial

11    conference and address them at the final pretrial conference.

12         I typically allow three pages per motion and response

13    on a motion in limine to really cut to the chase.  Sometimes I

14    end up with 12 of them, but it sure cuts down on the briefing.

17:07:23  15         I require you all to submit proposed jury

16    instructions, proposed voir dire for the jury, a statement to

17    be read to the jurors before jury selection, which is a 2 or 3

18    paragraph summary of the case, provide proposed verdict forms,

19    and to file a Rule 26 final pretrial order which identifies

17:07:51  20    the issues in the case, the witnesses each side will call, the

21    exhibits that will be used, and the objections to the

22    exhibits.  And I follow what Rule 16(e), I think it is, says,

23    which is that once I adopt that final pretrial order, you

24    can't add evidence to it, or objections to it, except to

17:08:17  25    prevent manifest injustice.  It's the highest standard I know

17:08:22  1   of in the civil rules.

2        Once that blueprint for trial is set, it really is

3   set.

4        But that's all done at final pretrial conference.

17:08:30  5   Which is, as I say -- and we can make it farther ahead of

6   trial than a week or two if it would be helpful.

7        I recognize you've got busy schedules, and I do as

8   well.  But my thought is that what we probably should do is

9   see on October 2nd if we can at least set a date for you to

17:08:57  10  hold on your calendars, and me to hold, for the first

11  bellwether trial in 2018.  Because by then the motions will be

12  filed, the responses will be filed, so we'll have a sense for

13  how difficult the task of getting those all decided will be

14  and I'll have a sense whether we can set it in the first

17:09:14  15  quarter or we have to push it farther into 2018.

16       It may be we want to block out several three-week

17  periods over the year in 2018 for trials as well to make sure

18  everybody has it on their calendars.

19       But right now, I just honestly don't have any sense

17:09:36  20  whether we'll be ready to try those cases in the first part of

21  2018 because if I've got 25 very substantive and difficult

22  *Daubert* and summary judgment motions, those will not be

23  decided in two and a half months.

24       MR. STOLLER:  That's fair, Your Honor.  The concern

17:09:55  25  we have on our side is getting ready for trial.  There's going

17:09:57  1    to be a lot of video excerpts, and presumably objections and

2    those sort of things that will need to be ruled on, in advance

3    of trial and those sort of things.  So it's a little bit more

4    cumbersome a process because a lot of the witnesses, and even

17:10:09  5    the cases, are from different places around the country where

6    we're not going to have live people.  And at least

7    historically there's been a fair amount of back and forth

8    about exhibits and objections in advance of trial.

9         Our concern is making sure that we have those issue

17:10:26 10    teed up timely so we can get those resolved and have a

11    smoother process to trial.

12         MR. NORTH:  Your Honor, just out of curiosity, you

13    were discussing your normal pretrial procedures.  Would a

14    juror questionnaire be something that the Court would

17:10:38 15    entertain?

16         THE COURT:  I've used juror questionnaires three or

17    four times in 14 years, and only when the cases were high

18    profile public cases where it was likely people had heard

19    about them or where they included unusually sensitive issues

17:10:59 20    or evidence that people might be reluctant about in voir dire

21    and open court.  So I usually don't use them.  I'm not opposed

22    to it if you think it would be helpful.

23         It adds several steps to the process because those

24    questionnaires need to go out 10 weeks, is it, Traci, before

17:11:22 25    trial?  If there's going to be time to get them back, have you

17:11:27  1    review them, hold a hearing where we go through them and weed

2    people out on the basis of the questionnaires.

3          So I'll be happy to consider that if you think it

4    would be helpful.  It makes the process longer in some ways,

17:11:42  5    but it saves time in some ways.  It can be informative.  I

6    just don't have an opinion yet on whether this is the kind of

7    case where it would be better than a regular voir dire.

8          MR. STOLLER:  Thank you, Your Honor.

9          THE COURT:  Let me ask one other question of you.

17:12:06 10          I think I know the answer to this, but I'm interested

11    in your reaction.

12          As I indicated last time, I think I did, I've got

13    some pretty heavy travel responsibilities for the courts

14    because I chair the rules of practice and procedure for the

17:12:24 15    federal courts and I'm probably going to have to travel out of

16    state 15 to 20 times in 2018, and the same amount in 2019.

17    That makes it really tough to schedule three-week trials that

18    run consecutively when you consider there are other trials

19    that need to be fit in as well.

17:12:45 20          I've tried to think about how we deal with that and

21    get these bellwethers tried in a reasonably short period of

22    time.  I don't have the luxury of just setting aside

23    everything and doing these one after another.  And it's

24    possible, you never know what your other trial docket is going

17:13:06 25    to be, but given the trial docket and my travel schedule, that

1    these six bellwether trials could stretch out to a year and a

2    half or two before getting them done.

3         An alternative is to set them all on a fairly

4    aggressive schedule, but bring in a visiting judge or two to

5    try some of them.

6         That would allow us to try them in shorter order.

7    But obviously that way you've got different judges.  That may

8    not be a bad thing.  That may be a good part of the test case.

9         But I'm interested in your thoughts about that,

10   whether it's better to try to get them all set over the course

11   of a year or a year and a half and bring in visiting judges to

12   handle some of them or whether it's better to have me try them

13   all at the risk of pushing the schedule out farther.

14        I don't know if you want to think about that or if

15   you have thoughts about it now.

16        MR. LOPEZ:  Well, I think from the plaintiffs'

17   perspective, I don't know what this is going to look like next

18   year, Judge, but I think that for the bellwether process to

19   really accomplish what it's set to accomplish, to have gaps is

20   probably not a good idea.

21        What happens is all of a sudden just the bellwether

22   case gets resolved and it really hasn't done much to work

23   toward the parties having a better feel for what these cases

24   would look like if they're tried.  It's just going to put off

25   the potential for maybe resolution of the entire litigation.

17:14:42   1        I think on balance -- we'll talk about it, but I mean

       2   personally I think that's a good idea.  I mean, I don't know,

       3   maybe we'll have some remand cases by then, too.  We haven't

       4   addressed that yet, but it could be we've got other cases

17:14:58   5   going to trial at the same time.  If that's the case, then the

       6   bellwether and this whole process, what a jury verdict is

       7   going to look like, may happen outside of the bellwether

       8   process.  Maybe it's not an issue, maybe we can wait for Judge

       9   Campbell to come back and handle the next case.  There's a lot

17:15:17  10   to be said for continuity and predictability once we've tried

      11   a case in front of you to know what to expect the next time

      12   around.

      13        Let me say this:  From plaintiffs' perspective we're

      14   open, certainly, for a process like that, I think.

17:15:32  15        MR. NORTH:  Your Honor, if I could, I'd like to have

      16   some time to think about that and consult with my client.  I

      17   certainly understand the Court's concerns in that regard.  I

      18   think the ultimate answer may depend how many we're able to

      19   schedule in a year and a half time or something of that

17:15:49  20   nature, which we will probably know better by October, I would

      21   think.

      22        I am concerned -- my first reaction is one of concern

      23   that we lose something, both sides lose something, in not

      24   having Your Honor try the cases, given the institutional

17:16:06  25   history.  We're going on almost two years of pretrial

17:16:11  1    proceedings, and the Court has been involved since step one,

2    the first day, and I become concerned we lose continuity that

3    could be important to the ultimate resolution of the

4    litigation if we bring in somebody unfamiliar.  But if we

17:16:27  5    could, I would like to think about that further and discuss

6    that with my client.

7              MR. LOPEZ:  Let me ask -- I think that's a good

8    point.  I assume you're going to try the first case, of

9    course, and then you're going to have some rulings on

17:16:38 10    evidentiary issues that I assume will become -- I don't know

11    it's the right phrase, law of the case, at least with respect

12    to those rulings, that we don't have to worry about whether

13    we're going to get a different or inconsistent ruling by

14    judges.  Not that you want them to come in and be robots in

17:16:57 15    trying the case, but maybe there's a way that there's some

16    predictability and some consistency as we proceed, even if

17    it's a different --

18              THE COURT:  I don't think it would be law of the case

19    in a strict sense because it's a different case.

17:17:13 20              MR. LOPEZ:  I agree.  I agree.

21              THE COURT:  I don't know that there's a law of the

22    MDL doctrine when it gets to trials.

23              MR. LOPEZ:  I'm thinking more -- I'm thinking more

24    evidentiary rulings and --

17:17:22 25              THE COURT:  Yeah.  Part of my thought would be that

17:17:24  1   if we ended up having some other judges come in, I would try
       2   the first case.  I would obviously have the written order that
       3   rules on motions in limine that the next judge or judges could
       4   look at.  And what I probably would do is to try to keep track
17:17:41  5   of significant evidentiary rulings I make during the trial and
       6   dictate an order at the end that sort of reflects those, or
       7   memorandum or something, that the other judge could read so
       8   that we try to bring them up to speed.
       9        My concern, obviously, is if we hold a three-week
17:18:00 10   trial in February or March, given everything else I'm going to
      11   have to deal with, it may be July before we can do the next
      12   one and it may be October before we can do the third one, and
      13   then we're on a pace to take two years to try these cases.
      14   That wasn't my original intent but, boy, when I started
17:18:21 15   thinking about trying to fit 18 weeks of trial into a schedule
      16   that already is pretty full, it's just going to be real
      17   challenging to do that in a year.
      18        MR. LOPEZ:  Probably the biggest issues would be
      19   admissibility of evidence, obviously, and the depositions.  I
17:18:39 20   can't tell you how many times I've got depositions in this
      21   litigation and, you know, sometimes judges think it's okay to
      22   do this and some not.  I think at least from our standpoint,
      23   that's 75 percent of our case is knowing what depositions we
      24   can play or put a witness on, do a Q and A back and forth and
17:19:04 25   what documents we can use in the next trial.

17:19:07   1          I just think we don't want to have to re-litigate

2    that issue over and over again.  I think it could work, Judge.

3    Again, if -- I think we're open to it, and if we can talk

4    about those things and get them resolved -- you know, I think

17:19:22   5    it's something we should talk about.

6          THE COURT:  All right.  Let's plan to talk about that

7    at the status conference on October 2nd and -- October 5th and

8    I'll reflect that in the order that comes out after today.

9          There was another question that the plaintiffs wanted

17:19:39  10    to address, which was choice-of-law issues.  Tell me what your

11    thoughts are on that.

12          MR. O'CONNOR:  Well, Your Honor, we talked about with

13    defense counsel just before you came out today we are going to

14    discuss this in a meet and confer.  When we were thinking

17:20:02  15    about it on the plaintiff side, we think there may be just two

16    cases where there may be a dispute on the choice of law.

17    We're going to talk that out with the defense attorneys here,

18    hopefully next week.

19          The concern for us is this:  If there is briefing

17:20:16  20    that is necessary on the choice-of-law issue in any one of

21    these cases, that may well impact the motions that are going

22    to be filed, the motions for summary judgment on the

23    individual cases that are going to be filed, and in such a

24    case it may be necessary to discuss in those cases, which I'm

17:20:39  25    not sure but I don't think we're going to be talking maybe

17:20:42  1    more than just two of them, but still it may be necessary to

      2    think about a staggered schedule in terms of the motion for

      3    summary judgment, depending on the briefing that needs to be

      4    done if there is going to be dispute over choice of law in

17:20:57  5    these cases.

      6         THE COURT:  Well, the motions for summary judgment

      7    are going to be filed before we're back together on

      8    October 2nd.  So my thought is go ahead and talk about that.

      9    If you can reach an agreement and you have a proposed

17:21:12 10    procedure, you're welcome to present it to me.  If you want to

     11    call and just get on the phone, we can talk through how best

     12    to do it.

     13         I have seen lots of summary judgment motions that

     14    have choice-of-law issues briefed within the summary judgment

17:21:28 15    motion.  We could do that.

     16         So I'm open to addressing it in whatever way you all

     17    feel is most efficient.  If you think I need to decide the

     18    choice-of-law question before the summary judgment motion is

     19    filed, I'll be happy to consider that, although frankly, as

17:21:49 20    you know, the first step of a choice-of-law analysis is to ask

     21    whether there's really a conflict of law, and that depends on

     22    the issue that's being addressed.  So I don't know if it can

     23    be briefed intelligently outside of the context of what's

     24    being argued in the summary judgment motion.

17:22:07 25         MR. O'CONNOR:  I think that makes sense.  And I think

17:22:08  1  we'll have a better idea of how big of an issue it's going to

2  be next week when we talk to the other side.

3       THE COURT:  Okay.  If you think you need me to

4  address it before summary judgment briefing, call me and we'll

17:22:23  5  talk through it.  Otherwise, I'm happy to have you address it

6  on the issues in the summary judgment briefs where it really

7  makes a difference.

8       MR. O'CONNOR:  That makes sense.  Thank you.

9       THE COURT:  Let me ask another question that occurs

17:22:33  10  to me as we talk about this.  Is it August 21st when the

11  summary judgment motions are due?  Is that right?

12       MR. STOLLER:  Yes, Your Honor.

13       MR. O'CONNOR:  Yes.

14       THE COURT:  We may not have time to do this.  But

17:22:44  15  I'll tell you what I'm doing in all of my civil cases now that

16  has proven to be pretty helpful, and I got this idea from

17  couple of other judges in other districts.  I require parties,

18  before summary judgment briefs are filed, to exchange two-page

19  letters where the moving party lays out exactly what they're

17:23:06  20  going to argue in the motion for summary judgment and the

21  responding party lays out how they're going to respond.  They

22  exchange those, then they share them with me and they call me

23  and I get on the phone and we talk about how best to brief

24  summary judgment issues.

17:23:23  25       The advantage invariably -- not invariably, but often

17:23:26  1   issues drop out and as we talk through it, parties realize

2   they don't have to brief that issue or don't have to brief

3   this one, or here's the best way to put the facts together.

4   I'm still from time to time having ring in my head the number

17:23:42  5   818, which I think you mentioned at the last conference was

6   the number of paragraphs in your statements of facts on the

7   preemption issue.

8         In fact, in civil cases I limit parties to 10 pages

9   in their statement of facts.  Now, I may make exceptions where

17:23:57  10  it's truly warranted, but I have seen, as you have, lots of

11  statements of facts that begin just after the Earth cooled and

12  go through every possible fact in the case.  And part of this

13  discussion is to get all of that as focused as we can.

14        Like I say, I don't know if there's time to do that.

17:24:17  15  I'm willing to try if you think it would be something helpful

16  to do on these motions.

17        MR. O'CONNOR:  Your Honor, I think on our end we

18  think that would be a good idea.  That may help narrow a

19  number of things and make it a lot more of an efficient

17:24:36  20  process.

21        MR. NORTH:  Your Honor, I like the idea in concept.

22  I'm struggling with how we're going to pull that off given the

23  fact that fact discovery in some of these cases is not even

24  ending until August 15.  Some depositions will be concluded

17:24:54  25  August 8, some August 15.  So it will be a moving target.

17:24:58  1    We're working on outlines right now of what we anticipate, but

2    there are still additional people that are going to be

3    deposed.  And that's what I'm struggling with.

4         THE COURT:  Well, I understand that.  I suppose

17:25:12  5    another way it could be done would be without me in the loop.

6         Part of my thought is this:  I suspect, I don't know

7    this is true but I suspect it's quite possible your motion,

8    Mr. North, may make an attack on a particular kind of claim,

9    say a warranty claim, that would apply in every one of the

17:25:34 10    bellwethers because you think there's some legal flaw to

11    making a warranty claim in this kind of case.  If that's true,

12    my view is brief that once, not five times.

13         But I think there may be other ways to economize in

14    the briefing so we're being as efficient as possible, saving

17:25:54 15    you all time and money and me time.  So -- we could even have

16    those letters exchanged recognizing fact discovery isn't

17    closed but I'm guessing you've got a pretty good sense what

18    you're going to argue and a pretty good sense what they're

19    going to argue and how they're going to reply.  Talking about

17:26:11 20    it in advance might save some effort.

21         MR. NORTH:  We're willing to do that, Your Honor,

22    certainly.

23         MR. O'CONNOR:  We can do that as well.

24         THE COURT:  Let's do this:  I will say in the order

17:26:28 25    that comes out after today that I'm going to require you to

17:26:31  1   communicate in advance in some form on how best to brief it.

2   You can figure out how to do it.  But you see what the

3   objective is.  It really is to figure out -- I have often had

4   these conferences where the plaintiff says in response, well,

17:26:47  5   we're not really going to contest this or this or this.  The

6   other side was prepared to fully brief it and now they don't

7   have to.

8        So I'll require you to talk through that.  If you

9   decide you need my help in it, call and I'll be happy to help.

17:27:10  10       Let me make a note to myself on that.

11       MR. LOPEZ:  Your Honor, could I have a moment with

12   defense counsel?

13       THE COURT:  Yeah.  Please.

14     (Counsel confer.)

17:27:38  15       MR. NORTH:  Your Honor, if I could just mention, too,

16   it -- this just struck me in light of what the Court is

17   saying.  We're in a very strange situation, of course, with an

18   MDL in that we have a master complaint that probably alleges

19   claims from all 50 states of some sort.

17:27:55  20       It might be helpful to this process if the

21   plaintiffs, as part of our meet and confer on the summary

22   judgment, tell us which claims they're pursuing in each of

23   these cases, five cases, just so we can know what's at issue

24   because I haven't looked at it in a while, but --

17:28:09  25       THE COURT:  There's ten or 12 different claims.

17:28:12  1        MR. LOPEZ:  We -- we're willing to do that, Judge.

2    In fact, we just did it in the Austin state court case.  We

3    went through this process.

4        What you've suggested we kind of did on our own.  We

17:28:22  5    narrowed the scope of what Judge Murphy was going to have to

6    deal with in that case.  I think it's a good idea.  We'll do

7    it.  We'll work out a schedule to get that done.

8        THE COURT:  Okay.  Makes sense.

9        Do plaintiffs have issues you want to raise?

17:28:37  10        MR. LOPEZ:  I meant to talk to Mr. North before.  I

11    know it's late, Your Honor.  We don't have to do it today.

12    But we have -- from the plaintiffs' leadership standpoint we

13    have some administrative issue I'll call it.  I didn't realize

14    we have like 230-something different plaintiffs firms filed

17:28:58  15    lawsuits in this case.  We're involved in something right now,

16    I'll just say a project, and the we're not getting the

17    cooperation we need from some of them.

18        I don't know what else to do but maybe bring it to

19    the Court's attention to see if the Court has some ideas of

17:29:14  20    how your intervention might help that.  And Mr. North is

21    agreeable to having that discussion.  We don't have to do it

22    today, but I'd like to do it soon.

23        THE COURT:  Okay.

24        Well, let's figure out when.

17:29:29  25        MR. LOPEZ:  It will take about ten, 15 minutes.

17:29:31    1        THE COURT:  How about tomorrow by conference call?
        2   Are you going to be in town?
        3        MR. LOPEZ:  You know, believe it or not, I'm going to
        4   be out of the country starting tomorrow for a week.  I could
17:29:39    5   do it in the morning, though.  Of course I've got 17 things to
        6   do in the morning before I catch my flight.  I'll move this to
        7   the top of the list.
        8        Oh.  They're not available.  I need to be the one to
        9   address it, Your Honor, otherwise I'd pass it --
17:30:07   10        THE COURT:  I could do it tomorrow morning if you
       11   can.  If you can't, next week doesn't work for me either and
       12   when I get back I know I have ten sentencings on the 24th and
       13   eight on the 25th, so it would probably be Wednesday the 26th
       14   before --
17:30:26   15        MR. LOPEZ:  There's some urgency but it's not so much
       16   it can't wait until the 26th of July.
       17        THE COURT:  Actually, I'm on jury duty on the 26th of
       18   July in city court across the street, and they will not excuse
       19   me.  So I'm going to be sitting all day in courtrooms raising
17:31:07   20   my hand saying "I'm a judge" and they'll say "you're excused"
       21   and I'll go to the next courtroom.  So I'm gone all day on the
       22   26th.  How about the morning of the 27th?
       23        MR. LOPEZ:  I'm available, Your Honor.  Thank you.
       24        THE COURT:  Let's say 10:00 a.m.  You can just call
17:31:25   25   in.

17:31:25  1              MR. LOPEZ:  Sure.

2              THE COURT:  We'll address this issue then.

3              MR. LOPEZ:  And, seriously, if you could reserve just

4  10, 15 minutes we'll get it resolved.

17:31:33  5              THE COURT:  Okay.  That's fine.

6              How about defense counsel?

7              MR. NORTH:  Nothing further, Your Honor.

8              THE COURT:  Okay.  I'll get this order out.  Thank

9  you all.

17:31:40  10              MR. STOLLER:  Thank you, Your Honor.  Have a nice

11  weekend.

12          (End of transcript.)

13                              *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

1                        **C E R T I F I C A T E**

2

3            I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7            I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14           DATED at Phoenix, Arizona, this 25th day of July,

15   2017.

16

17

18

19

20                            s/ Patricia Lyons, RMR, CRR
                              Official Court Reporter
21

22

23

24

25