Exhibit B

 

Deposition of:

# Rebecca Betensky , Ph.D.

*July 26, 2016*

In the Matter of:

# Clare-Austin vs. C.R. Bard

Tiffany Alley, A Veritext Company
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-ga@veritext.com  | 770.343.9696

Rebecca Betensky , Ph.D.
Clare-Austin vs. C.R. Bard

July 26, 2016

Page 15

1    doing an analysis of particular adverse events that

2    may have been associated with those drugs.

3         Q.  And my understanding is, your analysis

4    there depended on a database called FAERS,

5    F-A-E-R-S?

6         A.  I used the FAERS database for that

7    analysis.

8         Q.  And for the analysis that you did in this

9    case, did you use the MAUDE database?

10        A.  This case, today's case?

11        Q.  Yes.

12        A.  I used information from the MAUDE database.

13        Q.  And when you say information from the MAUDE

14   database, you are talking about calculations that

15   Bard itself made based on that database?

16        A.  I'm talking about data that was provided

17   from Bard that was taken from that database, in

18   addition to their own data.

19        Q.  You in this case did not make an

20   independent research of the MAUDE database, did you?

21        A.  I did not.

22             Again, let me clarify.  So I certainly

23   did analysis and you might want to call it research

24   on the MAUDE database.  I did not myself go into the

25   MAUDE database website and extract data, but I did

Rebecca Betensky , Ph.D.
Clare-Austin vs. C.R. Bard
July 26, 2016

Page 39

1   Simon Nitinol filter?

2        A.   I don't recall.

3        Q.   Now, you are not a medical doctor; correct?

4        A.   That's correct.

5        Q.   And you do not treat patients?

6        A.   Correct.

7        Q.   You're not a radiologist?

8        A.   Correct.

9        Q.   You're not an expert in human anatomy;

10   correct?

11             MR. MANKOFF:   Object to form.

12        A.   Correct.

13        Q.   Have you ever seen an inferior vena cava

14   filter?

15        A.   I've seen photographs of some.

16        Q.   Prior to being retained to work in this

17   case on this litigation, had you ever seen a

18   photograph of an inferior vena cava filter?

19        A.   I don't know.

20        Q.   You're not an expert in blood clots or

21   hematology; correct?

22             MR. MANKOFF:   Object to form.

23        A.   I could certainly do -- I'm certainly a

24   statistical expert in any aspect of clots or

25   hematology that -- yes.

Rebecca Betensky , Ph.D.                          July 26, 2016
Clare-Austin vs. C.R. Bard

Page 40

1        Q.  But only from the statistical standpoint,

2     not from the medical standpoint; correct?

3        A.  Correct.

4        Q.  And you're not an expert in cardiology?

5             MR. MANKOFF:  Object to form.

6        A.  So I'd give the same answer there.

7        Q.  Prior to your work in this litigation, you

8     had never done any research regarding inferior vena

9     cava filters, had you?

10       A.  As far as I can remember, I did not.

11       Q.  And never published anything?

12       A.  Again --

13            MR. MANKOFF:  Object to form.

14       A.  -- as far as I can remember.  It's possible

15    that -- I have a long publication list, and some of

16    those publications have looked at complications, and

17    so it's possible that those may have been somewhere

18    buried in some articles.  So I wouldn't completely

19    rule it out, but I can't think of an example right

20    now.

21       Q.  The calculations you performed in this case

22    looked at the frequency of complications, I believe

23    you told us?

24       A.  I looked at relative risks that were

25    reported.

Rebecca Betensky , Ph.D.
Clare-Austin vs. C.R. Bard
July 26, 2016

Page 41

1    Q.  And by relative risks that were reported,

2  you mean relative risks based on the frequency of

3  complications reported in one filter versus another

4  filter?

5    A.  As we've defined it, yes.

6    Q.  And as I understand it, the relative risks

7  you looked at were only between the Recovery filter

8  and the Simon Nitinol filter or between the G2

9  filters and the Simon Nitinol filter; correct?

10           MR. MANKOFF:  Object to form.

11    A.  For the purpose of this case and this

12  analysis.

13    Q.  And you did not do any comparable relative

14  risk analysis between Bard filters and competitive

15  filters; correct?

16    A.  So first, I want to again be careful with

17  the language.  These are reporting relative risks or

18  reporting risk ratios, as I call them, but -- so

19  that's what we're dealing with.

20           And for this case, that's correct.

21    Q.  What's the significance of that limitation,

22  reporting risk ratios?

23           MR. MANKOFF:  Object to form.

24    Q.  Or relative risks, reporting relative

25  risks?  I'm sorry.

Rebecca Betensky , Ph.D.
Clare-Austin vs. C.R. Bard
July 26, 2016

Page 42

1          A.   Because I just want to be clear that the

2     basis of the analysis and the basis of the estimates

3     are based on what is reported.

4          Q.   And that limitation, does that impact the

5     accuracy of those relative risks?

6                    MR. MANKOFF:   Object to form.

7          A.   It means that I have to be careful in

8     interpreting them; and when you say accuracy, of

9     course, you have a target in mind, and as far as how

10    closely they estimate the true or actual risk ratio,

11    so that's a consideration that needs to be thought

12    through.

13         Q.   Now, what sort of complications were -- did

14    you look at, as far as relative risks?

15                   MR. MANKOFF:   Object to form.

16         A.   So I'm going to -- may I look at my --

17         Q.   Yes.

18         A.   So I looked at maybe six.  So I looked at

19    filter embolization deaths, migration events, caval

20    perforations, filter fractures, tilted filters, and

21    then combinations of some of those.

22         Q.   In calculating these reported relative

23    risks, did you break them down as to specific

24    complications?  Did you analyze a reported relative

25    risk for the Recovery filter versus Simon Nitinol

Rebecca Betensky , Ph.D.
Clare-Austin vs. C.R. Bard
July 26, 2016

Page 60

1      Q.  But it was clear, even if you didn't

2  perform the exact calculations, it was clear that

3  the frequency of these reported adverse events was

4  not huge; correct?

5           MR. MANKOFF:  Object to form.

6      A.  Correct, relative to the reported sales

7  numbers and the reported events, that's correct.

8      Q.  Now, you've been using and we've been using

9  interchangeably as you said reported risk ratio,

10  that term, with reported relative risk.  How does a

11  reported relative risk differ from a relative risk?

12      A.  So the qualifier "reported" is important,

13  and that's indicating that the data are coming from

14  reports, and are not being derived from a

15  beautifully run and designed experiment like a

16  clinical trial, in which there's perfect follow-up

17  and in which it's really a true experiment.

18           So the "reporting" qualifier is there to

19  say and to suggest that these are numbers that are

20  reported.  These are based on reports.

21      Q.  And that's different from a true relative

22  risk; correct?

23      A.  A relative risk, which is what the target

24  is, which is what would be of interest, wouldn't be

25  entangled with issues around reporting.

Tiffany Alley, A Veritext Company

Rebecca Betensky , Ph.D.                    July 26, 2016
Clare-Austin vs. C.R. Bard

                                                    Page 62

1        Q.  And we don't know whether that occurred in

2    this instance with this particular data set, do we?

3                MR. MANKOFF:  Object to form.

4        A.  We don't whether what occurred?

5        Q.  Underreporting or overreporting.  You said

6    it could lead to it.

7        A.  No --

8        Q.  We don't know whether it led to either way

9    in this case, do we?

10       A.  I'm sorry; I said --

11               MR. MANKOFF:  Just let the court

12   reporter catch up.

13               Object to form.

14       A.  Okay.  I didn't say anything about

15   overreporting.  What I said was overestimates.  So

16   these data could -- they provide an estimate, we

17   call it the reporting risk ratio.  And this estimate

18   could be an overestimate or it could be an

19   underestimate.

20       Q.  Okay, and I stand corrected.  Let me

21   rephrase that question.

22               And we cannot say, sitting here today,

23   whether the reported relative risk that you

24   calculated overestimates or underestimates in this

25   particular data set, can we?

Rebecca Betensky , Ph.D.
Clare-Austin vs. C.R. Bard

July 26, 2016

Page 64

1       you were to give, you know, implant these devices in

2       millions of people and then compare, have a perfect,

3       beautiful experiment and compare risks of events,

4       that would be pretty much close to or exactly equal

5       to the so-called true relative risk, the population

6       level theoretical relative risk.

7                    Any smaller study or sample that's used,

8       its whole purpose being to try to estimate or make

9       inference on that population level relative risk, or

10      reported -- I'm sorry; relative risk or risk ratio,

11      is an estimate of that truth.

12                   So I'm making the distinction, I'm being

13      careful to make the distinction between the data,

14      which in any case just provide an estimate.  Any

15      data in any context, whether it's a clinical trial

16      or anything, any data allow us to estimate; and what

17      we try to estimate is something true and

18      theoretical, and at a population level.

19          Q.  And when it's based on reports, when the

20      data is based on reports, it can be even more of an

21      estimate than otherwise; correct?

22                   MR. MANKOFF:  Object to form.

23          A.  That's part of the -- it's part of the

24      estimation.  It's part of the messiness of the data.

25      There's lots of messiness in even perfect, beautiful

Tiffany Alley, A Veritext Company

Rebecca Betensky , Ph.D.
Clare-Austin vs. C.R. Bard
July 26, 2016

Page 65

1    clinical trial data.  There's noise; that's what I

2    mean by messiness.  There's noise in the data, and

3    that's part of it.

4         Q.  But this analysis that you've conducted, as

5    I understand it, generates a hypothesis,

6    essentially; correct?

7              MR. MANKOFF:  Object to form.

8         A.  So I'm not sure what you mean by "generates

9    a hypothesis."

10        Q.  Well, you have tried to analyze the

11   reported relative risk, and if I understand what

12   you're saying, you think that generates a hypothesis

13   as to what the relative risk itself may be.

14             MR. MANKOFF:  Object to form.

15        Q.  Or maybe you don't.  You tell me.

16        A.  I don't know what you mean by "hypothesis."

17   "Hypothesis" is a very technical term for a

18   statistician, and so I don't know how to interpret

19   what you're saying.

20        Q.  Tell me what that means to a statistician,

21   "hypothesis."

22        A.  A hypothesis would be a statement about the

23   truth, about truth in the world.

24        Q.  I understand you to say a hypothesis is a

25   truth in the world?

Tiffany Alley, A Veritext Company

Rebecca Betensky , Ph.D.                      July 26, 2016
Clare-Austin vs. C.R. Bard

Page 92

1        Q.  Other than that, you did not review

2    regulations, did you?

3        A.  No.

4        Q.  And you have not yourself reviewed the

5    underlying data for the data set you've used; right?

6        A.  That's not correct.

7             So the company provided, as we've

8    discussed, many summary sheets that listed, much as

9    I have done, a first tab with all of the data put

10   together with the counts of the adverse events and

11   sales numbers.

12             And then separately within each

13   subsequent tab, they list it out by device or by

14   filter, in many cases individual-level data.  So

15   individual people who reported adverse events.  So

16   line by line, those are listed out.  I reviewed

17   several of those, as well as the Excel calculations

18   that were used to translate from those individual

19   listings to the summary data, and found mistakes,

20   but I definitely did review those individual-level

21   data.

22       Q.  Are you aware of the fact that Bard

23   prepares a detailed investigation report for every

24   adverse event that's reported?

25       A.  I would only -- I assume that to be true.

Rebecca Betensky , Ph.D.                          July 26, 2016
Clare-Austin vs. C.R. Bard

                                                    Page 93

1        Q.   And you didn't review those lengthy reports

2    for each individual event, did you?

3        A.   No.

4        Q.   What P-value is recognized as the standard

5    for statistical significance?

6             MR. MANKOFF:   Object to form.

7        A.   Very typically a P-value of .05 -- or a

8    threshold of .05 would be used as a threshold for

9    significance.   It's arbitrary, but that's commonly

10   used in some settings.

11       Q.   Let's look at Exhibit 4.

12       A.   Yes.

13       Q.   Look under Tilted Filter, with the Fisher's

14   exact P-values.

15       A.   Yes.

16       Q.   Do any of those rise to the level of .05?

17             MR. MANKOFF:   Object to form.

18       A.   Yes.   The highlighted ones, the six

19   highlighted ones do.

20       Q.   And excuse my ignorance here; I'm missing

21   something.   Like the first one for Recovery versus

22   SNF on November 9 is .0005 here on the chart;

23   correct?

24       A.   Correct.

25       Q.   How is that greater than .05?

Rebecca Betensky , Ph.D.                    July 26, 2016
Clare-Austin vs. C.R. Bard

Page 101

         (Question read.)

1

2      A.  I don't have the documents to show what

3  Bard -- any steps that Bard took.  All I have are

4  the end results, which are, the results are what

5  they -- any steps that they would have taken, what

6  they would have been trying to target.

7           So all I see are the very end results,

8  and those don't -- it's not just that they're not

9  consistent over time; they're actually increasing

10  over time.  So those aren't supportive of any steps,

11  but it is correct that I have not seen the Bard

12  documents about remediation steps, regarding

13  reporting.

14      Q.  Okay; let's look two paragraphs down there.

15  The sentence begins, "While there are several

16  potential limitations with the available data

17  sources that must be considered."

18           What are these potential limitations?

19      A.  Okay; so I think we've talked about some of

20  them.  I put them on my list to remind myself to

21  make sure to discuss them.

22           So underreporting is a potential

23  limitation of any such database, whether it's the

24  FAERS database or the MAUDE database or a company

25  database.

Rebecca Betensky , Ph.D.                     July 26, 2016
Clare-Austin vs. C.R. Bard

1              So then the question in evaluating any

2     of these is, well, what difference does it make?  So

3     with regard to underreporting, it really actually

4     makes no difference at all unless it's differential

5     underreporting.  So in other words, if one product

6     is underreported more than another product, that's

7     where there would be a problem.

8              But if every product is just -- if

9     adverse events for this patient population are just

10    uniformly underreported in some way and consistently

11    so across products, then that would not be a

12    limitation.

13       Q.  What are other limitations, potential

14    limitations?

15       A.  So another limitation are the data errors.

16    So I found several errors -- counting errors, Excel

17    errors, that kind of thing -- in the Bard data

18    sheets, and I've listed out some of them.  Some of

19    them are pretty considerable.

20              So there's, for example, on the

21    November -- on the data sheet that is cumulative

22    through November 2007, there was sort of a blatant

23    Excel error that counted Recovery migrations to be

24    zero, when in fact once that error in the Excel

25    calculation is corrected, there were 37 of them.  So

Rebecca Betensky , Ph.D.                                July 26, 2016
Clare-Austin vs. C.R. Bard

Page 103

1    there's several instances of that.

2              There's instances of counting the tilted

3    filters but not the filter tilts; so in other words,

4    misidentifying text fields and not including clearly

5    the same event, which was just flipped in the tilter

6    filt (sic) versus the tilted -- sorry; the filter

7    tilt versus the tilted filter.

8              So anyway, there are many of these data

9    errors, and in fact, they're -- in my review, and

10   like I said there are many instances of these, there

11   are more of them for Recovery than for SNF.

12             And I think the reason for this is that

13   there are just more listings, individual listings,

14   which leads whoever is putting the spreadsheet

15   together to use Excel formulas, and we all know that

16   you can easily go wrong with these Excel formulas.

17             And the other thing is that I would say

18   that in every instance that I found of one of these

19   errors, it was always an undercount, so the error

20   was always leading to an undercount of Recovery of

21   events, whether it was migration events or tilted

22   filters or filter embolization deaths.  So there

23   were always undercounts.

24             So that's another problem with the

25   database.

Rebecca Betensky , Ph.D.                    July 26, 2016
Clare-Austin vs. C.R. Bard

Page 106

1    respect to that is just looking at the sales data

2    over time across ten years of time for some

3    products, and less so for others because they were

4    removed from the market earlier.  The sales data

5    seems pretty constant month by month, which is the

6    granularity at which I have the data.

7              So I would imagine that these are

8    expensive devices and nobody wants too many of them

9    sitting on the shelf; and so over time, institutions

10   or physicians learn better how to estimate their

11   needs, and so that wouldn't be a very big problem.

12             So I did also address that through one

13   of my sensitivity analyses, and just assumed -- or

14   just considered what would happen if I discounted

15   the sales data by 20 percent and just assumed that

16   20 percent are sitting on the shelf and 80 percent

17   are implanted, and I obtained comparable results to

18   when I didn't do that discounting.

19       Q.   Other limitations?

20       A.   So another limitation is that these are

21   crude estimates of risk and reflect different times

22   of exposure to devices, partly due to when the SNF,

23   for example, was available prior to the start time

24   of 2000; also reflecting the permanent versus

25   retrievable issue.

Rebecca Betensky , Ph.D.                          July 26, 2016
Clare-Austin vs. C.R. Bard

1       Q.  Have you spoken with any of the other

2    experts in this case?

3       A.  I'm sorry; would you like me to continue

4    with my list?

5       Q.  Oh, yes, I'm sorry; more potential

6    limitations.

7       A.  Let's see.

8            So the other potential limitations to

9    consider in any of these types of analyses would be

10   any kind of confounding due to patient-level

11   characteristics, and I was unable to address those

12   head-on because patient-level characteristics are

13   not part of the data sheets or the data reports from

14   Bard.  So that is always an issue in every single

15   analysis.

16           Again, it would seem -- and that could

17   go in different directions.

18           It would seem that typically that has --

19   across, over many, many different kinds of these

20   analyses across such observational databases, it

21   tends to have a small, could make a small

22   difference.  So with reporting risk ratios of 100 or

23   200 or 40, I feel pretty confident in believing that

24   it's not going to put them below 1.  It may move

25   them a little bit, even if there is confounding, and

Rebecca Betensky , Ph.D.                    July 26, 2016
Clare-Austin vs. C.R. Bard

Page 110

1    I don't even know that there is; it's just something

2    that any statistician should think about.

3         Q.  So we just don't know whether there are

4    confounding factors like you're discussing now one

5    way or the other, do we?

6              MR. MANKOFF:  Object to form.

7         A.  I don't know if there are.

8         Q.  Other limitations?

9         A.  So then within these spontaneous reporting,

10   as they're called, databases -- the FAERS or

11   MAUDE -- there's always a potential that there's

12   increased reporting when a product first launches or

13   that there's increased reporting surrounding some

14   kind of notoriety.

15              It doesn't seem to be the case here, and

16   especially since, my understanding is there's no FDA

17   warning that was published which in other cases is

18   really what is associated -- what has been seen to

19   be associated with notoriety, when the FDA comes out

20   with some kind of a warning letter or something like

21   that.

22        Q.  Doesn't attorney advertising for litigation

23   involving a product contribute to notoriety that may

24   influence these numbers?

25        A.  I don't know.  I don't know the extent to

Rebecca Betensky , Ph.D.                    July 26, 2016
Clare-Austin vs. C.R. Bard

                                                    Page 112

1              MR. ROTMAN:  Can I see it?

2              (Marked, Exhibit 6, typewritten notes

3      made by the witness.)

4              MR. ROTMAN:  Richard, is it okay to take

5      a short break?

6              MR. NORTH:  Mm-hmm.

7              MR. ROTMAN:  Thank you.

8              THE VIDEOGRAPHER:  The time is 12:13,

9      and we are off the record.

10             (Recess)

11             THE VIDEOGRAPHER:  We are back on the

12     record.  The time is 12:17.

13        Q.  Doctor, in view of these limitations we

14     were talking about right before the break, have you

15     been able to identify or calculate a rate of error

16     for your calculations?

17             MR. MANKOFF:  Object to form.

18             MR. ROTMAN:  Can I have the question

19     reread?

20             (Question read.)

21        A.  So no, as I have listed, there are many

22     different potential limitations which can go in

23     different directions.  I can view each one by itself

24     and make a comment on, for example, what the

25     difference in reporting probabilities would have to

Rebecca Betensky , Ph.D.
Clare-Austin vs. C.R. Bard

July 26, 2016

Page 113

1   be between two products in order to observe a

2   reporting risk ratio of 288 if the true ratio should

3   be 1, for example.  So I can draw conclusions such

4   as that.

5            But to come up with a single measure of

6   bias relative to a true risk ratio is not even --

7   not possible here.

8            I think on the other hand, I do feel

9   comfortable -- while the estimate we recognize is

10   not the truth and is different in some ways from the

11   truth, I do feel comfortable in concluding that it

12   is different from 1, that it's communicating a risk

13   ratio greater than 1 for Recovery versus SNF, for

14   example, and for other products versus SNF.

15       Q.  You just said it's communicating a risk

16   ratio.  Wouldn't it be more accurate to say it's

17   communicating a reported risk ratio?

18       A.  No, I'm actually saying it's communicating

19   a risk ratio.  So we have the reporting risk ratio,

20   and -- of 200 or 100 or 40, and I agree that there

21   are potential limitations with that estimate.  It's

22   just an estimate, and there are various factors that

23   I've listed that influence that estimate.

24            So I'm not concluding that the estimate

25   is the true risk ratio, in other words, that the

Rebecca Betensky , Ph.D.
Clare-Austin vs. C.R. Bard
July 26, 2016

Page 126

1    estimate.

2              An estimate, we also call it a point

3    estimate; it's just a single number.  The confidence

4    interval tells us, gives us an interval, of course,

5    about which we can be 95 percent certain that the

6    truth lies within that interval.  So that provides a

7    measure of the variability.

8              So all of those statistical analyses

9    that are contained here, the P-values and the

10   confidence intervals for the through-2010 case, are

11   all about accounting for randomness and error.  What

12   they don't do -- which was my original response.

13             But what they don't do is account for

14   potential, these potential external limitations,

15   which can't be addressed exclusively by the numbers

16   on the page.

17             And so for those, there's additional

18   error or overestimation/underestimation, and that's

19   not part of the error that is accounted for in these

20   sheets.

21       Q.  Had you done an analysis like this, or

22   someone done an analysis like this, and submitted it

23   for publication to meet publication standards of

24   statistical analysis, would any different kind of

25   error rates be calculated?

Rebecca Betensky , Ph.D.                        July 26, 2016
Clare-Austin vs. C.R. Bard

Page 132

1   nature of any underreporting or lack of detection.

2            So anyway, putting it all together and

3   thinking about directionality, thinking about

4   everything, I would have to -- I do conclude that

5   it's not 1.5, it's hard to pin down a number, and I

6   don't want to pin down a number, but it would have

7   to be, in my opinion, very likely to be something

8   much larger than 1.

9        Q.  And do you hold that opinion to at least a

10  reasonable degree of scientific and statistical

11  certainty?

12       A.  Yes, I do.

13       Q.  Now, you were asked about some specifics

14  about the plaintiff in this case, Ms. Austin.  Do

15  you recall that?

16       A.  Yes.

17       Q.  And you were asked about what type of -- if

18  you knew what type of filter Ms. Austin had

19  implanted --

20       A.  Yes.

21       Q.  -- and what kind of complications she had.

22            Was it important to you to review the

23  medical facts or the medical records for Ms. Austin

24  for purposes of your analysis?

25       A.  No, it wasn't.  So I'm a statistician, I'm

Rebecca Betensky , Ph.D.
Clare-Austin vs. C.R. Bard

July 26, 2016

Page 133

1    a statistical expert, I'm not a medical expert, and

2    my task was to compare the set of filters as

3    compared to this predicate SNF.

4            And so the details didn't really matter.

5        Q.  Well, did it matter to you whether she had

6    a Recovery filter or a G2 filter or an Eclipse

7    filter?

8        A.  No.  That doesn't make any difference.

9        Q.  Assuming that the evidence at trial is that

10   Ms. Austin had a G2 filter, would that affect your

11   analysis or your opinions?

12       A.  No.

13       Q.  Would it affect how you would undertake

14   your analysis?

15       A.  No.

16       Q.  You were also asked questions about the

17   magnitude of the reported complication frequency.  I

18   believe Mr. North said it's 1 percent or 2 percent,

19   certainly less than 50 percent.  He used the term

20   small, not large.  Do you recall that?  Do you

21   recall that?

22       A.  Yes.

23       Q.  In your opinion, is that a meaningful

24   observation, the size of the frequency of adverse

25   event reports as compared to sales --

Rebecca Betensky , Ph.D.                    July 26, 2016
Clare-Austin vs. C.R. Bard

                                                    Page 134

1            MR. NORTH:  Objection to the form.

2      Q.  -- or as compared to some exposure measure?

3      A.  So the absolute numbers are not --

4  certainly not as important as comparisons.  So a

5  product should only be available if it's just as

6  safe as every other product, or not too much less

7  safe than any other product.

8            And I didn't look at those individually,

9  as I mentioned previously, because looking at those

10  individual numbers, frequencies, is much less robust

11  than looking at ratios, for example, such as I've

12  done.  Because in looking at ratios, as I've

13  discussed previously, any kinds of -- many kinds of

14  potential underreporting or potential discrepancy

15  between sales and implantation washes out in a

16  ratio, whereas it doesn't wash out in the absolute

17  numbers.

18            So I wasn't interested and didn't look

19  at those or focus on those in any way.

20      Q.  If you're looking at reporting rates, as

21  you were, as my understanding that's what you were

22  looking at, rates of reports of adverse events --

23  correct?

24      A.  Yes.

25      Q.  -- what does that tell you, if anything,

Rebecca Betensky , Ph.D.                          July 26, 2016
Clare-Austin vs. C.R. Bard

Page 135

1    about the actual complication rate or adverse event

2    rate?

3             MR. NORTH:  Objection to the form.

4        A.  So again, there's the link -- or the leap,

5    I should say, between the reporting rates or risks

6    and the actual risks.  And so there may be a

7    discrepancy there.  There may be underreporting.

8    There's likely underreporting.

9             And then, it's the differential

10   underreporting that matter in the comparisons, and

11   that doesn't go away.  The underreporting doesn't go

12   away from an absolute estimate.  So it makes it even

13   more difficult to interpret those absolute estimates

14   of risk.

15       Q.  You were asked a question about whether you

16   went beyond the internal documents with adverse

17   event data to the actual medical literature to

18   extract adverse event data and to include that as

19   part of your analysis.  Do you recall that?

20       A.  Yes.

21       Q.  And I believe you testified that it would

22   not be a good statistical practice to do that?

23             MR. NORTH:  Objection to the form.

24       Q.  Do you recall that?

25       A.  Yes.