Exhibit C



Deposition of:

# Rebecca Betensky , Ph.D.

*June 23, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Rebecca Betensky , Ph.D.                                    June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 18

1    literature.  So, so I would expand it in that way.

2         Q    I think that's helpful.  We're going to get

3    to this at a little bit later because I think it's

4    important to delineate the topics that you have

5    expertise in to the topics that you obviously are going

6    to say that's for somebody else, okay.

7              For example, you're not an engineer, right?

8         A    I'm not an engineer.

9         Q    Right.  So for the purpose of my question, I

10   think you might understand what I'm driving at a little

11   bit better, in this case you're employing your

12   expertise in the field of biostatistics and the

13   application of statistics to various data sets; is that

14   right?

15             MR. MANKOFF:  Object to form.

16        A    I think it's broader than that.  I -- again,

17   I'll -- I would like to emphasize that I have, you

18   know, 25 years of experience as a Ph.D.-level

19   statistician who has collaborated extensively with

20   investigators in the medical field, and so I have quite

21   a bit of expertise in the application of statistics to

22   medicine, to medical studies, to epidemiological

23   studies.

24        Q    Understood.  And you raise a good point.

25             When I took a look at your CV, you had many,

Rebecca Betensky , Ph.D.                                    June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 19

1    many articles in the world's published literature,

2    right?

3        A    I'm sorry, in the what?

4        Q    There are many articles listed in your CV

5    where you've collaborated with experts in the field of

6    medicine in various disciplines, right?

7                MR. MANKOFF:  Object to form.

8                THE WITNESS:  Can you repeat that,

9    please.

10       Q    You've published numerous times, right?

11       A    Yes.

12       Q    Many, many times, right?

13               MR. MANKOFF:  Object to form.

14       A    Many -- if many, many -- by many, many you

15    mean about 200, plus or minus, then yes.

16       Q    You often collaborate with subject matter

17    experts in various fields of medicine when you publish

18    an article, right?

19               MR. MANKOFF:  Object to form.

20       A    I -- yes, many of my publi -- many of my

21    publications are collaborative publications with

22    experts in medicine and science.

23       Q    For example, I've noticed on your CV various

24    publications relating to aspects of the care and

25    treatment of cancer patients, right?

Rebecca Betensky , Ph.D.                                    June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 20

1          A     Care and treatment.  I have some cancer-

2     related publications.  Many of them are lab related or

3     technologic -- technol -- genetic- or genomic-related

4     kinds of publications in cancer.  Some of them are -- a

5     few of them may be treatment related.

6          Q     I've seen publications related to issues in

7     the field of nephrology, right?

8          A     Yes.

9          Q     In those publications you are a coauthor

10    along with various medical doctors who are experts in

11    the underlying medicine in the article that you're

12    writing about, right?

13         A     Correct.

14         Q     And that's totally routine for you is what

15    I'm driving at, right?

16         A     I've, I've done it regularly over many years,

17    yes.

18         Q     It's common practice for a statistician and a

19    biostatistician like yourself to collaborate with

20    subject matter experts in the various medical fields in

21    which they're publishing.  It's routine, right?

22         A     I'm sorry if this is overly picky, but

23    it's -- there are many statisticians who don't

24    collaborate at all in the medical field or don't

25    collaborate at all because they're purely theoretical.

Rebecca Betensky , Ph.D.                                June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 24

1    of biostatistics, it is relatively common in your

2    experience for biostatisticians like yourself to

3    collaborate with medical doctors who are experts in the

4    underlying medical issue that is the subject of the

5    paper, right?

6                    MR. MANKOFF:  Object to form.

7         A    So let me rephrase your question, and you can

8    tell me if I get this right.

9               I would -- I can answer that and say within

10   my department of biostatistics at the Harvard Chan

11   School of Public Health, my colleagues, other faculty

12   within that department and myself commonly collaborate

13   with medical and public health and basic science

14   experts in the development of both statistical

15   methodology and in collaborative research, and everyone

16   is usually an author -- a coauthor on the paper that

17   comes out of that.

18        Q    Totally on the same page now.  I understand.

19             Here's the question.  In your department at

20   Harvard it is common and routine for you to collaborate

21   with various public health experts, experts in the

22   underlying medicine on whatever research it is you are

23   doing, and ultimately, you will all be coauthors on

24   whatever paper you were writing, right?

25                    MR. MANKOFF:  Object to form.

Rebecca Betensky , Ph.D.                    June 23, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 25

1        A    I do that activity frequently.

2        Q    Did you collaborate with anybody in order to

3    create the opinions that you're proffering in this

4    case?

5                  MR. MANKOFF:  Object to form.

6        A    I'm sorry.  What do you mean by collaborate

7    with anybody?

8        Q    Did you work with any other person, other

9    than an attorney, in order to create the opinions that

10   you've offered in this case?

11       A    No, I did not.

12       Q    Let's take a look to see what else we have in

13   this folder.  I have -- where are we?  We've marked

14   Exhibit No. 3?

15            You've also provided us a list of -- an

16   updated list of cases where you have testified, right?

17       A    Yeah.

18       Q    What period of time does this list cover?

19       A    May I see the list, please.

20       Q    Absolutely.

21                  MR. BUSMAN:  I'm going to mark it as

22   Exhibit 4.

23                      (Exhibit 4 marked

24                      for identification)

25       A    So this goes back to 2013 which I believe --

Rebecca Betensky , Ph.D.                    June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 92

1    these filters are actually removed if necessary, right?

2        A    Other than knowing that some of them at least

3    have a hook that is used for the removal, retrieval.

4        Q    You have no understanding of how an IVC

5    filter could be damaged during the course of a

6    retrieval, do you?

7        A    No.

8        Q    You're not an expert in the manner in which

9    potential filter adverse events are detected, are you?

10       A    Not in how they are clinically detected.

11       Q    You're not a -- strike that.

12            You're not an expert in the differences in

13   how adverse events are clinically detected in

14   retrievable filters versus permanent filters, right?

15       A    Correct.

16       Q    You don't hold yourself out as having any

17   expertise in the percentage of filter adverse events

18   that are detected only upon filter removal, right?

19       A    Again, as I mentioned, this does touch upon

20   work that I've done in a non-Bard case.

21       Q    Okay.  Let me make that distinction.

22            In this litigation you're not holding

23   yourself out as having any expertise in the percentage

24   of filter adverse events that are first detected during

25   the process of filter removal, right?

Rebecca Betensky , Ph.D.                    June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 93

1        A     Correct.

2        Q     You're not an expert in the process by which

3    a device company would report an adverse event to

4    MAUDE, are you?

5        A     I'm not sure what you mean by an expert in

6    that.  I understand that a company is required to

7    report to MAUDE.

8        Q     Do you hold yourself out as an expert in the

9    FDA rules, regulations, and guidance related to

10   submitting adverse event reports to MAUDE?

11       A     I'm not an expert in those regulations.

12       Q     Let's make it easy.

13             You don't hold yourself out as an FDA

14   regulatory expert, do you?

15       A     If -- I -- if there is a, such a thing as an

16   FDA regulatory expert, I am not that.

17       Q     Now, in this case you analyzed adverse events

18   and compared -- strike that.

19             In this case you derived a reporting risk

20   ratio comparing the number of adverse events reported

21   to MAUDE for the Simon Nitinol filter versus the number

22   of reports to MAUDE for the various retrievable filters

23   we've discussed, right?

24                   MR. MANKOFF:  Object to form.

25       A     Not exactly.  So, so first of all, that

Rebecca Betensky , Ph.D.                          June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 96

1    to me the assumptions that you were required to make

2    and the purpose that you were making them for.

3                    MR. MANKOFF:   Object to form.

4         A    So there's plenty of interpretation that can

5    be made about a reporting risk ratio without any

6    assumptions at all, in, in that it is a reporting risk

7    ratio and it show -- you know, it is of a certain

8    magnitude and -- but if, if that reporting risk ratio,

9    in order to go -- draw inferences about the risk ratio

10   from the reporting risk ratio, that's where assumptions

11   are required.

12        Q    Got it.   I hope.

13             The reporting risk ratio that you calculated

14   is completely divorced from any assumptions that you

15   later employed to make inferences about the risk ratio,

16   right?

17                   MR. MANKOFF:   Object to form.

18        A    No, I don't think I can say that.   I mean the

19   reporting risk ratio is a number, and along with that

20   number has to ha -- you know, I, I would provide or I

21   did provide an explanation of where that number comes

22   from.   So it's just a number, and it has sources of

23   information that went into its calculation.   That's the

24   reporting risk ratio.

25        Q    The reporting risk ratio that you --

Rebecca Betensky , Ph.D.                          June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 108

1      Q    Did you make any assumptions about the
2   reporting rates in connection with your analysis in
3   this case?
4      A    Again, the analysis stands alone without the
5   assumptions, and it's only going from the reporting
6   risk ratio to the risk ratio where these essential --
7   where, where these assumptions would be used.  Now, the
8   magnitude of the -- these reporting rates also can be
9   informative about the risk ratio.
10     Q    Did you make any assumptions with respect to
11  differential reporting between the permanent SNF filter
12  and the various retrievable filters in order to help
13  you provide any opinions at all in this case about the
14  reporting risk?
15     A    So, so one assumption is I think in my
16  rebuttal to Dr. Thisted's I expanded upon it in that
17  report, in that rebuttal report.
18          And one assumption is that, is that there may
19  be -- is that if there is differential reporting one
20  would expect it to be pretty constant across some of
21  the adverse events that are similar in level of
22  seriousness.
23     Q    Did you consult or confer with anybody that
24  has any medical expertise with respect to the products
25  at issue to determine whether your assumption that the

Rebecca Betensky , Ph.D.                    June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 109

1    difference in reporting for the devices would be

2    consistent?

3                    MR. MANKOFF:  Object to form.

4        A    It seems obvious to me that, that as long as

5    the events are of comparable seriousness that that

6    would follow.

7                    MR. BUSMAN:  I'm going to move to

8    strike.

9        Q    Did you consult with anybody that has any

10   medical expertise with respect to the adverse events at

11   issue to determine whether your assumptions that the

12   differential reporting -- whether your assumptions

13   about differential reporting hold true?

14       A    No.

15       Q    What, if anything, did you do in this case to

16   definitively rule out the possibility that your

17   calculations are not the product of differential

18   reporting between SNF and the various retrievable

19   filters?

20       A    So I think I expanded upon that in my

21   rebuttal to Dr. Thisted and -- would you like me to

22   continue?

23       Q    Please.

24       A    And so, so under that assumption, which

25   seemed very reasonable to me, and other assumptions, a

Rebecca Betensky , Ph.D.                                    June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 116

1   you any documents from any source reflecting adverse

2   events for the SNF prior to 2000?

3       A    No.

4       Q    As we sit here today do you have any idea how

5   many reports there may have been with respect to filter

6   fracture for the SNF from the time it was sold in 1990

7   until to 2000?

8       A    No, I don't know.

9       Q    Do you have any idea, as we sit here today,

10  how many reports of migration there may have been for

11  the SNF from 2000 -- strike that.

12          As we sit here today do you have any idea how

13  many reports there may have been from 1990 up to 2000

14  for migration with respect to the NSF -- SNF?

15      A    I don't know that number.

16      Q    Same for embolization?

17      A    I don't know that number.

18      Q    Do you know the answer with respect to any of

19  the adverse events you considered in this case?

20      A    I don't know the numbers of adverse events

21  for SNF prior to 2000.

22      Q    Now, for the various other removable filters

23  that you considered, you utilized Bard data that you

24  understood captured a period of time from market

25  introduction all the way up to the end of the period

Rebecca Betensky , Ph.D.                    June 23, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 117

1    that you calculated, right?

2         A    I believe that's true.  And by removable you

3    mean retrievable according to how we've defined it.

4         Q    Yes.

5              Now, you've described something previously

6    called the Weber effect, right?

7         A    Correct.

8         Q    And the shorthand version of that is that

9    statisticians like yourself and folks who have

10   expertise in the measurement of adverse events in the

11   statistical sense understand that the greatest number

12   of reports for a given product happen shortly after

13   market introduction, right?

14                  MR. MANKOFF:  Object to form.

15        A    I believe that can happen.  It's not a

16   necessary event that it happened, but I believe it can

17   happen.

18        Q    In a general sense it is understood in the

19   statistical community that the majority of adverse

20   reports likely occur with respect to a product shortly

21   after it hits the market, right?

22                  MR. MANKOFF:  Object to form.

23        A    No, I don't think that would be true because

24   certainly some adverse events take time to happen, and

25   so -- so I guess the Weber effect would need -- if you

Rebecca Betensky , Ph.D.                                    June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 120

1          Q     What page?

2          A     I'm looking at the first paragraph on page 1.

3                -- that I considered the Bard AE reports, and

4     the first one was 2000 to the second quarter of 2003.

5     And again, I'm, I'm assuming for the purposes of our

6     conver -- of our -- of your question that that means

7     that the AEs were not cumulative over the entire life

8     of the product, but only began in 2000.

9                And so under that assumption that I don't

10    actually have adverse events from prior to 2000, then,

11    then that is true that I did not consider adverse

12    events before 2000.  For -- right.  Yeah.

13         Q     To the extent that you did not have adverse

14    events for the SNF prior to 2000, you've done nothing

15    in the expert reports you've served so far in this case

16    to determine what impact, if any, those pre-2000

17    adverse event reports would have on the calculations

18    that you've submitted in this case, true?

19         A     I would also need to know the sales numbers

20    prior to 2000.  So I have not considered sales prior to

21    2000 or adverse events, as far as I know, prior to

22    2000.

23         Q     Because you have not considered either

24    adverse events reports -- strike that.

25               Because you have neither considered adverse

Rebecca Betensky , Ph.D.                          June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 121

1    event reports prior to 2000 nor sales reports prior to

2    2000 for the SNF, there's nothing in any of the reports

3    that you've served so far in this case to indicate what

4    impact, if any, those pre-2000 adverse event reports

5    and sales would have on the calculations that you've

6    derived, true?

7         A    I didn't do any analysis of pre-2000 adverse

8    events or sales for SNF.

9         Q    You have no idea, as we sit here today,

10   whether or not pre-2000 adverse event reports for the

11   SNF would indicate that there is no difference for the

12   null value with respect to the RRRs that you

13   calculated, right?  You just don't know.

14        A    I don't have the reporting risk ratio

15   including SNF going back to 2 -- prior to 2000.

16        Q    It's entirely possible that had you had

17   adverse event data for the SNF prior to 2000 and the

18   sales data prior to 2000 that you would not have

19   calculated any higher RRRs for the various removal

20   products as compared to the SNF.  You just don't know,

21   right?

22        A    I don't know what happened before 2000 on the

23   sales or the, the adverse events or whether that's any

24   different from what happened after 2000.

25        Q    Good point.  Let me try to clarify that.

Rebecca Betensky , Ph.D.                    June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 122

1          Because you didn't have data for adverse

2     events for SNF prior to 2000 and you didn't have sales

3     data for SNF prior to 2000, there's no way for you, as

4     you sit here today, to say that if you had that data

5     and calculated reporting risk ratios perhaps the

6     reporting risk ratios would be greater for SNF over

7     removable, maybe they'd be lower.  You just don't know

8     one way or another, right?

9          A    I don't have the data so I don't know what

10    the number would be if I had had the data.  It could

11    go -- like you said, I could get -- I could have gotten

12    RRs that are larger than what I got.  I could have

13    gotten RRs that are smaller than what I got.

14         Q    Now, because you didn't have adverse --

15    strike that.

16              Based on the Weber effect, it would be more

17    likely to find the greatest number of adverse events in

18    connection with the SNF sometime within the first ten

19    years it was on the market, right?

20                   MR. MANKOFF:  Object to form.

21         A    So --

22                   THE WITNESS:  I'm sorry.  Can you

23    restate that?

24         Q    We were going -- I had asked you some

25    questions about the Weber effect, and, and perhaps I

Rebecca Betensky , Ph.D.                                  June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 124

1    number of reports in connection with the SNF sometime

2    during the period between 1990 when it hit the market

3    and 2000 when you started your analysis?

4                    MR. MANKOFF:  Object to form.

5        A    I do know, and I'm reading in my report right

6    now, that although the SNF was lunched in 1990, the

7    first death associated with it was not -- did not occur

8    until 1997.  So that's just one piece of information.

9    But I don't know, I don't know whether the Weber effect

10   was in play here or not.

11                   MR. BUSMAN:  Okay.  I'm going to object

12   and move to strike everything other than you don't know

13   whether the Weber effect was in play or not.

14       Q    As you sit here today do you know how many

15   reports of death there were for the SNF between 1997

16   and 2000?

17       A    No.

18       Q    Now, you had Bard data reflecting reports of

19   adverse events for every other removable filter that

20   we've discussed starting at the time of product launch

21   going through the end of your analysis, right?

22       A    I believe that's what I had.

23       Q    You've also stated in your expert report that

24   as a general proposition there are more -- it is more

25   likely that MAUDE will get reports of adverse events

Rebecca Betensky , Ph.D.                                    June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 125

1    for newer devices on the market as opposed to older

2    devices, right?

3                    MR. MANKOFF:   Object to form.

4         A    Again, my understanding is that this is a

5    sys -- it's a complex system and that is -- one driver

6    of reporting is the newness of the device, but there

7    are other -- may be other drivers as well.

8         Q    Let me see if I can restate that.

9              One driver of reporting that you understand

10   exists for medical devices in a general sense is that

11   newer medical devices are likely to receive more

12   reports as recorded in MAUDE than older devices, right?

13        A    I don't know about likely.  I can't say are

14   likely to.  I can say that's a possibility.

15        Q    Let me try it again.

16             You recognize that it's possible that newer

17   devices have more MAUDE reports of adverse events than

18   older devices, right?

19        A    That's possible.

20        Q    In your analysis you captured periods in

21   which the removal devices were new to the market,

22   right?

23        A    Yes.

24        Q    In your analysis you didn't start considering

25   adverse events for the Simon Nitinol filter until it

Rebecca Betensky , Ph.D.                    June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 126

1    had been on the market for over ten years, right?

2         A    I believe that's true.

3         Q    *You did not do an apples-to-apples

4    comparison of time periods for any of the removable

5    filters as compared to the analogous time periods in

6    which the Simon Nitinol filter had been on the market,

7    right?

8                   MR. ROTMAN:  Please reread that

9    question.

10                       (*Record read)

11                   MR. MANKOFF:  Object to form.

12                   THE WITNESS:  I'm sorry.  Can you

13   restate that, please.

14                   MR. BUSMAN:  Sure.

15        Q    If you really wanted to do an accurate and

16   meaningful comparison between various of the Recovery

17   filters and the Simon Nitinol filter, you would have

18   wanted to compare MAUDE reports for any of the

19   recoverable filters in the first few years those

20   filters had been on the market as compared to the

21   reports for the first few years when the Simon Nitinol

22   filter was on the market, right?

23                   MR. MANKOFF:  Object to form.

24        A    Well, that's one analysis certainly, but I

25   guess I'm -- or let me back up.  But another way of

Rebecca Betensky , Ph.D.                                    June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 127

1    looking at this would be that what's of interest
2    might -- is really the current status.
3              And, you know, although the SNF came on the
4    market in 1990, perhaps other things have changed in
5    medicine and in treatment of these patients who
6    received these filters and in, you know, ancillary
7    treatments or drugs that are given to them alongside it
8    or how surgery is conducted or any number of things
9    that might have changed from 1990 to 2000.
10             And so, so that would be a reason why it
11   might be more meaningful to compare at a -- at the same
12   time period given that medi -- you know, things in
13   medicine do change quite a bit over ten years, and
14   those might be important factors.  And so, so it might
15   be more meaningful to be comparing at that time.
16             Secondly, even if there were no change in
17   medicine in the drugs patients are given or the way the
18   surgery or the procedure is done or anything like that,
19   it is of interest to compare to the current functioning
20   SNF.  So that would be I think another reason to -- why
21   this would, would contribute useful information.
22        Q    Do you know what, if anything, has changed in
23   the medical practice that might impact your opinions
24   from the ten years that were omitted from your analysis
25   to present or are you just speculating that things have

Rebecca Betensky , Ph.D.                                    June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 128

1   changed?

2                   MR. MANKOFF:  Object to form.

3       A    Well, it's -- I'm stating this based on my

4   understanding of, of medicine through involvement in

5   clinical trials and through, you know, my, my very --

6   you know, my various involvements in different kinds of

7   medicine that things can change quite a bit over a time

8   period in ways that really matter a lot in terms of how

9   patients do.  And that -- that's seen a lot of in

10  clinical trials and so I wouldn't call it speculation.

11  I would call it I'm using my experience and

12  understanding to make that statement.

13      Q    Do you know, as we sit here today, what

14  specifically has changed over the ten-year period for

15  which you don't have any information on adverse events

16  for the Simon Nitinol filter up until when you started

17  your analysis in 2000, do you know what has changed

18  specifically that is reflected in your expert reports

19  in this case?

20      A    So that's -- I mean that's --

21                  MR. MANKOFF:  Object to form.  Go ahead.

22      A    So I'm not a clinical expert so that would be

23  something for a clinical expert to comment on.

24                  MR. BUSMAN:  Can we go off the record

25  for a moment, folks?

Rebecca Betensky , Ph.D.                                    June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 172

1    it was that you've, you've done here in this report?

2                    MR. MANKOFF:   Same objection.

3        A    I -- as I'm looking at this now, I -- it

4    appears that I addressed it in some part.  It's not --

5    I wouldn't consider it, you know, a complete con -- I

6    didn't completely address -- I didn't comprehensively

7    address each of these.  I considered what they are and,

8    and maybe considered some possible responses to them.

9        Q    Okay.  You didn't comprehensively consider

10   each and every limitation to the data that you analyzed

11   in this case, you, rather, considered some of them,

12   right?

13       A    This is a, you know, this is a list, and I'm

14   sure there are additional potential limitations as

15   well.

16       Q    Let me jump back.  I forgot to ask you a

17   question.

18            What was the specific hypothesis that you

19   were analyzing this in this case?

20                    MR. MANKOFF:   Object to form.

21       A    So the question was a com -- the hypothesis

22   of -- or compar -- compar -- the task or the, the, the

23   purpose was to compare a select set of adverse events

24   between the retrievable filters and the permanent SNF

25   filter.

Rebecca Betensky , Ph.D.                    June 23, 2017
In Re: Bard IVC Filters Products Liability

                                              Page 173

 1      Q    Who provided you the hypothesis that you

 2   analyzed?

 3               MR. MANKOFF:  Object to form.

 4      A    That was the question that the attorneys

 5   asked me to address.

 6      Q    Am I correct that the attorneys didn't give

 7   you a set of data and said analyze the data and tell me

 8   whatever it is that you find through various

 9   statistical models, but, rather, asked you to analyze

10   and confirm a hypothesis that they had already

11   determined?

12               MR. MANKOFF:  Object to form.

13      A    They didn't ask me to confirm anything.  They

14   asked me to test whether there was a difference in

15   adverse event risks.

16      Q    In the cour --

17      A    Reported risks.

18      Q    Pardon me.  Please continue with your ...

19      A    That's it.

20      Q    In the course of your expert work in this

21   case, at any time did you see any internal Bard

22   documents that had reached the same conclusions that

23   you had with respect to the data that you analyzed?

24               MR. MANKOFF:  Object to form.

25      A    Yes, more or less.  So I have seen a couple

Rebecca Betensky , Ph.D.                                     June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 177

1    Q    Let me start off with I guess a general

2    statement to see if you agree and then we'll drill

3    down, okay.

4         What impact could differential reporting

5    between the Simon Nitinol filter and the various

6    retrievable filters have on your analyses in this case?

7    A    So again, it's not -- it would not have an

8    impact on the analysis.  It would have an impact

9    potentially on the interpretation of the reporting risk

10   ratio.  So if there is differential underreporting or

11   overreporting, then it wouldn't be appropriate to

12   consider the reporting risk ratio as a risk ratio.

13        However, that differential reporting still is

14   not problematic insofar as being able to draw some

15   conclusion about whether the risk ratio is greater than

16   1 or not as I described earlier.

17        So there can be differential reporting, but

18   if that differential reporting is relatively or nearly

19   constant across a set of adverse events of -- you know,

20   within a class of similar degree of seriousness, then,

21   then observ -- observation of variation in the

22   reporting risk ratios is a strong indication of a risk

23   ratio that's greater than 1 or elevated.

24   Q    Now, there's a difference between

25   differential reporting and differential detection of

Rebecca Betensky , Ph.D.                                    June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 185

1          A      Well, I would defer to their medical

2     expertise, but that's, that's 50 percent or, you know,

3     some large portion of that piece of information is

4     statistical.  So I would need to evaluate how they

5     arrived at their estimate before I could agree with it

6     or accept it.

7          Q      What, if anything, did you do in this case to

8     control for the possibility that individuals with

9     asymptomatic adverse events that have retrievable

10    filters only had those symptoms detected when the

11    filter was removed?

12                     MR. MANKOFF:  Object to form.

13         A      I didn't have any information to do anything

14    about that.

15         Q      What in -- strike, strike that.

16                What, if anything, did you do to control in

17    your analyses in this case for the possibility that

18    people with asymptomatic adverse events who have

19    retrievable filters are more likely to get imaging

20    follow-up than those with permanent filters?  What did

21    you do to control for that in this case?

22                     MR. MANKOFF:  Object to form.

23         A      So again, I'd want to make the distinction

24    between the analysis and the interpretation, and the

25    analysis was simply the calculation based on the data

Rebecca Betensky , Ph.D.                                    June 23, 2017
In Re: Bard IVC Filters Products Liability

                                                        Page 187

1              MR. MANKOFF:  Object to form.

2        A    I would describe that as interpretation.

3        Q    The various limitations that we've been

4   discussing today are significant in your interpretation

5   of the reporting risk ratio as it relates to the risk

6   ratio, right?

7              MR. MANKOFF:  Object to form.

8        A    Only if they're actual limitations.

9        Q    And I think we've discussed this earlier

10  today, but you don't purport to have the medical

11  expertise to provide expert opinions on the various

12  limitations between use of a Simon Nitinol filter and

13  use of a Recovery or other removable filter in various

14  patient populations, right?

15             MR. MANKOFF:  Object to form.

16       A    I'm not an medical expert in these filters.

17       Q    You're not a medical expert in the practical

18  limitations that might impact detection of an adverse

19  event in a removable filter versus a permanent filter,

20  right?

21             THE WITNESS:  Can you restate that?

22             MR. BUSMAN:  Sure.

23       Q    You're not a medical expert when it comes to

24  what might impact the differential discovery and

25  reporting of adverse events in a removable filter

Rebecca Betensky , Ph.D.                June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 188

1    versus adverse events in a permanent filter?

2        A    I'm not a medical expert in that.

3        Q    Who, if anybody, provided you any guidance in

4    this regard for your report in this case?

5        A    In which regard?

6             MR. BUSMAN:  Strike that.

7        Q    You do attempt to interpret the reporting

8    risk ratio that you calculated in terms of providing

9    some information on an estimated risk ratio, right?

10       A    Subject to some assumptions.

11       Q    And that's precisely what I was talking about

12   earlier today.  Who provided you the assumptions that

13   you used?

14       A    The assumptions are, in my view, reasonable

15   assumptions based on, you know, my general

16   understanding.

17       Q    Your assumptions are not based on any medical

18   expertise that you have with respect to these filters,

19   right?

20       A    I don't have medical expertise.

21       Q    Now, I recall in your report which we've

22   marked as Exhibit No. 6 one of the issues was -- strike

23   that.

24            What, if anything, did you do to consider the

25   effect that litigation involving removable IVC filters

Rebecca Betensky , Ph.D.                      June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 189

1   might have on the number of reports in the MAUDE

2   database for removable filters?

3       A    So again, I wasn't using the MAUDE database

4   directly.  I was using Bard's data which as I've said

5   I -- my understanding is overlaps with the MAUDE

6   database, but not necessarily entirely.  So, so I'm

7   not -- I don't know how reporting -- I, I didn't take

8   into account potential changes in reporting.

9       Q    Based on litigation?

10      A    Based on litigation.

11      Q    What, if anything, did you do in this case to

12  take into account the fact that the Simon Nitinol,

13  which was ten-years-old at the time that your analysis

14  began, may have been less likely to receive reports

15  than newer products?

16                  MR. MANKOFF:  Object to form.

17      A    So again, I didn't have the data for that

18  first ten years.  And, I believe also that there is

19  some value, there is value to be comparing these

20  devices contemporaneously, so at the same time.

21              So if I had had the data for the first ten

22  years, I would have used it.  I would have probably

23  done both analyses, the one starting at 2000 to align

24  everything in calendar time when -- you know, to

25  control for medical advance, potential medical

Rebecca Betensky , Ph.D.                    June 23, 2017
In Re: Bard IVC Filters Products Liability

Page 191

1      Q     It's entirely possible that the increases

2   over time in reporting for the removable products that

3   you noted were related to high profile litigation

4   connected with these products, right?  That's possible?

5                 MR. MANKOFF:  Object to form.

6      A     Anything is possible.  I suppose.

7      Q     You didn't do anything to rule out that

8   possibility, did you?

9      A     I don't have -- I didn't have the data to be

10  able to do that kind of level of analysis.

11     Q     Now, you also in addition to the analysis

12  that we've been talking about, you did two other

13  analyses as well, the DFMEA analysis and the testing

14  analysis, right?

15     A     Yes.

16                 MR. BUSMAN:  Can we go off the record?

17                 THE VIDEOGRAPHER:  The time is 2:46 p.m.

18  We're off the record.

19                 (Short break was taken.)

20                 THE VIDEOGRAPHER:  The time is 2:57 p.m.

21  This the beginning of tape 4.  We're back on the

22  record.

23  BY MR. BUSMAN:

24     Q     Doctor, please take a look at Exhibit 8 which

25  is your supplemental report in this case.  Do you have