1  James R. Condo (#005867)
   Amanda C. Sheridan (#027360)
2  SNELL & WILMER L.L.P.
   One Arizona Center
3  400 E. Van Buren, Suite 1900
   Phoenix, AZ 85004-2204
4  Telephone: (602) 382-6000
   jcondo@swlaw.com
5  asheridan@swlaw.com

6  Richard B. North, Jr. (admitted *pro hac vice*)
   Georgia Bar No. 545599
7  Matthew B. Lerner (admitted *pro hac vice*)
   Georgia Bar No. 446986
8  NELSON MULLINS RILEY & SCARBOROUGH LLP
   Atlantic Station
9  201 17th Street, NW, Suite 1700
   Atlanta, GA  30363
10 Telephone: (404) 322-6000
   richard.north@nelsonmullins.com
11 matthew.lerner@nelsonmullins.com

12 *Attorneys for Defendants*
   *C. R. Bard, Inc. and*
13 *Bard Peripheral Vascular, Inc.*

14        **IN THE UNITED STATES DISTRICT COURT**

15              **FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation | No. 2:15-MD-02641-DGC |
| | **DEFENDANTS C. R. BARD, INC.'S AND BARD PERIPHERAL VASCULAR, INC.'S MOTION TO EXCLUDE THE OPINIONS OF MARK J. EISENBERG, M.D. AND MEMORANDUM OF LAW IN SUPPORT** |
| | (Assigned to the Honorable David G. Campbell) |
| | **(Oral Argument Requested)** |

# MOTION

Pursuant to Federal Rule of Evidence 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively "Bard") respectfully move this Court to exclude the opinions of Plaintiffs' expert witness, Mark Eisenberg, M.D. in their entirety.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  Introduction.

Dr. Mark Eisenberg admits he is not an expert in IVC filters, regulatory compliance, corporate conduct, or ethics. Yet he authored a 221-paragraph report passing personal judgment on what he considers to be Bard's unethical conduct in the testing and marketing of its IVC filters. In so doing, he appoints himself the mouthpiece for doctors and patients everywhere, purporting to testify about what they would want to know and how they would expect an ethical company in Bard's position to act. His testimony is not tied to any objective law, rule, or standard. Rather, his opinions are based on ethical guidelines he admits are not binding on Bard. His report weaves a slanted narrative of corporate conduct based on a tiny fraction of the documentary evidence in this case, which he admits any layman could understand. His purported testimony sounds more like closing argument than the dispassionate opinions of an expert in the field. A federal court in Florida excluded Dr. Eisenberg's nearly identical opinions because they were unreliable and unhelpful to the jury. *See In re Trasylol Prod. Liab. Litig.*, No. 08-MD-01928, 2010 WL 1489793, at *8 (S.D. Fla. Feb. 24, 2010). For these reasons, and as set forth more fully below, this Court should do the same and exclude Dr. Eisenberg's opinions entirely.

### II.  Factual Background.

Dr. Eisenberg accuses Bard of malfeasance ranging from allegedly using patients as "experimental subjects," to failing to conduct large prospective clinical studies of its IVC Filters because Bard did not "want to know the answer." (Eisenberg Expert Report, ¶¶ 35-36, attached hereto as Exhibit A.) As set forth below, Dr. Eisenberg offers personal opinions based on Bard's alleged ethical responsibilities to physicians and patients. His

- 1 -

report is an impermissible factual narrative of documents Plaintiffs' counsel hand-selected, and he disclaims expertise in the subjects upon which he opines.

### A. Dr. Eisenberg Purports to Opine About Bard's Allegedly Unethical Conduct.

Dr. Eisenberg's opinions are tied to what he personally perceives to be Bard's ethical and moral responsibilities to physicians and patients. (*See, e.g.*, Eisenberg Dep. Tr., 84:20-25, June 6, 2017, ("MDL Dep. Tr.") attached hereto as Exhibit B ("I have opinions that I think are shared by most physicians about what Bard should and should not do and what kinds of information need to be given to physicians, what kinds of information need to be available to patients."); 89:21-25 ("Q. Your opinions are based on what you believe a responsible, moral and ethical device manufacturer would have disclosed to physicians. Is that fair? A. Yes, that's fair."); 160:16-25 ("I think that they had an ethical responsibility to do those studies in view of the data that they had from their small retrievability studies."); 166:6-16 ("Q. . . . would it be fair to say that it's your opinion that a reasonable, ethical and moral company would have conducted the studies that you have discussed? A. I think that's correct.").) Dr. Eisenberg relies primarily on corporate documents and deposition testimony to form the basis of his opinions, but also relies on published literature and the opinions of other experts.[1] (*See* Ex. A, Rep. ¶¶ 30-31.)

Dr. Eisenberg cites to no legally binding rule, regulation, standard, guidance or document of any type that he believes Bard violated. (*See, e.g.*, Ex. B, MDL Dep. Tr.,

---

[1] Dr. Eisenberg relies on Dr. Rebecca Betensky's analysis of adverse event/sales data, but merely regurgitates her analyses without adding anything already contained in her report. (*See* Ex. B, MDL Dep. Tr., 237:14 to 238:1 ("Yes, I think the section on Dr. Betensky's analyses largely recapitulates the results of her analyses, and I don't extend them beyond what she said.").) Courts in this circuit have held that "it is insufficient for an expert to simply rely on or parrot another expert's report prepared solely for litigation." *Crescenta Valley Water Dist. v. Exxon Mobile Corp.*, No. CV 07-2630-JST (ANX), 2013 WL 12120533, at *2 (C.D. Cal. Mar. 14, 2013). "Moreover, more scrutiny will be given to an expert's reliance on the information or analysis of another expert where the other expert opinions were developed for the purpose of litigation." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 978 F. Supp. 2d 1053, 1066 (C.D. Cal. 2013).

1  157:8-15 ("I don't think I have referenced any standard like that."); 85:15-20 ("Q. . . . are
2  there any paragraphs in your expert report here that touch on what you consider to be
3  Bard's violation of a legal duty? A. No, I don't think I have any paragraphs like that.");
4  92:11-22 ("No, there is nothing specifically, you know, identifying the responsibility of a
5  medical device company in these paragraphs."); 97:5-12 ("Q. . . . You agree with me that
6  the documents cited in paragraphs 24, 25 and 26 do not constitute any legally binding
7  authority, requirement that Bard in a legal sense should have complied with; right? A.
8  Yes, I think that's correct.").)

### B. Dr. Eisenberg Offers an Argumentative Factual Narrative Detailing Bard's Alleged Corporate Misconduct.

11  Moreover, a significant portion of Dr. Eisenberg's disjointed expert report, as he
12  admits, is based on a factual narrative constructed, and "in most instances [] quote[d]
13  directly from," a small portion of the millions of corporate documents produced in this
14  litigation. (Ex. B, MDL Dep. Tr., 60:10 to 61:20.) Indeed, he admits that much of his
15  expert report is simply recounting or setting forth the record evidence. (*See, e.g.*, *id.* at
16  170:16-20 ("Q. . . . you are just doing a narrative here of what you believe the facts are;
17  right? A. Yes."); 190:16-24 ("Q. . . . you simply recount what the record evidence is as
18  you see it with respect to this particular issue? A. Yes, that's correct. Q. You are not
19  expressing any one of your actual opinions in paragraph 45. Rather you are setting forth
20  some record evidence; right? A. Yes."); 191:8-11 ("Q. 47 is another narrative paragraph
21  where you are simply setting forth the record evidence; right? A. That's correct."); 208:4-
22  18 ("Q. You are not stating anything in paragraph 57 that's not contained in some type of
23  a written document; right? . . . A. No, none of this is my opinion."); 211:22 to 212:3 ("Q.
24  61 is another narrative paragraph, right? A. I agree that these are all narrative paragraphs,
25  but I think that they are sort of important to understand that -- you know, the temporal
26  nature of what was going on here and the environment.").) Additionally, Plaintiffs'
27  attorneys cherry-picked the corporate documents Dr. Eisenberg considered. (*See id.* at
28  60:10 to 62:1.) In fact, "in many instances," Plaintiffs' attorneys specifically directed

- 3 -

1    Dr. Eisenberg to certain documents for his report. (*Id.* at 62:2-6.) The result is a factual narrative tracking Plaintiffs' theory of the case that is better suited for closing argument than an expert's opinion.

**C.   Dr. Eisenberg Admits He Is Not an Expert in the Subjects at Issue.**

Furthermore, Dr. Eisenberg is offered as an expert on "the reasonable expectations physicians have of medical device companies like [Bard] in their design, testing, manufacturing, and marketing of IVC Filters" as it relates to "their obligations of informed consent" and their ultimate prescribing decisions, as well as the expectations of a reasonable patient. (Ex. A, Rep. ¶ 23.) However, Dr. Eisenberg has never been deputized to speak for and opine on behalf of reasonable physicians and patients. (*See* Ex. B, MDL Dep. Tr., 71:6-10 ("Q. Is there a single body, group, organization of any kind that has deputized or authorized you to speak for any other physician in this case? A. No, I wouldn't say that.").)

More importantly, Dr. Eisenberg disclaims expertise in the very subjects relevant to this litigation. Notwithstanding that his ethical opinions are not the proper subject of testimony even from an expert in the field, Dr. Eisenberg nonetheless admits he is not an expert in ethics, let alone corporate ethics or responsible corporate conduct. (*Id.* at 43:21 to 44:1; 133:19 to 134:9; 142:22 to 143:8.) Neither is he an expert in corporate compliance, or the review of corporate documents. (*Id.* at 50:17-22; 157:1-7.) Moreover, he has no expertise with IVC Filters. He has never implanted, retrieved, or even prescribed an IVC Filter. (*Id.* at 26:13-19; 37:16-18.) He is not an expert in detecting adverse events related to IVC Filter complications such as fracture, migration, tilt, or perforation. (*Id.* at 31:8 to 32:6.) He has never had a patient who experienced an adverse event from having an IVC Filter implanted. (*Id.* at 27:12-15.) He is not an expert in why an IVC Filter might fracture, migrate, tilt, perforate, or embolize. (*Id.* at 39:5-17.) He is not an expert in the design or testing of IVC Filters. (*Id.* at 39:22 to 40:6; 41:1-3.) He admits he is not a subject matter IVC Filter expert. (*Id.* at 69:7-10.) Simply put, he is not an expert in IVC Filters at all. (*Id.* at 29:15-17.)

Nor does Dr. Eisenberg possess any regulatory expertise. He is not a FDA regulatory expert. (*Id.* at 41:10-16.) He has no expertise with regard to what device manufacturers are required to do to bring a device to market or comply with pharmacovigilance or other various reporting requirements. (*Id.* at 41:19 to 42:8.) He is not an expert in pharmacovigilance. (*Id.* at 43:15-20.) He has no expertise with regard to medical device labeling, (*id.* at 44:10-12), or what device manufacturers are required to do to update doctors about risks associated with their products, (*id.* at 42:18-23), or even what a medical device company is allowed to communicate to physicians about their products. (*Id.* at 45:23 to 46:3.) Instead, his opinions about Bard's ethical and moral responsibilities—"what Bard should and should not do and what kinds of information need to be given to physicians [and] patients,"—are personal, and not based on any specialized knowledge or expertise. (*Id.* at 84:16 to 85:1.)

As will be demonstrated below, Dr. Eisenberg's opinions are not proper subjects of expert testimony or are otherwise unhelpful to the jury and should be excluded in their entirety.

## III. Argument and Citation of Authority.

### A. The Court Should Exclude Dr. Eisenberg's Opinions About Bard's Ethical Responsibilities.

#### 1. Dr. Eisenberg's Ethical Opinions Are Not the Proper Subject of Expert Testimony.

Courts routinely exclude ethics opinions as unreliable and speculative because they simply reflect the personal "subjective views" of the experts who offer them. *See, e.g.*, *Tillman v. C. R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1326 (M.D. Fla. 2015) (excluding experts' opinions that Bard's conduct was "unethical" because "these opinions appear to be simply their subjective views on how a medical device manufacturing company should act, and therefore, are due to be excluded as unreliable."); *In re: Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1053, 1058 (D. Minn. 2007) (excluding expert testimony on corporate ethics as speculative and not based on reliable methodology or scientific principle). "Such

- 5 -

speculative testimony . . . cannot serve as the predicate for any purported industry ethical standard." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004) (excluding expert opinions concerning purported ethical standards that were based on the "personal, subjective views" of the experts, which opinions, "[a]t their core, …articulate[d] nothing save for the principle that [defendant] should be honest. Even if charitably viewed as a 'standard,' the testimony nevertheless is 'so vague as to be unhelpful to a fact-finder.'").

The Southern District of Florida excluded Dr. Eisenberg's nearly identical opinions in the *Trasylol* litigation. As in this case, Dr. Eisenberg sought to offer opinions about Bayer's "responsibilities," "studies that Bayer should have done," and "issues that Bayer should have addressed earlier than it did." *In re Trasylol Prod. Liab. Litig.*, No. 08-MD-01928, 2010 WL 1489793, at *8 (S.D. Fla. Feb. 24, 2010). However, when pressed, Dr. Eisenberg was unable to cite to any rule, regulation, obligation, or source of duty that required Bayer to act in the way he suggested. *Id.* at *9. The *Trasylol* court concluded that Dr. Eisenberg's opinions were ultimately ethical in nature, grounded only in his "subjective beliefs and personal views." *Id.* at *8. "Plaintiffs' attempt to recast [impermissible ethics testimony] as an opinion that Trasylol raised serious safety issues that warranted further investigation does not alter the Court's analysis or outcome." *Id.* at *8. The court held these ethics opinions inadmissible because they were irrelevant as they were "not based on 'scientific, technical, or other specialized knowledge' as required by Rule 702." *Id.* at *9.

Dr. Eisenberg nonetheless attempts to offer the same ethics opinions here. He conceded that the major driving forces for his opinions are ethical in nature including that "companies should be honest," and "Bard should be responsible for its products." (Ex. B, MDL Dep. Tr., 186:14 to 187:7 ("Q. . . . Would it be fair to say that one of the primary drivers of your opinions in this case, not exclusive, but one of the primary drivers is that companies should bear responsibility for their products; correct? A. That's correct. I think that's correct."); 187:21 to 188:5 ("Q. Bard or another device manufacturer needs to be

honest about the risks and hazards associated with its products; right? A. Yes, I agree with that….Q. And that's one of the drivers, again, of your opinions; right? A. Yes.").)

Also identical to his purported testimony in the *Trasylol* litigation, Dr. Eisenberg routinely conceded that his opinions were not grounded in any written law, rule, regulation, guidance or standard binding on Bard. (*Id.* at 157:8-15 ("I don't think I have referenced any standard like that.").) Rather, the standards he relied on were purely ethical in nature unmoored to anything objective or reliable. (*See, e.g.*, *id.* at 83:22 to 84:15 ("Q. . . . You think that most physicians would understand that Exhibit 8 constitutes pretty strong ethical guidelines that should be followed; right? A. Yes."); 85:2-7 ("It is ethical guidance."); 185:1-5 ("Q. Would it be your opinion in this case that these documents that you have cited are generally accepted ethical standards for responsible companies? A. Yes, I think that's the case."); 186:2-12 ("Q. . . . You believe that the various guidance documents that we have discussed, all of the guidance documents you have referenced in your expert report in this case constitute strong ethical guidelines that reasonable physicians and patients would expect a device manufacturer to comply with; right? . . . [A.] Yes, I think that's right.").)

These ethical opinions are based on Dr. Eisenberg's personal, subjective views of what Bard should or should not have done rather than "on 'scientific, technical, or other specialized knowledge' as required by Rule 702." *In re Trasylol*, 2010 WL 1489793, at *8. Accordingly, Dr. Eisenberg's opinions are unreliable and should be excluded.

**2. Even if Ethical Opinions Were Admissible, Which They Are Not, Dr. Eisenberg Admits He Is Unqualified to Offer Them.**

Just as he did in the *Trasylol* litigation, Dr. Eisenberg again disclaims any expertise in ethics or corporate ethics, yet offers opinions on Bard's ethical and moral responsibilities—"what Bard should and should not do and what kinds of information need to be given to physicians [and] patients." (Ex. B, MDL Dep. Tr., 84:22-25.) Dr. Eisenberg testified, "I don't put myself out as an expert on ethics, so I can't really speak to that. I think that if you ask most clinicians and most patients, they would say yes,

- 7 -

Bard had an ethical duty to follow up the signal with an adequately powered and designed study. But as to whether an ethicist would say that, I don't know." (*See* Eisenberg Dep. Tr., 111:10-19, Aug. 17, 2016, ("Austin Dep. Tr.") attached hereto as Exhibit C; Ex. B, MDL Dep. Tr., 133:23 to 134:9 ("Again, I don't hold myself out to be an expert in ethics, but as a reasonable physician who, you know, implants permanent and temporary devices in patients and who routinely gets informed consent from patients, I would feel that there is a responsibility for the company to let physicians know about complication rates. Q. An ethical responsibility? A. I guess you could say an ethical responsibility. They may have a regulatory responsibility as well, but I can't speak to that.").)

### 3. **<u>Dr. Eisenberg's Ethical Opinions Are Irrelevant to Any Factual Dispute in This Litigation.</u>**

Even assuming Dr. Eisenberg's ethics opinions were based on a reliable foundation, such opinions are irrelevant because "Bard's compliance with … standards of ethical or professional conduct [are] not relevant to the issues in this case. Rather, the issues here are limited to whether the Filter is defective in its design, manufacture, or warnings, whether Bard breached a legal duty to [Plaintiffs] in designing, manufacturing, or labeling the device, and whether the defects or breaches caused [Plaintiffs'] damages." *Tillman v. C. R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1326 (M.D. Fla. 2015); *see also In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 544 (S.D.N.Y. 2004) ("While the defendants may be liable in the court of public opinion, or before a divine authority for any ethical lapses, expert opinion as to the ethical character of their actions simply is not relevant to these lawsuits."); *In re: Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2001 WL 454586, at **3, 9 (E.D. Pa. Feb. 1, 2001) (excluding opinion of a physician who had extensive postdoctoral education in clinical medical ethics, who was a senior scholar at the MacLean Center for Clinical Ethics in Chicago, and who had performed between 700 and 800 clinical ethical consultations because even this extensive background in ethics did not qualify him to offer opinions about the ethical appropriateness of pharmaceutical companies' conduct in the marketing of their medicines). For this reason too, this Court

should exclude these improper ethical opinions.

### B. Dr. Eisenberg Is Unqualified, His Opinions Are Irrelevant, and They Will Not Assist the Jury.

#### 1. Dr. Eisenberg Admits He Is Not an Expert in Any Issue Relevant to This Litigation, and His Personal Opinions Would Not Assist the Jury.

Qualified experts may offer opinions only if they are based on "some scientific, technical, or other specialized knowledge, [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. As described above, expert opinions based only on "personal, subjective views . . . do not meet the core requirement of Rule 702 that expert testimony rest on 'knowledge,' a term that 'connotes more than subjective belief or unsupported speculation.'" *In re Rezulin*, 309 F. Supp. 2d at 543. "To permit 'experts' to tender purely subjective views in the guise of expert opinions . . . would border on the absurd." *Id.* at 544.

Dr. Eisenberg has no expertise with IVC Filters. He has never implanted, retrieved, or even prescribed an IVC Filter. (*See* Ex. B, MDL Dep. Tr., 26:13-19; 37:16-18.) He is not an expert in detecting adverse events related to IVC Filter complications such as fracture, migration, tilt, or perforation. (*Id.* at 31:8 to 32:6.) He has never had a patient who experienced an adverse event from having an IVC Filter implanted. (*Id.* at 27:12-15.) He is not an expert in why an IVC Filter might fracture, migrate, tilt, perforate, or embolize. (*Id.* at 39:5-17.) He is not an expert in the design or testing of IVC Filters. (*Id.* at 39:22 to 40:6; 41:1-3.) He admits he is not a subject matter IVC Filter expert. (*Id.* at 69:7-10.) Dr. Eisenberg does not "hold [himself] out among [his] peers as an expert in IVC filters." (*Id.* at 29:15-17.)

Dr. Eisenberg also has no regulatory expertise. He is not a FDA regulatory expert. (*Id.* at 41:10-16.) He has no expertise with regard to what device manufacturers are required to do to bring a device to market or be compliant with pharmacovigilance requirements or other various reporting requirements, nor is he an expert in pharmacovigilance. (*Id.* at 41:19 to 42:8; 43:15-20.) He has no expertise with regard to

- 9 -

medical device labeling, or what device manufacturers are required to do to update doctors about risks associated with their products, or even what a medical device company is allowed to communicate with physicians about their products. (*Id.* at 42:18-23; 44:10-12; 45:23 to 46:3.)

Critically, as described above, Dr. Eisenberg is not an expert in ethics, let alone corporate ethics or responsible corporate conduct. (*Id.* at 43:21 to 44:1; 133:19 to 134:9; 142:22 to 143:8.) Neither is he an expert in corporate compliance, or the review of corporate documents. (*Id.* at 50:17-22; 157:1-7.)

Dr. Eisenberg has no "scientific, technical, or other specialized knowledge" with regard to any issue relevant to this litigation. The opinions that he proffers are based only on his personal beliefs, which will not help the jury. Furthermore, such opinions do not meet the threshold requirement of "knowledge" under Rule 702. For these reasons too, Dr. Eisenberg's opinions should be excluded.

### 2. Dr. Eisenberg's Opinions About Bard's Motive, Intent, State of Mind, and Knowledge Are Improper Subjects of Expert Testimony.

Dr. Eisenberg offers improper opinions about Bard's motive, intent, state of mind, and knowledge that are classic jury questions outside the bounds of appropriate expert testimony. "[T]he opinions of [expert] witnesses on the intent, motives or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise" and allowing such testimony would allow experts to "improperly . . . assume the role of advocates for the plaintiffs' case." *In re Rezulin*, 309 F. Supp. 2d at 514, 546–47; *Kaufman v. Pfizer Pharms., Inc.*, No. 1:02–CV–22692, 2011 WL 7659333, at *9 n. 8 (S.D. Fla. Aug. 4, 2011) (excluding all opinions about defendant's knowledge, state of mind, and motives wherever they were interspersed throughout her expert report); *In re Trasylol*, 709 F. Supp. 2d 1323, 1338 (S.D. Fla. 2010) (excluding all expert opinion about the defendant's knowledge, intent, and "bad company" opinions, and citing cases where other courts did the same); *In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769-Orl-22DAB, 2009 WL 3806436, at *5 (M.D. Fla. July 20, 2009) (excluding expert

opinions about "state of mind, intent, motives or ethics" of the defendant).

Several courts have already excluded similar expert opinions on Bard's state of mind, knowledge, and intent with regard to its IVC Filters recognizing that such opinions are "outside the bounds of appropriate expert testimony." *Tillman v. C. R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1326-27 (M.D. Fla. 2015); *see Ocasio v. C. R. Bard, Inc.*, No. 8:13-cv-1962-T-36AEP, 2015 WL 2062611, at *4 (M.D. Fla. May 4, 2015) (excluding opinions about "Bard's knowledge, intent, or state of mind because such testimony invades the province of a jury, which is capable of deciding such matters without an expert's help").

More importantly, the *Trasylol* court excluded Dr. Eisenberg's opinions for this very reason. Not only did the *Trasylol* court exclude Dr. Eisenberg's opinions because they were unreliable and irrelevant ethical opinions, it also excluded his conjectural testimony about why Bayer did not perform large studies of its drug when it saw a safety signal with its product because such testimony "rests on speculation about Bayer's subjective motivations, which is not a proper subject for expert testimony." *In re Trasylol*, 2010 WL 1489793, at **8-9.

Here, again, Dr. Eisenberg offers opinions similar to those in *Trasylol* that are grounded in his conclusory assertions about what Bard "knew," "should have known," and "should have done" about alleged safety information at numerous points in time and his conjecture as to why Bard took, or failed to take, certain actions. (*See, e.g.*, Ex. B, MDL Dep. Tr., 132:17-21 ("I am aware that there was data available to Bard showing high rates of complications. It does not look like these data were shared with physicians but as to, you know, whether there was intention or not, I can't speak to that."); 136:12-15 ("I can't speak to the company's intentions. I would say it appears to me that that information was withheld. That's all I have to say."); 137:7-25 ("I think it could be inferred from the data that the information was withheld from physicians and patients. You know, I really can't speak to the intentions of the company, but it seems to me that they had data available. It did not become available to physicians and patients in a timely manner."); 143:17 to 144:22 ("I believe it was troubling to Bard from reading their

- 11 -

1  internal documents….I think that's troubling to me that I was seeing those levels of
2  complications, but I think it was troubling to Bard as well, based on their response to
3  seeing these complication rates."); 144:24 to 145:13 ("But there is no question that they
4  were following the data very closely. When they saw that there were high complication
5  rates they reacted. So it was reactive, so I would call that troubling. They saw it and they
6  acted on it.").)

These opinions and testimony invade the province of the jury and this Court should follow the *Trasylol* court in excluding these opinions as falling outside the proper scope of expert testimony.

### 3. Dr. Eisenberg's Factual Narrative Will Not Help the Jury and Should Be Excluded.

Dr. Eisenberg's testimony is largely an improper factual narrative devoid of any expert analysis. Factual narratives about a product's regulatory history and summaries of a company's internal documents, interspersed with conclusory opinions, are not helpful to the jury, and therefore are not the proper subjects of expert testimony. *In re: Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1337, 1346 (S.D. Fla. 2010) (excluding an expert's opinions about regulatory history, FDA correspondence, and internal company documents as not assisting the jury, and in fact "invad[ing] the province of the jury"); *Payne v. C. R. Bard, Inc.*, No. 6:11-cv-1582-Orl-37GJK, 2014 WL 988754, at **5-8 (M.D. Fla. Mar. 12, 2014) (excluding "unhelpful, plaintiff-slanted summaries and characterizations of the evidence which should be excluded as unhelpful to the jury").

Court after court has held that "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *In re: Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009); *see Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989) (citing United States Courts of Appeal decisions finding similarly); *In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 880 (E.D. Ark. 2008) (granting post-trial motion to strike opinion testimony that was merely a summary of internal company documents, as any layperson could have

done), *aff'd in relevant part*, 586 F.3d 547, 571 (8th Cir. 2009); *Baldonado v. Wyeth*, No. 04 C 4312, 2012 WL 1802066, at *4 (N.D. Ill. May 17, 2012) (excluding experts' narrative testimony because the vast majority of the "proffered narratives amount to a summary and statement of the experts' advocacy-based interpretation of documents in the record"); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, MDL 07-1873, 2009 WL 2169224 (E.D. La. July 15, 2009) (excluding expert testimony merely opining as to the facts of the case because the expert's role was more akin to "the role of an 'über-juror' rather than as an expert [with opinions based on specialized knowledge]"); *In re: Baycol Prods. Litig.*, 495 F. Supp. 2d 977, 1014-15 (D. Minn. 2007) (excluding testimony as "lay matters" and "conclusory statements about questions of fact masquerading behind a veneer of technical language" where plaintiffs proffered an expert to opine that Bayer ignored its toxicologists' concerns about Baycol's steep dose-response curve as it concerned Baycol's safety profile).

To the extent such evidence is admissible, it is "properly presented through percipient witnesses and documentary evidence." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (excluding expert testimony concerning the alleged downplaying of hepatotoxic effects of Rezulin in the published literature based on internal documents, memos, and e-mails, finding that the issues constituted "lay matters"); *Ocasio v. C. R. Bard, Inc.*, No. 8:13-cv-1962-T-36AEP, 2015 WL 2062611, at *4 (M.D. Fla. May 4, 2015) (excluding expert "opinion" that summarized internal company documents because "the jury may consider only the underlying evidence itself, which should be presented directly to the jury through percipient witnesses and exhibits").

Dr. Eisenberg offers a strung-together summary of Bard internal e-mails, internal memoranda, and snippets of deposition testimony—all of which were hand-selected by Plaintiffs' counsel from among millions of pages produced in this case and hundreds of hours of deposition testimony. (*See* Ex. B, MDL Dep. Tr., 60:10 to 62:1.) Rather than having the documents properly admitted and presented to the jury through witnesses with first-hand knowledge of the information in the documents, the plaintiffs use Dr. Eisenberg

as an improper short cut to string together the record evidence about what Bard knew and when under the guise of expert opinion. This Court should prohibit plaintiffs attempts to short circuit the proper presentation of the evidence and exclude their improper use of Dr. Eisenberg as merely a "conduit for corporate information." *In re: Ethicon Inc.*, No. MDL 2327, 2016 WL 4582215, at *5 (S.D. W. Va. Sept. 1, 2016) ("I caution the parties against introducing corporate evidence through expert witnesses. Although an expert may testify about his review of internal corporate documents solely for the purpose of explaining the basis for his or her expert opinions—assuming the expert opinions are otherwise admissible—he or she may not offer testimony that is solely a conduit for corporate information."); *accord Walker v. Ethicon, Inc.*, No. 12-CV-1801, 2017 WL 2992301, at *5 (N.D. Ill. June 22, 2017) (excluding expert testimony that "would merely address facts found in corporate documents" as experts may not "serve as a conduit for corporate information.").

Moreover, Dr. Eisenberg's testimony "tracks plaintiff's legal arguments" with "very little significant analysis" and courts have held that such "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 887 (E.D. Ark. 2008) (quotations omitted). Dr. Eisenberg should not be permitted to testify to "simple inferences drawn from uncomplicated facts that serve only to buttress plaintiff's theory of the case." *In re Rezulin*, 309 F. Supp. 2d at 551; *see also In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769-Orl-22DAB, 2009 WL 3806436, at *4 (M.D. Fla. July 20, 2009) ("Plaintiffs' counsel may not simply use these expert witnesses to provide a narrative history of [the manufacturer's] marketing and labeling practices, or to make points that are within the province of counsel, rather than an expert witness."). Dr. Eisenberg's out-of-context summaries of a handful of lawyer-selected documents are unhelpful and can be done by the plaintiffs' lawyers in their closing argument. *U.S. v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004) (noting that expert opinion is not helpful to the trier of fact "when it offers nothing more than what lawyers for the parties can argue in closing arguments").

In sum, because plaintiff-slanted summaries of documents and deposition testimony improperly invades the province of the jury, are unreliable, and are precisely the types of "opinions" that courts routinely find unhelpful and inadmissible, this Court should similarly exclude them here.

### 4. Dr. Eisenberg Cannot Speak on Behalf of All Physicians and All Patients.

It is well-settled that witnesses such as Dr. Eisenberg cannot speak for anyone else, and any opinions that go to "what physicians would do with different information is purely speculative and not based on scientific knowledge." *In re: Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2001 WL 454586, at *18 (E.D. Pa. Feb. 1, 2001) ("The court perceives only one *Daubert* issue in this challenged testimony—whether Dr. Gueriguian can testify as to whether or not physicians would have prescribed or patients would have taken Pondimin or Redux had certain adverse event information been discussed in the drugs' labeling. Dr. Gueriguian is not qualified to opine on what decisions would have been made by the numerous physicians who prescribed diet drugs had they been provided with different labeling information."); *accord In re Diet Drugs*, No. MDL 1203, 2000 WL 876900, at *12 (E.D. Pa. June 20, 2000) ("The court can easily preclude, from a *Daubert* viewpoint, the rendering of opinions by either of these witnesses as to a label's compliance with federal regulatory requirements or as to what doctors in general think, because the witnesses are not qualified for that."); *see also In re Rezulin*, 309 F. Supp. 2d at 557 (excluding expert "testimony as to whether physicians would have prescribed Rezulin if different information about Rezulin had been available," because it was speculative and thus inadmissible).

Dr. Eisenberg's opinions focus primarily on the reasonable expectations that all physicians have of medical device companies like Bard. (*See* Ex. B, MDL Dep. Tr., 70:3-8.) He purports to speak for what other physicians would think and expect without any authority to do so. (*Id.* at 70:9 to 71:19.) No authoritative body has deputized him to speak for all physicians. (*Id.* at 71:6-10.) He admits he cannot say with any degree of certainty

that any given doctor would agree with his opinions, (*id.* at 77:10-17; 130:9-22), yet he opines on what most physicians would have done had they known of the alleged high rates of complications experienced by Bard IVC Filters. (*Id.* at 248:24 to 249:17 ("Q. You might be right and you might be wrong, but it calls for speculation for you to say what most physicians would have done with this information; right? A. Again, I would say I think in the issue of patient safety, I think that most physicians would be in pretty uniform agreement.").) Dr. Eisenberg has no authority to speak on behalf of other physicians, and his opinions as to what other physicians would have done with information regarding the alleged complication rates of Bard IVC Filters should be excluded because they are speculative and not based on any scientific knowledge.

### 5. Dr. Eisenberg's "Common Sense" Opinions Will Not Assist the Jury.

Expert opinions are limited to "scientific, technical, or other specialized knowledge . . . ." Fed. R. Evid. 702. "Common sense" opinions are not based on any scientific, technical, or specialized expertise, and therefore such opinions are inadmissible because they do not assist the jury in considering or understanding evidence or facts. *See, e.g., Rosenfeld v. Oceania Cruises, Inc.*, 682 F.3d 1320, 1331 (11th Cir. 2012) ("matters of common sense typically do not require or allow for expert testimony") (citing cases); *Russ v. Berchtold Corp.*, No. 12-cv-24482-UU, 2013 WL 11317072, at *2 (S.D. Fla. Nov. 27, 2013) ("These bases are matters of common sense, and because Dr. Masory's opinions are based on facts well within the understanding of the average lay person, his opinions would not assist the trier of fact through the application of scientific, technical, or specialized expertise.") (citing cases); *Hershberger v. Ethicon Endo-Surgery, Inc.*, No. 2:10-cv-00837, 2012 WL 524442, *8 (S.D. W. Va. Feb. 15, 2012) (excluding bioengineering opinion that was based on "common sense" rather than "any specialized knowledge, education, or experience as a biomedical engineer"); *Grupo Televisa, S.A. v. Telemundo Comms. Gr., Inc.*, No. 04-20073, 2008 WL 125601, at *1 (S.D. Fla. Jan. 7, 2008) ("common sense" conclusions "are not based on any scientific, technical, or

specialized expertise, and, thus, cannot be said to assist the jury in considering or understanding evidence or facts") (citing cases).

Many of Dr. Eisenberg opinions are based on nothing more than common sense. (*See e.g.*, Ex. C, Austin Dep. Tr., 58:22 to 60:9 ("I think that you don't need to be an expert to read some of these internal Bard documents . . . . I think any lay person would recognize that."); 78:16-22 ("So I think that although I can't cite FDA regulations, it's common sense that as a clinician or a patient you would want to know that information. You know, it's the company's product. They have to stand behind it and provide the data to show that it's not causing complications."); Ex. B, MDL Dep. Tr., 139:16-23 ("I think if the jurors saw these documents they would say there is a problem that physicians and patients were not given this information in a timely manner.").) These impermissible "common sense" opinions do not rely on any scientific, technical, or other specialized knowledge as required by Rule 702 and should therefore be excluded.

## IV. Conclusion.

For each of these reasons, Bard respectfully requests that this Court exclude the opinions of Dr. Eisenberg in their entirety.

RESPECTFULLY SUBMITTED this 24th day of August, 2017.

        s/Richard B. North, Jr.
        Richard B. North, Jr.
        Georgia Bar No. 545599
        Matthew B. Lerner
        Georgia Bar No. 446986
        NELSON MULLINS RILEY & SCARBOROUGH, LLP
        Atlantic Station
        201 17th Street, NW / Suite 1700
        Atlanta, GA  30363
        PH: (404) 322-6000
        FX: (404) 322-6050
        richard.north@nelsonmullins.com
        matthew.lerner@nelsonmullins.com

James R. Condo (#005867)
Amanda Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2204
PH: (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

**Attorneys for Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of August 2017, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

                                            s/Richard B. North, Jr.
                                            Richard B. North, Jr.

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000