# Exhibit B



Deposition of:

# Mark Eisenberg , M.D.

*July 6, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Mark Eisenberg , M.D.                                          July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 26

1          image the body.  So I do a lot of the things that

2          radiologists do, but I am not a radiologist.

3                   Q.     You don't hold yourself out as a

4          radiologist; right?

5                   A.     No, I do not.

6                   Q.     Now, you understand that IVC, the

7          acronym stands for inferior vena cava; right?

8                   A.     Yes.

9                   Q.     And if we refer in this deposition

10         to IVC or IVC filter you will understand what I

11         am talking about?

12                  A.     Yes, I will.

13                  Q.     And I recall from your last

14         deposition you have never inserted an IVC filter;

15         right?

16                  A.     No, I have not.

17                  Q.     You have never removed an IVC

18         filter?

19                  A.     No.

20                  Q.     Have you ever been present in a room

21         when an IVC filter was inserted?

22                  A.     I have not been present in a room

23         when an IVC filter was inserted, but I have put

24         in central lines into the inferior vena cava for

25         my own procedures, and then immediately after my

Page 27

1      procedure the patient moved to a radiology suite

2      where the same line that I had left in place was

3      used for insertion of the filter.

4              Q.      You have never been in an operating

5      room at the moment when an IVC filter was

6      implanted in a patient; right?

7              A.      No, that's correct.

8              Q.      You have never been in an operating

9      room at the moment when an IVC filter was removed

10     from a patient; right?

11             A.      Correct.

12             Q.      You have never had a patient, to

13     your knowledge, who experienced an adverse event

14     from having an IVC filter in them; right?

15             A.      Not to my knowledge, no.

16             Q.      You know that there are doctors and

17     scientists who routinely publish in the world's

18     literature about issues related to IVC filters?

19             A.      I do.

20             Q.      You have never published anything

21     about IVC filters?

22                     MR. ROTMAN:  Objection.

23                     THE WITNESS:  That's correct.  I

24     would like to elaborate on that a little bit,

25     which is through the course of this case I have

Mark Eisenberg , M.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 29

1        filters; correct?

2               A.     That's correct.

3               Q.     You have never received a grant to

4        do research on IVC filters; right?

5               A.     Right.

6               Q.     Of course, as we have -- strike

7        that.  You are well aware that there are doctors

8        who specialize in the implantation and removal of

9        IVC filters; right?

10              A.     Yes.

11              Q.     You are not a doctor who specializes

12       in the implantation or removal of IVC filters;

13       right?

14              A.     No, I do not.

15              Q.     You don't hold yourself out among

16       your peers as an expert in IVC filters, do you?

17              A.     No, I do not.

18              Q.     Now, prior to your retention for the

19       Plaintiffs in this litigation, you had never done

20       any research on IVC filters; right?

21              A.     I read some papers on IVC filters,

22       but I had never done any research on them.

23              Q.     Prior to your retention as a

24       litigation expert for Plaintiffs, you had never

25       done any organized or concerted research on IVC

Mark Eisenberg , M.D.                               July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 31

1        question earlier on that you don't understand, I

2        will rephrase it, it's not because you don't

3        understand.  It's because I have asked a terrible

4        question.  That was one of them.  Thanks for the

5        clarification.  Let me go back, with that

6        understanding.

7            A.     Okay.

8            Q.     You don't hold yourself out as an

9        expert or specialist in the detection of

10       fractures associated with IVC filters, do you?

11           A.     No, I do not.

12           Q.     You don't hold yourself out as an

13       expert in the potential migration of IVC filters;

14       right?

15           A.     I would like to go back to the

16       previous question.  You are right.  I don't hold

17       myself out as a specialist in the detection of

18       fractures and migrations but, to the extent that

19       they, for example, might migrate to the heart and

20       cause symptoms, I potentially could be involved

21       in that.

22           Q.     Do you hold yourself out as an

23       expert in the detection of tilt in a patient with

24       an IVC filter?

25           A.     No, I do not.

Mark Eisenberg , M.D.                              July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 32

1        Q.      Do you hold yourself out as an

2    expert in the detection of perforation associated

3    with an IVC filter?

4        A.      No.   Again, I don't hold myself out

5    as an expert in the area, but if a patient became

6    symptomatic I could potentially be involved.

7        Q.      You understand that a significant

8    portion of patients with alleged adverse events

9    associated with IVC filters are indeed

10   asymptomatic; right?

11            MR. ROTMAN:   Can I have the question

12   re-read, please?

13            QUESTION WAS READ BACK.

14            MR. ROTMAN:   Objection.

15            THE WITNESS:   I know that some

16   patients that have complications related to IVC

17   filters are asymptomatic.   I know that there is

18   many others who are symptomatic and that have had

19   major complications related to them.   I would

20   also say to that point that the patients who

21   received IVC filters, many of them have many

22   comorbidities and ultimately die not long after

23   they get the IVC filters, and it may be a death

24   that's related to the IVC filter but there is no

25   way to know because there is no autopsy results.

Page 37

1     related to the percentage of individuals who have

2     died as a result of alleged adverse events from

3     IVC filters; true?

4          A.     That's true.

5          Q.     Can you recall a specific patient

6     that you have ever had for whom you have

7     prescribed an IVC filter?

8          A.     I have not personally prescribed an

9     IVC filter for an individual patient.  I have

10    certainly been involved in the diagnosis of deep

11    vein thrombosis, pulmonary emboli, starting

12    anti-coagulation in these patients, and some of

13    these patient do go on to receive IVC filters but

14    I am typically not the one who makes the

15    determination that they got that.

16         Q.     You personally have never prescribed

17    an IVC filter for a patient; right?

18         A.     That's correct.

19         Q.     You have been involved in the care

20    of patients who have deep vein thrombosis,

21    though?

22         A.     Yes.

23         Q.     You don't hold yourself out among

24    your peers as an expert in the specific reasons

25    why an IVC filter might fracture; right?

Mark Eisenberg , M.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 39

1          literature and other materials in connection with

2          your work as a litigation expert in this case;

3          right?

4                    A.      Yes.

5                    Q.      Outside of your work as a litigation

6          expert, you don't hold yourself out as an expert

7          in the reasons why an IVC filter may fracture;

8          right?

9                    A.      Correct.

10                   Q.      Or migrate?

11                   A.      Correct.

12                   Q.      Or tilt?

13                   A.      Correct.

14                   Q.      Or perforate?

15                   A.      Yes.

16                   Q.      Or embolize?

17                   A.      Yes.

18                   Q.      Does the rate of a potential IVC

19         filter complication vary depending on the reasons

20         why a patient receives an IVC filter?

21                   A.      Can you repeat the question, please?

22                   Q.      Sure.  Strike that question.  You

23         are not an expert in any way, shape, or form in

24         bench testing for medical devices?

25                   A.      No, I don't do any bench testing or

Mark Eisenberg , M.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 40

1        hold myself out as an expert in bench testing.
2               Q.     Do you consider yourself an expert
3        in animal testing for medical devices?
4               A.     No.  Again, I don't do any animal
5        testing and I don't hold myself out as an expert
6        in any kind of animal testing.
7               Q.     You are not an engineer; right?
8               A.     I am not an engineer.
9               Q.     You are not a materials engineer;
10       right?
11              A.     I am not a materials engineer
12       although again, I have read this extensive
13       literature about IVC filters, so I would say I
14       know more about it than the average physician.
15              Q.     You are not a materials engineer;
16       right?
17              A.     No, I am not.
18              Q.     You are not a mechanical engineer?
19              A.     No.
20              Q.     You are not an expert in IVC filter
21       design?
22              A.     No, I am not an expert in IVC filter
23       design, but again I have more knowledge than the
24       average person about it, after reading all this
25       literature.

Page 41

1          Q.     You are not an expert in IVC filter

2      design?

3          A.     Correct.

4          Q.     Can you distinguish one IVC filter

5      from another based on visual observation alone?

6          A.     I think I can.  Certainly in the

7      Bard series I am pretty familiar.  Not with every

8      single variation in design from -- you know, from

9      design change to design change, but.

10         Q.     We are going to get back on to areas

11     we have covered before.  I just want to make sure

12     we are clear on this transcript on a couple of

13     different points.  You have been crystal clear in

14     the past you don't hold yourself as an FDA

15     regulatory expert.

16         A.     Correct.

17         Q.     That stands true today?

18         A.     No, I am not.

19         Q.     You are not an expert on what a

20     device manufacturer is required to do by law or

21     regulation to bring a device to market?

22         A.     No, I am not an expert in that area.

23         Q.     You are not an expert in what a

24     device manufacturer is required to do in order to

25     be compliant with pharmacovigilance requirements;

Page 42

1     right?

2          A.     No, I can't hold myself out as an

3     expert in FDA requirements.

4          Q.     You don't consider yourself an

5     expert in what a device manufacturer is required

6     to do by law in order to comply with various

7     reporting requirements; right?

8          A.     No. That's correct.

9          Q.     You are not an expert in what a

10    device manufacturer is required to do by law or

11    regulation to update doctors about risks

12    associated with its products; right?

13         A.     No, I would say that I am not an

14    expert in what's legally required, although I

15    know as a physician myself that -- what I would

16    expect a company to inform physicians about their

17    devices.

18         Q.     You don't consider yourself an

19    expert in what a device manufacturer is required

20    to do by law or regulation to update doctors

21    about risks associated with products?

22         A.     That's correct.  I am not an expert

23    in that area.

24         Q.     Have you ever taught a class on the

25    subject of pharmacovigilance?

Mark Eisenberg , M.D.                          July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 43

1          A.     Well, I don't think I have formally

2      taught a course on pharmacovigilance.  Although I

3      don't hold myself out as an expert in

4      pharmacovigilance, many of the research studies I

5      have done have involved, you know, safety and

6      certainly efficacy studies of different devices

7      and drugs, so I have a fair amount of knowledge

8      on pharmacovigilance.  I don't think I have

9      formally taught a course on that topic.

10          Q.     Let me break that down a little bit,

11      and you let me know if I get this wrong; okay?

12      Some of the research you have done in the past

13      touches on issues of product safety; right?

14          A.     Yes.

15          Q.     You don't hold yourself out as an

16      expert in pharmacovigilance; right?

17          A.     Again, I would say it's one of the

18      areas that I have some knowledge in, but do I

19      hold myself out as an expert in that area?

20      Probably not.

21          Q.     You are not an expert in corporate

22      ethics; right?

23          A.     No.

24          Q.     You are not an expert in responsible

25      corporate conduct; right?

Mark Eisenberg , M.D.                           July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 44

```
1              A.      That's correct.

2              Q.      You have never worked for FDA;

3       right?

4              A.      No, I have not.  Although I

5       mentioned in the Austin deposition that one of my

6       clinical trials, the FDA contacted me for some

7       additional information, but I was not compensated

8       and certainly can't construe myself as working

9       for them.

10             Q.      You are not an expert in medical

11      device labelling; right?

12             A.      No, I am not.

13             Q.      And you have never drafted a label

14      for a medical device?

15             A.      No, I have never drafted a label for

16      a medical device.

17             Q.      You have never advised a medical

18      device company related to product labelling?

19             A.      No, I don't believe so.

20             Q.      The FDA has never consulted you

21      about the appropriate labelling for a medical

22      device; right?

23             A.      No, they have not.

24             Q.      You have never been consulted by a

25      device manufacturer with respect to appropriate
```

Page 45

1              labelling for a medical device; right?

2                    A.     Correct.

3                    Q.     You have got no expertise in

4              marketing of medical devices or drugs; right?

5                    A.     Well, I don't have -- I would call

6              it professional expertise.  I have certainly been

7              a member of some advisory boards for some drug

8              companies that -- so we had meetings that were

9              related to marketing of particular drugs.  So --

10             I certainly don't hold myself out as an expert in

11             those areas, but I have some experience of

12             marketing for some pharmaceuticals.

13                   Q.     What are you referring to?

14                   A.     As an example, there is a drug,

15             varenicline, which is a smoking cessation drug.

16             So Phizer has advisory boards for physicians that

17             do research in that area, and we might meet once

18             every year or two, and they would present new

19             data that's come out, and get our take on that

20             and say:  How does that impact on  -- or how

21             should we present this to physicians in our

22             marketing effort.

23                   Q.     You don't consider yourself an

24             expert in what a pharmaceutical or medical device

25             company is allowed to do in terms of

Mark Eisenberg , M.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 46

1    communication with physicians about their

2    products; right?

3              A.     No.

4              Q.     Have you ever worked in any capacity

5    for Bard?

6              A.     No.

7              Q.     So I want to do a little bit of

8    additional housekeeping.  I think that you have

9    got your expert reports with you and they have

10   some of your notes on them; right?

11             A.     Yes.

12             Q.     You can feel free to refer to those

13   throughout the course of today's deposition.  I

14   have my own copies and I know that Steve does

15   too.  I am going to take my copies out.  I just

16   want to make sure that what I have is identical

17   to what you have.  So I will mark for the record

18   Exhibit copies and you can feel free to use the

19   Exhibits or your own personal copy.  The choice

20   is yours.

21             A.     Okay.

22             MR. ROTMAN:  I don't have copies.

23   You made an assumption about my having copies.  I

24   don't have copies of his reports.

25             MR. BUSMAN:  I have extra copies.

Mark Eisenberg , M.D.                                   July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 50

1          have any articles about IVC, period; right?

2          Strike that.  I messed it up.  You don't have any

3          articles about IVC filters at all listed in your

4          curriculum vitae; right?

5                  A.     No, I believe that's right; yes.

6                  Q.     You don't have any articles that you

7          have ever written about the value, if any, of

8          reviewing corporate documents to analyze product

9          risks; right?

10                 A.     No, I do not.

11                 Q.     You are not an expert in reviewing

12         corporate documents; right?

13                 A.     I don't hold myself out as an expert

14         in that area, but I have had some experience now

15         through this litigation and others, looking at

16         corporate documents.

17                 Q.     You have opinions about corporate

18         documents based on your review of the corporate

19         documents, but you certainly don't hold yourself

20         out as an expert in the review of corporate

21         documents; right?

22                 A.     That's correct.

23                 Q.     Look at paragraph 12, please.

24                 A.     Yes.

25                 Q.      "My research interests include

Page 60

1       imaging procedures.

2              Q.     So back to your report here.  You

3       have got after paragraph 22 a heading II which

4       states:  "Conclusions, Standards and Main

5       Opinions".  Do you see that?

6              A.     Yes, I do.

7              Q.     I want to try to go over how your

8       report is organized in a general sense; okay?

9              A.     Okay.

10             Q.     Now, a significant portion of your

11      expert report is based on a factual narrative

12      from the corporate documents you have reviewed;

13      right?

14             A.     Yes.

15             Q.     You try to be as accurate as you

16      possibly can when referring to those documents;

17      right?

18             A.     Yes.

19             Q.     You are not paraphrasing, but you

20      are trying to quote directly in most instances;

21      right?

22                    MR. ROTMAN:  Objection.

23                    THE WITNESS:  I believe in most

24      instances I quote directly from the document, but

25      occasionally, if there is multiple documents that

Page 61

1    say the same thing, I may have paraphrased.

2    BY MR. BUSMAN:

3         Q.    Now, obviously you didn't purport to

4    have reviewed every single document produced in

5    this litigation; right?

6         A.    No, that's correct.

7         Q.    Your understanding is that was

8    millions of pages of documents; right?

9         A.    Yes.

10        Q.    How did you go about -- strike that.

11   Who chose the corporate documents that you,

12   yourself, reviewed?

13        A.    Well, I was provided with a Drop Box

14   of a huge number of corporate documents from

15   which I could, you know, pick and choose.  My

16   attention was drawn to certain corporate

17   documents by the Lawyers as well.  I would say

18   also, in my reading through this case, I have

19   also gone back to see other documents that

20   perhaps were referred to in other expert reports.

21        Q.    The universe of corporate documents

22   that you were provided -- strike that.  The

23   universe of corporate documents you had access to

24   were provided by the Plaintiffs' Attorneys;

25   right?

Mark Eisenberg , M.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 62

1          A.     Yes.

2          Q.     Within that universe of documents

3     you were specifically directed to certain

4     documents that the Plaintiffs' Attorneys wanted

5     your opinions on; right?

6          A.     In many instances, yes.

7          Q.     Did you, yourself, draft this expert

8     report?

9          A.     Yes, I did.

10          Q.     You wrote every word of it?

11          A.     Yes.

12          Q.     Now, obviously your focus in this

13     case was on the specific documents that support

14     your theory of the case; right?

15          A.     Repeat that.

16          Q.     We established that there were

17     potentially millions of pages produced in this

18     litigation; right?

19          A.     Yes.

20          Q.     Your focus was on documents that

21     support your specific theory of the case; right?

22               MR. ROTMAN:  Objection.

23               THE WITNESS:  No, I wouldn't say

24     that.  I think that I -- I looked at most of the

25     documents, not all of the documents, that the

Page 69

1    right?

2              A.    I believe so.

3              Q.    And those are the doctors that are

4    being set forth as what we will call subject

5    matter IVC filter experts; right?

6              A.    Yes.

7              Q.    And you are not holding yourself out

8    as a subject matter IVC filter expert in this

9    case, are you?

10             A.    No.

11             Q.    Now, in paragraph 23 --

12             A.    Well, I would like to qualify that.

13   I am not holding myself out as an IVC filter

14   subject matter expert, but I am an interventional

15   cardiologist who takes care of patients with DVTs

16   and pulmonary emboli who get IVC filters.  I have

17   patients in my practice who have IVC filters, so

18   I am pretty comfortable, and I am certainly

19   comfortable with the ideas of informed consent

20   for procedures and for devices.  So there is a

21   lot of overlap there.

22             Q.    I am going to object and move to

23   strike as non-responsive.  In this case you are

24   not holding yourself out as a subject matter IVC

25   filter expert the way, for example, Drs Kinney,

Page 70

1        Roberts and Calva are?

2                A.      That's correct.

3                Q.      In paragraph 23 you state that your

4        expert opinions are focused primarily on the

5        reasonable expectation that physicians have of

6        medical device companies like C.R. Bard.  You say

7        that in part; right?

8                A.      Yes.

9                Q.      Are you, in this litigation,

10       attempting to give an opinion on what other

11       doctors would think and expect or are you

12       speaking for yourself?

13               A.      I think that I am pretty reflective

14       of the average physician in terms of what they

15       would expect from a device company.

16               Q.      What body, organization or group has

17       given you the authority to speak for other

18       physicians in this case?

19               A.      I think you could say that about any

20       one individual physician, that perhaps they don't

21       have authority from an organization to speak on

22       behalf of other physicians, but we -- you know,

23       we talk to each other constantly.  We have

24       conferences constantly.  We read the same medical

25       literature where there is papers, and there is

Mark Eisenberg , M.D.                          July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 71

1      letters to the editor, and there is editorials

2      and opinion pieces.   We go to major meetings.

3      So there is a community of physicians that, you

4      know, largely know what other physicians think

5      about things.

6             Q.     Is there a single body, group,

7      organization of any kind that has deputized or

8      authorized you to speak for any other physician

9      in this case?

10            A.     No, I wouldn't say that.

11            Q.     You understand that reasonable

12     physicians can have different opinions on any one

13     of a number of topics; right?

14            A.     Yes, I understand that.  There is

15     some extreme positions on either side of many

16     medical issues, but I think the bulk of

17     physicians are largely in agreement on most

18     things.  But certainly there is a range of

19     opinions about various medical issues.

20            Q.     What, if anything, have you done in

21     any formal way to determine what percentage of

22     physicians would agree with your opinions in this

23     case?

24            A.     Well, I certainly haven't spoken to

25     any physicians specifically about IVC filters,

Page 77

1          thing to do.  I think I am a pretty

2          middle-of-the-road, reasonable physician.

3          Presented with evidence I come to a conclusion,

4          so I think most physicians would come the same

5          conclusions as me.  I understand that there is

6          extremes.  I understand there is differences of

7          opinion, but on the whole I think we are pretty

8          reasonable, and we look at evidence pretty much

9          the same way.

10               Q.    I think I understand.  I think maybe

11         the problem is the word choice that I am using.

12         You can't say with any degree of certainty that

13         any given doctor would agree with your opinion,

14         although it is your belief based on your

15         education, experience and training that a

16         reasonable doctor would.  Is that fair?

17               A.    Yes.

18               Q.    Could we go off the record?

19                     BY THE VIDEOGRAPHER:  Going off the

20         record at 10:39 a.m.

21                     BY THE VIDEOGRAPHER:  This begins

22         tape number two in the deposition of Dr. Mark

23         Eisenberg.  We are back on the record at

24         10:50 a.m.

25

Mark Eisenberg , M.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 83

1          A.    Well, I certainly agree that it's
2     offered as ethics guidance.  I -- you know, I
3     understand the simple meaning of the rest of the
4     sentence.  I can't say as to whether that has
5     actually -- has been established as standards of
6     clinical practice or rules of law.
7          Q.    I think that's fair.  Let me try to
8     break that down into the two components.  You
9     understand and appreciate that the document that
10    we have marked as Exhibit 8 referenced in
11    paragraph 24 provides ethical guidance?
12         A.    Yes.
13         Q.    As to whether or not it establishes
14    a standard of any kind or rule of law, you can't
15    answer one way or the other; right?
16         A.    I think that most physicians would
17    understand that the recommendations by the
18    American Medical Association are pretty strong
19    ethics guidelines, and most physicians would
20    attempt to follow them.  I don't know if that
21    answers your question.
22         Q.    I think so.  Let me try to rephrase
23    it.  You think that most physicians would
24    understand that Exhibit 8 constitutes pretty
25    strong ethical guidelines that should be

Page 84

1          followed; right?

2                 A.      Yes.

3                 Q.      Whether or not Exhibit 8 is binding

4          in any legal sense, you would defer to others who

5          could discuss the binding impact, if any, on

6          Exhibit 8; right?

7                 A.      Yes, that's correct.  I don't -- I

8          don't know exactly what the law says about

9          informed consent.

10                Q.      Nor would you in any way purport to

11         give any legal opinions in this case, right?

12                A.      I am familiar with some legal terms

13         and some legal procedures, but I certainly can't

14         hold myself out as any kind of expert in legal,

15         you know, procedures.

16                Q.      Do any of the opinions you have in

17         this case have anything to do with legal

18         obligations of Bard?

19                A.      Again, I don't think I can speak to

20         legal obligations.  That's not my area.  I have

21         opinions that I think are shared by most

22         physicians about what Bard should and should not

23         do and what kinds of information need to be given

24         to physicians, what kinds of information need to

25         be available to patients.  But as to what's

Page 85

1       legally required, I can't speak to.

2              Q.     Now, paragraph 25 also is from the

3       AMA Code of Medical Ethics; right?

4              A.     Yes.

5              Q.     So again it's an ethical guidance;

6       right?

7              A.     It is ethical guidance.  And I would

8       like to get back to the legal issue.  Again, I

9       can't hold myself out as an expert in the legal

10      issues, but the my understanding that you -- it

11      would be wrong to, for example, do a procedure

12      without obtaining informed consent first from a

13      patient, except under unusual circumstances where

14      they can't respond, for example.

15             Q.     With that -- strike that.  With that

16      explanation in mind, are there any paragraphs in

17      your expert report here that touch on what you

18      consider to be Bard's violation of a legal duty?

19             A.      No, I don't think I have any

20      paragraphs like that.

21             Q.     Paragraph 25 quotes, as we have

22      established from the AMA code of medical ethics;

23      right?

24             A.     Is that a question?

25             Q.     Right.  I am just establishing

Mark Eisenberg , M.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 89

1          already out there for physicians to read, and I

2          think they were reading and responding to it.  I

3          have other sections of my report where I discuss

4          that I think Bard should have done controlled

5          trials or certainly prospective studies to look

6          at the efficacy and safety of their devices.  So

7          I think there is various parts of my report.

8          They don't all deal with, you know, the specific

9          point that you were making.

10         BY MR. BUSMAN:

11             Q.    You leave regulatory testimony and

12         determinations up to the regulatory experts that

13         Plaintiffs have disclosed; right?

14             A.    Yes, I leave the technical

15         considerations to the regulatory experts,

16         although I certainly read that and, in my context

17         of being a practising physician who implants

18         temporary and permanent devices, who has patients

19         that, you know, have filters, I think I can

20         respond to some of those issues.

21             Q.    Your opinions are based on what you

22         believe a responsible, moral and ethical device

23         manufacturer would have disclosed to physicians.

24         Is that fair?

25             A.    Yes, that's fair.

Page 92

1        although I think there is -- it's implicit in

2        these paragraphs, because these paragraphs

3        discuss how a physician obtains informed consent

4        before doing a procedure, and they have to be

5        able to disclose to the patients the risks,

6        complications and expected benefits of the

7        procedure or device to the patient.  So in order

8        to be able to do that they have to know what the

9        risks, complications and benefits are and how

10       frequently they occur.

11            Q.    I am going to object and move to

12       strike as non-responsive.  Is there anything in

13       paragraph 26 where you quote from these practice

14       guidelines that specifically references any

15       binding duty, obligation or responsibility of a

16       medical device manufacturer?

17                 MR. ROTMAN:  Objection.  Asked and

18       answered.

19                 THE WITNESS:  No, there is nothing

20       specifically, you know, identifying the

21       responsibility of a medical device company in

22       these paragraphs.

23       BY MR. BUSMAN:

24            Q.    Is Exhibit 9, in your opinion, the

25       same type of document as Exhibit 8 in terms of

Page 97

1     risks and complications and benefits of a

2     particular device and, you know, in order to

3     deliver that information to a patient.

4     BY MR. BUSMAN:

5          Q.     Let's take that in its component

6     parts.  I am going to break it down, because you

7     said two separate things.  You agree with me that

8     the documents cited in paragraphs 24, 25 and 26

9     do not constitute any legally binding authority,

10    requirement that Bard in a legal sense should

11    have complied with; right?

12         A.     Yes, I think that's correct.

13         Q.     It's your opinion; nonetheless, that

14    doctors, physicians would consider the documents

15    you have cited in paragraphs 24, 25, and 26 as

16    strong ethical guidance in terms of what a

17    physician is required to do to obtain informed

18    consent from his patient; right?

19         A.     Yes.  I would even go as far to say

20    those are probably authoritative documents in

21    terms of how you should go about obtaining

22    informed consent.

23         Q.     Let's take a look at paragraph 27.

24    I will read it into the record.

25                        "The totality of the evidence

Page 130

1        authority to speak for all other physicians.

2              Q.     You suspect and hope that reasonable

3        physicians would agree with the opinions that you

4        have set forth in your report; right?

5              A.     I think -- the words I would use

6        would be stronger than "suspect" and "hope".  I

7        am confident that most physicians would be

8        comfortable with these opinions.

9              Q.     Okay.  It's your expectation that a

10       reasonable physician would agree with the

11       opinions that you express in your report when you

12       refer to what a reasonable physician would want

13       to know; right?

14             A.     Right.

15             Q.     You can't; however, say with any

16       degree of certainty what any individual physician

17       would want or wouldn't want.  That specific

18       person would have to speak for themselves; right?

19             A.      Yes, I think we went over this

20       before.  There is the vast group of physicians

21       and then there is any one individual.  You can't

22       say what that person is going to say.

23             Q.     Let's turn to 29 and take a quick

24       look at that one.  Are you there?

25             A.     Yes.

Page 132

1              evidence demonstrating high

2              rate of complications with the

3              filters, Bard did not address

4              these issues in a way that

5              accurately and timely

6              disclosed or explained the

7              risks to physicians."

8         Did I read that correctly?

9    A.    Yes, you did.

10   Q.    Is it your opinion in this case that

11   Bard intentionally withheld information from

12   physicians?

13   A.    I don't think I can speak to

14   intentions of individuals or companies.  You

15   know, I am not an expert.  I don't know if there

16   are experts in terms of interpreting intentions.

17   I am aware that there was data available to Bard

18   showing high rates of complications.  It does not

19   look like these data were shared with physicians

20   but as to, you know, whether there was intention

21   or not, I can't speak to that.

22   Q.    Is it your opinion that Bard

23   violated any obligation, responsibility,

24   regulation, law or duty with respect to the

25   conduct that you describe in paragraph 31?

Page 133

1           MR. ROTMAN:  Objection.  Complex

2     question.  Do you want to break it down?  That

3     would be fine.

4     BY MR. BUSMAN:

5           Q.    Can you answer it the way I asked?

6           A.    It would be better that you break it

7     down.

8           Q.    What, if any, binding authority, in

9     your opinion, did Bard fail to comply with in

10    connection with the conduct described in

11    paragraph 31?

12          MR. ROTMAN:  Objection.

13          THE WITNESS:  So as we discussed

14    earlier, I am not an FDA expert or regulatory

15    expert, so I am not familiar with the FDA rules,

16    so I can't say whether they broke any rules by

17    not providing this information.

18    BY MR. BUSMAN:

19          Q.    Are you claiming that Bard failed to

20    comply with any moral or ethical responsibility

21    in connection with the conduct outlined in

22    paragraph 31?

23          A.    Again, I don't hold myself out to be

24    an expert in ethics, but as a reasonable

25    physician who, you know, implants permanent and

Page 134

1          temporary devices in patients and who routinely

2          gets informed consent from patients, I would feel

3          that there is a responsibility for the company to

4          let physicians know about complication rates.

5                  Q.     An ethical responsibility?

6                  A.     I guess you could say an ethical

7          responsibility.  They may have a regulatory

8          responsibility as well, but I can't speak to

9          that.

10                 Q.     Let's take a look at 31.  Let me

11         know when you have read that.  I will read the

12         first sentence:

13                             "Instead of exercising the

14                             kind of transparency

15                             physicians and patients expect

16                             from a medical device company

17                             like Bard, Bard continued to

18                             represent these devices as new

19                             and improved compared to

20                             predicate and competitor

21                             devices."

22                 Did I read that correctly?

23                 A.     Yes, you did.

24                 Q.     You used the word "transparency".

25         Is it your opinion in paragraph 32 that Bard

Page 136

1      question again.

2              A.      Okay.

3              Q.      Is it your opinion in paragraph 32

4      that Bard intentionally withheld any information

5      about patient safety from physicians and

6      patients?

7              A.      I am sorry.  Can you repeat it one

8      more time, please?

9              Q.      Read it back, please.

10             QUESTION WAS READ BACK.

11             THE WITNESS:  So my response is

12     again, I can't speak to the company's intentions.

13     I would say it appears to me that that

14     information was withheld.  That's all I have to

15     say.

16     BY MR. BUSMAN:

17             Q.      Let me see if I can characterise

18     this once again at a broader level so we can kind

19     of move past some of these issues.  Because as we

20     said, paragraph 32 follows a typical model for

21     various of the paragraphs in your report.  Not

22     all of them but a lot of them; right?

23             A.      Okay.

24             MR. ROTMAN:  Objection.

25

Mark Eisenberg , M.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 137

1          BY MR. BUSMAN:

2                   Q.    Would it be correct that you are

3          framing the record evidence in a way that you

4          believe would lead a reasonable person to infer

5          that information was intentionally withheld?

6                        MR. ROTMAN:  Objection.

7                        THE WITNESS:  I think it could be

8          inferred from the data that the information was

9          withheld from physicians and patients.  You know,

10         I really can't speak to the intention of the

11         company, but it seems to me that they had data

12         available.  It did not become available to

13         physicians and patients in a timely manner.

14         BY MR. BUSMAN:

15                  Q.    So would I be correct then in

16         stating that you have outlined the record

17         evidence and then are arguing that the evidence

18         appears to reflect that certain things were

19         withheld from FDA?  That's your take-away based

20         on the evidence you have seen.  Is that fair?

21                       MR. ROTMAN:  Objection.

22                       THE WITNESS:  Yes, and also -- and

23         beyond the FDA, the physicians and the patients

24         did not have access to this information in a

25         timely manner.

Mark Eisenberg , M.D.                                July 6, 2017
In Re: Bard IVC Filters Products Liability

                                              Page 139

 1        about whether they want to buy that car or not.

 2        So this is pretty much what's understood between

 3        physicians and patients and a medical device

 4        company, and consumers from any other kind of

 5        company.

 6              Q.    Let's take a look a little further

 7        on.

 8              A.    Could I add to that a little bit?

 9        The opposite of transparency is a lack of

10        transparency.  The lack of transparency was if

11        there was information available to the company

12        that these filters might not be functioning as

13        well as physicians and patients thought, and that

14        was not made apparent to the patients and the

15        physicians.

16              Q.    Do you believe that Bard's lack of

17        transparency would be readily apparent to the

18        jurors if they were able to see the documents

19        that you saw?

20              A.     Yes, I do.  I think if the jurors

21        saw these documents they would say there is a

22        problem that physicians and patients were not

23        given this information in a timely manner.

24              Q.    Let's take a look at paragraph 33.

25        Let me know when you are there.  Are you at

Page 142

1        opinion in paragraph 33 comes from Bard's

2        internal documents; right?

3               A.     It's partially from

4        Bard's internal documents, because there is

5        information in the internal documents about the,

6        you know, the complication rates associated with

7        the retrievable filters, but I also looked at

8        marketing materials that were sent to physicians,

9        that are publicly available documents as well.

10              Q.     Did Bard, in your opinion, lie to

11       any doctors or physicians in connection with the

12       marketing materials that you reviewed?

13              A.     I think that some of the marketing

14       materials that were given to physicians and also

15       instructions that were given, for example, to

16       representatives was misleading for physicians in

17       the sense that it led the physicians to believe

18       that the retrievable devices were just as safe

19       and efficacious as the predicate device, when in

20       fact they had internal information that that was

21       not the case.

22              Q.     Would it be correct in saying it's

23       your opinion that Bard acted unethically in

24       connection with the marketing materials that you

25       are referencing?

Page 143

1           A.     Again, I am not an expert on ethics.

2     I think that myself, as a physician, if I was

3     implanting these devices in patients and there

4     was information that this particular device did

5     not function as well as a competing device I

6     would be unhappy with the company, and if I knew

7     that information and I had a safer or more

8     efficacious alternative I would use that instead.

9                 MR. ROTMAN:  Off the record.

10                BY THE VIDEOGRAPHER:  Going off the

11    record at 12:30 p.m.

12                BY THE VIDEOGRAPHER:  This begins

13    tape number three in the deposition of Dr. Mark

14    Eisenberg.  We are back on the record at

15    1:11 p.m.

16    BY MR. BUSMAN:

17          Q.     Doctor, taking a look again at

18    paragraph 32, you refer to "lines of troubling

19    safety evidence".  Do you see that?

20          A.     Yes.

21          Q.     Is "troubling" your word choice or

22    does that come from any document you read?

23          A.     It's my word choice.

24          Q.     Do you believe it was troubling to

25    Bard?

Page 144

1          A.     I believe it was troubling to Bard

2      from reading their internal documents.  They

3      created -- I forget the term exactly, but I think

4      it was a crisis management team.  They used the

5      word "crisis".  If I understand correctly, they

6      hired a public relations firm in case this

7      information became public, so I think "troubling"

8      is a good word.

9          Q.     So would it be fair to say that you

10     are providing an opinion to a certain degree on

11     the state of mind of Bard when you used the word

12     "troubling"?

13                MR. ROTMAN:  Objection.

14                THE WITNESS:  Well, look, it's

15     troubling to me to see these complication rates

16     that I saw.  You know, internally was the -- you

17     know, the adverse event data and also the in

18     vitro data, so I think that's troubling to me

19     that I was seeing those levels of complications,

20     but I think it was troubling to Bard as well,

21     based on their response to seeing these

22     complication rates.

23     BY MR. BUSMAN:

24         Q.     By using the word "troubling", are

25     you in any way touching on Bard's intent or state

Page 145

1       of mind?

2                       MR. ROTMAN:  Objection.

3                       THE WITNESS:  You know, I forget

4       what the word is, but we are attributing the

5       characteristics of an individual to a company

6       here.  The word "troubling" is for an individual,

7       and you can't attribute that adjective to a

8       company.  But there is no question that they were

9       following the data very closely.  When they saw

10      that there were high complication rates they

11      reacted.  So it was reactive, so I would call

12      that troubling.  They saw it and they acted on

13      it.

14      BY MR. BUSMAN:

15           Q.    Would you agree that you cannot give

16      any opinions that touch on anybody's intent, or

17      state of mind or motive, or would you disagree

18      with that?

19                      MR. ROTMAN:  Objection.

20                      THE WITNESS:  I think that I

21      certainly cannot do that.  I think potentially

22      there might be some type of expert about it, who

23      could speak to intent, perhaps like a

24      psychiatrist, but myself, no.  I can say:  Okay,

25      there was data available.  It either was or was

Page 157

1          Q.     You are not an expert in corporate

2     compliance issues; right?

3          A.     Again, I am not an expert in -- as a

4     regulatory expert or corporate compliance, but I

5     know what a reasonable physician, even what a

6     reasonable patient or someone in my family would

7     expect from a responsible company.

8          Q.     Let me try one more time.  Have you

9     identified in any expert report that you have

10    served any binding rule, regulation, standard,

11    guidance or document of any type which would be

12    binding on Bard that you believe Bard violated?

13               MR. ROTMAN:  Objection.

14               THE WITNESS:  I don't think I have

15    referenced any standard like that.

16    BY MR. BUSMAN:

17         Q.     Let's go a little bit further into

18    -- skip ahead.  Back to paragraph 33.  If you

19    look one, two, three lines down, going in the

20    next line you refer to substantial improvements.

21    Do you see that?

22         A.     Yes.

23         Q.     Is that a term of art of some type?

24         A.     I am sorry?

25         Q.     Is the term "substantial

Mark Eisenberg , M.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 160

1       need to be explored by larger prospective

2       studies.

3              Q.      Move to object and strike as

4       non-responsive.  Doctor, is it your opinion that

5       a responsible, ethical company in Bard's position

6       would have conducted prospective large,

7       well-controlled safety studies?  Is that your

8       opinion?

9              A.      I think that they needed to do them.

10      I think it was actually -- it was their intention

11      to do one with Recovery, if I am not mistaken, a

12      European study that for some reason never got

13      done.  As to whether the FDA required those

14      studies or not, I can't speak to that.  I can say

15      that physicians would want to see those studies.

16             Q.      Do you believe that Bard had some

17      type of responsibility to do those studies?

18             A.      I do.

19             Q.      Do you believe that Bard had an

20      ethical responsibility to do those studies?

21                     MR. ROTMAN:  Objection.

22                     THE WITNESS:  I think that they had

23      an ethical responsibility to do those studies in

24      view of the data that they had from their small

25      retrievability studies.

Mark Eisenberg , M.D.                           July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 166

1        requirement with respect to the conduct outlined

2        in paragraphs 34, 35 and 36?

3              A.     So I am not an FDA regulatory

4        expert, so as to whether or not they complied

5        with the FDA regulations, I can't speak to that.

6              Q.     To the extent you take issue with

7        the conduct we are discussing in paragraphs 34 to

8        36, would it be fair to say that it's your

9        opinion that a reasonable, ethical and moral

10       company would have conducted the studies that you

11       have discussed?

12             A.     I think that's correct.  I think a

13       reasonable physician would want that information.

14       For sure patients and their families would want

15       that kind of safety information, which was not

16       available.

17             Q.     Take a look at 37, please.  Let me

18       know when you have read it.

19             A.     Okay.

20             Q.     I am going to read the last

21       sentence:

22                         "As a physician with patients

23                         who are candidates for IVC

24                         filters or have them

25                         implanted, I would expect that

Page 170

1                              have been marketed based on

2                              the in vitro test results."

3                   Are you giving a regulatory opinion

4         there?  Yes or no?

5              A.     Maybe we should say I am not giving

6         a regulatory opinion, because I am not an FDA

7         regulator.  But as a physician, and I use the

8         word "I", I would expect that that's evidence

9         that the filters are not substantially

10        equivalent.

11             Q.     It's your personal opinion?

12             A.     Personal opinion, and also opinion

13        that I think would be shared by the vast majority

14        of reasonable physicians and certainly patients

15        as well.

16             Q.     Okay.  I am going to move quickly

17        here.  Paragraph 38, you are just doing a

18        narrative here of what you believe the facts are;

19        right?

20             A.     Yes.

21             Q.     Okay.  What documents have you

22        relied on to support your opinions in paragraph

23        39?

24             A.     So there is a spreadsheet.  A Bard

25        internal document has a spreadsheet that shows

Page 185

1          Q.     Would you -- strike that.  Would it

2     be your opinion in this case that these documents

3     that you have cited are generally accepted

4     ethical standards for responsible companies?

5          A.     Yes, I think that's the case.  I

6     think that I should add -- part of the reason I

7     included it is because it's discussing at page

8     five of this document, it discusses

9     characteristics of a good case report and, on

10    page six, developing a case series, indicating

11    that the FDA thinks that these types of data are

12    -- are adequate signals that there may be a

13    problem with a drug or a device.

14         Q.     Let's try to break this down a bit.

15    It's not your opinion that any of these documents

16    we have gone over today constitute any legally

17    enforcing or binding authority on Bard; right?

18         A.     No, that's correct.

19         Q.     You do; however, believe that

20    reasonable physicians and a reasonable

21    manufacturer would look to any of these documents

22    for strong ethical guidance to guide their

23    conduct; right?

24         A.     Yes, and I would say patients and

25    their families would look to that, specifically

Page 186

1     with respect to patient safety.

2          Q.    Let me rephrase that to get that in

3     there; okay?  You believe that the various

4     guidance documents that we have discussed, all of

5     the guidance documents you have referenced in

6     your expert report in this case constitute strong

7     ethical guidelines that reasonable physicians and

8     patients would expect a device manufacturer to

9     comply with; right?

10                     MR. ROTMAN:  Objection.

11                     THE WITNESS:  Yes, I think that's

12     right.

13     BY MR. BUSMAN:

14          Q.    Would you say that essentially the

15     gist of what we are talking about here, to boil

16     it down, is the company should bear

17     responsibility for their products?  Is that the

18     point you are trying to make here?

19                     MR. ROTMAN:  Objection.

20                     THE WITNESS:  I think that's one of

21     the many points that I am trying to make.

22     BY MR. BUSMAN:

23          Q.    Right.  I didn't mean to suggest

24     that you don't have other points.  Let the record

25     be perfectly clear.  You make numerous other

Page 187

1      points.  Would it be fair to say that one of the

2      primary drivers of your opinions in this case,

3      not exclusive, but one of the primary drivers is

4      that companies should bear responsibility for

5      their products; correct?

6              A.     That's correct.  I think that's

7      correct.

8                      BY THE VIDEOGRAPHER:  Going off the

9      record at 2:11 p.m.

10                     BY THE VIDEOGRAPHER:  Going back on

11     the record at 2:22 p.m.

12     BY MR. BUSMAN:

13             Q.     Doctor, before we took a break we

14     were characterizing the standards that you have

15     cited in your expert report, and you agreed with

16     me that one of the drivers behind your opinion is

17     the notion that companies should bear a

18     responsibility for their products; right?  That's

19     not controversial at all; right?

20             A.     No.

21             Q.     Bard or another device manufacturer

22     needs to be honest about the risks and hazards

23     associated with its products; right?

24             A.     Yes, I agree with that.

25             Q.     That's not controversial at all;

Page 188

1       right?

2               A.      No, I don't think so.

3               Q.      And that's one of the drivers,

4       again, of your opinions; right?

5               A.      Yes.

6               Q.      Take a look at 44.  That's another

7       one of the narrative paragraphs; right?

8               A.      Yes.  Well, I mean -- go ahead.  Why

9       don't you say what you want to say.

10              Q.      When I say "narrative paragraph",

11      you understand that there are certain paragraphs

12      in your report that provide, I guess for lack of

13      a better word, the evidence as you see it, and

14      some contain your analysis and some contain both;

15      right?  Is that a fair characterization of the

16      way the paragraphs are set up?

17              A.      Yes.  I am not sure it's so black

18      and white.  We also have, you know, I have

19      paragraphs that I think evaluate evidence.  I

20      think I have other paragraphs that evaluate the

21      temporal nature of what went on.  There are

22      others putting the issues in context, I guess I

23      would say.  I think this is one of those

24      paragraphs.

25              Q.      Okay.  You are making a point in

Page 190

1          Do you want to repeat the question?

2          Q.    Sure.  You are not saying anything

3     in paragraph 45 that you wouldn't expect Mr.

4     Williamson to say himself if he were called to

5     testify; right?

6          A.    No, I think I quoted him extensively

7     in this paragraph.

8          Q.    There is none of your analysis or

9     editorialising in this paragraph; right?

10              MR. ROTMAN:  Objection.

11              THE WITNESS:  Well, I state in a

12     couple of places, I say he agreed with a

13     statement because he stated it.  So I don't know

14     if you call that interpretation on my part.

15     BY MR. BUSMAN:

16          Q.    I guess my question is simpler.

17     Paragraph 45 is one of the paragraphs where you

18     simply recount what the record evidence is as you

19     see it with respect to this particular issue?

20          A.    Yes, that's correct.

21          Q.    You are not expressing any one of

22     your actual opinions in paragraph 45.  Rather you

23     are setting forth some record evidence; right?

24          A.    Yes.

25          Q.    Let's turn to 46.  You don't hold

Mark Eisenberg , M.D.                              July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 191

1          yourself out as an expert in corporate compliance

2          with corporate standards; right?

3                  A.     No, I can't say that I am an expert

4          in that area.

5                  Q.     Take a look at 47.  Let me know when

6          you have had a chance to read it.

7                  A.     Okay.

8                  Q.     47 is another narrative paragraph

9          where you are simply setting forth the record

10         evidence; right?

11                 A.     That's correct.

12                 Q.     You are not an expert on Bard's

13         standard operating procedures, are you?

14                 A.     I am not an expert on corporate

15         operating procedures, although I would say that I

16         understand the importance of their standards.  I

17         think it's, you know, they are necessary for

18         patient safety that such standards be in place

19         and that the -- that the company has these

20         standards, that they should adhere to them.

21                 Q.     Take a look at 48, please, and let

22         me know when you have read it.

23                 A.     Yes.

24                 Q.     48 is another one of the narrative

25         paragraphs where you simply recount the record

Mark Eisenberg , M.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 208

1    a forum for discussion, patient safety and, you

2    know, the efficacy and safety of medical devices

3    and drugs.

4         Q.    All right.  Let's go through some of

5    these.  We can go through pretty quickly.  Take a

6    look at 57, please.  That's one of the narrative

7    paragraphs; right?

8         A.    Well, it's largely narrative, but it

9    also discusses, as I mentioned earlier, this

10   multicentre study about the SNF, you know,

11   attesting to its safety.  And the tail end of

12   that paragraph is, you know, comparing failure

13   rates, the SNF versus the retrievable filters.

14        Q.    You are not stating anything in

15   paragraph 57 that's not contained in some type of

16   a written document; right?  That's what I am

17   asking.

18        A.    No, none of this is my opinion.

19        Q.    Okay.  Let's take a look at 58.

20   Now, in the second sentence you said:

21                  "Bard perceived a market

22                  expansion opportunity to

23                  develop retrievable IVC

24                  filters."

25                Right?

Mark Eisenberg , M.D.                                July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 211

1          market niche for a retrievable filter, so they

2          said:   We are going to take our successful SNF

3          and we are modify the design in order to make it

4          retrievable.   But in order to modify the design

5          to make it retrievable the subsequent design, by

6          its very nature, was less resistant to migration,

7          and less resistant to fracture and less resistant

8          to tilt and embolization, and I don't think that

9          it was their intent to create such a device, but

10         what happened when they redesigned it not to make

11         it retrievable, it became a less vigorous filter.

12              Q.    You are not an expert in filter

13         design; right?

14              A.    I am not an expert in filter design.

15              Q.    Let's take a look, if you will,

16         please, at paragraph 59.  59 is a narrative

17         paragraph; right?

18              A.    Yes.

19              Q.    Paragraph 60 is also a narrative

20         paragraph; right?

21              A.    Yes, that's correct.

22              Q.    61 is another narrative paragraph,

23         right?

24              A.    I agree that these are all narrative

25         paragraphs, but I think that they are sort of

Page 212

1        important to understand that -- you know, the

2        temporal nature of what was going on here and the

3        environment.

4                Q.     Take a look at 62.  That's another

5        narrative paragraph, meaning it doesn't contain

6        any actual opinion that you have.  You are just

7        recounting the factual record as you see it;

8        right?

9                       MR. ROTMAN:  Objection.

10                      THE WITNESS:  Well, except for the

11       last line where I say:

12                             "At no time did Bard ever show

13                             that the Recovery had similar

14                             performance characteristics to

15                             the SNF."

16                      So I would say that's a

17       non-narrative statement.

18       BY MR. BUSMAN:

19               Q.     You haven't reviewed the entire

20       documentary record in this case; right?

21               A.     I am not sure what you mean by that.

22               Q.     You haven't reviewed every single

23       page of every document that Bard has produced in

24       this litigation; right?

25                      MR. ROTMAN:  Objection.

Page 237

1      context, as I mentioned earlier there was three

2      major lines of evidence I was evaluating here. So

3      one line was the medical literature, and one line

4      was the in vitro testing and one line was the

5      adverse events data.  So the adverse events data

6      was being tracked closely by Bard and, when they

7      saw unexpected complications, they called in Dr.

8      Lehmann to confirm it, which he did.  And then,

9      you know, the Attorneys asked Dr. Betensky to do

10     an independent analysis of the same Bard data,

11     and she came to the, you know, I think, to the

12     same conclusions which were there are elevated

13     complication rates.

14          Q.    I am going to object and move to

15     trying as non-responsive.  In the section of your

16     report heading E:  "Betensky Analyses, Adverse

17     Events", you don't say anything in any of these

18     paragraphs about Dr. Betensky's report that isn't

19     already contained in her own report; right?

20               MR. ROTMAN:  Objection.  Advise that

21     the Witness review the paragraph before answering

22     the question, unless you know from memory.

23               THE WITNESS:  Yes, I think the

24     section on Dr. Betensky's analyses largely

25     recapitulates the results of her analyses, and I

Page 238

1        don't extend them beyond what she has said.

2        BY MR. BUSMAN:

3              Q.     Have you reviewed any of Dr.

4        Betensky's other expert reports, like her

5        rebuttal report to Dr. Feigal or Dr. Fiska?

6              A.     What I have reviewed was her expert

7        report, plus she had an addendum.  Those are the

8        two reports from her that I examined.  A

9        supplement.  A supplement.

10             Q.     Okay.  Let me hand you what we will

11       mark as Exhibit 12.   It is Dr. Betensky's

12       rebuttal to the expert report of Dr. Feigal.  You

13       haven't seen this before, have you?

14             A.     Let me take a look.

15                    Exhibit 12 was marked for

16       identification.

17       BY MR. BUSMAN:

18             Q.     In particular, while you are taking

19       a look at this why don't we go off the record

20       and, while we are off the record, we can take a

21       break and you can, please, if you will, read

22       paragraph one in its entirety, which goes from

23       the first page on to the second page.

24             A.     Okay.

25                    BY THE VIDEOGRAPHER:  Going off the

Mark Eisenberg , M.D.                                   July 6, 2017
In Re: Bard IVC Filters Products Liability

                                              Page 248

1        another, because it might be outside of the focus

2        of an epidemiology study that you --

3             A.    But I completely understand what she

4        did, and I understand what it means.

5                   MR. ROTMAN:  I object to the

6        question.

7        BY MR. BUSMAN:

8             Q.    If you could turn to heading H,

9        "Discussion of the Medical Literature".  Take a

10       look at paragraph --

11            A.    What paragraph?

12            Q.    I am talking about paragraph 137,

13       but in general we have moved to your discussion

14       of the literature.  Take a look at paragraph 137.

15       It states:

16                        "The adverse event rates

17                        reported in this study are

18                        extremely high and would have

19                        dissuaded most physicians from

20                        using this device if it had

21                        still been on the market."

22                  Did I read that correctly?

23            A.    Yes.

24            Q.    You can't say to any degree of

25       certainty what any given physician would have

Mark Eisenberg , M.D.                                July 6, 2017
In Re: Bard IVC Filters Products Liability

                                              Page 249

1       done with this information.  You are speculating

2       that most physicians would not have used the

3       device; right?

4              A.     The statement is on the basis of

5       what I recognize as necessary for patient safety

6       and that I think other physicians would recognize

7       as necessary for patient safety.  So high event

8       rates in a particular device are going to make

9       the physician step back and say:  I don't want to

10      use that device.

11             Q.     You might be right and you might be

12      wrong, but it calls for speculation for you to

13      say what most physicians would have done with

14      this information; right?

15             A.     Again, I would say I think in the

16      issue of patient safety, I think that most

17      physicians would be in pretty uniform agreement.

18             Q.     Would you characterize that as an

19      educated guess?

20             A.     No, I think that -- we are all

21      trained the same way, to be very risk averse.

22      Patients are obviously risk averse as well.  So

23      if we see a report in the literature that has a

24      high risk associated with a device, we -- you

25      know, rightly or wrongly we step back and say:  I