# Exhibit C

 

Deposition of:

# Mark Eisenberg , M.D., M.P.H.

*August 17, 2016*

In the Matter of:

# Clare-Austin vs. C.R. Bard

Tiffany Alley, A Veritext Company
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-ga@veritext.com | 770.343.9696

Page 58

1  he was done with his answer?
2              THE WITNESS:  Yes, I guess I would
3  like to add to that, which is that I think that
4  -- from their internal documents it was clear
5  that Bard recognized that there were elevated
6  complication rates that were alarming or
7  concerning and they were concerned that
8  physicians were stopping to use their device and
9  that they were -- I mean, that they had reports
10 of multiple interventional radiologists who were
11 stopping to use Bard devices.  So there were some
12 instructions given to the sales team how to -- I
13 would call it spin control, but to put this in
14 context, and they were comparing the MAUDE rates
15 to the rates in the Grassi article, which really
16 is comparing apples and oranges which I think is
17 an inappropriate comparison and misleading.  I am
18 looking through my list of opinions here.  I
19 think that's it for my general opinions.  It's
20 possible I missed a few.
21 BY MR. NORTH:
22      Q.    Doctor, can you tell me anything
23 specifically that you were taught in your
24 training in medical school that gives you special
25 expertise in reviewing Bard's company documents

Page 59

1   and making determinations as to what the company
2   knew or did not know?
3              MR. MANKOFF:  Form.
4              MR. ROTMAN:  Objection.
5              THE WITNESS:  Well, I don't have
6   specific training looking at company documents
7   and identifying what the company knows or doesn't
8   know, but I will say first of all, as a clinician
9   who puts devices in patients and as a clinician
10  who takes care of patients with these devices
11  implanted, if the kind of information I was
12  seeing in the company documents was not provided
13  to me I would be very unhappy.  I think that --
14  if I or someone in my family had a device
15  implanted ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇
    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
    ▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Case 2:15-md-02641-DGC   Document 7291-3   Filed 08/24/17   Page 5 of 7
Mark Eisenberg , M.D., M.P.H.     August 17, 2016
Clare-Austin vs. C.R. Bard

Page 60

```
 1   ██████████████████████████████████████████████
 2   ███████████████████████████████████████
 3   ██████████   █████████████████████████████████████
 4   ████████████████████████████████████
 5   ██████████   ████████████████████████████████
 6   █████████████████████████   █████████████████████
 7   ████████████████████████████████████████████████
 8   ██████████████████████████   ███████████████████
 9   ██████████████████████████
10   BY MR. NORTH:
11        Q.    Doctor, one of the first things you
12   told me is that you have the opinion that there
13   was a high rate of complications with the
14   Recovery filter and the G2 when compared with the
15   Simon Nitinol filter; correct?
16        A.    Yes, I believe that's what I said.
17        Q.    And on what did you base that?  On
18   what data?
19        A.    This is based on the HHE, which
20   reports what the Bard consultant found when
21   exploring the MAUDE database.  So the consultant,
22   as I understand it, took the complication rates
23   from the MAUDE database, and divided it by sales
24   and compared rates of complications.  So these
25   are complications such as filter embolization,
```

Page 78

1  given?
2              MR. JOHNSON:  Form.
3              THE WITNESS:  Can you repeat that
4  question, please?
5              QUESTION WAS READ BACK.
6              THE WITNESS:  So I would say I am
7  not an FDA expert, so I can't cite FDA
8  regulations, but I am a clinician and a clinical
9  epidemiologist.  If I became aware of increased
10 complication rates with a device that I was
11 implanting in my patients or that my patients had
12 I would really want the company to let me know
13 and do the studies to show me that in fact it is
14 safe and this is not real, or to identify that
15 this is a problem and we need to stop using this
16 device or remove it.  So I think that although I
17 can't cite FDA regulations, it's common sense
18 that as a clinician or a patient you would want
19 to know that information.  You know, it's the
20 company's product.  They have to stand behind it
21 and provide the data to show that it's not
22 causing complications.
23 BY MR. NORTH:
24     Q.     My question was to do with
25 responsibility from the standpoint of the

Page 111

1  speak to that.
2  BY MR. NORTH:
3       Q.    Do you believe that Bard violated an
4  ethical duty by not conducting the sort of study
5  you have advocated?
6            MR. JOHNSON:  Form.
7            THE WITNESS:  Sorry.  Could you
8  repeat that one again also?
9  BY MR. NORTH:
10      Q.    Do you believe that Bard violated an
11 ethical duty by not performing the sort of
12 clinical study you have advocated?
13      A.    Again, I don't put myself out as an
14 expert on ethics, so I can't really speak to
15 that.  I think that if you ask most clinicians
16 and most patients, they would say yes, Bard had
17 an ethical duty to follow up the signal with an
18 adequately powered and designed study.  But as to
19 whether an ethicist would say that, I don't know.
20      Q.    Are there any objective criteria
21 that define when a safety signal such as you have
22 described here arises?
23           MR. ROTMAN:  Objection.
24           THE WITNESS:  It's possible in the,
25 for example, pharmacovigilance literature there