# Exhibit C



Deposition of:
# Michael Streiff , M.D.

*July 12, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Michael Streiff , M.D.                                    July 12, 2017
In Re: Bard IVC Filters Products Liability

Page 97

1      Q.   And the reason why evidence-based

2    medicine is important is because you don't want

3    doctors relying on unreliable and incomplete

4    information, fair?

5      A.   True.  You want the best information

6    possible.

7      Q.   Because if you have incomplete

8    information or unreliable information, that may

9    actually hurt patients in a situation?

10     A.   Possibly if you don't have -- yeah.

11     Q.   All right.  So turning to your kind of

12   area of expertise.  Your expertise is in hematology

13   and oncol-, oncology?

14     A.   Primarily -- I mean, I did a

15   hematology-oncology fellowship, but I would say

16   that my primary focus is in benign hematology, and

17   primarily in clotting and bleeding disorders.

18   Although, I see other benign hematology diseases,

19   anemia, low blood, you know, low platelet counts,

20   sickle cell disease, but I think most of my work is

21   in blood clots or bleeding disorders.

22     Q.   Okay.  So you are not a doctor that

23   places or removes IVC filters?

24     A.   True.

25     Q.   And have you ever placed or removed an

Michael Streiff , M.D.                    July 12, 2017
In Re: Bard IVC Filters Products Liability

Page 98

1    IVC filter?

2        A.   No.

3        Q.   Okay.  And you're not a member of the

4    Society of Interventional Radiology, correct?

5        A.   No.

6        Q.   And you're not a member of the American

7    College of Radiology?

8        A.   No.

9        Q.   Okay.  I just -- just I want to clear a

10   few areas of expertise to make sure we're on the

11   same page.

12       A.   Sure.

13       Q.   You have no training or experience or

14   education in engineering?

15       A.   No.

16       Q.   So you don't hold yourself out as an

17   engineering expert?

18       A.   No.

19       Q.   And you're not offering any opinions in

20   this case about the design or engineering of IVC

21   filters?

22       A.   No.

23       Q.   Okay.  And you have never done any bench

24   testing relating to IVC filters?

25       A.   No.

Michael Streiff , M.D.                    July 12, 2017
In Re: Bard IVC Filters Products Liability

Page 99

1      Q.   And you don't have any training or
2   education designing bench tests for IVC filters?
3      A.   No.
4      Q.   So I assume you have no experience
5   manufacturing IVC filters, medical devices?
6      A.   No.
7      Q.   Okay.  And the same as far as marketing
8   IVC filters, it's fair to say you don't have any
9   expertise as far as the marketing of IVC filters?
10     A.   No.
11     Q.   And you wouldn't say you're an expert in
12   the manufacture or marketing of IVC filters?
13     A.   No.
14     Q.   As far as corporate ethics, you wouldn't
15   consider yourself an expert in corporate, corporate
16   ethics?
17          MR. O'CONNOR:  Form.
18          THE WITNESS:  No.  Huh-uh.
19   BY MR. LERNER:
20     Q.   You have no education, specific training
21   about corporate, corporate ethics?
22     A.   No.  No.
23     Q.   Okay.  And then you're not an expert in
24   reviewing and summarizing internal corporate
25   documents?

Michael Streiff , M.D.                    July 12, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 100

1       A.    No.

2       Q.    And no training or experience in doing

3   that?

4            MR. O'CONNOR:   Excuse me.   Belated

5   objection.   Form and foundation.

6            THE WITNESS:   No.

7   BY MR. LERNER:

8       Q.    Okay.   I mean, have you ever --

9       A.    I don't do that as a, as a --

10      Q.    Okay.

11      A.    -- part of my job.

12      Q.    Have you ever reviewed internal company

13  documents ever?

14      A.    I would say that the, I've reviewed

15  several documents in this case.   Primarily in the

16  Kessler report, there are excerpts of documents

17  from the --

18      Q.    Okay.

19      A.    -- internal corporate documents, but,

20  otherwise, beyond that, no.   It's only the

21  documents I've seen, the few documents I've seen in

22  this case.

23      Q.    So outside of the Kessler report, you

24  have not ever reviewed internal company documents?

25      A.    Except there was a, I guess a couple that

Michael Streiff , M.D.                    July 12, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 101

1    I've seen as part of -- I think Dr. Garcia's

2    deposition, there's some in there; yeah.

3        Q.   Okay.  Outside, I guess, of the IVC

4    filter litigation and outside of Dr. Kessler's

5    report and reviewing Dr. Garcia's deposition and

6    the exhibits, you have not previously ever reviewed

7    internal, internal company documents?

8        A.   No.

9        Q.   And you are not an FDA expert?

10       A.   No.

11       Q.   And you're not holding yourself out as an

12   expert as, into FDA compliance?

13       A.   No.

14       Q.   You also have not worked in any company

15   in post-market surveillance --

16       A.   No.

17       Q.   -- for -- okay.  So you're not holding

18   yourself out as an expert in post-marketing

19   surveillance?

20           MR. O'CONNOR:  Form and foundation.

21           THE WITNESS:  No.

22   BY MR. LERNER:

23       Q.   Do you have any experience developing

24   warnings for IVC filters?

25       A.   Warnings?

Page 102

1      Q.   Warnings.

2      A.   No.

3      Q.   No.  And you're not offering -- strike

4   that.

5           You're not claiming to be an expert as to

6   warnings for medical devices or IVC filters?

7           MR. O'CONNOR:  Object to the form of the

8   question.

9           THE WITNESS:  No.

10   BY MR. LERNER:

11      Q.   Have you ever had your expert opinion

12   excluded by any court, to your knowledge?

13      A.   No.

14      Q.   And you've never -- in all of the cases

15   we've talked about, you've never attempted to offer

16   an expert opinion in anything other than

17   medical-related opinions; is that fair?

18      A.   That's true.

19      Q.   All right.  Now, I'm going to start

20   focusing more on the medicine now.

21      A.   Okay.

22      Q.   Are you still doing okay with time?

23      A.   Oh, yeah.  Yeah.  I'm fine.

24      Q.   Okay.  Can you describe what the

25   difference between a DVT is and a pulmonary

Page 133

1    you recommend placement of IVC filters?

2         A.    A dozen times, maybe.

3         Q.    Okay.  And has -- that dozen times, has

4    that changed at all, at all over the years, or has

5    that remained relatively consistent?

6         A.    Pretty consistent.  I mean, I think it

7    falls in that situation where you have someone that

8    has a blood clot you can't treat, and they're at

9    risk for pulmonary embolism.

10        Q.    And so of all of the times -- I think I

11   already asked you this.  So the times that you

12   recommended placement of a IVC filter have all been

13   within the parameters that are set forth in your

14   report?

15        A.    Yeah, where you can't, you have an acute

16   DVT or a PE and you can't use an anticoagulant.

17        Q.    Okay.  And what is your role as far as

18   recommending, recommending a placement of an IVC

19   filter -- because you don't actually place the IVC

20   filter, right?

21        A.    True.

22        Q.    So do you recommend whether the filter be

23   a permanent filter or an optional filter, or is

24   that at the discretion of the interventional

25   radiologist?

Michael Streiff , M.D.                                July 12, 2017
In Re: Bard IVC Filters Products Liability

                                          Page 134

1       A.   Usually that's the interventional

2   radiologist because they -- we're -- it's --

3   usually when I'm in the situation where I recommend

4   a filter, it's we've been asked by critical care,

5   you know, someone in the critical care unit that

6   has a blood clot, and they're, they're asking us

7   how to treat this.  And we say, No.  You -- we

8   don't think it's safe to use an anticoagulant in

9   this situation.  You need to consult IR to place a

10  filter, and we don't -- you know, I defer to my

11  colleagues in IR what, you know, what filter they

12  use, what, you know, whether they use permanents

13  or, or, you know, an optional filter.

14          I think they're using many fewer

15  permanents now because that's been, I think, the

16  wave, you know, in the U.S. Has been that permanent

17  filters are used a lot less.

18          As we had in that paper you can see, we

19  started using fewer and fewer permanent filters,

20  more optional filters.

21      Q.   So you'd defer then to interventional

22  radiology as far as the type of filter, whether

23  it's optional or permanent and also the brand of

24  filter?  Are you part of that decision-making --

25          MR. O'CONNOR:  Object to the form of the

Page 274

1  patients is, is, one, you look at, All right.  Did

2  they get the right prophylaxis after the procedure?

3  When was it started?  Did they get all of the doses

4  of that prophylaxis after the procedure?  And was

5  it an appropriate duration?

6          In some of them, there -- if their

7  duration was only two weeks, I put people on as

8  long as three months of anti-, you know, if you

9  look at the, the event curves for DVT or PE after

10  hip and knee surgery, a lot of them occur in the

11  first couple of weeks, but the event curve keeps

12  going upward after like three months and even a

13  little bit beyond that, so I've stretched people's

14  prophylaxis longer than that.

15          If I -- if I've done all of those things

16  by the third time, maybe, but I've never -- I've

17  never been in that situation where I thought a

18  filter would be the, you know, the right way to go.

19          I've always found some strategy whereby

20  we didn't have to put a, a filter in somebody;

21  yeah.

22  BY MR. LERNER:

23      Q.  In the next paragraph of your report you

24  say, Thus, in order for physicians to make

25  reasonable risk-benefit assessments regarding

Michael Streiff , M.D.                    July 12, 2017
In Re: Bard IVC Filters Products Liability

Page 275

1    filters, it is critically important that

2    manufacturers of IVC filters continuously apprise

3    the clinicians who order and implant IVC filters

4    about their safety profile, performance

5    characteristics, design problems and internal risk

6    assessments.  What is the basis for that statement?

7         A.    That comes -- I would say that we -- by

8    the time we got to this point in this document, we

9    had seen the Kessler report, and we added that,

10   added that in there.

11        So I think that's, that came, it come

12   from I guess both David and I's reviewing of the

13   Kessler report.  We thought that maybe that had not

14   occurred in this case, and so we think that

15   that -- you know, if there were events that were or

16   testing had shown that there were problems with the

17   device that, that, that it maybe wasn't released in

18   a time, a timely fashion, so I think that's what

19   David and I are getting to.

20        Theirs, if you know there's a problem

21   with a drug or a device, as soon as you do know

22   that it looks like there's a problem there, you

23   ought to let the broader clinician world know about

24   it, and that's -- so that's not from literature.

25   That's from Dr. Kessler's report --

Michael Streiff , M.D.                      July 12, 2017
In Re: Bard IVC Filters Products Liability

                                        Page 276

1       Q.   Okay.

2       A.   -- on those documents.

3       Q.   So that's --

4       A.   And then we went on further to make

5    an -- it was, you know, we ought to make an

6    addendum on, that goes into, more in detail about

7    that report, or at least several points from it.

8       Q.   Okay.  So the statement here that in

9    order for physicians to make reasonable

10   risk-benefit assessments regarding, regarding the

11   filters, it is critically important that

12   manufacturers of IVC filters continuously apprise

13   the clin-, clinicians who order implant IVC filters

14   about their safety profile, performance

15   characteristics, design problems, internal risk

16   assessments, that was a personal opinion that, that

17   you and then Dr. Garcia had after reading the

18   Dr. Kessler report?

19      A.   That is exactly --

20           MR. O'CONNOR:  Object to the form.

21           THE WITNESS:  Sorry.  That's, that's

22   right.  That's something we -- that's not something

23   coming from the literature.  That's coming from

24   after seeing that report large -- yes.

25   BY MR. LERNER:

Page 277

1      Q.   And, and you are not basing that

2   statement on any kind of FDA regulation standard or

3   some law.  That's just kind of a personal opinion?

4      A.   Yeah, that's after looking at those

5   documents.

6           MR. O'CONNOR:  Object to the form of the

7   question.

8           THE WITNESS:  Sorry.

9   BY MR. LERNER:

10     Q.   And, and when you say that manufacturers

11  should continuously apprise physicians of certain

12  information, again, that's not based on any

13  particular regulation, standard or law.  It's based

14  on your personal opinion?

15          MR. O'CONNOR:  Form.

16          THE WITNESS:  True.

17  BY MR. LERNER:

18     Q.   And when you use the term continuously

19  apprise, are you saying that manufacturers should

20  be providing information to doctors how often?

21     A.   I would say that if you have a -- you

22  know, obviously, I'm -- this is -- I'm an outsider.

23  The whole FDA, the vice pros, you know, approval

24  process or drug approval process, because I haven't

25  been involved with that either, but if you have --

Michael Streiff , M.D.                          July 12, 2017
In Re: Bard IVC Filters Products Liability

Page 283

1    stuff that internal documents that he references in

2    that report, and we're -- they were -- they looked

3    at -- these showed large, you know, comparisons

4    between different filters, and Bard filters in

5    those.  And I can't remember all of the different

6    comparators they, they have in those tables.

7        Q.   Did you review any of the underlying

8    documents in Dr. Kessler's report?

9        A.   I only reviewed the, the Kessler report

10   in itself, and he includes that data.  And then

11   there's a couple of documents I guess -- although I

12   don't -- from Dave -- I mean, I think there are a

13   couple of exhibits in there that are communications

14   or something, interim communications that are --

15       Q.   And for the, for the inter-device

16   comparisons that you're talking about, do you know

17   what the basis of the information is?

18       A.   It -- from my recollection, they're

19   laboratory testing, testing, you know, different

20   animal models or bench-top models of like

21   resistance to like migration, for instance, and

22   pressure that's required for a device to migrate.

23           That's kind of what I recall from the

24   Kessler report, and then they have some analyses, I

25   think, of the MAUDE data by a, a statistician or

Michael Streiff , M.D.                                July 12, 2017
In Re: Bard IVC Filters Products Liability

Page 284

1    something showing one filter is, like a Bard

2    filter, like a G2 is more prone to migration or

3    fracture than, than other filters.  Again, this

4    is -- but that's all from the, the Kessler report.

5         Q.   So you're not --

6         A.   But I don't know the -- if you're asking

7    about what do I know, like all of the details of

8    how these tests are conducted, no.  I'm looking at

9    the, you know, the snapshots of data that are in

10   the report.

11        Q.   Right.  And you're not an engineer?

12        A.   No.

13        Q.   You don't do testing of metal devices?

14        A.   No.

15        Q.   You've never created a bench test

16   yourself?

17        A.   No.

18        Q.   You may not even be able to interpret the

19   meaning of a bench test?

20             MR. O'CONNOR:  Form.

21             THE WITNESS:  No.  I mean, I think

22   it's -- you can -- as anyone -- you know, anyone

23   can look at data can -- if there are differences

24   between devices, you can see one is different than

25   another, but you're right, I don't, I don't know

Page 295

1       Q.   Right.

2       A.   -- based on that.

3       Q.   So it, it would be inappropriate and

4    unfair for you to review information that is

5    one-sided, wouldn't you agree?

6            MR. O'CONNOR:   Form.   Foundation.

7            THE WITNESS:   Yeah.   I mean, I guess if

8    there's -- we -- if we only saw part of the data,

9    then I think that would, yeah.

10   BY MR. LERNER:

11      Q.   Sure.

12      A.   Yeah.

13      Q.   And you've spent about, I guess, almost

14   five hours --

15      A.   Right.

16      Q.   -- reviewing Dr. Kessler's report?

17      A.   Right.  Going through that, yeah.

18      Q.   And he has a report and an addendum to

19   the report?

20      A.   Yeah.

21      Q.   Okay.  So did you review both of those?

22   Like he has like a table that's connected with the

23   report?

24      A.   I can't be -- I would have to go back and

25   look on my, my laptop and see if it's -- yeah, it's

Page 302

1      Q.   Well, I'm just saying that whenever,

2   whenever you consider an issue, you want to

3   consider both sides of the story.  It's not fair to

4   consider just one side of the story, right?

5      A.   True.

6           MR. O'CONNOR:  Objection.  Form.

7           THE WITNESS:  Of course, as a general

8   rule, yes.  Yeah.  Yeah.

9   BY MR. LERNER:

10     Q.   Right.  Have you ever spoken to

11  Dr. Kessler?

12     A.   Never.

13     Q.   Have you ever attempted to -- well,

14  strike that.

15          Have you attempted to be as accurate as

16  possible in describing Dr. Kessler's findings in

17  your report?

18     A.   Yeah.  We read through the report and

19  kind of pulled these right out, right out of his,

20  out of his report.

21     Q.   So you didn't modify any of his findings

22  in what you --

23     A.   I don't think so.

24     Q.   Let me just finish my question.

25     A.   Oh, yes.  Sure.  Sorry.

Michael Streiff , M.D.                    July 12, 2017
In Re: Bard IVC Filters Products Liability

Page 303

1      Q.   So in -- so you copied and pasted some

2   portions basically from his report into your

3   report?

4      A.   There may not be directly copied and

5   pasted, but, you know, took data that he had his

6   report, in his report and put it in our addendum,

7   yes.

8      Q.   Okay.  But you didn't modify

9   Dr. Kessler's findings in any, any way?

10     A.   I don't think so, no.

11     Q.   You didn't change any of his findings in

12  the process of taking what you saw from his report

13  and inserting it into your report?

14     A.   I don't -- I don't think so.  No, I don't

15  recall doing that.

16     Q.   So you included seven numbered paragraphs

17  in your report, your addendum repeating what

18  Dr. Kessler himself said in his own report?

19     A.   Right.

20     Q.   You, you don't add anything new about

21  Dr. Kessler's findings that Dr. Kessler himself

22  doesn't say in his own report?

23           MR. O'CONNOR:  Form.

24           THE WITNESS:  I don't think so, no.

25  BY MR. LERNER:

Page 304

1       Q.   So, in other words, you're repeating in

2    your report some of the findings that Dr. Kessler

3    has found without changing anything?

4       A.   Right.  I think it's a summary of what we

5    read in the, in his, his report.

6       Q.   But Dr. Kessler's findings do not factor

7    into your, the, the main opinions you're offering

8    in this, in this case?

9       A.   Sorry.

10      Q.   Sorry.  Dr. Kessler's opinions do not

11   factor into the medical opinions that you're

12   offering in this case?

13           MR. O'CONNOR:  Form.

14           THE WITNESS:  Well, I mean, I think that

15   when we saw those, I think that was, certainly that

16   was -- I think the data he had in his report I

17   think were, we found were troubling and would make

18   one consider whether there were events that had

19   already occurred in, you know, in papers.

20           Like the Nicholson papers, for instance,

21   where they had a lot of fractures, this kind of

22   would support what they were saying.  The Nicholson

23   paper only focused on G2 and recovery filters and

24   frac-, you know, frac-, you know, filter-like

25   fractures and stuff like that, but as these data

Page 307

1        He tells you basically that he went

2    through these internal documents and then produced

3    a report based on data that he has from internal

4    documentation, but I -- he doesn't have a method

5    section in his, in his, his report.

6        Q.   So did you independently verify

7    Dr. Kessler's methodology?

8             MR. O'CONNOR:  Form.

9             THE WITNESS:  No.

10   BY MR. LERNER:

11       Q.   Did you review any of the documents that

12   Dr. Kessler cites in his report?

13       A.   No.  Only the -- only the ones that are

14   in the report can I see, you know, where they have

15   data.

16       Q.   When you say only the ones in his report,

17   you're saying you actually reviewed the report

18   and --

19       A.   They're --

20       Q.   -- descriptions in the report --

21       A.   Yeah.

22       Q.   -- about underlying documents?  You never

23   actually pulled underlying documents?

24       A.   True.

25       Q.   Okay.  Did you independently assess the

Michael Streiff , M.D.                                    July 12, 2017
In Re: Bard IVC Filters Products Liability

                                                        Page 308

1    reliability of the underlying data that Dr. Kessler

2    relied on?

3         A.   I couldn't do that.

4              MR. O'CONNOR:  Form.

5    BY MR. LERNER:

6         Q.   Okay.  Did you check or test any of the

7    assumptions that Dr. Kessler made about the data he

8    analyzed?

9              MR. O'CONNOR:  Form.

10             THE WITNESS:  Again, you could not do

11   that.  Yeah.

12   BY MR. LERNER:

13        Q.   Okay.  Did you verify the documents that

14   Dr. Kessler reviewed actually showed what he says

15   they showed?

16        A.   I --

17             MR. O'CONNOR:  Form.

18             THE WITNESS:  Again, I, I saw, read the

19   report.  I don't have the, the documents it was

20   based on.

21   BY MR. LERNER:

22        Q.   So you assume for the purposes of your

23   addendum that Dr. Kessler employed a reliable

24   methodology?

25        A.   True.  I mean, he's a -- he's got a very