# Exhibit D



Deposition of:
# Anne Roberts , M.D.

*July 7, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Case 2:15-md-02641-DGC   Document 7296-4   Filed 08/24/17   Page 3 of 20
Anne Roberts, M.D.                                          July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 28

```
 1    sciences -- biology, chemistry, organic chemistry,
 2    physics?
 3         A    Yeah, that's correct.
 4         Q    Then you received your medical degree in
 5    1982?
 6         A    Yes.
 7         Q    Since 1982 you've been a practicing
 8    physician?
 9         A    No.  I did my internship in OB/GYN at
10    Cedar Sinai at Los Angeles for a year.  And then
11    after that I went to Mass General in Boston and
12    did my residency and fellowship there.  And then I
13    came back to San Diego in 1987 and began my
14    practice.
15         Q    But since 1982 you've dedicated your
16    professional life to the practice of medicine in
17    one way or another?
18         A    Yes, yes.
19         Q    You're not an expert in the field of IVC
20    filter design, are you?
21         A    I'm not an engineer.  I have not
22    designed an IVC filter.  I have used just about
23    every IVC filter that's ever been on the market.
24    So I think I have a lot of experience with IVC
25    filters using them clinically.
```

Case 2:15-md-02641-DGC   Document 7296-4   Filed 08/24/17   Page 4 of 20
Anne Roberts, M.D.                                                July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 29

1      Q    But you don't have any formal education,
2   training, or experience in the actual design of an
3   IVC filter, do you?
4           MR. LOPEZ:  Objection.  Form.
5           THE WITNESS:  Not specifically in terms
6   of the design.  But in terms of the components of
7   an IVC filter -- I think I'm very familiar with
8   what's important in components and the use of an
9   IVC filter and what it should do or not do when
10  it's put into a patient.  So I think I'm very
11  familiar with the design components that make up
12  an IVC filter.
13  BY MR. BROWN:
14     Q    And that knowledge of the design
15  components that make up an IVC filter comes from
16  your clinical practice with IVC filters; is that
17  fair?
18     A    Yes.
19     Q    You're not an expert in the tests that
20  IVC filters have to undergo for regulatory
21  clearance, are you?
22     A    Well, I'm familiar with -- I wouldn't
23  say all of the tests but -- since I've been
24  involved in the field and -- actually, my first --
25  my first study that I did was on the Bird's Nest

Case 2:15-md-02641-DGC   Document 7296-4   Filed 08/24/17   Page 5 of 20
Anne Roberts, M.D.                                          July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 30

1     filter at Mass General.  I spent a fair amount of
2     time looking at what are the flow characteristics
3     of IVC filters within the -- within an IVC.
4              And the Mass General group was
5     interested in that.  We had somebody that actually
6     worked on those projects where we would put in a
7     filter into a model and then do flow
8     characteristics through that.  I wasn't on those
9     papers.  But I did work with -- I'm sorry.  I
10    can't remember his name -- the person who was
11    doing some of those studies at Mass General.
12        Q    That was in the early 1980s?
13        A    Yeah.  It would have been probably 1985,
14    '86 maybe.
15        Q    Other than your work with the Bird's
16    Nest filter in 1985 and 1986, which sounds like
17    some form of bench top tests; is that right?
18        A    Well, the paper looked at -- and what we
19    did was to look at a number of filters that were
20    available.  So there was the Greenfield at that
21    point.  There was the Bird's Nest.  There was the
22    Simon Nitinol filter   You know, I -- honestly, I
23    didn't go back and look at those -- that paper.
24             But Evanasulis (phonetic) is one of the
25    authors.  And there were a number of filters that

Case 2:15-md-02641-DGC   Document 7296-4   Filed 08/24/17   Page 6 of 20
Anne Roberts, M.D.                                          July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 31

1  we looked at and then did flow studies just
2  looking at the flow going through and sometimes
3  putting in dye to see what it did when it went
4  through the filters.
5       Q    As far as the tests that IVC filters
6  needed to undergo from the period of 2000 to the
7  present, would you agree that you don't have any
8  training, education, or experience in that regard?
9            MR. JOHNSON:  Form objection.
10           MR. LOPEZ:  Join.
11 BY MR. BROWN:
12      Q    You can answer.
13      A    No formal work in terms of testing
14 filters like that.  I think that I'm aware of, you
15 know, some of the papers that have come out that
16 talked about fixations and talked about flow
17 dynamics and those kinds of things.  But I myself
18 was not involved with testing the IVC filters
19 after the time I left Mass General.
20      Q    Would you agree that you're not an
21 expert in the field of marketing?
22           MR. LOPEZ:  Object to form.
23           THE WITNESS:  I would probably say that
24 most physicians do some kind of marketing.  So I
25 would say that, you know, in a very general term

Page 112

1  BY MR. BROWN:
2      Q   In writing articles in the peer-reviewed
3  medical literature, do you ever cite to opinions
4  by paid litigation experts?
5          MR. JOHNSON:  Form.
6          THE WITNESS:  Excuse me?
7  BY MR. BROWN:
8      Q   When you're writing article for the
9  medical literature -- peer-reviewed medical
10 literature or book chapters, have you ever cited
11 to opinions by paid litigation experts?
12         MR. JOHNSON:  Form.
13         THE WITNESS:  I have -- no.  I mean, I
14 have no idea how that would be in context of doing
15 a peer-reviewed article.
16 BY MR. BROWN:
17     Q   In the roughly 850 or so publications
18 and presentations that are listed in your C.V.,
19 have you ever cited to opinions by a litigation
20 expert?
21         MR. JOHNSON:  Form objection.
22         THE WITNESS:  I guess I should make sure
23 I understand what you're asking.  And you're
24 asking have I ever taken a lawyer's opinion of
25 a -- of --

Page 113

1    BY MR. BROWN:
2        Q   No.  A litigation expert's opinion.  So,
3    for example, Dr. Kessler.
4             In the context of your private practice
5    when you're writing peer-reviewed medical
6    literature and giving presentations, have you ever
7    cited to anything like Dr. Kessler's report?
8             MR. JOHNSON:  Form objection.
9             THE WITNESS:  That's an interesting
10   question.  I -- I guess not.  I mean, I don't
11   quite -- I'm not quite sure I understand the
12   relevance or the -- what exactly you're asking.  I
13   guess I'm a little confused about that.
14   BY MR. BROWN:
15       Q   In your report in this case, you cite to
16   the opinions of Dr. Kessler, to Dr. Ritchie, to
17   Dr. McMeeking, to Dr. Begley (phonetic.)
18            Do you understand that all of those
19   physicians that I just named are paid litigation
20   experts in this litigation?  Do you understand
21   that?
22            MR. JOHNSON:  Form objection.
23            THE WITNESS:  Okay.  Now I'm beginning
24   to understand what your question is regarding.  I
25   would say in a peer-reviewed article you would be

Case 2:15-md-02641-DGC   Document 7296-4   Filed 08/24/17   Page 9 of 20
Anne Roberts , M.D.                                July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 116

1    those references to see -- to get a feeling of how
2    he characterized those.  So I felt quite
3    comfortable after looking at sort of the source
4    material and looking at his report that it seemed
5    to jive.
6         Q    But you don't know how Dr. Kessler went
7    about identifying the documents that he chose to
8    cite in his report, do you?
9              MR. JOHNSON:  Form.
10             THE WITNESS:  I have not discussed it
11   with Dr. Kessler as to how he decided to, you
12   know, take the documents that he talked about and
13   put them in his report.  So, no, I haven't had any
14   discussion with him about that.
15   BY MR. BROWN:
16        Q    In all of the articles that you've
17   written, in all of the prerequisites that you've
18   made, have you ever cited to a paid litigation
19   expert?
20             MR. JOHNSON:  Form.
21             THE WITNESS:  I don't think I've ever
22   been in the position where I was needing to quote
23   a litigation expert because that's not usually the
24   kind of work that I do.
25   ///

Case 2:15-md-02641-DGC   Document 7296-4   Filed 08/24/17   Page 10 of 20
Anne Roberts, M.D.                                          July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 117

```
 1    BY MR. BROWN:
 2         Q    So the answer is, no, you've never
 3    cited --
 4               MR. JOHNSON:  Form.
 5               THE WITNESS:  Not that I can recall.
 6    BY MR. BROWN:
 7         Q    When you're writing stuff in the
 8    peer-reviewed medical literature and giving
 9    presentations, you cite the medical literature; is
10    that fair?
11         A    When I'm doing a peer-reviewed article,
12    yes, I would generally cite the peer-reviewed
13    literature and usually my own experience.
14         Q    Turning to Appendix A of your report,
15    which is facts and data considered -- we
16    referenced this a few times -- the medical
17    literature that's listed here -- were you given
18    the medical literature that's listed here by the
19    plaintiffs' lawyers?
20         A    No.  No.  This is mostly medical
21    literature that -- I would say generally not.
22    This is mostly medical literature that is
23    available on pubmed or in the journals.  I'm
24    trying to remember if there's anything in here
25    that -- because it's data -- facts considered --
```

Veritext Legal Solutions
800.808.4958                                          770.343.9696

Case 2:15-md-02641-DGC   Document 7296-4   Filed 08/24/17   Page 11 of 20
Anne Roberts, M.D.                                          July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 139

1      is what the information was that the SIR quality
2      improvement guidelines used as a reference for
3      their -- for those guidelines.  So if you look on
4      page 1, it references the 2003 SIR guidelines.
5           Q    Right.
6           A    And this was -- this is information that
7      they would have used with that.  Sorry.
8           Q    Do you know who wrote Schedule 1?
9           A    Well, it's from -- it's from the SIR.
10     It's the -- this is the way that the SIR
11     guidelines are commonly put together is to have
12     these -- these -- you know, when you put together
13     guidelines, you're supposed to have the references
14     that you've used to -- as the source data.  And
15     this would be the source data for those tables.
16          Q    So you think that the SIR wrote
17     Schedule 1?
18          A    I'm not sure, honestly.  I don't
19     remember where we got this.  I'm assuming that's
20     where it comes from because this looks like what
21     the SIR has with a lot of their -- you know, when
22     we look at these.  You know, doing this in 2003 I
23     didn't really remember whether exactly this is
24     what it looked like.  But -- but that's where it
25     comes from.

Case 2:15-md-02641-DGC   Document 7296-4   Filed 08/24/17   Page 12 of 20
Anne Roberts, M.D.                                              July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 140

1    Q    So Schedule 1 I think comes from the
2    SIR.
3    A    I think it's part of -- I think it's
4    part of the guidelines.
5    Q    Did you review Schedule 1 before
6    finalizing the report in March of 2017?
7    A    You know, I don't remember.
8    Q    When is the first time you remember
9    seeing Schedule 1?
10   A    Well, I saw it when I reviewed
11   the -- when I reviewed the report, you know, over
12   the last, you know, few days or a week or
13   whatever.  I just don't remember -- I just don't
14   remember whether -- when before that I saw it.
15   Q    If you turn 17 pages in, there's
16   Schedule 2.  It says, Bard employees testifying
17   regarding the use of SIR article quality
18   improvement guidelines.
19        Do you see that?
20   A    Mm-hmm.
21   Q    "Yes"?
22   A    Yes, I do.  Sorry.
23   Q    Did you write this?
24   A    No.
25   Q    Do you know who wrote it?

Page 142

1      A    Yes.  Well, is this page 5?
2      Q    Schedule 5.
3      A    Oh.  But which page?  Oh, page 1 of
4  Schedule 5?
5      Q    Yes.
6           Did you write this?
7      A    No.
8      Q    Do you know who wrote it?
9      A    No.
10     Q    When is the first time you remember
11 seeing Schedule 5?
12     A    I think on the report when we were going
13 through the report.
14     Q    When was that?
15     A    March.
16     Q    Did you read Schedule 5?
17     A    Yes.
18     Q    Did you read it before or after you
19 signed your report?
20     A    Before.
21     Q    If you keep turning toward the end of
22 the document, there's a second Schedule 5 that
23 says, Bard's internal documents demonstrating the
24 improper use of SIR quality improvement
25 guidelines.

Case 2:15-md-02641-DGC   Document 7296-4   Filed 08/24/17   Page 14 of 20
Anne Roberts, M.D.                                    July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 143

```
 1              Do you see that?
 2       A      I'm sorry.  What page are you on?
 3       Q      You have to keep turning.  It's towards
 4   the end.
 5       A      I think so.  Yeah.
 6       Q      Did you write the second Schedule 5?
 7       A      No.
 8       Q      Do you know who did?
 9       A      No.
10       Q      Did you read the documents that are
11   listed here?
12       A      Did I read the documents?  I think these
13   are ones that are referenced in our references
14   here.
15       Q      If these are the documents that are
16   referenced in Appendix A then you believe you
17   reviewed them?
18       A      I believe so.
19       Q      If they're different, do you know if you
20   reviewed those documents?
21       A      I wouldn't without going back and
22   looking at the documents themselves.
23       Q      When was the first time you saw this
24   second Schedule 5?
25       A      Well, I certainly saw it when I reviewed
```

Case 2:15-md-02641-DGC   Document 7296-4   Filed 08/24/17   Page 15 of 20
Anne Roberts, M.D.                                             July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 145

1   synopsis.
2   BY MR. BROWN:
3        Q    In answering my question you were
4   referring to Appendix A?
5        A    Yes.
6        Q    So you said that you reviewed the
7   documents and the deposition transcripts that are
8   listed in Appendix A.
9             We've already discussed that, right?
10       A    Right.
11       Q    My question is related specifically to
12  the schedules.
13            Did you review and rely on specifically
14  the contents of the schedules in developing the
15  opinions that are contained in your report?
16       A    No.  We went from the documents.
17            MR. BROWN:  Okay.  Let's go off the
18  record.
19            THE VIDEOGRAPHER:  This marks the end
20  of Media No. 2 in the deposition of Dr. Anne
21  Christine Roberts, M.D.  Going off the record.
22  The time is 12:55 p.m.
23            (Lunch recess.)
24            THE VIDEOGRAPHER:  This marks the
25  beginning of Media No. 3 in the deposition of

Page 225

1    MAUDE database to see what's going on and why, you
2    know, sometimes, you know, we need to know what's
3    going on.  But, you know, I would hope, you
4    know -- I think there have been probably some
5    pharmaceutical companies that maybe knew there
6    were things that were going on with pharmaceutical
7    -- I don't know.  I don't think that's the
8    point.
9              I think the point is Bard knew.  And I
10   think that their duty was to their consumers,
11   which were both the physicians and the patients,
12   to say we've got a problem and we need to do
13   something about it.
14   BY MR. BROWN:
15        Q    Has any medical device company ever
16   provided you with their internal analysis about
17   its products?
18             MR. JOHNSON:  Form objection.
19             THE WITNESS:  I don't think so.  I don't
20   know.  And I'm not saying that you have to
21   give -- that Bard had to give their internal
22   documents to anybody.  I think they needed to act
23   on their internal documents.  You know, you could
24   tell me -- you could come to me and tell me, look,
25   we've been having a problem with the filters and

Page 230

1    Q   Are you using any written standard or
2    authority to define what a physician's reasonable
3    expectations are?
4            MR. JOHNSON:  Form.
5            THE WITNESS:  I suspect that reasonable
6    is in the eye of the beholder.  So I would say
7    that I don't believe that there is any absolute
8    number or percentage of what reasonable would be.
9    But I do think that we just -- that we would
10   require that there be preclinical, animal, and
11   laboratory bench testing of a device and that the
12   clinical safetyness and effectiveness, the risk
13   and benefits are appropriate.
14           And I think that one of the things
15   that's an issue is that if the -- you know, it's a
16   difficult situation.  Because if you look at the
17   literature, it's very hard to show that filters
18   actually prevent mortality.  And so if the -- if
19   the device is going to cause more mortality than
20   it may be treating, then we've got a problem.
21   BY MR. BROWN:
22       Q   My question is:  Do you have any written
23   authority or standard that you are relying on to
24   make the opinions that are contained in
25   subparagraph B on page 7?

Case 2:15-md-02641-DGC   Document 7296-4   Filed 08/24/17   Page 18 of 20
Anne Roberts, M.D.                                          July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 231

```
 1              MR. JOHNSON:  Form.
 2     BY MR. BROWN:
 3         Q    Do you or don't you?
 4         A    I do not have a written documentation of
 5     what reasonable expectations would be.
 6         Q    All right.  Subparagraph C you write,
 7     Data that Bard possessed, including testimony of
 8     witnesses, regarding the Recovery, G2, and Eclipse
 9     IVCFs.  What a reasonable physician's expectations
10     and acceptability of risks, slash, complications
11     versus benefits were and are in view of such data
12     whether Bard met those expectations.
13              Do you see that?
14         A    I do.
15         Q    Do you have any written standard or
16     authority that you are relying on to define what a
17     reasonable physician's expectations are regarding
18     data that Bard possessed?
19              MR. JOHNSON:  Form objection.
20              THE WITNESS:  Again, I think that I do
21     not have a written standard for reasonable in
22     terms of physician expectation.  But the idea that
23     a patient's going to die because I've done a
24     procedure is not acceptable.
25     ///
```

Case 2:15-md-02641-DGC   Document 7296-4   Filed 08/24/17   Page 19 of 20
Anne Roberts, M.D.                                         July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 238

1   something that physicians expect from companies.
2   Now -- and, again, I don't think in here that we
3   mean that you give us all of your databank.  I
4   don't think it means that we expect that you're
5   going to tell us everything about a device.  I
6   think what it means is that if a company finds
7   that there is a problem and that problem is such
8   that it affects the safety and efficacy of a
9   device, then a company has an obligation either to
10  get that device off the market temporarily or
11  permanently or to make sure that physicians know
12  what it is that they're up against so that they
13  can make good informed consent for their
14  patients.
15  BY MR. BROWN:
16      Q   All of the opinions that we just
17  discussed and the ones you reviewed in paragraphs
18  3, 4, 6, and 7 there's no way to test your
19  opinion, is there?
20          MR. JOHNSON:  Form.
21          THE WITNESS:  Only to ask a patient or a
22  family or the patient died and find out whether or
23  not they think it's reasonable to know that the
24  physician should have known about this so that
25  they could inform their patient appropriately.

```
 1    BY MR. BROWN:
 2         Q    Any other way that you know of to test
 3    your opinions?
 4         A    Ask you whether you think it's
 5    reasonable or not.
 6              MR. LOPEZ:  Or we'll just let a jury
 7    decide maybe.
 8    BY MR. BROWN:
 9         Q    If you got 100 doctors in the room,
10    there's no way to tell which ones would agree with
11    you and which ones would disagree with you?
12              MR. JOHNSON:  Form.
13              MR. LOPEZ:  About?
14    BY MR. BROWN:
15         Q    About the opinions contained in
16    paragraphs 3, 4, 6, and 7.
17         A    Would be an interesting exercise.  Maybe
18    someone could do that study and show people this
19    data and say, Out of 100 people that are in this
20    room, how many people think that it would have
21    been reasonable that the company release this data
22    to the physicians who are implanting this device
23    and putting, essentially, their patients at risk?
24         Q    The opinions --
25         A    Maybe I'll do the study.
```