# Exhibit E



Deposition of:

# Thomas Kinney , M.D.

*June 17, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Thomas Kinney , M.D.                       June 17, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 21

 1        BY MR. BROWN:

 2            Q.   And will you please ballpark the number of Bard

 3        documents that were in that Dropbox.

 4            A.   I'm going to guess 20.

 5            Q.   Okay.  Was the material that was provided to you

 6        in the Dropbox folder the material that you reviewed and

 7        relied upon in providing the opinions that are contained

 8        in your expert report in this litigation?

 9            A.   It was back-up material.  The main source for my

10        document was the Kessler report.

11            Q.   So the material that was provided to you on the

12        Dropbox, you're saying, was just some back-up information;

13        but the primary source of what you relied upon in

14        authoring your report was the Kessler report?

15                 MR. JOHNSON:   Form.

16        BY MR. BROWN:

17            Q.   Is that right?

18            A.   Let me clarify a little bit more, or I guess

19        embellish.  So there -- For instance, there was a 510(k)

20        that I reviewed for the original Simon Nitinol filter.

21            There was deposition from Dr. Asch that was in there,

22        as I recall.

23            Q.   Okay.  And those were part of the Dropbox

24        materials?

25            A.   Correct.

Thomas Kinney , M.D.                          June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 24

1          A.    It is.

2          Q.    I will represent to you that this is the

3    curriculum vitae that was attached to your expert report

4    in this case.  Okay?

5          A.    Right.

6          Q.    Is that curriculum vitae the most current

7    curriculum vitae that you have?

8          A.    Yes.

9          Q.    Doctor, I see here you received a master's

10   degree in mechanical engineering in 1979; is that right?

11         A.    Yes.

12         Q.    As part of that master's degree in mechanical

13   engineering, and your previous degree, which was a

14   bachelors in physics, did you have any coursework that

15   involved inferior vena cava filters?

16         A.    No.

17         Q.    How about implantable medical devices generally?

18         A.    No.

19         Q.    You don't have a Ph.D. in biomechanical

20   engineering, do you?

21         A.    No, I do not.

22         Q.    Then you started medical school in 1983?

23         A.    Yes.

24         Q.    Did you work continuously as an engineer between

25   1979 when you received your masters in mechanical

Thomas Kinney , M.D.                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 25

1    engineering and 1983 when you started medical school?

2         A.   Yes, I did.   I worked for NASA for a year and a

3    half doing aeronautical design and wind tunnel.

4         And then I worked for Thomas Fogarty as a bioengineer

5    designing medical devices, prototyping medical devices,

6    and doing FDA submissions for four years.

7         Q.   Why don't we start with the job you took

8    immediately after receiving your master's degree in

9    mechanical engineering.   Was that the job with NASA?

10        A.   That was the job with Thomas Fogarty.

11        Q.   Okay.   And what specifically did you do for

12   Dr. Fogarty?

13        A.   We were designing angioplasty balloons.   We did

14   pathophysiology experiments with mechanism of angioplasty.

15        We designed vascular clamps.

16        He was a referral person for many other physicians

17   that were interested in innovation and design, so we did

18   some ureteral dilators for one of his urology colleagues.

19        I designed a vascular clamp for one of Dr. Fogarty's

20   former partners, Dr. Pat Daily, who was here at San Diego.

21        We also got involved in designing a cardioplegia

22   jacket to do cardiac bypass.   And that was a project I

23   continued when I went to medical here, and that project we

24   actually did a 510(k) submission for FDA as well.

25        Q.   You mentioned a number of medical devices that

Thomas Kinney , M.D.                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 28

1      there, his report.  I wouldn't have any other specific

2      knowledge in, say, 2000 I was kind of doing other things.

3           Q.   Okay.  You mentioned that you continued your

4      work with the cardioplegia jacket when you began medical

5      school in 1984; is that right?

6           A.   1983.

7           Q.   '83.

8           And, then, did you continue to work with the

9      cardioplegia jacket through the time that you were in

10     medical school?

11          A.   We did.  So that -- that became -- I went to

12     medical school here at UCSD, and we had an independent

13     study project, and that was my study project for my

14     graduation, and we actually did a human -- human trial

15     actually.  We evaluated that in humans actually.  And that

16     that passed to another engineer as I kind of moved onto my

17     internship.

18          Q.   What was your role in the study regarding the

19     cardioplegia jackets used in humans?

20          A.   Well, we -- we made -- we made the jacket, and

21     we -- we actually were measuring -- we made these -- they

22     are mister probes to measure the temperatures to see if it

23     was effective in terms of achieving the temperatures that

24     they felt were protective during the periods where the

25     heart was stopped to do these prolonged procedures for --

Thomas Kinney , M.D.                     June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 31

1    that are elicited by a balloon in a different size

2    stenoses, and that got published in Academic Radiology.

3    The reason I'm kind of laughing is my other authors on

4    there told me they didn't understand a word I was saying

5    in there, but -- but that was engineering.  Yeah, it was a

6    mechanical analysis.

7         Q.   So you performed like a mathematical mechanical

8    analysis?

9         A.   Right.

10        Q.   Right?

11        A.   Yes.  Yeah.

12        Q.   But as far as actually designing medical

13   device-type work, like you would do as a mechanical

14   engineer, did you stop doing that after medical school?

15        A.   I didn't design anything.  But, you know, I --

16   Matthew, I did get involved with a patent lawsuit with

17   Bard actually with their Mahurkar catheter, and there was

18   a lot of engineering analysis about the theories of how to

19   get better flow from those with different sort of channels

20   and things like that.  So there was some mechanical

21   aspects of that.  But actually, design -- it was kind of

22   evaluating design, if you will, Matthew, but it wasn't --

23   we weren't building stuff or changing stuff, but it was

24   kind of looking at the evaluation of the novelty of the

25   ideas, those sort of issues.

Thomas Kinney , M.D.                          June 17, 2017
In Re: Bard IVC Filters Products Liability

                                                          Page 32

1          Q.    Okay.  And what product did that relate to

2     again?

3          A.    It was a Mahurkar hemodialysis catheter.

4          Q.    Can you describe for us what that is?

5          A.    It's a catheter that is implanted in a jugular

6     vein, goes to just above the heart.  It stays in the

7     patient for extended periods of time.  It has two access

8     ports, one blood goes in and one blood comes out, and it

9     gets hooked to a dialysis machine.

10         Q.    Since graduating from medical school in 1987,

11    you have been a full-time practicing physician?

12         A.    Correct.

13         Q.    Would it be fair to say that you focused the

14    last 30 years of your professional career to treating

15    patients?

16         A.    Yes.

17         Q.    You don't hold yourself out as an expert in

18    designing IVC filters, do you?

19         A.    Well, I have an interest in IVC filters, and I

20    published quite a bunch of articles.  So there's an

21    element of -- there's a knowledge of expertise, and then

22    there is an engineering background.  So while I don't

23    design -- I haven't designed IVC filters.  I can look at a

24    design and evaluate its features or the plusses and

25    possibly the minuses of the features of that device based

Thomas Kinney , M.D.                           June 17, 2017
In Re: Bard IVC Filters Products Liability

```
                                                  Page 35
 1          A.   Help me, Matthew.  What does that mean,
 2     "demonstrative"?
 3          Q.   The physicians come in, and you are showing them
 4     how these devices look in a bench top setting.
 5          A.   Correct.
 6          Q.   But as far as actually designing bench top
 7     testing that is going to be submitted to the FDA, for
 8     example?
 9          A.   No, we did not do that.  That's correct.
10          Q.   Would you agree that you're not an expert in the
11     field of marketing?
12          A.   No, I'm not a marketer.  No.
13          Q.   Do you have any education, training, or
14     experience in marketing?
15               MR. JOHNSON:  Form.
16       BY MR. BROWN:
17          Q.   You can answer.
18          A.   I have no experience in marketing.  Other than
19     marketing myself as a physician, I guess.  That's -- We
20     all kind of market ourselves, you know, on a level.
21     You -- We deal with people.  We're -- Physicianship is
22     kind of one on one, so there's a -- I don't know.  It's
23     not commercial marketing, I guess, is what you're saying,
24     Matthew.  Sorry.
25          Q.   Do you hold yourself out as an expert in the
```

Thomas Kinney , M.D.                    June 17, 2017
In Re: Bard IVC Filters Products Liability

                                                Page 67

1    plaintiffs?

2         A.    These two fine gentlemen mostly.

3              MR. LOPEZ:  He just looked at you, Joe, when he

4    said that.

5              MR. JOHNSON:  I agree with him.

6              THE WITNESS:  He was the closest to me.

7    Actually, I got involved because Wendy was so nice.

8      BY MR. BROWN:

9         Q.    In your report that we have marked as Exhibit 4

10   to today's deposition, do you agree that you're helping to

11   support the plaintiffs' arguments in this lawsuit?

12             MR. JOHNSON:  Form.

13             THE WITNESS:  I would say yes.

14     BY MR. BROWN:

15        Q.    In your report, do you agree that you are making

16   an argument for the plaintiffs' position in this lawsuit?

17             MR. JOHNSON:  Form.

18             THE WITNESS:  I guess maybe I should ask you to

19   be more specific, I guess.

20     BY MR. BROWN:

21        Q.    Well, the report that we have marked as

22   Exhibit 4 is several hundred pages long, and it lays out

23   opinions that you subscribe to at the end related to

24   Bard's IVC filters; is that right?

25        A.    Correct.  Correct.

Thomas Kinney , M.D.                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 68

1          Q.    And the upshot of the report is that in the

2      opinion of the authors, Bard filters are defective.

3          You understand that?

4          A.    Yes.

5              MR. LOPEZ:  Object to form.

6        BY MR. BROWN:

7          Q.    So in this report, do you agree that you're

8      making an argument for the plaintiffs' position in this

9      lawsuit?

10             MR. JOHNSON:  Form.

11             THE WITNESS:  Yes.

12       BY MR. BROWN:

13         Q.    I want to turn to Paragraph 14 of the report.

14         A.    (Indicating.)

15         Q.    Paragraph 14 says, "We apply the same analyses

16     and methodology in reaching these kind of opinions as we

17     apply in our professional, clinical and teaching

18     capacities and in many respects in our research, writing,

19     and submitting medical articles to peer-reviewed journals

20     and publications."

21         Do you see that?

22         A.    I do.

23         Q.    Can you describe what you mean by that?

24         A.    Well, I do peer-reviewed articles as a reviewer,

25     and so I have to analyze and look at the methodology of

Thomas Kinney , M.D.                        June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 73

1          Q.    Would you agree that if you did ignore data that

2     weighs against the opinion that Bard's filters are

3     defective, that you would be applying the same level of

4     intellectual rigor in this case as you apply in your

5     private practice as a researcher and clinician?

6                MR. JOHNSON:   Form.

7                THE WITNESS:   I would say that I'm always

8     willing to look at data.   If you have some data to show

9     me, I'd be happy to look at it and opine about it.

10      BY MR. BROWN:

11         Q.    In drafting this report, did you take data and

12    information out of context?

13         A.    I don't think so.

14         Q.    If you did take data and information out of

15    context, would you agree that you wouldn't be applying the

16    same level of intellectual rigor to your work in this case

17    as you apply in your work as a clinician?

18                MR. JOHNSON:   Form.

19                THE WITNESS:   Again, I would say show me what

20    you don't agree with, and we'll look at it and make an

21    intelligent decision.

22      BY MR. BROWN:

23         Q.    Okay.   How was the report, which we marked as

24    Exhibit 4, prepared?

25         A.    We basically used the document by Dr. Kessler is

Thomas Kinney , M.D.                      June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 74

1    what we did, and we were -- we were asked -- we were

2    tasked, actually, as interventional radiologists who were

3    academicians and involved with some of the writing

4    standards about IVC filters, and we were tasked to assess

5    the information that was provided by Bard about their

6    filters, and whether we thought that there was

7    transparency in that in our approach to, say, getting

8    consent for patients.

9        We were -- I lost my train of thought.  Sorry.

10            MR. LOPEZ:  If you need to refer to your report,

11   you can, by the way.

12            THE WITNESS:  Yeah.

13       You know, as clinicians that have multiple years of

14   experience on IVC filters, we were, you know, able to make

15   opinions about, you know, what we thought was done.  We

16   were able to assess the data that he presented, some of

17   the experimental data, that included lab experiments and

18   animal experiments.

19       Basically, it was listed as a permanent filter that

20   had -- that was supposed to act like permanent filters

21   that we had before.

22       My career and Anne Roberts' career spans the

23   transition in filters from permanent devices to retrieval

24   filters.  And we were promised that the retrieval filters

25   would have the same sort of performance characteristics

Thomas Kinney , M.D.                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 75

1    that our permanent devices had.  And unfortunately, as the

2    experience -- as the clinical experience accrued with the

3    retrieval filters, we were finding that that assumption

4    was not true, and there was -- it turned out, you know, I

5    had done a plenary session right before Bard did your

6    major marketing release of the Recovery Nitinol filter.

7    The -- The SIR meeting in 2004 was in Phoenix, and we

8    were -- my plenary session was on venous thromboembolism.

9    And we were all excited about having the use of retrieval

10   filters.  Because we all remembered that ten-year-old kid

11   that had a trauma that we put a filter in, and he had that

12   filter for multiple decades, and we never felt real

13   comfortable talking to that patient or his mother or

14   father about what was going to happen with this multiple

15   decades.  Really, you kind of say, "We don't really know,"

16   and that's an answer that families like to hear because

17   they -- they assume you are the doctor, you know

18   everything and, you know, you should know these things.

19        So again, I lost my train of thought.  Sorry.

20     BY MR. BROWN:

21        Q.   All right.  Well, I'm interested right now in

22   how the report actually was physically prepared.  Because

23   we have three authors and several hundred pages of

24   material here, and I want to get a sense as to how putting

25   pen to paper or fingers to the typewriter this was

Thomas Kinney , M.D.                          June 17, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 76

1     actually done.

2          A.    Okay.

3          Q.    So can you elaborate on how Exhibit 4 was

4     prepared?

5          A.    I -- My section, I wrote looking at the Kessler

6     report, and I did a literature search on -- on the -- on

7     the retrieval -- all the Bard filters, basically, from the

8     initial animal studies.  I even looked back at the Simon

9     Nitinol data.  I had experience putting in Simon Nitinol

10    filters myself.

11         And so we looked at the preliminary data before some

12    of the animal -- I looked at some animal abstracts that

13    Dr. Kaufman wrote back when he was still at Boston, and

14    even before that, it was approved as a device for humans.

15         Then I looked at Dr. Asch's studies.  And that study

16    was clearly done as a -- as just a retrievable study, and

17    it was a short-term study, but there were -- again, you

18    know, we talked about signals before.  There were things

19    in that study that we were concerned about in terms of

20    there were some fractures, and there was a surprise

21    migration of a filter that they fortunately caught because

22    they had scheduled to retrieve it at that time.

23         And then there was a subsequent report that

24    demonstrated yet another issue with a filter that came out

25    a few years later.

Thomas Kinney , M.D.                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 77

1        Then I looked at the 510(k), and I looked at the

2    studies that were involved in the 510(k).

3        What else did I look at?  Then I looked at all the

4    documents that were listed by Dr. Kessler in terms of when

5    they did the market release which was, I recall, was in

6    January of 2004.  And then the rapidity with what sort of

7    issues came up.

8        And the thing that surprised all of us that had

9    experience with the permanent filters was we were seeing

10   complications that we had never seen before.  I do

11   remember my point about the plenary session.  What I said

12   in that plenary session was that there were design changes

13   made in the retrieval filter to make it retrievable; and

14   again, we assumed that those design changes were made in a

15   compatible fashion that the performance characteristics

16   would be similar as a permanent filter.  But I remember in

17   that plenary session saying that it's possible that the

18   features that make a filter retrievable may also make it

19   migrate easily or move, and those are design tradeoffs.

20   You know, this is the engineering aspect again, and we'll

21   see if that's what happens or not.

22       And so anyway, I am getting off the track a little

23   bit, Matthew, and I apologize.  But basically, I went

24   through the Kessler report, and went through sequentially

25   all the different aspects of that.

Thomas Kinney , M.D.                    June 17, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 81

1          A.    This was three to four weeks.

2          Q.    At the very back of the report there is an

3     Appendix A.

4          A.    (Indicating.)

5     Yes.

6          Q.    It's titled, "Facts and Data Considered."

7     Do you see that?

8          A.    I do.

9          Q.    Were you given the literature listed here?

10         A.    Yes.

11         Q.    There are a number of expert reports that are

12    listed.  Were you given those expert reports as well?

13         A.    Yes.

14         Q.    Did you read the full reports?

15         A.    I did.

16         Q.    Of all of the expert reports that are listed

17    here?

18         A.    I did.

19         Q.    Then you were given internal Bard documents that

20    are listed here?

21         A.    Yes.

22         Q.    Did you read the full documents?

23         A.    Not -- Well, not -- Maybe not all of them.  But

24    if, for instance, sometimes on the reproduced copies I had

25    of -- of Kessler's, I couldn't necessarily read some of

Thomas Kinney , M.D.                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 82

1    the graphs, I would look then to make sure I was reading

2    those correctly.  But this report was -- I felt so

3    comfortable with what he wrote, that I didn't read all of

4    those, no.

5        Q.   You felt so comfortable with the report that

6    Dr. Kessler wrote?

7        A.   Yes.

8        Q.   The material that is listed in Appendix A, Facts

9    and Data Considered, this is the material that you believe

10   was on the Dropbox?

11       (Interruption in proceedings.)

12           MR. LOPEZ:  Maybe it's a little more annoying

13   than I thought.

14           THE WITNESS:  I'm sorry, Matthew.

15    BY MR. BROWN:

16       Q.   Let me ask the question again.

17       The material that's listed in Appendix A, which is

18   titled, "Facts and Data Considered," is that the material

19   that you believe was provided to you via Dropbox?

20       A.   Yes.

21       Q.   How did you pick these documents from among all

22   the documents that were produced in the litigation or were

23   they just provided to you?

24       A.   No.  They were from the report, so I would find

25   a section that Kessler had written, and it would have,

Thomas Kinney , M.D.                          June 17, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 83

1       say, a table or some specific quoted number that was

2       important to me in my argument, and I would say, "Well,

3       this refers to this document."

4             And so it was much like I wrote a medical article

5       when I'm quoting what the article says.  You give it a

6       reference, and that's -- that's the way I used these.

7             Q.   So am I correct that these are all documents

8       that you requested specifically?

9             A.   I didn't specifically request them, but they

10      were in this -- in Kessler's report.

11            Q.   Were some of the documents that are listed in

12      Appendix A, documents that you did not specifically

13      request?

14            A.   It's possible.  I suppose, I mean...

15            Q.   Are you aware that over 1.5 million documents

16      have been produced in this litigation?

17            A.   I'm not surprised.

18            Q.   Is that the first time you've heard that figure?

19            A.   I don't think it is, actually.  I think I've

20      heard there's a large number.

21            Q.   And there are 42 documents that are listed in

22      Appendix A?

23            A.   Correct.

24            Q.   So that's less than 0.0028 percent?

25                 MR. JOHNSON:   Form.

Thomas Kinney , M.D.                          June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 84

1        BY MR. BROWN:

2            Q.    Agreed?

3            A.    Yeah.   Yeah.

4            Q.    During the course of your practice, has any

5        medical device company, other than medical device

6        companies who you may have had a formal consulting

7        agreement with, ever showed you their internal documents?

8            A.    No.

9            Q.    Would you agree that the information in the

10       internal documents might be unreliable?

11                 MR. LOPEZ:  Form.

12                 THE WITNESS:  I'm not sure.  Can you be more

13       specific?  I'm not sure what you mean.

14       BY MR. BROWN:

15           Q.    Sure.

16           In a general sense, would you agree that information

17       contained in internal company documents could be

18       unreliable?

19                 MR. JOHNSON:  Form.

20                 THE WITNESS:  That is a possibility.  I mean,

21       anything could be unreliable.

22       BY MR. BROWN:

23           Q.    Would you agree that data that's included in

24       internal company documents could be preliminary?

25                 MR. JOHNSON:  Form.

Page 96

1              A.    Probably about -- Probably in the last, say, a

2      week ago.

3              Q.    So about June 10th, 2017?

4              A.    Right.

5              Q.    Did you do any searching of materials that were

6      contained in that database?

7              A.    I did, yeah.

8              Q.    What did you search?

9              A.    You know, like I said, if I had trouble reading

10     one of Kessler's things, and I was looking for something

11     to grasp or hard to read, I wanted to look and see, so I

12     would pull that document up.

13             Q.    Okay.  Other than pulling up individual

14     documents from Dr. Kessler's report that you wanted to

15     review, did you do any other searching of the material in

16     that database?

17             A.    No.  My -- My main focus was the Kessler report.

18     I guess in my report too.

19             Q.    How did you access this database that you first

20     accessed about a week ago?

21             A.    I'm not sure what you mean.

22             Q.    Do you have -- Is it on the internet?

23             A.    Yes.  Yeah.

24             Q.    Did you have to enter a user name and password

25     or something?

Thomas Kinney , M.D.                    June 17, 2017
In Re: Bard IVC Filters Products Liability

                                             Page 104

1        BY MR. BROWN:

2             Q.   Dr. Kinney, I want to turn to the back part of

3        your report to the schedules.

4             A.   Okay.

5             Q.   There is a Schedule 1 that says, "SIR Quality

6        Improvement Guidelines: Analysis of filters studied,

7        outcome and conclusions reached in referenced to

8        articles."

9                  MR. JOHNSON:  What page is that on, Matt?

10                 MR. BROWN:  It's after page 115.

11                 MR. JOHNSON:  Okay.  I got you.

12       BY MR. BROWN:

13            Q.   Do you have Schedule 1 in front of you, Doctor?

14            A.   I do.

15            Q.   Did you write this?

16            A.   I did not.

17            Q.   Do you know who wrote it?

18            A.   I do not.

19            Q.   Does Schedule 1 have any bearing on your

20       opinions that you have provided in the first 115 pages of

21       the report?

22            A.   No.  But they use the same articles I -- I cite

23       but no, I didn't -- I didn't use this.

24            Q.   Do you know if Dr. Roberts or Dr. Kalva wrote

25       Schedule 1?

Thomas Kinney , M.D.                    June 17, 2017
In Re: Bard IVC Filters Products Liability

                                        Page 105

 1          A.    I do not.

 2          Q.    Would you turn to Schedule 2, which is entitled,

 3      "Bard Employees Testifying Regarding The Use Of SIR

 4      Article Quality Improvement Guidelines."

 5          Do you see that?

 6          A.    I do.

 7          Q.    Did you write this?

 8          A.    I did not.

 9          Q.    Do you know who wrote it?

10          A.    I do not.

11          Q.    Did you review Schedule 2 as part of drafting

12      the report?

13          A.    I -- I recognize the comments on these because I

14      read the -- I read the depositions, but I did not use this

15      specific document.

16          Q.    The next schedule is also entitled Schedule 2

17      and is entitled, "Bard Employees Testifying" -- Strike

18      that.

19          Sorry.  It's a long schedule.

20          The next schedule is entitled Schedule 5, "Supporting

21      testimony from Bard employees on the importance of

22      providing pertinent information to physicians for making a

23      risk-benefit determination."

24          Do you see that?

25          A.    I do.

Thomas Kinney , M.D.                    June 17, 2017
In Re: Bard IVC Filters Products Liability

                                              Page 106

1          Q.    Did you write this?

2          A.    No, I did not.

3          Q.    Do you know who wrote Schedule 5?

4          A.    I do not.

5          Q.    Did you review or rely on Schedule 5 in forming

6     the opinions expressed in the first 115 pages of your

7     report?

8          A.    I didn't -- Well, I didn't use this schedule,

9     but I -- I recognize some of the comments again.

10         Q.    You recognize some of the testimony from

11    depositions that you've read?

12         A.    Correct.  That's correct.

13         Q.    But as far as the actual Schedule 5, you didn't

14    review or refer to it in drafting your report?

15         A.    Correct.  That's correct.  It's possible that

16    those were written by Dr. Roberts or Kalva, but I don't --

17    I don't recall.  You'll have to ask them.

18         Q.    If you hop ahead to Schedule 5, there's a second

19    Schedule 5, just before Appendix A.  It's entitled,

20    "Bard's internal documents demonstrating the improper use

21    of SIR Quality Improvement Guidelines."

22         A.    (Indicating.)

23         Yes, I see.

24         Q.    Do you see that?

25         A.    I do.

Thomas Kinney , M.D.                     June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 107

1       Q.   Did you write this Schedule 5?

2       A.   I did not, but I kind of made my own, actually,

3    when I was reviewing the -- the document that -- from

4    Kessler.

5       Q.   What do you mean that you kind of made your own?

6       A.   I was trying to keep track of the timing of

7    things, so I wrote it on a piece of paper.  I'm not sure I

8    even still have the paper, but I -- it's such a long

9    document, it's -- The timing of things is kind of

10   important, so I kind of did that on my own.

11      Q.   When you say it's such a long document, you're

12   referring to Dr. Kessler's report?

13      A.   Right.

14      Q.   And so as you were going through Dr. Kessler's

15   report, you were making notes to yourself about the

16   chronology of events listed in Dr. Kessler's report?

17      A.   That's right.

18      Q.   As far as Schedule 5 that we're discussing here

19   as part of your report, you didn't review or rely on this

20   in forming your opinions specifically; correct?

21      A.   I did not use this, no.

22      Q.   And you didn't write this?

23      A.   I didn't.

24      Q.   Do you know who wrote it?

25      A.   I do not.