# Exhibit F



Deposition of:
# Sanjeeva Kalva , M.D.

*July 11, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 8

1  copy of that?
2       A.   No.  This is the first time I'm seeing this
3  one.
4       Q.   Were you asked to bring any materials with
5  you to the deposition today?
6       A.   I brought something.  I brought my CV.  I
7  updated it from a recent lecture I gave yester- not
8  yesterday.  That was on Sunday morning.  So I updated
9  it since March.  And I think one of the papers were
10 published after March.  I think I updated those things
11 also.  And I gave a lecture to residents and fellows.
12 That was also updated in the CV.
13      Q.   What else did you bring with you today?
14      A.   The next one is our expert report that was
15 submitted before --
16      Q.   Okay.
17      A.   -- I have a copy of that.  And then --
18           MR. NORTH:  May I keep this one?
19           MR. JOHNSON:  Sure, you can.
20           MR. NORTH:  Okay.
21           MR. JOHNSON:  I'll give it back to you
22 once you go through everything.
23           MR. NORTH:  Oh, okay.
24      A.   Okay.  And this is the -- David Kessler's
25 report that we read and heavily relied on.  And --

Page 24

```
 1   I removed Denali.  So I have removed all of them but
 2   may not have implanted each one of them.
 3        Q.   Now, you're obviously an expert in
 4   interventional radiology, correct?
 5        A.   I believe so.
 6        Q.   You would agree that you're not an engineer,
 7   however?
 8        A.   By training I'm not an engineer.  By
 9   training I'm a medical person.  I have studied
10   medicine, and I became interventional radiologist.  I
11   do not have the same engineering background as an
12   engineer would have, if that's the question you're
13   trying to -- the question.  But do I understand some
14   of the concepts?  I do.
15        Q.   You do not have any prior experience in the
16   design of inferior vena cava filters, do you?
17        A.   Can you rephrase what exactly you mean by
18   that?
19        Q.   Do you have any prior experience in
20   designing inferior vena cava filters?
21        A.   You mean personally?
22        Q.   Yes.
23        A.   So I can tell that, mainly because I am
24   behind the scenes, I have ideas of new filter and that
25   I have not a patent.  Yes, I did think about it, but I
```

Case 2:15-md-02641-DGC   Document 7296-6   Filed 08/24/17   Page 5 of 15
Sanjeeva Kalva , M.D.                                July 11, 2017
In Re: Bard IVC Filters Products Liability

Page 25

1  have not officially taken patented so far.
2      Q.    You are not a regulatory expert, are you?
3      A.    What do you mean by that?
4      Q.    An expert in FDA regulations.
5      A.    I'm not expert in the FDA regulations, but I
6  know some of the regulations that they impose on
7  physicians how the hospital function.  I know those
8  things, but I do not consider myself expert in
9  designing or creating or implementing FDA regulations.
10     Q.    Do you consider yourself an epidemiologist?
11     A.    All medical doctors are -- learn about
12 epidemiology as a part of their medicine.  And if you
13 look into any book chapter, any textbook, the first
14 paragraph is always about the epidemiology of the
15 disease.  Epidemiology plays a significant role on our
16 understanding of the disease, how resources are
17 distributed.
18            So epidemiology is learned routinely
19 throughout medicine.  So the word epidemiologist is a
20 different question who actually conducts or gets
21 information about epidemiological conditions of a
22 disease process or treatment aspects.  But I'm not an
23 epidemiologist, if you're talking about that.  But I
24 understand epidemiology is part and parcel of medicine
25 that we learn every day.  We practice medicine that

Page 28

1   So, yes, I consider myself an expert in ethics
2   because we conduct so many (unintelligible) studies.
3              If you look at my CV, I have more than
4   a hundred (unintelligible) studies.  And most of them
5   involve regulation, ethics training.  But matter of
6   fact, we undergo formal ethics training in medicine to
7   conduct research.  It's a very rigorous process.
8              And a certification program goes
9   through, and we are asked to retake it multiple times
10  throughout our life just to make sure that we are up
11  to date with the changes both in the regulation and
12  also the basic ethical practice of research in
13  medicine.  So, yes, I am expert in ethics.
14       Q.   You read a number of Bard's internal
15  documents as a part of your work in this case,
16  correct?
17       A.   That is correct.
18       Q.   Prior to your involvement in this
19  litigation, have you ever had an instance
20  professionally to read a manufacturer's internal
21  documents as a part of your work?
22       A.   No.  Except for the IFUs that come on the
23  products, I have not been exposed to internal
24  documents.  I wish I was, to know the truth.  But
25  unfortunately they were not communicated with me.

Page 29

1    Q.   And so throughout your professional career,
2    this is the first time you have looked at or analyzed
3    internal company documents from a manufacturer,
4    correct?
5              MR. JOHNSON:  Form.
6    A.   That is correct.
7    Q.   Have you ever participated in the design of
8    an inferior vena cava filter?
9    A.   As I said, I can't disclose confidential
10   information, as I am designing, myself, a filter.  And
11   I can't tell other parties involved in the process.
12   Yes, I am.  And -- and we have -- in addition to my
13   one design, I have contributed to the knowledge of
14   other companies who ask my opinion and my feeling
15   about certain designs.
16              Yes, I did talk to intellectual people
17   or engineers of different companies about what my
18   feeling is about the design.  I can't tell which
19   company it is.  I have provided very detailed aspects
20   of the design which we thought are good, which we
21   thought are very, very bad for those companies.
22   Q.   So, if I understand what you're saying, you
23   are at present, although you can't disclose the
24   details, involved in designing a potential inferior
25   vena cava filter?

Case 2:15-md-02641-DGC   Document 7296-6   Filed 08/24/17   Page 8 of 15
Sanjeeva Kalva , M.D.                          July 11, 2017
In Re: Bard IVC Filters Products Liability

Page 30

1      A.    That is correct.
2      Q.    Is it fair to assume that you believe that
3   filters are an appropriate medical treatment for
4   certain indicated patients?
5            MR. JOHNSON:  Form objection.
6      A.    So that's a good question.  That's a very
7   loaded question too.  We had a process to make it more
8   clear.  One is, as you correctly pointed out, we had
9   to be very designate -- or very clear about what are
10  the indications, who are getting it, what are the
11  risk/benefit of any device we are placing on those
12  filters.
13           So, if appropriately used in certain
14  specific patient population, they are known to
15  decrease the incidence of pulmonary embolism but not
16  necessarily the lives of the patient.
17           The famous study by Decursis (phonetic)
18  published long time ago.  He published first somewhere
19  in late 2000.  And after it, he published one more
20  paper.  That is the basis of very, very excellent
21  study that showed whether IVC filters really have any
22  significant impact on the lives.
23           According to that study, at least what
24  I understand, I remember -- I may be -- I may have to
25  look back at the paper -- IVC filters do not improve

Page 52

1   but it would fill up my bag.  It took hours of my
2   time, and it was really high.
3       Q.   If I could ask you to look at Exhibit 4,
4   your report, and look at Schedule 1.
5       A.   Yes.
6       Q.   Who prepared Schedule 1?
7       A.   As I recall, it was prepared on our behest,
8   or at least Kinney told (unintelligible) to prepare
9   the comments on our -- the -- so we can reference back
10  quickly.  But we read all these documents.  We all
11  claim them, so I don't know how you can --
12      Q.   Who prepared the document?  Did lawyers
13  prepare that document?
14      A.   That schedule?
15      Q.   Yes.
16      A.   Yes.
17      Q.   Do you know which lawyers?
18      A.   I don't know.
19      Q.   Did you talk to the lawyers about the
20  preparation of that document, Schedule 1?
21      A.   Both Kinney and I mentioned to them it would
22  be a good idea to have references tabulated --
23           THE REPORTER:  I can't understand you.
24           MR. NORTH:  References.
25      A.   These references are tabulated, as far as

Case 2:15-md-02641-DGC   Document 7296-6   Filed 08/24/17   Page 10 of 15
Sanjeeva Kalva , M.D.
July 11, 2017
In Re: Bard IVC Filters Products Liability

Page 53

1   quick references so they are in one location.  You
2   don't have to go back to full articles every time.  So
3   the idea was -- was to have a simple -- simplified
4   tabular form in one location.
5              Most of it was outlined in the original
6   document and actually physically underlined,
7   everything.  I don't know where they are right now.  I
8   can --
9       Q.   So someone prepared Schedule 1, some lawyers
10  did, and presented it to you and your colleagues?
11      A.   We told them to prepare the way we want
12  them.
13      Q.   Look at Schedule 2, if you would.
14              Schedule 2 is entitled, Bard Employees
15  Testifying Regarding the Use of SIR Article Quality
16  Improvement Guidelines, correct?
17      A.   That is correct.  That's what it says.
18      Q.   And it has quotations from various
19  depositions of Bard employees, correct?
20      A.   That is correct.
21      Q.   And was this also prepared by a law firm?
22      A.   Yes.  And we did read -- we did look into
23  all those documents, and I have actually physically
24  viewed all the depositions of employees, which were
25  provided to me.  And I did those things.  And these

Page 54

1  were just a list of many things that we told them to
2  prepare, so --
3       Q.   So you have read each of these depositions
4  in their entirety?
5            MR. JOHNSON:  Form.
6       A.   Some in entirety.  For example, Grassi, I
7  read whole thing.  Some not entire.  Some I did not
8  read, but some I listened into it.  For example, many
9  of the employees had a video deposition.  So instead
10 of reading the text, I actually listened into them.
11 But everything that is written here is -- I have
12 looked into those documents.
13      Q.   Then there appear to be two different
14 Schedule 5's.  I think that Schedule 3 --
15      A.   That was a mistake.
16      Q.   -- was mistakenly listed as Schedule 5.
17      A.   Yeah, that is true.
18      Q.   And the first Schedule 5 is entitled,
19 Supporting Testimony From Bard Employees on the
20 Importance of Providing Pertinent Information to
21 Physicians For Making a Risk/Benefit Determination,
22 correct?
23      A.   You mean this (indicating)?
24      Q.   No.  That's the other, the second Schedule
25 5.

Case 2:15-md-02641-DGC   Document 7296-6   Filed 08/24/17   Page 12 of 15
Sanjeeva Kalva , M.D.                           July 11, 2017
In Re: Bard IVC Filters Products Liability

Page 55

1         MR. JOHNSON:  The first Schedule 5,
2    which should be Schedule 3.
3         A.   Where it says, yeah, something.  Let me see.
4              MR. JOHNSON:  They're upside down.
5              THE WITNESS:  Yeah, that was confusing.
6              MR. JOHNSON:  Yeah.
7    BY MR. NORTH:
8         Q.   Okay.  That's the first Schedule 5 which, in
9    reality, I believe, was intended to be Schedule 3.
10        A.   I believe so.
11        Q.   Is entitled, Supporting Testimony from Bard
12   Employees on the Importance of Providing Pertinent
13   Information to Physicians For Making a Risk/Benefit
14   Determination, correct?
15        A.   Yes, it says that.
16        Q.   And this, again, was prepared by attorneys,
17   correct?
18        A.   That is correct.
19        Q.   Did you personally review each and every
20   deposition listed there?
21        A.   I reviewed the deposition of Natalie Wong
22   completely, and I also reconfirmed may of the things
23   combined in the portions of --
24             THE REPORTER:  What, Doctor?
25        A.   I have read Natalie Wong's deposition.  And

Case 2:15-md-02641-DGC   Document 7296-6   Filed 08/24/17   Page 13 of 15
Sanjeeva Kalva , M.D.
July 11, 2017
In Re: Bard IVC Filters Products Liability

Page 56

1  some of them are in video format.  I listened to all
2  of them.  Some which are not in the video format and
3  some I have not completely read, I have -- each
4  paragraph I have to look at the deposition to make
5  sure that actually that's what it says.
6              MR. JOHNSON:  Slow down a little bit.
7              THE WITNESS:  I'm sorry.
8       Q.   So, if a deposition was available by
9  videotape --
10      A.   Uh-huh.
11      Q.   -- you would listen to the videotape instead
12  of reading the transcript?
13      A.   Yeah.
14      Q.   Okay.
15      A.   Why not?  That way I can --
16      Q.   Let's look at Schedule 4.
17             I get to ask the questions, not you.
18             (Laughter.)
19      Q.   Schedule 4.
20      A.   I'm sorry.  I didn't mean to --
21             MR. JOHNSON:  But you can ask for
22  clarification.
23      A.   Yeah, I didn't mean to say that.  I'm a good
24  guy.
25      Q.   Schedule 4, Involvement With IVC Filters?

Page 58

1    A.   That is correct.  And these are the things
2  we reviewed, everything.
3    Q.   So you reviewed each of these documents
4  listed?
5    A.   Uh-huh.
6    Q.   I'm sorry, you've got to answer --
7    A.   Yes.
8    Q.   -- yes or no.
9    A.   Sorry.  Yes.
10   Q.   But you did not make the choice of which
11 documents would be included in this schedule, did you?
12              MR. JOHNSON:  Form.
13   A.   What were provided to us, many of them we
14 reviewed.  Actually, most of them we reviewed.  And
15 whatever we felt pertinent, we told them, Please look.
16 This is what it is, this is what it is.
17              Obviously there are more than what I'm
18 exposed to.  There are other things which I don't
19 know, I don't know.  Whatever were given to me, I have
20 looked at them.  And then that's what the
21 documentation says.  I cannot tell things that I'm not
22 given to.
23   Q.   And I guess that's my point.  You were not
24 given all of the documents produced in this
25 litigation, were you?

Case 2:15-md-02641-DGC   Document 7296-6   Filed 08/24/17   Page 15 of 15
Sanjeeva Kalva , M.D.                                       July 11, 2017
In Re: Bard IVC Filters Products Liability

Page 117

1  promise him that they would do a longitudinal study
2  before releasing that device into market.
3              So my assumption was that they should
4  have done it.  And they didn't do it, according to
5  what I know now.  And when they -- when they knew some
6  problem existed and we are telling them the problem is
7  still present, a reasonable physician, reasonable
8  person, ethical person would do -- let us go and fix
9  it.  Let us go and find the problem.  Let us do
10 something to fix what is happening there.  And that
11 was not present anywhere.
12             It was more of, If I -- if I do the
13 study, I may fail or I may lose.  They're looking at
14 what is lost to the company rather than the patient's
15 safety that is of paramount importance to us.
16             So as a company, as an individual
17 working for a company, the person who wrote this email
18 didn't express any concern for the patients who are
19 suffering because of the device they manufactured.
20             So that bothers me.  It doesn't bother
21 you?  Somebody having a -- somebody tell me, I don't
22 really care what happens to you.  You already got the
23 filter.  So that really bothered me.  We are not
24 caring for patients there.
25             Patients are the essence, and as human