James R. Condo (#005867)
Amanda C. Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2204
Telephone: (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

*Attorneys for Defendants*
*C. R. Bard, Inc. and*
*Bard Peripheral Vascular, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation | No. 2:15-MD-02641-DGC<br><br>**DEFENDANTS C. R. BARD, INC.'S AND BARD PERIPHERAL VASCULAR, INC.'S MOTION TO EXCLUDE THE OPINIONS OF DEREK D. MUEHRCKE, M.D. AND MEMORANDUM OF LAW IN SUPPORT**<br><br>(Assigned to the Honorable David G. Campbell)<br><br>**(Oral Argument Requested)** |

## MOTION

Pursuant to Federal Rule of Evidence 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively "Bard") respectfully move this Court to exclude certain opinions of Plaintiffs' expert witness, Derek Muehrcke, M.D., as discussed herein.

# MEMORANDUM OF POINTS AND AUTHORITIES

Bard seeks to exclude seven opinions of Plaintiffs' case-specific medical expert, Derek Muehrcke, M.D., because he is either not qualified to proffer them, the opinions are unreliable as not based on scientific methodology, or the opinions are not proper subjects of expert testimony. Dr. Muehrcke submitted case specific reports in each of the five bellwether cases[1] and was deposed on those opinions on July 24, 2017. (Exhibit F, Muehrcke Dep. Tr., July 24, 2017.) The seven opinions Bard seeks to exclude are common to all five bellwether cases, with the exception of Opinion 7, relating only to the *Lisa Hyde* case:

1. Bard's filters contain design defects;
2. The adoption of the opinions expressed in the reports of Drs. Kinney, Kalva, Roberts, and Eisenberg;
3. The reasonable expectations of all physicians regarding the performance of medical devices;
4. That Bard filters have "unacceptable" complication rates;
5. That Bard acted unethically in selling its filters;
6. Opinions regarding Bard's state of mind, motive, and intent; and
7. The failure of plaintiff Lisa Hyde's filter resulted in an increased risk for arrhythmias, the need for an implantable defibrillator, and sudden death.

**I.   Argument and Citation of Authority.**

   **A.   Dr. Muehrcke Is Unqualified to Offer Opinions Regarding the Design of Bard's IVC Filters.**

Dr. Muehrcke is not qualified under Rule 702 to offer expert testimony on areas that fall outside his medical expertise as a cardiothoracic surgeon. Nevertheless, in his reports, Dr. Muehrcke opines on alleged design flaws in Bard's IVC filters:

---

[1] (Exhibit A, June 6, 2017 Rule 26 Report in *Booker* case; Exhibit B, June 6, 2017 Rule 26 Report in *Hyde* case; Exhibit C, June 6, 2017 Rule 26 Report in *Jones* case; Exhibit D, June 5, 2017 Rule 26 Report in *Kruse* case; Exhibit E, June 5, 2017 Rule 26 Report in *Mulkey* case.)

- 2 -

> Bard should never have put the [Bard filter model] on the market given its knowledge of the "unacceptable" risk of caudal migration associated with the design of that device. (Ex. A, Muehrcke Report, *Booker*, p. 7; Ex. B, Muehrcke Report, *Hyde*, p.7; Ex. C, Muehrcke Report, *Jones*, p. 7; Ex. E, Muehrcke Report, *Mulkey*, p.7.)

> Due to the inadequate design of [plaintiff]'s [filter], it tilted, became embedded in the vena cava, punctured through the vena cava, and a strut fracture occurred. . . the device's inadequate migration resistance, and lack of strength and stability, caused by its weak anchoring hooks and lack of radial force and inadequate leg span to accommodate vessel distention were substantial factors in causing this device to migrate in a caudal direction, tilt, perforate the vena cava and fracture. (Ex. A, Muehrcke Report, *Booker*, p. 9; Ex. B, Muehrcke Report, *Hyde*, p.8; Ex. D, Muehrcke Report, *Kruse*, p. 8; Ex. E, Muehrcke Report, *Mulkey*, p.8.)

Dr. Muehrcke also testified "I think that the design [of all Bard filters] is a structural problem. Conical shaped filters . . . have less migration resistance to make it easier to retrieve, and that less migration resistance and less radial force led to a device which does not really work appropriately" (Ex. F, Muehrcke Dep. Tr., p. 85:16-86:12); "I've spoken to our interventional radiologists who have told me that they think that the conical filters have a design flaw, and the Bard has – has more complications than most" (*Id.* at 26:6-9); and that "I think the Dr. Kuo's report [sic], the Deso study, kind of shows that there's a higher complication rate with – with conical-shaped filters. I think that they have a design issue with them." (*Id.* at 73:13-16.)

     Dr. Muehrcke is a medical doctor, not an engineer. He is not qualified to offer design-related opinions. He has no background in engineering, metallurgy, or materials science. (*Id.* at 33:23-34:2, 89:11-89:21.) He has not designed an IVC filter (*Id.* at 89:17-18); tested an IVC filter (*Id.* at 89:19-90:3); or attempted to come up with an alternative design for such a device. (*Id.* at 90:4-6.) His stated qualifications for giving opinions on filter design was ". . . I have read articles . . . I think the engineers are probably better suited to give that opinion, but my – my opinion of the Bard filter is that it's not robust enough." (*Id.* at 90: 7-16.) Indeed, Dr. Muehrcke admits he does not "have the expertise to determine how design modifications might impact clot trapping efficiency or a filter or its

retrievability." (*Id.* at 91:6-10.)

Courts routinely exclude, or limit the scope of, opinions outside an expert's particular area of qualifications. *See e.g. Morritt v. Stryker Corp.*, 973 F. Supp. 2d 177, 188 (E.D.N.Y. 2013) (finding that a physician who had significant clinical experience with the medical device at issue went "well beyond the 'reasonable confines' of his clinical expertise" when offering opinions regarding biomedical engineering and material science, and that therefore the physician was not qualified to offer such opinions); *Kruger v. Johnson & Johnson Professional, Inc*., 160 F. Supp. 2d 1026, 1031 (S.D. Iowa 2001) (finding that a metallurgist was unqualified to offer design opinions regarding bone screws where he had no experience in the design of medical implants or any other medical devices); *In re: Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1243-44 (D. Colo. 1998) (excluding design opinions of a scientist who held a Ph.D. in physical chemistry because being a chemist did not automatically qualify the witness on design issues when he lacked training and experience concerning design of breast implants). Dr. Muehrcke's opinions on device design should be excluded here, given his admitted lack of formal education, experience, training, or foundational knowledge to offer opinions on the issue.

Not only is he not qualified to provide these opinions, Dr. Muehrcke has failed to demonstrate any methodology by which he has determined that Bard filters have design flaws or what those flaws are, other than reviewing some internal Bard documents; testifying that he was told by some colleagues that "conical filters have a design flaw, and the Bard has – has more complications than most" (Ex. F, Muehrcke Dep. Tr., 26:6-9); and stating "I think that they have a design issue with them." (*Id.* at 73:13-16.) Having failed to demonstrate that his design opinions are based on scientific methodology, these opinions should be excluded. *Salinas v. Amteck of Ky.*, *Inc.,* 682 F. Supp. 2d 1022, 1030 (N.D. Cal. 2010).

**B.     Dr. Muehrcke's Opinions Are Unreliable Because He Adopts Opinions of Other Experts, Created Specifically for This Litigation, Without Independently Verifying Their Underlying Work.**

Dr. Muehrcke attempts to support certain of his opinions in this case by simply referring to the reports of other plaintiffs' experts, which reports were created specifically for this litigation. Dr. Muehrcke's reports in the five bellwether cases state: "I have read the expert report of Drs. Kinney, Roberts, and Kalva, and I adopt and agree with the opinions set forth therein. The same is true for the exert [sic] report of Mark Eisenberg, MD." (Ex. A, Muehrcke Report, *Booker*, p. 6; Ex. B, Muehrcke Report, *Hyde*, p. 6; Ex. C, Muehrcke Report, *Jones*, p. 6; Ex. D, Muehrcke Report, *Kruse*, p. 6; Ex. E, Muehrcke Report, *Mulkey*, p. 5.)

"Federal Rules of Evidence 702 and 703 permit an expert to rely upon 'facts or data' that is 'of a type reasonably relied upon by experts in the field.' The rules do not permit an expert to rely upon opinions developed by another expert for purposes of litigation without independent verification of the underlying expert's work." *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 630 (W.D. Wash. 2011) (citations omitted); *see also, Turner v. Burlington N. Santa Fe R. Co.*, 338 F.3d 1058, 1062 (9th Cir. 2003) (affirming the exclusion of an expert's testimony because he "intended to use [a second expert's findings] as substantive evidence of his ultimate conclusions," because the second expert's findings were not the "type reasonably relied on by experts in the particular field" and the "probative value of this otherwise inadmissible evidence d[id] not outweigh its prejudicial effect"). "[M]ore scrutiny will be given to an expert's reliance on the information or analysis of another expert where the other expert opinions were developed for the purpose of litigation." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1066 (C.D. Cal. 2013).

Although he relies on the reports of these other experts, Dr. Muehrcke is wholly uninformed about the bases for them, and has not undertaken to independently verify the underlying work or references cited therein. Dr. Muehrcke testified that while he

- 5 -

understood the Kinney, Kalva, and Roberts report to have "relied heavily on Dr. Kessler's report," he has not read Dr. Kessler's report, and he was unable to testify whether he had read all of the documents identified and discussed in the Kessler report. (Ex. F, Muehrcke Dep. Tr., p. 42:13-43:5.) Dr. Muehrcke confirmed that he had "not read all of the documents identified and discussed in the Dr. Kinney report," could not testify whether he had read all of the documents referenced in Dr. Eisenberg's report, and agreed he had made no effort to compare the list of documents referenced in Dr. Eisenberg's report to what he was provided in this case. (*Id.* at 43:6-44:10.) He could not state whether he had reviewed all of the medical literature cited in the Kinney, Kalva, and Roberts report (*Id.* at 50:22-24), or read the depositions cited in that report, and he does not believe that he has read all of the depositions to which Dr. Kessler cites in his report, either. (*Id.* at 49:17-50:5.) Dr. Muehrcke also testified that he had not had any discussions with Drs. Kinney, Kalva, and Roberts regarding the opinions contained in their report. (*Id.* at 50:8-21.)

Because Dr. Muehrcke simply adopts the reports of Kinney, Kalva, Roberts, and Eisenberg, created specifically for this litigation, with no verification of same, his opinions are unreliable and should be excluded.

> **C.** **Dr. Muehrcke Cannot Speak on Behalf of All Physicians and All Patients, as He Claims to in This Litigation.**

It is well-settled that witnesses such as Dr. Muehrcke cannot speak for anyone else, and any opinions that go to "what physicians would do with different information is purely speculative and not based on scientific knowledge." *In re Diet Drugs*, No. MDL 1203, 2001 WL 454586, at \*18 (E.D. Pa. Feb. 1, 2001) ("The court perceives only one *Daubert* issue in this challenged testimony—whether Dr. Gueriguian can testify as to whether or not physicians would have prescribed or patients would have taken Pondimin or Redux had certain adverse event information been discussed in the drugs' labeling. Dr. Gueriguian is not qualified to opine on what decisions would have been made by the numerous physicians who prescribed diet drugs had they been provided with different labeling information."); *accord In re Diet Drugs*, No. MDL 1203, 2000 WL 876900, at

*12 (E.D. Pa. June 20, 2000) ("The court can easily preclude, from a *Daubert* viewpoint, the rendering of opinions by either of these witnesses as to a label's compliance with federal regulatory requirements or as to what doctors in general think, because the witnesses are not qualified for that."); *see also In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 557 (S.D.N.Y. 2004) (excluding expert "testimony as to whether physicians would have prescribed Rezulin if different information about Rezulin had been available," because it was speculative and thus inadmissible).

Dr. Muehrcke proffers opinions focused on the alleged reasonable expectations that all physicians have of medical device companies such as Bard, with regard to the performance of their medical devices. In his case-specific reports he opines:

> Based upon the information available to Bard at the time the filter was implanted in [plaintiff], it was clear that the risks of the Bard [filter] exceeded its benefits and that this filter did not perform in a manner reasonably expected by physicians and patients, nor in the manner represented by Bard.
>
> In using Bard's [ filter], physicians reasonably expected that a properly placed filter would not [migrate, tilt, perforate the vena cava and adjacent organs/structures, or fracture]. In my opinion, because this filter failed in the manner previously described, [plaintiff] was exposed to risks that exceeded any benefits allegedly afforded by this particular filter nor would a physician or patient reasonably expect this constellation of failure modes to occur.

(Ex. A, Muehrcke Report, *Booker*, p. 9; Ex. B, Muehrcke Report, *Hyde*, p. 8; Ex. C, Muehrcke Report, *Jones*, p. 8; Ex. D, Muehrcke Report, *Kruse*, p. 8; Ex. E, Muehrcke Report, *Mulkey*, p. 9.)

Dr. Muehrcke purports to speak for what all physicians think and expect without demonstrating any qualifications to do so, or methodology employed by him in arriving at that opinion. He has not performed any surveys of doctors "to determine what physicians as a group, what their expectations are with regard to filters." (Ex. F, Muehrcke Dep. Tr., 97:23-98:5.) He has not attempted to canvas a broader audience of physicians to determine their expectations in this regard aside from "just scuttlebutt, talk around the

- 7 -

coffee machine" with his partners in his practice. (*Id.* at 98:1-8.) He could not point to any medical literature about physician expectations of filters. (*Id.* at 98:18-21.) Indeed, he acknowledged the risk-benefit analysis performed by physicians with regard to filters was "subjective," saying that "it's an art form, not a science." (*Id.* at 98:9-17.) Notably, Dr. Muehrcke admits that his basis for this opinion is not taken from what the implanting physicians in any of the bellwether plaintiffs' filters "expected" since he has not read any of those depositions – "I don't know what they know." (*Id.* at 119:5-18, 154:2-9.) Further, Dr. Muehrcke admits he has "no knowledge" about what Bard sales representatives might have told the plaintiffs' implanting physicians. (*Id.* at 99:9–13.)

Dr. Muehrcke has provided no basis for his qualifications to determine what physician expectations are generally with respect to IVC filters, no methodology for arriving at his opinions regarding what physician expectations are generally with respect to these devices, and he failed to even read the testimony of the implanting physicians in the bellwether cases to determine what those doctors testified were their actual expectations when implanting the filters into these plaintiffs. Accordingly, his opinions regarding these expectations should be excluded.

### D. The Court Should Exclude Dr. Muehrcke's Rates Opinions.

In four of the bellwether cases, Dr. Muehrcke's opines that Bard's IVC filters have an "unacceptable risk" of caudal migration. (Ex. A, Muehrcke Report, *Booker*, p. 7; Ex. B, Muehrcke Report, *Hyde*, p. 7; Ex. C, Muehrcke Report, *Jones*, p. 7-8; Ex. E, Muehrcke Report, *Mulkey*, p. 7; *see also*, Ex. F, Muehrcke Dep. Tr., p. 57:10-59:16, 72:9-14.) Dr. Muehrcke opines that Bard should have removed the G2 filter from the market – along with the Eclipse filter, which he claims has the same safety profile as the G2 – because of these "unacceptable" rates. (Ex. A, Muehrcke Report, *Booker*, p. 7; Ex. B, Muehrcke Report, *Hyde*, p. 7; Ex. C, Muehrcke Report, *Jones*, pp. 7-8; Ex. E, Muehrcke Report, *Mulkey*, p.7; *see also*, Ex. F, Muehrcke Dep. Tr., p. 67:12-22.)

Dr. Muehrcke has provided no evidence of his experience in the fields of statistics or epidemiology that might qualify him to give opinions on rates. Courts have limited the

- 8 -

1   scope of an expert's opinions where, as here, he ventures into areas outside the scope of
2   his qualifications. *See e.g. Morritt*, 973 F. Supp. 2d at 188; *In re: Breast Implant Litig.*, 11
3   F. Supp. 2d at 1243-44.

4   Dr. Muehrcke has also not shown that he employed any scientific methodology to reach this opinion that Bard filter caudal migration rates are "unacceptable." *See In re: Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1053, 1058 (D. Minn. 2007) (excluding expert testimony on corporate ethics as speculative and not based on reliable methodology or scientific principle); *Cabrera v. Cordis Corp.*, 945 F. Supp. 209, 213 (D. Nev. 1996), *aff'd*, 134 F.3d 1418 (9th Cir. 1998) (excluding the opinion of plaintiff's expert where the expert's theory was not based on any reliable methodology).

While Dr. Muehrcke agrees that all IVC filters can migrate caudally (Ex. F, Muehrcke Dep. Tr., p. 57:22-24), he does not state what the rate of caudal migration is, nor does he state on what basis he has determined that the rate is "unacceptable." He testified that his analysis to form this opinion amounted to his review and interpretation of a handful of Bard internal documents which reference caudal migration and include the term "unacceptable." (*Id*. at 58:2-59:3.) He does not know the context in which the authors used the term "unacceptable." (*Id*. at 61:18-62:11.) He cannot cite to medical literature which supports this opinion. (*Id*. at 59:10-59:16.) He is not aware of Bard and FDA communications relating to the extent of caudal migration in Bard filters and what the FDA's conclusion was about the acceptability, or unacceptability, of the frequency of the event. (*Id.* at 68:4-14.) He performed no independent analysis to determine the rate of caudal migration in Bard filters compared to that rate in competitive filters. Based on his review of the few Bard internal documents he saw, he concludes that the G2 filter had more caudal migration reports than Bard's permanent filter the [Simon] "Nitinol filter and Recovery." (*Id.* at 62:12-63:1.) He cannot explain how that comparison makes caudal migration in the G2 or Eclipse filters "unacceptable," however.

Dr. Muehrcke then relies on the report of Plaintiffs' biostatistician Dr. Betensky, stating that she "looked at all the [Bard] filters and showed a higher incidence of problems

- 9 -

with these filters compared to other retrievable filters . . . an unacceptable rate . . . compared to other retrievable filters." (*Id*. at 70:1-70:21.) He admits he has not read Dr. Betensky's report (which is apparent, as he misquotes her findings). (*Id*.) Having not read, let alone attempted to verify, that report, he cannot rely on it as support for his opinions here. *See Fosmire*, 277 F.R.D. at 630; *Turner*, 338 F.3d at 1062.

While opining that Bard's caudal migration rate is "unacceptable," Dr. Muehrcke refused to explain what an acceptable rate is. Asked if a migration rate of .16 percent in the IVC filter he is currently implanting (the Argon filter) would concern him, he responded that:

> That's a misleading question . . . you're asking me a very deceitful misleading question, because to take a rate out of context without looking at the timeframe with which it is made, and to not determine exactly how you came up with that rate – is it MAUDE data, is it internal complaints versus known sold devices, is it from a report where all patients are tracked – it's impossible. I mean, what's it compared to? It's an impossible question.

(Ex. F, Muehrcke Dep. Tr., p. 63:15-64:15.)

By his own admission, whether Bard's rate of caudal migration is "unacceptable" depends on an analysis of numerous factors, none of which Dr. Muehrcke has considered. When asked: "What is a tolerable rate of migration for a filter that you can still continue to use that filter knowing that that rate exists?" he replied: "As close to zero as possible over time." (*Id*. at 65:2-65:5.) Asked if .15 percent is reasonably close to zero, he responded: "I don't know." (*Id*. at 65:9-11.) Not only is Dr. Muehrcke unqualified to proffer his opinions regarding the "unacceptable" rates of caudal migration, those opinions should be excluded because they are not based on scientific analysis of reliable data. Instead, they are based on Dr. Muehrcke's assumptions, expert reports he has not read, and Bard internal documents, the meaning and context of which he does not know.[2]

---

[2] Dr. Muehrcke's opinions regarding comparative rates should also be excluded under *Daubert* because he bases these opinions on insufficient data: cherry picked documents from the plaintiffs' counsel, the context of which he is unaware, and assumptions. To support his opinion he cites ". . . there's e-mails from Dr. Ciavarella, December 2005, stating that if the Nitinol filter is safer than the G2 then why should doctors use the G2

As a subset of his opinions on "unacceptable rates," his opinions regarding the rates of failure of the Eclipse filter should be excluded because they are based wholly on the assumption that the safety profiles of the Eclipse and the G2 would be the same because they have a similar design. (*Id.* at 67:12-22, 69:3-6.) *Joiner v. Gen. Elec. Co.*, 864 F. Supp. 1310, 1327 (N.D. Ga. 1994), *rev'd,* 78 F.3d 524 (11th Cir. 1996), *rev'd,* 522 U.S. 136, 118 S. Ct. 512 (1997) (excluding expert testimony on the ground that opinions were "inextricably bound up with [an] unfounded assumption."). It is evident that Dr. Muehrcke's opinions regarding the Eclipse's rates are based on his assumptions about the filters' designs, because not only does he have no engineering or design qualifications (*Id.* at 33:23-34:2), but he also admits that he has not seen data showing relative complication rates of the G2 and Eclipse filter (*Id.* at 67:20-22, 69:3-72:3), nor has he read Dr. Betensky's report to determine what information she provided on this issue. (*Id.* at 69:19-72:14.)

Like the many courts that have excluded or limited the scope of opinions outside an expert's particular area of qualifications, the Court should exclude Dr. Muehrcke's testimony about "unacceptable" rates of complications, any statements or opinions in his expert reports about "unacceptable" rates of complications, and any opinions relying on "unacceptable" rates of complications, because he is not qualified to determine what these rates are and failed to employ any scientific methodology to support his opinions. *See Salinas*, 682 F. Supp. 2d at 1030.

### E. Dr. Muehrcke's Opinions About Bard's Motive, Intent, State of Mind, and Knowledge Are Improper Subjects of Expert Testimony.

Dr. Muehrcke offers opinions about Bard's motive, intent, and state of mind,

---

device when the Simon Nitinol is – is safer" (Muehrcke Dep., p. 58:2-7) and to a March 2006 Natalie Wong design failure mode and effect analysis report which references that the G2 had an unacceptable safety profile regarding caudal migration. (*Id.* at 58:9-11.) These documents were selected for Dr. Muehrcke by the plaintiffs' counsel and represent a miniscule portion of the millions of documents produced in this litigation. (*Id.* at 39:1-14.) Dr. Muehrcke has not reviewed the vast majority of the documents available to him and germane to his opinions in this case, rendering the basis for these opinions insufficient.

grounded in his conclusory assertions about what Bard knew and should have done. For instance, in his report in the *Mulkey* case, he opines:

> <u>Bard had been aware</u> since late 2005/early 2006 of the need to correct the "unacceptable" caudal migration risk with the G2 filter (and later the nearly identical Eclipse filter). <u>Bard was also aware</u> that caudal migration leads to tilt, perforation and penetration, irretrievability and fracture. Despite this knowledge, <u>Bard did nothing to inform physicians or patients of these safety risks</u>; [sic] choosing instead to launch two more filters, the G2X and Eclipse, prior to launching a filter, the Meridian, intended to address caudal migration. Bard continued to sell the Eclipse filter at the time it was implanted in Ms. Mulkey, and her filter ultimately failed in the manners expected of the Eclipse filter – i.e. caudal migration, tilt, irretrievability, perforation/penetration and fracture – which the Meridian was intended to correct. <u>In my opinion, Bard should never have put the Eclipse on the market given its knowledge of the "unacceptable" risk of caudal migration associated with the design of that device. However, having chosen to launch the Eclipse, Bard should have removed it from all medical facilities and stopped selling it when the Meridian was launched.</u>

(Ex. E, Muehrcke Report, *Mulkey*, p. 7.) (emphasis added) Similar passages exist in Dr. Muehrcke's reports in the *Jones*, *Booker*, and *Hyde* reports. (Ex. A, Muehrcke Report, *Booker*, p. 7; Ex. B, Muehrcke Report, *Hyde*, p. 7; Ex. C, Muehrcke Report, *Jones*, pp. 7-8.)

Such opinions are classic jury questions, however, outside the bounds of appropriate expert testimony. "[T]he opinions of [expert] witnesses on the intent, motives or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise" and allowing such testimony would allow experts to "improperly . . . assume the role of advocates for the plaintiffs' case." *In re Rezulin*, 309 F. Supp. 2d at 514, 546–47; *Kaufman v. Pfizer Pharms., Inc.*, No. 1:02–CV–22692, 2011 WL 7659333, at *9 n. 8 (S.D. Fla. Aug. 4, 2011) (excluding all opinions about defendant's knowledge, state of mind, and motives wherever they were interspersed throughout her expert report); *In re Trasylol*, 709 F. Supp. 2d 1323, 1338 (S.D. Fla. 2010) (excluding all expert opinion about the defendant's knowledge, intent, and "bad company" opinions, and citing cases where other courts did the same); *In re Seroquel*

- 12 -

*Prods. Liab. Litig.*, No. 6:06–md–1769–Orl–22DAB, 2009 WL 3806436, at *5 (M.D. Fla. July 20, 2009) (excluding expert opinions about "state of mind, intent, motives or ethics" of the defendant); *Tillman v. C. R. Bard, Inc., et al.*, 96 F. Supp. 3d 1307, 1326–27 (M.D. Fla. 2015); *Ocasio v. C. R. Bard, Inc.*, No. 8:13-cv-1962-T-36AEP, 2015 WL 2062611, at *4 (M.D. Fla. May 4, 2015) (excluding opinions about "Bard's knowledge, intent, or state of mind because such testimony invades the province of a jury, which is capable of deciding such matters without an expert's help").

Dr. Muehrcke's opinions regarding Bard's motive, intent, and state of mind invade the province of the jury and, therefore, are improper subjects for expert testimony. Thus, this Court should exclude these opinions in this litigation.

### F. The Court Should Exclude Dr. Muehrcke's Opinions Regarding the Risk of Future Arrhythmias and Need for Treatment of Same in the *Hyde* Case Because He Admits He Is Unqualified to Offer Them.

As discussed above, Dr. Muehrcke is a cardiothoracic surgeon and, as such, is not qualified under Rule 702 to offer expert testimony on areas that fall outside of this area of medical expertise. Nonetheless, in his report in the *Hyde* case, Dr. Muehrcke opines that "as a result of the failure of Ms. Hyde's G2 filter and resulting need for additional surgery involving the heart, she is at risk for arrhythmias, need for AICD [automatic implantable cardioverter-defibrillator], and sudden death." (Ex. B, Muehrcke Report, *Hyde*, pp. 7-8.)

In his deposition, Dr. Muehrcke clarified that the "additional surgery involving the heart" to which he referred was the percutaneous retrieval of a filter strut from her heart that had already occurred and that he did not predict she would need "additional surgery" to the heart. (Ex. F, Muehrcke Dep., 123:24-124:10.) Dr. Muehrcke then testified that he is unable to quantify what the future risk of developing arrhythmias was for Ms. Hyde and that "electrophysiology would be better to do that." (*Id.* at 126:12-16, *see also* 113:25-114:13, where in referencing the *Booker* bellwether case he notes he would have to leave quantification of risk of arrhythmia in a patient to an electrophysiologist.) He agreed he could not determine that risk for Ms. Hyde, as between two percent, twenty percent or

1  greater: "I don't know. Don't know how her body is going to respond to having that filter
2  fragment scar." (*Id.* at 126:18-126:22.)

3      With respect to his opinion that Ms. Hyde will need placement of an AICD, he
4  agreed that there are various treatments for arrhythmia, including medication, and that and
5  AICD would be necessary only if she developed "lethal arrhythmias," meaning
6  arrhythmias that can cause sudden death, which was a risk he could not quantify and
7  would have to defer to an electrophysiologist to determine. (*Id.* at 128:1-129:9.)
8  Dr. Muehrcke also could not assess Ms. Hyde's risk of sudden death associated with any
9  arrhythmia she may develop. Because Dr. Muehrcke admits he is not able to give an
10 opinion quantifying Ms. Hyde's risk of developing arrhythmias, what the potential is for
11 such a condition to cause her sudden death, or what her potential need is for an AICD,
12 deferring instead to an electrophysiologist to provide those opinions, he is not qualified to
13 render those opinions and has failed to provide those opinions within a reasonable medical
14 certainty. Therefore, the Court should exclude these opinions in the *Hyde* case.

## II.   Conclusion.

16     For each of these reasons, Bard respectfully requests that this Court exclude the
17 opinions of Dr. Muehrcke identified above.

18     RESPECTFULLY SUBMITTED this 24th day of August, 2017.

        s/Matthew B. Lerner
        Richard B. North, Jr.
        Georgia Bar No. 545599
        Matthew B. Lerner
        Georgia Bar No. 446986
        NELSON MULLINS RILEY & SCARBOROUGH, LLP
        Atlantic Station
        201 17th Street, NW / Suite 1700
        Atlanta, GA 30363
        PH: (404) 322-6000
        FX: (404) 322-6050
        richard.north@nelsonmullins.com
        matthew.lerner@nelsonmullins.com
        taylor.daly@nelsonmullins.com

| | |
|---|---|
| 1 | James R. Condo (#005867) |
| 2 | Amanda Sheridan (#027360) |
|   | SNELL & WILMER L.L.P. |
| 3 | One Arizona Center |
|   | 400 E. Van Buren |
| 4 | Phoenix, AZ 85004-2204 |
|   | PH: (602) 382-6000 |
| 5 | jcondo@swlaw.com |
|   | asheridan@swlaw.com |

**Attorneys for Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.**

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

- 15 -

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of August, 2017, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

s/ Matthew B. Lerner
Matthew B. Lerner

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000