# Exhibit D

In The Matter Of:

## *Rackliff vs. C.R. Bard*

---

## *Suzanne Parisian, M.D.*

June 13, 2014

---

## Tiffany Alley Global Reporting & Video

730 Peachtree Street NE

Suite 470

Atlanta, GA 30308

770.343.9696

www.tiffanyalley.com



 1   record.

 2       **A      My full name is Dr. Suzanne Parisian.**

 3       Q      And what is your present business address?

 4       **A      It's MD Assist, Inc., 7117 North 3rd Street,**

 5   **Phoenix, Arizona.**

 6       Q      And you've been deposed before?

 7       **A      Yes, sir.**

 8       Q      Can you estimate for me how many depositions

 9   you've given over the years?

10       **A      Over -- since 1997, 180 depositions.**

11       Q      So you are familiar with the process?

12       **A      Yes, I hope.  I think I am, but you never**

13   **know.**

14       Q      I would just ask that if at any time I ask you

15   a question that you do not hear or do not understand,

16   please ask me to repeat it or rephrase it.  And if at

17   any time you wish to take a break, please let us know

18   and we are happy to do so.

19       **A      Yes, sir.  Thank you.**

20       Q      You said you've been deposed 180 times since

21   1997.  Can you estimate how many times you've actually

22   testified in court?

23       **A      I think I've been in court about -- I think**

24   **maybe about 50 times.  I'm not sure.**

25       Q      Can you estimate for me how many depositions

 1           MR. LOPEZ:  This is -- let me just say

 2   this -- I know you are not supposed to -- but isn't

 3   this outside the scope?  We are talking -- she's here

 4   for three cases, and now you are deposing her on the

 5   MERIDIAN, and the MERIDIAN doesn't -- I mean, if you

 6   want to make this about the MERIDIAN case, I guess we

 7   can, but, I mean, I would just suggest to you that

 8   these are Recovery cases.

 9           MR. NORTH:  This has to do with her

10   credibility.  It's fair game.

11           MR. LOPEZ:  Oh, okay.  You are going to

12   testify --

13           MR. NORTH:  She submitted a report that

14   addresses all of these filters, and she generically

15   lumps them together, so all are fair game.

16           MR. LOPEZ:  I mean, you can use your

17   time as you wish, but...

18           **THE WITNESS:  Well, fine.  If we go to**

19   **page 141, I'm discussing what I know about the**

20   **MERIDIAN -- 142.  I haven't done a lot of research in**

21   **the MERIDIAN, and I basically looked at what the**

22   **company was saying that the MERIDIAN was going to**

23   **address in terms of a secure, safe filter.  It's using**

24   **the same different -- the same use of elastic cranial**

25   **hit hooks.  I talk about the marketing of the MERIDIAN**

1  too, but I am board certified in pathology.

2      Q     And you are still licensed to practice

3  medicine?

4      A     Yes, sir.

5      Q     In Arizona and Virginia?

6      A     Yes, sir.

7      Q     You are not a radiologist, are you?

8      A     Correct.

9      Q     And not an interventional radiologist?

10     A     Correct.

11     Q     Have you ever implanted an inferior vena cava

12  filter?

13     A     No, sir.

14     Q     In your medical practice, did you ever have

15  any dealings with a inferior vena cava filter?

16     A     Not that I recall.

17     Q     And my understanding is that you have not

18  treated a living patient since the 1980s; is that

19  correct?

20     A     Correct.  And the FDA -- and that the FDA

21  don't treat any living patients, that's correct.

22     Q     And you were at the FDA for approximately

23  three or four years?

24     A     I was from 1991 through 1995.  Four years with

25  the Public Health Service, yes, sir.

1    Q    And you began your consulting company in 1997?

2    **A    No, 1995 --**

3    Q    And --

4    **A    -- August.**

5    Q    -- ever since you left the FDA, you have

6    been -- your occupation has been a consultant?

7    **A    Yes, sir.**

8    Q    Are you still the only employee of your

9    company?

10   **A    My -- well, my husband has been my employee in**

11   **terms of doing all the billing and finances and**

12   **everything that I don't do.**

13   Q    You do not have training in engineering, are

14   you -- do you?

15   **A    Well, I have training from the FDA in**

16   **engineering because I would have to work with engineers**

17   **and read engineering drawings, and so I have on-the-job**

18   **training from engineering, so in terms of medical**

19   **device engineering.**

20   Q    But you've never studied engineering in an

21   academic setting, have you?

22   **A    I took a course in undergraduate school in**

23   **engineering, but I'm not an engineer.**

24   Q    And you are not a metallurgist?

25   **A    No, sir.**

1   this year.  And so I'm trying to cut back, and so

2   that's why I'm just not having as much time to consult

3   for medical device companies.

4                   And also there are consultants, and --

5   but I have been a member of Regulatory Affairs

6   Professional, and I've given -- I've lectured for their

7   medical device courses online.  I believe the course is

8   still online.

9                   I've been primarily a talking head for

10  the Arizona Medical Association when they need someone

11  to talk about the FDA for various issues.  I've talked

12  at the Biomedical -- Arizona Biomedical.  So I've

13  mainly been a resource as opposed to a consultant in

14  the last couple of years.

15     Q    How many active litigation cases do you have

16  right now?

17     A    Actually right now, I'm down to maybe about

18  five.

19     Q    Are all of those litigation cases on behalf of

20  plaintiffs?

21     A    Yes.

22     Q    Have you ever had a litigation case where you

23  were retained by the attorneys who represented a

24  medical device manufacturer?

25     A    Yes.

1      Q     On how many occasions over the years?

2      **A     Well, of the ones that have gone to**

3   **deposition, there's one, Clinical Diagnostics (sic).**

4   **It's on my list, and it's a fetal pressure monitor, and**

5   **so I gave a deposition testimony on that.  I have**

6   **agreed to take cases, but oftentimes they don't go**

7   **beyond me having to -- I don't have to give testimony.**

8                **So I have nothing against taking a**

9   **defense case, and so -- and I've worked also for -- and**

10  **that was a medical device company.**

11     Q     On the list of testimony that we have, which I

12  believe was Exhibit 8 right here --

13     **A     Yes, sir.**

14     Q     -- you mentioned a deposition.  Is there a

15  deposition listed where you were retained on behalf of

16  the medical device company?

17     **A     Yes, sir.**

18     Q     And how many depositions are -- or trial

19  testimonies are listed there where you were retained on

20  behalf of the device company?

21     **A     That would be the only one where I gave a**

22  **deposition.**

23     Q     What about for pharmaceutical companies in

24  there?

25     **A     No.  And I've taken cases.  I've also turned**

1      Q      On how many occasions have you met with

2   somebody from the Lopez McHugh firm --

3      **A      Only --**

4      Q      -- regarding this litigation?

5      **A      Only today.**

6      Q      All of your other communications during this

7   project have been by phone or e-mail?

8      **A      By phone.**

9      Q      Who have you dealt with primarily, Mr. Brenes

10   or Mr. Lopez?

11      **A      Both.**

12      Q      Did you write your report yourself?

13      **A      Yes, sir.  All the typos are mine.**

14      Q      Have you ever published anything regarding

15   inferior vena cava filters?

16      **A      No, sir.**

17      Q      It sounds to me like it's fair to say -- or

18   I'm asking you, is it fair to say that you've had no

19   professional involvement with inferior vena cava

20   filters until your retention in this litigation?

21                   MR. LOPEZ:  Objection as to form.

22                   **THE WITNESS:  I'm trying to -- I don't**

23   **recall if -- when I was with the FDA, we actually did**

24   **have some issues with inferior vena cava filters**

25   **because they were like Class III devices, and FDA was**

1    kind of concerned what they were going to do with them

2    because they came out with the guidance in 1999.

3                     So there were discussions, and I believe

4    there were some recalls and safety issues with them.

5    So I wouldn't say that professionally I've never had

6    anything to do with them, but I don't recall that they

7    were my responsibility.  I was used as a chief medical

8    officer, and I would be involved in issues.  And also

9    I've been involved in post-market issues.

10                    So I know that I was introduced to the

11   inferior vena cava when I was at the FDA, so I don't

12   recall what capacity.  I believe it was in post-market

13   safety issues.

14       Q     BY MR. NORTH:  As you sit here today, do you

15   have any specific recollection of what exactly you --

16   contact, if any, you had at the FDA with inferior vena

17   cava filters?

18       A     No, sir.

19       Q     And you never reviewed any 510(k) or premarket

20   applications regarding inferior vena cava filters, did

21   you?

22       A     I wasn't the reviewer; I was the clinical

23   officer.  I wouldn't have been the one reviewing these

24   applications.  I would be called in as a consult, as a

25   medical officer.  There's only ten medical officers in

1    was to be able to look at manufacturing and then to

2    come up with the health risk assessment as to the

3    potential effect on a patient and what needed to be

4    done in order to protect patients.  So yes, I did do

5    that.  I did that from '91 through '93.

6        Q    I understand the good manufacturing practices,

7    regulations and quality assurance issues that those

8    pose, but do you have any experience in the engineering

9    aspects of manufacturing?

10       A    Sometimes I did, yes.  It was -- that's why I

11   had to be trained by the engineers.  I had to be

12   trained how to produce things online, what the

13   verification process was, software, validation.  So

14   yes, I had to do that, and so that was part of my

15   training.

16       Q    My understanding is that you do have

17   experience in designing a medical device, and

18   particularly, a brain shunt and drug delivery device

19   for newborn infants.  Is that correct?

20       A    Well, those are two different devices.

21       Q    Okay.

22       A    One -- one would be the brain shunt which

23   would be the one from Stanford.  They were looking at

24   Alzheimer's disease, and they needed to figure out how

25   to make a shunt that you can use in elderly people, so

1    I was the one that helped design the shunt and find the

2    material.

3                  The surfactant was the drug delivery for

4    the newborn infants, and I had to help -- the company

5    wanted to have a device for delivery that would meet

6    CDRH standards, as well as CDR standards for drug and

7    device.  So I had to help them with the design of that

8    product.

9        Q    Are those the only two medical devices that

10   you've been personally involved in designing?

11       A    From the ground up, from pencil to paper to

12   materials and to testing, and by a compatibility.

13   Yeah, those are the two that I designed from the

14   get-go.

15       Q    And when were those projects?  When did they

16   occur?

17       A    They were back in the '90s.  I'm not sure when

18   it was.

19       Q    You've never served on the board of directors

20   of a medical device company, have you?

21       A    No, sir.

22       Q    And you have never run or operated a public

23   company, have you?

24       A    That's correct.

25       Q    And you've never worked in the regulatory

1   affairs of any drug or medical device manufacturer?

2        **A     That's right.  I've worked with -- as a**

3   **consultant.**

4        Q     And you've -- this I think is clear from your

5   previous testimony, that you've never designed an

6   inferior vena cava filter, have you?

7        **A     That's correct.**

8        Q     And you've never tested one?

9        **A     That's correct.**

10       Q     Have you ever been involved in the testing of

11  any medical devices, outside of possibly something with

12  the two you helped to design?

13       **A     Well, no.  In terms of the consulting, some of**

14  **the issues would be testing of medical devices and how**

15  **to get clearance or how to address the safety issues.**

16  **So there were companies that I would look at their**

17  **testing.  There are companies that I would come in and**

18  **look at their adverse event reports of complaints and**

19  **tell them what kind of testing to do.  Those I can't**

20  **disclose because those were under confidential, but**

21  **some companies have me come in the back door and find**

22  **out what their problems are.**

23       Q     Well, I understand you may have looked at

24  testing before, but you have not actually conducted

25  tests on medical devices, have you?

1    Q    Do you maintain files on specific medical

2  device manufacturers?

3    **A    At one time I did.  Now I don't.**

4    Q    You have testified in litigation involving

5  Bard before, haven't you?

6    **A    I believe so, yes, sir.**

7    Q    And that would have dealt with the hernia

8  patch litigation?

9    **A    Oh, yeah, the Davol, yes, sir, the Kugel Mesh.**

10   Q    Can you recall any other products, medical

11 devices involving Bard that you've testified

12 concerning?

13   **A    Not offhand.  I don't have a file on Bard as**

14 **to what their history is.  I did when I first started,**

15 **but I don't do that anymore.  I don't do that anymore.**

16   Q    When did you stop doing that?

17   **A    I would have stopped probably in the beginning**

18 **of 2000.  It's just -- I just -- I tend to now file**

19 **them by attorneys or issues.**

20   Q    Do you keep files based on the type of

21 products?

22   **A    It depends.  Like, for example, pain pumps, I**

23 **was involved in a lot of pain pumps; different**

24 **manufacturers, same issues.  So there is a file called**

25 **pain pumps, and there is all the different cases, all**

1   the FDA for their files concerning Bard filters, did

2   you?

3       A     No, sir.

4       Q     Describe for me your methodology in reviewing

5   a product like this and preparing a report like this.

6       A     It's the same methodology I used at the FDA.

7   I would go and I would look at -- basically do a glance

8   at what's on the FDA's Web site, what got cleared, what

9   the predicates are.  You know, what -- how did this

10  product evolve in terms of other devices that were

11  similar.

12              So first I establish, how did this

13  product get on the market?  And then I would look at

14  medical literature.  I would look at discovery

15  documents that are provided, but first I have to figure

16  out in my own head how it got to be on the market, and

17  then I would look at the types of reports that are

18  being given, not just for this device, but for similar

19  devices as to what -- what are physicians writing about

20  it, what's -- so -- and that was how I always began at

21  the FDA.  How did it get on the market?  What are

22  people writing about it?  What are the types of

23  reports?

24              I may look at the MDR database.  I

25  didn't in this particular case because there are

1   documents that actually deal with the MDR database that

2   the company had.

3                    Then I would focus more on the types of

4   complaints and looking at the manufacturing documents,

5   what I have from discovery, and then trying to put it

6   in context of how -- how it's -- you know, what types

7   of reports are being expressed in terms of the patients

8   that are the plaintiffs.

9                    I oftentimes will ask, well, what kind

10  of plaintiffs are we seeing?  What kind of reports are

11  we seeing?  And so it's the same process I've done

12  since -- if you looked at a report I did back at the

13  FDA, it would almost be the same thing.  How did this

14  come about?  What's the science?  And then what are

15  the -- what are the types of reports that are being

16  expressed?  And then in this particular case, I would

17  focus specifically on C.R. Bard.

18      Q     You mentioned the MAUDE database.  You

19  reviewed documents regarding the data in the MAUDE

20  database with regard to Bard filters?

21      A     In this particular case, the discovery

22  actually had MAUDE databases that had been reviewed by

23  the company.  I didn't go back and do my own search of

24  the MAUDE.  I could.  But in this particular case, I

25  didn't need to expend that amount of time looking at

1   to tell you why?

2                   MR. NORTH:  You are going beyond the

3   Arizona rules.  Let -- that's all --

4                   MR. LOPEZ:  I just asked you a question.

5   Do you want me --

6                   MR. NORTH:  No, I don't.

7                   MR. LOPEZ:  -- to tell you why?  Okay.

8                   **THE WITNESS:  I would discuss marketing**

9   **and what information is provided.  But now what an**

10  **individual physician thought, he's going to have to**

11  **testify or she is going to have to testify for**

12  **themselves.  I would be talking about in terms of the**

13  **regulatory, my role at the FDA as to adequate warnings,**

14  **instructions for use, off-labeled use.  So those are**

15  **regulatory issues.  But what one specific physician**

16  **thought, he's going to have to discuss that.  I**

17  **can't -- I don't know the mind of a particular surgeon**

18  **or an implanter.**

19      Q    BY MR. NORTH:  And your report in a number of

20  places talks about various marketing efforts on the

21  part of Bard, correct?

22      **A    Correct.  And this is in the context of what I**

23  **would have done at the FDA.  I would have been asked,**

24  **is this misleading?  Is this false?  You know, so it's**

25  **a regulatory context of a post-market sales of products**

1    and what a company can say and do in terms of their

2    marketing.  That's not in the brain of the one

3    particular surgeon.  He will have to answer whether --

4    you know, whether he agrees with me or not, she -- he

5    or she.

6        Q    You state an opinion in your report that the

7    Recovery filter was not substantially equivalent to the

8    Simon Nitinol Filter?

9        A    Correct.

10       Q    And why is it that you believe that?

11       A    Based on the data that I've reviewed and the

12   testing, the performance of it, the internal company

13   documents, and based on the history of a permanent

14   filter, the types of complications you see for the

15   Simon Nitinol, it wasn't substantially equivalent for

16   that.  And a lot of that would be even in the document

17   that I gave you today that I reviewed in terms of the

18   testing between the Simon Nitinol and the -- and the

19   Recovery filter; you will see my handwritten notes

20   about the different performances of the Simon Nitinol

21   back in '98 and '99.  So it goes -- it stems back to

22   their own testing.  So --

23       Q    What data --

24       A    -- it's based on facts.

25       Q    What data did you have about the complication

1   testing before they had the final device.  So it

2   actually had been on the prototype, not on the

3   manufactured device.  So I haven't seen any fatigue

4   testing on the final device.

5       Q     Did you review any of the laboratory notebooks

6   regarding the test?

7       A     I think I have.  That's why I brought

8   documents that I have reviewed in terms of some of the

9   testing documents.  The notebooks, per se, I don't know

10  if I've reviewed the notebooks because that's

11  oftentimes what a scientist will keep track of.  But

12  some of the data from those notebooks are in their

13  final reports.

14      Q     Have you ever conducted any studies about the

15  nature of the stresses that occur within the inferior

16  vena cava filter?

17      A     No.

18      Q     Have you formed an opinion as to anything

19  specific about the design of the Recovery filter that

20  you believe was defective?

21      A     If I was consulting for a manufacturer wanting

22  to make an IVC filter, one of the things that I would

23  take into consideration or would want them to test

24  would be the vena cava -- the environment of the vena

25  cava and the changes in the stress.

1    selling it anymore because it's got all these risks and

2    we are just monitoring safety issues.  That's not what

3    they told the FDA.  They didn't tell the FDA anywhere

4    that they stopped manufacturing it because of issues

5    when they are getting the G2 approved -- cleared.

6                    So that's the type of safety information

7    that ODE is not -- is not -- they don't think of that

8    types of information.  The company has to tell them

9    that there are relevant safety issues going on with

10   this Recovery that we've chosen as our predicate, and

11   we are not going to market it anymore.  You can't do

12   that.

13                   That's why I said they could have chosen

14   any other predicate.  They could have chosen the SNT

15   and made sure that it actually performed like the

16   SNT -- the SNF, but they didn't.  They chose the

17   Recovery, which is a product they knew they were going

18   to internally stop manufacturing, and just let it sit

19   on the market that had problems, and you can't do that,

20   and the process doesn't allow that.

21                   So that's what -- the company was the

22   one who actually misbranded the product and did not

23   comply with regulations in terms of providing FDA

24   relevant safety information so the FDA could ask

25   additional testing or information about the product.

1    Recovery.  Yeah, so I was wrong.  It's not the G2; it

2    was the 2004 was the Recovery.  I thought there was

3    another letter.

4                   And so, again, if you go to page 127,

5    Ms. Allen talking to FDA talking about sending out the

6    Dear Doctor letter in 2005.  I guess it begins on page

7    123, paragraph 397.  That would be the first one that

8    had been written as needed.  And then there is another

9    discussion about a letter that's going to be sent out

10   on -- by -- you get to paragraph 413, letter of

11   May 11th, 2005, and again it was a Recovery filter, so

12   they were both Recovery filter.

13       Q    You have discussed at great length today your

14   opinions that Bard did not provide sufficient

15   information to the FDA in its 510(k) submission for the

16   Recovery filter, correct?

17       A    In the context of safety for patients, so they

18   provided information, but it wasn't relevant safety

19   information as to the performance of the Recovery

20   filter.

21       Q    Did Bard provide any information or data in

22   its 510(k) submissions that was false?

23       A    Well, it said the migration resistance was

24   going to be substantial equivalent to the Simon Nitinol

25   Filter.  That's false.  And that it was substantially

1   equivalent to the Simon Nitinol Filter, that's false.

2   So it claimed that it was substantially equivalent to

3   the predicate, that it wasn't, and it didn't perform

4   that way as a permanent filter.

5              And the company was the one who chose it

6   to make it a permanent filter.  The FDA actually would

7   ask for them to limit the length of time it was

8   implanted.  Twice they asked them to do that, and both

9   times the company said it was a permanent filter and

10  they didn't want to limit the doctor as to when to

11  remove the filter.

12             They did that with the retrieval option

13  for the Recovery, and they did it again for the

14  retrieval option for the G2.  FDA tried to limit --

15  requested that the company limit the data for how long

16  it could be implanted, and the company opted both times

17  to say, no, it's a permanent filter.

18     Q    You are saying that the FDA attempted to get

19  Bard to limit the amount of time that the filter could

20  be implanted so that therefore it would not be used as

21  a permanent filter?

22             MR. LOPEZ:  Objection as to form.

23             THE WITNESS:  What the FDA did -- and

24  they did -- in the Recovery label, they do have the

25  Asch data and about -- the information about how long

1    Recovery -- the Recovery filter is not substantially

2    equivalent to the Simon Nitinol Filter as a permanent

3    filter.  It does say -- it indicates it's a permanent

4    filter and it has not been tested, it had not been

5    designed, it had been not developed to be a permanent

6    filter.  So right there it begins by saying it is a

7    permanent filter.  That's wrong.

8         Q    I'm not meaning to interrupt.  We will get

9    back to doing the other things, but while you are on

10   that point, can I ask you some follow-up, and then I

11   will ask you for the other points you think.

12              If the company knows or believes that

13   the device it's selling is not substantially equivalent

14   to the identified predicate, isn't the answer to that

15   to quit selling the product and not to put a warning in

16   the IFU?

17        A    I agree with you.  I said it shouldn't have

18   been sold.

19        Q    Right.

20        A    You are asking me about the IFU.  It shouldn't

21   have even been on the market.  So now if you are going

22   to continue to market an adulterated and misbranded

23   device and you want me to help you write a label, you

24   would say you are not a permanent filter; that you've

25   never been tested, designed or looked at as a permanent

1   device.  They put a label that was like that they were

2   substantially equivalent.  They put a label that got

3   them cleared, but it was not an appropriate label.  It

4   was basically a zebra that they are saying is a horse,

5   and FDA needed to approve it, clear it as a horse.

6   It's a zebra.

7                    And so the company shouldn't have

8   marketed it in the first place.  Once they knew that

9   there was a problem, they should have pulled it.  They

10  should have found a product that actually worked or

11  sold their own Simon Nitinol Filter.  Their own

12  salespeople don't know about the Simon Nitinol Filter

13  to sell it as a suitable alternative for a permanent

14  filter.

15      Q    Your opinion report at some point says that we

16  failed -- Bard failed to warn physicians about

17  deployment issues.  What do you mean by that?

18      A    Well, those are in terms of their internal

19  documents, that they were deployment issues in terms of

20  the femoral and the jugular kits.  That's basically

21  from Bard's tracking deployment issues, and so that's

22  another issue about the difficulty of putting the

23  device in.

24                    One of the issues is that if you have a

25  deployment problem, you can actually have it embolize

1   any evidence that Bard was affirmatively marketing the

2   product for that use?

3        A    It's awareness.  It's awareness alone.  That

4   you are aware of it, you have a duty.  You have a duty

5   to either get that clearance so that your product is

6   being used legally, or you have a requirement under

7   801.4 to update your warnings to warn against it.  So

8   it's awareness alone.  It doesn't -- and I don't even

9   have to show them where the document is saying

10   off-labeled use.  It triggers the responsibility of a

11   manufacturer selling a product in the United States.

12   You take an action, and they didn't take the action.

13                    Now, in terms of off-labeled use, we

14   have Dr. Asch with his live case studies presentations,

15   two physicians in 2002 before the device, the Recovery

16   is cleared for retrievable use, and he's showing it in

17   his Canadian patients to American physicians.  It's not

18   even cleared for permanent filter use, and the company,

19   Bard, is having these live case presentations.

20                    You can't do that.  That's off-labeled

21   use right there.  The Recovery wasn't even cleared for

22   any indication, and then he's showing how to retrieve

23   it.  It wasn't -- it wasn't cleared until a year later

24   for that indication.

25                    So that's an example of off-labeled use

```
 1    right there, that Dr. Asch, and then his article is

 2    published in 2002 about the time that the Recovery was

 3    cleared.  There's nothing in there that's saying this

 4    is investigational use.  You can't use it for

 5    retrieval.  You can't do that.  That's again promoting

 6    off-labeled use for the Recovery for retrieval.  You

 7    couldn't do that.  So that's another example.

 8                    So all these things, as a responsible

 9    manufacturer, Bard can't do.  He cannot promote

10    off-labeled use for a product that wasn't cleared.  He

11    can't promote off-labeled use for a product that's not

12    cleared for retrieval.

13                    And then we have the G2.  The G2 was not

14    cleared for Recovery until 2008, but I don't see Bard

15    saying, oh, we don't market a product now that we've

16    stopped in 2005 for Recovery, and the Recovery is

17    not -- G2 is not cleared for Recovery until 2008.  It

18    seems like they are still marketing retrievable filter

19    in there, and they are not necessarily producing one

20    that's safe and effective.  So Bard off-labeled use all

21    over the place, and then they are following off-labeled

22    use.

23                    So I don't know what -- so, yeah, I

24    don't have a document where it says here bariatric, but

25    I know they are going to bariatric conferences.  They
```