# Exhibit E



Deposition of:
# Suzanne Parisian , M.D.

*June 21, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Case 2:15-md-02641-DGC   Document 7308-4   Filed 08/24/17   Page 3 of 8
Suzanne Parisian, M.D.                                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 47

1    regulatory opinions are.
2         Q.   And -- and what percentage of cases would
3    you estimate that you reviewed that -- that you do
4    not take?
5         A.   Well, I'm trying to retire, believe it or
6    not, and so I'm trying to take fewer -- fewer --
7    I -- I don't even take -- consider cases as a rule.
8              And so at one period of time, it would
9    have been about maybe 1 percent.  But as you become
10   a -- a plaintiffs' expert, you tend to get asked
11   less and less also to look at cases for
12   manufacturers, but...
13        Q.   And what do you attribute that to?
14        A.   Well, you know who the people are who tend
15   to take plaintiffs' cases and the other side knows
16   who takes defense cases.  So they tend to keep you
17   in your -- in your avenue.
18             But I have agreed in the early days to
19   take drug cases, I've said that there's nothing
20   wrong with the label, and they usually don't go
21   anywhere in terms of those cases.
22             And so I would say that at one point, it
23   would have been maybe -- maybe 5 percent that -- and
24   I do turn cases down that I say, "No, I don't want
25   to do those," and that would be maybe about -- maybe

Page 48

1   5 or 6 percent in terms of, "I don't think there's a
2   role in this case for me," so I've turned them down.
3        Q.   And did I understand you correctly that
4   at -- at present, the percentage of cases that you
5   say that you review and you turn down is about
6   1 percent?
7        A.   No.  I would say now it would be about
8   5 percent.  It's getting higher, but it's about
9   5 percent.  I've returned -- I've turned down a case
10  because I didn't think I could support it.  Now I
11  turn down cases because I'm trying to retire.
12           But at -- at one point in time, I -- there
13  were cases that I would say, "No, I don't see that I
14  want to take this case."
15       Q.   Do you have a specific time that you plan
16  to retire?
17       A.   I -- three years ago.  Three years ago I
18  planned to retire.  So, you know, I'm trying to cut
19  down.
20           And many of these cases, you'll see I got
21  deposed over and over again for a case that's been
22  going on for years.  So that's the answer is, yeah,
23  three years ago I was ready to retire.
24       Q.   But you are not at a point where you are
25  not accepting new matters; is that correct?

Case 2:15-md-02641-DGC   Document 7308-4   Filed 08/24/17   Page 5 of 8
Suzanne Parisian , M.D.                                  June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 82

1   EVEREST trial?
2       A.   Yes, sir.
3       Q.   And would that also be true for the Denali
4   filter, you know, for the clinical data that's
5   reported in regard to that IFU?
6       A.   Yes, because there's a section where they
7   actually go through the clinical data.
8            But in terms of the indications for use,
9   there's no statement as to removal time
10  recommendation.
11      Q.   And, Dr. Parisian, you're familiar with --
12  and I think you brought them with you -- the FDA
13  Safety Communications --
14      A.   Yes, sir.
15      Q.   -- from 2010 to 2014?
16      A.   Right.  But also the reason why this is
17  important is because it was cleared as a permanent
18  filter and internally the company knew it did not
19  behave as a permanent filter.
20           So if the FDA clears something with no
21  indwell time, it's assumption that the company has
22  shown that it can be a permanent filter.  So that
23  would then color the clearance by the FDA allowing
24  to have the indwell time.
25           So, you know, I think everything hinges on

Page 83

1   the Simon Nitinol filter that this is not -- that
2   the internal documents did not support it was a
3   permanent filter -- it was suitable for a permanent
4   filter.
5           MR. ROGERS:  All right.  Move to strike as
6       nonresponsive.
7       Q.   (By Mr. Rogers)  Dr. Parisian, to go back
8   to my question that I started, the FDA Safety
9   Communications from 2010 and 2014 --
10      A.   Right.
11      Q.   -- they don't reference anything in those
12  communications about indwell time ranges; is that
13  correct?
14      A.   Well, let's see.  Well, the 2- --
15  actually, the 2013 Morales published article does
16  talk about recommendations for removing these
17  filters, and they do talk about removal in 29 to 54
18  days after implantation.
19           So the FDA is involved -- did I answer --
20  did -- I don't know if I understood your question.
21      Q.   Well --
22      A.   You might want to ask --
23      Q.   -- you're talking about the Morales
24  article; correct?
25      A.   Well, yes.  In the -- 2014, FDA is telling

Page 110

1  sense?
2      Q.   I'm not sure I understand what you're
3  saying.
4      A.   Yeah.  I saw the validation and I saw it
5  when they used it in the Denali.
6           And so, you know, my purpose is not to
7  talk specifically about the testing method, but that
8  it was something that the company knew about.  It
9  was something that you would -- if you're going to
10 say you're adhering to the FDA's guidance document,
11 recommendations, that you would have to adhere to.
12          So it's more in the regulatory context,
13 not in the -- not as a biomaterials person.  But in
14 terms of the company knew that they had this issue
15 and then what they did in 2010, they relied on the
16 same issue for the Denali.
17          And I describe what the issue was and --
18 and I talk about it particularly in paragraph 22.
19 Then I talk about it in paragraph 23, specifically
20 in terms of the FDA's 1999 guidance, which would be
21 the regulatory arm.
22          So, yes, I saw that and -- and what the
23 FDA was asking for in their guidance and what the
24 company was doing internally to have looked at this.
25 So it was -- it was being given not as a

Page 111

1    biomaterials person, but as a regulatory person.
2         Q.   And as a regulatory person, would you
3    agree with me that after this particular anchor
4    fractured at the welding joint, that Bard
5    investigated that and came up with a validated
6    process for the welding function?
7         A.   Well, it came up with a validated process,
8    which they used for Denali, but the question is:  Is
9    it effective?  I mean, you can validate a process,
10   but it doesn't mean that you have an effective --
11   have an effective process.  You can go through and
12   make the paperwork.
13            And so that's what I'm talking about here
14   in terms of their fatigue testing, was it actually
15   effective versus validated.  Because lots of people
16   validate stuff that is not very effective.
17        Q.   So do you have an opinion that this
18   particular welding process was not effective?
19        A.   Let's see what my opinion is.
20            Oh, look at paragraph 25, that they should
21   have compared this to the SNF in terms of --
22   remember, this -- Meridian, Recovery, are all
23   compared to SNF.  And so my paragraph 25 is saying
24   that if you're substantially equivalent to the SNF,
25   you needed to validate that it actually performed