# Exhibit F

Case 6:07-cv-01671-AA   Document 382-7   Filed 08/06/10   Page 1 of 25
Case 2:15-md-02641-DGC   Document 7308-5   Filed 08/24/17   Page 2 of 26

Page 460

Court File No. 00-CV-195906CP

ONTARIO

SUPERIOR COURT OF JUSTICE


B E T W E E N:

YVONNE ANDERSEN on her own behalf and as Executrix

of the Estate of Erik Andersen, SHARON FROST

and HER MAJESTY THE QUEEN IN RIGHT OF THE PROVINCE

OF ALBERTA, as represented by the MINISTER OF

HEALTH AND WELLNESS

Plaintiffs

- and -

ST. JUDE MEDICAL, INC. and

ST. JUDE MEDICAL CANADA, INC.

Defendants

Proceeding under the Class Proceedings Act, 1992.

--------

--- This is Day 10 in the trial proceedings held

before the Honourable Madam Justice Joan Lax, at

the Superior Court of Justice, 393 University

Avenue, Courtroom 807, Toronto, Ontario, on the 3rd

day of March, 2010 commencing at 12:00 p.m.

--------

REPORTED BY:  Kimberley Neeson

RPR, CRR, CSR, CCP, CBC

EXHIBIT - D
Page 1 of 25

Case 6:07-cv-01671-AA   Document 382-7   Filed 08/06/10   Page 2 of 25
Case 2:15-md-02641-DGC   Document 7308-5   Filed 08/24/17   Page 3 of 26

Page 461

```
 1   A P P E A R A N C E S :

 2

 3   Sandra Barton, Ms.,

 4    Angus T. McKinnon, Esq.,     for the Plaintiffs.

 5

 6   Gordon McKee, Esq.,

 7    Jill Lawrie, Ms.,

 8    Marcy McKee, Ms.

 9    Karin McCaig, Ms.,           for the Defendants.

10

11   Also present:   Brenda Lytwyn (Law Clerk - Blakes)

12                   Gail Oxtoby (Law Clerk - Heenan)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT - D
Page 2 of 25

Case 6:07-cy-01671-AA   Document 382-7   Filed 08/06/10   Page 3 of 25
Case 2:15-md-02641-DGC   Document 7308-5   Filed 08/24/17   Page 4 of 26

Page 462

```
 1                          I N D E X

 2

 3                                                      PAGE

 4
```

```
 5      Ruling on the admissibility of evidence

 6      of Dr. Suzanne Parisian.................   464
```

```
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT - D**
**Page 3 of 25**

DAY 10/VOL 10                          RULING                     March 3, 2010

Page 464

```
 1                          R U L I N G
 2          THE HONOURABLE MADAM JUSTICE JOAN LAX:
 3                  This action concerns the alleged
 4      negligent conduct of St. Jude Medical Inc. in the
 5      pre-market research and development, design and
 6      testing, manufacture, distribution and sale of a
 7      mechanical heart valve coated with Silzone, and the
 8      post-market monitoring, recall and warning to
 9      regulators, health care professionals and the
10      public.
11                  The St. Jude Silzone valve was approved
12      for sale in Canada by Health Canada in July 1997
13      and in the United States by the U.S. Food & Drug
14      Administration in March 1998.  The action is
15      brought on behalf of persons resident in Canada,
16      other than British Columbia or Quebec, who had one
17      of the Silzone valves or annuloplasty rings
18      implanted, and on behalf of their family members,
19      prior to the worldwide recall of these devices on
20      January 21, 2000.
21                  The plaintiffs allege, among other
22      things, that St. Jude made representations to
23      regulators regarding the safety and efficacy of the
24      Silzone valve that were false, unsupported or
25      unsupportable, and that it failed to disclose
```

**EXHIBIT - D**
**Page 4 of 25**

Page 465

1    sufficient information to regulators relating to

2    Silzone's safety and efficacy.

3            The trial is expected to be lengthy and

4    will involve complex technical and scientific

5    evidence.  The parties have completed their opening

6    statements and the plaintiffs have adduced the

7    evidence of the representative plaintiffs.  The

8    plaintiffs now propose to call Dr. Suzanne Parisian

9    as their first expert witness, and I have been

10   asked to rule on the admissibility of her evidence.

11           Dr. Parisian has testified as to her

12   qualifications and has been cross-examined.  Her

13   curriculum vitae has been marked as Exhibit 31.  I

14   have reviewed her two reports and I have heard

15   comprehensive submissions on the admissibility of

16   her evidence.

17           To be admissible, expert evidence must

18   meet the following criteria set out by Sopinka, J.

19   in Regina v. Mohan, [1994] 2 S.C.R. 9:

20               (1) the evidence must be relevant;

21               (2) the evidence must be necessary to

22   assist the trier of fact;

23               (3) there must be no exclusionary rule

24   otherwise prohibiting the receipt of the evidence;

25               and (4) the evidence must be given by a

Case 6:07-cv-01671-AA  Document 382-7  Filed 08/06/10  Page 6 of 25
Case 2:15-md-02641-DGC  Document 7308-5  Filed 08/24/17  Page 7 of 26

Page 466

1    properly qualified expert.

2            Our appellate courts have emphasized

3    that the trial court performs an important

4    gatekeeper role and the evidence should be

5    scrutinized at the time it is proffered.  An

6    "anything goes" approach to the admissibility of

7    expert evidence is no longer acceptable.  The

8    dangers of this approach were well expressed by

9    Justice Moldaver in Johnson v. Milton (Town)

10   (2008), 91 O.R. (3d) 190 (C.A.) at paragraphs 49

11   and 50 when he said:

12           "Apart from trial economy,

13           trial judges who fail to properly

14           perform their gatekeeper function

15           run the risk of having their

16           decision-making function usurped or

17           severely eroded by 'expert

18           generalists' who profess to know

19           something about everything and who

20           are only too willing to provide the

21           court with a ready-made solution for

22           any contentious issue that might

23           exist.  The problem with such

24           witnesses is that while they appear

25           knowledgeable and generally come

EXHIBIT - D
Page 6 of 25

DAY 10/VOL 10                        RULING                      March 3, 2010

Page 467

1              across well, upon closer scrutiny,

2              their opinions may well turn out to

3              be little more than concoctions

4              consisting of guesswork,

5              speculation, commonplace information

6              and junk science with a hint of

7              valid science thrown in for good

8              measure.

9                  Courts must be vigilant to guard

10             against such impermissible evidence.

11             It is trite law that expert

12             witnesses should not give opinion

13             evidence on matters for which they

14             possess no special skill, knowledge

15             or training, nor on matters that are

16             commonplace, for which no special

17             skill, knowledge or training is

18             required."

19                 The plaintiffs seek to have Dr.

20    Parisian qualified as an expert and give opinion

21    evidence on the practices and procedures employed

22    by the U.S. Food & Drug Administration in approving

23    a medical device, including determining its safety

24    and efficacy, the disclosure required of a

25    manufacturer in seeking approval, the kinds of

**EXHIBIT - D**
**Page 7 of 25**

DAY 10/VOL 10                        RULING                    March 3, 2010

Page 468

1    investigations to be expected of an applicant,

2    whether St. Jude fulfilled these obligations under

3    U.S. federal law during the pre-approval and

4    post-approval process, and if it did not do this,

5    what actions the FDA could or would have taken.

6              The defendants raise two broad

7    categories of objections to Dr. Parisian's proposed

8    testimony.  First, they submit that Dr. Parisian

9    has not been shown to have acquired special or

10   peculiar knowledge that qualifies her to testify on

11   the standards and practices of the United States

12   Food & Drug Administration relating to the approval

13   of a mechanical heart valve, including the

14   disclosure obligations of a manufacturer, whether

15   these obligations were fulfilled, and if they were

16   not, what action the FDA would or could have taken

17   had there been compliance.

18             Second, they submit that Dr. Parisian's

19   opinions with respect to St. Jude's post-approval

20   compliance with U.S. regulatory requirements with

21   respect to labelling, marketing and reporting of

22   adverse events are not relevant to the issues in

23   this action and are not necessary to assist the

24   court and constitute inadmissible opinion evidence.

25             Dr. Parisian is a medical doctor with

EXHIBIT - D
Page 8 of 25

Page 469

1    specialist qualifications in pathology who received

2    board certification in anatomic and clinical

3    pathology in 1989.  Between 1991 and 1995 she was

4    employed with the United States Public Health

5    Service and assigned to the Food & Drug

6    Administration.  Between 1991 and 1993 she was a

7    medical officer in the Office of Health Affairs

8    providing primary support to the Office of

9    Compliance and responsible for overseeing the

10   safety of medical devices already approved and

11   marketed in the United States.  Between 1993 and

12   1995 she served as one of two chief medical

13   officers in the FDA's Office of Device Evaluation

14   within the FDA's Centre for Devices and

15   Radiological Health.  This centre oversees and

16   evaluates new product marketing applications for

17   medical devices not yet on the United States

18   market.

19               The Office of Device Evaluation has a

20   number of divisions.  Dr. Parisian's assignment was

21   in the Division of Reproductive, Abdominal, Ear,

22   Nose & Throat, and Radiology.  Her curriculum vitae

23   contains a long list of devices for which she had

24   clinical responsibilities as a medical officer in

25   the FDA's Office of Device Evaluation, but she

DAY 10/VOL 10                      RULING                  March 3, 2010

1    never had clinical responsibilities for mechanical

2    heart valves.  That responsibility was in a

3    different division of the Office of Device

4    Evaluation.  This was the Division of

5    Cardiovascular, Respiratory and Neurology, whose

6    Chief Medical Officer was Dr. Wolf Sapirstein, a

7    cardiovascular surgeon.  This was the division

8    within the Office of Device Evaluation that

9    reviewed St. Jude's pre-market approval application

10   supplement for the St. Jude mechanical heart valve

11   with a sewing cuff coated with Silzone.

12           Dr. Parisian did not work with any of

13   the reviewers who had responsibility for the

14   approval of mechanical heart valves, including the

15   Silzone valve at issue in these proceedings.  Her

16   only experience with mechanical heart valves was

17   during her assignment to the Office of Health

18   Affairs between 1991 and 1993 when a safety issue

19   arose with the Bjork Shiley valve.  She testified

20   that she came in at the end of that issue and her

21   role was basically one of communication to

22   physicians regarding safety issues with that valve.

23           After leaving the FDA, Dr. Parisian

24   founded a company, MD Assist, and her husband, who

25   is also a medical doctor, are its two employees.

EXHIBIT - D
Page 10 of 25

DAY 10/VOL 10                    RULING                    March 3, 2010

Page 471

1    MD Assist is a regulatory and medical consulting

2    firm that works with medical device manufacturers,

3    mainly start-ups, to help bring new products to the

4    U.S. market and assists with product and marketing

5    development.  Dr. Parisian has never consulted to a

6    manufacturer of a mechanical heart valve.

7              In 2001 she self-published a book,

8    "FDA, Inside and Out."  Her curriculm vitae lists

9    four publications; none are related to

10   cardiovascular issues in general or heart valves in

11   particular.  Her last publication was in 1996.

12             Dr. Parisian maintains her medical

13   licence, but her clinical practice ended in the

14   late 1980s and her last work as a pathologist was

15   in 1995.

16             In recent years, her work has largely

17   been in what she describes as litigation support,

18   that is, in providing expert opinion evidence in

19   court proceedings in the United States, mainly on

20   behalf of plaintiffs.  She has not been qualified

21   as an expert witness on the topic of submissions to

22   the FDA on mechanical heart valves, or as an expert

23   witness in U.S. proceedings on the St. Jude Silzone

24   heart valve.

25             In her report, Dr. Parisian opines

EXHIBIT - D
Page 11 of 25

DAY 10/VOL 10                    RULING                    March 3, 2010

Page 472

1    broadly on FDA practices relating to the approval

2    of mechanical heart valves, although she has never

3    reviewed a heart valve submission.  She was not

4    part of the FDA's decision-making process relating

5    to the approval and oversight of St. Jude's Silzone

6    coated mechanical heart valve.  She was not one of

7    the authors of the FDA's 1994 Heart Valve Guidance

8    document and did not work with it on a day-to-day

9    basis while at the FDA.  This document was

10    developed by the FDA to assist industry and

11    reviewers on applications such as the one at issue

12    in this proceeding.  She read this document for the

13    first time in preparing her opinion for this

14    litigation.

15            Dr. Parisian has general knowledge and

16    experience about the practices and procedures of

17    the FDA for the approval of medical devices, but

18    she has no knowledge or experience relevant to the

19    safety and efficacy of a mechanical heart valve

20    that would inform the practices and procedures of

21    the FDA in approving this kind of device.

22            In her report, Dr. Parisian opines that

23    St. Jude failed to comply with various pre-market

24    disclosure obligations including with respect to

25    its sheep studies, the leaching of silver from the

DAY 10/VOL 10                          RULING                        March 3, 2010

Page 473

1    Silzone coated sewing cuff, and the extent of

2    medical literature that St. Jude provided to the

3    regulator.  She further opines on what the FDA

4    might have done in reviewing and approving St.

5    Jude's application had St. Jude provided FDA with

6    this information.

7              In cross-examination, Dr. Parisian

8    agreed that she has never designed or analyzed a

9    sheep or prosthetic valve implant study.  She has

10   not taught, studied or written on the effects of

11   silver on bacteria in human cells.  She has no

12   specialized knowledge in toxicology, biomaterials

13   science, cardiology or microbiology.

14             The science behind mechanical heart

15   valves, the testing of these valves to determine

16   safety and efficacy and the interpretation of test

17   results are matters that are technical and complex.

18   Other witnesses who do have this knowledge will be

19   testifying in this trial and will be able to

20   provide the court with the evidence it requires to

21   make the necessary factual determinations as to

22   whether or not St. Jude's conduct met or failed to

23   meet the standard of care in seeking U.S.

24   regulatory approval for the Silzone valve.

25             A properly qualified expert may provide

EXHIBIT - D
Page 13 of 25

Page 474

1    an opinion as to what material information bears on

2    the safety and efficacy of the Silzone coated heart

3    valve and may assist the court in understanding

4    these matters so that the court can make informed

5    findings as to whether the representations made by

6    St. Jude were false or misleading, and whether the

7    defendants' disclosure was full and truthful.

8              Dr. Parisian's generalized knowledge

9    acquired during her two years as a medical officer

10   with clinical responsibilities for the approval of

11   other medical devices does not qualify her to offer

12   an opinion about the approval or decision-making

13   process for a different device in a different

14   division of the Office of Device Evaluation.

15             In summary, on the objection with

16   respect to qualifications, Dr. Parisian is not

17   qualified to testify about the standards and

18   practices of the FDA relating to the pre-market

19   approval process for the St. Jude Silzone heart

20   valve.  Dr. Parisian is not a properly qualified

21   expert on this subject and any evidence she can

22   give about FDA practices with respect to the

23   approval of other medical devices will not assist

24   the court in evaluating St. Jude's conduct in the

25   FDA approval process.  Her evidence on these issues

EXHIBIT - D
Page 14 of 25

Page 475

1    is therefore not admissible.

2             I turn then to the second aspect of Dr.

3    Parisian's proposed evidence relating to

4    post-approval compliance with FDA requirements.

5    The breaches that Dr. Parisian alleges are specific

6    to regulations under the U.S. Federal Food, Drug,

7    and Cosmetic Act ("FDCA") and FDA requirements.

8    These sections of her report focus to a large

9    extent on the marketing restrictions placed on St.

10   Jude by the FDA, the FDA-approved labelling of the

11   Silzone coated valve in the United States, and

12   reporting of adverse events to the FDA.

13             To a lesser extent, she comments on

14   alleged breaches of various specific FDA

15   regulations such as those that relate to the

16   content of annual reports and PMA supplements.

17             These opinions can only be relevant if

18   they are relevant to the common issues that are to

19   be resolved in this action.  There is no common

20   issue that addresses breaches of U.S. regulatory

21   law with respect to labelling, marketing and

22   reporting.  Neither party alleges that there was

23   marketing in the United States in compliance with

24   or in breach of U.S. law.  Neither party alleges

25   there was compliance with or breach of marketing

Case 6:07-cv-01671-AA    Document 382-7    Filed 08/06/10    Page 16 of 25
Case 2:15-md-02641-DGC    Document 7308-5    Filed 08/24/17    Page 17 of 26

Page 476

 1    conditions in the U.S. or whether the heart valve

 2    was "misbranded" under U.S. law.

 3              While the fact of adverse events and

 4    the steps St. Jude took or failed to take to report

 5    adverse events is pleaded, neither party pleads

 6    breach of or compliance with U.S. law for reporting

 7    adverse events, nor does either party plead breach

 8    of or compliance with any other U.S. reporting

 9    requirements.

10              The alleged deficiencies of St. Jude

11    described in Dr. Parisian's reports are largely

12    introduced to establish that, in her opinion, there

13    was a breach of the U.S. FDCA regulations and/or

14    the FDA's conditions of approval.  She then relies

15    on her conclusion to discuss the regulatory and

16    legal consequences in the U.S. that would flow from

17    any such breach.

18              Dr. Parisian is not a lawyer and her

19    role at FDA did not entail providing legal

20    opinions, but rather providing her clinical

21    perspective on public safety issues in instances of

22    alleged non-compliance.  She is not qualified to

23    provide expert evidence to assist the court with

24    proving the content of U.S. law or opining on the

25    interpretation of these laws so as to conclude that

EXHIBIT - D
Page 16 of 25

DAY 10/VOL 10                    RULING                    March 3, 2010

Page 477

1    St. Jude was in violation of the U.S. FDCA

2    regulations and/or FDA's conditions of approval.

3    In any event, the plaintiffs have not pleaded any

4    breach of foreign law in their claim.

5              Even if Dr. Parisian were qualified to

6    provide an opinion on compliance with U.S. federal

7    law, this evidence is irrelevant.  One of the

8    ultimate questions for the court will be whether

9    the defendants met the standard of care in Canada

10   with respect to the sale and marketing of Silzone

11   coated products.

12             Another of the ultimate questions for

13   the court will be whether, given the information

14   and knowledge of the defendants regarding the

15   clinical experience with the Silzone heart valve,

16   their conduct was reasonable on the standard

17   applicable to class members' claims, all of whom

18   are Canadian.

19             There is no evidence or suggestion in

20   Dr. Parisian's reports of Canadian adoption of the

21   U.S. FDCA regulations or the FDA conditions of

22   approval which are largely based on these

23   regulations.  Dr. Parisian fairly acknowledges she

24   has little, if any, knowledge of Canadian

25   regulatory law that addresses these topics.

Page 478

1              Canada has its own regulatory regime

2     set out in the Medical Device Regulation that

3     includes specific requirements for the content of

4     product labels, marketing materials, the timing and

5     content of adverse event reports and the

6     circumstances in which other reports and filings to

7     the regulator are required.  To consider U.S. FDCA

8     regulations or conditions of approval in

9     determining the appropriate standard of care for

10    the defendants' conduct in Canada would be to give

11    effect to foreign legal obligations through the

12    vehicle of tort law.

13              Foreign statutes and regulations, which

14    represent statements by a foreign legislature about

15    appropriate standards in that jurisdiction, cannot

16    speak to what is an appropriate standard or what is

17    reasonable in Canada.  It is that standard that

18    must be applied to the claims of class members in

19    this action.

20              In Johnson & Johnson Inc. (c.o.b. as

21    McNeil Consumer Products Co.) v. Bristol-Myers

22    Squibb Canada Inc., [1995] O.J. No. 2230, (General

23    Division), the differences in values between Canada

24    and the U.S. were discussed in the context of

25    Health Canada and the FDA reaching different

DAY 10/VOL 10                    RULING                    March 3, 2010

Page 479

 1    conclusions on the same issues.  The court said at

 2    paragraph 11:

 3                    "In determining the issues

 4              before this court however, it must

 5              be borne in mind that Canada is an

 6              independent and sovereign nation

 7              with its own made-in-Canada

 8              administrative tribunals that have

 9              the right to make decisions that are

10              right for Canadians, decisions that

11              reflect Canadian values and

12              regulatory expectations.  That being

13              the case, the lack of FDA approval

14              of these advertising claims can have

15              no influence on this court's

16              determination of the issues in

17              litigation, and the plaintiffs'

18              reliance on administrative decisions

19              made abroad is misplaced and

20              inappropriate."

21              The court does not require Dr.

22    Parisian's opinions on U.S. regulatory law to

23    assess the ultimate questions on product labelling,

24    marketing materials and adverse event reporting and

25    tracking to determine whether the defendants

DAY 10/VOL 10                         RULING                        March 3, 2010

Page 480

1    breached the standard of care owed to Canadian

2    class members.

3              Further, the evidence regarding

4    labelling materials and marketing activities in the

5    U.S. has, in my view, no relevance or purpose other

6    than to allege that the defendants did not comply

7    with their regulatory obligations in the U.S.  In

8    this sense it is akin to character evidence which

9    is generally not admissible.  Any probative value

10   it may have is far outweighed by its prejudicial

11   effect as there is the potential for a negative

12   inference to be drawn from allegations of breach of

13   foreign regulatory obligations.  This is of no

14   assistance in the fact-finding process relevant to

15   the issues in this trial.  The proposed evidence

16   does not meet the Mohan criteria of relevance or

17   necessity and should not be admitted.

18             Finally, the plaintiffs propose that

19   Dr. Parisian be accepted as an expert to provide

20   testimony on the relationship between international

21   regulatory bodies such as the FDA, Health Canada

22   and the Medical Device Agency in regulating medical

23   devices and reporting on adverse events.  Dr.

24   Parisian devotes a page and a half of her almost

25   100-page report to this topic.  The effect of this

EXHIBIT - D
Page 20 of 25

DAY 10/VOL 10                    RULING                    March 3, 2010

Page 481

1    evidence is to describe the efforts of five

2    countries, including the U.S., Canada, Australia,

3    the European Union and Japan, to harmonize methods

4    for international cooperation for global medical

5    device regulation and safety.

6              This evidence is in the nature of fact

7    rather than opinion evidence.  It is my

8    understanding that Mr. Butchart, a surgeon from

9    Cardiff, Wales and a witness for the plaintiff, was

10   the first to trigger an alert about the Silzone

11   valve to the United Kingdom Medical Device Agency,

12   and that he and others will speak to this issue for

13   the period 1997 to 2000, which is the period

14   relevant to the issues in this action.  As Dr.

15   Parisian left the FDA in 1995, I do not consider it

16   necessary to hear Dr. Parisian's evidence on this

17   point.

18              For these reasons, I conclude that Dr.

19   Parisian is not qualified to give opinion evidence

20   about the FDA approval process for a mechanical

21   heart valve, or to opine on whether St. Jude

22   fulfilled its disclosure obligations.  She is not

23   qualified to opine on what the reviewers of the St.

24   Jude PMA supplement would or would not have done if

25   St. Jude failed to comply with these obligations.

EXHIBIT - D
Page 21 of 25

DAY 10/VOL 10                    RULING                    March 3, 2010

Page 482

1    She is also not qualified to testify about U.S.

2    regulatory law, but even if she were qualified, her

3    proposed testimony is not relevant to the issues in

4    this action.

5              Although Dr. Parisian possesses some

6    special knowledge about FDA practices, she

7    possesses no special knowledge about the FDA

8    approval process for mechanical heart valves, and

9    her report and proposed testimony go well beyond

10   her areas of expertise and can be of no assistance

11   to the court in resolving the issues in this

12   action.   Her evidence is therefore inadmissible.

13

14

15                        *  *  *  *

16

17

18

19

20

21

22

23

24

25

EXHIBIT - D
Page 22 of 25

DAY 10/VOL 10                    RULING                    March 3, 2010

Page 483

```
 1              MR. MCKINNON:   Thank you, Your Honour.

 2    I think two things that I'd like to raise.  One is

 3    I think it would be helpful if we had perhaps 10

 4    minutes to discuss amongst counsel where we go from

 5    here, and secondly, I don't know whether you

 6    propose releasing that ruling as a formal written

 7    ruling, and I'm not saying you need to, but if

 8    you're not going to, what I'd appreciate is a

 9    direction from Your Honour to the court reporter

10    that she provide us with a transcript of the

11    ruling.  We are prepared to pay for it page by

12    page, but I think we should have access to it in

13    one form or the other.

14              THE COURT:   Thank you.  I do not

15    propose to do further work on my ruling.  I have

16    spoken to the reporter and she will prepare a

17    transcript in the form of a ruling, which I would

18    like to review before its release to the parties,

19    and that will be available to you.

20              MR. MCKINNON:   That would be perfect.

21    Could I suggest that we have 10 minutes?

22              THE COURT:   Certainly.

23              MR. MCKINNON:   Because that may dictate

24    whether or not we're coming back this afternoon.

25    So rather than coming back and dealing with it
```

**EXHIBIT - D**
**Page 23 of 25**

DAY 10/VOL 10                        RULING                    March 3, 2010

Page 484

1     then, why don't we see if we can deal with it now.

2                    THE COURT:  Mr. McKee?

3                    MR. MCKEE:  If we could, Your Honour,

4     on a personal matter, could we meet in chambers

5     when the 10 minutes is up rather than in open court

6     for just a moment?

7                    THE COURT:  Certainly.

8                    MR. MCKINNON:  And I discussed that

9     with Mr. McKee and I'm quite content.

10                   THE COURT:  Absolutely.

11                   MR. MCKEE:  We'll speak to the bailiff

12    in 10 minutes.

13                   THE COURT:  Is it your intention that I

14    should close court now then?

15                   MR. MCKINNON:  I think adjourn court

16    for 10 minutes.

17                   THE COURT:  For 10 minutes, and then

18    you want to see me in chambers?

19                   MR. MCKINNON:  Correct.

20                   THE COURT:  Okay.

21                   -- RECESS AT 12:35 --

22    -- After an in-chambers hearing, court was

23    adjourned at 12:50 p.m.

24

25

**EXHIBIT - D**
**Page 24 of 25**

DAY 10/VOL 10                      RULING                      March 3, 2010

Page 485

1                    REPORTER'S CERTIFICATE

2

3                    I, KIMBERLEY A. NEESON, RPR, CRR,

4    CSR, CCP, CBC, Certified Shorthand Reporter,

5    certify;

6                    That the foregoing proceedings were

7    taken before me at the time and place therein set

8    forth, at which time the witness was put under oath

9    by me;

10                    That the testimony of the witness

11   and all objections made at the time of the

12   examination were recorded stenographically by me

13   and were thereafter transcribed;

14                    That the foregoing is a true and

15   correct transcript of my shorthand notes so taken.

16

17

18                    Dated this 3rd day of March, 2010.

19

20

21                    _____

22   NEESON & ASSOCIATES

23   COURT REPORTING AND CAPTIONING INC.

24   PER:KIM NEESON, RPR, CRR, CSR, CCP, CBC

25   CERTIFIED REAL-TIME REPORTER

EXHIBIT - D
Page 25 of 25