# Exhibit E

 

Deposition of:

# David Kessler , M.D.

*October 5, 2016*

In the Matter of:

# Clare-Austin vs. C.R. Bard

Tiffany Alley, A Veritext Company
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-ga@veritext.com  | 770.343.9696

David Kessler , M.D.                            October 5, 2016
Clare-Austin vs. C.R. Bard

Page 16

1    trying to think.  Obviously, you know, I have my medical

2    degree, have worked alongside in medical schools

3    with bioengineers, I've created departments of

4    bioengineering, in essence.  So -- and FDA, a very big

5    part of FDA, the regulation of medical devices has to do

6    with engineers.  So while I may have engineers in the

7    room, it's that interface with engineers and the safety

8    and efficacy that I have expertise in.

9        Q.  I believe my question was do you have any

10   training in engineering?

11            MR. LOPEZ:  I think he answered that, I think

12   he answered it.

13            MR. NORTH:  I don't think he did.  He supplied

14   his experience but no training.

15            THE WITNESS:  So certainly in medical school,

16   bioengineering is an aspect of medical school training.

17   BY MR. NORTH:

18       Q.  Other than taking a course in medical school on

19   biomedical engineering, have you taken any other formal

20   classes in engineering?

21       A.  No, but I've -- you know, again, I've had

22   engineers work for me in assessing the safety and

23   efficacy of devices.

24       Q.  Have you ever designed a medical device?

25       A.  Actually, I have.

David Kessler , M.D.                                    October 5, 2016
Clare-Austin vs. C.R. Bard

                                                        Page 18

1        Q.   Have you ever designed an implantable medical

2   device?

3        A.   I regulated them, I assessed them, I take

4   the designs and determine whether they were either safe

5   and effective or substantially equivalent.  So no,

6   usually I'm handed a design by somebody and then the

7   question is what -- how should I take those designs and

8   assess them for safety and efficacy or, you know,

9   substantial equivalence.

10       Q.   So while you have assessed and analyzed designs

11  of medical devices, you have never personally designed

12  an implantable medical device; is that correct?

13       A.   I've regulated, I think is the way to say that,

14  I regulated the design of medical devices.

15       Q.   Have you designed one, though?  I understand

16  you regulated one.  Have you personally designed an

17  implantable medical device?

18       A.   I don't believe from beginning to end I've done

19  the whole thing.  We may have had certain meetings on

20  how things should have been designed at FDA, but no.  We

21  take the designs and assess those designs for safety and

22  efficacy and substantial equivalence.

23       Q.   When were you first retained to assist in this

24  litigation?

25       A.   Retained is a, you know, a legal term.  I can

David Kessler , M.D.                          October 5, 2016
Clare-Austin vs. C.R. Bard

Page 80

1          Q.  Dr. Kessler, we've now marked a copy of the

2     schedules to your report as Exhibit 6; is that correct?

3          A.  Yes.

4          Q.  Now, Schedule 1 involves a listing of all the

5     plaintiffs, at least as of some date, in this

6     litigation; correct?

7          A.  Yes.

8          Q.  You did not prepare that yourself, did you?

9          A.  No.  I think there's a footnote that tells you

10    exactly who prepared the schedules, I'm sure you've read

11    it.  So if you look at my report, in the page on

12    schedules, it says "All schedules were prepared by staff

13    from legal counsel at my request and subject to my

14    review."

15         Q.  And why did you want a list of all the

16    plaintiffs?

17         A.  Because if you asked me who this report -- who

18    the plaintiffs are -- right? -- in this matter, I need

19    to be able to -- I mean, I thought I would want to be

20    able to answer that question.  I mean, and so if you

21    want to know who this report was done in anticipation of

22    as part of the MDL in addition to Austin, I think that

23    was fair information.

24             Hopefully, everything in -- the goal in the

25    schedules is just to have objective information.  If you

David Kessler , M.D.                                October 5, 2016
Clare-Austin vs. C.R. Bard

                                                        Page 81

1       disagree with anything, let me know, happy to consider

2       it and fix it.  It was just to make sure that you and

3       I -- that I had information available to me.

4            Q.  In the list, the spreadsheet with the names of

5       the plaintiffs, for some of them there's a description

6       of the medical course or complication; correct?

7            A.  Yes.

8            Q.  And you didn't prepare that yourself, did you?

9            A.  No, I didn't.  Again, I refer you to the

10      footnote on how it was prepared.  My goal was -- I

11      didn't want to make people do more work, but I did ask

12      for a list of all the plaintiffs to which this report

13      would be -- could be applicable so we could know that.

14           Q.  But you didn't revise any of those entries

15      about the medical condition or course, did you?

16           A.  I didn't touch any of those and I make no

17      representation to that.  And, again, if there's any

18      disagreement with any of those, I -- you know, let's

19      fix those.  It's not essential, I just wanted the

20      plaintiffs' names.

21           Q.  Let's look at Schedule 2, if we can.

22           A.  Yes.

23           Q.  Did you prepare -- did someone else prepare

24      that history and chronology for you?

25           A.  Yes.  And, again, please understand that I

David Kessler , M.D.                    October 5, 2016
Clare-Austin vs. C.R. Bard

Page 82

1      specifically -- I prepared my report myself, that's

2      every word myself.  These are factual things that others

3      have prepared specifically so if we want to know

4      something, I mean, it's available.

5          Q.  Did you revise this yourself at all?

6          A.  I don't think I -- I don't think so.

7          Q.  Schedule 3 is a diagram of the predicate and

8      prior predicate devices.  Did someone else prepare that?

9          A.  Yes, but I actually -- I did -- I mean, I

10     wanted to get it right, so I did have more input on

11     this.  For example, there were multiple SNFs, and so

12     when the first version came, it didn't have all the SNFs

13     and I sent it back, for example.  Again, this should be,

14     again, objective facts that we should all be able to

15     agree on.

16         Q.  Did you make any changes to the draft of this

17     other than to add the additional SNFs?

18         A.  I wouldn't know how to do a chart like this.

19         Q.  But, substantively, did you ask if there's

20     anything else?

21         A.  I may have -- I also was aware there's multiple

22     G2s, so I wanted to make sure this was as complete and

23     comprehensive.  So, if anything, I made sure -- let's

24     just make sure there's nothing left off this, that was

25     my goal, that was my contribution.

David Kessler , M.D.                    October 5, 2016
Clare-Austin vs. C.R. Bard

Page 86

1          Q.  But he's with one of the firms?

2          A.  He's with a firm.  I don't know who he was

3     with.  Again, let me just be clear, these data should be

4     just a way, if we want to have a discussion, of quickly

5     access the data, I tried to get it in one place.

6          Q.  But with these other schedules, who generally

7     prepared these; was it a single law firm or a number of

8     law firms, all these schedules?

9          A.  There were different people prepared them, I

10    assume, I think at different firms.

11         Q.  Okay.  Prior to your involvement in this

12    litigation, had you ever reviewed any filter migration

13    testing before?

14         A.  I don't re -- I'd have to go back to see what

15    we did at FDA.  I have some recollection of non-vena

16    cava kind of filters, but I have to go back.  It may

17    have been in a surgical context, but I have to go back.

18    It's been more than a decade.

19         Q.  You don't recall that specifically, as you sit

20    here?

21         A.  I remember getting involved in other programs,

22    I believe in a non-vena cava context, I'm pretty sure,

23    but I'd have to go back and check the records.

24         Q.  Have you ever conducted any migration resistant

25    testing yourself?

David Kessler , M.D.                          October 5, 2016
Clare-Austin vs. C.R. Bard

Page 92

1    BY MR. NORTH:

2         Q.   Okay.   Schedule 10, the list of names,

3    officials named in the report.   Who prepared that for

4    you?

5         A.   Actually, I don't know.   This is just

6    specifically every time there was a memo or an email or

7    a report that was cited, I just wanted to have a list of

8    everyone's title to see who was cited.

9         Q.   And so you did that yourself?

10        A.   No, I don't know who did this.   I did not do

11   this.

12        Q.   Okay.

13        A.   Again, literally, it's just every name in my

14   report is in this list, again administerial.

15        Q.   Schedule 11, deposition citations.

16        A.   Yes.

17        Q.   Do you know who prepared this?

18        A.   Nicholas Graham.

19        Q.   From Mr. Lopez's office?

20        A.   Yes.   So what -- you didn't ask me a question.

21        Q.   Number 12, schedule, timeline of FDA and Bard

22   communications.   Do you know who prepared this?

23        A.   I don't recall.   I have another log that I

24   guess was done by Bard.   I don't know who did this one.

25        Q.   Did you audit this one to see that it was

Tiffany Alley, A Veritext Company

David Kessler , M.D.                     October 5, 2016
Clare-Austin vs. C.R. Bard

Page 93

1    comprehensive or if it omitted anything?

2         A.   So I actually -- there is another Bard list.  I

3    have a Bard chronology -- happy to make it available --

4    that is more comprehensive on the years 2009, 2010, it's

5    an internal log.  So I have a more comprehensive log, if

6    you'd like, but only for those years.

7              Most of the time a company has their own

8    internal logs, and that's what I was trying to find

9    here.  I found it for 2009, 2010, but that was it.

10   That's the only thing I could find in the database,

11   so I have that available if you'd like to see it.

12        Q.   My question is on Schedule 12, did you audit

13   Schedule 12 to see if it was a comprehensive list?

14        A.   No, I didn't specifically.  I would assume

15   there's no list that could be comprehensive and catch

16   every communication, unless the company specifically did

17   that realtime, and I don't have evidence -- I can't find

18   Bard's copy of it.  I'd prefer Bard's copy of it if you

19   have it.

20        Q.   Let's look at Schedule 13.  Did you prepare

21   this?

22        A.   No, I did not.  This is just a -- the dates of

23   different filters.

24        Q.   Do you know who prepared it?

25        A.   I do not.

David Kessler , M.D.                          October 5, 2016
Clare-Austin vs. C.R. Bard

Page 94

1      Q.  With regard to schedule -- looking at Schedule

2    13 for a minute, have you ever -- well, let me ask you

3    this:  Have you ever actually seen a recovery filter,

4    the actual device?

5      A.  I don't think I've seen the actual device.

6      Q.  Have you ever actually seen a G2 filter?

7      A.  I don't think I -- I've seen it represented by

8    Bard in its documents and in their schematics, but they

9    didn't provide any to FDA as far as I know.  I have what

10   was provided to FDA.

11     Q.  Have you ever seen any actual filter by any

12   manufacturer?

13     A.  I've reviewed the schematics of those.  I have

14   the pictures and schematics that were provided to FDA,

15   and that's what -- we would not normally get the actual

16   device, we'd get the picture and schematics.

17     Q.  So is the answer to my question that you have

18   not seen any actual filters as opposed to schematics?

19     A.  I have no idea whether I've ever seen a filter

20   or a schematic.

21     Q.  But you don't recall?

22     A.  I don't recall whether I saw the schematics.

23     Q.  Did you review any of the IFUs for the

24   Greenfield filter?

25     A.  Yes.

David Kessler , M.D.                                    October 5, 2016
Clare-Austin vs. C.R. Bard

Page 95

1          Q.  Did you review the IFUs for the Birdsnest

2    filter?

3          A.  I have several of the -- I'd have to

4    double-check.  I certainly did Greenfield.  I have

5    Cortus, Trapeze.  I'd have to double-check on my file

6    whether I have Birdsnest.  I certainly have a summary, I

7    believe I reviewed the 510(k) summary for that public

8    document.  I'd have to go back and check if the IFU is

9    part of it.

10          Q.  Did you make a comprehensive survey of all

11    competitive filter IFUs?

12          A.  I tried to search -- I tried to search -- and,

13    again, I had access to the Bard database and I did with

14    regard to what was provided in the Bard database, and in

15    addition, I have, I think, a comprehensive list of the

16    510(k) summary basis for clearance that FDA has made

17    public.

18          Q.  And who went and obtained those summaries from

19    the public FDA records for you?

20          A.  I asked Wendy to help me make sure -- I mean, I

21    may have had some to make sure that I had everything

22    that was on the FDA website that was available.

23          Q.  Did you do any independent review of the MAUDE

24    database on the FDA website for your work in this case?

25          A.  Yes, I've searched the MAUDE database.  But

David Kessler , M.D.                     October 5, 2016
Clare-Austin vs. C.R. Bard

Page 96

1    I've realized -- well, I've gone to the MAUDE database

2    and looked at Bard's adverse reports both for

3    malfunction and serious injury.  What I've done is

4    I relied more -- I mean, you can't print out the entire

5    database.  What I've done is look at the entire database

6    that Bard has on MAUDE, rather than what MAUDE has on

7    MAUDE because it's harder to print it off.  You can only

8    print it off by ten or 25, and yet I have thousands in

9    the database.

10        Q.  Schedule 14 is a summary of Bard communications

11   to doctors.  Who prepared that for you?

12        A.  Bard, in essence.  I mean, all this is is the

13   actual -- these are Bard letters, so these are the

14   actual letters of dear doctor behind you, so these are

15   Bard documents.

16        Q.  Exhibit or Schedule 15 is a list of

17   alternatives to IVC filters; is that correct?

18        A.  Yes.

19        Q.  And who prepared that for you?

20        A.  That was -- I don't know the name of the

21   individual.  Again, this was, you know, sort of standard

22   textbook of -- you know, for how to deal with VTEs, it

23   should be just objective textbook data.

24        Q.  But somebody else and not you chose which

25   things to put in this file?

Tiffany Alley, A Veritext Company

David Kessler , M.D.                    October 5, 2016
Clare-Austin vs. C.R. Bard

Page 97

1          A.   Well, you could save -- well, no -- well, the

2     goal was, again, to be as comprehensive.  If you have

3     other alternatives that are not in this chart, let's put

4     'em on this chart.  I just want to have a comprehensive

5     database.  These are database kinds of schedules so we

6     have the data.  There was no intent to limit anything.

7     In fact, the whole goal is if you and I want to talk

8     about this question, we would have it all in front of

9     us to make sure we would have the data.  So, again,

10    there is -- there should be no limiting; right?  This

11    is meant to be within the confines of what's humanly

12    possible to be comprehensive.

13         Q.   That was not my question.  It's very simple:

14    You yourself did not choose which ones would be put on

15    here, someone else that prepared this chose what would

16    be on here; correct?

17         A.   No.  Someone chose per my direction to be

18    comprehensive and make sure that we listed the

19    comprehensible alternative therapies, so they were

20    acting under those instructions.  Whether they did that

21    or not, we can discuss, but as best I can see, it's

22    pretty comprehensive, it may not be perfect.

23         Q.   Schedule 16 is simply a listing of the two

24    public health notifications from the FDA; correct?

25         A.   Yes.

David Kessler , M.D.                    October 5, 2016
Clare-Austin vs. C.R. Bard

Page 98

1          Q.   Schedule 17 appears to be a summary of

2     citations from the SIR guidelines; is that correct?

3          A.   It is a -- it's more specific.  For every

4     article mentioned, this is a listing of what filter the

5     article covers, so it's a very specific -- it's a very

6     specific listing.

7          Q.   Who prepared this for you?

8          A.   I don't -- I don't recall specifically.  Again,

9     it's just per each footnote, it discusses -- it just

10    lists what filter was in each footnote.

11         Q.   Schedule 18 attempts to identify relationships

12    between SIR guidelines, authors, and IVC filter

13    companies; is that correct?

14         A.   Yes.

15         Q.   And what's the purpose of this?

16         A.   Well, this is just, again, based on a database,

17    on Bard's database, was there anyone on the SIR article

18    or acknowledgments that are listed as the authors and

19    what their relationship, if any, with Bard, so that's

20    just to have that and the citation so we can find them.

21         Q.   Dr. Clemick Grassi, which guidelines was he the

22    author of?

23         A.   So certainly 2003, I'd have to go back and

24    check the updates on that.  I have them here.

25         Q.   Do you know whether doctor Grassi had any

Page 99

1    relationship with Bard in 2003 when the guidelines were

2    published?

3        A.  I mean, this is, again -- this is the --

4    what I've been able to ascertain is what's cited in

5    footnote 1.

6        Q.  Cited in what, I'm sorry?

7            MR. LOPEZ:  Footnote 1.

8            THE WITNESS:  I mean, so he -- I have -- and we

9    can go and we can pull it up -- I have a -- in doctor

10   Grassi's deposition what he states about his

11   relationship unrelated to his deposition.

12   BY MR. NORTH:

13       Q.  So as you sit here today, you don't have a

14   recollection whether he worked with Bard at the time he

15   did those guidelines, do you?

16       A.  I have only the two citations and testimony.  I

17   don't have -- I don't believe -- I have to go back and

18   check the transcript -- happy to do that -- and see

19   whether he's testified -- sorry, if he's testified on

20   dates.  I don't recall that.

21       Q.  Schedule 19 is a compilation of deaths

22   purportedly related to the filters; correct?

23       A.  Yes.

24       Q.  Who prepared this for you?

25       A.  I don't remember who prepared it, but I was

David Kessler , M.D.                           October 5, 2016
Clare-Austin vs. C.R. Bard

Page 100

1    going through deaths as I was looking at this, and you

2    can see them on the timeline.  I don't know who actually

3    put these together, but they were basically to search

4    the database for any deaths that were associated with

5    Recovery and G2 and Eclipse, again in the database, to

6    search the database for specific report of death.

7        Q.  Is it your opinion that each of these instances

8    reflected in Schedule 19 presents a situation where the

9    filter was a causative factor in the death?

10        A.  This is only a list of deaths that Bard related

11    to be associated with the filter.  I'm not here as a

12    causation expert.

13        Q.  So just because these incidents are listed does

14    not mean necessarily that the filter was the cause or a

15    cause of the death?

16        A.  You have to talk to other -- I'm not here as a

17    causation expert.  This is just, for regulatory

18    purposes, obviously the number of deaths and what was

19    going on was important.

20        Q.  Schedule 20 is a summary of fatigue resistance

21    testing.  Do you know who prepared that for you?

22        A.  I believe Richard did, the same Richard, the

23    engineer who prepared the -- you know, so he was able

24    to, you know, go through the testing results and just

25    put the testing results down.

David Kessler , M.D.                    October 5, 2016
Clare-Austin vs. C.R. Bard

Page 101

1        Q.  Did you make any revisions to that?

2        A.  No.  There wasn't -- I mean, I went through

3   these.  There didn't seem to be any need to do that.  I

4   reviewed them.

5        Q.  Schedule 21 is a summary or just an itemization

6   of the 483 and FDA warning communications; correct?

7        A.  Yes.

8        Q.  Who prepared this for you?

9        A.  So I believe Laura Smith prepared this, if I'm

10  correct.

11       Q.  She's from the same firm as Ms. Saic; correct?

12       A.  Yes.

13       Q.  Schedule 22, corrosion test results of the

14  modified recovery filter by CC Technologies.  This is

15  just a test report; correct?

16       A.  Yes, because it's cited in the report and CDC

17  schedule.

18       Q.  Schedule 24, comparative corrosion results with

19  other competitive filters.  Was this prepared by that

20  same engineering paralegal you referenced?

21       A.  I'm not sure.  It's possible not.  I don't

22  recall.  Again, these are just Bard's corrosion testing

23  that had anything to do with other filters too.

24       Q.  Did you make any revisions to Schedule 24?

25       A.  No, but I reviewed it and found it to be

David Kessler , M.D.                    October 5, 2016
Clare-Austin vs. C.R. Bard

Page 102

1    complete.

2         Q.  Oh, I think we skipped 23.  23 are just some

3    photo micrographs; correct?

4         A.  On corrosion, yes, that's from the CC

5    Technologies report.

6         Q.  25 is a summary of testimony concerning the

7    signature on the recovery filter 510(k); is that

8    correct?

9         A.  Yes.

10        Q.  Who prepared this for you?

11        A.  I don't recall who prepared this.  It may have

12   been Shelley Blas who did this.

13        Q.  And remind me again who she is?

14        A.  In Howard Nations firm.

15        Q.  Did you read the deposition of Kate Fuller?

16        A.  Yes.

17        Q.  Did you read the deposition of Carol Vierling?

18        A.  Kay Fuller and Mary Edwards.  I'm not sure I

19   read all; I certainly went through it.  Hold on a

20   second.  Let me just check my records and see what I can

21   recall to answer your question.

22             So -- let me be accurate.  I have to go back,

23   I've got to go back and double-check that.  I'm not

24   pulling it up because I have a lot of depositions only

25   by their Bates numbers so I can't tell.  I'd have to go

David Kessler , M.D.                                    October 5, 2016
Clare-Austin vs. C.R. Bard

Page 103

1    back and review that.  I can do that at lunch, if you

2    want.

3         Q.  As you sit here today, do you recall who signed

4    the -- let me ask you this:  510(k) applications have a

5    certification of accuracy of some sort; correct?

6         A.  Several different parts of a 510(k).  There's

7    multiple signature lines at different points in the

8    510(k).

9         Q.  Do you know who signed those various

10   certifications in the 510(k) for recovery filter?

11        A.  The actual -- show me the page that you're

12   referring to specifically because there's multiple

13   signature lines; right?  And there's also, as I

14   remember -- and I have to go back and review -- there

15   was a library copy and there's a copy submitted to FDA,

16   and I will simply put -- I'd have to review exactly

17   which page you're talking about, so let's pull the

18   document.

19        Q.  So as you're sitting here right now, you cannot

20   tell me, without looking at the document, who actually

21   signed the certification on the 510(k)?

22        A.  I'd want to check and pull the document and,

23   again, which copy you're talking about, because I think

24   there were two copies, if my memory serves me right,

25   there was a library copy and there was a copy submitted

David Kessler , M.D.                                October 5, 2016
Clare-Austin vs. C.R. Bard

Page 104

1    to FDA, so we'd have to pull both copies.

2         Q.   Number 26 is Dr. Betensky's expert report that

3    you reference; correct?

4         A.   Yes.

5         Q.   And this is dated August 28th of 2016?

6         A.   Yes.

7         Q.   And since you haven't read her deposition,

8    you're not able to tell us whether this report is

9    consistent or inconsistent with her deposition, are you?

10        A.   I have to go back and double-check whether I

11   read her -- I think my answer was I have to go back and

12   check whether I read her deposition.

13        Q.   Number 27, Schedule 27 is simply the

14   spreadsheet from Dr. Betensky; correct?

15        A.   Exactly.

16        Q.   What is Schedule 28?

17        A.   So this is a listing which meant to be of

18   documents -- of times when Bard used comparative adverse

19   event data, so in Bard's document, whether they compared

20   adverse reporting rates of their filters versus another

21   filter.  So I was looking for their use of that

22   methodology.

23        Q.   Who prepared Schedule 28 for you?

24        A.   I think it was someone at Mr. Lopez's shop.  I

25   don't know who did it.  But it's basically -- they

David Kessler , M.D.                          October 5, 2016
Clare-Austin vs. C.R. Bard

Page 105

1    should be primarily from my report.

2         Q.   Did you make any revisions to Schedule 28?

3         A.   I looked at it, saw that it was complete, and I

4    didn't think there was any need to be -- again, it tries

5    to put in one place that aspect, those things in my

6    report.

7         Q.   Schedule 29, who prepared this?

8         A.   Shelley Blas.  This is just a listing of the

9    preclinical testing that was cited in the 510-Ks.

10   Again, an administrative compilation of all the

11   preclinical testing that's cited in the 510(k) so if we

12   wanted to be able to find a study, a preclinical study,

13   we have that list.

14        Q.   And did you make any changes to that?

15        A.   Yes.  There was one, the last page.  It wasn't

16   clear whether that was in the testing applied to

17   Recovery or G2, so I asked them to make that clearer.

18        Q.   Do you know any of the Bard present or former

19   employees whose names you saw referenced in the various

20   documents?

21        A.   Have I met them personally, are you asking me?

22        Q.   Yes.

23        A.   You know, you read so many documents you feel

24   like you know them.  So I don't think I know them.  I'm

25   not saying I've never met them; I mean as FDA

Tiffany Alley, A Veritext Company

David Kessler , M.D.                                    October 5, 2016
Clare-Austin vs. C.R. Bard

Page 162

1        Q.  Were the test reports that you are relying on

2    saying that Bard did not meet its own specifications for

3    migration resistance and/or caudal migration, were those

4    premarket or post-market tests?

5        A.  The migration resistance, the change in the

6    acceptance criteria, I believe, was premarket of the G2,

7    again modified G2, there are multiple ones.  The caudal

8    migration test, I believe, was November 27th, 2006, so

9    I believe that was post is my memory, but the initial

10   migration tests, Bard failed compared to SNF and then

11   changed the standard was premarket.

12       Q.  You have told us why you believe the G2 was

13   adulterated.  Do you believe the G2 was misbranded?

14       A.  Yes.

15       Q.  In what way?

16       A.  Well, because the IFU -- if you turn in my

17   report, if you look at the IFU, the IFU simply talks

18   about migration as, for example, being as with all

19   filters.  There's nothing in the IFU for G2 that points

20   out that it failed on caudal migration, there's nothing

21   in there that shows there's increased risk of migration

22   compared to SNF.  So it's certainly misleading because

23   it makes -- the IFU makes it sound like this is all

24   filters, when clearly there's evidence of increased

25   risk.

David Kessler , M.D.                                    October 5, 2016
Clare-Austin vs. C.R. Bard

Page 190

1    but I certainly probably have looked at IFUs when they

2    come to companies that I've been involved in, but I

3    normally don't draft them, but I certainly was

4    responsible for deciding whether IFUs were

5    misleading or not.

6         Q.   But you personally, as I understand it, have

7    not drafted an IFU, whether at the FDA or elsewhere?

8         A.   No.  But I reviewed them and regulated them and

9    decided whether they were in compliance with the Act.

10        Q.   Is it your opinion that Bard should have

11   recalled the G2 filter at any time?

12        A.   Should have never been on the market.

13        Q.   Well, assuming that it was on the market, as it

14   was introduced to the market, should it have been

15   recalled at some point?

16        A.   It should have never been on the market because

17   it didn't have a legally based predicate because RNF

18   shouldn't have been on the market, and certainly when it

19   became adulterated on November 2006, it should have

20   been -- when you fail the caudal migration, which was

21   the -- again, the rationale for substantial equivalence,

22   these things didn't migrate.  Once you find that it

23   didn't meet its performance test, I mean, you either

24   either fix it or take it off the market.  That's the

25   basis of adulteration.

David Kessler , M.D.                              October 5, 2016
Clare-Austin vs. C.R. Bard

Page 191

1        Q.   There were incidents of caudal migration in the

2    Everest study; correct?

3        A.   Sure, that's correct.

4        Q.   And the Everest study was provided to the FDA,

5    wasn't it?

6        A.   That's correct.

7        Q.   And the data and report of the caudal

8    migrations in the Everest study were disclosed to the

9    FDA?

10       A.   That's correct.  But the failure to meet the

11   performance spec in the representation that Bard made to

12   FDA was not disclosed to FDA.  So G2 was worse than RNF,

13   it was worse than SNF, it failed on the performance

14   spec.  That was never -- the basis of substantial

15   equivalence was basically undercut by that test.

16   That was never disclosed to FDA.

17       Q.   Do you know whether physicians generally that

18   work with filters consider caudal migration to be a

19   significant problem?

20       A.   So I believe that -- hold on a second.  Let me

21   just -- give me one second to answer that.  So let's go

22   to Dr. Ciavarella's own words, he's certainly a

23   physician, he certainly works with filters, and he

24   certainly is, I would assume, knowledgeable.

25            So if you look at his February 9, 2006, he