# EXHIBIT 1
## (Filed Under Seal)

# EXHIBIT 2

Do Not Disclose - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF ARIZONA
 3
 4
 5    ------------------------------
                                   )
 6    IN RE BARD IVC FILTERS        )
      PRODUCTS LIABILITY            ) NO. MD-15-02641-PHX-DGC
 7    LITIGATION,                   )
                                    )
 8    ------------------------------
 9                 DO NOT DISCLOSE
          SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
10
11              VIDEOTAPED DEPOSITION
                      - of -
12          CHRISTOPHER S. MORRIS, M.D.
13
14
15       taken on behalf of the Plaintiffs on Tuesday,
         July 25, 2017, at the Courtyard by Marriott,
16       25 Cherry Street, Burlington, Vermont,
         commencing at 9:08 AM.
17
18
19
20       VIDEO TECHNICIAN:  DEVYN MULHOLLAND
21      COURT REPORTER:  JOHANNA MASSÉ, RMR, CRR
22
23
24
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    you met with Mr. Rogers on -- here in Burlington,

 2    Vermont, for four hours?

 3         A.   Yes.

 4         Q.   And between July 18 and July 24, did you

 5    review any additional materials?

 6         A.   A few depositions.  Several.

 7         Q.   And did you review anything else?

 8         A.   No.

 9         Q.   So the total number of time that you spent

10    preparing for the class action/MDL litigation from May

11    18, 2017, to July 19, 2017, was a total of -- subtotal

12    of 41 hours in that time period?

13         A.   Well, just the MDL, yes.

14         Q.   And then for the Lisa -- for the expert review

15    of the Lisa Hyde case, you spent another 32 hours?

16         A.   Yes.

17         Q.   Okay.  And then for the expert review of the

18    Carol Kruse case, you spent another 35.5 hours; is that

19    correct?

20         A.   Correct.

21         Q.   So in the two-month time period, you spent a

22    total of 108.5 hours at $500 an hour --

23         A.   Yes.

24         Q.   -- is that correct?
```

Do Not Disclose - Subject to Further Confidentiality Review

```
1              So you were paid $54,250 --

2       A.   Yes.

3       Q.   -- for that period of time?

4       A.   Yes.

5       Q.   Then going back in time before that, from

6   February 25 to -- '17, to May 8, '17, that invoice is

7   on Exhibit No. 983; is that correct?

8       A.   Yes.

9       Q.   Okay.  And then that is -- refers to which

10  case?

11      A.   This would have been beginning with the class

12  action and then continuing on into the MDL report.

13      Q.   Okay.  And so there were -- where it's

14  referred to as "Expert Report revision" on February 25,

15  2017; February 26, 2017; March 4, 2017; March 5, 2017,

16  that all has to do with the -- with which report?

17      A.   That would have -- those early ones would have

18  been the class action.  At that point I didn't even

19  know there was an MDL action, so --

20      Q.   And then -- okay.  And then there's references

21  to your conversations with both Mr. Rogers and Brandee

22  Kowalzyk; is that correct?

23      A.   Yes.

24      Q.   And you -- and they were working on the class
```

Do Not Disclose - Subject to Further Confidentiality Review

1    action, correct?

2        A.   As well as the MDL eventually.

3        Q.   Okay.  And then the Trerotola deposition

4    review, Venbrux deposition review, Lynch deposition

5    review were all the depositions that were taken around

6    that time; is that correct?

7        A.   I think they were earlier, but I honestly

8    don't remember if they were part of the class action or

9    the MDL, to tell you the truth.

10       Q.   Okay.  And then you reviewed the rebuttal

11   reports of Drs. Vogelzang, Eisenberg, and Hertz?

12       A.   I'm looking to see where you're --

13       Q.   Okay.  I'm still on -- on Exhibit 983.

14            MR. ROGERS:  It's 4/15/17, Chris.

15       Q.   Right.  And I'm referring to --

16       A.   Oh, 4 -- okay.  Yes.

17       Q.   Yes.  April 15, 2017.  You had a call with

18   Mr. Rogers on April 13, 2017, for an hour.  Then you

19   looked at those three reports.  Then you had another

20   call with him the next day -- or, rather, a week later,

21   April 26, 2017, correct?

22       A.   Yes.

23       Q.   Then you met with him on May 2, 2017; you had

24   another call with him on May 5, 2017; and then met with

Do Not Disclose - Subject to Further Confidentiality Review

```
 1   him again on May 8, 2017.

 2       A.   Yes.

 3       Q.   Okay.  On May 8, 2017, you also met with

 4   Philip Busman and Jim Rogers in Boston.  Who's Philip

 5   Busman?

 6       A.   He -- I know he's also with Nelson Mullins, so

 7   he's a lawyer.

 8       Q.   And then on January 30, 2017, on the next page

 9   it refers to a "Medical record and image review of

10   Michael King."

11       A.   Yeah.

12       Q.   And that has nothing to do with the MDL?

13       A.   Right.  That's an error.  That should not be

14   there.

15       Q.   And then on February 1st, 2017, there's a

16   telephone call with Dennis Hom, Kate Helm, and Jim

17   Rogers.  Does that have to do with the class action?

18       A.   No.

19       Q.   Okay.  So that's also an error?

20       A.   That's an error, yeah.

21       Q.   And that should not be there?

22       A.   Right.

23            MR. ROGERS:  And just for the record, Wendy,

24   that -- I didn't realize that was on there, but that's
```

Do Not Disclose - Subject to Further Confidentiality Review

1    also a consultation that we probably should have

2    redacted out of here.

3              MS. FLEISHMAN:  Okay.

4              MR. ROGERS:  So --

5              MS. FLEISHMAN:  So let's agree to cull out

6    that reference.

7              MR. ROGERS:  That's fine.  I just don't want

8    to waive anything by sitting here like a bump on a log.

9              MS. FLEISHMAN:  No, no.  That's fine.  We'll

10   just -- we'll just -- when we -- when we take a break,

11   let's just take that page off of that exhibit.

12             MR. ROGERS:  Sounds great.  Thank you.

13             MS. FLEISHMAN:  Okay?

14        Q.   With respect to the -- Exhibit 982, is that --

15   that is an invoice from November 17, 2016, to February

16   21, 2017?

17        A.   Yes.

18        Q.   Okay.  And those are reviews of different

19   medical records of different individuals; is that

20   correct?

21        A.   Correct.

22        Q.   And -- and also reviews of certain deposition,

23   right?

24        A.   Some of the plaintiffs, yes.

Do Not Disclose - Subject to Further Confidentiality Review

```
 1      Q.   And in addition to that, there are some

 2  imaging reviews?

 3      A.   Yes.

 4      Q.   And then you say "Generation of initial draft

 5  individual Expert Reports on class representatives:

 6  Washington, Tomlin, Holt, Meeks, Barraza, Lester,

 7  Messner, Peck, Mosher, Flournay, and Mims."

 8      A.   Correct.

 9      Q.   Okay.  And that was 20 hours?

10      A.   Yes.

11      Q.   And did you draft those reports?

12      A.   Yes, I did.

13      Q.   During that time period?

14      A.   Yes.

15      Q.   And then you say "Generation of initial draft

16  overall Expert Report."  Do you refer -- does that mean

17  the MDL report?

18      A.   No.  That's the original class action general

19  report.

20      Q.   Okay.  And then you also then reference

21  another meeting with Nelson Mullins lawyers Jim Rogers

22  and Brandee Kowalzyk.

23      A.   Yes.

24      Q.   And then you again revise -- okay.  So you met
```

Do Not Disclose - Subject to Further Confidentiality Review

 1    them on January 10, 2017, and then a week later you

 2    revised the reports.

 3         A.   Yes.

 4         Q.   And then again the next -- so January 21, '17,

 5    and 22, '17, you spent another nine hours revising

 6    those reports?

 7         A.   Yes.

 8         Q.   Okay.  Then you reviewed Dr. Stavropoulos'

 9    deposition --

10         A.   Yes.

11         Q.   -- at that point?

12              And then after reviewing that deposition, did

13    you add anything to the reports?

14         A.   Not based on his deposition, no.

15         Q.   And then you met again with the Nelson Mullins

16    lawyers for six hours on February 14?

17         A.   Yes.

18         Q.   And then you reviewed the depositions of Drs.

19    Hertz, Dr. Bates, and Dr. Eisenberg; is that right?

20         A.   Yes.

21         Q.   So you spent two and a half hours looking at

22    Dr. Hertz's deposition?

23         A.   Yes.

24         Q.   You only spent half an hour looking at Dr.

Do Not Disclose - Subject to Further Confidentiality Review

1    Bates'?

2         A.   It was very short.

3         Q.   And then four hours looking at Dr. Eisenberg's

4    deposition?

5         A.   That was a little more thorough, and I had to

6    read that a little more carefully.

7         Q.   And then you made revisions to your overall

8    expert report.  Was that the -- that was the second

9    report?

10        A.   Yes.

11        Q.   Okay.  And then you had a conference call

12   again, I assume, with Nelson Mullins.  It just says

13   "Conference call 2/23/17" for an hour and a half.  Do

14   you know who that call was with?

15        A.   Can I change my last answer?  I think that was

16   still the class action report when I revised it on 2/18

17   and 2/19.

18        Q.   So you spent nine hours on 2/18 and 2/19

19   revising that report, and then you spent -- did second

20   revisions of the 11 draft class individual

21   representative reports also on February 19 for another

22   hour --

23        A.   Yes.

24        Q.   -- is that right?

Do Not Disclose - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   And then you had a call with someone on

 3   February 23rd, '17.

 4      A.   Right.

 5      Q.   And do you know who that call was with?

 6      A.   It would have been with Jim Rogers, but I

 7   don't -- I don't know why I omitted putting his name in

 8   there, but all my calls have been with Jim.  Yes.  So

 9   that would have had to have been Jim Rogers.

10      Q.   And how do you keep your time?  Do you just

11   write it down and then save it --

12      A.   Yeah.  I keep it on paper.  I have -- and then

13   any event that I do, I just write down exactly how many

14   hours it took me to do that, and so it's a paper

15   recording.

16      Q.   And then you provide it to Nelson Mullins and

17   they typed it?

18      A.   In an invoice periodically.

19           MR. ROGERS:  No.

20      A.   No.  I typed -- I typed these invoices up.

21      Q.   Oh.  Oh, okay.  So then when you created this

22   list of materials, this -- this list of materials

23   reflects the medical records that you reviewed during

24   that period?
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   And --

 3           MR. ROGERS:  Here's the official one.

 4           THE WITNESS:  Okay.

 5           MR. ROGERS:  Chris, hand me those.  I'm just

 6   trying to keep all these in order.  Thanks.

 7      Q.   The deposition list at page 12 --

 8      A.   Okay.

 9      Q.   -- does not -- is not the same as your

10   invoice.

11      A.   I didn't read all those depositions.

12      Q.   Okay.  So there's -- but, like, on page -- on

13   Exhibit No. 982, right --

14           MR. ROGERS:  Hang on.  Let me fish it out.

15      Q.   Okay.  It's the -- it's the invoice 11/17/2016

16   to February 21, 2017.

17           MR. ROGERS:  Here you go.

18           THE WITNESS:  Okay.

19      Q.   Right?  So there's a "Medical record review

20   Diane Washington" and then there's a "Deposition review

21   Diane Washington" for three and a half hours.

22      A.   Yes.

23      Q.   But Diane Washington's deposition's not

24   referenced in your deposition list on page 12 of
```

Do Not Disclose - Subject to Further Confidentiality Review

1    Exhibit 980.

2         A.    These are all experts, of course.  I don't

3    know if she's -- I don't know if her deposition's in --

4              MR. ROGERS:  Yeah.  It's on page 1.

5              THE WITNESS:  Page 1.

6              MR. ROGERS:  And, Wendy, those aren't

7    specifically identified as depositions, but where it

8    says "Case Specific Materials" Plaintiff, Maria

9    Barraza, et cetera, those are the depositions.

10             MS. FLEISHMAN:  Okay.

11        Q.    So where it says "Case Specific Materials,"

12   these are the list of depositions that you reviewed for

13   these plaintiffs; is that --

14        A.    I'd have to go through my invoice to make sure

15   each one of those had a deposition, but if that -- if

16   they match up, then yes, I read those depositions.

17        Q.    Okay.  So when you have "Case Specific

18   Materials," what is intended to be included in the

19   case-specific materials in that section of the

20   materials reviewed?

21        A.    I think primarily depositions.  There was also

22   the original complaint.  I read that.  And then the

23   second amended class action complaint.  I briefly

24   perused the discovery responses.  I don't think I

Do Not Disclose - Subject to Further Confidentiality Review

1    really spent much time on the responses.

2        Q.   And then you reviewed the medical records --

3    the medical records and radiology imaging are set forth

4    starting at page 1 and go on through page -- up to the

5    end of page 11; is that right?

6        A.   Yes.

7        Q.   Okay.  So those are the imaging records and

8    the medical records; is that right?

9        A.   Correct.

10       Q.   And then you also have medical records

11   summaries.

12       A.   Yes.

13       Q.   Okay.  Those are not referred to in either

14   list; is that correct?

15       A.   Those may be case-specific materials as well,

16   because each patient had a summary that was taken

17   verbatim from the medical records, so I used that as a

18   study guide, and I -- I would classify that as

19   case-specific materials for each patient -- for each

20   plaintiff.

21       Q.   Okay.  And you brought those with you today?

22       A.   No.

23            MR. ROGERS:  Yeah.  They're here.

24            THE WITNESS:  Oh, on thumb drive?

1          MS. FLEISHMAN:  They're here?

2          MR. ROGERS:  Yeah.

3          THE WITNESS:  I'm sorry.

4          MR. ROGERS:  Yeah.

5          MS. FLEISHMAN:  Okay.  So let's mark those, if

6    that's okay.

7          MR. ROGERS:  Okay.  I don't know where they

8    are.

9          MS. FLEISHMAN:  All right.  Let's take a short

10   break and just find them, please.

11         THE VIDEOGRAPHER:  The time is 10:13 AM.

12   We're off the record.

13         (A recess was taken.)

14         (Deposition Exhibit No. 985 was

15          marked for identification.)

16         THE VIDEOGRAPHER:  We're back on the record at

17   10:23 AM.

18   BY MS. FLEISHMAN:

19     Q.  Doctor, we've marked as Exhibit --

20         MR. ROTMAN:  Cronin.  Cronin.

21         MS. FLEISHMAN:  I'm sorry?

22         MR. ROGERS:  Sorry.  Steve was going to be

23   driven crazy until he thought of something, and I know

24   how that feels.

Do Not Disclose - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   What level of certainty did you apply to your

 3   opinions?

 4           MR. ROGERS:  Object to the form.

 5           You can respond.

 6      A.   I don't know really how to answer that

 7   question.  I think that's more of a legal term, as far

 8   as I can tell, but I approached this litigation the

 9   same way I practice interventional radiology on a daily

10   basis.  I always seek the truth, number one.  I use

11   many factors to help render my opinions.  That includes

12   first and foremost my personal experience, which I

13   consider large.  I also review the medical literature,

14   the pertinent medical literature, of which there's not

15   a lot of Level I or Level II evidence related to IVC

16   filters, unfortunately, and I'm -- I'm part of that

17   problem.  I've contributed to the Level III and below

18   evidence as well.

19           But I still use the literature to help me

20   make -- make these decisions.  I attend national

21   meetings, talk with colleagues, participate in journal

22   clubs, and honestly rely a lot on the FDA to -- to help

23   make these decisions as well.  So there are lots of

24   different factors that go into it.
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1        Q.   Right.  So --

 2        A.   My -- I approach the litigation using the

 3   same -- same methodology, essentially.  So I would say

 4   a high level of certainty.

 5        Q.   Right.  So I understand your answer was mostly

 6   about your methodology, your approach, what things

 7   you -- how you approach reaching a decision, and I'm --

 8   and I think the last part of your answer where you said

 9   "so I would say a high level of certainty," that's

10   really what I was getting after with my question is

11   what level of certainty, and you said a high level of

12   certainty.

13           So my question follow-up on that is, Did

14   you --

15        A.   I was going to say the reason I said all those

16   is because if I just relied on a hunch or what my

17   pulmonology colleague told -- told me that had never

18   placed a filter in his life, that methodology would

19   lead me to have less of a high level of certainty.

20        Q.   Of course.

21        A.   I might have a low -- so that's why I had to

22   give you the background on how I know that I reached a

23   high level of certainty in my opinions.

24        Q.   Yes.  And so if you were to put a numerical
```

Do Not Disclose - Subject to Further Confidentiality Review

1    quantification to "high level of certainty," would it

2    be -- what would it be, approximately?

3            MR. ROGERS:  Object -- object to the form.

4       A.   That is a very difficult question to answer,

5    quant- --

6       Q.   You're getting paid $500 an hour to answer

7    hard questions.

8       A.   Well, yeah.

9            MR. ROGERS:  Object to the form.  That's not

10   the definition --

11           MR. ROTMAN:  I'll strike that.

12           MR. ROGERS:  -- of what makes a question

13   acceptable.

14           MR. ROTMAN:  I'll strike that.  I'll strike

15   that.

16      Q.   Maybe you can't answer it.

17      A.   I mean, you know, the -- so --

18      Q.   What level of --

19      A.   -- I have to -- I have to answer that

20   difficult question with a difficult answer.  And, you

21   know, we were talking on a break a little while ago

22   about memory issues.  My -- my benchmark for 100

23   percent certain medical science, so to speak my

24   touchstone, is my brother, who I'm very close to, who's

Do Not Disclose - Subject to Further Confidentiality Review

```
 1   a top ten neuroscience researcher specializing in

 2   Alzheimer's and memory disorders, so I gauge that as

 3   being 100 percent certain.  He has $50 million in

 4   grants.  He's the quintessential medical scientist that

 5   relies on Level I and Level II evidence.  So when I

 6   compare his body of work, which I know -- which I've

 7   been following my entire life -- again, he's -- you

 8   know, he's very close to me and -- and I really respect

 9   his degree of scientific validity.  When I compare that

10   to the literature that's available regarding IVC

11   filters, there's basically no -- no comparison, so how

12   can I make 100 percent certain opinions based on

13   literature which is less than Level I or Level II

14   evidence?

15       Q.   Understood.  And -- and so nevertheless, you

16   have reached opinions --

17       A.   Yes, I --

18       Q.   -- and you had -- and in order to do that, you

19   had to reach a certain point based on your review of

20   the evidence where you had a high level of certainty;

21   that's what you testified.  And I'm trying to

22   understand how to understand what you mean by "high

23   level of certainty."  So, for example, I asked you for

24   a numerical and I don't -- and I didn't get an answer
```

Do Not Disclose - Subject to Further Confidentiality Review

1    to that.

2        A.    And I can't answer that.

3        Q.    And you can't answer that.

4        A.    Right.

5        Q.    So, you know, would -- would "high level" mean

6    more than 80 percent certain?

7              MR. ROGERS:  Object --

8        Q.    Let me -- let me suggest that as a starting

9    point.

10             MR. ROGERS:  Object to the form.  Asked and

11   answered.

12             You can respond.

13       A.    And your -- the question is related to all my

14   opinions?

15       Q.    Yeah.  Your opinions --

16       A.    Yeah.

17       Q.    -- in this case.

18       A.    I would say yes, I'm -- I'm more than a B -- B

19   student, so it would be more than 80 percent, yes.  I

20   generally score more than 90 percent.

21       Q.    So that's what you generally look for is more

22   than 90 percent certainty for your opinions in this

23   case?

24       A.    Generally speaking, yes.

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    literature, that a number of experts in the field based

 2    on their own studies of their own patient populations

 3    have concluded that the data shows that the -- the

 4    length of time that retrievable filters are implanted

 5    affects the complication of the retrieval and the

 6    likelihood of a complication; you've seen that, right?

 7         MR. ROGERS:  Object to the form.

 8    A.   I have seen that stated.  I agree with the

 9    first part.  I'm not convinced about the second part of

10    that.

11    Q.   You're not convinced using your level of

12    certainty standard of over 80 percent?

13         MR. ROGERS:  Object to the form.

14    A.   Because the literature does not support to a

15    high level of certainty that the complication rate

16    increases exponentially.  It may increase linearly, and

17    I think you're referring to exponentially, meaning that

18    every additional time frame, that rate of complication

19    increases, not just stays the same.

20         MR. ROTMAN:  Did I lose my monitor?

21         MR. LEWIS:  Oh, Wendy, can we pass that back?

22    This one right here.

23         MS. FLEISHMAN:  Oh, yes.  Sure.

24         MR. ROGERS:  Hey, Steve, not to interrupt, but
```

Do Not Disclose - Subject to Further Confidentiality Review

 1   we'll never know that they even have a fragment until

 2   someone tells them based on a chest x-ray or some kind

 3   of scan that they have a fragment there, and in my

 4   experience, all of a sudden those patients then do

 5   develop symptoms because now they know they have a

 6   fragment.

 7       Q.   But as we established before, asymptomatic

 8   fractures and migrations can become life-threatening

 9   events?

10       A.   Rarely.

11       Q.   Rarely.  In your opinion, rarely?

12       A.   I emphasize rarely.

13       Q.   Okay.  Now, I want to -- I want to talk about

14   how it could be that -- how it would present, this

15   scenario that you describe where the patient could die

16   from the -- from the needle in the heart, if you would,

17   causing tamponade and bleeding and that -- that series

18   of adverse events.

19           Let's assume a patient is at home with a Bard

20   retrievable filter that was implanted eight years ago

21   and -- this sequence of events in fact happened.  And

22   they're home, they're not in the hospital, they're not

23   in a doctor's office, and they wake up dead; in other

24   words, they -- this all happens and they die.  Okay?

Do Not Disclose - Subject to Further Confidentiality Review

```
 1        Q.   Right.  And you don't know as you sit here

 2   today whether that's happening all over the place every

 3   day or every week in this country and it's not being

 4   recognized but filter fractures are killing people and

 5   they're dying at home and nobody's connecting it to the

 6   filter?

 7            MR. ROGERS:  Object to -- object to the form

 8   and foundation.

 9            You can respond.

10        Q.   Did you just laugh?

11        A.   Well, I'm trying to think of the scenario.  I

12   mean, that -- people die from many different reasons.

13   That's, like, a negative question you're asking me, so

14   how can I prove a negative if there's no evidence on a

15   negative?

16        Q.   You can just answer my question, which was,

17   You don't know as you sit here today whether this is

18   happening frequently and not being detected?

19        A.   I don't know that --

20            MR. ROGERS:  Object to the form.

21        Q.   Right?

22        A.   I don't know that it is; I don't know that it

23   isn't.

24        Q.   Right.  And so you cannot say to a reasonable
```

Do Not Disclose - Subject to Further Confidentiality Review

1    degree of scientific certainty that this event is rare

2    unless you know the answer to the question of whether

3    it's recognized when it happens on a regular basis,

4    right?

5            MR. ROGERS:  Object to the form.

6        A.   It's speculation.

7        Q.   You don't know if it's rare or not, do you?

8            MR. ROGERS:  Object to the form.

9        A.   I -- that's really difficult to answer because

10   we know from some of these observational studies that

11   have filter fragments in their chest, the vast majority

12   of them are asymptomatic and they're not reporting

13   large numbers of deaths in their patient population,

14   so --

15       Q.   Now, in the middle paragraph of this Hull

16   paper, you see that in addition to evaluating

17   whether -- the condition of the filter, they were

18   looking at these fractured filter parts under a

19   scanning electron microscope, right?

20       A.   Yes.

21       Q.   And they did so and they made a determination

22   that it looked like to them bending fatigue fractures,

23   right?

24       A.   That's what they say, yes.

Do Not Disclose - Subject to Further Confidentiality Review

1    certainty you have regarding an opinion?

2        A.   No.

3        Q.   And did you have difficulty doing that?

4        A.   Yeah.  That was a little bit difficult for me

5    to answer.  I have -- I have testified as an expert

6    witness previously, and I was asked sort of a similar

7    question, and the term was "more likely than not," so I

8    always -- I always thought that that was, you know, 90

9    plus percent or greater, and it turns out by legal

10   definition that's 51 percent versus 49 percent, so

11   that's something I learned at that time, but I think

12   that's the only other time I've encountered a question

13   like that.

14       Q.   So you're familiar with that medical-legal

15   concept of opinion needing to be stated to a reasonable

16   degree of medical certainty?

17       A.   Yes.

18       Q.   And is that what you were talking about that

19   you're interpreting as being more than 50 percent?

20       A.   Yeah.  51 percent.

21       Q.   And so are all the opinions that you stated in

22   your report and in your deposition in this case, are

23   those all held to a reasonable degree of medical

24   certainty?

# EXHIBIT 3
## (Filed Under Seal)

# EXHIBIT 4

Do Not Disclose - Subject to Further Confidentiality Review

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

No. MD-15-02641-PHX-DGC

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN RE BARD IVC FILTERS PRODUCTS

LIABILITY LITIGATION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


DO NOT DISCLOSE

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW



VIDEOTAPED DEPOSITION OF CLEMENT J. GRASSI, MD


Thursday, June 15, 2017

9:24 a.m.


Held At:

Nelson Mullins Riley & Scarborough LLP

One Post Office Square

Boston, Massachusetts


REPORTED BY:

Maureen O'Connor Pollard, RMR, CLR, CSR

Do Not Disclose - Subject to Further Confidentiality Review

Page 51

1      and I have to try to think back over years of

2      working with them, I have not retrieved a Bard

3      recent device where I've seen a fracture, no.

4                   THE VIDEOGRAPHER:  Dr. Grassi, I'm

5      getting some noise from the wire.

6                   THE WITNESS:  Sorry about that.  Is

7      that better?

8                   THE VIDEOGRAPHER:  That's great.  It's

9      just if you --

10                  THE WITNESS:  Thank you.  Thanks for

11     letting me know.

12     BY MR. ROTMAN:

13          Q.   Have you ever implanted a Bard

14     Recovery filter?

15          A.   In the past, no, I don't believe I've

16     used the Recovery personally.

17          Q.   Have you ever implanted a Bard G2

18     filter?

19          A.   Yes.

20          Q.   How many?

21          A.   I would have to only estimate.  I

22     would say ten to a dozen.

23          Q.   And have you ever retrieved a Bard

24     Recovery filter?

Do Not Disclose - Subject to Further Confidentiality Review

Page 52

1          A.   Yes.  And perhaps one-third of the
2     previous number?
3          Q.   So the number would be what?
4          A.   Say three to four filters, from
5     memory.
6          Q.   So you've retrieved about three
7     Recoveries in your career?
8          A.   Again, this would be based on memory
9     from years back.
10          Q.   You've implanted no Recoveries, and
11     retrieved approximately three, from your memory,
12     from years back, correct?
13          A.   Well, I think you asked the question
14     of me, if I'm correct, about G2 filters, is that
15     true?
16          Q.   Let's just make it clear since there's
17     some confusion.  Let's just talk about Recovery
18     for now.
19          A.   Okay.
20          Q.   You've never implanted a Recovery
21     filter, correct?
22          A.   From memory, I don't remember
23     Recovery.  And I don't remember having retrieved
24     a Recovery.

Do Not Disclose - Subject to Further Confidentiality Review

Page 53

1          Q.   Okay.  So now let's go to the G2.

2               Have you implanted a G2; and if so,

3     how many?

4          A.   Yes.  And again, it would be by memory

5     an estimate.  A dozen or more.

6          Q.   And how many have you retrieved, if

7     any?

8          A.   By memory, four filters or more.

9          Q.   And have you seen any fractures in any

10    of the patients where you've either implanted or

11    retrieved a G2?

12               MR. BROWN:  Object to the form.  Asked

13    and answered.

14         A.   I believe I answered that question.

15    From memory, I don't remember having seen that.

16    BY MR. ROTMAN:

17         Q.   And I understand you've never seen a

18    fracture of a Bard Recovery filter in your own

19    patients -- sorry.  Strike that.

20               You have seen Recovery fractures from

21    patients of other physicians in your hospital?

22         A.   Well, of colleagues in general.

23         Q.   Colleagues.

24               How many?

Do Not Disclose - Subject to Further Confidentiality Review

Page 54

1         A.    From memory, over the years, I can say

2    that perhaps one or two cases were shown as

3    examples by colleagues.

4         Q.    Other than fracture, do you consider

5    tilt to be a complication?

6         A.    I consider tilt to be one aspect of

7    many types of vena cava filters.

8         Q.    I'm asking if you consider a tilt of

9    any filter to be a complication.

10        A.    I do not consider it to be a

11   complication unless there is an adverse event

12   with symptoms or signs in that particular

13   patient.

14        Q.    And do you consider a perforation to

15   be a complication of an IVC filter?

16        A.    A perforation, if it is of a moderate

17   to severe nature, and where there are either

18   adverse symptoms or signs in that patient would

19   be considered a complication.

20        Q.    So if there's no symptoms or signs in

21   conjunction with a moderate to severe

22   perforation, you do not consider that to be a

23   complication of the filter?

24        A.    I would say that specifically and in

Do Not Disclose - Subject to Further Confidentiality Review

1    the literature, penetration that is 3

2    millimeters or less is usually defined as

3    different from perforation greater than 3

4    millimeters.  So that if there were to be, for

5    example, a moderate perforation but the patient

6    had no adverse events, had no symptoms, we could

7    say that that was an image-identified

8    complication, but was not, obviously, a

9    symptomatic complication for that patient

10   because they had no adverse outcome.

11        Q.   But you would consider it to be a

12   complication of the device?

13             MR. BROWN:  Object to form.

14        A.   We could put it into that category,

15   yes.

16   BY MR. ROTMAN:

17        Q.   If it's a moderate to severe

18   perforation without symptoms?

19        A.   Correct, as compared to the more minor

20   degree of a penetration.

21        Q.   And have you ever seen a perforation

22   of a Bard recovery filter?

23        A.   I've seen them in cases, and displayed

24   at medical meetings, and talked about with

Do Not Disclose - Subject to Further Confidentiality Review

Page 56

1    colleagues.

2         Q.   How many perforations of Bard Recovery

3    filters have you seen?

4         A.   Overall in the whole group?

5         Q.   Bard Recovery.

6         A.   Yes, in your question, Counselor, so

7    that I can understand --

8         Q.   How many Bard Recovery filter

9    perforations have you seen?

10        A.   When you say when I've seen, I assume

11   you mean overall.  And I would say that at

12   scientific meetings, with colleagues, and just

13   from practice experience, I have had a chance to

14   see, that is see described, approximately five

15   to six perforations.

16        Q.   And how many in your own patients?

17        A.   In my own patients, I remember one.

18        Q.   So now we've got, I want to talk about

19   -- do you consider a tilt without symptoms to be

20   a complication of the device?

21        A.   I do not consider that to be a

22   complication because, as you know, tilt can be

23   shown both in Bard devices and in other IVC

24   filters, and may be of no clinical significance

Do Not Disclose - Subject to Further Confidentiality Review

Page 57

1    for the patient.

2         Q.   Well, that same explanation would

3    apply to a fracture, correct?

4         A.   It would if the fracture were

5    identified by imaging alone, and the patient had

6    no signs and no symptoms.

7         Q.   So if you -- you would not consider

8    that to be a complication of the device?

9              MR. BROWN:  Object to the form.

10        A.   To be fair to your question, I would

11   consider that to be a complication which has

12   been identified by imaging.

13   BY MR. ROTMAN:

14        Q.   Yes.

15             And so, have you ever seen a Bard

16   Recovery tilt complication?

17             MR. BROWN:  Object to the form.

18        A.   I have seen Bard Recovery filter

19   tilting, yes.

20   BY MR. ROTMAN:

21        Q.   How many times?

22        A.   I would estimate approximately three

23   times.

24        Q.   Have you ever implanted a Bard G2X?

Do Not Disclose - Subject to Further Confidentiality Review

Page 58

1          A.   To be fair to your question, I would

2     actually have to look back to records, because I

3     don't hold that in memory, whether the

4     particular filter was a G2X or a G2.  And I

5     would say that I really can't give you, to be

6     fair, I can't give you an accurate answer to

7     that question at this moment.

8          Q.   Have you ever retrieved a G2X?

9          A.   Really, the same answer to that.

10         Q.   Have you ever implanted a Bard

11    Eclipse?

12         A.   Yes.

13         Q.   How many?

14         A.   For that filter, which is a more

15    modern device, I would estimate 50 or more.

16         Q.   About how many filters do you implant

17    in a given year?

18         A.   The number of filters will vary per

19    year, as it does per month.  For myself, it

20    might be between 30 and 40 devices in a year,

21    depending on the particular year.

22         Q.   And that would be all filters, all

23    manufacturers combined?

24         A.   That's correct, all types.

Do Not Disclose - Subject to Further Confidentiality Review

Page 59

1        Q.   Do you know what period of time the
2   Eclipse was on the market?
3        A.   The Eclipse was on the market in the
4   period around 2008 to 2009, and I could not give
5   you an exact date range.
6        Q.   Do you know what period of time, you
7   know, whether it was a year or two years,
8   three years, that the Eclipse was on the market?
9        A.   Well, the Eclipse was not on the
10   market, as I understand it, for a long period of
11   time because there was the next iteration, the
12   Meridian, that was introduced by Bard, and that
13   filter was the device that we had subsequently
14   used.
15        Q.   So the answer to my question is?  Was
16   it one years, two years, three years, do you
17   know?
18        A.   For the Eclipse?
19        Q.   Yes.
20        A.   My impression from memory is that the
21   Eclipse was in clinical use between a year and
22   two years, as an estimate.
23        Q.   In that one to two years where you
24   would have implanted 30 to 40 filters of all

Do Not Disclose - Subject to Further Confidentiality Review

Page 60

1      manufacturer types per year, you implanted 50 or

2      more Eclipse devices?

3              MR. BROWN:  Object to the form.

4         A.   I'm sorry, I don't understand your

5      question.

6              MR. ROTMAN:  Could you reread it,

7      please?

8              (Whereupon, the reporter read back the

9      pending question.)

10             MR. BROWN:  Same objection.

11        A.   Well, I think that we're having a

12     misunderstanding on the wording of the question.

13     So when you had asked me how many Eclipse

14     devices have you implanted, I gave you from

15     memory an estimate number.  Okay.  And the exact

16     number, to be fair, I would have to go back and

17     check records.

18     BY MR. ROTMAN:

19        Q.   Your estimate was 50.  I didn't

20     misstate that, right?  That was what you

21     testified as your estimate, right?

22        A.   That was my approximation.

23        Q.   And how many Eclipses have you

24     retrieved?

Do Not Disclose - Subject to Further Confidentiality Review

Page 61

1          A.   Again, from memory as an

2     approximation, eight or more filters.

3          Q.   And have you ever had a patient with

4     an Eclipse complication?

5               MR. BROWN:  Object to the form.

6          A.   Personally, no.

7     BY MR. ROTMAN:

8          Q.   And have you ever implanted a

9     Meridian?

10         A.   By memory, and to the best of my

11    recollection, yes.

12         Q.   Approximately how many?

13         A.   Again, the exact number would be

14    something I would have to check records.  I

15    would say, as an estimate, 20 or more devices.

16         Q.   What records would you be able to

17    check to give you the information about the

18    number of Meridians that you've implanted?

19         A.   Well, that would be challenging,

20    because one would have to go back to either

21    medical records, specific patient records, or

22    perhaps even consult the company if there were a

23    product use invoice slip sent.

24         Q.   How many Meridians have you retrieved?

Do Not Disclose - Subject to Further Confidentiality Review

Page 62

1         A.    Again, as an estimate, six or more

2     devices.

3         Q.    And have you ever seen a Meridian

4     complication among your own patients?

5              MR. BROWN:  Object to the form.

6         A.    Personally, let's see, yes, I've seen

7     a case in which in my own patients there was not

8     a complication but there was, due to the

9     indication for use in the superior vena cava,

10    the arm processes not being in standard position

11    within the vena cava.

12    BY MR. ROTMAN:

13        Q.    Do you consider that to be a

14    complication of the device?

15             MR. BROWN:  Object to the form.

16        A.    No, simply because the patient had

17    severe embolus within the SVC, and was in a

18    state where she might have died within the next

19    two to four hours, and so the filter actually

20    was lifesaving.

21    BY MR. ROTMAN:

22        Q.    Have you ever implanted a Denali?

23        A.    Yes.

24        Q.    How many?

Do Not Disclose - Subject to Further Confidentiality Review

Page 63

1          A.    Again, as an estimate, 50 or more

2     devices.

3          Q.    And have you ever retrieved a Denali?

4          A.    Yes.  And I would say the estimate

5     there would be six or more devices.

6          Q.    And have you ever seen a Denali

7     complication?

8               MR. BROWN:  Object to the form.

9          A.    Personally, no.

10    BY MR. ROTMAN:

11         Q.    Have you ever conducted a study of the

12    patients in any of the hospitals where you

13    worked to assess the complications in IVC

14    retrievable filters in those patient

15    populations?

16         A.    I've participated in studies with IVC

17    permanent filters, but not retrievable ones.

18         Q.    And have you ever proposed a study of

19    retrievable filters in any of the hospitals in

20    which you have been a staff radiologist to

21    assess the status of the filters implanted in

22    the patients in that institution?

23              MR. BROWN:  Object to the form.

24         A.    By the question, study, you're

Do Not Disclose - Subject to Further Confidentiality Review

Page 91

1     mentioned as compared to there being only one
2     that must explain all fractures?
3          A.   My own personal opinion is that I have
4     not yet encountered an explanation which has
5     weight of evidence behind it.  Whether it is
6     connected with one factor or multifactorial, I
7     really can't say.  What I can say is it's my
8     opinion that there has not been a mechanism
9     which has yet been proven by the persons who
10    have advanced it.
11         Q.   When you say "proven," what level of
12    certainty does it take in your -- according to
13    your own standards that you're applying here to
14    say something is proven?
15              MR. BROWN:  Object to the form.
16         A.   That's a difficult question, only
17    because proof varies scientifically.  For
18    example, we could go back to some of Koch's
19    postulates -- that's spelled K-O-C-H -- in
20    which, medically speaking, if you have an
21    offending agent, the methodology is to identify
22    the offending agent, show that it causes a
23    problem in the human, then take the offending
24    agent and reintroduce it into the human and

Do Not Disclose - Subject to Further Confidentiality Review

1          A.    I would say that the one that would

2     fit for me --

3               MR. BROWN:   Just object to the form.

4               You can answer.

5          A.    The one that would fit for me would --

6     in consideration of the fact that this involves

7     many patients, many devices which have already

8     been implanted, and the protection against a

9     very fearful disease, that is pulmonary embolus,

10    that I would look for evidence where I felt

11    certain beyond any reasonable doubt.

12    BY MR. ROTMAN:

13         Q.    And is that the kind of evidence that

14    you're applying for your opinions in this case?

15         A.    Overall, yes.

16         Q.    And on the issue of explanations for

17    why the Bard retrievable filters fracture, are

18    you aware of what steps Bard has taken to answer

19    that question?

20         A.    Yes, I know that Bard has improved,

21    honed, and refined its various newer devices as

22    time has progressed.

23         Q.    But I'm asking a different question.

24    I'm asking, what has Bard done to figure out why

Do Not Disclose - Subject to Further Confidentiality Review

Page 128

1    and observe that there was a fracture.  They

2    observed a trend, but there's no way of knowing

3    when the fracture occurred, and if in that

4    particular patient the fracture occurred on day

5    two after it was implanted, or if it occurred on

6    the day before the filter was removed when they

7    observed it.

8           So my own opinion is that further work

9    has to be done on this particular subject before

10   I'm convinced of that direct relationship.

11       Q.   And again, you're using the word

12   "convinced."  Yes?

13       A.   Yes.

14       Q.   And this opinion of yours that more

15   work needs to be done, you have not done that

16   work yourself, have you?

17       A.   No, I have not done it personally.

18       Q.   You have not done any studies to

19   evaluate whether the risk of complications

20   increases with the increased duration of a

21   filter being implanted, a Bard retrievable

22   filter being implanted in a patient?

23       A.   No, I haven't performed those specific

24   research studies.