James R. Condo (#005867)
Amanda C. Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2204
Telephone: (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

*Attorneys for Defendants*
*C. R. Bard, Inc. and*
*Bard Peripheral Vascular, Inc.*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation | No. 2:15-MD-02641-DGC |
| | **DECLARATION OF ROBERT CARR IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING PREEMPTION** |
| | (Assigned to the Honorable David G. Campbell) |

I, Robert Carr, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge and belief:

1.    I am over 18 years of age and am competent to testify about the matters contained herein. The statements contained herein are based on my personal knowledge and upon the basis of the documents maintained by Defendants C. R. Bard, Inc. and Bard

1    Peripheral Vascular, Inc. (collectively, "Bard") in the regular course of business.

2        2.    I am presently employed as the Vice President of International at Bard

3    Peripheral Vascular, Inc. ("BPV") a subsidiary of C. R. Bard, Inc. ("C. R. Bard"). Until

4    October 2015, I was Senior Director of Research and Development at BPV. Bard

5    manufactures and distributes inferior vena cava ("IVC") filters and has manufactured and

6    distributed the Recovery® Filter, G2® Filter, G2® Express Filter, G2®X Filter, Eclipse®

7    Filter, Meridian® Filter, and Denali® Filter (collectively, "Bard IVC Filters"), each of

8    which is a medical device cleared by the Food and Drug Administration ("FDA")

9    indicated for treatment of blood flow problems posing the risk of pulmonary embolism.

10   Before joining BPV in 2002, I was employed by Nitinol Medical Technologies ("NMT"),

11   where I was also responsible for that company's research and development of IVC filters.

12       3.    As part of and during the course of my work with Bard and NMT, I have

13   become familiar with documentation and records associated with the design, development,

14   manufacture, regulatory compliance, and testing (including clinical testing) of the Bard

15   IVC Filters.

16   a.   The documentation and records include, for example, 510(k) submissions, IDE

17        submissions, and other materials sent to FDA, as well as contact reports and email

18        communications with FDA, that detail Bard's product development and regulatory

19        compliance activities of Bard's IVC Filters.

20   b.   The documentation and records also include internal documents prepared by the

21        FDA, a public federal agency. These records or statements of a public office detail

22        the agency's investigation and regulatory review activities of Bard's regulatory

23        compliance and product development activities concerning Bard's IVC Filters.

24        These internal records were produced by the FDA pursuant to the Freedom of

25        Information Act.

26       4.    As part of and during the course of my work with Bard, I have become

27   familiar with Bard's record-keeping procedures. I have personal knowledge of the roles

28   and responsibilities of Bard's employees responsible for this record-keeping process. The

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1    business documents referenced herein were prepared and maintained in the ordinary

2    course of Bard's business and it was the regular practice of Bard to make such records.

3    These documents were prepared at or near the time of the events they record by persons

4    with knowledge of the recorded events, or from information transmitted by persons with

5    knowledge of the recorded events. This declaration is based upon my personal knowledge

6    and review of certain business records prepared and maintained in the ordinary course of

7    business of Bard and of certain public records that set out FDA's regulatory activities

8    concerning Bard's IVC Filters. I could and would competently testify to the matters set

9    forth herein if called as a witness in this matter.

10   **I.      The FDA Regulatory Clearance Process**

11          1.      FDA is the federal agency responsible for regulating the manufacture, sale,

12   and distribution of medical devices, such as Bard's IVC filters. FDA derives its authority

13   from the Food, Drug and Cosmetic Act ("FDCA"), as amended by the Medical Device

14   Amendments of 1976 ("MDA"). As part of and during the course of my work with Bard

15   and NMT, I have become familiar with the provisions of the FDCA and of the FDA's

16   implementing regulations, particularly to the extent that they concern Bard's IVC Filters.

17          2.      The MDA established three classes of medical devices with different

18   regulatory controls: Class I, II, and III. FDA classifies Bard's IVC Filters as Class II

19   devices, which are subject to the general controls under the MDA and the specific special

20   controls for IVC Filters found in 21 C.F.R. § 870.3375. This FDA regulation required

21   Bard to comply with the following in each IVC Filter 510(k) submission: ISO 10993

22   Biological Evaluation of Medical Devices Part I: Evaluation and Testing; FDA's 510(k)

23   Sterility Review Guidance and Revision of 2/12/90 (K90-1); and FDA's Guidance for

24   Cardiovascular Intravascular Filter 510(k) Submissions (November 26, 1999).

25          3.      Class II devices, such as Bard's IVC Filters, are required to obtain FDA

26   clearance through the 510(k) premarket notification process before the device can be

27   marketed. FDA will clear a 510(k) device only after it finds that the device is

28   "substantially equivalent" to a "predicate" device. A device is deemed substantially

- 3 -

equivalent if FDA determines that the subject device has the same intended use and the same technological characteristics as the predicate device. If the device has the same intended use but different technological characteristics, then FDA will only clear the device if those new technological characteristics do not raise different questions of safety and effectiveness and the manufacturer provides data that demonstrates that the new device is as safe and effective as the predicate device.

4.      During FDA's review of a 510(k) submission, FDA has the authority to require additional information from the manufacturer if FDA deems it necessary to determine substantial equivalence under 21 C.F.R. § 807.87(l), including clinical data. 21 U.S.C. § 360c(i)(1)(A)(ii). If the device manufacturer does not comply, then the submission is deemed withdrawn under 21 C.F.R. § 807.87(l). If FDA determines that the device is substantially equivalent, then it will issue a letter clearing the device to be marketed.

## II.      **Recovery® Filter:**

### A.      **Recovery Filter for Permanent Indication (K022236)**

5.      On November 1, 1999, prior to Bard's acquisition of NMT's line of filter products, NMT submitted a Special 510(k) seeking clearance for the Recovery Filter System.[1] This filter modified NMT's previously cleared predicate device, the Simon Nitinol Filter/Straight Line System. NMT sought FDA clearance for an expanded indication allowing retrieval of the filter if it was misplaced or malpositioned.

6.      On December 10, 1999, the FDA sent a letter to NMT, stating that the Special 510(k) submission had "major deficiencies," in that clinical data would be required to determine whether the new device was substantially equivalent to the predicate devices.[2] The FDA therefore considered NMT's submission withdrawn and deleted from the FDA system.

7.      On February 10, 2000, NMT and FDA met to discuss the need for a clinical

[1] *See* BPV-17-01-00069501 through 69604, attached hereto as Exhibit 1.

[2] *See* BPV-17-01-00069470 through 69471, attached hereto as Exhibit 2.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

trial, but no decision was reached.[3] FDA reaffirmed that "clinical data would be required to support a future 510k submission during a February 29, 2000 telephone conference.[4] FDA required clinical data before it would clear a retrievability indication because the FDA was concerned about possible acute complications, including acute migration, fracture, occlusion, and cava puncture.[5] Before Bard acquired NMT's entire IVC filter line of products in 2001, a clinical study was underway for the Recovery Filter by Dr. Murray Asch in Toronto, Canada on behalf of NMT and Bard.

8.    On July 10, 2002, IMPRA, a subsidiary of Bard, submitted its Special 510(k) for the Recovery Filter for a permanent indication only.[6]

a. IMPRA's Recovery® 510(k) submission submitted a battery of *in vitro* testing BPV (and NMT) had conducted on the Recovery® Filter, including clot trapping efficiency, migration, weld integrity, hook strength, corrosion/fatigue testing, radial strength, simulated use, and more.[7]

b. BPV's bench testing was performed in conformance with the FDA guidance document: "Guidance for Cardiovascular Intravascular Filter 510(k) Submission."[8]

c. BPV's design verification for the modifications and the manufacturing facility for the Recovery® filter conformed to the design control requirements of 21 CFR § 820.30.[9]

d. The Recovery® 510(k) submission included the proposed labeling for the Recovery® Filter in conformance with 21 CFR § 807.87(e).[10]

e. The Recovery® 510(k) submission also included a summary of the safety and

---

[3] *See* BPV-17-01-00058907 through 58930, attached hereto as Exhibit 3.

[4] *See* BPV-17-01-00058895, attached hereto as Exhibit 4.

[5] *See* BPV-17-01-00051623 through 51624, attached hereto as Exhibit 5.

[6] *See* BPV-17-01-00057953 through 58037, attached hereto as Exhibit 6.

[7] *See* Ex. 6 at BPV-17-01-00057972 through 57980.

[8] *See* Ex. 6 at BPV-17-01-00057970, 58035.

[9] *See* Ex. 6 at BPV-17-01-00058031 through 58032.

[10] *See* Ex. 6 at BPV-17-01-00057998 through 58015.

- 5 -

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

effectiveness information upon which a substantial equivalence determination could be based as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92.[11]

f.  The Recovery® 510(k) submission further included clinical data from the Dr. Murray Asch clinical study conducted in Toronto to support the determination of substantial equivalence as a permanent filter.[12]

9.  On August 5, 2002, the FDA sent IMPRA a letter requiring additional information to complete the review of IMPRA's submission.[13] The FDA prohibited IMPRA from marketing its Recovery® filter until it had provided the additional information under 21 CFR § 807.87(l).  If IMPRA failed to respond within 30 days, the FDA would have treated this 510(k) submission as withdrawn. The FDA's August 5, 2002 letter required responses to 17 agency-posed questions regarding clinical testing, bench performance testing, biocompatibility, and administrative elements. Among other things, the FDA asked questions about IMPRA's root cause analysis of filter tilting, and whether tilting of the Recovery® Filter affected its safety and effectiveness. The FDA also sought information regarding issues such as integrity inspections of the filter and fatigue testing of its welds and hooks.

10.  On August 12, 2002, IMPRA and the FDA held a teleconference to discuss the FDA's demand for additional information.[14]

11.  On August 30, 2002, IMPRA provided the FDA with the required additional information.[15] IMPRA answered each question/request in order, including additional data or explanation as needed, as well as test results and other supporting materials. In particular, IMPRA responded to the FDA's safety and effectiveness concerns about root

---

[11] See Ex. 6 at BPV-17-01-00058033 through 58035.

[12] See Ex. 6 at BPV-17-01-00057981 through 57986, 58018 through 58029.

[13] See BPV-17-01-00057926 through 57930, attached hereto as Exhibit 7.

[14] See BPV-17-01-00059159 through 59193, attached hereto as Exhibit 8.

[15] See BPV-17-01-00057755 through 57917, attached hereto as Exhibit 9.

1    cause analysis of the Recovery® Filter tilting and IMPRA's clinical experience with such

2    tilting.

3        12.    On October 1, 2002 and October 3, 2002, IMPRA and the FDA held

4    additional teleconferences to discuss the additional information required by the FDA.[16]

5        a.  IMPRA provided the FDA with further clarification about its responses.

6        13.    On October 4, 2002, the FDA sent IMPRA a second letter requiring still

7    more information.[17] The FDA again prohibited IMPRA from marketing its Recovery®

8    filter until it had provided the additional information under 21 CFR § 807.87(l).   If

9    IMPRA failed to respond within 30 days, the FDA would have treated this 510(k)

10   submission as withdrawn.

    a.  The FDA required justification for IMPRA having not tested the filter's efficacy in

12           REDACTED     , and required IMPRA to provide "objective and

13       quantifiable data" to demonstrate that the device design was sufficiently similar to

14       the filters tested in the literature (Question 1).

15       b.  The FDA also required IMPRA to detail its radial strength testing and its

16       compliance with the caval perforation/filter migration testing requirement of the

17       Guidance for Cardiovascular Intravascular Filter 510(k) Submissions (Question 2).

18       c.  The FDA further required IMPRA to revise the filter's instructions for use ("IFU")

19       and labeling to state that the Recovery® Filter was indicated for permanent

20       placement only (Question 3).

21       14.    On October 25, 2002, IMPRA responded to the FDA's October 4, 2002

22   demand by providing the required additional information.[18]

23       a.  In response to FDA's demand (Question 1), IMPRA justified not separately testing

24       for 2-4mm clot trapping ability by comparing the design of the Recovery® Filter to

25       five equivalent filters already tested in the literature, as determined by comparative

---

[16] *See* BPV-17-01-00057740 through 57742, attached hereto as Exhibit 10.

[17] *See* Ex. 10.

[18] *See* BPV-17-01-00057722 through 57728, attached hereto as Exhibit 11.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

dimensional measurements.

   b.  In response to FDA's demand (Question 2), IMPRA provided an in-depth explanation of compliance with the requirements of FDA's Guidance for Cardiovascular Intravascular Filter 510(k) Submissions concerning radial strength and caval perforation/filter migration testing.

   c.  In response to FDA's demand (Question 3), IMPRA included the required revisions to the Recovery® Filter's indication statement in the IFU and labeling.

   15.   On November 27, 2002, the FDA cleared the Recovery® Filter, finding it as safe and effective as, and therefore substantially equivalent to, the predicate device for permanent indication, subject to the general controls and special controls of the FDCA.[19] The FDA had reviewed all of the data originally submitted by IMPRA, and the two sets of additional information the FDA had required by letter.

   a.  Because the FDA determined there was a reasonable likelihood that this device would be used off-label for a retrievable indication, and that such use could cause harm, the FDA limited the substantial equivalence finding and, pursuant to 21 U.S.C. § 360c(i)(1)(E), required IMPRA to include specific language in the Recovery® Filter's labeling and promotional materials stating: "The safety and effectiveness of the Recovery Filter for use as a retrievable or temporary filter have not been established."

**B.    Recovery® Filter for Percutaneous Retrieval (K031328)**

   16.   In November 2002 and December 2002, responsibility for Bard's filter line of products shifted to another division of Bard, moving from IMPRA to BPV. IMPRA had no further involvement.

   17.   On December 17, 2002, BPV sent the FDA a letter requesting a meeting with the FDA to propose changes to BPV's labeling and IFU for the Recovery® Filter.[20] BPV requested this meeting in preparation for its 510(k) filing for the Recovery® Filter to

---

[19] *See* BPV-17-01-00057709 through 57711, attached hereto as Exhibit 12.

[20] *See* BPV-17-01-00062069 through 62070, attached hereto as Exhibit 13.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

remove the FDA-imposed labeling limitation regarding percutaneous retrieval. BPV attached numerous materials to the letter in advance of the meeting, including proposed labeling and IFU amendments, results of animal testing, results of Dr. Asch's clinical study, and other materials.

18.    On January 14, 2003, BPV and the FDA met to discuss BPV's proposed changes and the materials submitted with BPV's December 17, 2002 letter.[21]

   a.  The FDA reviewed the *in-vivo* animal testing and the clinical testing of the Recovery® Filter and raised questions regarding the animal histology and whether additional clinical data was available, which BPV agreed to address (Question 1).

   b.  The FDA also reviewed the IFU and labeling and raised questions regarding the proposed amendments. The FDA stated that BPV's proposed precaution statement about thrombus should be raised to a warning and included in the warning section, which BPV agreed to address in the 510(k) (Question 2).

   c.  The FDA stated that the IFU should be revised to include removal techniques developed during BPV's *in-vivo* animal and clinical testing, which BPV agreed to address in the 510(k) (Question 2).

19.    On January 31, 2003, BPV and the FDA had a follow-up telephone conference.[22] The FDA stated that BPV "had supplied good supportive information that provided the agency with an appropriate level of comfort." During the telephone conference, the FDA raised additional concerns regarding, among other things, the proposed labeling. The FDA required that specific language be added to the Indication section providing that the Recovery® Filter could be removed only within a specified time period after insertion. BPV agreed to draft proposed language for FDA's review. The FDA also required that the precaution statement about thrombus not only be elevated to a warning but also be bolded and italicized, which BPV agreed to address in the 510(k).

20.    Between March 14 and March 21, 2003, BPV and the FDA exchanged

[21] *See* BPV-17-01-00054947 through 55252, attached hereto as Exhibit 14, at p. 286-88.
[22] *See* Ex. 14 at p. 282-85.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough

L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

emails about the proposed changes to the labeling of the Recovery® Filter.[23] The FDA reviewer stated that "it is likely that the label will need revision regarding the time to removal" and should specify a time for removal of the filter.[24] BPV emailed revised proposed labeling for FDA review, but the FDA responded that the proposed labeling regarding the retrieval time would probably be decided at a higher level, and that BPV should submit its 510(k) application based on the FDA's input to date. The FDA assured BPV that it would "work on revisions during the review process."

21.    On April 25, 2003, BPV submitted an Abbreviated 510(k) for percutaneous retrieval of the Recovery® Filter in order to remove the labeling restriction and add specific instructions for removal of the Recovery® Filter.[25] The proposed changes amended the indications, labeling, and IFU. BPV did not propose any design changes, and its 510(k) emphasized that the proposed changes did not change the original intended use of the cleared Recovery Filter.

a.  The 510(k) submission included and was supported by full results of BPV's animal study and the Asch clinical study that BPV previously shared with the FDA, as well as by testing materials from those studies. *See* Ex. 14 at p. 16-26, 45-275.

b.  The 510(k) also included proposed amendments to the labeling and IFU in conformance with 21 CFR § 807.87(e), which included the changes that the FDA required during its previous correspondence with BPV. *See* Ex. 14 at p. 12-14, 34-43.

c.  The submission also included a summary of the safety and effectiveness information upon which a substantial equivalence determination could be based as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92. *See* Ex. 14 at p. 29-30.

22.    On July 1, 2003, the FDA sent BPV an email requiring that BPV include a

---

[23] *See* Ex. 14 at p. 277-81.
[24] *See* Ex. 14 at p. 279-90.
[25] *See* Ex. 14.

"clinical experience" section in the Recovery® Filter IFU discussing the clinical results from the Asch study.[26] The FDA assured BPV that it would "provide comment" on the drafted language.

23.     On July 2, 2003, the FDA sent BPV an email demanding clarification regarding whether the testing reported in the Recovery® Filter 510(k) submission involved sterilized samples.[27] The FDA also inquired as to whether the tests were performed after aging. Later that same day, BPV responded to the FDA that shelf life testing was done on the devices in the submission, and FDA requested this shelf life data.

24.     On July 8, 2003, BPV faxed all of the required information to the FDA, including the stability protocols, stability test reports, stability product adoption/rationale, and accelerated aging protocols.[28]

25.     On July 22, 2003, an internal FDA memorandum extensively reviewed the animal testing submitted with BPV's Recovery® Filter 510(k).[29] The FDA stated that BPV "has provided the clarification and additional descriptions suggested at that [January 14, 2003] meeting by providing the pathology reports and figures of the histology and postmortem tissues with legends." The FDA concluded that "Overall, the studies support the proposed indication and use. Definitely easy to remove in sheep."

26.     On July 23, 2003, BPV received a follow-up email with the FDA's amended language regarding the required "clinical experience" section of the IFU.[30] The FDA further directed BPV to "add a warning in the labeling about the potential for recurrent pulmonary embolism if a device other than a Recovery Cone is used" and provided recommended language. Later that day, BPV accepted the FDA's language and revised the Recovery® Filter IFU to incorporate the FDA's requirements. BPV sent the FDA a

---

[26] *See* BPV-17-01-00054093, attached hereto as Exhibit 15.

[27] *See* FDA_PRODUCTION_00001288 through 1291, attached hereto as Exhibit 16.

[28] *See* BPV-17-01-00054002 through 54076, attached hereto as Exhibit 17.

[29] *See* FDA_PRODUCTION_00001209 through 1215, attached hereto as Exhibit 18.

[30] *See* BPV-17-01-00054098 through 54101, attached hereto as Exhibit 19.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

letter with copies of its revised IFU.[31]

27.    On July 24, 2003, the FDA sent BPV a follow-up email directing BPV to "format the Recovery Cone label such that the warnings and precautions appear before the clinical experience section."[32] BPV complied and sent the FDA updated copies of its IFU.[33]

28.    On July 25, 2003, the FDA reviewer prepared her file summary and recommendation after reviewing the *in-vitro*, *in-vivo* animal, and clinical testing, as well as all other "items requested during pre-submission meetings" that were submitted with the Recovery® 510(k) that "substantiate the temporary indication and removal of the" filter.[34] The FDA reviewer recommended that "the device can be cleared for market for retrieval, with the modified labeling submitted electronically on 7/23/03 (to be submitted officially)."

29.    On July 25, 2003, the FDA cleared the Recovery® Filter to be marketed for retrievable indication, subject to the general controls and special controls of the FDCA, after finding it substantially equivalent to the predicate device.[35]

## C.    Follow-Up Correspondence Regarding the "Dear Doctor Letter" and IFU Changes for Recovery Filter for Percutaneous Retrieval (K031328)

30.    On September 17, 2004, BPV contacted the local FDA investigator in Phoenix regarding BPV's intent to send out a "Dear Doctor" letter ("DDL") and to make certain changes to the IFU for the Recovery® Filter.[36] BPV intended to revise the IFU to include warnings about fracture and migration. The DDL was intended to inform doctors of BPV's changes to the filter's IFU. Although the local FDA investigator did not determine whether the DDL was necessary, BPV notified him as a "heads-up" regarding

---

[31] *See* BPV-17-01-00054109 through 54110, attached hereto as Exhibit 20.

[32] *See* Ex. 19.

[33] *See* BPV-17-01-00054127 through 54139, attached hereto as Exhibit 21.

[34] *See* FDA_PRODUCTION_00001201 through 1208, attached hereto as Exhibit 22.

[35] *See* BPV-17-01-00058122 through 58124, attached hereto as Exhibit 23.

[36] *See* BPV-17-01-00097745 through 97746 attached hereto as Exhibit 24.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

- 12 -

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1   BPV's plans.

2       31.    On September 28, 2004, BPV and the FDA had a conversation regarding

3   BPV's proposed DDL and the revised IFU.[37] FDA stated that it was aware of the potential

4   fracture and migration issues associated with filters and was not particularly alarmed.

5   FDA decided that "to be on the safe side," BPV should send the DDL to the agency. BPV

6   and the FDA agreed that BPV should send the FDA a packet of information, including the

7   proposed DDL, a red-lined IFU, and an analysis of complaint numbers, estimated rates,

8   and literature rates regarding fracture and migration. BPV would submit this information

9   as a supplement to the Recovery® Filter 510(k) to enable the FDA to make a decision

10  regarding whether BPV would need to file a new 510(k).

11      32.    On October 5, 2004, BPV sent a letter to the FDA with the information

12  discussed in the September 28, 2004 meeting, including new proposed labeling, a red-

13  lined version of the previous IFU, a copy of its proposed DDL, and a chart of possible and

14  reported adverse events associated with the RNF.[38] BPV did not propose any changes to

15  the design of the filter or delivery system, and it emphasized that the proposed changes

16  did not change the original intended use, indications, or contraindications of the cleared

17  Recovery® Filter.

18      33.    During this time period, Bard and the FDA actively discussed the safety and

19  efficacy of the Recovery Filter. Internal FDA emails describe members of FDA

20  independently reviewing the clinical performance of the Recovery® Filter. On Oct. 6,

21  2004, FDA personnel noted "detail analyses on the MDRs related to Bard Recovery vena

22  cava filter."[39]

23      34.    The FDA determined that Bard's proposal to issue a "Dear Doctor Letter"

24  and to revise the IFU for the Recovery® Filter were appropriate. On November 10, 2004,

---

[37] *See* BPV-17-01-00097730 through 97733, attached hereto as Exhibit 25.

[38] *See* BPV-17-01-00058083 through 58120, attached hereto as Exhibit 26.

[39] *See* FDA_PRODUCTION_00001022 through 1027, attached hereto as Exhibit 27.

FDA noted that the FDA "agreed that Bard's proposal appears to be adequate."[40]

35.     On November 24, 2004, the FDA emailed BPV to notify it to expect an official FDA response approving the proposed DDL and IFU changes and determining that BPV would not need to file a new 510(k).[41] The FDA did require BPV to incorporate specific FDA revisions to the proposed labeling and DDL.

36.     On November 28, 2004, BPV began revising its IFU and DDL to incorporate the FDA-mandated changes, in order to send the DDL as soon as possible.[42]

37.     On November 30, 2004, BPV received the FDA's formal letter determining that the proposed changes were not significant under 21 CFR 807.81(a)(3), and that BPV would not need to file a new 510(k).[43] The letter confirmed the FDA's emailed instructions requiring BPV to incorporate agency-specified language into BPV's proposed DDL and revisions to the IFU. The FDA letter also stated that, if adverse event monitoring indicated continuing improper use of the Recovery® Filter, the FDA may order additional measures.

38.     BPV began distributing the DDL in December, 2004.[44] After a phone conversation with the FDA on January 10, 2005, BPV faxed the FDA copies of its current IFU and as-mailed version of the DDL.[45]

39.     On January 21, 2005, the FDA and BPV had a telephone conference to discuss the revised IFU and as-mailed DDL, with BPV assuring the FDA that both were being distributed.[46]

a. BPV also sought FDA prior review of another planned update, a BPV Dear Colleague Letter ("DCL") to customers concerning the Recovery® Filter's

---

[40] See Ex. 27.

[41] See BPV-17-01-00029512 through 29516, attached hereto as Exhibit 28.

[42] See BPV-17-01-00102072 through 102075, attached hereto as Exhibit 29.

[43] See BPV-17-01-00058079 through 58081, attached hereto as Exhibit 30.

[44] See BPV-17-01-00043383 through 43402, attached hereto as Exhibit 31.

[45] See BPV-17-01-00043382 through 43402, attached hereto as Exhibit 32.

[46] See BPV-17-01-00097135 through 97137, attached hereto as Exhibit 33.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1    performance in bariatric patients.

2    b.  BPV and the FDA also discussed BPV's plan to create a clinical registry to further

3        evaluate the safety and effectiveness of the Recovery® filter in patients, as well as

4        a formal survey of current Recovery® Filter users, and a formal survey of

5        specialists treating bariatric patients.

6    c.  The FDA reiterated that it was "very pleased with the scientific approach [BPV

7        was] taking to better understand the risk/benefit of the Recovery Filter in bariatric

8        patients," and was "very interested in hearing about the outcomes of [BPV's]

9        planned surveys, expert panel meeting, and clinical registry."

10   d.  In response to BPV's inquiry, the FDA indicated it had no concerns with BPV's

11       approach, and appreciated that BPV was being proactive in its communications

12       with both the FDA and its customers.

13   40.    The day after the telephone conference, BPV emailed the FDA, per the

14   FDA's request: (1) a draft of the proposed DCL, (2) a formal survey of current

15   Recovery® Filter users, and (3) a formal survey of specialists treating bariatric patients.[47]

16   41.    On January 27, 2005, BPV contacted the FDA's local investigator in

17   Phoenix to communicate the same information.[48] The contact report quotes the FDA

18   investigator as saying, "I am so impressed with the ethical approach BPV is taking with

19   this product."

20   42.    On February 4, 2005, BPV contacted the FDA again to discuss the DCL.[49]

21   The DCL was intended to inform customers of BPV's internal analysis of reported

22   adverse events related to the Recovery® Filter, particularly those events associated with

23   bariatric patients.

24   43.    On February 8, 2005, the FDA sent a letter to BPV requesting information

[47] *See* BPVE-01-00303306 through 303318, attached hereto as Exhibit 34.
[48] *See* BPV-17-01-00098579 through 98582, attached hereto as Exhibit 35.
[49] *See* BPV-17-01-00000208 through 209, attached hereto as Exhibit 36.

- 15 -

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

so the FDA could evaluate medical device reports that had been reported to the FDA.[50] BPV followed up with a telephone conference.[51] BPV further discussed the DCL letter with the FDA. The FDA advised that "it is a very good idea to send this type of letter and [the agency] appreciates the BPV being so proactive." Also on February 8, 2005, BPV faxed the FDA responses to FDA questions regarding the dissemination of the DDL.[52]

44.     BPV and the FDA had another telephone conference on February 14, 2005.[53] The conference discussed: (1) the recent bariatric surgeons panel meeting in New Orleans, (2) whether BPV was planning further device modifications, and (3) the FDA's February 8, 2005 request for information. The FDA stated that it required additional information regarding the total number of Recovery Filters sold in the U.S. to identify trends of adverse events experienced by retrievable filters generally. The FDA specified the format for submitting this information.

45.     On February 28, 2005, BPV responded by letter to the FDA's February 8, 2005 requests and provided the additional information required by the FDA.[54] BPV sent the FDA an update to its October 5, 2004 chart regarding possible and reported adverse events associated with the Recovery® Filter and copies of the filter's labeling and marketing materials.

46.     On February 28, 2005, BPV and the FDA had a telephone conference.[55]

a. They discussed the DCL, the New Orleans panel meeting, and the two surveys

b. The FDA required BPV to forward for agency review: (1) the final draft of the DCL, (2) a summary of the panel meeting, and (3) summaries of the two surveys.

c. BPV and the FDA also discussed BPV's plan to make additional modifications via a Special 510(k) and arranged a meeting on March 21 to review BPV's data for the

---

[50] See BPV-17-01-00058077, attached hereto as Exhibit 37.

[51] See BPV-17-01-00000210 through 211, attached hereto as Exhibit 38.

[52] See BPV-17-01-00043415 through 43416, attached hereto as Exhibit 39.

[53] See BPV-17-01-00025340 through 25342, attached hereto as Exhibit 40.

[54] See BPV-17-01-00058041 through 58074, attached hereto as Exhibit 41.

[55] See BPV-17-01-00045869 through 45871, attached hereto as Exhibit 42.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Special 510(k).

   d. The FDA thanked BPV "for being so forthright with information" and "said the other removable filter manufacturers have been less than cooperative in sharing information."

   e. BPV assured FDA that BPV "would continue to cooperate, as Bard is deeply committed to patient safety and to obtaining a better understanding of the risk/benefit of the Recovery filter in morbidly obese patients."

## III.   G2® Filter System:

### A.   G2® Filter System (K050558)

47.   On March 2, 2005, BPV submitted a Special 510(k) application for a modified Recovery® Filter (to be called the G2® Filter). The application, made significant dimensional modifications to the predicate device, the Recovery® Filter, but incorporated no material changes or additional components.[56] Included in the 510(k) submission were:

   a. Results from acute *in vivo* animal testing BPV conducted to evaluate the modified delivery system. *See* Ex. 43, at p.28-30.

   b. Results from 21 *in-vitro* bench tests BPV conducted on the modified Recovery® Filter, those being REDACTED

REDACTED

*See* Ex. 43 at p. 22-27.

---

[56] *See* BPV-17-01-00125335 through 125415, attached hereto as Exhibit 43.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

i. BPV performed all testing in conformance with the FDA guidance document: "Guidance for Cardiovascular Intravascular Filter 510(k) Submission." *See* Ex. 43 at p. 20.

ii. BPV conducted a risk analysis, a Risk Assessment and Design Failure Modes and Effects Analysis ("DFMEA") for the device, in accordance with ISO 14971:2000, Medical Devices – Application of risk management to medical devices and BS EN 1441:1998, Medical Devices-Risk Analysis, to assure that risks posed by the design were acceptable. REDACTED REDACTED *See* Ex. 43 at p. 19.

iii. The design verification and validation were performed in conformance with

1. FDA Special Controls guidance document, "Guidance for Cardiovascular Intravascular Filter 510(k) Submission,"

2. BS EN 12006-3:1999 entitled, "Non-Active Surgical Implants – Particular Requirements for Cardiac and Vascular Implants – Part 3: Endovascular Devices,"

3. FDA guidance document, Design Control Guidance for Medical Device Manufacturers, dated March 11, 1997, and

4. The design control requirements under 21 CFR § 820.30. *See* Ex. 43 at p. 20-21, 64.

c. Proposed labeling for the modified Recovery® Filter in conformance with 21 CFR § 807.87(e). *See* Ex. 43 at p. 32-47.

d. A summary of safety and effectiveness information upon which a substantial equivalence determination could be based, as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92. *See* Ex. 43 at p. 59-62.

48.    On March 24, 2005, BPV and the FDA met to discuss FDA questions regarding BPV's Special 510(k) submission, the bariatric surgeon panel meeting, and the proposed DCL.[57] The FDA had no comments on BPV's DCL – "it looks good, but since

[57] *See* BPV-17-01-00097998 through 98003, attached hereto as Exhibit 44.

- 18 -

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

this is not an official [i.e. regulated] action the content is up to you and we don't give approval/disapproval. We appreciate you sharing it with us, though." The FDA warned that it might require a pre-market proof of concept 50 patient study before clearing the new device, but would evaluate the sufficiency of the information BPV had provided.

49.     An FDA internal memorandum circulated on March 29, 2005 reviewed BPV's Special 510(k) and concluded, "While these changes may have resulted in less of a chance of migration of the device, they may have resulted in more problems with retrieval of the device, especially after the healing process takes place. An unlimited time to retrieval may no longer be appropriate."[58] The FDA reviewer recommended that FDA require BPV to "conduct a small 'proof of concept' study to determine if there should be a maximum implant period, or if the current label with no such limitation is still appropriate."

50.     On March 30, 2005, the FDA responded to BPV's Special 510(k) by requiring additional information.[59] The FDA prohibited BPV from marketing the device until it had provided the additional information under 21 CFR § 807.87(l). If BPV failed to respond within 30 days, the FDA would have treated this 510(k) submission as withdrawn.

a.  The FDA required the small pre-market "proof of concept" clinical study previously described to assess whether the current label for retrieval indication was still appropriate (Question 2).

b.  The FDA directed BPV to provide the histology assessment and representative slides from BPV's animal study conducted in conjunction with this submission, and comparative slides from the animal study of the predicate Recovery® Filter (Question 1).

c.  The FDA further requested BPV to add a boxed warning to the modified Recovery® Filter labeling with specified language regarding use in obese patients,

---

[58] *See* FDA_PRODUCTION_00000206 through 220, attached hereto as Exhibit 45.
[59] *See* BPV-17-01-00125312 through 125314, attached hereto as Exhibit 46.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

and a warning that central venous lines may cause displacement or fracture (Question 3).

    i. Specifically, FDA requested BPV to add a boxed warning at the beginning of the "Warnings" section that stated: "Warning: The safety and effectiveness of the Recovery Filter System in morbidly obese patients has not been established. There have been fatal device adverse events reported in this population."

51.    On April 19, 2005, BPV emailed FDA its informal draft responses to FDA's demand for additional information.[60]

a. In response to FDA's request for certain data (Question 1), BPV provided the pathology reports from the animal study for the predicate device as well as pathology reports and clinical evaluation for the subject device.

b. In response to FDA's demand for clinical data (Question 2), BPV provided a detailed justification for why *in vivo* animal testing was sufficient to demonstrate the safety and effectiveness of long-term retrievability of the G2 Filter, as the "animal studies are highly predictive of the [G2] Filter's performance in humans, specifically concerning long-term retrieval."

    i. BPV discussed the extensive *in-vivo* animal and human clinical studies conducted on the predicate device (the Recovery Filter) evaluating long-term retrievability, and compared it to the *in vivo* animal testing conducted on the subject G2 Filter, to support that the *in vivo* testing would be predictive of clinical experience.

c. In response to FDA's request for a boxed warning that stated "The safety and effectiveness of the Recovery Filter System in morbidly obese patients has not been established" (Question 3), BPV responded that "The Indications for Use of all commercially available inferior vena cava (IVC) filters, including the Recovery

---

[60] *See* FDA_PRODUCTION_00000193 through 201, attached hereto as Exhibit 47.

Nelson Mullins Riley & Scarborough

L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Filter, do not specifically address the safety and effectiveness of the device in any one patient population."

   i. In response to FDA's request for a boxed warning in the "Warnings" section that stated "There have been fatal device-related adverse events reported in this [morbidly obese] population" (Question 3), BPV proposed to add the following alternative statement to the "Potential Complications" section of the labeling with the following similar language: "There have been reports of complications, including death, associated with the use of the Recovery Filter System in morbidly obese patients."

      1. BPV further responded that "Currently, there is a statement in the Recovery Filter IFU linking all of the potential complications to death. BPV continues to analyze available published literature on IVC filters and is conducting formal research to better understand the morbidly obese patient population. Physicians have indicated that there is a significant need to allow an IVC Filter to remain in place for an extended period of time (> 30 days) in certain high risk patient populations, including morbidly obese patients."

      2. BPV attached the proposed labeling to the email for FDA's review.

   ii. In response to FDA's request for a warning that central venous lines may cause the filters to move or fracture, BPV stated "there is no bench-top testing or clinical evidence that shows that the Recovery Filter is susceptible to fracture or movement due to the use of central venous lines."

   iii. "Additionally, there are no inherent design characteristics that would make the Recovery Filter likely to entrap the central venous lines, potentially leading to movement or fracture. There have been no reported complaints of guidewire and/or central venous line entrapment associated with the Recovery Filter."

52.    On April 27, 2005, BPV sent a letter to the FDA requesting a 30 day

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1   extension to formally respond to the FDA's questions of March 30, 2005.[61] The FDA

2   granted BPV's request on April 28, 2005.[62]

3        53.     On May 2, 2005, FDA circulated an internal memorandum reviewing the *in*

4   *vivo* animal testing and detailing that if a proof of concept human clinical study would be

5   required, the clinical protocol should incorporate certain considerations in study design.[63]

6        54.     On May 6, 2005, the FDA and BPV had a conference during which the FDA

7   again expressed its view that BPV was required to provide pre-market clinical data to

8   determine whether the device modifications might affect its long-term retrievability.[64]

9   The FDA would not approve BPV's proposed changes without this clinical data. The FDA

10   required evidence that dimensional modifications to improve migration and fracture

11   resistance would not adversely affect the long-term retrievability of the device. In

12   response to FDA's request for clinical data, BPV was prepared to submit an

13   Investigational Device Exemption ("IDE") clinical trial proposal to conduct the study

14   sought by the FDA. However, BPV still hoped to gain clearance of its Special 510(k) for a

15   more limited indication, an acute retrieval period of 3 to 4 weeks.

16        55.     On May 20-21, 2005, BPV began distributing the DCL.[65]

17        56.     On May 27, 2005, the FDA and BPV had another telephone conference.[66]

18   FDA informed BPV that it would not clear an indication for acute retrieval of 3 to 4

19   weeks without clinical data. The FDA determined that "all new and modified retrievable

20   filters will require clinical data to support a 510(k) determination of substantial

21   equivalence." The FDA stated that the most BPV could obtain from its Special 510(k) for

22   the modified Recovery® Filter would be a "substantial equivalence with limitations"

23   determination identical to the original Recovery Filter system's initial clearance as a

---

24   [61] *See* BPV-17-01-00125289, attached hereto as Exhibit 48.

25   [62] *See* BPV-17-01-00125288, attached hereto as Exhibit 49.

26   [63] *See* FDA_PRODUCTION_00000185 through 191, attached hereto as Exhibit 50.

27   [64] *See* BPV-17-01-00125422 through 125424, attached hereto as Exhibit 51.

   [65] *See* BPV-17-01-00100782 through 100784, attached hereto as Exhibit 52.

28   [66] *See* BPVE-01-00034167 through 34168, attached hereto as Exhibit 53.

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

permanent filter. "The limitations would require BPV to include a statement in the IFU indicating that the safety and effectiveness of the filter as a retrievable filter has not been established."

57.    On June 3, 2005, BPV formally responded to FDA's demand for additional information dated March 30, 2005, after conferring on multiple occasions with FDA about those demands.[67]

a.  BPV requested FDA to convert its Special 510(k) submission into a traditional 510(k) that sought clearance of the modified Recovery® Filter solely for permanent use.

b.  BPV's traditional 510(k) was essentially identical to the Special 510(k) submission with minor exceptions.

c.  The converted 510(k) made changes to the labeling and IFU to include the BPV's proposed alternative statement to FDA's request for a boxed warning concerning reports of complications, including death, associated with the Recovery Filter in morbidly obese patients, as well as the changes concerning the limitations language required by the FDA during the May 27, 2005 telephone conference.

d.  The 510(k) also provided protocols and reports for design verification/validation and *in-vivo* non clinical testing.

58.    On July 26, 2005, FDA circulated an internal memorandum reviewing BPV's draft informal responses dated April 19, 2005 to FDA's demand for additional information on March 30, 2005.[68]

a.  After reviewing BPV's response to FDA's demand for certain *in vivo data* (Question 1), the FDA reviewer recommended that FDA require BPV to provide additional data or scientific rationale for why the *in-vivo* animal data is applicable to the subject device when indicated for permanent placement.

b.  After reviewing BPV's response to FDA's demand for clinical data (Question 2),

---

[67] *See* BPV-17-01-00125416 through 125615, attached hereto as Exhibit 54.

[68] *See* FDA_PRODUCTION_00000179 through 183, attached hereto as Exhibit 55.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

the FDA reviewer stated that "Given that [BPV] is pursuing clearance of the subject device with an indication for permanent placement, this deficiency is no longer applicable."

    i.  "Historically, clinical data has not always been required for a clearance of a modified device with an indication for permanent placement if FDA believes that the device modifications can be adequately assess through *in vitro* and *in vivo* testing."

    ii.  BPV's "bench testing demonstrates that the device performs as good as or better than the predicate device; however, [BPV] has not provided data which demonstrates that the device modifications will not cause adverse reactions to the tissue when the device is permanently implanted in the IVC."

    iii.  BPV "should provide *in vivo* data which demonstrates that the proposed device modifications do not adversely affect the tissue of the IVC."

c.  After reviewing BPV's response to FDA's request for a boxed warning for morbidly obese patients (Question 3), the FDA reviewer stated that BPV's justification for not including a limitation statement regarding safety and effectiveness in morbidly obese patients, and BPV's proposed alternative labeling language in the "Potential Complications" section instead of the "Warnings" section, was "acceptable as it adequately captures the information known to date regarding the implantation of the Recovery Filter System in morbidly obese patients."

    i.  In response to BPV's response to FDA's demand for a warning for central venous lines causing filter migration or fracture (Question 3), the FDA reviewer discussed BPV's response with FDA colleagues "to determine what information FDA would like to see in the labeling. At this time, it is unclear what evidence led FDA to request the proposed language." Therefore, FDA found BPV's response "acceptable."

- 24 -

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

d.  The FDA reviewer "thoroughly reviewed" BPV's labeling but found that "while the labeling has been modified appropriately to reflect the use of the subject device as a permanent filter, the name of the device still implie[d] that it may be used off-label as a retrievable filter. This is especially true given that the currently marketed Recovery Filter System is indicated for device retrieval."

   i.  The FDA reviewer recommended that FDA require BPV to change the device name so that retrievability is not implied by the name. BPV should be further required to "remove all references to the device as the Recovery Filter System in the Instructions for Use, Indications for Use, 510(k) Summary and Package Labeling."

59.   On July 26, 2005, BPV and the FDA discussed BPV's submission for the modified Recovery® Filter (G2®) for permanent indication. [69] The FDA sought histopathology data from BPV's animal study, and BPV explained the data it had collected.

60.   On July 27, 2005, the FDA emailed a request for an electronic version of BPV's 510(k) submission.[70] BPV provided an electronic version, and stated that it would include electronic versions of all future submissions.

61.   On July 28, 2005, the FDA officially responded to BPV's traditional 510(k) submission for the modified Recovery® Filter and demanded additional information.[71] The FDA prohibited BPV from marketing the device until it had provided the additional information under 21 CFR § 807.87(l). If BPV failed to respond within 30 days, the FDA would have treated this 510(k) submission as withdrawn.

a.  The FDA questioned how the animal data included in the submission "provides an assurance of safety and effectiveness of the modified Recovery Filter as a permanent implant," and required BPV to provide additional *in vivo* data or a

---

[69] *See* BPVE-01-00034138, attached hereto as Exhibit 56.

[70] *See* BPVE-01-00157774 through 157777, attached hereto as Exhibit 57.

[71] *See* BPV-17-01-00125220 through 125222, attached hereto as Exhibit 58.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

scientific rationale for why the animal data is applicable to the permanent placement indication (Question 1).

b. The FDA also required BPV to change the name of the modified Recovery® Filter to reflect its permanent indication, because "Recovery" implied that it may be used off-label as a retrievable filter (Question 2).

62.     On the same day, BPV and the FDA had a telephone conversation to discuss the FDA's required additional information.[72] The FDA reaffirmed its requirement that BPV change the trade name of the Recovery® Filter to reflect the limited clearance BPV sought solely for permanent indication use. Eventually, BPV changed the name of the filter to G2®.

63.     On August 10, 2005, BPV provided the additional information that the FDA required on July 28, 2005.[73]

a. In response to FDA's demand (Question 1), BPV provided its scientific rationale for how the objectives of the *in-vivo* animal study relate to the permanent filter indication.

b. In response to FDA's demand (Question 2), BPV confirmed that the name of the Recovery Filter would be changed to G2, including in the Indications for Use, Instructions for Use, 510(k) Summary, and Package Labeling, which was provided for FDA review.

64.     On August 19, 2005, responding to another information demand from the FDA, BPV emailed the FDA a revised copy of its 510(k) summary.[74]

65.     On August 22, 2005, responding to another information demand from the FDA, BPV sent the FDA a revised copy of the G2® IFU, which included the alternate statement concerning use of the Recovery® Filter in morbidly obese patients, and

---

[72] *See* BPVE-01-00155254 through 155255, attached hereto as Exhibit 59.
[73] *See* BPV-17-01-00125616 through 125633, attached hereto as Exhibit 60.
[74] *See* BPVE-01-00155084 through 155088, attached hereto as Exhibit 61.

replaced "Recovery" with the new trade name "G2".[75]

66.     On August 23, 2005, FDA internally circulated a memorandum reviewing BPV's responses to FDA's demand for additional information on July 28, 2005.[76]

a. After reviewing BPV's response to FDA's demand for additional *in vivo* data (Question 1), the FDA reviewer stated that "BPV submitted an appropriate rationale for why the study conducted and previously reviewed by FDA is applicable to the filter when indicated for permanent placement."

   i. The FDA reviewer discussed BPV's rationale with FDA colleagues who corroborated that the data collected was applicable to the filter when indicated for permanent placement. FDA had no further questions on that subject.

b. After reviewing BPV's response to FDA's demand to change the trade name and remove all references to that name (Question 2), the FDA reviewer noted that BPV changed the name of the filter to the G2 Filter and removed all references to the former device name.

   i. The FDA reviewer required BPV to revise the labeling again to "move the following precaution statement "The safety and effectiveness of the G2 Filter System for use as a retrievable or temporary filter have not been established" to the beginning of the Precaution Section in bold font.

c. The FDA reviewer determined that BPV "adequately addressed" all of FDA's demands for additional information, and specific labeling and device name changes, and recommended that FDA clear the G2 Filter as substantially equivalent to the Recovery Filter with limitations.

67.     On August 26, 2005, BPV received a draft "substantial equivalence with limitations" letter from the FDA that required BPV to have "permanent placement of the G2 Filter System...prominently displayed in all labeling, pouch, box, and carton labels,

[75] *See* BPVE-01-00155392 through 155396, attached hereto as Exhibit 62.

[76] *See* FDA_PRODUCTION_00000165 through 168, attached hereto as Exhibit 63.

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

instructions for use, and other promotional materials, in close proximity to the trade name, of a similar point size and in bold print."[77] FDA requested BPV to review the language and provide written affirmation of BPV's acceptance of the FDA-mandated labeling. On that same day, BPV reviewed the specific limitations language and faxed to FDA written affirmation that BPV would revise its labeling to include the FDA-mandated specific language.[78]

68.     On August 29, 2005, BPV sent the FDA an email attaching copies of proposed revisions to the labeling and IFU for the G2® Filter that included language conspicuously stating the device had been cleared for permanent placement only, and again the alternative language regarding morbidly obese patients.[79] BPV thus sought clarification that the proposed labeling was sufficient to meet the FDA's requirements.

69.     On August 29, 2005, the FDA cleared the G2® Filter to be marketed for permanent placement, subject to FDCA general and special controls, after reviewing all of the data submitted by BPV, including the additional information and labeling changes required by the FDA, and after determining that the G2® Filter was as safe and effective as, and therefore substantially equivalent to, the Recovery® Filter for permanent indication.[80]

a. Because the FDA determined there was a reasonable likelihood that this device would be used off-label for a retrievable indication, and that such use could cause harm, the FDA limited the substantial equivalence finding, pursuant to 21 U.S.C. § 360c(i)(1)(E), and required BPV to include specific language in the G2® Filter System's labeling and promotional materials stating: "The safety and effectiveness of the G2 Filter System for use as a retrievable or temporary filter have not been established."

---

[77] *See* FDA_PRODUCTION_00000158 through 164, attached hereto as Exhibit 64.
[78] *See* FDA_PRODUCTION_00000150 through 157, attached hereto as Exhibit 65.
[79] *See* BPVE-01-00154718 through 154723, attached hereto as Exhibit 66.
[80] *See* BPV-17-01-00125199 through 125201, attached hereto as Exhibit 67.

- 28 -

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough

L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

## B.   The EVEREST Study (G050134)

70.   On June 3, 2005, BPV sent the FDA a proposed draft of the clinical protocol it planned to use for the clinical study required by the FDA to clear the G2® Filter for the retrievable indication, which was called the EVEREST study.[81] "The purpose of the study is to assess the safety of the removal of the [G2®] Filter."

71.   On July 8, 2005, BPV submitted an original IDE submission to the FDA for the EVEREST study.[82]

72.   On July 29, 2005, the FDA contacted BPV and indicated that the FDA "planned to disapprove the IDE due to the implication in the protocol and informed consent that the 510(k) was already cleared as a permanent filter."[83]

73.   On August 5, 2005, BPV and the FDA had a telephone conference to discuss some of the FDA's questions and concerns regarding the IDE submission.[84] After BPV assured the FDA that it was "committed to working with the FDA to reach a consensus on the protocol and informed consent," the FDA reconsidered the disapproval of the IDE and indicated that it would grant conditional approval, subject to BPV changing the protocol and informed consent.

74.   On August 8, 2005, the FDA granted BPV conditional approval of the IDE, subject to BPV correcting certain deficiencies identified by the FDA.[85] The FDA required BPV to change the study's informed consent form, change the study's protocol, provide clarification of the definition of migration, and change the manner in which study personnel were trained.

75.   On August 25, 2005, BPV and the FDA had a conference call to address the FDA's demands on August 8, 2005.[86] The FDA and BPV discussed the definition of

---

[81] See BPV-17-01-00125226 through 125285, attached hereto as Exhibit 68.

[82] See BPV-17-01-00122544 through 122829, attached hereto as Exhibit 69.

[83] See BPV-17-01-00098772 through 98774, attached hereto as Exhibit 70.

[84] See Ex. 72.

[85] See BPV-17-01-00122505 through 122508, attached hereto as Exhibit 71.

[86] See BPV-17-01-00122930 through 122932, attached hereto as Exhibit 72.

migration as used in the study. The FDA accepted BPV's proposal to maintain the definition of migration as movement of 2 cm or more.

76.     On October 3, 2005, BPV submitted its official response to the additional information required by the FDA on August 8, 2005, which included the required changes to the study's informed consent form, response justifying the study protocol, clarification of the definition of migration, and changes to the manner in which study personnel are trained.[87]

77.     On October 21, 2005, as evidenced in an internal BPV memorandum, the FDA indicated to BPV that the filter retrieval data from the EVEREST study could readily be used to support changing the indication for removal for both the femoral and jugular delivery systems, and therefore including the Jugular delivery system in the study was unnecessary.[88]

78.     On November 2, 2005, the FDA granted full approval of BPV's IDE application.[89]

79.     On December 2, 2005, BPV sent the FDA notice of IDE change.[90] The purpose of the notice was to inform the FDA of two typographical/clerical changes to the clinical protocol, which did "not affect the validity of the data or information resulting from the completion of the approved protocol, the relationship of likely patient risk to benefit relied upon to approve the protocol, the scientific soundness of the investigational plan, or the rights, safety, or welfare of the human subjects involved in the investigation."

80.     On June 21, 2006, BPV sent the FDA an IDE supplement with an updated list of investigators, pursuant to 21 C.F.R. § 812.150(b)(4).[91] Also on this date, BPV sent the FDA notification of an informed consent violation, pursuant to 21 C.F.R. §

[87] *See* BPV-17-01-00122845 through 122932, attached hereto as Exhibit 73.
[88] *See* BPVE-01-00275704, attached hereto as Exhibit 74.
[89] *See* BPV-17-01-00122502, attached hereto as Exhibit 75.
[90] *See* BPV-17-01-00123040 through 123067, attached hereto as Exhibit 76.
[91] *See* BPV-17-01-00123153 through 123175, attached hereto as Exhibit 77.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

- 30 -

812.150(b)(8), with all required information, pursuant 21 C.F.R. § 812.150(a)(5).[92] In response to these violations, BPV ceased enrollment at the single affected site and distributed a memorandum to all the clinical study sites and study monitors to remind them of their responsibilities regarding informed consent.

81.     On July 11, 2006, BPV sent an IDE supplement to the FDA, proposing to extend the study follow-up period from 6 months to 12 months and to increase the enrollment by up to 50 additional patients.[93] BPV indicated that it wanted to make these proposed changes so that it could obtain the necessary information for filing a future 510(k).

82.     On December 6, 2006, BPV sent a request to the FDA for an extension on the due date for its annual progress report as required by 21 C.F.R. § 812.150(b)(5).[94] BPV was anticipating that the first 30 filter retrievals would be completed by March 30, 2007, and it wanted to include data from those retrievals in its annual report.

83.     On December 8, 2006, BPV sent the FDA an IDE supplement with an updated list of investigators, pursuant to the requirements of 21 C.F.R. 812.150(b)(4).[95]

84.     On February 2, 2007, BPV sent the FDA its annual progress report, pursuant to the requirements of 21 C.F.R. 812.150(b)(5).[96] This report included extensive clinical data up to August 31, 2006, the date of the 30th retrieval of a filter, and noted that no unanticipated adverse events had been reported.

85.     On August 23, 2007, BPV sent the FDA another annual progress report, pursuant to the requirements of 21 C.F.R. 812.150(b)(5).[97] This report included extensive clinical data up to May 25, 2007, and again, no unanticipated adverse events had been reported.

---

[92] *See* BPV-17-01-00123183 through 123210, attached hereto as Exhibit 78.
[93] *See* BPV-17-01-00123071 through 123152, attached hereto as Exhibit 79.
[94] *See* BPV-17-01-00123217, attached hereto as Exhibit 80.
[95] *See* BPV-17-01-00123233 through 123249, attached hereto as Exhibit 81.
[96] *See* BPV-17-01-00123269 through 123351, attached hereto as Exhibit 82.
[97] *See* BPV-17-01-00123427 through 123474, attached hereto as Exhibit 83.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

86.   On September 21, 2007, the FDA reviewed the August 23, 2007 annual progress report and required BPV to provide additional information.[98] The FDA notified BPV of several requirements.

a. The FDA required BPV to provide additional detailed information regarding adverse events observed during the clinical study and reported in the progress report (Question 1).

b. The FDA required BPV to provide a detailed summary of the incidence of specific adverse events: caval injury or damage, caval occlusion, caval thrombosis, deep vein thrombosis, filter embolization, filter fracture, filter migration, IVC penetration, and pulmonary embolism (Question 2).

c. The FDA required BPV to provide an explanation of the incidence of filter migration experienced during the clinical study as well as provide a comparison of migration rates of the Recovery® and G2® Filters currently marketed (Question 3).

d. The FDA required BPV to report the cumulative number of follow-up visits conducted outside the study protocol and the number of patients who missed follow-up visits (Question 4).

e. The FDA required BPV to provide a comparison of the incidence of deployment related issues in the investigational G2® Filter as compared to the G2® Filter currently marketed with the modifications to the delivery system that FDA cleared on October 27, 2006 (Question 5).

f. The FDA required BPV to provide data regarding the appearance of the IVC on imaging studies after filter retrieval, as well as the implant duration of the filters at retrieval or attempted retrieval, which the FDA "considered essential for the analysis of your data for the purposes of determining substantial equivalence for a future 510(k) submission."

---

[98] *See* BPV-17-01-00123402 through 123405, attached hereto as Exhibit 84.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

87.    On October 25, 2007, BPV provided the additional information required by the FDA in its September 21, 2007 letter.[99]

   a. In response to FDA's demand (Question 1), BPV provided a tabulated list of the adverse events reported since the February annual progress report.

   b. In response to FDA's demand (Question 2), BPV provided a detailed list summarizing the adverse events observed during the study as well as a detailed list of the specific incidents required by the FDA.

   c. In response to FDA's demand (Question 3), BPV provided an explanation for the incidence of migration observed during the clinical study, as well as the comparative data required by the FDA.

   d. In response to FDA's demand (Question 4), BPV provided a report of the cumulative number of follow-up visits conducted outside the study protocol.

   e. In response to FDA's demand (Question 5), BPV provided a report of the deployment issues experienced with the filter during the clinical study, as well as the comparative data required by the FDA.

88.    On December 11, 2007, BPV and the FDA had a telephone conversation to discuss closing out the EVEREST study and whether BPV could satisfy its final reporting requirements by referencing the 510(k) submission that was then under review in accordance with the FDA guidance document "Guidance on IDE Policies and Procedures."[100] The FDA indicated that BPV should wait until the 510(k) submission was completed, then "if 510(k) clearance is received, BPV can refer to the 510(k) and provide any additional information, such as investigational device disposition."

89.    On February 12, 2008, BPV sent its final report on the EVEREST study to the FDA, pursuant to 21 C.F.R. 812.150(b)(7).[101] The FDA received BPV's final report

---

[99] *See* BPV-17-01-00123498 through 123562, attached hereto as Exhibit 85.

[100] *See* BPV-17-01-00122495, attached hereto as Exhibit 86.

[101] *See* BPV-17-01-00123573 through 123588, attached hereto as Exhibit 87.

1    and sent an acknowledgment of completion on March 12, 2008.[102]

2    **C.    G2® Filter System – Jugular/Subclavian Delivery Kit (K052578)**

3    90.    On September 19, 2005, BPV submitted a Special 510(k) for its G2® Filter

4    System – Jugular/Subclavian Delivery Kit to gain approval for a new delivery kit to the

5    previously cleared G2® Filter System.[103] The previous version of the G2® Filter System

6    (K050558) included a femoral delivery kit but not a jugular/subclavian delivery kit. The

7    filter that was the subject of this submission was identical to the predicate device.

8    Included in the 510(k) submission were the following:

9    a.    Results from 72 *in-vitro* bench tests conducted by BPV on the G2® Filter

10    Jugular/Subclavian delivery system. *See* Ex. 89 at p. 17-28.

11    i.    This testing was performed in conformance with the FDA guidance

12    document: "Guidance for Cardiovascular Intravascular Filter 510(k)

13    Submission." *See* Ex. 89 at p. 16.

14    ii.    BPV conducted a risk analysis, a Risk Assessment and Design Failure

15    Modes and Effects Analysis ("DFMEA") for the device, in accordance with

16    ISO 14971:2000, Medical Devices – Application of risk management to

17    medical devices and BS EN 1441:1998, Medical Devices-Risk Analysis, to

18    assure that risks posed by the design were acceptable. *See* Ex. 89 at p. 11.

19    iii.    The design verification and validation were performed in conformance with:

20    1.    FDA Special Controls guidance document, "Guidance for

21    Cardiovascular Intravascular Filter 510(k) Submission,"

22    2.    BS EN 12006-3:1999 entitled, "Non-Active Surgical Implants –

23    Particular Requirements for Cardiac and Vascular Implants – Part 3:

24    Endovascular Devices,"

25    3.    FDA guidance document, Design Control Guidance for Medical

26    Device Manufacturers, dated March 11, 1997, and

27    ───────────────
     [102] *See* BPV-17-01-00123564 through 123565, attached hereto as Exhibit 88.

28    [103] *See* BPV-17-01-00125658 through 125749, attached hereto as Exhibit 89.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

4.  The design control requirements under 21 CFR § 820.30. *See* Ex. 89 at p. 15-16, 58.

b.  Results from biocompatibility testing conducted by BPV in conformance with ISO/AAMI 10993-1, as well as packaging testing, sterilization testing, and shelf-life testing. *See* Ex. 89 at p. 29-31.

c.  Proposed labeling for the G2® Filter Jugular/Subclavian Delivery System in conformance with 21 CFR § 807.87(e). *See* Ex. 89 at p. 32-48.

d.  A summary of safety and effectiveness information upon which a substantial equivalence determination could be based as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92. *See* Ex. 89 at p. 53-56.

91.    On September 21, 2005, BPV submitted additional information to the FDA to correct certain misprints and labeling mistakes in its September 19, 2005 submission.[104]

92.    On October 13, 2005, the FDA emailed BPV requesting a telephone conference to discuss the FDA's concerns about BPV's submission.[105]

93.    On October 14, 2005, the FDA and BPV had a teleconference to discuss the FDA's concerns.[106] The FDA and BPV discussed:

a.  The modifications in the filter loading, storage, and configuration of the Jugular/Subclavian Delivery System as compared to the predicate G2® Filter Femoral Delivery System.

b.  The FDA stated it would require BPV to include additional information in the submission, specifically "a description of each part of the delivery system, a description of how the filter is loaded, stored, and delivered, a comparison of steps with the predicate device in tabular format, and any type of animation or simulation footage to help visually clarify the device."

c.  The FDA also discussed the Risk Analysis section of the submission and indicated

---

[104] *See* BPV-17-01-00125750 through 125772, attached hereto as Exhibit 90.
[105] *See* BPV-17-01-00046358 through 46362, attached hereto as Exhibit 91.
[106] *See* BPV-17-01-00125799 through 125801, attached hereto as Exhibit 92.

- 35 -

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

that BPV "should show the associated risk for each device change and the testing that was conducted in response to each risk."

d.  The FDA also stated it would require BPV to add clarification as to why new tests were performed for shelf-life testing, and add clarifications on any changes to the package labeling.

e.  The FDA further stated it would require BPV to provide more information relating to the biocompatibility section of the submission in a biocompatibility table that FDA would send to BPV following the conference.

94.  In a follow-up email that same day, the FDA summarized its formal demands for additional information.[107] The FDA required BPV to do the following:

a.  Explain the modifications in greater detail, including "a) a description of each part of the delivery catheter and its associated function; b) step-by-step instructions for how the filter is loaded into the delivery catheter and deployed; and c) a comparison in tabular format between the loading and deployment of the subject device and the predicate device." (Question 1).

b.  Provide "additional information regarding the risk analysis…in order to determine that the modifications you are requesting do not affect the safety and effectiveness of the device." (Question 2).

c.  "[I]dentify and list any risks associated with each modification, the verification/validation testing conducted to assess the identified risks for each modification, and an explanation for why the testing conducted mitigates the identified risk." (Question 2).

d.  Provide "additional information…to determine that the testing conducted supports the shelf life of the subject device," and required BPV to provide specific testing and acceptance criteria (Question 3).

e.  Summarize the biocompatibility testing within a biocompatibility testing results

---

[107] *See* BPV-17-01-00125804 through 125805, attached hereto as Exhibit 93.

- 36 -

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1     table provided by the FDA (Question 4).

2     f.   Provide a redlined copy of labeling that BPV modified from the predicate device

3          (Question 5).

4          95.    Also on that same day, the FDA mailed a letter to BPV informing BPV of

5     the FDA's decision to put the submission on a 30 day hold pending BPV's response to the

6     FDA's requests, and indicating that if BPV did not respond with the additional

7     information within 30 days, the 510(k) submission would be withdrawn.[108]

8          96.    On October 25, 2005, BPV provided the additional information required by

9     FDA in its October 14, 2005 email.[109]

10    a.   In response to FDA's demand (Question 1), BPV provided a detailed explanation

11         of the modifications of the subject device.

12    b.   In response to FDA's demand (Question 2), BPV provided a detailed explanation

13         of the risk analysis conducted for the subject device, including a table describing

14         the risks associated with the modifications, the testing that was performed, and an

15         explanation of how such testing mitigated this risk.

16    c.   In response to FDA's demand (Question 3), BPV provided specific testing and

17         acceptance criteria conducted on the subject device regarding shelf-life, as well as

18         comparative testing performed on the predicate device.

19    d.   In response to FDA's demand (Question 4), BPV provided a summary of

20         biocompatibility testing conducted on the subject device, including the completion

21         of the biocompatibility testing results table provided by the FDA.

22    e.   In response to FDA's demand (Question 5), BPV responded that no significant

23         changes were made to the predicate IFU, and provided a redlined copy of the

24         labeling that BPV modified from the predicate device (Question 5).

25         97.    On November 14, 2005, the FDA and BPV had another conference call to

26

27    _____
      [108] *See* BPV-17-01-00048142 through 48144, attached hereto as Exhibit 94.

28    [109] *See* BPV-17-01-00125782 through 125876, attached hereto as Exhibit 95.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

discuss the FDA's review of BPV's submission. [110] The FDA stated it still required additional information regarding risk analysis directing BPV to clarify whether the test protocols and acceptance criteria in "the original submission were the same as previous tests protocols and acceptance criteria previously performed on the predicate device."

98.     On November 16, 2005, BPV submitted the required information to the FDA, clarifying its previous response regarding the risk analysis testing conducted on the subject device. [111]

99.     On November 25, 2005, the FDA cleared the new G2® Filter Jugular/Subclavian Delivery Kit for market, subject to the FDCA general and special controls, with the usual limitations on labeling it for permanent placement only, after reviewing the information provided in the 510(k) submission, as well as all additional information provided in response to FDA's requests, and finding the device substantially equivalent to the G2® Filter System – Femoral Delivery Kit. [112]

**D.     G2 Filter System for Permanent Indication – Femoral Delivery Kit (K062887)**

100.     On September 25, 2006, BPV submitted a Special 510(k) for the G2 Filter System – Femoral Delivery Kit, which proposed changes to the delivery system only. [113] BPV proposed a new spline design that was intended to improve deployment accuracy and to prevent the filter hooks from sticking in the tip of the sheath during deployment. Included in the 510(k) submission were the following:

a.     Results from 7 *in-vitro* bench tests conducted by BPV on the G2® Filter Jugular/Subclavian delivery system, including REDACTED

REDACTED

REDACTED *See* Ex. 99 at p. 22-24.

---

[110] *See* BPV-17-01-00125891 through 125892, attached hereto as Exhibit 96.

[111] *See* BPV-17-01-00125893 through 125923, attached hereto as Exhibit 97.

[112] *See* BPV-17-01-00125637 through 125639, attached hereto as Exhibit 98.

[113] *See* BPV-17-01-00125963 through 126062, attached hereto as Exhibit 99.

    i.  BPV conducted a risk analysis, a Risk Assessment and Design Failure Modes and Effects Analysis ("DFMEA") for the device, in accordance with ISO 14971:2000, Medical Devices – Application of risk management to medical devices, to assure that risks posed by the design were acceptable.

**REDACTED**

REDACTED *See* Ex. 99 at p. 20.

    ii.  The design verification and validation were performed in conformance with

      1.  FDA Special Controls guidance document, "Guidance for Cardiovascular Intravascular Filter 510(k) Submission,"

      2.  FDA's "510(k) Sterility Review Guidance and Revision of 2/12/90 (K90-1)," FDA's "Use of International Standards Organizations ISO 10993 Biological Evaluation of Medical Devices Part I: Evaluation and Testing,"

      3.  BS EN 12006-3:1999 entitled, "Non-Active Surgical Implants – Particular Requirements for Cardiac and Vascular Implants – Part 3: Endovascular Devices,"

      4.  FDA guidance document, Design Control Guidance for Medical Device Manufacturers, dated March 11, 1997, and

      5.  The design control requirements under 21 CFR § 820.30. *See* Ex. 99 at p. 20-21, 67.

b.  Results from biocompatibility testing conducted by BPV in conformance to ISO 10993-1:2003, Biological Evaluation of Medical Devices – Part I: Evaluation and Testing. *See* Ex. 99 at p. 27.

c.  Results from packaging testing, sterilization testing, and shelf-life testing. *See* Ex. 99 at p. 25-26.

d.  Proposed labeling for the G2® Filter Jugular/Subclavian Delivery System in conformance with 21 CFR § 807.87(e). *See* Ex. 99 at p. 44-58.

e.  A summary of the safety and effectiveness information upon which a substantial

- 39 -

equivalence determination could be based as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92. *See* Ex. 99 at p. 63-66.

101.   On October 26, 2006, the FDA cleared the modified G2® Filter Femoral Delivery Kit for market, subject to the general controls and special controls under the FDCA, with the usual limitations on labeling it for permanent placement only, after reviewing the information provided in the 510(k) submission, and finding the device substantially equivalent to the G2® Filter System – Femoral Delivery Kit.[114]

**E.    G2    Filter    System    for    Removable    Indication–    Femoral    and Jugular/Subclavian Delivery Kits (K073090)**

102.   On December 4, 2006, BPV and the FDA had a teleconference to discuss BPV's strategy for its future traditional 510(k) for the G2® Filter System for removable indication that was currently being evaluated under the EVEREST clinical study.[115]

a.   BPV proposed filing one traditional 510(k) using two predicate devices (G2® Filter System – Femoral Delivery (K062887) and G2® Filter System – Jugular/Subclavian Delivery Kit (K052578)) and one subject device. The FDA agreed with this strategy and noted that BPV should emphasize that the two delivery systems have not changed since the last cleared submissions.

b.   BPV also proposed that it submit only the testing applicable to the removability of the filter and refer the reviewer to previous submissions for test data related to the filter and the delivery systems.

c.   The FDA agreed with this approach and suggested BPV include a summary table for all testing that has been completed and in which previous submissions the data was presented.

103.   On October 31, 2007, BPV submitted its over 1500-page traditional 510(k) for the G2® Filter System – Femoral and Jugular/Subclavian Delivery Kits, seeking to remove the limitation on its previous 510(k) clearance for the device and obtain clearance

---

[114] *See* BPV-17-01-00126184 through 126187, attached hereto as Exhibit 100.

[115] *See* BPV-17-01-00122493, attached hereto as Exhibit 101.

- 40 -

for removable indication.[116] Included in the 510(k) submission were the following:

a. Results from the previously reported extensive *in-vitro* bench testing and *in-vivo* animal testing, as well as the extensive clinical results of the EVEREST clinical study, including all testing reports and the clinical study materials that supported removability. *See* Ex. 102 at p. 34-52.

  i. BPV conducted a risk analysis, a Risk Assessment and Design Failure Modes and Effects Analysis ("DFMEA") for the device, in accordance with ISO 14971:2000, Medical Devices – Application of risk management to medical devices, to assure that risks posed by the design were acceptable. *See* Ex. 102 at p. 34.

  ii. The design verification and validation were performed in conformance with:

    1. FDA Special Controls guidance document, "Guidance for Cardiovascular Intravascular Filter 510(k) Submission,"

    2. FDA's "510(k) Sterility Review Guidance and Revision of 2/12/90 (K90-1),"

    3. FDA's "Use of International Standards Organizations ISO 10993 Biological Evaluation of Medical Devices Part I: Evaluation and Testing,"

    4. Bluebook Memorandum G95-1, Use of ISO 10993 Biological Evaluation of Medical Devices Part 1: Evaluation and Testing;

    5. BS EN 12006-3:1999 entitled, "Non-Active Surgical Implants – Particular Requirements for Cardiac and Vascular Implants – Part 3: Endovascular Devices,"

    6. FDA guidance document, Design Control Guidance for Medical Device Manufacturers, dated March 11, 1997, and

    7. The design control requirements under 21 CFR § 820.30. *See* Ex. 102

---

[116] *See* BPV-17-01-00123629 through 125197, attached hereto as Exhibit 102.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

at p. 34-52.

b. Results from biocompatibility and toxicity testing conducted by BPV in conformance with:

    i. ISO 10993-1:2003, Biological Evaluation of Medical Devices – Part I: Evaluation and Testing;

    ii. Blue Book memorandum G95-1, Use of ISO10993 Biological evaluation of Medical Devices Part 1: Evaluation and Testing; and Guidance for Cardiovascular Intravascular Filter 510(k) Submissions (November 26, 1999). *See* Ex. 102 at p. 46.

c. Results from packaging testing, sterilization testing, shelf-life testing, and MRI Compatibility testing. *See* Ex. 102 at p. 43-45.

d. Proposed labeling for the G2® Filter Jugular/Subclavian Delivery System in conformance with 21 CFR § 807.87(e). *See* Ex. 102 at p. 79-107.

e. A summary of the safety and effectiveness information upon which a substantial equivalence determination could be based as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92. *See* Ex. 102 at p. 135-39.

104.   On January 15, 2008, the FDA cleared the G2® Filter for retrievable indication, subject to the general and special controls of the FDCA, after reviewing the extensive *in-vitro* and *in-vivo* non-clinical testing, as well as the extensive clinical testing data that the FDA required, and all other additional information that the FDA requested over the three-year period of correspondence with BPV regarding this device, and finding that the G2® Filter was as safe and effective as, and therefore substantially equivalent to, the G2® Filter System – Femoral Delivery Kit and the G2® Filter System – Jugular/Subclavian Delivery Kit.[117]

---

[117] *See* BPV-17-01-00123590 through 125592, attached hereto as Exhibit 103.

IV. **G2® Express/G2®X Filter System**

A. **G2® Express Filter System – Femoral and Jugular/Subclavian Delivery Kits (K080668)**

105.    On March 7, 2008, BPV submitted a Special 510(k) for its G2® Express Filter System – Femoral and Jugular/Subclavian Delivery Kits.[118] Using the recently cleared G2® Filter System for removal indication (K073090) as a predicate device, BPV sought to gain approval for a filter with an electropolished snarable tip. Other than the addition of the tip, no other changes to the filter were made. BPV also proposed minor changes to its femoral and jugular/subclavian delivery kits. Included in the 510(k) submission were the following:

a. Results from the *in-vitro* bench testing and *in-vivo* animal testing conducted by BPV on the subject device, including testing of, among other things, REDACTED

REDACTED

*See* Ex. 104 at p. 22-37.

  i. BPV conducted a risk analysis, a Risk Assessment and Design Failure Modes and Effects Analysis ("DFMEA") for the device, in accordance with ISO 14971:2000, Medical Devices – Application of risk management to medical devices, to assure that risks posed by the design were acceptable. *See* Ex. 104 at p. 22.

  ii. The design verification and validation were performed in conformance with

    1. FDA Special Controls guidance document, "Guidance for Cardiovascular Intravascular Filter 510(k) Submission,"

    2. FDA's "510(k) Sterility Review Guidance and Revision of 2/12/90 (K90-1),"

    3. FDA's "Use of International Standards Organizations ISO 10993

---

[118] *See* BPV-17-01-00130498 through 130730, attached hereto as Exhibit 104.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Biological Evaluation of Medical Devices Part I: Evaluation and Testing,"

   4. BS EN 12006-3:1999 entitled, "Non-Active Surgical Implants – Particular Requirements for Cardiac and Vascular Implants ∠ Part 3: Endovascular Devices,"

   5. FDA guidance document, Design Control Guidance for Medical Device Manufacturers, dated March 11, 1997, and

   6. The design control requirements under 21 CFR § 820.30. *See* Ex. 104 at p. 25, 180.

b. Reference to the extensive clinical results of the EVEREST clinical study, which were applicable to the subject device because "there were no design modifications to the filter or delivery systems that would affect the safety of removability." *See* Ex. 104 at p. 37.

c. Results from biocompatibility and toxicity testing conducted by BPV in conformance to ISO 10993-1:2003, Biological Evaluation of Medical Devices – Part I: Evaluation and Testing. *See* Ex. 104 at p. 39-41, 170-78.

d. Results from packaging testing, sterilization testing, and shelf-life testing. *See* Ex. 104 at p. 37-39.

e. Proposed labeling for the G2® Express Filter in conformance with 21 CFR § 807.87(e). *See* Ex. 104 at p. 71-118.

f. A summary of the safety and effectiveness information upon which a substantial equivalence determination could be based as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92. *See* Ex. 104 at p. 123-26.

106.   On April 8, 2008, the FDA sent a letter to BPV demanding additional information to be able to complete the review of the device for substantial equivalence.[119] The FDA prohibited BPV from marketing the device until it had provided the additional

---

[119] *See* BPV-17-01-00130470 through 130473, attached hereto as Exhibit 105.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

information under 21 CFR § 807.87(l).  If BPV failed to respond within 30 days, the FDA would have treated this 510(k) submission as withdrawn.

   a.  The FDA inquired about the biocompatibility of the proposed filter, because BPV's initial submission did not include certain biocompatibility testing.

   b.  The FDA required BPV to provide full biocompatibility testing on the device or provide additional justification for omitting the testing.

      i.  This full biocompatibility testing would require BPV to conduct testing for, among other things, REDACTED

REDACTED

REDACTED

107.   On May 5, 2008, in response to the FDA's demand for additional information, BPV requested an extension of time to respond.[120] On May 6, 2008, the FDA granted BPV's request for an extension of time to respond but indicated that if the additional information was not provided by that extended date, the 510(k) would be considered withdrawn, pursuant to 21 C.F.R. § 807.87(l).[121]

108.   On May 8, 2008, BPV submitted its response to the FDA's demand for additional information dated April 8, 2008.[122]

   a.  BPV provided additional justification for omitting the testing in its original submission, emphasizing that "full biocompatibility testing should be employed where there is incongruence between the predicate and subject device base materials and where processes differ between the devices as well."[123]

---

[120] *See* BPV-17-01-00131255 through 131261, attached hereto as Exhibit 106.

[121] *See* BPV-17-01-00130468, attached hereto as Exhibit 107.

[122] *See* BPV-17-01-00130268 through 130441, attached hereto as Exhibit 108.

[123] *See* Ex. 108 at BPV-17-01-00130307 through 130311.

- 45 -

Nelson Mullins Riley & Scarborough

L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

b. BPV reiterated that the starting material of the subject device did not change from the predicate device, and emphasized that the only difference was the final processing of the filter apex, noting that the new snarable tip was electropolished.[124]

c. Despite these explanations, BPV conducted additional biocompatibility testing in response to the FDA's demands and provided detailed justification for omitting other testing required by the FDA.

   i. BPV conducted additional testing on REDACTED
   REDACTED

   ii. BPV did not complete additional testing on, and provided detailed justification for omitting testing of, among other things, REDACTED
   REDACTED
   REDACTED[125]

109.   On June 6, 2008, the FDA again sent a letter to BPV requiring additional information to complete the review of the subject device.[126] The FDA stated that BPV did not adequately respond to the FDA's previous demand for additional information. The FDA required BPV to provide additional information supporting BPV's justifications for declining to conduct the omitted biocompatibility testing. The FDA prohibited BPV from marketing the device until it had provided the additional information under 21 CFR § 807.87(l).  If BPV failed to respond within 30 days, the FDA would have treated this 510(k) submission as withdrawn.

110.   On June 25, 2008, before submitting its responses to the FDA's additional requests, BPV held a meeting with the FDA to discuss the deficiencies noted by the

---

[124] *See* Ex. 108 at BPV-17-01-00130309 through 130318.

[125] *See* Ex. 108 at BPV-17-01-00130318 through 130327.

[126] *See* BPV-17-01-00130460 through 130463, attached hereto as Exhibit 109.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

FDA.[127] The FDA reiterated its concern that BPV's responses did not provide adequate additional information to address the FDA's concerns regarding biocompatibility testing of surface contaminants and surface finish, and that such information must be provided in BPV's response to the second additional information letter dated June 6, 2008.

111.   On June 26, 2008, BPV requested an additional extension of time to respond to these new requests.[128] On July 1, 2008, the FDA granted BPV's request for an extension of time to respond, but indicated that if the additional information was not provided by that extended date, the 510(k) would be considered withdrawn, pursuant to 21 C.F.R. § 807.87(l).[129]

112.   On July 2, 2008, BPV submitted an over 500-page response with the additional information required by the FDA in the FDA letter dated June 6, 2008.[130] BPV answered each FDA question, provided additional information supporting its justification for omitting certain biocompatibility tests, and provided summaries and documentation of the biocompatibility testing it conducted in response to FDA's demand, including the protocols and testing reports.

113.   On July 30, 2008, FDA cleared the G2® Express Filter for market, subject to the general controls and special controls of the FDCA, after reviewing the 510(k) submission and all additional information required by the FDA, and finding that the G2® Express Filter was as safe and effective as, and therefore substantially equivalent to, the G2® Filter System – Femoral and Jugular/Subclavian Delivery Kits.[131]

**B.   G2®X Filter (K082305)**

114.   On August 12, 2008, BPV submitted a Special 510(k) for its G2® Express Filter System – Femoral and Jugular/Subclavian Delivery Kits (subsequently known as

---

[127] *See* BPV-17-01-00117271 through 117272, attached hereto as Exhibit 110.

[128] *See* BPV-17-01-00130442 through 130448, attached hereto as Exhibit 111.

[129] *See* BPV-17-01-00130459, attached hereto as Exhibit 112.

[130] *See* BPV-17-01-00117260 through 117783, attached hereto as Exhibit 113.

[131] *See* BPV-17-01-00130450 through 130452, attached hereto as Exhibit 114.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

G2®X), which included changes to the delivery system only.[132] In this submission, the filter remained unchanged from BPV's cleared G2® Express Filter System (K080668). Included in the 510(k) submission were the following:

   a.   Results from the *in-vitro* bench testing and *in-vivo* animal testing conducted by BPV on the subject device. *See* Ex. 115 at p. 32-54.

        i.   BPV conducted a risk analysis, a Risk Assessment and Design Failure Modes and Effects Analysis ("DFMEA") for the device, in accordance with ISO 14971:2000, Medical Devices – Application of risk management to medical devices, to assure that risks posed by the design were acceptable. *See* Ex. 115 at p. 32.

       ii.   The design verification and validation were performed in conformance with

          1.   FDA Special Controls guidance document, "Guidance for Cardiovascular Intravascular Filter 510(k) Submission,"

          2.   FDA's "510(k) Sterility Review Guidance and Revision of 2/12/90 (K90-1),"

          3.   FDA's "Use of International Standards Organizations ISO 10993 Biological Evaluation of Medical Devices Part I: Evaluation and Testing,"

          4.   FDA guidance document, Design Control Guidance for Medical Device Manufacturers, dated March 11, 1997, and

          5.   The design control requirements under 21 CFR § 820.30. *See* Ex. 115 at p. 32-33, 230.

   b.   Results from biocompatibility and toxicity testing conducted by BPV on ████████████████ REDACTED ████████████████ ████████ REDACTED ████████ in conformance to ISO 10993-1:2003, Biological Evaluation of Medical Devices – Part I: Evaluation and Testing.

---

[132] *See* BPV-17-01-00131320 through 131596, attached hereto as Exhibit 115.

1    *See* Ex. 115 at p. 67-73.

2    c. Results from packaging testing, sterilization testing, and shelf-life testing. *See* Ex.

3       115 at p. 55-66.

4    d. Proposed labeling for the G2® Express Filter in conformance with 21 CFR §

5       807.87(e). *See* Ex. 115 at p. 106-165.

6    e. A summary of the safety and effectiveness information upon which a substantial

7       equivalence determination could be based as required by the Safe Medical Devices

8       Act of 1990, and 21 CFR § 807.92. *See* Ex. 115 at p. 170-173.

9    115.   On September 4, 2008, the FDA required BPV to provide additional

10   information before the FDA could complete its review of this submission for substantial

11   equivalence.[133]

12   a. The FDA required BPV to provide the test reports for the *in vitro* testing conducted

13      to validate the device modifications (Question 1).

14   b. The FDA required BPV to provide information regarding whether BPV was

15      experiencing issues with oxidation and/or stability of the material in the predicate

16      device (Question 2).

17   c. The FDA required BPV to provide summaries of the biocompatibility testing

18      conducted on the proposed device by completing a biocompatibility testing results

19      form provided by the FDA (Question 3).

20   116.   On September 8, 2008, the FDA sent BPV a letter informing BPV that the

21   FDA was putting the 510(k) submission on hold pending BPV's responses to the FDA's

22   requests.[134] If BPV failed to respond within 30 days, the FDA would have treated this

23   510(k) submission as withdrawn under 21 CFR § 807.87(l).

24   117.   On September 29, 2008, BPV submitted the additional information required

25   by the FDA in its September 4, 2008 email.[135]

26   ───────────────

27   [133] *See* BPV-17-01-00131294 through 131295, attached hereto as Exhibit 116.

     [134] *See* BPV-17-01-00131298 through 131299, attached hereto as Exhibit 117.

28   [135] *See* BPV-17-01-00130734 through 130838, attached hereto as Exhibit 118.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

a. In response to FDA's demand (Question 1), BPV provided the FDA with a summary of its in vitro testing and the test reports to validate its proposed modifications.

b. In response to FDA's demand (Question 2), BPV provided the FDA with an explanation regarding the isolated event of issues with oxidation and/or stability of the material in the predicate device that BPV experienced, as well as BPV's investigation of the probable root causes of the failure mode and the immediate corrective actions that BPV implemented, which appeared to resolve the failure mode (no reported complaints since action taken).

c. In response to FDA's demand (Question 3), BPV provided the FDA with the completed Biocompatibility Test Results Forms that summarized the biocompatibility testing conducted on the subject device.

118.    On October 31, 2008, the FDA cleared the G2®X Filter for market, subject to the general controls and special controls of the FDCA, after reviewing the 510(k) submission and all additional information required by the FDA, and finding the G2®X Filter as safe and effective as, and therefore substantially equivalent to, the G2® Express Filter System – Femoral and Jugular/Subclavian Delivery Kits.[136]

## V.    ECLIPSE™ Filter System

### A.    ECLIPSE™ Filter System – Femoral and Jugular/Subclavian Delivery Kits (K093659)

119.    On August 14, 2009, BPV met with FDA to discuss its upcoming filter project which made minor process changes to the surface finish of the G2®X Filter.[137]

a. The purpose of the meeting was for BPV to obtain FDA guidance on the proper regulatory path for this project. The modifications would not result in any dimensional, physical, or performance changes to the filter or the delivery system and the risk assessment that BPV conducted identified "no new issues of safety and

---

[136] *See* BPV-17-01-00131282 through 131284, attached hereto as Exhibit 119.

[137] *See* BPV-17-01-00171823 through 171824, attached hereto as Exhibit 120.

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

effectiveness."

b. Accordingly, BPV followed FDA's guidance document "Deciding When to Submit a 510(k) for a Change to an Existing Device," which included a decision tree that BPV followed and which determined that this minor modification should not require a new 510(k).

c. BPV sought FDA's input because BPV believed "in an effort to keep FDA informed of this change, a special 510(k) might be more appropriate."

d. FDA and BPV discussed the minor modification and FDA indicated that the decision of whether to file a 510(k) or not to file in this case "was more of a decision for the business," but that FDA would confirm with FDA compliance department.

120.   On November 23, 2009, BPV decided to submit a formal Special 510(k) for its ECLIPSE Filter System – Femoral and Jugular/Subclavian Delivery Kits.[138] The primary change from the predicate device, the G2®X Filter System – Femoral and Jugular/Subclavian Delivery System (K082305), was an improvement in the surface finish of the filter wire by electropolishing the wire prior to forming the filter. Included in the 510(k) submission were the following:

a. Results from the *in-vitro* bench testing conducted by BPV on the subject device, including corrosion resistance testing, cyclic fatigue testing, and arm fatigue testing. *See* Ex. 121 at p. 37-38.

   i. BPV conducted a risk analysis, a Risk Assessment and Design Failure Modes and Effects Analysis ("DFMEA") for the device, in accordance with ISO 14971:2000, Medical Devices – Application of Risk Management to Medical Devices," to assure that risks posed by the design were acceptable. *See* Ex. 121 at p. 35.

   ii. The design verification and validation were performed in conformance with

---

[138] *See* BPV-17-01-00116991 through 117153, attached hereto as Exhibit 121.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1. FDA Special Controls guidance document, "Guidance for Cardiovascular Intravascular Filter 510(k) Submission,"

2. FDA's "510(k) Sterility Review Guidance and Revision of 2/12/90 (K90-1),"

3. FDA's "Use of International Standards Organizations ISO 10993 Biological Evaluation of Medical Devices Part I: Evaluation and Testing,"

4. FDA guidance document, Design Control Guidance for Medical Device Manufacturers, dated March 11, 1997,

5. ASTM F2129-06 Stand Test Method for Conducting Cyclic Petentiodynamic Polarization Measurements to Determine the Corrosion Susceptibility of Small Implant Devices, and

6. The design control requirements under 21 CFR § 820.30. *See* Ex. 121 at p. 14, 35-36.

b. Results from biocompatibility testing conducted by BPV in conformance to ISO 10993-1:2003, Biological Evaluation of Medical Devices – Part I: Evaluation and Testing. *See* Ex. 121 at p. 21-24.

c. Results from packaging testing, sterilization testing, and shelf-life testing. *See* Ex. 121 at p. 20-21, 24.

d. Proposed labeling for the Eclipse™ Filter in conformance with 21 CFR § 807.87(e). *See* Ex. 121 at p. 72-105.

e. A summary of the safety and effectiveness information upon which a substantial equivalence determination could be based as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92. *See* Ex. 121 at p. 10-12.

121. On December 15, 2009, the FDA reviewed the submission but demanded additional information before the FDA could complete its review of this submission for substantial equivalence.[139] The FDA required BPV to conduct additional testing on the

---

[139] *See* BPV-17-01-00171797 through 171799, attached hereto as Exhibit 122.

- 52 -

Nelson Mullins Riley & Scarborough

201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000
L.L.P.

1   subject device for ████████████ REDACTED ████████████

2   testing or provide justification for why these tests were not necessary. The FDA

3   prohibited BPV from marketing the device until it had provided the additional information

4   under 21 CFR § 807.87(l).  If BPV failed to respond within 30 days, the FDA would have

5   treated this 510(k) submission as withdrawn.

6       122.   On December 17, 2009, BPV responded to FDA's request and provided the

7   additional information required by FDA in its December 15, 2009 letter. [140] BPV

8   responded with the justification for why the testing was not included in the original

9   submission, but, nevertheless, BPV conducted the additional testing required by the FDA

10  and provided summary results for the radial strength testing, migration/clot trapping

11  testing, and tensile strength testing.

12      123.   On January 14, 2010, the FDA cleared the Eclipse™ Filter, subject to

13  FDCA general and special controls, after reviewing the submission and the additional

14  testing information that FDA required, and finding the Eclipse™ Filter as safe and

15  effective as, and therefore substantially equivalent to, the G2®X Filter.[141]

16      124.   BPV later made subsequent changes to the device labeling, developing a

17  patient brochure and implant card to accompany the Eclipse™ Filter. [142] Again, BPV

18  followed FDA's guidance document "Deciding When to Submit a 510(k) for a Change to

19  an Existing Device," which included a decision tree that BPV followed and which

20  determined that the changes did not require a 510(k). BPV sought FDA's review and input

21  on the content of the patient brochure and implant card.

22      125.   On March 18, 2010, BPV and FDA had a telephone conference to discuss

23  BPV's proposed changes to the labeling. FDA indicated that the patient brochure and

24  implant card could not be reviewed outside of a 510(k) submission, so BPV agreed to

25  provide the labeling to the FDA via a Special 510(k). See Ex. 125 at p. 15-16.

26

---

[140] See BPV-17-01-00145607 through 145616, attached hereto as Exhibit 123.

[141] See BPV-17-01-00117156 through 117158, attached hereto as Exhibit 124.

[142] See BPV-17-01-00171679 through 171793, attached hereto as Exhibit 125.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

126.   On May 20, 2010, BPV filed the Special 510(k) for the Eclipse™ Filter seeking clearance of the revised device labeling that added a patient brochure and implant card, as well as a "Does not Contain Latex" symbol and corresponding text to the label. Because no changes were made to the Eclipse™ Filter or the delivery systems previously cleared by the FDA on January 14, 2010, BPV did not need to re-conduct the battery of testing that the FDA already reviewed when it cleared the device. *See* Ex. 125 at p. 15.

127.   BPV conducted a risk analysis, a Risk Assessment and Design Failure Modes and Effects Analysis ("DFMEA") for the device, in accordance with ISO 14971:2000, Medical Devices – Application of Risk Management to Medical Devices," to assure that risks posed by the design were acceptable, which only identified packaging testing, sterilization testing, and shelf-life testing as necessary. Included in the submission were the following:

a.  Results from the packaging testing, sterilization testing, and shelf-life testing that BPV conducted on the device. *See* Ex. 125 at p. 20-22.

b.  Results from the chemical testing that BPV conducted on the device to confirm that the device did not contain latex, including Fourier transform infrared spectroscopy, and gas chromatography mass spectroscopy, as well as provided the test data and reports to FDA. *See* Ex. 125 at p. 19, 93-115.

c.  Proposed revised labeling for the Eclipse™ Filter in conformance with 21 CFR § 807.87(e). *See* Ex. 125 at p. 51-80.

d.  A summary of the safety and effectiveness information upon which substantial equivalence determination would be based as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92. *See* Ex. 125 at p. 10-12.

128.   On June 18, 2010, the FDA reviewed the submission but required BPV to provide additional information before the FDA could complete its review of the submission for substantial equivalence.[143] The FDA prohibited BPV from marketing the

---

[143] *See* BPV-17-01-00171794 through 171796, attached hereto as Exhibit 126

device until it had provided the additional information under 21 CFR § 807.87(l).  If BPV failed to respond within 30 days, the FDA would have treated this 510(k) submission as withdrawn.

    a.  FDA required BPV to revise the labeling of the Eclipse™ Filter to remove the statement "The Eclipse Vena Cava Filter does not have a time in which it must be removed" in the "When can the filter be removed?" section of the labeling (Question 1).

        i.  The FDA was concerned that the clinical data BPV provided in the labeling was not sufficient enough to support this statement.

    b.  The FDA also directed BPV to revise the 510(k) submission to include additional information in the 510(k) summary pursuant to 21 C.F.R. § 807.92 (Question 2).

    c.  The FDA further directed BPV to revise the 510(k) submission to remove "Trade Secret/Confidential" from the footer of the 510(k) summary (Question 2) and the Indication for Use page (Question 3).

129.   On June 21, 2010, BPV responded to FDA's demands for additional information and revised labeling.[144]

    a.  In response to FDA's demand (Question 1), BPV revised the labeling for the Eclipse™ Filter and removed the section entitled "When can the filter be removed?" and provided the revised version to the FDA.

    b.  In response to FDA's demand (Question 2), BPV revised the 510(k) Summary included with the original 510(k) submission and provided the revised version to the FDA.

    c.  In response to FDA's demand (Question 3), BPV revised the Indications for Use page included with the original 510(k) submission and provided the revised version to the FDA.

130.   On June 25, 2010, the FDA cleared the revised labeling for the Eclipse™

---

[144] *See* BPV-17-01-00145617 through 145633, attached hereto as Exhibit 127.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Filter, finding it as safe and effective as, and therefore substantially equivalent to, the Eclipse™ Filter, subject to the general controls and special controls of the FDCA. FDA reviewed the revised submission and the revised labeling.[145]

**VI.   The Above Referenced Documents Are Confidential and Proprietary**

131.   Bard or its affiliates are engaged in the development, design, manufacturing, and distribution of medical devices, including the Bard Filters. Many documents involving the Bard IVC Filters are confidential and are maintained as such by Bard for the reasons listed below.

132.   The medical device business for IVC filters is a highly technical and sophisticated industry.  It is also a highly competitive industry in which each company carefully guards its company documents, data, systems, processes, research and development, analysis, marketing strategies and trade secrets from competitors.

133.   As part of and during the course of my work with Bard, I have become familiar with Bard's efforts to protect its trade secret and confidential proprietary information and documents. This information is maintained internally at Bard and distributed to employees who need to know the information to perform their duties. It is not available outside the company. Outside physician consultants working with the company who have access to this information sign confidentiality agreements.

134.   As part of and during the course of my work with Bard and NMT (before Bard acquired the NMT filter product line), I have become familiar with documentation and records associated with the design, development, manufacture, regulatory compliance, and testing (including clinical testing) of the Bard IVC Filters.

a.   The documents referenced and attached to this Declaration contain confidential and proprietary information of Bard's concerning the design,

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

---

[145] *See* BPV-17-01-00171815 through 171817, attached hereto as Exhibit 128.

Nelson Mullins Riley & Scarborough

L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

development, testing (including clinical testing), manufacture, and regulatory compliance activities concerning Bard IVC Filters.[146]

   b.  The documents include, for example, 510(k) submissions, IDE submissions, and other materials sent to FDA that detail Bard's product development activities, proprietary testing, and implementation of various proprietary processes and procedures.

   c.  The documents also include contact reports and email communications, which likewise contain information Bard's product development activities, proprietary testing, and implementation of various proprietary processes and procedures.

   d.  The documents also include communications from FDA, which frequently contain questions that detail and disclose Bard's product development activities, proprietary testing, and implementation of various proprietary processes and procedures.

   e.  The information contained in the documents referenced and attached to this Declaration required years for Bard to develop and is Bard's critical business information which is not made public by Bard.

   f.  The information contained in the documents referenced and attached to this Declaration would be of economic value to Bard's competitors. Moreover, such value would extend not only to manufacturers of other IVC filters, but also to manufacturers of other medical devices, as the value and utility of this information is not limited to IVC filters.

135.   Bard invests very substantial sums of money in medical device research, testing (including clinical testing), development, design, analysis, regulatory compliance, evaluation, and marketing.   If the information Bard has developed over the years

---

[146] Note that Bard is not asserting as confidential Exhibits 12, 16, 18, 22, 23, 27, 45, 50, 52, 55, 63, 64, 65, 122, and 128.

- 57 -

1   pertaining to the Bard IVC Filters was obtained by its competitors, it would give an unfair

2   economic advantage to those competitors.

3       136.   Due to the economic disadvantage that would result if Bard's trade secrets

4   and other confidential, proprietary information regarding its products were disclosed to

5   one of its competitors, Bard seeks Protective Orders and Confidentiality Agreements to be

6   executed by all parties seeking confidential, proprietary and trade secret information in

7   civil lawsuits, including in products liability/personal injury litigation.

8       I declare under penalty of perjury, under the laws of the United States, that the

9   foregoing is true and correct.

10      Executed on this 23rd day of March, 2017.



12                                      Robert Carr

13  State of Arizona

14  County of Maricopa

15  Subscribed and sworn/affirmed before me this 23rd day of March, 2017

16  by Robert Carr.

17  In witness whereof, I have hereunto set my hand and official

18  Seal.

20  Stephanie Giancola

STEPHANIE GIANCOLA
NOTARY PUBLIC, ARIZONA
MARICOPA COUNTY
My Commission Expires
May 25, 2018

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000