James R. Condo (#005867)
Amanda C. Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2204
Telephone: (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

*Attorneys for Defendants*
*C. R. Bard, Inc. and*
*Bard Peripheral Vascular, Inc.*

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

IN RE: Bard IVC Filters Products Liability Litigation

No. 2:15-MD-02641-DGC

**DECLARATION OF JOHN D. VAN VLEET IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING PREEMPTION**

(Assigned to the Honorable David G. Campbell)

I, JOHN D. VAN VLEET, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge and belief:

1. I am over 18 years of age and am competent to testify about the matters contained in this Declaration. The statements contained in this Declaration are based on my personal knowledge and upon the basis of the documents maintained by

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively, "Bard") in the regular course of business. I could and would competently testify to the matters set forth herein if called as a witness in this matter.

2. I am currently Vice President, Regulatory Affairs and Clinical Programs at Bard Peripheral Vascular, Inc. ("BPV"). I have been in that position at BPV since June 2007.

3. Before joining BPV, I spent over 19 years in the medical device industry, primarily working in clinical and/or regulatory affairs.

4. As part of and during the course of my work with Bard, I have become familiar with documentation and records associated with the design, development, manufacture, regulatory compliance, and testing (including clinical testing) of the Bard IVC Filters. The documents include, for example, 510(k) submissions, IDE submissions, and other materials sent to FDA, as well as contact reports and email communications with FDA, that detail Bard's product development and regulatory compliance activities of Bard's IVC Filters.

5. As part of and during the course of my work with Bard, I have become familiar with Bard's record-keeping procedures. I have personal knowledge of the roles and responsibilities of Bard's employees responsible for this record-keeping process. The business documents referenced herein were prepared and maintained in the ordinary course of Bard's business and it was the regular practice of Bard to make such records. These documents were prepared at or near the time of the events they record by persons with knowledge of the recorded events, or from information transmitted by persons with knowledge of the recorded events. This declaration is based upon my personal knowledge and review of certain business records prepared and maintained in the ordinary course of business of Bard concerning Bard's IVC Filters.

## I. <u>The FDA Regulatory Clearance Process:</u>

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

6. The Food and Drug Administration ("FDA") is the federal agency responsible for regulating the manufacture, sale, and distribution of medical devices, such as Bard's inferior vena cava ("IVC") filters. FDA derives its authority from the Food, Drug and Cosmetic Act ("FDCA"), as amended by the Medical Device Amendments of 1976 ("MDA"). As part of and during the course of my work with Bard, I have become familiar with the provisions of the FDCA and of the FDA's implementing regulations, particularly to the extent that they concern Bard's IVC Filters.

7. The MDA established three classes of medical devices with different regulatory controls: Class I, II, and III. FDA classifies Bard's IVC Filters as Class II devices, which are subject to the general controls under the MDA and the specific special controls for IVC Filters found in 21 C.F.R. § 870.3375. This FDA regulation required Bard to comply with the following in each IVC Filter 510(k) submission: ISO 10993 Biological Evaluation of Medical Devices Part I: Evaluation and Testing; FDA's 510(k) Sterility Review Guidance and Revision of 2/12/90 (K90-1); and FDA's Guidance for Cardiovascular Intravascular Filter 510(k) Submissions (November 26, 1999).

8. Class II devices, such as Bard's IVC Filters, are required to obtain FDA clearance through the 510(k) premarket notification process before the device can be marketed. FDA will clear a 510(k) device only after it finds that the device is "substantially equivalent" to a "predicate" device. A device is deemed substantially equivalent if FDA determines that the subject device has the same intended use and the same technological characteristics as the predicate device. If the device has the same intended use but different technological characteristics, then FDA will only clear the device if those new technological characteristics do not raise different questions of safety and effectiveness and the manufacturer provides data that demonstrates that the new device is as safe and effective as the predicate device.

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

9. During FDA's review of a 510(k) submission, FDA has the authority to require additional information from the manufacturer if FDA deems it necessary to determine substantial equivalence under 21 C.F.R. § 807.87(l), including clinical data. 21 U.S.C. § 360c(i)(1)(A)(ii). If the device manufacturer does not comply, then the submission is deemed withdrawn under 21 C.F.R. § 807.87(l). If FDA determines that the device is substantially equivalent, then it will issue a letter clearing the device to be marketed.

## II. Meridian® Filter:

10. As early as August 14, 2009, BPV began discussing with the FDA BPV's plans to develop the Meridian® Filter (more than two years before FDA cleared the device).[1]

    a. The Meridian® Filter was to be BPV's next generation retrievable IVC filter. The design goal for the Meridian® Filter was to improve the device's resistance to caudal movement/migration.

    b. In BPV's discussions with FDA, BPV described the project as one "based on the existing filter platform [that] consisted of adding caudal anchors to the Filter." This project eventually became the Meridian® Filter.

11. On November 17, 2009, to ensure that the company was satisfying FDA's requirements regarding animal testing for the Meridian® Filter, BPV asked FDA if the agency would be willing to review BPV's proposed animal study protocol.[2]

    a. FDA agreed to review BPV's proposed animal study protocol, and asked BPV to submit the proposed protocol by way of submitting a formal pre-Investigational Device Exemption ("IDE") meeting request.

12. On December 3, 2009, in response to FDA's request, BPV provided the agency with a pre-IDE meeting request, which described the fundamental scientific technology of the Meridian® Filter (which, at the time, was internally called

---

[1] *See* BPV-17-01-00171823 through 171824, attached as Exhibit 1.

[2] *See* BPV-17-01-00171875 through 171876, attached as Exhibit 2.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

"Eclipse Anchor" filter), the risk analysis used by BPV, a summary of the design verification and validation testing, and a description of the proposed animal study protocol, along with an actual draft of the proposed protocol.[3]

13. On January 8, 2010, BPV had a face-to-face meeting with FDA to discuss Bard's pre-IDE meeting request for the Meridian® Filter.[4]

   a. During that meeting, FDA stated that BPV's *in vivo* animal study on Meridian® Filter would be required to (a) include animals that are seen by the veterinarian, (b) be performed to Good Laboratory Practices standards, and (c) use animals with IVCs that are comparable in size to human IVCs.

   b. FDA also asked BPV to conduct an acute animal study to test the delivery system.

   c. FDA also stated that BPV would be required to include in its 510(k) the animal study reports by the outside consulting company, LyChron LLC, which was to assist BPV with the animal studies.

   d. FDA additionally asked BPV about the company's flat plate fatigue testing that it intended to conduct on the device.

   e. BPV responded by providing FDA with information concerning the acceptance criteria for that test (10 year equivalent of valsalva, or no failures in 4,000,000 cycles at a rate and deflection simulating coughing), which the FDA stated would be acceptable.

14. On August 31, 2010 BPV submitted its Traditional 510(k) submission (K102511) to FDA for the Meridian® Filter System -- Jugular/Subclavian Delivery Kit.[5]

   a. In the Meridian® 510(k) submission, BPV described for FDA the battery of *in vitro* testing conducted by BPV on the Meridian® Filter, including REDACTED

[3] *See* BPVEFILTER-08-00026072 through 26125, attached as Exhibit 3.

[4] *See* BPV-17-01-00171850 through 171853, attached as Exhibit 4.

[5] *See* BPV-17-01-00150192 through 151045, attached as Exhibit 5.

REDACTED

REDACTED See Ex. 5 at p. 57-71.

b. These tests were conducted as required under 21 C.F.R. 870.3375 (which is a regulation specific to cardiovascular intravascular filters) and Special Control (1), which requires manufacturers to follow ISO 10993 "Biological Evaluation of Medical Devices Part I: Evaluation and Testing."

i. Along with describing the *in vitro* testing conducted by BPV on the Meridian® Filter, BPV attached to its 510(k) submission various reports of biocompatibility testing that had been performed. See Ex. 5 at p. 132-377.

c. In the submission, BPV also described for FDA the *in vivo* animal testing conducted by the company on the Meridian® Filter. That testing assessed retrievability, fatigue resistance, cephalad migration resistance, caudal migration resistance, penetration resistance, perforation, filter centering (tilt), and other attributes of the device. See Ex. 5 at p. 72-78.

i. Along with describing the *in vivo* animal testing on the Meridian® Filter, BPV's 510(k) submission attached voluminous documents related to that animal testing, including protocols, test reports, and histology slides. See Ex. 5 at p. 378-764.

15. Thereafter, on October 26, 2010, FDA sent BPV a letter requesting additional information before FDA could determine whether it could clear the Meridian® Filter.[6]

a. In the letter, FDA directed BPV to provide additional information and responses to 14 questions (many with multiple subparts) regarding device

REDACTED

[6] *See* BPVE-01-01977697 through 1977704, attached as Exhibit 6.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

b. In particular, FDA required BPV to perform additional testing. Specifically, FDA required Bard to perform corrosion testing on fatigued filters (Question 9c), and to perform clot trapping testing (Question 11).

c. Furthermore, "to assess the safety of [the Meridian® Filter] in the [magnetic resonance ("MR")] environment," FDA asked BPV to provide MR heating test results at the location of the maximum heating for at least three different orientations to the incident electrical field in two different systems (Question 12a).

d. Additionally, FDA directed BPV to provide various tests reports, including sterilization testing (Question 1a), endotoxin testing (Question 1b), corrosion testing (Question 9a), animal testing (Question 13). In particular, with regard to animal testing, FDA noted that it could not assess BPV's conclusions "about the chronic safety of the Meridian filter" based on the animal study test reports provided.

e. FDA also asked BPV to provide manuscripts of the articles used by BPV to develop the deformation distances for fatigue testing (Question 4b).

f. FDA further required BPV to describe BPV's fatigue test setup and apparatus and to explain why the testing is considered representative of the IVC (Question 4a). FDA also asked BPV to describe and provide explanation for various aspects of BPV's migration resistance testing (Question 6a-6c).

g. FDA also required BPV to make certain changes to the labeling of the device regarding magnetic resonance imaging ("MRI") compatibility (Question 12b), latex use (Question 14a), and retrievability and the potential need for follow-up monitoring (Question 14b).

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

h. FDA required BPV to provide responses to the above requests before the agency could complete review of the company's 510(k) submission. In FDA's letter, the agency stated that if BPV does not provide the requested information (or a request for extension of time) within 30 days, the company's 510(k) submission will be considered "withdrawn" and "deleted from [the agency's] system."

16. Subsequently, FDA and BPV had a teleconference on November 12, 2010 to discuss certain of the issues raised by FDA in its October 26 letter.[7]

a. In particular, BPV and FDA discussed FDA's desire to better understand BPV's development of the "worst case" values for its fatigue testing.

17. On November 16, 2010, BPV provided FDA with an email and attachments that explained BPV's fatigue testing setup and testing parameters, which addressed Questions 4a-4c of FDA's October 26, 2010 letter.[8]

18. On December 8, 2010, BPV and FDA had a teleconference to further discuss FDA's questions about BPV's fatigue testing.[9]

a. In particular, in follow-up to BPV's November 16 email, FDA asked further questions regarding how BPV's fatigue testing was monitored to ensure proper displacement, as well as questions about how BPV derived its fatigue deformation distance based on literature.

b. BPV responded by describing in further detail the fatigue testing and how BPV ensured that the filters were constantly and consistently fatigued during testing.

c. BPV also further explained the literature basis for selecting the fatigue deformation distance utilized in the test.

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

---

7 *See* BPV-17-01-00171872 through 171873, attached as Exhibit 7.

8 *See* BPVE-01-01404251 through 1404291, attached as Exhibit 8.

9 *See* BPV-17-01-00171830 through 171832, attached as Exhibit 9.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

19. On December 27, 2010, BPV sent FDA its official response to FDA's questions of October 26, 2010.[10]

a. In response to FDA's request (Question 9c), BPV performed additional corrosion testing on fatigued filters, and submitted the results of that test to FDA with the letter.

b. Additionally, in response to FDA's request (Question 11), BPV had performed clot trapping efficiency testing. BPV described the testing performed, and provided FDA with a copy of the clot trapping efficiency test report.

c. In response to FDA's safety questions regarding the device in the MR environment (Question 12a), BPV performed additional analyses and testing to determine the maximum heating location on the device. To do this, BPV performed tests to determine the temperature REDACTED REDACTED

d. BPV further provided FDA with the various test reports and medical literature that FDA had requested (Questions 1a, 1b, 4b, 9a, 13).

e. BPV also described in detail the BPV's fatigue testing and migration resistance testing (Questions 4a, 6a-6c).

f. Finally, BPV made changes to the Meridian® instructions for use ("IFU") and patient brochure as required by FDA (Questions 12b, 14a, 14b).

20. On February 1, 2011, FDA sent BPV a second letter requesting information necessary to determine whether it could clear the Meridian® Filter.[11]

---

[10] *See* BPVEFILTER-01-01201729 through 1201779 and BPVEFILTER-11-00002394 through 2960, attached as Exhibits 10 and 11.

[11] *See* BPVEFILTER-01-00016497 through 16501, attached as Exhibit 12.

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

a. In the letter, FDA directed BPV to provide additional information and responses to 13 questions regarding REDACTED .

b. In particular, FDA expressed "safety concerns" related to BPV's corrosion resistance testing of the Meridian® Filter. The agency required BPV to "address safety concerns related to the poor corrosion resistance" by performing additional "chemical characterization of the passivation layer of [Meridian® Filter] (atomic composition vs. depth) and nickel leach testing on pre- and post-fatigue devices" (Question 8). FDA also asked BPV to provide the corrosion rate and to provide further explanation regarding that rate.

c. Furthermore, FDA required BPV to submit images of post-fatigued filters for the agency's review (Question 5).

d. Additionally, FDA required BPV to modify its protocol for shelf life testing (Question 1).

e. FDA also required BPV to repeat chromosomal aberration testing or provide justification regarding the REDACTED (Question 3).

f. FDA also required BPV to repeat clot trapping efficiency testing using a REDACTED (Question 10).

g. FDA also required BPV to further revise its labeling regarding MRI compatibility and absorption rate (Questions 12 & 13).

h. FDA required BPV to provide responses to the above requests before the agency could complete review of the company's 510(k) submission. In FDA's letter, the agency stated that if BPV does not provide the requested information (or a request for extension of time) within 30 days, the

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

company's 510(k) submission will be considered "withdrawn" and "deleted from [the agency's] system."

21. On February 10, 2011, BPV and FDA had a conference call to address certain of FDA's questions from its February 1, 2011 Letter.[12]

a. During the meeting, FDA and BPV discussed FDA's various questions set forth in the February 1, 2011 Letter so that BPV could better understand FDA's concerns and provide appropriate responses.

22. A week later, on February 17, 2011, BPV and FDA had a conference call to address FDA's biocompatibility and corrosion testing questions from its February 1, 2011 Letter.[13]

a. Regarding the issue whether BPV would need to repeat REDACTED (Question 3), BPV identified for FDA certain test reports already provided to the agency regarding this biocompatibility concern. FDA stated that it would "review the report and let BPV know if any additional testing would be required."

i. In a February 17-22, 2011 email string, upon reviewing the test report, FDA indicated that BPV would be required to repeat the chromosomal aberration testing with water only under REDACTED and to further identify any compounds detected.[14]

b. Regarding Question 9 concerning BPV's galvanic corrosion testing, FDA stated that "surface characterization and nickel leaching are the only tests that can be done, and are the tests the FDA finds acceptable" to address galvanic corrosion.

c. In response, BPV committed to performing testing regarding atomic REDACTED. BPV also stated

[12] *See* BPV-17-01-00171836 through 171838, attached as Exhibit 13.

[13] *See* BPV-17-01-00171841 through 171844, attached as Exhibit 14.

[14] *See* BPVEFILTER-01-01853704 through 1853705, attached as Exhibit 15.

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

it would consult with its corrosion consultant regarding the corrosion testing to discuss repeating the testing until a steady state is reached.

23. On May 17, 2011, BPV had a face-to-face meeting with FDA to discuss Questions 8 and 9 from FDA's February 1, 2011 Letter.[15]

a. During the meeting, BPV provided a 70-slide PowerPoint presentation that summarized BPV's efforts regarding corrosion testing, REDACTED .[16]

i. This presentation included detailed charts and graphs of BPV's corrosion testing efforts, as well as summaries of FDA's requests and BPV's responses to date regarding the Meridian® Filter.

b. With respect to galvanic corrosion testing, FDA asked BPV to repeat galvanic corrosion on 6 straight anchor/wire couples and 6 offset anchor/wire couples.

i. FDA also asked BPV conduct plots that show the galvanic current and mixed potentials for the couples.

c. With respect to pitting corrosion, FDA directed BPV to re-plot CCP plots and discuss any noise.

d. With respect to nickel leach testing, FDA required BPV to perform Ni Leach testing on 5 non-fatigued filters from a single ingot.

e. FDA also required BPV to evaluate REDACTED, and to perform a calibration test.

f. FDA also stated it would propose to BPV language for labeling.

24. In a May 20-23, 2011 email chain with FDA, BPV and FDA further discussed a summary of the "list of required additional testing" FDA requested for BPV to "fully address deficiencies eight and nine."[17]

---

[15] *See* BPV-17-01-00171857 through 171864, attached as Exhibit 16.

[16] *See* BPVEFILTER-01-00136505, attached as Exhibit 17.

[17] *See* BPVEFILTER-08-00065051 through 65053, attached as Exhibit 18.

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

a. FDA confirmed that it was requiring BPV to do the following:

i. Regarding galvanic corrosion testing:

1. Repeat galvanic corrosion on 6 straight anchor/wire couples and 6 offset anchor / wire couples;

2. Only the galvanic test would be performed, not the LPR and Tafel test;

3. Plots would show the galvanic current and mixed potentials for the couples;

ii. Regarding pitting corrosion:

1. Re-plot CCP plots on the same scale;

2. Discuss any noise;

iii. Regarding nickel leach testing:

1. 5 non-fatigued filters would be tested;

2. One filter would be tested per vial;

3. BPV would provide a description of the manufacturing controls related to the surface to the device;

iv. Regarding nickel leach calibration test:

1. REDACTED;

b. In addition, FDA provided BPV with the following proposed language to include in BPV's Meridian® Filter IFU:

i. "The [DEVICE NAME] consists of nickel-titanium alloy, which is generally considered safe. However, in vitro testing has demonstrated that nickel is released from this device for a minimum of 60 days. Patients who are allergic to nickel may have an allergic reaction to this device, especially those with a history of metal allergies. Certain allergic reactions can be serious; patients should be instructed to notify their physicians immediately if they suspect they are experiencing an allergic reaction such as difficulty in breathing or

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

inflammation of the face or throat. Some patients may develop an allergy to nickel if this device is implanted. Some forms of nickel have also been associated with carcinogenicity (ability to cause cancer) in animal models. In humans, carcinogenicity has been demonstrated through an inhalation route (breathing nickel in), which will not occur in this procedure. The effect of other routes of exposure is not known, but the risk related to this device is considered small."

25. On May 23, 2011, BPV sent FDA the company's informal responses to certain of FDA's questions from the February 1, 2011 letter.[18]

a. In response to FDA's request (Question 1), BPV revised its shelf-life testing protocol.

b. Additionally, in response to FDA's requests (Questions 3, 10), BPV repeated its REDACTED.

c. BPV also provided FDA with images of post-fatigued filters, as FDA had requested (Question 5).

d. Finally, BPV submitted draft revised labeling with updates for MRI compatibility and absorption rate (Questions 12 &13).

26. On June 15, 2011, BPV sent FDA the company's informal responses to the remaining questions from FDA's February 1, 2011 Letter.[19]

a. In response to FDA's requests (Questions 8 & 9), and to address FDA's safety concerns, BPV performed additional testing to submit to FDA.

b. REDACTED

---

[18] *See* BPVEFILTER-08-00076994 through 77147, attached as Exhibit 19.

[19] *See* BPVEFILTER-01-01138842 through 1138951, attached as Exhibit 20.

REDACTED Test reports for each of these tests were submitted.

27. On June 22, 2011, BPV and FDA had a conference call to discuss BPV's June 15, 2011 response to the agency's February 1, 2011 Letter, and to specifically to discuss the results of BPV's additional testing conducted at FDA's request.[20]

a. As a result of the meeting, and at FDA's request, BPV agree to include in its formal response the following:

i. A discussion on the difference between the 60-day and 14-day data for non-fatigued devices;

ii. A table of the Ni release results;

iii. A description of the equation used to describe the results;

28. On June 27, 2011, BPV sent FDA BPV's formal responses to FDA's questions from its February 1, 2011 Letter.[21]

a. This formal response included descriptions, summaries, and reports for all additional testing and analyses that FDA required BPV to conduct before FDA could assess clearance of the Meridian® Filter, including:

i. (a) modifying the stability protocol (Question 1),

ii. (b) REDACTED (Question 3),

iii. (c) imaging at 40X magnification of fatigued filters, with BPV's justification for image location (Question 5),

[20] *See* BPV-17-01-00171877 through 171879, attached as Exhibit 21.

[21] *See* BPVEFILTER-08-00075953 through 76043, BPVEFILTER-08-00074784 through 74827, BPVEFILTER-08-00085241 through 85294, BPVEFILTER-08-00083555 through 83592, BPVEFILTER-08-00081986 through 82031, BPVEFILTER-08-00080312 through 80407, BPVEFILTER-01-01156092 through 1156185, BPVEFILTER-35-00027113 through 27173, attached as Exhibits 22, 23, 24, 25, 26, 27, 28, and 29.

Nelson Mullins Riley & Scarborough L.L.P. 201 17th Street NW, Suite 1700 Atlanta, GA 30363 (404) 322-6000

iv. (d) providing composite (linear / transverse) modulus of *in-vivo* IVC compared to mock vessels utilized in migration testing, which FDA deemed acceptable (Question 6),

v. (e) conducting retrieval force testing on predicate device the Eclipse® filter (Question 7),

vi. (f) REDACTED (Question 8),

vii. (g) REDACTED (Question 8),

viii. (h) REDACTED (Question 9),

ix. (i) REDACTED (Question 9),

x. (j) REDACTED (Question 9),

xi. (k) repeating clot trapping efficiency testing using shower clot trapping test method (Question 10),

xii. (l) providing FDA with an experimental analysis demonstrating worst case heating location (Question 11), and

xiii. (m) revised MRI labeling (Questions 11-13).

b. Additionally, in response to FDA's request, BPV provided FDA with a sample Meridian® Filter for FDA to review.

29. On August 16-17, 2011, FDA and BPV exchanged emails regarding FDA's proposal for still further changes to the Meridian® IFU, which BPV agreed to implement.[22]

a. Specifically, FDA requested, and BPV agreed to implement, the following changes to the Meridian® Filter IFU:

[22] *See* BPVEFILTER-08-00077841 through 77854, attached as Exhibit 30.

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

i. REDACTED

30. On August 24, 2011, FDA sent BPV a letter clearing the Meridian® Filter System -- Jugular/Subclavian Delivery Kit (K102511).[23]

a. In total, BPV's initial 510(k) submission for the Meridian® Filter System -- Jugular/Subclavian Delivery Kit (K102511), submitted August 31, 2010,

[23] *See* BPV-17-01-00171818 through 171820, attached as Exhibit 31.

Nelson Mullins Riley & Scarborough L.L.P. 201 17th Street NW, Suite 1700 Atlanta, GA 30363 (404) 322-6000

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

was pending for almost a full year before FDA cleared the device on August 24, 2011.

31. On August 27, 2011, BPV submitted its Special 510(k) submission to FDA for the Meridian® Filter System - Femoral Delivery Kit.[24]

   a. This 510(k) submission sought to make changes to the Meridian® Filter delivery system only, not to the filter itself, to accommodate delivery via the femoral vein.

   b. In the 510(k) submission, BPV described for FDA the *in-vitro* and *in-vivo* testing conducted by BPV to support clearance of the filter with a femoral delivery system. This included summaries of that testing (*see* Ex. 32 at pages 33-49), as well as various test protocols and reports (*see* Ex. 32 at pages 150-292, 296-452).

32. On September 30, 2011, FDA sent BPV a letter requesting additional information before FDA could determine whether it could clear the Meridian® Filter with a femoral delivery system.[25]

   a. In particular, FDA asked for clarification regarding the overmold for the storage tubing of the delivery system (Question 1).

   b. FDA also directed BPV to make certain revisions to BPV's 510(k) summary to better state the changes of the device compared to the predicates (Question 2).

   c. FDA required BPV to provide responses to the above requests before the agency could complete review of the company's 510(k) submission. In FDA's letter, the agency stated that if BPV does not provide the requested information (or a request for extension of time) within 30 days, the company's 510(k) submission will be considered "withdrawn" and "deleted from [the agency's] system."

[24] *See* BPV-17-01-00147141 through 147592, attached as Exhibit 32.
[25] *See* BPV-17-01-00147593 through 147597, attached as Exhibit 33.

33. On September 30, 2011, BPV provided its official response to FDA's questions.[26]

a. In its response, BPV clarified that the overmold used for the storage tubing is in the same configuration as the Denali delivery system (Question 1).

b. Additionally, BPV provided FDA with a revised 510(k) summary to more clearly describe the changes to the device, per FDA's request (Question 2).

34. On October 24, 2011, FDA sent BPV a letter clearing the Meridian® Filter System -- Femoral Delivery Kit (K112497).[27]

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

82. On February 26, 2016, FDA sent BPV a letter acknowledging the completion of the Denali® Filter clinical investigation.[76]

a. Per the FDA's letter, FDA considered BPV's IDE application closed.

**IV. The Above Referenced Documents Are Confidential and Proprietary**

83. Bard or its affiliates are engaged in the development, design, manufacturing, and distribution of medical devices, including the Bard Filters. Many documents involving the Bard IVC Filters are confidential and are maintained as such by Bard for the reasons listed below.

84. The medical device business for IVC filters is a highly technical and sophisticated industry. It is also a highly competitive industry in which each company carefully guards its company documents, data, systems, processes, research and development, analysis, marketing strategies and trade secrets from competitors.

85. As part of and during the course of my work with Bard, I have become familiar with Bard's efforts to protect its trade secret and confidential proprietary information and documents. This is information is maintained internally at Bard and distributed to employees who need to know the information to perform their

[75] *See* BPV-17-01-00231751 through 231756, attached as Exhibit 86.

[76] *See* BPV-17-01-00231750, attached as Exhibit 87.

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

duties. It is not available outside the company. Outside physician consultants working with the company who have access to this information sign confidentiality agreements.

86. As part of and during the course of my work with Bard, I have become familiar with documentation and records associated with the design, development, manufacture, regulatory compliance, and testing (including clinical testing) of the Bard IVC Filters.

a. The documents referenced and attached to this Declaration contain confidential and proprietary information of Bard's concerning the design, development, testing (including clinical testing), manufacture, and regulatory compliance activities concerning Bard IVC Filters.[77]

b. The documents include, for example, 510(k) submissions, IDE submissions, and other materials sent to FDA that detail Bard's product development activities, proprietary testing, and implementation of various proprietary processes and procedures.

c. The documents also include contact reports and email communications, which likewise contain information Bard's product development activities, proprietary testing, and implementation of various proprietary processes and procedures.

d. The documents also include communications from FDA, which frequently contain questions that detail and disclose Bard's product development activities, proprietary testing, and implementation of various proprietary processes and procedures.

e. The information contained in the documents referenced and attached to this Declaration required years for Bard to develop and is Bard's critical business information which is not made public by Bard.

[77] Note that Bard is not asserting as confidential Exhibits 31, 36, 79, and 82.

f. The information contained in the documents referenced and attached to this Declaration would be of economic value to Bard's competitors. Moreover, such value would extend not only to manufacturers of other IVC filters, but also to manufacturers of other medical devices, as the value and utility of this information is not limited to IVC filters.

87. Bard invests very substantial sums of money in medical device research, testing (including clinical testing), development, design, analysis, regulatory compliance, evaluation, and marketing. If the information Bard has developed over the years pertaining to the Bard IVC Filters was obtained by its competitors, it would give an unfair economic advantage to those competitors.

88. Due to the economic disadvantage that would result if Bard's trade secrets and other confidential, proprietary information regarding its products were disclosed to one of its competitors, Bard seeks Protective Orders and Confidentiality Agreements to be executed by all parties seeking confidential, proprietary and trade secret information in civil lawsuits, including in products liability/personal injury litigation.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Executed on this 23 day of March, 2017.

John D. Van Vleet

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000