James R. Condo (#005867)
Amanda C. Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2204
Telephone: (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

*Attorneys for Defendants*
*C. R. Bard, Inc. and*
*Bard Peripheral Vascular, Inc.*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation | No. 2:15-MD-02641-DGC |
| | **DEFENDANTS' SEPARATE STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT REGARDING PREEMPTION** |
| | (Assigned to the Honorable David G. Campbell) |

Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively "Bard") submit this Separate Statement of Facts in Support of their Motion for Summary Judgment Regarding Preemption. Bard contends that there is no genuine issue to be tried as to the following facts:

1.     Bard marketed several Inferior Vena Cava Filters (or "IVC Filters") for permanent and retrievable placement, including the Recovery®, G2®, G2® Express,

G2®X, Eclipse™, Meridian®, and Denali® Filters.  Decl. of Robert Carr ("Carr Decl.") at ¶ 2, attached hereto as Exhibit A.

2.      These Filters are prescription IVC filters that were designed, manufactured, packaged, labeled, and sold according to the terms of clearance by the Food and Drug Administration ("FDA") through the §510(k) process.

## I.      The FDA Regulatory Clearance Process

3.      FDA is the federal agency responsible for regulating the manufacture, sale, and distribution of medical devices, such as Bard's IVC Filters.  Decl. of John D. Van Vleet ("Van Vleet Decl.") at ¶ 6, attached hereto as Exhibit B.

4.      FDA derives its authority from the Food, Drug and Cosmetic Act ("FDCA"), as amended by the Medical Device Amendments of 1976 ("MDA"). Ex. B, Van Vleet Decl. at ¶ 6.

5.      The MDA requires that all medical devices, unless exempt by FDA regulation, undergo FDA premarket review through either premarket notification ("510(k)") or premarket approval ("PMA"), which are intended to achieve FDA's goal of providing reasonable assurance of safety and effectiveness. FDA, *CDRH Preliminary Internal Evaluations – Volume I: 510(k) Working Group Preliminary Report and Recommendations*, at 22 (Aug. 2010), attached hereto as Exhibit C.

6.      Class II devices, such as Bard's IVC Filters, are required to obtain FDA clearance through the 510(k) process before the device can be marketed.  Ex. B, Van Vleet Decl. at ¶ 8.

7.      FDA will clear a 510(k) device only after it finds that the device is "substantially equivalent" to a "predicate" device. Ex. B, Van Vleet Decl. at ¶ 8.

8.      A "predicate device" is either a device legally marketed prior to May 28, 1976, for which PMA is not required, or a device reclassified from Class III to Class II or I, or a device which has been found substantially equivalent through the 510(k) process. 21 C.F.R. § 807.92(a)(3).

Nelson Mullins Riley & Scarborough

L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

9.     The MDA introduced but did not define the term "substantially equivalent," so FDA was forced to look to the MDA's "legislative history for guidance on how to interpret and apply the statutory standard established by the MDA." Ex. C, at 23-24.

10.     FDA's first formal articulation of the factors it would consider for substantial equivalence determinations was in FDA's 1986 *Guidance on the CDRH Premarket Notification Review Program 6/30/86 (K86-3)* (issued June 30, 1986). Ex. C at 24-25.

11.     The Safe Medical Devices Act of 1990 ("SMDA") amended the MDA, codifying FDA's "substantial equivalence" review standard, and revising FDA's authority over medical devices.  Ex. C, at 28.

12.     Under the statutory definition, a device is deemed substantially equivalent if FDA determines that the subject device has the same intended use and the same technological characteristics as the predicate device.  Ex. B, Van Vleet Decl. at ¶ 8.

13.     If the device has the same intended use but different technological characteristics, then FDA will only clear the device if those new technological characteristics do not raise different questions of safety and effectiveness and the manufacturer provides data that demonstrates that the new device is as safe and effective as the predicate device. Ex. B, Van Vleet Decl. at ¶ 8.

14.     During FDA's review of a 510(k) submission, FDA has the authority to require additional information from the manufacturer if FDA deems it necessary to determine substantial equivalence under 21 C.F.R. § 807.87(l), including clinical data. 21 U.S.C. § 360c(i)(1)(A)(ii).  Ex. B, Van Vleet Decl. at ¶ 9.

15.     When clinical data is provided in the 510(k) submission it "should constitute valid scientific evidence as defined in 21 C.F.R. § 860.7(c)(2) and must comply with the Investigational Device Exemptions (IDE) regulations as applicable." FDA Guidance, *The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)]*, at 23 (July 28, 2014), attached hereto as Exhibit D.

16.    "Only approximately eight percent of 510(k)s for non–in-vitro-diagnostic devices contain clinical data, and only 11 percent of these 510(k)s reference a predicate for which clinical data was provided. Less than one percent of non–in-vitro-diagnostic 510(k)s reference a clinical trial conducted under an approved Investigational Device Exemption application (IDE)." Ex. C, at 77.

17.    If the device manufacturer does not comply with FDA's demand for additional information, then the submission is deemed withdrawn under 21 C.F.R. § 807.87(l).  Ex. B, Van Vleet Decl. at ¶ 9.

18.    If FDA determines that the device is substantially equivalent, then it will issue a letter clearing the device to be marketed. Ex. B, Van Vleet Decl. at ¶ 9.

19.    FDA stated in its 2017 Memorandum: "Although the 510(k) process involves a comparison of a new device to a predicate device rather than an independent demonstration of the new device's safety and effectiveness . . ., in all these cases FDA's review process reflects a determination of the level of control necessary to provide a 'reasonable assurance of safety and effectiveness.'" FDA Memorandum, *Public Health Interests and First Amendment Considerations Related to Manufacturer Communications Regarding Unapproved Uses of Approved or Cleared Medical Products*, at 44-45 (January 2017), attached hereto as Exhibit E.

## II.    Class II Devices and "Special Controls"

20.    The "MDA established a three-tiered regulatory system with safety and effectiveness requirements applicable to all medical devices, and a classification scheme requiring that devices be placed into one of three" regulatory control categories: Class I, II, or III. Ex. C, at 21; Ex. B, Van Vleet Decl. at ¶ 7.

21.    According to FDA, device classification depends upon "the degree of regulation necessary to provide reasonable assurance of [the device's] safety and effectiveness. The class into which a device is placed determines the requirements that a medical device manufacturer must meet prior to distributing a device in interstate commerce." Ex. D, at 2.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough

L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

22.     FDA classifies Bard's IVC Filters as Class II devices.  Ex. B, Van Vleet Decl. at ¶ 7.

23.     Class II devices are defined as "Devices for which general controls, by themselves are insufficient to provide reasonable assurance of the safety and effectiveness of the device, and for which there is sufficient information to establish special controls to provide such assurance." Ex. D, at 2.

24.     The original 1976 definition of Class II devices in the MDA "identified performance standards rather than special controls as the mechanism by which FDA could establish reasonable assurance of safety and effectiveness." Ex. D, at 2 n.2.

25.     The SMDA amended the MDA, adding "special controls" to the definition of Class II devices, "which can include the promulgation of performance standards as well as postmarket surveillance, patient registries, development and dissemination of guidance documents, and other appropriate actions as FDA deems necessary to provide such assurance. This authority gave FDA more flexibility in identifying the controls necessary to provide reasonable assurance of the safety and effectiveness of class II devices." Ex. C, at 28.

26.     According to FDA, "[s]pecial controls are regulatory requirements for class II devices."[1] Earlier this year, FDA reiterated that "[s]pecial controls are device-specific." Ex. E, at 41 n.122.

27.     Bard's IVC Filters, as Class II devices, are subject to the general controls under the MDA and the specific special controls for IVC Filters found in 21 C.F.R. § 870.3375. Ex. B, Van Vleet Decl. at ¶ 7.

28.     FDA's IVC Filter regulation, 21 C.F.R. § 870.3375, required Bard to comply with the following in each IVC Filter 510(k) submission: ISO 10993 *Biological Evaluation of Medical Devices Part I: Evaluation and Testing*; FDA's *510(k) Sterility*

---

[1] FDA, *Regulatory Controls (Medical Devices)*, http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Overview/GeneralandSpecialControls/ucm2005378.htm (last updated June 26, 2014).

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

*Review Guidance and Revision of 2/12/90 (K90-1)*; and FDA's *Guidance for Cardiovascular Intravascular Filter 510(k) Submissions* (November 26, 1999). Ex. B, Van Vleet Decl. at ¶ 7.

29.     The FDA's Guidance for IVC Filter 510(k) Submissions is a device-specific guidance document. FDA's *Guidance for Cardiovascular Intravascular Filter 510(k) Submissions* (November 26, 1999) [hereinafter "Filter Guidance"], attached hereto as Exhibit F.

30.     Using special controls, "FDA has issued many device-specific guidance documents that clarify the data that should be included in 510(k)s for particular device types." Exhibit D, at 6.

31.     The Filter Guidance required that Bard perform biocompatibility testing in accordance with the provisions in ISO 10993 for implantable, blood-clotting devices. Ex. F, at 3.

32.     The Filter Guidance further required Bard to perform pre-clinical testing that adequately addressed the following issues related to the filter design: simulated deployment, introducer/sheath suitability, clot trapping ability, filter fracture, caval perforation/filter migration, thrombogenicity, and MRI compatibility. Ex. F, at 3-5.

33.     The Filter Guidance warned that the "necessary array of tests for a particular filter will depend, in part, on the specific design," and that additional pre-clinical testing may be "necessary to qualify all filters/designs." Ex. F, at 2.

34.     "The degree to which a proposed device is similar to a currently marketed filter will indicate the level of testing necessary, i.e., whether the design characteristics can be assessed via *in vitro* bench testing, *in vivo* animal testing, clinical testing or some combination of all three." Ex. F, at 2.

35.     The Filter Guidance warned that human clinical investigations could be necessary for new IVC filter designs or even for modified filter designs. Ex. F, at 5.

36.     The Filter Guidance further identified specific complications that Bard had to analyze during its clinical investigation. Ex. F, at 5-9.

37. The Filter Guidance also required Bard to include specific text in its labeling and follow specific label formatting. Ex. F, at 9-10.

38. Bard is prohibited from unilateral labeling changes that significantly impact safety and effectiveness without first submitting a new 510(k). *See* FDA Guidance, *FDA Deciding When to Submit a 510(k) for a Change to an Existing Device* (K97-1), at 9-12 (January 10, 1997), attached hereto as Exhibit G.

39. "[T]he 510(k) program has changed significantly since its inception…. Through various statutory and regulatory modifications over time, it has become a multifaceted premarket review process that is expected to assure that cleared devices, subject to general and applicable special controls, provide reasonable assurance of safety and effectiveness, and to facilitate innovation in the medical device industry." Ex. C, at 28.

## III.   Recovery® Filter:

### A.   Recovery Filter for Permanent Indication (K022236)

40. On November 1, 1999, prior to Bard's acquisition of NMT's line of filter products, NMT submitted a Special 510(k) seeking clearance for the Recovery Filter System. Ex. A, Carr Decl. at ¶ 5.

41. This filter modified NMT's previously cleared predicate device, the Simon Nitinol Filter/Straight Line System. Ex. A, Carr Decl. at ¶ 5.

42. NMT sought FDA clearance for an expanded indication allowing retrieval of the filter if it was misplaced or malpositioned. Ex. A, Carr Decl. at ¶ 5.

43. On December 10, 1999, the FDA sent a letter to NMT, stating that the Special 510(k) submission had "major deficiencies," in that clinical data would be required to determine whether the new device was substantially equivalent to the predicate devices. Ex. A, Carr Decl. at ¶ 6.

44. The FDA therefore considered NMT's submission withdrawn and deleted from the FDA system. Ex. A, Carr Decl. at ¶ 6.

45. On February 10, 2000, NMT and FDA met to discuss the need for a clinical

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1   trial, but no decision was reached. Ex. A, Carr Decl. at ¶ 7.

2       46.    FDA reaffirmed that "clinical data would be required to support a future

3   510k submission during a February 29, 2000 telephone conference. Ex. A, Carr Decl. at ¶

4   7.

5       47.    FDA required clinical data before it would clear a retrievability indication

6   because the FDA was concerned about possible acute complications, including acute

7   migration, fracture, occlusion, and cava puncture. Ex. A, Carr Decl. at ¶ 7.

8       48.    Before Bard acquired NMT's entire IVC filter line of products in 2001, a

9   clinical study was underway for the Recovery Filter by Dr. Murray Asch in Toronto,

10  Canada on behalf of NMT and Bard. Ex. A, Carr Decl. at ¶ 7.

11      49.    On July 10, 2002, IMPRA, a subsidiary of Bard, submitted its Special

12  510(k) for the Recovery Filter for a permanent indication only. Ex. A, Carr Decl. at ¶ 8.

13      50.    IMPRA's Recovery® 510(k) submission submitted a battery of *in vitro*

14  testing BPV (and NMT) had conducted on the Recovery® Filter, including clot trapping

15  efficiency, migration, weld integrity, hook strength, corrosion/fatigue testing, radial

16  strength, simulated use, and more. Ex. A, Carr Decl. at ¶ 8.

17      51.    BPV's bench testing was performed in conformance with the FDA guidance

18  document: "Guidance for Cardiovascular Intravascular Filter 510(k) Submission." Ex. A,

19  Carr Decl. at ¶ 8.

20      52.    BPV's design verification for the modifications and the manufacturing

21  facility for the Recovery® filter conformed to the design control requirements of 21 CFR

22  § 820.30. Ex. A, Carr Decl. at ¶ 8.

23      53.    The Recovery® 510(k) submission included the proposed labeling for the

24  Recovery® Filter in conformance with 21 CFR § 807.87(e). Ex. A, Carr Decl. at ¶ 8.

25      54.    The Recovery® 510(k) submission also included a summary of the safety

26  and effectiveness information upon which a substantial equivalence determination could

27  be based as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92. Ex.

28  A, Carr Decl. at ¶ 8.

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

55.     The Recovery® 510(k) submission further included clinical data from the Dr. Murray Asch clinical study conducted in Toronto to support the determination of substantial equivalence as a permanent filter. Ex. A, Carr Decl. at ¶ 8.

56.     On August 5, 2002, the FDA sent IMPRA a letter requiring additional information to complete the review of IMPRA's submission. Ex. A, Carr Decl. at ¶ 9.

57.     The FDA prohibited IMPRA from marketing its Recovery® filter until it had provided the additional information under 21 CFR § 807.87(l).  Ex. A, Carr Decl. at ¶ 9.

58.     If IMPRA failed to respond within 30 days, the FDA would have treated this 510(k) submission as withdrawn. Ex. A, Carr Decl. at ¶ 9.

59.     The FDA's August 5, 2002 letter required responses to 17 agency-posed questions regarding clinical testing, bench performance testing, biocompatibility, and administrative elements. Ex. A, Carr Decl. at ¶ 9.

60.     Among other things, the FDA asked questions about IMPRA's root cause analysis of filter tilting, and whether tilting of the Recovery® Filter affected its safety and effectiveness. Ex. A, Carr Decl. at ¶ 9.

61.     The FDA also sought information regarding issues such as integrity inspections of the filter and fatigue testing of its welds and hooks. Ex. A, Carr Decl. at ¶ 9.

62.     On August 12, 2002, IMPRA and the FDA held a teleconference to discuss the FDA's demand for additional information. Ex. A, Carr Decl. at ¶ 10.

63.     On August 30, 2002, IMPRA provided the FDA with the required additional information. Ex. A, Carr Decl. at ¶ 11.

64.     IMPRA answered each question/request in order, including additional data or explanation as needed, as well as test results and other supporting materials. Ex. A, Carr Decl. at ¶ 11.

65.     In particular, IMPRA responded to the FDA's safety and effectiveness concerns about root cause analysis of the Recovery® Filter tilting and IMPRA's clinical experience with such tilting. Ex. A, Carr Decl. at ¶ 11.

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

66.     On October 1, 2002 and October 3, 2002, IMPRA and the FDA held additional teleconferences to discuss the additional information required by the FDA. Ex. A, Carr Decl. at ¶ 12.

67.     IMPRA provided the FDA with further clarification about its responses. Ex. A, Carr Decl. at ¶ 12.

68.     On October 4, 2002, the FDA sent IMPRA a second letter requiring still more information. Ex. A, Carr Decl. at ¶ 13.

69.     The FDA again prohibited IMPRA from marketing its Recovery® filter until it had provided the additional information under 21 CFR § 807.87(l).  Ex. A, Carr Decl. at ¶ 13.

70.     If IMPRA failed to respond within 30 days, the FDA would have treated this 510(k) submission as withdrawn. Ex. A, Carr Decl. at ¶ 13.

71.     The FDA required justification for IMPRA having not tested the filter's efficacy in ██REDACTED██, and required IMPRA to provide "objective and quantifiable data" to demonstrate that the device design was sufficiently similar to the filters tested in the literature (Question 1). Ex. A, Carr Decl. at ¶ 13.

72.     The FDA also required IMPRA to detail its radial strength testing and its compliance with the caval perforation/filter migration testing requirement of the Guidance for Cardiovascular Intravascular Filter 510(k) Submissions (Question 2). Ex. A, Carr Decl. at ¶ 13.

73.     The FDA further required IMPRA to revise the filter's instructions for use ("IFU") and labeling to state that the Recovery® Filter was indicated for permanent placement only (Question 3). Ex. A, Carr Decl. at ¶ 13.

74.     On October 25, 2002, IMPRA responded to the FDA's October 4, 2002 demand by providing the required additional information. Ex. A, Carr Decl. at ¶ 14.

75.     In response to FDA's demand (Question 1), IMPRA justified not separately testing for 2-4mm clot trapping ability by comparing the design of the Recovery® Filter to five equivalent filters already tested in the literature, as determined by comparative

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

dimensional measurements. Ex. A, Carr Decl. at ¶ 14.

76.     In response to FDA's demand (Question 2), IMPRA provided an in-depth explanation of compliance with the requirements of FDA's Guidance for Cardiovascular Intravascular Filter 510(k) Submissions concerning radial strength and caval perforation/filter migration testing. Ex. A, Carr Decl. at ¶ 14.

77.     In response to FDA's demand (Question 3), IMPRA included the required revisions to the Recovery® Filter's indication statement in the IFU and labeling. Ex. A, Carr Decl. at ¶ 14.

78.     On November 27, 2002, the FDA cleared the Recovery® Filter, finding it as safe and effective as, and therefore substantially equivalent to, the predicate device for permanent indication, subject to the general controls and special controls of the FDCA. Ex. A, Carr Decl. at ¶ 15.

79.     The FDA had reviewed all of the data originally submitted by IMPRA, and the two sets of additional information the FDA had required by letter.  Ex. A, Carr Decl. at ¶ 15.

80.     Because the FDA determined there was a reasonable likelihood that this device would be used off-label for a retrievable indication, and that such use could cause harm, the FDA limited the substantial equivalence finding and, pursuant to 21 U.S.C. § 360c(i)(1)(E), required IMPRA to include specific language in the Recovery® Filter's labeling and promotional materials stating: "The safety and effectiveness of the Recovery Filter for use as a retrievable or temporary filter have not been established." Ex. A, Carr Decl. at ¶ 15.

**B.     Recovery® Filter for Percutaneous Retrieval (K031328)**

81.     In November 2002 and December 2002, responsibility for Bard's filter line of products shifted to another division of Bard, moving from IMPRA to BPV. IMPRA had no further involvement. Ex. A, Carr Decl. at ¶ 16.

82.     On December 17, 2002, BPV sent the FDA a letter requesting a meeting with the FDA to propose changes to BPV's labeling and IFU for the Recovery® Filter.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1   Ex. A, Carr Decl. at ¶ 17.

2       83.     BPV requested this meeting in preparation for its 510(k) filing for the

3   Recovery® Filter to remove the FDA-imposed labeling limitation regarding percutaneous

4   retrieval. Ex. A, Carr Decl. at ¶ 17.

5       84.     BPV attached numerous materials to the letter in advance of the meeting,

6   including proposed labeling and IFU amendments, results of animal testing, results of Dr.

7   Asch's clinical study, and other materials. Ex. A, Carr Decl. at ¶ 17.

8       85.     On January 14, 2003, BPV and the FDA met to discuss BPV's proposed

9   changes and the materials submitted with BPV's December 17, 2002 letter. Ex. A, Carr

10  Decl. at ¶ 18.

11      86.     The FDA reviewed the *in-vivo* animal testing and the clinical testing of the

12  Recovery® Filter and raised questions regarding the animal histology and whether

13  additional clinical data was available, which BPV agreed to address (Question 1). Ex. A,

14  Carr Decl. at ¶ 18.

15      87.     The FDA also reviewed the IFU and labeling and raised questions regarding

16  the proposed amendments. The FDA stated that BPV's proposed precaution statement

17  about thrombus should be raised to a warning and included in the warning section, which

18  BPV agreed to address in the 510(k) (Question 2). Ex. A, Carr Decl. at ¶ 18.

19      88.     The FDA stated that the IFU should be revised to include removal

20  techniques developed during BPV's *in-vivo* animal and clinical testing, which BPV agreed

21  to address in the 510(k) (Question 2). Ex. A, Carr Decl. at ¶ 18.

22      89.     On January 31, 2003, BPV and the FDA had a follow-up telephone

23  conference.  Ex. A, Carr Decl. at ¶ 19.

24      90.     The FDA stated that BPV "had supplied good supportive information that

25  provided the agency with an appropriate level of comfort."  Ex. A, Carr Decl. at ¶ 19.

26      91.     During the telephone conference, the FDA raised additional concerns

27  regarding, among other things, the proposed labeling.  Ex. A, Carr Decl. at ¶ 19.

28      92.     The FDA required that specific language be added to the Indication section

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

providing that the Recovery® Filter could be removed only within a specified time period after insertion.  BPV agreed to draft proposed language for FDA's review.   Ex. A, Carr Decl. at ¶ 19.

93.    The FDA also required that the precaution statement about thrombus not only be elevated to a warning but also be bolded and italicized, which BPV agreed to address in the 510(k).   Ex. A, Carr Decl. at ¶ 19.

94.    Between March 14 and March 21, 2003, BPV and the FDA exchanged emails about the proposed changes to the labeling of the Recovery® Filter.   Ex. A, Carr Decl. at ¶ 20.

95.    The FDA reviewer stated that "it is likely that the label will need revision regarding the time to removal" and should specify a time for removal of the filter.    Ex. A, Carr Decl. at ¶ 20.

96.    BPV emailed revised proposed labeling for FDA review, but the FDA responded that the proposed labeling regarding the retrieval time would probably be decided at a higher level, and that BPV should submit its 510(k) application based on the FDA's input to date.  Ex. A, Carr Decl. at ¶ 20.

97.    The FDA assured BPV that it would "work on revisions during the review process."  Ex. A, Carr Decl. at ¶ 20.

98.    On April 25, 2003, BPV submitted an Abbreviated 510(k) for percutaneous retrieval of the Recovery® Filter in order to remove the labeling restriction and add specific instructions for removal of the Recovery® Filter.  Ex. A, Carr Decl. at ¶ 21.

99.    The proposed changes amended the indications, labeling, and IFU. BPV did not propose any design changes, and its 510(k) emphasized that the proposed changes did not change the original intended use of the cleared Recovery Filter.  Ex. A, Carr Decl. at ¶ 21.

100.    The 510(k) submission included and was supported by full results of BPV's animal study and the Asch clinical study that BPV previously shared with the FDA, as well as by testing materials from those studies.   Ex. A, Carr Decl. at ¶ 21.

101.   The 510(k) also included proposed amendments to the labeling and IFU in conformance with 21 CFR § 807.87(e), which included the changes that the FDA required during its previous correspondence with BPV.   Ex. A, Carr Decl. at ¶ 21.

102.   The submission also included a summary of the safety and effectiveness information upon which a substantial equivalence determination could be based as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92.   Ex. A, Carr Decl. at ¶ 21.

103.   On July 1, 2003, the FDA sent BPV an email requiring that BPV include a "clinical experience" section in the Recovery® Filter IFU discussing the clinical results from the Asch study.  Ex. A, Carr Decl. at ¶ 22.

104.   The FDA assured BPV that it would "provide comment" on the drafted language.  Ex. A, Carr Decl. at ¶ 22.

105.   On July 2, 2003, the FDA sent BPV an email demanding clarification regarding whether the testing reported in the Recovery® Filter 510(k) submission involved sterilized samples.  Ex. A, Carr Decl. at ¶ 23.

106.   The FDA also inquired as to whether the tests were performed after aging. Later that same day, BPV responded to the FDA that shelf life testing was done on the devices in the submission, and FDA requested this shelf life data.  Ex. A, Carr Decl. at ¶ 23.

107.   On July 8, 2003, BPV faxed all of the required information to the FDA, including the stability protocols, stability test reports, stability product adoption/rationale, and accelerated aging protocols.  Ex. A, Carr Decl. at ¶ 24.

108.   On July 22, 2003, an internal FDA memorandum extensively reviewed the animal testing submitted with BPV's Recovery® Filter 510(k).  Ex. A, Carr Decl. at ¶ 25.

109.   The FDA stated that BPV "has provided the clarification and additional descriptions suggested at that [January 14, 2003] meeting by providing the pathology reports and figures of the histology and postmortem tissues with legends." Ex. A, Carr Decl. at ¶ 25.

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

- 14 -

110.   The FDA concluded that "Overall, the studies support the proposed indication and use. Definitely easy to remove in sheep." Ex. A, Carr Decl. at ¶ 25.

111.   On July 23, 2003, BPV received a follow-up email with the FDA's amended language regarding the required "clinical experience" section of the IFU. Ex. A, Carr Decl. at ¶ 26.

112.   The FDA further directed BPV to "add a warning in the labeling about the potential for recurrent pulmonary embolism if a device other than a Recovery Cone is used" and provided recommended language. Ex. A, Carr Decl. at ¶ 26.

113.   Later that day, BPV accepted the FDA's language and revised the Recovery® Filter IFU to incorporate the FDA's requirements. BPV sent the FDA a letter with copies of its revised IFU.  Ex. A, Carr Decl. at ¶ 26.

114.   On July 24, 2003, the FDA sent BPV a follow-up email directing BPV to "format the Recovery Cone label such that the warnings and precautions appear before the clinical experience section."  Ex. A, Carr Decl. at ¶ 27.

115.   BPV complied and sent the FDA updated copies of its IFU.  Ex. A, Carr Decl. at ¶ 27.

116.   On July 25, 2003, the FDA reviewer prepared her file summary and recommendation after reviewing the *in-vitro*, *in-vivo* animal, and clinical testing, as well as all other "items requested during pre-submission meetings" that were submitted with the Recovery® 510(k) that "substantiate the temporary indication and removal of the" filter.  Ex. A, Carr Decl. at ¶ 28.

117.   The FDA reviewer recommended that "the device can be cleared for market for retrieval, with the modified labeling submitted electronically on 7/23/03 (to be submitted officially)."  Ex. A, Carr Decl. at ¶ 28.

118.   On July 25, 2003, the FDA cleared the Recovery® Filter to be marketed for retrievable indication, subject to the general controls and special controls of the FDCA, after finding it substantially equivalent to the predicate device. Ex. A, Carr Decl. at ¶ 29.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30163
(404) 322-6000

### C.     Follow-Up Correspondence Regarding the "Dear Doctor Letter" and IFU Changes for Recovery Filter for Percutaneous Retrieval (K031328)

119.    On September 17, 2004, BPV contacted the local FDA investigator in Phoenix regarding BPV's intent to send out a "Dear Doctor" letter ("DDL") and to make certain changes to the IFU for the Recovery® Filter.  Ex. A, Carr Decl. at ¶ 30.

120.    BPV intended to revise the IFU to include warnings about fracture and migration. Ex. A, Carr Decl. at ¶ 30.

121.    The DDL was intended to inform doctors of BPV's changes to the filter's IFU.  Ex. A, Carr Decl. at ¶ 30.

122.    Although the local FDA investigator did not determine whether the DDL was necessary, BPV notified him as a "heads-up" regarding BPV's plans.  Ex. A, Carr Decl. at ¶ 30.

123.    On September 28, 2004, BPV and the FDA had a conversation regarding BPV's proposed DDL and the revised IFU.   Ex. A, Carr Decl. at ¶ 31.

124.    FDA stated that it was aware of the potential fracture and migration issues associated with filters and was not particularly alarmed.  Ex. A, Carr Decl. at ¶ 31.

125.    FDA decided that "to be on the safe side," BPV should send the DDL to the agency. Ex. A, Carr Decl. at ¶ 31.

126.    BPV and the FDA agreed that BPV should send the FDA a packet of information, including the proposed DDL, a red-lined IFU, and an analysis of complaint numbers, estimated rates, and literature rates regarding fracture and migration. Ex. A, Carr Decl. at ¶ 31.

127.    BPV would submit this information as a supplement to the Recovery® Filter 510(k) to enable the FDA to make a decision regarding whether BPV would need to file a new 510(k).  Ex. A, Carr Decl. at ¶ 31.

128.    On October 5, 2004, BPV sent a letter to the FDA with the information discussed in the September 28, 2004 meeting, including new proposed labeling, a red-lined version of the previous IFU, a copy of its proposed DDL, and a chart of possible and

reported adverse events associated with the RNF. Ex. A, Carr Decl. at ¶ 32.

129.    BPV did not propose any changes to the design of the filter or delivery system, and it emphasized that the proposed changes did not change the original intended use, indications, or contraindications of the cleared Recovery® Filter. Ex. A, Carr Decl. at ¶ 32.

130.    During this time period, Bard and the FDA actively discussed the safety and efficacy of the Recovery Filter. Ex. A, Carr Decl. at ¶ 33.

131.    Internal FDA emails describe members of FDA independently reviewing the clinical performance of the Recovery® Filter. Ex. A, Carr Decl. at ¶ 33.

132.    On Oct. 6, 2004, FDA personnel noted "detail analyses on the MDRs related to Bard Recovery vena cava filter." Ex. A, Carr Decl. at ¶ 33.

133.    The FDA determined that Bard's proposal to issue a "Dear Doctor Letter" and to revise the IFU for the Recovery® Filter were appropriate. Ex. A, Carr Decl. at ¶ 34.

134.    On November 10, 2004, FDA noted that the FDA "agreed that Bard's proposal appears to be adequate." Ex. A, Carr Decl. at ¶ 34.

135.    On November 24, 2004, the FDA emailed BPV to notify it to expect an official FDA response approving the proposed DDL and IFU changes and determining that BPV would not need to file a new 510(k). Ex. A, Carr Decl. at ¶ 35.

136.    The FDA did require BPV to incorporate specific FDA revisions to the proposed labeling and DDL. Ex. A, Carr Decl. at ¶ 35.

137.    On November 28, 2004, BPV began revising its IFU and DDL to incorporate the FDA-mandated changes, in order to send the DDL as soon as possible. Ex. A, Carr Decl. at ¶ 36.

138.    On November 30, 2004, BPV received the FDA's formal letter determining that the proposed changes were not significant under 21 CFR 807.81(a)(3), and that BPV would not need to file a new 510(k). Ex. A, Carr Decl. at ¶ 37.

139.    The letter confirmed the FDA's emailed instructions requiring BPV to incorporate agency-specified language into BPV's proposed DDL and revisions to the

Nelson Mullins Riley & Scarborough

L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30163
(404) 322-6000

1    IFU. Ex. A, Carr Decl. at ¶ 37.

2        140.   The FDA letter also stated that, if adverse event monitoring indicated

3    continuing improper use of the Recovery® Filter, the FDA may order additional

4    measures. Ex. A, Carr Decl. at ¶ 37.

5        141.   BPV began distributing the DDL in December, 2004. Ex. A, Carr Decl. at ¶

6    38.

7        142.   After a phone conversation with the FDA on January 10, 2005, BPV faxed

8    the FDA copies of its current IFU and as-mailed version of the DDL.  Ex. A, Carr Decl. at

9    ¶ 38.

10       143.   On January 21, 2005, the FDA and BPV had a telephone conference to

11   discuss the revised IFU and as-mailed DDL, with BPV assuring the FDA that both were

12   being distributed.  Ex. A, Carr Decl. at ¶ 39.

13       144.   BPV also sought FDA prior review of another planned update, a BPV Dear

14   Colleague Letter ("DCL") to customers concerning the Recovery® Filter's performance

15   in bariatric patients.  Ex. A, Carr Decl. at ¶ 39.

16       145.   BPV and the FDA also discussed BPV's plan to create a clinical registry to

17   further evaluate the safety and effectiveness of the Recovery® filter in patients, as well as

18   a formal survey of current Recovery® Filter users, and a formal survey of specialists

19   treating bariatric patients.  Ex. A, Carr Decl. at ¶ 39.

20       146.   The FDA reiterated that it was "very pleased with the scientific approach

21   [BPV was] taking to better understand the risk/benefit of the Recovery Filter in bariatric

22   patients," and was "very interested in hearing about the outcomes of [BPV's] planned

23   surveys, expert panel meeting, and clinical registry." Ex. A, Carr Decl. at ¶ 39.

24       147.   In response to BPV's inquiry, the FDA indicated it had no concerns with

25   BPV's approach, and appreciated that BPV was being proactive in its communications

26   with both the FDA and its customers. Ex. A, Carr Decl. at ¶ 39.

27       148.   The day after the telephone conference, BPV emailed the FDA, per the

28   FDA's request: (1) a draft of the proposed DCL, (2) a formal survey of current

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Recovery® Filter users, and (3) a formal survey of specialists treating bariatric patients. Ex. A, Carr Decl. at ¶ 40.

149.    On January 27, 2005, BPV contacted the FDA's local investigator in Phoenix to communicate the same information.  Ex. A, Carr Decl. at ¶ 41.

150.    The contact report quotes the FDA investigator as saying, "I am so impressed with the ethical approach BPV is taking with this product."  Ex. A, Carr Decl. at ¶ 41.

151.    On February 4, 2005, BPV contacted the FDA again to discuss the DCL. Ex. A, Carr Decl. at ¶ 42.

152.    The DCL was intended to inform customers of BPV's internal analysis of reported adverse events related to the Recovery® Filter, particularly those events associated with bariatric patients. Ex. A, Carr Decl. at ¶ 42.

153.    On February 8, 2005, the FDA sent a letter to BPV requesting information so the FDA could evaluate medical device reports that had been reported to the FDA.  Ex. A, Carr Decl. at ¶ 43.

154.    BPV followed up with a telephone conference. Ex. A, Carr Decl. at ¶ 43.

155.    BPV further discussed the DCL letter with the FDA. Ex. A, Carr Decl. at ¶ 43.

156.    The FDA advised that "it is a very good idea to send this type of letter and [the agency] appreciates the BPV being so proactive." Ex. A, Carr Decl. at ¶ 43.

157.    Also on February 8, 2005, BPV faxed the FDA responses to FDA questions regarding the dissemination of the DDL.  Ex. A, Carr Decl. at ¶ 43.

158.    BPV and the FDA had another telephone conference on February 14, 2005. Ex. A, Carr Decl. at ¶ 44.

159.    The conference discussed: (1) the recent bariatric surgeons panel meeting in New Orleans, (2) whether BPV was planning further device modifications, and (3) the FDA's February 8, 2005 request for information. Ex. A, Carr Decl. at ¶ 44.

160.    The FDA stated that it required additional information regarding the total

number of Recovery Filters sold in the U.S. to identify trends of adverse events experienced by retrievable filters generally. Ex. A, Carr Decl. at ¶ 44.

161.   The FDA specified the format for submitting this information.  Ex. A, Carr Decl. at ¶ 44.

162.   On February 28, 2005, BPV responded by letter to the FDA's February 8, 2005 requests and provided the additional information required by the FDA.  Ex. A, Carr Decl. at ¶ 45.

163.   BPV sent the FDA an update to its October 5, 2004 chart regarding possible and reported adverse events associated with the Recovery® Filter and copies of the filter's labeling and marketing materials. Ex. A, Carr Decl. at ¶ 45.

164.   On February 28, 2005, BPV and the FDA had a telephone conference.   Ex. A, Carr Decl. at ¶ 46.

165.   They discussed the DCL, the New Orleans panel meeting, and the two surveys.   Ex. A, Carr Decl. at ¶ 46.

166.   The FDA required BPV to forward for agency review: (1) the final draft of the DCL, (2) a summary of the panel meeting, and (3) summaries of the two surveys.  Ex. A, Carr Decl. at ¶ 46.

167.   BPV and the FDA also discussed BPV's plan to make additional modifications via a Special 510(k) and arranged a meeting on March 21 to review BPV's data for the Special 510(k).  Ex. A, Carr Decl. at ¶ 46.

168.   The FDA thanked BPV "for being so forthright with information" and "said the other removable filter manufacturers have been less than cooperative in sharing information."  Ex. A, Carr Decl. at ¶ 46.

169.   BPV assured FDA that BPV "would continue to cooperate, as Bard is deeply committed to patient safety and to obtaining a better understanding of the risk/benefit of the Recovery filter in morbidly obese patients."  Ex. A, Carr Decl. at ¶ 46.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.    G2® Filter System:**

**A.    G2® Filter System (K050558)**

170.    On March 2, 2005, BPV submitted a Special 510(k) application for a modified Recovery® Filter (to be called the G2® Filter).   Ex. A, Carr Decl. at ¶ 47.

171.    The application, made significant dimensional modifications to the predicate device, the Recovery® Filter, but incorporated no material changes or additional components.   Ex. A, Carr Decl. at ¶ 47.

172.    Included in the 510(k) submission were results from acute *in vivo* animal testing BPV conducted to evaluate the modified delivery system. Ex. A, Carr Decl. at ¶ 47.

173.    Also included were results from 21 *in-vitro* bench tests BPV conducted on the modified Recovery® Filter, those    REDACTED

. Ex. A, Carr Decl. at ¶ 47.

174.    BPV performed all testing in conformance with the FDA guidance document: "Guidance for Cardiovascular Intravascular Filter 510(k) Submission."    Ex. A, Carr Decl. at ¶ 47.

175.    BPV conducted a risk analysis, a Risk Assessment and Design Failure Modes and Effects Analysis ("DFMEA") for the device, in accordance with ISO 14971:2000, Medical Devices – Application of risk management to medical devices and BS EN 1441:1998, Medical Devices-Risk Analysis, to assure that risks posed by the design were acceptable.    Ex. A, Carr Decl. at ¶ 47.

176.   REDACTED   Ex. A, Carr Decl. at ¶ 47.

177.   The design verification and validation were performed in conformance with FDA Special Controls guidance document, "Guidance for Cardiovascular Intravascular Filter 510(k) Submission"; BS EN 12006-3:1999 entitled, "Non-Active Surgical Implants – Particular Requirements for Cardiac and Vascular Implants – Part 3: Endovascular Devices"; FDA guidance document, Design Control Guidance for Medical Device Manufacturers, dated March 11, 1997; and the design control requirements under 21 CFR § 820.30.  Ex. A, Carr Decl. at ¶ 47.

178.   The submission also included proposed labeling for the modified Recovery® Filter in conformance with 21 CFR § 807.87(e).   Ex. A, Carr Decl. at ¶ 47.

179.   The submission also included a summary of safety and effectiveness information upon which a substantial equivalence determination could be based, as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92.    Ex. A, Carr Decl. at ¶ 47.

180.   On March 24, 2005, BPV and the FDA met to discuss FDA questions regarding BPV's Special 510(k) submission, the bariatric surgeon panel meeting, and the proposed DCL.  Ex. A, Carr Decl. at ¶ 48.

181.   The FDA had no comments on BPV's DCL – "it looks good, but since this is not an official [i.e. regulated] action the content is up to you and we don't give approval/disapproval. We appreciate you sharing it with us, though." Ex. A, Carr Decl. at ¶ 48.

182.   The FDA warned that it might require a pre-market proof of concept 50 patient study before clearing the new device, but would evaluate the sufficiency of the information BPV had provided.   Ex. A, Carr Decl. at ¶ 48.

183.   An FDA internal memorandum circulated on March 29, 2005 reviewed BPV's Special 510(k) and concluded, "While these changes may have resulted in less of a chance of migration of the device, they may have resulted in more problems with retrieval

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

of the device, especially after the healing process takes place. An unlimited time to retrieval may no longer be appropriate."   Ex. A, Carr Decl. at ¶ 49.

184.   The FDA reviewer recommended that FDA require BPV to "conduct a small 'proof of concept' study to determine if there should be a maximum implant period, or if the current label with no such limitation is still appropriate."   Ex. A, Carr Decl. at ¶ 49.

185.   On March 30, 2005, the FDA responded to BPV's Special 510(k) by requiring additional information.   Ex. A, Carr Decl. at ¶ 50.

186.   The FDA prohibited BPV from marketing the device until it had provided the additional information under 21 CFR § 807.87(l).   Ex. A, Carr Decl. at ¶ 50.

187.   If BPV failed to respond within 30 days, the FDA would have treated this 510(k) submission as withdrawn.   Ex. A, Carr Decl. at ¶ 50.

188.   The FDA required the small pre-market "proof of concept" clinical study previously described to assess whether the current label for retrieval indication was still appropriate (Question 2).   Ex. A, Carr Decl. at ¶ 50.

189.   The FDA directed BPV to provide the histology assessment and representative slides from BPV's animal study conducted in conjunction with this submission, and comparative slides from the animal study of the predicate Recovery® Filter (Question 1).   Ex. A, Carr Decl. at ¶ 50.

190.   The FDA further requested BPV to add a boxed warning to the modified Recovery® Filter labeling with specified language regarding use in obese patients, and a warning that central venous lines may cause displacement or fracture (Question 3).   Ex. A, Carr Decl. at ¶ 50.

191.   Specifically, FDA requested BPV to add a boxed warning at the beginning of the "Warnings" section that stated: "Warning: The safety and effectiveness of the Recovery Filter System in morbidly obese patients has not been established. There have been fatal device adverse events reported in this population."   Ex. A, Carr Decl. at ¶ 50.

192.   On April 19, 2005, BPV emailed FDA its informal draft responses to FDA's

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

demand for additional information.   Ex. A, Carr Decl. at ¶ 51.

193.   In response to FDA's request for certain data (Question 1), BPV provided the pathology reports from the animal study for the predicate device as well as pathology reports and clinical evaluation for the subject device.   Ex. A, Carr Decl. at ¶ 51.

194.   In response to FDA's demand for clinical data (Question 2), BPV provided a detailed justification for why *in vivo* animal testing was sufficient to demonstrate the safety and effectiveness of long-term retrievability of the G2 Filter, as the "animal studies are highly predictive of the [G2] Filter's performance in humans, specifically concerning long-term retrieval."   Ex. A, Carr Decl. at ¶ 51.

195.   BPV discussed the extensive *in-vivo* animal and human clinical studies conducted on the predicate device (the Recovery Filter) evaluating long-term retrievability, and compared it to the *in vivo* animal testing conducted on the subject G2 Filter, to support that the *in vivo* testing would be predictive of clinical experience.   Ex. A, Carr Decl. at ¶ 51.

196.   In response to FDA's request for a boxed warning that stated "The safety and effectiveness of the Recovery Filter System in morbidly obese patients has not been established" (Question 3), BPV responded that "The Indications for Use of all commercially available inferior vena cava (IVC) filters, including the Recovery Filter, do not specifically address the safety and effectiveness of the device in any one patient population."   Ex. A, Carr Decl. at ¶ 51.

197.   In response to FDA's request for a boxed warning in the "Warnings" section that stated "There have been fatal device-related adverse events reported in this [morbidly obese] population" (Question 3), BPV proposed to add the following alternative statement to the "Potential Complications" section of the labeling with the following similar language: "There have been reports of complications, including death, associated with the use of the Recovery Filter System in morbidly obese patients."   Ex. A, Carr Decl. at ¶ 51.

198.   BPV further responded that "Currently, there is a statement in the Recovery Filter IFU linking all of the potential complications to death. BPV continues to analyze

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

available published literature on IVC filters and is conducting formal research to better understand the morbidly obese patient population. Physicians have indicated that there is a significant need to allow an IVC Filter to remain in place for an extended period of time (> 30 days) in certain high risk patient populations, including morbidly obese patients." Ex. A, Carr Decl. at ¶ 51.

199.   BPV attached the proposed labeling to the email for FDA's review.   Ex. A, Carr Decl. at ¶ 51.

200.   In response to FDA's request for a warning that central venous lines may cause the filters to move or fracture, BPV stated "there is no bench-top testing or clinical evidence that shows that the Recovery Filter is susceptible to fracture or movement due to the use of central venous lines."   Ex. A, Carr Decl. at ¶ 51.

201.   "Additionally, there are no inherent design characteristics that would make the Recovery Filter likely to entrap the central venous lines, potentially leading to movement or fracture. There have been no reported complaints of guidewire and/or central venous line entrapment associated with the Recovery Filter."   Ex. A, Carr Decl. at ¶ 51.

202.   On April 27, 2005, BPV sent a letter to the FDA requesting a 30 day extension to formally respond to the FDA's questions of March 30, 2005.   Ex. A, Carr Decl. at ¶ 52.

203.   The FDA granted BPV's request on April 28, 2005.   Ex. A, Carr Decl. at ¶ 52.

204.   On May 2, 2005, FDA circulated an internal memorandum reviewing the *in vivo* animal testing and detailing that if a proof of concept human clinical study would be required, the clinical protocol should incorporate certain considerations in study design. Ex. A, Carr Decl. at ¶ 53.

205.   On May 6, 2005, the FDA and BPV had a conference during which the FDA again expressed its view that BPV was required to provide pre-market clinical data to determine whether the device modifications might affect its long-term retrievability.   Ex.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

A, Carr Decl. at ¶ 54.

206.    The FDA would not approve BPV's proposed changes without this clinical data.   Ex. A, Carr Decl. at ¶ 54.

207.    The FDA required evidence that dimensional modifications to improve migration and fracture resistance would not adversely affect the long-term retrievability of the device.   Ex. A, Carr Decl. at ¶ 54.

208.    In response to FDA's request for clinical data, BPV was prepared to submit an Investigational Device Exemption ("IDE") clinical trial proposal to conduct the study sought by the FDA.   Ex. A, Carr Decl. at ¶ 54.

209.    However, BPV still hoped to gain clearance of its Special 510(k) for a more limited indication, an acute retrieval period of 3 to 4 weeks.   Ex. A, Carr Decl. at ¶ 54.

210.    On May 20-21, 2005, BPV began distributing the DCL.   Ex. A, Carr Decl. at ¶ 55.

211.    On May 27, 2005, the FDA and BPV had another telephone conference. Ex. A, Carr Decl. at ¶ 56.

212.    FDA informed BPV that it would not clear an indication for acute retrieval of 3 to 4 weeks without clinical data.   Ex. A, Carr Decl. at ¶ 56.

213.    The FDA determined that "all new and modified retrievable filters will require clinical data to support a 510(k) determination of substantial equivalence." Ex. A, Carr Decl. at ¶ 56.

214.    The FDA stated that the most BPV could obtain from its Special 510(k) for the modified Recovery® Filter would be a "substantial equivalence with limitations" determination identical to the original Recovery Filter system's initial clearance as a permanent filter.   Ex. A, Carr Decl. at ¶ 56.

215.    "The limitations would require BPV to include a statement in the IFU indicating that the safety and effectiveness of the filter as a retrievable filter has not been established." Ex. A, Carr Decl. at ¶ 56.

216.    On June 3, 2005, BPV formally responded to FDA's demand for additional

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1   information dated March 30, 2005, after conferring on multiple occasions with FDA about

2   those demands.  Ex. A, Carr Decl. at ¶ 57.

3       217.   BPV requested FDA to convert its Special 510(k) submission into a

4   traditional 510(k) that sought clearance of the modified Recovery® Filter solely for

5   permanent use.  Ex. A, Carr Decl. at ¶ 57.

6       218.   BPV's traditional 510(k) was essentially identical to the Special 510(k)

7   submission with minor exceptions.  Ex. A, Carr Decl. at ¶ 57.

8       219.   The converted 510(k) made changes to the labeling and IFU to include the

9   BPV's proposed alternative statement to FDA's request for a boxed warning concerning

10   reports of complications, including death, associated with the Recovery Filter in morbidly

11   obese patients, as well as the changes concerning the limitations language required by the

12   FDA during the May 27, 2005 telephone conference.  Ex. A, Carr Decl. at ¶ 57.

13       220.   The 510(k) also provided protocols and reports for design

14   verification/validation and *in-vivo* non clinical testing.  Ex. A, Carr Decl. at ¶ 57.

15       221.   On July 26, 2005, FDA circulated an internal memorandum reviewing

16   BPV's draft informal responses dated April 19, 2005 to FDA's demand for additional

17   information on March 30, 2005. Ex. A, Carr Decl. at ¶ 58.

18       222.   After reviewing BPV's response to FDA's demand for certain *in vivo* data

19   (Question 1), the FDA reviewer recommended that FDA require BPV to provide

20   additional data or scientific rationale for why the *in-vivo* animal data is applicable to the

21   subject device when indicated for permanent placement.  Ex. A, Carr Decl. at ¶ 58.

22       223.   After reviewing BPV's response to FDA's demand for clinical data

23   (Question 2), the FDA reviewer stated that "Given that [BPV] is pursuing clearance of the

24   subject device with an indication for permanent placement, this deficiency is no longer

25   applicable."  Ex. A, Carr Decl. at ¶ 58.

26       224.   "Historically, clinical data has not always been required for a clearance of a

27   modified device with an indication for permanent placement if FDA believes that the

28   device modifications can be adequately assess through *in vitro* and *in vivo* testing."   Ex.

A, Carr Decl. at ¶ 58.

225.   BPV's "bench testing demonstrates that the device performs as good as or better than the predicate device; however, [BPV] has not provided data which demonstrates that the device modifications will not cause adverse reactions to the tissue when the device is permanently implanted in the IVC." Ex. A, Carr Decl. at ¶ 58.

226.   BPV "should provide *in vivo* data which demonstrates that the proposed device modifications do not adversely affect the tissue of the IVC." Ex. A, Carr Decl. at ¶ 58.

227.   After reviewing BPV's response to FDA's request for a boxed warning for morbidly obese patients (Question 3), the FDA reviewer stated that BPV's justification for not including a limitation statement regarding safety and effectiveness in morbidly obese patients, and BPV's proposed alternative labeling language in the "Potential Complications" section instead of the "Warnings" section, was "acceptable as it adequately captures the information known to date regarding the implantation of the Recovery Filter System in morbidly obese patients." Ex. A, Carr Decl. at ¶ 58.

228.   In response to BPV's response to FDA's demand for a warning for central venous lines causing filter migration or fracture (Question 3), the FDA reviewer discussed BPV's response with FDA colleagues "to determine what information FDA would like to see in the labeling. At this time, it is unclear what evidence led FDA to request the proposed language."  Ex. A, Carr Decl. at ¶ 58.

229.   Therefore, FDA found BPV's response "acceptable." Ex. A, Carr Decl. at ¶ 58.

230.   The FDA reviewer "thoroughly reviewed" BPV's labeling but found that "while the labeling has been modified appropriately to reflect the use of the subject device as a permanent filter, the name of the device still implie[d] that it may be used off-label as a retrievable filter. This is especially true given that the currently marketed Recovery Filter System is indicated for device retrieval." Ex. A, Carr Decl. at ¶ 58.

231.   The FDA reviewer recommended that FDA require BPV to change the

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

device name so that retrievability is not implied by the name. BPV should be further required to "remove all references to the device as the Recovery Filter System in the Instructions for Use, Indications for Use, 510(k) Summary and Package Labeling."  Ex. A, Carr Decl. at ¶ 58.

232.   On July 26, 2005, BPV and the FDA discussed BPV's submission for the modified Recovery® Filter (G2®) for permanent indication.  Ex. A, Carr Decl. at ¶ 59.

233.   The FDA sought histopathology data from BPV's animal study, and BPV explained the data it had collected.  Ex. A, Carr Decl. at ¶ 59.

234.   On July 27, 2005, the FDA emailed a request for an electronic version of BPV's 510(k) submission.  Ex. A, Carr Decl. at ¶ 60.

235.   BPV provided an electronic version, and stated that it would include electronic versions of all future submissions.  Ex. A, Carr Decl. at ¶ 60.

236.   On July 28, 2005, the FDA officially responded to BPV's traditional 510(k) submission for the modified Recovery® Filter and demanded additional information.  Ex. A, Carr Decl. at ¶ 61.

237.   The FDA prohibited BPV from marketing the device until it had provided the additional information under 21 CFR § 807.87(l).   Ex. A, Carr Decl. at ¶ 61.

238.   If BPV failed to respond within 30 days, the FDA would have treated this 510(k) submission as withdrawn.  Ex. A, Carr Decl. at ¶ 61.

239.   The FDA questioned how the animal data included in the submission "provides an assurance of safety and effectiveness of the modified Recovery Filter as a permanent implant," and required BPV to provide additional *in vivo* data or a scientific rationale for why the animal data is applicable to the permanent placement indication (Question 1). Ex. A, Carr Decl. at ¶ 61.

240.   The FDA also required BPV to change the name of the modified Recovery® Filter to reflect its permanent indication, because "Recovery" implied that it may be used off-label as a retrievable filter (Question 2). Ex. A, Carr Decl. at ¶ 61.

241.   On the same day, BPV and the FDA had a telephone conversation to discuss

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

the FDA's required additional information. Ex. A, Carr Decl. at ¶ 62.

242.    The FDA reaffirmed its requirement that BPV change the trade name of the Recovery® Filter to reflect the limited clearance BPV sought solely for permanent indication use.  Ex. A, Carr Decl. at ¶ 62.

243.    Eventually, BPV changed the name of the filter to G2®. Ex. A, Carr Decl. at ¶ 62.

244.    On August 10, 2005, BPV provided the additional information that the FDA required on July 28, 2005. Ex. A, Carr Decl. at ¶ 63.

245.    In response to FDA's demand (Question 1), BPV provided its scientific rationale for how the objectives of the *in-vivo* animal study relate to the permanent filter indication. Ex. A, Carr Decl. at ¶ 63.

246.    In response to FDA's demand (Question 2), BPV confirmed that the name of the Recovery Filter would be changed to G2, including in the Indications for Use, Instructions for Use, 510(k) Summary, and Package Labeling, which was provided for FDA review. Ex. A, Carr Decl. at ¶ 63.

247.    On August 19, 2005, responding to another information demand from the FDA, BPV emailed the FDA a revised copy of its 510(k) summary. Ex. A, Carr Decl. at ¶ 64.

248.    On August 22, 2005, responding to another information demand from the FDA, BPV sent the FDA a revised copy of the G2® IFU, which included the alternate statement concerning use of the Recovery® Filter in morbidly obese patients, and replaced "Recovery" with the new trade name "G2". Ex. A, Carr Decl. at ¶ 65.

249.    On August 23, 2005, FDA internally circulated a memorandum reviewing BPV's responses to FDA's demand for additional information on July 28, 2005. Ex. A, Carr Decl. at ¶ 66.

250.    After reviewing BPV's response to FDA's demand for additional *in vivo* data (Question 1), the FDA reviewer stated that "BPV submitted an appropriate rationale for why the study conducted and previously reviewed by FDA is applicable to the filter

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

when indicated for permanent placement." Ex. A, Carr Decl. at ¶ 66.

251.   The FDA reviewer discussed BPV's rationale with FDA colleagues who corroborated that the data collected was applicable to the filter when indicated for permanent placement. FDA had no further questions on that subject. Ex. A, Carr Decl. at ¶ 66.

252.   After reviewing BPV's response to FDA's demand to change the trade name and remove all references to that name (Question 2), the FDA reviewer noted that BPV changed the name of the filter to the G2 Filter and removed all references to the former device name. Ex. A, Carr Decl. at ¶ 66.

253.   The FDA reviewer required BPV to revise the labeling again to "move the following precaution statement "The safety and effectiveness of the G2 Filter System for use as a retrievable or temporary filter have not been established" to the beginning of the Precaution Section in bold font. Ex. A, Carr Decl. at ¶ 66.

254.   The FDA reviewer determined that BPV "adequately addressed" all of FDA's demands for additional information, and specific labeling and device name changes, and recommended that FDA clear the G2 Filter as substantially equivalent to the Recovery Filter with limitations. Ex. A, Carr Decl. at ¶ 66.

255.   On August 26, 2005, BPV received a draft "substantial equivalence with limitations" letter from the FDA that required BPV to have "permanent placement of the G2 Filter System…prominently displayed in all labeling, pouch, box, and carton labels, instructions for use, and other promotional materials, in close proximity to the trade name, of a similar point size and in bold print." Ex. A, Carr Decl. at ¶ 67.

256.   FDA requested BPV to review the language and provide written affirmation of BPV's acceptance of the FDA-mandated labeling. Ex. A, Carr Decl. at ¶ 67.

257.   On August 29, 2005, BPV reviewed the specific limitations language and faxed to FDA written affirmation that BPV would revise its labeling to include the FDA-mandated specific language.  Ex. A, Carr Decl. at ¶ 67.

258.   On August 29, 2005, BPV sent the FDA an email attaching copies of

proposed revisions to the labeling and IFU for the G2® Filter that included language conspicuously stating the device had been cleared for permanent placement only, and again the alternative language regarding morbidly obese patients. Ex. A, Carr Decl. at ¶ 68.

259.   BPV thus sought clarification that the proposed labeling was sufficient to meet the FDA's requirements. Ex. A, Carr Decl. at ¶ 68.

260.   On August 29, 2005, the FDA cleared the G2® Filter to be marketed for permanent placement, subject to FDCA general and special controls, after reviewing all of the data submitted by BPV, including the additional information and labeling changes required by the FDA, and after determining that the G2® Filter was as safe and effective as, and therefore substantially equivalent to, the Recovery® Filter for permanent indication.  Ex. A, Carr Decl. at ¶ 69.

261.   Because the FDA determined there was a reasonable likelihood that this device would be used off-label for a retrievable indication, and that such use could cause harm, the FDA limited the substantial equivalence finding, pursuant to 21 U.S.C. § 360c(i)(1)(E), and required BPV to include specific language in the G2® Filter System's labeling and promotional materials stating: "The safety and effectiveness of the G2 Filter System for use as a retrievable or temporary filter have not been established."  Ex. A, Carr Decl. at ¶ 69.

**B.     The EVEREST Study (G050134)**

262.   On June 3, 2005, BPV sent the FDA a proposed draft of the clinical protocol it planned to use for the clinical study required by the FDA to clear the G2® Filter for the retrievable indication, which was called the EVEREST study.  Ex. A, Carr Decl. at ¶ 70.

263.   "The purpose of the study is to assess the safety of the removal of the [G2®] Filter." Ex. A, Carr Decl. at ¶ 70.

264.   On July 8, 2005, BPV submitted an original IDE submission to the FDA for the EVEREST study. Ex. A, Carr Decl. at ¶ 71.

265.   On July 29, 2005, the FDA contacted BPV and indicated that the FDA

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

"planned to disapprove the IDE due to the implication in the protocol and informed consent that the 510(k) was already cleared as a permanent filter." Ex. A, Carr Decl. at ¶ 72.

266.    On August 5, 2005, BPV and the FDA had a telephone conference to discuss some of the FDA's questions and concerns regarding the IDE submission. Ex. A, Carr Decl. at ¶ 73.

267.    After BPV assured the FDA that it was "committed to working with the FDA to reach a consensus on the protocol and informed consent," the FDA reconsidered the disapproval of the IDE and indicated that it would grant conditional approval, subject to BPV changing the protocol and informed consent.  Ex. A, Carr Decl. at ¶ 73.

268.    On August 8, 2005, the FDA granted BPV conditional approval of the IDE, subject to BPV correcting certain deficiencies identified by the FDA. Ex. A, Carr Decl. at ¶ 74.

269.    The FDA required BPV to change the study's informed consent form, change the study's protocol, provide clarification of the definition of migration, and change the manner in which study personnel were trained. Ex. A, Carr Decl. at ¶ 74.

270.    On August 25, 2005, BPV and the FDA had a conference call to address the FDA's demands on August 8, 2005. Ex. A, Carr Decl. at ¶ 75.

271.    The FDA and BPV discussed the definition of migration as used in the study.  Ex. A, Carr Decl. at ¶ 75.

272.    The FDA accepted BPV's proposal to maintain the definition of migration as movement of 2 cm or more.  Ex. A, Carr Decl. at ¶ 75.

273.    On October 3, 2005, BPV submitted its official response to the additional information required by the FDA on August 8, 2005, which included the required changes to the study's informed consent form, response justifying the study protocol, clarification of the definition of migration, and changes to the manner in which study personnel are trained. Ex. A, Carr Decl. at ¶ 76.

274.    On October 21, 2005, as evidenced in an internal BPV memorandum, the

FDA indicated to BPV that the filter retrieval data from the EVEREST study could readily be used to support changing the indication for removal for both the femoral and jugular delivery systems, and therefore including the Jugular delivery system in the study was unnecessary. Ex. A, Carr Decl. at ¶ 77.

275.   On November 2, 2005, the FDA granted full approval of BPV's IDE application. Ex. A, Carr Decl. at ¶ 78.

276.   On December 2, 2005, BPV sent the FDA notice of IDE change. Ex. A, Carr Decl. at ¶ 79.

277.   The purpose of the notice was to inform the FDA of two typographical/clerical changes to the clinical protocol, which did "not affect the validity of the data or information resulting from the completion of the approved protocol, the relationship of likely patient risk to benefit relied upon to approve the protocol, the scientific soundness of the investigational plan, or the rights, safety, or welfare of the human subjects involved in the investigation." Ex. A, Carr Decl. at ¶ 79.

278.   On June 21, 2006, BPV sent the FDA an IDE supplement with an updated list of investigators, pursuant to 21 C.F.R. § 812.150(b)(4).  Ex. A, Carr Decl. at ¶ 80.

279.   Also on this date, BPV sent the FDA notification of an informed consent violation, pursuant to 21 C.F.R. § 812.150(b)(8), with all required information, pursuant 21 C.F.R. § 812.150(a)(5).   Ex. A, Carr Decl. at ¶ 80.

280.   In response to these violations, BPV ceased enrollment at the single affected site and distributed a memorandum to all the clinical study sites and study monitors to remind them of their responsibilities regarding informed consent.  Ex. A, Carr Decl. at ¶ 80.

281.   On July 11, 2006, BPV sent an IDE supplement to the FDA, proposing to extend the study follow-up period from 6 months to 12 months and to increase the enrollment by up to 50 additional patients.   Ex. A, Carr Decl. at ¶ 81.

282.   BPV indicated that it wanted to make these proposed changes so that it could obtain the necessary information for filing a future 510(k).  Ex. A, Carr Decl. at ¶

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

81.

283.   On December 6, 2006, BPV sent a request to the FDA for an extension on the due date for its annual progress report as required by 21 C.F.R. § 812.150(b)(5).  Ex. A, Carr Decl. at ¶ 82.

284.   BPV was anticipating that the first 30 filter retrievals would be completed by March 30, 2007, and it wanted to include data from those retrievals in its annual report. Ex. A, Carr Decl. at ¶ 82.

285.   On December 8, 2006, BPV sent the FDA an IDE supplement with an updated list of investigators, pursuant to the requirements of 21 C.F.R. 812.150(b)(4).  Ex. A, Carr Decl. at ¶ 83.

286.   On February 2, 2007, BPV sent the FDA its annual progress report, pursuant to the requirements of 21 C.F.R. 812.150(b)(5).  Ex. A, Carr Decl. at ¶ 84.

287.   This report included extensive clinical data up to August 31, 2006, the date of the 30th retrieval of a filter, and noted that no unanticipated adverse events had been reported.  Ex. A, Carr Decl. at ¶ 84.

288.   On August 23, 2007, BPV sent the FDA another annual progress report, pursuant to the requirements of 21 C.F.R. 812.150(b)(5).   Ex. A, Carr Decl. at ¶ 85.

289.   This report included extensive clinical data up to May 25, 2007, and again, no unanticipated adverse events had been reported.  Ex. A, Carr Decl. at ¶ 85.

290.   On September 21, 2007, the FDA reviewed the August 23, 2007 annual progress report and required BPV to provide additional information.  Ex. A, Carr Decl. at ¶ 86.

291.   The FDA notified BPV of several requirements.  Ex. A, Carr Decl. at ¶ 86.

292.   The FDA required BPV to provide additional detailed information regarding adverse events observed during the clinical study and reported in the progress report (Question 1). Ex. A, Carr Decl. at ¶ 86.

293.   The FDA required BPV to provide a detailed summary of the incidence of specific adverse events: caval injury or damage, caval occlusion, caval thrombosis, deep

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

vein thrombosis, filter embolization, filter fracture, filter migration, IVC penetration, and pulmonary embolism (Question 2). Ex. A, Carr Decl. at ¶ 86.

294.    The FDA required BPV to provide an explanation of the incidence of filter migration experienced during the clinical study as well as provide a comparison of migration rates of the Recovery® and G2® Filters currently marketed (Question 3). Ex. A, Carr Decl. at ¶ 86.

295.    The FDA required BPV to report the cumulative number of follow-up visits conducted outside the study protocol and the number of patients who missed follow-up visits (Question 4). Ex. A, Carr Decl. at ¶ 86.

296.    The FDA required BPV to provide a comparison of the incidence of deployment related issues in the investigational G2® Filter as compared to the G2® Filter currently marketed with the modifications to the delivery system that FDA cleared on October 27, 2006 (Question 5). Ex. A, Carr Decl. at ¶ 86.

297.    The FDA required BPV to provide data regarding the appearance of the IVC on imaging studies after filter retrieval, as well as the implant duration of the filters at retrieval or attempted retrieval, which the FDA "considered essential for the analysis of your data for the purposes of determining substantial equivalence for a future 510(k) submission." Ex. A, Carr Decl. at ¶ 86.

298.    On October 25, 2007, BPV provided the additional information required by the FDA in its September 21, 2007 letter. Ex. A, Carr Decl. at ¶ 87.

299.    In response to FDA's demand (Question 1), BPV provided a tabulated list of the adverse events reported since the February annual progress report. Ex. A, Carr Decl. at ¶ 87.

300.    In response to FDA's demand (Question 2), BPV provided a detailed list summarizing the adverse events observed during the study as well as a detailed list of the specific incidents required by the FDA. Ex. A, Carr Decl. at ¶ 87.

301.    In response to FDA's demand (Question 3), BPV provided an explanation for the incidence of migration observed during the clinical study, as well as the

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

comparative data required by the FDA. Ex. A, Carr Decl. at ¶ 87.

302.   In response to FDA's demand (Question 4), BPV provided a report of the cumulative number of follow-up visits conducted outside the study protocol. Ex. A, Carr Decl. at ¶ 87.

303.   In response to FDA's demand (Question 5), BPV provided a report of the deployment issues experienced with the filter during the clinical study, as well as the comparative data required by the FDA. Ex. A, Carr Decl. at ¶ 87.

304.   On December 11, 2007, BPV and the FDA had a telephone conversation to discuss closing out the EVEREST study and whether BPV could satisfy its final reporting requirements by referencing the 510(k) submission that was then under review in accordance with the FDA guidance document "Guidance on IDE Policies and Procedures." Ex. A, Carr Decl. at ¶ 88.

305.   The FDA indicated that BPV should wait until the 510(k) submission was completed, then "if 510(k) clearance is received, BPV can refer to the 510(k) and provide any additional information, such as investigational device disposition." Ex. A, Carr Decl. at ¶ 88.

306.   On February 12, 2008, BPV sent its final report on the EVEREST study to the FDA, pursuant to 21 C.F.R. 812.150(b)(7).  Ex. A, Carr Decl. at ¶ 89.

307.   The FDA received BPV's final report and sent an acknowledgment of completion on March 12, 2008. Ex. A, Carr Decl. at ¶ 89.

**C.   G2® Filter System – Jugular/Subclavian Delivery Kit (K052578)**

308.   On September 19, 2005, BPV submitted a Special 510(k) for its G2® Filter System – Jugular/Subclavian Delivery Kit to gain approval for a new delivery kit to the previously cleared G2® Filter System. Ex. A, Carr Decl. at ¶ 90.

309.   The previous version of the G2® Filter System (K050558) included a femoral delivery kit but not a jugular/subclavian delivery kit.  Ex. A, Carr Decl. at ¶ 90.

310.   The filter that was the subject of this submission was identical to the predicate device.  Ex. A, Carr Decl. at ¶ 90.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

- 37 -

311.   Included in the 510(k) submission were results from 72 *in-vitro* bench tests conducted by BPV on the G2® Filter Jugular/Subclavian delivery system.  Ex. A, Carr Decl. at ¶ 90.

312.   This testing was performed in conformance with the FDA guidance document: "Guidance for Cardiovascular Intravascular Filter 510(k) Submission."  Ex. A, Carr Decl. at ¶ 90.

313.   BPV conducted a risk analysis, a Risk Assessment and Design Failure Modes and Effects Analysis ("DFMEA") for the device, in accordance with ISO 14971:2000, Medical Devices – Application of risk management to medical devices and BS EN 1441:1998, Medical Devices-Risk Analysis, to assure that risks posed by the design were acceptable.  Ex. A, Carr Decl. at ¶ 90.

314.   The design verification and validation were performed in conformance with: FDA Special Controls guidance document, "Guidance for Cardiovascular Intravascular Filter 510(k) Submission;" BS EN 12006-3:1999 entitled, "Non-Active Surgical Implants – Particular Requirements for Cardiac and Vascular Implants – Part 3: Endovascular Devices;" FDA guidance document, Design Control Guidance for Medical Device Manufacturers, dated March 11, 1997; and the design control requirements under 21 CFR § 820.30.  Ex. A, Carr Decl. at ¶ 90.

315.   The submission also included results from biocompatibility testing conducted by BPV in conformance with ISO/AAMI 10993-1, as well as packaging testing, sterilization testing, and shelf-life testing.  Ex. A, Carr Decl. at ¶ 90.

316.   The submission also included proposed labeling for the G2® Filter Jugular/Subclavian Delivery System in conformance with 21 CFR § 807.87(e).  Ex. A, Carr Decl. at ¶ 90.

317.   The submission also included a summary of safety and effectiveness information upon which a substantial equivalence determination could be based as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92.  Ex. A, Carr Decl. at ¶ 90.

318.    On September 21, 2005, BPV submitted additional information to the FDA to correct certain misprints and labeling mistakes in its September 19, 2005 submission. Ex. A, Carr Decl. at ¶ 91.

319.    On October 13, 2005, the FDA emailed BPV requesting a telephone conference to discuss the FDA's concerns about BPV's submission. Ex. A, Carr Decl. at ¶ 92.

320.    On October 14, 2005, the FDA and BPV had a teleconference to discuss the FDA's concerns. Ex. A, Carr Decl. at ¶ 93.

321.    The FDA and BPV discussed the modifications in the filter loading, storage, and configuration of the Jugular/Subclavian Delivery System as compared to the predicate G2® Filter Femoral Delivery System.  Ex. A, Carr Decl. at ¶ 93.

322.    The FDA stated it would require BPV to include additional information in the submission, specifically "a description of each part of the delivery system, a description of how the filter is loaded, stored, and delivered, a comparison of steps with the predicate device in tabular format, and any type of animation or simulation footage to help visually clarify the device."  Ex. A, Carr Decl. at ¶ 93.

323.    The FDA also discussed the Risk Analysis section of the submission and indicated that BPV "should show the associated risk for each device change and the testing that was conducted in response to each risk."   Ex. A, Carr Decl. at ¶ 93.

324.    The FDA also stated it would require BPV to add clarification as to why new tests were performed for shelf-life testing, and add clarifications on any changes to the package labeling.   Ex. A, Carr Decl. at ¶ 93.

325.    The FDA further stated it would require BPV to provide more information relating to the biocompatibility section of the submission in a biocompatibility table that FDA would send to BPV following the conference.   Ex. A, Carr Decl. at ¶ 93.

326.    In a follow-up email that same day, the FDA summarized its formal demands for additional information. Ex. A, Carr Decl. at ¶ 94.

327.    The FDA required BPV to explain the modifications in greater detail,

including "a) a description of each part of the delivery catheter and its associated function; b) step-by-step instructions for how the filter is loaded into the delivery catheter and deployed; and c) a comparison in tabular format between the loading and deployment of the subject device and the predicate device." (Question 1).   Ex. A, Carr Decl. at ¶ 94.

328.   The FDA also required BPV to provide "additional information regarding the risk analysis…in order to determine that the modifications you are requesting do not affect the safety and effectiveness of the device." (Question 2).   Ex. A, Carr Decl. at ¶ 94.

329.   The FDA also required BPV to "[I]dentify and list any risks associated with each modification, the verification/validation testing conducted to assess the identified risks for each modification, and an explanation for why the testing conducted mitigates the identified risk." (Question 2).   Ex. A, Carr Decl. at ¶ 94.

330.   The FDA also required BPV to provide "additional information…to determine that the testing conducted supports the shelf life of the subject device," and required BPV to provide specific testing and acceptance criteria (Question 3).   Ex. A, Carr Decl. at ¶ 94.

331.   The FDA also required BPV to summarize the biocompatibility testing within a biocompatibility testing results table provided by the FDA (Question 4).   Ex. A, Carr Decl. at ¶ 94.

332.   The FDA also required BPV to provide a redlined copy of labeling that BPV modified from the predicate device (Question 5).   Ex. A, Carr Decl. at ¶ 94.

333.   Also on that same day, the FDA mailed a letter to BPV informing BPV of the FDA's decision to put the submission on a 30 day hold pending BPV's response to the FDA's requests, and indicating that if BPV did not respond with the additional information within 30 days, the 510(k) submission would be withdrawn.   Ex. A, Carr Decl. at ¶ 95.

334.   On October 25, 2005, BPV provided the additional information required by FDA in its October 14, 2005 email.   Ex. A, Carr Decl. at ¶ 96.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

335.   In response to FDA's demand (Question 1), BPV provided a detailed explanation of the modifications of the subject device.   Ex. A, Carr Decl. at ¶ 96.

336.   In response to FDA's demand (Question 2), BPV provided a detailed explanation of the risk analysis conducted for the subject device, including a table describing the risks associated with the modifications, the testing that was performed, and an explanation of how such testing mitigated this risk.   Ex. A, Carr Decl. at ¶ 96.

337.   In response to FDA's demand (Question 3), BPV provided specific testing and acceptance criteria conducted on the subject device regarding shelf-life, as well as comparative testing performed on the predicate device.   Ex. A, Carr Decl. at ¶ 96.

338.   In response to FDA's demand (Question 4), BPV provided a summary of biocompatibility testing conducted on the subject device, including the completion of the biocompatibility testing results table provided by the FDA.   Ex. A, Carr Decl. at ¶ 96.

339.   In response to FDA's demand (Question 5), BPV responded that no significant changes were made to the predicate IFU, and provided a redlined copy of the labeling that BPV modified from the predicate device (Question 5).   Ex. A, Carr Decl. at ¶ 96.

340.   On November 14, 2005, the FDA and BPV had another conference call to discuss the FDA's review of BPV's submission.   Ex. A, Carr Decl. at ¶ 97.

341.   The FDA stated it still required additional information regarding risk analysis directing BPV to clarify whether the test protocols and acceptance criteria in "the original submission were the same as previous tests protocols and acceptance criteria previously performed on the predicate device."   Ex. A, Carr Decl. at ¶ 97.

342.   On November 16, 2005, BPV submitted the required information to the FDA, clarifying its previous response regarding the risk analysis testing conducted on the subject device.   Ex. A, Carr Decl. at ¶ 98.

343.   On November 25, 2005, the FDA cleared the new G2® Filter Jugular/Subclavian Delivery Kit for market, subject to the FDCA general and special controls, with the usual limitations on labeling it for permanent placement only, after

- 41 -

reviewing the information provided in the 510(k) submission, as well as all additional information provided in response to FDA's requests, and finding the device substantially equivalent to the G2® Filter System – Femoral Delivery Kit.  Ex. A, Carr Decl. at ¶ 99.

**D.    G2 Filter System for Permanent Indication – Femoral Delivery Kit (K062887)**

344.   On September 25, 2006, BPV submitted a Special 510(k) for the G2 Filter System – Femoral Delivery Kit, which proposed changes to the delivery system only.  Ex. A, Carr Decl. at ¶ 100.

345.   BPV proposed a new spline design that was intended to improve deployment accuracy and to prevent the filter hooks from sticking in the tip of the sheath during deployment.  Ex. A, Carr Decl. at ¶ 100.

346.   Included in the 510(k) submission were results from 7 *in-vitro* bench tests conducted by BPV on the G2® Filter Jugular/Subclavian delivery system, including

REDACTED

.  Ex. A, Carr Decl. at ¶ 100.

347.   BPV conducted a risk analysis, a Risk Assessment and Design Failure Modes and Effects Analysis ("DFMEA") for the device, in accordance with ISO 14971:2000, Medical Devices – Application of risk management to medical devices, to assure that risks posed by the design were acceptable.   Ex. A, Carr Decl. at ¶ 100.

348.   REDACTED

Ex. A, Carr Decl. at ¶ 100.

349.   The design verification and validation were performed in conformance with FDA Special Controls guidance document, "Guidance for Cardiovascular Intravascular Filter 510(k) Submission;" FDA's "510(k) Sterility Review Guidance and Revision of 2/12/90 (K90-1)," FDA's "Use of International Standards Organizations ISO 10993 Biological Evaluation of Medical Devices Part I: Evaluation and Testing;" BS EN 12006-3:1999 entitled, "Non-Active Surgical Implants – Particular Requirements for Cardiac and

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Vascular Implants – Part 3: Endovascular Devices;" FDA guidance document, Design Control Guidance for Medical Device Manufacturers, dated March 11, 1997; and the design control requirements under 21 CFR § 820.30.   Ex. A, Carr Decl. at ¶ 100.

350.   The submission also included were results from biocompatibility testing conducted by BPV in conformance to ISO 10993-1:2003, Biological Evaluation of Medical Devices – Part I: Evaluation and Testing.   Ex. A, Carr Decl. at ¶ 100.

351.   Also included were results from packaging testing, sterilization testing, and shelf-life testing.   Ex. A, Carr Decl. at ¶ 100.

352.   Also included was proposed labeling for the G2® Filter Femoral Delivery System in conformance with 21 CFR § 807.87(e).   Ex. A, Carr Decl. at ¶ 100.

353.   Also included was a summary of the safety and effectiveness information upon which a substantial equivalence determination could be based as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92.   Ex. A, Carr Decl. at ¶ 100.

354.   On October 26, 2006, the FDA cleared the modified G2® Filter Femoral Delivery Kit for market, subject to the general controls and special controls under the FDCA, with the usual limitations on labeling it for permanent placement only, after reviewing the information provided in the 510(k) submission, and finding the device substantially equivalent to the G2® Filter System – Femoral Delivery Kit.   Ex. A, Carr Decl. at ¶ 101.

**E.   G2 Filter System for Removable Indication– Femoral and Jugular/Subclavian Delivery Kits (K073090)**

355.   On December 4, 2006, BPV and the FDA had a teleconference to discuss BPV's strategy for its future traditional 510(k) for the G2® Filter System for removable indication that was currently being evaluated under the EVEREST clinical study.   Ex. A, Carr Decl. at ¶ 102.

356.   BPV proposed filing one traditional 510(k) using two predicate devices (G2® Filter System – Femoral Delivery (K062887) and G2® Filter System – Jugular/Subclavian Delivery Kit (K052578)) and one subject device.   Ex. A, Carr Decl. at

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

¶ 102.

357.   The FDA agreed with this strategy and noted that BPV should emphasize that the two delivery systems have not changed since the last cleared submissions.   Ex. A, Carr Decl. at ¶ 102.

358.   BPV also proposed that it submit only the testing applicable to the removability of the filter and refer the reviewer to previous submissions for test data related to the filter and the delivery systems.   Ex. A, Carr Decl. at ¶ 102.

359.   The FDA agreed with this approach and suggested BPV include a summary table for all testing that has been completed and in which previous submissions the data was presented.   Ex. A, Carr Decl. at ¶ 102.

360.   On October 31, 2007, BPV submitted its over 1500-page traditional 510(k) for the G2® Filter System – Femoral and Jugular/Subclavian Delivery Kits, seeking to remove the limitation on its previous 510(k) clearance for the device and obtain clearance for removable indication.   Ex. A, Carr Decl. at ¶ 103.

361.   Included in the 510(k) submission were results from the previously reported extensive *in-vitro* bench testing and *in-vivo* animal testing, as well as the extensive clinical results of the EVEREST clinical study, including all testing reports and the clinical study materials that supported removability.   Ex. A, Carr Decl. at ¶ 103.

362.   BPV conducted a risk analysis, a Risk Assessment and Design Failure Modes and Effects Analysis ("DFMEA") for the device, in accordance with ISO 14971:2000, Medical Devices – Application of risk management to medical devices, to assure that risks posed by the design were acceptable.   Ex. A, Carr Decl. at ¶ 103.

363.   The design verification and validation were performed in conformance with: FDA Special Controls guidance document, "Guidance for Cardiovascular Intravascular Filter 510(k) Submission;" FDA's "510(k) Sterility Review Guidance and Revision of 2/12/90 (K90-1);" FDA's "Use of International Standards Organizations ISO 10993 Biological Evaluation of Medical Devices Part I: Evaluation and Testing;" Bluebook Memorandum G95-1, Use of ISO 10993 Biological Evaluation of Medical Devices Part 1:

Evaluation and Testing; BS EN 12006-3:1999 entitled, "Non-Active Surgical Implants – Particular Requirements for Cardiac and Vascular Implants – Part 3: Endovascular Devices;" FDA guidance document, Design Control Guidance for Medical Device Manufacturers, dated March 11, 1997; and the design control requirements under 21 CFR § 820.30.  Ex. A, Carr Decl. at ¶ 103.

364.   Also included in the submission were results from biocompatibility and toxicity testing conducted by BPV in conformance with: ISO 10993-1:2003, Biological Evaluation of Medical Devices – Part I: Evaluation and Testing; Blue Book memorandum G95-1, Use of ISO10993 Biological evaluation of Medical Devices Part 1: Evaluation and Testing; and Guidance for Cardiovascular Intravascular Filter 510(k) Submissions (November 26, 1999).  Ex. A, Carr Decl. at ¶ 103.

365.   Also included were results from packaging testing, sterilization testing, shelf-life testing, and MRI Compatibility testing.   Ex. A, Carr Decl. at ¶ 103.

366.   Also included was proposed labeling for the G2® Filter Femoral and Jugular/Subclavian Delivery System in conformance with 21 CFR § 807.87(e).   Ex. A, Carr Decl. at ¶ 103.

367.   Also included was a summary of the safety and effectiveness information upon which a substantial equivalence determination could be based as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92.  Ex. A, Carr Decl. at ¶ 103.

368.   On January 15, 2008, the FDA cleared the G2® Filter for retrievable indication, subject to the general and special controls of the FDCA, after reviewing the extensive *in-vitro* and *in-vivo* non-clinical testing, as well as the extensive clinical testing data that the FDA required, and all other additional information that the FDA requested over the three-year period of correspondence with BPV regarding this device, and finding that the G2® Filter was as safe and effective as, and therefore substantially equivalent to, the G2® Filter System – Femoral Delivery Kit and the G2® Filter System – Jugular/Subclavian Delivery Kit.   Ex. A, Carr Decl. at ¶ 104.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

## V.   **G2® Express/G2®X Filter System**

### A.   **G2® Express Filter System – Femoral and Jugular/Subclavian Delivery Kits (K080668)**

369.   On March 7, 2008, BPV submitted a Special 510(k) for its G2® Express Filter System – Femoral and Jugular/Subclavian Delivery Kits.   Ex. A, Carr Decl. at ¶ 105.

370.   Using the recently cleared G2® Filter System for removal indication (K073090) as a predicate device, BPV sought to gain approval for a filter with an electropolished snarable tip.   Ex. A, Carr Decl. at ¶ 105.

371.   Other than the addition of the tip, no other changes to the filter were made. BPV also proposed minor changes to its femoral and jugular/subclavian delivery kits. Ex. A, Carr Decl. at ¶ 105.

372.   Included in the 510(k) submission were results from the *in-vitro* bench testing and *in-vivo* animal testing conducted by BPV on the subject device, including testing of, among other things, REDACTED .   Ex. A, Carr Decl. at ¶ 105.

373.   BPV conducted a risk analysis, a Risk Assessment and Design Failure Modes and Effects Analysis ("DFMEA") for the device, in accordance with ISO 14971:2000, Medical Devices – Application of risk management to medical devices, to assure that risks posed by the design were acceptable.   Ex. A, Carr Decl. at ¶ 105.

374.   The design verification and validation were performed in conformance with FDA Special Controls guidance document, "Guidance for Cardiovascular Intravascular Filter 510(k) Submission;" FDA's "510(k) Sterility Review Guidance and Revision of 2/12/90 (K90-1);" FDA's "Use of International Standards Organizations ISO 10993 Biological Evaluation of Medical Devices Part I: Evaluation and Testing;" BS EN 12006-3:1999 entitled, "Non-Active Surgical Implants – Particular Requirements for Cardiac and

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Vascular Implants – Part 3: Endovascular Devices;" FDA guidance document, Design Control Guidance for Medical Device Manufacturers, dated March 11, 1997; and the design control requirements under 21 CFR § 820.30.  Ex. A, Carr Decl. at ¶ 105.

375.    The submission also included reference to the extensive clinical results of the EVEREST clinical study, which were applicable to the subject device because "there were no design modifications to the filter or delivery systems that would affect the safety of removability."  Ex. A, Carr Decl. at ¶ 105.

376.    Also included were results from biocompatibility and toxicity testing conducted by BPV in conformance to ISO 10993-1:2003, Biological Evaluation of Medical Devices – Part I: Evaluation and Testing.  Ex. A, Carr Decl. at ¶ 105.

377.    Also included were results from packaging testing, sterilization testing, and shelf-life testing.  Ex. A, Carr Decl. at ¶ 105.

378.    Also included was proposed labeling for the G2® Express Filter in conformance with 21 CFR § 807.87(e).  Ex. A, Carr Decl. at ¶ 105.

379.    Also included was a summary of the safety and effectiveness information upon which a substantial equivalence determination could be based as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92.   Ex. A, Carr Decl. at ¶ 105.

380.    On April 8, 2008, the FDA sent a letter to BPV demanding additional information to be able to complete the review of the device for substantial equivalence. Ex. A, Carr Decl. at ¶ 106.

381.    The FDA prohibited BPV from marketing the device until it had provided the additional information under 21 CFR § 807.87(l).  Ex. A, Carr Decl. at ¶ 106.

382.    If BPV failed to respond within 30 days, the FDA would have treated this 510(k) submission as withdrawn.  Ex. A, Carr Decl. at ¶ 106.

383.    The FDA inquired about the biocompatibility of the proposed filter, because BPV's initial submission did not include certain biocompatibility testing.  Ex. A, Carr Decl. at ¶ 106.

384.    The FDA required BPV to provide full biocompatibility testing on the

device or provide additional justification for omitting the testing.  Ex. A, Carr Decl. at ¶ 106.

385.    This full biocompatibility testing would require BPV to conduct testing for, among other things, REDACTED . Ex. A, Carr Decl. at ¶ 106.

386.    On May 5, 2008, in response to the FDA's demand for additional information, BPV requested an extension of time to respond.  Ex. A, Carr Decl. at ¶ 107.

387.    On May 6, 2008, the FDA granted BPV's request for an extension of time to respond but indicated that if the additional information was not provided by that extended date, the 510(k) would be considered withdrawn, pursuant to 21 C.F.R. § 807.87(l).  Ex. A, Carr Decl. at ¶ 107.

388.    On May 8, 2008, BPV submitted its response to the FDA's demand for additional information dated April 8, 2008.  Ex. A, Carr Decl. at ¶ 108.

389.    BPV provided additional justification for omitting the testing in its original submission, emphasizing that "full biocompatibility testing should be employed where there is incongruence between the predicate and subject device base materials and where processes differ between the devices as well."  Ex. A, Carr Decl. at ¶ 108.

390.    BPV reiterated that the starting material of the subject device did not change from the predicate device, and emphasized that the only difference was the final processing of the filter apex, noting that the new snarable tip was electropolished.  Ex. A, Carr Decl. at ¶ 108.

391.    Despite these explanations, BPV conducted additional biocompatibility testing in response to the FDA's demands and provided detailed justification for omitting other testing required by the FDA.  Ex. A, Carr Decl. at ¶ 108.

392.    BPV conducted additional testing on REDACTED

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Ex. A, Carr Decl. at ¶ 108.

393.   BPV did not complete additional testing on, and provided detailed justification for omitting testing of, among other things, REDACTED

. Ex. A, Carr Decl. at ¶ 108.

394.   On June 6, 2008, the FDA again sent a letter to BPV requiring additional information to complete the review of the subject device.  Ex. A, Carr Decl. at ¶ 109.

395.   The FDA stated that BPV did not adequately respond to the FDA's previous demand for additional information. Ex. A, Carr Decl. at ¶ 109.

396.   The FDA required BPV to provide additional information supporting BPV's justifications for declining to conduct the omitted biocompatibility testing. Ex. A, Carr Decl. at ¶ 109.

397.   The FDA prohibited BPV from marketing the device until it had provided the additional information under 21 CFR § 807.87(l). Ex. A, Carr Decl. at ¶ 109.

398.   If BPV failed to respond within 30 days, the FDA would have treated this 510(k) submission as withdrawn. Ex. A, Carr Decl. at ¶ 109.

399.   On June 25, 2008, before submitting its responses to the FDA's additional requests, BPV held a meeting with the FDA to discuss the deficiencies noted by the FDA. Ex. A, Carr Decl. at ¶ 110.

400.   The FDA reiterated its concern that BPV's responses did not provide adequate additional information to address the FDA's concerns regarding biocompatibility testing of surface contaminants and surface finish, and that such information must be provided in BPV's response to the second additional information letter dated June 6, 2008. Ex. A, Carr Decl. at ¶ 110.

401.   On June 26, 2008, BPV requested an additional extension of time to respond to these new requests.  Ex. A, Carr Decl. at ¶ 111.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

402.   On July 1, 2008, the FDA granted BPV's request for an extension of time to respond, but indicated that if the additional information was not provided by that extended date, the 510(k) would be considered withdrawn, pursuant to 21 C.F.R. § 807.87(l). Ex. A, Carr Decl. at ¶ 111.

403.   On July 2, 2008, BPV submitted an over 500-page response with the additional information required by the FDA in the FDA letter dated June 6, 2008.  Ex. A, Carr Decl. at ¶ 112.

404.   BPV answered each FDA question, provided additional information supporting its justification for omitting certain biocompatibility tests, and provided summaries and documentation of the biocompatibility testing it conducted in response to FDA's demand, including the protocols and testing reports.  Ex. A, Carr Decl. at ¶ 112.

405.   On July 30, 2008, FDA cleared the G2® Express Filter for market, subject to the general controls and special controls of the FDCA, after reviewing the 510(k) submission and all additional information required by the FDA, and finding that the G2® Express Filter was as safe and effective as, and therefore substantially equivalent to, the G2® Filter System – Femoral and Jugular/Subclavian Delivery Kits.  Ex. A, Carr Decl. at ¶ 113.

**B.   G2®X Filter (K082305)**

406.   On August 12, 2008, BPV submitted a Special 510(k) for its G2® Express Filter System – Femoral and Jugular/Subclavian Delivery Kits (subsequently known as G2®X), which included changes to the delivery system only.   Ex. A, Carr Decl. at ¶ 114.

407.   In this submission, the filter remained unchanged from BPV's cleared G2® Express Filter System (K080668).  Ex. A, Carr Decl. at ¶ 114.

408.   Included in the 510(k) submission were results from the *in-vitro* bench testing and *in-vivo* animal testing conducted by BPV on the subject device. Ex. A, Carr Decl. at ¶ 114.

409.   BPV conducted a risk analysis, a Risk Assessment and Design Failure Modes and Effects Analysis ("DFMEA") for the device, in accordance with ISO

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1  14971:2000, Medical Devices – Application of risk management to medical devices, to

2  assure that risks posed by the design were acceptable. Ex. A, Carr Decl. at ¶ 114.

3      410.   The design verification and validation were performed in conformance with

4  FDA Special Controls guidance document, "Guidance for Cardiovascular Intravascular

5  Filter 510(k) Submission;" FDA's "510(k) Sterility Review Guidance and Revision of

6  2/12/90 (K90-1);" FDA's "Use of International Standards Organizations ISO 10993

7  Biological Evaluation of Medical Devices Part I: Evaluation and Testing;" FDA guidance

8  document, Design Control Guidance for Medical Device Manufacturers, dated March 11,

9  1997; and the design control requirements under 21 CFR § 820.30.  Ex. A, Carr Decl. at ¶

10  114.

11      411.   Also included in the submission were results from biocompatibility and

12  toxicity testing conducted by BPV on ▮▮▮▮▮ REDACTED ▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, in conformance

14  to ISO 10993-1:2003, Biological Evaluation of Medical Devices – Part I: Evaluation and

15  Testing. Ex. A, Carr Decl. at ¶ 114.

16      412.   Also included were results from packaging testing, sterilization testing, and

17  shelf-life testing. Ex. A, Carr Decl. at ¶ 114.

18      413.   Also included was proposed labeling for the G2® Express Filter (G2®X) in

19  conformance with 21 CFR § 807.87(e). Ex. A, Carr Decl. at ¶ 114.

20      414.   Also included was a summary of the safety and effectiveness information

21  upon which a substantial equivalence determination could be based as required by the

22  Safe Medical Devices Act of 1990, and 21 CFR § 807.92. Ex. A, Carr Decl. at ¶ 114.

23      415.   On September 4, 2008, the FDA required BPV to provide additional

24  information before the FDA could complete its review of this submission for substantial

25  equivalence.  Ex. A, Carr Decl. at ¶ 115.

26      416.   The FDA required BPV to provide the test reports for the *in vitro* testing

27  conducted to validate the device modifications (Question 1).  Ex. A, Carr Decl. at ¶ 115.

28      417.   The FDA required BPV to provide information regarding whether BPV was

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

experiencing issues with oxidation and/or stability of the material in the predicate device (Question 2).  Ex. A, Carr Decl. at ¶ 115.

418.   The FDA required BPV to provide summaries of the biocompatibility testing conducted on the proposed device by completing a biocompatibility testing results form provided by the FDA (Question 3).  Ex. A, Carr Decl. at ¶ 115.

419.   On September 8, 2008, the FDA sent BPV a letter informing BPV that the FDA was putting the 510(k) submission on hold pending BPV's responses to the FDA's requests.  Ex. A, Carr Decl. at ¶ 116.

420.   If BPV failed to respond within 30 days, the FDA would have treated this 510(k) submission as withdrawn under 21 CFR § 807.87(l).  Ex. A, Carr Decl. at ¶ 116.

421.   On September 29, 2008, BPV submitted the additional information required by the FDA in its September 4, 2008 email. Ex. A, Carr Decl. at ¶ 117.

422.   In response to FDA's demand (Question 1), BPV provided the FDA with a summary of its in vitro testing and the test reports to validate its proposed modifications. Ex. A, Carr Decl. at ¶ 117.

423.   In response to FDA's demand (Question 2), BPV provided the FDA with an explanation regarding the isolated event of issues with oxidation and/or stability of the material in the predicate device that BPV experienced, as well as BPV's investigation of the probable root causes of the failure mode and the immediate corrective actions that BPV implemented, which appeared to resolve the failure mode (no reported complaints since action taken).  Ex. A, Carr Decl. at ¶ 117.

424.   In response to FDA's demand (Question 3), BPV provided the FDA with the completed Biocompatibility Test Results Forms that summarized the biocompatibility testing conducted on the subject device. Ex. A, Carr Decl. at ¶ 117.

425.   On October 31, 2008, the FDA cleared the G2®X Filter for market, subject to the general controls and special controls of the FDCA, after reviewing the 510(k) submission and all additional information required by the FDA, and finding the G2®X Filter as safe and effective as, and therefore substantially equivalent to, the G2® Express

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Filter System – Femoral and Jugular/Subclavian Delivery Kits. Ex. A, Carr Decl. at ¶ 118.

## VI.   ECLIPSE™ Filter System

### A.   ECLIPSE™ Filter System – Femoral and Jugular/Subclavian Delivery Kits (K093659)

426.   On August 14, 2009, BPV met with FDA to discuss its upcoming filter project which made minor process changes to the surface finish of the G2®X Filter. Ex. A, Carr Decl. at ¶ 119.

427.   The purpose of the meeting was for BPV to obtain FDA guidance on the proper regulatory path for this project.  Ex. A, Carr Decl. at ¶ 119.

428.   The modifications would not result in any dimensional, physical, or performance changes to the filter or the delivery system and the risk assessment that BPV conducted identified "no new issues of safety and effectiveness."  Ex. A, Carr Decl. at ¶ 119.

429.   Accordingly, BPV followed FDA's guidance document "Deciding When to Submit a 510(k) for a Change to an Existing Device," which included a decision tree that BPV followed and which determined that this minor modification should not require a new 510(k).  Ex. A, Carr Decl. at ¶ 119.

430.   BPV sought FDA's input because BPV believed "in an effort to keep FDA informed of this change, a special 510(k) might be more appropriate."  Ex. A, Carr Decl. at ¶ 119.

431.   FDA and BPV discussed the minor modification and FDA indicated that the decision of whether to file a 510(k) or not to file in this case "was more of a decision for the business," but that FDA would confirm with FDA compliance department. Ex. A, Carr Decl. at ¶ 119.

432.   On November 23, 2009, BPV decided to submit a formal Special 510(k) for its ECLIPSE Filter System – Femoral and Jugular/Subclavian Delivery Kits. Ex. A, Carr Decl. at ¶ 120.

433.   The primary change from the predicate device, the G2®X Filter System –

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Femoral and Jugular/Subclavian Delivery System (K082305), was an improvement in the surface finish of the filter wire by electropolishing the wire prior to forming the filter.  Ex. A, Carr Decl. at ¶ 120.

434.   Included in the 510(k) submission were results from the *in-vitro* bench testing conducted by BPV on the subject device, including corrosion resistance testing, cyclic fatigue testing, and arm fatigue testing.  Ex. A, Carr Decl. at ¶ 120.

435.   BPV conducted a risk analysis, a Risk Assessment and Design Failure Modes and Effects Analysis ("DFMEA") for the device, in accordance with ISO 14971:2000, Medical Devices – Application of Risk Management to Medical Devices," to assure that risks posed by the design were acceptable.  Ex. A, Carr Decl. at ¶ 120.

436.   The design verification and validation were performed in conformance with FDA Special Controls guidance document, "Guidance for Cardiovascular Intravascular Filter 510(k) Submission;" FDA's "510(k) Sterility Review Guidance and Revision of 2/12/90 (K90-1);" FDA's "Use of International Standards Organizations ISO 10993 Biological Evaluation of Medical Devices Part I: Evaluation and Testing;" FDA guidance document, Design Control Guidance for Medical Device Manufacturers, dated March 11, 1997; ASTM F2129-06 Stand Test Method for Conducting Cyclic Petentiodynamic Polarization Measurements to Determine the Corrosion Susceptibility of Small Implant Devices; and the design control requirements under 21 CFR § 820.30.  Ex. A, Carr Decl. at ¶ 120.

437.   Also included in the submission were results from biocompatibility testing conducted by BPV in conformance to ISO 10993-1:2003, Biological Evaluation of Medical Devices – Part I: Evaluation and Testing.  Ex. A, Carr Decl. at ¶ 120.

438.   Also included were results from packaging testing, sterilization testing, and shelf-life testing. Ex. A, Carr Decl. at ¶ 120.

439.   Also included was proposed labeling for the Eclipse™ Filter in conformance with 21 CFR § 807.87(e). Ex. A, Carr Decl. at ¶ 120.

440.   Also included was a summary of the safety and effectiveness information

Nelson Mullins Riley & Scarborough

L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

- 54 -

upon which a substantial equivalence determination could be based as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92. Ex. A, Carr Decl. at ¶ 120.

441.    On December 15, 2009, the FDA reviewed the submission but demanded additional information before the FDA could complete its review of this submission for substantial equivalence. Ex. A, Carr Decl. at ¶ 121.

442.    The FDA required BPV to conduct additional testing on the subject device for **REDACTED** testing or provide justification for why these tests were not necessary.  Ex. A, Carr Decl. at ¶ 121.

443.    The FDA prohibited BPV from marketing the device until it had provided the additional information under 21 CFR § 807.87(l). Ex. A, Carr Decl. at ¶ 121.

444.    If BPV failed to respond within 30 days, the FDA would have treated this 510(k) submission as withdrawn.  Ex. A, Carr Decl. at ¶ 121.

445.    On December 17, 2009, BPV responded to FDA's request and provided the additional information required by FDA in its December 15, 2009 letter.  Ex. A, Carr Decl. at ¶ 122.

446.    BPV responded with the justification for why the testing was not included in the original submission, but, nevertheless, BPV conducted the additional testing required by the FDA and provided summary results for the radial strength testing, migration/clot trapping testing, and tensile strength testing. Ex. A, Carr Decl. at ¶ 122.

447.    On January 14, 2010, the FDA cleared the Eclipse™ Filter, subject to FDCA general and special controls, after reviewing the submission and the additional testing information that FDA required, and finding the Eclipse™ Filter as safe and effective as, and therefore substantially equivalent to, the G2®X Filter.  Ex. A, Carr Decl. at ¶ 123.

448.    BPV later made subsequent changes to the device labeling, developing a patient brochure and implant card to accompany the Eclipse™ Filter.  Ex. A, Carr Decl. at ¶ 124.

449.    Again, BPV followed FDA's guidance document "Deciding When to

- 55 -

Submit a 510(k) for a Change to an Existing Device," which included a decision tree that BPV followed and which determined that the changes did not require a 510(k).  Ex. A, Carr Decl. at ¶ 124.

450.    BPV sought FDA's review and input on the content of the patient brochure and implant card.  Ex. A, Carr Decl. at ¶ 124.

451.    On March 18, 2010, BPV and FDA had a telephone conference to discuss BPV's proposed changes to the labeling.  Ex. A, Carr Decl. at ¶ 125.

452.    FDA indicated that the patient brochure and implant card could not be reviewed outside of a 510(k) submission, so BPV agreed to provide the labeling to the FDA via a Special 510(k).  Ex. A, Carr Decl. at ¶ 125.

453.    On May 20, 2010, BPV filed the Special 510(k) for the Eclipse™ Filter seeking clearance of the revised device labeling that added a patient brochure and implant card, as well as a "Does not Contain Latex" symbol and corresponding text to the label.  Ex. A, Carr Decl. at ¶ 126.

454.    Because no changes were made to the Eclipse™ Filter or the delivery systems previously cleared by the FDA on January 14, 2010, BPV did not need to re-conduct the battery of testing that the FDA already reviewed when it cleared the device. Ex. A, Carr Decl. at ¶ 126.

455.    BPV conducted a risk analysis, a Risk Assessment and Design Failure Modes and Effects Analysis ("DFMEA") for the device, in accordance with ISO 14971:2000, Medical Devices – Application of Risk Management to Medical Devices," to assure that risks posed by the design were acceptable, which only identified packaging testing, sterilization testing, and shelf-life testing as necessary.  Ex. A, Carr Decl. at ¶ 127.

456.    Included in the submission were results from the packaging testing, sterilization testing, and shelf-life testing that BPV conducted on the device.  Ex. A, Carr Decl. at ¶ 127.

457.    Also included were results from the chemical testing that BPV conducted on the device to confirm that the device did not contain latex, including Fourier transform

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

infrared spectroscopy, and gas chromatography mass spectroscopy, as well as provided the test data and reports to FDA.  Ex. A, Carr Decl. at ¶ 127.

458.    Also included was proposed revised labeling for the Eclipse™ Filter in conformance with 21 CFR § 807.87(e). Ex. A, Carr Decl. at ¶ 127.

459.    Also included was a summary of the safety and effectiveness information upon which substantial equivalence determination would be based as required by the Safe Medical Devices Act of 1990, and 21 CFR § 807.92.  Ex. A, Carr Decl. at ¶ 127.

460.    On June 18, 2010, the FDA reviewed the submission but required BPV to provide additional information before the FDA could complete its review of the submission for substantial equivalence.  Ex. A, Carr Decl. at ¶ 128.

461.    The FDA prohibited BPV from marketing the device until it had provided the additional information under 21 CFR § 807.87(l).  Ex. A, Carr Decl. at ¶ 128.

462.    If BPV failed to respond within 30 days, the FDA would have treated this 510(k) submission as withdrawn.  Ex. A, Carr Decl. at ¶ 128.

463.    FDA required BPV to revise the labeling of the Eclipse™ Filter to remove the statement "The Eclipse Vena Cava Filter does not have a time in which it must be removed" in the "When can the filter be removed?" section of the labeling  (Question 1). Ex. A, Carr Decl. at ¶ 128.

464.    FDA was concerned that the clinical data BPV provided in the labeling was not sufficient enough to support this statement. Ex. A, Carr Decl. at ¶ 128.

465.    The FDA also directed BPV to revise the 510(k) submission to include additional information in the 510(k) summary pursuant to 21 C.F.R. § 807.92 (Question 2). Ex. A, Carr Decl. at ¶ 128.

466.    The FDA further directed BPV to revise the 510(k) submission to remove "Trade Secret/Confidential" from the footer of the 510(k) summary (Question 2) and the Indication for Use page (Question 3).  Ex. A, Carr Decl. at ¶ 128.

467.    On June 21, 2010, BPV responded to FDA's demands for additional information and revised labeling.  Ex. A, Carr Decl. at ¶ 129.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

468.   In response to FDA's demand (Question 1), BPV revised the labeling for the Eclipse™ Filter and removed the section entitled "When can the filter be removed?" and provided the revised version to the FDA.  Ex. A, Carr Decl. at ¶ 129.

469.   In response to FDA's demand (Question 2), BPV revised the 510(k) Summary included with the original 510(k) submission and provided the revised version to the FDA.  Ex. A, Carr Decl. at ¶ 129.

470.   In response to FDA's demand (Question 3), BPV revised the Indications for Use page included with the original 510(k) submission and provided the revised version to the FDA.  Ex. A, Carr Decl. at ¶ 129.

471.   On June 25, 2010, the FDA cleared the revised labeling for the Eclipse™ Filter, finding it as safe and effective as, and therefore substantially equivalent to, the Eclipse™ Filter, subject to the general controls and special controls of the FDCA. FDA reviewed the revised submission and the revised labeling.  Ex. A, Carr Decl. at ¶ 130.

## VII.   Meridian® Filter:

472.   As early as August 14, 2009, BPV began discussing with the FDA BPV's plans to develop the Meridian® Filter (more than two years before FDA cleared the device). Ex. B, Van Vleet Decl. at ¶ 10.

473.   The Meridian® Filter was to be BPV's next generation retrievable IVC filter. The design goal for the Meridian® Filter was to improve the device's resistance to caudal movement/migration.  Ex. B, Van Vleet Decl. at ¶ 10.

474.   In BPV's discussions with FDA, BPV described the project as one "based on the existing filter platform [that] consisted of adding caudal anchors to the Filter." This project eventually became the Meridian® Filter.  Ex. B, Van Vleet Decl. at ¶ 10.

475.   On November 17, 2009, to ensure that the company was satisfying FDA's requirements regarding animal testing for the Meridian® Filter, BPV asked FDA if the agency would be willing to review BPV's proposed animal study protocol. Ex. B, Van Vleet Decl. at ¶ 11.

476.   FDA agreed to review BPV's proposed animal study protocol, and asked

BPV to submit the proposed protocol by way of submitting a formal pre-Investigational Device Exemption ("IDE") meeting request.  Ex. B, Van Vleet Decl. at ¶ 11.

477.   On December 3, 2009, in response to FDA's request, BPV provided the agency with a pre-IDE meeting request, which described the fundamental scientific technology of the Meridian® Filter (which, at the time, was internally called "Eclipse Anchor" filter), the risk analysis used by BPV, a summary of the design verification and validation testing, and a description of the proposed animal study protocol, along with an actual draft of the proposed protocol. Ex. B, Van Vleet Decl. at ¶ 12.

478.   On January 8, 2010, BPV had a face-to-face meeting with FDA to discuss Bard's pre-IDE meeting request for the Meridian® Filter. Ex. B, Van Vleet Decl. at ¶ 13.

479.   During that meeting, FDA stated that BPV's *in vivo* animal study on Meridian® Filter would be required to (a) include animals that are seen by the veterinarian, (b) be performed to Good Laboratory Practices standards, and (c) use animals with IVCs that are comparable in size to human IVCs.  Ex. B, Van Vleet Decl. at ¶ 13.

480.   FDA also asked BPV to conduct an acute animal study to test the delivery system.  Ex. B, Van Vleet Decl. at ¶ 13.

481.   FDA also stated that BPV would be required to include in its 510(k) the animal study reports by the outside consulting company, LyChron LLC, which was to assist BPV with the animal studies.  Ex. B, Van Vleet Decl. at ¶ 13.

482.   FDA additionally asked BPV about the company's flat plate fatigue testing that it intended to conduct on the device.  Ex. B, Van Vleet Decl. at ¶ 13.

483.   BPV responded by providing FDA with information concerning the acceptance criteria for that test (10 year equivalent of valsalva, or no failures in 4,000,000 cycles at a rate and deflection simulating coughing), which the FDA stated would be acceptable. Ex. B, Van Vleet Decl. at ¶ 13.

484.   On August 31, 2010 BPV submitted its Traditional 510(k) submission (K102511) to FDA for the Meridian® Filter System -- Jugular/Subclavian Delivery Kit.

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Ex. B, Van Vleet Decl. at ¶ 14.

485.   In the Meridian® 510(k) submission, BPV described for FDA the battery of *in vitro* testing conducted by BPV on the Meridian® Filter, including **REDACTED**

**[REDACTED]**

**[REDACTED]**. Ex. B, Van Vleet Decl. at ¶ 14.

486.   BPV additionally provided FDA with summary data sheets of this *in vitro* testing. Ex. B, Van Vleet Decl. at ¶ 14.

487.   These tests were conducted as required under 21 C.F.R. 870.3375 (which is a regulation specific to cardiovascular intravascular filters) and Special Control (1), which requires manufacturers to follow ISO 10993 "Biological Evaluation of Medical Devices Part I: Evaluation and Testing." Ex. B, Van Vleet Decl. at ¶ 14.

488.   Along with describing the *in vitro* testing conducted by BPV on the Meridian® Filter, BPV attached to its 510(k) submission various reports of biocompatibility testing that had been performed. Ex. B, Van Vleet Decl. at ¶ 14.

489.   In the submission, BPV also described for FDA the *in vivo* animal testing conducted by the company on the Meridian® Filter. Ex. B, Van Vleet Decl. at ¶ 14.

490.   That testing assessed retrievability, fatigue resistance, cephalad migration resistance, caudal migration resistance, penetration resistance, perforation, filter centering (tilt), and other attributes of the device. Ex. B, Van Vleet Decl. at ¶ 14.

491.   Along with describing the *in vivo* animal testing on the Meridian® Filter, BPV's 510(k) submission attached voluminous documents related to that animal testing, including protocols, test reports, and histology slides. Ex. B, Van Vleet Decl. at ¶ 14.

492.   Thereafter, on October 26, 2010, FDA sent BPV a letter requesting additional information before FDA could determine whether it could clear the Meridian® Filter.  Ex. B, Van Vleet Decl. at ¶ 15.

493.   In the letter, FDA directed BPV to provide additional information and responses to 14 questions (many with multiple subparts) regarding device **REDACTED**

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

. Ex. B, Van Vleet Decl. at ¶ 15.

494.   In particular, FDA required BPV to perform additional testing. Ex. B, Van Vleet Decl. at ¶ 15.

495.   Specifically, FDA required Bard to perform corrosion testing on fatigued filters (Question 9c), and to perform clot trapping testing (Question 11).  Ex. B, Van Vleet Decl. at ¶ 15.

496.   Furthermore, "to assess the safety of [the Meridian® Filter] in the [magnetic resonance ("MR")] environment," FDA asked BPV to provide MR heating test results at the location of the maximum heating for at least three different orientations to the incident electrical field in two different systems (Question 12a). Ex. B, Van Vleet Decl. at ¶ 15.

497.   Additionally, FDA directed BPV to provide various tests reports, including sterilization testing (Question 1a), endotoxin testing (Question 1b), corrosion testing (Question 9a), animal testing (Question 13). Ex. B, Van Vleet Decl. at ¶ 15.

498.   In particular, with regard to animal testing, FDA noted that it could not assess BPV's conclusions "about the chronic safety of the Meridian filter" based on the animal study test reports provided. Ex. B, Van Vleet Decl. at ¶ 15.

499.   FDA also asked BPV to provide manuscripts of the articles used by BPV to develop the deformation distances for fatigue testing (Question 4b). Ex. B, Van Vleet Decl. at ¶ 15.

500.   FDA further required BPV to describe BPV's fatigue test setup and apparatus and to explain why the testing is considered representative of the IVC (Question 4a). Ex. B, Van Vleet Decl. at ¶ 15.

501.   FDA also asked BPV to describe and provide explanation for various aspects of BPV's migration resistance testing (Question 6a-6c). Ex. B, Van Vleet Decl. at ¶ 15.

502.   FDA also required BPV to make certain changes to the labeling of the

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

device regarding magnetic resonance imaging ("MRI") compatibility (Question 12b), latex use (Question 14a), and retrievability and the potential need for follow-up monitoring (Question 14b). Ex. B, Van Vleet Decl. at ¶ 15.

503.   FDA required BPV to provide responses to the above requests before the agency could complete review of the company's 510(k) submission. Ex. B, Van Vleet Decl. at ¶ 15.

504.   In FDA's letter, the agency stated that if BPV does not provide the requested information (or a request for extension of time) within 30 days, the company's 510(k) submission will be considered "withdrawn" and "deleted from [the agency's] system." Ex. B, Van Vleet Decl. at ¶ 15.

505.   Subsequently, FDA and BPV had a teleconference on November 12, 2010 to discuss certain of the issues raised by FDA in its October 26 letter. Ex. B, Van Vleet Decl. at ¶ 16.

506.   In particular, BPV and FDA discussed FDA's desire to better understand BPV's development of the "worst case" values for its fatigue testing. Ex. B, Van Vleet Decl. at ¶ 16.

507.   On November 16, 2010 BPV provided FDA with an email and attachments that explained BPV's fatigue testing setup and testing parameters, which addressed Questions 4a-4c of FDA's October 26, 2010 letter. Ex. B, Van Vleet Decl. at ¶ 17.

508.   On December 8, 2010, BPV and FDA had a teleconference to further discuss FDA's questions about BPV's fatigue testing. Ex. B, Van Vleet Decl. at ¶ 18.

509.   In particular, in follow-up to BPV's November 16 email, FDA asked further questions regarding how BPV's fatigue testing was monitored to ensure proper displacement, as well as questions about how BPV derived its fatigue deformation distance based on literature.  Ex. B, Van Vleet Decl. at ¶ 18.

510.   BPV responded by describing in further detail the fatigue testing and how BPV ensured that the filters were constantly and consistently fatigued during testing.  Ex. B, Van Vleet Decl. at ¶ 18.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

511.   BPV also further explained the literature basis for selecting the fatigue deformation distance utilized in the test.  Ex. B, Van Vleet Decl. at ¶ 18.

512.   On December 27, 2010, BPV sent FDA its official response to FDA's questions of October 26, 2010. Ex. B, Van Vleet Decl. at ¶ 19.

513.   In response to FDA's request (Question 9c), BPV performed additional corrosion testing on fatigued filters, and submitted the results of that test to FDA with the letter.  Ex. B, Van Vleet Decl. at ¶ 19.

514.   Additionally, in response to FDA's request (Question 11), BPV had performed clot trapping efficiency testing.  Ex. B, Van Vleet Decl. at ¶ 19.

515.   BPV described the testing performed, and provided FDA with a copy of the clot trapping efficiency test report.  Ex. B, Van Vleet Decl. at ¶ 19.

516.   In response to FDA's safety questions regarding the device in the MR environment (Question 12a), BPV performed additional analyses and testing to determine the maximum heating location on the device.  Ex. B, Van Vleet Decl. at ¶ 19.

517.   To do this, BPV performed tests to determine the temperature REDACTED ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  Ex. B, Van Vleet Decl. at ¶ 19.

518.   BPV further provided FDA with the various test reports and medical literature that FDA had requested (Questions 1a, 1b, 4b, 9a, 13).  Ex. B, Van Vleet Decl. at ¶ 19.

519.   BPV also described in detail the BPV's fatigue testing and migration resistance testing (Questions 4a, 6a-6c).  Ex. B, Van Vleet Decl. at ¶ 19.

520.   Finally, BPV made changes to the Meridian® instructions for use ("IFU") and patient brochure as required by FDA (Questions 12b, 14a, 14b).  Ex. B, Van Vleet Decl. at ¶ 19.

521.   On February 1, 2011, FDA sent BPV a second letter requesting information necessary to determine whether it could clear the Meridian® Filter.  Ex. B, Van Vleet

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Decl. at ¶ 20.

522.    In the letter, FDA directed BPV to provide additional information and responses to 13 questions regarding ████████ REDACTED ████████ ████████████████████████████████████ ████████████████. Ex. B, Van Vleet Decl. at ¶ 20.

523.    In particular, FDA expressed "safety concerns" related to BPV's corrosion resistance testing of the Meridian® Filter. Ex. B, Van Vleet Decl. at ¶ 20.

524.    The agency required BPV to "address safety concerns related to the poor corrosion resistance" by performing additional "chemical characterization of the passivation layer of [Meridian® Filter] (atomic composition vs. depth) and nickel leach testing on pre- and post-fatigue devices" (Question 8). Ex. B, Van Vleet Decl. at ¶ 20.

525.    FDA also asked BPV to provide the corrosion rate and to provide further explanation regarding that rate. Ex. B, Van Vleet Decl. at ¶ 20.

526.    Furthermore, FDA required BPV to submit images of post-fatigued filters for the agency's review (Question 5). Ex. B, Van Vleet Decl. at ¶ 20.

527.    Additionally, FDA required BPV to modify its protocol for shelf life testing (Question 1). Ex. B, Van Vleet Decl. at ¶ 20.

528.    FDA also required BPV to repeat chromosomal aberration testing or provide justification regarding the ████████ REDACTED ████████ ████████████████ (Question 3). Ex. B, Van Vleet Decl. at ¶ 20.

529.    FDA also required BPV to repeat clot trapping efficiency testing using a ████████ REDACTED ████████ (Question 10). Ex. B, Van Vleet Decl. at ¶ 20.

530.    FDA also required BPV to further revise its labeling regarding MRI compatibility and absorption rate (Questions 12 & 13). Ex. B, Van Vleet Decl. at ¶ 20.

531.    FDA required BPV to provide responses to the above requests before the agency could complete review of the company's 510(k) submission. Ex. B, Van Vleet Decl. at ¶ 20.

532.    In FDA's letter, the agency stated that if BPV does not provide the

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

requested information (or a request for extension of time) within 30 days, the company's 510(k) submission will be considered "withdrawn" and "deleted from [the agency's] system." Ex. B, Van Vleet Decl. at ¶ 20.

533.   On February 10, 2011, BPV and FDA had a conference call to address certain of FDA's questions from its February 1, 2011 Letter. Ex. B, Van Vleet Decl. at ¶ 21.

534.   During the meeting, FDA and BPV discussed FDA's various questions set forth in the February 1, 2011 Letter so that BPV could better understand FDA's concerns and provide appropriate responses. Ex. B, Van Vleet Decl. at ¶ 21.

535.   A week later, on February 17, 2011, BPV and FDA had a conference call to address FDA's biocompatibility and corrosion testing questions from its February 1, 2011 Letter. Ex. B, Van Vleet Decl. at ¶ 22.

536.   Regarding the issue whether BPV would need to repeat **REDACTED** **REDACTED** (Question 3), BPV identified for FDA certain test reports already provided to the agency regarding this biocompatibility concern.   Ex. B, Van Vleet Decl. at ¶ 22.

537.   FDA stated that it would "review the report and let BPV know if any additional testing would be required." Ex. B, Van Vleet Decl. at ¶ 22.

538.   In a February 17-22, 2011 email string, upon reviewing the test report, FDA indicated that BPV would be required to repeat the chromosomal aberration testing with water only under **REDACTED** and to further identify any compounds detected. Ex. B, Van Vleet Decl. at ¶ 22.

539.   Regarding Question 9 concerning BPV's galvanic corrosion testing, FDA stated that "surface characterization and nickel leaching are the only tests that can be done, and are the tests the FDA finds acceptable" to address galvanic corrosion.   Ex. B, Van Vleet Decl. at ¶ 22.

540.   In response, BPV committed to performing testing regarding atomic **REDACTED**. Ex. B, Van Vleet Decl. at ¶

22.

541.   BPV also stated it would consult with its corrosion consultant regarding the corrosion testing to discuss repeating the testing until a steady state is reached.   Ex. B, Van Vleet Decl. at ¶ 22.

542.   On May 17, 2011, BPV had a face-to-face meeting with FDA to discuss Questions 8 and 9 from FDA's February 1, 2011 Letter. Ex. B, Van Vleet Decl. at ¶ 23.

543.   During the meeting, BPV provided a 70-slide PowerPoint presentation that summarized BPV's efforts regarding corrosion testing, **REDACTED** . Ex. B, Van Vleet Decl. at ¶ 23.

544.   This presentation included detailed charts and graphs of BPV's corrosion testing efforts, as well as summaries of FDA's requests and BPV's responses to date regarding the Meridian® Filter.   Ex. B, Van Vleet Decl. at ¶ 23.

545.   With respect to galvanic corrosion testing, FDA asked BPV to repeat galvanic corrosion on 6 straight anchor/wire couples and 6 offset anchor/wire couples. Ex. B, Van Vleet Decl. at ¶ 23.

546.   FDA also asked BPV conduct plots that show the galvanic current and mixed potentials for the couples. Ex. B, Van Vleet Decl. at ¶ 23.

547.   With respect to pitting corrosion, FDA directed BPV to re-plot CCP plots and discuss any noise. Ex. B, Van Vleet Decl. at ¶ 23.

548.   With respect to nickel leach testing, FDA required BPV to perform Ni Leach testing on 5 non-fatigued filters from a single ingot. Ex. B, Van Vleet Decl. at ¶ 23.

549.   FDA also required BPV to evaluate **REDACTED** , and to perform a calibration test. Ex. B, Van Vleet Decl. at ¶ 23.

550.   FDA also stated it would propose to BPV language for labeling. Ex. B, Van Vleet Decl. at ¶ 23.

551.   In a May 20-23, 2011 email chain with FDA, BPV and FDA further discussed a summary of the "list of required additional testing" FDA requested for BPV to "fully address deficiencies eight and nine." Ex. B, Van Vleet Decl. at ¶ 24.

552.    FDA confirmed that it was requiring BPV to do the following regarding galvanic corrosion testing: repeat galvanic corrosion on 6 straight anchor/wire couples and 6 offset anchor / wire couples; Only the galvanic test would be performed, not the LPR and Tafel test; and plots would show the galvanic current and mixed potentials for the couples. Ex. B, Van Vleet Decl. at ¶ 24.

553.    FDA confirmed that it was requiring BPV to do the following regarding pitting corrosion: re-plot CCP plots on the same scale and discuss any noise. Ex. B, Van Vleet Decl. at ¶ 24.

554.    FDA confirmed that it was requiring BPV to do the following regarding nickel leach testing: 5 non-fatigued filters would be tested, one filter would be tested per vial, and BPV would provide a description of the manufacturing controls related to the surface to the device. Ex. B, Van Vleet Decl. at ¶ 24.

555.    FDA confirmed that it was requiring BPV to do the following regarding nickel leach calibration test: REDACTED . Ex. B, Van Vleet Decl. at ¶ 24.

556.    In addition, FDA provided BPV with the following proposed language to include in BPV's Meridian® Filter IFU: "The [DEVICE NAME] consists of nickel-titanium alloy, which is generally considered safe. However, in vitro testing has demonstrated that nickel is released from this device for a minimum of 60 days. Patients who are allergic to nickel may have an allergic reaction to this device, especially those with a history of metal allergies. Certain allergic reactions can be serious; patients should be instructed to notify their physicians immediately if they suspect they are experiencing an allergic reaction such as difficulty in breathing or inflammation of the face or throat. Some patients may develop an allergy to nickel if this device is implanted. Some forms of nickel have also been associated with carcinogenicity (ability to cause cancer) in animal models. In humans, carcinogenicity has been demonstrated through an inhalation route (breathing nickel in), which will not occur in this procedure. The effect of other routes of exposure is not known, but the risk related to this device is considered small." Ex. B, Van

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Vleet Decl. at ¶ 24.

557.    On May 23, 2011, BPV sent FDA the company's informal responses to certain of FDA's questions from the February 1, 2011 letter.  Ex. B, Van Vleet Decl. at ¶ 25.

558.    In response to FDA's request (Question 1), BPV revised its shelf-life testing protocol.  Ex. B, Van Vleet Decl. at ¶ 25.

559.    Additionally, in response to FDA's requests (Questions 3, 10), BPV repeated its ███████████████ REDACTED ████████████████

███████████████████████████████████████████.  Ex. B, Van Vleet Decl. at ¶ 25.

560.    BPV also provided FDA with images of post-fatigued filters, as FDA had requested (Question 5).  Ex. B, Van Vleet Decl. at ¶ 25.

561.    Finally, BPV submitted draft revised labeling with updates for MRI compatibility and absorption rate (Questions 12 &13).  Ex. B, Van Vleet Decl. at ¶ 25.

562.    On June 15, 2011, BPV sent FDA the company's informal responses to the remaining questions from FDA's February 1, 2011 Letter.  Ex. B, Van Vleet Decl. at ¶ 26.

563.    In response to FDA's requests (Questions 8 & 9), and to address FDA's safety concerns, BPV performed additional testing to submit to FDA.  Ex. B, Van Vleet Decl. at ¶ 26.

564.    ████████████████████ REDACTED ████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████████

565.    ███████████████ REDACTED ███████████████.  Test reports for each of these tests were submitted.  Ex. B, Van Vleet Decl. at ¶ 26.

566.    On June 22, 2011, BPV and FDA had a conference call to discuss BPV's June 15, 2011 response to the agency's February 1, 2011 Letter, and to specifically to discuss the results of BPV's additional testing conducted at FDA's request.  Ex. B, Van

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Vleet Decl. at ¶ 27.

567.    As a result of the meeting, and at FDA's request, BPV agree to include in its formal response the following: a discussion on the difference between the 60-day and 14-day data for non-fatigued devices; a table of the Ni release results; and a description of the equation used to describe the results. Ex. B, Van Vleet Decl. at ¶ 27.

568.    On June 27, 2011, BPV sent FDA BPV's formal responses to FDA's questions from its February 1, 2011 Letter.  Ex. B, Van Vleet Decl. at ¶ 28.

569.    This formal response included descriptions, summaries, and reports for all additional testing and analyses that FDA required BPV to conduct before FDA could assess clearance of the Meridian® Filter, including:  (a) modifying the stability protocol (Question 1), (b) REDACTED (Question 3), (c) imaging at 40X magnification of fatigued filters, with BPV's justification for image location (Question 5), (d) providing composite (linear / transverse) modulus of *in-vivo* IVC compared to mock vessels utilized in migration testing, which FDA deemed acceptable (Question 6), (e) conducting retrieval force testing on predicate device the Eclipse® filter (Question 7), (f) REDACTED (Question 8), (g) REDACTED (Question 8), (h) REDACTED (Question 9), (i) REDACTED (Question 9), (j) REDACTED (Question 9), (k) repeating clot trapping efficiency testing using shower clot trapping test method (Question 10), (l) providing FDA with an experimental analysis demonstrating worst case heating location (Question 11), and (m) revised MRI labeling (Questions 11-13).   Ex. B, Van Vleet Decl. at ¶ 28.

570.    Additionally, in response to FDA's request, BPV provided FDA with a sample Meridian® Filter for FDA to review.  Ex. B, Van Vleet Decl. at ¶ 28.

571.    On August 16-17, 2011, FDA and BPV exchanged emails regarding FDA's

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

proposal for still further changes to the Meridian® IFU, which BPV agreed to implement. Ex. B, Van Vleet Decl. at ¶ 29.

572.    Specifically, FDA requested, and BPV agreed to implement, the following changes to the Meridian® Filter IFU: **REDACTED**

Ex. B, Van Vleet Decl. at ¶ 29.

573.    On August 24, 2011, FDA sent BPV a letter clearing the Meridian® Filter System -- Jugular/Subclavian Delivery Kit (K102511). Ex. B, Van Vleet Decl. at ¶ 30.

574.    In total, BPV's initial 510(k) submission for the Meridian® Filter System -- Jugular/Subclavian Delivery Kit (K102511), submitted August 31, 2010, was pending for almost a full year before FDA cleared the device on August 24, 2011. Ex. B, Van Vleet Decl. at ¶ 30.

575.    On August 27, 2011, BPV submitted its Special 510(k) submission to FDA for the Meridian® Filter System - Femoral Delivery Kit. Ex. B, Van Vleet Decl. at ¶ 31.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

576. This 510(k) submission sought to make changes to the Meridian® Filter delivery system only, not to the filter itself, to accommodate delivery via the femoral vein. Ex. B, Van Vleet Decl. at ¶ 31.

577. In the 510(k) submission, BPV described for FDA the *in-vitro* and *in-vivo* testing conducted by BPV to support clearance of the filter with a femoral delivery system. Ex. B, Van Vleet Decl. at ¶ 31.

578. This included summaries of that testing, as well as various test protocols and reports. Ex. B, Van Vleet Decl. at ¶ 31.

579. On September 30, 2011, FDA sent BPV a letter requesting additional information before FDA could determine whether it could clear the Meridian® Filter with a femoral delivery system. Ex. B, Van Vleet Decl. at ¶ 32.

580. In particular, FDA asked for clarification regarding the overmold for the storage tubing of the delivery system (Question 1). Ex. B, Van Vleet Decl. at ¶ 32.

581. FDA also directed BPV to make certain revisions to BPV's 510(k) summary to better state the changes of the device compared to the predicates (Question 2). Ex. B, Van Vleet Decl. at ¶ 32.

582. FDA required BPV to provide responses to the above requests before the agency could complete review of the company's 510(k) submission. Ex. B, Van Vleet Decl. at ¶ 32.

583. In FDA's letter, the agency stated that if BPV does not provide the requested information (or a request for extension of time) within 30 days, the company's 510(k) submission will be considered "withdrawn" and "deleted from [the agency's] system." Ex. B, Van Vleet Decl. at ¶ 32.

584. On September 30, 2011, BPV provided its official response to FDA's questions. Ex. B, Van Vleet Decl. at ¶ 33.

585. In its response, BPV clarified that the overmold used for the storage tubing is in the same configuration as the Denali delivery system (Question 1). Ex. B, Van Vleet Decl. at ¶ 33.

Nelson Mullins Riley & Scarborough

L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

586. Additionally, BPV provided FDA with a revised 510(k) summary to more clearly describe the changes to the device, per FDA's request (Question 2).   Ex. B, Van Vleet Decl. at ¶ 33.

587. On October 24, 2011, FDA sent BPV a letter clearing the Meridian® Filter System -- Femoral Delivery Kit (K112497).   Ex. B, Van Vleet Decl. at ¶ 34.

REDACTED

1   REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1  REDACTED

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

1   REDACTED

Nelson Mullins Riley & Scarborough
L.L.P.
201 I 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

1 | REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1  REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1   REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1 | REDACTED

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1 | REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REDACTED

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1 | REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1  REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

1   REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1 | REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1   REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1   REDACTED

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1   REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1 REDACTED

1    REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1 | REDACTED

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

REDACTED

817.   On February 26, 2016, FDA sent BPV a letter acknowledging the completion of the Denali® Filter clinical investigation.  Ex. B, Van Vleet Decl. at ¶ 82.

818.   Per the FDA's letter, FDA considered BPV's IDE application closed.  Ex. B, Van Vleet Decl. at ¶ 82.

RESPECTFULLY SUBMITTED this 24th day of March, 2017.

s/Richard B. North, Jr.
Richard B. North, Jr.
Georgia Bar No. 545599
Matthew B. Lerner
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW / Suite 1700
Atlanta, GA  30363
PH: (404) 322-6000
FX: (404) 322-6050
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

James R. Condo (#005867)
Amanda Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2204
PH: (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

**Attorney for Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.**

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

**CERTIFICATE OF SERVICE**

    I hereby certify that on this 24th day of March 2017, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

<div align="right">

s/Richard B. North, Jr.
Richard B. North, Jr.

</div>

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000