1

2

UNITED STATES DISTRICT COURT

3

DISTRICT OF ARIZONA

4

In Re Bard IVC Filters Products
Liability Litigation

No. MD-15-02641-PHX-DGC

5

**EXHIBIT INDEX**

6

7

8

**PLAINTIFFS' CONTROVERTING
STATEMENT OF FACTS IN
OPPOSITION TO BARD'S MOTION
FOR SUMMARY JUDGMENT
REGARDING PREEMPTION**

9

10

Exhibit 1        Daniel Orms 8-16-16 Deposition Excerpts

11

Exhibit 2        BPV-DEP-00014537 (G2 FAQS) (FILED UNDER SEAL)

12

Exhibit 3        M Kessler 2nd Supplemental Report (FILED UNDER SEAL)

13

Exhibit 4        M Kessler Preemption Declaration

14

Exhibit 5        Robert Carr 6-16-17 Deposition Excerpts (FILED UNDER SEAL)

15

Exhibit 6        Murray Asch 5-2-16 Deposition Excerpts (FILED UNDER SEAL)

16

Exhibit 7        Parisian Trial Transcript Excerpts

17

Exhibit 8        Christine Brauer 08-02-17 Deposition Excerpts

18

Exhibit 9        Kay Fuller 01-11-16 Deposition Excerpts

19

Exhibit 10       Kay Fuller 11-09-10 Deposition Excerpts

20

Exhibit 11       David Kessler MD 07-31-17 Deposition Excerpts

21

22

23

24

25

26

27

28

# EXHIBIT 1

Daniel Orms

```
 1        IN THE CIRCUIT COURT OF THE 17TH JUDICIAL
 2        CIRCUIT, IN AND FOR BROWARD COUNTY, FLORIDA
 3
 4
 5   --------------------------------§
     CLARE AUSTIN,                    §
 6                                    §
          Plaintiff,                  §
 7   v.                               §
                                      §
 8   C.R. BARD, INC., a foreign       §
     corporation, and BARD PERIPHERAL §
 9   VASCULAR, INC., an Arizona       §
     corporation, MATTHEW ROBBINS,    § Case No.
10   M.D., and CLEVELAND CLINIC       § CACE-15-008373
     FLORIDA,                         § Div: 07
11                                    §
          Defendants.                 §
12
13   -----------------------------
                              - - -
14
                     AUGUST 16, 2016
15
                              - - -
16
17                   - - -
          Videotaped deposition of DANIEL ORMS, held at
18   Miami Marriott Dadeland, 9090 South Dadeland
     Boulevard, Miami, Florida, 33156, commencing at
19   9:20 a.m., on the above date, before Trina B.
     Wellslager, Registered Professional Reporter and
20   Notary Public.
21                   - - -
22        GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph | 917.591.5672 fax
23             deps@golkow.com
24
```

Daniel Orms

```
 1      Q.   -- of the Recovery filter, correct?

 2      A.   Uh-hum.

 3      Q.   Do you remember what year that began to be

 4  marketed?

 5      A.   I don't.

 6      Q.   Does 2005 ring a bell?

 7      A.   It sounds about right.

 8      Q.   Okay.  And was it originally cleared with the

 9  retrievable indication?

10      A.   I believe not.

11      Q.   Okay.  So a permanent one and then the --

12      A.   Permanent, and then the retrievable indication

13  followed.

14      Q.   Do you remember how long it was in between?

15      A.   I don't.

16      Q.   Okay.  Do you remember hearing of any

17  physicians, although it wasn't approved for

18  retrievability, taking it out anyway?

19      A.   So using it off label, is that what you're

20  asking?

21      Q.   I'm asking you if you ever heard of any

22  physicians, despite it not being indicated for

23  retrievability, taking it out anyway?

24      A.   Yes.
```

Daniel Orms

1      Q.   Okay.  And when did you hear that?

2      A.   I can't give you specifics.  I can -- like when

3   you said do you remember, I do remember physicians using

4   it, again, what is off label, so out of indication.  I

5   can't tell you one exactly.

6      Q.   Okay.  Do you remember how many times you

7   became aware of physicians removing the G2 filter when

8   it didn't have a retrievable indication?

9      A.   No.

10     Q.   Okay.  But it happened in your territory.

11     A.   Yes.

12     Q.   Okay.  Did you hear about it happening in any

13  other territories?

14     A.   Yes.

15     Q.   Okay.  So this was understood that physicians

16  were removing the G2 filter prior to it having a

17  removable indication?  Retrievable indication, excuse

18  me.

19          MR. BROWN:  Object to the form.

20     A.   Yeah, physicians were choosing to use the

21  device off label.

22     Q.   Okay.  Do you know why the Recovery filter

23  was modified?

24     A.   Do I know why?

# EXHIBIT 2
## (Filed Under Seal)

# EXHIBIT 3
## (Filed Under Seal)

# EXHIBIT 4

Ramon Rossi Lopez - rlopez@lopezmchugh.com
(California Bar Number 86361; admitted *pro hac vice*)
Lopez McHugh LLP
100 Bayview Circle, Suite 5600
Newport Beach, California  92660
949-812-5771

Mark S. O'Connor (011029) – mark.oconnor@gknet.com
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona  85016-9225
602-530-8000

*Co-Lead/Liaison Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC |
|---|---|
| | **DECLARATION OF DAVID KESSLER** |

I, David Kessler, declare and state as follows:

1.      I am over the age of 18 and the statements made below are true and correct of my own personal knowledge, unless otherwise stated.

2.      I am one of the experts retained by Plaintiffs in the *In Re Bard IVC Filters Products Liability Litigation* case, No. MD-15-02641-PHX-DGC, pending in the District of Arizona.

3.      I previously authored reports in this case dated September 26, 2016, and March 3, 2017.

4.      As part of my work on this case, I have been asked to provide additional opinions relating to certain facts and issues recently raised by Bard in connection with its Motion for Summary Judgment re Preemption (Doc. 5396).

5.      My supplemental report dated July 15, 2017, contains these additional opinions, which I incorporate into this Declaration by reference.  I also incorporate my September 26, 2016, and March 3, 2017, reports into this Declaration by reference.

1      6.     If asked, I will testify consistently with the statements made in my

2 September 26, 2016, March 3, 2017, and July 15, 2017, reports.

3      Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the

4 foregoing is true and correct.

5      EXECUTED on this 2⁸ day of August 2017.

6

7                            David Kessler

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 5
# (Redacted and Filed Under Seal)

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF ARIZONA

 3

 4   IN RE: BARD IVC FILTERS PRODUCTS    )
     LIABILITY LITIGATION                ) No.
 5   _____) MD-15-02641-PHX-DGC

 6

 7

 8

 9
                 DO NOT DISCLOSE - SUBJECT TO FURTHER
10                    CONFIDENTIALITY REVIEW

11

12

13

14     VIDEOTAPED DEPOSITION OF ROBERT MICHAEL CARR, JR.

15                      Phoenix, Arizona
                         June 6, 2017
16                        9:00 a.m.

17

18

19

20

21

22

23   REPORTED BY:

24   Robin L. B. Osterode, RPR, CSR

25   AZ Certified Reporter No. 50695
```

DO NOT DISCLOSE SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

Page 31

1      Q.      Part 870.3375, which are -- it's a
2  regulation relating to cardiovascular/intravascular
3  filters.  Now, that indicates three types of
4  additional items that an IVC filter must comply with
5  to get 510(k) clearance.  Correct?

6      A.      Yes.

7      Q.      And those are related to IVC filters, but
8  not limited to IVC filters.  Right?

9              MR. NORTH:  Objection to the form.

10             THE WITNESS:  I believe they are limited to
11  IVC filters.

12  BY MR. CLARK:

13     Q.      Okay, so that -- and that's what I want to
14  understand.  Are there any types of filters that are
15  not -- that aren't placed in the inferior vena cava
16  that would also be subject to this, if you know?

17     A.      Not to my knowledge, no.

18     Q.      Do you have an understanding that these
19  regulations that we've just talked about, the four
20  regulations have not changed from 2002 through 2013
21  when all the sort of regulatory actions, so to speak,
22  happened with respect to 510(k) clearance for the
23  Recovery through Denali line of filters?

24     A.      I know that they've been revised; I
25  couldn't tell you the exact changes, but they have

DO NOT DISCLOSE SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

Page 32

1    certainly been revised.

2        Q.    If I told you that there were no changes to

3    these four regulations from 2002 through 2013, other

4    than possibly formatting, would you have any reason

5    to disagree with that?

6        A.    No, not without looking at them.

7        Q.    Now, with respect to your work with --

8    there's reference in the last statute that I -- I'm

9    sorry, regulation that I showed you to three

10    additional types of requirements for filters.  One is

11    ISO 10993.  What is that requirement?

12       A.    It's a requirement that outlines the

13    biocompatibility testing, biological testing that

14    medical devices, certain types of medical devices

15    must undergo.

16       Q.    And when you say "certain types of medical

17    devices," that includes IVC filters.  Correct?

18       A.    It does.

19       Q.    But there would potentially be other

20    medical devices that would also have to comply with

21    this ISO?

22       A.    They do, to varying degrees, yes.

23       Q.    Do you have any examples of other devices

24    besides IVC filters that would have to comply with

25    ISO 10993?

DO NOT DISCLOSE SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

Page 33

1    A.    I believe all do.  But it depends on their

2  classification as to what testing you need to do.

3    **Q.    So all devices have to establish**

4  **biocompatibility, but the testing that's needed to**

5  **establish, that will vary, depending on the type of**

6  **device.  Fair?**

7    A.    Yes.  Context of the patient or it's an

8  implant, et cetera.

9    **Q.    What's the 510(k) Sterility Review Guidance**

10  **and Revision of 2-12-90?**

11    A.    It's pretty self-explanatory.  It's a

12  guidance for testing for the sterility of a product.

13    **Q.    Is that -- does that apply to all products?**

14    MR. NORTH:  Objection to the form.

15  BY MR. CLARK:

16    **Q.    I'm sorry, does that apply to all medical**

17  **devices?**

18    A.    No.

19    **Q.    Do you have an understanding of the types**

20  **of medical devices that this requirement applies to?**

21    A.    Certainly implants.  Those that are not --

22  some surgical tools that are usable it probably would

23  not apply to directly; it's a bit different.  They

24  don't come sterile.

25    **Q.    So that -- that requirement is essentially**



# EXHIBIT 6
# (Redacted and Filed Under Seal)

Do Not Disclose - Subject to Further Confidentiality Review

1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ARIZONA

3

4   In Re Bard IVC Filters      )

5   Products Liability Litigation )

6   -------------------------------) No. MD-15-02641-PHX-DGC

7

8                Do Not Disclose -

9      Subject to Further Confidentiality Review

10

11      This is the videotaped deposition of MURRAY R.

12  ASCH, M.D., taken before Terry Wood, CSR, RPR, a court

13  reporter, at Victoria Room, Residence Inn, 160

14  Consumers Drive, Whitby, Ontario, Canada, on the 2nd of

15  May, 2016, at 9:13 a.m..

16

17      Reported by:  Terry Wood, CSR (Ont.), RPR

18           Videographer:  Jim Lopez

19

20

21

22

23

24

1     ▓▓▓▓▓▓▓▓▓▓▓

2                    Q.   All right.  Dr. Asch, I want to

3     talk to you now about that study.

4                    What were you asked to do by Bard?

5                    A.   I was asked to recruit patients

6     into the study and assess the safety and feasibility of

7     both implanting the device, and removing the device to

8     ensure that it was -- it was safe and lived up to their

9     expectations of a retrievable device.

10                   Q.   And so part of the study was to see

11    if these could be taken out, in fact, after a period of

12    weeks?

13                   A.   Yes, the main --

14                   MR. NORTH:  Objection to the form.  I'm

15    sorry.

16                   BY MR. BOATMAN:

17                   Q.   And was part of your analysis as to

18    whether, in retrieval, the vein would be damaged in the

19    removal process?

20                   MR. NORTH:  Objection to form.

21                   THE DEPONENT:  Yes.

22                   BY MR. BOATMAN:

23                   Q.   You can answer.  When you say it

24    was -- would you call this a retrievability study?

Do Not Disclose - Subject to Further Confidentiality Review

```
 1                   A.    Yes, absolutely.

 2                   Q.    When you say a retrievability

 3   study, is that different than a safety study?

 4                   A.    Yes, there are different aspects of

 5   any device and including an IVC filter.  So an IVC

 6   filter has a function to perform in terms of remaining

 7   in position, in terms of protecting patients from

 8   pulmonary emboli, blot clots to the lungs.  However,

 9   this study wasn't designed to test those things.  This

10   study was designed to ensure that the device could be

11   safely removed.

12                   Q.    If you had been asked to do a

13   safety study for the use of the filter long-term, would

14   have the study been done differently?

15                   A.    Yes.  There were different

16   questions.  The study would have been done differently

17   with a different question.

18                   Q.    And give me some examples of how it

19   would have been done differently?

20                   A.    Well, the design of scientific

21   studies is a bit complex and challenging, depending

22   upon the specific questions.  So if we are looking for

23   long-term safety of the device, I would then embark

24   upon a long-term study, leaving the filter in for a
```

# EXHIBIT 7

```
1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF NEVADA
2          BEFORE THE HONORABLE ROBERT C. JONES, DISTRICT JUDGE
                             ---oOo---
3

4     KEVIN PHILLIPS, an              :
      individual,                     :
5                                     :
                   Plaintiff,         :  No. 3:12-CV-344-RCJ-WGC
6                                     :
            -vs-                      :  February 2, 2015
7                                     :
      C.R. BARD, INC., a foreign      :  Reno, Nevada
8     corporation, et al.,            :
                                      :
9                  Defendants.        :
      _____:
10

11          TRANSCRIPT OF TESTIMONY OF SUZANNE PARISIAN, M.D.

12

13    APPEARANCES:

14    FOR THE PLAINTIFF:         RAMON R. LOPEZ and TROY A. BRENES
                                 Attorneys at Law
15                               Newport Beach, California

16                               JULIA N. REED ZAIC
                                 Attorney at Law
17                               Laguna Beach, California

18                               PETER C. WETHERALL
                                 Attorney at Law
19                               Las Vegas, Nevada

20    FOR THE DEFENDANTS:        RICHARD B. NORTH, JR., and
                                 MATTHEW B. LERNER
21                               Attorneys at Law
                                 Atlanta, Georgia
22

23    Reported by:               Margaret E. Griener, CCR #3, FCRR
                                 Official Reporter
24                               400 South Virginia Street
                                 Reno, Nevada 89501
25
       (Appearances continued on page 2.)
```

1    on a particular topic.

2              A guidance document is -- can be two types.  It can

3    be made for the manufacturer industry, guidance documents to

4    try to help them be aware of what the FDA requires, to help

5    them get 510(k) clearances, for various different things to

6    try to assist the industry.

7              There are also some guidances that include the

8    information for the reviewer, too.

9              But typically guidances are designed to give access

10   to industry of current FDA thinking, to try to help bring new

11   products to the public, and try to make it, you know, easier

12   to get products through the FDA.

13   Q   And in 1999 the FDA produced a guidance document for the

14   development of inferior vena cava filters, correct?

15   A   It wasn't for the development, it was for a 510(k).

16              The guidance document was to help encourage the

17   manufacturer to test certain things.  It's not all inclusive.

18   It's not a cookbook do this and then you have an IVF.

19              But it was to try to tell the manufacturer what you

20   would need to provide the FDA to get clearance, 510(k)

21   clearance.  The manufacturer itself does all the development

22   under good manufacturing of a new product.  So it's basically

23   based on a 510(k).

24              MR. NORTH:  If we could show the witness

25   Exhibit 2112.

# EXHIBIT 8

Do Not Disclose - Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT

 2                   DISTRICT OF ARIZONA

 3

 4      ----------------------x

 5      IN RE BARD IVC          )

 6      FILTERS PRODUCTS        ) No. MD-15-02641-PHX-DGC

 7      LIABILITY LITIGATION    )

 8      ----------------------x

 9

10

11          DO NOT DISCLOSE - SUBJECT TO FURTHER

12                 CONFIDENTIALITY REVIEW

12

13   VIDEOTAPED DEPOSITION OF CHRISTINE L. BRAUER, Ph.D.

14                   WASHINGTON, D.C.

15             WEDNESDAY, AUGUST 2, 2017

16                    9:07 A.M.

17

18

19

20

21

22

23

24   Reported by: Leslie A. Todd
```

1        Q     Okay.  When you say labeling, what are

2   you talking about exactly?

3        A     The instructions for use.

4        Q     Okay.  But that's not -- that's not

5   all -- that's not how labeling is defined in a

6   regulatory way, right?  It's not just IFUs or

7   other things that fall within the category of

8   labeling?

9        A     That's correct, sir.

10        Q     And what -- what --

11        A     The category of labeling can include

12   additional materials.

13        Q     For example?

14        A     Labels that are physically attached.

15        Q     What -- and that's it, just an IFU and

16   labels that are physically attached?

17        A     No, sir, it can include other things.

18        Q     Well, I'm asking you that question, what

19   does labeling entail in a regulatory sense?

20        A     In a regulatory sense, it can entail the

21   labels, the labeling or instructions for use, and

22   it can also entail promotional materials.

23        Q     All right.  In fact, it can include any

24   commune- -- any official communication by a

# EXHIBIT 9

1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3

4

     IN RE: BARD IVC FILTERS PRODUCTS    )

5    LIABILITY LITIGATION,               ) MD No.: 02641

     _____)

6

7

8

9    Do Not Disclose - Subject to Further Confidentiality Review

10

11

12

13

14          VIDEOTAPED DEPOSITION OF KAY FULLER

15                  Phoenix, Arizona

                    January 11, 2016

16                     9:07 a.m.

17

18

19

20

21

22

23   REPORTED BY:

24   Robin L. B. Osterode, RPR, CSR

25   AZ Certified Reporter No. 50695

```
 1   device.

 2       Q.    Okay.  Now, Exhibit 3, which is --

 3             What's your number on Exhibit 3?

 4             MS. BLAS:  It's Exhibit 117.

 5             (Marked for identification Exhibit 117.)

 6   BY MR. NATIONS:

 7       Q.    Let me show you Exhibit 117.  The caption

 8   on this is "Guidance for our Industry and FDA

 9   Staff" -- "Guidance for Cardiovascular/Intravascular

10   Filter 510(k) Submissions," and this was issued on

11   November 16th, 1999.  What is the purpose of this

12   document?

13       A.    As we just mentioned, this is a FDA-issued

14   guidance document to help companies understand FDA's

15   current thinking on what needs to go into a 510(k)

16   submission for a cardiovascular/intravascular filter

17   also known as an IVC filter.  And in it it tells you,

18   it gives, especially the regulatory people and the

19   company the scope of this guidance document, as well

20   as what -- what it is referring to and what it's not

21   referring to.  And it gives ideas on the type of

22   preclinical testing that would be required to be

23   included in that 510(k) submission, the

24   performance-related characteristics of the device,

25   how to both simulate it and in vivo-related
```

Do Not Disclose - Subject to Further Confidentiality Review

1    capabilities of the device.

2           And also it does refer to some clinical

3    investigations, and then addressing any types of

4    complications that the device might have, how to go

5    about incorporating that information into your 510(k)

6    application.

7    Q.    Now, this is -- this is stamped by CDRH,

8    which is the Center for Devices and Radiological

9    Health.  What's the relationship of CDRH to FDA?

10   A.    The CDRH is one of several divisions at the

11   FDA.  The CDRH is the primary center that handles

12   device-related submissions and applications.

13   Q.    Okay.

14   A.    It's the center that we would actually

15   submit the 510(k) to.

16   Q.    Under guidance for the 510(k) submissions,

17   it says their devi -- the manu -- can you read that

18   last part of that designation?

19          MS. BLAS:  It's on the screen.

20          THE WITNESS:  I'm sorry, the guidance --

21   BY MR. NATIONS:

22   Q.    Yeah.

23   A.    -- for cardiovascular/intravascular filter

24   submissions --

25   Q.    Yes.

Do Not Disclose - Subject to Further Confidentiality Review

```
1       A.      -- that paragraph?

2       Q.      Yes.

3       A.      "This guidance document describes a means

4    by which cardiovascular/intravascular filter devices

5    may comply with the requirement of special controls

6    for Class II devices."  Do you want me to continue?

7       Q.      Yes.

8       A.      "Designation of this guidance document as a

9    special control means that manufacturers attempting

10   to establish that their device is substantially

11   equivalent to a predicate

12   cardiovascular/intravascular filter device should

13   demonstrate that the proposed device complies with

14   either the specific recommendations of this guidance

15   or some alternate control that provides equivalent

16   assurance of safety and effectiveness."

17      Q.      So you have the guidance from this

18   document, and then you have -- you're comparing to

19   the predicate device?

20      A.      That's correct.

21      Q.      Is that primarily where the manufacturer

22   gets their guidelines that they have to comply with?

23      A.      It's -- it's one of the places.  Again,

24   this is a guidance document where we get, primarily,

25   one of the requirements reside are in the Code of
```

```
 1   Federal Regulation.

 2        Q.    Yes.

 3        A.    So there's a lot more detail in the

 4   regulation than in the guidance document.

 5        Q.    Okay.

 6        A.    Excuse me, could I have some water?

 7        Q.    Absolutely.  Where's --

 8        A.    May I stand up for a minute?

 9              MR. NATIONS:  Yeah, let's take a break

10   here, that's fine.

11              THE VIDEOGRAPHER:  With the approval of

12   counsel.  Going off the record.  The time is

13   approximately 10:00 a.m.

14              (Recessed from 10:00 a.m. until 10:14 a.m.)

15              THE VIDEOGRAPHER:  With the approval of

16   counsel, back on the record.  The time is

17   approximately 10:14 a.m.

18   BY MR. NATIONS:

19        Q.    Ms. Fuller, I'd like to direct your

20   attention now to when you first went to work with

21   Bard or when you were recruited at Bard.  Tell us the

22   facts surrounding that, would you, please.

23        A.    I was approached by a recruiter, and they

24   contacted me and I talked to them, they explained

25   there was an opening at Bard for a senior regulatory
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    engineering way to design a bench test that could do

 2    that.  The reason that's really important is you want

 3    to understand at what point does that metal fatigue

 4    and when does it break, such that you could improve

 5    the specifications of that metal to be more likely to

 6    be designed that the specifications would not only

 7    allow it not to break at that level, but to have some

 8    built-in reinforcements so that it would be able to

 9    endure longer stress before it would break.  So there

10    is certainly an engineering way to do that.

11         Q.    Did you ever participate in or witness

12    while you were at Bard before this submission, that a

13    recommendation that a validated test method to assess

14    fatigue resistance be developed?

15         A.    I don't recall that.

16         Q.    Okay.  Did you ever get the answer to your

17    question or did you get any -- not answer to the

18    question, did you ever get substantive evidence of

19    whether the proper sterilization had been done in the

20    proper order to produce a safe product?

21         A.    Well, there's two things in that question,

22    so --

23         Q.    All right.

24         A.    -- I -- I was -- I had seen the

25    sterilization validation to assure that the product
```

Do Not Disclose - Subject to Further Confidentiality Review

 1    could be sterilized and packaged and stay sterile.

 2    I'd seen that.  But what I had not seen was earlier

 3    testing that would have been conducted on the device,

 4    which at the time was this 10-year cycle testing.  I

 5    had not seen a report that indicated in the report

 6    that the company had tested post-sterilized product.

 7    I never did see that report.

 8              (Marked for identification Exhibit 126.)

 9    BY MR. NATIONS:

10        Q.    Okay.  We're going to show you Exhibit 126.

11    And see if you can --

12              MS. BLAS:  Give me one second to get

13    copies.

14    BY MR. NATIONS:

15        Q.    I'll have you look at this.

16              MS. BLAS:  Two seconds.  Yeah, it's on the

17    screen and the hard copies are coming.

18              It's on the screen, Howard.  It's right

19    here.

20    BY MR. NATIONS:

21        Q.    And what does this document appear to be?

22        A.    It looks like a copy of a cover letter to a

23    510(k) submission from IMPRA to the FDA.

24        Q.    Okay.  And is this the submission --

25    what -- what submission is this for?

Do Not Disclose - Subject to Further Confidentiality Review

```
 1              MR. NORTH:  58B.

 2              THE WITNESS:  I'm just refreshing my memory

 3    of the questions that the FDA asked, and how we

 4    responded, so to answer your question.

 5              MR. NORTH:  How much time --

 6              MS. DALY:  14.

 7              THE WITNESS:  There is some discussion

 8    about "the potential for vena cava filter to

 9    perforate the vessel being primarily due to the

10    outward radial force that the filter elements exert

11    onto the vena cava wall.  If the force is too high,

12    the localized pressure will tend to weaken the vessel

13    wall and could cause it to fail."

14              And then we go on to describe how the

15    original design inputs for the Recovery Filter was

16    designed to be no greater than the Simon Nitinol

17    Filter, the predicate filter.  Appropriate mechanical

18    test is the radial strength test, so yeah.

19    BY MR. NORTH:

20       Q.    Not once in that letter, though, did you

21    mention that you were concerned about the Recovery

22    Filter, because this cycle testing that you've

23    referenced, 10-year testing had not been performed on

24    post-sterilized filters, did you?

25       A.    That's correct.
```

# EXHIBIT 10

Katrina Newton, et al v.
C.R. Bard, Inc., et al

---

Kay Fuller
November 09, 2010

---

Moretti Group
471 W. South Street
Suite 41B
Kalamazoo, MI 49007
800-536-0804



Original File 110910KF.txt
Min-U-Script®

BPV-DEP-00002277
LMD1

**Kay Fuller - November 09, 2010**

26

1   A.    It's my opinion that it did.

2   Q.    In what way?

3   A.    Well, I decided one of the biggest concerns I had is

4         that the FDA requires a company to validate their

5         product will perform as intended.  There are

6         different ways to validate a product.  There are

7         bench testing methodologies; there are animal

8         studies; and then sometimes there are clinical

9         studies.  These are all types of validation tests.

10        My concern was that one of the most important

11        validation tests for this product from a performance

12        standpoint, was the fatigue testing that I believe

13        occurred with the Endura-Tech fatigue tester.

14            My recollection is they had conducted

15        pretty extensive fatigue testing, which replicated,

16        I believe, up to at least ten years of simulated

17        use.  In other words, ten years of simulated

18        implantation.  And my recollection is that that

19        fatigue testing did yield results that showed that

20        the product could withstand over ten years of

21        sumulated use.  However, and this was my biggest

22        concern, they had not tested it on a product that

23        had been ethyleenoxide sterilized.  They had tested

24        it prior to that sterilization process.  And my big

25        concern was that nitinol being a shaped memory metal

BPV-DEP-00002303

LMD1

27

```
 1          that is temperature sensitive metal, I did not know
 2          whether nitinol might be affected by the
 3          sterilization process.  In other words, one of the
 4          things that I don't believe we had a satisfactory
 5          data on, was whether or not the recovery filter
 6          after sterilization, would pass a ten-year
 7          simulated-use fatigue test.  Ethyleenoxide
 8          sterilization involves chemical, moisture,
 9          temperature and pressure environment in order to
10          sterilize the product.
11   Q.     Did you express these concerns to the other members
12          of the team and management?
13   A.     Yes, I did.
14   Q.     And what was the response that you received from
15          management?
16   A.     Various responses that were not heeding my concerns.
17   Q.     Could you give me some examples?
18   A.     I believe I wrote some e-mails.  Especially when I
19          first discovered that the testing had occurred on
20          pre-sterilized products.  Now, I would like to take
21          a moment to explain that it's my recollection that
22          many of these tests had been conducted by the
23          company NMT rather than Bard.
24   Q.     All right.
25   A.     And so I can't recall I need to say.  But I believe
```

BPV-DEP-00002304
LMD1

**Kay Fuller - November 09, 2010**

28

 1            some of this original fatigue testing occurred at

 2            NMT.  As NMT as I recall was the company that

 3            actually developed this device in the early stages.

 4            And I believe Bard purchased it from NMT, and some

 5            of the employees from NMT joined Bard, if I recall

 6            that correctly.

 7                  And so part of the pressure on the team was

 8            that there had been so many delays in getting this

 9            through the 510(k) process with the FDA, that a few

10            years had gone by, the company had hoped to already

11            have this product on the market, and additional

12            testing would add to the delay.

13    Q.    So, are you suggesting that it would cost the

14            company money in sales to do the testing that you

15            were recommending to determine whether the

16            fatigability of the filter or the fracture rate of

17            the filter would be impacted by the sterilization

18            process?

19                  MS. TAPLEY DALY:  Object to the form.  You,

20            can answer.

21                  THE WITNESS:  Yeah, I might say it a little

22            bit differently.  I don't want to speculate on

23            whether the company would lose sales or not.  It may

24            be a foregone conclusion that you can't make a sale

25            until you get FDA clearance on your product.  And so

BPV-DEP-00002305
LMD1

**Kay Fuller - November 09, 2010**

29

```
 1            what my understanding of the decision-making was
 2            that additional testing may delay getting the 510(k)
 3            cleared.  There was also some conflict within the
 4            time, frankly, that I was concerned about.
 5     Q.     What was that?
 6     A.     One of the company engineers from NMT had, I
 7            believe, helped develop the product while he was at
 8            NMT, and he ended up joining Bard and became an
 9            important project leader, I believe, for this
10            project at Bard.  I believe he may have been
11            involved in some of this testing that may have
12            occurred at NMT in the early development of the
13            product, and there were some disagreements on
14            whether or not this additional testing was really
15            necessary.  But I believe this particular engineer
16            has potential conflict in the pressure on him to get
17            the product out, you know, to the market, as well as
18            his early work on the product.  So he had the most
19            pressure on him, frankly, historically.
20     Q.     Who was that?
21     A.     Robert Carr.
22     Q.     Other than the response that we needed to -- we
23            meaning Bard, Bard needed to get the 510(k) approved
24            and get the product to market and Mr. Carr's
25            suggestion that the additional fatigue testing after
```

BPV-DEP-00002306
LMD1

Kay Fuller - November 09, 2010

30

1          sterilization was not needed, was there any other

2          response to your suggestion for fatigue testing?

3                    MS. TAPLEY DALY:  Object to the form.  I'm

4          sorry, Dean, object to the form.  You have misstated

5          her testimony, but she can answer subject to that

6          objection.

7                    THE WITNESS:  Can you restate the question?

8                    MR. HARTLEY:  Sure.  Let me rephrase the

9          question.

10   BY MR. HARTLEY:

11   Q.    In addition to the items that you have mentioned to

12         us already, was there any additional response to

13         your suggestion that further fatigue testing after

14         sterilization was needed?

15   A.    I apologize, Dean.  Can you ask me the question

16         again?

17   Q.    I believe you suggested to me, and I said -- my

18         question to you earlier was, what was management's

19         response to your suggestion that sterilization

20         fatigue testing after sterilization should be

21         accomplished, in light of what had been done with

22         the fatigue testing on the recovery filter at that

23         point in time, correct?

24   A.    Yes.

25   Q.    And then you mentioned to me that there was pressure

BPV-DEP-00002307
LMD1

**Kay Fuller - November 09, 2010**

31

```
 1          to get the product out and get it approved by FDA so
 2          that it could be marketed, correct?
 3    A.    I'd like to correct that slightly.  The FDA did not
 4          approve this product.  The FDA cleared this product.
 5    Q.    All right.  But there was pressure to get the
 6          product cleared so it could get on to the market,
 7          correct?
 8    A.    Yes.
 9    Q.    And there was, in your words, a conflict within the
10          team as to whether additional fatigue testing was
11          even necessary?
12    A.    I would say that is correct.  I was not in the
13          majority, in my opinion, I'll say.
14    Q.    All right.  And my question to you, then, was -- was
15          there any other response from management other than
16          those two items?
17    A.    Response from management that additional fatigue
18          testing wasn't necessary?
19    Q.    Yes, ma'am.
20    A.    I don't recall anything in particular, additional
21          response from management, per se.  However, I would
22          say that management's actions continued to move the
23          process forward.  I did bring up some concerns about
24          the failure investigation on the fractured filter,
25          and the conclusions that were made in that report
```

BPV-DEP-00002308
LMD1

# EXHIBIT 11



Deposition of:

# David Kessler , M.D.

*July 31, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

## Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 92

1      Q    And if in reviewing a 510(k) application the FDA

2    wants the label changed, it can request it, correct?

3      A    It's part of a negotiation with the company.

4    There's a back and forth.

5      Q    And, in fact, for the G2 -- G2 filter, the FDA

6    requested a warning -- specific warning regarding the

7    use of the filter in morbidly obese patients, correct?

8      A    I'd have to go back.  I think there was a

9    request.  I'd have to go back and actually understand

10   that chronology with regard to morbidly obese.  I do

11   have it in my notes here.

12     Q    Do you recall one way or the other whether a

13   warning regarding morbidly obese patients was ultimately

14   added to the G2 IFU?

15     A    I have it here in my schedules exactly.  Just let

16   me be -- I believe so.  Happy to check.  Just give me a

17   second and I can be double sure.  Let me just see if I

18   can...  I'd have to double-check on that to be sure.  I

19   believe that's correct.  But I think that there was a

20   back and forth with the company.

21     Q    You haven't spoken with any of the actual

22   reviewers of Bard's 510(k)s, have you?

23     A    I have not.  I stayed with the record.

24     Q    Are you going to offer any opinions that Bard, in

25   designing, manufacturing and selling any of its IVC

David Kessler , M.D.                          July 31, 2017
In Re: Bard IVC Filters Products Liability

Page 108

1     see if I can find it for you.  Let it be -- it's one of

2     the great titles of an article.  Let me just check the

3     journal.  Actually, I'm sorry.  It's Journal of Vascular

4     and Interventional Radiology.  Let it be finale of

5     seeing the safety and efficacy of inferior vena cava

6     filters.  If you go through this and if you look at the

7     Denali, it clearly was not a study of safety and

8     efficacy.  It was a study of placement and

9     retrievability.

10          MR. NORTH:  Let's mark this.

11       (Exhibit 12 was marked for identification

12        by the court reporter and is attached hereto.)

13          THE VIDEOGRAPHER:  Twelve.

14    BY MR. NORTH:

15       Q    No. 12 is the FDA's 1999 guidance regarding

16    filters, correct?

17       A    Yes, sir.

18       Q    And you are familiar with that?

19       A    I am.  It superseded the '97 guidance.  Yes, sir.

20       Q    And you state in Exhibit 4, your second

21    supplemental report, that this particular guidance is

22    not specific to Bard filters, correct?

23       A    It doesn't mention Bard filters at all.

24       Q    But it is applicable to Bard filters, correct?

25       A    It's not specific with regard to Bard filters.

David Kessler , M.D.                          July 31, 2017
In Re: Bard IVC Filters Products Liability

Page 109

1      Q    Isn't it applicable to all IVC filters?

2      A    It says -- all it says is "This guidance document

3    describes the means by which cardiovascular

4    intravascular filters may comply with the requirements

5    of special controls."  So it may -- I mean, it's there

6    and it may provide -- it says exactly that.  Companies

7    can go their own direction, but they also can comply

8    with the -- it's a roadmap.  It's a guidance document

9    with regard to that.  It's not specific with regard to

10   Bard.  And we've seen -- I mean, continual evidence of

11   that.  You know, Bard designed its own migration

12   testing.  It changed it's migration -- it's own

13   performance testing, it's own performance results.  It

14   changed what those standards were on its own independent

15   of this guidance.

16     Q    The guidance document does not tell you exactly

17   how to perform a migration study, does it?

18     A    Not only -- it certainly does not.  There's not

19   specificity in that, and you see it doesn't say what the

20   performance standard is.  It's not how to do it.  It

21   doesn't even say what the performance standard is.  And

22   you see that Bard changed those performance standards

23   when it failed.  The device failed.

24     Q    You would agree that Bard's retrievable filters

25   are cardiovascular intravascular filters, correct?