UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC<br><br>**EXHIBIT INDEX**<br><br>**PLAINTIFFS' OMNIBUS STATEMENT OF LAW AND GENERALLY-APPLICABLE ARGUMENTS IN OPPOSITION TO BARD'S MOTIONS TO EXCLUDE PLAINTIFFS' EXPERTS UNDER RULE 702 AND *DAUBERT*** |

Exhibit 1    Moritz Deposition Transcript Excerpts July 18, 2017

# EXHIBIT 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF ARIZONA
 3                    -  -  -
 4
    IN RE:  BARD IVC         :
 5  FILTERS PRODUCTS          :   NO.
    LIABILITY LITIGATION      :   MD-15-02641-
 6                            :   PHX-DGC
                              :
 7                            :
 8                    -  -  -
 9              July 18, 2017
10                    -  -  -
11
12    DO NOT DISCLOSE - SUBJECT TO FURTHER
13           CONFIDENTIALITY REVIEW
14
                Videotaped deposition of
15  MARK W. MORITZ, M.D., taken pursuant to
    notice, was held at the offices McCarter
16  & English, LLP, 100 Mulberry Street,
    Newark, New Jersey, beginning at 9:07
17  a.m., on the above date, before Michelle
    L. Gray, a Registered Professional
18  Reporter, Certified Shorthand Reporter,
    Certified Realtime Reporter, and Notary
19  Public.
20
                      -  -  -
21
22        GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
23            deps@golkow.com
24
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1            Q.    Did you read each one in
 2    detail?
 3            A.    There was one that was about
 4    250-some pages, I think Dr. Kessler.  So
 5    I read his conclusion, and I skimmed
 6    through the rest of the report.
 7            Q.    If there was anything
 8    pertinent in the report, would you have
 9    included that in your report?
10            A.    I would have.
11            Q.    Did you inquire where there
12    were additional depositions or additional
13    documents that could help you arrive at
14    your opinions?
15            A.    I don't recall.
16            Q.    Would that be noted in your
17    statement, your invoice, if you called
18    somebody and asked for additional
19    information?
20            A.    Not necessarily.  It would
21    just be a phone conversation.
22            Q.    Did you -- did you ever
23    inquire whether there might be
24    information out there that you needed to
```

```
 1   see that would be contrary to the
 2   opinions you were reaching in this case?
 3        A.    Well, I believe we had a
 4   conversation once about whether there was
 5   other relevant information I should see.
 6   And I did see some -- I did actually not
 7   see the documents that Dr. Kessler was
 8   referring to or that the other experts on
 9   the case were referring to.
10        Q.    You did not see them?
11        A.    No.  They were Bard internal
12   documents, I believe.
13        Q.    All right.  So when you
14   looked at the expert reports for the
15   plaintiffs, including Dr. Kessler and
16   some others, you saw that those experts
17   had been provided internal documents by
18   Bard?
19        A.    Yes.
20        Q.    And you made an inquiry
21   about those documents, right?
22        A.    I believe I did.
23        Q.    But you were not provided
24   any of those actual documents?
```

1    A.    I was not.
2    Q.    Did that concern you at all?
3    A.    Well, I thought that
4  Kessler's report was so thorough and so
5  long and so detailed that he probably
6  reviewed all of them.  And by looking at
7  his conclusions I got the gist of what
8  was in them.
9    Q.    But were you concerned that
10 you did not have access to the same type
11 of information that the experts on the
12 plaintiffs' side received?
13   A.    I was not concerned.
14   Q.    Were you provided any access
15 to any type of database on the part -- by
16 Bard that had all the internal documents
17 so that you could freely look at what you
18 wanted to?
19   A.    No.
20   Q.    Did you have to sign any
21 type of a confidentiality agreement with
22 the attorneys for Bard to perform work in
23 this case?
24   A.    I don't recall that I did.

```
 1    fatalities involved?
 2         A.    No.
 3         Q.    Is that true?
 4         A.    Yes.
 5         Q.    Thank you.
 6               Now, Dr. Moritz, as a
 7    medical doctor and a vascular surgeon,
 8    did you have interactions with medical
 9    device companies like Bard?
10         A.    I did.
11         Q.    And do you agree that in
12    those interactions that a doctor must act
13    in the best interest of his patients?
14         A.    I agree.
15         Q.    And that means that a doctor
16    must rely on the medical device company
17    to give it complete, accurate and
18    thorough information about its devices,
19    fair?
20               MR. BROWN:  Object to the
21         form.
22               THE WITNESS:  Yes.
23    BY MR. O'CONNOR:
24         Q.    Okay.  And among reasons
```

```
 1   that's important is because as a medical
 2   doctor and in treating your patients in
 3   advising your plaintiffs -- your
 4   patients, you need to be versed in risks
 5   and benefits of a device, correct?
 6           A.    Correct.
 7           Q.    And when you engage in the
 8   informed consent process, a patient
 9   relies on you to not only advise him or
10   her of the risks or the benefits, but
11   also of the risks, correct?
12           A.    Correct.
13           Q.    And it's important for you
14   as a medical doctor that is going to
15   engage in that important discussion with
16   your patients to not only be aware of the
17   risks, but also to be able to discuss
18   with your patients the likelihood of a
19   risk occurring should he or she decide to
20   undergo the procedure that's the subject
21   of the informed consent process?
22           A.    That makes sense.
23           Q.    And that's a reason why,
24   among others, a doctor has to rely on the
```

```
 1    medical community, correct?
 2              MR. BROWN:  Object to the
 3         form.
 4              THE WITNESS:  Well, I think
 5         it is if it's -- if it's
 6         significant.
 7    BY MR. O'CONNOR:
 8         Q.   Well, and if the company,
 9    the medical device company such as Bard,
10    has statistically significant evidence
11    that its device has the potential for
12    increased risks of harm, that's
13    information you expect that Bard or any
14    device company will be transparent and
15    open and honest to the medical community
16    about?
17              MR. BROWN:  Object to the
18         form.
19              THE WITNESS:  I agree.
20    BY MR. O'CONNOR:
21         Q.   Thank you.
22              Certainly if a device
23    company like Bard has promotional
24    information about a device that's no
```

Do Not Disclose – Subject to Further Confidentiality Review

1           THE WITNESS:  All the
2     filters being different, we have
3     different expectations depending
4     on how they're designed.  They're
5     used for different purposes.
6  BY MR. O'CONNOR:
7     Q.    Well, I hear you, but if a
8  device in principle must be as safe and
9  effective as its predicate device, that's
10  certainly something that would be a
11  reasonable expectation for a medical
12  doctor and a patient, fair?
13           MR. BROWN:  Object to the
14     form.
15           THE WITNESS:  What you would
16     want.
17  BY MR. O'CONNOR:
18     Q.    When you talk about
19  prophylaxis use of filters, you do know
20  that a company like Bard should not
21  market prophylactic -- prophylactic use
22  of its devices, correct?
23     A.    I don't know what the
24  regulations are in terms of what they're

```
 1          form.
 2                THE WITNESS:  Well,
 3          permanent filters can tilt and
 4          migrate too.
 5   BY MR. O'CONNOR:
 6          Q.    Well, I'm just comparing
 7   this to the Simon Nitinol filter.  You
 8   saw that there is literature out there
 9   that suggested that the optional filters
10   were not behaving in a way that the
11   predicate devices had behaved?
12                MR. BROWN:  Object to the
13          form.
14   BY MR. O'CONNOR:
15          Q.    True?
16          A.    That's true.
17          Q.    And that certainly is
18   something you would agree is against or
19   contrary to your reasonable expectations
20   as a medical doctor and a patient's
21   reasonable expectations as well?
22                MR. BROWN:  Object to the
23          form.
24                THE WITNESS:  Yes.
```

```
 1             Q.      Failures of Bard filters
 2    include tilting?
 3             A.      Correct.
 4             Q.      Failure of Bard filters
 5    include fracture?
 6             A.      Yes.
 7             Q.      Embolization?
 8             A.      Yes.
 9             Q.      And failures also include
10    penetration into other organs, correct?
11             A.      Correct.
12             Q.      And you have seen at least
13    in reviewing the plaintiff experts that
14    there were internal documents in Bard
15    which spoke to serious injuries, and even
16    death caused by failure modes of Bard
17    filters?
18             A.      Correct.
19             Q.      And certainly that's
20    something I think you would agree that a
21    medical doctor would want to know from a
22    medical device company in making
23    decisions about which type of devices to
24    use for patients, fair?
```

1             MR. BROWN:  Object to the
2       form.
3             THE WITNESS:  Yes.
4   BY MR. O'CONNOR:
5       Q.   And certainly from what
6   you've told me before, you certainly
7   cannot discuss what if anything Bard did
8   by way of warning of its knowledge of the
9   types of filters and complications that
10  Bard became aware of, true?
11      A.   Well, I remember a letter
12  around 2005 that I think I got.
13      Q.   All right.  So you got some
14  kind of "Dear Colleague" or "Dear Doctor"
15  letter?
16      A.   "Dear Doctor" letter.
17      Q.   You're not going to be
18  talking about that letter in this trial,
19  fair?
20            MR. BROWN:  Object to the
21      form.
22            THE WITNESS:  No, I didn't
23      intend to.
24