Ramon Rossi Lopez - rlopez@lopezmchugh.com
(California Bar Number 86361; admitted *pro hac vice*)
Lopez McHugh LLP
100 Bayview Circle, Suite 5600
Newport Beach, California 92660
949-812-5771

Mark S. O'Connor (011029) – mark.oconnor@gknet.com
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
602-530-8000

*Co-Lead/Liaison Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS C. R. BARD, INC.'S AND BARD PERIPHERAL VASCULAR, INC.'S MOTION TO EXCLUDE THE OPINIONS OF ROBERT O. RITCHIE, PH.D.** |

Plaintiffs oppose Defendants' Motion to Exclude the Opinions of Robert O. Ritchie, Ph.D. ("Motion" or "Mot.") [Doc. 7316]. Plaintiffs incorporate in this response their Omnibus Statement of Law and Generally-Applicable Arguments in opposition to Bard's Motion to Exclude Plaintiffs' Experts and Rule 702 and *Daubert* ("Omnibus Mem.") [Doc. 7799], filed contemporaneously herewith. For the reasons set forth below and in the Omnibus Memorandum, this Court should deny the Motion.

**I.      INTRODUCTION**

Dr. Ritchie is a mechanical engineer with special expertise in materials science. He was retained by Plaintiffs to examine several Bard IVC filters that had failed in order to provide an opinion as to why the failures occurred. He concluded that the filter devices were defectively designed and manufactured and unsafe for implant in the human body. Notably, Defendants do not challenge these opinions.

Instead, Defendants seek to exclude four opinions expressed by Dr. Ritchie that lie on the periphery of his proffered testimony. The four opinions collectively represent only a small fraction of the analysis Dr. Ritchie set forth in his reports and deposition testimony. None of the opinions targeted by Defendants relate to the core of his testimony: namely, that the Bard filters he examined failed for reasons that have been well documented in the literature regarding Bard's filters. Nonetheless, each of the opinions challenged by Defendants is based on a scientifically sound methodology and will assist the trier of fact. For this reason, Defendants' motion should be denied.

## II.    ARGUMENT

Consistent with Case Management Order No. 26 [Doc. 6799], and in the interest of judicial economy, Plaintiffs incorporate by reference Plaintiffs' Omnibus Statement of Law in Opposition to Bard's Motions to Exclude Plaintiffs' Experts Under Rule 702 and *Daubert* [Doc. 7799]. Plaintiffs rely specifically on sections I, II(B), and II(D) of their omnibus brief.

### A.    Dr. Ritchie's background in mechanical engineering and materials science qualifies him to opine on Bard's IVC filters.

Dr. Ritchie is currently the H.T. & Jessie Chua Distinguished Professor of Engineering, Professor in the Department of Materials Science & Engineering, and Professor of Mechanical Engineering at the University of California, Berkeley. Mot. Ex. A, Ritchie March 2, 2017 Report, at 106. He is also Senior Faculty Scientist in the Materials Sciences Division of the Lawrence Berkeley National Laboratory, and an affiliated member of the UCSF/UC Berkeley Bioengineering group. *Id.* He was Chairman of the UC Berkeley Materials Science & Engineering Department from 2005 to 2011. *Id.*

Dr. Ritchie received a Ph.D. in Materials Science in 1973 from Cambridge University. *Id.* His career in academia has taken him from Cambridge to M.I.T. to the University of California at Berkeley. *Id.* He has served as a consultant for both government and industry, including in the medical field on behalf of Abbott Vascular,

ATS Medical, Baxter, Cordis, Carbomedics, Edwards, Guidant, CV Medical, Medstone, NDC, Shiley, Sorin, and St. Jude Medical. *Id*. Dr. Ritchie is well known for his research in the fields of materials science, fracture mechanics and particularly fatigue, having authored or co-authored over 700 papers and authored or co-authored over 700 papers and edited 19 books in the technical literature (he is one of ISI's Highly Cited Authors in Materials Science). *Id*. During the course of his career Dr. Ritchie has received numerous awards, is a member of the National Academy of Engineering, and is a Fellow of the Materials Research Society, the American Society for Materials, and the American Society for Mechanical Engineers. *Id*. at 106-107.

Over the past forty-five years Dr. Ritchie has performed extensive research into the problem of fracture and fatigue of metallic alloys. Mot. Ex. C, Ritchie May 12, 2017, Rebuttal Report at 1. He has significant experience in the analysis of failures in medical devices specifically. *Id*. He has testified on numerous occasions before the Food and Drug Administration on issues pertaining to the fatigue, fracture and endurance of medical devices. *Id*. While Dr. Ritchie has not published on IVC filters, he has voluminous knowledge of the fatigue and failure of Nitinol (the alloy from which Bard filters are made) based on thirty years of active research on this material. *Id*.

**B.   Dr. Ritchie is qualified to rely on published literature and the analysis of other experts to opine on failure rates.**

Bard maintains Dr. Ritchie is not qualified to opine on IVC failure rates because he is not a biostatistician or epidemiologist. This argument is a red herring – neither Plaintiffs nor Dr. Ritchie ever claimed that he was qualified to analyze raw adverse event data in order calculate failure rates. Rather, and as discussed *infra*, Dr. Ritchie relied on two distinct sources of information for his opinion regarding high failure rates: (1) the rates reported in the published literature; and (2) the relative risks that were calculated by Plaintiffs' expert Dr. Betensky, who is indisputably qualified to make these calculations. Thus, Dr. Ritchie did not attempt to calculate a failure rate, but instead relied on

1  calculations performed by others and then opined on the significance of those calculated
2  rates.  This was reasonable, and customary for experts.
3      Defendants never explain why a mechanical engineer with more than four decades of
4  experience researching and testing failures in medical devices is not qualified to render an
5  opinion on whether a given failure rate can be characterized as "high" or "unacceptable."
6  Such opinions are part and parcel of the conclusions that any materials scientist would
7  render when evaluating the performance of a device.
8      In addition to questioning Dr. Ritchie's qualifications, Defendants also argue that
9  Dr. Ritchie's methodology was flawed because he couldn't identify the rate of failure or
10 the sources he relied upon.  Mot. at 6.  This argument is particularly bewildering given
11 that, in the very same section that Defendants make this argument, they quote at length
12 from the portion of Dr. Ritchie's deposition where *he identifies a reported failure rate as*
13 *well as a number of sources that he is relying on for his opinions*. In the testimony quoted
14 by Defendants, Dr. Ritchie testified that he reviewed one study that demonstrated a failure
15 rate of forty percent.  Mot. Ex. A, Ritchie Dep. Tr., at 133:5-12.  In this same section of
16 his testimony, Dr. Ritchie referenced at least two sources by name that he is relying on for
17 his opinions regarding failures rates: the Nicholson study and the expert report of
18 Dr. Betensky.  *Id*. at 133:5-134:5.
19     These sources were also identified and discussed in Dr. Ritchie's expert report, in
20 addition to many others.  Mot. Ex. B, Ritchie March 2, 2017, Report, at 3-4.  Thus, while
21 Dr. Ritchie did not recite line and verse from each of the studies he is relying on during
22 his deposition, his expert report clearly identifies the studies.  *Id*. (citing reference
23 numbers 6-11).  Many of these studies utilize the same terminology as Dr. Ritchie when
24 describing the observed failure rates.  *See, e.g*., Ex. A, Kalva et al., *Recovery' vena cava*
25 *filter: Experience in 96 patients*, Cardiovasc. Intervent. Radiol. 2006, 29:559-64, at 563
26 ("We found a high incidence of asymmetric deployment of the filter legs, fractures of the
27 device, and asymptomatic caval penetration by the filter arms."); Ex. B, Hull et al., *Bard*
28 *Recovery filter: Evaluation and management of vena cava limb perforation, fracture and*

*migration*, J. Vasc. Interv. Radiol. 2009, 20: 52-60, at 57 ("the Recovery filter is associated with a high rate of IVC arm perforation and structural weakness").

Dr. Ritchie's opinions regarding the high rate of complications in Bard's filters simply echo what is already reported in the literature. For this reason, his opinions should not be excluded because they bear the hallmark of a scientifically reliable methodology. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (key indicia of reliability is whether the expert's methods are employed outside the courtroom).

In addition to the peer-reviewed literature, Dr. Ritchie also relied on the analysis of Dr. Betensky for his opinions that the extent of complications in Bard filters is unacceptable. Dr. Betensky is a biostatistician who was retained by Plaintiffs to conduct a statistical analysis of adverse event reports for Bard's retrievable filters as compared to the 1995 Simon Nitinol Filter ("SNF"). Dr. Ritchie utilized the reporting risk ratios that Dr. Betensky calculated in order to assess the comparative performance of Bard IVC filters. Although Defendants suggest that such reliance is improper, courts routinely admit testimony of experts who rely on other experts with regard to matters outside their field of expertise. *See*, *e.g.*, *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1321 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (en banc) ("Experts routinely rely upon other experts hired by the party they represent for expertise outside of their field"); *Dura Automotive Sys. of Ind., Inc. v. CTS Corp.,* 285 F.3d 609, 609; 13 (7th Cir. 2002) ("[I]t is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert."); *Calva-Cerqueira v. United States,* 281 F.Supp.2d 279, 300 (D.D.C. 2003) ("an expert economist may rely on the opinions of other experts"). So long as this Court determines that Dr. Betensky's opinions satisfy the requirements of *Daubert*, there is no reason Dr. Ritchie may not rely on them.

In the end, Defendants are left to assert that an expert who specializes in materials science should be forbidden from observing that failure rates as high as 40% are unacceptable. Yet not even Bard would dispute that a 40 percent failure rate in an

5

1  implanted medical device is unacceptably high, and therefore Dr. Ritchie's testimony
2  should not be excluded.

### C. Dr. Ritchie's description of the "vicious circle" is based on a reliable methodology.

Defendants next target Dr. Ritchie's opinion that one complication can increases the risk of other complications, leading to a "vicious circle" of multiple complications. Defendants' suggest this opinion is mere conjecture and is not based on any data. However, Bard's own witnesses have already agreed with Dr. Ritchie that filter complications can work synergistically, such that the presence of one complication (e.g. tilting) can increase the risk of other complications (e.g. migration). Moreover, there is data from both Dr. McMeeking and published literature to support Dr. Ritchie's opinions regarding the interconnected nature of filter complications.

Dr. Ritchie succinctly explained his reference to a vicious cycle during his deposition:

> Q. Now let's talk about tilt as it relates to perforation for a moment. What do you rely on to opine that tilt can lead to perforation?
>
> A. Well, again, it's—there's a series—McMeeking has done calculations on this and has certain theories, but my feeling on this has been that – that there's a linkage with some—with migration as well. Some degree of tilt means that you have an anchor that's not anchored, and that means that the ability of the filter to move is obviously elevated because you're not fully anchored. Once the filter starts to move, the probability of perforation is likely, and all these things relate to the possibility of fracture and—'cause that's what we talked about earlier with the crack growing in different directions. So I've—I've always seen this as what I call a vicious circle. It's a synergy of events.

Ex. C, Ritchie Dep. Tr., at 123:5-21. The potential for a synergistic relationship among different types of complications lies at the heart of Dr. Ritchie's concept of a vicious circle. In Dr. Ritchie's report, he provides an illustration of this phenomenon whereby a facture of one leg leads to tilting which then results in migration and could ultimately lead to perforation. Mot. Ex. B at 36.

6

1    A former Bard vice-president confirms that Bard was well aware of the synergism
2 among different types of complications. Christopher A. Ganser was the head of quality
3 assurance at Bard during the period from 2003 to 2007. Ex. D, Ganser Dep. T., at 14:12-
4 15:14. He testified that he knew that tilting could increase the risk of other complications:

> Q. When you were involved with -- I'm going to talk about the recovery in the G2 filter right now. You knew that there were issues with both of those devices not staying perfectly centered in the vena cava, true?
>
> A. I knew there were reports of complaints where there was tilting.
>
> Q. And that tilting was a condition that could put a patient at an increased risk of perforations, of migrations, of fracture and of the device not working for its intended purpose of stopping pulmonary embolisms. Did you know that?
>
> A. The tilting could contribute to that.

*Id.* at 71:5-18.

   The published literature also supports Dr. Ritchie's opinions, at least with respect to the relationship between tiling and migration. In a study published in 2009, the authors determined there was a statistically significant relationship between a tilt of more than 15 degrees and subsequent migration. Ex. E, Binkert et al., *Technical Success and Safety of Retrieval of the G2 Filter in a Prospective, Multicenter Study*, Journal of vascular and interventional radiology, 20 (2009), 1449-53, at 1452. Thus, Dr. Ritchie's description of a vicious circle is consistent with actual data and is not, as Defendants suggest, some untested hypothesis.

   Finally, the expert report of Dr. McMeeking repeatedly echoes Dr. Ritchie's assessment regarding the synergistic relationship between filter complications. For example, Dr. McMeeking writes:

> In addition, fracture, through removing legs or arms or both, will make the remaining body of the filter more prone to tilt as it will be asymmetric, and the loss of legs, and arms in some cases, will make migration of the remaining body of the filter more probable as it will be less firmly attached to the vena cava wall. It is also possible that the asymmetry of the remaining filter body after fracture will lead to force distributions on the wall of the vena cava that will accelerate the rate at which one or more of the limbs penetrates and perforates

7

the vena cava wall. This point applies to all filters considered in this report.

Ex. A to Defendants' Motion to Exclude of Robert M. McMeeking [Doc. 7314], McMeeking March 3, 2017 Report, at 25; *see also id.* at 10 ("I have found that perforation contributes to tilting, and tilting contributes to perforation."), 12 (noting that tilt increases probability of fracture as a result of "alternating strains [that] are increased because of the larger span between the points where the filter limbs engage the wall of the vena cava").

Although Dr. McMeeking shares Dr. Ritchie's assessment regarding the interrelationship among different complications, Defendants did not seek to exclude Dr. McMeeking's opinion on this issue. Their decision undermines Defendants' assertion that Dr. Ritchie's opinions regarding the "vicious circle" should be struck under *Daubert*.

**D. Dr. Ritchie's decades-long experience with failure analysis renders him qualified to opine on Bard's testing.**

Despite acknowledging the depth of Dr. Ritchie's experience in the field of materials science and failure analysis, Defendants suggest that Dr. Ritchie is unqualified to render opinions regarding the adequacy of Bard's testing. In leveling this critique, Defendants misstate the substance of Dr. Ritchie's opinions. Dr. Ritchie did not simply state that Bard's testing was inadequate because "some patients have experienced complications with Bard's filters." Mot. at 12. Rather, Dr. Ritchie concluded that Bard's testing was flawed because it failed to reveal the fractures and complications that ultimately manifested time and time again in actual patients. Ex. C, Ritchie Dep. Tr., at 158:7-18. In this respect, Dr. Ritchie's opinion is entirely noncontroversial: it is self-evident that *any* testing of a product should be designed to detect complications that occur during real world use. If a testing program fails to discover a flaw that leads to an unacceptably high failure rate in actual patients, then that program was inadequate.

The fact that Dr. Ritchie did not explain in precise detail how Bard's testing protocol should have been improved is not relevant to *whether* the testing was inadequate. Dr. Ritchie never suggested that improvements were not possible. On the contrary, he

8

1    identified specific steps that Bard could have been taken to improve its testing, including
2    (1) increasing the severity of the loading conditions, (2) increasing the duration of the
3    tests; (3) increasing the number of filters that were tested, and (4) testing multiple filter
4    sizes. Mot. Ex. B, Ritchie March 2, 2017, Report, at 28, 31.

5    Other than noting their disagreement with Dr. Ritchie's opinions, Defendants never
6    articulate why they find Dr. Ritchie's qualifications lacking. Nor could they. Dr. Ritchie
7    has been studying fatigue problems for 49 years, and has fatigue tested "virtually every
8    material on the planet." Mot. Ex. A, at 36:14-16. His testing experience includes setting
9    up protocols and working with various testing machines in the laboratory environment.
10   *Id*. at 37:7-18. He is "absolutely" qualified to address the adequacy of Bard's testing. *Id*.
11   at 37:16-18.

   **E.  Dr. Ritchie should be permitted to testify that SNF is a safer alternative product.**

14   Defendants' final salvo is directed at Dr. Ritchie's opinion that the Simon Nitinol
15   Filter is a safer alternative to the Recovery, G2 and similar filters. As was the case with
16   Dr. Ritchie's opinion regarding high failure rates, his opinion regarding SNF is based on
17   the statistical analysis performed by Dr. Betensky of SNF's adverse events relative to
18   other Bard filters as well as studies in the published literature regarding comparative filter
19   complication rates. Mot. Ex. A, Ritchie Dep. Tr., at 134:10-136:6, 140:6-141:10; Mot. Ex
20   B, Ritchie March 2, 2017, Report, at 4.

21   The main thrust of Defendants' argument is that Dr. Ritchie may not rely on a
22   permanent filter (SNF) to establish a "safer alternative" to Bard's retrievable filters
23   because these filters are not functional equivalents. But this is a false dichotomy. As
24   Dr. Ritchie noted at his deposition, all of Bard's so-called retrievable filters were in fact
25   developed as permanent filters. Ex. C, Ritchie Dep. Tr., at 154:20-155:6. Thus, the
26   functional equivalence of SNF and retrievable Bard filters is a basis to include rather than
27   exclude SNF as a safer alternative product.

9

Defendants' "functional equivalence" criticism was also leveled almost verbatim against Plaintiffs' expert Dr. McMeeking in connection with Defendants' motion to exclude Dr. McMeeking. Rather than simply rehash Plaintiffs' response a second time, and consistent with Section I of Case Management Order No. 26, Plaintiffs incorporate by reference section III(D) of their Memorandum of Law and Arguments in Opposition to Defendants' Motion to Exclude the Opinions of Dr. McMeeking [Doc. 7806]. As these arguments demonstrate, Bard's suggestion of significant and dispositive functional differences between SNF and retrievable filters is contrary to Bard's own representations and actions, the testimony of its own medical expert, and the evidence in this litigation.

Bard also objects to Dr. Ritchie's testimony on the ground that he is not a medical doctor and is therefore not qualified to render an opinion on safer alternatives for a given patient. But this misconstrues the nature of Dr. Ritchie's opinion, which is offered from an engineering and materials science perspective rather than as a medical judgment. Dr. Ritchie will not testify that for any particular patient a certain filter should have been used. Instead, he is observing that, as an engineer who specializes in failure analysis, the significant reduction in adverse event rates for SNF, combined with the known design and manufacturing defects in Bard's retrievable filters, render SNF a safer alternative as compared to other available filters manufactured by Bard. This testimony is certainly helpful to the jury even though it is not directly applicable to the ultimate issue for a particular plaintiff, because the jury should be apprised that alternative, safer *options* were available and could have been considered.

**III.   CONCLUSION**

Based on the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to exclude Dr. Ritchie.

RESPECTFULLY SUBMITTED this 27th day of September, 2017.

                GALLAGHER & KENNEDY, P.A.

By:*/s/ Mark S. O'Connor*
    Mark S. O'Connor
    2575 East Camelback Road
    Phoenix, Arizona  85016-9225

LOPEZ McHUGH LLP
    Ramon Rossi Lopez (CA Bar No. 86361)
    (admitted *pro hac vice*)
    100 Bayview Circle, Suite 5600
    Newport Beach, California 92660

*Co-Lead/Liaison Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of September, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

                */s/ Gay Mennuti*