1
2
3
4
5
6

UNITED STATES DISTRICT COURT

7

DISTRICT OF ARIZONA

8
9

In Re Bard IVC Filters Products
Liability Litigation

No. MD-15-02641-PHX-DGC

**EXHIBIT INDEX**

10
11
12
13

**PLAINTIFFS' RESPONSE TO
DEFENDANTS C.R. BARD, INC.'S AND
BARD PERIPHERAL VASCULAR,
INC.'S MOTION TO EXCLUDE THE
OPINIONS OF DAVID GARCIA, M.D.
AND MICHAEL STREIFF, M.D.**

14
15

Exhibit 1    Garcia Deposition Excerpts 6-21-17

16

Exhibit 2    Streiff Deposition Excerpts 7-12-17

17

Exhibit 3    Brauer Deposition Excerpts 8-2-17

18

Exhibit 4    DeCant Deposition Excerpts 5-24-16 (**FILED UNDER SEAL**)

19

Exhibit 5    DeFord Deposition Excerpts 6-2-16

20

Exhibit 6    Ganser Deposition Excerpts 10-11-16

21

Exhibit 7    Tillman Deposition Excerpts 8-4-16

22

Exhibit 8    Moritz Deposition Excerpts 7-18-17

23
24
25
26
27
28

# EXHIBIT 1



Deposition of:

# David Garcia , M.D.

*June 21, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

David Garcia , M.D.                          June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 21

1              MR. JOHNSON:  Form objection.

2         A.   I think some of the information in those

3    documents may be pertinent to my global opinions.

4         Q.   (By Mr. Lerner)  Okay.

5         A.   Yeah.

6         Q.   After reviewing these documents, did you

7    request any additional documents from the plaintiffs'

8    counsel?

9         A.   No.

10        Q.   All right.  So if we look at all the documents

11   that you were relying upon to form your opinions in this

12   case -- we looked at your reliance list, which is

13   Exhibit-2.  We have Exhibit-2A, which are six internal

14   company documents.  You mentioned the Kessler report,

15   some IFUs.  You also mentioned you reviewed Dr. --

16   Mr. Ganser's deposition.

17        A.   (Witness moves head up and down.)

18        Q.   Is that the entirety of the materials that you

19   reviewed, that you're relying upon, for your opinions in

20   this case?

21        A.   I'll just make the one qualifier that -- I

22   mean, I have an extensive background, knowledge, and

23   clinical experience that of course influences my

24   opinion.  But with respect to specific

25   documents/publications, yes, that would be a

1   comprehensive list.

2        Q.   Okay.

3        A.   Yeah.

4             MR. JOHNSON:  Can I interject one thing,

5   Matthew?

6             MR. LERNER:  Yeah.

7             MR. JOHNSON:  It'll probably save us some

8   time.  There's one article that he actually provided to

9   us, that's not on this list --

10             MR. LERNER:  Okay.

11             MR. JOHNSON:  -- recently.

12             MR. LERNER:  Do you know what that article is?

13             MR. JOHNSON:  It's by Cook, I believe.

14        A.   I think it's Rogers, is the first author.  But

15   it's JAMA Surgery, 2017.  I'm pretty sure it was

16   published subsequent to the production of this report,

17   or right around the time the report's being produced.

18        Q.   (By Mr. Lerner)  And based on that article,

19   were you planning to do any further supplementation of

20   your report?

21        A.   Probably not, no.  And actually I should say

22   Rogers is -- Fred Rogers is the senior author.  He's the

23   last author of that paper.  So you might be right, Joe,

24   that Cook might be the first author.

25        Q.   All right.  So I think with that Fred Rogers

David Garcia , M.D.                    June 21, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 33

1          A.   We met from nine till about three, so

2    six hours.

3          Q.   And did you charge just for six hours, or

4    you're charging for the entire day?

5          A.   I'm going to just charge for six hours, but I

6    also did a little bit of prep time last night and early

7    this morning -- probably another couple of hours worth

8    that I'll charge for.

9          Q.   Okay.  So outside of your prep work with

10   counsel for the deposition, we're still looking at about

11   25-30 hours total time for you to submit your report?

12         A.   Yes.

13         Q.   And does that include the amount of time you

14   spent on the Jones case?

15         A.   Yes, mm-hmm.

16         Q.   Okay.  As far as how you spend your time for

17   those 30 hours, you don't have a breakdown of those --

18   that time?

19         A.   No.  I mean, if what you mean by that is, did

20   I submit this number of hours reading materials and this

21   number of hours talking to lawyers and this number of --

22   no.

23         Q.   Okay.  So how do you track your time then, in

24   order to submit your time?

25         A.   I use an app on my phone called Gleeo Time

David Garcia , M.D.                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 53

1        Q.    Okay.  And you've never removed an IVC filter?

2        A.    Neither one.

3        Q.    Okay.  And the focus of your scholarship has

4    primarily been on what?

5              If someone were to ask you -- "This is the

6    area that I focus in" -- what would you say?

7        A.    I usually answer -- laypeople -- that blood

8    clots and blood thinners.

9        Q.    Okay.  And because -- that you treat people

10   that sometimes have blood clotting disorders, sometimes

11   you interact with people that may need -- may need to be

12   treated with IVC filters?

13             MR. JOHNSON:  Form.

14       A.    I would say that, very rarely, there are

15   situations where I have recommended an IVC filter.

16       Q.    (By Mr. Lerner)  Okay.  Do you still recommend

17   IVC filters today?

18       A.    I recommended one just last month.

19       Q.    Okay.  And what was the situation for that?

20       A.    A patient who suffered pulmonary embolism, and

21   shortly after that suffered intracranial bleeding while

22   on anticoagulant therapy.  And I considered that the

23   risk of continuing anticoagulation in that patient was

24   prohibitive.

25             And the risk of additional thrombosis was high

Page 54

1    enough that, although I have serious doubts about the

2    magnitude of the benefits of filters, I felt that --

3    that the possibility that the filter could be beneficial

4    to that patient outweighed its various risks.  But we

5    had a long discussion with her and her family about

6    that.

7         Q.   Okay.  And then tell me about that a little

8    more.  When you are involved in the decision -- you are

9    involved in the decision for patients about whether to

10   recommend or not an IVC filter?

11        A.   Very often.

12        Q.   Okay.  But you're often, I would imagine,

13   talking to other physicians who are also part of that

14   decision-making process?

15        A.   I would say so.  Although because of my

16   background and expertise -- at least in my own

17   institution -- I would say there's a lot of deference to

18   my opinion.

19        Q.   Okay.  Do you have any protocols in place at

20   your institution about the placement of IVC filters?

21        A.   I don't know of any, no.

22        Q.   Okay.

23        A.   Any written protocol, no.

24        Q.   And there are IVC filters that to this day are

25   being placed in your facility --

David Garcia , M.D.                          June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 55

1        A.    Yes.

2        Q.    -- in your hospital?

3              When you are part of the decision-making

4    process for placement of IVC filters, are you involved

5    in making recommendations about whether somebody has a

6    permanent filter or an optional filter that can be

7    retrieved?

8        A.    I would say that the default recommendation

9    nowadays -- in those rare cases, where I would recommend

10   a filter -- is to place a retrievable one.

11       Q.    Okay.  And why is that?

12       A.    Because the sooner we can take the filter out,

13   the less risk I think it has.

14       Q.    Okay.  So, when was the last time you

15   recommended that a permanent filter be placed?

16       A.    I can't remember.

17       Q.    Okay.  Do you think you've ever recommended

18   that a permanent filter be placed?

19       A.    Not when I was in any position of authority,

20   no.

21       Q.    Okay.  And to this day you still wouldn't --

22   you would --  Strike that.

23             Your preference in recommending filters is

24   recommending an optional filter, correct?

25             MR. JOHNSON:  Form.

David Garcia , M.D.                                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 100

1          Q.    (By Mr. Lerner)  And are you aware that

2     there's guidelines out there by trauma surgeons that --

3     that would suggest use of an IVC filter in that

4     situation?

5          A.    Yes --

6               MR. JOHNSON:  Form.

7          A.    -- I'm vaguely aware of such guidelines.

8          Q.    (By Mr. Lerner)  Okay.  So, again, it goes

9     back to the notion that there is differences of opinion

10    among doctors in different specialties or even in the

11    same specialty about the use of IVC filters; is that

12    fair?

13         A.    Yes.

14         Q.    You have -- you have your opinions about the

15    use of IVC filters, and there's others out there that

16    have differences of opinions about -- than you, correct?

17               MR. JOHNSON:  Form.  Vague.

18         A.    I'm -- I'm sure there are people who have

19    different opinions from mine.  And the guidelines you

20    cited would -- would suggest that there's at least some

21    trauma surgeons who do.

22         Q.    (By Mr. Lerner)  And -- well, I'm going to

23    have some more specific questions about that a little

24    bit later.

25               When patients are being prescribed IVC

David Garcia , M.D.                                     June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 101

1    filters -- patients of yours -- are you involved in the

2    consent process for that?

3              MR. JOHNSON:  Form.

4         A.   Only if I am the doctor who is recommending

5    the filter.

6         Q.   (By Mr. Lerner)  Okay.

7         A.   I mean, I recently saw a patient who was

8    planned for a surgery to remove a bunch of blood clot

9    from her lungs and had been advised to have a filter

10   placed by the surgeon who's going to do the operation.

11   And I advised her against it.  So I mean, yes, I am

12   involved in that sort of informed decision-making.

13        Q.   Okay.  But is it typical for the person that's

14   actually placing the filter to be the person that gets

15   the consent from the patient?

16        A.   Well, I think -- I mean, I think the

17   interventional radiologist or the person who's actually

18   deploying the filter has a duty to inform the patient

19   about the risks and benefits of the specific procedure

20   itself.

21             So you might have bleeding on the site where

22   we put the catheter, you might get an infection from the

23   fact that we're entering a sterile part of your body.

24   But I actually think that there's a duty of the treating

25   physician to inform the patient about the long-term

David Garcia , M.D.                                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 102

1    risks and benefits, to the extent that he or she can

2    know them from published information.

3            Q.    And then of the 15 or so filters -- or maybe

4    it's less than that -- that you have been involved in

5    recommending over the last 15 years, how many of those

6    would you say that you were part of an actual consent

7    process?

8            A.    Yeah, like I said, I think it'd be closer to

9    half a dozen.    And I'm quite confident that I had a --

10   involved discussion with the patient before all of them.

11           Q.    Okay.    And the first time that you think you

12   would have been involved would be somewhere in 2005

13   or --

14           A.    Maybe a little before that, but in that

15   ballpark.

16           Q.    Okay.    And has your practice -- that would be,

17   tell patients about potential complications -- been the

18   same during that entire time?

19           A.    No, I would say it's -- my advice about risks

20   has changed a bit because -- for example, it's probably

21   only in the last 10 years or so that I've recognized --

22   or that I've come to the conclusion that the rate of

23   thrombosis of the cava itself is probably as high as

24   5 percent.

25                 And so -- and I've also seen -- I mean, dating

David Garcia , M.D.                                                                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 103

1   back to when I was a resident, I've personally seen

2   cases of a strut of a filter being in the duodenal

3   lumen, or had colleagues with patients who had a filter

4   and migrated to the heart.

5           And so based on experience that I've

6   accumulated over the years, as well as published

7   information that I'm aware -- that I've become aware of,

8   is I've focused in this area.  I think the nature of my

9   discussion about risk has probably changed.

10          Q.   Okay.  You said 5 percent thrombosis.  You're

11   saying for -- of all IVC filters -- that having an IVC

12   filter, 5 percent of the time there's going to be

13   thrombosis caused by the IVC filter?  Did I hear you --

14          A.   Yes.

15          Q.   -- correct?

16          A.   So -- so to restate it, caval thrombosis --

17   where the inferior vena cava is occluded by thrombus --

18   happens in 2 to 6 percent of patients with IVC filters,

19   according to published data.  And that is always, in my

20   opinion, the result of a filter.  It doesn't just

21   coincidentally happen.

22          Q.   So, that's not specific to a particular

23   filter.  You're saying for all filters, that's what the

24   literature shows?

25          A.   Yes.

David Garcia , M.D.                              June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 192

1     the relative safety or efficacy could be made based on

2     those observational studies?

3                    MR. JOHNSON:   Form.

4     A.    Because as I said -- as I said earlier,

5     observational studies cannot be relied on to determine

6     relative efficacy or safety between two treatment

7     options.

8                    But in this case, what -- I'm merely -- I'm

9     merely gleaning from the observational studies that if

10    you put an IVC filter in 100 people, about five of them

11    will have thrombosed their vena cava over the next one

12    to two years.

13                   I can tell you, from taking care of patients

14    for 20 years and again from other published literature,

15    that event -- IVC thrombosis -- almost never occurs in

16    the absence of an IVC filter.

17                   So, I'm very comfortable in that particular

18    instance concluding from the observational cohort study

19    that there -- that this risk is attributable to IVC

20    filters.  And I have a pretty good idea of what the

21    magnitude of the risk is.

22          Q.    (By Mr. Lerner)   Okay.   All right.   Let's go

23    down to the next paragraph here.   You say that, "Thus,

24    in order for physicians to make reasonable risk-benefit

25    assessments regarding filters, it's critically important

David Garcia , M.D.                                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 193

1       that manufacturers of IVC filters continuously apprise

2       the clinicians who order and implant IVC filters about

3       their safety profile, performance characteristics,

4       design problems, and internal risk assessments."

5               So, what are you saying there?

6               A.    Well, I mean, I think this is a -- a statement

7       that could apply to the manufacturer of any device or

8       medication that's going to be prescribed or deployed by

9       a -- by a treating physician.   But it's perhaps --

10              I think we wanted to emphasize it here,

11      because when you have an intervention -- the benefit or

12      efficacy of which is highly questionable or poorly

13      established -- ensuring that the doctors who are

14      choosing to use it know as much detail as possible about

15      its risks, has heightened importance.

16              Q.    What does that mean in practical terms?   Are

17      you suggesting that every time there's an adverse event

18      with a medical device, that the manufacturer should be

19      reporting that to every physician that uses the device?

20              A.    No.   I'm not trying to suggest an unreasonable

21      burden on any corporation.   But I think -- but I do

22      think that -- I think there's -- I do think there's a

23      strong requirement that --

24              I guess, I think that a company should have a

25      perhaps even lower than average threshold to track and

David Garcia , M.D.                              June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 194

1    report risk when a -- when a device or intervention has

2    poorly established or -- or unestablished benefit.

3         Q.   Are you familiar with the FDA regulations

4    about what information can and cannot be provided to

5    physicians by manufacturers?

6         A.   I'm not.

7              MR. JOHNSON:  Form.

8         Q.   (By Mr. Lerner)  And you wouldn't want

9    manufacturers providing unreliable information, correct?

10        A.   No, I wouldn't.

11             MR. JOHNSON:  Form.

12        Q.   (By Mr. Lerner)  And you wouldn't want

13   manufacturers to be providing incomplete information?

14             MR. JOHNSON:  Form.

15        A.   Well, I think -- I mean, I think that the

16   challenge there is -- who's making the judge to whether

17   it's complete or incomplete and -- and what context it's

18   being provided.

19             I certainly wouldn't want a manufacturer to be

20   providing information that would mislead a physician in

21   either direction, over- or underestimating the risk.

22        Q.   (By Mr. Lerner)  Yeah.  You want manufacturers

23   providing you with reliable scientific information,

24   correct?

25             MR. JOHNSON:  Form.

David Garcia , M.D.                                June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 196

1      judgment.

2           Q.    (By Mr. Lerner)   Is there any other

3      manufacturer, that you're aware of, that's providing you

4      the information that you say should be provided by

5      manufacturers?

6           A.    Well, I can't think of one.   But, I mean, I

7      also can't think of a -- of an intervention or a device

8      that is so widely used, at least in my sphere of

9      practice, with so little high-quality evidence for its

10     benefit.

11          Q.    What do you mean here when you say that

12     companies should be providing internal risk assessments?

13     What does that mean?

14          A.    Well, the -- I think what -- what we intended

15     to say there with Dr. Streiff is that if a company makes

16     an internal -- what's originally an internal

17     determination that a device or product is associated

18     with a particular risk that has not been publicly

19     disclosed, then -- then they need to publicly disclose

20     it -- I mean, whether it's to regulators or to

21     practicing physicians.   But somebody needs to know about

22     it.

23          Q.    In the next sentence you say, "In addition,

24     filter manufacturers have a key obligation to report the

25     experiences of other physicians who have reported

David Garcia , M.D.                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 198

1     potentially receive, you know, all or many reports of

2     complications from a much wider scope of observation, if

3     you will.

4               And if a company is getting reports from far

5     and wide of complications -- which are maybe happening

6     infrequently at any given institution, but with some

7     frequency in the world at large -- they're the only

8     entity that has the ability to provide that perspective

9     to an individual physician, who is him or herself just

10    only able to focus on what's going on in their immediate

11    surroundings.

12              Q.   (By Mr. Lerner)  Are you aware that reports of

13    complications are reported to the MAUDE database?

14              A.   I'm aware of the MAUDE database.  But I

15    believe that experts like Dr. Kessler and others, who

16    are much more familiar with regulatory history than I

17    am, believe or have evidence to think that there's

18    underreporting when it comes to the MAUDE database.

19              Q.   But individual adverse events themselves, like

20    case reports, they're on the lowest end of the spectrum

21    of the hierarchy of scientific evidence, correct?

22              A.   That is true.  In isolation, a case report is

23    at the lowest end.

24              Q.   I mean, even if not -- not in isolation, if

25    you have various adverse events, spontaneous reports,

David Garcia , M.D.                      June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 202

1      regulatory affairs that:  'Transparency in matters that

2      affect patient safety should be embraced as a primary

3      corporate obligation.'"

4              So you read the one deposition of Chris

5      Ganser, and you --

6          A.   Right.

7          Q.   -- you decided on your own to add this one

8      sentence here to your report?

9          A.   I mean, I decided in -- in conjunction with

10     Dr. Streiff, in the various back-and-forth discussions

11     we had, yeah.

12         Q.   So, are you implying here that somehow -- that

13     Bard has not been transparent about the safety profile

14     of its IVC filters?

15         A.   Well, I think the -- I mean, I don't consider

16     that to be the principal opinions in -- that I have in

17     this matter, but I -- but I am concerned by some of the

18     things that I've been shown by plaintiff counsel.

19              I mean, just -- and if you -- I can cite a

20     couple of examples, but -- but, yeah, I do have some

21     concern that Bard is not completely transparent.

22         Q.   Okay.  And the reason why you have that

23     concern, is it based on the Dr. Kessler report that you

24     reviewed?

25         A.   That's a big part of it, yep.

David Garcia , M.D.                                    June 21, 2017
In Re: Bard IVC Filters Products Liability

                                                        Page 204

1              (Exhibit-11 marked for identification.)

2              MR. JOHNSON:  I don't need one, Matthew.

3              MR. LERNER:  I figure you have the copy of the

4      report in front of you.

5              MR. JOHNSON:  I do.

6         Q.   (By Mr. Lerner)  All right.  So you have a

7      copy of Exhibit-11, which is your addendum?

8         A.   I do.

9         Q.   Okay.  Did you read Dr. Kessler's report?

10        A.   I've read it, yes.

11        Q.   Did you read it in its entirety?

12        A.   At some level, I've read it in its entirety.

13        Q.   How many pages is that report, do you recall?

14        A.   In the hundreds.

15        Q.   And you read all those pages in detail?

16        A.   I would say there were some pages I read much

17      less closely than others, but --

18        Q.   Okay.

19        A.   -- I've looked at the text of every page in

20      some form or fashion.

21        Q.   And what was the reason why you read his

22      report?

23        A.   Because, as I recall -- again in discussions

24      with counsel and Dr. Streiff, we -- it was felt that it

25      would provide important background information.

David Garcia , M.D.                              June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 210

1          Q.    So in drafting your addendum and kind of

2     essentially regurgitating what Dr. Kessler found in his

3     report, did you attempt to be as accurate as possible in

4     describing Dr. Kessler's findings?

5          A.    I did.

6               MR. JOHNSON:  Form.

7          Q.    (By Mr. Lerner)  You didn't try to modify in

8     any way Dr. Kessler's findings?

9          A.    That was certainly not my intent, no.

10         Q.    (By Mr. Lerner)  And so you didn't change any

11    of the findings from Dr. Kessler's report, in part of

12    the --

13         A.    No.

14         Q.    -- addendum there?

15         A.    No.

16         Q.    So you included seven numbered paragraphs,

17    repeating what Dr. Kessler himself says in his own

18    report?

19         A.    Yes, because the -- while there's publicly

20    available evidence of IVC filter risks that you and I

21    have discussed earlier in today's deposition, this --

22    these elements of Dr. Kessler's report, I thought,

23    highlighted additional risks associated with the Bard

24    product in particular, that were not necessarily

25    publicly known about or available to practicing doctors

David Garcia , M.D.                        June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 211

1    and -- and -- but were relevant in the overall

2    risk/benefit discussion that -- that my report entailed.

3         Q.    Okay.  So you don't say anything in your

4    addendum about Dr. Kessler's findings, that he himself

5    doesn't say in his own report, true?

6         A.    Correct.

7         Q.    Okay.  In other words, you are repeating what

8    Dr. Kessler found, without changing anything?

9         A.    Essentially, yes, in the context of my

10   report -- or to add context to my report with

11   Dr. Streiff, yes.

12        Q.    But Dr. Kessler's findings do not factor into

13   your actual analysis in this report, true -- your whole

14   report that we just went through?

15        A.    Well, only -- only in that they -- only to the

16   extent that they provide additional information about

17   risk, which we haven't talked about much today.  But the

18   risks associated with IVC filters, yeah, because that's

19   a major subject of my report -- is risk benefit, yeah.

20        Q.    No one asked you, as part of your analysis, to

21   perform a regulatory analysis?

22        A.    No.

23        Q.    And it's not necessary for you to conduct any

24   kind of regulatory analysis to reach the opinions that

25   you set forth in your expert report; is that true?

David Garcia , M.D.                                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 212

1          A.    True.

2          Q.    Yeah.  And you understand that Dr. Kessler

3     prepared this report for use in litigation?

4          A.    Yes.

5          Q.    Okay.  Can you describe the methodology that

6     Dr. Kessler employed in reaching his opinions?

7          A.    No.

8          Q.    Okay.  Did you independently verify

9     Dr. Kessler's methodology?

10         A.    Not in any great detail.  I mean, for example,

11    I've looked at the paper by Murray Ash and made sure

12    that my own assessment of that paper was consistent with

13    Dr. Kessler's.

14              And I read the report provided to

15    Dr. Kessler by Dr. Betensky regarding analysis of

16    adverse reports, just to generally make sure I shared

17    his conclusions.  But -- but beyond that, no.

18         Q.    Okay.  Have you reviewed any Bard FDA

19    submissions or correspondence?

20         A.    Not that I recall.

21         Q.    Did you independently review and assess the

22    reliability of the underlying data that Dr. Kessler

23    relied on?

24         A.    Not beyond what I just told you.

25         Q.    Okay.  Did you check or test any of the

David Garcia , M.D.                                      June 21, 2017

In Re: Bard IVC Filters Products Liability

Page 217

1      Q.    -- correct?

2            So you don't know if there are other facts or

3    data out there that Dr. Kessler or Dr. Betensky

4    admitted, that may affect whether you agree with their

5    opinions?

6      A.    No, I -- I don't.   But I would -- again, I

7    would just say that I considered this addendum about

8    Kessler's report to be information that strengthens the

9    rest of my report with Dr. Streiff.   But my report with

10   Dr. Streiff would still stand, even independent of all

11   this information.

12     Q.    So, you read Dr. Kessler's report.   You read

13   Dr. Betensky calculations.   You didn't perform any

14   independent analysis, but simply kind of agreed with

15   their analysis?

16     A.    Correct.   I guess one way you could say is

17   that, assuming their analysis is true, it just

18   strengthens the conclusions of my report.

19     Q.    Okay.   And how so?

20     A.    Because their -- the facts stated in -- or the

21   information stated in this addendum only further

22   highlights the risks of IVC filters, beyond what I could

23   have done using publicly available peer reviewed

24   information that's cited in my report -- the rest of my

25   report.

David Garcia , M.D.                                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 223

1     loop and that they were going to try to do some sort of

2     surgery to address it.  But I -- but I actually don't

3     remember the specific outcome of that.

4          Q.   Okay.  If her doctors have not determined what

5     the cause of her GI bleed is or has been, would

6     anticoagulants be appropriate?

7          A.   Possibly.  So patients who have GI bleeding

8     and undergo a thorough evaluation, including endoscopy

9     and usually a capsule camera exam of the small intestine

10    and who remain free of bleeding for some period of

11    time -- usually a week or two -- it's reasonable to

12    re-challenge them with anticoagulation.

13         Q.   And so do you know whether those situations

14    happened here?

15         A.   I don't know.

16         Q.   Okay.  So, given that, you can't say today

17    whether she would be an appropriate candidate for

18    anticoagulation?

19         A.   I can't -- I think it's fair to say I can't

20    fully assess the risk of anticoagulant therapy in her,

21    because I don't have some of those details, yeah.

22         Q.   Okay.  All right.  Based on your report, you

23    have an understanding that she has a fragment of one of

24    the struts from her filter that remains in a branch of

25    one of her pulmonary arteries?

David Garcia , M.D.                                      June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 226

1      presence of a foreign body in a pulmonary artery branch

2      represents a permanent, significant risk factor for the

3      development of in situ thrombosis."

4              Did I read that correctly?

5      A.    You did.

6      Q.    Okay.  Have you ever personally diagnosed a

7      fractured filter strut, causing thrombosis?

8      A.    No.

9      Q.    Okay.  Have you ever seen a fractured filter

10     strut, causing thrombosis, reported in the medical

11     literature?

12     A.    No.

13     Q.    And there are other risk factors for the

14     development of in situ thrombosis, correct, beyond what

15     you're saying here is a filter strut?

16     A.    Yes.

17     Q.    Can you describe some of the other risk

18     factors for development of in situ thrombosis?

19     A.    Sure.  Compression of a vessel, presence of

20     central venous catheter, prosthetic mechanical heart

21     valve would be a few.

22     Q.    And then in Mrs. Jones's situation, her

23     particular medical situation, can you describe any

24     conditions that she has that make her at risk for the

25     development of in situ thrombosis?

David Garcia , M.D.                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 227

1        MR. JOHNSON:   Form.

2        A.   Well, the -- I mean, the personal history of

3    venous thromboembolism is a risk factor to develop

4    venous thromboembolism again in the future, particularly

5    if the original clot was unprovoked.   And I don't

6    recall, in Ms. Jones's case, whether hers was or not.

7            But I guess -- I guess it's important to say

8    that venous thrombosis is almost always a multi-causal

9    event, meaning there's usually more than one

10   contributing factor to the formation of a blood clot.

11   We can't always identify what they are, but --

12       Q.   (By Mr. Lerner)   Right.

13       A.   -- it can be more than one, and it often is.

14       Q.   Are you aware of anything in the medical

15   literature that supports the finding that a fractured

16   fragment has contributed to causing thrombosis?

17       A.   No, I'll be -- I'll be extrapolating, though,

18   from data that I think does establish that an intact

19   filter promotes thrombosis formation.

20       Q.   But an intact filter, the size of that is very

21   different from a fragment --

22       A.   Yes.

23       Q.   -- from one of the arms or legs?

24       A.   But I'm not aware that surface area or size

25   has any correlation with thrombosis risk, when it comes

David Garcia , M.D.                                  June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 234

1       Q.    Okay.  And so you cannot state with a

2   reasonable medical certainty that Mrs. Jones' blood flow

3   in her pulmonary artery is turbulent because of the

4   filter strut?

5            MR. JOHNSON:  Form.

6       A.    Don't agree.  I mean, I -- I do -- I have a

7   reasonable degree of medical certainty that there is

8   turbulent blood flow around that strut.

9       Q.    (By Mr. Lerner)  So you've not examined the

10  strut, you've not examined any of her imaging.  And

11  without doing that, you believe that you can say to a

12  reasonable degree of medical certainty -- more likely

13  than not -- that Mrs. Jones' blood flow in her pulmonary

14  artery is turbulent because of the filter strut?

15           MR. JOHNSON:  Form objection.  The question's

16  also --

17      A.    I do.  But more importantly -- more

18  importantly, I can say to a reasonable degree of medical

19  certainty that that filter strut being there --

20  irrespective of by what mechanism -- is putting

21  Ms. Jones at increased risk of thrombosis in that -- at

22  that -- at that site and distal to it.

23      Q.    (By Mr. Lerner)  And what is that based on?

24      A.    The observations of IVC filters promoting

25  thrombosis in randomized controlled trials, as well as

David Garcia , M.D.                              June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 235

1    in observational cohort studies, as well as the

2    observation that foreign bodies -- examples of which I

3    cited to you earlier -- catheters, prosthetic mechanical

4    heart valves -- can promote -- do promote thrombosis.

5           Q.   Right.  But the situations in the literature

6    you cited dealt with filters -- whole filters; they

7    didn't deal with individual struts.  So, those articles

8    don't really support your position?

9           MR. JOHNSON:  Form.

10          A.   I think they do.  I mean, I -- I -- I guess

11   that's -- we can agree to disagree about that.  But, I

12   mean, I'm very comfortable in saying that -- that having

13   a foreign body sitting in one's pulmonary artery is

14   going to put a patient at risk for thrombosis.

15          Q.   (By Mr. Lerner)  Again, though, you can't

16   point to any specific literature relating to filter

17   struts in the pulmonary artery that would support your

18   position?

19          MR. JOHNSON:  Form.

20          A.   No, I can't.

21          Q.   (By Mr. Lerner)  And you cannot state within

22   reasonable medical certainty that Mrs. Jones' blood flow

23   in her pulmonary artery is turbulent because of the

24   filter strut, such that she will develop thrombosis?

25          MR. JOHNSON:  Form objection.  Misstates --

David Garcia , M.D.                                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 236

1          A.   Well, I --

2               MR. JOHNSON:  -- his testimony already.

3          A.   Yeah, I would -- I would say that the --

4     again, irrespective of the mechanism, I'm confi -- it's

5     my expert opinion that she is at increased risk to

6     develop in situ thrombosis, as well as embolization

7     distal to the site.

8          Q.   (By Mr. Lerner)  You say that she --

9          A.   Because of the presence of the filter strut.

10         Q.   You say that she's in an increased risk.  That

11    doesn't mean that she's more likely than not to develop

12    thrombosis because of the strut, correct?

13              MR. JOHNSON:  Form.

14         A.   Correct, yeah.

15         Q.   (By Mr. Lerner)  Your second explanation in

16    your report is that "the body has a biochemical response

17    to a foreign object exposed to the circulating blood.

18    This response promotes the formation of thrombus on the

19    foreign body (in this case, the filter fragment.)

20              "Thus, the mere presence of the filter in a

21    pulmonary artery branch can result in a hyper-coagulable

22    condition which promotes the creation of a local

23    thrombus."  Did I read that correctly?

24         A.   You did.

25         Q.   So, what is the basis of your opinion that a

David Garcia , M.D.                              June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 237

1    biochemical response to a filter fragment exposed to a

2    circulating blood promotes the formation of thrombus on

3    the filter fragment?

4         A.   So, a var -- I mean, a variety of foreign

5    objects again -- and I've cited clinical examples to you

6    of those -- when they're exposed to circulating blood,

7    they activate factor XII, which is one of the clotting

8    proteins that are involved in the so-called contact

9    activation or intrinsic activation pathway.

10             And that triggers a chain -- a series of chain

11   reactions that ultimately can lead to the formation of a

12   blood clot.   And it's entirely stimulated by contact

13   with foreign surfaces.   And I have no reason to think

14   that a filter fragment would be an exception to a rule

15   that's certainly followed by many other foreign bodies.

16        Q.   Are you aware of any literature that supports

17   your position that in this situation, where a

18   fragment -- a filter fragment -- that the body --

19   specifically Mrs. Jones' body would likely have a

20   biochemical response to the strut?

21             MR. JOHNSON:  Form.

22        A.   No.

23        Q.   (By Mr. Lerner)  Okay.  And if the strut is

24   endothelialized, as you believe it is, do you believe it

25   is exposed to circulating blood?

David Garcia , M.D.                                      June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 242

1     she's likely going to trigger formation of a blood clot?

2           A.   Well, I mean, I think she's at much higher

3     ri -- whether it's because of an injury to the blood

4     vessel wall or whether it's because of turbulence or

5     whether it's because of a direct biochemical stimulus,

6     she is at increased risk to form a clot, over and above

7     what she would be if this fracture weren't in her -- if

8     this fractured strut were not in her pulmonary artery.

9           Q.   Are you able to quantify what that risk is,

10    that increased --

11          A.   No.

12          Q.   -- risk is?

13               And then are you able to point to any

14    literature or scientific studies that would help

15    quantify that she's at an increased risk?

16          A.   No, other than again extrapolating from what

17    we know about intact filters.

18          Q.   And, then, doesn't the --  Strike that.

19               If the fragment has in fact at some point

20    caused injury to the inner wall, the pulmonary artery,

21    do you know when that would have occurred?

22          A.   I would assume shortly after the frac --

23    the -- it fractured and migrated there.

24          Q.   And wouldn't the wall that -- pulmonary artery

25    then heal?

# EXHIBIT 2



Deposition of:

# Michael Streiff , M.D.

*July 12, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Michael Streiff , M.D.                    July 12, 2017
In Re: Bard IVC Filters Products Liability

Page 101

1    I've seen as part of -- I think Dr. Garcia's

2    deposition, there's some in there; yeah.

3        Q.   Okay.  Outside, I guess, of the IVC

4    filter litigation and outside of Dr. Kessler's

5    report and reviewing Dr. Garcia's deposition and

6    the exhibits, you have not previously ever reviewed

7    internal, internal company documents?

8        A.   No.

9        Q.   And you are not an FDA expert?

10       A.   No.

11       Q.   And you're not holding yourself out as an

12   expert as, into FDA compliance?

13       A.   No.

14       Q.   You also have not worked in any company

15   in post-market surveillance --

16       A.   No.

17       Q.   -- for -- okay.  So you're not holding

18   yourself out as an expert in post-marketing

19   surveillance?

20           MR. O'CONNOR:  Form and foundation.

21           THE WITNESS:  No.

22   BY MR. LERNER:

23       Q.   Do you have any experience developing

24   warnings for IVC filters?

25       A.   Warnings?

Michael Streiff , M.D.                              July 12, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 102

1        Q.    Warnings.

2        A.    No.

3        Q.    No.   And you're not offering -- strike

4    that.

5              You're not claiming to be an expert as to

6    warnings for medical devices or IVC filters?

7              MR. O'CONNOR:   Object to the form of the

8    question.

9              THE WITNESS:   No.

10   BY MR. LERNER:

11       Q.    Have you ever had your expert opinion

12   excluded by any court, to your knowledge?

13       A.    No.

14       Q.    And you've never -- in all of the cases

15   we've talked about, you've never attempted to offer

16   an expert opinion in anything other than

17   medical-related opinions; is that fair?

18       A.    That's true.

19       Q.    All right.  Now, I'm going to start

20   focusing more on the medicine now.

21       A.    Okay.

22       Q.    Are you still doing okay with time?

23       A.    Oh, yeah.  Yeah.  I'm fine.

24       Q.    Okay.  Can you describe what the

25   difference between a DVT is and a pulmonary

Michael Streiff , M.D.                              July 12, 2017
In Re: Bard IVC Filters Products Liability

Page 276

1      Q.    Okay.

2      A.    -- on those documents.

3      Q.    So that's --

4      A.    And then we went on further to make

5  an -- it was, you know, we ought to make an

6  addendum on, that goes into, more in detail about

7  that report, or at least several points from it.

8      Q.    Okay.  So the statement here that in

9  order for physicians to make reasonable

10  risk-benefit assessments regarding, regarding the

11  filters, it is critically important that

12  manufacturers of IVC filters continuously apprise

13  the clin-, clinicians who order implant IVC filters

14  about their safety profile, performance

15  characteristics, design problems, internal risk

16  assessments, that was a personal opinion that, that

17  you and then Dr. Garcia had after reading the

18  Dr. Kessler report?

19      A.    That is exactly --

20            MR. O'CONNOR:  Object to the form.

21            THE WITNESS:  Sorry.  That's, that's

22  right.  That's something we -- that's not something

23  coming from the literature.  That's coming from

24  after seeing that report large -- yes.

25  BY MR. LERNER:

Page 277

1      Q.   And, and you are not basing that

2    statement on any kind of FDA regulation standard or

3    some law.  That's just kind of a personal opinion?

4      A.   Yeah, that's after looking at those

5    documents.

6            MR. O'CONNOR:  Object to the form of the

7    question.

8            THE WITNESS:  Sorry.

9    BY MR. LERNER:

10     Q.   And, and when you say that manufacturers

11   should continuously apprise physicians of certain

12   information, again, that's not based on any

13   particular regulation, standard or law.  It's based

14   on your personal opinion?

15           MR. O'CONNOR:  Form.

16           THE WITNESS:  True.

17   BY MR. LERNER:

18     Q.   And when you use the term continuously

19   apprise, are you saying that manufacturers should

20   be providing information to doctors how often?

21     A.   I would say that if you have a -- you

22   know, obviously, I'm -- this is -- I'm an outsider.

23   The whole FDA, the vice pros, you know, approval

24   process or drug approval process, because I haven't

25   been involved with that either, but if you have --

Michael Streiff , M.D.                              July 12, 2017
In Re: Bard IVC Filters Products Liability

Page 294

1      Q.   And am I right that you -- I thought

2   Dr. Garcia said this, but maybe I misremembered,

3   that you actually were the one that took the draft

4   of these?

5      A.   I may have -- I may have, you know -- I

6   guess I may -- yeah, I may have done that.  Yeah.

7      Q.   Okay.

8      A.   I can't recall if I did it all

9   or -- yeah.

10      Q.   In the beginning of the deposition, I

11   asked you about evidence-based medicine --

12      A.   Um-hum.

13      Q.   -- and is it important to you as a

14   physician, as an evidence-based physician to review

15   both sides when there's conflict in opinions about

16   things?

17      A.   True.  Yeah.

18         MR. O'CONNOR:  Object to the form of the

19   question.

20   BY MR. LERNER:

21      Q.   And you also in response to one of my

22   questions today, you said it was important to be

23   fair and balanced, right?

24      A.   Yeah.  Of course, yeah.  Look at all of

25   the data and make your decision --

Michael Streiff , M.D.                                July 12, 2017
In Re: Bard IVC Filters Products Liability

Page 304

1      Q.    So, in other words, you're repeating in

2   your report some of the findings that Dr. Kessler

3   has found without changing anything?

4      A.    Right.   I think it's a summary of what we

5   read in the, in his, his report.

6      Q.    But Dr. Kessler's findings do not factor

7   into your, the, the main opinions you're offering

8   in this, in this case?

9      A.    Sorry.

10     Q.    Sorry.   Dr. Kessler's opinions do not

11   factor into the medical opinions that you're

12   offering in this case?

13          MR. O'CONNOR:   Form.

14          THE WITNESS:   Well, I mean, I think that

15   when we saw those, I think that was, certainly that

16   was -- I think the data he had in his report I

17   think were, we found were troubling and would make

18   one consider whether there were events that had

19   already occurred in, you know, in papers.

20          Like the Nicholson papers, for instance,

21   where they had a lot of fractures, this kind of

22   would support what they were saying.   The Nicholson

23   paper only focused on G2 and recovery filters and

24   frac-, you know, frac-, you know, filter-like

25   fractures and stuff like that, but as these data

Michael Streiff , M.D.                                    July 12, 2017
In Re: Bard IVC Filters Products Liability

Page 305

1    would suggest, oh, is that what -- is there a

2    connection there?

3              I think that's what I think both Dave and

4    I both thought of when we, we saw it.   You have the

5    Nicholson data out there, and then you have this.

6    It's like, Wait a second.   This is -- was this

7    known before?   I think that's what came up in our

8    minds when we read the Kessler report.

9    BY MR. LERNER:

10       Q.    Okay.  And the Nicholson, you're talking

11   about the New York Hospital article?

12       A.    Yeah.  Exactly.  Yeah, yeah, yeah, yeah.

13       Q.    Are you aware that there was a correction

14   to that article?

15       A.    No.  Actually, I don't think I saw that.

16       Q.    So you were never aware there were

17   several inaccuracies within that article?

18       A.    No, but I'd love to take a look at it and

19   see what the inaccuracies were.

20       Q.    But no, no one has ever told you that

21   there are several --

22       A.    No, I didn't see that.

23       Q.    Let me finish my question.

24       A.    Oh, I'm sorry.

25       Q.    So no, no one ever told you that there

Michael Streiff , M.D.                                July 12, 2017
In Re: Bard IVC Filters Products Liability

Page 316

1        A.   Yes.

2             MR. LERNER:   Objection to form.

3   BY MR. O'CONNOR:

4        Q.   Did his report contain actual excerpts or

5   quotes of documents?

6        A.   Yes, it did.

7             MR. LERNER:   Objection to form.

8   BY MR. O'CONNOR:

9        Q.   And did that include internal documents

10  produced by Bard?

11            MR. LERNER:   Objection to form.

12            THE WITNESS:   Yes.   He had quotes from

13  different employees of Bard, some which had, some

14  of the employees had concerns about the, the

15  performance tests and also data, you know, data

16  from patient events.

17  BY MR. O'CONNOR:

18       Q.   When you reviewed Dr. Kessler's report

19  and relied on statements and facts from his report,

20  were you satisfied that the information you relied

21  upon from his report was reliable and trustworthy?

22            MR. LERNER:   Objection to form.

23            THE WITNESS:   Yes.   I mean, I think that

24  he has data to back up all of the con-, the

25  conclusions he made in his report.   They're, you

Michael Streiff, M.D.                          July 12, 2017
In Re: Bard IVC Filters Products Liability

Page 317

1    know, what looked like excerpts from internal

2    documents showing, you know, as I said before

3    migration testing and, and data from comparison

4    with the different filters, cranial and caudal

5    migration, and that the G2 and recovery filters had

6    a greater tendency to that than comparators.

7    BY MR. O'CONNOR:

8         Q.   Now, when formulating your opinions in

9    this case, first of all, as a hematologist in your,

10   in your position in the medical community,

11   including your position at Johns Hopkins Hospital,

12   do you keep yourself regularly apprised of the

13   medical literature, research and studies that

14   pertain to issues of DVT, PE, clotting and IVC

15   filters?

16        MR. LERNER:  Objection to form.

17        THE WITNESS:  Of course.  I subscribe to

18   a number of different articles.  With the Welsh

19   Medical Library, I have like 20,000 articles

20   online, and I can -- you know, so I get emails.  I

21   have context, contents to journal, you know, table

22   of contents sent to me of probably 30 journals that

23   I review, so yeah.

24   BY MR. O'CONNOR:

25        Q.   And when you were arriving, preparing

Michael Streiff , M.D.                           July 12, 2017
In Re: Bard IVC Filters Products Liability

Page 319

1    community?

2        A.    Yeah.

3        Q.    Is it an expectation in the medical

4    community that companies that provide medical

5    devices, that they will put patient safety, patient

6    safety first and paramount?

7        A.    Of course.

8        Q.    In this case when you arrived at

9    opinions, including opinions based upon the

10   information from Dr. Kessler, were those opinions

11   based upon what you understand and know are the

12   expectations of doctors in the medical community?

13            MR. LERNER:  Objection to form.

14            THE WITNESS:  Certainly.  I mean, when I

15   read his report, I was reading it as, you know, a

16   hematologist, you know, reading, looking at data

17   and, and assessing what I, what I had in there and

18   then comparing it to what I know from the

19   literature, having read the literature.

20   BY MR. O'CONNOR:

21       Q.    And based upon your review of all of the

22   information in this case, did you arrive at an

23   opinion whether the Bard filters met the reasonable

24   expectations of medical doctors in the community?

25            MR. LERNER:  Objection to form.  Outside

# EXHIBIT 3

```
 1                 UNITED STATES DISTRICT COURT

 2                    DISTRICT OF ARIZONA

 3

 4     ----------------------x

 5     IN RE BARD IVC          )

 6     FILTERS PRODUCTS        ) No. MD-15-02641-PHX-DGC

 7     LIABILITY LITIGATION    )

 8     ----------------------x

 9

10

11          DO NOT DISCLOSE - SUBJECT TO FURTHER

12               CONFIDENTIALITY REVIEW

13     VIDEOTAPED DEPOSITION OF CHRISTINE L. BRAUER, Ph.D.

14                   WASHINGTON, D.C.

15              WEDNESDAY, AUGUST 2, 2017

16                     9:07 A.M.

17

18

19

20

21

22

23

24     Reported by: Leslie A. Todd
```

Do Not Disclose - Subject to Further Confidentiality Review

1    the hesitancy in my voice is coming from a

2    difference in misrepresentation of facts versus

3    maybe not agreeing with his conclusions.

4            So I'd have to look at specific

5    statements to be able to affirmatively agree with

6    you or disagree with you.  Just sitting here today

7    without going through line by line of the report,

8    I cannot do it for you, sir.

9    BY MR. LOPEZ:

10       Q    Okay.  So you can't tell me whether or

11   not there's been misrepresentations in the report

12   as you sit here right now.

13       A    Misrepresentations of facts --

14       Q    Of facts, right.

15       A    -- is the question.  Sitting here today,

16   no, I can't say that.

17       Q    Did you look at his -- all of his

18   schedules?

19       A    I looked at a number of his schedules.

20       Q    Are there -- was there anything

21   contained in any of his schedules that were

22   misrepresentations of what are contained -- what

23   he -- what is summarized or what he relates in

24   those schedules as being factual?

Do Not Disclose - Subject to Further Confidentiality Review

 1      A    Not that I can recall sitting here

today.

 3      Q    All right.

 4      A    I think that there are certain areas of

 5   the report where I disagreed with Dr. Kessler's

 6   interpretation or conclusions or how he may have

 7   considered certain data.

 8      Q    Okay.  I asked you about the schedules.

 9   That's all I asked you about.  Whether or not

10   you -- as you went through the schedules, you're

11   saying, Well, that's not an accurate

12   representation of a document, that's not an

13   accurate representation of a study, that's not an

14   accurate representation of an IFU, that sort of

15   thing.

16      A    An actual -- if you're asking for an

17   accurate representation of certain data, I may

18   have differences of opinion with him.  The facts

19   may be the same.

20      Q    Okay.  I think I found an answer in

21   there somewhere.

22           Did Dr. Kessler in his report as he

23   relates to certain Bard documents take any of

24   those documents out of context?

Do Not Disclose - Subject to Further Confidentiality Review

```
 1   BY MR. LOPEZ:

 2       Q    Well, it --

 3       A    It's not possible for me to do, sir.

 4       Q    Isn't that the most important thing that

 5   we should be talking about in this case is what

 6   are doctors' and patients' expectations of the

 7   safety profile and the risk-benefit profile of the

 8   Recovery, G2 and all the other Bard filters,

 9   right?

10            MR. ROGERS:  Object to the form.

11            THE WITNESS:  I agree that it's

12   important for a medical device manufacturer to

13   understand healthcare professionals' expectations

14   for performance of a product.

15   BY MR. LOPEZ:

16       Q    So we know early in the -- the history

17   of the Recovery filter, based on everything we've

18   talked about and what you've reviewed, that the

19   Recovery filter proved to be not as safe as the

20   Simon Nitinol filter when -- when implanted in

21   patients, true?

22            MR. ROGERS:  Object to the form.

23            THE WITNESS:  I think you're stating

24   things in absolute black and white terms.  And I
```

# EXHIBIT 4
## (Filed Under Seal)

# EXHIBIT 5

```
1           IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF ARIZONA
3                        -  -  -
4
5

    In Re: Bard IVC          :   No.
6   Filters Products         :   MD-15-02641-
    Liability Litigation     :   PHX-DGC
7                            :
8

                         -  -  -
9

                    June 2, 2016
10

                        -  -  -
11

       Do Not Disclose - Subject to Further
12
              Confidentiality Review
13
                        -  -  -
14

             Videotape deposition of JOHN
15  A. DeFORD, Ph.D., taken pursuant to
    notice, was held at the Hilton Short
16  Hills, 41 John F. Kennedy Parkway, Short
    Hills, New Jersey, beginning at 9:11
17  a.m., on the above date, before Kimberly
    A. Cahill, a Federally Approved
18  Registered Merit Reporter and Notary
    Public.
19
20                       -  -  -
21
22        GOLKOW TECHNOLOGIES, INC.
       877.370.3377 ph | 917.591.5672 fax
23            deps@golkow.com
24
```

Do Not Disclose - Subject to Further Confidentiality Review

1           but the decision was made that the

2           product continued to add value and

3           shouldn't be placed on hold.

4    BY MS. BOSSIER:

5           Q.    Well, if the product had

6    been placed on hold, then you would not

7    have had a retrievable filter on the

8    market.  Right?

9           A.    Well, that's -- that's

10   correct, but that -- that wasn't part of

11   the analysis, except that clinicians

12   wanted a device they could retrieve.  It

13   wasn't a company decision, well, we're

14   not going to put it on hold because we're

15   selling a retrievable product.

16          It was the belief and our

17   continued belief that this product added

18   unique, special value and patients' lives

19   were being saved.

20          Q.    Well, physicians wanted a

21   retrievable filter, but physicians, I

22   would assume, and I'm sure that you would

23   agree, wanted a retrievable filter that

24   was safe, correct, and efficacious;

Do Not Disclose - Subject to Further Confidentiality Review

1    correct?

2         A.    Certainly.  The risk/benefit

3    has to be evaluated in every device.

4         Q.    Right.  And the doctor needs

5    to be aware of the risks of any device

6    prior to recommending that device for a

7    patient; correct?

8         A.    That's correct.

9         Q.    And we saw earlier that one

10   of Bard's threshold points that they made

11   in this investigation that began in

12   February of 2004 was that they were going

13   to do -- prepare a dear doctor letter to

14   let the doctors know about that single

15   migration event in February of 2004;

16   correct?

17              MR. NORTH:  Objection to

18         form.

19              THE WITNESS:  That -- that

20         was an item that was on the action

21         plan to be developed, yes.

22   BY MS. BOSSIER:

23         Q.    Because you're telling me

24   that these doctors were clamoring for the

# EXHIBIT 6

Do Not Disclose - Subject to Further Confidentiality Review

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF ARIZONA

 3                           _ _ _

 4

                                       :

 5   IN RE: BARD IVC FILTERS       :No. MD-15-02641-PHX-DGC

     PRODUCTS LIABILITY LITIGATION :

 6                                     :

     ----------------------------

 7

 8

                           -  -  -

 9                     OCTOBER 11, 2016

                           -  -  -

10

11        DO NOT DISCLOSE - SUBJECT TO FURTHER

12             CONFIDENTIALITY REVIEW

13

14         Videotaped deposition of CHRISTOPHER

15      D. GANSER, held at HILTON SHORT HILLS,

16      41 John F. Kennedy Parkway, Short Hills, New

17      Jersey, commencing at 9:32 a.m., before

18      Margaret M. Reihl, a Registered Professional

19      Reporter, Certified Realtime Reporter, and

20      Notary Public.

21

22

              GOLKOW TECHNOLOGIES, INC.

23       877.370.3377 ph | 917.591.5672  fax

                deps@golkow.com

24
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    go to doctors to provide treatment for me.

 2            Q.      I know, but you'd want your doctor to

 3    have the safety profile, the risk evidence, the

 4    effectiveness evidence that exists as to each device so

 5    that doctor could make that choice, true?

 6            A.      I want the doctor to have --

 7            Q.      Sir, is that true?  I mean, if it's not

 8    --

 9            A.      It's true I want the doctors to have as

10    much information as possible to make an informed

11    decision how to use the product.

12            Q.      All patients deserve that right --

13                    MS. DALY:  Objection.

14    BY MR. LOPEZ:

15            Q.      -- for their doctors to be fully

16    informed of all of the potential information about

17    risks and benefits so that the doctors can make an

18    educated choice for the patient, true?

19                    MS. DALY:  Object to the form.

20    BY MR. LOPEZ:

21            Q.      True, sir?

22            A.      Yes.

23            Q.      So did the company tell doctors that in

24    just one month, in January of 2007, that they have a G2
```

# EXHIBIT 7

Do Not Disclose - Subject to Further Confidentiality Review

1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF ARIZONA

3

4      -----------------------x

5      IN RE BARD IVC              )

6      FILTERS PRODUCTS            ) No. MD-15-02641-PHX-DGC

7      LIABILITY LITIGATION    )

8      -----------------------x

9

10          DO NOT DISCLOSE - SUBJECT TO FURTHER

11                CONFIDENTIALITY REVIEW

12

13     VIDEOTAPED DEPOSITION OF DONNA-BEA TILLMAN, Ph.D.

14                    WASHINGTON, D.C.

15                 FRIDAY, AUGUST 4, 2017

16                      9:18 A.M.

17

18

19

20

21

22

23

24     Reported by: Leslie A. Todd

Do Not Disclose - Subject to Further Confidentiality Review

1    omitted.

2         Q     Right.

3         A     So we presume that all material facts

4    have been provided.

5         Q     For example, if there was -- well, you

6    read Dr. Kessler's report, right?

7         A     I did.

8         Q     And did you actually look at the -- the

9    documents that he relies upon for purposes of

10   rendering his opinions?

11        A     I reviewed many of the documents that he

12   referenced.  I can't say that I reviewed every

13   single one of them.

14        Q     And you had an opportunity to rebut his

15   report in your report.

16        A     I did.

17        Q     And did you look at all his schedules

18   that were attached to his report?

19        A     I did review his schedules, yes.

20        Q     How many hours did you spend reviewing

21   the same materials and the same issues that

22   Dr. Kessler reviewed?

23        A     I don't know how to answer that question

24   the way you phrased it.

Do Not Disclose - Subject to Further Confidentiality Review

1          Q      Can you name or list for me any document

2     or -- from Bard or deposition testimony from Bard

3     that's in his report that you believe that

4     Dr. Kessler -- let's start with misstated?

5          A      Dr. Kessler's report is extremely long,

6     and I -- I could not make any kind of general

7     statement about that.

8          Q      Did he -- was any of the material within

9     his report taken out of context?

10                MR. ROGERS:  Object to the form.

11                THE WITNESS:  Once again, his report is

12    too long for me to make any kind of

13    generalization.

14    BY MR. LOPEZ:

15         Q      Was it -- did he mischaracterize any of

16    the factual data that he put in his report?

17                MR. ROGERS:  Object to the form.

18                THE WITNESS:  Once again, I'm unable to

19    provide an overall answer to that question.

20    BY MR. LOPEZ:

21         Q      Did he -- you know that he looked at a

22    number of different tests, right, that he got from

23    looking at the material from -- from Bard's

24    database that he was allowed to look at, right?

# EXHIBIT 8

1          IN THE UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF ARIZONA
3                     -  -  -
4

5   IN RE:  BARD IVC          :
    FILTERS PRODUCTS          :   NO.
    LIABILITY LITIGATION      :   MD-15-02641-
6                             :   PHX-DGC
                              :
7                             :
8                     -  -  -
9                  July 18, 2017
10                    -  -  -
11

12     DO NOT DISCLOSE - SUBJECT TO FURTHER
13          CONFIDENTIALITY REVIEW
14

               Videotaped deposition of
15   MARK W. MORITZ, M.D., taken pursuant to
     notice, was held at the offices McCarter
16   & English, LLP, 100 Mulberry Street,
     Newark, New Jersey, beginning at 9:07
17   a.m., on the above date, before Michelle
     L. Gray, a Registered Professional
18   Reporter, Certified Shorthand Reporter,
     Certified Realtime Reporter, and Notary
19   Public.
20

                       -  -  -

21

22        GOLKOW LITIGATION SERVICES
      877.370.3377 ph | 917.591.5672 fax
23          deps@golkow.com
24

Do Not Disclose - Subject to Further Confidentiality Review

1   would be significant from such a small

2   piece.

3        Q.    But certainly something that

4   you cannot rule out?

5        A.    I cannot rule it out.

6        Q.    And certainly that would be

7   one reason to consider anticoagulation

8   medication for her?

9        A.    Well, I think that's his

10   logic, but I don't agree with it.

11        Q.    Well, setting aside whether

12   it's his logic, Doris Jones has got a

13   fractured filter in her pulmonary artery,

14   and I think you and I can leave here

15   today agreeing that's a bad thing

16   medically, fair?

17              MR. BROWN:   Object to the

18        form.

19              THE WITNESS:   Correct.

20   BY MR. O'CONNOR:

21        Q.    And certainly we can agree

22   that Doris Jones deserves and is entitled

23   to every chance she can to be safe from

24   that fragment, correct?

Do Not Disclose - Subject to Further Confidentiality Review

1    A.    Correct.

2    Q.    And certainly something that

3    if she were your patient, you would agree

4    and that if you're consulted with a

5    doctor from another discipline, you would

6    be open to any suggestion that doctor had

7    to protect Doris Jones and give her every

8    opportunity, every chance to survive from

9    this failure that's exposing her to harm?

10         MR. BROWN:   Object to the

11    form.

12         THE WITNESS:   I agree.

13    BY MR. O'CONNOR:

14    Q.    And Doris Jones is exposed

15    to harm every day that fragment is with

16    her, true?

17         MR. BROWN:   Object to the

18    form.

19         THE WITNESS:   A very small

20    amount.

21    BY MR. O'CONNOR:

22    Q.    But that can change at any

23    moment?

24         MR. BROWN:   Object to the

Do Not Disclose - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:   It can change.

3     BY MR. O'CONNOR:

4          Q.     You agree with that?

5          A.     Yes.

6          Q.     All the more reason you

7     believe that she should see her doctor

8     often?

9          A.     How often is a question.

10    What do you mean by often?  I think once

11    a year would be often enough.

12         Q.     Or more if her doctor or

13    another doctor thinks that's a good idea?

14                  MR. BROWN:  Object to the

15              form.

16                  THE WITNESS:  If her doctor

17              thinks he needs to see her more,

18              then I would have to agree with

19              that.

20    BY MR. O'CONNOR:

21         Q.     Can you envision a scenario

22    where that fractured filter caused her

23    symptoms in her chest?

24         A.     I can envision a scenario

Do Not Disclose - Subject to Further Confidentiality Review

1    what risk.

2    BY MR. O'CONNOR:

3        Q.    But anytime a patient

4    goes -- undergoes any type of surgery,

5    especially a surgery to a blood vessel,

6    as a vascular surgeon, that is risky?

7        A.    It has risks.

8        Q.    And certainly risks that you

9    really have to weigh when you have a

10   patient like Doris that's presenting with

11   this foreign body in such a critical part

12   of her anatomy, fair?

13       A.    Correct.

14       Q.    Okay.  Any other opinions in

15   your report on Doris Jones that we

16   haven't talked about?

17            You talk about ongoing

18   monitoring.  Do you agree it's a good

19   idea that she receives imaging just to

20   monitor to see if that fragment has

21   moved?

22       A.    Yes, I do.

23       Q.    So she should undergo CT

24   imaging?

Do Not Disclose - Subject to Further Confidentiality Review

1   A.   No.

2   Q.   What should she go?

3   A.   CT imaging is a very large

4   dose of radiation.   And people who have

5   that are accumulating unnecessary

6   radiation for something like this.   I

7   think a plain chest x-ray would be

8   adequate.

9   Q.   At least on a yearly basis?

10   A.   Yes.

11   Q.   And maybe more if necessary?

12   A.   If necessary.   But I think

13   not.

14   Q.   Because of her other medical

15   conditions, she is even placed at more

16   risk to undergo a surgery or an attempt

17   to remove this, correct?

18   A.   I'm not sure if it's because

19   of her other medical conditions or

20   because of the method of attachment in

21   the pulmonary artery.   I can't make that

22   decision.

23   Q.   Okay.   So the way it's

24   attached to the artery may be a reason

Do Not Disclose - Subject to Further Confidentiality Review

1   not to undergo the procedure?

2           A.     Right.   Also, you have to

3   traverse the heart chambers to do it.

4   And the fragment can get caught in the

5   heart chambers theoretically.   Once

6   again, I'm not an interventional

7   radiologist, so I don't want to give a

8   more detailed opinion on that.

9           Q.     And just so you and I are on

10  the same page here today, she's got a

11  foreign body in a very critical vessel,

12  and that alone exposes her to risks of

13  complication of risks of harm, correct?

14              MR. BROWN:   Object to the

15      form.

16              THE WITNESS:   Small risk.

17  BY MR. O'CONNOR:

18          Q.     But risk, albeit?

19          A.     Risk.

20          Q.     And risk that you agree

21  could change at any moment anytime?

22              MR. BROWN:   Object to the

23      form.

24              THE WITNESS:   Yes.