1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC |
|---|---|
| | **EXHIBIT INDEX** |
| | **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF REBECCA BETENSKY, PH.D.** |

Exhibit 1    Betensky Report 1-27-2017 (**FILED UNDER SEAL**)

Exhibit 2    Betensky DFMEA Supplement 3-3-2017 (**FILED UNDER SEAL**)

Exhibit 3    BPVE-01-01019821

Exhibit 4    BPVEFILTER-01-01824432 (**FILED UNDER SEAL**)

Exhibit 5    BPV-DEP-00004804 (**FILED UNDER SEAL**)

Exhibit 6    BPV-TRIAL-EXHIBIT-0293 (**FILED UNDER SEAL**)

Exhibit 7    Edwards Deposition 8-19-16 Excerpts

Exhibit 8    Ganser Deposition 10-11-16 Excerpts

Exhibit 9    Betensky Austin Deposition Excerpts

Exhibit 10   BPVE-01-01019773

Exhibit 11   Walcott Deposition 8-24-16 Excerpts

Exhibit 12   Williamson Deposition 9-7-16 Excerpts

Exhibit 13   Kessler Report 9-26-2016 (**FILED UNDER SEAL**)

Exhibit 14   Eisenberg Report (Barazza 2-10-2017) (**FILED UNDER SEAL**)

Exhibit 15   Hertz Report 2-3-2017 (**FILED UNDER SEAL**)

| | | |
|---|---|---|
| Exhibit 16 | Kessler Schedule 28 (**FILED UNDER SEAL**) | |
| Exhibit 17 | BPVE-01-00511127 (**FILED UNDER SEAL**) | |
| Exhibit 18 | BPVE-01-00268632 | |
| Exhibit 19 | BPVE-01-00509492 (**FILED UNDER SEAL**) | |
| Exhibit 20 | BPVEFILTER-01-00002447 | |
| Exhibit 21 | BPV-17-01-00101588 (**FILED UNDER SEAL**) | |
| Exhibit 22 | BPVE-01-00985047 | |
| Exhibit 23 | BPVE-01-00268921 | |
| Exhibit 24 | BPVE-01-00492576 | |
| Exhibit 25 | 2005 FDA Guidance | |
| Exhibit 26 | Thisted Dep 7-28-17 | |
| Exhibit 27 | Feigal Deposition 9-1-16 Excerpts | |
| Exhibit 28 | Shifrin Deposition 9-8-16 Excerpts (**FILED UNDER SEAL**) | |
| Exhibit 29 | Andreoli, *Comparison of Complication Rates* | |
| Exhibit 30 | Angel, *Systematic Review of Retrieval IVC Filters* | |
| Exhibit 31 | Betensky Rebuttal to Thisted (**FILED UNDER SEAL**) | |
| Exhibit 32 | DiBardino, *Analysis of the USDA Manufacturer* | |
| Exhibit 33 | William, *Failure Rate Analysis of Femoral Stems* | |
| Exhibit 34 | Thennukonda, *Adverse Events Associated With Ultrasonic Scalers* | |
| Exhibit 35 | Harth, *Major Complications Associated With Xenograft Biologic Mesh* | |
| Exhibit 36 | Delaney, *Major Complications Associated With Transcatheter Atrial Septal* | |
| Exhibit 37 | Binkert, *Technical Success and Safety of Retrieval of G2 Filter* | |
| Exhibit 38 | Hudson Giordano 12 SNF Trial | |
| Exhibit 39 | Tam, *Fracture and Distant Migration of Recovery Filter* | |
| Exhibit 40 | An, *Prevalence and Clinical Consequences of Fracture* | |
| Exhibit 41 | Deso, *Evidence-Based Evaluation of IVC Filter* | |

| | | |
|---|---|---|
| 1 | Exhibit 42 | Nicholson, *Prevalence of Fracture and Fragment Embolization* |
| 2 | Exhibit 43 | Hull, *Recover Filter: Evaluation and Management* |
| 3 | Exhibit 44 | BPV-17-01-00006797 (**FILED UNDER SEAL**) |
| 4 | Exhibit 45 | BPV-17-01-00034448 (**FILED UNDER SEAL**) |
| 5 | Exhibit 46 | BPVE-01-00410985 |
| 6 | Exhibit 47 | BPVE-01-00330122 |
| 7, 8 | Exhibit 48 | McMeeking Bard IVC Filter Design Evolution Assessment 2-3-2017 (FILED UNDER SEAL) |
| 9 | Exhibit 49 | Ritchie March 2, 2017 Report (**FILED UNDER SEAL**) |
| 10 | Exhibit 50 | McMeeking Rebuttal Report 5-11-17 (**FILED UNDER SEAL**) |
| 11 | Exhibit 51 | Pre-Trial Order |
| 12 | Exhibit 52 | BPVE-01-00435295 |
| 13 | Exhibit 53 | BPV-17-01-00188520 (**FILED UNDER SEAL**) |
| 14 | Exhibit 54 | BPVE-01-00002092 (**FILED UNDER SEAL**) |
| 15 | Exhibit 55 | BPVE-01-00408669 (**FILED UNDER SEAL**) |
| 16 | Exhibit 56 | Hoffman, *2014 The Weber Effect and US FDA* |
| 17 | Exhibit 57 | BPVE-01-01054793 (**FILED UNDER SEAL**) |
| 18 | Exhibit 58 | BPVE-01-01054793 (**FILED UNDER SEAL**) |
| 19 | Exhibit 59 | BPVE-01-01054793 (**FILED UNDER SEAL**) |
| 20 | Exhibit 60 | Eisenberg Depo 7-6-17 |

# EXHIBIT 1
## (Filed Under Seal)

# EXHIBIT 2
## (Filed Under Seal)

# EXHIBIT 3

# Health Hazard Evaluation

**DATE:**   December 17, 2004

**TO:**   Doug Uelmen, BPV QA

**FROM:**   David Ciavarella, M.D.

**RE:**   Recovery® Filter – Consultant's report

**Summary:** Seventy-six reports of potentially serious hazards have been reported; 32 of these were judged to be serious, and 10 reports were associated with patient death. Total Recovery filter sales during this reporting period (through December 13, 2004) are 20,827 units. Reporting rates of death and other potentially serious complications for the Recovery filter remain below those reported in the literature. However, literature data are not directly comparable to these reporting rates. An analysis of reporting rates of serious adverse events for all inferior vena cava filters, as determined by analysis of the MAUDE and IMS databases by a consultant, revealed that reporting rates for Recovery are significantly higher than other filters. However, these databases are subject to known, significant biases that make calculation or comparison of incidence rates among products unreliable and inadvisable (according to experts and the FDA). Nevertheless, the number of reported complaints, and the size of the differences between Recovery and other filters, warrant further investigation.

**Conclusion:** The Frequency category for serious injury (Critical Severity rating) is Occasional (32/20,827, or 0.153%). The Frequency category for non-serious injury (Marginal Severity rating) is Occasional (44/20,827, or 0.21%).

**Description of the Problem:** Based on awareness of reports of patient death associated with migration of the Recovery inferior vena cava (IVC) filter, Bard requested an independent study of the risks and benefits of the Recovery filter, with an emphasis on its use in bariatric surgery and trauma patients. A consultant was retained for this purpose. The consultant's assignment had three components: 1) Perform a literature review of the risks and benefits of IVC filters, with an emphasis on bariatric surgery and trauma patients; 2) Review internal complaint files for the Recovery filter, and compare its reported adverse events rates to those of competitors' IVC filter by use of the MAUDE and IMS (sales) databases or other means; & 3) develop options for clinical studies that might provide information required to assess the risks and benefits of use of the Recovery filter.

The consultant made the following points:

1) The existing literature is of poor quality, with insufficient randomized, controlled trials (RCT) to definitively establish the effectiveness of IVC filters. However, widespread consensus exists in the medical community, obtained via clinical studies of lower credibility than the RCT (such as case reports, case series and prospective non-randomized studies of small size) and expert opinion, that IVC filters lower the likelihood of death from pulmonary embolism in patient groups thought to be at highest risk of this manifestation of venous thromboembolic disease. These high risk groups include patients who have already had a pulmonary embolus or in whom standard anticoagulation therapy cannot be given. However, the existing literature contains comparatively little information on a new generation of IVC filters, especially those with a removability feature (Recovery, Cook Tulip™ and Cordis OptEase™).

Proper product comparisons can be only be drawn from clinical studies where patient populations are carefully defined, comparisons are made under controlled circumstances from equivalent pa-

LMD1

BPVE-01-01019821

tient groups, and adverse events are prospectively defined and sought for in an effective manner. Such studies do not exist for the Recovery filter or its competitors. Therefore, the consultant judged that the literature is an inadequate source of reliable information upon which to make a risk/benefit assessment for the Recovery filter, either alone or in comparison to other IVC filters.

2) The consultant's analysis of the reports to Bard of adverse events associated with Recovery, along with competitors' information available via the MAUDE and IMS databases, showed the following:

    a. Reports of death, filter migration (movement), IVC perforation, and filter fracture associated with Recovery filter were seen in the MAUDE database at reporting rates that were 4.6, 4.4, 4.1, and 5.3 higher, respectively, than reporting rates for all other filters. These differences were all statistically significant. Recovery's reporting rates for all adverse events, filter fracture, filter migration, and filter migration deaths were found to be significantly higher than those for other removable filters. The TrapEase filter was found to have a statistically significant increased reporting rate for IVC thrombosis when compared to reporting rates for other filters.

    b. These reported adverse event rates were analyzed in conjunction with a bench test performed at BPV. This test measured "migration resistance" in a simulated IVC. Recovery filter had the lowest mean migration resistance (50 mm Hg), just below that of the removable Tulip filter (55 mm Hg). Linear regression analysis showed a significant inverse correlation ($R^2$ values of 0.40 to 0.65) of reported migration rates to the migration resistance values in the bench test.

    c. An analysis of the quality and validity of this analytical approach (use of MAUDE and IMS databases to generate comparative event rates), however, was performed as well. Many references were found that discussed the inadvisability of using MAUDE data for this purpose. Reported event data are seriously flawed, due to underreporting, various acknowledged forms of bias (such as the known propensity for more reports of adverse events in newer products), and confounding effects (such as lack of comparability in patient groups). The FDA has stated that such an approach is "…problematic, if not completely biased" [1] and "Accumulated reports cannot be used to calculate incidence or to estimate drug risk. Comparisons between drugs cannot be made from these data.". [2] Similar biases were discussed for use of the IMS sales data, in particular, the known lag period that exists between data collection and data publication, leading to large biases in data for products that are new or where indications are in evolution. Thus, actual incidence rates cannot be determined by this approach; these data are better interpreted as providing a signal for further investigation.

    d. A risk/benefit assessment has not been done, because the potential unique benefits of the Recovery filter (e.g., in certain patient groups) have not been evaluated as part of the consultant's report.

3) Little formal analysis has been completed with respect to potential clinical trials to obtain more definitive risk/benefit information. A randomized, controlled trial is the gold standard for determining risks and benefits; however, such a study is likely to require many subjects and therefore be difficult or impossible to execute. The consultant stated that a survey of physicians regarding their use of IVC filters and/or an analysis of data from a large payor or provider organization might be alternative approaches that might provide useful information in a shorter timeframe.

*Page 2*

LMD1

BPVE-01-01019822

In addition to the consultant's report, a case-by-case analysis of all reported Recovery complaints as of December 13, 2004 related to filter migration, filter fracture, IVC thrombosis, IVC perforation and recurrent pulmonary embolus was performed.

**The Actual Occurrence of Injuries:** Serious injury is defined here as reported death, or necessity for a surgical intervention to prevent death or serious injury. Reported recurrent pulmonary embolus or IVC thrombosis despite the presence of the filter were also classified as serious injury. In addition, migration of a filter or filter fragments to the heart or lung, or the presence of a filter fragment outside the vasculature, were classified as serious injury, since there is a possibility that serious injury could develop in the future.

With these criteria, there were a total of 32 reported serious injuries, a reporting rate of 0.153%. Details of these reports are given below.

**Human Exposure to the Problem:** About 20,827 Recovery filters have been distributed as of December 13, 2004.

**General Consequences:** The consequences of reported adverse events associated with the Recovery IVC filter depend upon the kind of event. Filter migration to the heart, especially when the filter is encased in thrombus, has been associated with sudden death. In some cases, filter migration is associated with trapping of clot before it reaches the heart, and it continues to perform its primary function despite the migration. Filter fracture may be asymptomatic, but has been associated with fragment embolization to the heart causing syncope and/or arrhythmias. IVC perforation is also generally asymptomatic, but it can lead to serious bleeding and, if occurring in conjunction with filter limb fracture, may be associated with fragment migration outside the IVC to nearby organs.

**Population Exposed to the Risk:** All patients in whom a Recovery filter is placed are potentially at risk for filter-associated adverse events.

**Mitigating/Predisposing Factors in the Population at Risk:** Unknown.

**Nature & Seriousness of the Risk:** The nature of the injury is generally related to the cardiovascular system, such as pulmonary embolus, myocardial or pericardial puncture or damage, or bleeding. There was one case of renal vein thrombosis requiring dialysis, listed as a serious event because the filter migrated above the renal veins, thus potentially allowing clot in the lower IVC to propagate to the renal veins. However, it is also possible that renal vein thrombosis developed because of the underlying disease and was unrelated to the filter migration. There was one case of reported IVC thrombosis in a patient in whom recurrent pulmonary embolus was also reported. No further information about this case is available at this time.

The seriousness of the risk ranged from reports of patient death to no effects. There were 10 reports of death. One death was reported in association with recurrent PE, while the other 9 were associated with filter migration. Six (6) of these migration-associated deaths were migrations to the heart of a thrombus-encased filter. In a seventh case, only a small amount of clot was attached to the filter, but large clots were present in the pulmonary arteries. In one case, it was not known whether the filter contained clot, and in the remaining 2 cases, physicians judged the deaths to be unrelated to the filter. In the first of these 2 cases, the filter, without adherent clot, flowed out of the ventricle at autopsy. A chest X-ray taken during CPR and just prior to death did not reveal the filter in the heart, and migration to the heart may have occurred due to CPR or post mortem. In the second case, a CT scan performed minutes prior to death revealed migration to the upper IVC. In this case, an autopsy was not performed, and the physician stated that death was not related to the filter.

*Page 3*

BPVE-01-01019823

**Likelihood of Occurrence of the Problem:** The number, severity classification and type of complication (hazard) reported for the Recovery filter are summarized in Table I.

Table I. Reporting Rates for Adverse Events Associated with the Recovery Filter

| Hazard type | Total | Reporting Rate | Serious Injury(as above) | Reporting Rate |
|---|---|---|---|---|
| Death | 10(8*) | 0.048%(0.038%*) | 10(8*) | 0.048% (0.038%*) |
| Migration | 25 | 0.12% | 16 (14*) | 0.077% (0.067%*) |
| Fractures | 33 | 0.158% | 12 | 0.058% |
| Perforation | 15 | 0.072% | 1 | 0.005% |
| P. embolus | 3 | 0.014% | 3 | 0.014% |
| [IVC Thrombosis | 1** | 0.005% | 1 | 0.005%] |
| Total | 76** | 0.365% | 32 (30) | 0.153% (0.149%) |

\* Number and rates if the 2 migration-associated deaths that were judged not related to the filter are excluded.
\*\* Recurrent pulmonary embolism was also reported in this case; therefore, the total number of patients/reports is listed as 76 and not 77.

A summary of reported rates for these filter-related complications in the literature is provided in Table II..[3] These rates refer to the use of permanent, non-removable filters.

Table II.  Reported Rates of IVC Filter Complications Provided by Literature Review.
**Threshold levels are quality improvement guidelines published by the Society of Interventional Radiologists. Reference: Grassi CJ, Swan TL, Cardella JF et al: Quality improvement guidelines for percutaneous permanent inferior vena cava filter placement for the prevention of pulmonary embolism. J Vasc Interv Radiol 2003;14:S271-S275.**

| Hazard type | Reported rates | | Threshold (for review) |
|---|---|---|---|
| Death | 0.12% | | < 1% |
| Filter Embolization* | 2-5% | 2% | |
| Fractures | 2-10% | | Not listed |
| Perforation | 0-41% | | Not listed |
| P. embolus | 0.5-0.6% | | 5% |
| IVC Occlusion** | 2-30 | | 10% |

\* This is equivalent to Migration in the Table above listing Recovery reporting rates
\*\* This is equivalent to IVC Thrombosis in the Table above

**Likelihood of Harm if the Problem Occurs:**  See above for the reporting rates of serious injury, defined as described in **The Actual Occurrence of Injuries.**

**Is the Product Essential to Health:** Yes, in selected patient groups. As mentioned above, a general consensus exists for the utility of IVC filters in high risk patient groups despite the lack of definitive RCTs.

*Page 4*

BPVE-01-01019824

**Is there an Alternative Available**:  Yes. Alternative permanent and removable IVC filters exist. However, the Recovery filter is unique in the length of the implant period. The Recovery implant period is not limited in the Recovery instructions for use (IFU), and can be utilized as a permanent filter. The clinical experience for the other removable filters, as discussed in the product IFUs, reports short implant periods (mean implant period about 2-3 weeks) before filter removal must be undertaken.

**Must the Problem Device be Removed or Corrected Surgically**:  Yes, in some cases.

**Is the Problem Expected & Within an Acceptable Statistical Range**: From the analysis of the MAUDE and IMS databases, Recovery reporting rates are significantly higher than those of other filters. In conjunction with these data, there appears to be a significant correlation, although $R^2$ values are only in the 0.5 range, of the migration reporting rates with the simulated migration resistance bench test. However, the flaws in the data collection methodologies makes calculation and comparison of actual incidence rates impossible from these data, and no definitive conclusions as to relative performance can be made. Adverse events rates reported in the literature are well above these reporting rates. But, as discussed above, direct comparisons of reporting rates to literature-derived rates are not possible because mostly permanent filters have been studied and the data have been collected using markedly different detection methods and patient populations.  However, further investigation of these reported adverse events is warranted because of the size of the differences in the reporting rates and the correlation with the bench test of migration resistance.

**Can the Problem be Corrected in the Field**:  No.

**Is the Problem or Health Hazard Obvious to the User**:  No.

**Can the Product Continue to be Used with Proper Warnings**:  One could consider providing summary information concerning the analysis of reporting rates to physicians in the context of the limitations of the data. Further work into the collection of survey data from surgeons or payors might be explored.

**Is the Device Used Only by Specially Trained Health Care Professionals**: Yes.

**References:**

[1]. Goldman SA. Limitations and strengths of spontaneous reports data. Clin Ther 1998; 20 Suppl C: C40-44.

[2]. Jones JK. Spontaneous reports cannot serve as a basis for comparison of two drugs. Am J Cardiol 2003;92:1141-1142.

[3]. Grassi CJ, Swan TL, Cardella JF, et al: Quality improvement guidelines for percutaneous permanent inferior vena cava filter placement for the prevention of pulmonary embolism. J Vasc Interv Radiol 2003;14:S271-S275.

*Page 5*

BPVE-01-01019825

# EXHIBIT 4
# (Filed Under Seal)

# EXHIBIT 5
# (Filed Under Seal)

# EXHIBIT 6
# (Filed Under Seal)

# EXHIBIT 7

Do Not Disclose - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ARIZONA

 3

 4   In Re: BARD IVC FILTERS      )

     PRODUCTS LIABILITY           )

 5   LITIGATION                   )   No.

                                  )   MD-15-02641-PHX-DGC

 6                                )

 7

 8                     - - - -

 9                  DO NOT DISCLOSE

10       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

11                     - - - -

12              VIDEOTAPED DEPOSITION OF

13                    MARY EDWARDS

14

15       Held at the Hilton Sonoma Wine Country

16   3555 Round Barn Boulevard, Santa Rosa, California

17          Friday, August 19, 2016, 8:58 a.m.

18                     - - - -

19

20

21

22

23

24   REPORTED BY:  ELAINA BULDA-JONES, CSR No. 11720

25
```

```
 1   BY MR. NATIONS:

 2       Q.   Okay.  Well, we just looked at the one

 3   from June 30th of 2004 --

 4       A.   Sure.  Let me go back there.

 5       Q.   -- from Dr. Ciavarella.  And he had

 6   reported 12, I believe, so this actually looks a

 7   little low.

 8       A.   And I think that's always one of the

 9   issues.  So I would trust the HHE versus somebody

10   combing through the MAUDE database.

11       Q.   Okay.  That's fine.  Let's go to the next

12   one so I can wrap this thing up.

13            MR. NATIONS:  This one.

14            MS. ESPITIA:  370.

15            (Whereupon, Exhibit 370 was marked for

16   identification.)

17   BY MR. NATIONS:

18       Q.   Okay.  This is a year later, after the

19   April -- almost exactly a year after the hold and

20   after the hold was lifted.  This is April 19th,

21   2005.

22            And by this time, we now have 34

23   migrations reported greater than two centimeters.

24   So the -- this is out of 27,466 units.

25            So the migrations, the filter migrations
```

# EXHIBIT 8

```
  1              IN THE UNITED STATES DISTRICT COURT

  2                 FOR THE DISTRICT OF ARIZONA

  3                          _ _ _

  4

                                      :

  5    IN RE: BARD IVC FILTERS      :No. MD-15-02641-PHX-DGC

       PRODUCTS LIABILITY LITIGATION :

  6                                   :

       -----------------------------

  7

  8

                             -  -  -

  9                    OCTOBER 11, 2016

                             -  -  -

 10

 11        DO NOT DISCLOSE - SUBJECT TO FURTHER

 12               CONFIDENTIALITY REVIEW

 13

 14           Videotaped deposition of CHRISTOPHER

 15        D. GANSER, held at HILTON SHORT HILLS,

 16        41 John F. Kennedy Parkway, Short Hills, New

 17        Jersey, commencing at 9:32 a.m., before

 18        Margaret M. Reihl, a Registered Professional

 19        Reporter, Certified Realtime Reporter, and

 20        Notary Public.

 21

 22

                   GOLKOW TECHNOLOGIES, INC.

 23        877.370.3377 ph | 917.591.5672  fax

                    deps@golkow.com

 24
```

1    filter and its competitive devices, true?

2            A.    We use a known numerator for our devices

3    and an estimated denominator based upon marketing data,

4    and I think it was -- is very crude and had

5    limitations.

6            Q.    But for purposes of Bard's comparisons

7    to its predicate device, the Simon Nitinol filter to

8    the Recovery filter to the G2 filter or any other

9    filter down the road in this iteration of retrievable

10   devices, Bard had actual sales data and actual reports

11   of those events, right?

12           A.    We had reports of the events for the

13   Bard recovery filters.

14           Q.    Didn't have to rely on MAUDE?

15           A.    We didn't have to rely on them.  That

16   was our data and we had sales data.

17           Q.    Didn't have to rely on IMS?

18           A.    We did not.

19           Q.    So a much more reliable comparative

20   analysis based on actual Bard data than if you were to

21   use IMS or MAUDE data; wouldn't you agree?

22           A.    For the purposes of Bard's data, yes.

23           Q.    And doing comparisons among its own

24   devices?

1      A.     Its own devices, but I don't know if we

2   had all of the data for the Simon Nitinol filter when

3   it was owned by Nitinol Technologies, I don't know how

4   much of that -- I think we only used the Simon Nitinol

5   data once Bard became responsible or started promoting

6   that filter.

7      Q.     Okay.  You know what, we've asked enough

8   questions about that.  I'm not going to ask you any

9   questions about this exhibit.  You can just put that

10  aside.

11            And before I leave this, I'll probably

12  come back to it later anyway, but I'm thinking about

13  it, sales reps were a general important source of

14  reporting complications with the Recovery, G2 and other

15  IVC filters to Bard, right?

16      A.     Yes.

17      Q.     And at least based on my review of the

18  documents, it seems like most of the reports came in

19  through sales reps.  Has that been -- was that your

20  experience?

21      A.     I think that typically sales reps were

22  the primary source of data.

23      Q.     So sales reps could be the vehicle to

24  bring information from the doctors to the company,

1    right?

2          A.    It could be.

3          Q.    And, of course, the company had the

4    sales reps out in the field to bring information to

5    doctors about its products, true?

6          A.    Yes.

7          Q.    And you asked me earlier how could Bard

8    or how could Bard have done this, in other words,

9    communicated, another way that Bard could have

10   communicated any of its own experiences -- strike that.

11          Another way that Bard could have

12   communicated the experiences of other doctors was to

13   use their sales force to do that, right?

14          A.    It could have.

15          Q.    In fact, they anticipated in some

16   instances that sales reps would be asked questions

17   about the Recovery and the G2 filters; do you remember

18   that?

19          A.    I believe there was.

20          Q.    And then the company -- and the company

21   actually had to anticipate those questions and then

22   provided the sales force with corporate approved

23   responses to each of those anticipated inquiries?

24          A.    I believe there was a sales force

# EXHIBIT 9



Deposition of:

# Rebecca Betensky , Ph.D.

*July 26, 2016*

In the Matter of:

# Clare-Austin vs. C.R. Bard

Tiffany Alley, A Veritext Company

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-ga@veritext.com  | 770.343.9696

Rebecca Betensky , Ph.D.                    July 26, 2016
Clare-Austin vs. C.R. Bard

Page 16

1    do the research on the MAUDE database.

2        Q.   When you say you did research, just

3    generally reading about what the MAUDE database is

4    and how it's built, basically?

5        A.   No, I was just using the term because you

6    had used it.  I was interpreting your -- maybe we

7    could restate that original question that used the

8    word "research."

9        Q.   Well, let me restate it.

10           Did you -- you never accessed the MAUDE

11   database yourself to extract data; correct?

12       A.   Correct.

13           MR. ROTMAN:  Clarification:  Do you mean

14   for this case?

15           MR. NORTH:  Yes.

16       Q.   So your opinions in this case are not based

17   in any way on MAUDE data that you've extracted from

18   the database yourself?

19       A.   I have not extracted the data myself.  I

20   trusted that the company's extractions of the data

21   were a good, reliable source.

22       Q.   Prior to your involvement in the In Re

23   Incretin case, had you ever been involved in the

24   FAERS database?

25           MR. MANKOFF:  Object to form.  You can

Rebecca Betensky , Ph.D.                July 26, 2016
Clare-Austin vs. C.R. Bard

Page 61

```
1        Q.   And the issues that you say entangle the

2    analysis are limitations on how far you can use that

3    data; correct?

4              MR. MANKOFF:  Object to form.

5        A.   They're potential limitations and they're

6    really considerations, and they could lead to

7    various types of overestimates or underestimates; it

8    can go either way.

9        Q.   And we don't know in this particular case

10   which way it goes, do we?

11             MR. MANKOFF:  Object to form.

12       Q.   For underreporting or overreporting?

13       A.   I'm sorry; what is your question?

14       Q.   You were talking about the limitations of

15   this qualifier, reporting relative risk, and you

16   said one thing is that we don't know whether it

17   underreports or overreports.

18             MR. MANKOFF:  Object to the form.

19       Q.   If I understand you.

20       A.   That's not what I said.

21       Q.   Tell me again.

22       A.   What I said was these potential

23   limitations -- and there's more than just reporting;

24   reporting is one of them that we use in the label --

25   can lead to overestimates or underestimates.
```

Rebecca Betensky , Ph.D.                    July 26, 2016
Clare-Austin vs. C.R. Bard

Page 66

1          A.  A statement about some truth, yes.

2          Q.  Are you aware of any publications in the

3     medical literature that try to calculate reported

4     relative risks as you've done here?

5               MR. MANKOFF:  Object to form.

6          A.  There are many, many papers that have done

7     this kind of analysis.

8          Q.  You have never worked for the FDA; correct?

9               MR. MANKOFF:  Object to form.

10         A.  That's correct.

11         Q.  Have you ever done any consulting on FDA

12    regulations or related issues?

13         A.  I was on a committee several years ago that

14    was I believe perhaps co-sponsored by the FDA that

15    was dealing with biomarker qualification.

16         Q.  What is biomarker qualification?

17         A.  It's a process by which a biomarker is,

18    quote-unquote, approved, but their language would be

19    qualified for use -- for use, yes.

20         Q.  Other than that, have you had any

21    involvement with the FDA?

22         A.  I was invited to give a talk at a

23    conference that they ran several years ago, which

24    ended up being cancelled due to bad weather, so I

25    didn't go, but I had accepted the invitation and I

Rebecca Betensky , Ph.D.                    July 26, 2016
Clare-Austin vs. C.R. Bard

Page 84

1      Q.  And just for the record, a sensitivity
2   analysis is a method you use in your area of science
3   to sort of test the reliability of some kinds of
4   calculation or comparison; correct?
5      A.  That's right.
6      Q.  So that was just sort of an adjunct or
7   another step in the comparisons we were talking
8   about earlier?
9      A.  Correct.  And it's just an additional set
10  of analyses.
11     Q.  Now, are there any other sorts of
12  comparisons or analyses you have performed for this
13  case that don't fall within the ambit of what we've
14  just been talking about?
15     A.  Yes.  I've also done an analysis of the --
16  I believe it's called the bench testing resistance
17  experiment, and did a comparison of those resistance
18  measures, looking at temperature and at one
19  diameter, comparing again Recovery to SNF.
20     Q.  Okay; we'll get back to that.
21          Anything else besides the comparisons
22  we've talked about and the various steps,
23  sensitivity analysis, et cetera, and the analysis of
24  the bench testing?  Anything else as a part of your
25  work in this particular case?

Rebecca Betensky , Ph.D.                           July 26, 2016
Clare-Austin vs. C.R. Bard

Page 89

1    model, meaning resistance may very well be affected

2    by temperature.  But it didn't -- it's not

3    differentially affected by which device is being

4    used.

5        Q.  So other than your assessment of

6    temperature and the ultimate conclusion that

7    Recovery was less migration-resistant than Simon

8    Nitinol, did you reach any other opinions in your

9    evaluation of that data?

10       A.  Well, just thinking about it in this larger

11   context, it provides external and -- some external

12   and -- what do I want to say? -- evidence or backup

13   to the findings that I had with the reporting risk

14   ratios.

15            So looking at migration as a clinical

16   adverse event, there certainly is a highly elevated

17   reporting risk ratio for Recovery versus SNF on

18   migration, and this bench testing experiment seems

19   to be consistent with that from a complete -- from a

20   mechanistic point of view.

21            So it provides a mechanism that would be

22   consistent and in support of the findings on the

23   reporting risk ratio.

24       Q.  Anything else of significance in your

25   analysis of that data from the testing?

Rebecca Betensky , Ph.D.                          July 26, 2016
Clare-Austin vs. C.R. Bard

Page 101

1           (Question read.)

2       A.  I don't have the documents to show what

3   Bard -- any steps that Bard took.  All I have are

4   the end results, which are, the results are what

5   they -- any steps that they would have taken, what

6   they would have been trying to target.

7              So all I see are the very end results,

8   and those don't -- it's not just that they're not

9   consistent over time; they're actually increasing

10  over time.  So those aren't supportive of any steps,

11  but it is correct that I have not seen the Bard

12  documents about remediation steps, regarding

13  reporting.

14      Q.  Okay; let's look two paragraphs down there.

15  The sentence begins, "While there are several

16  potential limitations with the available data

17  sources that must be considered."

18              What are these potential limitations?

19      A.  Okay; so I think we've talked about some of

20  them.  I put them on my list to remind myself to

21  make sure to discuss them.

22              So underreporting is a potential

23  limitation of any such database, whether it's the

24  FAERS database or the MAUDE database or a company

25  database.

Rebecca Betensky , Ph.D.                                July 26, 2016
Clare-Austin vs. C.R. Bard

Page 102

1        So then the question in evaluating any

2   of these is, well, what difference does it make?  So

3   with regard to underreporting, it really actually

4   makes no difference at all unless it's differential

5   underreporting.  So in other words, if one product

6   is underreported more than another product, that's

7   where there would be a problem.

8        But if every product is just -- if

9   adverse events for this patient population are just

10  uniformly underreported in some way and consistently

11  so across products, then that would not be a

12  limitation.

13      Q.  What are other limitations, potential

14  limitations?

15      A.  So another limitation are the data errors.

16  So I found several errors -- counting errors, Excel

17  errors, that kind of thing -- in the Bard data

18  sheets, and I've listed out some of them.  Some of

19  them are pretty considerable.

20      So there's, for example, on the

21  November -- on the data sheet that is cumulative

22  through November 2007, there was sort of a blatant

23  Excel error that counted Recovery migrations to be

24  zero, when in fact once that error in the Excel

25  calculation is corrected, there were 37 of them.  So

Rebecca Betensky , Ph.D.                          July 26, 2016
Clare-Austin vs. C.R. Bard

Page 103

1    there's several instances of that.

2              There's instances of counting the tilted

3    filters but not the filter tilts; so in other words,

4    misidentifying text fields and not including clearly

5    the same event, which was just flipped in the tilter

6    filt (sic) versus the tilted -- sorry; the filter

7    tilt versus the tilted filter.

8              So anyway, there are many of these data

9    errors, and in fact, they're -- in my review, and

10   like I said there are many instances of these, there

11   are more of them for Recovery than for SNF.

12             And I think the reason for this is that

13   there are just more listings, individual listings,

14   which leads whoever is putting the spreadsheet

15   together to use Excel formulas, and we all know that

16   you can easily go wrong with these Excel formulas.

17             And the other thing is that I would say

18   that in every instance that I found of one of these

19   errors, it was always an undercount, so the error

20   was always leading to an undercount of Recovery of

21   events, whether it was migration events or tilted

22   filters or filter embolization deaths.  So there

23   were always undercounts.

24             So that's another problem with the

25   database.

Rebecca Betensky , Ph.D.                          July 26, 2016
Clare-Austin vs. C.R. Bard

Page 104

1        Q.   Okay.   You've mentioned as potential

2   limitations underreporting and data errors.   What

3   other potential limitations are there with the data?

4        A.   So another limitation, actually, is that

5   the data sheets that I use and the data that I use

6   are all -- all begin in 2000 and are cumulative from

7   2000 on with regard to sales and to -- I'm sorry;

8   with regard to reports of adverse events.   And then

9   I use corresponding sales data to match those time

10   periods.

11            However, my understanding is that for

12   SNF, the counts of adverse events were not only from

13   individuals who had the SNF implanted after 2000,

14   they may have included people who had the filter

15   implanted prior to 2000, whereas the denominators

16   that I'm using just begin in 2000.

17            And so what I'm really doing is

18   overestimating the SNF reporting risk, which means

19   that I'm underestimating the reporting risk ratio,

20   which has SNF in the denominator.   So that's another

21   limitation having to do with sort of these start-

22   and-stop times.   So --

23        Q.   Let me clarify there.   It's your

24   understanding that the data included adverse event

25   reports from the 1990s but not sales numbers with

Rebecca Betensky , Ph.D.                    July 26, 2016
Clare-Austin vs. C.R. Bard

Page 105

1    regard to the SNF?

2        A.  I put together the sales data from a

3    separate document, separate from these individual

4    sheets that seemed to be the best information on

5    sales over time for all the products.  So I

6    calculated the sales starting in 2000.

7        Q.  Okay.  So we've had, you've listed as

8    potential limitations underreporting, data errors,

9    incomplete sales data.  What else?

10       A.  I'm sorry; I wouldn't -- I know you're just

11   abbreviating, but it's incomplete with respect to

12   the numerator.  So some of those numerator adverse

13   event counts were not included in the denominator,

14   were not from among the denominator.  So the

15   denominator should have been larger than it actually

16   was.

17            So another potential issue is that the

18   sales data don't translate, presumably, one to one

19   into implantation numbers.  So the sales data,

20   probably to some extent, overestimate the number of

21   patients implanted with these filters.

22            Now, again, like with the

23   underreporting, that's only a problem if those

24   numbers are differential between products.

25            So the one thing that I evaluated with

Rebecca Betensky , Ph.D.                                July 26, 2016
Clare-Austin vs. C.R. Bard

Page 106

1    respect to that is just looking at the sales data

2    over time across ten years of time for some

3    products, and less so for others because they were

4    removed from the market earlier.  The sales data

5    seems pretty constant month by month, which is the

6    granularity at which I have the data.

7              So I would imagine that these are

8    expensive devices and nobody wants too many of them

9    sitting on the shelf; and so over time, institutions

10   or physicians learn better how to estimate their

11   needs, and so that wouldn't be a very big problem.

12             So I did also address that through one

13   of my sensitivity analyses, and just assumed -- or

14   just considered what would happen if I discounted

15   the sales data by 20 percent and just assumed that

16   20 percent are sitting on the shelf and 80 percent

17   are implanted, and I obtained comparable results to

18   when I didn't do that discounting.

19        Q.   Other limitations?

20        A.   So another limitation is that these are

21   crude estimates of risk and reflect different times

22   of exposure to devices, partly due to when the SNF,

23   for example, was available prior to the start time

24   of 2000; also reflecting the permanent versus

25   retrievable issue.

Rebecca Betensky , Ph.D.                    July 26, 2016
Clare-Austin vs. C.R. Bard

Page 107

1        However, one way of thinking about

2    this -- so in my thinking through, as I did with

3    every one of these potential limitations, I

4    considered it as any person analyzing any data set

5    would do, and then think about, how does that impact

6    the analysis, and in what direction might it impact

7    the analysis?

8        So in thinking about this issue of

9    person time, I came to the conclusion that if we

10   think about the reporting risk ratio as potentially

11   an estimate -- we would really like to be adjusting

12   for exposure time or person time.  So that going

13   back to the beginning of today, we could really call

14   it a rate ratio instead of a risk ratio.

15       And so we can actually think of it as

16   approximating an incidence rate ratio, but with --

17   after we multiply it by a factor.  And that factor

18   that we need to multiply by is the ratio of person

19   time for the numerator product divided by the

20   denominator product.

21       And so what that means is that the

22   incidence rate ratio or the reporting incidence rate

23   ratio is really -- or let me put it this way:  The

24   reporting risk ratio is really going to be an

25   underestimate of the incidence rate ratio -- sorry;

Rebecca Betensky , Ph.D.                                     July 26, 2016
Clare-Austin vs. C.R. Bard

Page 108

1     maybe I didn't say the words right.   Let me back up.

2                The reporting risk ratio would be an

3     underestimate of the reporting incidence rate ratio

4     if they believe that more person time is available

5     for the permanent SNF product than for the

6     potentially retrievable Recovery product.

7        Q.   And conversely --

8                MR. ROTMAN:   Excuse me; can I just have

9     the last one sentence of the answer reread?   I

10    missed part of it.

11                (Last part of answer read.)

12       Q.   And conversely, if there were less person

13    time with the SNF because the device was more

14    customarily implanted in older people than the

15    retrievable devices, that could skew the analysis

16    the other way; correct?

17                MR. MANKOFF:   Object to form.

18       A.   So let me just make sure I understand.

19                So your point is that if it's implanted

20    in older individuals who die?

21       Q.   Mm-hmm.

22       A.   And so they have less person time?

23       Q.   Mm-hmm.

24       A.   If that's a substantial difference between

25    the products, then it could.

Rebecca Betensky , Ph.D.                    July 26, 2016
Clare-Austin vs. C.R. Bard

Page 109

1     Q.  Have you spoken with any of the other

2     experts in this case?

3          A.  I'm sorry; would you like me to continue

4     with my list?

5          Q.  Oh, yes, I'm sorry; more potential

6     limitations.

7          A.  Let's see.

8               So the other potential limitations to

9     consider in any of these types of analyses would be

10    any kind of confounding due to patient-level

11    characteristics, and I was unable to address those

12    head-on because patient-level characteristics are

13    not part of the data sheets or the data reports from

14    Bard.  So that is always an issue in every single

15    analysis.

16               Again, it would seem -- and that could

17    go in different directions.

18               It would seem that typically that has --

19    across, over many, many different kinds of these

20    analyses across such observational databases, it

21    tends to have a small, could make a small

22    difference.  So with reporting risk ratios of 100 or

23    200 or 40, I feel pretty confident in believing that

24    it's not going to put them below 1.  It may move

25    them a little bit, even if there is confounding, and

Case 2:15-md-02641-DGC   Document 7809-1   Filed 09/27/17   Page 39 of 189

Rebecca Betensky , Ph.D.
Clare-Austin vs. C.R. Bard
July 26, 2016

Page 110

1    I don't even know that there is; it's just something

2    that any statistician should think about.

3        Q.  So we just don't know whether there are

4    confounding factors like you're discussing now one

5    way or the other, do we?

6              MR. MANKOFF:  Object to form.

7        A.  I don't know if there are.

8        Q.  Other limitations?

9        A.  So then within these spontaneous reporting,

10   as they're called, databases -- the FAERS or

11   MAUDE -- there's always a potential that there's

12   increased reporting when a product first launches or

13   that there's increased reporting surrounding some

14   kind of notoriety.

15             It doesn't seem to be the case here, and

16   especially since, my understanding is there's no FDA

17   warning that was published which in other cases is

18   really what is associated -- what has been seen to

19   be associated with notoriety, when the FDA comes out

20   with some kind of a warning letter or something like

21   that.

22       Q.  Doesn't attorney advertising for litigation

23   involving a product contribute to notoriety that may

24   influence these numbers?

25       A.  I don't know.  I don't know the extent to

Tiffany Alley, A Veritext Company

800.808.4958                                              770.343.9696

Rebecca Betensky , Ph.D.                         July 26, 2016
Clare-Austin vs. C.R. Bard

Page 111

1    which that would.

2         Q.   It's possible, though, isn't it?

3         A.   It's possible, depending on who sees those

4    ads.  It's possible.

5         Q.   Other limiting factors --

6         A.   Although I would say additionally that I

7    would think that that kind of advertising would also

8    just in general heighten awareness and so even if

9    the advertising is about, call us if you have a

10   Recovery device, as a vena cava filter, it may make

11   the person who had the SNF filter start to worry and

12   go see their physician and have -- it may increase

13   it across the board to that patient population.  So

14   it's hard to say.

15        Q.   Other limiting factors?

16        A.   I think we've covered most of them, and

17   many of the other ones I may not have mentioned

18   explicitly probably could be subsumed within some of

19   these as some form of data error, underreporting,

20   estimate of something else.  So I think this

21   comprehensively probably covers the issues; whether

22   I've used every term, maybe not.

23        Q.   Could I see your notes?

24        A.   Sure.

25        Q.   Could I mark this as an exhibit?

# EXHIBIT 10



# Recovery Filter Migration
## Remedial Action Plan
## SPA-04-12-01
## January 4, 2005

**Confidentiality Notice:** This message contains information that may be confidential and privileged. If you have received this in error, and are not the intended recipient, you may not use, copy or disclose to anyone the message or any information contained in the message.

1625 West 3rd Street • P. O. Box 1740 • Tempe, AZ 85280-1740
Tel: 1-800-321-4254 • 1-480-894-9515 • Fax: 1-480-966-7062 • www.bardpv.com

BPVE-01-01019773



# Recovery Filter Migration
# Remedial Action Plan
# SPA-04-12-01
## January 4, 2005

## Table of Contents

I. Remedial Action Plan SPA-04-12-01

II. Lehmann Report

III. Health Hazard Evaluation, Dr. David Ciavarella

**Confidentiality Notice:** This message contains information that may be confidential and privileged. If you have received this in error, and are not the intended recipient, you may not use, copy or disclose to anyone the message or any information contained in the message.

1625 West 3rd Street • P. O. Box 1740 • Tempe, AZ 85280-1740
Tel: 1-800-321-4254 • 1-480-894-9515 • Fax: 1-480-966-7062 • www.bardpv.com

BPVE-01-01019774



To:        Doug Uelmen

From:      Peter Palermo

Date:      January 6, 2005

Subject:   Remedial Action Plan:  BPV RNF Filter Investigation

---

The above action plan was reviewed by the Corporate PAT on:

        **Date Reviewed:**       **December 28, 2004**

        **Corporate PAT Reviewers:**

| | |
|---|---|
| Corporate Law: | D. Passero |
| Corporate RA: | B. Barry |
| Corporate CA: | D. Ciavarella, M.D. |
| Corporate Ops: | J. Cherry |
| Corporate QA: | P. Palermo |

**Corporate PAT Recommendations:**

Concur with Division PAT recommendations;
Corporate PAT will continue to monitor the progress of the Division PAT
recommendations through periodic meetings.

**Corporate PAT Recommendations were presented to Vice President, Regulatory
Sciences:**

        **Presented By:**        **P.Palermo**
        **Date Presented:**      **January 6, 2005**

**Decision of the Vice President, Regulatory Sciences:**
        Concurs with recommended Action

*Peter Palermo*
Peter Palermo
Vice President, Quality Systems

Cc:   C. Ganser
     J. Weiland
     J. McDermott
     Corporate PAT

BPVE-01-01019775



**Division Product Assessment Team**
**Bard Peripheral Vascular, Inc.**
**Remedial Action Plan**
**SPA-04-12-01**

L. DeCant

_____   _____
V.P. R&D                              1/6/2005
                                              Date

M. Edwards

_____   _____
V.P. R.A. / C.A.                    1/6/2004  1/6/2005
                                              Date

J. McDermott

_____   _____
President                            1/6/05
                                              Date

K. Shifrin

_____   _____
V.P. Marketing                     1/6/05      Jan/06/2005
                                              Date

D. Uelmen

_____   _____
V.P. QA                               1/6/05
                                              Date

**Confidentiality Notice:** This message contains information that may be confidential and privileged. If you have received this in error, and are not the intended recipient, you may not use, copy or disclose to anyone the message or any information contained in the message.

1625 West 3rd Street • P. O. Box 1740 • Tempe, AZ 85280-1740
Tel: 1-800-321-4254 • 1-480-894-9515 • Fax: 1-480-966-7062 • www.bardpv.com



**PERIPHERAL**
**VASCULAR**

Remedial Action Plan
Bard Peripheral Vascular, Inc.
SPA-04-12-01
January 4, 2005

I.   Product Description and Intended Use

A.   The Recovery Filter (RNF) consists of twelve shape-memory nitinol wires emanating from the central nitinol sleeve.  These twelve wires form two levels of filtration.  The legs provide a lower level of filtration and fixation to the caval wall.  The arms provide the upper level of filtration and help center the filter in the vessel.  The RNF is intended to be used in vena cava circular diameters up to 28 mm.

B.   The Recovery Filter Delivery System consists of a 7 French I.D. introducer sheath and dilator, the Recovery Filter, a delivery storage tube with saline infusion port, and a pusher system.  The RNF is packaged pre-loaded within the delivery storage tube.

C.   The RNF is a blood clot trapping device designed to prevent pulmonary embolism by mechanical filtration.  The filter is implanted in the inferior vena cava (IVC).  The RNF has the additional feature of being able to be percutaneously removed after implantation.  The RNF is indicated as a permanent filter or implanted temporarily to treat the temporary risk of pulmonary embolism.  The RNF has the following indications for placement:

1.   Pulmonary thromboembolism when anticoagulants are contraindicated.
2.   Failure of anticoagulant therapy in thromboembolic disease.
3.   Emergency treatment following massive pulmonary embolism where the anticipated benefits of conventional therapy are reduced.
4.   Chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated.

II.   Manufacturer / Distributor

A.   The product is manufactured by the Bard Glens Falls Operation, Queensbury, NY and distributed by BPV through the Bard Distribution Center, Covington, GA.

III.   Identification of the Problem

A.   As part of the ongoing evaluation of RNF, Bard requested an independent study of the risks and benefits of the RNF, with an

**Confidentiality Notice: This document contains information that is confidential and privileged.  If you have received this in error, and are not the intended recipient, you may not use, copy or disclose to anyone all of the information contained in this document.**
1625 West 3rd Street • P. O. Box 1740 • Tempe, AZ 85280-1740
Tel: 1-800-321-4254 • 1-480-894-9515 • Fax: 1-480-966-7062 • www.bardpv.com

LMD1

BPVE-01-01019777



emphasis on its use in bariatric surgery and trauma patients. A consultant was retained for this purpose and reported the following:

1. The MAUDE database maintained by FDA was reviewed. The reporting rates between the RNF and aggregates of the other commercialized vena cava filters were compared.
   a. In the MAUDE dataset, the RNF demonstrated "a consistent, statistically significant and potentially clinically important higher rate of reporting of adverse events in several analyzed categories." Of greatest concern were reports for migration and fracture (Ref. Lehmann Report, p. 3 & 18/21).
   b. "Given the pattern of reported events, a higher rate of death reports seem related to filter movement and filter embolization..." (Ref. Lehmann Report, p.18/21).
   c. The above information is to be substantially tempered in light of the poor quality and validity of the data available, and that it analyzes reporting behavior as much as actual adverse events. (Ref. Lehmann Report, p.18/21).
   d. Other commercially available filters also have significantly higher reporting rates into MAUDE when compared with other vena cava filters for 1) thrombosis, 2) filter embolization, as well as higher *proportional* reporting rates for 1) death, 2) filter movement and embolization, and 3) caval perforation (Ref. Lehmann Report, p.18/21).
   e. Benefits of a VCF were not considered, "given the absence of any quantitative information, but must be considered in the evaluation of performance even if not quantifiable" (Ref. Lehmann Report, p.18/21).
   f. The differential reporting rates are large enough and consistent enough to constitute a signal for further evaluation for ALL VCFs (Ref. Lehmann Report, p.18/21).

2. The consultant also reviewed simulated migration resistance testing done by BPV. This test measured "migration resistance" in a simulated IVC. The test was designed to measure filter migration in a simulated IVC at diameters within the indicated range ($\leq$ 28mm) and at diameters larger then indicated on the labeling ( > 28mm). The simulated test results concluded the RNF had the lowest mean migration resistance at larger simulated caval diameters (25-32mm). RNF with a mean pressure value of 50mmHg was closely followed by Gunther-Tulip at 55 mmHg.

3. Linear regression analysis showed a significant inverse correlation of reported migration rates to the migration

**Confidentiality Notice:** This document contains information that is confidential and privileged. If you have received this in error, and are not the intended recipient, you may not use, copy or disclose to anyone any of the information contained in this document.



resistance values in the bench test suggesting that  (Ref. Lehmann Report, p.21/21:

    a.  Bench testing may be predictive for clinical performance
    b.  The two independent datasets (MAUDE report rates and bench testing results) contain significant signals regarding vena cava filter performance related to migration.

B.  The independent consultant's report concluded that the data and his analysis provided two significant signals that further investigation particularly in relation to migration and fracture is urgently warranted. The consultant, however, also cautioned that "given the multiple known flaws in the data available, this analysis is insufficient to demonstrate conclusively that any of the vena cava filters analyzed present an excess risk.  Valid product performance assessment must also consider product benefit" (Ref. Lehmann Report, p. 3/21).

IV.   Medical Evaluation

    A.  See Health Hazard Evaluation report attached.

V.   Number of units and lots involved:

    A.  As of January 4, 2005, there have been approximately 21,953 RNFs distributed since the product was released in December 2002.

VI.   Distribution of Units

    A.  RNFs are distributed in the United States, United Kingdom, Canada, Australia, Italy and Benelux.

VII.   Investigation

    A.  The Division Product Assessment Team (PAT) was assigned to review the data discussed above on December 9, 2004. This team included the BPV VP of QA, the BPV VP of RA/CA, the BPV VP of R&D, the Director of R&D for Interventional Products, and the IVC Filter Marketing Manager.  In addition, two members of the RA staff were assigned to provide confirmation of the MAUDE database review.  The investigation team reviewed the consultant's document, along with internal complaint data, literature, bench testing results, and sales data to complete this investigation.

    B.  The Division PAT involved a review of all IVC Filter MDRs reported in the MAUDE database from Q1 2000 through Q3 2004.  The accuracy of the data was verified and discussed with the independent consultant.

**Confidentiality Notice:** This document contains information that is confidential and privileged.  If you have received this in error, and are not the intended recipient, you may not use, copy or disclose to anyone any of the information contained in this document.



C. The Division PAT concurred that the MAUDE database is difficult to use for comparison because of inherent inaccuracies. The signals regarding migration and fractures with RNF warrant an additional review of the currently available data to determine what actions could be taken to mitigate the identified adverse events (Ref. Lehmann Report, Appendix A, p. 10/11). The PAT did note the Proportional Reporting Rates show all IVCs currently on the market are associated with severe adverse events (Ref. Lehmann Report, p. 17/21). The PAT endeavors to identify the actions required to help mitigate the adverse events associated with the RNF. BPV Field Assurance and Design Assurance data revealed the following:

Migration

1. 5 of 9 (55%) migration related deaths were associated with the bariatric population.
2. 1 of 9 (11%) migration deaths was associated with trauma patients.
3. 3 of 9 (33%) migration deaths were associated with DVT patients contraindicated for anticoagulation.
4. 9 of 25 (36%) total migrations were associated with bariatric patients.

Bench Data

1. Complaint data shows migrations associated with massive clot burdens are thought to result in an increase in pressure in the IVC with a corresponding dilation of the IVC to above initially measured caval diameters.

2. Bench Testing was performed by the R&D Department of BPV to measure migration resistance per protocol TPR-04-02-02. The testing was performed primarily to determine if the RNF filter met the intended design acceptance criteria of 50mmHg. Secondarily, the results were compared to competitive products. Testing of the RNF filter and competitive product was performed at fixture diameters ranging from 15mm to 32mm in diameter.

   a. The testing clearly showed that all individual data points for the RNF exceed the BPV design requirement of 50mmHg. At simulation diameters larger than 28mm, the design requirement of 50mmHg was not met. The RNF is indicated for IVCs of 28mm or less.
   b. All filters tested show a progressive decrease in migration resistance with increased fixture diameters.

Confidentiality Notice: This document contains information that is confidential and privileged. If you have received this in error, and are not the intended recipient, you may not use, copy or disclose to anyone any of the information contained in this document.



c.  At fixture diameters of 15mm and 18mm it was not possible to dislodge many of the filter samples at pressures of 155mmHg which was the limitation of the test equipment. This was true for many of the VCF types including the RNF.

3.  In the independent consultant report (Ref. Lehmann Report, p. 21/21), a correlation was made between the bench testing performed at BPV and the MAUDE reporting rates for filter migration. Specifically the mean migration resistance results averaged over fixture diameters between 25 and 32 mm was compared to the MAUDE reported rates of migration.

a.  The known inaccuracies of MAUDE reporting make it very difficult to accept this correlation.
b.  The correlation was calculated only for results in diameters from 25 to 32 mm.  This may have been due to the limitations discussed in VII, 2c.  Consequently, the data is skewed in that it suggests that migration occurs only with larger caval diameters (defined 25-32mm).
c.  The correlation assumes a causal relationship between the bench test and MAUDE reported migration rates. This test only tested migration resistance to increased caval pressures. The varied filter designs could exhibit markedly different failure mechanisms that cause migration besides pressure. Some designs lend themselves to incomplete expansion upon deployment resulting in migration.

Fracture (See SPA-04-04-01)

1.  3 of 33 (9%) fracture related incidents were associated with the bariatric population.
2.  8 of 33 (24%) fractures were associated with trauma patients.
3.  2 of 33 (6%) fractures were associated with DVT patients contraindicated for anticoagulation.
4.  4 of 33 (12%) fractures were associated with pregnancy.
5.  4 of 33 (12%) fractures were associated with orthopedic patients.
6.  2 of 33 (6%) fractures were associated with PE.
7.  11 of 33 (33%) fractures were unknown.

D.  RNF Estimated Product Utilization.  A product utilization evaluation was conducted to better identify the percentage of RNFs used in the bariatric population.

**Confidentiality Notice:** This document contains information that is confidential and privileged.  If you have received this in error, and are not the intended recipient, you may not use, copy or disclose to anyone any of the information contained in this document.

Page 5 of 7



The sales force was queried in May-June 2004 regarding RNF utilization for their top users (N=50). The results are as follows:

1. 16% of total utilization is in bariatric surgery
2. 32% trauma
3. 13% oncology
4. 39% all others

The Division PAT analyzed the effect of either reducing or eliminating the bariatric patients as a sub-population would have on the overall complication rates.

RNF Migration / Death Rate

| Condition | Sales (units) | Total Migrations | Total Mig. / Deaths |
|---|---|---|---|
| All Recovery | 21,953 | 0.114% (25) | 0.041% (9) |
| w/o bariatric | 18,441* | 0.087% (16) | 0.022% (4) |

*estimate based on the informal query of the sales force (see VII.D. above).

E. The Division PAT determined the following based on the internal field assurance data from December 2002 to January 4, 2005.

    1. The bariatric patient population may be highest risk for IVC filter migration of the population presently receiving the RNF.
      a. 55% of the migration related deaths have been reported for the bariatric population.
      b. 36% of the overall migrations have been reported for the bariatric population.
    2. A causal relationship for migration and bariatric patients is unknown.
    3. No clear signal emerged for a specific patient population for fractures (See Health Hazard Evaluation, SPA-04-04-01).

VIII. Action Plan. The Divisional PAT proposes the following actions:

A. Bard will initiate a formal survey of current RNF users to identify filter utilization by patient population / physician user groups targeted for January 10, 2005. This survey will be coordinated by BPV Marketing with a targeted completion date of January 31, 2005.

B. Initiate a formal survey of specialists treating bariatric patients targeted for January 10, 2005. The survey will be conducted by an independent third-party (with known scientific/medical background). The protocol for the survey will be coordinated by the BPV PAT with input from: marketing, BPV RA/CA, Corporate RA/CA and an independent third-party.

Confidentiality Notice: This document contains information that is confidential and privileged. If you have received this in error, and are not the intended recipient, you may not use, copy or disclose to anyone any of the information contained in this document.

LMD1

BPVE-01-01019782

Bard Limited
Forest House, Tilgate Forest Business Park
Brighton Road, Crawley
West Sussex RH11 9BP
England, U.K.



To:        Shari Allen

From:      David Marshall

Date:      1ˢᵗ March 2005

Subject:   **Recovery Filter**

As European Authorised Representative for C. R. Bard Inc., I confirm that I have acted on
behalf of Bard Peripheral Vascular Division (BPV) with respect to the Recovery Filter as
follows:

I have received notification from BPV regarding changes to the product IFU, generated in
the light of worldwide clinical experience and reviewed and agreed by FDA. I understand
these changes to have been developed in part as a result of adverse incidents reported in the
USA market. Understanding that such adverse incidents, occurring outside the EU and
resulting in what might be considered to be a corrective action by the manufacturer, might
also be considered to require a Vigilance reporting obligation within the EU, I have
consulted with MHRA. The MHRA Product Specialist has reviewed and agreed the IFU
changes, understands the rationale for their development and has received and has reviewed
worldwide statistics for adverse incidents concerning this product. The MHRA are satisfied
with BPV's diligence with regard to these issues and has approved the process for informing
Doctors, which has been completed to the Agency's satisfaction.

In light of this comprehensive consultation process with the relevant European Competent
Authority I believe that we have adequately discharged any obligation to notify adverse
events occurring outside Europe for this product to date. I know that BPV will continue to
monitor whether any further such notification might be appropriate in future.

Yours sincerely

David Marshall
Director of Regulatory Affairs & Quality Assurance
Bard Europe

LMD1



The objective of the survey is to gather information about current usage of filters in bariatric patients, relative risk/benefit decisions for filter usage, and specifically removable filters. Completion of the survey is targeted for January 31, 2005.

C.  Convene an expert panel to understand treatment algorithms for bariatric patients and understand risk/benefit of RNF compared with other vena cava filters by January 25, 2005.  Migration risks will also be discussed to determine if additional warnings or precautions are appropriate, or if further action is required.

D.  BPV will convene the Division and Corporate PATs to formally review the results, conclusions, and the division's recommendations stemming from the initial consultant's reports, surveys conducted, and expert panel data targeted prior to February 1, 2005.  This information will be evaluated for discussion with the FDA once a final plan of action has been agreed upon by the Division and Corporate PATs.

E.  BPV will continue to closely monitor all adverse events including migration, fractures, perforations, and others as part of normal field assurance activities.

**Confidentiality Notice:**  This document contains information that is confidential and privileged. If you have received this in error, and are not the intended recipient, you may not use, copy or disclose to anyone any of the information contained in this document.

LMD1

BPVE-01-01019784

# EXHIBIT 11

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ARIZONA

 3

 4
        IN RE: BARD IVC FILTERS PRODUCTS    ) No.:

 5      LIABILITY LITIGATION,               ) MD-15-02641

        _____ ) -PHX-DGC

 6

 7

 8

 9

10

11          DO NOT DISCLOSE - SUBJECT TO FURTHER

                    CONFIDENTIALITY REVIEW

12

13

14

15

        VIDEOTAPED DEPOSITION OF CYNTHIA ANN WALCOTT

16

                        Phoenix, Arizona

17                      August 24, 2016

                          9:00 a.m.

18

19

20

21

22

23      REPORTED BY:

24      Robin L. B. Osterode, RPR, CSR

25      AZ Certified Reporter No. 50695
```

1    in the literature and the MAUDE database for

2    IVC filters."

3              Did I read that properly?

4        A.    Yes.

5        Q.    Can you describe the controls that were in

6    place in the complaint-handling department to ensure

7    that information was accurately reported to the FDA,

8    and therefore, the MAUDE database?

9        A.    We had huge numbers of approval processes.

10   I can go through those if you're interested.

11       Q.    "Huge numbers of approval processes."  What

12   does that mean?  What's an approval process?

13       A.    Meaning that anything that goes into

14   TrackWise is approved by several different people.

15       Q.    Okay.  For example, if a doctor calls and

16   reports a death associated with an IVC filter that he

17   or she used, that would be information that would be

18   input.  Correct?

19       A.    That is correct.

20       Q.    And how would that be verified?

21       A.    We would be calling the doctor.

22       Q.    Okay.  But internally how do you verify

23   that that information was actually input accurately?

24       A.    If you look at the complaint files, every

25   interaction that we have with a sales rep or any

1    customer is, in fact, put into TrackWise.

2        Q.    Okay.  But what are the controls in place

3    to make sure that the person who collects that

4    information in field assurance actually accurately

5    inputs it into TrackWise?

6        A.    That's how we go back and talk to the

7    customers to make sure that we have all of the

8    information involved with the complaint.

9        Q.    Okay.  But is there -- once someone in the

10   field assurance department at Bard --

11       A.    Yes.

12       Q.    -- enters something into the TrackWise

13   database --

14       A.    Yes.

15       Q.    -- is there anyone that comes behind them

16   to make sure what they entered is accurate,

17   regardless of the source and how they collected it?

18       A.    Again, we had the approval processes, so

19   everything that is entered into TrackWise, we open up

20   an investigation.  Often engineers will go back to

21   the customer also, to -- to assure that the

22   information is complete and accurate.  We have an

23   approval process of the MDR submissions, that's one

24   person, we have the approval process for the

25   investigation, which is another person.  And then we

 1    have management that approves everything in totality

 2    before a complaint file can be closed.

 3        Q.    Okay.  And do each one of those steps, do

 4    those individuals in -- in charge of those steps

 5    verifying information actually look at what is

 6    entered in the TrackWise database to make sure that

 7    it reflects what they verify?

 8        A.    Yes.  And I used to do it all the time, I

 9    can assure you.

10        Q.    Okay.  Tell me about that process.

11        A.    I was the person that would assure that --

12    I was often the -- the final approval of the

13    complaint file before it could be closed.  So

14    especially, from a clinical aspect, I would read

15    every line to assure that everything made sense and

16    to make sure that the submissions were complete,

17    accurate.

18        Q.    Okay.  And as you were doing that or

19    whomever was doing that, did they have the source

20    documentation with them to verify that what was

21    entered into the system, not only made sense, but it

22    reflected what was actually reported?

23        A.    What -- excuse me -- what's reported is

24    directly entered into the complaint file.  There's no

25    scraps of paper around, so to speak.

# EXHIBIT 12

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ARIZONA

 3

 4    IN RE: BARD IVC FILTERS PRODUCTS    )  MD No.:

 5    LIABILITY LITIGATION,               )  MD-15-02641-PHX-DGC

 6    _____)

 7

 8

 9

10          DO NOT DISCLOSE - SUBJECT TO FURTHER

11                  CONFIDENTIALITY REVIEW

12

13

14

15      VIDEOTAPED DEPOSITION OF STEVEN S. WILLIAMSON

16

17                      Phoenix, Arizona

18                     September 7, 2016

19                         9:00 a.m.

20

21

22

23    REPORTED BY:

24    Robin L. B. Osterode, RPR, CSR

25    AZ Certified Reporter No. 50695
```

1   complications; therefore, we chose to use

2   evidence-based methods to identify the highest

3   reported complication rates in the literature for

4   each filter."

5            Do you see that?

6       A.   I see that.

7       Q.   All right.  Is it, in fact, true that the

8   MAUDE database is based on voluntary reporting?

9       A.   Reporting to the FDA is not voluntary.

10  It's voluntary for the physician to report to us.

11      Q.   Right.  And is it understood that there's

12  gross underreporting of complications in the MAUDE

13  database?

14      A.   I think that people believe there is gross

15  underreporting in many instances.  I don't believe

16  that filters is necessarily the same.

17      Q.   You think the MAUDE database is consistent

18  with actual failure rates?

19      A.   I believe that they're pretty close.

20      Q.   So have you seen any data in your own

21  tracking or in the MAUDE database that has fracture

22  rates reported in the medical literature of 39 1/2

23  percent?

24      A.   I've not.  What medical literature?  Where

25  are you looking?

# EXHIBIT 13
## (Filed Under Seal)

# EXHIBIT 14
## (Filed Under Seal)

# EXHIBIT 15
# (Filed Under Seal)

# EXHIBIT 16
## (Filed Under Seal)

# EXHIBIT 17
# (Filed Under Seal)

# EXHIBIT 18

**From:**      Carr, Robert [/O=BARD/OU=TPE AG/CN=RECIPIENTS/CN=RCARR]
**Date:**      4/23/2004 4:36:19 PM
**To:**        Weiland, John [John.Weiland@crbard.com]
**CC:**        McDermott, John [John.McDermott@crbard.com], Uelmen, Doug
               [Doug.Uelmen@crbard.com], Edwards, Mary [Mary.Edwards@crbard.com],
               DeCant, Len [Len.DeCant@crbard.com], Shifrin, Kevin
               [Kevin.Shifrin@crbard.com], Ganser, Christopher [Christopher.Ganser@crbard
               .com], Hudnall, Janet [Janet.Hudnall@crbard.com], 'John Lehmann'
               [jlehmann@lehmannthomas.com]
**Attachments:** MAUDE 2004.XLS

---

John,

As promised here is the updated database.

I just wanted to point some things out to anticipate your questions.

The MAUDE events are from 01/00 through 03/04 for all competitors.

For SNF they are from 01/00 to current.

For Recovery they are from release to current.

The Sales data is sourced as follows;

IMS data from 01/00 through 12/03 for all competitors + a predicted Q1 2004 sales number (using linear regression).

For SNF and Recovery the data are actuals from 01/00 to present.

Please feel free to give me a call with any questions.

-Rob

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

# EXHIBIT 19
## (Filed Under Seal)

# EXHIBIT 20

**From:**       Schulz, Gin [/O=BARD/OU=TPE AG/CN=RECIPIENTS/CN=GSCHULZ]
**Date:**       12/19/2005 6:34:08 PM
**To:**         Shifrin, Kevin [Kevin.Shifrin@crbard.com], Hudnall, Janet
                [Janet.Hudnall@crbard.com]
**Subject:**    FW: Recovery Filter Limb Fractures
**Attachments:** RF Limb detch 1206051a.doc

---

Kevin and Janet,

Chris had asked Rich to pull together an addendum to the November 2004
R002. Cindi Walcott, Len, Shari and I spoke with Dr. Ciavarella Friday.
The overall reported rate of fractures is now estimated to be 0.3% (was
0.16%) and the reported rate of fractures judged to be serious (Critical
R002 rating) has gone from 0.046% to 0.13%(Critical/serious being
defined by Dr. Ciavarella last year as those involving migration to
heart or lungs or other critical organs).

Cindi mentioned that 3 of these 89 separate reports involved a single
filter in a single patient. The scenario could have been multiple
updates on the same case, e.g. a fracture was reported and then
re-reported after it migrated. This stuttering reporting may be an
aberration. Cindi is reviewing all 89 (now 90, see below) events to be
sure that the event rates are calculated based on number of filter (same
as number of patients probably) rather than number of fractures. That
what she is referring to below.

Since the frequency of Critical events was now in the R002 Occasional
range, we need to reassemble the BPV PAT to discuss the new information.
How can I get a good estimate of the number of RNFs still implanted?
That number is important to gauge residual risk. Also, do you have a
good estimate of the number of RNFs not implanted, but in inventory?

Thanks for your help.

Gin

---

From: Walcott, Cindi
Sent: Friday, December 16, 2005 3:24 PM
To: Ciavarella, David; Schulz, Gin; Allen, Shari; DeCant, Len
Subject: Recovery Filter Limb Fractures

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          BPVEFILTER-01-00002447

To All,

Attached is the data involving the Recovery Filter limb fractures as we discussed it during today's conference call.

Each of the 89 events will be further reviewed to determine how many patients were involved in these complaints.

Please note that while we were on the conference call, Field Assurance received a phone call with new information on one of the newer events that had not been classified on the attached report as a serious injury. The new information indicated that a filter arm had migrated to the heart, and perforated the heart and the pulmonary artery. This would change the number from 39 to 40 for reported serious injuries. The patient indicated he was pursuing litigation. Therefore, this e-mail and the attachment should be considered confidential information.

Cindi

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    BPVEFILTER-01-00002448

# EXHIBIT 21
## (Filed Under Seal)

# EXHIBIT 22



**MEMORANDUM**

TO:       Shari Allen, Len DeCant, Micky Graves, Janet Hudnall, Brian Hudson, Gin Schulz, Charlie Simpson

FROM:   Natalie Wong

DATE:    April 14, 2006

SUBJECT:  RNF Fracture and G2 Caudal Migration update with Brian Barry

**In attendance:** Shari Allen, Brian Barry, Len DeCant, Micky Graves, Brian Hudson, Gin Schulz, Charlie Simpson, Natalie Wong

**Discussion Held on:** April 13, 2006

**Discussion:**

RNF Data Review through 4/12/06.  See attached for presentation.
Comments:
- Fracture Summary slide
  - Clarify Clinical Trial is Canadian Trial with Dr. Asch
  - How many of the MDRs resulted in real adverse events and/or patient injuries?
    - What is predicted rate of patient injuries (e.g., How many open heart surgeries do we expect).
    - Identify worst case scenario from reported events.
- Recovery Complaint Trend slide
  - We need to follow-up on the Unknown (symptomatic vs. asymptomatic) complaints. Especially, those that occurred in the last two months.
- RNF compared to SNF – discussion on need to develop action limits and when to take action. We should reconsider previous decision to track number of complaints vs. rates.
- RNF compared to Competitors
  - Identify which are Retrievable filters and Permanent filters,
  - add clinical trial rates, and
  - identify how many are symptomatic or asymptomatic
- Recovery Fracture Analysis – What is the effect of limbs in patients over time?
- Recovery Implant population – add placement – suprarenal or infrarenal

Other Comments:
1. AE info – has not been put into context as to what has occurred and what is the effect on patient (consequence of fracture)
2. Stats:
   a. number of complaints alone is not sufficient, need overall rate to be more inline with FDA and BCR policy
   b. monthly rate – needs confidence interval, a/r, justification

| Deleted: S |
| Deleted: – |
| Deleted: clarify Clinical Trial is Canadian Trial with Dr. Asch |
| Formatted: Bullets and Numbering |
| Formatted: Bullets and Numbering |
| Deleted: , w |
| Deleted: e need to consider using rates and not just number of complaints |
| Deleted: Recovery Implant population – add placement – suprarenal or infrarenal |
| Deleted: Recovery Fracture Analysis – What is the effect of limbs in patients over time? |

LMD1

BPVE-01-00985047



     c.  given #1, and remains implanted, predict # of AE by type, i.e. Open heart surgery

3. Do not have rate
    a. What is the time related fatigue
    b. R&D test

4. Customer Letter
    a. No rate, no severity, no direction or guidance given in last letter
    b. Do recommend removal of filter after the risk passes
    c. Is a new letter needed?
    d. Monitor more frequently?

5. Analysis of asymptomatic fractures
    a. Why should we worry or don't worry
    b. What would make these fractures symptomatic over time
    c. What is the long term affect?

6. Possible Field action


<u>G2 Data Review through 3/31/06</u>
Comments:
- <u>Include breakdown of MDRs to actual injuries</u>
- <u>Compare Caudal rates to competitors and competitor history (e.g., How was the Greenfield caudal migration situation dealt with?)</u>    ◄----   | **Formatted:** Bullets and Numbering |
- Event Reporting Data – add column for G2
- Everest Retrieval Summary – update information on Binkert Retrieval
- Review Jugular event involving PE death.
- In addition, consider above RNF comments and apply to G2 caudal migration


<u>Review Draft Pre-PAT minutes from 4/7/06</u>
Comments:  none

LMD1

BPVE-01-00985048

# EXHIBIT 23

| | |
|---|---|
| **From:** | Hudnall, Janet [/O=BARD/OU=TPE AG/CN=RECIPIENTS/CN=JHUDNALL] |
| **Date:** | 7/15/2004 11:24:56 PM |
| **To:** | TPE-Interventional Sales-DG [/O=BARD/OU=MHL AG/cn=Recipients/cn=TPE-InterventionalSales-DG], Coutanche, Monica [/O=BARD/OU=MHL AG/cn=Recipients/cn=MCoutanche], Lawson, Matthew [/O=BARD/OU=SYD AG/cn=Recipients/cn=MLawson], Ruggiero, Roberto [/O=BARD/OU=ROM AG/cn=Recipients/cn=RRuggiero], Borremans, Frank [/O=BARD/OU=OLN AG/cn=Recipients/cn=FBorremans] |
| **CC:** | McDermott, John [John.McDermott@crbard.com], Shifrin, Kevin [Kevin.Shifrin@crbard.com], Edwards, Mary [/O=BARD/OU=TPE AG/CN=RECIPIENTS/CN=MEdwards], Uelmen, Doug [Doug.Uelmen@crbard.com], Carr, Robert [Robert.Carr@crbard.com], DeCant, Len [/O=BARD/OU=TPE AG/CN=RECIPIENTS/CN=LDeCant] |
| **Subject:** | Vena Cava Filter Complications Q&A |
| **Attachments:** | Vena Cava Filter Complications 3.doc |

All,

Attached is a document that details some frequently asked questions regarding Recovery complications. This document contains verbiage that has been corporate-reviewed and approved. Please do not deviate from this script and please do not distribute--this document is strictly for internal use only.

Please feel free to contact me with any questions/concerns.

Regards,
Janet

Confidentiality Notice: The information contained in this email message is privileged and confidential and intended only for the use of the individual or entity to whom it is addressed. If the reader of this message is not the intended recipient, please inform the sender and note that any dissemination, distribution, or copy of this message is strictly prohibited.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

**Vena Cava Filter Complications – FAQs**

Q: What is the migration rate for Recovery® Filter?

A: It is difficult to determine actual rates.  Acceptable statistical ranges cannot be reliably calculated from available data.  However, estimates based on MAUDE and sales data suggest that there is no significant difference in the rates of these complications between competitive devices, including the Recovery® Filter.

The following table shows the number of incidents reported to the MAUDE database for period beginning Q2, 2003 through Q2,2004:

| Complication Type | Recovery | Total for All Filters (includes Recovery) |
|---|---|---|
| Migration | 9 | 39 |
| Central Migration (Subset of Migration) | 7 | 23 |
| Caval Penetration | 1 | 2 |
| Caval Perforation | 0 | 12 |
| Caval Thrombosis | 0 | 10 |
| PE | 4 | 5 |
| Filter Fracture | 1 | 13 |
| Death | 5 | 16 |

*Reporting period: April 2003 - June 2004*

Q: What were the circumstances surrounding the deaths?

A: In all cases of migration-related deaths, the filter was reportedly placed appropriately; however, a massive thrombus burden overwhelmed the filter.  The diameter of the thrombus distended the vena cava to the point where its diameter exceeded the physical limits of the filter.

Q: Why did the new complaints not prompt a product hold?

A: The initial hold was an internal action.  The FDA was never involved in the decision to put the product on hold.  It was a conservative step that allowed us the time to determine if our overall complication rates were comparable to those reported in the literature and the MAUDE database for other IVC filters.

Every reported complication is treated with the utmost care and seriousness.  Although the new reported migrations are unfortunate, they still fall within our expected parameters.

**FOR INTERNAL USE ONLY**          **CONFIDENTIAL**          **DO NOT DISTRIBUTE**

Q: Why didn't you tell us about the complications before the MAUDE database update?

A: It is inappropriate to discuss reported complications prior to the completion of the investigation.  For each case reported, we conduct a thorough investigation according to our established, systematic process which can take a great deal of time and resources.

Q: Is Recovery® Filter a safe device?

A: The Recovery Filter was rigorously tested for all physical performance characteristics according to our established test methods and protocols and was found to meet all test specifications and requirements.

As stated previously, Recovery® Filter's overall complication rates are comparable to those reported in the literature and the MAUDE database for other IVC filters.

**FOR INTERNAL USE ONLY**         **CONFIDENTIAL**         **DO NOT DISTRIBUTE**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

# EXHIBIT 24

**From:**  Hudnall, Janet [/O=BARD/OU=TPE AG/CN=RECIPIENTS/CN=JHUDNALL]
**Date:**  7/6/2004 11:32:22 AM
**To:**  Cortelezzi, Bob [/O=BARD/OU=MHL AG/cn=Recipients/cn=BCortelezzi]
**CC:**  DeLeon, Robert [Robert.DeLeon@crbard.com], DeJohn, Joe [Joe.DeJohn@crbard.com], Carr, Robert [Robert.Carr@crbard.com], Shifrin, Kevin [Kevin.Shifrin@crbard.com]
**Subject:**  RE: Maude Website discussion
**Attachments:** Vena Cava Filter Complications FAQs.doc

---

Bob,
Thank you for distilling your concerns down to the points below. Your thoughts gave me a really good framework from which to compile the attached Frequently Asked Questions.

Everyone,
Please take a look and let me know what you think. If this covers everything, then this is the document that will go through Regulatory Approval. If we need to add to it, then we will send through the revised version.

I got a summary from Field Assurance and added the number of reports that were filed by us. We won't know how many are reported by users until the update actually happens....... it may not be as bad as we orginally thought.....

Regards,
Janet

-----Original Message-----
From: Cortelezzi, Bob
Sent: Monday, July 05, 2004 12:07 PM
To: Hudnall, Janet
Cc: DeLeon, Robert; DeJohn, Joe; Carr, Robert
Subject: Maude Website discussion


Janet,

I hope you are having a good weekend. I will be out this evening.

If you need to reach me tomorrow (Tuesday), I will be available until mid-day on my cell phone. I am going to Philadelphia for a few days to work with Hugh (during my visit, I am hoping to see Drs. Treratola, Bonn and Cohen). I will be available in the evening (Eastern Time) to further discuss the Maude website. To me, these are the key needs:

1) Explain the information to the TM's (especially the patient deaths)

Discuss the factors of the case(s) and the nature of the thrombus. Tie the patient death occurrences (number, not rate) to our competitors.

2) Explain to TM's and physicians why these migration/deaths did not require a product hold

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

The product hold we experienced in May was solely a Bard Peripheral Vascular decision. It was not related to the FDA in any way. We simply stepped back to confirm that our experience with the Recovery was similar to that of the overall filter market. It was a conservative step that we felt was worth taking. After our research, we confirmed that the experience with the Recovery was similar to that of the other filters in the market. There is a natural complication rate (extremely small) with vena cava filters. Although every complication is taken very seriously, these recent complications on the Maude website continue to fall within expected parameters.

3) Verify statistical insignificance of the overall complications. Confirm relevance to our competitors complications.

I know we are waiting on this. I believe the key is to mention that are number of occurrences are well within the expected norm of all filters.

4) Explain to the TM's, DM's and physicians why we did not mention the migration/deaths before the website was updated in July

We were investigating these cases throughout the quarter. We simply did not have enough information to comment on or share with the marketplace.

5) Address the physicians concerns of the product efficacy and safety

The Recovery filter has been tested to verify that it meets the migration resistance parameters that have been used for the Simon Nitinol filter. The Recovery is tested such a way that a totally occluded vena cava will generate less pressure than the force required to pull the filter into the Recovery sheath. We expect an extraordinary thrombus burden, as well as other factors (cava size, device manipulation, etc.) to contribute to a migration.

Just some random thoughts. Talk to you soon.

Bob

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

**Vena Cava Filter Complications – FAQs**

Q: What is the migration rate for Recovery?

A: It is very difficult to determine actual rates because it is impossible to know the exact number of filters implanted not only for Recovery, but for all commercially available filters.

   The only way to come close to comparing "apples to apples" is to review the number of reported incidents to the FDA MAUDE database

|  | Recovery* | Tulip | OptEase | TrapEase | Greenfield | VenaTech | Bird's Nest | SNF |
|---|---|---|---|---|---|---|---|---|
| Migration | 5 | 6 | 0 | 16 | 36 | 21 | 5 | 1 |
| Central Migration | 4 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| Caval Perforation | 1 | 4 | 0 | 11 | 6 | 0 | 7 | 5 |
| Caval Thrombosis | 0 | 0 | 1 | 51 | 0 | 0 | 0 | 0 |
| PE | 1 | 0 | 0 | 2 | 3 | 0 | 1 | 0 |
| Death | 3 | 3 | 2 | 19 | 12 | 5 | 2 | 0 |

*Recovery data includes all entries to MAUDE as of Q1, 04 plus Bard entries to MAUDE for Q2, 04
All other data as of Q1, 04 only

Q: What were the circumstances surrounding the deaths?

A: In all cases of death, the filter was reportedly placed appropriately; however, an extremely large thrombus burden overwhelmed the filter.  The diameter of the thrombus distended the vena cava to the point where its diameter exceeded the physical limits of the filter.

Q: Why did the new complaints not prompt a product hold?

A: The initial hold was an internal action.  The FDA was never involved in the decision to put the product on hold.  It was a conservative step that allowed us the time to determine internal allowable thresholds for complications.

   Every reported complication is treated with the utmost care and seriousness. Although the new reported complications are unfortunate, they still fall within our expected parameters.

Q: Why didn't you tell us about the complications before the MAUDE database update?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
BPVE-01-00492578

A:  It is inappropriate to discuss reported complications prior to the completion of the investigation.  For each case, we were conducting the investigation according to our established, systematic procedure throughout the quarter.

Q:  What is Recovery's overall complication rate?

A:  All filters carry some associated risk of major complications.  However, the rates are very small for all filters, <u>including Recovery</u>.  Presented below are some reported complication rates, along with published thresholds for these complications.

| Complication | Grassi[1] | Kinney[2] | Becker[3] | Threshold[4] |
|---|---|---|---|---|
| Death | ~ | 0.82% | 0.66% | <1 % |
| Recurrent PE | 0.5 – 6 % | 2 – 5 % | 2.50% | 5% |
| IVC Occlusion | 2 – 30 % | 6 – 30 % | | 10% |
| IVC Penetration | 0 – 41 % | 9 – 24 % | | ~ |
| Migration (>2 cm) | 0 – 18 % | 3 – 69 % | 2.20% | ~ |

Q:  Is Recovery a safe device?

A:  The Recovery Filter was rigorously tested for all physical performance characteristics according to our established test methods and protocols.  For all performance criteria, the Recovery performed as well as or better than the Simon Nitinol Filter, the predicate device.

As for migration resistance testing, we first determined the pressure gradient that can be expected in a completely occluded vena cava.  In our validation testing, we made sure that every Recovery Filter is able to withstand that much pressure prior to dislodging from its intended position.

---

[1] Grassi, CJ et al. Quality Improvement Guidelines for Percutaneous Permanent IVC Filter Placement for the Prevention of Pulmonary Embolism. JVIR 2003; 14:S271-S275

[2] Kinney, TB. Update on inferior vena cava filters. J Vasc Interv Radiol 2003; 14:425-440

[3] Becker, DM et al. Inferior vena cava filters: Indications, safety, effectiveness. Arch Intern Med 1992; 152:1985-1994

[4] Grassi, CJ et al. Quality Improvement Guidelines for Percutaneous Permanent IVC Filter Placement for the Prevention of Pulmonary Embolism. JVIR 2003; 14:S271-S275

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00492579

# EXHIBIT 25

# Guidance for Industry

## Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**March 2005**
**Clinical Medical**



EXHIBIT 4

D. Feigal, MD
Thurs. 09/01/16
KIM SCHROEDER, CSR

# Guidance for Industry
## Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment

*Additional copies are available from:*
*Office of Training and Communication*
*Division of Drug Information, HFD-240*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*5600 Fishers Lane*
*Rockville, MD 20857*
*(Tel) 301-827-4573*
*http://www.fda.gov/cder/guidance/index.htm*
*or*
*Office of Communication, Training, and*
*Manufacturers Assistance, HFM-40*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*1401 Rockville Pike, Rockville, MD 20852-1448*
*http://www.fda.gov/cber/guidelines.htm.*
*(Tel) Voice Information System at 800-835-4709 or 301-827-1800*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**
**March 2005**
**Clinical Medical**

*J:\IGUIDANC\6359OCC.doc*
*03/22/05*

*Contains Nonbinding Recommendations*

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................................1

II.  BACKGROUND ............................................................................................................1

    A.  PDUFA III's RISK MANAGEMENT GUIDANCE GOAL ..............................................2
    B.  OVERVIEW OF THE RISK MANAGEMENT GUIDANCES .............................................2

III.  THE ROLE OF PHARMACOVIGILANCE AND PHARMACOEPIDEMIOLOGY IN RISK
MANAGEMENT ..............................................................................................................3

IV.  IDENTIFYING AND DESCRIBING SAFETY SIGNALS:  FROM CASE REPORTS TO CASE
SERIES ............................................................................................................................4

    A.  GOOD REPORTING PRACTICE ..............................................................................4
    B.  CHARACTERISTICS OF A GOOD CASE REPORT .......................................................5
    C.  DEVELOPING A CASE SERIES ...............................................................................6
    D.  SUMMARY DESCRIPTIVE ANALYSIS OF A CASE SERIES .........................................7
    E.  USE OF DATA MINING TO IDENTIFY PRODUCT-EVENT COMBINATIONS ...................8
    F.  SAFETY SIGNALS THAT MAY WARRANT FURTHER INVESTIGATION ........................10
    G.  PUTTING THE SIGNAL INTO CONTEXT:  CALCULATING REPORTING RATES VS. INCIDENCE RATES ...............10

V.  BEYOND CASE REVIEW:  INVESTIGATING A SIGNAL THROUGH OBSERVATIONAL
STUDIES .........................................................................................................................12

    A.  PHARMACOEPIDEMIOLOGIC STUDIES ...................................................................12
    B.  REGISTRIES ........................................................................................................15
    C.  SURVEYS ............................................................................................................16

VI.  INTERPRETING SAFETY SIGNALS:  FROM SIGNAL TO POTENTIAL SAFETY RISK ..............17

VII.  BEYOND ROUTINE PHARMACOVIGILANCE:  DEVELOPING A PHARMACOVIGILANCE
PLAN ..............................................................................................................................18

*Contains Nonbinding Recommendations*

# Guidance for Industry[1]
# Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment

This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance. If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.

## I.   INTRODUCTION

This document provides guidance to industry on good pharmacovigilance practices and pharmacoepidemiologic assessment of observational data regarding drugs, including biological drug products (excluding blood and blood components).[2] Specifically, this document provides guidance on (1) safety signal identification, (2) pharmacoepidemiologic assessment and safety signal interpretation, and (3) pharmacovigilance plan development.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

## II.   BACKGROUND

---

[1] This guidance has been prepared by the PDUFA III Pharmacovigilance Working Group, which includes members from the Center for Drug Evaluation and Research (CDER) and the Center for Biologics Evaluation and Research (CBER) at the Food and Drug Administration.

[2] For ease of reference, this guidance uses the term *product* or *drug* to refer to all products (excluding blood and blood components) regulated by CDER and CBER. Similarly, for ease of reference, this guidance uses the term *approval* to refer to both drug approval and biologic licensure.

**Paperwork Reduction Act Public Burden Statement:** This guidance contains information collection provisions that are subject to review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3501-3520). The collection(s) of information in this guidance were approved under OMB Control No. 0910-0001 (until March 31, 2005) and 0910-0338 (until August 31, 2005).

*Contains Nonbinding Recommendations*

### A.     PDUFA III's Risk Management Guidance Goal

On June 12, 2002, Congress reauthorized, for the second time, the Prescription Drug User Fee Act (PDUFA III).  In the context of PDUFA III, FDA agreed to satisfy certain performance goals.  One of those goals was to produce guidance for industry on risk management activities for drug and biological products.  As an initial step towards satisfying that goal, FDA sought public comment on risk management.  Specifically, FDA issued three concept papers.  Each paper focused on one aspect of risk management, including (1) conducting premarketing risk assessment, (2) developing and implementing risk minimization tools, and (3) performing postmarketing pharmacovigilance and pharmacoepidemiologic assessments.  In addition to receiving numerous written comments regarding the three concept papers, FDA held a public workshop on April 9 – 11, 2003, to discuss the concept papers.  FDA considered all of the comments received in developing three draft guidance documents on risk management activities. The draft guidance documents were published on May 5, 2004, and the public was provided with an opportunity to comment on them until July 6, 2004.  FDA considered all of the comments received in producing the final guidance documents.

*1.     Premarketing Risk Assessment (Premarketing Guidance)*
*2.     Development and Use of Risk Minimization Action Plans (RiskMAP Guidance)*
*3.     Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment*
      *(Pharmacovigilance Guidance)*

### B.     Overview of the Risk Management Guidances

Like the concept papers and draft guidances that preceded them, each of the three final guidance documents focuses on one aspect of risk management.  The *Premarketing Guidance* and the *Pharmacovigilance Guidance* focus on premarketing and postmarketing risk assessment, respectively.  The *RiskMAP Guidance* focuses on risk minimization.  Together, risk assessment and risk minimization form what FDA calls *risk management*.  Specifically, risk management is an iterative process of (1) assessing a product's benefit-risk balance, (2) developing and implementing tools to minimize its risks while preserving its benefits, (3) evaluating tool effectiveness and reassessing the benefit-risk balance, and (4) making adjustments, as appropriate, to the risk minimization tools to further improve the benefit-risk balance.  This four-part process should be continuous throughout a product's lifecycle, with the results of risk assessment informing the sponsor's decisions regarding risk minimization.

When reviewing the recommendations provided in this guidance, sponsors and applicants should keep the following points in mind:

- Many recommendations in this guidance are *not* intended to be generally applicable to all products.

  Industry already performs risk assessment and risk minimization activities for products during development and marketing.  The Federal Food, Drug, and Cosmetic Act (FDCA) and FDA implementing regulations establish requirements for *routine* risk assessment and risk minimization (see e.g., FDA requirements for professional labeling, and adverse

*Contains Nonbinding Recommendations*

event monitoring and reporting). As a result, many of the recommendations presented here focus on situations when a product may pose a clinically important and unusual type or level of risk. To the extent possible, we have specified in the text whether a recommendation is intended for all products or only this subset of products.

- It is of critical importance to protect patients and their privacy during the generation of safety data and the development of risk minimization action plans.

  During all risk assessment and risk minimization activities, sponsors must comply with applicable regulatory requirements involving human subjects research and patient privacy.[3]

- To the extent possible, this guidance conforms with FDA's commitment to harmonize international definitions and standards as appropriate.

  The topics covered in this guidance are being discussed in a variety of international forums. We are participating in these discussions and believe that, to the extent possible, the recommendations in this guidance reflect current thinking on related issues.

- When planning risk assessment and risk minimization activities, sponsors should consider input from health care participants likely to be affected by these activities (e.g., from consumers, pharmacists and pharmacies, physicians, nurses, and third party payers).

- There are points of overlap among the three guidances.

  We have tried to note in the text of each guidance when areas of overlap occur and when referencing one of the other guidances might be useful.

## III.   THE ROLE OF PHARMACOVIGILANCE AND PHARMACOEPIDEMIOLOGY IN RISK MANAGEMENT

Risk assessment during product development should be conducted in a thorough and rigorous manner; however, it is impossible to identify all safety concerns during clinical trials. Once a product is marketed, there is generally a large increase in the number of patients exposed, including those with co-morbid conditions and those being treated with concomitant medical products. Therefore, postmarketing safety data collection and risk assessment based on observational data are critical for evaluating and characterizing a product's risk profile and for making informed decisions on risk minimization.

---

[3] See 45 CFR part 46 and 21 CFR parts 50 and 56. See also the Health Insurance Portability and Accountability Act of 1996 (HIPAA) (Public Law 104-191) and the Standards for Privacy of Individually Identifiable Health Information (the Privacy Rule) (45 CFR part 160 and subparts A and E of part 164). The Privacy Rule specifically permits covered entities to report adverse events and other information related to the quality, effectiveness, and safety of FDA-regulated products both to manufacturers and directly to FDA (45 CFR 164.512(b)(1)(i) and (iii), and 45 CFR 164.512(a)(1)). For additional guidance on patient privacy protection, see http://www.hhs.gov/ocr/hipaa.

*Contains Nonbinding Recommendations*

This guidance document focuses on pharmacovigilance activities in the post-approval period. This guidance uses the term *pharmacovigilance* to mean all scientific and data gathering activities relating to the detection, assessment, and understanding of adverse events. This includes the use of pharmacoepidemiologic studies. These activities are undertaken with the goal of identifying adverse events and understanding, to the extent possible, their nature, frequency, and potential risk factors.

Pharmacovigilance principally involves the identification and evaluation of safety signals. In this guidance document, *safety signal* refers to a concern about an excess of adverse events compared to what would be expected to be associated with a product's use. Signals can arise from postmarketing data and other sources, such as preclinical data and events associated with other products in the same pharmacologic class. It is possible that even a single well-documented case report can be viewed as a signal, particularly if the report describes a positive rechallenge or if the event is extremely rare in the absence of drug use. Signals generally indicate the need for further investigation, which may or may not lead to the conclusion that the product caused the event. After a signal is identified, it should be further assessed to determine whether it represents a potential safety risk and whether other action should be taken.

## IV.   IDENTIFYING AND DESCRIBING SAFETY SIGNALS:  FROM CASE REPORTS TO CASE SERIES

Good pharmacovigilance practice is generally based on acquiring complete data from spontaneous adverse event reports, also known as case reports. The reports are used to develop case series for interpretation.

### A.    Good Reporting Practice

Spontaneous case reports of adverse events submitted to the sponsor and FDA, and reports from other sources, such as the medical literature or clinical studies, may generate signals of adverse effects of drugs. The quality of the reports is critical for appropriate evaluation of the relationship between the product and adverse events. FDA recommends that sponsors make a reasonable attempt to obtain complete information for case assessment during initial contacts and subsequent follow-up, especially for serious events,[4] and encourages sponsors to use trained health care practitioners to query reporters. Computer-assisted interview technology, targeted questionnaires, or other methods developed to target specific events can help focus the line of questioning. When the report is from a consumer, it is often important to obtain permission to contact the health care practitioner familiar with the patient's adverse event to obtain further medical information and to retrieve relevant medical records, as needed.

---

[4] Good reporting practices are extensively addressed in a proposed FDA regulation and guidance documents.  See (1) Safety Reporting Requirements for Human Drug and Biological Products, Proposed Rule, 68 FR 12406 (March 14, 2003), (2) FDA guidance for industry on *Postmarketing Reporting of Adverse Experiences*, (3) FDA guidance for industry on *E2C Clinical Safety Data Management: Periodic Safety Update Report (PSUR)*, (4) FDA guidance for industry on *Postmarketing Adverse Experience Reporting for Human Drug and Licensed Biological Products: Clarification of What to Report.*

*Contains Nonbinding Recommendations*

FDA suggests that the intensity and method of case follow-up be driven by the seriousness of the event reported, the report's origin (e.g., health care practitioner, patient, literature), and other factors. FDA recommends that the most aggressive follow-up efforts be directed towards serious adverse event reports, especially of adverse events not known to occur with the drug.

### B.    Characteristics of a Good Case Report

Good case reports include the following elements:

1. Description of the adverse events or disease experience, including time to onset of signs or symptoms;

2. Suspected and concomitant product therapy details (i.e., dose, lot number, schedule, dates, duration), including over-the-counter medications, dietary supplements, and recently discontinued medications;

3. Patient characteristics, including demographic information (e.g., age, race, sex), baseline medical condition prior to product therapy, co-morbid conditions, use of concomitant medications, relevant family history of disease, and presence of other risk factors;

4. Documentation of the diagnosis of the events, including methods used to make the diagnosis;

5. Clinical course of the event and patient outcomes (e.g., hospitalization or death);[5]

6. Relevant therapeutic measures and laboratory data at baseline, during therapy, and subsequent to therapy, including blood levels, as appropriate;

7. Information about response to dechallenge and rechallenge; and

8. Any other relevant information (e.g., other details relating to the event or information on benefits received by the patient, if important to the assessment of the event).

For reports of medication errors, good case reports also include full descriptions of the following, when such information is available:

1. Products involved (including the trade (proprietary) and established (proper) name, manufacturer, dosage form, strength, concentration, and type and size of container);

2. Sequence of events leading up to the error;

3. Work environment in which the error occurred; and

4. Types of personnel involved with the error, type(s) of error, and contributing factors.

---

[5] Patient outcomes may not be available at the time of initial reporting. In these cases, follow-up reports can convey important information about the course of the event and serious outcomes, such as hospitalization or death.

*Contains Nonbinding Recommendations*

FDA recommends that sponsors capture in the case narrative section of a medication error report all appropriate information outlined in the National Coordinating Council for Medication Error Reporting and Prevention (NCC MERP) Taxonomy.[6] Although sponsors are not required to use the taxonomy, FDA has found the taxonomy to be a useful tool to categorize and analyze reports of medication errors. It provides a standard language and structure for medication error-related data collected through reports.

### C.    Developing a Case Series

FDA suggests that sponsors initially evaluate a signal generated from postmarketing spontaneous reports through a careful review of the cases and a search for additional cases. Additional cases could be identified from the sponsor's global adverse event databases, the published literature, and other available databases, such as FDA's Adverse Event Reporting System (AERS) or Vaccine Adverse Events Reporting System (VAERS), using thorough database search strategies based on updated coding terminology (e.g., the Medical Dictionary for Regulatory Activities (MedDRA)). When available, FDA recommends that standardized case definitions (i.e., formal criteria for including or excluding a case) be used to assess potential cases for inclusion in a case series.[7] In general, FDA suggests that case-level review occur before other investigations or analyses. FDA recommends that emphasis usually be placed on review of serious, unlabeled adverse events, although other events may warrant further investigation (see section IV.F. for more details).

As part of the case-level review, FDA suggests that sponsors evaluate individual case reports for clinical content and completeness, and follow up with reporters, as necessary. It is important to remove any duplicate reports. In assessing case reports, FDA recommends that sponsors look for features that may suggest a causal relationship between the use of a product and the adverse event, including:

1.  Occurrence of the adverse event in the expected time (e.g., type 1 allergic reactions occurring within days of therapy, cancers developing after years of therapy);

2.  Absence of symptoms related to the event prior to exposure;

3.  Evidence of positive dechallenge or positive rechallenge;

4.  Consistency of the event with the established pharmacological/toxicological effects of the product, or for vaccines, consistency with established infectious or immunologic mechanisms of injury;

5.  Consistency of the event with the known effects of other products in the class;

---

[6] See http://www.nccmerp.org for the definition of a medication error and taxonomy of medication errors.

[7] See, for example, Institute of Medicine (IOM) Immunization Safety Review on Vaccines and Autism, 2004.

*Contains Nonbinding Recommendations*

6. Existence of other supporting evidence from preclinical studies, clinical trials, and/or pharmacoepidemiologic studies; and

7. Absence of alternative explanations for the event (e.g., no concomitant medications that could contribute to the event; no co- or pre-morbid medical conditions).

Confounded cases are common, especially among patients with complicated medical conditions. Confounded cases (i.e., cases with adverse events that have possible etiologies other than the product of concern) could still represent adverse effects of the product under review. FDA recommends that sponsors carefully evaluate these cases and not routinely exclude them. Separate analyses of unconfounded cases may be useful.

For any individual case report, it is rarely possible to know with a high level of certainty whether the event was caused by the product. To date, there are no internationally agreed upon standards or criteria for assessing causality in individual cases, especially for events that often occur spontaneously (e.g. stroke, pulmonary embolism). Rigorous pharmacoepidemiologic studies, such as case-control studies and cohort studies with appropriate follow-up, are usually employed to further examine the potential association between a product and an adverse event.

FDA does not recommend any specific categorization of causality, but the categories *probable, possible,* or *unlikely* have been used previously.[8] If a causality assessment is undertaken, FDA suggests that the causal categories be specified and described in sufficient detail to understand the underlying logic in the classification.

If the safety signal relates to a medication error, FDA recommends that sponsors report all known contributing factors that led to the event. A number of references are available to assist sponsors in capturing a complete account of the event.[9] FDA recommends that sponsors follow up to the extent possible with reporters to capture a complete account of the event, focusing on the *medication use systems* (e.g., prescribing/order process, dispensing process, administration process). This data may be informative in developing strategies to minimize future errors.

**D.    Summary Descriptive Analysis of a Case Series**

In the event that one or more cases suggest a safety signal warranting additional investigation, FDA recommends that a case series be assembled and descriptive clinical information be summarized to characterize the potential safety risk and, if possible, to identify risk factors. A case series commonly includes an analysis of the following:

1. The clinical and laboratory manifestations and course of the event;

---

[8] See World Health Organization, the Uppsala Monitoring Center, 2000, *Safety Monitoring of Medicinal Product,* for additional categorizations of causality.

[9] See Cohen MR (ed), 1999, *Medication Errors,* American Pharmaceutical Association, Washington DC; Cousins DD (ed), 1998, *Medication Use: A Systems Approach to Reducing Errors,* Joint Commission on Accreditation of Healthcare Organizations, Oakbrook Terrace, IL.

*Contains Nonbinding Recommendations*

2. Demographic characteristics of patients with events (e.g., age, gender, race);

3. Exposure duration;

4. Time from initiation of product exposure to the adverse event;

5. Doses used in cases, including labeled doses, greater than labeled doses, and overdoses;

6. Use of concomitant medications;

7. The presence of co-morbid conditions, particularly those known to cause the adverse event, such as underlying hepatic or renal impairment;

8. The route of administration (e.g., oral vs. parenteral);

9. Lot numbers, if available, for products used in patients with events; and

10. Changes in event reporting rate over calendar time or product life cycle.

### E.  Use of Data Mining to Identify Product-Event Combinations

At various stages of risk identification and assessment, systematic examination of the reported adverse events by using statistical or mathematical tools, or so-called *data mining*, can provide additional information about the existence of an excess of adverse events reported for a product. By applying data mining techniques to large adverse event databases, such as FDA's AERS or VAERS, it may be possible to identify unusual or unexpected product-event combinations warranting further investigation. Data mining can be used to augment existing signal detection strategies and is especially useful for assessing patterns, time trends, and events associated with drug-drug interactions. Data mining is not a tool for establishing causal attributions between products and adverse events.

The methods of data mining currently in use usually generate a score comparing (1) the fraction of all reports for a particular event (e.g., liver failure) for a specific drug (i.e., the "observed reporting fraction") with (2) the fraction of reports for the same particular event for all drugs (i.e.,"the expected reporting fraction").[10] This analysis can be refined by adjusting for aspects of reporting (e.g., the reporting year) or characteristics of the patient (e.g., age or gender) that might influence the amount of reporting. In addition, it may be possible to limit data mining to an analysis for drugs of a specific class or for drugs that are used to treat a particular disease.

The score (or statistic) generated by data mining quantifies the disproportionality between the observed and expected values for a given product-event combination. This score is compared to a threshold that is chosen by the analyst. A potential excess of adverse events is operationally defined as any product-event combination with a score exceeding the specified threshold. When

---

[10] Evans SJ, 2000, Pharmacovigilance: A science or fielding emergencies? *Statistics in Medicine* 19(23):3199-209; Evans SJW, Waller PC, and Davis S, 2001, Use of proportional reporting ratios (PRRs) for signal generation from spontaneous adverse drug reaction reports, *Pharmacoepidemiology and Drug Safety* 10:483-6.

*Contains Nonbinding Recommendations*

applying data mining to large databases (such as AERS), it is not unusual for a product to have several product-event combinations with scores above a specified threshold. The lower the threshold, the greater the likelihood that more combinations will exceed the threshold and will warrant further investigation.

Several data mining methods have been described and may be worth considering, such as the Multi-Item Gamma Poisson Shrinker (MGPS) algorithm[11,12,] the Proportional Reporting Ratio (PRR) method[13,14]and the Neural Network approach.[15] Except when the observed number of cases with the drug event combination is small (e.g., less than 20) or the expected number of cases with the drug event combination is < 1, the MGPS and PRR methods will generally identify similar drug event combinations for further investigation.[16]

Although all of these approaches are inherently exploratory or hypothesis generating, they may provide insights into the patterns of adverse events reported for a given product relative to other products in the same class or to all other products. FDA exercises caution when making such comparisons, because voluntary adverse event reporting systems such as AERS or VAERS are subject to a variety of reporting biases (e.g., some observations could reflect concomitant treatment, not the product itself, and other factors, including the disease being treated, other co-morbidities or unrecorded confounders, may cause the events to be reported). In addition, AERS or VAERS data may be affected by the submission of incomplete or duplicate reports, under-reporting, or reporting stimulated by publicity or litigation. As reporting biases may differ by product and change over time, and could change differently for different events, it is not possible to predict their impact on data mining scores.

Use of data mining techniques is not a required part of signal identification or evaluation. If data mining results are submitted to FDA, they should be presented in the larger appropriate clinical epidemiological context. This should include (1) a description of the database used, (2) a description of the data mining tool used (e.g., statistical algorithm, and the drugs, events and

---

[11] DuMouchel W and Pregibon D, 2001, Empirical Bayes screening for multi-item associations, *Seventh ACM SigKDD International Conference on Knowledge Discovery and Data Mining*.

[12] Szarfman A, Machado SG, and O'Neill RT, 2002, Use of screening algorithms and computer systems to efficiently signal higher-than-expected combinations of drugs and events in the US FDA's spontaneous reports database, *Drug Safety* 25(6): 381-92.

[13] Evans SJW, Waller P, and Davis S, 1998, Proportional reporting ratios: the uses of epidemiological methods for signal generation [abstract], *Pharmacoepidemiology and Drug Safety* 7:S102.

[14] Evans SJ, 2000, Pharmacovigilance: A science or fielding emergencies? *Statistics in Medicine* 19(23):3199-209; Evans SJW, Waller PC, and Davis S, 2001, Use of proportional reporting ratios (PRRs) for signal generation from spontaneous adverse drug reaction reports, *Pharmacoepidemiology and Drug Safety* 10:483-6.

[15] Bate A et al., 1998, A Bayesian neural network method for adverse drug reaction signal generation, *European Journal of Clinical Pharmacology* 54:315-21.

[16] This conclusion is based on the experience of FDA and of William DuMouchel, Ph.D., Chief Scientist, Lincoln Technologies, Wellsley, MA, as summarized in an email communication from Dr. DuMouchel to Ana Szarfman, M.D., Ph.D., Medical Officer, OPaSS, CDER, on October 13, 2004.

*Contains Nonbinding Recommendations*

stratifications selected for the analyses) or an appropriate reference, and (3) a careful assessment of individual case reports and any other relevant safety information related to the particular drug-event combination of interest (e.g., results from preclinical, clinical, pharmacoepidemiologic, or other available studies).

### F.   Safety Signals That May Warrant Further Investigation

FDA believes that the methods described above will permit a sponsor to identify and preliminarily characterize a safety signal. The actual risk to patients cannot be known from these data because it is not possible to characterize all events definitively and because there is invariably under-reporting on some extent and incomplete information about duration of therapy, numbers treated, etc. Safety signals that may warrant further investigation may include, but are not limited to, the following:

1.   New unlabeled adverse events, especially if serious;

2.   An apparent increase in the severity of a labeled event;

3.   Occurrence of serious events thought to be extremely rare in the general population;

4.   New product-product, product-device, product-food, or product-dietary supplement interactions;

5.   Identification of a previously unrecognized at-risk population (e.g., populations with specific racial or genetic predispositions or co-morbidities);

6.   Confusion about a product's name, labeling, packaging, or use;

7.   Concerns arising from the way a product is used (e.g., adverse events seen at higher than labeled doses or in populations not recommended for treatment);

8.   Concerns arising from potential inadequacies of a currently implemented risk minimization action plan (e.g., reports of serious adverse events that appear to reflect failure of a RiskMAP goal);[17] and

9.   Other concerns identified by the sponsor or FDA.

### G.   Putting the Signal into Context:  Calculating Reporting Rates vs. Incidence Rates

If a sponsor determines that a concern about an excess of adverse events or safety signal warrants further investigation and analysis, it is important to put the signal into context. For this reason, calculations of the rate at which new cases of adverse events occur in the product-exposed population (i.e., the incidence rate) are the hallmark of pharmacoepidemiologic risk assessment.

---

[17] For a detailed discussion of risk minimization action plan evaluation, please consult the *RiskMAP Guidance*.

*Contains Nonbinding Recommendations*

In pharmacoepidemiologic studies (see section V.A), the numerator (number of new cases) and denominator (number of exposed patients and time of exposure or, if known, time at risk) may be readily ascertainable. In contrast, for spontaneously reported events, it is not possible to identify all cases because of under-reporting, and the size of the population at risk is at best an estimate. Limitations in national denominator estimates arise because:

1. Accurate national estimates of the number of patients exposed to a medical product and their duration of exposure may not be available;

2. It may be difficult to exclude patients who are not at risk for an event, for example, because their exposure is too brief or their dose is too low;[18] and

3. A product may be used in different populations for different indications, but use estimates are not available for the specific population of interest.

Although we recognize these limitations, we recommend that sponsors calculate crude adverse event reporting rates as a valuable step in the investigation and assessment of adverse events. FDA suggests that sponsors calculate reporting rates by using the total number of spontaneously reported cases in the United States in the numerator and estimates of national patient exposure to product in the denominator.[19,20] FDA recommends that whenever possible, the number of patients or person time exposed to the product nationwide be the estimated denominator for a reporting rate. FDA suggests that other surrogates for exposure, such as numbers of prescriptions or kilograms of product sold, only be used when patient-level estimates are unavailable. FDA recommends that sponsors submit a detailed explanation of the rationale for selection of a denominator and a method of estimation.

Comparisons of reporting rates and their temporal trends can be valuable, particularly across similar products or across different product classes prescribed for the same indication. However, such comparisons are subject to substantial limitations in interpretation because of the inherent uncertainties in the numerator and denominator used. As a result, FDA suggests that a comparison of two or more reporting rates be viewed with extreme caution and generally considered exploratory or hypothesis-generating. Reporting rates can by no means be considered incidence rates, for either absolute or comparative purposes.

To provide further context for incidence rates or reporting rates, it is helpful to have an estimate of the background rate of occurrence for the event being evaluated in the general population or, ideally, in a subpopulation with characteristics similar to that of the exposed population (e.g., premenopausal women, diabetics). These background rates can be derived from: (1) national health statistics, (2) published medical literature, or (3) ad hoc studies, particularly of

---

[18] See *Current Challenges in Pharmacovigilance: Pragmatic Approaches*, Report of the Council for International Organizations of Medical Sciences (CIOMS) Working Group V, Geneva, 2001.

[19] See Rodriguez EM, Staffa JA, Graham DJ, 2001, *The role of databases in drug postmarketing surveillance*, Pharmacoepidemiology and Drug Safety, 10:407-10.

[20] In addition to U.S. reporting rates, sponsors can provide global reporting rates, when relevant.

*Contains Nonbinding Recommendations*

subpopulations, using large automated databases or ongoing epidemiologic investigations with primary data collection. FDA suggests that comparisons of incidence rates or reporting rates to background rate estimates take into account potential differences in the data sources, diagnostic criteria, and duration of time at risk.

While the extent of under-reporting is unknown, it is usually assumed to be substantial and may vary according to the type of product, seriousness of the event, population using the product, and other factors. As a result, a reporting rate higher than the background rate may, in some cases, be a strong indicator that the true incidence rate is sufficiently high to be of concern. However, many other factors affect the reporting of product-related adverse events (e.g., publicity, newness of product to the market) and these factors should be considered when interpreting a high reporting rate. Also, because of under-reporting, the fact that a reporting rate is less than the background rate does not necessarily show that the product is not associated with an increased risk of an adverse event.

## V.   BEYOND CASE REVIEW:  INVESTIGATING A SIGNAL THROUGH OBSERVATIONAL STUDIES

FDA recognizes that there are a variety of methods for investigating a safety signal. Signals warranting additional investigation can be further evaluated through carefully designed non-randomized observational studies of the product's use in the "real world" and randomized trials. The *Premarketing Guidance* discusses a number of types of randomized trials, including the large simple safety study, which is a risk assessment method that could be used either pre- or post-approval.

This document focuses on three types of non-randomized observational studies:  (1) pharmacoepidemiologic studies, (2) registries, and (3) surveys. By focusing this guidance on certain risk assessment methods, we do not intend to advocate the use of these approaches over others. FDA encourages sponsors to consider all methods to evaluate a particular safety signal. FDA recommends that sponsors choose the method best suited to the particular signal and research question of interest. Sponsors planning to evaluate a safety signal are encouraged to communicate with FDA as their plans progress.

### A.   Pharmacoepidemiologic Studies

Pharmacoepidemiologic studies can be of various designs, including cohort (prospective or retrospective), case-control, nested case-control, case-crossover, or other models.[21]  The results of such studies may be used to characterize one or more safety signals associated with a product, or may examine the natural history of a disease or drug utilization patterns. Unlike a case series, a pharmacoepidemiologic study which is designed to assess the risk attributed to a drug exposure has a protocol and control group and tests prespecified hypotheses. Pharmacoepidemiologic studies can allow for the estimation of the relative risk of an outcome associated with a product, and some (e.g., cohort studies) can also provide estimates of risk (incidence rate) for an adverse

---

[21] *Guidelines for Good Pharmacoepidemiology*, , International Society for Pharmacoepidemiology, 2004 (http://www.pharmacoepi.org/resources/guidelines_08027.cfm)

*Contains Nonbinding Recommendations*

event. Sponsors can initiate pharmacoepidemiologic studies at any time. They are sometimes started at the time of initial marketing, based on questions that remain after review of the premarketing data. More often, however, they are initiated when a safety signal has been identified after approval. Finally, there may also be occasions when a pharmacoepidemiologic study is initiated prior to marketing (e.g., to study the natural history of disease or patterns of product use, or to estimate background rates for adverse events).

For uncommon or delayed adverse events, pharmacoepidemiologic studies may be the only practical choice for evaluation, even though they can be limited by low statistical power. Clinical trials are impractical in almost all cases when the event rates of concern are less common than 1:2000-3000 (an exception may be larger trials conducted for some vaccines, which could move the threshold to 1:10,000). It may also be difficult to use clinical trials: (1) to evaluate a safety signal associated with chronic exposure to a product, exposure in populations with co-morbid conditions, or taking multiple concomitant medications, or (2) to identify certain risk factors for a particular adverse event. On the other hand, for evaluation of more common events, which are seen relatively often in untreated patients, clinical trials may be preferable to observational studies.

Because pharmacoepidemiologic studies are observational in nature, they may be subject to confounding, effect modification, and other bias, which may make results of these types of studies more difficult to interpret than the results of clinical trials. Some of these problems can be surmounted when the relative risk to exposed patients is high.

Because different products pose different benefit-risk considerations (e.g., seriousness of the disease being treated, nature and frequency of the safety signal under evaluation), it is impossible to delineate a universal set of criteria for the point at which a pharmacoepidemiologic study should be initiated, and the decision should be made on a case-by-case basis. When an important adverse event–product association leads to questions on the product's benefit-risk balance, FDA recommends that sponsors consider whether the particular signal should be addressed with one or more pharmacoepidemiologic studies. If a sponsor determines that a pharmacoepidemiologic study is the best method for evaluating a particular signal, the design and size of the proposed study would depend on the objectives of the study and the expected frequency of the events of interest.

When performing a pharmacoepidemiologic study, FDA suggests that investigators seek to minimize bias and to account for possible confounding. Confounding by indication is one example of an important concern in performing a pharmacoepidemiologic study.[22] Because of the effects of bias, confounding, or effect modification, pharmacoepidemiologic studies evaluating the same hypothesis may provide different or even conflicting results. It is almost always prudent to conduct more than one study, in more than one environment and even use different designs. Agreement of the results from more than one study helps to provide reassurance that the observed results are robust.

---

[22] See, for example, Strom BL (ed), 2000, *Pharmacoepidemiology*, 3rd edition, Chichester: John Wiley and Sons, Ltd; Hartzema AG, Porta M, and Tilson HH (eds), 1998, *Pharmacoepidemiology: An Introduction*, 3rd edition, Cincinnati, OH: Harvey Whitney Books.

*Contains Nonbinding Recommendations*

There are a number of references describing methodologies for pharmacoepidemiologic studies, discussing their strengths and limitations,[23] and providing guidelines to facilitate the conduct, interpretation, and documentation of such studies.[24]  Consequently, this guidance document does not comprehensively address these topics.  However, a protocol for a pharmacoepidemiologic study generally includes:

1.  Clearly specified study objectives;
2.  A critical review of the literature; and
3.  A detailed description of the research methods, including:
    - the population to be studied;
    - the case definitions to be used;
    - the data sources to be used (including a rationale for data sources if from outside the U.S.);
    - the projected study size and statistical power calculations; and
    - the methods for data collection, management, and analysis.

Depending on the type of pharmacoepidemiologic study planned, there are a variety of data sources that may be used, ranging from the prospective collection of data to the use of existing data, such as data from previously conducted clinical trials or large databases.  In recent years, a number of pharmacoepidemiologic studies have been conducted in automated claims databases (e.g., HMO, Medicaid) that allow retrieval of records on product exposure and patient outcomes.  In addition, recently, comprehensive electronic medical record databases have also been used for studying drug safety issues. Depending on study objectives, factors that may affect the choice of databases include the following:

1.  Demographic characteristics of patients enrolled in the health plans (e.g., age, geographic location);

2.  Turnover rate of patients in the health plans;

3.  Plan coverage of the medications of interest;

4.  Size and characteristics of the exposed population available for study;

5.  Availability of the outcomes of interest;

6.  Ability to identify conditions of interest using standard medical coding systems (e.g., International Classification of Diseases (ICD-9)), procedure codes or prescriptions that could be used as markers;

---

[23] Ibid.

[24] *Guidelines for Good Pharmacoepidemiology*, International Society for Pharmacoepidemiology, 2004 (http://www.pharmacoepi.org/resources/guidelines_08027.cfm).

*Contains Nonbinding Recommendations*

7.    Access to medical records; and

8.    Access to patients for data not captured electronically.

For most pharmacoepidemiologic studies, FDA recommends that sponsors validate diagnostic findings through a detailed review of at least a sample of medical records. If the validation of the specific outcome or exposure of interest using the proposed database has been previously reported, FDA recommends that the literature supporting the validity of the proposed study be submitted for review.

FDA encourages sponsors to communicate with the Agency when pharmacoepidemiologic studies are being developed.

## B.    Registries

The term *registry* as used in pharmacovigilance and pharmacoepidemiology can have varied meanings. In this guidance document, a registry is "an organized system for the collection, storage, retrieval, analysis, and dissemination of information on individual persons exposed to a specific medical intervention who have either a particular disease, a condition (e.g., a risk factor) that predisposes [them] to the occurrence of a health-related event, or prior exposure to substances (or circumstances) known or suspected to cause adverse health effects."[25] Whenever possible, a control or comparison group should be included, (i.e., individuals with a disease or risk factor who are not treated or are exposed to medical interventions other than the intervention of interest).[26]

Through the creation of registries, a sponsor can evaluate safety signals identified from spontaneous case reports, literature reports, or other sources, and evaluate factors that affect the risk of adverse outcomes, such as dose, timing of exposure, or patient characteristics.[27] Registries can be particularly useful for:

1.    Collecting outcome information not available in large automated databases; and

2.    Collecting information from multiple sources (e.g., physician records, hospital summaries, pathology reports, vital statistics), particularly when patients receive care from multiple providers over time.

A sponsor can initiate a registry at any time. It may be appropriate to initiate the registry at or before initial marketing, when a new indication is approved, or when there is a need to evaluate

---

[25] See Frequently Asked Questions About Medical and Public Health Registries, The National Committee on Vital and Health Statistics, at http://www.ncvhs.hhs.gov.

[26] See for example, FDA Guidance for Industry, *Establishing Pregnancy Exposure Registries*, August 2002 http://www.fda.gov/cder/guidance/3626fnl.pdf.

[27] Ibid.

*Contains Nonbinding Recommendations*

safety signals identified from spontaneous case reports. In deciding whether to establish a registry, FDA recommends that a sponsor consider the following factors:

1. The types of additional risk information desired;
2. The attainability of that information through other methods; and
3. The feasibility of establishing the registry.

Sponsors electing to initiate a registry should develop written protocols that provide: (1) objectives for the registry, (2) a review of the literature, and (3) a summary of relevant animal and human data. FDA suggests that protocols also contain detailed descriptions of: (1) plans for systematic patient recruitment and follow-up, (2) methods for data collection, management, and analysis, and (3) conditions under which the registry will be terminated. A registry-based monitoring system should include carefully designed data collection forms to ensure data quality, integrity, and validation of registry findings against a sample of medical records or through interviews with health care providers. FDA recommends that the size of the registry and the period during which data will be collected be consistent with the safety questions under study and we encourage sponsors to discuss their registry development plans with FDA.

### C.    Surveys

Patient or health care provider surveys can gather information to assess, for example:

1. A safety signal;

2. Knowledge about labeled adverse events;

3. Use of a product as labeled, particularly when the indicated use is for a restricted population or numerous contraindications exist;

4. Compliance with the elements of a RiskMAP (e.g., whether or not a Medication Guide was provided at the time of product dispensing); and[28]

5. Confusion in the practicing community over sound-alike or look-alike trade (or proprietary) names.

Like a registry, a survey can be initiated by a sponsor at any time. It can be conducted at the time of initial marketing (i.e., to fulfill a postmarketing commitment) or when there is a desire to evaluate safety signals identified from spontaneous case reports.

FDA suggests that sponsors electing to initiate a survey develop a written protocol that provides objectives for the survey and a detailed description of the research methods, including: (1) patient or provider recruitment and follow-up, (2) projected sample size, and (3) methods for data collection, management, and analysis.[29] FDA recommends that a survey-based monitoring

---

[28] For a detailed discussion of RiskMAP evaluation, please consult the *RiskMAP Guidance*.

[29] See 21 CFR parts 50 and 56 for FDA's regulations governing the protection of human subjects.

*Contains Nonbinding Recommendations*

system include carefully designed survey instruments and validation of survey findings against a sample of medical or pharmacy records or through interviews with health care providers, whenever possible. FDA recommends that survey instruments be validated or piloted before implementation. FDA suggests that sponsors consider whether survey translation and cultural validation would be important.

Sponsors are encouraged to discuss their survey development plans with FDA.

## VI.   INTERPRETING SAFETY SIGNALS: FROM SIGNAL TO POTENTIAL SAFETY RISK

After identifying a safety signal, FDA recommends that a sponsor conduct a careful case level review and summarize the resulting case series descriptively. To help further characterize a safety signal, a sponsor can also: (1) employ data mining techniques, and (2) calculate reporting rates for comparison to background rates. Based on these findings and other available data (e.g., from preclinical or other sources), FDA suggests that a sponsor consider further study (e.g., observational studies) to establish whether or not a potential safety risk exists.

When evaluation of a safety signal suggests that it may represent a potential safety risk, FDA recommends that a sponsor submit a synthesis of all available safety information and analyses performed, ranging from preclinical findings to current observations. This submission should include the following:

1. Spontaneously reported and published case reports, with denominator or exposure information to aid interpretation;

2. Background rate for the event in general and specific patient populations, if available;

3. Relative risks, odds ratios, or other measures of association derived from pharmacoepidemiologic studies;

4. Biologic effects observed in preclinical studies and pharmacokinetic or pharmacodynamic effects;

5. Safety findings from controlled clinical trials; and

6. General marketing experience with similar products in the class.

After the available safety information is presented and interpreted, it may be possible to assess the degree of causality between use of a product and an adverse event. FDA suggests that the sponsor's submission provide an assessment of the benefit-risk balance of the product for the population of users as a whole and for identified at-risk patient populations, and, if appropriate, (1) propose steps to further investigate the signal through additional studies, and (2) propose risk

*Contains Nonbinding Recommendations*

minimization actions.[30]  FDA will make its own assessment of the potential safety risk posed by the signal in question, taking into account the information provided by the sponsor and any additional relevant information known to FDA (e.g., information on other products in the same class) and will communicate its conclusions to the sponsor whenever possible.  Factors that are typically considered include:

1.  Strength of the association (e.g., relative risk of the adverse event associated with the product);

2.  Temporal relationship of product use and the event;

3.  Consistency of findings across available data sources;

4.  Evidence of a dose-response for the effect;

5.  Biologic plausibility;

6.  Seriousness of the event relative to the disease being treated;

7.  Potential to mitigate the risk in the population;

8.  Feasibility of further study using observational or controlled clinical study designs; and

9.  Degree of benefit the product provides, including availability of other therapies.

As noted in section II, risk management is an iterative process and steps to further investigate a potential safety risk, assess the product's benefit-risk balance, and implement risk minimization tools would best occur in a logical sequence, not simultaneously.  Not all steps may be recommended, depending on the results of earlier steps.[31]  FDA recommends that assessment of causality and of strategies to minimize product risk occur on an ongoing basis, taking into account the findings from newly completed studies.

## VII.  BEYOND ROUTINE PHARMACOVIGILANCE:  DEVELOPING A PHARMACOVIGILANCE PLAN

For most products, routine pharmacovigilance (i.e., compliance with applicable postmarket requirements under the FDCA and FDA implementing regulations) is sufficient for postmarketing risk assessment.  However, in certain limited instances, unusual safety risks may become evident before approval or after a product is marketed that could suggest that consideration by the sponsor of a pharmacovigilance plan may be appropriate.  A

---

[30] In the vast majority of cases, risk communication that incorporates appropriate language into the product's labeling will be adequate for risk minimization.  In rare instances, however, a sponsor may consider implementing a RiskMAP.  Please refer to the *RiskMAP Guidance* for a complete discussion of RiskMAP development.
[31] For additional discussion of the relationship between risk assessment and risk minimization, please consult the *RiskMAP Guidance.*

*Contains Nonbinding Recommendations*

pharmacovigilance plan is a plan developed by a sponsor that is focused on detecting new safety risks and/or evaluating already identified safety risks. Specifically, a pharmacovigilance plan describes pharmacovigilance efforts above and beyond routine postmarketing spontaneous reporting, and is designed to enhance and expedite the sponsor's acquisition of safety information.[32] The development of pharmacovigilance plans may be useful at the time of product launch or when a safety risk is identified during product marketing. FDA recommends that a sponsor's decision to develop a pharmacovigilance plan be based on scientific and logistical factors, including the following:

1. The likelihood that the adverse event represents a potential safety risk;

2. The frequency with which the event occurs (e.g., incidence rate, reporting rate, or other measures available);

3. The severity of the event;

4. The nature of the population(s) at risk;

5. The range of patients for which the product is indicated (broad range or selected populations only); and

6. The method by which the product is dispensed (through pharmacies or performance linked systems only).[33]

A pharmacovigilance plan may be developed by itself or as part of a Risk Minimization Action Plan (RiskMAP), as described in the *RiskMAP Guidance*. Sponsors may meet with representatives from the appropriate Office of New Drugs review division and the Office of Drug Safety in CDER, or the appropriate Product Office and the Division of Epidemiology, Office of Biostatistics and Epidemiology in CBER regarding the specifics of a given product's pharmacovigilance plan.

FDA believes that for a product without safety risks identified pre- or post-approval and for which at-risk populations are thought to have been adequately studied, routine spontaneous reporting will be sufficient for postmarketing surveillance. On the other hand, pharmacovigilance plans may be appropriate for products for which: (1) serious safety risks have been identified pre- or post-approval, or (2) at-risk populations have not been adequately studied.

---

[32] As used in this document, the term "pharmacovigilance plan" is defined differently than in the ICH draft E2E document (version 4.1). As used in the ICH document, a "pharmacovigilance plan" would be routinely developed (i.e., even when a sponsor does not anticipate that enhanced pharmacovigilance efforts are necessary). In contrast, as discussed above, FDA is only recommending that pharmacovigilance plans be developed when warranted by unusual safety risks. This ICH guidance is available on the Internet at http://www.fda.gov/cder/guidance/index.htm under the topic ICH Efficacy. The draft E2E guidance was made available on March 30, 2004 (69 FR 16579). ICH agreed on the final version of the E2E guidance in November, 2004.

[33] For a detailed discussion of controlled access systems, please consult the *RiskMAP Guidance*.

*Contains Nonbinding Recommendations*

Sponsors may discuss with the Agency the nature of the safety concerns posed by such a product and the determination whether a pharmacovigilance plan is appropriate.

A pharmacovigilance plan could include one or more of the following elements:

1.  Submission of specific serious adverse event reports in an expedited manner beyond routine required reporting (i.e., as 15-day reports);

2.  Submission of adverse event report summaries at more frequent, prespecified intervals (e.g., quarterly rather than annually);

3.  Active surveillance to identify adverse events that may or may not be reported through passive surveillance. Active surveillance can be (1) <u>drug based:</u> identifying adverse events in patients taking certain products, (2) <u>setting based:</u> identifying adverse events in certain health care settings where they are likely to present for treatment (e.g., emergency departments, etc.), or (3) <u>event based:</u> identifying adverse events that are likely to be associated with medical products (e.g., acute liver failure);

4.  Additional pharmacoepidemiologic studies (for example, in automated claims databases or other databases) using cohort, case-control, or other appropriate study designs (see section V);

5.  Creation of registries or implementation of patient or health care provider surveys (see section V); and

6.  Additional controlled clinical trials.[34]

As data emerges, FDA recommends that a sponsor re-evaluate the safety risk and the effectiveness of its pharmacovigilance plan. Such re-evaluation may result in revisions to the pharmacovigilance plan for a product. In some circumstances, FDA may decide to bring questions on potential safety risks and pharmacovigilance plans before its Drug Safety and Risk Management Advisory Committee or the FDA Advisory Committee dealing with the specific product in question. Such committees may be convened when FDA seeks: (1) general advice on the design of pharmacoepidemiologic studies, (2) comment on specific pharmacoepidemiology studies developed by sponsors or FDA for a specific product and safety question, or (3) advice on the interpretation of early signals from a case series and on the need for further investigation in pharmacoepidemiologic studies. While additional information is being developed, sponsors working with FDA can take interim actions to communicate information about potential safety risks (e.g., through labeling) to minimize the risk to users of the product.

---

[34] For a discussion of risk assessment in controlled clinical trials, please consult the *Premarketing Guidance*.

# Exhibit 26

Do Not Disclose - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2                   DISTRICT OF ARIZONA

 3   -----------------------------x

     IN RE: BARD IVC FILTERS        :

 4   PRODUCTS LIABILITY             :

     LITIGATION                     :

 5                                  :

                                    :   Case No.:

 6                                  :   MD-15-02641-PHX-DGC

     -----------------------------x

 7           DO NOT DISCLOSE - SUBJECT TO FURTHER

 8                CONFIDENTIALITY REVIEW

 9                   July 28, 2017

10                   Washington, D.C.

11   Videotaped Deposition of:

12              RONALD A. THISTED,

13         Called for oral examination by counsel for

14      Plaintiff, pursuant to notice, at the offices

15      of Nelson Mullins, 101 Constitution Avenue, NW,

16      9th Floor, Washington, D.C. beginning at 8:55

17      a.m., before Teague Gibson, a Notary Public.

18

19

20                 *    *    *    *    *

21

22

23

24

25
```

```
 1    effect and it's reasonably well-known and is very

 2    common.

 3         Q    Have you seen or are you aware of any

 4    papers that call into question whether the Webber

 5    effect occurs in all cases?

 6         A    I don't think I've seen papers.  It

 7    wouldn't surprise me if there are papers of

 8    investigate whether there are circumstances where

 9    the Webber effect doesn't occur.

10         Q    Is your experience with the Webber effect

11    mainly with pharmaceuticals?

12         A    Well, it's a general phenomenon and it's

13    not restricted to pharmaceuticals.

14         Q    Have you seen papers discussing it in the

15    context of medical devices?

16         A    I don't believe I have seen any.

17         Q    Did you do anything to evaluate the degree

18    of monitoring that might occur among the various

19    filters that Dr. Betensky looked at?

20              MR. BUSMAN:  Object to the form.

21         A    No, I didn't have any way of assessing the

22    degree of monitoring and Dr. Betensky didn't either.

23         Q    Did you consider whether the company might

24    have internal documents that would help address that

25    question?
```

1    one that you referenced in your report as well?

2         A    I don't believe I reference that in my

3    report.  I believe Dr. Betensky referenced it in her

4    rebuttal report.

5         Q    Do you agree that the information in that

6    guidance document applies or is relevant guidance

7    for device manufacturers?

8         A    The guidance document is not directed at

9    device manufacturers, but the principles of

10   pharmacovigilance apply equally to device

11   manufacturers.  Some of the specific advice is drug

12   specific and doesn't apply to devices.  For

13   instance, looking at challenge/rechallenge effects

14   on adverse events.  But for the most part, the

15   advice does apply to devices and -- except for drug

16   specific recommendations.

17        Q    But -- so you're saying that the general

18   recommendations about post-market surveillance and

19   interpreting safety signals and follow-up from

20   safety signals, that applies generally -- in your

21   opinion, it applies to device manufacturers?

22        A    It applies to adverse events that arise

23   from any therapeutic intervention, whether they're

24   drugs or biologics or devices.

25        Q    And by applies I mean that you would

 1    consider it good advice to a device manufacturer, as

 2    far as post-market activity?

 3                    MR. BUSMAN:  Object to the form.

 4         A    It's always good advice to advise

 5    manufacturers to follow FDA guidelines.  In this

 6    case, I think the guidelines are good.

 7         Q    Let's mark them.

 8                    (Exhibit No. 3 was marked)

 9    BY MR. MANKOFF:

10         Q    Do I have the right guidelines, the ones

11    that we've been discussing and the ones that you

12    referred to as the 2005 guidelines?

13         A    Yes.

14         Q    If you could turn to page 17, there's a

15    section on interpreting safety signals?

16         A    Okay.

17         Q    It says, interpreting safety signals from

18    signal to potential safety risk.  Do you see that?

19         A    I do see that.

20         Q    So you would agree with the advice there

21    that a sponsor should submit a synthesis of all

22    available safety information and analyses performed?

23         A    Yeah, I would say that this would

24    represent good practice.

25         Q    On the next page they list a number of

# EXHIBIT 27

David W. Feigal, M.D., MPH

```
 1                    IN THE CIRCUIT COURT

 2             OF THE SEVENTEENTH JUDICIAL DISTRICT

 3              IN AND FOR BROWARD COUNTY, FLORIDA

 4

 5                         --o0o--

 6   CLARE AUSTIN,                )
                                  )
 7               Plaintiff,       )
                                  )
 8        vs.                     )
                                  )  No. 15-008373
 9   C.R. BARD, INC. A foreign    )  Div: 12
     corporation, and BARD        )
10   PERIPHERAL VASCULAR, INC. An )
     Arizona corporation, MATTHEW )
11   ROBBINS, MD, and CLEVELAND   )
     CLINIC FLORIDA,              )
12                                )
                 Defendants.      )
13   _____)

14

15

16             Videotaped Deposition of

17          DAVID W. FEIGAL, JR., MD, MPH

18           THURSDAY, SEPTEMBER 1, 2016

19

20

21

22

23

     Reported by:

24   KIMBERLEE SCHROEDER, CSR, RPR, CCRR

     License No. 11414

25
```

David W. Feigal, M.D., MPH

```
1       Q.   And Everest did not compare rates of adverse

2   events between the G2 and any other filter; did it?

3       A.   No, they did not.

4       Q.   So as far as an epidemiology study sponsored by

5   Bard that would compare whether Bard's filters were

6   associated with more adverse events than some other

7   manufacturer, Bard never did that; did they?

8       A.   No, Bard did not.

9       Q.   I believe you testified that you own at least

10  one addition of the Strom textbook?

11      A.   Yes, I own three.

12      Q.   Three.  Do you have the most recent one, which

13  is 2012?

14      A.   Yes, I do.

15      Q.   Like me, are you eagerly awaiting the sixth

16  edition?

17      A.   Actually --

18      Q.   It's like Rocky 6, Strom 6.  He's from

19  Philadelphia too.

20      A.   Because this field does change and the resource

21  changes, actually the new editions of his textbooks are

22  more interesting than the updated revisions of some of

23  the other textbooks.  But yes, I look forward to his

24  next one.

25      Q.   Do you have the fifth edition 2012?
```

David W. Feigal, M.D., MPH

```
 1    was that formally known as CDER, or was that Office of

 2    Drug Safety?

 3        A.   It's had various names.  It was at one time

 4    Office of Drug Safety, yes.  These are CDER, Center For

 5    Drug Evaluation, positions that he's held.

 6        Q.   As far as you know, Dr. Dal Pan has an

 7    excellent reputation?

 8        A.   Yes.  As I recall, he's written a chapter in

 9    Dr. Strom's textbook.

10        Q.   Have you read that chapter?

11        A.   Yes.

12             MR. ARBITBLIT:  Mark that.

13             MR. LOPEZ:  That's 6.

14             (Plaintiff's Exhibit No. 6 was marked for

15             identification.)

16             THE WITNESS:  Well, ask and you shall receive.

17             MR. ARBITBLIT:  Not always.

18        Q.   So if you look at -- so No. 6 is a chapter from

19    Strom's Fifth Edition of "Pharmacoepidemiology,"

20    Chapter 10, "Postmarketing Spontaneous Pharmacovigilance

21    Reporting Systems," lead author Gerald Dal Pan,

22    coauthors Marie Lindquist and Kate Gelperin; correct?

23        A.   Yes.

24        Q.   You've read this chapter before?

25        A.   Yes.
```

David W. Feigal, M.D., MPH

```
1        Q.    When did you first read it?

2        A.    I don't recall.  But probably shortly after the

3    textbook came out.

4        Q.    And if you turn to page 139, on the right-hand

5    column, at the bottom, the paragraph starting with

6    "Responsibility," could you read that into the record?

7        A.     "Spontaneous adverse events, adverse drug

8    reaction reports, have at times served as necessary and

9    sufficient basis for regulatory actions including

10   product withdrawals."

11       Q.    And you've read that statement before?

12       A.    Yes.

13       Q.    And you agree with it?

14       A.    Yes, that's true.

15       Q.    And then could you read the next sentence?

16       A.    "In August 2001, the manufacturer of

17   cerivastatin withdrew the drug for marketing based on a

18   markedly increased reporting rate of fatal

19   rhabdomyolysis compared to other drugs in the statin

20   class."

21       Q.    Do you recall that episode taking place while

22   you were at the FDA in 2001?

23       A.    I do.

24       Q.    Rhabdomyolysis that's mentioned there is a

25   muscle disease that cause the contents of muscle cells
```

David W. Feigal, M.D., MPH

```
 1    "artifact" in this case?

 2         A.   I think that's correct.  I'm just trying to

 3    actually read here what the -- what the -- what the

 4    criteria for the different, different, different,

 5    different time periods were.

 6         Q.   Okay, you can read, but please don't start

 7    answering a question I haven't asked.

 8         A.   No, no.  Did I answer your last question?

 9         Q.   No, you started reading.

10         A.   Would you repeat it?

11         Q.   How would you define "artifact"?

12         A.   Oh, well, an artifact usually would describe a

13    finding that was caused by a flawed methodology,

14    something that was biased or that created a spurious

15    result.

16         Q.   Do you interpret Staffa saying this was more

17    than artifact to mean that the finding was not spurious?

18    In fact, if they thought it was spurious, they wouldn't

19    have concurred with the decision to withdraw the

20    product; right?

21              MS. DALY:  Object to the form.  Lack of

22    foundation.

23              THE WITNESS:  I don't know what she meant by

24    that.  I would interpret just the plain meaning as the

25    findings are too large to be explained by an artifact in
```

David W. Feigal, M.D., MPH

 1    her opinion.

 2            MR. ARBITBLIT:  Q.  And then the sentence after

 3    that states, "On the basis of the finding of a markedly

 4    increased reporting rate of fatal rhabdomyolysis in

 5    association with cerivastatin, Bayer, with the

 6    concurrence of the FDA, moved to withdraw the

 7    cerivastatin from the U.S. market."

 8            Did I read that correctly?

 9       A.   Yes.

10       Q.   Then it says, "Clinicians should be aware of

11    this labeled but rare event associated with the use of

12    all statins and should warn patients" -- why is that

13    happening?

14            THE VIDEOGRAPHER:  It's an Amber alert.

15            MR. ARBITBLIT:  Well, I turned it off.

16            THE WITNESS:  That will stop it.

17            MR. ARBITBLIT:  Q.  Going back to just reading

18    the conclusion, "clinicians should be aware of labeled

19    but rare event associated with the use of all statins

20    and should warn patients to watch for symptoms of

21    myopathy, such as muscle pain or weakness, which should

22    prompt an immediate consultation with their physician."

23            Did I read that correctly?

24       A.   Yes, you did.

25       Q.   Is this correct the rare event associated with

# EXHIBIT 28
## (Filed Under Seal)

# EXHIBIT 29

CLINICAL STUDY

# Comparison of Complication Rates Associated with Permanent and Retrievable Inferior Vena Cava Filters: A Review of the MAUDE Database

Jessica M. Andreoli, MD, Robert J. Lewandowski, MD,
Robert L. Vogelzang, MD, and Robert K. Ryu, MD

## ABSTRACT

**Purpose:** To compare the safety of permanent and retrievable inferior vena cava (IVC) filters by reviewing the U.S. Food and Drug Administration Manufacturer and User Facility Device Experience (MAUDE) database.

**Materials and Methods:** The MAUDE database was reviewed from January 1, 2009, to December 31, 2012. Product class search criteria were "filter, intravascular, cardiovascular." Type of device used and specific adverse events (AEs) were recorded.

**Results:** For the period January 2009–December 2012, 1,606 reported AEs involving 1,057 IVC filters were identified in the MAUDE database . Of reported AEs, 1,394 (86.8%) involved retrievable inferior vena cava filters (rIVCFs), and 212 (13.2%) involved permanent inferior vena cava filters (pIVCFs) ($P < .0001$). Reported AEs included fracture, migration, limb embolization, tilt, IVC penetration, venous thromboembolism and pulmonary embolism, IVC thrombus, and malfunctions during placement. Each specific AE was reported with significantly higher frequency in rIVCFs compared with pIVCFs. The most common reported complication with rIVCFs was fracture, whereas the most commonly reported complications with pIVCFs were placement malfunctions. For rIVCFs, the most commonly reported AE varied depending on filter brand.

**Conclusions:** The MAUDE database reveals that complications occur with significantly higher frequency with rIVCFs compared with pIVCFs. This finding suggests that the self-reported complication rate with rIVCFs is significantly higher than the self-reported complication rate with pIVCFs.

## ABBREVIATIONS

AE = adverse event, FDA = Food and Drug Administration, IVC = inferior vena cava, MAUDE = Manufacturer and User Facility Device Experience (MAUDE), PE = pulmonary embolism, pIVCF = permanent inferior vena cava filter, rIVCF = retrievable inferior vena cava filter, VTE = venous thromboembolism

The use of inferior vena cava (IVC) filters in the United States has steadily increased each year since their introduction (1). Two types of IVC filters are available: permanent inferior vena cava filters (pIVCFs) and potentially retrievable inferior vena cava filters (rIVCFs). pIVCFs have been available since the 1970s

From the Department of Radiology, Section of Interventional Radiology, Northwestern University, 676 North St Clair Street, Ste 800, Chicago, IL 60611. Received February 14, 2014; final revision received April 8, 2014; accepted April 19, 2014. Address correspondence to R.K.R.; E-mail: Robert. Ryu@ucdenver.edu

From the SIR 2014 Annual Meeting.

R.J.L. and R.K.R. are consultants for Cook Medical Inc. Neither of the other authors has identified a conflict of interest.

Published by Elsevier, Inc., on behalf of the SIR

J Vasc Interv Radiol 2014; 25:1181–1185

http://dx.doi.org/10.1016/j.jvir.2014.04.016

for prevention of pulmonary embolism (PE) in patients with acute lower extremity deep venous thrombosis in whom anticoagulation is contraindicated or has failed (2). In the early 2000s, rIVCFs were approved by the U.S. Food and Drug Administration (FDA) and introduced to the marketplace. rIVCFs appeared to offer clinicians the benefit of a dual-purpose device. Clinicians now had the option of leaving the filter in place as a permanent device or retrieving it after the contraindication to anticoagulation or transient high risk of PE had resolved. The trend in increased use of IVC filters each year since their introduction has been largely attributed to the introduction of rIVCFs and lower thresholds for use. An increasing proportion of IVC filters are placed for venous thromboembolism (VTE) prophylaxis in patients who are at transient high risk of PE (ie, in the setting of severe trauma or before major surgery).

Although efficacy and complication rates of pIVCFs and rIVCFs in retrospective reviews appear to be comparable (3,4), most follow-up times in studies of rIVCFs have been < 1 year, and no randomized studies exist comparing the clinical efficacy and safety profile of rIVCFs and pIVCFs. The purpose of the present study is to compare the safety of pIVCFs and rIVCFs by reviewing the FDA Manufacturer and User Facility Device Experience (MAUDE) database. We hypothesize that self-reported complication rates associated with permanent and retrievable devices are equivalent to the relative prevalence of complication rates in the population.

## MATERIALS AND METHODS

The MAUDE database was reviewed from January 1, 2009 to December 31, 2012. Product class search criteria were "filter, intravascular, cardiovascular." Type of device used and specific adverse events (AEs) were recorded.

### Filters

FDA-approved pIVCFs included percutaneous Greenfield (stainless steel and titanium; Boston Scientific Corporation, Natick, Massachusetts), Vena Tech LGM and LP (B. Braun Medical, Inc, Bethlehem, Pennsylvania), TRAPEASE (Cordis Endovascular, Cordis Corporation, Warren, New Jersey), Simon Nitinol (Bard Peripheral Vascular, Tempe, Arizona), and Bird's Nest (Cook, Inc, Bloomington, Indiana). rIVCFs included Recovery, G2, G2X, G2 Express, Eclipse, and Meridian (all Bard Peripheral Vascular); Celect (Cook, Inc); OPTEASE (Cordis Endovascular, Cordis Corporation); Gunther Tulip (Cook, Inc); Option (Argon Medical Devices, Inc, Plano, Texas); and ALN (ALN International, Bormes les Mimosas, France).

### Data Analysis

The MAUDE database provides a sample of self-reported complications associated with both pIVCFs and rIVCFs. Because the true prevalence of IVC filters in the population is unknown, overall complication rates could not be calculated from these data. As of 2010, it was estimated that 50% of all newly placed filters were rIVCFs, with the potential for the market share to increase to 75% by 2012 (5). Given these projections, we conservatively assumed for our statistical analysis that 75% of filters present in the population during the study time period were rIVCFs.

### Statistical Analysis

Statistical analysis was performed with SPSS software (version 22; SPSS, Inc, Chicago, Illinois). Comparisons were performed with $\chi^2$ test with rejection of the null hypothesis at $P < .05$.

## RESULTS

For the period January 2009–December 2012, 1,606 reported AEs involving 1,057 IVC filters were identified in the MAUDE database (Table 1). Of reported AEs, 1,394 (86.8%) involved rIVCFs, and 212 (13.2%) involved pIVCFs ($P < .0001$). Patient symptoms were not reported in association with 82% of AEs.

Table 2 summarizes the most commonly reported AEs associated with use of pIVCFs and rIVCFs. Each specific AE was reported with significantly higher frequency in rIVCFs compared with pIVCFs.

The most common complication with rIVCFs was fracture (Table 3). There were 350 reports of fracture with rIVCFs, accounting for 24% of AEs associated with use of rIVCFs. Malfunctions and other issues during placement accounted for 15.7% of reported AEs. There were 214 reports of IVC penetration (defined as visualization of a filter element > 3 cm beyond the IVC lumen), 82 (38.3%) of which were associated with patient symptoms. Of cases of IVC penetration, 28 (13.1%) penetrated into the duodenum or small bowel, 14 (6.5%) penetrated into the aorta, and 12 (5.6%) penetrated into adjacent retroperitoneal structures such as the vertebral bodies and disks. Nine cases (4.2%) were associated with retroperitoneal bleeds.

For rIVCFs, the most common AE varied depending on filter brand. Fracture was the most commonly reported AE for Bard devices (27.1%), IVC penetration was the most commonly reported AE for Celect (29.9%), and placement malfunctions were most common for OPTEASE (30.8%) and Gunther Tulip (45%) (Table 3). For pIVCFs, the most commonly reported AEs were malfunctions during filter placement, which accounted for 46.7% of all complications. Filter migration (defined as movement > 2 cm from initial placement) was the next most common complication for pIVCFs, accounting for 27.1% of AEs.

## DISCUSSION

The American College of Chest Physicians (ACCP) and American College of Radiology (ACR)/Society of Interventional Radiology (SIR) have each published evidence-based guidelines for the placement of IVC filters. The ACCP recommends placement of an IVC filter in patients with acute proximal lower extremity

| Table 1. All Complications Reported 2009–2012 | | | |
|---|---|---|---|
| | Total | Permanent | Retrievable |
| 2009–2012 | 1,606 | 212 (13.2%) | 1,394 (86.8%) |
| 2009 | 486 | 49 (10.1%) | 437 (89.9%) |
| 2010 | 390 | 86 (22.1%) | 304 (77.9%) |
| 2011 | 405 | 57 (14.1%) | 348 (85.9%) |
| 2012 | 325 | 20 (6.2%) | 305 (93.8%) |

Volume 25 ■ Number 8 ■ August ■ 2014                                                                 1183

**Table 2**. Complications Reported with Permanent and Potentially Retrievable Devices

|  | Total | pIVCFs (% Total) | rIVCFs (% Total) | P Value |
|---|---|---|---|---|
| All complications | 1,606 | 212 (13.2%) | 1,394 (86.8%) | < .0001 |
| Fracture | 350 | 16 (4.6%) | 334 (95.4%) | < .0001 |
| Migration | 215 | 46 (21.4%) | 169 (78.6%) | < .0001 |
| Limb embolization | 154 | 4 (2.6%) | 150 (97.4%) | < .0001 |
| Tilt | 197 | 3 (1.5%) | 194 (98.5%) | < .0001 |
| IVC penetration | 228 | 14 (6.1%) | 214 (93.9%) | < .0001 |
| VTE/PE | 30 | 8 (26.7%) | 22 (73.3%) | < .007 |
| IVC thrombus | 41 | 8 (19.5%) | 33 (80.5%) | < .001 |
| Placement issue | 318 | 99 (31.1%) | 219 (68.9%) | < .0001 |
| Other | 73 | 14 (19.2%) | 59 (80.8%) | < .0001 |

IVC = inferior vena cava; PE = pulmonary embolism; pIVCF = permanent inferior vena cava filter; rIVCF = retrievable inferior vena cava filter; VTE = venous thromboembolism.

**Table 3**. Frequency of Complications Reported with Potentially Retrievable Devices

|  | Bard Retrievable® | Cook Celect | OPTEASE | Gunther Tulip | Option | ALN |
|---|---|---|---|---|---|---|
| All complications | 1,063 | 157 | 107 | 51 | 11 | 5 |
| Fracture | 288 (27.1%) | 31 (19.7%) | 9 (8.4%) | 3 (5.9%) | 2 (18.2%) | 1 (20%) |
| Migration | 120 (11.3%) | 15 (9.6%) | 26 (24.3%) | 7 (13.7%) | 0 (0%) | 1 (20%) |
| Limb embolization | 131 (12.3%) | 16 (10.2%) | 2 (1.9%) | 0 (0%) | 0 (0%) | 1 (20%) |
| Tilt | 165 (15.5%) | 19 (12.1%) | 6 (5.6%) | 3 (5.9%) | 1 (9.1%) | 0 (0%) |
| IVC penetration | 161 (15.1%) | 47 (29.9%) | 2 (1.9%) | 3 (5.9%) | 1 (9.1%) | 0 (0%) |
| VTE/PE | 15 (1.4%) | 3 (1.9%) | 1 (0.9%) | 0 (0%) | 1 (18.2%) | 1 (20%) |
| IVC thrombus | 21 (1.9%) | 5 (3.2%) | 7 (6.5%) | 0 (0%) | 0 (0%) | 0 (0%) |
| Placement issues | 144 (13.5%) | 15 (9.6%) | 33 (30.8%) | 23 (45.1%) | 2 (27.3%) | 1 (20%) |
| Other | 18 (1.7%) | 6 (3.8%) | 21 (19.6%) | 12 (23.5%) | 2 (18.2%) | 0 (0%) |

IVC = inferior vena cava; PE = pulmonary embolism; VTE = venous thromboembolism.
*Recovery, G2, G2X, G2 Express, Eclipse, and Meridian.

deep venous thrombosis or PE in whom anticoagulation is contraindicated or failed. When bleeding risk resolves, a conventional course of anticoagulation therapy should be administered (6). The ACCP does not recommend inferior vena cava filters as primary prophylaxis for any patient group. However, the ACR/SIR guidelines recognize both therapeutic and prophylactic indications for filter placement. Prophylactic indications include patients without VTE who are at increased risk and have contraindications to effective primary prophylaxis (ie, compression stockings, anticoagulation). SIR also recognizes indications for placement of retrievable filters for patients with VTE and transient contraindication to anticoagulation, PE prophylaxis in high-risk patients, and filter placement in children.

In a review of the National Hospital Discharge Survey database, Stein et al (7) estimated that 2,000 filters were placed in 1979, and by 1999 that number had increased to 49,000. By 2007, approximately 167,000 filters were placed with an expected increase to 259,000 in 2012 (1). Much of the growth in IVC filter usage has been attributed to increased use of rIVCFs and expansion of indications to include placement for prophylaxis. In 2010, 50% of filters placed were potentially retrievable devices, with a projected increase to 75% by 2012 (1). In 1999, 19% of filters were placed for prophylaxis (7), whereas it is estimated that > 50% of filters are currently placed for prophylactic indications (8,9). Other factors in the increased use of these filters may be related to the increased number of IVC filters approved for use in the United States through a major change in the regulatory status. The FDA downgraded IVC filters from higher risk class III to lower risk class II (10). This downgrade permitted manufacturers to achieve market approval more readily as "cleared medical devices," which are ones that the FDA has determined to be substantially equivalent to another legally marketed device. A premarket notification, referred to as a 510(k), must be submitted to the FDA for clearance. As a result, numerous rIVCFs were submitted to the FDA, approved, and subsequently widely marketed to physicians as permanent filters with an option for retrieval.

When retrieved, rIVCFs theoretically offer similar protection against significant PE without the long-term complications associated with pIVCFs, such as increased risk of subsequent deep venous thrombosis (2–4,11). In practice, only a small percentage of rIVCFs are actually removed, with a retrieval rate of 8.5% reported in the literature (12). Low retrieval rates and the potential

complications associated with rIVCFs have raised concerns regarding the safety of these devices (13,14). In 2010, the FDA issued a safety alert acknowledging the increasing use of rIVCFs and growing number of reported AEs, such as filter migration or fracture, IVC perforation, and IVC occlusion, and raised concerns that filters were being left in place well after they were indicated.

In our review of the MAUDE database, the most commonly reported AE among rIVCFs was fracture. In the literature, rates of fracture of rIVCFs range from 9.8%–16% (13,15,18). However, the rate of filter fracture is not reported with consistency in most studies (19). Additionally, the type of AE most commonly reported varied depending on device. For example, fracture was most prevalent among Bard retrievable devices, whereas the most frequently encountered AE among Celect filters was IVC penetration. There are no studies directly comparing complication rates among rIVCF types. However, filter fracture and migration may be more common in recipients of Recovery and G2 filters because this complication was cited as a reason for the withdrawal of these devices from the market. Studies specifically examining filter fracture as a complication involve exclusively Bard retrievable devices (13,15,18). IVC penetration may be more common among Cook Celect filters; a rate of 86.1% has been reported in the literature (20,21). Although fracture was the most frequently reported AE among rIVCFs in the MAUDE database, IVC penetration has been recognized in the literature as significantly more common (22). This disparity may reflect bias in the MAUDE database toward reporting of complications that were thought to be more severe.

In the present study, each specific type of AE was reported with significantly higher frequency with rIVCFs compared with pIVCFs. Retrospective reviews have reported similar complication rates between pIVCFs and rIVCFs; however, these studies involved relatively small numbers of patients, and many patients with rIVCFs were lost to follow-up (3,4). A recent retrospective review found that patients with rIVCFs have significantly more complications than patients with pIVCFs (23). Complication rates for rIVCFs and pIVCFs clearly differ in the literature. Although the fracture rate for rIVCFs approaches 16% in some series (13), the reported incidence of strut fracture for Greenfield filters ranges from 0.05%–1.3% (24).

No prospective studies directly comparing complication rates with rIVCFs and pIVCFs exist at the present time. SIR and the Society of Vascular Surgery are in the process of initiating the PRESERVE (PREdicting the Safety and Effectiveness of InferioR VEna Cava Filters) study, a prospective, multicenter, single-arm clinical trial that aims to evaluate the safety and effectiveness of IVC filters placed in the United States.

Although most AEs reported in the MAUDE database were not associated with patient symptoms, multiple cases of IVC penetration were associated with duodenal or small bowel penetration, penetration into adjacent retroperitoneal structures such as the vertebral bodies and disks, or retroperitoneal bleeds. Even if the overall incidence of these complications is relatively low, the clinical consequences can be significant, particularly for a device placed for prophylactic indications. There appears to be a linear relationship between complication rate and time from implantation with no apparent plateau (15). Given this increase in complication rate with longer dwell time, several institutions have initiated rigorous follow-up of these patients with resulting significant increase in retrieval rates (16,17).

This study has several limitations. The MAUDE database is a voluntary, self-report database, and a very small portion of all IVC filters present in the population are represented. Based on estimates by Smouse and Johar (1), approximately 800,000 filters were placed in the United States during the time period of this study. However, only 1,057 filters were reported to the MAUDE database with complications. Also, only the relative frequency of reported AEs in the MAUDE database could be calculated. Overall incidence of complications could not be determined because the number of IVC filters in the population at any given time is unknown. For the statistical analysis, we assumed that 75% of filters present in the population were rIVCFs. Given the historical use of exclusively permanent devices before the introduction of rIVCFs, this assumption likely overestimates the prevalence of rIVCFs from 2009–2012. However, even using this very conservative estimate in our analysis, the results were statistically significant.

In conclusion, our review of the MAUDE database reveals that complications were reported with significantly higher frequency with rIVCFs compared with pIVCFs. This finding suggests that the self-reported complication rate with rIVCFs is significantly higher than the self-reported complication rate with pIVCFs.

## REFERENCES

1. Smouse B, Johar A.  Is market growth of vena cava filters justified? Endovascular Today, February 2010:74–77.
2. Decousus H, Leizorovicz A, Parent F, et al.  A clinical trial of vena caval filters in the prevention of pulmonary embolism in patients with proximal deep-vein thrombosis. Prevention du Risque d'Embolie Pulmonaire par Interruption Cave Study Group. N Engl J Med 1998; 338:409–415.
3. Kim HS, Young MJ, Narayan AK, Hong K, Liddell RP, Streiff MB.  A comparison of clinical outcomes with retrievable and permanent inferior vena cava filters. J Vasc Interv Radiol 2008; 19:393–399.
4. Van Ha TG, Chien AS, Funaki BS, et al.  Use of retrievable compared to permanent inferior vena cava filters: a single-institution experience. Cardiovasc Intervent Radiol 2008; 31:308–315.
5. Molvar C.  Inferior vena cava filtration in the management of venous thromboembolism: filtering the data. Semin Intervent Radiol 2012; 29: 204–217.
6. Kearon C, Akl EA, Comerota AJ, et al.  Antithrombotic therapy for VTE disease: Antithrombotic Therapy and Prevention of Thrombosis, 9th ed: American College of Chest Physicians Evidence-Based Clinical Practice Guidelines. Chest 2012; 141:e419S–e4194S.

Volume 25 ■ Number 8 ■ August ■ 2014

7. Stein PD, Kayali F, Olson RE.   Twenty-one-year trends in the use of inferior vena cava filters. Arch Intern Med 2004; 164:1541–1555.

8. Kaufman JA, Rundback JH, Kee ST, et al.   Development of a research agenda for inferior vena cava filters: proceedings from a multidisciplinary research consensus panel. J Vasc Interv Radiol 2009; 20:697–707.

9. Carlin AM, Tyburski JG, Wilson RF, Steffes C.  Prophylactic and therapeutic inferior vena cava filters to prevent pulmonary emboli in trauma patients. Arch Surg 2002; 137:521–525, (discussion 525–527).

10. U.S. Food and Drug Administration. 2012. Classify Your Medical Device. Available at: http://www.fda.gov/MedicalDevices/DeviceRegulationand Guidance/Overview/ClassifyYourDevice/default.htm.  Accessed February 6, 2014.

11. Imberti D, Bianchi M, Farina A, Siragusa S, Silingardi M, Ageno W.   Clinical experience with retrievable vena cava filters: results of a prospective observational multicenter study. J Thromb Haemost 2005; 3:1370–1375.

12. Sarosiek S, Crowther M, Sloan JM.   Indications, complications, and management of inferior vena cava filters: the experience in 952 patients at an academic hospital with a level I trauma center. JAMA Intern Med 2013; 173:513–517.

13. Nicholson W, Nicholson WJ, Tolerico P, et al.   Prevalence of fracture and fragment embolization of Bard retrievable vena cava filters and clinical implications including cardiac perforation and tamponade. Arch Intern Med 2010; 170:1827–1831.

14. Stawicki SP, Sims CA, Sharma R, et al.   Vena cava filters: a synopsis of complications and related topics. J Vasc Access 2008; 9:102–110.

15. Vijay K, Hughes JA, Burdette AS, et al.   Fractured Bard Recovery, G2, and G2 express inferior vena cava filters: incidence, clinical consequences, and outcomes of removal attempts. J Vasc Interv Radiol 2012; 23: 188–194.

16. Lynch FC.   A method for following patients with retrievable inferior vena cava filters: results and lessons learned from the first 1,100 patients. J Vasc Interv Radiol 2011; 22:1507–1512.

17. Minocha J, Idakoji I, Riaz A, et al.   Improving inferior vena cava filter retrieval rates: impact of a dedicated inferior vena cava filter clinic. J Vasc Interv Radiol 2010; 21:1847–1851.

18. Tam MD, Spain J, Lieber M, Geisinger M, Sands MJ, Wang W.   Fracture and distant migration of the Bard Recovery filter: a retrospective review of 363 implantations for potentially life-threatening complications. J Vasc Interv Radiol 2012; 23(199–205):e1.

19. Angel LF, Tapson V, Galgon RE, Restrepo MI, Kaufman J.   Systematic review of the use of retrievable inferior vena cava filters. J Vasc Interv Radiol 2011; 22(1522–1530):e3.

20. Zhou D, Spain J, Moon E, McLennan G, Sands MJ, Wang W.   Retrospective review of 120 celect inferior vena cava filter retrievals: experience at a single institution. J Vasc Interv Radiol 2012; 23:1557–1563.

21. Durack JC, Westphalen AC, Kekulawela S, et al.   Perforation of the IVC: rule rather than exception after longer indwelling times for the Gunther Tulip and Celect retrievable filters. Cardiovasc Intervent Radiol 2012; 35: 299–308.

22. Wang W, Zhou D, Obuchowski N, Spain J, An T, Moon E.   Fracture and migration of Celect inferior vena cava filters: a retrospective review of 741 consecutive implantations. J Vasc Interv Radiol 2013; 24: 1719–1722.

23. Desai TR, Morcos OC, Lind BB, et al.   Complications of indwelling retrievable versus permanent inferior vena cava filters. J Vasc Surg Venous Lymphat Disord 2014; 2:166–173.

24. Greenfield LJ, Proctor MC.   Filter complications and their management. Semin Vasc Surg 2000; 13:213–216.

# EXHIBIT 30

CLINICAL STUDY

# Systematic Review of the Use of Retrievable Inferior Vena Cava Filters

Luis F. Angel, MD, Victor Tapson, MD, Richard E. Galgon, MD, MS, Marcos I. Restrepo, MD, MS, and John Kaufman, MD

## ABSTRACT

**Purpose:** To review the available literature on retrievable inferior vena cava (IVC) filters to examine the effectiveness and risks of these devices.

**Materials and Methods:** Investigators searched MEDLINE for clinical trials evaluating retrievable filters and reviewed the complications reported to the Manufacturer and User Facility Device Experience (MAUDE) database of the U.S. Food and Drug Administration (FDA).

**Results:** Eligibility criteria were met by 37 studies comprising 6,834 patients. All of the trials had limitations, and no studies were randomized. There were 11 prospective clinical trials; the rest were retrospective studies. Despite the limitations of the evidence, the IVC filters seemed to be effective in preventing pulmonary embolism (PE); the rate of PE after IVC placement was 1.7%. The mean retrieval rate was 34%. Most of the filters became permanent devices. Multiple complications associated with the use of IVC filters were described in the reviewed literature or were reported to the MAUDE database; most of these were associated with long-term use (> 30 days). At the present time, the objective comparison data of different filter designs do not support superiority of any particular design.

**Conclusions:** In high-risk patients for whom anticoagulation is not feasible, retrievable IVC filters seem to be effective in preventing PE. Long-term complications are a serious concern with the use of these filters. The evidence of the effectiveness and the risks was limited by the small number of prospective studies.

## ABBREVIATIONS:

ACCP = American College of Chest Physicians,  CI = confidence interval,  DVT = deep vein thrombosis,  FDA = U.S. Food and Drug Administration,  IVC = inferior vena cava,  MAUDE = Manufacturer and User Facility Device Experience,  PE = pulmonary embolism,  VTE = venous thromboembolism

Pulmonary embolism (PE) and deep vein thrombosis (DVT), collectively known as venous thromboembolism (VTE), are important causes of disability and death (1–6). The impact of VTE is most severe among hospitalized patients; more than half of the cases of VTE occur during hospitalization (7–9). PE is the leading cause of preventable in-hospital mortality in the United States. In view of the magnitude of the problem and the large population at risk, multiple medical and governmental organizations have made VTE prevention a priority for hospitalized patients (10,11).

The most frequently recommended method of VTE

From the Division of Pulmonary and Critical Care Medicine (L.F.A., M.I.R.), University of Texas Health Science Center at San Antonio, 7703 Floyd Curl Drive, San Antonio, TX 78229; Division of Pulmonary, Allergy and Critical Care Medicine (V.T.), Duke University Medical Center, Durham, North Carolina; Department of Anesthesiology (R.E.G.), University of Wisconsin at Madison, Madison, Wisconsin; Veterans Evidence Research Dissemination and Implementation Center (VERDICT)/South Texas Veterans Health Care System Audie L. Murphy Division (M.I.R.), San Antonio, Texas; and Dotter Interventional Institute (J.K.), Oregon Health and Science Center, Portland, Oregon. Received June 6, 2011; final revision received August 18, 2011; accepted August 18, 2011. **Address correspondence to** L.F.A.; E-mail: angel@uthscsa.edu

An Appendix is available online at *www.jvir.org*.

Funding was provided by the Department of Medicine, Division of Pulmonary and Critical Care Medicine, University of Texas Health Science Center at San Antonio.

The views expressed in this article are those of the authors and do not necessarily represent the views of the University of Texas Health Science Center at San Antonio.

L.F.A. has a financial relationship with BiO$_2$ Medical. J.K. has received research funding from BiO$_2$ Medical. None of the other authors have identified a conflict of interest.

© SIR, 2011

*J Vasc Interv Radiol 2011; 22:1522–1530*

DOI: 10.1016/j.jvir.2011.08.024

prophylaxis and treatment is anticoagulation. However, anticoagulation is contraindicated in many patients, including patients undergoing complex surgery; patients with acute or recent bleeding, hemorrhagic stroke, or advanced liver disease; and some patients with severe trauma. As an alternative to anticoagulation in patients with VTE at high bleeding risk, the American College of Chest Physicians (ACCP) Antithrombotic and Thrombolytic Therapy Evidence-Based Clinical Practice Guidelines, the Society of Interventional Radiology (SIR) Clinical Practice Guidelines, and the United Kingdom National Institute for Health and Clinical Excellence (NICE) Guidelines recommend offering inferior vena cava (IVC) interruption (12–14). There are conflicting recommendations for IVC filters in high-risk patients without VTE who are unable to undergo pharmacologic prophylaxis, with ACCP recommending against IVC filters and SIR recommending placement of IVC filters (12–14).

In patients with short-term indications for IVC filters, retrievable devices can be used. The introduction of filters that can be placed and potentially removed when no longer indicated has probably contributed to the increased overall use of IVC filters (15–18). Filter use has not been studied with the same methodologic rigor that has been applied to medical therapy of VTE with anticoagulation (13,14). Improvement in overall mortality with IVC filters has been hypothesized, but it has been difficult to document. Randomized clinical trials comparing IVC filters and drug therapy are challenged by complex design considerations, including the critical condition of potential subjects, difficult blinding procedures, and, more importantly, mutually excluding indications: IVC filters are recommended for patients for whom anticoagulation is contraindicated. Our aim in this systematic review is to summarize the available clinical experience with the use of retrievable IVC filters in the prevention of PE, to determine whether retrievable IVC filters perform as intended in the prevention of PE, and to assess whether the risks associated with the use of retrievable IVC filters are acceptable when weighed against the benefits to the patients.

## MATERIALS AND METHODS

We searched MEDLINE (PubMed from 1966–2011; English language, clinical trial, and human) for terms describing retrievable IVC filters (key words *vena cava filter, recovery filter, G2 filter, Eclipse filter, Tulip filter, Celect filter, OptEase filter, ALN filter, Option filter*). We retrieved potentially relevant articles and reviewed their reference lists to find studies that our search strategy may have missed. We excluded case reports and review articles to avoid duplication of reporting; however, we included case series if they reported a complication of IVC filters or the technique of insertion (**Fig 1**). In addition to searching the above-referenced databases, we searched for complications that were associated with the use of currently approved retrievable IVC filters and were reported to the Manufac-

turer and User Facility Device Experience (MAUDE) database of the U.S. Food and Drug Administration (FDA) during the past 10 years (January 1, 2000, to December 31, 2010). This self-report database provides a sample of the observed complications associated with temporary IVC filters since their approval for clinical use. The denominator is absent, so even basic complication rates cannot be determined.

## Data Extraction and Quality Assessment

We created a standardized data extraction form for use in collecting the following information: number and types of IVC filters; insertion route (femoral or jugular); indications for use (ie, therapeutic use for patients with VTE before IVC filter placement or prophylactic use for patients with no VTE at the time of placement); incidence of PE; and rate of retrieval failures and complications, including DVT, vena cava thrombosis or stenosis, and filter migration, penetration, or fracture. Complications were categorized as short-term (≤ 30 days after placement) or long-term (> 30 days after placement). One reviewer (L.F.A.) extracted data by using the standardized form, and a second reviewer (R.G.) verified the data for accuracy and completeness.

We graded the strength of the evidence for each study as high, intermediate, or low by using a method suggested for the clinical evaluation of medical devices (19). The first analysis determined the suitability of each clinical study by assessing four criteria: appropriate device, appropriate application, appropriate patient group, and acceptable report or data collection. The second component of the analysis determined the contribution of each study to establishing the safety and performance of the device. The criteria for data contribution included appropriate study design, outcome measures, duration of follow-up, statistical significance, and clinical significance (**Table 1**).

## RESULTS

Our search yielded 37 clinical studies of retrievable vena cava filters and 842 FDA MAUDE—categorized reports involving five FDA-approved retrievable vena cava filters. Of 37 studies, 11 (30%) received a high suitability grade (20–30), whereas the remaining 26 (70%) studies received an intermediate suitability grade (31–56). For data contribution, all of the studies were graded as intermediate, and none received a high or low grade (**Tables 1** and **2** in **Appendix**; available online at *www.jvir.org*).

In the 37 clinical studies, 6,834 retrievable IVC filters were placed. In the studies that reported the indication for filter placement, 3,667 (58%) filters were placed for prophylactic use, and 2,702 (42%) were placed for therapeutic use. Placement through the femoral vein was more common (70%) than placement through the internal jugular vein (30%). There were no reports of any serious procedural complications during placement; the infrarenal placement position was documented for 98% of the patients. The 37



**Figure 1.**  Screening and selection of the literature.

**Table 1.** Evaluation Criteria for Suitability and Data Contribution

| Criteria for Suitability | | Criteria for Data Contribution | |
|---|---|---|---|
| Appropriate device | D1 Actual device | Appropriate study design | T1 Yes |
| | D2 Equivalent device | | T2 No |
| | D3 Other device | | |
| Appropriate application | A1 Same indicated use | Outcome measures | O1 Yes |
| | A2 Minor deviation | | O2 No |
| | A3 Major deviation | | |
| Appropriate patient group | P1 Applicable | Follow-up (duration) | F1 Yes |
| | P2 Limited | | F2 No |
| | p3 different population | | |
| Acceptable report/data collation | R1 High quality | Statistical significance | S1 Yes |
| | R2 Minor deficiencies | | S2 No |
| | R3 Insufficient information | | |
| | | Clinical significance | C1 Yes |
| | | | C2 No |
| **High:** D1, A1, P1, R1 | | **High** T1 O1 F1 S1 C1 | |
| **Low:** D3, A3, P3, R3 | | **Low:** T2, O2, F2, S2, C2 | |
| **Intermediate:** All others | | **Intermediate:** All others | |

**Table 2.** Summary of High-Suitability Prospective Studies

| Filter Type | First Author (ref) | Year | Study Design | No. Filters Placed | Mean Implantation of Removed Filters (days) | Mean Follow-up (mo) | Prophylactic Indication* | Therapeutic Indication† |
|---|---|---|---|---|---|---|---|---|
| ALN | Mismetti (25) | 2007 | Prospective cohort | 220 | 51 | 11.0 | 131 | 89 |
| Celect | Lyon (24) | 2009 | Prospective, multicenter | 95 | 179 | 12.0 | 52 | 43 |
| G2 | Binkert (20) | 2009 | Prospective, multicenter | 100 | 138 | 6.0 | 58 | 42 |
| Optease | Oliva (27) | 2005 | Prospective, multicenter | 27 | 11 | 1.5 | 8 | 19 |
| Optease | Rosenthal (28) | 2005 | Prospective, single center | 94 | 19 | NA | 94 | 0 |
| Optease | Ziegler (30) | 2008 | Prospective, multicenter | 150 | NA | 6.0 | 84 | 66 |
| Option | Johnson (23) | 2010 | Prospective, multicenter, | 100 | 67 | 6.0 | 35 | 65 |
| Tulip | De Gregorio (21) | 2006 | Prospective, single center | 43 | 30 | 11.0 | 23 | 20 |
| Tulip | Hoppe (22) | 2006 | Prospective, multicenter | 42 | 11 | 3.0 | 36 | 6 |
| Tulip | Smouse (29) | 2009 | Prospective, multicenter | 554 | 58 | 12.0 | 332 | 222 |
| Tulip | Neuerburg (26) | 1997 | Prospective, multicenter | 83 | 11 | 4.5 | 10 | 73 |
| **Total** | | | | **1,508** | **52** | **7.3** | **863 (57%)** | **645 (43%)** |

NA = not available.
* For patients with no venous thromboembolism at the time of placement.
† For patients with venous thromboembolism before inferior vena cava filter placement.

**Table 3.** Inferior Vena Cava Filter Benefits: Frequency of Pulmonary Embolism by Filter Type (Literature Review)

| Filter Type | Studies Reporting Pulmonary Embolism/Total No. Studies | No. Patients with Inferior Vena Cava Filter | No. Patients with Pulmonary Embolism |
|---|---|---|---|
| ALN | 3/3 | 738 | 5 (0.7%) |
| Celect | 3/3 | 283 | 3 (1.1%) |
| G2 | 1/5 | 265 | 9 (3.4%) |
| Optease | 4/7 | 487 | 8 (1.6%) |
| Option | 1/1 | 100 | 4 (4%) |
| Recovery | 2/3 | 103 | 1 (1%) |
| Tulip | 7/8 | 1,509 | 14 (0.9%) |
| **Total** | **21/30** | **3,485** | **44 (1.3%)** |

studies reported an average follow-up of 9.9 months (range 2–25 months). **Table 2** reports the characteristics of the high-suitability prospective studies highlighting the type and number of filters placed, the mean implantation time and follow-up, and the indication for filter placement.

## Prevention of PE by Retrievable IVC Filters

No clinical trials directly compared the effects of medical therapy and IVC filters, and no trials compared the efficacy of the various filter designs. In addition, not all of the studies systematically investigated PE (symptomatic or asymptomatic) as a study endpoint. In 21 of the 30 studies that investigated the placement of a single type of retrievable IVC filter, the overall rate of PE was 1.3% (44 of 3,485) (**Table 3**). Eight high-suitability prospective studies reported PE as one study endpoint; the overall rate of PE in these studies was 2% (16 of 785) (20–25,28,29). The highest reported rate of PE (4%) was associated with the Option filter (Rex Medical, Conshohocken, Pennsylvania); four

confirmed cases of recurrent PE were classified as device related.

## Risks of Retrievable IVC Filters

**Tables 4** and **5** summarize the most common anticipated and unanticipated complications associated with the use of approved retrievable IVC filters. The MAUDE database reported 842 complications associated with the use of retrievable IVC filters during the past 10 years and provided a snapshot of the main unanticipated complications associated with the use of retrievable IVC filters outside of clinical trials. The numbers of unanticipated complications were highest for perforation, migration, and fracture of the filters; these events were reported more frequently with prolonged use of the filter (> 30 days). Of these complications, 7% (58 of 842) occurred during the first 30 days after filter placement; the most common complications were filter migration (in 21) and filter penetration into the wall of the vena cava (in 26).

**Table 4.** Frequency of Inferior Vena Cava Filter Complications by Filter Type (Literature Review)

| Filter Type | DVT | | | Filter Migration | | | Vena Cava Thrombosis or Stenosis | | |
|---|---|---|---|---|---|---|---|---|---|
| | No. Studies/ Total Studies | No. Patients with IVC Filter | No. Patients with DVT | No. Studies/ Total Studies | No. Patients with IVC Filter | No. Patients with Migration | No. Studies/ Total Studies | No. Patients with IVC Filter | No. Patients with Thrombosis or Stenosis |
| ALN | 2/3 | 250 | 35 (14%) | 3/3 | 738 | 4 (0.5%) | 3/3 | 738 | 13 (1.8%) |
| Celect | 2/3 | 168 | 2 (1.2%) | 2/3 | 168 | 1 (0.6%) | 2/3 | 168 | 1 (0.6%) |
| G2 | 0/5 | NR | NR | 2/5 | 512 | 23 (4.5%) | 3/5 | 1,227 | 45 (3.7%) |
| Optease | 4/7 | 487 | 4 (0.8%) | 2/7 | 378 | 1 (0.3%) | 4/7 | 543 | 20 (3.7%) |
| Option | 1/1 | 100 | 18 (18%) | 1/1 | 100 | 0 | 1/1 | 100 | 8 (8.0%) |
| Recovery | 1/3 | 96 | 10 (10.4%) | 1/3 | 241 | 2 (0.8%) | 1/3 | 103 | 1 (1.0%) |
| Tulip | 3/8 | 176 | 0 | 5/8 | 579 | 4 (0.7%) | 7/8 | 1,199 | 28 (2.3%) |
| **Total** | **13/30** | **1,277** | **69 (5.4%)** | **16/30** | **2,716** | **35 (1.3%)** | **15/30** | **4,078** | **116 (2.8%)** |

DVT = deep vein thrombosis; IVC = inferior vena cava; NR = not reported; PE = pulmonary embolism.

**Table 5.** Filter Complications Reported from January 1, 2000, to December 31, 2010, to Manufacturer and User Facility Device Experience (MAUDE) Database*

| Filter Name | Manufacturer | No. Reports | Deployment | Perforation | Migration | Fracture | Retrieval | Other | Complications in the First 30 Days | Description of Complication in the First 30 Days |
|---|---|---|---|---|---|---|---|---|---|---|
| Celect | Cook | 18 | 3 | 16 | 0 | 1 | 4 | 0 | 4 | 1: Unable to retrieve at day 17, required surgery 3: Perforation |
| Gunther Tulip | Cook | 144 | 63 | 8 | 35 | 9 | 21 | 20 | 14 | 9: Migration 1: PE 2: Perforation 1: Lower extremity edema 1: Flipped in vena cava |
| G2 | Bard | 500 | 130 | 119 | 127 | 157 | 55 | 26 | 34 | 18: Perforation 11: Migration 1: Fracture 2: Thrombosed 1: PE 1: Tilted |
| Eclipse | Bard | 17 | 3 | 7 | 3 | 1 | 1 | 2 | 3 | 3: Perforation |
| Optease | Cordis | 163 | 29 | 24 | 27 | 20 | 30 | 33 | 3 | 1: Thrombosed 1: Migration 1: Other |
| **Total** | | **842** | **228 (27%)** | **174 (20%)** | **192 (22%)** | **188 (22%)** | **111 (13%)** | **81 (9%)** | **58 (7%)** | |

PE = pulmonary embolism.
* Part of the U.S. Food and Drug Administration.

**Table 6.** Retrievable Inferior Vena Cava Filters: Retrieval Rates and Retrieval Complications (Literature Review)

| Filter | No. Filters | Total No. Removed | % Filter Removed | Filters with Substantial Clot | Unable to Remove | Reason for Failure to Remove | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Embedded | Tilting | Clots |
| ALN | 738 | 191 | 26 | 7 (3.7) | 3 | 2 | 1 | 0 |
| Celect | 283 | 127 | 45 | 10 (7.9) | 7 | 4 | 1 | 2 |
| G2 | 1,517 | 416 | 27 | 16 (3.8) | 28 | 0 | 17 | 11 |
| Optease | 662 | 246 | 37 | 16 (6.5) | 5 | 1 | 3 | 1 |
| Option | 100 | 36 | 36 | 0 | 3 | 2 | 1 | 0 |
| Recovery | 143 | 17 | 12 | 1 (5.9) | 3 | 1 | 2 | 0 |
| Tulip | 1,600 | 682 | 43 | 25 (3.7) | 51 | 29 | 18 | 4 |
| **Total** | **5,043** | **1,715** | **34** | **75 (4.3)** | **100** | **39** | **43** | **18** |

## Deep Vein Thrombosis

The criteria for evaluation of DVT varied, but only 13 of 30 (43%) studies reported the frequency of DVT; the overall rate was 5.4% (69 of 1,277) (**Table 4**). The highest incidence rates were found by Mismetti et al (25) in the prospective ALN filter trial (ALN Implants Chirurgicaux; Ghisonaccia, France), in which 33 (15.2%) subjects experienced DVT, most (84%) during the first 3 months, and by Johnson et al (23) in the Option filter prospective study, in which 18 (18%) of subjects experienced a DVT. The lowest rates of DVT were reported in three of the eight studies evaluating the Tulip filter (Cook, Bloomington, Indiana); these studies found no DVT (21,22,43).

Interpretation of the data regarding the frequency of DVT is limited because most of the studies did not report this complication. Data about the use of anticoagulation for patients with long-term filters (> 30 days) were not reported in most of the studies. The patient populations were heterogeneous, with a high percentage of prophylactic indications (i.e., no VTE at the time of filter placement).

## Filter Migration or Embolization

Filter migration > 2 cm from initial placement location within the IVC was reported in 16 of the 30 clinical studies we reviewed. However, in these studies, significant migration and filter embolization, defined as the movement of the filter from the IVC into the heart, lungs, or tributary vein, were often considered together in the definition of *significant migration*. The overall incidence of significant migration reported by these studies was 1.3% (35 of 2,716 patients) (**Table 4**). All filters were associated with an incidence of significant migration of < 1% with the exception of the G2 filter (Bard Peripheral Vascular, Tempe, Arizona), for which the incidence of significant migration was 4.5%.

The MAUDE database contained 192 reports of filter migration and embolization. Of these incidents, 10% occurred during the first 30 days after placement, whereas 90% occurred > 30 days after placement (**Table 4**). As with the published reports, most of the migration reports (127 of 500 [25%]) in the MAUDE database were associated with the G2 filter (**Table 5**).

## Filter Fracture

Filter fracture is a phenomenon in which the components of a vena cava filter experience a structural failure and separate. This complication was not systematically reported in the studies reviewed. Most of the fracture reports in the MAUDE database were associated with the G2 filter (157 of 500 [31%]) (**Table 5**).

## Vena Cava Thrombosis or Stenosis

The incidence of vena cava thrombosis or stenosis was reported in 15 of the 30 studies that evaluated a single IVC filter. The overall incidence of vena cava thrombosis or stenosis was 2.8% (116 of 4,078), with a range of 0.6%–8% (**Table 4**). The lowest rate of vena cava thrombosis or stenosis was reported with the Celect filter (Cook, Bloomington, Indiana; 0.6% [1 of 168]); the highest rate was reported with the Option filter (8% [8 of 100]).

## IVC Perforation

Filter perforation is defined as visualization of a filter element > 3 mm beyond the lumen of the IVC or within an adjacent structure. Clinically significant IVC perforation associated with IVC filters has been described in case reports and reported in the MAUDE database (**Table 5**) but has not been systematically reported in clinical trials. Overall, 20% of the complications in the MAUDE database are reportedly perforations.

## Retrievable Filter Removal

No prospective randomized studies have evaluated the benefits of filter retrieval. **Table 6** summarizes reported retrieval rates and retrieval complications associated with retrievable IVC filters. Retrieval rates ranged from 12%–45% (mean 34%). The average time to retrieval was 72 days. In 20 of 37 reviewed publications, the mean length of follow-up after IVC filter placement was 9.9 months (range 2–25 months).

The pooled reported success of retrieval attempts was 99% at 1 month after placement, 94% at 3 months, and 37% at 12 months (24). In the studies reporting retrieval attempts and characterizing failures, the overall retrieval failure rate was 5.5% (100 of 1,815). The most common reasons for retrieval failure were tilting of the filter (43%); adherence of the filter to the IVC wall (39%); and large clot burden (18%), defined as a clot volume of > 25% of the filter volume. For the 18 patients whose filters were not removed because of a large clot burden, the filters were left in situ as permanent filters. The most common reasons for not removing retrievable filters were loss of the patient to follow-up and continued risk of PE with or without the ability to continue anticoagulation. Also, in some of the studies, radiographic evaluation before removal suggested substantial penetration, tilting, or thrombosis; these patients were excluded as candidates for filter retrieval.

The MAUDE database contains 111 reports of complications that occurred during the removal of retrievable vena cava filters (Table 5). Most of these reports relate to inability to retrieve the filter. Of the reported complications associated with retrieving IVC filters, only one was reported during the first 30 days after placement.

## DISCUSSION

Although based on heterogeneous studies, none of which were randomized prospective clinical trials, our systematic review provides a synthesis of the state of the evidence on the use of retrievable IVC filters. We systematically reviewed published reports by using a rating system that is recommended for the evaluation of medical devices (19), particularly for devices such as IVC filters that are based on a long-standing technology for which data from randomized controlled trials are limited.

The current recommendations for the use of IVC filters are summarized by the ACCP and SIR guidelines (13,14). The ACCP guidelines are more conservative, strongly recommending the use of IVC filters only for patients with VTE or at very high risk of VTE for whom mechanical and pharmacologic VTE prophylaxis is contraindicated; however, the quality of the evidence received a low rating (recommendation 1C) (13). The ACCP grading was heavily dependent on the review of multiple randomized controlled trials that evaluated medical therapy and the single randomized prospective study using permanent IVC filters (the PREPIC study) (57). The ACCP panel did not evaluate any clinical IVC filter data from nonrandomized trials.

Since the first description of IVC filters by Mobin-Uddin, studies have found that the rates of PE associated with these filters are declining (58). In the PREPIC study, 372 patients with VTE were randomly assigned to treatment with a nonretrievable vena cava filter plus anticoagulation or to treatment with anticoagulation alone (57). During the first 12 days after randomization, the insertion of a vena cava filter was associated with a statistically signif-

icant reduction of 78% in the risk of PE (odds ratio 0.22, 95% confidence interval [CI] 0.05–0.90, $P = .03$). The trial also reported an increased risk of major bleeding with anticoagulation (odds ratio 1.49, 95% CI 0.53–4.20, $P = .44$) (Table 3 in Appendix; available online at www.jvir.org). Similar results were found in the Worcester population-based VTE study, which involved 205 patients with acute VTE treated by placement of a permanent IVC filter (59). In this study, the cumulative incidence of PE at 3 years was lower for IVC-treated patients (1.7%) than for patients not treated with a filter (5.3%; $P = .18$).

Our review of published studies could not consistently evaluate the benefits of retrievable IVC filters in terms of PE prophylaxis because the studies were not randomized, were not properly powered to evaluate this outcome, had a varying incidence of VTE, or did not include a systematic evaluation of PE as an endpoint. Nevertheless, in the studies in which PE was reported, the overall incidence was 1.3% (44 of 3,485), and this rate is comparable to the 1.1% incidence of PE associated with permanent IVC filters in the PREPIC study (57) and the 1.7% incidence in the Worcester VTE study (59). Despite substantial differences between clinical trials of medical therapy plus IVC filters, the overall reported rate of PE with IVC filters compares favorably with the rates of PE in randomized clinical trials of therapeutic anticoagulation. In a large systematic review by Carrier et al (60), the rate of recurrent PE during anticoagulation therapy was 1.7% (95% CI 1.1–2.5) for patients with previous VTE and 4.4% (95% CI 0.7–11.5) for patients with previous PE; the case-fatality rate was 13.7% for patients with previous VTE and 20.6% for patients with previous PE. In this same study, the rate of major bleeding was 2.1% (95% CI 1.6–2.6); major bleeding occurred early after the initiation of anticoagulation (median 11 days, range 0–90 days), and the case-fatality rate was 11.0% (60). The comparable rates of PE in high-risk patients and the lower risk of bleeding associated with withholding anticoagulation support the ACCP guidelines for IVC filter use in this patient population.

The incidence of proximal DVT is thought to increase with the use of IVC filters, and this risk appears to rise with the duration of use (57,61). However, it is unclear whether this increased risk is related to filter-induced changes in venous flow, the underlying systemic condition that predisposed the patient to thrombosis as the initial indication for IVC filter placement, or a combination of both causes. Our systematic review found that during the mean follow-up of 9.9 months, the incidence of DVT was 5.4%; however, for more than half of these patients, the filter was placed prophylactically, in the absence of documented VTE. In the PREPIC study, the incidence of DVT after 2 years was 20.8% in the filter group and 11.6% in the anticoagulation group (hazard ratio 1.87, 95% CI 1.1–3.2, $P = .02$) (57). At 8 years, the incidence increased to 37% in the filter group and 27.5% in the anticoagulation group (hazard ratio 1.52, 95% CI 1.02–2.27, $P = .042$) (61). The rate of anticoagulation was similar in both groups. Likewise, in the Worcester VTE study, the incidence of recurrent DVT at 3

Volume 22 ■ Number 11 ■ November ■ 2011                                                                              1529

years was 21% for patients treated with IVC filters and 14.9% for patients not treated with a filter ($P = .009$).Considering the reported progression rates from DVT to PE (15%–32%) (8,9), the low rates of PE in these studies despite high rates of DVT suggest that IVC filters offer effective protection against PE.

The overall use of IVC filters has increased since the introduction of retrievable filters (15–18). The low retrieval rates and the occurrence of serious complications directly related to retrievable IVC filters, such as filter migration or fracture, vena cava perforation, and vena cava occlusion, have raised concerns about retrievable devices (62–64). Even if the reported incidence of these complications is relatively low, the clinical consequences can be substantial, especially for a device that is placed as a prophylactic measure. The incidence of these complications is time dependent; few of them are reported in the initial 30 days after filter placement. The complication rates increase with the prolonged use of filters ($> 30$ days). The complications also appear to be device dependent, although no prospective comparative studies have been performed. Direct comparison of devices is needed.

Successful retrieval appears to depend partly on the time after placement at which filter retrieval is attempted. This dependency reflects issues related to filter tilt, the extent of adherence to the wall of the IVC, the presence of trapped thrombus, and, most of all, the intensity of follow-up. Retrieval rates are also highly dependent on the follow-up of patients with filters placed with the intention to be retrieved. In situations in which a retrievable filter is used as the default device for all patients, retrieval rates appear very low.

The findings of our review have limitations because the conclusions are supported by evidence of intermediate strength at best. The evidence base, although large and consistent, includes inadequately reported cohort studies and case series. Despite the reporting standards for IVC filter placement and patient follow-up that have been established by SIR (65,66), the way in which the results of these studies are reported often makes it difficult to determine whether the studies were likely to be affected by bias. This finding stresses the importance of consistently reporting the results of these clinical trials because they are the most feasible studies for evaluating these devices. More than 40 years after the introduction of the first device, prospective studies that address the prophylactic indications for the use of IVC filters and that compare the available devices, the risks and benefits of retrieval, and long-term outcomes are still needed.

In conclusion, this systematic review of available clinical studies and reported evidence evaluated the benefits and risks associated with retrievable IVC filters. The benefits of these filters in preventing PE are at least consistent with the reported rates of PE in two clinical trials of medical therapy, the PREPIC study and the Worcester VTE study. However, concerns remain about the long-term risks and complications and the low retrieval rates, especially now that prophylaxis is the most common indication for IVC filter placement. Medical therapy with anticoagulants is recognized as the primary prophylactic and therapeutic measure. Improvements in retrieval rates may help to balance the risk-benefit profile of retrievable IVC filters.

# REFERENCES

1. Tapson VF. Acute pulmonary embolism. N Engl J Med 2008; 358: 1037–1052.
2. Anderson FA Jr, Zayaruzny M, Heit JA, Fidan D, Cohen AT. Estimated annual numbers of US acute-care hospital patients at risk for venous thromboembolism. Am J Hematol 2007; 82:777–782.
3. Bullano MF, Willey V, Hauch O, Wygant G, Spyropoulos AC, Hoffman L. Longitudinal evaluation of health plan cost per venous thromboembolism or bleed event in patients with a prior venous thromboembolism event during hospitalization. J Manag Care Pharm 2005; 11:663–673.
4. Cohen AT, Agnelli G, Anderson FA, et al. Venous thromboembolism (VTE) in Europe: the number of VTE events and associated morbidity and mortality. Thromb Haemost 2007; 98:756–764.
5. Heit JA, Cohen AT, Anderson F Jr; VTE Impact Assessment Group. Estimated annual number of incident and recurrent, non-fatal and fatal venous thromboembolism (VTE) events in the US. Blood (ASH Annual Meeting Abstracts) 2005; 106:910.
6. White RH. The epidemiology of venous thromboembolism. Circulation 2003; 107:I4–I8.
7. Baglin TP, White K, Charles A. Fatal pulmonary embolism in hospitalised medical patients. J Clin Pathol 1997; 50:609–610.
8. Kucher N, Tapson VF, Goldhaber SZ; DVT FREE Steering Committee. Risk factors associated with symptomatic pulmonary embolism in a large cohort of deep vein thrombosis patients. Thromb Haemost 2005; 93:494–498.
9. Stein PD, Matta F, Musani MH, Diaczok B. Silent pulmonary embolism in patients with deep venous thrombosis: a systematic review. Am J Med 2010; 123:426–431.
10. Agency for Healthcare Research and Quality. Preventing hospital-acquired venous thromboembolism. A guide for effective quality improvement. AHRQ Publication No. 08-0075. August 2008. Available at: http://www.ahrq.gov/QUAL/vtguide/vtguide.pdf. Accessed October 7, 2011.
11. House of Commons Health Committee. The prevention of venous thromboembolism in hospitalised patients. Second Report of Session 2004-05. March 8, 2005. http://www.publications.parliament.uk/pa/cm200405/cmselect/cmhealth/99/99.pdf. Accessed March 26, 2011.
12. Geerts WH, Bergqvist D, Pineo GF, et al. Prevention of venous thromboembolism: American College of Chest Physicians Evidence-Based Clinical Practice Guidelines (8th Edition). Chest 2008; 133:381S–453S.
13. Kaufman JA, Kinney TB, Streiff MB, et al. Guidelines for the use of retrievable and convertible vena cava filters: report from the Society of Interventional Radiology multidisciplinary consensus conference. J Vasc Interv Radiol 2006; 17:449–459.
14. National Institute for Health and Clinical Excellence. NICE Clinical Guideline 92. Venous thromboembolism: reducing the risk. Reducing the risk of venous thromboembolism (deep vein thrombosis and pulmonary embolism) in patients admitted to hospital. January 2010. http://www.nice.org.uk/nicemedia/live/12695/47195/47195.pdf. Accessed March 26, 2011.
15. Kaufman JA. Optional vena cava filters: what, why, and when. Vascular 2007; 15:304–313.
16. Keeling AN, Kinney TB, Lee MJ. Optional inferior vena caval filters: where are we now? Eur Radiol 2008; 18:1556–1568.
17. Kinney TB. Update on inferior vena cava filters. J Vasc Interv Radiol 2003; 14:425–440.
18. Rectenwald JE. Vena cava filters: uses and abuses. Semin Vasc Surg 2005; 18:166–175.
19. European Commission Enterprise and Industry Directorate General. Guidelines on medical devices. Clinical evaluation: a guide for manufacturers and notified bodies. December, 2009. http://ec.europa.eu/consumers/sectors/medical-devices/files/meddev/2_7_1rev_3_en.pdf. Accessed March 26, 2011.
20. Binkert CA, Drooz AT, Caridi JG, et al. Technical success and safety of retrieval of the G2 filter in a prospective, multicenter study. J Vasc Interv Radiol 2009; 20:1449–1453.
21. De Gregorio MA, Gamboa P, Bonilla DL, et al. Retrieval of Gunther Tulip optional vena cava filters 30 days after implantation: a prospective clinical study. J Vasc Interv Radiol 2006; 17:1781–1789.

22. Hoppe H, Nutting CW, Smouse HR, et al. Gunther Tulip filter retrievability multicenter study including CT follow-up: final report. J Vasc Interv Radiol 2006; 17:1017–1023.

23. Johnson MS, Nemcek AA Jr, Benenati JF, et al. The safety and effectiveness of the retrievable option inferior vena cava filter: a United States prospective multicenter clinical study. J Vasc Interv Radiol 2010; 21: 1173–1184.

24. Lyon SM, Riojas GE, Uberoi R, et al. Short- and long-term retrievability of the Celect vena cava filter: results from a multi-institutional registry. J Vasc Interv Radiol 2009; 20:1441–1448.

25. Mismetti P, Rivron-Guillot K, Quenet S, et al. A prospective long-term study of 220 patients with a retrievable vena cava filter for secondary prevention of venous thromboembolism. Chest 2007; 131:223–229.

26. Neuerburg JM, Günther RW, Vorwerk D, et al. Results of a multicenter study of the retrievable Tulip Vena Cava Filter: early clinical experience. Cardiovasc Intervent Radiol 1997; 20:10–16.

27. Oliva VL, Szatmari F, Giroux MF, Flemming BK, Cohen SA, Soulez G. The Jonas study: evaluation of the retrievability of the Cordis OptEase inferior vena cava filter. J Vasc Interv Radiol 2005; 16:1439–1445.

28. Rosenthal D, Wellons ED, Levitt AB, Shuler FW, O'Conner RE, Henderson VJ. Role of prophylactic temporary inferior vena cava filters placed at the ICU bedside under intravascular ultrasound guidance in patients with multiple trauma. J Vasc Surg 2004; 40:958–964.

29. Smouse HB, Rosenthal D, Thuong VH, et al. Long-term retrieval success rate profile for the Gunther Tulip vena cava filter. J Vasc Interv Radiol 2009; 20:871–877.

30. Ziegler JW, Dietrich GJ, Cohen SA, Sterling K, Duncan J, Samotowka M. PROOF trial: protection from pulmonary embolism with the OptEase filter. J Vasc Interv Radiol 2008; 19:1165–1170.

31. Cantwell CP, Pennypacker J, Singh H, Scorza LB, Waybill PN, Lynch FC. Comparison of the Recovery and G2 Filter as retrievable inferior vena cava filters. J Vasc Interv Radiol 2009; 20:1193–1199.

32. Charles HW, Black M, Kovacs S, et al. G2 inferior vena cava filter: retrievability and safety. J Vasc Interv Radiol 2009; 20:1046–1051.

33. Doody O, Given MF, Kavnoudias H, Street M, Thomson KR, Lyon SM. Initial experience in 115 patients with the retrievable Cook Celect vena cava filter. J Med Imaging Radiat Oncol 2009; 53:64–68.

34. Given MF, McDonald BC, Brookfield P, et al. Retrievable Gunther Tulip inferior vena cava filter: experience in 317 patients. J Med Imaging Radiat Oncol 2008; 52:452–457.

35. Hammond CJ, Bakshi DR, Currie RJ, et al. Audit of the use of IVC filters in the UK: experience from three centres over 12 years. Clin Radiol 2009; 64:502–510.

36. Imberti D, Bianchi M, Farina A, Siragusa S, Silingardi M, Ageno W. Clinical experience with retrievable vena cava filters: results of a prospective observational multicenter study. J Thromb Haemost 2005; 3: 1370–1375.

37. Kalva SP, Marentis TC, Yeddula K, Somarouthu B, Wicky S, Stecker MS. Long-term safety and effectiveness of the "OptEase" vena cava filter. Cardiovasc Intervent Radiol 2011; 34:331–337.

38. Karmy-Jones R, Jurkovich GJ, Velmahos GC, et al. Practice patterns and outcomes of retrievable vena cava filters in trauma patients: an AAST multicenter study. J Trauma 2007; 62:17–24.

39. Keller IS, Meier C, Pfiffner R, Keller E, Pfammatter T. Clinical comparison of two optional vena cava filters. J Vasc Interv Radiol 2007; 18:505–511.

40. Looby S, Given MF, Geoghegan T, McErlean A, Lee MJ. Gunther Tulip retrievable inferior vena caval filters: indications, efficacy, retrieval, and ccomplications. Cardiovasc Intervent Radiol 2007; 30:59–65.

41. Lynch FC, Kekulawela S. Removal of the G2 filter: differences between implantation times greater and less than 180 days. J Vasc Interv Radiol 2009; 20:1200–1209.

42. Marquess JS, Burke CT, Beecham AH, et al. Factors associated with failed retrieval of the Günther Tulip inferior vena cava filter. J Vasc Interv Radiol 2008; 19:1321–1327.

43. Millward SF, Oliva VL, Bell SD, et al. Günther Tulip Retrievable Vena Cava Filter: results from the Registry of the Canadian Interventional Radiology Association. J Vasc Interv Radiol 2001; 12:1053–1058.

44. Oliva VL, Perreault P, Giroux MF, Bouchard L, Therasse E, Soulez G. Recovery G2 inferior vena cava filter: technical success and safety of retrieval. J Vasc Interv Radiol 2008; 19:884–889.

45. Pellerin O, Barral FG, Lions C, Novelli L, Beregi JP, Sapoval M. Early and late retrieval of the ALN removable vena cava filter: results from a multicenter study. Cardiovasc Intervent Radiol 2008; 31:889–896.

46. Rosenthal D, Swischuk JL, Cohen SA, Wellons ED. OptEase retrievable inferior vena cava filter: initial multicenter experience. Vascular 2005; 13:286–289.

47. Sangwaiya MJ, Marentis TC, Walker TG, Stecker M, Wicky ST, Kalva SP. Safety and effectiveness of the celect inferior vena cava filter: preliminary results. J Vasc Interv Radiol 2009; 20:1188–1192.

48. Singh P, Lai HM, Lerner RG, Chugh T, Aronow WS. Guidelines and the use of inferior vena cava filters: a review of an institutional experience. J Thromb Haemost 2009; 7:65–71.

49. Smoot RL, Koch CA, Heller SF, et al. Inferior vena cava filters in trauma patients: efficacy, morbidity, and retrievability. J Trauma 2010; 68:899–903.

50. Zhu X, Tam MD, McLennan G, Sands MJ, Wang W. Indications, complications and outcomes of G2 retrievable IVC filters in 765 patients: a single institute experience [abstract no. 3]. J Vasc Interv Radiol 2010; 21:S3–S4.

51. Van Ha TG, Chien AS, Funaki BS, et al. Use of retrievable compared to permanent inferior vena cava filters: a single-institution experience. Cardiovasc Intervent Radiol 2008; 31:308–315.

52. Yavuz K, Geyik S, Hoppe H, Kolbeck KJ, Kaufman JA. Venous thromboembolism after retrieval of inferior vena cava filters. J Vasc Interv Radiol 2008; 19:504–508.

53. Grande WJ, Trerotola SO, Reilly PM, et al. Experience with the recovery filter as a retrievable inferior vena cava filter. J Vasc Interv Radiol 2005; 16:1189–1193.

54. Kalva SP, Athanasoulis CA, Fan CM, et al. "Recovery" vena cava filter: experience in 96 patients. Cardiovasc Intervent Radiol 2006; 29:559–564.

55. Onat L, Ganiyusufoglu AK, Mutlu A, et al. OptEase and TrapEase vena cava filters: a single-center experience in 258 patients. Cardiovasc Intervent Radiol 2009; 32:992–997.

56. Pfammatter T, Hechelhammer L, Pfiffner R. A "Buddy Wire" technique for successful OptEase filter retrieval. J Vasc Interv Radiol 2009; 20:656–659.

57. Decousus H, Leizorovicz A, Parent F, et al. A clinical trial of vena caval filters in the prevention of pulmonary embolism in patients with proximal deep-vein thrombosis. Prevention du Risque d'Embolie Pulmonaire par Interruption Cave Study Group. N Engl J Med 1998; 338:409–415.

58. Mobin-Uddin K, Trinkle JK, Bryant LR. Present status of the inferior vena cava umbrella filter. Surgery 1971; 70:914–919.

59. Spencer FA, Bates SM, Goldberg RJ, et al. A population-based study of inferior vena cava filters in patients with acute venous thromboembolism. Arch Intern Med 2010; 170:1456–1462.

60. Carrier M, Le Gal G, Wells PS, Rodger MA. Systematic review: case-fatality rates of recurrent venous thromboembolism and major bleeding events among patients treated for venous thromboembolism. Ann Intern Med 2010; 152:578–589.

61. PREPIC Study Group. Eight-year follow-up of patients with permanent vena cava filters in the prevention of pulmonary embolism: the PREPIC (Prevention du Risque d'Embolie Pulmonaire par Interruption Cave) randomized study. Circulation 2005; 112:416–422.

62. Nicholson W, Nicholson WJ, Tolerico P, et al. Prevalence of fracture and fragment embolization of Bard retrievable vena cava filters and clinical implications including cardiac perforation and tamponade. Arch Intern Med 2010; 170:1827–1831.

63. Cipolla J, Weger NS, Sharma R, et al. Complications of vena cava filters: a comprehensive clinical review. Opus 12 Scientist 2008; 2:11–24.

64. U.S. Food and Drug Administration. Inferior vena cava (IVC) filters: initial communication: risk of adverse events with long term use. Posted August 9, 2010. http://www.fda.gov/Safety/MedWatch/SafetyInformation/SafetyAlertsforHumanMedicalProducts/ucm221707.htm. Accessed March 27, 2011.

65. Grassi CJ, Swan TL, Cardella JF, et al. Quality improvement guidelines for percutaneous permanent inferior vena cava filter placement for the prevention of pulmonary embolism. J Vasc Interv Radiol 2003; 14:S271–S275.

66. Millward SF, Grassi CJ, Kinney TB, et al. Reporting standards for inferior vena caval filter placement and patient follow-up: supplement for temporary and retrievable/optional filters. J Vasc Interv Radiol 2005; 16:441–443.

## APPENDIX

**Table 1.** Appraisal Criteria for Suitability of Published Reports of Retrievable Inferior Vena Cava Filters

| Filter | First Author | Year | Study Design | Device | Application | Patient Group | Report/ Data Collection | Suitability Level |
|---|---|---|---|---|---|---|---|---|
| ALN | Mismetti | 2007 | Prospective cohort | D1 | A1 | P1 | R1 | High |
| ALN | Imberti | 2005 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| ALN | Pellerin | 2008 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| Celect | Doody | 2009 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| Celect | Lyon | 2009 | Prospective, multicenter | D1 | A1 | P1 | R1 | High |
| Celect | Sangwaiya | 2009 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| G2 | Zhu | 2010 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| G2 | Oliva | 2008 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| G2 | Charles | 2009 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| G2 | Lynch | 2009 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| G2 | Binkert | 2009 | Prospective, multicenter (11 sites) | D1 | A1 | P1 | R1 | High |
| Optease | Rosenthal | 2004 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| Optease | Kalva | 2010 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| Optease | Oliva | 2005 | Prospective, multicenter | D1 | A1 | P1 | R1 | High |
| Optease | Pfammatter | 2009 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| Optease | Rosenthal | 2004 | Prospective, single center | D1 | A1 | P1 | R1 | High |
| Optease | Ziegler | 2008 | Prospective, multicenter | D1 | A1 | P1 | R1 | High |
| Optease | Onat | 2009 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| Option | Johnson | 2010 | Prospective, multicenter | D1 | A1 | P1 | R1 | High |
| Recovery | Grande | 2005 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| Recovery | Kalva | 2006 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| Recovery, G2 | Cantwell | 2010 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| Tulip | Given | 2008 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| Tulip | De Gregorio | 2006 | Prospective | D1 | A1 | P1 | R1 | High |
| Tulip | Looby | 2007 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| Tulip | Hoppe | 2006 | Prospective, multicenter | D1 | A1 | P1 | R1 | High |
| Tulip | Smouse | 2009 | Prospective | D1 | A1 | P1 | R1 | High |
| Tulip | Millward | 2001 | Retrospective, multicenter | D1 | A1 | P1 | R2 | Intermediate |
| Tulip | Neurburg | 1997 | Prospective, multicenter | D1 | A1 | P1 | R1 | High |
| Tulip | Hammond | 2009 | Retrospective, multicenter | D1 | A1 | P1 | R2 | Intermediate |
| Tulip Optease | Keller | 2007 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| Tulip Optease | Marquess | 2008 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| Tulip Recovery | Smoot | 2010 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| Tulip Recovery | VanHa | 2007 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| Tulip Recovery Optease | Yavuz | 2008 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| Tulip, Recovery, Optease | Karmy-Jones | 2007 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |
| Tulip, Recovery, Optease, G2, Celect | Singh | 2009 | Retrospective | D1 | A1 | P1 | R2 | Intermediate |

**Table 2.** Appraisal Criteria for Data Contribution of the Published Reports for Retrievable Inferior Vena Cava Filters

| Filter | First Author | Year | Study Design | Data Source | Outcome Measure | Follow-up | Statistical Significance | Clinical Significance | Contribution Level |
|---|---|---|---|---|---|---|---|---|---|
| ALN | Mismetti | 2007 | Prospective cohort | T1 | O1 | F1 | S2 | C1 | Intermediate |
| ALN | Imberti | 2005 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| ALN | Pellerin | 2008 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| Celect | Doody | 2009 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| Celect | Lyon | 2009 | Prospective, multicenter | T1 | O1 | F1 | S2 | C1 | Intermediate |
| Celect | Sangwaiya | 2009 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| G2 | Zhu | 2010 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| G2 | Oliva | 2008 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| G2 | Charles | 2009 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| G2 | Lynch | 2009 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| G2 | Binkert | 2009 | Prospective, multicenter (11 sites) | T1 | O1 | F1 | S2 | C1 | Intermediate |
| Optease | Rosenthal | 2004 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| Optease | Kalva | 2010 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| Optease | Oliva | 2005 | Prospective, multicenter | T1 | O1 | F1 | S2 | C1 | Intermediate |
| Optease | Pfammatter | 2009 | Retrospective | T1 | O1 | F1 | S2 | C2 | Intermediate |
| Optease | Rosenthal | 2004 | Prospective, single center | T1 | O1 | F1 | S2 | C1 | Intermediate |
| Optease | Ziegler | 2008 | Prospective, multicenter | T1 | O1 | F1 | S2 | C1 | Intermediate |
| Optease | Onat | 2009 | Retrospective | T2 | O1 | F1 | S2 | C1 | Intermediate |
| Option | Johnson | 2010 | Prospective, multicenter | T1 | O1 | F1 | S2 | C1 | Intermediate |
| Recovery | Grande | 2005 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| Recovery | Kalva | 2006 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| Recovery, G2 | Cantwell | 2010 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| Tulip | Given | 2008 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| Tulip | De Gregorio | 2006 | Prospective | T1 | O1 | F1 | S2 | C1 | Intermediate |
| Tulip | Looby | 2007 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| Tulip | Hoppe | 2006 | Prospective, multicenter | T1 | O1 | F1 | S2 | C1 | Intermediate |
| Tulip | Smouse | 2009 | Prospective | T1 | O1 | F1 | S2 | C1 | Intermediate |
| Tulip | Millward | 2001 | Retrospective, multicenter | T2 | O1 | F1 | S2 | C2 | Intermediate |
| Tulip | Neurburg | 1997 | Prospective, multicenter | T1 | O1 | F1 | S2 | C1 | Intermediate |
| Tulip | Hammond | 2009 | Retrospective, multicenter | T2 | O1 | F1 | S2 | C2 | Intermediate |
| Tulip Optease | Keller | 2007 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| Tulip Optease | Marquess | 2008 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| Tulip Recovery | Smoot | 2010 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| Tulip Recovery | VanHa | 2007 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| Tulip Recovery Optease | Yavuz | 2008 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| Tulip, Recovery, Optease | Karmy-Jones | 2007 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |
| Tulip, Recovery, Optease, G2, Celect | Singh | 2009 | Retrospective | T2 | O1 | F1 | S2 | C2 | Intermediate |

Volume 22 ■ Number 11 ■ November ■ 2011                                                                          1530.e3

**Table 3.** Randomized Trials of Inferior Vena Cava Filters as an Adjunct to Anticoagulation in Patients with Deep Vein Thrombosis: The PREPIC Study, Short-Term (12 Days) Results

| Study Year | Interventions | Patients Analyzed | Follow-up | PE Rate (12 days) | Major Bleeding (12 days) | Total Mortality (12 days) |
|---|---|---|---|---|---|---|
| 1998 | Permanent IVC filter vs no IVC filter | 372 patients: 183 filter and 189 no filter | 12 days | Filter 2/183 (1.1%) | Filter 9/183 (4.9%) | Filter 5/183 (2.7%) |
| | | | | No filter 9/189 (4.8%) | No filter 6/189 (3.1%) | No filter 5/189 (2.7%) ($P > .05$) |
| | | | | RR 0.23 (95% CI 0.05–1.05) | RR 1.5 (95% CI 0.54–4.14) | |
| | | | | Symptomatic PE: | | |
| | | | | Filter 2/183 (1.1%) | | |
| | | | | No filter 5/189 (2.6%) | | |
| | | | | RR 0.41 (95% CI 0.08–2.1) | | |

CI = confidence interval; IVC = inferior vena cava; PE = pulmonary embolism; RR = relative risk.

# EXHIBIT 31
## (Filed Under Seal)

# EXHIBIT 32

# Analysis of the US Food and Drug Administration Manufacturer and User Facility Device Experience database for adverse events involving Amplatzer septal occluder devices and comparison with the Society of Thoracic Surgery congenital cardiac surgery database

Daniel J. DiBardino, MD,[a] Doff B. McElhinney, MD,[b] Aditya K. Kaza, MD,[a] and John E. Mayer, Jr, MD[a]

**Objective:** Amplatzer (AGA Medical Corporation, Plymouth, Minn) septal and vascular occluder devices have significantly altered the care of patients with congenital heart disease. The relative frequency and consequence of complications resulting from the attempted placement of such devices, however, have not been well assessed. The purpose of this study is to use large databases to assess the frequency and severity of such complications and compare them with those of surgical atrial septal defect closure.

**Methods:** The US Food and Drug Administration Manufacturer and User Facility Device Experience database was quarried for all adverse events for Amplatzer septal occluder devices, which were categorized and analyzed with particular emphasis on management and outcome. The Society of Thoracic Surgery database was likewise quarried for the same data regarding atrial septal defect closures over a contemporaneous time period. By using a literature-derived denominator for total Amplatzer implant numbers, the results of the 2 therapies were compared.

**Results:** Since July 1, 2002, 223 adverse events in patients undergoing Amplatzer atrial septal defect closure were submitted to the Food and Drug Administration, resulting in 17 deaths (7.6%) and 152 surgical rescue operations (68.2%). Society of Thoracic Surgery data demonstrated 1537 primary operations with 2 deaths (0.13%) and 6 reoperations (0.39%). By extrapolating on published estimates of Amplatzer implantation to provide an implant denominator (n = 18,333), there was no difference between overall mortality for surgical (0.13%) and device closure (0.093%, $P$ = .649). Rescue operation for device adverse events (0.83%) was 2.1 times more likely than reoperation for surgical closure (0.39%, $P$ = .063). Mortality per adverse event was higher for device closure (7.6%) than for surgical closure (1.2%, $P$ = .004), and the need for surgery per adverse event was higher for device closure (68.2%) than for surgical closure (3.6%, $P$ < .001). The mortality for surgical management of a device adverse event (2.6%) was 20-fold higher than for primary elective atrial septal defect closure (0.13%, $P$ < .0001).

**Conclusion:** Overall crude mortality for device and surgical closure atrial septal defect closure is equivalent, and the need for subsequent operation (surgical rescue) is more common in patients undergoing device closure than reoperation is in patients undergoing surgical closure. Complications from device closure tend to be serious and most often require urgent or emergency operative management, whereas the mortality for surgical management of a device complication appears higher than that of elective atrial septal defect closure. Further information is required in the form of postmarketing surveillance, such as a mandatory user registry with periodic end-user notification.



Earn CME credits at
http://cme.ctsnetjournals.org

From the Departments of Cardiac Surgery[a] and Cardiology,[b] Children's Hospital Boston, Harvard Medical School, Boston, Mass.

Read at the Eighty-eighth Annual Meeting of the American Association for Thoracic Surgeons, May 11–14, 2008, San Diego, California.

Received for publication May 25, 2008; revisions received Dec 26, 2008; accepted for publication Feb 16, 2009.

Address for reprints: Daniel J. DiBardino, MD, Cardiac Surgery, Children's Hospital Boston, 300 Longwood Avenue, Boston, MA 02115 (E-mail: dibardino@partners.org).

J Thorac Cardiovasc Surg 2009;137:1334-41

0022-5223/$36.00

Copyright © 2009 by The American Association for Thoracic Surgery

doi:10.1016/j.jtcvs.2009.02.032

Amplatzer septal and vascular occluder devices (Amplatzer, AGA Medical Corporation, Plymouth, Minn) have significantly altered the care of patients with congenital heart disease and are becoming standard care in many institutions. The relative frequency, consequence, and cost of complications resulting from the attempted placement of the Amplatzer occluder devices, however, have not been well assessed. The overall mortality and need for surgical intervention are unknown. In addition, periprocedural adverse events (AEs) for catheter therapies often mandate operative intervention such that an analysis of the patterns of such failures are germane to the cardiac surgeon and essential to the cardiologist providing informed consent to patients and families. To generate such data, an analysis was undertaken of the US Food and Drug Administration (USFDA) on-line database for device-related AEs, and a denominator of device implants was

<table>
</table>

**Abbreviations and Acronyms**

| | |
|---|---|
| AE | = adverse event |
| ASD | = atrial septal defect |
| MAUDE | = Manufacturer and User Facility Device Experience |
| PER | = perforation/erosion/rupture |
| PFO | = patent foramen ovale |
| STS | = Society of Thoracic Surgery |
| USFDA | = US Food and Drug Administration |

**TABLE 1. Major adverse event categories for patients reported to the US Food and Drug Administration between January 1, 2002, and June 30, 2007**

| Adverse event | No. of reported events | Percentage of reported events |
|---|---|---|
| Device embolization | 114 | 51% |
| Cardiac PERs | 51 | 23% |
| Thromboembolitic complication | 11 | 5% |
| Residual/recurrent defect | 9 | 4% |
| Device infection | 5 | 2% |

*PER*, Perforation/erosion/rupture.

estimated from published literature. AEs involving surgical atrial septal defect (ASD) and patent foramen ovale (PFO) closure were likewise obtained from the Society of Thoracic Surgery (STS) Congenital Cardiac Surgery Database, such that a comparative analysis could be performed.

## MATERIALS AND METHODS

The Manufacturer and User Facility Device Experience (MAUDE) data base was accessed via the USFDA main Web page.[1] A query was performed using the brand name ''Amplatzer'' to select for AEs involving all Amplat zer devices, and only the results for ASD and PFO closures were included in this analysis. The first such reported AE was received by the USFDA on January 24, 2002, and the search was arbitrarily concluded on June 30, 2007, for a total of a 5.5 year collection period. Events were broadly clas sified into categories (Table 1). If multiple AEs occurred within a single pa tient narrative, the event that dominated the clinical presentation and course of the patient was used for classification purposes. Device ''embolization'' was defined by the movement of a device to a location other than the atrial septum, differentiating it from device ''malposition,'' an unacceptable position within the atrial septum. Cardiac perforation/erosion/rupture (PER) was defined as any narrative where perforation, device erosion, or rupture of a cardiac structure occurred or was thought to have occurred. This is differentiated from the category of ''pericardial effusion,'' which would be a serous effusion or one in which a perforation or erosion was not suspected. Infection refers to cases in which the device was thought to be the infectious source, and the thromboembolitic event category included all stroke, transient ischemic attack, and device thrombus events.

All data regarding the manner in which complications were addressed (catheter intervention, operative management, or both) and the final out come (mortality) were included in the analysis when sufficient information was provided in the reported narrative. Any patient with death as the out come of the AE was listed as a device mortality, whereas all patients under going operation in the management of the AE were counted as ''surgical rescue.'' To calculate the relative frequency of events, a request was made to AGA Medical for estimates of implants over the study period. This request was subsequently denied via electronic mail correspondence. Thus, a previously published device estimate calculation was used to gener ate a denominator and allow comparison with STS data.

The STS Congenital Cardiac Surgery Database was likewise quarried for the results of surgical closure of defects at the atrial septum during a similar time frame (beginning January of 2002 with data available through Decem ber 2006). Patients with primary closure of PFO, primary ASD closure, and patch closure of ASD as the primary qualifying index operation were included in the analysis, whereas patients with other defects addressed at the time of the index operation were excluded secondary to complexity mismatch with device closure candidates. Outcomes were requested and obtained for discharge mortality, postoperative length of stay, and a com plete list of any and all complications. From the complication tally, any

patient undergoing an unplanned reoperation of any kind was counted in the ''surgical reoperation'' group. The overall mortality rate of surgical versus device closure was compared, as was the need for surgical rescue compared with device closure. The rate of death per AE and need for operation per AE were also compared for device versus surgical closure.

Because the MAUDE database narratives are widely and freely available to the public on the World Wide Web and no patient identification variables are included, there was no requirement for institutional review board permission. Likewise, no such institutional permission is needed for the use of STS data; permission was requested and granted from the STS data base committee. All data were coded using an Excel spreadsheet (Microsoft Corp, Redmond, WA), and all percentages all reported with the accompany ing raw numeric data in the form of a fraction. Inferential statistics were performed as 2 tailed chi square analysis[2] for categoric data.

## RESULTS
### Manufacturer and User Facility Device Experience Database Adverse Events: Embolization and Perforation/Erosion/Rupture

AE reports totaling 274 involving any type of Amplatzer device were received over a 5.5-year period; closure of



**FIGURE 1.** Histogram demonstrating the number of AEs involving the Amplatzer (AGA Medical Corporation, Plymouth, MN) septal occluder reported to the USFDA between January 2002 and December 2006. *AE*, Adverse event.

CHD

**TABLE 2.** Failing component listed for adverse events reported to the US Food and Drug Administration between January 1, 2002, and June 30, 2007

| Failing component | No. of reported events | Percentage of reported events |
|---|---|---|
| ASD occluder device | 197 | 88.3% |
| PFO occluder device | 16 | 7.2% |
| Delivery catheter | 10 | 4.5% |
| Sizing balloon | 6 | 2.7% |
| Guidewire | 1 | 0.5% |
| Unknown | 2 | 0.9% |

*ASD,* Atrial septal defect; *PFO,* patent foramen ovale.

**TABLE 4.** Location of embolized devices among 114 patients reported to the US Food and Drug Administration between January 1, 2002, and June 30, 2007

| Location | No. of reported events | Percentage of reported events |
|---|---|---|
| Right atrium | 2 | 1.8% |
| Right ventricle | 19 | 16.7% |
| Pulmonary artery | 18 | 15.8% |
| Left atrium | 28 | 24.6% |
| Left ventricle | 12 | 10.5% |
| Aorta | 21 | 18.4% |
| Unknown | 14 | 12.3% |

the atrial septum was involved in 232 reports (84.7%) (Figure 1). Reliable morphologic data on the location within the atrial septum was unavailable, and specific patient demographics and identifiers such as age, weight, body surface area were likewise not found in the online reports. The specific Amplatzer system elements identified as the failing component in the 232 AE narratives are listed in Table 2. Careful review of each independent event narrative revealed that multiple entries were sometimes found when multiple devices were used for the same patient. Controlling for these duplications resulted in 223 individual patients having AEs.

Death is listed as the outcome for 17 of 223 patients (7.6% mortality per AE, Table 3). Cardiac PER was the most frequent AE type resulting in mortality (10/17, 58.8%). One woman who survived perforation lost her pregnancy, although this was not counted as mortality. To provide a denominator for analysis, we relied on a published precedent for implant estimate calculation used by Delaney and colleagues,[3] which was derived from published esti-

mates by a panel of physicians who were previously chosen by AGA Medical to perform complication analysis and who appear to be financially linked to the company.[4] According to these data, approximately 10,000 implants are estimated over a 3-year period from 2002 to 2004. Extrapolation of this rate over a 5.5-year period starting in 2002 gives 18,333 implants and an overall mortality of 17 of 18.333 (0.093%).

Embolization of Amplatzer occluder devices was the most prevalent AE (114/223 patients, 51.1%), giving a national embolization rate of 114 of 18,333 (0.62%). A 2004 survey of AGA proctors determined the rate of embolization to be 21 of 3824 implants (0.55%), not significantly different from our data (*P* = .599).[5] There were 2 deaths, giving a mortality rate per embolization of 1.8%. Table 4 lists the sites and relative frequencies of embolization, demonstrating the most frequent embolization to the left side of the heart. In 12 of the 114 cases (10.5%), a secondary arrhythmia occurred with embolization and was often the ''warning sign'' of an AE, triggering further workup (Table 5). Eighty-eight patients with embolization (77.2%) required operation, whereas successful transcatheter management was possible in 19 patients (16.7%). Management is not known for 5 patients (4.4%), and no action was taken in 2 patients (1.8%).

**TABLE 3.** Mortality among adverse events in 223 patients reported to the US Food and Drug Administration between January 1, 2002, and June 30, 2007

| Number | Failing component catalog number | Adverse event type |
|---|---|---|
| 1 | 9 ASD 022 | Cardiac PER |
| 2 | 9 ASD 000 | Cardiac PER |
| 3 | 9 ASD 020 | Cardiac PER |
| 4 | 9 ASD 026 | Cardiac PER |
| 5 | 9 ASD 026 | Cardiac PER |
| 6 | 9 ASD 019 | Embolization |
| 7 | 0 ASD 017 | Thromboembolitic event |
| 8 | 9 ASD 024 | Embolization |
| 9 | 9 ASD 022 | Sudden death |
| 10 | 9 PFO HDE 025 | Myocardial infarction |
| 11 | 9 ASD 008 | Respiratory failure |
| 12 | 9 PFO HAD 025 | Cardiac PER |
| 13 | 9 ASD 026 | Cardiac PER |
| 14 | 9 ASD 026 | Cardiac PER |
| 15 | 9 ASD 036 | Cardiac PER |
| 16 | 9 ASD 026 | Cardiac PER |
| 17 | 9 DEL 12F 45/80 | Air embolization |

*PER,* Perforation, erosion, rupture.

**TABLE 5.** Arrhythmia and device location among 114 patients with device embolization reported to the US Food and Drug Administration between January 1, 2002, and June 30, 2007

| No. | Rhythm disturbance (from narrative) | Device location |
|---|---|---|
| 1 | Nonsustained VT | Left ventricle |
| 2 | Atrial flutter | Unknown |
| 3 | ''Significant ectopy'' | Right ventricle |
| 4 | PVCs | Right ventricle |
| 5 | PVCs | Right ventricle |
| 6 | PVCs | Right ventricle |
| 7 | Atrial fibrillation, complete heart block | Pulmonary artery |
| 8 | ''Transient arrhythmia'' | Left atrium |
| 9 | Bradycardia (with hypotension) | Aorta |
| 10 | PVCs | Aorta |
| 11 | ''Extreme rhythm changes'' | Right ventricle |
| 12 | VT | Right ventricle |

*VT,* Ventricular tachycardia; *PVC,* premature ventricular contraction.

**TABLE 6.** Timing of 51 cardiac perforations, erosions, or ruptures as reported to the US Food and Drug Administration between January 1, 2002, and June 30, 2007

| Timing of event | No. of reported events | Percentage of reported events |
| --- | --- | --- |
| During implant | 4 | 7.8% |
| Within 24 h | 16 | 31.4% |
| Within 1 mo | 11 | 21.6% |
| 1–6 mo | 8 | 15.7% |
| 6 mo to 1 y | 2 | 3.9% |
| >1 y | 3 | 5.9% |
| Unknown | 7 | 13.7% |

*PER,* Perforation, erosion, or rupture.

**TABLE 7.** Confirmed or suspected locations of 51 cardiac perforation, erosion, or rupture events, as indicated in the reports to the US Food and Drug Administration between January 1, 2002, and June 30, 2007

| Timing | No. of reported events | Percentage of reported events |
| --- | --- | --- |
| Atrium and aorta | 18 | 35.3% |
| Left atrium | 8 | |
| Right atrium | 5 | |
| Unlisted atrium | 5 | |
| Atrium alone | 13 | 25.5% |
| Left atrium | 7 | |
| Right atrium | 2 | |
| Unlisted atrium | 3 | |
| Both atria | 1 | |
| Unlisted | 11 | 21.6% |
| Left atrial appendage | 3 | 5.9% |
| Pulmonary vein | 2 | 3.9% |
| Ascending aorta | 2 | 3.9% |
| Atrial septum | 1 | 2.0% |
| ''Left atrium or pulmonary vein'' | 1 | 2.0% |

Cardiac PER was the second most commonly reported AE (51/223, 22.9%). Mortality for this complication was 10 of 51 patients (19.6%), with 1 survivor losing her pregnancy and at least 2 survivors described as having serious neurologic morbidity. By similarly applying the previous estimates, the national PER rate is 51 of 18,333 (0.28%). A 2004 publication by investigators affiliated with AGA Medical determined the PER rate to be 9 in the known 9000 US implants, giving a rate of 0.1%, which is significantly lower than in our findings (P = .0003).[4] Timing of the AE is listed in Table 6; only 4 events occurred at implant, and whereas most were clustered in the first 6 months, erosions and ruptures are still being reported as late as 3 years after deployment. Table 7 lists the confirmed or suspected locations of cardiac PER; a location is specified in 40 patients and not specified in 11 patients.

Some combination of atrium and aorta was found in 18 patients (35.3%, 18/51), whereas the atria alone were involved in 13 patients (25.5%, 13/51). Cases involving the ascending aorta and 2 of the 3 left atrial appendage perforations were confirmed at surgery or autopsy. The other left atrial appendage perforation was suspected by the implanting physician after frank hemopericardium occurred within ''a few hours'' of the procedure. One patient died 4 hours after implant and was found to have a 1.5-mm right upper pulmonary vein perforation at autopsy. A device erosion through the atrial septum resulted in a new ASD that was confirmed at catheterization and successfully treated with a new device. Hemoptysis secondary to what the implanting physician thought to be a pulmonary vein perforation developed in 1 patient; the procedure was immediately aborted, and this was successfully managed nonoperatively. Likewise, an implanting physician suspected perforation of the ''left atrium or pulmonary vein'' on review of a case of frank hemopericardium occurring 2.5 hours after the implant; the drainage slowed down, and successful nonoperative management was used.

In the 11 cases of PER where the location is not specified, 3 cases were confirmed by successful surgical exploration, but the location is unlisted in the narrative. An additional 4 cases were described as sudden grossly bloody pericardial effusions, but the location is unknown because each was successfully treated nonoperatively by pericardial drainage. The timing of 3 of these presentations was within 1 hour (n = 1) and within 24 hours (n = 2) such that these were most consistent with PER; in the fourth case, presenting at 1 month postimplant, erosion was suspected such that ''surgery was scheduled,'' but no follow-up details of the operation are given. In 3 cases the location was unknown because each was a death and limited autopsy data are given describing bloody fluid in the pericardium and left side of the chest, making PER the most likely event. In the last unknown case, an infant underwent cardiopulmonary resuscitation several weeks after a device implant and was then found to have a large effusion. It is unclear whether erosion occurred first, mandating cardiopulmonary resuscitation, or erosion occurred during the chest compressions and final outcome is not given.

## Surgical Outcome and Comparison Between Databases

According to MAUDE narratives, 112 patients appear to have been sent directly to the operating room (112/223, 50%), resulting in 2 operative deaths. Forty additional patients (40/223, 17.9%) were sent to the operating room after failed catheter intervention to control the AE, resulting in 2 additional operative deaths. Summation gives 152 of 223 Amplatzer AEs (68.2%), ultimately requiring operative management and an overall operative mortality for surgical rescue of 2.6% (4/152).

STS data revealed that surgical closure of ASD and PFO was performed in 1537 patients; primary closure was performed in 457 patients (35 PFO and 422 ASD); and patch

**TABLE 8. Comparison of overall mortality, need for operation to control adverse event mortality per adverse event, and need for operation per adverse event between device closure and surgical closure groups**

| Benchmark end point | Surgery | Device | P value |
|---|---|---|---|
| Overall mortality | 0.13% | 0.093% | .649 |
| Need for operation | 0.39% | 0.83% | .063 |
| Mortality per AE | 1.2% | 7.6% | .004 |
| Operation per AE | 3.6% | 68.2% | <.001 |

*AE*, Adverse event. "Need for operation" is defined as *reoperation* for surgical group and *need for surgical rescue* for device group.

ASD closure was performed in 1080 patients. Discharge mortality was 2 patients (0.13%), and median length of stay was 3.0 days (quartiles 2 and 4 days). *Any* complication as defined on the STS data harvest worksheets occurred in 167 of 1537 patients (10.9%). Serious complications, however, were rare; no patient required a pacemaker (no permanent arrhythmia) or any form of dialysis (temporary or permanent), 2 patients had a persistent neurologic finding at discharge (0.13%), 3 patients had postoperative cardiac arrest (0.20%), and 6 patients required unplanned reoperation (0.39%). There were no cases of sternal dehiscence, mediastinitis, endocarditis, systemic or pulmonary venous obstruction, phrenic, or recurrent laryngeal nerve injury, and in no case was tracheostomy or mechanical support required.

A comparison of the benchmark events (operative mortality, need for surgery and operative mortality, or need for surgery *per* AE) for device and surgical closure was performed (Table 8). Overall mortality for surgical (0.13%) and device closure (0.093%) was similar (*P* = .649). Rescue operation for device closure (0.83%) was 2.1 times more likely than reoperation for surgical closure (0.39%), closely approaching statistical significance (*P* = .063). Mortality per AE was higher for device closure than surgical (7.6% vs 1.2%, *P* = .004). Likewise, the need for surgery to control an AE was higher for device closure (68.2% vs 3.6%, *P* < .001).

## DISCUSSION

The MAUDE is a USFDA-driven reporting mechanism, the purpose of which is to allow public access and review of AEs involving medical devices.[1] With the 1976 advent of the Medical Device Amendments to the Federal Food, Drug, and Cosmetic act, the FDA was charged with ensuring the safety and efficacy of such devices.[6,7] Although premarket requirements are more stringent for class III (highest risk) devices, there are several relevant examples in cardiovascular medicine in which limitations of premarket analysis have been exposed. Two examples from cardiac surgery include the Bjork-Shiley tilting disk prosthesis (Shiley Inc, Irvine, Calif) and the use of St Jude Silzone (St Jude Medical Inc, St Paul, Minn) valve coating.[7] For these and many other reasons, postmarketing surveillance has become an important focus for the FDA. Voluntary reporting (focusing on the health

care professional) has been encouraged in 1973 and was formalized under the "MedWatch program in 1993. Important steps were added in 1984, when Medical Device Reporting regulations enforced mandatory manufacturer reporting, and in 1990, when the Safe Medical Devices Act similarly charged user facilities with the same reporting responsibility. The MAUDE allows rapid access to these reports.

We acknowledge a priory the potentially serious limitations of this analysis and have taken this into consideration regarding the data we have chosen to report. Our experience with MAUDE has confirmed that the events reported are essentially all "sentinel events"; they are the most serious, life-threatening complications (of the device and related hardware) that generated enough concern and exposure that the physicians or user facilities thought that a report was necessary. *Procedural*-related complications such as access site problems (bleeding, infection, arteriovenous fistula), blood transfusion, contrast allergy, anesthesia, and airway problems and other commonly recognized catheter complications are not captured by such a database. Furthermore, data from the General Accounting Office report that less than 0.5% of all medical device AEs actually end up reported to the FDA, a serious source of potential error in using that data as a national estimate.[8] The STS database only includes approximately half of the congenital centers in the country and on a voluntary basis such that extrapolation of results to *all* centers provides a source of potential error. The STS database does not account for perception of pain and other end points that would certainly confirm clear advantages to some aspects of catheter procedures. Perhaps the most serious deficiency of the STS database, however, is that the data are not longitudinal.

It is for these reasons that we choose to analyze death and need for operation (surgical rescue vs surgical reoperation) as benchmark end points; both are definitive categoric ("yes or no") outcomes of significant interest to clinicians and patients. We believe that the issue of requiring an operation to control an AE is of particular interest given our finding that the mortality rate of surgical rescue is 20-fold higher than for elective repair. Thus, the argument that "the patient is only getting the same operation they would have gotten anyway" does not apply to operations for device complications. Attempts to group certain possible complications from a procedure as "serious" or "potentially serious" are fraught with numerous pitfalls and problems such that the subject has itself become an independent science; it is well beyond the scope of this article to breech this topic, and so we make no such comparisons.

## Results of the Manufacturer and User Facility Device Experience Database and Society of Thoracic Surgery

Comparing the embolization, PER, and thromboembolitic event rates from the MAUDE database with the published

literature, we find that the current rate of embolization is the same as was found in a 2004 survey of AGA proctors,[5] whereas the PER rate is 3 times that reported in 2004 by AGA investigators.[4] Embolized devices often require operative intervention, and there is a risk of damage to cardiac structures with catheter removal. Comparison of thromboembolitic event rates with other publications reveals that it may be a bigger problem than is currently believed. Only 1 such complication was found in 3 major studies (including 2 specifically aimed at detecting thrombosis rates),[9-11] and a report in 2006 claims to be first to report stroke from an Amplatzer device.[12]

Comparison with other publications also confirms a lower published rate of death and serious complications than or findings indicate.[13-16] From 2003 to 2006, 5 case reports of device erosion and perforation are found in the literature, and these seem to be accounted for in the MAUDE database.[17-21] Twice before, investigators have published results of the reported PER events from the MAUDE database,[3,22] and there continues to be debate over the cause of this complication. The findings of Divekar and colleagues[22] highlight that larger devices (>25 mm) do not seem to be overrepresented in the known events and that many patients with oversized devices do not experience perforation. We conclude that this seems to be a more frequently encountered complication with a high mortality but make no conclusions about cause.

## CONCLUSIONS

The overall mortality for device and surgical closure of the atrial septum seems equivalent, and the need for subsequent operation (surgical rescue) may be more common in patients undergoing device closure than reoperation is in patients undergoing surgical closure. Complications from device closure tend to be serious and most often require urgent or emergency operative management, whereas the mortality for surgical management of a device complication appears higher than that of elective ASD closure. Further information is required in the form of postmarketing surveillance, such as a mandatory user registry with periodic end-user notification.

## References

1. U.S. Food and Drug Administration Web site. Available at: http://www.fda.gov/default.htm.
2. GraphPad Software Web site. Available at: www.graphpad.com.
3. Delaney JW, Li JS, Rhodes JF. Major complications associated with transcatheter atrial septal occluder implantation: a review of the medical literature and the MAUDE database. Congenit Heart Dis. 2007;2:256-64.
4. Amin Z, Hijazi ZM, Bass JL, Cheatham JP, Hellenbrand WE, Kleinman CS. Erosion of Amplatzer septal occluder device after closure of secundum atrial septal defects: review of registry of complications and recommendations to minimize future risk. Catheter Cardiovasc Interv. 2004;63:496-502.
5. Levi DS, Moore JW. Embolization and retrieval of the Amplatzer septal occluder. Catheter Cardiovasc Interv. 2004;61:543-7.
6. O'Shea JC, Kramer JM, Califf RM, Peterson ED. Sharing a commitment to improve cardiovascular devices. Part I: Identifying holes in the safety net. Am Heart J. 2004;147:977-84.
7. Peterson ED, Hirshfeld JW, Ferguson TB, Kramer JM, Califf RM, Kessler LG. Sharing a commitment to improve cardiovascular devices. Part II: Sealing holes in the safety net. Am Heart J. 2004;147:985-90.
8. Gross TP, Kessler LG. Medical device vigilance at FDA. Stud Health Technol Inform. 1996;28:17-24.
9. Chessa M, Carminati M, Butera G, et al. Early and late complications associated with transcatheter occlusion of secundum atrial septal defect. J Am Coll Cardiol. 2002;39:1061-5.
10. Krumsdorf U, Ostermayer S, Billinger, et al. Incidence and clinical course of thrombus formation on atrial septal defect and patent foramen ovale closure devices in 1,000 consecutive patients. J Am Coll Cardiol. 2004;43:302-9.
11. Anazai H, Child J, Natterson, et al. Incidence of thrombus formation on the CardioSEAL and the Amplatzer interatrial closure devices. Am J Cardiol. 2004;93:426-31.
12. Raghu A, Kawalsky D, Feldman M. Embolic stroke due to a left atrial thrombus two years after placement of an atrial septal defect closure device. Am J Cardiol. 2006;98:1294-6.
13. Butera G, Carminati M, Chessa M, et al. CardioSEAL/STARflex versus Amplatzer devices for percutaneous closure of small to moderate (up to 18 mm) atrial septal defects. Am Heart J. 2004;148:507-10.
14. Wang JK, Tsai SK, Wu MH, Lin MT, Lue HC. Sort-and intermediate-term results of transcatheter closure of atrial septal defect with the Amplatzer septal occluder. Am Heart J. 2004;148:511-7.
15. Hong TE, Thaler D, Brorson J, Heitschmidt M, Hijazi ZM. Transcatheter closure of patent foramen ovale associated with paradoxical embolism using the Amplatzer PFO occluder: initial and intermediate-term results of the U.S Multicenter Clinical Trial. Catheter Cardiovasc Interv. 2003;60:524-8.
16. Du ZD, Hijazi ZM, Kleinman CS, Silverman NH, Larntz K. Comparison between Transcather and surgical closure of secundum atrial septal defect in children and adults. J Am Coll Cardiol. 2002;1836-44.
17. Grayburn PA, Schwartz B, Anwar A, Hebeler RF. Migration of an Amplatzer septal occluder device for closure of atrial septal defect into the ascending aorta with formation of an aorta-to-right-atrial fistula. Am J Cardiol. 2005;96:1607-9.
18. Preventza O, Sampath-Kumar S, Wasnick J, Gold JP. Later cardiac perforation following transcatheter atrial septal defect closure. Ann Thorac Surg. 2004;77:1435-7.
19. Maimon MS, Ratnapalan S, Do A, Kirsh JA, Wilson GJ, Benson LN. Cardiac Perforation 6 weeks after percutaneous atrial septal defect repair using an Amplatzer septal occluder. Pediatrics. 2006;118:e1572-5.
20. Chun DS, Turrentine MW, Moustapha A, Hoyer MH. Development of aorta-to-right atrial fistula following closure of secundum atrial septal defect using the Amplatzer septal occluder. Catheter Cardiovasc Interv. 2003;58:246-51.
21. Cecconi M, Quarti A, Bianchini, et al. Later cardiac perforation after transcatheter closure of patent foramen ovale. Ann Thorac Surg. 2006;81:e29-30.
22. Divekar A, Gaamangwe T, Shaikh N, Raabe M, Ducas J. Cardiac perforation after device closure of atrial septal defects with Amplatzer septal occluder. J Am Coll Cardiol. 2005;45:1213-8.

## Discussion

**Dr Carl L. Backer** (*Chicago, Ill*). I want to congratulate Dr Di Bardino and colleagues at Children's Hospital Boston for their very clever idea of mining the MAUDE database to determine the incidence of adverse events involving the Amplatzer septal occluder device. I first became aware of this database at the AATS in Toronto in 2004 when Richard Jonas debated Andrew Reddington about this very topic. A brief look at that MAUDE database is quite an eye opener.

This is a very timely presentation and an important analysis. The issue of device closure was the first paper at the STS in the Plenary Session this year. In that paper, Dr Tara Karamlou also mined a database, the Nationwide Inpatient Sample and ICD 9 procedure and diagnosis codes. She discovered an increased incidence of ASD closure mostly due to a sudden and dramatic rise in percutaneous closure beginning in the year 2001.

The comparison of the MAUDE database to the STS database clearly demonstrates the importance of our own congenital

CHD

database. When I debated this topic at the ACC 3 years ago, the cardiologists complained that there is no MAUDE database for surgeons. The STS database is our answer to that issue.

I have three questions for you, and they relate to your numerator and your denominator.

My first question relates to the numerator in your analysis. There were 223 adverse events and 17 deaths related to the Amplatzer device. At the AATS meeting in 2006, when we had a similar discussion, I asked this audience how many people had taken Amplatzer devices out of various parts of the body; nearly everyone in the room raised their hand. Is it possible that the MAUDE database might only be capturing the tip of the iceberg, and how confident are you in your numerator?

**Dr DiBardino.** Thank you Dr Backer. That's a tricky question to answer. I presented this data to the interventional cardiologists in Boston before I left and it's their sense that this is the tip of the iceberg. There are folks who place these devices who don't know about the MAUDE database. And that makes me very suspicious that our numerator is, in fact, grossly under reported.

There was an interesting study published by the United States General Accounting Office that stated that 0.5% of all device related complications ever make it to the FDA 0.5%. And that also makes me very wary of this numerator. I think that this is the tip of the iceberg.

**Dr Backer**. My second question relates to the denominator. The analysis of the predicted complication rate of the Amplatzer device hinges on this number. You noted in your manuscript that a request of AGA Medical was made for an estimate of implants over the time of the study period and that this request was denied. You derived an estimate of 18,333 implants, although the paper you quoted was from 2004. This makes the calculated mortality of the Amplatzer device 1 in 1,000. How comfortable are you with the denominator that you have given us?

**Dr DiBardino.** Well, the 2 papers that I mentioned (from 2004 and 2007) were both papers that used implants estimates based on AGA medical data and the 2004 paper was published by folks financially tied to AGA medical. So the number 18,333 comes from an estimation that was made of implants over about a 2 and a half year period; we simply converted that estimate into ''number of implants per month'' and multiplied it by 66 months, or 5.5 years. I think it's the best we can do. I can't speak to its accuracy because I cannot externally validate it, but I do submit that it is an honest effort and the best we can do.

**Dr Backer.** And what about the company not responding to your requests?

**Dr DiBardino.** Well, yes, it was actually interesting. I called the Boston AGA Medical representative (who services Children's Hospital Boston) and asked for the actual implant numbers. They looked into it, and I received an electronic mail correspondence subsequently that said that that information would not be available for me. I just can't get it.

**Dr Backer.** All right. My final question relates to the incidence of complications in the MAUDE database over time. It was a little disturbing to see that slide that showed that actually the number of reports are increasing per year. This could possibly be related to an increase in the total number of devices implanted or that there is not a positive learning curve that we would hope would happen. When we discussed this in 2006, Dr del Nido noted that the interventional

cardiologists are now looking at things like the size of the aortic rim, not oversizing the device, more careful follow up, and that this would, indeed, actually reduce the incidence of these complications. What's your feeling, looking at this database, whether the incidence of these complications is going up or down over time?

**Dr DiBardino.** Well, the histogram that I showed is not very useful because it, of course, does not answer the question about whether the increase in reported events is simply that people are reporting them more often or are they being implanted more often such that the frequency of complications cannot be ascertained. The cardiology literature does comment on the fact that, after the device was first approved for general use, there was perceived to be a rise in the complication rate and this has been ascribed to the unfamiliarity of new cardiologists to that device. Beyond around 2004 2005, we sort of lose track of that in the literature. I really don't have enough information to truly accurately know what the trend is in complication rate.

**Dr Jeffrey P. Jacobs** (*St. Petersburg, Fla*). First, I would like to congratulate you for doing a great job and making an outstanding presentation. It really makes me proud to see our database, the STS Congenital Heart Surgery Database, mature to the point that it can be used for a study like this one. I think you did a great job with this study and presented it quite well.

I think one could criticize the data from the STS database by saying that it stops at hospital discharge, and we do not know what happens after hospital discharge. This criticism underscores the importance of what we are trying to accomplish in the STS database by incorporating HIPAA Compliant Unique Patient, Surgeon, and Hospital Identifier Fields into the STS Database, and creating a framework where our database can be used as a tool for longitudinal follow up. The STS Adult Cardiac Database has incorporated these identifier fields as of January 1, 2008. These fields will be incorporated into the STS Thoracic Database on January 1, 2009, and into the STS Congenital Heart Surgery Database on January 1, 2010. I think that this accomplishment is going to mature our STS database.

My question is: How would you recommend maturing the way that we follow these devices, and the device databases, based on what you have learned from this study?

**Dr DiBardino.** Thank you, Dr Jacobs. In my time as a junior resident in general surgery in Dr Chuck Fraser's research lab, I became interested in databases and outcomes analysis and hope to make that the backbone of my own academic career as I progress.

I think the answer to your question is that if you look at the history of the FDA in cardiovascular surgery, there are numerous examples (the Bjork Shiley prosthesis, the Silzone coating that was transiently used on St. Jude valves) of where postmarketing surveillance has become important. Even changed the way products are handled, what their recommendations are for their placement and, in some cases, products being eliminated from the market. I think what we're not going to have is a head to head trial. It's just not going to happen. I think an easy solution would be simply creating a registry, an implant registry, with periodic end user notification. That has been done with LVADs; it is easy and effective and it would give us real answers about what the numerators and denominators are.

**Dr Shunji Sano** (*Okayama City, Japan*). Just over one year, we studied the Amplatzer ASD closure. In the last year, our cardiologists

have done 94 Amplatzer ASD closures and defend the first year closure on 10 patients. And we have no host mortality and no surgical rescue, one temporary episode of thromboembolism. So the result is completely different from yours. I think maybe the difference is the indication. If you have wide range of indications, you have more complications.

The question is: Do you have surgeons involved in the indication of Amplatzer ASD closure and surgical closure? Because we, in our unit, the surgeon is completely involved in the indication of the technique, 2 techniques, and our young surgical fellow is also involved in this procedure.

**Dr DiBardino.** Well, I think what you're describing is very common when you examine the results from a single center that has excellent physicians who are doing procedures that they are very experienced with. And if you look at single center reporting from the United States, you'll find the results that you've just described: No mortality, no erosions, no embolizations. But when you apply a product to the general audience and you allow people who are less familiar with it, then, to start using it, there is going to be a learning curve. And I think that's part of what we're seeing in this analysis.

In Boston, the surgeons are not involved in the decision, by and large, to place implants or devices. One thing I will say, however, is that our interventionalists (one of whom is my coauthor on this paper) are gifted and talented but also careful. What I mean to say is that they are very careful about their selection and techniques in terms of using stop flow technique for balloon sizing, paying careful attention to the amount of retro aortic rim, and being very careful not to oversize devices. They're probably more careful about it than they are at some other places and there not afraid to send certain patients to the operating room. All of this leads, as it has at your center, to a low complication rate. But I think that it's difficult to extrapolate those results to everywhere, all over, because of the different comfort level and skill level of the physicians who provide care.

CHD

# EXHIBIT 33

### Failure Rate Analysis of Femoral Stems from the MAUDE Database

[1]William, P A; +[1]Clarke, I C; [2]Donaldson, T D
[1]Loma Linda University, Loma Linda, CA. [2] Empire Orthopaedics, Colton, CA
Senior author  ianclarke4@msn.com

**INTRODUCTION:** Orthopedic retrieval analyses are usually confounded by small data sets, the suspicion of novel outliers, and a potential for missed data [1]. However, the economic impact of revisions emphasizes the need for more analysis [2]. The analysis of debris from simulator wear models presents a similar problem with small sample sets representing large populations. We have experience using distribution models to best represent the frequency and volume effects of polyethylene debris. Our goal in this study was to examine the universal applicability of such distribution models to implant revision data that is federally mandated and appears in the FDA database. Implant fractures were selected as the first criterion, namely metal stems, ceramic balls, and polyethylene cups. In this report we will analyze the incidence of metal stem fractures.

**METHODS:** The FDA's database *'Manufacturer and User Facility Device Experience'* (MAUDE) was interrogated for reports on fractures of THR femoral stems from 1996 - 2007. Multiple keyword searches and various strategies provided several hundred reports of THR device failure. The reports were reviewed and selection criteria utilized to produce failure types of interest in this study. Data were entered into a spreadsheet for sorting and analysis. Details on the device (manufacturer and model), year of surgery, time to failure, failure modes, etc, were entered and collated. Descriptive statistics, contingency tables, and distributions were performed on the data. Since the Gamma and Weibull distributions have been used for such analysis these were investigated as predictors of failure as a function of post-op time [3,4]. Power analysis was performed to determine the accuracy and necessary numbers of failures required for statistical significance.

**RESULTS:** 206 device reports were found on MAUDE with about 167 meeting our criteria. These included 130 incidents of THR stem failure for both primary and modular revision stems. Of the 130 stem failures, one fracture was reported in 2002 but occurred in 1987, another was actually a fracture of the cement mantle, but not of the stem, and three stems were revised for reasons other than stem fracture. Therefore, a total of 125 stem fractures were reported with 93 (74%) being Ti-6Al-4V stems (17 revision and 70 modular revision). Of these, three orthopedic companies were represented in 98% of the events. The reports of stem fractures averaged six or less a year in the first six years of data surveyed (Figure 1). Beginning in 2002, there was a rise in fracture incidence such that overall appeared to represent a linearly increasing trend (slope=2 5 Fxs/year; r=0.9) (Figure 1).

Based on the mean squared error the Gamma distribution appeared to fit the data better than the Weibull (Figure 2). This relationship (Gamma distribution) can be expressed as

$$P_f = \frac{T_f^{1.97}}{4.8} \cdot e^{\frac{T_f}{1.36}}$$

where $P_f$ is the percentage of fractures and $T_f$ is the post-op time to failure in years. Power analysis indicated an accuracy of ±5% for this data set (N=125). A collection of 1,000 stem fractures would have been required to obtain an accuracy < ±1%. Approximately 75% of the fractures occurred within the first five years post-op and 95% of all fractures occurring within eleven of follow-up (Figure 2).

**DISCUSSION:** This is one of the first studies to interrogate the MAUDE database of device retrieval reports to obtain an understanding and prediction of implant fracture trends. This in part was greatly facilitated by use of the clinical data sets provided by Kurtz et al. [2,5,6]. With the assumption that from 1990 through 2005 approximately 150,000 total hip arthroplasties performed per year [5,6], this would result in a overall stem fracture estimation of 8.3 in 100,000 implanted. This is about one-third the rate reported by Heck et al. in 1995 [2]. The largest subset of data available for analysis were modular revision stems (MRS) of Ti-6Al-4V alloy (56%). It was unfortunate that the fracture types could not have been investigated further. However, the FDA

database does not contain the detailed information we sought. Nevertheless, the distribution analysis did permit the formulation of new questions:

a) Fracture estimate was 8.3 per 100,000 cases. However, this represented only 1/3 disclosed in a previous study in 1995. Did this represent and improvement in stem design and materials or was it simply an example of events under-reported by a factor of 3-fold?

b) What factors were responsible for an increased incidence of stem fractures beginning in 2002?

c) Why was the highest annual incidence of stem fractures appearing at the time interval of only three years? This appeared to be true for the MRS, non-MRS, and overall stem population.

d) Was the risk of a stem fracture negligible after 11 years?

e) Why did Ti6Al4V stems represent the majority of fractures reported?

**REFERENCES:** [1] D. A. Heck, *J Arthroplasty* **10**, 575-80, 1995. [2] S. M. Kurtz *et al.*, *J Bone Joint Surg Am* **89 Suppl 3**, 144-51, 2007. [3] S. S. Shapiro, in *Handbook of Statistical Methods for Engineers and Scientists* H. M. Wadsworth, Ed. (McGraw-Hill, Inc., New York, 1990) pp. 6.1-6.34. [4] S. M. Kurtz, J. Bergstrom, C. M. Rimnac, *J Biomed Mater Res B Appl Biomater* **73**, 214-20, 2005. [5] S. Kurtz *et al.*, *J Bone Joint Surg Am* **87**, 1487-97, 2005. [6] S. Kurtz, K. Ong, E. Lau, F. Mowat, M. Halpern, *J Bone Joint Surg Am* **89**, 780-5, 2007.



Figure 1: Reported stem fractures from 1996 - 2006. The linear fit indicated an average increase of 2 fractures per year.



Figure 2: Distribution of stem fractures (%) with time to failure.

# EXHIBIT 34

[Downloaded free from http://www.ijdr.in on Thursday, October 27, 2016, IP: 115.112.118.202]

ORIGINAL RESEARCH

# Adverse events associated with ultrasonic scalers: A manufacturer and user facility device experience database analysis

Rajagopal Athmarao Thennukonda, Bhavani Rekha Natarajan

Department of Dentistry,
Madurai Medical College and
Hospital, Madurai, Tamil Nadu,
India

## ABSTRACT

**Background:** The present study was conducted to determine the frequency and type of adverse events (AEs) associated with ultrasonic scaler reported to the Food and Drug Administration manufacturer and user facility device experience (MAUDE) database.

**Materials and Methods:** The authors reviewed the ultrasonic scaler units (USU) related AEs reported to MAUDE from October 1, 1995, to September 31, 2015. Analyses of details collected are presented.

**Results:** MAUDE received a total of 667 unique USU-related AE reports. Of 667 cases, MAUDE classified 628 instances (94.2%) as malfunction 27 (4%) as injurious, 10 (1.5%) as others, and 2 (0.3%) claiming the use of USU as cause of death. Of the 667 cases, 511 (76.6%) were used for endodontic application, and 147 (22%) as scaler applications. In 512 (76.8%) instances, there was separation of the tips, posing danger to patients or users, and 112 (16.8%) instances of overheating, 12 (1.8%) instances of breakage, and electrical issues in 8 (1.2%) instances. These AE resulted in 19 instances of thermal injury, 2 suspicious deaths, and hearing loss in 3 cases. In 4 cases, patient swallowed broken parts requiring additional medical care.

**Conclusions:** Use of USU, a Class 2 device without exemption, carries a degree of risk to patient's safety, if not properly used. As of today, MAUDE data is the only reliable source of AE until another database or such study is carried out. Certain AE that has been largely anecdotal, such as hearing loss has been reported in this study. The findings from study reiterate that more in-depth analysis of AE of USU is needed. Until then operator needs to take all precautions to avoid AE when using USU.

Received          : 29-11-15
Review completed  : 20-01-16
Accepted          : 26-01-16

**Key words:** Adverse events, endodontic retrieval instrumentations, oral prophylaxis, overheating, thermal burns, ultrasonic scaler

Human is capable of hearing vibrations in the range of 20 Hz to 20 KHz. Any sound wave above this frequency is referred to as ultrasonic.[1,2] It was proposed in the early 1950s that ultrasonic sound waves can be used to disintegrate dental calcified tissues. With the introduction of high-speed rotary devices, interest in ultrasonic application waned.

In mid-1950s, it was demonstrated that ultrasonics can be efficiently used to dislodge deposits from dental surfaces. Several other studies that followed confirmed the efficiency of ultrasonic in removing calculus. With such proof, widespread use of ultrasonics in dental clinic begin to emerge. It was since 1957, use of ultrasonics in endodontics began to materialize.[2]

Currently, ultrasonics use in dentistry has grown to large proportions. All dental clinics in affordable settings have at

Address for correspondence:
Dr. Rajagopal Athmarao Thennukonda
E-mail: tarajagopal@gmail.com

| Access this article online | |
|---|---|
| **Quick Response Code:** | **Website:** www.ijdr.in |
| | **DOI:** 10.4103/0970-9290.176923 |

This is an open access article distributed under the terms of the Creative Commons Attribution-NonCommercial-ShareAlike 3.0 License, which allows others to remix, tweak, and build upon the work non-commercially, as long as the author is credited and the new creations are licensed under the identical terms.

**For reprints contact:** reprints@medknow.com

How to cite this article: Thennukonda RA, Natarajan BR. Adverse events associated with ultrasonic scalers: A manufacturer and user facility device experience database analysis. Indian J Dent Res 2015;26:598-602.

[Downloaded free from http://www.ijdr.in on Thursday, October 27, 2016, IP: 115.112.118.202]

least one type of ultrasonic scaler units (USU). The application of ultrasonic scaler units is found in dental scaling, has wide applications in endodontics, and oral surgical procedure. In a typical USU, ultrasonic is produced by "magnetostriction" (a mechanism which converts electromagnetic energy into mechanical energy) or based on "Piezoelectric principle" (crystal is used that changes dimension in an electrical field. Subsequent deformation of crystal results in a mechanical oscillation without producing heat).[2] The older units use the former principle while that newer units rely on piezoelectric principle. The newer USU have been used as a scaler, an endodontic retreatment application or as a piezo-surgical unit.

Currently, ultrasonic scaler unit is a Class 2 device, without exempt as per the Food and Drug Administration (FDA). As compared to the widespread use of USU, very little is known about adverse, deleterious effects, or hazards associated with its use. Only a very few case reports have been known to be reported in literature[3] and up to 2% of all adverse events (AEs) associated with dental devices and equipment were reported to involve scalers.[4] The FDA of the United States of American Government defines AEs as "any undesirable experience associated with the use of a medical product in a patient."[4] There is a paucity of literature on the quantum of such adverse effects associated with USU, with last one such report's qualitatively discussing the subject[5] and another not detailing into scalers.[4]

Reports containing such warnings may help the users and even government officials to recall the potentially dangerous materials from the market. To cite an example, the recall of a denture cream with excess zinc leading to a downstream of events such as hypocupremia and neurological disease in a young individual who was using a partial denture and denture cream with high zinc content. Such seemingly unrelated correlations is often missed in general practice.[6-8] Database such as manufacturer and user facility device experience (MAUDE) could be collection of such events, providing strong large-scale collective evidence for knowledge of AE as well as practice.

General dentistry, especially seemingly harmless equipment such as an ultrasonic scaler, over these years of usage have poor patient safety literature baring very few isolated case report unlike in medical field.[3,9] Probably, this could emanate from the fact that most of the dental devices being Class 1 and 2 devices, the possibility/probability of injury arising from the use of such materials might be less severe, follow-up is rare or fear of lengthy, costlier legal proceeding or the inherent gap in patient safety culture.[9] The aim of this manuscript is to list possible AE associated with USU usage in dental clinics in the past 10 years.

## MATERIALS AND METHODS

The FDA of the federal government of the United States is the agency that is responsible for the approval and grant of permission of all the health-related products and devices. This agency maintains an open access database, called as the MAUDE (http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/search.cfm) that lists all the AE associated all FDA approved devices. It is mandated that the manufacturer/or distributor should file an AE in an preapproved, prescribed, narrative format within 30 days of event being reported compulsorily while voluntary reports are also being accepted by the organization. The MAUDE database contains the submitted anonymous narrative description of the AE, manufacturer's versions, and conclusions about reported events.[3]

For this study, all AE, as defined by FDA (any undesirable experience associated with the use of a medical product in a patient) by the usage of USU, as identified by the unique code supplied, (ELC), for dental ultrasonic scaler units between October 1, 2005 and September 30, 2015 were collected from the MAUDE database.

From the data, the following were collected and then categorized as - voluntary or mandatory reports; The year of reporting; broad event type; application used – scalers/endodontic/piezo-surgical; types of defect; place of event; nature and site of injury; and outcome of the injury.

These data were then entered in Statistical Package for Social Services (version 20.0, IBM, IL, USA). Descriptive statistics were performed and presented. Simple cross-tabulations were employed to identify the outcome AE with nature of reporting (voluntary/mandatory) and applications (endodontics/periodontics/others). Chi-square test was used to identify the statistical significance. A $P \le 0.05$ was taken to be significant.

## RESULTS

There were 675 reports of AE involving USU collected from the MAUDE database in the time frame. Of them, 8 were identified to be duplicates which were removed from further analysis. Hence, a total of 667 cases were collected for this study. Among the cases, 653 (97.9%) were mandatory reports while a 14 (2.1%) were voluntary reports. The annual reporting trend for the time frame is given in Figure 1.

Of the 667 cases, 5 cases involved operator. Of the 667 cases, MAUDE classified 628 instances (94.2%) as malfunction 27 (4%) as injurious, 10 (1.5%) as others, and 2 cases (0.3%) claiming the use of USU as cause of death. Of the 667 cases, 511 (76.6%) were used for endodontic application, 147 (22%) as scaler applications, and 9 cases exclusively for piezo-surgical applications. In 512 instances (76.8%), there was separation of the tips, posing danger to patients or users, 112 (16.8%) instances of overheating, 12 (1.8%) instances of breakage, electrical issues in 8 (1.2) instances, poor flow of coolant in 2 (0.3%) of cases, and failure in 1 case.

Case 2:15-md-02641-DGC   Document 7809-1   Filed 09/27/17   Page 157 of 189
[Downloaded free from http://www.ijdr.in on Thursday, October 27, 2016, IP: 115.112.118.202]



**Figure 1:** Annual trends in adverse event reports associated with ultrasonic scaler in the study population

Of the 667 cases reported, 453 cases (67.9%) of episodes occurred intraorally, 82 occurred (12.3%) extraorally, involved the whole body in 4 cases. There was no detail in 116 (17.4) instances and not applicable in 7 cases (1%) were the USU were being used for demonstration or in standard packing. On studying the nature of the outcome of AE, 91 instances were found to be not applicable in 91 cases (13.6%), and no details in 134 cases (20.1%). Of the remaining cases, tooth was involved in 243 (36.4%) of cases, lip injury was observed in 9 (1.3%) cases, mouth in 60 (9%) of cases, gingival in 8 (1.2%), 6 instances of alveolar bone (0.9%) damage, emphysema in 1 cases, and 4 instances were instruments were dislodged and swallowed. Infection was result in 3 cases, hearing issues in 3 (0.4%), and Bell's palsy in a single case.

Of the 667 cases, in terms of outcome of AE, there were 2 instance of (0.3%) death; 2 cases of emphysema, strokes each (0.3); benign paroxysmal positional vertigo in a single case; hearing loss in 3 cases (0.4%); 4 cases swallowed dislodged material (0.6%); and epilepsy, Bell's palsy, and traumatic cut injury in each one case (0.1). Thermal burns were observed in 19 cases (2.8%), dislodgment and foreign body impaction in tissues necessitating surgical removal in 9 cases (1.3%). The remaining instances were either not applicable (56 cases) or no details available or no lesions noted.

Table 1 shows the comparison of outcome parameters by the status of reports. There is statistically significant difference in between voluntary and mandatory reports ($P = 0.000$). On comparing the applications in terms of the type of AE and the site of injury or being affected was compared. There was statistically significant difference between the endodontic, periodontic, and piezo-applications ($P = 0.000$) [Table 2].

## DISCUSSION

Knowledge of AE would help a dentist to take sufficient precaution, equip and train themselves to react and provide help in times of AE. Furthermore, such a knowledge can

**Table 1: Outcome parameter's compared between the mandatory and voluntary reports**

| Event | Mandatory | Voluntary | P |
|---|---|---|---|
| Injury | 21 (3.2) | 6 (42.9) | 0.000 |
| Malfunction | 626 (95.9) | 2 (14.3) | |
| Death | 1 (0.2) | 1 (7.1) | |
| Other | 5 (0.8) | 5 (35.7) | |
| Application | | | |
| Dental scalers | 135 (20.7) | 12 (85.7) | 0.000 |
| Endodontic | 510 (78.1) | 1 (7.1) | |
| Piezo-application | 8 (1.2) | 1 (7.1) | |
| Defect | | | |
| Separated | 511 (78.3) | 1 (7.1) | 0.000 |
| Breakage | 10 (1.5) | 2 (14.3) | |
| Bursting/shattering | 2 (0.3) | 0 | |
| Overheating | 108 (16.5) | 4 (28.6) | |
| Electric issues | 8 (1.2) | 0 | |
| Poor flow | 2 (0.3) | 0 | |
| Failure | 1 (0.2) | 0 | |
| No abnormality | 11 (1.7) | 7 (50) | |
| Outcome | | | |
| Bell's palsy | 0 | 1 (7.1) | 0.000 |
| Benign Paroxysmal Positional Vertigo | 1 (0.2) | 0 | |
| Thermal injury | 16 (2.5) | 3 (21.4) | |
| Cut | 1 (0.2) | 0 | |
| Death | 1 (0.2) | 1 (7.1) | |
| Emphysema | 2 (0.3) | 0 | |
| Epilepsy | 1 (0.2) | 0 | |
| Foreign body | 8 (1.2) | 1 (7.1) | |
| Hearing loss | 2 (0.3) | 1 (7.1) | |
| Necrosis | 1 (0.2) | 1 (7.1) | |
| Nil | 514 (78.7) | 2 (14.3) | |
| No detail | 47 (7.2) | 1 (7.1) | |
| Not applicable | 56 (8.6) | 0 | |
| Stroke | 0 | 2 (14.3) | |
| Swallowed | 3 (0.5) | 1 (7.1) | |

help them to inform, educate their patient, helping in the informed decision-making process. The MAUDE database reports are not extensively validated as they do have their shortcomings.[4] However, in certain high-risk fields such as cardiology, obstetrics, and gynecology, they have been used with varying success.[10-13]

MAUDE suffers from the chance of multiple reporting, as evidence from this study too. They do not grade the severity of the event; chance of root cause analysis is nearly impossible; possibility of missing data and time line; MAUDE database is not a true global reflection of all dentists, even that of America.[4] Hence, a greater caution should be exercised while using the numbers that arising from this data. However, in the absence of any other such data, they could provide with robust numbers and list the possibility of AEs associated with any dental devices.

Ultrasonic powered dental equipment such as scalers and endodontic tips are ubiquitously used nearly in all dental settings. It is not possible to document the number of USUs and possibly all AE arising with the use of USU. However, in the last review of the hazards of using an ultrasonic scaler, several potential hazards events were listed. However, the

[Downloaded free from http://www.ijdr.in on Thursday, October 27, 2016, IP: 115.112.118.202]

relative incidences of the hazards were not arrived at. This manuscript probably attempts to address this issue.

The low volume of voluntary reporting in this study of about 2.1% indicates that most of AE are not serious in nature. In contrast about, 5% of all AE in a study comprising all dental materials and devices comprised voluntary reports.[4] Our further exploration in this study also indicates that most of the AE are self-limiting and did not warrant hospitalization, medication, or a day care. The difference in annual reporting trend is rather confusing, and a rationale explanation could not be arrived at. Furthermore, as MAUDE has issued against at reporting annual trend or comparison of AE across brands using MAUDE data is isolation, hence both of them were not probed further.

The predominant AE was malfunction – mostly arising due to separation of endodontic tips. Only about 4% of the instances were listed as injurious and 0.3 very grievous in nature. In most of the instances in this group, USU was used as an endodontic application – in about 76.6% of cases. An approximate number of cases of separation of tips were reported as the AE. It could be seen in the Tables 1 and 2 that in 240 cases, separated tips were lodged inside the tooth and required additional efforts in retrieving. In some cases, it caused damage to gingival tissues and or permanent loss of tooth. This finding probably indicates the safety aspects of endodontic tips are most probably not followed by the operator, as outlined in the manual. In addition, the observation of that only certain tips separated more often than others, the design of such tips needed to be revised. More in-depth analysis of this phenomenon are the need of

Table 2: Outcome parameters classified by application of the ultrasonic scaler units

| | Endodontics | Periodontics | Peizo-application | P |
|---|---|---|---|---|
| **Defect** | | | | |
| Separated | 508 (99.4) | 4 (2.7) | 0 | 0.000 |
| Breakage | 0 | 11 (7.5) | 1 (11.1) | |
| Bursting/shattering | 0 | 2 (1.4) | 0 | |
| Overheating | 2 (0.4) | 108 (73.5) | 2 (22.2) | |
| Electric issues | 0 | 8 (5.4) | 0 | |
| Poor flow | 1 (0.2) | 1 (0.2) | 0 | |
| Failure | 0 | 0 | 1 (11.1) | |
| No abnormality | 0 | 13 (8.8) | 5 (55.6) | |
| **Site** | | | | |
| Alveolar bone | 0 | 2 (1.4) | 4 (44.4) | 0.000 |
| Face (Bell's palsy) | 0 | 1 (0.7) | 0 | |
| Gingiva | 0 | 8 (5.4) | 0 | |
| Hearing loss | 0 | 3 (2.0) | 0 | |
| Infection (stroke) | 0 | 2 (1.4) | 0 | |
| Lip | 1 (0.2) | 6 (4.1) | 2 (22.2) | |
| Mouth | 56 (11.0) | 4 (2.7) | 0 | |
| Planes of tissue | 0 | 1 (0.7) | 0 | |
| Swallowed | 0 | 4 (2.7) | 0 | |
| Tooth | 240 (47) | 3 (2) | 0 | |
| No lesions | 10 (2) | 93 (63.3) | 1 (11.1) | |
| No details | 116 (22.7) | 16 (10.9) | 2 (22.2) | |
| Not applicable | 88 (17.2) | 3 (2) | 0 | |

the hour to prevent untoward events endangering patients and rarely the operators.

The next more common AE was overheating which was more observed with scaler. Though only 19 cases of thermal injury resulted in this serious, some of them have been described to be as large as 6 cm and at least in two instances required plastic surgery intervention as the burn was associated with vermillion border and part of lower lip skin too. Using the incompatible tips, using in dry mode, flash clogs, biofilm build-up, and using tips beyond its recommended time/use are sited to be some of the common reasons for overheating and in certain instances thermal injury. Operators should be well-educated that different instruments at different settings and tip permit the different amount of coolant.[14] As they are specific in nature, every effort shall be made to stick to recommended regimen than standardizing this. In cases of breakage of tips, positioning of tip has been found to be the most common mistake. The operators in several instances probably have used the sides of tip instead of the head of the tip to make the contact with teeth. Piezosurgery has least number and most commonly associated with overheating and breakage of tips, resulting in foreign body impaction inside oral tissues.

In the review of hazards of using ultrasonic scalers, the phenomenon of "cavitation" and "microstreaming" has been discussed. The subsequent damage of platelets has been discussed.[5] In this study, there have been two instances of stroke caused by the dislodged plaque and attributed to the deep scaling 24 to 48 h before the AE. As a root-cause-analysis could not be performed, more details are needed to confirm and attribute such an event to scaling needs to be explored. Until such evidence emerges, the association needs to be eyed with suspicion.

Possibility of occurrence of acoustic trauma in patient with use of USU has been predicted,[5] though no evidence provided in support of such a possibility. The finding of three cases in this database provides a direct evidence of this remote possibility. Furthermore, one more case where there was tinnitus that was subsequently diagnosed to have benign paroxysmal positional vertigo strengthen the notion that acoustic trauma from a USU is a possibility, and at least 4 cases have been identified from this data. More detailed analysis is needed to establish the complete pathogenesis other than previously proposed. Infection, especially one that reported after a postoral prophylaxis, if serious such as infective endocarditis, needs to be acted against in a rapid manner. Two deaths have been reported in this data and attributed to dissemination of infection via deep scaling. Though largely anecdotal until date, more reliable evidence needs to be collected before establishing the cause-effect relationship. Similarly, Bell's palsy and trigeminal neuralgia have been reported with use of USU. Though nerve injury is a remote possibility resulting with USU use, more details are needed to confirm the association. The possibility of postoral

Case 2:15-md-02641-DGC   Document 7809-1   Filed 09/27/17   Page 159 of 189

[Downloaded free from http://www.ijdr.in on Thursday, October 27, 2016, IP: 115.112.118.202]

prophylaxis sensitivity of teeth and triggering of an epilepsy episode also needs to be viewed under the same angle.

Swallowing of broken or dislodged parts, embedding of broken material in the gingival, teeth, alveolar bone are events that can be managed uneventfully often and rarely resulting in widespread necrosis, as reported under AE. A dentist or hygienist handling a USU needs to be aware of the potential hazards associated with it. All manufacturers' recommendation need to be adhered to very rigorously.

## CONCLUSION

To the best of our knowledge, this manuscript is the first of its kind to describe AE associated with USU use. As any other dental device, USU is not free from the risk of AEs. Considering the widespread use of USU, an operator needs to be educated about all the listed potential risks of using USU application. Operator should be adequately trained to approach and manage if such an AE arises in practice. Prior possibility of such an AE shall be explained, and consent shall be obtained to avoid medicolegal issues too. Until further strong evidence emerges, this robust number of events shall serve as a reference marker of AEs associated with use of ultrasonics scalers.

### Financial support and sponsorship
Nil.

### Conflicts of interest
There are no conflicts of interest.

### REFERENCES

1. Corso JF. Bone-conduction thresholds for sonic and ultrasonic frequencies. J Acoust Soc Am 1963;35:1738-43.

2. Plotino G, Pameijer CH, Grande NM, Somma F. Ultrasonics in endodontics: A review of the literature. J Endod 2007;33:81-95.

3. Walters JD, Rawal SY. Severe periodontal damage by an ultrasonic endodontic device: A case report. Dent Traumatol 2007;23:123-7.

4. Hebballi NB, Ramoni R, Kalenderian E, Delattre VF, Stewart DC, Kent K, et al. The dangers of dental devices as reported in the food and drug administration manufacturer and user facility device experience database. J Am Dent Assoc 2015;146:102-10.

5. Trenter SC, Walmsley AD. Ultrasonic dental scaler: Associated hazards. J Clin Periodontol 2003;30:95-101.

6. Nations SP, Boyer PJ, Love LA, Burritt MF, Butz JA, Wolfe GI, et al. Denture cream: An unusual source of excess zinc, leading to hypocupremia and neurologic disease. Neurology 2008;71:639-43.

7. Hedera P, Peltier A, Fink JK, Wilcock S, London Z, Brewer GJ. Myelopolyneuropathy and pancytopenia due to copper deficiency and high zinc levels of unknown origin II. The denture cream is a primary source of excessive zinc. Neurotoxicology 2009;30:996-9.

8. Tezvergil-Mutluay A, Carvalho RM, Pashley DH. Hyperzincemia from ingestion of denture adhesives. J Prosthet Dent 2010;103:380-3.

9. Perea-Pérez B, Santiago-Sáez A, García-Marín F, Labajo-González E, Villa-Vigil A. Patient safety in dentistry: Dental care risk management plan. Med Oral Patol Oral Cir Bucal 2011;16:e805-9.

10. Chatterjee S, Herrmann HC, Wilensky RL, Hirshfeld J, McCormick D, Frankel DS, et al. Safety and procedural success of left atrial appendage exclusion with the lariat device: A systematic review of published reports and analytic review of the FDA MAUDE database. JAMA Intern Med 2015;175:1104-9.

11. Pokorney SD, Greenfield RA, Atwater BD, Daubert JP, Piccini JP. Novel mechanism of premature battery failure due to lithium cluster formation in implantable cardioverter-defibrillators. Heart Rhythm 2014;11:2190-5.

12. Overbey DM, Townsend NT, Chapman BC, Bennett DT, Foley LS, Rau AS, et al. Surgical energy-based device injuries and fatalities reported to the food and drug administration. J Am Coll Surg 2015;221:197-205.e1.

13. Naumann RW, Brown J. Complications of electromechanical morcellation reported in the manufacturer and user facility device experience (MAUDE) database. J Minim Invasive Gynecol 2015;22:1018-21.

14. Koster TJ, Timmerman MF, Feilzer AJ, Van der Velden U, Van der Weijden FA. Water coolant supply in relation to different ultrasonic scaler systems, tips and coolant settings. J Clin Periodontol 2009;36:127-31.

# EXHIBIT 35

PubMed

**Format**: Abstract ▾

**Full text links**


View Full-Text Article
at SAGE Publications

Surg Innov. 2009 Dec;16(4):324-9. doi: 10.1177/1553350609353609. Epub 2009 Dec 22.

# Major complications associated with xenograft biologic mesh implantation in abdominal wall reconstruction.

Harth KC[1], Rosen MJ.

⊕ **Author information**

## Abstract

**BACKGROUND:** There is limited research for xenograft biologic mesh performance in the setting of infection despite widespread use and significant associated costs.

**DESIGN:** The authors retrospectively reviewed an FDA database for reported xenograft adverse events (AEs). All meshes were used in the setting of abdominal wall reconstruction from 1997 to 2008.

**RESULTS:** The authors identified 150 AEs. Permacol and Collamend comprised 75% (n = 112) of reported cases. Main AEs included acute mechanical failure (42%; n = 63), mesh disintegration (32%; n = 48), and poor mesh integration (13%; n = 20); 80% of cases were described as infected, and nearly 90% of AEs required reoperation.

**CONCLUSIONS:** Major complications are reported to the FDA for xenograft biologic meshes. Cross-linked meshes had the most AE reports to the FDA. The intrinsic properties of meshes and how they relate to infection-related outcomes are poorly understood. The findings from this FDA database review point toward a need to carefully evaluate these products.

## Comment in

Xenograft biologic mesh implantation in abdominal wall reconstruction and the FDA MAUDE database.  [Surg Innov. 2010]
A response to "Major complications associated with xenograft biologic mesh implantation in abdominal wall reconstruction" (Harth KC, Rosen MJ. Surg Innov. 2009;16:324-329) and discussion of the MAUDE (manufacturer and user facility device experience) database, FDA regulation of biologic implants, and evidence-based medicine.  [Surg Innov. 2010]

PMID: 20031943   DOI: 10.1177/1553350609353609

[PubMed - indexed for MEDLINE]

  

**MeSH Terms**



**LinkOut - more resources**



## PubMed Commons

PubMed Commons home

0 comments

How to join PubMed Commons

# EXHIBIT 36




Wiley Online Library

Log in / Register

📰 Go to old article view

## Congenital Heart Disease    *Explore this journal >*

View issue TOC
Volume 2, Issue 4
July/August 2007
Pages 256–264

# Major Complications Associated with Transcatheter Atrial Septal Occluder Implantation: A Review of the Medical Literature and the Manufacturer and User Facility Device Experience (MAUDE) Database

Jeffrey W. Delaney MD,  Jennifer S. Li MD,  John F. Rhodes MD

**First published:**
23 July 2007   Full publication history
**DOI:**
10.1111/j.1747-0803.2007.00107.x  View/save citation

**Cited by:**
40 articles     Citation tools



✉  Jeffrey W. Delaney, MD, Duke University Medical Center, Division of Pediatric Cardiology, Room 7506 C—Duke
Hospital North, Box 3090, Durahm, NC 27710, USA. Tel: (+1) 919-681-2916; Fax: (+1) 919-681-8927; E-mail:
jeffrey.delaney@duke.edu

## ABSTRACT

**Objective.**   To summarize major complications and outcome for patients receiving percutaneous closure
of atrial septal communications.

**Design.**   The Medline database and the United States Food and Drug Administration manufacturer and
user facility device experience databases (MAUDE) were searched for reports related to complications
with atrial septal occluding devices. The medical literature documenting complication rates for these
devices were reviewed and summarized. The MAUDE database complication reports were compared with
those reported in the medical literature using national implant estimates.

**Outcome.**   The MAUDE database correlated in the type of complications most frequently encountered

with each device. However, based on estimated total implant numbers, there is a higher incidence of major complications, including death. AGA devices had a 0.3% erosion/perforation rate with a higher morbidity and mortality (29%) than previously reported. NMT devices had a lower incidence of erosion/perforation rate of 0.05%. Embolization rates for the NMT devices were also lower than published European studies, possibly reflecting the US restriction of the device for closure of patent foramen ovale. Thrombus was more frequently encountered on the NMT device. Both AGA and NMT devices have been shown to be safe and effective alternatives to cardiac surgery. The MAUDE database correlated, with a very low overall complication rate, but showed a higher estimated major complication rate than the medical literature. These data demonstrate the difficulty in quantifying rare complications in the premarketing analysis and the obligation providers have to report and evaluate complications through vigilant postmarketing surveillance.

**🚗 Get access to the full text of this article**

## 🔳 Article Information

## 🔽 Related content

### Articles related to the one you are viewing

The articles below have been selected for you based on the article you are currently viewing.

**Percutaneous atrial Septal Occluder devices and cardiac erosion: A review of the literature**

Geoffrey B. Crawford, Ralph G. Brindis, Mitchell W. Krucoff, Benjamin P. Mansalis, John D. Carroll

2 May 2012

---

**Short and long term complications of device closure of atrial septal defect and patent foramen ovale: Meta-analysis of 28,142 patients from 203 studies**

Adnan Abaci, Serkan Unlu, Yakup Alsancak, Ulker Kaya, Burak Sezenoz

31 August 2013

---

**Erosion of Amplatzer septal occluder device after closure of secundum atrial septal defects: Review of registry of complications and recommendations to minimize future risk**

Zahid Amin, Ziyad M. Hijazi, John L. Bass, John P. Cheatham, William E. Hellenbrand, Charles S. Kleinman

22 November 2004

## Percutaneous Closure of Patent Foramen Ovale and Atrial Septal Defect: Procedure Outcome and Medium-Term Follow-Up

M. EGRED, M. ANDRON, K. ALBOUAINI, A. ALAHMAR, R. GRAINGER, W.L. MORRISON

22 August 2007

## Transcatheter Closure of Intracardiac Defects in Adults

MICHAEL S. KIM, ANDREW J. KLEIN, JOHN D. CARROLL

16 November 2007

## ⏩ Citing Literature

# WILEY

**Browse Publications**

**Browse by Subject**

**Resources**

Help & Support

Cookies & Privacy

Terms & Conditions

About Us

Wiley Job Network

Advertisers & Agents

Powered by Wiley Online Library Copyright © 1999 - 2016 John Wiley & Sons, Inc. All Rights Reserved

# EXHIBIT 37

# Technical Success and Safety of Retrieval of the G2 Filter in a Prospective, Multicenter Study

Christoph A. Binkert, MD, MBA, Alain T. Drooz, MD, James G. Caridi, MD, Mark J. Sands, MD, Haraldur Bjarnason, MD, Frank C. Lynch, MD, William S. Rilling, MD, Domenic A. Zambuto, MD, S. William Stavropoulos, MD, Anthony C. Venbrux, MD, and John A. Kaufman, MD

**PURPOSE:** To assess the technical success and safety for retrieval of the G2 filter.

**MATERIALS AND METHODS:** The authors performed a prospective, multicenter study of 100 patients with temporary indication for caval interruption. Patients were enrolled consecutively between December 2005 and July 2006. There were 67 men and 33 women with a mean age of 52.1 years (range, 19–82 years). Indications for filter placement were trauma ($n = 56$), perioperative risk ($n = 16$), and medical indications ($n = 28$). Forty-two patients had venous thromboembolism at filter placement. Fifty-eight filters were placed prophylactically.

**RESULTS:** Retrieval was attempted in 61 patients. Fifty-eight of the 61 filters (95%) were successfully retrieved after a mean dwell time of 140 days (range, 5–300 days). In all failed retrievals, the filter tip was against the caval wall. There was no difference in dwell times between successful and unsuccessful retrievals. Although there were no cases of cranial migration, caudal migrations were observed in 12% of cases (10 of 85 patients with a complete data set). Other device-related complications included filter fracture (1/85, 1.2%), filter tilt of more than 15° (15/85, 18%), and leg penetration (16/61, 26%). The recurrent pulmonary embolism (PE) rate was 2%, with no PE in the 30-day period after filter retrieval.

**CONCLUSIONS:** Retrieval of the Recovery G2 filter was safe and successful in most patients. Caudal migration was observed as an unexpected phenomenon.

J Vasc Interv Radiol 2009; 20:1449–1453

**Abbreviations:**  DVT = deep venous thrombosis, IVC = inferior vena cava, PE = pulmonary embolism, VTE = venous thromboembolism

VENOUS thromboembolism (VTE) is a leading cause of death in hospitalized patients (1–3). Anticoagulation is the standard therapy for VTE, but in certain cases anticoagulation may be contraindicated for short- or long-term VTE therapy.

Inferior vena cava (IVC) filters have been shown to successfully prevent pulmonary embolism (PE) (4). However, although IVC filters decrease the risk of PE in the short term, they are associated with a higher incidence of deep vein thrombosis (DVT) after 2 and

8 years (5,6). The observation of Decousus et al (5) stimulated the idea of optional filters. Optional filters are permanent filters with the "option" to be retrieved if they are no longer clinically needed to avoid possible long-term adverse effects of permanent filters.

The G2 filter (Bard Peripheral Vascular, Tempe, Arizona) is a second-generation optional filter with an updated design compared to the original Recovery filter (Bard Peripheral Vascular). The permanent use of the G2 filter for the prevention of PE was previously reported (7–10). The purpose of this study was to assess the retrievability of the G2 filter.

## MATERIALS AND METHODS

### Study Design

This prospective single-arm multicenter Investigational Device Exemption clinical study, sponsored by Bard Peripheral, was conducted in accor-

From the Department of Radiology, Brigham and Women's Hospital/Harvard Medical School, Boston, Massachusetts (C.A.B.); Department of Radiology, Inova Fairfax Hospital, Falls Church, Virginia (A.T.D.); Department of Radiology, University of Florida, Gainesville, Florida (J.G.C.); Department of Radiology, Cleveland Clinic, Cleveland, Ohio (M.J.S.); Department of Radiology, Mayo Clinic, Rochester, Minnesota (H.B.); Department of Radiology, Penn State Milton S. Hershey, Hershey, Pennsylvania (F.C.L.); Department of Radiology, Froedtert Memorial Lutheran Hospital, Milwaukee, Wisconsin (W.S.R.); Department of Radiology, Hartford Hospital, Hartford, Connecticut (D.A.Z.); Department of Radiology, Hospital of the University of Pennsylvania, Philadelphia, Pennsylvania (S.W.S.); Department of Radiology, George Washington University Medical Center, Washington, DC (A.C.V.); and Department of Radiology, Dotter Interventional

Institute, Portland, Oregon (J.A.K.). Received February 12, 2009; final revision received August 9, 2009; accepted August 13, 2009. **Address correspondence to** C.A.B., Institute of Radiology, Kantonsspital Winterthur, Brauerstrasse 15, 8401 Winterthur, Switzerland; E-mail: christoph.binkert@ksw.ch

From the 2008 SIR Annual Meeting.

The study was an industry-funded clinical research by Bard Peripheral, Tempe, Arizona. A.T.D. is a lecturer with honorarium at Bard Peripheral, F.C.L. is a paid consultant for Bard, and S.W.S. has a research grant from and is a consultant to BARD Peripheral. None of the other authors have identified a conflict of interest.

© SIR, 2009

DOI: 10.1016/j.jvir.2009.08.007

dance with the SIR reporting standards (11) at 11 sites within the United States: Brigham & Women's Hospital, Boston, Massachusetts; Inova Fairfax Hospital, Falls Church, Virginia; University of Florida, Gainesville, Florida; Dotter Interventional Institute-OHSU, Portland, Oregon; Cleveland Clinic, Cleveland, Ohio; Mayo Clinic, Rochester, Minnesota; Penn State, Hershey, Pennsylvania; Hartford Hospital, Hartford, Connecticut; Froedtert Memorial Lutheran Hospital, Milwaukee, Wisconsin; Hospital of the University of Pennsylvania, Philadelphia, Pennsylvania; and George Washington University Medical Center, Washington, DC.

Patients were consecutively enrolled from December 2005 through July 2006. All patients were informed of the risks and benefits of participating in the study and gave written informed consent to participate before enrollment. The protocol was approved by the institutional review board at each study site, and all study procedures were conducted in accordance with Good Clinical Practices.

Study procedures included ultrasonographic (US) screening for a patent jugular vein to be used for future filter retrieval, placement of the study filter, and conventional radiographic examination of the abdomen in full expiration (anteroposterior, lateral, and bilateral anterior-oblique projections) within 48 hours after filter placement. If the filter was not retrieved, a phone assessment was conducted at 3 months and a clinic visit at 6 months, including repeat conventional radiography.

The indication for filter retrieval was discussed with the referring medical team. Filter retrieval was performed if there was no longer an increased risk for PE and/or no longer a contraindication to anticoagulation. Vascular US of the deep vein system was performed beforehand in patients with prophylactic filter placement. If no DVT was found, no further anticoagulation was undertaken. If a DVT was found in these patients and in all patients with known DVT or PE, a 6-month course of anticoagulation was carried out. A cavogram with iodinated contrast medium was obtained before and after filter retrieval in all patients. In addition, a follow-up clinic visit was required 1 month after retrieval.

## Patient Population

One hundred patients (67 men, 33 women) were included in the study. The mean patient age was 52.1 years (range, 19–82 years). Patients considered for inclusion in the study were temporarily at increased risk for PE with a need for caval interruption because of a contraindication of anticoagulation. The indication for filter placement is summarized in the **Table**. Additional study requirements included an estimated life expectancy of more than 6 months, a normal right-sided IVC with a diameter less than 28 mm, and a serum creatinine level of less than 2.0 mg/dL (176.8 $\mu$mol/L) for safe application of iodinated contrast medium.

Forty-two patients presented with VTE at filter placement: 18 had DVT only, 10 had PE only, and 14 had both DVT and PE. Of the 58 patients without VTE, 10 had a history ($>3$ months) of VTE.

## Device

The devices used in this study were the G2 filter (**Figure**) and the Recovery Cone Removal System (Bard Peripheral Vascular). The filter consists of 12 shape-memory nitinol wires emanating from a central nitinol sleeve. The wires form two levels of filtration, with the legs (leg span, 40 mm; overall height, 39 mm) providing the lower level of filtration and the arms (arm length, 18.5 mm; span, 33 mm) providing the upper level of filtration. The nitinol filter was designed for use in IVCs with diameters less than or equal to 28 mm. The insertion and retrieval techniques were previously described by Oliva et al (12).

## Outcome

The primary objective of the study was to assess the technical and clinical success of the G2 filter retrieval, including adverse events within 30 days after retrieval. In addition, we evaluated the overall clinical experience, as assessed by filter migration and filter fracture and relevant placement procedural parameters and outcomes.

Filter migration was defined as a change in filter position compared to its deployed position (either cranial or caudal) of more than 2 cm as documented with plain radiography or venography.

| Indications for Filter Placement | |
| --- | --- |
| Indication for Filter Placement | No. of Patients ($n = 100$) |
| Trauma* | 56 (56%) |
| Surgery (within 1 mo)† | 16 (16%) |
| Nonsurgical treatment‡ | 28 (28%) |

\* The trauma category includes spine, abdominal, long bone, pelvic, thoracic, and head trauma.
† The surgical category includes surgical patients with a history of or active VTE at the time of filter placement, including those with a primary diagnosis that was bariatric, gastrointestinal, orthopedic (joint replacement, spine), neurosurgical (intracranial, spine), or related to a gynecologic procedure.
‡ The nonsurgical treatment category includes patients with a medical condition preventing safe anticoagulation, including those with a primary diagnosis that was related to cancer (with or without metastases), a gynecologic disorder, hypercoagulopathy (without malignancy), morbid obesity, or stroke (within 6 months).

Filter fracture was defined as any loss of structural integrity (ie, breakage or separation) of the filter documented at imaging. Filter penetration/protrusion was defined as penetration of a filter leg or arm of more than 3 mm outside the IVC measured at venography according to the American College of Radiology Practice Guidelines (13). During the clinical visit 6 months after filter placement or 1 month after filter retrieval, a history and physical examination were performed, focusing on symptoms of PE (shortness of breath) and DVT (leg swelling, leg pain).

## RESULTS

### Filter Placement

All 100 G2 filters were deployed successfully. For access, the right common femoral vein was used 90 times, and the left common femoral vein was accessed 10 times.

The mean fluoroscopy time was 3.2 minutes (range, 0.4–33.6 minutes). The mean IVC diameter ($\pm$ standard deviation) was 20.5 mm $\pm$ 3.4 (range, 12–28 mm). Two filters were noted to



**Figure.** G2 filter. Compared with the original Recovery filter, the arms are longer and the legs wider. The welding at the tip was also changed.

have had a tilt of more than 15° immediately following placement. Both filters were placed from the right common femoral vein, and no attempt was made to straighten the filters. All imaging studies were assessed by the site investigators.

### Postplacement Procedure Follow-up

All patients enrolled in the study were to be followed up to 6 months after filter placement or to 1 month after filter retrieval, whichever came first. A phone call was placed 3 months after filter placement to assess filter retrieval status, current medications, and adverse events. Office visits were scheduled at 6 months after placement if the filter had not been retrieved. A physical examination, current medication assessment, adverse event assessment, and follow-up imaging were completed (supine anteroposterior abdominal radiography in anteroposterior and lateral projections at full expiration and posteroanterior digital spot radiography centered on the filter). If the physician determined that the filter continued to be clinically indi-

cated, the device could be left in place permanently. At study completion, 83 of the 100 patients enrolled had a complete data set for evaluation (see Final Follow-up).

### Filter Retrieval

Retrieval was attempted in 61 patients. The right internal jugular vein was used for access in all cases. In 58 of the 61 patients, retrieval was successful. All study retrieval procedures were performed by using standard Recovery cone technique. In three cases, retrieval failed because the filter tip could not be engaged with the cone as the filter tip was embedded in the IVC wall.

The mean fluoroscopy time for the attempted filter retrievals, as recorded in 59 of the 61 patients, was 7.4 minutes ± 10.5 (range, 1.4–59.8 minutes). The mean fluoroscopy time for successful retrieval procedures (56/58 recorded values) was 6.3 minutes ± 8.5 (range, 1.4–59.63 minutes). The mean fluoroscopy time of unsuccessful retrieval attempts was 27.8 minutes

(range, 2.4–48.3 minutes). The significantly longer fluoroscopy times for the unsuccessful retrievals are indicative of more difficulties during retrieval attempt (P = .03).

The mean filter dwell time in the 61 patients in whom retrieval was attempted was 138 days (range, 5–300 days). The mean dwell time in patients with successfully retrieved filters was 140 days (range, 5–300 days). The mean dwell time in patients with failed retrievals was 107 days (range, 92–134 days). There was no statistically significant difference between the dwell times of successful versus unsuccessful retrievals (P = .11).

Venography was normal in 52 of the 61 attempted retrievals (in one case, venograms were lost). In eight cases, venograms were reported as abnormal. Four venograms showed a small thrombus in the filter. In three cases, a stenosis was noted at the filter level of the IVC before retrieval and in two cases there was a stenosis after retrieval secondary to difficulties during filter retrieval. One stenosis was measured at more than 50%; however, there were no related clinical sequelae noted at the 1-month follow-up visit. In one case, both a stenosis of the IVC and a thrombus in the filter was documented.

### Final Follow-up

Overall, 83 of 100 patients had a complete data set either with successful retrieval or observation for 6 months. Four patients completed all clinical evaluations but were lacking final imaging. Fifty-eight of the 61 attempted filter retrievals were successful. As previously discussed, three filter retrieval attempts were unsuccessful. Fifty-six of the 58 patients completed 1-month follow-up after retrieval; two patients were lost to follow-up. A total of 42 filters were not retrieved. No retrieval attempt was undertaken in 39 patients. Thirty-one of the 42 patients in whom filters were not retrieved completed the 6-month follow-up. However, as mentioned above, the final imaging data set was not available in four patients. Of the 11 patients who did not complete follow-up, six died, three withdrew consent, and two were lost to follow-up as previously discussed. Six deaths were reported between 22 and 100 days after filter placement (mean, 60.6 days). All were due to

pre-existing conditions (colon cancer, cardiac arrest, myocardial infarction, chronic obstructive pulmonary disease, pneumonia, and chondrosarcoma) and were not related to the filter device, placement procedure, or retrieval procedure.

During the study, two symptomatic PE were recorded. Both PE occurred with the filter in place. No PE was noted during the 1-month observation period after the filter was removed. No new symptomatic DVT was noted during the study period.

### Procedure-related Complications

One hundred filters were successfully deployed in 100 patients. There were four procedure-related complications during the study: three complications occurred during placement and one complication occurred during retrieval. One patient experienced an allergic skin reaction following access site preparation during both implantation and retrieval. One patient had acute renal failure secondary to multiple, same-day contrast studies and one had a hematoma related to device placement; however, all complications were resolved with no clinical sequelae.

### Device-related Complications

*Migration.*—Ten filter migrations of more than 2 cm occurred in the 85 patients (12%) who were assessed for this category at a mean follow-up of 155 days (range, 5–323 days). The mean migration distance observed for the 10 migrated filters was 2.7 cm (range, 2.0–4.1cm). The 85 filter images analyzed for this endpoint include 58 filters imaged at retrieval and 27 nonretrieved filters imaged at 6 months. All migrations occurred toward the feet (ie, caudal migration). Five of these migrated filters were retrieved successfully and two remained in place after an unsuccessful retrieval attempt. In three cases, no retrieval attempt was performed.

*Filter fracture.*—One filter fracture occurred in the 85 assessed devices (1.2%). Preretrieval venography performed on day 92 revealed a mild filter tilt with a fractured strut external to the IVC. One arm and one leg were observed outside the IVC. A retrieval attempt was unsuccessful secondary to the apex being embedded in the IVC wall. Nevertheless, this patient re-

mained asymptomatic and without symptoms of PE during final follow-up through day 209.

*Filter tilt.*—Overall, 15 of the 85 filters (18%) with assessable images showed a tilt of more than 15°. Two previously mentioned filters tilted during placement; the remaining 13 developed tilt during follow-up. Of the 15 tilted filters, 10 were removed successfully and three could not be removed. In two cases, no retrieval attempt was performed. No PE or other adverse event occurred in this group.

*Filter penetration.*—Assessment of filter penetration was only possible in the 61 patients who underwent venography before filter retrieval. Sixteen of the 61 patients (26%) showed a filter leg or arm penetrated more than 3 mm outside the IVC. Of these 16 patients, 14 had undergone a successful retrieval. Fifteen of 16 patients with penetration were asymptomatic, and one patient reported back pain that was relieved following filter retrieval.

*Complication relationship.*—The study data show a significant relationship between tilt or more than 15° and migration ($P < .001$); however, there is no statistical evidence that either migration or tilt is related to penetration.

## DISCUSSION

In the present study, a relatively high percentage of retrieval attempts were undertaken (61/100). This is similar to that performed in other trials—including the studies by Ray et al (14) (47.7%), Keller et al (15) (49%, 70%), and Wicky et al (16) (67%)—and substantially higher than the retrieval rate in a clinical setup reported by Grande et al (17) (14%). This observation underlines again the importance of an organized follow-up in patients with optional filters.

The retrieval success of the G2 filter in our multicenter study was good, with a technical success rate of 95% (58/61). In a single-center study, Oliva et al (12) had an even higher retrieval rate (100%) for the G2 filter. The retrieval rates for the G2 are similar to those reported for other filter types: The rates for the Günther Tulip filter, the original Recovery filter, the ALN filter (ALN Implants, Chirurgicaux, Ghisonaccia, France), and the OptEase filter (Cordis, Bridgewater, New Jersey) varied from 76% to 98%; 82% to 100%,

50% to 100%, and 91% to 100%, respectively (14,15,17–20). The fluoroscopy times for filter retrieval (mean, 7.4 minutes; range, 1.4–59.8 minutes) were similar to those of other reports with the Günther Tulip filter (Wicky et al (16) reported a mean fluoroscopy time of 6.61 minutes and de Gregorio et al (21) reported a mean fluoroscopy time of 4.4 minutes) and the original Recovery filter (Binkert et al (9) reported a mean fluoroscopy time of 5.8 minutes).

The retrieval rates may have been even higher had alternative retrieval techniques, such as the loop-snare-technique, been applied (22). However, during the present study only the standard retrieval with the Recovery cone was allowed. Retrieval failures were all due to tilted filters with the tips embedded in the IVC wall and were unrelated to dwell time. The mean dwell time in our study was 140 days, which is higher than that reported in most published studies of other filter types—with reported dwell times between 8 and 28 days (15,16,23). The results from the present study suggest that the G2 may likely be retrievable even after 6 months, similar to the reported results with the original Recovery filter (9).

Filter migration is likely the most concerning filter-related complication. Cranial migration was not seen with the G2 filter in our study. Two case reports described migration of a G2 into the right ventricle (24,25). In both case reports the G2 did not open properly and legs entangled within each other, allowing the filter to migrate cranially. It seems that it is important to check for appropriate leg opening of the G2 after placement. Caudal migration, however, was observed in 10 cases in our study (12%). This is a rare phenomenon with a yet unclear mechanism. There is one letter reporting a caudal migration of a G2 filter during carbon dioxide venography (26). The authors hypothesized that caudal filter displacement was due to rapid IVC diameter expansion caudal to the filter caused by carbon dioxide injection. No carbon dioxide was used in the present study, but it is possible that other abrupt changes of the IVC diameter led to caudal migration. The mechanism of caudal migration remains unclear and warrants further investigation. However, the caudal migration of the G2 did not cause any clinical problems in our study.

The frequency of filter fracture and penetration has been reduced compared to original Recovery filter. In our study only one filter fracture (1.2%) was observed. Another study with the G2 reported no fracture (0/51) (12). These rates compare favorably with the reported fracture rate of 7.5% for the original Recovery filter (19). The penetration rate for a filter leg outside the IVC was also reduced—from the reported 62% for the original Recovery filter (19) to 26.2% in our study and to 18% of another study looking at the G2 (12).

The Recovery G2 filter provided a protection against PE in our study. We encountered two PE (2%), which is well within the 5% threshold of the American College of Radiology guidelines and comparable with reported rates of other studies (Grande et al [17%], 2.8%; Ray et al [14], 5%; Keller et al [15], 1.2%; Mismetti et al [18], 2.4%; and Neuerburg et al [27], 2.5%). Importantly, there was no additional PE during the 30-day follow-up after filter retrieval and no new symptomatic DVT caused by the study filter.

The present study has some limitations. The focus was on the technical aspect of the G2 filter. Inclusion criteria to enter the study were quite open, which explains the heterogeneous patient population. Clinical follow-up was performed 6 months after placement and/or 1 month after retrieval. However, during these visits the focus was on detecting clinically significant DVT and/or PE. The venous system was not examined with US for patency or insufficiency. Imaging was performed according to a defined schedule and technique but without a core laboratory for interpretation.

In conclusion, the Recovery G2 filter shows filtration properties that meet the SIR guidelines (28) and which are comparable to other filters. Retrievals were possible after dwell times up to 300 days, similar to the original reported long dwell times of the original Recovery filter. Compared to the original Recovery filter, the new design of the G2 filter showed a decrease in filter fracture and penetration rates. With the adjusted design, cranial migration was successfully avoided in the present study; however, caudal migration of the filter was observed in 12% of cases. The mechanism and the clinical effect of caudal migration warrant further investigation.

## References

1. Goldhaber SZ.   Pulmonary embolism. N Engl J Med 1998; 339:93–104.
2. Rosner MK, Kuklo TR, Tawk R, et al.   Prophylactic placement of an inferior vena cava filter in high-risk patients undergoing spinal reconstruction. Neurosurg Focus 2004; 17:1–6.
3. Bick RL.   Hereditary and acquired thrombophilia. I. Preface. Semin Thromb Hemost 1999; 25:251–253.
4. Hoff WS, Hoey BA, Wainwrigt GA, et al.   Early experience with retrievable inferior vena cava filters in high-risk trauma patients. J Am Coll Surg 2004; 199:869–874.
5. Decousus H, Leizorovicz A, Parent F, et al.   A clinical trial of vena caval filters in the prevention of pulmonary embolism in patients with proximal deep-vein thrombosis. N Engl J Med 1998; 338:409–415.
6. The PREPIC Study Group.   Eight-year follow-up of patients with permanent vena cava filters in the prevention of pulmonary embolism: the PREPIC Randomized Study. Circulation 2005; 112:416–422.
7. Richard HM III, Lowe SR, Malloy PC.   Retrieval of Bard Recovery filter from left-sided vena cava. J Vasc Interv Radiol 2005; 16:1039–1040.
8. Rosenthal DR, Wellons ED, Levitt AB.   Role of prophylactic temporary inferior vena cava filter placed at the ICU bedside under intravascular ultrasound guidance in patients with multiple trauma. J Vasc Surg 2004; 40:958–964.
9. Binkert CA, Sasadeusz K, Stavropoulos SW.   Retrievability of the recovery vena cava filter after dwell times longer than 180 days. J Vasc Interv Radiol 2006; 17:299–302.
10. Kalva SP, Athanasoulis CA, Fan CM, et al.   Recovery vena cava filter: experience in 96 patients. Cardiovasc Interv Radiol 2006; 29:559–564.
11. Millward SF, Grassi CJ, Kinney TB, et al.   Reporting standards for inferior vena caval filter placement and patient follow-up: supplement for temporary and retrievable/optional filters. J Vasc Interv Radiol 2005; 16:441–443.
12. Oliva VL, Perreault P, Giroux MF, et al.   Recovery G2 inferior vena cava filter: technical success and safety of retrieval. J Vasc Interv Radiol 2008; 19:884–889.
13. American College of Radiology.   Practice guidelines for the performance of percutaneous inferior vena cava (IVC) filter placement for the prevention of pulmonary embolism. J Am Coll Radiol 2005; 40:627–638.
14. Ray CE, Mitchell E, Zipser S, Kao EY, Brown CF, Moneta GL.   Outcomes with retrievable inferior vena cava filters: a multicenter study. J Vasc Interv Radiol 2006; 17:1595–1604.
15. Keller IS, Meier C, Pfiffner R, Keller E, Pfammatter T.   Clinical comparison of two optional vena cava filters. J Vasc Interv Radiol 2007; 18:505–511.
16. Wicky S, Doenz F, Meuwly J, Portier F, Schnyder P, Denys A.   Clinical experience with retrievable gunther tulip vena cava filters. J Endovasc Ther 2003; 10:994–1000.
17. Grande WJ, Trerotola SO, Reilly PM, et al.   Experience with the recovery filter as a retrievable inferior vena cava filter. J Vasc Interv Radiol 2005; 16:1189–1193.
18. Mismetti P, Rivron-Guillot K, Quenet S, et al.   A prospective long-term study of 220 patients with a retrievable vena cava filter for secondary prevention of venous thromboembolism. Chest 2007; 131:223–229.
19. Berczi V, Bottomley JR, Thomas SM, Taneja S, Gaines PA, Cleveland TJ.   Long-term retrievability of IVC filters: should we abandon permanent devices? Cardiovasc Interv Radiol 2007; 30:820–827.
20. Imberti D, Prisco D.   Retrievable vena cava filters: key considerations. Thromb Res 2008; 122:442–449.
21. de Gregorio MA, Gamboa P, Gimeno J, et al.   The Gunther Tulip retrievable filter: prolonged temporary filtration by repositioning within the inferior vena cava. J Vasc Interv Radiol 2003; 14:1259–1265.
22. Rubenstein L, Chun AK, Chew M, Binkert CA.   Loop-snare technique for difficult inferior vena cava filter retrievals. J Vasc Interv Radiol 2007; 18:1315–1318.
23. Rosenthal D, Wellons ED, Hancock SM, Burkett AB.   Retrievability of the Gunther Tulip vena cava filter after dwell times longer than 180 days in patients with multiple trama. J Endovasc Ther 2007; 14:406–410.
24. Bui JT, West DL, Pinto C, Gramling-Babb P, Owens CA.   Right ventricular migration and endovascular removal of an inferior vena cava filter. J Vasc Interv Radiol 2008; 19:141–144.
25. Kuo WT, Loh CT, Sze DY.   Emergency retrieval of a G2 filter after complete migration into the right ventricle J Vasc Interv Radiol 2007; 18:1177–1182.
26. Cantwell CP, Lynch FC.   Caudal migration of a G2 filter during carbon dioxide cavography. J Vasc Interv Radiol 2007; 18:814–815.
27. Neuerburg JM, Gunther RW, Vorwerk D, et al.   Results of a multicenter study of the retrievable tulip vena cava filter: early clinical experience. Cardiovasc Interv Radiol 1997; 20:10–16.
28. Grassi CJ, Swan TL, Cardella JF, et al.   Quality improvement guidelines for percutaneous permanent inferior vena cava filter placement for the prevention of pulmonary embolism. J Vasc Interv Radiol 2003; 14:S271–S275.

# EXHIBIT 38

# US FDA Clinical Data Summary of the Simon Nitinol Filter®

The following is a non-published summary of a non-randomized, prospective clinical study sponsored by NMT Medical, Inc. (Nitinol Medical Technologies, Inc.) of the Simon Nitinol Filter® for the prevention of recurrent pulmonary embolism. The purpose of the investigation was to confirm filter design and to develop safety and effectiveness data to support a 510(k) submission for approval by the United States Food & Drug Administration (FDA). This clinical investigation was conducted according to a written protocol and in compliance with US Good Clinical Practices regulations. The Simon Nitinol Filter received FDA 510(k) approval in July 1989. All data referenced are on file at NMT Medical.

## Abstract

From February 1988 through November 1990, 258 patients underwent percutaneous placement of the Simon Nitinol Filter in 23 clinical sites in the United States. Follow-up studies mandated clinical evaluation and abdominal radiography; US, MR, and CT were optional. The final clinical results in 180 patients (70%) who completed the 6-month follow-up are analyzed, and significant adverse events during and beyond the 6 month trial period are reported. The data obtained from the trial were analyzed to determine if they adequately demonstrated the safety and effectiveness of the device. The Simon Nitinol Filter demonstrated excellent safety and effectiveness characteristics in protecting at-risk patients from the potentially serious consequences of recurrent pulmonary embolism. The filter was successfully inserted percutaneously via the femoral, jugular or antecubital route in all patients. Symptomatic recurrent pulmonary embolism was demonstrated in 1.2% of patients, and additional asymptomatic emboli were documented in 0.8% of patients. Symptomatic vena caval occlusions occurred in 8.1% and asymptomatic caval occlusions in an additional 1.6% by MR imaging. Filter migration (0.8%) was low and all cases were asymptomatic. The SNF is efficacious and has low morbidity. Its small introducer, two-level filtering, multiple access sites and MRI compatibility are advantageous.

## Introduction

A clinical study was performed to assess the safety and effectiveness of the Simon Nitinol Filter® (SNF). The study enrolled 258 patients at risk of pulmonary embolism. Patients were enrolled at 23 clinical sites and the available data from these centers were compiled for purposes of evaluating the filter's safety and effectiveness.

Each patient enrolled in the study was followed up immediately after filter insertion and at 3 and 6 months post implantation. The data that were collected for each patient included the following: preexisting conditions, previous treatment, primary and secondary indications, procedural difficulties, and complications (major misplacement, migration, occlusion, pulmonary embolism and death). In addition, major complications were reported to the sponsor as they occurred. The sponsor also contacted investigators by telephone to assure that all significant problems and complications were reported.

1



Hudson
EXHIBIT NO. 12
1-17-14
Kim Thrall, CSR, RPR

The data obtained from the trial were analyzed to determine if they adequately demonstrated the safety and effectiveness of the device.

## Device Description

The Simon Nitinol Filter represents a new generation of venous interruption devices designed to prevent recurrent pulmonary embolism. It is primarily indicated for patients who cannot, for a variety of reasons, be treated with anticoagulants. The unique design and material of the Simon Nitinol Filter provide excellent filtering efficiency and allow percutaneous placement through a standard 7 French I.D. angiographic introducer with minimal entry site difficulties. The filter may be placed in the right or left femoral, jugular, subclavian or antecubital vein. The placement procedure is quick and simple to perform.

Compared to other filters, the SNF has the thermal shape-memory properties of nitinol, an alloy of nickel and titanium, that allow it to exist as a straightened set of wires when cooled within the storage tube or delivery catheter, and to transform into its predetermined filter shape when warmed to body temperature within the vena cava. The Simon Nitinol Filter has the advantages of a small (7 French I.D.) introducer size, two-level filtering, and MR imaging compatibility.



## Clinical Investigation

This report of the clinical investigation includes the entire 258 patient study population. The parameters that were evaluated included occlusion characteristics, ease and success of insertion, prevention of recurrent pulmonary embolism, and incidence of migration and perforation as well as other adverse events.

## Study Objectives

The objectives of the study included:

a.  To assess the ease of filter insertion and placement.

b.  To assess the security of filter anchorage as measured by lack of filter migration.

c.  To assess the clinical complications of the filter both during the insertion procedure and in the postinsertion period. Complications evaluated included such events as minor complications related to the insertion procedure and occlusion of the filter. Major events such as filter migration, perforation and recurrent pulmonary embolism were likewise evaluated.

d.  To assess clot-filtering effectiveness of the filter as measured by lack of recurrent pulmonary embolism.

The Simon Nitinol Filter is intended for use in the prevention of life-threatening pulmonary emboli in those patients at risk for pulmonary embolism or with a history of recurrent

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00280773

pulmonary embolism. The filter was placed percutaneously in all cases. While concurrent anticoagulant therapy was utilized where indicated, this amounted to relatively few cases because of the study selection criteria.

## Patient Selection and Exclusion Criteria

Patients were selected for this study if they presented with pulmonary embolism, or were at risk for pulmonary embolism from deep venous thrombosis, and anticoagulation was contraindicated, had proven ineffective in the past, or had produced complications. In some patients, the SNF was inserted prophylactically prior to major surgery. It was anticipated that many of the patients enrolled in the study would be in poor general health due to the underlying disorders necessitating insertion of the Simon Nitinol Filter. Male and female patients 18 years old and over were selected for inclusion in the study if they:

1. Had experienced a pulmonary embolism and had a clear contraindication to standard anticoagulation treatment,

2. Continued to have recurrent pulmonary embolism despite anticoagulation treatment,

3. Had massive pulmonary embolism requiring treatment with thrombolytic drugs or pulmonary embolectomy,

4. Were undergoing major surgery with high risk of pulmonary embolism (*e.g.,* hip surgery, major neurological surgery),

5. Had deep venous thrombosis involving the pelvic veins or inferior vena cava and were considered at high risk of pulmonary embolism, or

6. Had experienced pulmonary embolism and were likely to have recurrences because of chronic predisposing diseases such as congestive heart failure, pulmonary emphysema, paraplegia, chronic or recurrent deep venous thrombosis.

Individuals not suffering from any of the above were excluded from this study, along with:

1. Patients with a vena cava shown by venography to be greater than 28 mm in diameter (changed to 24mm after 2 migrations were reported),

2. Patients with acute submassive pulmonary embolism secondary to a transient problem (*i.e.,* sports, injury), or

3. Patients prone to leg edema and skin ulcerations.

## Study Population

This report includes all 258 patients who received the Simon Nitinol Filter from February 1988 to November 1990. The data were derived from 23 clinical centers, and the number of patients reported from each center ranges from 1 to 33, with 11 centers contributing 10 or more patients each. Clinical trials were begun at the institutions after approval by their institutional review boards, and appropriate informed consent was obtained from all patients in which the SNF was placed.

3

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00280774

*Evaluation of Safety and Effectiveness Criteria for Filter Placements over Time*

This section will discuss the various complications that have been noted with vena cava filters, in general, and analyze the significance of each. In doing so, complications that affect the safety or effectiveness of any type of vena cava filter are divided into two broad categories. The first category consists of operative complications that occur during the placement procedure. These usually are apparent at the time of the procedure or within 24 hours. The second category consists of postoperative complications. Clinically significant postoperative complications generally occur within one month of placement and almost always within three months (Epstein 1989).

*Methods*

*Insertion procedure.* The specific filter placement procedure including cooled saline infusion during the delivery, pre- and post-delivery vena cavography, and post-procedure radiography of the Simon nitinol filter have been described previously (1). Protocol requirements included clinical history and physical examination, recording of the filter insertion and peri-procedural details, and plain radiography of the filter post-procedure and again at 3 and 6 months. The 3 and 6 month clinical examination included history, physical examination of the lower extremities and puncture site, and plain radiography of the filter region. Chest radiography and ventilation perfusion lung scans were optional studies. US imaging of the puncture site and filter region, CT, MR, or digital-subtraction angiography were optional studies performed at the discretion of the principal investigators, generally in symptomatic patients. Laboratory tests of blood and urine for kidney and liver function, and blood clotting were performed. For patients who died during the course of the 6-month study or later, autopsy examination of the vena cava and filter was encouraged, but was not a protocol requirement.

*Follow-up studies.* Initial and delayed routine follow-up examinations were performed in order to screen for complications at the venipuncture site, such as hemorrhage and venous thrombosis; and at the filter delivery site, including migration, penetration of the vena cava, filter misplacement, tilting or crossing of the filter legs. Recurrent pulmonary embolism was identified by history and physical examination supplemented by nuclear ventilation/perfusion lung scans in suspected cases, according to standard clinical practice. Vena caval occlusion was diagnosed clinically; follow-up imaging by US, contrast-enhanced CT, MRI, or vena cavography was additionally performed in a number of these cases at the discretion of principal investigators. Laboratory tests were obtained to check for any untoward systemic effects of the nitinol material.

Minor complications such as misplacement or tilting were documented in the study records. Major complications were required to be reported to the study monitor within 3 days by telephone and within 10 days in writing. These included filter migrations, recurrent pulmonary embolism, IVC occlusions, and filter-related death. Such major complications were reported during and beyond the 6-month trial period.

*Discussion of Safety and Effectiveness Data from the Simon Nitinol Filter Study*

*Summary*

Preexisting conditions for the patients enrolled in the study included many forms of malignancies and cancer, vascular disease, major surgery, and other underlying conditions.

4

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

The overwhelming majority of patients (174 patients or 67%) were either in poor or fair health at the time of entry into the study with 16% of the patients having an advanced malignancy. The indications for filter insertion were reported for 245 of 258 and included: contraindication to anticoagulation—158 patients (65%), failure of anticoagulation—33 patients (14%), severe pulmonary hypertension—1 patient (0.4%), surgery—5 patients (2%), trauma—0 patients (0%) and combinations of these 5 categories—48 (19%)

The insertion procedure for the filter was via the femoral approach for 234 (91%) patients, the jugular approach for 15 (6%) patients, and the antecubital approach for 1 (.3%) patient. There were 8 patients (3%) in whom the approach was not noted. Of the 77 patients who died, only one death was related to the filter.

*Success of Insertion and Placement*

*Perforation of the IVC Wall*

During the course of caudal migration the diverging legs of the Greenfield filter tend to spread further apart and perforate the vena cava wall (Cimochoski 1980). They may also penetrate adjacent structures such as the aorta, the ureter, or a vertebral body. This process appears to be slowly progressive over a period of months. A protective fibrous tissue sheath develops over the tips of the legs and hooks as a filter extends through the caval wall. Remarkably, perforation of the IVC usually is not associated with symptoms and consequently requires no treatment. The Gunther filter also has shown a high incidence of caudal migration but without further leg spread, since the legs are directed cranially. The Simon Nitinol Filter has shown no perforation of the IVC and minimal caudal migration, probably due to the dual anchoring points of the dome and the filter legs. Filters other than the SNF that have migrated appear to have done so early, prior to three months.

The rate of successful insertion for the Simon Nitinol Filter is 100%. This rate compares quite favorably with the rate of successful insertions for other similar devices, which range from 89 to 99%. There were 10 reports (4%) of difficulties with venipuncture, 18 procedures with reported difficulty advancing the device into the IVC (7%), and 37 reports of difficulty releasing the device into the IVC (14%). As stated, however, none of these difficulties was significant enough to cause a failure of insertion.

With respect to perforation of the vena cava wall and adjacent structures, there have been no reports of such an occurrence with the SNF. There were three (1%) reports of penetration, which is defined as encroachment of the filter legs or dome into the vena cava wall far enough to be visualized via venacavogram. As noted earlier, one of these reports was described as "tenting" and another was indicated as being uncertain. Yet a third report was noted by an investigator but was not substantiated through imaging studies. Penetration itself is not expected to have adverse affects; indeed, for most filters, hooks or barbs in the filter legs must engage the vena cava wall in order to secure the filter attachment.

There was one reported instance of major filter misplacement with the SNF.[1] This problem did not result in any patient safety concerns or in lessening of filter efficacy.

---

[1] Major misplacement is defined as unintentional placement of the SNF somewhere other than in the intended location, which is in the IVC below the renal vein. Unintended placement in the iliac, hepatic,

5

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00280776

Tilting of the filter within the vena cava was included in the investigators' report form simply because it reflects an efficacy criterion for certain other filters. Tilting does not, however, affect the efficiency of the Simon Nitinol Filter as long as the dome remains in contact with the vena cava wall throughout its circumference. There were 54 reports of filter tilting (21%).

## Migration of the Device After Insertion

### Filter Embolization

The Simon Nitinol Filter is initially secured in the IVC by the outward pressure of its expanding elements and by engagement of the terminal leg hooks with the vena cava wall. Within two weeks the SNF becomes further secured by the formation of a thin neoendothelium which grows over the wires wherever they contact the vein wall. Theoretically, embolization of a filter to the heart or lungs may occur at the time of delivery if its normal expansion is prevented by thrombus forming around it while still in its introducer sheath or if the caval diameter is excessively large. Delayed embolization also may occur within the first two weeks if a filter captures clot, the vena cava pressure rises, and the vena cava consequently becomes overdistended[2] (Greenfield 1977). After two weeks, the points of contact between the device and the vein wall become tightly bound by collagen, muscle fibers, and neoendothelium, and embolization of the filter becomes virtually impossible (Epstein 1989).

Embolization of the filter is a serious complication with variable clinical consequences, comparable to pulmonary thromboembolism. These range from being totally asymptomatic to sudden death. Therapy also ranges from nil to open chest surgery and removal of the device.

### Local Filter Migration

It has been noted that vena cava filters may migrate a few centimeters toward the head or toward the feet during the weeks or months following their placement (Sidaway 1986; Miller 1986). This complication is largely dependent upon the specific filter design and reflects the susceptibility of the particular filter to hydrodynamic forces acting upon it. The direction of blood flow and elevated pressure in the vena cava below the filter after clot capture tend to push the filter craniad. Most filters are designed to resist this. A waterhammer effect in the upright position after clot capture, particularly during ambulation, tends to force the filter downward. This may be due principally to the design of those filters. The design of the SNF provides for a second anchor point at the mushroom cap which helps to resist any downward movement. These small migrations usually are clinically insignificant.

The Simon Nitinol Filter is designed to expand to the size of the vena cava and firmly attach to the wall in spite of blood flow or pressure. The ability of the device to remain in position can be assessed by the rate of migration of the filter. During the course of the study, only two instances of migration were noted (0.8%). In one of these cases, the filter was inserted less than two weeks prior to surgery in a patient with a large vena cava. It is believed that as a result of surgery, the vena cava expanded slightly and the device migrated through the heart to the pulmonary artery. The patient was asymptomatic and experienced no adverse effects as a

renal vein, or right heart is major misplacement. Placement in the IVC below the renal vein but 1 cm or less too high or 2 cm or less too low is not major misplacement.

[2] The vena cava also may overdistend without clot as a result of right heart failure or during surgical anesthesia involving positive pressure ventilation or abdominal manipulations.

6

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
_MD1

BPVE-01-00280777

result of the device's migration. Following this incident, labeling for the Simon Nitinol Filter was modified to state that, for filter placement less than two weeks prior to surgery, the maximum vena cava diameter is 24 mm rather than 28 mm as provided in all other situations.

*Prevention of Recurrent Pulmonary Embolism*

It is clinically recognized that the greatest risk of recurrent pulmonary embolism exists during the first few days or weeks after the development of deep venous thrombosis (DVT) or following the initial pulmonary embolic event. The fresh thrombus may still be undergoing active propagation, is relatively fragile, and is poorly attached to the vein wall. It is during this period that pieces break off most easily and migrate to the lungs. For this reason, anticoagulant therapy is instituted immediately or, if this therapy is contraindicated, a vena cava filter device is inserted on an emergency basis. Within the first few weeks the thrombi become more organized, less fragile, and more adherent so that the recurrence rate falls dramatically (Huisman 1989; Sabiston 1977). Thus, anticoagulant therapy may be discontinued after six weeks, though more commonly it is given for three to six months when the risk of recurrent pulmonary embolism (PE) is minimal. Only if there is an underlying disease that continues to predispose to new episodes of DVT or PE is prophylactic anticoagulant therapy continued for more than six months, possibly for life. Once a filter has been inserted it remains in place and offers protection permanently.

The declining rate of recurrent embolization also is reflected in the incidence of postoperative events. The reported incidence of recurrent pulmonary embolism following placement of a filter is very low, i.e., 1–5% (Epstein 1989; Ricco 1988; Greenfield 1984). Where indicated in the literature, and as shown in the clinical studies for the Simon Nitinol Filter and similar filters, such recurrences almost always occur within the first three months, usually within one month (Epstein 1989). While recurrent emboli may have traversed the filter, they also may originate above the filter or even come from the upper limbs, neck, or right heart (McAuley 1984; Gelsinger 1984). Thus a small PE recurrence rate should be expected even with a theoretical perfect filter.

The intended use of the Simon Nitinol Filter is to prevent large clots from entering the lung and posing a serious threat to the life of a patient. Only emboli that pass through the inferior vena cava are trapped by the filter; it is not intended/designed to filter emboli from other parts of the body. Thus, a certain baseline rate of pulmonary embolism is expected despite filter placement, especially with the treatment of patients with recurrent PE.

There were five reported cases of recurrent pulmonary embolism during the study of the Simon Nitinol Filter, for a rate of 1.9%. Two cases were asymptomatic and three cases were symptomatic; all occurred within approximately one month of filter placement. The first patient, who had a history of pulmonary embolism, had a filter placed on May 2, 1988 prior to neurosurgery. On June 3, 1988, the first symptoms of recurrent pulmonary embolism were noted, along with symptomatic occlusion. One month later, the patient's symptoms were resolving. The second patient, who had a primary CNS malignancy, had fatal symptomatic pulmonary embolism one week after filter placement. Upon autopsy, it was found that the filter was completely occluded. The third patient had a filter placed due to a recent PE. The patient had a brain tumor and had had a brain biopsy two weeks prior to filter placement. During filter placement, it was noted that a partial clot was present above the filter in the right ventricle. Within 36 hours of filter placement the patient had expired from a PE. The fourth patient had a filter placed due to deep vein thrombosis. Although the patient was

7

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

asymptomatic, pulmonary emboli were discovered during a routine lung scan two weeks after filter placement. When this patient was followed up two and four months later, no new emboli were found. The fifth patient had a history of pulmonary embolism. The filter was placed on 1/30/89. A routine V/Q scan performed on 3/13/89 demonstrated evidence of a new pulmonary embolus. No symptoms were reported. Of interest was a note on the operative report stating that the filter was placed too low.

Thus, the death rate related to recurrent pulmonary embolism was 0.8%, which compares very favorably with predicate devices. Overall, the Simon Nitinol Filter was shown to be very effective in trapping emboli and preventing embolization to the lungs.

*Filter Occlusion*

Any vena cava filter is designed to trap emboli in the IVC and thus prevent them from reaching the lung where they could prove fatal. Small or moderate sized emboli trapped in a filter are usually asymptomatic since the residual patency of the vena cava and the normal paravertebral collateral veins permit adequate venous return. A large trapped embolus or a cluster of small emboli may occlude a filter completely and thus block the vena cava. Even this may be asymptomatic if there is a generous network of collateral paravertebral veins. More typically, after a period of days or weeks following filter placement, the occlusion occurs and causes a sudden swelling of both lower limbs. The severity may range from mild swelling at the end of the day to severe swelling even at rest, probably depending upon the state of the collateral veins. In rare extreme cases, the collateral vessels also may be occluded, causing severe painful swelling of both lower limbs. In almost all cases the symptoms of IVC occlusion are transient and resolve almost completely within a few weeks or, possibly, a few months. Treatment is primarily leg elevation, the use of elastic stockings, and, if not contraindicated, use of anticoagulant or thrombolytic drugs. On rare occasions surgical thrombectomy may be required.

In these patients it often is clinically difficult or impossible to distinguish IVC occlusion from extension of the preexisting DVT, since the symptoms may be similar. Any preexisting DVT may be a particular problem because the patients often are unable to receive anticoagulant therapy. In the case of the Simon Nitinol Filter, which is nonferromagnetic, the cause can usually be distinguished by magnetic resonance imaging. In the literature reporting the incidence of occlusion with other filters, and in the results of the present clinical study, occlusions have virtually all occurred within three months of insertion of the filter, generally within two months (Epstein 1989; Greenfield 1984; Kanter 1988; Sfeir 1982). This is in accord with general understanding of the declining frequency of recurrence of pulmonary embolism.

It is probable that occlusions of the SNF are almost always the result of captured emboli, rather than thrombosis in situ, for a number of reasons:

1. The majority of SNF's do not develop thrombi or occlusions.

2. There is usually a delay of days or weeks before occlusions occur.

3. The location of thrombi in the SNF corresponds to sites of trapping rather than regions of maximal wire concentration.

4. Animal and in vitro experiments have shown low thrombogenicity of the nitinol material.

8

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

Thus, one can conclude that, for any vena cava filter, occlusion is an expected outcome in a small but significant fraction of patients who experience a major embolic event after filter placement (Simon 1989). It is not a complication in the usual sense of the word, but simply the filter fulfilling its intended purpose (Epstein 1989). In addition, the incidence of filter occlusion likely reflects, primarily, the rate of recurrent embolism in the particular patient population and, secondarily, the mechanical efficiency of the filter. Thus, an inefficient filter might have too low an occlusion rate and too high a pulmonary embolism rate. At the opposite extreme, a filter could have too high an occlusion rate if it could be too easily obstructed by small embolic particles that could be readily managed by the lungs (e.g., the Mobin-Uddin umbrella filter). Optimally, the filter should capture all clinically threatening pulmonary emboli above a critical size. If it is successful, an appropriate rate of IVC occlusion and lower limb venous obstruction is unavoidable.

Studies of vena cava filters typically report on filter occlusion as a complication of filter placement. It is clear, however, that filter occlusion also is indicative of a filter's ability to trap clots effectively and to prevent them from migrating to the lungs (Epstein 1989). Filter occlusion is self-limiting and often resolves spontaneously as the clot is broken down. In other cases, medication may be administered to help dissolve clots.

Of the twenty-five patients for whom filter occlusion was reported, four were asymptomatic and twenty-one were symptomatic. Two of the symptomatic patients also had RPE. In one of these two patients, a complete occlusion and swelling of both legs was observed. One month later, the swelling in one leg had resolved, while the other leg was phlebitic. The patient refused follow-up and was dropped from the study. In the second patient, the patient expired from a PE three days after filter placement. On autopsy, the cava was reported to be completely occluded with clot. Nine other patients with symptomatic occlusion had their symptoms resolved and completed six month follow-up. Five other patients with symptomatic occlusion died of the underlying disease before completing the study and five other patients were lost-to-followup. Of the four patients with asymptomatic occlusion, all completed six month follow-up.

The occlusion rate for the Simon Nitinol Filter appears to be slightly higher than the reported rates for certain other devices. As previously discussed, there is a trade-off between occlusion rates and rate of RPE, such that a lower rate of RPE may lead one to expect a higher rate of occlusion, due to more efficient trapping of clots by the filter. The higher rate may also reflect the underlying disease state(s) of our patient population.

*Deaths*

There were 77 patients who expired during the 6 month study period. In 69 (90%) of these patients, the cause of death was known. In 68 of these patients the death was related to the patient's underlying condition and in 1 additional case the death was associated with the device. In another 8 patients, the cause of death was not specified. The high death rate observed in this study was thought to be primarily related to the patients' poor health status upon entry into the study.

In the one death that was possibly related to the device, the patient had a recent brain biopsy two weeks prior to filter implant. The biopsy confirmed the presence of a brain tumor. The patient developed left lower extremity deep vein thrombosis and was recruited into the study. Filter placement was uneventful except for the fact that the patient had a circumaortic left renal vein and therefore filter placement was anatomically lower because of the caudal position of

9

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

the lowest renal vein. The filter was placed approximately 1 cm below the lowest renal vein. The patient had not previously had symptoms suggestive of a PE. Approximately 1 week after filter placement, the patient expired from a PE. On autopsy, there was a large PE in the main pulmonary artery. There was also inferior vena cava thrombus completely occluding the vena cava below the filter and extending past the filter by approximately 2 cm. This fresh inferior vena cava thrombus was anatomically separated from the lower extremity thrombus previously diagnosed. The embolus identified in the pulmonary artery was similar in structure and age to the fresh inferior vena cava thrombus.

Unfortunately, there were no imaging studies performed to confirm if the thrombus formation was new thrombus or an extension of the current thrombus. The investigator summized that extension of the fresh thrombus above the filter could be responsible for the acute PE. Therefore, in the absence of any definitive information relative to this thrombus, a conservative approach was taken to the classification of this PE as possibly related to the lack of the filter's efficiency.

*Patient Status*

One hundred and twenty patients completed the study, 77 (30%) patients died prior to completing the study and the remaining 60 (23%) patients did not complete the study. Of the 77 patients who expired, 63 (82%) expired early in the study (prior to the 3 month follow-up evaluation). At the 3 month evaluation, 194 patients were thought to be available for follow-up and at the 6 month evaluation, 180 patients were thought to be available. Completion of these two evaluations were 54% and 67% respectively. Of the 60 patients not completing the study, 2 were lost to follow-up, 2 were dropped from the study after refusing further follow-up, 55 did not come back for their final visit and the follow-up data for 1 patient was not recorded.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00280781

## Discussion

The dome of the filter was noted to tilt less than 25 degrees especially in small venae cavae (1). Tilting is due to the circular dome geometry, which is more easily accommodated in the oval IVC diameter with a short axis less than the dome diameter. Such a mild degree of tilting has been shown in vitro not to affect filtering function since the size of the openings in the dome remain constant (8-9).

Significant proximal migration of Simon nitinol filters was observed in two cases, and each was discovered on routine plain film follow-up. Both patients were asymptomatic, and had no evidence of embolism by nuclear ventilation perfusion scans. One of these patients had an IVC diameter within the upper size range for the filter (28 mm, corrected for magnification) by vena cavography, and had major surgery with positive pressure ventilation, a recognized cause of IVC over-distension a day later (11). For this reason, the manufacturer's recommendation for maximum corrected IVC diameter was lowered for pre-operative cases from 28 mm to 24 mm. A second patient had post-operative placement after orthopedic surgery. In each case, the SNF migrated to the pulmonary artery. Migration probably occurs prior to 2 weeks after filter placement, before the progressive endothelialization develops at the IVC wall contact points and secures the filter hooks and legs (12).

The rates of subacute filter occlusion observed in this series are comparable with reported rates of other filter types (13). However, further comments are warranted in order to explain our observations on the distribution of the patients with symptomatic occlusion, and the four patients with asymptomatic occlusion. In the occlusion group, it is important to note that there was a significantly higher occlusion rate in the first 5 sequentially manufactured lots, compared with the subsequent lots used in the trial. The occlusion rate for lots #1-5 was 15.7%, (22/140), and the occlusion rate for the remaining lots #6-32 was 5.3% (7/133) (Fig.2). The possible explanations of this difference are speculative. Such a three-fold reduction in occlusion rate raises the possibility of a factor in the manufacturing process influencing filter occlusion. For instance, a suboptimum surface finish or material handling process during manufacture could have adversely affected the filter performance initially, and might have been eliminated by subsequent technical refinements (14). An improvement in the methodology of SNF surface treatment was indeed made (15). It is possible that the original surface finish of the SNF was associated with increased thrombogenicity (14). Alternatively, the difference could be related to a change in the patient population characteristics since the initial patients who received the first five lots were predominantly those with advanced malignancy, notably neurosurgical, or other terminal illness cases. Since too many of these sicker patients died before completing the trial, the investigators were requested not to use the filter for patients not expected to survive the follow-up period of at least 6 months. Subsequently, the patients enrolled may have represented a more general population of pulmonary embolism cases. It is our belief that the patient population is the major determinant of the filter occlusion rate, rather than the filter type or inherent thrombogenicity of the metal alloy. Sicker patients will have a higher occlusion rate, particularly if anticoagulant therapy cannot be used.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
_MD1

BPVE-01-00280782

## Conclusion

The study was designed to evaluate the safety and effectiveness of the Simon Nitinol Filter. The device was inserted in patients meeting the inclusion criteria for the study and representing a variety of ages and underlying conditions. The procedures were performed at a number of institutions representative of the settings where the filter is expected to be used. NMT attempted to obtain immediate follow-up for patients experiencing significant complications as well as to follow up patients 3 and 6 months post-implantation.

As an indiciation of safety and effectiveness, NMT evaluated procedural difficulties and complications, the success of insertion, filter migration, the rate of recurrent pulmonary embolism, and the rate of occlusion. Patient deaths also were tracked and, although the rate was high, only one was possibly due to the lack of filter efficacy. Overall, the data show that the Simon Nitinol Filter is safe and effective.

We recognize that published clinical trials of vena cava filters, including our own, do not meet strict scientific criteria since they are not randomized or comparative trials, involve different patient populations with many confounding clinical variables, employ limited and different imaging procedures due to added patient risk and cost, have different criteria for complications or adverse events, and may involve industrial interests for FDA requirements. Nevertheless, these data are presented as a particular prospective, multicenter clinical experience, recognizing these limitations. It is hoped that a truly randomized, prospective, independent, multicenter comparative clinical trial will eventually be undertaken.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00280783

*References*

(1) Katsamouris AA, Waltman AC, Delichatsios MA, Athanosoulis CA. Inferior vena cava filters: In vitro comparison of clot capture and flow dynamics. Radiology 1988; 166:361–366.

(2) Huisman MV, Biller HR, ten Cate JW, van Royen EA, Vreeken J, Kersten MJ, Bakx R. Unexpected high prevalence of silent pulmonary embolism in patients with deep venous thrombosis. Chest 1989; 95, 3:496–502.

(3) Sabiston DC. Pulmonary embolism. In textbook of Surgery. Editor: Sabiston DC. WB Saunders Co., Philadelphia 1977 Ch. 52; 1841–1859.

(4) Epstein HE, Darcy MD, Hunter DW, Coleman CC, Tadavarthy SM, Murray PH, Castaneda-Zuniga WR, Amplatz K. Experience with the Amplatz retrievable vena cava filter. Radiology 1989; 172:105–110.

(5) Ricco JB, Crochet D, Sebilotte P, Serradimigni A, Lefebvre JM, Boissou E, Geslin P, Virot P, Vaislic C, Gallet M, Biron Y, Lefant D, Desmarq JM, De La Faye D. Percutaneous transvenous caval interruption with the LGM filter; early results of a multicenter trial. Ann Vasc Surg 1988; 3:242–247.

(6) Greenfield LJ. Current indications for and results of Greenfield filter placement. J Vasc Surg 1984; 1:502–504.

(7) McAuley CE, Webster MW, Jarrett F, Hirsch SA, Steed DL. The Greenfield Intracaval filter as a source of recurrent pulmonary thrombo-embolism. Surgery 1984; 96:574–576.

(8) Gelsinger MA, Zelch MG, Risius B. Recurrent pulmonary embolism after Greenfield filter placement. Radiology 1984; 165:383–384.

(9) Kanter B, Moser KM. The Greenfield vena cava filter. Chest 1988; 1:170–175.

(10) Sfeir R, Queral LA, Dagher F. Clinical experience with Kimray Greenfield filters. Md State Med J 1982; 31:45–47

(11) Simon M, Athanosoulis CA, Kim D, Steinberg FL, Porter DH, Byse BH, Kleshinski S, Geller S, Orron DE, Waltman AC. Simon Nitinol Vena Cava Filter; Initial clinical experience. Radiology 1989; 172:99–103.

(12) Greenfield LJ, Zocco J, Wilk J, Shroeder TM, Elkins RC. Clinical experience with the Kim-Ray Greenfield vena cava filter. Ann of Surgery 1977; 185:692–698.

(13) Sidawy AN, Menzoian JO. Distal migration and deformation of the Greenfield vena cava filter. Surgery 1986; 99:369–372.

(14) Miller CL, Wechsler RJ. CT evaluation of Kimray-Greenfield filter complications. AJR 1986; 147:45–50.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00280784

## GLOSSARY OF TERMS

*Major Misplacement* is defined as the unintentional placement of a Filter not in the intended location immediately below the renal veins, for example, in an iliac, renal, or hepatic vein, or in the right heart. Placement in the IVC below the renal veins, but slightly too high or too low (*e.g.*, 1 cm above or 2 cm below the intended level) is not considered a major misplacement.

*Penetration* is defined as incursion into the vena cava wall. In contrast, perforation is defined as penetration completely through the vena cava wall.

*Migration* is defined as any upward or downward movement of the Filter after its placement as documented by follow-up imaging.

*Recurrent PE (RPE)* is defined on the basis of new perfusion defects on lung scan, filling defects or obstruction, pulmonary arteriogram, or recent thromboembolism at autopsy.

*Occlusion*, by definition, is the state of being closed. The terms partial and complete occlusion have been used to describe IVC occlusion, either by an embolus captured in the filter or by thrombus propagated from below. Complete occlusions of the IVC are likely to be symptomatic. Occlusions are usually transient due to lysis of the thrombus within weeks or months, or less if thrombolytic drugs are used.

14

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| Indication | Patients (n) | Patients (%) |
|---|---|---|
| Contraindication to anticoagulation | 158/245 | 64% |
| Failure of anticoagulation | 33/245 | 13% |
| Severe pulmonary hypertension | 1/245 | 0.4% |
| Surgery | 5/245 | 2% |
| Trauma | 0/245 | 0% |
| Combinations of the above | 48/245 | 20% |
| Total reported indications | 245/258 | 95% |

| Access-Delivery Route | Patients (n) | Patients (%) |
|---|---|---|
| Femoral | 234/250 | 94% |
| Jugular | 15/250 | 6% |
| Antecubital | 1/250 | 0.4% |
| Total reported indications | 250/258 | 97% |

| Clinical Results | Patients (n) | Patients (%) |
|---|---|---|
| Technical success | 258/258 | 100% |
| Recurrent PE | 5/258 | 1.9% |
|    Symptomatic | 3/258 | 1.2% |
|    Asymptomatic | 2/258 | 0.8% |
| Death due to recurrent PE[†] | 2/258 | 0.8% |
| Migration | 2/258 | 0.8% |
| Filter Occlusion | 25/258 | 9.7% |
|    Symptomatic | 21/258 | 8.1% |
|    Asymptomatic | 4/258 | 1.6% |

[†] The two deaths represent two of the three symptomatic recurrent PE cases reported here.

15

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00280786



SNF Filter Occlusions

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00280787