1

2

3

4

5

6

UNITED STATES DISTRICT COURT

7

DISTRICT OF ARIZONA

8

| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC |
|---|---|
| | **EXHIBIT INDEX** |
| | **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF REBECCA BETENSKY, PH.D.** |

9

10

11

12

13

14

Exhibit 1     Betensky Report 1-27-2017 (**FILED UNDER SEAL**)

15

Exhibit 2     Betensky DFMEA Supplement 3-3-2017 (**FILED UNDER SEAL**)

16

Exhibit 3     BPVE-01-01019821

17

Exhibit 4     BPVEFILTER-01-01824432 (**FILED UNDER SEAL**)

18

Exhibit 5     BPV-DEP-00004804 (**FILED UNDER SEAL**)

19

Exhibit 6     BPV-TRIAL-EXHIBIT-0293 (**FILED UNDER SEAL**)

20

Exhibit 7     Edwards Deposition 8-19-16 Excerpts

21

Exhibit 8     Ganser Deposition 10-11-16 Excerpts

22

Exhibit 9     Betensky Austin Deposition Excerpts

23

Exhibit 10    BPVE-01-01019773

24

Exhibit 11    Walcott Deposition 8-24-16 Excerpts

25

Exhibit 12    Williamson Deposition 9-7-16 Excerpts

26

Exhibit 13    Kessler Report 9-26-2016 (**FILED UNDER SEAL**)

27

Exhibit 14    Eisenberg Report (Barazza 2-10-2017) (**FILED UNDER SEAL**)

28

Exhibit 15    Hertz Report 2-3-2017 (**FILED UNDER SEAL**)

| | | |
|---|---|---|
| 1 | Exhibit 16 | Kessler Schedule 28 (**FILED UNDER SEAL**) |
| 2 | Exhibit 17 | BPVE-01-00511127 (**FILED UNDER SEA**L) |
| 3 | Exhibit 18 | BPVE-01-00268632 |
| 4 | Exhibit 19 | BPVE-01-00509492 (**FILED UNDER SEAL**) |
| 5 | Exhibit 20 | BPVEFILTER-01-00002447 |
| 6 | Exhibit 21 | BPV-17-01-00101588 (**FILED UNDER SEAL**) |
| 7 | Exhibit 22 | BPVE-01-00985047 |
| 8 | Exhibit 23 | BPVE-01-00268921 |
| 9 | Exhibit 24 | BPVE-01-00492576 |
| 10 | Exhibit 25 | 2005 FDA Guidance |
| 11 | Exhibit 26 | Thisted Dep 7-28-17 |
| 12 | Exhibit 27 | Feigal Deposition 9-1-16 Excerpts |
| 13 | Exhibit 28 | Shifrin Deposition 9-8-16 Excerpts (**FILED UNDER SEAL**) |
| 14 | Exhibit 29 | Andreoli, *Comparison of Complication Rates* |
| 15 | Exhibit 30 | Angel, *Systematic Review of Retrieval IVC Filters* |
| 16 | Exhibit 31 | Betensky Rebuttal to Thisted (**FILED UNDER SEAL**) |
| 17 | Exhibit 32 | DiBardino, *Analysis of the USDA Manufacturer* |
| 18 | Exhibit 33 | William, *Failure Rate Analysis of Femoral Stems* |
| 19 | Exhibit 34 | Thennukonda, *Adverse Events Associated With Ultrasonic Scalers* |
| 20<br>21 | Exhibit 35 | Harth, *Major Complications Associated With Xenograft Biologic Mesh* |
| 22<br>23 | Exhibit 36 | Delaney, *Major Complications Associated With Transcatheter Atrial Septal* |
| 24 | Exhibit 37 | Binkert, *Technical Success and Safety of Retrieval of G2 Filter* |
| 25 | Exhibit 38 | Hudson Giordano 12 SNF Trial |
| 26 | Exhibit 39 | Tam, *Fracture and Distant Migration of Recovery Filter* |
| 27 | Exhibit 40 | An, *Prevalence and Clinical Consequences of Fracture* |
| 28 | Exhibit 41 | Deso, *Evidence-Based Evaluation of IVC Filter* |

Exhibit 42    Nicholson, *Prevalence of Fracture and Fragment Embolization*

Exhibit 43    Hull, *Recover Filter: Evaluation and Management*

Exhibit 44    BPV-17-01-00006797 (**FILED UNDER SEAL**)

Exhibit 45    BPV-17-01-00034448 (**FILED UNDER SEAL**)

Exhibit 46    BPVE-01-00410985

Exhibit 47    BPVE-01-00330122

Exhibit 48    McMeeking Bard IVC Filter Design Evolution Assessment 2-3-2017 (FILED UNDER SEAL)

Exhibit 49    Ritchie March 2, 2017 Report (**FILED UNDER SEAL**)

Exhibit 50    McMeeking Rebuttal Report 5-11-17 (**FILED UNDER SEAL**)

Exhibit 51    Pre-Trial Order

Exhibit 52    BPVE-01-00435295

Exhibit 53    BPV-17-01-00188520 (**FILED UNDER SEAL**)

Exhibit 54    BPVE-01-00002092 (**FILED UNDER SEAL**)

Exhibit 55    BPVE-01-00408669 (**FILED UNDER SEAL**)

Exhibit 56    Hoffman, *2014 The Weber Effect and US FDA*

Exhibit 57    BPVE-01-01054793 (**FILED UNDER SEAL**)

Exhibit 58    BPVE-01-01054793 (**FILED UNDER SEAL**)

Exhibit 59    BPVE-01-01054793 (**FILED UNDER SEAL**)

Exhibit 60    Eisenberg Depo 7-6-17

# EXHIBIT 39

**CLINICAL STUDY**

# Fracture and Distant Migration of the Bard Recovery Filter: A Retrospective Review of 363 Implantations for Potentially Life-Threatening Complications

Matthew D. Tam, MD, James Spain, MD, PhD, Michael Lieber, MS, Michael Geisinger, MD, Mark J. Sands, MD, and Weiping Wang, MD

**ABSTRACT**

**Purpose:** To report the occurrence of fracture of the Recovery filter and incidence of potentially life-threatening complications associated with fractured fragment migration.

**Materials and Methods:** A retrospective study of images obtained after placement of Recovery inferior vena cava (IVC) filters from 2003 to 2006 was conducted at a single tertiary-care center. Images were reevaluated for fracture and migration; complications related to filter fracture were investigated. Kaplan–Meier survival analysis was performed to investigate the relationship between time in situ and fracture.

**Results:** A total of 363 Recovery filters were placed; 97 were retrieved, leaving 266 filters in situ (135 patients subsequently died of other causes). The following images were evaluated: 130 chest computed tomography (CT) scans, 153 abdominal CT scans, 254 chest radiographs, 148 radiographs of the abdomen/pelvis, and 106 cavagrams. Mean imaging follow-up interval was 18.4 months (maximum, 81.3 mo). No en bloc migration occurred outside the IVC. Twenty-six limb fractures (all short limbs) were identified in 20 patients; the earliest occurred at 4.1 months. Eight fragment migrations occurred into pulmonary arteries, seven into iliac/femoral veins, one into the right ventricle, and one into the renal vein. Seven fragments were intracaval near the filter, one was extracaval, and one could not be located. Kaplan–Meier survival estimates predicted a fracture rate of 40% at 5.5 years. Of the 20 patients with filter fractures, three died of unrelated causes and 17 remain asymptomatic.

**Conclusions:** Recovery filter fractures occurred at the short limb only, with a suggested 5.5-year fracture risk of 40%. No life-threatening events occurred in patients with filter fracture.

**ABBREVIATION**

FDA = Food and Drug Administration,  IVC = inferior vena cava

The United States Food and Drug Administration (FDA) recently issued a warning regarding the safety of inferior vena cava (IVC) filters after reports of life-threatening

From the Imaging Institute, Section of Interventional Radiology (M.D.T., J.S., M.G., M.J.S., W.W.) and Department of Quantitative Health Sciences (M.L.), Cleveland Clinic, 9500 Euclid Ave., Cleveland, OH 44195. Received April 18, 2011; final revision received October 14, 2011; accepted October 19, 2011. **Address correspondence** to W.W.; E-mail: wangw2@ccf.org

From the SIR 2011 and 2012 Annual Meetings.

None of the authors have identified a conflict of interest.

Table 4 is available online at *www.jvir.org*.

© SIR, 2012

*J Vasc Interv Radiol 2012; 23:199–205*

DOI: 10.1016/j.jvir.2011.10.017

device-related complications (1). This warning was released the day after the publication of a study reporting fracture rates of 25% in a series of 28 Recovery filters (Bard Peripheral Vascular, Tempe, Arizona) and 12% in a series of 52 G2 filters (Bard Peripheral Vascular) (2). An earlier report published in 2006 (3) had raised safety concerns about structural weakness, high penetration rate, and asymmetric deployment with these filters; a more detailed study (4) later found instances of limb perforation, fracture, and migration in 14 patients who had Recovery filters placed. Before the FDA warning was released, there were case reports documenting life-threatening complications resulting from filter fracture and embolization of filter limbs beyond the IVC into the heart (5–7). The aim of the present study was to report the frequency of limb fracture and potential life-threatening events of subsequent end-organ

embolization of the fracture fragments of the Recovery filter in a single tertiary-care center.

## MATERIALS AND METHODS

This study was approved by the institutional review board. Retrospective review of the departmental inventory database was used to identify consecutive Recovery filter placements at a single tertiary-care center (main campus). Demographics and clinical data were gathered according to Society of Interventional Radiology guidelines (8,9). From July 2003 to May 2006 (the Recovery filter discontinuation date), a total of 363 patients were identified as having had Recovery filters placed, including 210 men and 153 women, with a mean age of 58.9 years (range, 10–86 y). The Social Security Death Index and hospital electronic medical record were used to obtain mortality data. All images (retrieval cavagrams, plain radiographs, and computed tomography [CT] scans of the chest, abdomen, pelvis, and lumbar spine) were reviewed by using the image archive system, which includes the main campus as well as affiliated hospitals, where many patients had their care after filter placement.

Two radiologists (both of whom were interventional radiology fellowship–trained) independently reviewed the images to identify fracture and distant migration (en bloc or filter fragment migration beyond the IVC in either direction). If the image was negative for fracture, the interval from placement was calculated and used to determine the length of fracture-free follow-up. If a fracture or migration was identified, previous images were reevaluated for the earliest study identifying the event, as well as the last image with negative findings before the fracture or migration. Complications related to filter fracture were investigated by reviewing notes from the inpatient charts and clinic visits. Patients were then divided into two groups. Group 1 included patients with at least one study that allowed direct visualization of the filter, including abdominal CT (with or without intravenous contrast medium) or plain radiographs of the abdomen, kidneys/ureter/bladder, and lumbar spine. Group 2 included patients with studies that did not contain the filter itself but could be evaluated for migrated fractures to the lung, heart, or pelvis; these studies included chest CT (with or without intravenous contrast medium) and plain radiographs of the chest and pelvis. In terms of analysis, multiple images in either group were treated as single events (eg, if the patient had five abdominal radiographs with negative findings, only the most recent radiograph was counted in the analysis as the group 1 right-censored time point for the length of fracture-free follow-up). In those patients who did not have any images with direct visualization of the filter, the most recent indirect study, such as a chest or pelvis radiograph, was included in the analysis as the group 2 censored event.

The prevalence and incidence of fracture among study patients were calculated. Statistical analysis was performed by using SAS software (version 9.1; SAS, Cary, North Carolina)

**Table 1.** Summary of Follow-Up Imaging in 363 Patients

| Image | No. | Mean (Range) Interval (mo) |
|---|---|---|
| Cavagram | 106 | 3.9 (0.01–18.4) |
| Chest radiograph | 254 | 18.3 (0.01–81.0) |
| Chest CT | 130 | 19.8 (0–80.7) |
| Abdominal radiograph | 78 | 18.3 (0.01–73.3) |
| Abdominal KUB | 33 | 6.3 (0.04–71.8) |
| Lumbar spine radiograph | 26 | 27.4 (0.01–77.7) |
| Pelvic radiograph | 11 | 24.6 (9.9–31.5) |
| Abdominal CT | 151 | 19.3 (0.01–81.3) |
| Total | 789* | — |

Note.—KUB = kidney, ureter, and bladder.
* Regardless of the number of images available in a single patient, any same image modality was only counted once.

to determine the relationship between time and filter fracture. Survival analysis was used to obtain Kaplan–Meier estimates of the hazard function (fracture and fracture with distant migration), and survival curves were constructed.

## RESULTS

Of 363 patients, 106 patients presented for filter retrieval, and 97 patients had their filters successfully removed at an average interval of 3.8 months (range, 3 d to 18.3 mo). Of the 97 patients who had their filter retrieved, 85 were still alive at the time of analysis, with a mean follow-up interval from filter removal of 53.2 months (range, 2.7–85.6 mo); 12 patients had died after filter removal, with a mean interval after filter removal of 34 months (range, 2–82 mo). A total of 131 patients were alive with the filter in situ (including nine cases of unsuccessful retrieval as a result of retained thrombus in three cases, severe tilt in three cases in which the hook could not be snared, and incorporation of the filter into the caval wall in three cases in which the hook could be snared but the filter could not be removed), with a mean follow-up interval from filter placement of 46.2 months (range, 1 d to 85.9 mo). A total of 135 patients had died with the filter in situ, at a mean interval from filter placement of 16.7 months (range, 2 d to 76.6 mo).

The total numbers of available image modalities and respective time intervals are listed in **Table 1**. Of the 363 patients, 207 patients had both group 1 and group 2 images, 74 patients had only group 1 images, 61 patients had only group 2 images, and 21 patients had no images. For the survival analysis, all the group 1 images were used for analysis. For group 2 images, only those patients who did not have group 1 images were included for analysis. Therefore, the composition of image studies included in the statistical analysis was as follows: 77.4% in group 1 (281 of 363), 16.8% in group 2 (61 of 363), and 5.8% without imaging follow-up (21 of 363; **Table 2**).

A total of 26 limb fractures were identified in 20

**Table 2.** Imaging Details of Patients and Studies Included in Survival Analysis

| Image | Total |
|---|---|
| Group 1 | 281 (77.4) |
| Cavagram | 99 |
| Abdominal radiograph | 76 |
| Abdominal CT | 52 |
| KUB radiograph | 32 |
| Lumbar spine radiograph | 22 |
| Group 2 | 61 (16.8) |
| Chest radiograph | 48 |
| Chest and pelvic radiographs | 6 |
| Pelvic radiograph | 4 |
| Chest CT | 3 |
| No follow-up | 21 (5.8) |

Note.—Values in parentheses are percentages. KUB = kidney, ureter, and bladder.



**Figure 1.** Posteroanterior chest radiograph demonstrates a fractured IVC filter limb (arrow) that has embolized to a pulmonary artery.



**Figure 2.** Plain radiograph of the abdomen demonstrates an IVC filter limb (arrow) that has embolized against the flow of blood and lies at the level of the common femoral vein.

patients (prevalence, 5.5%; incidence, 7.2%), all of which involved the short limbs (ie, arms); the average interval from placement to identification of fracture was 33.9 months (range, 4.1–77.7 mo). Among these 20 patients, 12 had negative imaging findings (ie, an intact filter without migration) before fracture, with an average duration from placement of 14.7 months (range, 12 d to 50.6 mo). A total of eight limbs (30.8%) had migrated to pulmonary arteries (**Fig 1**), seven limbs (26.9%) were in iliac/femoral veins (**Fig 2**), and seven limbs (26.9%) remained near the filter (**Fig 3**). One limb (3.8%) was found in each of the following sites: right ventricle (**Fig 4**), renal vein (**Fig 5**), and outside the IVC at the level of the filter; one limb could not be located. There was no distant en bloc migration. Of the 20 patients with limb fractures, three died of an unrelated cause (cases 2, 4, and 17) and 17 were asymptomatic as of the last clinical visit (**Table 3**). No complications related to filter fracture were identified in these 20 patients.

Fracture-free follow-up in the 322 patients without fracture but with imaging follow-up ranged from 0 to 76 months. A total of 50% of the patients without fracture had imaging follow-up of less than 4 months. Analysis of group 1 showed that the risk of fracture reached 31.2% at 57.6 months. The group 2 analysis showed a risk of fracture with distant embolization of 11.7% at 28.7 months (**Table 4**; available online at *www.jvir.org*). The combined analysis of all images yielded Kaplan–Meier estimates of overall fracture incidence of 10.9% at 28.7 months, 20.5% at 51.5 months, and 39.5% at 65.7 months (**Fig 6**).

## DISCUSSION

The Recovery filter (Bard Peripheral Vascular) was designed as both a permanent and temporary filter. The filter



**Figure 3.** Abdominal radiograph demonstrates a fractured IVC filter fragment (arrow) at the level of the filter.



**Figure 4.** Lateral chest radiograph 52 months after IVC filter placement demonstrates a fractured limb that has embolized to the right ventricle (arrow). The inset shows a corroborative axial CT image.



**Figure 5.** Abdominal radiograph demonstrates a fractured limb (arrow) that has embolized against the venous flow into the kidney. The inset shows a corroborative axial CT image.

first obtained FDA approval for sale in the United States in 2002 (10) and was replaced by the second-generation G2 filter (Bard Peripheral Vascular) in 2006. Since then, a series of reports has emerged highlighting safety concerns associated with Recovery filters. In a study of 96 Recovery filters (3), 40 patients underwent CT scans of the abdomen, and three filters were found to have arm fractures. In one patient, the fractured arm was found to have migrated to the pancreas; in the remaining two patients, the fractured arms were attached to the device and protruded into the aortocaval space (3). A second study of 14 filters (4) found four

cases of fracture, with the filter arms remaining locally at the filter or migrating into the right ventricle, the right upper lobe pulmonary artery, or the retroperitoneum. Severe complications related to fracture and distant embolization to the heart have been documented in three separate case reports (5–7). In one patient, a fragment migrated to the right ventricle, resulting in a small laceration on the diaphragmatic surface, which led to pericardial tamponade and necessitated open heart surgery (5). In another case report (7), the fragment embolized to the left inferior ventricle wall and caused left ventricle perforation, which required surgical retrieval. In a third patient, a limb migrated to the right ventricle, causing chest pain and tachycardia; the fragment was retrieved percutaneously (6).

In an attempt to quantify the safety concerns associated with Bard retrievable filters, Nicholson et al (2) assessed the prevalence of fracture and fragment embolization in patients with these filters placed. In this study, 28 patients with Recovery filters in place underwent fluoroscopy, and seven of these patients (25%) were found to have at least one strut (arm or leg not specified) that had fractured and embolized (2). A fragment had embolized to the right ventricle in five patients and to the pulmonary artery in one patient. In five patients with fragments in the heart, two were asymptomatic, two experienced pleuritic chest pain and ventricular tachycardia (one of whom experienced sudden death at home 3 mo later), and one had cardiac tamponade that necessitated emergency open heart surgery.

Previous studies have demonstrated that fragment migration to the right ventricle can cause a fatal arrhythmia (2) or laceration of the cardiac wall and tamponade (5,7). In our published studies (11,12), fracture and fractured fragment migrations were identified in patients who presented for retrieval of the Recovery and G2 filters, but no instances of death or severe complications were seen. The low incidence of life-threatening complications in the present study may be the result of only nine of the fragments (35%) migrating in a cephalad direction; more importantly, most of these

Volume 23 ■ Number 2 ■ February ■ 2012

**Table 3.** Fracture and Migration in 20 Patients

| ID | Sex/Age (y) | Arms Fractured | Migration Site | Interval (mo) | | |
| | | | | Since Identified* | Last Normal† | Last Visit |
|---|---|---|---|---|---|---|
| 1 | M/49 | 1 | Right ventricle | 51.5 | 50.6 | 57.8 |
| 2 | F/65 | 2 | Right renal vein, unknown | 20.5 | NA | 72.4‡ |
| 3 | F/45 | 1 | Extracaval | 51.3 | NA | 62.4 |
| 4 | F/62 | 2 | Pulmonary (RML), at filter | 4.8 | NA | 72.2‡ |
| 5 | M/50 | 1 | Pulmonary (LLL) | 57.6 | 4.2 | 63.1 |
| 6 | M/40 | 1 | Pulmonary (RLL) | 25.6 | 16.5 | 67.2 |
| 7 | M/17 | 1 | Pulmonary (RLL) | 28.7 | 25.6 | 55.8 |
| 8 | M/71 | 1 | Pulmonary (RLL) | 31.9 | 13.1 | 55.9 |
| 9 | M/53 | 1 | Pulmonary (RLL) | 18.4 | NA | 69.8§ |
| 10 | M/37 | 2 | Pulmonary (RLL), at filter | 64.7 | NA | 80.3 |
| 11 | F/63 | 1 | Pulmonary (RML) | 30.7 | 11.3 | 67.2 |
| 12 | F/79 | 1 | At filter | 77.7 | NA | 77.7 |
| 13 | F/29 | 1 | At filter | 4 | 0.4 | 61.9 |
| 14 | F/76 | 1 | At filter | 57.4 | 18 | 63.3 |
| 15 | F/79 | 1 | At filter | 9 | NA | 84.9 |
| 16 | M/47 | 1 | At filter | 9.9 | NA | 56.9 |
| 17 | F/80 | 2 | Iliac vein, at filter | 27.6 | 26.2 | 70.1 |
| 18 | F/65 | 2 | B/L iliac vein | 5.4 | 0.6 | 61.1§ |
| 19 | F/68 | 2 | Iliac and femoral vein | 65.7 | NA | 66.9 |
| 20 | F/48 | 1 | Iliac vein | 37.2 | 8.8 | 85.9 |

Note.—NA = not available, RLL = right lower lobe, RML = right middle lobe, B/L = bilateral, LLL = left lower lobe.
* Interval since the date of the imaging study on which the filter fracture was identified.
† Interval since the date of the imaging study on which the filter was seen to be normal.
‡ Patient died.
§ Filter was removed.

fragments (n = 8) passed to the pulmonary arteries, where they are less likely to be symptomatic. These findings are very different from those of Nicholson et al (2), in which six of seven fragments had cephalad migration and five of these six embolized to the heart. The present study and the previous report by Hull et al (4) have demonstrated that a fragment in the right ventricle is not necessarily symptomatic. The present study also demonstrated no distant en bloc filter migration, which would have fatal consequences if the entire filter were to become trapped in the heart (13,14). Additionally, we found that the main body of the filter remained in the IVC at or near the original position, even when as many as two limbs were fractured.

Although fracture was observed and confirmed in only 5.5% of the filters placed in our sample (with other fractures possibly having occurred but not recorded in patients already lost to follow-up), our Kaplan–Meier analysis predicted a fracture rate of 40% after 5.5 years. Recovery filter fracture rates have been reported to range from 0% to 29% (2–4), and rates of distant fragment embolization have been reported to range from 0% to 21% (2–4), but these studies are all small series and may be influenced by reporting bias. Our Kaplan–Meier survival estimate is fairly robust, as it is based on a relatively large dataset.

The management of in situ Recovery filters presents a clinical dilemma. At the time of writing, 131 patients of the original 363 are alive with the filter in situ, and 17 have a fractured limb. Chart review for these 131 patients suggests that all had an indication for permanent filter placement. Retrieval of a fractured filter may increase the risk of fragment embolization, and retrieval of an intact filter may cause fractures (11). In our limited experience with fractured filter retrieval, we have had mixed results. In one case, the operator decided not to disturb the filter. In another case, the main body of the filter was removed, but the limbs embolized caudally (one to the iliac vein and one to the femoral vein). Fragments in the peripheral pulmonary arteries may be difficult to retrieve and are not likely to be associated with any further potential complication. Similarly, fragments elsewhere may not need retrieval; CT scans at 2 and 3 years after placement showed that two iliac fragments had remained in a stable, unchanged position, suggesting a degree of endothelialization of the fragment. Therefore, the important question raised by the present study is whether to recall all living Recovery and G2 filter recipients for evaluation and consultation, with possible removal of the filter. Although such a recall may prevent a number of filter fractures and identify silent fractures in some patients, it would be costly and could result in increased anxiety for the patients. Such a recall could also potentially



**Time (months)**

**Figure 6.** Kaplan–Meier survival curve demonstrates predicted risk of fracture (group 1, crosses and straight lines) and risk of distant embolization events (group 2, diamonds and broken lines).

lead to procedural complications in a patient who may otherwise have experienced no harm. Alternatively, individual cases could be evaluated when they incidentally come to receive medical attention, with the decision to attempt removal based on whether fracture has occurred or, to an extent, patient preferences.

The present study did have several limitations. The main limitation was the retrospective nature of the study and the need for follow-up, with minimal selection bias. Images were available only for those patients who returned to our institution for ongoing medical issues; consequently, a substantial number of patients were lost to imaging follow-up. Indeed, approximately 50% of patients had follow-up of less than 4 months. A significant number of patients live out of state or internationally, which affected our ability to track and record complications.

In conclusion, we observed filter fracture (in the short limbs only) in 5.5% of the 363 patients included in this study; Kaplan–Meier survival analysis predicted a fracture rate of 40% at 5.5 years. No catastrophic or life-threatening events occurred in the present study, as the incidence of cardiac migration of the fractured fragment was low despite the fact that most fragments migrated to distant sites. However, patients with any retrievable filter in situ should understand the risks of potentially life-threatening complications that can result from device failure.

## ACKNOWLEDGMENT

The authors would like to thank Megan Griffin for her help with revising the manuscript.

## REFERENCES

1. United States Food and Drug Administration. Removing retrievable inferior vena cava filters: initial communication. Available at: http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/ucm221676.htm. Accessed October 1, 2011.
2. Nicholson W, Nicholson WJ, Tolerico P, et al. Prevalence of fracture and fragment embolization of Bard retrievable vena cava filters and clinical implications including cardiac perforation and tamponade. Arch Intern Med 2010; 170:1827–1831.
3. Kalva SP, Athanasoulis CA, Fan CM, et al. "Recovery" vena cava filter: experience in 96 patients. Cardiovasc Intervent Radiol 2006; 29:559–564.
4. Hull JE, Robertson SW. Bard Recovery filter: evaluation and management of vena cava limb perforation, fracture, and migration. J Vasc Interv Radiol 2009; 20:52–60.
5. Saeed I, Garcia M, McNicholas K. Right ventricular migration of a recovery IVC filter's fractured wire with subsequent pericardial tamponade. Cardiovasc Intervent Radiol 2006; 29:685–686.
6. Hull JE, Han J, Giessel GM. Retrieval of the recovery filter after arm perforation, fracture, and migration to the right ventricle. J Vasc Interv Radiol 2008; 19:1107–1111.
7. Desjardins B, Kamath SH, Williams D. Fragmentation, embolization, and left ventricular perforation of a recovery filter. J Vasc Interv Radiol 2010; 21:1293–1296.

8. Vena Caval Filter Consensus Conference. Recommended reporting standards for vena caval filter placement and patient follow-up. J Vasc Interv Radiol 2003; 14(Suppl):S427–S432.

9. Millward SF, Grassi CJ, Kinney TB, et al; Technology Assessment Committee of the Society of Interventional Radiology. Reporting standards for inferior vena caval filter placement and patient follow-up: supplement for temporary and retrievable/optional filters. J Vasc Interv Radiol 2005; 16:441–443.

10. United States Food and Drug Administration. 510(k) Summary of safety and effectiveness data: Recovery filter system. Available at: http://www.accessdata.fda.gov/cdrh_docs/pdf2/K022236.pdf. Accessed October 6, 2011.

11. Zhu X, Tam MD, Bartholomew J, Newman JS, Sands MJ, Wang W. Retrievability and device-related complications of the G2 filter: a retrospective study of 139 filter retrievals. J Vasc Interv Radiol 2011; 22:806–812.

12. Tam MD, Zhu X, McLennan G, et al. Complications of the Bard Recovery filter and their effect on attempted retrieval in 107 patients. J Vasc Interv Radiol 2010; 21(Suppl):S3.

13. Haddadian B, Shaikh F, Djelmami-Hani M, Shalev Y. Sudden cardiac death caused by migration of a TrapEase inferior vena cava filter: case report and review of the literature. Clin Cardiol 2008; 31:84–87.

14. Shmuter Z, Frederic FI, Gill JR. Fatal migration of vena caval filters. Forensic Sci Med Pathol 2008; 4:116–121.

**Table 4.** Predicted Risk of Fracture (Group 1), Risk of Distant Embolization (Group 2), and Combined Overall Risk of Fracture or Distant Embolization

| Time (mo) | Risk (%) | | |
|---|---|---|---|
| | Group 1 | Group 2 | Combined |
| 0 | 0 | 0 | 0 |
| 4.0 | 0.69 | 0 | 0.6 |
| 4.8 | 0.69 | 4.4 | 1.3 |
| 5.4 | 1.6 | 4.4 | 2.1 |
| 9.0 | 2.9 | 4.4 | 3.1 |
| 9.9 | 4.2 | 4.4 | 4.1 |
| 18.4 | 5.7 | 4.4 | 5.4 |
| 20.5 | 7.2 | 4.4 | 6.6 |
| 25.6 | 8.9 | 4.4 | 8.0 |
| 27.6 | 10.7 | 4.4 | 9.4 |
| 28.7 | 10.7 | 11.7 | 10.9 |
| 30.7 | 12.6 | 11.7 | 12.4 |
| 31.9 | 14.5 | 11.7 | 13.9 |
| 37.2 | 16.6 | 11.7 | 15.6 |
| 51.3 | 19.6 | 11.7 | 18.0 |
| 51.5 | 22.6 | 11.7 | 20.4 |
| 57.4 | 26.9 | 11.7 | 23.9 |
| 57.6 | 31.2 | 11.7 | 27.4 |
| 64.7 | 36.9 | NA | 33.4 |
| 65.7 | 42.7 | NA | 39.5 |

Note.—NA = not available.

# EXHIBIT 40

<u>CLINICAL STUDY</u>

# Prevalence and Clinical Consequences of Fracture and Fragment Migration of the Bard G2 Filter: Imaging and Clinical Follow-up in 684 Implantations

Tianzhi An, MD, Eunice Moon, MD, Jennifer Bullen, MS, Baljendra Kapoor, MD, Alex Wu, MD, Mark Sands, MD, and Weiping Wang, MD

## ABSTRACT

**Purpose:** To investigate the prevalence and clinical sequelae of G2 filter (Bard Peripheral Vascular, Tempe, Arizona) fractures and fragment migration.

**Materials and Methods:** Patients who underwent G2 filter placement between October 2005 and February 2010 were assessed for filter fractures and complications. Fracture prevalence was estimated at various time points based on data from patients with known fracture status.

**Results:** Among 829 patients who underwent G2 filter placement, 684 had follow-up imaging and qualified for the study (381 men and 303 women; average age, 60.3 y; range, 15.8–95.2 y). For 541 (79%) patients, at least one image was available that contained the filter (imaging follow-up interval, 14.9 mo ± 20.0; range, 0–78.6 mo); images that did not include the filter but may have shown the migrated fracture fragment were available for 143 (21%) patients (follow-up interval, 11.2 mo ± 19.3; range, 0–83.4 mo). There were 16 fractured limbs identified in 13 patients (incidence, 1.9%; follow-up interval, 30.4 mo ± 18.7; range, 5.5–76.5 mo). Fracture fragments were identified in the pulmonary arteries (n = 4), right ventricle (n = 2), pericardium (n = 1), iliac vein (n = 1), and kidney (n = 1). Four fracture limbs remained near the filter; the remaining three could not be located. All patients with filter fracture were asymptomatic. The estimated 5-year fracture prevalence was 38% (95% confidence interval, 22.9%, 54.8%).

**Conclusions:** The early occurrence of G2 filter fractures was low, but the incidence increased over time. No life-threatening events occurred in patients with filter fracture during the study time frame.

## ABBREVIATION

IVC = inferior vena cava

From the Imaging Institute (T.A., E.M., B.K., A.W., M.S., W.W.), Section of Interventional Radiology, and Department of Quantitative Health Sciences (J.B.), Cleveland Clinic, 9500 Euclid Ave, Cleveland, OH 44195. Received October 19, 2013; final revision received and accepted January 28, 2014. **Address correspondence to** W.W.; E-mail: wangw2@ccf.org

None of the authors have identified a conflict of interest.

T.A. was sponsored by the Department of Interventional Radiology, Hospital of Guiyang Medical College, Guizhou Province, China, and Cleveland Clinic, Cleveland, Ohio.

© SIR, 2014

J Vasc Interv Radiol 2014; 25:941–948

http://dx.doi.org/10.1016/j.jvir.2014.01.035

An inferior vena cava (IVC) filter fractures when structural failure and separation of the components of the filter occur. These fractures can have serious consequences; migration of the fractured components has been known to cause life-threatening complications such as arrhythmia and pericardial tamponade (1–4). The reported incidence of fracture in retrievable filters ranges from 0–25%, with wide variations among filter models and length of follow-up (1,5–7). The earlier models of Bard filters Recovery and G2 (Bard Peripheral Vascular, Tempe, Arizona) have the highest reported fracture incidence (8,9). Many of the reported fractures in the Manufacturer and User Facility Device Experience database are associated with the G2 filter (157 of 500; 31%) (8).

The G2 filter, a redesign of the Recovery retrievable filter, was approved by the U.S. Food and Drug Administration for permanent use in 2005 and for retrievable use in 2008 (10). Although the G2 filter was replaced in 2009 with a new model, many patients still have the G2 filter in situ for permanent indications. The

prevalence of G2 fractures and the severity of associated complications in such patients are largely unknown because of limited data. The goal of this retrospective study was to assess the prevalence of filter fracture and its clinical sequelae in a cohort of patients who underwent G2 filter placement at our institution.

## MATERIALS AND METHODS

This study was approved by our institutional review board. A retrospective review of the departmental inventory database was performed to identify consecutive G2 filter placements done between October 2005 and February 2010 at a single tertiary-care center. Patients included in this study had at least one imaging study that was performed after filter placement, which was used to determine the presence of filter fracture directly or indirectly. Demographic and clinical data were retrieved from our main hospital's electronic medical records (Epic Systems, Verona, Wisconsin), and mortality data were obtained from the Social Security Death Index. All images were retrieved from the image archiving database (AGFA, Mortsel, Belgium) in our health care system (including the main hospital complex and affiliated hospitals at which many patients received care after filter placement). Imaging studies included cavograms performed at filter retrieval and plain radiographs and computed tomography (CT) scans of the chest, abdomen, pelvis, and lumbar spine.

Two fellowship-trained interventional radiologists independently reviewed the images to identify cases of fracture and migration of filter fragment from the original filter position. The imaging studies were divided into "direct" and "indirect" categories (11). Direct imaging studies contain the filter and include any abdominal CT scans or plain radiographs of the abdomen; kidneys, ureter, and bladder; and lumbar spine. Indirect studies do not contain the filter itself but may visualize a fracture fragment that has migrated to the lung, heart, or pelvis. These studies include chest CT scans and plain radiographs of the chest and pelvis. If no fracture was found on the most recent direct image, the study was labeled negative for fracture. The time interval from placement was calculated and used to determine the maximum fracture-free period. If a fracture or fragment migration was identified, all previous images were examined to identify the first positive study (ie, earliest evidence of fracture or migration). Information about fracture-related complications (if present) was obtained from review of inpatient and outpatient notes within the electronic medical record.

The prevalence of filter fracture at various time points after placement was estimated based on data from patients whose fracture status was known at that time. Agresti-Coull 95% confidence intervals, which give an approximate confidence interval for a binomial proportion, were also calculated for fracture prevalence (12). When there were no known fractures at a certain time point, a simple method for calculating the upper confidence bound for a binomial proportion when no events are observed was used (13). The basic idea was to identify the largest value of a population proportion ($p$) for which the probability of observing our results (0/N) was at least α, where α is the significance level for the interval. The upper confidence bound then was found by solving $(1 - p)^N = \alpha$ for $p$.

## RESULTS

From October 2005 to February 2010, 829 consecutive patients underwent G2 filter placement at our institution. For 684 patients, at least one image was available that could be used for evaluation of fracture or migration after filter placement; the remaining 145 patients without follow-up imaging were excluded from the analysis. Of the 684 patients, 381 were male and 303 were female, with an average age of 60.3 years (range, 15.8–95.2 y) at the time of filter placement. The mean clinical follow-up period for study patients was 22.7 months ± 24.5 (range, 0–83.4 mo).

The imaging modalities and times to follow-up among study patients are shown in Table 1. The mean imaging follow-up interval for all study patients was 14.1 months ± 19.9 (range, 0–83.4 mo). For 541 (79%) of 684 patients, at least one direct follow-up image was available, with a mean follow-up interval of 14.9 months ± 20.0 (range, 0–78.6 mo); for 143 (21%) patients, only indirect follow-up images were available, with a mean follow-up interval of 11.2 months ± 19.3 (range, 0–83.4 mo) (Table 2). For patients with direct imaging available, 177 patients (32.7%) had a follow-up period > 1 year; for patients with indirect imaging available, 33 (23.1%) had a follow-up period > 1 year.

There were 146 (21.3%) patients who presented for filter retrieval, and 133 of these patients (91.1%) had

**Table 1**. Summary of Follow-up Imaging in 684 Patients

| Type of Imaging | Studies (No.)* | Follow-up Interval (mo)† |
|---|---|---|
| Cavogram | 146 | 4.85 (0.11–51.52) |
| Chest radiograph | 368 | 15.53 (0–83.38) |
| Chest CT | 41 | 15.85 (0.01–68.92) |
| Abdominal radiograph | 235 | 14.52 (0–77.71) |
| Kidney, ureter, and bladder radiograph | 9 | 17.1 (0.11–77.29) |
| Lumbar spine radiograph | 12 | 32.05 (5.09–57.37) |
| Pelvic radiograph | 24 | 20.27 (0.57–75.26) |
| Abdominal CT | 261 | 12.76 (0–75.53) |
| Total | 1,096 | — |

CT = computed tomography.
*Regardless of the number of images available for a single patient, any same image modality was counted only once.
†Mean value (range).

| Patient Groups | Imaging Follow-up (mo)* | Clinical Follow-up (mo)* |
|---|---|---|
| Patients with direct image available (n = 541) | 14.9 ± 20.0 (0–78.6) | 25.2 ± 24.8 (0–80.1) |
| Patients with indirect image available (n = 143) | 11.2 ± 19.3 (0–83.4) | 12.7 ± 20.1 (0–83.4) |
| Deceased patients (n = 291) | 6.2 ± 10.5 (0–59.5) | 7.1 ± 10.8 (0–59.5) |
| Alive patients (n = 393) | 20.0 ± 22.9 (0–83.4) | 32.0 ± 25.6 (0–83.4) |

**Table 2**. Imaging and Clinical Follow-up in 684 Patients

*Mean value ± SD (range).

their filters successfully removed (mean time to removal, 4.9 mo ± 5.5; range, 0.1–51.5 mo). There were 291 patients who died of causes unrelated to the filter, with a mean imaging follow-up interval of 6.2 months ± 10.5 (range, 0–59.5 mo); 282 of these patients (96.9%) died with their filters in place (4 having undergone unsuccessful retrievals), and 9 of these patients (3.1%) died after filter removal (mean interval from filter placement, 18.8 ± 16.1 mo; range, 0.8–54.9 mo). At last follow-up, 393 patients were alive with a mean imaging follow-up interval of 20.0 months ± 22.9 (range, 0–83.4 mo). Of these 393 patients, 269 had filters in situ (9 patients having undergone unsuccessful retrievals), and 124 had undergone successful filter retrieval. Among patients alive at last follow-up, 325 had direct imaging follow-up with a mean follow-up interval of 19.9 months ± 22.8 (range, 0–78.6 mo), and 68 had only indirect imaging follow-up with a mean follow-up interval of 20.5 months ± 24.0 (range, 0–83.4 mo).

In 13 of 684 patients (1.9%), 16 fractured limbs (11 arms and 5 legs) were identified. The average interval from placement to identification of fracture was 30.4 months ± 18.7 (range, 5.5–76.5 mo). Limb fracture was identified in two patients at filter retrieval. In one patient, a fractured arm was identified at the right kidney, and no fragment retrieval was attempted. In the second patient, the limb fracture occurred during retrieval. The fractured limb migrated to the distal IVC and was subsequently removed. All patients with limb fracture had at least one direct image of the filter except for one patient, in whom the single short limb was identified within the left lung on a chest radiograph (**Fig 1**). Of the 16 fractured limbs, 9 had distant migration, including 4 to the pulmonary arteries, 2 to the cardiac chambers (**Fig 2a, b**), and 1 to each of the following sites: pericardium (**Fig 3a, b**), iliac vein (**Fig 4**), and kidney (**Fig 5**). Four fractured limbs remained near the filter, and the remaining three fragments could not be



**Figure 1.** Posteroanterior chest radiograph demonstrates a fractured long limb (arrow) that embolized to the left pulmonary artery. There were no direct images for this patient that visualized the filter proper.

visualized on the available studies. Of the 13 patients with limb fractures, 2 died of underlying medical conditions, and 11 were asymptomatic at the last clinical visit (**Table 3**). There was no documentation of chest pain, arrhythmia, or other symptoms possibly related to migration of fracture fragments among the 13 patients with fractured limbs during an average interval of 9.2 months ± 13.6 from the first identification of filter fracture to the last follow-up date.

Point and interval estimates of fracture prevalence are shown in **Table 4**. For the first year after filter placement, estimates of fracture prevalence were low: 0.9% at 90 days, 2.7% at 180 days, and 3.8% at 360 days. These estimates continued to increase over time, with the estimated fracture prevalence reaching 38% at 5 years after filter placement (95% confidence interval, 22.9%, 54.8%).

## DISCUSSION

The incidence of G2 filter fractures was low in the present study, but the estimated risk of fracture increased with longer filter indwelling time. No life-threatening events occurred in patients with filter fractures during the follow-up interval.

The construction of the G2 filter was modified from the original design of the Recovery filter and included thicker leg hooks, a wider leg span, and longer arms with a more



**Figure 2.** Posteroanterior (**a**) and lateral (**b**) chest radiographs demonstrate an embolized short limb (arrows) projecting over the right ventricle. Insets show a magnified view of the fracture fragment.



**Figure 3.** Posteroanterior abdominal radiograph (**a**) and coronal view of volume-rendered CT image (**b**) demonstrate a fractured short limb (arrows) that migrated to the pericardial space. In addition, there is a fractured long limb (curved arrow) inferior and medial to the main body of the filter (**a**).

progressive angle of the arm wires at the filter apex and inwardly curved ends. These modifications were aimed at reducing the occurrence of filter migration, fracture, and tilting without compromising the retrievability of the filter (14). Studies have reported a lower incidence of fracture with the G2 filter than with the Recovery filter. Nicholson et al (1) reported a 12% fracture rate with the G2 filter over 23.5 months ± 8.3 among 52 patients and a 25% fracture rate with the Recovery filter over 50.2 months ± 4.9 among 28 patients. Vijay et al (15) found that

G2 filters were significantly less likely to fracture than Recovery filters over 36 months of follow-up, a difference the authors attributed to the change in filter design. **Table 5** summarizes the overall incidence of G2 filter fractures as reported in previous studies (1,2,9,14–27). Variations in reported fracture rates may be caused in part by differences in sample size or filter indwelling time or both.

In the present study, the earliest G2 fracture was identified at 5.5 months, and the risk of fracture



**Figure 4.** Plain radiograph of the abdomen demonstrates a fractured long limb (arrow) that embolized to the left iliac vein.



**Figure 5.** IVC carbon dioxide cavogram shows a fractured long limb that migrated to the right renal vein (arrow). The filter itself is tilted and deformed.

increased over time, reaching 38% at 5 years after filter placement. This estimate of fracture prevalence is similar to the predicted rate previously reported for Recovery filters (40% at 5.5 y in 363 patients) (6). In other studies, G2 filter fracture usually occurred > 180 days after filter implantation (2,28). These results suggest that indwelling time is an important factor in determining the risk of fracture in patients with a G2 filter.

The most serious complication associated with filter fracture is cephalad migration of the fracture fragment to the heart, risking fatal arrhythmia, laceration of the cardiac wall, and cardiac tamponade (1,3,4,29). The occurrence of cephalad migration varies among the reports. Nicholson et al (1) reported that 64% (16 of 25) of fracture fragments of 13 Bard filters (7 Recovery and 6 G2 filters) migrated to the heart (n = 10) and lungs (n = 6). In a previous study of Recovery filters, 35% (9 of 26) of filters exhibited cephalad migration (6). Although no cases of life-threatening events attributable to G2 filter fractures have been reported to date, the risk of ventricular tachycardia, cardiac tamponade, hemopericardium, and sudden death from cephalad or cardiac migration of the filter fragment (as seen in the Recovery and G2X filters) is still present (1,2,15). In the present study, 54% (7 of 13) of fracture components migrated in the cephalad direction, with embolization of four fragments to the lung, two to the cardiac chambers, and one into the pericardium. It is unclear how a fracture fragment can migrate to the pericardium. The present study and previous reports by Hull et al (30) and Tam et al (6) found that a fragment in the right ventricle does not always result in symptoms.

Caring for patients with G2 filters in situ presents a clinical dilemma. The Food and Drug Administration approved all retrievable filters for permanent and retrievable indications. Retrievable filters were favored over permanent filters because they offered greater flexibility in case management; additionally, the literature has not offered data supporting the superiority of permanent filters over retrievable filters in patients requiring long-term deep vein thrombosis protection. In our practice, retrievable G2 filters were used for both permanent and temporary indications, but approximately 80% of patients received filters for permanent indications. A low percentage of this patient cohort returned for filter retrieval despite the current consensus dictating prompt removal of the filter when deep vein thrombosis protection is no longer needed. Several factors led to this low retrieval rate, including a high number of patient deaths shortly after filter insertion, a large number of international and out-of-state patients, and a lack of surveillance program at the time.

In patients with a permanent indication for deep vein thrombosis protection, replacing an intact G2 filter with another device with unknown long-term risks is difficult to advocate. Active long-term surveillance may find more silent fractures but may also needlessly increase patient anxiety. Cases of known filter fractures present even greater challenges. Studies have demonstrated the feasibility and benefit of removing a fractured IVC filter and accessible filter fragments (2,9). However, a decision to retrieve such a fragment ultimately depends on the operator, who must balance the risks and benefits of the procedure. In this study, all fractures and fragment migrations were incidentally identified and clinically asymptomatic. In addition, most of the fracture

**Table 3.** Fracture and Migration in 13 Patients

| Sex/Age (y) | Fracture Arm | Fracture Leg | Migration Site | First Positive* | Last Normal† | Last Visit‡ |
|---|---|---|---|---|---|---|
| M/45 | 1 | | Right ventricle | 24 | 0.3 | 24 |
| M/54 | | 1 | Left iliac vein | 38.7 | NA | 38.7 |
| F/82 | | 1 | Right renal vein | 5.5 | NA | 18.5§‖ |
| F/69 | 2 | | Right ventricle, at filter | 49.5 | 35.3 | 49.5 |
| F/49 | 1 | | Left pulmonary | 22.6 | 16.5 | 51.9 |
| F/66 | 1 | | Unknown | 76.5 | 11.4 | 76.5 |
| F/74 | 1 | | Pericardial | 34.9 | NA | 40.7 |
| M/71 | 1 | | At filter | 32.6 | NA | 56§ |
| F/19 | 1 | | Left pulmonary | 12.2 | NA | 19.2‖ |
| M/56 | 2 | 1 | 1 right pulmonary, 2 unknown | 23 | 8 | 63.9 |
| F/32 | | 1 | At filter | 22.5 | 19.7 | 51.5§ |
| F/66 | | 1 | At filter | 12.2 | NA | 12.5§ |
| F/83 | 1 | | Right ventricle | 41.2 | 21.8 | 41.9 |

F = female; M = male; NA = not available.
*Interval between filter placement and first imaging study to identify filter fracture.
†Interval from filter placement to the date of last imaging study on which filter was seen to be normal.
‡Interval from filter placement to the last date of clinical follow-up.
§Filter was removed.
‖Patient died.

**Table 4.** Estimate of G2 Filter Fracture Prevalence Over Time

| Time Point after Filter Placement | Patients without Known Fracture (n) | Patients with Known Fracture (n) | Fracture Prevalence Estimate (%) | 95% CI (%) |
|---|---|---|---|---|
| 3 mo | 337 | 0 | 0 | 0.000, 0.009 |
| 6 mo | 225 | 1 | 0.44 | 0.000, 0.027 |
| 1 y | 158 | 1 | 0.63 | 0.000, 0.038 |
| 2 y | 102 | 6 | 5.6 | 0.023, 0.118 |
| 3 y | 75 | 9 | 10.7 | 0.055, 0.193 |
| 4 y | 42 | 11 | 20.8 | 0.118, 0.336 |
| 5 y | 20 | 12 | 37.5 | 0.229, 0.548 |

CI = confidence interval.

fragments were situated in locations that would make retrieval difficult, impossible, or highly risky, such as within a distal pulmonary artery branch or within the pericardium. We are unsure whether all patients with G2 filters should be routinely monitored for possible filter retrieval and whether migrated fracture fragments should always be retrieved. However, we advocate removal of any symptomatic fracture fragment or fragment with embolization to a high-risk location if possible.

This study had several limitations. This was a retrospective review of imaging studies performed in patients who returned to our institution for ongoing medical issues. There is no standard imaging follow-up protocol for patients with G2 filters. Not all patients in this study had imaging of the filter; 21% of patients had indirect images only. The average follow-up time was 14.1 months for all available imaging studies, with filters being retrieved in a large number of patients in the first year and additional loss of patients to death or lack of follow-up. Finally, the clinical information, including cause of death, was based on retrospective electronic medical records review without autopsy, imaging studies, or clinical or telephone follow-up focusing on filter-related complications.

In conclusion, this series demonstrated a low overall initial rate of filter fractures in patients with G2 filters, but the estimated fracture risk progressively increased with longer filter dwell times. No life-threatening events related to fracture of the G2 filter were observed over a limited period of time. Patients no longer requiring a filter should be scheduled for retrieval because of the risk of filter fracture and migration, but the benefit of screening patients with a G2 filter in situ for possible replacement of the filter is less clear.

**Table 5 .** Fractures and Related Complications in G2 Filter Studies

| Study | Filters (No.) | Fractures (No.) | Dwell Time* | Fracture Fragments (No.) | Migration (No.) | Fracture-Related Symptoms | Fragment Retrieval |
|---|---|---|---|---|---|---|---|
| Nicholson et al (1) | 52 | 6 | 24.6 mo (10–35 mo)† | 8 | 6 IVC, 1 lung, 1 liver | No | No |
| Kuo et al (2)‡ | 9 | 9§ | 1,276 d (351–2,263 d)† | Unknown | | No | NA |
| Dinglasan et al (9)‡ | 8‖ | 8 | 13.5 mo (4–61 mo) | 10 | 5 IVC, 2 extraluminal, 2 IVC wall, 1 lung | Not reported | 6 (60%) |
| Oliva et al (14) | 51 | 0 | 53.4 d (7–242 d) | 0 | NA | NA | NA |
| Vijay et al (15)‡ | 350 | 19 | 692 d (65–1,771 d) | 41¶ | 10/77¶ | Not reported | 15/77¶ |
| Charles et al (16) | 26 | 0 | 122 d (11–260 d) | 0 | NA | NA | NA |
| Binkert et al (17) | 85 | 1 | 92 d† | 2 | Out of the cava | No | No |
| Kim et al (18) | 10 | 0 | 24.7 mo | | NA | NA | NA |
| Uberoi et al (19) | 95 | 0 | 77 d (34–154 d) | | NA | NA | NA |
| Nazzal et al (20) | 1 | 0 | 1 d | | NA | NA | NA |
| Malek et al (21) | 3 | 0 | 285 d (20–2,091 d) | | NA | NA | NA |
| Janvier et al (22) | 1 | 0 | 18 mo | | NA | NA | NA |
| Hermsen et al (23) | 16 | 0 | 228 d (33–441 d) | | NA | NA | NA |
| Gupta et al (24) | 1 | 1 | 1–2 y | 2 | 1 right lung, 1 left upper abdomen | No | No |
| Damascelli et al (25) | 107 | 1 | 5 mo | 1 | 1 left lung | No | No |
| Caceres et al (26) | 1 | 0 | 3 y | | NA | NA | NA |
| Bui et al (27) | 1 | 0 | 4 mo | | NA | NA | NA |
| Total | 817 | 45 (5.5%) | | 74 | | | |

IVC = inferior vena cava; NA = not applicable.

*The time from G2 filter placement to available image for all filters in a particular study (range). G2 filters without images after placement were excluded.

†Represents the true fracture interval (time from G2 filter placement to time fracture was reported).

‡The authors' group published several other G2 filter–related studies, which were excluded from this table because of data overlapping.

§The number of G2 fractures could not be calculated because the article did not specify which fractures involved G2 filters (fractures were reported in 31 of 47 conical-shaped filters).

There was the potential for fracture in up to 9 G2 filters.

¶This study included 548 patients, 63 fractures, and 77 fractured limbs for three types of Bard filters (Recovery, G2, and G2X). Specific data regarding G2 filters could not be retrieved from the article.

‖There were 148 IVC filters studied, including Bard Recovery, G2, and Celect filters. No details were provided about the total number of each filter type.

## ACKNOWLEDGMENT

We thank Matthew Tam, MD, for his invaluable advice in manuscript preparation, and Megan Griffiths for her help with revising the manuscript.

## REFERENCES

1. Nicholson W, Nicholson WJ, Tolerico P, et al. Prevalence of fracture and fragment embolization of Bard retrievable vena cava filters and clinical implications including cardiac perforation and tamponade. Arch Intern Med 2010; 170:1827–1831.

2. Kuo WT, Robertson SW, Odegaard JI, Hofmann LV. Complex retrieval of fractured, embedded, and penetrating inferior vena cava filters: a prospective study with histologic and electron microscopic analysis. J Vasc Interv Radiol 2013; 24:622–630.

3. Saeed I, Garcia M, McNicholas K. Right ventricular migration of a recovery IVC filter's fractured wire with subsequent pericardial tamponade. Cardiovasc Intervent Radiol 2006; 29:685–686.

4. Hull JE, Han J, Giessel GM. Retrieval of the recovery filter after arm perforation, fracture, and migration to the right ventricle. J Vasc Interv Radiol 2008; 19:1107–1111.

5. Wang W, Zhou D, Obuchowski N, Spain J, An T, Moon E. Fracture and migration of Celect IVC filters: a retrospective review of 741 consecutive implantations. J Vasc Interv Radiol 2013; 24:1719–1722.

6. Tam MD, Spain J, Lieber M, Geisinger M, Sands MJ, Wang W. Fracture and distant migration of the Bard Recovery filter: a retrospective review of 363 implantations for potentially life-threatening complications. J Vasc Interv Radiol 2012; 23:199–205.

7. Cantwell CP, Pennypacker J, Singh H, Scorza LB, Waybill PN, Lynch FC. Comparison of the recovery and G2 filter as retrievable inferior vena cava filters. J Vasc Interv Radiol 2009; 20:1193–1199.

8. Angel LF, Tapson V, Galgon RE, Restrepo MI, Kaufman J. Systematic review of the use of retrievable inferior vena cava filters. J Vasc Interv Radiol 2011; 22:1522–1530.

9. Dinglasan LA, Trerotola SO, Shlansky-Goldberg RD, Mondschein J, Stavropoulos SW. Removal of fractured inferior vena cava filters: feasibility and outcomes. J Vasc Interv Radiol 2012; 23:181–187.

10. Cantwell CP, Lynch FC. Caudal migration of a G2 filter during carbon dioxide cavography. J Vasc Interv Radiol 2007; 18:814–815.

11. Zhu X, Tam MD, Bartholomew J, Newman JS, Sands MJ, Wang W. Retrievability and device-related complications of the G2 filter: a retrospective study of 139 filter retrievals. J Vasc Interv Radiol 2011; 22:806–812.

12. Agresti A, Coull BA. Approximate is better than 'exact' for interval estimation of binomial proportions. American Statistician 1998; 52:119–116.

13. Hanley JA, Lippman-Hand A. If nothing goes wrong, is everything all right? Interpreting zero numerators. JAMA 1983; 249:1743–1745.

14. Oliva VL, Perreault P, Giroux MF, Bouchard L, Therasse E, Soulez G. Recovery G2 inferior vena cava filter: technical success and safety of retrieval. J Vasc Interv Radiol 2008; 19:884–889.

15. Vijay K, Hughes JA, Burdette AS, et al. Fractured Bard Recovery, G2, and G2 express inferior vena cava filters: incidence, clinical consequences, and outcomes of removal attempts. J Vasc Interv Radiol 2012; 23:188–194.

16. Charles HW, Black M, Kovacs S, et al. G2 inferior vena cava filter: retrievability and safety. J Vasc Interv Radiol 2009; 20:1046–1051.

17. Binkert CA, Drooz AT, Caridi JG, et al. Technical success and safety of retrieval of the G2 filter in a prospective, multicenter study. J Vasc Interv Radiol 2009; 20:1449–1453.

18. Kim HS, Young NJ, Narayan AK, Hong K, Liddell RP, Streiff MB. A comparison of clinical outcomes with retrievable and permanent inferior vena cava filters. J Vasc Interv Radiol 2008; 19:393–399.

19. Uberoi R, Tapping CR, Chalmers N, Allgar V. British Society of Interventional Radiology (BSIR) Inferior Vena Cava (IVC) Filter Registry. Cardiovasc Intervent Radiol 2013; 36:1548–1561.

20. Nazzal M, Abbas J. A complication of a G2 Bard filter. J Vasc Interv Radiol 2010; 21:1784–1785.

21. Malek JY, Kwolek CJ, Conrad MF, et al. Presentation and treatment outcomes of patients with symptomatic inferior vena cava filters. Ann Vasc Surg 2013; 27:84–88.

22. Janvier L, Hamdan H, Malas M. Bilateral renal vein thrombosis and subsequent acute renal failure due to IVC filter migration and thrombosis. Clin Nephrol 2010; 73:408–412.

23. Hermsen JL, Ibele AR, Faucher LD, Nale JK, Schurr MJ, Kudsk KA. Retrievable inferior vena cava filters in high-risk trauma and surgical patients: factors influencing successful removal. World J Surg 2008; 32:1444–1449.

24. Gupta P, Lopez JA, Ghole V, Rice GD, Ketkar M. Aortic and vertebral penetration by a G2 inferior vena cava filter: report of a case. J Vasc Interv Radiol 2009; 20:829–832.

25. Damascelli B, Ticha V, Patelli G, et al. Use of a retrievable vena cava filter with low-intensity anticoagulation for prevention of pulmonary embolism in patients with cancer: an observational study in 106 cases. J Vasc Interv Radiol 2011; 22:1312–1319.

26. Caceres M, Braud R, Weiman D. Aortic penetration by temporary inferior vena cava filters: report of an interesting case and review of the literature. Vasc Endovasc Surg 2012; 46:181–186.

27. Bui JT, West DL, Pinto C, Gramling-Babb P, Owens CA. Right ventricular migration and endovascular removal of an inferior vena cava filter. J Vasc Interv Radiol 2008; 19:141–144.

28. Lynch FC, Kekulawela S. Removal of the G2 filter: differences between implantation times greater and less than 180 days. J Vasc Interv Radiol 2009; 20:1200–1209.

29. Desjardins B, Kamath SH, Williams D. Fragmentation, embolization, and left ventricular perforation of a recovery filter. J Vasc Interv Radiol 2010; 21:1293–1296.

30. Hull JE, Robertson SW. Bard Recovery filter: evaluation and management of vena cava limb perforation, fracture, and migration. J Vasc Interv Radiol 2009; 20:52–60.

# EXHIBIT 41

# Evidence-Based Evaluation of Inferior Vena Cava Filter Complications Based on Filter Type

Steven E. Deso, MD[1]   Ibrahim A. Idakoji, MD, MPH[1]   William T. Kuo, MD[1]

[1] Division of Vascular and Interventional Radiology, Stanford University Medical Center, Stanford, California

Address for correspondence  Steven E. Deso, MD, Division of Vascular and Interventional Radiology, Stanford University Medical Center, 300 Pasteur Drive, H-3651, Stanford, CA 94305 (e-mail: sdeso@stanford.edu).

Semin Intervent Radiol 2016;33:93–100

## Abstract

Many inferior vena cava (IVC) filter types, along with their specific risks and complications, are not recognized. The purpose of this study was to evaluate the various FDA-approved IVC filter types to determine device-specific risks, as a way to help identify patients who may benefit from ongoing follow-up versus prompt filter retrieval. An evidence-based electronic search (FDA Premarket Notification, MEDLINE, FDA MAUDE) was performed to identify all IVC filter types and device-specific complications from 1980 to 2014. Twenty-three IVC filter types (14 retrievable, 9 permanent) were identified. The devices were categorized as follows: conical ($n = 14$), conical with umbrella ($n = 1$), conical with cylindrical element ($n = 2$), biconical with cylindrical element ($n = 2$), helical ($n = 1$), spiral ($n = 1$), and complex ($n = 1$). Purely conical filters were associated with the highest reported risks of penetration (90–100%). Filters with cylindrical or umbrella elements were associated with the highest reported risk of IVC thrombosis (30–50%). Conical Bard filters were associated with the highest reported risks of fracture (40%). The various FDA-approved IVC filter types were evaluated for device-specific complications based on best current evidence. This information can be used to guide and optimize clinical management in patients with indwelling IVC filters.

**Keywords**
► IVC filters
► nonthrombotic complications
► interventional radiology

**CME Objective:** Upon completion of this article, the reader should be able to distinguish the various retrievable and permanent IVC filter designs, and explain the most common complications associated with the various designs.

**Accreditation:** This activity has been planned and implemented in accordance with the Essential Areas and Policies of the Accreditation Council for Continuing Medical Education (ACCME) through the joint providership of Tufts University School of Medicine (TUSM) and Thieme Medical Publishers, New York. TUSM is accredited by the ACCME to provide continuing medical education for physicians.

**Credit:** Tufts University School of Medicine designates this journal-based CME activity for a maximum of *1 AMA PRA Category 1 Credit™*. Physicians should claim only the credit commensurate with the extent of their participation in the activity.

The use of inferior vena cava (IVC) filters has dramatically increased over the past three decades in the United States, and the number of filter insertions doubled between 1998 and 2008.[1,2] By 2012, an estimated 259,000 IVC filters were placed in the United States alone,[3] coinciding with a growing number of Food and Drug Administration (FDA)-approved devices. Consequently, the increasing variety of filters along with rising overall use has resulted in increased complications from indwelling IVC filters; this prompted the FDA to issue a safety alert urging all physicians caring for patients with indwelling filters to consider removing the filter as soon as protection from pulmonary embolism (PE) is no longer needed.[4] Despite this recommendation, many devices are not adequately followed for removal, and the large number of filter types now encountered on routine imaging has made proper device identification difficult. The purpose of this study was to evaluate the various FDA-approved IVC filter designs to determine device-specific risks, as a way of

**Issue Theme** Inferior Vena Cava Filters; Guest Editors, Kush R. Desai, MD, and Robert J. Lewandowski, MD

Copyright © 2016 by Thieme Medical Publishers, Inc., 333 Seventh Avenue, New York, NY 10001, USA. Tel: +1(212) 584-4662.

**DOI** http://dx.doi.org/ 10.1055/s-0036-1583208. **ISSN** 0739-9529.

Downloaded by: Johns Hopkins University. Copyrighted material.

Case 2:15-md-02641-DGC   Document 7809-2   Filed 09/27/17   Page 24 of 148

94   Evidence-Based Evaluation of IVC Filter Complications   Deso et al.



**Fig. 1** Fluoroscopic image showing a G2 filter with multiple fractured components.



**Fig. 3** Axial CT image showing a 12F Stainless Steel Greenfield filter in place complicated by component perforation (arrow).

helping to identify patients who may benefit from ongoing follow-up or prompt filter retrieval.

## Materials and Methods

### Identification of IVC Filter Types

The FDA Premarket Notification Database[5] was searched electronically to identify all IVC filters receiving 510(k) clearance (product code DTK—filter, intravascular, cardiovascular) between 1980 and 2014.

### Classification of Filter Complications

IVC filter complications were classified according to the Society of Interventional Radiology (SIR) guidelines[6] as follows:

*Fracture:* Breakage or separation of any filter component due to structural failure.[6] The fractured components can remain in situ or undergo distal embolization (►**Fig. 1**).

*Insertional problems:* Malfunctions in filter deployment including tilting of the filter more than 15 degrees from the IVC axis, incomplete opening, and prolapse of filter components[6] (►**Fig. 2**).

*IVC perforation:* Visualization of one or more filter components extending greater than 3 mm beyond the caval wall or into an adjacent structure[6] such as the duodenum, aorta, psoas muscle, kidney, or vertebral body. Grading schemes defining the degree of perforation have been described in the literature[7] (►**Fig. 3**).

*Migration:* Movement of an IVC filter greater than 2 cm along the IVC beyond the initial placement position.[6] Filter migration may result in filter embolization into the right atrium, right ventricle, or pulmonary arteries (►**Fig. 4**).



**Fig. 2** Fluoroscopic images showing a severely tilted and tip embedded Celect filter.



**Fig. 4** Fluoroscopic image demonstrating an IVC filter that has migrated into the right ventricle.

Downloaded by: Johns Hopkins University. Copyrighted material.



**Fig. 5** Coronal CT image showing a Bard filter (open arrow) in place with acute thrombotic occlusion of the IVC (solid arrow).

*IVC occlusion:* Acute or chronic thrombotic occlusion of the IVC following filter placement[6] (►**Fig. 5**).

### Evidence-Based Search of Filter Complications

An electronic MEDLINE search was performed using the following index search terms: "IVC filter" OR "inferior vena cava filter" OR "ALN filter" OR "Bard Eclipse" OR "Bard G2" OR "Bard G2X" OR "Bard Recovery" OR "Bard Denali" OR "Bard Meridian" OR "Simon Nitinol" OR "Vena Tech LGM" OR "Vena Tech LP" OR "Greenfield filter" OR "Bird's Nest filter" OR "Celect filter" OR " Günther Tulip" OR "Optease" OR "Trapease" OR "Safeflo" OR "Option filter" OR "Crux vena cava filter." The results were filtered for English language, clinical trial study type, human species, and date range from 1980 to 2014 (►**Fig. 6**). All potentially relevant articles were collected for analysis. The references within these articles were reviewed to obtain additional relevant articles for analysis. A data extraction form was used to record the following information: filter type, retrieval rate, complications, and frequency of complications per filter type. Two reviewers verified the accuracy of all data prior to analysis. The FDA Manufacturer and User Facility Device Experience (MAUDE) database[8] was queried electronically (1992–2014) to identify additional adverse events associated with IVC filter use (product class —filter, intravascular, cardiovascular).

### Results

Twenty-four IVC filters were identified. From this group, the Edwards Mobin-Uddin device was excluded as it was removed from the market in 1986.[9] From the remaining group, nine filters cleared for permanent use, and 14 filters cleared for retrievable or permanent use, were identified (►**Table 1**). The device distribution based on geometry was as follows: conical ($n = 15$), conical with umbrella ($n = 1$), conical with cylindrical element ($n = 2$), biconical with cylindrical



**Fig. 6** Literature screening flowchart.

Downloaded by: Johns Hopkins University. Copyrighted material.

Case 2:15-md-02641-DGC   Document 7809-2   Filed 09/27/17   Page 26 of 148

96   Evidence-Based Evaluation of IVC Filter Complications   Deso et al.

**Table 1** IVC Filters in the United States (1980–2014)

| Permanent filters | Retrievable filters[a] |
|---|---|
| • 24F stainless steel Greenfield (Boston Scientific, Natick, MA)[b]<br>• 12F stainless steel Greenfield (Boston Scientific)<br>• Titanium Greenfield (Boston Scientific)<br>• Vena Tech LGM (B. Braun Medical, Bethlehem, PA)[b]<br>• Vena Tech LP (B. Braun Medical)<br>• Trapease (Cordis Endovascular, Warren, NJ)<br>• Bird's Nest (Cook, Bloomington, IN)<br>• Simon Nitinol (Bard Peripheral Vascular, Tempe, AZ)<br>• SafeFlo (Rafael Medical Technologies, Dover, DE)[b] | • ALN (ALN International, Miami, FL)<br>• Recovery (Bard Peripheral Vascular)[b]<br>• G2 (Bard Peripheral Vascular)[b]<br>• G2X (Bard Peripheral Vascular)[b]<br>• Eclipse (Bard Peripheral Vascular)[b]<br>• Meridian (Bard Peripheral Vascular)[b]<br>• Denali (Bard Peripheral Vascular)<br>• Günther Tulip (Cook)<br>• Celect (Cook)[b]<br>• Celect Platinum (Cook)<br>• Optease (Cordis Endovascular, Warren, NJ)<br>• Option (Argon, Plano, TX)[b]<br>• Option Elite (Argon, Plano, TX)<br>• Crux (Volcano, San Diego, CA) |

[a]All retrievable filters are also approved for permanent use.
[b]No longer manufactured but may still be encountered from prior implantation.

element (n = 2), helical (n = 1), spiral with umbrella (n = 1), and complex (n = 1) (►**Fig. 7**).

Reported device-specific complications were identified among all filter types, and the highest reported complications for each device are summarized in ►**Table 2**. The risk of complications was found to vary widely depending on the specific IVC filter type.

### Fracture

Early conical Bard Peripheral Vascular (Tempe, AZ) filters were associated with the highest reported rates of fracture. The fracture rate for the original Bard Recovery device was 5.5 to 25% with an estimated incidence of 39.5% at 65.7 months.[10–14] The fracture rate for the Bard G2 devices (G2, G2X, Eclipse, Meridian) was initially 1.2 to 12%, but the highest reported rate was later found to be 38% at 60 months.[11,13,15,16] High fracture rates were also reported



**Fig. 7** IVC filter geometries: (A) conical, (B) conical with cylindrical element, (C) biconical with cylindrical element, (D) conical with umbrella, (E) helical, (F) complex, (G) spiral with umbrella.

for the Simon Nitinol filter (Bard) (10–16%)[17,18] and the Optease/Trapease (Cordis, Miami Lakes, FL) (up to 50%).[19]

### Insertional Issues

Filter tilting greater than 15 degrees during insertion were reported among the following conical filters: Bard Recovery (2.3–15%),[20,21] Bard G2/G2X/Eclipse (14–18%),[15,22,23] Cook (Bloomington, IN) Günther Tulip (11.5–24%),[24–27] 24F Greenfield (Boston Scientific, Marlborough, MA) (7–12%),[28,29] 12F Stainless Steel Greenfield (Boston Scientific) (9.9–55%),[30,31] and Titanium Greenfield (Boston Scientific) (8.3–41%).[30,32,33] In addition, wire prolapse up to 70% was reported for the Cook Bird's Nest filter.[34]

### Inferior Vena Cava Perforation

Purely conical filters were associated with the highest reported rates of IVC perforation and were reported as follows: Bard Recovery (27–100%),[12,14] Bard G2/G2X/Eclipse (26–44%),[15,23] Bard Simon Nitinol (25–95%),[17,18] Cook Günther Tulip (22–78%),[7,35–37] Cook Celect (22–93%),[7,35,38,39] and Titanium Greenfield (prior to hook modification) (13–50%).[40,41] In addition, IVC strut perforation up to 85% was reported for the Cook Bird's Nest filter.[34]

### Migration

Migration rates greater or equal to 10% were reported among the following devices: Bard Recovery (0–10%),[10,12,20] Bard G2 (12–25%),[15,20] Titanium Greenfield (7.5–15%),[33,42] Cook Günther Tulip (2.4–12.5%),[26,36,43] and Vena Tech LGM (6–18.4%).[33,44,45]

### Inferior Vena Cava Occlusion

Filters with a cylindrical component (Vena Tech LGM, Trapease/Optease) or umbrella element (Simon-Nitinol) were associated with high rates of caval thrombosis. The highest reported rate of IVC occlusion for the Trapease/Optease filters was 28.6%.[46] The rates of chronic IVC occlusion with the Simon Nitinol filter range from 3.5 to 50%,[17,47–49] and for the VenaTech LGM, the IVC occlusion rate is as high as 65% at 9 years.[45]

Downloaded by: Johns Hopkins University. Copyrighted material.

**Table 2** Highest reported radiographically identifiable complications for each filter type

| Device (year FDA cleared) | Fracture | IVC perforation | Migration | IVC occlusion |
|---|---|---|---|---|
| ALN (2008) | Case reports (0%)[54-56] | 3.4% (3.4%)[54] | 3% (1.4-3%)[57,58] | Case reports (0%)[54,58,59] |
| Recovery (2003/2005[a]) | 39.5% at 65.7 mo 25% (5.5-25%)[10-14] | 100% (27-100%)[12,14] | 10% (0-10%)[10,12,20,21] | Case reports (0%)[14] |
| G2 (2005/2008[a]) G2X (2008) Eclipse (2008) Meridian (2011) | 38% at 60 mo 12% (1.2-12%)[11,13,15,16,23,60] | 44% (18-44%)[15,23,60,61] | 25% (12-25%)[15,20,23] | 2.2% (0-2.2%)[22,60] |
| Denali (2013) | Case reports[62] | 2.5% (2.5%)[63] | Limited data | Limited data |
| Simon Nitinol (1990) | 16% (10-16%)[17,18] | 95% (25-95%)[17,18] | 5% (0-5%)[18,47] | 50% (3.5-50%)[17,47-49] |
| LGM/Vena Tech LGM (1989) | Case reports[64] | Case reports (0%)[44,65] | 18.4% (6-18.4%)[33,44,45,66] | 65% at 9 y (3.7%/y)[45] |
| Vena Tech LP (2001) | Limited data | Case reports (0%)[67] | Case reports (0%)[67] | Limited data |
| 24F SS Greenfield (1973) | Case reports[68] | 15% (2-15%)[69,70] | 2% (2%)[69] | 5% (2-5%)[28,29,71,72] |
| 12F SS Greenfield (1995) | 0.3% (0.3%)[73] | 1% (1%)[73] | 2.6% (2.6%)[73] | 12% (5-12%)[31,74] |
| Titanium Greenfield (1989) | 3.8% (3.8%)[74] | 50% (13-50% prior to hook modification, 1% with MH design)[40,41] | 15% (7.5-15%)[33,42] | 20% (3.5-20%)[32,75] |
| Günther Tulip (2000/2003[a]) | 0.3% (0.3%)[36] | 78% (22-78%)[7,35-37] | 12.5% (2.4-12.5%)[26,36,43] | 4.1% (2.4-4.1%)[36,43] |
| Celect (2007/2008[a]) Celect Platinum (2012) | 5.6% (4.3-5.6%)[39,76] | 93% (22-93%)[7,35,38,39] | 4.3% (0-4.3%)[38,76,77] | 2.5% (2.5%)[38] |
| Bird's Nest (1989) | 4% (3-4%)[41] | 85% (85%)[34] | 1.1% (1.1%)[78] | 4.7% (2.9-4.7%)[34,78] |
| Optease (2002/2004[a]) Trapease (2000) | 50% (0-50%)[19,79-84] | Case Reports (0%)[79,83,84] | 0.9% (0-0.9%)[79-81,83,84] | 29% (0.8-29%)[46,79,83-86] |
| Option (2009) | Limited data | 10% (2.9-10%)[37,87] | 2% (2%)[87] | 4% (4%)[87] |
| Crux (2012) | Limited data (0%)[88] | Limited data | Limited data (0%)[88] | Limited data (7.2% nonocclusive IVC thrombus)[88] |

Abbreviations: FDA, Federal Drug Administration; IVC, inferior vena cava.
Note: For the SafeFlo filter (2009), no significant clinical data are available, and the device is no longer manufactured.
[a]Subsequent year when filter was cleared for retrieval indication.

Downloaded by: Johns Hopkins University. Copyrighted material.

Case 2:15-md-02641-DGC   Document 7809-2   Filed 09/27/17   Page 28 of 148

98   Evidence-Based Evaluation of IVC Filter Complications   Deso et al.

## Discussion

Over the past few decades, IVC filter use has risen in the United States,[1,2] which has led to increased recognition of a wide range of potential filter-related complications. These complications include fracture, IVC perforation, component embolization, device migration, and IVC occlusion. In response to rising complication rates, the current FDA Safety Alert on IVC filters recommends filter removal when protection from PE is no longer needed. More recently, the FDA released an additional Safety Communication stating that the risk-to-benefit ratio begins to favor IVC filter removal within 29 to 54 days after implantation, if the risk of PE has passed.[50,51]

The systematic review by Angel et al[52] concluded that filter complications are a serious concern associated with long-term filter use, but the study did not address device-specific risks, and there was no analysis specifically of complications from permanent IVC filters. A large variety of retrievable and permanent IVC filters are commonly encountered on routine imaging studies, but the myriad number of filter types and their associated complications prevents interpretation of such radiographic findings. Filter-related complications may therefore go unrecognized or underappreciated as potential causes of morbidity in patients, including those presenting with intractable abdominal pain from filter penetration.[53]

The goal of this study was to evaluate the various FDA-approved IVC filter designs to determine device-specific risks, and to help identify patients who may benefit from ongoing follow-up versus permanent filter retrieval. First, we identified the 23 filter types currently encountered in the United States. Next, the complications associated with each filter type were identified. Although we initially searched the FDA MAUDE database, we soon realized these data were based on voluntary reporting and there was gross underreporting of complications. Therefore, we chose to use evidence-based methods to identify the highest reported complication rates in the literature for each filter type (►Table 2).

These data revealed a high risk of fracture among Bard and Cordis (Miami Lakes, FL) IVC filters, including a fracture incidence of 39.5% at 65.7 months with the Bard Recovery device,[10–14] a 38% risk of fracture at 60 months among the Bard G2 type filters,[11,13,15,16] and a 50% risk of fracture with Cordis Optease/Trapease devices.[19] A high risk of IVC perforation was reported with the Bard Recovery and Cook Celect filters, with penetration rates exceeding 90% for both.[7,12] For permanent filter types, a high risk of IVC occlusion was reported among the Simon Nitinol and Vena Tech LGM,[9] filters with occlusion rates of 50 and 65% (at 9 years),[45,49] respectively. Overall, as these complications appear to be related to filter geometry, one should always assess for IVC perforation, when a conical device is identified, and IVC occlusion, when a cylindrical or umbrella filter component is identified.

This study is limited by the quality of available data on IVC filters, and some filter types in this study were limited published data. In addition, many studies had limited long-term follow-up; therefore, it is possible that the true risk of

complications for these filter types could be even higher than currently reported, as complications tend to increase after longer dwell times. Nevertheless, mitigation against these effects was attempted by identifying the highest complication rates reported so far in the literature. Future studies should involve methods to provide constant updating of filter complication rates as new data emerge in larger cohorts.

## References

1  Duszak R Jr, Parker L, Levin DC, Rao VM. Placement and removal of inferior vena cava filters: national trends in the Medicare population. J Am Coll Radiol 2011;8(7):483–489

2  Stein PD, Kayali F, Olson RE. Twenty-one-year trends in the use of inferior vena cava filters. Arch Intern Med 2004;164(14):1541–1545

3  Smouse BJ. Is market growth of vena cava filters justified? Endovasc Today 2010:74–77

4  Food and Drug Administration. Removing Retrievable Inferior Vena Cava Filters: Initial Communication. Published August 9, 2010. Available at: http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/ucm221676.htm. Accessed July 30, 2015

5  Food and Drug Administration. 510(K) Premarket Notification Database. Published 2014. Available at: http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm. Accessed January 1, 2015

6  Caplin DM, Nikolic B, Kalva SP, Ganguli S, Saad WE, Zuckerman DA; Society of Interventional Radiology Standards of Practice Committee. Quality improvement guidelines for the performance of inferior vena cava filter placement for the prevention of pulmonary embolism. J Vasc Interv Radiol 2011;22(11):1499–1506

7  Durack JC, Westphalen AC, Kekulawela S, et al. Perforation of the IVC: rule rather than exception after longer indwelling times for the Günther Tulip and Celect retrievable filters. Cardiovasc Intervent Radiol 2012;35(2):299–308

8  Food and Drug Administration. MAUDE - Manufacturer and User Facility Device Experience Database. Published 2014. Available at: http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm. Accessed January 1, 2015

9  Bakal CW, Silberzweig JE. Vascular and Interventional Radiology: Principles and Practice. New York, NY: Thieme; 2011

10  Tam MD, Spain J, Lieber M, Geisinger M, Sands MJ, Wang W. Fracture and distant migration of the Bard Recovery filter: a retrospective review of 363 implantations for potentially life-threatening complications. J Vasc Interv Radiol 2012;23(2):199–205.e1

11  Nicholson W, Nicholson WJ, Tolerico P, et al. Prevalence of fracture and fragment embolization of Bard retrievable vena cava filters and clinical implications including cardiac perforation and tamponade. Arch Intern Med 2010;170(20):1827–1831

12  Hull JE, Robertson SW. Bard Recovery filter: evaluation and management of vena cava limb perforation, fracture, and migration. J Vasc Interv Radiol 2009;20(1):52–60

13  Vijay K, Hughes JA, Burdette AS, et al. Fractured Bard Recovery, G2, and G2 express inferior vena cava filters: incidence, clinical consequences, and outcomes of removal attempts. J Vasc Interv Radiol 2012;23(2):188–194

14  Kalva SP, Athanasoulis CA, Fan CM, et al. "Recovery" vena cava filter: experience in 96 patients. Cardiovasc Intervent Radiol 2006;29(4):559–564

15  Binkert CA, Drooz AT, Caridi JG, et al. Technical success and safety of retrieval of the G2 filter in a prospective, multicenter study. J Vasc Interv Radiol 2009;20(11):1449–1453

16  An T, Moon E, Bullen J, et al. Prevalence and clinical consequences of fracture and fragment migration of the Bard G2 filter: imaging

Downloaded by: Johns Hopkins University. Copyrighted material.

Downloaded by: Johns Hopkins University. Copyrighted material.

and clinical follow-up in 684 implantations. J Vasc Interv Radiol 2014;25(6):941–948

17 Poletti PA, Becker CD, Prina L, et al. Long-term results of the Simon nitinol inferior vena cava filter. Eur Radiol 1998;8(2):289–294

18 McCowan TC, Ferris EJ, Carver DK, Molpus WM. Complications of the nitinol vena caval filter. J Vasc Interv Radiol 1992;3(2):401–408

19 Sano M, Unno N, Yamamoto N, Tanaka H, Konno H. Frequent fracture of TrapEase inferior vena cava filters: a long-term follow-up assessment. Arch Intern Med 2012;172(2):189–191

20 Cantwell CP, Pennypacker J, Singh H, Scorza LB, Waybill PN, Lynch FC. Comparison of the recovery and G2 filter as retrievable inferior vena cava filters. J Vasc Interv Radiol 2009;20(9):1193–1199

21 Binkert CA, Sasadeusz K, Stavropoulos SW. Retrievability of the recovery vena cava filter after dwell times longer than 180 days. J Vasc Interv Radiol 2006;17(2, Pt 1):299–302

22 Charles FK, Black M, Kovacs S, et al. G2 inferior vena cava filter: retrievability and safety. J Vasc Interv Radiol 2009;20(8):1046–1051

23 Lynch FC, Kekulawela S. Removal of the G2 filter: differences between implantation times greater and less than 180 days. J Vasc Interv Radiol 2009;20(9):1200–1209

24 Marquess JS, Burke CT, Beecham AH, et al. Factors associated with failed retrieval of the Günther Tulip inferior vena cava filter. J Vasc Interv Radiol 2008;19(9):1321–1327

25 Smouse HB, Rosenthal D, Thuong VH, et al. Long-term retrieval success rate profile for the Günther Tulip vena cava filter. J Vasc Interv Radiol 2009;20(7):871–877, quiz 878

26 Wicky S, Doenz F, Meuwly J-Y, Portier F, Schnyder P, Denys A. Clinical experience with retrievable Günther Tulip vena cava filters. J Endovasc Ther 2003;10(5):994–1000

27 Xiao L, Huang DS, Shen J, Tong JJ. Introducer curving technique for the prevention of tilting of transfemoral Günther Tulip inferior vena cava filter. Korean J Radiol 2012;13(4):483–491

28 Greenfield LJ, Peyton R, Crute S, Barnes R. Greenfield vena caval filter experience: late results in 156 patients. Arch Surg 1981;116(11):1451–1456

29 Messmer JM, Greenfield LJ. Greenfield caval filters: long-term radiographic follow-up study. Radiology 1985;156(3):613–618

30 Kinney TB, Rose SC, Weingarten KE, Valji K, Oglevie SB, Roberts AC. IVC filter tilt and asymmetry: comparison of the over-the-wire stainless-steel and titanium Greenfield IVC filters. J Vasc Interv Radiol 1997;8(6):1029–1037

31 Johnson SP, Raiken DP, Grebe PJ, Diffin DC, Leyendecker JR. Single institution prospective evaluation of the over-the-wire Greenfield vena caval filter. J Vasc Interv Radiol 1998;9(5):766–773

32 Sweeney TJ, Van Aman ME. Deployment problems with the titanium Greenfield filter. J Vasc Interv Radiol 1993;4(5):691–694

33 Wittenberg G, Kueppers V, Tschammler A, Scheppach W, Kenn W, Hahn D. Long-term results of vena cava filters: experiences with the LGM and the Titanium Greenfield devices. Cardiovasc Intervent Radiol 1998;21(3):225–229

34 Nicholson AA, Ettles DF, Paddon AJ, Dyet JF. Long-term follow-up of the bird's nest IVC filter. Clin Radiol 1999;54(11):759–764

35 McLoney ED, Krishnasamy VP, Castle JC, Yang X, Guy G. Complications of Celect, Günther tulip, and Greenfield inferior vena cava filters on CT follow-up: a single-institution experience. J Vasc Interv Radiol 2013;24(11):1723–1729

36 Hoffer EK, Mueller RJ, Luciano MR, Lee NN, Michaels AT, Gemery JM. Safety and efficacy of the Gunther Tulip retrievable vena cava filter: midterm outcomes. Cardiovasc Intervent Radiol 2013;36(4):998–1005

37 Olorunsola OG, Kohi MP, Fidelman N, et al. Caval penetration by retrievable inferior vena cava filters: a retrospective comparison of Option and Günther Tulip filters. J Vasc Interv Radiol 2013;24(4):566–571

38 Zhou D, Spain J, Moon E, Mclennan G, Sands MJ, Wang W. Retrospective review of 120 Celect inferior vena cava filter retrievals: experience at a single institution. J Vasc Interv Radiol 2012;23(12):1557–1563

39 Sangwaiya MJ, Marentis TC, Walker TG, Stecker M, Wicky ST, Kalva SP. Safety and effectiveness of the celect inferior vena cava filter: preliminary results. J Vasc Interv Radiol 2009;20(9):1188–1192

40 Greenfield LJ, Cho KJ, Proctor M, et al. Results of a multicenter study of the modified hook-titanium Greenfield filter. J Vasc Surg 1991;14(3):253–257

41 Ferris EJ, McCowan TC, Carver DK, McFarland DR. Percutaneous inferior vena caval filters: follow-up of seven designs in 320 patients. Radiology 1993;188(3):851–856

42 Greenfield LJ, Cho KJ, Pais SO, Van Aman M. Preliminary clinical experience with the titanium Greenfield vena caval filter. Arch Surg 1989;124(6):657–659

43 Hoppe H, Nutting CW, Smouse HR, et al. Günther Tulip filter retrievability multicenter study including CT follow-up: final report. J Vasc Interv Radiol 2006;17(6):1017–1023

44 Millward SF, Peterson RA, Moher D, et al. LGM (Vena Tech) vena caval filter: experience at a single institution. J Vasc Interv Radiol 1994;5(2):351–356

45 Crochet DP, Brunel P, Trogrlic S, Grossetête R, Auget J-L, Dary C. Long-term follow-up of Vena Tech-LGM filter: predictors and frequency of caval occlusion. J Vasc Interv Radiol 1999;10(2, Pt 1):137–142

46 Corriere MA, Sauve KJ, Ayerdi J, et al. Vena cava filters and inferior vena cava thrombosis. J Vasc Surg 2007;45(4):789–794

47 Simon M, Athanasoulis CA, Kim D, et al. Simon nitinol inferior vena cava filter: initial clinical experience. Work in progress. Radiology 1989;172(1):99–103

48 Kim D, Edelman RR, Margolin CJ, et al. The Simon nitinol filter: evaluation by MR and ultrasound. Angiology 1992;43(7):541–548

49 Grassi CJ, Matsumoto AH, Teitelbaum GP. Vena caval occlusion after Simon nitinol filter placement: identification with MR imaging in patients with malignancy. J Vasc Interv Radiol 1992;3(3):535–539

50 Food and Drug Administration. Removing Retrievable Inferior Vena Cava Filters: FDA Safety Communication. Published 2014. Available at: http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/ucm396377.htm. Accessed January 1, 2015

51 Morales JP, Li X, Irony TZ, Ibrahim NG, Moynahan M, Cavanaugh KJ Jr. Decision analysis of retrievable inferior vena cava filters in patients without pulmonary embolism. J Vasc Surg Venous Lymphat Disord 2013;1(4):376–384

52 Angel LF, Tapson V, Galgon RE, Restrepo MI, Kaufman J. Systematic review of the use of retrievable inferior vena cava filters. J Vasc Interv Radiol 2011;22(11):1522–1530.e3

53 Meyer A, Schönleben F, Heinz M, Lang W. Perforated inferior vena cava filters as the cause of unclear abdominal pain. Ann Vasc Surg 2013;27(3):354.e9–354.e12

54 Pellerin O, di Primio M, Sanchez O, Meyer G, Sapoval M. Successful retrieval of 29 ALN inferior vena cava filters at a mean of 25.6 months after placement. J Vasc Interv Radiol 2013;24(2):284–288

55 Pellerin O, Barral FG, Lions C, Novelli L, Beregi JP, Sapoval M. Early and late retrieval of the ALN removable vena cava filter: results from a multicenter study. Cardiovasc Intervent Radiol 2008;31(5):889–896

56 Kuo WT, Robertson SW, Odegaard JI, Hofmann LV. Complex retrieval of fractured, embedded, and penetrating inferior vena cava filters: a prospective study with histologic and electron microscopic analysis. J Vasc Interv Radiol 2013;24(5):622–630.e1, quiz 631

57 Mismetti P, Rivron-Guillot K, Quenet S, et al. A prospective long-term study of 220 patients with a retrievable vena cava filter for secondary prevention of venous thromboembolism. Chest 2007;131(1):223–229

Case 2:15-md-02641-DGC   Document 7809-2   Filed 09/27/17   Page 30 of 148

100   Evidence-Based Evaluation of IVC Filter Complications    Deso et al.

58  Imberti D, Bianchi M, Farina A, Siragusa S, Silingardi M, Ageno W. Clinical experience with retrievable vena cava filters: results of a prospective observational multicenter study. J Thromb Haemost 2005;3(7):1370–1375

59  Caronno R, Piffaretti G, Tozzi M, et al. Mid-term experience with the ALN retrievable inferior vena cava filter. European journal of vascular and endovascular surgery: the official journal of the European Society for Vascular Surgery 2006;32(5):596–9

60  Zhu X, Tam MDBS, Bartholomew J, Newman JS, Sands MJ, Wang W. Retrievability and device-related complications of the G2 filter: a retrospective study of 139 filter retrievals. J Vasc Interv Radiol 2011;22(6):806–812

61  Oliva VL, Perreault P, Giroux M-F, Bouchard L, Therasse E, Soulez G. Recovery G2 inferior vena cava filter: technical success and safety of retrieval. J Vasc Interv Radiol 2008;19(6):884–889

62  Kuo WT, Robertson SW. Bard Denali IVC filter fracture and embolization resulting in cardiac tamponade: a device failure analysis. Journal of vascular and interventional radiology. J Vasc Interv Radiol 2014; In press

63  Stavropoulos SW, Sing RF, Elmasri F, et al; DENALI Trial Investigators. The DENALI Trial: an interim analysis of a prospective, multicenter study of the Denali retrievable inferior vena cava filter. J Vasc Interv Radiol 2014;25(10):1497–1505, 1505.e1

64  Awh MH, Taylor FC, Lu CT. Spontaneous fracture of a Vena-Tech inferior vena caval filter. AJR Am J Roentgenol 1991;157(1):177–178

65  Ricco J-B, Dubreuil F, Reynaud P, et al. The LGM Vena-Tech caval filter: results of a multicenter study. Ann Vasc Surg 1995;9(Suppl):S89–S100

66  Murphy TP, Dorfman GS, Yedlicka JW,et al. LGM vena cava filter: objective evaluation of early results. J Vasc Interv Radiol 1991;2(1):107–115

67  Le Blanche AF, Benazzouz A, Reynaud P, et al. The VenaTech LP permanent caval filter: effectiveness and safety in the prevention of pulmonary embolism–a European multicenter study. Journal of vascular and interventional radiology. J Vasc Interv Radiol 2008;19(4):509–515

68  Taheri SA, Kulaylat MN, Johnson E, Hoover E. A complication of the Greenfield filter: fracture and distal migration of two struts—a case report. J Vasc Surg 1992;16(1):96–99

69  Carabasi RA III, Moritz MJ, Jarrell BE. Complications encountered with the use of the Greenfield filter. Am J Surg 1987;154(2):163–168

70  Wingerd M, Bernhard VM, Maddison F, Towne JB. Comparison of caval filters in the management of venous thromboembolism. Arch Surg 1978;113(11):1264–1271

71  Greenfield LJ, Michna BA. Twelve-year clinical experience with the Greenfield vena caval filter. Surgery 1988;104(4):706–712

72  Greenfield LJ, Proctor MC. Twenty-year clinical experience with the Greenfield filter. Cardiovasc Surg 1995;3(2):199–205

73  Greenfield LJ, Proctor MC. The percutaneous greenfield filter: outcomes and practice patterns. J Vasc Surg 2000;32(5):888–893

74  Cho KJ, Greenfield LJ, Proctor MC, et al. Evaluation of a new percutaneous stainless steel Greenfield filter. J Vasc Interv Radiol 1997;8(2):181–187

75  Greenfield LJ, Proctor MC, Cho KJ, et al. Extended evaluation of the titanium Greenfield vena caval filter. J Vasc Surg 1994;20(3):458–464, discussion 464–465

76  Wang W, Zhou D, Obuchowski N, Spain J, An T, Moon E. Fracture and migration of Celect inferior vena cava filters: a retrospective review of 741 consecutive implantations. J Vasc Interv Radiol 2013;24(11):1719–1722

77  Lyon SM, Riojas GE, Uberoi R, et al. Short- and long-term retrievability of the Celect vena cava filter: results from a multi-institutional registry. J Vasc Interv Radiol 2009;20(11):1441–1448

78  Roehm JO Jr, Johnsrude IS, Barth MH, Gianturco C. The bird's nest inferior vena cava filter: progress report. Radiology 1988;168(3):745–749

79  Ziegler JW, Dietrich GJ, Cohen SA, Sterling K, Duncan J, Samotowka M. PROOF trial: protection from pulmonary embolism with the OptEase filter. J Vasc Interv Radiol 2008;19(8):1165–1170

80  Oliva VL, Szatmari F, Giroux M-F, Flemming BK, Cohen SA, Soulez G. The Jonas study: evaluation of the retrievability of the Cordis OptEase inferior vena cava filter. J Vasc Interv Radiol 2005;16(11):1439–1445, quiz 1445

81  Rosenthal D, Swischuk JL, Cohen SA, Wellons ED. OptEase retrievable inferior vena cava filter: initial multicenter experience. Vascular 2005;13(5):286–289

82  Kalva SP, Wicky S, Waltman AC, Athanasoulis CA. TrapEase vena cava filter: experience in 751 patients. J Endovasc Ther 2006;13(3):365–372

83  Liu WC, Do YS, Choo SW, et al. The mid-term efficacy and safety of a permanent nitinol IVC filter(TrapEase). Korean J Radiol 2005;6(2):110–116

84  Rousseau H, Perreault P, Otal P, et al. The 6-F nitinol TrapEase inferior vena cava filter: results of a prospective multicenter trial. J Vasc Interv Radiol 2001;12(3):299–304

85  Kalva SP, Marentis TC, Yeddula K, Somarouthu B, Wicky S, Stecker MS. Long-term safety and effectiveness of the "OptEase" vena cava filter. Cardiovasc Intervent Radiol 2011;34(2):331–337

86  Usoh F, Hingorani A, Ascher E, et al. Prospective randomized study comparing the clinical outcomes between inferior vena cava Greenfield and TrapEase filters. J Vasc Surg 2010;52(2):394–399

87  Johnson MS, Nemcek AA Jr, Benenati JF, et al. The safety and effectiveness of the retrievable option inferior vena cava filter: a United States prospective multicenter clinical study. J Vasc Interv Radiol 2010;21(8):1173–1184

88  Smouse HB, Mendes R, Bosiers M, Van Ha TG, Crabtree T, Investigators R; RETRIEVE Investigators. The RETRIEVE trial: safety and effectiveness of the retrievable crux vena cava filter. J Vasc Interv Radiol 2013;24(5):609–621

Downloaded by: Johns Hopkins University. Copyrighted material.

# EXHIBIT 42

**ORIGINAL INVESTIGATION**

ONLINE FIRST

# Prevalence of Fracture and Fragment Embolization of Bard Retrievable Vena Cava Filters and Clinical Implications Including Cardiac Perforation and Tamponade

*William Nicholson, MD; W. Jay Nicholson, MD; Paul Tolerico, MD; Bradley Taylor, MD; Samuel Solomon, MD; Thomas Schryver, MD; Kevin McCullum, MD; Howard Goldberg, MD; James Mills, MD; Brian Schuler, MD; Larry Shears, MD; Lyle Siddoway, MD; Nikhilesh Agarwal, MD; Christopher Tuohy, MS, MPH*

**Background:** Vena cava filters represent an alternative treatment option for patients with contraindications to anticoagulation, or they might serve as adjunctive treatment for continued emboli despite anticoagulation. The fracture of a filter strut with subsequent end-organ embolization is a rarely reported but potentially life-threatening occurrence.

**Methods:** We sought to determine the prevalence of fracture and embolization of the Bard Recovery (first generation) and the Bard G2 (second generation) vena cava filters. A retrospective, single-center, cross-sectional study was conducted by evaluating all patients who received either a Bard Recovery or Bard G2 filter from April 2004 until January 2009. A total of 189 patients had undergone implantation: 1 pregnant woman and 35 patients who died were excluded from our study. In addition, 10 patients who had the filter removed were also excluded. Ultimately, 80 patients participated in the trial. Subjects underwent fluoroscopy to assess the filter's integrity. Embolized struts were localized by fluoroscopy. Echo-

cardiography and cardiac computed tomography were performed in patients with fragment embolization to the heart.

**Results:** Thirteen of 80 patients had at least 1 strut fracture (16%). At least 1 strut in 7 of the 28 Bard Recovery filters fractured and embolized (25%). In 5 of these 7 cases, patients had at least 1 fragment embolize to the heart (71%). Three patients experienced life-threatening symptoms of ventricular tachycardia and/or tamponade, including 1 patient who experienced sudden death at home. Six of 52 Bard G2 filters fractured (12%). In 2 of these 6 cases, the patients had asymptomatic end-organ fragment embolization.

**Conclusion:** The Bard Recovery and Bard G2 filters had high prevalences of fracture and embolization, with potentially life-threatening sequelae.

*Arch Intern Med. Published online August 9, 2010.*
doi:10.1001/archinternmed.2010.316

V ENOUS THROMBOEMBOLism occurs in more than 200 000 US citizens per year.[1] Anticoagulation is the standard therapy for these patients. Vena cava filters have been used as an alternative therapy for patients who have contraindications to anticoagulation or as adjunctive treatment in patients with continued emboli despite anticoagulation.

*See Invited Commentary
at end of article*

Widely recognized complications from filter placement have included erosion through the vena cava wall, visceral perforation, and filter thrombosis, obstruc-

tion, and migration. Fracturing of a filter strut with subsequent migration to the heart is a rarely reported occurrence.

The Bard Recovery filter (Bard Peripheral Vascular, Tempe, Arizona) was developed as a permanent but potentially retrievable filter and was commercially available from April 2003 until October 2005. The basic design of the filter's construction (**Figure 1**A) consists of 2 levels of 6 radially distributed nitinol arms and legs that anchor the filter into the inferior vena cava and serve to trap any embolizing clot.

A patient was seen at our institution more than 3 years after filter placement with pleuritic chest pain, cardiac tamponade, and perforation of the right ventricle as a result of filter fragmentation and embolization. The patient underwent emergency open-heart surgery for removal of

Author Affiliations: Departments of Cardiology (Drs W. Nicholson, W. J. Nicholson, Tolerico, Solomon, Schryver, McCullum, Mills, Schuler, and Siddoway), Cardiothoracic Surgery (Drs Taylor and Shears), Radiology (Dr Goldberg), and General Surgery (Dr Agarwal), York Hospital, York, Pennsylvania; and Penn State College of Medicine, Hershey, Pennsylvania (Mr Tuohy).

Downloaded from www.archinternmed.com on August 10, 2010
©2010 American Medical Association. All rights reserved.



Figure 1. Bard Recovery vena cava filter (Bard Peripheral Vascular, Tempe, Arizona) implanted in patient 2. A, Fluoroscopic image of the filter showing 3 of the 6 radial nitinol arms attached to the cava filter (arrows) and all 6 radial nitinol legs still attached to the cava filter (arrowheads). B, The 3 arms missing from the filter in panel A are clearly seen on fluoroscopy of the heart (arrows). C, Computed tomographic image showing an embolized filter fragment (arrow) that missed perforating the right coronary artery (RCA) by less than 1 cm.

## Table 1. Characteristics of the 80 Patients Who Underwent Bard Vena Cava Filter Implantation[a]

| Characteristic | Bard Filter Implanted | |
|---|---|---|
| | Recovery (n=28) | G2 (n=52) |
| Patient age, mean (SD), y | 56.2 (17.5) | 48.5 (17.7) |
| Men, No. (%) | 14 (50) | 28 (54) |
| Duration of implantation, mean (SD), mo | 50.2 (4.9) | 23.5 (8.3) |
| Implanting physicians, No. | 6 | 21 |
| Indications for implantation, No. (%)[b] | | |
| Unknown | 1 (4) | 17 (33) |
| Trauma | 7 (25) | 10 (19) |
| DVT/PE | 12 (43) | 5 (10) |
| Warfarin intolerance | 1 (4) | 4 (8) |
| Surgery prophylaxis | 6 (21) | 15 (29) |
| Malignant neoplasm prophylaxis | 1 (4) | 1 (2) |

Abbreviations: DVT, deep vein thrombosis; PE, pulmonary emboli.
[a] The receiving patient's age, duration of months from implantation until follow-up fluoroscopy, number of different implanting physicians and indications for implantation are reported for patients receiving the Recovery filter and the G2 filter. "Recovery" and "G2" are proprietary names of vena cava filters manufactured by Bard Peripheral Vascular, Tempe, Arizona.
[b] Percentages do not total 100% owing to rounding.

the fractured fragments and drainage of the pericardial effusion.

In September 2005, Bard modified the design of the Bard Recovery filter to improve fracture resistance by reducing stress concentration at the apex of the filter using longer arms with curved ends to reduce the load to the arms as they exit the apex. This new design was labeled and marketed as the Bard G2 cava filter, replacing the initial Bard Recovery filter. Over 65 000 Bard G2 filters have been implanted since September 2005.

Based on our institution's herald case and the limited case reports in the literature, we undertook a retrospective review of all patients at our institution who received the Bard Recovery filter or Bard G2 filter.

## METHODS

The institutional review board approved this study. Retrospective review of the procedure logs was used to identify all patients who received a Bard Recovery or Bard G2 filter from April 2004 until January 2009. We attempted to contact all nonpregnant living patients at their last known places of residence. Patients were asked to submit to fluoroscopy of the filter to assess its integrity. If a device had fragmented, all embolized nitinol arms or legs were localized on fluoroscopy, and their locations were recorded. Transthoracic echocardiography was performed in all patients who had fragment embolization to the heart. Selected patients with embolization to the heart also underwent cardiac computed tomography to further define the exact location of the fragments.

## RESULTS

A total of 189 patients underwent implantation of the Bard Recovery or Bard G2 vena cava filter at our institution between 2004 and 2009, usually as treatment for deep-vein thrombus or pulmonary embolus (**Table 1**). Because the Bard Recovery filter was first on the market and was later replaced by the Bard G2, the duration of time between filter implantation and fluoroscopy for the Bard G2 filter is shorter than that of the Bard Recovery filter.

Thirty-five of the 189 patients with Bard filters had died by the time of the study; 10 others had undergone routine scheduled prophylactic recovery of their filter; and 1 was pregnant and could not undergo fluoroscopy. Attempts were made to contact the remaining 143 patients by letter and telephone, and 84 patients were contacted, of whom 80 agreed to participate in the trial. After informed consent, all 80 patients underwent fluoroscopy of the device. The patient enrollment flowchart is shown in **Figure 2**. Thirteen of the 80 patients who underwent fluoroscopy were found to have at least 1 nitinol arm or leg fracture (16%). The average age for

Downloaded from www.archinternmed.com on August 10, 2010
©2010 American Medical Association. All rights reserved.

this group was 48.9 years, and the device was evaluated, on average, 37.8 months after implantation (**Table 2**).

The subset of patients who had received the Bard Recovery filter had a 25% prevalence of device fragmentation and embolization (7 of 28). All Bard Recovery filter fractured fragments embolized via the venous system from the inferior vena cava (IVC) to an end organ. Five of the 7 fractured devices had at least 1 fragment embolize and come to rest in the right ventricle of the heart (71%). Two of these patients experienced symptoms of pleuritic chest pain with documented nonsustained ventricular tachycardia. Three months after completion of this study, 1 of these 2 patients experienced sudden death at home. Included in this group is the patient who experienced hemorrhagic pericardial effusion with subsequent cardiac tamponade requiring emergency open-heart surgery with drainage and fragment removal. In total, 6 of 7 patients who experienced fracture of a Bard Recovery filter (86%) had a fragment either embolize and come to rest within the right ventricle of the heart or continue moving within the venous system through the heart and into the pulmonary arteries. The 7 fractured Bard Recovery filters found on follow-up had been implanted by 3 different physicians, including an interventional radiologist and 2 different general surgeons.

The Bard G2 filter had a lower, but still high, fracture prevalence (12%; 6 of 52). Two of these 6 patients had a fragment embolize cephalad to the IVC, with 1 fragment coming to rest in the hepatic vein and 1 in the lung. Four of the 6 Bard G2 fragmented filters had the fractured strut(s) remain local to the original device implantation location in the IVC (67%). Three different physicians implanted the 6 filters that fragmented, including a vascular surgeon, an interventional radiologist, and a general surgeon.



**Figure 2.** Patient enrollment flowchart. "Recovery" and "G2" are proprietary names of vena cava filters manufactured by Bard Peripheral Vascular, Tempe, Arizona.

strates a high prevalence of fracture of these devices. The Bard Recovery filter had an overall fracture prevalence of 25% (7 of 28). Six of these 7 patients had at least 1 fragment embolize to the heart or beyond to the lungs (86%) (Figure 1), and 3 of the 7 patients experienced life-threatening symptoms. While the Bard G2 filter incorporated engineering modifications to reduce these occurrences, 12% of the implanted Bard G2 filters also fractured (6 of 52). The modifications might have reduced the ability of the fragments to distally embolize—two-thirds of the fragments remained locally within the IVC near the original implantation site—but as demonstrated in patients 10 and 13, the potential for embolization out of the IVC to other vital organs still exists.

The observed prevalence of filter fracture was 25% with the Bard Recovery filter (7 of 28) and 12% in the Bard G2 filter (6 of 52). These data initially suggest that the fracture rate for the Bard G2 filter is approximately half that of the Bard Recovery filter. However, on further analysis, this conclusion may not be accurate. The average time between filter implantation and assessment of filter integrity for the Bard Recovery filter was 1498 days, or approximately 50 months. For the Bard G2 filter, the average time interval was 717 days, or approximately 24 months. The average time intervals in patients where fracture was observed in the Bard Recovery and Bard G2 groups were nearly identical to those of all patients in those respective groups.

Because nitinol metal fatigue may play a role in the filter fracture, it is reasonable to assume that the incidence of filter fracture would be directly proportional to the time that the filter is allowed to dwell in the patient after implantation. Lynch and Kekulawela[7] reported their experience in removing Bard G2 filters before and after 180 days following implantation. A total of 3.4% of the filters removed had fractured prior to removal, and all fractures were observed in patients who had the filter implanted for more than 180 days. Cantwell et al[8] reported a lower observed prevalence of fracture than we observed of the Bard Recovery and Bard G2 filters on removal of the devices, but 95% of the filters in that study were recovered within 15.5 months of implantation

<hr>

## COMMENT

Complications subsequent to the initial placement of vena cava filters are multiple, and some occur with significant frequency. It is reported that up to 5% of all filters migrate further than 1 cm, with almost all occurrences being asymptomatic.[2] Perforation or erosion of the filter through the vena cava at the site of implantation is more common[3] but is usually without clinical consequence. Fracture of a filter strut has been reported rarely in the literature but has resulted in life-threatening events.[4,5] In 2 of the cases we found in the literature, the fractured filter fragment embolized to the heart and perforated the right ventricle. In 1 case, the patient had chest pain, and in the second case, the patient had life-threatening cardiac tamponade. Both patients underwent successful emergency open-heart surgery for removal of the fractured filter fragment. The Bard Recovery filter was the implanted device implicated in both of these cases. Hull and Robertson[6] reported a third patient who had chest pain and nonsustained ventricular tachycardia necessitating removal of fragments from the heart and recovery of the remaining Bard Recovery filter from the vena cava.

Our retrospective review of patients receiving either the Bard Recovery filter or the Bard G2 filter demon-

Downloaded from www.archinternmed.com on August 10, 2010
©2010 American Medical Association. All rights reserved.

**Table 2. Characteristics of the 13 Patients Found on Fluoroscopy to Have Filter Fragmentation**

| Patient No./ Age, y | Bard Filter Device[a] | Indication for Implantation | Duration of Implantation, mo | Implanting Physician-No. | No. of Fractured Fragments; No. in Embolization Location | Symptoms |
|---|---|---|---|---|---|---|
| 1/78 | Recovery | Pulmonary emboli | 56 | IR-1 | 3 arms: 2 heart, 1 lung | Palpitations, VPCs and couplets, CP, SOB |
| 2/54 | Recovery | Surgery prophylaxis | 37 | GS-1 | 3 arms: 3 heart | CP, SOB, tamponade |
| 3/48 | Recovery | Surgery prophylaxis | 52 | GS-2 | 1 arm: 1 liver | None |
| 4/73 | Recovery | Surgery prophylaxis | 52 | GS-2 | 2 arms: 1 in each lung | SOB |
| 5/27 | Recovery | Malignant neoplasm prophylaxis | 51 | GS-2 | 3 arms: 2 heart, 1 lung | None |
| 6/26 | Recovery | Trauma | 52 | IR-2 | 3 arms and 1 leg: 2 heart, 1 lung, 1 local in IVC | CP, SOB, NSVT |
| 7/63 | Recovery | Surgery prophylaxis | 44 | GS-3 | 1 arm: 1 heart | CP, NSVT, sudden death |
| 8/21 | G2 | Trauma | 35 | VS-1 | 1 leg: 1 local in IVC | None |
| 9/37 | G2 | Surgery prophylaxis | 29 | GS-2 | 1 leg: 1 local in IVC | None |
| 10/75 | G2 | Pulmonary emboli | 29 | GS-2 | 1 arm: 1 liver | None |
| 11/49 | G2 | Unknown | 18 | IR-2 | 2 legs and 1 arm: all local in IVC | None |
| 12/30 | G2 | Trauma | 10 | GS-2 | 1 leg: 1 local in IVC | None |
| 13/55 | G2 | Surgery prophylaxis | 27 | GS-2 | 1 arm: 1 lung | None |

Abbreviations: CP, chest pain; GS, general surgeon; IR, interventional radiologist; IVC, inferior vena cava; NSVT, nonsustained ventricular tachycardia; SOB, shortness of breath; VPCs, ventricular premature contractions; VS, vascular surgeon.

[a]"Recovery" and "G2" are proprietary names of vena cava filters manufactured by Bard Peripheral Vascular, Tempe, Arizona.

(mean, 7.5 months). There was a high prevalence of fracture in this short period with the Bard Recovery filter (9%) but no fractures of the Bard G2 filter. Our follow-up periods of 50 months for the Bard Recovery Filter and 24 months for the Bard G2 filter were much longer. These devices are therefore experiencing prolonged exposure to repetitive movement and subsequent metal fatigue, potentially predisposing them to fail.

We would contend that the fracture prevalence seen by Cantwell et al[8] might have been significantly higher if the filter (which has a permanent implant indication) was allowed to remain in place for a longer period. If one were to extrapolate our observed prevalence of Bard G2 filter fractures to 50 months (essentially double the observed period), the prevalence of fracture would be identical to that observed for the Bard Recovery filter, thus challenging the hypothesis that the Bard G2 filter represents an improvement in fracture resistance.

Of the filters that went on to fracture in our study, 6 different physicians from 3 different disciplines had implanted the devices. While it is possible that our findings may represent a local phenomenon, it is difficult to assert that fracture and fragmentation is an operator-dependent event.

The results of this study point to a difficult clinical challenge to the treating physician advising patients with and without filter fragmentation. Many of the implanted devices are left in place, owing to potential long-term indications for pulmonary embolism prophylaxis. Although the recoverable nature of the filter allows for recovery at a later date, the low rate of recovery in our study is similar to that reported in other series.[9] As such, the ability to safely remove the device after it experiences local fibrosis into the vena cava may be compromised. It is encouraging that Hull and Robertson[6] reported 100% successful retrieval of the Bard Recovery filter without complications an average of 899 days after initial implantation in patients requesting Bard Recovery filter removal (12 of 12). In addition, Lynch and Kekulawela[7] reported a similarly large-volume experience with safe late removal (>180 days after implantation) of the Bard G2 filter.

The fact that fragment removal from the heart obviously requires open-heart surgery also poses a difficult clinical decision for a physician caring for a patient who has had embolization of fragments to the heart. While echocardiography is useful to determine if a pericardial effusion is present in these patients, absence of effusion at evaluation does not exclude the possibility of its later development or the occurrence of ventricular tachycardia.

Thirty-five of the 189 patients who underwent vena cava filter implantation at our center had died by the time of this study (19%). Indication for filter implantation obviously selects a patient population with a high mortality rate. Twenty-four of the 35 dead patients in our overall population (69%) died either during the hospital stay when the filter was implanted or within 6 months after the implantation.

Reported filter fractures and migration are rare, and it is not a well-known potential clinical complication. Therefore, the clinical suspicion of a filter fracture and migration being the cause of a patient's complaints or symptoms will be low. Patients with perforation of the right heart and tamponade may have shortness of breath, pleuritic chest discomfort, dizziness, and syncope. Death might also result. These are the same symptoms found in patients with pulmonary emboli. One could hypothesize that some patients who might subsequently be seen with presumed symptoms of recurrent pulmonary emboli may in fact have had filter fracture, migration, and perforation.

It is essential that patients and their treating physicians be educated about this previously underrecognized and potentially life-threatening complication of these devices. Armed with this knowledge, educated patients can be alert to the presence of pleuritic chest pain and other symptoms that should prompt immediate evaluation. Such early awareness and evaluation could certainly be life saving. In addition, the propensity for filter fragmentation may be directly related to the duration of implantation. Patients and their physicians

Downloaded from www.archinternmed.com on August 10, 2010
©2010 American Medical Association. All rights reserved.

should be educated about this fact so that they have the opportunity to consider having the filter removed.

It is important to recognize that our data represent only a single-center experience. However, 6 different physicians from 3 different specialties implanted the devices that went on to fracture. While our medical center is representative of most large tertiary care hospitals, it is important that our data be corroborated with independent evaluation of implanted devices from other centers. In addition, other brands of IVC filters must be evaluated to determine if our findings are specific to the Bard devices or are a flaw of all such filters.

In conclusion, the prevalence of fragmentation and embolization was found to be high in both the Bard Recovery (25%, 7 of 28) and the Bard G2 (12%, 6 of 52) vena cava filters. Dissemination of these results has a clear benefit for the medical community. Further implantation of these particular devices has been halted at our institution. Educating the medical community and patients on the possibility of device fragmentation and embolization will lead to future patient protection. The optimal approach to the treatment of patients who have already received one of these devices is unclear. Filter fragmentation and embolization might be due to metal fatigue, and therefore its incidence might be directly related to the time that it remains implanted. The decision whether to remove an implanted device will have to be tailored to each individual's particular clinical scenario. It is essential that other medical centers evaluate patients who have received a Bard retrievable filter or any other IVC filter, both for patient safety and to corroborate our single-center findings.

Accepted for Publication: May 26, 2010.

Published Online: August 9, 2010. doi:10.1001/archinternmed.2010.316

Correspondence: William Nicholson, MD, 25 Monument Rd, Ste 200, York, PA 17403 (wjnichmd2@aol.com).

Author Contributions: Dr W. Nicholson had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis. *Study concept and design:* W. Nicholson, Goldberg, and Schuler. *Acquisition of data:* W. Nicholson, W. J. Nicholson, Tolerico, Taylor, Solomon, Schryver, McCullum, Mills, Shears, Agarwal, and Tuohy. *Analysis and interpretation of data:* W. Nicholson, Solomon, McCullum, Siddoway, and Tuohy. *Drafting of the manuscript:* W. Nicholson, Schuler, and Shears. *Critical revision of the manuscript for important intellectual content:* W. Nicholson, W. J. Nicholson, Tolerico, Taylor, Solomon, Schryver, McCullum, Goldberg, Mills, Siddoway, Agarwal, and Tuohy. *Statistical analysis:* W. Nicholson and Tuohy. *Obtained funding:* W. Nicholson. *Administrative, technical, and material support:* W. Nicholson, Tolerico, Solomon, McCullum, Schuler, Shears, Siddoway, and Tuohy. *Study supervision:* W. Nicholson.

Financial Disclosure: None reported.

Additional Contributions: We acknowledge the efforts of the research coordinators at the York Hospital Heart Center: Barbara DelioCox, RN, Kathy Hutcheson, RN, Elayne Grim, Kathaleen Patierno, RN, and Linda Gerberick, RN, for their diligent efforts in coordinating this study.

### REFERENCES

1. Silverstein MD, Heit JA, Mohr DN, Petterson TM, O'Fallon WM, Melton LJ III. Trends in the incidence of deep vein thrombosis and pulmonary embolism: a 25-year population-based study. *Arch Intern Med.* 1998;158(6):585-593.
2. Ferris EJ, McCowan TC, Carver DK, McFarland DR. Percutaneous inferior vena caval filters: follow-up of seven designs in 320 patients. *Radiology.* 1993;188 (3):851-856.
3. Poletti PA, Becker CD, Prina L, et al. Long-term results of the Simon nitinol inferior vena cava filter. *Eur Radiol.* 1998;8(2):289-294.
4. Kumar SP, Mahtabifard A, Young JN. Fractured inferior vena cava filter strut presenting as a penetrating foreign body in the right ventricle: report of a case. *J Card Surg.* 2008;23(4):378-381.
5. Saeed I, Garcia M, McNicholas K. Right ventricular migration of a recovery IVC filter's fractured wire with subsequent pericardial tamponade. *Cardiovasc Intervent Radiol.* 2006;29(4):685-686.
6. Hull JE, Robertson SW. Bard Recovery filter: evaluation and management of vena cava limb perforation, fracture, and migration. *J Vasc Interv Radiol.* 2009;20(1):52-60.
7. Lynch FC, Kekulawela S. Removal of the G2 filter: differences between implantation times greater and less than 180 days. *J Vasc Interv Radiol.* 2009;20(9):1200-1209.
8. Cantwell CP, Pennypacker J, Singh H, Scorza LB, Waybill PN, Lynch FC. Comparison of the recovery and G2 filter as retrievable inferior vena cava filters. *J Vasc Interv Radiol.* 2009;20(9):1193-1199.
9. Grande WJ, Trerotola SO, Reilly PM, et al. Experience with the recovery filter as a retrievable inferior vena cava filter. *J Vasc Interv Radiol.* 2005;16(9):1189-1193.

---

### INVITED COMMENTARY

HEALTH CARE REFORM

# Medical Devices and the FDA Approval Process

*Balancing Safety and Innovation*

The use of medical devices has greatly increased during the past decade. Indeed, more than 8000 new medical devices are marketed in the United States annually.[1] The US Food and Drug Administration (FDA) is responsible for assuring the safety and effectiveness of devices prior to and following approval for use in the United States. The FDA classifies medical devices according to risk of causing harm. Class I and II devices are considered to be low risk and approval may be accomplished through a relatively simple "premarket notification" or 510(k) clearance, which does not require clinical data. Class III devices are those consid-

Downloaded from www.archinternmed.com on August 10, 2010
©2010 American Medical Association. All rights reserved.

ered high risk; Class III devices generally require a premarket approval (PMA) process that includes clinical data showing safety and effectiveness. When Congress established device classes in 1976, its intent was that all Class III devices eventually would be required to undergo premarket review through the more stringent PMA process.[2(p17)]

Recently, the process for device approval has come under scrutiny owing to the poor quality of evidence supporting the PMAs on which devices have been approved and owing to the large percentage of high-risk devices that bypass PMAs altogether and are approved through 510(k) clearances.[3,4] In particular, despite the surprisingly weak PMA data, a 2009 Government Accountability Office study discovered that the *FDA did not deny approval of a single PMA submission* between 2003 and 2007.[2] Moreover, even though the FDA claims that "most Class III devices require Premarket Approval," nearly 60% of the Class III devices approved during this period failed to undergo the PMA process at all and instead received 510(k) clearances which do not require clinical data.[4] These statistics alone strongly suggest that the FDA's device approval process needs urgent improvements.

In making approval decisions the FDA must protect the public safety without stifling innovation through unnecessary delays in approval. The Critical Path Initiative[5] was launched in 2004 with the goal of shortening the time to approval for new drugs and devices by "developing better evaluation tools like biomarkers and new assays and streamlining clinical trials by modernizing the clinical trial sciences to make trials safe and efficient." The FDA Center for Devices and Radiologic Health has established a Council on Medical Device Innovation. A recent public workshop[6] (June 2010) brought together industry representatives, physicians, and patients and other members of the public in an effort designed, according to the Center Director, Jeffrey Shuren, to "get better devices to patients faster."

Faster approval, however, increases the need for high-quality, reliable data showing safety and effectiveness to support approval. In addition, the collection of *postapproval* data becomes more crucial. This need for long-term follow-up is especially important for high-risk cardiovascular devices, which generally are permanently implanted in patients. However, the longest follow-up for high-risk cardiovascular devices approved via the more stringent PMA process was only a median of 365 days for intracardiac devices and endovascular grafts.[3]

In their study, Nicholson and colleagues report a serious and possibly fatal complication of the popular and widely used Bard inferior vena cava (IVC) filters (Bard Peripheral Vascular, Tempe, Arizona). Three years after receiving an IVC filter, one of the authors' patients presented with pleuritic chest pain and cardiac tamponade as a result of filter fragmentation and embolization of the device. The group thereafter contacted all of their patients who had received Bard Recovery and Bard G2 filters to further investigate the longer-term effects. They found that the filters had fractured in an astounding 25% of patients implanted with the Bard Recovery filter (ap-

proved in 2002). For patients implanted with the newer Bard G2 filter (approved in 2005), they found fracturing in 12% of patients. They theorize that the lower rate for the newer filter is due to the shorter indwelling time and predict G2 filter fractures will rise over time. Extrapolating this data for the 65 000 G2 filters that have been implanted suggests that more than 7000 Americans may now be carrying a fractured G2 filter, with the potential to embolize to the IVC and beyond. Moreover, although the devices were approved as retrievable, the data suggest removal is not simple: less than 7% of devices were removed according to the article by Nicholson and colleagues. The safety of removal of the device after long-term use is not well established.

Remarkably, these filters, which are placed inside the IVC, were considered Class II by the FDA—the same risk category of mercury thermometers—and received approval without any clinical data of safety and effectiveness identified in their 510(k) clearances. The only performance data listed in the Bard Recovery Summary (K022236)[7] describes bench testing performed per the FDA document "Guidance for Cardiovascular Intravascular Filter 510(k) Submission." Testing showed that the Recovery filter is substantially equivalent to the Bard predicate device. The Bard Recovery Filter was submitted as a "Special 510K" pursuant to which a manufacturer may "declare conformance to design controls without providing the data." In that case, the manufacturer need only submit a "Declaration of Conformity" with design control requirements. For the Bard Recovery Filter, the only clinical data provided were to support the safety of removing the device and thus a retrievable filter was approved in a subsequent 510(k).[8] Similarly, the G2 filter Summary (K050558)[9] has no clinical data, only a list of similarities to the Bard Recovery filter.

The report by Nicholson et al is a case study showing why the FDA device approval process must be more clearly defined. First, high-risk devices must go through the appropriate approval process adequately supported by reliable data. Manufacturers should not be routinely permitted to circumvent the PMA process for high-risk devices by means of 510(k) clearances. Second, PMAs must be supported by high-quality clinical data showing safety and effectiveness prior to approval of high-risk devices, including such products as valve rings, vascular filters, and other devices that are permanently implanted and can have serious adverse events, including death, after placement.

Fortunately, the FDA appears to be taking action. Among other things, the FDA has asked the Institute of Medicine to review the use of the 510(k) clearance, and a report with their recommendations is expected in spring 2011. In addition, in light of the fact that short-term studies often will miss less common problems, the process for developing and reviewing postmarket data must be significantly strengthened. Currently, required follow-up studies are often not completed, the follow-up data are not publicly available, and even if they are completed, the FDA rarely acts on the findings.

The FDA also has announced a new transparency initiative.[10] Hopefully, this transparency will include requiring that clinical data submitted to the FDA, both in

Downloaded from www.archinternmed.com on August 10, 2010
©2010 American Medical Association. All rights reserved.

the application process and postapproval, be publicly available. The FDA also must have authority and the will to withdraw device approvals if postmarketing data requirements are not met or if the postmarketing data show safety or effectiveness problems. Mechanisms for collecting postmarketing data must be made user friendly and publicly accessible. Registries such as the National Cardiovascular Data Registry and others are an important step in that direction. Currently, only 5% to 10% of all adverse events are actually reported. We have had many recent reminders that even those adverse events that are reported are not readily publicly available or turned over to the FDA in a timely fashion. The FDA recently sent another 12-page warning letter to Pfizer about delays in reporting adverse events dating back 6 years. The recent Avandia firestorm highlighted the importance of transparency of data. The problem is even more pressing and urgent for devices as seen in high-profile device recalls (Fidelis) as well as the recent Boston Scientific alert of serious problems with some of their implantable cardioverter-defibrillators.[11]

While we all appreciate the potential advantages of medical devices, prudent policy requires high-quality clinical data showing that the benefits outweigh the risks, before and after FDA approval. Holding manufacturers to these standards will enhance, not hinder, innovation and advancement of the science of medical devices.

*Rita F. Redberg, MD, MSc*
*Editor*

**Published Online:** August 9, 2010. doi:10.1001/archinternmed.2010.323

**Author Affiliation:** Department of Medicine, University of California, San Francisco.
**Correspondence:** Dr Redberg, Department of Medicine, University of California, San Francisco, 505 Parnassus, M-1180, San Francisco, CA 94143-0124 (redberg@medicine.ucsf.edu).

**Additional Contributions:** I wish to thank Lucy Liu, BS, who assisted in the research for this article.

1. Feigal DW, Gardner SN, McClellan M. Ensuring safe and effective medical devices. *N Engl J Med.* 2003;348(3):191-192.
2. US Government Accountability Office. FDA Should Take Steps to Ensure that High-risk Device Types are Approved Through the Most Stringent Premarket Review Process. GAO-09-190. January 2009. http://gao.gov/new.items/d09190.pdf. Accessed July 26, 2010.
3. Dhruva SS, Bero LA, Redberg RF. Strength of study evidence examined by the FDA in premarket approval of cardiovascular devices. *JAMA.* 2009;302(24):2679-2685.
4. Garber AM. Modernizing device regulation. *N Engl J Med.* 2010;362(13):1161-1163.
5. Critical Path Initiative. http://www.fda.gov/ScienceResearch/SpecialTopics/CriticalPathInitiative/default.htm. Accessed July 26, 2010.
6. Public Workshop: Identifying Unmet Public Health Needs and Facilitating Innovation in Medical Device Development. June 24, 2010. http://www.fda.gov/MedicalDevices/NewsEvents/WorkshopsConferences/ucm212831.htm#agenda. Accessed July 26, 2010.
7. Recovery Filter System. 510(k) Summary of Safety and Effectiveness Information. http://www.accessdata.fda.gov/cdrh_docs/pdf2/K022236.pdf. Accessed July 29, 2010.
8. Recovery Filter System. Abbreviated 510(k). http://www.accessdata.fda.gov/cdrh_docs/pdf3/K031328.pdf. Accessed July 29, 2010.
9. G2 Filter With Femoral Delivery. Traditional 510(k). Summary of Safety and Effectiveness. http://www.accessdata.fda.gov/cdrh_docs/pdf5/K050558.pdf. Accessed July 29, 2010.
10. Asamoah AK, Sharfstein JM. Transparency at the Food and Drug Administration. *N Engl J Med.* 2010;362(25):2341-2343 Published online May 19, 2010.
11. Boston Sci confirms problems in 3 ICD models. http://www.reuters.com/assets/print?aid=USN2222410920100722. Accessed July 26, 2010.

Downloaded from www.archinternmed.com on August 10, 2010
©2010 American Medical Association. All rights reserved.

# EXHIBIT 43

# Bard Recovery Filter: Evaluation and Management of Vena Cava Limb Perforation, Fracture, and Migration

Jeffrey E. Hull, MD, and Scott W. Robertson, PhD

PURPOSE: To report on the evaluation and management of Bard Recovery filter limb perforation, fracture, and migration.

MATERIALS AND METHODS: In 2007, all patients who received a Bard Recovery filter at a single institution were contacted for consultation and evaluation by noncontrast computed tomography. Rates of limb perforation, fracture, and migration were evaluated on early (<180 days) and final images. Retrieval success and complications were evaluated.

RESULTS: Fourteen of 16 patients with Bard Recovery filters were evaluated. The early images in nine patients (mean, 30 days; range, 0–126 d ± 40) demonstrated arm perforations in 56% ($n = 5$), leg perforation in 11% ($n = 1$), and no early fractures or migrations. Final images (mean, 899 days; range, 119–1,218 d ± 320) demonstrated filter arm perforations in all 14 patients. Leg perforations were seen in 36% of patients ($n = 5$), and there were a total of four fractures with migration in 21% of patients ($n = 3$). All fractures occurred in arms that had perforated the vena cava on early images. Two patients had already had their filters retrieved at 119 and 302 days, respectively; the remaining 12 patients elected to have their filters retrieved after evaluation. All 12 filters were retrieved at a mean of 1,021 days (range, 119–1,242 d ± 134). Leg hook fractures occurred during eight of 12 filter retrieval procedures (67%).

CONCLUSIONS: Recovery filter limb perforation of the vena cava increases over time and is associated with a 21% incidence of filter arm fracture and migration. Follow-up imaging is recommended. Filter retrieval has a high success rate and is the authors' preferred management strategy.

J Vasc Interv Radiol 2009; 20:52–60

Abbreviation: IVC = inferior vena cava

THE Recovery filter (Bard Peripheral Vascular, Tempe, Arizona) was developed as a permanent and retrievable filter and was commercially available from April 2003 to October 2005. Reports on the early experience with the Recovery filter noted problems with

From the Vascular Center (J.E.H.), Chippenham and Johnston Willis Medical Center, 7101 Jahnke Road, Richmond, VA 23225; and Nitinol Devices and Components (S.W.R.), Fremont, California. Received February 17, 2008; final revision received and accepted September 29, 2008. Address correspondence to J.E.H.; E-mail: hull.jeffrey@hcahealthcare.com

Neither of the authors has identified a conflict of interest.

© SIR, 2009

DOI: 10.1016/j.jvir.2008.09.032

arm fracture and migration (1). In 2005 the G2 filter (Bard Peripheral Vascular) replaced the Recovery filter. The new G2 filter was modified to reduce filter tilt, fracture, and migration (2). Despite the initial concerns, there is little information published in the literature on long-term outcomes with the Recovery filter.

A patient presented to our institution with symptomatic filter arm fracture and migration 2 years after placement of a Recovery filter. This patient was having chest pain and nonsustained ventricular tachycardia. The filter fragments were removed from the heart and the remaining filter was removed from the vena cava (3). A separate case report (4) describes a patient with Recovery filter arm migration to

the right ventricle resulting in right ventricle perforation and cardiac tamponade. As a result, we reviewed the records and available images in patients treated with the original Recovery filter to evaluate the incidence of inferior vena cava (IVC) arm perforation, arm fracture, and migration. All known patients were subsequently contacted for consultation and further evaluation with noncontrast computed tomography (CT). This report details the imaging findings and the resulting patient management.

## MATERIALS AND METHODS

The institutional review board approved this study. Retrospective review of procedure logs, picture archiving and

| Indications for Filter Placement (N = 16) | |
| --- | --- |
| Indication | Incidence (%) |
| Anticoagulation contraindication | 4 (25) |
| Anticoagulation complication | 1 (6) |
| Prophylaxis | 4 (25) |
| Prophylaxis with anticoagulation | 7 (44) |
| Device failure | 0 (0) |
| Associated with procedure | 0 (0) |
| Placed with Intended removal | 15 (94) |

communication system images, and purchasing and billing records was performed to identify patients treated with the Recovery filter. These records revealed 16 patients with the Recovery filter. Fifteen filters were placed with intention for retrieval; one filter was placed as a permanent filter. The mean age of patients was 45 years ± 11 (SD; range, 26–68 y). Seven filters (44%) were placed in male patients and nine (56%) were placed in female patients. Indications for filter placement are listed in the Table. All available images were reviewed for filter limb perforation, fracture, and migration. The number of limbs perforating the vena cava, fractured, or migrated was recorded for each examination. Subsequently, all patients were contacted by telephone and scheduled for consultation and follow-up abdominal CT. The number of final limb perforations, fractures, and migrations were obtained from follow-up CT or IVC images before filter removal. The patients' medical records were reviewed for age, sex, indication for filter placement, and symptoms related to filter fracture or migration. At follow-up consultation, the patient's current need for an IVC filter was assessed. They were advised that the Recovery filter was designed for removal, that their filter was placed with the intention of retrieval, and that the Recovery filter had been found to have arm fracture and migration in as many as 10%–20% of patients with arm perforation. Patients were then notified if they had arm perforation, fracture, or migration. In patients with filter fracture, removal was recommended. Patients with arm perforation were given the option of filter removal or regular imaging follow-up. Filter retrievals were performed in the angiography suite from the jugular approach with use of the Recovery Cone catheter (Bard Pe-

ripheral Vascular). All filters retrieved were examined with a dissecting microscope (magnification ×50) to evaluate the location of fracture. If present, fracture surfaces were evaluated at high magnification with a scanning electron microscope to determine the fracture mechanism.

### Definitions

*IVC limb perforation.*—A filter limb was considered to have perforated the IVC when the inferior tip of a limb was clearly outside the circumference of the vena cava on abdominal CT or an inferior vena cavogram (Fig 1).

*Indication for filter placement.*—The six indications for filter placement described by the Vena Caval Filter Consensus Committee (5) are listed in the Table.

*Early images.*—Early images are abdominal CT scans or inferior cavograms of the filter obtained less than 180 days after filter placement.

*Final images.*—Final images are abdominal CT scans or inferior cavograms obtained at the time of follow-up consultation or filter removal.

*Spontaneous filter retrieval.*—Filters removed from patients without concern for perforation, fracture, or migration were considered to have been removed spontaneously.

*Complications.*—Complications included pulmonary embolus, deep vein thrombosis, whole filter migration, limb perforation of IVC, limb fracture and migration, IVC thrombosis, filter tilting, IVC perforation after removal, and incomplete retrieval of the filter.

*Extreme filter tilting.*—Filter tilting to such an extent that the cap of the filter was in contact with the wall of the IVC was considered to constitute extreme filter tilting.

*Distal attachment hook fracture.*—Distal attachment hook fracture is sim-

ply fracture of the distal leg hook from the filter during filter retrieval.

### Data Collection and Analysis

Data were collected as described, and quantitative analysis comparing the number of patients with perforation, fracture, and migration was performed, along with the total numbers of each. Whole filter migration, filter tilting, and IVC thrombosis rates were obtained from final images. A best estimate of time to fracture was obtained by evaluation of images between filter placement and fracture identification. Images reviewed were those available on our picture archiving and communications system. Rates of spontaneous filter retrieval and retrieval for arm perforation or fracture were calculated. Success rate, complications, fluoroscopy time, and contrast agent use during retrieval were obtained from reports. History of previous and ongoing thromboembolic disease was determined from follow-up consultation (ie, history and physical examination), available medical records on the hospital information system, and available imaging. Statistical comparisons of arm and leg perforation and fracture rates between early and final imaging was performed with use of a paired Student t test.

### RESULTS

On initial review, nine of 16 patients had early images (range, 0–126 days ± 40; mean, 30 d), including one patient presenting with arm fracture and migration to the right ventricle. All these patients had CT examinations of the abdomen. All filters appeared to be centered within the IVC without filter tilting. The early images demonstrated arm perforations in 56% of patients (n = 5), leg perforation in 11% (n = 1), and no early fractures or migrations. There were 12 arm perforations in five patients and one leg perforation in one patient.

At time of initial review, four patients had final images. Two patients had spontaneous removal of intact filters at 119 and 302 days, respectively, and their final images were IVC images before filter removal. Two other patients had recent abdominal CT examinations demonstrating filter arm fracture with migration and under-

Case 2:15-md-02641-DGC   Document 7809-2   Filed 09/27/17   Page 42 of 148

January 2009  JVIR



**Figure 1.**   Appearance of perforated arms on CT and inferior vena cavogram. The Recovery filter has six arms and six legs. **(a)** Intact top of the filter with six arms. On images **(b)**, note that all the arms are outside the IVC. Several of the arms are completely surrounded by fat. The arm at 7 o'clock (white arrow) appears to be in a small vein. The six legs are in the center of IVC and none of the legs have perforated the IVC. **(c)** On an image taken caudal to b, the tips of only four arms are noted. Arms at 5 and 7 o'clock are adjacent to but outside the IVC (note acute angle between arm and IVC wall), and these were counted as perforations. **(d)** Anteroposterior view of the IVC shows the arms on either side to be well outside the IVC.

went filter retrieval. Therefore, in our initial review, we found a 22% prevalence ($n = 2$) of filter arm fracture and migration.

## Follow-up Examination

Two of 16 patients were completely lost to follow-up. Two patients had undergone spontaneous filter removal. Twelve patients were seen in consultation, and all 12 requested filter retrieval. Two patients had symptoms related to filter fracture and migration. No patients had a history of pulmonary embolus. One patient had recurrent deep vein thrombosis.

Final images (range, 119–1,218 days; mean, 899 d ± 320) were available in 88% of patients (14 of 16). Of these patients, filter arm perforation was found in all 14, leg perforation in five (36%), and fracture with migration in three (21%). A total of 61 arm perforations, 10 leg perforations, four arm fractures, and four migrations were noted. Final images were abdominal CT in 12 patients and inferior vena cavograms in two. Filter arms migrated into the right ventricle, into the right upper-lobe pulmonary artery, among the legs of the filter, and into the retroperitoneum. There were no whole-filter migrations or tilted filters. One patient had evidence of IVC thrombosis and recanalization (Fig 2). No acute thrombus was noted in the IVC.

All filters were successfully retrieved without significant complications. Procedure time ranged from 9 to 24 minutes (mean, 14 min ± 5). Fluoroscopy time ranged from 2 to 7.5 minutes (mean, 4.0 min ± 1.7) and contrast agent dose ranged from 20 to 80 mL (mean, 30 mL ± 21). Half the migrated arms ($n = 2$) were retrieved, one from the right ventricle and one from the IVC. Two migrated filter arms were not retrieved; one was left in the right upper-lobe pulmonary artery where it had been for 18 months and one was left in the retroperitoneum. One filter was retrieved via the external jugular vein because of right internal jugular vein thrombosis. One filter was retrieved from a vena cava deformed at the filter site from earlier occlusion. There was no significant extravasation of contrast medium seen on angiograms obtained after filter retrieval. Examination of the extracted filters



**Figure 2.** Narrowed and irregular IVC is seen below the Recovery filter. There is a prominent collateral vessel to the left.

demonstrated 11 distal attachment hook fractures in eight of the 12 extracted filters.

Statistical comparison of early and final images with a paired Student $t$ test demonstrated significant increases in arm perforation rate over time, and a tendency—but not a statistically significant one—toward increased leg perforation and arm fractures. Early imaging (range, 0–126 days; mean, 30 d ± 40) showed average per-patient rates of arm perforation of 1.33 (12 arms in nine patients), leg perforation of 0.11 (one in nine patients), and arm fracture with migration of zero. Final imaging (range, 119–1,218 days; mean, 899 d ± 319) in 14 patients demonstrated higher average per-person rates of arm perforation of 4.36 (61 in 14 patients; $P = .002$), leg perforation of 0.71 (10 in 14 patients; $P = .10$), and arm fracture with migration of 0.29 (four in 14 patients; $P = .20$).

Microscopic evaluation of all four arm fractures revealed fracture just below the filter cap. Furthermore, eight of the 12 retrieved filters (66%) contained fractures through the device leg's distal attachment hooks (11 total fractures). Examination of the fracture surfaces by scanning electron microscopy revealed classical signs of high-cycle metal fatigue in the fractured arms, whereas the hook fractures exhibited ductile overload fracture features with a possible low-cycle (ie, high-stress) fatigue component (6). Representative arm and hook fracture surfaces are presented in **Figures 3**b and **c**, respectively.

There was no apparent trend in the initiation site of the fatigue-fractured arms. Indeed, two fractures initiated at the outer part of the nitinol wire arm whereas the other two initiated toward the medial position of the device. However, the mechanism of fatigue fracture was evident in each fractured arm and suggested a slow fracture process resulting from the cumulative effect of cyclic deformations



a.



b.



c.

**Figure 3.** (a) Filter arm fracture site just below filter cap (arrow) viewed through a dissecting microscope. Scanning electron micrographs of representative arm fracture (b) and hook fracture (c) surfaces. Arm fractures were characterized by high-cycle fatigue fracture with initiation at the surface of each wire (arrow), propagation of the fatigue crack through approximately 25% of the arm wall thickness, and final ductile overload failure. Hook fractures were characterized by ductile bending overload failure with possible initiation from low-cycle bending fatigue most likely attributed to the retrieval operation. (Available in color online at www.jvir.org.)

witnessed by the device in vivo (ie, breathing). Conversely, all hook fractures were similar. They exhibited pure overload bending fractures that initiated on the concave surface of the hook. In addition, the fracture initiation sites were surrounded by rough (ie, high-energy) low-cycle fatigue features, and contained little to no tissue on the surface. It is therefore most likely that the hook fractures occurred during device the removal procedure, as the long indwell time likely promoted endothelialization of the hooks, thereby requiring significant forces to extract the devices.

## DISCUSSION

Our initial review of picture archiving and communication system images of patients treated with a Recovery filter demonstrated three arm fractures and migrations in two of nine patients with images. We believed this exceeded the previously noted fracture rate of 2%–10% outlined in the Society of Interventional Radiology consensus statement on IVC filters (7), and thus felt compelled to review our records and contact patients in whom we had placed a Recovery filter.

All the Recovery filters inserted at our institution were placed with the intention of retrieval; one patient from an outside institution had a filter placed as a permanent filter (**Table**). The Recovery filter was placed in a small, highly selected group of patients for whom the referring physician specifically requested a removable filter. Despite this strong bias in favor of retrieval, we found that only 13% of our patients ($n = 2$) had returned for filter removal. This low rate of retrieval is similar to the 13% reported by Grande et al (8) in 105 patients who had filters placed with the intention of retrieval. However, we found our patient population was receptive to returning for follow-up consultation and examination of their filters. All counseled patients elected to have their filter removed in part because there was a preexisting expectation that the filter would be removed and in part because they were informed that there was a potential for fracture and migration.

According to the Society of Interventional Radiology quality improvement guidelines (7), vena cava perforation is a trackable event with reported rates as high as 40%. In the current study, the incidence of Recovery filter arm perforation progressed from 56% of patients on early images (mean, 30 days ± 40) to 100% of patients on final images (mean, 899 days ± 320). In the same interval, fractures progressed from an incidence of

Case 2:15-md-02641-DGC   Document 7809-2   Filed 09/27/17   Page 45 of 148

zero to 21% (four arms in three of 14 patients).

One published report (1) showed 28% of patients (11 of 40) with arm perforation at 80 days. Conversely, Binkert et al (9) reported only two limb perforations and no fractures in 13 patients at an average of 254 days. However, these authors described arms of the filter extending outside the wall of the IVC in 12 of 13 patients (92%) on inferior vena cavograms at the time of removal. The authors described this finding as "tenting the vena cava" (9). In our experience, arms extending outside the IVC wall on venograms had clearly perforated the IVC on CT images when both studies were available (Fig 1). Therefore, we considered arm extension beyond the IVC wall a perforation. Our study further finds a significant increase in the rate of arm perforation from early to final images.

In the present study, all fractures occurred in arms that had previously shown perforation of the IVC. Three of our 14 patients (21%) exhibited device fracture and migration. The association of fracture with previous arm perforations has been noted in a case report and an earlier study (1,3). Kalva et al (1) described 11 arm perforations with three fractures. Fractures have been reported to occur in as many as 7.5% of patients in previous studies (1,8,9), which evaluated filters at 80–254 days. The average estimated time to fracture in our study was 668 days. The current study finding of a 21% fracture prevalence may be related to longer follow-up interval.

All fractured arms migrated. Two migrations were local: one migrated into the adjacent retroperitoneum and one moved into the legs of the filter. These local migrations were thought to be asymptomatic. Two of our patients were symptomatic; one had persistent symptoms of chest pain and nonsustained ventricular tachycardia to the extent that we were obliged to uncover the underlying source. The other patient had transitory symptoms after right pulmonary artery migration. This patient came to the hospital with atypical chest pain; the patient was evaluated and discharged after negative findings on a workup that included chest radiography (Fig 4). The migrated filter arm was discov-



**Figure 4.** Chest radiograph obtained in a patient with a Recovery filter who was seen in the emergency room for atypical chest pain.

ered 18 months later after we contacted the patient for follow-up.

The fractures were seen to have occurred just below the filter cap on CT images as well as on microscopic examination (Fig 3a). Scanning electron microscopy of the fractured arm surfaces demonstrated changes characteristic of bending fatigue fractures (Fig 3b). Arm fractures are apparent on abdominal CT studies (Fig 5), but the migrated fragments were more difficult to detect. The conspicuity of migrated arms on plain radiographs was poor, and migrated arms were difficult to find even when an arm was known to be absent from its proper location on the filter. In one case, an arm that migrated to the right upper lobe was repeatedly missed on plain radiography and CT of the chest. The difficulty in identifying the fragment on plain radiographs most likely arose from the fact that there were surgical clips nearby (Figs 4,6). On CT, the arm was difficult to see on axial noncontrast images. Contrast-enhanced images obscured the arm on most stan-

dard window and level settings (Fig 6). Assuming that our data do not represent a statistical aberration, we suggest there are many other patients with Recovery filters with arm fractures and migrations in whom it is conceivable that these migrated fragments have gone undetected.

The purpose of the retrievable filter is to reduce risk to the patient. The retrievable filter concept is built on the idea that a long-term venous foreign body is undesirable, as is demonstrated in the often-cited article by Decousus et al (10). In addition, the Recovery filter is associated with a high rate of IVC arm perforation and structural weakness, as initially reported by Kavla et al (1) in a multicenter study. The current study is in agreement with the findings of Kavla et al (1) that arm perforation and structural weakness leads to fracture. In addition, we have shown high incidences and statistically significant progression of filter arm IVC perforation rates between early and final images, suggesting that fracture rates may progress as well. A

January 2009  JVIR




a.                                       b.

**Figure 5.** Abdominal CT findings of fracture. **(a)** At the top of the filter, the cap is in the center of the IVC. Only five arms are present (compare with Fig 1a). The arm at nine o'clock is absent. **(b)** The most caudal image demonstrates the tips of the remaining arms: three arms have perforated the IVC, extending beyond the IVC wall. Arms at 3 and 6 o'clock were not counted as perforations because of a lack of a clear acute angle of tissue between the arm and the IVC wall.

significant increase in fracture rates was not demonstrated in the present small series, but an arm fracture and migration rate of 21% was found. Serious clinical events associated with filter fracture and migration have been reported rarely (3,4). The overall risk of leaving the Recovery filter in place is defined by the risk of increased thromboembolic disease inherent in all filters and the risk that the high rate of arm perforation will lead to increasing numbers of fractures, migrations, and clinical events. Fortunately, the retrieval side of this analysis is better defined.

The current report demonstrated a 100% success rate for late filter retrieval at a mean of 1,014 days ± 137. Similarly high success rates of 82%–100% for retrieval of the Recovery filter have been reported in small series of 13–24 patients (1,8,9,11,12). The range of average indwell times for these series was 33–254 days. In the series with the longest reported dwell time of 254 days in 13 patients (9), 100% of retrievals were successful. In all reports, retrievals were performed without major complication. Failed re-

trievals were related to residual thrombus or tilted filters (1,8,12). It appears the indwell time before retrieval of the Recovery filter is indefinite. The relative ease, high success rate, and low complication rate of retrieving the Recovery filter makes the decision for removal less complicated.

Based on the clinically successful filter retrieval in the limited patient population of the present study, there appears to be justification for late-stage removal of these devices. The most clinically significant reason is the potential risk of migration of a fractured arm into the heart or lungs, which could result in a negative clinical sequela; or that leaving the devices implanted exposes them to additional deformation cycles, thereby increasing the risk of arm fatigue fracture. In addition, fracture of the device exposes fresh (ie, nonpassivated) metal to the blood stream, which could result in an inflammatory response in patients with nickel allergies, and/or corrosion of the device itself. However, retrieval is not without its risks. Indeed, removal of the Recovery filter resulted in leg hook fracture in 66% of patients (eight of 12). Although it

is most likely that the fractured leg hook remnants stay contained within the IVC walls, there is the possibility of migration of these small (approximately 1 mm long) fragments through the circulatory system, which poses a potential risk of embolization.

The patients with the Recovery filter did not have clinical evidence of recurrent pulmonary embolus. One patient had problems with bilateral leg swelling and recurrent deep vein thrombosis. This patient was found to have a narrowing and irregularity of the IVC at the level of the filter and a prominent collateral vein, suggesting thrombosis and recanalization of the IVC at the filter placement site (**Fig 2**). This patient receives permanent long-term anticoagulation. His filter was removed without complication. No other thromboembolic complications were noted in our patients. None of the filters were tilted into the wall of the IVC or exhibited significant displacement. These complications are in keeping with expected outcomes for a permanent or retrievable filter (7).



a.

b.

c.

**Figure 6.** **(a)** Magnified view of right upper lobe (same as **Fig 4**). Migrated arm (open arrow) was missed on numerous chest radiographs and chest CT examinations over a period of 18 months. **(b)** Fragment in right upper lobe is seen on contrast-enhanced chest CT scan (white arrow). **(c)** Axial images with and without contrast medium windowed and leveled for mediastinum, lung, and bone, respectively. White arrow points to the hard-to-see filter fragment on the contrast images.

January 2009  JVIR

The present study has profound implications for patients with Recovery filters, suggesting that these patients require more intensive imaging and clinical follow-up; however, the patient cohort is too small to allow definitive recommendations. The study does define an important clinical problem with the Recovery filter and describes some of the clinical and imaging findings associated with filter fracture and migration. The site and type of the arm and distal attachment hook fractures has been identified, but the overall mechanism for the more clinically relevant arm fractures is still uncertain. *In situ* motion analysis could give insight into the forces causing the arms to fracture. The present study does not evaluate the risk and benefits of leaving the Recovery filter in place versus removal, as all patients underwent filter retrieval. Study of a larger number of patients with the Recovery filter is necessary to clarify the best course of action for these patients.

The Bard Recovery filter was found to be associated with increasing rates of limb perforation, arm fracture, and migration in our small study population. IVC wall perforations of the upper arm of the Recovery filter progress over time and are associated with filter arm fracture and migration. The Recovery filter has otherwise functioned well as an IVC filter. The Recovery filter appears to have an indefinite indwell time before retrieval. We are recommending imaging with abdominal CT to screen for perforation, fracture, and migration in patients with a Recovery filter in place. In our experience, fractured filters can be removed successfully with high success rates and a low incidence of complications. Removal may be considered if the clinical risks associated with leaving the fractured device in place outweigh the risks attributed to the removal procedure.

**Acknowledgments:** The authors thank our research assistant Patricia Eichenlaub and physician assistant Janlyn Anthony for their help in making this project possible.

**References**

1. Kalva SP, Athanasoulis CA, Fan CM, et al. "Recovery" vena cava filter: experience in 96 patients. Cardiovasc Intervent Radiol 2006; 29:559–564.
2. Oliva VL, Perreault P, Giroux MF, Bouchard L, Therasse E, Soulez G. Recovery G2 inferior vena cava filter: technical success and safety of retrieval. J Vasc Interv Radiol 2008; 19:884–889.
3. Hull JE, Han J, Giessel GM. Retrieval of the recovery filter after arm perforation, fracture, and migration to the right ventricle. J Vasc Interv Radiol 2008; 19:1107–1111.
4. Saeed I, Garcia M, McNicholas K. Right ventricular migration of a recovery IVC filter's fractured wire with subsequent pericardial tamponade. Cardiovasc Intervent Radiol 2006; 29: 685–686.
5. Greenfield LJ, Rutherford RB. Recommended reporting standards for vena caval filter placement and patient follow-up. J Vasc Interv Radiol 2003; 14(suppl):S427–S432.
6. Kerlins V, Phillips A. Fractography: modes of fracture. In: Mills K, ed. ASM Handbook, 9th ed. Materials Park, OH: ASM International 1987; 12–21.
7. Grassi CJ, Swan TL, Cardella JF, et al. Quality improvement guidelines for percutaneous permanent inferior vena cava filter placement for the prevention of pulmonary embolism. J Vasc Interv Radiol 2003; 14(suppl):S271–S275.
8. Grande WJ, Trerotola SO, Reilly PM, et al. Experience with the recovery filter as a retrievable inferior vena cava filter. J Vasc Interv Radiol 2005; 16:1189–1193.
9. Binkert CA, Sasadeusz K, Stavropoulos SW. Retrievability of the recovery vena cava filter after dwell times longer than 180 days. J Vasc Interv Radiol 2006; 17:299–302.
10. Decousus H, Leizorovicz A, Parent F, et al. A clinical trial of vena caval filters in the prevention of pulmonary embolism in patients with proximal deep-vein thrombosis. Prevention du Risque d'Embolie Pulmonaire par Interruption Cave Study Group. N Engl J Med 1998; 338:409–415.
11. Asch MR. Initial experience in humans with a new retrievable inferior vena cava filter. Radiology 2002; 225: 835–844.
12. Ray CE Jr, Mitchell E, Zipser S, Kao EY, Brown CF, Moneta GL. Outcomes with retrievable inferior vena cava filters: a multicenter study. J Vasc Interv Radiol 2006; 17:1595–1604.

# EXHIBIT 44
## (Filed Under Seal)

# EXHIBIT 45
## (Filed Under Seal)

# EXHIBIT 46

| | |
|---|---|
| **From:** | Tessmer, Alex [/O=BARD/OU=TPE AG/CN=RECIPIENTS/CN=ATESSMER] |
| **Date:** | 2/25/2004 12:26:33 AM |
| **To:** | Carr, Robert [Robert.Carr@crbard.com], Hudson, Brian [Brian.Hudson@crbard.com] |
| **Subject:** | Filter Migration Test Results |
| **Attachments:** | Migration15mm.xls, Migration21mm.xls, Migration25mm.xls, Migration28mm.xls |

Rob and Brian,

I have attached the most current results.

Alex


Alex Tessmer
Bard Peripheral Vascular
Research & Development
Engineer II
1415 West 3rd Street, Suite 109
Tempe, AZ 85281
Direct: 480-303-2704
FAX: 480-449-2597
Email: <mailto:alex.tessmer@crbard.com> alex.tessmer@crbard.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00410986

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

|   | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (psi) | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
| 3 | | | 1 | 3.33 | 172.2 | 40 ± 3 | 15 | | | | | |
| 4 | RF11 | 07KN2852 | 2 | 2.72 | 140.7 | 40 ± 3 | 15 | | | | | |
| 5 | | | 3 | 2.13 | 110.2 | 40 ± 3 | 15 | | | | | |
| 6 | | | 1 | 3.05 | 157.7 | 40 ± 3 | 15 | | | | | |
| 7 | RF12 | 07KN2852 | 2 | 3.55 | 183.6 | 40 ± 3 | 15 | | | | | |
| 8 | | | 3 | 2.22 | 114.8 | 40 ± 3 | 15 | | | | | |
| 9 | | | 1 | 3.39 | 175.3 | 40 ± 3 | 15 | | | | | |
| 10 | RF13 | 07KN2852 | 2 | 3.02 | 156.2 | 40 ± 3 | 15 | | | | | |
| 11 | | | 3 | 3.91 | 202.2 | 40 ± 3 | 15 | | | | | |
| 12 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |
| 13 | RF14 | 07KN2852 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |
| 14 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |
| 15 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | Average | 151.3 | | |
| 16 | RF15 | 07KN2852 | 2 | 2.86 | 147.9 | 40 ± 3 | 15 | | Std. Dev. | 19.38 | | mmHg |
| 17 | | | 3 | 2.40 | 124.1 | 40 ± 3 | 15 | | Min | 110.2 | | |
| 18 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | Max | 202.2 | | |
| 19 | RF16 | 07KN2852 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |
| 20 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |
| 21 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |
| 22 | RF17 | 07KN2852 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |
| 23 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |
| 24 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |
| 25 | RF18 | 07KN2852 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |
| 26 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |
| 27 | | | 1 | 2.87 | 148.4 | 40 ± 3 | 15 | | | | | |
| 28 | RF19 | 07KN2852 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |
| 29 | | | 3 | 2.44 | 126.2 | 40 ± 3 | 15 | | | | | |
| 30 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |
| 31 | RF20 | 07KN2852 | 2 | 2.27 | 117.4 | 40 ± 3 | 15 | | | | | |
| 32 | | | 3 | 2.60 | 134.5 | 40 ± 3 | 15 | | | | | |

BPVE-01-00410987

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | | | | | | |
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (psi) | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | | | | | | | | | | |
| 3 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 4 | SF1 | 07JN2673 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 5 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 6 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 7 | SF2 | 07JN2673 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 8 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 9 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 10 | SF3 | 07JN2673 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 11 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 12 | | | 1 | 2.95 | 152.6 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 13 | SF4 | 07JN2673 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 14 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 15 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | Average | 155.1 | | | | | | | | | | |
| 16 | SF5 | 07JN2673 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | Std. Dev | 0.47 | mmHg | | | | | | | | | |
| 17 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | Min | 152.6 | | | | | | | | | | |
| 18 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | Max | 155.1 | | | | | | | | | | |
| 19 | SF6 | 07JN2673 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 20 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 21 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 22 | SF7 | 07JN2673 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 23 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 24 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 25 | SF8 | 07JN2673 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 26 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 27 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 28 | SF9 | 07JN2673 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 29 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 30 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 31 | SF10 | 07JN2673 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 32 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 33 | | | | | | | | | | | | | | | | | | | | |
| 34 | | | | | | | | | | | | | | | | | | | | |
| 35 | | | | | | | | | | | | | | | | | | | | |
| 36 | | | | | | | | | | | | | | | | | | | | |
| 37 | | | | | | | | | | | | | | | | | | | | |
| 38 | | | | | | | | | | | | | | | | | | | | |
| 39 | | | | | | | | | | | | | | | | | | | | |
| 40 | | | | | | | | | | | | | | | | | | | | |
| 41 | | | | | | | | | | | | | | | | | | | | |
| 42 | | | | | | | | | | | | | | | | | | | | |
| 43 | | | | | | | | | | | | | | | | | | | | |
| 44 | | | | | | | | | | | | | | | | | | | | |
| 45 | | | | | | | | | | | | | | | | | | | | |
| 46 | | | | | | | | | | | | | | | | | | | | |

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (psi) | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
| 3 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | |
| 4 | VT1 | F0507080 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | |
| 5 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | Average | 155.1 | |
| 6 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | Std. Dev | 0.00 | |
| 7 | VT2 | F0507080 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | Min | 155.1 | mmHg |
| 8 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | Max | 155.1 | |
| 9 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | |
| 10 | VT3 | F0507080 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | |
| 11 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | |

BPVE-01-00410988

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00410989

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (psi) | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | | |
| 3 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |
| 4 | GS1 | 6115450 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |
| 5 | | | 3 | 1.08 | 55.9 | 40 ± 3 | 15 | | Average | 143.8 | | |
| 6 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | Std. Dev | 33.00 | mmHg | |
| 7 | GS2 | 6115450 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | Min | 55.9 | | |
| 8 | | | 3 | 2.95 | 152.6 | 40 ± 3 | 15 | | Max | 155.1 | | |
| 9 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |
| 10 | GS3 | 6115450 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |
| 11 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | |

BPVE-01-00410990

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | | | | | | |
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (psi) | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | | | | | | | | | | |
| 3 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 4 | GT1 | 6113410 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 5 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | Average | 155.1 | | | | | | | | | | |
| 6 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | Std. Dev | 0.00 | | | | | | | | | | |
| 7 | GT2 | 6113410 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | Min | 155.1 | mmHg | | | | | | | | | |
| 8 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | Max | 155.1 | | | | | | | | | | |
| 9 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 10 | GT3 | 6113410 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 11 | | | 3 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | | | | | | | | | |
| 32 | | | | | | | | | | | | | | | | | | | | |
| 33 | | | | | | | | | | | | | | | | | | | | |
| 34 | | | | | | | | | | | | | | | | | | | | |
| 35 | | | | | | | | | | | | | | | | | | | | |
| 36 | | | | | | | | | | | | | | | | | | | | |
| 37 | | | | | | | | | | | | | | | | | | | | |
| 38 | | | | | | | | | | | | | | | | | | | | |
| 39 | | | | | | | | | | | | | | | | | | | | |
| 40 | | | | | | | | | | | | | | | | | | | | |
| 41 | | | | | | | | | | | | | | | | | | | | |
| 42 | | | | | | | | | | | | | | | | | | | | |
| 43 | | | | | | | | | | | | | | | | | | | | |
| 44 | | | | | | | | | | | | | | | | | | | | |
| 45 | | | | | | | | | | | | | | | | | | | | |
| 46 | | | | | | | | | | | | | | | | | | | | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | | | | | | |
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (psi) | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | | | | | | | | | | |
| 3 | | | 1 | 2.70 | 139.6 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 4 | TP1 | 1309079 | 2 | 2.91 | 150.5 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 5 | | | 3 | 1.95 | 100.8 | 40 ± 3 | 15 | | Average | 137.0 | | | | | | | | | | |
| 6 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | Std. Dev | 22.03 | | | | | | | | | | |
| 7 | TP2 | 1309079 | 2 | 2.72 | 140.7 | 40 ± 3 | 15 | | Min | | 99.8 | mmHg | | | | | | | | |
| 8 | | | 3 | 2.63 | 136.0 | 40 ± 3 | 15 | | Max | | 155.1 | | | | | | | | | |
| 9 | | | 1 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 10 | TP3 | 1309079 | 2 | 3.00 | 155.1 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 11 | | | 3 | 1.93 | 99.8 | 40 ± 3 | 15 | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | | | | | | | | | |
| 32 | | | | | | | | | | | | | | | | | | | | |
| 33 | | | | | | | | | | | | | | | | | | | | |
| 34 | | | | | | | | | | | | | | | | | | | | |
| 35 | | | | | | | | | | | | | | | | | | | | |
| 36 | | | | | | | | | | | | | | | | | | | | |
| 37 | | | | | | | | | | | | | | | | | | | | |
| 38 | | | | | | | | | | | | | | | | | | | | |
| 39 | | | | | | | | | | | | | | | | | | | | |
| 40 | | | | | | | | | | | | | | | | | | | | |
| 41 | | | | | | | | | | | | | | | | | | | | |
| 42 | | | | | | | | | | | | | | | | | | | | |
| 43 | | | | | | | | | | | | | | | | | | | | |
| 44 | | | | | | | | | | | | | | | | | | | | |
| 45 | | | | | | | | | | | | | | | | | | | | |
| 46 | | | | | | | | | | | | | | | | | | | | |

BPVE-01-00410991

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00410992

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | |
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
| 3 | | | 1 | 155.0 | 40 ± 3 | 15 | | | | |
| 4 | T1 | R1103502 | 2 | 155.0 | 40 ± 3 | 15 | | | | |
| 5 | | | 3 | 155.0 | 40 ± 3 | 15 | | Average | 155.0 | |
| 6 | | | 1 | 155.0 | 40 ± 3 | 15 | | Std. Dev | 0.00 | mmHg |
| 7 | T2 | R1103502 | 2 | | 40 ± 3 | 15 | | Min | 155.0 | |
| 8 | | | 3 | | 40 ± 3 | 15 | | Max | 155.0 | |
| 9 | | | 1 | | 40 ± 3 | 15 | | | | |
| 10 | T3 | R1103502 | 2 | | 40 ± 3 | 15 | | | | |
| 11 | | | 3 | | 40 ± 3 | 15 | | | | |

BPVE-01-00410993

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
| 3 | | | 1 | | 40 ± 3 | 15 | | | | |
| 4 | O1 | | 2 | | 40 ± 3 | 15 | | | | |
| 5 | | | 3 | | 40 ± 3 | 15 | | Average | #DIV/0! | |
| 6 | | | 1 | | 40 ± 3 | 15 | | Std. Dev | #DIV/0! | mmHg |
| 7 | O2 | | 2 | | 40 ± 3 | 15 | | Min | 0.0 | |
| 8 | | | 3 | | 40 ± 3 | 15 | | Max | 0.0 | |
| 9 | | | 1 | | 40 ± 3 | 15 | | | | |
| 10 | O3 | | 2 | | 40 ± 3 | 15 | | | | |
| 11 | | | 3 | | 40 ± 3 | 15 | | | | |

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
| | | | 1 | 63.3 | 40 ± 3 | 21 | | | | |
| | RF 11 | 07KN2852 | 2 | 100.0 | 40 ± 3 | 21 | | | | |
| | | | 3 | 92.5 | 40 ± 3 | 21 | | | | |
| | | | 1 | 104.2 | 40 ± 3 | 21 | | | | |
| | RF 12 | 07KN2852 | 2 | 112.7 | 40 ± 3 | 21 | | | | |
| | | | 3 | 112.2 | 40 ± 3 | 21 | | | | |
| | | | 1 | 84.3 | 40 ± 3 | 21 | | | | |
| | RF 13 | 07KN2852 | 2 | 85.1 | 40 ± 3 | 21 | | | | |
| | | | 3 | 81.9 | 40 ± 3 | 21 | | | | |
| | | | 1 | 104.6 | 40 ± 3 | 21 | | | | |
| | RF 14 | 07KN2852 | 2 | 66.9 | 40 ± 3 | 21 | | | | |
| | | | 3 | 76.1 | 40 ± 3 | 21 | | | | |
| | | | 1 | 90.1 | 40 ± 3 | 21 | | Average | 96.1 | |
| | RF 15 | 07KN2852 | 2 | 95.6 | 40 ± 3 | 21 | | Std. Dev | 17.45 | mmHg |
| | | | 3 | 76.5 | 40 ± 3 | 21 | | Min | 63.3 | |
| | | | 1 | 104.2 | 40 ± 3 | 21 | | Max | 136.9 | |
| | RF 16 | 07KN2852 | 2 | 95.9 | 40 ± 3 | 21 | | | | |
| | | | 3 | 102.8 | 40 ± 3 | 21 | | | | |
| | | | 1 | 100.2 | 40 ± 3 | 21 | | | | |
| | RF 17 | 07KN2852 | 2 | 88.1 | 40 ± 3 | 21 | | | | |
| | | | 3 | 102.6 | 40 ± 3 | 21 | | | | |
| | | | 1 | 128.5 | 40 ± 3 | 21 | | | | |
| | RF 18 | 07KN2852 | 2 | 105.5 | 40 ± 3 | 21 | | | | |
| | | | 3 | 79.5 | 40 ± 3 | 21 | | | | |
| | | | 1 | 106.1 | 40 ± 3 | 21 | | | | |
| | RF 19 | 07KN2852 | 2 | 72.4 | 40 ± 3 | 21 | | | | |
| | | | 3 | 84.8 | 40 ± 3 | 21 | | | | |
| | | | 1 | 101.8 | 40 ± 3 | 21 | | | | |
| | RF 20 | 07KN2852 | 2 | 126.1 | 40 ± 3 | 21 | | | | |
| | | | 3 | 136.9 | 40 ± 3 | 21 | | | | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00410994

BPVE-01-00410995

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
LMD1

|   | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
| 3 | SF1 | 07JN2073 | 1 | 155.0 | 40 ± 3 | 21 | | | | |
| 4 | | | 2 | 155.0 | 40 ± 3 | 21 | | | | |
| 5 | | | 3 | 155.0 | 40 ± 3 | 21 | | | | |
| 6 | | | 1 | 155.0 | 40 ± 3 | 21 | | | | |
| 7 | SF2 | 07JN2073 | 2 | 155.0 | 40 ± 3 | 21 | | | | |
| 8 | | | 3 | 155.0 | 40 ± 3 | 21 | | | | |
| 9 | | | 1 | 155.0 | 40 ± 3 | 21 | | | | |
| 10 | SF3 | 07JN2073 | 2 | 155.0 | 40 ± 3 | 21 | | | | |
| 11 | | | 3 | 155.0 | 40 ± 3 | 21 | | | | |
| 12 | | | 1 | 121.3 | 40 ± 3 | 21 | | | | |
| 13 | SF4 | 07JN2073 | 2 | 149.6 | 40 ± 3 | 21 | | | | |
| 14 | | | 3 | 131.5 | 40 ± 3 | 21 | | | | |
| 15 | | | 1 | 155.0 | 40 ± 3 | 21 | | Average | 150.7 | |
| 16 | SF5 | 07JN2073 | 2 | 155.0 | 40 ± 3 | 21 | | Std. Dev. | 9.70 | mmHg |
| 17 | | | 3 | 155.0 | 40 ± 3 | 21 | | Min | 121.3 | |
| 18 | | | 1 | 155.0 | 40 ± 3 | 21 | | Max | 155.0 | |
| 19 | SF6 | 07JN2073 | 2 | 155.0 | 40 ± 3 | 21 | | | | |
| 20 | | | 3 | 126.6 | 40 ± 3 | 21 | | | | |
| 21 | | | 1 | 155.0 | 40 ± 3 | 21 | | | | |
| 22 | SF7 | 07JN2073 | 2 | 155.0 | 40 ± 3 | 21 | | | | |
| 23 | | | 3 | 155.0 | 40 ± 3 | 21 | | | | |
| 24 | | | 1 | 141.9 | 40 ± 3 | 21 | | | | |
| 25 | SF8 | 07JN2073 | 2 | 155.0 | 40 ± 3 | 21 | | | | |
| 26 | | | 3 | 155.0 | 40 ± 3 | 21 | | | | |
| 27 | | | 1 | 155.0 | 40 ± 3 | 21 | | | | |
| 28 | SF9 | 07JN2073 | 2 | 155.0 | 40 ± 3 | 21 | | | | |
| 29 | | | 3 | 155.0 | 40 ± 3 | 21 | | | | |
| 30 | | | 1 | 130.9 | 40 ± 3 | 21 | | | | |
| 31 | SF10 | 07JN2073 | 2 | 155.0 | 40 ± 3 | 21 | | | | |
| 32 | | | 3 | 155.0 | 40 ± 3 | 21 | | | | |

BPVE-01-00410996

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
| 3 | VT1 | F0507080 | 1 | | 40 ± 3 | 21 | | | | |
| 4 | | | 2 | | 40 ± 3 | 21 | | | | |
| 5 | | | 3 | | 40 ± 3 | 21 | | Average | #DIV/0! | |
| 6 | VT2 | F0507060 | 1 | | 40 ± 3 | 21 | | Std. Dev | #DIV/0! | |
| 7 | | | 2 | | 40 ± 3 | 21 | | Min | 0.0 | mmHg |
| 8 | | | 3 | | 40 ± 3 | 21 | | Max | 0.0 | |
| 9 | VT3 | F0507080 | 1 | | 40 ± 3 | 21 | | | | |
| 10 | | | 2 | | 40 ± 3 | 21 | | | | |
| 11 | | | 3 | | 40 ± 3 | 21 | | | | |

BPVE-01-00410997

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

|   | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | | | | | | |
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | | | | | | | | | | | |
| 3 | GS1 | 6115450 | 1 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 4 | | | 2 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 5 | | | 3 | | 40 ± 3 | 21 | | Average | #DIV/0! | | | | | | | | | | | |
| 6 | GS2 | 6115450 | 1 | | 40 ± 3 | 21 | | Std. Dev | #DIV/0! | | | | | | | | | | | |
| 7 | | | 2 | | 40 ± 3 | 21 | | Min | 0.0 | mmHg | | | | | | | | | | |
| 8 | | | 3 | | 40 ± 3 | 21 | | Max | 0.0 | | | | | | | | | | | |
| 9 | GS3 | 6115450 | 1 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 10 | | | 2 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 11 | | | 3 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |

BPVE-01-00410998

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 3 | GT1 | 6113410 | 1 | | 40 ± 3 | 21 | | | | |
| 4 | | | 2 | | 40 ± 3 | 21 | | | | |
| 5 | | | 3 | | 40 ± 3 | 21 | | Average | #DIV/0! | |
| 6 | GT2 | 6113410 | 1 | | 40 ± 3 | 21 | | Std. Dev | #DIV/0! | |
| 7 | | | 2 | | 40 ± 3 | 21 | | Min | 0.0 | mmHg |
| 8 | | | 3 | | 40 ± 3 | 21 | | Max | 0.0 | |
| 9 | GT3 | 6113410 | 1 | | 40 ± 3 | 21 | | | | |
| 10 | | | 2 | | 40 ± 3 | 21 | | | | |
| 11 | | | 3 | | 40 ± 3 | 21 | | | | |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | | | | | | |
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | | | | | | | | | | | |
| 3 | TP1 | 1309079 | 1 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 4 | | | 2 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 5 | | | 3 | | 40 ± 3 | 21 | | Average | #DIV/0! | | | | | | | | | | | |
| 6 | TP2 | 1309079 | 1 | | 40 ± 3 | 21 | | Std. Dev | #DIV/0! | | | | | | | | | | | |
| 7 | | | 2 | | 40 ± 3 | 21 | | Min | 0.0 | mmHg | | | | | | | | | | |
| 8 | | | 3 | | 40 ± 3 | 21 | | Max | 0.0 | | | | | | | | | | | |
| 9 | TP3 | 1309079 | 1 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 10 | | | 2 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 11 | | | 3 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | | | | | | | |

BPVE-01-00410999

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00411000

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | | | | | | |
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | | | | | | | | | | | |
| 3 | | | 1 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 4 | T1 | | 2 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 5 | | | 3 | | 40 ± 3 | 21 | | Average | #DIV/0! | | | | | | | | | | | |
| 6 | | | 1 | | 40 ± 3 | 21 | | Std. Dev | #DIV/0! | | | | | | | | | | | |
| 7 | T2 | | 2 | | 40 ± 3 | 21 | | Min | 0.0 | mmHg | | | | | | | | | | |
| 8 | | | 3 | | 40 ± 3 | 21 | | Max | 0.0 | | | | | | | | | | | |
| 9 | | | 1 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 10 | T3 | | 2 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 11 | | | 3 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | | | | | | |
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | | | | | | | | | | | |
| 3 | O1 | | 1 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 4 | | | 2 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 5 | | | 3 | | 40 ± 3 | 21 | | Average | #DIV/0! | | | | | | | | | | | |
| 6 | O2 | | 1 | | 40 ± 3 | 21 | | Std. Dev | #DIV/0! | mmHg | | | | | | | | | | |
| 7 | | | 2 | | 40 ± 3 | 21 | | Min | 0.0 | | | | | | | | | | | |
| 8 | | | 3 | | 40 ± 3 | 21 | | Max | 0.0 | | | | | | | | | | | |
| 9 | O3 | | 1 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 10 | | | 2 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 11 | | | 3 | | 40 ± 3 | 21 | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | | | | | | | | | |
| 32 | | | | | | | | | | | | | | | | | | | | |
| 33 | | | | | | | | | | | | | | | | | | | | |
| 34 | | | | | | | | | | | | | | | | | | | | |
| 35 | | | | | | | | | | | | | | | | | | | | |
| 36 | | | | | | | | | | | | | | | | | | | | |
| 37 | | | | | | | | | | | | | | | | | | | | |
| 38 | | | | | | | | | | | | | | | | | | | | |
| 39 | | | | | | | | | | | | | | | | | | | | |
| 40 | | | | | | | | | | | | | | | | | | | | |
| 41 | | | | | | | | | | | | | | | | | | | | |
| 42 | | | | | | | | | | | | | | | | | | | | |
| 43 | | | | | | | | | | | | | | | | | | | | |
| 44 | | | | | | | | | | | | | | | | | | | | |
| 45 | | | | | | | | | | | | | | | | | | | | |
| 46 | | | | | | | | | | | | | | | | | | | | |

BPVE-01-00411001

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00411002

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
|---|---|---|---|---|---|---|---|---|---|
| RF11 | 07KN2852 | 1 | | | | | | | |
| | | 2 | 75.3 | 40 ± 3 | 25 | | | | |
| | | 3 | 76.5 | 40 ± 3 | 25 | | | | |
| RF12 | 07KN2852 | 1 | 74.8 | 40 ± 3 | 25 | | | | |
| | | 2 | 72.8 | 40 ± 3 | 25 | | | | |
| | | 3 | 81.4 | 40 ± 3 | 25 | | | | |
| RF13 | 07KN2852 | 1 | 70.0 | 40 ± 3 | 25 | | | | |
| | | 2 | 79.3 | 40 ± 3 | 25 | | | | |
| | | 3 | 75.3 | 40 ± 3 | 25 | | | | |
| RF14 | 07KN2852 | 1 | 68.6 | 40 ± 3 | 25 | | | | |
| | | 2 | 66.1 | 40 ± 3 | 25 | | | | |
| | | 3 | 67.0 | 40 ± 3 | 25 | | | | |
| RF15 | 07KN2852 | 1 | 79.6 | 40 ± 3 | 25 | | Average | 73.6 | |
| | | 2 | 64.7 | 40 ± 3 | 25 | | Std. Dev | 7.73 | mmHg |
| | | 3 | 73.3 | 40 ± 3 | 25 | | Min | 52.2 | |
| RF16 | 07KN2852 | 1 | 52.2 | 40 ± 3 | 25 | | Max | 89.6 | |
| | | 2 | 79.1 | 40 ± 3 | 25 | | | | |
| | | 3 | 75.9 | 40 ± 3 | 25 | | | | |
| RF17 | 07KN2852 | 1 | 71.0 | 40 ± 3 | 25 | | | | |
| | | 2 | 89.6 | 40 ± 3 | 25 | | | | |
| | | 3 | 79.2 | 40 ± 3 | 25 | | | | |
| RF18 | 07KN2852 | 1 | 79.4 | 40 ± 3 | 25 | | | | |
| | | 2 | 74.0 | 40 ± 3 | 25 | | | | |
| | | 3 | 68.4 | 40 ± 3 | 25 | | | | |
| RF19 | 07KN2852 | 1 | 64.6 | 40 ± 3 | 25 | | | | |
| | | 2 | 75.5 | 40 ± 3 | 25 | | | | |
| | | 3 | 81.6 | 40 ± 3 | 25 | | | | |
| RF20 | 07KN2852 | 1 | 67.1 | 40 ± 3 | 25 | | | | |
| | | 2 | 69.3 | 40 ± 3 | 25 | | | | |
| | | 3 | 63.3 | 40 ± 3 | 25 | | | | |

BPVE-01-00411003

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | Data Summary | | |
|---|---|---|---|---|---|---|---|---|
| SF1 | 07JN2673 | 1 | 116.1 | 40 ± 3 | 25 | | | |
| | | 2 | 105.6 | 40 ± 3 | 25 | | | |
| | | 3 | 150.2 | 40 ± 3 | 25 | | | |
| SF2 | 07JN2673 | 1 | 141.0 | 40 ± 3 | 25 | | | |
| | | 2 | 149.5 | 40 ± 3 | 25 | | | |
| | | 3 | 158.9 | 40 ± 3 | 25 | | | |
| SF3 | 07JN2673 | 1 | 136.4 | 40 ± 3 | 25 | | | |
| | | 2 | 140.3 | 40 ± 3 | 25 | | | |
| | | 3 | 145.1 | 40 ± 3 | 25 | | | |
| SF4 | 07JN2673 | 1 | 136.1 | 40 ± 3 | 25 | | | |
| | | 2 | 133.3 | 40 ± 3 | 25 | | | |
| | | 3 | 83.6 | 40 ± 3 | 25 | | | |
| SF5 | 07JN2673 | 1 | 52.5 | 40 ± 3 | 25 | Average | 116.9 | |
| | | 2 | 150.2 | 40 ± 3 | 25 | Std. Dev | 32.31 | |
| | | 3 | 105.4 | 40 ± 3 | 25 | Min | 44.9 | mmHg |
| SF6 | 07JN2673 | 1 | 99.1 | 40 ± 3 | 25 | Max | 158.9 | |
| | | 2 | 107.8 | 40 ± 3 | 25 | | | |
| | | 3 | 126.8 | 40 ± 3 | 25 | | | |
| SF7 | 07JN2673 | 1 | 143.0 | 40 ± 3 | 25 | | | |
| | | 2 | 65.2 | 40 ± 3 | 25 | | | |
| | | 3 | 44.9 | 40 ± 3 | 25 | | | |
| SF8 | 07JN2673 | 1 | 53.8 | 40 ± 3 | 25 | | | |
| | | 2 | 116.8 | 40 ± 3 | 25 | | | |
| | | 3 | 148.9 | 40 ± 3 | 25 | | | |
| SF9 | 07JN2673 | 1 | 108.2 | 40 ± 3 | 25 | | | |
| | | 2 | 149.6 | 40 ± 3 | 25 | | | |
| | | 3 | 117.8 | 40 ± 3 | 25 | | | |
| SF10 | 07JN2673 | 1 | 125.5 | 40 ± 3 | 25 | | | |
| | | 2 | 78.2 | 40 ± 3 | 25 | | | |
| | | 3 | 115.9 | 40 ± 3 | 25 | | | |

BPVE-01-00411004

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | |
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
| 3 | | | 1 | 117.2 | 40 ± 3 | 25 | | | | |
| 4 | VT1 | F0507080 | 2 | 155.0 | 40 ± 3 | 25 | | | | |
| 5 | | | 3 | 70.7 | 40 ± 3 | 25 | | Average | 120.2 | |
| 6 | | | 1 | 148.0 | 40 ± 3 | 25 | | Std. Dev | 29.64 | mmHg |
| 7 | VT2 | F0507080 | 2 | 129.3 | 40 ± 3 | 25 | | Min | 70.7 | |
| 8 | | | 3 | 127.6 | 40 ± 3 | 25 | | Max | 155.0 | |
| 9 | | | 1 | 93.9 | 40 ± 3 | 25 | | | | |
| 10 | VT3 | F0507080 | 2 | | 40 ± 3 | 25 | | | | |
| 11 | | | 3 | | 40 ± 3 | 25 | | | | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00411005

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
| 3 | | | 1 | 134.0 | 40 ± 3 | 25 | | | | |
| 4 | GS1 | 6115450 | 2 | 114.0 | 40 ± 3 | 25 | | | | |
| 5 | | | 3 | 126.2 | 40 ± 3 | 25 | | Average | 116.6 | |
| 6 | | | 1 | 151.2 | 40 ± 3 | 25 | | Std. Dev | 27.45 | mmHg |
| 7 | GS2 | 6115450 | 2 | 117.3 | 40 ± 3 | 25 | | Min | 52.5 | |
| 8 | | | 3 | 132.5 | 40 ± 3 | 25 | | Max | 151.2 | |
| 9 | | | 1 | 111.8 | 40 ± 3 | 25 | | | | |
| 10 | GS3 | 6115450 | 2 | 52.5 | 40 ± 3 | 25 | | | | |
| 11 | | | 3 | 110.1 | 40 ± 3 | 25 | | | | |

BPVE-01-00411006

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

|   | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | |
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
| 3 | GT1 | 6113410 | 1 | 148.6 | 40 ± 3 | 25 | | | | |
| 4 | | | 2 | 155.0 | 40 ± 3 | 25 | | | | |
| 5 | | | 3 | 155.0 | 40 ± 3 | 25 | | Average | 144.0 | |
| 6 | GT2 | 6113410 | 1 | 155.0 | 40 ± 3 | 25 | | Std. Dev | 25.11 | mmHg |
| 7 | | | 2 | 148.0 | 40 ± 3 | 25 | | Min | 82.5 | |
| 8 | | | 3 | 82.5 | 40 ± 3 | 25 | | Max | 155.0 | |
| 9 | GT3 | 6113410 | 1 | 155.0 | 40 ± 3 | 25 | | | | |
| 10 | | | 2 | 155.0 | 40 ± 3 | 25 | | | | |
| 11 | | | 3 | | | | | | | |

BPVE-01-00411007

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

|  | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) |  | Data Summary |  |  |  |  |  |  |  |  |  |  |  |  |
| 3 | TP1 | 1309079 | 1 |  | 40 ± 3 | 25 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 4 |  |  | 2 |  | 40 ± 3 | 25 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 5 |  |  | 3 |  | 40 ± 3 | 25 |  | Average | #DIV/0! |  |  |  |  |  |  |  |  |  |  |  |
| 6 | TP2 | 1309079 | 1 |  | 40 ± 3 | 25 |  | Std. Dev | #DIV/0! |  |  |  |  |  |  |  |  |  |  |  |
| 7 |  |  | 2 |  | 40 ± 3 | 25 |  | Min | 0.0 | mmHg |  |  |  |  |  |  |  |  |  |  |
| 8 |  |  | 3 |  | 40 ± 3 | 25 |  | Max | 0.0 |  |  |  |  |  |  |  |  |  |  |  |
| 9 |  |  | 1 |  | 40 ± 3 | 25 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 10 | TP3 | 1309079 | 2 |  | 40 ± 3 | 25 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 11 |  |  | 3 |  | 40 ± 3 | 25 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 12 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

BPVE-01-00411008

|   | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | |
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | | |
| 3 | | | 1 | | 40 ± 3 | 25 | | | | | |
| 4 | T1 | | 2 | | 40 ± 3 | 25 | | | | | |
| 5 | | | 3 | | 40 ± 3 | 25 | | Average | #DIV/0! | | |
| 6 | | | 1 | | 40 ± 3 | 25 | | Std. Dev | #DIV/0! | | mmHg |
| 7 | T2 | | 2 | | 40 ± 3 | 25 | | Min | 0.0 | | |
| 8 | | | 3 | | 40 ± 3 | 25 | | Max | 0.0 | | |
| 9 | | | 1 | | 40 ± 3 | 25 | | | | | |
| 10 | T3 | | 2 | | 40 ± 3 | 25 | | | | | |
| 11 | | | 3 | | 40 ± 3 | 25 | | | | | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00411009

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | Data Summary | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| O1 | | | 1 | | 40 ± 3 | 25 | | | | |
| | | | 2 | | 40 ± 3 | 25 | | | | |
| | | | 3 | | 40 ± 3 | 25 | Average | #DIV/0! | | |
| O2 | | | 1 | | 40 ± 3 | 25 | Std. Dev | #DIV/0! | mmHg | |
| | | | 2 | | 40 ± 3 | 25 | Min | 0.0 | | |
| | | | 3 | | 40 ± 3 | 25 | Max | 0.0 | | |
| O3 | | | 1 | | 40 ± 3 | 25 | | | | |
| | | | 2 | | 40 ± 3 | 25 | | | | |
| | | | 3 | | 40 ± 3 | 25 | | | | |

BPVE-01-00411010

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (psi) | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | Data Summary | | |
|---|---|---|---|---|---|---|---|---|---|
| RF1 | 07KN2852 | 1 | 0.85 | 44.0 | 37 ± 2 | 28 | | | |
| | | 2 | 0.90 | 46.5 | 37 ± 2 | 28 | | | |
| | | 3 | 1.07 | 55.3 | 37 ± 2 | 28 | | | |
| RF2 | 07KN2852 | 1 | 0.62 | 32.1 | 37 ± 2 | 28 | | | |
| | | 2 | | | | | | | |
| | | 3 | | | | | | | |
| RF3 | 07KN2852 | 1 | 0.14 | 7.2 | 37 ± 2 | 28 | | | |
| | | 2 | 0.89 | 46.0 | 37 ± 2 | 28 | | | |
| | | 3 | 0.89 | 46.0 | 37 ± 2 | 28 | | | |
| RF4 | 07KN2852 | 1 | 0.70 | 36.2 | 37 ± 2 | 28 | | | |
| | | 2 | 0.63 | 32.6 | 37 ± 2 | 28 | | | |
| | | 3 | 0.70 | 36.2 | 37 ± 2 | 28 | Average | 45.2 | |
| RF5 | 07KN2852 | 1 | 0.87 | 45.0 | 37 ± 2 | 28 | Std. Dev | 12.07 | mmHg |
| | | 2 | 0.56 | 29.0 | 37 ± 2 | 28 | Min | 7.2 | |
| | | 3 | 1.13 | 58.4 | 37 ± 2 | 28 | Max | 70.3 | |
| RF6 | 07KN2852 | 1 | 0.92 | 47.6 | 37 ± 2 | 28 | | | |
| | | 2 | 1.02 | 52.7 | 37 ± 2 | 28 | | | |
| | | 3 | 1.36 | 70.3 | 37 ± 2 | 28 | | | |
| RF7 | 07KN2852 | 1 | 0.84 | 43.4 | 37 ± 2 | 28 | | | |
| | | 2 | 0.97 | 50.2 | 37 ± 2 | 28 | | | |
| | | 3 | 0.96 | 49.6 | 37 ± 2 | 28 | | | |
| RF8 | 07KN2852 | 1 | 0.80 | 41.4 | 37 ± 2 | 28 | | | |
| | | 2 | 0.88 | 45.5 | 37 ± 2 | 28 | | | |
| | | 3 | 1.28 | 66.2 | 37 ± 2 | 28 | | | |
| RF9 | 07KN2852 | 1 | 0.95 | 49.1 | 37 ± 2 | 28 | | | |
| | | 2 | 0.90 | 46.5 | 37 ± 2 | 28 | | | |
| | | 3 | 0.71 | 36.7 | 37 ± 2 | 28 | | | |
| RF10 | 07KN2852 | 1 | 1.12 | 57.9 | 37 ± 2 | 28 | | | |
| | | 2 | 0.90 | 46.5 | 37 ± 2 | 28 | | | |
| | | 3 | 0.89 | 46.0 | 37 ± 2 | 28 | | | |
| RF11 | 07KN2852 | 1 | 1.00 | 51.7 | 40 ± 3 | 28 | | | |
| | | 2 | 1.36 | 70.3 | 40 ± 3 | 28 | | | |
| | | 3 | 1.29 | 66.7 | 40 ± 3 | 28 | | | |
| RF12 | 07KN2852 | 1 | 0.54 | 27.9 | 40 ± 3 | 28 | | | |
| | | 2 | 1.01 | 52.2 | 40 ± 3 | 28 | | | |
| | | 3 | 1.21 | 62.6 | 40 ± 3 | 28 | | | |
| RF13 | 07KN2852 | 1 | 1.26 | 65.2 | 40 ± 3 | 28 | | | |
| | | 2 | 1.15 | 59.5 | 40 ± 3 | 28 | | | |
| | | 3 | 1.24 | 64.1 | 40 ± 3 | 28 | | | |
| RF14 | 07KN2852 | 1 | 1.37 | 70.8 | 40 ± 3 | 28 | | | |
| | | 2 | 0.80 | 41.4 | 40 ± 3 | 28 | | | |
| | | 3 | 0.91 | 47.1 | 40 ± 3 | 28 | Average | 51.5 | |
| RF15 | 07KN2852 | 1 | 1.05 | 54.3 | 40 ± 3 | 28 | Std. Dev | 12.05 | mmHg |
| | | 2 | 0.67 | 34.6 | 40 ± 3 | 28 | Min | 27.9 | |
| | | 3 | 0.82 | 42.4 | 40 ± 3 | 28 | Max | 70.8 | |
| | | 1 | 1.01 | 52.2 | 40 ± 3 | 28 | | | |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 50 | RF16 | 07KN2852 | 2 | 0.85 | 44.0 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 51 | | | 3 | 1.07 | 55.3 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 52 | | | 1 | 0.67 | 34.6 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 53 | RF17 | 07KN2852 | 2 | 1.19 | 61.5 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 54 | | | 3 | 0.92 | 47.6 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 55 | | | 1 | 0.62 | 32.1 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 56 | RF18 | 07KN2852 | 2 | 1.08 | 55.9 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 57 | | | 3 | 0.84 | 43.4 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 58 | | | 1 | 0.83 | 42.9 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 59 | RF19 | 07KN2852 | 2 | 0.69 | 35.7 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 60 | | | 3 | 1.31 | 67.7 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 61 | | | 1 | 1.21 | 62.6 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 62 | RF20 | 07KN2852 | 2 | 1.00 | 51.7 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 63 | | | 3 | 0.91 | 47.1 | 40 ± 3 | 28 | | | | | | | | | | | | | |

BPVE-01-00411011

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (psi) | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | SF1 | 07JN2673 | 1 | 1.37 | 70.8 | 37 ± 2 | 28 | | | | |
| 4 | | | 2 | 2.01 | 103.9 | 37 ± 2 | 28 | | | | |
| 5 | | | 3 | 1.21 | 62.6 | 37 ± 2 | 28 | | | | |
| 6 | SF2 | 07JN2673 | 1 | 1.08 | 55.9 | 37 ± 2 | 28 | | | | |
| 7 | | | 2 | 1.67 | 86.4 | 37 ± 2 | 28 | | | | |
| 8 | | | 3 | 1.04 | 53.6 | 37 ± 2 | 28 | | | | |
| 9 | SF3 | 07JN2673 | 1 | 0.65 | 33.6 | 37 ± 2 | 28 | | | | |
| 10 | | | 2 | 1.69 | 87.4 | 37 ± 2 | 28 | | | | |
| 11 | | | 3 | 2.20 | 113.8 | 37 ± 2 | 28 | | | | |
| 12 | SF4 | 07JN2673 | 1 | 1.64 | 84.8 | 37 ± 2 | 28 | | | | |
| 13 | | | 2 | 1.38 | 71.4 | 37 ± 2 | 28 | | | | |
| 14 | | | 3 | 1.43 | 74.0 | 37 ± 2 | 28 | | Average | 76.3 | |
| 15 | SF5 | 07JN2673 | 1 | 1.27 | 65.7 | 37 ± 2 | 28 | | Std. Dev | 28.45 | mmHg |
| 16 | | | 2 | 0.96 | 49.6 | 37 ± 2 | 28 | | Min | 32.1 | |
| 17 | | | 3 | 1.75 | 90.5 | 37 ± 2 | 28 | | Max | 179.5 | |
| 18 | SF6 | 07JN2673 | 1 | 1.04 | 53.8 | 37 ± 2 | 28 | | | | |
| 19 | | | 2 | 1.63 | 84.3 | 37 ± 2 | 28 | | | | |
| 20 | | | 3 | 3.47 | 179.5 | 37 ± 2 | 28 | | | | |
| 21 | SF7 | 07JN2673 | 1 | 1.50 | 77.6 | 37 ± 2 | 28 | | | | |
| 22 | | | 2 | 1.93 | 99.8 | 37 ± 2 | 28 | | | | |
| 23 | | | 3 | 1.10 | 56.9 | 37 ± 2 | 28 | | | | |
| 24 | SF8 | 07JN2673 | 1 | 1.59 | 82.2 | 37 ± 2 | 28 | | | | |
| 25 | | | 2 | 1.59 | 82.2 | 37 ± 2 | 28 | | | | |
| 26 | | | 3 | 1.48 | 76.5 | 37 ± 2 | 28 | | | | |
| 27 | SF9 | 07JN2673 | 1 | 0.62 | 32.1 | 37 ± 2 | 28 | | | | |
| 28 | | | 2 | 1.14 | 59.0 | 37 ± 2 | 28 | | | | |
| 29 | | | 3 | 2.03 | 105.0 | 37 ± 2 | 28 | | | | |
| 30 | SF10 | 07JN2673 | 1 | 1.80 | 93.1 | 37 ± 2 | 28 | | | | |
| 31 | | | 2 | 1.14 | 59.0 | 37 ± 2 | 28 | | | | |
| 32 | | | 3 | 0.83 | 42.9 | 37 ± 2 | 28 | | | | |
| 33 | | | | | | | | | | | |
| 34 | SF1 | 07JN2673 | 1 | 1.00 | 51.7 | 40 ± 3 | 28 | | | | |
| 35 | | | 2 | 2.47 | 127.7 | 40 ± 3 | 28 | | | | |
| 36 | | | 3 | 0.98 | 50.7 | 40 ± 3 | 28 | | | | |
| 37 | SF2 | 07JN2673 | 1 | 1.58 | 81.7 | 40 ± 3 | 28 | | | | |
| 38 | | | 2 | 1.45 | 75.0 | 40 ± 3 | 28 | | | | |
| 39 | | | 3 | 1.35 | 69.8 | 40 ± 3 | 28 | | | | |
| 40 | SF3 | 07JN2673 | 1 | 2.05 | 106.0 | 40 ± 3 | 28 | | | | |
| 41 | | | 2 | 2.39 | 123.6 | 40 ± 3 | 28 | | | | |
| 42 | | | 3 | 1.84 | 95.2 | 40 ± 3 | 28 | | | | |
| 43 | SF4 | 07JN2673 | 1 | 1.60 | 82.7 | 40 ± 3 | 28 | | | | |
| 44 | | | 2 | 2.13 | 110.2 | 40 ± 3 | 28 | | | | |
| 45 | | | 3 | 1.72 | 88.9 | 40 ± 3 | 28 | | | | |
| 46 | SF5 | 07JN2673 | 1 | 1.98 | 102.4 | 40 ± 3 | 28 | | Average | 89.1 | |
| 47 | | | 2 | 1.69 | 87.4 | 40 ± 3 | 28 | | Std. Dev | 22.86 | mmHg |
| 48 | | | 3 | 2.39 | 123.6 | 40 ± 3 | 28 | | Min | 48.1 | |
| 49 | | | 1 | 0.93 | 48.1 | 40 ± 3 | 28 | | Max | 140.1 | |

BPVE-01-00411012

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00411013

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 50 | SF6 | 07JN2673 | 2 | 1.70 | 87.9 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 51 | | | 3 | 1.85 | 95.7 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 52 | | | 1 | 1.47 | 76.0 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 53 | SF7 | 07JN2673 | 2 | 1.65 | 85.3 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 54 | | | 3 | 1.13 | 58.4 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 55 | | | 1 | 1.50 | 77.6 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 56 | SF8 | 07JN2673 | 2 | 2.71 | 140.1 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 57 | | | 3 | 1.69 | 87.4 | 40 ± 3 | 26 | | | | | | | | | | | | | |
| 58 | | | 1 | 2.17 | 112.2 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 59 | SF9 | 07JN2673 | 2 | 1.64 | 84.8 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 60 | | | 3 | 1.72 | 88.9 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 61 | | | 1 | 1.36 | 70.3 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 62 | SF10 | 07JN2673 | 2 | 2.01 | 103.9 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 63 | | | 3 | 1.56 | 80.7 | 40 ± 3 | 28 | | | | | | | | | | | | | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00411014

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (psi) | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
| 3 | | | 1 | 1.60 | 82.7 | 37 ± 2 | 28 | | Average | 84.5 | |
| 4 | VT1 | F0507080 | 2 | 1.69 | 87.4 | 37 ± 2 | 28 | | Std. Dev | 2.55 | mmHg |
| 5 | | | 3 | 1.61 | 83.3 | 37 ± 2 | 28 | | Min | 82.7 | |
| 6 | | | | | | | | | Max | 87.4 | |
| 7 | | | | | | | | | | | |
| 8 | | | 1 | 1.30 | 67.2 | 40 ± 3 | 28 | | | | |
| 9 | VT1 | F0507080 | 2 | 2.60 | 134.5 | 40 ± 3 | 28 | | Average | 76.4 | |
| 10 | | | 3 | 2.06 | 106.5 | 40 ± 3 | 28 | | Std. Dev | 28.49 | mmHg |
| 11 | | | 1 | 1.28 | 66.2 | 40 ± 3 | 28 | | Min | 45.0 | |
| 12 | VT2 | F0507080 | 2 | 1.47 | 76.0 | 40 ± 3 | 28 | | Max | 134.5 | |
| 13 | | | 3 | 0.97 | 50.2 | 40 ± 3 | 28 | | | | |
| 14 | | | 1 | 0.87 | 45.0 | 40 ± 3 | 28 | | | | |
| 15 | VT3 | F0507080 | 2 | 1.14 | 59.0 | 40 ± 3 | 28 | | | | |
| 16 | | | 3 | 1.61 | 83.3 | 40 ± 3 | 28 | | | | |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | | | | | | |
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (psi) | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | | | | | | | | | | |
| 3 | | | 1 | 1.65 | 85.3 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 4 | GS1 | 6115450 | 2 | 2.18 | 112.7 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 5 | | | 3 | 2.15 | 111.2 | 40 ± 3 | 28 | | Average | 89.9 | | | | | | | | | | |
| 6 | | | 1 | 1.15 | 59.5 | 40 ± 3 | 28 | | Std. Dev | 20.28 | mmHg | | | | | | | | | |
| 7 | GS2 | 6115450 | 2 | 1.57 | 81.2 | 40 ± 3 | 28 | | Min. | 59.5 | | | | | | | | | | |
| 8 | | | 3 | 2.12 | 109.6 | 40 ± 3 | 28 | | Max. | 112.7 | | | | | | | | | | |
| 9 | | | 1 | 1.82 | 94.1 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 10 | GS3 | 6115450 | 2 | 1.83 | 94.6 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 11 | | | 3 | 1.17 | 60.5 | 40 ± 3 | 28 | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | | | | | | | |

BPVE-01-00411015

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00411016

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (psi) | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
|---|---|---|---|---|---|---|---|---|---|---|
| GT1 | 6113410 | 1 | 2.25 | 116.4 | 37 ± 2 | 28 | | Average | 110.0 | |
| | | 2 | 1.80 | 93.1 | 37 ± 2 | 28 | | Std. Dev | 14.78 | mmHg |
| | | 3 | 2.33 | 120.5 | 37 ± 2 | 28 | | Min | 93.1 | |
| | | | | | | | | Max | 120.5 | |
| | | | | | | | | | | |
| GT1 | 6113410 | 1 | 2.06 | 106.5 | 40 ± 3 | 28 | | | | |
| | | 2 | 1.07 | 55.3 | 40 ± 3 | 28 | | Average | 89.6 | |
| | | 3 | 1.70 | 87.9 | 40 ± 3 | 28 | | Std. Dev | 28.14 | mmHg |
| GT2 | 6113410 | 1 | 1.05 | 54.3 | 40 ± 3 | 28 | | Min | 54.3 | |
| | | 2 | 1.76 | 91.0 | 40 ± 3 | 28 | | Max | 140.1 | |
| | | 3 | 2.71 | 140.1 | 40 ± 3 | 28 | | | | |
| GT3 | 6113410 | 1 | 1.24 | 64.1 | 40 ± 3 | 28 | | | | |
| | | 2 | 2.07 | 107.0 | 40 ± 3 | 28 | | | | |
| | | 3 | 1.94 | 100.3 | 40 ± 3 | 28 | | | | |

| Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (psi) | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 0.90 | 46.5 | 37 ± 2 | 28 | | Average | 51.4 | |
| TP1 | 1309079 | 2 | 1.05 | 54.3 | 37 ± 2 | 28 | | Std. Dev | 4.21 | |
| | | 3 | 1.03 | 53.3 | 37 ± 2 | 28 | | Min | 46.5 | mmHg |
| | | | | | | | | Max | 54.3 | |
| | | | | | | | | | | |
| | | 1 | 0.61 | 31.5 | 40 ± 3 | 28 | | | | |
| TP1 | 1309079 | 2 | 0.36 | 18.6 | 40 ± 3 | 28 | | | | |
| | | 3 | 0.67 | 45.0 | 40 ± 3 | 28 | | Average | 42.7 | |
| | | 1 | 0.50 | 25.6 | 40 ± 3 | 28 | | Std. Dev | 14.61 | |
| TP2 | 1309079 | 2 | 1.16 | 60.0 | 40 ± 3 | 28 | | Min | 18.6 | mmHg |
| | | 3 | 0.98 | 50.7 | 40 ± 3 | 28 | | Max | 60.0 | |
| | | 1 | 1.06 | 54.8 | 40 ± 3 | 28 | | | | |
| TP3 | 1309079 | 2 | 0.79 | 40.9 | 40 ± 3 | 28 | | | | |
| | | 3 | 1.10 | 56.9 | 40 ± 3 | 28 | | | | |

BPVE-01-00411017

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00411018

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
| 3 | T1 | R1103502 | 1 | 124.6 | 40 ± 3 | 28 | | | | |
| 4 | | | 2 | 106.8 | 40 ± 3 | 28 | | | | |
| 5 | | | 3 | 106.4 | 40 ± 3 | 28 | | Average | 122.9 | |
| 6 | T2 | R1103502 | 1 | 95.6 | 40 ± 3 | 28 | | Std. Dev | 20.24 | |
| 7 | | | 2 | 118.2 | 40 ± 3 | 28 | | Min | 95.6 | mmHg |
| 8 | | | 3 | 113.3 | 40 ± 3 | 28 | | Max | 155.0 | |
| 9 | T3 | R1103502 | 1 | 140.1 | 40 ± 3 | 28 | | | | |
| 10 | | | 2 | 155.0 | 40 ± 3 | 28 | | | | |
| 11 | | | 3 | 146.5 | 40 ± 3 | 28 | | | | |

BPVE-01-00411019

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
LMD1

| Sample ID # | Lot No. | Run No. | Pressure at Filter Migration (mmHg) | Testing Temp (°C) | Tube Diameter (mm) | | Data Summary | | |
|---|---|---|---|---|---|---|---|---|---|
| O1 | R0603592 | 1 | 155.0 | 40 ± 3 | 28 | | | | |
| | | 2 | 114.0 | 40 ± 3 | 28 | | Average | 136.8 | |
| | | 3 | 155.0 | 40 ± 3 | 28 | | Std. Dev | 18.44 | |
| O2 | R0603592 | 1 | 155.0 | 40 ± 3 | 28 | | Min | 111.3 | mmHg |
| | | 2 | 155.0 | 40 ± 3 | 28 | | Max | 155.0 | |
| | | 3 | 111.3 | 40 ± 3 | 28 | | | | |
| O3 | R0603592 | 1 | 127.8 | 40 ± 3 | 28 | | | | |
| | | 2 | 128.0 | 40 ± 3 | 28 | | | | |
| | | 3 | 128.6 | 40 ± 3 | 28 | | | | |

# EXHIBIT 47

| From: | Tessmer, Alex [/O=BARD/OU=TPE AG/CN=RECIPIENTS/CN=ATESSMER] |
|---|---|
| Date: | 3/24/2004 11:34:55 PM |
| To: | Benware, Charlie [Charlie.Benware@crbard.com], Fitzpatrick, Ed [Ed.Fitzpatrick@crbard.com] |
| CC: | Hudson, Brian [Brian.Hudson@crbard.com], Carr, Robert [Robert.Carr@crbard.com] |
| Subject: | Starguide Filter Migration Test Results |
| Attachments: | Starguide.xls |

Charlie and Ed,

I have shipped copies of the migration resistance test data sheets via FEDEX overnight (tracking #6347 6318 7941). I have also attached an Excel spreadsheet with the raw data results and along with an average result for each filter.

A total quantity of 40 filters were tested. Each filter was tested three times for a total of 120 runs.

A quantity of 10 filters from each of the three ESM lots were tested (n=30 Starguide nitinol wire). A quantity of 10 filters manufactured using the current supplier wire were also tested.

You will quickly notice that there were values below the 50.0 mmHg acceptance criteria for all the three Starguide manufactured lots. Since this was the case, we tested filters manufactured using the current supplier wire to determine whether the issue was with the filters or the migration resistance testing. We quickly discovered that there were values below 50.0 mmHg when testing the filters manufactured using the current supplier. This points to the fact that there is an issue with the migration resistance testing.

When we had previously tested the GFO manufactured filters to compare to historic NMT data, all data values were above the 50.0 mmHg acceptance criteria. The testing that was performed on the filters above utilized an identical test method. It is important to note that a new batch of sausage casing had been purchased to complete the testing. However, the operators did not notice any difference with the new casing in comparison to what had been previously used. The sausage casing was packaged the same and came from the same supplier. It had the same appearance, feel, and odor as the previous casing.

In any case, more testing may need to occur before the Starguide nitinol wire should be approved. Perhaps we can test the radial expasion force of 10 Starguide manufactured filters to determine if the data is statiscally equivalent to the data we captured for the filters manufactured using the current nitinol supplied wire. Please contact Brian Hudson to discuss this issue further.

Best regards,

Alex

Alex Tessmer
Bard Peripheral Vascular
Research & Development
Engineer II
1415 West 3rd Street, Suite 109
Tempe, AZ 85281
Direct: 480-303-2704
FAX: 480-449-2597
Email: alex.tessmer@crbard.com

BPVE-01-00330123

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| Run # | A1-A10 | B1-B10 | C1-C10 | RF300-RF309 |
|---|---|---|---|---|
| 1 | 56.3 | 39.3 | 63.3 | 37.5 |
| 2 | | 48.1 | 49.1 | 33.9 |
| 3 | 55.2 | 62.3 | 40.1 | 50.5 |
| 4 | | 49.4 | 57.8 | 85.2 |
| 5 | | 57.6 | 41.7 | 64.4 |
| 6 | 38.7 | 50.5 | 51.4 | 64.7 |
| 7 | 33.8 | 60.5 | 42.4 | 91.9 |
| 8 | 60.2 | | 58.7 | 125.5 |
| 9 | 47.2 | | 50.0 | 32.6 |
| 10 | | 47.2 | 44.8 | 52.0 |
| 11 | 72.1 | 67.1 | 43.8 | 43.9 |
| 12 | 60.8 | | | |
| 13 | 68.4 | 68.6 | 62.1 | 58.4 |
| 14 | 57.0 | 47.3 | 61.2 | 53.0 |
| 15 | | 62.7 | | 54.2 |
| 16 | 61.2 | 41.5 | 50.4 | 47.5 |
| 17 | 49.1 | 64.9 | 52.0 | 50.9 |
| 18 | 58.9 | 35.4 | | 68.9 |
| 19 | 51.5 | 41.6 | 58.3 | 64.5 |
| 20 | | | 45.2 | 79.6 |
| 21 | | 45.3 | 48.2 | 76.7 |
| 22 | | 78.1 | 57.1 | 83.9 |
| 23 | | 62.3 | | 72.3 |
| 24 | 47.3 | | | 70.9 |
| 25 | 58.0 | 56.1 | 46.7 | |
| 26 | 53.4 | 56.4 | 43.8 | 81.1 |
| 27 | 59.5 | 60.7 | 47.5 | 50.8 |
| 28 | 44.1 | 69.7 | | 66.5 |
| 29 | 67.5 | 67.0 | 46.6 | 75.4 |
| 30 | | | | |

| Average A1-A10 | Average B1-B10 | Average C1-C10 | Average RF300-RF309 |
|---|---|---|---|
| 55.8 | 49.9 | 50.8 | 40.6 |
| 38.7 | 52.5 | 50.3 | 71.4 |
| 47.1 | 60.5 | 50.4 | 83.3 |
| 66.5 | 57.2 | 44.3 | 48.0 |
| 62.7 | 59.5 | 61.7 | 55.2 |
| 56.4 | 47.3 | 51.2 | 55.8 |
| 51.5 | 43.5 | 50.6 | 73.6 |
| 47.3 | 70.2 | 57.1 | 75.7 |
| 57.0 | 57.7 | 46.0 | 66.0 |
| 55.8 | 68.4 | 46.6 | 71.0 |

# EXHIBIT 48
# (Filed Under Seal)

# EXHIBIT 49
## (Filed Under Seal)

# EXHIBIT 50
## (Filed Under Seal)

# EXHIBIT 51

WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: BARD IVC FILTERS PRODUCTS LIABILITY LITIGATION | MDL No. 2641 |
| This Order Relates to: All Actions | |

Defendants C. R. Bard, Inc. and Bard Peripheral Vascular Services, Inc. ("Bard") seek a protective order to prevent Plaintiffs from using the December 15, 2004 report of Dr. John Lehmann. Doc. 306. The issues are fully briefed (Docs. 379, 412), and the Court heard oral argument on January 29, 2016 (Doc. 507). The Court concludes that no additional discovery or evidentiary hearing is necessary to resolve this issue. For the following reasons, the Court will grant Bard's motion.

I.      Background.

The facts in this section are taken largely from testimony given in an evidentiary hearing in *Alexander v. Bard*, No. 3:12-CV-05187-O-BK (N.D. Tex. June 11, 2014). *See* Doc. 319-2 at 7-137. The Court will explain later in this order why it finds the testimony credible.

Dr. Lehmann is a consultant who has provided different services to Bard at different times. Beginning in late 2003, Dr. Lehmann was retained to serve as Bard's acting director of medical services. Doc. 319-2 at 93, 107-08. Dr. Lehmann served in this capacity until Bard hired Dr. David Ciavarella to replace him in May 2004. Docs. 319-2 at 93-94; 412-1 at 6. As acting medical director, Dr. Lehmann reviewed and

approved documents, prepared health hazard evaluations ("HHE") and remedial action plans ("RAP"), responded to queries from various medical divisions, and assisted in Bard's hiring of Dr. Ciavarella. Doc. 319-2 at 93-96. In this role, Dr. Lehmann drafted two HHEs that are particularly relevant to this dispute: the March 10, 2004 HHE (Doc. 445-1 at 4-15), and the April 27, 2004 HHE (Doc. 414 at 3-15), both of which address Recovery Filter migration events. The Law Department occasionally asked Dr. Lehmann in his capacity as acting medical director to review medical records for particular cases. Doc. 319-2 at 30. Once Bard hired Dr. Ciavarella, Dr. Lehmann did not work on anything related to the Recovery Filter until the Law Department retained his services in November 2004. *Id.* at 102.

In early 2004, Bard began receiving notices of adverse events associated with the Recovery Filter. For example, in February 2004 Bard learned of a patient death related to the migration of a Recovery Filter. Docs. 319-2 at 40-41; 445-1 at 5. In April, Bard learned of a second migration death associated with the filter. Doc. 414 at 4. Bard's assistant general counsel, Donna Passero, began to receive letters demanding compensation from lawyers and patients who had experienced such adverse events. Doc. 319-2 at 25. In June, Passero responded to a letter that raised possible product liability and medical malpractice claims. Doc. 319-2 at 28-29. In July, Bard notified its insurance carrier of potential claims involving the Recovery Filter. Docs. 319 at 27-29; 319-2 at 29, 91. These potential claims led the Law Department to retain Dr. Lehmann to conduct a broad risk assessment of the Recovery Filter. Doc. 319-2 at 38-39.

The Law Department retained Dr. Lehmann as a consultant in November 2004. *Id.* at 2-3, ¶ 6, 93. On November 15, 2004, Dr. Lehmann and Judith Reinsdorf, Bard's General Counsel, executed a consulting agreement. Docs. 319-2 at 3, ¶ 8, 36, 94; 335 at 3-9. The agreement said that Dr. Lehmann's services would be provided in "anticipation of litigation." Doc. 335 at 3, ¶ 1. Dr. Lehmann's work for the Law Department was unlike the work he had performed as acting medical director; he was retained to provide a broad assessment of the risks associated with Bard's Recovery Filter to assist the Law

Department in advising Bard on the extent of its legal exposure. Doc. 319-2 at 31-32, 96. Dr. Lehmann reviewed relevant medical literature, examined the Recovery Filter complaints Bard had received up to that point, analyzed data from the FDA's adverse event reporting database (known as "MAUDE"), reviewed bench testing data for the Recovery Filter and its competitors, and prepared a written report of his findings. Docs. 319-2 at 97-98; 335 at 9. During this investigation, and at Passero's direction, Dr. Lehmann communicated with "a small and limited number of Bard employees for the purpose of obtaining and providing information in order to" complete his work. Doc. 319-2 at 3, ¶ 10.

On December 15, 2004, Dr. Lehmann submitted his report ("Report") to Passero. Docs. 319-2 at 3, ¶ 11, 98, 104-05; 335 at 3, ¶ 2, 11. The Report contained a header on every page stating that it was "[p]rivileged and confidential," "[a]ttorney work product," and "[p]ursuant to contract." *See, e.g.*, Doc. 335 at 13. Passero distributed the Report to five Bard employees, including Bard's general counsel. Doc. 319-2 at 3, ¶ 11, 36, 83. Eventually, the Report was distributed to approximately 12 Bard employees.[1] *See id.* at 140-41, ¶¶ 3-4. Passero testified that she distributed the Report internally because it recommended that Bard immediately and urgently address several issues. *Id.* at 37; *see also id.* at 3, ¶ 11. Passero instructed the recipients "that the report and associated materials were confidential and that any further distribution of the report should be limited to only those employees or consultants who need the report to perform their proper job functions." *Id.* at 3, ¶ 11, 83. There is no evidence that the Report was distributed to anyone other than Bard employees.

## II.    Legal Standard.

"A party or any person from whom discovery is sought may move for a protective

---

[1] The record does not clearly establish how the remaining Bard employees received the Report. Presumably, the individuals to whom Passero gave the Report passed it along to others. *See* Doc. 319-2 at 3, ¶ 11. The record is similarly unclear as to the identities of the 12 Bard employees who received the Report, although Bard's briefing suggests that it is the 12 individuals named in Robert Carr's February 3, 2014 affidavit. *See* Doc. 306 at 9, 16; *see also* Doc. 319-2 at 140-41, ¶¶ 3-4.

order in the court where the action is pending."  Fed. R. Civ. P. 26(c)(1).  Rule 26(c) authorizes a district court to grant a protective order where "good cause" is shown.  *See San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1103 (9th Cir. 1999). "[T]he party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted."  *Phillips v. G.M. Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002) (quotation marks and citations omitted).

## III.    Analysis.

Bard argues that (1) the Report is protected from disclosure by the work product doctrine; (2) Plaintiffs have not shown a substantial need for the Report, or that they will experience an undue hardship in obtaining substantially equivalent information; and (3) Bard did not waive the Report's work-product protection.  The Court will explain why it agrees with these three assertions.

### A.    The Report is protected work product.

"Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, *consultant*, surety, indemnitor, insurer, or *agent*)."  Fed. R. Civ. P. 26(b)(3)(A) (emphasis added).  Courts in the Ninth Circuit use the "because of" test to determine whether dual purpose documents were prepared in anticipation of litigation:

> In circumstances where a document serves a dual purpose, that is, where it was not prepared exclusively for litigation, then the "because of" test is used.  Dual purpose documents are deemed prepared because of litigation if in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation.  In applying the "because of" standard, courts must consider the totality of the circumstances and determine whether the document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of litigation.

*United States v. Richey*, 632 F.3d 559, 567-68 (9th Cir. 2011) (quotation marks and citations omitted).

Before the start of this MDL, Passero and Lehmann testified in an evidentiary hearing in the *Alexander* case cited above.  *See* Doc. 319-2 at 7-137.  Attorneys who are part of the Plaintiffs' Steering Committee in this MDL participated in the hearing and cross-examined Passero and Lehmann.  *Id.* at 9.  Bard relies on affidavits, documentary evidence, and testimony from the *Alexander* hearing to show that the Report was created because of anticipated litigation.  *See* Doc. 306 at 9-13.

Documents confirm that, beginning in early 2004, Bard and its legal counsel began receiving notices that the Recovery Filter was associated with adverse events, including several deaths.  *See* Docs. 319 at 14-25 (letters and emails involving lawyers and patients who had experienced adverse events associated with the Recovery Filter); *id.* at 31-80 (Bard complaint files for patients who had experienced adverse events associated with the Recovery Filter); 319-1 at 1-230 (same).  Bard received several threats of litigation.  Doc. 319 at 14-16 (February 3, 2004); *id.* at 20-21 (June 7, 2004); *id.* at 23 (June 15, 2004).  In July 2004, Bard notified its insurance carrier of potential claims relating to the Recovery Filter.  Docs. 319 at 27-29; 319-2 at 29, 91.  Plaintiffs do not dispute this documentation.

Ms. Passero stated in an affidavit and during her testimony in *Alexander* that these events caused the Law Department to retain Dr. Lehmann as a consultant to conduct a broad risk assessment.  Doc. 319-2 at 2 (¶¶ 6-7), 32.  Dr. Lehmann confirmed this fact in his testimony.  *Id.* at 93-95.

The consulting agreement was executed by Dr. Lehmann and Bard's general counsel, and provided that Dr. Lehmann would report directly to, and take directions from, attorney Passero and the Law Department.  Docs. 319-2 at 3, ¶ 9, 36, 94; 335 at 3-9.  The agreement stated that Dr. Lehmann's services were being retained in "anticipation of litigation."  Doc. 335 at 3, ¶ 1.  Dr. Lehmann's Report was submitted directly to Passero.  Docs. 319-2 at 3, ¶ 11, 98, 104-05; 335 at 3, ¶ 2, 11.  The Report contained a header stating that it was "[p]rivileged and confidential," "[a]ttorney work product," and "[p]ursuant to contract."  *See, e.g.*, Doc. 335 at 13.

- 5 -

Plaintiffs argue that the Report was prepared in the ordinary course of business. *See* Doc. 379 at 12-19. They assert that Bard's regular business includes remedial actions and "significant obligations to investigate and to report product failures, including conducting comparisons to competitor products." *Id.* at 13. Plaintiffs point to Bard's Regulatory Affairs Manual (Doc. 445-2 at 11-26, 35-53) and various statutes and administrative regulations as proof of these obligations. *See* Doc. 379 at 5-6, 13-14. Plaintiffs contend that Bard's Regulatory Affairs Manual establishes that Dr. Lehmann was a member of Bard's Product Assessment Team when he was serving as acting medical director. *Id.* at 13-14. Even if this is true, Plaintiffs fail to link this fact to Dr. Lehmann's work in preparing the Report – work that was conducted months later and in his capacity as a consultant for the Law Department.

It is true that the statutes and regulations impose on Bard certain obligations: to maintain complaint and adverse event files (*see* 21 C.F.R. §§ 820.198, 803.1), investigate and report to the FDA certain product failures (*see* 21 C.F.R. § 820.198), undertake certain duties with respect to misbranded or adulterated devices (*see* 21 U.S.C. §§ 321, 331, 351, 352, 360), and perform quality audits (*see* 21 C.F.R. § 820.22). But these laws do not impose an obligation to conduct the extensive and comparative statistical and bench testing data analyses undertaken by Dr. Lehmann and memorialized in the Report. Both Passero and Dr. Lehmann testified that the Report was an unusual undertaking, prepared in anticipation of litigation and unrelated to Bard's regulatory obligations. *See* Doc. 319-2 at 33-34, 38, 93-98, 108-10, 113-17. Even considering and crediting Plaintiffs' evidence, the Court finds these assertions largely unrebutted. The Report was a more extensive and detailed analysis than Bard normally created. The evidence does not support Plaintiffs' assertion that the Report was prepared in the ordinary course of Bard's business. It supports a finding that the Report "would not have been created in substantially similar form but for the prospect of litigation," *Richey*, 632 F.3d at 568, which satisfies the Ninth Circuit's work product test.[2]

_____

[2] At oral argument, the Court asked Plaintiffs to cite the specific statute or

1    Plaintiffs also argue that the Report was used for Bard's business purposes, and

2    that there is no evidence it was used for litigation purposes. Doc. 379 at 14-15. Plaintiffs

3    identify three internal Bard documents that contain information from the Report: the

4    December 12, 2004 HHE, the January 4, 2005 RAP, and a December 9, 2004 draft of the

5    January RAP. *Id.* at 14. A review of these documents confirms that the Report was used

6    in creating them. Bard also admitted this fact during oral argument and in its reply brief.

7    Doc. 412 at 7. But use of the Report to create internal HHEs and RAPs does not deprive

8    the Report of work product protection. To the contrary, the "because of" test is directed

9    at documents that serve both litigation and business purposes. *See Richey*, 632 F.3d at

10   567-68 ("In circumstances where a document serves a dual purpose, that is, where it was

11   not prepared exclusively for litigation, then the 'because of' test is used."). The Court

12   must determine whether "the document was created because of anticipated litigation, and

13   would not have been created in substantially similar form but for the prospect of

14   litigation." *Id.* at 568. As discussed in this order, the evidence supports such a finding.

15   Plaintiffs also cite no authority for their argument that Bard must show the Report

16   was actually used in litigation. The test is whether the Report was "*prepared* in

17

18   regulation that they claim required Bard to produce the Report. Plaintiffs cited 21 C.F.R.
     § 820.22. The Court has closely reviewed this regulation, as well as related regulations,
     and concludes that § 820.22 did not require Bard to create the Report. First, § 820.22

19   focuses on quality systems. *Id.* ("Each manufacturer shall *establish procedures for
     quality audits* and conduct such audits to assure that the *quality system is in compliance*

20   with the established quality system requirements and to *determine the effectiveness of the
     quality system*.") (emphasis added). "Quality system" is defined as "the organizational

21   structure, responsibilities, procedures, processes, and resources for implementing quality
     management." *Id.* § 820.3(v). This suggests that the quality audits mentioned in § 820.22

22   are focused on ensuring that manufacturers have proper quality assurance procedures in
     place and are, in fact, following those procedures. Second, the FDA's comments in the

23   preamble to the regulation confirm that this is the purpose of § 820.22. *See* 61 Fed. Reg.
     52602, 52614 (Oct. 7, 1996) ("Quality audit[s] are for an internal audit and review of the

24   quality system to verify compliance with the quality system regulation. The review and
     evaluations under § 820.22 are very focused. During the internal quality audit, the

25   manufacturer should review all procedures to ensure adequacy and compliance with the
     regulation, and determine whether the procedures are being effectively implemented at all

26   times."). Third, the regulatory structure indicates that § 820.22 is focused on procedures
     and processes, rather than on a particular product's safety. The regulation is located in

27   Subpart B "Quality System Requirements," and not in other subparts that more directly
     address the subject matter of the Report, such as Subpart G "Production and Process

28   Controls," Subpart I "Nonconforming Product," or Subpart J "Corrective and
     Preventative Action."

1  anticipation of litigation," not whether it was used in litigation.  Fed. R. Civ. P. 26(b)(3)

2  (emphasis added).  Requiring parties to show that a document was used in litigation

3  would likely invade both the work product protection and the attorney-client privilege.

4       Plaintiffs similarly argue that the Report does not mention litigation, legal

5  analysis, or litigation strategy.  But work product protection is not limited to legal

6  analysis or litigation strategy – it includes "documents and tangible things that are

7  prepared in anticipation of litigation . . . for another party or its representative," including

8  by its "consultant" or "agent."  *Id.*; *see Richey*, 632 F.3d at 567 ("The work-product

9  doctrine covers documents or the compilation of materials prepared by agents of the

10 attorney in preparation for litigation.").  Thus, a purely technical analysis of a Bard filter

11 prepared by one of Plaintiffs' consulting experts in anticipation of litigation would be

12 work product regardless of whether it included litigation strategy or legal analysis.

13 Indeed, when work product must be disclosed under Rule 26 for substantial need, courts

14 are directed to withhold "mental impressions, conclusions, opinions, or legal theories of a

15 party's attorney or other representative concerning the litigation," making clear that work

16 product includes more than this kind of legal analysis.  Fed. R. Civ. P. 26(b)(3)(B).

17      Plaintiffs contend that the Report is not work product because litigation was not

18 "imminent."  Doc. 379 at 16-17.  But Plaintiffs cite no authority for the proposition that

19 work product protection applies only when litigation is imminent.  The test is whether

20 litigation was reasonably anticipated, and the adverse events and litigation threats of 2004

21 clearly satisfied this requirement.

22      Plaintiffs also argue that Bard did not reasonably anticipate litigation when it

23 retained Dr. Lehmann because Bard had not yet implemented a litigation hold on

24 documents and electronically stored information.  *Id.* at 16.  But even if Bard failed to

25 implement a timely litigation hold as Plaintiffs contend – an issue the Court does not

26 decide at this time – that fact would not prove that litigation was not reasonably

27 anticipated.  Parties can fail to comply with preservation obligations in the face of

28 reasonably anticipated litigation.  Plaintiffs do not dispute that deaths and injuries from

- 8 -

the Recovery Filter had been reported in 2004, that Bard had received demands for compensation, or that Bard had put its insurance carrier on notice of possible claims. The totality of the circumstances clearly shows that litigation was reasonably anticipated.

Plaintiffs argue that the Report was prepared in the ordinary course of business because "Dr. Lehmann's work was well underway long before he was given a contract with the Law Department." Doc. 379 at 17. While there is no dispute that Dr. Lehmann worked as Bard's acting medical director in late 2003 and early 2004, Dr. Lehmann testified in the *Alexander* hearing that this role terminated on the hiring of Dr. Ciavarella in May 2004 and that, other than occasional communications with Dr. Ciavarella, he performed no work for Bard until November 2004. Doc. 319-2 at 93-98. Dr. Lehmann also testified that the work he performed as acting medical director was substantially different from the work done to produce the Report. *Id.* Plaintiffs present no direct evidence to contradict this testimony. Plaintiffs instead identify several documents as indirect evidence that Dr. Lehmann's work as acting medical director was related to his Law Department work that culminated in the Report: the March 10, 2004 HHE (Doc. 445-1 at 4-15); an April 15, 2004 email (Doc. 443-1 at 5-8); and the April 27, 2004 HHE (Doc. 414 at 3-15).

Dr. Lehmann's testimony directly addressed the differences between these HHEs and the Report. Dr. Lehmann testified that: HHEs were prepared pursuant to Bard's regulatory obligations, while the Report was not; the purpose of HHEs was to "guide potential market actions or corrections," while the purpose of the Report was to provide guidance on Bard's risk and overall exposure from adverse events associated with the Recovery Filter; HHEs considered a product's risks and benefits, while the Report considered only the Recovery Filter's risks; HHEs each focused on a single adverse event involving migration, while the Report dealt with all adverse events associated with the Recovery Filter; and the Report involved detailed statistical analysis personally performed by Dr. Lehmann, while HHEs did not. *See* Doc. 319-2 at 96-98. The Court's close review of the HHEs and the Report confirms these distinctions.

- 9 -

1    The four-page HHE dated March 10, 2004 was prepared by Dr. Lehmann after the

2    February 2004 death of a patient due to the migration of a massive blood clot and a

3    Recovery Filter to the patient's heart.[3] Doc. 445-1 at 5. The HHE focused on this single

4    adverse event and discussed the placement of the filter, the patient's risk factors, the

5    autopsy report, and other medical evidence. *Id.* at 5-6. The HHE included a short review

6    of other Recovery Filter migration complaints. *Id.* at 6. The HHE then addressed the

7    following subjects: human exposure to the problem, general consequences, population

8    exposed to risk, mitigating or predisposing factors, nature and seriousness of the risk,

9    likelihood of occurrence, likelihood of harm, whether the product is essential to health,

10   whether there are available alternatives, whether the problem must be corrected

11   surgically, whether the problem is expected and within an acceptable statistical range,

12   whether the problem can be field corrected, whether the problem is obvious to the user,

13   whether the product can continue to be used with proper warnings, and whether the

14   device is used only by specially-trained health care professionals. *See id.* at 6-8. The

15   HHE concluded that "[t]here have been 3 migrations of the Recovery VC Filter in which

16   the device ended up in or near the heart, with one fatality, in an estimated 6,402 sales

17   through March 2, 2004, for a rate of 0.05%." *Id.* This is the only statistical calculation in

18   the HHE, and includes a warning that comparative assessments using data from "the

19   MAUDE database do not yield reliable quantitative estimates." *Id.* With respect to

20   whether the problem is expected and within an acceptable statistical range, the HHE

21   stated that "[e]stimates based on MAUDE and sales data suggest that there is no

22   significant difference in the rates of these complications between devices, including the

23   Recovery" Filter. *Id.* at 8.

24   The Report has a broader focus. It contains statistical analyses relating to selected

25   types of adverse events associated with the Recovery Filter and other filters on the

26   market, including rates of reported filter fractures, caval perforation, filter movement,

27   filter embolization, and filter embolization deaths. Doc. 335 at 13. Using MAUDE data,

28

[3] The April 27, 2004 HHE is similar to the March HHE in all relevant respects.

actual sales data for the Recovery Filter, and estimated sales data for other filters, the Report calculates and compares adverse event reporting rates for the Recovery Filter and seven other types of filters. *Id.* at 19-20. The Report then uses the reporting rates to calculate relative risks for each of the eight filters for different types of adverse events. *Id.* at 21-27. The Report also reviews Bard's bench testing data that was used to determine migration resistance for each of the eight filters, and compares the bench data to the frequency of adverse events reported in the MAUDE data base. *Id.* at 31-33. The Report concludes that "[t]his data and analysis provides two significant signals (MAUDE rates and bench test data) that further investigation of the Recovery VCF filter performance in relation to migration and fracture is urgently warranted." *Id.* at 16. This is a different focus than the HHEs. True, there are some similarities between the HHEs and the Report, but the documents clearly serve different purposes and their substantial differences corroborate Dr. Lehmann's testimony that the Report was a different undertaking than the work he did as acting medical director.

In the April 15, 2004 email relied on by Plaintiffs, Dr. Lehmann stated that "[c]omparison with other filters is problematic in many ways, and we should avoid / downplay this as much as possible." Doc. 443-1 at 5. Plaintiffs argue that this statement shows that Dr. Lehmann performed the same work as acting medical director that he did in preparing the Report. But the fact that Dr. Lehmann – or others within Bard – did some comparisons with other filters while he was acting as Bard's medical director does not prove that the detailed statistical analysis and evaluation of bench-testing results contained in the Report were done before his contract with the Law Department or for another reason. Nor have Plaintiffs cited any authority for the proposition that work product is not entitled to protection if it is similar in some way to work the person has done before. Rather, the test is whether the Report "would not have been created in substantially similar form but for the prospect of litigation." *Richey*, 632 F.3d at 568. After examining the HHEs and the April 2004 email, and comparing them with the Report, the Court finds that they do not undercut the testimony of Dr. Lehmann that the

Report was prepared at the behest of the Law Department and would not have been created in substantially similar form otherwise.

Finally, Plaintiffs cite language from the December 2004 draft RAP which states that Dr. Lehmann "was commissioned by *Corporate Senior Management* to provide an independent study of the risk/benefit of the [Recovery Filter] in bariatric patients." Doc. 379 at 9 (emphasis added by Plaintiffs). Plaintiffs argue that this proves Dr. Lehmann was hired by the business, not by the legal department, to prepare the Report. But Dr. Lehmann's consulting contract was signed by Judith Reinsdorf, Bard's Vice President, General Counsel, and Secretary. Doc. 335 at 8. She clearly qualified as "Corporate Senior Management," as stated in the draft RAP. She also was Bard's lead in-house lawyer. The Court cannot conclude that the statement in the draft RAP is somehow inconsistent with the fact that the Report was prepared at the request of the Law Department and in anticipation of litigation.[4]

In summary, the Court finds that the clear threat of litigation in 2004, Dr. Lehmann's retention by the Law Department in November of that year, the contract he signed with Bard's general counsel, the scope of work be performed under the contract, and the clear labeling of the Report as work product all support a finding that the Report was prepared because of anticipated litigation. Dr. Lehmann testified that his work in late 2003 and early 2004 as acting medical director was different than the work he did under the contract, and the documents cited by Plaintiffs do not undercut that testimony. To be sure, there are some general similarities between the HHEs and the Report, and the Report was used for some business purposes, but these facts do not contradict the clear evidence that the Report "would not have been created in substantially similar form but for the prospect of litigation." *Richey*, 632 F.3d at 568. The Court finds no evidence to support Plaintiffs' suggestion that the work product label for the Report was some kind of

---

[4] What is more, this language did not appear in the January 4, 2005 final version of the RAP. *See* Doc. 306-1 at 43-44 ("As part of the ongoing evaluation of [the Recovery Filter], Bard requested an independent study of the risks and benefits of the [Recovery Filter], with an emphasis on its use in bariatric surgery and trauma patients.").

1  grand ruse, implemented to hide unfavorable information.  Based on the totality of the

2  circumstances, the Court concludes that the Report was prepared "because of" anticipated

3  litigation and is protected by the work-product doctrine.  Fed. R. Civ. P. 26(b)(3)(A);

4  *Richey*, 632 F.3d at 567-68.

5          **B.      Plaintiffs have not shown substantial need or undue hardship.**

6          Work product protection is not absolute.  A protected but otherwise discoverable

7  document may be obtained in discovery if "the party shows that it has substantial need

8  for the materials to prepare its case and cannot, without undue hardship, obtain their

9  substantial equivalent by other means."   Fed. R. Civ. P. 26(b)(3)(A).   The Advisory

10 Committee has made clear that a "special showing" is required.  *See Bickler v. Senior*

11 *Lifestyle Corp.*, 266 F.R.D. 379, 384 (D. Ariz. 2010) (citing Fed. R. Civ. P. 26(b)(3)

12 advisory committee's note (1970)).

13         Bard argues that Plaintiffs have full access to all of the data analyzed in Dr.

14 Lehmann's Report and that their experts can – and already have in some of the

15 consolidated cases – perform the same analysis.  Plaintiffs do not disagree, but instead

16 attempt to show their substantial need by arguing this:

17             Yes, Plaintiffs can analyze the same data Dr. Lehmann did.  Plaintiffs in
              other cases have even hired experts to do the same work.  But Plaintiffs
18            should not be required to present the evidence in this cumbersome fashion
              and incur the expense and delay associated with hiring an independent
19            expert simply to show what Bard knew as of December 2004 and
              communicated to several high-ranking officials in its corporation.  The
20            Report does all of that.  Why waste days of trial (in every MDL case
21            remanded for trial) with the concomitant strain on judicial and party
              resources to employ, prepare, present, and depose experts, along with the
22            inevitable *Daubert* hearing exercise, when all that same information is in
23            one report provided to several Bard employees primarily used to comply
              with Bard's reporting requirements to the FDA?
24

25 Doc. 379 at 28.

26         The Court finds this argument wholly unpersuasive.  Plaintiffs essentially concede

27 that they can create the substantial equivalent of the Report through their own experts,

28 but argue – in this substantial and well-funded MDL proceeding – that they should not be

put to the time and expense of retaining their own experts. If this were a sufficient "special showing" to overcome work product protection, *Bickler*, 266 F.R.D. at 384, the protection would be lost in every case where the opposing side would have to expend meaningful resources to obtain the substantial equivalent of the work product. This is not the law. *See, e.g.*, *Fletcher v. Union Pac. R.R. Co.*, 194 F.R.D. 666, 671 (S.D. Cal. 2000) (citing 8 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2025, at 374, n.15 (3d ed. 2015)) (finding "mere[] expense or inconvenience" insufficient to constitute undue hardship).

Plaintiffs asserted during oral argument that there is a fact they cannot prove through their own experts: that Bard *knew* of Dr. Lehmann's unfavorable conclusions. But Plaintiffs' briefing on this issue suggestions otherwise: "Plaintiffs should not be required to . . . incur the expense and delay associated with hiring an independent expert simply to show what Bard *knew* as of December 2004." Doc. 379 at 28 (emphasis added). What is more, Plaintiffs' briefing includes many cites to evidence they claim shows that Bard knew about the problems arising from its filters, including a statement in which Dr. Lehmann, in his role as acting medical director, allegedly was urging Bard to downplay the problem. *See* Doc. 443-1 at 5 ("Bottom line: good filter, severe case, bad outcome, deep regret. This is the simple story we should repeat again and again. Comparison with other filters is problematic in many ways, and we should avoid / downplay this as much as possible."). Plaintiffs asserted in oral argument that Dr. Lehmann's report would make this point even more credibly, but the Court cannot conclude that enhanced credibility satisfies the special showing required to overcome work product protection. *See Baker v. Gen. Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000) ("A party also does not demonstrate substantial need when it merely seeks corroborative evidence.").

It is undisputed that Plaintiffs have access to the same data that Dr. Lehmann relied on in creating the Report. Docs. 306 at 14; 379 at 28. Further, "Plaintiffs in other cases have even hired experts to do the same work." Doc. 379 at 28; *see* Doc. 319-2 at

143-64 (expert report of Dr. Michael Freeman).  Plaintiffs have not made the showing of substantial need or undue hardship required to overcome the Report's work product protection.

### C.    Bard did not waive the Report's work product protection.

Plaintiffs argue that Bard waived any claim to work product protection by (1) internal distribution of the report to 12 Bard employees, (2) disclosure of the report in the *Phillips* trial in the District of Nevada, (3) attempting to use work product protection as both a sword and a shield, and (4) using the Report in furtherance of a crime or fraud. *See* Doc. 379 at 20-27.  The Court will address each argument separately.

### 1.    Internal distribution of the Report.

"Courts have recognized that work product protection may be lost when the disclosure substantially increases the opportunity for potential adversaries to obtain the information." *Bickler*, 266 F.R.D. at 384 (quotation marks and citation omitted).  Bard contends that its distribution of the Report to 12 internal employees did not substantially increase the opportunity for Plaintiffs to obtain the Report.  The Court agrees.

Passero distributed the Report to five people, including Bard's general counsel, with instructions that it was confidential and distribution "should be limited."  Doc. 319-2 at 3, ¶ 11, 36-37.  Passero testified that she distributed the report internally because the Report recommended that Bard promptly take certain steps and she thought it important to give it "to people who would know what to do with that information." *Id.* at 37.  Eventually, the Report was distributed to a total of 12 Bard employees.  *See* Doc. 319-2 at 140-41, ¶¶ 3-4.

Plaintiffs argue that the Report was circulated without restrictions.  They cite deposition testimony of Dr. Ciavarella that "he received the Report 'without restriction' as to its use," and that he was "*never instructed that the Report was secret or prepared in anticipation of litigation*."  Doc. 379 at 10 (emphasis by Plaintiffs).  Plaintiffs' Exhibit 5 contains several pages of Dr. Ciavarella's deposition transcript, but none of them contains this testimony.  *See* Doc. 445-2 at 1-9.  The Court therefore cannot consider Ciavarella's

1   statement in context. But even if it was made as quoted by Plaintiffs and is accepted as
2   true, the Court cannot conclude that one high-level employee's receipt of the Report
3   without Passero's restrictions substantially increased the risk that the Report would be
4   distributed outside of Bard. Every page of the Report was labeled "[p]rivileged and
5   confidential" and "[a]ttorney work product." Doc. 335 at 13-46. In addition, Bard's
6   internal policies state that communications between Bard's legal counsel and its
7   employees are to be kept confidential, as are documents created in anticipation of
8   litigation. Doc. 319-2 at 2, ¶ 5.

9       The Court concludes that Bard's internal distribution of the Report to 12
10  employees did not substantially increase the opportunity for Plaintiffs or others outside of
11  Bard to obtain the Report. *Bickler*, 266 F.R.D. at 384.

12                  **2.    Disclosures of the Report in the *Phillips* trial.**

13      Courts have been willing to preserve a document's work product protection where
14  an earlier disclosure of the document was compelled. *Bickler*, 266 F.R.D. at 384 (citation
15  omitted); *see also Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989)
16  ("When a party is compelled to disclose privileged work product and does so only after
17  objecting and taking other reasonable steps to protect the privilege, one court's disregard
18  of the privileged character of the material does not waive the privilege before another
19  court."). In *Phillips v. Bard*, No. 3:12-CV-344-RCJ-WGC (D. Nev. Feb. 2, 2015), the
20  Report was admitted into evidence during trial over Bard's work product objection. *See*
21  Doc. 306-1 at 150-55; 159-60. Bard argues that this compelled disclosure did not amount
22  to waiver. The Court agrees.

23      Bard took reasonable steps to protect the Report's confidential nature during the
24  *Phillips* trial. Bard objected to the Report's use at trial, argued against its admission
25  during a hearing in the middle of trial, and objected again when the Report was actually
26  introduced in evidence. *See* Doc. 306-1 at 150-55, 159-60. The Court is not persuaded
27  by Plaintiffs' argument that "Bard failed to timely request that [the] Report (and other
28  trial exhibits) be sealed." Doc. 379 at 27. Bard actively opposed the use of the Report

during trial and moved to seal the Report at the conclusion of the trial.  Doc. 412 at 15. Bard's compelled disclosure was not a waiver of its work product protection.  *Bickler*, 266 F.R.D. at 384; *Shields*, 864 F.2d at 382.

### 3.    Sword and shield argument.

The attorney-client privilege and work product protection may not be used as both a sword and a shield.  "Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived."  *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001) (quotation marks and citations omitted).

Plaintiffs assert that Bard has selectively quoted the Report in several documents, including the December 17, 2004 HHE (Doc. 306-1 at 52-56) and the January 4, 2005 RAP (*id.* at 39-50).  Both the HHE and the RAP do repeat the Report's findings that the Recovery Filter was experiencing significantly higher reporting rates of adverse events than comparable filters.  *See id.* at 44, 53.  The documents also convey some of the Report's limitations, such as the lack of reliable data and the need to conduct follow-up research.  *See id.*  But Plaintiffs do not show how this use of the Report constitutes a sword.  The sword-shield rulings stand for basic fairness – a party should not be allowed to use work product affirmatively to gain some advantage in litigation, and at the same time withhold the work product from scrutiny by asserting the work product protection. The use of data and conclusions from the Report in internal Bard documents, such as the RAPs and the HHEs, does not amount to such affirmative use, and fairness therefore does not demand disclosure of the full document.

Plaintiffs also point to representations that Bard made to "the FDA and the medical community that the Recovery [Filter] failed at the same rate as competition models while knowing from the Report that this was not true."  Doc. 379 at 21-22 (citing Doc. 443-1 at 5-8).  For support, Plaintiffs cite an April 15, 2004 email from Dr. Lehmann.  Doc. 443-1 at 5-8.  But this email does not support Plaintiffs' position.  At the time, Dr. Lehmann could not have known from the Report that the Recovery Filter was

1    failing at higher rates than its competitors because the Report had not been created – it
2    was not issued for another eight months. What is more, making a public statement
3    contrary to what is contained in work product does not constitute use of the work product
4    as a sword. The work product is not used at all in such a communication. The work
5    product may contradict the public statement, but the sword-shield basis for waiver does
6    not turn on impeachment value; it turns on the unfairness of using a document to make an
7    affirmative assertion for one's advantage while simultaneously withholding the document
8    from scrutiny. Dr. Lehmann's email did not do that.

9                    **4.    Crime-fraud exception.**

10         The attorney-client privilege and work product protection do not apply to
11   communications made or work done in furtherance of a crime or fraud. *In re Grand Jury*
12   *Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996); *United States v. Zolin*, 491 U.S. 554, 562-
13   63 (1989); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 n.2 (2d Cir. 1995) (work product). A
14   party that invokes the crime-fraud exception must show that: (1) "the client was engaged
15   in or planning a criminal or fraudulent scheme when it sought the advice of counsel to
16   further the scheme," and (2) the work product was sufficiently related to and was made in
17   furtherance of the intended, or present, continuing illegality. *In re Napster, Inc.*
18   *Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007) (quotation marks and citations
19   omitted), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100
20   (2009).

21         Plaintiffs argue that the crime-fraud exception can be established merely by
22   showing "reasonable cause" to believe that the legal services were used to promote an
23   unlawful scheme. Doc. 379 at 22. But the case law cited by Plaintiffs concerns grand
24   jury proceedings, and the Ninth Circuit has noted that there is reason to apply a lower
25   standard in such proceedings – which require speed and simplicity – than in civil cases.
26   *In re Napster*, 479 F.3d at 1094. The Ninth Circuit has held that a party in a civil case
27   must establish the crime-fraud exception by a preponderance of the evidence when
28   challenging attorney-client communications. *Id.* at 1094-95 ("For several reasons, we

1    conclude that in a civil case the burden of proof that must be carried by a party seeking
2    outright disclosure of attorney-client communications under the crime-fraud exception
3    should be preponderance of the evidence."). Plaintiffs do not address this holding, nor do
4    they provide reason for the Court to conclude that a different standard should apply to
5    work product protection. The Court concludes that the preponderance of the evidence
6    standard should be applied to this work product challenge.[5]

7         In an opening footnote on this issue, Plaintiffs cite a recall of another Bard product
8    in 1990, criminal charges brought in 1993 against Bard related to other products, two
9    MDL proceedings against Bard, and Bard's settlement of a qui tam lawsuit. Doc. 379 at
10   23-24 n.15. Plaintiffs provide no evidence linking these events to this case. Moreover,
11   the crime-fraud exception does not apply to past conduct. *Zolin*, 491 U.S. at 562-63.

12        Plaintiffs assert that Bard committed a "cover up of adverse testing, injuries, and
13   deaths associated with its filters," which they contend is both fraudulent and criminal.
14   Doc. 379 at 24. Plaintiffs produce the following evidence: Bard learned of the first
15   reported death associated with the Recovery Filter in February 2004; in response, Bard
16   formed a Crisis Communication Team; in April 2004, a Bard executive emailed Dr.
17   Lehmann expressing concern about the Recovery Filter's mortality rate; in July 2004,
18   Bard issued an HHE that showed the Recovery Filter had a failure rate 28 times higher
19   than other filters; the Report showed high rates of adverse events associated with the
20   Recovery Filter; and witnesses have testified about the Recovery Filter's high rate of
21   adverse events. *Id.* at 24-25. Plaintiffs assert that Bard committed fraud by not reporting
22   this information to the FDA, doctors, and patients, and by failing to issue a product recall.

23        Bard presents contrary evidence and arguments. Doc. 412 at 13. Bard notes that

24   ──────────────

25        [5] The Court finds that the four reasons given by the Ninth Circuit for adopting the
     preponderance standard for challenges to attorney-client communications apply as well to
26   work product: (1) the importance of the work product protection has been recognized
     since *Hickman v. Taylor*, 329 U.S. 495 (1947); (2) the *prima facie* standard is not
27   inconsistent with a preponderance standard; (3) Federal Rule of Evidence 104(a) applies
     to admissibility questions regarding work product and calls for a preponderance standard;
28   and (4) the problem of limited access to proof is mitigated by the possibility of *in camera*
     review as well as the substantial need exception to work product protection. *See In re
     Napster*, 479 F.3d at 1095-96.

- 19 -

the two deaths, which led to creation of the Crisis Communications Team, were both reported to the FDA. Doc. 319 at 32, 44. In addition, the adverse outcome rates set forth in the Report were based on adverse events in the MAUDE database, which is maintained by the FDA. Doc. 335 at 14. Bard thus asserts that FDA was fully aware of the deaths and adverse events Plaintiffs rely on for their fraud allegations. Bard also cites evidence of additional adverse-event-rate disclosures to the FDA in October 2004. Doc. 412 at 13. Bard further cites evidence that migration rates for the Recovery Filter were well below rates reported in medical literature for all IVC filters (Doc. 412 at 12), and that the overall adverse event rates for the Recovery Filter were small (*id.*). Finally, Bard notes that the FDA, which is aware of Recovery Filter adverse event rates, has never suggested that the Recovery Filter be recalled. *Id.* at 13.

Given the parties' conflicting evidence and allegations, the Court cannot find by a preponderance of the evidence that Bard engaged in fraudulent or criminal conduct. Plaintiffs have failed to carry their burden of proving the crime-fraud exception.

## IV. Additional discovery or evidentiary hearing.

If the Court is inclined to reject their arguments, Plaintiffs ask for additional discovery and an evidentiary hearing. The Court declines this request for two reasons.

First, this issue has already been litigated in many state and federal courts that preceded this MDL. Thirteen court decisions have found the Report to be protected work product.[6] Four have found the Report subject to discovery.[7] The Court does not find

---

[6] *Alexander v. Bard*, No. 3:12-CV-05187-O-BK (N.D. Tex.); *Barkley v. Bard*, No. CV2011-021250 (Ariz. Super. Ct.); *Carr v. Bard*, 297 F.R.D. 328 (N.D. Ohio 2014); *Cason v. Bard*, No. 1:12-CV-01288-MHS (N.D. Ga.); *Ebert v. Bard*, No. 5:12-CV-01253-LS, 2014 WL 1632155 (E.D. Pa. Apr. 24, 2014); *Jones v. Bard*, No. 3:13-CV-00599-K (N.D. Tex); *Kilver v. Bard*, No. 1:13-CV-01219-MMM-JEH (C.D. Ill.); *Leus v. Bard*, No. 13-CV-00585-W-GAF (W.D. Mo.); *Peterson v. Bard*, No. 3:13-CV-00528-JJR-RLB (M.D. La.); *Phillips v. Bard*, 290 F.R.D. 615 (D. Nev. 2013) (Cobb, M.J.); *Rackliff v. Bard*, No. CV2011-021206 (Ariz. Super. Ct.); *Stesney v. Bard*, No. CV2012-006103 (Ariz. Super. Ct.); *Towlson v. Bard*, No. CV2011-022334 (Ariz. Super Ct.).

[7] *Giordano v. Bard*, No. 37-2011-00069363-CU-PO-EC (Cal. Super. Ct.); *Payne v. Bard*, No. 6:11-CV-01582-ORL-37GJK (M.D. Fla.); *Phillips v. Bard*, No. 3:12-CV-00344-RCJ-WGC (D. Nev.) (Jones, J.); *Tillman v. Bard*, No. 3:13-CV-00222-J-34JBT (M.D. Fla.).

these four decisions persuasive. In one, *Giordano v. Bard*, the California Superior Court denied Bard's attempt to clawback the inadvertently produced Report without providing any comment or analysis. Doc. 306 at 4-5 n.2. In two others – *Tillman v. Bard* and *Payne v. Bard* – Magistrate Judge Toomey of the Middle District of Florida applied the more rigorous "primary purpose" work product standard, which protects "documents prepared principally or exclusively to assist in anticipated or ongoing litigation." *See* Doc. 443-1 at 110-132. The fourth case, *Phillips v. Bard*, actually involved two conflicting decisions in Nevada Federal District Court. After briefing and a hearing, Magistrate Judge Cobb held that the Report was protected work product. *See* Doc. 306-1 at 120-24, 133, 139-141. During trial, the plaintiff in *Phillips* sought to place the Report in evidence, Bard objected, and District Judge Jones – without the benefit of briefing – overruled the objection. *Id.* at 152-54. Thus, the four decisions which found the Report discoverable either were made without explanation, applied a different legal standard than the Ninth Circuit's "because of" test, or were made without briefing.

Moreover, the fact that the Report has been litigated more than 15 times in a wide range of courts shows that it has been the subject to ample discovery and argument. And as noted above, it was the subject of an evidentiary hearing in *Alexander v. Bard*, in the Northern District of Texas. The plaintiff's lawyers in that hearing are members of the Plaintiffs' Steering Committee in this MDL. *See* Doc. 319-2 at 7. Bard was represented by the same lawyers who are representing it in this MDL. *See id.* at 8.

Given this prior litigation history, the Court cannot conclude that Plaintiffs have been disadvantaged in any way by a lack of discovery or opportunity to develop their arguments. *See* Fed. R. Civ. P. 26(b)(2)(C)(ii).

Second, the evidence the Court has considered in making this decision does not suggest that an evidentiary hearing is needed. The testimony of Passero and Lehmann is consistent with the documentary evidence. Plaintiffs have presented no evidence that causes the Court to think this is a difficult evidentiary issue requiring in-person credibility determinations. In short, this is not a close question. The Court therefore will

- 21 -

deny Plaintiffs' request for additional discovery and an evidentiary hearing. There are more relevant and productive tasks to be completed in this MDL.

**V.      Effect of this ruling on prior rulings in other cases.**

The parties agree that this Court's ruling should not affect any prior rulings on this issue in other cases. *See* Docs. 306 at 21-23; 379 at 29-30. The Court agrees. This ruling shall operate prospectively only, and shall apply in all MDL cases where the issue has not previously been decided.

**VI.     Conclusion.**

The Court finds that Bard will suffer specific prejudice or harm if Plaintiffs are permitted to use a Report entitled to work product protection in discovery or at trial. Bard has shown good cause for a protective order. *San Jose Mercury News*, 187 F.3d at 1103; *Phillips*, 307 F.3d at 1210-11.

**IT IS ORDERED:**

1.      Defendants' motion for a protective order (Doc. 306) is **granted**. Dr. John Lehmann's December 15, 2004, report is protected work product pursuant to Federal Rule of Civil Procedure 26(b)(3). Plaintiffs may not use or rely on the report in any pending or future case in this MDL. This order shall not affect any transferor courts' previous orders regarding the discoverability or use of Dr. Lehmann's report.

2.      Defendants' unopposed motion to seal (Doc. 413) is **granted**. The Clerk is directed to accept for filing under seal the document lodged on the Court's docket as Doc. 414.

Dated this 11th day of February, 2016.

_____
David G. Campbell
United States District Judge

- 22 -

# EXHIBIT 52

**From:** Uelmen, Doug [/O=BARD/OU=TPE AG/CN=RECIPIENTS/CN=DUELMEN]
**Date:** 12/12/2004 10:36:22 PM
**To:** Jones, Kellee [Kellee.Jones@crbard.com]
**Attachments:** SPA-04-12-01.doc



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
MD1

BPVE-01-00435295

**Remedial Action Plan (Revised)**
**Bard Peripheral Vascular Division**
SPA-04-12-01
**December 9, 2004**

I.   Product Description and Intended Use

> A.  The Recovery Filter consists of twelve shape-memory nitinol wires
> emanating from the central nitinol sleeve.   These twelve wires form two
> levels of filtration.   The legs provide a lower level of filtration and fixation to
> the caval wall.   The arms provide the upper level of filtration and help
> center the filter in the vessel.  The Recovery Filter is intended to be used
> in vena cava circular diameters up to 28 mm.
>
> B.  The Recovery Filter Delivery System consists of a 7 French I.D.
> introducer sheath and dilator, the Recovery Filter, a delivery storage tube
> with saline infusion port, and a pusher system.  The Recovery Filter is
> packaged pre-loaded within the delivery storage tube.
>
> C.  The Recovery Filter is a blood clot trapping device designed to prevent
> pulmonary embolism by mechanical filtration.  The filter is implanted in the
> inferior vena cava (IVC).  The Recovery Filter has the additional feature of
> being able to be percutaneously removed after implantation.  The
> Recovery Filter is indicated as a permanent filter or implanted temporarily
> to treat the temporary risk of pulmonary embolism.  The Recovery Filter
> has the following indications for placement:
>
> > 1.  Pulmonary thromboembolism when anticoagulants are
> > contraindicated.
> > 2.  Failure of anticoagulant therapy in thromboembolic disease.
> > 3.  Emergency treatment following massive pulmonary embolism
> > where the anticipated benefits of conventional therapy are reduced.
> > 4.  Chronic, recurrent pulmonary embolism where anticoagulant
> > therapy has failed or is contraindicated.

II.  Manufacturer / Distributor

> A.  The product is manufactured by the Bard Glens Falls Operation,
> Queensbury, NY and distributed by the Bard Peripheral Vascular Division
> through the Bard Distribution Center, Covington, GA.

III. Identification of the Problem

> A.  A consultant was commissioned by Corporate Senior Management to
> provide an independent study of the risk / benefit of the RNF in bariatric

**Confidentiality Notice:** This document contains information that is confidential and privileged.  If you have received this in error, and are not the
intended recipient, you may not use, copy or disclose to anyone any of the information contained in this document.

Page 1 of 8

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
.MD1

*patients.  While preparing data for this study, several unfavorable comparisons were discovered.  These data comparisons are being addressed in this remedial action plan.*

1. This comparison included:

   a) The Simon Nitinol Filter (C.R. Bard)
   b) The VenaTech Filter (B Braun)
   c) The Titanium & SS Greenfield Filters (Boston Scientific)
   d) The Bird's Nest Filter (Cook)
   e) The Günther Tulip Filter (Cook)
   f) The TrapEase Filter (Cordis)
   g) The OptEase Filter (Cordis)

2. Comparative data was obtained from the following sources:

   a) The FDA MAUDE database (2000 to present).  MDR reports for each of the filters were used as a measure of field performance.
   b) The IMS database was used to provide sales data.
   c) BPV bench test data.

3. Rates were developed using the MAUDE & IMS data.  These rates were normalized by the consultant to show adverse events per 100,000 units used.

4. Normalized data was used to compare the RNF to the above mentioned filters in the following catagories:

   a) Fatalities associated with migration.
   b) Non-fatal migrations.
   c) Vena cava perforations associated with fractures.
   d) All deaths.

5.  For each comparison a statement of releative risk was developed.  The relative risk provides a multiple of the risk associated with RNF when compared to:

   a)  All ICV filters individually.
   b)  IVC filters with a retrievable indication.
   c)  All ICV filters as a group.

6.  The comparison provided by the consultants indicates a signicant differnce in the catagories studied between the RNF and other filters (see attachment A).

**Confidentiality Notice:** This document contains information that is confidential and privileged.  If you have received this in error, and are not the intended recipient, you may not use, copy or disclose to anyone any of the information contained in this document.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00435297

IV. Medical Evaluation

    A. *See Heath Hazard Evaluation report attached.*

V. Number of units and lots involved:

    A. *As of December 9, 2004, there have been approximately 20,597 Recovery Filter units distributed since the product was released in April 2003.*

VI. Distribution of Units

    A. *Recovery Filters are distributed in the United States, United Kingdom, Canada, Australia, Italy and Benelux.*

VII. Action Plan:

    A. *A Division Investigation Team (DIT) was assigned to review the data associated with the identification of the problem (above). This team included the BPV VP of QA, the BPV VP of RA/CA, the BPV VP of R&D, the Director of R&D for Interventional Products, and the IVC Filter Marketing Manager. In addition, two members of the RA staff were assigned to provide independent confirmation of the MAUDE database review.*

        1. The DIT completed a review of all IVC Filter MDRs found in the MAUDE from Q1 200 through Q3 2004. Clarifications and corrections were completed and discussed with the Corporate Consultant. Upon completion of this activity, both the Corporate Consultant and the DIT concur that the database being used for comparison is in agreement with the MAUDE database. The DIT continues to hold view that the value of the MAUDE database does not yield reliable quantitative estimates because the number of MDRs are likely to be underestimated by unpredictable yet significant reporting issues.

        2. The Division Investigation Team believes that although the IMS database can be a useful marketing tool, it has the following limitations when attempting to provide detailed sales data needed to yield precise rate comparisons. Due to these limitations, only mean data has been provided to the Corporate Consultant for this comparison (95% confidence interval: mean $\pm$ 27.3%).

**Confidentiality Notice:** This document contains information that is confidential and privileged. If you have received this in error, and are not the intended recipient, you may not use, copy or disclose to anyone any of the information contained in this document.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00435298

a) The IMS database is a retrospective sampling of sales from approximately 5% of U.S. Hospitals (350 of 6,000).
b) The current published IMS report is from Q2 2004, which contains Q1 2004 actual sales.
c) Because it is the companies' responsibility to inform IMS of new product introduction, there is a delay associated with updating the IMS database, resulting in inaccurate information.
d) Procedure-based databases (SMG) tend to be more closely aligned with the lower end of the IMS confidence interval.

3. Sales/Procedure Data Source Comparison
   a) IMS – Market data estimated from the sales data of 350 out of 6000 U.S. hospitals. The Hospital Supply Index precision tables can be used to estimate the 95% confidence interval for the mean data that is presented in the quarterly IMS reports.
   b) Millenium – Market projection
   c) Medtech Insights – Market projections
   d) Solucient – Procedure data
   e) Verispan (SMG) – Procedure data collected from 100% Medicare patients and 100% of the private-pay patients from 21 of the states, used to project the total of private-pay patients.

| Source | 2002 | 2003 | 2004 |
|--------|------|------|------|
| IMS (Mean) | 113,697 | 124,020 | not available |
| IMS (Lower 95% CI) | 82,317 | 89,790 | not available |
| IMS (Upper 95% CI) | 145,077 | 158,250 | not available |
| Millenium | 94,000 | 97,000 | 100,800 |
| Medtech Insights | 100,000 | 111,000 | 126,000 |
| Solucient | 75,813 | 85,287 | not available |
| Verispan | 72,563 | 80,439 | not available |

4. The following comparative table provides an overview of the adverse events associated with each IVC filter presently on the market:

| Brand | Migration | Caval Perforation | Caval Thrombosis | Pulmonary Embolism | Filter Fracture | Insertion |
|-------|-----------|-------------------|------------------|--------------------|-----------------| ----------|
| SNF | 3 | 9 | 0 | 0 | 3 | 25 |
| RNF | 82 | 36 | 0 | 20 | 31 | 36 |
| VenaTech | 52 | 0 | 0 | 2 | 2 | 31 |
| Greenfield | 22 | 5 | 1 | 2 | 4 | 97 |
| Bird's Nest | 31 | 124 | 0 | 15 | 77 | 124 |
| Tulip | 36 | 20 | 3 | 3 | 0 | 56 |

Confidentiality Notice: This document contains information that is confidential and privileged. If you have received this in error, and are not the intended recipient, you may not use, copy or disclose to anyone any of the information contained in this document.

Page 4 of 8

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| TrapEase | 12 | 10 | 36 | 3 | 6 | 15 |
| OptEase | 12 | 0 | 12 | 24 | 12 | 35 |

*rates per 100,000 patients

    a)  Predominant failure mode associated with RNF is
    migration (3X industry average).
    b)  Predominant failure mode associated with TrapEase is
    caval thrombosis (16X).
    c)  Predominant failure modes for Bird's Nest include
    perforation (11X), fractures (9X), and insertion difficulties
    (3X).

B.  *The DIT concludes there is no perfect filter.*

    1.  The DIT has reviewed the BPV database and found the
    following:
        a)  3 of 6 migration related deaths were associated with the
        bariatric population.
        b)  1 of 6 migration deaths were associated with trauma
        patients.
        c)  2 of 6 migration deaths were associated with DVT
        patients contraindicated for anticoagulation.
        d)  7 of 16 total migrations were associated with bariatric
        patients.

    2.  Product Utilization. (Insert Joe's data)
        a)  16% of total utilization is in bariatric surgery.
        b)  50% of the migration related deaths have been reported
        for the bariatric population.
        c)  44% of the overall migrations have been reported for the
        bariatric population.
        d)  The bariatric patient population is highest risk patient
        population presently receiving the RNF.

    3.  Bariatric Patient Population Removal Effect on rates/regression
    analysis:
        a)  Rates:
RNF Migration/Death Rate

| Condition | Sales (units) | Total Migrations | Total Mig./Deaths |
|---|---|---|---|
| All Recovery | 19,537 | 0.082% (16) | 0.031% (6) |
| Without Bariatric | 16,411 | 0.055% (9) | 0.018% (3) |

Total Fatality Rate Comparison

**Confidentiality Notice:**  This document contains information that is confidential and privileged.  If you have received this in error, and are not the intended recipient, you may not use, copy or disclose to anyone any of the information contained in this document.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

| Brand | LCI | All Deaths | UCI |
|---|---|---|---|
| SNF | 0.000% | 0.000% | 0.000% |
| Recovery | 0.018% | 0.018% | 0.018% |
| VenaTech | 0.009% | 0.007% | 0.006% |
| Greenfield | 0.009% | 0.007% | 0.005% |
| Bird's Nest | 0.020% | 0.015% | 0.012% |
| Tulip | 0.014% | 0.011% | 0.009% |
| TrapEase | 0.016% | 0.012% | 0.010% |
| OptEase | 0.030% | 0.024% | 0.019% |
| Recovery to all filters | 1.30x | 1.65x | 2.10x |

*LCI is most consistent with procedural databases.

b) Regression analysis with/without bariatric patients



TABLE XX: With RNF Bariatric Population
Note: All Migrations normalized to 100,000 vs migration resistance bench data (average 25-32mm)

**Confidentiality Notice:** This document contains information that is confidential and privileged. If you have received this in error, and are not the intended recipient, you may not use, copy or disclose to anyone any of the information contained in this document.

Page 6 of 8

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
LMD1



Table XX:  RNF without bariatric population
Note: All Migrations normalized to 100,000 vs migration resistance bench data
(average 25-32mm).

C.  *The following provides a list of opportunities to mitigate the*
*predominate failure mode associated with RNF (migration).*
    1.  No Action until G1a becomes available.
        a)  DIT believes that BPV data is
        compelling as to sub-population of bariatric patients.

    2.  No immediate action while additional data is gathered (survey,
Q4 Maude).
        a)  Not Recommended:  Internal data is adequate to make
        recommendation regarding sub-population.
   3.  Inform and Warn
        a)  Safety Alert- Warning
            (1) (1) *Recommended:  Appropriate to reduce death*
            *and major complication rates.  Physician/patients may*
            *still choose Recovery Filter based on updated*
            *information.*
        b)  Safety Alert – Contraindication
            (2) (1) *Not recommended:  For bariatric patients, the*
            *RNF provides a necessary benefit to prevent lethal*
            *PE. (10x less likely to die) Sapala, et al. "Fatal*
            *Pulmonary Embolism after Bariatric Operations for*

**Confidentiality Notice:** This document contains information that is confidential and privileged.  If you have received this in error, and are not the intended recipient, you may not use, copy or disclose to anyone any of the information contained in this document.

Page 7 of 8

*Morbid Obesity: a 24-year retrospective analysis"*
*Obesity Surgery, 13, 819-825.*

4.   Market Withdrawal.

  b) a)   Not Recommended:  Filter provided benefit to 99.8% patients treated.  Reducing number of bariatric patients treated will reasonably reduce number of migration-related complications.

**Confidentiality Notice:** This document contains information that is confidential and privileged.  If you have received this in error, and are not the intended recipient, you may not use, copy or disclose to anyone any of the information contained in this document.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1

BPVE-01-00435303

# EXHIBIT 53
## (Filed Under Seal)

# EXHIBIT 54
# (Filed Under Seal)

# EXHIBIT 55
## (Filed Under Seal)

# EXHIBIT 56

Drug Saf (2014) 37:283–294
DOI 10.1007/s40264-014-0150-2

ORIGINAL RESEARCH ARTICLE

# The Weber Effect and the United States Food and Drug Administration's Adverse Event Reporting System (FAERS): Analysis of Sixty-Two Drugs Approved from 2006 to 2010

Keith B. Hoffman · Mo Dimbil · Colin B. Erdman · Nicholas P. Tatonetti · Brian M. Overstreet

Published online: 19 March 2014
© The Author(s) 2014. This article is published with open access at Springerlink.com

## Abstract

*Background*   The United States Food and Drug Administration's (FDA) Adverse Event Reporting System (FAERS) consists of adverse event (AE) reports linked to approved drugs. The database is widely used to support post-marketing safety surveillance programs. Sometimes cited as a limitation to the usefulness of FAERS, however, is the 'Weber effect,' which is often summarized by stating that AE reporting peaks at the end of the second year after a regulatory authority approves a drug. Weber described this effect in 1984 based upon a single class of medications prescribed in the United Kingdom. Since that time, the FDA has made a concerted effort to improve both reporting and the database itself. Both volume and quality of AE reporting has dramatically improved since Weber's report, with an estimated 800,000 yearly reports now being logged into FAERS.

*Objective*   The aim of this study was to determine if current FAERS reporting follows the trend described by Weber.

*Methods*   Sixty-two drugs approved by the FDA between 2006 and 2010 were included in this analysis. Publicly available FAERS data were used to assess the 'primary suspect' AE reporting pattern for up to a 4-year period following each drug's approval date.

*Results*   A total of 334,984 AE reports were logged into FAERS for the 62 drugs analyzed here. While a few of the drugs demonstrated what could be considered 'Weber effect' curves, a majority of the drugs showed little evidence for the effect. In fact, the general AE reporting pattern observed in this study appears to consist simply of increasing case counts over the first three quarters after approval followed by relatively constant counts thereafter.

*Conclusions*   Our results suggest that most of the modern adverse event reporting into FAERS does not follow the pattern described by Weber. Factors that may have contributed to this finding include large increases in the volume of AE reports since the Weber effect was described, as well as a concerted effort by the FDA to increase awareness regarding the utility of post-marketing AE reporting.

**Electronic supplementary material**   The online version of this article (doi:10.1007/s40264-014-0150-2) contains supplementary material, which is available to authorized users.

K. B. Hoffman (✉) · M. Dimbil · C. B. Erdman · B. M. Overstreet
AdverseEvents, Inc., 3663 N. Laughlin Road, Suite 102, Santa Rosa, CA 95403, USA
e-mail: keith@adverseevents.com

N. P. Tatonetti
Department of Biomedical Informatics, Columbia University, New York, NY, USA

### Key Points

Adverse event (AE) archives such as the US FDA's Adverse Event Reporting database (FAERS) are sometimes assumed to suffer from the 'Weber effect,' often generalized as 'after regulatory approval, AE reporting peaks by the end of year 2 and then rapidly diminishes with time.'

We did not find evidence for such a general trend in 62 drugs, therefore assertions that modern FAERS data are unreliable due to the 'Weber effect' appear unfounded.

## 1 Introduction

By necessity, pre-approval clinical testing is conducted in relatively homogenous subjects and, accordingly, cannot delineate the complete adverse event (AE) profile

of a drug. Limitations common to pre-approval testing include small test populations, brief drug exposure durations, and exclusion criteria that often eliminate testing of pregnant subjects, the elderly, the young, subjects with existing comorbidities, and patients who take multiple medications [1]. Therefore, unexpected actions often occur once a drug is approved and introduced into the broad and heterogeneous population of consumers. In fact, many serious and life-threatening adverse events are commonly encountered only after a drug obtains US Food and Drug Administration (FDA) approval [2–5]. Additionally, only half of all serious AEs are listed in the main source of AE information for many prescribers (the *Physician's Desk Reference*) within 7 years after they win FDA approval [5]. In short, careful post-approval AE monitoring is vital to the ongoing drug evaluation process and patient safety.

The FDA's Adverse Event Reporting System (FAERS) is a centralized, computerized, information database that is broadly used by the FDA and other pharmacovigilance experts for post-marketing drug safety surveillance [1, 6–21]. The FDA uses FAERS analyses to make post-marketing regulatory decisions such as the issuance of warnings, label changes, and/or market removal [22]. International government and related organizations (Australia's Therapeutic Goods Administration, Canada's Vigilance Adverse Reaction Online Database, Europe's EudraVigilance, Japan's Pharmaceuticals and Medical Devices Agency, The United Kingdom's Yellow Card Scheme, and The World Health Organization's VigiBase) also use spontaneous AE databases to identify post-approval drug safety concerns.

Two commonly assumed limitations of spontaneous AE databases is that they suffer from 'stimulated reporting' [23–27] and the 'Weber effect' [28]. With regard to the Weber effect, in 1984, JCP Weber published a paper in which he detailed adverse event reporting trends in the United Kingdom regarding oral drugs in the non-steroidal anti-inflammatory drug (NSAID) class [28]. Of note, the reporting trend he described occurred during a time period when the UK's 'Black Triangle' reporting guidelines [29] directed prescribers to pay special attention to AEs during the first 2 years after a drug's approval.

In many modern publications, the Weber effect is assumed to operate in various global AE databases and is often too simply summarized as 'after regulatory approval of a drug, AE reporting increases over the first 2 years, peaks near the end of year 2, and then reliably, and rapidly, diminishes with further time on the market.' An important point that Weber made about the pattern, however, is often overlooked by such a generalization. Weber stated "this decline is due to a reduction in the reporting of clinically mild or trivial reactions. The more serious ADR, such as

haematemesis, perforation of peptic ulcers, blood dycrasias, etc. are reported from year to year in a quite constant manner" [28].

Since Weber's original paper was published, multiple publications have either approximated or replicated the Weber effect [30, 31] while other publications that did not directly test for the effect cite it as an accepted principle [32–34]. Some of the same authors, however, who found a Weber effect with the NSAID class of drugs [31] reported only a partial Weber effect with the serotonin-reuptake class of medications [35]. Other authors discovered that some NSAIDs had a Weber-like pattern, while others did not [36]. A recent report that correlated usage data with reported AEs also did not observe Weber-like patterns [37]. An analysis of new drugs approved in 2006 also showed no evidence to support the contention that the modern generalization of the Weber effect accurately describes current AE reporting trends [38]. Most of the studies, however, that analyzed reporting trends have been conducted in a limited drug class or with a narrow time window. Additionally, the nature of AE reporting has dramatically changed since 1984, with improvements both in the quality of reports and the volume of data [39, 40]. In fact, an estimated 800,000 new case reports are currently logged into FAERS every year [41].

Accordingly, in order to determine general AE reporting patterns for recent FAERS data, we analyzed 62 drugs approved from 2006 to 2010.

## 2 Methods

### 2.1 Drugs Included

We included prescription drugs approved from 2006 to 2010 that had a total of at least 1,000 'primary suspect' case reports in FAERS. ('Primary suspect' is a designation by the person who submitted a given case report, and is their estimate of which drug, if the subject was taking more than one, was likely responsible for the observed AE). Over-the-counter and recreational drugs, vaccines, and broad, undefined compounds listed in FAERS were not analyzed. Duplicate case reports were removed.

### 2.2 Inclusion Criteria for FAERS Case Reports

Case reports that were missing or contained malformed key identification fields (Individual Safety Report number [ISR], patient number, drug sequence identification, or MedDRA® AE term) were discarded. As long as the aforementioned key identification fields were contained in a given case report, allowable missing fields included age, gender, weight, outcome, and condition. Cases were

**Table 1** New molecular entity drugs approved in 2006

| Generic name | EPC | Date of approval | Total primary reports (n) | Healthcare reporter (%) | Other reporter (%) |
|---|---|---|---|---|---|
| Sunitinib | Kinase inhibitor | 1/26/2006 | 12,947 | 55.50 | 44.50 |
| Drospirenone; ethinyl estradiol[a] | Estrogen[b], progestin[b] | 3/16/2006 | 21,137 | 10.48 | 89.52 |
| Methylphenidate[c] | Central nervous system stimulant | 4/6/2006 | 3,711 | 24.28 | 75.72 |
| Varenicline | Partial cholinergic nicotinic agonist | 5/10/2006 | 56,683 | 21.39 | 78.61 |
| Darunavir | Protease inhibitor | 6/23/2006 | 1,066 | 90.15 | 9.85 |
| Dasatinib | Kinase inhibitor | 6/28/2006 | 2,880 | 41.60 | 58.40 |
| Ranibizumab | Vascular endothelial growth factor-directed antibody | 6/30/2006 | 7,420 | 45.04 | 54.96 |
| Etonogestrel[d] | Progestin | 7/17/2006 | 2,464 | 50.45 | 49.55 |
| Budesonide; formoterol | β2-Adrenergic agonist, corticosteroid | 7/21/2006 | 10,370 | 16.84 | 83.16 |
| Panitumumab | Epidermal growth factor receptor antagonist | 9/27/2006 | 2,283 | 82.83 | 17.17 |
| Sitagliptin | Dipeptidyl peptidase 4 inhibitor | 10/16/2006 | 10,708 | 64.53 | 35.47 |
| Carvedilol[e] | α-Adrenergic blocker, β-adrenergic blocker | 10/20/2006 | 1,268 | 5.44 | 94.56 |
| Paliperidone | Atypical antipsychotic | 12/19/2006 | 6,405 | 79.98 | 20.02 |

[a] Yaz®

[b] Manually mapped established pharmaceutical class (*EPC*)

[c] Daytrana®

[d] Implanon®

[e] Coreg CR®

discarded if the drug name was found to be indeterminate or if the name was determined to not represent an FDA-approved drug (e.g., dietary supplements, foods, etc). In an effort to exclude pre-approval AE case reports mistakenly logged into FAERS, the date of receipt for a given case report must have occurred after the drug's FDA approval date.

### 2.3 Drug Name Mapping

Drug-name text mapping was accomplished as previously described by Hoffman et al. [42]. Drug names were normalized to RxNorm reference codes [43] using string searching and manual curation. National Drug File Reference Terminology [44] was used to provide ancillary information on class and mechanism of action.

### 2.4 Established Pharmacologic Classes (EPC)

EPC is a designation by the FDA that indicates the established pharmacologic class(es) of a drug or other therapeutic compound [44]. EPC data were obtained from the FDA National Drug Code file and mapped by researchers to the appropriate FAERS drug-name data by way of brand or generic compound name.

### 2.5 Case Counting

Quarterly primary suspect case reports submitted by 'all reporters' were counted from the first full quarter after a drug's FDA approval through quarter 4 of 2012.

### 2.6 Normalization

For each drug, the highest case count total reached, in any of the 16 quarters analyzed, was normalized to 100. All remaining 15 quarters were normalized accordingly.

## 3 Results

Sixty-two drugs and 334,984 primary suspect reports were included in this analysis. Our results show that the Weber effect may no longer be a valid concern in modern FAERS reporting. AE reporting volume increased, as would be expected, over the first few quarters after a drug was introduced to the market. While no clear pattern could be ascribed to the reporting trends, most drugs reached a near maximum amount of reports by the third full quarter after approval. In general, after that point, case counts per quarter stayed relatively constant.

**Table 2** New molecular entity drugs approved in 2007

| Generic name | EPC | Date of approval | Total primary reports (n) | Healthcare reporter (%) | Other reporter (%) |
|---|---|---|---|---|---|
| Diclofenac[a] | Nonsteroidal anti-inflammatory drug | 1/31/2007 | 1,189 | 19.76 | 80.24 |
| Lisdexamfetamine | Central nervous system stimulant | 2/23/2007 | 3,076 | 35.73 | 64.27 |
| Aliskiren | Renin inhibitor | 3/5/2007 | 4,538 | 60.45 | 39.55 |
| Lapatinib | Kinase inhibitor | 3/13/2007 | 6,607 | 37.26 | 62.74 |
| Eculizumab | Complement inhibitor | 3/16/2007 | 5,178 | 38.95 | 61.05 |
| Metformin; sitagliptin | Biguanide, dipeptidyl peptidase 4 inhibitor | 3/30/2007 | 1,080 | 64.07 | 35.93 |
| Zoledronic acid[b] | Bisphosphonate | 4/16/2007 | 12,880 | 36.76 | 63.24 |
| Fluticasone furoate | Corticosteroid | 4/27/2007 | 1,205 | 16.85 | 83.15 |
| Rotigotine | Nonergot dopamine agonist[c] | 5/9/2007 | 1,261 | 32.36 | 67.64 |
| Quetiapine[d] | Atypical antipsychotic | 5/17/2007 | 6,053 | 29.29 | 70.71 |
| Temsirolimus | Kinase inhibitor[c] | 5/30/2007 | 1,968 | 81.61 | 18.39 |
| Ambrisentan | Endothelin receptor antagonist | 6/15/2007 | 9,083 | 28.40 | 71.60 |
| Armodafinil | Central nervous system stimulant[c] | 6/15/2007 | 2,653 | 41.42 | 58.58 |
| Amlodipine; valsartan | Angiotensin 2 receptor blocker, dihydropyridine calcium channel blocker | 6/20/2007 | 2,438 | 22.07 | 77.93 |
| Raltegravir | Human immunodeficiency virus integrase strand transfer inhibitor | 10/12/2007 | 1,617 | 70.32 | 29.68 |
| Ixabepilone | Microtubule inhibitor[c] | 10/16/2007 | 1,119 | 43.07 | 56.93 |
| Nilotinib | Kinase inhibitor | 10/29/2007 | 3,956 | 57.25 | 42.75 |
| Methoxy polyethylene glycol-epoetin β | Erythropoiesis-stimulating agent[c] | 11/14/2007 | 1,266 | 59.32 | 40.68 |
| Nebivolol | β-Adrenergic blocker[c] | 12/17/2007 | 1,350 | 58.44 | 41.56 |

[a] Flector®

[b] Reclast®

[c] Manually mapped established pharmaceutical class (*EPC*)

[d] Seroquel XR®

Tables 1, 2, 3, 4, and 5 list the drugs analyzed by year, with EPC, approval date, total number of primary suspect case reports, and the percentage of 'healthcare professionals' versus 'other' reporters. The brand name was noted for generic compounds marketed in the US under multiple commercial names.

Figures 1, 2, 3, 4, and 5 show primary suspect case reports submitted by all reporters from the first full quarter after a drug's approval through quarter 4 of 2012. We also charted year-by-year results for healthcare professional reporters (data included in Electronic Supplementary Material as tables 1–5), but there were no significant differences between the reporter groups (see Figs. 6 and 7 for grand averages for both groups of reporters). The black line represents the average of all drugs for that year. In general, case counts increase until approximately 3–7 quarters after approval and then remain relatively constant.

Figures 6 and 7 show average primary case counts (± standard error) for all drugs, across all years, for up to 16 full quarters after approval. Figure 6 was derived by using the case counts logged into FAERS for all reporters, while Fig. 7 used healthcare professional reports only. As can be seen from Figs. 6 and 7, the average number of case reports filed for new drugs increases steadily until it reaches a plateau within quarter 3–7.

Table 6 (included in the Electronic Supplementary Material) and Fig. 8 show within-drug comparisons of normalized case counts compared with a hypothetical Weber-like decrease in case counts from quarter 8 after approval to quarter 16. For each drug, we modeled the quarterly report counts as a linear function of time and evaluated the fit above a constant (null) model using an ANOVA. Table 6 lists the $p$ values for each drug regarding line fit and intercept to the hypothetical Weber-like decrease in reporting rates after quarter 8. For this analysis we used 42 of the 61 drugs in this study because they had case count data for quarters 8–16. Of the 20 drugs with significant estimates ($p < 0.05$) for the period coefficient, six drugs (carvedilol, certolizumab, eltrombopag, romiplostim, sitagliptin, and varenicline) had negative slopes

**Table 3** New molecular entity drugs approved in 2008

| Generic name | EPC | Date of approval | Total primary reports (n) | Healthcare reporter (%) | Other reporter (%) |
|---|---|---|---|---|---|
| Niacin; simvastatin | HMG-CoA reductase inhibitor, nicotinic acid | 2/15/2008 | 9,663 | 3.61 | 96.39 |
| Desvenlafaxine | Serotonin and norepinephrine reuptake inhibitor | 2/29/2008 | 9,278 | 40.61 | 59.39 |
| Bendamustine | Alkylating drug | 3/20/2008 | 2,585 | 83.79 | 16.21 |
| Certolizumab | Tumor necrosis factor blocker[a] | 4/22/2008 | 11,318 | 61.34 | 38.66 |
| Tetrabenazine | Vesicular monoamine transporter 2 (VMAT) inhibitor[a] | 8/15/2008 | 1,244 | 70.42 | 29.58 |
| Romiplostim | Thrombopoiesis stimulating agent | 8/22/2008 | 5,144 | 87.56 | 12.44 |
| Lacosamide | Anti-epileptic agent | 10/28/2008 | 2,080 | 64.66 | 35.34 |
| Fesoterodine | Muscarinic antagonist[a] | 10/31/2008 | 2,223 | 31.98 | 68.02 |
| Eltrombopag | Thrombopoiesis stimulating agent | 11/20/2008 | 1,642 | 54.51 | 45.49 |
| Choline fenofibrate | Peroxisome proliferator receptor $\alpha$ agonist | 12/15/2008 | 1,851 | 60.72 | 39.28 |
| Bimatoprost[b] | Prostaglandin analog | 12/24/2008 | 3,224 | 29.62 | 70.38 |

[a] Manually mapped established pharmaceutical class (*EPC*)

[b] Latisse®

**Table 4** New molecular entity drugs approved in 2009

| Generic name | EPC | Date of approval | Total primary reports (n) | Healthcare reporter (%) | Other reporter (%) |
|---|---|---|---|---|---|
| Milnacipran | Serotonin and norepinephrine reuptake inhibitor | 1/14/2009 | 1,830 | 56.39 | 43.61 |
| Everolimus[a] | Kinase inhibitor | 3/30/2009 | 4,119 | 58.68 | 41.32 |
| Golimumab | Tumor necrosis factor blocker | 4/24/2009 | 2,602 | 68.95 | 31.05 |
| Dronedarone | Antiarrhythmic | 7/1/2009 | 2,934 | 69.90 | 30.10 |
| Prasugrel | P2Y12 Platelet inhibitor | 7/10/2009 | 1,916 | 61.59 | 38.41 |
| Treprostinil[b] | Prostacycline vasodilator | 7/30/2009 | 1,429 | 47.94 | 52.06 |
| Saxagliptin | Dipeptidyl peptidase 4 inhibitor | 7/31/2009 | 1,888 | 45.13 | 54.87 |
| Asenapine | Atypical antipsychotic | 8/13/2009 | 3,699 | 80.43 | 19.57 |
| Interferon β-1B[c] | Recombinant human interferon β[d] | 8/14/2009 | 1,009 | 21.90 | 78.10 |
| Ustekinumab | Interleukin-12 and -23 antagonist[d] | 9/25/2009 | 2,462 | 76.20 | 23.80 |
| Pazopanib | Kinase inhibitor | 10/19/2009 | 2,346 | 37.30 | 62.70 |

[a] Afinitor®

[b] Tyvaso®

[c] Extavia®

[d] Manually mapped established pharmaceutical class (*EPC*)

(decreasing reporting) and thus fit the expected behavior of our experimental Weber-effect model ($df = 7$, $F$ test).

## 4 Discussion

In modern publications, the Weber effect [28] is typically generalized as an increase in AE reporting over the first 2 years after a drug's approval, followed by a rapid decline in reporting rates. This generalization of what Weber described is often cited as a limitation to the interpretation and usefulness of post-marketing AE databases such as FAERS. We found little evidence of such a reporting trend

regarding FAERS data for 62 drugs approved from 2006 to 2010. If a generalizable pattern to the data can be discerned, it is simply that case counts in FAERS tend to increase for approximately the first three quarters after a drug's approval date and then stay relatively constant for at least the next 13 quarters thereafter. Our findings comport with both an internal FDA study that did not replicate the Weber effect [37] and a recent study that mapped 5-year AE reporting trends for drugs approved in 2006 [38].

We postulate that modern-day FAERS reporting may no longer exhibit the Weber effect due to increased focus on the importance and utility of post-approval AE reporting by both the FDA and key healthcare players

△ Adis

**Table 5** New molecular entity drugs approved in 2010

| Generic name | EPC | Date of approval | Total primary reports (n) | Healthcare reporter (%) | Other reporter (%) |
|---|---|---|---|---|---|
| Tocilizumab | Interleukin-6 (IL-6) receptor inhibitor[a] | 1/8/2010 | 3,839 | 63.04 | 36.96 |
| Dalfampridine | Potassium channel blocker[a] | 1/22/2010 | 1,626 | 32.84 | 67.16 |
| Liraglutide | Glucagon-like peptide (GLP)-1 receptor agonist | 1/25/2010 | 9,768 | 40.47 | 59.53 |
| Everolimus[b] | Kinase inhibitor | 4/20/2010 | 1,259 | 68.55 | 31.45 |
| Denosumab[c] | RANK ligand inhibitor | 6/1/2010 | 5,880 | 52.23 | 47.77 |
| Fingolimod | Sphingosine 1-phosphate receptor modulator | 9/21/2010 | 6,327 | 42.01 | 57.99 |
| Dabigatran | Direct thrombin inhibitor[a], anti-coagulant[a] | 10/19/2010 | 20,980 | 57.52 | 42.48 |
| Denosumab[d] | RANK ligand inhibitor | 11/19/2010 | 1,202 | 67.30 | 32.70 |

[a] Manually mapped established pharmaceutical class (*EPC*)

[b] Zortress®

[c] Prolia®

[d] Xgeva®



**Fig. 1** Drugs approved in 2006

over the last decades. With specific reference to potential AE reporting differences between when Weber published his findings and the results presented here, the following events may have contributed to improved AE reporting, and therefore a suppression of Weber-like reporting trends. In 1997, the FDA formed the FAERS (then referred to as AERS) database to facilitate the reporting of post-approval AEs. FAERS now has a total of over seven million AE case reports. In 2005, the FDA formed a permanent Drug Safety Oversight Board with the specific task of monitoring post-marketing AEs [45]. The FDA issued new guidance in 2006 for how AE data should be presented in drug labels [46]. In 2007, in order

to enhance post-approval drug safety analysis even further, the FDA Amendments Act was implemented to improve FAERS and provide more resources (including regulatory enforcement) to the FDA [47, 48]. Also in 2007, the FDA began to require drug companies to enact Risk Evaluation and Mitigation Strategies (REMS) to better manage, track, and report AEs [49]. Finally, in 2008, Title IX of the FDA Amendments Act [50] was enacted, which required direct-to-consumer advertisements to contain, in prominent text, "you are encouraged to report negative side effects of prescription drugs to the FDA" with phone numbers and a website listed to facilitate such reporting.

△ Adis



**Fig. 2** Drugs approved in 2007



**Fig. 3** Drugs approved in 2008

## 4.1 Limitations

A number of constraints must be considered when analyzing these data. FAERS relies heavily upon voluntary reporting, and therefore, the frequency of actual AEs is very likely to be underestimated. We, however, see no obvious reason why overall underreporting would affect the type of trend analyses reported here. Even though we view primary suspect FAERS cases to be the most accurate for quantitative purposes, the designation is subjective and the influence of other drugs or factors cannot be ruled out from a given case report. Since we did not have usage data for these drugs, we could not analyze AE case counts as a 'reporting rate.' Our analysis was therefore limited to total case counts per drug. A related study, however, that normalized case counts with usage data did not find evidence of the Weber effect [37].

△ Adis



**Fig. 4** Drugs approved in 2009



**Fig. 5** Drugs approved in 2010

## 5 Conclusions

Our primary objective was to determine if modern FAERS case reports parallel the AE reporting trend first described by Weber for NSAIDs marketed in the UK in 1984. Based on the first 4 years of reporting after drug approval, we did not observe a Weber reporting pattern for drugs approved from 2006 to 2010 with over 1,000 primary suspect case reports. Instead, the general reporting pattern detected was a steep rise in case counts over the first three quarters after approval. After an initial plateau was reached by the third full quarter, relatively constant case count totals continued for the remaining 13 quarters. While a few of the drugs in the group of 62 analyzed here did show Weber-like trending, the vast majority did not. We do not know the exact reasons why our analysis did not replicate Weber's

△ Adis

findings, but we estimate that modern-day AE reporting is quite different than it was in 1984. Indeed, post-marketing AE reporting has dramatically increased in volume since Weber's analysis. Additionally, the systems for capturing AE reports, as well as the value of analyzing such data, have greatly improved over the last decades. The Weber effect should not be assumed when analyzing modern-day FAERS reporting.



**Fig. 6** The average of all 'all reporters' for the 62 drugs



**Fig. 7** The average of all 'healthcare professional reporters' for the 62 drugs



**Fig. 8** Within-drug comparison of normalized case counts compared with a hypothetical linear Weber-like decrease in case counts from quarter 8 after approval to quarter 16

**Acknowledgments** The research leading to these results was funded entirely by AdverseEvents, Inc., a private corporation.

MedDRA®, the Medical Dictionary for Regulatory Activities terminology, is the international medical terminology developed under the auspices of the International Conference on Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH).

Keith B. Hoffman, Mo Dimbil, Colin B. Erdman, and Brian M. Overstreet have all declared employment- and stock-related conflicts of interests in their declaration forms related to AdverseEvents Inc. (AEI). Nicholas P. Tatonetti has declared a stock-related conflict of interest in his declaration forms related to AEI. Keith B. Hoffman, Mo Dimbil, Colin B. Erdman, Nicholas P. Tatonetti, and Brian M. Overstreet have no other conflicts of interest that are directly relevant to the content of this manuscript.

Keith B. Hoffman conceived of the study; analyzed and interpreted data; and drafted and approved the final submitted manuscript. Nicholas P. Tattonetti made suggestions for data interpretation and approved the final submitted manuscript. Mo Dimbil, Colin B. Erdman, and Brian M. Overstreet collected data and approved the final submitted manuscript.

**Open Access** This article is distributed under the terms of the Creative Commons Attribution Noncommercial License which permits any noncommercial use, distribution, and reproduction in any medium, provided the original author(s) and the source are credited.

## References

1. Ahmad SR. Adverse drug event monitoring at the Food and Drug Administration. J Gen Intern Med. 2003;18(1):57–60.
2. FDA. Follow-Up to the November 2009 Early Communication about an Ongoing Safety Review of Sibutramine, Marketed as Meridia. 2010. http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafety InformationforPatientsandProviders/DrugSafetyInformationfor HeathcareProfessionals/ucm198206.htm. Accessed Feb 2014.
3. Charatan F. Bayer decides to withdraw cholesterol lowering drug. BMJ (Clin Res Ed). 2001;323(7309):359.
4. FDA. Safety Information: Vioxx (rofecoxib). 2002. http://www.fda.gov/Safety/MedWatch/SafetyInformation/SafetyAlertsfor HumanMedicalProducts/ucm154520.htm. Accessed Feb 2014.
5. Lasser KE, Allen PD, Woolhandler SJ, Himmelstein DU, Wolfe SM, Bor DH. Timing of new black box warnings and withdrawals for prescription medications. JAMA, J Am Med Assoc. 2002; 287(17):2215–20.
6. Szarfman A, Tonning JM, Doraiswamy PM. Pharmacovigilance in the 21st century: new systematic tools for an old problem. Pharmacotherapy. 2004;24(9):1099–104.
7. Poluzzi E, Raschi E, Koci A, Moretti U, Spina E, Behr ER, et al. Antipsychotics and Torsadogenic risk: signals emerging from the US FDA Adverse Event Reporting System Database. Drug Saf Int J Med Toxicol Drug Exp. 2013;36(6):467–79. doi:10.1007/s40264-013-0032-z.
8. Hochberg AM, Hauben M. Time-to-signal comparison for drug safety data-mining algorithms vs. traditional signaling criteria. Clin Pharmacol Ther. 2009;85(6):600–6. doi:10.1038/clpt.2009. 26.
9. Robertson HT, Allison DB. Drugs associated with more suicidal ideations are also associated with more suicide attempts. PLoS ONE. 2009;4(10):e7312. doi:10.1371/journal.pone.0007312.
10. Weaver J, Grenade LL, Kwon H, Avigan M. Finding, evaluating, and managing drug-related risks: approaches taken by the US Food and Drug Administration (FDA). Dermatol Ther. 2009;22(3):204–15. doi:10.1111/j.1529-8019.2009.01233.x.
11. Bailey S, Singh A, Azadian R, Huber P, Blum M. Prospective data mining of six products in the US FDA Adverse Event Reporting System: disposition of events identified and impact on product safety profiles. Drug Saf Int J Med Toxicol Drug Exp. 2010;33(2):139–46. doi:10.2165/11319000-000000000-00000.
12. Harpaz R, Chase HS, Friedman C. Mining multi-item drug adverse effect associations in spontaneous reporting systems. BMC Bioinform. 2010;11(Suppl 9):S7. doi:10.1186/1471-2105-11-S9-S7.
13. Moore TJ, Glenmullen J, Furberg CD. Prescription drugs associated with reports of violence towards others. PLoS ONE. 2010;5(12):e15337. doi:10.1371/journal.pone.0015337.
14. Wang HW, Hochberg AM, Pearson RK, Hauben M. An experimental investigation of masking in the US FDA adverse event reporting system database. Drug Saf Int J Med Toxicol Drug Exp. 2010;33(12):1117–33. doi:10.2165/11584390-000000000-00000.
15. Moore TJ, Furberg CD, Glenmullen J, Maltsberger JT, Singh S. Suicidal behavior and depression in smoking cessation treatments. PLoS ONE. 2011;6(11):e27016. doi:10.1371/journal.pone.0027016.
16. Sakaeda T, Kadoyama K, Okuno Y. Statin-associated muscular and renal adverse events: data mining of the public version of the FDA adverse event reporting system. PLoS ONE. 2011;6(12):e28124. doi:10.1371/journal.pone.0028124.
17. Takarabe M, Kotera M, Nishimura Y, Goto S, Yamanishi Y. Drug target prediction using adverse event report systems: a pharmacogenomic approach. Bioinformatics. 2012;28(18):i611–8. doi:10.1093/bioinformatics/bts413.
18. Tamura T, Sakaeda T, Kadoyama K, Okuno Y. Aspirin- and clopidogrel-associated bleeding complications: data mining of the public version of the FDA adverse event reporting system, AERS. Int J Med Sci. 2012;9(6):441–6. doi:10.7150/ijms.4549.
19. Chen HC, Tsong Y, Chen JJ. Data mining for signal detection of adverse event safety data. J Biopharm Stat. 2013;23(1):146–60. doi:10.1080/10543406.2013.735780.
20. Harpaz R, DuMouchel W, LePendu P, Bauer-Mehren A, Ryan P, Shah NH. Performance of pharmacovigilance signal-detection algorithms for the FDA adverse event reporting system. Clin Pharmacol Ther. 2013;93(6):539–46. doi:10.1038/clpt.2013.24.
21. Hoffman KB, Kraus C, Dimbil M, Golomb BA. A survey of the FDA's AERS database regarding muscle and tendon adverse events linked to the statin drug class. PLoS ONE. 2012;7(8):e42866. doi:10.1371/journal.pone.0042866.
22. FDA U. FDA Adverse Event Reporting System (FAERS) (formerly AERS). 2012. http://www.fda.gov/drugs/guidance complianceregulatoryinformation/surveillance/adversedrugeffects/default.htm. Accessed Feb 2014.
23. Dusetzina SB, Higashi AS, Dorsey ER, Conti R, Huskamp HA, Zhu S, et al. Impact of FDA drug risk communications on health care utilization and health behaviors: a systematic review. Med Care. 2012;50(6):466–78. doi:10.1097/MLR.0b013e318245a160.
24. Piening S, Haaijer-Ruskamp FM, de Vries JT, van der Elst ME, de Graeff PA, Straus SM, et al. Impact of safety-related regulatory action on clinical practice: a systematic review. Drug Saf Int J Med Toxicol Drug Exp. 2012;35(5):373–85. doi:10.2165/11599100-000000000-00000.
25. Busch SH, Frank RG, Leslie DL, Martin A, Rosenheck RA, Martin EG, et al. Antidepressants and suicide risk: how did specific information in FDA safety warnings affect treatment patterns? Psychiatr Serv. 2010;61(1):11–6. doi:10.1176/appi.ps.61.1.11.
26. Dasgupta N, Mandl KD, Brownstein JS. Breaking the news or fueling the epidemic? Temporal association between news media report volume and opioid-related mortality. PLoS ONE. 2009;4(11):e7758. doi:10.1371/journal.pone.0007758.

K. B. Hoffman

27. Conti RM, Dusetzina SB, Herbert AC, Berndt ER, Huskamp HA, Keating NL. The impact of emerging safety and effectiveness evidence on the use of physician-administered drugs: the case of bevacizumab for breast cancer. Med Care. 2013;51(7):622–7. doi:10.1097/MLR.0b013e318290216f.

28. Weber J. Epidemiology of adverse reactions to nonsteroidal anti-inflammatory drugs. Adv Inflamm Res. 1984;6:1–7.

29. MHRA. Black Triangle Scheme—new medicines and vaccines subject to EU-wide additional monitoring. United Kingdom. 2014. http://www.mhra.gov.uk/Safetyinformation/Howwemonitorthe safetyofproducts/Medicines/BlackTriangleproducts/index.htm. Accessed Feb 2014.

30. Davenport MS, Dillman JR, Cohan RH, Hussain HK, Khalatbari S, McHugh JB, et al. Effect of abrupt substitution of gadobenate dimeglumine for gadopentetate dimeglumine on rate of allergic-like reactions. Radiology. 2013;266(3):773–82. doi:10.1148/radiol.12120253.

31. Hartnell NR, Wilson JP. Replication of the Weber effect using postmarketing adverse event reports voluntarily submitted to the United States Food and Drug Administration. Pharmacotherapy. 2004;24(6):743–9. doi:10.1592/phco.24.8.743.36068.

32. Berlin JA, Glasser SC, Ellenberg SS. Adverse event detection in drug development: recommendations and obligations beyond phase 3. Am J Public Health. 2008;98(8):1366–71. doi:10.2105/ajph.2007.124537.

33. Thomsen HS, Webb J. The Lalli and Weber effects and the incidence of acute non-renal adverse reactions to contrast media. Acta Radiol (Stockholm, Sweden: 1987). 2012;53(9):953–4. doi:10.1258/ar.2012.12a006.

34. Slade BA, Leidel L, Vellozzi C, Woo EJ, Hua W, Sutherland A, et al. Postlicensure safety surveillance for quadrivalent human papillomavirus recombinant vaccine. JAMA J Am Med Assoc. 2009;302(7):750–7. doi:10.1001/jama.2009.1201.

35. Hartnell NR, Wilson JP, Patel NC, Crismon ML. Adverse event reporting with selective serotonin-reuptake inhibitors. Ann Pharmacother. 2003;37(10):1387–91. doi:10.1345/aph.1C522.

36. Wallenstein EJ, Fife D. Temporal patterns of NSAID spontaneous adverse event reports: the Weber effect revisited. Drug Saf Int J Med Toxicol Drug Exp. 2001;24(3):233–7.

37. McAdams MA, Governale LA, Swartz L, Hammad TA, Dal Pan GJ. Identifying patterns of adverse event reporting for four members of the angiotensin II receptor blockers class of drugs: revisiting the Weber effect. Pharmacoepidemiol Drug Saf. 2008;17(9):882–9. doi:10.1002/pds.1633.

38. Chhabra P, Chen X, Weiss SR. Adverse event reporting patterns of newly approved drugs in the USA in 2006: an analysis of FDA Adverse Event Reporting System data. Drug Saf Int J Med Toxicol Drug Exp. 2013;36(11):1117–23. doi:10.1007/s40264-013-0115-x.

39. Staffa JA, Dal Pan GJ. Regulatory innovation in postmarketing risk assessment and management. Clin Pharmacol Ther. 2012;91(3):555–7. doi:10.1038/clpt.2011.289.

40. Weiss-Smith S, Deshpande G, Chung S, Gogolak V. The FDA drug safety surveillance program: adverse event reporting trends. Arch Intern Med. 2011;171(6):591–3. doi:10.1001/archinternmed.2011.89.

41. FDA U. Reports Received and Reports Entered into AERS by Year. 2013. http://www.fda.gov/Drugs/GuidanceCompliance RegulatoryInformation/Surveillance/AdverseDrugEffects/ucm07 0434.htm. Accessed Feb 2014.

42. Hoffman KB, Overstreet, BM, Doraiswamy, PM. A Drug Safety ePlatform for Physicians, Pharmacists and Consumers based on Post-Marketing Adverse Events. Drugs and Therapy Studies 2013;3(e4).

43. RxNorm. National Library of Medicine. http://www.nlm.nih.gov/research/umls/rxnorm/. Accessed Feb 2014.

44. FDA. Pharmacological Class: National Drug File Reference Terminology. 2013. http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/ucm162549.htm. Accessed Feb 2014.

45. FDA. Milestones in Food and Drug Law History. 2005. http://www.fda.gov/aboutfda/whatwedo/history/milestones/ucm081229.htm. Accessed Feb 2014.

46. FDA. Guidance for Industry: Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products. 2006.

47. Schultz WB. Bolstering the FDA's drug-safety authority. New Engl J Med. 2007;357(22):2217–9. doi:10.1056/NEJMp078212.

48. Traynor K. Law gives FDA new enforcement clout. Am J Health Syst Pharm Off J Am Soc Health Syst Pharm. 2007;64(22):2314–5. doi:10.2146/news070094.

49. FDA. Approved Risk Evaluation and Mitigation Strategies (REMS). 2007. http://www.fda.gov/drugs/drugsafety/postmarket drugsafetyinformationforpatientsandproviders/ucm111350.htm. Accessed Feb 2014.

50. FDA. FDAAA Title IX: enhanced authorities regarding post-market safety of drugs. 2008.

△ Adis

# EXHIBIT 57
## (Filed Under Seal)

# EXHIBIT 58
## (Filed Under Seal)

# EXHIBIT 59
## (Filed Under Seal)

# EXHIBIT 60

Mark Eisenberg , M.D.                                        July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 1

1

                    IN THE UNITED STATES DISTRICT COURT
2                       FOR THE DISTRICT OF ARIZONA
3

4

5
       IN RE BARD IVC FILTERS
6      PRODUCTS LIABILITY
       LITIGATION,
7                                   NO.
                                    MD-15-02641-PHX-DGC
8

9

10

11

      VIDEOTAPED DEPOSITION OF MARK J. EISENBERG, MD
12              ON THURSDAY, JULY 6, 2017
                IN MONTREAL, QUEBEC, CANADA.
13

14

15

         VIDEOGRAPHER:  DAVID OXILIA
16

17       COURT REPORTER:  C.L. KLEIN
18

19

20

21

22

23

24

25

Mark Eisenberg , M.D.                              July 6, 2017
In Re: Bard IVC Filters Products Liability

                                        Page 266

1        started with the year 2000?

2                    MR. BUSMAN:  I object to form.

3                    QUESTION WAS READ BACK.

4        BY MR. ROTMAN:

5             Q.     If one were to raise a question

6        about whether Dr. Betensky's analysis was in some

7        way unreliable because of information from

8        pre-2000 regarding the Simon Nitinol filter in

9        the MAUDE database, did the information in

10       Exhibit 10 in any way relate to that issue?

11            A.     Yes.

12                   MR. BUSMAN:  I am going to object on

13       the basis that this calls for opinion testimony

14       that is not contained in any one of Dr.

15       Eisenberg's reports.

16                   THE WITNESS:  I think it's very,

17       very pertinent to that question.  I think that I

18       understand that Dr. Betensky did this analysis

19       from 2000 on to parallel Bard's analysis.  But it

20       is important to look at the safety of the SNF,

21       and so looking back in the MAUDE database, prior

22       to 2000 there is virtually no reports of

23       migration or fracture.  So if you take those

24       numbers and you actually put them into Dr.

25       Betensky's analyses, they would not materially

Mark Eisenberg , M.D.
In Re: Bard IVC Filters Products Liability
July 6, 2017

Page 267

1    affect her analyses or the conclusions at all

2    because the numbers are so small.

3    BY MR. ROTMAN:

4         Q.    Now, you heard the information that

5    there was nothing in your report about this

6    specific analysis.  Was there anything in your

7    report about adverse event data?

8         A.    Well, the whole report is about

9    adverse event data.

10        Q.    Was there anything in your report

11   about Dr. Betensky's analysis?

12        A.    Yes, there was a whole section in my

13   report that dealt with her analysis, what she

14   did, what she found, the conclusions.

15        Q.    Was there anything in your report

16   about MAUDE data?

17        A.    There is a whole section in the

18   report about MAUDE data, what it could be used

19   for, potential limitations, why these may or may

20   not be limitations.

21        Q.    Now, switching to another topic,

22   this morning you were asked some questions which

23   were triggered by paragraph 33 of your report. If

24   you could turn to paragraph 33 of your report.

25        A.    Yes.