1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC |
| | **EXHIBIT INDEX** |
| | **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF MARK J. EISENBERG M.D.** |

Exhibit 1     Eisenberg (Austin) Deposition Excerpts

Exhibit 2     Eisenberg Deposition Excerpts 7-6-17

Exhibit 3     DeCant Deposition Excerpts 5-24-16

Exhibit 4     DeFord Deposition Excerpts 6-2-16
              (**REDACTED AND FILED UNDER SEAL**)

Exhibit 5     Ganser Deposition Excerpts 10-11-16

Exhibit 6     Brauer Deposition Excerpts 8-2-17

Exhibit 7     Myerburg Life-Threatening Malfunction of Implantable Cardiac
              Devices"

# EXHIBIT 1

 

Deposition of:

# Mark Eisenberg , M.D., M.P.H.

*August 17, 2016*

In the Matter of:

## Clare-Austin vs. C.R. Bard

Tiffany Alley, A Veritext Company
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-ga@veritext.com  | 770.343.9696

Mark Eisenberg , M.D., M.P.H.                    August 17, 2016
Clare-Austin vs. C.R. Bard

                                                        Page 16

1    epidemiologist.

2            A.        Yes, I am.

3            Q.        Define for us what a clinical

4    epidemiologist is.

5            A.        Well, I have a masters of public

6    health degree from Harvard where I studied

7    biostatistics and epidemiology as well as other

8    topics.  So I spent half my time doing clinical

9    cardiology, including interventional cardiology,

10   and I spent half my time doing research.  And the

11   research that I do is clinical epidemiology

12   research, so that involves clinical trials,

13   systematic reviews, meta analyses, cohort studies

14   as well as a variety of other methodologies that

15   are within the rubric of clinical epidemiology.

16           Q.        Have you ever been the lead

17   investigator of a clinical trial?

18           A.        I have.

19           Q.        On how many occasions?

20           A.        I believe five clinical trials.

21           Q.        Generally what did those clinical

22   trials involve?

23           A.        I did two clinical trials with

24   patients who had percutaneous coronary

25   interventions -- among patients who had

Tiffany Alley, A Veritext Company

Mark Eisenberg , M.D., M.P.H.          August 17, 2016
Clare-Austin vs. C.R. Bard

Page 88

1    and, as I understand, that was also statistically

2    significant, I believe, although I am not as --

3    I didn't have complete access to that internal

4    testing data, or perhaps it was in the documents

5    I had but I didn't see it all.

6    BY MR. NORTH:

7         Q.     You have mentioned a number of sort

8    of sources of information:  Dr. Betensky's

9    analysis, the consultant's analysis.  Did you

10   make any independent assessment as to whether the

11   complication data showed a statistically

12   significant safety signal?

13        A.     Can you repeat that again?

14        Q.     Okay.  You tell us the data showed a

15   safety signal.  Did you independently yourself

16   calculate whether that signal was statistically

17   significant?

18        A.     So you know, I do a lot of this

19   research, this type of research in my regular

20   practice where I do systematic reviews and meta

21   analyses.  So I am quite experienced in looking

22   at the totality of evidence from multiple sources

23   to do that determination.  I did not do any

24   analyses myself.  I think that, you know, I went

25   over in detail the Betensky analyses and I am

Mark Eisenberg , M.D., M.P.H.                    August 17, 2016
Clare-Austin vs. C.R. Bard

Page 118

```
 1    questions?

 2         A.     Yes, I do.

 3         Q.     And do you recall at one point you

 4    provided an answer about whether reviewing --

 5    whether reviewing an internal document required

 6    particular expertise?

 7              MR. NORTH:  Objection, leading.

 8              THE WITNESS:  Yes, I recall that.

 9    BY MR. ROTMAN:

10         Q.     What -- can you explain your answer

11    on that issue?

12              MR. NORTH:  Objection.

13              THE WITNESS:  Yes.  I am glad you

14    asked, because I think I was not as clear as I

15    could have been, which was, I think -- I think

16    that when you read internal company documents for

17    a device company there are certain things that a

18    lay person can read and understand such as crisis

19    management, alarmingly high rate.  So there are

20    things that do not require particular expertise

21    to understand.  But let's face it, this whole

22    area is dealing with things that a lay person

23    could not understand, that you need to be a

24    medical expert of some sort in order to even know

25    what an IVC filter is, to know what tilt, to know
```

Mark Eisenberg , M.D., M.P.H.                    August 17, 2016
Clare-Austin vs. C.R. Bard

Page 119

1    what perforation, embolization, fracture.  All of

2    those issues, you need to be an expert in order

3    to read the documents.  In order to know about

4    relative risk and statistically significant

5    differences you need to have some epidemiologic

6    biostatistical background.  To know about -- and

7    I only went through a very small portion of the

8    internal documents, but in order to, you know, to

9    look at the totality of the internal documents

10   and see how the company dealt with the FDA, for

11   example, you would need somebody who was an

12   expert, you know, with FDA industry relations,

13   which I am not.  So I think that while there are,

14   you know, an isolated communication, some of them

15   a lay person might be able to read and certainly

16   would potentially be alarmed at.  Other internal

17   documents you clearly need different types of

18   expertise.  For example, you know, migration

19   testing, you need somebody who knows about in

20   vitro testing which, you know, I don't portray

21   myself as an expert in that area.  So I think you

22   need different types of experts in order to read

23   and interpret different parts of, you know,

24   internal company documents.

25

# EXHIBIT 2

Mark Eisenberg , M.D.                         July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 1

1

              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ARIZONA

3

4

5

      IN RE BARD IVC FILTERS

6     PRODUCTS LIABILITY

      LITIGATION,

7                              NO.

                               MD-15-02641-PHX-DGC

8

9

10

11

      VIDEOTAPED DEPOSITION OF MARK J. EISENBERG, MD

12            ON THURSDAY, JULY 6, 2017

              IN MONTREAL, QUEBEC, CANADA.

13

14

15

      VIDEOGRAPHER:  DAVID OXILIA

16

17    COURT REPORTER:  C.L. KLEIN

18

19

20

21

22

23

24

25

Mark Eisenberg , M.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 43

```
 1        A.    Well, I don't think I have formally
 2   taught a course on pharmacovigilance.  Although I
 3   don't hold myself out as an expert in
 4   pharmacovigilance, many of the research studies I
 5   have done have involved, you know, safety and
 6   certainly efficacy studies of different devices
 7   and drugs, so I have a fair amount of knowledge
 8   on pharmacovigilance.  I don't think I have
 9   formally taught a course on that topic.
10        Q.    Let me break that down a little bit,
11   and you let me know if I get this wrong; okay?
12   Some of the research you have done in the past
13   touches on issues of product safety; right?
14        A.    Yes.
15        Q.    You don't hold yourself out as an
16   expert in pharmacovigilance; right?
17        A.    Again, I would say it's one of the
18   areas that I have some knowledge in, but do I
19   hold myself out as an expert in that area?
20   Probably not.
21        Q.    You are not an expert in corporate
22   ethics; right?
23        A.    No.
24        Q.    You are not an expert in responsible
25   corporate conduct; right?
```

Mark Eisenberg , M.D.                              July 6, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 61

1        say the same thing, I may have paraphrased.

2        BY MR. BUSMAN:

3              Q.    Now, obviously you didn't purport to

4        have reviewed every single document produced in

5        this litigation; right?

6              A.    No, that's correct.

7              Q.    Your understanding is that was

8        millions of pages of documents; right?

9              A.    Yes.

10             Q.    How did you go about -- strike that.

11       Who chose the corporate documents that you,

12       yourself, reviewed?

13             A.    Well, I was provided with a Drop Box

14       of a huge number of corporate documents from

15       which I could, you know, pick and choose.  My

16       attention was drawn to certain corporate

17       documents by the Lawyers as well.  I would say

18       also, in my reading through this case, I have

19       also gone back to see other documents that

20       perhaps were referred to in other expert reports.

21             Q.    The universe of corporate documents

22       that you were provided -- strike that.  The

23       universe of corporate documents you had access to

24       were provided by the Plaintiffs' Attorneys;

25       right?

Mark Eisenberg , M.D.                      July 6, 2017
In Re: Bard IVC Filters Products Liability

                                           Page 62

1              A.     Yes.

2              Q.     Within that universe of documents

3       you were specifically directed to certain

4       documents that the Plaintiffs' Attorneys wanted

5       your opinions on; right?

6              A.     In many instances, yes.

7              Q.     Did you, yourself, draft this expert

8       report?

9              A.     Yes, I did.

10             Q.     You wrote every word of it?

11             A.     Yes.

12             Q.     Now, obviously your focus in this

13      case was on the specific documents that support

14      your theory of the case; right?

15             A.     Repeat that.

16             Q.     We established that there were

17      potentially millions of pages produced in this

18      litigation; right?

19             A.     Yes.

20             Q.     Your focus was on documents that

21      support your specific theory of the case; right?

22                    MR. ROTMAN:   Objection.

23                    THE WITNESS:   No, I wouldn't say

24      that.  I think that I -- I looked at most of the

25      documents, not all of the documents, that the

Page 63

1    Lawyers directed me to.  I also looked at a

2    variety of other documents that were available to

3    me.  I looked at even other documents that were

4    referred to in other reports.  So I was mostly

5    looking at the documents to see -- I would say

6    what the time sequence -- what happened, and when

7    it happened, and what was known and when was it

8    known.

9    BY MR. BUSMAN:

10        Q.    Thank you.  Your focus in the expert

11   report that you prepared was on the documents

12   that support your theory of the case.  Would that

13   be fair?

14             MR. ROTMAN:  Objection.

15             THE WITNESS:  Again, I don't know if

16   this speaks to your question.  If I found

17   documents that were not in support of my thoughts

18   or -- about this case -- how can I say, they were

19   clearly discrepant from other documents, I

20   probably would have included them.  I didn't

21   encounter any of those documents.

22   BY MR. BUSMAN:

23        Q.    Would I be correct in saying that,

24   in your review of documents for your work in this

25   case, you didn't see any documents that were

Mark Eisenberg , M.D.
In Re: Bard IVC Filters Products Liability

July 6, 2017

Page 64

1    discrepant with your theory of the case?

2            A.       Again, I think that --

3            MR. ROTMAN:   Objection.

4            THE WITNESS:   I wouldn't say that I

5    looked at these documents with a theory of --

6    "theory of the case".   I looked at the documents

7    to see when -- when were the different design

8    modifications made to the various filters, what

9    kinds of analyses were being done by Bard, what

10   were the results of those analyses.   I looked at

11   emails between officers at Bard and with their

12   consultant.   I looked at things like HHE's.   So I

13   wouldn't -- I wouldn't say that I looked at this

14   with a particular theory of the case going in.   I

15   was just looking at the documents to see what the

16   time sequence of what happened, and what types of

17   analyses were done, and when they were done, what

18   the results were, what did they do with those

19   results.

20   BY MR. BUSMAN:

21           Q.     Did you review every document --

22   strike that.   Did you review every internal

23   corporate document that was in the Drop Box that

24   you had access to?

25           A.     No, I did not.

Mark Eisenberg , M.D.                                July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 70

1        Roberts and Calva are?

2            A.     That's correct.

3            Q.     In paragraph 23 you state that your

4    expert opinions are focused primarily on the

5    reasonable expectation that physicians have of

6    medical device companies like C.R. Bard.  You say

7    that in part; right?

8            A.     Yes.

9            Q.     Are you, in this litigation,

10   attempting to give an opinion on what other

11   doctors would think and expect or are you

12   speaking for yourself?

13           A.     I think that I am pretty reflective

14   of the average physician in terms of what they

15   would expect from a device company.

16           Q.     What body, organization or group has

17   given you the authority to speak for other

18   physicians in this case?

19           A.     I think you could say that about any

20   one individual physician, that perhaps they don't

21   have authority from an organization to speak on

22   behalf of other physicians, but we -- you know,

23   we talk to each other constantly.  We have

24   conferences constantly.  We read the same medical

25   literature where there is papers, and there is

Page 71

1    letters to the editor, and there is editorials

2    and opinion pieces.   We go to major meetings.

3    So there is a community of physicians that, you

4    know, largely know what other physicians think

5    about things.

6            Q.    Is there a single body, group,

7    organization of any kind that has deputized or

8    authorized you to speak for any other physician

9    in this case?

10           A.    No, I wouldn't say that.

11           Q.    You understand that reasonable

12   physicians can have different opinions on any one

13   of a number of topics; right?

14           A.    Yes, I understand that.  There is

15   some extreme positions on either side of many

16   medical issues, but I think the bulk of

17   physicians are largely in agreement on most

18   things.  But certainly there is a range of

19   opinions about various medical issues.

20           Q.    What, if anything, have you done in

21   any formal way to determine what percentage of

22   physicians would agree with your opinions in this

23   case?

24           A.    Well, I certainly haven't spoken to

25   any physicians specifically about IVC filters,

Mark Eisenberg , M.D.                                   July 6, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 82

1       are knowledgeable about the risks and benefits

2       associated with the procedure and the device.

3       That's dependent on having that information

4       available to them.

5            Q.    Let me hand you what we will mark as

6       Exhibit 8.

7                  Exhibit 8 was marked for

8       identification.

9       BY MR. BUSMAN:

10           Q.    Do you recognize this as the

11      document identified in paragraph 24?

12           A.    Yes.

13           Q.    Take a look at the very top, if you

14      will, right under the heading:  "Chapter Two,

15      Opinions on Consent, Communications and Decision

16      Making".  I will read it into the record.

17                         "The opinions in this chapter

18                         are offered as ethics guidance

19                         for physicians and are not

20                         intended to establish

21                         standards of clinical practice

22                         or rules of law."

23                 Did I read that correctly?

24           A.    Yes.

25           Q.    Do you agree with that statement?

Mark Eisenberg , M.D.

In Re: Bard IVC Filters Products Liability

July 6, 2017

Page 83

1          A.     Well, I certainly agree that it's

2     offered as ethics guidance.   I -- you know, I

3     understand the simple meaning of the rest of the

4     sentence.   I can't say as to whether that has

5     actually -- has been established as standards of

6     clinical practice or rules of law.

7          Q.     I think that's fair.  Let me try to

8     break that down into the two components.  You

9     understand and appreciate that the document that

10    we have marked as Exhibit 8 referenced in

11    paragraph 24 provides ethical guidance?

12         A.     Yes.

13         Q.     As to whether or not it establishes

14    a standard of any kind or rule of law, you can't

15    answer one way or the other; right?

16         A.     I think that most physicians would

17    understand that the recommendations by the

18    American Medical Association are pretty strong

19    ethics guidelines, and most physicians would

20    attempt to follow them.  I don't know if that

21    answers your question.

22         Q.     I think so.  Let me try to rephrase

23    it.  You think that most physicians would

24    understand that Exhibit 8 constitutes pretty

25    strong ethical guidelines that should be

Page 102

1    retrievable filters compared to the Simon Nitinol

2    filter.

3            Q.    You speak often in your report about

4    higher complication rates; right?

5            A.    Yes.

6            Q.    What do you understand the word

7    "rate" to mean?

8            A.    No, you know, rates have -- in

9    epidemiology rates have very specific meanings,

10   to use perhaps some lay terms differently, but

11   frequency occurrence would be the lay

12   understanding of rates.

13           Q.    Now, of course you are a clinical

14   epidemiologist; right?

15           A.    Yes.

16           Q.    You have got significant training in

17   epidemiology; right?

18           A.    Yes, I would say I have a fair

19   amount of training in epidemiology.  I have

20   certainly done more than 20 years of research

21   using epidemiologic tools, epidemiology type of

22   research.

23           Q.    You understand that word choices in

24   epidemiology are significant?  Words have very

25   specific meanings in the world of epidemiology?

Mark Eisenberg , M.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 141

1          Q.     What specific expertise are you

2     bringing to bear with respect to your opinions in

3     paragraph 33?

4                    MR. ROTMAN:  Objection.

5                    THE WITNESS:  I am sorry.  Could you

6     repeat that question?

7     BY MR. BUSMAN:

8          Q.     What specific expertise are you

9     bringing to bear with respect to your opinions in

10     paragraph 33?

11                   MR. ROTMAN:  Objection.

12                   THE WITNESS:  My expertise comes

13     from two points of view.  One is as a clinician

14     who puts in permanent and temporary devices into

15     patients, who obtains informed consent from

16     patients, who takes care of patients that have

17     permanent devices in them, and on the other hand

18     is my experience as a clinical epidemiologist who

19     does studies looking at the safety and efficacy

20     of different drugs and devices.

21     BY MR. BUSMAN:

22          Q.     You don't reference any medical

23     literature in paragraph 33, do you?

24          A.     No, I do not.

25          Q.     The evidence that led you to the

Mark Eisenberg , M.D.                                July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 151

1           MR. ROTMAN:  Objection.

2           THE WITNESS:  So for the first part

3     I cannot point you to a particular document that

4     says that if Bard finds out that its product is

5     not functioning as well as they thought, they had

6     a legal responsibility to provide this material

7     to physicians.  But as a physician, as someone

8     who has decades of experience with medical

9     devices and certainly decades of research

10    experience looking into patient safety, I think

11    that it's clear that it was misleading for a

12    company to say that their retrievable devices

13    function as well as or better than the predicate

14    device.  But I cannot point you to a particular

15    document.

16    BY MR. BUSMAN:

17           Q.    Okay.  Keep that in your mind,

18    because I am going to ask the question again and

19    I am going to ask you to focus on the question

20    that I ask.

21           A.    Okay.

22           Q.    You can't point to any binding law,

23    rule, regulation, standard or document of any

24    kind that you believe Bard violated in connection

25    with the conduct outlined in paragraph 33; true?

Mark Eisenberg , M.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

                                        Page 268

1          Q.    And according to my notes, you were

2     asked a question in connection with paragraph 33

3     about whether the meaning or the import of the

4     Bard corporate documents would be apparent to

5     jurors.  Do you recall that question?

6          A.    Yes, I do.

7          Q.    So can you elaborate on how it would

8     be or what you meant by -- in your answer to that

9     question?

10               MR. BUSMAN:  Objection to the form.

11     BY MR. ROTMAN:

12          Q.    Can you elaborate to what extent the

13     import and the meaning of the corporate documents

14     would be apparent to jurors?

15          A.    I really need to clarify that, and I

16     think I was probably not clear this morning.  I

17     think that jurors did clearly understand this

18     data that's presented in the Bard internal

19     documents, but it really needs to be interpreted

20     and presented to them by an expert.  There is

21     many, many terms that are used in the corporate

22     documents that would not be readily intelligible

23     to a juror who is not familiar with inferior vena

24     cava filters, who is not familiar with the MAUDE

25     database, who is not familiar with in vitro

Mark Eisenberg , M.D.                          July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 269

1    testing, who is not familiar with statistics.

2    And many, many different areas are dealt with in

3    the corporate documents.  I think a juror would

4    understand if it was interpreted and put in

5    context by an expert, and I am talking about

6    what's the history, what's the background, what's

7    the temporal nature of what went on, what were

8    the exact design changes to the IVC filter, what

9    does the medical literature mean, what does --

10   what is a cohort study, what is a clinical trial,

11   what is a retrospective study.  So these are all

12   terms and concepts that people can readily

13   understand if it is presented to them by an

14   expert, but it's not readily available -- readily

15   understandable by a lay person without getting

16   into context.  For example, a four or five-fold

17   increased risk with Recovery filter versus SNF is

18   reported by Dr. Lehmann.  What does that mean to

19   a layman?  Not much without some background and

20   interpretation by an expert to provide that with

21   the background.

22        Q.    You were asked some questions this

23   morning, a fair number of questions about areas

24   in which you held yourself out to be an expert.

25   Do you recall that you were asked questions on

Mark Eisenberg , M.D.                          July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 270

1        those topics?

2            A.    Yes, I do.

3            Q.    So for example, you were asked if

4        you hold yourself out to be an expert on IVC

5        filter implantation.  Do you recall questions

6        like that?

7            A.    Yes, I do.

8            Q.    Do you hold yourself out to be an

9        expert in clinical epidemiology?

10           A.    I do.

11           Q.    And what is clinical epidemiology?

12           A.    So --

13           Q.    As relates to the -- you know, to

14       help you answer the question in a focused way, as

15       relates to the kinds of issues that you addressed

16       in this case.

17           A.    So clinical epidemiology is very

18       directly related to the kinds of issues that were

19       looked at in this case.  You have to contrast

20       clinical epidemiology with traditional

21       epidemiology.  Traditional epidemiology is much

22       more so about risk factors like what's the

23       relationship between smoking and cancer, alcohol

24       and development of cirrhosis.  Clinical

25       epidemiology is using epidemiologic principles to

Mark Eisenberg , M.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 271

1        look at much more clinical issues, very much like

2        looking at inferior vena cava filters is a very

3        clinical issue.  In order to look at the evidence

4        base for whether these filters are efficacious or

5        not, whether they are safe or not, how do they

6        compare to alternatives, other filters, predicate

7        filters, you need these all sorts of

8        epidemiologic principles.  But when we use them

9        in a very clinical context we call that clinical

10       epidemiology, so knowledge about clinical trials,

11       cohort studies, registries, case control studies,

12       case series, case reports, statistics,

13       biostatistics, limitations of studies like bias

14       and confounding, ideas like using databases like

15       the MAUDE database, what they can be used for and

16       what they can't be used for, statistics that are

17       used when looking at, for example, in vitro

18       testing are used in statistics.  Dr. Lehmann was

19       using statistics.  These are all things I have

20       used on a daily basis, and used for decades going

21       back to my training with a Masters of public

22       health degree from Harvard and even before that.

23            Q.    You testified a number of times in

24       response to questions asked to you during the day

25       about how certain things involving your --

Mark Eisenberg , M.D.                                                   July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 273

1      that a procedure or a device or a drug is safe

2      and efficacious, and my primary goal is patient

3      safety.  So that's what this is about.

4      BY MR. ROTMAN:

5           Q.     So you were asked questions several

6      times by Mr. Busman throughout the day about

7      whether you could identify any binding regulation

8      or any binding legal standard that supported your

9      opinion about what Bard should have done

10     regarding studies or disclosures.  Do you recall

11     that?

12          A.     Yes, I do.

13          Q.     And was it your purpose to -- in

14     giving, setting forth these opinions, was it your

15     purpose to base those opinions on what were the

16     regulatory binding requirements?

17                 MR. BUSMAN:  Objection to the form.

18                 THE WITNESS:  No, that was not my

19     purpose.  My purpose really with this report and

20     the research I have done into this area was

21     really to look at what was and is necessary for

22     patient safety with respect to IVC filters.  Do

23     we have data to say that they are safe and

24     effective?  Yes or no and, if not, what types of

25     studies, what size studies, how should they be

Mark Eisenberg , M.D.                                        July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 275

1     vigilant about drugs or devices in terms of their

2     safety.  So it's not enough just to put these

3     drugs and devices out there.  We have to actually

4     track them and see if there are safety issues

5     and, if there are, we need to quantify them.  And

6     the reason we do that is because we want to make

7     sure that everything we do is safe for the

8     patient and actually improves either their

9     quality of life or length of life.  And as we

10    discussed earlier today, when a physician obtains

11    informed consent from a patient it's critically

12    important that they have the safety information.

13    They cannot get informed consent from a patient

14    unless they actually have the correct safety

15    information to present to the patient.  And the

16    patient makes their own decision the same way

17    that it's not just the physician but the patient

18    needs to have that safety information.  It's not

19    enough just for the physician to have it.  They

20    have to be able to present that.  So if the data

21    is not there, then it needs to be generated, or

22    produced, or provided or disclosed.

23         Q.     You were asked a question, a series

24    of questions this morning and your response

25    pertained to a period in which your medical

# EXHIBIT 3

```
 1              THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF ARIZONA

 3

 4   IN RE BARD FILTERS      )

                             )

 5   PRODUCTS LIABILITY      ) No. MD-15-02641-PHX-DGC

                             )

 6   LITIGATION              )

 7

 8                 - Do Not Disclose -

 9        Subject to Further Confidentiality Review

10

11             The video-recorded deposition of

12   LEN DeCANT, taken before Pauline M. Vargo, an

13   Illinois Certified Shorthand Reporter, C.S.R.

14   No. 84-1573, at the Marriott Suites O'Hare,

15   Rosemont II Conference Room, 6155 North River

16   Road, Rosemont, Illinois, on May 24, 2016, at

17   9:04 a.m.

18

19

20

21

22

23            GOLKOW TECHNOLOGIES, INC.

           877.370.3377 ph | 917.591.5672 fax

24                 deps@golkow.com
```

Do Not Disclose - Subject to Further Confidentiality Review

```
1    information to doctors that the Recovery filter,

2    which had been on the market for all of six weeks

3    in full release, had failed and ended up in the

4    heart of a patient, whereas the Simon Nitinol

5    filter, which had been in production and

6    distribution for 25 years had never killed a

7    patient?

8         A.    I'm saying we might -- I'm saying we

9    wouldn't necessarily do that, no.

10        Q.    Do you agree with me that the company

11   has an obligation to disclose to the doctors who

12   are using its medical devices all information

13   relating to its products that those doctors would

14   reasonably need to know in order to make

15   determinations regarding whether to use the

16   product?

17        A.    Yes.

18        Q.    And it's your position that if Bard had

19   ultimately decided that there was not root cause

20   despite the fact that the filter had failed and

21   ended up in the heart, it would not have to

22   disclose that?

23        A.    I'm saying I don't -- yes, I guess I am

24   saying that.
```

# EXHIBIT 4
## Redacted in Part
## (Filed Under Seal)

Do Not Disclose - Subject to Further Confidentiality Review

1      IN THE UNITED STATES DISTRICT COURT
2         FOR THE DISTRICT OF ARIZONA
3                  -  -  -
4
5

In Re: Bard IVC          :   No.
6    Filters Products        :   MD-15-02641-
     Liability Litigation    :   PHX-DGC
7                             :
8

                     -  -  -
9

               June 2, 2016
10

                     -  -  -
11

      Do Not Disclose - Subject to Further
12

             Confidentiality Review
13

                     -  -  -
14

             Videotape deposition of JOHN
15   A. DeFORD, Ph.D., taken pursuant to
     notice, was held at the Hilton Short
16   Hills, 41 John F. Kennedy Parkway, Short
     Hills, New Jersey, beginning at 9:11
17   a.m., on the above date, before Kimberly
     A. Cahill, a Federally Approved
18   Registered Merit Reporter and Notary
     Public.
19
20                   -  -  -
21
22        GOLKOW TECHNOLOGIES, INC.
       877.370.3377 ph | 917.591.5672 fax
23            deps@golkow.com
24

Do Not Disclose - Subject to Further Confidentiality Review

1        A.      No.

██          ██        ████████████████

██      ████████████████████████████████

██      ██████████████████████████████

██      ██████████████████████████████████

██      ████████

7        A.      No.  You shouldn't downplay

8   the risks.  You should share as much

9   information as you can that's

10  appropriate, that's been scientifically

11  validated or vetted or evaluated.

12        Q.      And when you say share that,

13  you should share that with the doctors

14  that are implanting it; correct?

15        A.      The FDA, the doctors that

16  are implanting it.  Yeah, I don't

17  disagree with that.

18        Q.      My question is, you should

19  share whatever information you have about

20  the risks of the product about which

21  you're aware with the doctors who are

22  implanting it; is that correct?

23        A.      I don't disagree with the

24  basic premise, although that's a fairly

# EXHIBIT 5

Do Not Disclose - Subject to Further Confidentiality Review

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF ARIZONA

 3                            - - -

 4

                                       :

 5    IN RE: BARD IVC FILTERS        :No. MD-15-02641-PHX-DGC

      PRODUCTS LIABILITY LITIGATION :

 6                                     :

      -----------------------------

 7

 8

                            -  -  -

 9                      OCTOBER 11, 2016

                            -  -  -

10

11         DO NOT DISCLOSE - SUBJECT TO FURTHER

12               CONFIDENTIALITY REVIEW

13

14         Videotaped deposition of CHRISTOPHER

15    D. GANSER, held at HILTON SHORT HILLS,

16    41 John F. Kennedy Parkway, Short Hills, New

17    Jersey, commencing at 9:32 a.m., before

18    Margaret M. Reihl, a Registered Professional

19    Reporter, Certified Realtime Reporter, and

20    Notary Public.

21

22

               GOLKOW TECHNOLOGIES, INC.

23       877.370.3377 ph | 917.591.5672  fax

                  deps@golkow.com

24
```

Do Not Disclose - Subject to Further Confidentiality Review

1    experience with the Recovery filter.

2                        Don't you agree with me?

3          A.     Once we make that determination.

4          Q.     Okay.  I agree.  And you and I agree on

5    that?

6          A.     I do agree.

7                 MS. DALY:  Object to the form.

8    BY MR. LOPEZ:

9          Q.     Once there's statistically significant

10    evidence of that, you ought to tell doctors about it,

11    right?

12          A.     Once there's sufficient information that

13    could substantiate the need to tell the doctors to help

14    mitigate further risk.

15          Q.     For example, statistically significant

16    evidence of increased reporting risks of fatalities

17    that are consistent with the company's bench testing,

18    they ought to tell them that there is an increased

19    risk, potential increased risk of death from

20    migrations, right?

21          A.     If the data is relevant and significant.

22          Q.     I just gave you the data.  There's

23    statistically significant evidence of increased

24    fatalities with the Recovery filter against its

# EXHIBIT 6

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF ARIZONA

3

4      -----------------------x

5      IN RE BARD IVC              )

6      FILTERS PRODUCTS            ) No. MD-15-02641-PHX-DGC

7      LIABILITY LITIGATION    )

8      -----------------------x

9

10

11          DO NOT DISCLOSE - SUBJECT TO FURTHER
                    CONFIDENTIALITY REVIEW
12

13     VIDEOTAPED DEPOSITION OF CHRISTINE L. BRAUER, Ph.D.

14                        WASHINGTON, D.C.

15                  WEDNESDAY, AUGUST 2, 2017

16                         9:07 A.M.

17

18

19

20

21

22

23

24     Reported by: Leslie A. Todd

CHRISTINE L. BRAUER, PH.D.

1    BY MR. LOPEZ:

2           Q     Well, it --

3           A     It's not possible for me to do, sir.

4           Q     Isn't that the most important thing that

5    we should be talking about in this case is what

6    are doctors' and patients' expectations of the

7    safety profile and the risk-benefit profile of the

8    Recovery, G2 and all the other Bard filters,

9    right?

10                MR. ROGERS:  Object to the form.

11                THE WITNESS:  I agree that it's

12   important for a medical device manufacturer to

13   understand healthcare professionals' expectations

14   for performance of a product.

15   BY MR. LOPEZ:

16          Q     So we know early in the -- the history

17   of the Recovery filter, based on everything we've

18   talked about and what you've reviewed, that the

19   Recovery filter proved to be not as safe as the

20   Simon Nitinol filter when -- when implanted in

21   patients, true?

22                MR. ROGERS:  Object to the form.

23                THE WITNESS:  I think you're stating

24   things in absolute black and white terms.  And I

# EXHIBIT 7



## The NEW ENGLAND JOURNAL of MEDICINE



Perspective

JUNE 1, 2006

# Life-Threatening Malfunction of Implantable Cardiac Devices

Robert J. Myerburg, M.D., David W. Feigal, Jr., M.D., M.P.H., and Bruce D. Lindsay, M.D.

During the summer of 2005, in the wake of widespread criticism of its failure to communicate the potentially fatal malfunctions of its implantable defibrillators,[1,2] Guidant Corporation created an independent panel, of which we were members. The purpose of the panel was to conduct an unbiased examination of these incidents, including the methods used to identify the malfunctions and evaluate products in the postmarketing phase and the policies regarding communication within the corporation and with physicians and patients. The panel was also asked to recommend corrective actions. Concurrently, the Heart Rhythm Society — which represents physicians who implant cardiac devices — established a task force to examine assessments of device performance and develop policy recommendations and guidelines.[3] Since the report by

the independent panel had implications for the device industry in general, Guidant made it available to the public.[4]

Three points quickly emerged as guidelines for the panel's deliberations. First, manufactured products can never be entirely free of design or manufacturing flaws, but when the consequence of a malfunction is a potentially fatal event, tolerance and surveillance strategies should aim to achieve a risk of malfunction that is as close to zero as possible. Second, physicians must know about the performance features of any device they recommend for a patient, so that they can carry out their ethical obligation of obtaining

informed consent. This information must be in a form that is understandable and clinically useful. And third, patients have a right to obtain product information so that they can make informed decisions about risks and benefits and can understand what expectations are reasonable.

The panel recognized that, as compared with the clinical benefit of implantable cardiac devices, the rate of serious malfunctions is very low. We also concluded, however, that if a malfunction is life-threatening, even a low risk of its occurrence takes on importance beyond its numbers. Although it is intuitively clear that any manufactured product will have a measurable failure rate, until recently, industry had not provided information to physicians about potentially serious malfunctions when the failure rates fell within the overall performance predic-



EXHIBIT

518

10/11/16 mR

The New England Journal of Medicine
Downloaded from nejm.org by Brooke Meyers on May 20, 2014. For personal use only. No other uses without permission.
Copyright © 2006 Massachusetts Medical Society. All rights reserved.



**Defects Leading to Potential Failure in Two Types of Guidant Implantable Defibrillators.**
The numbers of implantable defibrillators identified between 2002 and mid-2005 as having defects that predisposed them to short-circuiting (arcing), with an attendant risk of failure to deliver therapy when needed, are shown. The Prizm 2 DR was a conventional implantable defibrillator, and Renewal 1 and 2 were implantable defibrillators with biventricular pacing capability. Open symbols represent malfunctions that were associated with the death of a patient; one of these malfunctions was due to a random manufacturing defect rather than to the identified defect that resulted in short-circuiting ("different root cause"). Adapted from Myerburg et al.[4]

tions.[4] In most cases, these malfunctions were simply folded into overall statistics that also included less critical malfunctions and the expected depletion of batteries over time — a practice that made serious but infrequent malfunctions invisible to physicians and patients.

Although there is no industry-wide performance standard for malfunction rates in the cardiac-device industry, all companies are required by the Food and Drug Administration (FDA) to evaluate device malfunctions systematically in the post-marketing phase, to identify those that are clinically significant, to correct defects, and to act to prevent failures in performance. These internal processes necessarily center on engineering skills and methods. But the consequences of device malfunctions are more than an issue for engineering: they have clinical implications for patients that may include a risk of fatal events. Thus,

engineering performance standards are insufficient benchmarks without evaluation by experts of the possible effects on individual patients. The independent panel concluded that the lack of adequate clinical expertise, combined with undue reliance on arbitrary statistical criteria, led to decisions that had potentially and manifestly serious consequences. The graph shows the number of implantable defibrillators that were identified as having defects that predisposed them to short-circuiting (arcing) between 2002 and 2005.

As the number of defibrillators with life-threatening malfunctions continued to grow, the overall reliability of the products remained within the predicted rates. Therefore, in keeping with the company's standard practices at the time, the engineering group at Guidant decided, without any input from physicians, that it was unnecessary to inform physician-customers about these events.[4] In addition,

implantations of the potentially defective defibrillators continued for a time, and physicians, hospitals, and patients were not informed that the devices had flaws that could result in the inability to deliver therapy when necessary. It seems clear that the industry needs physicians with defined responsibilities focused on patient safety to provide recommendations to corporate leaders.

Post-marketing surveillance continues to be a challenge for the FDA and industry. Clinical trials rarely identify significant signals of very uncommon adverse events, and only a small proportion of later events are ever reported. One potential solution to this limitation of tracking, at least for cardiac devices, lies in the National Cardiovascular Data Registry mandated by the Centers for Medicare and Medicaid services for implantable cardioverter-defibrillators, which could be expanded and adapted to other databases. Moreover, the number of malfunctions that occur at the time of deaths that are assumed to be from natural causes remains unknown, because most devices are not returned to manufacturers for evaluation after patients die.

The FDA recently announced plans to address post-marketing surveillance more actively, including having electrophysiology experts from its Circulatory System Devices Panel review the post-marketing performance of implantable devices. The Heart Rhythm Society's task force also suggested that the FDA establish post-marketing advisory committees to recommend actions that should be taken when malfunctions are identified in defibrillators or pacemakers.[5] These steps could help the FDA address many issues, in-

The New England Journal of Medicine
Downloaded from nejm.org by Brooke Meyers on May 20, 2014. For personal use only. No other uses without permission.
Copyright © 2006 Massachusetts Medical Society. All rights reserved.

cluding the lack of standard definitions and classifications of malfunctions that makes evaluating reports from different manufacturers problematic. It is uncertain whether the FDA could appreciably enhance the effectiveness of its post-marketing surveillance program without expanding both its authority and its budget. But if patient safety is a priority, the federal government should appropriate the funds required to make this effort feasible, without adversely influencing the FDA's other areas of responsibility.

In the meantime, companies must reevaluate their approach to patient safety in the context of communication. A critical question is when and how information about product performance should be communicated to physicians and patients. Although the issues — both ethical and practical — are complex, one conclusion is clear: transparency in matters that affect patient safety should be embraced as a primary corporate obligation.

In the past, this industry has not had a good record of open communication, but transparency does benefit companies that want to be viewed as trusted partners in the health care enterprise. As the panel noted, transparency may be passive, with information made available to those who seek it; active, with information targeted to specific groups of stakeholders; or forced, with a third party bringing forth information that elicits further disclosure by a company, as a defensive move. From the perspective of physicians' and patients' expectations, corporate responsibility, and public perception, we believe that proactive communication policies,

centering on the proper use of active and passive transparency, should be the norm. Insofar as such communication is hindered by perceived business conflicts, the solution may lie in new regulatory definitions that distinguish informational actions from those that indicate the removal of a device. Changing language can be difficult, since much of it is embedded in statutory requirements.

The panel also recommended that Guidant establish an independent review group to provide unbiased analysis of information on product performance and advice on decisions about external communications. Voluntary, independent review at the level suggested is a notion both foreign and frightening to most corporations, whose perceived need is to protect business interests. But corporate culture fosters a loyalty to corporate goals that may create unintended bias and distorted perceptions about product performance and patient safety. Independent review groups could assist corporations by generating unbiased advice that was responsive to society's view of the best business practices and clinical priorities.

Historically, corporations have — by themselves — set the expectations for device reliability and the communication of product malfunctions, seeking little input from patients, physicians, or professional organizations. This practice developed in the early years of the industry, when the combination of small numbers of device recipients and low malfunction rates made it difficult to detect problems. With the explosive growth of the industry in

recent years, previously unrecognizable signals have become increasingly visible. Clearly, strategies for evaluating and communicating device malfunctions must be adjusted accordingly. Our conclusion is that industry should work collaboratively with physicians, professional societies, patient representatives, and regulatory agencies to establish reasonable standards and guidelines for the device industry to follow. Patients deserve nothing less.

The opinions expressed in this article reflect the views of the authors and are not endorsed by Guidant or any of the institutions or organizations with which the authors are affiliated.

Drs. Myerburg, Feigal, and Lindsay report having received honoraria from Guidant. Dr. Myerburg also reports having received consulting fees from Procter & Gamble and Reliant and having served as an expert witness. Dr. Lindsay reports having received consulting fees from Medtronic.

This article was published at www.nejm.org on May 15, 2006.

Dr. Myerburg is a professor of medicine and physiology at the University of Miami Miller School of Medicine, Miami. Dr. Feigal is a partner at NDA Partners, Phoenix, Ariz., and the former director of the Center for Devices and Radiological Health, Food and Drug Administration, Rockville, Md. Dr. Lindsay is an associate professor of medicine and director of cardiac electrophysiology at Washington University School of Medicine, St. Louis.

1. Meier B. Maker of heart device kept flaw from doctors. New York Times. May 24, 2005:A1.
2. Steinbrook R. The controversy over Guidant's implantable defibrillators. N Engl J Med 2005;353:221-4.
3. Proceedings Document from the Policy Conference on Pacemaker and ICD Performance. Presented by the Heart Rhythm Society and the Food and Drug Administration, September 16, 2005. (Accessed May 11, 2006, at http://www.hrsonline.org/advocacyDocs/HRS-device_conference.pdf.)
4. Myerburg RJ, Apostolakis GE, Beller GA, et al. Report of the Independent Panel of Guidant Corporation. March 20, 2006. (Accessed May 11, 2006, at http://www.guidant.com/panel/panel.pdf.)
5. Heart Rhythm Society Task Force report on device performance policies and guidelines. Heart Rhythm (in press).

The New England Journal of Medicine
Downloaded from nejm.org by Brooke Meyers on May 20, 2014. For personal use only. No other uses without permission.
Copyright © 2006 Massachusetts Medical Society. All rights reserved.