1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC |
| | **EXHIBIT INDEX** |
| | **PLAINTIFFS' RESPONSE TO DEFENDANTS C. R. BARD, INC.'S AND BARD PERIPHERAL VASCULAR, INC.'S MOTION TO EXCLUDE THE OPINIONS OF THOMAS KINNEY, M.D., ANNE CHRISTINE ROBERTS, M.D., AND SANJEEVA KALVA, M.D.** |

Exhibit 1    Kinney Deposition Excerpts 6-17-17

Exhibit 2    Kalva Deposition Excerpts 7-11-17

Exhibit 3    Roberts Deposition Excerpts 7-1-2017

Exhibit 4    Tillman Dep. 8-4-16 (**FILED UNDER SEAL**)

Exhibit 5    Grassi Deposition Excerpts 6-15-17

Exhibit 6    Ganser Deposition Excerpts 10-11-16 (**FILED UNDER SEAL**)

Exhibit 7    Myerburg, *Life-Threatening Malfunction of Implantable Cardiac Devices*

Exhibit 8    Brauer Deposition Excerpts 8-2-17 (**FILED UNDER SEAL**)

Exhibit 9    BPVE-01-00617777

# EXHIBIT 01

## EXCERPTS FROM DEPOSITION TRANSCRIPT OF THOMAS KINNEY, M.D.

June 17, 2017

Page 1

1               IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF ARIZONA

3

4

5     IN RE BARD IVC FILTERS

6     PRODUCTS LIABILITY                 MD-15-02641-PHX-DGC

7     LITIGATION

8

9

10

11

12          VIDEOTAPED DEPOSITION OF THOMAS KINNEY, M.D.

13                     La Jolla, California

14                   Saturday, June 17, 2017

15                          Volume I

16

17

18

19

20

21

22     Reported by:

23     Gail E. Kennamer, CSR 4583, CCRR

24

25

Thomas Kinney , M.D.                                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 25

1    engineering and 1983 when you started medical school?

2            A.    Yes, I did.   I worked for NASA for a year and a

3    half doing aeronautical design and wind tunnel.

4            And then I worked for Thomas Fogarty as a bioengineer

5    designing medical devices, prototyping medical devices,

6    and doing FDA submissions for four years.

7            Q.    Why don't we start with the job you took

8    immediately after receiving your master's degree in

9    mechanical engineering.   Was that the job with NASA?

10           A.    That was the job with Thomas Fogarty.

11           Q.    Okay.   And what specifically did you do for

12   Dr. Fogarty?

13           A.    We were designing angioplasty balloons.   We did

14   pathophysiology experiments with mechanism of angioplasty.

15           We designed vascular clamps.

16           He was a referral person for many other physicians

17   that were interested in innovation and design, so we did

18   some ureteral dilators for one of his urology colleagues.

19           I designed a vascular clamp for one of Dr. Fogarty's

20   former partners, Dr. Pat Daily, who was here at San Diego.

21           We also got involved in designing a cardioplegia

22   jacket to do cardiac bypass.   And that was a project I

23   continued when I went to medical here, and that project we

24   actually did a 510(k) submission for FDA as well.

25           Q.    You mentioned a number of medical devices that

Thomas Kinney , M.D.                                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 26

1    you worked on during your time with Thomas Fogarty.

2          How many of those medical devices involved a 510(k)

3    application?

4          A.   As I recall, there were two.  At least two that

5    we did.

6          Q.   That was the cardioplegia jacket?

7          A.   Yeah.

8          And I'm pretty sure we did a vascular clamp as well.

9          Q.   You did.

10         So to the best of your recollection, the vascular

11   clamp and the cardioplegia jacket both involved eventual

12   510(k) submissions?

13         A.   Correct.

14         Q.   Did you work on the content of those 510(k)

15   submissions?

16         A.   I did.  I did.

17         Q.   What do you recall doing with regard to the

18   510(k) submissions for those two products?

19         A.   We -- We did in vitro and ex vivo studies to

20   confirm the performance characteristics of those devices

21   and provided data.

22         And then we submitted those as -- as applications.

23   And as I recall, the FDA had specific things that we had

24   to fill out for that.  We had the right instructions for

25   use in there as well for the labeling.  I kind of recall

Thomas Kinney , M.D.                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 27

1      doing that.

2            And we submitted it and waited to see what their

3      responses were, and then there were questions, as I

4      recall, and we -- we addressed those.

5            Q.   Have you done any work with 510(k) applications

6      in the last 30 years?

7            A.   No, I have not.

8            Q.   So would it be fair to say that you're not

9      familiar with the current regulations regarding 510(k)

10     applications?

11               MR. JOHNSON:  Form.

12      BY MR. BROWN:

13            Q.   You can answer.

14            A.   I would say -- Yeah, I imagine there has been

15     changes.  I have not looked at those.  Those were not

16     pleasant sites to look at.  I mean, if you are challenged

17     for sleep perhaps.  But no, I have not looked at those.

18               MR. LOPEZ:  He's not being offered as a 510(k)

19     expert either, so...

20               MR. BROWN:  Okay.

21            Q.   And I assume that the same is true for the

22     510(k) regulations as they existed in the early 2000s, you

23     don't have any knowledge about what those related to?

24            A.   I wouldn't have any real knowledge of those

25     other than what I kind of read from what Kessler wrote in

Thomas Kinney , M.D.                    June 17, 2017
In Re: Bard IVC Filters Products Liability

                                        Page 33

1    on my experience and knowledge of engineering.

2          So for me, it's how do you separate that from not

3    being a designer versus being a designer?  To me those --

4    those intersect.  They are not mutually exclusive.

5          Q.   When you are talking about evaluating the

6    features of an IVC filter, are you talking about how those

7    features relate clinically or some type of mechanical

8    analysis or engineering analysis of those features?

9              MR. JOHNSON:  Or both.

10     BY MR. BROWN:

11         Q.   Or maybe both.

12         A.   I -- I couldn't have said it better.  I would

13   say they are both related, in my mind.  Again, there's

14   mechanical aspects.  It's a mechanical device.  It's a

15   mechanical interruption is what it was labeled as at one

16   point.  And so basically, if you are doing that, you are

17   thinking about the clinical aspects of how well does it

18   function collecting clots and staying where you put it,

19   and the long-term performance characteristics.  Those sort

20   of issues.

21         Q.   Have you done any type of publishing related to

22   IVC filters with regard to analysis of the actual design

23   specifications?

24         A.   I don't recall.  I mean, I did a big review

25   article in 2003 that was the most downloaded paper from

Thomas Kinney , M.D.                                June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 34

1    the JVIR website for two years in a row, and we did -- we

2    did talk about dimensional aspects, the size of the

3    filters and the lengths of the filters.  We might even

4    have talked about the diameters of some of the wires.  And

5    to me, those are mechanical aspects.  We didn't do --

6    specifically address analysis on those.  It was a review

7    article, and so it focused on all the commercially

8    available filters that were available at the time, and I

9    think there was also some comments about upcoming filters

10   that were -- included the Bard filter, Recovery Nitinol

11   filter.

12        Q.   You touched on there a little bit about what I

13   was trying to get at which is: Did you have any type of

14   involvement in bench testing of IVC filters?

15        A.   I have to say, so I have done a lot of filter

16   workshops over the years for our Society of Interventional

17   Radiology.  So we would bring all the filters we had, and

18   they would be on a bench top that we show physicians, and

19   you'd squeeze them and say this is how strong this one is.

20   And so is that bench top?  In a sense, it is to me.  I

21   suppose we didn't have mechanical transducers or anything

22   like that, so it's not high-level bench top work, but it

23   was bench top evaluations involved.

24        Q.   Would you describe that as more

25   demonstrative-type bench top work?

Thomas Kinney , M.D.                                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 42

1    want to clarify that.

2      BY MR. BROWN:

3          Q.    All right.   Do you have any education, training,

4    or experience with regard to the contents of what should

5    be included in IVC filter instructions for use?

6          A.    Being an expert in IVC filters and having a

7    30-year experience placing filters, and considered -- I

8    have been invited to give lectures on filters, so I -- I

9    know a lot of about filters.

10         And also having written formal instruction for use

11   for at least two other different devices, and also

12   actually looking at multiple instruction for uses for all

13   the other devices that I use on my daily work, while I may

14   not be labeled as an expert in IFU, I think I can look at

15   an IFU and understand what it's telling me or hoping to

16   tell -- what's -- what it's trying to convey to me.

17         Q.    Do you have any training, education, or

18   experience concerning what an IVC filter's IFU should be

19   required to include?

20         A.    I don't have specific training.  But again, I

21   have written articles about things that go into IFUs.  So

22   those are the things that include indications,

23   contraindications, the specific risks that are involved

24   with filters.  So while I'm not a -- I haven't been

25   trained in that.  I kind of -- I think I know what should

Thomas Kinney , M.D.                                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 72

1          Q.   In the same vein, do you practice evidence-based

2    medicine?

3          A.   Yes.   When possible, there is -- we don't always

4    have evidence, and so, then, we're kind of left to

5    clinical experience.   We're left to opinions.

6          What's really unique, I think, in the environment I

7    work in is I work with seven or eight other

8    interventionalists, and you can elicit comments from, I

9    don't know, suggestions from them, so that's our approach

10   to cases.

11         Q.   When you are making the treatment decisions for

12   your patients, am I correct that you are trying to base

13   that decision on the most reliable information that you

14   have?

15         A.   Yes.

16         Q.   As part of your methodology in this case, did

17   you cherrypick data that helped advance your opinion that

18   Bard's filters are defective?

19              MR. JOHNSON:   Form.

20              THE WITNESS:   I don't think so.

21      BY MR. BROWN:

22         Q.   As part of your methodology in this case, did

23   you ignore data that weighed against your opinions that

24   Bard's filters are defective?

25         A.   I don't think so.

Thomas Kinney , M.D.                              June 17, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 73

1        Q.   Would you agree that if you did ignore data that

2   weighs against the opinion that Bard's filters are

3   defective, that you would be applying the same level of

4   intellectual rigor in this case as you apply in your

5   private practice as a researcher and clinician?

6            MR. JOHNSON:   Form.

7            THE WITNESS:   I would say that I'm always

8   willing to look at data.   If you have some data to show

9   me, I'd be happy to look at it and opine about it.

10   BY MR. BROWN:

11        Q.   In drafting this report, did you take data and

12   information out of context?

13        A.   I don't think so.

14        Q.   If you did take data and information out of

15   context, would you agree that you wouldn't be applying the

16   same level of intellectual rigor to your work in this case

17   as you apply in your work as a clinician?

18            MR. JOHNSON:   Form.

19            THE WITNESS:   Again, I would say show me what

20   you don't agree with, and we'll look at it and make an

21   intelligent decision.

22   BY MR. BROWN:

23        Q.   Okay.   How was the report, which we marked as

24   Exhibit 4, prepared?

25        A.   We basically used the document by Dr. Kessler is

Thomas Kinney , M.D.                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 74

1    what we did, and we were -- we were asked -- we were

2    tasked, actually, as interventional radiologists who were

3    academicians and involved with some of the writing

4    standards about IVC filters, and we were tasked to assess

5    the information that was provided by Bard about their

6    filters, and whether we thought that there was

7    transparency in that in our approach to, say, getting

8    consent for patients.

9        We were -- I lost my train of thought.  Sorry.

10           MR. LOPEZ:  If you need to refer to your report,

11   you can, by the way.

12           THE WITNESS:  Yeah.

13       You know, as clinicians that have multiple years of

14   experience on IVC filters, we were, you know, able to make

15   opinions about, you know, what we thought was done.  We

16   were able to assess the data that he presented, some of

17   the experimental data, that included lab experiments and

18   animal experiments.

19       Basically, it was listed as a permanent filter that

20   had -- that was supposed to act like permanent filters

21   that we had before.

22       My career and Anne Roberts' career spans the

23   transition in filters from permanent devices to retrieval

24   filters.  And we were promised that the retrieval filters

25   would have the same sort of performance characteristics

Thomas Kinney , M.D.                                    June 17, 2017
In Re: Bard IVC Filters Products Liability

                                                        Page 75

1     that our permanent devices had.  And unfortunately, as the

2     experience -- as the clinical experience accrued with the

3     retrieval filters, we were finding that that assumption

4     was not true, and there was -- it turned out, you know, I

5     had done a plenary session right before Bard did your

6     major marketing release of the Recovery Nitinol filter.

7     The -- The SIR meeting in 2004 was in Phoenix, and we

8     were -- my plenary session was on venous thromboembolism.

9     And we were all excited about having the use of retrieval

10    filters.  Because we all remembered that ten-year-old kid

11    that had a trauma that we put a filter in, and he had that

12    filter for multiple decades, and we never felt real

13    comfortable talking to that patient or his mother or

14    father about what was going to happen with this multiple

15    decades.  Really, you kind of say, "We don't really know,"

16    and that's an answer that families like to hear because

17    they -- they assume you are the doctor, you know

18    everything and, you know, you should know these things.

19         So again, I lost my train of thought.  Sorry.

20      BY MR. BROWN:

21         Q.   All right.  Well, I'm interested right now in

22    how the report actually was physically prepared.  Because

23    we have three authors and several hundred pages of

24    material here, and I want to get a sense as to how putting

25    pen to paper or fingers to the typewriter this was

Thomas Kinney , M.D.                                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 76

1     actually done.

2           A.    Okay.

3           Q.    So can you elaborate on how Exhibit 4 was

4     prepared?

5           A.    I -- My section, I wrote looking at the Kessler

6     report, and I did a literature search on -- on the -- on

7     the retrieval -- all the Bard filters, basically, from the

8     initial animal studies.  I even looked back at the Simon

9     Nitinol data.  I had experience putting in Simon Nitinol

10    filters myself.

11          And so we looked at the preliminary data before some

12    of the animal -- I looked at some animal abstracts that

13    Dr. Kaufman wrote back when he was still at Boston, and

14    even before that, it was approved as a device for humans.

15          Then I looked at Dr. Asch's studies.  And that study

16    was clearly done as a -- as just a retrievable study, and

17    it was a short-term study, but there were -- again, you

18    know, we talked about signals before.  There were things

19    in that study that we were concerned about in terms of

20    there were some fractures, and there was a surprise

21    migration of a filter that they fortunately caught because

22    they had scheduled to retrieve it at that time.

23          And then there was a subsequent report that

24    demonstrated yet another issue with a filter that came out

25    a few years later.

Thomas Kinney , M.D.                                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 77

1          Then I looked at the 510(k), and I looked at the

2     studies that were involved in the 510(k).

3          What else did I look at?  Then I looked at all the

4     documents that were listed by Dr. Kessler in terms of when

5     they did the market release which was, I recall, was in

6     January of 2004.  And then the rapidity with what sort of

7     issues came up.

8          And the thing that surprised all of us that had

9     experience with the permanent filters was we were seeing

10    complications that we had never seen before.  I do

11    remember my point about the plenary session.  What I said

12    in that plenary session was that there were design changes

13    made in the retrieval filter to make it retrievable; and

14    again, we assumed that those design changes were made in a

15    compatible fashion that the performance characteristics

16    would be similar as a permanent filter.  But I remember in

17    that plenary session saying that it's possible that the

18    features that make a filter retrievable may also make it

19    migrate easily or move, and those are design tradeoffs.

20    You know, this is the engineering aspect again, and we'll

21    see if that's what happens or not.

22         And so anyway, I am getting off the track a little

23    bit, Matthew, and I apologize.  But basically, I went

24    through the Kessler report, and went through sequentially

25    all the different aspects of that.

Thomas Kinney , M.D.                                June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 196

1          Q.    Is it your opinion in this case that medical

2     device companies should provide all complaint files for

3     the medical devices to physicians?

4               MR. JOHNSON:   Form.

5               THE WITNESS:   You know, I would say as a general

6     statement, no.  But when you -- when you start getting to

7     see signals, I think that's of concern because it's

8     transparency, and it's our ability to really do an

9     adequate informed consent.  You know, that's -- or even

10    device selection for us.  So I was -- You know, I thought

11    I was in a unique position with Bard; that, you know, I

12    was kind of a consultant with them.  I helped them do

13    animal studies to get approval of what I thought were

14    better devices.  They never showed me the data of any of

15    the animal studies I did.  And then furthermore, they

16    never showed me any of this data that maybe would have

17    been -- I might have had opinions about that might have

18    been helpful for them.  And you go why is that?  Why --

19    Why was my opinion not important?  And maybe if I had the

20    chance to look at that data I would have said, "I'm not so

21    sure about this test.  You know, maybe we need to do

22    more."

23          You may get to this later, but, you know, they talked

24    to us in 2006 with this consensus agreement, and then

25    they -- they met with me a little bit after that asking

Thomas Kinney , M.D.                                   June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 197

1    certain things, vague sort of questions about we think our

2    fracture rate is this.  Is that a good thing or is that a

3    bad thing?  And I -- I was very concerned about that rate.

4    Although if you look at the document, it doesn't convey

5    that.  I mean, it's verbiage, so it doesn't convey my

6    concern in the field.

7         What I was worried about is that in the short period

8    of time that data had accrued, that the rate may

9    eventually go above a rate that I thought was safe.  It

10   was going to be beyond what was the standard for the

11   generation of devices at that time.  We already looked at

12   tables that show really high numbers, and those are some

13   old numbers that is across multiple different filters and

14   maybe decades of data.  But as we get further along, I

15   think the devices should get better.

16        And so maybe I'm unique because I was a consultant

17   with Bard, and I thought I should have had the information

18   shared with me.  But I think that there is other

19   physicians that are in difficult situations with patients

20   that have Bard filters, and I suspect if you ask them,

21   they might say they wished they had known.

22    BY MR. BROWN:

23        Q.   You mentioned in the beginning of your answer

24   that you think that the company should be providing

25   information when it receives signals; is that right?

Thomas Kinney , M.D.                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 196

1           Q.   Is it your opinion in this case that medical

2      device companies should provide all complaint files for

3      the medical devices to physicians?

4                MR. JOHNSON:   Form.

5                THE WITNESS:   You know, I would say as a general

6      statement, no.  But when you -- when you start getting to

7      see signals, I think that's of concern because it's

8      transparency, and it's our ability to really do an

9      adequate informed consent.  You know, that's -- or even

10     device selection for us.  So I was -- You know, I thought

11     I was in a unique position with Bard; that, you know, I

12     was kind of a consultant with them.  I helped them do

13     animal studies to get approval of what I thought were

14     better devices.  They never showed me the data of any of

15     the animal studies I did.  And then furthermore, they

16     never showed me any of this data that maybe would have

17     been -- I might have had opinions about that might have

18     been helpful for them.  And you go why is that?  Why --

19     Why was my opinion not important?  And maybe if I had the

20     chance to look at that data I would have said, "I'm not so

21     sure about this test.  You know, maybe we need to do

22     more."

23           You may get to this later, but, you know, they talked

24     to us in 2006 with this consensus agreement, and then

25     they -- they met with me a little bit after that asking

Thomas Kinney , M.D.                                         June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 197

1    certain things, vague sort of questions about we think our

2    fracture rate is this.  Is that a good thing or is that a

3    bad thing?  And I -- I was very concerned about that rate.

4    Although if you look at the document, it doesn't convey

5    that.  I mean, it's verbiage, so it doesn't convey my

6    concern in the field.

7         What I was worried about is that in the short period

8    of time that data had accrued, that the rate may

9    eventually go above a rate that I thought was safe.  It

10   was going to be beyond what was the standard for the

11   generation of devices at that time.  We already looked at

12   tables that show really high numbers, and those are some

13   old numbers that is across multiple different filters and

14   maybe decades of data.  But as we get further along, I

15   think the devices should get better.

16        And so maybe I'm unique because I was a consultant

17   with Bard, and I thought I should have had the information

18   shared with me.  But I think that there is other

19   physicians that are in difficult situations with patients

20   that have Bard filters, and I suspect if you ask them,

21   they might say they wished they had known.

22        BY MR. BROWN:

23        Q.   You mentioned in the beginning of your answer

24   that you think that the company should be providing

25   information when it receives signals; is that right?

Thomas Kinney , M.D.                                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 299

1    are not referenced in Table 2.

2           THE WITNESS:  I have to look at this.  Let's

3    see.  Table 2 is two...

4        (Indicating.)

5        2, 7, 2, 7, 10, 12, 13.  And 12, 13, 24.  That's

6    correct, actually.  Looks like it's going to be correct.

7    43.

8        So I take that statement back.  Actually, the way

9    it's worded, it actually is correct.  I was reading it,

10   just part of it.

11     BY MR. BROWN:

12       Q.   First sentence says, "The data evaluated in the

13   medical literature for 2003 and 2011 articles involved

14   past studies, none of which involved retrievable filters,"

15   that sentence is not accurate?

16       A.   The first sentence is not accurate.  That Table

17   2 -- That really should apply to Table 2 --

18       Q.   Okay.

19       A.   -- is what -- is the way that should be.

20       Q.   And you wrote Paragraph 220?

21       A.   I don't remember.  Sorry.  I don't remember.

22       Q.   Do you know who would have written Paragraph 220

23   if you didn't?

24       A.   Well, I assume it's Dr. Roberts or Dr. Kalva.

25       Q.   Did the plaintiffs provide any drafts of your

Page 300

1     report?

2            A.    No.   This was -- We wrote this ourselves.

3            Q.    The totality of the report was written by you,

4     Dr. Roberts, and Dr. Kalva; correct?

5            A.    That's correct.

6            Q.    So no pre-worded information was provided to

7     you; these are your own words?

8            A.    No, no.   This we wrote ourselves.   Yes.

9            Q.    Turning to Paragraph 229, you are referring to

10    testimony by Dr. Clement Grassi, the first named author of

11    the 2001 SIR guidelines?

12           A.    Right.

13           Q.    Do you see that?

14           A.    Yes.

15           Q.    You write, "Dr. Clement Grassi, the first named

16    author of the 2001 SIR article (republished in 2003) and

17    retained expert witness for Bard, testified that the

18    article should not be used and was not intended to be used

19    to indicate safety thresholds..."

20           And then you cite some testimony by Dr. Grassi.

21           Do you see that?

22           A.    I do.  Yes.

23           Q.    Did you read Dr. Grassi's full deposition?

24           A.    I did.  I did.

25    (Continued on following page.)

Thomas Kinney , M.D.                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 310

1              MR. JOHNSON:  Form objection.  Question is also

2       vague.

3              THE WITNESS:  It's a suggestion, but there's --

4       I don't see them giving a lot of details about how they

5       are doing that.  It's -- It's a one-sentence structure

6       with no specifics.

7          We kind of talked about that, you know, like we

8       talked about whether there is, I don't know, prospective

9       randomized studies, the grades of those versus case

10      studies.  There is no mention about how that's done here.

11      I guess we're making assumptions.

12             MR. BROWN:  Okay.  Thank you, Doctor.  I don't

13      have any other questions for you.

14             THE WITNESS:  Thank you, I think.

15             MR. JOHNSON:  I will have some questions for

16      him.  I won't be too long.

17

18                        -EXAMINATION-

19        BY MR. JOHNSON:

20          Q.   Doctor, did I understand you to tell us that for

21      a number of years, Bard had you act in different

22      capacities on their behalf?

23          A.   I did many different things for Bard.  I did --

24      I trained physicians on how to put filters in and take

25      them out.

Veritext Legal Solutions
800.808.4958                                              770.343.9696

Thomas Kinney , M.D.                          June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 311

1        I did animal studies to evaluate new designs.

2        I participated in the patent lawsuit that had to do

3    with dialysis catheters.

4        And then I did phone conversations with them, in

5    contact with their clinical support staff or sales

6    personally about particular problems.

7        Q.   All right.  And you did that for a number of

8    years?

9        A.   From about 2004 to about 2007 is what I recall.

10       Q.   Who were your primary contact people with Bard?

11   You mentioned Janet Hudnall, for example.

12       A.   Hudnall was one of my major contacts.  But I do

13   remember talking to Richard North, I think.  He was the

14   guy -- he was the person that contacted me about the phone

15   conversations, if I remember right.

16       It could have been Dr. Civarella.  I don't remember.

17   It's quite a while ago now.

18       Q.   And did you mention Rob Carr?

19       A.   You know, Rob Carr was always in the background,

20   but he -- I didn't -- he didn't solicit me directly.  I

21   remember Janet, and I remember either Richard North or

22   Civarella.

23       Q.   Richard North?

24       A.   I think so.  Why?

25       Q.   He's an attorney for Bard, defending them in

Thomas Kinney , M.D.                     June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 314

1    make if one of your colleagues at one of your hospitals

2    asked you for your advice relating to a problem with a

3    filter?

4              MR. BROWN:  Object to the form.

5              THE WITNESS:  Correct.

6       BY MR. JOHNSON:

7         Q.   All right.  Were you also a trainer for Bard,

8    that is, did you train other physicians on how to implant

9    the filter and explant filters?

10        A.   Yes.

11        Q.   All right.  With regard to the report that you

12   prepared for this litigation, does it set forth your

13   opinions within a reasonable degree of medical

14   probability?

15        A.   Yes.

16        Q.   All right.  And you told us that you were first

17   retained in this litigation in December of 2016 or January

18   of 2017?

19        A.   I -- I kind of recall January, but I could be

20   wrong about that.

21        Q.   There is a list in your report of Bard

22   documents.  Do you recall that?

23        A.   Yes.

24        Q.   And do you recall reviewing all of those

25   documents?

# EXHIBIT 02

## EXCERPTS FROM
## DEPOSITION TRANSCRIPT OF
## SANJEEVA KALVA, M.D.

## July 11, 2017

Sanjeeva Kalva , M.D.                      July 11, 2017
In Re: Bard IVC Filters Products Liability

Page 1

1              IN THE UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF ARIZONA

2

3    In re Bard IVC Filters       NO. MD-15-02641-PHX-DGC

     Products Liability

4    Litigation

5

6

7

8           ORAL AND VIDEOTAPED DEPOSITION OF

                 SANJEEVA KALVA, MD

9                  Volume 1 of 1

                   July 11, 2017

10

11           ORAL AND VIDEOTAPED DEPOSITION OF SANJEEVA

12   KALVA, MD, produced as a witness at the instance of

13   the Defendants, and duly sworn, was taken in the

14   above-styled and numbered cause on July 11, 2017 from

15   9:08 AM to 2:38 PM, before Gaylord A. Sturgess, CSR

16   No. 744, in and for the State of Texas, reported by

17   Stenographic method, at the offices of UT SOUTHWESTERN

18   MEDICAL CENTER, 5323 Harry Hines Boulevard, Room

19   POB1-600, Dallas, Texas  75390, pursuant to the

20   Federal Rules of Civil Procedure and the provisions

21   stated on the record.

22

23

24

25

Sanjeeva Kalva , M.D.                    July 11, 2017
In Re: Bard IVC Filters Products Liability

Page 24

1    I removed Denali.  So I have removed all of them but

2    may not have implanted each one of them.

3        Q.    Now, you're obviously an expert in

4    interventional radiology, correct?

5        A.    I believe so.

6        Q.    You would agree that you're not an engineer,

7    however?

8        A.    By training I'm not an engineer.  By

9    training I'm a medical person.  I have studied

10   medicine, and I became interventional radiologist.  I

11   do not have the same engineering background as an

12   engineer would have, if that's the question you're

13   trying to -- the question.  But do I understand some

14   of the concepts?  I do.

15       Q.    You do not have any prior experience in the

16   design of inferior vena cava filters, do you?

17       A.    Can you rephrase what exactly you mean by

18   that?

19       Q.    Do you have any prior experience in

20   designing inferior vena cava filters?

21       A.    You mean personally?

22       Q.    Yes.

23       A.    So I can tell that, mainly because I am

24   behind the scenes, I have ideas of new filter and that

25   I have not a patent.  Yes, I did think about it, but I

Sanjeeva Kalva , M.D.                    July 11, 2017
In Re: Bard IVC Filters Products Liability

Page 25

1    have not officially taken patented so far.

2         Q.    You are not a regulatory expert, are you?

3         A.    What do you mean by that?

4         Q.    An expert in FDA regulations.

5         A.    I'm not expert in the FDA regulations, but I

6    know some of the regulations that they impose on

7    physicians how the hospital function.  I know those

8    things, but I do not consider myself expert in

9    designing or creating or implementing FDA regulations.

10        Q.    Do you consider yourself an epidemiologist?

11        A.    All medical doctors are -- learn about

12   epidemiology as a part of their medicine.  And if you

13   look into any book chapter, any textbook, the first

14   paragraph is always about the epidemiology of the

15   disease.  Epidemiology plays a significant role on our

16   understanding of the disease, how resources are

17   distributed.

18             So epidemiology is learned routinely

19   throughout medicine.  So the word epidemiologist is a

20   different question who actually conducts or gets

21   information about epidemiological conditions of a

22   disease process or treatment aspects.  But I'm not an

23   epidemiologist, if you're talking about that.  But I

24   understand epidemiology is part and parcel of medicine

25   that we learn every day.  We practice medicine that

Sanjeeva Kalva , M.D.                    July 11, 2017
In Re: Bard IVC Filters Products Liability

Page 62

1    ACR-SIR publications, correct?

2         A.   That is correct.

3         Q.   The list of medical articles here --

4         A.   Yes.

5         Q.   -- is that a comprehensive list of the

6    articles that you and your coauthors utilized in

7    preparing this report?

8              MR. JOHNSON:  Form.

9         A.   We -- we looked into as many as available to

10   us, meaning whatever we search on the PubMed or we

11   got.  If anything we have not considered in that

12   document, we are happy to look at them and give my

13   opinion on that.

14        Q.   That's not my question.  My question is:  Is

15   this the list of doc- -- medical articles that you-all

16   consulted and relied on in doing your report?

17             MR. JOHNSON:  Form.

18             THE WITNESS:  I'm not sure what he's

19   asking.

20        A.   I looked for -- we searched for IVC filters

21   on PubMed, and we got articles.  And we selected what

22   we think are relevant and which are not reviewed,

23   which are a little bit more scientific papers that we

24   limited to some articles.  And we got them, and we

25   looked at them; and we wrote this document.

Sanjeeva Kalva , M.D.                                    July 11, 2017
In Re: Bard IVC Filters Products Liability

Page 65

1            So if your question is whether it is

2    comprehensive, comprehensive as much as we could do.

3    Do you think we -- we could have left something

4    inadvertently?  It is possible.  We might have left

5    inadvertently something.

6            But technically, if I did, if somebody

7    can find out, that is the reason all the articles go

8    to peer review.  Because that is always

9    (unintelligible) by us.  And whenever we write papers,

10   even though ten people are involved in the room, we

11   all look into the paper.  We think these are the

12   articles that's mostly referenced to this paper.

13   Report them.  Then they go to peer review process when

14   we submit to journal.

15            That peer review goes to three or four

16   different experts in the field through all the world,

17   and they look into it.  There are many times those

18   people will tell us, Hey, guys, you forgot this

19   reference.  Can you please include this?  And it says

20   exactly what you said, but I would like to see that

21   also be included in that.

22            So there are possibilities that we

23   might have not included inadvertently some articles

24   that are published.

25        Q.    Did you and your colleagues personally

Sanjeeva Kalva , M.D.                                July 11, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 66

1      search for these articles on PubMed, or did the

2      lawyers do that?

3           A.   We did.  Actually, I did.  I don't know how

4      much the lawyers did themselves, but I personally did.

5                    The reason why I did was, I know most

6      of the articles.  I was part of the SIR document, and

7      I personally contributed to the document through lot

8      of references.  If you see the latest revision

9      completed, previous revision, you might have seen a

10     lot of new references coming into the new document.

11                   And actually, I personally looked into

12     all those articles and then asked the ACR and SIR

13     people to consider them in putting them together into

14     the document.  As a matter of fact, we read them.

15     We -- that is part of our life, unfortunately or

16     fortunately.  We like to read, we like to learn, we

17     like to see contradictions among sciences, and we make

18     formulations of opinions based on the science.

19          Q.   So you said you like to see contradictions

20     among scientists, correct?

21          A.   Yes.  That is part of science.

22          Q.   Well, let's look at the expert reports that

23     you read.  You were furnished five expert reports, as

24     I count here; is that correct?

25          A.   Will you show me where you're talking about?

Sanjeeva Kalva , M.D.                    July 11, 2017
In Re: Bard IVC Filters Products Liability

Page 75

1    involvement with anterior motor neurons, I will only

2    look at the documents that talk anterior motor

3    neurons.

4                So just like that, if I'm talking about

5    one particular thing on that, I'll only include that

6    corresponding relevant document.  That's all.  I think

7    that's there.

8        Q.    I'm not sure I'm following you, Doctor.  My

9    question is:  How did you decide which internal Bard

10   documents you were going to discuss in this section of

11   the report that you prepared?

12       A.    Whatever re-emphasized my points, that's

13   what I included.  Whatever -- so, for example, I

14   talked about filter fracture was a problem.

15   Penetration was a problem.  And the document that talk

16   about it in those internal documents, I included them.

17       Q.    Now, my understanding is that sometime in

18   2005, you and your practice group at Mass General quit

19   using Bard filters; is that correct?

20       A.    That is correct.

21       Q.    And that would be the Recovery filter at

22   that time?

23       A.    Yeah.  Recovery filter was the reason why we

24   stopped using Bard filter.  We wrote a paper, and it's

25   published in 2006 in Cardiovascular Interventional

Sanjeeva Kalva , M.D.                                July 11, 2017
In Re: Bard IVC Filters Products Liability

Page 152

1    number of documents and reports; is that correct?

2        A.    That is correct.

3        Q.    For example, you've seen the report prepared

4    by Dr. Kessler?

5        A.    Yes.

6        Q.    And there are numerous internal Bard

7    documents that are part of that report?

8        A.    That's correct.

9        Q.    Did you look at those documents for the

10   purpose of not only seeing what they reflect but for

11   the purpose of determining whether the opinions

12   expressed by Dr. Kessler were supported by those

13   documents?

14       A.    Yes.

15               MR. NORTH:   Objection, leading.

16       Q.    Did you consider those documents in the

17   Kessler report in rendering your opinions in this

18   litigation?

19       A.    Yes.

20       Q.    In addition, you've had an opportunity to

21   review the report of Dr. Betensky, the Harvard-trained

22   biostatistician?

23       A.    Yes.

24       Q.    You've also had an opportunity to review the

25   report of Dr. Eisenberg --

Sanjeeva Kalva , M.D.                    July 11, 2017
In Re: Bard IVC Filters Products Liability

Page 165

1    anything like that.
2         Q.    You also say that you reviewed the company
3    documents that are referenced in the reports of
4    Drs. Kessler and Betensky and Ritchie?
5              MR. JOHNSON:  And Eisenberg, he said.
6         Q.    And Eisenberg.  Is that correct?
7         A.    That's correct.
8         Q.    And were those attached to their reports?
9         A.    They were not attached.  Whatever he quoted
10   inside the document, I read them.  And corresponding
11   documents in the Dropbox, I reviewed them.
12        Q.    So, if you were going to the actual document
13   that's quoted in Dr. Kessler or Betensky or
14   Eisenberg's report, you would be able to find that
15   document in the Dropbox?
16        A.    I believe so.
17        Q.    So there -- all of the company documents you
18   reviewed then --
19        A.    Are in the Dropbox.
20        Q.    -- are in the Dropbox; is that correct?
21        A.    Uh-huh.
22        Q.    Okay.
23              MR. NORTH:  That's it.
24              MR. JOHNSON:  He'll read.
25              MR. NORTH:  We would just to put on the

# EXHIBIT 03

## EXCERPTS FROM
## DEPOSITION TRANSCRIPT OF
## ANNE ROBERTS, M.D.

July 7, 2017

Anne Roberts , M.D.                                    July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF ARIZONA

3

4

5

        In re Bard IVC Filters

6       Products Liability        Case No. MD-15-02641

        Litigation                          PHX-DGC

7

8

9

                    VIDEOTAPED DEPOSITION OF

10               ANNE CHRISTINE ROBERTS, M.D.

                   San Diego, California

11                   July 7, 2017

                      Volume I

12

13

14

15

16

17

18

19

20

21     Reported By:

       Christine E. Milkovits,

22     CSR NO. 12650

23

24

25

Page 2

1             IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF ARIZONA

3

4        _____

                                     )

5                                    )

         In re Bard IVC Filters      )

6        Products Liability          )Case No. MD-15-02641

         Litigation                  )         PHX-DGC

7                                    )

         _____)

8

                 Videotaped deposition of ANNE CHRISTINE

9

         ROBERTS, M.D., Volume I, taken on behalf

10

         of Defendants, at 4240 La Jolla Village Drive,

11

         San Diego, California, beginning at 9:18 a.m. and

12

         ending at 6:26 p.m. on Friday, July 7, 2017,

13

         before CHRISTINE MILKOVITS, Certified

14

         Shorthand Reporter No. 12650.

15

16

17

18

19

20

21

22

23

24

25

Anne Roberts , M.D.                                July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 17

1    electronically.

2         A    Mr. Lopez had documents that were

3    available through a drop box.  And so I would

4    periodically get some information that there was

5    some files that were available, and then I could

6    download them.  And I'm old enough that print

7    tends to work better sometimes than always

8    electronic.  So I could print out things as well.

9         Q    Were those documents that he provided to

10   you unsolicited?

11        A    Yes, I guess, that would be most --

12        Q    About how many documents were provided

13   to you via drop box?

14        A    I don't know.  Tens -- probably not a

15   hundred but a large number.  I didn't always

16   download everything that was available there.

17   Some of the product information I didn't download

18   because there were multiple iterations of the

19   product information, for example.

20        Q    You also mentioned that there were

21   documents that you collected along the way as you

22   did work on this case?

23        A    Right.

24        Q    Can you explain what you mean by that.

25        A    Well, there's documents that --

Anne Roberts , M.D.                    July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 18

1    articles, for example, that we used in terms of

2    generating this report.  And so, you know, those

3    articles I downloaded mostly were pubmed.  And

4    you'll see, for example, the standards of practice

5    guidelines that were something that I downloaded

6    and printed out.

7         Q    The only medical literature that I see

8    among the documents that you provided in this red

9    file folder are 2003 Quality Improvement

10   Guidelines for Percutaneous Permanent Inferior

11   Vena Cava Filter Placement for the Prevention of

12   Pulmonary Embolism.  There look to be two copies

13   of that one from 2001 and 2003.  Then an article

14   by Dr. Kinney entitled "Update on Inferior Vena

15   Cava Filters."

16        A    Right.

17        Q    Are there other medical literature that

18   you pulled from pubmed aside from these?

19        A    I've been interested in inferior vena

20   cava filters for many years.  And I have folders

21   and folders of articles on inferior vena cava

22   filters which I didn't bring with me.

23        Q    Do those folders and folders -- strike

24   that.

25             As part of your work on your expert

Anne Roberts , M.D.                              July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 19

1    report in this case, did you specifically pull any

2    other medical literature besides the three

3    articles that are included in this folder that you

4    brought with you today?

5         A    Oh, yeah.  You'll see the references in

6    the report.  And we -- and so many of those

7    articles are articles that I have either

8    electronically or in print.

9         Q    You mentioned a third way that you

10   obtained documents as part of your work in this

11   litigation.

12              Other than the drop box and then

13   materials that you just collected along the way --

14   I forget now what you said -- do you remember what

15   you said?

16        A    I believe I was referring to pubmed.  Is

17   that what you were referring to, the

18   electron- -- I mean, it's where you can get

19   articles.  You can do a search on whatever you're

20   interested in through the Library of Congress.

21   And -- or excuse me -- National -- I guess it's

22   the National Health Library and you can download

23   articles.

24        Q    Other than the drop box, pubmed, and

25   some additional documents that you received along

Anne Roberts , M.D.                                    July 7, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 37

1        to many physicians.

2        BY MR. BROWN:

3            Q    Are you familiar with all of the

4        regulations, statutes, guidance documents

5        concerning IVC filters?

6                    MR. JOHNSON:  Form.

7                    THE WITNESS:  I would never say that I'm

8        probably familiar with all of those.  I certainly

9        have an understanding of 510 (k) process, a PMA

10       process.  I have an understanding of what the FDA

11       has a tendency to look for in terms of those

12       submissions.  But I certainly would not hold

13       myself up as knowing every piece of information

14       that is a regulatory thing for IVC filters.

15       BY MR. BROWN:

16           Q    Have you ever submitted a 510 (k)

17       application for IVC filters since 2000?

18           A    No.

19           Q    Have you ever submitted any PMA

20       application to the FDA since 2000?

21           A    No.

22           Q    Are you an expert in postmarketing

23       adverse event analysis?

24                    MR. LOPEZ:  Form objection.

25                    THE WITNESS:  I'm certainly aware of the

Anne Roberts , M.D.                            July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 38

1     fact that one needs to submit adverse effect -- or

2     adverse events to -- if we discover them as

3     physicians, that we need to submit them through

4     our risk management group who then will submit

5     those to -- usually to a company, if that's

6     appropriate, or to the regulatory bodies for

7     evaluation.

8     BY MR. BROWN:

9          Q    Would you agree that you're not an

10    expert in what might constitute a safety signal

11    for a medical device?

12               MR. JOHNSON:  Form objection.

13               MR. LOPEZ:  Same here.  I won't do that

14    all -- one objects for both.  But sometimes we do

15    both.  Sorry about that.

16               THE WITNESS:  I'm sorry.  One more

17    time.

18               MR. LOPEZ:  I apologize.

19    BY MR. BROWN:

20         Q    Would you agree you're not an expert on

21    what might constitute a safety signal for a

22    medical device?

23               MR. JOHNSON:  Form objection.

24               THE WITNESS:  I think that, I guess, I

25    would ask you how you would define a safety signal

Anne Roberts , M.D.                                July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 40

1    trend, which I would think another way of defining

2    that would be a signal that there's a problem with

3    a device, for example.

4    BY MR. BROWN:

5         Q    But my question is specific to

6    regulations or guidance documents.

7              Are you familiar with any regulation or

8    guidance documents concerning what might be a

9    signal for a medical device?

10             MR. LOPEZ:  Form objection.

11             THE WITNESS:  I can't say that I am --

12   that I know that there's a particular regulation

13   that defines that.

14   BY MR. BROWN:

15        Q    Would you agree that you are not an

16   expert in the contents of IVC filter labelling?

17             MR. JOHNSON:   Form objection.

18             THE WITNESS:   I would say that I have

19   probably -- because of the work that I did at the

20   FDA and the work that I did in terms of helping to

21   write some of that labelling, I would say that I

22   have a pretty good understanding of what labelling

23   is supposed to consist of.

24             And I would say that my -- probably my

25   understanding of labelling is substantially better

Anne Roberts , M.D.                                    July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 41

1      than most physicians probably.  So, yes, I would

2      kind of hold myself up as a little bit of an

3      expert in that.

4      BY MR. BROWN:

5           Q      When did you work at the FDA?

6           A      I worked at the FDA from 1995 to 1996.

7           Q      So 20 years ago?

8           A      Yes.

9                  MR. LOPEZ:  Good, Matt.  I have a

10     calculator if you need it next time.

11                 THE WITNESS:  But I've kept -- I've kept

12     involved since then.  So I would say that although

13     the time that I spent there was then -- I've

14     actually kept involved with the FDA first on its

15     circulatory device panel and then through the --

16     Society of Interventional Radiology we've had

17     meetings with people at the FDA over the years to

18     discuss issues with regards to devices.  Or if

19     they need information and they want a way to get

20     some information from the profession, this was

21     a -- this was a mechanism for them to do that.

22     BY MR. BROWN:

23          Q      You mentioned that you have written IVC

24     filter labelling?

25          A      No, no, not IVC filter labelling.  But

Anne Roberts , M.D.                                    July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 44

1    those have gone -- been a while ago.  But, yeah, I

2    don't think that I -- other than perhaps

3    referencing it that we -- the articles didn't

4    discuss that.

5    BY MR. BROWN:

6        Q    Have any of the articles, book chapters,

7    or presentations that you've given over the years

8    ever dealt specifically with marketing of IVC

9    filters, meaning what is appropriate marketing and

10   inappropriate marketing?

11             MR. JOHNSON:  Form.

12             THE WITNESS:  Probably not.  Although

13   certainly I discussed changes in the use of IVC

14   filters but not specifically -- not specifically

15   the marketing of that.

16   BY MR. BROWN:

17       Q    Have any of the articles, book chapters,

18   or presentations that you've given over the years

19   specifically concerned the topic of corporate

20   ethics?

21       A    No.

22       Q    Have any of the articles, book chapters,

23   or presentations that you've given over the years

24   specifically concerned the issue of evaluation of

25   510 (k) submissions for IVC filters?

Anne Roberts , M.D.                                    July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 45

1          A      Not of IVC filters specifically.  I've

2    given a number of talks that talk about the FDA

3    process and 510 (k)s in general, PMAs, that type

4    of thing, but not specifically only about IVC

5    filters.

6          Q      When were those presentations given

7    concerning 510 (k)s and PMAs more generally?

8          A      Oh, I would say after I was at the FDA I

9    gave a lot of talks on the -- how the FDA

10   processes work.  Because what became very clear is

11   that many physicians don't really understand that

12   process.  And so I was asked to give talks

13   explaining that.

14            So I gave -- for example, I gave a talk

15   at the School of Engineering here at -- actually,

16   a couple of talks at UCSD explaining to the

17   biomechanical engineers how does a 510 (k) process

18   work, how does a PMA work, what the FDA is looking

19   for, that kind of thing.

20            I gave a number of talks dealing with

21   clinical trial design.  And as part of the

22   clinical trial design how do -- how do you put

23   that clinical trial design in place to get a

24   510 (k) or PMA.  So those were at professional

25   organization.

Anne Roberts , M.D.                          July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 92

1    this one, that, and that one, and the other.  We

2    kind of looked -- you know, I would say that we

3    both looked at this and worked on this more as a

4    paper in a way that we had -- were putting

5    together for -- so we would -- as you would write

6    a paper, you would get literature.  You would get

7    the, you know, other sources of information and

8    then put them together to create a document.

9    BY MR. BROWN:

10        Q    You said you would get literature.

11             How would you get literature for this

12   report?

13        A    Well, as I indicated before, we had -- I

14   know I have literature that I collected over the

15   years.  And we have -- and pubmed is another

16   source of literature.  We both read journals, so

17   there's information from that.  And we have

18   experience in putting IVC filters.  So I think

19   when you're doing something like this, those are

20   all the sources of information that you tend to

21   put together to come up with a document.

22        Q    How were the articles that are cited in

23   the report at the very end of the report,

24   Appendix A entitled "Facts and Data Considered" --

25   how were those articles identified for inclusion

Anne Roberts , M.D.                          July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 93

1    in this report?

2         A    Well, by and large because they're

3    articles that pertain to the use of IVC filters.

4         Q    Are you aware that there are over 2,000

5    articles in the medical literature concerning IVC

6    filters?  Yes?

7              MR. JOHNSON:  Form.

8              THE WITNESS:  I would say I am not sure

9    that I know that there are 2,000.  But I wouldn't

10   be surprised.  And there might even be more.

11   BY MR. BROWN:

12        Q    So how did you land on 30 or so articles

13   that are listed in the report?

14        A    Well, I think that some of it

15   is -- they're articles that, you know -- I mean,

16   IVC filters is a huge topic.  The -- there are

17   some that wouldn't necessarily pertain to this

18   particular issue, and so you wouldn't necessarily

19   use those.  And then there's other ones that

20   pertain to this.

21             So when you look at the articles, you're

22   going to pick out ones that have more relevance to

23   this issue than ones that don't have any relevance

24   to it.

25        Q    Did you have any e-mail correspondence

Anne Roberts , M.D.                                July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 103

1    decisions based on unreliable information could be

2    harmful to patient care?

3              MR. JOHNSON:  Form objection.

4              THE WITNESS:  I guess it depends -- it

5    would really depend on -- unreliable.  I mean, if

6    someone is lying about their research, for

7    example, and publishing something that's not true,

8    clearly that would be a problem.

9              If someone is publishing results that

10   don't contain all of the data or you don't have

11   information about things that have happened so

12   that you're basically left in the dark, that would

13   be unreliable information and would be very

14   problematic in terms of you making good decisions

15   about how to take care of a patient if you don't

16   know what the data is.  And if it's concealed from

17   you or not broadcast, you know, so that you know

18   what's going on, then that is really bad.

19   BY MR. BROWN:

20        Q    My question is about the data itself.

21   If the data itself is unreliable, do you agree

22   that relying on that data to make clinical

23   decisions could be harmful to patients?

24             MR. JOHNSON:  Form objection.

25             THE WITNESS:  I guess I would ask you

Anne Roberts , M.D.                    July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 110

1      recovery in general -- I mean, the recovery

2      specifically.

3      BY MR. BROWN:

4          Q    Did you consider data that weighed

5      against the opinions included in your report?

6              MR. JOHNSON:  Form.

7              THE WITNESS:  Yeah.  I mean, we looked

8      at the -- we looked at the literature in terms of

9      a Bard filter and filters in general as part of

10     our putting together this report.

11     BY MR. BROWN:

12         Q    If you ignored data that weighs against

13     the opinion that Bard's filters are defective,

14     would you agree that you wouldn't be applying the

15     same level of intellectual rigor for your work in

16     this case as you do in your private practice?

17             MR. JOHNSON:  Form objection.

18             THE WITNESS:  Well, if we had ignored

19     data, that would not be particularly -- I mean, we

20     would not do that.  If you have data that we

21     didn't consider, I'll be more than happy to look

22     at that data and make sure that it's, you know,

23     part of any further work that we do on this case.

24     But, you know, like I say, we went through the

25     literature and these were our conclusions.  And if

Anne Roberts , M.D.                                    July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 115

1              I mean, he's an extraordinarily well

2      respected physician.  Clearly has enormous

3      expertise, particularly having to do with his

4      position at the FDA and his position in academic

5      medicine and had -- from reading his report and

6      then going back to some of the source documents

7      and looking at those and understanding those -- or

8      looking at those in the context of his report, I

9      think gave us a, you know -- we would certainly

10     quote him because we wouldn't want to be saying

11     that we had made this up ourselves.

12     BY MR. BROWN:

13          Q    Do you have any idea of the methodology

14     that Dr. Kessler employed in the -- reaching the

15     opinions that he sets forth in his report?

16          A    Well, only that in the report -- you

17     know, my recollection is that he discusses looking

18     and references, you know, multiple, multiple

19     documents which were obtained from Bard in terms

20     of putting together sort of a chronology of what

21     went on, you know, looking at their -- looking at

22     the data that, you know, was available.

23              And so, I mean -- but it's quite clear

24     -- I mean, he references multiple -- and I did go

25     back and look at some of those memos and some of

Anne Roberts , M.D.                              July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 116

1    those references to see -- to get a feeling of how

2    he characterized those.  So I felt quite

3    comfortable after looking at sort of the source

4    material and looking at his report that it seemed

5    to jive.

6         Q    But you don't know how Dr. Kessler went

7    about identifying the documents that he chose to

8    cite in his report, do you?

9              MR. JOHNSON:  Form.

10             THE WITNESS:  I have not discussed it

11   with Dr. Kessler as to how he decided to, you

12   know, take the documents that he talked about and

13   put them in his report.  So, no, I haven't had any

14   discussion with him about that.

15   BY MR. BROWN:

16        Q    In all of the articles that you've

17   written, in all of the prerequisites that you've

18   made, have you ever cited to a paid litigation

19   expert?

20             MR. JOHNSON:  Form.

21             THE WITNESS:  I don't think I've ever

22   been in the position where I was needing to quote

23   a litigation expert because that's not usually the

24   kind of work that I do.

25   ///

Anne Roberts , M.D.                                    July 7, 2017
In Re: Bard IVC Filters Products Liability

Page 300

1        Q        And perception of physician does that

2    mean what the physician is -- knows about the

3    safety profile of a device --

4                 MR. BROWN:  Object to the form.

5    BY MR. LOPEZ:

6        Q        -- such as an IVC filter?

7                 MR. BROWN:  Calls for speculation.

8                 THE WITNESS:  Well, I think that the

9    degree of disclosure it -- I think that in this

10   case that the degree of disclosure is what the

11   physician knows and is able to tell the patient.

12   So it -- it's going to -- if you know about a

13   problem, then you should disclose that problem.

14   If you don't know about it, obviously you're not

15   going to be able to disclose it.

16   BY MR. LOPEZ:

17       Q        Would you agree that the perception of a

18   physician might have about the safety and

19   effectiveness of a device, at least based on what

20   you've seen in the Bard documents, depends in

21   large part on what the manufacturer tells

22   physicians or conceals from physicians?

23                MR. BROWN:  Object to the form.

24                THE WITNESS:  Yes.  I think that the

25   perception would -- you know, if you don't know,

# EXHIBIT 04
# FILED UNDER SEAL

## EXCERPTS FROM
## DEPOSITION TRANSCRIPT OF
## DONNA-BEA TILLMAN, Ph. D.

### August 4, 2017

# (Filed Under Seal)

# EXHIBIT 05
# FILED UNDER SEAL

## EXCERPTS FROM
## DEPOSITION TRANSCRIPT OF
## CLEMENT J. GRASSI, M.D.

June 15, 2017

Do Not Disclose - Subject to Further Confidentiality Review

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

No. MD-15-02641-PHX-DGC

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN RE BARD IVC FILTERS PRODUCTS

LIABILITY LITIGATION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DO NOT DISCLOSE

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

VIDEOTAPED DEPOSITION OF CLEMENT J. GRASSI, MD

Thursday, June 15, 2017

9:24 a.m.

Held At:

Nelson Mullins Riley & Scarborough LLP

One Post Office Square

Boston, Massachusetts

REPORTED BY:

Maureen O'Connor Pollard, RMR, CLR, CSR

Do Not Disclose - Subject to Further Confidentiality Review

1          And the question is, if the filter had

2     a greater risk over time to the patient, should

3     doctors be made aware of that?

4          MR. BROWN:  Object to the form.  Asked

5     and answered.

6          A.   I believe I have answered that,

7     because it is not my opinion, and I haven't

8     presented -- been presented with any information

9     that shows that there's a greater risk over time

10    when used as a permanent device.

11    BY MR. ROTMAN:

12         Q.   I wasn't asking you about whether

13    you've been shown evidence of it.  I'm asking

14    you a hypothetical.

15         If -- you realize that there are

16    conclusions stated in the papers that I showed

17    you earlier today and in others that disagree

18    with you about that point, about risk over time,

19    correct?

20         A.   I understand your point.

21         Q.   Okay.  So I'm asking you if they're

22    right and you're wrong on this issue about risk

23    over time, if there is an increased risk over

24    time, is that something that doctors should be

Do Not Disclose - Subject to Further Confidentiality Review

Page 184

1      advised about --

2            A.    Well, let me say this.

3            Q.    -- so that they can give the best safe

4      treatment for their patients?

5                  MR. BROWN:   Object to the form.

6            A.    Let me say this, that if that

7      condition existed with a significant risk

8      increase, then I would expect physicians in a

9      summary fashion to be informed about it.

10     BY MR. ROTMAN:

11           Q.    Do you expect a manufacturer will

12     adequately test a product before it's put out on

13     the market?  And I mean a device manufacturer.

14           A.    Yes.

15                 MR. BROWN:   Object to the form.

16     BY MR. ROTMAN:

17           Q.    And you also expect a device

18     manufacturer to follow the federal regulations

19     on postmarketing surveillance, correct?

20           A.    Yes.

21           Q.    And just like doctors should be

22     informed if there is a greater risk over time of

23     having a filter implanted, patients should also

24     have that information provided to them, correct?

Do Not Disclose - Subject to Further Confidentiality Review

Page 185

1          A.   As part of an informed consent,
2     patients should have information provided that
3     is relevant to them and to their procedure.
4          Q.   You would agree that there have been
5     no long-term studies performed on the Bard
6     retrievable filters?
7               MR. BROWN:   Object to the form.
8     BY MR. ROTMAN:
9          Q.   Would you agree that there have been
10    no long-term studies on Bard retrievable
11    filters?
12              MR. BROWN:   Object to the form.
13         A.   No, I'm afraid I can't agree with
14    that.  For example, I can think of a paper which
15    was published by a colleague of mine, Christoph
16    Binkert, in which he looked at the
17    retrievability and recovery of vena caval
18    filters longer than 180 days.  And so depending
19    on in your question what you consider to be
20    long, there have been studies, or there have
21    been clinical reports, some retrospective, in
22    which interventional radiologists or other
23    radiologists have looked at vena caval filters
24    and have summarized what has been the

Do Not Disclose - Subject to Further Confidentiality Review

Page 226

1       COMMONWEALTH OF MASSACHUSETTS )

2       SUFFOLK, SS.                  )

3              I, MAUREEN O'CONNOR POLLARD, RMR, CLR,

4       and Notary Public in and for the Commonwealth of

5       Massachusetts, do certify that on the 15th day

6       of June, 2017, at 9:24 o'clock, the person

7       above-named was duly sworn to testify to the

8       truth of their knowledge, and examined, and such

9       examination reduced to typewriting under my

10      direction, and is a true record of the testimony

11      given by the witness.  I further certify that I

12      am neither attorney, related or employed by any

13      of the parties to this action, and that I am not

14      a relative or employee of any attorney employed

15      by the parties hereto, or financially interested

16      in the action.

17             In witness whereof, I have hereunto

18      set my hand this 17th day of June, 2017.

19

20      _____

21      MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC

22      Realtime Systems Administrator

23      CSR #149108

24

# EXHIBIT 06
# FILED UNDER SEAL

## EXCERPTS FROM
## DEPOSITION TRANSCRIPT OF
## CHRISTOPHER D. GANSER.

October 11, 2016

(Filed Under Seal)

# EXHIBIT 07

## ARTICLE

Robert J. Myerburg, MD, et al., *Life-Threatening Malfunction of Implantable Cardiac Devices,* 354:22 NEW ENG. J. MED., June 1, 2006, at 2309 and 2311.



# *The* NEW ENGLAND JOURNAL *of* MEDICINE



Perspective

JUNE 1, 2006

# Life-Threatening Malfunction of Implantable Cardiac Devices

Robert J. Myerburg, M.D., David W. Feigal, Jr., M.D., M.P.H., and Bruce D. Lindsay, M.D.

During the summer of 2005, in the wake of widespread criticism of its failure to communicate the potentially fatal malfunctions of its implantable defibrillators,[1,2] Guidant Corporation created an

independent panel, of which we were members. The purpose of the panel was to conduct an unbiased examination of these incidents, including the methods used to identify the malfunctions and evaluate products in the postmarketing phase and the policies regarding communication within the corporation and with physicians and patients. The panel was also asked to recommend corrective actions. Concurrently, the Heart Rhythm Society—which represents physicians who implant cardiac devices — established a task force to examine assessments of device performance and develop policy recommendations and guidelines.[3] Since the report by

the independent panel had implications for the device industry in general, Guidant made it available to the public.[4]

Three points quickly emerged as guidelines for the panel's deliberations. First, manufactured products can never be entirely free of design or manufacturing flaws, but when the consequence of a malfunction is a potentially fatal event, tolerance and surveillance strategies should aim to achieve a risk of malfunction that is as close to zero as possible. Second, physicians must know about the performance features of any device they recommend for a patient, so that they can carry out their ethical obligation of obtaining

informed consent. This information must be in a form that is understandable and clinically useful. And third, patients have a right to obtain product information so that they can make informed decisions about risks and benefits and can understand what expectations are reasonable.

The panel recognized that, as compared with the clinical benefit of implantable cardiac devices, the rate of serious malfunctions is very low. We also concluded, however, that if a malfunction is life-threatening, even a low risk of its occurrence takes on importance beyond its numbers. Although it is intuitively clear that any manufactured product will have a measurable failure rate, until recently, industry had not provided information to physicians about potentially serious malfunctions when the failure rates fell within the overall performance predic-



EXHIBIT

5 | 8

10/11/16 mR

The New England Journal of Medicine
Downloaded from nejm.org by Brooke Meyers on May 20, 2014. For personal use only. No other uses without permission.
Copyright © 2006 Massachusetts Medical Society. All rights reserved.



**Defects Leading to Potential Failure in Two Types of Guidant Implantable Defibrillators.**
The numbers of implantable defibrillators identified between 2002 and mid-2005 as having defects that predisposed them to short-circuiting (arcing), with an attendant risk of failure to deliver therapy when needed, are shown. The Prizm 2 DR was a conventional implantable defibrillator, and Renewal 1 and 2 were implantable defibrillators with biventricular pacing capability. Open symbols represent malfunctions that were associated with the death of a patient; one of these malfunctions was due to a random manufacturing defect rather than to the identified defect that resulted in short-circuiting ("different root cause"). Adapted from Myerburg et al.[4]

tions.[4] In most cases, these malfunctions were simply folded into overall statistics that also included less critical malfunctions and the expected depletion of batteries over time — a practice that made serious but infrequent malfunctions invisible to physicians and patients.

Although there is no industry-wide performance standard for malfunction rates in the cardiac-device industry, all companies are required by the Food and Drug Administration (FDA) to evaluate device malfunctions systematically in the post-marketing phase, to identify those that are clinically significant, to correct defects, and to act to prevent failures in performance. These internal processes necessarily center on engineering skills and methods. But the consequences of device malfunctions are more than an issue for engineering: they have clinical implications for patients that may include a risk of fatal events. Thus,

engineering performance standards are insufficient benchmarks without evaluation by experts of the possible effects on individual patients. The independent panel concluded that the lack of adequate clinical expertise, combined with undue reliance on arbitrary statistical criteria, led to decisions that had potentially and manifestly serious consequences. The graph shows the number of implantable defibrillators that were identified as having defects that predisposed them to short-circuiting (arcing) between 2002 and 2005.

As the number of defibrillators with life-threatening malfunctions continued to grow, the overall reliability of the products remained within the predicted rates. Therefore, in keeping with the company's standard practices at the time, the engineering group at Guidant decided, without any input from physicians, that it was unnecessary to inform physician-customers about these events.[4] In addition,

implantations of the potentially defective defibrillators continued for a time, and physicians, hospitals, and patients were not informed that the devices had flaws that could result in the inability to deliver therapy when necessary. It seems clear that the industry needs physicians with defined responsibilities focused on patient safety to provide recommendations to corporate leaders.

Post-marketing surveillance continues to be a challenge for the FDA and industry. Clinical trials rarely identify significant signals of very uncommon adverse events, and only a small proportion of later events are ever reported. One potential solution to this limitation of tracking, at least for cardiac devices, lies in the National Cardiovascular Data Registry mandated by the Centers for Medicare and Medicaid services for implantable cardioverter–defibrillators, which could be expanded and adapted to other databases. Moreover, the number of malfunctions that occur at the time of deaths that are assumed to be from natural causes remains unknown, because most devices are not returned to manufacturers for evaluation after patients die.

The FDA recently announced plans to address post-marketing surveillance more actively, including having electrophysiology experts from its Circulatory System Devices Panel review the post-marketing performance of implantable devices. The Heart Rhythm Society's task force also suggested that the FDA establish post-marketing advisory committees to recommend actions that should be taken when malfunctions are identified in defibrillators or pacemakers.[5] These steps could help the FDA address many issues, in-

The New England Journal of Medicine
Downloaded from nejm.org by Brooke Meyers on May 20, 2014. For personal use only. No other uses without permission.
Copyright © 2006 Massachusetts Medical Society. All rights reserved.

cluding the lack of standard definitions and classifications of malfunctions that makes evaluating reports from different manufacturers problematic. It is uncertain whether the FDA could appreciably enhance the effectiveness of its post-marketing surveillance program without expanding both its authority and its budget. But if patient safety is a priority, the federal government should appropriate the funds required to make this effort feasible, without adversely influencing the FDA's other areas of responsibility.

In the meantime, companies must reevaluate their approach to patient safety in the context of communication. A critical question is when and how information about product performance should be communicated to physicians and patients. Although the issues — both ethical and practical — are complex, one conclusion is clear: transparency in matters that affect patient safety should be embraced as a primary corporate obligation.

In the past, this industry has not had a good record of open communication, but transparency does benefit companies that want to be viewed as trusted partners in the health care enterprise. As the panel noted, transparency may be passive, with information made available to those who seek it; active, with information targeted to specific groups of stakeholders; or forced, with a third party bringing forth information that elicits further disclosure by a company, as a defensive move. From the perspective of physicians' and patients' expectations, corporate responsibility, and public perception, we believe that proactive communication policies, centering on the proper use of active and passive transparency, should be the norm. Insofar as such communication is hindered by perceived business conflicts, the solution may lie in new regulatory definitions that distinguish informational actions from those that indicate the removal of a device. Changing language can be difficult, since much of it is embedded in statutory requirements.

The panel also recommended that Guidant establish an independent review group to provide unbiased analysis of information on product performance and advice on decisions about external communications. Voluntary, independent review at the level suggested is a notion both foreign and frightening to most corporations, whose perceived need is to protect business interests. But corporate culture fosters a loyalty to corporate goals that may create unintended bias and distorted perceptions about product performance and patient safety. Independent review groups could assist corporations by generating unbiased advice that was responsive to society's view of the best business practices and clinical priorities.

Historically, corporations have — by themselves — set the expectations for device reliability and the communication of product malfunctions, seeking little input from patients, physicians, or professional organizations. This practice developed in the early years of the industry, when the combination of small numbers of device recipients and low malfunction rates made it difficult to detect problems. With the explosive growth of the industry in recent years, previously unrecognizable signals have become increasingly visible. Clearly, strategies for evaluating and communicating device malfunctions must be adjusted accordingly. Our conclusion is that industry should work collaboratively with physicians, professional societies, patient representatives, and regulatory agencies to establish reasonable standards and guidelines for the device industry to follow. Patients deserve nothing less.

The opinions expressed in this article reflect the views of the authors and are not endorsed by Guidant or any of the institutions or organizations with which the authors are affiliated.

Drs. Myerburg, Feigal, and Lindsay report having received honoraria from Guidant. Dr. Myerburg also reports having received consulting fees from Procter & Gamble and Reliant and having served as an expert witness. Dr. Lindsay reports having received consulting fees from Medtronic.

This article was published at www.nejm.org on May 15, 2006.

Dr. Myerburg is a professor of medicine and physiology at the University of Miami Miller School of Medicine, Miami. Dr. Feigal is a partner at NDA Partners, Phoenix, Ariz., and the former director of the Center for Devices and Radiological Health, Food and Drug Administration, Rockville, Md. Dr. Lindsay is an associate professor of medicine and director of cardiac electrophysiology at Washington University School of Medicine, St. Louis.

1. Meier B. Maker of heart device kept flaw from doctors. New York Times. May 24, 2005:A1.
2. Steinbrook R. The controversy over Guidant's implantable defibrillators. N Engl J Med 2005;353:221-4.
3. Proceedings Document from the Policy Conference on Pacemaker and ICD Performance. Presented by the Heart Rhythm Society and the Food and Drug Administration, September 16, 2005. (Accessed May 11, 2006, at http://www.hrsonline.org/advocacyDocs/HRS-device_conference.pdf.)
4. Myerburg RJ, Apostolakis GE, Beller GA, et al. Report of the Independent Panel of Guidant Corporation. March 20, 2006. (Accessed May 11, 2006, at http://www.guidant.com/panel/panel.pdf.)
5. Heart Rhythm Society Task Force report on device performance policies and guidelines. Heart Rhythm (in press).

The New England Journal of Medicine
Downloaded from nejm.org by Brooke Meyers on May 20, 2014. For personal use only. No other uses without permission.
Copyright © 2006 Massachusetts Medical Society. All rights reserved.

# EXHIBIT 08
# FILED UNDER SEAL

## EXCERPTS FROM
## DEPOSITION TRANSCRIPT OF
## CHRISTINE L. BRAUER, Ph. D.

### August 2, 2017

## (Filed Under Seal)

# EXHIBIT 09

Ex. 3 to Schultz Dep.,

G3 Vena Cava Filter Design Input Summary

BPVE-01-00617777 – 7793



| | G3 Vena Cava Filter | DIS-8049 |
|---|---|---|
| | Design Input Summary | Revision 001 |
| | **Report** | Page 1 of 17 |

## Table of Contents

Section | Description

1 | Purpose
2 | Scope
3 | Information Sources
4 | Project Background Information
5 | Summary of Design Input
Appendix A | Bard Customer Vena Cava Filter Usage Study – Report of Fax Survey
Appendix B | Bariatric Surgeon Vena Cava Filter Usage Study – Report of Fax Survey
Appendix C | Multidisciplinary Panel Summary
Appendix D | Key Opinion Leader/High Volume User Panel – Panelist Profiles
Appendix E | Key Opinion Leader/High Volume User Panel - Meeting Summary
Appendix F | Field Visit Log
Appendix G | Clinical Literature
Appendix H | Complaint data
Appendix I | Regulatory Requirements

### 1.0 Purpose

This report documents and summarizes the design input information gathered during the concept phase of the G3 Vena Cava Filter project. This design input information is used to develop the Product Performance Specification (PPS), product design, and test plans. The business case for this project is outlined in Product Opportunity Appraisal POA-8049.

### 2.0 Scope

This design input summary applies to development of the G3 Vena Cava Filter. This report will document design input specific to the this product, as well as additional information related to actual use conditions and complaint data received on our currently marketed IVC Filters.

### 3.0 Information Sources

Design input information was gathered from multiple sources. These included the following:
- Discussions with clinicians who perform IVC Filter placement and retrieval procedures
- Focus group interviews with Interventional Radiologists, Trauma Surgeons, Bariatric Surgeons, Hematologists, Internal Medicine and Vascular Medicine specialists
- Market Research Studies
- Clinical Literature Review

Confidential: This document contains information that is the confidential and proprietary property of C.R. Bard, Inc. Neither this document nor may be reproduced, used or distributed to or for the benefit of any third party without prior written consent of Bard.

EXHIBIT 3
Schultz-3
Date: 1-30-14
M.L. GRAY, CSR, RPR



| | **G3 Vena Cava Filter**<br>Design Input Summary<br>**Report** | **DIS-8049**<br>**Revision 001**<br>**Page 2 of 17** |
|---|---|---|

- Complaint review
- MAUDE website review
- Regulatory requirements review

## 4.0   Project Background Information

BPV launched the Recovery Vena Cava Filter (RF-048F) with a permanent indication in April 2003, followed with the retrievable indication in October 2003.  As the first IVC filter to receive a retrievable indication in the U.S., Recovery Filter brought a new level of awareness within the medical community to filter technologies and their associated complications.

Traditionally, permanent filters were placed primarily in patients with documented thromboembolic disease and a contraindication to or complication with anticoagulation. These patients typically received a filter during their hospital course and then were never follow up specifically for the filter.  With newer, retrievable filters, not only are more patients receiving filters, but they are being followed at a higher rate due to the intent to retrieve the filter.  The implication of this updated follow up regimen is that more asymptomatic filter complications are being discovered than ever before.

BPV discontinued the Recovery Filter in September 2005 and immediately replaced it with the G2 Filter (RF310F, RF210F), which has a permanent indication.  As part of the routine passive post-market surveillance program, BPV began receiving reports of caudal migrations of the G2 Filter.  Although the rate of caudal migration has always remained well below the reported rates in the SIR Quality Improvement Guidelines for IVC Filters, BPV undertook the effort to modify the design of the G2 Filter to improve its caudal migration resistance.

## 5.0   Summary of Design Input

Migration (both cranial and caudal) is a known and well-documented complication of vena caval filters.  Although most agree that caudal migration is not the most serious of filter complications in terms of patient safety, it is nevertheless worrisome for most physicians when they encounter one of their patients with a filter that has migrated caudally.

Numerous sources and methods were utilized to determine the design input for this project.  The main goal of the efforts was to determine the expected and threshold complication rates for IVC Filters.  Below is a summary of the information gathered from each input source.

### 5.1   Literature Review

5.1.1   A comprehensive review of the available literature revealed that although caudal migration is not the most serious of possible filter complications, some filters in history have undergone redesign efforts (Titanium Greenfield) or were discontinued entirely (Gunther) due to caudal migration.

Confidential:   This document contains information that is the confidential and proprietary property of C.R. Bard, Inc.  Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without prior written consent of Bard.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1



| BARD | G3 Vena Cava Filter<br>Design Input Summary<br>Report | DIS-8049<br>Revision 001<br>Page 3 of 17 |
|---|---|---|

5.1.2   A secondary review of the available literature detailed the necessity of certain vena cava filter characteristics.  These characteristics included (in no specific order):

- Self-Centering and Tilt Resistance
- No arm/leg entanglement (crossed limbs)
- Efficient clot trapping
- Caval patency
- Low profile
- Extended retrievability
- Easy retrieval
- Fracture resistance
- Migration resistance
- Filter sized accordingly (one sized filter fits most vena cava)
- Ability to power inject
- Accurate deployment
- Deployment with minimal force
- Perforation

The corresponding clinical literature is provided in Appendix G.

## 5.2   Market Research Studies

### 5.2.1   Bard Customer Surveys

A survey of Bard customers regarding their IVC Filter utilization was conducted in Q1 2005.  Respondents were recruited by telephone and asked to fax back a 3-page questionnaire.   A total of 154 surveys were completed and returned.

One of the questions in the survey assessed the problems that users have had with various types of optional filters.  The responses showed a trend toward a higher (perceived) rate of migrations, perforations, and filter tilt with Bard's filter than the Gunther Tulip (Cook) or the OptEase (Cordis).

Q: Problems experienced with optional filters, by brand (n=154, multiple answers were accepted)

| | Recovery<br>(Bard) | Gunther Tulip<br>(Cook) | OptEase<br>(Cordis) |
|---|---|---|---|
| Filter tilt | 38% | 33% | 3% |
| Inability to retrieve | 24% | 19% | 11% |
| Filter migration | 14% | 3% | 2% |
| Caval perforation | 9% | 3% | 1% |
| Caval thrombosis | 6% | 11% | 14% |
| Filter fracture | 5% | 3% | 0% |
| Death | 3% | 1% | 1% |
| Inadequate indwelling | 1% | 3% | 3% |
| Other | 5% | 3% | 5% |

Confidential:   This document contains information that is the confidential and proprietary property of C.R. Bard, Inc.  Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without prior written consent of Bard.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1



| None | 43% | 55% | 73% |
|------|-----|-----|-----|

### 5.2.2   Bariatric Surgeon Surveys

Another survey was completed in Q1 2005 involving Bariatric Surgeons and their filter utilization.  The aim of this study was to assess bariatric surgeons' awareness of IVC Filter technology and the possible risks and benefits associated with caval interruption.  Respondents were once again recruited by telephone and asked to fax back a 4-page questionnaire.  A total of 90 completed surveys were returned.

One of the questions in this survey illustrated bariatric surgeons' general knowledge/perception of the types of complications that can occur with filters and how often:

Q: How often do you observe the following complications due to IVC Filters In your patients? (n=90)

|  | < .1%<br>(Less than<br>1/1,000) | 1%<br>(1/100) | 5%<br>(5/100) | >5%<br>(over 5/100) | Do Not See |
|------|------|------|------|------|------|
| Filter migration | 41% | 19% | 4% | 1% | 34% |
| Caval Thrombosis | 34% | 20% | 9% | 1% | 36% |
| Caval perforation | 43% | 9% | 1% | 0% | 47% |
| Filter fracture | 43% | 6% | 1% | 0% | 50% |
| Death | 47% | 6% | 0% | 0% | 48% |

The responses to the above question indicate that bariatric surgeons do and expect to see complications with filters.  The majority expects to see these filter problems at a rate less than 1/1,000 cases.

### 5.3    Focus Groups

### 5.3.1   Multidisciplinary Panel

In June 2004, BPV convened a multidisciplinary panel of physicians with specific expertise and/or interest in thromboembolic disease and IVC Filters to discuss filter complications.  This panel discussed many issues including expected and threshold rates for various filter complications and possible causes for these filter problems.

With regard to <u>filter migration</u>, the panel's perspective was the following.

- It should occur less than 1% of time
- For prophylactic filter placement, migration to the heart should virtually never happen.  The rate should be less than 1 in 1,000.

---

Confidential:   This document contains information that is the confidential and proprietary property of C.R. Bard, Inc.  Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without prior written consent of Bard.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
.MD1



| | G3 Vena Cava Filter<br>Design Input Summary<br>Report | DIS-8049<br>Revision 001<br>Page 5 of 17 |
|---|---|---|

- Migration should not be different for retrievable filters than for permanent filters.

It should be noted, however, that this discussion was mainly about proximal (or cranial) migration.
For <u>caval perforations</u>, the panel believed that symptomatic perforations should be less than 1% and that the rate of asymptomatic perforations does not matter.

In summary, the multidisciplinary panel felt the following about general filter performance:

- A retrievable filter is expected to perform just as well as a permanent filter.
- A filter should not migrate; no matter what the size of thrombus burden it captures.

5.3.2   Key Opinion Leader/High Volume User Panel

BPV convened another panel in June 2006 to discuss caudal migration of filters, specifically the BPV experience to date with the G2 Filter.  This panel included Key Opinion Leaders and High-Volume users of IVC Filters.  The list of panelists along with their profiles is included as Appendix D.

Below are some highlights of the discussion:

<u>IVC Perforation</u>:
- Could lead to erosion into duodenum, perforation of aorta, lodge in vertebral body
- OK if asymptomatic, but could become symptomatic over time
- 0 – 1% for "true" peforation; most perceived perfs are not "true" perforations
- Belief there is strong correlation between tilting and perforation

<u>Migration (More than 2cm)</u>:
- Concern when goes to heart/lungs or goes from infrarenal vs suprarenal or symptomatic migration or in combination with tilt/perforation
- More concern over cephalad migration vs caudal migration
- Theoretical concern if filter migrates caudally, since there is more space above filter in the IVC for thrombus formation (source for recurrent PE)

<u>BPV Experience</u>:
- Should focus on symptomatic complications – asymptomatic events probably occur at a much higher rate because underreported
- At the time of the Expert Panel, there had been 3 symptomatic migrations in females: panelists thought these were coincidental in relation to small IVC diameter.  Also, suggested females experience more abdominal & pelvic pain; therefore, may not be of real concern.
- The panelists expressed concern over 3 suprarenal caudal migrations vs 4

Confidential:    This document contains information that is the confidential and proprietary property of C.R. Bard, Inc.  Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without prior written consent of Bard.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1



| G3 Vena Cava Filter<br>Design Input Summary<br>Report | DIS-8049<br>Revision 001<br>Page 6 of 17 |
|---|---|

- infrarenal that had been reported as of the date of the Panel.  This does not represent actual placement practice:  100 infrarenals to 1 suprarenal.
- Generally, believe most migrations occur early (first 2 weeks) due to healing process
- Horizontal orientation: higher clot trapping efficiency may indicate higher risk of caval thrombosis and greater risk of pain due to stretching IVC
- Felt reassured by BPV's due diligence with clot trapping study
- Suggested IVC diameter may play role in caudal migration and tilting could lead to pain (symptomatic) in patients with smaller IVC due to stretching

Summary of Concerns Expressed:
- Inability to remove
- "True" migrations
- PE due to filter failure
- Concern with caudal rates but not in relation to other filters

Dr. Oliva Experience at CHUM:
- Of 40 attempted retrievals 24 anticoagulation contraindicated.  8 need prolonged filtration.
- 1 Caudal migration of 23 retrievals
- 17% tilting, some associated with perforation/penetration
- Retrieval window:  44 days (7 – 128)

Potential Root Causes for Caudal Migration:
- Believe most influential factor is caval dimensional changes
- Watermelon seed affect
- Small cava....more likely because arms may allow filter to ski down
- Large cava... arms more likely to catch and prevent downward migration
- Not much vessel spasm in IVC, but there is in small vessels


5.4     Field Visits

Numerous field visits were conducted by BPV sales, marketing, and R&D to respond to questions regarding various filter issues, including caudal migrations. These visits were also utilized to gather information regarding users' expected and threshold rates of various filter complications.

The main message that came out of the clinical interviews conducted during field visits is that users who have experienced caudal migrations of the G2 Filter are generally unhappy with the rate of this failure mode they are seeing.  The users' perceived rate of caudal migrations seem to have a strong positive relationship with retrieval rate, as can be seen in the below table, which is a representative depiction of the general opinion based on utilization and retrieval rate.

| Physician | Hospital | Annual Utilization | Retrieval Rate | Perceived caudal migration rate (G2 Filter) |
|---|---|---|---|---|

Confidential:     This document contains information that is the confidential and proprietary property of C.R. Bard, Inc.  Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without prior written consent of Bard.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
_MD1



| | | | | |
|---|---|---|---|---|
| Frank Lynch, MD | Hershey Penn State Hershey, PA | 200 – 250 units | 50% | 30% |
| Mamood Razavi, MD | St. Joseph's Hospital Orange, CA | 50 – 75 units | 15% | 1% |
| Bruce Zweibel, MD | Tampa General Hospital Tampa, FL | 150 – 200 units | >5% | 0% |

Although most physicians believe that caudal migration has less serious patient safety implications than some other types of filter complications, they believe that a filter that moved caudally implies a general instability of the device in situ and therefore felt less comfortable using it as their default filter.

A summary of the field visit log, along with a justification of which of these design inputs will or will not be pursued as part of the G3 Filter project is located in Appendix F.

5.5    Complaint analysis

A thorough review of all received internal filter complaints was completed by conducting a search within Trackwise (BPV's internal complaint tracking software) by FDA code for both the currently marketed filter devices (Simon Nitinol Filter, G2 Filter, and Recovery Cone), as well as historically marketed filter devices (Recovery Filter).  A detailed list of all complaints, shown by FDA code is shown in Appendix H.  In summary, the top five complaints as of July 31, 2007 for each filter product are shown in the table below.

| Filter Type | Top Five Reported Complaints | | | | |
|---|---|---|---|---|---|
| | #1 | #2 | #3 | #4 | #5 |
| SNF | Difficult to Deploy (QTY: 41) | Failure to Deploy (QTY: 26) | Twisting (QTY: 19) | Dome Collapse (QTY: 10) | Detachment of Components (QTY: 7) |
| Recovery | Detachment of Components (QTY: 123) | Migration* (QTY: 61) | Difficult to Deploy (QTY: 31) | Twisting (QTY: 31) | Perforation (QTY: 29) |
| G2 Femoral | Difficult to Deploy (QTY: 99) | Failure to Deploy (QTY: 73) | Migration** (QTY: 45) | Misplacement (QTY: 25) | Missing Components (QTY: 18) |
| G2 Jugular | Migration*** (QTY: 17) | Other**** (QTY: 7) | Broken Components (QTY: 5) | Twisting (QTY: 4) | Perforation (QTY: 4) |
| Recovery Cone | Detachment of Components (QTY: 26) | Broken Components (QTY: 7) | Bend (QTY: 4) | Failure to Capture (QTY: 4) | Other (QTY: 4) |

*The majority of these migrations were in the cranial direction
**37 of these migrations were caudal, 8 were cranial
***All of these migrations were in the caudal direction
****Typically 'other' encompasses tilt and delayed opening

As well, a review of the MAUDE database was conducted, comparing the

Confidential:    This document contains information that is the confidential and proprietary property of C.R. Bard, Inc.  Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without prior written consent of Bard.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
_MD1



| G3 Vena Cava Filter | DIS-8049 |
|---|---|
| Design Input Summary | Revision 001 |
| Report | Page 8 of 17 |

complaint rates of all commercially available filters against the SIR Guidelines. It is important to keep in mind that companies are only liable for reporting medical device reports (MDRs) for those complaints that they determine could or have caused patient injury. Each company uses their own internal standards for making this determination, thus, there potentially exists a wide range of discrepancy from company to company on what complaints are reported to the FDA. A summary of the MAUDE database findings, as well as a ranking by company for each complaint type are provided in Appendix H.

5.6   Current Regulation Review

A review of the following regulations was completed:
-   Guidance for Cardiovascular Intravascular Filter 510(k) Submissions, November 26, 1999
-   Smith, Angela. Regulation of Peripheral Vascular Devices: Current issues in the regulation of IVC filters. Endovascular Today; Nov. 2005: 93-94
-   Shelf Life of Medical Devices, April 1991
-   Sterile, single-use intravascular catheters, ISO10555-1:1995
-   Non-active surgical implants – General Requirements, ISO14630:1997
-   Non-active surgical implants – Particular requirements for cardiac and vascular implants; Part 3: Endovascular devices, EN12006-3:1999

From this review, many additional regulatory requirements were identified, including, but not limited to: biocompatibility, simulated deployment, introducer/sheath suitability, clot trapping ability, filter fracture, caval perforation filter migration, thrombogenicity, MRI compatibility, and many more. The detailed requirements can be found in Appendix I.

**Description of Change—**

| Revision number | Changes |
|---|---|
| 000 | Original/J.Hudnall |
| 001 | Updated project name from Tetra to G3 throughout, updated Appendix F to include rationale for user needs, changed document number from TD-00395 to DIS-8049/S.Klocke |

Confidential:   This document contains information that is the confidential and proprietary property of C.R. Bard, Inc. Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without prior written consent of Bard.



| **G3 Vena Cava Filter** Design Input Summary **Report** | **DIS-8049** **Revision 001** **Page 9 of 17** |
|---|---|

**Appendix A**
Vena Cava Filter Usage Study
Among Bard Customers
Final Report

Confidential:    This document contains information that is the confidential and proprietary property of C.R. Bard, Inc.  Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without prior written consent of Bard.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1



| G3 Vena Cava Filter | DIS-8049 |
|---|---|
| Design Input Summary | Revision 001 |
| **Report** | Page 10 of 17 |

# Appendix B
## Vena Cava Filter Usage Study
## Among Bariatric Surgeons
## Final Report

Confidential:   This document contains information that is the confidential and proprietary property of C.R. Bard, Inc.  Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without prior written consent of Bard.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
_MD1



| G3 Vena Cava Filter | DIS-8049 |
|---|---|
| Design Input Summary | Revision 001 |
| **Report** | Page 11 of 17 |

# Appendix C
## Multidisciplinary Panel
## Summary Report

Confidential:   This document contains information that is the confidential and proprietary property of C.R. Bard, Inc.  Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without prior written consent of Bard.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1



| | **G3 Vena Cava Filter** | **DIS-8049** |
| --- | --- | --- |
| | Design Input Summary | **Revision 001** |
| | **Report** | **Page 12 of 17** |

# Appendix D
## Key Opinion Leader/High-Volume User Panel
## Panelist Profile

Confidential:   This document contains information that is the confidential and proprietary property of C.R. Bard, Inc.  Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without prior written consent of Bard.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
_MD1



| | **G3 Vena Cava Filter**<br>Design Input Summary<br>**Report** | **DIS-8049**<br>**Revision 001**<br>**Page 13 of 17** |
|---|---|---|

**Appendix E**
Key Opinion Leader/High Volume User Panel
Meeting Summary

Confidential:   This document contains information that is the confidential and proprietary property of C.R. Bard, Inc.  Neither this document nor the information therein
may be reproduced, used or distributed to or for the benefit of any third party without prior written consent of Bard.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
_MD1



| | G3 Vena Cava Filter | DIS-8049 |
|---|---|---|
| | Design Input Summary | Revision 001 |
| | **Report** | Page 14 of 17 |

## Appendix F
Field Visit Log

Confidential:    This document contains information that is the confidential and proprietary property of C.R. Bard, Inc.  Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without prior written consent of Bard.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
LMD1



| | G3 Vena Cava Filter | DIS-8049 |
| --- | --- | --- |
| | Design Input Summary | Revision 001 |
| | Report | Page 15 of 17 |

**Appendix G**
Clinical Literature

Confidential:   This document contains information that is the confidential and proprietary property of C.R. Bard, Inc.  Neither this document nor the information therein
may be reproduced, used or distributed to or for the benefit of any third party without prior written consent of Bard.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
_MD1



| | **G3 Vena Cava Filter** | **DIS-8049** |
|---|---|---|
| | Design Input Summary | **Revision 001** |
| | **Report** | **Page 16 of 17** |

## Appendix H
Complaint Data

Confidential:   This document contains information that is the confidential and proprietary property of C.R. Bard, Inc.  Neither this document nor the information therein
may be reproduced, used or distributed to or for the benefit of any third party without prior written consent of Bard.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
_MD1



| | **G3 Vena Cava Filter**<br>Design Input Summary<br>**Report** | **DIS-8049**<br>**Revision 001**<br>**Page 17 of 17** |
|---|---|---|

# Appendix I
## Regulatory Requirements

Confidential:   This document contains information that is the confidential and proprietary property of C.R. Bard, Inc.  Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without prior written consent of Bard.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
_MD1