Mark S. O'Connor (011029) – mark.oconnor@gknet.com
Paul L. Stoller (016773) – paul.stoller@gknet.com
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona  85016-9225
602-530-8000

*Counsel for Plaintiffs Doris and Alfred Jones*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC |
| DORIS JONES and ALFRED JONES, a married couple,<br><br>                    Plaintiffs,<br><br>v.<br><br>C.R. BARD, INC., a New Jersey corporation and BARD PERIPHERAL VASCULAR, an Arizona corporation,<br><br>                    Defendants. | **JONES PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS DORIS AND ALFRED JONES'S CLAIMS** |

1    In their Motion for Partial Summary Judgment of Plaintiffs Doris and Alfred

2    Jones's Claims ("Motion" or "Mot.") [Doc. 7351], Defendants seek summary judgment

3    on six claims[1] and Plaintiffs' ability to recover punitive damages.  The facts and

4    reasonable inferences from the facts, construed in the light most favorable to Plaintiffs,

5    allow Plaintiffs' claims to go to the jury.  Accordingly, this Court should deny the Motion.

6    **I.      Introduction and Summary of Argument**

7        Plaintiff Doris Jones was implanted with Bard's Eclipse Inferior Vena Cava Filter

8    (the "Filter") on August 24, 2010.  At the time, Bard knew its IVC filters (including the

9    Filter) fractured, migrated, tilted, and perforated patients' IVCs at rates significantly

10   higher than its competitors' IVC filters and Bard's own Simon Nitinol Filter ("SNF");

11   Bard also had internally concluded that its G2 filter (which is effectively the same device

12   as the Filter) caused an unreasonable risk of serious injury and death.  Nonetheless, Bard

13   did not warn implanting physicians—including Doris's implanting doctor—of these

14   significantly higher risks or of its determination that its filters (including the Eclipse)

15   presented an unreasonable risk of harm.  Five years later, Doris's Filter fractured and the

16   fractured strut migrated to her pulmonary artery; where it remains today.

17       Bard's Motion focuses primarily on the failure-to-warn and misrepresentation

18   claims, contending it had no duty to warn doctors of the significantly increased rate of

19   failure associated with its devices or of its determinations that its devices carried an

20   unreasonable risk of harm.  But this very issue was decided against Bard in *Cason v. C.R.*

21   *Bard, Inc.*, 2015 WL 9913809 (N.D. Ga. Feb. 9, 2015).  There, Judge Shoob of the

22   Northern District of Georgia *rejected* Bard's argument over the same warnings at issue

23   here (and relating to what is essentially the same device, the G2).  Based on Georgia law,

24   Judge Shoob found that there was a "genuine issue of fact" for the jury as to whether

25   Bard's warnings were adequate and should have included that the G2 experienced

26   complications at significantly higher rates than other manufacturer's IVC filters and the

27   ─────────────

28   [1] Those are failure-to-warn (Counts II & VII), negligent and fraudulent misrepresentation (VIII & XII), negligence per se (IX), and Violation of Georgia's Fair Business Practices Act (XIV).  Plaintiffs withdraw Count XIV as summary judgment is proper on that claim.

1

SNF.  *Id.* at \*3-4.  *Cason* is not the only time that Bard has lost on this issue.  In *Cisson v. C.R. Bard, Inc.*, 2013 WL 5700513, at \*7 (S.D. W.Va. Oct. 18, 2013), Judge Goodwin came to the same conclusion; applying Georgia law, he rejected Bard's argument that "its duty was limited to warning[s] about possible complications, not their rate or severity" and found evidence of higher complication rates with Bard devices sufficient to create a jury question as to the adequacy of the warnings.

Bard's other warnings arguments likewise fail because they are premised on its incorrect assertion that its warnings need not include anything more than generic complications for all IVC filters.  Bard's argument as to negligence per se fares no better, since it is predicated entirely on the false premise that Plaintiffs' claims are preempted.  Finally, Bard's argument as to punitive damages ignores the enormity of the evidence concerning Bard's wrongful and egregious conduct (including Bard's decision to ignore proven design changes in favor of profit).  Because the evidence permits a reasonable inference that Bard engaged in a course of conduct that knowingly endangered those using its product—resulting in multiple deaths and numerous significant injuries—punitive damages is a question of fact for the jury.

**II.     Facts**

This case arises from injuries Plaintiff Doris Jones suffered after she was implanted with a Bard Eclipse IVC filter on August 24, 2010.  *See* Plaintiffs' Omnibus Statement of Facts ("OSOF"), filed concurrently herewith, ¶ 271.  On August 14, 2010, Doris ███

███████████████████████████████████████████████████████

███████████████████████████████████.  *Id.* ¶¶ 264-265.  ████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████,

vascular surgeon Dr. Anthony Avino met with Doris and her husband, Alfred Jones, on August 24, 2010, and discussed implantation of an IVC filter with them.  *Id.* ¶ 269.  Alfred, on Doris's behalf, signed the consent form for the procedure.  *Id.* ¶ 270.  Dr. Avino implanted the Eclipse filter in Doris later that day.  *Id.* ¶ 271.

The Eclipse is a "retrievable" IVC filter, meaning that while it can be removed if necessary or appropriate, Bard promoted the Filter as safe for implantation as a permanent device. *Id.* ¶ 273.  Dr. Avino intended that Doris could keep the Eclipse permanently, with an option for removal if it filled with clots.  *Id.* ¶ 274.  At the time, Bard's SNF was available on the market for implantation as a permanent IVC filter.  *Id.* ¶¶ 110-111.

Prior to Doris's implantation, Bard was aware of the following facts relating to its IVC filters, including the Eclipse[2] and its predicate devices (the Recovery, G2, and G2X):

- In its sole clinical study for the Recovery filter, the filter in one of the 32 study patients had two fractures, *id.* ¶ 10; after the fractures were reported, the Canadian Institutional Review Board suspended the study, *id.*  ¶ 11.  That same study also involved two tilted filters, one migration, and one perforation of the IVC.  *Id.* ¶ 10.

- Subsequent comparative bench testing for migration resistance demonstrated that the Recovery filter: (a) performed worse than the SNF at every caval diameter, (b) performed worse than almost all competitor devices at every caval diameter, and (c) failed Bard's own performance threshold for resistance at 28 mm.  *Id.* ¶ 34.

- Two months after full market release of the Recovery, Bard national sales training manager stated: "Tilt resistance should probably be downplayed." Its marketing director acknowledged, "We knew very little about the long-term clinical performance of this device when we launched it. After a year of commercialization, there are still many questions that need to be answered." *Id.* ¶ 33(b) and (c).

- In the first 12 months after full market release, there were seven deaths resulting from migration of the Recovery filter to patients' hearts.  *Id.* ¶ 48.

- By April 2004, Bard knew that the Recovery filter was designed in a way that did not account for how the IVC actually behaved.  *Id.* ¶ 41.

- In the midst of the migration deaths from the Recovery filter, Bard developed a Crisis Communication Plan, which included a messaging instruction from a team member that "[c]omparison with other filters is problematic in many ways and we should avoid/downplay this as much as possible. When pressed, we simply paraphrase … that estimates based on the available data suggest that there is no significant difference in the rates of these complications between any of the devices currently marketed in the U.S., including the Recovery device." *Id.* ¶ 45.

- By May 2004, Bard determined that, based on complications, "[a]t a 95% confidence, there IS a significant difference between Recovery, Gunther Tulip, Bird's Nest and SNF." *Id.* ¶ 49(d).

---

[2] The Eclipse filter is essentially the same filter as Bard's G2X IVC filter.  OSOF ¶ 102. Bard electoropolished the Eclipse filter, which made no changes to the filter's performance or complications, in order to make a name change to "break with the baggage associated with the previous versions despite the fact that the new iteration was the same as G2X in every way but one [electropolishing]." *Id.*

3

- By July 9, 2004, Bard determined that the Recovery had a fracture rate that was tens of times higher than other filters on the market. *Id.* ¶ 49(a).

- By November 2, 2004, Bard knew of 32 Recovery filter fractures. *Id.* ¶ 56.
  - Of those 32, nine fragments had traveled to the heart or lungs of patients, including three open heart surgeries to retrieve fragments. *Id.* ¶ 138.

- By December 2004, Bard determined that the Recovery filter had reporting rates of complications as compared to all other filters, including the SNF, as follows:
  - for deaths, 4.6 times higher;
  - for migrations, 4.4 times;
  - for IVC perforations, 4.1 times higher; and
  - for fractures, 5.3 higher times higher.
  Bard concluded that "[t]hese differences were all statistically significant." *Id.* ¶ 57.

- In January 2005, Bard's internal analysis revealed that "the data and [a consultant's] analysis provided two significant signals that further investigation particularly in relation to migration and fracture is urgently warranted." *Id.* ¶ 59.

- According to Bard's current Quality Engineering Manager for New Product Development, Natalie Wong, the Recovery was worse than the SNF with regard to filter-related deaths and filter fracture. *Id.* ¶ 38.

- On August 3, 2005, an internal report from Bard's VP of Regulatory/Science reported 68 fractures—25 of which involved fragments embolizing to the heart or lung. *Id.* ¶ 62.

- Despite advertising the G2 filter as being 12 times more resistant to fracture, Bard did not run a test for fracture resistance because it concluded that the resulting data "would still fall outside of the acceptable range" and it "didn't think the answer would support our design change." *Id.* ¶ 76.

- Bard knew that comparatively the SNF was a significantly safer device than the G2 filter. In December 2005, Dr. Ciavarella, Bard's Corporate Clinical Affairs Director, noted the complications with the G2 filter and stated: "The G2 is a permanent filter; we also have one (the SNF) that has virtually no complaints associated with it. 'Why shouldn't doctors be using that one rather than the G2?'" *Id.* ¶ 80.

- In December 2005, internal Bard reports determined that the "reported rate of fractures [was] judged to be serious (Critical R002 rating)." *Id.* ¶ 308.

- By February 2006, Bard determined the G2 filter was migrating caudally and a "high percentage of caudal migrations accompanied by significant filter tilting and limb displacement." *Id.* ¶ 82. Bard concluded the severity of these occurrences was "critical." *Id.*

- By March 2, 2006, Bard determined the G2 filter propensity for caudal migration represented an "unacceptable risk" of serious injury and death. *Id.* ¶ 87. Nonetheless, Bard took no "preventative action" to warn physicians or patients about the "unacceptable risk." *Id.*

- In March 2006, internal emails at Bard described "a terrible situation [with Bard's IVC filters] that was held together with scotch tape, smoke, mirrors, crying, etc." *Id.* ¶ 46.

4

- In August 2006, the medical monitor for Bard's clinical retrievability study for the G2 filter expressed significant concern regarding the rate of tilt in the study and suggested Bard consider redesigning the filter at that point. *Id.* ¶ 91.

- By June 2008, Bard had identified the need to make material improvements to the G2 filter to reduce migration, tilt, fracture, and perforation. *Id.* ¶ 94. At the time, Bard tied caudal migrations to causing tilt, perforation, and fractures. *Id.*

- By November 2008, Bard was aware that the G2 filter had significantly higher rates of caudal migration, tilt, and perforation than even the Recovery. *Id.* ¶ 84.

- By August 2010, Bard had identified 172 fractures in G2, G2X, and Eclipse filters. *Id.* ¶ 104. Of those, 60 percent were discovered at retrieval – meaning most fractures continued not to be discovered without doctor invention. *Id.* It also knew that both the number of fractures and rate of fractures had increased since the full market release of the G2. *Id.*

- Bard knew that fracture, tilt, and perforation were caused by migration, including caudal migration. *Id.* ¶¶ 94, 99.

- Bard knew the G2 and G2X filters had increased rates of caudal migration as compared to the Recovery. *Id.* ¶ 99.

- Bard was aware that the physician perception was that "design sacrifices" were made for its optional filters that led to higher rate of movement or migration, which Bard knew led to an increased risk of fracture. *Id.* ¶ 99.

- Bard's internal analysis demonstrated that the Recovery filter fractured 55 times more often than the SNF; the G2 fractured more than 12 times as often as the SNF, the G2X fractured 10 times as often as the SNF, and the Eclipse, even after limited sales, fractured nearly 4 times as often as the SNF. *Id.* ¶ 114.

- As a marketing ploy, Bard made minimal, non-corrective changes to the G2X and marketed the "new" Eclipse filter even though it was effectively the same device.
  - Bard made the name change to "break with the baggage associated with the previous versions [Recovery and G2]." *Id.* ¶ 102. But, the Eclipse "was the same as G2X in every way but one." *Id.* That one difference – electropolishing – was only to be "consistent with emerging industry standards." *Id.* And, there was no evidence the change improved fracture resistance or corrosion resistance. *Id.* ¶ 108.

- Bard's retrospective analysis of its filter fractures groups the G2, G2X, and Eclipse together and shows that both the number of fractures and the cumulative fracture rate increased consistently over time. *Id.* ¶ 128. Thus, consistent with the later medical literature,[3] Bard knew that its filters fractured at an increasing rate the longer they stayed in the body.

Nonetheless, Bard never warned patients or physicians that its filters, including the Eclipse, had a greater risk of complications and failures than its competitors' devices and

---

[3] A 2009 study demonstrated that, after 180 days, Bard IVC filters began to fracture. *Id.* ¶ 98. A 2010 study demonstrated that Bard's filters had an increasing fracture rate over time and an expected fracture rate of approximately 25 percent at 50 months. *Id.*

the SNF.  Bard also failed to provide this and similar information to its sales representatives.  *Id.* ¶¶ 146-48.

Furthermore, Bard's Instructions for Use ("IFU") for the Eclipse do not include warnings that its filters fractured, migrated, tilted, and perforated patients' IVCs at rates significantly higher than competitor IVC filters and Bard's SNF.  Nor did they disclose that the filters caused an unreasonable risk of serious injury and death, as Bard had determined.  Nor did the G2 or G2X IFUs contain any such disclosures.  Dr. Avino testified he did not recall reading the Eclipse IFU but he had read the IFUs for Bard's other IVC filters.  *Id.* ¶¶ 276-277.  The G2X IFU is identical to the Eclipse IFU with respect to warnings regarding fracture, tilt, migration, and perforation; the G2 IFU is substantially identical to the Eclipse IFU with respect to those same warnings.  *Id.* ¶¶ 278-282.   Thus, Dr. Avino was aware of Bard's actual warnings at the time he implanted the Filter in Doris.

Dr. Avino testified that August 2010, when he implanted the Eclipse IVC filter in Doris, predates the "peak" of his concern regarding IVC filters.  *Id.* ¶ 287.  Since then, he has learned more about IVC filters and their complications.  *Id.* ¶ 288.  But, he would have wanted to know before he implanted the Eclipse IVC in Doris, what Bard knew about complications with its IVC filters.  *Id.* ¶ 289.

Dr. Avino was not aware of specific rates of fracture of Bard IVC filters.  *Id.* ¶ 285. He believed the rates were very low; but, after implanting Doris's filter, he learned that they were higher.  *Id.* ¶ 286.  For example, Dr. Avino would have wanted to know if Recovery's fracture rates exceeded the rates of other IVC filters.  *Id.* ¶ 290.  And, he believed "[a]ll of the fracture information rate [for Bard's IVC filters] is something that was important to consider in the decision [to use Bard IVC filters]."  *Id.* ¶ 291.  Similarly, it would have been important to Dr. Avino to know that the Recovery filter had reporting rates for death, filter migration, IVC perforation, and filter that were substantially higher than all other filters.  *Id.* ¶ 292.  Indeed, Dr. Avino believed that comparative information

as between filters was important: "all information is helpful, if there's -- if it is information regarding concern about one filter being better than the other." *Id.* ¶ 293.

Dr. Avino would expect a medical-device company to report to doctors when it learns its device is less safe than alternative treatments or other alternative products. *Id.* ¶ 294. And, he would need to know that information to make informed decisions about using products. *Id.* ¶ 295. Similarly, he testified that patients cannot make informed-consent decisions if the doctors do not receive the information to inform them. *Id.* ¶ 296.

Dr. Avino's concerns are echoed by Bard's own witnesses and experts. According to Dr. Clement Grassi, a Bard expert, informed consent requires taking into consideration what "a reasonable patient would want to know in the same or similar circumstances." *Id.* ¶ 116(a). And, Bard's V.P. of Quality Assurance, Regulatory Affairs and Medical Affairs agreed Bard should have communicated to physicians and patients statistically significant findings that Bard's IVC filters had greater risks, complications, and malfunctions than the SNF and competitor filters. *Id.* ¶ 115(a). Dr. Grassi agreed patients would want to know this kind of information in making risk/benefit determinations as to having the device implanted. *Id.* ¶ 116(d). Natalie Wong, Bard's marketing manager, also agreed. *Id.* ¶ 117. Similarly, John McDermott, BPV's President from 1999 through 2008, testified physicians would want to know this information and it is important to their decision making. *Id.* ¶ 121. But Bard failed to provide this known information, concealing it from physicians and patients who need it to make reasonable risk/benefit decisions.

Similarly, Plaintiffs' and Bard's physician experts have testified that this type of information is important to treating physicians to determine the risk/benefit of using the device and in order to obtain appropriate informed consent from patients. *Id.* ¶¶ 309-310.

Unfortunately, contrary to Dr. Avino's intention, the Eclipse filter could not be left in Doris permanently—it fractured sometime between August 2013 and April 2015. On April 21 and 22, 2015, Doris ████████████████████████████

████████████████████████.[4]  *Id.* ¶ 298.  A chest x-ray and CT scan revealed the Filter had fractured and a piece had embolized into her right pulmonary artery.  *Id.* ¶ 300.[5]

On April 22, 2015, endovascular interventional radiologist Dr. Kirstin Nelson recommended, and Doris agreed, that Dr. Nelson should remove the damaged filter because of the risk of additional struts breaking and embolizing.  *Id.* ¶¶ 302-303.  The fractured strut in Doris's pulmonary artery was not retrieved because it was "in a dangerous area and was not suitable for removal."  *Id.* ¶ 304.  Dr. Nelson operated on April 23, 2015, and removed the body of Doris's Filter without complication.  *Id.* ¶ 305. The fractured piece of the filter remains in her pulmonary artery today.  *Id.* ¶ 306.

## III.   Summary Judgment Is Not Appropriate on the Contested Claims.

### A.   The Appropriate Standard on Summary Judgment Requires this Court to View the Facts in the Light Most Favorable to Plaintiffs – Not Bard.

Summary judgment is appropriate when no genuine issues of material fact exist and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In applying this standard, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Thus, if a reasonable trier of fact could find in favor of the non-moving party, summary judgment is improper.  *Id.* at 248.

### B.   Bard Fails to Demonstrate Summary Judgment is Appropriate on Plaintiffs' Failure to Warn and Misrepresentation Claims (Counts II, VII, VIII, & XII)

Under Georgia law, a manufacturer breaches its duty to warn if it fails (1) to "adequately communicate the warning to the ultimate user or (2) fail[s] to provide an adequate warning of the product's potential risks."  *Watkins v. Ford Motor Co.*, 190 F.3d 1213, 1219 (11th Cir. 1999) (quoting *Thornton v. E.I. Du Pont De Nemours & Co., Inc.*,

---

[4] ████████████████████████████████████████
████████████████████████████████.  ¶ 299.
[5] Expert testimony has subsequently determined that Doris's Filter fracture began with tilt and caudal migration of the Filter.  *Id.* ¶ 307.

22 F.3d 284, 289 (11th Cir. 1994)).  The duty to warn an end user of a risk associated with product use arises "whenever the manufacturer knows or reasonably should know of a danger arising from the use of its product."  *Chrysler Corp. v. Batten*, 450 S.E.2d 208, 211 (Ga. 1994).  Thus, the duty is a continuing one and may arise "months, years, or even decades after the date of the first sale of the product."  *Watkins*, 190 F.3d at 1218.

"Under the learned intermediary doctrine, the manufacturer of a . . . medical device does not have a duty to warn the patient of the dangers involved with the product, but instead has a duty to warn the patient's doctor, who acts as a learned intermediary between the patient and the manufacturer."  *McCombs v. Synthes (U.S.A.)*, 587 S.E.2d 594, 595 (Ga. 2003).  "[U]nder the learned intermediary doctrine, the manufacturer's warnings to the physician must be adequate or reasonable under the circumstances of the case."  *Id.*  In Georgia, the general rule is that the adequacy of a warning is an issue for the jury.  *Thornton*, 22 F.3d at 289 (citing *Watson v. Uniden Corp. of America*, 775 F.2d 1514, 1516 (11th Cir. 1985)).  "Whether adequate efforts were made to communicate a warning to the ultimate user and whether the warning if communicated was adequate are uniformly held questions for the jury."  *Id.*

<ol>
<li value="1">Bard's warnings were inadequate because they did not include risk rates or disclose that the risk associated with Bard's devices were higher than those of competitor devices or the SNF.</li>
</ol>

Bard contends that it is entitled to summary judgment because its generic warnings that its filters may migrate, tilt, or fracture were "adequate" as a matter of law.  Mot. at 7.  In particular, Bard suggests that it "can find no Georgia law creating a duty on a manufacturer to provide comparative rates of complication for its product to other similar products on the market."  *Id.* at 8.[6]  But, Bard and its counsel are well aware of the rulings in *Cason* and *Cisson* in which the courts rejected this very argument.  In *Cason*, the court specifically found that there was a question of fact as to whether Bard's warnings for IVC filters were adequate because the warnings did not disclose that complication rates for the

---

[6] "Although Bard frames this argument as one of duty, it actually relates to whether Bard's warnings were adequate, which is a question of breach."  *Cisson*, 2013 WL 5700513, at *7.

9

G2 filter were significantly higher than the rates for competitor IVC filters and the SNF. *Cisson*, 2013 WL 5700513, at *7. The same question of fact exists here as to Bard's identical warning that fails to disclose that the Eclipse filter (which is just a rebranded G2) has significantly higher complication rates than the rates for competitor IVC filters and the SNF.

Under Georgia law, whether the failure to warn about the rate or severity of potential injury is inadequate is a question for the jury. *Thornton*, 22 F.3d at 289 (adequate warning "must provide a complete disclosure of the existence and extent of the risk involved."). Whether a device should include a warning that it carries an increased risk of a particular complication is particularly a question of fact for the jury. *See In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 711 F. Supp. 2d 1348, 1378 (M.D. Ga. 2010) (holding reasonable jury could find warnings inadequate given manufacturer "did not inform Plaintiffs' physicians of any increased risks associated with ObTape"); *Watkins*, 190 F.3d at 1220 (finding genuine issue of material fact on failure-to-warn claim because jury could conclude that more adequate warning was needed on vehicle that had greater propensity than other vehicles to roll over).

Bard's warnings indicated only that its filters may tilt, migrate, or fracture—complications that exist for all filters. They failed to warn that Bard's IVC filters tilt, migrate, and fracture at rates higher than competitor filters and Bard's SNF; they also failed to warn of Bard's conclusion that Bard's filters presented an unreasonable risk of serious injury and death. The failure to disclose higher complication rates than the SNF is particularly significant here as Dr. Avino wanted to place a permanent IVC filter in Doris. Bard knew its new generation filters (including the Eclipse) were failing and fracturing at rates higher than competitor devices and much higher than the SNF. A reasonable jury could certainly conclude that an adequate warning would include such information.

The precise warnings on which Bard relies and the arguments it makes here were at issue in *Cason*, 2015 WL 9913809. There, as here:

> Plaintiffs concede[d] that the IFU provides a list of potential complications of which [the implanting doctor] was aware, but they argue that the warnings were inadequate because they [the warnings] failed to disclose that the frequency with which these complications occurred with the G2 Filter was significantly higher than with other IVC filters manufactured both by defendants' competitors and defendants themselves.

*Id.* at *3. Citing *In re Mentor Corp. ObTape*, Judge Shoob of the Northern District of Georgia concluded "there is a genuine issue for trial as to whether the warnings provided by Bard were adequate." *Id.* Judge Shoob noted the evidence that (a) the G2 filter had "a significantly greater propensity to fracture, migrate, and perforate the IVC than other IVC filters," and (b) Bard "knew or should have known about the increased risks associated with the G2 Filter."

> Given this evidence, combined with the evidence that defendants did not warn Ms. Cason's doctor about any increased risk associated with the G2 Filter, a reasonable fact finder could conclude that the IFU did not contain an adequate warning regarding the G2 Filter.

*Id.* at **4-5

In *Cisson v. C.R. Bard, Inc.*, 2013 WL 5700513, Bard argued, as it does here, "that its duty was limited to warning about possible complications, not their rate or severity." *Id.* at *7. Applying Georgia law, the court found to the contrary: "Bard's warnings were adequate as a matter of law only if 'a reasonable jury would not have a legally sufficient evidentiary basis' to find against Bard." *Id.* at *8. Identifying evidence that Bard knew its device "created a higher risk of complications," the court found "sufficient evidence to create a jury question as to whether Bard's warning was adequate." *Id.*

Bard claims "Georgia law does not require a manufacturer to provide comparative rates of complication for its products," citing two cases—both of which inapposite to the argument it makes. The first, *Hoffman v. AC&S, Inc.*, 548 S.E.2d 379, 382 (Ga. App. 2001), did not involve a failure-to-warn claim. Rather, the court found that the plaintiff needed to establish that the product or products that allegedly caused her mesothelioma were manufactured or supplied by the defendants. And, the language and pin cite Bard uses for *Dixie Grp., Inc. v. Shaw Indus. Grp., Inc.*, 693 S.E.2d 888, 892 (Ga. App. 2010), relate to whether the defective product reached the user without substantial change in

11

1   condition and had nothing to do with the failure-to-warn claim in that suit.  Bard's other

2   authorities are not Georgia law and are inconsistent with *Cason*, *Cisson*, *In re Mentor*

3   *Corp. ObTape*, and *Watkins*.  *See* Appendix A addressing same.

2.   <u>Dr. Avino did not fail to read the applicable warnings.</u>

5        Bard contends Doris cannot pursue her failure-to-warn claims because Dr. Avino,

6   testified that he did not recall reading the Eclipse IFU.  Mot. at 5-6.  Bard, however,

7   ignores material testimony of Dr. Avino.  The facts and reasonable inferences construed in

8   the light most favorable to Plaintiffs establish that Dr. Avino read and was fully aware of

9   Bard's warnings in the Eclipse IFU.

10        As Bard contends, Georgia law precludes failure-to-warn claims based on the

11   inadequacy of the warning in circumstances where a plaintiff (or the learned intermediary)

12   fails to read the warning at issue.  *Wilson Foods Corp. v. Turner*, 460 S.E.2d 532, 534

13   (Ga. App. 1995).  But that rule does not apply in this case.

14        First, the facts and inferences reasonably construed in Plaintiffs' favor are that Dr.

15   Avino was fully apprised and aware of Bard's warnings in the Eclipse IFU by virtue of

16   reading those very warnings in Bard's other IVC filter IFUs.  Dr. Avino read IVC filter

17   IFUs for Bard devices.  OSOF ¶ 276.  The G2 and G2X IFUs (immediate predecessors to

18   the Eclipse) contained the exact same warnings as were in the Eclipse IFU.  *Id.* ¶ 278.[7]

19   Given that the Eclipse is "the same as G2X in every way but one" and there is no evidence

20   that the one difference (electropolishing) improved fracture resistance or corrosion

21   resistance, *id.* ¶¶ 101-02, the warnings are the same for both devices.  Thus, Dr. Avino

22   read Bard's warnings prior to implanting Doris's Filter.  Those warnings failed to convey

23   that the Bard filters, including the Eclipse, experienced complications at a significantly

24   higher rate than competitor IVC filters and Bard's SNF.  Even if he did not read the

---

[7] Indeed, the G2X and Eclipse IFUs are essentially identical in all parts except for the
device names used in them.  OSOF ¶ 278.  And, the "warnings" and "complications"
sections of the Eclipse IFU and G2 are identical with respect to fracture, movement,
migration, and tilt except for numbering of those warnings.  *Id.* ¶ 279.  Indeed, Bard
admits that the warning at issue in the IFU were the same in the G2X and Eclipse IFUs.
*See* Bard's Statement of Facts in Support of Motion for Summary Judgment in *Hyde v.
Bard*, Doc. 7360, ¶¶ 19-21.

1    specific papers that came in the box with the specific device he implanted in Doris, there

2    is simply no requirement in Georgia law that Dr. Avino read the same warnings over and

3    over again every time he implanted a Bard IVC filter.

4         Additionally, the IFU is not the only way that warnings are given to physicians

5    relating to medical devices.  Warnings from medical-device companies come in multiple

6    forms: IFUs, "Dear Doctor" letters, product pamphlets, and conversations with company

7    sales representatives, among others.  Georgia considers such sources relevant in

8    determining what its doctors are—or should be—aware of for product warnings.  *See*

9    *Allen v. Belinfante*, 458 S.E.2d 867, 869 (Ga. App. 1995) (assessing doctor's awareness of

10   manufacturer's "dear doctor" letters, articles in professional journals, FDA alerts, etc. in

11   determining liability for failing to warn plaintiff of risks).  And, in general, when applying

12   the learned-intermediary doctrine, Georgia's courts consider alternative sources of

13   information supplied by a manufacturer or distributor as relevant to whether that party has

14   provided adequate warnings.  *See Fouch v. Bicknell Supply Co.*, 756 S.E.2d 682, 690 (Ga.

15   App. 2014) (finding question of fact as to adequacy of distributor's warnings where hoods

16   were labeled as not for use in sandblasting, but catalogue referenced product as sandblast

17   hood).  Thus, Bard cannot rely on the IFU as being the sole location to which a doctor

18   must look for adequate warnings.  And nowhere did it give the warnings at issue.

19        Bard's authorities are distinguishable.  In *Wilson Foods*, unlike here, the plaintiff

20   had not read the identical warnings that were at issue on prior occasions when using the

21   same product from the same manufacturer.  460 S.E.2d at 534. ("[t]he record establishes

22   without contradiction that [plaintiff] failed to read any of the warnings affixed to" the

23   product).  *In re Wright Med. Tech. Inc., Conserve Hip Implant Prod. Liab. Litig.*, applies

24   Utah law, not Georgia law.  *See* 127 F.Supp.3d 1306, 1358 (N.D. Ga. 2015) ("A strict

25   liability defective warning claim, under Utah law, requires . . . .").  Moreover, the doctor

26   testified that he did not read the manufacturer insert and relied on his own research and

27   information from sales representatives.  *Id.* at 1360.  Those facts are simply different than

28   here where Dr. Avino had read and was familiar with Bard's IVC filter warnings.

3.      Neither Dr. Avino nor the medical community was aware of the
information Plaintiffs contend should have been in Bard's warnings.

a.      Dr. Avino was not aware.

Bard argues that because "Dr. Avino had actual knowledge of the risk of fracture," there is not proximate cause for the failure-to-warn claims.  Mot. at 6.  Bard is wrong.

There is no dispute Dr. Avino was aware the Filter he implanted in Doris could fracture; nor is there any dispute the Filter's warnings included a risk of fracture as a potential complication.  But, Plaintiffs contend that Bard's warnings were inadequate because they did not disclose that the risk of fracture for the G2 and Eclipse filters was greater than the risk of the same complication for its competitors' devices or as against the SNF.  Dr. Avino was not aware of the rate of risk or that the rate was significantly higher than for other IVC filters.  OSOF ¶¶ 285-286.  And, Dr. Avino would have wanted to know the fracture-rate information.  *Id.* at ¶¶ 289-293.[8]

Bard's citations to *Wheat v. Sofamor, S.N.C.*, 46 F. Supp. 2d 1351 (N.D. Ga. 1999), and *Ellis v. C.R. Bard, Inc.*, 311 F.3d 1272 (11th Cir. 2002), are unavailing.  In both cases, the courts found that the doctors were aware of the very warning the plaintiffs contended should have been given.  *Wheat*, 46 F. Supp. 2d at 1363-64 (treating doctors testified they were "aware of the risks"); *Ellis*, 311 F.3d at 1277, 1279 (both doctors and patient were aware that "only the patient should activate the PCA pump unless a doctor instructed otherwise.").  That is simply not the case here.

b.      There is no evidence that the medical community was aware.

Finally, Bard suggests that Plaintiffs' failure-to-warn claims fail because the complications of its filters "are well-known by medical professionals."  Mot. at 8.  Again, this argument is a straw man.  Plaintiffs do not dispute that the medical community was aware that IVC filters generally carry the risk of certain complications, including tilt, migration, and fracture (as common sense would dictate for any device implanted in the

---

[8] Additionally, Plaintiffs' experts have opined that precisely this type of information is important to implanting physicians in making decisions as to whether to utilize an IVC filter and, if so, which filter to use.  OSOF ¶ 309.

body).  But, Plaintiffs' argument is not that Bard's warnings were inadequate because they failed to warn of the *existence* of complications; Bard's warnings were inadequate because they neither warned doctors regarding *rate* of the complications involved nor disclosed that the rate of dangerous complications associated with Bard's devices were significantly higher than those of other IVC filters.  Bard has failed to present undisputed evidence to carry its burden to establish that "medical professionals" were aware in August 2010 of the failure rates of Bard IVC filters or that the filters had a higher risk of complications than competitor devices and the SNF.  Certainly Dr. Avino – a medical professional – was not aware of these facts.  *Id.* ¶ 285-286.[9]

4.   Plaintiffs' negligent and fraudulent misrepresentation claims likewise go to the jury.

Bard cites *Brazil v. Janssen Research & Dev. LLC*, No. 4:15-CV-0204-HLM, 2016 WL 4844442, at *11 (N.D. Ga. Mar. 24, 2016), and *Swicegood v. Pliva, Inc.*, 543 F. Supp. 2d 1351, 1357 (N.D. Ga. 2008), for the proposition that Georgia does not recognize a claim for misrepresentation apart from a failure-to-warn claim.  Mot. at 5, n. 2.  Those cases, however, do not support Bard's contention.

*Swicegood* involved an unusual set of facts and the court's reluctance to recognize a claim absent clear Georgia precedent.  543 F. Supp. 2d at 1357.  There, a plaintiff sued a name-brand manufacturer for alleged misrepresentations in its warnings that caused the generic-brand manufacturer to supply plaintiff with inadequate warnings as to the generic medication.  *Id.*  Expressing reluctance to recognize an independent misrepresentation claim against the name-brand manufacturer, the *Swicegood* court cited to *Potts v. UAP-GA AG CHEM, Inc.*, 567 S.E.2d 316, 318 (Ga. App. 2002).  *Potts* upheld a negligent-misrepresentation claim against an employer who induced a physician to believe (falsely)

---

[9] Bard's cites to *Exxon Corp. v. Jones*, 433 S.E.2d 350 (Ga. App. 1993), and *Ellis*, 311 F.3d at 1281, are factually distinguishable.  The evidence was undisputed in both cases that the relevant community was aware of the risks about which the plaintiffs contended there should have been warnings.  The *Exxon* court found "it is undisputed that Exxon sold LP gas in bulk to Tugalo, a commercial distributor that should have been aware of the dangers involved in the handling of LP gas."  433 S.E.2d at 353.  In *Ellis*, the court found the "dangers associated with third-party activation [of pain pumps] are well known in the medical community" and plaintiff's expert admitted as much.  311 F.3d at 1278.

15

that an employee had not been exposed to chemicals, thus impairing the physician's

treatment of the employee.  *Id.* at 319-20.  The *Swicegood* court acknowledged that "*Potts*

itself contemplated that a misrepresentation claim could be distinct from a failure to warn

claim[.]"  543 F. Supp. 2d at 1357.  But the *Swicegood* court found the misrepresentation

claim in that case was "masquerading" as a products-liability claim against a manufacturer

whose product had not caused plaintiff's injuries; it concluded that liability for

misrepresentation under those facts would have resulted in "an unprecedented departure

from traditional Georgia tort law."  *Id.*  In *Brazil*, the court dismissed the

misrepresentation claim for different reasons, citing *Swicegood* in dicta as not supporting

such a claim in lieu of a product-liability claim.  2016 WL 4844442 at *11.

      C.    <u>Plaintiffs Have a Viable Claim for Negligence Per Se (Count IX).</u>

Georgia has codified the doctrine of negligence per se.  Under the Georgia statute:

> When the law requires a person to perform an act for the benefit of another
> or to refrain from doing an act which may injure another, *although no cause
> of action is given in express terms*, the injured party may recover for the
> breach of such legal duty if he suffers damage thereby.

Ga. Code Ann. § 51-1-6 (emphasis added); *St. Mary's Hosp. of Athens, Inc. v. Radiology

Professional Corp.*, 421 S.E.2d 731, 736 (Ga. App. 1992).  To establish negligence per se

under Georgia statutory and common law, a plaintiff must demonstrate that (1) the injured

person falls within the class of persons the statute was intended to protect and (2) the harm

complained of was the harm against which the statute was intended to guard.  *See Amick

v. BM & KM, Inc.*, 275 F. Supp. 2d 1378, 1382 (N.D. Ga. 2003).  When both criteria are

met, the plaintiff has fulfilled the duty and breach elements of a negligence claim.  *Id.*

      Here, Count IX of Plaintiff's Master Complaint (adopted by Doris Jones) alleges

that Bard was negligent per se and based upon violations of several sections of the Food

Drug and Cosmetic Act, 21 U.S.C. §§ 321, 331 and 352, and various attendant

regulations, specifically 21 C.F.R. §§ 1.21, 801, 803, 807 and 820.

      Bard does not dispute Plaintiff's allegations that Doris Jones falls within the class

of persons these laws were intended to protect or that the harm Doris suffered from her

1   Bard IVC Filter was the type of harm the statute the state laws were intended to guard

2   against.  Mot. at 10-11.  Rather, Bard's sole challenge to Plaintiff's negligence per se

3   count is Bard's suggestion the claim is preempted.  Mot. at 11.  There are two flaws in

4   Bard's argument.  First, Plaintiffs' claims are not preempted.  *See* Plaintiffs' Response in

5   Opposition to Defendants' Motion for Summary Judgment Regarding Preemption

6   ("Preemption Opposition") [Doc. 7369].

7        Second, Bard's attack relies exclusively on *Leonard v. Medtronic Inc.*, 2011 WL

8   3652311 (N.D. Ga. 2011).  *Leonard* stated that "[a] private litigant cannot bring a state-

9   law claim against a defendant when the state-law claim is in substance (even if not in

10  form) a claim for violating the FDCA—that is, when the state claim would not exist if the

11  FDCA did not exist[.]"  *Id.* at *7 (quoting *Riley v. Cordis Corp.*, 625 F. Supp. 2d 769, 777

12  (D. Minn. 2009)).  But, the district court's holding was predicated upon the finding that

13  the *Leonard* claims were preempted by virtue of the fact that the subject medical device at

14  issue in that case had undergone the rigorous premarket approval ("PMA") process.  *Id.* at

15  *8 (citing cases for proposition that plaintiffs cannot escape preemption by reference to

16  FDCA provisions since there is no private right of action under FDCA).  Thus, the

17  *Leonard* plaintiffs could not resurrect otherwise preempted claims simply by calling them

18  state-law negligence-based claims.  *Leonard*, however, has no application to Plaintiff's

19  claims here since Plaintiff's claims are based on devices that did not undergo PMA review

20  and, therefore, are not preempted.  *See generally* Preemption Opposition.

21       To the extent Bard suggests that *Leonard* established a broad rule that where a

22  statute, regulation, or other type of law does not create a private right of action it cannot

23  support a claim for negligence per se, it is wrong.  Georgia common law and its statute

24  expressly recognize that laws that do not create a private cause of action may nonetheless

25  support a claim for damages.  *See* Ga. Code Ann. § 51-1-6; *Amick*, 275 F. Supp. 2d at

26  1382.  Such a sweeping rule would vitiate Georgia's common law and directly conflict

27  with the language of Georgia Code § 51-1-6.  In the overwhelming majority of cases in

28  which negligence per se applies, the subject statutes do not create private cause of action.

1   And, Section 51-1-6 expressly permits such claims.  It is not, and cannot be, the rule that a

2   statute must create a private cause of action in order to support a claim for negligence per

3   se.  *See, e.g., Amick*, 275 F. Supp. 2d at 1382-83 (noting that statutory obligations

4   applicable to hotels and innkeepers could serve as basis for negligence per se claims

5   brought by blind person for damages arising from conduct alleged to be in violation of

6   these statutory duties).

7         D.    <u>There is Sufficient Evidence for Punitive Damages to Go to the Jury</u>

8       Bard lastly contends that the Court should grant summary judgment on Plaintiffs'

9   punitive damages claim, claiming Plaintiffs have not established by clear-and-convincing

10  evidence that Bard's conduct warrants an award of punitive damages under Georgia law,

11  and because Bard complied with federal regulations with respect to the Eclipse filter's

12  510(k) clearance submission and its labeling.  Both arguments are wrong.

13        1.    <u>A jury could readily conclude that Bard's conduct warrants punitive</u>

14  <u>damages.</u>

15      In Georgia, punitive damages are available in tort actions "in which it is proven by

16  clear and convincing evidence that the defendant's actions showed willful misconduct,

17  malice, fraud, wantonness, oppression, or that entire want of care which would raise the

18  presumption of conscious indifference to consequences."  O.C.G.A. 51-12-5.1(a).  Willful

19  or wanton behavior is not required; "an entire want of care and an indifference to

20  consequences" is enough to support a punitive damages claim.  *CSX Transp., Inc. v. West*,

21  523 S.E.2d 63, at 66 (Ga. App. 1999).

22      Bard's actions demonstrate an "entire want of care and an indifference to

23  consequences" warranting imposition of punitive damages.  Despite owning and selling an

24  IVC filter that had a low incidence of complications and had never been associated with a

25  patient death (the SNF), Bard recognized a financial opportunity to create a market for a

26  "retrievable" filter by "aggressive marketing even in the absence of solid clinical history

27  and in spite of documented negative clinical experiences."  *Id*. ¶ 20.  Thus, Bard

28  developed the "Recovery" filter.  *Id*. ¶¶ 6-8.

18

1    In its rush to get Recovery on the market, Bard cut significant corners.  First, it

2    never properly understood the environment of use for the IVC filters.  Its Vice President

3    of Research & Development admitted as much.  *Id.* ¶ 37.  And, internally, long before this

4    lawsuit Bard admitted as much: "After a year of commercialization, there are still many

5    questions that need to be answered."  *Id.* ¶ 33(b).  The Recovery failed internal tests and

6    performed worse than the SNF.  *Id.* ¶¶ 21, 34.  And, just a month before full market

7    release, its Special Design Review team raised serious questions and asked for "objective

8    evidence" to support the safety and efficacy of the Recovery, including that certain criteria

9    be supported and tests be done.  *Id.* ¶¶ 29.  But Bard never did any of those things before

10   releasing the Recovery to the market.  *Id.*

11   Bard also never did repeatable, long-term clinical trials regarding the safety of

12   efficacy of its devices.  And the one study it held raised serious concerns about the safety

13   and efficacy of its product.  Of the first 32 patients evaluated, there were two fractures in

14   one device, one migration, two tilts, one perforation, and 19 deployment problems.  *Id.* ¶

15   10.  As a result of the fractures, the Canadian Institutional Review Board suspended the

16   study.  *Id.* ¶ 11.  Bard promised the physician who ran the study, Dr. Murray Asch, that

17   would conduct additional safety studies before the filter was marketed.  *Id.* ¶ 13.  But it

18   never did.  And, contrary to Dr. Asch's testimony that his study should never have been

19   used as a basis for market clearance of the Recovery, Bard used it for just that.  *Id.* ¶ 12.

20   And, even before the Recovery went to full market release, Bard was already

21   receiving reports of adverse events from the field.  *Id.* ¶ 28.  Despite these events, never

22   identifying the root cause of the failures in the study (let alone an understanding of how

23   the anatomy of the IVC actually performed in patients), and not conducting studies

24   requested by Bard design review team members, Bard pushed ahead to get the Recovery

25   on the American market.  *Id.* ¶ 50.

26   It was successful.  Predicated on the claim that the Recovery was substantially

27   equivalent to the SNF in terms of safety and efficacy, Bard obtained clearance from the

28   FDA to market the Recovery filter through the 510(k) process as a permanent device on

November 2002, and for optional retrieval on July 25, 2003.  *Id.* ¶¶ 17, 18.  As detailed in Section II, *supra*, and in Section I(B)-(F) of Plaintiffs' OSOF, Bard quickly obtained additional information of what it already knew but did not tell the public—the Recovery and subsequent filters were not the substantial equivalent of the SNF.  Full market release of the Recovery was followed by significant migrations and fractures, including seven deaths the first year.  OSOF ¶¶ 28, 31, 41, 48.

Based on reporting and internal analysis, it was fully aware that the Recovery, G2, and G2X, the devices upon which the Eclipse is modeled without meaningful design changes, were dramatically inferior to Bard's SNF and most competitor devices in terms of migration, tilt, perforation, and fracture.  *Id.* ¶¶ 33-38, 40, 49, 57, 60, 62, 66, 78, 97,104.  In early 2004, it learned that its products' design did not account for how the IVC actually performed and that its devices were causing injury and death at alarming rates.  *Id.* ¶¶ 29, 41, 53.  In the face of mounting reports of injury and death, and increasing physician and patient complaints, instead of taking its product off the market or warning the medical community of the dangers of its retrievable line of IVC filters, Bard actively sought to keep the medical community in the dark and protect its products' reputation.  It hired outside spin doctors to help Bard develop a Crisis Communication Plan to control messaging to physicians and media (e.g., "downplay[ing]" "comparison with other filters [because it was] problematic in many ways").  *Id.* ¶ 45.  It misled its own internal employees, *id.* ¶ 52, and sales representatives concerning dangers and failure rates.  *Id.* ¶¶ 107, 131-49.

And, rather than pull its devices off the market, Bard engaged in a campaign of offering newer but equally defective designs to maintain its position in the market.  In 2005, after the Recovery's mounting number of fractures, migrations, and deaths, Bard redesigned the filter to the G2 but never adequately tested the device to determine whether it actually fixed the problems.  Indeed, it actively avoided certain tests for fracture resistance because it knew the results "would still fall outside of the acceptable range" and its engineers "didn't think the answer would support our design change as a viable

option." *Id.* ¶ 76.  Nonetheless, Bard pressed forward.  Even when its internal analysis and the EVEREST study demonstrated significant complications with the G2 (even greater than the Recovery for several of them), *id.* ¶¶ 84, 90-93, and that the caudal migrations (which can cause perforation and fracture) presented an "unacceptable risk" of harm, *id.* ¶ 87, Bard continued its marketing and sale of the product.  Indeed, even when, in 2008, it identified significant design changes to the G2 that were essential to the safety of the device, *id.* ¶ 94, it did not notify doctors or remove the product from the market.  It kept selling.  And, as the bad studies, bad articles, and bad publicity on the G2 and G2X mounted, Bard created the Eclipse.

The Eclipse "was the same as the G2X in every way but one" but Bard changed the name to "break with the baggage associated with previous versions." *Id*. ¶ 102.  The one change was to electropolish the device, but that change was solely to be "consistent with emerging industry standards" and did not improve the device's safety performance. *Id.* ¶¶ 102, 108.  This change was really just a re-branding. *Id.* ¶ 105.  Nonetheless, Bard promoted the Eclipse to its sales personnel as more resistant to fracture and as having enhancements to a number of complications seen in prior iterations, in which doctors were interested. *Id.* ¶ 107.  During that time, Bard was actively engaged in the development of its complete re-design. *Id.* ¶ 106.  And Bard did not employ known safety features in the Eclipse such as caudal anchors (to reduce migration) or penetration limiters, despite the fact that both designs were available and known to improve filter performance. *Id*. ¶¶ 23, 86.  As a result, the Eclipse suffered from the same design defects and produced the same suite of filter-related injuries as its predecessors. *Id*. ¶¶ 101-04.  Thus, rather than make substantive improvements to the device to improve patient safety, Bard put a new name on it and continued to sell in order to maintain market share and associated profits.

Thus, despite the fact that Bard knew that its retrievable IVC filters:  (1) had never been adequately tested clinically for safety and efficacy; (2) were vastly less safe and efficacious as the SNF; (2) were failing at a rate substantially higher than its competitors; and (3) were injuring and killing patients, Bard never: (a) identified the root cause of its

filters' many failures; (b) provided the medical community or regulators with adequate, let alone complete, disclosure of the damning information described above and in the OSOF; (c) recalled its filters (instead allowing prior devices to simply run out); (d) suspended sales of its retrievable IVC filters; or (e) implemented known design improvements to address alarming rates of filter migration and perforation.  Succinctly, Bard's profit-driven acts and conscious omissions demonstrate that "entire want of care which would raise the presumption of conscious indifference to consequences."

> 2. <u>Plaintiffs' dispute that Bard complied with federal law, but even if it did, compliance with federal law would not insulate Bard from punitive damages here.</u>

Bard's claim that its alleged compliance with federal regulations insulates it from punitive damages here is wrong.  Where a manufacturer "engaged in a deliberate course of conduct which knowingly endangered those using the product," punitive damages may lie despite the manufacturer's compliance with applicable federal regulations. *Uniroyal Goodrich Tire Co. v. Ford,* 461 S.E.2d 877, 884 (1995), *rev'd in part on other grounds by Ford v. Uniroyal Goodrich Tire Co.,* 267 Ga. 226, 476 S.E.2d 565 (1996).

For example, a punitive damages award against General Motors was upheld despite its compliance with safety standards because there was evidence that it had rejected safer designs "because of economic considerations."  *General Motors Corp. v. Moseley,* 447 S.E.2d 302 (Ga. App. 1994), *abrogated on other grounds by Webster v. Boyett,* 496 S.E.2d 459 (Ga. 1998).  Likewise, a tire manufacturer's motion for summary judgment on a punitive damages claim was denied because, even though it complied with the relevant federal safety standards, there was evidence it knew of separation defects with its tires' treads, had "refused to implement simple, relatively inexpensive solutions" because of profit margin concerns, and other tire manufacturers had adopted the safer designs. *Mascarenas v. Cooper Tire & Rubber Co.,* 643 F. Supp. 2d 1363, 1374 (S.D. Ga. 2009).

Tellingly, Judge Schoob, after evaluating a less developed factual record than that set forth in Plaintiffs' OSOF, rejected precisely the same arguments Bard asserts here:

Defendants argue that punitive damages are not warranted because there is no evidence they acted with any malice, fraud, or oppression or deliberately to cause damage or interfere with plaintiffs' rights, and because they complied with all applicable FDA regulations.  Compliance with federal regulations, however, is not sufficient to automatically preclude an award of punitive damages.  *See Cisson*, 2013 WL 5700513, at *11–*12. Moreover, plaintiffs rely on the "conscious indifference" prong of the statute, which defendants' argument does not directly address. . . .  Under the "conscious indifference" prong, "[n]umerous Georgia cases have held that punitive damages are available where a manufacturer knows that its product is potentially dangerous and chooses to do *nothing* to make it safer or to warn consumers."  *Id.* at *13 (citations omitted) (emphasis in original).  As discussed above, when viewed in the light most favorable to plaintiffs, there is sufficient evidence in the record to permit a reasonable fact finder to conclude that defendants knew the G2 Filter was failing at a significantly higher rate than other IVC filters but did nothing to correct the problem or to warn doctors or patients of the increased risk.  Therefore, viewing the evidence most favorably to plaintiffs, a reasonable jury could find that punitive damages are warranted because defendants' conduct exhibited an entire want of care raising the presumption of conscious indifference to the consequences.

*Cason*, 2015 WL 9913809, at *6.

### a.    Bard placed profit over patient safety.

There is clear and convincing evidence from which a jury can conclude that Bard (like General Motors in *Moseley* and Cooper Tire in *Mascarenas*) acted out of a motive for profit over patient safety.  Its plan was to sell retrievable filters using "aggressive marketing even in the absence of solid clinical history and in spite of documented negative clinical experiences."  Indeed, contrary to promises to Dr. Asch—after his trial had multiple device failures, including a fracture—Bard never conducted safety and efficacy studies and took the Recovery to market without evidence it was actually safe.  And, when patient deaths and filter failures mounted, instead of notifying doctors, Bard hired spin doctors to control the message and continued to sell—Beta testing its filters on unwitting human patients.  Rather than recalling its filters or stopping sales, Bard kept its products on the market and just changed names—making "design changes" that were neither proven nor even necessarily aimed to correct the significant problems.

Doris's Eclipse was marketed at a time when Bard understood that its venture into the retrievable filter space has been a public health disaster and that Bard needed to completely redesign its filter.  Knowing the G2 and G2X had significant design problems

23

resulting in caudal migration, tilt, and fracture, Bard created the Eclipse as nothing more than a rebranding—using the device as a market saver it was actively engaged in development of its Denali filter to address its dangerous and flawed retrievable filters.

b.   <u>Bard did not comply with applicable federal regulations.</u>

Moreover, there is significant evidence controverting Bard's pro forma contention that it complied with federal regulations concerning its 510(k) submission and device labeling.  *See* OSOF ¶¶ 14, 88, 186-190.

Bard's submissions for the retrievable filters all required that they be substantially equivalent to their predicate devices.  21 C.F.R. § 807.87(f).  All the filters tie back to the SNF as their predicate device (either directly or through their predicate device).  And, the evidence demonstrates conclusively that the retrievable IVC filters were not the substantial equivalent of the SNF.  OSOF ¶ 33-38, 40, 49, 57, 60, 62, 65, 66, 78, 97,104.

Bard also had an obligation to provide the FDA with honest and complete information in its 510(k) submissions and labeling.  *Id.* ¶¶ 70, 75; 21 CFR § 807.87(k).  The evidence described above establishes that Bard did not submit substantial adverse information with respect to its IVC filters or to alert the FDA that its retrievable filters were not the substantial equivalent of their predicate device, making Bard's 510(k) submission both false and incomplete.

**IV.   Conclusion**

For the reasons discussed above, this Court should deny Bard's Motion, except as to Count XIV (Fair Business Practices Act), which Plaintiffs withdraw.

RESPECTFULLY SUBMITTED this 2nd day of October 2017.

GALLAGHER & KENNEDY, P.A.

By:___*/s/ Paul L. Stoller*_____
     Mark S. O'Connor
     Paul L. Stoller
     2575 East Camelback Road
     Phoenix, Arizona  85016-9225

*Counsel for Plaintiffs Doris and Alfred Jones*

1

2

**CERTIFICATE OF SERVICE**

3

I hereby certify that on this 2nd day of October 2017, I electronically transmitted

4

the attached document to the Clerk's Office using the CM/ECF System for filing and

5

transmittal of a Notice of Electronic Filing.

6

7

*/s/ Deborah Yanazzo*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28