Ramon Rossi Lopez - rlopez@lopezmchugh.com
(California Bar Number 86361; admitted *pro hac vice*)
Lopez McHugh LLP
100 Bayview Circle, Suite 5600
Newport Beach, California 92660
949-812-5771

Mark S. O'Connor (011029) – mark.oconnor@gknet.com
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
602-530-8000

*Co-Lead/Liaison Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC |
| CAROL KRUSE, an individual, | Case No. 2:15-cv-01634-DGC |
| Plaintiff, | **PLAINTIFF CAROL KRUSE'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF CAROL KRUSE'S CLAIMS** |
| v. | |
| C.R. BARD, INC., a New Jersey corporation and BARD PERIPHERAL VASCULAR, an Arizona corporation, | |
| Defendants. | |

1    **I.      Introduction and Procedural Background.**

2            Plaintiff Carol Kruse currently brings the following claims against Defendants

3    arising out of allegations that her Bard G2 inferior vena cava (IVC) filter has tilted,

4    migrated, perforated the IVC, fractured, and is unable to be retrieved:

| | |
|---|---|
| Count II: | Strict Products Liability – Information Defect |
| Count III: | Strict Products Liability – Design Defect |
| Count IV: | Negligence – Design |
| Count VI: | Negligence – Failure to Recall/Retrofit |
| Count VII: | Negligence – Failure to Warn |
| Count VIII: | Negligent Misrepresentation |
| Count IX: | Negligence Per se |
| Count XII: | Fraudulent Misrepresentation |
| Count XIII: | Fraudulent Concealment |
| Count XIV: | Violations of Applicable State Law Prohibiting Consumer Fraud and Unfair Deceptive Trade Practices |
| Claim for: | Punitive Damages |

*See* Master Compl. Dam. Individual Claims, Dkt. No. 364 [hereinafter Master Compl.].[1]

        Defendants have moved for summary judgment only as to "Counts II, VI, VII,

VIII, IX, XII, XIII, XIV" and the "claim for punitive damages."  Defs.' MSJ at 1.  Counts

III and IV are not subject to Defendants' motion, and Plaintiff has not agreed to abandon

those two counts.  Concerning the counts that are subject to Defendants' motion,

numerous material facts remain in genuine dispute, and even where facts are undisputed,

Defendants are not entitled to judgment as a matter of law.  Defendants' motion should

therefore be denied.

**II.     Summary Judgement Standard.**

        A motion for summary judgment is appropriate where the court is satisfied "that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under Rule 56(c), where a "genuine

---

[1] This Master Complaint is deemed pled in Ms. Kruse's previously filed complaint.  2d Am. Case Mgmt. Order No. 4, at 1, Dkt. No. 1485.  Ms. Kruse's complaint, previously filed in the District of Nebraska, contains no claims that are not also pled in the Master Complaint.  *See* Compl., *Kruse v. Bard, Inc.* (D. Neb. Apr. 6, 2015) (No. 8:15-cv-00108-JMG-CRZ), Dkt. No. 1 [hereinafter Original Compl.].

The parties have met and conferred to discuss other claims pled in the Master Complaint, and Plaintiff has agreed to not pursue Counts I, V, X, XI, XV, XVI, or XVII in this case.  *See* Defs.' Mot. Mem. Supp. Mot. Summ. J. Pl. Carol Kruse's Claims at 1, Dkt. Nos. 7341 (redacted), 7348 (sealed) [hereinafter Defs.' MSJ].

1  issue" of "material fact" exists, summary judgment is not proper.  Material facts are those
2  facts which, under the governing substantive law, "might affect the outcome of the suit."
3  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute over such material
4  facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor
5  of the nonmoving party.  *Id*.  To support a motion for summary judgment, "the moving
6  party has the burden of showing the absence of a genuine issue as to any material fact, and
7  for these purposes the material it lodged must be viewed in the light most favorable to the
8  opposing party." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970).  In determining
9  whether the movant has satisfied his burden of persuasion on a summary judgment
10 motion, the "evidence of the non-movant is to be believed, and all justifiable inferences
11 are drawn in his favor." *Anderson*, 477 U.S. at 255.  "If reasonable minds could differ as
12 to the import of the evidence," summary judgment may not be ordered.  *Id.* at 250–51.

13 **III.    Plaintiff's Statement of Facts.**

14      Plaintiff Carol Kruse received a Bard G2 filter on July 8, 2009, implanted by
15 Shanon Smith, M.D., ████████████████████████████████████████
16 ████████████████████ Pl. Carol Kruse's Controverting Statement Facts Supp. Mem.
17 Opp'n Defs.' Mot. Mem. Supp. Mot. Summ. J. Pl. Carol Kruse's Claims ¶¶ 1, 4
18 [hereinafter Pl.'s CSOF].  Dr. Smith attempted to retrieve Plaintiff's filter on April 7,
19 2011, but was unsuccessful because it had tilted, migrated, perforated the IVC, and
20 fractured.  *Id.* ¶¶ 27–28.

21      For further discussion of relevant facts controverted and uncontroverted by
22 Plaintiff and discussed herein, please see Plaintiff Carol Kruse's Controverting Statement
23 Facts and exhibits thereto.

24 **IV.    Argument.**

25      Plaintiff's claims are governed by Nebraska substantive law.[2]  This memorandum
26 will show:

27 ─────────────
28 [2] "[I]n the MDL context" where a case is transferred to an MDL court from another
federal jurisdiction, "'the transferee court applies the choice of law rules of the state in
which the transferor court sits.'"  *In re: Bard IVC Filters Prod. Liab. Litig.*, No. MDL 15-

2

A.      Plaintiff's claims are not barred by Nebraska's statute of limitations because they were timely filed within the period defined by the discovery rule.

B.      Plaintiff's claims are not barred by judicial estoppel because plaintiff did not derive an unfair advantage by not disclosing this case in her bankruptcy, and regardless, she has amended her bankruptcy petition to include it.

C       Plaintiff's failure-to-warn claims (Counts II & VII) do not fail as a matter of law because Defendants did not provide a legally sufficient warning to Plaintiff or her implanting physician, proximately causing her injuries.

D.      Plaintiff's failure-to-recall-and/or-retrofit claim (Count VI) does not fail as a matter of law because the duty to recall and/or retrofit is not inconsistent Nebraska Supreme Court precedent.

E.      Plaintiff's negligence per se claim (Count IX) does not fail as a matter of law because Nebraska law recognizes negligence per se in extraordinary circumstances such as this.

F.      Plaintiff's negligent misrepresentation, fraudulent misrepresentation, and fraudulent concealment claims (Counts VIII, XII & XIII) do not fail as a matter of law because Plaintiff and her implanting physician did rely on Defendants' representations and omissions.

G.      Plaintiff's consumer law claim (Count XIV) does not fail as a matter of law because Plaintiff seeks equitable relief under Nebraska's Uniform Deceptive Trade Practices Act and because Plaintiff has suffered property injury under Nebraska's Consumer Protection Act.

H.      Plaintiff's claim for punitive damages does not fail as a matter of law because punitive damages may be recovered to benefit Nebraska schools.

Defendants are also not entitled to summary judgment on Counts III and IV, which they explicitly omitted when enumerating the counts contested in their motion.  Defendant's motion for summary judgment should therefore be wholly denied.

---

2641 PHX DGC, 2016 WL 3970338, at *1 (D. Ariz. July 25, 2016) (quoting *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, No. 3:09-MD-02100-DRH, 2011 WL 1375011, at *4 (S.D. Ill. Apr. 12, 2011)).  This case was transferred to the District of Arizona from the District of Nebraska.  Therefore, Nebraska choice-of-law rules will apply to determine what substantive law should apply to this case.  Nebraska "has adopted the Restatement (Second) of Conflict of Laws § 188."  *Mertz v. Pharmacists Mut. Ins. Co.*, 625 N.W.2d 197, 202 (Neb. 2001).  Section 188 identifies the principles courts should apply when evaluating conflict-of-law questions "[i]n the absence of an effective choice of law by the parties."  § 188(2).  The parties have agreed that Nebraska state law applies to Plaintiff's claims.  *See* Defs.' MSJ 17 n.7.  Therefore, the Court need not engage in a conflict-of-law analysis.

3

## A.      Plaintiff's Claims Are Not Barred by the Statute of Limitations.

Defendants first argue that Plaintiff's claims are barred by Nebraska's four-year statute of limitations.  Defendants' argument fails because the facts show that Plaintiff did not actually know, nor did she have reason to know, of her injuries until April 7, 2011—fewer than four years before she commenced this action on April 6, 2015.  Furthermore, granting summary judgment on this case-specific limitations issue would contravene the purpose of this bellwether selection.

### 1.      Nebraska Applies a Four-Year Statute of Limitations and the Discovery Rule.

Nebraska applies a four-year statute of limitations to products liability actions such as this one.  Neb. Rev. Stat. Ann. § 25-224.  The limitations period "begins to run on the date on which the party holding the cause of action discovers, or in the exercise of reasonable diligence should have discovered, the existence of the injury or damage." *Thomas v. Countryside of Hastings, Inc.*, 524 N.W.2d 311, 313 (Neb. 1994) (quotation marks omitted).  Where facts are disputed as to when a plaintiff did discover or should have discovered an actionable injury, that dispute should be left to the jury—not adjudicated on summary judgment.  *See, e.g.*, *Vacura v. Plott*, 666 F.2d 1200, 1204 (8th Cir. 1981) ("The dispute of fact concerning whether the [plaintiff] discovered or, in the exercise of reasonable care, should have discovered the negligence of defendant, should have been left for the jury to decide.").

### 2.      Plaintiff Neither Knew nor Should Have Known of her Injuries Until the Failed Removal Attempt.

Plaintiff filed this case on April 6, 2015.  *See* Original Compl.  Defendants argue that "Plaintiff subjectively knew about her alleged Filter injury at least as early as March 14, 2011"—the date of a preoperative appointment before Plaintiff's unsuccessful filter retrieval attempt, which was more than four years before April 6, 2015.  Defs.' MSJ at 5. Defendants point to alleged facts concerning Plaintiff's ███████ communications made by Plaintiff relating to a television commercial, and Plaintiff's decision to have her filter removed, which Defendants say "undisputedly demonstrate Plaintiff's knowledge of

4

her injury" before April 7, 2011—the date of her unsuccessful retrieval attempt. *Id.* at 6.
Plaintiff, however, disputes that any of these alleged facts demonstrate that Plaintiff knew
of, or even had reason to know of, her injuries on any date before April 7, 2011.

                 **a.** ████████████████ **Prior to the Failed Removal Attempt.**

        Defendants argue that Plaintiff's ██████████ prior to April 7, 2011
demonstrates that the limitations period has run.  Defs.' MSJ at 6–7.  First, Defendants
contend that "███████████████████████████████████████████████████████
██████████████████"  *Id.* at 6.  However, that fact alone does not demonstrate that Plaintiff
knew, suspected, or should have suspected that her filter was responsible for that ██████
*See* Pl.'s CSOF Ex. 3, Kruse Dep. Tr., at 195:2–10.

        Second, Defendants contend that "███████████████████████████████
████████████████████████████████████████████."  Defs.' MSJ at
6–7.  However, Plaintiff contests that those discussions evince her understanding that her
filter had caused the injuries complained of in this case.  Prior to the April 7, 2011
removal attempt, ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████.  Pl.'s CSOF ¶ 7.  Plaintiff did not know, or even suspect, that her
IVC filter had tilted, migrated, perforated her IVC, or fractured until after the failed
removal attempt.  *Id.* ¶¶ 15–16.

        Third, Defendants contend that "Plaintiff's own medical records state that her filter
'████████████████████████████.'"  Defs.' MSJ at 7 (quoting Defs.' Ex.
C, at KRUSEC_MLMH_MDR00055, Dkt. No. 7350-2 (sealed)).  The medical record to
which Defendants refer is ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████.
*See* Defs.' Ex. C, at KRUSEC_MLMH_MDR00055.  ████████████████████████

1   ████████ Plaintiff thought the filter was no longer needed and because April 2011 was a

2   convenient time for her to have the removal procedure—not because she was planning to

3   have her IVC filter removed because it was ██████████. Pl.'s CSOF ¶ 14.  In fact,

4   Plaintiff explicitly testified that she neither knew nor had reason to know that her ███ was

5   filter-related in March 2011.  *Id.*  Furthermore, although Plaintiff did have a ██████

6   ████████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████████

8   ████████████████████. *Id.* ¶ 14.

9      Finally, ████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████

11  ████. *Id.* ¶¶ 14–15.  Therefore, any ████████████████ prior to the failed retrieval attempt

12  did not cause Plaintiff to know, suspect, or have any reason to suspect that her IVC filter

13  had tilted, migrated, perforated her IVC, or fractured.  *Id.* ¶¶ 14–16.

14          **b.      Communications Prior to the Failed Removal Attempt.**

15          Defendants next argue that Plaintiff's communications following a television

16  commercial seen prior to April 7, 2011 demonstrate that the limitations period has run.

17  Defs.' MSJ at 6.  First, Defendants contend that "Plaintiff called an attorney about her

18  potential IVC filter lawsuit after seeing a TV advertisement soliciting potential plaintiffs."

19  *Id.*  Sometime in 2009 or 2010, Plaintiff did see a television commercial about people who

20  had been implanted with IVC filters, which included a telephone number to call for more

21  information.  Pl.'s CSOF ¶ 8–9.  However, Plaintiff did *not* testify that the commercial

22  was "soliciting potential plaintiffs" as defendants suggest.  *See id.*  Plaintiff did call the

23  phone number on the advertisement, but *not* to discuss her "potential IVC filter lawsuit"

24  as defendants suggest; Plaintiff called simply because she knew she had an IVC filter, and

25  because this commercial encouraged people who had an IVC filter to call for more

26  information.  *Id.* ¶ 10.  That phone call therefore does not demonstrate that Plaintiff knew

27  or should have known that her filter had caused her any injury whatsoever.

28

Second, Defendants contend that "Plaintiff called her daughter to discuss her [f]ilter." Defs.' MSJ at 6. Plaintiff disputes that this fact is even material. Defendants do *not* demonstrate that Ms. Kruse discussed any suspected injuries with her daughter during that call. *See* Pl.'s CSOF ¶ 12. Ms. Kruse is a private person who kept much to herself during what were brief, infrequent phone calls with her daughter concerning her health conditions. *Id.* In fact, this particular conversation was limited to a brief mention that Ms. Kruse had had called a number on advertisement. *Id.* Plaintiff's knowledge of her injuries prior to April 7, 2011 cannot be inferred from that conversation.

### c.       Decision to Have the Filter Removed.

Finally, Defendants argue that the fact that Plaintiff decided, prior to April 7, 2011, to remove her filter demonstrates that the limitations period has run. Defs.' MSJ at 6–7. That decision, however, does not imply that Plaintiff knew or had reason to know that her filter was causing her any injury. On the contrary, Plaintiff decided to have her filter removed simply because she thought the filter was no longer needed and because April 2011 was a convenient time for her to have the removal procedure. Pl.'s CSOF ¶¶ 7, 14.

Plaintiff's ▓▓▓▓▓▓▓ prior to the failed removal attempt, communications prior to the failed removal attempt, and decision to have her filer removed simply do not support the inference that Plaintiff either knew or should have known before April 7, 2011 that her filter had tilted, migrated, perforated her IVC, or fractured. The limitations period therefore began to run on April 7, 2011, and Plaintiff timely filed her case within four years of that date. At the very least, because there is a dispute of material fact as to when Plaintiff knew or should have known of her injuries, Defendants' motion for summary judgment should be denied as to limitations.

### 3.       Summary Judgment on Case-Specific Limitations Would Contravene the Purpose of This Bellwether Selection.

Finally, entry of summary judgment on a case-specific statute-of-limitations issue would run contrary to the purpose of this bellwether selection. The purpose of bellwether test cases is to be "representative of the range of cases" in an MDL:

> Test cases should produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis' and what range of values the cases may have if resolution is attempted on a group basis.

Manual for Complex Litigation (Fourth) § 22.315 (2004); *see, e.g.*, *In re: Tylenol (Acetaminophen) Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2436, 2016 WL 4039267, at *1 n.1 (E.D. Pa. July 27, 2016) ("A 'bellwether' case is a test case. 'Bellwether' trials should produce representative verdicts and settlements."); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, No. 3:09-MD-02100-DRH, 2010 WL 4024778, at *2 (S.D. Ill. Oct. 13, 2010) ("Little credibility will be attached to this [bellwether] process, and it will be a waste of everyone's time and resources, if cases are selected which do not accurately reflect the run-of-the-mill case.").

> [B]ellwether trials are most beneficial if they: (a) produce decisions on key issues that can then be applied to other cases in the proceeding (e.g., Daubert issues, *cross-cutting summary-judgment arguments*, the admissibility of key evidence); and (b) help the parties assess the strengths and weaknesses of various types of claims pending in the MDL proceeding.

Duke L. Sch. Ctr. for Judicial Studies, *MDL Standards and Best Practices* 19 (2014) (emphasis added). "If a case is picked that is *dismissed on summary judgment*" for reasons other than cross-cutting theories applicable throughout an MDL, that case would be "an outlier," rather than a properly representative case. *In re Yasmin*, 2010 WL 4024778, at *2 (emphasis added).

Here, Defendants seek summary judgment not on a cross-cutting legal theory applicable to multiple cases in this MDL, but rather on a narrow, case-specific limitations issue that would effectively render this case inappropriate as a bellwether selection. The fact that Defendants themselves recommended this case for bellwether selection makes their request for summary judgment on this issue all the more improper. *See* Defs.' Submission Regarding Selection Cases Disc. Group 1, at 5 & Attach. A, Dkt. No. 4341-1 (sealed). In the very document in which Defendants recommended this case for bellwether selection, Defendants extolled the importance of selecting representative cases: "

8

1  ███████████████████████████████████████████████

2  ███████████████████████████████████.”  *Id.* at 2.  Plaintiff

3  agrees; summary judgment should be denied as to limitations.

### B.    Judicial Estoppel Should Not Apply to Plaintiff's Claims.

Defendants next argue that Plaintiff's claims should be barred by the doctrine of judicial estoppel because Plaintiff did not disclose this case as an asset in a prior Chapter 7 bankruptcy petition.  Defendants' argument should fail because Plaintiff derived no unfair advantage in her bankruptcy proceeding by inadvertently neglecting to disclose her claim, because Plaintiff has nonetheless reopened and amended her bankruptcy to identify this case as an unliquidated asset, and because summary judgment on a case-specific estoppel issue would contravene the purpose of this bellwether selection.

### 1.    Estoppel Can Apply to Claims not Disclosed in Bankruptcy.

"Judicial estoppel is an equitable doctrine that . . . prohibits a party who takes one position in a legal proceeding, 'and succeeds in maintaining that position,' from then assuming a contrary position 'simply because his interests have changed.'" *Combs v. The Cordish Companies, Inc.*, 862 F.3d 671, 678 (8th Cir. 2017) (citation omitted) (quoting *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006)).

> In deciding whether judicial estoppel is appropriate, courts consider three non-exhaustive factors: "(1) whether the party's later position is 'clearly inconsistent' with its prior position; (2) whether a court was persuaded to accept a prior position 'so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled'; and (3) whether the party claiming inconsistent positions 'would derive an unfair advantage or impose an unfair detriment on the opposing party if not stopped.'"

*Id.* (quoting *Smith v. AS Am., Inc.*, 829 F.3d 616, 624 (8th Cir. 2016) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001))).

Plaintiff filed for Chapter 7 bankruptcy on February 5, 2013, and received a discharge on June 3, 2013, but Plaintiff did not initially identify this case as an asset of her estate.  Pl.'s CSOF ¶¶ 30–32, 38.  In a Chapter 7 bankruptcy, a debtor's estate includes accrued "causes of action existing at the time the bankruptcy case was filed."  *In re Key*, 255 B.R. 217, 219 (Bankr. D. Neb. 2000).  "A party who has filed for bankruptcy may be

1   judicially estopped from pursuing a claim not disclosed in his or her bankruptcy filings"

2   when (1) omission of an accrued claim is a representation that the claim does not exist,

3   which is inconsistent with later prosecution of the claim; (2) discharge of a bankruptcy

4   petition constitutes judicial acceptance of the position that the claim does not exist; and

5   (3) an unfair advantage is gained because if the claim had been disclosed, the bankruptcy

6   trustee could have allocated proceeds from the claim to the debtor's creditors.  *Jones v.*

7   *Bob Evans Farms, Inc.*, 811 F.3d 1030, 1033–34 (8th Cir. 2016).

8        Defendants argue that because Plaintiff did not identify this case in her bankruptcy

9   proceeding, she should be judicially estopped from pursuing it now.  Defs.' MSJ at 7–10.

10  However, Defendants overlook that Ms. Kruse derived no unfair advantage by not

11  disclosing this case in her bankruptcy proceedings.  As shown below, the third *New*

12  *Hampshire* factor is therefore not met, making judicial estoppel inappropriate in this case.

**2.    Proceeds From This Claim Are Exempt.**

14       Nebraska bankruptcy law exempts from creditor claims all proceeds that are

15  received by a debtor as a result of a civil judgment or settlement to compensate the debtor

16  for personal injury.  Neb. Rev. Stat. Ann. § 25-1563.02(1).

> Distilled to its essence, the statute says, "all proceeds and benefits . . . paid
> either in a lump sum or . . . structured settlement providing periodic
> payments, . . . made as compensation for personal injuries or death, shall be
> exempt from . . . all claims of creditors[.]"

*In re Rhea*, 335 B.R. 428, 431 (Bankr. D. Neb. 2004) (quoting § 25-1563.02(1))

(alteration in original).  Section 25-1563.02(1) must be "liberally construed in favor of the

debtor."  *In re Rhea*, 335 B.R. at 430.  Therefore, in a personal-injury action, damages

construed as compensating personal injury include not only "pain and suffering," but also

"medical expenses or lost wages" and the like.  *Id.* at 431.  Accordingly, Nebraska courts

exempt proceeds that compensate a plaintiff for personal injury, but not proceeds that

compensate other injury such as property damage.  *See, e.g.*, *In re Wilson*, No. ADV.

A10-4035-TJM, 2010 WL 5341917, at *3 (Bankr. D. Neb. Dec. 21, 2010) ("[T]he trustee

objected on the grounds that the settlement is not for personal injuries or death, in its

10

1    entirety, but also includes property damage which is outside of the scope of the provisions

2    of § 25–1563.02.") (footnote and quotation marks omitted); *In re Key*, 255 B.R. at 221

3    ("[P]otential damages available in debtors' employment discrimination causes of action

4    include damages for personal injury and damages other than for personal injury.").

5           In this case, Ms. Kruse is seeking damages that can only be considered to

6    compensate personal injury.  Therefore, any proceeds from this case would be totally

7    exempt from distribution to her creditors.  Unlike in *Jones*, where a debtor gained an

8    unfair advantage by failing to identify his claim because "the trustee could have moved

9    the bankruptcy court to order him to make the proceeds from any potential settlement

10   available to his unsecured creditors," 811 F.3d at 1034, Ms. Kruse's creditors would have

11   gotten nothing even if this lawsuit had been listed as a bankruptcy asset.  The omission of

12   this lawsuit therefore resulted in no benefit to Ms. Kruse to justify judicial estoppel.

13                  **3.      Omission of This Claim Was Inadvertent.**

14          The Eighth Circuit also recognizes that "a district court should not judicially estop

15   a debtor whose prior inconsistent position was attributable to 'a good-faith mistake rather

16   than as part of a scheme to mislead the court'"; inadvertent nondisclosure does not justify

17   judicial estoppel.  *E.E.O.C. v. CRST Van Expedited, Inc.*, 679 F.3d 657, 680 (8th Cir.

18   2012) (quoting *Stallings*, 447 F.3d at 1049).  "'A debtor's failure to satisfy its statutory

19   disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge

20   of the undisclosed claims *or* has no motive for their concealment.'"  *Stallings*, 447 F.3d at

21   1048 (quoting *In re Coastal Plains, Inc.*, 179 F.3d 197, 210 (5th Cir. 1999)).  Ms. Kruse

22   lacked knowledge of the undisclosed claims *and* had no motive for their concealment.

23          Plaintiff filed for Chapter 7 bankruptcy on February 5, 2013, and received a

24   discharge on June 3, 2013.  Pl.'s CSOF ¶¶ 30, 38.  Although this claim had accrued on

25   April 7, 2011, Ms. Kruse did not actually know she had a valid claim for unliquidated

26   damages until well after her bankruptcy had already been discharged.  *Id.* ¶ 11.  Ms. Kruse

27   did not contact her current attorneys until late 2013.  *Id.*  She did not actually know that

28   she had a viable claim against Defendants until the conclusion of her attorneys'

investigation of her possible claims in early 2015. *Id.*[3] Moreover, Ms. Kruse had no motive to conceal her claim even if she had known about it. As discussed *supra* Part IV.B.2, any proceeds from Ms. Kruse's claim would have been exempt from creditors as compensation for Ms. Kruse's personal injuries. What motive could Ms. Kruse possibly have had to conceal from creditors a claim for damages that those creditors could not recover? Because Plaintiff did not actually know about this claim until well after her bankruptcy had been discharged, and because even if Plaintiff had known about this claim she had no motive to conceal it from her creditors, omission of this claim should be considered inadvertent, not justifying judicial estoppel.

### 4.    Plaintiff Has Amended Her Bankruptcy Petition.

Further, even though Plaintiff did not derive an unfair advantage by neglecting to disclose this claim in her bankruptcy, Plaintiff has nonetheless reopened and amended her bankruptcy petition to include this case as an asset. Pl.'s CSOF ¶ 39. Plaintiff thus seeks to give the trustee an opportunity to evaluate this case to absolutely ensure that Plaintiff receives no unfair advantage by prosecuting this case. Defendants criticize this approach as "'last minute candor'" that they suggest the Court should not countenance. Defs.' MSJ at 9 (quoting *Jones*, 811 F.3d at 1032). Plaintiff, however, humbly submits that the Court, before imposing the drastic remedy of summary judgment, should permit the bankruptcy trustee the opportunity to evaluate this claim.

The federal Bankruptcy Court in Nebraska has held:

> The Court can envision circumstances where the only recovery available under a particular cause of action would be compensation for personal injuries. In that limited situation, it would be known prior to judgment that the proceeds of the cause of action would be exempt property under § 25-1563.02 as compensation for personal injuries. In that limited circumstance, the Chapter 7 trustee should abandon the claim because its administration would be burdensome to the bankruptcy estate and the proceeds of the cause of action would be exempt.

---

[3] Defendants contend that Ms. Kruse "admits that she first attributed her injuries to her [f]ilter on" April 7, 2011. Defs.' MSJ at 8. That attribution, however, is different from knowledge of this lawsuit as an asset. Defendants confuse the discovery rule for the purposes of claim accrual with actual knowledge of a lawsuit for the purposes bankruptcy asset identification. Even if Plaintiff attributed her injuries to her filter in 2011, she did not actually know that she had a viable claim that must be listed as an asset until, at the earliest, the completion of her attorneys' investigation in 2015. Pl.'s CSOF ¶ 11.

1   *In re Key*, 255 B.R. at 220.  The possibility—and in Plaintiff's estimation, probability—

2   that the trustee will not pursue this claim on behalf of creditors means that Ms. Kruse

3   would be free to prosecute her claim for exempt personal-injury damages; there would be

4   no reason to judicially estop Plaintiff from prosecuting this case.  Therefore, the Court

5   should not enter summary judgment on the basis of judicial estoppel before the trustee has

6   had an opportunity to act on the amended petition.

7              **5.      Summary Judgment on Case-Specific Estoppel Would
                         Contravene the Purpose of This Bellwether Selection.**

8

9              Finally, entry of summary judgment on a case-specific estoppel issue would run

10  contrary to the purpose of this bellwether selection.  As discussed *supra* Part IV.A.3, the

11  purpose of bellwether trials is to be representative of the range of cases in an MDL and to

12  inform all parties of the substantive strengths and weaknesses of their cases.  Summary

13  judgment on a narrow, case-specific estoppel issue would effectively render this case

14  inappropriate as a bellwether selection.  For this reason as well, summary judgment

15  should be denied as to estoppel.

16         **C.      The Learned Intermediary Doctrine Does Not Foreclose Plaintiff's
                     Failure-to-Warn Claims (Counts II & VII) as a Matter of Law.**

17             Nebraska applies the learned intermediary doctrine to failure-to-warn claims:

18             A prescription drug or medical device is not reasonably safe due to
               inadequate instructions or warnings if reasonable instructions or warnings
19             regarding foreseeable risks of harm are not provided to:

20                      (1) prescribing and other health-care providers who are in a position
                        to reduce the risks of harm in accordance with the instructions or
21                      warnings; or

22                      (2) the patient when the manufacturer knows or has reason to know
                        that health-care providers will not be in a position to reduce the risks
23                      of harm in accordance with the instructions or warnings.

24  *Freeman v. Hoffman-La Roche, Inc.*, 618 N.W.2d 827, 842 (Neb. 2000) (quoting

25  Restatement (Third) of Torts § 6(d)).

26             Defendants first argue that because Plaintiff's filter was not available to the general

27  public, warnings only needed to be provided to Dr. Smith, not Ms. Kruse.  Defs.' MSJ at

28  11.  However, Plaintiff contests that the filter was not for sale to Ms. Kruse; billing

                                                      13

1    records indicate that she bought it, and the G2 instructions for use (IFU) indicate that her

2    implanting physician was authorized to sell it.  Pl.'s CSOF ¶ 2.  Plaintiff thus disputes that

3    she was not herself owed a duty to be adequately warned of potential complications of her

4    filter by Defendants.  *See, e.g.*, *Freeman*, 618 N.W.2d at 842 (reversing dismissal of

5    failure-to-warn claim where the defendant allegedly failed to provide the plaintiff *herself*

6    with adequate warnings in the package insert for the prescription drug Accutane); *Jackson*

7    *v. Pfizer, Inc.*, 432 F. Supp. 2d 964, 967 (D. Neb. 2006) ("[A] prescription drug is not safe

8    if the warnings are not provided to health care providers *or in some cases the patient*.")

9    (emphasis added).[4]

10         Defendants second argue that they provided Dr. Smith, as the learned intermediary,

11   with legally adequate warnings contained in the G2 IFU.  Defs.' MSJ at 11–12.  On the

12   contrary, those warnings were legally insufficient.  "When prescribing health-care

13   providers are adequately informed of the relevant benefits and risks associated

14   with . . . medical devices, they can reach appropriate decisions regarding which drug or

15   device is best for specific patients."  Restatement (Third) of Torts § 6, cmt. d.  The G2

16   IFU does not meet that standard.  Although the G2 IFU applicable in July 2009 mentions

17   tilt, migration, fracture, perforation, and inability to retrieve, it does not contain specific

18   warnings of the risks of those complications, the severity or consequences of those risks,

19   or the rate of incidence of those complications as compared with other filters, despite

20   Defendants' knowledge that those risks were more severe in the G2.  Pl.'s CSOF ¶¶ 18–

21   19; Plaintiffs' Omnibus Statement of Facts ¶¶ 72, 74 ("OSOF").  Dr. Smith therefore

22   lacked the information necessary to reach an appropriate decision regarding which IVC

23   filter was best for Ms. Kruse.  Defendants are therefore not entitled to judgment as a

24   matter of law that they provided legally sufficient warnings in the IFU.[5]

25   ─────────────
     [4] Notably, Defendants do not argue that Ms. Kruse herself was adequately warned, or that

26   Plaintiff has not shown that she was not adequately warned.

     [5] In a footnote, Defendants attempt to bypass the page limits of their memorandum by

27   incorporating by reference an entire argument from a brief to a separate motion in a
     separate case (*Jones v. Bard*) concerning the lack of relative complication rates.  Defs.'

28   MSJ at 12 n.5.  That tactic violates the spirit, if not the letter, of the Court's order limiting
     the length of Defendants' brief, and Plaintiff regrets that she cannot fully address this

Defendants finally argue that even if they failed to adequately warn Dr. Smith, that failure did not proximately cause Plaintiff's injuries because Dr. Smith was independently aware of the risks of using a G2 filter and because Plaintiff cannot show that Dr. Smith would have used a different filter had he been adequately warned. Defs.' MSJ at 13. This argument is without merit. First, Dr. Smith was *not* independently aware of the actual risk of using a G2 filter. Although he was aware of the *existence* of risks of tilt, migration, perforation, and fracture, he was not aware of the severity or rate of incidence of those risks as compared with other filters. Pl.'s CSOF ¶ 20. Second, Dr. Smith may well have decided to use a different filter had he been adequately warned of the risks of the G2. He testified that if he had been presented with data showing that another filter was safer, "[y]ou would have to decide which filter . . . you would want to use . . . based on" that data. Pl.'s CSOF Ex. 7, Smith Dep. Tr., at 51:14–16. He further testified that had he been presented with adequate warnings, he "would have definitely looked at the risk and benefits if there was more information" and "[i]t's possible" that he would have used a different device. Pl.'s CSOF ¶ 22.[6] Plaintiff has therefore shown that if Defendants had adequately warned Dr. Smith of the actual risks of using a G2, he would have diligently considered that warning and may have used a different device as a result. Therefore, Defendants' failure to warn proximately caused Plaintiff's injuries, making summary judgment is inappropriate.

**D.**   **Plaintiff's Failure-to-Recall-and/or-Retrofit Claim (Count VI) Does Not Fail as a Matter of Law.**

---

argument separately here. Plaintiff encourages the Court to please refer to plaintiff Jones's opposition on this issue.

[6] After he was presented with documents containing additional risk information during his deposition, Dr. Smith did testify that he "wouldn't want to say how [the documents] would influence me without knowing what they say in detail"—which Defendants curiously interpret to mean that Dr. Smith would not have been influenced by that additional risk information *at all.* Defs.' MSJ at 13. On the contrary, Dr. Smith would have considered that risk information and may well have decided to use a different filter had Defendants communicated that risk information to him. That he was unable to immediately say, only seconds after seeing the information for the first time, that he definitely would have used a different product had he been presented with the information is not surprising, nor is it at all conclusive that Dr. Smith would *not* have elected to use a different product had he been presented with that information earlier.

15

1    Defendants next move for summary judgment on Count VI, alleging that Nebraska

2    courts do not recognize such a claim.  Defendants' argument fails because defendants

3    mischaracterize Plaintiff's claim as alleging breach of a post-sale duty to warn and

4    because it is not settled law that Nebraska courts would not recognize a claim for breach

5    of the duty to recall or retrofit.

6    Defendants alternatively mischaracterize Count VI as a "post-sale duty to *warn*

7    claim" and a "post-sale duty to *warn* or retrofit claim."  Defs.' MSJ at 2, 13–14 (emphasis

8    added).  In actuality, Plaintiff pleads Count VI as a claim that "Bard breached its duty to

9    *recall and/or retrofit* Bard IVC Filters."  Master Compl. ¶¶ 204–08 (emphasis added).

10   "[A] duty to recall is not generally incorporated in a duty to warn."  *Burke v. Deere & Co.*,

11   6 F.3d 497, 510 (8th Cir. 1993).

12   "'In determining the law of the State of Nebraska, [federal courts] are bound by the

13   decisions of the Nebraska Supreme Court.'"  *Anderson v. Nissan Motor Co.*, 139 F.3d

14   599, 601 (8th Cir. 1998) (quoting *Farr v. Farm Bureau Ins. Co. of Neb.*, 61 F.3d 677, 679

15   (8th Cir. 1995)).  "If the Nebraska Supreme Court has not addressed the issue" before the

16   federal court, the federal court "must determine what the [Nebraska Supreme Court]

17   would probably hold were it to decide the issue."  *Id.*  "The Nebraska Supreme Court has

18   not specifically addressed the issue of whether it would recognize . . . a duty to [recall

19   and/or] retrofit."  *Anderson v. Nissan Motor Co.*, 139 F.3d 599, 602 (8th Cir. 1998).

20   Therefore, this Court must look to "'relevant state precedent, analogous decisions,

21   considered dicta, scholarly works and any other reliable data'" to make its determination.

22   *Id.* (quoting *Farr*, 61 F.3d at 679).

23   Defendants rely heavily on *Anderson*, which concluded that Nebraska courts would

24   not recognize a duty to recall and/or retrofit.  *Id.*, *cited in* Defs.' MSJ at 13–14.  *Anderson*

25   examined the 1987 Nebraska Supreme Court case *Rahmig v. Mosley Mach. Co.*, which

26   addressed whether Nebraska law required a plaintiff alleging product defect to prove the

27   feasibility of an alternative safer product design.  *Anderson*, 139 F.3d at 602 (citing

28   *Rahmig v. Mosley Mach. Co.*, 412 N.W.2d 56, 82 (Neb. 1987)).  The *Rahmig* Court held

16

1    that evidence of a safer alternative design was not required, reasoning that requiring such

2    evidence "unnecessarily invites perilous and unfairly prejudicial evidence of postaccident

3    matters excludable under Neb. Evid. R. 407," which generally excludes evidence of

4    subsequent remedial measures to prove product defect. *Rahmig*, 412 N.W.2d at 82. The

5    *Anderson* Court thus inferred that "Nebraska favors limiting the state's products liability

6    law to actions or omissions which occur at the time of manufacture or sale." *Anderson*,

7    139 F.3d at 602. Plaintiff submits, however, that a post-sale duty to recall and/or retrofit

8    can comfortably coexist with the Nebraska Supreme Court's holding in *Rahmig*.

9         A duty to recall and/or retrofit arises when a manufacturer of a product becomes

10   aware of a significant safety problem with the product after it is on the market. *See, e.g.*,

11   *Kociemba v. G.D. Searle & Co.*, 707 F. Supp. 1517, 1528 (D. Minn. 1989) ("[I]f a

12   manufacturer does obtain sufficient credible information that a product already in use is

13   potentially dangerous, the manufacturer should test that product to determine the extent of

14   any danger, and then issue an appropriate warning or product recall."). Breach of such a

15   duty would not implicate evidentiary rules concerning subsequent remedial measures.

16   Plaintiff is not attempting to prove that the original design of her filter was defective by

17   way of the failure to later recall it; rather, she is independently claiming that once

18   Defendants became aware of safety problems with her filter, they should have taken

19   action to recall or make safe the filter before it became implanted in her body. Such a

20   duty would not "invite[] perilous and unfairly prejudicial evidence of postaccident

21   matters," because the "accident" complained of here is the very failure to recall. *Rahmig*,

22   412 N.W.2d at 82.

23        Furthermore, a duty to recall and/or retrofit arises only in "extraordinary

24   cases . . . in which the potential danger is severe and widespread." *Gregory v. Cincinnati*

25   *Inc.*, 538 N.W.2d 325, 334–35 (Mich. 1995). Plaintiff submits that such a duty will rarely

26   arise, but that it has in her case due to the extraordinarily dangerous and widespread

27   defects in Bard G2 filters. *See, e.g.*, OSOF ¶¶ 66–85, 87–94.

28

                                          17

1     The 1983 Nebraska Supreme Court case *Nat'l Crane Corp. v. Ohio Steel Tube Co.*

2  also lends credulity to the viability of a claim for breach of the duty to recall and/or

3  retrofit in Nebraska.  332 N.W.2d 39 (Neb. 1983).  In that case, the plaintiff sought

4  recovery of costs and expenses he incurred when he undertook a retrofit program to

5  replace defective boom cylinders manufactured by the defendant for use in the plaintiff's

6  cranes.  *Id.* at 41–42.  The Court ultimately held that the plaintiff's recovery was barred by

7  the economic loss doctrine, which prohibits tort recovery absent physical injury; the Court

8  did *not* hold that the manufacturer of the defective product was shielded from liability for

9  retrofitting costs on a broader theory that the manufacturer had no retrofitting liability

10  whatsoever.  *Id.* at 44.  The inference can be drawn that had the plaintiff suffered a

11  physical harm, the manufacturer could have been liable under a duty-to-recall-and/or-

12  retrofit theory.  *See id.* at 47 (Boslaugh, J., dissenting) (discussing "the policies of

13  consumer protection, risk allocation, and deterrence, upon which the *duty to recall* is

14  founded") (emphasis added).  Of course, Ms. Kruse suffered physical injuries that would

15  give rise to liability under such a theory.  *See* Pl.'s CSOF ¶ 28.

16     It remains an unsettled question of law whether a duty to recall and/or retrofit

17  exists in Nebraska.  Because such a duty can coexist with relevant Nebraska Supreme

18  Court precedent, the Court should avoid the drastic remedy of summary judgment on

19  Count VI.

20         **E.**    **Plaintiff's Negligence Per Se Claim (Count IX) Does Not Fail as a**
21               **Matter of Law.**

22     Defendants next contend that Plaintiff's negligence per se claim fails because

23  Nebraska does not recognize negligence per se premised on violation of statutes and/or

24  regulations.  Defendants' argument should fail because Defendants again mischaracterize

25  Plaintiff's claim and because Nebraska law recognizes negligence per se in extraordinary

26  circumstances.

27     Defendants incorrectly assert that "Plaintiff's negligence per se claim (Count IX) is

28  based *exclusively* on alleged violations of federal statutes and federal regulations."  Defs.'

18

1  MSJ at 14 (emphasis added).  Plaintiff does assert that violations of federal statutes and

2  regulations give rise to her negligence per se claim, Master Compl. ¶ 231, but she also

3  asserts that violation of Nebraska consumer protection law constitutes negligence per se,

4  *id.* ¶¶ 232–33.

5          In Nebraska, the ordinary rule is that violation of a statute or regulation does not

6  constitute negligence per se.  *In re Derailment Cases*, 416 F.3d 787, 795 (8th Cir. 2005)

7  ("[V]iolation of a regulation or statute is *generally* not recognized as negligence per se

8  under Nebraska law.") (emphasis added); *Goodenow v. State Dep't of Corr. Servs.*, 610

9  N.W.2d 19, 22 (Neb. 2000) ("[A] violation of a statute or regulation *ordinarily* is not

10 negligence per se . . . .") (emphasis added); *Maresh v. State*, 489 N.W.2d 298, 311 (Neb.

11 1992) ("*Ordinarily*, a violation of a statute or regulation is not negligence per se . . . .")

12 (emphasis added), *superseded on other grounds*, *Walton v. Patil*, 783 N.W.2d 438, 445

13 (Neb. 2010).  However, if the modifiers "ordinarily" or "generally" are to have any

14 meaning, then negligence per se must be recognized in Nebraska in *extraordinary* cases.

15         This is not a case of some minor infringement of a statute or regulation.

16 Defendants violated at least 12 federal laws and safety regulations, *see* Master Compl.

17 ¶ 231, as well as Nebraska consumer protection law, *see* discussion *infra* Part IV.G.

18 Defendants' callous disregard for this multitude of federal and state laws and regulations

19 designed to ensure product safety has caused (and continues to contribute to) a real

20 nationwide public health crisis.  A reasonable medical device manufacturer cannot

21 possibly have committed these numerous, significant violations and not been negligent.

22 Furthermore, imposing a negligence per se standard upon Defendants in this extraordinary

23 case comports with the policy justifications behind negligence per se liability.  *See*

24 Restatement (Second) of Torts § 14, cmt. c. (discussing the rationales behind negligence

25 per se liability, including that "it would be awkward for a court in a tort case to commend

26 as reasonable that behavior that the legislature has already condemned as unlawful").

27

28

1    Because Nebraska precedent allows for negligence per se in extraordinary cases,

2    and because this is such a case, Count IX does not fail as a matter of law.[7]

3    **F.    Plaintiff's Negligent Misrepresentation (Count VIII), Fraudulent
          Misrepresentation (Count XII), and Fraudulent Concealment Claims
4         (Count XIII) Do Not Fail as a Matter of Law.**

5    Defendants next argue that Plaintiff's claims alleging negligent misrepresentation,

6    fraudulent misrepresentation, and fraudulent concealment fail as a matter of law because

7    Plaintiff cannot establish that either she or her implanting physician relied on any

8    representations made by Defendants concerning the G2 filter.  Defendants' argument fails

9    because the facts show that Plaintiff and her implanting physician did so rely.

10                **1.    Reliance Is an Element Common to Counts VIII, XII, and XIII.**

11    Negligent misrepresentation requires a showing of "'justifiable reliance'" upon a

12    misrepresentation by the party to whom the misrepresentation is communicated.  *Knights*

13    *of Columbus Council 3152 v. KFS BD, Inc.*, 791 N.W.2d 317, 330 (Neb. 2010) (quoting

14    Restatement (Second) of Torts § 552(1)).  Fraudulent misrepresentation requires that the

15    party to whom a misrepresentation is communicated "rely on it."  *Id.* at 331.  Fraudulent

16    concealment requires that the party from whom a fact is concealed "reasonably rely[] on

17    the fact or facts as the [party] believed them to be as the result of the concealment."  *Id.* at

18    334.

19                **2.    Plaintiff's Implanting Physician Relied on Defendants'
                   Representations.**

20    Defendants first argue that "whether Plaintiff's implanting physician relied on an

21    alleged misrepresentation or omission should be irrelevant for purposes of Plaintiff's

22    misrepresentation and concealment claims."  Defs.' MSJ at 15.  However, Plaintiff

23    specifically pleads that Defendants, *inter alia*, "negligently and carelessly represented

24    to . . . Plaintiffs' treating physicians . . . that Bard IVC Filters were safe, fit, and effective

25

26    ───────────────
      [7] Even in the absence of a negligence per se claim—and as Defendants admit—
      Defendants' violations of federal and state laws and regulations constitute admissible
27    evidence to support Plaintiff's other remaining negligence claims (Counts IV, VI, VII &
      VIII).  Defs.' MSJ at 14 (quoting *Scheele v. Rains*, 874 N.W.2d 867, 872 (Neb. 2016)
28    ("[T]he violation of a regulation or statute . . . may be evidence of negligence to be
      considered with all the other evidence in the case.")).

for use," Master Compl. ¶ 219, "intentionally provided Plaintiffs' physicians . . . with false or inaccurate information," *id.* ¶ 246, and "concealed material facts from . . . Plaintiffs' healthcare providers," *id.* ¶ 261.  Plaintiff further pleads that Defendants made those misrepresentations with the intent that her physicians rely on them.  *Id.* ¶¶ 222, 255, 265.  It is difficult to understand, then, how the issue of whether Dr. Smith relied on Defendants' misrepresentations "should be irrelevant," as Defendants suggest, to Plaintiff's claims that he did so rely.

Defendants next argue that Dr. Smith did not, in fact, rely on any representations made by Defendants.  Defs.' MSJ at 15.  That is simply incorrect.  Dr. Smith testified that he relies on "multiple sources" including *but not limited to* training, experience, colleagues' experience, and medical literature.  Pl.'s CSOF ¶ 25.  In fact, when asked whether he relied on information in the Bard G2 IFU to be accurate and correct, Dr. Smith testified that such information must be correct.  *Id.* ¶ 26.[8]  Because Dr. Smith relied on statements made in the G2 IFU (and, by necessary implication, any omissions of material fact from the G2 IFU) when deciding to use the G2 filter, Plaintiff has demonstrated reliance by Dr. Smith and summary judgment is not justified.

### 3.    **Plaintiff Relied on Defendants' Representations**.

Defendants also argue that Plaintiff herself cannot demonstrate reliance on any representations made by Defendants because they were not communicated to her.  Defs.' MSJ at 15.  On the contrary, Ms. Kruse clearly relied on the alleged safety and effectiveness of the device as represented to Dr. Smith, as she consented to having the filter implanted in her body.  *See* Pl.'s CSOF Ex. 4, Kruse Decl., at 1.  Ms. Kruse testified that she did receive at least general information about her filter before implantation.  Pl.'s CSOF ¶ 41.  It goes without saying that any fact fraudulently concealed from Dr. Smith would not have been communicated to Ms. Kruse.  If Ms. Kruse had received adequate warnings about the higher risk of caudal migration and perforation posed by the G2, she

---

[8] Notably absent from the G2 IFU upon which Dr. Smith relied are specific warnings or the risks of adverse events, the significance of those events, and rates of those events as compared with other filters.  Pl.'s CSOF ¶ 18.

1 | would have ████████████████████████████████ and not had a G2

2 | filter implanted.  Pl.'s CSOF Ex. 4, Kruse Decl., at 2.  Because Plaintiff would not have

3 | had her filter implanted but for Defendants' misrepresentations and omissions upon which

4 | she relied, summary judgment is not appropriate.

### G. Plaintiff's Consumer Law Claim (Count XIV) Does Not Fail as a Matter of Law.

Defendants next argue that Plaintiff's claims premised on Nebraska consumer law fail because Nebraska's Uniform Deceptive Trade Practices Act (UDTPA) does not allow claims for monetary damages and because Nebraska's Consumer Protection Act (CPA) does not allow claims based on personal injury.  Defendants' arguments fail because Plaintiff has prayed for equitable relief—not just money damages—and Plaintiff has suffered injury to her property—not just her person.

### 1. Plaintiff Seeks Equitable Relief Under the UDTPA.

The UDTPA prohibits any person from engaging in a laundry list of enumerated deceptive trade practices, Neb. Rev. Stat. Ann. § 87-302(a), and creates a private right of action for UDTPA violations, *id.* § 87-303(a).  However, the UDTPA only allows a court to "grant[] an injunction under the principles of equity against the person committing the deceptive trade practice" and to "order such additional equitable relief as it deems necessary." *Id.*  Thus, as Defendants correctly point out, § 87-303 only permits equitable relief, not recovery of damages.  Defs.' MSJ at 16.  However, Defendants then *incorrectly* point out that "Plaintiff seeks monetary damages, not injunctive relief." *Id.*  On the contrary, Plaintiff explicitly "demand[s] judgment against Defendants for . . . [s]uch other additional and further relief as Plaintiff[] may be entitled to in law *or in equity*."  Master Compl. 64 (Prayer for Relief ¶ K) (emphasis added).  Therefore, Plaintiff's consumer law claim, insofar as it is based on a prayer for equitable relief under the Nebraska UDTPA, does not fail as a matter of law.[9]

---

[9] In a footnote, Defendants contend that "Plaintiff also failed to comply with the notice requirements under [Neb. Rev. Stat. Ann.] § 87-1303.12."  Defs.' MSJ at 16 n.6.  Those requirements include mailing the Nebraska Attorney General a copy of a complaint alleging a UDTPA violation.  § 87-303.12(1).  However, any lack of notice is irrelevant

1          **2.      Plaintiff Has Suffered Property Injury Under the CPA.**

2          The CPA declares unlawful "[u]fair methods of competition and unfair or

3   deceptive acts or practices in the conduct of any trade or commerce," Neb. Rev. Stat. Ann.

4   § 59-1602, and creates a private right of action for CPA violations, *id.* § 59-1609.

5   However, the CPA only allows for recovery by a "person who is injured in his or her

6   business or property." *Id.* Thus, as Defendants correctly point out, § 59-1609 does not

7   does not create a cause of action for personal injury claims. Defs.' MSJ at 16. However,

8   Defendants then *incorrectly* point out that "Plaintiff's claim is for personal injury, not

9   injury to her 'business or property.'" Defs.' MSJ at 16. Plaintiff has demonstrated that

10  she has suffered injury to her property—the filter itself.

11         Plaintiff purchased her filter from the implanting hospital, which purchased the

12  filter from Defendants; the filter is indisputably Ms. Kruse's property. Pl.'s CSOF ¶ 2.

13  Plaintiff has also established that her property has been damaged. In addition to tilting,

14  migrating, and perforating her IVC, Plaintiff's filter has fractured: one strut has

15  completely broken off from the still-implanted filter. *Id.* ¶ 28. Therefore, Plaintiff's

16  consumer law claim, insofar as it is based on property damage under the Nebraska CPA,

17  does not fail as a matter of law.[10]

18         **H.      Plaintiff's Claim for Punitive Damages Does Not Fail as a Matter of
                     Law.**
19
            Nebraska constitutionally restricts the availability of punitive damages:
20
            [A]ll fines [and] penalties . . . arising under the general laws of the
21          state . . . shall belong and be paid over to the counties respectively where the
            same may be levied or imposed. . . . All such fines [and] penalties . . . shall
22          be appropriated exclusively to the use and support of the common
            schools . . . .
23

24  _____

25  for the purposes of Defendants' motion. "Failure to provide the required mailings to the
    Attorney General shall not be grounds for dismissal of an action under the act . . . ." § 87-
26  303.12(5).

27  [10] Defendants also argue entitlement to summary judgment under the CPA because
    "Plaintiff has never identified an alleged violation by Bard of one of the prohibited
    practices under the Act." Defs.' MSJ at 17. On the contrary, Plaintiff has identified a
28  multitude of such violations. *See, e.g.*, OSOF ¶¶ 72–73, 75–76, 79, 87–88. Once again,
    Defendants' motion for summary judgment should be denied.

23

1    Neb. Const. art. VII, § 5(1).  Punitive damages constitute such a fine or penalty.

2    *Distinctive Printing & Packaging Co. v. Cox*, 443 N.W.2d 566, 574 (Neb. 1989).

3    Defendants thus argue that punitive damages are totally and completely unavailable in

4    Nebraska, such that they are entitled to judgment as a matter of law on Plaintiff's punitive

5    damages allegations.  Defs.' MSJ 17.  Defendants, however, selectively apply the state

6    constitutional provision upon which their no-punitives argument is based, overlooking the

7    one instance in which such damages may be awarded: to benefit Nebraska schools.

8         By the plain language of Section 5(1), fines and penalties *are* constitutionally

9    permitted so long as they are paid over to counties and appropriated for school funding.

10   *See, e.g.*, *Kaapa Ethanol, L.L.C. v. Affiliated FM Insurace, Co.*, No. 7:05CV5010, 2008

11   WL 2986277, at *36 (D. Neb. July 29, 2008) (recognizing that "'[s]tatutes providing for

12   the assessment of civil penalties are not repugnant to the Nebraska Constitution' provided

13   the penalties are not paid to a private person" but are instead paid to Nebraska common

14   schools) (quoting *State ex rel. Stenberg v. American Midlands, Inc.*, 509 N.W.2d 633, 637

15   (Neb. 1994)).  Therefore, punitive damages contravene the Nebraska Constitution only

16   when they are paid to an individual plaintiff.

17        The purpose of punitive damages as pled in this case is "to punish Bard's conduct

18   and deter like conduct by Bard and other similarly situated persons and entities in the

19   future."  Master Compl. ¶ 349.  Ms. Kruse has no objection to Nebraska schools

20   benefitting from an appropriate pecuniary punishment levied against Defendants.  *Cf.*

21   *Kaapa Ethanol*, 2008 WL 2986277, at *36 (granting summary judgment for the defendant

22   on punitive damages where the plaintiff "pray[ed] for an award of punitive damages in

23   favor of the plaintiff, not the 'common schools'").  Therefore, Plaintiff's claim for

24   punitive damages, so long as paid to Nebraska schools, does not fail as a matter of law.

25   **V.    Conclusion.**

26        For these reasons, Defendants' Motion for Summary Judgment should be denied.

27

28

24

RESPECTFULLY SUBMITTED this 2nd day of October 2017.

GALLAGHER & KENNEDY, P.A.

By:/s/ Mark S. O'Connor
   Mark S. O'Connor
   2575 East Camelback Road
   Phoenix, Arizona 85016-9225

LOPEZ McHUGH LLP
   Ramon Rossi Lopez (CA Bar No. 86361)
   (admitted *pro hac vice*)
   100 Bayview Circle, Suite 5600
   Newport Beach, California 92660

*Co-Lead/Liaison Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of October 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

/s/Wendy Espitia