1  Ramon Rossi Lopez - rlopez@lopezmchugh.com
   (California Bar Number 86361; admitted *pro hac vice*)
2  Lopez McHugh LLP
   100 Bayview Circle, Suite 5600
3  Newport Beach, California 92660
   949-812-5771
4
   Mark S. O'Connor (011029) – mark.oconnor@gknet.com
5  Gallagher & Kennedy, P.A.
   2575 East Camelback Road
6  Phoenix, Arizona 85016-9225
   602-530-8000
7
   *Co-Lead/Liaison Counsel for Plaintiffs*
8
                  UNITED STATES DISTRICT COURT
9
                       DISTRICT OF ARIZONA
10

| 11 | In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC |
|---|---|---|
| 12 | | Case No. 2:15-cv-01634-DGC |
| 13 | CAROL KRUSE, an individual, | |
| | Plaintiff, | **PLAINTIFF CAROL KRUSE'S CONTROVERTING STATEMENT OF FACTS IN SUPPORT OF HER** |
| 14 | v. | **MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION AND** |
| 15 | | **MEMORANDUM IN SUPPORT OF** |
| 16 | C.R. BARD, INC., a New Jersey corporation and BARD PERIPHERAL VASCULAR, an Arizona corporation, | **MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF CAROL KRUSE'S** |
| 17 | Defendants. | **CLAIMS** |
| 18 | | |

19        Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively

20  "Bard") submit this Separate Statement of Facts in Support of their Motion for Summary

21  Judgment as to Plaintiff Carol Kruse's Claims.

22        **Plaintiff Carol Kruse hereby submits this Controverting Statement of Facts in**

23  **Support of her Memorandum in Opposition to Defendants' Motion and**

24  **Memorandum in Support of Motion for Summary Judgment as to Plaintiff Carol**

25  **Kruse's Claims.**

26

27

28

1.      Plaintiff Carol Kruse received a Bard G2® Filter on July 8, 2009. (Ex. A, Fourth Supplemental Plaintiff Fact Sheet of Plaintiff Carol Kruse (hereinafter "PFS"), at § II.2(a).)

**Uncontroverted.**

2.      The Filter is not sold directly to patients. (Ex. B, G2 Filter Instructions for Use (the "G2 IFU") at page 1.)

**Controverted.  The G2 IFU applicable in July 2009 when Plaintiff received her filter cautions that "Federal (U.S.A.) law restricts this device to *sale by or on the order of a physician*."  Thus, the filter may be sold directly to a patient by a physician.  (Defs.' Ex. B, G2 Filter Instructions for Use, at 1 (emphasis added).)  Further, billing records show that a Bard G2 filter was sold to Plaintiff for $2,372.00. (Ex. 1, Additional Records, at KRUSEC_MLMH_BIL00020.)**

3.      Plaintiff received her Filter ██████████████████████████ ████████████████████████████████████████████████████ ████████████████████. (Ex. C, Selected Plaintiff Medical Records.)

**Uncontroverted.**

4.      According to Plaintiffs implanting physician, Dr. Shanon Smith, Plaintiff ████████████████████████████████████████████████ ████████████████████ (Ex. D, April 4, 2017 Dr. Shanon Smith Deposition Transcript (Smith Dep. Tr. at 123:2-12.)

**Uncontroverted that Dr. Smith so testified, but controverted as to any suggestion as to why Plaintiff's filter was implanted.  Plaintiff had her filter implanted because ███████████████████████████████ ████████████████████████████████████████████ ████████████████████ Her surgeon would have delayed █████████ █████████████████ if she did not agree to placement of the IVC filter.  (Defs.' Ex. C, Selected Plaintiff Medical Records, at KRUSEC_MLMH_MDR00055 █████ ███████████████████████████████████**

1     ██████, **KRUSEC_MLMH_MDR00092**████████████

2     ██████ **Ex. 2, Hutchins Dep. Tr., at 67:22–69:4** ████

3     **Ex. 3, Kruse Dep. Tr., at 111:1–112:9, 121:6–16** ██████

4     ███████████████████████

5     5.     Plaintiff has a complex medical history that includes ████

6     ████████████████████

7     ██████████████████████████

8     ███████████████████ (Ex. C, Selected

9     Plaintiff Medical Records.)

10     **Uncontroverted.**

11     6.     Plaintiff testified that, shortly after she received her filter in 2009, she began

12     ███████████████████████

13     (Ex. E, February 20, 2017 Carol Kruse Deposition Transcript (Kruse Dep. Tr. at 127:21 to

14     128:16.)

15     **Uncontroverted that Plaintiff so testified.**

16     7.     Plaintiff testified that in approximately late 2010, before she underwent an

17     attempted removal procedure, █████████████████

18     ███████████████ (Ex. E, Kruse Dep. Tr. at 129:16 to

19     130:3; 134:4-17.)

20     **Uncontroverted that Plaintiff so testified, but** ████████

21     ██████████████████████████

22     ████████████████████

23     █████████████████████ **(Ex. 4,**

24     **Kruse Decl., at 2–3.)**

25     8.     Plaintiff testified that in 2009 or 2010, she saw TV advertisements soliciting

26     potential IVC filter plaintiffs. (Ex. E, Kruse Dep. Tr. at 45:6-23.)

27     **Controverted in part.  Plaintiff testified in that in 2009 or 2010, she saw an ad**

28     **on TV about people having IVC filters, which included a telephone number to call.**

1    Plaintiff did not testify that the ad was "soliciting potential IVC filter plaintiffs."

2    (Ex. 3, Kruse Dep. Tr., at 45:6–23, 49:2–7.)

3        9.    Plaintiff testified that she saw these TV advertisements soliciting potential

4    IVC filter plaintiffs before she underwent her Filter removal procedure in April 2011. Ex.

5    E, Kruse Dep. Tr. at 48:23 to 49:7.)

6        **Controverted in part.  Plaintiff testified that before she underwent her filter**

7    **removal procedure in April 2011, she saw an ad on TV about people having IVC**

8    **filters, which included a telephone number to call.  Plaintiff did not testify that the**

9    **ad was "soliciting potential IVC filter plaintiffs."  (Ex. 3, Kruse Dep. Tr., at 45:6–23,**

10   **48:23–49:7.)**

11       10.    Plaintiff testified that, within "a couple of weeks" of seeing the TV

12   advertisements soliciting potential IVC filter plaintiffs, she called the phone number she

13   saw on the advertisement regarding her potential IVC filter claim. (Ex. E, Kruse Dep. Tr.

14   at 45:24 to 46:15.)

15       **Controverted in part.  Plaintiff testified that within a couple of weeks of seeing**

16   **a TV advertisement, she called the phone number she saw on the advertisement, but**

17   **the call was not "regarding her potential IVC filter claim."  Plaintiff called not**

18   **because she was experiencing pain or suspected that she was having any problems**

19   **with her filter, but simply because she knew she had an IVC filter, and because this**

20   **commercial encouraged people who had an IVC filter to call for more information.**

21   **(Ex. 4, Kruse Decl., at 2.)**

22       11.    Although it was "years" before she formally hired an attorney regarding her

23   potential IVC filter lawsuit, Plaintiff testified that she periodically received letters

24   regarding her "case" from a lawyer named Russell Button. (Ex. E, Kruse Dep. Tr. at 46:24

25   to 47:22.)

26       **Uncontroverted that Plaintiff testified that it was years before she hired an**

27   **attorney, but Ms. Kruse did not retain Mr. Button until July 2013 or receive letters**

28   **from him until after that date.  Only upon the conclusion of Plaintiff's attorneys'**

4

investigation of her possible claims in early 2015, shortly before she filed this case in April 2015, did Ms. Kruse come to know that she actually had a claim against Defendants.  (Ex. 4, Kruse Decl., at 2.)

12.    Plaintiff testified that she called her daughter shortly after seeing the TV advertisements regarding potential IVC filter lawsuits to discuss her IVC filter. (Ex. E, Kruse Dep. Tr. at 14:4-19.)

**Uncontroverted that Plaintiff testified that she called her daughter near when she saw the TV advertisement, but controverted that Plaintiff testified that she saw more than one advertisement, and controverted that Plaintiff testified that the advertisement was "soliciting potential IVC filter plaintiffs."  (Ex. 3, Kruse Dep. Tr., at 45:6–23, 49:2–7.)**

**Further controverted that either the fact that Plaintiff testified that she called her daughter near when she saw the TV advertisement, or the fact that Plaintiff called her daughter near when she saw the TV advertisement, constitute material facts.  Plaintiff testified that her conversation with her daughter was limited to a brief mention that she had called a number on advertisement.  (Ex. 3, Kruse Dep. Tr., at 14:4–19.)  Plaintiff's daughter testified that Plaintiff is a "private person" who did not share "everything" during brief, infrequent phone calls concerning her health conditions.  (Ex. 5, Biere Dep. Tr., at 55:7–56:3.)**

13.    On March 14, 2011, ███████████████████████████████████████ ████████████████████████████ (Ex. C, Selected Plaintiff Medical Records.)

**Uncontroverted.**

14.    The medical record associated with this March 14, 2011, procedure notes Mr. Kruse ████████████████████████████████████████████████ ████████████ (Ex. C, Selected Plaintiff Medical Records.)

**Uncontroverted that the quoted medical record so notes, but controverted that Plaintiff was planning to have her IVC filter removed because it was causing her pain.**

1      ███████████████████████████████        **Plaintiff thought the filter was no**

2   **longer needed and because April 2011 was a convenient time for her to have the**

3   **removal procedure.**  ███████████████████████████████████

4   ████████████████████████████████████████████████

5   ██████████████████████████████████████████

6      ████   **(Ex. 4, Kruse Decl., at 3.)**

7      **Plaintiff neither knew nor had reason to know that her pain was filter-related**

8   **in March 2011.  (Ex. 3, Kruse Dep. Tr., at 195:2–4.)**

9      **According to Defendants' own expert in interventional radiology,** ████████

10  ███████████████████████████████████████

11  **(Ex. 6, Expert Report of Christopher S. Morris, M.D., at 7** █████████████████

12  ████████████████████████████████████████████████

13  ████████████████████████████

14      15.    As of March 14, 2011, Plaintiff was still having ██████████████████

15  ██████████████████████████████████████████████████████

16  █████████████    (Ex. E, Kruse Dep. Tr. at 134:23 to 138:16.)

17      **Controverted in part.  As of March 14, 2011,** █████████████████████

18  ████████████████████████████████████████████████

19  █████████████████████████████████████████

20  ████████████████████████████████████, **but she did not know, or even suspect, that the**

21  **IVC filter tilted, migrated, perforated her IVC, or fractured.  (Ex. 4, Kruse Decl., at**

22  **3.)**

23      **Plaintiff neither knew nor had reason to know that her pain was filter-related**

24  **in March 2011.  (Ex. 3, Kruse Dep. Tr., at 195:2–4.)**

25      **According to Defendants' own expert in interventional radiology,** ████████

26  ███████████████████████████████████████

27  **(Ex. 6, Expert Report of Christopher S. Morris, M.D., at 7** █████████████████

28

1 ███████████████████████████████████████████████

2 ████████████████████████████

3      16.     Plaintiff admits that at least as of April 7, 2011, she first attributed

4 symptoms to her Bard G2 Filter. (Ex. A, PFS at § II.13(c).)

5      **Uncontroverted as to the date identified, but controverted as to any suggestion**

6 **that Plaintiff may have attributed her symptoms to her filter on any date prior to**

7 **April 7, 2011.  Plaintiff first learned that she had any type of injury caused by her**

8 **filter after her unsuccessful retrieval surgery on April 7, 2011.  Plaintiff did not**

9 **know or suspect that her filter had migrated, tilted, or caused any other symptoms**

10 **or injury prior to that date.  (Ex. 1, Additional Records, at KRUSEC_MLMH**

11 **_MDR00029 ████████████████████████████████████████**

12 **████████████████████████ Ex. 3, Kruse Dep. Tr., at 195:5–10; Ex. 4, Kruse**

13 **Decl., at 3 ("The first time that I knew or had a reasonable basis for knowing that**

14 **the Bard G2 filter implanted in my body had caused any injury was after Dr. Smith**

15 **attempted to remove the filter on April 7, 2011.  Prior to April 7, 2011, I did not**

16 **know that the filter had migrated downward in my inferior vena cava, that the filter**

17 **was tilted, that the filter may have fractured, or that I had suffered any injury or**

18 **damage to my inferior vena cava.").)**

19      17.     Dr. Smith testified that before he placed the Filter, he had the IFU that

20 accompanied the Filter available to him to read. (Ex. D, Smith Dep. Tr. at 152:25 to

21 153:6.)

22      **Uncontroverted that Dr. Smith so testified.**

23      18.     The G2 IFU applicable in July 2009 (when Plaintiff received her Filter)

24 contains specific warnings regarding the risks of filter tilt, migration, fracture, perforation,

25 and inability to retrieve. (Ex. B, G2 IFU.)

26      **Controverted.  Although the G2 IU applicable in July 2009 mentions tilt,**

27 **migration, fracture, perforation, and inability to retrieve, the G2 IFU does not**

28 **contain "specific warnings" of the risks of those complications.  Tilt is only**

7

1    **mentioned in discussion of clinical experience—not under the boldface heading**

2    **"Potential Complications."  No specific warning is given as to the severity or rate of**

3    **incidence of tilt as compared with other filters.  Migration, fracture, and perforation**

4    **are simply identified as "known complication[s]."  No specific warnings are given as**

5    **to the severity or rate of incidence of these complications as compared with other**

6    **filters.  Inability to retrieve is simply mentioned as a possibility and the IFU suggests**

7    **that failure to retrieve a filter may be the result of a "clinician's decision to have the**

8    **device remain permanently implanted" rather than a device failure.  No specific**

9    **warnings are given as to the consequences of failure to retrieve, or the rate of**

10   **incidence of failure to retrieve as compared with other filters.  (Defs.' Ex. B, G2 IFU;**

11   *see also* **Plaintiffs' Omnibus Statement of Facts ¶¶ 72–74.**

12         19.     Specifically, the IFU states as follows:

13              a.      Under the bolded heading "**Potential Complications**," the G2 IFU

14   reads as follows:

15         • Movement or migration of the filter is a known complication of vena cava filters.

16         • Filter fracture is a known complication of vena cava filters.

17         • Perforation or other acute or chronic damage of the IVC wall.

18         * * *

19         **All of the above complications have been associated with serious adverse**

20         **events such as medical intervention and/or death. There have been reports of**

21         **complications including death, associated with the use of vena cava filters in**

22         **morbidly obese patients. The risk/benefit ratio of any of these complications**

23         **should be weighed against the inherent risk/benefit ration for a patient who is**

24         **at risk of pulmonary embolism without intervention.**

25   (Ex. B, G2 IFU.)

26              b.      In the bolded "**Clinical Experience**" section, the IFU notes that in

27   the clinical trial regarding the G2 Filter, "filter tilt" was observed 15 times, and that there

28   were "3 technical failures for retrieval resulted from inability to engage the filter apex

8

with the Recovery Cone® Removal System due to filter tilt leading to embedding of the filter apex into the vena caval wall."

(Ex. B, G2 IFU.)

c.    Under the bolded "**G2® Filter Removal**" heading, the G2 IFU states in bolded language as follows:

> **It is possible that complications such as those described in the "Warnings", "Precautions," and "Potential Complications" sections of this Instructions for Use may affect the recoverability of the device and result in the clinician's decision to have the device remain permanently implanted.**

(Ex. B, G2 IFU.)

**Uncontroverted that the G2 IFU so states, but controverted that these quotations alone, taken out of context, sufficiently describe the content of the IFU sections quoted.**

20.    Dr. Smith testified that he was independently aware of the risks of filter tilt, migration, perforation, and fracture, and that he would have discussed with Plaintiff the potential complications associated with her receiving an IVC filter. (Ex. D, Smith Dep. Tr. at 100:2-14; 153:7-17.)

**Controverted in part.  Dr. Smith testified that he was aware of the *existence* of risks of tilt, migration, perforation, and fracture.  However, Dr. Smith was not aware of the severity or rate of incidence of those risks as compared with other filters, because Defendants never communicated information about the severity or incidence rates of these risks to Dr. Smith.  (Ex. 7, Smith Dep. Tr., at 53:21–54:6, 60:5–18, 171:11–20.)**

21.    Dr. Smith testified that more information is helpful. (Ex. D, Smith Dep. Tr. at 181:16-20.)

**Uncontroverted that Dr. Smith so testified, but controverted that this portion of testimony alone, taken out of context, sufficiently describes the context of the testimony. (Ex. 7, Smith Dep. Tr., at 49:1–57:6, 60:5–62:3.)**

9

22.     Dr. Smith never testified that had he received some additional information from Bard, he would have used a different device with Plaintiff.

**Uncontroverted that Dr. Smith did not testify using those exact words, but controverted as to any suggestion that such lack of testimony means that Dr. Smith would not have used a different device with Plaintiff if he had been more fully informed of the risks and benefits of the Bard G2 filter relative to other filters.  He "would have definitely looked at the risk and benefits if there was more information" and "[i]t's possible" he would have chosen a device other than the G2 had he been more fully informed of the risks of the G2.  (Ex. 7, Smith Dep. Tr., at 60:19–62:3.)**

23.     Dr. Smith testified that "it's possible" he would have changed his treatment of Plaintiff had he received some additional information from Bard about the G2 Filter. (Ex. D, Smith Dep. Tr. at 60:25 to 62:3.)

**Uncontroverted that Dr. Smith so testified.**

24.     When asked whether the alleged facts and documents shown to Dr. Smith by Plaintiff's counsel would have changed his decision to use a G2 Filter with Plaintiff, Dr. Smith testified that he "wouldn't want to say how they would influence me without knowing what they say in detail." (Ex. D, Smith Dep. Tr. at 148:21 to 149:5.)

**Uncontroverted that Dr. Smith so testified, but controverted that this portion of testimony alone, taken out of context, sufficiently describes the content of the testimony.  (Ex. 7, Smith Dep. Tr., at 148:5–149:10.)**

25.     Dr. Smith testified that he relied on his training, experience, the experience of his colleagues, and the applicable medical literature when he makes treatment decisions regarding his patients, including Ms. Kruse. (Ex. D, Smith Dep. Tr. at 145:21 to 146:12.)

**Uncontroverted that Dr. Smith so testified, but controverted that this portion of testimony alone, taken out of context, sufficiently describes the context of the testimony.  Dr. Smith relies on "multiple sources."  (Ex. 7, Smith Dep. Tr., at 145:21–146:12.)**

10

26.     Dr. Smith did not testify that he relied on any statement by Bard, or any omission of material fact, in deciding to use the Filter.

**Controverted.  Dr. Smith relied on statements made in the G2 IFU (and, by necessary implication, any omissions of material fact from the G2 IFU) when deciding to use the G2 filter.  (Ex. 7, Smith Dep. Tr., at 160:4–10.)**

27.     On April 7, 2011, Plaintiff underwent an unsuccessful percutaneous filter removal procedure. (Ex. A, PFS at § II.11.)

**Uncontroverted.**

28.     Dr. Smith attempted the Filter removal procedure, but he was unable to retrieve the Filter because it was tilted with the tip of the filter abutting Ms. Kruse's IVC wall. (Ex. D, Smith Dep. Tr. at 74:16-25.)

**Controverted in part.  Dr. Smith attempted the filter removal procedure, but was unable to retrieve the filter because the filter had caudally migrated, tilted, the filter tip had become incorporated into or had punctured through the caval wall, multiple filter struts had perforated the IVC, and one strut had fractured.  (Ex. 8, Hurst Dep. Tr., at 150:5–151:20, 157:3–5; Ex. 9, Muehrcke Dep. Tr., at 144:21–145:15, 150:9–151:5, 155:2–16, 175:8–25, 181:13–14.)**

29.     Plaintiff's vascular and interventional radiologist expert, Dr. Darren Hurst, testified that Plaintiff's Filter could "likely" be removed via a complex percutaneous procedure. (Ex. F, July 21, 2017 Dr. Darren Hurst Deposition Transcript at 159:1-11.)

**Uncontroverted that Dr. Hurst so testified, but controverted as to any suggestion that Dr. Hurst concluded that an open surgical procedure would not be necessary.  (Ex. 8, Hurst Dep. Tr., at 159:8–10 (testifying that "there's always a chance they won't be able to retrieve it" percutaneously).**

**Further controverted as to the fact asserted that the filter could likely be retrieved percutaneously.  Because the apex of the filter has perforated the caval wall, the filter likely cannot be retrieved percutaneously.  (Ex. 9, Muehrcke Dep. Tr., at 144:21–145:15, 155:2–16.)**

11

30.     On February 5, 2013, Plaintiff filed a Chapter 7 Bankruptcy Petition. (Ex. G, Carol Kruse Bankruptcy Case (Case No. 13-40196-TLS, U.S Bankruptcy Court, District of Nebraska (Lincoln Office)), Bankruptcy Petition ("Kruse Bankruptcy Petition); Ex. E, Kruse Dep. Tr. at 187:8-20.)

**Uncontroverted.**

31.     In her Petition, Plaintiff filled out a Schedule in which she verified all of her "personal property . . . of whatever kind." (Ex. G, Kruse Bankruptcy Petition, Schedule B - Personal Property.)

**Uncontroverted.**

32.     Under No. 21 ("Other contingent and unliquidated claims of every nature") of Schedule B of her Bankruptcy Petition, Plaintiff marked an "X" for "NONE." (Ex. G, Kruse Bankruptcy Petition, Schedule B - Personal Property, No. 21.)

**Uncontroverted.**

33.     Under No. 35 ("Other personal property of any kind not already listed") of Schedule B of her Bankruptcy Petition, Plaintiff marked an "X" for "NONE." (Ex. G, Kruse Bankruptcy Petition, Schedule B - Personal Property, No. 35.)

**Uncontroverted.**

34.     Plaintiff filled out "Schedule F - Creditors Holding Unsecured Nonpriority Claims," in which she identified $36,067.44 in such claims. (Ex. G, Kruse Bankruptcy Petition, Schedule F -Creditors Holding Unsecured Nonpriority Claims.)

**Uncontroverted.**

35.     Plaintiff signed the Petition, declaring under penalty of perjury that the information provided in the Petition is true and correct. (Ex. G, Kruse Bankruptcy Petition at page 3 ("Signatures").)

**Uncontroverted.**

36.     On February 8, 2013, an Interim Trustee was appointed to Plaintiff's bankruptcy estate. (Ex. H, Carol Kruse Bankruptcy Case (Case No. 13-40196-TLS, U.S

Bankruptcy Court, District of Nebraska (Lincoln Office)), Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines.)

**Controverted in part. An interim trustee was appointed on February 6, 2013—not February 8, 2013. (Defs.' Ex. H, at 1.)**

37.     On April 1, 2013, after making a "diligent inquiry into the financial affairs" of Plaintiff, the bankruptcy trustee declared that he did not "receive[] any property" for the estate, and that "there is no property available for distribution," and he certified that Plaintiff's estate has been fully administered. (Ex. I, Carol Kruse Bankruptcy Case (Case No. 13-40196-TLS, U.S Bankruptcy Court, District of Nebraska (Lincoln Office)) Docket Report ("Kruse Bankruptcy Docket Report") at No. 7.)

**Uncontroverted.**

38.     On June 3, 2013, Plaintiff obtained a bankruptcy discharge order. (Ex. J, Carol Kruse Bankruptcy Case (Case No. 13-40196-TLS, U.S Bankruptcy Court, District of Nebraska (Lincoln Office)), Discharge Order; Ex. E, Kruse Dep. Tr. at 187:24 to 188:16.)

**Uncontroverted.**

39.     As of the date of this filing, Plaintiff has not filed a motion to reopen her bankruptcy estate. (Ex. I, Kruse Bankruptcy Docket Report.)

**Uncontroverted, but Plaintiff has since reopened her bankruptcy case. (Ex. 4, Kruse Decl., at 4.)**

**On September 25, 2017, Plaintiff/Debtor moved to reopen her case "to allow Debtor to file amended schedules to correctly reflect assets existing at the time of the filing of her voluntary petition." (Ex. 10, Motion to Reopen Case.)**

**On September 26, 2017, the motion was granted. (Ex. 11, Kruse Bankruptcy Docket Report, Dkt. No. 16.)**

**On September 28, 2017, Plaintiff amended her schedule of assets to include this case. (Ex. 12, Amended Schedules.)**

40.     Plaintiff testified that she never spoke to anyone at Bard. (Ex. E, Kruse Dep. Tr. at 187:1-3.)

**Uncontroverted that Plaintiff initially so testified, but Plaintiff also testified that she "talked with" a Bard representative who was present during her failed retrieval attempt.  (Ex. 3, Kruse Dep. Tr., at 141:20–142:6, 186:8–190:5.)**

41.     Plaintiff testified that she never received any written or verbal information about her filter before she received it. (Ex. A, PFS at § II.8.)

**Uncontroverted that Plaintiff responded to an interrogatory posed in her Plaintiff Fact Sheet that she never received any written or verbal information about her filter before she received it.**

**Controverted that Plaintiff did not, in fact, receive any information whatsoever prior to implantation.  Ms. Kruse testified that she did receive at least general information about her filter before she received it.  (Ex. 3, Kruse Dep. Tr., at 124:18–125:12.)**

42.     Plaintiff testified that she never researched IVC filters. (Ex. E, Kruse Dep. Tr. at 87:25 to 88:5.)

**Uncontroverted that Plaintiff so testified.**

43.     Plaintiff testified that she did not know that Bard was the manufacturer of her Filter until the day she underwent her unsuccessful retrieval procedure. (Ex. E, Kruse Dep. Tr. 87:8-24.)

**Uncontroverted that Plaintiff so testified.**

RESPECTFULLY SUBMITTED this 2nd day of October 2017.

GALLAGHER & KENNEDY, P.A.

By:*/s/* Mark S. O'Connor
Mark S. O'Connor
2575 East Camelback Road
Phoenix, Arizona  85016-9225

14

LOPEZ McHUGH LLP
Ramon Rossi Lopez (CA Bar No. 86361)
(admitted *pro hac vice*)
100 Bayview Circle, Suite 5600
Newport Beach, California 92660

*Co-Lead/Liaison Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of October 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

*/s/ Wendy Espitia*

**EXHIBIT LIST**

1. KRUSEC_MLMH_BIL00020 **(Sealed)**

2. Deposition of Mark Hutchins, M.D. **(Sealed)**

3. Deposition of Carol Kruse **(Sealed)**

4. Declaration of Carol Kruse **(Sealed)**

5. Deposition of Diane Biere **(Sealed)**

6. Expert Report Christopher S. Morris, M.D. **(Sealed)**

7. Deposition of Shannon Smith, M.D. **(Sealed)**

8. Deposition of Darren Hurst, M.D. **(Sealed)**

9. Deposition of Derek D. Muehrcke, M.D. **(Sealed)**

10. Motion to Reopen Case

11. Kruse Bankruptcy Docket Report, Dkt. No. 16

12. Amended Schedules