1

2

3

4

5

6                        UNITED STATES DISTRICT COURT

7                            DISTRICT OF ARIZONA

8   In Re Bard IVC Filters Products          No. MD-15-02641-PHX-DGC

9   Liability Litigation

10  SHERR-UNA BOOKER, an individual,          **EXHIBIT INDEX**

11              Plaintiff,                    **PLAINTIFF SHERR-UNA'S**
                                              **CONTROVERTING STATEMENT OF**
12  v.                                        **FACTS TO DEFENDANTS' SEPARATE**
                                              **STATEMENT OF FACTS IN SUPPORT**
13  C.R. BARD, INC., a New Jersey             **OF THEIR MOTION FOR PARTIAL**
    corporation and BARD PERIPHERAL           **SUMMARY JUDGMENT AS TO**
14  VASCULAR, an Arizona corporation,         **PLAINTIFF SHERR-UNA BOOKER**

15              Defendants.

16

17        Exhibit A    Derek D. Muehrcke M.D. Deposition Excerpts 7-24-17
                       (Redacted and Filed Under Seal)
18
          Exhibit B    Marcus D'Ayala M.D. Deposition Excerpts 3-21-17
19                     (Redacted and Filed Under Seal)

20        Exhibit C    G2 IFU

21        Exhibit D    Brandon Kang MD Deposition Excerpts 6-15-17
                       (Redacted and Filed Under Seal)
22
          Exhibit E    Plaintiff's Medical Records
23                     (Redacted and Filed Under Seal)

24
          Exhibit F    Robert Hurst M.D. Deposition Excerpts 7-21-17
25                     (Redacted and Filed Under Seal)

26
          Exhibit G    Sherr-Una Booker Deposition Excerpts 2-20-17
27                     (Redacted and Filed Under Seal)

28

# EXHIBIT A
# (Redacted and Filed Under Seal)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA


NO. MD-15-92641-PHX-DGC


In re Bard IVC Filters Products
Liability Litigation


    Videotaped Deposition of DEREK D. MUEHRCKE, M.D., taken on behalf of defendant herein, pursuant to Notice of Taking Deposition, at 32 Avienda Menendez St., St. Augustine, St. Johns County, Florida, on July 24, 2017, at 9:00 a.m., before Terry T. Hurley, Registered Professional Reporter, and Notary Public in and for the State of Florida at Large.

1    yes.

2        Q     That would include migration?

3              MR. O'CONNOR:   Form.

4        A     Well, I think that there's rates of migration,

5    but they can -- they can migrate.

6        Q     All filters can migrate; correct?

7              MR. O'CONNOR:   Form.

8        A     There are -- all filters can migrate, yes.

9        Q     And all filters have the potential complication

10   of fracture?

11       A     Yes.   That's true.

12       Q     And all filters have the potential complication

13   of tilt?

14             MR. O'CONNOR:   Okay.

15       A     Correct.   Some are much less likely, the

16   TrapEase, OptEase, but all can tilt.

17       Q     What's the difference, if any, between the

18   words penetration and perforation with regard to

19   filters?

20       A     That's a nuance for the radiologist to kind of

21   get into.   I think -- to a certain extent, to me they're

22   synonymous, but I think they prefer the word penetration

23   as opposed to perforation.   Perforation, one of the BARD

24   defense experts felt was a kind of a pejorative term

25   implying that things were going to leak out all over the

1    place.  And I think that the radiologists prefer

2    penetration as opposed to perforation.

3            I think it's a distinction without a difference

4    in my mind, but whatever.

5        Q    Would you agree that all filters carry the risk

6    of penetration --

7            MR. O'CONNOR:  Form.

8        Q    -- or perforation?

9        A    Yes.

10       Q    Looking at the Booker report, page 7,

11   paragraph 2, you said:  ███████████████████

12   implanted with a BARD G2 filter BARD had been aware

13   since late 2005, early 2006 of the need to correct the

14   unacceptable caudal migration risk with the G2 filter.

15           Is that correct?

16       A    That's correct.

17       Q    And would you agree that all filters have the

18   potential to caudally migrate?

19       A    I believe that there was an unacceptable safety

20   profile for the -- for the G2 filter.

21           MR. O'CONNOR:  Move to strike as nonresponsive.

22       Q    My question was, do you agree that all filters

23   have the potential to caudally migrate?

24       A    All filters can migrate caudally.

25           MR. O'CONNOR:  Late objection to the form of

1    filter, would expect that it absolutely would never have

2    one of those complications.  But your point, if I

3    understand it correctly, is not that physicians don't

4    expect there to be an occasional complication, it's that

5    they don't expect the complications to occur at the rate

6    you allege they do?

7         A    It's more than that.  Can I expound?

8         Q    Yeah.

9         A    The BARD filter has all these problems.  The

10   other filters have -- like, the TrapEase and OptEase

11   have a problem with cable thrombosis.  You know, the --

12   the -- the BARD filter not only has a higher rate of

13   individual complication, but it has a lot more of

14   several complications.

15             MR. NORTH:  Move to strike as nonresponsive.

16        Q    Do you believe that a physician implanting a

17   BARD filter has an expectation that under no

18   circumstances, in no scenario, no matter what happens,

19   that filter will not migrate?

20        A    Well, I think that's an unrealistic

21   expectation.

22             MR. O'CONNOR:  Form.

23        A    I think that the filters can have problems.

24        Q    And the same would be true as to tilt,

25   perforation, or fracture?

1    removed, because the filter's been removed she's at risk

2    for recurrent DVT's and PE's in hypercoagulable state.

3        Q    So those two parts.  First of all, is it -- do

4    you have an opinion that the BARD filter caused injuries

5    to Ms. Booker?

6        A    Yes.

7        Q    And what are the injuries?

8        A    ██████████████████████████████ ████████████

     ████████████████████████████████████ ████

     ████████████████████ ████████████████████

     ████████ ██████████████████████████ ████████████

     ████████████████████████████████████████████

     ████████████████████.

14       Q    And are those opinions you hold to a reasonable

15   degree of medical certainty and medical probability?

16       A    Yes.

17       Q    And you also talked on a slightly different

18   issue about the future Ms. Booker faces in terms of

19   complications.

20       A    Yes.

     █ ███████████████████████████████████████████████

     ███████████████████████████████████ ████████

     ███████████████████████████████████████████

     █████████████████████████████████████

     █ ████

# EXHIBIT B

# (Redacted and Filed Under Seal)

```
 1           IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF ARIZONA

 3                      -   -   -

 4  IN RE BARD IVC FILTERS         : NO. MD-15-02641-PHX-DGC

    PRODUCTS LIABILITY LITIGATION    :

 5

 6

 7                      -   -   -

 8                 MARCH 21, 2017

 9                      -   -   -

          DO NOT DISCLOSE - SUBJECT TO FURTHER

10             CONFIDENTIALITY REVIEW

11             Videotape deposition of ██████

██    ████████  ███ , taken pursuant to notice, was held at

13  the law offices of Aaronson Rappaport Feinstein &

14  Deutsch, LLP, 600 Third Avenue, New York, New York

15  10016, beginning at 12:45 p.m., on the above date,

16  before Amanda Dee Maslynsky-Miller, a Certified

17  Realtime Reporter and Notary Public in and for the

18  State of New York.

19

20                      -   -   -

21

22

23

              GOLKOW TECHNOLOGIES, INC.

24       877.370.3377 ph | 917.591.5672 fax

                 deps@golkow.com

25
```

```
 1          A.      It is.

 2          Q.      All right.  The other 80 percent of

 3   the time, you are a clinician; that is, you spend

 4   time treating patients?

 5          A.      Correct.

 6          Q.      All right.

 7          A.      With a small amount of that time

 8   dedicated to administration of our division.

 9          Q.      Okay.  Doctor, I represent Sherr-Una

10   Booker.  ████████████████████████████████████

11   You, at that time, implanted a G2, Bard G2 IVC

12   filter.

13                  I suspect you do not recall her

14   personally?

15          A.      I do not.

16          Q.      Have you had a chance to look at the

17   records, your records, of the implant and the

18   procedure that took place back in ██████

19          A.      I have.

20          Q.      Other than the review of the medical

21   record, your medical record wherein you implanted

22   this Bard G2 in Ms. Booker, did you look at any

23   other medical records?

24          A.      I did.

25                  But for the sake of clarity, I must
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    will not treat that patient, in other words, that

 2    patient is being treated by someone else?

 3         A.      Yes.

 4         Q.      All right.  And if there's a decision

 5    to remove a filter, that decision is often someone

 6    else's, whether it's a primary care physician,

 7    whether it's the orthopedic surgeon, whether it's

 8    the internist that's treating that patient, that

 9    decision oftentimes isn't even yours?

10                 MS. HELM:  Object to the form.

11    BY MR. MATTHEWS:

12         Q.      Is that true?  Is that basically

13    true?

14                 MS. HELM:  Same objection.

15                 THE WITNESS:  I'm not entirely sure

16    that I agree with that.  I think we play an

17    important role in retrieving these filters, or at

18    least we try to.

19                 So the whole issue of filter

20    retrieval is one that has been an evolution over the

21    years.  And today it's part of our practice to

22    advise these patients to return for follow-up to

23    have filters retrieved, if it's possible to do so

24    and do so safely.

25                 So a number of requirements must be
```

1    met for us to retrieve these filters.

2    BY MR. MATTHEWS:

3         Q.      I'm going to back up, if I could,

4    because now we're talking about 2017 --

5         A.      Correct.

6         Q.      -- and ████ is the time frame.  So

7    I'm going to ask a different question.

8         A.      Okay.

9         Q.      Back in ████ when you were implanting

10   in particular the G2, the G2 had only been cleared

11   for permanent implantation; is that correct?

12        A.      Correct.

13        Q.      So you were implanting this filter as

14   a permanent filter in ████, correct?

15        A.      Correct.

16        Q.      ████████████████  ████████████████

█   ████████████████████  ██████  ████████████████

█   ████████████████  ████████

19               MS. HELM:  Object to the form.

20               THE WITNESS:  Correct.

21   BY MR. MATTHEWS:

22        Q.      All right.  Well, let's talk about,

23   then, a different subject, and that is your history

24   with the use of filters.

25               Can you tell the jury when you first

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    timelines as to when these things were done.
 2         Q.      Did you ever use the Bard Recovery
 3    filter?
 4         A.      I believe I did.
 5         Q.      All right.  So you used the Bard
 6    Recovery, the Bard G2, the Cordus TRAPEASE.  And you
 7    said the Cook filters.
 8                 Do you recall which Cook filters you
 9    used?
10         A.      We use the Günther Tulip and right
11    now it's a variation of it called the Cook Celect,
12    C, as in Charles, E-L-E-C-T.
13         Q.      You said you moved away from the Bard
14    filter because of problems associated with it,
15    correct?
16         A.      Yes.
17                 MS. HELM:  Object to the form.
18    BY MR. MATTHEWS:
19         Q.      What were the problems associated
20    with the Bard that -- the reason that you moved away
21    from it?
22         A.      There is a database known as the
23    MAUDE database and it was becoming clear that there
24    were numerous reports in the literature of filter
25    fragmentation and filter migration with these
```

```
 1    filters.
 2          Q.      Do you recall the time frame when you
 3    moved away from Bard filters?
 4          A.      I do not.
 5          Q.      Clearly it was after ▮▮▮▮ because
 6    you were still implanting the G2 in ▮▮▮▮, correct?
 7          A.      Correct.
 8          Q.      Were you called upon by a sales rep
 9    or somebody that's known as a detailer from Bard
10    that came to your hospital to talk to you --
11          A.      Yes.
12          Q.      -- about their filters?
13                  Do you recall that sales rep?
14          A.      We had a number throughout the years
15    from different corporations, so if you could be a
16    little bit more specific.
17          Q.      Well, I guess I'm referring to a
18    sales rep by the name of Ferrara.
19                  Do you recall a sales rep by the name
20    of Ferrara?
21          A.      Robert Ferrara?
22          Q.      Ferrara, I'm sorry.
23          A.      I do.
24          Q.      Was he in your offices from time to
25    time to talk about the Recovery and the G2?
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1          A.       Uh-huh.

 2          Q.       Yes?

 3          A.       Yes.

 4          Q.       I'm sorry.  You've got to answer

 5     aloud for her.

 6          A.       Yes.

 7          Q.       Were you ever told by Mr. -- is it

 8     Ferrara?

 9          A.       Uh-huh.

10          Q.       -- Mr. Ferrara that Bard had a crisis

11     management plan, as early as 2004, to deal with the

12     high rates of AEs, that being, adverse events,

13     perforation, fracture and migration?

14                   MS. HELM:  Object to the form.

15                   THE WITNESS:  No.

16     BY MR. MATTHEWS:

17          Q.       Were you ever told that Bard

18     conducted an investigation in 2004 into the high

19     number or large number of adverse events of the

20     Recovery done by an independent investigator?

21                   MS. HELM:  Object to the form.

22                   THE WITNESS:  No.

23     BY MR. MATTHEWS:

24          Q.       Were you ever sent a letter by the

25     company that talked to you or -- I'm sorry, that
```

1    informed you about the results of this

2    investigation, this independent investigation by

3    Bard?

4                    MS. HELM:  Object to the form.

5                    THE WITNESS:  No.

6    BY MR. MATTHEWS:

7         Q.      Were you ever told, either by letter

8    or by Mr. Ferrara, that there was a 530 percent

9    higher fracture rate than other filters on the

10   market with the Bard Recovery?

11                   MS. HELM:  Object to the form.

12                   THE WITNESS:  No.

13   BY MR. MATTHEWS:

14        Q.      Were you ever told that there was a

15   1,200 percent higher risk of death from the Recovery

16   fracture and embolization to the heart than other

17   filters on the market?

18                   MS. HELM:  Object to the form.

19                   THE WITNESS:  No.

20   BY MR. MATTHEWS:

21        Q.      ███████████   █████████

██  █████████████████   ████████████████, would

23   that have been important information for you to

24   know?  Assuming that that was information that was

25   known to Bard, is that something that you would want

```
 1    to have known?

 2            A.      Yes.

 3                    MS. HELM:  Object to the form.

 4                    THE WITNESS:  Can I interrupt for one

 5    second?  I just wanted to clarify one other point.

 6                    Previously you asked me how many

 7    publications I had regarding filters.  And there's

 8    actually a third publication that I had forgotten,

 9    and I see it here in my C.V.  It's one in which a

10    filter migrated to the heart.  And with your

11    question before, I remember you asking me about

12    filters migrating to the heart.

13    BY MR. MATTHEWS:

14            Q.      That was a case study, correct?

15            A.      That was a case report, that's

16    correct.

17            Q.      Yes, case report.  I did read that.

18    Thank you.

19                    MS. HELM:  Do you mind telling us

20    which number that is?

21                    THE WITNESS:  That would be 28 to 32

22    under publications.

23    BY MR. MATTHEWS:

24            Q.      Let me show you what's been marked as

25    Exhibit Number 2.
```

```
 1                   MS. HELM:  Do you have a copy for me?

 2                   MR. MATTHEWS:  This is a health

 3   hazard evaluation dated December 17th, 2004.

 4                        -   -   -

 5                   (Whereupon, Exhibit-2,

 6   BPVE-01-01019821-825, Health Hazard Evaluation,

 7   Dated 12/17/04, was marked for identification.)

 8                        -   -   -

 9                   THE WITNESS:  Thank you.

10   BY MR. MATTHEWS:

11        Q.      Let me show you, if you could turn.

12   Just so we're clear on the record, this is a health

13   hazard evaluation from David Ciavarella, MD, who I

14   believe was the vice president of clinical trials --

15   clinical affairs, dated December 17th, 2004, to Doug

16   Uelmen, BPV QA.  And this is Recovery Filter

17   Consultants Report, and I would turn your attention

18   to the second page --

19        A.      Okay.

20        Q.      -- under Number 2.  It says that, The

21   consultant's analysis of the reports of Bard -- to

22   Bard of adverse events associated with the Recovery,

23   along with competitors' information available via

24   the MAUDE and IMS databases, showed the following:

25   Reports of death, filter migration, IVC perforation
```

1    and filter fracture associated with the Recovery

2    filter were seen in the MAUDE database at reporting

3    rates that were 4.6, 4.4, 4.1 and 5.3 higher,

4    respectively, than reporting rates for all other

5    filters.

6                    Doctor, this is dated December 17th,

7    2004.  Would this have been important information

8    for you to know, that is, a doctor who is implanting

9    Recovery filters, that those filters had a greater

10   risk of fracture that's four and five times higher

11   than the competitor filters?

12                    MS. HELM:  Object to the form.

13                    THE WITNESS:  Yes.

14   BY MR. MATTHEWS:

15        Q.       Is that the type of information that

16   would influence your prescribing habits, whether you

17   would use that filter, a Bard filter, or another

18   filter?

19                    MS. HELM:  Object to the form.

20                    THE WITNESS:  Yes.

21   BY MR. MATTHEWS:

22        Q.       Let me show you what's been marked as

23   Exhibit-3, which is the Recovery filter migration,

24   Remedial Action Plan, dated January 4, 2005.

25                       -  -  -

 1              (Whereupon, Exhibit-3,

 2    BPVE-01-01019773-784, Recovery Filter Migration,

 3    Dated 1/4/05, was marked for identification.)

 4                      -   -   -

 5    BY MR. MATTHEWS:

 6         Q.      Again, ████████████████████████

      █ ███████████████████████   ██████████████

 8              And I would turn your attention to

 9    the first, second, third, fourth, fifth page.  It

10    says, actually, 1 of 7 on the fifth page of that

11    document.

12         A.      I'm sorry, could you --

13         Q.      At the bottom under Roman III.

14              It says, Identification of the

15    problem:  As part of the ongoing evaluation of RNF,

16    Recovery Nitinol filter, Bard requested an

17    independent study of the risks and benefits of the

18    RNF, with an emphasis on its use in bariatric

19    surgery and trauma patients.  A consultant was

20    retained for this purpose and reported the

21    following:  The MAUDE database maintained by the FDA

22    was reviewed.  The reporting rates between the RNF

23    and aggregates of the other commercialized vena cava

24    filters were compared.

25              A, in the MAUDE dataset, the RNF

 1    demonstrated a consistent statistically significant

 2    and potentially clinically important higher rate of

 3    reporting of adverse events in several analyzed

 4    categories.

 5                    B, given the pattern of reported

 6    events, a higher rate of death reports seem related

 7    to filter movement and filter embolization.

 8                    You referenced the MAUDE database

 9    earlier in questions, Doctor.  Is that information

10    important to you as a doctor that is implanting the

11    Recovery filter?

12                    MS. HELM:  Object to the form.

13                    MR. LERNER:  Which information?

14                    MR. MATTHEWS:  That is A and B that I

15    just read.

16                    MS. HELM:  Object to the form.

17                    MR. LERNER:  But you questioned him,

18    you said you referenced the MAUDE database before.

19    Your question then becomes confusing.  I'm asking

20    you to clarify it.

21                    MR. MATTHEWS:  All right.  I'll

22    strike it and ask another question.

23    BY MR. MATTHEWS:

24         Q.        In looking at A and B, Doctor, is

25    that the type of information that's important to you

1    to know prior to implanting a Recovery filter?

2         A.      Yes.

3                 MS. HELM:  Object to the form.

4    BY MR. MATTHEWS:

5         Q.      Do you know what the term

6    "statistically significant" means?

7         A.      I do.

8         Q.      And that's an important

9    epidemiological statement, correct?

10                MS. HELM:  Object to the form.

11                THE WITNESS:  Statistical statement,

12   yes.

13   BY MR. MATTHEWS:

14        Q.      Doctor, at ███████████████████

███   ██████  did you have more than one filter at your

16   disposal?  That is, you talked about, I think you

17   told me, you had the TRAPEASE, you had the Tulip,

18   and you had the Recovery, and you had the select.

19                Were all of those available back in

20   2007, do you recall?

21        A.      No.

22        Q.      Do you know which were available?

23        A.      The G2.

24        Q.      That was the only one available in

25   the hospital?

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    time period are you talking about now?

 2                    MR. MATTHEWS:  Well, that was kind of

 3    a general question as to filters in general.  So I

 4    will leave that open.

 5    BY MR. MATTHEWS:

 6         Q.      Whether you have a medical opinion

 7    from your practice, from your reading, from your

 8    research, from your treatment of patients, as to

 9    which filter failure would be the most dangerous,

10    producing the most serious injury to a patient.

11                    MS. HELM:  Object to the form.

12                    THE WITNESS:  I do.

13    BY MR. MATTHEWS:

14         Q.      What's your opinion?

15         A.      Obviously, all complications are bad,

16    although caval thrombosis can be devastating in

17    terms of lower extremity edema and dysfunction.  I

18    think that migration or fracture are more serious

19    events.

20         Q.      Were you ever told, at any time prior

21    to today and being shown some documents about the

22    MAUDE database, that Bard evaluated specifically the

23    MAUDE database to compare their filter with others

24    in 2004?

25                    MS. HELM:  Object to the form.
```

```
 1                    THE WITNESS:  No.

 2   BY MR. MATTHEWS:

 3        Q.      Is that the type of information you

 4   would expect a manufacturer that sets out to make a

 5   decision, or at least look at the MAUDE information

 6   to determine filter fracture compared to other

 7   filters on the market, is that the type of

 8   information you want to know about?

 9                    MS. HELM:  Object to the form.

10                    THE WITNESS:  Yes.  But it's a bit

11   more complicated in the sense that my understanding

12   of the MAUDE database is that it is a voluntary

13   database.  It's not legally required for a physician

14   to report a problem with an implant or a product,

15   although you could argue that it is ethically

16   required.  As with any database, it has problems

17   with regards to vetting of data, with regards to

18   accuracy of data.

19                    So if a concern existed regarding a

20   particular product, yes, I think that should be

21   brought forth and studied, scientifically studied

22   and addressed.

23   BY MR. MATTHEWS:

24        Q.      At a bare minimum, the MAUDE database

25   would be a signal, a red flag --
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1                    MS. HELM:  I'm sorry, can the folks

 2     on the phone, can you please mute the phones?  We're

 3     getting all kinds of noise.

 4                    Thank you.

 5     BY MR. MATTHEWS:

 6          Q.       Knowing about the lack of efficacy

 7     and the fact there was no reduction mortality in

 8     PREPIC 1 nor PREPIC 2, with the information I've

 9     shown you that there was a fivefold increased risk

10     for fracture with the G2, ███████████████████████

       ████████████████████████████████████, would you

12     have implanted that G2?

13                    MS. HELM:  Object to the form.

14     Mischaracterizes the prior testimony.

15                    MR. LERNER:  It's unclear, are you

16     talking about any filter or this particular filter?

17                    MR. MATTHEWS:  I was talking about

18     taking into account the lack of efficacy and the

19     fact there were no reduction in mortality in PREPIC

20     1 and PREPIC 2, coupled with the fact that the G2

21     had a fivefold increased risk for fracture compared

22     to other filters.

23     BY MR. MATTHEWS:

24          Q.       In ██████ would you have implanted that

25     filter?
```

1                    MS. HELM:  Object to the form.

2                    MR. LERNER:  That particular filter?

3                    MR. MATTHEWS:  That particular

4        filter.

5                    THE WITNESS:  The PREPIC 1 trial is a

6        great study, and it's a very interesting study.  But

7        there are problems in this study, as there are

8        problems with every study.  And the fundamental

9        problem that you have with this trial is that it

10       randomized patients who were candidates for caval

11       interruption or not; in other words, all patients

12       were treated with blood thinners.  It doesn't really

13       address the question of what to do with those

14       patients that cannot be treated with blood thinners.

15       ████████████████████████████████████

█  ████  ████  ████████████████████████████

█  ██████████████████████  ████████████████████

█  ████████████████████████████  █████████  ██

█  ██████  ██████  ████████████████████████████

█  ██████████████████

█  ████████████████████████████████

█  ██████  ██████  ████████████████████████████

█  ██████████████████  ██████  ██████████████████

█  ██████████████████

25                   With regards to the Bard filter,

1    would I have used a different device if I knew at

2    the time that the Bard filter was not ideal or as

3    good as some of the other implants?  The answer

4    would have to be yes.

5    BY MR. MATTHEWS:

6            Q.      You would have used --

7            A.      I would have used a different filter

8    if there was a different filter that I knew of that

9    was better, in terms of its safety profile.

10           Q.      In terms of the documents that you

11   have, I think they are Exhibit-2 and 3, the health

12   hazard report and then the investigation conducted

13   by Bard that showed a fivefold increased risk for

14   fracture and embolization of that fracture, and you

15   told us that would be the type of information you

16   would want to know in your benefit/risk analysis,

17   knowing that --

18           A.      Yes.

19           Q.      -- and seeing that today, would that

20   have been enough to use another filter?

21                   MS. HELM:  Object to the form.

22                   THE WITNESS:  Difficult to say with

23   certainty.  It would depend upon what other filters

24   we had at the time and what their problems would

25   have been.  But it would have been a very important

```
 1    piece of information, as far as making decisions

 2    regarding this or any other patient, yes.

 3    BY MR. MATTHEWS:

 4          Q.      And it would have influenced your

 5    prescribing habit?

 6                  MS. HELM:  Object to the form.

 7                  THE WITNESS:  Yes.

 8    BY MR. MATTHEWS:

 9          Q.      Let me show you a study, I'm going to

10    mark this as ██████ Exhibit Number 7.  And this is

11    entitled, The Prevalence of Fracture -- I'm sorry,

12    let me hand that to you.

13          A.      Sure.

14          Q.      The Prevalence of Fracture and

15    Fragment Embolization of Bard Retrievable Vena Cava

16    Filters and Clinical Implications Including Cardiac

17    Perforation and Tamponade.

18                        -   -   -

19                  (Whereupon, Exhibit-7, AMA,

20    Prevalence of Fracture and Fragment Embolization of

21    Bard Retrievable Vena Cava Filters and Clinical

22    Implications Including Cardiac Perforation and

23    Tamponade, was marked for identification.)

24                        -   -   -

25    BY MR. MATTHEWS:
```

```
 1    if you extrapolate indwelling time with the G2

 2    filter, that making it a 25 percent filter fracture

 3    rate for the G2.

 4                  Do you understand that premise within

 5    the paper?

 6         A.      I think I understand the premise.

 7    I'm not so sure that I understand the science behind

 8    it.

 9         Q.      Well, let me ask you this question,

10    then, Doctor:  If you knew back in ███ when you

11    were implanting that filter that there was even a 12

12    percent probability of fracture with that filter,

13    would you have used a G2?

14                  MS. HELM:  Object to the form.

15                  THE WITNESS:  Unlikely.

16    BY MR. MATTHEWS:

17         Q.      If there was a 25 percent risk of

18    filter fracture, can we safely say you would not

19    have used that filter?

20         A.      Most likely.  But you have to

21    understand that you have to have a way of treating

22    these difficult patients.  So some filter has to be

23    used.  And it becomes a matter of deciding which

24    filter is best, so to speak.  And sometimes that's

25    not entirely clear.
```

```
 1    longer contraindicated for anticoagulants?

 2                    MR. MATTHEWS:  Object to the form.

 3                    THE WITNESS:  Yes.

 4    BY MS. HELM:

 5         Q.     And as you sit here today, ▮▮▮▮▮▮

      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, do

 7    you?

 8         A.     I can only guess.

 9         Q.     We're not asking you to guess.

10                    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

      ▮▮▮▮▮▮▮▮▮▮▮ you were aware of the potential

12    complications associated with that filter, were you

13    not?

14                    MR. MATTHEWS:  Object to the form.

15                    THE WITNESS:  Of the G2 filter?

16    BY MS. HELM:

17         Q.     Yes.

18         A.     The reported complications at the

19    time I was aware of, I'm sure.

20         Q.     And, in fact, you previously looked

21    at Exhibit-4, which was the IFU --

22         A.     Yes.

23         Q.     -- for the G2 filter.

24                    And you would have had that IFU

25    available to you ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1          Q.      And you don't know whether the FDA

 2   was fully satisfied with information it received

 3   from Bard and with its continuing to market the

 4   Recovery filter despite analysis of complications;

 5   is that right?

 6          A.      That's right.

 7          Q.      And you were asked if you knew why

 8   the Recovery filter was taken off the market.

 9                  Do you recall that question?

10          A.      Yes.

11          Q.      And do you understand that the G2

12   filter is a second generation?

13          A.      I do.

14          Q.      And, in fact, it replaced the

15   Recovery filter?

16          A.      Indeed.

17          Q.      So does it make sense to you that

18   when they put the G2 on the market they took the

19   Recovery off the market?

20          A.      Yes.

21          Q.      And are you aware that there was a

22   filter that replaced the G2?

23          A.      I've since stopped using the Bard

24   filters, so I'm not familiar with that particular

25   product.
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1   designed --

 2         A.      No.

 3         Q.      -- an IVC filter, correct?

 4         A.      No.

 5         Q.      And you've never built one?

 6         A.      I just do my best to put them in.

 7         Q.      Thank you.

 8                 Do you recall any specific

 9   discussions you had with the sales reps from Bard

10   regarding the G2 filter?

11         A.      No.

12         Q.      Do you recall ever raising any

13   questions or concerns with the sales reps regarding

14   the G2 filter?

15         A.      No.

16         Q.      Your decision to stop using Bard

17   filters was based on your review of literature; is

18   that right?

19         A.      It would be based on multiple --

20   multiple factors.  As I told you before, my personal

21   experience was that initially the complication rate

22   was low and acceptable.  But long-term durability of

23   these implants became clear based on reports

24   published in the literature, based on discussions

25   with colleagues.
```

```
 1    general?  Yes, of course.  I think we alluded to

 2    that previously in the sense that we have pushed

 3    away from using filters and make sure that when we

 4    use them, we use them in those patients who have

 5    absolute indications for implantation.

 6              Q.      Doctor, you were asked a number of

 7    times today, if something is true, would that have

 8    impacted your decision of whether to use a certain

 9    filter or not.

10              Do you recall those questions?

11              A.      Yes, I do.

12              Q.      What you have not been provided today

13    is with any peer-reviewed or reliable information

14    showing that those "ifs" are, in fact, true; is that

15    right?

16                      MR. MATTHEWS:  Object to the form.

17                      MR. LERNER:  That's more a statement

18    than a question, don't you think?

19                      THE WITNESS:  I agree.

20    BY MS. HELM:

21              Q.      And for you to make an evaluation and

22    to make a decision relating to whether you would

23    have done something or not, it would be important

24    for you to have reliable and complete information;

25    is that right?
```

1          A.      Yes.

2                  MS. HELM:  That's all I have right

3     now.

4                  MR. MATTHEWS:  I have just some quick

5     follow-ups.

6                  THE WITNESS:  Okay.

7                       -  -  -

8                  EXAMINATION

9                       -  -  -

10    BY MR. MATTHEWS:

11         Q.      You were just asked about

12    peer-reviewed information that's been put in front

13    of you.

14         A.      Yes.

15         Q.      The Nicholson article is a

16    peer-reviewed journal article; is that correct?

17         A.      It is.

18         Q.      And let me show you the next exhibit,

19    which is the VJ study, which is called --

20                  MS. HELM:  What exhibit?

21                  MS. BLAS:  12.

22                       -  -  -

23                  (Whereupon, Exhibit-12, Fractured

24    Bard Recovery, G2, and G2, Express Inferior Vena

25    Cava Filters:  Incidence, Clinical Consequences, and

```
 1    outcomes of Removal Attempts, was marked for

 2    identification.)

 3                            -  -  -

 4    BY MR. MATTHEWS:

 5         Q.       It's called, Fractured Bard Recovery,

 6    G2 and G2 Express Interior Vena Cava Filters,

 7    Incidence, Clinical Consequences and Outcomes of

 8    Removal Attempts.

 9                  This is in the Journal of Vascular

10    and Interventional Radiology, 2012.  That's also a

11    peer-reviewed journal article, correct?

12         A.       It is.

13         Q.       And the results is -- the results

14    are, A total of 63 fractured Recovery, G2, G2

15    Express were identified, for an overall fracture

16    rate of 12 percent.

17                  So this is a second peer-reviewed

18    journal that talks about the fracture rate of the

19    G2, correct?

20         A.       Correct.

21         Q.       Let me show you the Deso study, which

22    is also a peer-reviewed journal article comparing

23    the filters, G2, with other filters, in terms of

24    their fracture rate.  And we're going to mark this

25    as Exhibit-13.
```

```
 1                        -   -   -
 2                (Whereupon, Exhibit-13,
 3    Evidence-Based Evaluation of Inferior Vena Cava
 4    Filter Complications Based on Filter Type, was
 5    marked for identification.)
 6                        -   -   -
 7    BY MR. MATTHEWS:
 8         Q.      This is in Interventional Radiology,
 9    also a peer-reviewed journal article, by Deso,
10    Idakoji and William Kuo.
11                If I could turn your attention to the
12    Table 2.
13         A.      Sorry about that, I just wanted to
14    read that first paper.
15         Q.      It's okay.
16                I was just trying to move it along,
17    but you can take as long as you want.
18                Have you seen this article before?
19         A.      I have not.
20         Q.      All right.  This is from the Division
21    of Vascular and Interventional Radiology at Stanford
22    University.  And this was published in 2012.
23                And if I could turn your attention to
24    Table 2 on the fifth page.
25         A.      Okay.
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1           Q.      This table, Doctor.

 2           A.      Okay.

 3           Q.      I think it's the fifth page or so,

 4    Page 97.

 5           A.      Okay.

 6           Q.      Have you seen the comparison of

 7    filters and the fracture rate between filters before

 8    today?

 9                   MR. LERNER:  Are you talking about

10    that page?

11                   THE WITNESS:  No.

12                   MR. MATTHEWS:  I'm sorry?

13                   MR. LERNER:  Are you talking about

14    that page?

15    BY MR. MATTHEWS:

16           Q.      Well, actually, the question is more

17    general than that.

18                   Have you seen a comparison of

19    filters, the fracture rates between published

20    journal articles, such as we see in Table 2?

21           A.      I have not seen this particular paper

22    before, and I have not seen data like this before.

23           Q.      Is that a peer-reviewed journal

24    article as well?

25           A.      It is.
```

# EXHIBIT C



# G2
## FILTER SYSTEM
### for Permanent Placement

*Timeless Performance®*

**G2 Filter System**
**Femoral Vein Approach**

## ENGLISH

## Instructions for Use

### For use in the Vena Cava

Caution: Federal (U.S.A.) law restricts this device to sale by or on the order of a physician.

### A. General Information

The G2 Filter represents a new generation of venous interruption devices designed to prevent pulmonary embolism. The unique design and material of the G2 Filter provide filtering efficiency and allow percutaneous placement through a standard 7 French I.D. angiographic introducer catheter with minimum entry site difficulties. The placement procedure is quick and simple to perform.

The Femoral set is designed to advance through its 48 cm, 7 French I.D. introducer catheter using a flexible, nitinol pusher wire. A pad at the end of the wire is designed to push on the filter apex and a grooved segment is designed to hold and properly orient the filter legs. These components secure the filter to the pusher wire as it advances the filter, tip-first, to the distal end of the catheter, positioned 1 cm below the lowest renal vein. When the tip of the filter approaches the tip of the introducer catheter, it will be positioned between the radiopaque markers on the introducer catheter. The introducer catheter and delivery assembly are then pulled back onto the pusher wire handle to unsheath and release the filter and allow it to recover to its predetermined shape. The centering system allows the G2 Filter to be deployed with the filter tip centered and minimizes the potential for legs crossing.

The G2 Filter is designed to act as a permanent filter.

MRI Compatible: The G2 Filter implant is MRI-safe and neither interferes with nor is affected by the operations of an MRI device. The G2 Filter performance was evaluated in a shielded 1.5-Tesla MRI system.

### B. Device Description

The G2 Filter System - Femoral consists of the filter and delivery system. The G2 Filter consists of twelve, shape-memory nitinol wires emanating from a central nitinol sleeve. These twelve wires form two levels of filtration of emboli: the legs provide the lower level of filtration and the arms provide the upper level of filtration. The G2 Filter is intended to be used in the inferior vena cava (IVC) with a diameter less than or equal to 28 mm.

The G2 Filter System - Femoral is illustrated in Figure A. The delivery system consists of a 7 French I.D. introducer catheter and dilator, the G2 Filter, a storage tube with saline infusion port, and a pusher system. The G2 Filter is packaged pre-loaded within the delivery storage tube.

### Figure A. G2 Filter System - Femoral



A.   INTRODUCER CATHETER
B.   FILTER STORAGE TUBE
C.   SALINE DRIP INFUSION SET
D.   SIDE PORT
E.   ADJUSTABLE TOUHY-BORST ADAPTER
F.   NITINOL PUSHER WIRE
G.   PUSHER WIRE HANDLE

**IMPORTANT:** Read instructions carefully before using the G2 Filter

### C. Indications for Use

The G2 Filter System - Femoral is indicated for use in the prevention of recurrent pulmonary embolism via permanent placement in the vena cava in the following situations:

•   Pulmonary thromboembolism when anticoagulants are contraindicated.
•   Failure of anticoagulant therapy for thromboembolic disease.
•   Emergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced.
•   Chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated.

### D. Contraindications for Use

CAUTION:  If the IVC diameter exceeds 28 mm, the filter must not be inserted into the IVC.

The G2 Filter should not be implanted in:

•   Pregnant patients when fluoroscopy may endanger the fetus.  Risks and benefits should be assessed carefully.
•   Patients with an IVC diameter larger than 28 mm.
•   Patients with risk of septic embolism.

### E. Warnings

G2 Filter Implantation

1.    The G2 Filter is pre-loaded into the storage tube and is intended for single use only.  Do not deploy the filter prior to proper positioning in the IVC, as the G2 Filter cannot be safely reloaded into the storage tube.
2.    Do not deploy the filter unless IVC has been properly measured.  (Refer to Precaution # 4.)
3.    Delivery of the G2 Filter through the introducer catheter is advance only.  Retraction of the pusher wire during delivery could result in dislodgment of the filter, crossing of filter legs or arms, and could result in damage to the filter from further advancement within the introducer catheter.
4.    The G2 Filter System - Femoral is designed for femoral approaches only.  Never use the G2 Filter and Delivery System for superior approaches (jugular, subclavian or antecubital vein), as this will result in improper G2 Filter orientation within the IVC.

5.    If large thrombus is demonstrated at the initial delivery site, do not attempt to deliver the filter through it as migration of the clot and/or filter may occur.  Attempt filter delivery through an alternate site.  A small thrombus may be bypassed by the guidewire and introducer catheter.
6.    Never advance the guidewire or introducer catheter/dilator or deploy the filter without fluoroscopic guidance.
7.    Filter fracture is a known complication of vena cava filters. There have been reports of embolization of vena cava filter fragments resulting in retrieval of the fragment using endovascular and/or surgical techniques. Most cases of filter fracture, however, have been reported without any adverse clinical sequelae.
8.    Movement or migration of the filter is a known complication of vena cava filters. This may be caused by placement in IVCs with diameters exceeding the appropriate labeled dimensions specified in the IFU. Migration of filters to the heart or lungs has been reported in association with improper deployment, deployment into clots and/or dislodgment due to large clot burdens.
9.    Persons with allergic reactions to nickel may suffer an allergic response to this implant.
10.   After use, the G2 Filter System and accessories may be a potential biohazard.  Handle and dispose of in accordance with accepted medical practice and applicable laws and regulations.

See Potential Complications section for further information regarding other known filter complications.

### F. Precautions

The safety and effectiveness of the G2 Filter System for use as a retrievable or temporary filter have not been established.

G2 Filter Implantation

1.    The filter should be placed in the suprarenal position in pregnant women and in women of childbearing age.[1]
2.    Anatomical variances may complicate filter insertion and deployment. Careful attention to these instructions for Use can shorten insertion time and reduce the likelihood of difficulties.
3.    Position the filter tip 1 cm below the lowest renal vein. Venacavography must always be performed to confirm proper implant site.  Radiographs without contrast, which do not clearly show the wall of the IVC, may be misleading.
4.    When measuring caval dimensions, consider an angiographic catheter or IntraVascular Ultrasound (IVUS) if there is any question about caval morphology.
5.    Spinal deformations: It is important to exercise care when contemplating implantation in patients with significant kyphoscoliotic spinal deformations because the IVC may follow the general course of such anatomic deformations.
6.    In patients with continued risk of chronic, recurrent pulmonary embolism, patients should be returned to anti-thrombotic therapy as soon as it is deemed safe.
7.    If resistance is encountered during a femoral insertion procedure, withdraw the guidewire and check vein patency fluoroscopically with a small injection of contrast medium.  If a large thrombus is demonstrated, remove the venipuncture needle and use the vein on the opposite side.  A small thrombus may be bypassed by the guidewire and introducer.
8.    The introducer catheter has radiopaque markers to assist in visualization and predeployment filter positioning.  The radiopaque markers on the introducer catheter provide a "target" location between which the filter should be positioned just prior to unsheathing and deployment.
9.    The introducer catheter has a special internal design.  Care should be taken to make connections firmly, but without excessive force that may cause breakage of the hub.
10.   It is very important to maintain introducer catheter patency with the saline flush so that the grooved segment that holds and properly orients the filter legs does not become covered by clot.  This will interfere with filter deployment.
11.   Do not deliver the filter by pushing it beyond the end of the introducer catheter.  To achieve proper placement, unsheath the stationary filter by withdrawing the introducer catheter.  Do not twist the pusher wire handle at anytime during this procedure.

### G. Potential Complications

Procedures requiring percutaneous interventional techniques should not be attempted by physicians unfamiliar with the possible complications.  Complications may occur at any time during or after the procedure.

Possible complications include, but are not limited to, the following:

•   Movement or migration of the filter is a known complication of vena cava filters. This may be caused by placement in IVCs with diameters exceeding the appropriate labeled dimensions specified in the IFU.  Migration of filters to the heart or lungs have also been reported in association with improper deployment, deployment into clots and/or dislodgment due to large clot burdens.
•   Filter fracture is a known complication of vena cava filters. There have been reports of embolization of vena cava filter fragments resulting in retrieval of the fragment using endovascular and/or surgical techniques. Most cases of filter fracture, however, have been reported without any adverse clinical sequelae.
•   Perforation or other acute or chronic damage of the IVC wall.
•   Acute or recurrent pulmonary embolism. This has been reported despite filter usage. It is not known if thrombi passed through the filter, or originated from superior or collateral vessels.
•   Caval thrombosis/occlusion.
•   Extravasation of contrast material at time of venacavogram.
•   Air embolism.
•   Hematoma or nerve injury at the puncture site.
•   Hemorrhage.
•   Restriction of blood flow.
•   Occlusion of small vessels.
•   Distal embolization.
•   Infection.
•   Intimal tear.
•   Stenosis at implant site.

All of the above complications have been associated with serious adverse events such as medical intervention and/or death.  There have been reports of complications, including death, associated with the use of vena cava filters in morbidly obese patients.  The risk/benefit ratio of any of these complications should be weighed against the inherent risk/benefit ratio for a patient who is at risk of pulmonary embolism without intervention.

### H. Equipment Required

The following equipment is required for use:

•   One G2 Filter and Delivery System that contains:
    -One 48 cm, 7 French I.D. introducer catheter and dilator set
    -One storage tube with pre-loaded G2 Filter and pusher delivery system
•   0.038" 3 mm J-tipped Guidewire, 110 cm long or longer
•   18 gauge entry needle
•   Saline
•   Sterile extension tube for saline drip or syringe for saline infusion
•   All basic materials for venipuncture: scalpel, #11 blade, local anesthesia, drapes, etc

I. Directions for Use

Insertion of the 7 French Introducer Catheter and Preliminary Venography

1. Select a suitable femoral venous access route, on either the right or left side, depending upon the patient's size or anatomy, operator's preference or location of venous thrombosis.
2. Prep, drape and anesthetize the skin puncture site in standard fashion.
3. Select and open the filter package. Open Kit A Introducer Catheter package.
4. Nick the skin with a #11 blade and perform venipuncture with an 18-gauge entry needle.
5. Insert the J-tipped guidewire and gently advance it into the distal vena cava or iliac vein.

Precaution: If resistance is encountered during a femoral insertion procedure, withdraw the guidewire and check vein patency fluoroscopically with a small injection of contrast medium. If a large thrombus is demonstrated, remove the venipuncture needle and try the vein on the opposite side. A small thrombus may be bypassed by the guidewire and introducer.

6. Remove the venipuncture needle over the J-tipped guidewire. Advance the 7 French introducer catheter together with its tapered dilator over the guidewire and into the distal vena cava or the iliac vein.

Precaution: The Introducer catheter has radiopaque markers to assist in visualization and predeployment filter positioning. The radiopaque markers on the introducer catheter provide a "target" location between which the filter should be positioned just prior to unsheathing and deployment.

7. Remove the guidewire and dilator, leaving the Introducer catheter with its tip in the distal vena cava or iliac vein. Flush intermittently by hand or attach to the Introducer catheter a constant saline drip infusion to maintain Introducer catheter patency.

Precaution: The Introducer catheter hub has a special internal design. Care should be taken to make connections firmly, but without excessive force that may cause breakage in the hub.

8. Perform a standard inferior venacavogram (typically 30 mL of contrast medium at 15 mL/s). Check for caval thrombi, position of renal veins and congenital anomalies. Select the optimum level for filter placement and measure the IVC diameter, correcting for magnification (typically 20 percent).
9. Advance the Introducer catheter to the selected level under fluoroscopic control. The guidewire and dilator should be reinserted to facilitate this. For femoral insertion, the Introducer catheter tip should be 1 cm below the lowest renal vein.
10. Remove the filter and delivery system from Kit B and flush with saline.

Precaution: It is very important to maintain Introducer catheter patency during the saline flush so that the grooved segment that holds and properly orients the filter legs does not become clotted over. This will interfere with filter deployment.

11. Attach the free end of the filter storage tube directly to the Introducer catheter already in the vein. The Introducer catheter and filter delivery system should be in a straight line to minimize friction.
12. Advance the filter by moving the nitinol pusher wire forward through the Introducer catheter, advancing the filter with each forward motion of the pusher wire (Figures A-D). Do not pull back on the pusher wire, only advance the pusher wire forward. For the operator's convenience, the nitinol pusher wire may be looped, without causing kinking to the nitinol material, to facilitate pusher wire handling and advancement.

## Advancement of Filter, Illustrated



FIGURE A — Grasp Wire, Push Forward

FIGURE B — Release Wire

FIGURE C — Move Hand Backwards

FIGURE D — Regrasp Wire

13. Continue forward movement of the pusher wire until the filter tip advances to the radiopaque marker on the distal end of the Introducer catheter. At this point, the pusher wire handle should be adjacent to the Y-adapter.

Filter Release/Deployment

14. Deliver and release filter as described below.
   Figure E: Firmly hold the pusher wire handle. Keep this hand stationary throughout the entire filter release/deployment process.
   Figure E-1: Filter positioned in Introducer catheter between the radiopaque markers prior to deployment in IVC.

## Filter Release, Illustrated



FIGURE E
FIGURE E-1

FIGURE F
FIGURE F-1 — Hold Hand Stationary

Pull Hand Back

FIGURE G
FIGURE G-1

Precaution: Do not deliver the filter by pushing it beyond the end of the Introducer catheter. Instead, unsheath the stationary filter by withdrawing the Introducer catheter as described below. Do not twist the pusher wire handle at anytime during this procedure.

Position the filter tip 1 cm below the lowest renal vein.

Figure F: With one hand held stationary, the other hand draws the Y-adapter and storage tube assembly back completely over the handle, uncovering and releasing the filter. Ensure that there is no slack or bend in the system during the filter release/deployment process. The Y-adapter and storage tube assembly should be retracted in one smooth, continuous motion.
   Figure F-1: Unsheathing of filter in IVC.
   Figure G: The position of the hands at the completion of the unsheathing process.
   Figure G-1: The filter deployed in the IVC.

15. Now withdraw the pusher wire back into the storage tube by firmly holding the Y-adapter, storage tube, and Introducer catheter assembly and pulling back on the pusher wire. Do not twist the pusher wire handle at anytime during this procedure.
16. Resume the intermittent saline flush or constant drip infusion to maintain Introducer catheter patency.

Follow-up Venacavogram

17. A follow-up venacavogram may be performed after withdrawing the Introducer catheter into the iliac vein (typically 30mL of contrast medium at 15mL/s).
18. Remove the Introducer catheter and apply routine compression over the puncture site in the usual way to achieve hemostasis.

J. How Supplied

Each G2 Filter is supplied preloaded in a storage tube. Each G2 Filter is sterile and nonpyrogenic unless the package is damaged or opened, and is ready for single use only. The storage tube and delivery system are pre-assembled. If the filter is inadvertently discharged, do not attempt to re-sterilize or reload it.

Warning: After use, the G2 Filter Delivery System and accessories may be a potential biohazard. Handle and dispose of in accordance with accepted medical practice and applicable local, state and federal laws and regulations.

The G2 Filter should be stored in a cool (room temperature), dry place.

K. Warranty

Bard Peripheral Vascular warrants to the first purchaser of this product that this product will be free from defects in materials and workmanship for a period of one year from the date of first purchase and liability under this limited product warranty will be limited to repair or replacement of the defective product, in Bard Peripheral Vascular's sole discretion or refunding your net price paid. Wear and tear from normal use or defects resulting from misuse of this product are not covered by this limited warranty.

TO THE EXTENT ALLOWABLE BY APPLICABLE LAW, THIS LIMITED PRODUCT WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. IN NO EVENT WILL BARD PERIPHERAL VASCULAR BE LIABLE TO YOU FOR ANY INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM YOUR HANDLING OR USE OF THIS PRODUCT.

Some states/countries do not allow an exclusion of implied warranties, incidental or consequential damages. You may be entitled to additional remedies under the laws of your state/country.

Labeling Issue Date: 10/06. In the event 3 years have elapsed between this date and product use, the user should contact C. R. Bard, Inc. to see if additional product information is available.

References:

1. Quality Improvement Guidelines for Percutaneous Permanent Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism. Grassi, Swan, Cardella, et al. J Vasc Interv Radiol 2003; 14:S271-S275.

 G2 Filter System for Permanent Placement

 MRI compatible: MRI-safe and neither interferes with nor is affected by the operations of an MRI device.

 Use By

 Contents:   Kit A:   One (1) 7 Fr. Introducer  Catheter 48cm Long with Dilator
                         Kit B:   One (1) G2 Filter Femoral Delivery System

 Lot Number

 Protect From Heat

**REF** Catalog Number

 Keep Dry

 Attention, See Instructions for Use

 Manufactured By:

 Sterilized By Using Ethylene Oxide

 Bard and Timeless Performance are registered trademarks of C. R. Bard, Inc. or an affiliate.
G2 is a trademark of C. R. Bard, Inc. or an affiliate.

 Non-pyrogenic

 Variously protected by one or more of the following U.S. Patents: 6,007,558 and 6,258,026.  Other U.S. and Foreign Patents Pending.
Copyright © 2006 C. R. Bard, Inc. All rights reserved. Printed in U.S.A.

 Single Use.

 Do Not Resterilize.

 Do Not Use If Package Is Damaged Or Opened.



 Manufactured By:
**Bard Peripheral Vascular, Inc.**
P.O. Box 1740
1625 West 3rd Street
Tempe, AZ 85280-1740
USA

TEL:  1-480-894-9515
        1-800-321-4254
FAX:  1-480-966-7062
        1-800-440-5376
        www.bardpv.com

# EXHIBIT D

# (Redacted and Filed Under Seal)

```
 1                UNITED STATES DISTRICT COURT
                     DISTRICT OF ARIZONA
 2

     ------------------------------§
 3                                 §
     In Re Bard IVC Filters        § No. MD-15-02641-PHX-DGC
 4   Products Liability Litigation §
                                   §
 5   ------------------------------§
 6

 7

 8                        - - -
 9               Thursday, June 15, 2017
10                        - - -
11

                    ** DO NOT DISCLOSE **
12

       ** SUBJECT TO FURTHER CONFIDENTIALITY REVIEW **
13

14                        - - -
15

16

17          Videotaped deposition of ███████████ ████,
     held at Mahaffey, Pickens & Tucker, 1550 North
18   Brown Road, Suite 125, Lawrenceville, Georgia,
     commencing at 10:09 a.m., on the above date,
19   before Susan D. Wasilewski, Registered
     Professional Reporter, Certified Realtime
20   Reporter, Certified Realtime Captioner, Certified
     Manager of Reporting Services, Florida
21   Professional Reporter, Certified Court Reporter
     (NJ), and Realtime Systems Administrator
22

                         - - -
23

                 GOLKOW LITIGATION SERVICES
24        877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
25
```

Do Not Disclose - Subject to Further Confidentiality Review















It



# EXHIBIT E

## (Redacted and Filed Under Seal)

Patient: BOOKER, SHERR UNA    MRN: 41306035    Encounter: 1420400289



OneContent: Generated By GHS_NT1\sdunnigan    Generated On: 08/23/2016 11:25

BOOKERS_GWIMC_MDR00447

Patient: BOOKER, SHERR UNA   MRN: 41306035   Encounter: 1420400289



GWIMC_MDR00448

Patient: BOOKER, SHERR UNA   MRN: 41306035   Encounter: 1420400289



BOOKERS_GWIMC_MDR00449

# EXHIBIT F

# (Redacted and Filed Under Seal)



Deposition of:
# Darren Robert Hurst , M.D.

*July 21, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Darren Robert Hurst , M.D.                    July 21, 2017
In Re: Bard IVC Filters Products Liability

Page 179



13        A.    Again, any sharp foreign body in the

14   body has a risk of causing a problem.  We don't

15   know.  I have no idea where it could go or what it

16   could do.

17        Q.

Darren Robert Hurst , M.D.                    July 21, 2017
In Re: Bard IVC Filters Products Liability

Page 185



# EXHIBIT G

# (Redacted and Filed Under Seal)



Deposition of:

## Sherr-Una Booker

*February 20, 2017*

In the Matter of:

## In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Sherr-Una Booker                                    February 20, 2017
In Re: Bard IVC Filters Products Liability



Page 181

Sherr-Una Booker                                    February 20, 2017
In Re: Bard IVC Filters Products Liability

Page 185



Page 186



Sherr-Una Booker                    February 20, 2017
In Re: Bard IVC Filters Products Liability

Page 195



Sherr-Una Booker                    February 20, 2017
In Re: Bard IVC Filters Products Liability

Page 196



9        Q      Who went to the hospital with you when you

10   had the ▇▇▇▇▇▇▇▇▇

11       A      My mother, my sons.

12       Q      Both sons?

13       A      I believe both of them were here at the

14   time.

15       Q      Okay.

16       A      Yes, they were both here actually.

17       Q      Did Mr. Hairston go?

18       A      He was here.  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

20       Q      And what about Ms. Eddy, did she come to

21   the hospital, because she was staying with you then?

22       A      Bridgette Epps?

23       Q      I'm sorry, Ms. Epps, yes.

24       A      She didn't come that day, but she did come

25   when I was in the ICU.  My family took turns staying

Sherr-Una Booker                    February 20, 2017
In Re: Bard IVC Filters Products Liability

Page 202



Page 203





Sherr-Una Booker                                February 20, 2017
In Re: Bard IVC Filters Products Liability

Page 209



```
 5        Q    What is your understanding of what

 6   pericarditis is?

 7        A    It's the sac around the heart that becomes

 8   inflamed.

 9        Q
```

Sherr-Una Booker                                         February 20, 2017
In Re: Bard IVC Filters Products Liability



Page 215

Sherr-Una Booker                    February 20, 2017
In Re: Bard IVC Filters Products Liability



Page 216

Sherr-Una Booker                                    February 20, 2017
In Re: Bard IVC Filters Products Liability



Sherr-Una Booker                    February 20, 2017
In Re: Bard IVC Filters Products Liability

