1

2

3

4

5

6              UNITED STATES DISTRICT COURT

7                  DISTRICT OF ARIZONA

8   In Re Bard IVC Filters Products          No. MD-15-02641-PHX-DGC
9   Liability Litigation

10  SHERR-UNA BOOKER, an individual,
                                             **EXHIBIT INDEX**
11              Plaintiff,
                                             **PLAINTIFF, SHERR-UNA BOOKER'S**
12  v.                                       **SUPPLEMENT TO THE "PLAINTIFFS'**
                                             **OMNIBUS SEPARATE STATEMENT OF**
13  C.R. BARD, INC., a New Jersey            **FACTS IN SUPPORT OF THEIR**
    corporation and BARD PERIPHERAL          **RESPONSE TO DEFENDANTS'**
14  VASCULAR, an Arizona corporation,        **MOTION FOR SUMMARY JUDGMENT**
                                             **IN THE BELLWETHER CASES"**
15              Defendants.

16

17       Exhibit B-A   Plaintiff's Medical Records
                       (Redacted and Filed Under Seal)
18
         Exhibit B-B   Marcus D'Ayala M.D. Deposition Excerpts 3-21-17
19                     (Redacted and Filed Under Seal)

20       Exhibit B-C   Brandon Kang MD Deposition Excerpts 6-15-17
                       (Redacted and Filed Under Seal)
21
22       Exhibit B-D   Harvey MD Deposition Excerpts 6-20-17
                       (Redacted and Filed Under Seal)
23
         Exhibit B-E   Sherr-Una Booker Deposition Excerpts 2-20-17
24                     (Redacted and Filed Under Seal)

25       Exhibit B-F   Robert Ferrara Deposition Excerpts 4-7-17
26
         Exhibit B-G   BPVE-01-00719569 (Filed Under Seal)
27
         Exhibit B-H   Natalie Wong Deposition Excerpts 10-18-16
28

Exhibit B-I    BPVEFILTER-45-00019568 (Filed Under Seal)

Exhibit B-J    BPV-17-01-00108473 (Filed Under Seal)

Exhibit B-K   K102511-Meridian 8-24-11

Exhibit B-L    BPVEFILTER-45-00012404 (Filed Under Seal)

Exhibit B-M   BPV-17-01-00148749 (Filed Under Seal)

Exhibit B-N   Mark W. Moritz M.D. Deposition Excerpts

Exhibit B-A

**(Redacted and Filed Under Seal)**



1/11/2017 9:15 AM

BOOKERS_NYMH_MDR00108



1/11/2017 9:15 AM

BOOKERS_NYMH_MDR00109





1/11/2017 9:15 AM

BOOKERS_NYMH_MDR00069



OneContent  Generated By GHS_NT1\sdunnigan    Generated On: 08/23/2016 11:20

**BOOKERS_GWIMC_MDR01365**



OneContent. Generated By GHS_NT1\sdunnigan    Generated On. 08/23/2016 11 20

BOOKERS_GWIMC_MDR01366



BOOKERS_GWIMC_RAD00011



BOOKERS_GWIMC_RAD00012



BOOKERS_GWIMC_RAD00016



BOOKERS_GWIMC_RADOOOl7



BOOKERS_GWIMC_RAD00018



BOOKERS_GWIMC_RAD00019



OneContent: Generated By GHS_NT\\sdunnigan   Generated On: 08/23/2016 11:25

BOOKERS_GWIMC_MDR00447



OneContent: Generated By GHS_NT1\sdunnigan   Generated On: 06/23/2016 11:25

BOOKERS_GWIMC_MDR00448



OneContent: Generated By GHS_NT1\sdunnigan Generated On 08/23/2016 11:25

BOOKERS_GWIMC_MDR00449

# Exhibit B-B

## (Redacted and Filed Under Seal)

Do Not Disclose - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF ARIZONA
 3                        -   -   -
 4    IN RE BARD IVC FILTERS        : NO. MD-15-02641-PHX-DGC
      PRODUCTS LIABILITY LITIGATION    :
 5
 6
 7                        -   -   -
 8                   MARCH 21, 2017
 9                        -   -   -
            DO NOT DISCLOSE - SUBJECT TO FURTHER
10                 CONFIDENTIALITY REVIEW
11                 Videotape deposition of MARCUS
12    D'AYALA, M.D., taken pursuant to notice, was held at
13    the law offices of Aaronson Rappaport Feinstein &
14    Deutsch, LLP, 600 Third Avenue, New York, New York
15    10016, beginning at 12:45 p.m., on the above date,
16    before Amanda Dee Maslynsky-Miller, a Certified
17    Realtime Reporter and Notary Public in and for the
18    State of New York.
19
20                        -   -   -
21
22
23
               GOLKOW TECHNOLOGIES, INC.
24        877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
25
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1          A.      It is.

 2          Q.      All right.  The other 80 percent of

 3     the time, you are a clinician; that is, you spend

 4     time treating patients?

 5          A.      Correct.

 6          Q.      All right.

 7          A.      With a small amount of that time

 8     dedicated to administration of our division.
```



```
15          A.      I do not.

16          Q.      Have you had a chance to look at the

17     records, your records,

19          A.      I have.

20          Q.      Other than the review of the medical

21     record

                                    did you look at any

23     other medical records?

24          A.      I did.

25                  But for the sake of clarity, I must
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    will not treat that patient, in other words, that
 2    patient is being treated by someone else?
 3         A.      Yes.
 4         Q.      All right.  And if there's a decision
 5    to remove a filter, that decision is often someone
 6    else's, whether it's a primary care physician,
 7    whether it's the orthopedic surgeon, whether it's
 8    the internist that's treating that patient, that
 9    decision oftentimes isn't even yours?
10                 MS. HELM:  Object to the form.
11    BY MR. MATTHEWS:
12         Q.      Is that true?  Is that basically
13    true?
14                 MS. HELM:  Same objection.
15                 THE WITNESS:  I'm not entirely sure
16    that I agree with that.  I think we play an
17    important role in retrieving these filters, or at
18    least we try to.
19                 So the whole issue of filter
20    retrieval is one that has been an evolution over the
21    years.  And today it's part of our practice to
22    advise these patients to return for follow-up to
23    have filters retrieved, if it's possible to do so
24    and do so safely.
25                 So a number of requirements must be
```

Do Not Disclose - Subject to Further Confidentiality Review

1    met for us to retrieve these filters.

2    BY MR. MATTHEWS:

3         Q.      I'm going to back up, if I could,

4    because now we're talking about 2017 --

5         A.      Correct.

6         Q.      -- and 2007 is the time frame.  So

7    I'm going to ask a different question.

8         A.      Okay.

9         Q.      Back in 2007 when you were implanting

10   in particular the G2, the G2 had only been cleared

11   for permanent implantation; is that correct?

12        A.      Correct.

13        Q.      So you were implanting this filter as

14   a permanent filter in 2007, correct?

15        A.      Correct.

16        Q.      At that time in 2007, ███████████████

███ ████████████████████████████████████ was intended as

18   a permanent filter, correct?

19                MS. HELM:  Object to the form.

20                THE WITNESS:  Correct.

21   BY MR. MATTHEWS:

22        Q.      All right.  Well, let's talk about,

23   then, a different subject, and that is your history

24   with the use of filters.

25                Can you tell the jury when you first

Golkow Technologies, Inc.                      Page 29

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    timelines as to when these things were done.

 2         Q.      Did you ever use the Bard Recovery

 3    filter?

 4         A.      I believe I did.

 5         Q.      All right.  So you used the Bard

 6    Recovery, the Bard G2, the Cordus TRAPEASE.  And you

 7    said the Cook filters.

 8                 Do you recall which Cook filters you

 9    used?

10         A.      We use the Günther Tulip and right

11    now it's a variation of it called the Cook Celect,

12    C, as in Charles, E-L-E-C-T.

13         Q.      You said you moved away from the Bard

14    filter because of problems associated with it,

15    correct?

16         A.      Yes.

17                 MS. HELM:  Object to the form.

18    BY MR. MATTHEWS:

19         Q.      What were the problems associated

20    with the Bard that -- the reason that you moved away

21    from it?

22         A.      There is a database known as the

23    MAUDE database and it was becoming clear that there

24    were numerous reports in the literature of filter

25    fragmentation and filter migration with these
```

Do Not Disclose - Subject to Further Confidentiality Review

1    filters.

2         Q.      Do you recall the time frame when you

3    moved away from Bard filters?

4         A.      I do not.

5         Q.      Clearly it was after 2007, because

6    you were still implanting the G2 in 2007, correct?

7         A.      Correct.

8         Q.      Were you called upon by a sales rep

9    or somebody that's known as a detailer from Bard

10   that came to your hospital to talk to you --

11        A.      Yes.

12        Q.      -- about their filters?

13               Do you recall that sales rep?

14        A.      We had a number throughout the years

15   from different corporations, so if you could be a

16   little bit more specific.

17        Q.      Well, I guess I'm referring to a

18   sales rep by the name of Ferrara.

19               Do you recall a sales rep by the name

20   of Ferrara?

21        A.      Robert Ferrara?

22        Q.      Ferrara, I'm sorry.

23        A.      I do.

24        Q.      Was he in your offices from time to

25   time to talk about the Recovery and the G2?

Do Not Disclose - Subject to Further Confidentiality Review

```
1          A.      Uh-huh.

2          Q.      Yes?

3          A.      Yes.

4          Q.      I'm sorry.  You've got to answer

5     aloud for her.

6          A.      Yes.

7          Q.      Were you ever told by Mr. -- is it

8     Ferrara?

9          A.      Uh-huh.

10         Q.      -- Mr. Ferrara that Bard had a crisis

11    management plan, as early as 2004, to deal with the

12    high rates of AEs, that being, adverse events,

13    perforation, fracture and migration?

14                 MS. HELM:  Object to the form.

15                 THE WITNESS:  No.

16    BY MR. MATTHEWS:

17         Q.      Were you ever told that Bard

18    conducted an investigation in 2004 into the high

19    number or large number of adverse events of the

20    Recovery done by an independent investigator?

21                 MS. HELM:  Object to the form.

22                 THE WITNESS:  No.

23    BY MR. MATTHEWS:

24         Q.      Were you ever sent a letter by the

25    company that talked to you or -- I'm sorry, that
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    informed you about the results of this

 2    investigation, this independent investigation by

 3    Bard?

 4                    MS. HELM:  Object to the form.

 5                    THE WITNESS:  No.

 6    BY MR. MATTHEWS:

 7         Q.        Were you ever told, either by letter

 8    or by Mr. Ferrara, that there was a 530 percent

 9    higher fracture rate than other filters on the

10    market with the Bard Recovery?

11                    MS. HELM:  Object to the form.

12                    THE WITNESS:  No.

13    BY MR. MATTHEWS:

14         Q.        Were you ever told that there was a

15    1,200 percent higher risk of death from the Recovery

16    fracture and embolization to the heart than other

17    filters on the market?

18                    MS. HELM:  Object to the form.

19                    THE WITNESS:  No.

20    BY MR. MATTHEWS:

21         Q.        In 2004 and 2005, ███████████████

      ██  ██████████████████████████████████, would

23    that have been important information for you to

24    know?  Assuming that that was information that was

25    known to Bard, is that something that you would want
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1   to have known?

 2        A.      Yes.

 3                MS. HELM:  Object to the form.

 4                THE WITNESS:  Can I interrupt for one

 5   second?  I just wanted to clarify one other point.

 6                Previously you asked me how many

 7   publications I had regarding filters.  And there's

 8   actually a third publication that I had forgotten,

 9   and I see it here in my C.V.  It's one in which a

10   filter migrated to the heart.  And with your

11   question before, I remember you asking me about

12   filters migrating to the heart.

13   BY MR. MATTHEWS:

14        Q.      That was a case study, correct?

15        A.      That was a case report, that's

16   correct.

17        Q.      Yes, case report.  I did read that.

18   Thank you.

19                MS. HELM:  Do you mind telling us

20   which number that is?

21                THE WITNESS:  That would be 28 to 32

22   under publications.

23   BY MR. MATTHEWS:

24        Q.      Let me show you what's been marked as

25   Exhibit Number 2.
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1                    MS. HELM:  Do you have a copy for me?

 2                    MR. MATTHEWS:   This is a health

 3     hazard evaluation dated December 17th, 2004.

 4                         -  -  -

 5                    (Whereupon, Exhibit-2,

 6     BPVE-01-01019821-825, Health Hazard Evaluation,

 7     Dated 12/17/04, was marked for identification.)

 8                         -  -  -

 9                    THE WITNESS:  Thank you.

10     BY MR. MATTHEWS:

11         Q.      Let me show you, if you could turn.

12     Just so we're clear on the record, this is a health

13     hazard evaluation from David Ciavarella, MD, who I

14     believe was the vice president of clinical trials --

15     clinical affairs, dated December 17th, 2004, to Doug

16     Uelmen, BPV QA.  And this is Recovery Filter

17     Consultants Report, and I would turn your attention

18     to the second page --

19         A.      Okay.

20         Q.      -- under Number 2.  It says that, The

21     consultant's analysis of the reports of Bard -- to

22     Bard of adverse events associated with the Recovery,

23     along with competitors' information available via

24     the MAUDE and IMS databases, showed the following:

25     Reports of death, filter migration, IVC perforation
```

Do Not Disclose - Subject to Further Confidentiality Review

1  and filter fracture associated with the Recovery

2  filter were seen in the MAUDE database at reporting

3  rates that were 4.6, 4.4, 4.1 and 5.3 higher,

4  respectively, than reporting rates for all other

5  filters.

6                Doctor, this is dated December 17th,

7  2004.  Would this have been important information

8  for you to know, that is, a doctor who is implanting

9  Recovery filters, that those filters had a greater

10  risk of fracture that's four and five times higher

11  than the competitor filters?

12                MS. HELM:  Object to the form.

13                THE WITNESS:  Yes.

14  BY MR. MATTHEWS:

15      Q.      Is that the type of information that

16  would influence your prescribing habits, whether you

17  would use that filter, a Bard filter, or another

18  filter?

19                MS. HELM:  Object to the form.

20                THE WITNESS:  Yes.

21  BY MR. MATTHEWS:

22      Q.      Let me show you what's been marked as

23  Exhibit-3, which is the Recovery filter migration,

24  Remedial Action Plan, dated January 4, 2005.

25                    -  -  -

Do Not Disclose - Subject to Further Confidentiality Review

```
 1                    (Whereupon, Exhibit-3,

 2      BPVE-01-01019773-784, Recovery Filter Migration,

 3      Dated 1/4/05, was marked for identification.)

 4                         -  -  -

 5      BY MR. MATTHEWS:

 6          Q.        ████████████████████████████████

        ████████████████████████████████████████████

 8                    And I would turn your attention to

 9      the first, second, third, fourth, fifth page.  It

10      says, actually, 1 of 7 on the fifth page of that

11      document.

12          A.        I'm sorry, could you --

13          Q.        At the bottom under Roman III.

14                    It says, Identification of the

15      problem:  As part of the ongoing evaluation of RNF,

16      Recovery Nitinol filter, Bard requested an

17      independent study of the risks and benefits of the

18      RNF, with an emphasis on its use in bariatric

19      surgery and trauma patients.  A consultant was

20      retained for this purpose and reported the

21      following:  The MAUDE database maintained by the FDA

22      was reviewed.  The reporting rates between the RNF

23      and aggregates of the other commercialized vena cava

24      filters were compared.

25                    A, in the MAUDE dataset, the RNF
```

Do Not Disclose - Subject to Further Confidentiality Review

1    demonstrated a consistent statistically significant

2    and potentially clinically important higher rate of

3    reporting of adverse events in several analyzed

4    categories.

5                    B, given the pattern of reported

6    events, a higher rate of death reports seem related

7    to filter movement and filter embolization.

8                    You referenced the MAUDE database

9    earlier in questions, Doctor.  Is that information

10   important to you as a doctor that is implanting the

11   Recovery filter?

12                   MS. HELM:  Object to the form.

13                   MR. LERNER:  Which information?

14                   MR. MATTHEWS:  That is A and B that I

15   just read.

16                   MS. HELM:  Object to the form.

17                   MR. LERNER:  But you questioned him,

18   you said you referenced the MAUDE database before.

19   Your question then becomes confusing.  I'm asking

20   you to clarify it.

21                   MR. MATTHEWS:  All right.  I'll

22   strike it and ask another question.

23   BY MR. MATTHEWS:

24       Q.      In looking at A and B, Doctor, is

25   that the type of information that's important to you

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    to know prior to implanting a Recovery filter?

 2          A.      Yes.

 3                  MS. HELM:  Object to the form.

 4    BY MR. MATTHEWS:

 5          Q.      Do you know what the term

 6    "statistically significant" means?

 7          A.      I do.

 8          Q.      And that's an important

 9    epidemiological statement, correct?

10                  MS. HELM:  Object to the form.

11                  THE WITNESS:  Statistical statement,

12    yes.

13    BY MR. MATTHEWS:

14          Q.      Doctor, at the Methodist Hospital in

15    2007, did you have more than one filter at your

16    disposal?  That is, you talked about, I think you

17    told me, you had the TRAPEASE, you had the Tulip,

18    and you had the Recovery, and you had the select.

19                  Were all of those available back in

20    2007, do you recall?

21          A.      No.

22          Q.      Do you know which were available?

23          A.      The G2.

24          Q.      That was the only one available in

25    the hospital?
```

Do Not Disclose - Subject to Further Confidentiality Review



```
1                    MS. HELM:  Object to the form.

2                    MR. LERNER:  That particular filter?

3                    MR. MATTHEWS:  That particular

4      filter.

5                    THE WITNESS:  The PREPIC 1 trial is a

6      great study, and it's a very interesting study.  But

7      there are problems in this study, as there are

8      problems with every study.  And the fundamental

9      problem that you have with this trial is that it

10     randomized patients who were candidates for caval

11     interruption or not; in other words, all patients

12     were treated with blood thinners.  It doesn't really

13     address the question of what to do with those

14     patients that cannot be treated with blood thinners.

15

25                   With regards to the Bard filter,
```

Do Not Disclose - Subject to Further Confidentiality Review

1    would I have used a different device if I knew at

2    the time that the Bard filter was not ideal or as

3    good as some of the other implants?  The answer

4    would have to be yes.

5    BY MR. MATTHEWS:

6           Q.      You would have used --

7           A.      I would have used a different filter

8    if there was a different filter that I knew of that

9    was better, in terms of its safety profile.

10          Q.      In terms of the documents that you

11   have, I think they are Exhibit-2 and 3, the health

12   hazard report and then the investigation conducted

13   by Bard that showed a fivefold increased risk for

14   fracture and embolization of that fracture, and you

15   told us that would be the type of information you

16   would want to know in your benefit/risk analysis,

17   knowing that --

18          A.      Yes.

19          Q.      -- and seeing that today, would that

20   have been enough to use another filter?

21                  MS. HELM:  Object to the form.

22                  THE WITNESS:  Difficult to say with

23   certainty.  It would depend upon what other filters

24   we had at the time and what their problems would

25   have been.  But it would have been a very important

Do Not Disclose - Subject to Further Confidentiality Review

```
 1   piece of information, as far as making decisions

 2   regarding this or any other patient, yes.

 3   BY MR. MATTHEWS:

 4        Q.     And it would have influenced your

 5   prescribing habit?

 6               MS. HELM:  Object to the form.

 7               THE WITNESS:  Yes.

 8   BY MR. MATTHEWS:

 9        Q.     Let me show you a study, I'm going to

10   mark this as D'Ayala Exhibit Number 7.  And this is

11   entitled, The Prevalence of Fracture -- I'm sorry,

12   let me hand that to you.

13        A.     Sure.

14        Q.     The Prevalence of Fracture and

15   Fragment Embolization of Bard Retrievable Vena Cava

16   Filters and Clinical Implications Including Cardiac

17   Perforation and Tamponade.

18                        -   -   -

19               (Whereupon, Exhibit-7, AMA,

20   Prevalence of Fracture and Fragment Embolization of

21   Bard Retrievable Vena Cava Filters and Clinical

22   Implications Including Cardiac Perforation and

23   Tamponade, was marked for identification.)

24                        -   -   -

25   BY MR. MATTHEWS:
```

Do Not Disclose - Subject to Further Confidentiality Review

```
1    if you extrapolate indwelling time with the G2

2    filter, that making it a 25 percent filter fracture

3    rate for the G2.

4                Do you understand that premise within

5    the paper?

6         A.     I think I understand the premise.

7    I'm not so sure that I understand the science behind

8    it.

9         Q.     Well, let me ask you this question,

10   then, Doctor:  If you knew back in 2007 ██████████

██████████████████████████████████████ there was even a 12

12   percent probability of fracture with that filter,

13   would you have used a G2?

14                MS. HELM:  Object to the form.

15                THE WITNESS:  Unlikely.

16   BY MR. MATTHEWS:

17         Q.     If there was a 25 percent risk of

18   filter fracture, can we safely say you would not

19   have used that filter?

20         A.     Most likely.  But you have to

21   understand that you have to have a way of treating

22   these difficult patients.  So some filter has to be

23   used.  And it becomes a matter of deciding which

24   filter is best, so to speak.  And sometimes that's

25   not entirely clear.
```

Do Not Disclose - Subject to Further Confidentiality Review

1                    Are you there?

2          A.       Uh-huh.

3                    MR. MATTHEWS:   Is everybody there?

4     BY MR. MATTHEWS:

5          Q.       There's some handwritten notes here.

6                    Are these yours?

7          A.       No.

8          Q.       Is the bottom right-hand corner

9     yours?

10         A.       No.

11         Q.       If we could move to the next one,

12    which is MDR69.

13         A.       Uh-huh.

14         Q.       Any of those notes yours?

15         A.       Yes, that's all written by me.

16         Q.       Okay.  It says, that I can read,

17    ███████████████████████████████████████████████

      █ ████████████████████████████████████████████

      ████████████████████████████████████████████

20         A.       Uh-huh.

21         Q.       Can you read that?

22         A.       ███████████████████████████████

23    PE.

24         ██     █████████████████████████████████

      █ █████████████████████████████████████████████

Do Not Disclose - Subject to Further Confidentiality Review

```
6        Q.      All right.  And the next entry that
7   may or may not be yours, Page 71.
8        A.      No, that's -- that's mine.
9        Q.      It is?  Okay.
10       A.      Unmistakable.
11       Q.      All right.  I think that says,
12
13       A.      I'd be happy to translate into
14  English --
15       Q.      Yes, please.
16       A.      -- if you'd like.


19       Q.      I'm sorry.  On top of that, what does
20  that say?  Does that say duplex?
21       A.      I'm sorry, you're in the second box?


24       Q.      I apologize.  Can we start over on
25  the first box?
```

Do Not Disclose - Subject to Further Confidentiality Review

```
1      A.    The top box?

2      Q.    Yes, I messed up.

3      A.    Sure.    ████████████████

       ██████████████████████████

       ██████████████████████████

       ██████████████     ████████████

       ███   ██    ██████████████

       ███    ████████

       ██    ██    ████████

       ██    ██    ██████████████

       █████████████████████████████

       ██    █████████

       ██    ██    ████████

       ██    ██████████████████

       ██    ████████████████████

       ████████████████████████████

       ██    █████████████████

       ██    ████████████

19     Q.    ████████████████

       ██    ██████████████

       ██    ████████

22     A.    Correct.

23     Q.    And that's done -- how is that done?

24     A.    Using ultrasound.

25     Q.    All right.
```

Do Not Disclose - Subject to Further Confidentiality Review

1        A.        So the way duplex

2        Q.        Externally

3        A.        Correct, it's a non-invasive

4    procedure.

5        Q.        Is that the gold standard for

6    determining DVT, would you say?

7        A.        It depends upon the clinical

8    scenario.  But, yes, it's the imaging modality of

9    choice for lower extremity DVT.

10       Q.        ███████████████████████████

██   ████████████████████████████████

██       ██       ████████████████

██       ██       ██████████████

14                 MS. HELM:  For the record, can we

15   identify it by the Bates number, please?

16                 MR. MATTHEWS:  Yeah, Bates stamped

17   108 and 109.  It's a two-page document.

18                 MS. HELM:  Thank you.

19   BY MR. MATTHEWS:

20       Q.        I think this is all legible.

21       A.        Indeed.

22       Q.        ███████████████████████████████

██   ████████████████████████████████████

██   ████████████████████████████████████

25                 That actual -- is that actually

Do Not Disclose - Subject to Further Confidentiality Review



1

2                    MR. MATTHEWS:  Object to the form.

3                    THE WITNESS:

4   BY MS. HELM:

5          Q.

14                   MR. MATTHEWS:  Object to the form.

15                   THE WITNESS:

16  BY MS. HELM:

17         Q.



Do Not Disclose - Subject to Further Confidentiality Review

1    Q.    ___ in
2  2007, you were aware, as you've stated, that filter
3  fracture was a risk associated with a G2 and all
4  filters; is that right?
5    A.    Yes.
6    Q.

Do Not Disclose - Subject to Further Confidentiality Review

1    their decision-making process.

2         Q.



25        Q.    Okay.   Based on your review of the

# Exhibit B-C

## **(Redacted and Filed Under Seal)**

Do Not Disclose - Subject to Further Confidentiality Review

```
 1                  UNITED STATES DISTRICT COURT
                        DISTRICT OF ARIZONA
 2
     ------------------------------§
 3                                 §
     In Re Bard IVC Filters        § No. MD-15-02641-PHX-DGC
 4   Products Liability Litigation §
                                   §
 5   ------------------------------§
 6
 7
 8                           - - -
 9                 Thursday, June 15, 2017
10                           - - -
11
                      ** DO NOT DISCLOSE **
12
         ** SUBJECT TO FURTHER CONFIDENTIALITY REVIEW **
13
14                           - - -
15
16
17         Videotaped deposition of BRANDON KANG, M.D.,
         held at Mahaffey, Pickens & Tucker, 1550 North
18       Brown Road, Suite 125, Lawrenceville, Georgia,
         commencing at 10:09 a.m., on the above date,
19       before Susan D. Wasilewski, Registered
         Professional Reporter, Certified Realtime
20       Reporter, Certified Realtime Captioner, Certified
         Manager of Reporting Services, Florida
21       Professional Reporter, Certified Court Reporter
         (NJ), and Realtime Systems Administrator
22
                             - - -
23
                    GOLKOW LITIGATION SERVICES
24          877.370.3377 ph | 917.591.5672 fax
                       deps@golkow.com
25
```

```
 1   ████████████████████████████████████
 2   ████████████████████████████████████████
 3   ████████████████████████████████████████
 4   ████████████████████████████████████████████
 5   ████████████████████████████████████████████
 6   ██████████████████████████████████████
 7   ████████████████████████████████████████
 8   ████████
 9   ███████████████████████████████████
10   ████████████████████████████████████████████
11   ████████████████████████████████████████████
12   ██████████████████████████████████████████████
13   ██████████████████████████████
14   ██████████████████████████████████████
15   ██████████████████████████████████
16   ██████████████████████████████████
17   ████████████████████████████████████████████
18   ███████████████
```

19       Q.   Yes, sir.  All right.

20           (Kang Exhibit 4 was marked for

21   identification.)

22   BY MR. ROLL:

23       Q.   And we have ████████████████ that I will

24   mark as Exhibit 4.

25           MS. LOURIE:  Your microphone.

Do Not Disclose - Subject to Further Confidentiality Review



1      Q.   All right.  My microphone fell off.  Sorry,

2  Doctor.

3           All right.  So Exhibit 4, could you take a

4  look at that and identify that for us?

5      A.   ███████████████████████████████

6  █████████████████████

7      Q.   All right.  ████████████████████

8  ███████████████████████

9      A.   Correct.

10     Q.   If you could just describe for me ████

11  ███████████████████████████████████████████

12  █████

13     A.   Sure.

14     Q.   ██████████████████████████████ --

15     A.   ████████

16          MS. HELM:  Excuse me.  Object to the form.

17     Q.   Could you describe for me what ████████

18  ████████

19     A.   ██████████████████████████

20  █████████████████████████████

21  ████████████████████████████

22  █████████████████████████████

23  ███████████████████

24  ██████████████████████████

25  █████████████████████████

Do Not Disclose - Subject to Further Confidentiality Review



17          MS. HELM:  Object to the responsiveness and

18      move to strike.

19      Q.   Would you state whether or not ▮▮▮▮▮▮▮▮

20      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21      A.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22      Q.   I'm sorry.

23          MS. HELM:  You're going to have to let me --

24      I'm sorry.

25          THE WITNESS:  I'm sorry.

Do Not Disclose - Subject to Further Confidentiality Review



1

2

3

4          MS. HELM:  Object to the responsiveness and

5      move to strike.

6      Q.   With regard to

7

8

9      A.

10

11     Q.   Okay.

12

13

14     A.

15          MS. HELM:  Object to the form.

16     A.

17

18     Q.   Okay.  Had you formed an opinion,

19

20

21

22

23          MS. HELM:  Object to the form.

24     A.

25

Do Not Disclose – Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9          MS. HELM:   Object to the responsiveness.

10     Q.   All right.   And did you form an opinion

11   specifically

12

13

14          MS. HELM:   Object to the form.

15     A.

16

17

18

19

20

21

22

23

24          MS. HELM:   Object to the responsiveness.

25     Q.   And is this

Do Not Disclose - Subject to Further Confidentiality Review



1

2          MS. HELM:  Object to the form.

3     A.

4

5

6

7

8

9

10

11

12

13     Q.   Would you state whether or not you had formed

14   an opinion that it was prudent and in the best

15   interest of the patient

16

17          MS. HELM:  Object to the form.

18     A.

19

20

21     Q.   Okay.  Now,

22

23

24

25     A.

Do Not Disclose - Subject to Further Confidentiality Review



1 ████████████████████████████████

2 ████████████████████████████████

3 ██████████████████████████████████

4 ████████████████████████████████

5 ██████████████████████████████

6          MS. HELM:  Objection to the responsiveness

7     and move to strike.

8     Q.   Okay.  Did you have an occasion ████████████

9 ██████████████████████████████████████

10 ██████████████████████████ -- let me start

11    over.

12          Did you have an occasion ██████████████

13 ██████████████████████████████████████

14 ████████████████████████████████████

15          MS. HELM:  Object to the form.

16     Q.   Simply put: ████████████████████

17 ██████████████████

18     A.   ██████

19     Q.   ██████████████████

20 ████████████

21     A.   ███████████████████████████

22 ███████████████████████████████

23 ██████████

24     Q.   Okay.

25          (Kang Exhibit **5** was marked for

Do Not Disclose - Subject to Further Confidentiality Review

1    identification.)

2    BY MR. ROLL:

3        Q.   I'm going to mark as Exhibit 5 the

4    ████████████████████████████████████████████████

5    ██████████████████████████████████████████

6          ██████████████████████████████████████████

7    ██████████████████████████

8        A.   ████████████████████████████████████

9        Q.   All right.  And I see at the bottom of this,

10   on the second page, ██████████████████████████

11   ████████████████████████████████████████

12            MS. HELM:  Object -- object to the form.

13   A.   ███████████████████

14   Q.   All right.  Were you aware ████████████

15   ████████████████████████████████████████████████████

16   ██████████████████████████████████████████████

17   ████████████████████████████████

18   A.   █████████████████████████████████████████████

19   ███████████████████████████████████████████████████████

20   ██████████████████████████████████████████████████████

21   ██████████████████████████████████████████████████

22   ██████████████████████████████████████████████████

23   ██████████████████████████

24   Q.   ██████████████████████████████████████████

25   A.   ██████████████████████████████████████████████

Do Not Disclose - Subject to Further Confidentiality Review

1 

2 

3 

4      Q.   All right. 

5 

6 

7      A. 

8      Q. 

9 

10          MS. HELM:  Object to the form.

11     A. 

12 

13     Q.   Right. 

14 

15          MS. HELM:  Object to the form.

16     Q.   Well, let's just summarize. 

17 

18 

19     A. 

20 

21 

22 

23 

24     Q.   Okay. 

25 



Do Not Disclose - Subject to Further Confidentiality Review



1

2      A.   ███████████████████████████

3   █████████████████████████████████████████

4   ███████████████████████████████████

5   ███████████████████████████████████

6   ████████████████████████████████████████

7   ████████████████████████████████████████

8   ████████████████████████████████████████

9   ███████████████████████

10      Q.   Okay.  Well, let me stop you there, if I may.

11      A.   Okay.

12      Q.   ██████████████████████████████

13   █████████████████████

14      A.   █████████████████████████

15      Q.   Which, of course, ██████████████

16      A.   █████████

17      Q.   ██████████████████████████████

18   ████████████████████████████████████████████

19   ██████████████████████████

20      A.   █████████████

21      Q.   ███████████████████████████████████

22   ████████

23      A.   ███████

24      Q.   And was this a -- ██████████████████

25   ███████████████████

Do Not Disclose - Subject to Further Confidentiality Review

1       A.      ████████████

2       Q.      █████████████████████████
3       ██████████████████

4               MS. HELM:  Object to the form.

5       Q.      You can answer the question.

6       A.      What was the question exactly?

7       Q.      ████████████████████████
8       ██████████████

9               MS. HELM:  Object to the form.

10      Q.      You can answer the question.

11      A.      █████████████████████████
12      █████████

13      Q.      ████████████████████
14      ██████████

15      A.      █████████████████████████
16      ████████████████████████
17      ██████████████████████
18      █████████████████████

19      Q.      ███████████████
20      A.      ████████████████████████
21      ███████████████████████████
22      ████████████████████████
23      ████████████████████████████
24      █████████

25      Q.      All right.  ███████████████████

Do Not Disclose - Subject to Further Confidentiality Review



1

2

3    A.

4    Q.    --

5

6

7    A.

8

9

10

11

12

13

14

15

16    Q.   All right.  And describe for me

17

18

19

20

21    A.   Sure.

22

23

24

25    Q.   Okay.

Do Not Disclose - Subject to Further Confidentiality Review



1

2      A.

3      Q.

4

5      A.

6      Q.   Okay.

7      A.

8      Q.   Okay.

9

10     A.   Well,

11

12

13     Q.   Okay.

14     A.   So what you would describe

15

16     Q.

17

18     A.

19     Q.   And did its --

20

21   in your opinion?

22        MS. HELM:   Object to the form.

23     A.

24

25     Q.   Were you in fact

Do Not Disclose - Subject to Further Confidentiality Review



1   ███████████████████████████████

2       A. ██████████████████████████████

3   █████████████████████████

4       Q.   Now, just to be sort of clear in our mind, ████

5   ████████████████████████████████

6   ███████████████████ correct?

7       A. ██████

8       Q. ██████████████████████████████

9   ██████████████████████████████████

10  █████████████████

11      A. ████████████████

12          MS. HELM:  Object to the form.

13      Q.   What's the name ████████████?

14      A. ██████████████████

15      Q.   Right.  So what was your ████████████

16  ████████?

17      A. ████████████████████████████

18  ███████████████████████████████

19  ████████████████████████████████

20  ████████████████████████████████

21  ██████████████████████████████

22  ████████████████████████████████

23  ████████████████████████████████

24  ██████████████████████

25      Q.   Again, you could ████████████████

Do Not Disclose – Subject to Further Confidentiality Review



1

2    A.

3         MS. HELM:   Object to the form.

4    A.

5

6

7    Q.   Due to the objection, let me just reask the

8  question.

9         Could you describe for us what

10

11

12   A.

13

14

15

16   Q.   All right.   Were you able

17

18

19   A.

20

21

22

23   Q.   All right.  So what occurred after this or --

24  strike that.

25

Do Not Disclose - Subject to Further Confidentiality Review



1

2

3          MS. HELM:  Object to the form.

4      Q.   You can answer the question.

5      A.

6

7      Q.   Now, what was going on with

8

9

10     A.

11

12

13

14

15

16

17     Q.   All right.  Would you state whether or not

18   that

19          MS. HELM:  Object to the form.

20     Q.   You can answer the question.

21     A.

22

23

24     Q.   Do you have an opinion as to whether at all

25   times during

# Exhibit B-D

## (Redacted and Filed Under Seal)

Do Not Disclose - Subject to Further Confidentiality Review

```
 1                 UNITED STATES DISTRICT COURT
                        DISTRICT OF ARIZONA
 2

     ------------------------------§
 3                                 §
     In Re Bard IVC Filters        § No. MD-15-02641-PHX-DGC
 4   Products Liability Litigation §
                                   §
 5   ------------------------------§
 6
 7
 8                          - - -
 9                 Tuesday, June 20, 2017
10                          - - -
11
                      ** DO NOT DISCLOSE **
12
         ** SUBJECT TO FURTHER CONFIDENTIALITY REVIEW **
13
14                          - - -
15
16
17         Videotaped deposition of RICHARD HARVEY,
         M.D., held at Mahaffey, Pickens & Tucker,
18       1550 North Brown Road, Suite 125, Lawrenceville,
         Georgia, commencing at 10:02 a.m., on the above
19       date, before Susan D. Wasilewski, Registered
         Professional Reporter, Certified Realtime
20       Reporter, Certified Realtime Captioner, Certified
         Manager of Reporting Services, Florida
21       Professional Reporter, Certified Court Reporter
         (NJ), and Realtime Systems Administrator
22
                            - - -
23
                 GOLKOW LITIGATION SERVICES
24         877.370.3377 ph | 917.591.5672 fax
                     deps@golkow.com
25
```

Do Not Disclose - Subject to Further Confidentiality Review



1    Q.    And what are they separated by?

2    A.    ████████████████████

3    Q.    Okay.  ████████████████████████

4    ████████████████████████████████████████

5    ████████████████████████████████████████

6    ████████████████████████████████

7    ████████████████████

8          MS. HELM:  Object to the form.

9    A.    Well, as always, when we see -- the reason I

10   remember this is because this is unusual, so, I mean,

11   I really don't have to look at the notes too much to

12   remember this, ████████████████████

13   Essentially, what we always do, ████████████

14   ████████████████████████████████████████

15   ████████████████████████████████████████

16   ████████████████████████████████████

17   ████████████████████

18         ████████████████████████████████████

19   ████████████████████████████████████████

20   ████████████████████████████████████████

21   ████████████████████████████████████████

22   ████████████

23   Q.    Okay.  So let me break that down a little

24   bit.  ████████████████████████████████

25   ████████████████████     if you could explain to the

Do Not Disclose - Subject to Further Confidentiality Review



1    jury exactly anatomically

2

3          MS. HELM:  Object to the form.

4        A.    We -- you know,

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                    so -- but --

24        Q.    Okay.  And when you say --

25                              What did you mean by

Do Not Disclose - Subject to Further Confidentiality Review



1    that?

2        A.   Well,

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20            MS. HELM:  Object to the responsiveness.

21        Q.   And, Doctor, is there a difference between

22

23

24

25        A.   Right.  It's done --

Do Not Disclose - Subject to Further Confidentiality Review



1

2

3

4

5

6        Q.    Based upon the

7

8

9    Exhibit 4,

10

11

12

13        A.

14        Q.    And again, just so I understand it, exactly

15

16        A.

17

18        Q.    Was there -- would you state whether or not

19

20

21

22        A.

23

24

25

Do Not Disclose - Subject to Further Confidentiality Review



1

2      Q.   All right.  And would you state whether or

3   not

4

5

6      A.

7      Q.   Now, the records show as -- strike that.

8

9

10

11

12

13

14        MS. HELM:  Object to the form.

15   A.

16

17

18

19      Q.   Okay.  Let me just ask it this way.  What is

20   your understanding of

21

22   A.

23   Q.

24   A.

25   Q.   Okay.

Do Not Disclose - Subject to Further Confidentiality Review

```
 1   ████████████████████████████████████████
 2   ██████████████████████████████████████████
 3   ████████████████████████████
 4          MS. HELM:  Object to the form.
 5      A.   My best recollection of that is that
 6   ██████████████████████████████████████████
 7   ██████████████████████████████████████████
 8   ███████████████████████████████████████████
 9   ████████████████████████████████████████████
10   █████████████████████████████████████
11   ███████████████████████████████████████████
12   ███████████████████████████████████████████
13   ███████████████████████████████████████████
14   █████████████████████████████████████████
15   ██████████████████████████████████████
16   ███████████████████████████████████████████
17   ████████████
18      Q.   Okay.  Would you state whether or not ████████
19   ████████████████████████████████
20          MS. HELM:  Object to the form.
21      A.   Well, that is an old term that was used
22   from -- there was a time when nobody got any kind of
23   ████████████████████████████████████████████
24   ██████████████████████████   That's no longer the
25   case.  ██████████████████████████
```

Do Not Disclose - Subject to Further Confidentiality Review



1 ████████████████████████████████████████

2 ████████████████████████████████████

3 ██████████████████████████

4     Q.   Okay.   Now, ████████████████████

5 █████████████████████████████████████████

6 ████████████████████████

7     A. ███████████████████████████████████████

8 ████████████

9     Q.   Okay.   Now, ████████████████████████

10 ████████████████████████████████

11 ██████████████████████████████████████████

12 ████████████████████

13     A. ████████████████████████████████████

14 ██████████████████████████████████████

15 ███████████████████████████████████████████

16 ███████████████████████████████████████

17 ██████████████████████████

18     Q.   Okay. ██████████████████████████

19 ███████████████████████████████████████

20 █████████████

21         MS. HELM:  Object to the form.

22     A.   Correct. ████████████████████████

23     Q.   All right.  And you say you may or may not

24   remember whether or not ██████████████████████ --

25         MS. HELM:  Object to the form.

# Exhibit B-E

## (Redacted and Filed Under Seal)



Deposition of:
## Sherr-Una Booker

*February 20, 2017*

In the Matter of:

## In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com | 770.343.9696



Sherr-Una Booker                                    February 20, 2017
In Re: Bard IVC Filters Products Liability

Page 154

1    last 10 years.

2         A    Okay.

3    █

4    █

5    █

6    █

7    █

8    █

9    █

10   █

11   █

12   █

13   █

14   █

15   █

16   █

17   █

18   █

19   █

20   █

21   █

22   █

23   █

24   █

25   █

Page 155







Exhibit B-F

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ARIZONA

3                    -  -  -

4    In re Bard IVC Filters Products

5    Liability Litigation

6

7    No. MD-15-02641-PHX-DGC

8                    -  -  -

9       DO NOT DISCLOSE - SUBJECT TO FURTHER

10          CONFIDENTIALITY REVIEW

11                    -  -  -

12             April 7, 2017

13                    -  -  -

14          Videotaped deposition of

15    ROBERT FERRARA, held at Nixon Peabody,

16    LLP, 50 Jericho Quadrangle, Jericho, New

17    York, commencing at 8:39 a.m., on the

18    above date, before Marie Foley, a

19    Registered Merit Reporter, Certified

20    Realtime Reporter and Notary Public.

21                    -  -  -

22          GOLKOW TECHNOLOGIES, INC.

23       877.370.3377 ph | 917.591.5672 fax

24             Deps@golkow.com

1    statement?

2              MS. KOWALZYK:   Object to the

3        form.

4        A.    It's her opinion.

5        Q.    But do you agree with it?

6              MS. KOWALZYK:   Object to the

7        form.

8        A.    I -- I -- I don't know what that

9    means by "trusted advisor" that she's

10   referring it to, so I wouldn't necessarily

11   agree or disagree.

12       Q.    Did you consider yourself a

13   trusted advisor to the physicians?

14             MS. KOWALZYK:   Object to the

15       form.

16       A.    I considered myself a help in

17   any way I could be.

18       Q.    Can you keep reading the

19   highlighted portion, please?

20       A.    "The radiologists and support

21   staff look to you for clinical knowledge."

22       Q.    Do you agree with that

23   statement?

24       A.    At times, sure.

Do Not Disclose - Subject to Further Confidentiality Review

1      form;  misstates prior testimony.

2  BY MS. LOURIE:

3      Q.    You can answer.

4      A.    I'm sorry, okay.  One more time

5  the question, please?

6      Q.    Okay.  Would you agree or

7  disagree that the clinical knowledge that

8  you would be giving your clients would be

9  knowledge of a product's strengths and

10  weaknesses?

11     A.    Potentially.

12     Q.    Would you agree that a primary

13  concern of Bard in developing and selling

14  medical products need to be the safety of

15  the patient?

16     A.    Sure, I think it's reasonable.

17     Q.    And would you agree that doctors

18  need to be able to trust you in giving

19  them information that's reliable and

20  trustworthy about the products?

21     A.    I -- I believe that we have to

22  give them accurate information.

23     Q.    Do you believe that that

24  information needs to be updated on a

Do Not Disclose - Subject to Further Confidentiality Review

1   the dissemination of it and tells you to

2   give it out to the doctors, then you're

3   okay with it?

4        A.     If it's an approved item for

5   distribution and they have directed us to

6   distribute it, then yes.

7        Q.     All right.  But if you learn

8   information that would potentially affect

9   a doctor's decision about whether to

10  implant a product and it's not on this

11  approved dissemination list, do you feel a

12  responsibility to tell the doctor that

13  information?

14       A.     Whatever -- whatever -- any

15  information that's unapproved for me to

16  disseminate to a physician I will not

17  disseminate to a physician.

18       Q.     So you're relying on Bard to

19  give you the go-ahead on disseminating any

20  information?

21       A.     On -- on -- on approved

22  information, yeah.

23       Q.     All right.  So if it wasn't

24  approved by Bard, you weren't

1    disseminating it?

2          A.    As far as I know.

3          Q.    You didn't mean to anyway?

4          A.    I don't think I did.

5          Q.    Okay.  Would you agree that

6    doctors should use the safest product on

7    the market that meets the needs of their

8    patients?

9                MS. KOWALZYK:  Object to the

10         form.

11         A.    I think that doctors should use

12   whatever product they feel -- feel

13   appropriate for their patients.

14         Q.    And would a doctor be

15   considering the safety of the product in

16   making his determination of which product

17   to use?

18               MS. KOWALZYK:  Object to the

19         form.

20         A.    You have to ask the doctor.

21         Q.    Okay.  Well, you've been selling

22   medical supplies for, what, 16 years?

23         A.    Give or take.  I think medical

24   devices for a dozen or so, give or take.

1     Q.    Okay.  Would you agree that

2    marketing materials put out by the

3    manufacturer should be truthful and

4    accurate and should present all pertinent

5    information for the doctors to consider?

6              MS. KOWALZYK:  Object to the

7         form.

8         A.    One more time.

9         Q.    Do you agree or disagree that

10   marketing materials put out by a

11   manufacturer, in this situation Bard, I'll

12   break it down, should be truthful?

13        A.    Yes.

14        Q.    Should the marketing materials

15   put out by Bard be accurate?

16        A.    Yes.

17        Q.    Should the marketing materials

18   put out by Bard contain all pertinent

19   information for a doctor?

20             MS. KOWALZYK:  Object to the

21        form.

22        A.    As defined by what Bard has

23   approved and data for and can back up,

24   claims that they can back up.

Do Not Disclose - Subject to Further Confidentiality Review

1       A.     I think as a general assumption,

2    physicians would expect that products are

3    tested before they're released to the

4    market.

5       Q.     Would you agree or disagree that

6    it is a good idea to hide data or studies

7    from a doctor on a product?

8              MS. KOWALZYK:  Object to the

9        form.

10      A.     I don't think that it is a good

11   idea to -- to do that.

12      Q.     Okay.  Your background is in

13   engineering, correct?

14      A.     Mechanical engineering, correct.

15      Q.     Have you ever done any sort of

16   research on products yourself?

17      A.     No, I have not.

18      Q.     You've never been a part of the

19   research or development program for Bard?

20      A.     No.  The -- the only input I've

21   had is sometimes they'll ask the field

22   their feelings about, let's say,

23   angioplasty for example, because that's

24   one I can remember, about what maybe

Do Not Disclose - Subject to Further Confidentiality Review

1          doesn't have a Bates number on it.

2              Do you know where you got this?

3              MS. LOURIE:  All of these I can

4     represent to you are documents that

5     have been produced by Bard, that have

6     been marked multiple times in

7     depositions.

8              THE WITNESS:  Can I write on

9     this, or no?

10             MS. KOWALZYK:  No.

11             THE WITNESS:  Okay.

12             MS. LOURIE:  I was trying to

13    think if I have another copy.

14             THE WITNESS:  It's not that

15    important.  I just like to make notes.

16             MS. LOURIE:  All right.

17    BY MS. LOURIE:

18        Q.    All right.  I think we are up to

19    Plaintiff's Exhibit Number 4, and I will

20    ask you if you have ever seen that

21    document before?

22        A.    Not that I recall.

23        Q.    All right.  And I will tell you

24    it is the results of the Asch study, as

Do Not Disclose - Subject to Further Confidentiality Review

1    you can see, and the Asch study, as you

2    will see under the summary, or by looking

3    at the entire document, had to do with the

4    Recovery filter.

5              Do you see that?

6       A.    Let me just -- give me one

7    second to --

8       Q.    Under the summary, if you'll

9    look under the summary.

10      A.    Okay.  Hold on.

11      Q.    Sure.

12      A.    (Perusing document.)

13              So, if I'm reading this

14   correctly, this says implanted the filter.

15   It doesn't specify the filter that was

16   implanted.

17      Q.    If you look under "Summary" it

18   says the Recovery filter.

19      A.    Okay.  The Recovery filter --

20   okay.

21      Q.    All right.  You feel comfortable

22   talking about it, or do you need more

23   time?

24              MS. KOWALZYK:  Object to the

1    7.

2              Do you agree that that agenda

3    item says that they're going to update the

4    matrix comparing the migration rates of

5    all known vena cavas?

6         A.    Yes.

7         Q.    If you look at number 8, do you

8    agree that that agenda item stated that

9    the team discussed a threshold level for

10   migration and agreed that if a migration

11   requiring surgical intervention is

12   confirmed during the course of the

13   investigation, that Recovery filters would

14   be placed on hold pending the outcome of

15   the investigation?

16        A.    I agree that that's what number

17   8 says.

18        Q.    Do you know if Recovery filters

19   were ever placed on hold?

20              MS. KOWALZYK:  Object to the

21        form.

22        A.    I don't recall offhand if they

23   were placed on hold.

24        Q.    Were you ever given any data or

Do Not Disclose - Subject to Further Confidentiality Review

1    information about the comparison of the

2    migration rates of the known vena cava

3    filters?

4              MS. KOWALZYK:  Object to the

5         form.

6         A.    To my knowledge, I don't think

7    there's any level 1 evidence that compares

8    that.  So I don't think we would have --

9    there's nothing that I can remember being

10   given.

11             MS. LOURIE:  Okay.  I'm going to

12        object to the responsiveness of the

13        answer.

14        Q.    The question was were you ever

15   given any comparison data by Bard of the

16   migration rates of all known vena cava

17   filters?

18             MS. KOWALZYK:  Object to the

19        form;  asked and answered.

20        Q.    It's just a yes or a no.

21             Were you ever given that

22   information?

23        A.    I don't recall offhand.

24             (Exhibit Ferrara 6, memo from

Do Not Disclose - Subject to Further Confidentiality Review

```
 1              MS. KOWALZYK:  Okay.
 2              (Exhibit Ferrara 7, e-mail from
 3        John Lehmann dated April 15, 2004,
 4        Bates No. BPV-17-01-00165419 through
 5        BPV-17-01-001654422, was marked for
 6        identification, as of this date.)
 7   BY MS. LOURIE:
 8        Q.    Let me show you Plaintiff's
 9   Exhibit Number 7.
10              Have you ever seen that document
11   before?
12        A.    I don't believe so.
13        Q.    What is the date of that
14   document?
15        A.    This e-mail is dated, what looks
16   to be an e-mail is dated April 15th, 2004.
17        Q.    What's the subject line of that
18   e-mail?
19        A.    "Crisis plan and supporting
20   documents for your review."
21        Q.    Were you aware when you came to
22   work for Bard that there had been a crisis
23   plan in place for the Recovery filter?
24              MS. KOWALZYK:  Object to the
```

Do Not Disclose - Subject to Further Confidentiality Review

1          form.

2          A.    I'm not aware of any crisis plan

3     at Bard at all.

4          Q.    No one shared the data contained

5     in this plan with you?

6          A.    As I'm not aware of the plan,

7     I'm not aware of any data that would go

8     with a plan.

9               (Pause.)

10         Q.    Do you know John Lehmann?

11         A.    I do not.

12         Q.    Do you know Lee Lynch, Holly

13    Glass, Donna Passero, you've already told

14    us who Janet is, and Kellee Jones?

15         A.    I don't know anybody other than

16    Janet.

17         Q.    Okay.  All right.  If you'll

18    look in the middle of the page and read

19    the --

20         A.    Page 1?

21         Q.    The first page.  Where it says:

22    "This is a simple story we should repeat

23    again and again."

24               Will you read that next

Do Not Disclose - Subject to Further Confidentiality Review

1    Plaintiff's Exhibit Number 8.

2              And, do you know who Natalie

3    Wong is?

4         A.    I do not.

5         Q.    If I tell you that she's an

6    engineer at Bard, you can just assume that

7    that's accurate, okay?

8         A.    I -- I don't like to make

9    assumptions.

10        Q.    Okay.  Well, I'm representing to

11   you that Natalie Wong --

12        A.    As fact.

13        Q.    Yes, is an engineer or was an

14   engineer at Bard.

15        A.    Okay.

16        Q.    Okay.  Did anyone ever tell you

17   that Ms. Wong had conducted a statistical

18   analysis of data in May of 2004 with

19   respect to the Recovery?

20        A.    No.

21        Q.    Did anyone at Bard tell you that

22   she had compared the statistical data

23   between Recovery and other filters on the

24   marketplace?

Do Not Disclose - Subject to Further Confidentiality Review

1    BY MS. LOURIE:

2        Q.    Have you ever seen a Health

3    Hazard Evaluation from Bard?

4        A.    I have no idea what that is.

5        Q.    Okay.

6        A.    So no.

7        Q.    This one is dated December 17th,

8    2004.  So that would have been the time

9    when you were starting at Bard; is that

10   right?

11       A.    I may have just signed on at

12   that point.

13       Q.    That month though?

14       A.    Yeah.

15       Q.    Okay.  So, this is report from

16   David Ciavarella.

17             Do you know who he is?

18       A.    I have no idea what that is.

19       Q.    Okay.  He's the medical director

20   at Bard, or he was at that time.

21             In his summary, do you see at

22   that point there were 76 reports of

23   potentially serious hazards that had been

24   reported?  First line.

Do Not Disclose - Subject to Further Confidentiality Review

```
 1          A.     The first page, hold on.

 2                 (Perusing document.)

 3          Q.     Very first sentence.

 4          A.     Yep.

 5          Q.     Okay.  And of those, 32 were

 6    judged to be serious and 10 reports were

 7    associated with patient death.

 8                 Do you see that?

 9          A.     Yes.

10          Q.     Okay.  Since you've never seen

11    the Health Hazard Evaluation reports --

12                 MS. LOURIE:  Well, let me just

13          strike that.

14          Q.     Were you aware of these reported

15    injuries?

16          A.     No.

17                 MS. KOWALZYK:  Object to the

18          form.

19          A.     This -- this injuries, no.

20          Q.     Were you aware that there had

21    been 10 reported deaths?

22          A.     No.

23          Q.     If you will turn to page 5 of

24    this document.  Actually, page 4 of the
```

Do Not Disclose - Subject to Further Confidentiality Review

1   relevant or not, did you have the

2   information?

3       A.    If something is not

4   statistically significant, I do not agree

5   that it counts as data.

6       Q.    Was it something that you were

7   ever told, whether it was -- it's a simple

8   question.

9             Were you told --

10      A.    I don't feel it's a simple

11  question.  I think that it's the answer --

12  I'm answering the best way that I can,

13  which is you're calling it data.  For

14  something to be data, it needs to be

15  statistically significant.

16      Q.    Okay.  Let's just call it

17  information.

18            Were you ever given any

19  information about any differences between

20  the Recovery fracture rates and any other

21  IVC filter?

22      A.    No.

23            MS. KOWALZYK:  Object to the

24  form.

Do Not Disclose - Subject to Further Confidentiality Review

1        A.      "The G2 filter combines the best

2    design features of Bard's existing vena

3    cava filters to create a brand new

4    permanent filter platform taking strength

5    and stability to a new level."

6        Q.      Did you have any understanding

7    as to what in the G2 filter would make it

8    have increased migration resistance?

9        A.      I believe they may have changed

10   something with the hooks on the feet, but

11   I'm not a hundred percent sure.

12              Again, we're going back kind of

13   a long time.

14              (Exhibit Ferrara 16,

15          presentation titled G2 Filter -

16          Summary of Features/Benefits, Bates

17          No. BPV-17-01-00062014 through

18          BPV-17-01-00062023, was marked for

19          identification, as of this date.)

20   BY MS. LOURIE:

21       Q.      The exhibit that you have in

22   front of you is G2 Filter Summary of

23   Features/Benefits.  That might help you to

24   answer some of the next few questions.

Do Not Disclose - Subject to Further Confidentiality Review

1        A.      Okay.

2        Q.      Have you ever seen the summary

3    of features and benefits document?

4        A.      Not that I recall.  I don't know

5    if they put it up at a sales meeting or

6    something, but I don't remember offhand.

7        Q.      We've already gone over this,

8    but if you look at the second page which

9    is Bates page 20, the first question at

10   the top says:  "Is the G2 filter

11   retrievable?"

12             And what is the answer there?

13       A.      "The G2 filter is not indicated

14   for retrievable in the U.S."

15       Q.      All right.  And if you go back

16   to the first page, which is -- ends in

17   '2014, the increased migration resistance,

18   would you agree that it was being marketed

19   as being more resistant because it had

20   wider leg span and stronger hooks?

21       A.      Yeah.

22       Q.      Okay.  And was it being marketed

23   as having reduced tilt?

24       A.      Sure.

Do Not Disclose - Subject to Further Confidentiality Review

1      Q.    Was it being marketed as

2    increased fracture resistance, as having

3    increased fracture resistance?

4      A.    Sure.

5            Enhanced fracture resistance.

6      Q.    Were you instructed to tell

7    physicians about the way that these

8    increased benefits were accomplished, or

9    is that something that you didn't talk

10   about?

11     A.    I -- honestly, I don't remember

12   offhand specifically.

13     Q.    Were these factors, these

14   benefits, something that you used as a

15   selling tool?

16     A.    The ben -- I mean, they

17   potentially could have.  I don't, at the

18   time, remember specifically how we were,

19   you know, selling the filter versus what

20   the physician was currently using,

21   offhand.

22     Q.    Okay.  Because at this time when

23   the G2 filter came out, the Simon was

24   still available?

Do Not Disclose - Subject to Further Confidentiality Review

1        this document?

2                MS. LOURIE:   Yes.

3    BY MS. LOURIE:

4        Q.     This new exhibit is another one

5    of those Health Hazard Evaluations.   This

6    one's dated February 15th, 2006.

7                Since you testified already

8    you've never saw any of these, I take it

9    you've never seen this document.

10       A.     Correct.

11       Q.     All right.   So, this one is in

12   reference to the G2 and migration, and at

13   this point in February of 2006, would you

14   agree that there were 10 reports of

15   migration, 9 of which were caudal,

16   according to this report?

17       A.     According to this summary, yes.

18       Q.     Okay.   And in the "Conclusion"

19   section of this report, would you agree

20   that Dr. Ciavarella concluded that the

21   migration events with the G2 filter have

22   been associated with a high percentage of

23   caudal migrations accompanied by

24   significant filter tilting and limb

Do Not Disclose - Subject to Further Confidentiality Review

1    pretty proud of yourself."

2         Q.    Okay.  So, Mr. Greer felt like

3    the situation with respect to the filter

4    problems was so terrible that it was held

5    together with Scotch tape, smoke, mirrors,

6    crying, et cetera, apparently, correct?

7              MS. KOWALZYK:  Object to the

8         form.

9         A.    So, you would have to ask Jason

10   how he felt about it.

11        Q.    Okay.  But you don't agree with

12   Mr. Greer's assessment?

13        A.    No, I don't agree with his

14   assessment.

15        Q.    All right.

16              THE WITNESS:  Next document?

17              MS. LOURIE:  Yep.

18              (Exhibit Ferrara 22, chart

19        titled What is G2 trend relative to

20        RNF?, was marked for identification,

21        as of this date.)

22   BY MS. LOURIE:

23        Q.    All right.  Exhibit 22 is G2

24   trend relative to RNF.

Do Not Disclose - Subject to Further Confidentiality Review

1              RNF would be Recovery, correct?

2       A.     Yes, I believe so.

3              MS. KOWALZYK:  Do you have a

4       copy for me?

5              MS. LOURIE:  I'm sorry

6       (handing.)

7    BY MS. LOURIE:

8       Q.     Okay.  If you look at this

9    chart, will you agree, or can you tell the

10   jury which product had more caudal

11   migrations?

12             MS. KOWALZYK:  Object to the

13      form.

14      A.     Caudal migration, according to

15   this chart, it says G2.

16      Q.     Okay.  And that would be 14

17   percent compared to 3 percent; is that

18   right?

19      A.     On this chart, that's correct.

20      Q.     Which one had more tilts?

21      A.     On this chart?

22      Q.     Yes.

23      A.     This says 39 versus 16 with G2

24   having more.

Do Not Disclose - Subject to Further Confidentiality Review

1          Q.    Which one had more perforations?

2                MS. KOWALZYK:  Object to the

3          form.

4                MS. LOURIE:  What's your

5          objection?

6                MS. KOWALZYK:  This is a single

7          page taken out of a 20-plus page

8          presentation, and this completely

9          mischaracterizes, used in this form,

10         completely mischaracterizes what this

11         data is summarizing.

12               MS. LOURIE:  Okay.  So you don't

13         have an objection to the form of my

14         question.

15               MS. KOWALZYK:  I have -- I have

16         objection to the foundation.

17               MS. LOURIE:  Okay.  All right.

18         That's what I wanted to know, if you

19         didn't like the way I was asking the

20         question.

21    BY MS. LOURIE:

22         Q.    Okay.  Go ahead and answer the

23    question.

24         A.    Sorry, what was the question?

Do Not Disclose - Subject to Further Confidentiality Review

1      Q.    Which product had more

2   perforation?

3      A.    On this chart, the number with

4   G2 is higher.

5      Q.    And what is the number for G2?

6      A.    36.

7      Q.    And what's the number for

8   Recovery?

9      A.    Nine.

10     Q.    Did anyone ever give you any of

11  this information on this chart while you

12  were working at Bard?

13        MS. KOWALZYK:  Object to the

14     form.

15     A.    I don't remember ever seeing

16  this chart, so no.

17     Q.    Were you aware while you were

18  working at Bard that the G2 had more

19  caudal migrations than the Recovery?

20        MS. KOWALZYK:  Object to the

21     form.

22     A.    I wasn't privy to the numbers

23  for both of them.  So I wouldn't be privy

24  to any of that.

Do Not Disclose - Subject to Further Confidentiality Review

1    Q.    So, the same would be true about

2    the more tilting and more perforations?

3    A.    Any tilting or any perforation

4    rate I would not have specific access to.

5    Q.    All right.  So I would take it

6    from this answer you would have not been

7    able to relay that information to Dr.

8    D'Ayala?

9    A.    D'Ayala.

10    MS. KOWALZYK:  Object to the

11    form.

12 BY MS. LOURIE:

13    Q.    I'm not going to get it right

14    the entire time.

15    A.    Okay.  I could not have passed

16    to Dr. D'Ayala any information that I

17    didn't have or was approved to give him.

18    THE WITNESS:  Moving on from

19    this?

20    MS. LOURIE:  Moving on.

21 BY MS. LOURIE:

22    Q.    Have you ever heard of the

23    migration push test?

24    A.    No.

Do Not Disclose - Subject to Further Confidentiality Review

1        Q.      -- on page 5.

2        A.      Page 5.  Page 5 for me says with

3    the title "Product Development/Launch

4    Schedule."

5        Q.      Yes.

6        A.      Okay.

7        Q.      If you look at the second entry

8    there, it's the G2 with caudal

9    improvements.

10             So, at this point, which is

11   February of '06, Bard is looking into a

12   project to modify the G2 filter to

13   minimize caudal migration.

14       A.      Okay.

15       Q.      According to the project status.

16       A.      Project initiated to modify G2

17   filter to minimal caudal migration.

18       Q.      They're trying to -- they're

19   doing a failure investigation to determine

20   the design and physiological root causes

21   of the caudal migration?

22       A.      Yeah, they're more R and D, it

23   looks like.

24       Q.      Okay.  At this point, again I'll

Do Not Disclose - Subject to Further Confidentiality Review

1    ask you had anyone at Bard told you about

2    this issue with caudal migration in the

3    G2?

4        A.    So, again I don't remember any

5    specific time frames, and I wouldn't

6    necessarily call it an issue.  I had

7    become aware that there were caudal

8    migrations with G2 at some point, that

9    there were reported cases.

10       Q.    Okay.  And did you ever talk to

11   the doctors at New York Methodist about

12   the issues with caudal migration?

13             MS. KOWALZYK:  Object to the

14       form.

15       A.    I can't specifically --

16       Q.    Or the fact that caudal

17   migrations were being reported?

18       A.    I don't specifically remember

19   any conversations.

20       Q.    All right.  Flip over to page 8,

21   and in this month there were four

22   migrations reported for the G2; is that

23   right?

24       A.    Four, yes.

Do Not Disclose - Subject to Further Confidentiality Review

1      Q.    Okay.  Well, then I think that

2   pretty much sums it up, that you were not

3   interested in the Everest study or the

4   push study or the comparative studies and

5   you did not want any of that information

6   to pass along to your physicians?

7             MS. KOWALZYK:  Object to the

8        form.

9      A.    I would not agree with that.

10            The Everest study I do remember

11   hearing something about.  I don't recall

12   the specifics.

13            Any of the internal studies that

14   you're referencing that I'm unaware of

15   were not my purview, and if they were

16   relevant, I trust management and the

17   internal in Bard to, at the time, give me

18   that information once approved through

19   their approval process to disseminate out

20   to physicians.  I at no point have an

21   expectation to disseminate non-approved

22   information to physicians.

23      Q.    Okay.  So you trusted Bard to

24   pass along the information that was

Do Not Disclose - Subject to Further Confidentiality Review

1   important to pass along, and so did the

2   physicians.

3           Would you agree with that?

4           MS. KOWALZYK:  Object to the

5       form.

6       A.   I -- I would say that I trusted

7   Bard to give to me the information that

8   was appropriate and approved to give to me

9   to pass along to physicians.

10          I feel that physicians have a

11  reasonable expectation that a product is

12  safe and effective and that if they have

13  any questions, they can certainly ask the

14  company for answers to them.

15      Q.   Okay.  You made quite a bit of

16  money when you were working at Bard;  is

17  that true?

18      A.   That's a --

19          MS. KOWALZYK:  Object to the

20      form.

21      A.   That's a relative term.

22      Q.   Okay, fair enough.

23          The year that you won one of

24  those awards, I think I saw you got

# Exhibit B-G

**(Filed Under Seal)**

Exhibit B-H

Do Not Disclose - Subject to Further Confidentiality Review

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ARIZONA
 3
    IN RE: BARD IVC FILTERS PRODUCTS    )
 4  LIABILITY LITIGATION,               ) MD No.: 02641
    _____)
 5
 6                IN THE CIRCUIT COURT OF THE SEVENTEENTH
 7                       JUDICIAL CIRCUIT
 8              IN AND FOR BROWARD COUNTY, FLORIDA
 9
    CLARE AUSTIN,                       )
10                                      )
           Plaintiff,                   )
11                                      )
    vs.                                 ) Case No.:
12                                      ) 15-008373
    C.R. BARD, INC., a foreign          ) Div.: 07
13  corporation, and BARD PERIPHERAL    )
    VASCULAR, INC., an Arizona          )
14  corporation; MATTHEW ROBBINS,       )
    M.D.; and CLEVELAND CLINIC          )
15  FLORIDA,                            )
                                        )
16         Defendants.                  )
    _____)
17
                DO NOT DISCLOSE - SUBJECT TO FURTHER
18                   CONFIDENTIALITY REVIEW
19
                VIDEOTAPED DEPOSITION OF NATALIE WONG
20
                Phoenix, Arizona
21              October 18, 2016
                    9:00 a.m.
22
23
24                   REPORTED BY:
                     Robin L. B. Osterode, RPR, CSR
25                   AZ Certified Reporter No. 50695
```

Do Not Disclose - Subject to Further Confidentiality Review

1      A.      I was on new product development teams when

2    I started back at Bard, and I was on PTFE grafts.

3    And so if there was a failure mode, I would probably

4    be working on root cause analysis.

5      Q.      Fair to say it's something that you've

6    done, at some level or another, since you started

7    back at Bard in February 2004?

8      A.      Yes.

9      Q.      Is that something you know how to do?

10      A.      Yes.

11      Q.      Something you understand?

12      A.      Yes.

13      Q.      And why -- why does Bard do root cause

14    analysis, I mean, what's their -- why do they do

15    them?

16      A.      To prevent failure modes from occurring.

17      Q.      And is that something that's important to

18    do?

19      A.      Yes, absolutely.

20      Q.      And why is it important?

21      A.      Because we don't want complaints.  We don't

22    want patient injury.

23      Q.      It's important to understand the root cause

24    of failure modes to prevent injury to patients.

25    Fair?

```
 1      A.    Yes.

 2      Q.    And safety of the patients is first and

 3   foremost for manufacturing companies.  Right?

 4      A.    Yes.

 5      Q.    And -- and Bard feels that way?

 6      A.    Yes.

 7      Q.    So as of today, has Bard determined the

 8   root cause of filter fracture?

 9      A.    I don't know.  I haven't been on filters

10   the last several years.

11      Q.    As of the time you left filters in -- in

12   2012, has Bard figured out the root cause of filter

13   fracture?

14      A.    No, not that I know of.

15      Q.    How about filter migration?

16      A.    No, not that I know of.

17      Q.    How about perforations?

18      A.    Not that I know of.

19      Q.    How about tilt?

20      A.    Not that I know of, no.

21      Q.    Okay.  And Bard continues to sell, and has

22   all along continued to sell, the filter for placement

23   in patients in a vein that leads directly to the

24   heart and lungs.  Right?

25      A.    Can you repeat your question, I'm sorry?
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I'm not sure what that means.

 2   BY MR. DEGREEFF:

 3       Q.    You can answer.

 4              MS. DALY:  You can answer the question.

 5              THE WITNESS:  Okay, sorry.

 6              Yeah, I think physicians should know, and I

 7   think we do communicate through the IFU.

 8   BY MR. DEGREEFF:

 9       Q.    So you believe that in the IFU it states

10   that Bard has failed to identify the root cause of

11   the failure modes?

12       A.    Sorry, no, not that part.

13       Q.    Okay.  As far as you know, has it ever been

14   communicated to physicians that Bard has been unable

15   to identify the root cause of the failure modes

16   associated with its filters?

17       A.    I don't know what's been communicated.

18       Q.    As you sit here, are you aware of that

19   occurring?

20       A.    No.

21       Q.    Is that something you personally would want

22   your physician to know if you were going in and

23   having an IVC filter placed?

24              MS. DALY:  Object to the form.

25              THE WITNESS:  I would want to know what
```

 1              MS. DALY:  He's talking about based on your

 2   data here.

 3              THE WITNESS:  That SNF -- sorry, SNF is

 4   better than G2 on caudal migration, yes.

 5   BY MR. DEGREEFF:

 6       Q.    And it would be -- based on the data

 7   that's -- the available data that's in this

 8   spreadsheet, it would be inaccurate to say that the

 9   G2 was more stable than the -- than the RNF.

10   Correct?

11              MS. DALY:  Object to the form.

12              THE WITNESS:  Yes.

13   BY MR. DEGREEFF:

14       Q.    Let's see, look at the next page, if you

15   would.

16       A.    Sorry, what's the -- what's the first

17   bullet point?

18       Q.    It says "G2 Analysis."  Right there.

19       A.    Okay.

20       Q.    And it says "How discovered?"  Right?

21       A.    Yes.

22       Q.    And under -- underneath that it says, three

23   of them say "Patient pain."  Correct?

24       A.    Yes.

25       Q.    And so 3 of the 13, G2 caudal migrations

Do Not Disclose - Subject to Further Confidentiality Review

1    or analysis done within Bard which showed an

2    association between caudal migration and tilt?

3         A.    I think this is what -- what we were trying

4    to do here was to understand how many caudals were

5    associated with tilt, how many were associated with

6    perforation and perforation/penetration.

7         Q.    Was the ultimate conclusion of Bard that

8    there was an association between caudal migration and

9    tilt?

10        A.    There was only eight datapoints here.

11        Q.    I know I'm talking about ultimately.  I

12   mean, if this was something that was being analyzed,

13   what was the ultimate conclusion?  Was there an

14   association between caudal migration and tilt?

15        A.    I'd have to go back and look at the report.

16        Q.    Is that something you don't know, as you

17   sit here?

18        A.    Yeah, I don't remember.

19        Q.    Okay.  Look at the next page, if you would.

20   This is the caudal severity description.  And I'm

21   looking at type III and type IV.  Caudal migration

22   can be -- can result in a reintervention to remove

23   the filter.  Right?

24        A.    Yes, for -- for the type III.

25        Q.    And, yeah, and caudal migration can result

Do Not Disclose - Subject to Further Confidentiality Review

1    in the need to repair damage to a patient's anatomy?

2        A.    Yes.

3        Q.    And caudal migration can result in patient

4    injury?

5        A.    Yes.

6        Q.    And caudal migration can result in a filter

7    no longer providing its primary function of -- of

8    protection from pulmonary embolism?

9        A.    Yes.

10       Q.    And if you're no longer providing

11   protection of pulmonary embolism, is that a bad

12   thing?

13       A.    Yes.

14       Q.    Why is it a bad thing?

15       A.    Because you don't have protection from PE.

16       Q.    And what happens if you don't have

17   protection from PE?

18             MS. DALY:  Object to the form.

19             THE WITNESS:  You can have a really long

20   clot to your heart.

21   BY MR. DEGREEFF:

22       Q.    And can that ultimately result in death?

23       A.    Yes.

24       Q.    And pulmonary embolism can also -- I mean,

25   excuse me, and caudal migration can also result in

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    excessive tilt; is that right?

 2         A.    Yes.

 3         Q.    And it can also result in an arm and leg --

 4    an arm or leg in a side branch of the vena cava?

 5         A.    Yes.

 6         Q.    And caudal migration can also result in

 7    iliac or renal confluence?

 8         A.    I think here it's saying it could be in --

 9    it could migrate to the iliac renal confluence.

10         Q.    Yeah, you're right, correct.  And caudal

11    migration can also result in perforation?

12         A.    Yes.

13         Q.    And caudal migration can result in -- in

14    death, correct, according to the type IV?

15         A.    Yes.

16         Q.    And life-threatening injury?

17         A.    Yes.

18         Q.    All right.  Let's look at the -- there's

19    a -- there's a -- a later one that says "G2 caudal

20    threshold."

21         A.    There's two of them, which one?

22         Q.    The one -- the DFMEA.

23         A.    The first one?

24         Q.    Yeah.

25         A.    Okay.
```

# Exhibit B-I

**(Filed Under Seal)**

# Exhibit B-J

**(Filed Under Seal)**

Exhibit B-K

Case 2:15-md-02641-DGC   Document 8165-1   Filed 10/12/17   Page 122 of 136

Traditional 510(k)
MERIDIAN™ Filter System – Jugular/Subclavian Delivery Kit

H02511
P. 1 of 4
Page 19



## MERIDIAN™ Filter System –Jugular/Subclavian Delivery Kit
### 510(k) Summary
### 21 CFR 807.92

AUG 2 4 2011

As required by the Safe Medical Devices Act of 1990, coded under Section 513, Part (I)(3)(A) of the Food, Drug and Cosmetic Act, a 510(k) summary upon which substantial equivalence determination is based is as follows:

### Submitter Information:

| | |
|---|---|
| Applicant: | Bard Peripheral Vascular, Inc<br>1625 West 3rd Street<br>Tempe, Arizona  85281 |
| Phone: | 480-638-2906 |
| Fax: | 480-449-2546 |
| Contact: | Joni Creal, Regulatory Affairs Associate |
| Date: | August 31, 2010 |

### Subject Device Name:

| | |
|---|---|
| Device Trade Name: | **MERIDIAN™ Filter System –<br>Jugular/Subclavian Delivery Kit (MD800J)** |
| Common or Usual Name: | Filter, Intravascular, Cardiovascular |
| Classification: | Class II |
| Classification Panel: | Cardiovascular Devices |
| Product Code: | DTK |
| **Predicate Devices:** | ECLIPSE™ Filter System – Jugular/Subclavian Delivery<br>Kit (K101431; Clearance June 25, 2010) |

### Summary of Change:

The primary modification to the predicate device, the ECLIPSE™ Filter System – Jugular/Subclavian Delivery System (K101431), compared to the subject device, the MERIDIAN™ Jugular/Subclavian Delivery System, is the addition of one downward pointing titanium anchor which is laser welded to each filter wire arm (6 total). In

---

addition, the Jugular delivery system has been modified to accommodate the filter design changes and minor changes have been made to the IFU.

**Device Description:**

The MERIDIAN™ Filter consists of twelve electropolished shape-memory nitinol wires emanating from a central electropolished nitinol filter hook.  These 12 wires form two levels of embolic filtration: the six legs provide the lower level of filtration and the six arms provide the upper level of filtration.   The legs contain hooks and the arms contain anchors to resist filter movement. The MERIDIAN™ Filter is intended to be used in the inferior vena cava with diameters less than or equal to 28 mm.

The subject MERIDIAN™ Filter System – Jugular/Subclavian Delivery Kit consists of a 10 French I.D. introducer sheath and dilator set and a delivery device preloaded with the MERIDIAN™ Filter.  The introducer sheath and dilator are used to gain access to the inferior vena cava via a jugular approach using the Seldinger technique.  The dilator accepts a 0.038" guidewire, enables a contrast medium power injection up to 800 psi maximum pressure, and is fitted with two radiopaque marker bands spaced 28 mm apart for caval sizing.  The introducer sheath contains a radiopaque tip for identification of the distal end of the sheath and a hemostasis valve with a side port for injecting contrast medium via a syringe.  The delivery device fits within the introducer sheath and delivery mechanism to deploy the MERIDIAN™ Filter.

**Indications for Use of Device:**

The subject device, the MERIDIAN™ Filter System – Jugular/Subclavian Delivery Kit, is indicated for use in the prevention of recurrent pulmonary embolism via permanent placement in the vena cava in the following situations:

- Pulmonary thromboembolism when anticoagulants are contraindicated.
- Failure of anticoagulant therapy for thromboembolic disease.
- Emergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced.
- Chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated.

MERIDIAN™ Filter may be removed according to the instructions supplied under the section labeled:  Optional Procedure for Filter Removal.

**Technological Comparison to Predicate Devices:**

The technological characteristics of the subject device, the MERIDIAN™ Filter System – Jugular/Subclavian Delivery Kit, are substantially equivalent to those of the predicate device, the ECLIPSE™ Filter System –Jugular/Subclavian Delivery System (K101431), in terms of intended use, indications for use, application, user population, operating principle, delivery system design, filter bi-level design, fundamental scientific technology, packaging configuration, and sterilization method.

**Performance Testing Summary:**

To demonstrate substantial equivalence of the subject device to the predicate device, the technological characteristics and performance criteria were evaluated using *in vitro* and *in vivo* testing performed as outlined below:

> ### *In Vitro*
> - Fatigue Resistance
> - Anchor Weld Tensile Strength
> - Cephalad Migration Resistance
> - Caudal Migration Resistance
> - Removal Force
> - MRI Compatibility
> - Delivery System Trackability
> - Delivery System Pushability
> - Deployment Accuracy
> - Filter Centering (Tilt)
> - Arm/Leg Entanglement (Configuration)
> - Biocompatibility
> - Corrosion Resistance

### *In Vivo*

- Retreivability
- Fatigue Resistance
- Cephalad Migration Resistance
- Caudal Migration Resistance
- Penetration Resistance
- Perforation
- Caval Patency
- Caval Damage
- Caval Narrowing
- Delivery System Trackability
- Delivery System Pushability
- Ease of Deployment (Deployment Force)
- Deployment Accuracy
- Filter Centering (Tilt)
- Arm/Leg Entanglement (Configuration)
- Filter Visibility Under Fluoroscopy
- Delivery System Visibility Under Fluoroscopy

The results from these tests demonstrate that the technological characteristics and performance criteria of the MERIDIAN™ Filter System – Jugular/Subclavian Delivery Kit is comparable to the predicate device and that the subject device can perform in a manner substantially equivalent to devices currently on the market for the same intended use.

**Conclusions:**

The MERIDIAN™ Filter System – Jugular/Subclavian Delivery Kit is substantially equivalent to the legally marketed predicate device, the ECLIPSE™ Filter System – Jugular/Subclavian Delivery System (K101431).

**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Room –WO66-G609
Silver Spring, MD 20993-0002


Bard Peripheral Vascular, Inc.
c/o Ms. Joni Creal
Regulatory Affairs Associate
1625 West Third Street                    AUG 2 4 2011
Tempe, AZ 85281

Re: K102511
    Trade Name:  MERIDIAN Filter System – Jugular/Subclavian Delivery Kit
    Regulation Number: 21 CFR 870.3375
    Regulation Name: Cardiovascular intravascular filter
    Regulatory Class: Class II
    Product Code: DTK
    Dated:  June 27, 2011
    Received:   June 28, 2011

Dear Ms. Creal:

We have reviewed your Section 510(k) premarket notification of intent to market the device
referenced above and have determined the device is substantially equivalent (for the indications
for use stated in the enclosure) to legally marketed predicate devices marketed in interstate
commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to
devices that have been reclassified in accordance with the provisions of the Federal Food, Drug,
and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA).
You may, therefore, market the device, subject to the general controls provisions of the Act.  The
general controls provisions of the Act include requirements for annual registration, listing of
devices, good manufacturing practice, labeling, and prohibitions against misbranding and
adulteration.  Please note:  CDRH does not evaluate information related to contract liability
warranties.  We remind you, however, that device labeling must be truthful and not misleading.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA), it
may be subject to additional controls.  Existing major regulations affecting your device can be
found in the Code of Federal Regulations, Title 21, Parts 800 to 898.  In addition, FDA may
publish further announcements concerning your device in the Federal Register.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean
that FDA has made a determination that your device complies with other requirements of the Act
or any Federal statutes and regulations administered by other Federal agencies.  You must
comply with all the Act's requirements, including, but not limited to: registration and listing (21
CFR Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical

Page 2 – Ms. Joni Creal

CFR Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical device-related adverse events) (21 CFR 803); good manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801), please go to http://www.fda.gov/AboutFDA/CentersOffices/CDRH/CDRHOffices/ucm115809.htm for the Center for Devices and Radiological Health's (CDRH's) Office of Compliance. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21CFR Part 807.97). For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part 803), please go to http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm for the CDRH's Office of Surveillance and Biometrics/Division of Postmarket Surveillance.

You may obtain other general information on your responsibilities under the Act from the Division of Small Manufacturers, International and Consumer Assistance at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.

Sincerely yours,

Bram Zuckerman, M.D.
Director
Division of Cardiovascular Devices
Office of Device Evaluation
Center for Devices and
Radiological Health

Enclosure

# Indications for Use

**510(k) Number (if known):**

**Device Name:** MERIDIAN™ Filter System –Jugular/Subclavian Delivery Kits

**Indications for Use:**

The MERIDIAN™ Filter System –Jugular/Subclavian Delivery Kits are indicated for use in the prevention of recurrent pulmonary embolism via permanent placement in the vena cava in the following situations:

- Pulmonary thromboembolism when anticoagulants are contraindicated.

- Failure of anticoagulant therapy for thromboembolic disease.

- Emergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced.

- Chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated.

MERIDIAN™ Filter may be removed according to the instructions supplied under the section labeled:  Optional Procedure for Filter Removal.

Prescription Use_X_               AND/OR               Over-The-Counter Use_____
(Part21 CFR 801 Subpart D)                              (21CFR 801 Subpart C)

(PLEASE DO NOT WRITE BELOW THIS LINE-CONTINUE ON ANOTHER PAGE IF NEEDED)

Concurrence of CDRH, Office of Device Evaluation (ODE)

**(Division Sign-Off)**
**Division of Cardiovascular Devices**

**510(k) Number**___K10254____

**Bard Peripheral Vascular, Inc.**

# Exhibit B-L

**(Filed Under Seal)**

# Exhibit B-M

**(Filed Under Seal)**

Exhibit B-N

1       IN THE UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF ARIZONA

3               - - -

4

    IN RE:  BARD IVC        :

5   FILTERS PRODUCTS      :   NO.

    LIABILITY LITIGATION   :   MD-15-02641-

6                    :   PHX-DGC

                     :

7                    :

8               - - -

9           July 18, 2017

10            - - -

11

12    DO NOT DISCLOSE - SUBJECT TO FURTHER

13        CONFIDENTIALITY REVIEW

14

             Videotaped deposition of

15  MARK W. MORITZ, M.D., taken pursuant to
notice, was held at the offices McCarter

16  & English, LLP, 100 Mulberry Street,
Newark, New Jersey, beginning at 9:07

17  a.m., on the above date, before Michelle
L. Gray, a Registered Professional

18  Reporter, Certified Shorthand Reporter,
Certified Realtime Reporter, and Notary

19  Public.

20

                - - -

21

22      GOLKOW LITIGATION SERVICES
    877.370.3377 ph | 917.591.5672 fax

23        deps@golkow.com

24

Do Not Disclose - Subject to Further Confidentiality Review

```
1    BY MR. DEGREEFF:

2         Q.    And there are no high level

3    studies that have been performed that

4    show that filters are effective in saving

5    lives, fair?

6         A.    I don't know.

7         Q.    You are not aware of such a

8    study, are you?

9         A.    I'm not.

10        Q.    Are you aware of the recent

11   study showing that filters don't increase

12   the number of PEs that people -- that

13   people have while filters are in place?

14        A.    Say the question again.

15        Q.    Are you aware of the recent

16   studies determining that filters don't

17   even increase the rate of PEs?

18        A.    They don't increase the

19   rate?

20        Q.    Decrease.  I'm sorry.

21             MR. BROWN:  Object to the

22        form.

23             THE WITNESS:  I'm not aware

24        of that study.
```

Do Not Disclose - Subject to Further Confidentiality Review

1  BY MR. DEGREEFF:

2      Q.    You're not aware of that

3  study?

4      A.    No.

5      Q.    Are you aware of any high

6  level evidence establishing the

7  effectiveness of filters in saving lives?

8      A.    Other than -- other than

9  these studies, I'm not.

10      Q.    And nothing about those

11  studies establishes that filters save

12  lives, correct?

13      A.    Yes, we agreed to that

14  before.

15      Q.    And, Doctor, you summarized

16  several articles related to Bard IVC

17  filters in your report, correct?

18      A.    Yes.

19      Q.    And consistently throughout

20  those articles, they found a higher rate

21  of fracture and migration with Bard

22  filters over other filters, fair?

23          MR. BROWN:  Object to the

24      form.

Do Not Disclose - Subject to Further Confidentiality Review

1          THE WITNESS:  I believe

2      that's correct.

3  BY MR. DEGREEFF:

4      Q.    Doctor, why do you think

5  Bard didn't want to give you its internal

6  documents?

7          MR. BROWN:  Object to the

8      form.

9          THE WITNESS:  I don't know

10     why they didn't give it to me,

11     except it wouldn't have been

12     relevant to what I was doing.

13     It's probably a large number of

14     documents, and I'm not sure that

15     knowing who said what to whom and

16     when they said it inside the

17     company is relevant to what I'm

18     doing.

19  BY MR. DEGREEFF:

20     Q.    Why do you think Bard didn't

21  give you the substance of their internal

22  analysis of their failure rates, adverse

23  event rates, versus other filters and

24  versus permanent filters?

Do Not Disclose - Subject to Further Confidentiality Review

1    BY MR. O'CONNOR:

2          Q.     But certainly for Bard

3    filters?

4          A.     For Bard filters.

5          Q.     You saw what concerned you

6    to be an increased rate of failures of

7    Bard filters when you went to the

8    literature and focused in on this case, a

9    Bard case?

10              MR. BROWN:  Object to the

11         form.

12              THE WITNESS:  Well, that's

13         what the literature says, if you

14         believe it.

15   BY MR. O'CONNOR:

16         Q.     Well, and you being a doctor

17   who has patients, and putting your

18   patients' interests first and foremost,

19   fair to say that you became concerned

20   when you were preparing your opinions in

21   this case about Bard filters?

22         A.     Yes.

23              MR. BROWN:  Object to the

24         form.