# REDACTED DOCUMENTS RELATING TO DOCKET 7292

EXHIBIT A – Previously filed redacted in DKT 8118

EXHIBIT B – Filed redacted

## Page 1

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL
CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

CLARE AUSTIN,

Plaintiff,

-VS-       CASE NO. 15-008373
       Div: 07
C.R. BARD, INC., a
foreign corporation and
BARD PERIPHERAL VASCULAR,
INC., an Arizona
corporation, MATTHEW
ROBBINS, MD., and
CLEVELAND CLINIC FLORIDA,

Defendants.

VIDEOTAPED DEPOSITION OF.
MARK J. EISENBERG, M.D., M.P.H.
ON WEDNESDAY, AUGUST 17, 2016
IN MONTREAL, QUEBEC, CANADA.


VIDEOGRAPHER:  DAVID OXILIA
COURT REPORTER:  C.L. KLEIN

## Page 2

1  APPEARANCES:
2  FOR BARD DEFENDANTS:
3  NELSON, MULLINS, RILEY & SCARBOROUGH LLP
   BY:  RICHARD B. NORTH, JR., ESQUIRE
4     PHILIP BUSMAN, ESQUIRE
   201 17th Street NW, Suite 1700
5  Atlanta, GA 30363
   Tel: 404-322-6155
6  richard.north@nelsonmullins.com
   phil.busman@nelsonmullins.com
7
8
   FOR PLAINTIFF:
9
   HAUSFELD
10 BY: STEVEN B. ROTMAN, Esquire
   1700 K. Street, NW, Suite 650
11 Washington, DC 20006
   Tel:  202-540-7371
12 Srotman@hausfeld.com
13 BABBITT & JOHNSON
   BY:  JOSEPH R. JOHNSON, ESQUIRE
14 1641 Worthington Road
   West Palm Beach, FLA 33409
15 Tel: 561-684-2500
   jjohnson@babbitt-johnson.com
16
   LOPEZ McHUGH
17 BY:  JOSHUA M. MANKOFF
   1123 Admiral Peary Way, Quarters K
18 Philadelphia, PA 19112
   Tel: 215-952-6910
19 jmankoff@lopezmchugh.com
20
21
22
23
24
25

## Page 3

1            INDEX
2
3  WITNESS:  MARK J. EISENBERG, M.D., M.P.H.

4  DIRECT EXAMINATION      PAGE
      BY MR. NORTH      5
   CROSS-EXAMINATION
5     BY MR. ROTMAN     117
   RE-DIRECT EXAMINATION
6     BY MR. NORTH     120
7
8
9       INDEX OF EXHIBITS
10 NUMBER   DESCRIPTION     PAGE
   Exhibit 1   Deposition Notice   6
11 Exhibit 2   Confidence Interval   9
        Calculations
12 Exhibit 3   Sample Size and Power   9
        Calculations
13 Exhibit 4   Sample Size Calculations   9
   Exhibit 5   Interrogatory Response   10
14 Exhibit 6   Curriculum Vitae   12
   Exhibit 7   Discovery Response   50
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1  UPON COMMENCING AT 10:05 A.M., THIS SEVENTEENTH
2  DAY OF AUGUST 2016 at the offices of Decision
3  One, One Place Ville Marie, Suite 2901, Montreal,
4  Quebec, Canada, H3B 0E9.
5
6       BY THE VIDEOGRAPHER:  Good morning.
7  We are now on the record. My name is David
8  Oxilia.  I am the Videographer representing
9  Veritext Legal Solutions.  This begins the
10 deposition of Dr. Mark J. Eisenberg, M.D., M.P.H.
11 in the case entitled Clare Austin versus C.R.
12 Bard Inc. et al.  This case is case number 15-008373,
13 Division 07.  This deposition is taking place at
14 Decision One in Montreal, Quebec, Canada on
15 August 17, 2016.  The time on the video monitor
16 is 10:05 a.m.  The Court Reporter today is Cherie
17 Klein.  Will Counsel please state their
18 appearances for the record.
19      MR. ROTMAN:  Steve Rotman for
20 Plaintiffs.
21      MR. MANKOFF: Joshua Mankoff for
22 Plaintiffs.
23      MR. JOHNSON:  Joe Johnson
24 representing Clare Austin.
25      MR. NORTH:  Richard North

Page 5

1  representing the Bard Defendants.
2       MR. BUSMAN:  Phil Busman for Bard.
3       BY THE VIDEOGRAPHER:  Thank you.
4  The Court Reporter will now swear in the Witness.
5  WITNESS SWORN
6  DIRECT EXAMINATION
7  BY MR. NORTH:
8       Q.    Good morning, Dr. Eisenberg.
9       A.    Good morning.
10      Q.    As I introduced myself earlier, my
11  name is Richard North and I represent the Bard
12  Defendants in this action.  Today I am going to
13  be asking you some questions about your work in
14  this case and the opinions you may have reached
15  since you have been designated as an expert
16  Witness.  If at any time I ask you anything that
17  you did not hear or do not understand, please ask
18  me to repeat it or rephrase it.  Is that
19  agreeable?
20      A.    Yes.
21           MR. NORTH:  And Counsel, I would
22  also propose that we proceed with this deposition
23  in accordance with the usual stipulations.  It's
24  being taken by agreement and by notice under the
25  Florida Rules.

Page 6

1           MR. JOHNSON:  No problem.
2  BY MR. NORTH:
3       Q.    And I would also ask, Doctor, that
4  as you answer questions, try to avoid a nod of
5  the head, or uh huh or uh uh, because it makes it
6  difficult for the Court Reporter to create a
7  transcript.
8       A.    Understood.
9       Q.    And you have been deposed before,
10  haven't you?
11      A.    Yes, I have.
12      Q.    On how many occasions?
13      A.    I can't say exactly.  The last time,
14  I believe, was five years ago or more, so I would
15  have to go back and look.
16      Q.    Have you ever testified in Court?
17      A.    I have.
18      Q.    On how many occasions?
19      A.    Again, I would have to go back and
20  look.  The last time was at least five years ago.
21      Q.    Do you think you have testified in
22  Court as many as five times?
23      A.    No, I don't believe so.
24           Exhibit 1 was marked for
25  identification.

Page 7

1  BY MR. NORTH:
2       Q.    Doctor, let me hand you what's been
3  marked as Exhibit 1, which is the Notice that was
4  filed for your deposition.  Have you seen this
5  before?
6       A.    Yes.  Yes, I have.
7       Q.    And if you would look at Exhibit A
8  to the Notice, which is a list of the documents
9  you were requested to bring, did you bring any of
10  these items to the deposition today?
11      A.    It was my understanding that all of
12  these documents have been provided to you
13  directly.
14      Q.    So nothing was brought separately
15  today?
16      A.    The only thing I brought separately
17  were a few handwritten calculations that I have
18  here.
19      Q.    And what sort of calculations are
20  those?
21      A.    These are sample size of power
22  calculations and calculations of confidence
23  intervals for studies of different sample sizes.
24      Q.    Concerning what underlying data?
25           MR. ROTMAN:  Objection.

Page 8

1           THE WITNESS:  I am sorry.  Could you
2  repeat the question?
3  BY MR. NORTH:
4       Q.    You said these are calculations of
5  sample sizes and confidence intervals.  What data
6  were you using to make these calculations?
7           MR. ROTMAN:  Objection.
8           THE WITNESS:  Well, the first set of
9  calculations is just calculations of confidence
10  interval sizes depending on various sample sizes,
11  so not referring to any specific study.  So I
12  looked at different sample sizes, and different
13  potential complication rates and looked at what
14  size the confidence intervals would be around the
15  point estimates and complication rates.  So that
16  would be the first set of calculations.   The
17  second set of calculations are sample size and
18  power calculations, if one were to design a
19  clinical trial comparing a predicate device with
20  low complication rates and a newer device with
21  higher calculation rates.  And these calculations
22  were calculating sample sizes for the two arms of
23  the trial that would be required to look and
24  identify the various differences that I
25  presupposed.

Page 9

BY MR. NORTH:
Q.   Okay.
A.   The third set of calculations is again sample size calculations for clinical trials if one wanted to identify differences between a -- two different complication rates. And the complication rates that I was looking at came from the Grassi article.
Q.   If I could see those just a minute. And we are going to have them marked as Exhibits with the understanding you can keep the originals and then we will make copies.
        Exhibits 2, 3 and 4 were marked for identification.
BY MR. NORTH:
Q.   Just so the record is clear, what we have marked as Exhibit 2 are the first set of calculations you described concerning confidence intervals.
A.   Yes.
Q.   What we have marked as Exhibit 3 is the second group of calculations you have just discussed, which deal with sample size for a projected clinical trial.
A.   Yes.

Page 10

Q.   And Exhibit 4 focuses on, as I understand it, sample sizes that -- for a clinical trial that would make comparisons between two different complication rates.
A.   That's correct.
Q.   Okay.  Are those the only documents you brought with you today?
A.   Yes.
Q.   In looking at the previous cases that you have testified in as an expert witness, we were provided with a list of those and I am going to mark that as an Exhibit.  It appears most of those cases were medical malpractice actions.  Is that correct?
A.   I believe that's correct, yes.
Q.   We saw that you did testify as an expert in a multi-district proceeding against Bayer, the manufacturer.
A.   Yes.  I would have to refresh my recollection with that.
        Exhibit 5 was marked for identification.
BY MR. NORTH:
Q.   This has been marked as Exhibit 5, and this is an attachment to an interrogatory

Page 11

response provided by the Plaintiff in this case. Does that look to be a copy of your previous testimony list?
A.   Yes.
Q.   And the second from the bottom, what does that concern?  I believe it's -- I can't say this -- Aprotinin?
A.   Yes.
Q.   That involved a drug or pharmaceutical product manufactured by Bayer Corporation, didn't it?
A.   I believe so.
Q.   Is that the only time you have testified in a case involving a pharmaceutical product or a medical device?
        MR. ROTMAN:  Objection.
        THE WITNESS:  Again, I would have to go through.  This happened a while ago, so I would have to go through these again to say with assurance, but I believe so.
BY MR. NORTH:
Q.   As you sit here today you cannot recall another case, other than the Bayer proceeding, in which you testified where there was an issue concerning a pharmaceutical product

Page 12

or a medical device?
        MR. ROTMAN:  Objection.
        THE WITNESS:  I don't recall being deposed or testifying, yes.
BY MR. NORTH:
Q.   Okay.  In your medical malpractice actions are you generally testifying on behalf of the Plaintiffs, or on behalf of the physicians or is it both?
        MR. ROTMAN:  Objection.
        THE WITNESS:  I have been consulted for both Plaintiffs and Defendants.  I think most of the -- of the depositions and testimony were on behalf of the Plaintiffs.
        Exhibit 6 was marked for identification.
BY MR. NORTH:
Q.   Let me hand you what's been marked as Exhibit 6.  Is that a copy of your curriculum vitae?
A.   Yes, it is.
Q.   And this one appears to be dated May 23rd of 2014, if you look at the bottom left-hand corner.
A.   Yes, that's correct.

Page 13

1       Q.      Do you have an updated one since
2   then?
3       A.      I do, and I believe that I --
4           MR. ROTMAN:  I believe he has
5   provided that to us and I understood that we had
6   provided it to you.  I am not sure, because I
7   wasn't the one doing it.  Joe?
8           MR. JOHNSON:  I am not sure which
9   one we provided.  I assume whichever one we were
10  provided was in turn provided.
11          MR. NORTH:  My understanding is the
12  one we were provided was from May 23rd of 2014,
13  the one that has been marked as an Exhibit.  We
14  would ask that an updated c.v. please be provided
15  to us.
16          MR. JOHNSON:  Sure.
17  BY MR. NORTH:
18      Q.      Now, you are a medical doctor?
19      A.      I could e-mail you right now if that
20  will assist you.
21      Q.      Okay.  You are a medical doctor?
22      A.      Yes.  I am a cardiologist and a
23  clinical epidemiologist.  So I am a medical
24  doctor, yes.
25      Q.      Do you consider yourself an

Page 14

1   interventional radiologist?
2       A.      Well, I am an interventional
3   cardiologist, so I am not an interventional
4   radiologist but I do a lot of the same techniques
5   that interventional radiologists do.
6       Q.      Did you implant inferior vena cava
7   filters as a part of your practice?
8       A.      No, I have never implanted inferior
9   vena cava filters.
10      Q.      Have you retrieved inferior vena
11  cava filters?
12      A.      I have retrieved fragments of
13  catheters from radiation but I have never
14  retrieved an inferior vena cava filter.
15      Q.      Have you ever implanted stents of
16  any sort?
17      A.      Yes, I routinely implant stents.
18      Q.      What facility are you primarily
19  associated with now?
20      A.      The Jewish General Hospital, which
21  is one of the McGill hospitals here in Montreal.
22          MR. ROTMAN:  Off the record.
23          ---(OFF-THE-RECORD DISCUSSION)---.
24  BY MR. NORTH:
25      Q.      Doctor, at McGill, at your hospital

Page 15

1   are you part of an interventional cardiology
2   group?
3       A.      Well, there is a group of us
4   interventional cardiologists, but we are a
5   sub-set of a general cardiology group.
6       Q.      Are there other interventional
7   cardiologists in your group that implant inferior
8   vena cava filters?
9       A.      No.
10      Q.      Are there interventional
11  radiologists at your hospital that implant
12  filters?
13      A.      Yes, we have interventional
14  radiologists that implant filters at our
15  hospital.
16      Q.      Do you know what brand of filters
17  they are presently implanting?
18      A.      If I am not mistaken, they are
19  implanting a variety of filters, so I can't tell
20  you which ones, but it's not just a single brand.
21      Q.      Do you know if they are presently
22  implanting any Bard filters?
23      A.      I do not know that.
24      Q.      I believe you said you were both an
25  interventional cardiologist and a clinical

Page 16

1   epidemiologist.
2       A.      Yes, I am.
3       Q.      Define for us what a clinical
4   epidemiologist is.
5       A.      Well, I have a masters of public
6   health degree from Harvard where I studied
7   biostatistics and epidemiology as well as other
8   topics.  So I spent half my time doing clinical
9   cardiology, including interventional cardiology,
10  and I spent half my time doing research.  And the
11  research that I do is clinical epidemiology
12  research, so that involves clinical trials,
13  systematic reviews, meta analyses, cohort studies
14  as well as a variety of other methodologies that
15  are within the rubric of clinical epidemiology.
16      Q.      Have you ever been the lead
17  investigator of a clinical trial?
18      A.      I have.
19      Q.      On how many occasions?
20      A.      I believe five clinical trials.
21      Q.      Generally what did those clinical
22  trials involve?
23      A.      I did two clinical trials with
24  patients who had percutaneous coronary
25  interventions -- among patients who had

Page 17

1  angioplasty, and they were randomized to routine
2  stress testing versus a more conservative
3  strategy, and then they were followed up to see
4  if more intensive stress testing strategy made a
5  difference in outcomes.  I did a clinical trial
6  for patients with non-QA myocardial infarctions,
7  and they were randomized to an invasive strategy
8  versus a conservative strategy to see which one
9  had better outcomes.  I did a clinical trial in
10  patients who had acute coronary syndrome or
11  myocardial infarctions and who were smokers, and
12  they were randomized to Bupropion, which is an
13  anti-smoking medication.  They were randomized to
14  Bupropion versus placebo, and then they were
15  followed up to see if that had any impact on
16  their smoking cessation rates.  I did another
17  trial that took patients with acute coronary
18  syndromes that were smokers, and the patients
19  were randomized for Varenicline versus placebo,
20  again to see the impact on smoking cessation
21  rates.  I am involved in a trial which we are
22  just starting now.  It's been funded and we are
23  just about to start randomizing with smokers
24  being randomized to electronic cigarettes, with
25  or without nicotine, as well as counselling to

Page 18

1  see if that has an impact on smoking cessation
2  rates.
3      Q.    Have you ever conducted a clinical
4  trial about a medical device?
5      A.    I don't think that I have ever been
6  a lead investigator of a clinical trial where
7  patients were randomized to a medical device
8  versus not.
9      Q.    Have you ever been an investigator
10  in such a trial, even if you were not the lead
11  investigator?
12      A.    No.  As you know, I routinely
13  implant stents.  Some of those -- some of those
14  patients that received stents were collected in
15  the form of a registry, but again I was not the
16  lead investigator.  I have also been involved in
17  other clinical trials as a collaborator, again
18  not as a lead investigator, for example, drug
19  trials where patients were randomized for one
20  drug versus another.
21      Q.    Other than the experience with
22  clinical trials or registries actually and
23  stents, have you ever been involved as an
24  investigator in a clinical trial involving a
25  medical device?

Page 19

1      A.    Well, I have never been the lead
2  investigator for a clinical trial involving
3  medical devices, but I actually have quite a
4  number of publications related to medical
5  devices.  One of the areas that I am involved
6  with and interested in research-wise is
7  technology assessments.  So we have done
8  technology assessments on different medical
9  devices over the years, done some cost-effective
10  analyses as well involving medical devices.
11      Q.    Have you ever published anything
12  concerning inferior vena cava filters?
13      A.    No, I have not.
14      Q.    Prior to your retention as an expert
15  in this litigation, have you ever had any
16  professional involvement with inferior vena cava
17  filters?
18          MR. ROTMAN:  Objection.
19          THE WITNESS:  Well, sir, although I
20  am an interventional cardiologist I am also a
21  general cardiologist, so I am routinely involved
22  in the diagnosis of patients with deep vein
23  thrombosis and pulmonary emboli.  And some of
24  those patients I refer on to thrombosis experts
25  and eventually those patients, some of them get

Page 20

1  inferior vena cava filters.  And also in the
2  cath. lab I am doing angiograms.  Our centre is a
3  centre of excellence for pulmonary hypertension,
4  so I do a lot of right and left heart cath's.  So
5  the left heart cath's are the ones where we are
6  putting stents in the coronaries.  But I am
7  routinely putting catheters in the inferior vena
8  cava to go into the right atrium, the right
9  ventricle pulmonary arteries to measure pressures
10  and do pulmonary angiograms.  As well I do at our
11  hospital -- it's usually done by radiologists at
12  other hospitals.  But I would like to say that
13  some of my patients that come to the cath lab
14  have inferior vena cava filters, so I cannot put
15  a catheter into the inferior vena cava to do my
16  studies, so then I would have to go through the
17  superior vena cava, through a jugular vein to do
18  the studies.
19  BY MR. NORTH:
20      Q.    Is it fair to say that your
21  professional involvement with inferior vena cava
22  filters has been observing the filters in your
23  patients or treating patients that ultimately
24  would receive the filter?
25          MR. ROTMAN:  Objection.

Page 21

1    THE WITNESS:  Yes.  I think the
2  majority of my exposure to inferior vena cava
3  filters is in situations of diagnosing patients
4  who eventually require filters or my patients who
5  have filters in place, yes.
6  BY MR. NORTH:
7    Q.   But in your practice you are not the
8  person that makes the recommendation for an
9  inferior vena cava filter to be implanted in a
10  patient; correct?
11    A.   Typically not, but that would happen
12  occasionally that it was a clear-cut case of a
13  patient who needed a filter and I would refer
14  them directly, but it would be unusual.
15    Q.   Can you recall the last time you
16  referred a patient to have an inferior vena cava
17  filters implanted?
18    A.   Well, I was just rounding in CCU two
19  weeks ago where we had a patient who came in with
20  a DVT pulmonary emboli and had a pericardial
21  infusion which needed to be drained, and they
22  needed anti-coagulation, but they are at high
23  risk because of the drain.  So I think this
24  patient will ultimately get an inferior vena cava
25  filter.  I did not refer them for it.  I think

Page 22

1  they were not quite ready for it.  And this would
2  be a case where if the drain had been pulled from
3  the pericardial sac we would have referred
4  directly for an inferior vena cava filter.
5    Q.   But that has not happened with that
6  particular case as yet?
7    A.   Well, I don't know after I left the
8  CCU whether that's happened yet or not.
9    BY THE VIDEOGRAPHER:  Going off the
10  record at 10:28 a.m.
11    BY THE VIDEOGRAPHER:  Going back on
12  the record at 10:48 a.m.
13  BY MR. NORTH:
14    Q.   Doctor, before we took that break,
15  we were talking about your involvement as a
16  physician in referrals of patients of implants of
17  inferior vena cava filters, and I believe you
18  told us you had done that before.
19    A.   Yes.
20    Q.   So do you believe that inferior vena
21  cava filters are an appropriate treatment in some
22  patients?
23    MR. ROTMAN:  Objection.
24    THE WITNESS:  I think that they are
25  -- there is a group of patients who either cannot

Page 23

1  be anticoagulated or they are resistant to an
2  anticoagulation, and they would benefit from
3  inferior vena cava filters.
4  BY MR. NORTH:
5    Q.   And you have made that determination
6  for some of your patients over the years?
7    A.   Yes.
8    Q.   Do you make any recommendations when
9  you are referring a patient for an inferior vena
10  cava filter between permanent filters and
11  retrievable filters?
12    MR. ROTMAN:  Objection.  Can I hear
13  the question again?
14    THE WITNESS:  Yes.
15    QUESTION WAS READ BACK.
16    MR. ROTMAN:  Same objection.
17    THE WITNESS:  No, I mean, I am
18  obviously aware of the differences between the
19  retrievables and the permanents, but I am
20  typically not giving recommendation about which
21  filters should be put in.  In our hospital we
22  fortunately have a thrombosis service that
23  usually takes care of these patients, so they are
24  typically the ones that would make those
25  determinations in conjunction with the

Page 24

1  interventional radiologists.
2  BY MR. NORTH:
3    Q.   So you defer to those fellow
4  professionals to make that determination?
5    A.   Typically; yes, I do.
6    Q.   Doctor, how much do you charge for
7  your consulting work for your work as an expert
8  witness?
9    A.   I charge $700 an hour.
10    Q.   Does that charge differ depending on
11  whether you are simply reviewing materials versus
12  giving testimony?
13    A.   It's $700 an hour for reviewing
14  materials and teleconferences and meetings.  I
15  charge $1,100 an hour for depositions and
16  testimony.
17    Q.   Do you charge for your travel when
18  you travel to give testimony?
19    A.   Well, I haven't done that for a long
20  time, so I have to go back and look and see what
21  I did.  If I am not mistaken, I had sort of a
22  minimum charge.
23    Q.   Do you have a minimum number of
24  hours that you charge for a deposition?
25    A.   No.

Page 25

1    Q.   Do you have a minimum number of
2  hours that you charge for a day of trial
3  testimony?
4    A.   Again, I haven't done this in a
5  while, so I would have to go back and see.  If I
6  was to take a day off of work and travel
7  somewhere and only testify for one hour, I
8  probably would have to have some kind of minimum.
9    Q.   Can you estimate for me how many
10 cases you have presently that you are consulting
11 on on litigation?
12   A.   I mean, I guess I have to say, I
13 don't know if --
14       MR. ROTMAN:  So the question, just
15 so that we are staying clear of areas where
16 information is protected from Discovery, the
17 question is just for a number, not to identify
18 anything beyond a number.  So can you re-read the
19 question?
20       QUESTION WAS READ BACK.
21       THE WITNESS:  I believe the answer
22 to that would be two, including this one.
23 BY MR. NORTH:
24   Q.   Okay.  Is it fair to say that
25 litigation consulting is a small percentage of

Page 26

1  your professional time?
2    A.   Yes, it's the case.
3    Q.   Would you say less than ten percent?
4    A.   I would.
5    Q.   And the same would be true as far as
6  income.  Income generated from litigation
7  consulting is a small percentage of your income?
8    A.   I am not sure -- how does that
9  differ from your previous question.
10   Q.   Well, time versus income?
11   A.   I see.  Well, both income and the
12 time is very small compared to my regular job.
13   Q.   Under ten percent in both instances?
14   A.   Yes, I think that's correct.  I am
15 sure that's correct.
16   Q.   Who were you first contacted by
17 concerning filter litigation?
18   A.   If I am not mistaken, it was Ramon
19 Lopez.
20   Q.   And how long ago were you contacted
21 by Mr. Lopez?
22   A.   If I am not mistaken, that would be
23 2013.
24   Q.   Have you had -- well, in preparation
25 for the deposition today, did you have any

Page 27

1  meetings with Counsel?
2    A.   Yes, I did.
3    Q.   And who was that with and when was
4  that?
5    A.   I met yesterday afternoon with these
6  three gentlemen.
7    Q.   For the record, Mr. Rotman and Mr.
8  Mankoff and Mr. Johnson?
9    A.   That's correct.  And then last week
10 I also met for half a day with Mr. Rotman and Mr.
11 Mankoff.
12   Q.   On how many prior occasions -- well,
13 have you ever met with Mr. Lopez regarding filter
14 litigation?
15   A.   I have met with Mr. Lopez.  I don't
16 recall how many times.  I think maybe twice.
17   Q.   Were both of those occasions here in
18 Montreal?
19   A.   Yes.
20   Q.   Prior to the meeting last week, had
21 you ever met with Mr. Rotman or Mr. Mankoff
22 before?
23   A.   Not about this Austin case.
24   Q.   Prior to yesterday had you ever met
25 with Mr. Johnson before?

Page 28

1    A.   Again, not related to this Austin
2  case.
3    Q.   Can you estimate for us how much
4  time you have spent in preparing and working with
5  the Austin case?
6    A.   Well, I think I -- you have copies
7  of my invoices.
8    Q.   Your invoices tell us nothing.
9  Everything is blacked out.
10       MR. ROTMAN:  For the record, that's
11 inaccurate.  You are asking for the amount of
12 time, and that is not blacked out on the
13 invoices.
14       MR. NORTH:  We cannot tell.  Well,
15 we cannot tell from those invoices whether the
16 time was spent with Austin or another case.  So
17 no, they do not tell us.
18 BY MR. NORTH:
19   Q.   Can you estimate for us how many
20 hours you have spent on the Austin case?
21   A.   I think that -- at the time of that
22 invoice I think it was approximately 20 hours and
23 then since then perhaps 30 hours or less.
24   Q.   So you are estimating 50 hours on
25 this case?

Page 29

1      A.   Yes.
2           MR. NORTH:  And for the record,
3   Counsel, we are going to reserve the right to
4   reconvene this deposition because of what we
5   consider a frivolous redaction of invoices and --
6   once we challenge that with the Court.
7           MR. ROTMAN:  We reserve the right to
8   object.
9   BY MR. NORTH:
10     Q.    What Attorneys retained you in the
11  litigation against Bayer?
12     A.    I don't recall exactly.  I would
13  have to refer back to my document here.
14     Q.    There is a mention on the listing of
15  a Ronca under Lawyers.
16     A.    Yes, I recall Jim Ronca.  I don't
17  recall if there were any other Lawyers that were
18  involved.
19     Q.    Have you ever worked with any of the
20  Lawyers you are working with before -- or working
21  with with regard to this Austin case, have you
22  worked with them on any previous litigation,
23  other than filter litigation?
24     A.    I don't believe I worked with Mr.
25  Mankoff or Mr. Rotman before.  Joe Johnson, I

Page 30

1   believe we met before.  I don't recall if that
2   actually led to litigation or not, and I don't
3   recall what the topic was either.
4      Q.    Well, prior to your involvement in
5   the filter litigation with Mr. Lopez, had you
6   worked with him on any consulting matter?
7      A.    Not to my recollection.  But for
8   example, the Aprotinin, there were often many
9   Lawyers involved, so I don't recall who was
10  involved.
11     Q.    In looking through your c.v., it
12  appears you obtained your medical degree from the
13  University of Rochester School of Medicine.
14     A.    Yes, that's correct.  I graduated
15  there in 1985.
16     Q.    And your c.v. seems to suggest you
17  took a break from your studies.
18     A.    While I was I medical school; yes, I
19  did.  I took a year off.
20     Q.    What did you do during that year
21  off?
22     A.    I went to Israel for the year, and
23  then I spent six months in an intensive Hebrew
24  course and then I did research in a hospital in
25  Jerusalem.  I think it's listed on my c.v. under

Page 31

1   a different section, if I am not mistaken.
2      Q.    In 1994 and 1995 you have listed an
3   interventional fellow at Cleveland Clinic.  Could
4   you tell me what that was about?
5      A.    Yes.  I mean, after medical school I
6   came to Montreal and did my internal medicine at
7   McGill and I also did a masters of public health
8   at Harvard and I was overseas for a year, but
9   then I did my cardiology training in San
10  Francisco, so I had matched in an academic
11  cardiology program.  So it was two years of
12  research and two years of clinical cardiology,
13  and then finally one year interventional
14  cardiology fellowship at the Cleveland Clinic.
15  So that was July '94 to July '95, and that was
16  learning how to do angioplasty.
17     Q.    Doctor, do you know what the
18  predicted annual rate of occurrence of pulmonary
19  emboli each year is in either Canada or the
20  United States?
21          MR. ROTMAN:  Objection.
22          THE WITNESS:  Well, I didn't review
23  that literature in preparation for this
24  deposition, so I would be reluctant to give you a
25  number.

Page 32

1   BY MR. NORTH:
2      Q.    I believe you mentioned earlier that
3   there is a thrombo -- what did you call it?
4      A.    Thrombosis.
5      Q.    Thrombosis group in your hospital.
6   As a consequence, are you not the primary
7   treating physician of patients that are being
8   treated for pulmonary embolism?
9      A.    I am the primary treater for some
10  patients and other patients are primarily treated
11  by the thrombosis team.  Oftentimes they will
12  initiate therapy and then the patient will be
13  followed by me in clinic.  So we have all
14  different variations there.
15     Q.    Do you generally prescribe
16  anticoagulants as a part of your practice?
17     A.    Yes, I do.
18     Q.    Which ones do you generally or
19  predominantly prescribe?
20     A.    Well, I prescribe Coumadin.  I
21  prescribe novel oral anticoagulants like
22  Apixaban, Rivaroxaban.
23     Q.    What do you mean by the use of the
24  word "novel" in that context?
25     A.    Well, "novel" is a bit of a

Page 33

1   misnomer.  They started calling them novel when
2   they first came out.  They have been out for a
3   while.  They have been out long enough now that
4   they are no longer novel, but we still use that
5   term.  They are also known as NOACS.  N-O-A-C-S.
6   These are alternatives to coumadin that can be
7   taken orally and they don't require any medical
8   monitoring in terms of blood testing like
9   coumadin does.
10      Q.   Have you ever had a patient where
11  you believe an inferior vena cava filter actually
12  saved the patient's life?
13      A.   Not to my recollection, but
14  oftentimes it might has been and you would not
15  realize it.
16      Q.   Have you ever had a patient that has
17  suffered from an adverse event related to an IVC
18  filter?
19      A.   In my personal practice I do not
20  believe I have ever had anybody with a
21  complication that I have been made aware of.
22      Q.   You seem to be limiting that to your
23  personal practice.  Have you had contact with
24  patients that you know had adverse events related
25  to IVC filters?

Page 34

1       A.   I am aware of complications from the
2   medical literature, but I have not seen a patient
3   directly that had a complication related to IVC
4   filters.
5       Q.   So you have never had personal
6   contact with a patient who has had a fracture or
7   migration of an IVC filter, to your knowledge?
8           MR. JOHNSON:  Objection.
9           THE WITNESS:  Not to my
10  recollection.
11  BY MR. NORTH:
12      Q.   What is the average size of an
13  individual's IVC?
14          MR. ROTMAN:  Objection.
15          THE WITNESS:  I don't know what the
16  average size is of an individual's inferior vena
17  cava, but I know that the Bard filters are
18  indicated for patients with an inferior vena cava
19  diameter of 28 millimetres or less.
20  BY MR. NORTH:
21      Q.   Do you have any information about
22  the range of sizes of the typical human IVC?
23      A.   I did not look at that literature.
24  I mean I didn't look at the literature regarding
25  IVC sizes.  I also know it's a dynamic structure,

Page 35

1   so depending on whether a patient coughs or their
2   position changes, whether they are -- I am very
3   aware -- in cardiology we are very aware of
4   patients, if they are dehydrated or that the
5   inferior vena cava is smaller, or if they are in
6   right heart failure it's dilated.  If they have
7   an acute pulmonary embolus it's dilated.  So we
8   are very aware of the diameter changing.  That's
9   why we use that clinically, but in terms of
10  measuring the actual diameter, that's not
11  typically what we do.
12      Q.   Do you know what sort of
13  complication, if any, Ms. Austin alleges?
14          MR. ROTMAN:  Objection.
15          THE WITNESS:  I believe that she had
16  a filter tip, and perforation and fracture,
17  migration of pieces of the filter into -- if I am
18  not mistaken, into the pancreas and I think into
19  the spine as well.
20  BY MR. NORTH:
21      Q.   Have you reviewed any of her medical
22  records?
23      A.   I have not reviewed any of her
24  medical records.  I believe I saw a few lines
25  describing her medical case.

Page 36

1       Q.   You have not spoken with any of her
2   treating physicians, have you?
3       A.   No, I have not spoken to any of her
4   treating physicians.
5       Q.   Do you know whether her filter has
6   been removed?
7       A.   If I am not mistaken, her filter has
8   been removed.  But again, I didn't have access to
9   any of her direct medical records.
10      Q.   Do you know what model filter she
11  had placed?
12      A.   I believe she had a G2 filter that
13  was placed.
14      Q.   Before your involvement in the
15  filter litigation, were you aware of Bard filters
16  specifically?
17      A.   I had heard of them.  I had heard of
18  the various filters.  I was not -- I mean, I
19  peripherally was aware of the literature, but not
20  to the extent that I am now.
21      Q.   Prior to your involvement in filter
22  litigation, were you aware of the differences
23  between the Recovery filter and the G2?
24      A.   I knew the names.  I wasn't aware of
25  the exact differences between them.

Page 37

1       Q.    Before your involvement in the
2   filter litigation, were you aware of any
3   differences between the G2 and later generation
4   Bard filters?
5       A.    Again, I was aware of the names of
6   the filters, but not the specific differences
7   between the different generations.
8       Q.    Prior to your involvement in this
9   litigation, had you ever heard of the Simon
10  Nitinol filter?
11      A.    I had heard of that.
12      Q.    Do you know whether you have had
13  involvement with any patient that had a Simon
14  Nitinol filter placed?
15      A.    I can't say that.  Again in
16  cardiology, is there a filter:  Yes or no.  So I
17  wasn't aware of the different models that were
18  put in.
19      Q.    Do you know whether the
20  interventional radiology group in your hospital
21  implants Simon Nitinol filters?
22      A.    I do not know that.
23      Q.    Do you know whether they have in the
24  past?
25      A.    Again, I am not aware of what models

Page 38

1   they have placed.  I am confident they have
2   placed more than one model and they have over the
3   years, but I can't tell you exactly which ones.
4       Q.    So you do not know one way or
5   another whether the interventional radiology
6   group at your hospital either has placed in the
7   past or presently places Bard filters?
8       A.    No, I can't say that, that I know
9   with assurance that they have placed Bard
10  filters.  I would suspect that they have but I
11  don't know for sure.
12      Q.    We can agree you are not an
13  engineer; correct?
14      A.    I am not an engineer.
15      Q.    And you are not a metallurgist?
16      A.    I have no training of metallurgy.
17      Q.    Have you ever been involved in the
18  design of a medical device?
19      A.    I can't say that I have been
20  directly involved in the design of a medical
21  device.
22      Q.    Have you ever worked with the United
23  States Food and Drug Administration?
24      A.    I haven't worked with them.  Can you
25  repeat that question, please?

Page 39

1       Q.    Have you ever worked with the United
2   States Food and Drug Administration?
3       A.    Well, I have never worked for the
4   FDA.  I have had some communications with the FDA
5   over one of the clinical trials that I did.  They
6   called me and I gave them information.
7       Q.    Other than communications --
8           MR. ROTMAN:  Are you done with the
9   answer?
10          MR. NORTH:  Sorry?
11          MR. ROTMAN:  Were you done with the
12  answer?
13          THE WITNESS:  I have also done
14  submissions to the FDA for some of our clinical
15  trials to be done in the U.S. as well as Canada.
16  BY MR. NORTH:
17      Q.    You haven't done any submissions to
18  the FDA seeking approval for a pharmaceutical or
19  medical device, have you?
20      A.    I haven't done any seeking approval
21  for a medical device.  For drugs I -- again, I
22  went to the FDA to seek approval to do a clinical
23  trial with a non-label indication, but it was not
24  for a new drug.
25      Q.    Have you ever done any work with

Page 40

1   Health Canada?
2       A.    Yes, I have done some work with
3   Health Canada, again in the same context of
4   getting approval to do clinical trials.
5       Q.    Would you consider yourself an
6   expert in the regulations of the FDA or Health
7   Canada?
8       A.    No, I can't construe that I am an
9   expert with regulations for either the FDA or
10  Health Canada.
11      Q.    Would you consider yourself an
12  expert in pharmacovigilance?
13          MR. ROTMAN:  Objection.
14          THE WITNESS:  Can you repeat that
15  question, please?
16  BY MR. NORTH:
17      Q.    Would you consider yourself an
18  expert in pharmacovigilance?
19      A.    Well, although I wouldn't consider
20  myself an expert in pharmacovigilance, I believe
21  I have a lot of training in that area, certainly
22  much more so than the typical clinician.  I mean,
23  a lot of the research I do involves drugs, and
24  drug complications and database research.  So
25  although I can't say that I am an expert in

Page 41

1    pharmacovigilance, I am pretty comfortable with
2    many of the issues in that area.
3        Q.   In your work in the litigation
4    against Bayer you were furnished and you reviewed
5    some internal Bayer documents, didn't you?
6        A.   Yes, I believe I did.
7        Q.   And in this litigation you have been
8    furnished and reviewed some internal Bard
9    documents.  Is that correct?
10       A.   Yes, I have been given some internal
11   Bard documents for review.
12       Q.   Other than your involvement in these
13   two litigations, the Bayer litigation and the
14   Bard filter litigation, have you ever had an
15   occasion, as a part of your professional work, to
16   read and analyse internal documents from a
17   pharmaceutical or medical device manufacturer?
18       A.   I don't recall exactly, but it's
19   possible that there were one or two other
20   situations where I saw internal documents from a
21   company that was more an exploratory phase and
22   never reached deposition or testimony.  I am not
23   even sure whether the litigation was pursued.
24   But again, this is recollection.
25       Q.   And what you are talking about

Page 42

1        there, the other instance that may have happened,
2        that would have been litigation-related; correct?
3            A.   I think there were situations where
4        there is a possibility of litigation or where
5        they were exploring the possibility of
6        litigation, but I don't know if it actually
7        proceeded or not.  I am not even sure that I saw
8        internal documents at that time.
9            Q.   Well, is it fair to say you have not
10       had occasion to review internal manufacturer
11       documents as part of your professional work
12       outside of your consulting practice?
13           MR. ROTMAN:  Objection.
14           THE WITNESS:  It's unusual for me to
15       review internal document from companies.  I do --
16       as I had mentioned earlier, I am doing a clinical
17       trial on electronic cigarettes and, as part of
18       that trial, we had to go through Health Canada
19       and we are working with a company in the U.S.
20       that produces the electronic cigarettes.  So I
21       have had access to some of their internal
22       documents and some of their internal testing that
23       had to be provided to Health Canada.  So in that
24       context I had seen some documents -- internal
25       documents from a pharmaceutical -- not a

Page 43

1    pharmaceutical company but a device company.  I
2    am not sure that I have seen internal documents
3    in other situations other than that.
4        Q.   I mean, you don't look at internal
5    corporate documents as a part of your work as a
6    cardiologist at Jewish Hospital, do you?
7        A.   That's not a typical part of my --
8    no.  If I did, it would be very small, but I am
9    not sure that I see any.
10       Q.   And you don't consider yourself an
11   expert in corporate ethics, do you?
12       A.   No, I can't say that I am an expert
13   in corporate ethics.
14       Q.   Do you know what division of the FDA
15   regulates IVC filters?
16       A.   I would have to -- I would have to
17   go back and review my documents to tell you the
18   answer to that.
19       Q.   So as you sit here today you can't
20   tell me?
21       A.   I don't recall.
22       Q.   Do you know how the FDA defines a
23   safety signal?
24           MR. JOHNSON:  Form.
25           THE WITNESS:  Again, I would have to

Page 44

1    go back to their documents or website in order to
2    give you the exact definition they use.
3    BY MR. NORTH:
4        Q.   Have you ever seen in the past, that
5    you can recall, documents or regulations where
6    the FDA has defined a safety signal?
7        A.   I don't recall offhand.  It's quite
8    possible that I have seen that.
9        Q.   Have you ever made a report to the
10   MAUDE database at the United States FDA
11   concerning an incident or complication involving
12   a medical device?
13       A.   I have not made a direct submission
14   to the MAUDE database myself.
15       Q.   Have you -- well, have you ever
16   directed somebody that works with you or for you
17   to make such a report?
18       A.   I don't recall ever doing that.
19       Q.   Have you ever reported a
20   complication with a medical device to Health
21   Canada?
22       A.   Sorry?  Can you repeat that
23   question, please?
24       Q.   Have you ever reported a
25   complication involving a medical device to Health

Page 45

Canada?
     A.    Offhand I don't recall doing that.
I was involved when I was training here in
Montreal, being involved in a report -- there was
-- this is not a medical device, but there was an
epidemic from mussel poisoning, so that was a
reportable event that I was involved in.
     Q.    Other than that, can you recall
making a report to Health Canada regarding a
complication involving a medical device?
     A.    Offhand I don't recall doing that.
     Q.    Are you aware of the fact that
Health Canada recently issued a public health
notification regarding inferior vena cava
filters?
     A.    Yes, I did see that.  That was
circulated at McGill.
     Q.    Did you have any consultation with
Health Canada about that issue prior to the
release of that notice?
          MR. ROTMAN: Can I have the question
again?
          QUESTION WAS READ BACK.
          THE WITNESS:  Do you mean have I
received other notices from Health Canada?

Page 46

BY MR. NORTH:
     Q.    No.  I am asking concerning the
notice regarding IVC filters.  Did you consult
with Health Canada about that topic prior to
their issuance of that notice?
     A.    No, I have not had any contact with
Health Canada about IVC filters.
     Q.    You are not an expert in medical
device labelling, are you?
     A.    No, I cannot say that I am.
     Q.    When you implant medical devices do
you generally review the instructions for use?
     A.    I typically do when I first use it,
yes.
     Q.    You have no education or training
specific to medical device labelling, do you?
     A.    No, I don't have any specific
training.
     Q.    You have never drafted the label for
a medical device?
     A.    No, I don't believe I have been
involved in drafting labelling for medical
devices.
     Q.    And have you ever worked directly
for a medical device company as a consultant?

Page 47

     A.    I don't believe that I have been a
consultant to a medical device company, but I
have been members of advisory boards for
pharmaceutical companies.  It's possible that I
was -- you know, attended one or two meetings for
advisory boards for medical devices, but again I
don't recall.
     Q.    Have you ever had any contact with
Bard prior to your involvement in this
litigation?
     A.    Not to my knowledge.
     Q.    What sort of advisory boards for
pharmaceutical companies have you served on?
     A.    Well, the advisory boards that I
have served on have been in very limited
capacities.  So these are typically when they
gather a small group of physicians together that
use a particular medication to get feedback on
whether the medication is effective, safe,
marketing issues.  But really I would say I have
done that only on a handful of occasions.
     Q.    Do you remember which pharmaceutical
companies?
     A.    I was on the advisory board with
Phizer for Varenicline for a couple of years

Page 48

which involved, I believe, a yearly meeting.  I
probably went to two meetings.  And then I, you
know, decided to get off the board.  I have been
to a couple of advisory board meetings recently
which I believe was with Bayer regarding one of
their anticoagulants, but really I would say I
have been to a very small number of advisory
board meetings.  These are not ongoing
commitments.
     Q.    Do you know Dr. Betensky who is
another expert in this case?
          MR. ROTMAN:  Objection.
          THE WITNESS:  I have never met her
personally.  I know of her.
BY MR. NORTH:
     Q.    Have you spoken with her on the
phone?
     A.    I have.
     Q.    On how many occasions?
     A.    I believe I spoke with her twice.
     Q.    Have you reviewed her deposition
taken in the Austin case?
     A.    I don't believe I reviewed her
deposition.
     Q.    Have you reviewed any of her

Page 49

1    calculations?
2        A.    I have reviewed her calculations and
3    was provided with a spreadsheet that I believe
4    she prepared.
5        Q.    Did you try to recreate her
6    calculations?
7            MR. ROTMAN:  Objection.
8            THE WITNESS:  I am sorry.  Can you
9    repeat that?
10   BY MR. NORTH:
11       Q.    Did you attempt to recreate her
12   calculations?
13       A.    Well, I had her spreadsheet, and the
14   purpose of these two telephone calls were for me
15   to ask questions about her spreadsheet and how
16   she generated these numbers so I could understand
17   the types of calculations she did.  So I -- I am
18   quite confident I understand how those numbers
19   were generated.
20       Q.    That was not my question, Doctor.
21   Did you independently recreate her calculations?
22           MR. ROTMAN:  Same objection.
23           THE WITNESS:  I did not
24   independently recreate her calculations but I am
25   quite confident I understand how they were done,

Page 50

1    and they were done appropriately.
2    BY MR. NORTH:
3        Q.    Other than the calculations that you
4    showed us earlier concerning confidence levels
5    and sampling sizes for potential clinical trials,
6    those three pages of calculations, have you
7    performed any other calculations in this
8    litigation?
9        A.    No, I don't believe I have.
10       Q.    Let me hand you what's been marked
11   as Exhibit 7.
12           Exhibit 7 was marked for
13   identification.
14   BY MR. NORTH:
15       Q.    Which is a Discovery Response filed
16   by the Plaintiffs in this case.  Have you ever
17   seen that before?
18       A.    I believe that I saw this document
19   previously, but I had asked it be amended, so I
20   believe there was another version of it after
21   this one.
22       Q.    Turning to page six, that's where
23   the discussion -- the description of your view
24   begins; correct?
25       A.    Yes, this is a section about my --

Page 51

1    some of my views.
2        Q.    Can you tell me what parts of this
3    you asked to be amended or revised?
4        A.    Well, I can't recall exactly, but I
5    recall specifically on page two much earlier
6    that, although I have training in biostatistics
7    and I use them on a daily basis and am very
8    comfortable with them and work with
9    biostatisticians, I would not call myself a
10   biostatistician, so I thought that that should be
11   removed.  And I thought that -- I call myself a
12   clinical epidemiologist rather than a
13   epidemiologist.  A clinical epidemiologist, I
14   believe, works on clinical issues and uses
15   epidemiological methods to look at clinical
16   issues, whereas epidemiologists typically are
17   more dealing with traditional epidemiology with
18   risk factors which are much closer to the patient
19   than that.  And also in that same section I asked
20   to remove the sections about rates of pulmonary
21   embolism mortality rates because I didn't
22   specifically review that literature for this
23   case.  So those are some of the things that I had
24   asked to be revised.  I don't recall if that was
25   all of them.

Page 52

1        Q.    It's fair to say that the
2    descriptions or summaries of your testimony in
3    this document were not originally drafted by you;
4    correct?
5        A.    Which sections are you referring to?
6        Q.    Both sections that mention you, the
7    one on page two and the one beginning on page
8    six.
9        A.    I think that these sections were
10   drafted in consultation with me and also with
11   reference to my c.v.
12       Q.    That's not my question.  Did you
13   personally put pen to paper for the original
14   drafts of these?
15       A.    I did not put pen to paper to write
16   these sections.
17       Q.    I guess in this age I shouldn't
18   limit it to pen and paper.  You didn't personally
19   type the initial draft of these; right?
20       A.    I don't believe that I did.
21       Q.    Do you -- have you ever seen a
22   version of the paragraph about you on page two
23   that was revised in accordance with your
24   requests?
25       A.    Yes, I have.

1    Q.    Did you make any revisions to the
2  section that begins on page six?
3    A.    I don't recall if I had asked this
4  to be revised.  Certainly, in re-reading this,
5  there is clearly a typo on the bottom of page six
6  where it says he is expected to testify that the
7  Asch study and Everest study on retrievability
8  were safety or efficacy studies -- it should be
9  that they were not safety or efficacy studies and
10  they were not designed to function as safety or
11  efficacy studies, so there is missing a "not"
12  there, although I don't recall if I had actually
13  asked that to be revised.
14         MR. ROTMAN:  I don't think he is
15  done reading the rest of the section.  There may
16  be more.
17         THE WITNESS:  That's all I recall at
18  this time for that section.
19  BY MR. NORTH:
20    Q.    In the litigation involving the
21  Bayer drug, you prepared a lengthy expert report,
22  didn't you?
23    A.    Yes, I did.
24    Q.    And you wrote that report yourself,
25  didn't you?

1    A.    Yes, I prepared it myself.
2    Q.    But for this particular case you
3  have not prepared a report, have you?
4    A.    No, I have not.
5    Q.    Since you did not prepare a report
6  and you did not initially draft this description
7  of your testimony, could you list for me what
8  your principal opinions are in the Austin case?
9         MR. ROTMAN:  Objection.
10         MR. JOHNSON:  Objection.
11         THE WITNESS:  I think that would be
12  -- I mean, I could list some of my opinions.  I
13  have a large number of opinions.  I haven't
14  written them out.  I am sure I would miss some.
15  Could you ask me specifically about particular
16  opinions?
17  BY MR. NORTH:
18    Q.    Doctor, you have not furnished a
19  writing of your opinions that you drafted.  We
20  are entitled under the procedural rules to take
21  this deposition and ask you your opinions.  So my
22  question to you is:  Can you tell me generally
23  what your opinions are in this case?
24         MR. ROTMAN:  Objection.
25         MR. MANKOFF:  Objection.

1         THE WITNESS:  I am sorry.  Can you
2  repeat the question?
3  BY MR. NORTH:
4    Q.    Can you tell me generally what your
5  opinions are in this case?
6    A.    I can give you a couple of my
7  general opinions, and then there will be a whole
8  lot of specific opinions under that.
9    Q.    Okay.  Let's start there.
10    A.    My general opinion is that there is
11  a high rate of complications with both Recovery
12  in the G2, G2 Express filter compared to the
13  Simon Nitinol filter; that there are a variety of
14  complications associated with these retrievable
15  filters that are more common with them than their
16  predicate device that was the SNF; further that
17  there were multiple early safety signals with
18  these devices and these safety signals include
19  safety signals seen from the MAUDE database which
20  is known internally to Bard.  There was also an
21  extensive medical literature documenting elevated
22  complication rates with retrievable filters, and
23  then there was also some Bard internal
24  documentation about low migration resistance with
25  the retrievables compared to the permanent.  So

1  -- and I believe there was -- Bard had a
2  consultant that brought these issues to the
3  attention of Bard and that Bard --
4    Q.    Doctor, I would ask you not to talk
5  about this consultant.  There is an agreement in
6  this case that that is privileged and there are
7  rulings in other cases that that is privileged,
8  so I don't want that on the Record, a discussion
9  of this consultant.  You can continue.
10         MR. MANKOFF:  There is a reference
11  to the consultant in the HHE.
12         THE WITNESS:  Yes, that's what I am
13  referring to.
14  BY MR. NORTH:
15    Q.    Okay.  What that understanding, yes.
16    A.    Okay.  So I am referring to that HHE
17  which refers to the consultant's findings, that
18  there were complication rates on the order of
19  four or five times more common among Recovery
20  filters compared to the predicate device.
21    Q.    Okay.  Continue.
22    A.    So my opinion is that Bard -- it was
23  their responsibility to do large safety and
24  efficacy studies in order to address these
25  concerns and that these safety studies were never

Page 57

1    done.  I believe that Bard recognized that there
2    were increased complications with Recovery.  They
3    had -- I don't recall the exact term, but they
4    had a crisis or a crisis evaluation plan.  There
5    was a hold put on -- a commercial hold for a
6    short while with Recovery, but then the G2 was
7    developed to overcome the complications
8    associated with Recovery, and so Recovery was
9    removed from the market and G2 was put on the
10   market, again without large safety and efficacy
11   studies.  And again, there was data from the
12   MAUDE database and from migration testing, from
13   medical literature that there were high
14   complication rates associated with G2.  So again
15   the device was redesigned and released as another
16   iteration of device.  So I guess my overall
17   opinion is that there are increased complication
18   rates associated with retrievable devices
19   compared to the predicate device.  There were
20   signals from at least three different lines which
21   suggested this, and yet the company did not
22   pursue looking at these safety signals as they
23   should have.
24        Q.   Okay. The first thing you told me --
25             MR. ROTMAN: Can you just make sure

Page 58

1    he was done with his answer?
2             THE WITNESS: Yes, I guess I would
3    like to add to that, which is that I think that
4    -- from their internal documents it was clear
5    that Bard recognized that there were elevated
6    complication rates that were alarming or
7    concerning and they were concerned that
8    physicians were stopping to use their device and
9    that they were -- I mean, that they had reports
10   of multiple interventional radiologists who were
11   stopping to use Bard devices.  So there were some
12   instructions given to the sales team how to -- I
13   would call it spin control, but to put this in
14   context, and they were comparing the MAUDE rates
15   to the rates in the Grassi article, which really
16   is comparing apples and oranges which I think is
17   an inappropriate comparison and misleading.  I am
18   looking through my list of opinions here.  I
19   think that's it for my general opinions.  It's
20   possible I missed a few.
21   BY MR. NORTH:
22        Q.   Doctor, can you tell me anything
23   specifically that you were taught in your
24   training in medical school that gives you special
25   expertise in reviewing Bard's company documents

Page 59

1    and making determinations as to what the company
2    knew or did not know?
3             MR. MANKOFF:  Form.
4             MR. ROTMAN:  Objection.
5             THE WITNESS:  Well, I don't have
6    specific training looking at company documents
7    and identifying what the company knows or doesn't
8    know, but I will say first of all, as a clinician
9    who puts devices in patients and as a clinician
10   who takes care of patients with these devices
11   implanted, if the kind of information I was
12   seeing in the company documents was not provided
13   to me I would be very unhappy.  I think that --
14   if I or someone in my family had a device
15   implanted and within the company documents they
16   were reporting rates, you know, four times
17   greater of complications than another device, I
18   would want to know about it.  I wouldn't want
19   that device in me or in my family member.
20   Certainly as a clinician taking care of those
21   patients, that would be very relevant information
22   for me to know.  So -- and then I think that you

Page 60

10   BY MR. NORTH:
11        Q.   Doctor, one of the first things you
12   told me is that you have the opinion that there
13   was a high rate of complications with the
14   Recovery filter and the G2 when compared with the
15   Simon Nitinol filter; correct?
16        A.   Yes, I believe that's what I said.
17        Q.   And on what did you base that?  On
18   what data?



Page 61



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14    retrospective study of all the IVC filters that
15    were placed in our institution.  They published
16    the paper and documented high rates of
17    complications.  Other studies were prospective
18    studies, prospective registries, such as the Asch
19    study or the -- what, I guess, you guys term the
20    Everest study which the first author was Binkert,
21    looking at G2.  So there are a whole host of
22    medical studies in the medical literature,
23    looking at complication rates among the
24    retrievable filters.
25        Q.    Did the Asch -- -
```

Page 62

```
 1            MR. ROTMAN:  Were you done?
 2            THE WITNESS:  In addition to that
 3    there were also a large number of case reports of
 4    complications associated with IVC filters that
 5    appeared in the literature and while, you know,
 6    case reports on their own can't really tell you a
 7    rate of complication, they indicate that
 8    physicians were seeing complications that they
 9    had not seen before, and felt impelled to report
10    them in the literature so other physicians would
11    be aware of this.  I -- I also read the
12    deposition by Murray Asch, and I read his article
13    where he was doing the retrievability study on
14    Recovery filters and found that there were
15    complications in his first 33 patients.  He had
16    two major complications that he found that he
17    felt that he had been misled by the company and
18    that he felt that the company was just using this
19    -- was supposed to use this as a pilot study and
20    that a further large study would be done
21    afterwards.
22            MR. NORTH:  I object to the
23    responsiveness of the answer.
24    BY MR. NORTH:
25        Q.    Are you finished?
```

Page 63

```
 1        A.    I believe I am finished.
 2        Q.    Can you name me some of these
 3    medical studies that you believe support this
 4    opinion that the complication rate of the
 5    Recovery filter and the G2 are higher than that
 6    the Simon Nitinol filter?
 7        A.    I am sorry.  Can you repeat that
 8    question, please?
 9        Q.    Can you name me some of the medical
10    studies that support your opinion that the
11    complication rate of the Recovery filter and the
12    G2 is higher than that of the Simon Nitinol
13    filter?
14        A.    Well, there is a large number.  I
15    can name you a couple of them:  The Kalva study.
16    There is Nicholson.  There is an Asch study.
17    There is the Binkert study.  So those are just a
18    few of them.
19            MR. ROTMAN:  Can we take another
20    break?  Ask another question and take a break?
21            MR. NORTH:  Let me ask another
22    question.
23    BY MR. NORTH:
24        Q.    Were there any complications
25    reported in the Binkert study?
```

Page 64

```
 1        A.    Yes, there were.
 2        Q.    Do you recall what those were?
 3        A.    I would have to see a copy of it to
 4    refresh my memory.
 5            MR. NORTH:  Okay.  Let's take a
 6    break.
 7            BY THE VIDEOGRAPHER:  Going off the
 8    record at 11:49 a.m.
 9            BY THE VIDEOGRAPHER:  This begins
10    disk number two in the deposition of Dr.
11    Eisenberg.  We are going back on the record at
12    12:05 p.m.
13    BY MR. NORTH:
14        Q.    Before we took that break we were
15    talking about some of the medical literature, and
16    you were listing for me some of those that you
17    believe supported your opinion, and one of those
18    you mentioned was a Nicholson article.
19        A.    Yes.
20        Q.    Did the Plaintiff's Attorneys
21    provide you with the deposition that's been taken
22    in filter litigation of Dr. Nicholson?
23        A.    I don't believe so.
24        Q.    Did they provide you with a copy of
25    the clarification published regarding his
```

Page 65

1   article?
2      A.   I had seen that clarification on the
3   web.
4      Q.   Are you familiar with any of the
5   criticisms of how he conducted that study?
6         MR. JOHNSON:  Objection.
7         THE WITNESS:  Well, I am -- I read
8   many papers in preparation for today, and I am
9   aware that every study has potential limitations.
10  Specifically for that study, you know, the
11  additional piece I read, I believe that was the
12  article that had an editorial connected to it by
13  Rita Redburn, if I am not mistaken, in the
14  Archives of Internal Medicine, but that didn't
15  really criticize the paper, as I recall.
16     Q.   So the answer is you don't recall
17  any specific information about criticisms of this
18  study?
19        MR. JOHNSON:  Form.
20        THE WITNESS:  No, I do not recall
21  that. I think that in many medical journals, if
22  there is a paper it may be accompanied by an
23  editorial, and many times the editorialist will
24  put the paper in context but also discuss
25  potential limitations.  But I didn't see anything

Page 66

1   to that effect for the Nicholson paper.
2   BY MR. NORTH:
3      Q.   Did you provide any meta analysis in
4   this case?
5      A.   I did not do any pooling of data
6   from different studies in this case.  I have done
7   many meta analyses in my research career, as you
8   can see from my cv, but I have not done a meta
9   analysis for this case.
10     Q.   In this particular case all of the
11  company documents that you have reviewed were
12  furnished to you by the Plaintiff's Attorneys;
13  correct?
14     A.   Well, are you talking about the Bard
15  internal documents?
16     Q.   Right.
17     A.   The Attorneys did provide me with a
18  whole list of Bard internal documents that was
19  shared in a Drop Box account.  I actually picked
20  and chose documents to look at because there were
21  so many of them, so I can say that I didn't go
22  through all of them.  I was given a large number,
23  and I looked at a variety of internal documents
24  from that, from that that I selected myself.
25     Q.   But all of the internal documents

Page 67

1   that you were given came from the Plaintiff's
2   Attorneys?
3      A.   Yes.  I would no other source of
4   getting internal Bard documents.
5      Q.   Now, did the Plaintiff's Attorneys
6   provide you with the medical literature that you
7   reviewed?
8      A.   They provided me with some of the
9   medical literature that I reviewed, and then I
10  did multiple searches on my own and identified
11  additional medical literature.  I also looked
12  through the references of most articles and
13  identified further medical literature from those
14  articles, from the references.
15     Q.   Prior to your retention as a
16  consultant in the filter litigation, had you ever
17  conducted an extensive research or review of the
18  medical literature related to IVC filters?
19     A.   Well, as I said before, I do lots of
20  meta analyses and systematic reviews, so the
21  methodology that I used here is what I used in
22  many of my previous studies, but I had never done
23  this previously with inferior vena cava filters.
24     Q.   Prior to your retention as a
25  consultant in this case, had you ever read the

Page 68

1   Kalva article?
2      A.   I don't believe so.
3      Q.   What about the Nicholson article?
4      A.   Nicholson I recall.  I am pretty
5   sure I did see.
6      Q.   What about the Binkert?
7      A.   I am pretty sure I did not see that
8   previously.
9      Q.   What about the Asch?
10     A.   Also the Asch article probably I did
11  not see.  Much of the literature in this area
12  appears in the interventional radiology
13  literature, and typically I am looking at the
14  cardiology literature, internal medicine
15  literature, New England Journal or JAMA.  So most
16  of these articles are not appearing in those
17  types of journals.
18     Q.   Just so it's clear for the record,
19  if I understand what you are saying, most of the
20  articles that you have reviewed regarding filters
21  for this litigation don't generally appear in the
22  periodicals that you routinely review as part of
23  your professional work?
24     A.   I think that's mostly correct.  I
25  mean, I do look at periodicals in other areas of

Page 69

1    medicine besides cardiology and internal
2    medicine, but I don't routinely review articles
3    in the interventional radiology literature unless
4    I have a particular issue that I am going there
5    for.
6         Q.    We were provided a list of materials
7    you had relied upon yesterday.  Did that include
8    all of the articles that you have reviewed for
9    this case?
10        A.    Yes, I believe so.
11        Q.    Did you review the medical
12   literature concerning complication rates of other
13   manufacturers' filters?
14        A.    I read some articles that involved
15   filters made by other companies.  That was not my
16   focus but that was -- as an example, in the
17   Grassi article many of the references were from
18   filters that were not Bard filters, and I looked
19   at some of those references as well.
20        Q.    Is it fair to say that you did not
21   review -- comprehensively review the medical
22   literature to determine how the complication
23   rates with Bard filters compared to the
24   complication rates with competitive filters?
25        A.    I would say I did review some

Page 70

1    articles that did those comparisons, but that was
2    not my focus and I would not say I did a
3    comprehensive review of that comparison.
4         Q.    Well, it's my understanding that
5    it's your opinion that the complication rate with
6    the Recovery filter and the G2 filters was higher
7    than the complication rate regarding the Simon
8    Nitinol filter; correct?
9         A.    Yes, that's one of my opinions.
10        Q.    Have you done an assessment to see
11   whether the fracture rate of the Recovery filter
12   and G2 filter are higher than the Select filter?
13        A.    I am sorry.  Can you repeat that
14   question, please?
15        Q.    Have you done any assessment, as a
16   part of your work, as to whether the fracture
17   rate of the Bard filters is higher than that of
18   the Select filter?
19        A.    First of all, I haven't done any
20   analyses of that sort.  I have seen some articles
21   looking at that, and one particular document I
22   saw, which was a spreadsheet of complication
23   rates of Select, and I believe it was a G2
24   comparison, but there was only one comparison.
25   So I have seen some data related to that, but I

Page 71

1    can't say that I comprehensively reviewed that
2    literature.
3         Q.    And that would be true with regard
4    to any of the complication modes, wouldn't it?
5    Migration, tilt, penetration.  You haven't done
6    the comprehensive review of the literature to
7    compare Bard filters with other manufacturers'
8    filters?
9         A.    Yes, I would -- you know, I would
10   repeat what I just said was I have seen some of
11   that literature, but I did not do a comprehensive
12   review of Bard filters versus other company
13   filters.
14        Q.    Is it your opinion that the medical
15   literature clearly establishes high complication
16   rates for the Recovery and G2 filters?
17        A.    I think that the totality of the
18   evidence from the medical literature indicates
19   that there is higher complication rates with
20   Recovery and G2 versus the Simon Nitinol filter.
21   There is clearly many studies out there
22   documenting higher complication rates.  The exact
23   rates vary from study to study, but really the
24   totality of the evidence from the medical
25   literature demonstrates that there is a higher

Page 72

1    complication rate.
2         Q.    So would you agree that anyone that
3    looked at the medical literature could determine
4    that the Recovery filter and the G2 had higher
5    complication rates.
6              MR. ROTMAN:  Objection.
7              MR. BUSMAN:  Objection.
8              QUESTION WAS READ BACK.
9              MR. ROTMAN:  Same objection.
10             THE WITNESS:  I am sorry.  Could you
11   repeat it one more time, please?
12             QUESTION WAS READ BACK.
13             THE WITNESS:  I don't think you
14   could say anyone could look at that literature,
15   because a lay person, I don't think, is capable
16   of reviewing the medical literature.  I mean,
17   they just don't know the terminology.  They don't
18   study methodology.  They really wouldn't be able
19   to sort that out, but I would say that any
20   clinician, excluding like psychiatrists, for
21   example, would be able to read the medical
22   literature and identify that there are higher
23   complication rates with Recovery and G2 versus
24   the SNF.
25   BY MR. NORTH:

Page 73

1    Q.   You said there were multiple early
2 safety signals with regard to these filters;
3 correct?
4    A.   I believe I said that, yes.
5    Q.   And as one basis for that opinion
6 you cited the MAUDE database.  Is that correct?
7    A.   Yes, that's correct.
8    Q.   You did not conduct any independent
9 review of the MAUDE database as part of your work
10 in this litigation, did you?
11    A.   I did not conduct any analyses of
12 the MAUDE database myself.  I did see what the --
13 ████████████████████████████████
14 ███████████████████████████
15 ████████████████████████████████
16 ██████████████████  In addition I, you know,
17 spent a lot of time looking at the analyses done
18 by Dr. Betensky, which is also MAUDE data, which
19 I think very clearly demonstrates there is higher
20 complication rates with Recovery and G2 versus
21 the SNF.  I did not do those analyses myself, but
22 I did go through the spreadsheet and understand,
23 I think, very well how the calculations were
24 performed, and it was done according to the kind
25 of standards that I would do if I were to do that

Page 74

1 type of analysis.
2    Q.   And prior to this litigation, your
3 involvement in this litigation, had you ever had
4 occasion to review the MAUDE database?
5    A.   What do you mean by "review the
6 MAUDE database"?
7    Q.   Conduct some sort of study, some
8 sort of analysis of a complication frequency rate
9 or anything of that nature?
10    MR. ROTMAN:  Objection.
11    THE WITNESS:  I am sorry.  Could you
12 repeat the question, please?
13 BY MR. NORTH:
14    Q.   I will rephrase it.  Prior to your
15 involvement in this litigation, had you ever had
16 occasion to review the MAUDE database with regard
17 to analyzing complication rates or frequencies
18 with regard to devices?
19    A.   So prior to this case I have not
20 done any analyses involving the MAUDE database.
21 I was aware of the MAUDE database.  I am aware of
22 studies that have used the MAUDE database, but
23 within my own research I have not used the MAUDE
24 database for studies.
25    Q.   Have you ever sat down at a computer

Page 75

1 and accessed the MAUDE database?
2    A.   I have accessed the MAUDE database.
3    Q.   How many times?
4    A.   Probably once.
5    Q.   Was that as part of your work in
6 this case?
7    A.   Yes.  I wanted to go back and see
8 what it looked like.
9    Q.   Did you read any of the FDA's
10 discussions of the limitations of the MAUDE
11 database?
12    MR. ROTMAN:  Objection.
13    THE WITNESS:  I believe that on the
14 -- I don't recall where this document was, but I
15 believe it was from the website itself that I
16 read about potential limitations of the MAUDE
17 database.  It's possible it wasn't at that
18 website, but I certainly have seen one or two
19 documents describing the potential limitations of
20 using the MAUDE database.
21 BY MR. NORTH:
22    Q.   And what were those limitations, if
23 you recall?
24    A.   Some of the -- well, I can't give
25 you an exhaustive list, but some of the

Page 76

1 limitations would be that there is known
2 under-reporting with the MAUDE database, such
3 that it is -- because it's a voluntary reporting
4 system, it's suggested that many, many
5 complications occurred that never get reported to
6 the MAUDE database.  So there is under-reporting.
7 The second issue I believe that was mentioned is
8 that -- that reporting rates can vary depending
9 on if a device is newly released or if there was
10 some media events, for example, that would make
11 clinicians more aware if there is an issue and
12 they would be more likely to report to the MAUDE
13 database.  Another limitation is that the -- in
14 and of itself the MAUDE database can't really be
15 used to calculate rates of complications because
16 it's purely a numerator and it requires a
17 denominator to generate rates.  So those are some
18 of the limitations that I recall offhand.
19    Q.   As far as medical literature, you
20 mentioned the Kalva, Nicholson, Asch and Binkert
21 studies.  As you sit here right now, can you
22 recall the names of any of the other studies?
23    A.   I don't recall offhand.
24    Q.   You also told me earlier that one of
25 your opinions was that --

Page 77

1    A.   Can I just add to that?  Although I
2 don't recall offhand, I mean, there are a large
3 number of studies that support that opinion, and
4 I have gone over all of those papers, so I would
5 have to get back to you with a comprehensive list
6 of those studies.
7    Q.   But as far as actual names, you
8 don't recall any names?
9    A.   No, but if you were, for example, to
10 give me a name, I would probably recall whether I
11 had reviewed that or not.
12    Q.   Are you familiar with the Preserve
13 study that is underway?
14    A.   I am aware that it is a study that
15 is ongoing, comparing different types of vena
16 cava filters from different companies.
17    Q.   You testified earlier that, in your
18 opinion, it was Bard's responsibility upon having
19 the data to conduct safety and efficacy studies
20 regarding these filters; correct?
21    A.   I believe that's correct.
22    Q.   Let's talk about the source of this
23 responsibility.  Are there any FDA regulations
24 that you can cite that would require Bard to
25 conduct studies based upon the data that was

Page 78

1 given?
2         MR. JOHNSON:  Form.
3         THE WITNESS:  Can you repeat that
4 question, please?
5         QUESTION WAS READ BACK.
6         THE WITNESS:  So I would say I am
7 not an FDA expert, so I can't cite FDA
8 regulations, but I am a clinician and a clinical
9 epidemiologist.  If I became aware of increased
10 complication rates with a device that I was
11 implanting in my patients or that my patients had
12 I would really want the company to let me know
13 and do the studies to show me that in fact it is
14 safe and this is not real, or to identify that
15 this is a problem and we need to stop using this
16 device or remove it.  So I think that although I
17 can't cite FDA regulations, it's common sense
18 that as a clinician or a patient you would want
19 to know that information.  You know, it's the
20 company's product.  They have to stand behind it
21 and provide the data to show that it's not
22 causing complications.
23 BY MR. NORTH:
24    Q.   My question was to do with
25 responsibility from the standpoint of the

Page 79

1 company.  I understand what you are saying about
2 the clinician and patient.  I am focused right
3 now on the responsibility of the company, which
4 you said.  If you cannot cite an FDA or
5 regulatory responsibility or requirement that
6 these clinical studies be conducted under the
7 circumstances, is the source of that
8 responsibility, in your view, ethical?
9         MR. ROTMAN:  Form.
10        THE WITNESS:  I am not sure I
11 understand the question.
12
13 BY MR. NORTH:
14    Q.   You say they had a responsibility.
15 That's the word you used.  "Responsibility"
16 generally means that there is -- something
17 creates a responsibility.  It can be a legal
18 requirement, a regulation or it can be just a
19 matter of good ethics.  What is the source of
20 this responsibility that you characterize here?
21        MR. JOHNSON:  Form objection.
22        MR. ROTMAN:  He testified.
23        MR. NORTH:  He is testifying, not
24 you.
25        MR. ROTMAN:  That's right.  So

Page 80

1 objection, asked and answered.
2         THE WITNESS:  Can you repeat it one
3 more time, please?
4 BY MR. NORTH:
5    Q.   From the standpoint of the company,
6 you say they had a responsibility to conduct
7 clinical studies, given the data that they had.
8 You cannot cite a regulatory requirement or
9 responsibility that they conduct those studies,
10 so I am trying to identify what's the source of
11 that responsibility.  Is it because good ethics
12 would require it?  Is it because of a regulation
13 we haven't talked about?  What is the source of
14 that responsibility?
15        MR. JOHNSON:  Form.
16        THE WITNESS:  Maybe I could give an
17 example which would be if, you know, you are
18 driving a Honda Civic and there is a problem with
19 the air bag, and this problem with this air bag
20 is much more common with a Honda Civic than
21 another brands.  And the company knows about it.
22 Maybe they have got to find out if this is a
23 statistical aberration or is this a real problem
24 and we have to fix it?  Do we need to recall the
25 car?  The people that are driving it need to

Page 81

```
 1   know.  Even the people that are selling it need
 2   to know.  So it's the same thing with this
 3   situation with Bard and with Recovery and G2.  If
 4   there is an indication from you know, the MAUDE
 5   database or clinicians are saying:  We are seeing
 6   complications that we didn't see before.  We are
 7   seeing them at a higher rate than we have seen
 8   before.  The clinicians did what they could do.
 9   For example, they would look back at their
10   database at their hospital and see all the
11   patients that had it implanted, an IVC filter,
12   and look at the complication rate.  But the
13   clinicians are not in  a position to do a
14   multi-centre study looking at this.  They are not
15   in a position to set up a randomized control
16   trial comparing Recovery versus SNF.  It's the
17   responsibility of the company to do that if there
18   is a concern that there is a safety issue here.
19   Is it an ethical issue?  I mean, is the basis of
20   this ethical?  I don't know.  As I said before, I
21   am not ethics expert, but it seems like common
22   sense for the average person that the company
23   that is producing this, if there is an issue it's
24   their responsibility to put that issue to rest
25   one way or the other.  Could I add to that?  I
```

Page 82

```
 1   think that opinion was expressed, I think, by
 2   Murray Asch as well when he did his, you know,
 3   his pilot study and had complications.  And he
 4   understood that the company was going to do a
 5   large study after this to look at safety and
 6   efficacy, and it was never done and he felt
 7   misled in that sense.  He recognized that the
 8   study that he did was a retrievability study
 9   which was not powered to look at complication
10   rates, and that that needed to be done.
11   BY MR. NORTH:
12        Q.   You mentioned in discussing the
13   Grassi article that you believe the comparisons
14   made by Bard were apples and oranges comparisons.
15   Explain what you meant by that.
16
```



Page 83

Page 84

```
 9        Q.   Prior to your involvement in this
10   litigation, were you aware of the claim by many
11   people that the MAUDE database is affected by
12   under-reporting?
13        A.   You say "many people".  I don't know
14   what that means exactly.  I knew before my
15   involvement in this case about the MAUDE
16   database.  I knew that under-reporting was, you
17   know, a limitation or potential limitation of the
18   database.
19        Q.   You don't know about Bard's
20   particular policies and procedures of reporting
21   adverse events to the MAUDE database, do you?
22            MR. ROTMAN:  Objection.
23            THE WITNESS:  I am sorry.  Can you
24   repeat that question, please?
25   BY MR. NORTH:
```

Page 85

1    Q.    You do -- you have not studied
2  Bard's own policies and procedures for reporting
3  adverse events to the MAUDE database, have you?
4    A.    I can't say that I have gone through
5  every internal Bard document about their policies
6  about reporting to the MAUDE database.
7    Q.    And you can't -- you haven't made
8  any assessment as to whether Bard reports more or
9  reports less events than the competitor
10  manufacturers, can you?
11    A.    I am not sure what you mean by that.
12  Could you repeat that?
13    Q.    Have you made any study as to how
14  Bard's standards for reporting events to the
15  MAUDE database compare to the standards of other
16  manufacturers?
17    A.    I have not made a study of that and,
18  as I say, I haven't looked exhaustively at the
19  Bard documents about reporting, and I have no
20  access to internal documents about other
21  companies about their standards about reporting
22  to the MAUDE database.  It's my understanding
23  that the companies are supposed to report all
24  their complications to the MAUDE database, but as
25  to whether that actually happens and whether

Page 86

1  there is any coding problems, I can't speak to
2  that.
3    Q.    With regard to the safety signals
4  that you believe the data demonstrated, were
5  those signals statistically significant?
6    MR. ROTMAN:  Objection.
7    THE WITNESS:  You know, the safety
8  signals come from a couple of different sources.
9  As I mentioned, they come from the MAUDE database
10  and also the Betensky analyses which is derived
11  from the MAUDE database.  They come from the
12  medical literature and they come from the Bard
13  internal data about migration resistance.  So I
14  ████████████████████████████████
    ████████████████████████████████
    ████████
    ████████████████████████████████
18  that it should be looked into.  The Betensky
19  analyses which replicate the MAUDE database
20  analyses actually show highly statistically
21  significant differences between the Recovery and
22  SNF and between the G2 and SNF and, in fact, I
23  believe that Dr. Betensky found some reporting
24  errors between Bard and the MAUDE database, I
25  think some transcription errors which actually

Page 87

1  even magnified the size of the complication
2  rates.  They were clearly statistically
3  significant in her analyses.  The second group of
4  data, second source of data here of increased
5  complications comes from the medical literature,
6  so the medical literature, there has never been a
7  randomized controlled trial, to my knowledge, of
8  Recovery versus SNF or G2 versus SNF.  So they
9  have not reported statistically significant or
10  not statistically significant data.  Most of the
11  studies reported are registry data, so they
12  follow a group of patients with the Recovery
13  filters and then report complication rates.  So
14  they don't typically report statistical
15  significance.  That could be done if a meta
16  analysis had been done. I think the company
17  should have and could have easily done a meta
18  analysis of all the reports from the medical
19  literature and would have been able to provide
20  some statistical information, but again the
21  totality of the evidence from the medical
22  literature, it's overwhelming that there is
23  complication rates with these retrievable
24  filters.  And the last bit is the migration
25  resistance testing was done internally in Bard

Page 88

1  and, as I understand, that was also statistically
2  significant, I believe, although I am not as --
3  I didn't have complete access to that internal
4  testing data, or perhaps it was in the documents
5  I had but I didn't see it all.
6  BY MR. NORTH:
7    Q.    You have mentioned a number of sort
8  of sources of information:  Dr. Betensky's
9  analysis, the consultant's analysis.  Did you
10  make any independent assessment as to whether the
11  complication data showed a statistically
12  significant safety signal?
13    A.    Can you repeat that again?
14    Q.    Okay.  You tell us the data showed a
15  safety signal.  Did you independently yourself
16  calculate whether that signal was statistically
17  significant?
18    A.    So you know, I do a lot of this
19  research, this type of research in my regular
20  practice where I do systematic reviews and meta
21  analyses.  So I am quite experienced in looking
22  at the totality of evidence from multiple sources
23  to do that determination.  I did not do any
24  analyses myself.  I think that, you know, I went
25  over in detail the Betensky analyses and I am

Page 89

1    very comfortable with those analyses.  The
2    analyses by the Bard internal consultant, I
3    didn't have access to those analyses, so I
4    couldn't replicate that.  But I am not sure it's
5    such an issue.  If a company hires a consultant
6    to look at their data and the consultant says:
7    There is a problem, you better look at it, I
8    think the company needs to treat that seriously.
9    The -- in terms of the medical literature, I am
10   capable of pooling the data from all these
11   different reports.  I haven't done it, but it
12   could be done.  I think it could have been done
13   by Bard and should have been done.  It still is
14   possible it could be done.
15        Q.    In all the medical literature that
16   you have reviewed, have you seen any case report
17   or instance where a Bard filter tilted an entire
18   90 degrees?
19        MR. JOHNSON:  Form.
20        THE WITNESS:  I have seen many,
21   many, many reports of tilted filters and I think
22   that the definition of -- what's considered a
23   tilted filter is more than 15 degrees.  So there
24   has been large numbers of patients with Bard
25   filters that have tilted more than 15 degrees.

Page 90

1    As to whether they have been more than 90
2    degrees, I am not sure I could tell you that it
3    was exactly 90 degrees.  There certainly have
4    been cases of complete embolization of Bard
5    filters.
6    BY MR. NORTH:
7        Q.    I am not asking about embolization.
8    I am asking about where the filter simply tilts.
9    Can you recall seeing any specific report of a
10   Bard filter tilting 90 degrees?
11        MR. JOHNSON:  Form.
12        THE WITNESS:  I don't recall seeing
13   that exactly, but again, I would say that I
14   didn't go exhaustively through the case reports.
15   I focused on the case series, and the cohort
16   studies and the retrospective cohort studies.  So
17   individual cases, it's quite possible that there
18   are cases if Bard filters tilting 90 degrees, but
19   I can't point you to one.
20   BY MR. NORTH:
21        Q.    You have talked about overall
22   complication rates, that you believe the
23   complication rates for the Recovery and G2 exceed
24   the complication rate of the Simon Nitinol
25   filter.  Let's look at one specific complication.

Page 91

1    For tilt and tilt alone, do you know how the
2    complication rate of the Recovery filter compares
3    to the Simon Nitinol filter?
4        A.    I would have to refer back to the
5    Betensky analyses.  So if you showed me the
6    spreadsheet I could walk you through the numbers.
7        Q.    As you sit here now, without
8    consulting Dr. Betensky's spreadsheet, do you
9    know whether the data showed that the Recovery
10   filter tilted more often than the Simon Nitinol
11   or not?
12        A.    There were multiple studies in the
13   medical literature, case series registries,
14   cohort studies, retrospective cohort studies
15   looking at, for example, all patients in an
16   institution that had a retrievable filter put in
17   and then they report tilt rates.  The tilt rates
18   are -- they are high.  They are different in
19   different studies.  There has been, at least
20   since 2000, there has been very few, if any,
21   reports of tilt with the Simon Nitinol filter in
22   literature that I am aware of.  To do a -- so
23   that in itself is telling.  We are seeing lots
24   and lots of reports with tilts and other
25   complications with retrievable filters over a

Page 92

1    16-year period, and very few, if any,
2    complications with a Simon Nitinol filter over
3    that period in the medical literature; okay.  I
4    mean, really, what you would need -- what you
5    would really like to see as a clinician is a
6    head-to-head trial of patients randomized to a
7    Simon Nitinol filter versus a retrievable filter,
8    and follow them forward with systematic imaging
9    to see.
10        Q.    Move to strike the answer as not
11   responsive to the question.  Dr. Eisenberg, you
12   kept answering the question in terms of studies
13   of retrievable filters.  My question didn't have
14   to do with the generic term "retrievable
15   filters".  It had to do with the Recovery filter.
16        A.    Yes.
17        Q.    Do you know whether the data shows
18   that the Recovery filter has a higher tilt rate
19   than the Simon Nitinol filter?
20        A.    Yes, I think the data is quite clear
21   that the tilt rate is higher with the Recovery
22   than it is with the Simon Nitinol.  The Betensky
23   analyses showed very clearly.  It was also shown
24   in the analyses done by the consultant with the
25   MAUDE database for Bard.  And in the medical

Page 93

1    literature there has been very studies, as I say,
2    of registries, cohort studies of the Recovery
3    which show tilt.  Over that same time period we
4    have virtually no reports of tilt with the Simon
5    Nitinol filter, so I think the totality of the
6    evidence is quite convincing, very convincing
7    that there is more tilt with Recovery than with
8    the Simon Nitinol filter.
9        Q.    Without the support of Dr.
10   Betensky's data analyses would you be able to
11   express an opinion as to whether the complication
12   rates of the Bard filters, retrievable filters
13   exceed that of the Simon Nitinol filter?
14            MR. JOHNSON:  Objection.  Form
15   objection.
16   BY MR. NORTH:
17       Q.    In a statistically significant
18   fashion?
19       A.    So in the absence of the Betensky
20   analyses, then I would have to do those analyses
21   myself and I -- I am very comfortable that my
22   analyses would replicate what Dr. Betensky has
23   done, and because she found highly statistically
24   significant differences, I am sure I would find
25   the same thing.  But aside from that, we have the

Page 94

1    Bard consultant who did those analyses and found
2    statistically significant differences.  So we
3    have that, and we have Betensky and we have many,
4    many reports in the literature of complications
5    associated with Recovery and virtually no reports
6    of complications with SNF.

24       Q.    If that's true, then the only source
25   of your opinion that the complication rate of the

Page 95

1    G2 is higher than that of the Simon Nitinol in a
2    statistically significant fashion is Dr.
3    Betensky's analyses, which we discussed.
4            MR. ROTMAN:  Objection.
5            THE WITNESS:  Well, in addition to
6    that we have -- we have several studies that --
7    that compared the G2 to Recovery.  So these were
8    not randomized controlled trials, but they were
9    studies where they looked at a group of patients
10   who got Recovery or a group of patients who got
11   G2 and compared their complication rates.  And
12   the complications we are seeing with the G2 were
13   similar in incidence to the Recovery.
14   BY MR. NORTH:
15       Q.    So it's your testimony that the
16   complication rates for the G2 were equivalent to
17   the complication rates -- equivalent to the
18   complication rates for the Recovery filter?
19       A.    In some studies.  In addition, if I
20   am not mistaken, in the Binkert study they also
21   demonstrated that the migration rate or at least
22   the caudal migration rate was much, much higher
23   than had been reported to Recovery.  So although
24   we don't have direct statistical evidence, we
25   have evidence that G2 had a high complication

Page 96

1    rate.  Recovery had a high complication rate.
2    Recovery was statistically different than SNF
3    but, in any case, we still have the Betensky
4    analyses which I think are overwhelmingly
5    convincing that complications with G2 are much
6    greater than SNF.
7        Q.    That's not my question.  I am
8    talking about G2 versus Recovery filter.
9        A.    Yes.
10       Q.    Did the Betensky analysis show that
11   the G2 rate was equivalent to the Recovery rate
12   as far as complications go?
13            MR. JOHNSON:  Form.
14            THE WITNESS:  I don't believe that
15   they did a direct analysis, a direct comparison
16   of G2 versus Recovery, although that could be
17   done with the data that's available.
18   BY MR. NORTH:
19       Q.    We were talking a few minutes ago
20   about the tilt rate comparing Recovery and Simon
21   Nitinol.  Is it your belief that the tilt rate
22   with the G2 is higher than that of the Simon
23   Nitinol?
24       A.    Yes, it is.
25            MR. JOHNSON:  Are we going to take a

Page 97

1    lunch break?
2           MR. NORTH:  Let's take a pretty
3    quick one.
4           BY THE VIDEOGRAPHER:  Going off the
5    record at 12:53 p.m.
6           BY THE VIDEOGRAPHER:  This begins
7    disk number three in the deposition of Dr.
8    Eisenberg.  We are back on the record at
9    1:47 p.m.
10   BY MR. NORTH:
11         Q.    Good afternoon, Doctor.  Could you
12   tell me when, in your opinion, the evidence first
13   showed a safety signal that the G2 had a higher
14   tilt rate than the Simon Nitinol?
15         A.    I would have refer to the Betensky
16   analyses to tell you when that happened.  I would
17   really need to have the spreadsheet in front of
18   me with the analyses.
19         Q.    Did you make any independent
20   analyses of when that safety signal first became
21   apparent?
22         A.    Well, I mean, I did my own analyses
23   of the data that was presented in the
24   spreadsheet, but I didn't do any actual
25   calculations myself.

Page 98

1          Q.    And would that be true as to any
2    complication mode that you would have to refer to
3    Dr. Betensky's calculations that determine when a
4    safety signal first became apparent with regard
5    to G2 vis-à-vis the Simon Nitinol filter?
6          A.    There are several sources of
7    evidence here.  So the Betensky analysis nicely
8    lays out, according to different dates, how much
9    data had accumulated and, you know, what the
10   reporting relative risk ratios were and when they
11   were statistically significant, and in a very
12   quantitative way.  But in the medical literature,
13   you know, you see reports of this coming out.  So
14   I would have to go back, and again I don't have
15   it in front of me.  But you could see reports
16   coming out of registries, cohort studies of the
17   G2 reporting rates of tilt and fracture and
18   migration, et cetera.  So I would have to go back
19   and actually pinpoint when those were actually
20   published and when the data was from.
21         Q.    In other words, you would have to go
22   back and consult the medical literature and/or
23   Dr. Betensky's analysis to pinpoint a date when
24   the safety signals first became apparent.  You
25   can't tell us that off the top of your head,

Page 99

1    sitting here right now?
2          A.    That's right.  I would need the data
3    right in front of me.
4          Q.    Doctor, have you attempted to
5    construct a clinical study that you believe
6    should have been conducted here?
7          A.    I haven't constructed a clinical
8    study but I have given some serious thought to
9    what types of studies should have been done and
10   what they would look like, if that's what you are
11   asking.
12         Q.    Yes.  Well, tell me what you have
13   come up with in that regard.
14         A.    Well, I think that most people would
15   agree that a randomized controlled trial is the
16   gold standard for safety and efficacy in the
17   medical world.  So if you want to say that the
18   Recovery is substantially equivalent to the
19   predicate device, which is the SNF, you would
20   ideally do a randomized controlled trial,
21   randomizing patients to SNF versus Recovery and
22   then follow them forward with systematic imaging
23   and clinical follow-up long-term to see what the
24   outcomes are.  And if you have an adequate sample
25   size and therefore, the power, you can identify

Page 100

1    whether they are substantially equivalent both
2    for efficacy and for safety.
3          Q.    Would it be ethical to conduct a
4    study like that, given the fact that you might
5    end up putting permanent filters in some people
6    that should have retrievable filters and
7    vice-versa?
8           MR. JOHNSON:  Form.
9           THE WITNESS:  I think that -- I
10   think that when the Recovery filter was first
11   available for commercial use and the G2 as well,
12   they were marketed as the permanent filters, so
13   they -- it would certainly be -- excuse me --
14   clinically ethical to randomize patients who need
15   a permanent filter to either an SNF or a
16   Recovery, because they were marketed and were
17   said to be okay to leave in permanently.  So I
18   think that would be reasonable to do.  If you had
19   a patient who you said this patient for sure
20   needs a retrievable filter, they would probably
21   not be a candidate for that study.
22   BY MR. NORTH:
23         Q.    How long do you think, in general
24   terms, it would take to complete such a study?
25         MR. ROTMAN:  Objection.

Page 101

1    THE WITNESS: I think -- you know, I
2  did analyses looking at sample sizes, and I think
3  in order to do an adequately powered clinical
4  trial you would need hundreds and perhaps
5  thousands of patients for a trial like that. But
6  I think that a multi-centre trial can randomise
7  patients very quickly. These kinds of filters
8  were being widely used and I think there would be
9  many centres that would be interested in
10  participating in such a trial. So I think that
11  the patients could be randomized fairly quickly.
12  Most of the studies that I saw only had six-month
13  follow-up for their filters. I would like to see
14  longer follow-up than that and, at a minimum, you
15  would have six-month follow-up and then you could
16  have 12 months with systematic imaging. So I
17  think it would take several years to do.
18  BY MR. NORTH:
19    Q.   Talking about sample size, the three
20  sets of calculations that we marked as Exhibits
21  that you did concerning confidence intervals and
22  sample sizes, tell me a little bit more about why
23  you did those for this case.
24    MR. ROTMAN: Objection.
25    THE WITNESS: Well, I think it was

Page 102

1  clear that there was a safety signal early on,
2  and the company was aware of this and it should
3  have been followed up with clinical studies,
4  ideally a clinical trial. We are just talking
5  about clinical trials. I think there is other
6  studies that could be done as well, ideally a
7  clinical trial, but if not a clinical trial, then
8  a meta analysis. A large registry could also be
9  done, which we could talk about if you like. But
10  in considering a clinical trial, when I was doing
11  these calculations I was thinking along the lines
12  of if you were to do a clinical trial, how large
13  a clinical trial would you need to do in order to
14  really address this issue to say, yes, there is a
15  difference in complication rates or no, I can
16  safely say there is no difference in complication
17  rates. So the sample size estimates that I
18  calculated were based on -- I looked at different
19  rates of complications and different sample sizes
20  to see what kind of confidence interval you would
21  have or what the sample size would be in order to
22  have adequate power to look at differences in
23  postulated complication rates.
24  BY MR. NORTH:
25    Q.   Am I correct that those are sort of

Page 103

1  general calculations and there is nothing within
2  the calculations that relies on data specifically
3  tied to filters?
4    A.   That's not quite true. One of the
5  calculations which was -- it's been labelled as
6  Exhibit 4 is sample size calculations if one were
7  designing a study to see if Recovery had a
8  significantly higher complication rate than the
9  rates quoted in the Grassi article. So for
10  example, if -- in the Grassi article they are
11  recording a death rate of less than one percent.
12  If you wanted to identify a death rate of ten
13  percent or more, which is huge, the minimum you
14  would require would be 100 patients per arm, so
15  200 patients in a trial. But that's a more than
16  ten-fold difference in death rates. And for
17  death you would obviously want much more
18  confidence that there was no difference between
19  the two, so you would need a much larger study
20  than that. So I used the numbers in the Grassi
21  article just as, you know, a comparison for one
22  arm.
23    Q.   Do you know whether the FDA has the
24  same complication data that you have reviewed?
25    MR. JOHNSON: Form.

Page 104

1    THE WITNESS: I am not sure what you
2  mean.
3  BY MR. NORTH:
4    Q.   Do you know whether the United
5  States Food and Drug Administration has reviewed
6  the same complication data that you have
7  reviewed?
8    A.   As far as I am aware, they have not
9  seen the Betensky analyses and I am -- you know,
10  I am not -- I don't know what Bard reported to
11  the FDA, so I don't know what the FDA is aware
12  of. They have issued some warnings. They are
13  clearly aware that there is issues with
14  retrievable filters. And also there is many --
15  as I mentioned, there is many reports in the
16  literature, but I don't know if the FDA actually
17  looks at them on an ongoing quantitative manner
18  or whether, for example, the company is supposed
19  to bring it to their attention. I don't know
20  that process.
21    Q.   Are you able to pinpoint, as you sit
22  here today, able to pinpoint for me the point in
23  time when you think it became obvious in the
24  medical literature that the Recovery filter and
25  G2 filter had excessive complication rates?

Page 105

1          MR. JOHNSON: Form.
2          THE WITNESS: Again, you know, I
3   would have to have the articles in front of me to
4   see their publication dates and also when the
5   data was collected. But the HHE, again there is
6   one particular HHE where the Bard internal
7   consultant was reporting higher rates. I believe
8   it was from 2004. So I believe that the Recovery
9   was released in 2003 or very, very late in 2002
10  and that by 2004 there were reports of
11  complications with the Recovery. The G2, I would
12  have to go back and look.
13  BY MR. NORTH:
14      Q.   Even in the Recovery, that wasn't in
15  the medical literature. I am talking about just
16  medical literature. Do you know when it became
17  obvious in the medical literature that there were
18  excessive complications with the Recovery filter?
19         MR. ROTMAN: Form objection.
20         THE WITNESS: I am going to have to
21  look back. I think the Asch article which was a
22  retrievability study, and in the first 32
23  patients there was a case of significant
24  migration and in the 33rd patient, which was not
25  reported in that article, there was fracture

Page 106

1   which is -- you know, so this is a signal for a
2   clinician. If you see something in a relatively
3   small number of patients, that's alarming. One
4   would say: We need to look at this in a bigger
5   sample size. But again, I don't recall exactly
6   what year that was published. I think it was
7   pretty early on, because that study was done even
8   before the Recovery was released, as I recall.
9   BY MR. NORTH:
10      Q.   Have you shared any of your concerns
11  about Bard filters with the radiologists at your
12  hospital?
13      A.   No, I have not.
14      Q.   Have you shared any of your concerns
15  about Bard filters with anybody at your hospital?
16      A.   I have not, and part of that is my
17  understanding is this is all privileged
18  information and I really shouldn't be talking to
19  anybody about this stuff, if I am not mistaken.
20  Isn't that correct?
21      Q.   I get to ask the questions, sir. So
22  the answer is you have not?
23      A.   No, I have not.
24      Q.   Okay. You talked about these
25  advisory boards for pharmaceutical companies that

Page 107

1   you had been a member of. Have you ever been
2   directly employed by a pharmaceutical company or
3   a medical device company as opposed to consultant
4   work?
5       A.   No, I have never been an employee of
6   a pharmaceutical company.
7       Q.   Am I correct that Dr. Betensky
8   calculated a relative risk for the complications
9   of the G2 and the Recovery filter?
10      A.   She calculated what she called a
11  reported relative risk -- reported relative risk
12  ratios. So what she did was she calculated the
13  relative risk for the Recovery and the relative
14  risk for the Simon Nitinol filter, and then she
15  divided the Recovery number by the SNF number to
16  come up with her reported -- reporting relative
17  risk ratio.
18      Q.   Are you familiar with the concept of
19  a reported relative risk ratio?
20      A.   I am certainly -- I know about
21  relative risk and relative risk ratios. The
22  reported relative risk ratio, I think, is just
23  referring to the fact that there may be
24  under-reporting in the MAUDE database. So these
25  are reported cases rather than prospectively

Page 108

1   documented in a clinical study.
2       Q.   Are you aware of any statistical --
3   or literature concerning statistics or literature
4   concerning epidemiology that defines the term
5   "reported relative risk ratio"?
6       A.   I -- you know, I have pretty
7   extensive training in epidemiology but this, I
8   think, is a concept that's probably in a very
9   narrow area of epidemiology dealing with
10  databases like the MAUDE database. So it's not a
11  typical thing that I calculate. It's not a
12  typical thing that I am using. I use relative
13  risk ratios, but it's -- what I believe is the
14  reporting or reported part is only referring to
15  the fact that these are reported numbers in the
16  MAUDE database.
17      Q.   Well, prior to your involvement in
18  this case, in discussions with Dr. Betensky, were
19  you aware of a data point called the reported
20  relative risk ratio?
21      A.   I don't believe I was.
22      Q.   Would you rely -- not rely. Would
23  you defer to Dr. Betensky as to the limitations
24  of the data and analysis she used?
25      A.   Sorry? Could you repeat that?

Page 109

1    Q.    Would you defer to Dr. Betensky as
2  to the limitations on the data that she used for
3  her analysis?
4    A.    I am relying on her data.  I think
5  her data is robust.  I respect her credentials as
6  a biostatistician.  I think her analyses are
7  correct.  Defer to her?  I view it more as I am
8  on the epidemiology side and she is on the
9  biostatistical side.  So I have more of a
10  clinical sense of what these numbers mean and she
11  has more of the numerical sense.  So I think it's
12  more of a collegial effort.
13    Q.    Well, would you defer to Dr.
14  Betensky as to any limitations on the data she
15  used for her analysis from a statistical point of
16  view.?
17    A.    I am not sure what you mean by
18  "defer".  You mean if she suggested there was a
19  potential limitation, would I agree that that
20  might be a potential limitation?
21    Q.    Well, if she suggested there were
22  potential limitations would you take issue with
23  her?
24    A.    No.  I agree there is potential
25  limitations with this type of analysis.

Page 110

1    Q.    Would you agree that, to your
2  knowledge, Bard did not violate a regulatory duty
3  by not conducting the sort of clinical study you
4  have proposed?
5    MR. JOHNSON:  Form objection.
6    THE WITNESS:  Can you repeat that,
7  please?
8  BY MR. NORTH:
9    Q.    Would you agree that.  To your
10  knowledge, Bard did not violate a regulatory duty
11  in not performing the sort of clinical study you
12  have advocated?
13    MR. JOHNSON:  Objection.
14    MR. ROTMAN:  Objection.
15    THE WITNESS:  Can you repeat it one
16  more time?
17    QUESTION WAS READ BACK.
18    THE WITNESS:  So I really can't
19  speak to that because, you know, as we discussed
20  earlier, I am not an FDA expert, so I don't know
21  what the regulatory requirements are.  But you
22  know, as a clinician I would say, you know, my
23  expectation would be that if there was a signal
24  that it would be followed up by the company that
25  made the product.  But regulatory-wise I can't

Page 111

1  speak to that.
2  BY MR. NORTH:
3    Q.    Do you believe that Bard violated an
4  ethical duty by not conducting the sort of study
5  you have advocated?
6    MR. JOHNSON:  Form.
7    THE WITNESS:  Sorry.  Could you
8  repeat that one again also?
9  BY MR. NORTH:
10    Q.    Do you believe that Bard violated an
11  ethical duty by not performing the sort of
12  clinical study you have advocated?
13    A.    Again, I don't put myself out as an
14  expert on ethics, so I can't really speak to
15  that.  I think that if you ask most clinicians
16  and most patients, they would say yes, Bard had
17  an ethical duty to follow up the signal with an
18  adequately powered and designed study.  But as to
19  whether an ethicist would say that, I don't know.
20    Q.    Are there any objective criteria
21  that define when a safety signal such as you have
22  described here arises?
23    MR. ROTMAN:  Objection.
24    THE WITNESS:  It's possible in the,
25  for example, pharmacovigilance literature there

Page 112

1  is a -- that's an issue, and you alluded earlier
2  to an FDA definition for a signal.  But for an
3  individual clinician even one case report or one
4  case that's not reported of a new complication
5  that you have not seen before to me is a safety
6  signal.  So if you see something that you have
7  never seen before, you say what's going on here?
8  Is this happening in other places?  We need to
9  look at this.  That's the whole reason we have
10  case reports, and the case reports go back
11  decades and decades, because that was the early
12  sentinel system for safety issues.  So if you
13  reported your case reports and somebody else in
14  Alaska reported the same safety issue and
15  somebody else in Texas reported it, all of a
16  sudden you would say:  There is an issue here.
17  That's how AIDS was identified, just from a
18  handful of cases.  So for me, as a clinician, I
19  would say one case is enough if it's a
20  complication that's not been seen before.  But
21  it's possible that there are objective
22  definitions with different organizations, but I
23  don't know them offhand.
24  BY MR. NORTH:
25    Q.    So do I understand, from your

Page 113

1    standpoint a single case report can create -- I
2    am sorry, a case report of a complication can
3    create a safety signal?
4         A.    For me as a clinician, I would say
5    yes, if you see a new retrievable filter has been
6    put out and all of a sudden you see one has
7    migrated to the right ventricle and is causing
8    ventricular tachycardia and death and you have
9    never seen that before, you would say:  This is a
10   big safety issue.  We have got to stop putting
11   these in and look and see if anybody else has had
12   these kind of complications.  In terms of
13   clinical epidemiology, you start with a case or a
14   series of small cases and then you put together a
15   study to see if that in fact is a real safety
16   issue or not.  But depending on the severity of
17   the presentation; yes, one case can be a safety
18   signal.
19        Q.    Do you believe that that is a
20   standard belief among all clinicians that a
21   single case report can create a safety signal?
22        MR. JOHNSON:  Form objection.
23        THE WITNESS:  Yes, I do believe
24   that, and again I draw us back to the AIDS
25   situation.  The first patients showed up.  There

Page 114

1    were gay men with Kaposi's Sarcoma, which is a
2    very, very rare condition which you never see
3    except in immunocompromised people.  And alert
4    physicians reported it, and then there were a
5    couple more reports, and then they looked into it
6    and there was an epidemic.  That was the tip of
7    the iceberg.  So I would say that most clinicians
8    would say:  Yes, a single case report can be a
9    signal, depending on its severity.  And if it's
10   something you have never seen or heard of before
11   it can be a safety signal and should be reported.
12   BY MR. NORTH:
13        Q.    Have you read any depositions in the
14   filter litigation by a Dr. David Feigal?
15        A.    Yes, I did.
16        Q.    Do you know Dr. Feigal?
17        A.    No, I don't.
18        Q.    Do you have any specific criticisms
19   of his opinions that you read?
20        MR. JOHNSON:  Form objection.
21        THE WITNESS:  I read the deposition
22   a while ago, so I would have to re-read it before
23   I could speak to that question.
24   BY MR. NORTH:
25        Q.    Have you read any depositions by Dr.

Page 115

1    Clement Grassi?
2         A.    Yes.
3         Q.    Same question.  Do you have any
4    specific criticisms of his opinions?
5         MR. ROTMAN:  Form objection.
6         THE WITNESS:  Well, again this is --
7    I read it a while ago, so I would have to, you
8    know, re-read it in order to get back to you, but
9    there are two things that I recall from that
10   deposition.  One is he said in his deposition
11   that the article I referred to as the Grassi
12   article was not a guidelines article but was
13   rather a quality assurance article, and that the
14   numbers given in that article should not be taken
15   as thresholds for safety but rather thresholds
16   that should be used by hospitals to initiate a
17   root-cause analysis if they see that they are
18   approaching these numbers.  So that's what he
19   said in his deposition and I agree with that.
20   The other -- one other thing he said in his
21   deposition, which I don't agree with, is that if
22   you have patients with retrievable filters that
23   are having complications -- interventional
24   radiologists like Dr. Asch feel those patients
25   should be followed in a systematic manner with

Page 116

1    regular imaging and Dr. Grassi said -- if I
2    recall correctly, that -- that the follow-up
3    should be personalized to the individual patient
4    rather than doing routine systematic monitoring
5    of these patients, and I don't agree with that.
6    I think that patients with a retrievable filter
7    really need regular systematic follow-up with
8    imaging in order to identify problems with the
9    filters.
10   BY MR. NORTH:
11        Q.    Do you know Dr. Grassi?
12        A.    No, I do not.
13        Q.    Have you read any depositions of
14   Robert Carr?
15        A.    Yes, I have.
16        Q.    Do you have any specific criticism
17   of Mr. Carr or his testimony?
18        A.    Again, I read -- I guess there is
19   more than one deposition by Mr. Carr, and I read
20   them a while ago, so I would really have to
21   re-read them in order to speak to any specific
22   point.
23        Q.    Have you read a deposition or
24   depositions of Andre Chanduszko?
25        A.    I read that deposition and I read

Page 117

1   that a long, long time ago, and so I don't have
2   much recollection of that. So again, I would
3   have to re-read that in order to speak to that.
4           MR. NORTH: That's all the questions
5   I have.
6           MR. ROTMAN: Let's take a break. We
7   may be done. We may have a few questions.
8           BY THE VIDEOGRAPHER: Going off the
9   record at 2:19 p.m.
10          BY THE VIDEOGRAPHER: Going back on
11  the record at 2:28 p.m.
12  CROSS-EXAMINATION
13  BY MR. ROTMAN:
14      Q.   Dr. Eisenberg, good afternoon.
15      A.   Good afternoon.
16      Q.   Thank you for your testimony this
17  morning. I do have a question for you, just to
18  go back over one of the topics that came up
19  before lunch. Do you remember you were asked
20  some questions about your background and
21  experience in reviewing internal documents of
22  medical device companies?
23          MR. NORTH: Objection, leading.
24  BY MR. ROTMAN:
25      Q.   Do you remember that series of

Page 118

1   questions?
2       A.   Yes, I do.
3       Q.   And do you recall at one point you
4   provided an answer about whether reviewing --
5   whether reviewing an internal document required
6   particular expertise?
7           MR. NORTH: Objection, leading.
8           THE WITNESS: Yes, I recall that.
9   BY MR. ROTMAN:
10      Q.   What -- can you explain your answer
11  on that issue?
12          MR. NORTH: Objection.
13          THE WITNESS: Yes. I am glad you
14  asked, because I think I was not as clear as I
15  could have been, which was, I think -- I think
16  that when you read internal company documents for
17  a device company there are certain things that a
18  lay person can read and understand such as crisis
19  management, alarmingly high rate. So there are
20  things that do not require particular expertise
21  to understand. But let's face it, this whole
22  area is dealing with things that a lay person
23  could not understand, that you need to be a
24  medical expert of some sort in order to even know
25  what an IVC filter is, to know what tilt, to know

Page 119

1   what perforation, embolization, fracture. All of
2   those issues, you need to be an expert in order
3   to read the documents. In order to know about
4   relative risk and statistically significant
5   differences you need to have some epidemiologic
6   biostatistical background. To know about -- and
7   I only went through a very small portion of the
8   internal documents, but in order to, you know, to
9   look at the totality of the internal documents
10  and see how the company dealt with the FDA, for
11  example, you would need somebody who was an
12  expert, you know, with FDA industry relations,
13  which I am not. So I think that while there are,
14  you know, an isolated communication, some of them
15  a lay person might be able to read and certainly
16  would potentially be alarmed at. Other internal
17  documents you clearly need different types of
18  expertise. For example, you know, migration
19  testing, you need somebody who knows about in
20  vitro testing which, you know, I don't portray
21  myself as an expert in that area. So I think you
22  need different types of experts in order to read
23  and interpret different parts of, you know,
24  internal company documents.
25

Page 120

1   BY MR. ROTMAN:
2       Q.   I have no other questions.
3   RE-DIRECT EXAMINATION
4   BY MR. NORTH:
5       Q.   Doctor, you had lunch today with Mr.
6   Rotman, Mr. Mankoff and Mr. Johnson; correct?
7       A.   Correct.
8       Q.   And did you all discuss your
9   testimony concerning whether lay people can
10  understand these company documents?
11          MR. ROTMAN: Objection. Work
12  product.
13          MR. NORTH: Are you instructing him
14  not to answer?
15          MR. ROTMAN: Yes. Also
16  attorney/client privilege.
17          MR. NORTH: On what grounds? Do you
18  represent him? Are you his Attorney?
19          MR. JOHNSON: It's work product. We
20  will say it on that.
21          MR. ROTMAN: It's work product.
22  BY MR. NORTH:
23      Q.   But you did have lunch with these
24  three gentlemen, didn't you?
25          MR. ROTMAN: You already answered

Page 121

1    that.
2              THE WITNESS:  Yes, I did.
3              MR. NORTH:  No further questions.
4              MR. JOHNSON:  We will read.
5              BY THE VIDEOGRAPHER:  This concludes
6    the deposition of Dr. Mark Eisenberg.  Going off
7    the record at 2:33 p.m.
8              UPON ADJOURNING AT 2:33 P.M.
9
10             -------
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 123

1    August 22, 2016
2    Re: Austin v. C.R Bard, et al
3    Case No.: CACE-15-008373 DIV: 07
4    Please take notice that on the 17th day of August
5    2016 you gave your deposition in the above cause.
6    At that time, you did not waive your signature.
7    The above-addressed attorney has ordered a copy
8    of this transcript and will make arrangements
9    with you to read their copy. Please execute the
10   Errata Sheet, which can be found at the back of
11   the transcript, and have it returned to us for
12   distribution to all parties.
13   If you do not read and sign the deposition within
14   a reasonable amount of time, the original, which
15   has already been forwarded to the ordering
16   attorney, may be filed with the Clerk of the
17   Court.
18   If you wish to waive your signature now, please
19   sign your name in the blank at the bottom of this
20   letter  and return to the address listed below.
21
22   I do hereby waive my signature.
23   _____
24     MARK J. EISENBERG
25

Page 122

1
2
3
4
5              C E R T I F I C A T E
6
7    I, C.L. KLEIN, Official Court Reporter, duly
8    sworn as such, DO HEREBY CERTIFY that the
9    foregoing is a true and faithful transcription of
10   the evidence herein, AND I HAVE SIGNED:
11
12
13
14             <%Signature%>
               _____
15               C.L. KLEIN, O.C.R.
16
17
18
19
20
21
22
23
24
25

Page 124

1              ERRATA SHEET
2    DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
3    In Re: AUSTIN V. C.R BARD, ET AL
4    Case No.: CACE-15-008373 DIV: 07
5    MARK J. EISENBERG
6    August 17, 2016
7    PAGE LINE CHANGE REASON
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

Page 125

```
 1    _____
 2    _____
 3    _____
 4    _____
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18        Under penalties of perjury, I declare that I
19    have read the foregoing document and that the
20    facts stated in it are true.
21    _____   _____
22    Date       MARK J. EISENBERG
23
24
25
```

Page 127

```
 1    partly, on motion under rule 1.330(d)(4).
 2
 3
 4    DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
 5    ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
 6    THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
 7    2014. PLEASE REFER TO THE APPLICABLE STATE RULES
 8    OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 126

```
 1    FLORIDA RULES OF CIVIL PROCEDURE
 2    Rule 1.310
 3    (e) Witness Review. If the testimony is
 4    transcribed, the transcript shall be furnished to
 5    the witness for examination and shall be read to
 6    or by the witness unless the examination and
 7    reading are waived by the witness and by the
 8    parties. Any changes in form or substance that
 9    the witness wants to make shall be listed in
10    writing by the officer with a statement of the
11    reasons given by the witness for making the
12    changes. The changes shall be attached to the
13    transcript. It shall then be signed by the
14    witness unless the parties waived the
15    signing or the witness is ill, cannot be found,
16    or refuses to sign. If the transcript is not
17    signed by the witness within a reasonable time
18    after it is furnished to the witness, the officer
19    shall sign the transcript and state on the
20    transcript the waiver, illness, absence of the
21    witness, or refusal to sign with any reasons
22    given therefor. The deposition may then be used
23    as fully as though signed unless the court holds
24    that the reasons given for the refusal to sign
25    require rejection of the deposition wholly or
```