# REDACTED DOCUMENTS RELATING TO DOCKET 7315

EXHIBIT A – Previously filed redacted in DKT 8118

EXHIBIT B – No redactions

EXHIBIT C – No redactions

EXHIBIT D – Previously filed redacted in DKT 8118

EXHIBIT E – Previously filed redacted in DKT 8118

# EXHIBIT B



Deposition of:
# Robert McMeeking , Ph.D.

*July 6, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Page 1

1                  IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF ARIZONA

3

4

5        IN RE BARD IVC FILTERS          CASE NO.

6        PRODUCTS LIABILITY LITIGATION   MD-15-02641-PHX-DGC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21        VIDEOTAPED DEPOSITION OF ROBERT M. McMEEKING, Ph.D.

22

23                     THURSDAY, JULY 6, 2017

24

25          REPORTED BY:  MONICA T. CORLEY, CSR NO. 8803

Robert McMeeking , Ph.D.                                      July 6, 2017
In Re: Bard IVC Filters Products Liability

---

**Page 2**

1  VIDEOTAPED DEPOSITION OF ROBERT M. McMEEKING,
2  Ph.D., THE WITNESS, TAKEN ON BEHALF OF THE
3  DEFENDANTS, AT 9:06 A.M., THURSDAY, JULY 6, 2017,
4  AT 401 STORKE ROAD, GOLETA, CALIFORNIA, BEFORE
5  MONICA T. CORLEY, CMR, CRR, CSR NO. 8803.
6
7
8  APPEARANCES OF COUNSEL
9
10 FOR PLAINTIFFS:
11    GALLAGHER & KENNEDY, P.A.
      BY: MARK S. O'CONNOR, ESQ.
12    2575 EAST CAMELBACK ROAD
      PHOENIX, ARIZONA 85016-9225
13    (602) 530-8000
      MARK.OCONNOR@GKNET.COM
14
15
16
17 FOR DEFENDANTS:
18    NELSON MULLINS RILEY & SCARBOROUGH, LLP
      BY: TAYLOR TAPLEY DALY, ESQ.
19    201 17TH STREET
      SUITE 1700
20    ATLANTA, GEORGIA 30363
      (404) 322-6000
21    TAYLOR.DALY@NELSONMULLINS.COM
22
23 ALSO PRESENT:
24    GEOFF MINGER, VIDEOGRAPHER
25

---

**Page 3**

1           I N D E X
2  WITNESS       EXAMINATION        PAGE
3  ROBERT M. McMEEKING, Ph.D.
4       BY MS. DALY        8, 325
5       (P.M. SESSION)        170
6       BY MR. O'CONNOR     303, 334
7
8
9
10
11
12         E X H I B I T S
13 NO.    PAGE    DESCRIPTION
14
   EXHIBIT 1      5  CURRICULUM VITAE
15
   EXHIBIT 2      5  ASSESSMENT OF THE DESIGNS
16                   OF BARD INFERIOR VENA CAVA
                     FILTERS: THE RECOVERY,
17                   G2, G2 EXPRESS, ECLIPSE,
                     MERIDIAN AND DENALIS
18                   BY McMEEKING
19 EXHIBIT 3      5  SUPPLEMENTARY REPORT BY
                     McMEEKING, DATED 4-7-17
20
   EXHIBIT 4      5  REBUTTAL REPORT BY
21                   McMEEKING, DATED 5-11-17
22 EXHIBIT 5      5  11-6-16 INVOICE TOTALING
                     $14,800
23
   EXHIBIT 5A     5  11-6-16 INVOICE TOTALING
24                   $5,200
25 EXHIBIT 6      5  4-18-17 INVOICE TOTALING
                     $51,400

---

**Page 4**

1  EXHIBITS (CONTINUED)
2  NO.    PAGE    DESCRIPTION
3
4  EXHIBIT 7      5  REPORT ON THE BARD
                     INFERIOR VENA CAVA FILTER
5                    IMPLANTED IN
                     MS. SHERRA-UNA BOOKER
6
   EXHIBIT 7A   282  HURST REPORT ON BOOKER
7
   EXHIBIT 7B   282  MUEHRCKE REPORT ON BOOKER
8
9  EXHIBIT 8      5  REPORT ON THE BARD
                     INFERIOR VENA CAVA FILTER
10                   IMPLANTED IN MS. LISA ANN
                     HYDE
11 EXHIBIT 8A   282  HURST REPORT ON HYDE
12 EXHIBIT 8B   282  MUEHRCKE REPORT ON HYDE
13 EXHIBIT 9      5  REPORT ON THE BARD
                     INFERIOR VENA CAVA FILTER
14                   IMPLANTED IN MRS. DORIS Y.
                     JONES
15
16 EXHIBIT 9A   282  HURST REPORT ON JONES
17 EXHIBIT 9B   282  MUEHRCKE REPORT ON JONES
18 EXHIBIT 10     5  INFERIOR VENA CAVA FILTER
                     IMPLANTED IN MS. CAROL
19                   KRUSE
20 EXHIBIT 10A  282  HURST REPORT ON KRUSE
21 EXHIBIT 10B  282  MUEHRCKE REPORT ON KRUSE
22 EXHIBIT 11     5  INFERIOR VENA CAVA FILTER
                     IMPLANTED IN MS. DEBRA
                     MULKEY
23
24 EXHIBIT 11A  282  HURST REPORT ON MULKEY
25 EXHIBIT 11B  282  MUEHRCKE REPORT ON MULKEY

---

**Page 5**

1  EXHIBITS (CONTINUED)
2  NO.    PAGE    DESCRIPTION
3
4  EXHIBIT 12    46  CLINICAL STUDY ENTITLED
                     "ANALYSIS OF THE FINAL
5                    DENALI TRIAL DATA: A
                     PROSPECTIVE, MULTICENTER
6                    STUDY OF THE DENALI
                     INFERIOR VENA CAVA FILTER"
7                    BY STAVROPOULOS, ET AL.
8  EXHIBIT 13    64  ARTICLE ENTITLED
                     "RESPIRATORY-INDUCED
9                    HAEMODYNAMIC CHANGES: A
                     CONTRIBUTING FACTOR TO IVC
10                   FILTER PENETRATION, BY
                     LABORDA, ET AL.
11 EXHIBIT 14    93  ARTICLE ENTITLED
                     "EVALUATION OF WALL MOTION
12                   AND DYNAMIC GEOMETRY OF
                     THE INFERIOR VENA CAVA
13                   USING INTRAVASCULAR
                     ULTRASOUND," BY MURPHY,
14                   ET AL.
15 EXHIBIT 15    93  ARTICLE ENTITLED
                     "INFLUENCE OF BREATHING
16                   MOVEMENTS AND VALSALVA
                     MANEUVER ON VENA CAVAL
17                   DYNAMICS," BY LABORDA,
                     ET AL.
18
19 EXHIBIT 16   155  EXCERPT ON BARD DENALI
                     FILTER FRACTURES, BY
20                   MAJDALANY, ET AL.
21 EXHIBIT 17   180  ARTICLE ENTITLED "A
                     STATISTICAL APPROACH TO
22                   UNDERSTAND THE ROLE OF
                     INCLUSIONS ON THE FATIGUE
23                   RESISTANCE OF SUPERELASTIC
                     NITINOL WIRE AND TUBING,"
24                   BY ROBERTSON, ET AL.
25

---

2 (Pages 2 - 5)

Robert McMeeking , Ph.D.                                July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 6

1   EXHIBITS (CONTINUED)
2   NO.        PAGE    DESCRIPTION
3
    EXHIBIT 18      208   ARTICLE ENTITLED
4                         "LONG-TERM RESULTS OF THE
                          SIMON NITINOL INFERIOR
5                         VENA CAVA FILTER," BY
                          POLETTI, ET AL.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1              GOLETA, CALIFORNIA;
2          THURSDAY, JULY 6, 2017, 9:06 A.M.
3
4      (Whereupon, Deposition Exhibits 1 through
5      11 were pre-marked for identification by
6      the Court Reporter.)
7
8      THE VIDEOGRAPHER:  Good morning.
9   We are on the record at 9:06 a.m. on July
10  6, 2017.  This is the video recorded deposition of
11  Robert McMeeking, Ph.D.
12      My name is Geoff Minger, here with our
13  court reporter Monica Corley.  We are here from
14  Veritext Legal Solutions.
15      This deposition is being held at 401
16  Storke Road in Goleta, California.  The caption of
17  the case is In Re:  Bard IVC Filters Liability
18  Litigation filed in the United States District
19  Court for the District of Arizona, Case
20  No. MD-15-02641-PHX-DGC.
21      Would Counsel please identify themselves
22  for the record, and state their appearances.
23      MR. O'CONNOR:  Yes.  My name is Mark
24  O'Connor, and I represent the plaintiffs.
25      MS. DALY:  I'm Taylor Daly for the Bard

Page 8

1   defendants.
2       THE VIDEOGRAPHER:  Those present on the
3   phone.
4       MS. DALY:  They don't make appearances.
5       MR. O'CONNOR:  They don't need to make
6   appearances.
7       THE VIDEOGRAPHER:  Okay.  The witness will
8   be sworn in, and Counsel may begin the examination.
9
10      ROBERT M. McMEEKING, Ph.D.,
11          having been first duly sworn, was
12          examined and testified as follows:
13
14              EXAMINATION
15  BY MS. DALY:
16      Q   Dr. McMeeking, we've met several times
17  before.
18      A   Yes, we have.
19      Q   How are you today?
20      A   Very well, thank you.
21      Q   Good.
22          I went ahead and premarked a couple of
23  things before we started the deposition, so let's
24  just go through those.
25          The first item is marked Exhibit 1, and

Page 9

1   that is a new updated curriculum vitae that you
2   handed me this morning, correct?
3       A   That's correct.
4       Q   Can you tell me what areas include
5   something new?
6       A   There's three areas.  There's a few papers
7   that I've added to the list of publications.  I
8   have a new title at UCSB, although that may be on
9   the last curriculum vitae that I submitted, because
10  in addition to being emeritus professor of
11  structural materials, I'm distinguished professor
12  of mechanical engineering and distinguished
13  professor of materials.  And then the third area
14  where there is an addition is that I have been
15  elected the president of the International Congress
16  on Fracture, which actually happened last month, so
17  I'm the president of that organization for four
18  years.
19      Q   On your three new papers, what do they
20  talk about?
21      A   It may not be three new papers but -- I
22  didn't count how many new papers there are, but
23  there's a number of new papers, and they outline --
24  I need to refer to the list to --
25      Q   Sure.

3 (Pages 6 - 9)

Robert McMeeking , Ph.D.                                        July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 10**

1    A  -- give you that information.
2         There is one on adhesion, there's one on
3    plasticity in high temperature nickel-based alloys,
4    there's one on the behavior of materials called
5    hydrogels, there's one on calculations for lithium
6    ion batteries, and there's a number of other
7    similar papers but they're all along those lines in
8    terms of the areas which are involved.
9    Q   Are any of them relating to nitinol
10   materials?
11   A   No.
12   Q   Or to IVC filters?
13   A   No.
14   Q   Okay.  Thank you.
15        All right.  Then I marked as Exhibit 2
16   what I call your main report in the MDL litigation
17   that's dated 3-17 of 2017, correct?
18   A   I need to look at the date, which is in
19   the middle of the report.  Page -- March the 3rd,
20   2017.
21   Q   Oh, sorry.  Okay.
22   A   Yeah.
23   Q   March the 3rd.  All right.
24        And then what I've marked as Exhibit 3 is
25   the Supplementary Report specific to Meridian and

**Page 11**

1    Denali that's dated at the top April 7, 2017,
2    correct?
3    A   Correct.
4    Q   And then I marked as Exhibit 4 a report by
5    you called Rebuttal Report dated May 11, 2017?
6    A   Correct.
7    Q   All right.  Now, let me go ahead and show
8    you what I've marked 5, 5A and 6.  5 and 5A are
9    copies of bills that you gave me, where the bills
10   are dated November 6, 2016; and Exhibit 6 is a bill
11   dated April 18, 2017.
12        Starting with 5 and 5A, would you just
13   tell me basically what work was that that was being
14   done and through what time frame?
15   A   The work on that was in regard to the case
16   Austin versus Bard and it was expert witness work
17   for the plaintiff, and the time involved ranges
18   from the 8th of April 2016 to the 31st of August
19   2016.
20   Q   All right.  And then 5A, what is that?
21   A   5A is the bill I submitted for a
22   deposition that took place on 19th of July 2016 in
23   connection with the Austin versus Bard case.
24   Q   All right.  And then let's look at 6, and
25   tell me what the work is on -- that's represented

**Page 12**

1    on that invoice and through what period of time.
2    A   The work represented in this invoice is in
3    connection with the Bard MDL cases and is for
4    expert witness work for the plaintiff, or the
5    plaintiffs, and the dates involved range from 18th
6    of January 2017 to the 2nd of April 2017.
7    Q   Okay.  Now, is there work that you have
8    done since the time of that invoice?
9    A   Yes.
10   Q   And what period of time and approximately
11   how much have you billed?
12   A   Well, from the 3rd of April 2017 -- I have
13   not billed that, that time.
14   Q   Okay.
15   A   But the dates are from the 3rd of April
16   2017 to yesterday, and the number of hours involved
17   is approximately 110.
18   Q   What did you do for preparation for your
19   deposition today?
20   A   I reviewed a number of documents,
21   including the reports that you have marked as
22   exhibits, and then I read a number of papers that
23   are connected to the case, these are scientific
24   papers that are connected to the case, and I read
25   expert reports of individuals appearing for the

**Page 13**

1    defense and individuals appearing for the
2    plaintiffs.
3    Q   Which individuals for the Bard did you
4    read in preparation for today?
5    A   I read the reports by Dr. Fasching.  I
6    read the reports by Dr. Briant.
7    Q   Anybody else?
8    A   Well, in the past I've read reports by
9    medical experts who provided reports in connection
10   with case-specific individuals, but I did not
11   review them in the last few -- last week or so --
12   Q   Okay.
13   A   -- for the deposition.
14   Q   Now, I'm going to show you, just while
15   we're talking about exhibits that we're getting on
16   the record, I've marked as 7, 8, 9, 10 and 11 five
17   case-specific reports that you did in the
18   Bellwether cases.  So 7 is on Ms. Booker's case.
19   If you just confirm "yes" when I hand these to you.
20   A   Yes, that's correct.
21   Q   8 is in Mrs. Hyde's case?
22   A   Yes, that's correct.
23   Q   9 is Doris Jones?
24   A   Yes, that's correct.
25   Q   10 is Carol Kruse?

4 (Pages 10 - 13)

Robert McMeeking , Ph.D.                                July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 14

1    A   Yes, that's correct.
2    Q   And 11 is Debra Mulkey?
3    A   Yes, that's correct.
4    Q   Did you read any case-specific reports of
5   any expert for Bard or the plaintiffs in connection
6   with your work in writing those case-specific
7   reports or in preparation for today's deposition?
8    A   Yes.  In -- in preparation for writing the
9   case-specific reports, I consulted reports by
10  Dr. Darren Hurst, Dr. Derrick Muehrcke, and
11  Dr. Robert Richie.
12   Q   So Hurst, Muehrcke and Richie?
13   A   Correct.  Yes.
14   Q   For the case specific?
15   A   Yes.
16   Q   Okay.  Did you see any Bard medical
17  case-specific reports?
18   A   On those individuals?
19   Q   On those individuals.
20   A   No.
21      MR. O'CONNOR:  Object to the form.
22  BY MS. DALY
23   Q   Okay.  What reports have you read of
24  plaintiffs' experts in preparation for today?
25   A   I read reports by Dr. Richie.  I read

Page 15

1   reports by Dr. Parisian and by Dr. Kessler.  And I
2   should say that I also read, in preparation for the
3   case, some transcripts of depositions, which I
4   didn't mention before.
5    Q   And who did you read transcript-wise?
6    A   I read transcripts of depositions of
7   Dr. Fasching.  I read an old -- not old, a
8   deposition in the Austin case by Dr. Briant.  I
9   read deposition by Dr. Richie.  And I believe
10  that's it.
11   Q   Okay.  All right.  I'm going to start with
12  Exhibit 2, which is your main report.
13      All right.  So Exhibit -- Exhibit 2, your
14  March 2017 MDL report, on page 5, that references
15  the IMDRF/GHTF standards?
16   A   Correct.
17   Q   In your Section 3.2.1, right?
18   A   Yes, that's right.
19   Q   All right.  What is the IMDRF/GHTF?
20   A   It's an international organization that
21  coordinates regulatory -- not so much coordinating
22  regulatory affairs but coordinates the activities
23  of regulators and industrial participants and
24  academics in terms of processes, procedures and
25  concepts that are relevant to the regulation of

Page 16

1   medical implant devices.
2    Q   Does it direct or regulate the FDL?
3    A   The FDA?
4    Q   The FDA.
5    A   No.  No.
6    Q   It does not establish their regulations?
7    A   It does not establish their regulations.
8    Q   Does it oversee them in any way?
9    A   Not to my knowledge.
10   Q   Okay.  And to what industries does it
11  apply?  You said medical devices?
12   A   Medical implant devices.
13   Q   So it has to be medical and implantable?
14   A   I believe so.
15      MR. O'CONNOR:  Form.  Foundation.
16      THE WITNESS:  It may cast a wider remit,
17  but I don't know whether other devices and systems
18  are involved.
19  BY MS. DALY:
20   Q   Okay.  Has the United States FDA formally
21  adopted the standards for application to devices
22  that fall under the FDA's jurisdiction?
23      MR. O'CONNOR:  Form and foundation.
24      THE WITNESS:  Not to my knowledge.
25  BY MS. DALY:

Page 17

1    Q   Has the FDA formally issued any comments
2   on the applicability of those standards to medical
3   devices it has jurisdiction over?
4       MR. O'CONNOR:  Form and foundation.
5       THE WITNESS:  Not to my knowledge.
6   BY MS. DALY:
7    Q   Has the FDA ever stated that medical
8   devices presented to it via 510(k) submissions must
9   follow the standards of IMDRF/GHTF?
10      MR. O'CONNOR:  Form and foundation.
11      THE WITNESS:  Not to my knowledge.
12  BY MS. DALY:
13   Q   Section 3.2.1 in paragraph 1 of your
14  report states "Medical devices should be designed
15  and manufactured so they will perform as intended
16  by the manufacturer and not compromise the clinical
17  condition or safety of patients."
18      Did I read that right?
19   A   Well, it says "for the purposes intended
20  and where applicable."  I don't see where it says
21  "by the manufacturer."  But other than that, I
22  agree with your reading of the sentence.
23   Q   Okay.  And you agree with me that's a very
24  general statement about product development and
25  manufacture?

5 (Pages 14 - 17)

Robert McMeeking , Ph.D.                                     July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 18

1      A   Well, yes.
2          MR. O'CONNOR: Form.
3          THE WITNESS: And it -- it would apply to
4    more than just medical implant devices.
5    BY MS. DALY:
6      Q   And what I just read, is that a direct
7    quote from the standards or is that a summarization
8    of yours?
9      A   Well, as far as I remember, it's a direct
10   quote. But let me read.
11     Q   I only ask that because it doesn't have
12   quotes around it. That's --
13     A   Oh, yeah, it's -- it is, to my
14   recollection, a direct quote from the principles,
15   which are enunciated by what is now GHTF.
16     Q   You did not cite to an exact portion of
17   those standards in this paragraph 1.
18     A   I --
19     Q   In other words, I don't have a page, I
20   don't have a section from the GHTF --
21     A   May I look?
22     Q   -- that I could go to. Do you know if you
23   did that?
24     A   Well, I looked at a specific page to
25   obtain those paragraphs.

Page 19

1      Q   Okay.
2      A   So it references 9 --
3      Q   Uh-huh.
4      A   -- in the list of references, and there's
5    information there which I believe will enable me to
6    find the page which is involved. Namely, the
7    GHTF/SGI/N68:2012, 2nd November 2012 information.
8      Q   Okay. And I was just asking, did you cite
9    anything more specific, like it's page 10, section
10   such-and-such? You just -- you just cited to the
11   standards generally?
12     A   Yes.
13     Q   Okay. Paragraph 2, moving on in your
14   report, states that "When risk reduction is
15   required," do you see that sentence -- that --
16     A   Starting --
17     Q   -- the third line?
18     A   Starting on the third line?
19     Q   Uh-huh.
20     A   Yes. Yes.
21     Q   What does that mean, "When risk reduction
22   is required"?
23     A   Well, when the manufacturer or the
24   engineer is trying to reduce the risks that a
25   device presents to anyone who receives the device,

Page 20

1    then that is the process of risk reduction.
2      Q   And there are -- in your experience, are
3    there situations when after design and manufacture
4    and a product goes to market, the manufacturer
5    recognizes that there are some risks they might not
6    have understood in the development process?
7          MR. O'CONNOR: Object to the form of the
8    question.
9          THE WITNESS: Yes, that can happen.
10   BY MS. DALY:
11     Q   And that when risk reduction is required
12   might indicate that a manufacturer should look at
13   that situation?
14     A   I would agree with that statement.
15         MR. O'CONNOR: Object to the form of the
16   question.
17   BY MS. DALY:
18     Q   All right. Paragraph 2 goes on to say at
19   the fifth line there that "A manufacturer should
20   identify" -- first of all, are you with me?
21     A   Yes. Yes.
22     Q   All right. "Should identify known or
23   foreseeable hazards and estimate the associated
24   risks arising from the intended use," I'm skipping
25   forward a little bit, "eliminate risks as far as

Page 21

1    reasonably practical through inherently safe design
2    and manufacture, reduce as far as reasonably
3    practicable the remaining risk by taking adequate
4    protection measures, including alarms and inform
5    users of any residual risks."
6          Is that what the standard says?
7      A   Yes, that's what it -- yeah, that's what
8    the standard says. The principle. The principle.
9      Q   So let's take that last comment first, if
10   I could. Is it your opinion that Bard did not
11   inform users of risks in its products?
12     A   They informed users of risks in their
13   products. What I'm not aware of is whether they
14   fully informed the users of the risks.
15         MR. O'CONNOR: Belated objection to form
16   and foundation.
17   BY MS. DALY:
18     Q   So you know that, for example, Bard
19   submitted with its products Information For Use
20   documents, correct?
21     A   Yes.
22         MR. O'CONNOR: Form and foundation.
23   BY MS. DALY:
24     Q   And that from time to time it issued "dear
25   doctor" or "dear colleague" letters?

6 (Pages 18 - 21)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 22**

1    A   That is my understanding.
2    Q   And do you also understand that the FDA
3  reviewed and approved those IF Use and dear doctor
4  letters?
5         MR. O'CONNOR: Form. Foundation.
6         THE WITNESS: I don't know of that for a
7  fact in this particular case, but I -- I assume
8  that that is the process which is involved.
9  BY MS. DALY:
10   Q   And then backing up to the prior statement
11 in that paragraph, that "The manufacturer should
12 reduce as far as reasonably practicable the
13 remaining risks by taking adequate protection
14 measures," what risks associated with Bard filters
15 do you think Bard needed to reduce as reasonably
16 practicable?
17   A   I think they should have tried to reduce
18 the risks of tilting, perforation, migration and
19 fracture by fatigue.
20   Q   Are those risks that you've just
21 identified risks that are known to be associated
22 with all IVC filters?
23        MR. O'CONNOR: Form and foundation.
24        THE WITNESS: As far as I know, there are
25 such risks in many of the filters which are on the

**Page 23**

1  market.
2  BY MS. DALY:
3    Q   Is it your opinion that Bard failed to
4  reduce as far as reasonably practicable the
5  remaining risks by taking adequate protection
6  measures?
7    A   Can you repeat the question, please.
8    Q   Yes.
9         Is it your opinion that Bard failed to
10 reduce as far as reasonably practicable the
11 remaining risks by taking adequate protection
12 measures?
13        MR. O'CONNOR: Form and foundation.
14        THE WITNESS: In certain of the designs of
15 the filters those risks, in my opinion, were not
16 reduced to the extent practicable, and I would say
17 that that applies to all of the models that we are
18 discussing in the -- in the present case.
19 BY MS. DALY:
20   Q   And which risks do you identify -- that
21 you have an opinion that Bard failed to reduce?
22   A   The risks of tilting, perforation,
23 migration and fracture by fatigue.
24   Q   Have you determined by any research or any
25 other method that any other manufacturer of

**Page 24**

1  percutaneously retrievable IVC filters have been
2  able to reduce as far as reasonably practical --
3  practicable by taking adequate protection measures
4  any of those risks you just identified?
5         MR. O'CONNOR: Form and foundation.
6  BY MS. DALY:
7    Q   In filters.
8    A   I have not investigated that in many
9  cases, and in other cases I'm under restrictions in
10 terms of what I can say when I have been involved
11 in investigating that.
12   Q   Do you rely on any of the work that you
13 have done that you cannot talk to me about for your
14 opinions in this case?
15   A   No.
16        MR. O'CONNOR: Form.
17 BY MS. DALY:
18   Q   So anything that you have learned either
19 as a consulting expert or a retained expert with
20 respect to other IVC filters you do not rely on for
21 your opinions in the Bard litigation?
22   A   Yeah, I do not rely on that other
23 information.
24   Q   Okay. And I'm aware that you've been
25 retained in the Cook litigation.

**Page 25**

1    A   That's correct, yes.
2    Q   Because that's been public. Okay.
3         I think you just said a moment ago that
4  with respect to all of Bard's retrievable filters,
5  that is from the Recovery to the Denali, that it is
6  your opinion that Bard has not done what is
7  reasonably practicable to take adequate protection
8  measures against tilt, perforation, migration and
9  fracture?
10   A   That's correct.
11   Q   Okay. Is it your opinion that the various
12 modifications that Bard has made along the way to
13 its retrievable IVC filters did nothing to reduce
14 the risks associated with either tilt, perforation,
15 migration or fracture?
16        MR. O'CONNOR: Form.
17        THE WITNESS: The -- some of the changes
18 that were made would have some effects on one or
19 more of those phenomena that can take place in
20 filters, and in some cases it's unclear whether the
21 measure taken had the effect intended, but -- but
22 there would have been some benefits from some of
23 the changes which were made.
24 BY MS. DALY:
25   Q   Have you specifically modeled any filter

7 (Pages 22 - 25)

Robert McMeeking , Ph.D.                              July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 26

1  from the G2X, Eclipse, Meridian or Denali models?
2     A  I've modeled the G2X. I have modeled all
3  of the filters in the sense that I've made the
4  assessment that they all have similar
5  characteristics and, therefore, in certain of the
6  aspects of the behavior, the response will be the
7  same -- will be very similar in each of the
8  filters.
9     Q  When you say "model," with respect to the
10  G2X on to the Denali, you've looked at design
11  drawings, correct?
12     A  Correct.
13     Q  And you've taken -- you've looked at the
14  measurements of the, you know, length of legs or
15  width of legs, those sorts of things, correct?
16     A  Well, I've relied on the engineering
17  drawing to give me the values of those lengths.
18     Q  So in that sense you've -- you've modeled
19  from the design drawings, correct?
20     A  Well, I should -- I should clarify my
21  response.
22        I have looked at those drawings and I've
23  compared all the filters with each other in terms
24  of their size and shape and so on, and then that
25  has allowed me to make a deduction that my modeling

Page 27

1  of the G2 and the G2X is representative of the
2  behavior that one would expect to see in the models
3  namely the Eclipse, the Meridian and the Denali.
4  Although not exactly the same, there would be
5  similar behavior in each of these other three
6  filters.
7     Q  Have you done any FEAs specific to the
8  Eclipse, the Meridian or the Denali?
9     A  I have not done FEA analysis specific to
10  the Eclipse, Meridian and Denali.
11     Q  And you have not done work that would tell
12  you what the specific modifications of filters that
13  Bard has -- has included would do with respect to,
14  for example, loads on the filter, strains that the
15  filter is --
16     A  I have not --
17        MR. O'CONNOR: Form and foundation.
18  BY MS. DALY:
19     Q  Let me finish.
20        MR. O'CONNOR: Let her finish the
21  question.
22  BY MS. DALY:
23     Q  Let me finish.
24        -- strains that the filter sees or loads
25  that are put on those filters?

Page 28

1        MR. O'CONNOR: Form and foundation.
2        THE WITNESS: I have not done any
3  calculations that specifically identify the
4  detailed differences that would occur because of
5  the design changes going from the G2X through to
6  the Denali.
7  BY MS. DALY:
8     Q  So going back to the language of the
9  standard, on what do you base your opinion that
10  Bard has not done what is reasonably practicable to
11  take appropriate protection measures in any of its
12  retrievable filters against the complications that
13  you identified?
14     A  Well, part of the issue is that they
15  should have taken certain measures sooner than they
16  ultimately did and that the measures that they
17  eventually took were not necessarily effective at
18  reducing the risk to the extent practicable and
19  they didn't investigate the consequences -- they
20  didn't investigate thoroughly the consequences of
21  the trade-offs that were involved in the design
22  changes to modify the filters from the G2
23  through -- G2X through to the Denali.
24     Q  How would they have done that differently?
25     A  Well, they would have done more

Page 29

1  investigations of the behavior in bench tests and
2  they would -- they should have designed bench tests
3  that were more effective at investigating the
4  behavior that you would expect to see in the filter
5  when it was eventually implanted in the -- in
6  patients. And they perhaps should have done animal
7  tests as well, but I will not comment specifically
8  on what those animal tests should have been.
9     Q  And you haven't yourself done any further
10  investigations beyond what Bard did to see if you
11  can determine, through investigation, whether Bard
12  in fact failed to understand or determine some
13  characteristic in their filter that was leading to
14  complications?
15        MR. O'CONNOR: Object to the form of the
16  question.
17        THE WITNESS: I -- I have not done such
18  investigations.
19  BY MS. DALY:
20     Q  And you also have not developed any bench
21  testing that you think would have been better
22  testing that Bard could have done to reveal
23  something about their filter that identified
24  information about these complications?
25     A  I don't do bench testing, so no, I haven't

8 (Pages 26 - 29)

Robert McMeeking , Ph.D.                          July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 30

1    developed any bench tests.
2      Q   And you just said you hadn't done any
3    animal testing and you didn't --
4      A   No.
5      Q   -- have any ideas of protocols?
6      A   I don't do animal testing and I --
7      Q   Okay. With respect to the comment you
8    just made about Bard should have taken certain
9    measures sooner, we've talked about some of these
10   before. The electropolishing issue, for example,
11   you've testified before that you thought they
12   should have done that earlier?
13     A   I believe I said I rely on prof- --
14   Dr. Richie in regard to the question of
15   electropolishing the wires that are in the filters.
16     Q   Okay. So with respect to an opinion that
17   Bard could have electropolished its retrievable
18   filters before it did so in the Eclipse, you're not
19   going to give that opinion, you defer to
20   Dr. Richie?
21     A   Well, I --
22         MR. O'CONNOR: Form and foundation.
23         THE WITNESS: I'll defer to his opinion in
24   terms of the wires, but a point I would like to
25   make is that they could have switched to using tube

Page 31

1    materials sooner, and they could have made the
2    material out of tube material which they could --
3    which they could have electropolished at the stage
4    of -- of making the filters from tube material
5    rather than wires.
6    BY MS. DALY:
7      Q   I'm sorry, I'm missing what that word is.
8    What materials?
9      A   Oh, so --
10     Q   You said troop?
11     A   Tube.
12     Q   Tube materials.
13     A   Tube, yeah.
14     Q   Got it.
15     A   T-u-b-e.
16     Q   Okay. Do you know of any manufacturer
17   that was using tube materials to make IVC filters
18   before the time that Bard came out with the
19   electropolished Eclipse?
20     A   No.
21     Q   Do you have any papers you can cite me to
22   that that -- that one could electropolish wire
23   adequately to have it improve any characteristic of
24   an IVC filter before Bard did so in the Eclipse?
25         MR. O'CONNOR: Form.

Page 32

1          THE WITNESS: I've -- I've not
2    investigated that aspect of the situation, and as I
3    said before, I defer to Dr. Richie in regard to
4    electropolishing wires.
5    BY MS. DALY:
6      Q   Are there any other changes that you think
7    Bard later made to its filters that it could have
8    made earlier --
9      A   Yes.
10     Q   -- to -- to impact resistance to
11   complications?
12     A   Yes.
13     Q   All right. And what are those?
14     A   They could have developed caudal anchors
15   sooner than they ultimately did. They could have
16   developed penetration limiters sooner than they
17   ultimately did. And they could have redesigned the
18   filter configuration to try and find a better -- a
19   better combination of -- of -- of phenomena that
20   would improve the behavior of the filter in terms
21   of the risks involved.
22     Q   All right. So let's talk about caudal
23   anchors and limiters. On what do you base your
24   opinion that Bard could have added caudal anchors
25   and limiters earlier than it did?

Page 33

1      A   Well, the -- the reason is that they
2    eventually did put caudal anchors on the filters,
3    and so my point is simply that they could have
4    started to consider that possibility sooner than
5    they -- they did, once they realized that caudal
6    migration was contributing to tilt and tilt was
7    contributing to other failures that the filter was
8    experiencing.
9      Q   Okay. Do you know of any other IVC filter
10   manufacturer who incorporated anchors or limiters
11   earlier than Bard did?
12         MR. O'CONNOR: Form and foundation.
13         THE WITNESS: Not to my knowledge.
14   BY MS. DALY:
15     Q   Okay. Do you know any -- do you know in
16   any in-depth way what the process was internally in
17   Bard to develop these anchors and limiters?
18         MR. O'CONNOR: Form.
19         THE WITNESS: I've read some of the
20   documents that describe activities that were
21   involved, but I -- I wouldn't say that I know in
22   detail what the processes were that were involved
23   in developing those caudal anchors.
24   BY MS. DALY:
25     Q   Do you know -- do you know of design

9 (Pages 30 - 33)

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 34

1    efforts that Bard made to add these anchors and
2    limiters that were unsuccessful initially and more
3    changes had to be made?
4        MR. O'CONNOR: Form.
5        THE WITNESS: I do know that some of the
6    designs of the caudal anchors that they
7    investigated did not work as well as others.
8    BY MS. DALY:
9        Q   The other thing you talked about was that
10   Bard could have redesigned the configuration of its
11   filters. It was a little vague to me. What do you
12   mean by that?
13       A   Well, I mean the -- the shape of the
14   limbs, the dimension of the limbs, in other words
15   their -- their diameter, they could have considered
16   different numbers of limbs, they could even have
17   considered moving to a different material. So
18   there's a fairly large number of design choices
19   that could have been considered, and they could
20   well have come up with a combination of features in
21   the design that gave them a better combination
22   of -- of phenomena in terms of how the filter
23   behaved.
24       Q   Do you know -- are you aware of any steps
25   that Bard took along the way from Recovery to

Page 35

1    Denali to look specifically at shapes, diameters of
2    limbs, numbers of limbs, new materials?
3        A   Well, when they went from the Recovery to
4    the G2, they changed the shapes and the lengths
5    of -- of the limbs. When they went to the G2X,
6    they made some changes to the details of the cap
7    shape. And then of course the next big change --
8    adding caudal anchors and electropolishing were
9    changes, but the next big change was moving to the
10   Denali where they use a tube instead of wires to
11   design the -- the filter. But I'm not aware of
12   whether they considered other changes such as
13   changing the number of limbs or moving to a
14   different material.
15       Q   Have you done any work to -- to look at
16   combinations of things like type of material,
17   diameter, shapes of limbs, numbers of limbs, that
18   you think would cause an IVC filter to perform
19   better?
20       A   Well, in --
21       MR. O'CONNOR: Object to the form of the
22   question.
23       THE WITNESS: In this case, I've done a
24   comparison of the -- of the Recovery through Denali
25   line of filters with the Simon nitinol filter.

Page 36

1    BY MS. DALY:
2        Q   Uh-huh.
3        A   And in other activities, which I cannot
4    talk about, I've made similar comparisons among
5    filters.
6        Q   But you've said you're not going to rely
7    in this case on the comparisons you made in the
8    cases you can't talk about, right?
9        A   That's correct.
10       Q   All right. So we'll set that aside for a
11   moment. But you -- you have developed no prototype
12   making changes to any of Bard's filters that you
13   think would perform better, correct?
14       MR. O'CONNOR: Form.
15       THE WITNESS: No, I've -- I've developed
16   no prototype to attempt to -- to achieve that
17   objective.
18   BY MS. DALY:
19       Q   And of course since you don't have a
20   prototype for that, you've not bench tested such a
21   prototype to see how it would perform either, true?
22       A   That's correct.
23       Q   Okay.
24       MR. O'CONNOR: Belated objection to the
25   form of the question.

Page 37

1    BY MS. DALY:
2        Q   You talk about the changes to the G2X cap,
3    and I want to know what your opinion is on the
4    chamfer design in the G2X compared to the G2.
5        MR. O'CONNOR: You can refer to your
6    report, too, it's in there.
7    BY MS. DALY:
8        Q   Sure.
9        A   In my opinion, the chamfer was changed
10   very little in going from the G2 to the G2X, and
11   the reason is that although the cap was bead
12   blasted, the chamfer area was masked during the
13   bead blasting and as a consequence of that, the
14   bead blasting would not have broken the sharp
15   edges, which are the -- problem that is
16   associated with the chamfer. And this is contrary
17   to Dr. Fasching's claim that the bead blasting
18   would have softened that particular sharp edge.
19       The next point is that after the bead
20   blasting, there was a process of tumbling the cap
21   in a bed of ceramic particles, and that would have
22   removed some material by a process of pol- --
23   essentially polishing, mechanical polishing, but in
24   my assessment it would not have removed a great
25   deal of material and, therefore, would not have

Veritext Legal Solutions
800.808.4958                                              770.343.9696

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 38

1  changed the shape of the chamfer very much.
2         And as information that's consistent with
3  that, we can look at Figure -- Figure 187 in
4  Dr. Fasching's report, which the report dated May
5  11 of 2017, where it can be seen that there are two
6  rounded edges at the bottom of the cap; one of them
7  is very gradual, which is the one on the outside,
8  and my assessment is that that edge was broken by
9  the bead blasting; whereas the one on the inside of
10 the cap adjacent to the limb you can see is much
11 sharper in the sense that the radius of curvature
12 is much smaller than the other curved surface.
13        And I did an estimate of the radius of
14 curvature and I found that the radius of curvature
15 for that chamfer is about 20 microns. Now, I would
16 defer to those who measure the -- the radius of
17 curvature directly in images on the electron
18 microscope and so on, so I'm not going to say this
19 is a definitive measure of the radius of curvature,
20 but it leaves me with the impression that the
21 radius of curvature is about 20 microns. And the
22 radius of curvature that was measured by
23 Dr. Fasching on a Recovery filter quite some time
24 ago was 15 microns.
25        And so it's my inference that there was

Page 39

1  not a big change to the radius of curvature of the
2  chamfer in the processes that were used in the
3  manufacture of the G2X. And that, therefore, the
4  strain concentration which would be associated with
5  that chamfer was not reduced significantly,
6  although if some material was removed, it would
7  have reduced the strain concentration to some
8  extent.
9     Q   Okay. So, first of all, let me start with
10 that last thing first. You have not done any
11 specific modeling or FEA to determine what the
12 change in chamfer that you're willing to say
13 occurred to this 20 millimeters -- microns,
14 would -- what that impact would be on fracture
15 resistance? You have not done any of that work
16 specifically?
17    A   Well, I've -- I've considered the
18 difference between a radius of curvature of 5
19 microns and one in which, if you like, the radius
20 of curvature is very large, but in between -- which
21 spans the range from a radius of curvature of 5
22 microns to ones which are much larger. But other
23 than that, I've not done a specific calculation.
24        But I should point out that the reduction
25 is proportional to the degree of change of the

Page 40

1  radius of curvature, so if you don't change the
2  radius of the curvature very much, you're not going
3  to change the strain concentration very much.
4     Q   What's the largest curvature that you've
5  looked at to see how that would impact strain?
6     A   You mean what's the largest curvature I've
7  considered?
8     Q   Yeah. I thought you said that you looked
9  at a range and there was a large one that you
10 looked at.
11    A   Well, infinity would be the answer, which
12 of course is not --
13    Q   Well --
14    A   -- not a reasonable answer in the sense
15 that it's not practical for a filter.
16    Q   Did you actually model something on the
17 order of 40 microns, 50 microns, something like
18 that?
19    A   No, what I modeled was a case where the
20 chamfer is having no effect on raising the strains
21 at the -- in the arms where the arms are in contact
22 with the chamfer.
23    Q   Okay.
24    A   And that means that the radius of
25 curvature is -- is just very large.

Page 41

1     Q   Do you know from any SEM work that either
2  Dr. Fasching has presented or Dr. Richie has
3  presented whether the arms of G2Xs ever touch the
4  chamfer?
5     A   Did you say SEM work?
6     Q   Yeah.
7     A   Well, I have not seen that work
8  specifically, but as I look at these images it
9  looks as if there is contact between the chamfer
10 and the arms. Although, again, I would not claim
11 that that's a definitive interpretation of the
12 situation. But there are many images throughout
13 Dr. Fasching's report and Dr. Richie's reports
14 where you can see that there seems to be direct
15 contact between the chamfer and the -- the limb and
16 that -- that that contact seems to occur in several
17 of the filters that they looked at.
18    Q   How about G2Xs?
19    A   This is --
20    Q   And just to be clear, are you aware that
21 they've seen very few G2Xs --
22    A   That's --
23    Q   I think two.
24    A   Yeah, that's what I was going to comment
25 on, that there's -- there's -- I'm not even sure,

11 (Pages 38 - 41)

Robert McMeeking , Ph.D.                                July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 42

1    to my recollection, that there's a G2X looked at
2    in -- in this report or in Dr. Richie's report
3    other than the exemplar, so there's very little
4    information to go on in that regard.
5        Q    And did you see an exemplar G2X?
6        A    I have an exemplar that I have in my
7    possession.
8        Q    Okay.  And have you done any bench testing
9    of that exemplar to see if you can cause wires to
10   touch the chamfer?
11       A    No.
12           MR. O'CONNOR:  Form and foundation.
13           THE WITNESS:  No.
14   BY MS. DALY:
15       Q    Were there any modifications to Bard's
16   retrievable filters starting with the G2 that did
17   not go forward into the next model until the
18   Denali, which you and I know is quite different?
19           MR. O'CONNOR:  Form and foundation.
20           THE WITNESS:  There -- there may have been
21   slight changes to the lengths of limbs, but other
22   than that, I believe all of the modifications went
23   forward until the Meridian.
24           MR. O'CONNOR:  Are you done with the
25   Fasching report?

Page 43

1           THE WITNESS:  Yes.
2           MR. O'CONNOR:  Keep your report in front
3    of you and refer to it if you need to, please.
4    BY MS. DALY:
5        Q    Now, you have not examined an exemplar
6    Meridian, correct?
7        A    Yes, I have a Meridian in my possession.
8        Q    Okay.  When did you get that?
9        A    Oh, a week or two ago.
10       Q    Okay.  Because I noticed it was not in
11   your report at that time --
12       A    Right.  Right.
13       Q    -- you did not have the Meridian.  So from
14   what source did you get a Meridian?
15       A    I asked for it from the plaintiffs'
16   counsel.
17       Q    And what about a Denali, do you have that?
18       A    I have a Denali.
19       Q    When did you get that?
20       A    About two weeks ago as well.
21       Q    Do you know why you didn't get it before
22   two weeks ago?
23           MR. O'CONNOR:  Form.
24           THE WITNESS:  Because I didn't ask for it.
25   BY MS. DALY:

Page 44

1        Q    Okay.  So at the time that you wrote all
2    of these reports that we've marked as 2, 3 and 4,
3    you did not ask for those filters?
4        A    That's right.  But they -- they were
5    not -- seeing them was not relevant to my opinions
6    in the case.
7        Q    So you're not going to rely on the
8    exemplars?
9        A    No.  No.
10       Q    Okay.  Have you talked to Dr. Richie about
11   the exemplars or his examination of the exemplars?
12       A    Well, I've looked at his report, but I've
13   not talked directly with him about his examination
14   of them.
15       Q    Do you know if he has them?
16       A    You mean -- sorry, my exemplars?
17       Q    Do you know if Dr. Richie has exemplars of
18   them?
19           MR. O'CONNOR:  Form and foundation.
20           THE WITNESS:  I would need to look at
21   Dr. Richie's report to see what exemplars --
22   BY MS. DALY:
23       Q    Well --
24       A    -- are included in that report.
25       Q    I deposed him June 9 and he complained he

Page 45

1    didn't have them at that time.  So you don't know?
2        A    I don't know.
3           MR. O'CONNOR:  Form.
4    BY MS. DALY:
5        Q    Having looked at the Denali filter, you do
6    see that there are some differences in that filter
7    than the previous ones, true?
8        A    Yes, that's correct.
9        Q    Okay.  Is it your opinion that Bard has
10   failed to reduce as far as reasonably practicable
11   by taking adequate protection measures risks of
12   tilt, perforation, fracture and migration in the
13   Denali?
14       A    Yes.
15       Q    And what's the basis for that?
16       A    Because you still see incidences of all of
17   those phenomena in Denali filters.
18       Q    We'll -- we'll talk about that further
19   later.
20           You have not undertaken to compare
21   reported rates or reported incidents, let's put it
22   that way, reported numbers of incidents of any of
23   the complications you've identified in the various
24   ones of the Bard filter models, have you?
25       A    No, I have not done that.

12 (Pages 42 - 45)

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 46

1    Q   Okay. Have you read the clinical trial
2  that was done by -- authored by Dr. Stavropoulous
3  on the Denali filters that was published in 2016?
4       MR. O'CONNOR: Form and foundation.
5       THE WITNESS: Yes, I've read the paper and
6  the Bard report on that.
7  BY MS. DALY:
8    Q   Okay. And do you recall that this Denali
9  trial had 200 patients in it?
10   A   I would need to see the document before I
11 could --
12   Q   Sure.
13   A   -- answer that question.
14   Q   We're going to mark this 12.
15      (Whereupon, Deposition Exhibit 12 was
16      marked for identification by the Court
17      Reporter.)
18 BY MS. DALY:
19   Q   And my question for you is: Do you see it
20 was 200 patients and it went for about a period of
21 two years?
22   A   Yes, there are 200 patients.
23   Q   And do you know that they reported no
24 fractures?
25   A   I see that in the abstract it says that

Page 47

1  they reported no fractures.
2    Q   Okay. All right. Now, going back to your
3  report, your report Exhibit 2, again we're back at
4  page 5, Section 3.2.1, paragraph 3 there that goes
5  on to page 6 says --
6       MR. O'CONNOR: Sorry, where are we looking
7  at? I apologize.
8       MS. DALY: His MDL report.  It's
9  Exhibit 2.
10      MR. O'CONNOR: You're going to page 6?
11      MS. DALY: Yeah.  Well, the bottom of 5.
12      MR. O'CONNOR: Thank you.
13      MS. DALY: To top.
14   Q   It says "Medical devices should achieve
15 the performance intended by the manufacturer and be
16 designed and manufactured in such a way that during
17 normal condition of use they are suitable for their
18 intended purpose."
19      Do you see that?
20   A   I see that.
21   Q   Okay. How do you interpret that statement
22 by that standard?
23   A   Well, that when -- when the manufactured
24 device is used, that its functionality should be
25 consistent with the purpose of the device.

Page 48

1    Q   Okay. In paragraph I of the standards
2  that you quoted back on the previous page, that
3  im- --- that standard carries with it the
4  understanding, does it not, that medical devices
5  carry risks?
6       MR. O'CONNOR: Form. Foundation.
7       THE WITNESS: Can you specify the line
8  where that is.
9  BY MS. DALY:
10   Q   Sure. Where it --
11   A   The second to last line --
12   Q   Yeah.
13   A   -- it says -- it says "Provided that any
14 risk which may be associated with their use
15 constitute acceptable risks" --
16   Q   Right.
17   A   -- "when weighed against the benefits."
18 So yes.
19   Q   Okay. So there is not in these GHTF
20 standards that you've quoted any standard saying
21 that a medical device must have no risks associated
22 with it, true?
23      MR. O'CONNOR: Form.
24      THE WITNESS: Not to my knowledge is there
25 any such specification.

Page 49

1  BY MS. DALY:
2    Q   And you're not aware of any standard, are
3  you, that says that implantable medical devices
4  must be risk free?
5    A   I'm not aware of any such --
6       MR. O'CONNOR: Form.
7       THE WITNESS: -- rule or regulation.
8  BY MS. DALY:
9    Q   And are you aware of any implantable
10 medical device that is 100 percent risk free?
11      MR. O'CONNOR: Form. Foundation.
12      THE WITNESS: I don't have enough
13 knowledge of medical implants as a whole to be able
14 to answer that question.
15 BY MS. DALY:
16   Q   Okay. Now, going back to that paragraph
17 3, it -- it speaks in terms of the device being
18 managed -- being manufactured in such a way that
19 during normal conditions of use. You see that
20 language?
21   A   Yes.
22   Q   What is normal conditions of use with
23 respect to what this standard is?
24   A   I would say normal conditions of use are
25 conditions that would be experienced by a very

13 (Pages 46 - 49)

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 50

1  large fraction of the population of patients that
2  receive the device.
3      Q   Is there any definition that you're aware
4  of in the standard that that's what they mean when
5  they say "during normal conditions of use"?
6      A   I -- I -- I'm not aware of such specific
7  definition.
8      Q   Okay.  Are you aware of any standard for
9  medical devices that says that normal condition of
10 use is a wide range of uses or patient populations
11 or anything?
12         MR. O'CONNOR:  Form and foundation.
13         THE WITNESS:  I'm not aware of any
14 specific regulation in that regard.
15 BY MS. DALY:
16     Q   If you look at page 6, paragraph 6, where
17 you've quoted to the standard, it says "All known
18 and foreseeable risk" -- "risks and any undesirable
19 effects should be minimized and be acceptable when
20 weighed against the benefits of the intended
21 performance of the medical devices during normal
22 conditions of use."
23         Do you see that?
24     A   I see that.
25     Q   Are tilt, perforation, migration and

Page 51

1  fracture known and foreseeable risks of IVC
2  filters?
3      A   Of many IVC filters, yes.
4      Q   And are you aware that some of those
5  events have undesirable effects on the patient and
6  some don't?
7          MR. O'CONNOR:  Form.
8          THE WITNESS:  Well, I'm not a medical
9  expert so I can't really answer that question.
10 BY MS. DALY:
11     Q   Fair enough.
12         And similarly, as an -- as an engineer,
13 you're not qualified to give an opinion as to what
14 the benefits are of any -- to any given patient of
15 the use of an IVC filter, true?
16         MR. O'CONNOR:  Form.
17         THE WITNESS:  No, I would not do that.  I
18 would not offer such opinions on the benefits.
19 BY MS. DALY:
20     Q   Okay.  Are you giving any opinions in this
21 litigation that Bard complied with or failed to
22 comply with any specific FDA regulations?
23     A   No, I'm not offering such opinions.
24     Q   If you look at page 10 of the report
25 you're looking at now, you say that "Bard was not

Page 52

1  frank and honest with the FDA and did not fully
2  inform the FDA of deficiencies in the G2 filter."
3      Q   Do you see that?  It's at the very last
4  long sentence at the bottom of 10.
5      A   Yes.  I see that.
6      Q   What's the basis for your opinion?
7      A   The basis, I'm relying on Dr. Parisian for
8  that opinion.
9      Q   Okay.  You have not reviewed the materials
10 that she has reviewed, for example, true?
11     A   I've not reviewed --
12         MR. O'CONNOR:  Form.
13         THE WITNESS:  -- all of that material.  I
14 probably have seen some of it.
15 BY MS. DALY:
16     Q   And to your point a moment ago that you
17 are not giving opinions about FDA regulations, is
18 it also fair to say that you are not giving
19 opinions about what Bard's corporate behavior was
20 vis-a-vis what was expected by the FDA?
21     A   I'm --
22         MR. O'CONNOR:  Form.
23         THE WITNESS:  I'm not offering such
24 opinion.  Although may I go back and add to my
25 answer to your previous question --

Page 53

1  BY MS. DALY:
2      Q   Of course.
3      A   -- which is that in a couple of
4  situations, I've identified information that Bard
5  gave to the FDA which was not correct, was not
6  information that they should have provided as
7  credible information; for example, the claim that
8  the G2 was 12 times better than the Recovery in
9  terms of its fatigue performance and, also, at the
10 same stage when the 510(k) was being undertaken for
11 the G2, they represented calculations that they did
12 that were irrelevant to fatigue as being -- should
13 I stop?
14         MR. O'CONNOR:  No.  Finish your answer.
15         THE WITNESS:  Oh.
16         So they -- they represented calculations
17 that were not done for fatigue situations which
18 were in fact done to estimate the strains upon
19 implantation of the filter into the vena cava.
20 They represented those calculations as ones that
21 could be used to understand or -- or represent
22 fatigue behavior of the filter, and they also
23 represented those calculations as being
24 experimental tests that would validate the fatigue
25 performance of the G2.

14 (Pages 50 - 53)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 54

1    So in my view, this information was at the
2  very least misleading.
3    MR. O'CONNOR: Okay. Hold on a second.
4  Excuse me. What was ringing?
5    THE COURT REPORTER: Sorry.
6    MR. O'CONNOR: Thank you.
7  BY MS. DALY:
8    Q   So I appreciate that answer. My question
9  is: Are you going to take it the next step and
10 give the opinion that the intention of Bard was to
11 be not frank and not honest with the FDA?
12   MR. O'CONNOR: Form.
13   THE WITNESS: I -- I will not interpret
14 those actions in that way but, instead, rely on
15 Dr. Parisian for the overall assessment of that
16 situation.
17 BY MS. DALY:
18   Q   All right. Thank you.
19   And I guess one other question I have
20 there is: Do you have any idea what the FDA did
21 with the information that you've just described for
22 us that Bard gave them about the G2? Do you know
23 what they -- if they relied on it, if they asked
24 questions about it, if they rejected it? Do you
25 know?

Page 55

1    MR. O'CONNOR: Form.
2    THE WITNESS: Well, I know that because of
3  some reports of contacts, reports with -- with the
4  FDA, that these points were -- well, the matter of
5  the 12 times better fatigue performance was -- was
6  discussed with the FDA.
7  BY MS. DALY:
8    Q   Okay. Your report that we're on now, back
9  at page 6, Section 3.2.2.2, it's entitled "FDA
10 Mandated Quality System Regulation Design
11 Controls." And you just -- you cite to some of
12 those regs, correct?
13   A   Correct.
14   Q   And then in 3.2 -- 3.2.2.1 you talk about
15 the class of devices that those -- the design
16 controls relate to, correct?
17   A   Correct.
18   Q   In citing this section or including this
19 section, are you providing any opinion that Bard
20 failed to comply with FDA regulations as they
21 relate to design controls, quality systems, design
22 validation, design output or verification that are
23 listed on pages 6 and 7 of your report?
24   MR. O'CONNOR: Form.
25   THE WITNESS: No, I'm not offering any

Page 56

1  such opinion.
2  BY MS. DALY:
3    Q   All right. Let's look at page 9 of that
4  report where you start talking about the G2. I'm
5  going to talk about arm strain issues first. Okay?
6    A   Okay.
7    Q   What types of analyses did you perform to
8  estimate strains on any of the Bard IVC filter
9  arms?
10   A   I carried out calculations that were done
11 by what is called Euler-Bernoulli beam theory, and
12 I also carried out some finite element calculations
13 of some of the -- the filter limbs.
14   Q   And what were the principal assumptions
15 that you incorporated when you did your
16 calculations and/or FEAs about the Bard filter
17 arms?
18   A   In the F- --- FEA?
19   Q   Either remodeling or --
20   A   Either --
21   Q   -- in the FEA.
22   A   Yeah.
23   Q   For example, I know that you assumed that
24 the vessel arm had perforated or endothelialized in
25 the vessel?

Page 57

1    A   In some calculations I assumed that that
2  was the case, yes.
3    Q   Okay. What else?
4    A   And I assumed that it had -- the -- the
5  arm had endothelialized to the wall of the vena
6  cava.
7    Q   And when you say that, are you saying it's
8  like setting rebar in concrete type of
9  endothelialization or that there's some allowable
10 movement --
11   A   Well --
12   Q   -- considered in your calculations?
13   A   I'm only saying that the tissue grows in
14 such a way that it glues the arm to the wall of the
15 vena cava.
16   Q   And that's what I'm saying. When you say
17 "glue," to what extent is the arm then
18 unavailable -- unable to move, in your analysis?
19   A   Well, in my analysis it is constrained
20 from experiencing rotating at the location where
21 it --
22   Q   Okay.
23   A   -- is glued to the wall of the vena cava.
24   Q   All right. So do you also assume that the
25 vessel motion is unaffected by the presence of the

15 (Pages 54 - 57)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 58

1  filter in your calculations?
2      A    Yes.
3      Q    Okay.  And you also assume that the vessel
4  is stiff enough to prevent rotation at the tip of
5  the filter --
6      A    Well --
7      Q    -- is that right?
8      A    -- assume that the vessel and the
9  surrounding tissue and organs are stiff enough to
10  constrain that rotation, not just the wall of the
11  vena cava itself.
12      Q    It's the combination?
13      A    It's the combination.
14      Q    And you assumed for purposes of some of
15  your arm calculations that there was linear elastic
16  material behavior?
17      A    I assumed that that was the behavior
18  because that is the behavior that the arm will
19  experience in the circumstances -- in certain of
20  the circumstances involved.
21      Q    And your analysis on arm strain there was
22  involving a single arm?
23      A    Correct.
24      Q    Did you do the same kind of analysis on a
25  leg, something that had the design dimensions or

Page 59

1  characteristics of the leg?
2      A    Well, I did some calculations of the
3  behavior of a leg which is hit by a clot.
4      Q    Right.  But not the kind of thing where
5  you're constraining the leg, gluing it?
6      A    Well, yes, the constraining of the leg was
7  involved in that calculation as well.
8      Q    Of the clot?
9      A    Of the clot arriving at the leg and -- but
10  what I have not done is calculations where I look
11  at the leg response to the expansion and
12  contraction of the vena cava.
13      Q    Okay.  That's -- thank you.
14          So what you did not do was to take your
15  analysis of the arm that we've just talked about
16  and expand that to be an analysis of all arms?
17          MR. O'CONNOR:  Form.
18          THE WITNESS:  Well, it is in fact an
19  analysis of all arms because the symmetry of the
20  filter, as long as it remains in its designed
21  shape, the symmetry of the filter and the
22  assumption that the vena cava itself is symmetric
23  around the filter, ensures that all of the arms
24  will behave in the same way under the expansion and
25  contraction of the wall of the vena cava.

Page 60

1  BY MS. DALY:
2      Q    What if others of the arms are not
3  endothelialized to the point that they are
4  basically glued, have you modeled anything like
5  that?
6      A    I've not modeled that, no.
7      Q    Okay.  And the same question with the leg
8  analysis that you did, you did not take it further
9  and look at what would -- what strains would be on
10  any of the legs of a filter if you assumed all six
11  legs, one of them in the glued position and the
12  other ones in other conditions?
13          MR. O'CONNOR:  Form.
14          THE WITNESS:  Yes, I have not done a
15  calculation in which one of the legs is -- is under
16  different circumstances from the others.
17  BY MS. DALY:
18      Q    Okay.  One or more?
19      A    One or more, yes.
20      Q    Yeah.  Okay.
21          What structures in the body are sufficient
22  to contribute to the -- are sufficient to work with
23  the vena cava itself to prevent rotation at the
24  tip?
25      A    Well --

Page 61

1          MR. O'CONNOR:  Form.
2          THE WITNESS:  -- there's vertebra near the
3  vena cava.
4  BY MS. DALY:
5      Q    Okay.
6      A    And --
7      Q    What else?
8      A    -- there are some muscles which are quite
9  close to the vena cava, and so that it's -- it's
10  feasible that they could enforce that -- they're
11  stiff enough to enforce enough constraint to limit
12  the rotation of the -- of the limb of the vena
13  cava.
14      Q    How about perforation --
15      A    Of the limb of the filter.  Sorry.  Excuse
16  me.
17      Q    How about perforation of some other -- of
18  a strut to a duodenum?
19      A    Well, I'm uncertain as to whether that
20  would have sufficient effect.
21      Q    How about to a vessel?
22      A    But can I --
23      Q    Of course.
24      A    -- continue my answer?
25      Q    Of course.

16 (Pages 58 - 61)

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 62

1    A    Which is that the duodenum does have some
2    muscle around its perimeter, so there are some
3    muscle structures associated with the duodenum.
4    But I'm unsure whether that is going to be stiff
5    enough to have the effect that you're addressing.
6        Q    Okay.  What about a perforating strut to a
7    vessel such as the aorta, an iliac artery, a renal
8    vein?
9        A    I don't have an assessment of the impact
10   of -- of those organs.
11       Q    Okay.  What is the typical stiffness, if
12   you know, of either vertebra or muscle in the area
13   around the vena cava?
14       A    Well, Dr. Briant gives values for that, so
15   it would be easiest to refer to his report to get
16   those stiffnesses.
17       Q    Do you have any criticisms of what he used
18   in that regard?
19       A    I don't have criticisms of the values that
20   he used in the -- for the moduli of the various
21   materials.
22       MR. O'CONNOR:  Is it warm in here?
23       (Brief discussion off the record.)
24   BY MS. DALY:
25       Q    So your assumption that the vessel

Page 63

1    prevented rotation and is maintained in the same
2    motion as it did prior to filter implat- --
3    implantation is an assumption you made in your
4    analysis in this case?
5        A    Sorry, can you repeat the question.
6        Q    Yeah.
7            You made an assumption that went into your
8    calculations in this case that the vessel was
9    prevented from rotating under the condition that
10   you modeled and it maintained -- the vessel
11   maintained the same motion as it did prior to
12   filter implantation?
13       A    That's correct.
14       Q    Okay.  Did you perform any calculations to
15   justify those assumptions?
16       A    Well, I didn't perform any calculations
17   but I've looked at some information that's in the
18   scientific literature and it's -- it's contained in
19   one of the papers that I brought today.  And if
20   I --
21       Q    Yeah, you show me that --
22       A    -- find that.
23       Q    -- and I'll put a number on it.
24           Is it this one that I took away from you?
25       A    No, it's not that one.  No.

Page 64

1        Q    Okay.
2        A    It's this paper here.
3        Q    All right.  We're going to mark as 13 the
4    Laborda Kuo paper entitled "Respiratory-Induced
5    Haemodynamic Changes:  A Contributing Factor to IVC
6    Filter Penetration," and its publication date is
7    March 2015.
8            (Whereupon, Deposition Exhibit 13 was
9            marked for identification by the Court
10           Reporter.)
11   BY MS. DALY:
12       Q    Let me get that out of my pile and catch
13   up with you.
14       MR. O'CONNOR:  Thank you.
15   BY MS. DALY:
16       Q    All right.  So tell me what in this paper
17   you rely on for what we were just talking about.
18       A    Well, I -- I rely on the author's
19   measurements of the area reduction of the vena cava
20   during Valsalva that they measured in a number of
21   patients, and I've forgotten how many patients, 101
22   patients that they measured this -- these -- this
23   reduction in area.  And --
24       Q    Where is that on the --
25       A    It's -- it's summarized on -- in Table 2

Page 65

1    on page -- well, I'm not sure if your copy has page
2    numbers but --
3        Q    It does.
4        A    Okay.  1195.
5        Q    Okay.
6        A    And at the top you'll see that there's
7    Table 2.
8        Q    Yes.
9        A    And what they did was they measured the
10   area reduction in the vena cava during Valsalva --
11       Q    Uh-huh.
12       A    -- and they did it in patients who had
13   received either a Cook Celect or a Cook Tulip
14   filter, and they found that where the filter was
15   located, the area reduction of the vena cava was
16   6- -- on average, 62.55 percent.  And what they
17   found is that elsewhere than where the filter is,
18   namely 3 centimeters above the filter and 3
19   centimeters below the filter, they found that the
20   area reduction was -- was 90 percent.
21           And so what that indicates is that the --
22   in the case of the Tulip and the -- the Celect
23   filter, the filter is resisting the area reduction
24   of the vena cava but only to the extent of making
25   the area reduction about two-thirds of the area

17 (Pages 62 - 65)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 66**

1 reduction when the filter is not present. Now,
2 there's other information which is -- I need to
3 identify it, but I think if you go to page 1194 --
4    Q   Okay.
5    A   -- and the right-hand column under the
6 Results section.
7    Q   Uh-huh.
8    A   And if you go to the -- one, two, three,
9 four, five -- the fifth paragraph which starts "In
10 four patients with major filter penetration," you
11 see that in -- it's actually in 23 patients because
12 there were four with major penetration and 19 with
13 minor penetration.
14    Q   Uh-huh.
15    A   And, therefore, at least 23 patients they
16 found that the area reduction of the vena cava was
17 71.93 percent on average.
18        And I interpret this to be the worst case
19 in the sense that of the patients who had filters,
20 the ones who had penetrated filters were
21 experiencing the greatest reduction at the filter
22 of the area of the vena cava, and what this means
23 is that the area of the vena cava after Valsalva or
24 as a consequence of Valsalva is about 28 percent of
25 its area before the Valsalva event takes place. So

**Page 67**

1 it's a very big reduction in the area of the
2 cross-section of the vena cava even although the
3 filter is present.
4    Q   And what does that mean with respect to
5 strains on the filter?
6    A   I didn't estimate the level of strains in
7 the filter, and I can come to that in -- in a
8 second when I go through my summary of the
9 situation, because I would like to present that
10 information specifically in terms of -- of the Bard
11 filter rather than the Cook filter.
12        But I suppose, to be responsive to your
13 question, I would say that it means that there's a
14 very large strain would be developed in the Celect
15 filter as a consequence of the reduction of area
16 which was involved.
17    Q   Okay. So the reduction of the area is
18 connected to the Valsalva?
19    A   Yes.
20    Q   Okay. And this study shows that in Celect
21 and Tulip filters, that with -- with no perforation
22 being taken into consideration, let's look back on
23 1195 --
24    A   So --
25    Q   -- with all patients --

**Page 68**

1    A   Yes, all patients was perforating --
2    Q   Perforating or not perforating
3    A   Yes. Correct.
4    Q   Okay. After -- from the Valsalva event,
5 for these Celect and Tulip filters, there was the
6 filter resisting -- putting resistance up to the
7 reduction?
8    A   Correct.
9    Q   Okay. Of two-thirds?
10    A   Well --
11    Q   Approximately 60-some percent?
12    A   Essentially, the area reduction was
13 two-thirds of what it would be without the filter,
14 so, in other words, whereas when the filter was not
15 there, the area went down to about 11 percent of
16 its original area. With the filter's present, on
17 average it went down to 37 percent or thereabouts.
18    Q   Meaning that in Valsalva there's less of a
19 contraction/expansion --
20    A   There's --
21    Q   -- with the filter in place?
22    A   That's correct, yes.
23    Q   All right. So take me back to 11- -- the
24 page before that, 1194, so I understand what you're
25 saying there. So then they looked at 23 patients

**Page 69**

1 who had penetration, and do we know what
2 they're saying -- what they mean when they're
3 saying -- they say "Four patients had major filter
4 penetration and nine had minor filter penetration"?
5 Do we know what their --
6    A   I don't know what their definition of --
7    Q   Okay.
8    A   -- "major" and "minor" is. My only -- my
9 only reason for identifying that is that it was a
10 subset of the -- of -- of the cohort and it has a
11 worst -- worst case in terms of how much reduction
12 was involved compared to the cohort as a whole.
13    Q   Okay. So with the penetrating ones,
14 forget how much they are because we don't really
15 know.
16    A   Right.
17    Q   With the penetrating ones in the Celect
18 and Tulip filters, in Valsalva there was also a
19 limitation to the contraction and expansion that
20 was seen when filters were in place?
21    A   That's correct.
22    Q   All right.
23    A   So now instead of reducing to 10 percent
24 of the original area, it goes down to 28 percent of
25 the original area.

18 (Pages 66 - 69)

Robert McMeeking , Ph.D.                                July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 70

1    Q   Okay. Now, look at the last sentence in
2    that paragraph that you pointed out that begins "In
3    four patients." The last sentence says
4    "Penetration was not significantly related to
5    venous pressure increase."
6        Do you know what they meant by that?
7    A   Well, in the paper, they measure the
8    increase of the pressure during Valsalva, and I'm
9    not exactly sure what they mean but they -- they
10   obviously found that the venous pressure didn't
11   matter to the penetration which was involved --
12   which they observed in the -- in the cohort. But
13   I'm not --
14   Q   Yeah.
15   A   -- I should say I'm not exactly sure what
16   they mean by this.
17   Q   The way I read it is that the venous
18   pressures that they read on all patients were --
19   were about the same whether you had penetration or
20   you didn't.
21   A   I guess so, yes.
22   Q   Okay.
23   A   I'm not sure if that's what it means, but
24   that's a reasonable interpretation.
25   Q   And what we also don't know from this

Page 71

1    paragraph is what the differences were in the
2    reduction of the cross- -- what do we call that?
3    A   Cross-sectional.
4    Q   Cross-sectional, we don't know what the
5    cross-sectional reduction was keyed to whether you
6    had multiple perforations at 5 millimeters or you
7    had two perforations at 3 millimeters, there's no
8    information?
9        MR. O'CONNOR: Form.
10       THE WITNESS: Well, there's no information
11   on that, but that's not relevant to my assessment
12   of -- of this information.
13   BY MS. DALY:
14   Q   Okay. So why is this information
15   important to you as you relate it to the Bard
16   filters?
17   A   Okay. So Celect filters and Tulip filters
18   are significantly stiffer than Bard filters.
19   Perhaps the limb of a Celect filter is perhaps 10
20   times the stiffness of -- of a Bard filter, and
21   that's only based on public information that is
22   available by measuring the diameter of a filter and
23   knowing the material which -- which is present in
24   the filters.
25       So the Celect and the Tulip filters are

Page 72

1    stiffer than the Bard filters, which means they
2    would resist the reduction in area more than the
3    Bard filter. So I deduce from that that the
4    reduction in area when the Bard filter is present
5    in these 23 patients that have the larger area
6    reduction would see an even bigger reduction in
7    area than was observed when the Celect or Tulip
8    filter was present.
9        And it's my assessment that the area
10   reduction could even approach the 90 percent that
11   was observed in the absence of the filter because
12   of that difference in stiffness of the -- of the
13   filters involved.
14   Q   Meaning with the Bard filters, you would
15   expect a present Bard filter to put up some
16   resistance to the reduction that Valsalva is
17   causing?
18   A   Correct.
19       MR. O'CONNOR: Form.
20   BY MS. DALY:
21   Q   But your deduction is that it could be as
22   little as 90 percent?
23   A   Well, no, that's not quite what I said.
24   Q   Okay.
25   A   What I said is that the resistance could

Page 73

1    be so small that the reduction in area would be
2    almost 90 percent, very similar to what is observed
3    when the filter is not present.
4    Q   Okay. So what have you done insofar as
5    modeling or FEAs to confirm your deduction that the
6    resistance with the Bard filters in place could be
7    very small?
8    A   I didn't do finite element analysis, I
9    just made that estimate that the stiffness is
10   perhaps five times greater in the case of the
11   Celect filter compared to the Bard filter and that,
12   therefore, when the Bard filter is there, the
13   reduction in area is going to be more than when the
14   Celect filter is there.
15   Q   And where are your calculations that show
16   my calculations and what assumptions I used for
17   Celect, Tulip, and what assumptions I used for Bard
18   in that regard?
19   A   I didn't --
20       MR. O'CONNOR: Form.
21       THE WITNESS: I didn't bring them with me.
22   Q   Do you have that?
23   A   Yes.
24   Q   Can you send it to Mark so he can send it
25   to me?

19 (Pages 70 - 73)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 74

1     A   Yes, I can do that.
2     Q   All right.
3     A   But I need to continue with my
4  information.
5     Q   Oh, yeah, keep going.
6     A   So now if I could have a copy of
7  Dr. Briant's report.  Do you have one available?
8     Q   Hmmm.  I don't know that I do.
9     A   Well, I can do it without reference to his
10  report.
11        MR. O'CONNOR:  Let's see if you have the
12  report.
13        MS. DALY:  I do not.
14     Q   You mean his general MDL one?  I do not
15  have --
16     A   Yes.
17     Q   I do not have that with me.
18     A   Okay.  So he does calculations in which he
19  has his model of the physiology surrounding the
20  vena cava.
21     Q   Uh-huh.
22     A   And he imposes displacement, I'm referring
23  specifically to Configuration 3 where he is
24  modeling Valsalva --
25     Q   Okay.

Page 75

1        MR. O'CONNOR:  Here, I got a copy of the
2  report.
3        MS. DALY:  Okay.  Good.  Let's let him
4  look at that.  Give us a page.
5        MR. O'CONNOR:  Which report are you
6  looking at?  Which report are you referring to?
7        THE WITNESS:  It's -- I'd need to look at
8  it before I can say which one it is.
9  BY MS. DALY:
10     Q   And while he's looking for that, what
11  you're about to say about Briant's report is not in
12  your rebuttal report, this is new?
13     A   This is new -- that's correct, it's new.
14     Q   Okay.
15        MS. DALY:  I'm not saying that's okay, to
16  your lawyer --
17        THE WITNESS:  No, but --
18        MS. DALY:  Hold on one second.
19     Mark, I'm not saying it's not necessarily
20  true -- okay, we're going to talk about it, but I
21  think he was supposed to put everything in his
22  rebuttal.
23        MR. O'CONNOR:  Well, I think he's
24  covered --
25        MS. DALY:  Go ahead.

Page 76

1        MR. O'CONNOR:  I think he's covered this
2  area in his rebuttal report.
3        MS. DALY:  Well, we'll argue about that
4  later.
5        THE VIDEOGRAPHER:  Excuse me, Counsel,
6  your microphone, when you get a chance.  Sorry to
7  interrupt.
8        THE WITNESS:  So --
9  BY MS. DALY:
10     Q   So take me to a page, would be great.
11     A   So -- yes.
12     Q   All right.
13     A   In this fashion, page 33.
14     Q   Okay.
15     A   Just before Section 4.3.2.
16     Q   All right.
17     A   And you see that these are -- there's a
18  Figure 23 --
19     Q   Okay.
20     A   -- in which modeling of the Valsalva
21  processes is -- is undertaken.
22     Q   Okay.
23     A   And Dr. Briant presents his results, which
24  are in blue, and my results, which are in red,
25  where I assume that the filter does not restrict

Page 77

1  the contraction of the vena cava at all.
2     Q   Uh-huh.
3     A   And you observe in the case where the
4  reduction -- the nominal reduction is 50 percent,
5  that my results are about 10 times larger than his.
6  Now, there's an adjustment that should be made
7  because, as you've referred to, I assume no
8  rotation of the -- of the arm where it intersects
9  the vena cava wall.
10     Q   Uh-huh.
11     A   Which will essentially double the strains
12  that I compute.  So if -- if we take that out of
13  the picture, then we have strains in my case which
14  are about five times the strains that -- that he
15  calculates.
16     Q   Okay.
17     A   Now, what that indicates is that the
18  deflection of the arm is about -- in his case, is
19  about one-fifth of the deflection of the arm in my
20  case, which means that the reduction in area of the
21  vena cava where the filter is -- is present would
22  only be about one-fifth of the reduction in area of
23  the vena cava in the absence of the filter.
24     Q   Okay.
25     A   But as we've -- I've already pointed out,

20 (Pages 74 - 77)

Robert McMeeking , Ph.D.
July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 78**

1  that in the experimental data, the reduction in
2  area should be much more like three-quarters or
3  even 80 percent where the filter is present
4  compared to where the filter is not present.
5      Q   And how would that change his blue versus
6  your red?
7      A   Well, his -- it would bring his blue up to
8  halfway up my red because I'm discounting the
9  constraint on rotation --
10     Q   Okay.
11     A   -- when making that comparison, to try and
12 make it as a direct comparison as possible.
13     Q   And are you -- in telling me this now, are
14 you taking into consideration what you've just
15 previously told me, that you think that the Bard
16 filter in place has a small resistance, somewhere
17 on the order of 10 percent?
18     A   Yes.
19     MR. O'CONNOR: Form.
20     THE WITNESS: When I said that the results
21 would come up to halfway along my red results, that
22 assumes that the Bard filter has no resistance
23 relative to contraction of the vena cava.  If I
24 take the other result, which is that its resistance
25 would reduce the area reduction to two-thirds, that

**Page 79**

1  would still bring you up to a third of -- of the
2  way up my red mark; in other words, deflections and
3  strains which are much bigger than Dr. Briant has
4  calculated.
5      BY MS. DALY:
6      Q   Okay.  And then what you have not done
7  with what you just discussed with me, you haven't
8  done an FEA specific to that issue, true?
9      A   I haven't done FEA, but I've done all the
10 Bernoulli calculations which are specific to that
11 situation and which relax the rotation constraint.
12 And that's -- that is mentioned in the report where
13 I comment that the rotation constraint
14 approximately doubles the strains which are
15 involved.
16     Q   And are you aware of any medical
17 literature that looks at Bard filters for its
18 impact on resistance to expansion as was done by
19 Laborda with the Celect and Tulip filter?
20     A   I haven't seen any such data or papers.
21     Q   And you haven't tried to recreate that in
22 a test yourself?
23     A   No.
24     MR. O'CONNOR: Form.
25     BY MS. DALY:

**Page 80**

1      Q   All right.
2      A   When you say "a test," you mean --
3      Q   Like a bench test.
4      A   Not in a bench test, no.
5      Q   And --
6      A   Or even --
7      Q   -- do we even know how we would do that?
8      A   -- in a clinical test.
9      Q   How would we do that in a bench test?
10     A   I think I know how to do it but I don't --
11     Q   You haven't developed one yet?
12     A   Yes.  Exactly.
13     Q   Okay.
14     MR. O'CONNOR: But were you done with your
15 answer?  You were saying -- did you do something
16 else?  I didn't follow your answer.
17     THE WITNESS: Sorry, which answer are
18 you —
19     BY MS. DALY:
20     Q   I thought you answered to me what --
21     THE WITNESS: Which answer are you
22 referring to?
23     MR. O'CONNOR: Just continue.
24     THE WITNESS: Okay.
25     BY MS. DALY:

**Page 81**

1      Q   Okay.  Is there anything else you wanted
2  to say from Dr. Briant's report about the topic
3  we're on?
4      A   About the which?
5      Q   Topic that we're on right now?
6      A   Well, all I want to say is that this
7  deduction tells me that my assumptions are much
8  closer to being relevant to what really happens in
9  the vena cava, both during normal breathing and
10 during Valsalva, than the assumptions that
11 Dr. Briant has made.  And it's my deduction from
12 that that what he should have done to make it more
13 realistic would have been to impose the
14 displacement constraints much closer to the vena
15 cava than he actually did; in other words, instead
16 of having the physiological model of the
17 surroundings go out to --
18     MR. O'CONNOR: That's mine.
19     THE WITNESS: Oh, sorry.
20     MR. O'CONNOR: That has my notes on it.
21     MS. DALY: That's all right.  He can talk
22 from it, I won't look at your notes.
23     THE WITNESS: So instead of the
24 physiological model going out to 1 inch away from
25 the vena cava, it would have been more realistic to

21 (Pages 78 - 81)

Robert McMeeking , Ph.D.                                July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 82

1  impose the displacement constraints closer to the
2  vena cava. I'm not sure where, but closer than the
3  1 inch that he assumed in his calculation.
4  BY MS. DALY:
5     Q    But you agree that there has been no bench
6  testing done by either you or Dr. Briant to verify
7  what you've done with modeling, true?
8     A    Could you repeat the question.
9     Q    There has been no bench testing done under
10  any protocol by either you or Dr. Briant to try to
11  verify what you modeled?
12        MR. O'CONNOR:  Form.
13        THE WITNESS:  You mean --
14  BY MS. DALY:
15     Q    On this issue.  On this issue
16     A    -- this specific issue?
17     Q    Yes, sir.
18     A    No, I agree.  No.
19     Q    Okay.  And you are not aware of any
20  clinical work that's been done looking at a Bard
21  filter in a patient in Valsalva to try to look at
22  this -- to try to gain the same data that Laborda
23  got in the Celect/Tulip study?
24     A    I'm not aware of any such paper or data.
25     Q    Okay.

Page 83

1        MR. O'CONNOR:  Are you done with that?
2        THE WITNESS:  May I just add one thing,
3  which is -- and perhaps I wasn't finished with the
4  answer that was -- which is that since the boundary
5  conditions I used are much closer to being
6  realistic in my opinion, it means that the strain
7  amplitudes that I computed are more -- are more
8  realistic in terms of representing what will happen
9  both during normal breathing and during Valsalva.
10  Although, I would say that there's still the
11  question of the rotation which could be debated in
12  terms of what that will do to the strain levels
13  involved.
14        But I've assumed that as a worst case,
15  which is always -- always my concern when I make
16  the assumptions about how to do the calculations.
17  BY MS. DALY:
18     Q    Do you retain -- do you routinely assume a
19  linear elastic constitutive response for nitinol --
20     A    I --
21     Q    -- in your analysis for companies during
22  device development relating to nitinol products?
23     A    Well, yes, when the response that is being
24  investigated is in the linear elastic regime, I use
25  a linear elastic model for the behavior of the

Page 84

1  nitinol.
2     Q    Have you submitted fatigue strain analyses
3  for any medical device submission or consulting
4  work where you only did analyses that included
5  linear elastic calculations?
6     A    Well, the -- yes, in the sense that the
7  linear elastic calculations were presented in
8  parallel with calculations that were done using
9  nonlinear nitinol constitutive laws as well.
10     Q    At page 53 of your report, it's the last
11  paragraph I wanted to ask you about, it says "The
12  analysis just described requires follow-up by more
13  detailed exploration by FEA as it shows that cyclic
14  strains are potentially dangerously high."
15        Do you see that?
16     A    I see that.
17     Q    And what does that relate to?  Which --
18  which -- which of the analyses is that relating to?
19     A    Well, the analyses that it relates to
20  would be those strain ranges in my calculations
21  that fall outside of the linear elastic range
22  because that requires a nonlinear analysis to carry
23  it out.  But I should say that where those strain
24  levels are that high, then you're already looking
25  at worrisome levels of strain.

Page 85

1     Q    And have you done any more detailed
2  exploration by FEA of that issue?
3     A    Not of that issue, no.
4     Q    Okay.  You state there that the cyclic
5  strains are potentially dangerously high.  That was
6  your term?
7     A    Yes.
8     Q    Does your analysis show what the potential
9  high strains are?
10     A    Could you repeat that question and
11  possibly clarify.
12     Q    Yeah.
13        Does your analysis show what the potential
14  high strains are, the range of potential high
15  strains are, in that particular analysis where
16  you're saying the cyclic strains are potentially
17  dangerously high?
18     A    Can you --
19     Q    Yeah, it's that same sentence at the
20  bottom -- bottom paragraph of 53, first sentence.
21  You're talking about the analysis --
22     A    Okay.  So --
23     Q    -- and you say more detailed exploration
24  by FDE -- FEA should -- and then it says "as it
25  shows that the cyclic strains are potentially

22 (Pages 82 - 85)

Robert McMeeking, Ph.D.
July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 86

1  dangerously high." That's what I'm asking about.
2  What does that mean?
3      A   So is this question independent of whether
4  FEA should be done?
5      Q   Yes.
6      A   Is it simply --
7      Q   Yes. Yes.
8      A   Yes. Okay.
9          So in the preceding pages, there are a
10  number of results that give you levels of strain at
11  the place where the limb -- where the arm enters
12  the cap and that is where, given my assumptions
13  that the level of strains is highest, and some of
14  those values are in excess of levels that Bard
15  would identify as the fatigue limit of the
16  material.
17          And, in addition, many of the results are
18  higher than the fatigue limit of similar materials,
19  and in those circumstances one would worry that
20  when -- you're in a danger level because the
21  material similarities and dissimilarities may mean
22  that this is a high enough level of strain to cause
23  fatigue failure of the material.
24      Q   And that was really my question. Your
25  "dangerously" term goes to it might be approaching

Page 87

1  its fatigue --
2      A   Yes, so I --
3      Q   Its fatigue limit?
4      A   That -- so I can clarify precisely my --
5      Q   Okay.
6      A   -- answer, which is that some of these
7  results lie above the fatigue limit that Bard
8  identified --
9      Q   Got it.
10      A   -- for their material.
11      Q   Good. Okay.
12      A   And can I make one more comment, which is
13  that if that situation is modified by the strain
14  concentration, then the level of strains is even
15  higher, and that means that some of these other
16  results which lie below the Bard fatigue limit
17  might rise above the Bard fatigue limit because of
18  the strain concentration.
19      Q   Okay. But again, with respect to those
20  things, there have been no separate FEAs done to
21  verify?
22      A   Well, there's one FEA that we did which
23  confirms the strain levels which I computed by
24  Euler-Bernoulli beam analysis and I've compared the
25  strain levels that are in these tables with results

Page 88

1  that Dr. Briant obtained, adjusting for the
2  different assumptions which went into the
3  calculations, and I find that my results are always
4  consistent with his results in terms of the
5  magnitude of the strains which are predicted.
6      Q   So let's go back to your report, page 9,
7  and we were back on -- we were back on the G2
8  section.
9      A   Okay.
10      Q   And this initial discussion in paragraph
11  1 -- I'm sorry, number -- the number 1, not
12  paragraph 1, but go down to where you got --
13      A   Oh, yes.
14      Q   -- the 1.
15      A   Yes.
16      Q   And you're talking about the alternating
17  strain in the arm of the G2?
18      A   So we're talking about paragraph 2 or
19  Section 2 of this?
20      Q   Yes, and I'm talking about the No. 1 --
21      A   Yes.
22      Q   -- that begins "The alternating strain in
23  the arm." Okay. Is it your opinion that the
24  strain in the arm that you're discussing there
25  could be a contributor to fracture or is that also

Page 89

1  relating to any of the other complications,
2  migration, perforation or tilt?
3      A   Well, it's -- it's related to fracture.
4  That's its relevance.
5      Q   Okay. In that same No. 1 section, you say
6  that "the arm has fully perforated." What do you
7  mean by the term "fully perforated"?
8      A   I mean that the arms have gone through the
9  vena cava to such an extent that the arms are in
10  their design shape, which is the shape they would
11  be in when the filter is simply sitting on the
12  table in front of us.
13      Q   So it would -- how far they're out would
14  depend on the diameter of the vena cava of the
15  person?
16      A   That's correct.
17      Q   All right. With what frequency does a
18  full perforation like that occur in patients that
19  have Bard filters?
20          MR. O'CONNOR: Form and foundation.
21          THE WITNESS: I -- I don't know the answer
22  to that.
23  BY MS. DALY:
24      Q   You're aware of individuals either in the
25  medical literature or in cases that you've seen on

23 (Pages 86 - 89)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 90**

1   this litigation who experience no fracture but have
2   perforations of different kinds, true?
3       A   Yes.  Correct.
4       Q   Tilts of different kinds?
5       A   Correct.
6       Q   And even migrations of different kinds?
7       A   Yes.
8       Q   In that -- in that sentence, you make an
9   assumption about the arm having endothelialized by
10  the tissue.  We've just talked about what you mean
11  by that, correct?
12      A   Right.  Right.  Correct.
13      Q   All right.  With what frequency does that
14  type of endothelialization, in effect gluing the
15  arm as you modeled it, happen in patients who have
16  IVC filters?
17          MR. O'CONNOR:  Form and foundation.
18          THE WITNESS:  Well, I'm -- I'm not a full
19  expert on that issue, but it's my understanding
20  that almost all of the filters endothelialize
21  eventually to the wall of the vena cava.
22  BY MS. DALY:
23      Q   To the extent that you modeled it?
24      A   You mean to the extent that it would
25  constrain the rotation?

**Page 91**

1       Q   Yes.
2       A   I don't know the answer to that question.
3       Q   Okay.
4       A   But I should comment that it -- it's not
5   so much whether the wall will directly constrain
6   the rotation as that the interaction of the end of
7   the filter arm, the wall of the vena cava, and the
8   material outside the vena cava, plus the motions
9   which are being imposed on that system, will affect
10  how the arm moves.
11      Q   Right.  And there can be thousands, I
12  think Dr. Richie said millions, of permutations of
13  filter condition in a -- in people, fair?
14      A   That's correct.
15          MR. O'CONNOR:  Form.
16          THE WITNESS:  But my -- my assessment is
17  always to find the worst-case condition that is
18  likely to occur.
19  BY MS. DALY:
20      Q   On any of the worst-case conditions that
21  you have considered in your analyses, with what
22  frequency does that set of conditions occur in
23  patients with Bard filters?
24          MR. O'CONNOR:  Form and foundation.
25          THE WITNESS:  I don't know.

**Page 92**

1          MR. O'CONNOR:  When you get to a point,
2   can we take a break?
3          MS. DALY:  Sure.  I'm heading to page 11.
4   We'll take a break.
5          MR. O'CONNOR:  Oh, okay.
6          THE WITNESS:  The break is now?
7          MS. DALY:  Yes.
8          THE WITNESS:  Okay.
9          THE VIDEOGRAPHER:  This is the end of
10  Media No. 1.  We are going off the record at 10:52.
11          (Recess taken.)
12          THE VIDEOGRAPHER:  This is the beginning
13  of Media No. 2.  We are back on the record at
14  11:06.
15  BY MS. DALY:
16      Q   Dr. McMeeking, I'm going to start on page
17  11 of your report, please.
18      A   Okay.
19      Q   And what I wanted to talk about was at
20  this point in your report, you're talking about a
21  model that you were using and that -- that involves
22  a filter arm fully perforating in this model?
23      A   Can you draw me --
24      Q   Yeah, I --
25      A   Draw my attention to a specific line.

**Page 93**

1       Q   Yeah, I'm just -- I'm about to talk about
2   the Murphy paper and the Laborda paper.
3       A   Okay.
4       Q   It's at the top of 11.
5       A   All right.  Fine.
6       Q   And so what I think is happening here is
7   you're modeling the filter fully perforating and
8   the endotheli- -- endothelialized arm, correct?
9       A   Correct.  That's correct.
10      Q   And then you're -- you're about to talk
11  here or you do talk here about movement of greater
12  than 1 millimeter of the arm?
13      A   Yes.
14      Q   Okay.  So let's talk about Murphy for a
15  minute.
16      A   Okay.
17          (Whereupon, Deposition Exhibits 14 and 15
18          were marked for identification by the
19          Court Reporter.)
20  BY MS. DALY:
21      Q   You cite to the Murphy study, and let me
22  go ahead and give you -- I'm going to talk about
23  Laborda too.  I've marked as 14 the Murphy study,
24  "Evaluation of Wall Motion and Dynamic Geometry,"
25  and as 15 the Laborda "Influence of breathing

24 (Pages 90 - 93)

Robert McMeeking , Ph.D.                                                July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 94

1  movements and Valsalva maneuver on vena cava
2  dynamics."
3     A   Okay.
4     Q   Okay.  So the Murphy paper came out in
5  2008?
6     A   Correct.
7     Q   Okay.  And the Laborda paper that I just
8  handed you was published in 2- -- 2014?
9     A   That's correct.
10    Q   Now, the Laborda paper that we just talked
11 about a few moments ago that related to the Celect
12 and Tulip, when -- when did that paper come out?
13    A   It was published in 2015.
14    Q   Okay.  Now, Murphy's study was of a small
15 number of patients and he was looking at what?
16    A   She and her colleagues were looking at the
17 expansion and contraction of the vena cava during
18 normal breathing in supine patients who had been
19 anesthetized for -- yeah.
20    Q   Are you aware of any study similar to
21 Dr. Murphy's study prior to the time that she
22 published that in 2008?
23    A   Well, there -- there are studies by
24 various individuals, I can't name them, but there
25 were studies prior to that using various methods to

Page 95

1  try and establish the expansion and contraction of
2  the wall of the vena cava.
3     Q   And was there any discussion in the Murphy
4  paper about any impact that an in situ IVC filter
5  would have on expansion and contraction of the vena
6  cava during respiration?
7     A   I don't recall.  I...
8     Q   These were patients without IVC filters?
9     A   That's correct, they had no filter.
10    Q   Okay.  Do you know whether other doctors
11 or scientists agree or have come to the same
12 conclusions that Murphy came to with this small
13 study?
14    A   Well, I recall that prior to this study,
15 there were different values for the expansion and
16 contraction that one would see in the literature.
17 Some of -- some of them smaller than the results in
18 Murphy, et al.
19    Q   Okay.  And what did Murphy determine?
20    A   They determined -- may I look at the
21 paper?
22    Q   Yes.  Of course.
23    A   They determined that on the short axis of
24 a vena cava which was approximately elliptical,
25 that the expansion and contraction of the diameter

Page 96

1  of the span of the vena cava in some cases was as
2  small as .6 millimeters and was in some cases as
3  big as 1.8 millimeters.
4     Q   Did you use that information in any of
5  your analysis?
6     A   Well, in some of it, yes.
7     Q   And how did you use it?
8     A   I -- I took the 1.8 millimeter expansion
9  and contraction of the diameter and I assumed that
10 that would take place on the span of the -- of
11 the -- the short span of the vena cava with having
12 the smallest span of all those that Murphy, et al.
13 looked at; namely, the -- the short span of the
14 vena cava that they looked at ranged from, well,
15 the standard deviation, so it wasn't necessarily
16 the shortest span.  The standard deviation took the
17 diameter down to 10.2 millimeters.
18        I then assumed the 1.8 millimeter would
19 occur for that 10.2 millimeter diameter vena cava
20 as the worst case that was possible in the
21 combination of results that they obtained, and that
22 gave me an 18 percent reduction in the diameter of
23 the vena cava.  And I used that as a worst-case
24 possibility of what would happen during normal
25 breathing in the -- in a patient's vena cava.

Page 97

1     Q   Did you take into consideration, in using
2  that number, what the presence of a filter might do
3  to restrict the change in the vena cava by
4  respiration?
5     A   No, I didn't take that into consideration,
6  and for the reasons that we've just discussed.  I
7  don't think that is necessary in terms of getting
8  worst-case condition.  Yes.
9     Q   And again, what we've already talked about
10 is you've told me what you have done and what you
11 haven't done to determine how much presence of a
12 Bard filter will change the expansion of the vena
13 cava whether under respiration or Valsalva?
14    A   That's correct, but -- but what I'm saying
15 is that if you deduce what are the worst-case
16 conditions, that the filter is not stiff enough to
17 resist the motion of the vena cava, and the
18 combination of data in the Murphy, et al. paper
19 comes out in the way that I described it, then the
20 worst case is that even with the filter, the
21 contraction is 18 percent of the diameter.
22    Q   Have you done any testing of any kind or
23 seen any other clinical testing that looks at the
24 respiration impact in patients who do have a vena
25 cava filter present?

25 (Pages 94 - 97)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 98**

1    A   Well, there's the paper we discussed by
2  Laborda, et al. that has the study of the patients
3  with Celect and Tulip filters.
4    Q   But that's in Valsalva, right?
5    A   That's in Valsalva.
6    Q   I'm limiting it right now to just regular
7  respiration.
8    A   I haven't seen any studies -- I'm not
9  aware of any studies where there is a filter
10 present and this study -- the equivalent of this
11 study has been carried out.
12   Q   Do you know that Bard was aware of the
13 Murphy study after it came out and considered it in
14 working on their designs?
15      MR. O'CONNOR:  Form.
16      THE WITNESS:  I'm not aware --
17      MR. O'CONNOR:  Foundation.
18      THE WITNESS:  -- of that aspect.
19 BY MS. DALY:
20   Q   Now, the analysis that you did applying
21 the Murphy paper data resulted in an estimate, if
22 you look down towards the end of that first
23 paragraph, it's about 6 lines -- 7 lines up, and it
24 says "It would suggest that a filter arm
25 experiencing alternating strains of 1.38 percent in

**Page 99**

1  a 14-millimeter-diameter vena cava" --
2    A   Yes, I see that.
3    Q   -- "would last between 5,000 and 100,000
4  breaths or between 5.5 hours and 111 hours at 15
5  breaths a minute."
6    A   Yes.
7    Q   Okay.  111 hours is less than five days,
8  right?
9    A   Correct. Yep.
10   Q   Okay.  So how many cases of fracture are
11 you aware of that have been documented to have
12 occurred within 5.5 to 111 hours with Bard filters?
13      MR. O'CONNOR:  Form and foundation.
14      THE WITNESS:  Well, I'm not -- I'm not --
15 I don't know results like that, but a point to be
16 made is that the clock starts when the full
17 perforation and endothelialization of the filter
18 has been achieved, so it's not a matter of counting
19 the time from the beginning of the filter being
20 implanted in the patient but, rather, the time is
21 counted from when the conditions that I assume have
22 arisen.
23 BY MS. DALY:
24   Q   And when do those conditions arise?
25   A   It could take quite some time for those

**Page 100**

1  conditions to arise because tilting and
2  perforation -- well, tilting is not in this
3  assumption, but -- but perforation is progressive
4  and can take some time to develop.  It might be a
5  matter of weeks or it might be a matter of -- of --
6  of a number of years.
7    Q   And you don't know patient to patient how
8  long that takes, true?
9    A   No, I don't.
10   Q   And what degree of perforation are you
11 saying is necessary to start this clock ticking for
12 your analysis of failure in 5.5 to 111 hours?
13   A   Well, in this case the degree of --
14 perforation would be the full extent of -- of
15 perforation, so the clock wouldn't start until the
16 filter has achieved its designed shape.
17   Q   Okay.  Meaning it's perforated so far
18 through the vena cava of the subject patient that
19 it's regained its full size when it's fully
20 deployed?
21   A   That's correct.
22   Q   How often does that happen in patients?
23   A   I don't know.
24   Q   You assume it doesn't happen in everybody?
25      MR. O'CONNOR:  Form.

**Page 101**

1      THE WITNESS:  I don't have any basis for
2  making any assumption at all.
3  BY MS. DALY:
4    Q   Okay.  One way or the other?
5    A   One way or the other.
6    Q   Okay.  Did you do any actual bench testing
7  with a Bard filter or any Bard filter to determine
8  if your assumptions could be verified that
9  perforating struts of the filter to the maximum
10 amount through vena cava tissue would lead to fast
11 failure?
12   A   I did no bench tests of that nature.
13   Q   If the condition that you're talking about
14 with full perforation -- first, let me back up.
15      When you're talking about the filter
16 getting to the point of having this full
17 perforation, are you talking about one strut?
18 Multiple struts?  All struts?  What is -- what do
19 you mean?
20   A   Well, it would be at least two struts
21 opposite each other.
22   Q   Okay.  On opposite sides?
23   A   Opposite sides.
24   Q   Okay.  So the condition starting this fast
25 fracture would not be -- using a clock now, as we

26 (Pages 98 - 101)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 102

1  obviously do with this, if the 12:00 and the 1:00
2  side by side were doing that, that wouldn't start
3  the clock?
4      A    That wouldn't constitute the condition,
5  no.
6      Q    They have to be on opposite sides, like a
7  3:00 and a 9:00?
8      A    Correct.
9      Q    All right.  And you don't know how often
10  perforation occurs with struts that are in
11  opposition to each other as opposed to side by
12  side, true?
13          MR. O'CONNOR:  Form.
14          THE WITNESS:  I don't know information on
15  that.
16  BY MS. DALY:
17      Q    You've seen -- you've seen cases where the
18  medical reports are that you've got two struts side
19  by side that might be perforating, true?
20      A    That's correct.
21      Q    Now, Laborda study that was published in
22  2014, that talks about the Valsalva impact on
23  changes in size of the vena cava, right?
24      A    That's correct.
25      Q    And sort of the precursor of what they

Page 103

1  then applied to the Celect and Tulip?
2      A    That's correct.
3      Q    All right.  Were their findings in that
4  paper any different with respect to contraction and
5  expansion of the vena cava than what they found
6  with the Celect filter in place?
7      A    Sorry, could you --
8      Q    Yeah.
9      A    -- repeat that question.
10      Q    Yeah.  Let's do it easier.
11          What did they find was the average
12  expansion and/or contraction of the vena cava under
13  the effect of Valsalva?
14      A    I'm going to read the Results --
15      Q    Sure.
16      A    -- section in the -- in the abstract.
17          So they give results for the area during
18  neutral breathing and the area during Valsalva.
19      Q    Uh-huh.
20      A    And the ratio is approximately five, say,
21  maybe four or five.  So the area changes from --
22  from 100 percent down to about 25 percent according
23  to these results on average.  But then later on,
24  they make a comment that the collapsibility index
25  is about .5, so there's something I don't quite

Page 104

1  understand in terms of relationship between those
2  two results.  But either of those results can be
3  used to come up with the sort of information that
4  you're asking about.
5      Q    Did their -- did their results on neutral
6  breathing, were those consistent or different from
7  what Murphy found?
8      A    I have to look at both papers to --
9      Q    Okay.
10      A    -- try and answer that question.
11          So the Murphy paper says that during
12  normal breathing, the area changed from 249
13  millimeters squared on average to 310 millimeters
14  squared on average.  The numbers in the Laborda
15  paper are significantly higher.  They find areas of
16  400 meters squared, 380 meters squared, 342 meters
17  squared.  So the areas, although they're not
18  completely different, there's a difference in terms
19  of the average areas which were observed.
20      Q    So which -- which is larger?
21      A    The -- I need to look at this carefully.
22          If I'm looking at the correct numbers, the
23  numbers for the areas in the Laborda, et al., paper
24  are larger.
25      Q    And that paper was not available to

Page 105

1  medicine or science until -- looks like it's
2  published October 2014, true?
3      A    That's correct.
4      Q    Now, with respect to Valsalva movements, I
5  take it that you do not have any information about
6  how often any person with a Bard filter has a
7  Valsalva event?
8      A    No, I don't have any information on that.
9          MR. O'CONNOR:  Belated objection to the
10  form.
11  BY MS. DALY:
12      Q    So at page 11, the last paragraph on that
13  page where you're talking about that Laborda paper
14  that we just discussed, which is Exhibit 13, you
15  say your calculation showed that a filter arm
16  experiencing those strains would last only about
17  500 Valsalva maneuvers before fracturing, correct?
18      A    Which line is that on?
19      Q    Let me see where --
20      A    I see it.  Yes, I see it.  Yes, I agree.
21      Q    Okay.  So do you know if there's a range
22  amongst people who do have Valsalva movements of
23  what the change in diameter would be?
24      A    Well, the information in the Laborda, et
25  al. paper indicates that that's the case because

27 (Pages 102 - 105)

Robert McMeeking , Ph.D.                                July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 106

1   there are ranges for the areas before Valsalva and
2   there are ranges for the areas during Valsalva, so,
3   therefore, it suggests that there's a range of area
4   changes which occur because of Valsalva.
5       Q   So person to person there are differences?
6       A   Yes.
7       Q   You would agree?
8       A   Yes.
9       Q   Similarly, person to person there are
10  differences in what changes would happen in their
11  anatomy in normal respiration; would you agree with
12  that?
13      A   I would agree with that.
14          MR. O'CONNOR:  Form.
15  BY MS. DALY:
16      Q   Okay.
17      A   Again, from the Murphy, et al. paper,
18  that's the suggestion.
19      Q   Okay.
20      A   Or that's the indication, I should say,
21  yeah.
22      Q   And of course the numbers of times people
23  have Valsalva movements during the time they have a
24  Bard filter in situ would range greatly?
25      A   I agree.

Page 107

1           MR. O'CONNOR:  Form.
2   BY MS. DALY:
3       Q   Okay.  Have you seen any case that you --
4       A   Can I revise that answer?
5       Q   Yes.
6       A   Although I agree from the position of a
7   non-expert in what causes people to do Valsalva,
8   knowing what is involved in terms of what causes
9   Valsalva I can understand that there would be a
10  range of -- of numbers of times that an individual
11  would undergo such a maneuver.
12      Q   And, for example, if you had a respiratory
13  problem and you were a chronic person that had to
14  do huge coughs, for example --
15      A   Yes.  Yes.
16      Q   -- that's a Valsalva type, correct?
17      A   Yes, that's right.
18      Q   Okay.  Do you know of any case that you
19  have looked at as an individual case in this
20  litigation where a doctor has reported that a
21  patient had frequent Valsalva es- -- episodes
22  between the time of implant and the time of
23  fracture of the filter?
24      A   I didn't see any such information in the
25  medical records that I studied, and I didn't see

Page 108

1   any such comment in the experts' reports that I
2   read, although I don't know if that can be ruled
3   out.  But, yeah.
4       Q   Did you -- do you -- did you see anything
5   in the literature that indicated that changes due
6   to respiration, normal respiration, or Valsalva put
7   strains on an IVC filter that resulted in tilt,
8   migration or perforation?
9       A   Well, there's a bench test study that Bard
10  carried out in which they compared the Meridian
11  filter with some other filters, and they imposed
12  what would be representative of Valsalva changes of
13  shape to a synthetic vena cava and they found that
14  that caused tilt of the -- of the filters involved.
15  So I think that's the only study I know where
16  anything like what you asked me about is -- is
17  looked at.
18      Q   And do you know what --
19      A   Sorry, I should say the only one I'm aware
20  of.
21      Q   Do you know which filters in that test
22  performed any tilt in a Valsalva condition?
23      A   I'd have to look at my report or --
24          MR. O'CONNOR:  Well, look at it.
25          THE WITNESS:  — look at the original

Page 109

1   report to -- to -- to figure that out.
2   BY MS. DALY:
3       Q   Yeah, I wasn't sure whether you meant it
4   was with respect to the Meridian or something they
5   were comparing it to.
6       A   Well, they were doing comparisons, but my
7   point of my answer was simply that they observed
8   the Valsalva maneuver -- sorry, the Valsalva
9   simulation in the experiment would cause the
10  Meridian to tilt and some other filters to tilt.
11      Q   Was it one Valsalva event?
12      A   No, it was multiple Valsalvas.
13      Q   Okay.  And that test will tell us how
14  often that was?
15      A   Yes.
16      Q   How many times it was --
17      A   Yes.
18      Q   -- and what the pressures were, and so on?
19      A   Right.  Correct.
20      Q   Okay.  What about any either Bard testing
21  or any literature that tells us whether changes
22  during normal respiratory behavior or Valsalva
23  caused perforation?
24      A   I know of no such study.  I'm not aware of
25  it.

28 (Pages 106 - 109)

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 110**

1    Q   Or any Bard information?
2    A   Or any Bard...
3    Q   All right.  Let's look a minute at page 9,
4  paragraph 2 and 3.  And we're talking about the
5  arms at the sheath and strains on the arms relative
6  to the sheath.
7    A   Right.
8    Q   Okay.  All right.  One of your -- one of
9  your findings there is that "A strain concentration
10  where the arm enters the sheath can elevate the
11  alternating strain in some cases by factors of 10
12  or more."
13        Do you see that?
14    A   I see that, yes.
15    Q   What analysis did you perform to evaluate
16  that?
17    A   We carried out a finite element -- I
18  carried out -- well, it was with Professor Begley,
19  I carried out a finite element simulation of an arm
20  touching the edge of the sheath where it -- where
21  the arm entered the sheath, and the chamfer on the
22  cap we chose to be, as I recall, 5 microns and
23  found that there were strain concentrations higher
24  than 10.
25    Q   That was your 2D FE?

**Page 111**

1    A   That was the 2D FE --
2    Q   Okay.
3    A   -- finite element analysis.
4    Q   Did you present any calculations that
5  demonstrate that the strain near the sheath would
6  increase by that factor?
7    A   Sorry, could you repeat that question.
8    Q   Yeah.  Did you -- did you present any
9  actual calculations that demonstrated that the
10  strain near the sheath would increase by a factor
11  of 10 plus?
12    A   I believe that we presented color contour
13  plots of the strains, and I'd have to review that
14  to see exactly what information is in it.
15        MR. O'CONNOR:  Are they here?
16        THE WITNESS:  They're here, yeah.
17  BY MS. DALY:
18    Q   Yeah, and my next question was:  Were
19  those results presenting stress or strain?  So...
20    A   Oh, I see.
21        These are stress plots.
22    Q   Okay.  And did you use -- for that 2D FEA
23  analyzing the sheath interaction, did you use a
24  linear elastic material response?
25    A   Yes.

**Page 112**

1    Q   Okay.  At the increased strain levels that
2  you're describing, this 10 -- 10 times greater, is
3  the assumption of linear elastic material response
4  valid?
5    A   Well, the -- it depends on what the
6  imposed level of -- of strain is, so if you take
7  the nominal strain and multiply it by the strain
8  concentration factor and that is below the limit to
9  linear elastic behavior, then the result is a
10  correct estimate of the strain concentrating effect
11  of the -- of the feature.
12        If the nominal strain is higher and drives
13  the strain at the -- in the strain concentration to
14  higher than the limit on linear elastic strain,
15  then the calculation is not exactly correct.
16  However, strain, because of its nature, since it's
17  a geometric effect, the level of strain that you're
18  going to get when the material becomes nonlinear is
19  not going to be very different from the level of
20  strain that you get when the -- when the -- in
21  terms of the strain concentration factor is not
22  going to be very different from what you predict
23  using a purely linear analysis.
24    Q   But for the purpose of the work that you
25  did with these stress values, is it correct that

**Page 113**

1  the stress values you determined in your analysis
2  rely on your assumption of a linear elastic
3  response?
4    A   Well, the -- the -- the strain levels in
5  the region where the strain has exceeded the limit
6  on linear elastic strain would be affected by the
7  fact that there is nonlinear behavior beginning to
8  set in.  However, around the region where you have
9  nonlinear behavior, there is a zone in which the
10  response is still linear because the strains are
11  low enough that the strains remain in the lineal
12  elastic regime, and those strains control the way
13  that the behavior occurs closer in to the -- to the
14  place where there is a high strain and constrain
15  that motion and, as a result, the strain that you
16  get at the strain concentration in the nonlinear
17  material is relatively -- is little different from
18  what you get from the linear elastic analysis.
19        And this is something that I've studied in
20  my own research.  It's -- it's a known consequence
21  of compatibility that is associated with the way
22  materials deform.
23    Q   And you did not then take this analysis to
24  the point of a bench test to see if you could
25  actually measure strains of 10 times greater or

29 (Pages 110 - 113)

Robert McMeeking , Ph.D.                July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 114**

1    whatever?
2        A   No --
3            MR. O'CONNOR: Form.
4            THE WITNESS: -- I have not done such a
5    bench test.
6    BY MS. DALY:
7        Q   Okay. Now, we've talked about the chamfer
8    issues in these cases --
9        A   Yes.
10       Q   -- several times before.
11       A   Yes.
12       Q   Okay. Is it your opinion that any of the
13   fractures of Bard filters where we've been able to
14   see the filters, or Richie and Fasching have seen
15   the filters, have occurred from struts actually
16   coming in contact with a chamfer?
17       A   Well, some of them appear to have been
18   generated that way because the fracture surface is
19   very close to being adjacent to the -- to the
20   chamfer and --
21       Q   And the information that you would have
22   about that would be based on the SEM work that
23   either Dr. Fasching did or Dr. Richie, true?
24       A   That's correct.
25       Q   All right. Are you aware of any example

**Page 115**

1    of a fracture in a strut where there's evidence of
2    it coming in contact with the chamfer in a G2X,
3    Eclipse, Meridian or Denali?
4        A   Sorry, could you repeat the question.
5        Q   Yes.
6            Are you aware of any Bard filter having a
7    strut fracture where there is evidence that that
8    strut came in touch -- came in contact with the
9    chamfer in any G2X, Eclipse, Meridian or Denali?
10           MR. O'CONNOR: Form.
11           THE WITNESS: I would need to review
12   Dr. Fasching's report and Dr. Richie's report to
13   see whether that's the case.
14   BY MS. DALY:
15       Q   Well, I will tell you that they have not
16   looked at explanted Eclipse, Meridian or Denalis,
17   and they've had a couple of G2Xs.
18       A   So did you ask me about G2Xs?
19       Q   Yeah.
20       A   Well, then I'd have to review those
21   reports to see whether the G2X has that feature.
22       Q   Would you rely on what Dr. Richie or
23   Dr. Fasching found about whether there is an
24   example or not an example of a filter with evidence
25   of fracture -- a G2X filter with evidence of

**Page 116**

1    fracture of a strut contacting the chamfer?
2        A   I would rely on them both where they're
3    consistent with each other, and then I'd have to
4    make a judgment if they came to different
5    conclusions.
6        Q   All right. Very good.
7            Are you -- same question about are you
8    aware of examples of filter fracture caused by
9    wire-to-wire fretting or contact independently of
10   whatever Dr. Fasching and Dr. Richie have found?
11       A   I --
12           MR. O'CONNOR: Form.
13           THE WITNESS: I don't have any independent
14   information on that.
15   BY MS. DALY:
16       Q   Okay. And if they do not have any
17   examples of evidence of fracture from fretting wire
18   to wire of any filters from G2X on to Denali, do
19   you have anything more that you could give me for
20   evidence that that can occur in those filters?
21       A   No.
22           MR. O'CONNOR: Form.
23           THE WITNESS: I have nothing addition- --
24   additional.
25   BY MS. DALY:

**Page 117**

1        Q   Okay. The other thing that you and I
2    talked about before, and Dr. Richie also comments
3    on, is strain concentrations in an area in the arm
4    struts, as opposed to legs, sort of up towards the
5    cap, correct?
6        A   Yes.
7        Q   All right. Do you agree with Dr. Richie
8    that even if you see an explanted filter, you
9    cannot necessarily determine -- let me start over.
10   Let me start over.
11           In a filter that has not been retrieved,
12   are you aware of any way to determine the precise
13   point at which that filter fractured?
14       A   No.
15           MR. O'CONNOR: Form.
16           THE WITNESS: I'm not aware of any safe
17   method that -- that would be feasible.
18   BY MS. DALY:
19       Q   Okay. And what about being able to look
20   at the surface areas of two sides of fractures,
21   what's left with the filter and the -- and the
22   strut, in situ, you would agree that you can't do
23   that safely?
24       A   You can't do it safely if both pieces are
25   still in the patient.

30 (Pages 114 - 117)

Robert McMeeking , Ph.D.                           July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 118

1    Q    And would you also agree that if you do
2  not have retrieved filters and/or the fractured
3  strut, that again you cannot do an analysis to
4  determine what type of fracture it is?
5        MR. O'CONNOR:  Form.
6        THE WITNESS:  I would say --
7        MR. O'CONNOR:  Foundation.
8        THE WITNESS:  -- if you have one -- if you
9  either have a detached piece or if you have the
10  filter itself, you can do an analysis of the
11  fracture surface that you do have.
12  BY MS. DALY:
13    Q    If you have neither?
14    A    If you have neither, you -- you can't do
15  it safely.
16    Q    Okay.
17    A    Or if it's -- or if the filter has
18  disappeared, you can't do it.
19    Q    Right.  All right.
20        Are you aware of cases that you have
21  looked at in this litigation where there has been
22  perforation or tilt in the absence of fracture?
23    A    You mean one of the five cases that
24  we're --
25    Q    No, I'm talking about --

Page 119

1    A    In general.
2    Q    -- in your whole experience with different
3  cases.
4    A    Can you repeat the question, please.
5    Q    Yeah.
6        Have you done any work -- given a report
7  on any cases in this litigation where the
8  complications were tilt and perforation only
9  without fracture?
10    A    "This litigation" meaning any --
11    Q    Bard filter cases.
12    A    -- case -- yeah, I -- I recall that there
13  are some cases like that.
14    Q    Do you recall there being some cases
15  you've worked on where there was a fracture and no
16  tilt?
17    A    I don't recall whether that's the case,
18  but I'm not sure.
19    Q    How about fracture and no perforation?
20    A    Again I'm not sure.  Yes, I'm not sure.
21    Q    On page 12 of your report, paragraph 4.
22    A    Sorry, which page?
23    Q    Page 12.  Counting full paragraphs, I'm
24  looking at paragraph 4, and if you go down to line
25  5 it starts with "For example."

Page 120

1    A    Yes.
2    Q    "The possibility of strain concentration
3  should have been eliminated either by breaking,
4  curving or chamfering the edge in question at the
5  mouth of the" -- "of the sheath."
6        We've talked earlier this morning about
7  chamfer changes and the breaking or doing the
8  beading, or whatever, to change that, correct?
9    A    Yes.
10    Q    All right.  Do you think that there is a
11  method by which Bard can eliminate strain
12  concentrations completely with respect to the
13  chamfer?
14    A    Well, there's two ways.  One is that you
15  isolate the arms completely from the cap by holding
16  the arms in some way so that they can't move close
17  enough to the cap to contact it, and then you have
18  to be very careful about how you design -- how the
19  arm goes into whatever's holding it because you
20  have to avoid strain concentrations there as well.
21        And then you could do something such as
22  was done for the Denali, which is that you would
23  make it from a tube so that the contact between
24  what you would otherwise call a cap is -- is not a
25  feature of what can happen.  Although I should

Page 121

1  comment that even those situations generate strain
2  concentrations, but it may be very small.
3        So I suppose the simplest answer to your
4  question is that you can't reduce strain
5  concentrations to one in any sort of feature that
6  has a complicated shape.
7    Q    You cannot eliminate that prob- -- that
8  problem?
9    A    Yes, you can't eliminate strain
10  concentrations other than in the simplest --
11    Q    Okay.
12    A    -- of shapes.
13    Q    And you haven't tried to put together a
14  prototype chamfer that would do that --
15    A    No.  No.
16    Q    -- that is, eliminate strains?
17    A    No.
18    Q    Okay.  Foot fractures, let's talk about
19  that for a minute.  Dr. Richie recently testified
20  that he saw fewer foot fractures in the G2 filter.
21  Do you know if that's correct or not?
22    A    I don't know independently whether that's
23  correct or not.
24    Q    Do you know if there was any modification
25  to the G2 that -- from your engineering -- from an

31 (Pages 118 - 121)

Robert McMeeking , Ph.D.                          July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 122

1    engineering standpoint may have reduced fracture to
2    the feet?
3        A   You mean from the Recovery to the G2?
4        Q   Yes, sir.
5        A   The ankle was thickened, and that would
6    have reduced the nominal strains that were present
7    in the material and then what would fall from that
8    is the question of whether any gouge or other kind
9    of feature that would concentrate strains would
10   still elevate the strains to dangerous levels.
11       Q   Do you know how many foot fractures have
12   been reported with any of Bard's filters from the
13   G2 onto the Denali?
14       A   I haven't studied that.
15       Q   Okay. Do you have the opinion that a foot
16   fracture causes tilt, migration, perforation or
17   fracture?
18       A   I have the opinion that a foot fracture
19   would lead to tilt, and since it's my assessment
20   that tilt leads to perforation I think that would
21   then be a second consequence. And since it's my
22   opinion that a perforation can lead to fracture, I
23   think that that would be a follow-on consequence
24   of -- of a foot fracture.
25       Q   What if the -- what if the leg is

Page 123

1    perforating to the point that you've discussed
2    before, that is the filter's now all the way out to
3    its former -- or greatest extent that it could be
4    out, would you expect a foot fracture to contribute
5    to tilt or migration?
6        A   Well --
7            MR. O'CONNOR: Form. Foundation.
8            THE WITNESS: My assessment is the foot
9    fracture would have taken place while the foot was
10   still engaged with the vena cava wall, and,
11   therefore, when it was broken it would have had an
12   impact on the stability of the filter. But once
13   perforation has taken place and any tilt that's
14   associated with that, then the implications would
15   be less direct and probably not involved at all.
16   BY MS. DALY:
17       Q   So do you know if when a foot fractures if
18   the leg on which it was, that leg starts moving
19   freely within the vena cava? Do you know that?
20       A   You mean does it move by large amounts?
21       Q   Or does it move at all?
22           MR. O'CONNOR: Form.
23           THE WITNESS: I -- I don't know for any
24   certainty that that's the case.
25   BY MS. DALY:

Page 124

1        Q   And for -- for there to be additional
2    strains on a leg that is missing a foot, would
3    there need to be some movement in the leg?
4        A   Could you repeat the question.
5        Q   Yeah.
6            If you've got a leg that's now missing a
7    foot, is it your opinion that the leg has to be
8    moving in some way to have sufficient strain put on
9    it that it would later fracture?
10           MR. O'CONNOR: Form.
11           THE WITNESS: You mean would the vena cava
12   wall have to move the leg in some way? It's my --
13   my --
14   BY MS. DALY:
15       Q   Or the blood flow maybe. I don't know.
16       A   Say that again.
17       Q   Or blood flow.
18       A   Well, whatever -- whatever would cause the
19   deformation, there would have to be some sort of
20   distortion that would take place for a fatigue
21   fracture to follow because fatigue fracture is
22   generated by strain, strain changes.
23       Q   Have you identified any case that you've
24   worked on thus far that had a foot fracture that
25   you believe led to a later leg fracture?

Page 125

1        A   I haven't --
2            MR. O'CONNOR: Form.
3            THE WITNESS: -- studied that.
4    BY MS. DALY:
5        Q   In what percentage of foot fractures does
6    migration of the filter occur?
7        A   I don't know.
8            MR. O'CONNOR: Form.
9    BY MS. DALY:
10       Q   When Bard electropolished the Eclipse
11   filter, did that have any impact on improving the
12   resistance to foot fracture?
13           MR. O'CONNOR: Form.
14           THE WITNESS: I don't know for -- for
15   sure, but in principle it would have improved the
16   resistance to foot fracture.
17   BY MS. DALY:
18       Q   And how so?
19       A   Because it smooths the surface and makes
20   the initiation of fatigue cracks somewhat less
21   likely.
22       Q   And again, you don't know about the
23   numbers of events of foot fractures reported in
24   Eclipse, for example?
25       A   No. No.

32 (Pages 122 - 125)

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 126

1    Q   Okay.  What causes -- what causes failure
2  of legs in Bard filters?
3    A   Well, one possibility is the blood clots
4  repeatedly impact the filter, and even a single
5  blood clot, as the blood flows up and down -- not
6  down, but as the pulsatile flow of the blood moves
7  the clot around, that would push the clot against
8  the leg multiple times and so that could cause --
9  that would cause strain -- strain increments to
10 the -- to the material in the leg that could
11 ultimately cause it to fracture by fatigue.
12     There's another possibility, which is that
13 if the arms and the legs are endothelialized to the
14 wall of the vena cava and the vena cava is stiff
15 enough to resist axial motion of the points where
16 the arms and the legs are glued to the wall of the
17 vena cava, it can cause some additional strains on
18 the legs, and on the arms for that matter, because
19 of the constraint that makes it more difficult for
20 the filter to respond to the expansion and
21 contraction of -- of the vena cava.  So that's
22 another possibility for where leg fractures can
23 come from.
24    Q   So the first one that you talked about is
25 your water hammer --

Page 127

1    A   That's right.
2    Q   -- theory.
3    A   Well, it's not my water hammer theory --
4  well, first of all, it's not my theory.  But
5  secondly, it's not only my water hammer model but
6  it is -- it is a consequence of the actions of the
7  clots on the filter which in one interpretation can
8  be looked at in terms of water hammer.
9    Q   Okay.  We're going to talk about that in a
10 separate thing in a moment.
11     So the second thing you're talking about
12 that could lead to leg fracture is you've got
13 perforating legs; am I getting this right?
14    A   Perforated or unperforated, but they're
15 endothelialized to the wall of the vena cava.
16    Q   So they're not moving?
17    A   They're moving because the vena cava is
18 expanding and contracting, but otherwise their
19 relative motion is constrained.
20    Q   And, in addition, the vena cava is stiff
21 enough that on those constrained legs, let's talk
22 about legs for a minute, that there's a possibility
23 that could cause fracture?
24    A   Yeah.
25    Q   Do I have that right?

Page 128

1    A   Right.  And the stiffness --
2      MR. O'CONNOR:  Form.
3      THE WITNESS:  -- we're now talking about
4  is -- is more or less the axial stiffness of the
5  vena cava, not the stiffness in the circumferential
6  direction.
7  BY MS. DALY:
8    Q   And stiffness of a vena cava could be a
9  range of stiffness being patient-dependent, true?
10    A   Yes.
11      MR. O'CONNOR:  Form.
12  BY MS. DALY:
13    Q   And it could also be impacted by organs?
14    A   Yes.
15    Q   And the stiffness of those organs
16 contributing to vena cava stiffness could be
17 patient-specific?
18    A   Yes.
19    Q   Okay.
20    A   Can I add one amplification of my answer,
21 which is that let's say that an arm and a leg -- an
22 arm and a leg are perforated and they get inserted
23 into, say, the vertebrae and they get firmly
24 connected to the vertebrae and now the vena cava's
25 expanding and contracting, that could be a very

Page 129

1  severe stiffness constraint on whether the relative
2  motion of the arms and the legs can be accommodated
3  as the filter, if you like, tries to stretch.  So
4  that -- that's a possibility.
5    Q   Do you have any case that you can point to
6  that you have worked on where there was imaging
7  evidence of perforation, tilt or migration that
8  occurred before a leg fracture?
9    A   I haven't looked into that.
10      MR. O'CONNOR:  Belated objection to the
11 form of the question.
12  BY MS. DALY:
13    Q   Have you done any work to determine what
14 modifications Bard could have made to the legs
15 themselves to improve on those legs' contribution,
16 if any, to tilt, perforation, fracture or
17 migration?
18    A   No, I haven't looked into that.
19    Q   We've talked a little bit about the
20 anchors and limiters present on the Meridian.  Is
21 it your opinion that those are reasonable
22 modifications by Bard to -- to improve resistance
23 to migration, tilt and perforation?
24    A   It's a reasonable concept for how the tilt
25 and migration behavior can become -- can be

33 (Pages 126 - 129)

Robert McMeeking , Ph.D.                                July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 130

1    limited.
2        Q    Would -- do you have an opinion whether
3    those anchors or limiters on the Meridian would add
4    fracture resistance to that filter?
5        A    I have no opinion on that.
6        Q    Same questions with Denali, do you think
7    that the limiters that the Denali has will act to
8    improve resistance to migration, tilt, perforation
9    and fracture?
10        MR. O'CONNOR:  Form.
11        THE WITNESS:  It's -- it is reasonable to
12    expect that there will be some effect on -- on tilt
13    and migration and that those would have possible
14    knock-on consequences to perforation and fracture.
15    And so I'd like to revise my answer about the
16    Meridian in the same way, that the caudal anchors,
17    to the extent they limit tilt and migration, they
18    could have beneficial effects on perforation and
19    fracture.
20    BY MS. DALY:
21        Q    Okay.  What modifications to the G2 filter
22    assisted in resistance to cephalic migration?  Do
23    you have an opinion on that?
24        MR. O'CONNOR:  Form.
25        THE WITNESS:  I'm not aware of any changes

Page 131

1    that would have had an impact on cephalic
2    migration.
3    BY MS. DALY:
4        Q    Are you aware that the incidents of
5    cephalic migration of G2 and later Bard filters
6    has -- has improved greatly?
7        A    I'm not aware of that.
8        Q    What about the change to the G2 filter
9    contributed to caudal migration, if you have an
10    opinion?
11        MR. O'CONNOR:  Form.
12        THE WITNESS:  Sorry, can you repeat the
13    question.
14    BY MS. DALY:
15        Q    Yeah.
16        Do you have an opinion about whether any
17    design modification that Bard made to the G2 filter
18    resulted in caudal migration?
19        A    You mean going from the Recovery to the G2
20    filter --
21        Q    Yeah.
22        A    -- whether that improved caudal migration?
23        Q    No, whether it caused it.
24        A    Whether it contributed to it.
25        Q    Yes.

Page 132

1        A    I have no opinion on that because I have
2    not studied it.
3        Q    Okay.  Have you studied what the mechanism
4    is anatomically to create caudal migration in any
5    Bard filter?
6        A    I've not studied that independently.
7        Q    Okay.
8        A    I've only --
9        Q    What does that mean?
10        A    What does it mean.  I've looked at the
11    Bard report of their bench test --
12        Q    Okay.
13        A    -- and -- which is suggestive of a
14    mechanism that can drive caudal migration.
15        Q    Okay.
16        A    Because it's -- because it's associated
17    with tilt.
18        Q    Okay.  And have you done any work to
19    determine how Bard might have modified its filters
20    to reduce tilt that you associate with caudal
21    migration, with contributing to caudal migration?
22        MR. O'CONNOR:  Form.
23        THE WITNESS:  Well, the only observation I
24    have is that the effective caudal anchors would
25    have had a beneficial effect, but otherwise I've

Page 133

1    done no thinking or studying of that.
2    BY MS. DALY:
3        Q    All right.  If you look at your report,
4    page 13, it's the G2 Express filter.
5        A    Yes.
6        Q    We've talked about the cap change I think
7    exhaustively.
8        A    Yes.
9        Q    And did you have any other observation of
10    the G2 Express as -- as having characteristics that
11    that particular filter had that contributed to any
12    of these complications different from Recovery and
13    G2?
14        A    Well, the cap -- sorry, the hook on the
15    cap, because it would have touched -- during tilt
16    it would have been touched, under certain
17    assumptions about how the filth occurs, it would
18    have touched the wall of the vena cava first as
19    opposed to other points on the cap, and that would
20    have had some effect on what happens in terms of
21    perforation and tilting of the -- of the filter.
22        And it's my assumption that the big hook
23    would have taken -- would have been -- would have
24    taken longer to perforate through the wall of the
25    vena cava than the cap that, although that's just

34 (Pages 130 - 133)

Robert McMeeking , Ph.D.                           July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 134

1    an assumption, it's not a -- it's not anything
2    definitive.
3        Q    And if the hook took longer to perforate,
4    how would that impact any of these complication
5    events?
6        A    Well, to the extent the tilt contributes
7    to fracture, it would have helped to reduce the
8    tendency for fracture to occur.
9        Q    Okay.
10       A    But I don't think that would have been a
11   big effect, but that -- that's a possibility.
12       Q    Do you understand from your reading or
13   looking at any design drawings that inclusion
14   of the hook on the G2X was at the recommendation of
15   user doctors who felt it was a -- an improvement to
16   methods for retrieval?
17           MR. O'CONNOR:  Form and foundation.
18           THE WITNESS:  I've seen comments in
19   various documents that say it has improved
20   retrievability.
21   BY MS. DALY:
22       Q    You don't hold an opinion on it?
23       A    I have no opinion on it.
24       Q    We've talked about the Eclipse and
25   electropolishing.  And if you look at page 15 of

Page 135

1    your report, full paragraph 1.
2            MR. O'CONNOR:  What page?
3            MS. DALY:  15.
4        Q    In the first about five or six lines
5    you're talking about that change, and then you say
6    "I would expect a marginal improvement in terms of
7    incidents of fatigue fractures in the Eclipse
8    model."
9        A    Yes.
10       Q    And what do you mean by "a marginal
11   improvement"?
12       A    Well, I mean a small improvement.  I'm
13   not -- I -- I don't want to specify a specific
14   number, but there would have been a small number of
15   filters that would not have failed because of the
16   electropolishing.  So I'm not being very clear on
17   this.
18           So if you take a certain number of filters
19   that are going to fail without electropolishing,
20   the number of filters that would fail with
21   electropolishing would not be that much different
22   as -- yeah, not much -- not that much different.
23       Q    Okay.  And with respect to filters that
24   fail due to surface -- non-electropolish surface
25   conditions, do you have any opinion about the

Page 136

1    degree to which that issue contributed to any
2    fractures in Recovery or G2?
3        A    No, I have no opinion about that.
4        Q    Okay.  Would you leave that to Dr. Richie
5    to discuss?
6        A    Yes, I would.
7        Q    All right.
8        A    Although can I make one further comment?
9        Q    Of course.
10       A    That she gave me a shape of a gouge, I
11   could then estimate the strain concentration, but
12   other than that I would not look at that question.
13       Q    Do you know whether surface conditions
14   were of particular great moment to contribution for
15   fractures in G2s or Recoveries?
16       A    I don't know --
17           MR. O'CONNOR:  Form.
18           THE WITNESS:  -- I just leave that to
19   Dr. Richie.
20   BY MS. DALY:
21       Q    Okay.  Did the electropolishing of the
22   Eclipse have any other positive impact on
23   resistance to any other complication?  We've talked
24   about feet, but what about electropolishing
25   contributing to resistance to perforation,

Page 137

1    migration or tilt?
2        A    Other than reducing the number of
3    fractures to whatever extent that occurs, I
4    don't -- I can't think of any consequence that the
5    electropolishing would have had.  It might have had
6    some consequence to epithelialization, but other
7    than that I don't see any direct consequence.
8        Q    Okay.  And I guess what you're saying,
9    too, is if -- if your hypothesis is correct that
10   fracture equals tilt or other things, if it didn't
11   fracture because electropolishing kept it from
12   fracturing, it would also help it not tilt or
13   perforate?
14       A    Yeah, I'm -- yes.  For example --
15           MR. O'CONNOR:  Form.
16           THE WITNESS:  -- if a fracture was --
17   would have otherwise contributed to tilt and
18   perforation, then that consequence would have been
19   eliminated to some extent.
20   BY MS. DALY:
21       Q    Okay.  Meridian, you talk about that at
22   page 16 of your report at the bottom.  And you note
23   that the Meridian has three anchors added to the
24   arms at the wrists and three anchors added at the
25   arms at the elbows, correct?

35 (Pages 134 - 137)

Robert McMeeking , Ph.D.                                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 138

1    A   I -- yes, that's correct.
2    Q   And do you know what the purpose of those
3    two different placements of anchors was?
4    A   I don't know definitively, but I've --
5    I've made a -- I feel like a guess as to why that
6    was done.
7    Q   And what do you think was the reason?
8    A   I think it was -- let me -- let me look at
9    what I say.  Yeah, it would deal with vena cava
10   diameters of different size with, and I'm making
11   the guess, that the ones at the wrist will help to
12   inhibit caudal migration and larger-diameter vena
13   cavas and the ones at the elbow will help to
14   inhibit caudal migration in smaller-diameter
15   vessels.
16   Q   All right.  If you look at page 17, it's
17   first and second full paragraphs, you're talking
18   about Meridian bench testing.
19   A   Yes.
20   Q   Okay.  And you talk about -- you say Bard
21   used a more aggressive protocol for certain tests
22   on Meridian that it did not use I guess on earlier
23   filters?  Is that what your point is.
24   A   That's my point, yeah, that -- yes.
25   Q   But then you're still critical of the

Page 139

1    Meridian testing.  Can you explain that to me?
2    A   Well, the Meridian testing was not done in
3    what would be identifiable as worst-case
4    conditions, so perforation was not accounted for in
5    the fatigue tests.  There may -- well, I don't
6    recall whether tilt was allowed for in the fatigue
7    tests, but combinations of -- of tilt and
8    perforation were not allowed for, so aspects like
9    that were deficiencies in the approach to the
10   testing.
11   Q   So your criticism is that you don't
12   believe they did it to worst case?
13   A   That's correct.
14   Q   All right.
15   A   And -- but in addition, they didn't design
16   the test to identify failure conditions, and,
17   therefore, they -- they did not have a basis on
18   which to determine whether the test was realistic
19   in truly assessing the failure and the mechanisms
20   of failure which were possibly present in the
21   filter.
22   Q   So you're critical, for example, that the
23   testing didn't simulate perforation?  Is that what
24   you're saying, by way of an example?
25   A   Yeah, that's one example of what I'm

Page 140

1    talking about.
2    Q   Okay.  What's another example?
3    A   That it didn't account for combinations of
4    tilt and perforation.  It didn't account for the
5    effect of endothelialization.
6    Q   Okay.  Do you know if any other IVC filter
7    manufacturer tests with those combined types of
8    issues?
9    A   I'm not allowed to comment.
10   Q   Okay.  So you're not going to rely on what
11   some other company is doing to say Bard could have
12   done this?
13   A   No.
14   Q   And you have not developed test protocols
15   to try out, to see if one can successfully test for
16   perforation with a tilt and what happens for
17   strains or any other combination?
18       MR. O'CONNOR:  Form.
19   BY MS. DALY:
20   Q   True?
21   A   That's correct.
22   Q   On page 19, paragraph 2, it's -- I wanted
23   to ask you about five lines from the bottom -- six,
24   actually.  You're talking about "I note that no
25   changes were made to the Meridian design that would

Page 141

1    improve cephalic migration resistance."
2       Do you see that?
3    A   Yes, I see that.
4    Q   Is that because your understanding is
5    those anchors will only prevent caudal migration?
6    A   Yes, that's right.
7    Q   Okay.  Have you seen any tests about
8    Meridians having -- being tested for cephalic
9    migration?
10   A   I don't recall seeing any tests like that.
11   Q   Do you know of any incidents reported
12   where Meridian filter has migrated cephalically?
13   A   I -- I don't recall.
14   Q   And you of course have not tested the
15   Meridian in any way?
16   A   No, not at all.
17   Q   Let's look at your supplemental report of
18   April 17 (sic), '17.  It's Exhibit 3, page 2.
19   A   Exhibit 3?  Thank you.
20   Q   Yes.
21   A   Which page?
22   Q   On page 2 of your report.
23   A   Okay.
24   Q   And I think I wanted to ask you --
25       MR. O'CONNOR:  Hold on one second.  Let me

36 (Pages 138 - 141)

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 142

1    find it.
2        Go ahead and start. I'll find it.
3    BY MS. DALY:
4        Q   You're -- you're talking about an FEA by
5    Harrison at the top of that page.
6        A   Yes.
7        Q   To obtain conservative results for the
8    magnitudes of alternating strains.
9            What is your criticism there on that
10   testing relative -- I mean that FEA relative to the
11   Meridian? The same things we're talking about with
12   respect to the testing that we just talked about or
13   something different?
14       A   Okay. So when I say he's imposed a rigid
15   constraint, this is the question of rotation of the
16   arm relative to the wall of the vena cava as the
17   expansion and contraction of the vena cava takes
18   place, which would effectively double the level of
19   strain generated by that motion.
20       Q   And you have not done an FEA to see if in
21   fact that would double the strains as well, right?
22       MR. O'CONNOR: Object to the form.
23       THE WITNESS: Well, I've not done a finite
24   element analysis, but that's not necessary to do
25   because the Euler-Bernoulli bead analysis provides

Page 143

1    you with that result.
2    BY MS. DALY:
3        Q   And then you have, of course, not done any
4    bench testing on the Meridian to see how it would
5    really hold up in actual testing?
6        A   No, I've done no bench testing.
7        MR. O'CONNOR: Belated objection to the
8    form of the question.
9    BY MS. DALY:
10       Q   So to that point, you're -- you're
11   making -- you're just critical that the same
12   erroneous, according to you erroneous, variables
13   were used?
14       A   Assumptions.
15       Q   Assumptions --
16       A   Yes.
17       Q   -- were used?
18       A   Correct.
19       Q   But we've already talked about those?
20       A   Yes, we have.
21       Q   Yes.
22       A   But I note further down the paragraph,
23   there's other comments, which is that the Harrison
24   calculation took no account of perforation
25   endothelialization of the filter arm to the wall of

Page 144

1    the vena cava, not of tilt.
2        Q   And we talked about that?
3        A   We talked about that.
4        Q   Okay. So going back to your main report
5    again, I'm on page 18, paragraph 2, that first line
6    you say that "In one of the caudal migration tests,
7    the bar was set very low by Bard as to what was
8    required of Meridian."
9            What do you mean by that?
10       A   Can you tell me which paragraph we're in?
11       Q   Yeah. It's the second full paragraph, the
12   first sentence, on page 18.
13       A   Well, I mean that it -- the -- the test
14   was simply to compare the caudal migration of the
15   Meridian with the caudal migration behavior of the
16   Eclipse.
17       Q   Okay.
18       A   And since the caudal anchors would have an
19   effect on the tendency for caudal migration to take
20   place in the Meridian, it was almost certain that
21   the Meridian would have better performance than the
22   Eclipse.
23       Q   Sure. So why was that setting the bar
24   low? I guess I'm not following you.
25       A   Well, it was simply comparison between a

Page 145

1    filter that should have had better performance with
2    one that -- that -- that did not have that level of
3    performance, as opposed to a test in which there
4    was an objective criterion for what -- for what was
5    adequate resistance to caudal migration.
6        Q   Okay. So you don't know what those values
7    are, in other words, you don't know what the
8    Meridian's caudal migration resistance is by load
9    or anything, right?
10       A   Well, other than the results from that
11   bench test, no.
12       Q   Okay.
13       A   I don't know.
14       Q   And you haven't tried to do that yourself?
15       A   No, I have not.
16       Q   So it may be fantastic?
17       MR. O'CONNOR: Form and foundation.
18       THE WITNESS: I won't comment.
19   BY MS. DALY:
20       Q   You just don't know?
21       A   I don't know.
22       Q   All right. In your -- back to your
23   4-7-17, Exhibit 3 report, still on Meridian but on
24   page 6, you cite to two papers, Nissan/Romano and
25   Wu, W-u.

37 (Pages 142 - 145)

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 146**

1      A    Correct.
2      Q    In the Nissan/Romano paper, they detected
3   two arm fractures in a single Meridian, correct?
4      A    That's correct.
5      Q    And then in the Wu paper, they detected an
6   arm fracture one year after implant in the
7   Meridian; is that right?
8      A    That's correct.
9      Q    And you note that there has been no
10  examination, apparently, of either the filter from
11  which the fracture happened or the fractured piece
12  in either of those Meridians to tell us what type
13  of fracture that was; is that fair?
14     A    Yeah, I --
15         MR. O'CONNOR:  Form.
16         THE WITNESS: -- don't know examination.
17  BY MS. DALY:
18     Q    Okay.  And you quote to those events for
19  what purpose?
20     A    Just to identify the fact that -- that
21  Meridian filters can fracture in vivo.
22     Q    Does -- does two reports of Meridian, or
23  even more than two reports, support that it's prone
24  to fracture?
25     A    I think it does with the definition that

**Page 147**

1   "prone" means it can happen.
2      Q    Okay.  So that's your definition, it can
3   happen?
4      A    Yes.
5      Q    "Prone" means can happen, not is likely to
6   happen?
7         MR. O'CONNOR:  Form.
8         THE WITNESS:  It -- I -- I would just
9   repeat my definition, that prone to fracture means
10  it can happen.
11  BY MS. DALY:
12     Q    Can happen.  Is it more likely than not to
13  happen in a Meridian?
14     A    I don't know whether that's the case.
15     Q    Have you ever used the term prone to
16  fracture, tilt, perforate or migrate relative to a
17  Bard filter where your def- --- where your
18  definition was something other than can happen?
19     A    I don't believe so.
20     Q    All right.  On to Denali, and back, I'm
21  sorry, to your March report, Exhibit 2, page 20.
22  On page 20 you give sort of an overview of the
23  changes to the Denali filter?
24     A    Yes.
25     Q    Okay.  And it's -- there are a lot of

**Page 148**

1   differences in the -- from the previous iterations,
2   true?
3      A    Yes.
4      Q    All right.  And you are still highly
5   critical of the Denali filter why?
6      A    Because it -- it wasn't changed -- well,
7   although there's lots of differences, it wasn't
8   changed that much from the basic shape of the
9   Meridian filter, and, therefore, its basic behavior
10  in the same circumstances as the Meridian filter
11  would have been quite similar.
12     Q    It has a different cap?
13     A    Yes.
14     Q    It does not have the -- the chamfer
15  contact possibility that previous ones did, true?
16     A    I agree that there are some changes that
17  eliminate some aspects of the expected behavior,
18  but what I'm saying is that many of the -- of the
19  features of the behavior would have been left
20  unchanged because of the basic similarity in shape
21  of the Denali filter to the Meridian filter.
22     Q    To what extent can the Denali perforate?
23     A    I -- you mean what is the rate of
24  perforation?
25     Q    Yeah.

**Page 149**

1      A    I don't have any information on that.
2      Q    What about its ability to migrate either
3   cephalad or caudal, do you have any information on
4   that?
5      A    I have no direct information on that.
6      Q    So your criticism is that there are
7   aspects of the Denali that in your opinion will
8   allow it -- make it that it can tilt, perforate,
9   fracture or migrate?
10     A    Yes.  And I -- I -- I should comment that
11  there is some description of -- of events for the
12  Denali in the supplementary report.
13     Q    Right.  Right.  And I'm going to --
14     A    I don't mean to ignore --
15     Q    -- get to those.
16     A    -- that.
17     Q    Yeah, I'm going to get to those.
18         Okay.  Do you know of modifications to the
19  Bard filters, any of them, that would have made
20  them unable to fracture, tilt, perforate or
21  migrate?
22         MR. O'CONNOR:  Object to the form of the
23  question.
24         May I hear the question back again.
25         THE WITNESS:  Could you repeat the

38 (Pages 146 - 149)

Robert McMeeking , Ph.D.                              July 6, 2017
In Re: Bard IVC Filters Products Liability

| Page 150 | Page 152 |
|---|---|
| 1 question. | 1 Q Yeah. |
| 2 MS. DALY: Can you read that one. | 2 A I'm still at Table 2. |
| 3 (Record read as follows: | 3 Q Okay. |
| 4 "Do you know of modifications to | 4 A Table 4. |
| 5 the Bard filters, any of them, | 5 Q Okay. The data from that study showed |
| 6 that would have made them unable | 6 zero fractures in the Denali? |
| 7 to fracture, tilt, perforate or | 7 A I -- yes. |
| 8 migrate?") | 8 Q Zero migrations? |
| 9 THE WITNESS: I haven't studied that. | 9 A Yes. Zero migrations greater than 2 |
| 10 BY MS. DALY: | 10 centimeters. |
| 11 Q So you -- you do not have an opinion that | 11 Q Yes. Zero tilts greater than 15 degrees |
| 12 there was a method by which Bard could eliminate | 12 or -- |
| 13 tilt, fracture, perforation or migration in any one | 13 A Yes, zero tilt greater than 15 degrees. |
| 14 of its iterations from Recovery to Denali? | 14 Q Three penetrations at implant? |
| 15 MR. O'CONNOR: Form and foundation. | 15 A Yes. |
| 16 THE WITNESS: You mean simultaneously | 16 Q And two penetrations at retrieval? |
| 17 eliminate all of those negatives? | 17 A Well, 3 out of 200 at placement, 2 out of |
| 18 MR. O'CONNOR: Form. | 18 121 at retrieval. |
| 19 BY MS. DALY: | 19 Q Okay. I read that right? |
| 20 Q Or one by -- or any of them, either all of | 20 A Yes. |
| 21 them or, yes, you could -- you could have | 21 Q Yes. Okay. |
| 22 eliminated completely this, this or this. | 22 Then in your Denali-specific report, which |
| 23 A Well, I -- I think it's possible to | 23 is the April report, back to Exhibit 3 -- |
| 24 eliminate one of the phenomena by itself but -- | 24 A Okay. |
| 25 Q What's that? | 25 Q -- page 7 at Section 2.2. Yeah, top of |

| Page 151 | Page 153 |
|---|---|
| 1 A Possibly perforation. | 1 the page, 2.2. |
| 2 Q And how would you do that? | 2 A Yes. |
| 3 A Make a big penetration limiter. | 3 Q You report on a case report by Dr. Kuo of |
| 4 Q Okay. And you had not done a prototype of | 4 a Denali fracture, correct? |
| 5 that, correct? | 5 A In the Kuo and Robertson paper. Is that |
| 6 A No, I have not. | 6 what you're -- |
| 7 Q You have not determined what other | 7 Q Yes. |
| 8 unintended consequences it might have to the design | 8 A Yes. |
| 9 or benefits of the filter? | 9 Q And then there's a paper by |
| 10 A No, I haven't studied that. | 10 Sathyanarayana -- I will spell that later -- of one |
| 11 Q All right. With respect to Denali, we | 11 Denali fracture, correct? |
| 12 talked earlier today about Dr. Stavropoulous's | 12 A Can you remind me how far down that one |
| 13 study, the final -- he did the clinical trial? | 13 is. |
| 14 A Yes. Correct. | 14 Q Yeah, he's -- |
| 15 Q Okay. And if you would look at that | 15 A We're on page 7? |
| 16 again. I forget what we've numbered that. | 16 Q Yeah. Where is Sathyanar- -- |
| 17 A Oh, do I still have it? Yes, I do. | 17 MR. O'CONNOR: What report are we looking |
| 18 Q Is it there? | 18 at again? |
| 19 A Yes. No. 12. | 19 MS. DALY: The April one. |
| 20 Q Okay. 12. If you look at Table 4 on page | 20 THE WITNESS: Supplementary report, April |
| 21 7 of that. Just count in 7, I'm not sure it's | 21 7. |
| 22 actually 7. Table 4. | 22 BY MS. DALY: |
| 23 A Yes. | 23 Q He is citation 12. |
| 24 Q Okay. That study -- | 24 A Oh, it's almost -- it's two-thirds of the |
| 25 A Sorry, Table 4. | 25 way down the paragraph. |

39 (Pages 150 - 153)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 154**

1    Q   Oh, I see it.
2    A   Yeah.
3    Q   Yep.
4    A   Yes.
5    Q   Okay.  So you cited to that page -- that
6    paper that detected an arm fracture in a Denali 13
7    months after implant?
8    A   Correct.
9    Q   And then you cited to Majdalanay on two
10   other Denali fractures?
11   A   Correct.
12   Q   And he was reporting on some fractures
13   that he had found in the raw database?
14   A   That's correct.
15   Q   First of all, you don't know whether the
16   paper that he's counting the stuff from Majdalanay,
17   whether that included the previous reports of
18   Denali fracture from Kuo and Sathyanarayana?
19   A   No, I don't know.
20   Q   Okay.  Now, the Kuo and Sathyanarayana
21   reports do not state whether the filter was tilted,
22   perforated or migrated before fracture, do they?
23   A   I don't exactly recall, but I didn't write
24   it down so I -- I'm assuming that's the case.
25   Q   Okay.

**Page 155**

1    A   I would have written it down if I observed
2    that in the papers.
3    Q   And the Majdalanay reported that both
4    patients he saw with a filter -- a Denali fracture
5    had center filters and there was no comment about
6    perforation or migration.  Let me show you that.
7        We'll mark that as -- and I'm happy to
8    show you the other ones, too, if you'd like.  This
9    is 16, Majdalanay.
10       (Whereupon, Deposition Exhibit 16 was
11       marked for identification by the Court
12       Reporter.)
13   THE WITNESS:  You've given me two copies
14   of something.
15   BY MS. DALY:
16   Q   Okay.  Give me that back.
17       Am I right, that --
18   A   Oh.
19   Q   -- he reports that they were centered?
20   A   Well, the wording I find -- the centering
21   wording may be elsewhere, but it's -- the wording I
22   found, this is the Madja- -- Majdalanay paper --
23   Q   Uh-huh.
24   A   -- it says "No filter tilt or angulation
25   of the IVC was present relative to the Denali IVC

**Page 156**

1    filter at implantation."  I don't know if it's a
2    comment about it later on as well.
3    Q   Yeah --
4    A   And --
5    Q   -- I didn't see anything about him
6    noticing --
7    A   Yeah.
8    Q   -- any other complication in connection
9    with that fracture.
10   A   Right.  Right.
11   Q   Okay.
12   A   But I would comment that what that
13   statement must mean is that if there was any tilt,
14   it was very small.
15   Q   Okay.  And the reason that you cited to
16   these papers in your Denali section was to note
17   that Denali can fracture?
18   A   Yes, that's correct.
19   Q   Okay.  Let's talk about your water hammer
20   effect --
21   A   Okay.
22   Q   -- issue for a moment.  And that relates
23   to potential leg fractures, as I understand it,
24   with clot hitting them?
25   A   That's correct.

**Page 157**

1    Q   All right.  And I think you talk about
2    this at page 9 of your other report, your big
3    report.
4    A   Page 9?
5    Q   Of the main report.  Yeah.
6    A   Oh, you mean in the summary.  I see.
7    Q   Yeah, in the March report.  I think it's
8    at page 9.  We're going way backwards.
9        MR. O'CONNOR:  Which report?
10       MS. DALY:  His original March 17 report,
11   at -- in paragraph 4 on page 9.
12       THE WITNESS:  Correct.
13   BY MS. DALY:
14   Q   Okay.  Now, what analysis have you done to
15   quantify -- well, to ascertain that this water
16   hammer effect, as you describe it, occurs?
17   A   Well, can I make one comment, first of
18   all, which is that I interpret this water hammer
19   effect to encompass the arrival of a blood clot
20   that simply pushes the filter because of its
21   arrival.  In other words, there's something driving
22   the blood clot, there's -- the clot arrives at the
23   filter and it has to push the legs to make room for
24   itself as it inserts itself into the filter.
25   Q   But it doesn't keep coming down and

40 (Pages 154 - 157)

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 158

1 hammering, does it?
2     A   Well, no, it may not -- hammering may not
3 be the right wording to use in terms of implied
4 severity, but it is possible, because of the
5 pulsatile flow, for that blood clot to continue to
6 push multiple times on -- on the clot -- sorry, on
7 the filter.
8         Now, there's -- there's another model that
9 I discuss which is perhaps more clearly the water
10 hammer effect, which is what you get in pipes in
11 houses when you hear banging in the -- in the
12 pipes, where you shut a faucet off and the motion
13 of the water is arrested very suddenly and that
14 generates a very high pressure that impinges on the
15 valve that you've just closed.  And that is another
16 aspect of the situation that I'm including in my
17 broad meaning of the water hammer effect.
18     Q   And to analyze this what we've called
19 water hammer effect, that's really a dynamic
20 condition?
21     A   Yes, it is.
22     Q   Okay.
23     A   Yes.
24     Q   Did you do an analysis with a dynamic
25 analysis of that potential condition?

Page 159

1         MR. O'CONNOR:  Form.
2         THE WITNESS:  Well, that's what my water
3 hammer analysis is, that it's based on fluid moving
4 in a -- in a what I will call a vena cava.
5 BY MS. DALY:
6     Q   Okay.
7     A   It's a -- it's a tube.  And you suddenly
8 stop the motion of that water, and balance of
9 momentum tells you how high the pressure goes as a
10 consequence.
11     Q   So do you -- do you -- do you assume the
12 size of the clot that's necessary to have this
13 effect?
14     A   It -- it would have to occlude the filter.
15     Q   Okay.  It would have to occlude?
16     A   Yes.
17     Q   All right.  And then what you've got,
18 going back to your -- your plumbing example, you
19 got so much of a hair clot in your plumbing that
20 you have really no water coming past?
21     A   That's correct.
22         MR. O'CONNOR:  Form.
23         THE WITNESS:  Yes.
24 BY MS. DALY:
25     Q   All right.  And so have you seen any cases

Page 160

1 in this litigation where the patient had an
2 occlusion?
3     A   I'm not aware of that.
4     Q   Okay.  And do you know how often an
5 occluded Bard IVC filter occurs?
6     A   I don't know.
7     Q   Okay.  All right.  Would -- would the
8 water hammer effect, if it occurs, lead to fracture
9 in your view or one of the other complications?
10     A   Well, it's going to contribute to
11 fracture, although it may dislodge the filter and,
12 therefore, cause it to migrate, or it could distort
13 the filter so much that it either is able to tilt
14 or it may not even function well as a clot traffic
15 device.  So although I -- so there are other
16 possible consequences to the effect of the water
17 hammer event.
18     Q   Let's talk about tilt for a minute.
19     A   Yes.
20     Q   If you go back to your March report, it's
21 in your big report, at page 10, the first thing you
22 talk about there is very top of the page, paragraph
23 5.
24     A   Yes.
25     Q   "The filter is unstable after

Page 161

1 implementation in the vena cava, and it is very
2 likely that it will always tilt."
3     A   Correct.
4     Q   To which Bard filters does this opinion
5 apply?
6     A   Well, it applies specifically to the -- I
7 think it's the G2 that I did -- no, can I revise
8 that answer?
9     Q   Yeah.  Of course.
10     A   It applies to all of them.
11     Q   Okay.  Even the ones with anchors, like
12 Meridian and Denali?
13     A   Yes.
14     Q   How much tilt are you talking about when
15 you say they will always tilt?
16     A   A small amount.  Measured by 1 or 2 or 3
17 degrees.
18     Q   Okay.  Do you know if there's any clinical
19 significance to a 1 to 3 percent -- 1 to 3 degree
20 tilt of an IVC filter?
21         MR. O'CONNOR:  Form.
22         THE WITNESS:  I'm not aware of any
23 clinical significance.
24 BY MS. DALY:
25     Q   Okay.  Have you done any analysis to

41 (Pages 158 - 161)

Robert McMeeking , Ph.D.                                         July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 162

1  determine what a tilt in the amount of 1 to 3
2  degrees might do to contribute to strains or
3  loading on the filter?
4      A   Yes.  I -- I used an estimate based on the
5  angle of tilt to calculate what tilt can do to the
6  level of strains involved, and it's proportional --
7  not directly proportional but the bigger the tilt,
8  the bigger the effect.
9      Q   And which effect is the tilt going to --
10  what is the tilt going to effectuate, first of all?
11     A   It's going to -- it's going to raise what
12  are called the alternating strains that contribute
13  to fracture.
14     Q   How about perforation, does it -- how does
15  it relate to that?
16     A   I -- it's my assessment that a small
17  amount of tilt will set off an asymmetric response
18  of the -- of the filter and can lead to tilt
19  occurring, because -- because the --
20     Q   Tilt or --
21     A   Sorry, what was the question?
22     Q   More tilt?
23     A   Sorry, what was the question?  Oh, sorry,
24  yeah, I misstated my answer.
25     Q   Yeah.

Page 163

1      A   Sorry.  So it is my assessment, from the
2  mechanics, that a small amount of tilt will
3  generate an asymmetric loading in the sense that
4  one of the arms will apply a bigger force to the
5  wall of the vena cava than other ones, which will
6  generate more tendency for it to perforate the vena
7  cava wall, and then that can ultimately contribute
8  to tilting occurring.
9      Q   And what -- what low amount of tilt have
10  you analyzed in reaching your conclusion that a low
11  degree of tilt will set that in process?
12     A   I haven't analyzed any level of tilt in
13  that sense.
14     Q   Okay.
15     A   I've simply used the deduction that the
16  loads on the legs will not be the same and,
17  therefore, one of them is going to -- it's likely
18  that one of them will -- the one that's more
19  heavily loaded will perforate the wall of the vena
20  cava more rapidly than the one that's lightly
21  loaded.
22     Q   But to model that, a 5 degree tilt to the
23  left will add X amount of strain to struts on the
24  left or the right, you have not done that?
25     MR. O'CONNOR:  Form.

Page 164

1      THE WITNESS:  Well, I think there's --
2  could you repeat the question.
3  BY MS. DALY:
4      Q   Yeah.
5      So what I'm trying to figure out is have
6  you done an analysis that looks at "I'm going to
7  start at 5 degrees of tilt," let's just say, "and
8  I've analyzed it, I've done modeling that tells me
9  that 5 percent" -- "5 degrees of tilt to the left,
10  you will see strains in X, Y, Z places in the
11  filter of" --
12     A   So --
13     Q   -- "a certain amount"?
14     A   -- you're asking me about the strains that
15  contribute to fatigue.
16     Q   Sure.
17     A   Okay.  So I did a calculation and I recall
18  that the angle of tilt I assumed was 45 degrees, so
19  that's the only direct calculation that I've done.
20  But the formula involved can be used to compute the
21  strains that would be associated with any level of
22  tilt, including much smaller values.
23     Q   To bring about fatigue?
24     A   To bring about fatigue.
25     Q   So then let's back up and I'm going to ask

Page 165

1  you the question.  Have you done the same kind of
2  meddling -- modeling, not meddling -- modeling, to
3  look at any certain degrees of tilt and be able to
4  tell us what force that puts on struts that would
5  contribute to perforation, for example?
6      MR. O'CONNOR:  Object to the form.
7      THE WITNESS:  I haven't done any numerical
8  calculations regarding that.
9  BY MS. DALY:
10     Q   You've basically done a deduction, you
11  deduced that?
12     A   Exactly.
13     Q   All right.
14     A   Although I should comment that Dr. Briant
15  does a calculation in which he looks at the loads
16  applied by the feet -- filters that have tilted and
17  finds that in the tilted filter the loads applied
18  by the -- one of the -- at least one of the limbs
19  of the tilted filter is higher than the loads
20  applied in the case of the untilted filter.
21     Q   But how that then contributes to
22  occurrence of perforation or progressive of
23  perforation, you haven't looked at that?
24     A   I haven't looked --
25     MR. O'CONNOR:  Form.

42 (Pages 162 - 165)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 166

1    THE WITNESS: -- directly at it, but it's
2  my assessment the higher the loads, the more likely
3  perforation is to occur and the more rapidly it is
4  likely to occur.
5  BY MS. DALY:
6    Q   And I have to ask this question for my
7  record, that you've developed no test to bench test
8  that deduction or hypothesis, that certain degrees
9  of tilt will cause perforation in certain places to
10  certain degrees, right?
11    MR. O'CONNOR: Form.
12    THE WITNESS: I've -- I've developed no
13  test to test that hypothesis or that theory. I
14  would -- I only point to the prevalence of the
15  behavior in regard to other implants and other
16  tissues that is a common observation.
17  BY MS. DALY:
18    Q   All right. Let's look at your March
19  report, page 13, the paragraph just above the 4.2
20  section.
21    A   Yes.
22    Q   And it says "A conclusion that can be
23  drawn from the above," we'll get there in a minute,
24  "is that the likelihood of fracture due to fatigue
25  in the Bard G2 filter is patient-dependent and can

Page 167

1  be influenced by the details of how a normal
2  successful implantation occurred with some patients
3  having an experience in which their G2 filter
4  offers no danger of fracture while other patients
5  are not so fortunate."
6    Would you explain to me what -- what you
7  mean.
8    A   Well, what I mean is that even -- that
9  even if a filter is implanted in a successful
10  manner, and that's something that I would leave to
11  medical experts to -- to define, but what I'm
12  saying is that the implantation itself does not
13  directly cause any complications, that there are
14  features of the behavior, features of the -- of the
15  results, that can occur because of differences
16  among patients just because of their different
17  physiology, which is a range of -- of -- of
18  features that we've discussed already --
19    Q   Okay.
20    A   -- that is -- is normally come across in
21  populations of patients, and that some of those
22  physiologies, some of -- in some cases it will lead
23  to negative consequences and other cases it -- it
24  can lead to situations which are quite benign.
25    Q   And that's what we've seen in looking at

Page 168

1  the cases that you've seen in this litigation and
2  medical literature and other things, that there's a
3  range?
4    A   That's correct.
5    MR. O'CONNOR: Form.
6  BY MS. DALY:
7    Q   Okay. So have you done any analysis to
8  determine what percentage of people with Bard
9  filters have conditions that meet your assumptions?
10    A   Oh, is that the question?
11    Q   Yeah. Is it 1 percent? 99 percent?
12    A   I have done no such study.
13    Q   Okay. So you don't know?
14    A   I don't know.
15    Q   And have you found in the cases you've
16  looked at and the work you've done whether there's
17  any predictability of failures in any particular
18  type of person, type of situation?
19    A   Well, I'm always looking at worst-case
20  conditions, and so the question of predictability
21  is really not the point to be made but, rather,
22  that having identified worst-case conditions, that
23  will those worst-case conditions, are they -- are
24  they probable in terms of causing failures of the
25  filter. And, therefore, I've not looked at how

Page 169

1  quickly are the rates at which these negative
2  consequences will occur.
3    Q   And have you -- have you looked to
4  determine or have you found from medical experts or
5  literature that there are in fact persons who --
6  with Bard filters who fall in the worst-case
7  scenario?
8    MR. O'CONNOR: Form.
9  BY MS. DALY:
10    Q   In other words, they're people that those
11  things are going on with?
12    MR. O'CONNOR: Form --
13    THE WITNESS: Well --
14    MR. O'CONNOR: -- and foundation.
15    THE WITNESS: Well, with Bard filters, no,
16  I haven't made that assessment.
17  BY MS. DALY:
18    Q   Nor -- nor have you assessed what percent
19  of people with Bard filters could fall into the
20  worst-case scenario?
21    A   No.
22    MR. O'CONNOR: Object to the form.
23    THE WITNESS: I haven't made that
24  assessment.
25    MS. DALY: What time is it?

43 (Pages 166 - 169)

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 170

1      12:45  1        MR. O'CONNOR:      .
2   2          MS. DALY: Do you want to eat something?
3   3          THE WITNESS: Might as well have some
4   4   lunch.
5   5          MS. DALY: Yeah. Why don't we stop a
6   6   minute and have lunch. We're making -- let's go
7   7   off the record.
8   8          THE VIDEOGRAPHER: This is the end of
9   9   Media No. 2. We are going off the record at 12:46.
10  10         (Lunch recess taken.)
11  11         THE VIDEOGRAPHER: This is the beginning
12  12   of Media No. 3. We are back on the record at 1349.
13  13   BY MS. DALY:
14  14      Q   Dr. McMeeking, let's talk about
15  15   perforation for a minute.
16  16      A   Okay.
17  17      Q   Can you summarize what -- what are the
18  18   causes of perforation in the Bard filter that
19  19   you're aware of?
20  20      A   Well, I covered that in my report so -- so
21  21   there are sections where I look at the issue of
22  22   what would drive perforation, and those issues are
23  23   the force that the leg applies to the wall of the
24  24   vena cava and the size of the -- of the -- of the
25  25   limb because that controls the pressure that the

Page 171

1   limb will apply against the vena cava wall. And
2   that's covered in my report.
3       Q   Is there any difference in contribution to
4   perforation between arms and legs or in mechanisms
5   by which they do it?
6       A   Well, the mechanisms are the same, and as
7   I think I say in my report, the force that the arms
8   apply to the wall of the vena cava are greater than
9   the forces that the legs apply, and, therefore,
10  depending on the extent of the area of contact, it
11  is likely that the arms will perforate the wall of
12  the vena cava to a greater extent than the legs,
13  although I expect both the legs and the arms to
14  perforate the wall of the vena cava.
15      Q   Did you determine any catient --
16  patient-specific conditions that would make a
17  particular -- that would make a particular patient
18  more or less susceptible to perforation?
19      A   Can you clarify that question. What --
20  what --
21      Q   Yeah.
22      A   What contributions are you thinking of?
23      Q   In anything that you have identified that
24  you think impacts whether a particular individual
25  will be more likely to have perforation or less

Page 172

1   likely.
2       A   Well, the -- the size of the vena cava I
3   expect play a role because the smaller the vena
4   cava, the bigger the force that the filter will
5   apply to the walls of the vena cava. There are
6   other aspects of the attributes of the tissue in
7   the vena cava wall that I would expect to play a
8   role in determining whether or how much perforation
9   will take place, and those are to do with just the
10  properties of -- of the -- of the tissue.
11      Q   Have you read any medical literature
12  identifying any types of people in patient
13  populations that are more susceptible to
14  perforation than others?
15      A   I believe I have, but I don't recall
16  exactly the details of that situation.
17      Q   And you have taken no data from that type
18  of literature to try to analyze it or do any
19  modeling with it; is that right?
20      A   That -- no, I haven't done that, because
21  what's most important is the observation that the
22  limbs of the Bard filters do perforate the wall of
23  the vena cava.
24      Q   Do you hold the opinion that Bard filters
25  perforate more than any other IVC filters on the

Page 173

1   market?
2       A   I -- I don't have that opinion. I mean, I
3   don't have any opinion on that one way or the
4   other.
5       Q   All right. Now, we've talked several
6   times already this morning about some of your
7   criticisms of Bard's testing of filters, correct?
8       A   Correct.
9       Q   All right. Have you determined, with
10  respect to any of Bard's testing that you're
11  critical of, that had Bard tested with different
12  protocols, the test results would have revealed
13  something different?
14         MR. O'CONNOR: Form.
15         THE WITNESS: I'm not quite sure what you
16  mean by have I done anything to determine that, but
17  what I've done is that I've identified the nature
18  of tests that would be more revealing of the
19  performance of -- of the filter and, therefore,
20  would be more informative than the tests that Bard
21  did on the filters that they were intending to --
22  to market.
23  BY MS. DALY:
24      Q   And then beyond that, have you taken any
25  step to verify that those different tests would in

44 (Pages 170 - 173)

Robert McMeeking , Ph.D.                July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 174**

1  fact show you something different more --
2      A   Well, I haven't done any tests but I've
3  considered the mechanics of what would occur in the
4  tests, and that leads me to conclude that there
5  would be -- you would expect to see significant or
6  at least substantial differences between the
7  behavior in the tests that I've been thinking of
8  and the ones that were actually carried out.
9      Q   But as an engineer, you have seen
10  occasions where testing results actually surprised
11  you, that they didn't meet the hypothesis, true?
12      MR. O'CONNOR: Object to the form of the
13  question.
14      THE WITNESS: That does happen from time
15  to time, but of course the steps that one would
16  take then are either to consider whether the tests
17  need to be redesigned or whether the hypothesis
18  needs to be modified so --
19  BY MS. DALY:
20      Q   Right.
21      A   -- there's a step forward that needs to be
22  taken.  And I don't think Bard took those steps
23  based on their observations of what was happening
24  to the filter.
25      Q   And you haven't taken those steps forward

**Page 175**

1  either with your analysis?
2      A   No, I have not.
3      MR. O'CONNOR: Form.
4  BY MS. DALY:
5      Q   Okay.  Are you aware of any FDA
6  regulations relating to testing that Bard failed to
7  meet?
8      MR. O'CONNOR: Form.
9      THE WITNESS: I'm -- I'm not giving any
10  opinion on what they did relative to requirements
11  of the FDA.
12  BY MS. DALY:
13      Q   All right.  Thank you.
14      Are you going to provide an opinion that
15  Bard had a higher rate of any particular type of
16  complication relative to other filters?
17      MR. O'CONNOR: Form.
18      THE WITNESS: I'm not going to offer any
19  opinion on the relative rates of complications of
20  one filter versus another.
21  BY MS. DALY:
22      Q   What about one Bard filter versus another
23  Bard filter?
24      A   I'm not going to give an opinion on that
25  because I don't have enough data to truly assess

**Page 176**

1  the situation.
2      Q   Okay.  You're not going to give opinions
3  on your interpretation of medical literature that
4  reports on various incidents of complications then;
5  is that correct?
6      A   I'm not going to give opinions on what's
7  in the medical literature, other than to say that
8  they're consistent with my assessment of the
9  engineering considerations of the filter and that
10  they tend to confirm that the filters are --
11  have -- are dangerous.
12      Q   Well, let's talk about that a minute.
13  What you -- what you would take from medical
14  literature is that there are reports of, for
15  example, fracture, perforation, tilt and migration
16  in Bard filters, true?
17      A   Yes, that's correct.
18      Q   And you also see medical literature that
19  says that there are perforations, tilts, migration
20  and fractures in other IVC filters on the market,
21  true?
22      A   I'm aware of those reports.
23      Q   Okay.  And so what did you -- how are you
24  using medical literature to support a conclusion of
25  dangerousness?  That's where I'm --

**Page 177**

1      A   Okay.
2      Q   -- missing you.
3      A   Well, I'm observing in the medical
4  literature that these complications occur with the
5  filter and that those complications do present
6  dangers to the -- to the patients, such as a
7  fracture damaging an adjacent organ or a fracture
8  leading to a limb that escapes into the heart or
9  the lungs or the pulmonary artery.
10      Q   And I don't mean to do semantics, but you
11  just said that they do cause that.  They can cause
12  that?
13      MR. O'CONNOR: Form.
14  BY MS. DALY:
15      Q   Fair?
16      A   Can you repeat the question, please.
17      Q   Yeah.
18      You used the word that they -- that these
19  complications do cause patient events or patient
20  symptoms.  Isn't it more correct to say they can,
21  they don't always?
22      MR. O'CONNOR: Form.
23      THE WITNESS: They -- they can generate
24  patient symptoms.
25  BY MS. DALY:

45 (Pages 174 - 177)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 178**

1    Q    And you've seen literature that reports
2    that they can be asymptomatic, true?
3    A    I'm aware of that literature, too.
4    Q    Okay.  Is there any medical literature
5    that we have not discussed thus far today that you
6    rely on for any of your opinions in the case
7    directly?  And there's one that's sitting in front
8    of us that we haven't talked about.  It looks like
9    that's an engineering --
10    A    Yeah --
11    Q    -- rather than --
12    A    -- that's the materials engineering paper.
13    Yeah.
14    Q    Okay.  Any other medical literature that I
15    may have missed?
16    A    Not literature in the sense of published
17    papers, but of course there's the expert reports --
18    Q    Right.
19    A    -- in -- in the various cases.
20    Q    And what do you rely on from any of the
21    expert reports that we haven't talked about thus
22    far?  I know what you've relied on from Richie.
23    What other ones --
24    A    Well, from --
25    Q    -- you've taken anything from?

**Page 179**

1    A    From Dr. Hurst to Dr. Muehrcke, I rely on
2    observations of what happened to the filter in
3    terms of -- of complications and negative events
4    that took place, such as fracture, tilt,
5    perforation and migration.
6    Q    And are you talking about the ones that
7    they submitted in the Bellwether cases?
8    A    Yes, that's correct.
9    Q    Okay.  And we'll get to that.
10    Anything else?
11    A    No, not that I can recall.
12    Q    Okay.  So while I remembered this document
13    lying in the middle of the table, let's talk about
14    this and what this relates to vis-a-vis your
15    opinions.  I'm marking --
16    MR. O'CONNOR:  Let me just get a
17    clarification.  Are you asking him about any
18    literature or reports not mentioned in his reports
19    that he prepared here?
20    MS. DALY:  No, I'm asking him whether
21    there's anything else that he relies on for his
22    analyses today.
23    MR. O'CONNOR:  Separate and apart from
24    what he talks about in his reports, right?
25    MS. DALY:  Yeah.  He has some things in

**Page 180**

1    his report; for example, he'll -- he's got some
2    medical literature in here that he just told me he
3    doesn't really rely on, it has to do with rates and
4    stuff, so...
5    MR. O'CONNOR:  Well, I...
6    MS. DALY:  I don't think we're missing.
7    (Whereupon, Deposition Exhibit 17 was
8    marked for identification by the Court
9    Reporter.)
10    BY MS. DALY:
11    Q    Here, this -- this that I've marked as
12    Exhibit 17 has got Robertson, "A statistical
13    approach to understand the role of inclusions on
14    the fatigue resistance of superelastic nitinol wire
15    and tubing," published in 2015.
16    Could you tell me what that -- what you
17    rely on that for.
18    A    Well, I rely on it because there are some
19    experimental data in here that relate to the
20    fatigue properties of nitinol --
21    Q    Okay.
22    A    -- and specifically to nitinol wire.  And
23    the reason that I'm talking about it is that
24    Dr. Briant says that this paper shows that the
25    fatigue limit for nitinol can be higher than the

**Page 181**

1    difference between the upper plateau of the
2    transformation stress strain curve and the lower
3    plateau of the transformation stress strain curve,
4    and I studied this paper and looked at the data and
5    there's two things that I should say about it.
6    One is that the data on nitinol tubes that
7    are turned into what is called a diamond specimen,
8    those experiment -- and the experiments are done in
9    those diamond-shaped specimens, those experiments
10    have to be interpreted through calculations, and,
11    therefore, it's quite uncertain in regard to the
12    accuracy of the results that are presented as a
13    consequence of the calculations which are carried
14    out.
15    In other words, it's -- it's entirely
16    feasible and I think likely that the calculations
17    are giving a misleading result for what goes on in
18    the strains that are experienced by the -- the
19    specimen during the test.
20    Q    Whose calculations are misleading?
21    A    These are calculations carried out by the
22    individuals who are associated with doing the
23    experiments.
24    Q    Oh, so in Robertson's paper --
25    A    Yes.

46 (Pages 178 - 181)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 182**

1   Q   -- he's talking about that?
2   A   Yeah, Robertson --
3   Q   Oh.
4   A   Robertson carries out some of those
5   calculations for the data in the experiment with
6   results such as Figure 3, illustrated, and uses
7   those results to interpret the experiments which
8   are carried out on specimens of a similar shape.
9   And what I'm saying is that those data are, in my
10  view, unreliable because the results can be -- the
11  results as presented can be erroneous because of
12  errors in the calculations.  The --
13  Q   Okay.  So --
14      MR. O'CONNOR:  Hold it.  Let him --
15      THE WITNESS:  -- therefore, the only
16  reliable data, in my view, in this paper is the
17  data obtained by carrying out experiments on wire,
18  which is under what is called tension tension; in
19  other words, you take the wire and you stretch it
20  and then you let it unstretch, and you do that
21  repeatedly to obtain the fatigue data that you need
22  for the behavior of the material.
23      And because the specimen is very simple,
24  just a wire that's straight and has a round
25  cross-section, the results that you can get from

**Page 183**

1   the tests are very reliable in the sense of knowing
2   exactly what the strains are during the test?
3   BY MS. DALY:
4   Q   Because that is a direct test of the
5   widget itself --
6   A   Correct.
7   Q   -- of the material itself?
8   A   Yes.
9   Q   Okay.
10  A   And -- and -- but most importantly, the
11  calculations that you do to obtain the strain are
12  very simple and don't require assumptions about how
13  to do calculations and what should go into those --
14  those finite element calculations.
15      So the data on the wire are clean, and
16  when I look at the data on the wire, I find that
17  the fatigue limit for the experiments that they're
18  doing is consistent with the difference in strain
19  between the upper plateau of the stress strain
20  transformation and the lower plateau, which is in
21  contradiction to what Dr. Briant claims and
22  supports my point of view that -- that if you
23  impose strain on the specimen which exceed the
24  difference between the upper plateau and the lower
25  plateau and, therefore, during the test are

**Page 184**

1   triggering incremental transformation from
2   austenite to martensite and then incremental
3   transformation from martensite to austenite, that
4   the fatigue limit will be -- will be such that
5   relatively rapid fatigue failure will occur if you
6   go above that level of strain.
7   Q   And what you've pointed out about the
8   Robertson paper is that there are other situations
9   in engineering when direct testing on the bench of
10  a device, a product, a material, gets you better
11  real-life answers than doing your calculations,
12  doesn't it?
13      MR. O'CONNOR:  Form.
14      THE WITNESS:  Well, that's -- no, I
15  don't -- I don't agree with that point of view,
16  because although it gives you certain answers
17  related to the behavior of the component itself, it
18  doesn't give you clean and direct information about
19  the nature of the material, which is what you
20  ultimately need to truly understand what is
21  happening in the component that you're designing or
22  constructing or -- or testing.
23  BY MS. DALY:
24  Q   Do you know of any medical device
25  manufacturer that puts a device on the market based

**Page 185**

1   on FE- -- FEA work alone without bench testing?
2   A   I -- I know of no manufacturer who does
3   that.
4   Q   Do you know of any medical device that the
5   FDA would clear without having some actual bench
6   testing?
7   A   I'm not familiar with what FDA does in
8   every particular case.
9   Q   Okay.  Would you look at your March
10  report, page 25.  At the very bottom, paragraph 9.
11  A   Yes.
12  Q   And it is a reference to an analysis by
13  biostatistician Rebecca Betensky?
14  A   That's correct.
15  Q   And then the last sentence on that page
16  that goes on to page 26 is "Dr. Betensky's
17  analysis," and you cite to the report, "shows
18  statistically significant differences between the
19  Recovery and the Simon nitinol," et cetera.
20  That -- that sentence then goes on, right?
21  A   Yes.
22  Q   Okay.  Have you read Dr. Betensky's
23  report?  Because you didn't mention that this
24  morning.  Maybe --
25  A   Oh.

47 (Pages 182 - 185)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 186

1   Q   Did you read her report?
2   A   I read it at the time that I wrote this
3   report.
4   Q   Okay.  Did you review any of the actual
5   data that she analyzed?
6   A   I looked at tables and other information
7   in her reports.  So in that sense I -- I reviewed
8   it.
9   Q   Her Excel sheets, did you --
10  A   No, I didn't --
11  Q   -- review her --
12  A   No, I did not look at her Excel sheets.
13  Q   Okay.  Do you know what information her
14  spreadsheets contain or don't contain with respect
15  to information about the Simon nitinol filter
16  versus other Bard filters?
17  A   Well, I understand that the -- her Excel
18  sheets contain information about failures that were
19  identified in Bard and -- well, Bard filters and
20  that the source of some of that information was
21  more data, and so on.
22  Q   Do you know what time frames she had data
23  for -- data from?
24  A   I would need to look at her report to give
25  you a specific answer to that.

Page 187

1   Q   Okay.  If I tell you that she had data on
2   the Simon nitinol from 2004, do you know that one
3   way or another?
4   A   I --
5       MR. O'CONNOR:  Form.
6       THE WITNESS:  I don't know that
7   information, but I could establish it by reviewing
8   her report.
9   BY MS. DALY:
10  Q   Well, it -- that's fine.
11      You did not perform any of the biostat- --
12  biostatistical calculations that went into her
13  report, true?
14  A   No, I -- yes, that's true, I did not carry
15  out any of those calculations.
16  Q   And you did not independently verify her
17  work?
18  A   No.
19  Q   Did you provide her with any information
20  that she used in her report or that she
21  considered --
22  A   No --
23  Q   -- as far as you know?
24  A   -- I provided her no information.
25  Q   Have you talked to her about the report?

Page 188

1   A   No, I have not.
2   Q   When you say at the top of page 26 that
3   she found -- you have to go back to 25, that she
4   found statistically significant differences between
5   the Recovery and the Simon nitinol filter and then
6   between the Simon nitinol and the other Bard
7   filters, what do you mean by "statistically
8   significant differences"?
9       MR. O'CONNOR:  Object to the form of the
10  question.
11      THE WITNESS:  That -- I mean that the
12  differences in the numbers involved were put
13  through tests by her that analyzed the statistical
14  distributions and the differences and the
15  comparisons and indicated, in the cases that I've
16  identified, that these -- these deductions made
17  from those statistics by her were meaningful in
18  that they were identifying real differences in the
19  performance and rates that were observed in the
20  various filters.
21  BY MS. DALY:
22  Q   They were showing lower numbers of
23  reported incidents of fracture in Simon nitinol
24  than the other filters?
25  A   Yes, that's correct.

Page 189

1   Q   Okay.  Was it just fracture that you were
2   looking at or that -- that you rely on in any way
3   in the report?
4   A   Well, the -- so there's statistical
5   differences among the filters compared to the Simon
6   nitinol and not just the fracture results but in
7   some other of the negative phenomena as well, but I
8   would have to review the document to -- the report
9   to identify that explicitly.
10  Q   And in what -- in what way does
11  Dr. Betensky's information support any conclusion
12  that -- or opinion that you have in the case?
13      MR. O'CONNOR:  Form and foundation.
14      THE WITNESS:  Well, it -- it confirms and
15  is consistent with my analysis, confirms in the
16  sense that it's consistent with my analysis in that
17  the Recovery, the G2, the Eclipse and the S- -- and
18  the Meridian, and to some extent the Denali, are
19  subject to rates of failure which are greater than
20  the Simon nitinol filter and that that is
21  consistent with my comparative assessment of the
22  Simon nitinol filter compared to the other filters
23  in the Bard line of products.
24  BY MS. DALY:
25  Q   Right.  And we're going to get to the

48 (Pages 186 - 189)

Robert McMeeking , Ph.D.                                        July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 190

1    Simon nitinol just a minute.
2         Do you know who Dr. Thisted is?
3    A   I -- I understand that he is a
4    biostatistician at University of Chicago, but
5    that's all I know.
6    Q   Okay.  Have you read his report --
7    A   I --
8    Q   -- that he did for Bard in this
9    litigation?
10   A   I have not read that report.
11   Q   Do you know what his opinions are about
12   Dr. Betensky's opinions?
13   A   Since I haven't read the report, I don't
14   know.
15   Q   Do you know that Dr. Betensky was
16   calculating -- whether she was calculating risk
17   ratios or reporting risk ratios?
18        MR. O'CONNOR:  Form.
19        THE WITNESS:  I would --
20        MR. O'CONNOR:  Foundation.
21        THE WITNESS:  I would need to review the
22   document to be sure which -- which parameters she
23   was reporting.
24   BY MS. DALY:
25   Q   Do you know what the differences between

Page 191

1    those things are, a risk ratio and a reporting risk
2    ratio?
3    A   I'm not familiar with that difference.
4    Q   Okay.  Did Dr. Betensky do any work with
5    respect to the probability of the occurrence of any
6    complication in a Bard retrievable filter that you
7    recall?
8    A   Could you clarify that question.
9    Q   Yeah.
10        Did she do any statistical analysis of the
11   probability, the likelihood, of which any
12   complication would happen in any particular Bard
13   retrievable filter?
14        MR. O'CONNOR:  Form and foundation.
15        THE WITNESS:  In an implanted --
16   BY MS. DALY:
17   Q   Yes.
18   A   -- filter in a patient?
19   Q   Yes.
20   A   I would have to review the document to be
21   sure, but I'm not aware of that analysis.
22   Q   All right.  Let's talk about your SNF
23   analysis, which really comes in your rebuttal
24   report of 5-11-17, which we have marked as
25   Exhibit 4.

Page 192

1         MR. O'CONNOR:  I'm sorry, which one is
2    that?
3         MS. DALY:  It's his rebuttal report, May
4    11, 2017.
5         MR. O'CONNOR:  Thank you.
6    BY MS. DALY:
7    Q   Did you have the opportunity to examine an
8    exemplar Simon nitinol filter?
9    A   I have a Simon nitinol exemplar in my
10   possession now.
11   Q   Okay.  When did you get that?
12   A   Last week.
13   Q   Who sent it to you?
14        MR. O'CONNOR:  Hold on.
15        MS. DALY:  Who sent it to him?  Did he get
16   it from you?
17        MR. O'CONNOR:  He got it from I believe
18   somebody, but is that necessary to know?
19        MS. DALY:  Yeah, I want to know if he got
20   it from a plaintiff's attorney, if he got it from a
21   friend, if he got it from somebody at the
22   drugstore.
23        MR. O'CONNOR:  I believe he -- he
24   requested it from attorneys.
25   BY MS. DALY:

Page 193

1    Q   You received it from an attorney?
2    A   I received it from an attorney.
3    Q   Okay.  And you had not had that before?
4    A   No, I had not had an exemplar in my
5    possession before.
6    Q   Did your examination of the exemplar
7    change anything that you've written in the rebuttal
8    report about the SNF --
9    A   No.
10   Q   -- or how it compares --
11   A   No.
12   Q   -- to the Bard filters?
13   A   No.
14   Q   All right.  You -- to do your rebuttal
15   report, you looked at the engineering drawings for
16   the SNF --
17   A   Correct.
18   Q   -- is that true?
19   A   That's correct.
20   Q   What else did you look at?
21   A   I looked at -- well, I was looking at the
22   510(k) for the Recovery --
23   Q   Okay.
24   A   -- and it told me various things to do
25   with changes that were made, such as the diameter

49 (Pages 190 - 193)

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 194

1  of the -- of the limbs and the material of which
2  the filters were made, and so that enabled me to
3  draw conclusions about how to compare the Simon
4  nitinol with the other filters.
5      Q   Okay.  And the Simon nitinol filter is
6  basically -- got a round -- a rounded dome with
7  petals.  You've got a good diagram of that at the
8  back of the report.  And then legs on the bottom,
9  six legs?
10     A   That's correct, yes.
11     Q   Okay.  What design characteristics of the
12  Simon nitinol filter make that filt- -- made that
13  filter not retrievable percutaneously?
14         MR. O'CONNOR:  Form and foundation.
15         THE WITNESS:  Well, I'm not entirely sure
16  because I've not investigated that situation, but
17  it's my surmise that it is the extent of -- of
18  connection among the wire -- wires of the petals
19  and the vena cava wall which presents more material
20  that can bond from the vena cava wall to the petals
21  of the -- of the filter, and so that will generate
22  a robust connection between the filter and the vena
23  cava wall.
24  BY MS. DALY:
25     Q   Did --

Page 195

1      A   And also the -- the legs do seem to
2  perforate to some extent through the wall of the
3  vena cava, and I -- I'm assuming that that would
4  present complications upon retrieval.
5      Q   Did you investigate whether once deployed
6  that petal formation was at all difficult to slim
7  back down, if you will, to crimp it into a sheath
8  for retrieval?
9      A   Well, I made an estimate of the stiffness
10  of those petals, and so although I didn't make a
11  comparison with what is required to put it into the
12  delivery sheaths, I -- I did have the analysis at
13  hand from which that could be undertaken.
14     Q   And you determined they were pretty stiff?
15     A   They're -- they're
16     Q   Not to use a good engineering term.
17     A   Yeah, they're -- they're stiff compared to
18  the Bard arms -- sorry, the arms on the Recovery,
19  the G2, and other subsequent filters.
20     Q   And the legs are stiffer than the Recovery
21  and other retrievable --
22     A   Yes.
23     Q   -- Bard filters as well?
24     A   That's correct.
25     Q   Okay.  You understand that the -- that

Page 196

1  Bard's purpose in developing the Recovery filter
2  was to provide for a filter that could be
3  percutaneously retrieved?
4      A   I understand that that's the case, but
5  they were developing an optional filter which meant
6  that it was represented as being usable as a
7  permanent filter as well as having the option of
8  being percutaneously removed.
9      Q   But so you do understand it had the
10  dual --
11     A   I understand it has --
12     Q   -- the dual goals?
13     A   -- that dual target.
14     Q   Right.
15         And did you understand that an important
16  benefit to patients in a retrievable IVC filter is
17  the fact that it can be retrieved?
18     A   Well, I'm -- I'm not a doctor and I'm not
19  a medical expert so I don't know that in a detailed
20  way, but from a position of someone who may be a
21  patient, it makes sense that one would want to have
22  the implant out if that is possible.
23     Q   Okay.  Now, in your -- in your rebuttal
24  report where you're comparing the Simon nitinol,
25  you compare it to the G2 and Recovery filters,

Page 197

1  correct?
2      A   Can you remind me of where I do that.
3      Q   Yes.  Let's see.  Pages 8 through 16 is
4  where you discuss the Simon nitinol.  And if you
5  look at the bottom of page 9, my impression is that
6  you're looking at it comparatively to Recovery and
7  G2 throughout and that you -- and that you didn't
8  do specifically a head-to-head comparison of it to
9  the later generations.
10         MR. O'CONNOR:  Form.
11         THE WITNESS:  I didn't do that specific
12  comparison but that's because the characteristics
13  of the later generations would be similar to the
14  Recovery and the G2, and, therefore, at the level I
15  was doing that comparison, it was not a significant
16  aspect of what I needed to consider.
17  BY MS. DALY:
18     Q   Okay.  I understand that's your -- that's
19  your opinion.
20         Okay.  So what your -- what your report
21  concludes about the SNF is a couple of things, and
22  I'm trying to see whether I got this from a place
23  where you summarized them all together or they're
24  spread out.
25         All right.  Let's start, first of all, on

50 (Pages 194 - 197)

Robert McMeeking , Ph.D.                                          July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 198

1    page 9 at the second full paragraph where you say
2    "The shape of the petals." Do you see that?
3         A    Oh, the second full paragraph.
4         Q    Yeah.
5         A    I see it, yes, yes.
6         Q    "The shape of the petals is quite
7    complicated, so to estimate their stiffness to
8    radial compression I simply treat them as two arms
9    of a length of 16 millimeters joined together."
10        Okay. Will you explain to me what you
11   mean by that. How did you do that analysis of
12   stiffness of the petalled shape?
13        A    Well, I mean that I approximated them as
14   straight wires that were in the form of a loop but
15   the wires were -- the two wires -- sorry, I should
16   start again because I became imprecise.
17        So I represented the petal as a single
18   wire that has the shape of a loop but the loop is
19   such that the two wires are parallel to each other
20   except at the end where they meet together in the
21   form of a -- of a junction adjoined, a joint.
22        Q    Okay. So -- so with that assumption, you
23   determined their basic stiffness?
24        A    That's correct.
25        Q    Okay. Vis-a-vis the Recovery or the G2,

Page 199

1    you say that "The radial compression for the
2    SNF" -- we're talking about the petal portion?
3         A    Yes.
4         Q    Okay. -- "is 10 times that of a single
5    arm of Recovery and approximately 18 times that of
6    a single arm of the G2," right?
7         A    Yes, that's what I -- that's what I wrote.
8         Q    But what you're comparing is the whole
9    petal to one Recovery arm for comparison of
10   stiffness?
11        A    That's correct.
12        Q    All right. So if you go down below that a
13   couple more lines after you've talked about the 18
14   times the single arm of the G2 --
15        A    Yes.
16        Q    -- you go down four lines and it says "I
17   find that a single petal of the SNF is
18   approximately 50 percent stiffer than a single arm
19   of the Recovery or G2."
20        What -- what is the definition of the
21   single petal?
22        A    Well, single petal is the loop that you
23   can see in this diagram, although it's maybe
24   unclear at the level that it can be seen, but a
25   loop is formed by the wire coming out of the top

Page 200

1    bushing, it goes out in a radial direction more or
2    less, there's a segment which is almost
3    circumferential in -- in regard to the shape of the
4    vena cava which -- by which I'm using to define
5    circumference.
6         Q    Okay.
7         A    And then the loop comes back in towards
8    the center of the filter and enters the lower
9    bushing.
10        Q    Okay.
11        A    So that's what I'm considering to be the
12   loop.
13        Q    So for the first comparison that you did
14   where the petal stiffness was 10 times that of a
15   single arm of Recovery and 18 that of a single G2,
16   are you able to take this yellow highlighter and
17   draw for me what you were comparing off of the SNF
18   against the Recovery or the G2 arm?
19        A    I'm sorry, could you repeat that.
20        Q    Yeah.
21        I'm trying to figure out what you are
22   defining as the petal of the SNF where you say here
23   on page 9 "A single petal of the SNF during radial
24   compression is 10 times greater than that of a
25   single arm of the Recovery and a single arm of the

Page 201

1    G2."
2         A    Okay. I'll do that by putting some
3    letters on the --
4         Q    Great.
5         A    -- diagram.
6         Q    Perfect.
7         A    A, B, C, D.
8         Q    Perfect.
9         A    And the -- is it going to be visible using
10   yellow?
11        Q    Well, you know what? You can have a pen.
12   Do it any way that makes sense.
13        A    So a single petal starts at A.
14        Q    Okay.
15        A    Comes down to B.
16        Q    Okay.
17        A    Runs around to C.
18        Q    Oh, okay.
19        A    And then goes down into the other -- the
20   lower bushing at D.
21        Q    All right.
22        A    So A, B, C, D is -- is that loop.
23        Q    So it goes to the left of the cap and to
24   the right of the cap, that's a single petal?
25        A    That's correct.

51 (Pages 198 - 201)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 202**

1    Q   All right. So when you mentioned single
2  petal a couple of sentences down, that's the same
3  thing you're talking about where you say "A single
4  petal of the SNF is approximately 50 percent
5  stiffer"?
6    A   Yes.
7    Q   Okay. Then you say "If endothelialization
8  constrains rotation of the wire where it's bonded
9  to the wall of the vena cava, all stiffness will
10  increase by a factor of 4."
11       What do you mean by that?
12   A   Well, I mean that if you have an end to
13  the loop or the Bard -- sorry, the G2 or Recovery
14  arms and you compress it by the action that the
15  vena cava would apply to the filter as the
16  reduction -- as the diameter of the vena cava
17  reduces, if you have an end of those features which
18  is capable of rotating as that deformation takes
19  place, you would get a certain value of the
20  stiffness where the stiffness is the ratio of the
21  force that you apply to the displacement which is
22  imposed.
23   Q   Okay.
24   A   Now if you constrain the rotation so that
25  the end both moves according to the vena cava wall

**Page 203**

1  but does not change its orientation relative to the
2  vena cava wall, then the stiffness will be four
3  times, which means that the force will -- that you
4  apply will be four times that which you got when
5  you did not constrain the rotation.
6    Q   Okay. And that stiffness in the petal
7  area may make folding that back down, once it's in
8  the patient to put it in a sheath for retrieval,
9  more difficult?
10   A   It would mean --
11       MR. O'CONNOR: Form.
12       THE WITNESS: It would mean --
13       MR. O'CONNOR: Foundation.
14       THE WITNESS: It would mean that you have
15  to pull on the filter with a bigger force relative
16  to the Recovery catheter to put into that Recovery
17  catheter.
18  BY MS. DALY:
19   Q   And what that might translate into insofar
20  as patient injury, you do -- you have not done an
21  analysis of that?
22   A   I have not done an analysis of that.
23   Q   All right. Now, this is what I wrote down
24  about your conclusions from the SNF report, and I
25  want to talk about these separately and tell me if

**Page 204**

1  I'm missing something.
2        The first one I wrote down was that it was
3  more resistant to migration than the Bard's
4  retrievable filters. Is that a conclusion that you
5  make?
6    A   Yes, that's correct.
7    Q   Okay. And in what direction is it more
8  resistant to migration?
9    A   Well, my engineering assessment would
10  indicate that it's more resistant to migration
11  after it's been firmly implanted in the vena cava,
12  that it's more resistant to migration in both the
13  caudal and the cephalic direction.
14   Q   Okay. Are you saying that it will never
15  migrate?
16   A   No, I'm not saying that, no.
17   Q   Is it principally the stiffness of the
18  petals that contributes to the migration resistance
19  in this or is it more than that?
20   A   Well, I think it's -- I think it's a
21  combination of the stiffness of the petals and the
22  stiffness of the legs.
23   Q   Is there anything about any other
24  dimensions of the Simon nitinol, diameter of wire,
25  length of -- length of anything, height of the

**Page 205**

1  filter overall, anything like that, that
2  contributes to migration resistance?
3    A   Well, the diameter of the wire controls
4  the stiffness of the wire -- of the components that
5  are made from the wire, so that has a -- that has
6  an effect, which I've already alluded to in the --
7  in the answers I just gave.
8    Q   Okay.
9    A   The length of the petals and the lengths
10  of the legs also contribute to controlling the
11  stiffness, so those would contribute as well. And
12  I'm not sure if I can identify anything else, but
13  those were -- those would be the things that I
14  would identify.
15   Q   Did you do any analysis of how one would
16  make changes to either the petal dome or the legs
17  of the SNF to allow it to be retrievable?
18   A   Can I augment my answer of just a second
19  ago? The -- the diameter or the span of the petals
20  and the span of the arms -- the legs relative to
21  the diameter of the vena cava would contribute to
22  the forces which are involved and, therefore,
23  contribute to the question of whether migration is
24  or is not likely in the Simon nitinol filter.
25       But to move on to your subsequent

52 (Pages 202 - 205)

Robert McMeeking , Ph.D.                              July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 206

1   question, I didn't make -- do any analysis to look
2   at what changes might -- what changes -- what
3   impact they would have on the behavior of the -- of
4   the filter.
5       Q   Including the last thing that you just
6   mentioned to me, the difference in span?
7       A   Yes.
8       Q   How that might have to be re-engineered to
9   allow for retrieval?
10      A   I did not look at that.
11      Q   Okay. The next thing that I saw from your
12  report was that the design of the SNF legs make
13  them more prone to perforation than the struts of
14  the Recovery and the G2?
15          MR. O'CONNOR: Where are you looking at in
16  the report?
17  BY MS. DALY:
18      Q   The different ones start on page 11. Your
19  first one was migration, and then the little B on
20  page 11 is where I'm reading from right now.
21          I'm sorry, that's not where I got it from.
22  Go to page 13. I apologize. B on page 13.
23      A   Yes.
24      Q   So I think what you concluded there was
25  that the legs of the Simon nitinol were more prone

Page 207

1   to perforation of the vena cava wall than the
2   Recovery or G2?
3       A   In the legs of the Recovery and the G2.
4       Q   The legs. Okay.
5           Did you look at any medical literature
6   about the Simon nitinol to confirm whether you were
7   correct that there was more -- that there was a
8   fair amount of perforation from the legs of the
9   Simon nitinol?
10          MR. O'CONNOR: Object to the form of the
11  question.
12          THE WITNESS: I -- I didn't look at papers
13  to specifically ascertain that information, but I
14  did read some papers that indicated that
15  perforation by the legs of the Simon nitinol filter
16  do occur.
17  BY MS. DALY:
18      Q   Are you familiar with the Poletti paper,
19  for example, where he says that legs perforated
20  95 percent of the time and 76 percent of the time
21  to --
22      A   Yes, I --
23      Q   -- to organs?
24          MR. O'CONNOR: Hold it. Hold it. Object
25  to the form of the question.

Page 208

1           Why don't you get the Poletti article and
2   take a look at it. Do we have it?
3           THE WITNESS: I don't have it.
4           MR. O'CONNOR: Do you have --
5   BY MS. DALY:
6       Q   Do you agree that it says that? Do you
7   remember it saying that?
8       A   May I look -- may I look at the paper --
9       Q   Of course.
10      A   -- to ascertain that?
11      Q   Of course. Let's make this 18.
12          (Whereupon, Deposition Exhibit 18 was
13          marked for identification by the Court
14          Reporter.)
15          THE WITNESS: Thank you.
16  BY MS. DALY:
17      Q   And if you look at the abstract, that
18  might help you find it quickly.
19      A   In the abstract is it says "A CT
20  examination showed that the struts of the SNF have
21  penetrated the vena cava in 95 percent."
22      Q   And then does it say something like
23  76 percent?
24      A   "And where in contact with adjacent
25  organs, in 76 percent."

Page 209

1       Q   Okay. All right. So is the -- in your
2   analysis of the Simon nitinol, is the perforation
3   of legs in the Simon nitinol related to the
4   dimensions of the leg, the stiffness of the legs,
5   or something else?
6       A   Well, in my engineering assessment, it's a
7   combination of -- of the stiff -- of the dimension
8   of the leg or the length of the leg and the
9   material from which it's made.
10      Q   So what would one have to do to engineer
11  the legs of the Simon nitinol to diminish
12  perforation?
13      A   One would perhaps lengthen the legs or
14  make them smaller in diameter or one may choose a
15  different material that is more compliant than the
16  nitinol from which it's made.
17      Q   Okay. But again, you have not tried to do
18  any finite element analysis or any testing to
19  determine how one would re-engineer that, true?
20      A   I've done no calculations or tests --
21      Q   Okay.
22      A   -- in that regard.
23      Q   The next one on page 14, C, is you're
24  talking about the high stiffness of the SNF petals
25  and legs and that relationship to tilt. Will you

53 (Pages 206 - 209)

Robert McMeeking , Ph.D.                                July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 210

1    tell me what your -- what you found.
2        A    Well, as it -- is is written in the
3    report, the stiffness of the petals means that when
4    you compress them into a vena cava to achieve a
5    specific diameter of the petals, that the strain
6    energy, the work that's stored in the petals, is
7    higher than the work that would be stored in the
8    arms of and the legs of the Recover- -- yeah, the
9    arms and the legs, and I should include the legs in
10   the Simon nitinol filter as well.
11       Q    Okay.
12       A    But the work done -- the work stored in
13   the arms and the legs of the Simon nitinol filter
14   is greater than the work stored in the arms and
15   legs of the Recovery and G2 filters where they've
16   been put through the same reduction in size.
17       Q    And what does that mean?
18       A    It means that each component of the Simon
19   nitinol filter has -- in other words, the petals or
20   the legs, has a higher driving force for tilting
21   than the equivalent component of the Recovery and
22   the G2 filter.
23       Q    Meaning it will tilt less or tilt more in
24   your opinion?
25       A    Well, it -- it -- each component will want

Page 211

1    to tilt more but --
2        Q    In the SNF or the --
3        A    In the SNF.
4        Q    Okay.
5        A    But there is a feature of the design of
6    the SNF which is that you have these two bushings
7    with some compliance in between them which allows
8    the top of the filter to rotate relative to the
9    bottom, which means that -- that while there are
10   high driving forces for the tendency to tilt, there
11   is a more forgiving aspect to the filter that
12   enables it to accommodate the tendency to tilt
13   perhaps by the petals alone tilting but not the
14   legs or the legs alone tilting but not the petals.
15       Q    And what accommodation are you speaking
16   of? Meaning that the tilt doesn't have
17   consequences beyond tilting or that -- what do you
18   mean by that?
19       A    Yeah, I mean that the -- that the
20   tilting -- I mean that the tilting would be
21   self-limiting and the -- the driving force would
22   not be as continuous as it would be in the G2 and
23   Recovery filters, and, therefore, the extent of net
24   tilting of the filter is likely to be less in the
25   case of the Simon than in the Recovery and the G2.

Page 212

1        Q    Did you do any analysis of the Simon
2    nitinol for tilt and strains on the filter as a
3    result of tilt as you did with the G2/Recovery
4    filters?
5        A    No, I did not carry out such calculations.
6        Q    And the Poletti article talks about there
7    being 63 percent of the Simon nitinols in that
8    study that demonstrated eccentric position. I
9    don't think that's in the abstract, I think I have
10   to go in there to look for it.
11       A    It is in the abstract.
12       Q    Okay.
13       A    It says "Filters were in eccentric
14   position in 63 percent."
15       Q    And I take that to mean Poletti's talking
16   about tilt; is that what you think?
17       A    I'm assuming that there was an
18   identifiable degree of tilt, so there was some tilt
19   and it was big enough that it could be identified.
20       Q    Have you done any analysis comparing the
21   Simon nitinol in whatever amount of tilt it could
22   do to how it would fare comparatively to the
23   Meridian and Denali that have the anchors on them?
24           MR. O'CONNOR:  Form.
25           THE WITNESS:  I haven't done such a

Page 213

1    comparative analysis except in the sense that it is
2    my assessment that the -- did you say the Meridian
3    and the Denali?
4    BY MS. DALY:
5        Q    Yes.
6        A    The Meridian and the Denali are very
7    similar in shape to the Recovery and G2, and,
8    therefore, some of these features are analogous in
9    the Meridian and Denali in terms of the behavior in
10   tilting.
11       Q    But you haven't done any specific analysis
12   to determine whether the modifications to the
13   Meridian and Denali will have improved resistance
14   to tilt and anything that tilt might cause?
15           MR. O'CONNOR:  Form and foundation.
16   Excuse me. Object to the form of the question.
17           THE WITNESS:  Well, I haven't done any
18   analysis, but I recall the tests that Bard carried
19   out that showed that the Meridian was tilting just
20   as much as the -- I believe it was the Eclipse
21   filter in the bench test that they carried out.
22   BY MS. DALY:
23       Q    But what were the strains on the legs in
24   tilt?
25       A    I didn't do that calculation.

54 (Pages 210 - 213)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

### Page 214

1    Q   Okay.  And it would be the strains that
2  would drive fracture perhaps?
3        MR. O'CONNOR:  Object to the form of the
4  question.
5        THE WITNESS:  It would be the strains that
6  would drive fatigue fracture, yes.
7  BY MS. DALY:
8    Q   Okay.  On page 14, we're still in C but
9  we're in the next paragraph of little C.
10   A   Okay.
11   Q   And it's talking about clot trapping by
12 the Simon nitinol.
13   A   Yes.
14   Q   And tell me what your opinion is about the
15 Simon nitinol's ability to clot trap and tilt
16 versus Recovery or G2?
17   A   You mean to act as a clot trap?
18   Q   Yeah.  I thought what you were saying here
19 was you were comparing a tilted Simon nitinol and
20 its effectiveness to still capture clot versus
21 Recovery and G2 in tilt.  Did I misinterpret
22 that?
23   A   No, in that paragraph I'm not doing that.
24   Q   Okay.  Did you do that analysis?
25   A   I need to look through this to see.

### Page 215

1        So as I write in the report at the bottom
2  of page 14 --
3    Q   Okay.
4    A   -- you see there's a sentence that says --
5    Q   Yeah.
6    A   -- "In the design of the SNF as depicted
7  in Figure 2, the clot trap appears to remain
8  effective even after it tilts."
9    Q   Uh-huh.
10   A   "The tilting of the clot trap will not
11 greatly increase any likelihood" -- that's not
12 relevant to what you're asking.
13   Q   Okay.
14   A   So just because of the number and nature
15 of the shape of the petals in the clot trap, it is
16 my assessment that even after it's til- -- tilted,
17 it can remain effective as a device for trapping
18 clots.
19   Q   Did you see any test of the Simon nitinol
20 in tilt and see what the results were with a clot
21 trapping test?
22   A   No, I haven't seen any results of such
23 tests.
24   Q   Okay.  And similarly, have you seen those
25 tests for clot trapping effectiveness in the

### Page 216

1  Recovery or G2 filter?
2    A   I may have seen those, but I don't recall
3  the results.
4    Q   How far would a G2 or Recovery filter have
5  to tilt to be less effective at clot trapping than
6  a Simon nitinol?
7    A   I -- I don't know.
8        MR. O'CONNOR:  Object to the form.
9  BY MS. DALY:
10   Q   Then there's a next sentence that -- you
11 just stopped at that semicolon and it says "The
12 tilting of the clot trap will not greatly increase
13 any likelihood of perforation of the caudal wall."
14       Could you explain that to me?
15   A   Well, I mean that the -- because the
16 contact between the petals and the wall of the vena
17 cava is spread out over a significant length of the
18 perimeter of the petals in the clot trap, that
19 the -- that there would not be a tendency for the
20 shape of the petals to try to aggressively
21 penetrate the wall of the vena cava.
22       And, in addition, because the forces that
23 are being applied by the petals to the wall would
24 go down when the clot trap tilts, it's my -- that
25 would contribute to the tendency for the likelihood

### Page 217

1  of perforation to not increase.
2    Q   Okay.  But the endothelialization of the
3  petal-shaped dome into the vena cava in the Simon
4  nitinol creates a stiff element?  Am I describing
5  that right?  I mean, it's -- it's got a lot of
6  radial force and stiffness --
7        MR. O'CONNOR:  Object to --
8  BY MS. DALY:
9    Q   -- because of the way that the petal
10 contacts the vena cava wall; is that correct?
11       MR. O'CONNOR:  Object to the form of the
12 question.
13       THE WITNESS:  No, that -- that's not the
14 reason it has a high degree of stiffness, it's
15 simply the shape of the clot trap --
16 BY MS. DALY:
17   Q   Okay.
18   A   -- and how it's composed of wires that
19 would give it its high stiffness.
20   Q   And then does it also endothelialize, this
21 is the petal dome, does it endothelialize into the
22 circumference of the vena cava?
23   A   I don't know that for certain, but it's my
24 surmise that that's what would occur.
25   Q   Would that be something that would also

55 (Pages 214 - 217)

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 218

1   make retrievability -- would that be something that
2   would also contribute to non-retrievability of the
3   Simon nitinol?
4       MR. O'CONNOR: Form and foundation.
5       THE WITNESS: Yes, that would tend to
6   inhibit retrievability, which is what I said
7   earlier in answer to one of your questions.
8   BY MS. DALY:
9       Q   Okay. Then you talk about, in section D,
10  I summarize that as you're saying the SNF is more
11  fracture-resistant than the R -- the Recovery or
12  the G2. Is that what you're saying?
13      A   That's what I'm saying, yes.
14      Q   All right. And what features of the Simon
15  nitinol make it more fracture resistant?
16      A   I need to read this first, please.
17      Q   Sure.
18      A   So the contribution that I'm addressing is
19  that it is usually perforation that increases the
20  strains up to levels that become dangerous in the
21  fatigue behavior of the material, and since it's
22  unlikely, in my assessment from the engineering,
23  that the SNF petals are not likely to perforate the
24  wall, therefore it's unlikely that the strains
25  driven by expansion and contraction of the vena

Page 219

1   cava would be driven up to levels that would lead
2   to fatigue failure in -- in relatively short
3   periods of time.
4       Q   And did you do any modeling to show that?
5       MR. O'CONNOR: Object to the form of the
6   question.
7   BY MS. DALY:
8       Q   Using --
9       A   I didn't.
10      Q   -- specifically the Simon nitinol and
11  comparing it over.
12      A   I didn't do any modeling directly,
13  although the analysis that I did would enable that
14  kind of assessment.
15      Q   But you have not done that?
16      A   I haven't done it.
17      Q   Okay. And what about the legs of the
18  Simon nitinol, you just talked about your opinion
19  that perforation is a driver of fracture and we've
20  just talked about SNF legs being prone to
21  perforate, so what about them and fracture?
22      A   Well, the -- the perforation process would
23  drive up the fatigue strains, and, therefore, it
24  would make fatigue fracture more likely in the SNF
25  compared to the situation where its legs do not

Page 220

1   perforate the wall of the vena cava.
2       Q   Because there's no difference, in your
3   opinion, perforation in an SNF is going to drive
4   strains, perforation in a G2 or Recovery is going
5   to drive strains, they could lead to fatigue?
6       A   That's true, although I really -- I would
7   like to make -- I should make that assessment
8   numerically, because the geometry and the shape of
9   the legs, for example, make it -- play a role in
10  the exact results that you'd get out of such a
11  calculation. But in -- but broadly speaking,
12  perforation would have the same effect on both
13  models of filters.
14      Q   And you did not do any specific comparison
15  of Simon nitinol design for resistance to any one
16  of the complications versus the G2X with some
17  change to its chamfer, you didn't do that specific
18  comparison?
19      A   No.
20      Q   You did not do that specific comparison
21  with the electropolishing change to the Eclipse?
22      A   No.
23      Q   Nor did you do it with the changes that
24  were brought forward from the Eclipse into the
25  Meridian and its addition to anchors, you didn't do

Page 221

1   that?
2       A   No.
3       MR. O'CONNOR: Form.
4   BY MS. DALY:
5       Q   Nor did you do it with the Denali
6   laser cut from a nitinol tube that also has
7   anchors?
8       MR. O'CONNOR: Form.
9       THE WITNESS: I didn't do any of those
10  analyses because it's my assessment that those
11  changes did not make a significant difference
12  to the -- to the filters in terms of reducing
13  the danger that they present because of their
14  failures.
15  BY MS. DALY:
16      Q   Are you giving the opinion that the Simon
17  nitinol is an alternative safer product than the
18  Bard retrievable products?
19      MR. O'CONNOR: Form.
20      THE WITNESS: I'm offering the opinion
21  that in the setting of permanent use of a filter,
22  which the Recovery and the G2 and its successors
23  can -- can be used as, that the Simon nitinol is a
24  safer alternative.
25  BY MS. DALY:

56 (Pages 218 - 221)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 222**

1    Q   But you would agree that the Simon nitinol
2    will not serve populations of people whose doctors
3    believe they need a retrievable filter, true?
4        MR. O'CONNOR: Form.
5        THE WITNESS: I'm -- I'm not offering that
6    opinion. Was that -- could you ask the question
7    again?
8        MS. DALY: Can you read that question.
9        (Record read Lines 1-3.)
10       MR. O'CONNOR: Form.
11       THE WITNESS: Well, since I'm not a
12   medical doctor and I can't really answer that
13   question properly, but since it's -- since it's
14   represented as a permanent filter, that would
15   suggest that it's not meant to be used in
16   situations where retrievability is -- is advised by
17   the doctor.
18   BY MS. DALY:
19       Q   The Simon nitinol isn't?
20       A   The Simon nitinol.
21       Q   Okay. Did you make any effort to look at
22   modifications that would have had to be made to the
23   Simon nitinol filter to allow it to maintain what
24   you conclude is low complications rate but make it
25   percutaneously retrievable?

**Page 223**

1        A   No --
2        MR. O'CONNOR: Form.
3        THE WITNESS: -- I didn't look at that.
4        MR. O'CONNOR: Okay. When you get to a
5    place where we can take a quick break?
6        MS. DALY: Yeah. Almost.
7        MR. O'CONNOR: Okay.
8        MS. DALY: This is a good break point.
9        MR. O'CONNOR: Oh, great.
10       MS. DALY: Can you tell us what our time
11   is.
12       THE VIDEOGRAPHER: This is the end of
13   Media No. 3. We are going off record at 1454.
14       (Recess taken.)
15       THE VIDEOGRAPHER: This is the beginning
16   of Media No. 4. We are back on the record at 1508.
17   BY MS. DALY:
18       Q   Dr. McMeeking, have you performed any
19   actual tests on Bard retrievable filters to
20   determine if an interrelatedness of complications
21   actually exists?
22       A   Do you mean a bench test or --
23       Q   Yes.
24       A   -- an experiment of some kind?
25       I have not carried out any experiments on

**Page 224**

1    Bard filters.
2        Q   And what analyses have you done that we
3    have not talked about yet today that you claim is a
4    model that would support some interrelatededness of
5    any types of complications?
6        A   Can you point me to where I write that in
7    the reports?
8        Q   No, because I'm -- I'm trying to just do
9    this kind of generally. I guess let me ask it a
10   different way.
11       You talked -- you talked briefly about
12   perforation leading to fracture.
13       A   Correct.
14       Q   Okay. So let's start with that one. Have
15   you done a model that actually shows that
16   perforation creates a load that leads to a
17   fracture?
18       A   Yes.
19       MR. O'CONNOR: Form.
20       THE WITNESS: Yes, I have.
21   BY MS. DALY:
22       Q   And which of your analyses is that? Just
23   describe which one.
24       A   Well, the beam bending analysis where I
25   consider both the G2 and the Recovery filters, the

**Page 225**

1    arms of those filters, and I look at shapes which
2    are consistent with different degrees of
3    perforation through the wall of the vena cava and
4    then I calculate the strains imposed on the filter
5    by expansion and contraction of the wall of the
6    vena cava, and then I consider that in the light of
7    fatigue performance of the material.
8        Q   And so that's what I wanted to ask you for
9    each of these connections. So your alleged
10   connection between perforation and tilt, have you
11   done a model of that? And which one of it is?
12   Just point me to which one it is.
13       A   So are you asking me have I looked at
14   perforation that occurs first and then leads to
15   tilt? Is that the --
16       Q   Yes.
17       A   Is that how I interpret the question?
18       Q   Or either -- or either way around.
19       A   Well, I -- I've carried out assessments in
20   which the process of -- of -- of perforation --
21   I've done calculations where the process of
22   perforation leads to tilt of the filter, so I've
23   done finite element calculations in which that
24   occurs as -- that tilting occurs as a consequence
25   of perforation. And it's in my report.

57 (Pages 222 - 225)

Robert McMeeking , Ph.D.                                July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 226

1   And then in terms of the question of tilt
2   leading to perforation, I've considered the
3   elevation of the loads that is associated with the
4   tilt in terms of one leg having a higher -- or one
5   arm having a higher load applied to the vena cava
6   than another, and concluded that that would lead to
7   more rapid perforation of one leg into the wall of
8   the vena cava.
9        And, in addition, that's supported by
10  calculations that Dr. Briant has done in regard to
11  comparing a tilted and untilted filter in terms of
12  the forces that the limbs apply to the wall of the
13  vena cava.
14       Q   And then with respect to any of your
15  opinions about interrelatedness of one complication
16  to the next, you agree that the relationships may
17  well be patient-specific?
18       MR. O'CONNOR: Object to the form of the
19  question.
20       THE WITNESS: I would -- I would assess
21  that in each -- in each patient, given the
22  differences in physiology, that different
23  interactions can occur in terms of what the
24  implications or what the consequences of tilt and
25  perforation is on -- in that particular patient.

Page 227

1   BY MS. DALY:
2        Q   And that, for example, perforations
3   occurring at different places in the filter --
4        MR. O'CONNOR: Object to the form -- form
5   of the question.
6        MS. DALY: I'm not sure why you're
7   objecting to that.
8        Q   That perforations in different struts in a
9   given filter may result in no increased strains
10  that will lead to a fracture; is that fair to say?
11       MR. O'CONNOR: Object to the form of the
12  question.
13       THE WITNESS: No, I think in every case,
14  that perforation of one limb will lead to an
15  increase in strains in the filter compared to what
16  you get in an unper- -- did I say perforation?
17  BY MS. DALY:
18       Q   Uh-huh.
19       A   We're talking about perforation.
20       So that perforation of one limb would
21  increase the strains in that limb and the limb
22  opposite it compared to what you would get in an
23  unperforated filter, and this would occur whether
24  it's two neighboring filters -- sorry, two
25  neighboring limbs that perforate or three

Page 228

1   neighboring limbs that perforate or any combination
2   of limbs that -- that perforate, because it's the
3   interaction between one limb and the one that's
4   opposite on the clock that determines the degree of
5   strain that will develop as a consequence of the
6   motion of the vena cava wall.
7        Q   And the one that's on the opposite side of
8   the clock, if it's perforating the same amount,
9   what then?
10       A   Well, if -- if the two are perforating
11  on -- if they're opposite each other on the clock,
12  then that is going to give you bigger strains than
13  if one alone on that pair of limbs perforates.
14       Q   But you haven't done any specific modeling
15  to look at the clock and try different sequences of
16  perforating limbs and see what the strains are?
17       MR. O'CONNOR: Object to the form of the
18  question.
19       THE WITNESS: Other than what I just
20  described, I haven't done that kind of modeling.
21  BY MS. DALY:
22       Q   Okay.
23       A   But I should say I don't think that that
24  kind of modeling is necessary to make the
25  conclusions I just gave you.

Page 229

1        Q   And have you determined an amount of
2   perforation that's required to start to increase
3   the strain?
4        MR. O'CONNOR: Object to the form.
5        THE WITNESS: Even a small amount of
6   perforation will increase the strain.
7   BY MS. DALY:
8        Q   Increase the strain to the point of
9   contributing to a fatigue fracture?
10       A   I haven't -- well, I have in the -- in the
11  calculations that are -- I draw your attention to
12  my report where in one section there are a whole
13  lot of tables and the --
14       Q   We're looking --
15       A   -- tables --
16       Q   -- at Exhibit 2?
17       A   Yes. Exhibit 2.
18       Q   Okay.
19       A   And we're looking at Section -- well, I
20  can do it in terms of page numbers.
21       Q   Yeah.
22       A   We're looking at pages 45 or maybe 44
23  through --
24       Q   Okay.
25       A   -- through page 53 or so.  Yeah, 53.  And

58 (Pages 226 - 229)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 230

1    in each of these tables there's a calculation for
2    different degrees of perforation that has taken
3    place for a pair of arms which are on the opposite
4    side of each other on the clock.
5        Q   Right.
6        A   And the resulting strain is in the table,
7    and one can compare the strain in the table with
8    the fatigue limit of the material and when the
9    strain in the table crosses the fatigue limit, then
10   that will begin to induce failures which will
11   eventually happen if the number of cycles of
12   loading occurs to take the material to its -- to
13   its fracture condition as a consequence of the
14   cyclic loading of the material.
15       Q   So this section that's here at 45 that
16   you've just described is where you compare the --
17   the arms perforating on opposite sides of the
18   clock, if you will?
19       A   That's correct, yes.
20       Q   Okay.  All right.
21       A   Yes.
22       Q   And what is the least perforation that you
23   considered, the least amount of perforation?
24       A   Well, I'd have to compare every result and
25   every table, which could take some time.  I --

Page 231

1    well, the least --
2        Q   I mean, do you know the range?  That's
3    what I'm saying.  Do you --
4        A   Well, actually the least perforation I
5    considered was zero.
6        Q   Okay.
7        A   And then --
8        Q   Show me what page is your highest shown.
9        A   Well, in some of the tables I don't
10   actually give the results, so of all the four
11   tables I can't give you an answer, but in the
12   tables where I do give the results, the answer is
13   in Table 2 at the bottom, on the bottom line where
14   the degree of perforation is 3.5 millimeters.
15       Q   Okay.  And that's page what?
16       A   Page 49.
17       Q   49.  That's where I am.  Okay.
18       MR. O'CONNOR:  How do you take it?  Black?
19       THE WITNESS:  Yes, black, please.  Thank
20   you.
21   BY MS. DALY:
22       Q   Have you done any work to look at the
23   probabilities of, for example, fracture in --
24       (Brief interruption.)
25       MS. DALY:  I forgot what I was saying.

Page 232

1    Can you read what I started to say.
2        (Record read as follows:
3        "Have you done any work to
4        look at the probabilities of,
5        for example, fracture in --")
6    BY MS. DALY:
7        Q   Fracture in a filter that has nothing
8    going on but two perforating arms on opposite sides
9    of the clock to, what was it, 3.5 millimeters out?
10       MR. O'CONNOR:  Object to the form of the
11   question.
12       THE WITNESS:  I'm sorry, could you repeat
13   the question.
14   BY MS. DALY:
15       Q   Yeah.
16       Have you done any work to look
17   statistically at probabilities of fil- -- of when
18   filters will fracture based on perforations that
19   they have present, tilt they have present, any of
20   the complications?
21       MR. O'CONNOR:  Form.
22       THE WITNESS:  I haven't done statistical
23   assessments of that situation.
24   BY MS. DALY:
25       Q   Okay.  And similarly, you have not done

Page 233

1    any statistical assessment of the probability of a
2    filter that is -- has experienced one complication,
3    let's say perforation, having another complication,
4    let's say tilt?
5        MR. O'CONNOR:  Objection.
6        THE WITNESS:  Can I --
7        MR. O'CONNOR:  Form.
8        THE WITNESS:  I'd like to augment my
9    previous question (sic), which is that if I assume
10   in certain sizes of the vena cava if the
11   perforation continues to the extent that I've
12   assumed, that the probability of the frac- -- the
13   fatigue -- the limb failing by fatigue after a
14   certain number of cycles is very high, and if --
15   and if you take a large number at a certain stage,
16   over half of those filters would fail.
17   BY MS. DALY:
18       Q   In a certain amount of time, what does
19   that mean?
20       MR. O'CONNOR:  Object to the form.
21       THE WITNESS:  Can you -- can you tell me
22   what I said.
23       MS. DALY:  Yeah, would you re-read his
24   last answer, because he had something about a
25   certain amount of time.

59 (Pages 230 - 233)

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 234

1    (Record read as follows:
2    "I'd like to augment my previous
3    question (sic), which is that
4    if I assume in certain sizes of
5    the vena cava if the perforation
6    continues to the extent that I've
7    assumed, that the probability of
8    the limb failing by fatigue after
9    a certain number of cycles is very
10   high, and if you take a large
11   number at a certain stage, then
12   half of those filters would fail.")
13   BY MS. DALY:
14   Q    At a certain number of cycles.  What are
15   those -- what's the certain number of cycles?
16   A    Well, it depends on the strain which is
17   involved, and the bigger the strain, the smaller
18   the number of cycles.
19   Q    So you're saying in a given filter, if
20   that given filter has the condition that you've
21   modeled, after a certain number of cycles, that you
22   haven't computed what those are, it's more -- it's
23   50 percent likely to -- to fracture?
24   A    That's correct.
25   Q    But we don't know what the cycle numbers

Page 235

1    are?
2    A    Well, if we look at the Bard data and we
3    take that as the true reflection of how the
4    material behaves, then that can be used to look at
5    the number of cycles that will give you that
6    50 percent level of the -- of the limbs failing.
7    Q    So in everybody who's got a perforation to
8    the extent of -- what?  What number?  What --
9    A    3.5 millimeters.  This number is what
10   would occur if the filter is perforated to the
11   extent that it goes back to its designed shape.
12   Q    So in everybody that has a perforated
13   filter 3.5 millimeters or more outside the vena
14   cava in some number of cycles that you can't
15   compute --
16   A    Well, we have to be careful how we
17   interpret this number, because the 3.5 millimeters
18   is where the elbow is outside of the vena cava, so
19   there's also the -- lower arm would be outside
20   the vena cava as well, so this is a very large
21   element of the limb outside of the vena cava.
22   Q    Okay.  So very large element is outside
23   the vena cava and in a certain number of cycles
24   that you cannot compute, 50 percent of those will
25   fail?

Page 236

1    MR. O'CONNOR:  Form.
2    THE WITNESS:  But I said I can compute it.
3    BY MS. DALY:
4    Q    The number of cycles?  What number of
5    cycles then?
6    A    Well, for example, in -- if the number is
7    in a -- is exactly equal to the fatigue limit of
8    the material, then the number of cycles involved
9    would be 10 to the 8.
10   Q    So have you done that type of calculation
11   for any individual person?
12   A    No, I have not.
13   Q    Okay.  So you don't have from a real-life
14   person any example of where you followed them
15   through imaging, saw what was happening with
16   perforation or tilt or movement of the filter, put
17   these calculations on it and said "A-ha, they had a
18   fracture"?
19   MR. O'CONNOR:  Object to the form of the
20   question.
21   THE WITNESS:  I have not gone through such
22   a process.
23   BY MS. DALY:
24   Q    Okay.
25   MR. O'CONNOR:  How do you spell "a-ha"?

Page 237

1    MS. DALY:  She knows how to spell it.
2    Q    All right.  We are going to case-specific.
3    Starting with Ms. Booker's case.  And
4    starting with your report in Ms. Booker's case.
5    A    Okay.
6    Q    All right.  You say in your Booker report,
7    page 2, paragraph 1 that, quote, "I have determined
8    to a reasonable degree of engineering and
9    scientific certainty that Ms. Booker's G2 filter
10   experienced all of the failure modes consistent
11   with defects inherent in that filter."
12   Is that what you say?
13   A    That's what I said.
14   Q    Okay.  Then in that same report on page 1,
15   and it's bullet No. 2, you state that "The filter
16   caudally migrated 3 centimeters, tilted 18 to 20
17   degrees with the tip to the wall, 8 of 12 struts
18   perforated, many to adjacent organs, vessels or
19   structures, and three struts fractured."  Right?
20   A    That's correct.
21   Q    What did you do to determine that
22   Ms. Booker's filter experienced those things?
23   A    I read the reports of Dr. Hurst and
24   Dr. Muehrcke, and I also looked through medical
25   records myself, although I primarily relied on

60 (Pages 234 - 237)

Robert McMeeking , Ph.D.                           July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 238

1  Dr. Hurst and Dr. Muehrcke, although my reading of
2  the medical records is consistent with what I saw
3  in the reports by Dr. Hurst and Dr. Muehrcke.
4      Q    So based on the medical records that you
5  read, you can say that somebody other than Hurst
6  and Muehrcke has said the filter caudally migrated
7  3 centimeters --
8      A    Oh, sorry, I should -- so what I was able
9  to determine is that some of these failure modes --
10     Q    Okay.
11     A    -- occurred.
12     Q    But not with tiny detail?
13     A    Not -- not with this detail.
14     Q    Okay.
15     A    And not all of them from the medical
16 records.  The others were gathered from the medical
17 expert reports.
18     Q    And you've said many times today you're
19 not a doctor.  You don't deem yourself to be
20 qualified to read medical records and interpret
21 whether what the doctor reported is accurate?
22         MR. O'CONNOR:  Form.
23         THE WITNESS:  That's correct.
24 BY MS. DALY:
25     Q    And you do not deem yourself to be

Page 239

1  qualified to read imaging to a level that would
2  allow you to determine the depth of a perforation
3  or the amount of tilt, that kind of thing?
4      A    I didn't read imaging in the -- in four of
5  these cases, so -- and I don't -- I don't claim to
6  be an expert in reading such imaging.
7      Q    Okay.  Muehrcke's report, if you want to
8  look at that, at page 8, the top paragraph, and I
9  hope I gave you ones that have page numbers on it
10 because he didn't number his.  Do yours have page
11 numbers?
12     A    No.
13     Q    Shoot.
14     A    So when I get to 8, it's the second to
15 last page, is that --
16     Q    Yeah.  Sorry.  At the top he says "There
17 are multiple legs penetrating through the IVC
18 wall," and then he describes "a leg extending into
19 the aorta 8 millimeter" --
20     A    Could you tell me which paragraph we're
21 on.
22     Q    Yeah, I'm at the very top here.
23     A    That looks different from my copy so --
24     Q    Hmmm.
25     A    It's --

Page 240

1      Q    Let me see your -- oh, right here.  The
2  first word there.  "Multiple legs penetrating" --
3      A    Okay.  Start from there?
4      Q    Yes.
5      A    All right.
6      Q    "Multiple legs penetrating through the IVC
7  wall, with one extending into the aorta 8
8  millimeters."  All right.  That's the kind of
9  information that you had to accept as accurate from
10 Dr. Muehrcke?
11     A    That's correct.
12     Q    All right.  How about the fact of tilt or
13 caudal migration, is that something you were able
14 to determine yourself?
15     A    I did not determine that myself, and I
16 don't recall whether I saw reference to tilt in the
17 medical records.
18     Q    All right.  And then he goes on and says
19 "Additionally, filter struts perforated the small
20 bowel, psoas muscle, lumber vein at L4."  Again,
21 that's not something that you determined on your
22 own?
23     A    No, not by myself.
24     Q    All right.  And then Hurst's report, page
25 5 and 6, let's look at him.

Page 241

1      A    Oh, Hurst.  Sorry.
2      Q    He put page numbers on there, which is
3  good.  And he starts with, like paragraph little C,
4  he's talking about the -- the filter having no tilt
5  and its placement -- no tilt, no fracture, and its
6  placement at the right pedicle of the L2?
7      A    Yes.
8      Q    All right.  This is not imaging you looked
9  at yourself and made your own conclusions?
10     A    No, I did not look at the imaging.
11     Q    All right.  And then he goes on in E and G
12 on the next page and he gives very specific
13 interpretations of the imaging, degrees of tilt,
14 which arms at which position are in a Grade III or
15 Grade II.  You see those kinds of things?
16     A    Yes, I see that, yes.
17     Q    All right.  And again, you would rely on
18 Dr. Hurst for that?
19     A    That --
20     Q    For that kind of detail?
21     A    Yes, that kind of detail, yes.
22     Q    Okay.  Do you know what he means by a
23 Grade II or a Grade III perforation --
24     A    I'd have to --
25     Q    -- what his --

61 (Pages 238 - 241)

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 242

1   A   I'd have to look back at papers to find
2   the definition of Grade III, but I have come across
3   it in papers but I can't quote it to you.
4   Q   Have you ever talked to him about what his
5   definition is of Grade II --
6   A   No, I have not.
7   Q   -- or Grade III?
8   A   No.
9   Q   Okay. All right. Whoops.
10      And it appears that Dr. Muehrcke did not
11  read imaging as -- in as much detail as Dr. Hurst;
12  would you agree with that?
13  A   I don't have any opinion on that.
14      MR. O'CONNOR: Form.
15  BY MS. DALY:
16  Q   Okay. You don't know if they're
17  consistent in what they've read or they're
18  inconsistent?
19  A   I don't know.
20  Q   Okay. Dr. Hurst and Dr. Muehrcke both say
21  in their reports, and you could look at Dr. Hurst's
22  opinions in -- at paragraph 4, which is on page 8,
23  and go to page -- I'm sorry -- I'm sorry, go to
24  page 12. Under his opinions, page 12, H. Hurst
25  says "In rendering my opinions in this matter, I

Page 243

1   took into consideration Ms. Booker's comorbidities,
2   medical history and preexisting problems."
3       Do you see that he says that?
4   A   I see that he says that.
5   Q   And then Muehrcke on the last page of his
6   report in Booker, just before his signature page,
7   paragraph second from the bottom, he says exactly
8   the same thing. "I was" -- "I am aware of
9   Ms. Booker's comorbidities, medical history and
10  preexisting problems, and these are taken into
11  consideration in rendering my opinions."
12      Do you see he says that?
13  A   The meaning of the sentence is the same,
14  yes.
15  Q   Okay. What comorbidities, medical history
16  or conditions did they take into consideration as
17  far as you know?
18      MR. O'CONNOR: Form.
19      THE WITNESS: Well, I don't know except
20  what's in this report, so I'd have to read it and
21  then identify what other problems the patient had,
22  but I -- I'm --
23  BY MS. DALY:
24  Q   And that really wasn't a good question.
25  I'm sorry.

Page 244

1       Do you know what conclusions they drew
2   from taking into consideration these comorbidities,
3   medical history, and so on?
4   A   No, I don't.
5       MR. O'CONNOR: Object to the form.
6   BY MS. DALY:
7   Q   Okay. Did you take into consideration any
8   of Ms. Booker's comorbidities, medical history or
9   preexisting conditions?
10  A   No, I didn't.
11  Q   Do you know if she had any medical
12  history, comorbidities, preexisting conditions that
13  may have impacted the performance of her filter in
14  any way?
15  A   I -- I'm not aware of any. I -- I just
16  don't know. I haven't gotten the information.
17  Q   Did you read the deposition of the
18  retrieving doctor in Ms. Booker's case, who is
19  Dr. Kang?
20  A   No, I did not.
21  Q   Did he verify whether there was caudal
22  migration?
23      MR. O'CONNOR: Form.
24  BY MS. DALY:
25  Q   Do you know?

Page 245

1   A   I don't know. Unless it's in the --
2   Dr. Hurst's or Dr. Muehrcke's report, which I'd
3   have to read to find out, but otherwise I wouldn't
4   know.
5   Q   Okay. Whatever Dr. Kang had to say you
6   did not rely on in giving this Booker report; is
7   that fair?
8   A   No, I did not.
9   Q   Okay. Did you read any of the Bard
10  case-specific medical experts' reports in the
11  Booker case?
12  A   No.
13  Q   You conclude that the events that occurred
14  to Ms. Booker's filter are consistent with the
15  kinds of failures that you've discussed in your
16  reports and we've discussed today, right?
17  A   That's correct.
18  Q   And, therefore, with respect to any tilt
19  or any perforation or fracture or migration that
20  might occur in a Bard filter, you're of the opinion
21  that they were caused by filter defects?
22  A   That's my opinion in that the -- their
23  design and the testing of them was insufficient to
24  reveal whether they were adequate to the task that
25  they were expected to perform in the patient.

62 (Pages 242 - 245)

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 246

1     Q   Okay.
2     A   And, therefore, that in -- in that sense,
3   these filters are dangerous to the -- to the
4   patient.
5     Q   And -- and by "dangerous," again, you're
6   not saying that from a medical standpoint, correct,
7   whether when something happens to the filter it
8   hurts them?
9     A   That's correct, I'm simply observing
10  that -- that these events, especially the fracture
11  of a filter, seem like, or they are, undesirable
12  phenomena that I would not like to have happen
13  inside me.
14    Q   You have not attempted to model or do any
15  calculations with respect to Ms. Booker's vena cava
16  size?
17    A   No.
18    Q   Her respiratory rate?
19    A   No.
20    Q   Her Valsalva experience?
21    A   No.
22    Q   Her -- the quality of her vena cava tissue
23  or the quality, flexibility, inflexibility, of
24  nearby organs?
25        MR. O'CONNOR:  Object to the form of the

Page 247

1   question.
2         THE WITNESS:  I haven't looked into that
3   in any manner, although I should say that in my
4   assessment, these failures are entirely predictable
5   in the sense that they're going to occur in -- in
6   some patients and they're going to be some -- they
7   are going to be phenomena that will occur in some
8   cases.
9   BY MS. DALY:
10    Q   But that doesn't make it predictable
11  because it happens in some cases and it doesn't
12  happen in other cases?
13        MR. O'CONNOR:  Form.
14        THE WITNESS:  Well, it's predictable in a
15  cohort of patients but not -- doesn't -- I'm not
16  saying it's predictable in any specific case.
17  BY MS. DALY:
18    Q   Are you saying it's predictable in any
19  particular population of patients?
20        MR. O'CONNOR:  Form.
21        THE WITNESS:  I'm -- no, I'm not saying
22  that.  I'm saying that overall the individuals who
23  receive filters, that it's predictable that some of
24  them will fail in the manner that's observed in
25  these cases.

Page 248

1   BY MS. DALY:
2     Q   And you know that Bard warns in its IFU
3   that those are risks associated with these filters,
4   true?
5         MR. O'CONNOR:  Form.  Foundation.
6         THE WITNESS:  I know that they warn of
7   risks.  I'm not completely familiar with -- with
8   what risks they warn of.
9   BY MS. DALY:
10    Q   And going back to my question, you also
11  have not attempted to do any calculations specific
12  to Ms. Booker putting in as variables which of her
13  filter struts were perforating or the extent to
14  which they were perforating, correct?
15    A   Correct.
16    Q   You have also not done any calculations in
17  her case putting in this alleged caudal migration
18  and what the extent of that caudal migration was,
19  correct?
20    A   Correct, I have not put that into any
21  calculation.
22        MR. O'CONNOR:  Object to form.
23  BY MS. DALY:
24    Q   Nor have you put in any calculation on the
25  degree of tilt that Dr. Hurst is reporting,

Page 249

1   correct?
2     A   No, I have not done that.
3     Q   So you have not generated any modeling
4   specific to Ms. Booker that you can tell us "Here
5   were the strains that were going on specifically in
6   Ms. Booker in these locations at these times during
7   the time her filter was in situ"?
8     A   No, I haven't.
9         MR. O'CONNOR:  Object to the form of the
10  question.
11        THE WITNESS:  I have not done that.
12  BY MS. DALY:
13    Q   All right.  Let's talk about Ms. Hyde.
14  All right.  In Ms. Hyde's report, it's page 1 at
15  the very bottom, the beginning of the last sentence
16  to the top of page 2.  You say the same thing you
17  said in Ms. Booker's case, you say "I've determined
18  to a reasonable degree of engineering and
19  scientific certainty" -- "certainty that Ms. Hyde's
20  G2/G2X filter experienced all the failure modes
21  consistent with defects inherent in that filter,"
22  correct?
23    A   That's correct.
24    Q   Why do you say G2/G2X there as opposed to
25  knowing if it's one or the other?

63 (Pages 246 - 249)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 250

1    A   Because the information that I had didn't
2  allow me to tell whether it was actually a G2 or a
3  G2X filter that was involved.
4    Q   Okay.  Then in your report page 1, bullet
5  2, you note that Mrs. Hyde's filter tilted,
6  caudally migrated, perforated in multiple struts,
7  and an arm fractured and embolized to her heart,
8  right?
9    A   Correct.
10   Q   When you say "arm," do you mean arm or do
11 you mean a strut?
12   A   I mean a strut.
13   Q   So it could have been an arm or a leg?
14   A   Could have been an arm or a leg.
15   Q   You don't know which?
16   A   Correct.
17   Q   All right.  Do you know -- what did you do
18 to determine if Ms. Hyde experienced these events
19 or when?
20   A   I read the reports by Dr. Hurst and
21 Dr. Muehrcke.
22   Q   Okay.
23   A   And I read her medical rec- -- the medical
24 records I had available to me, and the combination
25 of those sources gave me the information, which is

Page 251

1  in these bullet points.
2    Q   Did you principally rely on what either
3  Dr. Muehrcke or Dr. Hurst said?
4    A   I principally relied on them.
5    Q   Okay.  So let's look at Muehrcke first,
6  and his report on page 1, paragraph 1, lists as her
7  failure modes there before the colon, "Caudal
8  migration, tilt fracture, perforation, penetration
9  of adjacent organs and structures, and embolization
10 of a fracture of the filter that fractured."
11       Do you see that?
12   A   I see that, yes.
13   Q   Then Dr. Hurst -- oh, and he doesn't -- I
14 note that Dr. Muehrcke doesn't cite to any medical
15 records where he got that information.  I mean, he
16 lists medical records he saw but I mean right where
17 he's talking about those things, he doesn't cite to
18 a -- to a medical record, correct?
19   A   Yeah, there's no citation right there.
20 I'd have to review the whole report to see whether
21 he cites specific records elsewhere.
22   Q   He -- he lists -- well, I thought he
23 listed records but I don't see them.  At any rate,
24 let's go to Hurst.  Page 6.
25   A   Okay.

Page 252

1    Q   Paragraph 4, little 2.
2    A   Okay.
3    Q   Hurst says that the filter was implanted,
4  that's little 1, was implanted on 2-25-11, and then
5  little 2I he says "Filter subsequently caudally
6  migrated, with penetration of multiple arms and
7  legs, ultimately led to fracture of a stabilizing
8  arm that went to the right ventricle."
9        Do you know whether in her case the
10 fracture was an arm or a leg?
11   A   Well, reading this section, I assumed it's
12 an arm because of how that paragraph was written.
13   Q   Do you know for sure?
14   A   I don't know for sure.
15   Q   Okay.
16   A   Since often, as I think you probably know,
17 there are different terms used for different
18 struts.
19   Q   Right.  Some people call all the pieces
20 struts, some call them arms.
21   A   Right.
22   Q   Okay.  Now, in this report on Ms. Hyde,
23 different from the report that Dr. Hurst did on
24 Booker, if you look through here with me there is
25 not a detailed interpretation by him of imaging

Page 253

1  where he says, you know, the 1:00 arm is doing
2  this, the 6:00 arm is doing that?
3        MR. O'CONNOR:  Object to the form of the
4  question.
5  BY MS. DALY:
6    Q   Correct?
7    A   Well, sorry, can you draw me -- draw my
8  attention to --
9    Q   Yeah.  I don't see where he said that
10 anywhere.
11   A   Well, again, I'd have to look through the
12 whole report to confirm that but --
13   Q   Well, he doesn't.
14   A   Yeah.
15   Q   And you're welcome to look through that,
16 but you'll see he doesn't with the specificity he
17 did for Booker.  He doesn't say which -- which
18 filter strut is perforating to what degree on what
19 image.  That's my only point.
20       MR. O'CONNOR:  Object to the form of the
21 question.
22       THE WITNESS:  That would appear to be the
23 case.
24 BY MS. DALY:
25   Q   Okay.  So what we don't have from

64 (Pages 250 - 253)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 254

1    Dr. Hurst -- and you're welcome to look at
2    Dr. Muehrcke's too, he doesn't do it either -- what
3    we don't have from Muehrcke or Hurst is any detail
4    of information about which struts perforated, how
5    much they perforated or when they perforated
6    relative to each other or relative to the fracture?
7        MR. O'CONNOR: Form.
8    BY MS. DALY:
9        Q   Is that fair?
10       MR. O'CONNOR: And foundation.
11       THE WITNESS: That would appear to be the
12   case.
13   BY MS. DALY:
14       Q   Okay. Now, with respect to Ms. Hyde, do
15   you have any information on your own or from
16   Dr. Hurst or Dr. Muehrcke about what her vena cava
17   tissue quality, firmness, flexibility was?
18       A   I have no information on that.
19       Q   Or what her blood flow was?
20       A   No, no information on that.
21       Q   What her respiration rate was?
22       A   I have no information on that.
23       Q   What her experiences were with Valsalva?
24       A   No information on that.
25       Q   Do you know how the sleep apnea that she's

Page 255

1    been diagnosed with may have impacted her filter?
2        A   No, I haven't thought about that.
3        Q   Okay. What about her smoking history, how
4    that might have impacted the filter?
5        MR. O'CONNOR: Form. Foundation.
6        THE WITNESS: I'm not an expert in
7    medicine, so I'm not able to make that to --
8    assessment.
9    BY MS. DALY:
10       Q   And another one is did you -- did you try
11   to determine how, if at all, anti-coagulant use
12   might have impacted issues with the filter?
13       A   No, I haven't made that assessment since
14   I'm not an expert in -- in that aspect of the
15   situation.
16       Q   And Drs. Hurst or Muehrcke, or any other
17   doctor for that matter, did not give you any such
18   information for -- for Ms. Hyde?
19       A   I didn't observe anything about that.
20       Q   All right.
21       A   At least I don't recall observing anything
22   like that in their reports.
23       Q   Once again in the same areas in their
24   report, Hurst and Muehrcke both say we took into
25   consideration the plaintiff's comorbidities,

Page 256

1    medical history and preexisting conditions. Same
2    question I had for you for Ms. Booker and Ms. Hyde:
3    You don't know what Dr. -- what Dr. Hurst or
4    Dr. Muehrcke took into consideration about those
5    items?
6        A   No, I don't know how -- what they took
7    into consideration.
8        Q   Okay. And you did not take those things
9    into consideration in your opinions?
10       A   No, I did not.
11       Q   Okay. Do you know that it's Dr. Kuo that
12   removed Ms. Hyde's filter and strut?
13       A   I don't recall whether I read that
14   somewhere but I may well have, but...
15       Q   Do you know whether he reported that there
16   was caudal migration or not?
17       A   I read the medical records and that may
18   have been in there, but I don't recall whether it
19   was.
20       Q   Was there anything that he provided, as
21   far as you recall, about when any migration of her
22   filter, if it happened, began and what its
23   progression was over time?
24       A   No, I don't recall that. It -- it may
25   have been in the medical records I read, but I

Page 257

1    don't recall the details.
2        Q   Did you take any details from Dr. Kuo's
3    operative report or his deposition about what he
4    observed with respect to perforation of any of the
5    struts of the filter when he went to retrieve it?
6        MR. O'CONNOR: Object to the form of the
7    question.
8        THE WITNESS: I didn't use any of that
9    information.
10   BY MS. DALY:
11       Q   And likewise, did you use any information
12   from Dr. Kuo about whether any of the struts were
13   perforating into any adjacent organs, vessels or
14   anything like that?
15       A   No, I didn't take any of that information
16   or use it.
17       Q   And -- and you didn't have any information
18   about what the quality of tissue or the density of
19   tissue was in any of her adjacent organs or
20   vessels?
21       A   No, I didn't have any information about
22   that.
23       Q   In your report on Hyde, your own report,
24   in -- on page 1, bullet 3, you say that she
25   underwent successful retrieval of the filter and a

65 (Pages 254 - 257)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 258**

1  complex procedure performed by Dr. Kuo of the
2  filter fragment from the heart.
3     A   Yes.
4     Q   Do you know what "complex procedure"
5  means?
6     A   Well, again, since I'm not a medical
7  expert I don't know precisely what it meant, but
8  since the -- since the fragment was in the heart,
9  it must have been a complicated procedure that was
10  undertaken.
11     Q   I guess my -- did you borrow that term
12  from some medical thing that you read as opposed to
13  your own opinion that it was complex?
14        MR. O'CONNOR:  Form.
15        THE WITNESS:  It was my interpretation of
16  what I read in the Hurst and Muehrcke reports and
17  possibly also what I read in the medical records
18  from Dr. Kuo's reports.
19  BY MS. DALY:
20     Q   Did you read what Dr. Kuo's procedure
21  notes indicated that the procedure entailed, the
22  procedure that he did entailed?
23     A   I believe I did read it, but I don't
24  recall any details.
25     Q   Do you recall that he described for the

**Page 259**

1  strut retrieval that it was a single snare attempt
2  of the filter and immediate removal of the strut?
3     A   I don't recall that.
4        MR. O'CONNOR:  Form.
5  BY MS. DALY:
6     Q   Okay.  Would you defer to medical people
7  to describe how complex or difficult this procedure
8  was for Ms. Hyde?
9     A   Well --
10        MR. O'CONNOR:  Form.
11        THE WITNESS:  -- going with a catheter
12  inside the heart and with a snare seems like a
13  complex procedure to me, but I would defer to
14  medical experts in terms of where that scales on
15  the level of complexity.
16  BY MS. DALY:
17     Q   Okay.  In your report on page 1, bullet 4,
18  you state that in Ms. Hyde's case the filter was
19  "used as intended, properly implanted and there
20  were no other causes for failure," so I want to
21  talk about those one at a time.  Okay?
22     A   Okay.
23     Q   What do you mean with respect to
24  Ms. Hyde's case that the filter was used as
25  intended?

**Page 260**

1     A   Well, it was implanted as a filter in her
2  vena cava.
3     Q   Okay.
4     A   And it -- I rely on Dr. Hurst and
5  Dr. Muehrcke for that information.
6     Q   And did you know that in her case she'd
7  had recurrent DVT and pulmonary embolus in the
8  past?
9     A   I may have read that in her medical
10  records but I don't recall.
11     Q   And you're not -- when you say the filter
12  was used as intended, you're not intending to make
13  any comment about whether she was a proper
14  candidate for the filter medically?
15     A   No.  No.
16        MR. O'CONNOR:  Form.
17  BY MS. DALY:
18     Q   Okay.  You said that the filter was
19  properly implanted.  On what information do you
20  rely for that?
21     A   Well, I rely on Dr. Hurst and Dr. Muehrcke
22  who -- who, as I recall, state that the
23  implantation was successful.
24     Q   Okay.  You've made no independent
25  assessment of that?

**Page 261**

1     A   No.
2     Q   Okay.  The next thing you said is that no
3  other causes of the failures of that filter -- that
4  there were no other causes of the -- yeah, there
5  were no other causes of the failures of that
6  filter.  What does that mean, first of all?
7     A   Well, the -- I -- it means that the
8  experiences that I've described that implanted
9  filters go through when they're implanted in the
10  vena cava, such as expansion and contraction of the
11  wall of the vena cava and blood clots hitting it
12  and the other things that we've talked about, were
13  the causes of the failure of the filter.
14     Q   But do you agree with me that you did not
15  investigate anything specific about Ms. Hyde's
16  anatomy?
17     A   No, I didn't investigate that.
18     Q   Or her medical conditions?
19     A   No.
20     Q   Medical history?
21     A   I did not review other than the medical
22  records that were related to the filter.
23     Q   You just noted that for medical records or
24  from what Hurst and Muehrcke said, there was a
25  tilt, perforation, fracture and/or migration in her

66 (Pages 258 - 261)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 262

1  filter?
2      A   Correct.
3      Q   Okay.  Now, do you understand that nobody
4  has had the opportunity to examine either the
5  retrieved filter or the retrieved piece of
6  Mrs. Hyde's filter?
7      A   I need to look --
8          MR. O'CONNOR: Form.
9          THE WITNESS: -- at my report to see what
10  it -- what I obtained from the information.
11         Well, I don't comment on that, so I don't
12  know where the filter is and where the fragment is.
13  BY MS. DALY:
14     Q   Okay.  You have not seen any report from
15  Dr. Richie, for example, or Dr. Fasching examining
16  that filter?
17     A   No.
18     Q   So what we don't have as a piece of this
19  puzzle is whatever that filter or fragment might
20  have shown us that would give us any information
21  about the fracture, correct?
22         MR. O'CONNOR: Form.
23         THE WITNESS: Well, I don't know whether
24  Dr. Fasching or Dr. Richie have inspected the
25  filter, but if they haven't inspected the filter,

Page 263

1  then we don't have such information unless someone
2  else has inspected it for anyone in the -- in the
3  case.
4  BY MS. DALY:
5      Q   All right.  Okay.  Then you concluded
6  that -- in your report that the events that
7  occurred with Ms. Hyde's filter were consistent
8  with the kind of failures that you have discussed
9  in your prior reports and in -- and in this
10  deposition with me today, right?
11     A   Correct.
12     Q   Okay.
13     A   So they're -- they're consistent and they
14  support my assessment of those -- of those failure
15  modes.
16     Q   Well, they're consistent with what you --
17  with the modes you've talked about, correct?
18     A   Correct.
19     Q   All right.  But you have done no modeling
20  or calculations specific to anything about
21  Ms. Hyde, including you didn't calculate her vena
22  cava size, respiratory rate, Valsalva experience,
23  any other medical condition she had, extent of her
24  perforations, distance of her caudal migration,
25  degree of any tilt, extent to which the filter was

Page 264

1  catching clots, for example, to calculate any --
2  what strains were on her filter or any portion of
3  her filter at any time it was in situ, true?
4          MR. O'CONNOR: Form.
5          THE WITNESS: True, I have done none of
6  that.
7  BY MS. DALY:
8      Q   Okay.  All right.  Let's talk about
9  Ms. Jones.  As with the previous two Bellwether
10  reports, on page 1 -- actually, I'm sorry, it's at
11  page 2 at the top of the page -- you say again,
12  "I've determined to a reasonable degree of
13  engineering and scientific certainty that
14  Ms. Jones' Eclipse filter experienced all the
15  failure modes consistent with defects inherent to
16  that filter," correct?
17     A   Yes, that's what is written, yes.
18     Q   And then on page 1, bullet 4 of your
19  report, you list complications for Ms. Jones as
20  filter tilt, migration, and one strut fractured,
21  correct?
22     A   Let me read through the information.
23         Yes, they're all there, yes.
24     Q   And then you note that the in situ
25  fragment is in her right pulmonary artery?

Page 265

1      A   Yeah, at the time that I wrote this
2  report, that was the information available to me.
3      Q   Do you know anything new now?
4      A   I don't know anything else --
5      Q   Okay.
6      A   -- since then.
7      Q   So once again, as you said with the last
8  ones, you principally relied on Dr. Hurst and
9  Dr. Muehrcke's report of what was happening with
10  this patient, correct?
11     A   That's correct.
12     Q   All right.  So Dr. Muehrcke on page 1 of
13  his report, it's about the fourth line down, he
14  says the Eclipse filter implanted in her had the
15  following failure modes, and he has caudal
16  migration, tilt and fracture of the filter, with
17  embolization to the pulmonary vascu--
18  vasculature.  Do you see that?
19     A   I see that, yes.
20     Q   Okay.  And again, he does not -- you can
21  flip through -- he does not discuss in any detail
22  at all where he gets that information.
23         MR. O'CONNOR: Object.
24  BY MS. DALY:
25     Q   He's listed some medical records at page

67 (Pages 262 - 265)

Robert McMeeking , Ph.D.                                                July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 266

1   6, which is four -- yeah, page 6 in.
2          MR. O'CONNOR: I object to the form of the
3   question.
4          THE WITNESS: Sorry, is that a question?
5   BY MS. DALY:
6   Q    Yeah.
7   A    What's the question?
8   Q    The question is: Do you see anywhere that
9   he has cited to a particular medical record that
10  shows these failure modes that he's listed on page
11  1?
12  A    Well, not a specific citation, but he -- I
13  think it's the same page that you're referring to.
14  He says "I also reviewed the following
15  case-specific medical records and images."
16  Q    Correct. But which of those show which
17  failure mode, he hasn't expressed that, correct?
18         MR. O'CONNOR: Form.
19         THE WITNESS: I need to read through them
20  all to see what's said against each of them.
21         Well, there's one that says "Chest X ray
22  with IVC filter being at the L2 lower vertebral
23  body and vertical, mostly with 4 percent tilt to
24  the left."
25  BY MS. DALY:

Page 267

1   Q    Right, so on page -- on page 7 he's got a
2   bullet point that says that, correct?
3   A    Well, I don't know if -- I have to count
4   to get --
5   Q    I know.
6   A    -- to whether it's page 7.
7   Q    Sorry about that.
8   A    But it's -- it's just above a section
9   that's entitled "Case-specific" --
10  Q    Correct.
11  A    -- "opinions regarding Doris Jones."
12  Q    Correct.
13  A    And then there's IV- -- there's -- it
14  doesn't say what it is but he does refer
15  specifically in the next line to "IVC filter with a
16  right mid-lung metallic object near the right
17  hilum," and then --
18  Q    Uh-huh.
19  A    -- the next one down referring to PA and
20  lateral films which show the right middle lung
21  metallic device.
22  Q    Okay.
23  A    So there are some -- there's some
24  specificity.
25  Q    Okay. And what he has here for amount of

Page 268

1   tilt, the only thing I see is the 4 percent, which
2   I'm not sure what that means, we normally -- you
3   and I normally talk about that in degrees, right?
4   A    Correct. Yeah.
5   Q    All right. So then let's look at --
6          MR. O'CONNOR: Belated objection to the
7   form.
8   BY MS. DALY:
9   Q    -- Dr. Hurst.
10  A    Can I comment that you can -- you could
11  compare it to degrees.
12  Q    Okay. Degrees or percent?
13  A    Degrees or percent, they are more or less
14  equivalent.
15  Q    Well, wait a minute. Degrees goes around
16  in a circle and that's 360, and percent only has
17  100. I'm a lawyer.
18  A    Right.
19  Q    Yeah, we won't -- we won't waste time on
20  that.
21  A    Sorry, I was thinking of radians, radians,
22  which you then have to convert.
23  Q    I will not put my math up to yours.
24  A    You're -- I stand corrected. I stand
25  corrected.

Page 269

1   Q    That was pretty smart of me just then.
2          Okay. Hurst, let's look at Hurst, page 5,
3   and if you look under B he's talking about the
4   implant or Dr. Avino positioning it, the filter in
5   her case, with the superior tip at L2-L3. Do you
6   see that?
7   A    Yes.
8   Q    All right. And then below that, on E, he
9   also talks about the filter fragment in the right
10  middle lobe of the pulmonary artery?
11  A    Yes.
12  Q    Okay. All right. Okay. Beyond what's in
13  Dr. Hurst and Dr. Muehrcke's reports, did you do
14  anything else to verify whether there were
15  perforations, for example, in the case of
16  Ms. Jones?
17         MR. O'CONNOR: Form.
18         THE WITNESS: Well, I read some medical
19  records but I didn't directly look at them to --
20  well, I did, I looked for whether they mentioned
21  things like something outside of the vena cava, but
22  I didn't -- I didn't correlate what was -- what I
23  saw with what was in the Muehrcke and Hurst
24  reports.
25  BY MS. DALY:

68 (Pages 266 - 269)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 270

1     Q    So do you know if she had perforations or
2  not?
3     A    I don't know.
4     Q    Okay.
5     A    Actually, I should look at this again to
6  see what it says in the summary.
7     Q    Sure.
8     A    So there's no mention of perforations, so
9  it appears that there's no record of perforation.
10    Q    All right. And you read off a moment ago
11 that in Dr. Muehrcke's report he shows the tilt of
12 4 percent or 4 degrees, whatever --
13    A    4 percent.
14    Q    He says percent. Okay.
15         Do you know -- well, I'm assuming you
16 haven't talked to Dr. Muehrcke about what he means
17 by 4 percent?
18    A    No, I haven't.
19    Q    Whether it's our 4 degrees or it's
20 something else?
21    A    No, I haven't talked to him.
22    Q    Okay. Do you know that physicians who use
23 IVC filters typically don't consider a tilt to an
24 IVC filter to be clinically significant unless it's
25 15 degrees or above?

Page 271

1         MR. O'CONNOR:  Form.
2         THE WITNESS:  I don't know that for a fact
3  myself.
4  BY MS. DALY:
5     Q    Okay. And then again, other than
6  Muehrcke's information about a 4 percent tilt, do
7  you have any other information of her filter
8  progressing beyond that to a greater degree of tilt
9  at any time that she had it?
10    A    Not to my recollection.
11    Q    And again with her, you have not gotten
12 any information that gives you data on what the
13 quality of her vena cava tissue is or its firmness
14 or its flexibility?
15    A    No.
16         MR. O'CONNOR:  Form.
17 BY MS. DALY:
18    Q    And you have not had any information about
19 what her blood flow was?
20    A    No.
21    Q    Her respiratory rate --
22    A    No.
23    Q    -- while she had the filter?
24    A    No.
25    Q    What information -- any information about

Page 272

1  whether she experienced Valsalva movements?
2         MR. O'CONNOR:  Form.
3         THE WITNESS:  I have no information about
4  that.
5  BY MS. DALY:
6     Q    Do you know how her history of GI bleeds
7  and being on anti-coagulants may have impacted the
8  filter?
9     A    Since I'm not a medical expert, I have no
10 view on that.
11    Q    Okay. And once again in this report,
12 Dr. Hurst and Dr. Muehrcke both say they took into
13 consideration the plaintiff's comorbidities,
14 medical history and preexisting conditions with
15 respect to her. Do you know what interpretation,
16 if any, they made of those things?
17    A    No.
18         MR. O'CONNOR:  Object to form.
19         THE WITNESS:  I don't know.
20 BY MS. DALY:
21    Q    And you did not take those into
22 consideration yourself in drawing your conclusions?
23         MR. O'CONNOR:  Objection. Form.
24         THE WITNESS:  No, I did not.
25 BY MS. DALY:

Page 273

1     Q    Okay. Now, in Mrs. Jones' case, did you
2  read the deposition of her retrieving doctor, a
3  Dr. Kristin Nelson?
4     A    No, I did not.
5     Q    Do you know if she verified whether there
6  was migration of the filter?
7         MR. O'CONNOR:  Form.
8         THE WITNESS:  No, I don't -- I don't know
9  that.
10 BY MS. DALY:
11    Q    Or perforation?
12    A    I don't know. I don't know.
13    Q    Okay.
14    A    I don't know what she said.
15    Q    Okay. About any complication --
16    A    About anything.
17    Q    -- that she saw?
18    A    Yeah, about anything.
19    Q    You do know that she saw a fracture
20 because she made an attempt to remove the piece?
21    A    Well, I may have observed that in the
22 medical records, but I don't recall exactly whether
23 it was this case or another one.
24    Q    Okay.
25    A    Of course it may have been someone else,

69 (Pages 270 - 273)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 274

1    another physician involved if it was another case.
2       Q    All right.  Now, also in Mrs. Jones'
3    report on page 1 at your bullet -- your last bullet
4    there, bullet 5, you say that "Ms. Jones' Eclipse
5    filter was used as intended, properly implanted,
6    and there was no other causes of failures of that
7    filter."
8          Again with her, what did you mean for her
9    when you said the filter was used as intended?
10      A    I mean it was implanted in her vena cava
11   and it functioned as a filter within her vena cava.
12      Q    And you didn't try to make any assessment
13   whether her previous bleeding issues or anything
14   made her a good candidate for the filter?
15      A    I did not make that assessment.
16      Q    Okay.  Did you make any assessment of
17   whether it was properly implanted or you just
18   accepted the doctor's statements on that?
19      A    I relied on --
20           MR. O'CONNOR:  Object to form.
21           THE WITNESS:  -- Dr. Hurst and
22   Dr. Muehrcke in -- on that question.
23   BY MS. DALY:
24      Q    And then with respect to your comment "no
25   other causes of failures of the filter were

Page 275

1    present," you did not, in making that -- in giving
2    that opinion, you did not investigate anything
3    specific to Ms. Jones' anatomy or medical
4    conditions, medical history, true?
5       A    Correct.
6           MR. O'CONNOR:  Form.
7    BY MS. DALY:
8       Q    And in her case, has -- do you -- nobody
9    has sent you a report showing that they have
10   examined the removed filter, correct?
11      A    That's correct.
12      Q    And assuming that the piece is in situ and
13   we don't have the filter, we can't look on either
14   the filter or the piece to determine what it might
15   tell us about cause of fracture or contribution
16   to -- to the fracture, correct?
17           MR. O'CONNOR:  Object to the form.
18           THE WITNESS:  I need to look at what I
19   say.
20           So I don't know where the filter is.  It
21   was removed successfully, but otherwise I don't
22   know where it is.  And as of the time of writing of
23   this document, the fragment was still within her,
24   so...
25   BY MS. DALY:

Page 276

1       Q    So without those pieces of evidence, we --
2    we don't have the physical evidence from the
3    fragment or the filter to help us look at causes of
4    the fracture, true?
5           MR. O'CONNOR:  Form.
6           THE WITNESS:  Without either the filter or
7    the fragment, that information's not available.  Or
8    cannot be obtained safely.
9    BY MS. DALY:
10      Q    So again in your report, you concluded
11   that events that occurred with Ms. Jones' filter
12   were consistent with the kinds of failures that
13   you've discussed in your prior reports and in this
14   deposition today, correct?
15      A    That's correct.
16      Q    Okay.  And again, you have not attempted
17   to do any modeling or calculations specific to
18   Ms. Jones that might include consideration of her
19   vena cava size, respiratory rate, Valsalva
20   experience, vena cava or surrounding organ tissue
21   quality or stiffness, existence or extent of
22   perforations, existence of or distance of any
23   alleged caudal migration, the degree of tilt of her
24   filter, whether the filter was catching clots at
25   the time, in order to calculate any strains that

Page 277

1    might have been occurring in her filter at any
2    location at any time, true?
3           MR. O'CONNOR:  Object to the form of the
4    question.
5           THE WITNESS:  I have not done any
6    calculations related to those phenomena that you
7    describe.
8    BY MS. DALY:
9       Q    So we'll go to --
10          MR. O'CONNOR:  What is the time, by the
11   way?
12   BY MS. DALY:
13      Q    -- Ms. Kruse.
14          THE VIDEOGRAPHER:  It's 4:12.
15          MR. O'CONNOR:  No, how long have we been
16   on?
17          THE VIDEOGRAPHER:  We've been on the
18   record for 5 hours and 36 minutes.
19          MR. O'CONNOR:  Thanks.
20   BY MS. DALY:
21      Q    And just -- you don't have to go off the
22   record for this, the reason I'm going through each
23   one of these boringly repetitively is that they'll
24   each be separate cases, obviously, so I want to do
25   each one separately.

70 (Pages 274 - 277)

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 278

1      A    Thank you for clarifying that.  Thank you.
2      Q    It's not that I'm just done and I'm water
3  hammering you.
4           Okay.  So we're going to Ms. Kruse.  In
5  your report on Ms. Kruse on page 1, in the bottom
6  paragraph you say "I determined to a reasonable
7  degree of engineering and scientific certainty that
8  Ms. Kruse's G2 filter experienced all of the
9  failure modes consistent with defects inherent in
10  that filter," correct?
11     A    That's correct.
12     Q    And then on page 1 at bullet 3 you talk
13  about the failure modes, and you've listed filter
14  tilted in excess of 15 degrees and embedded in the
15  wall; 5 of 12 struts of her IVC filter perforated
16  the vena cava with involvement of vital organs,
17  vessels and structures; filter caudally migrated
18  approximately 5 centimeters; and filter not
19  retrieved and remains in place.
20     A    That's correct.
21     Q    All right.  And what did you do to
22  determine that Ms. Kruse's filter had experienced
23  each of those events?
24     A    I read the medical records that I had
25  available to me, I read Dr. Hurst's report and

Page 279

1  Dr. Muehrcke's report.
2      Q    Okay.  And would -- do you rely on
3  Dr. Hurst and Dr. Muehrcke's report principally for
4  being able to say that her filter experienced these
5  things?
6      A    Yes, I relied principally on those two
7  reports.
8      Q    All right.  Let's look at Hurst on her
9  first.  Page 5.  Section D.  If you would, go back
10  a page to page 4 and look at -- under "Case
11  Summary," paragraph 3A and B.  Dr. Hurst is
12  reporting that a G2 filter was placed on July 8,
13  2009 in Ms. Kruse, correct?
14     A    Yes, the date against that paragraph is
15  the 8th of July 2009.
16     Q    Yes.  And then if you look at his comments
17  in D where he is referencing a CT of abdomen and
18  pelvis 3-7-11 --
19     A    Yes.
20     Q    -- he is commenting on "The tip of filter
21  caudally migrated 5 centimeters."
22     A    Yes.
23     Q    So at least based on Dr. Hurst's
24  materials, somewhere between implant in July of '09
25  and this CT in March of '11 the filter caudally

Page 280

1  migrated?
2      A    That's correct.
3      Q    Okay.
4      A    According to this information.
5      Q    And then below that he says that the
6  filter is tilted more than 15 degrees --
7      A    Correct.
8      Q    -- do you see that?
9      A    Yes.
10     Q    And he identifies perforation with a
11  vertebral body and an iliac artery wall of some
12  struts there?
13     A    Which -- which line is that?
14     Q    In little -- in Roman vi, vii, viii, ix
15  and x, he's talking about different perforating
16  struts.
17     A    Yes.
18     Q    And he also gives his grading, II or III
19  on that, right?
20     A    That's correct.
21     Q    And you do not know what Dr. Hurst's own
22  definition is of Grade II or III?
23     A    No, I don't.
24     Q    Okay.  Do you have any information that
25  Ms. Kruse's filter has tilted more than the amount

Page 281

1  that Dr. Hurst is commenting on it in this imaging
2  in 2011?
3      A    Well, I would have to read through the
4  report to see whether that's mentioned elsewhere in
5  the report --
6      Q    Okay.  Go ahead.
7      A    -- and in Dr. Hurst's report and I --
8  possibly read the medical records again, but right
9  as I -- what I have now, I don't have information
10  about that.
11     Q    Okay.
12          MR. O'CONNOR:  Well --
13  BY MS. DALY:
14     Q    And do you have any information about any
15  changes in the number or extent of perforation of
16  struts in her filter as described by Dr. Hurst
17  here?
18     A    Well, I really should read what's in here
19  before I --
20     Q    Yeah, go ahead.
21     A    -- answer the question.
22     Q    Go ahead.
23          MR. O'CONNOR:  Let's take five minutes
24  while he's doing that, please.
25          MS. DALY:  Uh-huh.

71 (Pages 278 - 281)

Robert McMeeking , Ph.D.                                July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 282**

1    THE VIDEOGRAPHER: We're going off the
2 record at 1617.
3    (Brief pause.)
4    THE VIDEOGRAPHER: We're back on the
5 record at 1618. This is the end of Media No. 4.
6 We are going off the record at 1618.
7    (Recess taken.)
8    (Whereupon, Deposition Exhibits 7A, 7B,
9    8A, 8B, 9A, 9B, 10A, 10B, 11A and 11B
10    were marked for identification by the
11    Court Reporter.)
12    (Record read as follows:
13    "And do you have any information
14    about any changes in the number
15    or extent of perforation of
16    struts in her filter as described
17    by Dr. Hurst here.")
18    THE VIDEOGRAPHER: This is the beginning
19 of Media No. 5. We are back on the record at 1625.
20    THE WITNESS: Well, having read the
21 report, I realize that Dr. Hurst says that it was
22 observed that the filter tilted to more than 15
23 degrees at some stage.
24    So correcting what I said before, there is
25 information that says that the tilting preceded

**Page 283**

1 beyond 15 degrees. I have -- the comment on
2 perforation is -- is not there to allow me to --
3 sorry, there is no comment on the perforation in a
4 manner that allows me to say whether perforation
5 increased in number in terms of the number of limbs
6 involved or progressed further than it was in the
7 observation at the 7th of March 2011.
8 BY MS. DALY:
9    Q   All right. Let's look at Dr. Muehrcke,
10 page 1. In that first paragraph he describes the
11 following failure modes: Caudal migration, tilt,
12 fracture, perforation of the vena cava, penetration
13 of adjacent organs and structures, and
14 irretrievability.
15    MR. O'CONNOR: Where -- where are you
16 looking at? I'm sorry.
17    MS. DALY: Page 1 of Muehrcke. We're not
18 in Hurst, we're on Muehrcke.
19    MR. O'CONNOR: Are you talking about
20 Kruse?
21    MS. DALY: Yeah.
22    MR. O'CONNOR: Okay. Thank you.
23 BY MS. DALY:
24    Q   Do you see where he's said that?
25    A   Oh. Yes. Yes.

**Page 284**

1    Q   Okay. Do you have any information either
2 on your own or from Dr. Hurps -- Hurst or anything
3 that Dr. Muehrcke cites to that Ms. Kruse has a
4 fracture?
5    A   I need to look again at my report.
6    Q   Sure.
7    A   See what I say.
8       I make no mention of fracture, so that
9 would indicate that there is no information
10 indicating a fracture has taken place.
11    Q   Okay. And with Ms. Kruse, you have not
12 received any information about the quality,
13 flexibility, firmness, or lack thereof, of her vena
14 cava tissue?
15    A   Correct.
16    Q   Or of the stiffness, lack of stiffness, or
17 makeup of her vertebral bodies or iliac artery
18 vessel?
19    MR. O'CONNOR: Form.
20    THE WITNESS: No specific information on
21 that.
22 BY MS. DALY:
23    Q   You don't have any information about what
24 her blood flow was?
25    A   No information on that.

**Page 285**

1    MR. O'CONNOR: Form.
2 BY MS. DALY:
3    Q   Or what her typical respiratory rate was?
4    A   I have no information on that.
5    Q   Do you have any information on whether she
6 experienced Valsalva movements and to what extent?
7    A   I have no information on that.
8    Q   Do you know whether her diabetes, anemia,
9 use of anti-coagulants or her cancer issues played
10 any role in impacting the filter?
11    A   Since I'm not a medical expert, I can't
12 make an assessment of that.
13    Q   Dr. Hurst and Dr. Muehrcke in this report
14 also said they took into consideration the
15 plaintiff's comorbidities, medical history and
16 preexisting conditions. Again, you do not know
17 what interpretation of those they did; is that
18 correct?
19    A   That's correct, I don't know what
20 interpretation they placed on that.
21    Q   And you did not interpret or rely on
22 anything about her comorbidities, medical history
23 or preexisting conditions in your opinions, true?
24    A   That's correct.
25    Q   On page 1 of your report, and it's bullet

72 (Pages 282 - 285)

Page 286

1  4, you -- you say that her "G2 filter was used as
2  intended, properly implanted, and there were no
3  other causes of failures of that filter."
4      With respect to Ms. Kruse, are you giving
5  any opinion with respect to whether she was an
6  appropriate candidate for the filter?
7  A  I'm not giving any opinion on that.
8      MR. O'CONNOR:  Form.
9  BY MS. DALY:
10 Q  Are you aware that she had had recurrent
11 DVT and PE with anti-coagulants prescribed before
12 the time that she was implanted with the filter?
13 A  I may have been aware of that from reading
14 her medical records, but I don't recall.
15 Q  With respect to the comment on "proper
16 implant," would you defer to Dr. Hurst or Muehrcke
17 or the medical records about whether that was a
18 properly done implant?
19 A  Well, I would defer to Drs. Hurst and
20 Muehrcke and the physician who prepared the medical
21 records.
22 Q  Okay.  With respect to your comment "no
23 other causes of the failures of the filter," did
24 you investigate anything specific to Ms. Hyde's
25 anatomy or medical conditions?

Page 287

1      MR. O'CONNOR:  Kruse.
2      MS. DALY:  Oh.  Sorry.
3      MR. O'CONNOR:  That's all right.
4  BY MS. DALY:
5  Q  Did you investigate anything specific to
6  Ms. Kruse's anatomy, medical conditions, history or
7  comorbidities?
8  A  No, I did not.
9  Q  If there was any fracture in this filter,
10 you're not aware of anyone having been able to
11 inspect the filter or the fractured limb, correct?
12     MR. O'CONNOR:  Form.
13     THE WITNESS:  Repeat the -- repeat the
14 question, please.
15 BY MS. DALY:
16 Q  Yeah.
17     You don't know if -- if anyone -- if there
18 is a fracture in this filter, you are not aware of
19 anyone who has looked at either the filter or the
20 fragment, true?
21 A  That's correct.
22 Q  So to the extent -- to the extent that
23 looking at the filter or the fragment might tell us
24 something about causation of the fracture, as far
25 as you know that has not been done?

Page 288

1      MR. O'CONNOR:  Form.
2      THE WITNESS:  That has not been done, so
3  the information directly from the fracture surface
4  has not been obtained.  But, nevertheless, we still
5  know to a reasonable degree of -- of engineering
6  probability that if it has fractured as in -- that
7  as in the other cases which have fractured, that
8  the cause is very probably fatigue fracture.
9  BY MS. DALY:
10 Q  But there are other causes that you all
11 have talked about, Dr. Richie and you have talked
12 about, that initiate fracture besides -- like
13 perforation, right?
14     MR. O'CONNOR:  Object to the form.
15 BY MS. DALY:
16 Q  Let me restate that.
17 A  I --
18 Q  There are causes of fracture that might
19 include contact wire to wire that you might be able
20 to see on surfaces, true?
21 A  But -- but that would initiate fatigue
22 fracture.
23 Q  Right.  Well, everything -- to have a
24 fatigue fracture, you've got to have fatigue,
25 right?

Page 289

1  A  Yes.  Correct.
2  Q  Okay.  So in every case, if it is
3  determined that a fracture was fatigued as opposed
4  to a cutting -- a cutting of the wire or something
5  like that, there's going to be some cause for
6  fatigue, correct?
7  A  Okay.  The -- the statement I made is that
8  it is a fatigue mechanism that causes the fracture,
9  and that fatigue mechanism will go back to some
10 source that initiates the fatigue cracking and the
11 fatigue damage that the filter is experiencing,
12 although filter -- although just cycling the
13 material through a range of strains will cause
14 fatigue damage within the material, so even if
15 there are not features present in the material that
16 you can identify specifically as associated with
17 the design of the filter or its manufacturing.
18     So my point is simply that it is fatigue
19 failure that is most likely to have caused the
20 fractures that we're looking at in all of these
21 cases, if there are fractures --
22 Q  Okay.
23 A  -- in any given case.
24 Q  And you will agree with me that with
25 respect to any given person, there are numerous

Robert McMeeking , Ph.D.                                      July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 290

1   permutations of conditions that the filter can be
2   in?
3       A   There are many configurations it can be
4   in, yes.
5       Q   And those can be impacted by
6   patient-specific things?
7       A   That's correct.
8       Q   And they can be dependent on -- well, I'll
9   just leave it at that, patient-dependent things,
10  you agree with that?
11      MR. O'CONNOR:  Form.
12      THE WITNESS:  I agree, but these
13  patient-dependent things are entirely predictable
14  in terms of what will happen over a population of
15  patients who are implanted with vena cava filters.
16  BY MS. DALY:
17      Q   But what's not predictable is whether
18  Ms. Kruse will have a perforation and Ms. Smith
19  might not?
20      MR. O'CONNOR:  Form.
21      THE WITNESS:  Well, without the relevant
22  information, that -- it's not possible to make that
23  prediction.
24  BY MS. DALY:
25      Q   Right.  You can't ever predict for a given

Page 291

1   person what complication they're going to have with
2   the medical device, true?
3       MR. O'CONNOR:  Form.
4       THE WITNESS:  Well, I think you can, but
5   the -- gathering the information you need to do
6   that is the challenge --
7   BY MS. DALY:
8       Q   Yeah.
9       A   -- rather than the actual carrying out of
10  the prediction.
11      Q   Okay.  And now with respect to Ms. Kruse,
12  I think this is where I was, you have not attempted
13  to do any models or calculations specific to her as
14  a patient, for example, using as a variable her
15  vena cava size, her respiratory rate, any Valsalva
16  experience she had, the quality of her vena cava
17  tissue or surrounding organ or vessel tissue, the
18  extent of her perforations, the degree of any tilt
19  that she had, the extent to which the filter was
20  catching clots, to calculate specific strains in
21  any portion of the filter at any time in her?
22      A   That's correct.
23      MR. O'CONNOR:  Form.
24  BY MS. DALY:
25      Q   All right.  Let's talk about Ms. Mulkey.

Page 292

1       With Ms. Mulkey, your report at the top of
2   page 2 says that "I have determined to a reasonable
3   degree of engineering and scientific certainty that
4   Ms. Mulkey's Eclipse filter experienced all the
5   failure modes consistent with defects inherent in
6   that filter," correct?
7       A   That's correct.
8       Q   And then your report page 1, bullet 3,
9   says that her filter tilted approximately 20
10  degrees and embedded to the wall of the IVC, 4 of
11  12 struts of her IVC perforated the vena cava with
12  involvement in vital organs and structures adjacent
13  to the vena cava, her filter migrated approximately
14  3 centimeters, and one of the stabling arms of her
15  filter fractured and has yet to be located.
16      On what information did you rely for those
17  events?
18      A   A combination of the medical records and
19  in this case there -- I think I'm correct in saying
20  there were some copies of imaging, so I need to
21  look at that.
22      Q   Okay.
23      A   I think it's this case I had some images,
24  copies of images, but I'm not absolutely sure.  But
25  I looked at that, I looked at the medical records,

Page 293

1   and I looked at the reports by Drs. Hurst and
2   Muehrcke.
3       Q   Were you able to confirm that there was
4   any fracture?
5       A   You mean -- can you repeat the question
6   and clarify.
7       Q   Yeah.
8       Were you able to confirm that there was a
9   fracture in Ms. Mulkey's filter?
10      A   You mean independently of reading the
11  reports by Drs. Hurst and Muehrcke?
12      MR. O'CONNOR:  Object to the form of the
13  question.
14  BY MS. DALY:
15      Q   Which of them indicates that they have
16  identified a fracture?
17      A   I need to look through those reports to --
18      Q   Sure.
19      A   -- determine that.
20      MR. O'CONNOR:  Go ahead.
21  BY MS. DALY:
22      Q   And let me help you.  Are you on Hurst?
23      A   I'm on Hurst, yes.
24      Q   Look at page 6, G, F and G.
25      A   Yes, it says in F that -- that the -- that

Robert McMeeking , Ph.D.                                          July 6, 2017
In Re: Bard IVC Filters Products Liability

**Page 294**

1 it was demonstrated that there was additional
2 failure to the filter with an internal fracture of
3 the 11:00 stabilizing arm.
4      Q   And what does Dr. Muehrcke say about
5 fracture, other than on -- on page 1 he says that
6 the failure modes were caudal migration, tilt,
7 fracture, perforations of the vena cava and
8 perforation --
9      A   I would have to look at the report to see
10 that.
11      Q   Yeah.  Okay.
12      A   On the second to last page.
13      Q   Uh-huh.
14      A   In the first full paragraph it says, in
15 the sentence that begins -- one, two, three, four,
16 five, six, seven -- seventh line, "This risk of
17 harm is ongoing as Ms. Mulkey is exposed to further
18 and progressive perforation of her vena cava,
19 penetration of adjacent vital organs and
20 structures, additional strut fracture, and
21 embolization of the existing fracture fragment."
22 And then there's more words in that sentence, too.
23      Q   Okay.  Does he -- does he cite to where
24 he's -- he's seeing this alleged strut fracture or
25 progression of perforation?

**Page 295**

1      MR. O'CONNOR:  Object to the form of the
2 question.
3      THE WITNESS:  He does not specifically
4 cite any observation, but nevertheless, I find the
5 report very informative because of the information
6 which is within it.
7 BY MS. DALY:
8      Q   If --
9      A   As I do the report by Dr. Hurst and all
10 the other reports in the Bellwether cases.
11      Q   Have you read any of Bard's case-specific
12 medical experts?
13      A   No, I have not.
14      Q   Do you know that the doctors don't agree
15 about there being a fracture in Ms. Mulkey?
16      A   I'm not aware of that.
17      MR. O'CONNOR:  Object to the form of the
18 question.
19 BY MS. DALY:
20      Q   Do you know that the doctors don't agree
21 about there being a fracture in Ms. Kruse?
22      MR. O'CONNOR:  Object --
23      THE WITNESS:  I'm not --
24      MR. O'CONNOR:  -- to the form of the
25 question.

**Page 296**

1      THE WITNESS:  I'm not aware of that.
2 BY MS. DALY:
3      Q   You noted in your report a foreign -- what
4 did you say?  The -- something about a foreign
5 object that has yet to be located?
6      A   Can you find the --
7      Q   Yeah, let me --
8      A   -- the line.
9      Q   I think it's in your final bullet point
10 there.  Yeah.
11      A   Final bullet point on page --
12      Q   No, it's the third bullet point.  The last
13 line of the third bullet point.
14      A   Oh.  So it says "One of the stabilizing
15 arms of her filter fractured and has yet to be
16 located."  Is that the --
17      Q   Yeah.
18      A   That's what you're referring to?
19      Q   And -- and you're basing that on Hurst and
20 Muehrcke's saying that there's been a fracture and
21 it hasn't been located?
22      A   That's correct.
23      Q   Okay.  I mean, I'm making -- you haven't
24 looked at imaging and said "Oh, there's no fracture
25 located"?

**Page 297**

1      A   No, I haven't done that.
2      Q   Okay.  And with respect to Ms. Mulkey, do
3 you have any information about her tissue quality,
4 firmness, flexibility, or lack thereof, in the vena
5 cava?
6      MR. O'CONNOR:  Form.
7      THE WITNESS:  No, I have no such
8 information.
9 BY MS. DALY:
10      Q   Do you have any information about her --
11 her tissue quality, flexibility, firmness, or lack
12 thereof, in any of her adjacent organs or vessels?
13      A   No, I have no specific information about
14 that.
15      Q   Did you have any information about what
16 her blood flow rate was?
17      A   No, I have no such information.
18      Q   Or about her respiratory rate?
19      A   I have no such information.
20      Q   Or about information -- any information
21 about her experience of Valsalva movements or how
22 often?
23      A   No, I have no such information.
24      Q   Dr. Hurst and Dr. Muehrcke both said in
25 their reports that they took into consideration

75 (Pages 294 - 297)

Robert McMeeking , Ph.D.                              July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 298

1  plaintiff's comorbidities, medical history and
2  preexisting conditions. Do you know what
3  interpretation they have made of those items?
4      A   No --
5      MR. O'CONNOR: Form.
6      THE WITNESS: -- I do not know.
7  BY MS. DALY:
8      Q   And you have not taken into consideration
9  any comorbidities, medical history or preexisting
10  conditions in Ms. Mulkey in making your opinions in
11  the case?
12      MR. O'CONNOR: Object --
13      THE WITNESS: No --
14      MR. O'CONNOR: -- to the form of the
15  question.
16      THE WITNESS: -- I have not.
17  BY MS. DALY:
18      Q   In your report, page 1, in your last
19  bullet point, you say "The filter was used as
20  intended, properly implanted, and there were no
21  other causes for failure."
22      With respect to Ms. Mulkey, do you have
23  any information about why her doctors made the
24  decision to implant her with the IVC filter?
25      MR. O'CONNOR: Form.

Page 299

1      THE WITNESS: Well, I've read some medical
2  records and the information may be in there, but
3  I -- I don't recall the reasons from that.
4  BY MS. DALY:
5      Q   Do you recall that she had recurrent DVT
6  and PDN and was about to undergo surgery at the
7  time?
8      A   I may have read that, but I don't recall
9  that specific information.
10      Q   With respect to your comment on proper
11  implantation, do you defer to either Hurst,
12  Muehrcke or other medical specialists to give the
13  opinion whether it was a proper implant?
14      A   I defer to Drs. Hurst, Muehrcke and the
15  implanting -- implanting physician.
16      Q   Okay. With respect to your comment "no
17  other causes of failures of the filter," do you
18  agree that you have not done anything specific to
19  Ms. Mulkey to determine information about her
20  anatomy, medical conditions, medical history or
21  comorbidities?
22      A   I have done --
23      MR. O'CONNOR: Object to form.
24      THE WITNESS: -- nothing concerning those
25  issues.

Page 300

1  BY MS. DALY:
2      Q   If there was a fracture in her filter, do
3  you agree that we -- do you have any information
4  that anybody has been able to examine the filter
5  itself or this alleged fragmented piece?
6      MR. O'CONNOR: Form.
7      THE WITNESS: It appears that both the
8  filter itself and the fragment are -- at the time
9  of writing of this document, were still in
10  Ms. Mulkey, and, therefore, it's not been possible
11  to examine those pieces of the filter.
12  BY MS. DALY:
13      Q   Okay. You conclude that the events that
14  occurred in Ms. Mulkey's filter are consistent with
15  the kinds of failures that we've discussed in this
16  deposition and in your reports in the litigation,
17  correct?
18      A   That's correct.
19      Q   All right. But you've not attempted to
20  model or do any calculations of Ms. Mulkey's vena
21  cava size, her respiratory rate, Valsalva
22  experience, her vena cav- -- cava or surrounding
23  organ and vessel tissue or stiffness, nor have you
24  done any modeling of any -- the extent of her
25  perforations, the degree of any tilt that her

Page 301

1  filter experienced, the extent to which it was
2  catching clots to calculate what strains may have
3  been in play on Ms. Mulkey's filter at any time --
4      MR. O'CONNOR: Form.
5  BY MS. DALY:
6      Q   -- while it's been in situ?
7      A   I have --
8      MR. O'CONNOR: Objection. Form.
9      THE WITNESS: I have not done anything on
10  those issues specific to Ms. Mulkey.
11  BY MS. DALY:
12      Q   Okay. Let me look at my notes.
13      You cannot say to a reasonable degree of
14  engineering probability that any given Bard filter
15  in any given patient will have any complication?
16      MR. O'CONNOR: Form.
17      THE WITNESS: I can say to a reasonable
18  degree of probability that it is likely that there
19  will be some complications in a population of
20  patients, but I cannot specify that for any
21  individual member of that population.
22  BY MS. DALY:
23      Q   And can you determine what percentage of
24  population of people with Bard filters will
25  experience any complication?

76 (Pages 298 - 301)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 302

1      MR. O'CONNOR: Form.
2      THE WITNESS: No, I cannot, but there will
3  be some fraction of the population will experience
4  complications, and that is predictable.
5  BY MS. DALY:
6      Q   But not the individual?
7      MR. O'CONNOR: Form.
8      THE WITNESS: Not for any individual
9  without information that would be a challenge to
10  gather.
11  BY MS. DALY:
12      Q   And not -- not the rate at which it will
13  happen?
14      MR. O'CONNOR: Form.
15      THE WITNESS: Well, for an individual it
16  would either happen or it wouldn't, so I'm not
17  quite sure what that question means.
18  BY MS. DALY:
19      Q   For the population.
20      A   For the population, again, if one has
21  enough information about distributions of all the
22  attributes of the population, that kind of
23  assessment could be made, but that information
24  would be a challenge to collect, so...
25      Q   And you have not done that?

Page 303

1      A   I have not done that.
2      Q   Okay. Thank you, Dr. McMeeking.
3      MR. O'CONNOR: Okay. I've got some
4  follow-up. I'll just come over there so you're not
5  looking over at me.
6      (Brief pause.)
7
8      EXAMINATION
9  BY MR. O'CONNOR:
10      Q   Dr. McMeeking, if you would, find the
11  three general reports we've been talking about
12  today.
13      A   Okay.
14      Q   And I think it's a report dated March 3,
15  2017; another report dated April 7, 2017; and a
16  report dated May 11, 2017. Am I right?
17      A   Yes. So Exhibit 2 is report dated --
18      Q   That's March 3.
19      A   I'll find it. I'm just double-checking.
20  It's dated March 3, 2017. Exhibit 3 is a report
21  dated April 7, 2017. And Exhibit 4 is a report
22  dated May the 11th, 2017.
23      Q   And in addition, we marked your five
24  Bellwether individual reports today, correct?
25      A   That's correct.

Page 304

1      Q   Any other reports that were marked today
2  that you prepared?
3      A   That I prepared? I don't believe so, no.
4      Q   All right. Now, Dr. McMeeking, do the
5  reports that you've talked about today, the ones we
6  just listed, do those set forth your opinions and
7  the bases for the opinions that you've arrived at
8  that are to a reasonable degree of engineering
9  probability?
10      A   Yes, they do.
11      Q   And in arriving at your opinions, did you
12  follow a methodology?
13      A   I did.
14      Q   Did you follow a methodology that is
15  utilized by engineers in your field to solve and
16  resolve engineering problems?
17      A   Yes, I used the standard method knowledge
18  that's used by engineers in my field across a broad
19  range of -- of engineering problems, in addition --
20  and, in addition, that I used specifically in
21  addressing design analysis and testing of medical
22  implants for companies that manufacture such
23  devices.
24      Q   Did you exercise the same level of
25  intellectual rigor that's used by engineers,

Page 305

1  whether in litigation or outside of litigation,
2  to -- to address engineering issues and engineering
3  problems?
4      A   I did.
5      Q   Let's just talk about one of your
6  opinions. Based upon your assessment of the Bard
7  filters, the Bard retrievable filters, the G2, the
8  G2X, the Recovery, the Eclipse and the Denali and
9  Meridian, is it your opinion that failure modes
10  that we've talked about, tilt, perforation,
11  migration and fracture, are predictable based upon
12  those designs?
13      A   Yes, they are.
14      Q   Is that an opinion that you hold to a
15  reasonable degree of engineering probability?
16      A   I do.
17      Q   Now, in your opinions, you talked about
18  calculations that you performed?
19      A   Yes.
20      Q   Was it necessary to perform calculations
21  on each of the model filters or were you able to
22  use calculations that you have arrived at and apply
23  those to the Bard filter and Bard filter models?
24      A   I was able to do calculations for certain
25  models and then make use of the results of those

77 (Pages 302 - 305)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 306

1   calculations to understand and make a -- come to
2   opinions on the other models that I did not do
3   specific calculations for.
4       Q   And could you tell us, you described some
5   through, but tell us the types of calculations, the
6   types of analyses, that you performed in arriving
7   at your opinions in this case.
8       A   Well, I did Euler-Bernoulli beam
9   calculations to look at the strains induced in the
10  limbs of filters as the vena cava expands and
11  contracts.  I looked at some finite element
12  calculations for the same problem.  I carried out
13  finite element calculations to look at the
14  phenomenon of tilt in -- of the filter in the vena
15  cava.
16      Q   To arrive at the opinions, was it
17  necessary for you to engage in any type of testing
18  such as bench testing?
19      A   No, it wasn't necessary for me to carry
20  out any bench testing.
21      Q   Why?
22      A   Because I had information that was
23  available to me from tests carried out by Bard and,
24  in addition, I had my engineering analysis which
25  enabled me to assess the phenomenon that would take

Page 307

1   place in the filters in the circumstances that I
2   described.
3       Q   Your report -- and you were asked some
4   questions today about Bard testing and Bard
5   analyses, so let's just talk about testing.  Have
6   you reviewed the testing, bench testing, that Bard
7   did of its filters?
8       A   I've reviewed a lot of the bench testing
9   that Bard did of the filters.
10      Q   And what is your opinion about the
11  bench -- the testing, including bench testing, that
12  Bard did?
13      A   That the testing that they undertook was
14  inadequate and that it was not at a level that
15  would enable them to understand the failures that
16  are likely to occur in the filter.
17      Q   Explain your opinion, if you will.
18      A   Well, for example, they didn't identify
19  the worst-case conditions that the filter would
20  experience, and they didn't test the filter in
21  conditions that would reproduce such worst-case
22  conditions.
23      Q   Do your reports detail your opinions about
24  the inadequacy of testing?
25      A   Yes, they do.

Page 308

1       Q   And when you talk about worst-case
2   scenario, is that a standard that engineers are
3   required to follow?
4       A   Yes, in dealing with this kind of problem,
5   engineers are expected and required to identify the
6   worst-case conditions and then take that into
7   consideration when assessing the performance of
8   their design and the consequences of -- of the
9   design.
10      Q   Now I want to -- I want to move around a
11  little bit.  Well, let me ask you about
12  calculations and analyses.  You talked about the
13  ones you've performed.  In your work in this case,
14  did you look at and review the types of
15  calculations, the engineering analyses, that Bard
16  performed?
17      A   I reviewed finite element calculations
18  that they performed.
19      Q   And do you have an opinion about whether
20  those were sufficient or adequate?
21      A   Almost all of them were inadequate for
22  various reasons.
23      Q   What were the reasons, among the reasons,
24  please?
25      A   Well, some of the reasons were that it was

Page 309

1   clear that they were not carried out in a reliable
2   manner and the results looked inconsistent with
3   each other within sets of calculations and
4   comparing some calculations from one set with
5   calculations from another, and that this was not
6   scrutinized in a way that would enable the
7   discrepancies to be understood so that the
8   calculations could be carried out in a reliable and
9   accurate manner.
10          In addition, the assumptions that went
11  into the calculations were almost always not
12  appropriate for the calculations that were being
13  done, such as the constraints on the motion of the
14  components of the filter and the way that the
15  calculation was carried out to ensure that accurate
16  results were obtained.
17      Q   If the tests -- the analyses that Bard
18  performed were -- did take the step to be reliable
19  and were accurate, as you suggest they were not, do
20  you have an opinion whether Bard would have known
21  that its filters were predictably going to fail?
22      A   Yes.
23          MS. DALY:  Object to form.
24          THE WITNESS:  Those results, when
25  accurately computed, would have revealed that there

78 (Pages 306 - 309)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 310

1   were failure modes that would be predictable when
2   the filters were implanted in patients.
3   BY MR. O'CONNOR:
4       Q    Does that include migration?
5       A    That includes migration.
6       Q    Fracture?
7       A    Fracture.
8       Q    Tilt?
9       A    Tilt.
10      Q    And perforation?
11      A    And perforation.
12      Q    You were asked questions about the Denali
13  filter.  You have evaluated the Denali filter?
14      A    I have evaluated it in -- in -- in terms
15  of its features that make it similar and different
16  from other models in the -- in the Bard line of
17  filters.
18      Q    And have you determined that the design of
19  the Denali fil- -- filter will cause it to
20  predictably fail?
21      A    Yes.
22      Q    And what is the based -- what is that
23  opinion based upon?
24      A    Because it is very similar in shape and
25  configuration to the other filters which also --

Page 311

1   which themselves are subject to failures, and the
2   analysis that I've done on the various Bard filters
3   indicates that such failure modes will be present
4   in them.  And because of the similarities that the
5   Denali has with the ones that I analyzed, one will
6   expect the same kind of failures to occur in the
7   Denali.
8       Q    You discussed your reports do cite
9   references to medical literature and other
10  literature?
11      A    That's correct.
12      Q    And did that literature that you reviewed
13  appear to have consistent findings that were
14  consistent with your opinions in this case?
15      A    Yes, the observations of -- of the medical
16  literature in terms of the failures that were
17  observed in implanted filters were consistent and
18  support the conclusions and opinions that I drew in
19  regard to the behavior of those filters and where
20  my opinions were based on my calculations.
21      Q    For example, you were asked questions
22  about an article written by Dr. Stavropoulous on
23  the Denali filter.  Do you remember that?
24      A    That's correct.
25      Q    And in that article, did it talk about

Page 312

1   dwell time?
2       A    May I look at the report?
3       Q    Please.
4       A    So that's Exhibit No. 12 and -- so in the
5   abstract it says "The mean filter dwell time at
6   trieval" -- "at retrieval was 200.8 days and the
7   range was 5 to 736."
8       Q    And -- and was there a limit in the number
9   of filters that were studied, patients?
10      A    There were 200 patients that were studied.
11      Q    Now, you mentioned something earlier in
12  your testimony, you talked about the filters, the
13  Recovery, the G2, the G2X, the Eclipse, the
14  Meridian and then the Denali.  You mentioned that
15  these filters were permanent filters?
16      A    The Recovery through the Denali were
17  optional filters, which means that they can be
18  implanted as permanent filters with an option to
19  retrieve.
20      Q    And was your point earlier that -- being
21  permanent, that the design should be one that will
22  not fail after it's implanted in a patient?
23      A    Yes.  Yes.  My --
24           MS. DALY:  Object to form.
25           THE WITNESS:  The important point is if a

Page 313

1   filter is to be used as a permanent filter, it
2   should be able to deal with the lifetime
3   environment that that filter will experience during
4   implantation.
5   BY MR. O'CONNOR:
6       Q    And when --
7       A    Since it will remain in the patient until
8   death, presumably.
9       Q    When you look -- did your work in this
10  case and read the medical literature, I think you
11  talked about this before, but due to the design
12  deficiencies, these dangerous designs, do you have
13  an opinion that there is a relationship that as
14  they stay in a patient, there's a greater
15  likelihood of failure?
16           MS. DALY:  Object to the form.
17           THE WITNESS:  Yes, since the failures that
18  I observed are -- or that I've dealt with are all
19  progressive and the tilt tends to be progressive
20  and increases over time, perforation is progressive
21  and increases over time, and fracture is a
22  progressive phenomenon in that it takes cycles of
23  loading for the fatigue damage to ultimately cause
24  fracture of the component, that is also a
25  time-dependent phenomenon.  And, therefore, the

79 (Pages 310 - 313)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 314

1    longer the filter is in a patient, the greater is
2    the likelihood that failure will occur.
3         MR. O'CONNOR:  Thank you.
4         I just got a message that the phone has
5    been disconnected.
6         MS. DALY:  Maybe it has a length of time
7    that it will do a conference call.  Probably --
8    that's probably it.  We're probably over the time
9    that the thing allows.
10        MR. O'CONNOR:  I wonder how we can
11   reconnect the people in.
12        THE COURT REPORTER:  Can we go off the
13   record?
14        MR. O'CONNOR:  Yes.
15        THE VIDEOGRAPHER:  We're going off the
16   record at 1705.
17        (Recess taken.)
18        THE VIDEOGRAPHER:  We are back on the
19   record at 1706.
20   BY MR. O'CONNOR:
21   Q    Now, in your work, you have analyzed each
22   of the failure modes, correct?
23   A    That's correct.
24   Q    You were asked some questions and you
25   talked about Dr. Briant's reports, correct?

Page 315

1    A    That's correct.
2    Q    And you testified about some assumptions
3    that he made regarding the vena cava filter, true?
4    A    That's correct.
5    Q    You were talking about a Laborda article.
6    Now, did Dr. Briant cite a Laborda article in his
7    report?
8    A    Well, he cited one Laborda article in his
9    report, and he also cited an article that said that
10   there were Cook filters involved in the experiment.
11   Q    Was his citation correct?
12   A    The citation was incorrect because he
13   referred to the one Laborda, et al., paper that did
14   not have any filters involved in the -- in the --
15   in the work, and, therefore, it was -- it was a
16   mis-citation of the relevant paper.
17   Q    When you went and did your research, did
18   you learn about the mis-citation?
19   A    Well, I read his report and noted that he
20   had referenced a paper erroneously, and I then
21   tried to find the paper that would be consistent
22   with what he was saying he was citing, but at that
23   stage I could not find it in time to make use of it
24   to carry out my assessment of that paper.
25   Q    And you finally found the report?

Page 316

1    A    Yeah, I finally found the paper and was
2    able to make use of the information within that
3    paper.
4    Q    All right.  And assuming that was the
5    paper that Dr. Briant was referring to, did he cite
6    it correctly?
7    A    He -- if it was the paper he meant to
8    cite, he did not cite it correctly.
9    Q    And where was he incorrect?
10   A    Well, you -- when I say "cite," I mean
11   provide the location where the paper is to be
12   found.  Are you asking -- is that -- can you
13   clarify the question?
14   Q    Did he represent the article -- the
15   information in that paper correctly?
16   A    Well, he stated that it showed that a Cook
17   filter would significantly impede the contraction
18   of the vena cava during the relevant motion that
19   was imposed on it, and that seemed to, in my -- in
20   my interpretation "significant" means that the
21   compression would be much less than the compression
22   that would occur in the absence of the filter;
23   whereas, the data in the paper shows that the
24   compression of the vena cava at the filter is
25   two-thirds that which occurs in the absence of the

Page 317

1    filter.
2         And to me, that's -- that's a -- I note
3    that that's a -- there's a reduction in the
4    compression, but I would not interpret that as a
5    significant reduction in the compression.
6    Q    And is that consistent with the opinions
7    that are set forth in your reports?
8    A    Sorry, could you repeat that question.
9    Q    Well, when you talked about today, when
10   you talked about that the misinterpretation by
11   Dr. Briant, have you discussed those issues in your
12   earlier reports?
13   A    Well, I've discussed it in that I've
14   always taken the position that the filters will not
15   impede the motion to any significant extent of
16   compression of the vena cava, and so I've addressed
17   that in various reports and rebuttals that I've
18   provided in various cases.
19   Q    Now, you were asked questions about a
20   linear and nonlinear report -- approach, and you
21   used the linear approach in your calculations; is
22   that correct?
23   A    l used linear elastic analysis for certain
24   calculations which are to be done by linear elastic
25   analysis because that's the behavior of the

80 (Pages 314 - 317)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 318

1  material in the conditions involved.
2      Q    And is that the appropriate methodology
3  that --
4      A    That's --
5      Q    -- engineers should follow?
6      A    That's the appropriate methodology that
7  should be followed in that case.
8      Q    So when you were talking about the sheath
9  and arm relationship, is that a linear issue?
10     A    So can you clarify that question.
11     Q    Well, give me examples of why linear is
12 appropriate in your analysis.
13     A    Oh, because in the cycling of the strains
14 the filter experiences within the vena cava, within
15 a certain range, the cycling will motivate only
16 linear elastic behavior of the material in the
17 filter.
18     Q    On this issue of the cap, is, con- -- is
19 contact between the cap and an arm necessary for
20 fracture?
21     A    No.
22     Q    How can a fracture related to the cap
23 occur without direct contact?
24     A    Well, the -- the fracture that I'm
25 describing is one that would take place in the arm

Page 319

1  in the high strain location near the cap, but it
2  doesn't necessarily occur exactly at where the
3  wires of the limbs enter the cap.  And so the
4  fracture that takes place a little distance away
5  from the edge of the cap will occur whether the arm
6  itself is touching the cap or not in the
7  circumstances that we're describing.
8      Q    By the way, is it necessary for you to
9  look at an exemplar filter to render your opinions
10 in this case?
11     A    No, it's not.
12     Q    Was it necessary for you to look at
13 explanted filters to explain the cause of filter
14 fractures?
15     A    No, it's not.
16     Q    Did you use appropriate methodology and
17 appropriate foundation to arrive at those opinions?
18     A    Yes, I did.
19     Q    Was it necessary for you to do tests and
20 test -- and look at test results in this case?
21     A    It was not necessary for me to do bench
22 tests or any other kind of tests to come to my
23 opinion.
24     Q    Why not?
25     A    Because I based my opinions on the

Page 320

1  calculations that I carried out, and that was
2  sufficient for me to form the opinion that I did.
3      Q    All right. And I'm getting close here.
4  You were asked questions about opinions that you
5  have about the Simon nitinol filter, correct?
6      A    Correct.
7      Q    And you have talked about the Simon
8  nitinol in terms of it is better in terms of
9  failure modes than the other Bard filters; is that
10 correct?
11     A    That's correct.
12     Q    Have you seen Bard internal documents that
13 indicate that the Simon nitinol filter was regarded
14 by Bard to be a better filter in terms of failures
15 and failure modes compared to its other models of
16 filters?
17     A    Yes, I've seen copies of e-mails by
18 Dr. C- -- I can't quite say it correctly --
19 Cierrela, that refer to the Simon nitinol filter as
20 a better filter than other filters in the Bard
21 line.
22     Q    Why were you -- can you explain the reason
23 that you compared the petal of the Simon nitinol
24 filter to the arm of the Recovery and the G2?
25     A    Because they are elements of the

Page 321

1  various -- of the two filters that play similar
2  roles in the two filters.
3      Q    The medical articles that you've reviewed
4  about the Simon nitinol filter, including the
5  Poletti, have those affected your opinions at all?
6      A    No, they have not affected my opinions.
7      Q    Do those articles support your opinion
8  that the Bard is a better filter -- I mean that the
9  Simon nitinol is a better filter in terms of
10 failures?
11     A    Since the Poletti article comments that
12 the Simon nitinol filter is a safe filter, I use
13 that information in the paper to support my view
14 that the Simon nitinol is a safer filter than the
15 other ones.
16     Q    All right.  Now, let's talk about your
17 case-specific opinions.  To arrive at the opinions
18 you did in each of the five Bellwether cases, that
19 would be Booker, Jones, Kruse, Mulkey and Hyde,
20 correct?
21     A    Correct.
22     Q    Was it necessary for you to do any
23 calculations specific to those patients?
24     A    No, because the failures that were
25 observed in them were consistent with the

81 (Pages 318 - 321)

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 322

1  predictable failures that I identified as a
2  consequence of my analysis of the Bard filters.
3      Q   Did you follow the type of methodology
4  that engineers should follow when they are looking
5  at failures and failure modes of medical devices
6  such as filters when you arrived at your opinions
7  in the five cases?
8      A   Yes, I did.
9      Q   And did you rely on the work you did in
10  your prior reports?
11      A   I did, yes.
12      Q   Does it matter to your opinions whether
13  the Hyde filters are G2 or G2X?
14      A   No.
15      Q   Why not?
16      A   Because they're -- they're essentially
17  similar.  They have only the difference that
18  there's a hook on the cap and there's a slight
19  difference to the details of the shape of the cap,
20  but the detail differences are not big enough to
21  make a difference to the fatigue behavior of the
22  G2X compared to the G2 in any significant way.
23      Q   And Ms. Hyde had a fractured leg in the
24  ventricle of her heart?
25      A   I'd have to look at the reports to --

Page 323

1      Q   Could you quickly, just to verify that.
2      MS. DALY:  I'll stipulate to it.
3  BY MR. O'CONNOR:
4      Q   And -- and the point is is that that
5  failure was spelled out clearly by both
6  Dr. Muehrcke and Dr. Hurst, true?
7      A   That's -- I need to look at the reports,
8  but yes, that's my recollection.
9      Q   And do you need to inspect Mrs. Hyde's
10  filter or any filter to understand how the design
11  resulted in the failure mode in each of the five?
12      A   No, I don't need to carry out specific
13  inspection of the filter because it's the design
14  itself that is the cause of the dangerous failures
15  that take place.
16      Q   Is it necessary for you in any of the five
17  Bellwether plaintiffs to know anything of a
18  specific event, such as Valsalva, the size of their
19  vena cava?
20      A   No, I don't need to know anything specific
21  because the design makes it probable that there
22  will be failures of filters in patients.
23      Q   And is your opinion the same as it relates
24  to blood flow, comorbidities and whatever -- and
25  whether they have any impact?

Page 324

1      A   Yes, that's my opinion.
2      Q   You don't need to know that information?
3      A   I don't need to know that information.
4      Q   And that's something that would not be
5  necessary following the appropriate methodology
6  that engineers follow when they arrive at their
7  opinions --
8      A   That's correct.
9      Q   -- regarding failures?
10      A   That's correct.
11      Q   Was it necessary for you to do specific
12  models or calculations in any of the five
13  Bellwether cases?
14      A   No.
15      Q   A fracture is the result of fatigue?
16      A   Yes.  Correct.  If the process goes on
17  long enough, fracture is the result of that
18  fatigue.
19      Q   And the same thing:  To follow the
20  appropriate methodology, was it necessary for you
21  to know anything about the tissue quality of any of
22  the five Bellwether plaintiffs or their vena cava,
23  their organs or blood flow or respiratory issues?
24      A   No, because it's -- knowing, for example,
25  that Bard filters are the type we're talking about

Page 325

1  perforate the wall of the vena cava, and that is
2  sufficient to provide me with information that
3  allows me to come to my opinion.
4      Q   And again, are the opinions that you've
5  arrived at in the five Bellwethers, as well as the
6  opinions that you have arrived at in your MDL
7  reports, opinions to a reasonable degree of
8  engineering probability?
9      A   And reasonable degree of engineering
10  certainty, yes.
11      Q   Thank you.
12
13          FURTHER EXAMINATION
14  BY MS. DALY:
15      Q   Dr. McMeeking, to the extent that any of
16  the work that you have done in this case makes
17  assumptions that are inaccurate, then the outcomes
18  of the calculations would be different?
19      MR. O'CONNOR:  Form and foundation.
20      THE WITNESS:  That's always the case.  If
21  the assumptions are not correct, then the analysis
22  is -- is not relevant.  Although the degree of
23  relevance may depend on how poorly the assumptions
24  have been drawn.
25  BY MS. DALY:

82 (Pages 322 - 325)

Robert McMeeking , Ph.D.                              July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 326

1    Q   Right.  With respect to what Mr. O'Connor
2   just asked you about, the citation by Dr. Briant to
3   the Laborda paper, you don't have any reason to
4   believe that Dr. Briant purposely mis-cited the
5   paper, do you?
6    A   You mean mis-cited in the terms of stating
7   what was in the paper or --
8    Q   Telling you --
9    A   -- where to find it?
10    Q   Where to find it.
11    A   I have no reason -- I know nothing about
12   why it was mis-cited.
13    Q   Okay.  And in fact, as we talked about
14   both today, Laborda had two similar papers
15   published a year apart, right?
16    A   I -- I think it's a year apart, yes,
17   that's correct.
18    Q   And the Laborda paper was easy to find by
19   like Googling the author's name, true?
20    A   But I didn't know it was a Laborda paper.
21    Q   Okay.
22    A   And I should comment that in terms of
23   standard of work, it's -- it's a problem if you
24   don't cite sources of information properly.
25    Q   Right.  Like Dr. Muehrcke, correct?

Page 327

1        MR. O'CONNOR:  Object to the form of the
2   question.
3   BY MS. DALY:
4    Q   All right.  To the extent --
5        MR. O'CONNOR:  Argumentative.
6   BY MS. DALY:
7    Q   To the extent that you did analyses in
8   this case, you state that for those analyses you
9   employed appropriate engineering principles,
10   correct?
11    A   Correct.
12    Q   All right.  And you based your opinions on
13   the calculations analyses that you have presented,
14   true -- correct?
15    A   I did.
16    Q   And you said you did not do bench testing
17   that went beyond the analysis, so you did not use
18   actual testing to determine whether your
19   assumptions and the conclusions you drew from them
20   were accurate, true?
21        MR. O'CONNOR:  Form.
22        THE WITNESS:  That's correct.
23   BY MS. DALY:
24    Q   And you have not devised a filter that you
25   claim would have resolved the various complications

Page 328

1   we've talked about today, true?
2    A   I have not devised any such filter.
3    Q   And you don't know a filter on the market
4   ever that would -- that exists with a design that
5   resolves all these complications, true?
6    A   I'm not aware of any such filter, although
7   it's -- it's because I don't know the attributes of
8   all filters.
9    Q   And you just testified that you did not
10   have to do bench testing here because you had Bard
11   testing to review; is that what you said?
12    A   That's correct.
13    Q   But you said that was inadequate?
14    A   Yes.
15    Q   Okay.  So in not doing your own testing
16   and relying on inadequate testing of Bard, you have
17   no bench testing that will provide us with an
18   example of a better test that Bard could have done,
19   true?
20        MR. O'CONNOR:  Form.
21        THE WITNESS:  Can you repeat the question.
22   BY MS. DALY:
23    Q   Okay.  Yes.
24        So having not done your own testing and
25   being critical of the testing that Bard did, you

Page 329

1   have devised no testing that you've provided to us
2   that is an example of better tests that Bard could
3   have done?
4        MR. O'CONNOR:  Form.
5        THE WITNESS:  Well, I -- the statement I
6   made is that I re- -- I was able to review the Bard
7   testing and that that is a contributor to my -- my
8   assessment of the situation, but it doesn't mean
9   that I would have to do further, more elaborate
10   bench testing or bench testing under different
11   circumstances to come to the opinions that I came
12   to in -- by using my calculations.
13   BY MS. DALY:
14    Q   And if your assumptions in your
15   calculations are inaccurate, bench testing might
16   show that?
17        MR. O'CONNOR:  Form.  Foundation.
18        THE WITNESS:  Well, I -- I'm not sure if I
19   agree with that.  I don't agree with that, because
20   if you do a calculation based on certain
21   assumptions and then you do a bench test with the
22   same assumptions, then you're likely to get the
23   same results from a properly designed bench test.
24   BY MS. DALY:
25    Q   But you've seen that not happen in the

83 (Pages 326 - 329)

Robert McMeeking , Ph.D.                          July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 330

1   world of engineering, true?
2       A   That can happen too, yes.
3       Q   And you have not developed any better
4   tests or different tests that Bard could have done;
5   is that right?
6       A   I've described some tests that I think
7   they should have done, but I've not devised a
8   protocol and plan for carrying those tests out.
9       Q   And having not done that, you have not
10  taken it further to employ those tests to determine
11  what they would show?
12          MR. O'CONNOR:  Form.
13          THE WITNESS:  I have not.
14  BY MS. DALY:
15      Q   Okay.  Now, you said that your analysis
16  shows that tilt, migration, fracture and
17  perforation are predicted based on your analysis,
18  correct?
19      A   Correct.
20      Q   But you will agree that the FDA recognizes
21  that filters can experience any of these
22  complications, true?
23          MR. O'CONNOR:  Form and foundation.
24          THE WITNESS:  I'm aware that Dr. Briant
25  has written statements like that in his report.

Page 331

1   BY MS. DALY:
2       Q   And you're just saying that because you
3   don't know exactly what he recognizes?
4       A   I don't know exactly -- right.  Exactly.
5       Q   All right.  But having looked at the
6   testing, you know that testing was submitted to
7   the FDA that looked at things like migration,
8   fracture?
9       A   Yes.
10      Q   Okay.  And you know also that Bard listed
11  those four complications on its instructions for
12  use as things that can happen, correct?
13          MR. O'CONNOR:  Form.  Foundation.
14          THE WITNESS:  Well, I haven't reviewed the
15  instructions for use, so I don't know that for a
16  fact.
17  BY MS. DALY:
18      Q   On what literature or other information do
19  you rely on your statement to Mr. O'Connor that the
20  end dwell time actually leads to progression of
21  failure modes?
22          MR. O'CONNOR:  Form.
23          THE WITNESS:  Well, I rely on lots of
24  literature in regard to the fatigue behavior of
25  nitinol.

Page 332

1   BY MS. DALY:
2       Q   Okay.
3       A   And I rely on papers that indicate --
4   papers and information from reports in which the
5   degree of perforation at one stage is greater --
6   sorry, let me start again with that.
7           So that as time passes, the degree of
8   perforation increases as time passes, and,
9   therefore, that perforation is a progressive
10  phenomenon.
11      Q   What about tilt?
12      A   Again, there are reports in the literature
13  and in technical reports, such as in this case,
14  that the tilt increases with time in some cases.
15      Q   What about migration?
16      A   I -- I can't comment on migration.
17      Q   And we've seen in cases that you've given
18  reports on in this litigation and in some of these
19  Bellwether cases that there appears to be no
20  evidence of progression, true?
21          MR. O'CONNOR:  Object to the form.
22          THE WITNESS:  Can you clarify the
23  question.
24  BY MS. DALY:
25      Q   Sure.

Page 333

1           We just went through some Bellwether cases
2   in which there was no data showing a progression
3   of perforation in some cases or a progression of
4   tilt?
5       A   In some cases there's no information on
6   that, but it doesn't mean that progression didn't
7   occur.
8       Q   But you don't have any information to back
9   it up?
10      A   In -- in certain cases there is no
11  specific observation that backs that up.
12      Q   Okay.  With respect to the SNF, one last
13  thing, the bottom line on the SNF filter is that it
14  cannot be retrieved percutaneously due to a number
15  of reasons related to its design, fair?
16          MR. O'CONNOR:  Form.
17          THE WITNESS:  It's a permanent filter,
18  yes.
19  BY MS. DALY:
20      Q   And it -- and, therefore, it does not
21  provide the same benefits as the Bard retrievable
22  filters in that it cannot be percutaneously
23  retrieved, true?
24          MR. O'CONNOR:  Form.  Foundation.
25          THE WITNESS:  I'm not a medical expert, so

84 (Pages 330 - 333)

Robert McMeeking , Ph.D.                                   July 6, 2017
In Re: Bard IVC Filters Products Liability

| Page 334 | Page 336 |
|---|---|
| 1  I can't comment on that. | 1  Ph.D.  The total number of media used was five and |
| 2  BY MS. DALY: | 2  will be retained by Veritext Legal Solutions. |
| 3      Q   You can't comment on the fact that the SNF | 3          (Whereupon, at 5:29 P.M., the |
| 4  is not readily percutaneously retrievable? | 4  videotaped deposition of ROBERT M. McMEEKING, |
| 5      A   No, I meant that I can't comment on | 5  Ph.D. was adjourned.) |
| 6  the benefits of having a retrievable filter. | 6 |
| 7  That's what I meant.  Because I'm not a medical | 7          ---oOo--- |
| 8  expert. | 8 |
| 9      Q   Okay.  We'll just leave it at the SNF you | 9 |
| 10  know is not readily percutaneously retrievable? | 10 |
| 11      A   Correct.  I agree. | 11 |
| 12      Q   All right.  Thank you very much. | 12 |
| 13 | 13 |
| 14          FURTHER EXAMINATION | 14 |
| 15  BY MR. O'CONNOR: | 15 |
| 16      Q   Just to clarify, the calculations you've | 16 |
| 17  done in this case and -- and the assessments you've | 17 |
| 18  done, you followed the appropriate methodology, | 18 |
| 19  correct? | 19 |
| 20      A   Correct. | 20 |
| 21      Q   Does that methodology require you to do | 21 |
| 22  bench testing? | 22 |
| 23      A   No. | 23 |
| 24      Q   And in terms of Bard's bench testing, your | 24 |
| 25  qualifications and what you did, you followed | 25 |

| Page 335 | Page 337 |
|---|---|
| 1  appropriate methodology to assess their bench | 1  STATE OF CALIFORNIA      ) |
| 2  testing? | 2  COUNTY OF SANTA BARBARA  ) ss. |
| 3      A   I did, and I used that methodology when | 3 |
| 4  I consult for medical implant companies, assessing | 4      I, MONICA T. CORLEY, RMR, CRR, CSR No. 8803, |
| 5  their testing and interpreting it and advising | 5  in and for the State of California, do hereby certify: |
| 6  them whether it's being done adequately or | 6      That, prior to being examined, the witness |
| 7  whether improvements to the testing should be | 7  named in the foregoing deposition was by me duly sworn |
| 8  undertaken. | 8  to testify the truth, the whole truth and nothing but |
| 9      Q   And in this case you determined that the | 9  the truth; |
| 10  testing was inadequate? | 10      That said deposition was taken down by me in |
| 11      A   I did. | 11  shorthand at the time and place therein named and |
| 12      Q   And that it failed to provide information | 12  thereafter reduced to typewriting under my direction, |
| 13  showing that these filters would fail? | 13  and the same is a true, correct and complete transcript |
| 14      A   That's correct. | 14  of said proceedings; |
| 15      Q   Okay.  That's all I have. | 15      That if the foregoing pertains to the original |
| 16      And that's an opinion you hold to a | 16  transcript of a deposition in a Federal Case, before |
| 17  reasonable degree of engineering certainty? | 17  completion of the proceedings, review of the transcript |
| 18      A   I do. | 18  { } was { } was not required. |
| 19      MR. O'CONNOR:  Thanks. | 19      I further certify that I am not interested in |
| 20      THE COURT REPORTER:  Do you read and sign? | 20  the event of the action. |
| 21      MR. O'CONNOR:  We'll read and sign. | 21      Witness my hand this 19th day of July, |
| 22      THE WITNESS:  I will read and sign. | 22  2017. |
| 23      THE VIDEOGRAPHER:  We are off -- excuse | 23 |
| 24  me.  We are off the record at 1729, and this | 24  _____ |
| 25  concludes today's testimony of Robert McMeeking, | 25      Certified Shorthand Reporter |
|  |      for the State of California |

85 (Pages 334 - 337)

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

---

**Page 338**

1

1  TO: Mark O'Connor
2  Re: Signature of Deponent Robert McMeeking , Ph.D.
3  Date Errata due back at our offices:  08/19/2017
4
5  Greetings:
6  The deponent has reserved the right to read and sign.
   Please have the deponent review the attached PDF
7  transcript, noting any changes or corrections on the
   attached PDF Errata. The deponent may fill out the
8  Errata electronically or print and fill out manually.
9
   Once the Errata is signed by the deponent and notarized,
10 please mail it to the offices of Tiffany Alley (below).
11
   When the signed Errata is returned to us, we will seal
12 and forward to the taking attorney to file with the
   original transcript. We will also send copies of the
13 Errata to all ordering parties.
14
   If the signed Errata is not returned within the time
15 above, the original transcript may be filed with the
   court without the signature of the deponent.
16
17
18 Please send completed Errata to:
19 Veritext   Production Facility
20 11539 Park Woods Circle, Suite 302
21 Alpharetta, GA 30005
22 (770) 343-9696
23
24
25

---

**Page 340**

3

1  Page _____ Line _____ Change _____
2  _____
3  Reason for change _____
4  Page _____ Line _____ Change _____
5  _____
6  Reason for change _____
7  Page _____ Line _____ Change _____
8  _____
9  Reason for change _____
10 Page _____ Line _____ Change _____
11 _____
12 Reason for change _____
13 Page _____ Line _____ Change _____
14 _____
15 Reason for change _____
16 Page _____ Line _____ Change _____
17 _____
18 Reason for change _____
19
20        DEPONENT'S SIGNATURE
21
   Sworn to and subscribed before me this ___ day of
22 _____, _____.
23
24 NOTARY PUBLIC
25 My Commission Expires: _____

---

**Page 339**

2

1  ERRATA for ASSIGNMENT #
2  I, the undersigned, do hereby certify that I have read the
   transcript of my testimony, and that
3
4  ___ There are no changes noted.
5  ___ The following changes are noted:
6
   Pursuant to Rule 30(7)(e) of the Federal Rules of Civil
7  Procedure and/or OCGA 9-11-30(e), any changes in form or
   substance which you desire to make to your testimony shall
8  be entered upon the deposition with a statement of the
   reasons given for making them. To assist you in making any
9  such corrections, please use the form below. If additional
   pages are necessary, please furnish same and attach.
10
11 Page _____ Line _____ Change _____
12 _____
13 Reason for change _____
14 Page _____ Line _____ Change _____
15 _____
16 Reason for change _____
17 Page _____ Line _____ Change _____
18 _____
19 Reason for change _____
20 Page _____ Line _____ Change _____
21 _____
22 Reason for change _____
23 Page _____ Line _____ Change _____
24 _____
25 Reason for change _____

---

86 (Pages 338 - 340)

# EXHIBIT C

# In The Matter Of:
## *NEWTON v.*
## *BARD*

---

## *ROBERT MAXWELL MCMEEKING, PH.D.*
### *May 24, 2011*

---

*Tri-County Court Reporters*
*420 East Carrillo Street*
*Santa Barbara, California  93101*
*877.963.0294   Fax: 805.963.9740*
*www.tricountycourtreporters.com*

Original File McMeeking.Robert. PhD.txt
**Min-U-Script® with Word Index**

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

**Page 1**

```
 1        IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
 2            IN AND FOR THE COUNTY OF MARICOPA
 3
 4        _____
 5   KATRINA NEWTON, et al.,        )
 6            Plaintiffs,           )
 7          vs.                     )    No. CV2009-019232
 8   C. R. BARD, INC., et al.,      )    No. CV2009-035781
 9            Defendants.           )
10        _____    )
11   RICHARD KOLENDA, et al.,       )
12            Plaintiffs,           )
13          vs.                     )
14   C. R. BARD, INC., et al.,      )
15            Defendants.           )
16        _____    )
17        DEPOSITION OF ROBERT MAXWELL MCMEEKING, PH.D.,
18   taken on behalf of Defendant, commencing at 2:03 p.m.,
19   Tuesday, May 24, 2011, at 420 East Carrillo Street, Santa
20   Barbara, California, before ELIZABETH A. MOOY, CSR
21   #11281, Certified Shorthand Reporter in the County of
22   Santa Barbara, State of California.
23
24                      --oo0oo--
25
```

**Page 2**

```
 1   APPEARANCES OF COUNSEL:
 2   For Plaintiffs:
 3          HARTLEY & O'BRIEN, PLLC
            BY:  R. DEAN HARTLEY, ESQ.
 4          The Wagner Building
            2001 Main Street, Suite 600
 5          Wheeling, West Virginia 26003
            (304) 907-0041
 6          Dhartley@hartleyobrien.com
 7
 8   For Defendants:
 9          NELSON MULLINS RILEY & SCARBOROUGH, LLP
            BY:  TAYLOR TAPLEY DALY, ESQ.
10          Atlantic Station
            201 17th Street NW, Suite 1700
11          Atlanta, Georgia 30363
            (404) 322-6156
12          NelsonMullins.com
13
14   ALSO PRESENT:
15          MATTHEW R. BEGLEY, PH.D.
16
17   VIDEOGRAPHER:
18          FRANK J. KAP, CLVS
19
20
21
22
23
24
25
```

**Page 3**

```
 1                    I N D E X
 2   WITNESS           EXAMINATION BY              PAGE
 3   ROBERT MAXWELL MCMEEKING, PH.D.
 4                    BY MS. DALY           5, 59, 64
 5                    BY MR. HARTLEY          58, 59
 6
 7
 8              E X H I B I T S
 9   DEPOSITION        DESCRIPTION                 PAGE
10   1        Deposition Notice (4 pages)            10
11   2        Curriculum Vitae (29 pages)            13
12   3        Plaintiff's Expert Witness Designation
             (5 pages)                              13
13
14   5        Response to Correspondence, 04/19/11   11
             (5 pages)
15
16   Previously Marked:
17   4        Invoice for Consulting Services,
             5/11/11, 1/15/11 (2 pages)
18
19   6        Report:  Mechanical Reliability
             Assessment of the Bard IVC Recovery
             Filters (9 pages)
20
21
22
23
24
25
```

**Page 4**

(14:04:01-14:04:29)

 1    **VIDEOGRAPHER:** Good afternoon.  This is the
 2 videotaped deposition of Robert Maxwell McMeeking, Ph.D.,
 3 in the matter of Katrina Newton, et al., versus CR Bard,
 4 Inc., the case pending in the Superior Court of the State
 5 of Arizona, in and for the County of Maricopa.  The case
 6 number is CV 2009-019232.  Today's date is Tuesday, May
 7 24th, 2011, and the location is 420 East Carrillo Street,
 8 Santa Barbara, California.  The time on the monitor is
 9 2:03 p.m.  The Certified Shorthand Reporter is Liz Mooy.
10 My name is Frank Kap.  I'm a Certified Legal Video
11 Specialist and I represent D'Amico Gershwin Court
12 Reporters located in Atlanta, Georgia.
13    Would Counsel and all present please introduce
14 yourselves for the record and state whom you represent.
15    **MR. HARTLEY:** Dean Hartley on behalf of
16 plaintiffs.
17    **MS. DALY:** Taylor Daly for Bard.
18    **THE WITNESS:** Robert McMeeking, appearing for
19 the plaintiff.  Expert witness.
20    **MR. BEGLEY:** Matthew Begley, expert witness for
21 the plaintiff.
22    **MS. DALY:** We can have the same stipulation as
23 for Dr. Begley's deposition.
24    **MR. HARTLEY:** Yes.
25

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

Page 5

(14:05:04-14:05:32)

1    ROBERT MAXWELL MCMEEKING, PH.D.,
2        Having been first duly sworn by the
3    Certified Shorthand Reporter, testified as follows:
4
5            EXAMINATION
6  BY MS. DALY:
7    Q  Dr. McMeeking, I'm Taylor Daly.  We met earlier
8  today, and you sat through the deposition of your
9  colleague, Dr. Begley?
10    A  Yes.
11    Q  You were present when we talked about -- at the
12  beginning of his deposition -- trying to efficiently take
13  your deposition, and you and he presented a joint report;
14  correct?
15    A  That's correct.
16    Q  And what we discussed was that you would try to
17  take some notes and you would be able to then add to any
18  of the questions that I ask Dr. Begley, correct anything
19  that he said that you thought should be different, and so
20  on; correct?
21    A  Correct.
22    Q  My intent is not to shortcut your deposition;
23  rather, it is to be efficient.  So please feel free that
24  you can answer any of the questions as fully as you want.
25  I'm not holding you to what Dr. Begley said in any way.

Page 6

(14:06:23-14:07:03)

1  Do you understand that?
2    A  I understand that, yes.
3    Q  Very good.  Would you tell me, what would you
4  describe as your general expertise?
5    A  My general expertise is mechanical engineering
6  and materials science, more specifically the modeling and
7  analysis of the mechanical and functional behavior of
8  materials and the fairly significant focus on medical
9  devices.
10    Q  What medical device work have you done either as
11  part of litigation or non-litigation consulting?
12    A  The one litigation case was a long time ago.  It
13  was a failed -- a bicycle broke while the rider was on
14  it.  It was 20 years ago.  But the balance of my work on
15  medical devices has been consulting for medical device
16  companies.  The biggest area has been prosthetic heart
17  valves.  In addition, I've done consulting work on some
18  stents for various purposes, and another area that I've
19  worked on is breast implants.
20    Q  Have any of the heart valve products or the
21  stent products involved Nitinol use?
22    A  Yes.
23    Q  Which ones?
24    A  There are a couple of heart valves that are in
25  the pre-market stage of being looked at by the companies

Page 7

(14:08:02-14:08:46)

1  and the FDA.  They are balloon expandable and they use
2  the Nitinol behavior specifically in the way that they're
3  implanted into the heart; and in addition, a stent that
4  is expanded into arteries to clear the stuff that gets
5  stuck to the wall in -- when the artery is diseased.
6    Q  Are the heart valves made of Nitinol themselves,
7  or did you just say they had Nitinol-like memory
8  characteristics?
9    A  Well, they have Nitinol stents or -- I've
10  forgotten the word for them -- but one component of the
11  device is Nitinol, and sewn onto the Nitinol are tissues.
12  Usually they come from pig pericardium, and the tissue
13  functions as the actual occludo that controls the flow of
14  the blood through the valve.
15    Q  For either the stent consulting that you did or
16  the heart valve work that you did, did you develop any
17  modeling for those companies that was a part of their
18  design work?
19    A  Not as part of the design work, no.
20    Q  What was it a part of?
21    A  It was a part of the reliability assessment of
22  the valve that was needed both for assurance of the
23  safety and reliability of the device -- not just the
24  valve, but of the device -- and also to take forward to
25  the FDA to obtain licensing of the device for either

Page 8

(14:09:45-14:10:19)

1  pre-market or eventually full sale activity for the
2  device involved.
3    Q  In that case, did the FDA require the kind of --
4  was an FEA the modeling that you did?
5    A  Well, some of it was FEA modeling.  I looked at
6  the way that fluid can lower the devices, I looked at the
7  way that tissue to which the device is sewn or implanted
8  can lower the devices, and looked to the effect of
9  residual stress that can be present within the device in
10  the case of carbon valves, and looked at all those
11  features in a variety of ways that involved calculations
12  and modeling.  Some of it was finite element modeling to
13  identify the levels of stresses which were involved in
14  the way that the devices function.
15    Q  Do you know if the work that you did, the
16  modeling you did, was something that was required by the
17  FDA for clearance of that particular type of device?
18    A  Yes, yes.  And in some cases, the FDA directed
19  companies to me to carry out that kind of work.
20    Q  And the IVC filters that we're talking about
21  here, you are aware that the FDA has never required that
22  type of modeling; correct?
23    A  I'm not aware of what the FDA requires for these
24  devices.
25    Q  Following up on that, do you consider yourself

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

**Page 9**

(14:11:21-14:11:59)

1 to be an expert in FDA regulatory approval processes?
2    A  I guess I'm an expert in part of the process.  I
3 would not claim that I'm an expert in every single
4 feature of the FDA approval process because that involves
5 animal modeling, clinical work; it involves a question of
6 shelf life, packaging, and also sort of aspects of the --
7 how the device will be implanted, used, and operated with
8 and so on.
9    Q  Which you don't do?
10   A  Which I don't do, but I'm aware of a great deal
11 of the process because of my involvement in the sector
12 that involves safety and reliability of the devices.
13   Q  With respect to the IVC filters, did you review
14 any of the submissions that Bard made to the FDA either
15 for the permanent or the retrievable recovery filter?
16   A  I read through one 510(k) submission.  I don't
17 remember whether it was for the recovery or the other
18 device, but I did read through a 510(k) submission.
19   Q  Was there anything in that 510(k) submission
20 that informed you in any way that helped you write the
21 report in the case?
22   A  Yes.  For example, I read carefully the -- I
23 mean, I read them all carefully -- but I read
24 specifically the description of the fatigue test that was
25 carried out on that device, the way that the device was

**Page 10**

(14:12:55-14:13:33)

1 placed inside the tube, and the tube was expanded and
2 contracted to carry out the fatigue test, and that guided
3 me in my thinking as to what would be the appropriate
4 things to look at in the modeling and analysis of the
5 stresses that can be generated in the device, and also it
6 helped me think about what testing should be done to
7 obtain further information about the performance of the
8 device.
9    Q  So some of the -- the testing that you just
10 described that you saw in the 510(k), you did use aspects
11 of that when you modeled one or both of the FEAs that you
12 and Dr. Begley did?
13   A  When I discussed how we should go about
14 modeling, that did inform my thinking about what we
15 should do, such as, move the end of the arm by one
16 millimeter to simulate the way that loading could occur
17 to the device when it is en vivo.
18       (Exhibit 1 was marked for identification.)
19   Q  Okay.  Let me show you Exhibit 1 that I've
20 marked for your deposition, which is the Notice of
21 Deposition in this case.  And if you would just turn to
22 page 4 that has the list of materials, is there any
23 additional article or publication -- again, other than
24 some major fluids textbook -- that you refer to during
25 the investigation of this matter that is not listed in

**Page 11**

(14:14:39-14:14:59)

1 your report on page 7?
2    A  No, all of the material that I've looked at and
3 relied upon is listed on page 7 and, of course, there's
4 also the list of all the Bard reports that --
5    Q  Correct, and I'll ask you that in a minute.
6 Have you had a chance to look, actually, at the letter
7 from Jack Davis with the list of Bard materials?
8    A  I haven't looked at it recently, but --
9    Q  Have you looked at it in the past?
10   A  Yes.
11   Q  Are you able to confirm that's what you
12 reviewed?
13   A  Yes.
14   Q  And that it was limited to that?
15   A  It was limited to that.
16   Q  All right.  Let me just, for the record, put
17 this in.  This is Exhibit 5, actually, to your deposition
18 and be sure we're talking about the same letter and the
19 same list.
20   A  Well, I haven't memorized all the numbers.
21       (Exhibit 5 was marked for identification.)
22   Q  BY MS. DALY:  Of course.
23   A  But it looks consistent with the list of reports
24 that we have in our possession and that we have looked
25 through.

**Page 12**

(14:15:29-14:16:08)

1    Q  There was a memorandum and it's the last item on
2 the list.  There was a memorandum by one of plaintiff's
3 attorneys whose name is Michael Prascik.  Do you remember
4 that memo?
5    A  No, I don't.
6    Q  Do you remember ever going through that memo to
7 ask him to get you anything in addition that was listed
8 on his memo?
9    A  Sorry, could you repeat the question.
10   Q  Do you ever recall reviewing that memo and
11 asking plaintiff's counsel to get you anything else
12 listed on that memo that you thought was relevant?
13   A  Well, I don't remember -- since I don't remember
14 the memo, I don't remember it that way.  What I do
15 remember is asking plaintiff's counsel to obtain material
16 of a specific nature, such as finite element analyses,
17 descriptions of anything that might relate to how the
18 device is loaded, and anything else that was related to
19 those two issues.
20   Q  Okay.  So the list that is part of this letter
21 from Jack Davis, Exhibit 5, is in response from
22 plaintiffs to that sort of general request by you; is
23 that correct?
24   A  I believe so, yes.
25   Q  And you don't know what else is out there that

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

**Page 13**

(14:16:47-14:17:30)

1  is a Bard document that might fall within the category of
2  what you just described?
3     A   Since I haven't seen it, I don't know.  Since I
4  haven't seen them, I don't know.
5     Q   Do you have any patents?
6     A   I have, I think, three.  I'm not sure exactly
7  what -- I've forgotten the number, but three or four.
8     Q   What do they relate to?
9     A   They relate to -- nothing to do with medical
10  devices.  One of them is maybe a little bit related which
11  has to do with adhesion, dry adhesion, and the patent
12  surfaces that you would use to make one surface stick to
13  another.  The other ones were analytical systems for
14  analyzing manufacturing processes.
15     Q   So have you ever designed a medical device?
16     A   No.
17     Q   Have you ever done a study of or written an
18  article on an implantable medical device?
19     A   I -- actually, I forgot to look through my CV to
20  count it, but I think it's two.  I have two papers that
21  are on heart valves, and safety and reliability of heart
22  valves, which, of course, are implantable devices.
23        (Exhibits 2 and 3 were marked for
24  identification.)
25     Q   BY MS. DALY:  Let me show you what we've marked

**Page 14**

(14:18:14-14:18:40)

1  as Exhibit 2 and ask you to identify that.
2     A   That's my curriculum vitae.
3     Q   Do you believe it's an up-to-date one?
4     A   Easiest thing is to look at the last page.  It's
5  almost up-to-date.  There's one or two papers been added
6  to my publications list and maybe one or two lectures or
7  seminars that I've given that have been added more
8  recently than this version.
9     Q   But don't have anything to do with IVC filters?
10     A   Nothing to do with IVC filters.
11     Q   All right.  You stated in your report that you
12  have not given trial or deposition testimony in
13  litigation in the last four years?
14     A   Correct.
15     Q   How about four years before that?
16     A   Never.  I've never -- the few cases I've been
17  involved in were settled before even depositions were
18  taken.
19     Q   Very good.  I'm going to hand you Exhibit 4,
20  actually, to Dr. Begley's deposition, which are two
21  billing letters that he provided, one January and one May
22  of 2011, and ask you if those are accurate joint billing
23  letters for your time at Dr. Begley's?
24     A   Yes, they are.
25     Q   Thank you.  Will you state what your

**Page 15**

(14:19:48-14:20:31)

1  understanding is of your role as an expert in this filter
2  litigation?
3     A   My role was to make an assessment of the device
4  in terms of the loads that could be applied to it and to
5  work -- to assess how high the level of stresses would be
6  as a consequence of the kind of loads the device would
7  experience, and to make an assessment of whether there
8  were concerns that that raised as to the safety and
9  reliability of the device.
10     Q   Okay.  You were not asked to look at any
11  particular plaintiff's filter and come to a conclusion
12  about what had caused that particular fracture in that
13  particular filter?
14     A   Well, I was asked to look at pictures of the
15  devices that had failed, and as Professor Begley
16  mentioned, we did have -- we do have -- we did have
17  one -- I think one filter in our possession which we've
18  looked at visually, and from the pictures that we've
19  looked at, the SEM micrographs that we've looked at, I'm
20  certainly able to make an assessment of why the filters
21  failed, and it's quite clear that the filters failed
22  because of fatigue associated with high stresses that
23  they were experiencing.
24     Q   Are you able to key a particular plaintiff to a
25  particular scenario in your report that that filter

**Page 16**

(14:21:32-14:22:12)

1  failure happened because of that particular scenario?
2     A   Only in the sense that we identified --
3  Professor Begley and I together identified the places
4  where the stresses would be high in the filter as a
5  consequence of the way that they are implanted and the
6  way that they function within the vena cava, and that the
7  location and the nature of the failure is consistent with
8  the fact that we found the possibility of high stresses
9  in those locations in the filter.
10     Q   Do you intend when you come to trial to go
11  through, for example, Mrs. Newton, and testify to the
12  jury from the SEM where her fractures are and how that
13  relates to your findings?
14     A   I intend to testify in the way that I just
15  described which is that we made an assessment of where
16  the high stresses can arise in the device under
17  assumptions that should reasonably have been made by Bard
18  when they designed and analyzed the device, and that the
19  failure that was experienced by Mrs. Newton's filter is
20  consistent with the analysis that we carried out and the
21  observations we made of the filter.
22     Q   Did you have an opportunity to look at Dr.
23  Fasching's report?
24     A   Yes.
25     Q   Do you have any criticisms of her findings on

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

Page 17

(14:23:17-14:23:53)
1  SEM about what fracture looks like what?
2    A  She is, I think, a little too categorical in
3  some of the things that she says.  For example, she says
4  that only two of the failures are directly associated
5  with the fact -- or associated with the edge of -- or
6  corner of the sheath; whereas, it is my assessment that
7  several more, a few more of the fractures, can be
8  associated with the fact that the sheath is a component
9  that is causing an increase in stresses in the arms of
10  the device and that she's, I think, been a little bit too
11  tight in the way that she defines association of the
12  fractures with the stress raiser at the corner of the
13  sheath.
14    Q  All right.  We'll go through those in a minute.
15  Let me ask you generally about the topics that I was
16  talking to Dr. Begley about and see if you have any
17  additions to that or any corrections to what we were
18  talking about, and then I want to take those premises and
19  I want to walk through these individual plaintiffs.
20    A  Okay.
21    Q  Let's talk first about the chamfer issue.  You
22  heard what Dr. Begley said about the chamfer issue?
23    A  Yes.
24    Q  Do you agree with what he said on the issue of
25  chamfer?

Page 18

(14:24:38-14:25:22)
1    A  I do.
2    Q  Is there anything you would like to add or
3  correct about his testimony on the chamfer issue?
4    A  No.
5    Q  When we say, "The chamfer issue," does that
6  cover all of the different discussions that Dr. Begley
7  and I were having about sharp edges, beveling,
8  chamfering?
9    A  Yes.  I'm interpreting the statement that -- the
10  "chamfer" to mean the question of whether the end of the
11  sheath is beveled or flat, whether there is a sharp edge
12  to the sheath where the legs are adjacent to it, or
13  whether there's a larger radius of curvature at that
14  location.  So I'm taking it as an all-encompassing
15  question regarding the whole geometry in that area.
16    Q  And what do you rely on for the statement in the
17  report that the filter, the recovery filter as
18  manufactured, is not consistent with a spec with respect
19  to the chamfer?
20    A  Well, the ones that -- the filters that we
21  looked at all have flat ends to the sheath, which was not
22  reflected in the drawings of the devices that we saw -- I
23  saw.
24    Q  Do you know which drawing you were looking at?
25    A  It was a Bard filter.  That's all I recollect.

Page 19

(14:26:13-14:27:05)
1    Q  It's one of the ones on the list in Jack Davis's
2  letter?
3    A  Yes, correct.
4    Q  When you said, "The filters we looked at," are
5  you talking about looking at filters by looking at design
6  drawings of filters, as one way to look at it?
7    A  I mean, looking at the filters both in terms of
8  the design drawings and the SEM images that's in both of
9  the reports, Dr. Ritchie's and Dr. Fasching's.
10    Q  And then again, like Dr. Begley, the only
11  physical filter you've seen is Mrs. Carnehl's G2?
12    A  Correct.
13    Q  Did Mrs. Carnehl's filter that you saw inform
14  you in any particular way about Mrs. Carnehl's filter?
15    A  No, because I didn't even look at it under a
16  microscope.  I simply -- it was more interesting just to
17  get an idea of the size and feel of the device and its
18  general configuration.
19    Q  Dr. Begley and I were talking about other
20  scenarios that you all considered as a possibility that
21  could be scenarios that the filter would be placed in --
22    A  Yes.
23    Q  -- when implanted in a human.
24    A  Yes.
25    Q  And would you answer the questions I asked Dr.

Page 20

(14:27:52-14:28:29)
1  Begley the same way with respect to the scenario of the
2  upper portion of the arms adhering to the side walls and
3  therefore pulling away during respiratory, and the
4  loosening of the hooks from the soft tissue causing
5  individual legs to go slack and shed their loads?  Would
6  you answer the same way Dr. Begley did, that you all made
7  an assumption about that, but you haven't actually seen
8  imaging, either human or animal or cadaver photographs,
9  that support that that's a phenomenon that occurs?
10    A  Well, broadly speaking, I agree with what
11  Professor Begley said, but I would respond in a slightly
12  different way, which is that we know -- at least I
13  know quite a bit about what is likely, what one should
14  expect in this situation.  And this comes from the great
15  deal of experience, if I may say so, I have had with,
16  especially, heart valves, which are subject to some of
17  the same phenomenon that I'm about to describe.
18       For example, it's -- well, let me back up.
19  First of all, there's quite a lot we do know about what
20  happens in an inferior vena cava.  There's blood going
21  through it; it's pulsatile flow; it does expand and
22  contract, at least in some circumstances, as a
23  consequence of a person breathing;  and, of course, it's
24  composed of tissue and cells that lighten the tissue
25  wall.

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

**Page 21**

(14:29:39-14:30:23)

1   And I should comment that I have additional
2  publications, not on medical devices, but on cell
3  mechanics, which remodeling of cells and remodeling of
4  tissue as a consequence of the mechanical effects is one
5  of the features in the topic covered by the paper.
6   So let me go back to answering the question,
7  which is that from my interaction with the heart valve
8  companies, I know very clearly that remodeling goes on as
9  a consequence of the presence of an implantable device
10  leading to endothelization, that you mentioned earlier,
11  so that the tissue and the cells can grow over the device
12  and entrap the device and therefore cause it to move in a
13  manner that's consistent with the motion of the tissue
14  wall; and furthermore, when loads are applied to cells
15  and to tissue, that they tend to remodel in such a way as
16  to relax the loads which are being applied to them so
17  that there are all sorts of possibilities as to what can
18  happen to the filter when it's implanted in the vena
19  cava, including it being trapped by the wall of the vena
20  cava. It can also perforate the wall of the vena cava
21  because of the tendency for tissue to remodel and relax
22  under the loads which are being applied to the tissue.
23   And I should also comment at this stage that the
24  sort of imaging that one can do in a live patient would
25  not reveal exactly how the legs are being loaded, whether

**Page 22**

(14:31:21-14:31:45)

1  all six of them are being evenly loaded.
2   Q   True; you can see position and so on.
3   A   Yes, but the precision by which you can do the
4  imaging would not reveal the question of whether the legs
5  are evenly loaded or not; and therefore, Bard would not
6  know whether all of the legs were equally loaded when in
7  an implanted device.
8   And I should comment that I know this from
9  concerns raised by trying to image heart valves to
10  determine exactly their location and position when
11  they're implanted because that does relate to how they're
12  loaded en vivo, and --
13   Q   And it's quite variable?
14   A   And it's quite variable.
15   Q   As it probably is with IVCs as well?
16   A   Yes.
17   Q   And back to my point --
18    MR. HARTLEY: Did you finish your answer?
19    THE WITNESS: Yes, I did.
20  BY MS. DALY:
21   Q   With respect to the arms adhering to the side
22  walls and pulling the arms outwards --
23   A   Yes.
24   Q   -- to what extent did your investigation try to
25  model that?

**Page 23**

(14:32:39-14:33:15)

1   A   The way that we did model it is that we
2  undertook finite element analysis using a
3  three-dimensional model of one arm, although it was a
4  truncated section of one arm, and we imposed a
5  displacement on the truncated end of that arm to reflect
6  the fact that the rest of the arm would be trapped in the
7  vena cava wall and would force that segment of the arm to
8  move in a manner consistent with the motion of the vena
9  cava wall.
10   Q   And what Dr. Begley described about that 3-D FEA
11  -- what variables were put in, whatever you included in
12  the modeling -- do you agree that he was complete in his
13  description of that?
14   A   Yes, I agree that he was complete concerning the
15  things that were needed to do that analysis.
16   Q   Okay. What was he not complete about?
17   A   Well, he didn't model the inelastic -- not the
18  inelastic -- the shape memory behavior of the Nitinol,
19  which was irrelevant to the problem that we were
20  addressing.
21   Q   Okay. With respect to this other thing, the
22  loosening of the hooks in the soft tissue causing the
23  legs to go slack, you all did not do an FEA to
24  demonstrate that?
25   A   No.

**Page 24**

(14:34:03-14:34:29)

1   Q   That is one of the things that I guess Dr.
2  Begley called a "possibility" that he was calling out as
3  a red flag?
4   A   I think he said it was a "probability." He did
5  call it a "possibility" at some stages, but then adjusted
6  his description to describe it as a "probability" for the
7  reasons that he went through, which is that it's
8  essentially impossible to assure that the legs would all
9  be equally loaded. And the only sensible assumption that
10  Bard should have made is that only three of the legs
11  would be loaded because three of the legs would keep the
12  filter in a stable location.
13   Q   But again, that's an assumption; true? Without
14  testing and without modeling?
15   A   It is an assumption that Bard should have made.
16   Q   But that's not my question to you. With respect
17  to what you just said about "possibility" versus
18  "probability," that phenomenon is an assumption that you
19  and Dr. Begley are making?
20   A   It is an assumption.
21   Q   Okay. And consequently, an assumption -- to
22  make an assumption be probable, don't you agree from an
23  engineering standpoint you would have to have some
24  modeling or some testing?
25   A   No, I disagree. There are many things that one

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

Page 25

(14:35:32-14:35:55)

1   has to assume, but one makes the assumptions on a logical
2   basis, does so in a manner which is conservative, and
3   within a reasonable envelope of considerations,
4   represents a worst case that can arise.
5        For example, you do not go inside a patient and
6   measure their physiology; you don't go inside a patient
7   and measure their tissue mechanical characteristics; you
8   don't go inside a patient and measure in detail the way
9   that the blood flows through a vessel within their body
10  before you implant the device; and therefore, you must
11  make assumptions about the conditions which will be met
12  by the device.
13  Q   Correct.
14  A   And that is standard engineering procedure.
15  Q   But it's still an assumption; it's not
16  necessarily hard science?
17  A   Engineering is not science, and science is not
18  engineering.
19  Q   Okay.  But it's not necessarily hard
20  engineering?
21  A   It is hard engineering.  I agree, it's not hard
22  science, but it is hard engineering.
23  Q   And it's not necessarily hard medicine?
24  A   No, I -- I'm not -- I am not a doctor.  I am not
25  claiming to have any knowledge of the ability to practice

Page 26

(14:36:39-14:37:15)

1   medicine, but I do know that medicine is much more like
2   engineering than it is -- it's not a science.  Medicine
3   is --
4   Q   Which is something that the medical device
5   manufacturers have to deal with, isn't it, because it's
6   not an exact science; you would agree with that?
7   A   I agree with that, yes.
8   Q   And even person-to-person variations can happen
9   that impact medical devices and their usefulness or their
10  helpfulness or their failure; true?
11  A   Yes, and those person-to-person variations,
12  within a reasonable level of understanding, are norm; and
13  therefore, can be anticipated.
14  Q   Would you agree that despite whatever testing
15  one can do to a medical device, until you implant -- if
16  it's an implantable device -- until you implant it into a
17  human being, you are not going to have complete
18  information about how that device actually does in a
19  human?
20  A   You will not have complete understanding or
21  knowledge of how it would perform in the human being, but
22  you can do sufficient preparatory work to ensure that
23  your -- that the likelihood of being surprised about what
24  happened is very, very, very low.  Many of the heart
25  valve companies that I work with have never had a failure

Page 27

(14:38:23-14:38:46)

1   of their heart valves, and that's because they do good
2   engineering before they take the device to clinical
3   trials to test it out.
4   Q   Are you aware of any IVC filter manufacturers
5   never had a failure?
6   A   I do not have that knowledge.
7   Q   The other FEA work that Dr. Begley and I were
8   talking about was the modeling of the wire against the
9   sheath.
10  A   Yes.
11  Q   Do you agree that he gave me all of the
12  variables, criteria, whatever was put into that model?
13  A   Yes.
14  Q   Do you agree with what he said the findings of
15  that were?
16  A   I do, yes.
17  Q   Do you have anything you want to add to that --
18  testing?
19  A   No, except it wasn't testing.
20  Q   Modeling, sorry.  And you have done no
21  additional testing -- physical testing, bench testing,
22  animal testing -- as Dr. Begley has not done, in
23  addition?
24  A   I have done no additional testing.
25  Q   Now, there are some comments in the report, for

Page 28

(14:39:53-14:40:29)

1   example, on page 2 --
2        And this has previously been marked as Begley's
3   6.  So we'll put a -- make it "6."
4   A   Page 2?
5   Q   Yeah, page 2.
6   A   Okay.
7   Q   There are couple of places in the report where
8   the report talks about deductions about what Bard's
9   considerations were.  And here's one at the beginning of
10  your report, portion 2.  Quote, "Based on our review of
11  the Bard documentation, we deduce that their principal
12  consideration of in-situ loading pertained to a full
13  blockage of the filter due to arrival of a clot in the
14  blood flow, thereby inducing tensile strength in the legs
15  caused by blood pressure.  Bard's analysis assumes all
16  legs are sharing an equal fraction of the load.  Such an
17  assumption is not conservative."  Where do you believe
18  you got the information that that was Bard's assumption?
19  A   It was based on a reading of the document and
20  the fact that I saw no statements that suggested that
21  other concerns were uppermost in the minds of those that
22  were developing the design and analyzing the behavior of
23  the device on the load.
24  Q   And when you say, "Reviewing the document," do
25  you mean that whole list of documents?

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

Page 29

(14:41:16-14:41:54)

1    A   Whole list of documents that are in that letter.
2    Q   And do you know that you don't have all the
3   documents that were produced in this litigation?
4    A   If you're telling me I don't have all the
5   documents, then I accept that statement.
6    Q   And let's talk a minute about other information
7   that you reviewed.  Have you read any deposition that's
8   been given in this litigation?
9    A   No.
10    Q   And have you talked to anybody who has ever been
11   with an IVC medical manufacturer or anybody who was
12   formerly with Bard about Bard's process and
13   considerations in the development of the recovery?
14    A   No.
15    Q   Have you talked to Dr. Ritchie about it?
16    A   I have talked to Dr. Ritchie, yes.
17    Q   And to what extent did you all share
18   information?
19    A   We discussed the likely nature -- or not the
20   likely -- but the deductions about the nature of the
21   failures and the fact that they are clearly fatigue
22   failures and they clearly indicate high stresses being
23   present in the device.
24    Q   Would you agree that of the filters that we have
25   to look at, the plaintiffs' explanted filters, that there

Page 30

(14:42:49-14:43:15)

1   are a number of fractures in different areas in the
2   filter?
3    A   If you design different areas as immediately
4   adjacent to the sheath -- and I'm using that term
5   precisely, which means within a few microns of the edge
6   of the sheath -- at the first bend where the arms are
7   moving as you move along the arms away from the sheath,
8   there are failures there; and then in the legs, there are
9   failures mainly down the knee of the hook.  So in that
10   sense, I agree that there are failures in different areas
11   of the filter.
12    Q   And when we go through the individual
13   plaintiffs, you're going to help me, if you can, tie the
14   fractures that are seen there to your theory of what
15   caused that; okay?
16    A   Yes.
17    Q   Okay.  You heard Dr. Begley's and my discussion
18   about the welding issue?
19    A   Yes.
20    Q   Are you critical of the use of welding to put
21   the wires in place in the first place?
22    A   A Not of -- no, not of welding the wires in the
23   first place.
24    Q   So how would you describe your criticism of the
25   welding situation?

Page 31

(14:44:08-14:44:29)

1    A   That it was poorly controlled and that the
2   consequences were -- in terms of what I saw in the
3   documentation, the consequences were not explored in
4   terms of how that might make the device vulnerable to
5   failure.
6    Q   Do you know of any plaintiff filter that you
7   would attribute the weld issue to a fracture in that
8   plaintiff's --
9    A   No.
10    Q   Okay.  Let's talk about the fluid drag forces
11   for a moment.  No, let me go back.
12        Was there anything else that you and Dr. Ritchie
13   talked about?
14    A   No.
15    Q   Have you talked to Scott Robertson?
16    A   No.
17    Q   Do you know him?
18    A   No.
19    Q   Have you talked to any of the other experts who
20   have given reports for the plaintiff in this case?
21    A   No.
22    Q   And you've read Dr. Fasching's report?
23    A   Correct.
24    Q   Do you know her?
25    A   No.

Page 32

(14:45:16-14:45:58)

1    Q   Then let's talk about fluid drag forces.  If you
2   look at page 3, the first full paragraph -- and I asked
3   Dr. Begley about this -- the first sentence is, quote,
4   "Fluid drag forces acting on arms and legs during normal
5   unblocked operation were apparently assumed by Bard to be
6   negligible."  What is the basis for that?
7    A   That there was -- mainly that there was no
8   effort -- in the documentation that I saw -- to analyze
9   the effect of that fluid drag on the arms or the legs and
10   to identify what level of stress might be associated with
11   the fact that there would be drag caused by the blood
12   flowing past the wires.
13    Q   And then you all did some analysis or some
14   research -- I don't know what you want to call it -- and
15   you came up with a fluid drag force on the wires as
16   small, on the order of one Newton slash "M"?
17    A   One Newton per meter, which means that if you
18   had an arm of a length one meter, there would be one
19   Newton load applied to it.  Yes, but I forgot what the
20   question was.
21    Q   The question was, you either researched or did
22   something --
23    A   Yes.
24    Q   -- to come up with that and determine that the
25   drag forces -- sorry, the fluid drag forces on the wires

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

Page 33

(14:46:46-14:47:30)

1 were small?
2   A  Yes.  We looked up -- I looked up Batchelor's
3 book on fluid dynamics, found the section on drag caused
4 by fluid flowing past a circular cylinder, and used the
5 formulae and the diagrams in that -- in those pages of
6 the book to deduce that with the velocity of the fluid
7 involved in the vena cava and its viscosity -- the
8 viscosity of blood and its other properties that might be
9 relevant -- that this would be the level of drag that
10 would be imposed on the wire in those circumstances.
11   Q  Okay.  So you're critical of Bard for not
12 considering the level of drag that you found?
13   A  I am critical of the fact that they did not
14 consider the drag on the wire, come to their own
15 conclusions about what level that drag force would be,
16 and impose those drag forces on the wire in a model or a
17 finite element calculation to estimate what level of
18 stresses they would produce in the wire.
19   Q  And then, did you all do that, model that drag
20 force?
21   A  Yes, that's the -- that leads to the number
22 here, one Newton per meter.
23   Q  So that's what you did to get that?
24   A  That's correct, yes.
25   Q  And the impact of that on fatigue is what?

Page 34

(14:48:24-14:49:02)

1   A  Well, the flow in the vena cava is "pulsatile,"
2 which means that about once every second, the blood stops
3 and starts, which means that the loading goes through
4 cycles, which is the classic circumstance that can cause
5 fatigue in any system, any engineering mechanical system;
6 and since -- I used to know this number by heart because
7 of all my heart valve work -- but there's millions of
8 cycles per second -- per year involved in the circulatory
9 system and therefore you quickly ramp up very, very,
10 many, many millions of cycles whenever loading is being
11 caused by the blood circulating within the human body.
12 And therefore, even with very low levels of drag force,
13 one should at least be concerned that they can generate
14 stresses that could lead to fatigue failure, given a long
15 enough time of implantation.
16   Q  Are you of the opinion that the Bard testing,
17 the respiratory diaphragmatic testing that Bard did and
18 submitted to the FDA, did not simulate this sort of
19 force?
20   A  I saw nothing in the documentation I read that
21 indicated that those kind of tests, except animal
22 modeling -- that was the only modeling, filters in
23 animals -- but that's the only testing that I observed
24 would involve drag forces coming from blood flow.
25   Q  So you're saying that the respiratory testing

Page 35

(14:49:56-14:50:41)

1 that they did would not be adequate to simulate that?
2   A  The respiratory testing as -- just make sure I
3 understand what you're describing as respiratory
4 testing -- that is the test where the filter is placed in
5 a tube, and the tube is dilated to expand its diameter
6 and contract its diameter, and that would not simulate
7 the effect of pulsatile flow of the blood going past the
8 filter.
9   Q  How would you do that?
10   A  You would put the filter in the same kind of
11 tube and attach it to a pulsatile flow system, which are
12 very commonly used in heart valve companies because of
13 the fact that the issues are almost identical; you've got
14 pulsatile flow of the blood going through the device
15 opening and closing it, in that case, so such testing
16 devices are quite common.  And you would put the tube in
17 the fluid circuit of such a device and carry out tests
18 over many millions of cycles to see what happens.  And
19 you would simultaneously dilate and contract the tube.
20      One would have to design the protocol for the
21 test accordingly, but I think that's quite easily done.
22 And therefore you would simultaneously apply the dilation
23 that's caused by the respiratory action and the pulsatile
24 flow that's associated with the blood moving past the
25 filter.

Page 36

(14:51:25-14:52:08)

1   Q  So that could be done?
2   A  It could be done.
3   Q  Okay.  Sitting here today, you don't have -- you
4 have not tested an IVC filter in that way?
5   A  No.
6   Q  Nor have you modeled a test like that to
7 determine whether a test like that would tell us more?
8   A  Well, "modeling" is a very broadly defined word,
9 and I would say we have done modeling because we've
10 calculated drag forces; we've estimated stress levels;
11 and we've looked at diagrams that indicate the number of
12 cycles it would take at those stress levels to fail the
13 device, fail the material in fatigue, and the number of
14 cycles involved.  Although we didn't write it down in the
15 report, the number of cycles involved at the stress
16 levels we estimated are very small, of the order of
17 hundreds of thousands.
18   Q  Okay.  And having not done the test that you've
19 just talked about, doing the respiration with the flow --
20   A  Yes.
21   Q  -- you are not able to tell me how that would
22 come out?
23   A  No, it's true.  Well, actually, can I revise my
24 answer?
25   Q  You can always revise your answer.

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

Page 37

(14:52:53-14:53:32)

1    A  Yeah. I know that I can set up the test in such
2    a way that I can make it fail in a thousand cycles, so in
3    that sense, I do know. But that would not be --
4        Q  Well, you can set up the test, but that might
5    not necessarily be what's happening in the human.
6        A  I agree it would not reflect the loading en
7    vivo, but what I'm saying is that one can anticipate the
8    outcome of the test in some circumstances.
9        Q  But we haven't done it, so we don't know how it
10   would come out?
11       A  We haven't done it, so we don't know the outcome
12   of the test in other circumstances.
13       Q  Okay. Now, let's talk about the three -- we
14   talked about the three-dimensional finite element test,
15   which is the wire against the sheath?
16       A  The three-dimensional finite element analysis is
17   the arm being displaced on its end.
18       Q  And we've talked about that?
19       A  Yes.
20       Q  And you don't have anything further to add to
21   what Dr. Begley said about that?
22       A  No.
23       Q  And you don't have anything further to add to
24   what Dr. Begley said about the two-dimensional finite
25   element analysis?

Page 38

(14:54:19-14:54:46)

1    A  No.
2        Q  Now, if you look at your report, page 4, the top
3    sentence, "We wish to emphasize that it is impossible to
4    accurately quantify the stresses in the implanted device
5    where the wires emanate from the surrounding sheath."
6    What was the reason for that sentence?
7        A  The reason is that the specification of the
8    shape and the design was not clear enough in the
9    documents that we saw to enable the analysis to be
10   carried out in a way that reflected precisely how the
11   device is shaped and how it would be loaded.
12       Q  So that's based on the information you had?
13       A  Based on information that we had, right.
14       Q  If you had had an exemplar filter, for example?
15       A  Well, we did have an exemplar.
16       Q  But you couldn't cut that one up because it
17   belonged to somebody?
18       A  Yes.
19       Q  If you had had an exemplar that you could do
20   with as you wished, would that have informed you further?
21       A  It would have in the sense that we could then
22   analyze that specific example, but one has to be very
23   careful because that doesn't mean that that is a typical
24   example of the device as produced. Therefore, it is
25   better to work from engineering drawings and to utilize

Page 39

(14:55:49-14:56:38)

1    the tolerances that were specified in engineering
2    drawings to identify the worst case shapes that can arise
3    and to then analyze the device based on the deductions
4    that come from such information. But one of the problems
5    we faced is that such information was not clearly
6    available from the drawings and the other documentation
7    that we had.
8        Q  Okay. Do you have any reason to believe that
9    these filters as manufactured -- I'm talking about the
10   recovery ones -- had any significant variability over the
11   course of the manufacturing, one to the next?
12       A  I have no information regarding that.
13       Q  Do you have any information that anything about
14   the manufacturing process, as opposed to the design
15   process, contributed to fractures in these filters?
16       A  Certainly looking at the SEM micrographs raised
17   serious concerns in my mind because of the gouges,
18   because of other marks that were visible on the surface
19   of the wires, that in standard practice one would
20   implicate in the possibility of fatigue failure and
21   therefore do something to eliminate or to assure oneself
22   that they, in fact, would not lead to fatigue failure
23   within the time that the device had to operate in
24   whatever it was being used for.
25       Q  Are there any of the plaintiff filters -- that

Page 40

(14:57:36-14:58:21)

1    we'll look at in a minute -- that you believe fractures
2    occurred from that situation?
3        A  I'm not sure if it's a G2 or recovery, but my
4    recollection is that there's one where the fracture
5    starts from a defect on the surface, at the surface.
6        Q  And do you think it's possible with Nitinol wire
7    to ever be completely free of some sort of surface issue?
8        A  It is never possible to be completely free of
9    defects on the surface of any metal or engineering
10   device, but it's certainly possible to reduce the level
11   of defects that were present on the surface of the
12   devices that I saw in the SEM micrographs.
13       Q  Are you going to testify about electropolishing?
14   It's not in the report.
15       A  I am not going to testify regarding
16   electropolishing, although I can respond to your question
17   by saying that I do know that electropolishing would
18   reduce the level of roughness present on the surface of
19   the material. And I do also know that many medical
20   device companies use electropolishing and are very, very,
21   very careful about the surface finish to their devices
22   for the reasons that we are discussing.
23       Q  Are you going to say that any particular
24   plaintiff's filter fractured due to a lack of
25   electropolishing?

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

Page 41

(14:59:22-14:59:54)

1   A   No.
2   Q   You heard Dr. Begley talk about the "pre-crack"?
3   A   Yes.
4   Q   Is that what you called it?  The sheath issue
5   against the wire?  Do you have anything to add to that
6   description or that opinion?
7   A   No.
8   Q   What about to the issue of wire-to-wire contact?
9   Do you have anything additional to say about that?
10  A   No.
11  Q   Do you know of any of the plaintiff's filters
12  where you believe that the fracture was a result of
13  wire-to-wire fracture?
14  A   To my recollection, and I don't know whether it
15  was a G2 or a recovery, but one of the fractures is in a
16  location where there is roughness on the surface that
17  could be associated with fretting between the wires as
18  they come into contact.
19  Q   And I forgot to ask Dr. Begley about that
20  sentence in your report, about the fretting.
21  A   Yes.
22  Q   So would you go through what your analysis was
23  and your conclusion about fretting.
24  A   Well, fretting involves the contact between two
25  surfaces that then move relative to each other and rub

Page 42

(15:01:44-15:02:28)

1   against each other, and that process can generate the
2   initiation of fatigue cracks and defect fatigue damage in
3   the material which can then eventually fail the device as
4   a consequence of the extension of that fatigue damage.
5   So --
6   Q   And when we go through these, you'll show me if
7   you see an example that you believe is fretting?
8   A   Yes.
9   Q   Is there any other type of testing, other than
10  what was described by you thus far or by Dr. Begley, that
11  you are critical of Bard not doing?
12  A   Yes.  Although it really sort of amplifies on
13  what I was saying before.  For example, in the kind of
14  test that I described, one would make sure that only
15  three legs were hooked into the tube wall, and just as --
16  and I can amplify on something else that Professor Begley
17  said, which is that testing should have been done in
18  tubes of various diameter within the range of the
19  diameters of the vena cava that the implant -- the filter
20  is qualified for and lie within the range of
21  counter-indications that were specified by Bard.
22      In particular, I would have wanted to see a test
23  in the largest diameter of vena cava that was allowed
24  because it is my deduction that that would be the one
25  that would lead to the most severe concentration of

Page 43

(15:03:35-15:04:18)

1   stress between the wire and the sheath at the location
2   where the wire can contact the edge of the sheath.
3   Q   Do you agree that in the past decade, let's say,
4   that with respect to implantable medical devices, there
5   has been an evolution in improvement in numbers of those?
6   A   There has been an improvement, but there's
7   improvement all the time, and -- but I would say that the
8   most dramatic period of improvement was about -- between
9   about 25 years ago and 20 years ago.  So that by 10 years
10  ago, there was a culture and a requirement -- I should
11  back off the word "requirement" -- but there was
12  certainly a culture and there was the understanding that
13  very serious consideration should be given to the
14  possibilities that an implantable device could experience
15  to assess whether it would fail in fatigue during the
16  lifetime of its implantation.
17  Q   And do you agree that the information we get
18  from the field from clinicians and even patients who have
19  these medical devices implanted help us as engineers and
20  as medical device manufacturers to improve our product?
21  A   Yes.
22  Q   And actually, that's a very valuable bit of
23  information for the improvement of products?
24  A   Yes.  But as Professor Begley stated, you
25  shouldn't do the experiment in the human in a manner that

Page 44

(15:04:58-15:05:31)

1   places the human at risk when you can readily avoid that
2   risk.
3   Q   Well, and that's one problem that manufacturers
4   of medical devices have in any event is the issue of
5   clinical testing; right?
6   A   Yes.
7   Q   And there are ethical considerations or
8   restrictions for clinical testing; true?
9   A   Yes.
10  Q   And depending upon the device, there are
11  sometimes limitations on clinical testing because you
12  can't get people to do it?
13  A   Yes.
14  Q   Okay.  And at some point, the device has to be
15  implanted in people to see how it does?
16  A   I don't think that's true.  If you come to the
17  assessment that the device is too great a risk --
18  Q   Of course.
19  A   -- to implant, then one should not proceed.
20  Q   Of course.  But in the end -- you can do
21  whatever testing you do -- we still tend to be informed
22  further, beyond whatever type of testing could have been
23  done, once it's put into the person; true?
24  A   At least in -- yes, I agree.
25  Q   Okay.  Let's look --

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

Page 45

(15:06:09-15:15:59)

1   A   Can I just respond?
2   Q   Yes.
3   A   One would hope that the experience that one has
4   is a null data set; in other words, that it doesn't fail.
5   Q   That's the goal?
6   A   Yes.
7   Q   All right.  Can we look through Dr. Fasching's
8   report, and if you would rather look through Dr.
9   Ritchie's report for this, we can do that.
10  A   Can I look through Dr. Ritchie's report?
11  Q   Sure.  Why don't we take a minute.
12  A   Okay, fine.
13      MS. DALY: Let's take a break.
14      VIDEOGRAPHER: We're going off the record, and
15  the time is 3:06 p.m.
16      (Break taken.)
17      (Mr. Begley left.)
18      VIDEOGRAPHER: We are back on the record, and
19  the time is 3:15 p.m.
20  BY MS. DALY:
21  Q   Dr. McMeeking, when we took the break, the
22  question on the table is if you would go through either
23  Dr. Ritchie on Dr. Fasching's -- whichever you prefer to
24  use -- SEM pictures, and I believe you're going through
25  Dr. Fasching's?

Page 46

(15:16:58-15:17:38)

1   A   Yes, that's correct.
2   Q   And if you would do two things at once for me.
3   If you would call out anything that she labels those
4   pictures that you do not believe the SEM shows or that
5   the SEM shows differently; and then if you will also
6   plaintiff-by-plaintiff call out any SEM that you think
7   represents some fracture that you think could be
8   associated with any of the issues you've raised.
9   A   Well, I mean, they're all caused by the issues
10  that we've raised in the sense that they're all fatigue
11  failures and they're all caused by levels of stress that
12  would cause fatigue.  And, you know, we've identified
13  high stress as an issue that is associated with the
14  design of the filter.  For example, it looks to me that
15  the Carnehl arm -- I'm not sure if that's a G2 or a --
16  Q   It's a G2.
17  A   A G2.  But the Carnehl arm could well be
18  fretting because of the surface marks adjacent to the
19  source of the fatigue.
20      What I can say is that, in each of these cases,
21  I agree with her that the source of the fatigue -- the
22  beginning of the fatigue failure is where she says it is,
23  and that then that -- for example, in the case of the
24  Carnehl one, it's possible that fretting was associated
25  with the way that that fatigue got started.

Page 47

(15:18:36-15:19:14)

1   Q   All right.  You can keep going.
2   A   Can you remind me what issues we were talking
3   about?
4   Q   We're talking about -- here are the ones that I
5   believe you talked about.  We're talking about the
6   chamfer issue; the wire against the sheath; wire against
7   wire where it might -- where in your view it could be
8   caused by the arm stuck in the vessel, expanding; where
9   it could be the legs not loading all in a balanced way.
10  A   Okay, so, Bloomquist -- again, I don't -- it
11  says, "Recovery," so it should be recovery --
12  Q   Right.
13  A   I would say that both of the arm failures are
14  associated with the fact that there's -- that it's close
15  enough to the end of the sheath for that to cause
16  problems in terms of the level of stress which is
17  generated.  In the case of the Carnehl, which is a G2 --
18  should we just skip over that or is that --
19  Q   We might as well go through them.
20  A   Okay.  So in the case of the G2, I would say
21  that Arm 1, as she depicts it, is close enough to the
22  sheath for the raising of the stress by the sheath to be
23  an issue in how that fatigue got started.
24  Q   And let me say this one thing while we're on
25  this G2.  There will be a whole different deposition

Page 48

(15:20:00-15:20:50)

1   where we talk about G2 --
2   A   Yes, I understand.
3   Q   -- and it's different.  But to the extent that
4   it's anything that you've already talked about that's the
5   same in this model, go ahead and call that out.
6   A   Okay.  I would say that Arm 2 is in the bend
7   location where stresses can be high as a consequence of
8   how the arms get loaded.
9   Q   In the Carnehl?
10  A   In the Carnehl.  The Ciaburri is a failure -- in
11  the Arm 1, as she calls it, is a failure that to me is
12  associated with the raising of the stress by the
13  adjacency of the location with the end of the sheath.
14  Q   So sheath wire?
15  A   Sheath wire.
16  Q   Okay.
17  A   From her report, I can't say anything about the
18  Clark case.
19  Q   Okay.
20  A   There's no pictures of where the actual failure
21  is.
22  Q   Do you remember anything about the Clark case
23  independently?
24  A   No.
25  Q   Okay, that's fine.

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

Page 49

(15:21:26-15:21:51)

1   A  I'd have to refer to Professor Ritchie's report
2   to say anything further.
3       In the case of the Gray, Arm 1 is adjacent to --
4   the failure is adjacent to the end of the sheath, and I
5   would implicate the effect of the end of the sheath on
6   the way that stresses have been raised and in the shape
7   of failure.
8       In the case of Arm 2, that's in the bend
9   location where we find the stresses to be high in certain
10  circumstances.
11      VIDEOGRAPHER: Sorry to interrupt, but I want to
12  point something out.  That vehicle parked right over
13  there is reflecting onto our witness, and look at the
14  screen.
15      MS. DALY: Yeah, let's stop because all of a
16  sudden you're completely -- it looks like you're on a
17  beach.  We need to move him.
18      VIDEOGRAPHER: Right.  Going off the record.
19  The time is 3:21 p.m.
20      (Discussion held off the record.)
21      VIDEOGRAPHER: We are back on the record, and
22  the time is 3:24 p.m.
23      THE WITNESS: Shall I keep going?
24      MS. DALY: Yes, thank you.
25      THE WITNESS: I won't say anything about the

Page 50

(15:24:59-15:25:53)

1   legs because we didn't do anything in the way of stress
2   analysis except to point out that the stresses are
3   probably -- or not probably -- we would assess them to be
4   twice as high as Bard thought them to be, but I don't --
5   I can't comment in detail on the leg fractures in any
6   case.
7   BY MS. DALY:
8       Q  And your assumption of what Bard thought them to
9   be is based on just the material you have?
10      A  Just the material I have, that's right.
11      The Lindsey recovery, both the arm failures are
12  adjacent to the end of the sheath, and in my assessment
13  are clearly associated with the stress raising that that
14  adjacency caused in the arms.
15      The Lynch case, the Lynch recovery filter, Arm 1
16  is a fracture adjacent to the end of the sheath, and in
17  my assessment, the raising of the stress by the end of
18  the sheath where the arm would come into contact with it
19  is implicated in the fatigue and fracture of that arm.
20      Arm 2 is perhaps marginal in terms of whether
21  it's close enough to the end of the sheath and whether
22  it's in the region where the wire bends.  Looking at it,
23  as I do now, it looks to me like it's in the region where
24  the arm bends and therefore is in one of the locations
25  where we find stresses to become high in the arms in

Page 51

(15:27:11-15:28:08)

1   certain circumstances.
2       The Newton case, both of those failures are
3   close enough -- at least in the view that is in Figure 30
4   of Dr. Fasching's report -- are close enough to the end
5   of the sheath that I would implicate the end of the
6   sheath in the raising of stresses that would initiate the
7   fatigue failure in those cases, but I guess I would
8   prefer to see another picture just to be sure because the
9   perspective in this case is not very good for making that
10  assessment.
11      And in the case of the Newton Arm Number 2, it
12  looks to me like there's a defect on the surface which
13  may be a surface mark or something like that from the
14  manufacturing that is associated with the initiation
15  site.  So that is one point of relevancy.
16      And in the case of the Stahl, Arm Number 1 --
17  there are a lot of broken arms in this case -- Arm Number
18  1 has broken where the first bend takes place after the
19  wire has come out of the sheath, and that's one of the
20  locations where we find the stresses to become high in
21  certain circumstances in which the arms can be loaded.
22      Arm 2 and 3 look to me as if they're in that
23  same location and are subject to the same concern of the
24  stresses being high there in certain circumstances.
25      I think that's the end, isn't it?

Page 52

(15:29:08-15:29:35)

1       Q  Yeah, I think that's right.  I'm not keeping
2   track.
3       A  I'm looking at exemplars now.
4       Q  Thank you very much, that's great.  Few more
5   questions.  Now, as you described your role as an expert
6   in this litigation, you said that you were to look at the
7   devices to see if there was concern of susceptibility to
8   failure?
9       A  Yes.
10      Q  I think I quoted you right, okay.  And you did
11  that as best you could with the material that you had?
12      A  Correct.
13      Q  Which I will represent to you is not all of the
14  Bard produced materials nor all of the testing that Bard
15  did.
16      A  If you say so, I accept that.
17      Q  Okay.  And which also did not include your
18  review of the failure investigation report of August 2004
19  that Bard did, once it was reported to them that
20  fractures were occurring; correct?
21      A  Can you clarify?  Was that included in the list
22  of documents?
23      Q  It was not.
24      A  Because I have seen some material that indicates
25  that further work was done, given that there had been

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

Page 53

(15:30:16-15:30:39)

1  failures observed.  But I'm not sure if it -- obviously
2  it wasn't the document you're talking about.
3     Q  Right.  You have seen, for example, there's a
4  summary by a man named Avijit Mukherjee --
5     A  Yes.
6     Q  -- that talks about the investigation?  But you
7  do not have amongst your documents the 199-page
8  investigation report?
9     A  I don't have anything that's 199 pages.
10    Q  Okay.  And also your investigation did not
11  include your reading of depositions of Bard personnel?
12    A  That's correct.
13    Q  So you were -- your investigation, your
14  conclusions, are based on what you had to review;
15  correct?
16    A  That's correct.
17    Q  And your FEAs, similarly, were done with
18  whatever information you had available to you?
19    A  That's correct.
20    Q  And FEAs, you would agree, are only as good as
21  what you put into them, variable-wise?
22    A  That's correct, but we do a very good job of
23  that, so --
24    Q  Correct.
25    A  If you don't mind me saying so.

Page 54

(15:31:09-15:31:32)

1     Q  If you had wrong information, you could have
2  wrong outcome?
3     A  Yeah, there's a common expression, "Garbage in,
4  garbage out."
5     Q  Right.  And that certain assumptions that you
6  made --
7     A  Can I amplify that response?
8     Q  Yes, of course.
9     A  Which is that, I did look at the finite element
10  analysis.  Some of it was done either by or for Bard, and
11  quite frankly, I was appalled at how poorly it was
12  carried out.  And it looked to me a case of what I just
13  described, "Garbage in, garbage out."
14    Q  And so you didn't use that data --
15    A  No.
16    Q  -- in yours?  Okay.  And you also testified that
17  some things that are --
18    A  So can I back up and amplify on that response?
19    Q  Yes.
20    A  We did not -- I did not -- we did not use the
21  results of the inputs or the configurations from those
22  finite element analysis; however, what we did do repeated
23  one of their analyses in the sense that we moved an arm
24  by one millimeter and got radically different results
25  from what they obtained in their analysis, in which their

Page 55

(15:32:26-15:32:54)

1  stresses were relatively low and not something that would
2  cause you concern.  But the concern is that they did the
3  analysis very poorly and they should have done it in a
4  much better fashion.
5     Q  Well, you noticed that -- I think that the --
6  that that FEA was not done in-house; right?
7     A  Yes.
8     Q  And do you know that they don't have capability
9  to do that in-house, or didn't at the time?
10    A  You're telling me.  I don't know.
11    Q  But --
12    A  Can I just comment?
13    Q  Let me ask this question; then you can.  What
14  you're saying is that the information that they got, on
15  an outside FEA, you didn't think was -- you did not think
16  was the right outcome?
17    A  That's right, yes.  The results they got were
18  meaningless because the analysis that was done was
19  meaningless, but the responsibility lay on the shoulders
20  of Bard to direct their consultants to do a job that was
21  appropriate for the way that the filter was loaded and
22  used.
23    Q  And you don't know how they relied upon or
24  didn't rely upon that particular FEA to which you're
25  referring?

Page 56

(15:33:50-15:34:11)

1     A  No, I don't, but it was provided as one of the
2  few documents that Bard produced in their activities that
3  described finite element analysis of the filter.
4     Q  But it was done after the recovery filter was
5  taken off the market in 2003, don't you agree?
6     A  I don't recall the dates, but I did notice it
7  was sometime into the period that we're talking about.
8  It wasn't right at the beginning.
9     Q  So if they relied on that or didn't, you don't
10  know?
11    A  I don't know.
12    Q  Okay.  The other thing that you talked about and
13  put into your report, in addition to doing these specific
14  FEAs, you also made certain assumptions?
15    A  Yes.
16    Q  And again, it's the same thing, "Garbage in,
17  garbage out."  An assumption is only as good as what
18  variables you're using for the assumption?
19    A  That's correct.  But as I said, the assumptions
20  that we made were quite appropriate, quite sensible, and
21  were the assumptions that Bard should have made in their
22  assessment of the performance of the filter, and they
23  should have done that before they started implanting it
24  in human beings.
25      If they didn't have finite element capability 10

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

Page 57

(15:35:08-15:35:35)

1  years ago -- is that the date we're talking about?  Could
2  you clarify?  If they didn't have finite element
3  capability 10 years ago, they should have because by then
4  it was a very mature technology; it was commonly
5  available to engineers and companies; and it was not an
6  expensive system to bring in-house and train people to
7  use.  By then, it was quite easy to use it in a reliable
8  way, as long as the supervision of what was done was
9  knowledgeable, by which I mean, that the engineers in
10  charge should know what it is they're trying to do, and
11  do it, and direct the analyst to do it properly.
12    Q  And I'm not saying that they didn't do it or
13  they didn't have it.  I'm just saying, my question was,
14  the FEA materials you did look at -- I'll tell you they
15  were after the date the recovery was taken off the
16  market -- so you don't know to what extent they relied on
17  that for what purpose?
18    A  No, I don't.
19    Q  Okay.  And you don't know, because you haven't
20  seen it, what other analyses they may have done before
21  they put the recovery on the market; fair enough?
22    A  Well, I accept what you're telling me, but what
23  I can say is that we asked the plaintiff's lawyers to
24  seek all finite element analysis that was carried out on
25  the filters.  And that's -- the few documents we received

Page 58

(15:36:19-15:36:52)

1  is all that we got.
2    Q  And testing, you asked for testing too, didn't
3  you?
4    A  Yeah.
5    Q  Okay.  Is it your intention to do any physical
6  testing of this filter?
7    A  No.
8      MS. DALY:  That's all I have, thank you.
9
10      FURTHER EXAMINATION
11  BY MR. HARTLEY:
12    Q  Doctor, you made notes during Dr. Begley's
13  deposition.  Is there anything on your notes that you
14  didn't get an opportunity to discuss with Ms. Daly?
15    A  We -- I took care of everything that I noted,
16  except one comment which is that when we made assessments
17  of how we should load the arm in our finite element
18  analysis and our consideration of the loading of the
19  device, we took information from Bard's documentation and
20  we looked at those papers that you mentioned, that we
21  were referred to in our list of materials relied upon,
22  and I made the assessment that what we did, what we were
23  going to do, what was in those papers, and what Bard was
24  saying was happening in the vena cava were all
25  consistent.  And so we carried out finite element

Page 59

(15:37:36-15:37:51)

1  analyses that were, in that sense, consistent with the
2  common view as to what was going on in the vena cava.
3      Although, I'm not saying that Bard did
4  everything they should have done.  I'm just saying it was
5  consistent with what we saw in Bard documentation and in
6  the papers.
7      MS. DALY:  And with respect to that one thing --
8  sorry to break in on you.
9
10      FURTHER EXAMINATION
11  BY MS. DALY:
12    Q  With respect to that one thing -- after this
13  deposition when you get a chance to go back to your
14  office, are you able to look at those materials and tell
15  me which document or documents it is that you were
16  describing, for that particular issue, that you used?
17    A  I can.
18    Q  And just let Dean know.  That would be very
19  helpful.
20    A  Yes, I can and will.  Yes.
21      MS. DALY:  Thank you.
22
23      FURTHER EXAMINATION
24  BY MR. HARTLEY:
25    Q  You indicated during your testimony that you

Page 60

(15:38:52-15:39:39)

1  were surprised, I guess, at what your analysis
2  demonstrated in light of the stresses that were put on
3  that filter.  Had you been implored by Bard before they
4  brought the filter to market, what would you have advised
5  them, Professor?
6    A  I would have advised them to consider two
7  possible routes:  One would be to redesign the filter,
8  by, for example, specifying and ensuring that a radius at
9  the edge of the sheath was chosen that would be benign in
10  terms of the stresses that would be generated in the arms
11  that were subject to loading within the device.
12      And I suppose if the decision was made not to
13  redesign the device, which I would say would be the wrong
14  decision -- and let me back up.  There would be other
15  design changes that would be possible, such as changing
16  the diameter of the wires, possibly putting a spacer
17  inside the sheath to keep the wires away from the sheath
18  where they come out of the sheath; one could redesign the
19  shape of the arms to try and reduce the level of stresses
20  that would arise in the circumstances that we were
21  concerned about; and there's other design changes that
22  one could think of making.
23      But if, let's say, there was a decision made not
24  to change the design for some reason, which, as I said, I
25  would say is the wrong decision, then a more extensive

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

Page 61

(15:40:40-15:41:27)

1 effort of testing would be appropriate in the preclinical
2 setting. I'm not saying our models, but in the
3 preclinical setting in the lab to find out whether the
4 device was going to be subject to premature fatigue
5 failures as a consequence of certain things that we're
6 concerned about.
7     And I would have advised them to carry out much
8 more complete finite element analysis of the device in
9 its three-dimensional shape to get a clear understanding
10 of what the levels of stress are in the device when it
11 experiences certain circumstances such as the ones that
12 we described: The arms being trapped in the vena cava
13 wall; only three legs being properly embedded in the vena
14 cava wall to support the filter in place.
15    Q Given what you found in your analysis, had Bard
16 done a more robust analysis of their recovery filter,
17 even the elementary level that you all did in this
18 litigation, should Bard have been surprised that the
19 recovery filter was failing?
20    A If they had done even the more elementary things
21 that we did without even going to finite element
22 analysis, if they had simply did what we call "bean
23 theory" modeling of the loading of the arms and then used
24 standard books to look up stress concentration factors
25 that could arise at the critical locations in the design

Page 62

(15:42:30-15:43:14)

1 of the filter, if they had even done that, they would
2 have expected to see premature fatigue failures when the
3 device was implanted.
4    Q You've mentioned "fatigue failures," and that's
5 what Dr. Ritchie has described them as. Does your
6 analysis of the stressors that are on the filter support
7 Dr. Ritchie's opinion that it is fatigue that is causing
8 the fracturing of the filter?
9    A Yes. Our modeling and stress analysis supports
10 not only the fact that it is fatigue that is causing
11 these failures, but it supports -- well, in a sense, this
12 is topological -- but it supports the fact that the
13 failures occur in the locations that they do.
14    Q If we look at the exemplar filter you had an
15 opportunity to review, the SEM, as well as Dr. Ritchie's
16 SEMs, your analysis of the stressors that were on the
17 filter, as well as the design, and even Dr. Fasching's
18 scanning electron microscopy photographs, can you say for
19 the filters that we don't have scanning electron
20 microscopy photographs of, that it was the design of the
21 filter, with the stressors that you've been discussing
22 here today, that more probably than not caused the four
23 filters of Mohammed, Evert, Kolenda, and Heidi Smith to
24 fail?
25    A Yes, I agree it's more probable than not that

Page 63

(15:44:18-15:44:56)

1 the failures are caused by fatigue from the same sources
2 that we've been talking about today.
3    Q Do you agree with Dr. Begley that the Bard
4 recovery filter was defectively designed?
5    A Yes, I do.
6    Q Do you have an opinion as to whether it was
7 defectively manufactured?
8    A I think that's more difficult to say in that
9 it's not obvious that the surface texturing was a very
10 big problem in the way that the devices failed; however,
11 I would say that the surface quality was very poor and an
12 engineer would have -- with any sort of experience in the
13 effect of surface texture on the reliability and fatigue
14 life of a device -- they would take steps to improve the
15 quality of the surface.
16    Q Let me ask you this question then. Can you say
17 that it's more probable than not that the surface finish
18 contributed to the problems that we see with the recovery
19 filter in the fractures?
20    A Yes, it's more probable than not.
21    Q All right. One final question. You've been
22 asked about numerous other analyses that Bard's done that
23 you may or may not have seen, that may or may not be in
24 existence. Regardless of any analysis that Bard has done
25 of the filter, in addition to whatever you've seen, did

Page 64

(15:45:58-15:46:22)

1 any of the analysis that they did impact the design of
2 the filter and its ability to fracture and migrate?
3    A I'm not sure if I understand the question, but
4 can I state it this way, that our observations of the
5 shape of the filter and the drawings that we saw were
6 such that it seemed that no serious analysis had been
7 done on the device that would tell them that this was a
8 bad design.
9    Q Would it be fair to say that if Bard did
10 additional analyses that you haven't seen, that those
11 analyses missed a spot as well as their previous
12 analyses?
13    A Yes, because there's nothing that I've seen that
14 suggests that improvements were made to the design to
15 such an extent that it eliminated all the problems we've
16 been talking about.
17       MR. HARTLEY: Thank you, Doctor.
18       MS. DALY: Dr. McMeeking, a few more.
19
20       FURTHER EXAMINATION
21 BY MS. DALY:
22    Q With respect to the surface condition issue,
23 your sort of general comment in the answer to Mr.
24 Hartley's question was that you saw examples of poor
25 surface condition? I'm not rephrasing you perfectly

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

Page 65

(15:46:58-15:47:31)

1 well.

2  A  Yes.

3  Q  Okay. However, when you were going through
4 these particular filters in the Dr. Fasching's report, I
5 believe there was one that you said might -- one arm,
6 Newton filter, that might be related to a surface
7 problem; correct?

8  A  Yes.

9  Q  So the surface problem creating a fracture is
10 really on a case-by-case basis; true?

11  A  Yes.

12  Q  So you were then asked a question of whether you
13 could say in a very general sense, more probable than
14 not, that the fractures in plaintiffs' filters where we
15 don't have the filters to look at them were caused by any
16 of the things that you testified about today; correct?
17 You were asked about that?

18  A  It is more probable than not that those failures
19 were caused by fatigue caused by high stresses from
20 this -- and/or possibly surface finish, but caused by
21 high stresses of the type that we've been talking about
22 from the sources that we've identified.

23  Q  But without looking at them, you cannot be
24 certain?

25  A  One cannot be 100 percent certain.

Page 66

(15:48:18-15:48:46)

1  Q  And really, the best way to determine that would
2 be to do the SEM and actually look at it, if we have
3 them?

4  A  Well, no, there's an intermediate step, which is
5 that you can image what's left and the other bits that --
6 if it can be found in the body, and identify the location
7 of those failures. And if they are in the same place as
8 the failures we've been talking about, then that
9 increases the probability that it's from exactly the same
10 source that we're talking about. But I agree it would
11 not take the certainty to 100 percent.

12  Q  Right. And it would be more difficult to make
13 that analysis if the filter is still in the body?

14  A  Which analysis?

15  Q  The analysis of what caused the fracture.

16  A  Yes.

17  Q  And the other thing you were talking about was
18 recommend -- what you would have recommended Bard to do
19 when you talked about additional testing, and you talked
20 about redesign issues; correct?

21  A  Yes.

22  Q  Okay. In those events --

23  A  Excuse me, and I said, "A more complete and
24 accurate finite element analysis."

25  Q  You're right. In the event of redesign, would

Page 67

(15:49:20-15:49:55)

1 you agree with me that that would require a full-blown
2 retesting to see if any redesign created a problem in a
3 different area that you hadn't anticipated?

4  A  Absolutely, yes.

5    MS. DALY: Okay.

6    MR. HARTLEY: I have nothing further. Thank
7 you, Doctor.

8    MS. DALY: Thank you very much for spending the
9 whole day with me.

10    VIDEOGRAPHER: This concludes today's deposition
11 of Robert Maxwell McMeeking, Ph.D. The number of
12 videotapes and DVDs used was one. The time is 3:49 p.m.,
13 and we are off the record.

14    MR. HARTLEY: Do you want to read and sign,
15 Doctor?

16    THE WITNESS: What does that mean?

17    MR. HARTLEY: It means that she will type up
18 everything we said today. She will then send you a copy
19 of that, or me a copy. You then have the opportunity to
20 review what you said to make sure it is accurate.

21    MS. DALY: And mostly it's just some technical
22 term that maybe she doesn't get or --

23    MR. HARTLEY: Or you can waive the right to read
24 and sign and assume she's going to get it correct.

25    THE WITNESS: I think it's best to read and

Page 68

1 sign.

2    THE REPORTER: Do I have his address?

3    (Discussion held off the record.)

4    MR. HARTLEY: You have 30 days to complete your
5 task. And if you don't complete your task, it's as if
6 you didn't read it.

7    (Deposition concluded at 3:51 p.m.)

8

9

10 STATE OF CALIFORNIA        )
11 COUNTY OF SANTA BARBARA   ) ss.

12

13

14    I, ROBERT MAXWELL MCMEEKING, PH.D., hereby
15 certify under penalty of perjury under the laws of the
16 State of California that the foregoing is true and
17 correct.

18    Executed this _____ day of
19 _____, 2011, at
20 _____, California.

21

22

23    _____

24    ROBERT MAXWELL MCMEEKING, PH.D.

25

ROBERT MAXWELL MCMEEKING, PH.D. - May 24, 2011
NEWTON v. BARD

Page 69

```
 1  STATE OF CALIFORNIA        )
 2  COUNTY OF SANTA BARBARA    )  ss.
 3
 4         I, ELIZABETH A. MOOY, CSR NO. 11281, A Certified
 5  Shorthand Reporter in and for the County of Santa
 6  Barbara, the State of California, do hereby certify:
 7         That, prior to being examined, the witness named
 8  in the foregoing deposition was by me duly sworn to
 9  testify the truth, the whole truth, and nothing but the
10  truth;
11         That said deposition was taken down by me in
12  shorthand at the time and place therein named, and
13  thereafter reduced to typewriting by computer-aided
14  transcription under my direction.
15         I further certify that I am not interested in
16  the event of the action.
17         WITNESS my hand this _____ day of _____,
18  2011.
19
20
21         _____
22         Certified Shorthand Reporter in and for the
23         County of Santa Barbara, State of California
24
25
```