# REDACTED DOCUMENTS RELATING TO DOCKET 7317

EXHIBIT A – No redactions

EXHIBIT B – Previously filed redacted in DKT 8118

EXHIBIT D – No redactions

EXHIBIT E – Previously filed redacted in DKT 8118

EXHIBIT F – Filed redacted

# EXHIBIT A



Deposition of:

# Robert Ritchie , Ph.D.

*June 9, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF ARIZONA

3

4    In re Bard IVC Filters

5    Products Liability Litigation

6

7                               No. MD-15-02641-PHX-DGC

8

9

10

11                    DEPOSITION OF:

12              ROBERT O. RITCHIE, Ph.D.

13                   June 9, 2017

14

15

16

17         REPORTER'S TRANSCRIPT OF PROCEEDINGS

18        BY Jill Anne Stephenson, CSR 8563

19

20

21

22

23

24

25

Robert Ritchie , Ph.D.                                June 9, 2017
In Re: Bard IVC Filters Products Liability

**Page 2**

1          A P P E A R A N C E S
2
3  FOR PLAINTIFF:    JOHN DALIMONTE
                     DALIMONTE RUEB
4                    85 DEVONSHIRE STREET STE. 1000
                     BOSTON, MA  02109
5                    john@drlawllp.com
6
   FOR DEFENSE:      TAYLOR DALY
7                    NELSON MULLINS RILEY SCARBOROUGH
                     201-17TH STREET NW STE. 1700
8                    ATLANTA, GA  30363.
                     taylor.daly@nelsonmullins.com
9
10 ALSO PRESENT TELEPHONICALLY:
11 FOR DEFENSE:      RAMON LOPEZ
                     LOPEZ MCHUGH, LLP
12                   100 BAYVIEW CIRCLE
                     NORTH TOWER STE. 5600
13                   NEWPORT BEACH, CA  93660
14
   FOR DEFENSE:      MARK O'CONNOR
15                   GALLAGHER & KENNEDY
                     2575 E. CAMELBACK RD. STE. 1100
16                   PHOENIX, AZ  85016
                     markoconnor@gknet.com
17
18
   VIDEOGRAPHER:  JOE MARGOULIS, EUREKA STREET VIDEO
19
20
21
22
23
24
25

**Page 4**

1
2                   E X H I B I T S
3  PLAINTIFF'S EXHIBITS
4  Exhibit 1 Notice of Deposition, 5 pgs.
5  Exhibit 2 3.2.17 Assessment of the Structural Integrity of
           Bard IVC Filters: Recovery, G2, G2-Express
6          and Eclipse; 121 pgs.
7  Exhibit 3 4.1.17 Rebuttal to Defendants' Experts' Opinions
           of Assessment of the Structural Integrity of
8          Bard IVC Filters: Recovery, G2, G2-Express
           and Eclipse; 27 pgs.
9
   Exhibit 4 4.1.17 Supplementary Report, 3 pgs.
10
   Exhibit 5 List of various filters; 2 pgs.
11
   Exhibit 6 Excerpt of Ritchie Motion Hearing; 35 pgs.
12
   Exhibit 7 McMeeking Assessment of the Designs of Bard Inferior
13          Vena Cava Filters; 173 pgs.
14 Exhibit 8 4.7.17 McMeeking Supplementary Report; 12 pgs.
15 Exhibit 9 5.11.17 McMeeking Rebuttal Report; 20 pgs.
16 Exhibit 10 3.17.17 Ritchie Invoice to Lopez; 1 pg.
17 Exhibit 11 3.11.16 Ritchie invoice to Lopez; 1 pg.
18
19
20
21
22
23
24
25

**Page 3**

1     INDEX OF EXAMINATION
2
3       ROBERT O. RITCHIE
4
5  DIRECT EXAMINATION BY MS. DALY, PG. 6
6  CROSS-EXAMINATION BY MR. DALIMONTE, PG. 147
7  REDIRECT EXAMINATION BY MS. DALY, PG. 160
8  RECROSS EXAMINATION BY MR. DALIMONTE, PG. 164
9
10      QUESTIONS INSTRUCTED NOT TO ANSWER
11 NONE
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1          VIDEOGRAPHER:  Here begins Video No. 1 in the
2  deposition of Robert O. Ritchie, Ph.D in re: Bard IVC
3  Filters Products Liability Litigation venued in the
4  United States District Court for the District of
5  Arizona.  The case number is MD-15-02641-PHX-DOC.
6  Today's date is June 9, 2017, and the time on the video
7  monitor is 10:07 a.m.
8          The video operator today is Joseph Morgous
9  representing Veritext Legal Solutions.  This video
10 deposition is taking place at 2140 Shattuck Avenue Suite
11 407, Berkeley, California and was noticed by Nelson
12 Mullins, Riley & Scarborough, LLP.
13         Counsel, please voice-identify yourselves and
14 state whom you represent.
15         MR. DALIMONTE:  Good morning, my name is John
16 Dalimonte from the law firm of Dalimonte Rueb in Boston,
17 Massachusetts, on behalf of the plaintiffs.
18         MS. DALY:  And I'm Taylor Daly, for the BARD
19 defendants.
20         VIDEOGRAPHER:  The court reporter today is Jill
21 Stephenson representing Veritext Legal Solutions.  Would
22 the reporter please administer the oath?
23         BE IT REMEMBERED that, pursuant to Notice of
24 Deposition, and on June 9, 2017 commencing at the hour
25 of 10:07 a.m. at Clark Reporting & Video Conferencing,

2 (Pages 2 - 5)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 6

1 Berkeley, California, before me, Jill Stephenson, CSR
2 8563, State of California, there personally appeared
3        John O. Ritchie,
4 who was provided as a witness under the provisions of
5 the Superior Court of California.
6        DIRECT EXAMINATION BY
7        MS. DALY: Q.  Good morning, Dr. Ritchie.
8   A.  Good morning.
9   Q.  Exhibit 1 is before you, and that's the Notice
10 of Deposition for today.
11  A.  No, it's not.
12  Q.  What did you bring with you?
13  A.  No, it's not.
14  Q.  What?  It's not?  Oh.  It's the McMeeking
15 notice.
16      Let's make this one No. 1 instead.  Can I have
17 one more?
18      (Whereupon, Exhibit 1 was
19      marked for identification.)
20  Q.  Starting again, Exhibit 1 before you is the
21 Notice of Deposition for the deposition today, correct?
22  A.  It is, indeed.
23  Q.  What have you brought with you today?
24  A.  Not very much, actually.  I brought bills, and
25 -- and in the words of Oscar Wilde, I brought my

Page 7

1 intellect.
2   Q.  Okay.  Is there anything new that you rely on
3 in your MDL litigation work that was not previously
4 listed in the three MDL reports that you have provided
5 recently?
6   A.  I'm not quite certain, but I -- I mean, there
7 are things, like I've seen some recent depositions and
8 some recent reports, the Fashing report, for example,
9 and so I, of course, have looked at those, so they
10 certainly could have influenced me in some respects, but
11 basically it's much the same.
12  Q.  All right, but nothing -- nothing new that I
13 wouldn't either know about because it's Dr. Fashing's
14 report, or it's already cited as a reference to your
15 reports?
16  A.  I would think everything that's in my report,
17 you know about it.  It either has a Bates stamp or it's
18 been declared.  I have not taken any other input from
19 anywhere else.
20  Q.  All right.  We got started a little bit late.
21 The notice was for 9:00.  I know that Mr. Dalimonte
22 needed a little time with you this morning, so we got
23 started a little bit after 10:00.  And I just want to
24 make you all understand, if I need my seven hours --
25      MR. DALIMONTE:  Oh, yeah.

Page 8

1      MS. DALY:  -- I'm going to take my seven hours,
2 but we'll move along rapidly, as Dr. Ritchie and I are
3 usually able to do.
4      MR. DALIMONTE:  Understood.
5   Q.  (By Ms. Daly) I am going to give you copies of
6 your three reports that I'm going to be talking to you
7 about so you have them in front of you.  And this -- I
8 made a copy already.
9   A.  I'm going to take my jacket off.
10  Q.  This is going to be 2.
11      (Whereupon, Exhibit 2 was
12      marked for identification.)
13      MR. DALIMONTE:  Thank you.  That was 2?
14      MS. DALY:  Yes.
15      MR. DALIMONTE:  I see you marked it at the top,
16 right.
17  Q.  (By Ms. Daly) And Exhibit 2, if you would,
18 just tell us what that is.
19  A.  It's a report written by me entitled,
20 "Assessment of the Structure Integrity of Bard IVC
21 Filters: Recovery, G2, G2-Express and Eclipse."
22  Q.  And that's on March 2, 2017.
23  A.  March 2, 2017.
24      (Whereupon, Exhibit 3 was
25      marked for identification.)

Page 9

1   Q.  All right.  And then let me show you what's
2 been marked as No. 3, and ask you to tell us what that
3 one is.
4   A.  That's the Rebuttal to the Defendant's Expert
5 Opinions, and same title, dated April 1st, 2017.
6      (Whereupon, Exhibit 4 was
7      marked for identification.)
8   Q.  All right.  And then we have another report
9 filed called the MDL, which will be No. 4.  Will you
10 tell us what that one is?
11  A.  That's an Assessment of the Structural
12 Integrity of Bard IVC Filters: Meridian and Denali
13 Filters, dated April 1st, Supplementary Report.
14      You want me to repeat that?
15      THE REPORTER:  No, I got it.
16  Q.  (By Ms. Daly) Very good.  I'm going to be,
17 from time to time, referring to one of these three
18 reports and a page, and I'll take you there as I ask you
19 questions.
20  A.  Thanks.
21  Q.  All right.  Now, your opinions -- and let's go
22 to -- Exhibit 2, which is your larger report.  I want
23 to go through some issues about opinions we've talked
24 about before.
25  A.  Okay.

3 (Pages 6 - 9)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

**Page 10**

1    Q. And I want to start with your Opinion 1 in this
2  -- in this report, Exhibit 2, which is the opinion on
3  lack of appropriate chamfer causing increased local
4  stresses. All right?
5    A. Yes.
6    Q. All right. First of all, does that opinion
7  relate to stresses that will cause fracture, or stresses
8  that will cause something else, like tilt or
9  perforation?
10    A. The chamfer issue is a local elevation of
11  stresses, and I would think that it would mainly pertain
12  to fracture issues. However, if -- if there was a
13  fracture of, for example, a leg or an arm, at that point
14  it would obviously affect the other function of the
15  device, but -- so you can't rule out, but primarily it's
16  a fracture issue.
17    Q. The way that you've looked at it, from your
18  role in this case, is the chamfer, as it relates to
19  fractures, principally, true?
20    A. Yeah, but I mean, as I said, you know, there is
21  a -- you can't box these things; there is a synergism
22  between the various different modes of operation.
23    Q. And we'll get to that.
24    A. But, yes, the fractures of these parts are due
25  to fatigue, and fatigue is motivated by stress, or in

**Page 11**

1  this case more strain, and there are more sources of
2  that stress and strain, and this is one of them,
3  potentially one of them.
4    Q. Now, in talking about the chamfer, there is, in
5  your opinion, the ability of this chamfer or edge to
6  actually physically contact a wire leading to fatigue of
7  the wire and fracture, true?
8    A. Yeah.
9    Q. And have you seen that in any of the ones
10  you've examined?
11    A. Well, you -- I mean, the wires are coming out
12  of that, of that rim, and so you're seeing -- seeing a
13  snapshot of it after the fact; you're not seeing it in
14  real time, right? You'd have to have a CT scan. But it
15  will be beyond credibility to think there wasn't contact
16  between the wires and the edge of the rim.
17    Q. Well, wait, my question was have you seen -- in
18  any of the ex-planted filters that you've examined, have
19  you seen evidence on any given filter that a wire
20  actually came in contact with the edge or chamfer,
21  leading to fracture?
22    A. Well, again, if it fractured, you wouldn't see
23  it anymore, right? But there are -- there are examples
24  of where struts have broken off exactly at the point of
25  the chamfer, so that led to a fracture. And there are

**Page 12**

1  examples, quite a few examples, when you look at the
2  region on the wires where they're close to the edge of
3  the chamfer where you can see what appears to be pretty
4  fretting markings, which is associated with contact of
5  the wire to the edge of the sheaths.
6    Q. All right, well let's -- let's look at the
7  chart that you have done in the past of the -- of the
8  filters you've reviewed, if we could.
9    MR. DALIMONTE: What particular case was this
10  chart prepared? I could pull it up.
11    MS. DALY: I have no idea. It's been used so
12  many times.
13    THE DEPONENT: It's just basically a list of
14  the various filters I looked at.
15    MS. DALY: Let me mark this as 5.
16    (Whereupon, Exhibit 5 was
17    marked for identification.)
18    Q. And if you look at the date on it, I don't know
19  that it even contains all the ones you've seen. That's
20  the last chart I have for you, I'm sorry. There's one
21  on the back.
22    MR. DALIMONTE: Can I take a look at that
23  document? There you go.
24    THE DEPONENT: There is some -- there may be a
25  few more. The statistics don't change very much.

**Page 13**

1    Q. (By Ms. Daly) All right, so let's -- while we
2  have the chart in front of us, let's first look at the
3  chart, because I have a couple of questions about the
4  chart and then I'll go back to my question. Do you see
5  on this chart that there is missing any filter that you
6  have in fact reviewed before -- examined physically?
7    MR. DALIMONTE: Objection.
8    THE DEPONENT: I don't know. I mean, this is
9  -- the answer to that question is have I examined
10  filters since February 2014.
11    Q. (By Ms. Daly) Well, it's more than that. My
12  question is just --
13    A. Have I put -- have I not put any on the chart?
14    Q. Yeah. Is there anything missing from this
15  chart that you have seen?
16    A. As of 2014, these are the Bard filters that I
17  have seen.
18    Q. All right, what Bard filters have you seen
19  since 2014?
20    A. Well, I'm not quite certain, but I can -- I can
21  check. I haven't seen very many. I've probably seen
22  one or two. And the -- and the -- you know, the
23  statistics don't change very much.
24    Q. Well, on a -- on a break -- and I'd like to
25  have it be a break because I want to keep it moving --

4 (Pages 10 - 13)

Robert Ritchie , Ph.D.                                                     June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 14

1 I'd like to know if there are any additional filters
2 that you've seen that aren't on this chart, because this
3 is the only place I have them all together, other than
4 digging through your report. So if we can do that.
5        MR. DALIMONTE: If I may add, we know two off
6 the top of my head would be Jones and Keene, right?
7        MS. DALY: Jones is on here.
8        MR. DALIMONTE: Oh, is it?
9        THE DEPONENT: There's a different Jones, isn't
10 it?
11       MR. DALIMONTE: Yeah, so -- well --
12       MS. DALY: Well, you can help him, but I would
13 like to have --
14       THE DEPONENT: There isn't very many, though.
15 There really isn't very many, but there may be one or
16 two.
17       MS. DALY: Okay. We'll figure that out.
18    Q.  The other thing is, with respect to the five
19 Bellweather cases -- you know what I'm talking about?
20    A.  Yes, I do.
21    Q.  You are going to get an opportunity to see the
22 Booker filter; you understand that?
23    A.  Yes, that's good to know.
24    Q.  We're working on figuring out how to get that
25 processed.

Page 15

1    A.  And all the remnants, all the remnants as well.
2    Q.  I don't know what's with it, actually. But I'm
3 not aware of filter fragments or filters in any of the
4 other four cases.
5    A.  That's my understanding, too. By the way,
6 those reports are due today, so presumably I can look at
7 the filter and amend.
8    Q.  Yes. They should have told you that.
9 Plaintiffs should have told you that we agreed to that.
10   A.  Yes.
11   Q.  Now, if you look down your list here, look at
12 where it comes to Baluska -- Belusko? (sic)
13   A.  Yes.
14   Q.  So you have three filters in a row there,
15 Belusko, Davis and Cason; it says that you are unable to
16 examine those.
17   A.  Yes.
18   Q.  Okay. So for the G2 filters -- oh, and one
19 other question. Beckfield, would you look at the
20 Beckfield one?
21   A.  Yes.
22   Q.  Do you know -- I have that as a Recovery
23 filter, not a G2. Do you know, one way or the other?
24   A.  Offhand, no. I mean, I -- I find that hard to
25 believe, but, okay. But I -- that's -- it could be -- I

Page 16

1 don't tend to make mistakes like that, but it could have
2 gotten mis-listed, but I don't think so.
3        MR. DALIMONTE: Well, just a backup, too, when
4 you refer to G2, are you also including G2-Express?
5        MS. DALY: No, because you see, below, he's got
6 a G2 --
7        MR. DALIMONTE: I saw that; I just wanted a
8 clarification.
9    Q.  (By Ms. Daly) Below, you have a G2-Express,
10 and we've called them -- do you call a G2-X and a
11 G2-Express, that's the same thing?
12   A.  I mean, my understanding is they're identical.
13 The name may have changed, likely, but I use the terms
14 interchangeably.
15   Q.  That's fine. You have listed on this chart
16 having seen the Seale G2-X.
17   A.  Yes.
18   Q.  You see that?
19   A.  Yes.
20   Q.  What I saw in your report was you also
21 commented on seeing a Milton G2-Express, so that's one I
22 know is not on this list, and I've -- I've written it on
23 my own.
24   A.  Okay. I can dig that out.
25   Q.  All right.

Page 17

1        MR. DALIMONTE: Well, I'm going to object to --
2 you know, we'll do what we can, but we're not going to
3 say it's a complete list until he gets to his office.
4 He can get back to you -- agree to get back to you
5 Monday.
6        MS. DALY: Well, I'm going to redepose him
7 anyway on the case specifics, so we could do that at
8 that time.
9        MR. DALIMONTE: Yeah, all right. I don't see
10 the point in wasting time.
11       THE DEPONENT: What I can do, If I'm given a
12 bit of time, which I will, I'll revise this, check the
13 Beckfield with this. And as I said, there may be two or
14 three more I can add.
15       MS. DALY: That would -- that would be great.
16 Thank you.
17   Q.  All right. So going -- using your chart that
18 you have there and going back to my question, of the
19 ones that you have examined, tell me which ones you
20 identified as having a fracture that was caused by,
21 first, actual contact of wire to the chamfer edge.
22   A.  Well, you're asking the exact question; it's
23 difficult to give you an exact answer to that, because
24 it's like saying, "Why do people die?"
25   Q.  No, I don't think it's at all like that.

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

---

**Page 18**

1    A.   It is, because you can't -- the point about
2  fatigue it's driven by stress or strain, and there
3  are multiple sources of stress and strain.  So --
4    Q.   Let me -- let me be really clear in my
5  question, because we'll move to the second part.  My
6  question is, in which filters did you see evidence, on
7  the remaining part of the strut or on the edge of the
8  chamfer, that a -- that a strut of the filter had --
9  that fracture had been in direct contact with the
10 chamfer?  That's my first question.
11   A.   Well, to answer that briefly and sort of
12 approximately, I would think that there is -- there's
13 always contact between the edge of the wires and the
14 filter, so the -- so the rim of the sheath and the --
15 and the wires.  So the question is, then, if a fracture
16 occurred exactly at the rim where specifically the
17 stresses should be higher so the strain should be
18 highest anyway, then you would make the pretty sound
19 assumption that was associated with contact there, and
20 the stress concentration caused by that.  And of the
21 filters I looked at in the G2s, there are three you can
22 identify --
23   Q.   That's my question.
24   A.   -- fractures and that's the Cadbury, (sic) the
25 Beckfield and the Gaskins.

---

**Page 19**

1    Q.   Ciaburri --
2    A.   "Ciaburri," okay.
3    Q.   Beckfield and Gaskin.
4    A.   So there's not a lot of them, of the -- of the
5  -- the arms that broke, 20% probably, four of them broke
6  that way, but they do break exactly at the point of the
7  rim.
8    Q.   Okay.  So on your categories at the top, which
9  of those categories tells me that the Ciaburri filter
10 fractured because of the chamfer?
11   A.   Okay, let me just go through this, because
12 we've had this problem before.
13   Q.   Yeah.
14   A.   So the first column talks about how many of
15 these, these struts failed by fatigue --
16   Q.   Right.
17   A.   And virtually every one failed by fatigue.
18   Q.   Right.
19   A.   And then subsequently by the ductile fracture.
20        The next two columns determined which way the
21 cracks are growing, whether they're growing from the
22 outside of the filter or the inside of the filter
23 out.  But they're not mutually exclusive, these columns.
24   Q.   Right.
25   A.   The third -- so that the main, the main sources

---

**Page 20**

1  of fractures of the arms appear in this region where the
2  arms come out of the sheath.  And there are basically
3  two nominal locations.  The commonest one is just a
4  little bit above the sheath, about a hundred microns,
5  which is very small, two human hairs above the -- above
6  the sheath.  And there's a bend there, and there's also
7  evidence of gouge marks which are caused by the shape
8  setting.
9        And in that whole region, that little region
10 above the sheath is where the stresses get very high
11 because they're bending.  So most of them form there,
12 but a few of them form exactly at the rim, and they're
13 just flush with the rim.  So it's to the -- to a person
14 on the street, it's the same location, but most of them
15 are a little bit above that, about 100 microns above.
16        So you can look at those.  Of that sequence of
17 fractures of the arms, they virtually all occur in that
18 region.  But of that, of those -- and there's 17 that I
19 look at there -- 22%, like four of them, actually fail
20 at the rim.  So the perception there, a pretty strong
21 one, would be that the -- that the -- the chamfer was
22 pretty important.
23   Q.   In those G2s.
24   A.   Yeah.
25   Q.   So then in your G2-Express --

---

**Page 21**

1    A.   Yes.
2    Q.   The only one you have on here is Seale.
3    A.   Yes.
4    Q.   You do not show a fracture at the rim on that
5  filter.
6    A.   Yes.
7    Q.   Okay.  Do you recall that Milton also did not
8  have a fracture there?
9        MR. DALIMONTE:  Objection.
10       THE DEPONENT:  I don't --
11   Q.   (By Ms. Daly)  We'll find Milton when we go
12 through your report.
13       Okay, so let's look at the Recovery filters on
14 the next page.
15   A.   Yeah.
16   Q.   And your -- of the ones that you looked at that
17 were Recovery, how many of those are fractures that you
18 associate with the chamfer?  And I'm looking at the
19 fourth column.  Is it all of those?
20   A.   No, I mean -- yes, it's -- I mean, again, all
21 the arm fractures occur in this region within 100
22 microns, the top of the sheath, and the -- of those, 25%
23 now as opposed to the 22% in the ones I looked at,
24 fractured exactly at the point of the rim.  So the
25 chamfer, clearly, would not be unimportant there.

---

6 (Pages 18 - 21)

Robert Ritchie , Ph.D.                                          June 9, 2017
In Re: Bard IVC Filters Products Liability

**Page 22**

1    Q.  So if the -- if the chamfer is a contributing
2  factor to the fracture, one would see it either -- one
3  would see it very close to the rim.  Is that right?
4    A.  Well, the stress concentration effects are
5  pretty localized, so now -- I mean, I don't know --
6  specifically it's this.  If the chamfer has a radius say
7  of 50 microns, you'd expect the effect of the stress
8  concentration of that chamfer to be felt within about
9  one to two radii away from that.  So 50 to 100 microns.
10  So you can't be precise.
11    Q.  So if the -- if the arm fractures below the
12  elbow, for example, would you say that probably was not
13  associated --
14    A.  No, because that's only 100 microns above,
15  right; so you're still potentially in the -- in the
16  regime where that edge would be affected.  But, quite
17  frankly, it's getting to the point of where it's -- it's
18  becoming less important.  It's on the edge of the field
19  there.
20       So -- so, I -- my take on this, again, you can
21  not be precise because there's so many different forces
22  playing a role in these things.  But where they break a
23  little bit further up near the first bend, you're in the
24  same nominal location where the stresses and strains are
25  high.  But there's also some markings there.  Those

**Page 23**

1  shaped markings don't help things either, so you can't
2  be precise.  But, definitely, when they break at the
3  rim, to say that the chamfer is unimportant would be --
4  would be very difficult to say.
5    Q.  Have you -- have you seen leg fractures that
6  you think were associated with chamfer?
7    A.  No.
8    Q.  Now, this is obvious, but I want to put it in
9  the record.  The filters that you have examined in your
10  work in this litigation which are not exemplars are all
11  retrieved filters that were sent to you because a
12  patient had had a complication, true?
13    A.  Well, there's a few that don't have any -- I
14  mean, they may have had a medical complication, but
15  there's no fractures.  It was one or two that looked
16  perfectly -- looked fine, right --
17    Q.  Right.
18    A.  -- in terms of fractures.  But, not -- yes, the
19  answer to that question is.
20    Q.  My point being, you weren't sent some randomly
21  retrieved filters; these were filters that were sent to
22  you to look at, usually for fracture, correct?
23    A.  Correct.
24    Q.  All right.
25    A.  Well, I mean, I can't speak to how they chose

**Page 24**

1  them, whether they chose them randomly or not, but as
2  far as I know.
3    Q.  It wasn't random.  Okay.  Who performed the
4  actual SEM examination that was done?
5    A.  Well, I -- I mean, I'm old now, so I sit there,
6  but I have a technician who does that for me.
7    Q.  Do you direct what the technician is doing?
8    A.  Absolutely.
9    Q.  So with respect to the chamfer for a minute, do
10  you -- do you know exactly which of the Recovery filters
11  that show the cracks at the rim -- are there any of
12  those that have evidence of -- of precise rubbing of the
13  fractured rim against the chamfer, or do you just see it
14  in the area?
15    A.  They're -- I mean, specifically, I don't know
16  exactly, but in many cases when you look at the region
17  where the wires are emerged from the rim, right, I mean,
18  -- it's -- it's not a very good engineering feature
19  because there can be contact and they're all bunched
20  together.  So inevitably you will see contact between
21  the individual wires and you will see contact between
22  the edge of the rim, and sometimes you see little, you
23  know, markings there which are clearly caused by that
24  contact.
25       This is quite a phenomenon plagued aerospace,

**Page 25**

1  and when you get two bits of metal rubbing together, you
2  get fretting and it can lead to -- it can lead -- it can
3  initiate fatigue cracks.
4    Q.  Do you have any examples of the filters that
5  you've seen, that show contact with the chamfer, that
6  are not fractured?
7    A.  Yes.
8    Q.  Can you think of one to show me?
9    A.  Yes.  Give me a second.  I have a picture, I'm
10  sure.  I've looked at too many of these things.  This
11  may take a second, okay?
12    Q.  Sure.
13    A.  Well, there's one example there; maybe it's not
14  the best, but you can see the edge of the rim there?
15  It's not so clear.
16    Q.  Yeah, I've got mine.  You can hold on to --
17  you're on Page 12?
18    A.  I'm on Page 12, and it's Figure 14, yes.
19    Q.  That's the Mata?
20    A.  Yeah, and that's -- you can see a little bit of
21  a -- an undercut and gouge there.  You can see the
22  contact there on the lower right one where it's actually
23  touching the rim.  And that -- it didn't break there, of
24  course, necessarily, but, nevertheless, you can see that
25  contact.

7 (Pages 22 - 25)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 26

1        And -- and there are few other examples, on
2 Page 17, for example, and that's on the -- you can see
3 that one -- that one -- it's not actually at the rim,
4 but it's close to the rim there.
5    Q.  Which figure was that one?  Figure 17?
6    A.  Yeah.
7    Q.  And that one was the Ciaburri -- no, Carnehl.
8 And, again, it's a G2.
9    A.  Yeah.
10   Q.  Okay.
11   A.  But you can see -- I mean, you can see here
12 that under -- under the scanning microscope there is a
13 distinction between fractures at the rim and below the
14 rim, but this distance is actually two human hair.  It's
15 all that region.  There's the first bend.  So that's
16 what I would call the danger zone.
17   Q.  Okay.  Did you see in your examination of these
18 filters whether the manufacturing process for that
19 chamfer was consistent throughout the G2s and the
20 Recovery filters you saw, or were there differences?
21   A.  Well, I mean, I -- I looked at exemplars to do
22 this, basically, so I could cut them and section them.
23 So I looked at, I think, four, two G2s and two
24 Recoverys, and they were all sharp, but I estimated
25 between 5 and 15 microns.

Page 27

1        And then your expert, Fashing, got upset and
2 said it was 10.  As far as I, know it varied, because it
3 was unset.  There was nothing in the engineering
4 drawings apart from the early ones that specified what
5 that chamfer should be.
6    Q.  Was there anything above 15 that you saw?
7    A.  Not that I saw.  But, you know, my population
8 was very small.  I looked at four exemplars, so I didn't
9 do an exhaustive study on every valve, because to get a
10 good -- you need to section the --
11   Q.  Right.
12   A.  -- and I couldn't do that with the ones --
13   Q.  So were you able to tell on the non-exemplar
14 ones and the retrieved ones what the radius of the edge
15 was?
16   A.  Well, the problem is, to get a decent reading,
17 you need to section them, and that would be conceived as
18 -- perceived as destructive.
19   Q.  Yeah.  So you have -- you have no data that
20 tells you that the retrieved filters that you saw were
21 anything different from the 5 to 15 microns on that
22 edge.
23   A.  I have no information that says they were
24 larger or smaller.  I didn't look at that point.  But my
25 particular point here is not the fact that it was or it

Page 28

1 wasn't.  The fact is that it was this feature, which I
2 think is a very important feature, was unset in the
3 engineering drawings, and so it could be anything.
4    Q.  Well, that's kind of my point.  Do you know
5 whether it varied a whole lot in manufacturing or
6 whether it was pretty consistent to fall within 5 to
7 15 --
8    A.  Well, I don't -- I don't know, I don't know.
9 But, I mean, being unset anything could happen, right,
10 so you'd have to look at a lot more than four filters to
11 make that decision, but I don't know.
12   Q.  Now, does the G2-X or G2-Express have the same
13 chamfer?
14   A.  The Express -- I've only looked at one Express,
15 but that looked a little bit different.  It has a sort
16 of a 45-degree section.  I have a picture of it here if
17 I can find it.  It's still not perfect because the edges
18 are still unset, but it's, certainly to my way of
19 thinking, a better feature.  Yes, you can see it there.
20 Now, I only looked at one.  I looked at the Milton,
21 which is Express, right, you have --
22   Q.  Right.
23   A.  So you can see there --
24   Q.  What page are you on?
25   A.  I'm on Page 20, Figure 25.

Page 29

1    Q.  All right.  Let me get there with you.  Yeah.
2    A.  And you see they cut a 45 -- looks like a 45
3 degree.  But there's an edge there.  It's not the nicest
4 detail from a perspective of -- you could still get
5 stress concentrations at that lower edge, but,
6 nevertheless, I think it's an improvement.
7    Q.  All right, and how -- how much of an
8 improvement is it?  What would you estimate that edge
9 is?
10   A.  Well, again, it would depend on the radius of
11 that lower rate.  I don't know exactly what that is.
12 With a -- with an unset chamfer, the elevation of the
13 stresses is unbanded.  It could be infinite, basically.
14 And so it depends on the radius.  And so -- I haven't
15 done these calculations because McMeeking did these
16 calculations, and he was able to come up with numbers
17 quite significant.
18       MR. DALIMONTE:  So just for the record, for
19 clarification, it's -- Figure 25, I think in response to
20 your question what page.
21       MS. DALY:  Yeah.
22       MR. DALIMONTE:  You said 25.
23       MS. DALY:  20 I mean.
24       MR. DALIMONTE:  Page 20, figure 25.
25   Q.  (By Ms. Daly)  So in order to actually

8 (Pages 26 - 29)

Robert Ritchie , Ph.D.                                        June 9, 2017
In Re: Bard IVC Filters Products Liability

**Page 30**

1 determine what you determined for the G2 and Recoverys,
2 which was that radius being somewhere between 5 and 15
3 microns, to determine that for G2-Express you would have
4 to get an exemplar and you'd have to cut into it, right?
5    A.  Well, you could sort of ballpark it, but, yes,
6 you really need to do a section.  And I have a picture
7 of one here.  That kind of thing.  You see?
8    Q.  Yeah.
9    A.  You can then get a good reading of the radius.
10    Q.  And the higher the microns for radius?
11    A.  The lower the -- lower the stress.
12    Q.  Lower the strain.
13    A.  No.  Stress concentrations.
14    Q.  Stress concentrations.
15    A.  Now, remember, these are what's called elastic
16 stress concentrations, and if they -- if they exceed the
17 yield strength of the material, then -- then you don't
18 get the full effect.  So when you do a calculation like
19 McMeeking did, in some of these you got factors of ten
20 times the stresses..  You wouldn't necessarily see that,
21 because it would cause local yielding.  But it's --
22    Q.  Well, do you know that Dr. McMeeking didn't
23 consider the chamfer in the G2-Express, but the
24 calculations he did --
25    A.  No, I'm talking in general.  Stress

**Page 31**

1 concentrations are elastic there.  They're bad news.
2 They're very localized.  But they can lead to
3 plasticity, which is something that deforms, and that
4 creates tea cracks.
5    Q.  My simple question on the G2-Express is that
6 you have not seen an exemplar to be able to do a
7 cut-down to know what the modification of the chamfer
8 was, correct?
9    A.  Yes.
10    Q.  And you do not know that Dr. McMeeking has done
11 that, McMeeking has done that.
12    A.  As far as I know.  I don't know.  He wouldn't
13 have looked at that; I would have looked at that.
14    Q.  So that is, to be honest, an unknown for you,
15 correct?
16    MR. DALIMONTE:  Well, objection.
17    THE DEPONENT:  I'm going to say -- all I'm
18 saying is the sharp edge is a nasty design detail.  In
19 the G2-Express they have made some attempt to rectify
20 that issue, and it certainly would have improved the
21 situation, but it hasn't resolved it totally because
22 there's still an edge there.  But I don't have exact
23 details, so --
24    Q.  (By Ms. Daly)  Okay, but having seen one
25 G2-Express, you don't know if any G2-Express in the

**Page 32**

1 world has fractured at that point.
2    A.  No.
3    Q.  Okay.
4    A.  See, my -- I've only looked at theory, two
5 G2-Expresses, so my statistics are a little bit --
6    Q.  Right.  And on the Seale one, you're not
7 showing any fracture at the rim.
8    A.  No, it's the more common one that occurs just
9 within a couple hundred microns.
10    Q.  Okay.  So based on the Seale one or the Molten
11 one, you don't have an example of one that is likely to
12 have fractured at the chamfer; is that fair?
13    A.  Yes.  I mean, just as -- I mean, I think you're
14 -- you're on the edge of the field of the chamfer, in
15 the hundred microns, but I would think that because
16 you're on the edge of that, I don't think the chamfer
17 itself -- presence of the rim is important, but the
18 chamfer itself is probably less important in those
19 Express cases.
20    Q.  All right.  In your -- in your report, it's
21 actually at Page 5, top paragraph,
22    A.  Yes.  I have to tell you something about that.
23 There's one typo in this report.
24    Q.  Okay.
25    A.  Right here.

**Page 33**

1    Q.  If you look down to like the fourth from the --
2 from the bottom sentence above Figure 2?
3    A.  Yes.
4    Q.  It says:
5       "The G2-Express with retrievable hook added
6       to the cap and small differences to the
7       shape of this cap."
8       Were you talking about the chamfer area or
9 something in addition?
10    A.  I mean, it's not -- it's the form of this here,
11 but it doesn't --
12    Q.  The form of the cap as shown in Figure 2?
13    A.  That's a general statement, so the chamfer was
14 different; I made my point.  But the cap looks like it
15 as well.
16    Q.  Is there -- do you have any opinion that the
17 change in the cap either increased the possibility of a
18 fracture or decreased it, or you're neutral on that?
19    A.  I'm neutral on that.  Just while we're here,
20 there's a -- I think this is where -- there's a comment
21 on here about -- well, yes.  It says at top of Page 3,
22 fourth line down, it says the Eclipse cleared by the FDA
23 in 2008.  That should be 2010.
24    Q.  Yeah, all right.
25    A.  And there's another reference to that on Page

9 (Pages 30 - 33)

Robert Ritchie , Ph.D.                          June 9, 2017
In Re: Bard IVC Filters Products Liability

**Page 34**

1  24, which should be 2010 as well.
2    Q.  All right.  Now, you have not done any bench
3  testing in the course of your work in this litigation of
4  any Bard filter, true?
5    A.  True.
6    Q.  And you've not tried to do any bench testing
7  that compares, you know, how does the Recovery do versus
8  the G2 or the G2 —
9    A.  No, I have not done anything.
10   Q.  Now, that, that kind of testing is something
11 you have done in your career?
12   A.  Oh, yeah, I mean, not necessarily with — I've
13 looked at certain medical devices, but I haven't done
14 bench testing on that.  I don't have pulse duplicators
15 and stuff, but I've certainly looked at those things,
16 yes.
17   Q.  What kind of testing have you — have you done?
18   A.  Well, I'm a person that studies the mechanical
19 properties of materials and how they fail and so forth.
20 And so most of my testing are what's known as coupon
21 testing, where I get the properties of the material
22 occasionally when it's forced to test the actual
23 component.
24     But, quite frankly, for understanding
25 properties, that's — that's not the best way to go.

**Page 35**

1  It's more important from the perspective of if you can
2  design a widget you want it to operate and work.  But
3  I'm more at the other end of the fundamental end trying
4  to understand what the property materials are and so
5  forth.
6    Q.  I wanted to show you this Ocasio, because this
7  is what you've said about the tests you did before, and
8  just get you to confirm this is what you've done in the
9  past.  This is from your — you recall coming live to
10 give testimony in a Florida case called Ocasio?
11   A.  Yes.
12   MS. DALY:  Okay, I'm going to make this No. 6.
13     (Whereupon, Exhibit 6 was
14       marked for identification.)
15   Q.  It's falling off the back a little bit, but I
16 wanted you to look at that and then see Page 12.  Then
17 look at Page 12, is what I wanted you to do.
18   A.  Okay.  So —
19   MR. DALIMONTE:  Hold on a second.
20   MS. DALY:  Because I want to let him look at
21 that, and then I want to just read it for one second and
22 get you to comment on it, okay?
23   MR. DALIMONTE:  Hold on a second.  Page 6, you
24 said?
25   MS. DALY:  No, 12.

**Page 36**

1    MR. DALIMONTE:  Oh.  And what did you want him
2  to read?
3    MS. DALY:  Let me take this back for a second.
4  He was talking about —
5    MR. DALIMONTE:  Well, what line?
6    MS. DALY:  I'm looking for it.  If you look
7  starting at Line 8, he was talking about things he'd
8  done in the past, the type of testing, and through what
9  I'm going to ask him —
10   MR. DALIMONTE:  Hold on —
11   MS. DALY:  Hold on.  I'm going to ask him about
12 through 13.
13   MR. DALIMONTE:  Read through Line 8 through
14 Line 13?
15   MS. DALY:  No, through Page 13.
16   MR. DALIMONTE:  Oh, okay.
17   MS. DALY:  Line 4.
18   MR. DALIMONTE:  Okay.  Let me read it, please.
19 (Reviewing.)  You want the question before?
20   MS. DALY:  I just want him to — I'm happy to
21 read it, but this is what he said he had done about
22 testing before, and I just wanted to ask him to look at
23 that and agree whether that testimony is correct for the
24 type of testing that he's done in the past.
25   MR. DALIMONTE:  Yeah, hold on a second.  Let me

**Page 37**

1  read it.  (Reviewing.)  Okay.
2    THE DEPONENT:  So I've studied fatigue for 49
3  years, and I think I've tested — I think I've fatigued
4  virtually every material on the planet.  That's,
5  obviously, not true, but a host of metals, bones,
6  plastics, composites and what have you.  That's my
7  forte.  And if you can look on the web, I think I'm the
8  most quoted person in fatigue of craft publication
9  issues.
10     So I got involved in Nitinol in probably the
11 late '70s, early '80s, and I was funded by people like
12 Cortis and NDC, and I've done a lot of work on fatigue.
13 So my situation has generally been to a number of
14 things.  I'm interested in mechanisms, why things fail,
15 why things deform.  And I'm also interested in trying to
16 devise life prediction strategies, particularly medical
17 devices, and I did this for heart valves; I've done it
18 for stints.  I haven't done it for filters, but —
19   Q.  But you have done it on Nitinol.
20   A.  Of course.  I've worked on Nitinol basically
21 since the late '70s.
22   Q.  And is that fatigue, fatigue testing that you
23 set up a protocol for it and you do it in a lab with a
24 machine?
25   A.  Yes.  I have — I have a lot of testing

10 (Pages 34 - 37)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

1 machines, and we do it under various conditions,
2 different frequencies, different environments and so
3 forth, so --
4    Q.   So it's something you're very familiar with
5 doing.
6    A.   Absolutely.
7    Q.   Whether you have a grad student standing at a
8 machine --
9    A.   I used to do it myself in the early days.
10   Q.   Okay.  So the only point I was making out of
11 that was in this litigation you have not done that kind
12 of lab failure testing on a Bard product.
13   A.   No.  The only things I've done, I've looked at
14 the failures and I've tried to understand why they
15 failed.  But I have not done specific testing on Bard
16 products.
17   Q.   All right.  Very good.  Going forward to the
18 Eclipse filter --
19   A.   Yes.
20   Q.   Have you seen one, whether an exemplar or a
21 retrieved one?
22   A.   No.
23   Q.   Do you know what the chamfer radius is on an
24 Eclipse?
25   A.   No.

1    Q.   Have you looked at the design history file or
2 510K submission for that?
3    A.   I haven't looked at the 515K submission; I've
4 looked at the earlier file you talked about, and I've
5 looked at various images of the Eclipse, particularly
6 some of the pictures that Fashing took.  She -- she --
7 she's like me, has only looked at very few Eclipses --
8 I'm sorry, very few Expresses, but she had looked at one
9 Eclipses.  And I certainly looked at those, yes.
10   Q.   You looked at her pictures?
11   A.   Yes.
12   Q.   Are you able to tell from her pictures of that
13 one Eclipse what the chamfer --
14   A.   I don't think there's a picture of that.  I was
15 more interested in that of the surface condition of the
16 wires.
17   Q.   And we'll get to that, but -- so similar to
18 what you just answered for me on the G2-X, you have not
19 been able -- you have not taken an Eclipse filter, cut
20 it open and actually measured the chamfer.
21   A.   I've never seen the Eclipse.
22   Q.   So you do not know what it is, as far as --
23   A.   No.
24   Q.   All right.  And so therefore you do not know,
25 because of that and also because you haven't seen an

1 Eclipse failure, you do not know that chamfer causes
2 failures in Eclipses.
3        MR. DALIMONTE:  Objection.
4        THE DEPONENT:  I mean, I don't -- I -- I don't
5 know.  I have not.
6    Q.   (By Ms. Daly)  Okay.  Now, same thing I'm going
7 to ask you about Meridian and Denali, same questions.
8 Have you seen a Meridian?
9    A.   No.
10   Q.   Have you looked at a design file?
11   A.   Yes, I've looked at the design file.
12   Q.   Okay.  Have you seen any SEM photographs that
13 Dr. Fashing has done of a Meridian?
14   A.   No, I don't think she has -- the reports that I
15 have, I have not seen one.
16   Q.   Have you -- have you seen a Denali?
17   A.   No.
18   Q.   Have you seen the design history files for
19 those?
20   A.   I've skimmed those reports.
21   Q.   All right.  For either the Meridian or the
22 Denali -- well, let's start with the Meridian.  For the
23 Meridian, do you know what the chamfer radius situation
24 is?
25   A.   No.

1    Q.   Okay.  So, again, for that one you can not say
2 that a chamfer issue is causing fractures in that
3 picture.
4    A.   That's true.
5    Q.   Do you know if the Denali even has a chamfer?
6    A.   No, it's a different -- it's a laser cut thing,
7 so I don't know the chamfer is an issue there.
8    Q.   All right, so no chamfer -- no chamfer
9 contributing to fracture in Denali.
10   A.   Yeah.
11   Q.   Because it doesn't have one.
12        MR. DALIMONTE:  Can we take a quick break, get
13 some water?
14        VIDEOGRAPHER:  We're off the record at 10:54
15 a.m.
16        (Recess)
17        VIDEOGRAPHER:  We're back on the record.  The
18 time is 10:58 a.m.
19        MS. DALY:  You can just set that one aside;
20 pieces are coming off a little.  Yeah.
21   Q.   I'm going next to Page 6 of your report.  What
22 I want to talk to you about next is your opinion that in
23 many devices poor surface conditions promote initiation
24 of fatigue cracks, okay?
25   A.   Yes.

11 (Pages 38 - 41)

Robert Ritchie , Ph.D.                                     June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 42

1  Q.  Page 6 is talking about that from the
2  standpoint of Recovery filters.  All right?  Are you
3  with me?
4  A.  Yes.
5  Q.  You note that in 12 -- in all 12 of the
6  Recovery filters and the exemplar that you examined,
7  they showed evidence of preexisting, pre-implant surface
8  damage, correct?
9  A.  Yes.
10  Q.  How many of the Recovery filters which are on
11  Page 2 of the chart that was previously identified as
12  Exhibit 5, how many of those had fractures that
13  initiated at or because of a surface condition?
14  A.  Well, it's difficult to answer that question
15  precisely, but I can say that of the Recovery filters
16  there's one exception.  One failed, up, further up the
17  leg, but virtually all failed in the feet region.  And
18  they failed -- I can only -- you can almost
19  categorically state they failed because the cracks were
20  initiated and the grinding marks that were left where
21  they tapered the -- the hook there.
22  Q.  Okay.  And that's another opinion I'm going to
23  go to next.
24  A.  Yes.
25  Q.  So setting aside the foot fractures --

Page 43

1  A.  Yes.
2  Q.  -- were there any leg or arm fractures that you
3  could associate with a specific surface anomaly,
4  condition, whatever?
5  A.  Well, it's difficult to see after the fact
6  sometimes, because you might be looking -- there's
7  fractures in two places and maybe the defect was on the
8  bit you don't see.  But of the ones I looked at, I've
9  got a column here that says "initiated at a defect."
10  And in those, those situations, it's reasonably clear,
11  it's not a hundred percent, always, but the cracks --
12  the initiation of the crack seemed to be associated with
13  defect.  So when you look at the edge of the fractured
14  surface, you can see some sort of marking or defect.
15  And you'd expect that, of course, because any defect,
16  it's a local stress concentration that starts the crack
17  propagating.  So --
18  Q.  So the ones you've listed with that column are
19  the Gray filter, Lynch with a question mark.
20  A.  The Lynch is not quite certain.
21  Q.  Okay.  Newton.
22  A.  Yeah.
23  Q.  Roble.
24  A.  Yeah, and Mata.
25  Q.  And Mata.  Now, with respect to Gray, though,

Page 44

1  is that a foot fracture only?
2  A.  No, there was one -- there was an arm fracture.
3  Q.  Okay.
4  A.  I mean, that's -- that column, crack-initiated
5  defect, fall under the global column of failed arms.
6  Q.  So all those are arms I just read off.
7  A.  You know, my feeling was, essentially, looking
8  at the Recovery is that virtually 100%, but there is one
9  leg there on a stall where they failed in the foot
10  region.  They all failed in the foot region.
11  Q.  So -- so, let me be sure I'm clear.  So the
12  ones that you think initiated at a surface defect that
13  were not feet --
14  A.  Yes.
15  Q.  -- they were arms, was Gray, maybe Lynch,
16  Newton, Roble and Mata.
17  A.  That's right.
18  Q.  All right.  Can -- do surface conditions that
19  initiate fracture initiate them locally?
20  A.  Yes.  I mean -- let me just explain that the
21  material doesn't know where the stress or strain is
22  coming from, right, so it just reacts to what it sees.
23  And I talk about global stresses or strains, and if you
24  bend something, you put a global stress on it.  But
25  there are -- local phenomenon and stress concentrations

Page 45

1  are the main reason for that.  And this is the plague of
2  aircraft and anything.
3  Q.  And this is a very simplistic question, but say
4  you've got a gouge mark on an arm.
5  A.  Yes.
6  Q.  That is not going to translate into a strain
7  that causes a fracture in a leg.
8  A.  No.
9  Q.  It would be local to that arm.
10  A.  I mean -- and I said earlier, you know, they're
11  pretty localized, and typically whatever the radius of
12  curvature of that defect is, it's typically within two,
13  two radii.  It would feel -- the material would feel the
14  effect of that stress concentration.
15  Q.  All right.
16  A.  That's, of course, why any technique which
17  smooths the surface, like electropolishing, is highly
18  beneficial.
19  Q.  Now, in your G2s, same question.  If we look at
20  the chart, which of the G2s could you associate a
21  non-foot fracture with a surface condition?
22  A.  Well, again this -- the -- they may have all
23  gotten that way, but in terms of what one can see and a
24  reasonable assessment of a crack and a defect in the
25  Carnehl and the Moore, one of the Moores, the cracks

12 (Pages 42 - 45)

Robert Ritchie , Ph.D.                                  June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 46

1 seemed to initiate exactly at a defect.
2        In a failure analysis, that's the holy grail.
3 If you can trace the crack back to some origin and you
4 can find a defect there, then that makes a strong case.
5 You can't always do that.
6    Q.  So perhaps in Carnehl.
7    A.  Yeah.
8    Q.  That would be one of the contributors.
9    A.  I think that was a pretty good -- in the first
10 Moore.
11   Q.  In the first Moore.
12   A.  Yeah. I have some pictures of these somewhere,
13 here, if you can find them.
14   Q.  Okay.  Now, in looking at -- let's stick with
15 Recovery filters for a minute, the Recovery filters that
16 were retrieved and the exemplar you looked at --
17   A.  Yes.
18   Q.  Would -- obviously, the surface conditions are
19 never going to be exactly the same, right?
20   A.  Yes, uh-huh.
21   Q.  Did you see much variation filter to filter
22 that would tell you there was a large manufacturing
23 variation?
24   A.  No, I didn't see that. There was a lot -- a
25 lot of the surface damage which could have been removed,

Page 47

1 but I didn't see masses. Again, my population was not
2 that great, but the sort of damage you see is -- you
3 call it typical.
4    Q.  Okay, fairly consistent.
5    A.  Uh-huh.
6    Q.  Okay. And in the G2-Express that you did
7 examine, two of them, what can you tell me about the
8 surface condition of those? Was there any difference?
9    A.  No, it looked pretty much the same, actually.
10 There was no -- the Express, that's right. It was
11 pretty much the same.
12   Q.  And you did not get to see an exemplar on the
13 Express, right?
14   A.  No.
15   Q.  I think you noted in your report that you saw
16 on the Recovery filter some gouging that you didn't
17 typically see in the G2s. Do you remember that?
18   A.  Yeah, I -- that was an earlier report. I think
19 -- certainly the original Recoverys there was -- there's
20 this sort of dent, looks like, which is in the knee of
21 the first bend where the failures often occur, and that
22 to me was where they shape-set it. They put it on a rig
23 and fit it to form the shape. And initially I thought
24 that was more of a problem with the Recoverys, but I'm
25 not sure it is. It's quite a load of that on the G2s as

Page 48

1 well.
2    Q.  Okay, can you give me an example of a G2 that
3 shows that phenomenon?
4    A.  Yeah, hopefully. Yeah, it's not a particularly
5 great picture, but on Page 16, specifically Figure 19,
6 the crack in that particular arm appears to be
7 associated with one of those gadgets. And there are
8 other examples, but that one that comes up.
9    Q.  So in the G2s, that's the Carnehl that you
10 already told us --
11   A.  Yes.
12   Q.  -- you thought was a surface condition.
13   A.  Yes.
14   Q.  Can you look at your Moore 1 and G2 and tell me
15 whether you think you see a gouge there as opposed to a
16 different kind of --
17   A.  Okay, let me just see what I'm doing here. So
18 this is -- this is not -- Moore is a G2, right? Is it?
19   Q.  This one has Moore 51 and Moore 43.
20   A.  And they're G2s, though, right?
21   Q.  Yeah, they're G2s.
22   A.  Okay, just give me a second here. I'll go
23 through. Okay, G2s, here we go. Moore, right. Okay.
24 Here we go, Moore. Yeah, well, that's -- I mean, that's
25 -- again, the pictures don't come out really well here,

Page 49

1 but that's --
2    Q.  We're looking at Page 84, Figure A2-6.
3    A.  Yeah.
4    Q.  Okay. Do you see a gouge in that leading to
5 the Moore one?
6    A.  Yeah, well, there's -- there's -- you can see
7 the surface here.
8    Q.  Uh-huh.
9    A.  It's kind of rough and so forth. There's a bit
10 of debris there as well.
11   Q.  But -- but I'm asking, is that -- is that a
12 similar type of gouge --
13   A.  Yes, I think so.
14   Q.  Okay. So in those two examples, you saw a
15 similar gouge to what you --
16   A.  Yeah, you can see them here, in that region.
17   Q.  Okay. Now we're looking at Figure A2-8.
18   A.  Yeah.
19   Q.  All right. Very good.
20   A.  And they're -- they're -- I refer to different
21 types of surface, and these are the gouges they talk
22 about, and I think some of those were a result of the
23 manufacturing process, the shape-setting, specifically.
24   Q.  And then we've talked about this before, your
25 section on crack initiation, whether it's outside to

13 (Pages 46 - 49)

Robert Ritchie , Ph.D.                    June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 50

1  inside or inside to out.
2      A.   Uh-huh.
3      Q.   And they were about roughly equal for whether
4  it was inside-out or outside-in?
5      A.   In the G2s they're more outside-in, but in the
6  Recoverys they're generally pretty well balanced.
7      Q.   And what is -- what opinion do you hold about
8  the factors that caused that that give you the
9  outside-in versus the inside-out?  Is there anything you
10  can point to that would have it start one way or the
11  other?
12     A.   Well, I mean, one can never be certain about
13  this, but my -- my -- when you see this kind of
14  scenario, when you have a device which is -- or
15  component which is -- and the cracks are growing in
16  different directions, it generally means the component
17  is experiencing different functionalities.  And I think
18  what we understand now is that if the arms or the legs
19  are moving freely within the vena cava, then you can
20  generate certain bending stresses which will be tensile
21  or compressive on one side of the -- of the wire.
22          But if these -- these arms or wires get, you
23  know, etherealized to the wall, if they perforate, then
24  that's going to radically change the stress state.  And
25  that's what I felt initially, that there was a change in

Page 51

1  the function of the device.  Again, people like
2  McMeeking have done calculations which suggest there is
3  this change of a stressed state, and I think that's
4  perfectly reasonable, and I think that's the reason.
5          So in some of these cases -- and it's difficult
6  to be precise, because we don't know what was happening
7  in the body; we look at it afterwards.  But maybe one of
8  these wires perforated and that caused the stress state
9  to change.  So that -- that's my opinion.
10         It also could be that there could be defects
11  that we can't see on the back, but defects are fairly
12  small, localized, rather.  I think the main factor here,
13  whether the crack goes this way or this way, is due to
14  the global stresses and what the filter's doing.
15     Q.   And we're going to talk about perforation in a
16  minute, because that's also a column on the chart which
17  is Exhibit 5.
18     A.   Yeah.
19     Q.   So you talked about perforation a little bit.
20  Is -- is there any work that you have done that you can
21  say, "I can tell you by the type of fracture I've seen
22  on the ones I've examined that that filter was in a tilt
23  situation"?
24     A.   By looking at the fracture surface?
25     Q.   Right.

Page 52

1      A.   No.
2      Q.   Is there any way that you can look at a -- at
3  any of the fractures in these cases and say, "That was
4  contributed to by amount of clot that came into that
5  filter"?
6          MR. DALIMONTE:  Objection.
7          THE DEPONENT:  I mean, you might be able to do
8  it from other techniques, but by looking at the fracture
9  surface, you wouldn't.
10     Q.   (By Ms. Daly)  So you're not going to give that
11  opinion?
12     A.   No -- there -- there are multiple sources for
13  fatigue and there are multiple reasons why these cracks
14  formed.
15     Q.   Right.
16     A.   Some may have played a bigger role in some
17  cases than others, but certainly by looking at the
18  fractography of the surface you couldn't tell whether a
19  clot caused it or --
20     Q.   And I just want to be clear that when you get
21  up at trial you're not going to say in any of these
22  Bellweather cases, for example --
23         MR. DALIMONTE:  Objection.  This deposition
24  isn't about the Bellweather case; it's about his
25  opinions on the MDL.

Page 53

1          MS. DALY:  Right.  I'll rephrase it.
2      Q.   In any case that goes to trial in the MDL,
3  based on what you've submitted right now -- and if you
4  do future work, that's fine, but based on what you've
5  presented today, you are not going to testify that in a
6  case X, "I can tell you that that fracture was a result
7  of perforation of so much tilt, of so much clot burn, of
8  so much" -- you have not done that work.
9      A.   That is not quite the question asked me.  You
10  asked me based on the fractography of looking at
11  fractured surfaces.
12     Q.   Let's start there.
13     A.   You can't do that.
14     Q.   Okay.
15     A.   But certainly there can be -- if, in a
16  hypothetical case, you had CT scans of a person that had
17  a filter in for a long period of time and you could
18  follow whether a perforated strut subsequently broke,
19  then you could, for example, have direct evidence that
20  the perforation would have led to the fracture.  So
21  that's -- that's an important distinction, but you don't
22  get that information by looking at the fracture surface.
23     Q.   Okay, and what -- what you just described one
24  could do with looking at imaging and so on, have you, as
25  one person, done that --

14 (Pages 50 - 53)

Robert Ritchie , Ph.D.                                      June 9, 2017
In Re: Bard IVC Filters Products Liability

**Page 54**

1    A.  Yes.
2    Q.  -- in any case?  Okay, which cases have you
3  done that for?
4    A.  Well, this is one of those new cases you're
5  talking about, right?
6      MR. DALIMONTE:  Well --
7      MS. DALY:  The reports are due today.  If he's
8  done it, let's just say.  Then I'll leave that to the
9  next deposition.
10     MR. DALIMONTE:  Yeah, I would leave that to the
11 next deposition --
12     MS. DALY:  But I --
13     MR. DALIMONTE:  On the Bellweather.
14     MS. DALY:  That's fine.
15   Q.  Have you done that in any cases?
16   A.  I made a point, actually, in -- in the
17 rebuttal, in that I've been very anxious to try and show
18 that perforation can lead to fracture.  It seems
19 blatantly obvious that it should.  It seems, on the
20 basis of McMeeking's calculations, it clearly should.
21 The fact that the cracks grow in different directions in
22 these wires indicates there's a change of function.  So
23 everything points to that.
24     But when you look at the fracture after the
25 fact, you don't know which -- which wire is perforating,

**Page 55**

1  which is not.  But in some of the more recent cases
2  which you'll see in this report, there's one in
3  particular where the filter was in that person for a
4  long period of time, five, six, seven or eight years,
5  and she had a series of CT scans.  The interventional
6  cardiologist was able to point to specific struts which
7  perforated and then subsequently fractured.
8      And so in those cases, I think -- to my way of
9  thinking, this provides me with a bit of direct proof
10 that perforation -- again, it's not looking at the
11 fracture surface --
12   Q.  I understand.
13   A.  -- looking at something else.
14   Q.  So you -- you have put in a report as of today
15 in one case with doing that analysis?
16   A.  There's two cases.  I can't remember what the
17 other one is.  But one of the five being submitted
18 today.  But one is particularly persuasive because the
19 filter was in such a long time.
20   Q.  Which case is that?
21     MR. DALIMONTE:  Well, why don't we wait?
22     MS. DALY:  No.  Your reports are due today.
23 Can I just know which one he's doing?  I mean, your
24 reports are due today, for heaven's sake.  And we gave
25 you an extension of time.

**Page 56**

1      MR. DALIMONTE:  So --
2      MR. DALIMONTE:  Booker.
3    Q.  (By Ms. Daly)  Booker, okay, thank you.  And
4  you'll get to see the filter on that one.
5    A.  That would be -- that would be really nice.
6    Q.  Okay, all right.
7    A.  Because Dr. Fashing had said there's no direct
8  evidence between perforation and fractures, so this does
9  provide compelling evidence; it's an obvious thing.
10   Q.  In one case.
11   A.  Of course.
12   Q.  Okay.
13   A.  As I said in my rebuttal, it's damn dangerous
14 leaving these things in there --
15   Q.  That's nonresponsive.  Please, let's just let
16 me go to the next thing.
17     Okay, so continuing on on the surface
18 conditions --
19   A.  Yes.
20   Q.  -- opinions, I'm moving now to Eclipse.
21   A.  Yes.
22   Q.  Have you examined the surface of an Eclipse,
23 exemplar?
24   A.  I have not seen an Eclipse, so the only -- the
25 only observations that I've made on the surface

**Page 57**

1  condition of the Eclipse are based on about four or five
2  photographs in a recent report by Dr. Fashing.
3    Q.  Okay.  Why did you not examine one?
4    A.  I was not sent one.
5      MR. DALIMONTE:  Oh, Objection.
6      MS. DALY:  Why are you objecting to that?
7      MR. DALIMONTE:  Well, because there's a -- a
8  set of requests for documents where exemplars were
9  supposed to be produced by Bard for each of the
10 iterations, and they have yet to produce them.  So we
11 can't send them to --
12     MS. DALY:  Oh, my heavens.
13     MR. DALIMONTE:  -- experts until you
14 produce --
15     MS. DALY:  Oh, my heavens --
16     MR. DALIMONTE:  -- those exemplars.
17   Q.  (By Ms. Daly)  Okay, so you asked your attorney
18 to get you an exemplar.
19   A.  I would like to have seen them.
20   Q.  Okay.  And you haven't seen them for whatever
21 reason, the lawyers will work that out, but you haven't
22 seen one.
23     MR. DALIMONTE:  Well, first of all, no, no.
24 You're not going to ask him questions, anything that
25 we've discussed.

Veritext Legal Solutions
800.808.4958                                          770.343.9696

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

---

Page 58

1     MS. DALY: I didn't. I said "You haven't
2  gotten one, correct?"
3     MR. DALIMONTE: Okay, that's different, but you
4  said you asked your lawyer -- you asked the lawyers, is
5  what you said. Anyway, just move on.
6     MS. DALY: Okay --
7     MR. DALIMONTE: Just move on.
8     Q. (By Ms. Daly) You haven't seen an Eclipse, a
9  Denali or a Meridian.
10    A. Correct.
11    Q. All right. Did you understand that the court
12  had given an extension of time to experts to put in a
13  specific report about Denali and Meridian?
14    A. Yes, I did.
15    Q. Okay. And did you want to see an exemplar for
16  Meridian and Denali?
17    A. I would like to have, but, remember, I'm a
18  fracture person and I've never seen any fractures of
19  these components. But certainly it would be nice to see
20  those things. You can see the files which has the
21  statistics of fractures, so if you knew what that was,
22  even though you're not looking at your own ones, that
23  would be something useful to have, definitely.
24    Q. Yes.
25    A. But I don't have that.

Page 59

1     Q. Well, for the record --
2     MR. DALIMONTE: Well, for the record, too, in
3  clarification of Professor Ritchie's statement, he
4  hasn't seen cases -- specific cases haven't been
5  evaluated by him.
6     MS. DALY: I understand that --
7     MR. DALIMONTE: But it doesn't mean they don't
8  exist.
9     MS. DALY: I understand that, but I want to put
10  this on the record. So Mr. Dalimonte is saying that
11  experts, including you and Mr. McMeeking, have not seen
12  exemplars of the Eclipse, the Meridian or Denali because
13  somehow we failed to answer a request for production,
14  which you have filed no motion to compel on; you have
15  not done a meet and confer on to say, "We don't have
16  them." You have an MDL that includes, at your request,
17  Eclipse, Meridian and Denali. The court gave you extra
18  time to depose Meridian and Denali. You did not ask about
19  exemplars. Is that your position, that it's our fault?
20    MR. DALIMONTE: You were required to produce
21  them.
22    MS. DALY: Yeah.
23    MR. DALIMONTE: You haven't.
24    MS. DALY: You've heard of the rules of civil
25  procedure?

Page 60

1     MR. DALIMONTE: Move on. We don't have to have
2  this colloquy on the record.
3     MS. DALY: We probably need to take that up
4  with the court so we know where we're going on those
5  filters, so we don't have late -- we don't have late
6  provided information from these experts.
7     Q. Okay, so surface conditions -- going back,
8  because you have not seen and have not examined under
9  SEM or any other way, an Eclipse, a Meridian or Denali,
10  you can not testify about what the precise surface
11  conditions are. True?
12    A. I've seen pictures of the Express -- sorry, the
13  Eclipse --
14    Q. The Eclipse, okay.
15    A. And that's -- and that's -- that's all I have
16  at this point.
17    Q. And how does the surface look to you based on
18  Dr. Fashing's SEM of the Eclipse?
19    A. Well, again, it's a little bit arbitrary, but,
20  as you know, the Eclipse is electropolished, and there
21  is certainly evidence still of inclusions; there has
22  been evidence of the circumferential markings and draw
23  markings, but they are much smoother than they ever were
24  prior, in the previous filters.
25    Q. Okay.

Page 61

1     A. So the electropolishing would certainly --
2  these -- these -- these parts still may fail in the same
3  location, from what I gather is true, but -- in that
4  same sort of regions, but the presence of defects there
5  certainly is vastly improved by that question.
6     Q. And can you -- based on just seeing pictures
7  from one Eclipse, are you able to say the extent to
8  which that improvement will provide fracture resistance
9  in an Eclipse?
10    A. To put a number on it, of course, no. It would
11  certainly alleviate or tend to -- act to alleviate one
12  of the problems with the filters, but, no, you don't
13  need to have a defect to form a crack if you have a
14  large enough stress and so forth. There are many
15  reasons why these cracks form, but the role of defects
16  and certainly the circumferential grinding marks in the
17  foot seem to have been improved by the presence of
18  electropolishing.
19    Q. All right. So you are not -- because you
20  haven't seen any and you haven't seen an exemplar of
21  Eclipse, is it fair to say that you can not say if any
22  fractured Eclipse out there in the world is related to
23  surface conditions?
24    MR. DALIMONTE: Objection.
25    THE DEPONENT: Well, I couldn't anyway. That's

16 (Pages 58 - 61)

Robert Ritchie , Ph.D.                                June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 62

1   too broad a question. But I've looked at the fracture
2   files, the statistics of the various fractures, and
3   there isn't -- the Denali I'm not too certain was, but
4   there's an alarming similarity about where these things
5   tend to fail.
6       Q.   (By Ms. Daly) Okay, and I'm not -- but I'm not
7   asking that; I'm asking --
8       A.   That's pertinent.  We talked about local
9   effects like the chamfers and so forth.  But the fact is
10  that if you identify the surface condition, the
11  electropolishing -- and this has been known for decades
12  -- would certainly improve the fatigue resistance.  So
13  it would -- likely if you measured the fatigue limit it
14  would slightly increase it, but that doesn't guarantee,
15  of course, that there'd be no fatigue fractures --
16      Q.   Right.
17      A.   -- but that aspect would be an improvement.
18      Q.   An improvement.  All right.  And Meridian
19  carried forward with that electropolishing, true?
20      A.   Yes.
21      Q.   Do you know if there was any improvements in
22  the electropolishing process itself from the time -- by
23  Bard, from the time the Eclipse was first marketed
24  through when the Meridian has been marketed?
25      A.   I -- I have not seen any evidence of that.  I

Page 63

1   don't know the answer to that question.
2       Q.   Do you know one way or the other?
3       A.   I don't know one way or the other.
4       Q.   Okay.  Then Denali, is that electropolished?
5       A.   It's a laser cut.  It's built like a stint,
6   basically, and I'm -- I'm  actually -- I'm not certain.
7   I can't remember whether it was electropolished or not.
8   The need for electropolishing the Denali would be less,
9   you know, less imperative than in a wire one, but I
10  honestly don't -- I can't remember exactly whether it
11  was.  It's a similar design, but it's a very different
12  animal by the way it's made.
13      Q.   Right.  Have you reviewed any medical
14  literature about failures in Eclipse filters
15  specifically?
16      A.   Yes, and that again pertains to these five
17  cases that are being submitted today.
18      Q.   One is an Eclipse?
19      A.   There's two, I believe.
20      Q.   I think there's one.
21      A.   Whatever.  And I've been sent all the medical
22  records.  It a little difficult for people like me to
23  interpret medical records, so most of the time I've
24  looked at them and then I've relied on the -- the
25  interventional cardiologist reports, these reports by a

Page 64

1   Dr. Hearst.
2       Q.   Right.
3       A.   So in that respect I have looked at that, yes.
4       Q.   Okay.  And in some of the medical literature
5   you've looked at, were there descriptions or discussions
6   of types of fracture in the Eclipse, or just the fact
7   that a leg broke or an arm broke?
8       A.   Well, I mean, there's a lot of medical issues,
9   so I can't say for certain there's nothing, but I doubt
10  it, quite frankly, because most of it's based on
11  radiology or CT scans, and that just tells you whether
12  something's separate, or its location.  It couldn't
13  really tell you much about how it failed.
14      Q.   And same question for Meridian.  Did you look
15  at any literature specific to failures in a Meridian
16  filter?
17      A.   I've looked -- I've seen the fracture files
18  that list the statistics and where they break and so
19  forth, and these are updated, as you know.  I've not
20  seen any specific reports of fracture.  I've not
21  examined any myself.
22      Q.   What do you mean, "fracture files"?  Are you
23  talking, about MAUDE data?
24          MR. DALIMONTE:  Bard.
25          THE DEPONENT:  The Bard statistics --

Page 65

1          MR. DALIMONTE:  Fracture history file --
2   fracture analysis, the monthly fracture --
3          THE DEPONENT:  I have a whole slew of those.
4       Q.   (By Ms. Daly) And those just tell you
5   generally location --
6       A.   Yeah, but -- but, you know, there's an alarming
7   similarity, if you look over the history that -- you
8   know, in the Recovery, the legs and feet, and there was
9   some in the G2s that went further up the legs.  And then
10  if you look at the arm fractures, they -- they sort of
11  mirror the statistics in some respects.
12      Q.   Well --
13      A.   You know, they have a much bigger population
14  than I do, but if you look at those pictures over the
15  years, the arm fractures still seem to occur in that
16  region just below the sheath.
17      Q.   Okay, but you've seen no pictures of a fracture
18  of a Meridian.
19      A.   No.
20      Q.   Other than Dr. Fashing's pictures of the one
21  Eclipse, you haven't seen pictures of those, true?
22      A.   Not -- I've -- like I've said, the only -- the
23  -- I've seen the pictures of Dr. Fashing's examination
24  of an Eclipse, and I've read -- I've -- I've -- the
25  medical files and interpretation of medical files for

17 (Pages 62 - 65)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

| Page 66 | Page 68 |
|---|---|

**Page 66**

1 two Eclipse fractures.
2     Q.  What Bard documents have you read that give you
3 any information about locations of fractures in either
4 Eclipse, Meridian or Denali?
5         MR. DALIMONTE: Objection; asked and answered.
6         THE DEPONENT: Those are those Bard injury
7 fracture files, and they -- they tend to give number of
8 units sold and fractures or various adverse conditions.
9     Q.  (By Ms. Daly) But not like you've done; it
10 won't say so many microns from the --
11     A.  No, not but it -- it shows a picture of the
12 filter, you know, and it says that X failed up here and
13 Y failed down there. So, again, it sort of mirrors the
14 general locations. I mean, what I found fascinating was
15 that, you know, throughout this whole sequence of
16 Recovery G2 and the various different G2s, the failure
17 modes were remarkably similar in terms of their general
18 location.
19     Q.  Is the Bard documents that you're just
20 referring to about these locations of fractures, are
21 they referenced in your report that we've marked 2?
22     A.  No, I don't think they're specifically
23 referenced. I think they're probably listed as
24 something I looked up. I didn't talk about them
25 directly.

**Page 67**

1     Q.  Okay. For our next deposition, can you find
2 for me the document before our next deposition? Can you
3 find for me the document you're talking. about?
4         MR. DALIMONTE: Yeah, it's the complete --
5         THE DEPONENT: What are they called, the
6 Bard --
7         MR. DALIMONTE: They're -- they're Bard
8 fracture analysis reports. They were monthly. They go
9 back to the Recovery -- they didn't do them monthly on
10 the Recovery, but they go back as far as 2004.
11     MS. DALY: I'm just a little confused, because
12 I don't -- I can't sum it up in my head that we did
13 fracture reports that have pictures showing --
14         MR. DALIMONTE: Hold on. Andre Chandusko. One
15 of the exhibits is a complete binder. At that time, the
16 latest report that we had was January 2013. Bard has
17 since produced an updated file that goes to May 2016,
18 and they're monthly, and they have a picture of a filter
19 and they have a count of how many leg failures occurred
20 at the chamfer versus elsewhere, versus the hook. And
21 there were numbers.
22         MS. DALY: If you would help me, because I want
23 to know what he relied on. So before his next
24 deposition, if you would give me the Bates ranges of
25 what he relied on for that.

**Page 68**

1         MR. DALIMONTE: Or I can give them to you, no
2 problem.
3         MS. DALY: All right, that's good. I probably
4 don't want them all. I probably -- I just need the
5 Bates ranges.
6     Q.  Okay. Did you review the 2016 publication by
7 Dr. Stavoropolis and others on the results -- the final
8 study results for the Denali and what the outcomes were
9 there?
10     A.  I didn't.
11     Q.  So do you know that he reported zero fractures
12 of the Denali in that article?
13     A.  No, I don't.
14         MR. DALIMONTE: Well, the Denali hasn't been on
15 the market very long.
16         MS. DALY: Excuse me, John, that's not an
17 objection, okay; it's not an objection.
18         MR. DALIMONTE: Sorry. Just a silly question,
19 that's all.
20         THE DEPONENT: It's funny, because when you
21 look at these Bard fracture reports, they're
22 cumulative --
23         MR. DALIMONTE: Well, don't volunteer any
24 information unless you're asked a question.
25     Q.  (By Ms. Daly) You haven't looked at

**Page 69**

1 Dr. Stavoropolis' study which was the clinical trial of
2 the Denali filter.
3     A.  Yes -- no, I haven't.
4     Q.  Okay. Now, you have examined -- have you --
5 I'm sorry, have you examined a Simon Nitinol filter?
6     A.  No.
7     Q.  Have you looked at a design history file for a
8 Simon Nitinol filter?
9     A.  Yes, I've read about it and so forth.
10     Q.  Have you done that recently?
11     A.  Yeah. I've done it some time ago. I'm looked
12 at it, actually, reading some of it last night.
13     Q.  Okay. And I notice you have examined some Cook
14 filters.
15     A.  Yes.
16     Q.  Recently.
17     A.  Well, over the last year-and-a-half.
18     Q.  Okay. And I know that you have submitted a
19 report on the Cook filters. I know that, but obviously
20 I I'm have not seen the report. Okay. Is there -- are
21 there any other manufacturers of IVC filters that you
22 have personally been able to examine?
23     A.  No.
24     Q.  I'm not going to ask you what the comparison is
25 or what the finding is. Have you done a side-by-side

18 (Pages 66 - 69)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 70

1 comparison of Bard Cook filters?
2    A.  What do you mean by "side-by-side"?
3    Q.  Looking at features to see if this one has this
4 feature, this one has this feature and that area is
5 different.
6    A.  Well, indirectly, yeah.  I haven't done a -- I
7 haven't done a precise, you know, back-to-back study,
8 but, you know, I can -- you can see various different
9 features in one that you don't see in others.  They're
10 -- they're nominally similar designs, but they're
11 different animals, of course.
12    Q.  Do any of the Cook filters that you looked at
13 have electropolished surfaces?
14    A.  They're a different material.  I can't recall
15 now.  I can't recall.  But they -- they -- I would say
16 that they were cleaner, but it's a different material,
17 so that's sort of a little bit of an imprecise.  But I
18 can't remember if they were electropolished or not.
19    Q.  All right, let's talk about centerless grind on
20 the feet.  All right, you -- you have an opinion you've
21 given many times that the centerless grind on feet was a
22 contributor to fracture of those feet.
23    A.  Yes.  I'm mean, I'm think that's fair.
24    Q.  And you've listed on your chart -- we just
25 talked about it -- those filters that have feet

Page 71

1 breaking.
2    A.  Yes, I've used a distinction, foot versus leg,
3 right.
4    Q.  In every instance of a broken foot, was it at
5 the centerless grind area, if you recall?
6    A.  In the foot.  There's one ankle -- I just
7 noticed there's one ankle that may have been slightly
8 away.  I don't quite know, but it's in the shutter.
9 I'll have to look at that.  But virtually all of them
10 failed in that sort of tapered -- remember, it's tapered
11 so there's a thinner section.
12    Q.  And you call the ankle the part just above --
13    A.  Just above.  So there's a change in radius
14 there, so that, of course, does lead to a stress
15 concentration, but nothing I think to the tune of what
16 you'd have with the sharp grinding.
17    Q.  So the one ankle fracture you just mentioned
18 was in the Shutter case.  For the court reporter, it's
19 S-h-u-t-t-e-r.
20    A.  Yes, I should look at that.  And I think, if I
21 recall, it was just a little further up.
22    Q.  So, yeah, you're welcome to look at that, and
23 then I wanted you --
24    A.  Well, you can talk to me.
25    Q.  Okay.  So looking at your chart, Exhibit 5

Page 72

1 again, let's go to the Recovery filters first.  In those
2 filters that you looked at, most of them had foot
3 fractures.
4    A.  Yes, indeed.
5    Q.  If we go, then, to the G2 group --
6    A.  Yes.
7    Q.  -- which is a larger number of filters that you
8 looked at, correct?
9    A.  Yes.
10    Q.  There are an ankle --
11    A.  And leg fractures, yes.
12    Q.  Okay, there's an ankle fracture, and then
13 you've got a foot in the Carnehl case and two feet in
14 Beckfield.
15    A.  Yes.
16    Q.  Correct?
17    A.  Yes.
18    Q.  Now, if I'm right and Beckfield is a Recovery
19 filter; we'll find that out, you would only have found a
20 fractured foot in Carnehl and maybe Shutter, correct?
21    A.  Yes.
22    Q.  Okay.  You recall that in the G2 filter a
23 modification that was made was to make the wires
24 slightly larger?
25    A.  Yes.

Page 73

1    Q.  Is it your understanding that that wire
2 contributed to improving resistance to foot fracture for
3 the G2s?
4    A.  It may have.  It's -- I mean, it -- it's very
5 difficult to say precisely, but certainly if it's
6 slightly thicker, then the stresses may be somewhat
7 lower.
8    Q.  So it may have improved --
9    A.  It may have improved, and that may have driven
10 the fracture a little further up the leg.  But certainly
11 the -- there's a distinct difference between the -- at
12 least on the basis of what I've looked at, between the
13 leg fractures and the G2 and the Recovery, in that
14 they're -- you don't see this evidence of the legs
15 breaking further up.  So the fact that the hook was
16 perhaps thicker down there may have driven the fractures
17 up.
18    Q.  Do you know -- what would you rely on to tell
19 me, if that's the case?
20    A.  It's very difficult to do it.  You'd have to do
21 a pretty sophisticated calculation and you'd have to
22 know exactly what the function of these filters are.  A
23 lot of the failures are a result of their adverse
24 function; they tilt, they move and so forth, and so it's
25 a difficult calculation to do precisely.

19 (Pages 70 - 73)

Robert Ritchie , Ph.D.                                       June 9, 2017
In Re: Bard IVC Filters Products Liability

**Page 74**

1  Q. And you haven't done it to date?
2  A. I haven't.
3  Q. Okay.
4     MR. DALIMONTE: Hold on one second.
5     Did you try to flag me? I'm talking to the
6  videographer.
7     VIDEOGRAPHER: (Shakes head back and forth.)
8     MR. DALIMONTE: Okay.
9  Q. (By Ms. Daly) All right. So then going to the
10 Eclipse filter -- well, let's go to the G2-X. Do you
11 believe that the foot design is the same in the G2-X as
12 it was in the G2?
13 A. That's my understanding.
14 Q. And that that foot chain modification carried
15 forward into the Eclipse as well?
16 A. Well, the Eclipse was -- was -- I mean, as far
17 as I know, the design of the foot was the same, but --
18 Q. That's my question.
19 A. But, of course, it was electropolished.
20 Q. So with respect to feet contributing to
21 fracture in G2-X or Eclipse, for example, you would
22 expect there would be some improved resistance to
23 fracture in that area because of the change that went
24 into G2 and carried forward?
25 A. Well, there have been improvements with respect

**Page 75**

1  to the fracture in that location, but if you -- if you
2  improve that location and it breaks somewhere else just
3  up the road, basically, then you haven't gained much.
4  But certainly, yes.
5  Q. And again, with either the Eclipse, the
6  Meridian, the Denali, you've done no work to determine
7  how that modification a foot may have improved fracture
8  resistance in the leg or --
9     MR. DALIMONTE: Objection.
10 Q. (By Ms. Daly) True?
11 A. Well, the -- as I said, the only thing I've
12 done is I've looked at these Bard fracture analysis
13 reports and, again, they're general, right, but the
14 locations of fractures are remarkably similar, and the
15 general -- and the general locations of the leg in the
16 foot versus in the mid-range of the -- of the leg and in
17 the arm at the rim and just below the rim. And so
18 that's -- that's a consist -- not so much Denali, but
19 that's the consistent path throughout.
20    And a slight change -- as I said, when you go
21 to the Recovery to G2, then there's evidence that foot
22 fractures are found and not -- they're leg fractures
23 further up the wire. But that -- so the trends are not
24 that different. But I haven't looked specifically at
25 any Eclipse or Meridian or Denali fractures or even

**Page 76**

1  looked at the filters, so that's -- I'm just relying on
2  what Bard has generated.
3  Q. Have you done any sort of a count to try to see
4  how often the foot -- or fracturing from G2 to G2-X,
5  Eclipse, Meridian?
6     MR. DALIMONTE: Objection.
7     THE DEPONENT: I think Bard has, and that
8  information is available in those things. What I did is
9  I looked at lots of these files a month or so ago. I
10 looked through them and just saw the patents there and,
11 as I said, the thing that was interesting to me is even
12 though I haven't looked specifically at Eclipse,
13 Meridian or Denali, there were a -- there was a certain
14 consistency of what you see.
15    Now, remember, there's a bit of a problem with
16 this because the numbers are cumulative. So, for
17 example, when the Denali came on the market, there would
18 be less -- there would be less examples of those
19 failures, and so that distorts the statistics, but the
20 general trend is very similar.
21 Q. (By Ms. Daly) Well, have you done some sort of
22 calculation to get a rate or an incidence of when
23 they're -- how many of these are happening and which
24 filters?
25    MR. DALIMONTE: Objection; that's a different

**Page 77**

1  discipline.
2     THE DEPONENT: You can't really do that,
3  actually, from that data. All they're giving you is a
4  cumulative plan.
5  Q. (By Ms. Daly) Right. So you haven't done
6  that.
7  A. As I said, again --
8  Q. Wait. You haven't done that.
9  A. I haven't done that.
10 Q. Okay.
11 A. But all I'm saying is that the -- the general
12 locations of fractures of arms and legs are remarkably
13 similar in all the G2s throughout -- I don't know about
14 the Meridian, just the Denali. But they're remarkably
15 similar. But, again, the statistics are slightly
16 distorted by the cumulative nature of them.
17 Q. And you've done nothing statistically to try to
18 figure out incidence.
19 A. I don't think I could do that for that data
20 anyway.
21 Q. Okay. Now, the centerless grind issues that
22 you saw in the Recovery filter, let's start there. Was
23 it pretty consistent what you were seeing -- again,
24 understanding there's slight differences in the
25 manufacturers, but were you seeing a fairly consistent

20 (Pages 74 - 77)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

---

**Page 78**

1 method of centerless grind in the Recovery filters?
2    A.   Yes.
3    Q.   Then when we move to G2, albeit we've got the
4 modified foot wire, were you again seeing similar
5 process there?
6    A.   Yeah, I'd -- I'd -- again, to get -- you know,
7 one of the questions would be how sharp are these things
8 and how deep were they.  One would really have to
9 section them to look at that, and I couldn't do that, of
10 course.  But, yes, in a general assessment they looked
11 identical.
12    Q.   Will you look back at your -- your report on
13 Milton?  Do you know where to find him in your report,
14 or his filter?
15    A.   Milton, the Express?
16    Q.   Yeah, he's the only Express.
17    A.   Yes, it should be here.  Okay.
18    Q.   Where were you finding him?
19    A.   Well, I've got a picture on Page 25.
20    Q.   All right.  Were there any fractures in that
21 filter, in Figure 25?  Is that what it is?
22    A.   Page 21.
23    Q.   21, Figure 26, all right.  Were there any
24 fractures in Milton?
25    A.   It doesn't look like there was, no.

**Page 79**

1    Q.   All right.  All right, let's talk about another
2 opinion that you hold.  It's on your report, Page 2, and
3 it's at the bottom of that first full paragraph, about
4 seven lines up.  It's a little Roman Numeral IV.  Do you
5 see it?
6        MR. DALIMONTE:  Page 22?
7    Q.   (By Ms. Daly) No, 2, Page 2, and it's in this
8 big section here, on Page 2.  There's a little 4.
9    A.   Oh, yeah.
10    Q.   All right?  That's what I want to talk to you
11 about next.  All right, your opinion there was:
12        "Filters are prone to tilting and
13        migration which can cause
14        perforation, significantly elevating
15        stress, which promotes fracture."
16        All right?
17    A.   Yes.
18    Q.   What do you mean when you use the term "prone"?
19    A.   Susceptible to.  I mean -- and that's just
20 based on the statistics of fracture that we've seen and
21 the -- in fact, where there is medical records primarily
22 where there's indications that these tilt, and they can
23 move and migrate and so forth.
24    Q.   I want to know your definition of the term,
25 because I notice you use "susceptible" sometimes and you

**Page 80**

1 use "prone."
2    A.   It's the same words.
3    Q.   Okay.  Moving on beyond that sentence, you then
4 say:
5        "Additionally, when these failures" --
6        meaning what you've said before, which I
7 assume is tilt, migration:
8        "Additionally, when these failures
9        render the device unable to be
10        removed, it creates an unacceptable
11        situation of a device that is
12        unusually prone to fracture remaining
13        in the body."
14        Right?
15    A.   Uh-huh.
16    Q.   You've said that.
17    A.   Yes.
18    Q.   All right.  So are you giving any opinion in
19 this case about when a filter is not retrievable?
20    A.   No -- well, I mean, that would be beyond my
21 station.  There's some obvious things you can say, but
22 I'm not a medical person.
23    Q.   Are you of the opinion that Bart filters are
24 prone or susceptible to not being retrievable?  Do you
25 hold that opinion?

**Page 81**

1    A.   Well, again, on the basis of the cases that
2 I've looked at, there are numerous cases where, because
3 of fragmentation or etherealization and so forth that
4 the medical reports give the impression that it can be
5 difficult to retrieve them.
6    Q.   Okay.
7    A.   And retrieve parts of them -- maybe they're in
8 dangerous situations, but I'm not a medical person, so I
9 can't speak directly to that.
10    Q.   And you've done no -- you've made no attempt to
11 try to statistically determine the percentage of Bard
12 filters that can't be retrieved.
13    A.   No.  I'm sure somebody has, but I have not.
14    Q.   I do not believe so.
15    A.   Really?  Okay.
16    Q.   All right.  Then you also gave an opinion on
17 Page 4 of that report -- I'm sorry, it's back on -- it's
18 back on Page 2, pardon me.  It's the last sentence
19 there.  You say:
20        "It's my opinion that these filter
21        devices were defectively designed and
22        manufactured, rending them unsafe for
23        implant to the human body."
24        Do you see that?
25    A.   Yes.

21 (Pages 78 - 81)

Robert Ritchie , Ph.D.                      June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 82

1   Q.  Okay.  Are you giving that opinion from a
2 materials expert standpoint only and not from a medical
3 standpoint?
4   A.  Well, it's -- it's, of course, my -- my
5 education, it would be from a materials standpoint, but
6 if something is lodged in the heart, it's not difficult
7 to understand that.  It might be a difficult thing to
8 have medically, but obviously my statement is primarily
9 -- well, let's say scientifically based on material
10 science and engineering, and sort of commonplace, based
11 on some sort of medical understanding.
12   Q.  Do you hold the opinion in any case in this
13 litigation that the particular plaintiff should not have
14 had that particular Bard filter?  Are you going to give
15 that opinion?
16   A.  No.
17   Q.  Let's talk about McMeeking for a moment --
18 actually, let me back up and talk about a few other
19 experts.  You have referenced reading the Kessler,
20 Eisenberg and Betensky reports.
21   A.  Yes.
22   Q.  Do you rely on those reports for anything in
23 particular?
24   A.  No, they're background, basically.  It's
25 interesting to read the stories and so forth, but I

Page 83

1 don't -- I wouldn't say I don't rely on them, but
2 they're more of a background to me.
3   Q.  There is no specific statement or opinion or
4 data they have in those reports that is essential to you
5 in giving your opinions in the case?
6   MR. DALIMONTE:  Objection.
7   THE DEPONENT:  It's difficult to say.  I mean,
8 I would hate to rule it out, but, I mean, some of the
9 discussion of how some of the tests were done and how
10 some of the -- mirror and give more detail than I
11 originally understood before I read them, so there's a
12 lot of background information there.
13   I'm not concerned about the politics and how
14 they dealt with the FDA; that's not in my area.  But
15 certainly how the tests were done, what was -- what was
16 looked at, what wasn't looked at, they have a bearing,
17 yes.  And I'm --
18   Q.  Have you --
19   MR. DALIMONTE:  Hold on.  Let him finish.
20   Q.  (By Ms. Daly) I'm sorry.
21   A.  I mean -- but, I mean, I think -- as you know,
22 I think Bard was somewhat gung ho in their approach to
23 the design of these devices and the testing they did,
24 and I think that's amplified in those reports.
25   Q.  We'll talk about testing in another section.

Page 84

1 Let's talk about Dr. McMeeking for a moment, because I
2 know you do rely on him, correct?
3   A.  Uh-huh.
4   Q.  All right.  You say in this March 2 report
5 that's Exhibit 2 --
6   A.  Yes.
7   Q.  You've said that you've read McMeeking's
8 depositions; is that correct?
9   A.  Yes.
10   Q.  You've read his MDL reports.
11   A.  Well, I've read -- I'm -- I don't know how many
12 he's written, but I've -- I read a recent one, yes.
13   Q.  Okay.  So let's look at McMeeking's reports, if
14 we could, and --
15   A.  I'm not sure I've been sent all the recent
16 depositions.  I've read the earlier ones, but certainly
17 there's a recent report I've read which is the MDL
18 report, I think.
19   MR. DALIMONTE:  Just one second.  Once again,
20 you were raising your hand.
21   VIDEOGRAPHER:  I had an itch.
22   MR. DALIMONTE:  Oh.  Sorry.
23   (Whereupon, Exhibits 7-9 were
24   marked for identification.)
25   Q.  (By Ms. Daly)  Okay, I'm going to first hand

Page 85

1 you what's Exhibit 7, which is a McMeeking report dated
2 March 3rd of 17.
3   A.  Most of this is --
4   MR. DALIMONTE:  I want to make sure it's the
5 same document I'm referring to.
6   THE DEPONENT:  It's thicker than I have.
7   Q.  (By Ms. Daly)  And then I'm going to show you
8 what I've marked as 8, which is his supplementary report
9 assessing Meridian and Denali dated April 7th, 2007.
10   And then I'm going to give you 9, which is his
11 rebuttal report in the MDL dated May 11th, 2017.  Just
12 take a minute to look at those and tell me which of
13 those you have studied, reviewed, studied, whatever you
14 want to call it.
15   A.  I haven't seen the rebuttal report.
16   Q.  All right.
17   A.  These -- these look somewhat different to what
18 I've seen, but they contain a lot of the same
19 information.
20   Q.  Okay.  So you think you've seen Exhibit 7,
21 which is -- I'll tell you, it's his general MDL report.
22   A.  Yeah, but there's a lot of mathematics in here
23 that was not in my version, so I think -- I don't know
24 what that is.
25   Q.  So you may not have seen his final MDL one, is

22 (Pages 82 - 85)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 86

1  what you're saying.
2      A.  I don't know.
3      Q.  All right.
4      A.  I don't think I've seen this one, the
5  supplementary report, but I've seen a lot of -- I've
6  seen a lot of this, but there's details in here that
7  were not in the version that I saw.
8      Q.  All right. So you don't believe that you've
9  seen Exhibit 8, which is his supplementary report in the
10  MDL on Meridian and Denali, April 7th, 2017.
11     A.  I don't think so.
12     Q.  Okay. Have you seen Exhibit 9, which is his
13  rebuttal report, May 11, 2017?
14     A.  No.
15     Q.  All right. Let's just put those there for a
16  minute and work off this, work off this one, which is
17  Exhibit 7.
18         MR. DALIMONTE:  This might be a good breaking
19  point, before we get into this report. It's noon. We
20  can go off the record.
21         VIDEOGRAPHER:  We're off the record at 11:57.
22  This is the end of Disk No. 1.
23         (Recess)
24         VIDEOGRAPHER:  We're back on the record. This
25  marks the beginning of Disk No. 2 in the deposition of

Page 87

1  Robert O. Ritchie, Ph.D. The time is 12:42 p.m.
2      Q.  (By Ms. Daly) Doctor Ritchie, when we broke,
3  we were talking about making reports, and just to recap,
4  I think you said for the report marked as Exhibit 7,
5  you've seen that, but maybe not the full one that's
6  before you?
7      A.  Yeah, I'm not sure whether -- I've seen -- most
8  of it's identical, but I didn't recognize some of the
9  bits at the back. Maybe I didn't look at all the
10  appendice, I'm not quite certain, but it's the report
11  I've seen. I took out a lot of -- a lot of stuff here
12  on this resume that I didn't -- it's the same report.
13     Q.  Okay, and then on Exhibit 8, which is his
14  supplementary report on Meridian and Denali, April 7th?
15     A.  Yes, I -- I realize I have both those; 8 and 9
16  I have.
17     Q.  Okay. You've had 8 and 9.
18     A.  Yes.
19     Q.  Okay. All right, I'm going to refer to those
20  at times, so just keep those with you.
21     A.  Okay.
22     Q.  As I've said, you -- you noted several times in
23  testimony or in your recent reports that you either
24  adopt information from Dr. McMeeking's reports or you
25  agree with it or you rely on it. Is that correct, that

Page 88

1  you do rely on some of his work?
2      A.  Yes -- well, let me just say that what I try to
3  do is understand why fractures took place, and look at
4  -- look at the -- hopefully look at the actual part and
5  see how it failed, sort of trying to decipher why things
6  failed when it did with the defects present and so
7  forth.
8         What McMeeking does is he does calculations,
9  and so the advantage of that is that you start to get
10  some numbers, right, so you -- so, for example, you can
11  say this had an effect, but with some numbers you can
12  get some quantification of that effect. That's what's
13  very useful about this.
14     Q.  So did you rely on that?
15     A.  Well, I mean, it impacts upon my opinions. For
16  example, I believe that when you perforate a strut, that
17  the likelihood of fracture is increased. That seems
18  intuitively obvious to me. And McMeeking's calculations
19  will then show actually the stresses are raised by the
20  perforation. So that's consistent with my -- that's the
21  way I use it.
22     Q.  So let's take that as an example. So you have
23  a hypothesis that perforation can lead to fracture.
24         MR. DALIMONTE:  Objection.
25         THE DEPONENT:  It's not really a hypothesis. I

Page 89

1  mean --
2      Q.  (By Ms. Daly) You said it was intuition.
3      A.  Well, okay, but, I mean, there's certain things
4  that are intuitively obvious to me, and it's nice to get
5  some confirmation, numerical confirmation. Nothing in
6  engineering is, you know, 100% precise, but if you know
7  that a certain feature or an event causes an elevation
8  of a stress, that is completely consistent with the fact
9  that -- okay, call it a hypothesis, say a hypothesis,
10  that if you perforate a strut it's more likely to
11  fracture.
12     Q.  Okay, so looking at it from what I want to look
13  at it from, which is the science of how this was done,
14  you have an opinion that fracture and perforation are
15  associated, yes?
16     A.  They can be associated.
17     Q.  Okay. And what you relied on from McMeeking
18  that is relevant to that is the calculations he does in
19  his MDL reports about strains in a perforating filter.
20     A.  Well, I'm -- I mean, when you say "relied on,"
21  it's a strong word. I mean, on the basis of the
22  evidence that I see, and now I've seen it from the
23  medical report, I'm almost certain that happens, and
24  then a calculation is showing that's consistent with
25  that. So if that's what you mean by "relied," then I

23 (Pages 86 - 89)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 90

1  relied. But I don't need that information to draw my
2  conclusion, but it's certainly consistent with that.
3      Q. Let's break that down. Was there something
4  from medical records that gave you some scientific
5  information or medical information that allowed you to
6  say that perforation is equated with fracture or --
7      A. Well, as I said this morning, in many of the
8  cases where there are multiple perforations or many
9  perforations there often are fractures. And so you can
10 make the correlation that one led to the other, but
11 without knowing exactly that Strut No. 3 perforated and
12 Strut No. 3 fractured, it's difficult to make that
13 direct comparison.
14      And so now with some of the more detailed
15 intervention cardiologist reports where they can -- they
16 looked at each individual strut and watched it in
17 someone's body over a period of time -- I'm talking
18 about the Booker case now -- that that becomes more
19 definitive. And then so that, to me, is pretty
20 compelling proof that, in fact, that in -- when you have
21 a perforated strut, it can certainly fracture. Now --
22      Q. Would you agree that it can certainly -- that
23 it can also not fracture when you have --
24      A. Of course. There's a million things. You
25 know, you can die of cancer -- doesn't say you wouldn't

Page 91

1  die of a heart attack in a different situation.
2      Q. Well --
3      A. I mean, that's the point. You've got to
4  remember that -- I've heard this so many times, that
5  this thing didn't perforate but it still fractured,
6  therefore perforation is not associated with fracture.
7  Everything is synergistically interactive and, you know,
8  the worst case causes the eventual failure, so --
9      Q. Okay, so is there any study out there that
10 you're aware of that looked at the association between
11 fracture and perforation?
12      A. Well, there are indirect studies that basically
13 show that there's so many perforations and so many
14 fractures. But to be absolutely certain, you have to
15 really focus on one particular strut that perforated, or
16 more than one strut and then subsequently fractured.
17      It seems intuitively obvious to anybody that if
18 you've got something wedged in there, it's constrained,
19 that's going to raise, raise the stresses. And that's
20 -- okay, it's not more than a hypothesis; it makes
21 sense. And that someone -- like when McMeeking has done
22 calculations, you know, they're done to a strong degree
23 of engineering certainty, but you don't know all the
24 details. But if, if indeed it shows that the stresses
25 are elevated and they're significantly manned, then that

Page 92

1  is certainly important information.
2      Q. So I want to separate these two things again.
3  I want to know what work you did and what work McMeeking
4  did, and what work of McMeeking's you must rely on to
5  come to your opinion.
6      I'm going to start again. You --
7      MR. DALIMONTE: Objection; asked and answered.
8      THE DEPONENT: I mean, I'm --
9      MR. DALIMONTE: He just explained it.
10     MS. DALY: No -- you know what, John, you did
11 this last time. I have him. You already are wasting my
12 time. I have seven hours with him. He is an expert.
13 He's been an expert in this litigation for years. I'm
14 am going to ask him every question I need until I'm
15 understand it, whether you like it or not.
16     MR. DALIMONTE: Then you can ask him --
17     MS. DALY: Thank you.
18     MR. DALIMONTE: -- to explain.
19     MS. DALY: That's what I'm doing.
20     MR. DALIMONTE: You asked --
21     MS. DALY: I can ask him --
22     MR. DALIMONTE: -- same question and he
23 explained it, and I said it was asked and answered.
24     Q. (By Ms. Daly) Dr. Ritchie --
25     MR. DALIMONTE: If you want a further

Page 93

1  explanation, then it's a -- when I object, then it's
2  because it's an issue related to form.
3      MS. DALY: You're wasting my time, and we've
4  already had two breaks and started at 10:00 o'clock.
5  So, please.
6      Q. Dr. Ritchie, I am interested in science because
7  that's what the court's going to be interested in, okay?
8  I want to know everything that you rely on to say that
9  perforation is related to fracture. Let's start with
10 that.
11      And if it's your intuition, that's fine, say
12 that. But I need to know every single thing that you
13 would even remotely testify about at trial in these
14 cases of why you think perforation leads to fracture.
15      A. With due respect, I think I've answered it,
16 but, I mean, first the -- the first, first issue is the
17 fact that the fracture surfaces indicate propagation in
18 different directions.
19      The second factor is that the constraint of any
20 wire will certainly elevate the stresses or strains,
21 particularly in the point where they fracture, which is
22 the pivot point where it comes out of the sheath. So
23 one would expect that to be a problem in terms of
24 elevating the stresses.
25      There is not quite anecdotal information, but

24 (Pages 90 - 93)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 94

1 there's information where there's been filters that have
2 had perforations and have also had fractures, and now we
3 have evidence where specific struts which are perforated
4 subsequently fracture. This is a pretty compelling
5 argument the two things are linked.
6        And now you look at some calculations and they
7 suggest what one would suspect in the first place, that
8 a perforated strut would have an elevated stress on it.
9 So that's the consistent picture of what you would say.
10    Q. Thank you. Does that information that you've
11 just recited allow you to know how often a perforating
12 strut will fracture?
13    A. No.
14    Q. Does it allow you to know what degree of
15 perforating strut will be the one that fractures?
16        MR. DALIMONTE: Objection.
17        THE DEPONENT: You mean how much it perforates?
18    Q. (By Ms. Daly) Correct.
19    A. Well, I'm sure those calculations could be
20 done. I haven't done them, of course. McMeeking may
21 have done them, I haven't seen them. But one could then
22 -- you could determine the degree of elevation of
23 stresses, but there's so many other factors, it's
24 difficult to do a calculation which, you know, takes
25 into account everything. So you have to talk in degrees

Page 95

1 of scientific certainty. It's not -- you can't be exact
2 on this.
3    Q. And so you -- you can't say whether it's more
4 probable than not that any --
5    A. I didn't say that.
6    Q. Wait a minute. Let me ask my question, then
7 you can answer.
8        You can't say, within a reasonable engineering
9 certainty, that it's more probable than not that any
10 given perforating strut is going to fracture.
11        MR. DALIMONTE: Objection.
12        THE DEPONENT: Well, you know, you're trying to
13 box me into a situation where there are a myriad of
14 factors that are involved, and so they all contribute.
15 I can say that a perforated strut will -- will almost
16 certainly see a higher stress on it or strain on it,
17 which will make it more likely to fracture, but -- and
18 that's certainly more likely than not, but to actually
19 go one stage further and say just because it perforates
20 it will fracture, you can't say that.
21    Q. (By Ms. Daly) And let me -- let me point you
22 to a study that I think you're familiar with. It's a
23 study that Coe and Peterson -- I'm sorry, Robertson did
24 in 2014, I think, where, interestingly, in studying
25 fractures they had almost exactly half the -- half the

Page 96

1 50 fractured filters came to them with no perforations
2 and half came with perforations. Are you familiar with
3 that?
4    A. Yeah, I've seen that study.
5    Q. Okay. So that study doesn't really provide us
6 with anything more than basically what you've just said,
7 that perforation and strut -- I mean perforation and
8 fracture can be seen in the same strut.
9    A. No. It's -- I mean, there's -- it could have
10 failed by some other reason prior to that. So you can't
11 say that. But, you know, that study is -- I wouldn't
12 say inconsistent, but it's not supportive, because
13 there's too many other things going on. And that's not
14 unusual in failure.
15    Q. And -- and let's go forward with that, because
16 you've said this multiple times to me in depositions and
17 you said it in your reports, that there is a complex
18 interaction of things going on in these filters that
19 will lead to any given complication, say fracture, tilt,
20 perforation; there's an interaction of things.
21    A. Well, I think -- yeah, it would be kind of
22 preposterous to think there wasn't. But there are --
23 there are -- I guess that's not the right word, but
24 abnormal modes of operations of filter. It can tilt; it
25 can migrate; it can perforate. And those situations

Page 97

1 will certainly change its function and change the
2 stresses on it.
3        If, just by thinking about it in general terms
4 a lot of these things you'd expect to cause an elevation
5 of local stresses. The material doesn't care where the
6 stresses and strains come from. So that increases the
7 likelihood of some of the other events occurring.
8        Now, whether tilt precedes migration or
9 migration precedes tilt is -- is a -- sort of almost an
10 impossible question to answer. But certainly these
11 adverse modes are not the way the filter was intended to
12 operate.
13        And what McMeeking has done is he's looked at
14 each of these and given some estimate of numerically
15 now, or at least a quantitative estimate, of what that
16 might factor the stresses. And I don't care whether
17 it's a factor of -- you know, whether it goes from 35 to
18 36 or 35 to 38; it's giving a trend that's important,
19 because we can't know these things precisely when we
20 look at the actual things.
21        So that's how I like McMeeking's work, because
22 it gives a totally different analysis. I'm looking at
23 the part -- I'm looking at the failure, and he's doing a
24 calculation, and the results are consistent. And that's
25 the way that science is generally done.

25 (Pages 94 - 97)

Robert Ritchie , Ph.D.                                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

| Page 98 |
|---|
1 Q. Well, will you agree with me that there could
2 be literally millions of different configurations of
3 this filter in a person and --
4     MR. DALIMONTE: Objection.
5 Q. (By Ms. Daly) -- let me give you thoughts on
6 that. So you've got 12 legs, right? You could have a
7 filter that was tilting from one degree to 180, I guess.
8 You could have two perforating legs that were side by
9 side. You could have two perforating legs that were at
10 12:00 o'clock and 6:00 o'clock, and any number of
11 combinations of that sort of thing. True?
12 A. Sure.
13 Q. So that a precise determination in a given
14 filter of what caused a fracture in that filter is, as
15 you've said, a complex thing to determine. True?
16     MR. DALIMONTE: Objection.
17     THE DEPONENT: Yeah, but you can say that if --
18 you know, if one leg broke then the stresses on the
19 remaining legs would be elevated. You could say that if
20 the filter tilted, there would be an argument that you
21 could think that it might be more likely to penetrate.
22 And so there are -- there are very reasonable conclusive
23 statements that you can make.
24     Now, do you have hundred percent scientific
25 proof? Science is not like that; it's very rare you

| Page 99 |
|---|
1 have that. So you put together a picture and you hope
2 to get input from totally different sources.
3     And McMeeking's calculations are completely
4 different to what I do in looking at a fracture surface.
5 You know, there obviously has to be, in any normal of
6 engineering, some degree of idealization. You couldn't
7 look at every one of these scenarios; there's a million
8 scenarios; you've talked about it. But you can
9 certainly pick up general trends.
10     And the converse of this is it would be absurd
11 to think the fact that if a filter lost a leg that it
12 will be less likely to have an adverse -- one of these
13 adverse events.
14 Q. But it may or may not.
15 A. Well, of course, because it all depends on the
16 individual -- also the individual person, you know, the
17 stiffness of their vena cava and what they're doing.
18 But -- but, you know, this is -- this is a medical
19 device that's put into a lot of people, and therefore
20 one would expect it to function in a fashion that
21 wouldn't cause so much distress and problems.
22 Q. Well, this is what -- what you've just said
23 about the complexity of it makes a determination of the
24 probability of event one causing event two difficult to
25 predict.

| Page 100 |
|---|
1 A. This is -- every --
2 Q. "Yes" or "no"?
3 A. I can't qualify that. Every fracture analysis
4 of everything that's ever failed, be it an aircraft,
5 it's no different. It's -- I mean, failures take place
6 because generally a multitude of events occur and --
7 problems, be it design or material or defects or stress,
8 and so you have to put together a consistent picture.
9 It's very difficult to say that one failed because --
10 that's just something not --
11 Q. Yeah, I understand what you're saying, and my
12 point beyond that is that makes it very difficult.
13 A. I think it makes it easier, because if there
14 was one thing wrong with this filter you could say,
15 "Yes, because it perforated." But there's so many
16 things wrong with it that -- that you don't need to say
17 that. You know, there's always something there; there's
18 always some weak link there to cause it.
19 Q. But you don't know the probability for any
20 given filter or all filters to fracture or not; you
21 don't know the probability of that?
22     MR. DALIMONTE: Objection.
23     THE DEPONENT: Well, there's statistics --
24 Q. (By Ms. Daly) That you don't do.
25 A. No, but I've read about them, and people have

| Page 101 |
|---|
1 looked at X number of filters that have ever been
2 implanted and find that X, Y percent failed by fracture,
3 and so there is that information which is the facts of
4 what has happened. But I look -- I'm at the other end
5 trying to understand. I know here --
6 Q. You're not trying to --
7     MR. DALIMONTE: Let him finish his --
8     MS. DALY: It's hard, because he continues for
9 a long time.
10     MR. DALIMONTE: He's a professor. Let him
11 finish what he was going to say.
12     THE DEPONENT: I've forgotten.
13 Q. (By Ms. Daly) Your role in this case is not to
14 figure out the probability of that happening, though, is
15 it?
16     MR. DALIMONTE: Objection.
17     THE DEPONENT: Well, I -- I don't think that
18 people like stress analysts like McMeeking and a person
19 like myself can actually do that. I think the
20 probabilities of failure have to be based on the
21 postmortem effects of looking at these devices, this --
22 we've got 60 devices here and 30 failed by this and 20
23 failed by that. That's where the statistics comes up.
24 That's almost impossible to predict.
25 (By Ms. Daly) All right. So -- so let me ask you a

26 (Pages 98 - 101)

Robert Ritchie , Ph.D.                                      June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 102

1 little bit more about McMeeking and reliance on him. In
2 some past depositions you said, very candidly, "I have
3 not attempted to verify what he's done."
4        Have you done anything now that you verified
5 assumptions that he made, verified calculations that he
6 did?
7    A. I wouldn't verify his calculations. I mean, he
8 is probably the finest stress analyst on the planet.
9    Q. How about verification of assumptions he used
10 to put in?
11   A. Oh, yeah, I will look at some of those. I
12 mean, I've talked to him a little bit about what -- what
13 he's assumed for fatigue limits, and some of the
14 material properties we've talked about, but far be it
15 for me to question his mechanics.
16   Q. Yeah, so let's put mechanics to the side. So
17 tell me what assumptions of his you have independently
18 verified.
19   A. Well, when we -- the main things have been on
20 material properties. I mean, we've -- we've had a
21 considerable problem understanding what BARD meant by
22 their fatigue properties because of their impreciseness
23 in quoting what they're measuring. So I've helped in
24 that regard and given some information. I've written a
25 lot of reports on this anyway, in the literature.

Page 103

1    Q. Have you given him any input to the method by
2 which he modeled the calculation?
3    A. No.
4    Q. So, for example, how he's -- how he's modeled
5 the -- the strut, how he's got it affixed in that model,
6 anything like that you --
7    A. Well, he's read my report, so he would -- he
8 would -- I don't know he'd have the benefit of that
9 information. He would know where the fatigue cracks
10 have formed and if they were defect-associated or
11 rim-associated, or what have you, but I don't think --
12 beyond that, no. I mean, he's -- he's aware of the
13 various modes of operation of these filters en vivo, and
14 he specifically went through and looked at each of these
15 various scenarios and tried to do an estimate of the
16 effect of these scenarios, right? And it's -- it's --
17 it's engineering.
18   Q. So when it comes to his -- to a description of
19 why the modeling was done as it was done, will you rely
20 on Dr. McMeeking to explain that, rather than you?
21   A. Yes, of course -- no -- what was the question?
22 Why the modeling was done, no --
23   Q. No, not why --
24   A. How.
25   Q. How the modeling was done.

Page 104

1    A. Yes, of course, of course.
2    Q. Okay.
3    A. I mean, we've worked together for a long time
4 and this is how we operate. We've always done it that
5 way.
6    Q. Did you look to see if there was any literature
7 out there that would lead you to believe that an
8 assumption that Dr. McMeeking has used is inaccurate,
9 for example, blood flow?
10   A. Not a priority. I've looked -- I mean, some of
11 the things that he's done I've looked at afterwards.
12 I've been intrigued by -- for example, he has some
13 theories about the vena cava and why it generates such
14 large displacements and so forth, and they're a little
15 different than what's been in the literature. So I've
16 just checked on some of those things. I find it kind of
17 interesting, actually.
18   Q. Have you looked at any of the literature he's
19 citing to as support for his assumptions to see -- to
20 see if, A, they actually support his assumptions or, B,
21 there may be other literature out there that
22 contradicts?
23   A. Well, I mean, I have looked at some of them. I
24 haven't done a specific study like that and gone through
25 every paper he's cited and seen whether he's done

Page 105

1 exactly the right conclusions and whether there's
2 alternative studies. There's always -- there's always
3 alternative studies. But I've certainly looked at --
4 I've found some of his notions very interesting. I
5 mean, so I'll follow up on some of that.
6    Q. So, again, with respect to the assumptions that
7 he used in these calculations, you have not done
8 anything to specifically verify them, and so you're
9 going to let him talk about that and where they came
10 from.
11   A. Well, you know, I -- he's a -- as I said, I'm
12 going to let him come up to deal with -- I teach
13 mechanics, but to the level he does it here is something
14 that I would defer to, if you want -- if that's the term
15 you want. So he would defer to me on the basis of
16 interpreting fracture surfaces.
17   Q. So let's look for a minute at exhibit -- your
18 Exhibit 4 for a minute. Okay, so Exhibit 4 is your
19 supplement on Denali and Meridian.
20   A. Yes.
21   Q. To the MDL.
22   A. Yes.
23   Q. Okay. You said you had looked at McMeeking's
24 Denali and Meridian report in the MDL as well.
25   A. It was this one.

27 (Pages 102 - 105)

Robert Ritchie , Ph.D.                    June 9, 2017
In Re: Bard IVC Filters Products Liability

**Page 106**

1   Q.  Which is 8.
2   A.  I think that was --
3   Q.  Eight is his Denali and Meridian.
4   A.  But it's -- no, it's also in here.
5   Q.  Okay.
6   A.  This predates that.
7   Q.  Okay.
8   A.  So most of what I said here pertains to this.
9   Q.  Okay, so most of what you said in your -- your
10  report which is Exhibit 4 is already contained in
11  Exhibit 7.  Okay.
12  A.  Well, I mean, that's what I'm referring to when
13  I say I -- I was in full agreement with his conclusions.
14  I'm referring to this -- not sure I'd even seen that by
15  April the 1st.  That's April 7th.
16  Q.  All right.  So let's do it this way.  When you
17  issued your report of April the 2nd, which is Exhibit
18  4 --
19  A.  Yes.
20  Q.  -- and said that you were in full agreement
21  with McMeeking's analysis, findings and conclusions with
22  respect to Denali and Meridian --
23  A.  Yes.
24  Q.  -- that was based on what he said in his report
25  that is Exhibit 7, correct?

**Page 107**

1   A.  Yes, at the time I wrote that, yes.
2   Q.  Okay.  Is there anything in his -- specific to
3   Denali and Meridian report which is Exhibit 8 --
4   A.  Yes.
5   Q.  -- that you are not in agreement with, about
6   Meridian and Denali?
7   A.  As I sit here now, I don't know anything that I
8   would be in disagreement with, no.
9   Q.  And so what were his basic conclusions, his
10  general conclusions about Meridian and Denali?
11  A.  Well, I mean, the basis, as I understood it,
12  was the fact that the -- the general design of these
13  filters from the -- let's forget Recovery for a second,
14  but from the G2 onwards were essentially similar.  And
15  from his perspective in calculating sort of
16  probabilities of whether they would migrate or tilt, his
17  general conclusions were that there wasn't much
18  difference.
19      The differences were somewhat cosmetic, like
20  the addition of a hook and so forth.  Some pertain to
21  me, with respect to the chamfer and the lack -- the
22  better situation with respect to defects after
23  electropolishing.
24      And these would obviously help.  But what he
25  focused on, and as I understood it in these reports, was

**Page 108**

1   the global stress situations associated with things like
2   tilting and with migration, penetration, and his
3   conclusions were largely that there wasn't that much
4   difference.  Now, there are these anchors that are put
5   on the Meridian and the Denali, and these may, indeed,
6   affect the degree of perforation to some degree, but the
7   general conclusions that I got out of it, McMeeking's
8   report was basically that.
9   Q.  Did -- did he use, as far as you ever
10  understood, the same kinds of assumptions for the Denali
11  and Meridian analysis that he used back for the G2?
12  A.  Yeah.  The only difference was that the -- you
13  know, the way that the Denali is made, you don't have
14  these issues of wires coming out of a -- of a sheath, so
15  -- so he -- but his effective statement was that the
16  general design was similar.  And so aside from the
17  locality of that region and the possibility of what
18  we've talked about, the chamfer and fretting, the
19  general design of these things was not that different.
20  Q.  And as I asked you about the earlier models
21  with the Meridian and the Denali, you have not done
22  anything to verify his calculations, the mechanics of
23  his calculations, right?
24  A.  No.  I would not do that.
25  Q.  And you have not found anything that you

**Page 109**

1   thought brought question to your mind about the accuracy
2   of his assumptions as they relate to Denali and
3   Meridian; is that right?
4   A.  That's right.
5       MR. DALIMONTE:  Objection.
6   Q.  (By Ms. Daly)  Okay, now --
7   A.  Just let me reiterate that.  My assessment of
8   the Meridian and Denali is based on what I read, right?
9   Q.  Right.
10  A.  And so I've -- I've not had the -- I don't --
11  you don't necessarily need to see everything to be able
12  to draw a conclusion, but I would -- I would -- I would
13  like to see these parts before I make a definitive
14  statement.
15  Q.  Have either you or Dr. McMeeking made an effort
16  to see how those little anchors on the Meridian and the
17  Denali may impact tilt, perforation or even fracture?
18  A.  Well, I can't speak for McMeeking, but
19  certainly I have not had the benefit.
20  Q.  Okay.  Do you know from any information what
21  the trending looks like for complications in Meridian
22  and Denali versus the earlier --
23  A.  Well, this is what I was trying to talk about
24  earlier.  The -- there are the statistics in, what was
25  it, "Barinsky" (sic) reports?  But what I've relied on

28 (Pages 106 - 109)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

**Page 110**

1 is the Bard fair analysis reports, and they -- as I've
2 said before, they give a plot of the year and the
3 numbers sold, and then there's various events,
4 introduction of the Meridian and so forth, and you can
5 watch the trends. And then there's also the adverse
6 events trends as well.
7      So if you look along those, for example, and
8 you look at the number of failures, the point when the
9 Denali came in, the failures tend to drop. It goes up.
10 It trends with the actual numbers sold, but then it
11 begins to drop, and you think, "Oh, that's interesting."
12      But what is, though, these numbers are
13 cumulative numbers, and so at the point when the Denali
14 was put in, there wasn't so many. There were selling
15 those rather than a previous one, and therefore there
16 would have been less time for those things to fail. So
17 those statistics are a little biased by the fact they're
18 cumulative, but -- but -- but --
19      Q.  But you're not going to testify about the
20 relative rates of any given complication in any given
21 Bard filter, are you?
22      A.  No. It's something -- I mean, I don't think I
23 would -- other people would do that better than I would;
24 it's certainly a bearing. But the point I tried to make
25 earlier was the fact that if you look at the locations

**Page 111**

1 where these things are failing -- and I'm referring here
2 to the -- where they emerged from the sheath in that 100
3 micron zone for arms, and in the foot or in the mid-leg
4 region for the legs, those seem remarkably similar
5 throughout the whole history.
6      Q.  And I'm going to talk about that in just a
7 minute with you. Did you see Dr. Fashing's report that
8 was specific to the Denali and the Meridian?
9      A.  I don't think so. I've never seen that one.
10      Q.  Okay, it was -- it was issued on May 11th.
11      A.  No, I haven't seen that.
12      Q.  Okay, and it has in it photographs and
13 examination of exemplar Meridians and Denalis; do you
14 know that?
15      A.  No, I haven't seen it. The last one I saw had
16 a picture of, I think, an exemplar Eclipse.
17      Q.  And with respect to the Denali and the Meridian
18 filters, since you had not seen an exemplar or a
19 retrieved Meridian and Denali, there was nothing new for
20 you to say in your role as an examiner of these filters.
21 True?
22      A.  Well, in the context of what you just said, in
23 my role as examiner, I mean, I haven't had the benefit
24 of looking at them, but -- but, you know, certainly the
25 Meridian -- Denali is a little different, of course, but

**Page 112**

1 the -- the design of the Meridian is -- apart from these
2 anchors, is -- is essentially identical throughout the
3 whole -- G2 there's a little hook and there's, you know,
4 electropolishing and so forth.
5      But the basic form of the filter is not that
6 different, and so most of the problems that are
7 resulting from that form, as opposed to local problems,
8 you wouldn't expect there to be a vast change in the
9 performance.
10      Q.  So -- so I'm clear, so even without having seen
11 an exemplar or a retrieved Eclipse, Meridian or Denali,
12 it is your opinion they are detective.
13      A.  I would say on the basis of looking at their
14 design; I would say on the basis of seeing some of the
15 statistics of failures, that, yes, they're defective. I
16 would feel more secure about that if I'd actually seen
17 one and seen if they failed.
18      Q.  And obviously since you haven't seen one, you
19 haven't done any of the kind of lab testing you've done
20 before on Nitinol to see what the characteristics were,
21 correct, for those filters?
22      A.  Well, the fatigue -- yes, I haven't seen how
23 they -- I haven't had a direct chance to look at them.
24      Q.  Nor have you done testing on the previous
25 models in that lab testing in that way on the previous

**Page 113**

1 models.
2      A.  Oh, sorry, it was a different question. I
3 thought you were referring to looking at the failures.
4 I've not tested; I've not done device testing.
5      Q.  Right. On any of these.
6      A.  No.
7      Q.  Okay. You've -- you've said a couple times
8 today that in looking at these Bard documents, which I'm
9 not precisely sure which ones you looked at, because
10 they weren't on your report reliance list so I haven't
11 refreshed myself. But at any rate, whatever you've
12 looked at, I'm going to get.
13      A.  Yeah.
14      Q.  You have said something like looking at the
15 Bard charts the events that you see are similar from one
16 filter model to the next. What's the similarity?
17      A.  Well, what I've said is that -- there are two
18 things that come out -- there's many things that are in
19 those documents by Bard, but there's two things that I
20 focused on. One was the number of adverse events as
21 functions, the number of devices sold, and there's an
22 almost one-to-one correlation with that.
23      But what I'm was referring to was after these
24 charts -- there's a little picture of a filter, right,
25 and it has arrows saying X number failed here, Y number

29 (Pages 110 - 113)

Robert Ritchie , Ph.D.                                        June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 114

1 failed here and so forth. And with regard to fracture,
2 if you look through the series all the way from early
3 2000s up to today, these things are failing in the same
4 locations -- in general, not specific now, but they're
5 failing. The arms are failing near where the wires come
6 out of it. They do make a distinction at the sheath and
7 a little bit away from the sheath, but they're always --
8 it's always, as we see here, more, 100 microns away.
9      And then when it comes to the feet, when it's
10 -- in the Recovery, it points to mostly in the feet,
11 which is what I see here. They have a bit more
12 statistics than I, of course. And then when it comes to
13 the G2 series, it's the feet and that mid-range. And
14 that's -- you see it virtually in every report.
15      Q.   So that's what you mean by similarities --
16      A.   Yes.
17      Q.   -- or model to model. Okay.
18      A.   Yes. I mean, there's slight differences in
19 these, in the G2, G2-X Meridian and Express, but the
20 basic design of the filter is much the same.
21      Q.   With respect to the frequency with which either
22 a foot fail -- foot fracture or an arm fracture happens,
23 starting with Recovery to Denali, you have not made that
24 analysis.
25      MR. DALIMONTE: Objection.

Page 115

1      THE DEPONENT: Well, it's -- it's -- it's in
2 these reports, the Barinsky (sic) -- I can't recall
3 exactly, but, you know, there's a higher -- I can't
4 remember the details, but it was a higher percentage of
5 failures in Recovery versus a G2 and so forth. So --
6      Q.   (By Ms. Daly) Okay. But you're not -- you're
7 not going to testify about the relative frequency of
8 those, are you?
9      A.   No, I mean, we would -- I mean, if, for
10 example, you cure one of the problems, like the defect
11 problem, then you might expect there to be a slightly
12 lower frequency of --
13      Q.   And that could be true if the chamfer
14 contribution --
15      A.   Exactly, but that's --
16      Q.   And that could be true with the --
17      MR. DALIMONTE: Well, let him --
18      THE DEPONENT: But these are rather imprecise
19 correlations from what we're talking about. So I think
20 that the statistics of people like Barinsky (sic) have
21 done where they've looked at all these failures and
22 categorized them whether they're leg, foot or migration
23 will speak for themselves, but I'm not going to rely on
24 those, no.
25      Q.   (By Ms. Daly) And you're speaking now about

Page 116

1 Betensky's work.
2      A.   Yes.
3      Q.   So let me follow up. Chamfer is one of those
4 examples that the chamfer change, in your view, may well
5 improve fracture resistance.
6      A.   The chamfer change -- well, certainly would
7 help improve -- it would help alleviate one of the
8 problems, definitely. I think the one that I saw in the
9 Express, though, has not gone far enough, but it's
10 certainly better than one sharp corner.
11      Q.   And then you would agree that the
12 electropolishing is another way that would improve, in
13 your mind, fracture resistance for these filters.
14      A.   That undoubtedly did, and that was way too
15 late, but that undoubtedly would, yes.
16      Q.   Okay. And then with respect to fracturing in
17 the foot, the change to the G2 and the slightly larger
18 wire would also assist in fracture resistance at that
19 point.
20      A.   Yes, it would, certainly.
21      Q.   All right. Let's talk about Bard testing of
22 filters for a moment.
23      A.   Okay.
24      Q.   Your information about Bard testing, does it
25 come from you reviewing the testing or McMeeking's

Page 117

1 comments on the testing?
2      A.   No, it's not -- I looked at them in more detail
3 in the early days, but my -- I have a general philosophy
4 on the testing. Let me just say this for a second, that
5 I work for Rolls Royce as a consultant, and they have a
6 number of extremely difficult scenarios. And to
7 understand what's going on in the testing, they generate
8 a test that reproduces the -- the problem.
9      And Bard consistently has participated in a
10 series of tests that have virtually never reproduced the
11 problem when it comes to fracture. And so the problem
12 with that is you're clearly not testing the right thing;
13 you're not doing the right thing.
14      So the details of the test are almost less
15 important, but if you've got a test where everything
16 passes and yet you put it in people's bodies and things
17 are happening -- you know, the actual implant in the
18 body is the better test, and so your lab test is
19 obviously not reflecting reality.
20      So that's been my general criticism of Bard is
21 that they've -- whether they've done tests too fast or
22 haven't put a sufficiently large deflexion of the wires,
23 those are just details, but they haven't simulated
24 what's going on.
25      Q.   And have you done any work to determine how a

30 (Pages 114 - 117)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

**Page 118**

1 test protocol could be done for this device that would
2 simulate those things?
3      A.  Well, that's -- you know, that's something that
4 -- that -- I have not done that, but that's something
5 that Bard would need to do.  I mean --
6      Q.  So just -- just --
7      MR. DALIMONTE:  Object.
8      THE DEPONENT:  I mean, initially it may be that
9 they were a little bit lax, but -- but, you know, this
10 has been going on for many, many years and so they've
11 known they've had problems.  And so I think some of the
12 -- maybe the money they made from selling these things
13 could have been usefully spent to try and develop a
14 better way of assessing the problem.
15      Q.  (By Ms. Daly) Let me move to the next
16 question, please.  So you agree that you have not tried
17 to come up with any test protocol that could be used to
18 simulate the things that you're saying Bard was unable
19 to do, or failed to do.
20      MR. DALIMONTE:  Objection.
21      THE DEPONENT:  Well, that's not something that
22 I would do, but --
23      Q.  (By Ms. Daly) Okay.  And even if there were
24 those test protocols, would you agree with me that you
25 would have to test the protocols to see if it in fact

**Page 119**

1 simulated what you were trying to simulate?
2      A.  Of course.  You have to develop a test which
3 reflects at least some of the reality of the failures.
4 And if you've got a test where all your parts are
5 passing, and then when they're put in, implanted in
6 someone's body and failing, then you have a problem, and
7 maybe you should be using a larger displacement or a
8 different halls duplicate or something, but I -- I saw
9 no evidence that they -- they did much of that.
10      Q.  And you don't know how it would be done,
11 because you haven't tried to do it.
12      A.  Well, I haven't tried to it, but there are -- I
13 mean, for example, if you were worried about, you know,
14 the displacement of the vena cava, and you've assumed a
15 certain value and all your components pass and then when
16 they get put in people's body they fail, you might think
17 that you might want to use maybe a larger displacement
18 and things like that, you know.
19      I mean, there's a lot of scenarios that one has
20 to do that -- certainly aerospace goes to extreme
21 lengths to do this, and you find the one that somehow
22 gives you a simulation of what you're trying to correct.
23      But if you're doing tests and saying, "Gee,
24 everything passed," then -- and yet the components are
25 still failing, there's something wrong with that

**Page 120**

1 picture, as you know.  So that's -- that's the issue
2 I've had.
3      Q.  Yeah.  And I think you've answered my question.
4 My question is simply you -- you have not yourself
5 developed any test protocol that would allow this to be
6 simulated, the complications that you're concerned about
7 to be simulated; you yourself have not done that?
8 That's my only question.
9      A.  No, I wouldn't do that.
10      Q.  Okay.  Have you done a study of how other IVC
11 filter manufacturers have done the full measure of
12 testing?
13      A.  Superficially.  I mean, I haven't looked at --
14 I've seen a little bit of what Cook's done, but that's
15 all.
16      Q.  Okay.  Now, you've said in the past, and today
17 too, Bard -- Bard filters' tilt may cause fracture.
18 We've talked a little about perforation.  Tilting
19 leading to fracture.  What is the basis for your opinion
20 that tilt may lead to fracture?
21      MR. DALIMONTE:  Objection; asked and answered.
22      THE DEPONENT:  Well, I mean, again, it's -- I
23 mean, the design of these devices is such that it's very
24 difficult to stop them tilting, of course.  The
25 possibility of -- of leg failures, which seem to be, I

**Page 121**

1 think, partly related to the design, will certainly lead
2 to tilting.
3      Tilting has the potential to -- to lead to
4 perforation because you get an unbanded situation and
5 you also have -- if there's a leg failure, then stresses
6 in the other part -- other legs would be actually
7 increased.  So these things are all inter-related.  And
8 I can't recall exactly, but I think some of the
9 statistics that Barinsky (sic) has looked at seem to
10 support that there's a relationship there.
11      Q.  (By Ms. Daly) Have you seen any medical
12 literature, any studies, that demonstrate that tilt in
13 an IVC filter leads to perforation -- sorry, leads to
14 fracture?
15      A.  No.  I think we're -- we're in these same
16 situations again.  It's -- it would be very difficult.
17 I've not seen that.  I don't think there may -- they may
18 not even be there, because it -- you have to have it in
19 for a long time and follow it precisely and so forth.
20      Q.  Following up on that, then, have you seen
21 anything that gives a estimate of probability of tilt,
22 how often a tilt would lead to fracture?
23      MR. DALIMONTE:  Objection.
24      THE DEPONENT:  I don't think I've seen that,
25 no.

31 (Pages 118 - 121)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 122

1    Q.   (By Ms. Daly)  How about any work on the
2 quantity of your tilt necessary to lead to fracture?
3 For example, five degrees more than fifteen degrees, do
4 you know how any relative degree of tilt would be more
5 likely or less likely to cause fracture?
6    A.   Well, I know that tilts of about -- above about
7 58 80 percent, the filter becomes pretty well inactive.
8 And the more you expose -- the more you tilt, the more
9 you expose individual wires for the possibility of
10 perforating.  But the exact relationship between tilt
11 and fracture is difficult to say.
12    Q.   And what do you -- what do you mean when
13 there's a -- you said something about over 15 degrees,
14 something about inaction?
15    A.   Well, I've -- I've -- some of the reports say
16 once a filter gets above about -- a sufficiently large
17 tilt, like 15 degrees, then it's basically
18 non-functional.
19    Q.   Oh.  Can you --
20    A.   I'm just -- I'm just repeating what I've read,
21 something that I --
22    Q.   Can you think what that article is while we're
23 sitting here?
24    A.   I think it was in -- is it the Parisian report
25 -- there's a -- what's the name of that?  There's a

Page 123

1 report that goes through the history of -- it's by a
2 woman who used to work for the FDA.
3    Q.   Oh, Parisian?
4    A.   Parisian, that's right.  There's a comment in
5 there about that.
6    Q.   Oh.  I'm just wondering -- she's an expert in
7 the -- in the case.  I'm just wondering whether you're
8 aware of any medical study that talks about that.
9    A.   No.
10    Q.   Okay.  Do you -- have you looked at all at the
11 issue of whether electropolishing has any impact on
12 tilt?
13    A.   No, I haven't.  One could conceive that the
14 smoother surface may have a somewhat less of a
15 frictional resistance at the site of the vena cava, but
16 between you and me, I don't think it would have any
17 effect at all.
18    Q.   How about the Meridian and Denali additions of
19 the anchors relative to tilt?  Do you think that could
20 have had an impact on improving --
21    A.   I can't remember, but they certainly would have
22 had an impact, but I -- I don't recall the statistics of
23 what that was.
24    Q.   Okay.  And you haven't studied the mechanism by
25 which they might or might not improve tilt.

Page 124

1    A.   You know, peripherally they have little, these
2 little -- doesn't the Denali have a little plate --
3 these things could all influence it.  I haven't done a
4 precise study on it.
5    Q.   Now let's talk about tilt as it relates to
6 perforation for a moment.  What do you rely on to opine
7 that tilt can lead to perforation?
8    A.   Well, again, it's -- there's a series --
9 McMeeking has done calculations on this and has certain
10 theories, but my feeling on this has been that -- that
11 there's a linkage with some -- with migration as well.
12        Some degree of tilt means that you've got an
13 anchor that's not anchored, and that means that the
14 ability of the filter to move is obviously elevated
15 because you're not fully anchored.  Once the filter
16 starts to move, the probability of perforation is
17 likely, and all these things relate to the possibility
18 of fracture and -- because that's what we talked about
19 earlier with the crack growing in different directions.
20        So I've -- I've always seen this as what I call
21 a vicious circle.  It's a synergy of events.  And I
22 think what McMeeking has been able to do is to show that
23 some of these scenarios -- and the details are in here
24 -- will elevate the stresses and so forth.  So all this
25 seems to be a reasonably consistent picture.

Page 125

1    Q.   So a given -- a given tilt may result in
2 perforation, true?
3        MR. DALIMONTE:  Objection.
4        THE DEPONENT:  Of course.
5    Q.   (By Ms. Daly)  Okay.  But you have not been
6 able to drill down to determine what degree of tilt, for
7 example, would result in what perforation or where in
8 the filter; is that fair?
9    A.   Yeah, but there's so many other variables that
10 are involved, so it depends on -- it would be difficult
11 to do that precisely, but no, I haven't done that.
12    Q.   And have you done any work to determine the
13 probability of perforation in the face of any particular
14 degree of tilt?
15    A.   I haven't done that, no.
16    Q.   Do you know if that's ever been studied in the
17 literature?
18    A.   Not -- not to my knowledge.  I mean, you've got
19 the statistics of the failures where you could sort of
20 piece something together.  And if you looked at some of
21 McMeeking's calculations, you might be able to say,
22 "Well, certain scenarios would give rise to a higher
23 stress and therefore likely to be a higher probability,"
24 but I don't think there's any definitive studies on it.
25 You could do a definitive study on it.

32 (Pages 122 - 125)

Robert Ritchie , Ph.D.                                           June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 126

1  Q.  You don't think you could or --
2      MR. DALIMONTE: Objection.
3      THE DEPONENT: It would be very difficult.
4  Q.  (By Ms. Daly)  Okay.  Have you looked at all at
5  the issue of tilt in non-Bard filters?
6  A.  Peripherally with the Cook filters.
7  Q.  Are you familiar with, for example, Druack's
8  study of the Tulip and Celect filters?
9  A.  Yeah, I've looked at that.  I don't recall the
10 detail, but I've looked at that.
11 Q.  His finding was 30 percent of Tulips tilting
12 and 48 percent of Cooks tilting.  Does that --
13 A.  Yeah.
14 Q.  Do you recall that?  Are you also familiar with
15 the Zhou, Z-h-o-u study of Cook Celect showing a 73
16 percent tilt, 73 percent of filters tilting --
17 A.  Yeah, I did a Cook report some time ago and I
18 remember those things.  I haven't looked recently.
19 Q.  All right.  Let's talk just a little more about
20 perforation.  We've talked a good bit about that.  Have
21 you looked at medical literature about the
22 susceptibility or lack thereof of perforation in Bard
23 filters?
24 A.  I -- I've seen papers, yes, that talk about
25 that, yes.

Page 127

1  Q.  Do you remember what papers?
2  A.  Not offhand, but, I mean, I -- I -- I mean, I
3  remember the original Hull and Robinson papers.  There's
4  been -- some are referenced in here.
5  Q.  And the Hull one, that was a -- you remember
6  that was a small study of --
7  A.  Yeah, small study.
8  Q.  -- 14.  Okay.
9  A.  But, you know, with these things -- well, I'm
10 was going to say, you talk about reliance on McMeeking,
11 that some of the calculations that he does show
12 alarmingly large increases in strain associated with
13 perforations.  And if you compare those numbers with the
14 fatigue limits, then it would suggest rather short
15 fatigue lives, right?
16     So, again, I'm not saying that those numbers
17 you can rely on precisely, but the magnitude of those
18 effects is sufficiently large that it's consistent with
19 what you've called my hypothesis.
20 Q.  Well, let's talk about that short fatigue life
21 you talk about from McMeeking's work, okay?  Based on
22 your review of his work, is it your conclusion that
23 those strains that he's calculated will lead to quick
24 fatigue of parts of the filter?
25     MR. DALIMONTE: Objection.

Page 128

1      THE DEPONENT: Well, you see, this is where law
2  and engineering have a problem.  The -- the fatigue life
3  is something like a function of the tenth power of the
4  stress, so it takes a little teeny bit of stress to get
5  a huge change in life.  So all I'm saying is that when
6  you see a big number, it means that the probability of
7  that happening is more likely than if it was a small
8  number, right?  I'm not -- I'm not saying McMeeking's
9  calculations say they all should fail in fifteen cycles;
10 life's certainly not like that.  You can't say you're
11 going to die after 30 years; you might die after 50 or
12 60, that kind of thing.
13     But I think what I find compelling of that is I
14 think in numbers of whether they're small or large,
15 basically, not the absolute values, and I think some of
16 these -- these calculations that show, for example, a
17 perforation could cause a pretty large elevation of
18 stress or break or strain are very compelling.
19 Q.  And I guess that was really my point, was
20 whether anything that you've taken from McMeeking allows
21 you to give any opinion on the probability of a
22 complication happening over some set period of time.
23 A.  That's a good question.  It's very difficult to
24 answer.  There's too many -- too many other variables,
25 so you can't -- you really can't, "It's high, low or

Page 129

1  medium," but it's -- you couldn't -- it's very difficult
2  to put a number on.  Maybe a statistician could.  I
3  couldn't do that.  There's too many other variables.
4  Q.  And, again, this takes us back to what we were
5  talking about before.  It's not just a matter of this
6  one's tilting and we're going to calculate out a
7  probability of fracture; it could be tilting a certain
8  degree --
9  A.  Yeah, exactly, yeah.
10 Q.  It could be tilting with perforation; it could
11 be tilting without perforation.  Many variables.
12 A.  Yeah, but you can at least get some trends.
13 You can say that if it tilts, something happens; it if
14 migrates, something happens, and these numbers are then
15 consistent with the overall picture of the more complex
16 state.
17 Q.  And are you -- are you familiar with the
18 studies of, for example, Cook filters and perforation
19 percentages in those filters?
20 A.  I have looked.  I don't recall, but I've looked
21 at them, yeah.
22 Q.  Do you recall in Zhou -- again, it's the Zhou
23 that's spelled Z-h-o-u --
24 A.  Yeah.
25 Q.  That he reported a 90 — I'm sorry, he reported

33 (Pages 126 - 129)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

---

**Page 130**

1  an 86 percent perforation rate in Cook Celect?
2     A.  Yeah, I seem to recall --
3     Q.  It was high?
4     A.  It was high, yes.
5     Q.  And Durack studied the Tulip and reported a 93
6  percent perforation; is that right?
7     A.  Yeah.
8     Q.  Okay.  We talked earlier about your definition
9  of "prone" and "susceptibility" that you've stated in
10 your reports.
11    A.  Yes.
12    Q.  I'm moving to something else.  In your report
13 of April 1, 2017 -- let me find it.
14    A.  No. 4, right?  This one?
15       MR. DALIMONTE:  What report were you referring
16 to?  His original?
17       MS. DALY:  No, April.
18       THE DEPONENT:  Supplementary report, Meridian
19 and Denali.
20       MS. DALY:  I've got to go in search of it.
21       THE DEPONENT:  Oh, there's another one here.
22 There's two of them.
23    Q.  (By Ms. Daly)  Yeah.  The one I wanted was the
24 rebuttal, Rebuttal to Defendant's Expert Opinions.
25    A.  Okay.  I've got it.  That's No. 3.

**Page 131**

1     Q.  All right.  In that report, let's look at Page
2  5, and at the beginning of paragraph -- third full
3  paragraph that begins "In conclusion."
4     A.  Uh-huh.
5     Q.  Okay.  Hold on one second.  Okay.  It says:
6        "In conclusion, Dr. Fashing appears to
7        be pointing to individual factors that
8        contributed to" --
9     This is the quote I'm going to ask you about:
10       "...the totally unacceptable fatigue
11       failure rate of the Bard IVC filters."
12    Do you see that?
13    A.  Yes.
14    Q.  All right.  Then several lines down, seven
15 lines down, you say:
16       "Bard filters displayed an
17       unacceptably high incidence of filter
18       fractures."
19    A.  Uh-huh.
20    Q.  That's what I want to ask you about.
21    A.  Uh-huh.
22    Q.  What is -- what do you mean when you use the
23 term, "unacceptably high," in this context?
24    A.  It's -- it's -- I mean, we're talking about a
25 device which has suffered a high percentage of

---

**Page 132**

1  fractures.  I can't remember the numbers now, but in the
2  studies I've looked at they've been pretty severe.  And
3  I think it's incumbent upon a medical device company to
4  design something which does not have such a large
5  failure rate.  I'm using the term loosely, but I think
6  it's certainly -- if we were going to have one of those
7  things put in and we saw the failure rates, to me, that
8  would be an unacceptable failure rate.
9     Q.  Okay.  So who is it unacceptably high to?  Are
10 you saying from your perspective?
11    A.  Of course, from my perspective, but I think
12 anybody's perspective who looked at those numbers.
13    Q.  Has the FDA said it's an unacceptably high
14 rate?
15       MR. DALIMONTE:  Objection.
16       THE DEPONENT:  I don't know.
17    Q.  (By Ms. Daly)  How about the Society of
18 Interventional Radiologists?  Have they made any such
19 statements?
20       MR. DALIMONTE:  Objection.
21       THE DEPONENT:  I don't know.
22    Q.  (By Ms. Daly)  Are you aware of any
23 organization that's concluded that Bard filters have an
24 unacceptably high incidence of any kind of complication?
25    A.  Any organization?

**Page 133**

1     Q.  Yeah.
2     A.  Offhand I can't say.
3     Q.  When you used the term "unacceptably high
4  incidence," were you speaking of as to fracture or any
5  other type of complication for the Bard filters?
6     A.  Well, I use the term "unacceptable fatigue
7  failure rate," so I'm referring specifically there to
8  the -- I mean, components that are put in the body
9  should not fatigue, because that's -- that's a very
10 severe problem.  And the -- the numbers -- the
11 statistics of these, these fractures are particularly
12 high.  So in my terminology they're unacceptable.
13       It would be hard for me to believe that
14 organizations have not made a comment about it, but I
15 haven't read all the FDA stuff, so I can't comment on
16 that, but it certainly would be a surprise to me if they
17 didn't.
18    Q.  Do you hold the opinion that there's any other
19 complication in the Bard filter that is at the
20 unacceptably high rate, in your opinion ?
21    A.  Well, again, it's a -- it's a personal
22 statement, but I think since -- since the fractures are
23 all related to perforations, can be related to
24 perforations and tilts and so forth, these filters were
25 functioning in a situation that led to adverse events.

---

34 (Pages 130 - 133)

Robert Ritchie , Ph.D.                    June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 134

1  These are documented in more data and so forth, so --
2  but I don't know who's -- whether the Society of
3  Interventional Cardiologists have actually made comments
4  on those; I've not read those, but I'd be surprised if
5  they didn't.
6      Q.  How are you -- how are you coming up with a
7  determination of what the incidence of these various
8  complications are in Bard in order for you to say
9  they're unacceptably high?
10     A.  Well, I've -- I mean, there's a whole set of
11 data bases.  I've looked at certain papers which have
12 done smaller studies with numbers -- like 40 percent
13 failures have been seen.  That's obviously a small
14 study.  There's more data that has -- there's -- what do
15 they call it -- Labinski (sic) report or something?
16     Q.  Betensky.
17     A.  Betensky report -- that lists some of these
18 things.  These -- these -- these seem extremely high to
19 me, and my understanding of general engineering, these
20 are unacceptably high.
21     Q.  What is the -- what is the study that you're
22 talking about that's 40 percent rate of what?
23     A.  Oh, there was -- some of the -- I remember
24 having an interchange with Richard North about this,
25 that some of the earlier studies that I list in here --

Page 135

1  I think they're cited in here, where they looked and
2  they saw a large number of failures.  Nicholson or
3  something like that was one, I think.  There's a number
4  of them and they're, of course, small studies, so they
5  don't -- they don't portray the overall statistics which
6  come out of --
7      Q.  And they may -- they may over-state them for
8  some reason.
9      A.  Of course, yeah, because it's a small study.
10     Q.  So --
11     A.  But if you've got a device -- I mean, if you
12 just compare the Simon filter with the Ash -- study that
13 Ash did.  Ash had a very small duration of filters being
14 implanted and got -- got several adverse events in that
15 study, which in -- percentage-wise was far greater of
16 the whole history like the Simon.  So -- so there's --
17 there's a lot of evidence here that this was not an
18 acceptable --
19     Q.  Okay.
20         MR. DALIMONTE:  Let him finish.
21         THE DEPONENT:  -- place.
22     Q.  (By Ms. Daly)  Okay, so let's talk about Ash.
23 You just put a whole lot out there.  You just said that
24 the Ash study had a number of reported complications.
25     A.  Yes.

Page 136

1      Q.  Okay.  Which ones are you thinking of?
2      A.  Well, there was -- there was one fracture, of
3  course, and there was a number of -- I think it was
4  instances of tilt and a little -- and migrations.  This
5  was all very early.  And if you took -- what did he do?
6  He looked at 27 patients or something.  You looked at
7  the number of those, that was a -- and they were -- the
8  filters were implanted for a relatively short period of
9  time.  The rate of adverse events was far in excess of
10 what the history of the Simon filter had been, so --
11     Q.  How do you know that?
12     A.  Because that's what I've read.
13     Q.  How do you know what the experience of the
14 Simon Nitinol filter was up to the time that Ash did
15 that study and how it -- how it would compare?
16     A.  Well, I -- I think that's -- I read that in
17 some of the reports.  I think that was in this Parisian
18 report as well.
19     Q.  Okay.  So in the Ash study there was one
20 asymptomatic migration.  Do you recall that?
21     A.  Yeah, something like that.
22     Q.  How many migrations were there in Simon Nitinol
23 filters?
24     A.  Offhand, I can't remember, but -- but we're
25 looking -- and what we're not -- what we're not

Page 137

1  comparing is not numbers but rates.  There was a very
2  small study where filters were in for a short period of
3  time, and we're comparing with a somewhat larger study
4  of the past.  And so all I'm saying is that there were
5  indications immediately that there were -- that there
6  was -- there was situations that could have been looked
7  at.
8      Q.  There were also a number of studies -- I
9  noticed you didn't cite any of them -- that had zero
10 complication issues for Bard filters in those studies.
11         MR. DALIMONTE:  Objection.
12     Q.  (By Ms. Daly)  So my point is -- my point is
13 you didn't make a -- an exhaustive review of all studies
14 of Bard filters to see what each one of them determined.
15 Fair --
16         MR. DALIMONTE:  Objection.
17     Q.  (By Ms. Daly)  -- to say?
18     A.  No, but, I mean, there has been studies on the
19 statistics of adverse events in these devices, and I've
20 certainly read about those, and it would be very hard to
21 argue that the failure rate, particularly due to
22 fracture of a Bard filter, was acceptable.
23     Q.  What study is there that has done a statistical
24 review of fracture in a Bard filter?
25     A.  Well, there's -- there's the statistics of --

35 (Pages 134 - 137)

Robert Ritchie , Ph.D.                                      June 9, 2017
In Re: Bard IVC Filters Products Liability

**Page 138**

1  of -- I mean, there's -- there's the MAUDE data that has
2  the adverse events, right?  There's a number of --
3  those statistics can be somewhat flawed, but they list
4  the number of filters that have failed in a certain way,
5  and there's the Barinsky (sic) report which has the
6  statistics of different failure rates, so -- and I can't
7  remember exactly the numbers of what those rates are
8  offhand, but -- but --
9      Q.  You have not done a review to come up with a
10  statistical analysis of rates of any complication with a
11  Bard filter, fair?
12      A.  I'm just looking at -- I'm just reading people
13  who have done those things.
14      Q.  And really, Betensky, I think you're aware of
15  Betensky is the expert for plaintiffs in this case who
16  is a statistician; you know that?
17      A.  Yes, of course.
18      Q.  Okay.  Would you defer to her on her analysis
19  of what the statistics show?
20      A.  Well, she probably knows more about statistics
21  than I do.
22      Q.  So you would defer to her?
23      A.  I guess I would, yes.
24      Q.  Okay.  We have talked about this before, and I
25  want to be sure that I am absolutely clear on what it is

**Page 139**

1  you're saying on this one point in this litigation.
2      Is it your opinion that it is more likely than
3  not that any given Bard filter that is in situ will
4  fracture?
5      MR. DALIMONTE: Objection.
6      THE DEPONENT: I can't say that.
7      Q.  (By Ms. Daly) Okay.  Same question with any
8  Bard filter in situ; more likely than not that it will
9  perforate or tilt or migrate?
10      MR. DALIMONTE: Objection.
11      THE DEPONENT: Well, I mean, the more likely
12  than not means you -- you're talking greater than 51
13  percent, so --
14      Q.  (By Ms. Daly) Greater than 50 percent.
15      A.  Well, you can't say that.
16      Q.  Let's talk a minute about Betensky, if we
17  could.  You did not really discuss her analysis in your
18  report; you -- you
19      A.  No, I don't.
20      Q.  Yeah, in Exhibit 2 you comment on her report at
21  Page 4.
22      A.  Mainly because I was -- my focus has been on
23  identifying the fracture and trying to understand what
24  -- what's causing these fractures, and so --
25      Q.  So what you put in your report at Page 4, was

**Page 140**

1  that just a drop-in from her report, as opposed to --
2  what I mean is, as opposed to your having done some
3  analysis of her analysis?
4      A.  Oh, no, no.  Yes, I mean, it's almost
5  background that it's -- that I used that, because it was
6  a -- it indicates that there are specific functions of
7  these filters which are, dare I say it, characteristic.
8  And so she had the data for that, so that's why I put it
9  in.
10      Q.  Have you ever discussed her analysis with her?
11      A.  No.
12      Q.  Have you read the Excel spreadsheets or
13  reviewed the Excel spreadsheets that she created as part
14  of that report?
15      A.  I don't think I've gone in any detail, no.
16      Q.  So I take it you have not undertaken to verify
17  what her analysis was.
18      A.  No.
19      MR. DALIMONTE: Objection.
20      Q.  (By Ms. Daly) Was that a "no"?
21      A.  "No."
22      Q.  Did you provide her any information?
23      A.  No, I did not.
24      Q.  Okay.  And I take it you didn't write any part
25  of her report.

**Page 141**

1      A.  No.
2      Q.  Have you read the report of Bard
3  biostatistician -- his name is Ronald Thisted?
4      A.  Don't believe so.
5      Q.  Have you ever heard of him?
6      A.  No.
7      Q.  University of Chicago?
8      A.  Never heard of him.
9      Q.  Okay.  Do you know with any specificity the
10  methodology by which Dr. Betensky -- which Dr. Betensky
11  employed to reach her conclusions?
12      A.  Yeah, I mean, I have a footnote here which -- I
13  mean, I was more interested in just getting a general
14  feeling for the -- the -- what problems this particular
15  filter had, or filters had, and how they -- so, I mean,
16  she has this risk ratio which seemed like -- I mean, I
17  didn't go into great detail, but it indicates whether
18  something is more likely than not.  So that's what I was
19  -- I didn't go into any great detail.
20      I mean, just for example, it says here the
21  Eclipse has a particularly low number, but that's
22  because there wasn't so many Eclipses put in.  So,
23  again, statistics are a little bit tilted by that,
24  but --
25      Q.  Did —

36 (Pages 138 - 141)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

<table>
<tr><td>

**Page 142**

1      MR. DALIMONTE: Let him finish.
2      Q.   (By Ms. Daly) Go ahead.
3      A.   I mean, really I'm just giving a bit of
4  background there that indicates what's --
5      Q.   I noticed it was in the introduction.
6      A.   Yeah.
7      Q.   So did you understand that her analysis was
8  comparing the Bard filters after Simon Nitinol to the
9  Simon Nitinol?
10     A.   As I understood it, yes.
11     Q.   Rather than against some other filter on the
12  market.
13     A.   Yes.
14     Q.   And did you notice that she, between her --
15  well, have you seen her second report? She had an MDL
16  report and then a rebuttal report. Have you seen that?
17     A.   I've not seen the rebuttal.
18     Q.   Okay. Do you know that she speaks of risk
19  ratios and then reporting risk ratios?
20     A.   I don't recall that, actually.
21     Q.   Do you know the difference between those?
22     A.   Well, I can guess what it is.
23     Q.   From a biostatistician's standpoint, do you
24  know?
25     A.   No.

</td><td>

**Page 144**

1  2. We're off the record at 1:58 p.m.
2           (Recess)
3      VIDEOGRAPHER: We're back on the record. This
4  marks the beginning of Disk No. 3 in the deposition of
5  Robert O. Ritchie, Ph.D. The time is 2:09 p.m.
6      Q.   (By Ms. Daly) Dr. Ritchie, would you glance at
7  the CV that is with your Report No. 2?
8      A.   The CV?
9      Q.   Your CV should have been in there.
10     A.   Yes, it is. Should be.
11     Q.   Is it? Unless I cut it off and didn't do it.
12     A.   Yes, there it is.
13     Q.   Can you just glance at that and tell me if that
14  is your up-to-date one? This is done so recently, I
15  assume it was, but if there's anything that is missing.
16     A.   Well, the only thing, it's probably irrelevant,
17  but I was made a Fellow of the Royal Society this month.
18     Q.   Oh, congratulations.
19     A.   I was -- signed the book signed by Newton. But
20  that's the only thing.
21     Q.   Okay. So let's talk about your bills for a
22  minute. Let's make this Exhibit 10.
23           (Whereupon, Exhibit No. 10 was marked for
24           identification.)
25     Q.   You handed me this this morning. Let me just

</td></tr>
<tr><td>

**Page 143**

1      Q.   Okay. Are you of the opinion that the Simon
2  Nitinol filter is an alternative, safer product than any
3  of the later Bard filters?
4      A.   Well, again, that speaks to -- I mean, what do
5  you mean by "safer"? I mean, it was -- as I understand
6  it, it was less likely to migrate. It had a -- it was
7  -- it was not -- it was a permanent filter, as I
8  understand it. So I -- I just -- I think that in terms
9  of its rates of adverse events, they were less than --
10  than -- than the Recovery, and maybe the subsequent G2s,
11  but the safety with regard to medical, I don't know. I
12  mean, it's -- it's -- it's -- with this little bit at
13  the top which is pushed against the vena cava, it seemed
14  in principle to be less likely to migrate and so forth
15  and I think the statistics support that.
16     Q.   And do you understand that, insofar as it being
17  an alternative product for the later generations of
18  Bard, it was solely a permanent filter; it couldn't --
19     A.   Exactly, exactly. I mean, the whole basis of
20  the Recovery, it was -- where the name comes from.
21     Q.   Okay.
22     A.   Could we, per chance, take a -
23     Q.   That would be helpful, because I can get myself
24  organized to work on wrapping up.
25     VIDEOGRAPHER: This marks the end of Disk No.

</td><td>

**Page 145**

1  hand you that and ask you to tell us what work that
2  covers.
3      A.   Well, the first one was just the meeting last
4  year on -- with all the lawyers about these cases.
5  That's --
6      Q.   Oh, I should have marked that. So that was
7  March 11th, 2006 --
8      MR. DALIMONTE: Hold on.
9      MS. DALY: You better look at that.
10     THE DEPONENT: And that's one's -- that's the
11  bill for this.
12     MR. DALIMONTE: Right. Yep. Okay.
13     MS. DALY: So let me just make the second page
14  11.
15           (Whereupon, Exhibit 11 was
16           marked for identification.)
17     MR. DALIMONTE: I would like to note on the
18  record, however, we should -- well, never mind.
19     Q.   (By Ms. Daly) Okay. So let me ask you this,
20  to get it clear. Eleven is work done in March of `16.
21  Was that on any particular report or was that just
22  general work with the plaintiff's attorneys?
23     A.   No, no, that was -- actually that's a rebill.
24  I think the event was -- these are the only two bills
25  I've had since there's been consolidated cases dealt

</td></tr>
</table>

37 (Pages 142 - 145)

Robert Ritchie , Ph.D.                          June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 146

1  with.
2    Q.  Okay.
3    A.  And this was just a general meeting, and that's
4  specific to this report.
5    Q.  Okay.  So then Exhibit 10 is specific to your
6  MDL reports?
7    A.  Yes -- no.  Report...I haven't billed the
8  recent one.
9    Q.  Okay.  Can you estimate how much time you have
10  spent since the time that is on this bill dated March
11  17th, 2017?
12    A.  Now, does that include the individual --
13      MR. DALIMONTE:  The Bellweather cases?
14      THE DEPONENT:  Yes.
15      MR. DALIMONTE:  We'll treat those separately.
16  We'll take them up in the Bellweather.
17      THE DEPONENT:  So it's a few hours.
18    Q.  (By Ms. Daly) Okay.  Are -- are you able to
19  put together your time you spent on the Bellweather so
20  we'll have that when you and I --
21    A.  I hope -- yeah.
22      MR. DALIMONTE:  Or we can always get that to
23  you.
24      THE DEPONENT:  I haven't billed any of that
25  yet.  I don't know when the next deposition will be, but

Page 147

1  presumably I'll have billed it.
2    Q.  (By Ms. Daly) Okay.  I think we said this this
3  morning, but you have submitted a case-specific report
4  on each of the five cases; is that right?
5    A.  Yes.
6    Q.  Okay, all right.
7    A.  They're in, heads or tails.
8    Q.  All right, and I will look at those, and we
9  will reconvene.
10      MR. DALIMONTE:  All right, why don't we take a
11  break?
12      VIDEOGRAPHER:  Going off the record, the time
13  is 2:13 p.m.
14      (Recess)
15      VIDEOGRAPHER:  We are back on the record.  The
16  time is 2:30 p.m.
17      CROSS-EXAMINATION BY
18      MR. DALIMONTE:  Q.  Good afternoon,
19  Dr. Ritchie, Dalimonte on behalf of the plaintiffs.
20    A.  Yes.
21    Q.  Just for clarification, you were asked a couple
22  of questions by Taylor Daly concerning whether or not
23  you could say more likely than not that the filters --
24  any particular filter would fracture 51 percent of the
25  time.  Do you remember being asked that question?

Page 148

1    A.  Yes.
2    Q.  Okay, and what was your understanding of that
3  question?
4    A.  Well, to me the operative words were for a
5  "particular filter" could you say that it would be more
6  likely to fracture than not.  And --
7    Q.  Well, let me ask you this question.  Can you
8  say, to a reasonable degree of engineering and
9  scientific certainty, that all of the imperfections in
10  the draw markings that you describe and the dentation,
11  the centerless grinding markings, increase the
12  likelihood of the filter fracturing?
13    A.  That's undeniable.
14    Q.  And can you say, to a reasonable degree of
15  scientific and engineering certainty, that the edge of
16  the chamfer increases the stress and strain and
17  increases the risk of the filter fracturing at that
18  location?
19    A.  It increases the stress and strain in that
20  local scenario, and therefore since that's a potential
21  place of fracture, then it increases the probability
22  there could be a fracture there.
23    Q.  And you're not testifying or trying to tell the
24  jury that the arm is going to break there 51 percent of
25  the time.

Page 149

1    A.  No, that's whole -- that's why I answered the
2  question the way I did.  For a particular filter, if you
3  had -- if you said it had a 51 percent of fracture, then
4  you'd expect to see 51 percent of those filters
5  fracturing.  It's just the probability of a fracture,
6  the likelihood of a fracture is increased by these
7  details.
8    Q.  Okay, and also the same would be true with
9  perforation -- let me ask the question on that subject.
10  Can you say, to a reasonable degree of scientific and
11  engineering certainty, that the perforation will
12  increase the likelihood of fracture?
13    A.  That is my understanding.
14    Q.  Okay.  Similarly, can you say, to a reasonable
15  degree of scientific engineering certainty, that tilt
16  will increase the likelihood of perforation and/or
17  fracture, or both?
18    A.  That's my understanding as well.
19    Q.  Okay.  And that's because when it's in the tilt
20  position, as you described earlier, the stresses and
21  strains are no longer equally distributed amongst the
22  filter.
23    A.  That's one of the reasons, yes.
24    Q.  And, for instance, in the chamfer situation
25  you've described that there would be been an increase of

38 (Pages 146 - 149)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 150

1 stress and strain at that particular location as the
2 vessel, the dynamics of the vessel move.
3      A. Yes. I mean, the contact of a wire against a
4 sharp corner can lead to very high stress concentration.
5      Q. And the same thing with a hook or the foot, the
6 anchoring foot -- and I'm talking across the board --
7      A. Yes.
8      Q. For all iterations of the Bard IVC filter line.
9      A. Yes.
10     Q. With the exception of the Simon Nitinol.
11     A. Yes. I mean, these -- these details can
12 increase the likelihood of fracture. It doesn't mean to
13 say that a particular filter will fracture that way, and
14 if it doesn't fracture that way that that particular
15 detail is unimportant, but they all synergistically work
16 to promote fracture. And if there is any stress
17 concentration -- any stress concentration will likely
18 increase the probability of fracture. It doesn't mean
19 to say they will fracture, then, necessarily, in a given
20 case.
21     Q. But it certainly increase -- increases the
22 fracture of the filter --
23     A. Potentially. The operative words are for a
24 "particular filter," that's the case.
25     Q. And that's what you were asked by --

Page 151

1      A. Yes, I understand it being beyond a reasonable
2 -- you know, what was the words you used --
3      Q. Well --
4      A. The engineering certainty or whatever you call
5 it, it's saying that there's more than a 50 percent
6 chance something will happen. For a given filter you
7 can't say that there's a 50 percent chance that a given
8 filter will fracture.
9      Q. But what you can say is that more than 51
10 percent, or even higher, closer to 90 percent or 95
11 percent of the time, or 95 percent confidence level --
12     A. Yeah.
13     Q. -- that the likelihood of a fracture is
14 increased, that with the perforation or tilt or at the
15 chamfer, or the imperfections on the wire itself all
16 contribute to fracturing?
17        THE DEPONENT: That is --
18        MS. DALY: Object to the form.
19        THE DEPONENT: That's how I understand it.
20 It's undeniable to me.
21     Q. (By Mr. Dalimonte) I just want to make sure I
22 have this on the record; I may have already asked this
23 question. The centerless markings on the hook --
24     A. Yes.
25     Q. Can you say, to a reasonable degree of

Page 152

1 scientific and engineering certainty, that those
2 markings would increase the likelihood of the filter
3 fracturing at that area that you described, the hook,
4 where the centerless markings are?
5      A. Absolutely.
6      Q. Okay. And the basis for those opinions are set
7 forth in your reports that you've submitted already,
8 correct?
9      A. Absolutely.
10     Q. All right.
11        Oh. Your discipline is in material science,
12 correct?
13     A. Correct.
14     Q. Okay. You were asked a number of questions
15 that were, like, biostats and medical choices. That's
16 not your particular discipline, is it?
17     A. No. I mean, as a -- I mean, I've been around
18 the block a few years in the science community, so I can
19 appreciate some of these things, but, no, I'm not a
20 biostatistician. I'm not a medical doctor or anything
21 like that, so...
22     Q. You were also asked a question by Ms. Daly
23 about whether there was an exact relationship of tilt
24 and fracture, and I think your response was "That's
25 impossible to say." Can you explain what you meant?

Page 153

1      A. Well, I mean, the point is that the two events
2 are coupled. If you get a tilt, you don't necessarily
3 always get a fracture, so there's not an exact
4 relationship there, and if you get a fracture you don't
5 always have a tilt beforehand. But certainly each --
6 the tilting event can exacerbate the possibility of
7 fracture.
8        So it doesn't make it any safer, but it doesn't
9 guarantee -- so this -- it's the same story. There's a
10 series of phenomenon that can interact in a synergistic
11 fashion to lead to certain other events, but --
12     Q. So your definition of the word "exact" means
13 every time.
14     A. Yeah, for precise kind -- see, what I've found
15 a little bit difficult is people saying, "Well, you
16 know, there's been a whole bunch of these filters that
17 perforated but they didn't fracture; therefore
18 perforation and fracture are not coupled." That's an
19 imprecise statement.
20     Q. Right. But what you can say is that -- strike
21 that.
22        What you can say, to a reasonable degree of
23 scientific and engineering certainty, is that there is a
24 relationship of tilt and fracture.
25     A. That's what the data that we have now seems to

39 (Pages 150 - 153)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

**Page 154**

1 suggest, from several different sources, and so I would
2 say yes, definitely.
3   Q.  Okay.  And you can also say, to a reasonable
4 degree of scientific and engineering certainty, that
5 there would be -- if there was a tilt, there would be an
6 increase in likelihood of fracture to the filter,
7 correct?
8   A.  Yes.
9   Q.  And vice-versa?  In other words, if there was a
10 fracture, if a leg fractured off --
11   A.  Yes, yes.
12   Q.  -- you can say, to a reasonable degree of
13 scientific and engineering certainty, that that could --
14 increases the likelihood of tilt?
15   A.  Yes.
16   Q.  Because the filter is less stable.
17   A.  Of course, yes, yes.
18   Q.  Right.
19   A.  This is because of the imprecise interface
20 between law and engineering.
21   Q.  Talking about word choice?
22   A.  Yes.
23   Q.  I understand.  Were you aware that the Simon
24 Nitinol filter was the predicate device to the Recovery
25 filter?

**Page 155**

1   A.  Indeed, yes.
2   Q.  And so Bard used the Simon Nitinol filter as
3 the device that it was modifying under the FDA 510K?
4   A.  I'm aware of that, yes.
5   Q.  So they had to represent to the FDA that the
6 Recovery filter was safer and more effective than the
7 Simon Nitinol filter, correct?
8   A.  Yes.
9   Q.  And it had to be the substantial equivalent?
10   A.  Yes.
11   Q.  Okay.  And is it your opinion, to a reasonable
12 degree of scientific and engineering certainty, and your
13 familiarity with the Bard IVC filter line -- was the
14 Recovery filter safer and more efficacious than the
15 Simon Nitinol filter?
16   A.  Well, the -- you know, as I understood the
17 situations with respect to adverse events, that doesn't
18 seem to be borne out by the data.  I have a personal
19 opinion on this as well.  I think --
20   Q.  Well, let's just stick to the question.
21   A.  Okay, but --
22   Q.  Hold on.  So you're aware that the Simon
23 Nitinol filter is a permanent filter.
24   A.  I am, indeed.
25   Q.  And the Recovery filter was also permanent.

**Page 156**

1   A.  Initially, yes.
2   Q.  And it's still -- the Recovery, the G2, the
3 G2-X, the Meridian -- or the Eclipse, the Meridian and
4 the Denali are all permanent filters with the option to
5 retrieve them?
6   A.  Correct, yes.
7   Q.  So they're all permanent filters.
8   A.  Yes.
9   Q.  So would it be fair to say the Simon Nitinol
10 filter is the safer alternative amongst the other
11 filters?
12      MS. DALY:  Object to form; lack of foundation.
13      THE DEPONENT:  Yeah, I mean, I only have -- I
14 can just recall looking at failure rates and so forth,
15 and certainly the Recovery in G2s seem to have more
16 problems than the Simon Nitinol filter.
17   Q.  (By Mr. Dalimonte)  So your answer is "yes"?
18   A.  Yes.
19   Q.  Okay.  Do you need to actually conduct a bench
20 test to determine that there's the Bard IVC filter line,
21 the Recovery G2, Eclipse, and stick with the Meridian,
22 are defectively designed?
23   A.  Well, it's -- it's -- I mean, essentially no,
24 but it's nice to have; it's always good -- I'm an
25 experimentist.  I like to look at something, right?  And

**Page 157**

1 I'm having to rely on reading documents and so forth
2 about the design, but certainly the G2, G2-Express, the
3 Eclipse and the Meridian have an essentially similar
4 design, with a few little differences I've talked about.
5 So it's hard to believe that there would be radical
6 changes in the function that caused the problems.
7      Now, obviously, the fact that after the
8 Eclipse, that the electropolish, that will alleviate one
9 aspect.  But you don't need to actually touch one, but I
10 -- you know, when it comes to looking at fracture, I
11 like to be able to see a fracture mode, so it's nice to
12 be able to have the part.  And from the perspective of
13 do I expect this to have a similar set of problems or
14 something like that, you don't really need to see it for
15 that reason.
16   Q.  Well, yeah, you talked about what you do, what
17 you teach and what you do for the industry.
18   A.  Yeah.
19   Q.  And if there are certain failure modes being
20 reported, you know there's a problem.
21   A.  Yeah.  I mean, I work on nuclear graphite, but
22 I don't crawl on nuclear reactors just to be able to get
23 my hands on them.  Obviously, an experimentist likes to
24 see something, but it's not an essential thing.
25   Q.  It just provides that added confidence, right?

40 (Pages 154 - 157)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

| Page 158 | Page 160 |
|---|---|
| 1    A. But, I mean, when you're looking at fractures, | 1        (Recess) |
| 2 it's nice to have looked at the fracture. But, yes, of | 2        VIDEOGRAPHER: We are back on the record. The |
| 3 course, something. | 3 time is 2:51 p.m. |
| 4    Q. And without actually conducting a bench test, | 4        REDIRECT EXAMINATION BY |
| 5 that doesn't affect your opinion to -- any of your | 5        MS. DALY: Q. Dr. Ritchie, just a couple of |
| 6 opinions, to a reasonable degree of scientific and | 6 questions. Going back to the testing -- |
| 7 engineering certainty, correct? | 7    A. Yeah. |
| 8    A. A bench test would be a tested device, right? | 8    Q. -- which was the last thing Mr. Dalimonte asked |
| 9    Q. I'm sorry, what? | 9 you about, is it your understanding that Bard did not do |
| 10    A. A bench -- | 10 testing which resulted in taking the filter to a point |
| 11    Q. Yes, yes, correct. So let me repeat the | 11 that it fractured or migrated or tilted? |
| 12 question so the record is clear. | 12    A. Well, to some degree that's true, because the |
| 13        You do not need to conduct a bench test -- | 13 medical industry works on survival rather than failure, |
| 14 well, a bench test, lack of a bench test -- well, strike | 14 which is not a good thing. But my main point is if you |
| 15 that, because I asked the question perfectly the first | 15 have a bench test, you need to somehow simulate the |
| 16 time. | 16 reality of your situation, which can be a path en vivo. |
| 17        Your opinions, to a reasonable degree of | 17 And if you're suffering whatever it may be, tilt or what |
| 18 scientific and engineering certainty, are not affected | 18 have you; you need to have a bench test that somehow |
| 19 in any way by the fact that you personally didn't do any | 19 reflects that. |
| 20 type of bench tests, correct? | 20        And to have a bench test where you do something |
| 21    A. No. | 21 and it passes every time yet the reality is clearly not |
| 22    Q. Is that right? | 22 doing that, tells you that your bench test is really not |
| 23    A. That's right, yeah. | 23 reflective of the situation. So in some respects, some |
| 24    Q. And you also had the benefit of reviewing all | 24 of those bench tests are a complete waste of time. |
| 25 of the tests that Bard did on their filters, correct? | 25    Q. But you are aware that they did testing of |

| Page 159 | Page 161 |
|---|---|
| 1    A. Yeah, I've looked at all of them at some time | 1 filters to actual failure, where they -- |
| 2 over the last several years. | 2    A. Of course, yes, and that was good, that was |
| 3    Q. And you testified earlier to Ms. Daly's | 3 good, but -- |
| 4 questions as to what Bard needed to do as far as | 4    Q. And you're aware that they did testing where |
| 5 matching their bench test results, which were coming | 5 they tilted a filter to see would happen to it -- |
| 6 back with this filter's passing, with real life problems | 6    A. Yes. |
| 7 that are being reported, you know, to the FDA, to the | 7    Q. -- and that they tested a filter until they |
| 8 manufacturer about failures and adverse events | 8 could make it migrate. |
| 9 associated with their product. | 9    A. Yes, but -- and that was good, but, you know, |
| 10    A. Well, I think the bench tests that a company | 10 they -- to me, my way of thinking, they had sort of -- |
| 11 develops before and during the process of selling their | 11 they -- they chose, for example, for migration, to lower |
| 12 component, whatever it may be, if they're suffering | 12 pressure, and they had things that were migrating just a |
| 13 adverse events in practice, then they need to find the | 13 little bit higher pressure in their tests, and -- and |
| 14 source of that and they need to find a bench test that | 14 yet they had a problem with migration in reality. |
| 15 can simulate it. | 15        So I think the bench tests that were done from |
| 16        I think doing bench tests which -- which were | 16 the very beginning should have somehow sought to -- to |
| 17 their components would largely pass and yet the reality | 17 reflect some of the problems that they were seeing. And |
| 18 is that they're failing in practice, there's something | 18 I think that the function of these filters was somewhat |
| 19 wrong with that picture. So I've been critical of a lot | 19 abnormal to them. And that's okay initially, because -- |
| 20 of the tests that Bard did, because they never had a | 20 you know, to understand that, but there was a long |
| 21 failure. | 21 history where this -- where it wasn't dealt with; I |
| 22    Q. Give me a minute. I might be done. Can we go | 22 think that was the issue. That's my only query about |
| 23 off the record? | 23 that. |
| 24        VIDEOGRAPHER: We're off the record at 2:47 | 24    Q. And as we talked about before, you have not, in |
| 25 p.m. | 25 your role in this case, tried to fashion what those |

41 (Pages 158 - 161)

Robert Ritchie , Ph.D.                    June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 162

1 tests would be.
2    A.  Well, you know, no, that would not be my
3 position, but I think they should have done so.
4    Q.  All right.  You were asked a series of
5 questions about reasonable engineering certainties.
6    A.  Yeah.
7    Q.  Let me just -- let me clarify this in my own
8 mind.  What I think you're saying is you can not, within
9 a reasonable engineering certainty -- hold it.  Let me
10 say this right.
11        Okay.  You can not, within a reasonable
12 engineering certainty, say what the likelihood is of
13 occurrence of a particular type of complication in a
14 particular filter.
15    A.  In a particular --
16        MR. DALIMONTE:  Objection.
17        THE DEPONENT:  A given filter or a particular
18 type of filter?
19    Q.  (By Ms. Daly)  You can't say that there is a
20 increased likelihood --
21    A.  Yes.
22    Q.  -- of complications generally.
23    A.  Yes.
24    Q.  Okay.  Also you can not say, within a
25 reasonable engineering certainty, what the relative

Page 163

1 increased likelihood would be for any particular
2 complication to occur in each of the various models of
3 Bard filters.
4    A.  Well, this is difficult to answer.  The -- the
5 -- no, you can't give a precise number.  Now, you could
6 try to do that by using calculations or using
7 statistics, but I think it would be very, very difficult
8 to have a preciseness there.
9        So with these words, "reasonable degree of
10 engineering certainty," you can say the likelihood of a
11 certain type of fracture would increase, but there's so
12 many imponderables in the body and so forth, you -- it
13 would be very difficult to say there's a 60 percent
14 increase in positive tilting.
15    Q.  Also the next set that Mr. Dalimonte was asking
16 you about, within a reasonable engineering certainty,
17 you can say that there is a relationship between various
18 complications like tilt and perforation or fracture and
19 perforation, correct?
20    A.  That's right, yes.
21    Q.  All right.  You can not say, within a
22 reasonable engineering certainty, what combination of
23 those relationships of complication will lead to another
24 complication.
25        MR. DALIMONTE:  Objection.

Page 164

1    Q.  (By Ms. Daly)  It is that tricky, isn't it?
2    A.  It's that tricky.  God.
3        Now, the thing that I object to is saying that
4 since something failed by fracture and didn't penetrate,
5 therefore penetration and fracture are not related.  So
6 -- so the qualry is true that there is a relationship,
7 but it needn't be seen because other things can happen
8 -- this is --
9    Q.  I think we're on the same page.
10    A.  We're on the page.  How people interpret it is
11 another issue.
12        RECROSS-EXAMINATION BY
13        MR. DALIMONTE:  Q.  Getting back to Ms. Daly's
14 last question on the occurrences, what you can say is
15 that these particular filters, to a reasonable degree of
16 scientific and engineering certainty, have a greater
17 likelihood of failure in comparison to its intended use
18 and the safe use of the product itself.
19    A.  I think that's a very reasonable statement.
20    Q.  And so it doesn't matter what the occurrence
21 rates are; what matters is that there are multiple
22 variables, multiple adverse events.  You could have a
23 filter with a migration, tilt, perforation, fracture,
24 filter embolization all in one device, correct?
25    A.  That's right.

Page 165

1        MS. DALY:  Object to form.
2    Q.  (By Mr. Dalimonte)  And you could also have any
3 number of combinations of it.
4    A.  Yes.
5    Q.  Is that right?
6    A.  That's right.
7    Q.  And what you don't do is you don't count -- you
8 separate them all out and put them in different
9 categories ad try to tell the public that their adverse
10 event rate is lower than anybody else's, right?
11        MS. DALY:  Object to the form.
12    Q.  (By Mr. Dalimonte)  In other words, if you have
13 a filter that has a fracture alone and another filter
14 that has a migration, you don't say, "Well, we only had
15 one adverse event in each category," correct?
16        MS. DALY:  Object to the form, lack of
17 foundation, and outside the scope of his reports.
18    Q.  (By Mr. Dalimonte)  Okay, well, Ms. Daly asked
19 you a number of questions on occurrences, and that's why
20 we have a biostatistician, right?
21    A.  Well, the -- I mean, I think the numbers of
22 occurrences are just based on what people have looked
23 at, this one failed by that and that one failed by that.
24 That's a different -- that's a more definitive
25 statement, and statisticians can do what they have with

42 (Pages 162 - 165)

Robert Ritchie , Ph.D.                                    June 9, 2017
In Re: Bard IVC Filters Products Liability

Page 166

1 this.
2        What we're talking about is what is the
3 mechanistic cause of failures and how the various
4 different features link together, and that's a much more
5 complicated process.  And so you can -- all you can say,
6 and you can say this to more than a reasonable doubt, is
7 that --
8    Q.  Reasonable degree of scientific certainty.
9    A.  Whatever it is --
10   Q.  That's all right.
11   A.  But if -- if there's a -- if there's a stress
12 concentration there, for example, then there will be a
13 higher stress, and therefore the likelihood of fracture
14 in that event is increased.  It may not fracture there
15 because something might happen somewhere else, but that
16 is an absolute given, right?  So that's what I'm saying
17 here, is that some of them are very definitive.
18       Others where, for example, if you have a
19 perforation, it seems certainly more than likely that
20 you're going to elevate the stresses, and when
21 something's constrained by that -- and there's evidence
22 now from mathematical calculations that supports that.
23       So, again, that's a statement you can say, to a
24 reasonable degree of scientific doubt -- scientific and
25 engineering certainty, that there will be an increased

Page 167

1 chance of a fracture.  But to say a given filter will
2 fracture because it has a perforation is, obviously,
3 something you can't say, a given filter.
4    Q.  Understood.
5        MS. DALY:  You can't say.
6        THE DEPONENT:  You can't say.
7        MR. DALIMONTE:  Understood.
8        MS. DALY:  We're good.
9        MR. DALIMONTE:  Thank you.
10       VIDEOGRAPHER:  This marks the end of Disk No. 3
11 and today's testimony of Robert O. Ritchie, Ph.D.  We're
12 off the record at 3:00 o'clock p.m.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 168

1 STATE Of CALIFORNIA       )  ss.
2
3        I hereby certify that the deponent in the foregoing
4 deposition was by me duly sworn to testify to tell the
5 truth, the whole truth and nothing but the truth in the
6 within-entitled cause; that said deposition was taken at
7 the time and place therein stated; that the deposition
8 is a true record of the deponent's testimony as reported
9 to the best of my ability by me, a duly certified
10 shorthand reporter and a disinterested person, and was
11 thereafter transcribed under my direction into
12 typewriting by computer.
13       I further certify that I am not interested in
14 the outcome of the said action, nor connected with, nor
15 related to any of the parties in said action, nor to
16 their respective counsel
17       IN WITNESS WHEREOF, I have hereunto set my hand
18 this 21st day of June, 2017.
19
20
21
22
23
                        _____
24                      JILL ANNE STEPHENSON, CSR 8563
25

43 (Pages 166 - 168)

# EXHIBIT D

**Page 1**

SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

KATRINA NEWTON, et al.,

    Plaintiff,

-vs-                    CASE NO. CV2009-019232
                         CV2009-035787

C.R. BARD, et al.,
    Defendants.
_____/

RICHARK KOLENDA, et al.,
    Plaintiff,

-vs-

C.R. BARD, et al.,
    Defendants.
_____/

VIDEODEPOSITION OF ROBERT O. RITCHIE, PH.D.
May 23, 2011

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BY: JOANNA BROADWELL, CSR 10959

CLARK REPORTING AND VIDEOCONFERENCING
2140 SHATTUCK AVENUE, SUITE 405
BERKELEY, CALIFORNIA 94704
(510) 486-0700

**Page 2**

APPEARANCES:

For the Plaintiffs:   KATRINA NEWTON, et al.
    BY: R. DEAN HARTLEY
        ATTORNEY AT LAW
        Hartley & O'Brien
        2001 Main Street, Ste. 600
        Wheeling, West Virginia  26003
        (304)233-0777

For the Defendants:   C.R. BARD, INC. and
        BARD PERIPHERAL VASCULAR, INC.
    BY: RICHARD B. NORTH, JR.
        ELIZABETH C. HELM
        ATTORNEYS AT LAW
        Nelson, Mullins,
        Riley & Scarborough LLP
        201 17th Street NW, Ste. 1700
        Atlanta, GA  30363
        (404)322-6155
        Fax:322-6050

Also appearing: Stephen Statler, Videographer
        --o0o--

**Page 3**

INDEX OF EXAMINATION

Examination by:
                        Page
Mr. North               4

INDEX OF EXHIBITS

Defendants'   Description              Page

1    Curriculum Vitae                 10
2    IVC Deposition Index             44
3    Report of Robert O. Ritchie      63
4    Article entitled "Understanding the    71
     Deformation and Fracture of Nitinol
     Endovascular Stents In Situ X-Ray
     Microdiffraction"

5    ACR-SIR Practice Guidelines for the    88
     Perforance of Inferior Vena Cava (IVC)
     Filter Placement For the Prevention
     of Pulmonary Embolism

6    Quality Improvement Guidelines for     89
     Percutaneous Permanent Inferior Vena
     Cava Filter Placement

7    Handwritten Chart                109
8    Billing Records                  128

**Page 4**

9    Article entitled "An Investigation      144
     of Diverse Surface Finishes on
     Fatigue Properties of Superelastic
     Nitinol Wire"

10   Diagram                          151
                --o0o--

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

**Page 5**

1  BE IT REMEMBERED that, pursuant to Notice of
2  Taking Deposition, and on Monday, May 23, 2011,
3  commencing at the hour of 9:20 a.m. at the offices of
4  Clark Reporting and Videoconferencing, 2140 Shattuck
5  Avenue, Suite 405, Berkeley, California, before me,
6  JOANNA BROADWELL, a duly qualified Certified Shorthand
7  Reporter, License No. 10959, in and for the State of
8  California, there personally appeared
9  ROBERT O. RITCHIE, PH.D.
10  called as a witness by the Defendants, who, being first
11  duly sworn by me to tell the truth under penalty of
12  perjury under the laws of the State of California, was
13  thereupon examined and testified as hereinafter set forth.
14  --oOo--
15  PROCEEDINGS
16  THE VIDEOGRAPHER: Here begins the Video No. 1
17  of the deposition of Robert Ritchie, Ph.D. in the
18  matter of Katrina Newton, et al., versus C.R. Bard,
19  Incorporated, et al. and related actions in the
20  Superior Court of the State of Arizona for the County
21  of Maricopa. The case numbers are CV2009-019232 and
22  CV2009-035781. Today's date is May 23rd, 2011, and the
23  time on the video monitor is 9:20 a.m.
24  The video operator today is Stephen Statler,
25  representing Clark Reporting and Videoconferencing.

**Page 6**

1  This videodeposition is taking place at 2140 Shattuck
2  Avenue in Berkeley, California.
3  Counsel, please voice-identify yourself and
4  state who you represent.
5  MR. HARTLEY: Dean Hartley on behalf of the
6  Plaintiffs.
7  MR. NORTH: Richard North on behalf of the
8  Defendants Bard, C.R. Bard, and Bard Peripheral
9  Vascular.
10  MS. HELM: Kate Helm on behalf of the same
11  defendants.
12  THE VIDEOGRAPHER: Thank you. The court
13  reporter today is Joanna Broadwell of Clark Reporting
14  and Videoconferencing. And would the reporter please
15  administer the oath?
16  (The Witness was sworn.)
17  THE VIDEOGRAPHER: Please begin.
18  MR. NORTH: This will be the deposition of
19  Robert O. Ritchie, taken for purposes of discovery and
20  all other purposes permitted under the Arizona and
21  Federal Rules. Mr. Hartley, just so the record is
22  clear, I believe we have agreed that this deposition
23  will be utilized in all cases in which Dr. Ritchie has
24  been designated as an expert.
25  MR. HARTLEY: Yes.

**Page 7**

1  MR. NORTH: I would like to propose that we
2  reserve all objections except as to the form of the
3  question and responsiveness of the answer until such
4  time as this deposition may be used.
5  MR. HARTLEY: That is fine.
6  MR. NORTH: Have you discussed signature with
7  the witness?
8  MR. HARTLEY: We haven't.
9  Doctor, do you want to read and sign?
10  THE DEPONENT: I beg your pardon?
11  MR. HARTLEY: Do you want to read and sign
12  your deposition?
13  THE DEPONENT: Sure. Absolutely.
14  MR. HARTLEY: He just answered that.
15  EXAMINATION BY COUNSEL FOR THE DEFENDANTS
16  BY MR. NORTH
17  Q. Could you state your full name for the record?
18  A. My name is Robert Oliver Ritchie.
19  Q. Dr. Ritchie, as I introduced myself a few
20  moments ago, my name is Richard North, and I represent
21  the Defendant C.R. Bard, and Bard Peripheral Vascular
22  in the litigation which brings us here today.
23  Today I am going to be asking you a series of
24  questions about your involvement in that litigation.
25  If at any time I ask you a question that you do not

**Page 8**

1  hear or do not understand, please ask me to repeat it
2  or rephrase it. Is that agreeable?
3  A. Yes, indeed.
4  Q. If at any time you would like to take a break,
5  just let us know. This is not an endurance contest.
6  We are happy to take a break. Okay?
7  A. Surely.
8  Q. And I would ask also that you answer all
9  questions out loud, as opposed to a nod of the head or
10  "uh-huh" or "huh-uh" so that the court reporter can
11  prepare an accurate transcript for us.
12  A. Fair enough.
13  Q. Could you tell us your present business
14  address?
15  A. My -- I am a professor of material science
16  engineering at the University of California. So my
17  business address is the Department of Material Science
18  and Engineering, University of California, Berkeley.
19  MR. HARTLEY: Could you hear him? Is it
20  coming through all right?
21  BY MR. NORTH
22  Q. Dr. Ritchie, have you ever given a deposition
23  before?
24  A. Yes, I have.
25  Q. On how many occasions?

CLARK REPORTING (510) 486-0700

Page 9

1    A.  Four or five.  Five or so.
2    Q.  When is the last time you gave a deposition?
3    A.  About four years ago -- four or five years
4  ago.
5    Q.  Have all of your depositions been given in the
6  role of an expert witness?
7    A.  Yes, indeed.
8    Q.  Have you ever testified live at trial?
9    A.  Yes, indeed.
10   Q.  On how many occasions?
11   A.  I think twice, maybe three times.  I think
12 twice.
13   Q.  In the cases that you have testified live at
14 trial, have you -- did those involve personal injury
15 cases or patent cases?
16   A.  They were personal injury.  I have been
17 involved in patent cases, but none came to trial.
18   Q.  I'm sorry.  I am having a hard time finding
19 this curriculum vitae.
20   A.  I can give you a copy.
21   Q.  Do you have one with you?  That would be
22 great.
23   A.  There you go.
24   Q.  What is this booklet that you have just handed
25 us?

Page 10

1    A.  It's a document which contains all my reports.
2    Q.  And did you compile this document yourself?
3    A.  I wrote it, but I didn't compile it, no.
4    Q.  Okay.  You don't have a loose version of your
5  curriculum vitae with you, do you?  I don't think that
6  or his report is in here.  I tell you what, what I
7  would like to do is have marked as an Exhibit 1 to this
8  deposition -- I have a copy of your curriculum vitae.
9  It has got some scribbling on it; maybe we could just
10 substitute a clean copy at a later time.
11   A.  Sure.  That is fine.
12      MR. HARTLEY:  Do you want him to refer to the
13 one that is bound so that you don't --
14      MR. NORTH:  Yeah, that is fine.
15        (Whereupon Defendants' Exhibit No.
16        1 was marked for identification.)
17      MR. NORTH:  If we could mark this as
18 Exhibit 1.
19   Q.  Doctor, let me show you what's been marked as
20 Exhibit 1.  Does that appear to be a copy of your
21 curriculum vitae, albeit with some scribbling on it?
22   A.  Yes.
23   Q.  And you have another copy of that in front of
24 you?
25   A.  I think it is the exact -- I don't know.  I

Page 11

1  update this quite regularly, so I think it is the same
2  version.
3    Q.  Mr. Hartley, I believe we agreed we can
4  substitute a clean copy without my markings on it as an
5  exhibit to this deposition.
6      MR. HARTLEY:  Yes.
7      BY MR. NORTH
8    Q.  Dr. Ritchie, as I understand it, you have a
9  bachelor's degree in metallurgy and physics?
10   A.  Yes, indeed.
11   Q.  That is from Cambridge University?
12   A.  Yes.
13   Q.  And that's Cambridge in England?
14   A.  That's Cambridge in England.
15   Q.  Are you originally from England?
16   A.  I am, indeed.
17   Q.  What part of England did you grow up in?
18   A.  Plymouth.
19   Q.  You also have a master's in material science
20 and a Ph.D. from Cambridge?
21   A.  Yes, indeed.
22   Q.  And I believe your Ph.D. was in 1973?
23   A.  That's right.
24   Q.  Now, there is another degree listed on your
25 curriculum vitae in 1990 from Cambridge.  What is that?

Page 12

1    A.  It is quite a Doctor of Science.  There is no
2  equivalent in this country, but a Ph.D. is given for a
3  single piece of research, and a doctorate of science is
4  given for a lifetime of research, so it is a higher
5  degree than a Ph.D.
6    Q.  Did you -- I mean, obviously the Doctor of
7  Sciences was -- was bestowed on you some 17 years after
8  your Ph.D.?
9    A.  Yes.
10   Q.  Did you go back to Cambridge for additional
11 courses for that?
12   A.  No, no.  What one does is one submits -- when
13 asked, one submits all your published work.  And then
14 the University appoints a committee to examine it.  And
15 they charge you 400 guineas, and then they make a
16 decision about it.  So...
17      MR. HARTLEY:  You have to ask how much is a
18 guinea.
19      BY MR. NORTH
20   Q.  How much is a guinea?
21   A.  One pound, one shilling.
22   Q.  Okay.
23   A.  And it enables you to wear a rather fancy
24 gown.
25   Q.  My understanding is, there is no equivalent to

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

## Page 13

1  that degree in this country?
2      A.  No, there is no equivalent in this country.
3      Q.  Following the receipt of your Ph.D. in 1973,
4  have you taken any other formal training since that
5  time?
6      A.  Well, I was -- it depends on what you call
7  that, but I was a postdoctoral researcher in Cambridge,
8  and then I came to Berkeley as what's called a Miller
9  Postdoctoral Fellow.  And I did that until 1977 to '76,
10  actually.  Then I joined the faculty at M.I.T.
11      Q.  So I believe your first job around the time
12  that you did get your Ph.D. was this postdoctoral
13  fellow at Cambridge?
14      A.  Yeah.  I was what is called a Goldsmith's
15  Junior Research Fellow in Churchill College, Cambridge.
16      Q.  What does that connote, the Goldsmith's Junior
17  Research Fellow?
18      A.  It is basically -- It's the equivalent of a --
19  a slightly different system in England, but it is
20  equivalent of a faculty position at a junior level.  So
21  I was a Fellow -- a Fellow at one of the Cambridge
22  colleges.  And I did that for two years and then took a
23  year off to go to America and never came home.
24      Q.  Did you -- during that two years at Cambridge
25  in that position, did you actually teach students?

## Page 14

1      A.  Well, I gave what is called supervisions.  I
2  didn't -- I didn't give -- I didn't have a classroom
3  that I taught in groups of students.  It is called a
4  supervision format.  It is, again, different in this
5  country, but there are lecturers and there are
6  supervisors, and I acted in a supervisory capacity.  I
7  also taught lab classes.  But I wasn't a member of the
8  faculty.  I was a Fellow of the college.
9      Q.  Did you do any research during that two years?
10      A.  I was doing research the whole time.
11      Q.  And then in 1974, you moved to Berkeley?
12      A.  I moved to Berkeley, yes.
13      Q.  What was your position -- I believe your first
14  stint here at Berkeley was from '74 to '77?
15      A.  Yeah.  It was -- I left in -- in January '77.
16  I was what is called a Miller Research Fellow, which is
17  a -- they award five or six of these a year.  And that
18  brought me to Berkeley.  And as a Miller research
19  fellow I continued my research.  I also taught courses
20  at this time.  I taught several courses.
21      Q.  What sorts of research projects were you
22  working on generally during your three years at
23  Berkeley?
24      A.  I was working on fracture and fatigue.
25      Q.  What sort of classes were you teaching?

## Page 15

1      A.  I taught a course on the mechanical behavior
2  of materials.  It was on -- it was basically a
3  sophomore-junior class on how materials fail, the
4  defamation and fracture properties.
5      Q.  And then in 1977, I understand that you left
6  Berkeley for a stint at M.I.T. in Cambridge,
7  Massachusetts?
8      A.  Yeah, I joined the faculty of mechanical
9  engineering at M.I.T. and was an assistant professor
10  there, and then I was an associate professor there, and
11  then I became what is called a Class of 1922 Associate
12  Professor.  I was there until 1981.
13      Q.  Why did you leave M.I.T.?
14      A.  Because I hated the place.
15      Q.  Okay.
16      A.  I am being a bit flippant there, but I believe
17  education is interaction with all disciplines, having
18  lunch with a philosopher and tea with historians.
19  M.I.T. is a place full of engineers, and the weather
20  sucks in Boston.
21      MR. NORTH:  Has Dr. Ritchie been designated in
22  the John Long case?
23      Q.  Okay.  You returned to Berkeley in 1981?
24      A.  Indeed.
25      Q.  And what position did you take when you came

## Page 16

1  back to Berkeley?
2      A.  I came back, actually, in what is called an
3  Acting Associate Professor of Material Science and
4  Engineering, and then I became a full professor a year
5  later.
6      Q.  What is the difference in -- between an Acting
7  Associate Professor and an Associate Professor?
8      A.  It was a -- it is a long story, but basically
9  the University here only had a junior position, and I
10  had a relatively senior position at MIT.  So the
11  "Acting" was a way of getting me in without demeaning
12  my stature.  And I agreed to do it, provided they put
13  me up for a full professor within the year, no
14  guarantees, and which they did.
15      Q.  And so you became a full Professor of Material
16  Science and Engineering in 1982?
17      A.  I did, yes.
18      Q.  And that is still a position you hold today;
19  is that correct?
20      A.  Yes, I am head of department now.  But, yes.
21      Q.  And you became Chairman of the department in
22  2005?
23      A.  Yes.
24      Q.  And I also see some indication that beginning
25  in 2010, you had the title Professor of Mechanical

4 (Pages 13 to 16)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 17

1    Engineering?
2        A. Yeah. I was made a member of the Mechanical
3    Engineering Department last year. Yes.
4        Q. So are you simultaneously part of the
5    Mechanical Engineering Department and the Material
6    Science and Engineering Department?
7        A. I am, indeed.
8        Q. My assumption is, they would be pretty closely
9    aligned anyway, wouldn't they, those two departments?
10       A. In principle, yes, in reality, often no.
11       Q. Okay. Now, I gather you have been affiliated
12   with the Lawrence Berkeley Laboratory since your return
13   to Berkeley in 1981 or '82?
14       A. Yes. I have a position up there, and I have
15   in the past actually had a -- you know, a more
16   permanent position. I was half time at one stage. But
17   yes, I have an appointment.
18       Q. Well, just for my benefit, what is the
19   Lawrence Berkeley Laboratory?
20       A. It is one of the system of national labs. You
21   have Oak Ridge Argonne and Brookhaven. It was actually
22   the first national lab. It was administered by the
23   University of California; however, it is a totally
24   separate entity. It is akin to another campus of the
25   University of California. It is a federally-funded

Page 18

1    lab, primarily by the Department of Energy. Its
2    relationship to Berkeley, the University, is merely of
3    its close proximity.
4        Q. But you said that it is supervised somehow by
5    the California University system --
6        A. It is administered by University of
7    California, but they play a rather standoffish role.
8    They ran Los Alamos and Livermore. The ties with
9    University of -- were broken a few years ago with those
10   labs. They are now run by an industrial consortium.
11   LBL -- LBNL is still administered by the University of
12   California. So it's -- you can think of it like a
13   separate campus, but it is federally funded as opposed
14   to state funded.
15       Q. Now, I grew up not far from Oak Ridge, so I am
16   familiar with that, and we all know, I think, that Oak
17   Ridge National Laboratory was the site, as I understand
18   it, where the nuclear bomb was developed?
19       A. There was a number of sites, but that was one
20   of them, yes.
21       Q. Right. Is there any particular focus of the
22   Lawrence Berkeley Laboratory? Does it have any
23   specialty?
24       A. Well, it is -- it is not a weapons lab.
25       Q. Okay.

Page 19

1        A. Nor is Oak Ridge, for that matter, anymore.
2    It's just like Livermore would be or Sandia for weapons
3    labs. Lawrence Berkeley Lab is like Oak Ridge: It is
4    a general national lab. It is focused -- very focused
5    on the science rather than the engineering, though. It
6    has a heavy emphasis on physics and chemistry and
7    material science. And these national labs now are more
8    characterized by their facilities.
9        We have a synchrotron up there, which is
10   the -- and we have the National Computing Center, and
11   the National Center for Electron Microscopy. So that
12   is where the focus is, the emphasis of the lab. Oak
13   Ridge always has been more of a technological place,
14   more attuned to industrial concerns than LBL.
15       Q. These labs don't actually specialize in
16   producing inventions, or do they?
17       A. Well, they do generate inventions. A large
18   number of them do. I mean, there is IR awards every
19   year for inventions, and the Lawrence Lab, like most
20   national labs, will win three or four of them every
21   year. But it is not geared specifically to do that.
22       Q. Do you still maintain some affiliation with
23   the Lawrence Berkeley Lab?
24       A. All of my labs are up there. All my research
25   is done up there. So I am paid by the University,

Page 20

1    except in the summer when I get a salary from the
2    Lawrence Berkeley lab, but I conduct all of my research
3    business at LBL.
4        Q. So how much of your time in a typical work
5    week is spent up at the Lawrence Berkeley Laboratory?
6        A. It varies, because I have been head of the
7    department. It's kept me down on campus a lot of the
8    time. You know, under normal circumstances, I would
9    probably spend 60 to 70 percent of my time up at LBL.
10   In the last five or six years, it's probably been the
11   reverse. It's been closer to 30 to 40 percent.
12       Q. And I see that you have held administrative
13   positions at the Laboratory in the past?
14       A. Yes, I was the Director of the Center for
15   Advanced Materials in the '80s and '90s, and I was
16   associate -- acting -- sorry -- assistant -- associate
17   -- Deputy Director, sorry, of the Materials Division
18   for a time in the late '80s and early '90s.
19       Q. Do you presently maintain any leadership role
20   or administrative role at the laboratory?
21       A. I sit on the Scientific Council for the
22   Materials Division, and I run a major program, a
23   research program up there in materials.
24       Q. What is the focus of your research program up
25   there at the Laboratory right now?

5 (Pages 17 to 20)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING  (510)  486-0700

Page 21

1      A.  It is focused on fracture and fatigue,
2  primarily.  A lot of it is now on some of the newer
3  materials, like metallic glasses.  I do work on medical
4  implants, and I work on bio-inspired materials, and
5  although it is not funded by the Department of Energy,
6  I do a lot of work on bone and teeth and biological
7  materials.
8      Q.  What sort of medical implants are you doing
9  research work on?
10      A.  Well, I work primarily on Nitinol, actually,
11  and I have been looking at the fatigue of Nitinol and
12  various aspects of that for many, many years.  So it --
13  most of it has been Nitinol-focused.  I have also
14  looked at materials like the cobalt chrome materials,
15  which is an alternative material for medical device
16  manufacturing.
17      Q.  Is that research work focused on Nitinol as a
18  general substance, or on specific types of devices?
19      A.  Well, it is -- yes and yes.  I mean, it is --
20  I am interested in the fundamental properties of this
21  material.  It is a fascinating material.  It is a very
22  different material.  But we do a lot of work in the
23  synchrotron doing x-ray diffraction to understand how
24  these materials deform at almost an atomistic level.
25      But most of my funding has come from medical

Page 22

1  device companies, so the focus has been more on the
2  medical device.  So I have done work on predicting the
3  life of stents, for example, and looking at how the
4  texture of these materials changes.  So most of the
5  emphasis is geared to medical devices.
6      Q.  You mentioned stents.  What other types of
7  medical devices -- specific medical devices, has your
8  research focused on?
9      A.  Well, a lot of it has been on heart valves,
10  but I have looked at all types of medical devices.  I
11  have looked at stents.  I have looked at various
12  different types of heart valves.  I have looked at some
13  of these stent-like devices that close holes in the
14  heart.  I have looked at orthopedic implants, knee
15  implants, hip implants.  I have looked at aneurysm
16  clips, bone screws, all sorts of -- these are not all
17  Nitinol devices, of course, but I've looked at many
18  different types of medical devices.
19      My interest these days has been more on these
20  wire-type Nitinol devices, like the stent.
21      Q.  Obviously there are some stents that are made
22  of Nitinol.
23      A.  Oh, yes.
24      Q.  Are any of the heart valves made of Nitinol?
25      A.  They are starting to be.  I am working with a

Page 23

1  number of companies that are trying to make wire-like
2  heart valves that you could actually implant with a
3  catheter instead of having to break the ribcage, and
4  these would inflate inside the heart.  And most of
5  those -- the inflation -- the self-inflating portions
6  are made of Nitinol.
7      Q.  But those are not on the market yet, are they?
8      A.  There is one of them that's just been -- I'm
9  not sure it's been marketed -- it's just been approved
10  by the Food and Drug Administration.  I am working with
11  Edwards on that, and there is another one in Sorin, in
12  Italy, which I am working on, and that one is not --
13  that's not gone through FDA approval.  It's in the
14  process of -- about to be submitted, I believe.
15      Q.  Okay.  You mentioned Edwards Life Science.
16  And what was the company in Italy?
17      A.  Sorin, S-o-r-i-n.
18      Q.  What other medical device companies are you
19  presently consulting with?
20      A.  St. Jude Medical.
21      A.  I'm sorry, Synergy?
22      A.  St. Jude Medical.
23      Q.  St. Jude.
24      A.  Abbott is about to -- I haven't actually been
25  there yet, but Abbott just called me recently.

Page 24

1  Certainly Cordis, NDC, which is Nitinol Devices
2  Components, Sorin, and Edwards.
3      Q.  Have you consulted with any of these companies
4  you just listed, Edwards, Sorin, St. Jude, Abbott,
5  Cordis, or NDC with regard specifically to inferior
6  vena cava filters?
7      A.  The only company of those that makes them is
8  Cordis, and I haven't talk to Cordis about vena cava
9  filters.
10      Q.  Have you ever worked with any medical device
11  company with regard specifically to inferior vena cava
12  filters?
13      A.  No.
14      Q.  You have never been a full-time employee for a
15  private company, have you?
16      A.  Full-time employee?  No.
17      Q.  And, in fact, your full-time employment has
18  always been in academia; is that correct?
19      A.  Yes.  Well, I had jobs -- full-time
20  employment, yes, yes.
21      Q.  Do you hold any patents with regard to medical
22  devices?
23      A.  No.
24      Q.  Other than Cordis, have you ever consulted
25  with any company that does, to your knowledge,

6 (Pages 21 to 24)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 25

1  manufacture inferior vena cava filters?
2      A. Well, if I did, I was unaware of it at the
3  time.
4      Q. You have never designed an inferior vena cava
5  filter, have you?
6      A. No. What are you saying, "inferior," or --
7  what is the word before the "vena cava filter"?
8      Q. Inferior vena cava.
9      A. Inferior.
10     Q. Right. IVC.
11     A. No, I haven't.
12     Q. Are you familiar with that term, "inferior
13  vena cava"?
14     A. Yes.
15     Q. Have you ever designed any medical device?
16     A. I have been part of a team that has designed
17  those things. I have been involved in the assessment
18  of their fracture susceptibility. I have given advice
19  on the collection of data to support any
20  life-prediction procedure. I have been part of
21  life-prediction procedures, yes, so in that respect I
22  have been part of the design.
23     Q. Let me see if this is a fair characterization.
24  Over the course of the years in some of your consulting
25  work, you have been involved in the testing and sort of

Page 26

1  analysis of prototype designs, but you have not
2  actually designed a medical device yourself?
3      A. No. That is a fair assessment.
4      Q. Okay. You have never had occasion to address
5  inferior vena cava filters in any of the classes that
6  you have taught, have you?
7      A. No. I may have made mention to various
8  medical devices in the class, but nothing specific to
9  those filters.
10     Q. And your curriculum vitae, which has been
11  marked as Exhibit No. 1 to this deposition, it contains
12  a very long list of publications, correct?
13     A. Yes.
14     Q. Do any of those publications deal specifically
15  with inferior vena cava filters?
16     A. No. Sorry, beg pardon.
17     Q. Is it fair to say, then, that this particular
18  litigation is your first experience specifically with
19  inferior vena cava filters?
20     A. What do you mean by -- I mean, I knew of these
21  devices. I talked to NDC about some of these devices,
22  but in terms of -- if you mean specifically focused
23  solely on it, this is the first time, yes.
24     Q. Tell me about conversations with NDC regarding
25  inferior vena cava filters.

Page 27

1      A. NDC is of, course one, of the premiere
2  manufacturers of Nitinol and Nitinol devices. I have
3  put numerous students down there. I know those people
4  very well, and we generally talk a lot about Nitinol
5  and so forth. And I know the topic of these filters
6  came up at some point, not recently, but we have talked
7  about all sorts of devices made.
8      Q. So you just referenced some conversations you
9  may have had in the past. Let me ask you this way:
10  Have any of your professional activities, whether it be
11  teaching, publications, or consulting work, or research
12  in the past, specifically dealt with inferior vena cava
13  filters?
14     A. "Specifically" means -- I mean, certainly the
15  work I do on Nitinol will address the nature of a
16  wire-wound -- a wire Nitinol device, but not
17  specifically on filters. I haven't -- I haven't done a
18  life prediction on filters or anything like that.
19     Q. None of your past litigation cases involved
20  inferior vena cava filters, did they?
21     A. No, no.
22     Q. Your curriculum vitae also indicates that you
23  worked for -- in the late 1980s as a consultant for the
24  Usci Division of Bard?
25     A. Yes.

Page 28

1      Q. Do you recall that?
2      A. Yes. I don't recall what I exactly did there.
3  I was working, but I did something with them. It
4  wasn't very extensive. I tried to look up -- I
5  couldn't find any details on that, but yes, I did.
6      Q. That was from 1988 to 1990?
7      A. What it says there. Yes.
8      Q. Are you aware that Bard no longer owns the
9  Usci Division?
10     A. No. I was unaware of it.
11     Q. One of several products that the Usci division
12  marketed was a heart catheter that went under the trade
13  name of "The Probe". Does that sound familiar to you?
14     A. That is sort of vaguely familiar. I looked at
15  my records the other day and nothing registered, I'm
16  afraid, but there was something like that, yes. I
17  don't recall very closely what it was. I only went
18  there once or twice. It was a very short involvement.
19     Q. Do you recall who you worked with there?
20     A. No. I have no recollection.
21     Q. Since 1990, have you done any work for C.R.
22  Bard?
23     A. No.
24     Q. In the litigation consulting that you have
25  done in the past, have any of those cases involved

7 (Pages 25 to 28)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 29

1   implantable medical devices?
2       A.   Yes.
3       Q.   What types of devices?
4       A.   Heart valves, primarily.  I looked at aneurysm
5   clips, and I have looked at orthopedic implants.
6   Mainly, as I said, bone screws.  None of these came to
7   trial.  Hip implants, and knee implants, but most of my
8   work in the sort of devices that are nominally similar
9   to what we are talking about today have been heart
10  valves.
11      Q.   In the litigation cases that you have worked
12  on that concerned heart valves, were you retained by
13  individual plaintiffs or by a manufacturer?
14      A.   For heart valves, it was always by
15  manufacturers.
16      Q.   Who were those manufacturers?
17      A.   Shiley.
18      Q.   I'm sorry, what?
19      A.   Shiley.
20      Q.   Okay.
21      A.   They were bought out by Pfizer, St. Jude
22  Medical.  And I did one case that involved -- I was
23  never certain who I was working for, but it was
24  Carbomedics and Baxter.  I think they shared a lawyer,
25  or shared...

Page 30

1       Q.   Aneurysm clips, was your litigation experience
2   with those on behalf of the plaintiffs or
3   manufacturers?
4       A.   I honestly can't recall.  I think it was
5   manufacturers.  It was such a long time ago, that I
6   can't recall.
7       Q.   What about with regard to orthopedic implants?
8       A.   Generally, that's been -- a number of lawyers
9   in San Francisco tend to send me parts, so this would
10  be for -- not the manufacturers.  They sent me implants
11  for me to look at and just give an opinion on how they
12  failed, and none of these have gone beyond that.  So I
13  have just advised lawyers on how they may fail.  I
14  don't think I have ever worked for a manufacturer of an
15  orthopedic implant.
16      Q.   So your understanding is, the lawyers that are
17  contacting you with regard to orthopedic implants are
18  lawyers that represent individual plaintiffs?
19      A.   Yes, indeed.
20      Q.   Now, other than the filter litigation that you
21  are working on right now for Mr. Hartley and Mr. Davis,
22  how many other litigation cases do you have that are
23  active?
24      A.   I don't think any.  I am about to get involved
25  in one with St. Jude involving a heart-valve case, but

Page 31

1   I don't think there is anything else that is active at
2   this point.
3       Q.   And what is your rate?
4       A.   I charge $425 an hour.
5       Q.   Your report in this case indicates that you
6   have testified in the past in front of the FDA?
7       A.   Yes.
8       Q.   When is the last time that you appeared in any
9   proceeding involving the FDA?
10      A.   It was about two years, but I can't recall
11  exactly.  It was about two years ago.  I went there on
12  behalf of Edwards.  It was about two years ago.
13      Q.   So you went there -- you were retained by a
14  manufacturer to appear in front of the FDA?
15      A.   Yeah.  I put "testified" in quotes, I think.
16  It is quite frequent that during the process of the
17  preliminary stages or submission of a PMA or an IDE to
18  the FDA, that some sort of meeting is put forward, and
19  maybe we are answering questions about -- that came up
20  from some approval process.  And I have gone there for
21  various manufacturers over the years quite frequently
22  and to talk to the FDA and to discuss some of these
23  issues.
24      Q.   So these are not formal court or Congressional
25  hearing-type proceedings, correct?

Page 32

1       A.   No, not at all.
2       Q.   And these are generally meetings between the
3   manufacturer and the Food and Drug Administration to
4   discuss some aspect of a submission or a planned
5   submission?
6       A.   Yes, indeed.
7       Q.   And you have been retained by various
8   manufacturers over the years to accompany them to these
9   meetings and answer questions within your area of
10  expertise?
11      A.   Yes, indeed.
12      Q.   Have you ever met with the FDA in any context
13  in which you had not been retained by a medical device
14  manufacturer?
15      A.   Well, I know of a lot of the people at the
16  FDA, and I have met them at meetings, so that's where I
17  might have seen them.
18      Q.   But that wasn't my question.  Have you ever
19  appeared before the FDA in a formal-type setting?
20      A.   No.
21      Q.   Other than the times in which you were
22  retained by a medical device manufacturer to attend
23  these meetings?
24      A.   I think that is accurate.  I can't recall
25  absolutely, but I think so.

8 (Pages 29 to 32)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING  (510)  486-0700

Page 33

1    Q.  We all know that sometimes, on occasion,
2  generally more with pharmaceutical products than
3  medical device products, the FDA will convene
4  scientific advisory panels --
5    A.  Yes, indeed.
6    Q.  -- that do, in fact, entertain testimony?
7    A.  Right.
8    Q.  You have never testified in front of one of
9  those scientific advisory panels?
10    A.  I haven't -- I did it once.  It is -- again, I
11  was working for one of the heart-valve companies, and
12  they were appealing a ruling.  And the FDA put forward
13  one of these -- what they call them now, panel -- I
14  think a panel review, I think it is called.  And I
15  did -- I appeared before them.  But those generally are
16  mostly medics, very few engineers.  But I certainly
17  appeared before them.  That was that long time ago,
18  sometime in the 90s.
19    Q.  And that is the only time you recall appearing
20  before one of the panels or advisory committees of the
21  FDA?
22    THE REPORTER:  Could you please slow down?
23  And the answer was...
24    THE DEPONENT:  Most of the submissions that I
25  have been involved in, actually, have been successful

Page 34

1  and so that -- so that you wouldn't necessarily have
2  one of those panel reviews.  They are fairly rare.  So
3  for the case -- this was Medical Inc., I think, was the
4  heart valve company, and they wanted to appeal.  And so
5  that was the one occasion.
6    BY MR. NORTH
7    Q.  You have never had any dealings with the FDA
8  with regard to inferior vena cava filters, have you?
9    A.  No, indeed.
10    Q.  We already discussed the fact that none of
11  your previous publications specifically dealt with
12  inferior vena cava filters.  Do any of them
13  specifically deal with other implantable medical
14  devices?
15    A.  Yes.  Some do, yes.
16    Q.  Such as what types of devices?
17    A.  I worked -- I have written papers on heart
18  valves, many papers on heart valves.  And I have
19  written papers on stent-like devices.  Most of my focus
20  was to understand how they failed -- to predict their
21  life, their useful life in the body.  So it is really
22  focusing on fatigue analysis.  Some of these aren't
23  listed because the heart valve ones were done prior to
24  10 years ago.
25    I wrote one recently with the Cordis people on

Page 35

1  predicting the life of a stent.  Maybe they are listed,
2  because they go all the way back.  They probably are
3  listed.
4    Q.  What is the most recent publication that you
5  have had with regard to Nitinol?
6    A.  It is one that is in -- it is actually -- it
7  is just about to -- it has just been published.  It is
8  going to come out in August, actually, but it is on the
9  Web.  It is No. 623.  Equivalent
10  Strain/Coffin-Manson Approach to Multiaxial Fatigue and
11  Life Prediction in Superelastic --
12    THE REPORTER:  I am sorry.  Repeat that,
13  please.
14    THE DEPONENT:  "Equivalent
15  Strain/Coffin-Manson Approach to Multiaxial Fatigue and
16  Life Prediction in Superelastic Nitinol Medical
17  Devices."
18    BY MR. NORTH
19    Q.  Before that one, what was the most recent
20  publication you had specifically regarded to Nitinol?
21  Would that be No. 619, or 620, I guess?
22    A.  620 has just been accepted, so that is coming
23  out.  619, we're dealing with -- the paper's been
24  reviewed, and we have to answer some questions, and
25  then we will send that back.  So that hasn't quite been

Page 36

1  accepted yet.
2    Q.  Do either of those -- does 619 in any way deal
3  with your work in this particular case?
4    A.  It is a general analysis of fatigue and
5  fracture in Nitinol.  So it doesn't -- it is not
6  specific to any medical device per se.  It is on the
7  topic of fatigue and fracture, and it is, again,
8  focused on medical devices, so wire-wound, wire-type
9  devices, but I can't recall -- I don't think there is
10  any mention of a filter in there.
11    Q.  And when do you expect that to be published?
12    A.  Probably later this year.  I shouldn't be
13  presumptive.  We have to -- it's been reviewed; it's
14  been nominally accepted.  We have to respond to the
15  reviewers, which we are doing now, and it will probably
16  come out at the end of the year.
17    Q.  Stents are generally manufactured out of
18  Nitinol tubing, aren't they?
19    A.  They are laser-cut from tubing, yes.
20    Q.  And that is a little bit different than
21  Nitinol wire, which is used in the filters, isn't it?
22    A.  It's a different product form, yes.  The heart
23  valves, on the other hand, often use wire type, like a
24  wire type these newer ones.
25    Q.  Have any of your past publications dealt

9 (Pages 33 to 36)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

Page 37

1   specifically with Nitinol wire as opposed to Nitinol
2   tubing?
3       A.  I have looked at -- I have looked at various
4   different product forms of Nitinol, including wire,
5   tubing and plate, and tried to look at the difference
6   in their behavior.  There is something called "texture"
7   in Nitinol, which is how the grains form, and these can
8   change from product form.  So in that regard, I have
9   looked at it.
10      Q.  Are most of your Nitinol-related publications
11  dealing with Nitinol tubing?
12      A.  No.  They looked at different -- I mean, a lot
13  of it recently has been based on medical devices, so it
14  is general to Nitinol.  But I have looked at plate and
15  I have looked at tubing and various different product
16  forms.
17      Q.  Can you estimate for me what percentage of
18  your income is derived from litigation consulting?
19      A.  Pretty small.  Ten percent.  And by the way,
20  litigation, I mean, I am referring to all sorts of
21  consulting.  Some of it may not be litigation-related,
22  but, you know, consulting -- I work for certain
23  companies that call me in to ask about certain things,
24  nothing to do with legal cases.  But my consulting
25  income is typically about 10 percent of what I earn,

Page 38

1   probably a little bit less.
2       Q.  Looking at your curriculum vitae, beginning on
3   Page 2 and carrying over to Page 3, there is a list of
4   what you call "activities."
5       A.  Yes.
6       Q.  And those involve various journals in which
7   you have been involved, symposia and conferences and
8   things of that nature that you have presided over,
9   correct?
10      A.  Yes, indeed.
11      Q.  Do any of those activities specifically -- or
12  did they specifically focus on Nitinol?
13      A.  Well, as an editor -- on an editorial board of
14  the journal, certainly the issue of Nitinol comes up,
15  but most of them are in general -- in the general
16  materials field with focus on fatigue and fracture.
17      Q.  None of those activities specifically dealt
18  with inferior vena cava filters, to your knowledge, did
19  they?
20      A.  No, no.  None.  Not specifically, anyway.
21      Q.  Have you ever been involved in consulting with
22  a manufacturer about the actual manufacturing process
23  or assembly-line process for creation of a medical
24  device?
25      A.  Well, when I visited these companies, I am

Page 39

1   often shown that, and I have, you know, given my
2   opinion on occasion.  But -- so that is my involvement,
3   certainly.  I mean, with some of the heart valves,
4   where they were inserting certain disks into a metals
5   occluder, I certainly gave advice on how they should or
6   shouldn't do that, which affected that manufacturing
7   process.
8       Q.  Have you ever been involved in the actual
9   writing specifications for a manufacturing process for
10  a medical device?
11      A.  I have written -- I have written reports which
12  undoubtedly have been used to develop some of those
13  specifications.  But, no, I haven't actually written
14  them myself.  A consultant wouldn't necessarily do
15  that.
16      Q.  You are not a medical doctor, correct?
17      A.  I am not a medical doctor.
18      Q.  You are not an expert in anatomy, are you?
19      A.  I am not an expert in anatomy.
20      Q.  And you are not an expert on physiology?
21      A.  I am not an expert in physiology.  I work on
22  bone, and I work on teeth.  That is my involvement.
23      Q.  In the heart-valve litigation, are there any
24  attorneys with which you work primarily?
25      A.  No, I can't recall.  I mean, when I was

Page 40

1   working with Shiley, it was mainly during the period
2   when their valves started to fail.  So I was not
3   involved in a lot of the legal aspects; I was involved
4   in trying to find out why they failed and looking at
5   the newer valves.  For St. Jude, I did do a number of
6   litigation, and I have no recollection of who the
7   lawyers were.  So I -- that is all -- I can't tell you
8   anything else.
9       Q.  Have you consulted with lawyers from Los
10  Angeles on behalf of St. Jude?
11      A.  I honestly can't recall.  I have a conference
12  call with one tomorrow, but I am not quite sure where
13  she is from.
14      Q.  Have you -- has your testimony ever been
15  excluded by a judge, to your knowledge?
16      A.  I think there was a case a long time ago where
17  I worked for -- a lawyer in San Francisco had a knee
18  implant.  And -- who never paid me, by the way -- and
19  he went bankrupt afterwards, but I think there was some
20  issue there about -- that my testimony was excluded
21  because they said I wasn't a manufacturing expert.  I
22  think that's what it was about.
23      Q.  Do you recall whether that was in state or
24  Federal court?
25      A.  No clue.  No idea.

10 (Pages 37 to 40)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 41

1    Q.  Do you recall how long ago that was?
2    A.  Fifteen years, maybe.
3    Q.  Do you recall -- well, you would have been
4  retained on behalf of an individual plaintiff in that
5  case?  Is that correct?
6    A.  Yes, indeed.
7    Q.  Do you recall who the manufacturer was?
8    A.  No.  I don't recall.
9    Q.  But your recollection is that was right here
10  in San Francisco?
11    A.  It was in San Francisco, yes.
12    Q.  We have talked some about your litigation
13  consulting work with regard to medical devices.  What
14  other sorts of products have you done litigation
15  consulting about?
16    A.  Aerospace.  I do a lot of work on -- I was
17  part of the Sioux City, Iowa DC-10 crash; I was
18  involved in that.  I worked on helicopter crashes.  I
19  have done exploding propane cylinders.  Anything that
20  breaks or particularly fatigues is something that I
21  often get called into.  I haven't done as many lately;
22  I haven't had time, being head of department.  I did a
23  couple of automobile cases, pretty small.  I think that
24  is about it.
25    Q.  Have you -- who were you retained on behalf of

Page 42

1  in the Sioux City United Airlines crash?
2    A.  Sidley & Austin.  They are out of Chicago.  I
3  was working for General Electric.  They were working
4  for General Electric.
5    Q.  Have you ever worked with Dean Hartley before?
6    A.  No.
7    Q.  Have you ever worked with his colleague, Jack
8  Davis?
9    A.  No.
10    Q.  Do you know how they got to you in this
11  particular case, how they located you?
12    A.  No.
13    Q.  Do you know who recommended you to them?
14    A.  No.
15    Q.  You were given a number of depositions and
16  documents to review in this case; is that correct?
17    A.  Indeed.
18    Q.  And who provided those to you?
19    A.  It was sent to me by either Dean or Jack; I am
20  not sure who, but it was...
21    Q.  We were previously furnished a list of the
22  materials that you were provided, or that you had
23  reviewed as a part of your work in this case.  Did all
24  of the materials you reviewed come from either
25  Mr. Davis or Mr. Hartley?

Page 43

1    A.  A large proportion.  I may have found an odd
2  publication in the literature.  But I would think, yes,
3  most of it all came from Dean Hartley.
4    Q.  So if we have a list of materials that you
5  have relied upon and reviewed as a part of your work in
6  this case, it is fair to say that virtually all of that
7  material would have come from the Plaintiff's lawyers,
8  with the possible exception of a handful of additional
9  articles?
10    A.  Yes.  I think that is a fair comment.
11    Q.  You were provided with a number of depositions
12  in this case, weren't you?
13    A.  Way too many, but, yes.
14    Q.  Did you read those depositions?
15    A.  I have read most of them.  I haven't read --
16  actually, there is two or three that I have yet to
17  read, but I have read most of them.
18    Q.  Did you make any notes concerning those
19  depositions?
20    A.  Yeah, I have made -- scribbled noted, yes.
21    Q.  Did you bring those notes with you?
22    A.  They are on the copy of the deposition.
23    Q.  Did you bring the copies of the deposition?
24    A.  No, I didn't, because it was too big.  It is a
25  massive file.  I brought everything else, but not that.

Page 44

1    Q.  Okay.  Let me ask you, did you read the
2  deposition of Robert Carr?
3    A.  Yes.
4    Q.  What is it you just pulled out of your --
5    A.  Just a list of the depositions that were sent.
6  And that just indicates who these people are.
7    Q.  If they have checkmarks by them --
8    A.  Then I have read them.
9    Q.  If we could mark this as Exhibit 2 to the
10  deposition.
11    A.  You are not going to take that away from me.
12    Q.  What we'll do is we will make a copy of it at
13  the end of the deposition.
14        (Whereupon Defendants' Exhibit No.
15        2 was marked for identification.)
16    BY MR. NORTH
17    Q.  Doctor, how did you determine which
18  depositions you would read and which ones you would not
19  read?
20    A.  Their order in the book.
21    Q.  So you read a number of them, and then you
22  just quit reading them?
23    A.  I didn't have time to finish them.  I have got
24  through all but two.
25    Q.  Well, according to this chart -- well, let me

11 (Pages 41 to 44)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING  (510)  486-0700

Page 45

1  be sure I am correct.  On the chart that is Exhibit 2,
2  if the deposition does not have a check-mark on the
3  left-hand side, that means you have not read it,
4  correct?
5      A.  That is not quite true.  I am in the middle of
6  Kaufmann.  So, yes.
7      Q.  Okay.  So you are in the middle of reading
8  Dr. Kaufmann, but you have not completed it?
9      A.  I have got a few pages to finish.
10     Q.  You have not read the deposition of John
11  McDermott?
12     A.  Not yet.
13     Q.  You have not read the deposition of Sherry
14  Allen?
15     A.  Not yet.
16     Q.  You have not read the deposition of Janet
17  Hudnall?
18     A.  Not yet.
19     Q.  As I understand it, you were not furnished the
20  deposition of Tony Venbrux?
21     A.  No.
22     Q.  And you were not furnished the deposition of
23  Dr. William Stavropoulos?
24     A.  No.
25     Q.  And you were not furnished the deposition of

Page 46

1  Scott Trerotola?
2      A.  No.
3      Q.  You were provided with a copy of the Nicholson
4  article -- the York study regarding the recovery filter
5  and G2 filter?
6      A.  Yes.
7      Q.  But you were not provided a copy of Dr.
8  William Nicholson's deposition regarding that study,
9  were you?
10     A.  No.
11     Q.  And you were not provided a copy of the
12  deposition of the deposition of Dr. Nicholson's
13  research coordinator, Barbara Delio Cox, were you?
14     A.  No.
15     Q.  And you were not provided with a copy of the
16  deposition of Avuit Mukherjee, were you?
17     A.  No.
18     Q.  When were you first retained in this case?
19     A.  In 2009, I believe.  I am not sure of the
20  exact date.
21     Q.  You are familiar with Mr. Scott Robertson, Dr.
22  Scott Robertson?
23     A.  He was my student and postdoc.
24     Q.  Have you had discussions with him concerning
25  this litigation?

Page 47

1      A.  Peripherally, yes.
2      Q.  Was he involved at all in referring these
3  cases to you?
4      A.  It is possible.  I don't know exactly, but it
5  is possible, because he actually -- after he left me
6  and went to work for -- I think it was Cordis at that
7  time, he did a study on these -- the failure of these
8  filters.  And I think that was before I was retained.
9  So I don't know quite what his involvement was with
10  Dean Hartley and Jack Davis, but I certainly talked to
11  him about it -- peripherally about these failures at
12  that time.
13     Q.  But you don't recall any specific conversation
14  where he indicated to you that he had referred you --
15  referred Mr. Hartley and Mr. Davis to you?
16     A.  Maybe he did.  I can't recall.  Maybe he did.
17  I mean, it seems -- it is possible he could have done
18  that, but I don't recall exactly.
19     Q.  You mentioned that you -- advised that you had
20  never worked before with Mr. Davis or Mr. Hartley.
21  Have you ever worked with Mr. Tim Casey out of Phoenix?
22     A.  I don't think so.
23     Q.  Have you ever worked with a New York City law
24  firm Weitz & Luxenberg?
25     A.  I don't think so.

Page 48

1      Q.  So you were first, as you said, retained in
2  this case in 2009.
3      A.  I believe so, yes.
4      Q.  And you were -- were you provided some
5  materials at that time?
6      A.  I was -- in 2009, I was certainly given some
7  filters to look at, because I make a note in my files
8  about when I received them, and a lot of filters came
9  to me in 2009.
10     Q.  Did you bring your log of when you received
11  various information today?
12     A.  I don't really have such a log.  But I mean,
13  in my computer when I list -- I list the -- actually, I
14  have that if you are interested.  Yeah, I have a CD
15  of -- well, I sent it to you.  You have the CD of my --
16  all of the pictures that I took of the valves, and each
17  of the headings for each filter actually lists the date
18  of receipt.  I can fire up my computer and give them to
19  you if you want.
20     Q.  That is okay.  So the pictures of the filters
21  that you previously furnished to us will bear the date
22  that you received the filters?
23     A.  I believe so.  The heading -- of the file
24  heading which, you know, for each particular filter, be
25  it gray or what have you, should have a parenthesis

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

Page 49

1  after that says "received" and the date. On most of
2  them -- one I didn't get the exact date. If you don't
3  have it, I can certainly furnish it to you.
4      Q.  Can you tell me how much money you have billed
5  Mr. Hartley and Mr. Davis for your work thus far in
6  this case?
7      A.  Not offhand, but I have a list of my bills if
8  you want them.
9      Q.  Do you have them here?
10     A.  I have them on the CD, if that is okay.
11     Q.  Okay.  And I would assume that you have had a
12  number of graduate assistants assisting you in this
13  matter?
14     A.  I have had two postdocs, actually, who have
15  helped me with this.
16     Q.  And do you charge for their time?
17     A.  I pay them from what I earn.  You know, I pay
18  them basically for their work.
19     Q.  But do you separately bill Mr. Hartley and
20  Mr. Davis for their time at some sort of hourly rate?
21     A.  I can't remember what I did there.  But I
22  think -- I generally include it in whatever -- I mean,
23  I sit with them on the microscope, and I pay them out
24  of what I earn.
25         I don't think there is any separate billings.

Page 50

1  There may have been a separate billing for microscope
2  time on one occasion, but largely it is just billed --
3  I pay them out of what I earn.
4      Q.  Have you spoken with any of the individual
5  plaintiffs in this litigation?
6      A.  No.
7      Q.  Have you spoken with any of the witnesses that
8  have been deposed?
9      A.  No.
10     Q.  Have you spoken with any of the Plaintiffs'
11  other expert witnesses?
12     A.  Well, I have spoken with Professors McMeeking
13  and Begley.
14     Q.  Have you worked with Professors McMeeking and
15  Begley in the past?
16     A.  I have worked with Professor McMeeking for
17  many years.  We did a lot of the Shiley cases together.
18  We did some Jude cases together.  We were working with
19  Sorin together.  I work with Begley -- I have written a
20  paper with him recently, but this is the first
21  consulting job I have worked with Begley.
22     Q.  So in the past, you have done a fair amount of
23  litigation consulting with Professor McMeeking?
24     A.  Yes, indeed.
25     Q.  In this particular case, were you approached

Page 51

1  first by Mr. Davis and Mr. Hartley, or was it Professor
2  McMeeking?
3      A.  I was approached first.
4      Q.  And then did you recommend that Mr.
5  McMeeking -- Professor McMeeking also be brought on
6  board the team?
7      A.  Yes, I did.
8      Q.  Then was it Professor McMeeking that suggested
9  that Professor Begley help him?
10     A.  Yeah.  When I suggested Professor McMeeking,
11  Professor Begley wasn't even at Santa Barbara at that
12  point.  Begley's involvement would have been due to a
13  recommendation from Professor McMeeking.
14     Q.  Now, how do you envision the different roles
15  that you and Professor McMeeking play in the analysis
16  of this litigation?
17     A.  Well, in all of the times we have been
18  involved in cases together, I mean, the issues have
19  often been associated with fracture and fatigue.  And
20  the two primary factors involved there are the material
21  and the stresses that it sees.  And we both consider
22  ourselves to be fairly cognizant of both aspects,
23  although my particular forte is looking at the failure
24  processes, and his particular forte is looking at the
25  computation of the stresses.

Page 52

1  So I am a strong believer that in anything
2  that fails, perhaps the most important thing is to know
3  what the stresses are.  So I have always recommended
4  that who I consider the most competent stress analysis
5  on the planet is involved.  And that's why I got
6  Professor McMeeking involved.
7      Q.  I am hoping not to butcher this, but for a lay
8  perspective, I would like to try to characterize what I
9  think I understood you to say.  Your -- from a lay
10  perspective, your role, as you see it, was to determine
11  why these failures occurred, what the process was that
12  caused these failures?
13     A.  Yes.
14     Q.  And in turn, Dr. McMeeking's role was to
15  compute or try to quantify the stresses that led to the
16  failures you identified?
17     A.  Yeah.  But, I mean -- absolutely right.  But
18  of course those two aspects merge, of course.  But
19  yeah, his, his -- he is a numerical stress analyst, and
20  I am a material scientist, so I think that is a fair
21  assessment.
22     Q.  Have you had any meetings with Dr. McMeeking
23  and Dr. Begley regarding this matter?
24     A.  We certainly talked on the phone, but no
25  specific meetings.

13 (Pages 49 to 52)

CLARK REPORTING (510) 486-0700

Page 53

1    Q. On how many occasions have you talked on the
2 phone with him?
3    A. Two or three times.
4    Q. Did you review their report before it was
5 finalized?
6    A. No.
7    Q. Did they review your report before it was
8 finalized?
9    A. Possibly. Yeah, I think I sent them a copy of
10 my report.
11    Q. Did they make any recommendations or edits for
12 the report?
13    A. No.
14    Q. But you did not look at their report until it
15 was finished?
16    A. I didn't see it until it was submitted, yes.
17    Q. You have since seen it?
18    A. Oh, yes.
19    Q. Is there anything in that report with which
20 you disagree?
21    A. No. I think it is a very good report.
22    Q. Have you ever talked to an -- as part of your
23 work in this case, have you ever talked with an
24 interventional radiologist concerning inferior vena
25 cava filters?

Page 54

1    A. No.
2    Q. In your discussions with Professors McMeeking
3 and Begley, did you all specifically discuss
4 electropolishing?
5    A. Not really. I mean, the topic may have been
6 mentioned, but that is not something that they would
7 be -- I can't say that. We peripherally talked about
8 it, but as it may address the stress states, yes.
9    Q. Did you have any specific discussions with him
10 about chamfers?
11    A. Yes. We talked about that, certainly.
12    Q. Have you had any discussions in this
13 litigation with Dr. Joseph Dyro?
14    A. No.
15    Q. Have you had any discussions with Dr. Jeffrey
16 Hull?
17    A. No.
18    Q. Have you had any discussions with any of the
19 Plaintiffs' other experts, other than Drs. McMeeking
20 and Begley?
21    A. No.
22    Q. Have you published any papers in the past with
23 Dr. McMeeking?
24    A. I don't think so. We had one paper, actually,
25 we were going to publish with Baxter about a

Page 55

1 heart-valve case. But I don't think it was ever
2 published for some reason.
3    Q. In your report, you list on Page 17 a number
4 of references; is that correct?
5    A. Yes.
6    Q. Were the majority of those references provided
7 to you by Mr. Hartley and Mr. Davis?
8    A. Well, certainly from ten onwards. Eleven was
9 definitely provided by them. I honestly can't recall
10 exactly. They certainly -- certainly numbers 10 and
11 12, 13 and 14 were not provided. And I can't remember
12 in each individual case whether I found that by Google
13 Scholar or whether it was sent to me.
14    Q. The first nine articles all have to do with
15 inferior vena cava filters?
16    A. Right.
17    Q. Were those all sent to you by Mr. Davis and
18 Mr. Hartley?
19    A. I don't think the individual papers were sent
20 to me. As I said, I think they sent me a list at some
21 point. I can't honestly recall, but I certainly looked
22 around to see what was out there. I use Google Scholar
23 a lot. I can find some of these papers, so some of
24 them I may have found myself. I honestly can't
25 remember.

Page 56

1    Q. You were not provided, as I understand it,
2 with the Society of Interventional Radiologists'
3 quality improvement guidelines for filters, were you?
4    A. I don't think so.
5    Q. All of the specifications and operating
6 procedures for the manufacture of the recovery filter
7 were provided to you by Mr. Hartley and Mr. Davis,
8 correct?
9    A. Does the "all" refer to all of the docs or the
10 papers that I have received?
11    THE REPORTER: All of what, sir?
12    THE DEPONENT: What do you mean by "all?" I
13 mean, all of the ones that exist or that were sent to
14 me?
15    BY MR. NORTH
16    Q. I don't think you heard my question. I said,
17 "all of the specifications or operating procedures for
18 the recovery filter."
19    A. Yes. But my question is, are you referring to
20 all of the ones that exist or all of the papers that I
21 received? Everything I received on operating
22 instructions, I received from Mr. Hartley or Jack
23 Davis.
24    Q. Right. Okay.
25    A. But it may not pertain to all of the ones that

14 (Pages 53 to 56)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING  (510)  486-0700

Page 57

1  exist.  I can't speak to that.
2      Q.  And you simply relied on Mr. Davis and
3  Mr. Hartley to determine which ones they were to
4  provide to you?
5      A.  If there were more than they sent me, yes.
6      Q.  Were you provided the European standard or the
7  FDA guideline for the development of inferior vena cava
8  filters?
9      A.  No.
10     Q.  You were furnished some reports obtained by
11  Bard from a company called Altran --
12     A.  Yes.
13     Q.  -- regarding the evaluation of some fractured
14  filters in the 2003, 2004 time frame?
15     A.  Yes.
16     Q.  Did you review those reports?
17     A.  Yes.
18     Q.  As I understand it, you were not provided
19  Bard's communications back and forth with the FDA
20  regarding the testing of this device, were you?
21     A.  I was provided with -- as it pertains to what
22  is in the notes for Kay Fullo's deposition, the 510K
23  application is in there, and there is a lot of
24  subsequent discussion both within Bard and with the FDA
25  about that particular submission.  So I have certainly

Page 58

1  seen that.
2      Q.  Did you see the actual documents?  Were they
3  attached to Kay Fullo's deposition, or was it just her
4  discussion about them?
5      A.  No.  The actual documents were there, and
6  there is, of course, her discussion, too.
7      Q.  Do you know the materials expert that has been
8  designated by C.R. Bard in this case?
9      A.  This -- is this the woman who wrote the report
10  from Anamet?
11     Q.  Yes.  Dr. Fasching.
12     A.  I don't know her that well.
13     Q.  What were the names of the two assistants that
14  worked with you on this project?
15     A.  My first postdoc was called Max Launey, M-a-x,
16  L-a-u-n-e-y.
17     Q.  L-a-u-n-e-y?
18     A.  Yes.  And my current postdoc has an
19  Eastern-European name that I cannot either pronounce or
20  spell, so give me a second.  His name is Bernd,
21  B-e-r-n-d, and his surname is G-l-u-d-o-v-a-t-z.
22     Q.  Gludovatz?
23     A.  Gludovatz, right.
24     Q.  Did Mr. Launey and Mr. Gludovatz examine all
25  of the filters that you received from Mr. Hartley and

Page 59

1  Mr. Davis?
2      A.  One of the early ones, I have forgotten which
3  one it was, was done down at NDC.  I mean, I asked --
4  that is right.  I think somebody who worked for NDC
5  looked at one of the earliest valves -- one of the
6  earliest filters, rather, and then sent me a set of
7  photographs.
8      Q.  Had somebody from NDC been contacted by
9  Mr. Davis and Mr. Hartley regarding this project before
10  you were brought in?
11     A.  That is quite possible, now that I think about
12  it.  I can't recall why we sent it down there, but yes.
13  That may be where the involvement of Scott Robertson
14  came from.
15     Q.  Was he at NDC at that time period?
16     A.  Yes.  It was part of Cordis at that time
17  period.
18     Q.  Did Mr. Launey or Mr. Gludovatz or both of
19  them assist in drafting the report?
20     A.  Not at all.
21     Q.  On Page 4 of your report, you discuss your
22  methodology for examining these filters?
23     A.  Yes.
24     Q.  Generally, what was the condition of the
25  filters?  And I am talking here about the explanted

Page 60

1  filters, not the exemplar filters, but the ones that
2  had been removed from people's bodies.  What was their
3  condition generally at the time you received them?
4      A.  Some of them had a little bit of tissue on
5  them and so forth.  We can't handle that; we are not
6  allowed to handle anything like that.  So at the time I
7  requested from Mr. Hartley, and presumably through you,
8  what I could do to clean them before I could put them
9  in the microscope.
10     Q.  And so you subjected these filters that had
11  been returned to you to some sort of sterilization
12  process?
13     A.  Yeah.  We have to just -- exactly what it is.
14  This is also important when you put it in a scanning
15  electron microscope and you need to get rid of dust --
16         THE REPORTER:  Say that again.
17         THE DEPONENT:  A scanning electron microscope
18  particles and you need to get rid of dust particles and
19  this sort of thing that charge up in the microscope.
20  So they need to be -- we obviously clean them as well,
21  but the main thing is the sterilization; we can't
22  handle that.
23         BY MR. NORTH
24     Q.  Well, when you would receive the filters, how
25  did you handle them?  Do you use tweezers?

15  (Pages 57 to 60)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 61

1    A.  We use tweezers and gloves, yes.
2    Q.  And so you would have used tweezers on these
3    filters before you actually examine them, and then --
4    will you let me finish my -- I'm sorry, if I don't
5    finish my question before you answer, it she can't do
6    the transcript.
7    A.  I beg your pardon.
8    Q.  Did you use the tweezers to handle the filters
9    as a part of the sterilization process?
10   A.  You know, I can't remember exactly, but we --
11   whether we used tweezers or not.  We wouldn't use metal
12   tweezers; that could possibly damage the filters.  So
13   we would certainly use gloves and they would be put
14   into a -- you know, a beaker and soaked in this
15   solution.  That's how we did it.  So the tweezers would
16   not -- we have some plastic tweezers; I don't think
17   they were used here.  I think we just used hands and
18   gloved hands.
19   Q.  It sounds like in the way you describe that,
20   that it would have been your assistants and not you --
21   let me finish my question, please.  This transcript is
22   going to be a mess if we don't do it.  It sounds to me
23   in the way you described that, that it was your
24   assistants that would have sterilized it, not you?
25   A.  Absolutely.

Page 62

1    Q.  So you didn't sterilize any of these filters?
2    A.  No.  They sterilized it for me.
3    Q.  Did you observe them sterilizing any of these
4    filters?
5    A.  Yes.
6    Q.  Did you observe them sterilizing all of these
7    filters?
8    A.  No.  I gave instructions how it should be
9    done, certainly.  I mean, one of the problems here is
10   that you have to be very careful that you don't damage
11   anything in the process of cleaning them, but virtually
12   every device, every failure that is looked at in the
13   scanning microscope, which is generally used in
14   99 percent of all of these cases, you have to clean
15   them.  So this is a process that we are well used to
16   and...
17   Q.  And just so I understand the rhythm, the
18   sterilization occurs before they are placed under the
19   microscope?
20   A.  Of course.  Yes.
21   Q.  Did you understand that you were not to
22   perform any destructive testing on the filters?
23   A.  Absolutely.  Absolutely.  That's why I sought
24   advice over the sterilization.  Sometimes people seem
25   to think that tissue on those things could have some

Page 63

1    meaning from the point of view of evidence.  So we are
2    very, very careful of this.
3    Q.  At my request, you subsequently shipped these
4    filters to me, correct?
5    A.  Indeed, yes.
6    Q.  Two of the filters we received had a number of
7    small prongs clipped off of them.
8    A.  Yes, indeed.
9    Q.  Do you know how that occurred?
10   A.  No.  I presume that was done during explant or
11   something, but I certainly didn't do that.  One of them
12   had, I think, four legs cut off or the feet cut off.
13   That would -- we would not have done that, of course.
14   Q.  So is it your testimony that they arrived in
15   your possession from Mr. Hartley and Mr. Davis in that
16   condition?
17   A.  One hundred percent, absolutely.
18       MR. NORTH:  With the understanding that you
19   obviously can keep this book, I would like to just mark
20   his report as Exhibit 3, and then we'll substitute a
21   non-bound copy of them.
22       Okay.  I have 20 pounds of exhibits and don't
23   have his C.V.
24           (Whereupon Defendants' Exhibit No.
25            3 was marked for identification.)

Page 64

1       BY MR. NORTH
2    Q.  So we have marked as Exhibit 3 your report in
3    this case, correct?
4    A.  Well, there are several versions, so I don't
5    know which one -- that is the Newton one, right?
6    Q.  Okay, then that is the main report, correct,
7    the Newton report?
8    A.  They are all the same.  They just -- the way
9    the report is written, there is an appendix which
10   describes the individual filter failures which are
11   pertinent to that particular case.
12   Q.  But the main report is the same for every
13   case?
14   A.  The main report is the same for every case.
15   Q.  And what we have marked is the main report,
16   then with the filter, specific discussion for the
17   Newton case, correct?
18   A.  You have, indeed.  Yes.
19   Q.  Did Mr. Launey and Mr. Gludovatz examine these
20   filters under the scanning electron microscope?
21   A.  They operated the microscope, yes.
22   Q.  Did you look at each and every filter, or did
23   they look at some and report to you what they found?
24   A.  I looked at all of them.
25   Q.  What do you mean when you say, "They operated

16 (Pages 61 to 64)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 65

1  the microscope"?
2      A. They turned the knobs. This is a complicated
3  tool. You have to pump the thing down and vacuum and
4  then you -- so this is something that they do most of
5  the time at the lab, so they operate it for me.
6      Q. Did they provide you any written notes or
7  report of their observations in the microscope?
8      A. I got little notes saying, "Three or four legs
9  broke" just to supplement -- a couple of sentences to
10  supplement the images that I got. Most important was
11  the images, which was a record of what we looked at
12  when we looked in the microscope. I sent those to you.
13      Q. Who made these one or two sentences of notes,
14  you or Mr. Launey or Mr. Gludovatz?
15      A. They would have been written after the fact
16  several -- four legs broke, three legs broke, something
17  like that.
18      Q. Did you personally choose the magnification
19  level for the scanning electronic microscope?
20      A. That is a difficult -- I asked them to look at
21  the surface, to look at the fracture surfaces, so that
22  would be something that is done as you examine. So a
23  priori you wouldn't fix the microscope. You put it at
24  a magnification that you can see what you want to see.
25      Q. You told me earlier that you drafted the

Page 66

1  report that's been marked as Exhibit 3?
2      A. I drafted it and I wrote it.
3      Q. Did Mr. Launey or Mr. Gludovatz provide
4  revisions for the report?
5      A. No.
6      Q. Now I believe you have said even though you
7  may have shared it with Mr. McMeeking, he did not
8  provide any revisions to the report?
9      A. No.
10      Q. Nor did Dr. Begley?
11      A. No.
12      Q. What about Mr. Hartley and Mr. Davis?
13      A. They called me up and said there is a bunch of
14  typos, and they went through a bunch of typos with me.
15      Q. For any reason, did you pull out any expert
16  reports that you had done in other litigation to assist
17  you in preparing this report?
18      A. No.
19      Q. Now, we were talking earlier about Scott
20  Robertson. My understanding is he was a Ph.D. student
21  under your guidance here, correct?
22      A. He was my Ph.D. student, yes.
23      Q. And you have co-authored a number of articles
24  with Dr. Robertson?
25      A. Indeed.

Page 67

1      Q. And he has worked over the years for Cordis,
2  correct, companies affiliated with Cordis?
3      A. NDC and Cordis were the same company, and then
4  they separated. Now he works for NDC. He actually, I
5  think, formed his own company within NDC, making
6  filters, I believe, which are recently sold. I don't
7  know the full story about that.
8      Q. Are you aware of the fact that he has
9  attempted to market a filter?
10      A. Yes. I think --
11      Q. Let me finish -- that he has attempted to
12  market filter products to Bard?
13      A. No. I was not aware of that.
14      Q. Are you aware of the fact that he is generally
15  trying to market various filter designs?
16      A. My understanding was that he had formulated
17  his own company within NDC making a filter, and that he
18  recently sold that. And that is my -- that is all I
19  know about it. I don't know any further than that. I
20  don't know what kind of filter, or where it is made or
21  anything.
22      Q. When is the last time you talked to
23  Dr. Robertson?
24      A. A week or so, two weeks ago. We have this
25  paper coming out, so we had to talk about that.

Page 68

1      Q. When is the last time you talked to him
2  specifically about this litigation?
3      A. I don't think we have talked specifically
4  about this litigation. I can't recall. We talk about
5  Nitinol a lot and the papers we have written. I don't
6  think -- this litigation may have come up peripherally.
7  I don't know, but nothing -- nothing specific.
8      Q. Do you know one way or the other whether the
9  filter or filters that his company has designed and
10  attempted to market are electropolished?
11      A. I would imagine they are, but I honestly don't
12  know. NDC tends to electropolish most of their
13  products, so I imagine it was, but I don't know for
14  certain.
15      Q. At least during some period of time when Dr.
16  Robertson was employed by NDC, NDC was owned by Cordis,
17  correct?
18      A. Yes. Yes.
19      Q. Are you aware that Cordis manufactures a --
20  one or more inferior vena cava filters?
21      A. Yes. I have become aware. I didn't know
22  until recently. Yes.
23      Q. You do a fair amount of work, I believe you
24  indicated, for Cordis?
25      A. I have been their consultant, and they now

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 69

1  send me small gift money to -- that I work at the
2  University on.
3      Q.  Has Dr. Robertson seen your report in this
4  litigation, to your knowledge?
5      A.  No.  I haven't sent it to them, certainly.
6      Q.  So he's made no revisions or comments or
7  suggestions on your report?
8      A.  No.  In fact, other then the typos from Mr.
9  Hartley and Mr. Jack Davis, no one has made any
10 comments -- oh, apart from your expert, of course.
11     Q.  You do not have any training in epidemiology,
12 do you?
13     A.  No.
14     Q.  Would you agree with this as a general
15 proposition in your field that cracks always exist in
16 materials?
17     A.  Yes.
18     Q.  And that -- would you agree that components
19 must be tolerant of the presence of cracks?
20     A.  Ideally, yes.
21     Q.  You have done some study and analysis and
22 publication regarding the fracture of Nitinol stents,
23 correct?
24     A.  It is mainly on fracture of Nitinol, on the
25 wire-type material used to make stents.  The one topic

Page 70

1  that I wrote specific to stents was on the life
2  prediction of those stents, which is an article that
3  was published in Biomaterials a few years ago.
4      Q.  What about an article you co-authored with a
5  Dr. Mehta regarding understanding the defamation and
6  fracture of Nitinol in endovascular stents?
7      A.  Yeah.  That was -- again, I am using the
8  differential pertaining to stents.  That was involving
9  a certain geometry -- a stent-like geometry which we
10 looked at in the synchrotron to understand how the
11 stress analysis related to the transformations in the
12 stent.  So, yeah, all of the work I have done recently
13 pertains to stents, but it isn't necessarily -- the
14 only one that is specifically on stents is the one on
15 life prediction.  I mean, I don't pull the test stents.
16 I examine the wire used to make the stents.
17     Q.  Well, in your testing, in your article with
18 Dr. Mehta, you talked about testing that had been
19 done -- or modeling, finite element analysis
20 that had been done to try to gauge the strength of the
21 stent.
22     A.  Let me explain this, what happens here.  The
23 stents are very, very small.  I mean, the wire -- so
24 one of the philosophies that's been used to evaluated
25 that material -- you need to test the actual material,

Page 71

1  because with Nitinol, it changes with product form.
2      So what's called a diamond sample has been
3  generated, which is an enlarged version of the
4  stent-like form.  And that's where most of the fatigue
5  testing has been done for stents, on these diamond
6  samples, and we examine that diamond sample.  It not an
7  actual stent, but it is made from the same materials as
8  the stent, and it's in the image of a stent, and that
9  is basically the fundamental unit that we look at.
10     And that particular paper you are referring to
11 involves numerical analysis of the stresses in that
12 stent and the -- in that stent-like device or diamond
13 device, and a simultaneous examination with the X-ray
14 synchrotron up at LBL.
15     Q.  And in that study -- let me just hand it to
16 you.  It is Mehta.  I have got it right here.
17     MR. NORTH:  If we could mark this as Exhibit
18 4.
19         (Whereupon Defendants' Exhibit No.
20         4 was marked for identification.)
21 BY MR. NORTH
22     Q.  I am sorry, you will get the one that is
23 actually marked.  Let me give this to Dean.
24     MR. HARTLEY:  3 was the report?
25     MR. NORTH:  3 was the report, yes.

Page 72

1      BY MR. NORTH
2      Q.  And this is the article that -- and the study
3  that we were just referencing that you conducted with a
4  number of folks, including Dr. Mehta, correct?
5      A.  Indeed.
6      Q.  If I could draw your attention to the first
7  page, the second column, under "Stent Design."
8      A.  Yes.
9      Q.  If you would read that paragraph to yourself,
10 please.
11     A.  Okay.
12     Q.  And there you are talking about the fact that
13 finite element analysis conducted on stent designs or
14 stent materials sometimes don't prove to be true for
15 the actual stent when implanted, correct?
16     A.  No.  I don't say that.  I mean, the issues
17 here are that -- numerical analysis is now the
18 preferred way of doing any stress analysis.  And with
19 certain situations, it is a little bit more difficult
20 to do this analysis.  And certainly with Nitinol, there
21 is this question of the fact that it has what is called
22 superelasticity.
23     So the -- this is a difficult thing to deal
24 with.  And, in fact, the people at Abacus, who are the
25 premiere numerical stress analysis company, they have

18  (Pages 69 to 72)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING  (510)  486-0700

Page 73

1  spent a lot of time trying to focus on how to develop
2  the constitutive laws for Nitinol devices, so I don't
3  think they're -- there is still stuff to be done there
4  with respect to the multiaxial aspects.
5       But what we were trying to do in this
6  particular paper is to see how far those analyses can
7  go and whether they are consistent with what we
8  understand from the microstructural changes in the
9  material.
10      Q.  If I understand what you are saying now, what
11  you are saying in this paragraph, you are saying that
12  despite everyone's best efforts, these mathematical
13  computations of how -- at least with a Nitinol stent
14  material -- how it may perform in the human body
15  sometimes is not quite consistent with the actual
16  experience once -- can I finish my question, please?
17      A.  Sorry.
18      Q.  Not quite consistent with the experience once
19  the device is implanted?
20      A.  Well, the issue there is, the numerical
21  analysis can't tell you what the physiological loads
22  are.  So that's where -- a lot of the uncertainty comes
23  in certain people's calculations in estimating what the
24  physiological loads are.
25      Q.  I think that is exactly what I was trying

Page 74

1  to --
2      A.  It is not the analysis, per se.  It is the
3  fact that -- it is the inputs to the analysis.  There
4  are a few problems with Nitinol; it is much more
5  complicated than regular materials.  But the bigger
6  problem, I think, is the physiological aspects.
7      Q.  So numerical analyses cannot with complete
8  accuracy quantify the physiological stresses that occur
9  inside the human body?
10      A.  What do you mean by "complete accuracy?"
11  Nothing has complete accuracy.  But the issue is, if
12  you are trying to calculate the stresses in a medical
13  device, you -- there are two principle inputs.  One is
14  the computation of the stresses, which is where the
15  numerical analysis comes in, and the constitutive
16  behavior of material and all that aspect.
17      The second one that is, what are your boundary
18  conditions?  What loads you are putting in?  And so the
19  loads that the medical device experiences are
20  associated with the physiological aspects of the
21  environment it sits in.
22      So any designer of a medical device, it is
23  really incumbent upon them to understand what those
24  various modes are.  Is it a heart valve?  Is it the
25  regurgitation of the blood?  Is it the impact of a

Page 75

1  thromboid?  So those are the physiological inputs, and
2  they are much more difficult to get.  But that has
3  nothing to do with the numerical; it is the input to
4  the numerical analysis.
5      Q.  So designers obviously should use their
6  absolute best efforts to try to approximate what those
7  physiological loads are, but you just indicated that it
8  is difficult to do so?
9      A.  No.  I said -- I said -- obviously they have
10  to do -- in any design, you have to approximate what
11  the loads are in that device.  But it is -- it is
12  difficult in any situation, whether you are designing
13  an airplane or whether you are designing a medical
14  device.  But the numerical analysis does not do that;
15  the numerical analysis takes those inputs and computes
16  them into stresses or strains in the device itself.
17      Q.  So in talking about this phenomenon, the
18  difficulty in quantifying the physiological loads, you
19  indicated in this paper that's been marked as Exhibit 4
20  that with regard to stents fracturing, we, and I quote,
21  "We may conclude that either our knowledge of the
22  nature and magnitude of the defamation of a stented
23  artery is incomplete, or current finite element models
24  fail to fully represent the actual mechanical response
25  of a Nitinol stent."  Correct?

Page 76

1      A.  And the rationale for that is that until
2  fairly recently, all stents were designed on the basis
3  of the pulsatile loading of the flexure of the artery
4  on the cardiac cycle.  And there has been a lot of work
5  now done on trying the measure the actual stresses and
6  displacements inside arteries.
7      And there is indications that one should take
8  into account -- which should have been done before --
9  of things like tensile loads and bending loads.  That's
10  what that paper that I wrote recently on multiaxial
11  loading tends to address.
12      Q.  So the scientific community, its knowledge of
13  the physiological loads put on the stent when implanted
14  is evolving and improving as time goes on?
15      A.  Everything is evolving and improving.  I mean,
16  that is not peculiar to this situation.  Our state of
17  knowledge grows in everything.  The issue is that when
18  you design something from an engineering perspective,
19  one has to be sufficiently conservative to take into
20  account all of the imponderables, and there are always
21  imponderables in real-life devices.  There is no such
22  thing as black and white; everything is gray.  This is
23  not like physics and chemistry.
24      So when you design a bridge, you don't know
25  exactly what the loads are going to be, but you make

19  (Pages 73 to 76)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING  (510)  486-0700

Page 77

1  certain that you put in sufficient safety factors, or
2  you put in consideration of worst-case scenarios to
3  take into account for that.  It is very standard
4  procedure.
5      Q.  You have been involved with stents for a
6  number of years, correct?
7      A.  Yes.
8      Q.  Ten years?
9      A.  Yes, probably.  Yes.
10     Q.  And you would agree that we know much more
11  about the physiological stresses placed on stents when
12  implanted today than we did when we first -- you first
13  started -- when you first became involved with those
14  sorts of products around 10 years ago?
15     A.  I don't know for certain, but I would imagine.
16  I haven't worked on the measurement of physiological
17  loads and so forth, so I don't know precisely.  I mean,
18  one tends to try and simulate these impulse duplicators
19  and so forth.  But it would be very unusual if nothing
20  further has been known or gleaned in the last 10 years.
21     Q.  Now, Dr. Ritchie, you were just saying you
22  published recently about -- what did you just call it,
23  multiaxial --
24     A.  I didn't publish about the physiological
25  loads.  I merely published the means of doing a life

Page 78

1  prediction in light of the fact there is multiaxial
2  loads there.
3      Q.  But that reflected the evolving understanding.
4  I mean, the premise when you are looking at multiaxial
5  loads reflects the evolving understanding of what sort
6  of stresses are put on stents when implanted, correct?
7      A.  Yeah, but that wasn't necessarily my
8  motivation.  My motivation was that things go in
9  stages.  With all things, you look at uniaxial motions
10  first, and I looked at multiaxial motions.  I realized
11  that no one had done that for stent-like devices, so
12  that's why I looked at that analysis.  But, I mean,
13  certainly there have been many studies done in the last
14  decade.  I am sure there is more known now than there
15  was then.
16     Q.  Do you believe that just because a device has
17  a crack in it of some nature, that it is defective?
18     A.  That is a very impossible question to answer
19  because everything contains a crack.  And a crack is
20  referred to in the general vernacular as a defect.  And
21  so it is a question of whether that crack is dangerous
22  or not.  There is cracks in that chair that you are
23  sitting in, but it is not necessarily dangerous because
24  they're not big enough to be activated by your weight
25  on the stresses on the chair.  I have been put in this

Page 79

1  situation before.
2      I mean everything contains cracks.  If those
3  cracks are large enough that they lead to the failure
4  of that device, then it is certainly defective.  But to
5  say that if every component that contains a crack is
6  defective, then everything around us is defective.  You
7  can't put a black and white on that.
8      Q.  Let me pose it to you this way, and I think
9  you just answered this, but to use this terminology, do
10  you believe that all cracks pose hazards?
11     A.  Potentially all cracks pose hazards.  But the
12  reality is that -- if those cracks are small enough or
13  in situations where they are not activated by the
14  stresses, then they would not pose a hazard.  So again,
15  you are trying to put a black and a white perspective
16  on something which is neither black or white.  Somebody
17  once asked me, "Are cracks beneficial?"  You know, and
18  it is an impossible question; it is like saying, "Is
19  aging beneficial."  It is a fact of life.
20     Q.  Do you believe that product manufacturers can
21  create products that are immune to crack initiation?
22     A.  One would hope that they could do that, but it
23  is -- when you develop a product that sees a certain
24  environment, I think it is incumbent upon you as a
25  designer or as a manufacturer to make certain that

Page 80

1  those cracks that inevitably may be there or may form
2  in service are not likely to cause failure during the
3  time they are in the patient.
4      So one of the things that I try to do is do
5  life predictions, so you can -- for a heart valve or a
6  stent, you can predict the life, and you hope that life
7  would be longer than the patient lifetime.
8      Q.  I believe you said earlier that cracks always
9  exist in materials.
10     A.  Yes, always.  I mean, there is no such thing
11  as a perfect material.
12         MR. NORTH:  I'm sorry.  I think it is a good
13  time to take a break.
14         THE VIDEOGRAPHER:  This concludes Video No. 1
15  of the deposition of Robert Ritchie.  Going off the
16  record.  The time on the monitor is 11:05 a.m.
17         (Off the record from 11:05 a.m.
18          to 11:21 a.m.)
19         THE VIDEOGRAPHER:  Here begins Video No. 2 of
20  the deposition of Robert Ritchie, coming back on the
21  record.  The time on the monitor is 11:21 a.m.  Please
22  begin.
23         BY MR. NORTH
24     Q.  Doctor, I would like to turn now to the
25  substance of your report with regard to your opinions.

20  (Pages  77 to 80)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 81

1     A.  Okay.
2     Q.  And your report has been marked to the
3  deposition as Exhibit 3.  In your report, you state
4  that the recovery filter has a 21 to 31.7 percent rate
5  of fracture and/or migration of parts of the device; is
6  that correct?
7     A.  Yes.
8     Q.  And where did you draw those particular
9  numbers from?
10    A.  From Reference 6, I believe.
11    Q.  I'm sorry.  Reference 6?
12    A.  Yes.  I think -- I mean, I drew those from the
13  published literature on -- that is why there is a range
14  here.  I know the Hull and Robertson paper, on the
15  basis of the ones they looked at was about 20 percent.
16    Q.  So you are saying that Reference 6 is the
17  support for the statement that data suggests that the
18  recovery filter has a 21 to 31.7 percent rate of
19  fracture and/or migration of parts of the device?
20    A.  Yes.  That's how I understand it, yes.
21    Q.  And that is the Kalva article, correct?
22    A.  Yes.  There was also statistics in Hull's
23  article as well, Hull and Robertson.
24    Q.  But your paper doesn't cite Hull there, does
25  it?

Page 82

1     A.  Not on that particular point, no.
2     Q.  Now, you also read Dr. Nicholson's article?
3     A.  Yes.
4     Q.  And, in fact, you cite that later in the same
5  paragraph on Page 2 of your report, where you talk
6  about the G2 device and say that it has been associated
7  in the literature with a 12-percent rate of fracture
8  and stress of the filter, correct?
9     A.  Yes.
10    Q.  And Nicholson is our support for that
11  statement?
12    A.  Yes.  I think so, yes.
13    Q.  You have not conducted any independent studies
14  to try to determine the fracture rate, if any, of the
15  recovery of G2 filters, have you?
16    A.  Of course not.
17    Q.  And you are relying solely on these articles
18  that you have cited, correct?
19    A.  Absolutely.  Yes.  I hope I cited them
20  correctly, but certainly in those articles it gives
21  some estimates of the failure rates, and those are the
22  ones I have cited.
23    Q.  And while you have relied upon Dr. Nicholson's
24  article as one of the bases for those statements, you
25  have not read his deposition or the deposition of his

Page 83

1  research coordinator?
2     A.  No.  I would hope that his published paper,
3  though, would be accurate in that regard.
4     Q.  But you don't have any independent knowledge
5  as to whether it is, do you?
6     A.  I have to look at the peer-reviewed
7  literature, and I would -- and I would take that as a
8  good source.  That's what I have done here.
9     Q.  So if I understand what you are saying is,
10  because Dr. Nicholson's article has been peer-reviewed,
11  you would assume that it is a valid study?
12    A.  Depends on what you mean by "valid."  But
13  certainly if I am -- I was interested to know roughly
14  what the rates of failure of these devices are, and I
15  went to the literature, and Nicholson's article was one
16  such referenced source.  So I would have to assume it
17  was right.
18    Q.  Your statement mentions that the fracture --
19  reported fracture rate of the recovery filter goes as
20  high as 31.7 percent.  Do you know where you got that
21  number?
22    A.  I have forgotten the exact -- it is on the
23  basis of one of these studies.  You know, the problem
24  here is that each study has a limited number of
25  examinations, and so the numbers would vary depending

Page 84

1  on the small sample statistics.  So whether it is 21 or
2  31.7, it depends somewhat on the population of filters
3  that were examined.
4     Q.  And all of these studies were single-site
5  studies, correct?
6     A.  What does that mean?
7     Q.  Looking at procedures done at one facility.
8     A.  I can't recall.  It is possible.  I don't
9  know.
10    Q.  So you have not tried to analyze these studies
11  from an epidemiological standpoint, have you?
12    A.  Of course not, no.  In my opinion, if those
13  failure rates are even close to those numbers, then
14  that is a severe problem.  Whether they are 20 or 30 is
15  almost academic.
16    Q.  Do you recall how many filters were involved
17  in the Hull and Robertson study?
18    A.  No, I don't, offhand.  I can check for you if
19  you are interested.
20    Q.  That is okay.  Well, do you recall that Hull
21  and Robertson recognized that their patient cohort was
22  too small to allow definitive assessments from their
23  data?
24    A.  I mean, with the medical industry you are
25  never quite certain what small and large is, so, as I

21 (Pages 81 to 84)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

Page 85

1    said earlier, each of these studies has looked at a
2    limited number of filters. And so one would hope that
3    they would give a rough indication of what the overall
4    failure rates are, but without looking at all of them,
5    one can never be quite certain.
6        Q. Doctor, if you knew that in one of the studies
7    that out of 13 fractured filters, 10 had been implanted
8    by a single physician, would that cause you some
9    concern about the validity of that data?
10       A. Possibly. I mean, I am not going to argue
11   with you whether it is 21 or 31 percent. I think that
12   is somewhat academic here to my analysis. But in an
13   ideal world, you would like a somewhat larger
14   statistical population. If you want a definitive
15   number of the failure rates, then I was not given that
16   opportunity to have that information.
17       Q. I don't think that was my question, Doctor. I
18   didn't ask you about anything about the 21 to
19   31 percent. My question is very narrow and very
20   simple.
21          If you were to learn that in a study involving
22   13 fractured filters, 10 of the filters that fractured
23   had been implanted by a single physician, would that
24   cause you some concern about the validity of the data
25   in that study?

Page 86

1        A. I would question it, certainly. But I
2    question all data. That is part of the scientist's
3    job.
4        Q. Are you aware of the fact that all inferior
5    vena cava filters fracture to some extent?
6        A. All? I mean, that is a question that no one
7    can answer.
8        Q. All brands of filters?
9        A. Well, I am not privy to all brands of filters,
10   so it is very difficult to answer that question.
11       Q. So you have done no study as a part of your
12   work in this case as to whether other manufacturers'
13   filters fracture on occasion?
14       A. I have not looked directly at that. There has
15   been peripheral information in some of the depositions,
16   but my emphasis has been to try and find out why these
17   filters fractured.
18       Q. So as you sit here today, you have no personal
19   knowledge one way or the other as to whether the
20   fracture rates of the Bard filters exceed or are less
21   than the fracture rates of competitive IVC filters?
22       A. I have not seen specific statistics. I think
23   if the fracture rates in the other filters had been as
24   high as the ones that appear to be for the Bard filter,
25   I would know about it, but I haven't looked

Page 87

1    specifically at that aspect, no.
2          If the failure rates of all IVC filters are
3    around 30 percent for all devices, for all
4    manufacturers who make these filters, there is
5    something seriously wrong.
6        Q. You keep mentioning the 30 percent.
7        A. Have 20 percent. Have 10 percent. I don't
8    care what you say, 10, 20, 30 percent, in my opinion,
9    that is an unacceptable -- would you like one of these
10   things put inside you if you knew that --
11       Q. I am going to object to this.
12       A. Seriously. You asked me a question. I am
13   telling you the answer. I don't care if it is 10
14   percent, 20 percent, or 30 percent. Personally, I
15   think that is an unacceptable failure rate.
16       MR. NORTH: Doctor, before you gave -- I first
17   move as nonresponsive. There wasn't even a question on
18   the table. I have made one statement that was --
19   before I even finished my question, I said you have
20   mentioned this 30-percent fracture rate. You then
21   launched into that speech. We have every intent of
22   finishing this deposition by this afternoon, but if you
23   don't listen and answer my question and just give
24   speeches unrelated, we'll never get finished. We'll be
25   here for days.

Page 88

1          Now, that being said, my question is, you have
2    mentioned 30 percent several times. And based on your
3    report, it is my understanding that you believe at
4    least one of the studies supports a fracture rate of
5    the recovery filter of 31 percent; is that correct?
6        A. I wouldn't have made it up. Yes.
7        MR. NORTH: Okay. Would you mark this as the
8    next exhibit, please?
9          (Whereupon Defendants' Exhibit No.
10         5 was marked for identification.)
11       BY MR. NORTH
12       Q. Let me hand you what's been marked as
13   Exhibit 5. And based on the list the attorneys
14   provided us of the materials that you were given, my
15   understanding is that you were not provided with this
16   report and therefore have not seen this; is that
17   correct?
18       A. No. I haven't seen it.
19       Q. I'm sorry, what is that?
20       A. I haven't seen it, no.
21       Q. So you are not familiar with the reported
22   fracture rates for inferior vena cava filters as a
23   whole?
24       A. I don't know the basis of the question. I
25   mean, does this report refer to those rates?

22 (Pages 85 to 88)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

Page 89

1    Q. That wasn't my question. My question to you
2  was are you familiar with the reported fracture rates
3  of inferior vena cava filters as a class or product?
4    A. As much as they have been mentioned in
5  published papers on the failures of these filters, I
6  have, yes. I mean, how else can I answer that
7  question? I have looked at the literature, and I have
8  seen rates of failed filters, and I have quoted a range
9  there that I found from the papers.
10    Q. I am not talking about the Bard filters; I am
11  talking about all filters as a class of products.
12    A. No, I am not familiar with them. Sorry, I
13  misunderstood you.
14        MR. NORTH: Could we mark this as the next
15  exhibit, No. 6, please?
16        (Whereupon Defendants' Exhibit No.
17          6 was marked for identification.)
18        BY MR. NORTH
19    Q. Doctor, let me hand you what has been marked
20  as Exhibit 6, which is an article called "Quality
21  Improvement Guidelines for Percutaneous Permanent
22  Inferior Vena Cava Filter Placement." My understanding
23  is that the attorneys did not provide you with a copy
24  that document either, did they?
25    A. No.

Page 90

1    Q. Are you familiar with Dr. Clement Grassi?
2    A. No.
3    Q. Other than Dr. Kaufman, whose deposition you
4  are in the middle of reading, do you know of any other
5  leading interventional radiologists in the field?
6    A. No.
7    Q. You haven't spoken to any interventional
8  radiologists that may be affiliated with Berkeley here,
9  have you?
10    A. No.
11        THE VIDEOGRAPHER: Would you raise your
12  microphone?
13        MR. NORTH: I'm sorry.
14        THE VIDEOGRAPHER: That is okay.
15        BY MR. NORTH
16    Q. Your report talks in terms of slip-band
17  cracking.
18    A. Uh-huh.
19    Q. Can you explain to me what that is?
20    A. It is a process whereby in Nitinol materials,
21  you often get cracking on the surface which forms on
22  slip bands.
23    Q. What is a slip band?
24    A. Materials deform by a process of slip, just
25  like a pack of cards. On an atomistic level, the

Page 91

1  planes of atoms slide over one another. And if the
2  slip bands are particularly well-formed, then you can
3  see cracking along those regions. That's what
4  slip-band cracking is.
5    Q. Are slip bands fairly normal on Nitinol
6  surfaces?
7    A. If it is failing, yeah. They are generally
8  indicative of pretty high strain.
9    Q. Did you observe slip-band cracking on all the
10  filters you examined?
11    A. I can't recall exactly, because there was 12
12  of them. But in a lot of them, certainly, yes.
13    Q. Did you find slip-band cracking on the
14  exemplar filters?
15    A. I think there was some evidence of that on the
16  exemplars. Just give me a second to look here. Yeah,
17  there was slip bands on those.
18    Q. Are slip bands something that you would expect
19  to see on a Nitinol medical device that has been in
20  situ for a lengthy period?
21    A. Possibly. I mean, that is a very difficult
22  question to answer. It depends on the loads, the
23  stresses, the period. I mean, you know, if things are
24  allowed to deform and ultimately fail, then you
25  probably see slip-band cracking. If the stresses or

Page 92

1  loads they see are very small, you possibly wouldn't.
2  If they were deformed during manufacture, it is
3  possible you would see -- so it is too much of a
4  generalization. You can't answer a question like that.
5    Q. In your work with stents, have you seen
6  slip-band cracking on Nitinol stents that have been in
7  situ?
8    A. I haven't looked at many stents that have been
9  explanted in situ. I haven't looked at many stents at
10  all in that regard. So I don't recall any slip-band
11  cracking. I don't have enough experience to look at
12  those ex situ, explanted stents.
13    Q. Have you, in the course of your career, ever
14  done any sort of microscopic analyses of explanted
15  stents such as you have with regard to these filters
16  here?
17    A. Stents, no.
18    Q. Stents.
19    A. I have looked at stents before they are put
20  in. You don't see many explanted stents. They are not
21  generally explanted, so I don't know many studies that
22  have looked at that, quite frankly. A stent is not
23  such a critical device. They break occasionally, but I
24  have been more concerned with looking at the
25  manufacture of them and looking at some of the cracking

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 93

1  procedures during the manufacture of these stents.
2      Q.  Doctor, you've told what the literature says.
3  You've told me these things aren't normally explanted,
4  but you haven't answered the very simple question.
5      Have you personally ever examined,
6  microscopically, an explanted stent such as you did
7  with the filters removed in this case?
8      A.  No.
9      Q.  Have you ever analyzed any explantable --
10  explanted Nitinol medical device except for the --
11  other then the filters that you have looked at as a
12  part of this case?
13      A.  I worked for a company who were in the early
14  days of the production of Nitinol stents.  And I may
15  have looked at -- it was explants from, I think, sheep,
16  I may have done.  I can't quite recall.  I think it was
17  explanted sheep stents.  That was a long time ago in
18  the early days.  They were worried about the laser
19  cutting of the stents.  And I think I may have looked
20  at explanted stents at that point, but not from humans,
21  no.
22      Q.  And that would be with regard to any explanted
23  Nitinol device.  Other than the sheep stents you just
24  referenced and the filters involved in this case, you
25  have never done a microscopic analyses -- or analysis

Page 94

1  of explanted Nitinol medical devices in the past?
2      A.  Nitinol medical devices -- let me think here
3  for a second.  The only medical devices that have been
4  made that I work with here would be stents, and I
5  don't -- apart from those sheep stents, I don't think I
6  have looked at any explanted stents.
7      Q.  So my statement is correct:  The sheep stents
8  and the filters in this case are the only Nitinol
9  medical devices that have been explanted at the time
10  that you have examined them microscopically?
11      A.  I think that is the case.  I can't recall.
12      Q.  Did you see this slip-band cracking on all of
13  the exemplars you examined?
14      A.  I can't recall exactly.  I can refer to my --
15  to all of my figures.  I only looked at two or three,
16  so I can't recall if they were on every one.
17      Q.  Was the evidence of slip-band cracking as
18  severe on the exemplar filters as it was on the
19  explanted filters?
20      A.  I think it was -- I mean, it would be fair to
21  say it would be somewhat more severe on the explanted
22  filters.
23      Q.  Is it your opinion that no medical device
24  should exhibit any slip-band cracking prior to use?
25      A.  No.

Page 95

1      Q.  I'm sorry, what?
2      A.  No.
3      Q.  That is not your opinion, then?
4      A.  I don't have an opinion on that, quite
5  frankly.  I mean, slip-band cracking is simply evidence
6  of some kind of prior defamation or some defamation or
7  service of prior defamation from the manufacturer.  And
8  to say that you could make a generalization that all
9  devices could have no prior defamation is, again, way
10  too much of a generalization.
11      Q.  And just because a device has evidence of
12  slip-brand cracking prior to use does not mean it is
13  necessarily going to fail in actual use, does it?
14      A.  No, of course not.
15      Q.  With the explanted filters in which you saw
16  slip-band cracking, are you able to say one way or the
17  other whether that slip-band cracking existed prior to
18  implantation?
19      A.  You can't be precise.  It would be very
20  difficult to indicate whether it occurred during
21  service or prior to.
22      Q.  And actually, it would require you to actually
23  inspect it or examine the filters prior to implant to
24  be able to say whether the slip-band cracking
25  preexisted the implant, correct?

Page 96

1      A.  To be 100 percent certain, absolutely.
2      Q.  You also report that you see surface gouges in
3  some of the recovery filters; is that correct?
4      A.  Yes.
5      Q.  Did you observe these gouges in every filter?
6      A.  Of the recovery ones, again, I am not
7  absolutely certain, but they were very prevalent in
8  certainly most of them.  I looked at six.  I can't tell
9  you exactly what they were in every one, but they were
10  in most of them, certainly.
11      Q.  Were they present in the exemplar filters?
12      A.  Yes.  Yes, they were.
13      Q.  Did you take precise measurements of any of
14  these surface gouges?
15      A.  Other than taking -- it is very difficult to
16  do that unless you use a profilometer.  So you can see
17  the measurements from the scanning electron microscope
18  I didn't actually document those -- the depths of those
19  gouges.
20      Q.  Did you make any analysis or tests to
21  determine what may have caused those gouges?
22      A.  You can't do an analysis.  I didn't do an
23  analysis or test.  I can't destructively affect these
24  filters.  But my opinion is that they were -- since
25  they tend to form around the bend in the arm, they were

24  (Pages 93 to 96)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 97

1  almost certainly done during the shape-setting
2  procedure where they bend the arm to a particular
3  shape. That's what it looks like.
4      Q. So the gouges that you saw, surface gouges,
5  were concentrated in the area around the bend of the
6  arm?
7      A. That is typically -- there may have been other
8  places as well, but a lot of them were formed there.
9      Q. Did you see any surface gouges on the legs of
10  the filters?
11      A. No. I mean, there is a lot of other
12  defects -- I shouldn't say defects -- there is a lot of
13  other markings which are associated with the centerless
14  grinding and the draw-marks and so forth. There may
15  well have been small gouges down there. But the ones
16  that seemed to me to be the more -- ones that we would
17  have concern about were around the bend in the arm.
18      Q. Do you have any idea of how the actual
19  assembly line -- excuse me -- process for the
20  manufacturer of these filters operates?
21      A. Well, I have looked at what was given to me in
22  some of the documentation, and its pretty standard for
23  these Nitinol devices. You tend to deform them to a
24  particular shape, and then you give what is called a
25  shape-setting procedure which is an anneal, typically

Page 98

1  about 500 degrees Centigrade, which then sets that
2  shape. And I have seen a drawing of a rig that I think
3  that Bard used to do this. So insomuch, I have a
4  general idea how they did that, yes.
5      Q. I think it is clear from your report, but I
6  just want to make sure. You don't have any criticism
7  of the use of Nitinol in a filter, do you?
8      A. No.
9      Q. And properly done, in accordance with how you
10  think it should be treated and created, Nitinol is an
11  acceptable material for an inferior vena cava filter,
12  correct?
13      A. Yeah. Quite frankly, I think if you are going
14  to have a recoverable filter, then it is probably the
15  best way to go.
16      Q. So I believe you just said a minute ago that
17  you suspect that the gouge marks were -- around the
18  arms were caused in the process of bending the arms?
19      A. That is what I think it was caused by. I
20  mean, I don't know for certain, because no one can know
21  for certain other than perhaps Bard, but it would seem
22  to me that is most likely where those marks were
23  formed. They are certainly unusual.
24      Q. Do you have any understanding of what kind of
25  machine is used to bend those arms?

Page 99

1      A. Yeah. There is -- again, the documentation
2  that was sent to me, it is not very clear, by the way.
3  But there is some sort of rig they set up where they
4  put the filter in, and then they -- I think they bend
5  the arms in that particular rig.
6      Q. Okay. You make the following statement in
7  your report. You say, "Although the location of the
8  fatigue crack initiation sites could not always be
9  clearly identified with such surface damage, there is
10  evidence of such an association." I'm sorry. Look on
11  Page 6 of your report, if you would.
12      A. Can you -- which --
13      MS. HELM: Get the page numbers.
14      THE DEPONENT: Where are you?
15      BY MR. NORTH
16      Q. It is the one that has this picture at the
17  bottom.
18      MR. HARTLEY: Figure 6?
19      MR. NORTH: Yeah.
20      THE DEPONENT: Figure 6.
21      BY MR. NORTH
22      Q. Okay.
23      A. Okay.
24      Q. About midway through that paragraph, where it
25  says, "Although the location of the fatigue crack

Page 100

1  initiation sites could not always be clearly identified
2  with such surface damage, there is evidence of such an
3  association in Figure 10. The presence of such surface
4  markings is certainly not beneficial to the durability
5  of the device." Is that correct?
6      A. Yes, indeed.
7      Q. If I understand what you are saying there, you
8  are saying that these surface gouges you saw were not
9  always in every filter related to -- appeared to be
10  related to the actual fracture?
11      A. That is right.
12      Q. Can you tell me how many of the filters you
13  believe there was an association between the surface
14  gouge and the fracture?
15      A. Can I look at the crib sheet I made of this?
16      Q. Yeah.
17      A. So I looked at 11 filters, 6 of which were
18  recovery.
19      Q. Okay.
20      A. And by my assessment, there were three types
21  of failure modes that you can delineate. And one of
22  those failure modes was -- involved, I think, a clear
23  association with a defect, a surface gouge and a
24  fatigue failure. And out of the eleven I looked at,
25  three -- two recovery and one G2 -- I think you can

25 (Pages 97 to 100)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING  (510)  486-0700

Page 101

1.  attribute it to one of those gouges.
2      There is a -- there is a fourth one which your
3  expert indicated, associated with an inclusion, which
4  is effectively a defect.  And maybe she is right and
5  maybe she is not, but I don't really have much of an
6  opinion of that because you'd need to do an x-ray
7  analysis to see that that inclusion was there.  But so
8  I can definitely say that 3 out of the 11, the failure
9  of one of the arms can be attributed to a defect.
10      Q.  What are the other two failure modes that you
11  just mentioned, did you identify?
12      A.  Well, there is -- one failure mode involves
13  the initiation of fatigue crack at the rim.
14      Q.  The --
15      A.  The rim or the sheath, whatever you call it,
16  where the wires emerge from the rim.  And it looks like
17  that is where the wire is in contact with the rim.
18  There is a sharp corner there, as you know.  So that is
19  not a particularly good design.  And so the cracks tend
20  to start there, and then they propagate from the
21  outside of the device to the inside of the device.
22  This is -- I am talking about the arms now -- that is a
23  second failure mode.
24      Q.  How many of those did you perceive --
25      A.  Again, out of the -- out of the -- I am going

Page 102

1  to leave the G2s out, because several of the G2s didn't
2  even fail, at least in the arms.  Out of the six
3  recoveries, two can definitely be attributed to the
4  contact.  There are three other arms where the cracks
5  do propagate from the rim side inwards, which is
6  somewhat unusual in terms of the loading of the device.
7      And the third mode is the one that you would
8  probably think would be the most likely, is where the
9  cracks initiate on the inside of the wire of the filter
10  and propagate to the outside.  And they are the most
11  prevalent ones.  And I counted basically five arms
12  failing in that fashion.
13      And the initiation of the cracks, they are a
14  little bit more difficult to find out, but it appears
15  to be where the arms touch or maybe rub together.  I
16  think that most prevalent form of loading would
17  make that mode the most likely.  So those are the
18  three -- I mean, those are the three sort of broad
19  classifications of how the arms failed.
20      Q.  Okay.  I want to be sure that I understand
21  these numbers.  You say you had six fractured recovery
22  filters, correct?
23      A.  Yes.
24      Q.  And I understand that these numbers wouldn't
25  add up to six, because you are looking at individual

Page 103

1  arms?
2      A.  Yes.
3      Q.  Some of these had multiple-fracture arms?
4      A.  Yes.
5      Q.  How many arms did you see an association
6  between the surface -- a surface gouge and the
7  fracture -- in the recovery filters only?
8      A.  There were two failures out of all of the arm
9  failures that one could -- I can attribute to a surface
10  gouge, and there was this additional one that your
11  expert indicated from an occlusion.
12      Q.  So you have two of the arms that you believe,
13  in your view, had an association between a surface
14  gouge and a fracture?
15      A.  In the recovery filters.
16      Q.  In the recovery filters?
17      A.  Uh-huh.
18      Q.  And you believe that two of them -- and you
19  talked about them.  I believe some of the literature
20  or some of the specifications talk in terms of
21  sleeves?
22      A.  Sleeve or sheath.
23      Q.  You saw two that you believe the crack
24  initiated at the sleeve; is that correct?
25      A.  Yes.  I mean, there are basically of the --

Page 104

1  there are one, two, three, four, five arms that failed
2  at the rim where the crack propagated inward, which is
3  an unusual -- I mean, based on what you think the
4  loading is, it is a bit unusual.  And two of those you
5  can -- the crack initiates right where the wire is at
6  the rim.
7      The other two, it is slightly displaced, you
8  know, by a fraction of a millimeter from that point.
9  So it is a little bit more difficult to -- but there is
10  certainly five examples where the crack grows from the
11  rim contact inwards.  And the remaining failures --
12      Q.  Let me back up there, Doctor.  I am confused.
13      A.  It is easy to get confused.
14      Q.  You told me a moment ago that the crack -- you
15  saw two instances -- two arms where the crack initiated
16  right at the rim, at the edge of the sleeve.  Now you
17  are saying five?
18      A.  Yes, because there are five -- I tried to
19  explain that, if you listen to what I said.  Two of
20  those failures initiated exactly at the rim.  The other
21  three are slightly displaced, but in all cases the
22  crack propagates from the outside of the filter
23  inwards.
24      Q.  So there are two that initiate right at where
25  the rim of the sleeve --

26 (Pages 101 to 104)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

## Page 105

1    A.  Contacts, yes.
2    Q.  -- contacts the wire.  And then there are
3  three more that do slightly lower from there?
4    A.  Yeah, yeah.  Now, the reason this is important
5  is because, you know, it is possible that the wires can
6  pull slightly because of their contact with the vessel
7  walls.  And so, you know, we are looking at it after
8  the fact.  But there are five total where the cracks
9  propagate from the rim contact area in the general
10  vicinity inwards.
11    And all of the remaining ones, as far as I can
12  make out, propagate in the other way.  They propagate
13  from the inside of the filter, at least the wire
14  sections on the inside of the filter, outwards.
15    Q.  So I am counting 12 total arm fractures on the
16  recovery filters.
17    A.  Well, your expert got it wrong, by the way, on
18  two counts.  But I count four, five, six, seven, eight,
19  nine, ten, eleven, twelve, thirteen, fourteen, fifteen
20  arm failures.
21    Q.  On the recovery filters?
22    A.  On the recovery filters.
23    Q.  I am missing three.  You told me that there
24  were two that you associated with the surface gouge,
25  five total that were near the sleeve, two right at the

## Page 106

1  rim of the sleeve, and three nearby.  So that is seven
2  there.  And then five where the crack initiated on the
3  inside of the wire and propagated outwards.
4    A.  Yes.
5    Q.  So where are the other three?
6    A.  Well, some of them are heavily abraded, so it
7  is difficult to be certain what happened.  If you look
8  at some of the surfaces, they are very badly abraded,
9  which is possibly associated -- that could have
10  occurred in service when the thing breaks and they rub
11  together, or it could have occurred during explant.
12  But it is difficult to say exactly how those initiate.
13    Q.  So if I understand, the three that were badly
14  abraded, you just can't tell what was the cause of the
15  crack initiation there?
16    A.  It's certainly fatigue, but I can't really
17  tell which were initiating.
18    Q.  Okay.  So what we basically have is two you
19  associate with the surface gouge, five near the sleeve,
20  two right at the sleeve, and three a little further
21  away, five that have the crack initiating on the inside
22  and propagating outward, and three unknown.
23    A.  Let me just reiterate exactly what I am saying
24  here so we can then get the record straight.  There
25  were two that initiated at defects.  By the way, at

## Page 107

1  least some of these things are not -- some of them can
2  be in more than one category.  Two initiated, in my
3  opinion, directly from defects, and as such, propagated
4  from the rim -- sorry, they are defects.  I find that
5  five initiated at or near the rim.  You are quite
6  correct about that.
7    And now we are looking at the propagation of
8  which way the crack propagated.  I can't -- two, three,
9  four, five propagated from the outside of the filter
10  inwards from the rim contact area, and two, three,
11  four, five, six, seven, eight propagated from the
12  inside out.  And if there is any discrepancy of the
13  other ones, I wasn't quite certain.
14    Q.  So there was eight that propagated inward to
15  outward?
16    MS. HELM:  We have 20?
17    MR. NORTH:  These numbers are just not adding
18  up at all.
19    THE DEPONENT:  They don't add up because some
20  of them initiate at the rim and initiate from the
21  outside to the in.
22    BY MR. NORTH
23    Q.  Well, that is the five, right?  Five were at
24  or near the rim and you said initiated on the --
25    A.  Okay.  I am going to reiterate this again,

## Page 108

1  okay?  So let's go through this one by one.
2    MR. HARTLEY:  Some of them are in more than
3  one category.
4    THE DEPONENT:  In more than one category.  The
5  point is, that some initiate at the rim and also
6  initiate from out to in.  They are not mutually
7  exclusive categories.  Simple as that.  We can provide
8  you with this information and you can look at it at
9  your pleasure.
10    BY MR. NORTH
11    Q.  We're going to have to go through this today,
12  and we are going to have to have the record straight.
13  You told me earlier that in Category No. 2, at or near
14  the rim, that those all occurred outward and then
15  propagated inward.  You said that earlier.
16    MR. HARTLEY:  Why don't we do this?  Let's
17  make a copy of his little cheat-sheet, and then he can
18  tell you what he's got on his cheat-sheet so you can
19  appreciate what he is talking about.  That might help.
20    MR. NORTH:  Yeah.
21    MR. HARTLEY:  Because I know -- looking over
22  his shoulder, he's got like six categories going across
23  the top, and some of them have more than one in each
24  category.
25    MR. NORTH:  I understand that.  Let's mark

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

Page 109

1    this as Exhibit 7, if we can.
2         (Whereupon Defendants' Exhibit No.
3         7 was marked for identification.)
4    BY MR. NORTH:
5    Q.  Okay.  We have just marked what we called
6    earlier your crib sheet as Exhibit 7.
7    A.  Yes.
8    Q.  Okay.  I want to understand everything this is
9    telling me.  On the left, the first column down, is the
10   filter.  And you have the name of the individual filter
11   or plaintiff involving that filter, correct?
12   A.  Yes.  Yes.
13   Q.  The second column has an "R" if it is a
14   recovery filter and a "G2" if it is a G2 filter?
15   A.  Correct.
16   Q.  Okay.  What's No. 3?
17   A.  The next column refers to how many arms failed
18   by fatigue.
19   Q.  Just arms, not legs, right?
20   A.  The last column refers to the legs.
21   Q.  Okay.  After the column that "Arms Failed by
22   Fatigue," what is the next one?
23   A.  The next column refers to the number of arms
24   that I can definitively say propagated from the outside
25   of the arm.  And that is -- in the vicinity where the

Page 110

1    arm is close to the rim, the corner of the rim inwards
2    towards the center of the device.
3         The next column says "in to out," and that
4    says that that's where the fatigue crack that I can see
5    that is not abraded propagates and initiates from the
6    inside of the filter and then propagates out towards
7    the sheath.  The remaining columns refer to -- so those
8    two columns refer to the direction in which the crack
9    propagates.
10   Q.  I am with you.  What's the next one?
11   A.  The last three columns refer to where I think
12   the crack initiated from the base of the fractography,
13   and the first of them indicates that it initiates at or
14   in the near vicinity of the rim, and maybe it doesn't
15   come out, but I actually circled two of those, which is
16   the Gray and the Lynch filters where it initiates
17   exactly at the rim, where the contact of the rim is.
18        The next column refers to -- I said a quarter
19   to a half a millimeter below the rim, and that is
20   generally in the region where the bend in the wire is.
21   That's another prime location.
22   Q.  Give me that measurement again.
23   A.  It is about a quarter to a half a millimeter,
24   and it is generally where that --
25   MR. HARTLEY:  That is below.

Page 111

1    THE DEPONENT:  Yeah, where the bend is.
2    BY MR. NORTH
3    Q.  Below the sleeve?
4    A.  Yeah.  Let me just -- that looks like a funny
5    number.  Let me have a quick look at that.  It is in
6    the region where the wire starts to bend.  And so these
7    categories are not mutually exclusive.  The first three
8    refer to the direction; the second three refer to where
9    it initiates.  And so there is a number of failures in
10   that location, as I have indicated.
11        And then the last one is where it -- where you
12   can attribute the initiation of the crack directly to a
13   surface defect.  And I put one as a question mark
14   because that was the one that was indicated by your
15   expert, initiating at an inclusion.  And that is
16   exactly -- that is the one that is exactly at the rim,
17   by the way.
18        And the last column refers to the number of
19   feet that failed.  And I put -- 1F means a foot, and 1L
20   would mean a leg, because some of the failures didn't
21   occur in the feet.  They occurred in the legs.  And
22   there are notes in the last column which indicates
23   whether the surfaces were abraded, whether some of the
24   arms or the feet were clipped.
25   Q.  Okay.  Tell me what it says by "Gray," under

Page 112

1    the "Notes" column.
2    A.  It says, "clipped one arm and four feet," and
3    the last thing it says is "initiated a gouge."
4    Q.  Okay.  By "Lindsay," it says "abraded,"
5    correct?
6    A.  Yes, some of those were abraded, correct.
7    Q.  What does "Lynch" say?
8    A.  That says, "inclusion," question mark.
9    Q.  Newton says, "clipped, five feet at gouge."
10   A.  No.  No.  The -- yeah, sorry.  It is my
11   terminology, but the "clipped, five feet" is separate,
12   and then that particular -- one of those arms failed at
13   a surface gouge.
14   Q.  So then under "Stahl," it says two were
15   abraded, correct?
16   A.  Yes.  Yes.
17   Q.  So as I am reading this, because I am looking
18   at the second -- the third column, which is the number
19   of arms that failed, that shows us 15 total arms
20   fractured in the six recovery filters, right?
21   A.  Yes.
22   Q.  Where do you get the total number -- you told
23   us earlier that three arms were abraded.  Where do you
24   get that number?
25   A.  Well, I -- one of the Lindsay arms was heavily

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING   (510)   486-0700

Page 113

1    abraded, and at least two of the Stahl arms was heavily
2    abraded.
3        Q.   Okay.  So if they are listed as abraded, they
4    are probably not entered in one of these columns over
5    here, correct?
6        A.   Yeah.  Certainly in the Stahl case; I am not
7    certain of the Lynch.  I will have to look at the Lynch
8    again -- sorry, I mean the Lindsay case.  I think they
9    were included in the columns.
10       Q.   Yeah.  I think you are right; they were
11   included in these columns, still.  Okay.
12       A.   But certainly there is two of the Stahl arms
13   that are so badly abraded, I can't really tell where
14   they initiated.
15       Q.   So out of the 15 fractured arms, there are
16   only five arms you saw that had fractured at or near
17   the contact point between the arm and the sleeve,
18   correct?
19       A.   That's what I think, yes.
20       Q.   And only two of those had actually fractured
21   at that point.  Three of them were a little bit
22   distance away?
23       A.   I am not sure I like the word "only," but yes,
24   you are right.
25       Q.   And you would not associate those that you saw

Page 114

1    that had fractured a quarter to a half a millimeter
2    below the sleeve as having a crack initiation related
3    to that contact point with the sleeve, would you?
4        A.   Well, it is difficult to tell, because there
5    is a possibility of tension in these arms that pulls
6    them away.  So you know, it is a somewhat unusual
7    failure mode to come from the outside to the in,
8    because these arms are being bent in the other
9    direction.  So it is -- you can't say with absolute
10   definity that the contact point with the rim is not
11   important there.  It's clearly important in two of the
12   cases, and it is a little bit more difficult to be
13   definitive in the other cases.
14       Q.   I am talking about the ones under the column
15   "a quarter to a half a millimeter below the sleeve."
16       A.   Oh, I'm sorry.
17       Q.   That would not be related to that contact
18   point necessarily, would it?
19       A.   Well, it is difficult to say, because, you
20   know, the contact point there could raise the overall
21   stresses, but I would have thought that it would be
22   less likely there.  It is more -- it seems to be
23   associated with the bend in the arm rather than the
24   contact point.
25       Q.   Well, we are going to talk in a little while

Page 115

1    about the chamfer issue, and your opinion that the edge
2    of that sleeve, the rim of the sleeve, is too sharp,
3    correct?
4        A.   Oh, yes.
5        Q.   That is true, correct?
6        A.   Yes.  Absolutely.
7        Q.   Well, what I am saying is, those filters that
8    fractured a quarter to a half a millimeter below that
9    sleeve rim would not be attributable to the sharpness
10   of that sleeve rim, would it?
11       A.   Well, I haven't done the precise stress
12   analysis, so I don't quite know how much of an effect
13   that chamfer would have beyond the immediate vicinity
14   I suspect you need to talk to Professors Begley or
15   McMeeking about that point.
16       Q.   So that is outside of the scope of your
17   opinion here to say that?
18       A.   I am not -- without having that knowledge, I
19   would think that the failures that are occurring,
20   fractures of a millimeter away from the contact point,
21   would be less likely associated with that.
22       Q.   Right.
23       A.   But I don't know for certain, no.
24       Q.   And only as I am reading your chart, two of
25   the 15 fractured arms in the recovery filters you

Page 116

1    would, yourself, attribute to surface gouges?
2        A.   Yes.
3        Q.   And you said earlier that it was unusual, in
4    your view, to see the crack beginning on the outside of
5    the filter arm and propagating to the inside?
6        A.   Well, just from a rudimentary understanding of
7    how these filters would be loaded in practice, which is
8    the arms would tend to bend out.  So, you know, at
9    first sight you would correct the cracks to go from the
10   inside to the outside.  So it was -- I must say, I was
11   a little surprised to see the cracks going the other
12   direction initially.
13       Q.   Well, out of the 15 cracks, or 15 fractures,
14   only five of them showed that phenomenon where the
15   crack began on the outside and moved inside, correct?
16       A.   Thirty percent.  That is a lot of them.
17       Q.   That wasn't my question.  My question was, 5
18   of 15 showed that phenomenon, the crack starting on the
19   outside and moving to the inside, correct?
20       A.   Yes.
21       Q.   I'm sorry?
22       A.   Yes, absolutely.  I was a little surprised by
23   that.
24       Q.   And eight of them, you show that the crack
25   began on the inside and propagated to the outside,

29  (Pages 113 to 116)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING   (510)   486-0700

Page 117

1  correct?
2      A.  Yes.
3      Q.  And so obviously eight and five adds up to
4  thirteen.  And that is two less than the number of
5  fractured arms we had.  So I am assuming that with two
6  of the abraded arms, you could not tell where the crack
7  began; is that correct?
8      A.  Yes.
9      Q.  And it looks like that would be two of the
10 Stahl arms that you couldn't tell where it began?
11     A.  Yes.
12     Q.  So you saw a total of four --
13     A.  Yes, that is right.
14     Q.  -- but you only have two listed under those
15 two columns, correct?
16     A.  Yes.
17     Q.  And even though one of the Lindsay arms was
18 abraded, you were able to tell that both of those began
19 with an inside crack that propagated to the outside,
20 correct?
21     A.  Yes.
22     Q.  Now, with those arms that fractured, because
23 the crack began on the inside and moved to the outside,
24 you did not associate those cracks with any surface
25 irregularities on the wire, correct?

Page 118

1      A.  I wasn't able to associate that.  I mean,
2  there is -- generally, cracks begin at surface
3  irregularities and/or where there is rubbing or
4  fretting.  So when they propagate from the inside to
5  the out, they are in contact with other wire.  It is a
6  little difficult to see because you can't look at the
7  surface of the wire anymore.  So I -- I was unable to
8  relate those to a specific surface defect or surface
9  imperfection.
10     Q.  Now, this is going to be a very stupid
11 question from somebody that does not have your
12 training.  When you are talking about a crack that
13 begins on the inside and propagates to the outside, you
14 mean inside the core of the wire?
15     A.  No, I don't.
16     Q.  Or do you mean -- that's why I want to see.
17 Are you talking about if you have the filter, are you
18 talking about one that begins on the side of the arm
19 closer to the center point of the filter and moves
20 outward?
21     A.  Yes.
22     Q.  Okay, good.  Now, have you heard or seen
23 anything in the documents you reviewed about something
24 called the "saluting arm phenomenon"?
25     A.  I don't recall that, no.

Page 119

1      Q.  Well, let me ask you this:  If one of these
2  arms on this filter got bent at least partially
3  upwards, and then was bent back and forth over time,
4  like a paper clip bending back and forth, what type of
5  crack would that show as far as starting inside going
6  to the outside or starting outside going to the inside?
7      A.  Well, it is in bending and therefore on one
8  side it would be tensile; the other side would be
9  compressive.  It would depends on --
10     THE REPORTER:  In one side it would be what?
11     THE DEPONENT:  Would be tensile, the other
12 side would be compressive.  It would depend on
13 precisely the relative magnitude of those two
14 conditions.  I mean, you can bend something -- you
15 know, it depends on the relative magnitude to this.  So
16 the cracks generally proceed under tensile, not
17 compressive stresses.  So whatever would seize the
18 tensile stress would be the one that would initiate the
19 crack.  And all of that could be perturbated by the
20 fact that there is some imperfection on the surface.
21 That could be the trigger to initiate the crack.
22     BY MR. NORTH
23     Q.  So --
24     A.  Let me just finish.  I think if you refer to
25 the fact where the arms may have perforated the vessel

Page 120

1  or they were stuck to the vessel, my feeling would be
2  under those sort of conditions that the maximum tensile
3  stresses would be such that the crack would go from the
4  inside of the filter to the outside.  I think that
5  would be the more likely scenario there.
6      Q.  Let's talk about the feet and legs.
7      A.  Sure.
8      Q.  On the recovery filters -- if Mr. Hartley
9  would quit laughing at my --
10     MR. HARTLEY:  It was the tone.
11     BY MR. NORTH
12     Q.  You only identified one fractured leg in all
13 the six recovery -- explanted recovery filters,
14 correct, leg as opposed to foot?
15     A.  In the recovery, yeah, there was one failure
16 where it sort of -- it fractured in the leg, at sort of
17 half length.
18     Q.  And the rest were in the foot.  And that would
19 be right around the small little curved hook area,
20 correct?
21     A.  That is right, yes.
22     Q.  And isn't it your understanding that when this
23 filter is implanted, it is released from a cone where
24 the Nitinol is compressed, and it springs out to its
25 original shape?

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 121

1    A.   Yes.
2    Q.   And then these hooks or feet touch, ideally,
3    the circumference of the inferior vena cava?
4    A.   Correct.
5    Q.   And are you aware of the fact that over time,
6    they incorporate themselves into the tissue?
7    A.   I would imagine it would, yes.
8    Q.   And then if they are explanted and removed, a
9    device comes down over the top of the filter and
10   collapses it, correct?
11   A.   Yes.
12   Q.   And it removes the feet from the wall of the
13   inferior vena cava?
14   A.   Correct.
15   Q.   And therefore it is entirely possible that
16   these fractured feet or these feet that you observed,
17   fractured during the retrieval processes, correct?
18   A.   Incorrect.
19   Q.   Why is that?
20   A.   Because they are fatigue failures, so possibly
21   the final separation of the feet occurred during the
22   extraction.  But they certainly have fatigue --
23   evidence of fatigue in them.  So those fractures had to
24   have occurred in situ.  Fatigue is a process that takes
25   place over time in a number of cycles.  So typically

Page 122

1    those feet failed by about half of the fracture
2    surfaces fatigue, or something like that.
3         And the rest is what is called overload
4    failure where it finally snaps.  Difficult to be
5    certain when it finally snapped.  It could have snapped
6    in service; it could have snapped during explantation.
7    But the fatigue process, the fact that the foot was
8    cracked halfway through, had to have occurred in
9    service, had to have occurred in service.
10   Q.   You haven't reviewed the medical records of
11   any of these plaintiffs, have you?
12   A.   No.
13   Q.   You haven't reviewed their depositions, have
14   you?
15   A.   No.
16   Q.   As you sit here today, are you aware of any
17   plaintiff in which a fractured foot of a filter, as
18   opposed to a fractured arm or leg, has caused any
19   physical injury?
20   A.   Would you repeat the question?
21   Q.   As you sit here today, are you aware of any
22   plaintiff in this litigation who had a fractured foot
23   where that fractured foot, as opposed to a leg or an
24   arm in the filter, caused a physical injury?
25   A.   I haven't reviewed the patient information, so

Page 123

1    I wouldn't know the answer to that question.
2    Q.   Okay.  And this also includes your findings
3    regarding the G2 filters, correct?
4    A.   It does contain those, yes.
5    Q.   And I suspect we will ask you about those in
6    the future.
7    A.   At some later date, yes.
8    Q.   In one of the filters you received back, there
9    is no evidence of fracture; is that correct?
10   A.   In the case of the G2, it is not in
11   recoveries.  Only one filter seemed to have no failures
12   at all.
13   Q.   I believe that you determined that the
14   fractures you saw resulted from cyclic fatigue?
15   A.   They -- apart from the ones that were abraded
16   where it is difficult to say, they were all associated
17   with fatigue.
18   Q.   And I believe you found that the crack had to
19   initiate and then move -- propagate between 33 and
20   50 percent through the cross-section of the wire before
21   the fracture would actually occur?
22   A.   Yeah, that's what it looks like, yes.
23   Q.   Is that figure, 33 to 50 percent, generally
24   standard for materials like this?
25   A.   It depends on the loading.  The higher the

Page 124

1    loading, you know -- the crack would transition from a
2    fatigue crack to an overload crack when the loads
3    exceed the so-called fracture strengths.  And as the
4    fatigue crack propagates, the remaining load-bearing
5    region is getting small, and so the point at which it
6    fails, separates into two pieces, is a function not
7    simply of the material but of the particular loads or
8    stresses that it is seeing, or, you know, as we talk
9    about the feet, some of those fractures of the feet
10   could have occurred during explant.  But they were
11   certainly cracked halfway through.
12   Q.   Well, I mean, in your studies, have you seen
13   other applications where Nitinol might crack before the
14   crack propagates 30 percent of the -- wire?
15   A.   All devices, you know, whether you are talking
16   about aerospace or medical devices, one of the
17   principal modes of failure is propagation of fatigue
18   cracks.  And the fatigue cracks will propagate what is
19   called sub-critically at a stress less than the
20   fracture stress.  As it propagates, the remaining area
21   becomes smaller and smaller and smaller, and eventually
22   the part will presumably fail.
23        And so depending on the geometry of the part
24   or the loads it experiences, the amount of fatigue
25   prior to the fracture can be in some cases 1 percent,

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 125

1  2 percent, 10 percent, 99 percent. So, you know, 30 to
2  50 percent is not atypical. But you can't generalize
3  like that.
4      MR. NORTH: Why don't we take lunch?
5      THE VIDEOGRAPHER: Video going off the record.
6  The time on the monitor is 12:23 p.m.
7          (Off the record from 12:23 p.m.
8          to 1:26 p.m.)
9      THE VIDEOGRAPHER: Coming back on the record,
10 the time on the monitor is 1:26 p.m. Please begin.
11     BY MR. NORTH
12     Q. Dr. Ritchie, a few questions and then we'll
13 continue into the course of this. What is your
14 understanding of where in the human body the inferior
15 vena cava is located?
16     A. It sits in the artery to the lung. It leads
17 to the artery to the lung.
18     Q. Are there any other veins that feed into it,
19 to your knowledge?
20     A. I am sure there is.
21     Q. So you are not -- you're not that familiar
22 with the details of the anatomy in that area?
23     A. No.
24     Q. I believe you mentioned in the answer to some
25 of the previous questions that seeing the crack

Page 126

1  initiate on the outside of the arm and then propagate
2  inside was an unusual finding?
3      A. Yes. When I -- it was somewhat unexpected to
4  me. I would have thought they would have propagated in
5  the other direction.
6      Q. Can you explain why that was unexpected?
7      A. You have basically got a filter, and the
8  loading tends to move the arms out. And if -- so you
9  expect mainly the cracks to initiate outward towards
10 the edge of the filter. Of course, it is pulsatile
11 loading, so it is cyclic, as you mentioned yourself.
12 There is always a possibility it may go either way, but
13 I -- my first inkling is I expect to see them in the
14 other direction.
15     Q. If you saw an arm that cracked right next to
16 the rim of the sleeve --
17     A. Yes.
18     Q. -- as you did in that leads to -- right there
19 at the rim?
20     A. Yes.
21     Q. Would you expect the pressure point between
22 that rim of the sleeve and the wire to cause the crack
23 to initiate on the inside or the outside of the wire?
24     A. Depends on how it is loaded. Again, it's
25 where the tensile stresses are. So, again, it's a

Page 127

1  generalization. It is difficult to say.
2      Q. So it could be either way?
3      A. It could be either way. I mean, in the
4  general sense, it could be either way.
5      Q. Did I understand you to use a word
6  "perturbated" or something like that earlier?
7      A. I don't know.
8      Q. Okay. Now, I believe you testified earlier
9  that you were believing a likely scenario for the
10 cracks that initiated on the inside and then propagated
11 to the outside of the arms, was a situation where the
12 arms were adjoined to the IVC wall?
13     A. That's one possibility, yes.
14     Q. And how would the forces operate there to
15 cause a crack initiation and propagation in that
16 sequence?
17     A. Well, it depends on the -- exactly how it
18 adheres to the wall, but the reality is, you have a
19 variety of different loading modes on these things.
20 You have blood flow, and you've got clots hitting, and
21 you've got the possibilities if these things impact on
22 the wall. The wall is moving, and there is motion,
23 perhaps this way, so a variety of different loading
24 modes can happen that way, and they tend to be cyclic.
25     So, again, it is difficult to be precise about

Page 128

1  where you would expect it, but just from a simple
2  application, if it is bending this way, you might
3  expect to cracks to be and be going that way.
4  Again, all of this is -- can be changed by the nature
5  of the surface conditions or the details there.
6      I mean, cracks propagate, initiate and
7  propagate when they see a certain level of stress, and
8  that stress can come from the global stress associated
9  with the loading that it sees, but also come about due
10 to the local stresses associated with imperfections,
11 design defects, or design that can locally elevate the
12 stresses.
13     MR. NORTH: In looking through your billing
14 records -- and we would like to have these marked as
15 the next exhibit. We'll mark the outside and then have
16 a duplicate copy of this CD made.
17         (Whereupon Defendants' Exhibit No.
18         8 was marked for identification.)
19     BY MR. NORTH
20     Q. Okay. What we've marked as Exhibit 8, is that
21 a CD that contains your billing records?
22     A. Yes.
23     Q. In looking through those billing records, we
24 noticed that there was a great deal of activity in
25 2009. Is that when you received the filters to

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING  (510)  486-0700

Page 129

1  examine?
2      A.  I got most of them then.  I think I got all
3  but perhaps three or four at that point.
4      Q.  And then we didn't see, virtually, any
5  activity in 2010.  And why is that?
6      A.  I don't think there was any activity in
7  2000 -- possibly -- I don't think I missed my billing
8  records, but certainly there was a large degree of
9  activity when we first got the filters to look at.
10  There was activity during the time I wrote the reports.
11      Q.  And that would be in 2011 when you wrote the
12  reports, correct?
13      A.  Well, I wrote earlier versions of them.  So it
14  was an earlier version written -- I wrote a report as I
15  first did the analysis.  And then I -- and I billed --
16  I mean, the billings in 2011 were early in 2011 and
17  included a lot of activity in the fall of 2010.  I
18  don't necessarily bill every month.
19      So I think most of the activity would have
20  been probably in 2009 when we initially looked at most
21  of the devices.  There was activity in the latter part
22  of 2010 when I prepared a report on this.  And then
23  there would have been activity this year when I revised
24  the report to take into account some of these
25  additional filters that were sent to me.

Page 130

1      Q.  When is the first time you ever met Mr. Davis
2  or Mr. Hartley in person?
3      A.  I never met Mr. Davis, and I met Mr. Hartley
4  for the first time last night.
5      Q.  Okay.  Your billing records -- and this was
6  just a quick estimate by my colleague, Ms. Helm --
7  appear to total something in the range of 71, 72
8  thousand.  Does that sound about right, so far?
9      A.  I have no idea.  Quite possible, it is over
10  two years, so two or three years.
11      Q.  So whatever is depicted on Exhibit 8 would be
12  an accurate compilation of your billing?
13      A.  I think so.  I couldn't find any other bills
14  when I looked last night.
15      Q.  Mr. Launey, does he still work for you?
16      A.  No.
17      Q.  When did he leave your supervision?
18      A.  I think about this time last year.
19      Q.  And when did Mr. Gludovatz begin work for you?
20      A.  In September of last year.
21      Q.  So Mr. Launey is the gentleman that would have
22  been involved working with you in the review of the
23  filters in 2009 when they first arrived?
24      A.  Yes.
25      Q.  And Mr. Gludovatz would have been involved in

Page 131

1  any filters that had been -- in looking at any filters
2  that arrived since September of 2010?
3      A.  Yes.
4      Q.  Did Mr. Launey leave at the same time that
5  Mr. Gludovatz started?
6      A.  No.  Launey left -- his wife had a baby, so he
7  was gone in probably May last year.  And Gludovatz
8  started in September or October this year.  No, maybe
9  late November.  I can't remember exactly, last year.
10      Q.  Now, we have marked as Exhibit 7 your chart
11  showing the various attributes of each fractured arm --
12      A.  Yes.
13      Q.  -- on the recovery filters, correct?
14      A.  Yes.
15      Q.  Now, there were two or three plaintiffs in
16  this litigation for which you were unable to look at an
17  explanted filter, correct?
18      A.  Yes.
19      Q.  That is because the filter remains implanted
20  in those people, correct?
21      A.  That is my understanding, yes.
22      Q.  For those plaintiffs whose filters still
23  remain implanted, are you able to say under which
24  categories the fractured arms and/or legs of their
25  filters would fall?

Page 132

1      A.  Of course not.
2      Q.  So you are unable to say whether there is
3  evidence of an association between the surface gouge
4  and a crack initiation in any of the filters that still
5  remain implanted, correct?
6      A.  I would imagine that they wouldn't be any
7  different in terms of one of those failure modes, but
8  with -- certainly without looking at them, I can't say.
9  But you can attribute it to any one of those in
10  particular.
11      Q.  Okay.  If you would look for a moment at your
12  curriculum vitae, on Page 9.
13      A.  Okay.
14      Q.  Page 9.
15      A.  That's what it says here.  There is two page
16  nines.
17      Q.  I am looking at the one that has the doctoral
18  students graduated.
19      A.  Okay.  Okay.  Got you.  Right.
20      Q.  Mr. Launey is not on this one, is he?
21      A.  No.
22      Q.  Did he not graduate?
23      A.  He wasn't a doctoral student.
24      Q.  What was his position?
25      A.  He was a postgraduate associate.

33 (Pages 129 to 132)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING  (510)  486-0700

Page 133

1    Q.  Postgraduate associate.  Are any of these
2    students listed on this Page 9 female?
3        A.  Runciman, Barth, Zimmerman, Ionova-Martin,
4    Barney.  Do I need to go on?
5    Q.  That is fine.
6        A.  Schroeder.
7    Q.  Okay.  Just checking.
8        A.  Next question?
9    Q.  Do you believe that electropolishing would
10   have had any positive effects on surface gouging?
11       A.  Yes, I do.
12   Q.  In what way?
13       A.  Fatigue is a process where materials fail
14   under cyclic loading, and it is in most cases initiated
15   at surfaces.  And the condition of the surface,
16   particularly any imperfections, scratches or what have
17   you, are absolutely critical.  So there are various
18   ways to take care of this.  But one of the ways is to
19   polish the surface to try to remove as much of the
20   imperfection as you can.
21       So for this reason, many device manufacturers
22   like to electropolish the surfaces of their devices.
23   So the process of electropolishing would have helped to
24   smooth out the imperfections that are generated by a
25   gouge.  So I can't see any negative aspects of doing

Page 134

1    that, and there would certainly be potential positive
2    aspects.
3    Q.  Now, I understand that in your examination of
4    the filters you found surface flaws and irregularities
5    in a number of --
6        A.  Let's call it an imperfection, shall we?
7    Q.  Imperfections.  But in going through the chart
8    on Page 7 and discussing that with you, it is my
9    understanding that you were only able to associate the
10   crack initiation site of a fractured arm with a surface
11   imperfection in two of the fractured arms, correct?
12       A.  Well, there are so many imperfections on the
13   surface, it is difficult to be precise, and undoubtedly
14   all of these cracks didn't initiate in a perfectly
15   smooth region.  There are always found some
16   imperfection, as every crack does.  But certainly with
17   regard to the bigger imperfections, the gouges, as I
18   have talked about, amongst the recovery filters, two of
19   the arms, in my opinion, definitively initiated those
20   gouges.
21   Q.  I understand that is your opinion that some of
22   the other fractures probably initiated at locations
23   where surface imperfections existed.
24       A.  I can say they did.
25   Q.  I'm sorry, what?

Page 135

1        A.  They almost certainly did.
2    Q.  But you can't identify what specific type of
3    imperfection might have been at the crack initiation
4    site -- let me finish my question, please -- at these
5    other fracture points?
6        A.  There are so many scratches and, you know,
7    roughness on that surface that you can't depict an
8    individual imperfection.  But given the option, the
9    fatigue crack would always find the imperfection.
10   Q.  On Page 13 of your report, you say -- you make
11   the following statement, "Most manufacturers of Nitinol
12   medical devices choose to polish, or better still,
13   electropolish the surface of their components for
14   exactly this reason."
15       A.  I know I said that, yes.
16   Q.  Okay.  So the same sort of effect or
17   improvement that you are talking about can be achieved
18   with other polishing procedures other than just
19   electropolishing?
20       A.  Mechanical polishing has its drawbacks because
21   it can cause damage as well.  There is potential
22   benefits.  It can put residual stresses in, but by and
23   large mechanical polishing is a less effective
24   technique.  Electropolishing requires no mechanical
25   abrasion, so to speak.

Page 136

1        If you look at the vast majority of components
2    that fatigue, and you look at the data that shows what
3    the stress is to cause fatigue, generally speaking, the
4    electropolished surfaces will always have a higher
5    fatigue resistance just because they are removing these
6    small defects.  And there are other advantages, by the
7    way.  With Nitinol the electropolishing is also
8    associated with setting up a pasible, which is --
9        THE REPORTER:  Could you repeat that?
10       THE DEPONENT:  Setting up a pasible,
11   p-a-s-i-b-l-e, which is helpful for corrosion
12   resistance, and the device looks better as well, which
13   is not an unimportant point.
14       THE VIDEOGRAPHER:  Could you raise that,
15   please?  We are losing it.
16       THE DEPONENT:  Sure.  Sorry.
17       BY BY MR. NORTH:
18   Q.  During the course of the litigation, have you
19   had any discussions with Dr. McMeeking about
20   electropolishing?
21       A.  I don't think so.
22   Q.  Have you had any discussions with Scott
23   Robertson about electropolishing?
24       A.  I think we talked to him about it, yes.
25   Q.  With regard to the Bard filters?

34  (Pages 133 to 136)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

## Page 137

1    A.  Yeah, probably in regard to the Bard filters.
2    Q.  Did Scott Robertson ever actually examine one
3  of these filters with you?
4    A.  I think he examined one of the earlier ones,
5  actually.  I said this morning, I think that is where
6  probably Mr. Hartley and Mr. Davis got my name.  I
7  mean, he certainly looked at the filters in his paper.
8  So I don't know quite which ones he looked at.
9    Q.  Have you examined any electropolished filters
10  as a part of your work in this case?
11    A.  No.
12    Q.  Are you aware of whether or not there are any
13  electropolished filters on the market?
14    A.  Yeah, Bard makes one, doesn't it?
15    Q.  Besides Bard's filter that is electropolished,
16  are you aware of any others that are electropolished on
17  the market?
18    A.  I don't know the details of the other filters.
19    Q.  So you have made no comparative study of the
20  polishing procedures or techniques for Bard filters as
21  opposed to competitive filters, have you?
22    A.  No.  My opinion is based solely on just a
23  general understanding of fatigue and fatigue resistance
24  and how, in virtually every case I looked at, the
25  electropolished surface has better fatigue resistance

## Page 138

1  than the non-electropolished surface.
2    Q.  With regards specifically to inferior vena
3  cava filters, you have not done any comparative tests
4  between electropolished filters and filters that have
5  not been electropolished?
6    A.  By "tests," you mean by mechanical tests --
7    THE REPORTER:  I'm sorry.  Would everybody
8  please slow down so that I can get each speaker
9  speaking?  Repeat that please.  The question was, "With
10  regards specifically to inferior vena cava filters, you
11  have not done any comparative tests between" -- could
12  you finish this question for me please, it went a
13  little fast -- "between electropolished" --
14    MR. NORTH:
15    Q.  -- filters and filters that have not been
16  electropolished?
17    A.  As in tests by mechanical filters?
18    Q.  Yes.
19    A.  As no, I have not.
20    Q.  In your report, you state, and I quote, "The
21  nature of the surface of the wire arms and legs was
22  microscopically very rough."
23    A.  Yes.
24    Q.  What condition for the wires would you
25  consider acceptable?  Is it your expectations that

## Page 139

1  there should be no markings at all?
2    A.  No.  That would be impossible, probably, to
3  get no markings, but certainly a non-electropolished
4  surface would tend to show some of the draw-markings
5  that you see.  They are not so damaging because they
6  tend to be aligned along the wire, rather than
7  circumferential.  But the gouge marks, I think, are
8  much more serious in terms of possibly initiating
9  fatigue cracks.  And, you know, the nature of the legs
10  and particularly the feet, there the grinding marks are
11  pretty severe.  And they undoubtedly would have
12  initiated fatigue cracks down there.
13    You know, a lot depends on the nature of the
14  device.  If the device is highly stressed, then the
15  issue of the surface becomes much, much more important.
16  If the device is not that highly stressed, then it is
17  not so important.  Because it is the -- it is the
18  synergism of the applied stresses and the local stress
19  concentrations that leads to the stresses that cause
20  failure.  If you have a low -- a device that isn't
21  stressed very much, then the surface condition becomes
22  somewhat less important.
23    Q.  Are you able to quantify the extent of surface
24  markings that you would consider acceptable?
25    A.  It is a -- it is an almost impossible question

## Page 140

1  to answer.  If you can see if these devices fail, and
2  they fail even in small numbers at places where you see
3  surface imperfections, then clearly those imperfections
4  are not acceptable.
5    Q.  At one point in your report, you state that
6  surface gouges could have been avoided by improved
7  manufacturing procedures and/or quality control.
8    A.  Yes.
9    Q.  Do you have any specific manufacturing
10  procedures or quality control procedures that you
11  believe should have been implemented?
12    A.  They could have looked at them.  They could
13  have looked at these -- you know, in the heart-valve
14  industry, it was my recommendation that every -- every
15  valve be examined.  And in the case of Shiley, every
16  valve was put into a scanning electron microscope.  I
17  get the impression reading the depositions that these
18  things weren't looked at.
19    As regard manufacturing procedures, certainly
20  shape-setting shouldn't involve big gouges on the
21  surface.  I mean, that should be avoided, and it seems
22  like there is far less evidence in the G2, so I presume
23  that Bard found a way to avoid that.  But they are
24  highly undesirable.
25    Q.  So it is your impression that these filters

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 141

1  are not individually examined as a part of the
2  manufacturing process?
3     A.  Depends on when you say "examined." I
4  think -- I mean, a certain percentage should be
5  examined at high magnification to see the nature of the
6  surface. I don't know. There wasn't enough
7  information that I was able to glean about how -- what
8  proportion were examined. I think I remember one
9  deposition from somebody at Bard saying that very few
10  were looked at after manufacturing, but I don't know
11  the details of that. But I think if they were
12  examined, and someone had seen those gouges, then a big
13  red flag should have been raised.
14     Q.  On the explanted filters, do you believe that
15  some of the markings you saw could have been caused
16  during the retrieval procedure?
17     A.  Some of the markings, certainly. I mean, the
18  draw-markings that you see are clearly draw-markings.
19  The centralist grinding markings are certainly
20  centralist grinding markings. The gouges -- the other
21  ones that we saw in the exemplar filters clearly would
22  not have been caused by explantation.
23        I think some of the abrasions of the fracture
24  surface -- as I said, that could be caused by the two
25  surfaces rubbing together if the thing broke

Page 142

1  prematurely or could have been caused as the thing was
2  explanted. So some damage certainly would be
3  associated with explanting. I think some of the feet
4  that were clipped off, that was probably done during
5  explant. I can't see any reason why it would be done
6  later.
7     Q.  Would you agree that the exemplar filters you
8  viewed exhibited fewer surface marks than the explanted
9  filters?
10     A.  I didn't get that impression.
11     Q.  With regard to the Stahl filter, you made the
12  following comment, that the gouges were presumably
13  formed during manufacture, probably by bending on a
14  mandrel during shape-setting.
15     A.  Yes.
16     Q.  How were you able to determine that?
17     A.  Well, just by my understanding of how these
18  things are made. Most Nitinol devices have to be
19  shape-set, they have to put into a certain shape which
20  then the material remembers. That is the whole point.
21  So you do this by deforming it.
22        And a mandrel is used in the general term. I
23  think Bard has some sort of device where they stick the
24  thing in and the wires bend over some section, so it is
25  deformed in that condition. And then it is -- it is

Page 143

1  given a shape-setting heat treatment. So you heat it,
2  typically about 500 C, so the structure then forms in
3  that shape, and that's how the material remembers it.
4        So it seems to me that because these gouges
5  were generally in the region where there was a bend in
6  the wire, that the most probable way those were put in
7  was during the shape-setting procedure.
8     Q.  So you just base that observation on the
9  location of the gouge marks on that particular filter?
10     A.  Well, not totally. I mean, they look like
11  something that was done during the bending procedure.
12  So it is -- put it this way, it is certainly an
13  educated assumption, if that means anything. I am sure
14  they were put in that way, anyway.
15     Q.  Can you cite to any literature for me that
16  discusses the fatigue resistance of electropolished
17  Nitinol wire as opposed to electropolished Nitinol
18  stents -- or not stents, but electropolished Nitinol
19  tubing?
20     A.  Yes. There is a paper that your expert
21  pointed out by Patel that does look at that, yes.
22     Q.  Had you read the Patel article before?
23     A.  No, I hadn't, actually. It is in a rather
24  obscure place. It isn't in an archival journal, so I
25  hadn't read it before.

Page 144

1     Q.  Did you read it as a part of your work in this
2  case?
3     A.  I've read it, yes.
4     Q.  Did you read it only after you received our
5  expert's report?
6     A.  Yes.
7     Q.  And what was your impression of that article?
8     A.  It was an interesting article. They did a lot
9  of fatigue tests and tried to compare the conditions of
10  electropolished versus mechanically and etched, and so
11  forth.
12     Q.  Did you disagree with their conclusions?
13     A.  No. I think -- I mean, it is difficult to
14  disagree with experimental results. So I disagreed
15  with the interpretation that your expert put on them,
16  but I certainly don't disagree with the article.
17     MR. NORTH: If we could mark this as the next
18  exhibit.
19        (Whereupon Defendants' Exhibit No.
20         9 was marked for identification.)
21  BY MR. NORTH
22     Q.  Let me hand you what's been marked as Exhibit
23  9. Is that the Patel article that we were just
24  referencing?
25     A.  Yes.

36 (Pages 141 to 144)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 145

1  Q.  What about the interpretation that my expert
2  placed on this do you disagree with?
3  A.  Well, let's read what she said, shall we?
4  Q.  Sure.
5  A.  She said, "One study by Patel evaluated the
6  surface condition of the laboratory fatigue performance
7  of Nitinol wire" --
8  THE REPORTER:  Please read slowly.
9  THE DEPONENT:  You can take it afterwards.
10  THE REPORTER:  Would you please read that
11  slowly for me for the record.  This is how we have to
12  do it, unfortunately.  She said "One study by Patel
13  evaluated the surface condition of" --
14  THE DEPONENT:  -- "the laboratory fatigue
15  performance of" --
16  THE REPORTER:  Slowly and clearly for the
17  record.
18  THE DEPONENT:  -- "the laboratory fatigue
19  performance of Nitinol wire.  The results of this study
20  found that of the seven surface conditions the fatigue
21  performance of the electropolished wire was fourth of
22  seven.  In comparison, the etched surface, which
23  appears to closely compare with the recovery surface,
24  performed the best of the seven finishes in both high
25  and low-cycle fatigue."

Page 146

1  BY MR. NORTH
2  Q.  What do you disagree with, with that
3  statement?
4  A.  Oh, I think the problem with that statement is
5  that I see absolutely no evidence in the -- that I have
6  read, that when dealing with an etched surface here --
7  this is an oxide surface, not an etched surface, point
8  No. 1.  And, secondly, Patel didn't examine Nitinol
9  wire with gouges on it.  And thirdly, that if you look
10  at the high -- the high-strain fatigue, that, in fact,
11  the electropolished surface looks pretty good.  It
12  looks far better than the oxide surface.
13  Q.  Point to me where you are referencing right
14  there.  Is that in one of these figures?
15  A.  Figure 9.  Figure 9.  I mean, I -- this
16  surface, to me, looks like a black oxide surface to me,
17  but I am not going to make distinctions between whether
18  it is black or dark, or what have you, but certainly
19  electropolished is second only to the etched surface.
20  So, that is what Patel says, so I think that
21  is a rather judicious interpretation of what Patel
22  said.  Secondly, that eventually -- I have had
23  experience in fatigue for 40 years, and in virtually
24  every experience that I've looked at, every bit of data
25  I have looked at, irrespective of the material, if you

Page 147

1  clean the surface up and if you electropolish the
2  surface, it will have better fatigue reference.
3  You are probably familiar with the Southwest
4  Airline crashes -- not crashes, but they had holes in
5  the fuselage.  That was all caused by having too rough
6  a surface around the fastening holes.  This is Fatigue
7  101.  You want a smooth surface if you want to avoid
8  fatigue problems.
9  Q.  Do you not believe that etched surfaces work
10  well also?
11  A.  I mean, the difficulty of interpreting this is
12  the fact that sometimes you can put in -- sometimes
13  these things have residual stresses in the surface.  So
14  when you etch them or electropolish or do something to
15  them, you can change that.  I don't know quite -- I
16  didn't do the study by Patel, so I don't know quite
17  what they looked at.  They didn't mention these issues,
18  but these are issues that you have to decide on.
19  But, you know -- if this was a lowly stress
20  device, it wouldn't be so important that the surface
21  was rough.  You wouldn't perhaps need to electropolish.
22  But in view of the fact the stresses are so high, I
23  mean...
24  Q.  If this filter was electropolished, do you
25  believe that it would prevent all fractures?

Page 148

1  A.  No.  No.  I think -- I mean, very rarely can
2  you attribute anything to one factor.  It is always a
3  multitude of factors.  And the fact that there are so
4  many different failure modes here points to several
5  problems.
6  Maybe they all need to occur in concert for
7  something to happen, but certainly these surfaces were
8  particularly rough, in my opinion.  The gouges were an
9  unnecessary imperfection, and I have -- you can
10  attribute certainly two of the arm failures to those
11  gouges.  And I think anything you could do to avoid
12  that problem, and electropolishing would certainly help
13  in that regard, would be advantageous.  And clearly,
14  Bard thinks that way, because they are electropolishing
15  their latest filters.
16  Q.  Are you aware of any manufacturer of
17  electropolishing inferior vena cava filters in 2002
18  when the FDA first cleared the recovery filter for
19  commercial sale?
20  A.  I don't know.
21  Q.  Are you familiar with any manufacturers that
22  electropolished inferior vena cava filters in 2005,
23  when the G2 was first cleared for commercial sale?
24  A.  I don't know.  They should have done.  I don't
25  know.

37 (Pages 145 to 148)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING  (510)  486-0700

Page 149

1      Q.  You would agree that you saw a number of
2  surface gouges on these explanted filters in which no
3  crack had initiated, correct?
4      A.  Yes.  Well, I can't see a crack there, anyway.
5  So there possibly could be one, but it didn't cause
6  final failure of the device.
7      Q.  Are you familiar with the term "chamfer"?
8      A.  Yes.
9      Q.  Explain for the record what the chamfer is.
10      A.  It is basically the -- it describes the radius
11  of curvature of, in this case, a corner.  And it
12  pertains to the fact that the sleeve or the rim from
13  which the arms and the legs emanate from -- the inner
14  corner of the arms and the legs may actually touch the
15  sleeve.  It is that radius.
16      Q.  And what fault or criticism do you have for
17  the chamfer on the recovery filter?
18      A.  Well, it is -- it is a point of stress
19  concentration, and it is a sharp edge.  And there is a
20  number of problems with this.  One is that it could
21  lead to failures because of the very high stresses.
22  Bard appears to have noticed this, and on some of their
23  drawings in the literature that was sent, they call out
24  for a particular radius.  But when we looked at this
25  they were incredibly sharp -- I mean, incredibly sharp,

Page 150

1  I mean, fractions of a human hair sharpness.  These are
2  severely sharp corners.
3          And the difficulty with that is it is very
4  difficult to calculate the stresses.  The stresses can
5  tend towards infinity there.  If it was atomically
6  sharp, then the stresses would be infinity.
7          So it has two problems.  One is it could lead
8  to a local elevation of stresses which could cause
9  failure; secondly, it produces a huge uncertainty in
10  one's ability to calculate the stresses.  And that is
11  bad, too, because knowledge -- computation of the
12  stresses for a device prior to putting in service is
13  the most important thing.  I mean, in the world of
14  fatigue, the three most important things are the
15  stress, the stress, and the stress, and if you can't
16  calculate them, that puts you at a very severe
17  disadvantage.  That's what I didn't like about that
18  particular feature.
19      Q.  And this chamfer issue relates back to what
20  you were talking about earlier, about the arms where
21  they emanate from the sleeves rubbing against the sharp
22  edge of the rim of the sleeve, correct?
23      A.  Yes.  That is the location, yes.
24      Q.  And that is the one that you have associated
25  with, two, in your view, definitely where the break

Page 151

1  happened right at where the arm comes out the rim, and
2  three others with regard to the recovery filter where
3  it was nearby, correct?
4      A.  Well, I mean -- certainly there are two that
5  initiate exactly at the rim.
6      Q.  Right.
7      A.  There are three others which are close to
8  there.
9      Q.  Right.
10      A.  And so -- but there are also a few others
11  where the cracks are propagating from the outside to
12  the inside, and so I don't quite know that the -- the
13  influence of these elevated stresses of the rim would
14  affect that.  It depends on the stress.  You have to
15  ask Begley and McMeeking about that.
16      Q.  So from your vantage point, these are the only
17  five that you think -- that you are able to say, in
18  your view, may be related to that chamfer point,
19  correct?
20      A.  Yeah.  It looks like about 30 percent of the
21  ones I looked at, yes.
22      Q.  Now, I believe you referenced --
23              (Whereupon Defendants' Exhibit No.
24              10 was marked for  identification.)
25      BY MR. NORTH

Page 152

1      Q.  Let me hand you what's been marked as
2  Exhibit 10.  Are these the Bard -- not Bard, but are
3  these the drawings that you reference in your report as
4  having called for the chamfer, in your view?
5      A.  Yes.  They seem to call for the value of the
6  chamfer.  I think this is this same.  I, perhaps,
7  should check.
8      Q.  If you would cross-reference that against your
9  report and double-check that for me so we are clear.
10      A.  The Bates numbers would tell us.
11      Q.  Yes.  I am trying to find the page in your
12  report where you refer to it.
13      A.  I will page number them in the future.
14      Q.  Okay.  If you look at -- it is right where
15  these pictures are.  The next --
16      A.  Yes, that is right.
17      Q.  So those are the two drawings you reference in
18  your report as calling for a chamfer, correct?
19      A.  Yeah, they certainly mention the chamfer
20  specifications.
21      Q.  Are there any other materials you saw in the
22  materials provided to you by Mr. Hartley and Mr. Davis
23  that called for a chamfer?
24      A.  I don't recall, offhand.  There might have
25  been something in the text.  This is what caught my

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

## Page 153

1  mind. So it is difficult to say all, but I don't think
2  so. These are the two engineering drawings that seemed
3  to call for the chamfer, yes.
4      Q.  And these drawings were actually prepared by a
5  company called Nitinol Medical Technologies, correct?
6      A.  That's what it says here, yes.
7      Q.  Are you aware of the fact that Nitinol Medical
8  Technologies originally developed the recovery filter?
9      A.  I am, indeed.
10     Q.  And these drawings are dated June 30th of 1997
11 and November 24th of 1997, correct?
12     A.  That's what it says here, yes.
13     Q.  And were you ever shown later drawings?
14     A.  No, I wasn't.
15     Q.  Were you ever shown later specifications for
16 the manufacturing of the sleeve?
17     A.  Not that called out for the chamfer, I think,
18 no.
19     Q.  So these drawings were prepared roughly five
20 years before the recovery filter was cleared for
21 commercial sale, correct?
22     A.  That's what it -- yes. 2002, yes.
23     Q.  And as you sit here today, you don't know
24 whether or not the drawings for this device were
25 changed or the specifications were altered subsequent

## Page 154

1  to 1997, do you?
2      A.  No. But I know what the reality was on the
3  actual part itself.
4      Q.  Tell me again what an inclusion is.
5      A.  An inclusion is -- a lot of materials have
6  them. It is basically -- it depends what it is. It is
7  a little particle. It could be big, of course, but it
8  is generally a particle which is associated with
9  impurities. So in Nitinol, it can be carbides or
10 something like that which can be associated with the
11 manufacturing process. In steels you get sulfides
12 and -- not carbides, sulfides. And they are little
13 particles, and depending on the quality of the
14 material. In the case of aircraft quality, you would
15 clean the material up as best as you can to limit the
16 number of inclusions because they tend to be rather
17 brittle, and they can initiate cracks, fatigue cracks.
18     Q.  It is not unusual to see inclusions that are
19 in other material such as Nitinol, at least to some
20 extent?
21     A.  Yeah, you see some inclusions in there.
22 Depends on the size. And there are two ways of
23 measuring it, and I have forgotten which one, one makes
24 somewhat smaller inclusions. But you are right,
25 inclusions are certainly not something that would be

## Page 155

1  surprising. Big ones would be, not small.
2      Q.  You previously mentioned that the Lynch filter
3  was one of the filters that the crack was right at the
4  point where the arm and the -- contacted with the rim?
5      A.  Yes, indeed. Yes.
6      Q.  Did you see an inclusion at that crack
7  initiation?
8      A.  I didn't. And your expert points one out, and
9  it may be right. I mean, to be certain you would need
10 to do an EDAX, which is electro-diffraction -- she
11 didn't do this either, by the way -- but diffraction to
12 see what the composition of that region is. I don't
13 think that is an inclusion, but it may be. You know,
14 the problem is, that it is occurring right at the point
15 where I would expect a fatigue crack to form -- could
16 form, and it seems a bit of a coincidence, but it could
17 be an inclusion.
18     Q.  Have you discussed the chamfer issue with
19 Dr. McMeeking?
20     A.  No.
21     Q.  With Dr. Begley?
22     A.  Yes.
23     Q.  So not with Dr. McMeeking, but yes with
24 Dr. Begley?
25     A.  Most of my dealings have been with Dr. Begley.

## Page 156

1      Q.  Why is that?
2      A.  Just because he is easier to get ahold of.
3      Q.  Was it you who first raised the issue of
4  chamfer with Dr. Begley, or Dr. Begley who first raised
5  the issue of chamfer with you?
6      A.  I can't remember. I think it was probably
7  somewhat mutual because I did -- he was in the case a
8  lot later than I was, and I had looked and seen these
9  failures that occurred near the rim. And then we got
10 the papers to -- I don't quite -- I am not quite
11 certain exactly where it came from. But it was -- but
12 this was something that I thought was important for him
13 to do and something related to the stresses involved.
14     Q.  You would agree that even with the filters you
15 examined, they have at least some chamfer or radius of
16 curvature, correct?
17     A.  Oh, yes. It wouldn't be atomically sharp, so
18 it has some -- it is pretty sharp.
19     Q.  So it does have some radius of curvature; it
20 just does not have an adequate amount in your view. Is
21 that correct?
22     A.  Well, you know, let me just reiterate. In
23 essence, it is true. The point is that the stress
24 concentration there is -- is proportional, inversely
25 proportional, to that radius of curvature. So if that

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 157

1  radius of curvature is very, very small, stresses get
2  very, very large and vice versa.
3      So generally speaking, one tries to avoid
4  corners in all situations because that reduces the
5  stresses. The original Comet Airliners failed because
6  the windows were square, and they rounded the corners
7  of the windows, and the windows showed fatigue cracks.
8  Generally speaking with all engineering design, when
9  you are worried about fatigue, you remove these
10 corners. And since there was -- and if you evaluate
11 them, and these specifications were changed, then there
12 seem to be no specification for that corner, which
13 means the stresses are sort of unbanded. You can't
14 really calculate them.
15     Q.  Did you conduct any testing in an effort to
16 either recreate or to quantify the stresses on the arm
17 at that point of contact with the sleeve rim?
18     A.  I am not sure you could do that.
19     Q.  So you are not sure you could do that, but you
20 did not do that, did you, is my question?
21     A.  No. No. Because I don't think you can do
22 that, actually.
23     Q.  Did you conduct any tests to demonstrate that
24 a greater chamfer there would result in less stresses?
25     A.  No. It is a no-brainer, but certainly I don't

Page 158

1  see, again, how you could do that. You can calculate
2  that certainly, and I think that is what Professor
3  Begley did, but to measure -- actually measure that
4  would be a very difficult proposition.
5      Q.  What is fretting fatigue?
6      A.  When any two surfaces come into contact, even
7  small amounts of contact, they tend to disrupt the
8  surface. And that produces a local roughening of the
9  surface which can lead to the formation of fatigue
10 cracks.
11     So whenever you have two surfaces that are
12 articulating, a wire over the corner, or two wires
13 together, or something sliding over, or two plates that
14 are joined together, you can get this sort of rubbing,
15 which, again, it can trap moisture, but mainly it is
16 associated with the disruption of the surface. And
17 that can generate the presence of a crack, which then
18 grows under fatigue loading.
19     Q.  Did you see any evidence of fretting fatigue
20 on these filters?
21     A.  Yeah, the filters broke. I mean, the fact is
22 that there is such a rough surface, you couldn't see
23 much anyway. But certainly where you've got wires in
24 contact or similar together, that's where some of these
25 cracks began. So clearly fretting was involved.

Page 159

1      Q.  Are you able to say which ones on this list
2  had fretting involved?
3      A.  Well, I think, you know, it is -- basically
4  anywhere where you have contacts, and so the ones that
5  were associated with the contacts at the rim, probably
6  fretting was involved there. And then most of them, as
7  you know, are cracks that start from the inside and
8  grow out, and that's where all of the wires are bunched
9  together, and so there is certainly possibly contact
10 there as well. You have a bunch of wires together, so
11 fretting certainly contributed.
12     Q.  Your report states the following: "The
13 defective nature of the Bard IVC filters resulted in
14 failure of service because they were inadequately and
15 defectively designed and manufactured to withstand the
16 physiological loading that they experienced in vivo.
17 This appears to be due to an inaccurate evaluation by
18 the manufacturer of the stresses and strains in the
19 device during physiological service."
20     Is that an accurate statement of what you
21 said?
22     A.  Yes, indeed.
23     Q.  Did you review -- conduct a comprehensive
24 review of the tests Bard or NMT actually did perform
25 before introducing this product to the market?

Page 160

1      A.  The ones that I had been sent, yes. I looked
2  at the tests that were done for the 510K application.
3  I have found very little evidence of a stress analysis
4  on the other hand. I found very little evidence of a
5  proper characterization of the material that was used.
6  And -- but I have seen evidence of the series of
7  experiments or tests they did on these devices prior to
8  the submission to the FDA, which, by the way, I find to
9  be woefully inadequate.
10     Q.  The only tests you saw were the ones provided
11 to you by Mr. Davis and Mr. Hartley, correct?
12     A.  Indeed. Those were in response to
13 interrogatories, I presume, right?
14     Q.  Were you given copies of the corrosion and
15 fatigue testing for the filter?
16     A.  The ones that were submitted to the FDA, yes.
17     Q.  You have, during the course of this day, made
18 a number of comments critical of the manufacturing
19 process for the filters. And you have also made a
20 number of comments critical of the surface quality and
21 other aspects of the materials utilized in the filter.
22 What specifically do you have as a criticism for the
23 design of the filter?
24     A.  All these issues are interrelated. Remember,
25 I am looking at this from the failure. I am looking at

40 (Pages 157 to 160)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 161

1    it from something that is broken, and I am trying to
2    trace back and find out what caused that failure. So I
3    pointed out issues that I believe were contributing to
4    these -- these failures that I am looking at.
5        And certainly any design that has unbanded
6    corners or chamfers is somewhat suspect, in my opinion,
7    because it gives you an uncertainty in the stresses.
8    Any design where I don't see evidence of a
9    comprehensive stress analysis that reflects what is
10   interpreted to be the likely loading modes, I find to
11   be -- that's part of design. I haven't seen any
12   evidence of that.
13       And so those are the issues, and any design
14   which -- where you have got these rather severe defects
15   or imperfections in the surface, I mean, all of those
16   things appear to contribute to these failures. So that
17   is the basis of my criticisms, simply just coming out
18   of the facts that these seemed to cause the failures.
19       MR. NORTH: Okay. We are going to have to
20   change the tape right now.
21       THE VIDEOGRAPHER: This concludes Video No. 2
22   of the deposition of Robert Ritchie. Going off the
23   record. The time on the monitor is 2:19 p.m.
24       (Off the record from 2:19 p.m.
25       to 2:30 p.m.)

Page 162

1        THE VIDEOGRAPHER: Here begins Video No. 3 of
2    the deposition of Robert Ritchie, Ph.D. Coming back on
3    the record. The time on the monitor is 2:30 p.m.
4    Please begin.
5        BY MR. NORTH:
6    Q.   Dr. Ritchie, we were talking about design
7    issues before we took a break to have the tape changed,
8    and I understand your position that, in your view,
9    there are design problems with this filter because it
10   did not perform in -- as it should have, in your view.
11   But you pointed to one specific aspect of the design
12   that you thought was improper, and that was the
13   chamfer. Did you point to any other specific aspects
14   of the design or configuration of the filter itself
15   that you believe is improper other than -- and I
16   understand the general notion that it should not be
17   failing.
18   A.   Well, you know, in a design, one of the most
19   important aspects of a design is an appropriate
20   analysis of the stresses, because that, in essence, is
21   the reason why it could fail as a design. So to me, a
22   design of any component sets the values of stresses
23   amongst other things. This filter was apparently very
24   effective in catching -- doing what it was supposed to
25   do in catching clots.

Page 163

1        But I see very little evidence of an
2    appropriate analysis of the stresses, which I think is
3    one of the most important things in any design. And
4    the fact that how it performed in service is evidence
5    of the fact that there was not an appropriate analysis
6    of the stresses. So that aspect of the design is
7    severely lacking, in my opinion.
8    Q.   Again, and that goes as I understand what you
9    just said to design processes that you believe were
10   flawed. I am asking from a design standpoint, a
11   configuration standpoint. Can you point to anything
12   specifically, other than the chamfer, that you believe
13   was inappropriate about the design?
14   A.   I will reiterate, the stresses were too high
15   on the device. That is the design. I mean, that
16   speaks to many different features, you know, the way
17   that the thing operates, the thickness of the
18   components, the way it was manufactured -- there is a
19   multitude of issues there.
20       Whatever they were, the stresses were simply
21   too high in this device and that was associated with --
22   is a multifaceted problem. It is associated with the
23   various different modes in which the device acted in
24   the body. It's associated with the condition of the
25   device, and it's associated with the geometry of the

Page 164

1    device.
2    Q.   Did you attempt to design an alternative
3    design for this product?
4    A.   No, of course not. Why would I do that?
5    Q.   Have you attempted to design or outline what
6    tests specifically should have been done to this
7    product before it was released to the market?
8    A.   I have my opinions on that. I haven't
9    actually written them down, haven't been asked to put
10   them on paper, but certainly I have my opinions about
11   them.
12   Q.   What are your opinions on that?
13   A.   These opinions are based on, you know, my
14   general knowledge of how material -- how devices or
15   components in general fail and so forth. But I think
16   before any device that goes on the market, that
17   certainly we put in someone's body, most of the effort
18   should be put on an appropriate stress analysis that
19   tries to reflect the possible modes in which this
20   device can operate.
21       Secondly, I think that there should be a study
22   of the properties of the material. Now, I am basing
23   these comments, by the way, also on my experience with
24   other medical devices for other companies. And
25   thirdly, I think there should be an appropriate number

41  (Pages 161 to 164)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

Page 165

1  of tests under conditions that reflect worst-case
2  conditions of the device itself.
3      Now, from what I have seen, which is the
4  papers that have been sent to me, I see very little
5  evidence of the comprehensive stress analysis on its
6  part, certainly very little reflection of the various
7  modes in which it can operate in vivo.  Secondly,
8  the -- I don't see much evidence of the properties in
9  the material even being assessed.
10     And thirdly, the corrosion and fatigue testing
11  that was submitted to the FDA in 2001 and 2002 as part
12  of the 510K submission -- I don't know what other word
13  to use -- were pathetic.
14     Q.  And how do you believe it was pathetic?
15     A.  They tested 16 filters.  They tested them for
16  36 million cycles, by my understanding, since
17  pulmonary cycles are typically assessed at 15 to 20
18  beats per minute, that is about three years' worth of
19  testing.  They claim 10, but it is 3 to 4 in my
20  terminology.  And they used a model where they
21  deflected the end -- they put it in a tube, and they
22  deflected the tube by a millimeter.  Now I don't know
23  where they got that millimeter from, but clearly both
24  in terms of the number and the severity and the
25  duration of those tests, they -- and they were

Page 166

1  inadequate.  And as I understand it, they didn't appear
2  to look at these things afterwards other than just a
3  mere visual examination.
4      I believe the FDA, when I read from the notes
5  in the Kay Fullo deposition, requested that these
6  tested filters be looked at in the scanning electron
7  microscope.  And as far as I understand, they never
8  were by Bard.  So perhaps if they had looked at them,
9  they'd have seen the gouges.  Perhaps they would have
10  seen evidence of cracks.
11     But when I have done IDEs and PMAs for other
12  device manufacturers, they involve huge arrays of
13  testing the material itself.  A lot of effort is put
14  into stress analysis because that is one of the
15  critical issues, and there is generally a fair amount
16  of effort now put into testing the individual device
17  itself under, hopefully, you know, worst-case
18  conditions.  And there is just no evidence of that
19  here.
20     Q.  Was 36 million cycles the maximum the company
21  performed with regard to corrosion and fatigue testing?
22     A.  For that 510K submission, yes.
23     Q.  I am not talking about just limited to the
24  510K submission.
25     A.  I don't know.  I think they did other tests

Page 167

1  which I think lasted -- it is a little unclear what
2  they did with respect to that.  But in terms of
3  corrosion and fatigue, the study that was the most
4  definitive that I saw was the one that was submitted to
5  the FDA, and that was 36 million.
6      Q.  So you didn't see any studies that had more
7  than 36 million cycles?
8      A.  They may well have done them, but I didn't see
9  them defined very well.  They didn't make any impact on
10  me, and certainly when I read it in the papers, I don't
11  think they were done in corrosion and fatigue of the
12  actual device.
13     Q.  What sort of stress analysis testing did Bard
14  perform, that you saw?
15     A.  I didn't see any.  Your expert talks about a
16  computer study or something, and I have seen no
17  evidence of that.
18     Q.  But again, with regard to Bard documents, your
19  review was limited to those documents that were
20  furnished to you by Mr. Davis and Mr. Hartley, correct?
21     A.  Absolutely.
22     Q.  I believe we have established this.  You have
23  made no attempt to quantify the physiological loads,
24  and you would defer to Dr. McMeeking on that?
25     A.  No.  I mean, certainly I have not -- I mean, I

Page 168

1  don't any think either McMeeking or myself could easily
2  define the physiological loads.  I mean, that is an
3  issue that certainly I wouldn't be able to do.  So what
4  McMeeking, I think, did was to assume certain pressures
5  inside the artery and probably -- hopefully I am sure
6  worst-case pressures and based his analysis on that,
7  but I wouldn't have made any attempt to measure those.
8      Q.  Outside of the context of this litigation,
9  have you ever conducted a stress analysis for a device
10  to determine or attempt to quantify physiological
11  loading?
12     A.  Physiological loading is generally not
13  quantified with a stress analysis.  It is generally
14  done by knowledge of the medical conditions.  And so,
15  for example, for a heart valve, your blood pressure
16  maybe is 120-milligrams of mercury, so generally
17  speaking, the physiological loading would assume to be
18  something greater than that as a safety factor,
19  typically 150 or 200 or something like that.
20     Of late, now, people have started to do open
21  MRI, magnetic resonance measurements, to try to get
22  direct readings of the physiological loads.  But that
23  is very, very recent sort of -- something I wouldn't
24  do.  So generally, you assume a given pressure
25  associated with a part of the anatomy, which I think is

42  (Pages 165 to 168)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 169

1  fairly well understood by the medical community.
2  Q. You, yourself personally, have you ever
3  conducted any sort of analysis to determine the
4  physiological loading forces for a particular device?
5  A. Well, again, I reiterate, when I did the
6  analysis on the heart valves, I assumed a certain value
7  of -- I took a certain value of the blood pressure to
8  base -- to do that analysis. So that is basically what
9  I have done in that regard.
10  Q. Have you seen any medical or other literature
11  that attempts to quantify the physiological loads
12  within the inferior vena cava?
13  A. Yes, I've seen -- I mean, some of the
14  documents I was given, I was seeing numbers -- a couple
15  of people talked about, numbers like 15 milligrams of
16  mercury. When you are sitting, it is about two to five
17  milligrams of mercury, but for a worst-case you could
18  assume some elevation of that. That is the extent of
19  what I have seen, yes. Again, it is the pressure that
20  is typically chosen.
21  Q. Were those in medical articles that you saw,
22  or were those in Bard internal documents, or do you
23  recall?
24  A. I don't recall. I think one -- I think I read
25  one in one of these articles. I can't remember

Page 170

1  exactly. Certainly it was some comment of that in the
2  depositions, and I think -- I think there was some
3  assumption in one of the conditions for the Bard
4  articles as well, so I think in possibly all three
5  cases.
6  Q. Now, you were furnished with some exemplar
7  devices, correct?
8  A. Yes, indeed.
9  Q. Both the recovery filter and the G2?
10  A. Yes, indeed.
11  Q. And you did not conduct any fatigue tests on
12  those exemplars, did you?
13  A. No.
14  Q. You did not conduct any kind of stress
15  analysis with regard to them, did you?
16  A. No. My purpose was to look at the surface and
17  to look at the chamfer.
18  Q. As you sit here today, do you know one way or
19  the other whether Bard's testing for the recovery
20  filter that it submitted to the FDA complied with the
21  FDA's guidance regarding inferior vena cava filters?
22  A. Well, that is an interesting question,
23  actually. I don't think it should have gone through a
24  510K.
25  Q. That wasn't my question.

Page 171

1  A. So a designation of the Class-2 device I think
2  was -- I mean, if you considered it to be a Class-2
3  device, then it would have complied, but I think that
4  decision was wrong on all counts.
5  Q. Well, you are not sitting here disagreeing
6  with the fact that the FDA classified this as a Class-2
7  device at the time, correct?
8  A. I am disagreeing with that.
9  Q. You think the FDA did not classify it as 2 at
10  that point?
11  A. It was not a Class-2 device.
12  Q. How was it characterized under the FDA
13  regulations -- not what you say it should be -- how was
14  it under the FDA regulations?
15  A. It was classified as a Class-2 device because
16  they said there was a similar device on the market, and
17  that was the basis for the 510. That was a highly
18  questionable and incorrect decision by all concerned.
19  The device was different than the previous
20  device, and therefore the stress analysis was totally
21  different, and since the stress analysis is the most
22  important aspect of the design, that decision -- I
23  don't know if it was Bard or FDA or both -- in my
24  opinion, it was a flawed decision. It is incorrect.
25  Q. Okay. You have seen the 510K, correct?

Page 172

1  A. Uh-huh.
2  Q. I'm sorry. You can't answer that way. "Yes"
3  or "no"?
4  A. Yes, yes, yes.
5  Q. And you saw -- did you see correspondence from
6  the FDA to Bard asking follow-up questions regarding
7  the 510K?
8  A. Yes.
9  Q. And you did you see responses from Bard back
10  to the FDA answering those?
11  A. They sent answers back. In the case of
12  fatigue and corrosion, they didn't answer the question,
13  but they certainly sent responses back.
14  Q. And the FDA cleared this device for --
15  A. Yes.
16  Q. -- commercial sale, correct?
17  A. Yes. Yes, they did.
18  Q. So if I understand your testimony, you are
19  saying that Bard shouldn't have submitted it as a 510K,
20  and the FDA shouldn't have cleared it as a 510K?
21  A. It was a special 510K, and I think that -- in
22  my opinion, that was an incorrect decision because
23  there wasn't a similar device to compare it with -- to
24  compare it to. The stress analysis was totally
25  different. And I think the FDA actually made the wrong

43 (Pages 169 to 172)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 173

1  decision here, personally. It is not the first time
2  they have done that, by the way.
3      Q. So as you are sitting here today, it is your
4  understanding that this was submitted and cleared under
5  a special 510K?
6      A. Uh-huh.
7      Q. "Yes" or "no"?
8      A. Yes. That is my understanding.
9      Q. Have you ever prepared a 510K submission?
10     A. I have been part of submissions for IDEs and
11 PMAs. I have never been part of a 510K submission
12 before.
13     Q. Have you ever worked for the FDA?
14     A. No, not worked for the FDA. I have had a lot
15 of dealings with them over the last 20 years -- 30
16 years, in fact.
17     Q. Have you attempted to define specifically what
18 sort of stress analysis test should have been conducted
19 on these filters?
20     A. They should have calculated the stresses.
21 Presumably the best way to do it would be a numerical
22 analysis, and they should have done it under worst-case
23 conditions, and they should have considered the many
24 potential loading modes that they could experience.
25 And to my understanding they didn't do that.

Page 174

1      Q. Would you agree with this statement: "It is
2  impossible to accurately quantify the stresses in the
3  implanted device where the wires emanate from the
4  surrounding sheath or cap."
5      A. Yeah, because they didn't fix the chamfer.
6  That was their mistake.
7      Q. I am not asking whether they fixed it or not.
8  I am asking, would you agree that it is impossible to
9  accurately quantify the stresses in the implanted
10 device where the wires emanate from the surrounding
11 sheath or cap?
12     A. Which implanted device?
13     Q. The filter.
14     A. If the chamfer had a fixed -- that was a fixed
15 value of the chamfer, it might be possible, but since
16 that is an unknown quantity, the stress concentration
17 from there can vary all over the map. So it is -- that
18 is a huge design fault to have a corner that -- so it
19 is very difficult to calculate the stress level under
20 these conditions because you don't know what the nature
21 of the design is there.
22     Q. My question is, would you agree with that
23 statement or not agree?
24     A. It is too imprecise a statement. Are you
25 referring to what device, what cap, under what value of

Page 175

1  the chamfer, because if the chamfer is unset, you can't
2  calculate the stresses to any accuracy -- the local
3  stresses.
4      Q. It sounds to me like you are agreeing with the
5  statement. I quote, "It is impossible to accurately
6  quantify the stresses in the filter where the wires
7  emanate from the surrounding sheath or cap."
8      A. If the chamfer is unset, yes. It is hardly an
9  excuse for not doing it, though.
10     Q. Do you know whether the diameter of the
11 inferior vena cava fluctuates?
12     A. Of course it does.
13     Q. Do you know the range in which it fluctuates?
14     A. Not exactly, no.
15     Q. Your report states at one point, "There is
16 evidence in published reports of Bard IVC filter
17 failures from computed tomography imaging in patients
18 that perforation of the device arms, and to a lesser
19 extent, the legs, occurs through the wall of the vena
20 cava vein." Do you recall that?
21     A. Yes.
22     Q. What was the basis of the statement?
23     A. Those images -- certainly in the Hull and
24 Robertson article, there is images of the -- tomography
25 images of the filters as it sits in the body. And

Page 176

1  there is evidence that the -- these arms can perforate
2  the vena cava, and there is other reports of that in
3  other -- certainly the images that I remember most of
4  all would be tomography images in the Hull and
5  Robertson report.
6      Q. You haven't looked at any patients' medical
7  records that would demonstrate that, have you?
8      A. No.
9      Q. And you don't know how the perforation of the
10 Bard filters compares with the perforation rate of
11 competitive filters, do you?
12     A. No. I don't.
13     Q. Did you review the radial pull test performed
14 by Bard?
15     A. I looked at it, yes.
16     Q. As you sit here today, are you able to say
17 whether in the case of any of these particular
18 plaintiffs that you have been designated as an expert
19 for, the filter actually perforated the inferior vena
20 cava before fracturing?
21     A. I don't have exact knowledge of whether it did
22 or didn't. Just let me reiterate. I am looking at the
23 failures and trying to understand how these things
24 arose. And there is various features here that can
25 lead to these failures, and the fact that the -- that

44 (Pages 173 to 176)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 177

1   these cracks initiate on opposite sides of the wires
2   indicates a change in the stress states.
3           And there is evidence in the literature and in
4   the documents that I have read that these arms could
5   adhere to the sides of the vessel and also penetrate
6   them. And so that is clearly a mechanism by which the
7   stresses could increase quite dramatically, and I think
8   Bard recognized this, because they changed the nature
9   of the arms on the G2. So I don't think I am alone
10  there. But that is the basis of my decision here.
11      Q. Do you recall what fatigue or endurance limit
12  Bard utilized in its tests regarding Nitinol wire?
13      A. You know, I never saw the data that actually
14  specified that. But I -- there were numbers quoted,
15  and I think it may have come from the manufacturer.
16  And I seem to remember something like 40 to 50 KSI, or
17  150 to 200 mega-pascals. I think that is the number
18  that I saw.
19          But I would have liked to see some actual --
20  what is called stress life curves or strain life
21  curves, like you see in that Patel report, for example,
22  which would have characterized the fatigue resistance
23  of this particular wire used in these devices. But I
24  didn't see any evidence of that in the papers I was
25  sent. I think there was a specification from the

Page 178

1   manufacturer of the material, which I think it was 100
2   to 150 mega-pascals.
3       Q. Do you think that is an appropriate number to
4   utilize?
5       A. It is difficult to -- it is a reasonable
6   number. You know, the fatigue limits of Nitinol are
7   generally specified in terms of strain rather than
8   stress. It is an appropriate number. It is a little
9   difficult to say, but that seems reasonable.
10      Q. Would you consider that a conservative
11  estimate?
12      A. I don't know. I didn't -- sorry, I am wrong.
13  Strike that. The numbers are 400 to 500 MPA.
14      Q. 400 to 500 what?
15      A. Mega-pascals. Okay, if you want in English
16  units, it is 60 to 75 KSI, which is a thousand pounds
17  per square inch. So is it a reasonable number? Yeah,
18  I think the numbers for Nitinol depend very much on how
19  it is heat-treated and its composition. That's why I
20  think it is important that you need to specify or do a
21  good characterization on this material. So 4- or 500
22  is in the range. But, as I said, I think that came out
23  of the specifications from the material manufacturer.
24      Q. Do you have a listing with you of all of the
25  documents you were provided?

Page 179

1       A. No. I have them all here. I don't have a
2   listing. I mean, apart from the depositions which I
3   have given a list of, I have every document in my
4   suitcase here. And I think they are the ones that --
5   at least part of the ones that you provided to
6   Mr. Hartley and Mr. Davis.
7       Q. Can you find for me what fatigue reports you
8   were provided?
9       A. The only ones I have are the ones that I
10  remember from the IDE application. And that is the Kay
11  Fullo deposition, which I don't actually have with me,
12  but it is in the back of that. It may appear
13  somewhere.
14      Q. Okay. That is enough of that -- am I correct
15  that the only fatigue test you saw and you reviewed are
16  those that were attached as exhibits to Kay Fullo's
17  deposition?
18      A. No, that is not right. But they were there.
19  They were definitely there. There is a document here
20  that talks about how they did the various different
21  tests involved, design review report.
22      Q. Okay. So you read a design review report.
23  Did you actually read any fatigue test?
24      A. I read the documents that were submitted to
25  the FDA as part of the 510, and I -- the place I found

Page 180

1   those was in the Kay Fullo deposition.
2       Q. Other than what have been attached to the Kay
3   Fullo deposition, did you review any actual fatigue
4   reports from Bard?
5       A. There is a description of what they did here
6   and how they did the tests.
7       Q. I am talking about actual test reports.
8       A. Test reports, describing data?
9       Q. Right.
10      A. No. I didn't see any of those.
11      Q. Was there test reports describing data
12  attached to Kay Fullo's deposition or just summaries of
13  them?
14      A. Kay Fullo's report showed the -- what was
15  submitted to the FDA. So there is a summary -- there
16  is some more details in one of these documents here
17  about how they did the fatigue tests. Give me a second
18  here. Corrosion fatigue testing of Nitinol wire, there
19  is one here.
20      Q. Is that an actual test report?
21      A. Looks like it.
22      Q. What is the Bates-stamp on that?
23      A. 060100000274.
24      Q. What is the date of that?
25      A. 1997. There is another one here, a standard

45 (Pages 177 to 180)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING  (510)  486-0700

**Page 181**

1   operating procedure. There is -- it doesn't really
2   contain much fatigue in there. There is a series of
3   reports in these which talk about the 16 tests that
4   were done and how they did them, and so forth. This
5   describes -- yeah, endurance test, corrosion fatigue,
6   NF filters, design verification.
7       Q.  What is the date of that test?
8       A.  August the 4th, 1999. And that is Bates stamp
9   2742. And that really just gives the details of these
10  16 filters that were subjected to 36 thousand --
11  million cycles at one millimeter deflection. And quite
12  frankly, the amount of information in this report was
13  not much more than what was in that summary of the Kay
14  Fullo deposition, but that was the important one.
15      Q.  Okay. Let me ask you this: Were there actual
16  test reports in Kay Fullo's deposition or just a
17  summary?
18      THE DEPONENT: One moment, please.
19      THE VIDEOGRAPHER: Going off the record. The
20  time on the monitor is 3:01.
21      (Discussion off the record.)
22      THE VIDEOGRAPHER: Coming back on record. The
23  time on the monitor is 3:01 p.m. Please begin.
24      BY MR. NORTH
25      Q.  As you sit here today, do you recall whether

**Page 182**

1   the exhibits or the materials you looked at that were
2   attached to Kay Fullo's deposition were actual test
3   reports?
4       A.  No, they weren't. They were summaries.
5       Q.  Simply summaries. Now when I am looking
6   through an index of the test reports that you were
7   provided by your -- by Mr. Hartley and Mr. Davis, it
8   looks like most of the test reports that you were given
9   were performed -- or all of them were performed between
10  1997 and 1999. Does that sound about right?
11      A.  I didn't look very closely, but just on the
12  ones I looked at, that seems a reasonable assumption.
13      Q.  And I also have some reports dated from 2000,
14  2001, that appear not to have been given to you.
15      A.  On corrosion and fatigue?
16      Q.  Yes.
17      A.  Okay.
18      Q.  Well, let me just ask you this. As you sit
19  here today, are you able to say one way or the other
20  whether you have seen all testing performed by Bard
21  regarding the recovery filter?
22      A.  That is an impossible question to answer. I
23  have seen what was sent to me. I mean, there may have
24  been other tests. I couldn't possibly say anything,
25  talk to that.

**Page 183**

1       Q.  Exactly. You have seen what was sent to you,
2   correct?
3       A.  Yes, obviously.
4       Q.  Would you agree that prior to 2002, the cyclic
5   fatigue properties of Nitinol were not well understood?
6       A.  No.
7       Q.  You would not agree with that?
8       A.  No.
9       Q.  At what point do you believe that the cyclic
10  fatigue properties of Nitinol were well understood?
11      A.  Too vague a question to answer. I mean, the
12  process of understanding is a continual thing. I mean,
13  the fatigue limits of Nitinol were first determined in
14  the '70s and '80s. And the alloy has changed somewhat
15  in its use, in its composition, and so it is a
16  continual evaluation. So the bottom line is, if you
17  are going to make something out of a particular alloy,
18  you ought to be able to characterize it whether it is
19  known or not.
20      It is incumbent upon you as a manufacturer of
21  the device to measure it, to calculate it. So there is
22  ample data in the literature prior to 2002 on the
23  fatigue of Nitinol. I have contributed to it myself.
24      Q.  Would you agree that in 2004, data on fatigue
25  crack propagation in Nitinol was extremely limited?

**Page 184**

1       A.  Yes. That is a fracture mechanics approach
2   which is not necessarily used for small devices. So
3   these devices -- these wire devices and the tube
4   devices are not designed with fracture mechanics, so
5   you wouldn't necessarily use that data.
6       Q.  But it is your testimony here today that as of
7   2002, the cyclic fatigue properties of Nitinol were
8   well understood?
9       A.  Well, again, it is an impossible question to
10  answer. It's well understood. I mean, what do you
11  mean, the mechanisms? Do you mean -- you know, the
12  bottom line is we need to know what the data is.
13  Anybody can measure the data. So whatever alloy was
14  used, the data should have been measured. The people
15  should have measured -- so if a new alloy came
16  tomorrow, then we wouldn't have the data for it.
17      The process of understanding what fatigue is
18  in Nitinol, that is a different issue, the mechanistic
19  issues. They don't speak to a device. A device, you
20  just have to measure what is the fatigue limit, what is
21  the effect of notches.
22      That sort of information is basic information,
23  and if you were making a device in the '60s you would
24  simply have to measure that information or obtain it
25  some way. So it is not a question of being well

46  (Pages  181 to 184)

DEPOSITION OF ROBERT O. RITCHIE,  PH.D.

CLARK REPORTING  (510)  486-0700

Page 185

1    understood or not; that is really a peripheral point.
2         Mechanistically, we are learning all the time
3    how Nitinol behaves.  It's complicated material, but in
4    terms of characterization of data, the procedures used
5    to characterize the fatigue properties of Nitinol are
6    the same today as they were in the last century.
7    Q.  Would you agree that the diameter of a Nitinol
8    wire that is utilized would affect its fatigue
9    properties?
10   A.  Insomuch that it would affect the stresses on
11   that wire, yes, it would.  I mean, all other things
12   being -- if the stress on the wire is the same, it
13   wouldn't necessarily have that much of an effect.
14   Q.  Would you agree what the form of the Nitinol
15   itself -- for example, whether it is in a thin-walled
16   tube or wire would affect the fatigue properties?
17   A.  The -- in a normal material, it wouldn't make
18   much effect.  In Nitinol, it is important because there
19   is slightly different textures, so it is important to
20   characterize the same product form.  So if you are
21   making something out of a wire, it is important to test
22   the wire.  If you are making it out of a tube, it is
23   important to test the tube.
24        It is also important to test at the right
25   temperature in relation to some of the temperatures of

Page 186

1    transformation in the material.  And I have to say, on
2    the -- when I looked at the data, it indicated quite a
3    range for the transformation temperature, so that is
4    something that I didn't really like either.
5    Q.  Would you agree that the properties of Nitinol
6    are extremely sensitive to their precise chemical
7    composition and processing treatment?
8    A.  Yes.  Less so now than they used to be, but
9    yes.
10        MR. NORTH:  Okay.  Could we take a break?  I
11   think I am about finished.
12        THE VIDEOGRAPHER:  Going off the record.  The
13   time on the monitor is 3:10 p.m.
14        (Off the record from 3:10 p.m.
15        to 3:19 p.m.)
16        THE VIDEOGRAPHER:  Coming back on the record.
17   The time on the monitor is 3:19 p.m.  Please begin.
18        BY MR. NORTH
19   Q.  Dr. Ritchie, you made some references earlier
20   to the notion of worst-case scenario testing.
21   A.  Uh-huh.
22   Q.  Would you define for me particularly what type
23   of testing you believe should have been done to satisfy
24   that requirement of worst-case scenario testing?
25   A.  It is a generic term, okay?  So with respect

Page 187

1    to the stress analysis, one tends to try and take some
2    degree of -- a factor of safety here.  So, you know,
3    typically what we do, you do your stress analysis on
4    maybe the smallest valves or the smallest filters, the
5    ones that you might perceive to have the higher
6    stresses on.
7         And you consider perhaps that if you -- if
8    the -- you know the pressure in the pulmonary artery is
9    considered to be 10 to 15, you might take a larger
10   pressure just to give some degree of uncertainty.  You
11   know, in the aircraft industry, people say if the
12   stresses ever get above 75 percent of the failure
13   stresses, then you have, of course, the concerns.  So
14   you try to take a worst-case scenario.
15        And in the testing, you would -- ideally you
16   would need to see whether your devices or your wire,
17   whatever, would be able to withstand not simply the
18   life, but maybe a little bit more than the life that
19   required, just to have that extra aspect of certainty.
20   But the main thing is that you just have an appropriate
21   stress analysis done and you have appropriate
22   characterization of the material in which you make it
23   out of in terms of the properties, and then you test
24   the actual devices under conditions that reflect your
25   perception of what they may see in vivo.  So that's

Page 188

1    what I mean by worst case.
2    Q.  What type of equipment would you use to
3    perform the kind of testing you just described?
4    A.  Well, it depends.  The stress analysis, you'd
5    need to use numerical analysis, or maybe you could do
6    it analytically.  We generally use -- element analysis
7    is the best way to do that.  The evaluation of the
8    properties of the material that you make the device out
9    of, that -- so you could use the manufacturer's data,
10   but I don't think that is a good idea, because you want
11   to have your own assessment.
12        So you do fatigue tests and pieces of wire
13   that you would cycle and -- in a physiological analogue
14   environment over a range of stresses or strains to
15   characterize the material.  And then the actual device
16   testing, you would essentially put it under a variety
17   of tests, one where you put it in a sleeve like Bard
18   did and then subject to it to certain pressures.
19        But I think you would have to also simulate
20   conditions that are not ideal, you know, perhaps if the
21   thing doesn't seat properly or if the loading is
22   somewhat asymmetric, and some of the things you can't
23   test, so you may have to do computational theoretical
24   estimates on what effect something would have or
25   something else would have.  And if something had a

47  (Pages 185 to 188)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 189

1  defect there and the stress was a little higher, I
2  think you'd do those sort of tests.
3      Q.  As a part of your work in this case, you have
4  not attempted to write an actual test protocol for the
5  tests you are describing, have you?
6      A.  For the -- pertinent to this device?
7      Q.  Yes.
8      A.  No.
9      Q.  And you haven't tried to write any test
10 procedure specific to this device, have you?
11     A.  No.  I have told you, my philosophy is I was
12 asked to examine why these things failed, and I looked
13 and tried to understand why they have failed.  And in
14 the process of doing that, I have come to certain
15 conclusions, and part of those conclusions are what I
16 perceive to be some inadequacy in what was done when
17 the device was designed, manufactured, and put into
18 service.
19     Q.  With the understanding as always that under
20 Rule 26 that requires supplementation if experts reach
21 new and/or different opinions, and therefore you would
22 have the obligation to give us prior notice of that, we
23 will conclude the deposition at this time.
24     MR. HARTLEY:  Mind if I ask two questions,
25 maybe?

Page 191

1  implanted in the individuals, but I have every reason
2  to believe that they would have failed in the same way,
3  one of these modes, simply because they have the same
4  filters and they are in a human being.
5      So I would be extremely surprised if there was
6  an alternative explanation for those failures.  I
7  haven't been able to look precisely, as no one has,
8  because I haven't had the ability to look at the
9  device.  But if the arms or legs failed, it seems more
10 than reasonable that it was associated with the
11 mechanisms that I described.
12     MR. HARTLEY:  Can you say that with reasonable
13 scientific probability?
14     MR. NORTH:  Objection to the form.
15     THE DEPONENT:  It is a difficult thing to say,
16 but yes, I mean, because I haven't been able to look at
17 them directly.  But I have no reason to believe that
18 they failed any different way.
19     MR. HARTLEY:  That is all I have.
20     THE VIDEOGRAPHER:  Off the record?
21     MR. NORTH:  Yes.
22     THE VIDEOGRAPHER:  This concludes Video No. 3
23 of the deposition of Robert Ritchie, Ph.D.  Going off
24 the record.  The time on the monitor is 3:26 p.m.
25     (Whereupon the deposition was

Page 190

1      MR. NORTH:  If you pay me.
2      MR. HARTLEY:  If I what?
3      MR. NORTH:  Pay me.
4      MR. HARTLEY:  You don't get to pay me.
5      THE DEPONENT:  The State of California should
6  pay me.
7      MR. HARTLEY:  Dr. Ritchie, in your reports you
8  have talked about the Muhaimin case, the Everett case,
9  the Kolenda case and the Heidi Smith case, and the fact
10 that you did not have filters that were removed from
11 any of those four individuals to examine.  In light of
12 what you have reviewed for this matter, the exemplar
13 filters, the materials from Bard, the filters that were
14 explanted from the other individuals that you have, in
15 fact, had an opportunity to review, do you have an
16 opinion with reasonable scientific probability as to
17 the likely cause of the fracture of the struts or the
18 portions of the struts, the arms and legs, of Muhaimin,
19 Everett, Kolenda and Smith's recovery filters?
20     MR. NORTH:  Objection to the form.
21     THE DEPONENT:  Can I answer the question?
22     MR. NORTH:  Yes.
23     THE DEPONENT:  As I understand it, there are
24 arm and leg fractures in these devices.  I haven't
25 examined them because I can't.  They are still

Page 192

1  adjourned at 3:26 p.m.)
2
3
4
_____
SIGNATURE OF THE DEPONENT
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

CLARK REPORTING (510) 486-0700

Page 193

DECLARATION

1
2
3      I, ROBERT O. RITCHIE, PH.D., do hereby declare
4   under penalty of perjury that I have read the foregoing
5   transcript of my deposition; that I have made such
6   corrections as noted herein, in ink, initialed by me,
7   or attached hereto; that my testimony as contained
8   herein, as corrected, is true and correct.
9      EXECUTED this ____ day of
10  _____, 2011, at _____
11  _____.
12
13
14
15
16
17      _____
18      ROBERT O. RITCHIE, PH.D.
19
20
21
22
23
24
25

Page 195

REPORTER'S CERTIFICATE

1
2
3
4
5      I, Joanna Broadwell, Certified Shorthand Reporter No.
6   10959 in and for the State of California, hereby certify
7   that the deponent,
8      ROBERT O. RITCHIE, PH.D.,
9
10  was, by me, duly sworn to tell the truth, the whole
11  truth, and nothing but the truth in the within-entitled
12  cause; that the foregoing is a full, true and correct
13  transcript of the proceedings had at the taking of said
14  deposition, to the best of my ability.
15
16
17
18   Date:_____   _____
          Joanna Broadwell, CSR # 10959
19
20
21
22
23
24
25

Page 194

1      Clark Reporting and Videoconferencing
       2140 Shattuck Avenue, Suite 405
2         Berkeley, California 94704
            (510) 486-0700
3
4
5         June 4, 2011
6
7   ROBERT O. RITCHIE, PH.D.
    University of California
8   Materials Science and Engineering
    Berkeley, CA 94720-1760
9
10  Dear Deponent:
11  Pursuant to the California Code of Civil Procedure, please
    be advised that the original transcript of your deposition
12  taken on May 23, 2011 is ready for your review and
    corrections, if necessary.  The original will be held in
13  our office for a period of 35 days, at which time it will
    be forwarded to the noticing attorney.
14
15  If your attorney has ordered a copy, please review the
    transcript.  Reading, correcting and signing of the
16  deposition is an option and is not mandatory.  If changes
    are necessary, please do so on the correction sheet
17  provided.
18
    If your attorney has not ordered a copy of the transcript,
19  you may call to make an appointment to review the original
    in our offices.
20
21  Thank you,
22
23  Clark Reporting
24
25

49 (Pages 193 to 195)

DEPOSITION OF ROBERT O. RITCHIE, PH.D.

# EXHIBIT F

Do Not Disclose - Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT
 2                         FOR THE
 3                   DISTRICT OF ARIZONA
 4     * * * * * * * * * * * * * * * * * * * * * * * * *
       In Re BARD IVC FILTERS PRODUCTS
 5     LIABILITY LITIGATION
 6                     No. MD-15-02641-PHX-DGC
       * * * * * * * * * * * * * * * * * * * * * * * * *
 7
       and
 8
       * * * * * * * * * * * * * * * * * * * * * * * * *
 9     CAROL KRUSE              )MDL No. 2641
                                )
10               Plaintiff,)
                                )
11          vs.                 )
                                )
12     C.R. BARD AND BARD       )
       PERIPHERAL VASCULAR, INC., )
13                              )
                 Defendant.)
14     * * * * * * * * * * * * * * * * * * * * * * * * *
           DO NOT DISCLOSE - SUBJECT TO FURTHER
15              CONFIDENTIALITY REVIEW
16     VIDEOTAPED DEPOSITION OF:  SHANON SMITH, M.D.
17     DATE:  April 4, 2017
18     TIME:  2:00 p.m.
19     PLACE:  Mary Lanning Memorial Hospital, 15 North St.
       Joseph Avenue, Hastings, Nebraska
20
21
22
23
24
25
```

## Page 2

APPEARANCES

APPEARING ON BEHALF OF PLAINTIFF:
Thomas Wm. Arbon, Esquire
LAW OFFICES OF BEN C. MARTIN, LLP
3710 Rawlins Street, Suite 1230
Dallas, Texas 75219
(214)761-6614
tarbon@bencmartin.com

and

Daniel MacDonald, Esquire
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219
(214)521-3605
dmacdonald@baronbudd.com

APPEARING ON BEHALF OF DEFENDANT BARD:
Elizabeth C. Helm, Esquire
NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street NW, Suite 1700
Atlanta, Georgia 30363
(404)3226249
kate.helm@nelsonmullins.com

APPEARING ON BEHALF OF DEPONENT:
Mark E. Novotny, Esquire
LAMSON, DUGAN & MURRAY LLP
10306 Regency Parkway Drive
Omaha, Nebraska 68114
(402)397-7300
mnovotny@ldmlaw.com

ALSO PRESENT:  Roger Speakman - Videographer

## Page 3

I N D E X

WITNESS:          Direct  Cross  Redirect  Recross
SHANON SMITH, M.D.   6    106    156      181
                    184    190
                    191

EXHIBITS:                        Marked
2107 - Subpoena                      7
2108 - Curriculum Vitae              8
2109 - IFU G2 filter system         29
2110 - Bates stamp No. BPVE0100373887   42
2111 - Bates stamp No. BPVE01-00622867  45
2112 - Bates stamp No. BPVE010101982    50
2113 - Bates stamp No. BPVE010752806    52
2114 - Bates stamp No. BPV170100142912  57
2115 - Hospital record              62
2116 - Image RAD00011               64
2117 - Fluoroscopic images          66
2118 - Report dated April 7, 2011   72
2119 - X-ray images                 76
2120 - Hospital chart record        81
2121 - notes                        83
2122 - Hospital chart record        85
2123 - Informed consent form        93
2124 - Informed consent form        93

## Page 4

EXHIBITS:                        Marked
2125 - Diagnostic imaging timeout       131
2126 - E-mail                           169
2127 - Bates stamp No. KRUSEC_MLMH_MDR00057
       through 60                       172

## Page 5

VIDEOGRAPHER:  We are now on the record.  My name is Roger Speakman, I am a videographer for Golkow Technologies.  Today's date is April 4th, 2014 (sic) and the time is 1412.

This deposition is being held in Hastings, Nebraska, in the matter of Bard Filters Products Liability Litigation, Civil Action No. MD-15-02641-PHX-DGC with regard to Carol Kruse.  In the United States District Court for the District of Arizona.

The deponent is Shanon Smith, M.D.

Counsel, will you please identify yourselves with firm affiliation and whom you represent.

MR. ARBON:  My name is Thomas Arbon.  I'm with the law office of Ben C. Martin and we represent Carol Kruse.

MR. MACDONALD:  My name is Daniel MacDonald.  I'm with the law firm of Baron and Budd and I represent Carol Kruse.

MS. HELM:  I'm Kate Helm with Nelson Mullins Riley & Scarborough and I represent the defendants.

MR. NOVOTNY:  I am Mark Novotny

Do Not Disclose - Subject to Further Confidentiality Review

Page 6

1    with Lamson Dugan and Murray in Nebraska and I'm
2    her for Dr. Smith.
3          VIDEOGRAPHER:  Okay, the court
4    reporter is Christine Salerno and will now swear
5    in the witness.
6
7          SHANON SMITH, M.D.,
8    Of lawful age, being first duly cautioned and
9    solemnly sworn as hereinafter certified, was examined
10   and testified as follows:
11
12         DIRECT EXAMINATION
13   BY MR. ARBON:
14   Q.  Can I get you to state your full name, sir?
15   A.  Shanon Smith.
16   Q.  And Dr. Smith, how are you employed?
17   A.  I'm with a four-man radiology group that work at
18   Mary Lanning.
19   Q.  How long have you been with that group?
20   A.  Since approximately 2009.
21   Q.  And Mary Lanning is what?
22   A.  The name of a hospital in Nebraska.
23   Q.  And where in Nebraska?
24   A.  Hastings, Nebraska.
25   Q.  All right.  Do you perform -- do you have a

Page 7

1    specific area of radiology that you practice?
2    A.  I practice in all areas.
3    Q.  Is your practice -- do you limit your practice
4    to this hospital, Mary Lanning?
5    A.  No.
6    Q.  Okay.  Do you have other hospitals that you
7    practice for?
8    A.  Yes.
9    Q.  And what are they?
10   A.  They are several.  Do you want me to list 'em?
11   Q.  Sure.
12   A.  Kearney hospital, Superior, Nebraska.  Smith
13   County, Kansas; Red Cloud, Nebraska; Osceola,
14   Nebraska.  I think those are the most common.
15   Q.  Okay.  And you threw in a Kansas in there and
16   which was that one?
17   A.  Oh, Kansas.  Smith -- Smith County, Kansas.
18   Q.  Okay.  How long has your radiology practice
19   included these additional hospitals?
20   A.  In general, 2009.
21         (Exhibit No. 2107, marked for identification.)
22   Q.  I think I'm going to get into that in a little
23   more detail in a minute.  But I'm asking you what
24   I've marked -- take a look at the document I've
25   marked as 2107 and ask you if you recognize that

Page 8

1    document?
2    A.  Let's see.
3         (Discussion off the record.)
4    A.  Is in the --
5          MR. NOVOTNY:  Subpoena.
6    A.  Yeah, I believe it might be the subpoena.
7    Q.  (BY MR. ARBON) All right, Doctor, and that's
8    what it is.  And we'll talk in a minute, but the
9    subpoena has an Exhibit A to it; do you see that?
10   A.  Okay.
11   Q.  Which was a request for some documents if you
12   had them.  And I just want to go through that real
13   quick, see if there's some documents here that you
14   have brought with you.  Here's what we don't have,
15   and the first is a copy of your current resume or CV?
16   A.  Correct.
17   Q.  Have you brought one with you?
18   A.  I think I saw somebody had --
19         MR. NOVOTNY:  We gave that to you
20   previously.
21         MR. ARBON:  Okay, and that's what
22   I'm just trying to make sure.  If that's the
23   case then let's go ahead.
24         (Exhibit No. 2108, marked for identification.)
25   Q.  (BY MR. ARBON) I'm going to hand you now what

Page 9

1    we've marked as 2108 --
2    A.  Okay.
3    Q.  -- to your deposition, is that a copy of your --
4    A.  Correct.
5    Q.  Your current CV or resume?
6    A.  Yes.
7    Q.  All right.  Is that an accurate copy of your
8    resume?
9    A.  Yes.
10   Q.  And is it up to date?
11   A.  Yes.
12   Q.  All right.  Do you have a patient medical file
13   for Carol Kruse?
14   A.  The hospital has a medical file.
15   Q.  All right.  But you don't maintain one
16   separately in your own practice?
17   A.  Correct.
18   Q.  Did you have an opportunity to -- the next thing
19   we asked for is medical imaging related to Carol
20   Kruse, do you have any of that?
21   A.  The hospital has all that.
22   Q.  And let me just ask it this way:  Have you
23   brought any of that material with you?
24   A.  No.
25   Q.  Okay.  Did you have any correspondence from any

Do Not Disclose - Subject to Further Confidentiality Review

Page 10

1  physicians or medical facilities regarding Carol
2  Kruse?
3  A.  No.
4  Q.  And did you have any marketing materials or
5  other communications that you've ever received from
6  CR Bard or Bard Peripheral Vascular or anyone else
7  regarding their filters?
8  A.  None other than what's on the internet for Bard,
9  and their G2 filter.
10  Q.  So did you take a look at the internet for
11  materials related to the G2 or --
12  A.  They have a package insert on the internet.
13  Q.  Any other documents, is that a document -- and I
14  know it's not necessarily a document in hand, it's
15  information on the internet.  Are there any other
16  documents or information that you've reviewed to
17  prepare for the deposition today?
18  A.  No.
19  Q.  Doctor, have you ever given a deposition before?
20  A.  Once.
21  Q.  Uh-huh.  And you are represented today by
22  Mr. Novotny; is that correct?
23  A.  Correct.
24  Q.  And we're taking this deposition here at Mary
25  Lanning Hospital in a conference room that you were

Page 11

1  kind enough to help us arrange for, correct?
2  A.  Correct.
3  Q.  And so just a couple of things I will tell you
4  with regard to the deposition, and you're doing very
5  well.  And the first thing is always, if you would
6  answer in words as opposed to a nod of the head or a
7  uh-huh or na-huh, 'cause the court reporter is trying
8  to make sure she gets a correct transcript and
9  sometimes it's difficult to interpret those, all
10  right?
11  A.  Okay.
12  Q.  The next thing I'm going to ask you, if for some
13  reason I ask you a question and you don't understand
14  it, if you would let me know and I'll try to rephrase
15  it so I can be sure you're answering the question I'm
16  asking, all right?
17  A.  Okay.
18  Q.  Tell you something else too that may come up.
19  If I ask a question and what you think I'm asking you
20  is to tell me about conversations you've had with
21  Mr. Novotny, your attorney, that's -- I promise you
22  that's not my intent.  Communications that you've had
23  with your lawyer are not -- are privileged, I'm not
24  trying to ask that.  So if you would just tell me, do
25  you mean what Mr. Novotny and I talked about, I will

Page 12

1  tell you no, all right?
2  A.  (Witness nods.)
3          MR. NOVOTNY:  That's a yes?
4          THE WITNESS:  That's a yes.  I
5  think I understand your question or statement.
6  Q.  (BY MR. ARBON)  All right.  Let me try and
7  clarify.
8  If in order to answer my question what you're
9  going to have to say is oh, Mr. Novotny told me this,
10  I would rather you tell me the only way I know I can
11  answer that is based on what I've been told, we'll
12  move on -- we'll try to restate the question.
13  A.  Okay.
14  Q.  Next thing is, is if for some reason you would
15  like to take a break, let me know.
16  A.  Okay.
17  Q.  I may not be able to stop immediately if there's
18  a question pending or a line of questions, but I'll
19  get to the break as quick as I can.
20  A.  Okay.
21  Q.  Now Doctor, you understand that I represent
22  Carol Kruse in this matter?
23  A.  That makes sense.
24  Q.  Okay.  And Ms. Kruse was one of your patients --
25  A.  Correct.

Page 13

1  Q.  -- is that correct?
2  We have met one time before, right?
3  A.  Correct.
4  Q.  And we spoke for a little bit before this --
5  about the deposition and I asked you some questions
6  regarding your care of Ms. Kruse and your knowledge
7  of filters, right?
8  A.  Correct.
9  Q.  Other than that, we've had no communication
10  directly?
11  A.  Other than the e-mail that you sent me saying
12  that you would like to meet.
13  Q.  Okay.  You understand this is a lawsuit in which
14  Ms. Kruse is alleging or brought claims against CR
15  Bard and Bard Peripheral Vascular with regard G2, the
16  G2 filter she had implanted?
17  A.  Okay.
18  Q.  What I'll also -- do you also understand that my
19  client has made no claims against you and has not
20  brought any, any lawsuit -- you're not a party to
21  this lawsuit, you just are a witness.
22  A.  Okay.
23  Q.  Can you tell me the address for your medical
24  practice.
25  A.  715 North St. Joseph, Hastings, Nebraska.

Page 14

1  Q.  Okay.  And I think you said that they were, it's
2  a radiology group comprised of four doctors?
3  A.  Correct.
4  Q.  Has that membership or that physician practice
5  with your group remained constant since 2009?
6  A.  We had one member leave and then a new member
7  replace a couple years ago.
8  Q.  Okay.  Who are the members of the group now,
9  there's yourself?
10  A.  Yes, Dr. Herold, H-E-R-O-L-D, Dr. Rodriguez, and
11  Dr. Hart, H-A-R-T.
12  Q.  Okay.  And who is the physician who left
13  practice?
14  A.  Dr. Eric Rodriguez.
15  Q.  Okay.  So we have two Dr. Rodriguez?
16  A.  Correct.
17  Q.  And who is the doctor that's still with the
18  practice, the Dr. Rodriguez?
19  A.  His first name is Paul.
20  Q.  Okay.  And who is the physician that joined the
21  latest?
22  A.  Hart.
23  Q.  And when do you think he joined your firm, your
24  group?
25  A.  Two to three years ago.

Page 15

1  Q.  All right.  And so it's 2007 (sic), so 2015,
2  2014, somewhere in that range?
3  A.  That sounds reasonable.
4  Q.  Do you want to tell us where you received your
5  medical degree?
6  A.  Medical College of Georgia.
7  Q.  And when did you receive that degree?
8  A.  Many years ago.  Let's see, 2000 -- or 1992 is
9  when I graduated.
10  Q.  All right.  And where did you go to -- okay, so
11  that's medical school at the Medical College of
12  Georgia?
13  A.  Correct.
14  Q.  And did you do a residency?
15  A.  Yes.
16  Q.  And where did you do that?
17  A.  At Vanderbilt, in Nashville, Tennessee.
18  Q.  And how long was your residency?
19  A.  Three years.
20  Q.  And after your residency, did you do any other
21  particular specialized training?
22  A.  A fellowship in occupational medicine and
23  infectious disease from '95 to '98.
24  Q.  And where was that?
25  A.  University of Iowa.

Page 16

1  Q.  Can you tell me the difference between a
2  residency and a fellowship?
3  A.  A residency, you begin after your medical school
4  and a fellowship, is additional training.
5  Q.  Is a residency more of a broad based medical
6  education than a fellowship?
7       MS. HELM:  Object to the form.
8  Q.  (BY MR. ARBON) Let me try and rephrase it.
9  A.  Okay.
10  Q.  When you do residency, ever -- is it true that
11  every doctor who's going to practice would generally
12  have performed a residency?
13  A.  After you finish your residency, most doctors
14  either go into practice or they specialize.
15  Q.  Okay.  And residency is post the academic
16  education of medical school, you go into residency
17  for more of a clinical hands-on education in the
18  practice of medicine; is that accurate?
19  A.  Yeah, you have more patient contact.  I think
20  that's accurate.
21  Q.  And is the focus of residency to expose doctors
22  to several areas, specialties of medicine?
23  A.  Yes, that sounds reasonable.
24  Q.  And that's what I'm just getting to, is this
25  is -- then when you go to a fellowship, then the

Page 17

1  physician after completing the residency, if I'm
2  understanding the fellowship, as a physician you're
3  going to seek out additional education in a more
4  defined area of practice?
5  A.  That sounds accurate.
6  Q.  And in your case, the first fellowship you
7  obtained was an occupational medicine and infectious
8  disease?
9  A.  Correct.
10  Q.  And can you give me a brief understanding of
11  what that, what you learned through that fellowship?
12  A.  How to treat patients with on-the-job injuries
13  and different unusual infections, in addition to
14  general medicine.
15  Q.  And in looking at your resume, it referred to it
16  as an internal medicine residency prior to your
17  fellowship, so is your focus on internal medicine?
18  A.  Correct, primarily.
19  Q.  Give me a quick understanding of what internal
20  medicine involves?
21  A.  Taking care of patients with many medical
22  conditions.
23  Q.  And then, did you have any further specialized
24  training in any areas of medicine in addition to your
25  fellowship in occupational medicine and infectious

Page 18

1 disease?
2 A. Radiology and interventional radiology.
3 Q. And when did you begin your fellowship in
4 radiology?
5 A. 2000 -- the residency began in 2004.
6 Q. Okay. And where was that?
7 A. Augusta, Georgia.
8 Q. And in looking at your resume, it says
9 diagnostic radiology. What is diagnostic radiology?
10 A. It's the -- it's the study of radiology and all
11 its components.
12 Q. Does diagnostic radiology have more of a focus
13 on, I would almost say diagnosis and recognition of
14 conditions through imaging as opposed to treating?
15 A. Not necessarily, can actually do both.
16 Q. You completed that residency in 2008?
17 A. Correct.
18 Q. And then in 2008, you began a fellowship?
19 A. Correct.
20 Q. And that fellowship was in what area?
21 A. Interventional radiology.
22 Q. And what is interventional radiology?
23 A. The study of radiology procedures that require
24 more invasion to the body.
25 Q. And by "invasion," what do you mean?

Page 19

1 A. Penetrating the skin.
2 Q. And when did you complete your fellowship in
3 interventional radiology?
4 A. 2009.
5 Q. And do you know when in 2009 that was?
6 A. Most trans -- most people transition by July the
7 1st.
8 Q. And that fellowship, if I'm looking at it, is
9 University of Nebraska at Omaha?
10 A. Correct.
11 Q. And how far is that facility from here in
12 Hastings?
13 A. Three hours by car. If you drive the
14 appropriate speed.
15 Q. And so is it fair to say you completed your
16 fellowship in interventional radiology around July of
17 2009?
18 A. I think that would be accurate.
19 Q. Before you completed your residency, were you
20 practicing interventional radiology?
21 A. Before I completed --
22         MR. NOVOTNY: No, you said
23     residency.
24 Q. (BY MR. ARBON) I'm sorry, I'll withdraw the
25 question.

Page 20

1     Before you finished your fellowship in 2009,
2 you have a practice that included interventional
3 radiology?
4 A. No, not a private practice.
5 Q. Okay. And just to be a little, try and be a
6 little clearer if I am. In doing interventional
7 radiology procedures, more invasive procedures; first
8 of all, is IVC filter placement considered an
9 invasive procedure?
10 A. I would, I would consider that.
11 Q. Is that one of the procedures that you learned
12 and added to your practice through your
13 interventional radiology fellowship?
14         MS. HELM: Object to the form.
15 A. Actually, learned that in diagnostic radiology.
16 You don't necessarily have to do an interventional
17 fellowship, but you do learn that as well in the
18 fellowship.
19 Q. (BY MR. ARBON) When you were doing your
20 diagnostic radiology residency, were you being
21 instructed in how to perform IVC filter placement?
22 A. Sometimes, if the patient arises.
23 Q. And did you perform IVC filter placements during
24 your residency in diagnostic radiology?
25 A. I believe so.

Page 21

1 Q. Okay. And then did you perform additional
2 filter placement procedures during your fellowship in
3 interventional radiology?
4 A. Yes.
5 Q. And then once you completed your fellowship,
6 what did -- what was your next move in terms of your
7 professional career?
8 A. Private practice to where I am currently.
9 Q. Once you moved into private practice, did you
10 include the placement of enter -- enter -- start
11 over.
12     Once you moved into private practice, did you
13 include the placement of IVC filters as part of the
14 services you could offer as a physician?
15 A. Yes, they were included.
16 Q. When you went into private practice, did your
17 private practice include the different hospitals that
18 we've discussed, Mary Lanning, Kearney hospital,
19 Superior, Smith County, Red Cloud and Osceola, were
20 all those hospitals in your -- part of your practice?
21 A. Yeah. Yes.
22 Q. How long have you had -- do you have staff
23 privileges in all those facilities?
24 A. Yes.
25 Q. And how long have you had staff privileges at

Do Not Disclose - Subject to Further Confidentiality Review

Page 22

1  each of those hospitals?
2  A.  Since 2009, I believe.
3  Q.  Okay.  And would that have -- those staff
4  privileges come when you finished your fellowship or
5  before?
6  A.  After fellowship.
7  Q.  I'm sorry, are you board certified?
8  A.  I am board certified.
9  Q.  In what areas?
10  A.  Radiology, internal medicine, infectious
11  disease, occupational medicine.
12  Q.  Is there a board certification for
13  interventional radiology?
14  A.  Yes.
15  Q.  Do you hold that certification?
16  A.  Not yet.
17  Q.  Okay.  Are you board eligible in that area?
18  A.  Yes.
19  Q.  I'm assuming you just haven't sat for the boards
20  yet?
21  A.  It's a $4,000 out of town rigorous, so not yet.
22  Q.  All right.  Can you give me an idea and I'm just
23  going to ask you:  Is Hastings a small town?
24  A.  Some people may say so.
25  Q.  Okay.  What do you say?

Page 23

1  A.  I would call it a small town.
2  Q.  Okay.  I mean, you've been trained in Georgia
3  and --
4  A.  Uh-huh.
5  Q.  -- you've been trained in -- Vanderbilt, is that
6  Memphis?  Nashville?
7  A.  Tennessee, it's a larger town.
8  Q.  Which is?
9  A.  Nashville.
10  Q.  Okay.
11  A.  And Memphis.
12  Q.  Okay.  And I just, I mean, as a physician who is
13  board certified in radiology, internal medicine,
14  occupational medicine, infectious disease in a
15  smaller town or smaller hospital, I assume all of
16  your training comes to bear; is that fair?
17       MS. HELM:  Object to the form.
18  A.  It's nice to have as much training as you can,
19  that's for sure.
20  Q.  (BY MR. ARBON) Are you still called upon to
21  provide opinions or assist patients in areas other
22  than radiology?
23  A.  Yes.
24  Q.  Are you a member of any professional societies?
25  A.  ARRS.

Page 24

1  Q.  What is ARRS?
2  A.  American Roentgen Ray Society.  Good luck on
3  spelling that.
4  Q.  And what is that society?
5  A.  That's a radiology society.
6  Q.  Are you part of the society of interventional
7  radiologists?
8  A.  I used to be.
9  Q.  Okay.  And when were you a part of that society?
10  A.  I would guess between 2009 and until a couple
11  years ago.
12  Q.  And 2017, so 2015-ish, '14, '15?
13  A.  That sounds reasonable.
14  Q.  And is there a reason that you're not part of
15  that society anymore?
16  A.  I felt that the ARRS covered the same topics
17  they did.  And being a member of many societies is
18  extremely expensive so I focused on ARRS.
19  Q.  Have you ever been or are you currently a
20  reviewer for any medical journals?
21  A.  No.
22  Q.  Do you have a recollection of Carol Kruse as a
23  patient?
24  A.  I remember the room and the procedure, but I
25  don't recall her specifically, color of her hair or

Page 25

1  things like that.
2  Q.  Okay.  And you say room and her procedure and
3  I'm just going to, as you know, you actually
4  performed two procedures related to her --
5  A.  Yes, correct.
6  Q.  -- which procedure do you recall?
7  A.  The second one I recall the most.
8  Q.  Okay.  Is there a reason why you recall that
9  second procedure more?
10  A.  'Cause we tried to retrieve a filter and did not
11  retrieve a filter.
12  Q.  Do you remember what type of filter it was?
13  A.  I believe it's a G2 filter.
14  Q.  Do you recall if there was anybody else in
15  that -- was it a cath lab or operating room?
16  A.  It's a interventional room, interventional
17  suite.
18  Q.  Did you have anybody else present with you in
19  the interventional suite, other than the patient?
20  A.  An x-ray tech.
21  Q.  Okay.  Anyone else?
22  A.  That's the one I recall.
23  Q.  Okay.  Was there a Bard representative present
24  for that procedure?
25  A.  I don't recall.

Do Not Disclose - Subject to Further Confidentiality Review

Page 26

1  Q.  Okay.
2  A.  For the first, for the first -- for the first --
3  the placement, I don't recall.
4  Q.  Okay.  And that may be where we've gotten
5  crossed I'm still talking about the retrieval
6  procedure.
7  A.  Okay, sorry.  For the retrieval, yes, there was
8  a Bard representative, don't remember his name.
9  Q.  But it was a male?
10  A.  It was a man.
11  Q.  I've been told that there was a gentleman by the
12  name of Brofy Puckett (sic) that was assigned to this
13  territory at that time, do you know Mr. Puckett?
14  A.  No.
15  Q.  Do you know if that was -- so by saying that, do
16  you know if that was or was not Mr. Puckett that was
17  present?
18  A.  I don't know.
19  Q.  When there's a representative present during a
20  procedure like that, would there be any documents
21  generated to identify that they were -- by the
22  hospital to identify that they were present?
23  A.  I don't -- I don't know what the hospital policy
24  was at that time.
25  Q.  How is it you're so sure that he was present?

Page 27

1  A.  Because I remember him being there.
2  Q.  How -- in your practice, how often would you
3  have a product manufacturer representative available
4  during a procedure?
5  A.  Most times they are available.
6  Q.  Is that usually something -- well, could you
7  tell me how this particular rep came to be present
8  during this -- Ms. Kruse's retrieval procedure?
9  A.  Because we would have asked him to be there.
10  Q.  Okay.  So that would have been arranged through
11  your office?
12     Or through the hospital?
13  A.  Through the hospital.
14  Q.  And why would you have asked for him to be
15  there?
16  A.  Because it's always nice to have help.
17  Q.  And how, what kind of help would the -- the Bard
18  representative provide?
19  A.  Suggestions, if needed.
20  Q.  And I'm going to have to get kind of more detail
21  on that, but --
22  A.  Sure.
23  Q.  By suggestions, what kind of suggestions might
24  you expect or might you look to the Bard
25  representative for?

Page 28

1  A.  To discuss that, what my plan was was
2  appropriate.  And if it -- if the plan didn't
3  work, what would be alternate plans.
4  Q.  Did you look at the Bard representatives as some
5  kind of a resource for information on the product?
6         MS. HELM:  Object to the form.
7  A.  I look for them as a resource for their clinical
8  expertise.
9  Q.  (BY MR. ARBON) And in light of the objection,
10  let me ask the question a different way.
11     What did you look for or what did you hope to
12  gain by having a Bard representative present during
13  Ms. Kruse's explantation procedure?
14  A.  I would want, let's see, I -- how -- can you
15  repeat the question?
16  Q.  I'm going to broaden it up first, because that
17  may have hung you up.
18     When you request to have a Bard representative
19  present during any procedure, why are you making that
20  request?  What is your expectation with regard to the
21  Bard representative's being -- being at the
22  procedure?
23         MS. HELM:  Object to the form.
24  A.  I would request the representative be there in
25  case I had any questions that need to be answered.

Page 29

1  Q.  (BY MR. ARBON) And when you say, "any questions
2  that need to be answered," any questions about the
3  entire procedure or things in general or what are you
4  looking to the Bard rep for?
5         MS. HELM:  Object to the form.
6  A.  It could be any question that I pose, if he felt
7  comfortable answering.
8  Q.  (BY MR. ARBON) Can you give me an example of
9  some of the discussions you've had with the Bard reps
10  that have been present during filter procedures that
11  you've performed?
12         MS. HELM:  Object to the form.
13  A.  I remember in this particular case when we were
14  attempting to retrieve it, the suggestion was to do a
15  loop technique, but we had decided not to do that and
16  refer the patient to a tertiary care facility.
17  That's our, that's why I remember a rep was in the
18  room.
19  Q.  Okay.
20     (Exhibit No. 2109, marked for identification.)
21  Q.  I hand you what I've marked as document Exhibit
22  No. 1209.
23         MS. HELM:  2109.
24         MR. ARBON:  Let me rephrase.
25  Q.  (BY MR. ARBON) Let me show you what I've handed

Do Not Disclose - Subject to Further Confidentiality Review

Page 30

1  you as Exhibit No. 2109 and ask you if you recognize
2  that document?
3  A.  I believe this is the same package insert that
4  you see on the internet.
5  Q.  Okay.  Does this appear to be the package insert
6  that would have been available to you at the time
7  Ms. Kruse's filter was explanted?
8  A.  Most of the time they're in the box.
9  Q.  What is an IFU?
10  A.  I don't know.
11  Q.  Instructions for use?
12  A.  Okay.
13  Q.  Okay.  I'm sorry, this document -- let's just
14  talk about the G2 filter system information for use
15  document you have in front of you.  I mean, had you
16  seen that before you attempted to both -- well,
17  implant the filter in Ms. Kruse?
18  A.  I don't, I don't know.
19  Q.  Okay.  Did you see instructions for use when you
20  were training to use the G2 device?
21  A.  Yes.
22  Q.  Okay.  And so you're familiar with the
23  instructions for use for that device?
24          MS. HELM:  Object to the form.
25  A.  I've been trained to place the device and I've

Page 31

1  read through this document before.
2  Q.  (BY MR. ARBON) Do you consider an instruction
3  for use a document that is a benefit to you as a
4  physician that's going to be using the product?
5  A.  Yes.
6  Q.  What do you use -- why do you consult or read an
7  instruction for use document such as the G2 document
8  you have in front of you?
9  A.  To try to do the steps that are recommended.
10  Q.  Where were you trained to place G2 filters?
11          MS. HELM:  Object to the form.
12  A.  That's, that's -- I'm not sure what that means?
13          MS. HELM:  You mean, like, in
14      what --
15  A.  In a patient or --
16          MS. HELM:  Like in a state or --
17  (Court reporter interrupted for clarification.)
18          MS. HELM:  Or an interior vena
19      cava?
20          MR. NOVOTNY:  I knew what you
21      meant.
22  A.  Honestly --
23          MR. ARBON:  I honestly didn't
24      think we were going to head that, get confused
25      that quickly.

Page 32

1  A.  I could guess.  Do you mean like --
2          MR. ARBON:  I'll withdraw the
3      question.
4      (Court reporter interrupted for clarification.)
5  Q.  (BY MR. ARBON) Where did you receive your
6  training on the placement of IVC filters?
7  A.  It would have been in Georgia and Nebraska.
8  Q.  And specific to a Bard G2 filter, where did you
9  receive training on the use of the Bard G2 filter?
10  A.  In Nebraska for sure.  Unsure if Georgia carried
11  that product at the time.
12  Q.  When you were going through your fellowship in
13  interventional radiology at the University of
14  Nebraska in Omaha, as part of your training, were
15  Bard representatives ever present during your
16  training on the use of the Bard products?
17          MS. HELM:  Object to the form.
18  A.  Sometimes representatives were there for
19  multiple companies for different products that they
20  had.
21  Q.  (BY MR. ARBON) Okay.  And in this case, we're
22  specifically dealing with the Bard G2, obviously,
23  filter products.  Do you recall when you were
24  training -- in training in your fellowship at the
25  University of Nebraska Omaha, did Bard have

Page 33

1  representatives there available as a resource for the
2  students that were learning to use the product?
3          MS. HELM:  Object to the form.
4  A.  I remember seeing a Bard representative at
5  the -- at the University of Nebraska.
6  Q.  (BY MR. ARBON) And again, was that
7  representative available, similar to as we discussed
8  when you have procedures, to answer questions,
9  provides suggestions to assist you in your
10  understanding of the use of the products?
11          MS. HELM:  Object to the form.
12  A.  It could.
13  Q.  (BY MR. ARBON) Did you ever utilize them for
14  that?
15  A.  Sometimes.
16  Q.  Did you view them, again, as kind of a resource
17  for information on the Bard product?
18          MS. HELM:  Object to the form.
19  A.  Found their advice sometimes helpful.
20  Q.  (BY MR. ARBON) Did you have any expectations
21  about the level of education and training that that
22  representative would have with regard to the product?
23  A.  I assume they understood their product.
24  Q.  Would you expect -- was it your expectation the
25  manufacturer would make sure that the Bard

Page 34

1  representatives they made available to you were
2  knowledgeable with regard to the capabilities of the
3  Bard products?
4            MS. HELM:  Object to the form.
5  A.  I would assume as an employee they should be
6  trained appropriately.
7  Q.  (BY MR. ARBON) Okay.  And I'm getting to be --
8  should be trained appropriate to discuss the
9  capabilities of the product.
10           MS. HELM:  Object to the form.
11 A.  The product and -- correct, the product.
12 Q.  (BY MR. ARBON) Would you expect that Bard
13 representative to be knowledgeable if there are any
14 limitations with the product?
15           MS. HELM:  Object to the form.
16 A.  The rep should know the product well.
17 Q.  (BY MR. ARBON) Good.  And so if the product --
18 if within Bard there's knowledge that Bard has
19 regarding their product which indicates there may be
20 some limits or there may be issues related to
21 complications caused by their product, would you
22 anticipate that that Bard rep would convey them to
23 you as the physician who is making decisions about
24 using the product?
25           MS. HELM:  Object to the form.

Page 35

1  A.  Yes, I would think the rep would tell us risk
2  and benefits of the product.
3  Q.  (BY MR. ARBON) Is that one of the things that
4  you would look to the Bard rep for?
5  A.  Yes.
6  Q.  So if a Bard rep tells you that a G2 -- well,
7  let's just take the IFU for example.
8  A.  Okay.
9  Q.  If the Bard rep -- if the Bard and through its
10 representatives -- and when I say reps, you
11 understand I mean sales representatives?
12 A.  Correct.
13 Q.  I believe in Bard they're, territory managers is
14 their title.
15 A.  Okay.
16 Q.  For example, if the Bard rep were to tell you,
17 "The G2 filter system is indicated for use in the
18 prevention of recurrent pulmonary embolism by a
19 permanent placement in vena cava in the following
20 situations," if a Bard rep makes that representation,
21 you would expect that they would be knowledgeable
22 about that representation; is that fair?
23           MS. HELM:  Object to the form.
24 A.  Are you reading from this list?
25 Q.  (BY MR. ARBON) yes, for example, I'm just

Page 36

1  looking at Page 1.
2            MR. NOVOTNY:  Here.  (Indicating.)
3  Q.  Under indication for use.
4  A.  Okay, yes, I see that.
5  Q.  And you see it?
6  A.  Yes.
7  Q.  But let's just take indications for use in
8  general.
9  A.  Okay.
10 Q.  Is that an area that you, as a physician who is
11 going to be utilizing Bard products, would expect the
12 Bard rep that you're working with to be knowledgeable
13 about, the indications for use?
14           MS. HELM:  Object to the form.
15 A.  Yes.
16 Q.  (BY MR. ARBON) What is your understanding or
17 expectation when a manufacturer such as Bard
18 represents that a IVC filter is indicated for use for
19 the prevention of recurrent pulmonary embolism by a
20 permanent placement.  What does that mean to you?
21           MS. HELM:  Object to the form.
22 A.  That the product can be used for that indication
23 and the physician would be correct in putting it in
24 for that reason.
25 Q.  (BY MR. ARBON) If Bard makes that representation

Page 37

1  to you, what as a physician, do you believe would
2  have gone into Bard's -- strike that.  Let me try and
3  rephrase.
4     As a physician who is being asked to use this
5  filter and place it in patient, if Bard makes
6  representation that the filter is indicated for use
7  in the prevention of recurrent pulmonary embolism by
8  a permanent placement, would you anticipate that Bard
9  has fully tested the product to determine whether
10 it's safe for that purpose and for permanent
11 placement?
12           MS. HELM:  Object to the form.
13 A.  I would assume the company's checked safety and
14 efficacy of the filter.
15 Q.  (BY MR. ARBON) Would you anticipate the company
16 has verified the long-term safety of the product if
17 they're recommending it for permanent use?
18           MS. HELM:  Object to the form.
19 A.  I would -- I would think that's part of the FDA
20 process, is long-term assessment.
21 Q.  (BY MR. ARBON) And what's your understanding of
22 how -- of the FDA process, do you have one?
23 A.  The FDA, when a product is approved, then
24 there's a post follow-up of that follow-up -- of that
25 product.

Page 38

1  Q.  Was it your belief or your understanding that
2  the Bard G2 filter had gone through an FDA approval
3  process?
4          MS. HELM:  Object to the form.
5  A.  The -- I assume that there was some process that
6  it would be regulated before it went on the market.
7  Q.  (BY MR. ARBON) Did your Bard rep or anyone with
8  Bard represent to you that it was an FDA approved
9  device?
10 A.  I can't recall that they used those words.
11 Q.  Okay.  Would it surprise you to learn that an
12 FDA approval was not provided for the filter?
13         MS. HELM:  Object to the form.
14    It...
15 A.  I wouldn't know that.  I think you mentioned
16 that earlier in our meetings earlier, but I wouldn't,
17 I didn't...
18 Q.  (BY MR. ARBON) In fact, what the Bard G2 filter
19 did is went through the process called a 510K
20 proceeding, which does not involve approval by the
21 FDA, merely clearance based on a representation that
22 it is as safe and efficacious as an existing device;
23 were you aware of that?
24         MS. HELM:  Object to the form.
25 A.  No, I didn't know those exact words.

Page 39

1  Q.  (BY MR. ARBON) Did you know that the -- do you
2  have any idea of what device Bard utilized as the
3  predecessor device for the G2 in seeking FDA
4  approval?
5  A.  No, I wouldn't know that.
6          MS. HELM:  Object to form.
7  Q.  (BY MR. ARBON) Have you ever seen of or heard of
8  the Bard Recovery filter -- have you ever heard of
9  the Bard enter -- I'm going to have to restate.
10    Have you ever heard of the Bard inferior vena
11 cava Recovery filter?
12 A.  That doesn't ring a bell.
13 Q.  Okay.
14 A.  Not sure that's the right way to say that, I'm
15 not sure.
16 Q.  When you were going through training, did you
17 ever work with a recover, Bard Recovery filter?
18 A.  We used different filters, I can't recall the
19 name.
20 Q.  Would you have anticipated if a Bard is
21 marketing and representing that the G2 filter is
22 indicated for use in the prevention of recurrent
23 pulmonary emboli and by a permanent placement that
24 they would have proper randomized clinical study to
25 support that statement before they marketed it?

Page 40

1          MS. HELM:  Object to the form.
2  A.  I would think they would have done proper study
3  of the device before they put it on the market.
4  Q.  (BY MR. ARBON) Has any --
5  A.  Especially nowadays.
6  Q.  Any Bard rep or any representative of Bard ever
7  informed you that in fact there is no level one
8  randomized clinical study that demonstrates the
9  efficacy of their filters in preventing, with regard
10 to the mortality?
11         MS. HELM:  Object to the form.
12 A.  I don't recall talking about level one data
13 and -- I assume you mean, like, a randomized double
14 blind study?
15 Q.  (BY MR. ARBON) Yes, sir.
16 A.  I'm not familiar if that product's had that or
17 not.  I know those are difficult studies.
18 Q.  Would you expect that Bard would have performed
19 sufficient clinical studies to establish the safety
20 and long-term efficacy of their filter before they
21 sold it?
22         MS. HELM:  Object to the form.
23 A.  I would think they would have done proper
24 studies before they did -- put that on the market.
25 Q.  (BY MR. ARBON) If you were aware that no

Page 41

1  randomized clinical studies had been performed to
2  establish that the Bard G2 filter was safe and
3  efficacious for the -- for reducing mortality due to
4  permanent -- pulmonary embolism, is that information
5  that you would have liked to have had as a physician
6  in making your decision whether to utilize the
7  product?
8          MS. HELM:  Objection to form.
9  A.  As a doctor I would want as much information as
10 I could to figure out risk and benefits.  And I don't
11 know what the company would think is adequate to do
12 that, whether it's randomized study or what.  But the
13 more information I can to provide safe care, the
14 better.
15    (Discussion off the record.)
16         MS. HELM:  Before you hand this
17 document to the witness, may I please see a copy
18 of the signed protective order?
19         MR. ARBON:  The signed protective
20 order.
21         MS. HELM:  I want a copy of the
22 stipulated protective order entered in this case
23 signed by the doctor.
24         MR. NOVOTNY:  I have an e-mailed
25 version, I can show you.  I can e-mail it to

Do Not Disclose - Subject to Further Confidentiality Review



Page 42

1    you.

2    (Mr. MacDonald handing to Ms. Helm.)

3         MR. ARBON:  The one we presented

4    to counsel is copies of the Exhibit A from the

5    protective order, one signed by Mr. Novotny and

6    one signed by Dr. Shanon Smith.  All right.

7         MS. HELM:  Do you have a copy of

8    the protective order itself?

9         MR. NOVOTNY:  I did have that when

10   I was asked to sign the document and the

11   doctor -- and also for doctor.

12        MS. HELM:  And Dr. Smith have a

13   copy of the signed protective order?

14        MR. NOVOTNY:  I don't recall if I

15   sent you the whole order or not.

16        MS. HELM:  I'll ask him.

17        MR. ARBON:  Quick break.

18        VIDEOGRAPHER:  We are off the

19   video record at 1500.

20   (Recess was taken.)

21        VIDEOGRAPHER:  We're back on video

22   record at 1507.  We may proceed.

23   (Exhibit No. 2110, marked for identification.)

24

25

Page 43

Page 44

Page 45

11   Q.  Would you expect Bard to have knowledge of the

12   long-term clinical performance if they're selling a

13   product as a permanent implant?

14        MS. HELM:  Object to the form.

15   A.  I would think they would know how their products

16   performed, since they've launched it.

17        (Exhibit No. 2111, marked for identification.)

18        (Discussion off the record.)

19



**Page 46**

**Page 47**

**Page 48**

20       MS. HELM:  Object to the form.
21  A.  You know, honestly, as a doctor, I don't -- I
22  don't know what Bard was doing.  But as a doctor,
23  it -- it could take years to know something.  I mean,
24  we do things and it takes years for us to understand
25  the impact.

**Page 49**

1  Q.  (BY MR. ARBON) So as a doctor do you think it
2  would be appropriate for the manufacturer to use
3  patients as beta test grounds for the products?
4       MS. HELM:  Object to the form.
5  It's argumentative.
6  A.   I would expect it to be a safe product and that
7  they would know -- they would know the anatomy and it
8  would function like it's -- should.  I mean, I assume
9  they went through clinical trials with test patients
10  as well, I would assume that's the process.
11  Q.  (BY MR. ARBON) If there were no clinical trials
12  to establish the long-term safety and efficacy of
13  the -- their optional filters, would that be
14  information that you as a physician would like to
15  know when you're making a decision as to whether to
16  use the product or not?
17  A.  I think I remember you mentioned that, that
18  they -- they used other data from a different filter.
19  I would -- I would rely on that, that it's safe if
20  it's on the market.
21  Q.  But you -- but if you were told -- if you had
22  available to you information that demonst -- that No.
23  1, that long-term clinical trials had not been
24  performed to establish the long-term safety and
25  efficacy of the filter system, is that information



Page 50

1   you would like to have?
2            MS. HELM:  Object to the form.
3   A.  I would -- as much information as how dangerous
4   a product is, that would be good to have.
5   Q.  (BY MR. ARBON) All right.
6      (Exhibit No. 2112, marked for identification.)
7   Q.  Hand you what I've marked now as Exhibit 2112 to
8   your deposition.  Which begins with the Bates No.
9

Page 52

22     (Exhibit No. 2113, marked for identification.)
23  Q.  Hand you what's been marked as 211 -- Exhibit
24  2113 to your deposition.  It is a Bard document
25  beginning with Bates No. BPVE0101752806; do you see

Page 51

1

Page 53

1   that document, sir?
2   A.  Yes.
3   Q.  If you would turn to Page 18.
4      (Witness complies.)
5   Q.  Are you familiar with trending studies, where
6   you look for trends in products?
7   A.  Okay.
8   Q.  Okay.
9   A.  I'm not an expert.
10  Q.  All right.  But you understand the concept of
11  comparing products together to see if there are any
12  trends that develop?
13  A.  That sounds reasonable.
14

Do Not Disclose – Subject to Further Confidentiality Review



**Page 54**

**Page 55**

**Page 56**

**Page 57**

1    

2    A.  More information about the product is definitely

3    better.

4    Q.  Doctor, have you ever seen any of the

5    advertising related to the G2 filters or their

6    informational brochures?

7    A.  Possibly.

8       (Exhibit No. 2114, marked for identification.)

9    Q.  I'm going to kind of take a side trip.  When you

10   were placing the G2 filter in Ms. Kruse, did you have

11   an expectation as to how long she was going to have

12   that filter?

13   A.  Permanently, unless it needed to be removed.

14   Q.  So your intent was to use it as a permanent

15   filter?

16   A.  Correct.

17   Q.  And that was something Bard told you was

18   perfectly appropriate for their product, right?

19          MS. HELM:  Object to the form.

20   A.  Permanent option is listed on their package

21   insert.

22   Q.  (BY MR. ARBON) Let me rephrase.

23      From the information you were provided by Bard,

24   did you know whether a permanent use of the G2 was

25   one of the indicated uses?

Page 58

1  A.  Yes, most of these retrievable filters are
2  permanent and retrievable.
3  Q.  I've now marked exhibit, and I'm not sure I've
4  got number, 2114, to your deposition, which is again,
5  begins with Bard Bates No BPV170100142912?
6          MS. HELM:  Can you tell me which
7  number this is on the list of documents that you
8  said you were going to use with this deposition,
9  I don't see it on there.
10         MR. NOVOTNY:  What's your drop
11  dead time to be done by?
12         THE WITNESS:  Don't have one,
13  but --
14         MR. NOVOTNY:  Okay.
15         THE WITNESS:  -- I do have
16  children at home.
17         MR. ARBON:  Having said that, I'll
18  do my very best to pick up the pace.
19         MS. HELM:  And I get 50 percent of
20  the time.
21         MR. ARBON:  No, I understand.
22         THE WITNESS:  Six o'clock would be
23  preferable, if reasonable.
24  (Discussion off the record.)
25         MR. ARBON:  I apologize, Counsel,

Page 59

1  I thought it was on the list.
2          THE WITNESS:  Give it back?
3  (Witness handing document to Mr. Arbon.)
4  Q.  (BY MR. ARBON) Go back to the prior exhibit,
5  Doctor.  When you were using the G2 product, did you
6  have an understanding from Bard that the G2 was
7  designed to resist migration?
8          MS. HELM:  Object to the form.
9  A.  I don't recall ever being told that it cannot
10  migrate.
11  Q.  (BY MR. ARBON) And I think the question is a
12  little different.
13  A.  Okay.
14  Q.  Were you ever told that it was an improvement of
15  other filters that would migrate less?
16         MS. HELM:  Object to the form.
17  A.  I don't recall that.
18  Q.  Were you ever told that it would tilt less and
19  improve centering?
20         MS. HELM:  Object to the form.
21  A.  I don't recall that either.
22  Q.  (BY MR. ARBON) Does it surprise you to see that
23  in -- as of November of 2008, which would have been
24  about nine months before you used the G2 filter in
25  Ms. Kruse, that Bard had data indicating that that G2

Page 60

1  filter had more of a tendency to cause complications
2  than its -- than its Recovery filter?
3          MS. HELM:  Object to the form.
4  A.  Say that one more time.
5  Q.  (BY MR. ARBON) Yeah.  Does it surprise you to
6  see that Bard had data that demonstrated the G2
7  filter that you implanted in Ms. Kruse had more --
8  higher complication rate concerning migration, tilt
9  and perforation, than its predecessor the Recovery
10  filter?
11         MS. HELM:  Object to the form.
12  A.  I wouldn't have known what they had at the time.
13  Q.  (BY MR. ARBON) And I'm not asking you about at
14  the time, because I know you didn't have that
15  information.  You had no such information --
16  A.  No.
17  Q.  -- when you chose the G2, did you?
18  A.  Right, correct.
19  Q.  If you had that information when you were making
20  decisions as to what to implant, do you know if you
21  would have chosen that G2?
22         MS. HELM:  Object to the form.
23  A.  I would have definitely looked at the risk and
24  benefits if there was more information.
25  Q.  (BY MR. ARBON) And if Bard's data is correct

Page 61

1  that the G2 prevented a higher risk of migration, a
2  higher risk of perforation and a higher risk of tilt,
3  do you think you would have chosen that if that
4  information would have been available to you?
5          MS. HELM:  Objection to the form.
6  A.  Now, you made a big claim, so I assume that
7  claim is correct, you know, of these higher
8  percentages.  And that would be true in every case.
9  So, assuming that's a correct statement, the -- yeah,
10  I would want to know if one product had different
11  numbers relative to another product.
12  Q.  (BY MR. ARBON) Well, specific to the G2 numbers
13  that I've shown you.  If, assume for me those that,
14  that data that Bard gave us is accurate --
15  A.  Okay.
16  Q.  -- and you had that information back in --
17  A.  Right.
18  Q.  -- 2009 when you were making the decision to put
19  this G2 into Ms. Kruse, would that type of data
20  affected that decision?
21         MS. HELM:  Object to the form.
22  A.  I would have definitely used that information
23  and whatever else to make a decision.
24  Q.  (BY MR. ARBON) Okay.  And had you had the
25  benefit of that information, you may have chosen a

Page 62

1  device other than a G2; is that true?
2         MS. HELM: Object to the form.
3  A. It's possible.
4  Q. (BY MR. ARBON) Let's go to the implant, Doctor.
5  A. Because then I wouldn't be meeting with you.
6         MS. HELM: I got to move to strike
7  that off the record.
8         THE WITNESS: That's fine. I'm
9  not sure how to answer that.
10  (Discussion off the record.)
11  (Exhibit No. 2115, marked for identification.)
12  Q. (BY MR. ARBON) I'm going to hand you what I've
13  marked as 2115, Doctor, and ask you if you recognize
14  that document?
15  A. Yes, 2115.
16  Q. And is there a Bates number at the bottom of
17  that page?
18  A. There's a number.
19  Q. Okay. Can you read that for me.
20         MS. HELM: You can just read --
21  A. 00288.
22         MS. HELM: That's fine.
23  Q. (BY MR. ARBON) Okay.
24  A. Okay.
25  Q. And do you recognize that document, sir?

Page 63

1  A. Yes.
2  Q. And what is that?
3  A. That is the hospital record for deploying a G2
4  filter.
5  Q. Is that your record, is that your dictation?
6  A. Correct, yes.
7  Q. And that's for the deployment of the filter that
8  you placed in Ms. --
9  A. Kruse.
10  Q. -- Kruse; is that correct?
11  A. That's correct.
12  Q. And when you did you place the filter?
13  A. Procedure was 7/8/2009.
14  Q. Can you describe the procedure for placing the
15  filter into Ms. Kruse for me.
16  A. In general, you get consent from the patient.
17  For this case, I reviewed a CT scan of the abdomen to
18  know where the renal veins were located and where
19  the -- and the size of the IVC.
20     And then you discuss the risks and benefits with
21  the patient. And if they agree, then the patient's
22  placed on their back and a -- the neck is cleaned in
23  the appropriate manner and then all the procedural
24  steps are performed, where using x-ray device
25  fluoroscopy. And then the filter is placed,

Page 64

1  preferably below the renal vein unless it needs to be
2  placed above.
3     But in her case, it was below the renal veins
4  and it seemed to deploy well by x-ray. And then when
5  the procedure was done, she seemed to do well post
6  procedure.
7  Q. Do you have the I -- instructions for use there,
8  Doctor, in front of you?
9         MR. NOVOTNY: Number 2109.
10  A. 2109, yes, I have that.
11  Q. (BY MR. ARBON) All right. And Exhibit 2109,
12  instruction for use, was the procedure that you
13  performed to implant the G2 filter on Ms. Kru -- in
14  Ms. Kruse on July 8th of 2009, did you follow the
15  procedures outlined by those instructions for use?
16  A. I believe so.
17  Q. All right. One of the things that it says is
18  you need to know if her inferior vena cava diameter
19  was correct; is that right?
20  A. That's correct.
21  Q. And --
22  A. And hers was.
23     (Exhibit No. 2116, marked for identification.)
24  Q. I hand you Exhibit 2116, which is part of a
25  series of images under RAD00011. And are you

Page 65

1  familiar with that image, sir?
2  A. That looks like a CT image that would be from
3  Ms. Kruse based on the labeling.
4  Q. And based on labeling, can you tell what date
5  that was taken?
6  A. July 7, 2009.
7  Q. All right. And that would have been --
8  A. That would be one day prior to the procedure.
9  Q. All right. And there's a measurement in the
10  middle of that CT scan; do you see that?
11  A. That's correct.
12  Q. And what's that?
13  A. That says 21.4 millimeters.
14  Q. And what does that reference?
15  A. The size of the IVC at that level.
16  Q. All right. Is that the level at which the
17  filter was going to be placed?
18  A. Approximately.
19  Q. And is that the purpose of making that
20  measurement?
21  A. Correct.
22  Q. Can I get you to hold that up so the camera can
23  see it, sir.
24     (Witness complies.)
25  Q. Kind of like teaching school. You don't need to

Page 66

1  hold them both, just the image.
2     (Witness complies.)
3  Q.  And can you point to -- so her caval diameter
4  was appropriate to the filter, there's no doubt?
5          MS. HELM:  Object to the form.
6  A.  Correct.
7  Q.  (BY MR. ARBON) Was her caval diameter
8  appropriate for the G2 filter, sir?
9  A.  I believe so.
10  Q.  And then, once you placed the filter, did you do
11  any additional imaging?
12  A.  The fluoroscopic imaging to show that it was
13  located in the IVC.
14  Q.  I'll be with you in a second, sir.
15     I'm going to hand you what I've marked as
16  Exhibit 2117, sir, and ask if you recognize these
17  images?
18     (Exhibit No. 2117, marked for identification.)
19  Q.  Do you recognize those images, sir?
20  A.  I believe these would be from the July 8, 2009
21  procedure.
22  Q.  All right.  What types of images are we looking
23  at here?
24  A.  These are fluoroscopic images that are printed
25  on paper.

Page 67

1  Q.  All right.  Not always very easy to see.
2     Can you make out from these images, sir, the
3  location of the IVC filter?
4  A.  Barely.
5  Q.  All right.  If I give you this marker, could you
6  circle it for me?
7  A.  I think so.
8  Q.  All right.
9     (Witness complies.)
10  A.  Approximately in the middle of the spine.
11  Q.  All right.  And at what level vertebrae is that?
12  A.  Assuming 12 ribs, L3, approximately.
13  Q.  Is that proper placement?
14  A.  In most cases, that's true.
15  Q.  And for Ms. Kruse?
16  A.  I believe it was appropriate.
17  Q.  And is the filter deployed?
18  A.  The filter is deployed and it's without tilting
19  and at that location.
20  Q.  So she has a proper -- properly implanted and
21  deployed filter based upon your review of the imaging
22  and your recollection of the procedure based upon
23  your report?
24          MS. HELM:  Object to the form.
25  A.  Correct.

Page 68

1  Q.  (BY MR. ARBON) Let me ask you, Doctor, based on
2  your review of this imaging, your review of your
3  report, was the G2 filter that was placed in
4  Ms. Kruse on July 8th of 2009 placed properly?
5          MS. HELM:  Object to the form.
6  A.  I believe the filter I placed was appropriate in
7  position and the procedure went well.
8  Q.  (BY MR. ARBON) What was your intent in placing
9  that filter?
10  A.  To -- to properly place the filter to avoid any
11  complications she might have later.
12  Q.  And I think you told me it was your intention
13  that that filter remain as a permanent filter?
14          MS. HELM:  Object to the form.
15  A.  That was -- that was the -- that was the plan.
16  Q.  (BY MR. ARBON) Doctor, what was your plan for
17  that filter?  When you were you planning to retrieve
18  it when you put it in?
19  A.  I wasn't planning on retrieving it unless it
20  needed to be retrieved.
21  Q.  Once you place that filter, Doctor, what was
22  your expectation as to whether it would -- where it
23  would remain as long as in her body?
24  A.  I would expect it to remain in the same
25  location.  I would prefer it to remain in the same

Page 69

1  location.
2  Q.  In your review of that IFU, does the
3  instructions for use for the G2 filter, say anything
4  about a need to remove the filter as soon as the risk
5  of a pulmonary embolism subsides in the patient?
6          MS. HELM:  Object to the form.
7  A.  Say that again.
8  Q.  (BY MR. ARBON) Sure.  Does the instructions for
9  use related to the G2 filter that is marked as an
10  exhibit and that you've reviewed, say anything about
11  the need to remove the G2 filter as soon as the risk
12  of a pulmonary embolism subsides in the patient?
13  A.  The G2 filter can be a permanent or -- or
14  retrievable filter.
15  Q.  Was it your understanding that this filter would
16  not present any greater risk over time --
17          MS. HELM:  Object to the form.
18  Q.  (BY MR. ARBON) To the patient?
19          MS. HELM:  Same objection.
20  A.  The filter was not -- correct, if I understood
21  that right, the filter would not cause her any more
22  risk.
23  Q.  (BY MR. ARBON) If you had known and it had been
24  explained to you that the longer a G2 filter was
25  dwelling within a patient, the greater the risk that

Page 70

1  it would cause some complication, would that have
2  been information that may have altered your plan for
3  this patient?
4          MS. HELM:  Object to the form.
5  A.  Um, let's see, if a G2 filter long-term risk was
6  dangerous to the patient, that would change -- could
7  possibly change what I did.
8  Q.  (BY MR. ARBON) If you had known at the time you
9  were choosing the G2 and placing it into Ms. Kruse
10  that the longer the G2 was in place, the more the
11  risk of perforation, tilt, migration and fracture,
12  that those risks would increase, would that have
13  altered your plan for her?
14          MS. HELM:  Object to the form.
15  A.  I believe so.
16  Q.  (BY MR. ARBON) Would you have -- how?  In what
17  way?
18  A.  If you -- if the -- if the filter -- let me see
19  how to say this accurately.  If complications were to
20  come from the filter, retrieval may be appropriate.
21  Q.  If you had thought that the long term -- the
22  longer the filter remained in her body, the more risk
23  there was of a migration, fracture, tilt or
24  perforation, you would -- is it reasonable to say
25  that you might have considered retrieval as opposed

Page 71

1  to a permanent placement?
2          MS. HELM:  Object to the form.
3  A.  At the time, I was just thinking it was a
4  permanent filter would stay where it was.
5  Q.  (BY MR. ARBON) And I understand that.  And
6  that's what was represented to you by the IFU and
7  other sources, correct?
8  A.  Okay.
9  Q.  Is that true?
10          MS. HELM:  Object to the form.
11  A.  The filter could be a permanent filter and do
12  well.
13  Q.  (BY MR. ARBON) All right.  And what I'm asking
14  you I guess is hypothetical.  But hypothetically, if
15  the data had been made available for you where you
16  had been informed that the longer a G -- the longer
17  the in-dwell time or the implanting time of a G2
18  within the human body, the more you increase the risk
19  of a migration, perforation, tilt or other
20  complication, do you think that would have caused you
21  to alter your use of it as a permanent filter?
22          MS. HELM:  Object to the form.
23  A.  If the filter were unsafe, that might -- that
24  would change the way I managed the patient.
25  Q.  (BY MR. ARBON) Would that information have

Page 72

1  perhaps caused you to maybe want to monitor her
2  closely or remove the filter?
3          MS. HELM:  Object to the form.
4  A.  They're different options for patient care.
5  Q.  (BY MR. ARBON) When was the next time that
6  Ms. Kruse -- you came in contact with Ms. Kruse?
7  A.  When she represented for retrieval.
8  Q.  And do you know when that was?
9  A.  No.
10      (Exhibit No. 2118, marked for identification.)
11  Q.  Let me show you what I've marked as Exhibit 2118
12  to your deposition, sir, and ask you if you recognize
13  that document?
14  A.  This is the report of the attempt at IVC
15  retrieval dated April 7, 2011.
16  Q.  And can you explain to me what -- what was the
17  purpose of your performing this procedure on
18  Ms. Kruse on April 7th of 2011?
19  A.  To retrieve the filter that had migrated
20  caudally and tilted.
21  Q.  Okay.  And why were you trying to retrieve that
22  filter?
23  A.  Because it had migrated caudally.
24  Q.  Okay.  And I guess what I'm saying, what is it
25  about the fact that it migrated that caused you to

Page 73

1  believe it should be retrieved?
2          MS. HELM:  Object to the form.
3  A.  I believe she had some symptoms of pulling
4  sensation.
5  Q.  (BY MR. ARBON) Okay.  What did you do to attempt
6  to retrieve the filter?
7  A.  With similar technique as implanting it, using
8  instead a Recovery Cone device to snare the filter
9  and remove it.
10  Q.  So you made an incision in her neck, did you --
11  A.  Made a -- you could call it an incision, it's
12  more of a needle puncture.
13  Q.  All right.  And you went through the jugular
14  vein to try to reach the filter?
15  A.  Correct.
16  Q.  What device were you using to try to reach the
17  filter initially?
18  A.  The Recovery Cone device.
19  Q.  And if you look, sir, again at the instruction
20  for use, is that what Bard recommended you do to try
21  to retrieve the G2 filter?
22  A.  Yes, I believe so.
23  Q.  And in fact, did Bard state on numerous
24  occasions, remove the G2 filter using the Recovery
25  Cone Removal System only?

Page 74

1  A.  I saw that.
2  Q.  Okay.  And that's what you were attempting to
3  do; is that correct?
4  A.  That's correct.
5  Q.  Were you trying to follow the instructions for
6  use that Bard had provided for recovering a G2
7  filter?
8         MS. HELM:  Object to the form.
9  A.  I was recovering the way I had been trained.
10 Q.  (BY MR. ARBON) Did you think when you attempted
11 the recovery that you would be successful?
12 A.  I was hoping so.
13 Q.  Would you have attempted it if you did not
14 believe you had any chance to succeed?
15 A.  No.
16 Q.  Why were you unable to retrieve that filter?
17 A.  It had tilted so that the cone could not engage
18 the top part of the filter.
19 Q.  And when you say, "it had tilted," what is
20 tilted?
21 A.  The IVC filter.
22 Q.  And when you found you could not engage the,
23 the -- what portion of the filter were you going
24 after?
25 A.  The top part.

Page 75

1  Q.  All right.  When you could not engage the top of
2  that filter, what did you do?
3  A.   Tried placing a wire next to the filter and
4  engaging again.
5  Q.  And was that procedure successful?
6  A.  No.
7  Q.  Now, is that procedure of placing a wire next to
8  the filter to engage again something that was
9  included in Bard's instructions for how to retrieve a
10 filter?
11 A.  I don't know, that's --
12 Q.  You have those instructions in front of you,
13 sir.
14 A.  I would not know that answer, I would have to...
15    There's a section of optional procedure for
16 filter removal, but I would have to continue to read
17 to figure out what that involves.
18 Q.  Now, if you would take a minute and do it for
19 me, sir, I hate to waste your time, but it's
20 important.
21    (Witness complies.)
22 A.  Bottom of Page 4, it says if, if it is difficult
23 to align the cone, a guidewire could be used.
24 Q.  Okay.  And is that what you were attempting to
25 do?

Page 76

1  A.  I believe so.
2  Q.  And so again, in following the instructions for
3  use and conforming your retrieval technique to the
4  techniques recommended by Bard, were you successful
5  in retrieving her filter?
6  A.  I was not successful in retrieving her filter
7  the way I was trained.
8         (Exhibit No. 2119, marked for identification.)
9  Q.  I'm going to hand you what I've marked as
10 Exhibit 2119, sir.  And just ask if you recognize
11 those images?
12 A.  They are x-rays of the IVC filter.
13    (Witness indicates.)
14 Q.  All right.  Again, I'm going to give you the
15 blue pen back, sir.  And if I could, could you mark
16 for me where the IVC filter appears in these images.
17         MR. NOVOTNY:  There's another
18    page, Doctor.
19         THE WITNESS:  Okay.
20    (Witness complies.)
21 A.  There's two pictures, one from the front, one
22 from the side of the filter.
23    (Witness indicates.)
24 Q.  (BY MR. ARBON) And do you recognize, in the
25 context we're discussing this of the retrieval of

Page 77

1  Ms. Kruse, the positioning in these -- recognize
2  these images?
3  A.  Yes, this is a when she would have represented
4  for removal or prior to the removal.
5  Q.  Is that filter that's depicted in the images --
6         MS. HELM:  I'm going to just
7    object that it's not clear from the documents
8    what they are, but you can go on.
9  Q.  (BY MR. ARBON) Do you remember seeing these
10 images in the past, now that you've had a chance to
11 look at them, do you not?
12         MS. HELM:  Object to the form.
13 A.  After being notified with the case, I looked at
14 her medical records and she had an x-ray taken.  And
15 this is labeled Carol Kruse at the top with no date.
16 Q.  (BY MR. ARBON) Okay.  Is the filter that we --
17 as we see it in this exhibit, which is 2119 --
18 A.  Okay.
19 Q.  -- a properly positioned filter?
20 A.  Not, not -- not in my opinion --
21 Q.  Okay.
22 A.  -- for Ms. Kruse.
23 Q.  Do you know if this filter would be efficacious
24 in preventing pulmonary embolism from traveling
25 through the vena cava --

Page 78

1     MS. HELM: Object to form.
2  Q. (BY MR. ARBON) As its positioned?
3  A. A filter at this location could still stop a
4  blood clot in the leg from going to the lungs.
5  Q. Do you know if it is, it is capable of stopping
6  pulmonary embolism as designed, once it reached this
7  position?
8  A. It still could.
9  Q. Okay. But do you know if it would?
10     MS. HELM: Object to the form,
11  calls for speculation.
12  A. My impression would, it should.
13  Q. (BY MR. ARBON) Was this the medically desired
14  result you had when you placed that G2 filter as a
15  permanent filter?
16  A. No, I prefer it to stay where it was located.
17  Q. How many different approaches or attempts did
18  you make to try to retrieve her filter, sir; do you
19  recall?
20  A. At least two.
21  Q. And who was present with you when you were
22  making those attempts?
23     MS. HELM: Object to the form,
24  it's been asked and answered.
25  A. There would have been an x-ray tech and I recall

Page 79

1  a Bard rep there, I don't remember his name --
2  Q. (BY MR. ARBON) Do you recall any --
3  A. But don't remember his name.
4  Q. Do you recall any of the conversations you had
5  with the Bard rep during your attempts to retrieve
6  this filter?
7  A. I remember after we were unsuccessful, there's a
8  technique where you can use a wire to reposition the
9  filter and we discussed that, but I chose not to
10  pursue that and instead refer the patient.
11  Q. Okay. First of all, the technique you were
12  discussing, was it a technique being discussed by the
13  Bard rep or was it a technique you were asking him
14  about or if you understand the difference?
15  A. A technique that he knew about and that I seen
16  in literature before and heard about.
17  Q. And was that a technique that would be any of
18  the techniques that you read in the instructions for
19  use just now?
20  A. I would have to look again.
21     (Witness reading document.)
22  A. I don't think that technique's at the end of the
23  document, even though it's known in the literature.
24  Q. But what was being recommended and discussed
25  with the Bard rep was a technique that's not included

Page 80

1  in the instructions for use for the product; is that
2  fair?
3     MS. HELM: Object to the form.
4  A. It -- I don't see it in this G2 filter insert
5  and it's, but it's a known medical -- or it -- it's a
6  standard of care in some facilities to do that.
7  Q. (BY MR. ARBON) And in light of the objection,
8  let me ask it this way: Is this a loop technique
9  that you had mentioned earlier?
10  A. That's what I've called it, uh-huh.
11  Q. The loop technique that you're referencing, is
12  that a technique that is included as a method for
13  retrieving a Bard G2 filter in the instructions for
14  use provided by Bard?
15  A. I don't see it in this paperwork, it's a general
16  use for filters, retrievable filters in general.
17  Q. And it was -- was that technique discussed by
18  you and the Bard representative at the time of
19  Ms. Kruse's failed retrieval attempt?
20     MS. HELM: Object to the form.
21  A. As an option if I wanted to proceed.
22  Q. (BY MR. ARBON) Okay. And did you proceed with
23  that technique?
24  A. No, I chose not to.
25  Q. And what did you do instead?

Page 81

1  A. Referred the patient.
2  Q. All right. And what do you mean by, "referred
3  the patient"?
4  A. Planned for her to be seen at Lincoln for her
5  removal.
6  Q. And Lincoln, where in Lincoln?
7  A. I believe Bryan Hospital, but I would have to
8  check for sure. That's usually where patients are
9  referred.
10  Q. Okay. And you're saying you actually made an
11  arrangement for her to be referred to a particular
12  physician at that hospital?
13  A. Yeah, the notes from the technician are
14  documented on, in her chart.
15  Q. Is the technician the R T?
16  A. Correct.
17     (Exhibit No. 2120, marked for identification.)
18  Q. Who would you have referred her to at Bryan
19  Hospital in Lincoln?
20  A. They have an interventional radiologist there.
21  Q. Do you know his name, who it was you would have
22  made the referral to?
23  A. Well, there's -- well, there's two different
24  facilities so there's St. Elizabeth and there's Bryan
25  Hospital and there's an interventionist in each one.

Page 82

1  Q.  So you didn't make a recommendation to a
2  specific person, you were recommending a facility?
3  A.  I would have to -- I would have to look at the
4  medical record.
5  Q.  Okay.  Well, let me hand you what I marked as
6  2120 and ask you if that's the record you're talking
7  about?
8  A.  I think there's another documentation as well,
9  but this one did -- did seem to reflect that we had
10 offered her two choices, Grand Island where there's
11 an internationalist and actually, two
12 internationalist, and also Lincoln.
13      I think there's another handwritten
14 documentation from the -- from the tech that talks
15 about Ms. Kruse had some social issues so she wasn't
16 able to.
17 Q.  Well, is this a note from the tech, sir?
18 A.  No, there's another -- there's the tech but
19 there's --
20 Q.  And it references that --
21 A.  There's another note.
22 Q.  Just want to reference she scheduled -- moving
23 to Lincoln in July, will contact her doctor in
24 Lincoln.
25 A.  No, there's another one that should say that the

Page 83

1  tech is or the -- that she was -- I think there's
2  another note.  I could be wrong, but I believe
3  there's another note.
4          MS. HELM:  If you have a come --
5      if someone has a complete --
6  A.  This one says, "Obviously, it was offered to her
7  to go to Grand Island to have it removed and she
8  refused due to her work schedule."  I remember
9  communications about that.  And she was moving to
10 Lincoln and so there were some -- where she was
11 moving and living and when she could get off of work.
12     And we offered -- and there should be a note
13 that we encouraged -- that she was recommended to do
14 it sooner rather than later, there as note in the
15 chart somewhere.
16     (Exhibit No. 2121, marked for identification.)
17 Q.  (BY MR. ARBON) I'll hand you, Doctor, what I've
18 marked as Exhibit 2121.
19 A.  And that --
20 Q.  And ask you if you recognize those notes?
21 A.  Yeah, that's my note saying basically the risks
22 were discussed before we started the procedure and
23 had complications that could occur and that the
24 retrieval was unsuccessful.
25 Q.  Okay.  Once she stated that she was moving to

Page 84

1  Lincoln, she had to try and get a job, did you tell
2  her that that would be contraindicated that she
3  needed to get that filter out immediately or
4  urgently?
5  A.  I believe that, yes, the wording would be that
6  she was encouraged to not delay.
7  Q.  Okay.  And I have been through the record,
8  Doctor -- have you found it?
9  A.  There we go, yes.
10     So it says, "Called Carol Kruse," so this would
11 have been the tech, because I remember specifically
12 telling her that since this was a special case, that
13 she needed to document well, which we're all trained
14 to do and I guess in this case, it was true.
15     So it says, "Call Carol Kruse and spoke to her
16 about IVC filter and when she was going to have had
17 removed in Lincoln and that she stated she would call
18 me when she moves to Lincoln and she would schedule
19 it to see."
20     And I told the tech to make sure she documented
21 well and I see at the bottom she wrote, "Patient was
22 told not to delay removal and scheduling depends on
23 her choice," I think is the word.
24 Q.  Okay.
25 A.  So that's the x-ray tech, like you said.  So

Page 85

1  basically, yeah, she was -- we were unsuccessful and
2  so she was referred to a tertiary or to a different
3  facility.
4          MS. HELM:  Can we go off the
5      record and get copies of that?
6          MR. NOVOTNY:  Let's go off the
7      record first and we talk about it.
8          VIDEOGRAPHER:  We are off the
9      video record at 1604.
10     (Recess was taken.)
11     (Exhibit No. 2122, marked for identification.)
12         VIDEOGRAPHER:  We are back on the
13     video record at 1611, please proceed.
14 Q.  2122.  Doctor, we marked as exhibit to your
15 deposition, 2122.  Can you tell me what that is,
16 exactly?
17 A.  Knowing that we were unsuccessful and removing
18 the filter for Carol Kruse, I thought it was
19 important that we document well our plan.  And so I
20 total the tech to make sure any communication she had
21 she wrote down.  And this outlines basically the plan
22 that we gave her.
23     And then the last part was that the removal
24 would be better if it was sooner rather than later
25 essentially.

Do Not Disclose - Subject to Further Confidentiality Review

Page 86

1  Q.  And I just want to ask you something about this
2  and I'll just tell you; we requested copies from the
3  hospital of the records and this is the first time
4  I've seen this piece of paper.  So my question to you
5  is: First of all, what type of record is this?
6  A.  It's part of the medical record.
7  Q.  Okay.  If you would look, sir, at Exhibits 21 --
8  I think it's 2120 and 2122.  Now, those are
9  handwritten records --
10  A.  Uh-huh, so --
11  Q.  -- of the discussions you had post op from the
12  retrieval; are they not?
13  A.  Let's see, so they and you can -- the
14  handwriting's the same, signature is the same, Joyce
15  Biecks (sic), Bieck, RT.
16         MR. NOVOTNY:  Spell the last name
17     for us, Doctor, if you can.
18         THE WITNESS:  I'm not sure how to
19     spell it.
20         MR. NOVOTNY:  Understood.
21  Q.  (BY MR. ARBON) Can I just see which one of these
22  is which, I'm sorry.
23  A.  So these two are the same, looks like they
24  have --
25  Q.  And first I need to object to, the answer is

Page 87

1  nonresponsive.  Don't worry about that.
2  A.  Okay.
3  Q.  Just so I can know what I'm talking about, 2120
4  and then 2121.
5  A.  Okay, 2121 is my handwriting.
6  Q.  Okay.  If you would, sir, if you could just hold
7  up for the camera, 2120 and then could you hold up
8  2122, please, next to 2120.
9         (Witness complies.)
10  Q.  And what I'm trying to do is compare the two
11  notes and then I'm going to ask you some questions
12  about them.
13  A.  Uh-huh.
14  Q.  We need to have you do that again.  If you hold
15  that so the camera can focus on them for a minute.
16         (Witness complies.)
17  Q.  Okay.  In 2120, sir, if you look at it, that's a
18  hospital chart record; is it right?
19  A.  It looks like a, it has labeling on it.
20  Q.  Right.  And it's got Mary Lanning Hospital on it
21  on the bottom, it says physician progress note?
22  A.  Right.
23  Q.  It's got her bar code for Ms. Kruse's patient
24  admission?
25  A.  Correct.

Page 88

1  Q.  And then up at the top, there's a -- got kind of
2  I'll a call it a grid but there's a lined in area
3  where your notes were made, right?  And it says
4  progress notes at the top?
5  A.  Right.  That particular one, it has lines on it,
6  correct.
7  Q.  And then the same thing for 2121, it's on a same
8  form --
9  A.  Correct.
10  Q.  -- of paper?
11  A.  And usually these are a chart, a physical chart
12  that follows the patient around during procedures.
13  Q.  And I don't see any of those same markings or
14  indication on 2122, do I?
15  A.  I don't see lines, but, but it's part of the
16  medical record.
17  Q.  If you look -- and I understand, sir.  I'm
18  really just trying to point out the differences so I
19  can try to understand.
20      If you look carefully at the copy we have, does
21  that appear to be, do you see there's lines around
22  the note, does that appear to be a piece of notepad
23  that that was written on and placed on the record?
24  A.  I'm not sure what it is.  The x-ray tech was
25  instructed to document well and this is the

Page 89

1  documentation.
2  Q.  The note she has says called Carol Kruse?
3  A.  That's what it says.
4  Q.  Carol Kruse was in the hospital, she wouldn't
5  have to have been called, would she?
6         MS. HELM:  Object to the form.
7  A.  No, I don't -- why would you say that?
8  Q.  (BY MR. ARBON) Okay.  Well, none of the other
9  notes --
10  A.  Uh-huh.
11  Q.  -- the rad's note --
12  A.  Uh-huh.
13  Q.  -- your handwritten notes --
14  A.  And this was --
15  Q.  -- refer to her being called.  Carol was
16  called -- called Carol Kruse and spoke to her?
17  A.  That's what --
18  Q.  Had she already left the hospital when this call
19  was made?
20  A.  This is dated 7/7/2011.
21  Q.  You're absolutely right.
22  A.  So yes, she was called for follow-up to --
23  'cause the tech was instructed to document well and
24  maintain her care.
25  Q.  And I'm seeing it now.

Do Not Disclose - Subject to Further Confidentiality Review

Page 90

1  A.  Seeing what?

2  Q.  4/7/11 is when she had her procedure?

3  A.  Correct, that was -- I believe that's what the

4  pictures show.

5  Q.  I gotcha.  So this note was added to the chart

6  seven months after -- three months after the

7  procedure, the failed retrieval procedure?

8  A.  Yes, she -- that's true or it seems to be.

9  Q.  Okay.  So this was a follow-up some months after

10  the retrieval?

11  A.  It appears that way, yeah.

12  Q.  Okay.  I get it now, that's...

13  A.  Yeah.  So that's not -- that's why it's not,

14  probably the physical chart's not following the

15  patient around anymore, now it's, she is contacting

16  her by phone.

17  Q.  All right.

18  A.  So that may explain why the paper --

19  Q.  So the recommendation made at the time that you

20  told her you could set her up at Grand Island if she

21  wanted to have it removed at the time of the

22  procedure, I'm looking at Exhibit 2120.

23  A.  Yes, 4/7/2011, it was recommended since we

24  couldn't remove it, that she have it removed --

25  Q.  Okay.

Page 91

1  A.  -- either in Grand Island or Lincoln.  And

2  that's documented by the tech.

3  Q.  Right, but --

4  A.  And the same, same tech that wrote a note to

5  document the 7/7/2011 conversation.

6  Q.  Yeah.  And the tech's note is, Carol was offered

7  to go to Grand Island, right?

8  A.  And the day of 4/7, that's what we discussed

9  with her.

10  Q.  Okay.  And then there's another note three

11  months later where you followed up to say --

12  A.  Where the tech followed up.

13  Q.  All right.  Do you know if that physician,

14  either on 4/11 or 7/11, any physician can you state

15  that they would have been successful in retrieving

16  that filter?

17        MS. HELM:  Object to the form.

18  A.  I wouldn't know if they would be or not.

19  Q.  (BY MR. ARBON) Can you tell me what type of

20  procedure would have been required to retrieve that

21  filter, either in April or July of 2011?

22  A.  No, I don't know what technique he would use.

23  Q.  The techniques that you knew about and that you

24  were -- that are referenced in the IFU and that you

25  were comfortable performing that day were

Page 92

1  unsuccessful, correct?

2  A.  My attempts were unsuccessful.

3  Q.  And so the referral you were making was to see

4  if it could be retrieved; is that fair?

5  A.  That would -- the point was to retrieve,

6  retrieve the filter, if possible.

7  Q.  Doctor, during the implant procedure, I'm

8  turning your head around a little bit, how are the

9  instruments -- how is the G2 filter kit itself

10  handled during the surgery?

11  A.  It comes in a large box, it's unwrapped

12  sterilely and handed to the tech.  And then we lay it

13  out, usually on two trays, sterilely.

14  Q.  Is the box itself that it's shipped in, does

15  that come into the interventional suite?

16  A.  Yes.

17  Q.  And do you see that box when you come in?

18  A.  I see the -- when I -- yeah, I see the box.

19  Q.  Okay.

20  A.  It's opened up.

21  Q.  Do you see it open, being opened.

22  A.  Correct, yeah.

23  Q.  Is anything done to the G2 filter device, the

24  filter, the implanting equipment, the kit itself, is

25  anything done by any of the hospital staff to alter,

Page 93

1  modify or change that device?

2  A.  No.

3  Q.  If you had observed a G2 filter kit, the filter

4  itself, the implanting equipment being changed or

5  modified, would you have used it?

6  A.  No.

7  Q.  So is it fair to say, sir, that the G2 filter

8  that you implanted in Ms. Kruse was in the same

9  condition as when it arrived in the box?

10  A.  Yes.

11  Q.  At the time you obtained Ms. Kruse's consent to

12  have the filter placed, what were the risks that you

13  discussed with her?

14  A.  The risk, we'll have to get the --

15        MR. NOVOTNY:  You want your note?

16        THE WITNESS:  Yeah, I think

17  there's a couple of 'em.

18  Q.  (BY MR. ARBON) There are and I'm going to give

19  you both.

20  A.  Okay.  Let's see, so...

21  Q.  What I'm going to hand you, sir, are exhibits

22  2123 and 2124.

23        (Exhibit Nos. 2123 through 2124, marked for

24  identification.)

25  A.  Okay.  Can we have -- we have several papers

Page 94

1 where we try to discuss and cover risk, four total.
2 Q.  I understand.  Some of those are to do with the
3 retrieval, correct?
4 A.  Let's see here, three of them have to do with
5 July 8, 2009.
6 (Discussion off the record.)
7 Q.  (BY MR. ARBON) That is exactly where I'm going,
8 Doctor.  When I had the opportunity to meet with you,
9 you had brought up to me the issues of these consent
10 forms, correct?
11 A.  Correct.  Oh, yeah, here we go.
12 Q.  In looking at exhibit -- let me see which is
13 here, which one is the one that has your name at the
14 top, what number?
15       MR. NOVOTNY:  2123.
16 Q.  (BY MR. ARBON) 2123.  The other one is 24?
17       MR. MACDONALD:  Right.
18 Q.  All right.  2123 is what type of form, sir?
19 A.  2123 is a standard hospital form for most
20 invasive procedures.
21 Q.  All right.  And what's the date that's placed on
22 that form?
23 A.  At the top of the form says July 8, 2009.
24 Q.  And whose name appears on the first page of that
25 form?

Page 95

1 A.  Carol Kruse at the bottom and my handwritten
2 note at the top.
3 Q.  And what was the procedure that's listed on that
4 form?
5 A.  Says, "Procedure, clot filter placement."
6 Q.  All right.  There's a spot on that form that
7 says, "I've also been made aware of certain risk and
8 consequences associated with this particular
9 operation or procedure."  What is the reason to have
10 that on the form?
11       We're going to fix it --
12 A.  Do you want my honest answer?
13 Q.  I guess honest is what we're after today.
14 A.  Because even though this paperwork says you can
15 die, which would be the worst outcome, we still
16 sometimes write possibilities that are common but
17 don't include everything that could be detrimental to
18 the patient.  And sometimes it's, do this for legal
19 implications as well as informing the patient.
20 Q.  Informed consent for any procedure is important,
21 correct?
22 A.  Uh-huh, yes.
23 Q.  It's important that the patient be given
24 sufficient -- and the physician themselves, have
25 sufficient information about a procedure to make an

Page 96

1 informed decision as to whether to -- the benefits of
2 the procedure outweigh the risks?
3       MS. HELM:  Object to the form.
4 Q.  (BY MR. ARBON) Is that what the purpose of the
5 consent is?
6       MS. HELM:  Object to form.
7 A.  The purpose is to document as best you can that
8 the risk and benefits were covered and the patient
9 had an opportunity to be involved.
10 Q.  (BY MR. ARBON) And just so you know, I'm not
11 trying to necessarily play any games with you here,
12 my understanding from our conversation, can you
13 explain to me -- let's look at Page 2123.
14 A.  2123, yes.
15 Q.  All right.  Exhibit 2123 is also an informed
16 consent form, correct?
17       MS. HELM:  It's the same one.
18 A.  Like 2124.
19 Q.  (BY MR. ARBON) I'm sorry, I misnumbered it.
20 2124 is what I'm talking about.  So let me start
21 over.
22       We have 2123 is informed consent form that has
23 your handwritten name on it, correct?
24 A.  2123 has my name at the top.
25 Q.  2124 has Dr. Chingren's name at the top; is that

Page 97

1 right?
2 A.  Correct, Dr. Chingren's name at the top and
3 usually these are in that physical chart that follows
4 the patient.
5 Q.  All right.  Now, on 2124, in the section related
6 to certain risks and consequence, there's handwriting
7 on 2124; is that correct?
8 A.  Correct, on 2124, that's my handwriting 'cause
9 when I was in training one of the attendings said
10 that that was important in a lawsuit that she once
11 had and the patient was informed of certain risks.
12 And so I, kind of make it a habit to write a little
13 extra sometimes, even though we cover, cover the
14 informed consent with the patient.
15 Q.  All right.  The handwriting, your handwriting
16 appears on Dr. Chingren's consent related to the
17 total knee procedure, why is it there?
18 A.  I would assume that I accidentally looked in the
19 chart and wrote at the bottom of that similar consent
20 the most common risk that I would see for her.
21 Q.  And so when we look at the second page or Bates
22 Page 2296 of Exhibit 2124, whose signature appears at
23 the bottom of that page?
24 A.  At the end of 2124 is my signature, dated
25 7/8/2009.  And Carol's in the middle on the same

Page 98

1  date.
2        MS. HELM:  I got it.
3  Q.  (BY MR. ARBON) So, just so we understand and get
4  it clarified, the generic or the general risks of any
5  invasive procedure, surgical procedure are identical
6  on both Page 21 and 23, that's a form that is used by
7  the hospital, correct?
8  A.  It's a hospital mandated form.
9  Q.  All right.  The specific risks that were warned
10  about in relation to clot filter placement actually
11  appear on 2124?
12  A.  The common ones that I thought were common
13  listed infection, contrast reaction, hemothorax.
14  Q.  And those are the risks particular to the IVC
15  placement procedures that you were documenting with
16  regard to Ms. Kruse's procedure; is that fair?
17  A.  They were possible complications of her
18  procedure.
19  Q.  Okay.  And that's what you were documenting, you
20  just wrote them on the wrong page?
21  A.  That's what it appears, I was trying to document
22  well.
23  Q.  All right.  And that was your intent to --
24  A.  That's my intent.
25  Q.  -- document well and document the risks that you

Page 99

1  had --
2  A.  Correct.
3  Q.  -- specific to this procedure that you were
4  discussing with Ms. Kruse?
5  A.  That's correct.
6        MS. HELM:  Object to form.
7  Q.  (BY MR. ARBON) Did you discuss with Ms. Kruse
8  the fact that this filter could migrate to the
9  bifurcation of her IVC?
10  A.  I would -- I discussed several complications,
11  but I can't recall at this time the exact words that
12  I used.  But I usually try and cover a lot of common
13  complications.
14  Q.  Do you know if you discussed migration, specific
15  caudal migration with her as a potential?
16  A.  It's possible.
17  Q.  Do you recall if I did?
18  A.  It's -- it's possible.
19  Q.  All right.  So specific caudal migration,
20  migration towards the feet?
21  A.  I'm, it's -- it's unknown, I covered the most
22  common ones and those are the ones I documented.
23  Q.  Would it surprise you if caudal migration is not
24  common to all filters?
25        MS. HELM:  Object to the form.

Page 100

1  A.  I know it's a possible for filters.
2  Q.  (BY MR. ARBON) Migration -- or I'm being very
3  specific about caudal migration.
4  A.  I've been trained they can migrate.
5  Q.  And I guess that's specifically my point here,
6  sir.  Because it's important 'cause that's the
7  condition we're facing.
8        Were you in your training more or less advised
9  that filters can migrate, that they can move?
10  A.  Normally we taught that they tilt.  That's the
11  one thing that you're taught.  But there are other
12  complications that can occur, they can break, they
13  can move, they can penetrate, other bad things can
14  happen.
15  Q.  Before you experienced this with your patient,
16  Carol Kruse in 2011, had you ever seen a caudally
17  migrated filter before?
18  A.  I have not had a patient caudally migrate
19  before.
20  Q.  How many filters do you believe you've placed
21  since your fellowship?
22  A.  Several.
23  Q.  Can you give me an estimate of how many is
24  several?
25  A.  Between 10 and 20.

Page 101

1  Q.  And that's since 2009?
2  A.  Since 2009.
3  Q.  And what types of filters have you placed of
4  those 10 to 20?
5  A.  Retrievable and non-retrievable.
6  Q.  Of retrievable filters, whose brand have you
7  placed?
8  A.  I can't recall.
9  Q.  You've certainly placed a Bard, at least one?
10  A.  I've placed a Bard.
11  Q.  We know about the Bard G2.  Do you recall
12  replacing any other Bard products -- IVC products in
13  your career?
14  A.  I don't recall the names.
15  Q.  Do you know if you've ever placed a Denali?
16  A.  I know the name.  It's possible I could have but
17  can't say for sure.
18  Q.  Have you ever placed a, an Eclipse?
19  A.  I believe I probably have placed an Eclipse.
20  Q.  How many Bard filters can you recall having
21  retrieved in your career?
22  A.  In private practice, we haven't --
23  Q.  Yes, sir, let's start there.  Private practice.
24  A.  We haven't had to.
25  Q.  You attempted a retrieval on Ms. Kruse?

Do Not Disclose - Subject to Further Confidentiality Review

Page 102

1  A.  Correct.
2  Q.  Have you attempted retrieval of any other --
3  retrieval of any other Bard products, IVC products
4  that you're aware of, filter?
5  A.  In fellowship, yes, but in private practice, no.
6  Q.  In fellowship, do you have an idea of how many
7  IVC filters you placed?
8  A.  No.
9  Q.  Would it be a similar number, 10 to 20?
10  A.  That's possible.  Less than 50 for sure.
11  Q.  Okay.  When you were placing filters during your
12  fellowship, was that with supervision?
13  A.  Most of the time.
14  Q.  And when you were placing those filters in
15  fellowship, do you recall what filters were being
16  used?
17  A.  Don't recall the names.
18  Q.  Okay.  Do you recall manufacturers?  Did you
19  place Bard filters?
20  A.  I don't -- I don't recall.
21  Q.  Do you recall if you placed Cook filters?
22  A.  Cook supplied products, so it's always possible.
23  Q.  Have you ever heard of a Braun?
24  A.  I've heard the name but don't recall if I placed
25  one.

Page 103

1  Q.  Have you ever heard of Cordis?
2  A.  Cordis, I've heard of them as well as a supplier
3  for interventional products.
4  Q.  Have you placed a Cordis TrapEase?
5  A.  TrapEase, I believe the answer is yes.
6  Q.  And that's a type of permanent filter?
7  A.  Correct.
8  Q.  Was the Cordis TrapEase available to you in
9  2009, here at the hospital?
10  A.  I don't recall.
11  Q.  Were there any filters other than a G2 available
12  to you for use here at the hospital?
13  A.  Don't recall.
14  Q.  Back in 2009 when you placed Ms. Kruse's
15  filter -- I'm sorry.
16  A.  All right.
17  Q.  Did you have the option, if you had decided you
18  did not want to use a Bard G2, could you have
19  obtained a different filter for her case?
20  A.  I imagine if I felt that a certain filter needed
21  to be placed, I could obtain it if possible.  Easier
22  said than done.
23  Q.  Would you agree, sir, that a patient has the
24  right to be adequately consented regarding the risks
25  and benefits of the device that's going to be put in

Page 104

1  their body?
2         MS. HELM:  Object to form.
3  A.  I think the patient should have informed
4  consent.
5  Q.  (BY MR. ARBON) And the informed consent they
6  read -- they receive is in large part dependant upon
7  the adequacy of the information that's been imparted
8  to a physician, correct?
9         MS. HELM:  Object to the form.
10  A.  The patient does make an informed consent based
11  on the information provided.
12  Q.  (BY MR. ARBON) From the physician?
13  A.  From the physician and from whatever other
14  resource she can get, even the techs.
15  Q.  Okay.  Has Bard ever told you, through sales
16  reps or any instructions for use or other
17  communications, of a need to develop a protocol to
18  track your patients that have G2 filters because of
19  the potential for future fracture, perforation,
20  migration?
21         MS. HELM:  Object to the form.
22  A.  I've not had a Bard rep give me that in writing
23  or tell me.
24  Q.  (BY MR. ARBON) Doctor, if Bard had information
25  prior to the implanting of her -- Mrs. Kruse's

Page 105

1  filter, that the G2 filter had an unacceptable risk
2  for caudal migration, is that information that should
3  have been provided to you as her physician?
4         MS. HELM:  Object to the form.
5         MR. NOVOTNY:  Should have?  Are
6     you asking him the standard of care questions,
7     because doctor's not going to give any standard
8     of care opinions.
9         MS. HELM:  It's objected.
10        MR. ARBON:  All right, then let's
11     put it this way.
12  Q.  (BY MR. ARBON) If Bard knew that their G2 filter
13  presented an unacceptable risk for caudal migration
14  and tilt, do you believe Ms. Kruse would have had a
15  right to have that information in order to make her
16  decision whether to use the filter?
17        MS. HELM:  Object to the form.
18  A.  Let's see if I can -- it's a difficult question
19  to answer.  I'm not sure if I -- if you're asking if
20  the product was unsafe, would that impact
21  Mrs. Kruse's consent, I would say yes.
22  Q.  (BY MR. ARBON) And I guess it has to do with the
23  product safety, certainly.
24  A.  Okay.
25  Q.  The question is:  If in Bard's, internally to

Page 106

1  Bard, they had recognized that the G2 filter was
2  presenting an unacceptable risk of caudal migration
3  and tilt, is that information that you believe a
4  patient should be a party to if they're going to make
5  a decision whether or not to use the filter?
6        MS. HELM:  Object to the form.
7  A.  If I understand your question right, the patient
8  needs as much information as they can to make an
9  adequate decision.
10 Q.  (BY MR. ARBON) And certainly, if Bard had
11 information establishing the G2 filter had an
12 unacceptable risk for caudal migration or tilt,
13 that's information you as a physician needed in order
14 to provide the patient with an adequate risk benefit
15 analysis; is that true?
16        MS. HELM:  Object to the form.
17 A.  The problems with any product would be good for
18 the physician to know.
19        MR. ARBON:  I'll pass the witness.
20        MR. NOVOTNY:  Her turn.
21        CROSS EXAMINATION
22 BY MS. HELM:
23 Q.  My name is Kate Helm and I represent Bard, the
24 two Bard companies that Ms. Kruse has filed a lawsuit
25 against.  And I have a few, probably more than a few

Page 107

1  follow-up questions.  I'm going to try to move as
2  quickly as possible.  And some of mine are just
3  literally going to be follow-up and then I have some
4  direct questions.
5     The documents that you have looked at today,
6  that you said were part of the medical record or part
7  of the chart, those are documents that are maintained
8  in the regular course of business of treating
9  patients here at the hospital; is that right?
10 A.  Correct, by the hospital.
11 Q.  And you would have access to those for the
12 patients you treat?
13 A.  Correct.
14 Q.  And we talked about the notes a little bit and
15 we're going to go back through 'em.  But the notes in
16 particular -- everything has date on it?
17 A.  It appears so.
18 Q.  Okay.  And those records are prepared on the
19 date that's reflected on the chart, correct?
20 A.  Correct.
21 Q.  Okay.  I want to back up.  Both you and
22 Mr. Arbon have talked about a meeting you had with
23 him previously?
24 A.  Correct.
25 Q.  And I didn't have -- I wasn't invited and didn't

Page 108

1  have the opportunity to attend that meeting.  When
2  did it take place?
3        MR. ARBON:  Objection to form.
4  A.  I don't recall the exact date, I would assume
5  within the past month.
6  Q.  (BY MS. HELM) Okay.  I saw an e-mail -- I knew
7  this was going to happen to me.  From your lawyer
8  dated March 15, 2017 forwarding where you had signed
9  the protective order in this case.  Was that meeting
10 before or after you signed the protective order?
11 A.  I think it was before.
12 Q.  Okay.  So you actually had a meeting with
13 Mr. Arbon and during that meeting he asked you to
14 sign the protective order; is that right or did he
15 send it to you later?
16 A.  I think he sent it later.
17 Q.  Okay.
18 A.  But, I would have to ask my counsel.
19 Q.  Okay.  And in this meeting that occurred some
20 time before March 15, 2017, did he show you any
21 documents?
22 A.  I'm sorry, say that again?
23 Q.  Sure.  In the meeting -- the e-mail --
24 A.  Okay.
25 Q.  -- is dated March 15 and your signature on the

Page 109

1  protective order is March 15, the meeting was before
2  that?
3  A.  Correct, I believe so.
4  Q.  Okay.  So in the meeting before March 15, 2017,
5  did Mr. Arbon show you any documents?
6  A.  I believe there was a document of -- a paper
7  produced somewhere about risk of filters.
8  Q.  Okay.  A piece of medical literature or a paper
9  that someone had written?
10 A.  He showed -- he didn't give it to me, but it was
11 a -- I think it was from a journal, I don't remember
12 the name of the journal though.
13 Q.  Okay.
14 A.  'Cause...
15 Q.  Did he show you any other documents?
16 A.  Well, we went over the medical record pieces.
17 There was -- he didn't give me any documents.  There
18 was a discussion of an e-mail and that's all I can --
19 from Bard.
20 Q.  And the e-mail that he discussed with you, was
21 that the e-mail that eventually got marked as 2110?
22 A.  I don't recall if that was the exact e-mail.
23 Q.  And this e-mail that he discussed with you, did
24 he -- did he read to you from the e-mail?
25 A.  I believe he read from some document that he had

Do Not Disclose - Subject to Further Confidentiality Review

Page 110

1  in his hand.
2  Q.  Okay.
3  A.  If my counsel may be able to, he was there,
4  so --
5  Q.  Okay.  Maybe he can help.
6        MR. NOVOTNY:  At this moment, I'm
7    not the witness.
8  A.  Okay.
9  Q.  (BY MS. HELM) Unfortunately.
10  A.  That's fine.
11  Q.  So Mr. Arbon at this meeting before March 15,
12  2017 and before you signed the protective order read
13  to you from some Bard internal e-mail; is that right?
14        MR. ARBON:  Objection to form.
15  A.  I believe we discussed a comment of an e-mail
16  made, but it -- but I didn't, I didn't -- I didn't
17  get that e-mail to take it home.
18  Q.  (BY MS. HELM) Okay.  And what was the substance
19  or what was the topic in the e-mail?
20  A.  That there was some concern with the Bard
21  product.
22  Q.  Okay.  But as far as you know, the document that
23  he read from and discussed with you was not the same
24  e-mail that we marked as 2110?
25  A.  I don't -- actually, wouldn't know 'cause, I

Page 111

1  don't think I actually ever received the e-mail in my
2  hand to review.
3  Q.  Okay.  Other than the e-mail, did he discuss any
4  other documents with you in the meeting before you
5  signed the protective order?
6  A.  I don't believe so.  I think it was mainly the
7  medical record.
8  Q.  Did Mr. Arbon ask you if you -- to offer any
9  opinions in this case?
10  A.  If he asked any opinions, my answer would have
11  been they would only be opinions based solely on
12  Mrs. Kruse, and not an expert witness --
13  Q.  Okay.
14  A.  -- type opinion.
15  Q.  Okay.  When this meeting took place, was it just
16  the three of you; you --
17  A.  Correct.
18  Q.  -- Mr. Arbon and your lawyer?  And where did the
19  meeting take place?
20  A.  In this room.
21  Q.  And how long did it last?
22  A.  One to two hours.
23  Q.  Okay.  You talked about a Bard e-mail, you
24  talked about the medical record, which we're going to
25  get to go through again.

Page 112

1  A.  Uh-huh.
2  Q.  What else did you talk about?
3  A.  That he was from Texas and went to school in
4  Oklahoma and that I looked at his website for his law
5  firm.
6  Q.  Anything else?
7  A.  No.  No.
8  Q.  Okay.  Did you, were you paid for your time for
9  that meeting?
10  A.  No.
11  Q.  Do you intend to bill them for your time?
12  A.  No.
13  Q.  Are you billing for your time today?
14  A.  Not that I'm aware of, but...
15  Q.  Okay.  Did Mr. Arbon provide you with any
16  documents in that meeting, did he --
17  A.  No, I didn't -- I did not leave the meeting with
18  any documents.
19  Q.  Okay.  The copy of the medical record that you
20  had with you that day, was it a copy he brought with
21  him or did you actually have it?
22  A.  That, he had.  But I think my counsel also had
23  the same copies.  All of which I think we've
24  discussed, except for that one.
25  Q.  Okay.  And we'll get to the July 11, 2011

Page 113

1  document.
2        Okay, so the only two documents that you --
3  outside of your medical record that you specifically
4  recall Mr. Arbon discussing with you were a paper on
5  the risks of filters and a Bard internal e-mail; is
6  that right?
7  A.  Correct.
8  Q.  Okay.
9  A.  Neither one of which I wanted to have a copy of,
10  'cause then I would have to read it thoroughly.
11  Q.  You testified that you had given a deposition
12  one time prior?
13  A.  Correct.
14  Q.  What were the circumstances of that deposition?
15  A.  Working in an emergency room and there was a, I
16  guess would say the beginning evaluation, if
17  there was any malpractice event.
18  Q.  Okay.  Were you --
19  A.  It was by telephone.
20  Q.  It was a telephone deposition.  Were you a
21  witness in that case?
22  A.  No, I think -- I think they were probably trying
23  to see if I did proper standard of care.
24  Q.  Okay.
25  A.  Then there was, after that meeting nothing.

Page 114

1 Nothing ever happened.
2 Q. Okay. All right. I just wanted to check that
3 box because I had not had a follow-up on that.
4     Have you ever served as an expert witness?
5 A. No -- or wait a minute, once, maybe once, 2000
6 and...
7         MR. NOVOTNY: CV?
8 A. When I was in Alabama several years ago,
9 practicing occupational medicine, there was a work
10 comp claim that I had to go to the courthouse and sit
11 in the courthouse stand and answer medical questions.
12 Q. (BY MS. HELM) Okay.
13 A. That's the only time I can recall.
14 Q. Okay. So prior to today, there were only --
15 there have only been two times where you've had to
16 swear to tell the truth in a court or court like
17 proceeding?
18 A. Yes.
19 Q. One was a telephone interview of some kind --
20 A. Yes.
21 Q. -- relating to treatment in an ER. Is that when
22 you were a resident?
23 A. No, this was 2000 and -- approximately -- maybe
24 1997, 1998 years.
25 Q. Okay. And what were you doing in those years?

Page 115

1 A. I was the ER staff physician.
2 Q. Okay. And where was that?
3 A. University of Iowa.
4 Q. Okay. And then the second one was when you were
5 actually in private practice in Alabama?
6 A. Yeah, that would be approximately somewhere
7 between the years of 1999 and 2004.
8 Q. Okay. And you were working as an
9 occupational --
10 A. Correct.
11 Q. -- medicine? Okay.
12 A. Correct.
13 Q. And you testified in that case relating to the
14 treatment of some patient who had a workers'
15 compensation claim?
16 A. Carpal tunnel, correct.
17 Q. Okay. Let's go back and talk about IVC filters
18 and your experience with IVC filters and I think I
19 caught this but I want to make sure. While you were
20 in fellowship, you placed somewhere less than 50
21 filters?
22 A. Correct, correct.
23 Q. And those are retrievable or permanent, correct?
24 A. Correct.
25 Q. Okay. And since you went into private practice

Page 116

1 in 2009, you've placed somewhere between 10 or 20 IVC
2 filters?
3 A. Correct.
4 Q. And those are both retrievable and permanent?
5 A. Correct.
6 Q. Okay. If your fellowship ended late June, early
7 July and you implanted Ms. Kruse's filter on
8 July 8th, 2009, do you think that was the first
9 filter you implanted in private practice?
10 A. No, actually, there was -- I'm pretty sure there
11 was a filter placed almost a week before.
12 Q. Okay. So this was the second one in private
13 practice?
14 A. Correct.
15 Q. Okay.
16 A. At a minimum.
17 Q. Okay. And is it my -- did I understand your
18 testimony that the attempt to retrieve Ms. Kruse's
19 filter in 2011 was your first attempt to retrieve a
20 filter in private practice?
21 A. In private practice.
22 Q. Okay.
23 A. We had done it in fellowship before, but in
24 private practice.
25 Q. Okay. And how many do you think you had

Page 117

1 retrieved in fellowship?
2 A. I recall one case for sure because it was tilted
3 and -- but that was successful.
4 Q. Okay. So you only recall one retrieval attempt
5 while you were in fellowship and it was a tilted
6 filter and you were able to retrieve it?
7 A. Correct.
8 Q. Do you know -- okay.
9 A. And that was a one-year fellowship.
10 Q. Okay. And then since your attempt -- okay, from
11 when you went into private practice until April of
12 2011, when you attempted to retrieve Ms. Kruse's
13 filter, did you not have any filter retrievals,
14 correct?
15 A. Correct.
16 Q. And since Ms. Kruse's retrieval in -- or
17 retrieval attempt in April of 2011, you have not
18 retrieved any filters; is that right?
19 A. Correct.
20 Q. Okay. Okay. Do you know what kind of filters
21 the hospital's using today?
22 A. No.
23 Q. Okay. Is it fair to say that you implant the
24 filter that is available at the time of the implant?
25 A. Yes.

Page 118

1  Q.  And someone else makes the purchasing decision
2  on what type of filters to purchase for the hospital?
3  A.  Somebody else purchases 'em.  I'm sure if I had
4  to have something, they would -- there would be a
5  process for doing that.
6  Q.  Is Mary Lanning owned by a --
7  A.  No.
8  Q.  Okay.
9  A.  But there's a consortium with other hospitals.
10  Q.  Okay.  So there's a buying consortium?
11  A.  Correct.
12  Q.  And you are not part of the group that makes the
13  buying decisions?
14  A.  Correct.
15  Q.  Okay.  Ms. Kruse was referred to you by
16  Dr. Chingren?
17  A.  Correct.
18  Q.  And was it your understanding that she was
19  having a knee replacement surgery?
20  A.  Correct.
21  Q.  Okay.  Was it also your understanding that she
22  had had a history of both DVT and PE?
23  A.  Correct, two -- two PEs and a DVT.  And based on
24  the surgery, difficulty with anti coagulation plans.
25  Q.  Okay.  So it was your understanding that with

Page 119

1  her history of PE and DVT and because of the nature
2  of the surgery she had to be taken off of her
3  Coumadin or whatever anti coagulant she was on that
4  Dr. Chingren recommended that she be -- have an IVC
5  filter implanted; is that right?
6  A.  Correct, it seemed appropriate indications.
7  Q.  And you agreed with that recommendation?
8  A.  Yes.
9  Q.  And then you did an independent evaluation of
10  whether she was an appropriate candidate for an IVC
11  filter by in part measuring her inferior vena cava?
12  A.  Correct, with a CT to provide accurate
13  information.  'Cause as a physician, you want to --
14  it's best if you can tell where the renal arteries
15  are and sometimes with vena gram, it can be
16  difficult.
17  Q.  Okay.
18  A.  My intent was to try and do a good job.
19  Q.  After you implanted the filter, did you see
20  Ms. Kruse again before the retrieval attempt?
21  A.  No.
22  Q.  Okay.  And I would ask you to look at Exhibit
23  2115.
24      (Discussion off the record.)
25  Q.  (BY MS. HELM) And Doctor, Exhibit 2115 is your

Page 120

1  dictated note relating to the implantation of
2  Ms. Kruse's IVC G2 filter on July 8, 2009; is that
3  correct?
4  A.  Let -- and let me interrupt, we'll come back to
5  your question.  To fill out the indication question
6  that you had, there's also an outpatient -- I believe
7  a nurse practitioner note talking about the need for
8  a filter.
9  Q.  Okay.  Thank you.
10  A.  So that's in the medical record --
11  Q.  Okay.
12  A.  -- as well as...
13  Q.  Okay.  Before --
14  A.  But anyway, so repeat your question.
15  Q.  Sure, let's --
16          MR. ARBON:  Object to the
17      responsiveness of the answer.
18  Q.  (BY MS. HELM) Okay, let's go back and let me ask
19  the question:  There was an outpatient note that was
20  part -- that's part of the record, there was a
21  recommendation from Dr. Chingren, both of which
22  recommended that Ms. Kruse have a filter implanted
23  because of her history of PE and DVT, correct?
24  A.  Correct.
25  Q.  And also part -- the recommendation was also

Page 121

1  made because they felt like she needed to go off of
2  her anti coagulants because of the nature of the
3  surgery, correct?
4  A.  And there's a documentation in that primary care
5  note that she chose not to postpone the surgery to
6  pursue other options.
7  Q.  Okay.
8  A.  That's somebody else's note.
9  Q.  Okay.  Ms. Kruse was anxious to have the surgery
10  done, wasn't she, the knee surgery?
11  A.  I wouldn't know.
12  Q.  Okay.  Based on the -- recommendation of
13  Dr. Chingren and the primary care provider and the
14  referral to you, you then from an interventional
15  radiologist perspective evaluated her for the IVC
16  filter, correct?
17  A.  Correct.
18  Q.  And you've already testified about that --
19  A.  Correct.
20  Q.  -- correct?
21  A.  Correct.
22  Q.  Okay.  And your note that you dictated on 2115,
23  I have one question about it.  And it says,
24  "Impression, IVC G2 retrieval filter deployment,"
25  it's at the bottom; do you see that?

Page 122

1  A.  IVC G2 filter deployment, correct.
2  Q.  Well actually, will you read that again?
3  A.  IVC G2 retrievable filter deployment.
4  Q.  Okay.  So that word that says retrieval, should
5  actually say retrievable, correct?
6  A.  Oh, I didn't even notice, that's correct.
7  Q.  Okay.  So what you implanted in Ms. Kruse was a
8  retrievable filter, correct?
9  A.  It's a filter that can be permanent or
10  retrievable.  Or retrieved.
11  Q.  Okay.  And it can be retrieved in the manner in
12  which you attempted to do it percutaneously, correct?
13  A.  As my training, yes.
14  Q.  Okay.  And would you explain what percutaneous
15  means.
16  A.  To penetrate the skin.
17  Q.  Okay.  And so it's a procedure where you
18  actually do a, like, like, a needle prick in her neck and
19  go in through the vein, you don't have to do an open
20  incision?
21  A.  Correct.
22  Q.  Okay.  But you would agree that you implanted
23  and documented that you implanted a retrievable
24  filter?
25  A.  Correct.

Page 123

1  Q.  Okay.  Thank you.
2     Do you know why between -- do you know if or why
3  between July, 2009 when you implanted this
4  retrievable filter in Ms. Kruse and 2011 when she
5  came back, her filter was not retrieved?
6  A.  Because it was meant to be a permanent filter.
7  She had high risk indications, two pulmonary emboli,
8  DVT, anti coagulation issues, social issues -- the
9  moving social issues, moving from the Lincoln move.
10  And seems she had indication that were appropriate
11  and if we didn't place it, we may be meeting for
12  other reasons.
13  Q.  Okay.  So it was your --
14         MR. ARBON:  Object to the
15     responsiveness of the answer.
16  Q.  (BY MS. HELM) It was your opinion when you
17  implanted the filter in Ms. Kruse in July of 2008
18  (sic) that she was going to need both the filter and
19  long-term anti coagulation; is that fair?
20  A.  I'm sorry, repeat the question.
21  Q.  Sure.  Was it your opinion based on her history
22  that was provided to you that at the time you
23  implanted Ms. Kruse's filter in 2009, she needed the
24  filter not only for the surgery, but she needed it
25  beyond the surgery because of her medical history,

Page 124

1  and because she was suffering from PE and DVT while
2  on anti coagulants?
3         MR. ARBON:  Objection to form.
4  A.  In my own words, she was an adequate candidate
5  for a permanent filter.
6         MR. ARBON:  Objection,
7     responsiveness.
8     (Discussion off the record.)
9  Q.  (BY MS. HELM) Let's talk about your retrieval or
10  retrieval attempt.  And let me back up.  No, let me
11  back up first of all.
12     You talked about previously about the risks and
13  benefits of -- the risks that you explained to
14  Ms. Kruse when you implanted the filter; do you
15  remember that testimony?
16  A.  Correct.
17  Q.  And you also -- Mr. Arbon spent a lot of time
18  with you talking to you about the IFU and if you
19  would get --
20  A.  Package insert correct, okay.
21  Q.  Yes.  If you would get that exhibit back in
22  front of you?
23         MR. NOVOTNY:  2109.
24         MS. HELM:  Thank you.
25  Q.  (BY MS. HELM) Dr. Smith, at the time you

Page 125

1  implanted Ms. Kruse's filter in July of 2009, you
2  were aware that IVC filters could migrate; is that
3  right?
4  A.  I believe it's a possibility I knew that they
5  could move from their position.
6  Q.  Okay.  And were you aware that that was a
7  complication of all IVC filters?
8  A.  Definitely not permanent filters.
9  Q.  Okay.
10  A.  But I believe it's -- at that time in 2009, the
11  literature at that time was probably coming out that
12  there were issues with IVC filters.
13  Q.  Okay.  In fact, Bard in the package insert as
14  you called it or the IFU, Exhibit 2109, on -- under
15  Section G, potential complication; do you see that?
16  A.  Yes.
17  Q.  Okay.
18  A.  Page 2.
19  Q.  And the very first bullet point under potential
20  complications is, "Movement or migration of the
21  filter is a known complication of vena cava filters."
22  A.  That's what it says, correct.
23  Q.  Okay.  So in 2009, when you implanted
24  Ms. Kruse's filter, Bard told you in the package
25  insert that migration was a known complication of the

Do Not Disclose - Subject to Further Confidentiality Review

Page 126

1  filters; is that right?
2  A.  It's in the package insert that would come with
3  the box.
4  Q.  Okay.  If you go up further on -- and my
5  packaging insert may be different than yours, it's
6  above F, there's a -- above the precautions, there's
7  a note under reference, potential complication
8  sections for other -- "Further information regarding
9  other known filter complications."
10     And do you see that note under No. 1?
11  A.  Not yet.  Can you be more specific?
12  Q.  Okay.
13  A.  On --
14  Q.  We'll skip it.  And let's move on, because --
15  okay, let me get my copy of 2109 because I think it
16  will -- I'm working off of one that's printed
17  different.
18        MR. NOVOTNY:  Here's mine.
19  Q.  (BY MS. HELM) Yeah, but I'm going to move on and
20  ask you to look at Page 4.  It says, No. 4 at the
21  bottom of Exhibit 2109.
22  A.  Yes.
23  Q.  And you see the bar chart?
24  A.  Yes.
25  Q.  And immediately below the bar chart it says, "Of

Page 127

1  61 filter retrievals, three technical failures for
2  retrieval resulted from inability to engage the
3  filter apex with the Recovery Cone Removal System due
4  to filter tilt leading to embedding of the filter
5  apex in the vena cava wall."
6     Did I read that correctly?
7  A.  That's correct, so the filter can tilt and you
8  can't engage it.
9  Q.  And in the package insert that came with
10  Ms. Kruse's G2 filter, Bard told you that tilt was a
11  possible complication and inability to retrieve with
12  the cone because of tilt was a possible complication,
13  correct?
14  A.  If this is --
15        MR. ARBON:  Objection to form.
16  A.  If this package insert was in the box that I
17  opened, it does state that there are complications to
18  the filter.
19  Q.  (BY MS. HELM) Including tilt and the inability
20  to retrieve?
21  A.  Correct.
22  Q.  Okay.  And below that, you see the sentence that
23  starts asymptomatic?
24  A.  Yes.
25  Q.  It says, "Asymptomatic complications included

Page 128

1  caudal migration."
2  A.  Yes.
3  Q.  "Fracture, PE, filter tilt, penetration, caval
4  occlusion, non-occlusive caval thrombosis and caval
5  stenosis at implant site post successful retrieval."
6     Did I read that correctly?
7  A.  Correct.
8  Q.  Okay.  So again, in this IFU, which we've marked
9  as 2109, Bard identified that caudal migration was a
10  potential complication of the G2 filter; did it not?
11        MR. ARBON:  Objection to form.
12  A.  It does say caudal migration on the package
13  insert.
14  Q.  (BY MS. HELM) Okay.  And if you would look at
15  the very last page, it has very little print on it.
16  A.  Yes.
17  Q.  You see that at the bottom where it says
18  PK510090RED.0 and then it has the date 03/09?
19  A.  Yes, I see that.
20  Q.  So if this version of the IFU is dated March of
21  '09, that was before you implanted Ms. Kruse's filter
22  in July of '09; is that right?
23  A.  That date precedes the filter placement.
24  Q.  Okay.  Thank you.
25     Okay, do you know -- do you personally know if

Page 129

1  Ms. Kruse was having any physical symptoms as it
2  related to her filter or were those simply relayed to
3  you from some other source?
4  A.  The -- I would have discovered that when she
5  presented for the filter retrieval and read the note
6  that preceded that.
7  Q.  Okay.
8  A.  And it talked about a pulling sensation in her
9  lower abdomen.
10  Q.  Okay.  I want to talk to you about -- before we
11  talk about the retrieval, I want to talk about
12  your testimony that there was a Bard representative
13  in the room when you attempted to retrieve --
14  A.  Correct, it was a male representative.
15  Q.  Okay.  If you would like at Exhibit 21 -- it's
16  the retrieval note.
17        MR. NOVOTNY:  18.
18  Q.  (BY MS. HELM) You mentioned previously...
19     (Discussion off the record.)
20  Q.  You testified previously about the need to
21  document.  Does anywhere on 2118 mention that there
22  was a Bard representative present when you attempted
23  to retrieve Ms. Kruse's filter?
24  A.  My note does not have a Bard representative name
25  on it.

Page 130

1  Q.  Okay.  What is a -- and would you also look at
2  Exhibit 2121?
3  A.  Yes.
4  Q.  And those are your handwritten notes?
5  A.  Yes.
6  Q.  Both before and after the procedure; is that
7  right?
8  A.  Yes.
9  Q.  Okay.  And nowhere in those notes do you
10 indicate that there was a Bard representative or a
11 non-employee of the hospital present during the
12 procedure; do you?
13 A.  Correct.
14 Q.  Okay.  Do you know what a diagnostic imaging
15 timeout is?
16 A.  I'm familiar with the name.
17 Q.  Okay.  And what is that?
18 A.  That is a recently implemented procedure that
19 varies per hospital that talks about questions that
20 can help patient safety.
21 Q.  Okay.  And it's a checklist that documents to
22 make sure everything's being done right before you
23 proceed with the procedure; is that right?
24 A.  Tries to confirm most of the common problems
25 that can happen.

Page 131

1  Q.  Okay.  I'm going to show you what I've marked as
2  Exhibit 2125.  I don't have an extra copy.  It's
3  Bates number 34, sorry.  It's Bates number 34.
4       MR. ARBON:  Is it Mary Lanning?
5       MS. HELM:  That's it.
6       MR. NOVOTNY:  I can show him my
7  copy, you want to keep your copy?
8       MR. ARBON:  Give us a chance to
9  look at it or if I can just look at it and pass
10 it right back to you.
11 A.  Yeah, I'm trying to figure out the date.
12      MR. MACDONALD:  Here you go.
13      MR. ARBON:  Nevermind.  Thank you.
14 Q.  (BY MS. HELM)  Dr. Smith, you've been handed what
15 is going to be marked as Exhibit 2125.  And that is a
16 diagnostic imaging timeout form for Mary Lanning
17 memorial health care; is that right?
18      (Exhibit No. 2125, marked for identification.)
19 A.  It appears that's correct.
20 Q.  And --
21 Q.  And the date is --
22 Q.  If you look at the top --
23 A.  -- 4/7/2011.
24 Q.  Okay.  And the patient is --
25 A.  So that would be the re -- that would be the

Page 132

1  retrieval date, okay.
2  Q.  Okay.  So this is the date that you retrieved,
3  attempted to retrieve Ms. Kruse's filter; is that
4  right?
5  A.  That's correct.
6  Q.  And this document is part of Ms. Kruse's chart,
7  it has her name at the bottom, right?
8  A.  Correct.
9  Q.  And it has her patient number 0257272, correct?
10 A.  Correct.  And this is filled out by the
11 technologist usually.
12 Q.  Okay.  And this is -- and on this chart it says,
13 "Documentation of members present during timeout."
14 Do you see that?
15 A.  Yes, I see that.
16 Q.  Okay.  And it indicates that you were there as
17 the radiologist; is that right?
18 A.  That's correct.
19 Q.  It indicates that Joyce Breck (sic) and Michelle
20 White were there as technologist; is that right?
21 A.  Yes, Bieck, it might be spelled B-I-E-C-K.
22 Q.  Thank you.  It indicates that there were two
23 ultrasound technologist, Megan Ross and April
24 Eikmeier; is that right?
25 A.  That's correct, E-I-K-M-E-I-E-R.

Page 133

1  Q.  And that there was a nurse in the room, Regina
2  Anderson; is that right?
3  A.  That's correct.
4  Q.  Okay.  This document does not indicate that
5  there was any other person in the room; is that
6  right?
7  A.  That's correct.
8  Q.  Okay.  Is there anything in the medical record
9  that indicates that there was a Bard representative
10 in the room?
11 A.  I don't believe so.
12 Q.  And you would agree with me, that that is
13 something that should be documented, would you not?
14 A.  It would be best to document the appropriate
15 people in the room.  So it looks like the RT tech
16 wrote who she had down.
17 Q.  But she did not include a Bard representative?
18 A.  That's it, appears that way.
19 Q.  Okay.  And you didn't include it in your
20 progress note or in your dictated note?
21 A.  I don't normally do that in my note, that's the
22 hospital procedure.
23 Q.  Okay.  After you were unable to retrieve
24 Ms. Kruse's filter, did you ever call Bard and tell
25 them that you had a complication?

Page 134

1   A.  No, I did not.

2   Q.  Did you ask the sales rep to call Bard?

3   A.  No.

4   Q.  Okay.  Did you prepare any type of adverse event

5   or incident report for the hospital?

6   A.  No.

7           MR. NOVOTNY:  Whoa, we're not

8       going to talk about any types of reports you

9       gave to the hospital.  Under Nebraska law.

10          MS. HELM:  Okay.

11  Q.  (BY MS. HELM) So we don't have anything anywhere

12  in any of the medical records to indicate that there

13  was a Bard representative in the room or who was

14  there; is that right?

15  A.  Not from what you've shown me.

16  Q.  Okay.  Well, you've had an opportunity to look

17  at the record.  Have you seen it anywhere --

18  A.  No.

19  Q.  -- in the record?  Okay.

20      I want to stay on the retrieval.  And you

21  testified that, that the Bard representative, you

22  told him you weren't able to retrieve the filter; is

23  that right?

24  A.  The Bard representative saw that I was unable to

25  retrieve the filter, correct.

Page 135

1   Q.  Okay.  And you had a conversation with him about

2   another procedure that you were aware of?

3   A.  Correct.

4   Q.  But that you then decided not to do it; is that

5   right?

6   A.  That's correct.

7   Q.  Okay.  And that procedure, I believe you

8   testified, was using a wire to try to move the

9   filter; is that right?

10  A.  That's essentially correct.

11  Q.  Okay.  Had you ever performed that procedure

12  before?

13  A.  No.

14  Q.  Is part of the reason you chose not to do to it

15  because you had never done it before?

16  A.  That would be one reason, but also the duration

17  of the procedure, the facilities and then -- and so

18  it was chosen not to do that.

19  Q.  So you made a medical decision not to attempt to

20  do it based on your experience, the facilities and

21  the equipment you had available to you.  And you made

22  a medical decision to refer Ms. Kruse to another

23  interventional radiologist; is that right?

24  A.  Right, that's correct.

25  Q.  Okay.  And your record is clear that you --

Page 136

1   you -- there was an offer to refer her to go to Grand

2   Island where there were two interventional

3   radiologist; is that right?

4           MR. ARBON:  Objection to form.

5   A.  And refer to Grand Island or Lincoln, whatever

6   would facilitate her care.

7   Q.  Okay.  And your referring was to an

8   interventional radiologist, correct?

9   A.  They would be the ones most knowledgeable about

10  the procedure.

11  Q.  Okay.  And interventional radiologists don't do

12  open procedures like open heart surgery or anything

13  like that, do they?

14          MR. ARBON:  Objection, form.

15  A.  I would say in general they're not --

16  interventional radiologists are not trained to do

17  cardiac procedures openly.

18  Q.  (BY MS. HELM) So your referring was for her to

19  be evaluated by another interventional radiologist

20  and potentially another percutaneous procedure,

21  correct?

22          MR. ARBON:  Objection to form.

23  A.  That was the plan.

24  Q.  (BY MS. HELM) And according to the progress

25  note, which is Exhibit 2120, if you need it back,

Page 137

1   Ms. Kruse indicated that she would contact a doctor

2   in Lincoln after she moved to schedule an appointment

3   to remove the filter; is that right?

4   A.  Sorry, repeat the...

5   Q.  Sure.  Ms. Kruse indicated to miss -- is it --

6   A.  Joyce Bieck.

7   Q.  Bieck, that she would contact her doctor in

8   Lincoln after she has moved to schedule an

9   appointment to remove the IVC filter; is that right?

10  A.  Would not know their -- that's her

11  documentation.

12  Q.  Okay.

13  A.  So I wouldn't know exact words.

14  Q.  Okay.  But your words were, "Patient will

15  follow-up with other care.  Complications of IVC

16  filters were discussed"; is that right?

17  A.  Correct.

18  Q.  And what complications do you -- would you have

19  discussed with Ms. Kruse before discharging her?

20  A.  Complications of a retained filter.  And

21  commonly those would include, it's already migrated

22  so migration doesn't need to be discussed.  And that

23  they can fracture and the limbs can break on trying

24  to retrieve, other complications can occur from

25  trying to retrieve a filter.

Page 138

1  Q.  Okay.
2  A.  And those were discussed on the preoperative
3  note as well.
4          MR. NOVOTNY:  Doctor, are we okay
5      in the room to a certain time only?
6          THE WITNESS:  No, I think, no.
7          MR. NOVOTNY:  No, okay.
8          THE WITNESS:  I imagine we have it
9      all night.
10         MR. NOVOTNY:  No, say 'till 5
11     o'clock.
12  Q.  (BY MS. HELM) And Dr. Smith, at some point
13  after -- let me back up, were you aware that
14  Ms. Kruse is a nurse?
15  A.  No.
16  Q.  Okay.  At some point after she was discharged in
17  April of 2011, either you asked your radiology tech
18  or she took it upon herself to follow-up with
19  Ms. Kruse; is that right?
20  A.  It appears she wrote a note.
21  Q.  That's exhibit --
22  A.  I don't know the details.
23  Q.  2122.  And I want to -- if you would put --
24  you've got 2120 in front of you.  I think you have it
25  right there.

Page 139

1  A.  Yes.
2  Q.  Okay.  At the top of Exhibit 2122, it says
3  Kruse, Carol D; do you see that?  The very top
4  there's a line --
5  A.  Yes, I see her name at the top.
6  Q.  And then it says, "ID 0257272."
7  A.  I see those numbers.
8  Q.  Okay.  And these are the same numbers that are
9  on the bottom of Exhibit 2120 below Ms. Kruse's name;
10  is that right?
11  A.  They are the same numbers next to her name.
12  Q.  Okay.  And do you have an understanding of
13  whether that's -- whether that's a patient number or
14  an ID number that tracks her?
15  A.  I do not.
16  Q.  Okay.  I'm not going to ask you to go through
17  all of your records, but I'm going to do one more and
18  ask you to look at Exhibit 2115.  Sorry, I picked the
19  wrong one.
20      And on -- this is your note from, actually the
21  implantation of Ms. Kruse; is that right?
22  A.  Yes, 7/8/2009.
23  Q.  And at the top below the logo and the address of
24  the hospital it says, patient name, Carol Kruse,
25  Kruse, comma, Carol; do you see that?

Page 140

1  A.  Correct.
2  Q.  And it says med record No. 0257272.
3  A.  Correct.
4  Q.  And that's the same number that's on 2121 and
5  2122; is that right?
6  A.  Correct.
7  Q.  Okay.  So we have some sort of identifying
8  number for Ms. Kruse within the hospital within the
9  medical record, correct?
10         MR. ARBON:  Objection, form.
11  A.  Correct.
12  Q.  (BY MS. HELM) Okay.  So on July 11, 2000 -- I'm
13  sorry, July 7, 2011, and I'm going to say her name,
14  Breet (sic)?
15  A.  Bieck.
16  Q.  Bieck, Ms. Bieck recorded a telephone
17  conversation she had with Ms. Kruse and then you
18  signed the note as well; is that right?
19         MR. ARBON:  Objection, form.
20  A.  Which date?
21         MR. NOVOTNY:  Indicating.
22  A.  7/7/2011.  I imagine I would have told her to
23  document whatever she talked about so it would be
24  clear in the record.  And then it does appear I
25  signed the bottom to show that I had been involved

Page 141

1  with that process.  And then I made -- I would have
2  made the comment that Joyce needs to write down the
3  additional part at the bottom, not to delay removal.
4  Q.  Okay.  And according to what Joyce recorded and
5  you signed off on, Ms. Kruse said that she would, she
6  was going to schedule to have it removed in Lincoln.
7  She stated she would call Joyce when she moves to
8  Lincoln and will schedule to see Dr. John May --
9  Maijins (sic)?
10  A.  Those...
11  Q.  On 2122, the handwritten note.
12  A.  It does say John Majerus and I'm not sure who
13  that is.  But that would be the conversation that
14  Joyce would have had with the patient and I don't
15  know the details.
16  Q.  Okay.
17         MR. ARBON:  Objection.
18         MR. NOVOTNY:  M-A-J-A-R-I-S.
19  Q.  (BY MS. HELM) Do you know --
20         MR. ARBON:  Objection to
21      responsiveness.
22  Q.  (BY MS. HELM) Do you know if Ms. Bieck has ever
23  heard back from Ms. Kruse since July 7, 2011?
24  A.  I don't know.
25  Q.  Prior to being contacted for your deposition in

Page 142

1 this case, did you know that Ms. Kruse had not had
2 any further evaluation or treatment relating to her
3 IVC filter?
4 A.  No, I assumed -- I assumed she went to the
5 referral recommended.
6           MR. ARBON:  Objection,
7    responsiveness.
8 Q.  (BY MS. HELM) Thank you.
9    I'm not going through this whole thing, I
10 promise.
11 A.  Do what you got to do.
12 Q.  They send us with -- they send you with a lot
13 more than you need, right, Tom?
14           MR. MACDONALD:  I will say yes.
15 Q.  (BY MS. HELM) Okay.  Dr. Smith, during the
16 course of this deposition you were asked about some
17 internal documents from Bard; is that right?
18 A.  Today, yes.
19 Q.  Okay.  And prior to today, have you ever been
20 shown internal documents from any product
21 manufacturer?
22 A.  Not that's been presented to date that I'm aware
23 of.
24 Q.  Prior to today, has anybody over shown you an
25 internal e-mail from a product manufacturer?

Page 143

1 A.  I don't think I've ever actually seen an e-mail
2 with my own eyes.
3 Q.  Well, the one that you were shown today is 20 --
4 A.  Yeah, that was read, a small portion.  If this
5 is the same e-mail that happened a month ago, I don't
6 know 'cause I never saw it.  But it was a small
7 portion of an e-mail read from somebody and I don't
8 know if it's the same e-mail.
9           MR. ARBON:  Objection,
10    responsiveness.
11 Q.  (BY MS. HELM) Okay.  Before 2110 was handed to
12 you today --
13 A.  Uh-huh.
14 Q.  -- have you ever been handed any internal
15 documents from any product manufacturer for products
16 that you use?
17 A.  No.
18 Q.  Okay.  And then you were also handed Exhibit
19 2111, 2112 and 2113, all of which were represented to
20 you to be internal documents from Bard?
21 A.  Yes, this is the first time that I've seen these
22 today.
23 Q.  Okay.  Prior to today, have you ever been
24 provided any product manufacturer's internal
25 documents related to products that you implant?

Page 144

1 A.  I've never seen a company's personal
2 communication before.
3 Q.  And you don't know, as you sit here today,
4 whether the information in these documents is
5 accurate or correct, do you?
6 A.  Correct, I -- these are not my documents.
7 Q.  Okay.  And you don't know the context of the
8 documents for why they were created or the context in
9 which they were used, correct?
10 A.  Correct.
11 Q.  Okay.  And in fact, they could be drafts,
12 couldn't they?  In fact, if you look at 2113, it says
13 it's a draft, doesn't it, right on the front of it?
14 A.  The word draft is on the front of Exhibit 2113.
15 Q.  Okay.  And you don't know if the final document
16 is the same as the document you were shown today, do
17 you?
18 A.  I don't know anything about personal
19 communications in the company.
20 Q.  Are you aware that Bard has produced over
21 8 million pages of documents in this litigation?
22           MR. ARBON:  Objection, form.
23 A.  I imagine it's a lot based on television
24 commercials.
25           MR. ARBON:  Objection,

Page 145

1    responsiveness.
2 Q.  (BY MS. HELM) Have you seen commercials on
3 television placed by plaintiff's attorneys
4 advertising about IVC filters?
5           MR. ARBON:  Objection to form.
6 A.  I have.
7 Q.  (BY MS. HELM) Do you have a filter?  If you have
8 a filter, you might be entitled to compensation.
9 Call this number.  Have you seen those kind of adds?
10 A.  I think I have.
11           MR. ARBON:  Objection to form.
12 Q.  (BY MS. HELM) Okay.  Are you aware that dozens
13 of Bard witnesses have had their depositions taken
14 about Bard's documents and actions they took relating
15 to their IVC filters?
16 A.  I don't know what's happened outside this room.
17 Q.  Okay.  Plaintiff's counsel didn't show you any
18 of that testimony today, did he?
19 A.  I didn't -- I haven't seen anything other than
20 what's presented so far.
21 Q.  Okay.  And when it comes to making decisions for
22 your patients and weighing the risks and benefits of
23 medical devices that you use with your patients, you
24 rely on a number of sources, don't you?
25 A.  Yes.

Do Not Disclose - Subject to Further Confidentiality Review

Page 146

1 Q. You rely on your training and experience?
2          MR. ARBON: Objection, form.
3 A. Yes.
4 Q. (BY MS. HELM) You rely on your colleague's
5 experiences with certain products?
6          MR. ARBON: Objection, form.
7 A. Yes.
8 Q. (BY MS. HELM) You rely on available medical
9 literature; is that right?
10          MR. ARBON: Objection, form.
11 A. I rely my decision based on multiple sources and
12 journal articles is one.
13 Q. (BY MS. HELM) Okay. And you're not interested
14 in getting unreliable information or data?
15 A. Not usually.
16 Q. Okay. Because getting unreliable information or
17 data could adversely impact your risk benefit
18 analysis; is that right?
19 A. Good data is the best data.
20 Q. And in making your treatment decisions for your
21 patients, you don't rely on internal information from
22 internal documents of manufacturers of medical
23 devices, do you?
24          MR. ARBON: Objection, form.
25 A. That's not a common process.

Page 147

1 Q. (BY MS. HELM) Okay. Have you ever seen any peer
2 reviewed medical literature saying that the G2 filter
3 has complication rates that are higher than other
4 filters?
5 A. I don't recall an article like that.
6 Q. Okay. You also asked (sic) a lot of questions
7 about, did you know that there was not a clinical
8 trial, did you know that the FDA did not approve this
9 filter; do you recall those questions?
10 A. Vaguely.
11 Q. Okay. Are you familiar with the regulatory
12 process that a product such as an IVC filter has to
13 go through before it can go on the market?
14 A. Not probably in detail that everybody -- some
15 other people might know.
16 Q. Okay. And I assume you would rely on the FDA
17 to -- to implement the requirements before it allows
18 a product to go on the market?
19 A. If that's the process.
20 Q. Okay. And FDA did not require a clinical -- a
21 level one clinical study for a filter, would you
22 question the FDA's decision?
23          MR. ARBON: Objection, form.
24 A. I assume a level one is, means a randomized
25 control trial and I would -- I would think they would

Page 148

1 do whatever is appropriate --
2 Q. (BY MS. HELM) Okay.
3 A. -- to figure out effectiveness and safetyness
4 (sic).
5 Q. Are you familiar with what is called the 510K
6 process for clearance of a product?
7 A. Not, not well.
8 Q. Okay. But are you familiar that there's a
9 process where a product such as a Bard filter is
10 cleared for use without going through randomized
11 clinical studies.
12 A. I wouldn't know that.
13 Q. Okay. Do you rely on information from the FDA
14 in making a risk benefit analysis to -- regarding
15 products you're going to use with your patients?
16 A. Well --
17          MR. ARBON: Objection, form.
18 A. -- if medication has a black box FDA warning,
19 that would affect my treatment and I'm assuming for
20 other products as well.
21 Q. (BY MS. HELM) Okay. Is it fair to say that
22 those first four exhibits that came from Bard were
23 represented to you as Bard documents, you can't
24 comment as to whether -- how those impacted or would
25 have impacted your decision to use the G2 filter in

Page 149

1 Ms. Kruse?
2          MR. ARBON: Objection, form.
3 A. Those are the first time I seen the documents.
4 I wouldn't want to say how they would influence me
5 without knowing what they say in detail.
6 Q. (BY MS. HELM) And the context in which they were
7 created?
8 A. I'm sure my opinion would need to be based on a
9 lot of things.
10 Q. Okay. Fair.
11 A. Sorry for being vague on that.
12 Q. No, that's quite all right. It's quite all
13 right.
14    You would expect companies such as Bard to
15 continue to assess their products by looking at
16 complications and how the product's performing once
17 it's in the market; would you not?
18          MR. ARBON: Objection, form.
19 A. I would assume there's some post market process.
20 Q. (BY MS. HELM) Okay. And would you also assume
21 that Bard would undertake some sort of a formal
22 process to evaluate those complications or events
23 that occur once it's in the market?
24          MR. ARBON: Objection, form.
25 A. I wouldn't know what Bard would do in the normal

Page 150

1  course of business.
2  Q.  (BY MS. HELM) Fair.  Fair.
3      But if Bard updates its package insert, or IFU
4  as we call them, to make you aware of the
5  complications, it's -- it has experienced or been
6  told about, that's information available to you to
7  make your risk benefit analysis, correct?
8  A.  I would expect the package insert to have the
9  important information.
10  Q.  And in 2009, there would also have been medical
11  literature available for you to consider in making a
12  risk benefit analysis using IVC filters; would you
13  agree?
14          MR. ARBON:  Objection to form.
15  A.  Can you clarify and reask that question?
16  Q.  (BY MS. HELM) Sure.  In addition to the package
17  insert when you make a decision as to whether to use
18  a product with a patient, there's often medical
19  literature available that you can refer to regarding
20  that product, correct?
21          MR. ARBON:  Objection to form.
22  A.  I'm sure for all procedures there's background
23  medical information.
24  Q.  (BY MS. HELM) Okay.  And in fact, in 2009, there
25  was medical literature relating to IVC filters,

Page 151

1  correct?
2          MR. ARBON:  Objection, form.
3  A.  There might have been different papers written
4  about different topics of filters.  And some research
5  may have been good, some research may need more
6  research.
7  Q.  (BY MS. HELM) And in making your risk benefit
8  analysis, you have to take that into consideration
9  when you read that literature and evaluate it,
10  correct?
11  A.  Yes, I have to decide the, how good the
12  literature is.
13  Q.  Okay.  Okay, I'm going to take you back to the
14  IFU one more time and then we're probably going to be
15  in pretty good shape.
16      We've already discussed that on Page 2 under
17  G -- under potential complications that movement or
18  migration of the filter was identified as a risk; is
19  that right?
20  A.  Yes, that's written down.
21  Q.  Okay.  And we also discussed that tilt was a
22  risk; is that right?
23  A.  That's written down.
24  Q.  And caudal migration is a risk?
25          MR. ARBON:  Objection, form.

Page 152

1  Q.  (BY MS. HELM) Is that right?
2  A.  Let's see, migration is written down.
3  Q.  Okay.  And if you look again on Page 4 under the
4  bar chart, under the clinical experience -- it says
5  clinical experience at the top of the page and then
6  below the bar chart it indicates, "Asymptomatic
7  complications included caudal migration," correct?
8  A.  That's correct, that's written down.
9  Q.  So this IFU or package insert as you call it, in
10  it Bard indicated that migration and specifically
11  caudal migration of the G2 filter were a risk; is
12  that right?
13  A.  Yes, that's written down as a caudal migration
14  is on this package insert, assuming it was in the box
15  at -- on that date.
16  Q.  And the same thing as tilt, correct?
17          MR. ARBON:  Objection to form.
18  A.  Let let's see, tilt is...
19  Q.  (BY MS. HELM) Right above it it says, of the 61
20  retrievals, it says remember, "Resulted from
21  inability to engage the filter apex with the Recovery
22  Cone removal system due to filter tilt."
23  A.  That's correct.
24  Q.  Okay.  Okay.
25      And again, I understand you have to say assuming

Page 153

1  this was in the box, but assuming that this is the
2  IFU or package insert that accompanied the filter
3  that you implanted in Ms. Kruse in 2009, you had the
4  opportunity to review this IFU or package insert
5  before you did the implant, correct?
6  A.  Correct.
7  Q.  Okay.  You were also aware of risks of the IVC
8  filters from your training --
9  A.  Yes.
10  Q.  -- and fellowship, correct?
11  A.  Yes, because we already had one tilt that I was
12  involved with.
13  Q.  Right, in your fellowship?
14  A.  Correct.
15  Q.  So you knew when you implanted Ms. Kruse's
16  filter that tilt was a possible complication?
17  A.  Correct.
18  Q.  Did you discuss that with her?
19  A.  I'm sure we talked about several things when we
20  gave consent.
21          MR. ARBON:  Objection, form and
22      responsiveness.
23  Q.  (BY MS. HELM) Okay.  You understand that Bard
24  sales reps are not necessarily medically trained,
25  correct?

Page 154

1  A.  I understand they're not doctors and they're
2  not -- and I've had them say that they're not giving
3  medical advice.
4  Q.  Okay.  And so when you speak with one or ask one
5  to be present during a procedure, you do it with the
6  understanding that they may be able to provide some
7  factual information about the product but they can't
8  provide medical recommendations or medical advice,
9  correct?
10  A.  I understand they have limitations in what they
11  can say.
12  Q.  Okay.  And was -- was the reason that you
13  requested that -- would there be a record anywhere of
14  the request for the Bard representative to be present
15  at the retrieval of Ms. Kruse's filter?
16  A.  No, it probably would have been verbal, not
17  written.
18  Q.  Okay.  And you don't know the representative's
19  name?
20  A.  I do not know his name.
21  Q.  Okay.  And we've established today that it
22  wasn't recorded that he or she was in the room and
23  it's not anywhere in the medical record, correct?
24  A.  That's correct.
25  Q.  Okay.

Page 155

1  A.  And obviously those policies are directed by the
2  hospital, they're not my policies.
3  Q.  Do you think it was important for Ms. Kruse to
4  go see another interventional radiologist about
5  having her filter removed?
6  A.  I thought it appropriate at the time as opposed
7  to not getting treatment or seeing someone not
8  familiar with the filters.
9       MS. HELM:  That's all I have.
10  Thank you.
11       VIDEOGRAPHER:  Can we break for a
12  second?  If you're going to continue, can we
13  break for a second to change media?
14       MR. ARBON:  Sure.
15       VIDEOGRAPHER:  Thank you.
16       MR. ARBON:  And I promise this
17  won't be another...
18       VIDEOGRAPHER:  We are off the
19  video record at 1735.
20  (Recess was taken.)
21       VIDEOGRAPHER:  We are back on the
22  video record at 1738.  Please proceed.
23
24
25       REDIRECT EXAMINATION

Page 156

1  BY MR. ARBON:
2       MR. ARBON:  Yes, we have marked an
3  exhibit or plaintiff marked an Exhibit 2014
4  (sic), to the deposition, which is the G2 filter
5  permanent placement.  There's a question as to
6  whether that was on our designation prior to the
7  deposition.  Just for clarification, that
8  document was listed on our list as
9  BPVE01-149243.  The copy that we've brought with
10  you and marked as an exhibit, bears a different
11  Bates number but it is the same document as what
12  was identified.
13       MR. NOVOTNY:  Let me just for
14  clarification, you said 2014, it's 2114.
15       MR. ARBON:  2114, I'm sorry,
16  Exhibit 2114.
17  Q.  (BY MR. ARBON)  Doctor, I just want to take --
18  there's some statements or questions about the
19  meeting.
20       In our meeting, do you recall my referencing
21  that if I were to show you any document, I would need
22  you to sign a protective order?
23  A.  Yes.
24  Q.  And that's how that protective order got to you?
25  A.  Yes.

Page 157

1  Q.  Do you recall that I had a copy of the
2  protective order with me?
3  A.  I don't recall.  You might have.
4  Q.  Okay.  And then no e-mails were actually shown
5  to you or handed to you or -- during that meeting,
6  correct?
7  A.  Nothing was given to me --
8       MS. HELM:  Object to the form,
9  leading.
10  (Court reporter interrupted for clarification.)
11  A.  There was no papers given from the attorney to
12  me to hold.
13       MS. HELM:  Tom, you don't need to
14  ask these questions.
15       MR. ARBON:  Fair enough.
16       MS. HELM:  And I'll clarify it at
17  the end -- go ahead, I'll clarify it at the end.
18  Q.  (BY MR. ARBON)  Can you get the IFU in front of
19  you again, please?
20       MR. NOVOTNY:  That's a pretty
21  popular document.
22       MR. ARBON:  It is.  Today it is.
23  Q.  (BY MR. ARBON)  And do you have the IFU, sir?
24  A.  Yes.
25  Q.  And that is 2109?

Page 158

1      MS. HELM: It is.
2    Q. (BY MR. ARBON) Could you go to Page 1 of the
3    document, sir, you see a subsection --
4    A. Yes, I see.
5    Q. See a subsection at the bottom marked E?
6    A. Okay.
7    Q. There's a section marked E?
8    A. Okay, yes, warnings.
9    Q. Warnings. What does warnings mean to you as a
10   physician when you're reading an instruction for use?
11       MS. HELM: Objection to form.
12   A. Warning would mean for me something that
13   requires caution.
14   Q. (BY MR. ARBON) Something that could be related
15   to the safety of the product; is that fair?
16       MS. HELM: Objection to the form.
17       You're leading.
18   A. Not, not necessarily. It could be a warning of
19   how to deploy the product.
20   Q. (BY MR. ARBON) How do you, Doctor, when reading
21   an instruction for use, or an IFU, does the term
22   warnings have any particular import to you?
23   A. It would -- you would want to know what warnings
24   were to not make a mistake.
25   Q. What's No. 6 of the warnings?

Page 159

1    A. Number 6, "Filter fracture is a known
2    complication of vena cava filters. There have been
3    reports of embolization of vena cava filter fragments
4    resulting in retrieval of the fragment using
5    intravascular and/or surgical techniques. Most cases
6    a filter fracture, however, have been reported
7    without any adverse clinical sequella."
8    Q. What does, reported without any adverse clinical
9    sequella mean to you?
10   A. I didn't write this document, but I would
11   imagine it means the filter fracture fragments can be
12   removed and the patient does well.
13   Q. Would you consider reported cases of patients
14   having pieces of a G2 filter embolize into their
15   heart and not be retrievable, even through open heart
16   procedures, to be an adverse clinical sequella?
17       MS. HELM: Object to the form, it
18       calls for an expert opinion. It doesn't have
19       anything to do with Ms. Kruse.
20   A. I can only tell you about Ms. Kruse. Luckily
21   she didn't have a fracture. And that was one thing I
22   was concerned about on retrieval, is if I tried too
23   hard, I could break the filter.
24   Q. (BY MR. ARBON) Well, Doctor, these instructions
25   are directed to you, you're the target audience here,

Page 160

1    right?
2        MS. HELM: Object to the form.
3    A. I'm the doctor, correct.
4    Q. (BY MR. HELM) You as the doctor who is utilizing
5    these instructions and utilized instructions like
6    this for selecting the G2 filter that was placed in
7    Ms. Kruse, are relying on this information to be
8    accurate, correct?
9        MS. HELM: Object to the form.
10   A. The package insert should be correct.
11   Q. (BY MR. HELM) When there's a reference in the
12   package insert that says, filter fracture is a known
13   complication but most cases, however, have been
14   reported without -- without any adverse clinical
15   sequella; does that to you as a doctor give you some
16   degree of severity that is being associated to
17   fracture?
18       MS. HELM: Object to the form.
19   A. Fix -- I'm not an expert, but filter fracture
20   sounds bad to me.
21   Q. (BY MR. ARBON) Okay. But if that's modified by
22   saying the patient doesn't suffer any adverse
23   sequella, does that have any affect on your view of
24   that warning?
25       MS. HELM: Object to the form.

Page 161

1    A. That would mean sometimes there's -- sometimes
2    the procedure went well and sometimes it requires a
3    lot more.
4    Q. (BY MR. ARBON) Okay. And I promise, Doctor, I'm
5    not doing this just to delay, but No. 7 is the next
6    one on the list of warnings. Would you read that for
7    me?
8    A. Number 7, Page 2. Movement of -- Movement or
9    migration of the filter is a known complication of
10   vena cava filters. This may cause -- may be caused
11   by placement in IVCs with diameters exceeding the
12   appropriate labeled dimensions specified in the IFU.
13   Migration of filters to the heart or lungs have been
14   reported in association with improper deployment,
15   deployment into clots and/or dislodgement due to
16   large clot burdens.
17   Q. Does that warning about migration say anything
18   that death -- about deaths having occurred from
19   filter migration?
20       MS. HELM: Object to form.
21   A. That line, there's two things I would say
22   regarding that, now that you brought it up. Number
23   1, that's why I did a CT scan beforehand because I
24   knew if the filter -- if the IVC was too big, it
25   could -- it could migrate to the heart, so that's the

Page 162

1  first comment.
2      The second comment is:  There's no word death in
3  that No. 7 statement.
4  Q.  (BY MR. ARBON) Now, if Bard were aware that
5  filter migration --
6      (Court reporter interrupted for clarification.)
7  Q.  If Bard were aware that filter migration
8  utilizing the Recovery and the G2 filter had caused
9  deaths by migration to the heart, would that be
10  important information to include in that warning?
11         MS. HELM:  Object to the form, it
12      calls for speculation and lacks foundation.
13  A.  I don't know what Bard would consider important.
14  For me, the more I know about the filter, the better.
15  Q.  (BY MR. ARBON) Let me ask you -- we'll put it in
16  context, Doctor.
17      When they're discussing filter fracture, Bard in
18  its warnings, felt it necessary to state that most
19  cases of filter fracture have been reported without
20  any adverse clinical sequella.  Is there any other
21  purpose for including that information, to --
22  departing that information in IFU then to give the
23  information to the utilizing physician as to their
24  view of the severity of fracture?
25         MS. HELM:  Object to the form.

Page 163

1      Calls for speculation.
2  A.  I don't know what their intent was when they say
3  most cases, I'm not sure what the point was.
4  Q.  (BY MR. ARBON) Now, if there were deaths that
5  were known to have been associated with migration of
6  the filter to the heart, if they're going to tell you
7  the sequella of a fracture -- what the sequella from
8  the fractures were, should there be some indication
9  of as to what the sequella from a migration to the
10  heart was?
11         MS. HELM:  Object to the form.
12         MR. NOVOTNY:  If you're asking for
13      standard of care, should there be, he's not --
14      he's not giving a standard of care opinion the
15      way the question was phrased.
16         MR. ARBON:  No, I'm asking as a
17      physician reading the information, is that what
18      he would anticipate?
19         MS. HELM:  Same objection.
20  A.  I would expect the IFU to state the
21  complications that exist for their product.
22  Q.  (BY MR. ARBON) Now let me ask under this section
23  warnings, where we talk about movement or migration
24  of the filter:  Was Ms. Kruse's diameter
25  appropriate -- of an appropriate dimension?

Page 164

1  A.  Yes.
2  Q.  Did she have proper deployment?
3  A.  Yes.
4  Q.  Did you deploy this filter into a clot?
5  A.  No.
6  Q.  Did you see, when you attempted to retrieve the
7  filter, any indication of a large clot burden in that
8  filter?
9  A.  No.
10  Q.  Can you tell me then why that filter has
11  migrated?
12         MS. HELM:  Object to the form.
13  A.  I don't know why the filter -- the filter's not
14  where I placed it, that's all I can tell you.
15  Q.  (BY MR. ARBON) No doubt it's migrated, correct?
16  A.  Correct, from where I positioned it --
17  Q.  And none of -- and none of the conditions that
18  the warning provided by Bard regarding the G2 about
19  how migrations occur relate to Ms. Kruse's case, do
20  they?
21         MS. HELM:  Object to the form,
22      mischaracterizes the document.
23  A.  I'm not sure.  Repeat the question, I'm not
24  sure.
25  Q.  (BY MR. ARBON) None of these listed warnings

Page 165

1  that Bard provided in the IFU for the G2 filters that
2  she has, which reference the causes of migration,
3  none of those reference causes relate to Ms. Kruse's
4  case, do they?
5         MS. HELM:  Object to the form.
6  A.  The causes listed in No. 7 -- do not appear to
7  occur, have occurred in Ms. Kruse's case from what I
8  can tell.
9  Q.  (BY MR. ARBON) I'm sorry to do this but in light
10  of the objection, sir, let me ask you:  After review
11  of the warning No. 7 from the Bard IFU, did any of
12  the causes that Bard has listed related to the cause
13  of migration occur in Ms. Kruse?
14         MS. HELM:  Object to the form.
15  A.  Let's see, the No. 7 says the IVC diameter is an
16  issue and that seemed to be appropriate.  And that
17  filters have migrated, so that's a known
18  complication.  And there was no improper deployment,
19  that I could tell and there's no clots present.  So
20  as far as I can tell, all those things seemed
21  appropriate for our particular case and -- but the
22  filter migrated.
23  Q.  (BY MR. ARBON) Did any of those conditions that
24  are listed there as causes for migration, occur in
25  Ms. Kruse?

Do Not Disclose - Subject to Further Confidentiality Review

Page 166

1        MS. HELM:  Object to the form.
2   A.  For Ms. Kruse, there was no clot and the IVC was
3   the appropriate size, so I would not have predicted
4   any problems with migration.
5   Q.  (BY MR. ARBON) If you look down on Page 2, sir,
6   of the IFU, Section G, just below middle of the page?
7   A.  G, potential complications.
8   Q.  Right.  What are potential complications mean to
9   you as a physician to whom IFUs like this are
10  directed?
11  A.  To me, that would mean in the experience of
12  other doctors, events that weren't expected but could
13  be predicted happen.
14  Q.  Okay.  And is that -- do you look to potential
15  complications, that heading, when you're reviewing
16  IFUs?
17         MS. HELM:  Object to the form.
18  A.  The -- it's always best to know the
19  complications of a procedure.
20  Q.  (BY MR. ARBON) Similarly, do you look for, when
21  you're reading IFUs, the warning section?
22  A.  In the review literature, I look for
23  complications.
24  Q.  Okay.  And also, would you look for a section
25  headed warnings?

Page 167

1   A.  I would look for -- a section warning, I would
2   want to read.
3   Q.  Draws your attention as a physician --
4   A.  Right.
5   Q.  -- to those sections, right?
6          MS. HELM:  Object to the form.
7   A.  Correct.
8   Q.  (BY MR. ARBON) Do --
9   A.  Warning sounds important as a physician.
10  Q.  In reading IFUs, does the heading, "Warnings,"
11  cause you to pay attention to that section?
12         MS. HELM:  Object to the form.
13  A.  I would think the warnings written would be
14  helpful.
15  Q.  (BY MR. ARBON) And when you see a heading,
16  "Potential Complications," how does that affect what
17  you're reading of an IFU?
18  A.  That these are complications that one should
19  actually try and look out for.
20  Q.  Under warnings section in this IFU and under the
21  potential complications section, does the term caudal
22  migration appear anywhere?
23  A.  I'm sorry, say that again.
24  Q.  Under the warning section, that's up at the top
25  of the page.

Page 168

1   A.  Okay.
2   Q.  Or the complications heading, that's the middle
3   of the page, does caudal migration appear anywhere in
4   those sections of the IFU?
5   A.  Page 2 says migration.  I don't see the word
6   caudal migration written, at the top on No. 7.  Under
7   potential complication, I see the word migration, I
8   don't see the word caudal.
9   Q.  Okay.  So is it true that the only place that
10  the term caudal migration appears is on Page 4 where
11  it is noted as a finding in the clinical experience
12  discussion of the one study that's referenced?
13  A.  On Page 4, I see the word caudal migration, 10
14  cases.
15  Q.  Under what heading?
16  A.  "Asymptomatic complications include," under the
17  heading of, "Clinical Experience."
18  Q.  Clinical experience section is not a warning
19  section, is it?
20         MS. HELM:  Object to the form.
21  A.  Well, it talks about bad things that can happen
22  like filter tilting but it's not labeled warning.
23  Q.  (BY MR. ARBON) All right.  Filter tilts wasn't
24  brought up in the warnings or the complication
25  section, was it?

Page 169

1          MS. HELM:  Object to the form.
2   A.  You know, I didn't make this document, so I'm
3   not sure what they --
4   Q.  (BY MR. ARBON) And I understand.
5   A.  -- thought.  But let's see, if you're talking
6   about Page 1, warning E.  On Page 1, I don't see the
7   word tilting.
8   Q.  And I'm not to belabor but you mention on Page
9   2, do you see it under potential complications?
10  A.  I see in the Section G on Page 2, I don't see
11  the word tilt.
12      (Exhibit No. 2126, marked for identification.)
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 170

Page 172

1     have it.
2   A. But, yeah, the anesthesia record would easily
3   tell the time beginning and ending.
4   Q. (BY MR. ARBON) What I'm going to hand you doctor
5   are two pages from medical record. And those pages
6   are Kruse -- are Bates stamped KRUSEC_MLMH_MDR 00058
7   and 59.
8     (Exhibit No. 2127, marked for identification.)
9   Q. And I marked them at 2127.
10       MS. HELM: Actually, what you've
11   marked, just so the record is clear, is 57, 58,
12   59 and 60, because it's printed double sided.
13       MR. ARBON: And I apologize --
14       MS. HELM: It's fine, it's fine,
15   I've got it --
16       MR. ARBON: -- it's a double sided
17   copy.
18   Q. (BY MR. ARBON) Looking at the documents and
19   specifically the anesthesia record that's recorded
20   there, can you tell me how long your procedure was
21   with regard to retrieval -- attempted retrieval of
22   the filter?
23   A. Let's see, I have two-pieces of paper. 2127,
24   it's on the 7th of April. And if I can read the
25   handwriting right, it may start at 0930 and it may

Page 171

Page 173

1   end at 1126.
2   Q. Just shy of two hours?
3       MS. HELM: Object to the form.
4   A. From 9 a.m. to 11, almost, two hours.
5   Q. (BY MR. ARBON) During that two hours --
6   A. No, that's the anesthesia record, obviously.
7   Q. Sure. But during that period of time, what
8   were -- what was your -- what were you attempting to
9   do?
10   A. Well, anesthesia would provide conscious
11   sedation and get the patient appropriate for the
12   procedure. And then when they were adequate for the
13   procedure to begin, then we would access the neck and
14   then attempt to retrieval of the filter until we
15   thought it was time to stop. Which would have been,
16   it looks like roughly 11:26.
17   Q. And throughout that time, those were your
18   attempts to trying and retrieve this filter?
19       MS. HELM: Object to the form.
20   A. That was the, it looks like the anesthesia
21   duration for the case.
22   Q. (BY MR. ARBON) When you said you elected not to
23   attempt the loop procedure, you reference at one
24   point, I think you had mentioned, time of procedure;
25   is that what you were referencing?

21   Q. (BY MR. ARBON) Do you recall how long your
22   retrieval procedure lasted?
23   A. Long enough to decide not to retrieve it and
24   come up with an alternate plan.
25       MS. HELM: Let me just -- I may

Page 174

1  A.  No, the reason I had stopped was for many
2  reasons; the duration of the case, the complexity of
3  the case, the complications that could occur from
4  doing more advanced procedure, all of those things
5  which were -- influenced my decision.
6  Q.  What are the complications that you were aware
7  of that could have occurred had you tried more
8  advanced procedure at that time?
9  A.  Numerous, including death of the patient.
10  Q.  Was rupture of the IVC one of those potential
11  complications?
12        MS. HELM:  Object to the form.
13  A.  I believe that's why I documented that somewhere
14  in one of my records.
15  Q.  (BY MR. ARBON) Okay.  So certainly when you
16  discussed the complications as is noted in your, the
17  file, post op from the retrieval percentage, was the
18  fact that a percutaneous -- another percutaneous
19  procedure had the risk of tearing the IVC filter, was
20  that discussed with Ms. Kruse?
21        MS. HELM:  Object to the form.
22  A.  Having already presented the information once of
23  the complications, I don't think I would have told
24  her what are the complications, another doctor would
25  have told her.

Page 175

1  Q.  (BY MR. ARBON) And I guess that's not what
2  I'm...
3  A.  Then I, if I heard your question right.  If you
4  asked what would a doctor tell her on the fir -- I
5  don't know what they would tell her.
6  Q.  No, I'm talking about what did you tell --
7  "Unable to retrieve filter, discussed options."  When
8  you discussed options, did you discuss -- well, did
9  you explain to her why you stopped when you did?
10  A.  That we couldn't retrieve the filter and it was
11  tilted, yes, told her that.
12  Q.  Okay.
13  A.  And it had migrated.
14  Q.  In discussing options did you discuss then a
15  open procedure might be an option for needing to get
16  this out?
17        MS. HELM:  Object to the form.
18  A.  No, we didn't discuss all of the options
19  available to her.
20  Q.  (BY MR. ARBON) You just discussed you should see
21  another doctor, is that the extent of the options?
22  A.  No, we discussed that we tried to retrieve it
23  and then in order to avoid the complications that we
24  had discussed about before the procedure, we stopped.
25  And that she would need additional procedure done to

Page 176

1  remove it.
2  Q.  Given the condition of the filter and the
3  difficulty you had trying to remove it, would
4  rupturing the IVC be one of the potential problems
5  that could can occur with a percutaneous retrieval of
6  a filter?
7        MS. HELM:  Object the form, calls
8        for speculation.
9  A.  IVC damage or rupture was known preceding that
10  retrieval so I think your answer is correct.
11  Q.  (BY MR. ARBON) Okay.  If we can go to -- I'm
12  really winding down, I promise you.
13        2122, the note.
14        (Discussion off the record.)
15  Q.  Counsel defendants noted that there's a
16  typewritten header, for a better term, on that
17  exhibit; do you see it, sir?
18  A.  I see her name at the top with a type of a ID,
19  identifying number.
20  Q.  Do you know how that got on there?
21  A.  I'm not in charge of the hospital record
22  keeping.
23  Q.  You're not a custodian of those records, right?
24  A.  I'm not the custodian, that's true, the hospital
25  is.

Page 177

1  Q.  2121 and -- well, let me just list off, 2121,
2  2115, these are all hospital records, correct, that
3  we marked?
4  A.  Those are hospital records that are produced by
5  different software.  One's a physical chart -- one's
6  a physical chart and the other is a computer program.
7  Q.  Okay.
8  A.  And this is a handwritten note told to scan in
9  to the patient's record so it would be there
10  permanently.
11  Q.  Okay.
12  A.  So there was emphasis on this note.
13  Q.  So it was scanned in so that's --
14  A.  I --
15        (Court reporter interrupted for clarification.)
16  Q.  The scanning it in is how it got into the file?
17  A.  Let me retract that.  I don't know how it got
18  into the file, but it is part of the permanent file
19  and under my direction to be a part of the permanent
20  file.
21  Q.  Were you present when miss -- is it Bieck,
22  Bieck?
23  A.  Bieck.
24  Q.  Made this phone call that's documented under
25  7/7/11?

Page 178

1  A.  No, I would not have been present on the phone
2  with her.
3  Q.  Okay.  Do you know who John Mayors is or Majors
4  (sic?)
5  A.  No.
6  Q.  Majerus?
7  A.  I would assume Ms. Bieck and Ms. Kruse would
8  know who that is.
9  Q.  All right.  That's not an interventional
10  radiologist that you had Ms. Bieck recommend, is it?
11  A.  I don't know who John Mayors (sic) is.
12  Q.  Okay.  That's her primary care doctor, if that
13  helps, Doctor, I believe.
14  A.  Okay.  Let's see, so that would -- but our
15  instructions to her were to go to Grand Island or
16  Lincoln and that was our instructions and help
17  facilitate that.
18  Q.  Whose handwriting is the note at the bottom?
19  A.  That's Joyce Bieck's handwriting also.  And it's
20  my signature above it, because I knew it was
21  important to try to document as much of our
22  communication as we could.
23  Q.  Okay.  But you weren't present when she actually
24  spoke to Ms. Kruse?
25  A.  No, I was not on the phone when she spoke to

Page 179

1  Ms. Kruse.
2  Q.  Okay.  Doctor is there any doubt in your mind
3  that there was a Bard sales representative present
4  during the retrieval process, or attempted retrieval
5  of Ms. Kruse's filter?
6        MS. HELM:  Object to the form.
7  A.  I believe a rep was present there.
8  Q.  (BY MR. ARBON) If Ms. Kruse's G2 filter had not
9  caudally migrated and tilted in the bifurcation,
10  would she had needed any follow-up or referral to any
11  interventional radiologist?
12        MS. HELM:  Object to form.
13  A.  If --
14        MS. HELM:  Calls for speculation.
15  A.  My honest answer is I don't know.  Would we be
16  here today, probably not.
17  Q.  (BY MR. ARBON) Okay.  But let me rephrase the
18  question.
19        MS. HELM:  I'm going to object to
20    the responsiveness.
21  Q.  (BY MR. ARBON) If the G2 filter that was
22  implanted in Ms. Kruse in '09 had not migrated
23  caudally and tilted in -- as discovered in 2011,
24  would she have needed any follow-up for a retrieval
25  in 2011?

Page 180

1        MS. HELM:  Object to the form.
2    Calls for speculation.
3  A.  Well, it's, like, two questions.  One, she could
4  get it retrieved, but would she have necessarily
5  represented to the -- to the medical provider,
6  possibly not.  I mean, that's a complicated question.
7  Q.  (BY MR. ARBON) Let me try a different question.
8    If when you Ms. Kruse -- you saw Ms. Kruse in
9  2011, you had done imaging that indicated the filter
10  was still in the position you had placed it in, would
11  there have been a need to retrieve it?
12        MS. HELM:  Object to form.
13  A.  If it were in the same place -- I don't know
14  what their primary care doctor would have done,
15  because I didn't order that x-ray so I don't know
16  what they would have done.
17  Q.  If you had not observed the filter -- in April
18  of 2011, if you had not observed that her G2 filter
19  had caudally migrated and tilted, would you have
20  recommend -- would you be recommending that she have
21  another interventional radiologist evaluate her for
22  retrieval at that time?
23        MS. HELM:  Object to the form.
24  A.  So if your question is -- repeat your question.
25  Q.  (BY MR. ARBON) I'll just restate it.

Page 181

1    Doctor, was the only reason you were
2  recommending that she get a second opinion about
3  retrieval is because the filter had migrated
4  caudally, tilted and you couldn't get it out?
5  A.  I referred her because my attempt at retrieval,
6  I couldn't retrieve it.
7  Q.  And you couldn't retrieve it because it was
8  migrated and tilted, correct?
9        MS. HELM:  Object to the form.
10  A.  I believe that's accurate.
11        MR. ARBON:  I'll pass.
12        MS. HELM:  I have very couple
13    follow-ups.
14        CROSS EXAMINATION
15  BY MS. HELM:
16  Q.  Doctor, I'm not going to take you through the
17  IFU again, but you would agree with me that it's
18  important for you to read the entire IFU; would you
19  not?
20  A.  Yes, I think more information would be helpful.
21  Q.  Okay.  And we discussed previously that in the
22  clinical experience section of the IFU, it
23  specifically addressed caudal migration and tilt,
24  correct?
25  A.  The IFU has the word migration in it and I think

Page 182

1  it did have the word tilt in it, yes.
2  Q.  Okay.  And just so our record's clear:  If
3  you'll look on Page 4 under clinical experience it's
4  talking about experience with filters that have been
5  implanted.  And down below the bar graph it says that
6  some of the filters, they have an inability to engage
7  the filter apex with the Recovery Cone Removal System
8  due to filter tilt, correct?
9  A.  I remember you saying that.  Where exactly --
10  Q.  Right below the bar chart.
11  A.  Okay, yeah.  Let's see, it says three technical
12  failures of retrieval resulted from inability to
13  engage the filter on apex.
14  Q.  With the Recovery Cone Removal System due to
15  filter tilt.
16  A.  Correct.
17  Q.  Okay.  And again, below that in the sentence
18  starting asymptomatic complications, Bard again told
19  you there had been instances of caudal migration,
20  correct?
21  A.  It does state --
22         MR. ARBON:  Objection to form.
23  A.  -- the asymptomatic complications include caudal
24  migration, No. 10.
25  Q.  (BY MS. HELM) Okay.  And you would agree with me

Page 183

1  that caudal migration is a type of migration,
2  correct?
3  A.  I think that's reasonable.
4  Q.  Okay.  And then if you would refer to the last
5  exhibit, 2127.
6    This is not a record of how long you attempted
7  to retrieve the filter, is it?
8  A.  This is the anesthesia conscious sedation
9  record.
10  Q.  Okay.  So it's not a record of how long you
11  attempted to retrieve the filter, is it?
12  A.  Not necessarily minute by minute.
13  Q.  Okay.  In fact, this is the beginning of when
14  the patient was put under sedation until when the
15  sedation was stopped, correct?
16  A.  Actually, to be precise at 9:30 is when vitals
17  were begun and then it looks like the administration
18  of medication was 14 minutes later.  So this, all I
19  can say is this is the anesthesia record of the case.
20  Q.  Okay.  So you didn't start your retrieval
21  attempt at 9:30, did you?
22  A.  Not necessarily.  I wouldn't -- I didn't
23  document the time of beginning and end, so.  But this
24  is an anesthesia record, not my record.
25         MS. HELM:  Okay, that's all I

Page 184

1  have.  Thank you.
2         MR. ARBON:  If you can just let me
3  see that document, I want to see if there's
4  something on there.
5  (Witness handing to Mr. Arbon.)
6    FURTHER REDIRECT EXAMINATION
7  BY MR. ARBON:
8  Q.  Would your attempts pretty much -- once you
9  began your procedure, after she's been anesthetized,
10  how long after you stop would anesthesia stop
11  normally?
12  A.  Let's see the record to review.  Tell me your
13  question one more time.
14  Q.  I guess I'm just trying to figure out, they
15  stopped the anesthesia -- anesthesia ended at 11:26;
16  am I reading that correctly?
17  A.  She has that written down as the time of a vital
18  sign, but I don't know if she is administering it, a
19  sedation or not.
20  Q.  Okay.  Can you give me the last four digits of
21  the Bates number on that page you're looking at now
22  please, sir?
23    No, the one, just the Bates number.  Let me show
24  you.  I'll do it this way, just try and speed it up.
25  If that's possible.

Page 185

1         MS. HELM:  60.
2  Q.  (BY MR. ARBON) Yeah, Page 60, Doctor, which is
3  part of the record.
4  A.  Okay.
5  Q.  There's an indication in there as to when your
6  procedure started, correct?
7  A.  Let's see, this is an anesthesia note,
8  handwritten nursing note at the top.
9    Timeout done, patient understand verbalize good
10  understanding -- patient verbalized good
11  understanding of the procedure.  Right neck was
12  prepped by the Bieck, so that would be the tech.
13  Patient draped and Dr. Smith begins procedure at
14  9:40, roughly.
15    So that would -- that sounds like the beginning
16  of the procedure.  Which would begin first with
17  preparing the neck for the procedure.  And then it
18  says, "Sedation started."  So that seems helpful on
19  the time.
20  Q.  This may be more helpful, Doctor.
21  A.  Oh.
22  Q.  Am I this dumb?
23    (Discussion off the record.)
24  Q.  Everybody can answer this one for me.  Doctor --
25  A.  I mean, this isn't my record so it's hard for me

Do Not Disclose - Subject to Further Confidentiality Review

Page 186

1 to know.
2 Q. Wait a minute, let me strike my last question.
3   Let me show you page 2127.
4 A. Okay, let's see, Exhibit 2127.
5 Q. And let's just look right here. Does it say
6 what time the procedure started?
7 A. The No. 1 procedure time, 045, but I'm not sure
8 what that means, but that's what she's written there.
9 Q. See the line that says procedure start time?
10 A. That's what it says, yes.
11 Q. And what does it say?
12 A. 0945.
13 Q. And it says end time, correct?
14 A. That's correct, it says end time 11:15 and her
15 vitals signs extend to 11:27.
16 Q. Based on your understanding of anesthesia
17 records, Doctor, does it appear that the actual
18 interventional procedure went from 9:45 to 11:15?
19 A. I would -- I could say that the procedure in
20 total went from 9:45, I -- I don't know the exact
21 timing of when the needle stick occurred. I would
22 assume it's close to that.
23 Q. Doctor, and my last line of questioning here,
24 wonderful IFU again.
25   In that section counsel keeps referring to,

Page 187

1 clinical experience, where it's on Page 4, where it's
2 discussing a clinical study involving 100 patients
3 was conducted to assess the safety of removal of the
4 G2, that's the heading or lead into the section?
5 A. I'm sorry, repeat the question one more time.
6 Q. Sure. Clinical experience section --
7 A. Okay.
8 Q. -- that's been referenced by the defense
9 counsel. A clinical study involving 100 patients was
10 conducted to access the safety of removal of the G2
11 filter, do you see that line? Did I read that
12 correctly?
13 A. Let's see, can you -- at the top, okay. I see.
14 Now that I know you're at the top, can you repeat the
15 question one more time?
16 Q. Okay. You've been referred repeatedly to the
17 clinical experience section of the instructions for
18 use. The first sentence of which is a clinical study
19 involving 100 patients was conducted to assess the
20 safety of removal of the G2 filter, is -- did I read
21 that correctly?
22 A. Yes.
23 Q. So this section is describing a study done that
24 Bard said was done for safety of removal, correct?
25 A. That's what's written in the first sentence.

Page 188

1 Q. Then what she's also pointed to you is in
2 referencing the findings of that study. Of the
3 people of which there were attempted retrievals they
4 note there were 10 caudal migrations, that they call
5 asymptomatic complication, correct?
6 A. That's interesting, I'm not sure how to
7 interpret that actually. If clinical experience is
8 talking about removal, then that means they would
9 have already migrated, so I'm not quite sure.
10   So repeat your question, so I understand 'cause
11 I'm not --
12 Q. I'm just trying to get you caught up with me on
13 some of the facts that I'm seeing this in this
14 document.
15 A. Yeah, okay.
16 Q. This is not instructing you about a
17 complicate -- intention of this section is not to
18 discuss a complication or a warning, it's to describe
19 the findings of a study that was conducted to assess
20 the safety of the removal of a G2; is that a fair
21 assessment?
22   MS. HELM: Object to the form.
23   Calls for speculation.
24 A. I'm not sure what their intent was. I think it
25 means that they're providing a study that talks about

Page 189

1 the safety of the removal of the filter and what bad
2 things can happen.
3 Q. (BY MR. ARBON) All right. Now, in it where
4 counsel's pointed you out to, three failures resulted
5 from the inability to engage the filter apex with the
6 Recovery Cone system due to filter tilt, leading to
7 embedding. Do you see that paragraph?
8 A. Yes, I see that.
9 Q. Okay. This is the same IFU that tells you to
10 only retrieve utilizing the Recovery Cone, correct?
11   MS. HELM: Object to the form,
12 mischaracterizes the document and the prior
13 testimony.
14 A. I've seen that this literature or this Exhibit
15 2109 only talks about the retrieval cone technique.
16 Q. (BY MR. ARBON) And then what instruction does
17 this IFU give for those three patients or patients
18 like them where tilt has embedded the filter and you
19 can't get it out with the Recovery Cone, what help
20 does this IFU give you?
21 A. I don't know what the intent of the help -- I
22 don't know what the intent of the -- that section was
23 for.
24 Q. Okay. The IFU doesn't instruct you how to
25 handle that circumstance, does it? How to do a

Page 190

1  retrieval where the cone can't engage?
2  A.  You know, honestly I don't know what an IFU is
3  supposed to cover and what it's not supposed to
4  cover.
5          MR. ARBON:  I'll pass the witness.
6          MS. HELM:  Now I have to do it.
7      FURTHER RECROSS EXAMINATION
8  BY MS. HELM:
9  Q.  You would stay in the --
10  A.  This is a popular document.
11  Q.  In the IFU and specifically go to the bottom of
12  Page 4.
13  A.  Okay, Page 4, yes.
14  Q.  Okay.  And first of all, do you see on Page 4
15  where it says in the middle of the page, it says
16  Recovery Cone Removal System and insertion, insertion
17  and delivery?
18  A.  Yes, in the middle, No. 11 is the next number.
19  Q.  Okay.  And then if you go down a little bit
20  below -- before that -- below that, towards almost
21  the bottom of the page, it says, "Guidewire assisted
22  technique"; do you see that?
23  A.  I see those words.
24  Q.  And it -- under, below it it says use of a
25  guidewire, if it is difficult to align the cone with

Page 191

1  the G2 filter -- with the G2 filter tip, a guidewire
2  may be used to facilitate advancement of the cone
3  over the filter tip?
4  A.  I see those words, guidewire assisted technique
5  may be used.
6  Q.  Okay.  Thank you.  That's all I have.
7      FURTHER REDIRECT EXAMINATION
8  BY MR. ARBON:
9  Q.  That technique didn't work for you, did it?
10  A.  You know, I actually didn't try that -- oh, you
11  mean -- I thought you meant the loop technique.  I
12  only positioned the guidewire next to the filter and
13  the cone following the guidewire, did not engage the
14  tip.
15          MR. ARBON:  I'll pass the witness.
16          MS. HELM:  No further questions.
17  A.  So I'm not sure what the guidewire assisted
18  means.
19          MR. NOVOTNY:  Doctor, you have a
20  right to review the videotape.  You can waive
21  that right, is that okay?
22          THE WITNESS:  Yes.
23          MR. NOVOTNY:  You have the right
24  to review the typed up transcript of your
25  testimony, make changes or you can waive that

Page 192

1  right.  Is that okay if you waive it?  I
2  recommend it.
3          THE WITNESS:  I go with your
4  recommendation.  It would be nice to have a copy
5  though.
6          VIDEOGRAPHER:  This concludes the
7  deposition of Dr. Shanon Smith, M.D. on
8  April 4th, 2017 at 1822.
9          (Concluded at 6:22 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 193

1      C E R T I F I C A T E
2
3      I, Christine M. Salerno, RPR, do hereby certify
4  that the within and following complete transcript
5  contains all the evidence requested to be transcribed
6  by me, from the proceedings had in or at the trial of
7  the foregoing cause in said court; and that said
8  complete transcript is a correct and complete
9  transcription of the evidence requested to be
10  transcribed from the record made at the time of said
11  proceedings or trial.
12      Dated this        day of           , 2017.
13
14
15      _____
16      Christine M. Salerno, RPR
17
18
19
20
21
22
23
24
25