# REDACTED DOCUMENTS RELATED TO DOCKET 7294

**Defendants' Motion and Incorporated Memorandum
to Exclude the Opinions of David Garcia, M.D. and
Michael Streiff, M.D. and Memorandum of Law
in Support – Filed Redacted**

**Exhibit B – Filed Redacted**

**Exhibit D – Filed Redacted**

# REDACTED DOCUMENTS RELATED TO DOCKET 7294

**Defendants' Motion and Incorporated Memorandum
to Exclude the Opinions of David Garcia, M.D. and
Michael Streiff, M.D. and Memorandum of Law
in Support – Filed Redacted**

James R. Condo (#005867)
Amanda C. Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street, NW / Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000
Telephone: (404) 322-6050
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

*Attorneys for Defendants*
*C. R. Bard, Inc. and*
*Bard Peripheral Vascular, Inc.*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation | No. 2:15-MD-02641-DGC<br><br>**DEFENDANTS C. R. BARD, INC. AND BARD PERIPHERAL VASCULAR, INC.'S MOTION AND INCORPORATED MEMORANDUM TO EXCLUDE THE OPINIONS OF DAVID GARCIA, M.D. AND MICHAEL STREIFF, M.D. AND MEMORANDUM OF LAW IN SUPPORT**<br><br>(Assigned to the Honorable David G. Campbell)<br><br>**(Oral Argument Requested)** |

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

**MOTION**

Pursuant to Federal Rule of Evidence 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively "Bard") respectfully move this Court to exclude certain opinions of Plaintiffs' expert witnesses, David Garcia, M.D. and Michael Streiff, M.D.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    BACKGROUND**

The plaintiffs' hematology experts, Dr. David Garcia, and Dr. Michael Streiff (collectively the "Doctors"), offer three categories of opinions that should be excluded. First, the Doctors submitted an addendum to their report which merely regurgitates Dr. Kessler's findings. They have no expertise in any of the topics in Dr. Kessler's voluminous report, and did no independent analysis of Dr. Kessler's conclusions. Second, the Doctors opine on physician expectations and what Bard should have, and failed to, disclose to physicians. *See* Report, attached as Exhibit A (the "Report"), at pp. 6-7. However, the Doctors do not have any expertise in implanting or removing IVC filters, developing warning labels, or corporate conduct or ethics, and testified that they largely based these opinions on Dr. Kessler's report. And, these opinions should be excluded because the only relevant inquiry is whether the physician who implanted the filter in each specific plaintiff was adequately warned. Lastly, Dr. Garcia's case-specific opinions for Plaintiff Doris Jones should be excluded in their entirety because they lack reliable methodology. *See* Jones Report, attached as Exhibit B. Accordingly, Bard moves to exclude these opinions under Rule 702 and the standards set forth in *Daubert* and its progeny.

**II.    ARGUMENT AND CITATION OF AUTHORITY**

**A.    "Opinions" Regurgitating Dr. Kessler's Report Should Be Excluded.**

As Judge Posner explained in *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002):

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

> [t]he Daubert test must be applied with due regard for the specialization of modern science. A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science. A theoretical economist, however able, would not be allowed to testify to the findings of an econometric study conducted by another economist if he lacked expertise in econometrics and the study raised questions that only an econometrician could answer. If it were apparent that the study was not cut and dried, the author would have to testify; he could not hide behind the theoretician.

*Id.* at 614. *See also Turner v. Burlington N. Santa Fe R. Co.*, 338 F.3d 1058, 1062 (9th Cir. 2003) (affirming the exclusion of an expert's testimony because he "intended to use [a second expert's findings] as substantive evidence of his ultimate conclusions," because the second expert's findings were not the "type reasonably relied on by experts in the particular field" and the "probative value of this otherwise inadmissible evidence d[id] not outweigh its prejudicial effect").

Here, the Doctors provide an addendum to their expert report paraphrasing Dr. Kessler's report. (*See* Ex. A, Rep., at pp. 8-9.) The Doctors claim that their review of Dr. Kessler's report (and Dr. Betensky's analysis contained in Dr. Kessler's report) somehow corroborates or bolsters their own medical opinions. However, aside from merely repeating Dr. Kessler's conclusions and providing an avenue for duplicative testimony, the Doctors fall well short of all Rule 702 and *Daubert* requirements. Dr. Streiff spent less than five hours reviewing Dr. Kessler's 270-page, 707-paragraph report, and 448 pages of schedules. (July 17, 2017, Deposition of Dr. Michael Streiff ("Streiff Dep."), attached as Exhibit C, at 295:13-17.) Dr. Garcia spent about 25 to 30 hours total working on this litigation, although he could not estimate specifically what portion of that was spent with Dr. Kessler's materials. (June 21, 2017, Deposition of Dr. David Garcia ("Garcia Dep."), attached as Exhibit D, at 33:9-22.) When asked if he read Dr. Kessler's report in its entirety, Dr. Garcia could only respond "[a]t some level, I've read it in its entirety…I would say there were some pages I read much less closely than others, but I've looked at the text of every page in some form or fashion." (Ex. D, Garcia Dep. 204:-20.) The Doctors never spoke with Dr. Kessler. (Ex. C, Streiff Dep. 302:10-12; Ex. D, Garcia Dep. 209:24-25.) And they did not contribute to, change,

or modify any of Dr. Kessler's findings. (Ex. D, Garcia Dep. at 210:7-15.) The Doctors do not "say anything in [their] addendum about Dr. Kessler's findings that he himself doesn't say in his own report." (Ex. D, Garcia Dep. at 211:3-6.) Dr. Garcia agreed that "in drafting [the] addendum and kind of essentially regurgitating what Dr. Kessler found in his report, [the Doctors] attempt[ed] to be as accurate as possible in describing Dr. Kessler's findings." (Ex. D, Garcia Dep. 210:1-5.) Dr. Streiff agreed that they did not attempt to modify Dr. Kessler's finding in any way, testified that "[w]e read through the report and kind of pulled these right [] out of his report," and described their incorporation of Dr. Kessler's report as merely "a summary of what we read in the, in his, his report." (Ex. C, Streiff Dep. 302:15 – 304:5.)

Moreover, the Doctors admittedly lack the expertise to opine on the same material contained in Dr. Kessler's report, and do not rely on litigation-driven expert reports, or even the underlying corporate documents, in their medical practice. The Doctors are not experts in designing, engineering, testing, manufacturing, or marketing IVC filters, and are not experts in corporate ethics, FDA compliance, post-market surveillance, or reviewing internal medical device company documents (which they have never reviewed before this litigation). (Ex. C, Streiff Dep. 98:13 – 101:24; Ex. D, Garcia Dep. 83:16 – 85:12.) Dr. Garcia further explained that "I relied on Dr. Kessler's assessment of a very large body of information that I'm not, you know, familiar with or – or used to looking at and considered him – him and his conclusions to be reliable. And that – that's the basis of what I've written here." (Ex. D, Garcia Dep. 207:20 – 208:8.) The Doctors did not independently verify Dr. Kessler's methodology or review or assess any of the underlying documents or data. (Ex. C, Streiff Dep. 283:7 – 284:4; 307:6-24; 307:25 – 308:11; Ex. D, Garcia Dep. 212:8 – 213:6.) As a result, all opinions the Doctors offer based on Dr. Kessler's report should be excluded.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

**B.    The Court Should Exclude Opinions On Physician Expectations and Corporate Conduct.**

First, the opinions contained in the Doctors' "Physician Expectations" section of their report should be excluded because they are also based on Dr. Kessler's report. (*See* Ex. A, Rep. at pp. 6-7 (opining that "in order for physicians to make reasonable risk-benefit assessments regarding filters, it is critically important that manufacturers of IVC filters continuously apprise the clinicians who order and implant IVC filters about their safety profile, performance characteristics, design problems, and internal risk assessments," and that "Bard's complete transparency about the safety profile of its IVC filters is paramount"); Ex. C, Streiff Dep. 274:23 – 277:5 (testifying that "by the time we got to [the "Physician Expectations" section], we had seen the Kessler report, and we added that in there. So I think that's, that came, it came from I guess both David [Garcia] and I's reviewing of the Kessler report…And then we went on further to make…an addendum on, that goes into, more in detail about that report, or at least several points from it"); Ex. D, Garcia Dep. 192:22 – 194:10; 196:11 – 198:11; 201:4 – 202:25 (testifying that statements in this section were based on Dr. Kessler's report).) Moreover, the Doctors provide no explanation of how Dr. Kessler's conclusions, which purport to be regulatory in nature, relate to their medical opinions. Dr. Garcia testified that he simply agreed with Dr. Kessler's and Dr. Betensky's analysis, and that "I guess one way you could say is that, assuming their analysis is true, it just strengthens the conclusions of my report" because "the information stated in this addendum only further highlights the risks of IVC filters, beyond what I could have done using publicly available peer reviewed information that's cited in my report." (Ex. D, Garcia Dep. 217:12-25.)

Second, the Doctors are not qualified to opine on what is required of manufacturers to warn physicians who implant IVC filters. The Doctors do not have any expertise in implanting or removing IVC filters, developing warning labels, or corporate conduct or ethics, and testified that they largely based these opinions on their brief review of Dr. Kessler's report. The Doctors have never placed or removed an IVC filter. (Ex. C,

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Streiff Dep. 97:25 – 98:2; Ex. D, Garcia Dep. 52:24 – 53:2.) Dr. Garcia admitted that he does not make the ultimate decision of whether a patient should receive a filter, but is sometimes part of the decision-making process with other physicians. (Ex. D, Garcia Dep. 54:7-18.) He does not have any role in deciding what brand filter to place. (Ex. D, Garcia Dep. 56:8-16.) Similarly, Dr. Streiff makes recommendations in consultation with other physicians, does not place filters himself, and stated "I defer to my colleagues in [interventional radiology] what, you know, what filter they use…whether they use permanents or an optional filter." (Ex. C, Streiff Dep. 133:22 – 134:20.) And, the Doctors have no experience developing device labeling or warnings that would otherwise allow them to opine on what physicians should expect regarding the risks or warnings of IVC filters. (Ex. C, Streiff Dep. 101:23 – 102:9; Ex. D, Garcia Dep. 86:5-12.)

Finally, the Doctors' personal speculation on what physicians expect regarding IVC filters is irrelevant and does not fit the facts of this case. The only relevant inquiry for the plaintiffs' failure to warn claim is whether their implanting physicians were adequately warned under their respective jurisdictions' laws. *Cloud v. Pfizer, Inc.*, 198 F. Supp. 2d 1118, 1130 (D. Ariz. 2001) ("The trial court 'must ensure that the proposed expert testimony is relevant to the task at hand,…i.e., that it logically advances a material aspect of the proposing party's case.'") (*quoting Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir.1995)).

**C.    Dr. Garcia Did Not Use Reliable Methodology or Analysis for Jones-Specific Opinions.**

███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████,

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23  .

24  **III.    CONCLUSION**

25      The Doctors' opinions based on their brief review of Dr. Kessler's report, including

26  their opinions regarding physician expectations, are not only inadmissible under Rule 702,

27  but are also unhelpful and unreliable under *Daubert*. And, Dr. Garcia's opinions in

28

1   Plaintiff Jones' case lack any scientific support or methodology. Accordingly, these

2   opinions should be excluded in their entirety.

3       DATED this 24th day of August, 2017.

4                                           s/Richard B. North, Jr.
                                            Richard B. North, Jr.
5                                           Georgia Bar No. 545599
                                            Matthew B. Lerner
6                                           Georgia Bar No. 446986
                                            NELSON MULLINS RILEY & SCARBOROUGH, LLP
7                                           Atlantic Station
                                            201 17th Street, NW / Suite 1700
8                                           Atlanta, GA  30363
                                            PH: (404) 322-6000
9                                           FX: (404) 322-6050
                                            richard.north@nelsonmullins.com
10                                          matthew.lerner@nelsonmullins.com

11                                          James R. Condo (#005867)
                                            Amanda Sheridan (#005867)
12                                          SNELL & WILMER L.L.P.
                                            One Arizona Center
13                                          400 E. Van Buren
                                            Phoenix, AZ 85004-2204
14                                          PH: (602) 382-6000
                                            JCondo@swlaw.com
15                                          ASheridan@swlaw.com

16                                          **Attorneys for Defendants C. R. Bard, Inc. and
                                            Bard Peripheral Vascular, Inc.**

17

18

19

20

21

22

23

24

25

26

27

28

*Nelson Mullins Riley & Scarborough*
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

- 8 -

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **CERTIFICATE OF SERVICE**

I hereby certify that August 24, 2017, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

s/Richard B. North, Jr.
Richard B. North, Jr.

# REDACTED DOCUMENTS RELATED TO DOCKET 7294

## Exhibit B – Filed Redacted



*Department of Medicine*

*Division of Hematology*

Mark O'Connor / Shareholder
mark.oconnor@gknet.com / 602-530-8377
Gallagher & Kennedy, P.A.
2575 E. Camelback Road
Phoenix, Arizona 85016

June 5, 2017

Dear Mr. O'Connor:

At your request, ████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████ .

It is my opinion ████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████

In a ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████ .
████████████████████████████████████ .

Page 2

I therefore also hold the opinion that ███████████████████████████████████████
█████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████████
████████████████████

Along with my previously submitted general report I provided a copy of my CV and fee schedule, which have not changed.

My opinions are given to a reasonable degree of medical certainty and probability.

David A. Garcia, MD
Professor, Division of Hematology

# REDACTED DOCUMENTS RELATED TO DOCKET 7294

## Exhibit D – Filed Redacted

# Exhibit D



Deposition of:

# David Garcia , M.D.

*June 21, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

David Garcia , M.D.                          June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 10

1     some discussion, which included counsel, that let us to

2     think it -- it might be instructive to include a

3     particular quote from that deposition in our report.

4           Q.   Okay.  Outside from reading Dr. -- I mean,

5     Mr. Ganser's deposition, you haven't read any other fact

6     witness depositions?

7           A.   Not that I recall --

8           Q.   Okay.

9           A.   -- at the moment.

10          Q.   And you haven't read any expert depositions?

11          A.   No.

12          Q.   Okay.  All right.  Have you reviewed any

13    medical records?

14          A.   Yes, I've reviewed the records of -- of

15    Ms. Jones, at least the ones that were provided to me by

16    plaintiff counsel.

17          Q.   Okay.  Do you have a copy of those records?

18          A.   Electronically, I do --

19          Q.   Okay.

20          A.   -- yeah.

21               MR. LERNER:  Joe, can you make those

22    available, the records for Ms. Jones?

23               MR. JOHNSON:  Yes.

24          Q.   (By Mr. Lerner)  Do you know -- did you

25    receive the entirety of the records, or do you know?

David Garcia , M.D.                                June 21, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 33

1         A.   We met from nine till about three, so
2    six hours.
3         Q.   And did you charge just for six hours, or
4    you're charging for the entire day?
5         A.   I'm going to just charge for six hours, but I
6    also did a little bit of prep time last night and early
7    this morning -- probably another couple of hours worth
8    that I'll charge for.
9         Q.   Okay.  So outside of your prep work with
10   counsel for the deposition, we're still looking at about
11   25-30 hours total time for you to submit your report?
12        A.   Yes.
13        Q.   And does that include the amount of time you
14   spent on the Jones case?
15        A.   Yes, mm-hmm.
16        Q.   Okay.  As far as how you spend your time for
17   those 30 hours, you don't have a breakdown of those --
18   that time?
19        A.   No.  I mean, if what you mean by that is, did
20   I submit this number of hours reading materials and this
21   number of hours talking to lawyers and this number of --
22   no.
23        Q.   Okay.  So how do you track your time then, in
24   order to submit your time?
25        A.   I use an app on my phone called Gleeo Time

David Garcia , M.D.                    June 21, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 52

1     University of Washington in 2012, had you ever taught

2     any classes specific to IVC filters?

3          A.   Not that I can think of.  I mean, I've

4     certainly given presentations about the general

5     treatment and prevention of venous thrombosis, which

6     would have often included some mention of IVC filters.

7          Q.   Okay.  And when you were at these various

8     academic institutions, where you were either an

9     instructor or a professor, did you teach class -- actual

10    classes?

11         A.   Yes.

12         Q.   Okay.  And then you also had hands-on training

13    with the residents --

14         A.   Yes.

15         Q.   -- and fellows?  Okay.

16         A.   Both.

17         Q.   Did you ever train any of your residents or

18    fellows in IVC filter -- or about IVC filters?

19         A.   Yes, I would say that I frequently talk to

20    trainees of all levels about IVC filters and the -- the

21    clinical circumstances in which they're, you know,

22    contemplated and -- and we talk about the risks and

23    benefits associated.

24         Q.   Have you ever placed an IVC filter?

25         A.   No.

David Garcia , M.D.                                    June 21, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 53

1          Q.    Okay.  And you've never removed an IVC filter?

2          A.    Neither one.

3          Q.    Okay.  And the focus of your scholarship has

4     primarily been on what?

5                If someone were to ask you -- "This is the

6     area that I focus in" -- what would you say?

7          A.    I usually answer -- laypeople -- that blood

8     clots and blood thinners.

9          Q.    Okay.  And because -- that you treat people

10    that sometimes have blood clotting disorders, sometimes

11    you interact with people that may need -- may need to be

12    treated with IVC filters?

13               MR. JOHNSON:  Form.

14         A.    I would say that, very rarely, there are

15    situations where I have recommended an IVC filter.

16         Q.    (By Mr. Lerner)  Okay.  Do you still recommend

17    IVC filters today?

18         A.    I recommended one just last month.

19         Q.    Okay.  And what was the situation for that?

20         A.    A patient who suffered pulmonary embolism, and

21    shortly after that suffered intracranial bleeding while

22    on anticoagulant therapy.  And I considered that the

23    risk of continuing anticoagulation in that patient was

24    prohibitive.

25               And the risk of additional thrombosis was high

David Garcia , M.D.                         June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 54

1     enough that, although I have serious doubts about the

2     magnitude of the benefits of filters, I felt that --

3     that the possibility that the filter could be beneficial

4     to that patient outweighed its various risks.  But we

5     had a long discussion with her and her family about

6     that.

7          Q.   Okay.  And then tell me about that a little

8     more.  When you are involved in the decision -- you are

9     involved in the decision for patients about whether to

10    recommend or not an IVC filter?

11         A.   Very often.

12         Q.   Okay.  But you're often, I would imagine,

13    talking to other physicians who are also part of that

14    decision-making process?

15         A.    I would say so.  Although because of my

16    background and expertise -- at least in my own

17    institution -- I would say there's a lot of deference to

18    my opinion.

19         Q.   Okay.  Do you have any protocols in place at

20    your institution about the placement of IVC filters?

21         A.   I don't know of any, no.

22         Q.   Okay.

23         A.   Any written protocol, no.

24         Q.   And there are IVC filters that to this day are

25    being placed in your facility --

Veritext Legal Solutions

David Garcia , M.D.                                   June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 56

1          A.    My -- my -- my default, in the rare instances

2     where I would recommend a filter, would be to recommend

3     one that could be retrieved.

4          Q.    (By Mr. Lerner)  Okay.  And then what was the

5     filter that you recommended a couple of months ago or

6     last month?

7          A.    I don't know.

8          Q.    Okay.  So as far as what the brand or model

9     filter that's actually used, do you make that decision

10    or the doctor -- like the interventional radiologist who

11    actually placed the filters, do they make that decision?

12         A.    The interventional radiologist makes it.

13         Q.    Have you ever been part of a decision-making

14    process for the brand or model of filter that's going to

15    be used?

16         A.    No.

17         Q.    Okay.  You defer that to the people that are

18    actually placing the filters?

19         A.    That's right.

20         Q.    Okay.  And in your institution, who are those

21    folks that actually place the filters?

22         A.    Interventional radiology.

23         Q.    Okay.  Do they place IVC filters, to your

24    knowledge, without consulting with you?

25         A.    Well, they don't -- yes, but they -- they

David Garcia , M.D.                               June 21, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 83

1          Q.    You're used to 12-hour days, 15-hour days, so

2     that's no big deal.  All right.  I want to talk a little

3     about your qualifications.  You're a hematologist, and

4     you talked about that.  In lay terms, can you explain

5     that again?

6          A.    Sure.  I take care of patients with blood

7     disorders in general.  I've been trained to take care of

8     a variety of blood disorders, including blood cancers,

9     abnormal blood counts, abnormal amounts of iron in the

10    body.

11              But -- but my practice is certainly -- even

12    from before I was a board certified hematologist and

13    certainly including after my practice -- is focused on

14    patients either with or at risk for thromboembolic

15    disease.

16         Q.    Okay.  I want to ask you a few questions, but

17    I think the answer is going to be no too.  But I just

18    want to make sure.  You would agree that -- do you have

19    any engineering background?

20         A.    No.

21         Q.    Okay.  So, you're not a -- you're not offering

22    yourself as an expert in design or engineering

23    principles?

24         A.    No.

25         Q.    Okay.  And you're not an expert in bench

David Garcia , M.D.                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 84

1     testing?

2          A.   No.

3          Q.   Okay.  You're not an expert in the manufacture

4     of IVC filters?

5          A.   No.

6          Q.   You have no experience marketing IVC filters?

7          A.   No.

8          Q.   You have no education or training regarding

9     corporate -- corporate ethics?

10         A.   No.

11         Q.   Okay.  And then you're not an expert in

12    summarizing medical device company documents?

13              MR. JOHNSON:  Form objection.

14         A.   I -- I would -- I've never thought of myself

15    as an expert in summarizing medical device company

16    documents.

17         Q.   (By Mr. Lerner)  That's not something you

18    routinely do, is review internal company documents as

19    part of your clinical practice?

20              MR. JOHNSON:  Form.

21         A.   No, I would say not.

22         Q.   (By Mr. Lerner)  I mean, have you ever done

23    that -- reviewed internal company documents -- to make

24    decisions as part of your clinical practice?

25         A.   Prior to this litigation, I -- I have never

David Garcia , M.D.                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 85

1      had occasion to -- to do that or the opportunity to do

2      that.

3              Q.    Okay.  And then you're not an FDA expert,

4      right?

5              A.    No.

6              Q.    You're not holding yourself as an FDA expert?

7              A.    I don't consider myself an FDA expert, no.

8              Q.    Or an expert in regulatory compliance?

9              A.    No.

10             Q.    And you've never worked in post market

11     surveillance in any company?

12             A.    No.

13             Q.    Have you ever been on any boards with any

14     companies?

15             A.    Well, I've served on advisory boards, which

16     are usually constituted as a one-time event -- involve

17     so-called key opinion leaders, spending a day somewhere.

18     The company presents some data about a product; says,

19     "We'd like to get your opinions on strengths and

20     weaknesses of our product."

21             Q.    Okay.

22             A.    So if you consider that -- I -- I have served

23     on that sort of board, but I've never been on a -- on a

24     board of a company that meets with any regularity.

25             Q.    Okay.  And for those times, where you've kind

David Garcia , M.D.                          June 21, 2017
In Re: Bard IVC Filters Products Liability

                                                        Page 86

1      of reviewed or provided your -- your background and

2      information about the benefits of a product, has that

3      ever involved IVC filters?

4           A.    No.

5           Q.    Okay.  And you've never developed warnings for

6      products?

7           A.    No.

8           Q.    Never developed any warnings for IVC products?

9           A.    No.

10          Q.    So, you wouldn't consider yourself a warning

11     expert?

12          A.    No.

13          Q.    Okay.  All right.  I want to talk a little bit

14     more about deep vein thrombosis and pulmonary embolism.

15               Can you describe the difference between deep

16     vein thrombosis, DVT, and a pulmonary embolism?

17          A.    Sure.  We think of deep vein thrombosis and

18     pulmonary embolism, first of all, as being part of the

19     same spectrum of the disease.  Deep vein thrombosis

20     refers to the formation of blood clots in deep or large

21     vessels.

22               Most commonly, these are located in the legs,

23     although such clots can form elsewhere in other deep

24     veins.  Typical symptoms are pain, swelling.  Some

25     patients compare it to a charley horse or muscle cramp.

David Garcia , M.D.                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 192

1    the relative safety or efficacy could be made based on

2    those observational studies?

3              MR. JOHNSON:   Form.

4         A.   Because as I said -- as I said earlier,

5    observational studies cannot be relied on to determine

6    relative efficacy or safety between two treatment

7    options.

8              But in this case, what -- I'm merely -- I'm

9    merely gleaning from the observational studies that if

10   you put an IVC filter in 100 people, about five of them

11   will have thrombosed their vena cava over the next one

12   to two years.

13             I can tell you, from taking care of patients

14   for 20 years and again from other published literature,

15   that event -- IVC thrombosis -- almost never occurs in

16   the absence of an IVC filter.

17             So, I'm very comfortable in that particular

18   instance concluding from the observational cohort study

19   that there -- that this risk is attributable to IVC

20   filters.  And I have a pretty good idea of what the

21   magnitude of the risk is.

22        Q.   (By Mr. Lerner)  Okay.  All right.  Let's go

23   down to the next paragraph here.  You say that, "Thus,

24   in order for physicians to make reasonable risk-benefit

25   assessments regarding filters, it's critically important

David Garcia , M.D.                           June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 193

1     that manufacturers of IVC filters continuously apprise

2     the clinicians who order and implant IVC filters about

3     their safety profile, performance characteristics,

4     design problems, and internal risk assessments."

5           So, what are you saying there?

6           A.   Well, I mean, I think this is a -- a statement

7     that could apply to the manufacturer of any device or

8     medication that's going to be prescribed or deployed by

9     a -- by a treating physician.  But it's perhaps --

10          I think we wanted to emphasize it here,

11    because when you have an intervention -- the benefit or

12    efficacy of which is highly questionable or poorly

13    established -- ensuring that the doctors who are

14    choosing to use it know as much detail as possible about

15    its risks, has heightened importance.

16          Q.   What does that mean in practical terms?  Are

17    you suggesting that every time there's an adverse event

18    with a medical device, that the manufacturer should be

19    reporting that to every physician that uses the device?

20          A.   No.  I'm not trying to suggest an unreasonable

21    burden on any corporation.  But I think -- but I do

22    think that -- I think there's -- I do think there's a

23    strong requirement that --

24          I guess, I think that a company should have a

25    perhaps even lower than average threshold to track and

David Garcia , M.D.                          June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 194

1     report risk when a -- when a device or intervention has

2     poorly established or -- or unestablished benefit.

3          Q.   Are you familiar with the FDA regulations

4     about what information can and cannot be provided to

5     physicians by manufacturers?

6          A.   I'm not.

7               MR. JOHNSON:  Form.

8          Q.   (By Mr. Lerner)  And you wouldn't want

9     manufacturers providing unreliable information, correct?

10         A.   No, I wouldn't.

11              MR. JOHNSON:  Form.

12         Q.   (By Mr. Lerner)  And you wouldn't want

13    manufacturers to be providing incomplete information?

14              MR. JOHNSON:  Form.

15         A.   Well, I think -- I mean, I think that the

16    challenge there is -- who's making the judge to whether

17    it's complete or incomplete and -- and what context it's

18    being provided.

19              I certainly wouldn't want a manufacturer to be

20    providing information that would mislead a physician in

21    either direction, over- or underestimating the risk.

22         Q.   (By Mr. Lerner)  Yeah.  You want manufacturers

23    providing you with reliable scientific information,

24    correct?

25              MR. JOHNSON:  Form.

David Garcia , M.D.                           June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 196

1     judgment.

2          Q.   (By Mr. Lerner)   Is there any other

3     manufacturer, that you're aware of, that's providing you

4     the information that you say should be provided by

5     manufacturers?

6          A.   Well, I can't think of one.  But, I mean, I

7     also can't think of a -- of an intervention or a device

8     that is so widely used, at least in my sphere of

9     practice, with so little high-quality evidence for its

10    benefit.

11         Q.   What do you mean here when you say that

12    companies should be providing internal risk assessments?

13    What does that mean?

14         A.   Well, the -- I think what -- what we intended

15    to say there with Dr. Streiff is that if a company makes

16    an internal -- what's originally an internal

17    determination that a device or product is associated

18    with a particular risk that has not been publicly

19    disclosed, then -- then they need to publicly disclose

20    it -- I mean, whether it's to regulators or to

21    practicing physicians.  But somebody needs to know about

22    it.

23         Q.   In the next sentence you say, "In addition,

24    filter manufacturers have a key obligation to report the

25    experiences of other physicians who have reported

David Garcia , M.D.                        June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 197

1    serious complications, as well as any available relevant

2    inter-device comparisons or emerging studies that

3    compare IVC filter implantation to other management

4    strategies."

5           Let's break that down.  First, you say,

6    "filter manufacturers have a key obligation to report

7    the experience of -- experiences of other physicians who

8    have reported serious complications."  What do you --

9    what do you base that on?

10        A.   Well --

11             MR. JOHNSON:  And I'm going to ask that you

12   read the next sentence, because I think they -- they do

13   go hand in hand.

14             MR. LERNER:  I'm going to -- you can redirect,

15   if you want to.

16             MR. JOHNSON:  I just don't want you to take

17   his sentence out of context, because it goes on to say,

18   "In other words ..."

19        A.   Well, I mean, what I would say is the -- a

20   physi -- an individual physician, maybe in talking to --

21   even in talking to his or her colleagues, has very

22   limited bandwidth to assess the risks of -- of a device

23   or even a therapy.

24             And a company or manufacturer is a ware -- is

25   a warehouse, a clearinghouse, that is set up to

David Garcia , M.D.                                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 198

1    potentially receive, you know, all or many reports of

2    complications from a much wider scope of observation, if

3    you will.

4              And if a company is getting reports from far

5    and wide of complications -- which are maybe happening

6    infrequently at any given institution, but with some

7    frequency in the world at large -- they're the only

8    entity that has the ability to provide that perspective

9    to an individual physician, who is him or herself just

10   only able to focus on what's going on in their immediate

11   surroundings.

12        Q.   (By Mr. Lerner)  Are you aware that reports of

13   complications are reported to the MAUDE database?

14        A.   I'm aware of the MAUDE database.  But I

15   believe that experts like Dr. Kessler and others, who

16   are much more familiar with regulatory history than I

17   am, believe or have evidence to think that there's

18   underreporting when it comes to the MAUDE database.

19        Q.   But individual adverse events themselves, like

20   case reports, they're on the lowest end of the spectrum

21   of the hierarchy of scientific evidence, correct?

22        A.   That is true.  In isolation, a case report is

23   at the lowest end.

24        Q.   I mean, even if not -- not in isolation, if

25   you have various adverse events, spontaneous reports,

David Garcia , M.D.                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 201

1    information that pharmaceutical medical device companies

2    under FDA regulation can provide to the public?

3         A.   No.

4         Q.   Okay.  Let me ask you this next question.  So,

5    the last paragraph here -- well, second-to-last

6    sentence -- you say, "In other words, in order for

7    physicians (and ultimately patients) to properly assess

8    the risks versus the benefits of IVC filters (along with

9    other available therapies), it is our opinion that

10   Bard's complete transparency about the safety profile of

11   its IVC filters is paramount."

12        What was the purpose of adding that statement

13   to your report?

14        A.   I think it's just clarifying the -- the prior

15   statement in -- in that -- again, if you -- I think I

16   said this earlier, but I'm going to resay it.

17        When you have an intervention for which the

18   efficacy is poorly established or not established, the

19   importance of notifying physicians about any possible

20   risk or safety concern associated with that intervention

21   becomes even higher than -- than treatments, where at

22   least we know there's -- there is some well-documented

23   benefit.

24        Q.   Let's continue with the last sentence here.

25   "We share the sentiments of Bard's former director of

David Garcia , M.D.                                June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 202

1     regulatory affairs that:  'Transparency in matters that

2     affect patient safety should be embraced as a primary

3     corporate obligation.'"

4           So you read the one deposition of Chris

5     Ganser, and you --

6           A.   Right.

7           Q.   -- you decided on your own to add this one

8     sentence here to your report?

9           A.   I mean, I decided in -- in conjunction with

10    Dr. Streiff, in the various back-and-forth discussions

11    we had, yeah.

12          Q.   So, are you implying here that somehow -- that

13    Bard has not been transparent about the safety profile

14    of its IVC filters?

15          A.   Well, I think the -- I mean, I don't consider

16    that to be the principal opinions in -- that I have in

17    this matter, but I -- but I am concerned by some of the

18    things that I've been shown by plaintiff counsel.

19          I mean, just -- and if you -- I can cite a

20    couple of examples, but -- but, yeah, I do have some

21    concern that Bard is not completely transparent.

22          Q.   Okay.  And the reason why you have that

23    concern, is it based on the Dr. Kessler report that you

24    reviewed?

25          A.   That's a big part of it, yep.

David Garcia , M.D.                    June 21, 2017
In Re: Bard IVC Filters Products Liability

                                              Page 204

1              (Exhibit-11 marked for identification.)

2              MR. JOHNSON:  I don't need one, Matthew.

3              MR. LERNER:  I figure you have the copy of the

4      report in front of you.

5              MR. JOHNSON:  I do.

6         Q.   (By Mr. Lerner)  All right.  So you have a

7      copy of Exhibit-11, which is your addendum?

8         A.   I do.

9         Q.   Okay.  Did you read Dr. Kessler's report?

10        A.   I've read it, yes.

11        Q.   Did you read it in its entirety?

12        A.   At some level, I've read it in its entirety.

13        Q.   How many pages is that report, do you recall?

14        A.   In the hundreds.

15        Q.   And you read all those pages in detail?

16        A.   I would say there were some pages I read much

17     less closely than others, but --

18        Q.   Okay.

19        A.   -- I've looked at the text of every page in

20     some form or fashion.

21        Q.   And what was the reason why you read his

22     report?

23        A.   Because, as I recall -- again in discussions

24     with counsel and Dr. Streiff, we -- it was felt that it

25     would provide important background information.

David Garcia , M.D.                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 207

 1          A.   That sounds familiar, but I can't remember
 2     why.
 3          Q.   Do you recall reviewing his expert report in
 4     this case?
 5          A.   I don't think I reviewed a --
 6          Q.   And you --
 7          A.   -- regulatory report.
 8          Q.   -- didn't review his deposition either?
 9          A.   No.
10          Q.   Did you read the expert report of Dr. Ronald
11     Thisted?
12          A.   No.
13          Q.   Do you know who he is?
14          A.   No.
15          Q.   Do you think it's appropriate to only consider
16     one party's position in developing their opinion?
17               MR. JOHNSON:  Form.
18          A.   I mean, I guess -- I guess I do, because I --
19     I did that, so --
20          Q.   (By Mr. Lerner)  Well, just because you did
21     it, doesn't mean you have to agree to it.  Do you think
22     that is appropriate?
23               I mean, you're an evidence-based physician.
24     You've told me that throughout this deposition today.
25     So, is it appropriate for you -- who pride yourself on

Page 208

1     being evidence-based -- to rely on the opinions of a

2     single expert who is a paid advocate for the plaintiffs?

3                MR. JOHNSON:   Form.

4         A.   Well, I relied on Dr. Kessler's assessment of

5     a very large body of information that I'm not, you know,

6     familiar with or -- or used to looking at and considered

7     him -- him and his conclusions to be reliable.  And

8     that -- that's the basis of what I've written here.

9         Q.   (By Mr. Lerner)  Okay.  But, again, do you

10    think that it's appropriate for you to consider the

11    opinions of only one side of the story?

12               MR. JOHNSON:   Form.

13        A.   Well, I mean, I'm willing to look at other

14    representations and -- and consider them.

15        Q.   (By Mr. Lerner)  But you haven't done that --

16        A.   I have not as of today.

17        Q.   Right.

18        A.   Yeah.

19        Q.   And you're not an FDA expert, to begin with?

20        A.   I'm not.

21        Q.   And Dr. Kessler was offering regulatory

22    opinions?

23        A.   Correct.

24        Q.   Okay.  As a course of your work at the

25    university and part of your clinical practice, do you

Page 209

1    rely on litigation-driven expert reports to make -- to

2    form opinions?

3              MR. JOHNSON:  Form.

4         A.   No.

5         Q.   (By Mr. Lerner)  Have you ever done that?

6              MR. JOHNSON:  Form.

7         A.   No.

8         Q.   (By Mr. Lerner)  So, this is the first time --

9         A.   To -- to form opinions about patient care?

10        Q.   Right.

11        A.   No.

12        Q.   So, the first time you've ever done that --

13   regarding a litigation expert report to form opinions --

14   is in this litigation, correct?

15             MR. JOHNSON:  Form.

16        A.   As far as I can remember.

17        Q.   (By Mr. Lerner)  Yeah.  Your report is -- your

18   addendum -- Dr. Kessler's spoken to various sections,

19   correct?

20        A.   It is.

21        Q.   The addendum kind of references the finding of

22   Dr. Kessler, right?

23        A.   Right.

24        Q.   Have you ever spoken to Dr. Kessler?

25        A.   No.

David Garcia , M.D.                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 210

1        Q.    So in drafting your addendum and kind of

2    essentially regurgitating what Dr. Kessler found in his

3    report, did you attempt to be as accurate as possible in

4    describing Dr. Kessler's findings?

5        A.    I did.

6              MR. JOHNSON:   Form.

7        Q.    (By Mr. Lerner)  You didn't try to modify in

8    any way Dr. Kessler's findings?

9        A.    That was certainly not my intent, no.

10       Q.    (By Mr. Lerner)  And so you didn't change any

11   of the findings from Dr. Kessler's report, in part of

12   the --

13       A.    No.

14       Q.    -- addendum there?

15       A.    No.

16       Q.    So you included seven numbered paragraphs,

17   repeating what Dr. Kessler himself says in his own

18   report?

19       A.    Yes, because the -- while there's publicly

20   available evidence of IVC filter risks that you and I

21   have discussed earlier in today's deposition, this --

22   these elements of Dr. Kessler's report, I thought,

23   highlighted additional risks associated with the Bard

24   product in particular, that were not necessarily

25   publicly known about or available to practicing doctors

David Garcia , M.D.                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 211

1     and -- and -- but were relevant in the overall

2     risk/benefit discussion that -- that my report entailed.

3          Q.   Okay.  So you don't say anything in your

4     addendum about Dr. Kessler's findings, that he himself

5     doesn't say in his own report, true?

6          A.   Correct.

7          Q.   Okay.  In other words, you are repeating what

8     Dr. Kessler found, without changing anything?

9          A.   Essentially, yes, in the context of my

10    report -- or to add context to my report with

11    Dr. Streiff, yes.

12         Q.   But Dr. Kessler's findings do not factor into

13    your actual analysis in this report, true -- your whole

14    report that we just went through?

15         A.   Well, only -- only in that they -- only to the

16    extent that they provide additional information about

17    risk, which we haven't talked about much today.  But the

18    risks associated with IVC filters, yeah, because that's

19    a major subject of my report -- is risk benefit, yeah.

20         Q.   No one asked you, as part of your analysis, to

21    perform a regulatory analysis?

22         A.   No.

23         Q.   And it's not necessary for you to conduct any

24    kind of regulatory analysis to reach the opinions that

25    you set forth in your expert report; is that true?

David Garcia , M.D.                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 212

1          A.    True.

2          Q.    Yeah.  And you understand that Dr. Kessler

3     prepared this report for use in litigation?

4          A.    Yes.

5          Q.    Okay.  Can you describe the methodology that

6     Dr. Kessler employed in reaching his opinions?

7          A.    No.

8          Q.    Okay.  Did you independently verify

9     Dr. Kessler's methodology?

10         A.    Not in any great detail.  I mean, for example,

11    I've looked at the paper by Murray Ash and made sure

12    that my own assessment of that paper was consistent with

13    Dr. Kessler's.

14              And I read the report provided to

15    Dr. Kessler by Dr. Betensky regarding analysis of

16    adverse reports, just to generally make sure I shared

17    his conclusions.  But -- but beyond that, no.

18         Q.    Okay.  Have you reviewed any Bard FDA

19    submissions or correspondence?

20         A.    Not that I recall.

21         Q.    Did you independently review and assess the

22    reliability of the underlying data that Dr. Kessler

23    relied on?

24         A.    Not beyond what I just told you.

25         Q.    Okay.  Did you check or test any of the

David Garcia , M.D.                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 213

1      assumptions that Dr. Kessler made about the data that he

2      analyzed?

3           A.   No.

4           Q.   Did you verify the documents that Dr. Kessler

5      reviewed actually show what he says they show?

6           A.   Not beyond what I just told you.

7           Q.   Okay.  So you assumed, for purposes of your

8      report, that Dr. Kessler employed reliable methodology?

9           A.   Yes, I did make a lot of assumptions to that

10     effect.

11          Q.   And you assumed, for purposes of your report,

12     that Dr. Kessler utilized reliable underlying data?

13          A.   Yes.

14          Q.   Okay.  And, as we sit here today, you have no

15     independent information allowing you to vouch for the

16     reliability of Dr. Kessler's opinions?

17          A.   No, other than my independent review of the

18     Ash paper and the Betensky analysis that I just

19     mentioned.

20          Q.   Did you review the Dr. Betensky report?

21          A.   Not a report, no.  Only the --

22          Q.   Referenced by Dr. Kessler to Dr. Betensky?

23          A.   Well, no.  Among the materials that were sent

24     to me included -- I would call it more of an analysis

25     than a report, that Betensky did, looking at

David Garcia , M.D.                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 217

1       Q.   -- correct?

2            So you don't know if there are other facts or

3       data out there that Dr. Kessler or Dr. Betensky

4       admitted, that may affect whether you agree with their

5       opinions?

6       A.   No, I -- I don't.  But I would -- again, I

7       would just say that I considered this addendum about

8       Kessler's report to be information that strengthens the

9       rest of my report with Dr. Streiff.  But my report with

10      Dr. Streiff would still stand, even independent of all

11      this information.

12      Q.   So, you read Dr. Kessler's report.  You read

13      Dr. Betensky calculations.  You didn't perform any

14      independent analysis, but simply kind of agreed with

15      their analysis?

16      A.   Correct.  I guess one way you could say is

17      that, assuming their analysis is true, it just

18      strengthens the conclusions of my report.

19      Q.   Okay.  And how so?

20      A.   Because their -- the facts stated in -- or the

21      information stated in this addendum only further

22      highlights the risks of IVC filters, beyond what I could

23      have done using publicly available peer reviewed

24      information that's cited in my report -- the rest of my

25      report.

David Garcia , M.D.                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 220

1    list to us.

2              MR. JOHNSON:  I will.

3              MR. LERNER:  Okay.

4              MR. JOHNSON:  I will.  And I apol -- I mean, I

5    had intended to do that, and I apologize for that.

6         Q.   (By Mr. Lerner)  Did you review any imaging?

7         A.   No.

8         Q.   And I guess since you're not a radiologist,

9    would you be reviewing--

10        A.   No.

11        Q.   -- imaging?

12        A.   I mean, in fact, the plaintiff attorneys,

13   I'm -- I'm pretty sure, offered me the opportunity to do

14   so.  And I declined because I wouldn't have the

15   expertise.

16        Q.   Okay.  So, you wouldn't be qualified to review

17   imaging?

18        A.   No.

19        Q.   Okay.  That's what diagnostic radiologists do?

20        A.   Absolutely.

21        Q.   Okay.  Now, did you talk to any of the

22   plaintiffs' medical experts?

23        A.   No.

24        Q.   Okay.  Did you review any of the expert

25   reports of any available medical experts for Ms. Jones?

David Garcia , M.D.                         June 21, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 221

1          A.   No.

2          Q.   Okay.

3               MR. JOHNSON:  You mean beyond treaters'

4     records, the --

5               MR. LERNER:  Beyond the treater records.

6               MR. JOHNSON:  Yes.

7               MR. LERNER:  Actual retained experts by the

8     plaintiff.

9          A.   That's what I thought you meant.  And no.

10         Q.   (By Mr. Lerner)  Did you talk to Ms. Jones?

11         A.   No.

12         Q.   Okay.  Have you talked to any of Mrs. Jones's

13    physicians?

14         A.   No.

15         Q.   So in order to write this report for

16    Ms. Jones, am I right that you reviewed medical records?

17         A.   Yes.

18         Q.   Okay.  Is there any particular medical

19    literature that you relied upon in preparing your

20    report?

21         A.   No, other than -- again, I would go back to

22    PREPIC1, eight-year follow-up, and the evidence that an

23    IVC filter can induce the risk of thrombosis and a --

24    and a general knowledge that other published literature

25    suggest that to be the case.  I would -- I would say

David Garcia , M.D.                         June 21, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 222

1      there's no -- there's no specific evidence that I relied

2      upon for this report.



David Garcia , M.D.                                      June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 223



13      Q.   And so do you know whether those situations

14   happened here?

15      A.   I don't know.

David Garcia , M.D.                                    June 21, 2017
In Re: Bard IVC Filters Products Liability



Page 225

1

25      opinions.  The first opinion that you have is that "the



9        Q.    Okay.   Have you ever seen a fractured filter

10   strut, causing thrombosis, reported in the medical

11   literature?

12        A.    No.

13        Q.    And there are other risk factors for the

14   development of in situ thrombosis, correct, beyond what

15   you're saying here is a filter strut?

16        A.    Yes.

17        Q.    Can you describe some of the other risk

18   factors for development of in situ thrombosis?

19        A.    Sure.   Compression of a vessel, presence of

20   central venous catheter, prosthetic mechanical heart

21   valve would be a few.

David Garcia , M.D.                              June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 227



1            MR. JOHNSON:  Form.

2

11    We can't always identify what they are, but --

12         Q.   (By Mr. Lerner)  Right.

13         A.

14         Q.   Are you aware of anything in the medical

15    literature that supports the finding that a fractured

16    fragment has contributed to causing thrombosis?

17         A.   No, I'll be -- I'll be extrapolating, though,

18    from data that I think does establish that an intact

19    filter promotes thrombosis formation.

20         Q.   But an intact filter, the size of that is very

21    different from a fragment --

22         A.   Yes.

23         Q.   -- from one of the arms or legs?

24         A.   But I'm not aware that surface area or size

25    has any correlation with thrombosis risk, when it comes

David Garcia , M.D.                          June 21, 2017
In Re: Bard IVC Filters Products Liability

                                              Page 228

1      to putting a foreign object in the -- in the circulating

2      blood.

3          Q.   But do you have any evidence, either way, that

4      size doesn't matter?

5          A.   No, I don't have any evidence that it does or

6      does not.

7          Q.   Right.  And the PREPIC studies that you talked

8      about did not study or examine thrombosis in fractured

9      filters?

10         A.   Correct.

11         Q.   Okay.  And you're not aware of any studies --

12     scientific studies that seek to analyze the potential

13     impact of filter fragments, causing thrombosis?

14         A.   No.

15         Q.   Okay.  And as far as the condition of this

16     fragment of an undetermined size that -- in one of her

17     lungs, do you know whether it's endothelialized?

18         A.   My guess is that it has been endothelialized

19     over time, because most -- most things that are in --

20     dwelling in a blood vessel, grow an endothelial lining

21     around them.

22         Q.   Okay.  And what's a good way to explain what

23     that is, in layman terms?  Is that tissue growth over

24     the fragment?

25         A.   ███████████████████████████████

David Garcia , M.D.                                June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 242

1    ██████████████████████████████████████

2        A.   ██████████████████████████████

     ████████████████████████████████████████

     ████████████████████████████████████████

     █████████████████████████████████████████

     █████████████████████████████████████████

     ████████████████████████████████████████

     ████████████████████████████████████████

9        Q.   Are you able to quantify what that risk is,

10   that increased --

11       A.   No.

12       Q.   -- risk is?

13            And then are you able to point to any

14   literature or scientific studies that would help

15   quantify that she's at an increased risk?

16       A.   No, other than again extrapolating from what

17   we know about intact filters.

18       Q.   And, then, doesn't the --  Strike that.

19            If the fragment has in fact at some point

20   caused injury to the inner wall, the pulmonary artery,

21   do you know when that would have occurred?

22       A.   I would assume shortly after the frac --

23   the -- it fractured and migrated there.

24       Q.   And wouldn't the wall that -- pulmonary artery

25   then heal?

David Garcia , M.D.                                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 245

1        A.    (Witness moves head up and down.)



David Garcia , M.D.                                    June 21, 2017
In Re: Bard IVC Filters Products Liability



Page 246

1        Q.   -- right?

800.808.4958                                          770.343.9696

David Garcia , M.D.                                    June 21, 2017
In Re: Bard IVC Filters Products Liability



Page 247

David Garcia , M.D.                                  June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 248



David Garcia , M.D.                                            June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 249



 9          THE VIDEOGRAPHER:  Going off the record.  The

10     time is 3:47.

11          (Recess taken from 3:46 p.m. to 3:49 p.m.)

12          THE VIDEOGRAPHER:  Back on the record.  The

13     time is approximately 3:50.

14       Q.   (By Mr. Lerner)  Dr. Garcia, we're towards the

Case 2:15-md-02641-DGC   Document 8183-2   Filed 10/13/17   Page 59 of 60
David Garcia , M.D.                         June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 250



David Garcia , M.D.                                    June 21, 2017
In Re: Bard IVC Filters Products Liability

Page 254

1   █████████████████████████████████████

    █   █   ███

    █   ████████████████████████████████

    ████████████████████████████████████

    █   ████████████

    █   ███████████████████████████████

    ████████████████████████████████████

    █   ███   ███████████████████████████

    ███████████████████████████████████████

    ████████████████████████████████████████

    ██████████████████████████████████████

    ██████████████████████████████████████

    ████████████████████████████████

    █   ███   ████████████████████████

    ██████████████████████████████████████

    ███████████████

    █   ███

18          MR. LERNER:  Okay.  All right.  Those are all

19   the questions I have.

20          MR. JOHNSON:  Dr. Garcia will read.

21          THE VIDEOGRAPHER:  This is the end of Media

22   No. 3.  This ends this deposition.  The time is

23   approximately 3:58.

24          (Deposition concluded at 3:57 p.m.)

25          (Signature reserved.)