# REDACTED DOCUMENTS RELATED TO DOCKET 7334

**7334 - Defendants' Motion and Memorandum in Support of Motion for Summary Judgment as to Plaintiff Debra Mulkey's Claims - Filed Redacted**

**7335 - Defendants' Separate Statement of Facts in Support of Motion for Partial Summary Judgment as to Plaintiff Debra Mulkey's Claims  - Filed Redacted**

**Exhibit A - Filed Redacted**

**Exhibit C - Filed Redacted**

**Exhibit D - Filed Redacted**

**Exhibit E - Filed Redacted**

**Exhibit F - Filed Redacted**

**Exhibit G - Filed Redacted**

# REDACTED DOCUMENTS RELATED TO DOCKET 7334

**7334 - Defendants' Motion and Memorandum in Support of Motion for Summary Judgment as to Plaintiff Debra Mulkey's Claims - Filed Redacted**

James R. Condo (#005867)
Amanda C. Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2204
Telephone:  (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, GA  30363
Telephone: (404) 322-6000
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

*Attorneys for Defendants*
*C. R. Bard, Inc. and*
*Bard Peripheral Vascular, Inc.*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation, | No. 2:15-MD-02641-DGC |
| | **DEFENDANTS' MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF DEBRA MULKEY'S CLAIMS** |
| DEBRA MULKEY, an individual, | (Assigned to the Honorable David G. Campbell) |
| Plaintiff, | **(Oral Argument Requested)** |
| v. | |
| C. R. BARD, INC., a New Jersey corporation and BARD PERIPHERAL VASCULAR, INC., an Arizona corporation, | |
| Defendants. | |

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵀᴴ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

**MOTION**

Pursuant to Fed. R. Civ. P. 56, Local Rule 56.1, and Case Management Order No. 23 (Doc. 5770), Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively "Bard") respectfully move this Court for summary judgment as to Plaintiff Debra Mulkey's product liability claims as alleged in her Short Form Complaint (2:16-cv-00853-DGC, Doc. 1).[1] For the reasons stated below, Bard is entitled to judgment as a matter of law.

This motion is supported by Defendants' Memorandum of Points and Authorities and Separate Statement of Facts ("SSOF") which are filed herewith.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     Introduction.**

Plaintiff Debra Mulkey brings this product liability action for damages she claims to have suffered as a result of complications allegedly experienced related to a Bard Eclipse® inferior vena cava ("IVC") filter, a prescription medical device that was placed in her IVC before she underwent bariatric surgery. The subject Eclipse Filter was placed in Ms. Mulkey's IVC on April 11, 2012 (the "Filter"). Plaintiff claims that her Filter is defective because, after placement, it allegedly ███████████████████████████ ██████████████████████████████████████████████████████. The Filter remains implanted in Ms. Mulkey. The potential for Ms. Mulkey's Eclipse Filter to tilt and be unable to be retrieved are risks that are well-known and accepted potential complications associated with all retrievable IVC filters, and they are risks that Bard specifically warned about in the Instructions for Use ("IFU") that accompanied Ms. Mulkey's Filter.

Although Plaintiff ███████████████████████████ on October 4,

---

[1] Plaintiff and Bard have met and conferred regarding the claims that Plaintiff intends to pursue. Plaintiff has agreed that she is not pursuing claims for manufacturing defect (Counts I, V), breach of express warranty (Count X), loss of consortium (Count XV), wrongful death (Count XVI), or survival (Count XVII). However, Plaintiff represented during the meet and confer process that she intends to pursue all of the claims addressed in this Motion.

2012, she waited until March 29, 2016, to file her lawsuit against Bard, approximately 3 ½ years after ███████████████████████████, and approximately 2 ½ years after the applicable statute of limitations expired.

Bard moves for summary judgment under Federal Rule of Civil Procedure 56 on the following grounds:

A.  All of Plaintiff's claims are barred by the 1-year Kentucky statute of limitations.[2]

B.  Plaintiff's breach of implied warranty claim (Counts XI) fails as a matter of law because Plaintiff was not in privity with Bard.

C.  Plaintiff's failure-to-warn claims (Counts II, VII) fail as a matter of law because Bard provided legally adequate warnings of the complications allegedly experienced by Plaintiff to a learned intermediary (Plaintiff's implanting physician), and any alleged failure to warn by Bard was not the proximate cause of Plaintiff's alleged injuries.

D.  Plaintiff's negligent and fraudulent misrepresentation/concealment claims (Counts VIII, XII, XIII) fail as a matter of law because there is no proof that Plaintiff or her implanting physician relied on an alleged misrepresentation or omission of material fact by Bard regarding the Filter.

E.  Plaintiff's negligent post-sale duty to warn claim (Count VI) fails as a matter of law because Kentucky does not recognize a post-sale duty to warn.

F.  Plaintiff's negligence *per se* claim (Count IX) fails as a matter of law because such a claim cannot be based on alleged violations of federal statutes or regulations.

---

[2] Although Plaintiff listed the Southern District of West Virginia in Section 7 of her Short Form Complaint, (*see* 2:16-cv-00853-DGC, Doc. 1), Bard and Plaintiff's counsel met and conferred regarding conflict-of-law issues, and the parties agree that Kentucky law applies to Plaintiff's claims. Kentucky has a 1-year statute of limitations. *See* K.R.S. § 413.140(1)(a). Even of West Virginia law applied, that state has a 2-year statute of limitations, *see* W. Va. Code § 55-2-12(a), (b) (2016), and Plaintiff's claims would similarly be time barred.

Nelson Mullins Riley & Scarborough

L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

G. Plaintiff's consumer fraud claim (Count XIV) fails as a matter of law because Plaintiff is not a "purchaser" under the relevant statute, and because the relevant statute applies only to claims based on alleged losses of money or property, not personal injury claims.

## II.   Statement of Undisputed Facts.

Plaintiff Debra Mulkey received a Bard Eclipse Filter on April 11, 2012, ███████ ████████. (SSOF ¶ 1.) The Filter is not sold directly to patients. (*Id.* at ¶ 2.) Ms. Mulkey's implanting physician, Dr. Roderick Tompkins, testified that he placed the Filter in Plaintiff because ███████████████████████. (*Id.* at ¶ 3.) At the time Plaintiff received her Filter, ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████. (*Id.* at ¶ 4.)

Dr. Tompkins testified that before he placed the Filter, he had the IFU that accompanied the Filter available to him to read. (*Id.* at ¶ 5.) The relevant IFU contains specific warnings regarding the risks of filter tilt, migration, perforation, fracture, and inability to retrieve. (*Id.* at ¶ 6.) Dr. Tompkins testified that he discussed with Ms. Mulkey the risks and benefits of IVC filter placement, and then obtained her informed consent before placing the Filter. (*Id.* at ¶ 12.) Notably, complications such as tilt, migration, perforation, fracture, and inability to retrieve are complications associated with all brands of retrievable IVC filters, not just Bard's IVC filters. Indeed, even Plaintiff's expert acknowledges that all IVC filters are known to have complications, including filter fracture, migration, tilt, and perforation. (*Id.* at ¶ 25.)

On May 21, 2012, ████████████████████████████████ █████. (*Id.* at ¶ 13.) Thereafter, on October 4, 2012, ████████████████ ████████████████████████████████████. (*Id.* at ¶ 14.) ████████████████████████████████████████████████ ████████████████████████████████████████████████

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000



█████████████████████████████████████████ (*Id.* at ¶ 15.) Moreover, Ms. Mulkey

testified that she understood ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████. (*Id.* at ¶ 16.) Ms. Mulkey testified that she was

"upset" that █████████████████████. (*Id.* at ¶ 19.) Furthermore, Ms. Mulkey

admits that the first time she experienced symptoms of any bodily injuries ████████

████ was on October 4, 2012, ██████████████████████████████. (*Id.* at ¶

20.) Even though Plaintiff had knowledge of all of this information, she testified that she

never ████████████████████████████████████████████████████████████████

████████████. (*Id.* at ¶ 22.)

Although ████████████████████████████████████████

███████████████████████████, Dr. Darren Hurst, testified that ████

████████████████████████████████████████████. (*Id.* at ¶ 23.)

Likewise, ████████████████████████████, Dr. Derek Muehrcke, testified that

████████████████████████████████████████████████████████████████████.

(*Id.* at ¶ 24.) Dr. Hurst also opines that █████████████████████████████████

███████████████████. (*Id.* at ¶ 26.) Bard's vascular and interventional radiologist

expert, Dr. Moni Stein, disputes these opinions. However, in any event, the applicable

IFU specifically warned Dr. Tompkins of the potential risks of IVC perforation, caudal

migration, and fracture. (*Id.* at ¶ 6.)

### III.   Summary Judgment Standard.

Summary judgment is appropriate upon showing that "there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a); *see Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994).

"A moving party without the ultimate burden of persuasion at trial . . . has both the initial

burden of production and the ultimate burden of persuasion on a motion for summary

judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

(9th Cir. 2000). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* "If . . . a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense. If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* at 1130-31 (internal citations omitted).

## IV.   Argument and Citation of Authority.

### A.   Plaintiff's Claims Are Barred by Kentucky's One-Year Statute of Limitations.

Plaintiff waited approximately 3 ½ years after her unsuccessful removal procedure to bring this lawsuit against Bard. Kentucky has a 1-year statute of limitations for personal injury product liability actions. *See* K.R.S. § 413.140(1)(a) (providing that "action for an injury to the person of the plaintiff" is one that must "be commenced within one (1) year after the cause of action accrued"). Notably, the limitations period begins running "on the date the injury is inflicted even where the injury is slight initially and its full extent is not known until years later." *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 321–22 (6th Cir. 2010) (applying Kentucky law); *see also Caudill v. Arnett*, 481 S.W.2d 668, 669 (Ky. 1972) (holding that the statute of limitations began running when the plaintiff sustained "minor" injuries while riding a school bus that overturned, not when he was diagnosed more than six years later with chronic pancreatitis caused by the accident).

Although Kentucky recognizes the "discovery rule," that rule "is available ***only*** in cases where the fact of injury or offending instrumentality is not immediately evident or discoverable with the exercise of reasonable diligence, such as in cases of medical malpractice or latent injuries or illnesses." *Fluke Corp. v. LeMaster*, 306 S.W.3d 55, 60 (Ky. 2010) (emphasis added). Thus, where a plaintiff knows or with the exercise of reasonable diligence should know "the fact of injury" or "offending instrumentality," the

discovery rule does not apply. *See id.* Furthermore, "plaintiffs have a duty to inquire into the safety of products where it is apparent from the facts that the product may have been a potential cause of an injury." *Id.* Accordingly, "[a]n injured party has an affirmative duty to use diligence in discovering the cause of action within the limitations period. Any fact that should excite his suspicion is the same as actual knowledge of this entire claim." *Id.* at 64 (internal quotation marks omitted).

Pursuant to Kentucky's 1-year statute of limitations, Plaintiff's claims are time barred as a matter of law. Specifically, as of October 4, 2012, Plaintiff knew or should have known "the fact of injury." *Id.* at 60. Indeed, Plaintiff admits that she understood ███ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████. (SSOF, ¶ 16.) She testified that "it upset me when I found out ████████████ ███████████████████ (*Id.* at ¶ 19.) She also admits that the first time she experienced symptoms of any "bodily injuries" ███████████████ was on October 4, 2012, ███████ █████████████████████████. (*Id.* at ¶ 20.) Notwithstanding having this information as of October 4, 2012, Plaintiff testified that she ████████████████████ ████████████████ until December 2016, well after she filed the instant lawsuit. (*Id.* at ¶ 22.) Pursuant to the rule stated by the Kentucky Supreme Court in *LeMaster*, because the "fact of injury" *was* "immediately evident or discoverable with the exercise of reasonable diligence" to Plaintiff, *see LeMaster*, 306 S.W.3d at 60, the discovery rule simply does not apply in Plaintiff's case. *See id.* (holding that the discovery rule only applies "where the fact of injury or offending instrumentality is not immediately evident or discoverable with the exercise of reasonable diligence").

Plaintiff may argue that the discovery rule should apply because she claims she did not first attribute her bodily injuries to her Filter until October 2015 when she "saw a commercial on TV that indicated that IVC filters were causing bodily injuries to people." (SSOF, at ¶ 21.) However, seeing a television advertisement paid for by Plaintiffs'

Nelson Mullins Riley & Scarborough

L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

attorneys seeking new personal injury plaintiffs is not the type of event that triggers a statute of limitations under Kentucky law. Indeed, United District Court Chief Judge Clay Land, who is overseeing the multidistrict litigation *In re Mentor Corp. Obtape Transobturator Sling Products Liability Litigation*, which is pending in the Middle District of Georgia, addressed a similar issue under Kentucky law last year. There, the plaintiff received an ObTape implant in January 2005. *See In re Mentor Corp. Obtape Transobturator Sling Prod. Liab. Litig.*, No. 2004408MD2004CDL, 2016 WL 873647, at *1 (M.D. Ga. Mar. 4, 2016) (applying Kentucky law). Later in 2005, she experienced dyspareunia and an infection, and underwent two revision surgeries. *See id.* However, she waited until 2012 to file her claim against the manufacturer of the ObTape. In responding to the manufacturer's motion for summary judgment, the plaintiff argued that Kentucky's 1-year statute of limitation should not preclude her claim because she did not learn of the alleged connection between her ObTape and her injuries until after learning of a television commercial regarding mesh complications. *See id.* at 2. The MDL court rejected the argument. It reasoned that by the end of 2005, the plaintiff had undergone two revision surgeries for infections, and she "presented no evidence that her doctors told her that her injuries were ***not*** connected to ObTape." *Id.* (emphasis in original). Thus, the court reasoned that "by December 2005, [the plaintiff] had enough information to know of a connection between ObTape and at least some of her injuries. A reasonable person in that situation would take some action to follow up on the cause of her injuries and try to find out whether the injuries were caused by a problem with ObTape, a problem with the implant surgery, or some other problem." *Id.* Finally, the MDL court stated that the plaintiff "reasonably should have suspected a connection between ObTape and her injuries, so she had a duty to investigate. She did not, so the discovery rule does not save her claims." *Id.*

Like the plaintiff in the *ObTape* case above, Plaintiff here had sufficient information on October 4, 2012 -- ███████████████████████████ -- to put her on notice such that a reasonable person would follow-up and investigate the potential



cause of her injuries. Indeed, Plaintiff admits that, as of October 4, 2012, (a) she first experienced symptoms of "bodily injuries" that ████████████████████████; (b) that ████████████████████████████████████████; (c) that █ ████████████████████████; (d) that f █████████ ████████████████████; (e) that there was "some reason" why ████ ████████████████ (even if she did not subjectively know the precise reason); (f) that she knew she ████████████████████; and (g) that she was "upset" that ██ ████████████████. (SSOF, at ¶¶ 16, 17, 18, 19, 20.) At the very least, Plaintiff had sufficient facts to "inquire into the safety of [her Filter]" to determine whether the "product may have been a potential cause of an injury." *LeMaster*, 306 S.W.3d at 60. That is, the facts known to her were sufficient to the point that they "should [have] excite[d] [her] suspicion" such that she should be charged with "actual knowledge of this entire claim." *Id.* at 64. Moreover, like the plaintiff in the *ObTape* case above, Plaintiff has presented no evidence that her doctors told her that her injuries were not connected to her Filter. Finally, like the above plaintiff, Plaintiff here did absolutely no investigation until after learning of television commercials regarding alleged defects with her Filter.

Because Plaintiff failed to file her lawsuit against Bard within the 1-year statute of limitations, and because the discovery rule does not apply to Plaintiff's claims, Bard respectfully asks this Court to grant summary judgment as to all of Plaintiff's claims.

### B.   Plaintiff's Breach of Implied Warranty Claim (Counts XI) Fails as a Matter of Law Because Plaintiff Was Not in Privity with Bard.

Under Kentucky law, privity of contract is required for a plaintiff to bring an action based on breach of implied warranty. *See, e.g.*, *Brown Sprinkler Corp. v. Plumbers Supply Co.*, 265 S.W.3d 237, 240 (Ky. Ct. App. 2007) ("[A] plaintiff-buyer asserting a claim based upon an implied warranty *must establish* that it enjoyed privity of contract with the defendant-seller against whom the implied warranty claim is asserted.") (emphasis in original); *Compex Int'l Co. v. Taylor*, 209 S.W.3d 462, 465 (Ky. 2006) (noting vertical privity is a requirement for a plaintiff to maintain a breach of warranty action); *Baird v.*

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

*Bayer Healthcare Pharm., Inc.*, No. CIV.A. 6:13-077-DCR, 2013 WL 5890253, at *3 (E.D. Ky. Oct. 31, 2013) ("As this Court has previously noted, privity of contract is an essential element to breach of warranty claims."). Privity of contract requires "an underlying contractual relationship," one existing in a "buyer-seller relationship." *Compex*, 209 S.W.3d at 465. Kentucky courts have defined the privity of contract requirement to mean that "a 'seller's' warranty protections are *only* afforded to 'his buyer.'" *Id.* (emphasis in original).

Here, Plaintiff was never in privity with Bard, as the Filter is a prescription medical device that is not sold directly to patients. (SSOF, ¶ 2.) Plaintiff can produce no evidence that she is a "buyer" of the Filter from Bard. Consequently, Bard is entitled to summary judgment on Plaintiff's breach of implied warranty claim. *See Allen v. Abbott Labs.*, No. CIV.A. 11-146-DLB, 2012 WL 10508, at *6 (E.D. Ky. Jan. 3, 2012) (granting the defendant's motion for summary judgment on the plaintiff's breach of warranty claims, where the plaintiff failed to produce evidence of privity of contract in a prescription pharmaceutical drug case).

**C.      Plaintiff's Failure-to-Warn Claims (Counts II, VII) Fail as a Matter of Law Because Bard Provided Legally Adequate Warnings to a Learned Intermediary, and Any Alleged Failure to Warn Was Not the Proximate Cause of Plaintiff's Alleged Injuries.**

Plaintiff's failure-to-warn claims fail because Bard provided legally adequate warnings of the complications allegedly experienced by Plaintiff to a learned intermediary, Plaintiff's implanting physician, Dr. Tompkins. Moreover, any alleged failure to warn by Bard was not the proximate cause of Plaintiff's alleged injuries.

Under Kentucky law, for a failure-to-warn claim, "liability for a manufacturer follows only if it knew or should have known of the inherent dangerousness of the product and failed to 'accompany [ ] it with the quantum of warning which would be calculated to adequately guard against the inherent danger.'" *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 79 (Ky. 2010) (alteration in original) (quoting *Post v. Am. Cleaning Equip. Corp.*, 437 S.W.2d 516, 520 (Ky. 1968)). As with other claims, to succeed on a failure-to-warn claim,

a plaintiff has the burden of establishing causation. *See Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 537 (6th Cir. 1995) (applying Kentucky law). "[U]nder Kentucky law, causation or proximate cause is defined by the substantial factor test: was the defendant's conduct a substantial factor in bringing about plaintiff's harm?" *Id.* (citing *Deutsch v. Shein*, 597 S.W.2d 141, 144 (Ky. 1980)). "Causation is an element which may be proved by circumstantial evidence, and in that situation 'the evidence must be sufficient to tilt the balance from possibility to probability.'" *Morales*, 71 F.3d at 537 (quoting *Calhoun v. Honda Motor Co., Ltd.*, 738 F.2d 126, 130 (6th Cir. 1984)). In other words, a plaintiff has the burden of producing evidence to justify a reasonable inference of ***probability rather than a mere possibility***. *See Holbrook v. Rose*, 458 S.W.2d 155, 158 (Ky. 1970) ("[T]he essence of the test concerning the sufficiency of plaintiff's circumstantial evidence concerning causation is that the proof must be sufficient to tilt the balance from 'possibility' to 'probability.'").

In 2004, the Supreme Court of Kentucky adopted the learned intermediary rule. *See Larkin v. Pfizer*, 153 S.W. 3d 758 (Ky. 2004). Under the learned intermediary rule, a manufacturer of a prescription drug or medical device discharges its duty to warn if it provides a legally adequate warning to the "learned intermediary," which is the prescribing physician. *See id.* at 764. Stated differently, "[t]he obligation of a manufacturer to warn about risks attendant to the use of drugs and medical devices that may be sold only pursuant to a health-care provider's prescription traditionally has required warnings directed to health-care providers and not to patients." *Id.* at 762 (quoting *Restatement (Third) of Torts: Prods. Liab.* § 2 cmt. I)). Courts applying Kentucky law have applied the learned intermediary rule to prescription pharmaceutical drugs and medical devices. *See, e.g.*, *Larkin*, 153 S.W.3d 758 (prescription drugs); *Whybark v. Synthes, Inc.*, No. 515CV00084GNSLLK, 2017 WL 1788673, at *3 (W.D. Ky. May 4, 2017) (medical devices).

Here, the Filter is a prescription medical device not available to the general public. (SSOF, ¶ 2.) Accordingly, the learned intermediary doctrine applies, and Bard only had a

Nelson Mullins Riley & Scarborough

L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

duty to warn Dr. Tompkins, the physician who implanted the Filter, of the risks of its use. Dr. Tompkins' testimony establishes that the warnings accompanying the Filter were adequate to warn him of the specific complications encountered by Ms. Mulkey. Dr. Tompkins testified that before he placed the Filter, he had the IFU that accompanied the Filter available to him to read. (*Id.* at ¶ 5.) The relevant IFU contains specific warnings regarding the risks of filter tilt, migration, fracture, perforation, and inability to retrieve, which are complications allegedly experienced by Ms. Mulkey. (*Id.* at ¶ 6.) Under the bolded heading "**Potential Complications**," the IFU reads as follows:

- Movement, migration or tilt of the filter are known complications of vena cava filters. Migration of filters to the heart or lungs has been reported. There have also been reports of caudal migration of the filter. . . .

- Filter fractures are a known complication of vena cava filters. There have been some reports of serious pulmonary and cardiac complications with vena cava filters requiring the retrieval of the fragment utilizing endovascular and/or surgical techniques.

- Perforation or other acute or chronic damage of the IVC wall.

* * *

- Filter Tilt

* * *

**All of the above complications have been associated with serious adverse events such as medical intervention and/or death. There have been reports of complications including death, associated with the use of vena cava filters in morbidly obese patients. The risk/benefit ratio of any of these complications should be weighed against the inherent risk/benefit ration for a patient who is at risk of pulmonary embolism without intervention.**

(*Id.* at ¶ 6.a) (emphasis in original). Additionally, under the bolded "**Eclipse Filter Removal**" heading, the IFU states in bolded language as follows:

**It is possible that complications such as those described in the "Warnings", "Precautions," or "Potential Complications" sections of this Instructions for Use may affect the recoverability of the device and result in the clinician's decision to have the device remain permanently implanted.**

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

(*Id.* at ¶ 6.b) (emphasis in original). Because the IFU warned Dr. Tompkins regarding the relevant risks of using the Filter, Bard's warnings were legally adequate. *See CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 79 (Ky. 2010) (holding that if product includes inherent dangers, manufacturer must provide "'quantum of warning which would be calculated to adequately guard against the inherent danger'" (quoting *Post v. Am. Cleaning Equip. Corp.*, 437 S.W.2d 516, 520 (Ky. 1968))).[3]

In addition, Plaintiff has not established that any failure to warn by Bard was the proximate cause of her injuries. Although Dr. Tompkins testified on occasion that he would have "wanted to know" certain alleged factual information presented by Plaintiff's counsel, he admitted that he would be ***speculating*** as to whether such information would have altered his treatment decision for Plaintiff. (SSOF, ¶ 7.) Specifically, he testified as follows:

> 13 Q And it's important for you to rely on
> 14 accurate or reliable information, isn't that
> 15 right --
> 16 A Yes.
> 17 Q -- in making a decision as a medical
> 18 doctor?
> 19 A Yes.
> 20 Q Okay. So -- so again, being shown a
> 21 draft e-mail and asked if you had known, if you
> 22 had known, would you have made a different
> 23 decision, ***you're really speculating, aren't you***?
> 24 MR. DeGREEFF: Object to the form.
> 25 A ***Yes***.
> 1 Q Doctor, would you need much more
> 2 information other than an e-mail or a couple of
> 3 documents provided to you with testimony by
> 4 counsel in making a decision whether you would use
> 5 a product or not?

---

[3] Plaintiff may argue that Bard failed to warn Dr. Tompkins regarding the relative complication rates of Bard's IVC filters compared to competitor devices. Such an argument would be misplaced. Under Kentucky law, a manufacturer's obligation is to warn "of non-obvious dangers inherent in the probable use ***of the product***," not to provide a warning regarding some other product or products. *See Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1150 (6th Cir. 1996) (emphasis added). Accordingly, for the reasons and arguments stated at footnote 3, page 9 of Bard's Motion for Summary Judgment filed in *Jones v. C. R. Bard, Inc., et al.*, which are incorporated herein by reference, Bard had no legal duty to provide warnings to Dr. Tompkins regarding the rates of complications with the Eclipse Filter in comparison to any other product.

* * *

8 A Can you restate that?
9 Q Sure.
10 Would you need information beyond
11 documents taken out of context -- internal
12 documents taken out of context to make a decision
13 as to whether you would use a product or not?
14 MR. DeGREEFF: Object to form. Same
15 objection.
16 A Yes.

(*Id.* at ¶ 7) (emphasis added).

Critically, Dr. Tompkins never testifies that had he been given different information about the Eclipse Filter, it is probable that he would have decided against using the device. (*Id.* at ¶ 8.) In the absence of evidence establishing that an alleged failure to warn was the "probable" cause of Plaintiff's injury -- that is, that a different warning would have probably caused Dr. Tompkins to choose a different product -- Bard is entitled to summary judgment on Plaintiff's failure-to-warn claims. *See, e.g.*, *Ackermann v. Wyeth Pharm.*, 526 F.3d 203, 208 (5th Cir. 2008) (noting that a plaintiff has the burden to prove that "a proper warning would have changed the decision of the treating physician, *i.e.* that *but for* the inadequate warning, the treating physician would not have used or prescribed the product"); *Ingram v. Novartis Pharm. Corp.*, 888 F. Supp. 2d 1241, 1246–47 (W.D. Okla. 2012) (granting summary judgment to defendant in prescription drug case, where plaintiff failed to produce evidence that treating physician would have changed treatment decision had a proper warning been given); *Motus v. Pfizer Inc.*, 196 F. Supp. 2d 984, 995 (C.D. Cal. 2001) ("Pfizer may prevail in its motion for summary judgment if Ms. Motus has failed to adduce evidence that Dr. Trostler would have acted differently had Pfizer provided an adequate warning.").

### D.    Plaintiff's Negligent and Fraudulent Misrepresentation/Concealment Claims (Counts VIII, XII, XIII) Fail as a Matter of Law   Because Plaintiff Cannot Prove the Essential Elements of Reliance or Inducement.

To establish a claim of negligent or fraudulent misrepresentation, a plaintiff has the burden to prove that he or she "acted in reliance" upon an alleged "material

misrepresentation." *See, e.g.*, *Denzik v. Denzik*, 197 S.W.3d 108, 110 (Ky. 2006).[4] Similarly, to succeed on a fraudulent concealment claim (also called fraud by omission), a plaintiff must prove that "the defendants' failure to disclose the material fact induced the plaintiff to act." *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. Ct. App. 2003).

Here, Plaintiff's misrepresentation and concealment claims fail because she cannot prove the essential elements of reliance (for the misrepresentation claims) and inducement (for the concealment claim). Ms. Mulkey testified that she never received a patient card or brochure regarding her IVC filter, nor did she ask for any information about her filter before it was implanted. (SSOF, ¶¶ 27, 28.) Moreover, she has never spoken to anyone at Bard, nor has she visited Bard's website. (*Id.* at ¶ 29, 30.) Indeed, she did not even know that Bard was the manufacturer of her IVC filter until after she contacted her lawyer about her potential legal claim. (*Id.* at ¶ 31.)

Similarly, Plaintiff's implanting physician, Dr. Tompkins, testified that he relied on his experience, the experience of his colleagues, and the applicable medical literature when he decided to implant an Eclipse Filter in Ms. Mulkey. (*Id.* at ¶ 9.) He does not testify that he relied on any statement by Bard -- or on any omission of material fact -- in deciding to use the Filter. To the contrary, he testified that he ***does not*** rely on information from medical device manufacturers, such as Bard, when deciding which IVC filter he wanted to use. Specifically, Dr. Tompkins testified as follows:

> 19 Q    So -- so in -- in deciding which --
> 20 which filter to use, do you rely on information
> 21 from the manufacturer?
> 22 A    No.

(*Id.* at ¶ 10.) Finally, Dr. Tompkins testified he does not recall discussions with Bard's sales representatives regarding the use of IVC filters in bariatric patients. (*Id.* at ¶ 11.)

---

[4] "The tort of negligent misrepresentation differs from fraudulent misrepresentation only in that the former tort demands only that a false representation or concealment be made negligently, rather than recklessly or with knowledge of its falsity." *Clark v. Danek Med., Inc.*, 64 F. Supp. 2d 652, 657 (W.D. Ky. 1999).

Nelson Mullins Riley & Scarborough

L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Neither Plaintiff nor her implanting physician testified that they relied on a material misrepresentation -- or omission of material fact -- when deciding to use a Bard Eclipse Filter. Because Plaintiff cannot prove the essential elements of reliance or inducement, her misrepresentation and concealment claims fail as a matter of law.

### E.   Plaintiff's Negligent Post-Sale Failure to Recall/Retrofit Claim (Count VI) Is Not Recognized by Kentucky Law.

No Kentucky state court has recognized a post-sale duty to warn. Instead, the Eastern District of Kentucky -- applying Kentucky law and, in particular, Kentucky Supreme Court precedent -- predicted that "Kentucky would not adopt a post-sale failure to warn cause of action." *Cameron v. DaimlerChrysler Corp.*, No. CIV.A. 504CV24JMH, 2005 WL 2674990, at *7 (E.D. Ky. Oct. 20, 2005) (interpreting *Ostendorf v. Clark Equipment Co.*, 122 S.W.3d 530 (Ky. 2003)). The *Cameron* court relied on the Kentucky Supreme Court's refusal in *Ostendorf* to recognize a post-sale duty to retrofit, stating "[b]ecause the [*Ostendorf*] court declined to adopt the duty to retrofit, it is reasonable to assume that the court would similarly reject a post-sale duty to warn for the same reasons. *Cameron*, 2005 WL 2674990, at *7; *see also Ostendorf*, 122 S.W.3d at 533-37 (discussing the court's reasoning for following the majority of jurisdictions in refusing to recognize a post-sale duty to retrofit a product).

Because Kentucky does not recognize a post-sale duty to warn, her negligent failure to recall/retrofit is barred as a matter of law.

### F.   Plaintiff's Negligence *Per Se* Claim (Count IX) Fails as a Matter of Law Because it Is Impermissibly Based on Alleged Violations of Federal Statutes or Regulations.

Although Kentucky recognizes negligence *per se* claims, such a claim may not be based on alleged violations of federal statutes or regulations. *See Young v. Carran*, 289 S.W.3d 586, 589 (Ky. Ct. App. 2008) (holding that Kentucky's negligence *per se* statute, K.R.S. § 446.070, "does not extend to federal statutes and regulations or local ordinances"). As one Kentucky court stated, "[t]he Kentucky General Assembly did not intend for KRS 446.070 to embrace the whole of federal laws and the laws of other states

1    and thereby confer a private civil remedy for such a vast array of violations." *T & M*

2    *Jewelry, Inc. v. Hicks*, 189 S.W.3d 526, 530 (Ky. 2006). Instead, a negligence *per se*

3    claim must be based on alleged violations of a Kentucky statute. *See Young*, 289 S.W.3d

4    at 589.

5         Plaintiff's negligence *per se* claim (Count IX) is based exclusively on alleged

6    violations of federal statutes and federal regulations. (*See* Master Complaint for Damages

7    for Individual Claims [Dkt. No. 364] at ¶¶ 229-234.) Nowhere in Plaintiff's Master

8    Complaint or Short Form Complaint does Plaintiff identify any alleged violations of

9    Kentucky statutes.[5] Accordingly, her negligence *per se* claim fails as a matter of law.

10        **G.    Plaintiff's Consumer Fraud Claims (Count XIV) Fail as a Matter of**
11        **Law Because Plaintiff Is Not a "Purchaser" and Because the Relevant**
          **Statute Does Not Apply to Personal Injury Claims.**

12        Kentucky's consumer fraud and unfair and deceptive trade practices statutes are

13   codified under K.R.S. § 367.110, *et seq.* (the Kentucky Consumer Protection Act or

14   "KCPA"). Section 367.220(1) of the KCPA permits a private cause of action if a person

15   suffers an "ascertainable loss of money or property, real or personal" as a result of an

16   unfair or deceptive act of another. To sustain a claim under the KCPA, the plaintiff must

17   be in privity of contract with the defendant. *See Skilcraft Sheetmetal, Inc. v. Kentucky*

18   *Mach., Inc.*, 836 S.W.2d 907, 909 (Ky. Ct. App. 1992) ("The legislature intended that

19   privity of contract exist between the parties in a suit alleging a violation of the Consumer

20   Protection Act."). A "subsequent purchaser may not maintain an action against a seller

21   with whom he did not deal or who made no warranty for the benefit of the subsequent

22   purchaser." *Id.* "The language of the statute plainly contemplates an action by a purchaser

23   against his immediate seller." *Id.*

24        As explained in Section A, *supra*, Ms. Mulkey is not in privity of contract with

25   Bard. She is not a "person who purchase[d]" goods under the KCPA. Additionally, Ms.

26

27   _____
     [5] To the extent Plaintiff claims that her negligence *per se* claim is based on alleged
     violations of Kentucky's Consumer Protection Act, that claim fails as a matter of law as
28   explained in Section G, *infra*.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Mulkey's claims are for personal injury damages, not for an "ascertainable loss of money or property" as required under the KCPA. Accordingly, she cannot sustain an action under the KCPA against Bard as a matter of law.[6]

**V.    Conclusion.**

For these reasons, Bard respectfully requests that this Court grant Bard's Motion for Summary Judgment.

RESPECTFULLY SUBMITTED this 28th day of August, 2017.

s/Richard B. North, Jr.
Richard B. North, Jr.
Georgia Bar No. 545599
Matthew B. Lerner
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW / Suite 1700
Atlanta, GA  30363
PH: (404) 322-6000
FX: (404) 322-6050
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

James R. Condo (#005867)
Amanda Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2204
PH: (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

---

[6] To the extent Plaintiff alleges a violation of the West Virginia Consumer Credit and Protection Act (the "WVCCPA," West Virginia's comparable consumer protection statute), that claim fails as a matter of law as well. The WVCCPA requires that a plaintiff provide pre-suit notice to the seller, and Plaintiff has never provided such pre-suit notice. *See Waters v. Electrolux Home Prod., Inc.*, 154 F. Supp. 3d 340, 354 (N.D.W. Va. 2015) ("Because providing written notice is a prerequisite to filing a complaint, the plaintiffs' complaint cannot have served as the required notice. The plaintiffs failed to plead that they notified Equitrans in writing of the alleged violations prior to filing their complaint. Therefore, their claim under the WVCCPA is barred."). Additionally, like the KCPA, violations of the WVCCPA are predicated on losses of money or property, not personal injury. *See* W.Va. Code 46A-6-106(a). Finally, the WVCCPA applies only to "consumers" under the act, and Plaintiff is not a consumer as that term is defined. W.Va. Code 46A-6-102(2) ("'Consumer' means a natural person to whom a sale or lease is made in a consumer transaction, and a 'consumer transaction' means a sale or lease to a natural person or persons for a personal, family, household or agricultural purpose.").

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1

**Attorneys for Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of August 2017, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

s/Richard B. North, Jr.
Richard B. North, Jr.

- 1 -

# REDACTED DOCUMENTS RELATED TO DOCKET 7334

**7335 - Defendants' Separate Statement of Facts in Support of Motion for Partial Summary Judgment as to Plaintiff Debra Mulkey's Claims  - Filed Redacted**

1  James R. Condo (#005867)
   Amanda C. Sheridan (#027360)
2  SNELL & WILMER L.L.P.
   One Arizona Center
3  400 E. Van Buren, Suite 1900
   Phoenix, AZ 85004-2204
4  Telephone:  (602) 382-6000
   jcondo@swlaw.com
5  asheridan@swlaw.com

6  Richard B. North, Jr. (admitted *pro hac vice*)
   Georgia Bar No. 545599
7  Matthew B. Lerner (admitted *pro hac vice*)
   Georgia Bar No. 446986
8  NELSON MULLINS RILEY & SCARBOROUGH LLP
   Atlantic Station
9  201 17th Street, NW, Suite 1700
   Atlanta, GA  30363
10 Telephone: (404) 322-6000
   richard.north@nelsonmullins.com
11 matthew.lerner@nelsonmullins.com

12 *Attorneys for Defendants*
   *C. R. Bard, Inc. and*
13 *Bard Peripheral Vascular, Inc.*

14                **IN THE UNITED STATES DISTRICT COURT**

15                    **FOR THE DISTRICT OF ARIZONA**

16 | IN RE:  Bard IVC Filters Products Liability Litigation, | No. 2:15-MD-02641-DGC |
17 | | |
18 | | **DEFENDANTS' SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF DEBRA MULKEY'S CLAIMS** |
19 | | |
20 | | |
21 | | |
22 | DEBRA MULKEY, an individual, | (Assigned to the Honorable David G. Campbell) |
23 |                 Plaintiff, | |
24 | v. | |
25 | C. R. BARD, INC., a New Jersey corporation and BARD PERIPHERAL VASCULAR, INC., an Arizona corporation, | |
26 | | |
27 | | |
   |                 Defendants. | |
28 | | |

*Nelson Mullins Riley & Scarborough*
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Pursuant to Fed. R. Civ. P. 56(c), Local Rule 56.1(a), and Case Management Order No. 53 (Doc. 5770), Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively "Bard") respectfully submit this Separate Statement of Facts in Support of Motion for Summary Judgment as to Plaintiff Debra Mulkey's Claims.

1.     Plaintiff Debra Mulkey received a Bard Eclipse® Filter (the "Filter") on April 11, 2012, ███████████████████████. (Ex. A, Plaintiff Fact Sheet of Plaintiff Debra Mulkey (hereinafter "PFS"), at §§ II.2(a), II.3.)

2.     The Filter is not sold directly to patients. (Ex. B, Eclipse Filter Instructions for Use (the "Eclipse IFU") at page 1.)

3.     Plaintiff's implanting physician, Dr. Roderick Tompkins, testified that he placed the Filter in Plaintiff because ████████████████████████████ ██████. (Ex. C, April 11, 2017 Dr. Roderick Tompkins Deposition Transcript ("Tompkins Dep. Tr.") at 176:2 to 177:10.)

4.     At the time Plaintiff received her Filter, ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████. (Ex. D, Selected Plaintiff Medical Records.)

5.     Dr. Tompkins testified that before he placed the Filter, he had the IFU that accompanied the Filter available to him to read. (Ex. C, Tompkins Dep. Tr. at 173:6-24.)

6.     The Eclipse IFU applicable in April 2010 (██████████████████ ██████) included the following warnings:

a.     Under the bolded heading "**Potential Complications**," the Eclipse IFU reads as follows:

- Movement, migration or tilt of the filter are known complications of vena cava filters. Migration of filters to the heart or lungs has been reported. There have also been reports of caudal migration of the filter. . . .

- Filter fractures are a known complication of vena cava filters. There have been some reports of serious pulmonary and cardiac complications

- 1 -

with vena cava filters requiring the retrieval of the fragment utilizing endovascular and/or surgical techniques.

- Perforation or other acute or chronic damage of the IVC wall.

* * *

- Filter Tilt

* * *

**All of the above complications have been associated with serious adverse events such as medical intervention and/or death. There have been reports of complications including death, associated with the use of vena cava filters in morbidly obese patients. The risk/benefit ratio of any of these complications should be weighed against the inherent risk/benefit ration for a patient who is at risk of pulmonary embolism without intervention.**

(Ex. B, Eclipse IFU.)

b.     Under the bolded "**Eclipse Filter Removal**" heading, the Eclipse IFU states in bolded language as follows:

**It is possible that complications such as those described in the "Warnings", "Precautions," or "Potential Complications" sections of this Instructions for Use may affect the recoverability of the device and result in the clinician's decision to have the device remain permanently implanted**.

(Ex. B, Eclipse IFU.)

7.     Dr. Tompkins testified that he would be speculating as to whether information and alleged facts told to him by Plaintiff's counsel would have altered his treatment decision for Plaintiff. Specifically, he testified as follows:

13 Q And it's important for you to rely on
14 accurate or reliable information, isn't that
15 right --
16 A Yes.
17 Q -- in making a decision as a medical

Nelson Mullins Riley & Scarborough

L.L.P.

201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

18 doctor?
19 A Yes.
20 Q Okay. So -- so again, being shown a
21 draft e-mail and asked if you had known, if you
22 had known, would you have made a different
23 decision, ***you're really speculating, aren't you***?
24 MR. DeGREEFF: Object to the form.
25 A ***Yes***.
1 Q Doctor, would you need much more
2 information other than an e-mail or a couple of
3 documents provided to you with testimony by
4 counsel in making a decision whether you would use
5 a product or not?

\* \* \*

8 A Can you restate that?
9 Q Sure.
10 Would you need information beyond
11 documents taken out of context -- internal
12 documents taken out of context to make a decision
13 as to whether you would use a product or not?
14 MR. DeGREEFF: Object to form. Same
15 objection.
16 A Yes.
(Ex. C, Tompkins Dep. Tr. 184:13 to 185:16.)

8.     Dr. Tompkins never testified that had he been given different information about the Eclipse Filter, it is probable that he would have decided against using the device.

9.     Dr. Tompkins testified that he relied on his experience, the experience of his colleagues, and the applicable medical literature when he decided to implant an Eclipse Filter in Ms. Mulkey. (Ex. C, Tompkins Dep. Tr. 202:7-22.)

10.     Dr. Tompkins testified that he does not rely on information from medical device manufacturers, such as Bard, when deciding which IVC filter he wanted to use. Specifically, Dr. Tompkins testified as follows:

19 Q     So -- so in -- in deciding which --
20 which filter to use, do you rely on information
21 from the manufacturer?
22 A     No.
(Ex. C, Tompkins Dep. Tr. 88:19-22.)

11.     Dr. Tompkins testified he does not recall discussions with Bard's sales representatives regarding the use of IVC filters in bariatric patients. (Ex. C, Tompkins

- 3 -

Dep. Tr. 55:10-13.)

12.     Dr. Tompkins testified that he discussed with Ms. Mulkey the risks and benefits of IVC filter placement, and then obtained her informed consent before placing the Filter. (Ex. C, Tompkins Dep. Tr. at 80:22 to 81:5; 86:3-11; 94:2-15.)

13.     On May 21, 2012, ██████████████████████████████████
██████. (Ex. D, Selected Plaintiff Medical Records.)

14.     On October 4, 2012, ████████████████████████████████
████████████████████████████. (Ex. D, Selected Plaintiff Medical Records.)

15.     ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████ (Ex. D, Selected Plaintiff Medical Records.)

16.     Plaintiff testified that on October 4, 2012, ██████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████ (Ex. E, February 8, 2017 Debra Mulkey Deposition Transcript ("Mulkey Dep. Tr.") at 95:17 to 97:1.)

17.     Plaintiff testified that on October 4, 2012, she understood ████████
████████████████████████████████. (Ex. E, Mulkey Dep. Tr. at 99:7-10.)

18.     Plaintiff testified that on October 4, 2012, she knew ██████████
██████. (Ex. E, Mulkey Dep. Tr. at 97:13-17.)

19.     Plaintiff testified that on October 4, 2012, she was "upset" that ████
████████████████. (Ex. E, Mulkey Dep. Tr. at 185:3-9 (████████
████████████████████).)

20.     Plaintiff testified that the first time she experienced symptoms of any bodily

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

injuries ████████████ was on October 4, 2012, the day of ████████████

████████. (Ex. E, Mulkey Dep. Tr. at 142:8-24.)

21.     Plaintiff claims that "[i]n October 2015, I saw a commercial on TV that indicated that IVC filters were causing bodily injuries to people." (Ex. A, PFS at § II.13(c).)

22.     Plaintiff testified that she never ████████████████████████

████████████████. (Ex. E, Mulkey Dep. Tr. at 103:12 to 104:6.)

23.     ████████████████████████████████, Dr. Darren Hurst, testified ████████████████████████████████████

████████. (Ex. F, July 21, 2017 Dr. Darren Hurst Deposition Transcript ("Hurst Dep. Tr.") at 100:20 to 101:14.)

24.     Plaintiff's cardiothoracic surgeon expert, Dr. Derek Muehrcke, testified that ████████████████████████████████████████████. (Ex. G, July 24, 2017 Dr. Derek Muehrcke Deposition Transcript ("Muehrcke Dep. Tr."), at 154:22 to 155:14.)

25.     Plaintiff's expert, Dr. Muehrcke, acknowledges that all IVC filters are known to have potential complications, including filter fracture, migration, tilt, and perforation. (Ex. G, Muehrcke Dep. Tr. at 55:22 to 57:9.)

26.     Dr. Hurst testified ████████████████████████████

████████████████ (Ex. F, Hurst Dep. Tr., at 74:23 to 75:16.)

27.     Plaintiff testified that she never received a patient card or brochure regarding her IVC filter. (Ex. E, Mulkey Dep. Tr. at 67:11-18.)

28.     Plaintiff testified that she never asked for any information about her filter before it was implanted. (Ex. E, Mulkey Dep. Tr. at 67:16-18.)

29.     Plaintiff testified that she has never spoken to anyone at Bard. (Ex. E, Mulkey Dep. Tr. at 167:11-13.)

30.     Plaintiff testified that she has never visited Bard's website. (Ex. E, Mulkey Dep. Tr. at 69:24 to 70:1.)

Nelson Mullins Riley & Scarborough
— L.L.P. —
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1       31.    Plaintiff testified that she did not know that Bard was the manufacturer of

2 her IVC filter until after she contacted her lawyer about her potential legal claim. (Ex. E,

3 Mulkey Dep. Tr. at 66:23 to 67:1.)

4         RESPECTFULLY SUBMITTED this 28th day of August, 2017.

5

6
s/Richard B. North, Jr.
Richard B. North, Jr.
Georgia Bar No. 545599
Matthew B. Lerner
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW / Suite 1700
Atlanta, GA  30363
PH: (404) 322-6000
FX: (404) 322-6050
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

James R. Condo (#005867)
Amanda Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2204
PH: (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

**Attorneys for Defendants C. R. Bard, Inc. and
Bard Peripheral Vascular, Inc.**

1

**CERTIFICATE OF SERVICE**

2

3     I hereby certify that on this 28th day of August 2017, the foregoing was

4  electronically filed with the Clerk of Court using the CM/ECF system which will

5  automatically send email notification of such filing to all attorneys of record.

6

7                           s/Richard B. North, Jr.
                              Richard B. North, Jr.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

- 1 -

# REDACTED DOCUMENTS RELATED TO DOCKET 7334

## Exhibit A - Filed Redacted

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

*MDL No. 2641*
*In Re Bard IVC Filter Products Liability Litigation*

---

### PLAINTIFF FACT SHEET

Each plaintiff who allegedly suffered injury as a result of a Bard Inferior Vena Cava Filter must complete the following Plaintiff Fact Sheet ("Plaintiff Fact Sheet"). In completing this Fact Sheet, you are **under oath and must answer every question.** You must provide information that is true and correct to the best of your knowledge. If you cannot recall all of the details as requested, please provide as much information as you can and then state that your answer is incomplete and explain why, as appropriate. If you select an "I Don't Know" answer, please state all that you do know about that subject. If any information you need to complete any part of the Fact Sheet is in the possession of your attorney, please consult with your attorney so that you can fully and accurately respond to the questions set out below. If you are completing the Fact Sheet for someone who cannot complete the Fact Sheet for himself/herself, please answer as completely as you can.

The Fact Sheet shall be completed in accordance with the requirements and guidelines set forth in the applicable Case Management Order. A completed Fact Sheet shall be considered interrogatory answers pursuant to Fed. R. Civ. P. 33 and responses to requests for production pursuant to Fed. R. Civ. P. 34 and will be governed by the standards applicable to written discovery under Fed. R. Civ. P. 26 through 37. Therefore, you must supplement your responses if you learn that they are incomplete or incorrect in any material respect. The questions and requests for production of documents contained in this Fact Sheet are non-objectionable and shall be answered without objection. This Fact Sheet shall not preclude Bard Defendants from seeking additional documents and information on a reasonable, case-by-case basis, pursuant to the Federal Rules of Civil Procedure and as permitted by the applicable Case Management Order.

In filling out this form, "healthcare provider" shall mean any medical provider, doctor, physician, surgeon, pharmacist, hospital, clinic, medical center, physician's office, infirmary, medical/diagnostic laboratory, or any other facility that provides medical care or advice, along with any pharmacy, x-ray department, radiology department, laboratory, physical therapist/physical therapy department, rehabilitation specialist, chiropractor, or other persons or entities involved in your diagnosis, care and/or treatment.

In filling out this form, the terms "You" or "Your" refer to the person who received a Bard Inferior Vena Cava Filter manufactured and/or distributed by C. R. Bard, Inc. or Bard Peripheral Vascular, Inc. ("Bard Defendants") and who is identified in Question 1(a) below.

To the extent that the form does not provide enough space to complete your responses or answers, please attach additional sheets as necessary. Please identify any documents that you are

producing responsive to a question with Bates Stamp identifiers.   Information provided by Plaintiff will only be used for the purposes related to this litigation and may be disclosed only as permitted under the protective order in this litigation.

## I. BACKGROUND INFORMATION

1.  Please state:

    (a)  Full name of the person who received the Bard inferior vena cava filter, including maiden name:  Debra Mulkey  - Maiden Name: Fowler

    (b)  List all names by which you have ever been known, if different from that listed in 1(a):  Deborah Thompson

    (c)  Full name of the person completing this form, if different from the person listed in 1(a) above, and the relationship of the person completing this form to the person listed in 1(a) above:

    (d)  The name and address of your primary attorney:

    David C. DeGreeff

    Wagstaff & Cartmell LLP

    4740 Grand Ave., Ste. 300

    Kansas City, MO 64112

    (e)  When did you first retain an attorney to represent you in your lawsuit against Bard?

    10/14/2015

2.  Your Social Security Number: ████████

3.  Your Date of Birth: ████████

4.  Your current residential address:

    ████████████████

5.  If you have lived at this address for less than 10 years, provide each of your prior residential addresses from 2000 to the present:

| Prior Residential Address | Dates You Lived At This Address |
| --- | --- |

| | | | |
|---|---|---|---|
| ██████████████████████████ | | | |
| ██████████████████████████ | | | |
| ██████████████████████████ | | | |
| | | | |

6.   Have you ever been married? Yes ████      No ████

If yes, provide the names and addresses of each spouse and the inclusive dates of your marriage to each person:

████████████████████

████████████████████

7.   Do you have children?  Yes ████      No ████

If Yes, please provide the following information with respect to each child:

| Full Name of Child | Date of Birth | Home Address | Whether Biological/Adopted |
|---|---|---|---|
| ████████████████████████████████████████████ | | | |
| | | | |

8.   Identify the name and age of any person who currently resides with you and their relationship to you:

████████████████████

9.   Identify the name and age of any person who has resided with you at any point over the past ten (10) years:

N/A

3

If Yes, state what that condition was: _____

_____

13.    Within the last ten years, have you been convicted of, or plead guilty to, a felony and/or crime of fraud or dishonesty? Yes ███████ No ███████

If Yes, please set forth where and when and identify the felony and/or crime:

_____

14.    Before contacting any attorney regarding this lawsuit or claim, had you ever seen any television or print advertisements regarding possible claims against inferior Vena Cava Filter manufacturers?    Yes ███████ No ███████

If Yes, set forth the approximate date and nature of any such advertisement, whether the advertisement included the name of a law firm, whether the advertisement specifically mentioned C. R. Bard, Inc., Bard Peripheral Vascular, Inc., or "Bard", and other details that you recall. _____ Yes, latter part of 2015, but do not remember the name of the law firm or if Bard was mentioned. I do not remember if it mentioned Bard. _____

## II. CLAIM INFORMATION

1.    Have you ever received a Bard Inferior Vena Cava Filter? Yes __X__    No _____

If Yes, please check the box(es) for each type of Bard Inferior Vena Cava Filter you have received:

    ☐    Recovery®

    ☐    G2®

    ☐    G2®X

    ☐    G2®Express

    ☑    Eclipse®

    ☐    Meridian®

    ☐    Denali®

    ☐    Simon Nitinol

☐      Other (please identify):_____

2.      For each Bard Inferior Vena Cava Filter identified above, please provide the following
        information:

   (a)      The date each Bard Inferior Vena Cava Filter was implanted in you:

   ____ ████████████ _____

   (b)      The product code and lot number of each Bard Inferior Vena Cava Filter
            implanted in you:

   ____ ██████████████████████ _____

   (c)      Current location of the Bard Inferior Vena Cava Filter, including any portion
            thereof, if known:

   ____ ███████████████████ _____

   _____

   _____

3.      Describe your understanding of the medical condition for which you received the Bard
        Inferior Vena Cava Filter(s):

   ____ ███████████████ _____

   _____

4.      Give the name and address of the doctor who implanted the Bard Inferior Vena Cava
        Filter(s):____ ██████████████████████ _____

   _____

5.      Give the name and address of the hospital or other healthcare facility where the Bard
        Inferior Vena Cava Filter was implanted:____ ████████████████

   ████████ _____

6.      Have you ever been implanted with any other vena cava filters or related product(s)
        besides the Bard Inferior Vena Cava Filter(s) for the treatment of the same or similar
        condition(s) identified in your response to question 3 above? Yes ████     No ████
        If Yes:

   (a)      Please identify any such device(s) or product(s)._____

   _____

   (b)      When was this device or product implanted in you?_____

6

13.  Do you claim that you suffered bodily injuries as a result of the implantation of the Bard Inferior Vena Cava Filter(s)? Yes____    No____

If Yes:

(a)  Describe the bodily injuries, including any emotional or psychological injuries that you claim resulted from the implantation, attempted removal and/or removal of the Bard Inferior Vena Cava Filter(s)? ████████████████████████

████████████████████████████████████████████████████

_____

_____

(b)  When was the first time you experienced symptoms of any of the bodily injuries you claim in your lawsuit to have resulted from the Bard Inferior Vena Cava Filter(s)?

████████████████████████████████████████████████████

(c)  When did you first attribute these bodily injuries to the Bard Inferior Vena Cava Filter(s)? ████████████████████████

████████████████████████████████████████████████████

(d)  To the best of your knowledge and recollection, please state the approximate date when you first saw a health care provider for any of the bodily injuries, or symptoms related thereto, you claim to have experienced related to the Bard Inferior Vena Cava Filter(s)?

14

## VERIFICATION

I,   Debra Mulkey                                , declare under penalty of perjury,  subject to all
applicable laws and in the presence of the below named witness, that I have carefully reviewed
the final copy of this Plaintiff Fact Sheet dated   7-21-16    and verified that all of the
information provided is true and correct to the best of my knowledge, information and belief.


_Deanna Porter_____                    _Debra Mulkey_____
Signature of Witness                               Signature of Plaintiff
_Deanna Porter_____
Name of Witness
████████████████████████████
Address of Witness ████████████
          ██████████████████

30

# REDACTED DOCUMENTS RELATED TO DOCKET 7334

## Exhibit C - Filed Redacted

1              UNITED STATES DISTRICT COURT

               DISTRICT OF ARIZONA

2              No. MD-15-02641-PHX-DGC

3

4    In Re: Bard IVC Filters Products

     Liability Litigation

5

               DO NOT DISCLOSE - SUBJECT TO FURTHER

6                 CONFIDENTIALITY REVIEW

     _____

7

               WITNESS:   RODERICK TOMPKINS, M.D.

8    _____

9              Pursuant to Fed. R. Civ. P. 26 and 30

10   the videotaped deposition of Roderick Tompkins,

11   M.D. was taken before Janine N. Leroux,

12   Stenographic Court Reporter and Notary Public -

13   Special Commission in and for the State of

14   Kentucky at Large, at the 613 23rd Street, Suite

15   440, Ashland, Kentucky on Tuesday, April 11,

16   2017, commencing at the approximate hour of 4:45

17   p.m.  Said deposition was taken pursuant to

18   Notice.

19

20

21

22

23

24

25

Do Not Disclose - Subject to Further Confidentiality Review

1    accounts, yes.

2                MS. HELM:  Object to the form.

3        A       And so what was the question?

4        Q       I'll withdraw it.

5                We were talking earlier about sales

6    representatives being present when you were doing

7    IVC placements in bariatric patients.  Do you

8    remember that?

9        A       Yes.

10       Q       Did you ever have any specific

11   discussions with those reps about the use of IVC

12   filters in bariatric patients?

13       A       I don't recall.

14       Q       Okay.  Do you remember ever being told

15   by any Bard sales representative that IVC filters

16   should not be used in bariatric patients?

17       A       No.

18       Q       Would you expect the -- the information

19   that a -- that a medical device sales rep was --

20   was providing to you to be honest, accurate and

21   complete?

22       A       Yes.

23       Q       And would the same be true of a medical

24   device company in general?

25       A       Yes.



```
 1      Bates No. 19 is again ████████, right?

 2          A    Yes.

 3          Q    And then ████████████████████

 4      ████████████████████████, correct?

 5          A    Yes.

 6          Q    What is the ████████████████?  Is

 7      that what we discussed before the ████████?

 8               MS. HELM:  Object to the form.

 9          A    ██████████████████████████████

10      ████████

11          Q    Okay.  And what -- ████████████

12      ████████████████████████████████?

13          A    ████████████████████████████.

14          Q    Okay.  And then looking at -- at plan

15      on that page it says, ██████████████████

16      ████████████████████████████████████████

17      ████████████████████████████████████████

18      ████████████ --

19               I guess did I read that first sentence

20      correctly?

21          A    Yes.

22          Q    And then you went on to say, ████████

23      ██████████████████████████████████████████

24      ██████████████████████████████████████

25      ████████████████████████████████████
```



1       ████████

2              Do you remember in particular what was

3       discussed with Ms. Mulkey ██████████████████

4       ███████████?

5            A     ████████████████████.

6            Q     Okay.  And what would you have told her

7       ██████████████?

8            A     What is right there.

9            Q     Let -- let me ask you when you're

10      talking about ████████████████████████t

11      ███████████████████████████████████████████

12      ███████████████████████████████████████████

13      ███████████?

14           A     ████████████████████████.

15           Q     The █████████████████?

16           A     ████.

17           Q     Okay.  And what about ████████████

18      ██████?  Would -- ██████████████████████████

19      ████████████████████████████████████████████

20      ███████████?

21           A     Yes.

22           Q     Did you ever talk to Ms. Mulkey ██████

23      ███████████████████████████████████████?

24           A     ████████████████████████

25           Q     All right.  Well --

Do Not Disclose - Subject to Further Confidentiality Review

1    listed here?

2         A    No.

3         Q    And you then go on to say, ████████

4    ███████████████████████████████████████

5    ███████████████████████████████████████

6    ████████████████████

7              What did you tell her about that?

8         A    █████████████████████████████

9    ████████████████████████████████████████

10   █████████████████████████████████████████

11   ████████.

12        Q    Are you talking about the July 2010 FDA

13   statement?

14        A    Are there others?

15        Q    (Laughter).  Do you remember

16   specifically when they --

17        A    No.

18        Q    Okay.  And what did the FDA say about

19   removal of IVC filters?

20        A    They should be retrieved if possible.

21        Q    And why?

22             MS. HELM:  Object to the form.

23        A    I don't recall.

24        Q    Was it your intention and expectation

25   that the IVC filter you were going to place into

Do Not Disclose - Subject to Further Confidentiality Review

```
 1                    And so this was a record from

 2      April 11th of 2012; is that correct?

 3           A     Yes.

 4                 MS. HELM:  Exactly five days ago today.

 5                 MR. DeGREEFF:  Hey, you were married

 6           exactly --

 7                 MS. HELM:  25 years ago today.

 8                 MR. DeGREEFF:  That's right.  Happy

 9           anniversary by the way.

10                 MS. HELM:  Where is my bottle of

11           champagne?

12                 MR. DeGREEFF:  I know who would you

13           rather be with?

14                 MS. HELM:  On the advice of counsel I

15           decline to answer.

16                 MR. DeGREEFF:  There you go.  All

17           right.  I'm sure I'm super high on that list.

18      BY MR. DeGREEFF:

19           Q     So -- so in -- in deciding which --

20      which filter to use, do you rely on information

21      from the manufacturer?

22           A     No.

23           Q     Okay.  So you ultimately ████████

     ████  █████████████████████████; is that correct?

25           A     That's what I'm looking for.
```

1      A      Okay.

2      Q      All right.  You state that the risks --

3  under indications and findings it says, ███████

4  █████████████████████████████████████████████

5  ████████████████████████████

6             Did I read that correctly?

7      A      Yes.

8      Q      And is that -- would you have told her

9  anything other than what we have already

10  discussed?

11     A      No.

12     Q      And is this -- is this consent that was

13  obtained, is that a reference to the consent

14  document?

15     A      Yes.

16             MR. DeGREEFF:  9?

17             COURT REPORTER:  Yes.

18             MR. DeGREEFF:  Thank you, ma'am.

19             (DEPOSITION EXHIBIT 9 WAS MARKED.)

20  BY MR. DeGREEFF:

21     Q      I'm handing you what's been marked as

22  Deposition Exhibit 9.  So does that appear to be

23  the consent -- the consent form signed by Debbie

24  Mulkey for █████████████████████████████?

25     A      Yes.

Do Not Disclose - Subject to Further Confidentiality Review

1          Q     Okay.  And so and if you look at the

2     very last page, this document is dated at the

3     bottom.  It says, "02/10."  It's a revision for

4     February 2010.  Do you see that?

5          A     Uh-huh (affirmative), yes.

6          Q     So in February of 2010 in the

7     information for use that accompanied the filter,

8     Bard informed you as a physician implanting the

9     filter that migration had been reported and that

10     there had been reports of caudal migration; is

11     that right?

12          A     This was available to read.  I don't

13     know for a fact I read this one in its entirety.

14          Q     But you agree that Bard made this

15     available for you?

16          A     Yes.

17          Q     And that there was this -- an IFU -- a

18     copy of this IFU accompanies each the filters?

19          A     Yes.

20          Q     Okay.  So in 2010 Bard made available

21     information to you, as a physician implanting

22     filters, a warning that movement, migration or

23     tilt was a known complication; is that right?

24          A     Yes.

25          Q     Okay.  And a warning that there had

Do Not Disclose - Subject to Further Confidentiality Review

```
 1        A      Yes.

 2        Q      Okay.  Ms. Mulkey was ████████████,

 3   correct?

 4        A      Yes.

 5        Q      This was information that was available

 6   to you as a doctor implanting filters at the time

 7   you made the risk-benefit analysis to ███████

 8   █████████████, correct?

 9        A      Yes.

10        Q      And you made a risk-benefit analysis,

11   correct?

12        A      Yes.

13        Q      Based on the information available to

14   you?

15        A      Yes.

16        Q      Okay.  And based on ███████████████

17   ████████████████████████████████████

18   █████████████████████████████████████

19   ███████████, correct?

20        A      Start that over.

21        Q      Sure.  You made a risk-benefit analysis

22   based on information available to you, correct?

23        A      Yes.

24        Q      And based on Ms. Mulkey's ████████

25   ███████████████████████████████
```

1    ██████████████████████████████████,

2    correct?

3         A    Yes.

4         Q    Okay.  You were -- ████████████████

5    ███████████████████████████████████████████

6    ████████████████████████, correct?

7         A    Yes.

8         Q    Okay.  And so that was part of your

9    risk-benefit analysis?

10        A    Yes.

11        Q    Okay.  If you would turn the page of

12   this IFU, which marked I've as Exhibit 17, and on

13   the next page under G you see where it says,

14   "Potential complications"?

15        A    Yes.

16        Q    And it says, "Possible complications

17   include but are not limited to the following."  Do

18   you see where I am?

19        A    Yes.

20        Q    And again -- again they tell you

21   "Movement, migration or tilt the filter are known

22   complications of vena cava filters," correct?

23        A    Yes.

24        Q    And they also tell you that "Migration

25   of filters to the heart or lungs have been

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    documents that were you shown to you, do you?

 2         A     No.

 3         Q     You don't know, for example, if

 4    Exhibit 4, which is an e-mail that was circulated

 5    internally, you don't know if it was ever sent, do

 6    you?

 7         A     No.

 8         Q     Okay.  And you don't know if the

 9    information in Exhibit 4 is accurate or not, do

10    you?

11               MR. DeGREEFF:  Object to form.

12         A     No.

13         Q     And it's important for you to rely on

14    accurate or reliable information, isn't that

15    right --

16         A     Yes.

17         Q     -- in making a decision as a medical

18    doctor?

19         A     Yes.

20         Q     Okay.  So -- so again, being shown a

21    draft e-mail and asked if you had known, if you

22    had known, would you have made a different

23    decision, you're really speculating, aren't you?

24               MR. DeGREEFF:  Object to the form.

25         A     Yes.
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1          Q      Doctor, would you need much more

 2    information other than an e-mail or a couple of

 3    documents provided to you with testimony by

 4    counsel in making a decision whether you would use

 5    a product or not?

 6               MR. DeGREEFF:  Object to form.  Cut

 7          that shit out.  Testimony from counsel.

 8          A      Can you restate that?

 9          Q      Sure.

10               Would you need information beyond

11    documents taken out of context -- internal

12    documents taken out of context to make a decision

13    as to whether you would use a product or not?

14               MR. DeGREEFF:  Object to form.  Same

15          objection.

16          A      Yes.

17               MR. DeGREEFF:  Nothing was taken out of

18          context.  Those are your documents.

19          Q      Are you familiar with the regulatory

20    process that a medical device manufacturer has to

21    go through before it can make a product such as an

22    IVC filter available for use?

23          A      No.

24          Q      Okay.  So when you were asked about

25    Exhibit 3, which was represented to you as being,
```

```
 1        A     Yes.

 2        Q     Okay.  And the fact that it's a

 3   document that came from Bard, and is one of

 4   millions of pages of documents, does not

 5   necessarily put it in context for you, does it?

 6        A     No.

 7        Q     While you did not have access to Bard's

 8   internal documents, such as the ones shown to you

 9   today, did you have access to medical literature,

10   your experience and the experience of your

11   colleagues when you decided to ███████████████

12   ████████████████████████?

13        A     Yes.

14        Q     Is that what you relied on in making

15   that decision?

16             MR. DeGREEFF:  Object to form.

17        A     Can you read me back the list?

18        Q     Sure.

19             Medical literature, your experience and

20   the experience of your colleagues.

21             MR. DeGREEFF:  Object to form.

22        A     Yes.

23        Q     You were asked a number of questions

24   about would you expect Bard, and then there would

25   be something after that phrase.  Do you recall
```

# REDACTED DOCUMENTS RELATED TO DOCKET 7334

## Exhibit D - Filed Redacted

# EXHIBIT D

MULKEYD_RTOMP_MDR00001

MULKEYD_RTOMP_MDR00002

MULKEYD_RTOMP_MDR00003

MULKEYD_RTOMP_MDR00004

MULKEYD_RTOMP_MDR00037

MULKEYD_RTOMP_MDR00038

MULKEYD_KDMC_RAD00004

MULKEYD_KDMC_RAD00005

# REDACTED DOCUMENTS RELATED TO DOCKET 7334

## Exhibit E - Filed Redacted



Deposition of:

# Debra Mulkey

*February 8, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 66

1        attorney, you don't have to answer.

2              MS. HELM:  I didn't ask -- I just asked who.

3              MR. DEGREEFF:  No.  Who would -- who would be

4        infringing on any conversations we may have had with

5        her.

6    BY MS. HELM:

7        Q    Prior to retaining -- or prior to contacting

8    Mr. Degreeff's -- let me back up.  Let me start all

9    over.  Prior to receiving the letter from Mr. Degreeff's

10   law firm, did you -- you knew you had an IVC filter,

11   right?

12       A    Correct.

13       Q    Okay.  That's why you -- when you saw the ad,

14   that's why you called the number, right?

15       A    Correct.

16       Q    Okay.  Did you know who the manufacturer of

17   your filter was?

18       A    No.

19       Q    Okay.  Did you -- so if you didn't know the

20   manufacturer, it's safe to say you didn't know what

21   model filter you had, correct?

22       A    Correct.

23       Q    Okay.  So is it your testimony that until you

24   contacted a lawyer, you did not know you had a Bard

25   filter?

Debra Mulkey                                    February 8, 2017
In Re: Bard IVC Filters Products Liability

                                                        Page 67

1        A     Correct.

2        Q     Okay.  And you signed documentation in this

3    case saying that you have a Bard Eclipse filter; is that

4    right?

5        A     Yes.

6        Q     And other than verifying that in this -- in

7    Exhibit 1 and Exhibit 2, do you have any other

8    information about your Bard Eclipse filter?

9              MR. DEGREEFF:  Object to form.

10       A     No.

11       Q     When you got the filter in 2012, were you

12   given a card, a little card about the filter?

13       A     No.

14       Q     Okay.  Were you given a brochure?

15       A     No.

16       Q     When you got the filter back in 2012, did you

17   ask for any information about it?

18       A     No.

19       Q     Okay.  Before you contacted the toll-free

20   number from the ad, did you do any research of any kind

21   on filters?

22       A     I had heard -- I had seen on the Internet

23   where they were having problems with the filters.

24       Q     Okay.

25       A     And I had -- later after that -- that was

Page 69

1    Q    Okay.

2    A    It was a mention of the -- of the filters.

3    Q    Okay.  Not friends or acquaintances, this is

4    something you either saw on the Internet or on TV,

5    right?

6    A    Correct.

7    Q    Okay.  And do you recall seeing -- you don't

8    recall what the show was or who was talking about it?

9    A    I don't.

10    Q    Okay.  But, again, it was the ad on television

11    that prompted you to make the phone call; is that right?

12    A    Correct.

13    Q    Okay.  Okay.  Since you made the phone call,

14    retained lawyers, in pursuing this lawsuit, have you

15    done any research on your own about Bard, or IVC

16    filters?

17    A    No.

18    Q    Okay.  So you haven't done any kind of, like,

19    a Google research or anything like that?

20    A    The only thing I did is I Googled, you know,

21    just generalities, not -- not the company.  Just for a

22    filter, you know, how -- how they place them, where

23    they're placed.  Possibly could've been WebMD.

24    Q    Did you -- have you ever been on the Bard

25    website?

Debra Mulkey
In Re: Bard IVC Filters Products Liability
February 8, 2017

Page 70

1        A    No.  I have not.

2        Q    Okay.  I'm going to -- we're going to go

3    through -- and, again, I know it's been extensive, and I

4    know you can't remember it all, but we're going to kind

5    of go chronologically through your -- your health

6    history.  I'm not going to go all the way back.  I'm

7    going to start in 2010, and one of the things I want to

8    address is, because I don't have a lot of information

9    about you before 2010, but I understand that your health

10   problems ████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████████████████████████████████?

13       A    Correct.

14       Q    Okay.  And one thing we have not talked about

15   that the condition that ██████████████████████████████,

16   correct?

17       A    Correct.

18       Q    And do you recall -- and we'll jump forward a

19   little bit, but do you recall at the time ████████████████

20   ████████████████████████████████████████████████

21   ██████████?

22       A    ████████████████████████████████████████████

23   ████████████████████████████████████████████████████

24   ████████████████████████████.

25       Q    Okay.

Debra Mulkey
In Re: Bard IVC Filters Products Liability
February 8, 2017

Page 95

```
 1   ██████████████████████████████████████?
 2       A    Yes.
 3       Q    Okay.  ███████████████████████o
 4   ███████████████████████████████████
 5   █████████████; is that right?
 6       A    No.  To be honest, ████████████████
 7   ████████████████████████████████████
 8   ████.
 9       Q    Okay.
10       A    I believe I spoke to him, but I could not
11   guarantee that.
12       Q    Okay.  And ████████████████████████
13   ███████████████████████████
14   ████████████████████████
15   ████████████████, correct?
16       A    Correct.
17       Q    Okay.  ████████████████████████
18   ██████████████████████████████████
19   █████████████████████  If you
20   can't, we'll just change my question.
21       A    ████████████████████████████
22   ██████████████████████████████████
23   ██████████████████████████████████
24   ██████████████████████████████████
25   ██████████████████████████████████
```

Debra Mulkey
February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 96



1

2

3

4

5

6

7

8

9

10

11

12      Q      Okay.  Was he telling you that

13                                                          ?

14      A      No.                                        .

15      Q      Okay.

16                                                        t;

17 is that right?

18      A

19                                         .

20      Q                                   ?

21      A      Yes.

22      Q      Okay.  And that

23

24 --                  ; is that right?

25      A                              .

Debra Mulkey                                          February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 97



```
 1  ████████████████████████████████

 2      Q    Okay.  ██████████████████████████████

 3  ████████████████████████████████████████

 4  ████████████████████████████?

 5      A    ████████████████████████████████

 6  ████████████████████████████████████████

 7  ████████████████████████████████████████

 8  ██████████   I don't know.

 9      Q    Okay.  But you, after the --

10      A    But I did --  ████████████████████

11  ████████████████████████████████████████

12  ████████████████.

13      Q    Okay.  Okay.  ██████████████████████

14  ████████████████████████████████████████

15  ████████████████████████████████████████████

16  ████████████████████████, correct?

17      A    Correct.

18      Q    ██████████████████████████████████

19  ████████████████████████████████████████████

20  ██████████████?

21      A    Correct.

22      Q    ████████████████████████████████████

23      A    Correct.

24      Q    Okay.  ██████████████████████████████

25  ████████████████████████████████████████
```

Debra Mulkey                                    February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 99

```
 1        A    I just don't remember him saying --

 2        Q    He may have said it?

 3        A    He may have.  I think what he was trying to do

 4   is make it short and sweet.

 5        Q    Okay.

 6        A    In a layman's term.

 7        Q    Okay.  But you knew on ███████████████████

 8   ████████████████████████████████████████████████

 9   ███████████████████████

10        A    Correct.

11        Q    Okay.  ███████████████████████████████████

12   ███████████████████████████████████████████████████.

13   ████████

14        A    No.

15        Q    Okay.  I███████████████████████████████████

16   ████████████████████████?

17        A    As far as I know, yes.

18        Q    Okay.  ███████████████████████████████████

19   ███████████████████████████████████████████████████

20   ████████████████?

21        A    ██████████████████████████████████.

22        Q    Okay.  ██████████████████████████████.

23   ███████████████████████████████████████████

24        A    ██████████████████████████████████

25        Q    Okay.  ████████████████████████████████
```

Debra Mulkey
In Re: Bard IVC Filters Products Liability
February 8, 2017

Page 103

1          MS. HELM:  Okay.

2     BY MS. HELM:

3          Q    Ms. Mulkey, if ████████████████████████████

4     ████████████████████████████████████████████████

5     ████████████████████████████████████████████████

6     █████?

7          MR. DEGREEFF:  Object to form.

8          A    No.

9          Q    Okay.  ████████████████████████████████

10    █████████████████, did you?

11         A    I don't believe so.

12         Q    Okay.  ████████████████████████████████

13    ███████████████████████████████████████

14    ██████████████████ -- do you understand the time period

15    I'm talking about, ████████████████████████████████?

16         A    Yes.

17         Q    Do you understand that time period?

18         A    Yes.

19         Q    Okay.  During that time period, during that

20    approximately four-year-and-two-month time period, did

21    you ever talk to any medical professional about your IVC

22    filter?

23         A    No.

24         Q    You knew you had a filter, ██████████████.

25    ████████████████████████████████████████████████████

Debra Mulkey                              February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 104

1     ████████████████████████████████████████████████

2     ████████████████████████████████████████████████

3     ████████████████████████████   correct?

4          A     No.

5          Q     Is that correct?

6          A     Yes.

7          Q     And, in fact, you never even mentioned the

8     filter to doctors during that time period, correct?

9          A     I don't know.

10         Q     Okay.  Well, if I represent to you that we've

11    reviewed your medical records during that time period

12    and we see no mention of the filter, do you have any

13    reason to disagree with that?

14              MR. DEGREEFF:  Object to form.

15         A     Other doctors' records?

16         Q     Yes, ma'am.  And we're going to go through

17    them, but I just want to --

18         A     I don't know.

19         Q     Okay.  Okay.  In 2013, you moved to ███████,

20    correct, or that area?

21         A     Yes.

22         Q     Okay.  I'm not going -- I'm not going to try

23    to reestablish the ████████████geography.  And when

24    you moved back to the ███████ area, you needed a new

25    primary care doctor, right, and that's when you started

Debra Mulkey                          February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 142

1    asked about ████████████████████████████

2    ███████████████████████, and do you see your answer

3    there?

4         A    Yes.

5         Q    It's basically the same as your answer on

6    Exhibit 1, isn't it?

7         A    Correct.

8         Q    Okay.  And then, in paragraph 2, it says "When

9    was the first time you experienced symptoms of any

10   bodily injuries you claim in your lawsuit to have

11   resulted from that Bard inferior vena cava filter?"  Do

12   you see that question?

13        A    Yes.

14        Q    Okay.  And then -- and ████████████████████

15   ██████████████████████████████████████████████████████

16   ████████████████████ is that right?

17        A    Correct.

18        Q    Okay.  And so that's when your injuries

19   occurred, correct?

20             MR. DEGREEFF:  Object to form.

21        Q    ██████████████████?

22             MR. DEGREEFF:  Object to form.

23        A    ████████████████████████████████████████████

24   ████████ yes.

25        Q    Okay.  So that's when the injury occurred,

Debra Mulkey                                    February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 167

1    calendar of any type?

2        A    No.

3        Q    Okay.  How do you keep track of your medical

4    appointments?

5        A    Well, I have a planner.  I mean, I write my

6    appointments down, but that's -- I mean, I don't keep

7    track of --

8        Q    Other than your appointments, do you record

9    anything else on your planner?

10       A    No.

11       Q    Have you ever talked to anyone at Bard that

12   you're aware of?

13       A    No.

14       Q    You're currently under the care of Dr.

15   █████████; is that right?

16       A    Correct.

17       Q    And you're currently under the care of Dr.

18   █████████; is that right?

19       A    Correct.

20       Q    Are you currently under the care of any other

21   medical provider?

22       A    No.

23       Q    Okay.  ████████████████████████

24   ██████████████████████████████████████████████████

25   ███████████████████████████?

Debra Mulkey
In Re: Bard IVC Filters Products Liability
February 8, 2017

Page 185

1    allowed to claim and what you're not allowed to claim?

2         A    No.

3         Q    Ma'am, would you tell the jury in your own

4    words what impact this filter being stuck inside of you

5    has had on your life.

6              MS. HELM:  Object to the form.

7         A    It's -- since I've had it, you know, I've

8    found out -- well, ███████████████████████████████

9    ████████████████████. Yes.  It did.  ████████████████████

10   ███████████████████████████████████████████████████████

11   █████████. ███████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████

14   ████████████████████. ████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   █████████████. ████████████████████████████████████  ████

17   ████████████████████████████████████████████████████████,

18   ████████████████████████████████████████████████████,

19   ████████████████████████████████████████████████

20   █████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   █████████████████████████████████████████████████

25   ███████████████████████████████████████████████--

# REDACTED DOCUMENTS RELATED TO DOCKET 7334

## Exhibit F - Filed Redacted



Deposition of:

# Darren Robert Hurst , M.D.

*July 21, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Darren Robert Hurst , M.D.                    July 21, 2017
In Re: Bard IVC Filters Products Liability

Page 74

1    study of the filter's durability.

2    BY MR. NORTH:

3         Q.    Well, again, when you say long-term

4    study, you're talking about clinical studies,

5    correct?

6         A.    Correct, yes.

7         Q.    You don't know whether there were

8    bench testing and other studies like that to try

9    to assess durability, do you?

10        A.    I don't, but I think that there's

11   other expert reports that describe that bench

12   testing and have evaluated it thoroughly.

13             MR. NORTH:  What's the next exhibit

14   number, 6?  No.

15             COURT REPORTER:  Seven.

16             (Thereupon, Defendants' Exhibit No.

17   7, a multi-page Expert Report, Debra Mulkey, was

18   marked for purposes of identification.)

19   BY MR. NORTH:

20        Q.    Let's start looking at specific

21   patients or plaintiffs, if we could.

22        A.    Yes, sir.

23        Q.    And let's start with Ms. Mulkey.

24   Now, my understanding is that you believe that the

25   filter ████████████████████in Ms. Mulkey?

Page 75

1          A.    Yeah, just give me one minute.  I'm

2    bringing up Ms. Mulkey's case here in my notes.

3    I'm sorry.  Okay.  Yeah.  Can you repeat your

4    question, please?

5          Q.    It's your opinion that the filter

6    ████████████████████ in her; is that correct?

7          A.    That is correct.

8          Q.    And that the filter ████████████████

9    ████

10         A.    Correct.

11         Q.    And you believe a ████████████████████

12   █████████████████████████

13         A.    Correct.

14         Q.    And it's also your opinion that there

15   is ██████████████████████████?

16         A.    Yes.

17               MR. NORTH:  This is not going to be

18   easy, but it's the only way we can do it.  I've

19   got a jump drive with certain CT scans on it.

20               THE WITNESS: I can just bring up her

21   CT scan, if you would like.

22               MR. NORTH:  Well, how are we going to

23   mark it?  See, that's the problem, is how do we

24   mark this thing for the record.

25               MR. O'CONNOR:  Well, can you identify

Darren Robert Hurst , M.D.                    July 21, 2017
In Re: Bard IVC Filters Products Liability

Page 100

1    if that's easier.

2             THE WITNESS:  Is it on there?  Did I

3    put it in the report?  7/27/15.  Sorry.  Thank

4    you.

5    BY MR. NORTH:

6             Q.   And you believe that shows the same

7    ██████████████████?

8             A.   It does, yes.

9             Q.   Are you able to tell when -- ████████

10   ██████████████████████████████████████████████u

11   █████████████████████████████████████████████████

12   ████████████████████████████████?

13             A.   ██████████████████████████████ --

14   actually, I'm sorry, ███████████████████████████

15   █████████

16             Q.   Are you able to say one way or the

17   other whether that ██████████████████████████████

18   ████████████in Ms. Mulkey?

19             A.   I cannot.

20             Q.   Do you believe this filter could

21   potentially be -- in Ms. Mulkey, ████████████████

22   ████████████████████████████████████████████

23             A.   Yes.

24             MR. O'CONNOR:  Object to the form of

25   the question.

Page 101

1   BY MR. NORTH:

2          Q.    And you're aware that there are a

3   number of physicians, such as Dr. Kuo at Stanford

4   or Dr. Trerotola at U Penn or Dr. Lynch at Penn

5   State, as well as others, that specialize in

6   complex retrievals, correct?

7          A.    Yes.

8          Q.    And do you believe that one of those

9   physicians would have a good likelihood of

10  retrieving this filter percutaneously?

11              MR. O'CONNOR:  Form and foundation.

12              THE WITNESS:  I think that this

13  filter could be removed percutaneously.  Each case

14  is different, but it would be worth trying.

15  BY MR. NORTH:

16         Q.    And you would certainly recommend

17  that, if Ms. Mulkey wanted the filter removed, it

18  should be an attempted percutaneous removal?

19         A.    Yes.

20              MR. O'CONNOR:  Form.

21  BY MR. NORTH:

22         Q.    As opposed to an open abdominal

23  surgical procedure, correct?

24         A.    Yes, that would be the standard of

25  care.

# REDACTED DOCUMENTS RELATED TO DOCKET 7334

## Exhibit G - Filed Redacted



Deposition of:

# Derek Muehrcke , M.D.

*July 24, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Derek Muehrcke , M.D.                                    July 24, 2017
In Re: Bard IVC Filters Products Liability

                                                        Page 55

1        Q     What about Janet Hudnall?

2        A     Just that, you know, she felt that a lot was

3    not known about the BARD filter, the Recovery filter

4    when it was initiated, and a lot still wasn't known, and

5    that it was kind of cleared and sold without a lot of

6    knowledge about it.

7        Q     What about Chris Ganser?

8        A     I can't remember specifics about that.

9        Q     What about Steven Williamson?

10       A     Steven Williamson.  Oh, 42.  I can't remember

11   specifics.  Nothing specific.

12       Q     Have you ever asked the plaintiffs' attorneys

13   for the opportunity -- well, strike that.

14             Are you aware that more than 3 million pages of

15   documents have been produced by BARD in this litigation?

16       A     I've heard there's been millions, yeah.

17       Q     And have you ever asked for the opportunity to

18   review or search those documents?

19             MR. O'CONNOR:  Form.

20       A     I've never asked for the opportunity to search

21   them, no.

22       Q     Would you agree with me that all IVC filters

23   have a risk of complications?

24             MR. O'CONNOR:  Object to form.

25       A     All IVC filters have a risk of complications,

Derek Muehrcke , M.D.                           July 24, 2017
In Re: Bard IVC Filters Products Liability

Page 56

1    yes.

2        Q    That would include migration?

3             MR. O'CONNOR:   Form.

4        A    Well, I think that there's rates of migration,

5    but they can -- they can migrate.

6        Q    All filters can migrate; correct?

7             MR. O'CONNOR:   Form.

8        A    There are -- all filters can migrate, yes.

9        Q    And all filters have the potential complication

10   of fracture?

11       A    Yes.   That's true.

12       Q    And all filters have the potential complication

13   of tilt?

14            MR. O'CONNOR:   Okay.

15       A    Correct.   Some are much less likely, the

16   TrapEase, OptEase, but all can tilt.

17       Q    What's the difference, if any, between the

18   words penetration and perforation with regard to

19   filters?

20       A    That's a nuance for the radiologist to kind of

21   get into.   I think -- to a certain extent, to me they're

22   synonymous, but I think they prefer the word penetration

23   as opposed to perforation.   Perforation, one of the BARD

24   defense experts felt was a kind of a pejorative term

25   implying that things were going to leak out all over the

Page 57

1   place.  And I think that the radiologists prefer

2   penetration as opposed to perforation.

3           I think it's a distinction without a difference

4   in my mind, but whatever.

5       Q    Would you agree that all filters carry the risk

6   of penetration --

7           MR. O'CONNOR:  Form.

8       Q    -- or perforation?

9       A    Yes.

10      Q    Looking at the ██████████t, page 7,

11  paragraph 2, you said: ███████████████████████

12  ████████████████████████████████████████████████

13  ██████████████████████████████████████████████████

14  ██████████████████████████████████████████████████

15          Is that correct?

16      A    That's correct.

17      Q    And would you agree that all filters have the

18  potential to caudally migrate?

19      A    I believe that there was an unacceptable safety

20  profile for the -- for the G2 filter.

21          MR. O'CONNOR:  Move to strike as nonresponsive.

22      Q    My question was, do you agree that all filters

23  have the potential to caudally migrate?

24      A    All filters can migrate caudally.

25          MR. O'CONNOR:  Late objection to the form of

Derek Muehrcke , M.D.                        July 24, 2017
In Re: Bard IVC Filters Products Liability

Page 154

1       A       Yes, sir, it was.

2       Q       And again, you did not read the deposition of

3  her implanting physician?

4       A       I have not read the depositions of any of the

5  implanting physicians.

6       Q       So you do not know his decision-making process

7  in choosing an Eclipse and whether he considered a

8  Meridian, or any of those factors?

9       A       No.

10              MR. O'CONNOR:   Form.

11      Q       What's the status of Ms. Mulkey's filter?

12      A       ████████████████████████████████████,

13  ██████████████████████████████████████████,

14  ███████████████████████████████████████████

15  ████████████████████████████████████████

16  ███████████████████████   ████████████████████

17  ████████████████████████████████████████████

18  █████████████████████████████████████████████e

19  ████████████████████████████████████████

20  ███████████████████████████████████████

21  ████████████████████.

22      Q       Do you believe that her filter can be

23  retrieved?

24      A       ███████████████████████████████████

25  ███████████████████████████████████████

Veritext Legal Solutions
800.808.4958                                              770.343.9696

Page 155

1    ████████ .

2        Q    Well, in the case of ████████ you gave the

3    opinion that you did not think it could be -- the filter

4    could be ████████████████████

5            Do you believe there's a possibility that Ms.

6    Mulkey's can?

7        A    ████████████████████████████████

8    ████████████████████████████████████████████

9    ████████████████████ .

10       Q    So you think in Ms. Mulkey case ████████████

11   ████████████████████████ ?

12       A    No, I do not think the ████████████████e

13   ████████████████       ████████████████

14   ████████████████████ .

15            ████████████████████████████████

16   ████████████ .

17       Q    And where -- what was your evidence of a

18   ████████████████████ ?

19       A    I think she's ████████████████████

20   ████████████████ .

21            MR. NORTH:  Who just joined?

22            (David DeGreeff rejoined the deposition.)

23       Q    And again, even though you believe ████████

24   ████████████████████████████████████████████ ?

25       A    I do not.