# REDACTED DOCUMENTS RELATED TO DOCKET 7359

**7359 - Defendants' Motion and Memorandum in Support of Motion for Partial Summary Judgment as to Plaintiffs Lisa and Mark Hyde's Claims Filed Redacted**

**7360 - Defendants' Separate Statement of Facts in Support of Their Motion for Partial Summary Judgment as to Plaintiffs Lisa and Mark Hyde's Claims - Filed Redacted**

**Exhibit A - Filed Redacted**

**Exhibit B - Filed Redacted**

**Exhibit C - Filed Redacted**

**Exhibit K - Filed Redacted**

**Exhibit N - Filed Redacted**

**Exhibit O - Filed Redacted**

# REDACTED DOCUMENTS RELATED TO DOCKET 7359

**7359 - Defendants' Motion and Memorandum in Support of Motion for Partial Summary Judgment as to Plaintiffs Lisa and Mark Hyde's Claims Filed Redacted**

James R. Condo (#005867)
Amanda C. Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2204
Telephone: (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

*Attorneys for Defendants*
*C. R. Bard, Inc. and*
*Bard Peripheral Vascular, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation, | No. 2:15-MD-02641-DGC |
| | **DEFENDANTS' MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFFS LISA AND MARK HYDE'S CLAIMS** |
| LISA HYDE and MARK HYDE, a married couple, | (Assigned to the Honorable David G. Campbell) |
| Plaintiffs, | |
| v. | **(Oral Argument Requested)** |
| C. R. BARD, INC., a New Jersey corporation and BARD PERIPHERAL VASCULAR, INC., an Arizona corporation, | |
| Defendants. | |

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

**MOTION**

Pursuant to Fed. R. Civ. P. 56, Local Rule 56.1, and Case Management Order No. 23 (Doc. 5770), Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively "Bard") respectfully move this Court for partial summary judgment as to certain of the plaintiffs' product liability claims (Counts II, III, VI, VII, VIII, XI, XII, XIII, and XIV) as alleged in the plaintiffs' Short Form Complaint (2:16-cv-00893-DGC, Doc. 1).[1] If Bard's Motion is granted in full, the plaintiffs will be left with claims for negligent design (Count IV), negligence *per se* (Count IX), loss of consortium (Count XV), and punitive damages. For the reasons stated below, Bard is entitled to judgment as a matter of law.

This motion is supported by Defendants' Memorandum of Points and Authorities and Separate Statement of Facts ("SOF") which are filed herewith.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. Introduction.**

Lisa Hyde was treated with a Bard IVC filter in February 2011.[2] Plaintiffs allege that ███████ IVC filter is defective because, ████████████████████

████████████████████████████████████████████████

████████████████████████. Ms. Hyde ██████████████████

---

[1] Plaintiffs and Bard have met and conferred regarding the claims that the plaintiffs intend to pursue. Plaintiffs have agreed that they are not pursuing claims for manufacturing defect (Counts I,V) and breach of express warranty (Count X). However, the plaintiffs represented during the meet and confer process that they intend to pursue all of the claims addressed in this Motion.

[2] Plaintiffs bring this product liability action for damages they claim to have suffered as a result of complications Lisa Hyde allegedly experienced related to a Bard G2X IVC filter. Due to the fact that there is no lot number for the IVC filter implanted in Ms. Hyde and the filter was discarded after it was retrieved, there is no way to definitively identify the model of Ms. Hyde's IVC filter. Yet, Bard's IVC filter sales records to the hospital where Ms. Hyde's IVC filter was implanted from the pertinent time period indicate that Ms. Hyde's IVC filter was likely an Eclipse. Whether the filter was a G2X or an Eclipse filter, however, does not bear on Bard's Motion for Summary Judgment.

Nelson Mullins Riley & Scarborough

L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1   ████████ the IVC filter ████████. All of ████████

2   ████████ were known risks associated with all retrievable IVC filters, and they

3   are risks that Bard specifically warned about in its Instructions for Use for the G2®X and

4   Eclipse® IVC filter, one of which would have accompanied Ms. Hyde's filter.

5       Bard moves for partial summary judgment under Federal Rule of Civil Procedure

6   56, and under Wisconsin substantive law, on the following grounds:

7   A.  Strict liability design defect claim (Count III):

8       a.  Wisconsin presumes that FDA cleared products are not defective and the

9           plaintiffs should not be able to rebut the presumption without a reasonable

10          alternative design.

11      b.  Wisconsin bars strict liability claims for damages caused by known,

12          inherent characteristics of the product, such as the known and inherent risks

13          that ████████.

14      c.  Wisconsin law requires proof of a reasonable alternative design, but the

15          plaintiffs have proffered none.

16  B.  Strict liability failure-to-warn claim (Count II):

17      a.  Wisconsin presumes that FDA cleared products are not defective and the

18          plaintiffs should not be able to rebut the presumption without a reasonable

19          alternative warning.

20      b.  Wisconsin bars strict liability claims for damages caused by known,

21          inherent characteristics of the product, such as the known and inherent risks

22          that ████████.

23      c.  Wisconsin law requires proof that a reasonable alternative warning would

24          have made the Bard filter "safe," but the plaintiffs have proffered no such

25          alternative warning.

26  C.  Negligent failure-to-warn claim (Count VII):

27

28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

a. Bard had no duty to warn under Wisconsin's sophisticated user doctrine because the risks ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ were generally known to interventional radiologists.

b. The Instructions for Use that accompanied all of Bard's IVC filters contained warnings about the precise risks of injury ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇, and therefore were adequate as a matter of law.

c. The plaintiffs cannot prove that a specific and different warning would have caused Ms. Hyde's physician to use a different filter because they have offered no such alternative warning and the physician who placed Ms. Hyde's filter testified that he independently knew about the risks at issue.

D. Breach of implied warranty claim (Count XI):

a. Wisconsin does not recognize a breach of implied warranty cause of action in product liability cases.

b. Even if Wisconsin recognized such a claim in a product liability case, there was no privity of contract between Bard and the plaintiffs as would be required.

E. Negligent and fraudulent misrepresentation/concealment claims (Counts VIII, XII, XIII) and claim for Violation of Wisconsin Law (Count XIV):

a. Wisconsin requires proof that the plaintiffs or Ms. Hyde's implanting physician relied on an alleged misrepresentation or omission of material fact by Bard, and the plaintiffs have no such proof.

b. Wisconsin statute 100.18 regarding fraudulent representations requires proof of pecuniary loss from intentionally untrue statements, which the plaintiffs cannot prove.

F. Failure to recall/retrofit (Count VI): Wisconsin does not recognize this as an independent cause of action.

Nelson Mullins Riley & Scarborough

L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

## II.      Summary Judgment Standard.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A moving party without the ultimate burden of persuasion at trial . . . has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos*., 210 F.3d 1099, 1102 (9th Cir. 2000). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id*. "If . . . a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id*. at 1130-31 (internal citations omitted).

## III.     Argument and Citation of Authority.

### A. Wisconsin Law Applies to All of Plaintiffs' Claims

Ms. Hyde's IVC filter was placed in Wisconsin, her alleged damages were discovered while she was living in Nevada, and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ in California. (SOF, ¶¶ 3, 28, 31.)  Plaintiffs filed their short form complaint directly in the MDL and identified the Eastern District of Wisconsin as the forum in which venue would be proper absent direct filing.  (2:16-cv-00893-DGC, Doc. 1.)  Thus, pursuant to the Court's Second Amended Case Management Order No. 4, Wisconsin's conflict-of-law rules apply in determining whether Wisconsin's or Nevada's law applies.[3] (*See* Doc. 1485.)  Likewise, the parties have met and conferred, and agree that Wisconsin choice-of-law rules apply.

Wisconsin's choice-of-law principles weigh heavily in favor of applying Wisconsin law:  "[T]he law of the forum should presumptively apply unless it becomes

---

[3] During the parties' meet and confer process, the plaintiffs claimed that Nevada law should apply, and Bard claimed that Wisconsin law should apply.  Because neither party has suggested that California law should apply, because of the state's minimal connection to the case, Bard will not address California in its choice-of-law analysis.

clear that nonforum contacts are of greater significance." *Drinkwater v. Am. Family Mut. Ins. Co.*, 714 N.W.2d 568, 576 (Wis. 2006) (citation omitted). In Ms. Hyde's case, Nevada's contacts are of no greater significance than Wisconsin's contacts, and therefore Wisconsin law should apply. Indeed, Wisconsin's contacts are more significant than Nevada's contacts in this case:

- The Bard IVC filter that Ms. Hyde received was sold in Wisconsin. (SOF, ¶ 17.)

- Bard's alleged contacts with Ms. Hyde's Wisconsin-based physician occurred in Wisconsin. The plaintiffs have deposed the Wisconsin-based sales representative about these contacts. (*Id.* at ¶ 5.)

- Ms. Hyde's medical treatment leading to the placement of a Bard filter, as well as the placement of the Bard filter, occurred exclusively in Wisconsin while the plaintiffs were residents of Wisconsin. (*Id.* at ¶¶ 1-4.)

In contrast, in 2014, while the plaintiffs were living in Nevada, Ms. Hyde first learned that her IVC filter had fractured. (*Id.* at ¶ 28.) ███████████████████████ ██████████████ in California. (*Id.* at ¶ 31.)

Thus, Nevada's connections to the facts of this case—which are pure happenstance, as the plaintiffs could have chosen to move, and the filter fracture could have been discovered, anywhere—are not of greater significance to overcome the presumption that Wisconsin law applies. In fact, when compared to Wisconsin's contacts, Nevada's connection to the facts of this case are "so obviously limited and minimal that application of [its] law constitutes officious intermeddling" with the laws of Wisconsin. *Drinkwater*, 714 N.W.2d at 576; *Beloit Liquidating Tr. v. Grade*, 677 N.W.2d 298, 307 (Wis. 2004). Accordingly, Wisconsin law should be applied to the plaintiffs' substantive claims in this case.[4]

---

[4] Indeed, having identified the Eastern District of Wisconsin as the district of proper venue, if it were not for the MDL, the plaintiffs would be in the odd position of arguing that the law of the state in which they chose to file their case should not apply and that the Wisconsin court should apply Nevada law.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Because the plaintiffs cannot show that Nevada has significantly greater contacts than Wisconsin to overcome the presumptive application of Wisconsin law, the Court's analysis should end here. *See Extrusion Dies Indus., LLC v. Cloeren Inc.*, No. 08-cv-323-slc, 2008 WL 4401219, at *2, n.2 (W.D. Wis. Sept. 24, 2008). Nevertheless, should the Court proceed to the second step of the analysis, the "choice-influencing factors,"[5] the conclusion that Wisconsin law applies remains the same.

"Predictability of results," which is the first choice-influencing factor, looks at the parties' expectations as to the legal consequences of the conduct which led them to court. *See Drinkwater*, 714 N.W.2d at 577. "In other words, which state's law, if applied, would lead to the more predictable or expected result based on the facts of the case." *Clorox Co. v. S.C. Johnson & Son, Inc.*, 627 F. Supp. 2d 954, 966 (E.D. Wis. 2009). Because Bard's alleged interactions with the physician who placed Ms. Hyde's IVC filter, Dr. Henry, took place in Wisconsin; the plaintiff's IVC filter was sold to a Wisconsin hospital; and the filter was implanted in the plaintiff by Dr. Henry while the plaintiff was a resident in Wisconsin, it is reasonable for both Bard and the plaintiffs to expect that the law of Wisconsin would apply to any claims arising from these interactions. (SOF, ¶¶ 1-5, 17.) Conversely, it is not reasonable for Bard and the plaintiffs to expect that Nevada state law would apply to claims arising from Ms. Hyde's filter implant simply because the plaintiffs happened to move there for reasons unrelated to the IVC filter at issue. (*Id.* at ¶ 30); *see Schultz v. Glidden Co.*, No. 08-C-919, 2013 WL 4959007, at *4 (E.D. Wis. Sept. 13, 2013) (holding, where plaintiff was exposed to benzene-containing products while working in Wisconsin but was later treated and diagnosed in Florida, that Wisconsin law applied where defendant marketed and sold its products to a business in Wisconsin, because application of Wisconsin law was expected, while plaintiff's "move to Florida

---

[5] These factors include, "(1) Predictability of results; (2) Maintenance of interstate and international order; (3) Simplification of the judicial task; (4) Advancement of the forum's governmental interests; and (5) Application of the better rule of law." *See Extrusion Dies Indus., LLC,* 2008 WL at *2.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

was a fortuitous happenstance, not a predictable result").

"Maintenance of interstate and international order," requires that "a jurisdiction which is minimally concerned defer to a jurisdiction that is substantially concerned." *Drinkwater*, 714 N.W.2d at 577. This is because if "a state that is only minimally concerned with a transaction or tort [] thrust its law upon the parties [it] would be disruptive of the comity between states." *Heath v. Zellmer*, 151 N.W.2d 664, 672 (Wis. 1967). Here, the State of Wisconsin has the stronger interest because an allegedly defective product was sold in Wisconsin and implanted into a Wisconsin resident by a Wisconsin-licensed physician. (SOF, ¶¶ 1-4, 17); *Drinkwater*, 714 N.W.2d at 579 (noting that Wisconsin has a "strong interest in compensating its residents who are victims of torts"). In fact, Wisconsin, in particular, has an even stronger interest than many states would have because less than a month before Ms. Hyde received a Bard Filter, Wisconsin's product liability statute became effective, and the statute applies to all actions for damages caused by a product based on a claim of strict liability, like this case. *See* Wis. Stat. § 895.047. The statute provides the standard by which manufacturers will be judged for claims of design, manufacturing, and warnings defects, and the statute also outlines several defenses for product sellers and/or distributors. *Id.* Thus, in furtherance of the Wisconsin legislature's efforts to provide a comprehensive statutory framework for adjudication of product liability cases, Wisconsin has a strong interest in having its laws apply to a case where the medical device at issue was sold and implanted within Wisconsin's borders. *See, e.g., Stupak v. Hoffman-La Roche, Inc.*, 287 F. Supp. 2d 968, 971 (E.D. Wis. 2003) (holding that Wisconsin has the strongest interest in a medical malpractice and product liability action where the drug was prescribed in Wisconsin because the Wisconsin legislature created a statutory scheme to govern medical malpractice cases); *see also Schultz*, 2013 WL 4959007 at *4 (holding that Florida had no interest in plaintiff's recovery for conduct occurring in Wisconsin "simply because [plaintiff] later became a resident of Florida").

"Simplification of the judicial task" looks to whether application of one state's law over the other would simplify the court's work. *Drinkwater*, 714 N.W.2d at 578. Normally, application of the forum state's law will simplify the court's judicial task except where that law is complex or uncertain as compared to the proposed foreign jurisdiction. *Id.* Here, the MDL court is sitting in place of the transferor court in Wisconsin, so this factor should weigh in favor of applying Wisconsin's law, which is neither complex nor uncertain compared to Nevada's law.

Finally, "advancement of the forum government's interests" and "application of the better rule of law," also weigh in favor of applying Wisconsin law. For the same reasons as "maintenance of interstate and international order," Wisconsin, the forum state, has the most significant government interest in applying its law to this product liability action. *See Sharp v. Case Corp.,* 573 N.W.2d 899 (Wis. Ct. App. 1997) (holding that applying Wisconsin tort law advanced Wisconsin state interests, particularly where, as in Wisconsin, "[t]he law of the forum presumptively applies"), *aff'd sub nom.*, 595 N.W.2d 380 (Wis. 1999). In addition, Wisconsin's adoption of a product liability statute indicates that it considers its legal standards and defenses the better rule of law to be applied in this case. *See Love v. Blue Cross & Blue Shield of Georgia, Inc.*, 439 F. Supp. 2d 891, 896 (E.D. Wis. 2006) ("[I]n a case like this in which the forum state has a clear policy, and when the state's law fairly articulates that policy, it follows that the "better rule of law" will tend to be the forum state's law."). For example, Wisconsin statute 895.047(1)(a) codifies the requirement that a plaintiff establish a "reasonable alternative design" as part of its claim for strict liability design defect, while under Nevada law proof of alternative design is only one factor for the jury to consider. *See Robinson v. G.G.C., Inc.*, 107 Nev. 135, 140 (1991). Accordingly, even based on an analysis of Wisconsin's choice-influencing factors, Wisconsin law should apply to the substantive claims in this case.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

**B.  Plaintiffs' Strict Liability Design Defect Claim (Count III) Fails for Several Independent Reasons**

**1.  Plaintiff's IVC Filter Was Cleared by the FDA and is Presumed Non-Defective**

The Wisconsin product liability statute states that "[e]vidence that the product, at the time of sale, complied in material respects with relevant standards, conditions, or specifications adopted or approved by a federal or state law or agency shall create a rebuttable presumption that the product is not defective." Wis. Stat. § 895.047(3)(b). Bard's IVC filters complied with federal law and the 510(k) process standards and conditions approved by the FDA, a federal agency regarding the filters' design. (SOF, ¶ 25.)  Because of Bard's compliance with these federal standards, Bard's IVC filters were cleared for use by the FDA. (*Id.* at ¶ 26.)   Without a reasonable alternative design that would have rendered Bard's IVC filter "safe," as discussed below, the plaintiffs should not be able to overcome Wisconsin's statutory presumption.  As such, their strict liability design defect claim should fail as a matter of law.

**2.  Plaintiffs' Alleged Filter Complications Were Inherent and Known Risks of IVC Filters**

Wisconsin's product liability statute provides that "[t]he court shall dismiss the claimant's action under this section if the damage was caused by an inherent characteristic of the product that would be recognized by an ordinary person with ordinary knowledge common to the community that uses or consumes the product." Wis. Stat. § 895.047(3)(d). All IVC filters, including Bard's IVC filters, carry the risks of fracture, migration, perforation of the IVC, and tilt, which are the risks that came to pass in Ms. Hyde's filter.

By way of example, Ms. Hyde received a Bard filter in February 2011.  Ten years earlier, the Society of Interventional Radiology (the national society for physicians who place IVC filters) published clinical practice guidelines that reported about the complications of all IVC filters (indeed, Bard's retrievable filters were not on the market in 2001 when these Guidelines were published). (SOF, ¶ 8-9.)   The Society of

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Interventional Radiology reported that IVC filters migrate (reported at rates up to 18%), fracture (reported at rates up to 10%), perforate the IVC (reported at rates up to 41%), and tilt (reported at rates from 5 to 50%). (*Id.*) In 2010, the FDA issued a Safety Alert concerning all IVC filters, entitled, *Inferior Vena Cava (IVC) Filters: Initial Communication: Risk of Adverse Events With Long Term Use*. (*Id.* at ¶¶ 11-12.) The FDA wrote, "Known long term risks associated with IVC filters include but are not limited to lower limb deep vein thrombosis (DVT), filter fracture, filter migration, filter embolization and IVC perforation." (*Id.*) The plaintiffs' expert, Dr. Derek Muehrcke, likewise acknowledges that all IVC filters are known to fracture, migrate, tilt, and perforate the IVC. (*Id.* at ¶ 23.) Finally, Dr. Henry, who is an ordinary user of Bard's IVC filters, testified that at the time of Ms. Hyde's treatment he was aware that IVC filters in general could move, fracture, and that fractured components could embolize. (*Id.* at ¶ 14.) Thus, the complications that came to pass in Ms. Hyde's filter are inherent characteristics of IVC filters and were widely known and discussed before Ms. Hyde received a Bard filter in 2011. Accordingly, the plaintiffs' strict liability claims should be dismissed under Wisconsin Statute § 895.047(3)(d).

### 3. Plaintiffs Lack Evidence of a Reasonable Alternative Design

To establish a strict liability design defect, plaintiffs must prove, through expert testimony, that "the foreseeable risks of harm posed by the [plaintiff's IVC filter] could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer and the omission of the alternative design renders the product not reasonably safe." *See* Wis. Stat. § 895.047(1)(a); *Johnson v. Mylan Inc.*, 107 F. Supp. 3d 967, 974 (E.D. Wis. 2015) (expert testimony required when matters are outside a lay jury's common knowledge or ordinary experience).

In this case, Ms. Hyde was treated with a Bard retrievable IVC filter. Thus, one of the primary design elements of the filter was that it could be percutaneously removed at the physician's option. In fact, Dr. Henry testified that the Bard filter's ability to "potentially be retrieved" was "definitely" one of the benefits that he considered in

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

choosing the Bard filter for Ms. Hyde. (SOF, ¶ 7.)  The plaintiffs, however, have not identified a reasonable alternative design to the Bard filter that Ms. Hyde received that reduces or avoids the alleged complications that she experienced while also retaining the option of percutaneous retrieval.[6]  Accordingly, because the plaintiffs cannot establish a reasonable alternative design to the filter that Ms. Hyde received, their strict liability design defect claim fails as a matter of law under Wis. Stat. § 895.047(1)(a).

### C. Plaintiffs' Strict Liability Failure-To-Warn Claim (Count II) Fails Because of Wisconsin's Statutory Defense and for Lack of Evidence

As discussed, *supra*, the Wisconsin product liability statute provides a rebuttable presumption that products are not defective when they complied with standards adopted or approved by a federal agency, like the FDA. Wis. Stat. § 895.047(3)(b).  Here, Bard's Instructions for Use ("IFU") documents, which accompanied its IVC filters and contained warnings about the filters' risks, were submitted to and cleared by FDA. (SOF, ¶¶ 19-21, 25-26.)  Thus, Bard should be entitled to a presumption that the warnings were not defective.  And because the plaintiffs have not identified any language that would have cured the alleged defective warnings, as discussed below, they should not be permitted to overcome the presumption of no defect.  As such, the Court should grant summary judgment on the plaintiffs' strict liability failure-to-warn claim.

Similarly, the Wisconsin product liability statute bars strict liability claims where the damage to the plaintiff is caused by a known and inherent characteristic of the product. Wis. Stat. § 895.047(3)(d).  As discussed, *supra*, the complications that came to pass in

---

[6] To the extent that the plaintiffs claim that the Simon® Nitinol Filter ("SNF") is a reasonable alternative design, the argument fails because the filter cannot be retrieved. *See Godoy ex rel. Gramling v. E.I. du Pont de Nemours & Co.*, 743 N.W.2d 159, 162 (2007), *aff'd as modified*, 768 N.W.2d 674 (2009) (noting that an alternative design cannot make the product "something else."); *McCarthy v. Olin Corp.*, 119 F.3d 148, 155 (2d Cir. 1997) (finding that regular bullets were not a feasible alternative design for hollow-point bullets because the expansion mechanism of the hollow-point bullets "was an intentional and functional element of the design of the product.").  In addition, the plaintiffs' expert, Robert M. McMeeking, Ph.D., testified that the SNF does not represent a reasonable alternative design to Bard's retrievable IVC filters.  (SOF, ¶ 32.)

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Ms. Hyde's filter are inherent characteristics of IVC filters that were known and discussed before Ms. Hyde received a Bard filter in 2011.  As such, the plaintiffs' strict liability failure-to-warn claim fails as a matter of law.

Finally, to establish a prima facie strict liability failure-to-warn claim, the plaintiffs must prove that "the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe." Wis. Stat. § 895.047(1)(a).  Satisfying this element of proof requires reasonable alternative warnings that would have rendered Bard's filter "safe." *See Lexington Ins. Co. v. Whesco Grp., Inc.*, No. 11-CV-598-BBC, 2013 WL 4454959, at *8 (W.D. Wis. Aug. 16, 2013) (noting that a strict liability warnings claim requires proof of reasonable alternative warnings and granting summary judgment to the defendant manufacturer on this claim).  The plaintiffs, however, have identified no such alternative warnings.  As such, the plaintiffs cannot meet their burden of proof and summary judgment is warranted.

### D. Plaintiffs' Negligent Failure-To-Warn Claim (Count VII) Fails for Several Independent Reasons

#### 1. Under Wisconsin's Likely Adoption of the Learned Intermediary Doctrine and the Sophisticated User Doctrine, Bard Had No Duty To Warn

Although the Wisconsin Supreme Court has not yet had the opportunity to address the learned intermediary doctrine, multiple federal courts applying Wisconsin law have held that a medical device manufacturer's duty to warn runs to the treating physician rather than to the patient. *See, e.g.*, *Monson v. Acromed Corp.*, No. 96-C-1336, 1999 WL 1133273 at *20 (E.D. Wis. May 12, 1999) (applying Wisconsin law, holding that under the learned-intermediary doctrine, "the manufacturer must warn the physician . . . and not the patient directly"); *Menges v. Depuy Motech, Inc.*, 61 F. Supp. 2d 817, 830 (N.D. Ind. 1999) (applying Wisconsin law) ("under the Learned Intermediary Doctrine,

manufacturers of prescription medical products have a duty only to warn physicians, rather than patients, of the risks associated with the use of the product"); *Lukaszewicz v. Ortho Pharm. Corp.*, 510 F. Supp. 961, 963 (E.D. Wis. 1981), *amended*, 532 F. Supp. 211 (E.D. Wis. 1981). Further, a Wisconsin state trial court has followed this rule and recognized that "courts of numerous other jurisdictions almost universally hold that in the case of prescription drugs, a manufacturer's provision of proper warnings to a prescribing physician will satisfy the manufacturer's duty to warn since the patient cannot obtain the drug except through the physician." *Straub v. Berg*, Nos. 00-CV-2100, 00-CV-0117, 2003 WL 26468454 at *6 (Wis. Cir. Jan. 6, 2003) (citation omitted). Thus, in this case, any duty that Bard had to warn ran to Ms. Hyde's treating physician, not to Ms. Hyde.

Moreover, under Wisconsin's application of the sophisticated user doctrine, "there is no duty to warn members of a trade or profession about dangers generally known to that trade or profession." *Shawver v. Roberts Corp.*, 280 N.W.2d 226, 233 (Wis. 1979). Thus, there is "no duty to warn if the user knows or should know of the potential danger, especially when the user is a professional who should be aware of the characteristics of the product." *Haase v. Badger Mining Corp.*, 669 N.W.2d 737, 743 (Wis. Ct. App. 2003) (citation omitted).

Here, the sophisticated user doctrine bars the plaintiffs' negligent failure-to-warn claim because at the time of Ms. Hyde's treatment with a Bard IVC filter, the risks that came to pass in Ms. Hyde were known risks associated with IVC filter generally, including with Bard IVC filters. As discussed, *supra* in Section B.2, the Society of Interventional Radiology had published about these risks of IVC filters as early as 2001, the FDA described these as "[k]nown long term risks associated with IVC filters" in 2010, the plaintiffs' expert acknowledges that these risks exist with all IVC filters, and Dr. Henry testified that he knew the risks when he placed the Bard filter in Ms. Hyde. (SOF, ¶ 8-9, 11-12, 14, 23.) Moreover, by 2011, the medical literature contained numerous articles discussing Bard filters and the risks that came to pass in Ms. Hyde's filter. (*See, e.g., Id.* at ¶ 10, 13) (discussing an article published in 2010 reporting on the

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street N.W., Suite 1700
Atlanta, GA 30363
(404) 322-6000

complications of strut fracture and embolization to the heart in several patients with Bard's filters; and an article published in 2009 reporting on perforation, filter fracture, tilt, and migration with Bard's filters). Thus, the risks inherent in IVC filters were "generally known to that trade or profession." Accordingly, Bard had no duty to warn of these complications pursuant to the sophisticated user doctrine, and summary judgment is warranted on the plaintiffs' negligent failure-to-warn claim.

### 2. Bard's Warnings Were Adequate as a Matter of Law

Even if Bard had a duty to warn about the risks inherent in its IVC filters, Bard's warnings to physicians through the IFUs, which accompanied each IVC Filter, were adequate as a matter of law. Bard's IFUs contain specific warnings regarding the risks of migration, tilt, perforation, strut fracture, and cardiac complications requiring retrieval of the fragment percutaneously or surgically, which are the complications that Ms. Hyde experienced.

Under two separate bolded headings, "**Warnings**" and "**Potential Complications**" the IFUs contain the following language about filter fracture and embolization:

> **Filter fractures are a known complication of vena cava filters. There have been some reports of serious pulmonary and cardiac complications with vena cava filters requiring the retrieval of the fragment utilizing endovascular and/or surgical techniques.**

(SOF, at ¶ 19) (emphasis in original.)

Under the same two separate bolded headings, the IFUs contain the following language about filter migration and tilt:

> **Movement, migration or tilt of the filter are known complications of vena cava filters. Migration of filters to the heart or lungs has been reported. There have also been reports of caudal migration of the filter. Migration may be caused by placement in IVCs with diameters exceeding the appropriate labeled dimensions specified in this IFU. Migration may also be caused by improper deployment, deployment into clots, and/or dislodgement due to large clot burdens.**

(*Id.*) The "**Potential Complications**" section also warns about "Filter tilt" and "Filter malposition." (*Id.* at ¶ 20.)

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Under the bolded "**Potential Complications**" section, the IFUs also warn about perforation of the IVC wall: "Perforation or other acute or chronic damage of the IVC wall" and "Vessel injury." (*Id.*)

Finally, the IFUs warn that "**All of the above complications may be associated with serious adverse events such as medical intervention and/or death.**" (*Id.* at ¶ 21).

Because the IFU warned Dr. Henry about the precise risks of complications that came to pass with Ms. Hyde's IVC filter, Bard's warnings were legally adequate. *See, e.g., Kurer v. Parke, Davis & Co.*, 679 N.W.2d 867, 878 (Wis. Ct. App. 2004) (affirming that Warner-Lambert's warnings were adequate as a matter of law when they discussed the precise complications that the plaintiff experienced); *see also, e.g., Below by Below v. Yokohama Tire Corp.*, No. 15-CV-529-WMC, 2017 WL 570985, at *2 (W.D. Wis. Feb. 13, 2017) (holding that warning was adequate as a matter of law when it warned of the specific danger that occurred in the case); *Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp. 2d 791, 811, 813 (E.D. Wis. 2010) (same).

To the extent the plaintiffs argue that Bard failed to warn Dr. Henry regarding the relative complication rates of Bard's IVC filters compared to other filters, Bard can find no Wisconsin law creating such a duty. Rather, courts that have addressed the issue have found that pharmaceutical and medical-device manufacturers have no such duty to warn.[7] Likely for this reason, Bard could find no IVC filter manufacturer that provides comparative rates in the instructions for use that they provide to doctors. (SOF, ¶ 24.) Accordingly, Bard had no legal duty to provide warnings to Dr. Henry regarding the rates of complications with its IVC filters in comparison to any other IVC filter.

---

[7] *See, e.g., Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 291–92 (6th Cir. 2015) (affirming summary judgment on failure-to-warn claim where the lower court rejected the plaintiff's argument that the product labeling did not warn that the risk of stroke for the birth control at issue was higher than with other birth control products); *Ackley v. Wyeth Labs., Inc.*, 919 F.2d 397, 405 (6th Cir. 1990) ("The manufacturer is obligated to make a reasonable disclosure of all the risks inherent in its own drug . . . . It is not obligated to provide a comparison of its drug with others").

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street N.W., Suite 1700
Atlanta, GA 30363
(404) 322-6000

### 3. Any Alleged Failure To Warn Was Not the Proximate Cause of Plaintiffs' Alleged Injuries

An element of the plaintiffs' negligent failure-to-warn claim requires proof that the inadequate warning caused their alleged damages.[8] *See Kessel ex rel. Swenson v. Stansfield Vending, Inc.*, 714 N.W.2d 206, 211 (Wis. Ct. App. 2006). Wisconsin's standard for causation is "whether the defect was a substantial factor in producing the injury." *Solar v. Kawasaki Motor Corps, U.S.A*., 221 F. Supp. 2d 967, 970 (E.D. Wis. 2002); *see also Werner v. Pittway Corp.*, 90 F. Supp. 2d 1018, 1027 (W.D. Wis. 2000). In the context of prescription medical products, satisfying this burden requires proof that the purported proper warning would have caused a different product to be used, thereby avoiding the plaintiff's alleged injuries. *See Kurer v. Parke, Davis & Co.*, 679 N.W.2d 867, 876 (Wis. Ct. App. 2004) ("Absent proof that a more complete or explicit warning would have prevented [plaintiff's] use of [defendant's product], she cannot establish that [defendant's] alleged failure to warn was the proximate cause of her injuries.); *Menges v. Depuy Motech, Inc.*, 61 F. Supp. 2d 817, 830 (N.D. Ind. 1999) (applying Wisconsin law, and finding that "a plaintiff must not only show that a manufacturer's warning was inadequate, but that such inadequacy affected the prescribing physician's use of the product and thereby injured the plaintiff").

Here, Ms. Hyde's treating doctor never testified that if he had received a different warning for Bard's IVC filter, he would have chosen a different filter. Rather, he testified that his criteria for choosing an IVC filter was that it was cleared for use by the FDA, that he trusts the FDA more than individual manufacturers, and that he would not have altered his treatment of Ms. Hyde with a Bard IVC filter even if he was provided with certain facts the plaintiffs allege to be true. (SOF, ¶ 15.) In the absence of evidence establishing that an alleged failure to warn was the cause of the plaintiffs' injuries—that is, that a

---

[8] Proof of causation also applies to the plaintiffs' strict liability failure-to-warn claim. Wis. Stat. § 895.047(1)(e). As such, summary judgment is warranted on the plaintiffs' strict liability failure-to-warn claim on this ground too.

different warning would have caused Ms. Hyde's physician to use a different filter—the plaintiffs cannot satisfy the causation element of their failure-to-warn claims. *See Kurer*, 679 N.W.2d at 876 (affirming summary judgment on the plaintiff's failure-to-warn claim where the plaintiff failed to establish that any additional warning would have prevented her alleged harm).

Likewise, Dr. Henry testified that before he treated Ms. Hyde, he was already aware that IVC filters carried the risks that came to pass in Ms. Hyde: "At the time that you implanted the Bard filter in Mrs. Hyde, I think you've testified that you were aware that complications with filters included movement of the filter, fracture, and even embolization or movement of a fractured fragment; is that true?  A. Yes." (SOF, ¶ 14.) Because Dr. Henry already knew about the potential complications that occurred in Ms. Hyde's filter, no alleged failure to warn about those potential complications could have proximately caused Ms. Hyde's alleged injuries.

### E. Plaintiffs' Breach of Implied Warranty Claim (Count XI) Fails Because Wisconsin Does Not Recognize The Cause of Action in Product Liability Cases

Wisconsin does not recognize a product liability cause of action for breach of implied warranty. *Austin v. Ford Motor Co.*, 273 N.W.2d 233, 240 (Wis. 1979) (finding that under Wisconsin law "it is inappropriate to bring an action for breach of warranty where a tort remedy is sought").  Thus, tort and breach of implied warranty claims may not be brought in the same action. *Id.* at 241 ("[P]laintiffs [can] not encumber the case by trying it on the duplicative theories of strict product liability and implied breach of warranty.").  Accordingly, because the plaintiffs filed claims against Bard sounding in tort, they are precluded from also pursuing a breach of implied warranty claim. *See, e.g.*, *Adamany ex rel. Adamany v. Cub Cadet Corp.*, No. 04-C-02240C, 2004 WL 1795237, at **1-2 (W.D. Wis. Aug. 5, 2004) (dismissing plaintiffs' breach of implied warranty claim finding that plaintiffs could not pursue an action for strict products liability and for breach of implied warranties).

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street N.W., Suite 1700
Atlanta, GA 30363
(404) 322-6000

Even if the plaintiffs' breach of implied warranty claim against Bard was viable, a prima facie breach of implied warranty claim requires privity of contract. *Northridge Co. v. W.R. Grace & Co.*, 471 N.W.2d 179, 187 (Wis. 1991). Here, the plaintiffs were not in privity of contract with Bard because Bard's IVC filters are not sold directly to patients and the plaintiffs cannot produce any evidence that they are the "buyer" of Ms. Hyde's IVC filter from Bard. (SOF, ¶¶ 17-18.) As such, even if a breach of implied warranty claim were permitted, the plaintiffs cannot satisfy an element of the claim.

### F. Plaintiffs' Negligent and Fraudulent Misrepresentation/Concealment Claims (Counts VIII, XII, XIII) and Claim for Violation of Wisconsin Law Claim (Count XIV) Fail as a Matter of Law Because Plaintiffs Cannot Prove the Essential Elements of Reliance or Causation

To establish a claim of negligent or fraudulent misrepresentation, the plaintiffs have the burden to prove that they acted in reliance upon a false representation by Bard. *See Kohler Co. v. Kopietzki*, No. 13-cv-1170, 2016 WL 1048036, at *6 (E.D. Wis. Mar. 11, 2016); *Grube v. Daun*, 496 N.W.2d 106, 115 (Wis. Ct. App. 1992). Similarly, to succeed on a fraudulent concealment claim, the plaintiffs must prove that they acted in reliance on Bard's material factual omission. *See Staudt v. Artifex Ltd.*, 16 F. Supp. 2d 1023, 1031 (E.D. Wis. 1998).

Here, the plaintiffs both testified that they have never spoken to anyone at Bard or received any information from Bard, (SOF, ¶ 27), and therefore could not have acted in reliance on anything that Bard allegedly said or omitted. Moreover, Dr. Henry testified that he relied on information from the FDA, not Bard, when he chose to use Bard's IVC filter for Ms. Hyde. (*Id.* at ¶ 15). And he did not recall any discussions with Bard's sales representatives that occurred at any time before treating Ms. Hyde. (*Id.* at ¶ 16.f) Thus, the plaintiffs cannot prove that Dr. Henry acted in reliance on anything that Bard allegedly said or omitted in communications to him, and the plaintiffs' claims for negligent and fraudulent misrepresentation fail as a matter of law.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Similarly, a claim under Wisconsin statute 100.18 for fraudulent representations requires the plaintiffs to show that they sustained a pecuniary loss as a result of intentional untrue statements made to the public. Wis. Stat. § 100.18.  Here, there is no evidence that any alleged intentional untrue statements that Bard made to the public caused Dr. Henry to use the Bard IVC filter or the plaintiffs to incur any pecuniary loss. *See Valente v. Sofamor, S.N.C.*, 48 F. Supp. 2d 862, 874 (E.D. Wis. 1999) (claim under Wisconsin Statute § 100.18 fails because no causal connection between defendant's alleged conduct and any pecuniary loss suffered by the plaintiffs).  As such, the claim fails as a matter of law.

> **G. Plaintiffs' Claim for Failure to Recall/Retrofit (Count VI) Fails Because Wisconsin Does not Recognize This Claim as an Independent Cause of Action**

Plaintiffs' claim for failure to recall/retrofit is premised on Bard's purported breach of its duty to recall or retrofit Bard's IVC filters (See Master Complaint for Damages for Individual Claims [Dkt. No. 364] at ¶¶ 206-209).  Yet, no Wisconsin statute or court has recognized that a manufacturer has an independent duty to recall or retrofit a product. Because Wisconsin does not recognize an independent cause of action to recall or retrofit a product, the plaintiffs' claim fails as a matter of law.

**IV.   Conclusion.**

For these reasons, Bard respectfully requests that this Court grant Bard's Motion for Partial Summary Judgment.

RESPECTFULLY SUBMITTED this 28th day of August, 2017.

By:  s/ Richard B. North, Jr.
    James R. Condo
    Amanda C. Sheridan
    One Arizona Center
    400 E. Van Buren, Suite 1900
    Phoenix, Arizona  85004-2202

    Richard B. North, Jr. (admitted *pro hac vice*)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
Nelson Mullins Riley & Scarborough LLP
201 17th Street, NW / Suite 1700
Atlanta, GA  30363

Attorneys for C. R. Bard, Inc. and Bard
Peripheral Vascular, Inc.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2017, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

                                                              s/ Richard B. North, Jr.

# REDACTED DOCUMENTS RELATED TO DOCKET 7359

**7360 - Defendants' Separate Statement of Facts in Support of Their Motion for Partial Summary Judgment as to Plaintiffs Lisa and Mark Hyde's Claims - Filed Redacted**

James R. Condo (#005867)
Amanda C. Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2204
Telephone:  (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, GA  30363
Telephone: (404) 322-6000
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

*Attorneys for Defendants*
*C. R. Bard, Inc. and*
*Bard Peripheral Vascular, Inc.*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation, | No. 2:15-MD-02641-DGC |
| | **DEFENDANTS' MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFFS LISA AND MARK HYDE'S CLAIMS** |
| LISA HYDE and MARK HYDE, a married couple, | (Assigned to the Honorable David G. Campbell) |
| Plaintiffs, | |
| v. | |
| C. R. BARD, INC., a New Jersey corporation and BARD PERIPHERAL VASCULAR, INC., an Arizona corporation, | |
| Defendants. | |

Nelson Mullins Riley & Scarborough
———— L.L.P. ————
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Pursuant to Fed. R. Civ. P. 56(c), Local Rule 56.1(a), and Case Management Order No. 53 (Doc. 5770), Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively "Bard") respectfully submit this Separate Statement of Facts in Support of its Motion for Partial Summary Judgment as to Plaintiffs Lisa and Mark Hyde's Claims.

1. ███████████████████████████████████████████████████████████████████████████████████████████████████████████. (Ex. A, Plaintiffs' Fact Sheet ("PFS") at § II.3.; Ex. B, Selected Plaintiff Medical Records at HYDEL_WFHW_MDR00099.)

2. The plaintiffs were Wisconsin residents at that time. (Ex A, PFS at § I.5.)

3. ███████████████████████████████████████████████████████████████████. ██████████████████████████████████████████████████ (Ex. A, PFS, at §§ II.2(a), II.4, II.5.; Ex. B, Selected Plaintiff Medical Records at HYDEL_WFHF_RAD00002 - HYDEL_WFHF_RAD00003.)

4. At the time of Ms. Hyde's filter implant, Dr. Henry was only practicing medicine in Wisconsin. (Ex. C, April 6, 2017 Dr. David Henry Deposition Transcript ("Henry Dep. Tr.") at 4:23-5:2, 22:16-20.)

5. Any contacts Bard had with Dr. Henry would have occurred in Wisconsin through Bard's Wisconsin-based sales representative, Matthew Fermanich. (Ex. D, March 27, 2017 Matthew Fermanich Deposition Transcript at 17:1-18:19.)

6. Nothing in the record indicates what, if any, changes occurred to the Bard filter from the time that it left Bard's possession to the time that it was placed in Ms. Hyde.

7. Dr. Henry testified that the Bard filter's ability to "potentially be retrieved" was "definitely" one of the benefits that he considered in choosing the Bard filter for Ms. Hyde. (Ex. C, Henry Dep. Tr. at 89:25-90:12.)

8. In 2001, the Society of Interventional Radiology published the following clinical practice guidelines that reported about the complications of all IVC filters. (Ex. E, Grassi, *Quality Improvement Guidelines for Percutaneous Permanent Inferior Vena*

- 1 -

Nelson Mullins Riley & Scarborough

— L.L.P. —
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

*Cava Filter Placement for the Prevention of Pulmonary Embolism*, 12 J. Vascular & Interventional Radiology 137, 139 (2001).)

9.      The Society of Interventional Radiology reported that IVC filters migrate (reported at rates up to 18%), fracture (reported at rates up to 10%), perforate the IVC (reported at rates up to 41%), and tilt (reported at rates from 5 to 50%). *Id.*

10.     In 2009, *Binkert, et al.* published a study in the Journal of Vascular and Interventional Radiology 2009 reporting on perforation, filter fracture, tilt, and migration with Bard's filters. (Ex. F, Binkert, C.A., *et al.*, *Technical Success and Safety of Retrieval of the G2 Filter in a Prospective, Multicenter Study,* J VASC. INTERV. RADIOL. 2009; 20:1449-1453.)

11.     On August 9, 2010, the FDA issued a Safety Alert concerning all IVC filters. (Ex. G, *Inferior Vena Cava (IVC) Filters: Initial Communication: Risk of Adverse Events With Long Term Use.*)

12.     The FDA wrote, "Known long term risks associated with IVC filters include but are not limited to lower limb deep vein thrombosis (DVT), filter fracture, filter migration, filter embolization and IVC perforation." *Id.*

13.     Also in 2010, Dr. Nicholson, *et al.* authored a published article reporting on perforation, filter fracture, tilt, and migration with Bard's filters. (Ex. H, Nicholson, *et al.*, *Prevalence of Fracture and Fragment Embolization of Bard Retrievable Vena Cava Filters and Clinical Implications Including Cardiac Perforation and Tamponade,*" ARCHIVES OF INTERNAL MEDICINE, Vol. 170 No. 20, November 8, 2010.)

14.     Dr. Henry testified that at the time of Ms. Hyde's implant he was aware that IVC filters in general could move, fracture, and that fractured components could embolize. (Exhibit C, Henry Dep. Tr. at 85:17-87:10.)

15.     Dr. Henry also testified that his criteria for choosing an IVC filter for Ms. Hyde was that it is cleared for use by the FDA, that he trusts the FDA more than individual manufacturers, and that he would not have altered his treatment of Ms. Hyde with a Bard IVC filter even if he was provided with certain facts the plaintiffs allege to be

*Nelson Mullins Riley & Scarborough*
— L.L.P. —
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

- 2 -

true. *Id.* at 25:13-25, 31:15-32:11, 44:20-45:24.

16.     Dr. Henry further testified that he did not recall any discussions with Bard's sales representatives that occurred at any time before treating Ms. Hyde. *Id.* at 39:14-40:8.

17.     The IVC filter implanted in Ms. Hyde was sold by Bard to Wheaton Franciscan Healthcare Hospital.

18.     The IVC filter implanted in Ms. Hyde is not sold directly to patients. (Ex. I, G2®X Instructions for Use (the "G2X IFU") at page 1; Ex. J, Eclipse® Filter Instructions for Use (the "Eclipse IFU") at page 1.)

19.     The G2X and Eclipse® IFU applicable in February 2011 (when the plaintiff received her Filter) included the following identical warnings:

a.     Under the bolded headings "**Warnings**" and "**Potential Complications**," the IFUs warn of the following complications, which may occur at any time during or after the procedure:

- Filter fractures are a known complication of vena cava filters. There have been some reports of serious pulmonary and cardiac complications with vena cava filters requiring the retrieval of the fragment utilizing endovascular and/or surgical techniques.

- Movement, migration or tilt of the filter are known complications of vena cava filters. There have also been reports of caudal migration of the filter. Migration may be caused by placement in IVCs with diameters exceeding the appropriate labeled dimensions specified in this IFU. Migration may also be caused by improper deployment, deployment into clots, and/or dislodgement due to large clot burdens.

(Ex. I, G2X IFU, Ex . J, Eclipse IFU.)

20.     The "**Potential Complications**" of the IFUs also warn about "Filter tilt," "Filter malposition," "Perforation or other acute or chronic damage of the IVC wall, and "Vessel injury." *Id.*

21.     Finally, the IFUs also warn that "**All of the above complications may be associated with serious adverse events such as medical intervention and/or death.**"

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

*Id.*

22.     The plaintiffs have not identified alternative warnings that would have rendered Bard's IVC filter safe.

23.     The plaintiffs' expert,  Dr. Derek Muehrcke, acknowledges that all IVC filters are known to have complications, including filter fracture, migration, tilt, penetration, and perforation. (Ex. K, July 24, 2017 Dr. Derek Muehrcke Deposition Transcript at 55:22-57:9.)

24.     Bard is not aware of any IVC filter manufacturer that provides comparative rates in the instructions for use that it provides to doctors.

25.     Bard's G2X and Eclipse IVC filters were cleared for use by the FDA through its 510(k) process.  (Ex. L, FDA Clearance Letter for G2X IVC filter, Ex. M, FDA Clearance Letter for Eclipse IVC filter.)

26.     As part of Bard's compliance with the FDA's 510(k) process, Bard submitted proposed warnings for the G2X and Eclipse filters, which were approved by the FDA as part of the FDA's clearance of the devices. (*See* Exhibit 104 to Robert Carr's Declaration in Support of Bard's Motion for Summary Judgment Regarding Preemption at BPV-17-01-130627 – BPV-17-01-130660, lodged under seal at docket no. 5411; Exhibit 121 to Robert Carr's Declaration in Support of Bard's Motion for Summary Judgment Regarding Preemption at BPV-17-01-00117076 – BPV-17-01-00117095, lodged under seal at docket no. 5411.)

27.     Neither of the plaintiffs have ever spoken to anyone at Bard or received any information from Bard.  (Ex. N, January 25, 2017 Lisa Hyde Deposition Transcript (Lisa Hyde Dep. Tr.") at 140:13-22.;   Ex. O, January 25, 2017 Mark Hyde Deposition Transcript at 48:22-49:1.)

28.     On May 16, 2014, while the plaintiffs were residents of Nevada, Ms. Hyde first learned that ███████████████. (Ex A, PFS at I.5, II.12(iii).)

29.     The plaintiffs have not identified a reasonable alternative design to Bard's IVC filter that would have reduced or avoided risks of harm that Ms. Hyde experienced

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1  while also retaining the option of percutaneous retrieval.

2       30.    The plaintiffs moved from Wisconsin to Nevada because of Mark Hyde's

3  employment. (Ex. N, Lisa Hyde Dep. Tr. at 18:20-19:2.)

4       31.    Ms. Hyde's ███████████████████████████████ in

5  California. (Ex A, PFS at II.10(a)-(c).)

6       32.    The plaintiffs' expert, Robert M. McMeeking, Ph.D., acknowledges that the

7  Simon Nitinol Filter does not represent a reasonable alternative design to Bard's

8  retrievable IVC filters. (Ex. P, July 6, 2017 Robert M. McMeeking, Ph.D. Deposition

9  Transcript at 221:16-223:3.)

10

11       RESPECTFULLY SUBMITTED this 28th day of August, 2017.

12                s/Richard B. North, Jr.

13                Richard B. North, Jr.
              Georgia Bar No. 545599

14                Matthew B. Lerner
              Georgia Bar No. 446986

15                NELSON MULLINS RILEY & SCARBOROUGH, LLP
              Atlantic Station

16                201 17th Street, NW / Suite 1700
              Atlanta, GA 30363

17                PH: (404) 322-6000
              FX: (404) 322-6050

18                richard.north@nelsonmullins.com
              matthew.lerner@nelsonmullins.com

19                James R. Condo (#005867)

20                Amanda Sheridan (#027360)
              SNELL & WILMER L.L.P.

21                One Arizona Center
              400 E. Van Buren

22                Phoenix, AZ 85004-2204
              PH: (602) 382-6000

23                jcondo@swlaw.com
              asheridan@swlaw.com

24                **Attorneys for Defendants C. R. Bard, Inc. and**

25                **Bard Peripheral Vascular, Inc.**

26

27

28

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of August 2017, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

<u>s/Richard B. North, Jr.</u>
Richard B. North, Jr.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

# REDACTED DOCUMENTS RELATED TO DOCKET 7359

## Exhibit A - Filed Redacted

be used for the purposes related to this litigation and may be disclosed only as permitted under the protective order in this litigation.

## I. BACKGROUND INFORMATION

1.   Please state:

(a)   Full name of the person who received the Bard inferior vena cava filter, including maiden name: Lisa Ann Hyde, Maiden Name: DeRose

(b)   List all names by which you have ever been known, if different from that listed in 1(a): Lisa DeRose, Lisa Shack

(c)   Full name of the person completing this form, if different from the person listed in 1(a) above, and the relationship of the person completing this form to the person listed in 1(a) above: N/A

(d)   The name and address of your primary attorney:

Lopez McHugh LLP

100 Bayview Circle, Suite 5600

Newport Beach, CA 92660

(e)   When did you first retain an attorney to represent you in your lawsuit against Bard? In or around September 2014

2.   Your Social Security Number: ███████

3.   Your Date of Birth: ███████

4.   Your current residential address: ███████████████

5.   If you have lived at this address for less than 10 years, provide each of your prior residential addresses from 2000 to the present:

| Prior Residential Address | Dates You Lived At This Address |
|---|---|
| ████████████ | ████████████ |
| ████████████ | ████████████ |

6.   Have you ever been married? Yes___X___       No_____

If yes, provide the names and addresses of each spouse and the inclusive dates of your marriage to each person:

████████████████████████████

████████████████████.

2

13.     Within the last ten years, have you been convicted of, or plead guilty to, a felony and/or crime of fraud or dishonesty? Yes___ ▮___     No____ ▮_____

If Yes, please set forth where and when and identify the felony and/or crime:

_____

14.     Before contacting any attorney regarding this lawsuit or claim, had you ever seen any television or print advertisements regarding possible claims against inferior Vena Cava Filter manufacturers?   Yes____X_____          No_____

If Yes, set forth the approximate date and nature of any such advertisement, whether the advertisement included the name of a law firm, whether the advertisement specifically mentioned C. R. Bard, Inc., Bard Peripheral Vascular, Inc., or "Bard", and other details that you recall.

<u>Plaintiff recalls seeing a television advertisement pertaining to IVC filters in or around May 2014, but does not recall whether it mentioned a particular brand or law firm.</u>

## II. CLAIM INFORMATION

1.     Have you ever received a Bard Inferior Vena Cava Filter? Yes____X_____     No_____

If Yes, please check the box(es) for each type of Bard Inferior Vena Cava Filter you have received:

       ☐     Recovery®

       ☑     G2®

       ☐     G2®X

       ☐     G2®Express

       ☐     Eclipse®

       ☐     Meridian®

       ☐     Denali®

       ☐     Simon Nitinol

       ☐     Other (please identify):_____

2.     For each Bard Inferior Vena Cava Filter identified above, please provide the following information:

(a)   The date each Bard Inferior Vena Cava Filter was implanted in you:

██████████████████   _____

(b)   The product code and lot number of each Bard Inferior Vena Cava Filter

implanted in you:

Unknown at this time_____

(c)   Current location of the Bard Inferior Vena Cava Filter, including any portion

thereof, if known:

Unknown at this time_____

3.   Describe your understanding of the medical condition for which you received the Bard

Inferior Vena Cava Filter(s):

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████_____

4.   Give the name and address of the doctor who implanted the Bard Inferior Vena Cava

Filter(s): ████████████████ ███████████_____

5.   Give the name and address of the hospital or other healthcare facility where the Bard

Inferior Vena Cava Filter was implanted: ████████████____

████████████ ████████_____

6.   Have you ever been implanted with any other vena cava filters or related product(s)

besides the Bard Inferior Vena Cava Filter(s) for the treatment of the same or similar

condition(s) identified in your response to question 3 above? Yes___██___   No___██_____

If Yes:

(a)   Please identify any such device(s) or product(s)._____

_____

(b)   When was this device or product implanted in you?_____

_____

(c)   Did the implantation take place before, at the same time, or after the procedure

during which you were implanted with a Bard Inferior Vena Cava Filter?

_____

(d)   Who was the physician who implanted this other device or product?

_____

(e)    Were you told of any potential complications from the implantation of the Bard Inferior Vena Cava Filter(s)? Yes \_\_\_\_\_    No \_\_\_\_\_    Don't Know \_\_\_\_\_

(f)    If yes to (e), by whom?

(g)    If yes to (e), what potential complications were described to you?

9.    Do you believe that the Bard Inferior Vena Cava Filter(s) remains implanted in you?

Yes \_\_\_\_\_    No\_\_\_\_X\_\_\_\_\_    Don't Know \_\_\_\_\_

If Yes:

(a)    Has any doctor recommended removal of the Bard Inferior Vena Cava Filter(s)?

Yes \_\_\_\_\_    No \_\_\_\_\_

If Yes:

    (i)    Identify by name and address every doctor who recommended removal of the Bard Inferior Vena Cava Filter(s): _____

    (ii)    For each doctor identified in response to question 8(a)(i) above, state your understanding of why the doctor recommended removal.

    (iii)    For each doctor identified in response to question 8(a)(i) above, state when the doctor recommended removal. _____

10.    Has the Bard Inferior Vena Cava Filter(s) implanted in you been removed, in whole or in part?

Yes\_\_\_\_█\_\_\_\_\_    No\_█\_\_    Don't Know\_\_\_\_\_

If Yes:

(a)    Where, when, and by whom was the Bard Inferior Vena Cava Filter(s), or any portion of it, removed?

████████████████████████████ _____

███████ _____

7

(b)     What portion of the Bard Inferior Vena Cava Filter(s) was removed on the date indicated in response to question 9(a) above? ███████████████████ ███

███████ _____

(c)     Please check <u>all</u> that apply regarding the removal procedure(s):

██  ███████████████

██  █████████████████████

██  ███████████████

██  █████████████████████████████

██  ████████

(d)     Does any portion of the Bard Inferior Vena Cava Filter(s) remain implanted in you?   Yes ___██___   No___██_____        Don't Know _____

If Yes, explain what portion of the Bard Inferior Vena Cava Filter(s) you believe is still implanted in you:_____

(e)     Explain why you consented to have the Bard Inferior Vena Cava Filter(s), or any portion thereof, removed?

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████

████████████████

(f)     Does any medical provider, physician, entity, or anyone else acting on your behalf have possession of any portion of the Bard Inferior Vena Cava Filter that was previously implanted in you and subsequently removed?

Yes_____        No_____        Don't Know___X___

If Yes, please state the name and address of the person or entity having possession of same._____

11.     Has any doctor or healthcare provider unsuccessfully attempted to remove the Bard Inferior Vena Cava Filter(s) implanted in you?

Yes_██__        No___██_____              Don't Know_____

If Yes:

8

(a)     How many attempts have been made to remove the Bard Inferior Vena Cava Filter(s) implanted in you?_____

(b)     Provide the name and address of the doctor who removed (or attempted to remove) the <u>filter strut(s)</u> and the hospital or medical facility at which it was removed (or attempted to be removed).

<u>Filter Removal/Attempted Removal #1</u>

Doctor:_____

Hospital/Medical Facility:_____

Date:_____

(c)     Please check <u>all</u> that apply regarding attempted removal procedure #1:

☐     Attempted but unsuccessful percutaneous removal procedure

☐     Attempted but unsuccessful open abdominal procedure

☐     Attempted but unsuccessful open chest procedure

☐     Other, Describe: _____

_____

☐     Unknown

12.     Do you claim that your Bard Inferior Vena Cava Filter(s) fractured?

Yes____█_____        No__█___

If Yes:

(i)     Please state the number of fractured struts retained in your body?

█_____

(ii)    Please identify the location(s) within your body of each retained filter strut.

███████████████████████████████

(iii)   Please provide the date or approximate date when you were first informed of each fractured strut.

██████████_____

(iv)    Has any health care provider recommended to you that a retained filter strut(s) should be removed?

# REDACTED DOCUMENTS RELATED TO DOCKET 7359

## Exhibit B - Filed Redacted

HYDEL_WFHF_MDR00099

HYDEL_WFHF_RAD00002

HYDEL_WFHF_RAD00003

# REDACTED DOCUMENTS RELATED TO DOCKET 7359

## Exhibit C - Filed Redacted

```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF ARIZONA

 3     *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

 4

       In Re Bard IVC Filters Products
 5     Liability Litigation

 6                        No. MD-15-02641-PHX-DGC

 7

 8

       *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
 9

10        DO NOT DISCLOSE - SUBJECT TO FURTHER
                  CONFIDENTIALITY REVIEW
11

        VIDEOTAPED DEPOSITION OF DAVID HENRY, M.D.
12

                TAKEN AT: Leib Knott Gaynor
13        LOCATED AT: 219 North Milwaukee Street
                    Milwaukee, WI
14

                     April 6, 2017
15             10:07 a.m. to 12:28 p.m.

16            REPORTED BY ANITA K. FOSS
           REGISTERED PROFESSIONAL REPORTER
17

18

19

       *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
20

21

22

23

24

25
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    BY MR. SAELTZER:

 2        Q.   Good morning, Doctor.  My name is Douglas

 3    Saeltzer.  I'm going to be conducting an

 4    examination, which is asking you some questions for

 5    a trial involving one of your patients, against

 6    Bard.  Do you understand that, Doctor?

 7        A.   I do.

 8        Q.   Do you understand that neither your

 9    patient, Ms. Hyde, nor Bard or anybody here, is

10    making any allegation you did anything wrong?  And

11    do you understand that you're not the subject of

12    this lawsuit?

13        A.   Yes.

14        Q.   This video may be played for the jury in

15    the event this goes to trial, so I'll be asking you

16    questions for the jury's benefit and phrasing them

17    that way sometimes, even though we're in a

18    conference room, okay, Doctor?

19        A.   Yes.

20        Q.   And Doctor, do you practice medicine

21    generally in the greater Milwaukee, Wisconsin area?

22        A.   Currently, no.

23        Q.   Back in ██████████████████████████

24    ████████████████████████████████████████

25    ████████████, were you practicing in the Milwaukee
```

Do Not Disclose - Subject to Further Confidentiality Review

1    area?

2         A.    Yes.

3         Q.    Are we currently in Milwaukee today?

4         A.    We are, yes.

5         Q.    For the jury's benefit, the date today,

6    we are in March of 2017?

7         A.    Yes.

8         Q.    Actually, it would be April.

9         A.    Yes, you're right.

10         Q.    Doctor, have you ever had your deposition

11    taken before?

12         A.    I have.

13         Q.    About how many times?

14         A.    Three times.

15         Q.    So you're somewhat familiar with the

16    process; correct?

17         A.    Somewhat.

18         Q.    If I ask you a question you don't

19    understand, Doctor, please tell me you don't

20    understand the question.  Will you do that for me,

21    Doctor?

22         A.    Yes.

23         Q.    Likewise, if I interrupt you and you

24    haven't completed your answer, please tell me I've

25    interrupted you so I know to be quiet so we can

Do Not Disclose - Subject to Further Confidentiality Review

```
 1        Q.    And then you also apply your knowledge as

 2   to what possible procedures or devices are

 3   available to treat that condition; right?

 4        A.    Yes.

 5              MS. DALY:  Objection.  Objection,

 6   leading.

 7   BY MR. SAELTZER:

 8        Q.    And Doctor, in coming and exercising your

 9   clinical discretion, do you perform a risk-benefit

10   analysis?

11        A.    I get an informed consent, which includes

12   risks, benefits, and alternatives.

13        Q.    When you are choosing which IVC filter to

14   implant in a patient, can you describe for me what

15   thought process you go to as to which filter you

16   select from the various options that are out there

17   in the marketplace?

18              MR. LEIB:  We're talking about in or

19   around 2011 as a custom and practice pertaining to

20   your client, Lisa Herd?

21              MR. SAELTZER:  Yes, in and around

22   February of 2011.

23              THE WITNESS:  I look for any filter

24   that's FDA approved, that I'm familiar with

25   placing.
```

1    decision-making regarding this patient, we know he

2    doesn't remember the patient, and if the question

3    is what was your custom and practice regarding what

4    information you would use to make decisions

5    regarding this patient, that I don't have a problem

6    with, as long as it's asked in that form.

7                    And if you recall, then you should

8    indicate you recall.  And if you don't recall, you

9    should indicate you don't.  He doesn't want you to

10   guess at what the answers are.  So -- so you gotta

11   listen closely to the question.  So could I ask

12   that you ask the question within a context so I

13   don't have an issue with privilege on it?

14   BY MR. SAELTZER:

15        Q.   Doctor, based on your custom and

16   practice, if the company, Bard, knew that the G2X

17   filter that you ██████████████████carried a

18   significant risk of injury or death, that is the

19   type of information, based on your custom and

20   practice, you would have wanted to know about?

21             MS. DALY:  Objection, leading, and a

22   hypothetical.

23             MR. LEIB:  It's definitely a hypothetical

24   question, and the expertise that's required is to

25   know what you're talking about as to what's

1  significant or not.  And unless he has some

2  recollection of 2011 and can state the answer

3  historically as opposed to giving a new opinion

4  now -- 'cause a new opinion now is privileged in

5  this.  So unless you can answer that question

6  historically as to what your thought process was in

7  2011, if this would be giving a new opinion as of

8  today, then I would instruct you not to answer.

9          THE WITNESS:  If the product is FDA

10 approved and I'm comfortable with it, I don't

11 usually hesitate.

12 BY MR. SAELTZER:

13     Q.   What knowledge, if any, do you have of

14 how the Bard G2X filter received FDA clearance?

15     A.   I do not know.

16     Q.   At the time you implanted this filter,

17 did you believe it had gone through full clinical

18 trials to obtain FDA approval?

19     A.   I'm guessing, yes.

20     Q.   At least that was your state of mind back

21 then?

22     A.   Yes.

23     Q.   Are you aware of an alternate FDA

24 approval process called a 510(k) clearance?

25     A.   No.

1        A.   Nothing specifically.  Maybe just a

2   general feel for what was happening in the market.

3        Q.   Are you members of any journals or

4   publications?

5        A.   No.

6        Q.   Are you members of any societies,

7   professional societies?

8        A.   I am a member of the Society of

9   Interventional Radiology.

10       Q.   And what's your role within that

11   organization?

12       A.   Pay dues, and if I can get away, I might

13   go to a meeting, which is pretty rare.

14       Q.   Do you recall, prior to 2011 or at --

15   let's say at the time of February of 2011, if there

16   was a Bard sales representative you were

17   interacting with?

18       A.   I do not recall.

19       Q.   Does the name, a Mr. Chris

20   Siller, S-I-L-L-E-R, sound familiar?

21       A.   No.

22       Q.   Do you recall ever having any

23   discussions, at any time prior to February 2011,

24   with any Bard sales representative?

25       A.   Specifically, no.

Do Not Disclose - Subject to Further Confidentiality Review

```
1          Q.    Was it a part of your custom and practice

2    to occasionally meet with sales representatives of

3    medical device companies?

4          A.    Rarely.

5          Q.    Do you know if you ever met, prior to

6    2011, with any Bard sales representative?

7          A.    I probably did, but I don't specifically

8    recall.

9          Q.    Would you obtain information from the

10   product -- about the product from a sales

11   representative when you met with them?

12               MS. DALY:  Object to the form, leading.

13               THE WITNESS:  Can you repeat the

14   question?

15   BY MR. SAELTZER:

16         Q.    Sure.  I'm wondering when you met with

17   them, it was for professional reasons, I was

18   assuming, or was it personal?

19         A.    It was professional.

20         Q.    Okay.  The professional reason --

21         A.    (Witness laughing.)

22         Q.    I apologize for asking questions that are

23   very basic.  The professional meeting would be to

24   learn about the product --

25         A.    Yes.
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1              MR. SAELTZER:  Yes.

 2              MR. LEIB:  Yeah, that wasn't your

 3    question, though.  You're asking him for a present

 4    opinion as to whether or not something would have

 5    been helpful to him in the past.  That is calling

 6    for an expert opinion.  If you --

 7              MS. DALY:  Which --

 8              MR. LEIB:  Hold on.

 9              MS. DALY:  -- which -- which -- let me --

10    if I could add for the record, which also related

11    to a filter that was a predecessor to the filter in

12    the Hyde case.

13              MR. LEIB:  Yeah, I'm not apprised of the

14    different filters, so I'll leave those objections

15    to counsel.  But I'd invite you to rephrase the

16    question.  But I think the way you phrased it, it

17    is invading his privilege, that's why I instructed

18    him not to answer.

19    BY MR. SAELTZER:

20        Q.   Is the information that Bard determined

21    its Recovery filter migrated three times more than

22    the industry average the type of information you

23    would have found useful when you were making your

24    decisions about which filter to implant back in

25    2011?
```

Do Not Disclose - Subject to Further Confidentiality Review

1          MS. DALY:  Same objections.

2          MR. LEIB:  He doesn't want you to

3    speculate.  If you have to guess, you have to tell

4    him.  If you -- based upon the information you've

5    been given, if you can state back in 2011, you can

6    go ahead and historically tell him that.

7          THE WITNESS:  Right or wrong, I felt that

8    the risks for all of the FDA-approvable devices

9    were -- were reasonable and customary, and that I

10   probably wouldn't have deferred or postponed the

11   filter placement in a patient who I felt really

12   needed it.

13   BY MR. SAELTZER:

14        Q.  As I'm understanding your answer, right

15   or wrong, you assumed that the complication rates

16   among the FDA cleared or approved IVC filters was

17   roughly equivalent?

18        A.  Yes.

19        Q.  If you had learned differently, that

20   would be the type of information that you would

21   have used in your clinical practice, true?

22        MS. DALY:  Same objections.

23        THE WITNESS:  I tend to trust the FDA

24   more than individual companies.

25   BY MR. SAELTZER:

Do Not Disclose - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    ████████████████████████████████████

 3  ███████████████████████████████████

 4        A.    ██████

 5        Q.    Did you believe, ███████████████████

 6  ████████████████████████████  that it was safe to

 7  use as a long-term and permanent filter?

 8        A.    Yes.

 9              MR. SAELTZER:  Doctor, at this time I'll

10  pass questions.  Thank you for sitting through my

11  questions today and answering them.  I may have

12  some follow-up.  But at this time, I'll pass

13  questions to Ms. Daly.

14              MS. DALY:  Thank you very much.

15                 E X A M I N A T I O N

16  BY MS. DALY:

17        Q.    Dr. Henry, I'm going to skip around a

18  little bit just to fill in some holes that I have.

19  So if you bear with me while I skip around.

20  Following up on that last question that you were

21  asked.  At the time that █████████████████████

22  ████████████████████████, I think you've testified that

23  you were aware that complications with filters

24  included movement of the filter, fracture, and even

25  embolization or movement of a fractured fragment;
```

1    is that true?

2         A.   Yes.

3         Q.   Did you ever have an opportunity to read

4    the instructions for use document that accompanied

5    the Bard G2X filter of the type you put in

6    Mrs. Hyde?

7         A.   Yes.

8         Q.   Are you aware that the IFU, or the

9    instructions for use for that filter, lists, among

10   the complications that -- that may occur, fracture,

11   movement, and perforation of the filter?

12        A.   Could you repeat the first part of the

13   question?  Am I --

14        Q.   Yes.  Are you aware that the instructions

15   for use includes a section on complications that

16   one might experience with a Bard G2X filter?

17        A.   Yes.

18        Q.   And that that -- those precautions

19   included what we just talked about with

20   complications, which would be fracture, movement of

21   the filter, embolization of filter fragment pieces?

22        A.   Yes.

23        Q.   And also that the filter can perforate;

24   correct?

25             MR. LEIB:  The question is --

Do Not Disclose - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Oh.

 2              MR. LEIB:  -- whether the instructions --

 3    the question is whether or not the instructions

 4    state that or whether or not he was aware of that

 5    as of 2011?  I'm sorry, I lost the question.

 6    BY MS. DALY:

 7        Q.   Whether he believed it was within the

 8    instructions for use precaution.

 9              MR. LEIB:  If you know.

10              THE WITNESS:  I believe it was.

11    BY MS. DALY:

12        Q.   All right.  Thank you.  Has any

13    manufacturer of an IVC filter provided you with any

14    information, over time, that showed alleged

15    comparative rates of complications among IVC filter

16    models on the market?

17        A.   Probably.

18        Q.   Do you recall any particular filter

19    product that that was done for -- done with?

20        A.   I do not recall.

21        Q.   Do you know if the FDA has any

22    limitations or restrictions on what a filter

23    manufacturer may provide by way of information

24    about complications to doctors?

25              MR. LEIB:  Well, I think maybe that's
```

1    the FDA?

2         A.   I don't know.

3         Q.   So with respect to how rigorous a process

4    that is, you don't know what that would be;

5    correct?

6         A.   Correct.

7         Q.   When you -- ████████████████████████████

8    ████████████████████████████████████████████████

9    ████████████████████████████████████████████

10   ███████████████████████████████████████████

11        A.   ████████████████████████████████

12   ████████████████████████████████████████████████

13   ███████████████████████████████████████████

14   ███████████████████████████████████████████

15   ██████████████████████████████████████████████

16   ███████████████████████████████████████████

17   █████████████████████████

18                   And it's hard to prejudge the

19   situation, and so I can't speculate.   ██████████████

20   ████████████████████████████████████████████████

21   ████████████████████████████████████████████████

22   █████████████████████████████████████████████

23   █████████████████████████████████████████████

24   ███████████████████████████████████████

25        Q.   Is it fair to say then that at the time

1   ███████████████████████████████████████████,

2   ████████████████████████████████████████████

3   ██████████████████████████████████████████

4   ████████████████████████████████████

5        A.   ███████████████████████████████

6   ███████████████████████████████████████████

7   ██████████████████████████████████████

8   █████████████████████████████████████████████

9   ███████████████████████████████████████████

10  ████████████████████████████████████████

11  ██████████████████████████████████████

12  █████████

13       Q.   Right.  And to your point, the decision

14  to leave the filter or retrieve the filter is a

15  fairly complex decision -- decision tree, if you

16  will, that takes into consideration a lot of things

17  about the patient; correct?

18       A.   It's extremely dynamic, yes.  You phrased

19  that well.

20       Q.   All right.  What has your general

21  experience been with the Bard G2X filter in your

22  own clinical practice?

23            MR. SAELTZER:  Objection, vague, lacks

24  foundation.

25            MR. LEIB:  I'm okay with it as long as

# REDACTED DOCUMENTS RELATED TO DOCKET 7359

## Exhibit K - Filed Redacted



Deposition of:

# Derek Muehrcke , M.D.

*July 24, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 55

1      Q    What about Janet Hudnall?

2      A    Just that, you know, she felt that a lot was

3   not known about the BARD filter, the Recovery filter

4   when it was initiated, and a lot still wasn't known, and

5   that it was kind of cleared and sold without a lot of

6   knowledge about it.

7      Q    What about Chris Ganser?

8      A    I can't remember specifics about that.

9      Q    What about Steven Williamson?

10     A    Steven Williamson.  Oh, 42.  I can't remember

11  specifics.  Nothing specific.

12     Q    Have you ever asked the plaintiffs' attorneys

13  for the opportunity -- well, strike that.

14          Are you aware that more than 3 million pages of

15  documents have been produced by BARD in this litigation?

16     A    I've heard there's been millions, yeah.

17     Q    And have you ever asked for the opportunity to

18  review or search those documents?

19          MR. O'CONNOR:  Form.

20     A    I've never asked for the opportunity to search

21  them, no.

22     Q    Would you agree with me that all IVC filters

23  have a risk of complications?

24          MR. O'CONNOR:  Object to form.

25     A    All IVC filters have a risk of complications,

Derek Muehrcke , M.D.                          July 24, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 56

1  yes.

2      Q    That would include migration?

3           MR. O'CONNOR:  Form.

4      A    Well, I think that there's rates of migration,

5  but they can -- they can migrate.

6      Q    All filters can migrate; correct?

7           MR. O'CONNOR:  Form.

8      A    There are -- all filters can migrate, yes.

9      Q    And all filters have the potential complication

10 of fracture?

11     A    Yes.  That's true.

12     Q    And all filters have the potential complication

13 of tilt?

14          MR. O'CONNOR:  Okay.

15     A    Correct.  Some are much less likely, the

16 TrapEase, OptEase, but all can tilt.

17     Q    What's the difference, if any, between the

18 words penetration and perforation with regard to

19 filters?

20     A    That's a nuance for the radiologist to kind of

21 get into.  I think -- to a certain extent, to me they're

22 synonymous, but I think they prefer the word penetration

23 as opposed to perforation.  Perforation, one of the BARD

24 defense experts felt was a kind of a pejorative term

25 implying that things were going to leak out all over the

Page 57

1   place.  And I think that the radiologists prefer

2   penetration as opposed to perforation.

3           I think it's a distinction without a difference

4   in my mind, but whatever.

5       Q    Would you agree that all filters carry the risk

6   of penetration --

7           MR. O'CONNOR:  Form.

8       Q    -- or perforation?

9       A    Yes.

10      Q    Looking at the ████████████, page 7,

11  paragraph 2, you said: ████████████████████

12  ████████████████████████████████████

13  █████████████████████████████████████████

14  █████████████████████████████████████████

15          Is that correct?

16      A    That's correct.

17      Q    And would you agree that all filters have the

18  potential to caudally migrate?

19      A    I believe that there was an unacceptable safety

20  profile for the -- for the G2 filter.

21          MR. O'CONNOR:  Move to strike as nonresponsive.

22      Q    My question was, do you agree that all filters

23  have the potential to caudally migrate?

24      A    All filters can migrate caudally.

25          MR. O'CONNOR:  Late objection to the form of

# REDACTED DOCUMENTS RELATED TO DOCKET 7359

## Exhibit N - Filed Redacted



Deposition of:

# Lisa Hyde

*January 25, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

## Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 18

1      A     I grew up in Racine, Wisconsin.

2      Q     If you could you go through with me your

3   primary residence addresses for the last 10 years from

4   2007 to the present.

5      A     2007 would have been ██████████████

6   █████████████████████.  I lived there until -- know

7   what, you said 2007.

8      Q     We can start with 2000 if that's easier.

9      A     Because I lived there until 2004.  2004 we

10  moved to ████████████, and that was in Waterford,

11  Wisconsin, and that was until 2011 when we moved to

12  Las Vegas.

13     Q     And where did you move to in Las Vegas?

14     A     ████████████████████████

15     Q     And you currently live at that address?

16     A     Yes.

17     Q     So you have not moved since you've moved to

18  Las Vegas from Wisconsin?

19     A     Right.

20     Q     Is there a specific reason you moved from

21  Wisconsin to Las Vegas?

22     A     My husband transferred to McCarren.

23     Q     What type of employment does your husband

24  do?

25     A     He is retired now, but he was an air traffic

Page 19

1    controller and operations manager here at McCarren of

2    air traffic control.

3        Q     Your medical records indicate you were

4    adopted; is that correct?

5        A     Yes.

6        Q     Do you know the identity of any of your

7    biological family?

8        A     Yes, I do now.

9        Q     Who are those individuals?

10       A     My birth mother's name is -- was, she passed

11   away.  Her name was Shirley Ann Rothenberger.  I have

12   not met her.

13       Q     And any other individuals?

14       A     The father, his name is William.  I'm still

15   working on the rest of it.  I've spoken to her -- a

16   couple of her siblings, but I've never met them.

17       Q     So you have not met any of these --

18       A     No.  This is a recent development.

19       Q     Is it fair to say that you don't really have

20   any information about these individuals in terms of

21   their medical history, background, other things like

22   that?

23       A     No.

24       Q     You just recently been in contact with

25   them --

Lisa Hyde                                    January 25, 2017
In Re: Bard IVC Filters Products Liability

Page 140

1    you're a member of besides those two?

2        A    No.

3        Q    And besides those two FaceBook posts, you

4    have not discussed on FaceBook or Instagram anything

5    related to your IVC filter or injuries?

6        A    No.

7        Q    You mentioned that you went to a website

8    ███████████████████████████████████████████████

9        A    Yes.

10       Q    Was that the only time you performed online

11   research?

12       A    That I can remember, yes.

13       Q    Have you ever communicated in any manner to

14   another person who claims to be injured by an IVC

15   filter product?

16       A    No.

17       Q    Have you ever communicated with anyone at

18   Bard?

19       A    No.

20       Q    Have you ever received any information from

21   anyone at Bard?

22       A    No.

23       Q    Has any lawyer paid for any of your medical

24   care expenses concerning this lawsuit?

25       A    No.

# REDACTED DOCUMENTS RELATED TO DOCKET 7359

## Exhibit O - Filed Redacted



Deposition of:

# Mark Hyde

*January 25, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Mark Hyde                              January 25, 2017
In Re: Bard IVC Filters Products Liability

Page 48

1      Q     And have you ever posted anything related to

2  Ms. Hyde's injuries or medical course?

3      A     No.

4      Q     What do you normally post on there?

5      A     I normally don't.  If it is, it's probably

6  sports related.

7      Q     Have you ever deleted anything from FaceBook

8  over the last five years?

9      A     I take that back.  Let me retract that.  I

10  did post something, my daughter's concert.

11      Q     Have you ever deleted anything over the past

12  five years from FaceBook?

13      A     I'm not sure I know how.

14      Q     Have you ever visited a website, chat room

15  message board, or done other online research about IVC

16  filters?

17      A     Just Google.  Just Googled it.  I didn't go

18  into chat rooms or anything.

19      Q     What did you find when you Googled it?

20      A     Mostly just information about the fractures

21  and about the risks of IVC filter.

22      Q     Have you ever spoken to anyone at Bard?

23      A     No.

24      Q     Have you received any information from

25  anyone at Bard?

Mark Hyde                           January 25, 2017
In Re: Bard IVC Filters Products Liability

Page 49

1        A     No.

2        Q     Has any lawyer paid for any of Ms. Hyde's

3   medical care, expenses, concerning this lawsuit?

4        A     No.

5              MR. ROSENZWEIG:  That's all the questions I

6   have.

7              MS. SMITH:  I have just a few follow-up

8   questions.

9              THE WITNESS:  Okay.

10                       EXAMINATION

11  BY MS. SMITH:

12       Q     The first one pertains to the consent form.

13  ████████████████████████████████████████████████

14  ██████████████████████████████████████████████████

15  ████████████████████████████  So this is when the

16  doctor, ████████████████████████████████████████

17  ██████████████████████████████████████  I

18  think you testified you didn't recall.

19            But I wanted to see at that time if you

20  recall ████████████████████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████

23            So at that time, ██████████████████████

24  ██████████████████████████████████████

25       A     Not that I recall.

Veritext Legal Solutions

800.808.4958                                    770.343.9696