# Exhibit A



Deposition of:
# Thomas Kinney , M.D.

*June 17, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 20

1    before this deposition that I'm forgetting the name of,
2    and that had -- that had thousands of Bard documents on
3    it.
4         So the Dropbox was kind of limited, if you will,
5    entree -- entry, I guess, into the information.  But
6    before this, there was another -- just about a week or
7    so -- in the last week or so, there was a pretty big
8    access with multi- -- a multiplicity of different -- and
9    that had Bard documents that had depositions.  There
10   were -- There were thousands of different documents in
11   there.
12        Q.   So let me just make sure I understand what
13   you're telling me.
14        About a week before today, you were given access to a
15   larger database that had many depositions and many Bard
16   documents --
17        A.   Correct.
18        Q.   -- is that right?
19        A.   Correct.
20        Q.   Before then you were given access to a Dropbox
21   file that contained approximately 20 depositions and some
22   limited number of Bard documents; is that correct?
23        A.   Correct.
24             MR. JOHNSON:  Form.
25        Go ahead.

Page 21

1      BY MR. BROWN:
2         Q.   And will you please ballpark the number of Bard
3      documents that were in that Dropbox.
4         A.   I'm going to guess 20.
5         Q.   Okay.  Was the material that was provided to you
6      in the Dropbox folder the material that you reviewed and
7      relied upon in providing the opinions that are contained
8      in your expert report in this litigation?
9         A.   It was back-up material.  The main source for my
10     document was the Kessler report.
11        Q.   So the material that was provided to you on the
12     Dropbox, you're saying, was just some back-up information;
13     but the primary source of what you relied upon in
14     authoring your report was the Kessler report?
15             MR. JOHNSON:  Form.
16      BY MR. BROWN:
17        Q.   Is that right?
18        A.   Let me clarify a little bit more, or I guess
19     embellish.  So there -- For instance, there was a 510(k)
20     that I reviewed for the original Simon Nitinol filter.
21             There was deposition from Dr. Asch that was in there,
22     as I recall.
23        Q.   Okay.  And those were part of the Dropbox
24     materials?
25        A.   Correct.

1    Q.   Would you agree that if you did ignore data that
2    weighs against the opinion that Bard's filters are
3    defective, that you would be applying the same level of
4    intellectual rigor in this case as you apply in your
5    private practice as a researcher and clinician?
6              MR. JOHNSON:  Form.
7              THE WITNESS:  I would say that I'm always
8    willing to look at data.  If you have some data to show
9    me, I'd be happy to look at it and opine about it.
10      BY MR. BROWN:
11   Q.   In drafting this report, did you take data and
12   information out of context?
13   A.   I don't think so.
14   Q.   If you did take data and information out of
15   context, would you agree that you wouldn't be applying the
16   same level of intellectual rigor to your work in this case
17   as you apply in your work as a clinician?
18             MR. JOHNSON:  Form.
19             THE WITNESS:  Again, I would say show me what
20   you don't agree with, and we'll look at it and make an
21   intelligent decision.
22      BY MR. BROWN:
23   Q.   Okay.  How was the report, which we marked as
24   Exhibit 4, prepared?
25   A.   We basically used the document by Dr. Kessler is

Page 74

1  what we did, and we were -- we were asked -- we were
2  tasked, actually, as interventional radiologists who were
3  academicians and involved with some of the writing
4  standards about IVC filters, and we were tasked to assess
5  the information that was provided by Bard about their
6  filters, and whether we thought that there was
7  transparency in that in our approach to, say, getting
8  consent for patients.
9          We were -- I lost my train of thought.  Sorry.
10              MR. LOPEZ:  If you need to refer to your report,
11  you can, by the way.
12              THE WITNESS:  Yeah.
13      You know, as clinicians that have multiple years of
14  experience on IVC filters, we were, you know, able to make
15  opinions about, you know, what we thought was done.  We
16  were able to assess the data that he presented, some of
17  the experimental data, that included lab experiments and
18  animal experiments.
19         Basically, it was listed as a permanent filter that
20  had -- that was supposed to act like permanent filters
21  that we had before.
22         My career and Anne Roberts' career spans the
23  transition in filters from permanent devices to retrieval
24  filters.  And we were promised that the retrieval filters
25  would have the same sort of performance characteristics

Case 2:15-md-02641-DGC   Document 8220-1   Filed 10/18/17   Page 7 of 12
Thomas Kinney, M.D.                                          June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 75

1    that our permanent devices had.  And unfortunately, as the
2    experience -- as the clinical experience accrued with the
3    retrieval filters, we were finding that that assumption
4    was not true, and there was -- it turned out, you know, I
5    had done a plenary session right before Bard did your
6    major marketing release of the Recovery Nitinol filter.
7    The -- The SIR meeting in 2004 was in Phoenix, and we
8    were -- my plenary session was on venous thromboembolism.
9    And we were all excited about having the use of retrieval
10   filters.  Because we all remembered that ten-year-old kid
11   that had a trauma that we put a filter in, and he had that
12   filter for multiple decades, and we never felt real
13   comfortable talking to that patient or his mother or
14   father about what was going to happen with this multiple
15   decades.  Really, you kind of say, "We don't really know,"
16   and that's an answer that families like to hear because
17   they -- they assume you are the doctor, you know
18   everything and, you know, you should know these things.
19        So again, I lost my train of thought.  Sorry.
20   BY MR. BROWN:
21        Q.  All right.  Well, I'm interested right now in
22   how the report actually was physically prepared.  Because
23   we have three authors and several hundred pages of
24   material here, and I want to get a sense as to how putting
25   pen to paper or fingers to the typewriter this was

Page 81

1        A.    This was three to four weeks.
2        Q.    At the very back of the report there is an
3    Appendix A.
4        A.    (Indicating.)
5    Yes.
6        Q.    It's titled, "Facts and Data Considered."
7    Do you see that?
8        A.    I do.
9        Q.    Were you given the literature listed here?
10       A.    Yes.
11       Q.    There are a number of expert reports that are
12   listed.  Were you given those expert reports as well?
13       A.    Yes.
14       Q.    Did you read the full reports?
15       A.    I did.
16       Q.    Of all of the expert reports that are listed
17   here?
18       A.    I did.
19       Q.    Then you were given internal Bard documents that
20   are listed here?
21       A.    Yes.
22       Q.    Did you read the full documents?
23       A.    Not -- Well, not -- Maybe not all of them.  But
24   if, for instance, sometimes on the reproduced copies I had
25   of -- of Kessler's, I couldn't necessarily read some of

Page 82

1   the graphs, I would look then to make sure I was reading
2   those correctly.  But this report was -- I felt so
3   comfortable with what he wrote, that I didn't read all of
4   those, no.
5       Q.   You felt so comfortable with the report that
6   Dr. Kessler wrote?
7       A.   Yes.
8       Q.   The material that is listed in Appendix A, Facts
9   and Data Considered, this is the material that you believe
10  was on the Dropbox?
11       (Interruption in proceedings.)
12          MR. LOPEZ:  Maybe it's a little more annoying
13  than I thought.
14          THE WITNESS:  I'm sorry, Matthew.
15   BY MR. BROWN:
16       Q.   Let me ask the question again.
17   The material that's listed in Appendix A, which is
18  titled, "Facts and Data Considered," is that the material
19  that you believe was provided to you via Dropbox?
20       A.   Yes.
21       Q.   How did you pick these documents from among all
22  the documents that were produced in the litigation or were
23  they just provided to you?
24       A.   No.  They were from the report, so I would find
25  a section that Kessler had written, and it would have,

Page 83

1    say, a table or some specific quoted number that was
2    important to me in my argument, and I would say, "Well,
3    this refers to this document."
4         And so it was much like I wrote a medical article
5    when I'm quoting what the article says.  You give it a
6    reference, and that's -- that's the way I used these.
7         Q.   So am I correct that these are all documents
8    that you requested specifically?
9         A.   I didn't specifically request them, but they
10   were in this -- in Kessler's report.
11        Q.   Were some of the documents that are listed in
12   Appendix A, documents that you did not specifically
13   request?
14        A.   It's possible.  I suppose, I mean...
15        Q.   Are you aware that over 1.5 million documents
16   have been produced in this litigation?
17        A.   I'm not surprised.
18        Q.   Is that the first time you've heard that figure?
19        A.   I don't think it is, actually.  I think I've
20   heard there's a large number.
21        Q.   And there are 42 documents that are listed in
22   Appendix A?
23        A.   Correct.
24        Q.   So that's less than 0.0028 percent?
25             MR. JOHNSON:  Form.

Case 2:15-md-02641-DGC   Document 8220-1   Filed 10/18/17   Page 11 of 12
Thomas Kinney, M.D.                                         June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 95

1    A.   It is.  It is.
2    Q.   Did you do any searching or review of the
3    documents and transcripts in that database in forming your
4    report here?
5    A.   Yeah.  Yeah.
6    Q.   How did you access it, the database?
7    A.   It was on a Dropbox, so you just...
8    Q.   I thought you mentioned that you had -- there
9    was a Dropbox folder that contained material; and then
10   within the past week or two, there was another database
11   that you were given access to.
12   A.   Right.
13   Q.   Is this referring -- this sentence referring to
14   that newer database that you were just given access to?
15   A.   No, no, no.  This is -- This report was from --
16   from February and March, so it was the original Dropbox.
17   Q.   This is referring to the Dropbox?
18   A.   Correct.
19   Q.   Which contained the information listed in
20   Appendix A?
21   A.   Correct.
22   Q.   Okay.  The new database that you have been given
23   access to, have you accessed it?
24   A.   I have.
25   Q.   When did you access it first?

Page 96

1     A.   Probably about -- Probably in the last, say, a
2  week ago.
3     Q.   So about June 10th, 2017?
4     A.   Right.
5     Q.   Did you do any searching of materials that were
6  contained in that database?
7     A.   I did, yeah.
8     Q.   What did you search?
9     A.   You know, like I said, if I had trouble reading
10 one of Kessler's things, and I was looking for something
11 to grasp or hard to read, I wanted to look and see, so I
12 would pull that document up.
13    Q.   Okay.  Other than pulling up individual
14 documents from Dr. Kessler's report that you wanted to
15 review, did you do any other searching of the material in
16 that database?
17    A.   No.  My -- My main focus was the Kessler report.
18 I guess in my report too.
19    Q.   How did you access this database that you first
20 accessed about a week ago?
21    A.   I'm not sure what you mean.
22    Q.   Do you have -- Is it on the internet?
23    A.   Yes.  Yeah.
24    Q.   Did you have to enter a user name and password
25 or something?