# Exhibit K

```
 1                UNITED STATES DISTRICT COURT
 2                    DISTRICT OF ARIZONA
 3    ------------------------------x
      IN RE: BARD IVC FILTERS       :
 4    PRODUCTS LIABILITY            :
      LITIGATION                    :
 5                                  :
                                    :  Case No.:
 6                                  :  MD-15-02641-PHX-DGC
      ------------------------------x
 7            DO NOT DISCLOSE - SUBJECT TO FURTHER
 8                  CONFIDENTIALITY REVIEW
 9                      July 28, 2017
10                     Washington, D.C.
11    Videotaped Deposition of:
12                   RONALD A. THISTED,
13        Called for oral examination by counsel for
14    Plaintiff, pursuant to notice, at the offices
15    of Nelson Mullins, 101 Constitution Avenue, NW,
16    9th Floor, Washington, D.C. beginning at 8:55
17    a.m., before Teague Gibson, a Notary Public.
18
19
20                  *    *    *    *    *
21
22
23
24
25
```

```
 1        A     Accept by accident, they might turn out
 2   for other reasons to have recorded something that
 3   turns out to be a confounder, but.
 4        Q     So if after the study is completed they
 5   determine that there are one or more confounders
 6   that were either unmeasured or were previously
 7   unknown and now are identified as potential
 8   confounders, wouldn't you turn to external sources
 9   of data to gain information about those potential
10   confounders?
11              MR. BUSMAN:  Object to the form.
12        A     Some sources of information might tell you
13   how often those confounders occurred in a particular
14   population, others may have been the basis for
15   identifying it as something that affects the
16   outcomes and those might play into an analysis of
17   the extent to which those -- that confounder could
18   have affected the outcomes of the PRESERVE study,
19   but they wouldn't tell you the answer to the
20   question that PRESERVE study is intended to answer.
21        Q     Do you agree that MAUDE is part of FDA
22   adverse events surveillance system?
23        A     Yes.
24        Q     As we discussed, drug reports go into a
25   separate database, but it's similar in the sense
```

```
 1    they're both collecting spontaneous adverse events,
 2    right?
 3              MR. BUSMAN:  Object to the form.
 4       A      They're collecting -- both MAUDE and the
 5    FDA adverse event reporting system are recruiting
 6    both spontaneous adverse event reports -- yeah, they
 7    both collect spontaneous adverse event reports.
 8       Q      And do you agree that the FDA advises
 9    medical device manufacturers to calculate reporting
10    rates, that is adverse event -- reported adverse
11    events against sales or some other source or
12    exposure information?
13              MR. BUSMAN:  Object to the form.
14       A      I'm aware that FDA has guidance that
15    suggests as a signal detection measure that one
16    calculate crude rates of adverse events against a
17    measure of exposure.  In the context of drugs one,
18    again, crude measure of exposure is number of
19    prescriptions sold.  And the reason that's at least
20    a plausible measure of exposure is that the longer a
21    person is on a particular drug, the more
22    prescriptions they fill.  So the more prescriptions
23    reflects extent of exposure.  And someone who's on a
24    drug for a short time will have fewer prescriptions
25    than individuals on for a long time.
```

Do Not Disclose – Subject to Further Confidentiality Review

```
 1            Same thing can't be -- isn't true for things
 2     like devices where number of sales is the number of
 3     implants but has no relationship to exposure, other
 4     than initial exposure.  But in the context of drugs,
 5     FDA does suggest looking at crude estimates of
 6     adverse event rates.
 7        Q    And, in fact, they say that comparison of
 8     reporting rates and their temporal trends can be
 9     valuable, particularly across similar products or
10     across different product classes?
11            MR. BUSMAN:  Are you reading from -- I'm
12        just -- quick question.  Is this a quote that
13        you're reading from or is it a question?
14        Q    I'm just asking a question.
15        A    I believe that's consistent with the 2005
16     guidance document on pharmacovigilance, but it can
17     be helpful in identifying possible trends but that
18     same document goes on to describe the limitations of
19     such things.  It says, in particular, that because
20     reporting to change over time because there can be
21     differences in reporting rates for different drugs
22     or different products, that they can't be relied
23     upon for making causal comparisons between two
24     products.
25        Q    The 2005 guidance document, is that the
```