James R. Condo (#005867)
Amanda C. Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2204
Telephone: (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

*Attorneys for Defendants*
*C. R. Bard, Inc. and*
*Bard Peripheral Vascular, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation | No. 2:15-MD-02641-DGC<br><br>**DEFENDANTS C. R. BARD, INC.'S AND BARD PERIPHERAL VASCULAR, INC.'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE THE OPINIONS OF MARK J. EISENBERG, M.D.**<br><br>(Assigned to the Honorable David G. Campbell)<br><br>**(Oral Argument Requested)** |

**INTRODUCTION**

It is no surprise Plaintiffs conceded Dr. Eisenberg will not opine about "ethics, motivations, intentions, and state of mind." (Pls. Br. at 2 ("Dr. Eisenberg will not testify about any of those topics.").) In light of the overwhelming authority Bard cited, including the *Trasylol* decision expressly excluding Dr. Eisenberg's nearly identical "ethics" opinions about a drug company's "responsibilities, the studies [it] should have done to comply with drug safety principles, and the issues [it] should have addressed earlier than it did," Plaintiffs had little other choice. *See In re Trasylol Prod. Liab. Litig.*, No. 08-MD-01928, 2010 WL 1489793, at *8 (S.D. Fla. Feb. 24, 2010) (cited at page one of Bard's Motion). What is surprising, however, is Plaintiffs' blatant side-step of their own concession, in view of Dr. Eisenberg's sworn admissions, and the plain language of his expert report, in an effort to recast his opinions as *anything* other than the ethics opinions that they are. The *Trasylol* Court rejected the same attempt, and this Court should as well. *Id.* ("Despite Plaintiffs' argument that the opinion at issue is not an ethical opinion because Dr. Eisenberg does not use the word 'ethical' or 'unethical' in his Report and only refers to ethics once during his deposition, this Court will consider the substance of Dr. Eisenberg's proffered testimony rather than the use of the words 'ethical' or 'unethical' or the labels attributed to the testimony.").[1]

**ARGUMENT**

**I.   The Court Should Exclude The Ethical Opinions Plaintiffs Conceded Dr. Eisenberg Would Not Give.**

Dr. Eisenberg's opinions sound in ethics, no matter how Plaintiffs try to frame them. Ethics opinions are not helpful to the jury because they reflect the personal, subjective views of the experts who offer them, rather than the "scientific, technical, or

---

[1] Plaintiffs filed a separate Omnibus Statement Of Law And Generally-Applicable Arguments In Opposition To Bard's Motions To Exclude Plaintiffs' Experts Under Rule And *Daubert* (Doc. 7799). Plaintiffs' Omnibus Statement is not directed at any specific *Daubert* motion Bard filed. As such, Bard does not respond to the Omnibus Statement but instead will address any necessary issues in the context of its individual *Daubert* replies.

- 1 -

other specialized knowledge" Federal Rule of Evidence 702 requires. As a result, courts routinely exclude these opinions as unhelpful, unreliable, and speculative. *See, e.g.*, *Tillman v. C. R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1326 (M.D. Fla. 2015); *In re: Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1053, 1058 (D. Minn. 2007); *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004); *In re Trasylol*, 2010 WL 1489793, at *8.

Plaintiffs concede, as they must, that ethics opinions are impermissible and explicitly stipulate that "Dr. Eisenberg will not offer opinions on Bard's ethics." (Pls. Br. at 16.) Faced with the reality that this concession would leave Dr. Eisenberg with nothing left to say, they vainly attempt to recast his opinions into anything else. But, try as they might, they cannot escape the plain language of his report, the frank admissions of his sworn testimony, and the weight of authority excluding this precise type of testimony. The Court should hold Plaintiffs to their word and exclude Dr. Eisenberg's opinions entirely.

**A. Dr. Eisenberg's Report and Testimony Make Clear that He is Offering Ethical Opinions.**

Plaintiffs claim it is "unfair" to characterize Dr. Eisenberg's opinions as ethical, and accuse Bard of creating "a distortion of what he intends to say." (Pls. Br. at 2, 7.) They claim that "Dr. Eisenberg does not once in his 47-page report refer to Bard's conduct as unethical." (*Id*. at 2.)[2] The plain language of Dr. Eisenberg's report, however, speaks for itself. In the "Conclusions, Standards, And Main Opinions" section of his report, Dr. Eisenberg identifies the written bases for his opinions. (Ex. A, Rep. at 4.) At paragraph 24, Dr. Eisenberg identifies "The AMA Code of Medical *Ethics* – Chapter 2," the first sentence of which states "Informed consent to medical treatment is fundamental in both *ethics* and law." (*Id.* at ¶ 24 (emphasis added).) At paragraph 25, Dr. Eisenberg identifies "The AMA Code of Medical *Ethics*' Opinion 8.08," which discusses a

---

[2] Even a cursory reading of that report reveals that this representation is flatly incorrect, and that some derivation of the word "ethics" appears thirteen times. (*See, e.g.*, Ex. A, Rep. ¶ 81.)

1  physician's "*ethical* obligation to help the patient make choices." (*Id.* at ¶ 25 (emphasis
2  added).) At paragraph 26, Dr. Eisenberg identifies "The ACR-SIR Practice Guideline On
3  Informed Consent For Image-Guided Procedures," which discusses "Prudent and *ethical*
4  medical practice." (*Id.* at ¶ 26 (emphasis added).) At deposition, Dr. Eisenberg clearly
5  admitted that the written bases of his opinions are ethical:

6      Q.    You understand and appreciate that the document that
7             we have marked as Exhibit 8 referenced in paragraph
              24 provides *ethical guidance*?
8      A.    Yes.
9  (Ex. B, MDL Dep. Tr., 83:8-12 (emphasis added).)

10     Q.    You think that most physicians would understand that
11            Exhibit 8 constitutes pretty strong *ethical guidelines*
              that should be followed; right?
12     A.    Yes.
13 (*Id.* at 83:22 to 84:15 (emphasis added).)

14     Q.    Now, paragraph 25 also is from the AMA Code of
15            Medical Ethics; right?
16     A.    Yes.
17     Q.    So again it's an ethical guidance; right?
18     A.    *It is ethical guidance*.
19 (*Id.* at 85:2-7 (emphasis added).)

20     Q.    Is the document we have identified as Exhibit 9 the
21            document that you refer to in paragraph 26 of your
              report?
22     . . .
23     A.    Yes
24     . . .
25     Q.    Is Exhibit 9, in your opinion, the same type of
26            document as Exhibit 8 in terms of providing *ethical*
              *guidance* to practitioners?
27     A.    Yes, very similar.
28 (Eisenberg Dep. Tr., 90:15 to 93:2, July 6, 2017, ("MDL Dep. Tr. Supp.") attached

1 hereto as Exhibit B-1 (emphasis added).)

    Q.    Is it your opinion that the documents in paragraphs 24, 25, and 26 are in some way, shape or form actually binding on Bard, controlling of its conduct?

    A.    No.  As we discussed earlier, ***these are strong ethical guidelines*** for physicians on how to provide informed consent.

(*Id.* at 152:17 to 153:23 (emphasis added).)

    Q.    Would it be your opinion in this case that these documents that you have cited are generally accepted ***ethical standards*** for responsible companies?

    A.    Yes, I think that's the case.

(Ex. B, MDL Dep. Tr., 185:1-5 (emphasis added).)

    Q.    You believe that the various guidance documents that we have discussed, all of the guidance documents you have referenced in your expert report in this case constitute strong ***ethical guidelines*** that reasonable physicians and patients would expect a device manufacturer to comply with; right?

    A.    Yes, I think that's right.

(*Id.* at 186:2-12 (emphasis added).)

    Dr. Eisenberg testified that his opinions are grounded in "what Bard should and should not do and what kinds of information need to be given to physicians [and] patients." (*Id.* at 84:16 to 85:1.)  He admitted that these opinions are based on what a responsible, moral, and ethical device manufacturer would do. (*Id.* at 89:21-25 ("Q. Your opinions are based on what you believe a responsible, moral and ethical device manufacturer would have disclosed to physicians. Is that fair? A. Yes, that's fair."); 166:6-16 ("Q. . . . would it be fair to say that it's your opinion that a reasonable, ethical and moral company would have conducted the studies that you have discussed? A. I think that's correct.").)  He also conceded that the major driving forces for his opinions are ethical in nature including that "companies should be honest," and "Bard should be responsible for its products." (*Id.* at 186:14 to 187:7; 187:21 to 188:5.)

    The ethical nature of his opinions is also clear from the substance of his proffered

- 4 -

testimony. For example, Dr. Eisenberg clearly opines about the studies Bard should have, but did not, undertake in light of various safety signals. In his report, he states that failure to conduct such studies constitutes an ethical lapse. (*See, e.g.*, Ex. A, Rep. ¶ 81 (emphasis added) ("If these signals are identified, companies have the responsibility, as Bard itself, by its president recognizes, and also based, in part on physician expectation and medical *ethics* to follow up with properly designed and adequately powered studies."); ¶ 137 ("Bard should have conducted a multi-center study."); ¶ 34 ("should have prompted prospective large well-conducted safety studies."); ¶ 172 ("This is the type of investigation and communication that physicians expect a responsible device manufacturer to undertake.") When questioned at deposition about these opinions, he gave sworn testimony that Bard "had an *ethical responsibility* to do those studies in view of the data that they had from their small retrievability studies." (Ex. B, MDL Dep. Tr., 160:16-25 (emphasis added); *see also* Ex. C, Austin Dep. Tr., 111:10-19 (emphasis added) ("I think that if you ask most clinicians and most patients, they would say yes, Bard had an *ethical duty* to follow up the signal with an adequately powered and designed study.").) Plaintiffs do not address, let alone contradict, this testimony.

**B.      Dr. Eisenberg's Opinions Are Based On Ethical Standards That Are Not Binding On Bard.**

Dr. Eisenberg admits that none of these "ethical guidelines" or "standards" he relies on are even binding on the physicians they were directed to, let alone medical device manufacturers like Bard:

> Q.   Would I be correct that, in your opinion, the documents cited in paragraphs 24, 25 and 26 do not constitute any legally binding obligations for Bard?
>
> A.   I think that they -- first of all, it doesn't appear that they are legally binding obligations for physicians, if I understand these sentences correctly. And none of these paragraphs specifically mention medical device manufacturers. So technically I think you are correct.

(Ex. B-1, MDL Dep. Tr. Supp., 96:9-20)

As Bard made clear in its Motion, Dr. Eisenberg routinely conceded that none of

- 5 -

his opinions were grounded in any written law, rule, regulation, guidance or standard binding on Bard. (*Id.* at 157:8-15 ("I don't think I have referenced any standard like that."); 185:15-18 ("Q. It's not your opinion that any of these documents we have gone over today constitute any legally enforcing [sic] or binding authority on Bard; right? A. No, that's correct."); 185:19-186:1 ("Q. You do, however, believe that reasonable physicians and a reasonable manufacturer would look to any of these documents for strong *ethical guidance* to guide their conduct; right? A. Yes, and I would say patients and their families would look to that, specifically with respect to patient safety.").)

Moreover, the ethical standards provide no "objective" criteria for Dr. Eisenberg's opinions. The standards Dr. Eisenberg relies on are "not inflexible rules or requirements of practice and are not intended nor should they be used to establish a legal standard of care." (Ex. B-1, MDL Dep. Tr. Supp., 93:19-24; *see also id.* at 82:17-22 ("the opinions in this chapter are offered as ethics guidance for physicians and are not intended to establish standards of clinical practice or rules of law.") Indeed, Plaintiffs concede that "Dr. Eisenberg is not a regulatory expert and, therefore, does not offer opinions on Bard's regulatory obligations" or any other standards binding on Bard. (Pls. Br. at 16.)

As the *Tillman* court explained, "Bard's compliance with . . . standards of ethical or professional conduct [are] not relevant to the issues in this case. Rather, the issues here are limited to whether the Filter is defective in its design, manufacture, or warnings, whether Bard breached a *legal duty* to [Plaintiffs] in designing, manufacturing, or labeling the device, and whether the defects or breaches caused [Plaintiffs'] damages." 96 F. Supp. 3d at 1326 (emphasis added). "While the defendants may be liable in the court of public opinion, or before a divine authority for any ethical lapses, expert opinion as to the ethical character of their actions simply is not relevant to these lawsuits." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d at 544. Such opinions are likely to unfairly prejudice the jury by "introducing the 'experts' opinions and rhetoric concerning ethics as alternative and improper grounds for decision on bases other than the *pertinent legal standards*." *Id.* at 545 (emphasis added).

### C. Plaintiffs Cannot Escape the Weight of Authority Excluding This Precise Type of Testimony.

Plaintiffs give short shrift to the *Trasylol* decision excluding Dr. Eisenberg's same opinions, arguing only that "the expert's" opinion on what the drug manufacturer "should have" done in *Trasylol* was excluded because it "was not tied to any objective standard." (Pls. Br. at 15.) Dr. Eisenberg's opinions are even more egregious in this case because he expressly tied them to written ethical standards. Regardless, the Court actually held in *Trasylol* that Dr. Eisenberg's opinions were inadmissible as "a reflection of Dr. Eisenberg's own subjective beliefs and personal views" that did not "rest on knowledge as required by Rule 702." *Trasylol*, 2010 WL 1489793 at *8. The Court further explained that "Plaintiffs' attempt to recast it as an opinion that Trasylol raised serious safety issues that warranted further investigation does not alter the Court's analysis or outcome." *Id.* The Court noted that Dr. Eisenberg's deposition made it clear that, as in this case, he disclaimed expertise in corporate ethics, and testified that "the average lay person could have some opinions about corporate ethics." *Id.* at *9. The Court held that Dr. Eisenberg's opinions were likewise inadmissible for the additional reason that they rested on "speculation about [the company's] motivations, which is not a proper subject for expert testimony." *Id.*

Dr. Eisenberg's opinions on what Bard's responsibilities to physicians and patients were, the studies that Bard should have done, and issues that Bard should have addressed earlier than it did, are precisely the types of testimony that the *Trasylol* Court excluded as impermissible ethics opinions. *Id.* at *8. Such testimony is speculative and unreliable and Plaintiffs' attempts to recast them as anything other than ethics opinions should be rejected. *Id.*; *see also In re Rezulin Prod. Liab. Litig*, 309 F. Supp 2d at 543 n.27 ("Plaintiffs' attempt to recast [the] challenged testimony as relating to something other than ethics (*viz.* reasonableness) does not alter the effect of [his] admission that his opinions in this area—however labeled—are speculative.").[3]

---

[3] Plaintiffs do not even attempt to distinguish *In re Rezulin Product Liability Litigation*,

- 7 -

## II. The Court Should Exclude Dr. Eisenberg's Opinions Because He is Unqualified To Give Them, and They Will Not Assist The Jury.

### A. Plaintiffs Admit Dr. Eisenberg Is Not An Expert In The Areas Necessary For His Opinions.

Plaintiffs do not, and cannot, contest that Dr. Eisenberg lacks any hands-on expertise with IVC filters. They do not dispute the fact that he has never implanted, retrieved, or even prescribed an IVC Filter (*see* Ex. B, MDL Dep. Tr., 26:13-19; 37:16-18); he is not an expert in detecting adverse events related to IVC Filter complications such as fracture, migration, tilt, or perforation (*id.* at 31:8 to 32:6); he has never had a patient who experienced an adverse event from having an IVC Filter implanted (*id.* at 27:12-15); he is not an expert in why an IVC Filter might fracture, migrate, tilt, perforate, or embolize (*id.* at 39:5-17); and he is not an expert in the design or testing of IVC Filters (*id.* at 39:22 to 40:6; 41:1-3.)

Indeed, Plaintiffs do not contradict Dr. Eisenberg's frank admissions that he is not a subject matter IVC Filter expert, (*id.* at 69:7-10) nor does he "hold [himself] out among [his] peers as an expert in IVC filters." (*Id.* at 29:15-17.) Dr. Eisenberg has never gone through the informed consent process with a patient for placement of an IVC filter. In addition to the fact that these opinions are impermissible ethics opinions, Plaintiffs have not met their burden of showing that Dr. Eisenberg is qualified to opine on what physicians implanting IVC filters expect of Bard.

Plaintiffs claim that Dr. Eisenberg has relevant expertise in clinical epidemiology, (*see* Pls. Br. at 1-2), but ignore that he only relies on this expertise to form his ethical opinions on what studies he claims Bard had an "ethical responsibility" to conduct, or what information it should have disclosed, in light of various safety signals. (Ex. B, MDL Dep. Tr., 160:16-25; 133:23 to 134:9; *see also supra* §I.A.) Plaintiffs plainly concede that Dr. Eisenberg is not qualified to give these ethical opinions. Moreover, Dr. Eisenberg disclaims the very expertise necessary to give these opinions. (*See, e.g.*, Ex. B, MDL

---

309 F. Supp. 2d 531 (S.D.N.Y. 2004), or the other authority Bard cited. *See, e.g.*, *Tillman*, 96 F. Supp. 3d at 1326; *In re: Baycol Prods. Litig.*, 532 F. Supp. 2d at 1053, 1058.

- 8 -

Dep. Tr., 42:18-23 ("Q. You don't consider yourself to be an expert in what a device manufacturer is required to do by law or regulation to update doctors about risks associated with products? A. That's correct. I am not an expert in that area."); 45:23 to 46:3 ("Q. You don't consider yourself an expert in what a pharmaceutical or medical device company is allowed to do in terms of communication with physicians about products; right? A. No.").) Instead, his opinions are based on his subjective beliefs, personal views, and "his own expectations," (Pls. Br. at 2), of what Bard "should have," but was not legally required to have, studied or disclosed to physicians as a "responsible, moral and ethical device manufacturer." (Ex. B, MDL Dep. Tr., 89:21-25.)

Put simply, Dr. Eisenberg is not an expert in any area relevant to the opinions that he included in his report and that he testified to at deposition. Without "some scientific, technical, or other specialized knowledge" in these areas, Dr. Eisenberg's opinions are inadmissible under Federal Rule of Evidence 702.

**B.    Dr. Eisenberg Cannot Speak For Other Physicians.**

Plaintiffs assert that Dr. Eisenberg's "testimony focuses on what Bard knew about complications and risks with its IVC filters and what doctors and physicians expect a company to do, and disclose, to effectuate proper informed consent." (Pls. Br. at 7.) They assure the Court that Dr. Eisenberg will "not offer opinions that purport to speak on behalf of all physicians and patients," while in the same breath claiming he should be permitted to testify about the "reasonable expectations of physicians." (*Id.* at 2.) But Plaintiffs do not cite a single case in the civil product liability context qualifying an expert like Dr. Eisenberg to testify about what a "reasonable physician" would expect of a medical device or pharmaceutical manufacturer.

Plaintiffs' only citations outside of the irrelevant medical malpractice context are not only inapposite, but also emblematic of how unqualified Dr. Eisenberg is to opine on this issue. *See Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420 (E.D.N.Y. 2011); *In re Guidant Corp. Implantable Defribrillators Products Liabiity Litigation*, No. 05-1708 (DWF/AJB), 2007 U.S. Dist. LEXIS 48200, at *33 (D. Minn. June 29, 2007). The

- 9 -

*Guidant* Court admitted the opinions because, unlike Dr. Eisenberg, the expert at issue had substantial experience with the device at issue:

> Further, in light of the fact that Dr. Swerdlow has not only implanted 800-900 ICDs, but has also worked with another surgeon to implant 250-300 additional ICDs, and has consulted with both Medtronic, Inc. and St. Jude Medical, Inc. regarding ICDs, Dr. Swerdlow is qualified to opine generally on the expectations of the medical community. . . . and what he believes the medical community's expectations are of ICD manufacturers.

2007 U.S. Dist. LEXIS 48200, at *32-33. Similarly, the expert in *Deutsch* was undisputedly qualified through his personal experience prescribing the drug at issue, 768 F. Supp. 2d at 435, unlike Dr. Eisenberg who admittedly has never prescribed an IVC filter, and has no hands-on experience with the device whatsoever.

### C. Dr. Eisenberg's Factual Narrative and "Common Sense" Opinions Will Not Assist the Jury.

Dr. Eisenberg's improper factual narrative testimony will not assist the jury. Contrary to Plaintiffs' assertion, Dr. Eisenberg's testimony discussing Bard's internal documents is not simply providing a contextual summary, (*see* Pls. Br. at 11), but rather is regurgitating the facts contained in those corporate documents. Plaintiffs should not be permitted to circumvent the proper presentation of this evidence through percipient witnesses and admission of the documentary evidence. As detailed in Bard's motion, court after court has held that "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *In re: Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009); *accord Ocasio v. C. R. Bard, Inc.*, No. 8:13-cv-1962-T-36AEP, 2015 WL 2062611, at *4 (M.D. Fla. May 4, 2015); *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d at 551.[4]

---

[4] *See also Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989); *In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 880 (E.D. Ark. 2008), *aff'd in relevant part*, 586 F.3d 547, 571 (8th Cir. 2009); *In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769-Orl-22DAB, 2009 WL 3806436, at *4 (M.D. Fla. July 20, 2009); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, MDL 07-1873, 2009 WL 2169224 (E.D. La. July 15, 2009); *In re: Baycol Prods. Litig.*, 495 F. Supp. 2d at 1014-15.

Plaintiffs' attempt to address this authority is unavailing. (*See* Pls. Br. at 11.) Courts routinely exclude narrative opinions precisely because they "merely address facts found in corporate documents" and serve solely as "a conduit for corporate information." *Walker v. Ethicon, Inc.*, No. 12-CV-1801, 2017 WL 2992301, at *5 (N.D. Ill. June 22, 2017); *accord In re: Ethicon Inc.*, No. MDL 2327, 2016 WL 4582215, at *5 (S.D. W. Va. Sept. 1, 2016); *see also Baldonado v. Wyeth*, No. 04 C 4312, 2012 WL 1802066, at *4 (N.D. Ill. May 17, 2012) ("proffered narratives amount to a summary and statement of the experts' advocacy-based interpretation of documents in the record.").

Plaintiffs' cases are distinguishable as they all involved experts, unlike Dr. Eisenberg, that had significant and specific expertise in the products or subjects at issue in the case. *See, e.g.*, *Pooshs v. Philip Morris, USA, Inc.*, 287 F.R.D. 543, 551-553 (N.D. Cal. 2012) (in tobacco case, expert was co-leader of tobacco research program, whose "research has focused primarily on the health effects of tobacco, smoking cessation, and tobacco use prevention."); *Bryant v. Wyeth*, No. C04-1706 TSZ, 2012 WL 12844751, at *2 (W.D. Wash. Aug. 22, 2012) (in case alleging improper pharmaceutical marketing, both experts qualified through independent research of pharmaceutical advertising and promotion practices); *Deutsch*, 768 F. Supp. 2d at 435 (expert had personal experience prescribing drug at issue); *see also Goldenson v. Steffens*, No. 2:10-CV-00440-JAW, 2013 WL 682844, at *2 (D. Me. Feb. 25, 2013) (in case involving legal and compliance obligations with securities laws, expert qualified through extensive practice experience in securities law, including as Assistant General Counsel of the United States Security and Exchange Commission).

Moreover, Dr. Eisenberg is providing no permissible expert analysis of these internal documents,[5] nor tying it to any standard other than the admittedly ethical standards discussed above. Plaintiffs do not dispute that Dr. Eisenberg is not an expert in

---

[5] Plaintiffs also do not address, and therefore concede, that Dr. Eisenberg parroted Dr. Betensky's opinions without adding any expert analysis. (*See* Mot. at 2 n.1.) Therefore, this testimony should be excluded. *Crescenta Valley Water Dist. v. Exxon Mobile Corp.*, No. CV 07-2630-JST (ANX), 2013 WL 12120533, at *2 (C.D. Cal. Mar. 14, 2013).

- 11 -

the review of corporate documents. (*See* Ex. B, MDL Dep. Tr., 50:17-22.) Indeed, Dr. Eisenberg himself admitted that you "don't need to be an expert to read some of these internal Bard documents . . . . I think any lay person would recognize that." (Ex. C, Austin Dep. Tr., 58:22 to 60:9; *see also* Ex. B, MDL Dep. Tr., 139:16-23 ("I think if the jurors saw these documents they would say there is a problem that physicians and patients were not given this information in a timely manner.").) Thus, as demonstrated above, to the extent he provides any analysis, it is in the form of impermissible ethical opinions, opinions for which he is unqualified, or opinions that do not rely on any scientific, technical, or other specialized knowledge as required by Rule 702.

### III.   Conclusion.

For each of these reasons, Bard respectfully requests that this Court exclude the opinions of Dr. Eisenberg in their entirety.

RESPECTFULLY SUBMITTED this 18th day of October, 2017.

s/Richard B. North, Jr.
Richard B. North, Jr.
Georgia Bar No. 545599
Matthew B. Lerner
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW / Suite 1700
Atlanta, GA  30363
PH: (404) 322-6000
FX: (404) 322-6050
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

James R. Condo (#005867)
Amanda Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2204
PH: (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

**Attorneys for Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of October 2017, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

                                        s/Richard B. North, Jr.
                                        Richard B. North, Jr.

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000