# Exhibit B-1



Deposition of:
# Mark Eisenberg , M.D.

*July 6, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Case 2:15-md-02641-DGC   Document 8222-1   Filed 10/18/17   Page 3 of 10
Mark Eisenberg, M.D.                                         July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 82

1    are knowledgeable about the risks and benefits
2    associated with the procedure and the device.
3    That's dependent on having that information
4    available to them.
5         Q.   Let me hand you what we will mark as
6    Exhibit 8.
7              Exhibit 8 was marked for
8    identification.
9    BY MR. BUSMAN:
10        Q.   Do you recognize this as the
11   document identified in paragraph 24?
12        A.   Yes.
13        Q.   Take a look at the very top, if you
14   will, right under the heading:  "Chapter Two,
15   Opinions on Consent, Communications and Decision
16   Making".  I will read it into the record.
17                       "The opinions in this chapter
18                       are offered as ethics guidance
19                       for physicians and are not
20                       intended to establish
21                       standards of clinical practice
22                       or rules of law."
23             Did I read that correctly?
24        A.   Yes.
25        Q.   Do you agree with that statement?

Case 2:15-md-02641-DGC   Document 8222-1   Filed 10/18/17   Page 4 of 10
Mark Eisenberg , M.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 90

1    Q.    Let's take a look, please, at
2    paragraph 26.  If you could read that to yourself
3    and let me know when you are finished.
4    A.    Okay.
5    Q.    Let me hand you what we will mark as
6    Exhibit 9.
7            Exhibit 9 was marked for
8    identification.
9    BY MR. BUSMAN:
10   Q.    Can you identify Exhibit 9 for the
11   record, please?
12   A.    This is titled:  "The ACR-SIR-SPR
13   Practice Parameter on Informed Consent For Image
14   Guided Procedures."
15   Q.    Is the document we have identified
16   as Exhibit 9 the document that you refer to in
17   paragraph 26 of your report?
18   A.    The paragraph in my report -- the
19   paragraphs in my report are sub-sections from
20   this document.
21   Q.    Now, Exhibit 9 is a document put out
22   by the American College of Radiology; right?
23   A.    Yes.
24   Q.    In connection with what other
25   groups?

Case 2:15-md-02641-DGC   Document 8222-1   Filed 10/18/17   Page 5 of 10
Mark Eisenberg , M.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 91

1      A.     With the Society of Interventional
2    Radiology and the SPR.
3      Q.     Do you know what SPR stands for?
4      A.     I think the acronym escapes me for
5    the moment.
6      Q.     Now, are you a member of the
7    American College of Radiology?
8      A.     No, I am not.
9      Q.     Are you eligible to become a member
10   of the American College of Radiology?
11     A.     That I don't know.  As I said, I am
12   an interventional cardiologist, so there is some
13   overlap between radiology and interventional
14   cardiology, so it's possible I might be eligible.
15     Q.     Are you a member of the Society of
16   Interventional Cardiology?
17     A.     No, I am not.
18     Q.     There is nothing in paragraph 26 of
19   your report that quotes from these practice
20   guidelines that specifically mentions any
21   obligation, responsibility or duty on behalf of a
22   medical device manufacturer; right?
23     A.     No.  As we mentioned earlier, there
24   is no specific mention in these paragraphs of the
25   responsibility of a medical device manufacturer,

Page 92

1    although I think there is -- it's implicit in
2    these paragraphs, because these paragraphs
3    discuss how a physician obtains informed consent
4    before doing a procedure, and they have to be
5    able to disclose to the patients the risks,
6    complications and expected benefits of the
7    procedure or device to the patient.  So in order
8    to be able to do that they have to know what the
9    risks, complications and benefits are and how
10   frequently they occur.
11         Q.    I am going to object and move to
12   strike as non-responsive.  Is there anything in
13   paragraph 26 where you quote from these practice
14   guidelines that specifically references any
15   binding duty, obligation or responsibility of a
16   medical device manufacturer?
17               MR. ROTMAN:  Objection.  Asked and
18   answered.
19               THE WITNESS:  No, there is nothing
20   specifically, you know, identifying the
21   responsibility of a medical device company in
22   these paragraphs.
23   BY MR. BUSMAN:
24         Q.    Is Exhibit 9, in your opinion, the
25   same type of document as Exhibit 8 in terms of

Page 93

1      providing ethical guidance to practitioners?
2          A.   Yes, very similar.
3          Q.   Now, if you take a look at
4      Exhibit 9, I am going to read part of it into the
5      record.  If you take a look at the preamble on
6      the first page.  Do you see that heading?
7          A.   Yes.
8          Q.       "This document is an
9                   educational tool designed to
10                  assist practitioners in
11                  providing appropriate
12                  radiologic care for patients."
13              Did I read that correctly?
14         A.   Yes.
15         Q.   Do you agree?
16         A.   Yes.
17         Q.   The next sentence states:
18                  "Practice parameters and
19                  technical standards are not
20                  inflexible rules or
21                  requirements of practice and
22                  are not intended nor should
23                  they be used to establish a
24                  legal standard of care."
25              Did I read that correctly?

Page 96

1     are provided by these organizations to provide
2     guidance to physicians on how to obtain informed
3     consent.  At the same time, they don't want to
4     expose the physicians to lawsuits if they, you
5     know, if they haven't enumerated every single
6     risk or every single benefit.  So they don't want
7     to -- they don't want to set this up as a way
8     for, I think, patients to sue physicians.
9         Q.    Would I be correct that, in your
10    opinion, the documents cited in paragraphs 24, 25
11    and 26 do not constitute any legally binding
12    obligations for Bard?
13              MR. ROTMAN:  Objection.
14              THE WITNESS:  I think that they --
15    first of all, it doesn't appear that they are
16    legally binding obligations for physicians, if I
17    understand these sentences correctly.  And none
18    of these paragraphs specifically mention medical
19    device manufacturers.  So technically I think you
20    are correct.  On the other hand, these are, you
21    know, very strongly advised and they are widely
22    accepted amongst physicians that these are the --
23    these are the components of full and informed
24    consent.  If you want to get full and informed
25    consent you have to be fully apprised of the

Case 2:15-md-02641-DGC   Document 8222-1   Filed 10/18/17   Page 9 of 10
Mark Eisenberg , M.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 152

1          MR. ROTMAN:  Objection.
2          THE WITNESS:  Well, if we could turn
3     to the second part of paragraph 33 where we are
4     talking about it was misleading and detrimental
5     to patient health, safety, and informed consent
6     to continue to sell the earlier devices after the
7     newer ones had been cleared for marketing, so
8     that refers specifically to informed consent.  So
9     we have earlier in my expert report a couple of
10    documents that speak to informed consent where
11    the physician has to give the risks and benefits
12    of the procedure or device.
13    BY MR. BUSMAN:
14         Q.    You are talking about the documents
15    in paragraphs 24, 25 and 26; correct?
16         A.    That's correct.
17         Q.    Is it your opinion that the
18    documents in paragraphs 24, 25 and 26 are in some
19    way, shape or form actually binding on Bard,
20    controlling of its conduct?
21         A.    No.  As we discussed earlier, these
22    are strong ethical guidelines for physicians on
23    how to provide informed consent.
24         Q.    So let me try the question one more
25    time.  What binding document of any kind, whether

Page 153

1    it be a law, rule, standard or regulation, did
2    Bard violate in connection with the conduct
3    outlined in paragraph 33?
4         A.   So again, I can't point you to a
5    particular document.  I would say that I have
6    read the expert report of Dr. Kessler who is an
7    FDA expert, and he indicated in his documents
8    that Bard had violated, you know, various FDA
9    rules.  I can't point to the particular
10   paragraphs where he said that.
11        Q.   I am going to object and move to
12   strike everything other than "I can't point you
13   to a document."  I didn't ask you about Dr.
14   Kessler; okay, or his litigation report in this
15   case.  I am going to take your report as a whole
16   for the purpose of my next question; okay?  I am
17   referring to your expert report that we have
18   identified here and any rebuttal report or
19   supplemental report that you have served in this
20   case.  You have not identified any binding
21   document of any kind, whether it be a law, rule,
22   regulation or guidance that you believe Bard
23   violated in connection with any of your expert
24   opinions in this case; right?
25        A.   Again, I don't know if this gets to