James R. Condo (#005867)
Amanda C. Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2204
Telephone: (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

*Attorneys for Defendants*
*C. R. Bard, Inc. and*
*Bard Peripheral Vascular, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation | No. 2:15-MD-02641-DGC<br><br>**DEFENDANTS C. R. BARD, INC.'S AND BARD PERIPHERAL VASCULAR, INC.'S REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE THE OPINIONS OF DEREK D. MUEHRCKE, M.D.**<br><br>(Assigned to the Honorable David G. Campbell)<br><br>**(Oral Argument Requested)** |

The Plaintiffs' Response to Bard's motion to exclude seven opinions of Derek Muehrcke, M.D., the Plaintiffs' case-specific medical expert, fails to show that Dr. Muehrcke is qualified to proffer those opinions or that his opinions are based on scientific methodology such that they are reliable. Accordingly, Bard respectfully requests that the Court grant Bard's Motion to Exclude the Opinions of Derek D. Muehrcke, M.D. (the

"Motion").

### A. The Plaintiffs' Response Confirms that Dr. Muehrcke's Opinions Regarding the Design of Bard's IVC Filters Should Be Excluded Because He Is Not Qualified To Proffer Them.

Dr. Muehrcke is not qualified under Rule 702 to offer expert testimony regarding the design of Bard's IVC filters because such opinions fall outside of his medical expertise as a cardiothoracic surgeon. Because he is unqualified, Dr. Muehrcke should not be permitted to provide opinions regarding alleged design flaws in Bard's IVC filters in this case.

As noted at length in Bard's Motion, throughout Dr. Muehrcke's report and deposition testimony, he repeatedly opines regarding alleged deficiencies and flaws in Bard's IVC filter design. Among other things, he argues that Bard's IVC filters were designed in a way that led to "inadequate migration resistance, [because of a purported] lack of strength and stability caused by [] weak anchoring hooks and lack of radial force and inadequate leg span to accommodate vessel distention," which caused the Plaintiffs to experience complications. (Exhibit A to Motion, Muehrcke Report, *Booker*, p. 9; Exhibit B to Motion, Muehrcke Report, *Hyde*, p.8; Exhibit D to Motion, Muehrcke Report, *Kruse*, p. 8; Exhibit E to Motion, Muehrcke Report, *Mulkey*, p.8.) Specifically, he testified that flaws in several technical aspects of Bard's IVC filters lead to specific complications: "I think that the design [of all Bard filters] is a structural problem. Conical shaped filters . . . have less migration resistance to make it easier to retrieve, and that less migration resistance and less radial force led to a device which does not really work appropriately." (Exhibit F to Motion, Muehrcke Dep. Tr., p. 85:16-86:12.)

But as a cardiothoracic surgeon, Dr. Muehrcke is not qualified to offer technical opinions on the design of Bard's IVC filters. He has no background in engineering, metallurgy, or materials science, and has never designed an IVC filter, nor tested an IVC filter's design. (*Id.* at 33:23-34:2, 89:11-90:3.) When asked what qualifications he had that enabled him to give opinions on the adequacy of design of an IVC filters, he could only

cite his clinical experience as a medical doctor: "I'm a physician who actively puts in inferior vena cava filters of all designs, and have to interact with patients and determine which is the most appropriate filter for patients to receive. I do put a lot of filters in and try to take a lot of filters out." (*Id.* at 88:8-15.) In that same deposition, Dr. Muehrcke conceded that "the engineers are probably better suited to give" opinions regarding the technical aspects of filter design and admitted that he does not "have the expertise to determine how design modifications might impact clot trapping efficiency or a filter or its retrievability." (*Id.* at 90:7-91:10.)

The Plaintiffs do not refute that Dr. Muehrcke does not have specific expertise in medical device design or training in engineering, metallurgy, and materials science. They do not refute the fact that Dr. Muehrcke has never designed or tested an IVC filter. Instead, the Plaintiffs argue that Dr. Muehrcke is qualified to opine regarding design flaws with IVC filters simply because he has treated patients with IVC filters, has read articles in medical journals about IVC filters, and has read a few Bard internal documents out of the millions produced by Bard in this litigation. However, none of this establishes that he is an expert in device design, and hence, it is insufficient under *Daubert* for Dr. Muehrcke to give opinions on device design. *See, e.g., Alexander v. Smith & Nephew, P.L.C.*, 98 F. Supp. 2d 1310, 1315-16 (N.D. Okla. 2000) (excluding design-related and other opinions of a physician who had treated thousands of patients with the device at issue, noting that "[t]he simple possession of a medical degree is insufficient to qualify a physician to testify as to the advantages of a spinal fixation device, the medical causation of spine-related ailments, or the mechanical functioning of an orthopedic implantation device"); *Morritt v. Stryker Corp.*, 973 F. Supp. 2d 177, 188 (E.D.N.Y. 2013) (finding that a physician who had significant clinical experience with the medical device at issue went "well beyond the 'reasonable confines' of his clinical expertise" when offering opinions regarding biomedical engineering and material science, and that therefore the physician was not qualified to offer such opinions); *Steinman v. Spinal Concepts, Inc*., No. 05-cv-774S, 2011 WL 4442836, at *5 (W.D.N.Y. Sept. 22, 2011) (finding that an orthopedic surgeon was

not qualified to offer opinions about the design of the medical device at issue).

In their Response, the Plaintiffs also attempt to argue that Dr. Muehrcke is qualified to testify that there is a design flaw in Bard's filters "from a clinical perspective" that causes "performance flaws." (ECF No. 7813, p. 7). The Plaintiffs argue that Dr. Muehrcke "has also studied the design of Bard's filters and the effect on patients." (*Id.* at 8). While Dr. Muehrcke is qualified to comment on his experience with filter complications observed in patients and their "effect" on patients, he is not qualified to opine on how the design of Bard's filters may have caused those complications or how a change in design might reduce the risk of those complications. In other words, the Plaintiffs fail to establish that there is a "clinical perspective" on engineering, metallurgy, and device design. The Plaintiffs likewise fail to establish how having a "clinical perspective" would allow Dr. Muehrcke to opine regarding what the alleged flaws are in the technical design of Bard's IVC filters, such as the strength of the radial force exerted by an IVC filter and a filter's migration resistance, let alone how a conical design produces these alleged defects in greater numbers than other filter designs. The Plaintiffs' argument goes, in essence, that Dr. Muehrcke, as a doctor, is qualified as an expert on any topic about which he reads involving a medical device he uses in his practice.[1] This is not

---

[1] In support of their argument that even though he is not an engineer, Dr. Muehrcke is qualified to opine regarding technical aspects of device design and how design complications can be caused by various technical attributes of an IVC filter, the Plaintiffs cite *Ericson v. City of Phoenix*, No. CV-14-01942-PHX-JAT, 2016 WL 6522805, *4 (D. Ariz. Nov. 2, 2016). This case is inapposite. In *Ericson*, the issue was whether a nurse practitioner with over 40 years' experience, and who had been a forensic nurse for over 15 years, could opine regarding a strangulation, even though she did not have a medical degree. *Id.* Although not a doctor, the court allowed Ms. Ericson to be qualified as an expert, as she had specialized in strangulation, was familiar with how an individual could be strangled and the effects of strangulation, was a member of both the Advisory Team for the Strangulation Training Institute and the Strangulation Task Force for the International Association of Forensic Nurses, had written a medical article on strangulation, and had taught classes on the subject. *Id.* Here, by contrast, the Plaintiffs seek to qualify Dr. Muehrcke as an expert in a discipline in which he admittedly has no experience whatsoever.

Similarly, the Plaintiffs cite to *In re: Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, No. 2327, 2016 WL 4500765, **5-6 (S.D. W. Va. Aug 26, 2016) for the proposition that Dr. Muehrcke is qualified to opine regarding the technical aspects of the design of Bard's IVC filters because he has "ample experience" with them. *Ethicon* does not support the Plaintiffs' position, however, because there, the expert was in fact "familiar with the

- 4 -

the standard of admissibility under *Daubert*. *See In re: Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1243-44 (D. Colo. 1998) (excluding design opinions of a scientist who held a Ph.D. in physical chemistry because being a chemist did not automatically qualify the witness on design issues when he lacked training and experience concerning design of breast implants).

In addition to his lack of qualifications to offer opinions on device design, Dr. Muehrcke fails to demonstrate that he utilized sufficient methodology in determining that Bard filters allegedly have design flaws. In their Response, the Plaintiffs claim that Dr. Muehrcke has "studied" the design of Bard's filters, but by all accounts, that study merely involves reading a few Bard internal documents selected by the Plaintiffs' counsel out of the millions produced in this litigation, reading some medical literature, and being a practicing physician who uses IVC filters. (ECF No. 7813, p. 8). This does not describe a methodology by which he can reliably determine that Bard filters have design flaws, however. Because Dr. Muehrcke has provided no methodology for his opinions regarding the technical aspects of the design of Bard's IVC filters, Bard seeks the exclusion of Dr. Muehrcke's opinions regarding alleged design flaws in Bard's IVC filters.

### B. Dr. Muehrcke's Opinions Are Unreliable Because He Wholly Adopts Opinions of Other Experts, Created Specifically for this Litigation, Without Independently Verifying Their Underlying Work.

In their Response, the Plaintiffs claim that Bard has "greatly overreach[ed]" in asserting that Dr. Muehrcke relied upon opinions of other experts without independently verifying their work. The Plaintiffs incorrectly characterize Bard's argument, however. Bard seeks to prevent Dr. Muehrcke from being a mouthpiece for the opinions contained

---

design of surgical products" and had even "invented a catheter device." *Id.* at 5. The court in *Ethicon* relied on the expert's experience as a device designer to hold that he was qualified to opine regarding device design, specifically noting that "[e]xperience as a practicing urogynecologist or urologist alone does not translate into experience with or knowledge about the process of designing a product." *Id.* Here, Dr. Muehrcke admits that he has no experience or training in medical device design, having never designed or tested an IVC filter or any similar device, or attempted to come up with an alternative device. As such, the Plaintiffs' reliance on *Ethicon* does not alter the conclusion that Dr. Muehrcke is not qualified to provide his opinions regarding the design of Bard's IVC filters.

- 5 -

in the reports of Drs. Kinney, Roberts, Kalva, Eisenberg, and Kessler, which he has wholly *adopted* without any independent evaluation.

In their Omnibus brief,[2] the Plaintiffs concede it is impermissible for an expert to "merely act as a conduit for the other expert's opinion." (ECF No. 7799, Pls. Omnibus Br., p. 7.) Indeed, as the Plaintiffs further concede in their Omnibus brief, the law requires the record to show that "the expert independently evaluated the evidence supporting the other expert's opinion." (*Id.*) These concessions are fatal to the Plaintiffs' apparent attempt to use Dr. Muehrcke as an alternative source to introduce the opinions of Drs. Kinney, Roberts, Kalva, Eisenberg, and Kessler.

In each of his reports, Dr. Muehrcke fully adopted the opinions and expert reports of Drs. Kinney, Roberts, Kalva, and Eisenberg, but admitted during his deposition that he did not independently evaluate those opinions, or the opinions of Dr. Kessler, upon which those reports largely are based. Dr. Muehrcke testified that he could not say he reviewed the depositions and medical literature cited in the report of Drs. Kinney, Roberts, and Kalva. (Ex. F to Motion, p. 43:6-44:10, 49:17-50:5, 50:22-24.) Neither did he discuss Drs. Kinney, Roberts, and Kalva's opinions, or the bases of these opinions, with them, in an effort to analyze those opinions or the materials they cited. (*Id.* at 50:8-21.) Dr. Muehrcke also failed to independently evaluate Dr. Kessler's opinions, upon which many of the opinions of Drs. Kinney, Roberts, Kalva, and Eisenberg rely; in fact, he did not even read Dr. Kessler's report, and could not testify that he read all of the documents referenced in that report. (*Id.* at p. 42:13-44:10.) In short, no matter how the Plaintiffs attempt to walk it back in the Response, it is an inescapable fact that in his reports, Dr. Muehrcke simply "adopted" the opinions of Drs. Kinney, Roberts, Kalva, Eisenberg, and Kessler wholesale, without making any effort to independently verify them.

---

[2] The Plaintiffs filed a separate Omnibus Statement Of Law And Generally-Applicable Arguments In Opposition To Bard's Motions To Exclude Plaintiffs' Experts Under Rule 702 And Daubert (ECF No. 7799). The Plaintiffs' Omnibus Statement is not directed at any specific Daubert motion Bard filed. As such, Bard does not respond to the Omnibus Statement, but instead will address any necessary issues in the context of its individual Daubert replies.

- 6 -

In an attempt to avoid exclusion of these opinions, the Plaintiffs simply attempt to provide the bases for Dr. Muehrcke's <u>other opinions</u> in this case. Whether Dr. Muehrcke's case-specific opinions as a treating physician have reliable bases has no bearing on the issue presented in Bard's Motion. Bard does not contest that Dr. Muehrcke can testify within his expertise and provide opinions about the individual Plaintiffs for which he employed a verifiable, reliable methodology. Dr. Muehrcke cannot, however, simply adopt and repeat the opinions of other experts when he has not undertaken to independently evaluate the evidence and methodology behind them. Bard therefore requests that the Court prohibit Dr. Muehrcke from proffering any of the opinions of Drs. Kinney, Roberts, Kalva, Eisenberg, and Kessler in this case.

**C.    Dr. Muehrcke Cannot Speak on Behalf of All Physicians and All Patients, as He Claims to in this Litigation.**

As discussed in Bard's Motion, Dr. Muehrcke is not qualified to speak for anyone else but himself, and any opinion that goes to "what physicians would do with different information is purely speculative and not based on scientific knowledge." *In re Diet Drugs*, No. MDL 1203, 2001 WL 454586, at *18 (E.D. Pa. Feb. 1, 2001); *see also In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 557 (S.D.N.Y. 2004). Nonetheless, in his reports and deposition testimony, Dr. Muehrcke improperly proffers opinions regarding the reasonable expectations all physicians have of medical device companies. In their Response, while the Plaintiffs state that Muehrcke is "not speaking on behalf of other physicians" about their expectations, they spend the next several pages explaining that Muehrcke knows "what physicians need" with regard to warnings from medical device companies "to give their patients truly informed consent about medical procedures." (ECF No. 7813, pp. 10-12.) No matter how the Plaintiffs package it, Dr. Muehrcke's opinions regarding "what physicians need" is an opinion that physicians would have acted differently with additional complication rate information that Dr. Muehrcke claims all physicians require to adequately obtain informed consent.

The Plaintiffs do not, however, provide any reasonable explanation for how Dr.

Muehrcke is qualified as an expert in what all physicians consider sufficient to give their patients informed consent regarding the implantation of IVC filters. Instead, the Plaintiffs merely argue that Dr. Muehrcke is qualified to speak on behalf of all physicians because "he has been a practicing cardiothoracic surgeon for 24 years and regularly implants and explants IVC filters." (*Id.* at 11.) The law is clear that simply practicing as a physician only qualifies a doctor to speak for himself, and does not qualify Dr. Muehrcke to speak on behalf of other physicians. Therefore, his opinions in this regard should be excluded here.

Moreover, in the Response, the Plaintiffs provide no methodology Dr. Muehrcke employed to arrive at his opinion that all physicians require complication rate data in order to obtain informed consent for implantation of IVC filters. Dr. Muehrcke admitted during his deposition that to derive his opinions on the expectations of all physicians, he performed no surveys and canvassed no physicians, but only reached out for "scuttlebutt talk around the coffee machine" with his partners about risks. (Ex. F to Motion, p. 98:1-8.) The Plaintiffs only offer by way of methodology that Dr. Muehrcke arrived at those opinions after 24 years in practice and after reading some medical literature stating that physicians "need to have enough information to understand the risks and the benefits" of medical devices. (ECF No. 7813, p. 11.) Absent from the Plaintiffs' explanation of Dr. Muehrcke's methodology, however, is any discussion of how his manner of practicing medicine—and the information he uses to perform his own risk/benefit analysis—provides him insight into how all other physicians practice medicine, and the information they require to perform their own risk/benefit analysis. Put otherwise, in the Response, the Plaintiffs provide no insight into Dr. Muehrcke's methodology to determine how all physicians use information provided to them to "understand the risks and benefits" of medical devices and to determine how much information physicians consider "enough" to understand the risks and benefits of medical devices. Indeed, Dr. Muehrcke cannot testify regarding the expectations of the implanting physicians for the bellwether plaintiffs, as he admitted that each doctor's risk/benefit analyses is "subjective", and an "art form, not a

- 8 -

science," and he did not read any of the implanting physicians' depositions before proffering his opinion on the information they would require to obtain informed consent and perform their risk/benefit analysis. (Ex. F to Motion, p. 98:18-21, 119:5-18, 154:2-9.)

The Plaintiffs then argue that Dr. Muehrcke used proper methodology to give these opinions on "what doctors need to know" because he read germane medical literature regarding physician expectations to arrive at his opinions. Dr. Muehrcke could not identify any such literature in his deposition, however. Moreover, the Plaintiffs fail to identify any literature in the Response that would indicate the level of warning Dr. Muehrcke opines physicians expect from a medical device company—a warning he claims requires more than the potential complications to be identified. The Plaintiffs also state that, in forming his opinion regarding physicians' expectations, Dr. Muehrcke generally reviewed "Bard documents, depositions, radiology reports, and medical records," and that Dr. Muehrcke has studied IVC filters "in great depth." (ECF No. 7813, p. 12.) The Plaintiffs fail to explain however, which documents, depositions, radiology reports, and medical records Dr. Muehrcke reviewed in coming to his opinions, how those documents provided him the insight necessary to arrive at his opinion, and what specifically he did with that information to arrive at his opinions. Similarly, the Plaintiffs fail in the Response to provide any specifics of Dr. Muehrcke's "in depth" study of IVC filters that would allow him to proffer his opinions regarding physician expectations in this case. Simply put, the Plaintiffs have provided no ascertainable methodology that Dr. Muehrcke employed to derive his opinions regarding physicians' expectations.

In addition, Dr. Muehrcke's opinion regarding physicians' expectations generally is irrelevant to the Plaintiffs' failure to warn claim, as the only inquiry relevant is the expectations of the individual implanting physicians. Here, all of the implanting physicians for the bellwether Plaintiffs have provided deposition testimony regarding their informational expectations and the risk/benefit analysis they each undertook in deciding to implant the IVC filter in each plaintiff. Dr. Muehrcke admits that each physician's risk/benefit analysis is "subjective;" that he cannot know what the implanting physicians

"expected" because he has not read any of their depositions, admitting "I don't know what they know;" and that he has no idea what any Bard sales representative told any of the implanting physicians. (Ex. F to Motion, pp. 98:9-99:13, 119:5-18, 154:2-9.)

Dr. Muehrcke, by his own admission, cannot provide an opinion on the expectations of the physicians who implanted the filters in the bellwether plaintiffs. And, as explained above, Dr. Muehrcke's generalized thoughts on physician expectations are irrelevant to determine whether Bard discharged its duty to warn to the implanting physicians in each of the bellwether cases and, therefore, are unhelpful to the jury. Accordingly, his opinions on physician expectations and what physicians "need" should be excluded here.

**D.     The Court Should Exclude Dr. Muehrcke's Rates Opinions.**

As discussed in detail in Bard's Motion, Dr. Muehrcke is unqualified to provide opinions regarding alleged comparative complication rates of Bard's IVC filters, and any such opinions are unsupported by any articulated methodology. Bard respectfully requests that the Court exclude all of Dr. Muehrcke's opinions regarding the rates of complication for Bard's IVC filters.

As a threshold matter, the Response fails to establish that Dr. Muehrcke is qualified to provide opinions regarding complication rates of Bard's IVC filters. The Plaintiffs merely argue that Dr. Muehrcke is qualified to provide these opinions because he is a medical doctor who utilizes Bard's IVC filters in his practice and has read documents that the Plaintiffs purport derive complication rates for Bard's IVC filters. What this argument fails to consider is that deriving and opining regarding complication rates of medical devices requires expertise in statistics or epidemiology, the disciplines which allow for derivation of rates of occurrence, not simply expertise in the practice of medicine.[3] Under

---

[3] The Plaintiffs argue that "[i]f Dr. Muehrcke were an epidemiologist and not a physician, Bard would likely argue that he was unqualified to opine about migration rates because he lacked the necessary medical understanding." (ECF No. 7813, p. 13.) This is a classic strawman argument, which refers to, but mischaracterizes, the arguments employed in Bard's Motion to Exclude the Opinions of Dr. Betensky. In that motion, Bard argued that Dr. Betensky's assumptions regarding adverse event reporting practices of physicians were unreliable, as she had no experience with adverse event reporting through medical

- 10 -

*Daubert*, it is axiomatic that a doctor is not an expert in any discipline tangentially related to the practice of medicine simply because he is a doctor and because he read a few documents on the issue. *See Alexander*, 98 F. Supp. 2d at 1315-16; *Morritt*, 973 F. Supp. 2d at 188 (finding that a physician who had significant clinical experience with the medical device at issue went "well beyond the 'reasonable confines' of his clinical expertise" when offering opinions regarding biomedical engineering and material science, and that therefore the physician was not qualified to offer such opinions); *Steinman* 2011 WL 4442836 at *5. Without the expertise outlined above, Dr. Muehrcke's rates opinions are simply him regurgitating the contents of documents that speak for themselves.[4] As explained in Bard's Motion, this is not the standard for reliable expert testimony under *Daubert* and, therefore, Dr. Muehrcke's rates opinions should be excluded here.

Dr. Muehrcke's rates opinions are also subject to exclusion because the Plaintiffs offer no discernable methodology to demonstrate how he arrived at them, other than that he is a practicing physician, and has read some medical literature and a few internal Bard documents selected by the Plaintiffs' counsel. The Plaintiffs fail to establish in any way how Dr. Muehrcke derived complication rates from his experience in his own medical practice, however. The Plaintiffs have provided no information on the number of Bard filter implants he has performed over time, or the number of complications experienced by Dr. Muehrcke's patients over time. Even if they had, the fact that Dr. Muehrcke may have implanted and retrieved numerous filters over time and seen or heard about complications in Bard filters is not a scientific method for calculation of a rate. Nor does it provide the

---

practice, and relied upon no expert testimony from medical professionals regarding such adverse event reporting practices. Bard did not argue that Dr. Betensky was not qualified to derive complication rates because she was not a medical doctor, but merely challenged the reliability of the assumptions utilized in her methods. In Bard's Motion, however, Bard does argue that Dr. Muehrcke's lack of training or experience in statistics or epidemiology is fatal to his ability to proffer opinions based in those disciplines.

[4] In this regard alone, Dr. Muehrcke's opinions are not helpful to the jury and should be excluded. *See Payne v. C. R. Bard, Inc*., No. 6:11-cv-1582-Orl-37GJK, 2014 WL 988754, at *5-*8 (M.D. Fla. Mar. 12, 2014) (excluding "unhelpful, plaintiff-slanted summaries and characterizations of the evidence which should be excluded as unhelpful to the jury") (citing cases).

1  Court any idea how Dr. Muehrcke could have leveraged his practice to derive his opinions
2  regarding the complication rates of Bard's IVC filters. Similarly, although the Plaintiffs
3  generally cite a review of medical literature and internal Bard documents as Dr.
4  Muehrcke's methodology, this provides no insight into Dr. Muehrcke's methodology for
5  the use of that material to arrive at his opinions regarding complication rates. Indeed, the
6  medical literature and Bard documents cited by the Plaintiffs in the Response do not
7  contain precise complication rates and, in any event, speak for themselves, requiring no
8  expert opinion to explain their contents to the jury. In essence, in making his rate
9  opinions, Dr. Muehrcke's methodology is to impermissibly act as a voice for documents
10 that do not say what the Plaintiffs say they do, and speak for themselves. As such, his
11 opinions in this regard should be excluded. *See Payne*, 2014 WL 988754 at \*5-\*8.

12 The lack of qualification and methodology for Dr. Muehrcke's rate opinions is
13 evident in the fact that, during his deposition, Dr. Muehrcke could not articulate what
14 about Bard's rates of complication were unacceptable, except to state that rates should be
15 "as close to zero" as possible. (Ex. F to Motion, p. 65:2-65:5.) He could not, however,
16 provide a rate of failure that would be acceptable. (*Id.* at 63:15-64:15, 65:9-11.) This is
17 perhaps the best illustration that Dr. Muehrcke is not only unqualified to provide his rates
18 opinions, but that he followed no discernable methodology to arrive at them. For these
19 reasons, Bard respectfully requests the Court exclude his opinions regarding the
20 complication rates of Bard's IVC filters.

### E. The Court Should Exclude Dr. Muehrcke's Opinions Regarding the Risk of Future Arrhythmias and Need for Treatment of Same in the *Hyde* Case Because He Admits He Is Unqualified to Offer Them.

23 The Plaintiffs' Response fails to establish Dr. Muehrcke's qualifications to provide
24 opinions regarding the risk of future arrhythmias in the *Hyde* case, requiring his opinion in
25 that regard to be excluded. Dr. Muehrcke, by his own admission, is not qualified to
26 provide opinions regarding the risk of future arrhythmias because he is a cardiothoracic
27 surgeon, not an electrophysiologist. Dr. Muehrcke testified that he is unable to quantify
28 what the future risk of developing arrhythmias was for Ms. Hyde and that

- 12 -

"electrophysiology would be better to do that." (Ex. F to Motion, *p.* 126:12-16).

Despite Dr. Muehrcke's own testimony that he is not qualified to give this opinion, the Plaintiffs oppose Bard's Motion, arguing that they find it "difficult to understand how he could be unqualified to opine about the likely effects of an injury to the heart." (ECF No. 7813, pp. 18-9.) Regardless whether the Plaintiffs' attorneys understand their experts qualifications, his lack of expertise in the area readily clear to Dr. Muehrcke himself, who testified that he could not determine the risk of future arrhythmias for Ms. Hyde—as between two percent, twenty percent, or greater—saying "I don't know. Don't know how her body is going to respond to having that filter fragment scar," but that a practitioner in "electrophysiology would be better to" quantify Ms. Hyde's future risk of developing arrhythmias. (Ex. F to the Motion, p. 126:12-126:22.) Dr. Muehrcke similarly could not quantify the risk of Ms. Hyde developing "lethal arrhythmias" and again would have to defer to an electrophysiologist to determine that risk. (*Id.* at 128:1-129:9; *see also* 113:25-114:13, where, in referencing the *Booker* bellwether case, Dr. Muehrcke again notes he would have to leave quantification of risk of arrhythmia in a patient to an electrophysiologist.) Because Dr. Muehrcke frankly (and unequivocally) testified that he is not qualified or able to give an opinion quantifying Ms. Hyde's risk of developing arrhythmias, what the potential is for such a condition to cause her sudden death, or what her potential need is for an AICD, the Court should exclude these opinions in the *Hyde* case.

## **Conclusion**

For each of these reasons, Bard respectfully requests that this Court exclude the opinions of Dr. Muehrcke identified above.

//
//
//
//

RESPECTFULLY SUBMITTED this 18th day of October, 2017.

s/Richard B. North, Jr.
Richard B. North, Jr.
Georgia Bar No. 545599
Matthew B. Lerner
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW / Suite 1700
Atlanta, GA 30363
PH: (404) 322-6000
FX: (404) 322-6050
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

James R. Condo (#005867)
Amanda Sheridan (#027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2204
PH: (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

**Attorneys for Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of October, 2017, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

s/ Richard B. North, Jr.
Richard B. North, Jr.