# Exhibit I

 

Deposition of:

# Rebecca Betensky , Ph.D.

*July 26, 2016*

In the Matter of:

# Clare-Austin vs. C.R. Bard

Tiffany Alley, A Veritext Company
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-ga@veritext.com | 770.343.9696

Case 2:15-md-02641-DGC   Document 8230-3   Filed 10/18/17   Page 3 of 5

Rebecca Betensky, Ph.D.                                July 26, 2016
Clare-Austin vs. C.R. Bard

Page 60

1   Q.  But it was clear, even if you didn't
2   perform the exact calculations, it was clear that
3   the frequency of these reported adverse events was
4   not huge; correct?
5           MR. MANKOFF:  Object to form.
6   A.  Correct, relative to the reported sales
7   numbers and the reported events, that's correct.
8   Q.  Now, you've been using and we've been using
9   interchangeably as you said reported risk ratio,
10  that term, with reported relative risk.  How does a
11  reported relative risk differ from a relative risk?
12  A.  So the qualifier "reported" is important,
13  and that's indicating that the data are coming from
14  reports, and are not being derived from a
15  beautifully run and designed experiment like a
16  clinical trial, in which there's perfect follow-up
17  and in which it's really a true experiment.
18          So the "reporting" qualifier is there to
19  say and to suggest that these are numbers that are
20  reported.  These are based on reports.
21  Q.  And that's different from a true relative
22  risk; correct?
23  A.  A relative risk, which is what the target
24  is, which is what would be of interest, wouldn't be
25  entangled with issues around reporting.

Page 62

1   Q.  And we don't know whether that occurred in
2   this instance with this particular data set, do we?
3           MR. MANKOFF:  Object to form.
4   A.  We don't whether what occurred?
5   Q.  Underreporting or overreporting.  You said
6   it could lead to it.
7   A.  No --
8   Q.  We don't know whether it led to either way
9   in this case, do we?
10  A.  I'm sorry; I said --
11          MR. MANKOFF:  Just let the court
12  reporter catch up.
13          Object to form.
14  A.  Okay.  I didn't say anything about
15  overreporting.  What I said was overestimates.  So
16  these data could -- they provide an estimate, we
17  call it the reporting risk ratio.  And this estimate
18  could be an overestimate or it could be an
19  underestimate.
20  Q.  Okay, and I stand corrected.  Let me
21  rephrase that question.
22          And we cannot say, sitting here today,
23  whether the reported relative risk that you
24  calculated overestimates or underestimates in this
25  particular data set, can we?

Case 2:15-md-02641-DGC   Document 8230-3   Filed 10/18/17   Page 5 of 5

Rebecca Betensky , Ph.D.                July 26, 2016
Clare-Austin vs. C.R. Bard

Page 106

1  respect to that is just looking at the sales data
2  over time across ten years of time for some
3  products, and less so for others because they were
4  removed from the market earlier.  The sales data
5  seems pretty constant month by month, which is the
6  granularity at which I have the data.
7           So I would imagine that these are
8  expensive devices and nobody wants too many of them
9  sitting on the shelf; and so over time, institutions
10 or physicians learn better how to estimate their
11 needs, and so that wouldn't be a very big problem.
12          So I did also address that through one
13 of my sensitivity analyses, and just assumed -- or
14 just considered what would happen if I discounted
15 the sales data by 20 percent and just assumed that
16 20 percent are sitting on the shelf and 80 percent
17 are implanted, and I obtained comparable results to
18 when I didn't do that discounting.
19      Q.   Other limitations?
20      A.   So another limitation is that these are
21 crude estimates of risk and reflect different times
22 of exposure to devices, partly due to when the SNF,
23 for example, was available prior to the start time
24 of 2000; also reflecting the permanent versus
25 retrievable issue.