# REDACTED DOCUMENTS
# RELATED TO DOCKET 7948

## 7948 – Plaintiffs' Controverting Statement of Facts in Opposition to Bard's Motion for Partial Summary Judgement as to Carol Kruse

## REDACTED EXHIBITS:

**Exhibit 1:  Selected Medical Records of Carol Kruse;**
**Exhibit 2:  Excerpts of 4/3/17 Deposition of Mark Hutchins, M.D.;**
**Exhibit 3:  Excerpts of 2/20/17 Deposition of Carol Kruse;**
**Exhibit 4:  Declaration of Carol D. Kruse dated 9/27/17;**
**Exhibit 5:  Excerpts of 2/20/17 Deposition of Diane Biere;**
**Exhibit 6:  Expert Report of Christopher S. Morris, M.D.;**
**Exhibit 7:  Excerpts of 4/4/17 Deposition of Shanon Smith, M.D.;**
**Exhibit 8:  Excerpts of 7/21/17 Deposition of Darren Hurst, M.D.; and**
**Exhibit 9:  Excerpts of 7/24/17 Deposition of Derek Muehrcke, M.D.**

**REDACTED DOCUMENTS
RELATED TO DOCKET 7948**

# EXHIBIT 1

# FILED REDACTED



Continued on next page.

KRUSEC_        00020



| Date | Progress Notes |
|------|----------------|

KRUSE 00029

**REDACTED DOCUMENTS
RELATED TO DOCKET 7948**

# EXHIBIT 2

# FILED REDACTED

Do Not Disclose - Subject to Further Confidentiality Review

1              UNITED STATES DISTRICT COURT

2                    DISTRICT OF ARIZONA

3

4

   IN RE: BARD IVC FILTERS    ) Case No.

5  PRODUCTS LIABILITY         ) MD-15-02641-PHX-DGC

   LITIGATION                 )

6                             )

7                   DO NOT DISCLOSE

      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

8

      VIDEOTAPED DEPOSITION OF ██████████████.

9                    April 3, 2017

                   Lincoln, Nebraska

10                    1:55 p.m.

11

12

13

14

15  Reported by:  Lori J. McGowan, RDR, CRR

16

17

18

19

20           GOLKOW TECHNOLOGIES, INC.

        877.370.3377 ph | 917.591.5672 fax

21              deps@golkow.com

22

23

24

Do Not Disclose - Subject to Further Confidentiality Review



Do Not Disclose - Subject to Further Confidentiality Review



    23                    MS. HELM:   Object to the form.

    24    A.

Do Not Disclose - Subject to Further Confidentiality Review



1

2      Q.      (BY MR. MARTIN) Yes, sir.

3      A.

7      A.      Uh-huh.

8      Q.      --

10     A.      Uh-huh.

11     Q.      -- what did you mean by that statement?

12     A.

**REDACTED DOCUMENTS
RELATED TO DOCKET 7948**

# EXHIBIT 3

# FILED REDACTED

```
          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF ARIZONA

IN RE: BARD IVC FILTERS      NO. MD-15-02641-PHX-DGC
PRODUCTS LIABILITY
LITIGATION.
```

          VIDEOTAPE DEPOSITION OF CAROL KRUSE, taken

before Mary Lou Harmon, RPR, CRR, CSR(IA), General

Notary Public within and for the State of Nebraska,

beginning at 12:58 p.m., on the 20th day of

February, 2017, at The Lincoln Marriott Cornhusker

Hotel, 333 South 13th Street, Lincoln, Nebraska.

1   sometime this year?

2       A.   If not this year, real close to the end of

3   last year, yes.

4       Q.   Before that conversation with your

5   daughter, had you spoken with your daughter about

6   your lawsuit against Bard regarding your IVC filter?

7       A.   The only thing I had visited with her

8   about was way back when I, you know, called a number

9   that was on TV that said if you've had, you know, a

10  clot filter put in, call this number.

11      Q.   So you saw that TV advertisement, and you

12  spoke -- you then spoke with your daughter?

13      A.   I'm sure I didn't call her that day, you

14  know.

15      Q.   But near that time you spoke with your

16  daughter about --

17      A.   Yes.

18      Q.   -- the advertisement you saw?

19      A.   Yes.

20      Q.   In any of the -- strike that.

21           With the discussion you had with your

22  daughter recently about the fact that she was going

23  to be deposed and you were going to be deposed, did

24  you at any point talk with her about the questions

25  that you might get asked?

1    after you got the box?

2         A.    Probably.

3         Q.    And you filed your lawsuit on April 6,

4    2015; right?  Does that sound right?

5         A.    I don't know.

6         Q.    Okay.  Let's go back to Page-- to

7    Exhibit 5 for a moment, please.

8              And if you would look at Page 5, please.

9              At the top on question No. 14, it asks,

10   "Before contacting an attorney regarding this

11   lawsuit or claim, had you ever seen a television or

12   print advertisement regarding possible claims

13   against Inferior Vena Cava Filter manufacturers,"

14   and you marked "yes."

15        A.    Yes, uh-huh.

16        Q.    Read for me the response.  It asks for the

17   approximate date and nature of the advertisement.

18   What is your response there?

19        A.    "I remember seeing the ad on TV about

20   people having IVC filters, and there was a telephone

21   number to call."

22             As far as approximate date, it would have

23   to be maybe 2010, 2009, somewhere in there.

24        Q.    Do you know approximately between the time

25   that you saw the TV advertisement and when you

1    are not going to discuss any communications you had

2    with him or any letters or what was the content of

3    any of those letters.  That's attorney/client

4    privilege.

5            I just wanted to make sure we're talking

6    about what I thought we were talking about.

7            MR. NASH:  And I didn't know.  I

8    certainly don't want to --

9            MR. ARBON:  I'm not saying you did

10    anything wrong.  Until we established where we were

11    headed with that, I didn't want to interject, but

12    now I'm interjecting.

13    BY MR. NASH:

14        Q.   And, Ms. Kruse, let me make sure it's

15    clear.

16            When I ask a question about anyone you've

17    talked with, if you've talked with an attorney, I'm

18    not interested -- well, I am interested, but I don't

19    want you to answer that.

20        A.   Right.  I did not actually talk to him.  I

21    did not actually talk to anybody there.  All I got

22    was letters.

23        Q.   Do you remember seeing that TV

24    advertisement before you had your procedure to

25    remove your filter?

1       A.   Yes.

2       Q.   Do you remember the content or substance

3   of that TV advertisement?

4       A.   It was just a general -- you know, didn't

5   have any pictures or anything like that.  Just, you

6   know, if you've had an IVC filter placed and have

7   had, you know, problems, please call this number.

8       Q.   I'm going to mark -- or ask you to mark

9   for Exhibit 7, please.

10                     (Exhibit No. 7

11                     marked for identification.)

12                MR. NASH:   Tom, this is just the

13   notice or amended notice.

14   BY MR. NASH:

15       Q.   Ms. Kruse, I've -- you've been handed

16   Exhibit No. 7, and it -- if you read the title, it

17   says, "Amended Notice of Videotape Deposition Duces

18   Tecum of Carol Kruse."

19                Do you see that?

20       A.   No, I do not.

21       Q.   I'm sorry, flip to the first page of

22   what -- I'm sorry.

23       A.   I was going to say, "No, I don't see

24   that."

25       Q.   You are on the first page.

```
 1  ████████████████████████████████████
 ██ █████████████████████████████████
 ██ █████████████████████████████████
 ██ ██████████████████████
 5      A.    Yes.
 6      Q.    ████████████████████████████
 ██ █████████████████
 ██     ██ ███████████████████████████
 ██ ██████████████████████████
 ██ ██████████████████████████████████
 ██ █████████████████████████████████
 ██ ████████████
 ██      █████████████████████████████
 ██ █████████████    ██████████████████
 ██ ███████████████████████████████████
 ██ █████████████████████████████████
 ██ ███████████████████████████████
 ██ ██████████████████
 ██     ██ ███████████████████████████
 ██ ███████████████████
21      A.    Correct.
22      Q.    ███████████████████████████
 ██ ███████████████████████████████████
 ██ ████████████████████████
 ██ ██████
```

1      **A.    Evidently, yes.**

2      **Q.**   ███████████████████████████████

███████████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████

7                   MR. ARBON:  Objection.  Form.

8                   THE WITNESS:  ████████████████

███████████

10   BY MR. NASH:

11     **Q.**   ██████████████████████████████████

██████████████████████████████

█████████████████████████

14     **A.    Yes.**

15     **Q.**   ██████████████████████████

█████████████████████████████████

████████████████████████████

██████████████

19     **A.    Yes.**

20     **Q.**   ████████████████████████████████

██████████████████████████████

22     **A.    Yes.**

23     **Q.**   ██████████████████████████████████

█████████████████████████████

25                   MR. ARBON:  Go ahead.

1    A.    ███████████████████████████

   ████████████

   ██    ██████████████████████████████

   ████████████████████

   ██    ████████████████ yes.

6    Q.    ███████████████████████████

   ████████████████████████

   ████████████████████████

   ██    ██████████████████████████

   ████████████████████

   ██    ██████████████████████████

   ██████████████████████████

   ████████

   ██    ██████████████████████████

   ███████████████████████████

   ████████████████████

   ██    ██████████████████████████

   █████████████████

   ██    ██████████████████████████

   ███████████  █████████████████

   ███████████████████████████

22         (Exhibit No. 12

23         marked for identification.)

24         MR. NASH:  Tom, this is 12.

25

Page 124

1    ████████████████████    ████████████████

██   ██████████████████████████████

██   ██████████████████████████

██   ████████████████████

5    BY MR. NASH:

6         Q.   ████████████████████████

██   ████████████████████████████

██   ██████████████████

9         A.   Okay.

10        Q.   ████████████████████████

██   ████████████████

██   ██   ████████████████████████

██   ██████████████████████████

██   ██████████████████████████

15        Q.   ████████████████████████

██   ████████

17        A.   Yes.

18        Q.   ██████████████████████████████

██   ██████████████████████████████

██   ██████████████████████████

██   ████████████████████

22             MR. ARBON:  Objection to form.

23             THE WITNESS:  ████████████████

██   ████████████████████    ████████████

██   ██████████████████████████████

Page 125

1   ████████████████████

2   BY MR. NASH:

3       Q.   Understood.  ███████████████

    ████████████████████████████

5       A.   Yes.

6       Q.   ███████████████████

    █████

8       A.  ████████████ , yes.

9       Q.   ██████████████

    ████████████

11      A.   Yes.  █████████████

    ████████

13      Q.   ██████████████

    ████████████████████████

    ████████████████████████

    ██████████

17      A.   Yes.

18      Q.   ██████████████████

    ████████████████████

    ███   ██████

21      Q.   ██████████████████

    █████████

    ███   ███████████████

    ███████   █████████   ████████

    █████████████ .

Page 141

1    ████████████████████

████    ███    ████████████████████

████    ██████████████████████████████

████    ████████████████████████

████    ██████████████████████

████    ███

████    ███    ████████████████████

████    ████████████

████    ███    ██████████████████████

████    ████████████████████

████    ████████████    ██████████████

████    ██████████████████████

████    ████████████████

████    ███    ████████████████████████

████    ████████████████████

████    ████████████████

17    A.    No, I do not know.

18    Q.    ████████████████████

████    ████████████████

████    ███    ██████████████████████

████    ████████████████████    ███

████    ████████████████████

████    ████████████    ████████████

████    ████████████████████

████    ████████████    ████████████

Page 142

1 ██████████████████████████████████

██  ████████

██    ██  ████████████████████████████

██  █████████████████████

██    ██  █████████████████  ████████████

██  ████████████████████.

7                    (Exhibit No. 15

8                    marked for identification.)

9  BY MR. NASH:

10        Q.    Ms. Kruse, you've been handed Exhibit 15.

11              ████████████████████████████████

██  ██████████████████████████

13        A.    Yes.

14        Q.    And do you see at the bottom your name is

15  there, "Carol Kruse"?

16        A.    Yes.

17        Q.    ██████████████████████████

18        A.    Yes.

19        Q.    In the top corner?

20        A.    Yes.

21        Q.    ████████████████████████████████

██  ████████████████████████████████

██  ████████████  ██████████████████

██  ████████████████████████████████

██        ████████████████

1   texted anyone else or at any other time sent a text

2   message about your IVC filter?

3        A.   If I did, it would have been Diane, my

4   daughter, you know.

5        Q.   But you don't have any recollection as you

6   sit here today of any such text messages about your

7   IVC filter?

8        A.   No.  In fact, when I texted her, I said

9   come a little bit early and we'll chat while we have

10  time before the filter deposition.  So is that about

11  the filter, not really, but it sort of is, kind of.

12       Q.   Ms. Kruse, have you ever been convicted or

13  pled guilty to any felony or crime of fraud or

14  dishonesty?

15       A.   No.

16       Q.   Have you ever been arrested for a crime --

17  for a felony or a crime of fraud or dishonesty?

18       A.   No.

19       Q.   Do you keep a journal?

20       A.   No.

21       Q.   Do you keep a diary?

22       A.   No.

23       Q.   Do you have any place where you like to

24  write down your thoughts?

25       A.   No.

1        Q.   Have you ever spoken to anyone at C.R.

2   Bard or Bard Peripheral Vascular?

3        A.   No.

4                       (Exhibit No. 16

5                       marked for identification.)

6                  MR. NASH:   This is 16.

7   BY MR. NASH:

8        Q.   Ms. Kruse, I've handed you Exhibit 16.

9        A.   Yes.

10        Q.   Do you recognize this document?

11        A.   Yes.

12        Q.   I just want to confirm, this is you at the

13   top, Carol D. Kruse; correct?

14        A.   Correct.

15        Q.   Dated February 5, 2013?

16        A.   Yes.

17        Q.   Is this a -- appear to you to be a true

18   and correct copy of the bankruptcy petition that was

19   filed on your behalf back in 2013?

20        A.   Yes.

21                       (Exhibit No. 17

22                       marked for identification.)

23   BY MR. NASH:

24        Q.   And, Ms. Kruse, you've been handed Exhibit

25   No. 17.  Do you recognize this document?

1       A.   Yes.

2       Q.   At the top it's dated -- filed June 6 --

3  I'm sorry, June 3rd, 2013.  Do you see that?

4       A.   Yes.

5       Q.   And you see it says, "Discharge of

6  debtor"?

7       A.   Yes.

8       Q.   Do you understand -- I'm sorry, strike

9  that.

10          Towards the top you see where your name is

11  listed, "Carol D. Kruse"?

12      A.   Yes.

13      Q.   Do you understand this document to be a

14  true and correct copy of the discharge order related

15  to the bankruptcy filing we just looked at?

16      A.   Yes.

17              MR. NASH:  I don't have any further

18  questions.

19                  CROSS-EXAMINATION

20  BY MR. ARBON:

21      Q.   Let me ask you a quick question.

22          You just said have you ever contacted

23  Bard, counsel asked you that.

24      A.   Right.

25      Q.   Just to be clear, have you ever had any

1    reason to believe you've met anyone from Bard?

2         A.   No.

3         Q.   Or been introduced to anyone from Bard?

4              COURT REPORTER:  Excuse me, ma'am,

5    you need to answer out loud.

6              THE WITNESS:  No.

7    BY MR. ARBON:

8         Q.   ████████████████████████████████

     ████████████████████████████████████████

     ██  ████████████████████

11        A.   There was --

12             MR. NASH:  Objection.  Leading.

13             THE WITNESS:  -- a person that

14   ████████████  introduced me to.  And it's my

15   recollection that he was a representative from Bard.

16   I do not know his name.  I do not know what he

17   looked like, because I was under the, you know, blue

18   drape.  I could hear him and ██████████ visiting.

19   BY MR. ARBON:

20        Q.   So when you talked about ████████████

21   visiting with someone about -- I think you said,

22   "let's try a different size"?

23        A.   Yes.

24        Q.   Was it your belief or understanding that

25   was someone from Bard?

1      A.   Yes.   I'm assuming it was the same person

2   that, you know, he said we also have this person in

3   the room and he's a representative of Bard -- or

4   representative from the ████████████████████ or

5   something like that.

6                  MR. ARBON:   I'm wondering -- I didn't

7   write down page and line, I apologize.   Can you go

8   to -- if I give you a time reference, can you find

9   it?

10                 COURT REPORTER:   Do you want to go

11  off the record?

12                 MR. ARBON:   Yeah, let's go off the

13  record.

14                 VIDEOGRAPHER:   Off the record at

15  6 p.m.

16                 (Discussion off the record.)

17                 VIDEOGRAPHER:   Back on the record at

18  6:02 p.m.

19  BY MR. ARBON:

20     Q.   We just took a quick break to look at a

21  question and answer from the deposition.   And on the

22  rough, it would have been Page 146, Lines 12 through

23  22.   And it was back when you were discussing a

24  conversation you had with ████████████████████

25  ██████████.

1    BY MR. ARBON:

2         Q.    Did you know or have reason to know that

3    that ████████████████████████████████████████?

4         A.    No.

5         Q.    When was the first time that you had any

6    reason to believe your filter was -- there is

7    anything wrong with your filter?

8         A.    When the ████████████████████████████

     ██████████████████████████████████████████████

     ██████████████████████████████████████████

11                    MR. ARBON:  I'll reserve the rest of

12   my questions.

13                    MR. NASH:  I have no further

14   questions.

15                    VIDEOGRAPHER:  This is the end of

16   media No. 4.  End of deposition.  Off the record at

17   6:09 p.m.

18                    MR. ARBON:  We'll read and sign.

19                    COURT REPORTER:  (Requests transcript

20   orders.)

21                    MR. ARBON:  An E-file with exhibits.

22                    MR. NASH:  E-Tran with exhibits.

23                         (Whereupon, the deposition was
                           concluded at 6:09 p.m.)

24

25                    **  **  **  **

**REDACTED DOCUMENTS
RELATED TO DOCKET 7948**

# EXHIBIT 4

# FILED REDACTED

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: BARD IVC FILTERS PRODUCTS LIABILITY LITIGATION | No. 2:15-md-02641-DGC |
| This Document Relates to:<br><br>No. 2:15-cv-01634-DGC<br><br>CAROL KRUSE<br><br>v.<br><br>C.R. BARD, INC. AND BARD PERIPHERAL VASCULAR, INC | **DECLARATION OF CAROL D. KRUSE** |

My name is Carol Kruse. I am over the age of 19 and competent to make this declaration. I have personal knowledge of the facts stated herein.

I was first implanted with a Bard G2 IVC filter on July 8, 2009.  The filter was placed by Shanon Smith, M.D.

On the day the filter was implanted and prior to undergoing the procedure to implant the IVC filter, I signed a consent form that listed the general risks attendant to any invasive surgical procedure.  Prior the implantation of the Bard G2 filter, I was not informed of any risks that were specific to the IVC filter itself.

On July 8, 2009, prior to having the filter implanted, the only thing that Dr. Smith said about the filter was that it was a removable device and could be retrieved if and when I wanted it taken out.  I was never informed that there were any time limits by which the filter should be removed or that the risks of the filter migrating, tilting, perforating the wall of the vena cava, becoming embedded, or fracturing increased the longer the filter remained implanted in my

body.  I was not informed that there was any risk of caudal migration of the filter or that the filter

could tilt, perforate my vena cava, or fracture.  Had I been told that the Bard G2 filter had a

higher risk of caudal migration than other IVC filters or that filter presented higher risk of

perforating my inferior vena cava than other filters, I would have asked that ████████

████████████████████████████████████████████████████████

████████████████████ without placement of an IVC filter.

     In 2009 or 2010, I saw an advertisement on TV that mentioned some people who had

been implanted with IVC filters might have a claim against the manufacturer.  I called the

number from the television advertisement, not because I was experiencing pain or suspected that

I was having any problems with my filter, but simply because I knew I had an IVC filter, and

because this commercial encouraged people who had an IVC filter to call for more information.

I just wanted to know what the commercial was all about.  The person I spoke with took my

name and number, but several years passed before I was actually informed that a claim might

exist.  That information came from an attorney named Russell Button with the Law Offices of

Ben C. Martin.  My first contact with that law firm occurred in July 2013.  It would be more than

a year later before I was informed that my case had been investigated and that a claim was going

to be made on my behalf.

     In late 2010 to early 2011, I recall having a conversation with ████████████

████████████████████████████████████████████  When I mentioned that I still

had the Bard G2 IVC filter implanted, ████████████████████████████. My

reason for scheduling the removal procedure was not because I knew or believed at that time that

the filter was causing any ████ but simply because it had been brought to my attention that the

filter was no longer needed and it was a convenient time for me to have the procedure.  I then

spoke with Dr. Smith by telephone about scheduling the removal of the filter and he set the

retrieval for April 7, 2011.

I underwent a 

but I did not know, or even suspect, that the IVC filter had

tilted, migrated, perforated my IVC, or fractured. I thought

the filter was no longer needed and because April 2011 was a convenient time for me to have the

procedure

The first time that I knew or had a reasonable basis for knowing that the Bard G2 filter

implanted in my body had caused any injury was after Dr. Smith attempted to remove the filter

on April 7, 2011.  Prior to April 7, 2011, I did not know that the filter had migrated downward in

my inferior vena cava, that the filter was tilted, that the filter may have fractured, or that I had

suffered any injury or damage to my inferior vena cava.

Approximately two years after this failed filter retrieval attempt, I filed for Chapter 7

bankruptcy.  At the time the bankruptcy proceeding began in February of 2013 and continuing

until the proceedings were closed by an order entered in June 2013, I was not aware and had not

been told that I had any valid claim against any person or company arising from the implantation

of the Bard G2 filter in my body.  I did not know that I had a legal right to make claim against

any person or company with regard to the Bard G2 filter until after my bankruptcy had been

closed in June 2013.  I did not know there was even a potential claim that deserved further

investigation until I spoke with Russell Button in July 2013. I most certainly did not intend to conceal any unliquidated claims which were unknown to me during the period the bankruptcy was pending, and I had no motive to do so.  I was simply not aware that my right to pursue such a claim existed during that time period.

I have requested that the bankruptcy proceeding be reopened so that the trustee can evaluate whether the existence of this claim has any effect on the result.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on: _9·27·2017_

_Carol D. Kruse_
Carol D. Kruse

# REDACTED DOCUMENTS
# RELATED TO DOCKET 7948

# EXHIBIT 5

# FILED REDACTED

        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF ARIZONA

IN RE: BARD IVC FILTERS       NO. MD-15-02641-PHX-DGC
PRODUCTS LIABILITY
LITIGATION.




          VIDEOTAPE DEPOSITION OF DIANE BIERE, taken

before Mary Lou Harmon, RPR, CRR, CSR(IA), General

Notary Public within and for the State of Nebraska,

beginning at 9:54 a.m., on the 20th day of February,

2017, at The Lincoln Marriott Cornhusker Hotel, 333

South 13th Street, Lincoln, Nebraska.

Page 55

1   what you're asking?

2        Q.   Yes, ma'am.

3        A.   She may have mentioned something, but it

4   wasn't -- it wasn't anything that was, like, a red

5   flag or anything.   It was --

6        Q.   Let me ask very generally.

7        ████████████████████████████████████████████

8   █ ███████████  ████████████████████████████?

9             And just to be clear, I'm not asking just

10  sort of how you're doing today, but about any

11  specifics --

12       A.   ██████████████████████

13       Q.   -- ██████████████████████████████

14       A.   She will -- when I ask, she will give me

15  updates.   She's a very private person, so a lot of

16  times I don't know if I hear everything.

17       Q.   How frequently do you ask?

18       A.   Oh, when we talk on the phone, we'll talk

19  about it, or when she says, "I'm going to go to the

20  doctor," I will say, "Well, tell me how that was,

21  or, you know, tell me what they say," things like

22  that.

23       Q.   Would you say you have conversations like

24  that on a weekly basis?

25       A.   No, I wouldn't say that much.

Page 56

1      Q.    Would you say you have those kind of

2   conversations on a monthly basis?

3      A.    Maybe once a month.

4      Q.    ████████████████████████████████████

█   ████████████████████████████████████████████

█   ████████████████████████████████████████████

█   ████████████████████████████████████████?

8         Strike that.

9         ██████████████████████████████████████

██   ██████████████████████████?

11     A.    █████████████████████████████████████?

12     Q.    ████ .

13     A.    ███████████████████    ████████████████?

14     Q.    █████

15     A.    I don't -- I don't think -- I don't think

16   ████████████████████████████████ .

17     Q.    █████████████████████████████████████

██   ████████████████████████████████████████████

██   ██████████████████████████████████

20     A.    █████████████████████████████ .

21     Q.    ███████████████████████████████████████

22     A.    No.

23     Q.    ███████████████████████████████████████

██   ████████████████████████████████

25              MR. ARBON:   Objection to form.

**REDACTED DOCUMENTS
RELATED TO DOCKET 7948**

# EXHIBIT 6

# FILED REDACTED

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation, | No. 2:15-MD-02641-DGC |

**EXPERT REPORT OF CHRISTOPHER S MORRIS, MD**

**Carol Kruse**

Bard IVC Filter Litigation Expert Report

Carol D. Kruse

Christopher S. Morris, MD

**Personal Background and Experience**

I am an Interventional Radiologist with over 25 years of clinical experience at a busy tertiary care referral center. This includes the placement and retrieval of inferior vena cava filters (IVCFs), as well as the care and management of patients with IVCFs. I graduated from Case Western Reserve University School of Medicine in 1985 and completed an Internship in Internal Medicine at Cleveland Metropolitan General Hospital. My residency in Diagnostic Radiology was obtained at the Ohio State University Hospitals from 1986 to 1990 and my fellowship in Vascular and Interventional Radiology was obtained at the Massachusetts General Hospital from 1990 to 1991. My residency and fellowship were heavily weighted towards IVCFs. I trained with leaders in the field, including some of the first Interventional Radiologists, Drs. Van Aman and Stockum, to place Greenfield IVCFs percutaneously, which revolutionized the practice of IVCF insertion more than 30 years ago. Ohio State University Hospitals has a long tradition of innovation in Interventional Radiology, which stimulated my interest in this specialty. Drs. Van Aman and Stockum were trained by Dr. William Molnar, a Grandfather of Interventional Radiology who was instrumental in developing the technique of coronary and cardiac angiography, as well as long term percutaneous biliary drainage. A Founding Fellow of the Society of Cardiovascular and Interventional Radiology, Dr. Molnar was an emeritus Professor of Radiology who taught me during the early part of my residency. At Massachusetts General Hospital, I trained with Drs. Waltman and Athanasoulis, who are also distinguished Interventional Radiologists and experts in the field of IVCFs.

I serve as a Professor of Radiology and Surgery at the Robert Larner, MD College of Medicine at the University of Vermont, and teach residents, fellows, and medical students about IVCFs, including indications, contraindications, risks, and complications of IVCFs, as well as alternative therapies for venous thromboembolic disease. During this timeframe, I have taught and mentored more than 100 residents in Diagnostic Radiology as they rotated on the Interventional Radiology service, in addition to 28 fellows in Interventional Radiology, who worked closely with me on a daily basis. I co-founded the Fellowship in Interventional Radiology at the University of Vermont in 1994. I have served as the Program Director for the Diagnostic Radiology Residency, Program Director of the Fellowship in Interventional Radiology, and the Division Director of Interventional Radiology at the University of Vermont Medical Center (formerly Fletcher Allen Health Care, formerly Medical Center Hospital of Vermont).

1

I also taught Interventional Radiology colleagues about IVCFs as a member of the IVCF Workshop series during the annual national meeting of the Society of Interventional Radiology for five years, during the introduction of optional IVCFs in the United States. I was the chair of this Workshop series for three years.

Over my career at the University of Vermont, I have been part of a small team of full time Interventional Radiologists, and have performed a large variety of vascular and non-vascular procedures that embodies the gamut of Interventional Radiology. Our practice has always been a blend of clinical Interventional Radiology and academics. I have focused on building a busy and well-respected Interventional Radiology service and have strived to become the best versatile and well-rounded, full time clinical Interventional Radiologist possible. Throughout my 25-year career at the University of Vermont, I have continuously participated in frequent emergency call duties at a busy Level I Trauma Center, ranging from every other week to every fourth week in frequency. I have introduced or co-introduced innumerable vascular and non-vascular Interventional Radiology procedures to the state of Vermont, and still perform many neurointerventional, aortic endografting, and peripheral vascular interventions. We serve as the only tertiary care referral center for the entire state of Vermont and much of the Adirondack region of the state of New York. My electronic teaching collection, consisting of around 3,000 interesting procedures that I have personally performed, is a testament to my clinical Interventional Radiology experience. I estimate that I have placed more than 800 IVCFs and have retrieved many IVCFs since the advent of optional IVCFs in the U.S., around 15 years ago.

I also received a Master of Science degree from the Ohio State University Graduate School in 1990, with a concentration in radiation physics and radiobiology. I am a Fellow of the Society of Interventional Radiology and a Fellow of the American College of Radiology. In addition, I am a member of many medical societies and organizations. I am a diplomat of the American Board of Radiology in Vascular and Interventional Radiology, a subspecialty of Diagnostic Radiology, and hold certificate no. 34386.

In the past four years, I have testified as an expert witness in one case, Matthew Collins, MD and Jillian Collins v. Dartmouth Hitchcock Medical Center and Hitchcock Clinic, Inc.

My hourly rate is $500 per hour.

I have previously provided reports in this litigation dated March 16, 2017, and April 13, 2017, which I fully incorporate into this report.

2

## Opinions Regarding Carol D. Kruse







5

Imaging





## Crtitique of Expert Report Darren R. Hurst, MD

I have had the opportunity to review the Expert Report of Darren R. Hurst, MD. I disagree with many of his opinions, and wish to elaborate on some of his statements. If I do not discuss any particular opinion of Dr. Hurst, that does not indicate that I agree with it.



In section 4c, Dr. Hurst has copied the American Medical Association Code of Medical Ethics on informed consent.

In paragraph 4dii, Dr. Hurst states that Bard's own internal risk analysis deemed the G2 filter to pose an "unacceptable risk" of caudal migration. Some investigators have hypothesized that caudal migration of an IVCF predisposes it to perforation of the inferior vena caval wall and fracture. This may not be true, for several reasons. Many IVCFs perforate the inferior vena caval wall and fracture, without any migration at all. Fractures can occur without inferior vena caval wall perforation and perforation can

7

occur without fracture. As long as the IVCF is above the iliac vein confluence, which is the case with Ms. Kruse's IVCF, and if it has not tilted to a significant degree, there is no reason to believe that an IVCF that has migrated caudally should function any less well than an IVCF that has not migrated. Cantwell and colleagues retrospectively compared Bard Recovery and G2 filters during the retrieval procedure (3). 67 Recovery and 60 G2 IVCFs were evaluated at a mean of 592 and 396 days, respectively. The fracture rates of the Recovery and G2 IVCFs were 9% and 0%, respectively. Binkert, et al., in a multicenter prospective study of the retrieval of 100 Bard G2 IVCFs showed one fracture in the 85 patients that were completely studied, although there was a 12% caudal migration rate of greater than 2 cm (4). Of note, like most caudal migrations, these were asymptomatic. Mistunaga and Yoon performed a retrospective evaluation of all IVCFs placed at a single institution over a 10-year period. At a mean implantation to image time of 19.0 months, the 57 Bard G2 and G2X IVCFs had a fracture and/or embolization rate of 0% (5). In general, caudal migration, per se, is not a significant complication of an IVCF.



In paragraph 4ei2, Dr. Hurst

In paragraph 4ei3, Dr. Hurst

In paragraph 4ei4, Dr. Hurst states

In paragraph 4ei6, Dr. Hurst

All IVCFs can fracture. If the fractured fragment is not contained within the wall of the IVCF, it can embolize to the chest, and rest within the right side of the heart, or within the pulmonary artery distribution. The chance that an embolized IVCF fractured

8

fragment causing significant injury or death, even those residing within the right ventricle of the heart, or the pulmonary artery, is very rare (9-11). 

### Critique of Expert Report of Derek D. Muehrcke, MD

I have had the opportunity to review the Expert Report of Derek D. Muehrcke, MD. I disagree with many of his opinions, and wish to elaborate on some of his statements. If I do not discuss any particular opinion of Dr. Muehrcke, then it should not imply that I agree with it.

Dr. Muehrcke

In his Case Specific Opinions Regarding Carol Kruse,

9



I am not a surgeon,

## Summary of Opinions Regarding Carol D. Kruse



11. 

12.

My opinions are based on the medical records that I have reviewed, my training and experience as an interventional radiologist, and the medical literature cited in my reference list and in my previous reports in this litigation. I hold these opinions to a reasonable degree of medical and scientific certainty. I have evaluated and formed opinions on the issues involved in this case in the same manner that I would have evaluated and treated my own patient. I reserve the right to add to or change my opinions if additional information becomes available to me.

Dated: June 29, 2017

Christopher S. Morris

12

## References

1. 2016 Revised ACR-SIR-SPR Practice Parameter for the Performance of Inferior Vena Cava (IVC) Filter Placement for the Prevention of Pulmonary Embolism. https://www.acr.org/~/media/a569be8f18ae4cfaa2868b6e0984dbd8.pdf Accessed January 16, 2017.

2. Bard G2 Filter System. Femoral Vein Approach. Instructions for Use.

3. Cantwell CP, Pennypacker J, Singh H, Scorza LB, Waybill PN, Lynch FC. Comparison of recovery and G2 filter as retrievable inferior vena cava filters. J Vasc Interv Radiol 2009; 20:1193-9.

4. Binkert CA, Drooz AT, Caridi JG, et al. Technical success and safety of retrieval of the G2 filter in a prospective, multicenter study. J Vasc Interv Radiol 2009; 20:1449-53.

5. Mitsunaga MM, Yoon H-C. Fracture rate and serious complications of vena cava filters. Open Journal of Radiology 2013; 3:85-90.

6. Iliescu B, Haskal ZJ. Advanced techniques for removal of retrievable inferior vena cava filters. Cardiovasc Intervent Radiol 2012; 35:741-50.

7. Kuo WT, Tong RT, Hwang GL, et al. High-risk retrieval of adherent and chronically implanted IVC filters: techniques for removal and management of thrombotic complications. J Vasc Interv Radiol 2009; 20: 1548-56.

8. Katsamouris AA, Waltman AC, Delichatsios MA, Athanasoulis CA. Inferior vena cava filters: in vitro comparison of clot trapping and flow dynamics. Radiology 1988; 166:361-6.

9. An T, Moon E, Bullen J, et al. Prevalence and clinical consequences of fracture and fragment migration of the Bard G2 filter: imaging and clinical follow-up in 684 implantations. J Vasc Interv Radiol 2014; 25:941-948.

10. Vijay K, Hughes JA, Burdette AS, et al. Fractured Bard Recovery, G2, and G2 express inferior vena cava filters: incidence, clinical consequences, and outcomes of removal attempts. J Vasc Interv Radiol 2012; 23:188-94.

11. Treotola SO, Stavropoulos SW. Management of fractured inferior vena cava filters: outcomes by fragment location. Radiology 2017; Apr 19:162005.

**REDACTED DOCUMENTS
RELATED TO DOCKET 7948**

# EXHIBIT 7

# FILED REDACTED

Do Not Disclose - Subject to Further Confidentiality Review

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF ARIZONA

* * * * * * * * * * * * * * * * * * * * * * * * * *

In Re BARD IVC FILTERS PRODUCTS
LIABILITY LITIGATION

No. MD-15-02641-PHX-DGC

* * * * * * * * * * * * * * * * * * * * * * * * * *


and

* * * * * * * * * * * * * * * * * * * * * * * * * *

CAROL KRUSE                    )MDL No. 2641
                              )
              Plaintiff,)
                              )
          vs.                 )
                              )
C.R. BARD AND BARD            )
PERIPHERAL VASCULAR, INC., )
                              )
              Defendant.)

* * * * * * * * * * * * * * * * * * * * * * * * * *

DO NOT DISCLOSE - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

VIDEOTAPED DEPOSITION OF:  SHANON SMITH, M.D.

DATE:  April 4, 2017

TIME:  2:00 p.m.

PLACE:  Mary Lanning Memorial Hospital, 15 North St.
Joseph Avenue, Hastings, Nebraska

Do Not Disclose - Subject to Further Confidentiality Review

Page 49

1    Q.    (BY MR. ARBON) So as a doctor do you think it

2    would be appropriate for the manufacturer to use

3    patients as beta test grounds for the products?

4                    MS. HELM:   Object to the form.

5        It's argumentative.

6    A.    I would expect it to be a safe product and that

7    they would know -- they would know the anatomy and it

8    would function like it's -- should.  I mean, I assume

9    they went through clinical trials with test patients

10   as well, I would assume that's the process.

11   Q.    (BY MR. ARBON) If there were no clinical trials

12   to establish the long-term safety and efficacy of

13   the -- their optional filters, would that be

14   information that you as a physician would like to

15   know when you're making a decision as to whether to

16   use the product or not?

17   A.    I think I remember you mentioned that, that

18   they -- they used other data from a different filter.

19   I would -- I would rely on that, that it's safe if

20   it's on the market.

21   Q.    But you -- but if you were told -- if you had

22   available to you information that demonst -- that No.

23   1, that long-term clinical trials had not been

24   performed to establish the long-term safety and

25   efficacy of the filter system, is that information

Do Not Disclose - Subject to Further Confidentiality Review

Page 50

1    you would like to have?

2                     MS. HELM:  Object to the form.

3    A.   I would -- as much information as how dangerous

4    a product is, that would be good to have.

5    Q.   (BY MR. ARBON) All right.

6         (Exhibit No. 2112, marked for identification.)

7    Q.   Hand you what I've marked now as Exhibit 2112 to

8    your deposition.  Which begins with the Bates No.

9    BPVE010101982, a health hazard evaluation from

10   December 17th, of 2004.

11        Again, I'll tell you this is a document that

12   Bard has produced to us in this litigation.  And it

13   relates to the Recovery filter.  And again, that

14   Recovery filter is the filter that was used as the

15   predicate for the G2.

16        If you look at Page 2, Doctor, the first

17   paragraph under 2A.  There's a statement that,

18   "Reports of death, filter migration, movement, IVC

19   perforation and filter fracture associated with

20   Recovery filter we're seeing in the MAUDE database,

21   at reporting rates that were 4.6, 4.4, 4.1 and 5.3

22   higher respectively than the reporting rates for all

23   other filters."

24        Is that the type of information that you as a

25   physician would like to know and have available to

Do Not Disclose - Subject to Further Confidentiality Review

Page 51

```
 1      you when you're making a risk benefit analysis as to
 2      which filter you would like to place in one of your
 3      patients?
 4                      MS. HELM:  Object to the form.
 5      A.   The more information about the risks and the
 6      higher risk, if this statement is true, that would be
 7      helpful.
 8      Q.   (BY MR. ARBON) And if you had been told that the
 9      G -- or a Recovery filter in this case, had -- was
10      associated with reported deaths at a rate of 4.6
11      higher than the other filters, would you think you
12      would want to use that filter or another filter?
13                      MS. HELM:  Object to the form.
14      A.   You would have to decide which filter, yes, you
15      would want to use, Recovery or G2 if this is based on
16      Recovery data.
17      Q.   (BY MR. ARBON) Okay.  And if you were told that
18      the data held by Bard indicated that the Recovery
19      filter was more prone to perforate, fracture, migrate
20      than other filters, is that information you would
21      like to have had available to you when making your
22      determination as to what filters to utilize?
23                      MS. HELM:  Object to the form.
24      A.   As much information on the safety of the product
25      and the patient would be helpful.
```

Do Not Disclose - Subject to Further Confidentiality Review

Page 52

1    Q.   (BY MR. ARBON) And in doing a true risk benefit

2    analysis, your ability to perform a risk benefit

3    analysis is based upon the information available to

4    you; is that correct?

5    A.   That's correct.

6    Q.   So if manufacturers have information that would

7    directly effect or could have a direct effect on a

8    risk benefit analysis, did you as a physician using

9    Bard products have an expectation that Bard would

10   make that information available to you?

11                    MS. HELM:  Object to the form.

12   A.   I would expect that Bard would produce a safe

13   filter and if there were problems, they would notify

14   the physician.

15   Q.   (BY MR. ARBON) That seems reasonable to you as a

16   physician?

17                    MS. HELM:  Object to the form.

18   Move --

19   Q.   (BY MR. ARBON) Is that a reasonable thing to a

20   physician to expect?

21   A.   I would -- I would think so.

22   (Exhibit No. 2113, marked for identification.)

23   Q.   Hand you what's been marked as 211 -- Exhibit

24   2113 to your deposition.  It is a Bard document

25   beginning with Bates No. BPVE0101752806; do you see

Do Not Disclose - Subject to Further Confidentiality Review

Page 53

1    that document, sir?

2    A.    Yes.

3    Q.    If you would turn to Page 18.

4         (Witness complies.)

5    Q.    Are you familiar with trending studies, where

6    you look for trends in products?

7    A.    Okay.

8    Q.    Okay.

9    A.    I'm not an expert.

10   Q.    All right.  But you understand the concept of

11   comparing products together to see if there are any

12   trends that develop?

13   A.    That sounds reasonable.

14   Q.    Do you see where this is a G2 trend relative to

15   the RNF?  I will tell you RNF stands for the Recovery

16   filter.

17   A.    Okay.

18   Q.    And you're familiar with the G2, you've been

19   placing -- you've been putting them in, right?

20   A.    Correct.

21   Q.    Did Bard at any time let you know that the G2

22   presented more caudal migration or caused more caudal

23   migration than the Recovery filter?

24   A.    They never specifically told me those exact

25   words.

Do Not Disclose - Subject to Further Confidentiality Review

Page 54

1    Q.   Did they ever discuss the degree of migration

2    with you, their representatives?

3    A.   It's difficult to recall.  I know that filters

4    have problems in general, but I don't recall any rep

5    saying that this is -- this has more problems than

6    another filter.

7    Q.   All right.  And as a physician that's being

8    asked to use the G2 filter and put it in patient's

9    bodies, would it be beneficial to you that if Bard

10   had the data that demonstrated that caudal migration

11   occurred 4.7 times more often with the G2 than with

12   their Recovery filter; is that the type of

13   information that would be beneficial to you in trying

14   to decide if this is the best product for your

15   patient?

16                   MS. HELM:  Object to the form.

17   A.   More information's always better.  If the --

18   Q.   (BY MR. ARBON) Okay.  And more information

19   regarding an increased risk of caudal migration would

20   have an impact on you, wouldn't it?

21                   MS. HELM:  Object to the form.

22   A.   Possibly.

23   Q.   (BY MR. ARBON) Okay.  What is caudal migration?

24   A.   Where the filter moves toward the, toward the --

25   away from the heart.

Do Not Disclose - Subject to Further Confidentiality Review

Page 55

1  Q.  Down towards the feet?

2  A.  Toward the -- correct.

3  Q.  Okay.  ████████████████████████████

4  ██  ████████████████

5  A.  ████████████████████

6  Q.  Okay.  Now, there's soufflot migration is on

7  that list and what would that be --

8  A.  Toward the head.

9  Q.  And no difference in rate of soufflot migration

10  between the Recovery and the G2 according to Bard's

11  data, correct?

12               MS. HELM:  Object to the form.

13  A.  According to this chart.

14  Q.  (BY MR. ARBON) And then tilt, what is tilt?

15  A.  Where the filter leans toward the IVC wall.

16  Q.  And according to the Bard data compiled in this

17  chart, the G2 had more tilt than the Recovery; is

18  that right?

19               MS. HELM:  Object to the form.

20  A.  According to this chart, the percentage is

21  higher.

22  Q.  (BY MR. ARBON) And perforation is what?

23  A.  Perforation to me would mean that the limbs

24  penetrate through the wall of the IVC.

25  Q.  And what did Bard say about the G2 in comparison

Do Not Disclose - Subject to Further Confidentiality Review

Page 56

1    to its Recovery filter with perforation?

2    A.    That these percentages are higher.  As a doctor

3    I would want to know the number they're based on, but

4    still, this number is higher.

5    Q.    Well, and what I would like to talk to you about

6    there, is:  Doctor, is there a number that's

7    acceptable to you?

8    A.    Unfortunately there's not a absolute number,

9    but --

10   Q.    Yeah.

11   A.    -- definitely would have to figure out the risk.

12   Q.    So in figuring out the risk, wouldn't you look

13   to something like this, the trend?

14   A.    That data would be helpful.

15   Q.    When you're trying to pick a product for a

16   patient, an IVC filter for a patient that you're

17   going to use, are you looking for the safest product

18   available for your patient?

19   A.    I think that would be true.

20   Q.    So if a known data shows that there's a product

21   such as the G2 that is proven to be, you know, over

22   four times more likely to cause caudal migration or

23   two times more likely to tilt and four times more

24   likely to perforate than the predicate device it's

25   based upon, the RNF, would that be valuable

Do Not Disclose - Subject to Further Confidentiality Review

Page 57

1    information to you?

2    A.    More information about the product is definitely

3    better.

4    Q.    Doctor, have you ever seen any of the

5    advertising related to the G2 filters or their

6    informational brochures?

7    A.    Possibly.

8          (Exhibit No. 2114, marked for identification.)

9    Q.    I'm going to kind of take a side trip.  ███████

██   ████████████████████████████████████████████████████

██   ██████████████████████████████████████████████

██   ██████████████

13   A.    ████████████████████████████████████████.

14   Q.    ████████████████████████████████████

██   ██████████

16   A.    ████████████

17   Q.    ██████████████████████████████████

██   █████████████████████████████████████

██                      ████████████    ██████████████████

██         ██  █████████████████████████████

██   ██████████

██         ██  ████████████████████████████

██        ████████████████████████████████████████

██   █████████████████████████████████████████████

██   ████████████████████████████████

Do Not Disclose - Subject to Further Confidentiality Review

Page 60

1    filter had more of a tendency to cause complications

2    than its -- than its Recovery filter?

3                        MS. HELM:  Object to the form.

4    A.    Say that one more time.

5    Q.    (BY MR. ARBON) Yeah.  Does it surprise you to

6    see that Bard had data that demonstrated the G2

7    filter ████████████████████████  had more --

8    higher complication rate concerning migration, tilt

9    and perforation, than its predecessor the Recovery

10   filter?

11                        MS. HELM:  Object to the form.

12   A.    I wouldn't have known what they had at the time.

13   Q.    (BY MR. ARBON) And I'm not asking you about at

14   the time, because I know you didn't have that

15   information.  You had no such information --

16   A.    No.

17   Q.    -- when you chose the G2, did you?

18   A.    Right, correct.

19   Q.    If you had that information when you were making

20   decisions as to what to implant, do you know if you

21   would have chosen that G2?

22                        MS. HELM:  Object to the form.

23   A.    I would have definitely looked at the risk and

24   benefits if there was more information.

25   Q.    (BY MR. ARBON) And if Bard's data is correct

Do Not Disclose - Subject to Further Confidentiality Review

Page 61

1   that the G2 prevented a higher risk of migration, a

2   higher risk of perforation and a higher risk of tilt,

3   do you think you would have chosen that if that

4   information would have been available to you?

5                    MS. HELM:  Objection to the form.

6   A.   Now, you made a big claim, so I assume that

7   claim is correct, you know, of these higher

8   percentages.  And that would be true in every case.

9   So, assuming that's a correct statement, the -- yeah,

10  I would want to know if one product had different

11  numbers relative to another product.

12  Q.   (BY MR. ARBON) Well, specific to the G2 numbers

13  that I've shown you.  If, assume for me those that,

14  that data that Bard gave us is accurate --

15  A.   Okay.

16  Q.   -- and you had that information back in --

17  A.   Right.

18  Q.   -- ███████████████████████████████████████

    ███    ███████████████████████, would that type of data

20  affected that decision?

21                     MS. HELM:  Object to the form.

22  A.   I would have definitely used that information

23  and whatever else to make a decision.

24  Q.   (BY MR. ARBON) Okay.  And had you had the

25  benefit of that information, you may have chosen a

Page 62

1    device other than a G2; is that true?

2                          MS. HELM:  Object to the form.

3    A.   It's possible.

4    Q.   (BY MR. ARBON) Let's go to the implant, Doctor.

5    A.   Because then I wouldn't be meeting with you.

6                          MS. HELM:  I got to move to strike

7         that off the record.

8                          THE WITNESS:  That's fine.  I'm

9         not sure how to answer that.

10        (Discussion off the record.)

11        (Exhibit No. 2115, marked for identification.)

12   Q.   (BY MR. ARBON) I'm going to hand you what I've

13   marked as 2115, Doctor, and ask you if you recognize

14   that document?

15   A.   Yes, 2115.

16   Q.   And is there a Bates number at the bottom of

17   that page?

18   A.   There's a number.

19   Q.   Okay.  Can you read that for me.

20                         MS. HELM:  You can just read --

21   A.   00288.

22                         MS. HELM:  That's fine.

23   Q.   (BY MR. ARBON) Okay.

24   A.   Okay.

25   Q.   And do you recognize that document, sir?

Do Not Disclose - Subject to Further Confidentiality Review

Page 145

1          responsiveness.

2      Q.    (BY MS. HELM) Have you seen commercials on

3      television placed by plaintiff's attorneys

4      advertising about IVC filters?

5                        MR. ARBON:  Objection to form.

6      A.    I have.

7      Q.    (BY MS. HELM) Do you have a filter?  If you have

8      a filter, you might be entitled to compensation.

9      Call this number.  Have you seen those kind of adds?

10     A.    I think I have.

11                       MR. ARBON:  Objection to form.

12     Q.    (BY MS. HELM) Okay.  Are you aware that dozens

13     of Bard witnesses have had their depositions taken

14     about Bard's documents and actions they took relating

15     to their IVC filters?

16     A.    I don't know what's happened outside this room.

17     Q.    Okay.  Plaintiff's counsel didn't show you any

18     of that testimony today, did he?

19     A.    I didn't -- I haven't seen anything other than

20     what's presented so far.

21     Q.    Okay.  And when it comes to making decisions for

22     your patients and weighing the risks and benefits of

23     medical devices that you use with your patients, you

24     rely on a number of sources, don't you?

25     A.    Yes.

Do Not Disclose - Subject to Further Confidentiality Review

Page 146

1    Q.    You rely on your training and experience?

2                      MR. ARBON:  Objection, form.

3    A.    Yes.

4    Q.    (BY MS. HELM) You rely on your colleague's

5    experiences with certain products?

6                      MR. ARBON:  Objection, form.

7    A.    Yes.

8    Q.    (BY MS. HELM) You rely on available medical

9    literature; is that right?

10                     MR. ARBON:  Objection, form.

11   A.    I rely my decision based on multiple sources and

12   journal articles is one.

13   Q.    (BY MS. HELM) Okay.  And you're not interested

14   in getting unreliable information or data?

15   A.    Not usually.

16   Q.    Okay.  Because getting unreliable information or

17   data could adversely impact your risk benefit

18   analysis; is that right?

19   A.    Good data is the best data.

20   Q.    And in making your treatment decisions for your

21   patients, you don't rely on internal information from

22   internal documents of manufacturers of medical

23   devices, do you?

24                     MR. ARBON:  Objection, form.

25   A.    That's not a common process.

Do Not Disclose - Subject to Further Confidentiality Review

Page 148

1   do whatever is appropriate --

2   Q.   (BY MS. HELM) Okay.

3   A.   -- to figure out effectiveness and safetyness

4   (sic).

5   Q.   Are you familiar with what is called the 510K

6   process for clearance of a product?

7   A.   Not, not well.

8   Q.   Okay.  But are you familiar that there's a

9   process where a product such as a Bard filter is

10  cleared for use without going through randomized

11  clinical studies.

12  A.   I wouldn't know that.

13  Q.   Okay.  Do you rely on information from the FDA

14  in making a risk benefit analysis to -- regarding

15  products you're going to use with your patients?

16  A.   Well --

17                 MR. ARBON:  Objection, form.

18  A.   -- if medication has a black box FDA warning,

19  that would affect my treatment and I'm assuming for

20  other products as well.

21  Q.   (BY MS. HELM) Okay.  Is it fair to say that

22  those first four exhibits that came from Bard were

23  represented to you as Bard documents, you can't

24  comment as to whether -- ███████████████████████

██  ████████████████████████████████████████████████

Do Not Disclose - Subject to Further Confidentiality Review

Page 149

1   ███████████

2                         MR. ARBON:  Objection, form.

3   A.    Those are the first time I seen the documents.

4   I wouldn't want to say how they would influence me

5   without knowing what they say in detail.

6   Q.    (BY MS. HELM) And the context in which they were

7   created?

8   A.    I'm sure my opinion would need to be based on a

9   lot of things.

10  Q.    Okay.  Fair.

11  A.    Sorry for being vague on that.

12  Q.    No, that's quite all right.  It's quite all

13  right.

14        You would expect companies such as Bard to

15  continue to assess their products by looking at

16  complications and how the product's performing once

17  it's in the market; would you not?

18                        MR. ARBON:  Objection, form.

19  A.    I would assume there's some post market process.

20  Q.    (BY MS. HELM) Okay.  And would you also assume

21  that Bard would undertake some sort of a formal

22  process to evaluate those complications or events

23  that occur once it's in the market?

24                        MR. ARBON:  Objection, form.

25  A.    I wouldn't know what Bard would do in the normal

Do Not Disclose - Subject to Further Confidentiality Review

Page 160

1    right?

2                        MS. HELM:  Object to the form.

3    A.    I'm the doctor, correct.

4    Q.    (BY MR. HELM) You as the doctor who is utilizing

5    these instructions and utilized instructions like

6    this for ███████████████████████████████████

7    ██████████████    are relying on this information to be

8    accurate, correct?

9                        MS. HELM:  Object to the form.

10   A.    The package insert should be correct.

11   Q.    (BY MR. HELM) When there's a reference in the

12   package insert that says, filter fracture is a known

13   complication but most cases, however, have been

14   reported without -- without any adverse clinical

15   sequella; does that to you as a doctor give you some

16   degree of severity that is being associated to

17   fracture?

18                       MS. HELM:  Object to the form.

19   A.    Fix -- I'm not an expert, but filter fracture

20   sounds bad to me.

21   Q.    (BY MR. ARBON) Okay.  But if that's modified by

22   saying the patient doesn't suffer any adverse

23   sequella, does that have any affect on your view of

24   that warning?

25                       MS. HELM:  Object to the form.

Do Not Disclose - Subject to Further Confidentiality Review

Page 171

1    Q.   Okay.  Now, this is a 2005 memorandum --

2    December 23rd, 2005 memorandum?

3    A.   December 27, 2005.

4              MS. HELM:  The top.

5    A.   At the top.  If I read that -- well, no, it

6    looks like it's some kind of forwarded -- there's

7    multiple dates on this piece of paper.

8    Q.   (BY MR. ARBON) Okay.  December of 2005?

9    A.   I don't -- 2005, that's -- it looks like it's

10   made within the year 2005.

11   Q.   And so what the purpose of showing this to you,

12   Doctor, my question is:  Has any Bard sales rep or

13   anyone with Bard ever associated with told you that

14   as early as December of 2005, they were concerned

15   about the rate of caudal migration and tilt related

16   to the G2 filter?

17             MS. HELM:  Object to the form.

18   A.   Don't recall any Bard representative telling me

19   that in 2005 there were -- there was a company

20   concern for tilting.

21   Q.   (BY MR. ARBON) Do you recall how long your

22   retrieval procedure lasted?

23   A.   Long enough to decide not to retrieve it and

24   come up with an alternate plan.

25             MS. HELM:  Let me just -- I may

**REDACTED DOCUMENTS
RELATED TO DOCKET 7948**

# EXHIBIT 8

# FILED REDACTED

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


IN RE:  BARD IVC FILTERS

PRODUCTS LIABILITY          NO. MD-15-20641-PHX-DC

LITIGATION.


      Deposition of DARREN ROBERT HURST, M.D.,

Witness herein, called by the Defendants for

cross-examination pursuant to the Rules of Civil

Procedure, taken before me, Lisa M. Conley

Yungblut, a Notary Public within and for the State

of Ohio, at the offices of Mike Mobley Reporting,

312 Walnut Street, Suite 1600, Cincinnati, on

Friday, the 21st of July, 2017, at 8:01 a.m.



```
 1            A.    Ms. Kruse, thank you.

 2                  THE WITNESS:  Bless you.

 3                  MR. O'CONNOR:  Bless you.

 4    BY MR. NORTH:

 5            Q.    ███████████████████████████

 ██    ████████████████████████████████

 7            A.    ████

 8            Q.    ███████████████████████

 ██    ███████████████████

 10           A.    ████.

 11           Q.    ████████████████████████████

 ██    ████████████████████?

 13           A.    ███████.

 14           Q.    ████████████████████████

 ██    ████████████████████

 16           A.    █████████.

 17           Q.    ████████████████████████████

 18           A.    █████████.

 19           Q.    ████████████████████████████

 ██    █████████████

 21                 MR. O'CONNOR:  Are you looking at her

 22    report?

 23                 THE WITNESS:  ███████████████   ██

 ██    ██████████████████████████████████

 ██    ██████████████████████████   ████████
```

151



```
 1   ████████████████████████
     ██████████████████████████████
     ████     █████████████████████████████
     ██████████████████████████
     ███████████████████████████████   ██
     ███████████████████████████████████
     ████████████████████   ███████████
     ██████████████████████████████████
     ██████████████████████████████████
     ██████████████████
11   BY MR. NORTH:
12        Q.   ████████████████
13        A.   Oh, ███████████████████
     ████
15        Q.   ██████████████████████
     █████████████████████
17        A.   █████████.
18        Q.   ████████████████████
     ██████████████████
20        A.   ████████████.
21        Q.   ██████████████████████
     ██████████████████████
     ████
24        A.   ██████████████████████
     ████████████
```

157

```
 1                    MR. O'CONNOR:  Form.

 2   BY MR. NORTH:

 3            Q.    ████████████████████████████
     ██████████████████████████████████████████

 5            A.    Correct.

 6            Q.    ████████████████████████████████
     ████████████

 8            A.    No.   ██████████████████████████
     ████████████████████████████████████
     ███████████████████████████████████

11            Q.    ██████████████████████████████
     ██████████████████████████████████████
     ████████████████████████████

14            A.    I do.

15            Q.    Do you think one of those or both of

16   those?

17            A.    I think both of them.

18            Q.    █████████████████████████████

19            A.    ████████████████████████████████
     ██████████████    █████████████████████████
     ███████████████████████████████████████
     ███████████████████████████████████████████
     ████████████████████████████████

24            Q.    Scientific answer.

25            A.    Yeah.  It's this, it's right here.
```



```
 1          Q.    ████████████████████████████
            ██████████████████████████████████
            ████████████████████████████
            ████        ████
            ████        ███████████████████████
            █████████████████████████████████████
 7                MR. O'CONNOR:  Form.
 8                THE WITNESS: ███████████████
            ████████████████████████████████
            ████████████████████████████████████
            █████
12    BY MR. NORTH:
13          Q.    Do you, yourself, specialize in
14    complex retrievals?
15          A.    I do complex retrievals, yes.
16          Q.    Who do you consider the -- besides
17    yourself, the leading practitioners in this area
18    of complex retrievals?
19          A.    I would say that you've actually
20    already said who they are, Kuo, Lynch, Trerotola,
21    they're kind of the leaders.
22          Q.    █████████████████████████████
            ███████████████████████████████████
            ████████████████████████
25                MR. O'CONNOR:  Objection, form.
```

**REDACTED DOCUMENTS
RELATED TO DOCKET 7948**

# EXHIBIT 9

# FILED REDACTED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA


NO. MD-15-92641-PHX-DGC


In re Bard IVC Filters Products
Liability Litigation


Videotaped Deposition of DEREK D. MUEHRCKE, M.D.,
taken on behalf of defendant herein, pursuant to Notice
of Taking Deposition, at 32 Avienda Menendez St., St.
Augustine, St. Johns County, Florida, on July 24, 2017,
at 9:00 a.m., before Terry T. Hurley, Registered
Professional Reporter, and Notary Public in and for the
State of Florida at Large.

Page 144

```
 1   wrong. ████████████████████████████████

 2   ███████.

 3        Q    Again, you've never spoken ████████████

 4   ████████████

 5        A    No, sir.

 6        Q    And you've never seen his deposition, or read

 7   his deposition?

 8        A    Correct.

 9        Q    And ████████████████████████████████████;

10   correct?

11        A    That's correct.

12        Q    And ████████████████████████?

13        A    Correct.

14        Q    ████████████████████████████████

     ████████████████████████████████████

     ████████████

17        A    ████████████████████████████████

     ████████████

19        MR. O'CONNOR:  Form.

20        A    ████████████████████

21        Q    ████████████████████████████

22   ████████████████████

23        A    I disagree.  I mean, I know Dr. -- ████████████

     ████████████████████████████  ████████████

     ████████████████████████
```



Page 145

15      A      Yes, sir.

16      Q      Do you have experience yourself in complex

17   filter retrieval?

18      A      The only thing -- no.  The only thing I do is

19   I'll try and put a balloon in to move the cap away from

20   the wall, but I -- I don't have experience, no.

21      Q      Do you know whether Dr. Hurst has experience in

22   complex removal?

23      A      I don't know.

24      Q

Page 150

1      Q      You think the odds are more than 50 percent

2   that ████████████████████████████████████████

3      A      I think so.

4      Q      And is that the reason that you believe that

5   ████████████████████████████████████████████████

6   ██████████████████████

7      A      Yes, ███████████████████████████    ███████████

8   ████████████████████████.

9      Q      ████████████████████████████████████████████

10  ██  █████████████████████████████████████.

11     A      Yes, sir.

12     Q      ████████████████████████████████████████

13  ██  █████████████

14     A      I do not.

15     Q      ████████████████████████████████████

16     A      I do not.

17     Q      ████████████████████████████████████████████████

18  ██  ██████████████████

19     A      Just like BARD's expert witness Dr. Morris, I

20  ██████████████████████████████████   █████████████

21  ██  ██████████████████████████████   I agree with Dr. Morris.

22     Q      █████████████████████████████████████████

23  ██  ████████████████████████

24     A      Well, I -- I don't know.  I mean, I --  ████████████

25  ██  ████████████████████████████████████████████

Page 151



```
 1  ▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮

 ▮  ▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮

 ▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

 ▮  ▮▮▮▮▮▮  ▮▮▮▮▮▮

 ▮  ▮▮▮

 ▮     ▮  ▮▮▮▮▮▮▮▮▮

 ▮  ▮▮▮▮▮▮▮▮

 ▮     ▮  It's possible.

 9     Q  ▮▮▮▮▮▮▮▮▮▮

 ▮  ▮▮▮▮▮▮▮▮▮▮▮▮

 ▮  ▮▮▮▮▮▮▮▮▮

12        MR. O'CONNOR:   Form and foundation.

13     A  ▮▮▮▮▮▮▮  ▮▮▮▮▮

 ▮  ▮▮▮▮▮▮▮▮▮▮

 ▮  ▮▮▮▮▮  ▮▮▮▮▮▮  ▮▮▮▮

 ▮  ▮▮▮▮▮▮▮▮▮▮

 ▮  ▮▮▮▮▮▮▮

18     Q  ▮▮▮▮▮▮▮▮

 ▮  ▮▮▮▮

20     A  I▮▮▮▮▮▮▮▮

 ▮  ▮▮▮▮▮▮  ▮▮▮▮▮

 ▮     ▮  ▮▮▮▮▮▮▮▮

 ▮  ▮▮▮▮▮▮▮▮

 ▮     ▮  ▮▮

 ▮     ▮  ▮▮▮▮▮▮▮▮
```

Page 155

1   ▆▆▆▆▆

2   Q   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆

▆   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆   ▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆

▆   ▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆

▆   ▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆   ▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆

▆   ▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆

▆   ▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆

21  MR. NORTH:  Who just joined?

22  (David DeGreeff rejoined the deposition.)

23  Q   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆   ▆▆▆▆

1    like all the other Bellwethers, did you follow a

2    methodology that you would follow in your field and

3    exercise the same level of intellectual rigor that you

4    would in your clinical practice as well as in developing

5    peer-review studies?

6        A     Yes, sir.

7              MR. NORTH:   Objection.   Leading.

8        Q     And if you would, tell me what opinions you

9    arrived at regarding the injuries, conditions that Mrs.

10   -- Miss Kruse sustained as a result of the BARD filter.

11       A

1 ███████████████████████████████████████

█ █████████████████████████████  ████████████████

█ █████████████████████████████

█  ██  █████████

5      Q      Are patients who undergo a percutaneous -- a

6 complex percutaneous removal exposed to risks because of

7 that procedure?

8      A      Oh, yes.

9      Q      And what kind of complications and risks are

10 they exposed to?

11      A      Well, specifically the -- let's see which one

12 it was.

13       █████████████  ████████████████████████

█ ███████████████████████████  █████████

█ ██████████████████████████████

█ ████████████████████████.

17           But in general, there's a risk of injury to the

18 inferior vena cava the more manipulations you have to

19 do.  To do a complex retrieval oftentimes they'll have

20 to put a wire down by the tip of the filter and put a

21 balloon in to try to pry it away from the wall in the

22 vena cava.  You can tear it then.  Or else they'll grasp

23 it with biopsy forceps to try to control the head and

24 bring it into a larger side sheath.  And those are all

25 risks for injury when you take these filters out.