# REDACTED DOCUMENTS
# RELATED TO DOCKET 7953

**7953 - Plaintiffs' Controverting Statement of Facts in Opposition to Bard's Motion for Partial Summary Judgement as to Plaintiffs Lisa and Mark Hyde's Claims – Filed Redacted**

**Exhibit A:  Excerpts of 8/23/17 Deposition of Tim Hug;**

**Exhibit B:  Selected Medical Records of Lisa Hyde;**

**Exhibit C:  Excerpts of 4/6/17 Deposition of** ███████ **M.D.; and**

**Exhibit D:  Excerpts of 7/24/17 Deposition of Derek Muehrcke M.D.**

Ramon Rossi Lopez - rlopez@lopezmchugh.com
(California Bar Number 86361; admitted *pro hac vice*)
Lopez McHugh LLP
100 Bayview Circle, Suite 5600
Newport Beach, California  92660
949-812-5771

Mark S. O'Connor (011029) - mark.oconnor@gknet.com
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona  85016-9225
602-530-8000

*Co-Lead/Liaison Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC |
| | **PLAINTIFFS' CONTROVERTING STATEMENT OF FACTS IN OPPOSITION TO BARD'S MOTION FOR PARTIAL SUMMARY JUDGEMENT AS TO PLAINTIFFS LISA AND MARK HYDE'S CLAIMS** |
| LISA HYDE and MARK HYDE, a married couple, | |
| Plaintiffs, | |
| v. | |
| C.R. BARD, INC., a New Jersey corporation and BARD PERIPHERAL VASCULAR, an Arizona corporation, | |
| Defendants. | |

Plaintiffs submit this Controverting Statement of Facts in Support of Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment as to Plaintiffs Lisa and Mark Hyde's Claims. Plaintiffs respond to Bard's Statement of Facts allegations as follows:

1.    On █████████████, Lisa Hyde ████████████████████████

████████████████████████████████████████████████████████

(Ex. A, Plaintiffs' Fact Sheet ("PFS") at § II.3.; Ex. B, Selected Plaintiff Medical Records at HYDEL_____MDR00099.)

Admit.

2.      The Plaintiffs were Wisconsin residents at that time. (Ex. A, PFS at § I.5.)

**Plaintiffs admit that they were residents of Wisconsin in February of 2011.**

3.      On _____, _____ implanted a Bard IVC filter in Ms. Hyde at _____ Wisconsin. (Ex. A, PFS, at §§ II.2(a), II.4, II.5.; Ex. B, Selected Plaintiff Medical Records at HYDEL_____RAD00002 – HYDEL_____RAD00003.)

Admit.

4.      At the time of Ms. Hyde's filter implant, _____ was only practicing medicine in Wisconsin. (Ex. C, April 6, 2017 _____ Deposition Transcript ("____ Dep. Tr.") at 4:23-5:2, 22:16-20.)

Admit.

5.      Any contacts Bard had with _____ would have occurred in Wisconsin through Bard's Wisconsin-based sales representative, Matthew Fermanich. (Ex. D, March 27, 2017 Matthew Fermanich Deposition Transcript at 17:1-18:19.)

**Admit in part; deny in part.  Mr. Fermanich was one person representing Bard that had contacts with _____.  But the deposition testimony cited by Bard does not establish Dr. Fermanich was the only contact.  Moreover, Timothy Hug testified that he as well had contacts with _____ about Bard IVC filters, while a territory manager (sales representative) and district manager for Bard.  [Ex. A, August 22, 2017 Timothy Hug Deposition Transcript at 43:3-45:11].**

6.      Nothing in the record indicates what, if any, changes occurred to the Bard filter from the time that it left Bard's possession to the time that it was placed in Ms. Hyde.

**Deny.  There is no direct evidence of any changes having occurred to the Bard filter implanted in Lisa Hyde from the time that it left Bard's possession to the time**

2

1     **that it was placed in Mrs. Hyde.  Indeed, the record provides a strong and**

2     **reasonable inference that there were not any changes in the Bard IVC filter.** █████

3     ████ **has been an Interventional Radiologist with experience implanting IVC filters**

4     **since the early 1990s.  [Bard SOF Ex. C, at 9:12-10:18, 17:22-18: 9.]  The records**

5     **relating to his** ██████████ **implant procedure for Mrs. Hyde indicate a normal**

6     **placement of a Bard IVC filter; there is no mention of any perceived differences**

7     **between Mrs. Hyde's Bard IVC filter and others of its kind that** ████████ **has**

8     **placed in other patients.  [Ex. B, Selected Plaintiff Medical Records at**

9     **HYDE_██████_MDR00172.]  A reasonable and prudent physician would have noted**

10     **if there was and/or more than likely would have opted to use a different filter.**

11        7.     ██████████ testified that the Bard filter's ability to "potentially be retrieved"

12     was "definitely" one of the benefits that he considered in choosing the Bard filter for Ms.

13     Hyde. (Ex. C, ██████ Dep. Tr. At 89:25-90:12.)

14        **Admit in part; deny in part.  While it is true** ████████ ██████████

15     ████████████████████████████████████████████████████

16     ████████████████ **[Bard SOF Ex. C, at 72:23-73:1.]**

17        8.     In 2001, the Society of Interventional Radiology published the following

18     clinical practice guidelines that reported about the complications of all IVC filters. (Ex. E,

19     Grassi, *Quality Improvement Guidelines for Percutaneous Permanent Inferior Vena Cava*

20     *Filter Placement for the Prevention of Pulmonary Embolism,* 12 J. Vascular &

21     Interventional Radiology 137, 139 (2001).)

22        **Objection.  This statement is vague and ambiguous as to "the following**

23     **practice guidelines" and mischaracterizes the relied-upon document.  Subject to said**

24     **objection, Plaintiffs admit that the relied-upon document was published and**

25     **reported on the complication rates involved with IVC filters.**

26        **The relied-upon article is self-described as a document that "will provide**

27     **quality improvement guidelines for filter placement within the inferior vena cava**

28

1  because of the limited data available for implantation sites other than the IVC."

2  [Bard SOF Ex. E, at 137].

3      Additionally, the relied-upon document does not indicate which IVC filters

4  were involved in the study. The document only states, "[c]omplication rates are

5  highly variable depending on the filter being studied. For simplicity, these guidelines

6  will not suggest threshold rates for each individual filter; rather, filtration devices

7  will be considered as a group (Table 1)." *Id*. at 139.

8      9.   The Society of Interventional Radiology reported that IVC filters migrated

9  (reported at rates up to 18%), fracture (reported at rates up to 10%), perforate the IVC

10  (reported at rates up to 41%), and tilt (reported at rates from 5 to 50%). *Id.*

11      **Admit.**

12      10.  In 2009, *Binkert, et al.* published a study in the Journal of Vascular and

13  Interventional Radiology 2009 reporting on perforation, filter fracture, tilt, and migration

14  with Bard's filters. (Ex. F, Binkert, C.A., *et al.*, *Technical Success and Safety of Retrieval*

15  *of the G2 Filter in a Prospective, Multicenter Study,* J VASC. INTERV. RADIOL. 2009;

16  20:1449-1453.)

17      **Plaintiffs admit that the relied-upon document reported, among other things,**

18  **on perforation, filter fracture, tilt, and migration with Bard's G2 filter.**

19      11.  On August 9, 2010, the FDA issued a Safety Alert concerning all IVC

20  filters. (Ex. G, *Inferior Vena Cava (IVC) Filters: Initial Communication: Risk of Adverse*

21  *Events with Long Term Use.*)

22      **Admit.**

23      12.  The FDA wrote, "Known long term risks associated with IVC filters include

24  but are not limited to lower limb deep vein thrombosis (DVT), filter fracture, filter

25  migration, filter embolization and IVC Perforation." *Id.*

26      **Admit.**

27      13.  Also in 2010, Dr. Nicholson, *et al.* authored a published article reporting on

28  perforation, filter fracture, tilt, and migration with Bard's filters. (Ex. H, Nicholson, *et al.,*

4

1    *Prevalence of Fracture and Fragment Embolization of Bard Retrievable Vena Cava*

2    *Filters and Clinical Implications Including Cardiac Perforation and Tamponade,*"

3    ARCHIVES OF INTERNAL MEDICINE, Vol. 170 No. 20, November 8, 2010.)

4         **Admit.**

5         14.    ████████ testified that at the time of Ms. Hyde's implant he was aware that

6    IVC Filters in general could move, fracture, and that fractured components could

7    embolize. (Exhibit C, ██████ Dep. Tr. At 85:17-86:2.)

8         **Admit.**

9         15.    ████████ also testified that his criteria for choosing an IVC filter for Ms.

10   Hyde was that it is cleared for use by the FDA, that he trusts the FDA more than

11   individual manufacturers, and that he would not have altered his treatment of Ms. Hyde

12   with a Bard IVC filter even if he was provided with certain facts the plaintiffs allege to be

13   true. *Id.* at 25:13-25, 31:15-32:11, 44:20-45:24.

14        **Objection.  Misstates evidence and incorrectly characterizes** ████████

15   **understanding of the FDA's role and responsibility in terms of ensuring the safety**

16   **and efficacy of medical devices that are *cleared* by the FDA via its 510(k) process.**

17   **Plaintiff admits that** ████████ **testified several times that whether a device was**

18   **"*approved*" by the FDA was paramount to his decision to use it with a patient.** ██

19   ████ **never used the word "cleared" and did not indicate an understanding of the**

20   **difference between the two.  Rather,** ████████ **testified he does not understand**

21   **"exactly how the FDA goes about their business."  [Bard SOF Ex. C, at 49:6-14].**

22   **Plaintiffs admit** ████████ **testified that he trusts the FDA more than individual**

23   **companies.  Plaintiffs further deny that** ████████ **testified that he would not have**

24   **altered his treatment of Mrs. Hyde with a Bard IVC filter even if he was provided**

25   **with certain facts Plaintiffs allege to be true; this is a mischaracterization or, at best,**

26   **a self-serving prediction based on the cited language.  *Id.* at 44:20-45:24.  In terms of**

27   **what he knew of the risks and benefits of the different IVC filters,** ████████ **further**

28   **testified that he did not "see any deciphering thing to persuade me one way or the**

1  other" regarding failure and complication rates of IVC filters. *Id*. at 47:2-15.  This

2  goes to the heart of Plaintiffs' failure to warn claim – ███████ was not provided

3  with complete and accurate information, and was disallowed by his attorney from

4  reviewing other internal documents by Bard evidencing, among other things, the

5  complications and rates of complications associated with the Bard IVC filters and

6  whether such information would have impacted his decision to implant the Bard

7  IVC filter in Mrs. Hyde in 2011.

8        16.     ███████ further testified that he did not recall any discussions with Bard's

9  sales representatives that occurred at any time before treating Ms. Hyde. *Id.* at 39:14-

10  40:8.

11        **Admit in part; deny in part.**  ███████ testified that he did not recall any

12  discussions, but that he "probably did" meet with Bard sales representatives prior to

13  2011. [Bard SOF Ex. C, at 39:14-40:8]

14        17.     The IVC filter implanted in Ms. Hyde was sold by Bard to ███████

15  ███████████████████

16        Admit.

17        18.     The IVC filter implanted in Ms. Hyde is not sold directly to patients. (Ex. I,

18  G2®X Instructions for use (the "G2X IFU") at page 1; Ex. J, Eclipse® Filter Instructions

19  for Use (the "Eclipse IFU") at page 1.)

20        Admit.

21        19.     The G2X and Eclipse® IFU applicable in ███████ (when the Plaintiff

22  received her filter) included the following identical warnings:

23              a.     Under the bolded headings "**Warnings**" and "**Potential**

24        **Complications**," the IFUs warn of the following complications:

25        • Filter fractures are a known complications of vena cava filters. There have
26          been some reports of serious pulmonary and cardiac complications with vena
27          cava filters requiring the retrieval of the fragment utilizing endovascular
             and/or surgical techniques.

28

- Movement, migration or tilt of the filter are known complications of vena cava filters. There have also been reports of caudal migration of the filter. Migration may be caused by placement in IVCs with diameters exceeding the appropriate labeled dimensions specified in this IFU. Migration may also be caused by improper deployment, deployment into clots, and/or dislodgment due to large clot burdens.

(Ex. I, G2X IFU, Ex. J, Eclipse IFU.)

**Admit that Bard SOF Ex. I, G2X IFU and Ex. J, Eclipse IFU contain the quoted language.**

20.     The "**Potential Complications**" of the IFUs also warn about "Filter tilt," "Filter malposition," "Perforation or other acute or chronic damage of the IVC wall," and "Vessel injury." *Id.*

**Admit.**

21.     Finally, the IFUs also warn that "**All of the above complications may be associated with serious adverse events such as medical intervention and/or death.**" *Id.*

**Admit.**

22.     The plaintiffs have not identified alternative warnings that would have rendered Bard's IVC filter safe.

**Deny.  A reasonable alternative warning would feature all the information that Bard knew regarding its G2/G2X filters and their propensity to malfunction at a higher rate than other Bard filters and competitive filters, rather than the general warnings about *all* IVC filters included in the IFUs.** ▮▮▮▮▮ **testified that he may have been swayed by information indicating that Bard knew the filter implanted in Ms. Hyde was not performing as well as competitors' IVC filters.  [Ex. C, ▮▮▮▮ Dep. Tr. at 56:17-18.]**

23.     The plaintiffs' expert, Dr. Derek Muehrcke, acknowledges that all IVC filters are known to have complications, including filter fracture, migration, tilt, penetration, and perforation. (Ex. K, July 24, 2017 Dr. Derek Muehrcke Deposition Transcript at 55:22-57:9.)

7

1         **Admit in part; deny in part.  Admit that Dr. Muehrcke acknowledged that all**

2    **IVC filters can have complications, but deny that this is the overall position he takes**

3    **with regard to complications of IVC filters.  Dr. Muehrcke testified that some filters**

4    **are much less likely to have the potential complication of tilt.  [Ex. D, Muehrcke Dep.**

5    **Tr. at 56:12-16.]  Dr. Muehrcke also testified that the Bard G2 filter had an**

6    **unacceptable caudal migration risk that Bard had been aware of since late 2005,**

7    **early 2006, resulting in an unacceptable safety profile for the G2 filter.  [Ex. D,**

8    **Muehrcke Dep. Tr. at 57:10-20].  Finally, Dr. Muehrcke testified that particularly as**

9    **to Bard filters, their benefit does not outweigh their risk and that he does not use**

10   **Bard filters anymore because he thinks that their complication rates "are just too**

11   **high."  To a reasonable degree of medical certainty, Dr. Muehrcke differentiates the**

12   **complication rates of non-Bard filters and testified that the Bard filters were a**

13   **higher risk than benefit when implanted. [Ex. D, Muerhcke Dep. Tr. at 188:14-189:**

14   **20.]**

15        24.    Bard is not aware of any IVC filter manufacturer that provides comparative

16   rates in the instructions for use that it provides to doctors.

17        **Objection.  Bard cites to no evidence to support this statement.  Also, the**

18   **statement is immaterial and self-serving of the company's state of mind; it is not a**

19   **fact that can be denied of admitted.  Denied for the reasons so stated.**

20        25.    Bard's G2X and Eclipse IVC filters were cleared for use by the FDA

21   through its 510(k) process. (Ex. L, FDA Clearance Letter for G2X IVC filter, Ex. M, FDA

22   Clearance letter for Eclipse IVC filter.)

23        **Admit.**

24        26.    As part of Bard's compliance with the FDA's 510(k) process, Bard

25   submitted proposed warnings for the G2X and Eclipse filters, which were approved by the

26   FDA as part of the FDA's clearance of the devices. (*See* Exhibit 104 to Robert Carr's

27   Declaration in Support of Bard's Motion for Summary Judgement Regarding Preemption

28   at BPV-17-01-130627 – BPV-17-01-130660, lodged under seal at docket no. 5411;

1    Exhibit 121 to Robert Carr's Declaration in Support of Bard's Motion for Summary

2    Judgement Regarding Preemption at BPV-17-01-00117076 – BPV-17-01-00117095,

3    lodged under seal at docket no. 5411.)

4         **Admit.**

5         27.    Neither of the plaintiffs have ever spoken to anyone at Bard or received any

6    information from Bard. (Ex. N, January 25, 2017 Lisa Hyde Deposition Transcript ("Lisa

7    Hyde Dep. Tr.") at 140:13-22; Ex. O, January 25, 2017 Mark Hyde Deposition Transcript

8    at 48:22-49:1.)

9         **Admit.**

10        28.    On ▮▮▮▮▮▮▮▮, while the plaintiffs were residents of Nevada, Ms. Hyde

11   first learned that her IVC filter ▮▮▮▮▮▮▮ (Ex. A, PFS at I.5, II.12(iii).)

12        **Admit.**

13        29.    The plaintiffs have not identified a reasonable alternative design to Bard's

14   IVC filter that would have reduced or avoided risks of harm that Ms. Hyde experienced

15   while also retaining the option of percutaneous retrieval.

16        **Deny.  Plaintiffs have evidence by way of expert testimony, Bard corporate**

17   **witness testimony, and have even pointed to the obvious notion that the predicate**

18   **device of Bard's Recovery/G2 line of filters – the SNF – was indeed a safer**

19   **alternative design.  Moreover, at least one other manufacturer of IVC filters had**

20   **redesigned its filter in 2006 to include an anchoring system to help prevent caudal**

21   **migration.  *See* Plaintiffs' Omnibus Statement of Facts, filed contemporaneously,**

22   **Exhibit 86.  This, too, is evidence of another safer alternative design.**

23        30.    The plaintiffs moved from Wisconsin to Nevada ▮▮▮▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮. (Ex. N, Lisa Hyde Dep. Tr. At 18:20-19:2.)

25        **Admit.**

26        31.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27   ▮▮▮▮▮. (Ex. A, PFS at II.10(a)-(c).)

28

1       **Admit in part; deny in part.  Objection to the extent the statement incorrectly**

2   **characterizes the** ███████████████████████ **Mrs. Hyde.** ███████████

3   ████████████████████████████████████████████████

4   ████████████████████████████████████████████████████

5   ████████████████████████████████████████████████ **[Ex. B,**

6   **Selected Plaintiff's Medical Records, at HYDEL\_███\_MDR00035, 42, 53-56.]**

7       32.    The plaintiffs' expert, Robert M. McMeeking, Ph.D., acknowledges that the

8   Simon Nitinol Filter does not represent a reasonable alternative design to Bard's

9   retrievable IVC filters. (Ex. P, July 6, 2017 Robert M. McMeeking, Ph.D. Deposition

10  Transcript at 221:16-223:3.)

11      **Deny.  Dr. McMeeking testified that the Simon Nitinol Filter is a safer**

12  **alternative design to the Recovery and its successors.  (Bard's SOF Ex. P, July 6,**

13  **2017 at 221:20-24).** ███████████████████████████████

14  ████████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ██████████████████████████████

17

18      RESPECTFULLY SUBMITTED this 2nd day of October 2017.

19                              GALLAGHER & KENNEDY, P.A.

20                              By: ___/s/ Mark S. O'Connor_____
21                                   Mark S. O'Connor (011029)
22                                   2575 East Camelback Road
                                     Phoenix, Arizona  85016-9225
23
                                LOPEZ McHUGH LLP
24                                   Ramon Rossi Lopez (CA Bar No. 86361)
                                     (admitted *pro hac vice*)
25                                   100 Bayview Circle, Suite 5600
                                     Newport Beach, California 92660
26
                                *Co-Lead/Liaison Counsel for Plaintiffs*
27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of October 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

*/s/ Deborah Yanazzo*

# REDACTED DOCUMENTS
# RELATED TO DOCKET 7953

# EXHIBIT A
# FILED REDACTED

Do Not Disclose - Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT

 2                   DISTRICT OF ARIZONA

 3

 4

 5

    In Re Bard IVC Filters Products
 6  Liability Litigation            No.
                                    MD-15-02641-PHX-DGC
 7
    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
 8

 9

10                   Do Not Disclose

11        Subject to Further Confidentiality Review

12
                 VIDEOTAPED DEPOSITION OF
13
                        TIM HUG
14

15                  AUGUST 23, 2017

16                    10:00 a.m.

17

18
           2575 East Camelback Road, 11th Floor
19
                   Phoenix, Arizona
20

21

22
           SOMMER E. GREENE, CSR, RPR, CR No. 50622
23

24

25
```

1      Q.     -- in Franklin, Wisconsin?

2      A.     Yes, sir.

3      Q.     Do you know Dr. ███████ who -- well, he was

4   privileged at that hospital in 2010, 2011.

5      A.     I do know Dr. ███████.

6      Q.     You met with him before?

7      A.     I have.

8      Q.     Do you have a relationship with him?

9      A.     Business relationship.

10      Q.     When was the first time you met Dr. ███?

11      A.     My assumption is is that it was in 2007 -- 2007

12   as his territory sales representative.

13      Q.     Do you recall ever speaking with him about IVC

14   filters?

15      A.     I can't recall a specific instance, but I'm

16   sure I have.

17      Q.     Was -- excuse me.  Were IVC filters one of the

18   products you were tasked with promoting and trying to

19   sell in 2007?

20      A.     Yes, sir.

21      Q.     So the likelihood is that you probably did

22   speak with them about IVC filters?

23      A.     Yes, sir.

24      Q.     And they purchased G2 filters from Bard.

25   Correct?

Do Not Disclose – Subject to Further Confidentiality Review

```
 1        A.    I believe they did.  I'd have to look at the

 2   specific sales numbers, but I believe so.  They used Bard

 3   filters there, if that answers your question.

 4        Q.    Do you know how many times you met with

 5   Dr. Henry?

 6        A.    This is an assumption.  My assumption is

 7   probably anywhere from five to 15 times.

 8        Q.    Ever?

 9        A.    Yeah.

10        Q.    Okay.

11        A.    Actually, let me clarify.  It's probably more

12   than that.  Probably 10 to 20 times.

13        Q.    Okay.  When was the last time you saw him, if

14   you recall?

15        A.    It's been awhile.

16        Q.    Or spoken to him?

17        A.    Probably five years.

18        Q.    Do you know --

19        A.    Five years plus.

20        Q.    Do you recall in what capacity or why you spoke

21   with him five years ago?

22        A.    I can't recall the actual interaction with him.

23   I believe it was at the SIR meeting, which is a societal

24   meeting for interventional radiologists.  I believe

25   that's where I saw him, but I would have to -- but I
```

Do Not Disclose – Subject to Further Confidentiality Review

1    can't specifically recall.

2        Q.    Did you educate Dr. Henry on the G2 filter?

3              MR. LERNER:  Objection to form.

4              THE WITNESS:  In the sense of, yes,

5    communicating and discussing the filters with him, yes.

6        Q.    BY MR. LOPEZ:  You talk with him about the

7    risks and benefits associated with the G2 filter?

8        A.    Yes, sir.

9        Q.    And that information is information you

10   obtained from Bard.  Correct?

11       A.    Correct, sir.

12       Q.    Bard would give you the information or

13   materials that you would use to do your job to try to

14   sell or along the lines of selling to educate the

15   physicians on how to use products and why they should use

16   Bard products?

17       A.    Yes, sir.

18       Q.    So as a district manager, your primary job was

19   to basically monitor the sales reps that worked for you

20   and make sure that they're reaching quotas, sales quotas?

21       A.    Yeah, you could summarize that.  I mean, my --

22   I would say it a little bit differently, but, yes, I

23   would agree with kind of your description there.

24       Q.    And you track their performance.  Right?  You

25   monitor closely what they're doing day in and day out?

**REDACTED DOCUMENTS
RELATED TO DOCKET 7953**

# EXHIBIT B

# FILED REDACTED



HYDEL_WFHF_MDR00099



HYDEL_WFHF_MDR00100



HYDEL_WFHF_MDR00101



HYDEL_WFHF_MDR00169



HYDEL_WFHF_MDR00170



HYDEL_WFHF_MDR00118



170 of 290

HYDEL_WFHF_MDR00172



HYDEL_WFHF_MDR00173



HYDEL_WFHF_MDR00105



HYDEL_WFHF_MDR00106



HYDEL_WFHF_MDR00107



HYDEL_WFHF_MDR00083

HYDEL_WFHF_MDR00084



HYDEL_WFHF_BIL00002



HYDEL_WFHF_BIL00003



HYDEL_WFHF_BIL00004



HYDEL_WFHF_BIL00005



HYDEL_WFHF_BIL00006



HYDEL_WFHF_MDR00056



HYDEL_WFHF_MDR00057



HYDEL_WFHF_MDR00058



HYDEL_WFHF_MDR00064



HYDEL_WFHF_MDR00027



HYDEL_WFHF_MDR00028



HYDEL_WFHF_MDR00029



28 of 290

HYDEL_WFHF_MDR00030



HYDEL_WFHF_MDR00031



HYDEL_WFHF_MDR00042



HYDEL_WVI_RAD00002



HYDEL_WVI_RAD00003

HYDEL_SPARKFM_MDR00032

HYDEL_SPARKFM_MDR00007

HYDEL_SPARKFM_MDR00008

HYDEL_SPARKFM_MDR00009

Case 2:15-md-02641-DGC   Document 8385-5   Filed 10/24/17   Page 53 of 126

HYDEL_SPARKFM_MDR00131

HYDEL_SPARKFM_MDR00004

HYDEL_SPARKFM_MDR00005

HYDEL_SPARKFM_MDR00006

HYDEL_SPARKFM_MDR00132



HYDEL_SDMIC_RAD00009



HYDEL_SDMIC_RAD00010



HYDEL_SDMIC_RAD00008



HYDEL_SDMIC_MDR00001



HYDEL_SDMIC_MDR00002

HYDEL_SPARKFM_MDR00002

HYDEL_SPARKFM_MDR00003

HYDEL_SPARKFM_MDR00133



HYDEL_SPARKFM_MDR00075



HYDEL_SPARKFM_MDR00076



HYDEL_NHVC_MDR00002



HYDEL_NHVC_MDR00003



HYDEL_NHVC_MDR00004





HYDEL_NHVC_MDR00006



HYDEL_NHVC_MDR00007



HYDEL_NHVC_MDR00008



HYDEL_NHVC_MDR00009

HYDEL_NHVC_MDR00010



HYDEL_SLEHR_MDR00088



HYDEL_SLEHR_MDR00089



HYDEL_SLEHR_MDR00090



HYDEL_SLEHR_MDR00091



HYDEL_SHC_MDR00037



HYDEL_SHC_MDR00038



HYDEL_SHC_MDR00039



HYDEL_SHC_MDR00040



HYDEL_SHC_MDR00010



**HYDEL_SHC_MDR00011**



HYDEL_SHC_MDR00012



HYDEL_SHC_MDR00017



HYDEL_SHC_MDR00018



HYDEL_SHC_MDR00019



HYDEL_SHC_MDR00020



HYDEL_SHC_MDR00213



HYDEL_SHC_MDR00214



HYDEL_SHC_MDR00054



HYDEL_SHC_MDR00055



HYDEL_SHC_MDR00056



HYDEL_SHC_MDR00042



HYDEL_SHC_MDR00043



HYDEL_SHC_MDR00061

HYDEL_SHC_MDR00062



HYDEL_SHC_PAT00002

HYDEL_SHC_MDR00044



HYDEL_SHC_MDR00035



HYDEL_SHC_BIL00001

HYDEL_SLEHR_MDR00093



HYDEL_SLEHR_MDR00094



HYDEL_SLEHR_MDR00095

HYDEL_SLEHR_MDR00096

**REDACTED DOCUMENTS
RELATED TO DOCKET 7953**

# EXHIBIT C

# FILED REDACTED

Do Not Disclose - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
 2                  DISTRICT OF ARIZONA
 3      *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
 4
        In Re Bard IVC Filters Products
 5      Liability Litigation
 6                          No. MD-15-02641-PHX-DGC
 7
 8
        *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
 9
10          DO NOT DISCLOSE - SUBJECT TO FURTHER
                   CONFIDENTIALITY REVIEW
11
         VIDEOTAPED DEPOSITION OF ██████████, M.D.
12
               TAKEN AT: Leib Knott Gaynor
13        LOCATED AT: 219 North Milwaukee Street
                     Milwaukee, WI
14
                     April 6, 2017
15            10:07 a.m. to 12:28 p.m.
16          REPORTED BY ANITA K. FOSS
            REGISTERED PROFESSIONAL REPORTER
17
18
19
        *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
20
21
22
23
24
25
```

Do Not Disclose - Subject to Further Confidentiality Review

1    answer any of my questions.  Who referred ███████

2    to you?

3         A.   I do not recall.

4         Q.   Are you able to determine from the

5    records?

6         A.   It may have been ██████████████████

7         Q.   Do you recall the reason for your

8    consult?

9         A.   I do not recall, but this implies that

10   she had -- she had ████████████████████████████

██   ████████████████████████████.

12        Q.   What I want to do is go through your

13   understanding of the patient's history and your

14   thought process for the treatment you recommended.

15   And I want to give you the freedom to do that in a

16   way that is easiest for you with the records and

17   your memory.  So could you explain to this jury

18   your understanding of the patient's history?  We'll

19   start with that.

20        A.   Yeah.  "The patient is a ████████████

██   ████████████████████████████████████

██   ████████████████████████████████

██   █████████████████████████████████████████

██   █████████████████████████████████████

██   ████████████████████████  This also happened to

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    interventional radiology procedures during that 13

 2    to 14 years in Ohio?

 3         A.   Yes.

 4         Q.   About what percentage or practice, while

 5    you were in Ohio for those 14 years, was

 6    interventional radiology as opposed to general

 7    radiology?

 8         A.   Maybe 25 percent, 30 percent.

 9         Q.   Did that include implanting IVC filters?

10         A.   Yes.

11         Q.   Now, do you recall a patient of yours, my

12    client,              ?

13         A.   I do not.

14         Q.   Have you had an opportunity to review any

15    medical records to refresh your recollection about

16    that patient?

17         A.   I was here yesterday and I had -- I

18    reviewed a one -- my -- I think my -- my report of

19    the procedure.

20         Q.   That procedure was what?

21         A.   ████████████████████████

22         Q.   ████████████████████████

23         A.   I believe it may have been, but I'm not

24    sure.

25         Q.   Was that procedure -- or did that
```

Do Not Disclose - Subject to Further Confidentiality Review

```
1          Q.   Sure.   Understanding that you have some
2     more trust of the FDA than individual companies, if
3     you actually learned that the complication rates
4     among filters was not equivalent, even though they
5     had all been cleared, that's the type of
6     information, as a treating doctor, you would have
7     been interested in and considered -- at least
8     considered when making your treatment decisions?
9               MR. LEIB:   Well --
10              MS. DALY:   Objection.   Same objection as
11    before, leading, and now it's argumentative.
12              MR. LEIB:   It's -- it's clearly a
13    hypothetical, but I think unless it's tethered to
14    this patient, it is invading the privilege.   So I
15    would invite you to rephrase it to tether it this
16    to patient.
17    BY MR. SAELTZER:
18         Q.   And I had intended to mean that's the
19    type of information you would have considered in
20    making your treatment decision for ███████████
21              MR. LEIB:   Okay.   If you know that, you
22    can say yes.   And if you don't know, you say you
23    don't know.   If you have to speculate -- he doesn't
24    want you to guess at any of these answers.
25              THE WITNESS:   Yeah, I don't know.
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    that would have been something he would have

 2    factored into his clinical judgment.

 3            MR. LEIB:  You've tethered it to the

 4    article, that's the problem.  The form of the

 5    question invades his privilege, and that's why I'm

 6    instructing him not to answer.

 7    BY MR. SAELTZER:

 8        Q.   If Bard knew that ███████████████

 ██   ████████████████████████████████████████████████

 ██   █████████████████████████████  and it knew

 11   that before ████████████████, is that the type of

 12   information you would have considered if Bard had

 13   brought that to your attention?

 14            MS. DALY:  Same objection.

 15            THE WITNESS:  I don't particularly pay

 16   attention to everything that's published or comes

 17   my way.  And so if I had read the article, I -- I

 18   may or may not have been swayed by its contents.

 19   BY MR. SAELTZER:

 20       Q.   At the time you ██████████████████████

 ██   ████████████████  did you believe that ███████████

 ██   ████████████████████████████████████████████████

 ██   ██████████████████████

 24       A.   No.

 25       Q.   At the time you i█████████████████████
```

```
 1    in addition to the medication?

 2         A.   Well, we're not always certain how the

 3    body will react to blood thinning medication.  And

 4    if the patient has a pattern of -- of getting

 5    clots, there's concern that one more clot could --

 6    could be devastating.  You err on the side of

 7    caution, and you want to make sure that somehow the

 8    patient is protected.  And henceforth the notion of

 9    a filter would serve that purpose.

10         Q.   Somewhat of a belt-and-suspenders

11    approach here with the medicine and the filter?

12         A.   Yes.

13         Q.   Getting to the type of filter and your

14    discussions with the patient.  Did you have any

15    plan or follow-up that you implemented at the time

16    you saw ████████  for her to return so that she

17    could b████████████████████████████████████

18         A.   Yes.  I said to her -- or I may have

19    said; I don't recall specifically speaking to

20    her -- but in the patients that I ████████████

██    ████████████  I usually say to them, depending upon

22    how you do over the interim and many other factors,

23    that there's the potential that this ████████████

██    ████████████████████████████

25         Q.   It could be either?
```

Do Not Disclose - Subject to Further Confidentiality Review

1    Q.   And then you also apply your knowledge as

2    to what possible procedures or devices are

3    available to treat that condition; right?

4    A.   Yes.

5         MS. DALY:  Objection.  Objection,

6    leading.

7    BY MR. SAELTZER:

8    Q.   And Doctor, in coming and exercising your

9    clinical discretion, do you perform a risk-benefit

10   analysis?

11   A.   I get an informed consent, which includes

12   risks, benefits, and alternatives.

13   Q.   When you are choosing which IVC filter to

14   implant in a patient, can you describe for me what

15   thought process you go to as to which filter you

16   select from the various options that are out there

17   in the marketplace?

18        MR. LEIB:  We're talking about in or

19   around ████ as a custom and practice pertaining to

20   your client, ████████?

21        MR. SAELTZER:  Yes, in and around

22   February of 2011.

23        THE WITNESS:  I look for any filter

24   that's FDA approved, that I'm familiar with

25   placing.

Do Not Disclose - Subject to Further Confidentiality Review

```
 1              MS. DALY:  Same objections.
 2              MR. LEIB:  He doesn't want you to
 3    speculate.  If you have to guess, you have to tell
 4    him.  If you -- based upon the information you've
 5    been given, if you can state ███████, you can
 6    go ahead and historically tell him that.
 7              THE WITNESS:  Right or wrong, I felt all
 8    the risks for all of the FDA-approvable devices
 9    were -- were reasonable and customary, and that I
10    probably wouldn't have deferred or postponed the
11    filter placement in a patient who I felt really
12    needed it.
13    BY MR. SAELTZER:
14        Q.   As I'm understanding your answer, right
15    or wrong, you assumed that the complication rates
16    among the FDA cleared or approved IVC filters was
17    roughly equivalent?
18        A.   Yes.
19        Q.   If you had learned differently, that
20    would be the type of information that you would
21    have used in your clinical practice, true?
22              MS. DALY:  Same objections.
23              THE WITNESS:  I tend to trust the FDA
24    more than individual companies.
25    BY MR. SAELTZER:
```

1    custom and practice at the time that he ████████

  ██ ████████████████████████ -- client.  So I didn't

3    view it as invading privilege.  It was historical

4    as to his thought process.  So that's why I didn't

5    assert a privilege, and I wouldn't instruct him.

6              MS. DALY:  I'm sorry, just again note my

7    objection.

8              MR. LEIB:  Yeah, okay.  And Taylor, I

9    just didn't want to -- the reason why I asked you

10   to elaborate because I -- you know, I assume that

11   you're going to be asking some questions, and I

12   want to be, as I say, evenhanded as to asserting

13   the privilege to make sure that I understand what

14   your objection is so if other objections come down

15   the pike during your questioning, you know, I'll

16   instruct him evenly between both parties.

17             MS. DALY:  Thank you.

18   BY MR. SAELTZER:

19        Q.   Do you have the question in mind, Doctor?

20   Would you like it read back to you?

21        A.   I'm sorry, what am I being asked?

22        Q.   That tells me we should probably read you

23   the question.  So we'll have the question read to

24   you, Doctor.

25             COURT REPORTER:  "████████████████████

1    ████ , was it your understanding that all

2    FDA-cleared IVC filters had the same performance?

3    They all performed the same?"

4         THE WITNESS:  I think that they -- they

5    were -- they were all very comparable.

6    BY MR. SAELTZER:

7         Q.   Did you believe that they were all

8    comparable in terms of risk of complications, such

9    as migrations or fractures?

10        A.   Yes.

11        Q.   Doctor, going back to your state of mind

12   in 2011 when you were making the decision about

13   ████████████████████████████████████ if an IVC

14   filter carried with it a significant potential for

15   serious injury or death, that would be important

16   information for you to know as a clinician?

17        MR. LEIB:  Yeah, and I think that does

18   call for an expert opinion, and I would instruct

19   him not to answer.  And I would invite you to

20   re-frame the question to avoid invading the

21   privilege and --

22        MS. DALY:  Join in the objection.

23   BY MR. SAELTZER:

24        Q.   So Doctor, I want to go -- again, we'll

25   go back, we time travel back to your thought

Do Not Disclose - Subject to Further Confidentiality Review

1    is that true?

2        A.    Yes.

3        Q.    Did you ever have an opportunity to read

4    the instructions for use document that accompanied

5    ███████████████████████████████████████████████

6    █ ███████████████████

7        A.    Yes.

8        Q.    Are you aware that the IFU, or the

9    instructions for use for that filter, lists, among

10   the complications that -- that may occur, fracture,

11   movement, and perforation of the filter?

12       A.    Could you repeat the first part of the

13   question?  Am I --

14       Q.    Yes.  Are you aware that the instructions

15   for use includes a section on complications that

16   one might experience with a Bard G2X filter?

17       A.    Yes.

18       Q.    And that that -- those precautions

19   included what we just talked about with

20   complications, which would be fracture, movement of

21   the filter, embolization of filter fragment pieces?

22       A.    Yes.

23       Q.    And also that the filter can perforate;

24   correct?

25             MR. LEIB:  The question is --

**REDACTED DOCUMENTS
RELATED TO DOCKET 7953**

# EXHIBIT D

# FILED REDACTED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA


NO. MD-15-92641-PHX-DGC


In re Bard IVC Filters Products
Liability Litigation


Videotaped Deposition of DEREK D. MUEHRCKE, M.D.,
taken on behalf of defendant herein, pursuant to Notice
of Taking Deposition, at 32 Avienda Menendez St., St.
Augustine, St. Johns County, Florida, on July 24, 2017,
at 9:00 a.m., before Terry T. Hurley, Registered
Professional Reporter, and Notary Public in and for the
State of Florida at Large.

1   yes.

2        Q    That would include migration?

3             MR. O'CONNOR:  Form.

4        A    Well, I think that there's rates of migration,

5   but they can -- they can migrate.

6        Q    All filters can migrate; correct?

7             MR. O'CONNOR:  Form.

8        A    There are -- all filters can migrate, yes.

9        Q    And all filters have the potential complication

10  of fracture?

11       A    Yes.  That's true.

12       Q    And all filters have the potential complication

13  of tilt?

14            MR. O'CONNOR:  Okay.

15       A    Correct.  Some are much less likely, the

16  TrapEase, OptEase, but all can tilt.

17       Q    What's the difference, if any, between the

18  words penetration and perforation with regard to

19  filters?

20       A    That's a nuance for the radiologist to kind of

21  get into.  I think -- to a certain extent, to me they're

22  synonymous, but I think they prefer the word penetration

23  as opposed to perforation.  Perforation, one of the BARD

24  defense experts felt was a kind of a pejorative term

25  implying that things were going to leak out all over the

1  place.  And I think that the radiologists prefer

2  penetration as opposed to perforation.

3        I think it's a distinction without a difference

4  in my mind, but whatever.

5     Q     Would you agree that all filters carry the risk

6  of penetration --

7           MR. O'CONNOR:  Form.

8     Q     -- or perforation?

9     A     Yes.

10    Q     Looking at the ████ report, page 7,

11  paragraph 2, you said:  At the time ████████

██ ████████████████████████████ BARD had been aware

13  since late 2005, early 2006 of the need to correct the

14  unacceptable caudal migration risk with the G2 filter.

15        Is that correct?

16    A     That's correct.

17    Q     And would you agree that all filters have the

18  potential to caudally migrate?

19    A     I believe that there was an unacceptable safety

20  profile for the -- for the G2 filter.

21           MR. O'CONNOR:  Move to strike as nonresponsive.

22    Q     My question was, do you agree that all filters

23  have the potential to caudally migrate?

24    A     All filters can migrate caudally.

25           MR. O'CONNOR:  Late objection to the form of

1      Q      Dr. Muehrcke, let me just follow up on a point
2   so we're clear.
3            Now, earlier in this deposition you were asked
4   I think questions about these five Bellwether plaintiffs
5   and whether the benefit of ████████████████   in these
6   patients outweighed the risks.
7            Do you recall that?
8      A      Yes.
9      Q      But is it your opinion that for these five
10  Bellwether plaintiffs that there were benefits of the
11  BARD filters they received which outweighed the risks?
12           MR. NORTH:   Objection to the form, leading and
13      asking him to contradict previous testimony.
14     A      No, I don't think that the benefits outweighed
15  the risk for BARD filters, because I don't use them
16  anymore.
17     Q      Okay.  And to that point, is that a
18  contradiction to your prior testimony?
19           MR. NORTH:   Objection to form.
20     A      My understanding is that we're talking about
21  filters in general, but -- but -- I don't -- I don't
22  think -- I don't use BARD filters, as I stated earlier
23  in the deposition, because I just don't -- I think the
24  complication rates are just too high.
25     Q      And so when you talk about benefits outweigh

1    risks, is that in filters in general?

2              MR. NORTH:  Objection to the form.  Leading.

3    A      Yes.  In general, yes.

4    Q      At the time of implant?

5    A      At the time of implant, yes.

6              MR. NORTH:  Same objection.

7    Q      But is it your opinion these five Bellwether

8    patients received the benefits because they ████████

   ██ ████████████?

10             MR. NORTH:  Objection to form.  Leading.

11   A      I -- I -- I don't use BARD filters because I

12   think that they are -- have a high complication rate.

13   Q      And so in terms of your opinion about benefits

14   and risk for these five Bellwether plaintiffs, what is

15   your opinion?

16   A      I think that the BARD filters were a higher

17   risk than a benefit when they were implanted.

18   Q      Is that an opinion you hold to a reasonable

19   degree of medical certainty?

20   A      Yes.

21             MR. O'CONNOR:  That's all I have.

22             MR. NORTH:  I'm just going to let the record

23        speak for itself as to the contradiction, so I have

24        no further questions.

25             THE VIDEOGRAPHER:  This is the end of Disk 3,