# REDACTED DOCUMENTS
# RELATED TO DOCKET 8169

**8169 - Plaintiff, Sherr-Una Booker's Supplement to the "Plaintiffs' Omnibus Separate Statement of Facts in Support of Their Response to Defendants' Motion for Summary Judgment in the Bellwether Cases."
Filed Redacted**

Ramon Rossi Lopez - rlopez@lopezmchugh.com
(California Bar Number 86361; admitted *pro hac vice*)
Lopez McHugh LLP
100 Bayview Circle, Suite 5600
Newport Beach, California 92660
949-812-5771

Mark S. O'Connor (011029) – mark.oconnor@gknet.com
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
602-530-8000

*Co-Lead/Liaison Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC |
| SHERR-UNA BOOKER, an individual,<br><br>Plaintiff,<br><br>v.<br><br>C.R. BARD, INC., a New Jersey corporation and BARD PERIPHERAL VASCULAR, an Arizona corporation,<br><br>Defendants. | **PLAINTIFF, SHERR-UNA BOOKER'S SUPPLEMENT TO THE "PLAINTIFFS' OMNIBUS SEPARATE STATEMENT OF FACTS IN SUPPORT OF THEIR RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN THE BELLWETHER CASES"** |

Plaintiff Sherr-una Booker submits this Supplement to the "Plaintiffs' Omnibus Separate Statement of Facts in Support of their Response to Defendants' Motion for Summary Judgment in the Bellwether Cases." This Supplement is being filed in support of Plaintiff, Sherr-una Booker's "Response To Defendants' Motion For Partial Summary Judgment On Plaintiff Sherr-una Booker's Claims," which is being filed contemporaneously herewith.

**VI.    SPECIFIC FACTS RELATED TO *BOOKER***

315.    A Bard G2 permanent IVC filter was implanted in Plaintiff Sherr-una Booker on ███████████

1   Ex. B-A, Booker medical records, BOOKERS_▮▮▮▮_MDR0108-109; Ex. B-B,
2   Transcript of Deposition of ▮▮▮▮▮▮▮▮▮▮ ("▮▮▮▮ Dep.") at 83-84; 95.
3         316. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ IVC filter implantation.
4   Ex. B-A, BOOKERS_▮▮▮▮_MDR00170; Ex. B-B, ▮▮▮▮ Dep. at 99.
5         317. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. B-A, BOOKERS_▮▮▮▮_MDR00170.
7         318. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 108-109;
8   Ex. B-B, ▮▮▮▮ Dep. at 81-84.
9         319. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. B-A, BOOKERS_▮▮▮▮_MDR01365-
11  1366.
12        320. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*
13        321. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16  ▮▮  Ex. B-A, BOOKERS_▮▮▮▮_RAD00011-12.
17        322. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
18  Ex. B-C, Transcript of Deposition of ▮▮▮▮▮▮▮▮▮▮ ("▮▮▮▮ Dep.") at 12.
19        323. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. B-A,
20  BOOKERS_▮▮▮▮_RAD00016-17; Ex. B-C, ▮▮▮▮ Dep. at 13-14.
21        324. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. B-A,
24  BOOKERS_▮▮▮▮_RAD00016-17.
25        325. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
26  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
27  Ex. B-C, ▮▮▮▮ Dep. at 19-23; Ex. B-D, Transcript of Deposition of ▮▮▮▮
28  ("▮▮▮▮ Dep.") at 19-23.

1    326.   ███████████████████████████████████████████
2    ███████████████████████████████████████████████████
3    ███████████████████████████████████████████████.
4    Ex. B-D, ████ Dep. at 20-25.
5    327.   ███████████████████████████████████████
6    ███████████████████████████████████████. Ex. B-A,
7    BOOKERS_████_RAD00018-19; Ex. B-C, ████ Dep. at 35-37.
8    328.   ███████████████████████████████████████████
9    ███████████████████████████████. Ex. B-A,
10   BOOKERS_████_RAD00018-19; Ex. B-C, ████ Dep. at 37-42.
11   329.   ██████████████████████████████████
12   ██████████████████████████. Ex. B-A, BOOKERS_████_RAD00018-19; Ex. B-C,
13   ████ Dep. at 37-38.
14   330.   ███████████████████████████████████████████
15   ███████████████████████████████████████████
16   Ex. B-A, BOOKERS_████_MDR00447-449.
17   331.   ████████ testified that he was only aware of the potential complications
18   of the G2 that were reported at the time of implant. Ex. B-B, ████ Dep. at 93:10-19.
19   332.   ████████ was not aware of the Crisis Management Plan in effect by Bard
20   as early as 2004 to deal with the high rates of adverse events, perforation, fracture and
21   migration. Ex. B-B, ████ Dep. at 33:10-15.
22   333.   ████████ was not aware that Bard in 2004, through an independent
23   investigator, looked into the high number of adverse events of Recovery, nor was he
24   informed of the results of that investigation. Ex. B-B, ████ Dep. at 33:17-34:5.
25   334.   ████████ was never told by his sales rep that there was a 530% higher
26   fracture rate over other filters on the market for the Recovery or a 1200% higher risk of
27   death from Recovery fracture and embolization to the heart.  He testified he would have
28

3

1 liked to have known this information in 2004-2005 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
2 ▇▇▇▇▇▇▇ Ex. B-B, ▇▇▇▇▇▇ Dep. at 34:7-35:2.
3     335. ▇▇▇▇▇▇▇ testified that the adverse events analysis reports and the MAUDE information would have been important information to know and would have influenced his prescribing habits. He may have used a filter other than a Bard filter. Ex. B-B, ▇▇▇▇▇▇ Dep. at 36:11-37:13.

    336. ▇▇▇▇▇▇▇ testified that the information contained in the 2004 health hazard evaluation from David Ciavarella, M.D., vice president of clinical affairs at Bard showing higher fracture rates in the Recovery compared to other filters would have been important information for him to have. Ex. B-B, ▇▇▇▇▇▇ Dep. at 36:11-37:20.

    337. ▇▇▇▇▇▇▇ would have liked to have known about the Recovery Filter Migration Remedial Action Plan dated January 4, 2005. Ex. B-B, ▇▇▇▇▇▇ Dep. at 37:22-40:2.

    338. ▇▇▇▇▇▇▇ testified, "With regards to the Bard filter, would I have used a different device if I knew at the time that the Bard filter was not ideal or as good as some of the other implants? The answer would have to be yes… I would have used a different filter if there was a different filter that I knew of that was better, in terms of its safety profile." Ex. B-B, ▇▇▇▇▇▇ Dep. at 62:25-63:9.

    339. ▇▇▇▇▇▇▇ was asked if he would have used a different filter if he knew all the information that the investigation revealed he responded, "Difficult to say with certainty. It would depend upon what other filters we had at the time and what their problems would have been. But it would have been a very important piece of information, as far as making decisions regarding this or any other patient, yes." Ex. B-B, ▇▇▇▇▇▇ Dep. at 63:10-64:2.

    340. ▇▇▇▇▇▇▇ testified: Question: "If you knew back in 2007 when you were implanting that filter that there was even a 12 percent probability of fracture with the filter, would you have used a G2?" Answer: "Unlikely." Question: "if there was a 25

1   percent risk of filter fracture, can we safely say you would not have used that filter?"
2   Answer: "Most likely." Ex. B-B, ▬▬▬ Dep. at 70:9-20.
3          341.    ▬▬▬ testified that he also relies on the MAUDE database reports of
4   problems and the literature regarding filter fragmentation and migration. These reports,
5   his own experiences and the experiences of his colleagues were the reasons he moved
6   away from using the Bard filters. Ex. B-B, ▬▬▬ Dep. at 31:19-32:1.
7          342.    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
8   Ex. B-B, ▬▬▬ Dep. at 13:9-15.
9          343.    ▬▬▬ testified that the decision to remove a filter has evolved over
10  the years, and it is now a part of ▬▬▬ practice to advise patients to return for
11  follow-up to have filters retrieved. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, it had
12  only been cleared for permanent implantation and he was implanting the filter as a
13  permanent filter in 2007. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
14  ▬▬▬▬▬▬▬. B-B, ▬▬▬ Dep. at 28:19-29:20.
15         344.    Sherr-una Booker testified ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
16  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
17  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Ex. B-E,
18  Transcript of Deposition of Sherr-una Booker ("Booker Dep.") at 154:9-16. ▬▬▬▬
19  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Ex. B-E, Booker Dep. at 155:15-16,
20  156:23-157:4.
21         345.    Robert Ferrara, the Bard sales representative who sold Bard Recovery and
22  G2 filters to ▬▬▬, testified that the radiologists and support staff look to him for
23  clinical knowledge at times. Ex. B-F, Transcript of Deposition of Robert Ferrara
24  ("Ferrara Dep.") at 104:20-24. This knowledge potentially includes information about a
25  product's strengths and weaknesses, and that he would have to give the physicians
26  accurate information. Ex. B-F, Ferrara Dep. at 111:6-22.
27         346.    Mr. Ferrara testified that he would only convey to a physician information
28  that was approved by Bard. Ex. B-F, Ferrara Dep. at 113:7-114:1. He trusted Bard to

5

1    give him the information that, once approved through its internal process, was important
2    to pass along to the physicians. Ex. B-F, Ferrara Dep. at 287:13-288:2.
3         347.   Mr. Ferrara would expect the marketing materials to be put out by Bard to
4    be truthful and accurate. Ex. B-F, Ferrara Dep. at 116: 9-16.
5         348.   Mr. Ferrara admits that the G2 Patient Question and Answer Brochure
6    states, "The G2 filter combines the best design features of Bard's existing vena cava
7    filters to create a brand new permanent filter platform taking strength and stability to a
8    new level." Ex. B-F, Ferrara Dep. at 224:1-5.
9         349.   Mr. Ferrara testified that the G2 was marketed as having reduced tilt and
10   having increased fracture resistance. Ex. B-F, Ferrara Dep. at 225:22-226:4.
11        350.   Mr. Ferrara admitted that it is not a good idea to hide data or studies
12   regarding a product from doctors. Ex. B-F, Ferrara Dep. at 122:5-11.
13        351.   Mr. Ferrara was never provided with the Asch study or the results thereof.
14   Ex. B-F, Ferrara Dep. at 146:22-147:4.
15        352.   Mr. Ferrara does not recall being given any data or information about the
16   comparison of migration rates of various filters. Ex. B-F, Ferrara Dep. at 154:24-155:23;
17   204:18-22.
18        353.   Mr. Ferrara was not aware that Bard had instituted a Crisis Plan regarding
19   the Recovery filter in 2004. Ex. B-F, Ferrara Dep. at 165:15-166:3.
20        354.   Mr. Ferrara did not know about the statistical analysis performed by Natalie
21   Wong in 2004. Ex. B-F, Ferrara Dep. at 176:16-20.
22        355.   Mr. Ferrara was never shown any Health Hazard Evaluations prepared by
23   Bard reflecting reports of serious injuries and deaths with Recovery and G2 filters.
24   Ex. B-F, Ferrara Dep. at 191:21-192:16; 234:4-10.
25        356.   Mr. Ferrara was never advised about or shown the chart comparing G2
26   trends to Recovery, which chart shows that the G2 had more perforations, more caudal
27   migrations, and more tilts. Ex. B-F, Ferrara Dep. at 246:23-249:16.
28

6

357. Since Mr. Ferrara was never told about this chart or the information contained in the chart, he did not relay that information to Dr. D'Ayala.  Ex. B-F, Ferrara Dep. at 250:5-9.

358. Despite the fact that Bard was looking into a project to modify the G2 filter to minimize caudal migration in February 2006, Mr. Ferrara does not recall any specific discussions with any of the doctors at ███████████ about issues with caudal migration in the G2 filter.  Ex. B-F, Ferrara Dep. at 273:10-274:19.

359. Bard's February 10, 2006 "Monthly Global PV Report – January 2006" states the following concerning its "G2 with Caudal Improvements" Program:  (1) "Project initiated to modify the G2 filter to minimize caudal migration" and (2) "Caudal migration investigation underway to determine the design and physiological root causes."  Ex. B-G, BPVE-01-00719569-579 at 573.

360. As of 2012 when Natalie Wong, Bard's Quality Engineering Manager for New Product Development, stopped working on IVC filters, Bard had not determined the root cause of IVC filter migration, fracture, tilt or perforation.  Ex. B-H, Transcript of Deposition of Natalie Wong ("Wong Dep.") at 33:11-20.

361. Ms. Wong further testified that understanding the root cause of failure modes is important to prevent injuries to patients, and Bard's failure to identify the root cause of these failure modes was never communicated to physicians.  *Id.* at 32:20-33:1 and 35:13-20.

362. Bard was aware internally that improving caudal migration resistance "should reduce subsequent tilt, fracture, and penetration." (OSOF Ex. 99 at BPVE-01-00580608).

363. A Bard power point from a 2008 meeting to "provide justifications for proposed changes to the G2 filter" states "It is believed that caudal migration leads to tilts, perforations and fractures."  (OSOF Ex. 89, Randall Depo. Ex. 534).

364. Bard's sales representatives promoted later filters to physicians touting the improvements made from the predecessor G2 line of filters which included the Eclipse in

7

1   the form of the later manufactured Meridian filter and its improvements: "Caudal Anchors
2   to reduce caudal migration (a significant contributor to tilt, penetration, and fracture)."
3   Ex. B-I, March 8, 2012 Sales Representative Scott Karch Email, at BPVEFILTER-45-
4   00019568.

5         365.   Bard acknowledges caudal migration can result in an IVC filter no longer
6   providing protection to the patient from pulmonary embolism, excessive tilt, perforation,
7   life threatening injury, and death. Ex. B-H, Wong Depo. at 151:19-153:17.

8         366.   Knowing the risk of caudal migration that G2 filters posed, Bard's Eclipse
9   filter developed in January of 2010 while patients still had G2 filters implanted, failed to
10  address caudal migration in its Product Performance Specification on migration, instead
11  choosing to have that engineering standard specifically address cranial migration only:
12  "Filter must withstand a minimum of 50 mmHg pressure applied in a cranial direction in a
13  simulated IVC diameter of 28 mm." Ex. B-J, Eclipse Design History File at BPV-17-01-
14  00108473.

15        367.   With knowledge of the dangers associated with caudal migration and a need
16  to address that failure mode in January 2006, Bard did not seek and receive 510(k)
17  clearance for its Meridian filter (the third iteration of Bard's retrievable filters after the
18  G2) which included caudal anchors (to resist caudal migration) until August of 2011. Ex.
19  B-K, 510(k) approval for Meridian Filter, K102511.

20        368.   Following launch of the Meridian filter, Bard continued to sell the Eclipse
21  filter (a member of the G2 family of filters lacking caudal resistance anchors), until the
22  end of 2014. Ex. B-L, BPVEFILTER-45-00012404.

23        369.   Bard knew the G2, G2X and Eclipse had a higher complaint rate for caudal
24  migration than one of its competitors, the Optease, and as such the Product Performance
25  Specification for the later Meridian filter specifically included the following engineering
26  specification for caudal migration: "Resistance of filter in a simulated IVC diameter of
27  28mm must be equal to, or greater than, the caudal migration of the Optease filter in
28  bench testing." Ex. B-M, Meridian Design History File at BPV-17-01-00148749.

8

370. Ms. Wong testified that it was inaccurate to represent that the G2 is more stable than the SNF. Ex. B-H, Wong Depo. at 148:6-12.

371. Defense medical expert vascular surgeon Mark Moritz, M.D. testified that he is not aware of any high level evidence establishing the effectiveness of filters in saving lives. Ex. B-N, Transcript of Deposition of Mark W. Moritz, M.D. ("Moritz Dep.") at 194:2-9; 195:5-14.

372. Dr. Moritz's summary of medical articles he reviewed showed a higher rate of fracture and migration in Bard IVC filters compared to other filters. Moritz Dep. at 195:15-196:2.

373. Based upon the literature he reviewed for litigation, Dr. Moritz became concerned about Bard filters. Moritz Dep. at 221:5-22.

RESPECTFULLY SUBMITTED this 12th day of October 2017.

        GALLAGHER & KENNEDY, P.A.

        By: */s/ Mark S. O'Connor*
           Mark S. O'Connor
           2575 East Camelback Road
           Phoenix, Arizona 85016-9225

        LOPEZ McHUGH LLP
           Ramon Rossi Lopez (CA Bar No. 86361)
           (admitted *pro hac vice*)
           100 Bayview Circle, Suite 5600
           Newport Beach, California 92660

        *Co-Lead/Liaison Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of October 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

        */s/ Gay Mennuti*

9