# REDACTED DOCUMENTS RELATED TO DOCKET 8186

## 8186-Plaintiffs' Omnibus Separate Statement of Facts in Support of Their Response to Defendants' Motion for Summary Judgment in the Bellwether Cases – Filed Redacted

**Exhibit H-A:**   **Selected Medical Records of Lisa Ann Hyde;**
**Exhibit H-B:**   **Excerpts of 4/6/17 Deposition of David Henry, M.D.;**
**Exhibit H-C:**   **Excerpts of 1/25/17 Deposition of Lisa A. Hyde;**
**Exhibit H-D:**   **Lisa A. Hyde Fact Sheet;**
**Exhibit H-E:**   **Excerpts of 3/23/17 Deposition of William T. Kuo, M.D.;**
**Exhibit H-F:**   **Excerpts of 7/6/17 Deposition of Robert McMeeking;**
**Exhibit J-A:**   **Selected Medical Records of Doris Jones;**
**Exhibit J-B:**   **Excerpts of 3/23/17 Deposition of Anthony Avino, M.D.;**
**Exhibit J-C:**   **Doris Jones Consent Form dated 8/23/10;**
**Exhibit J-I:**   **Excerpts of 8/5/17 Deposition of David Chodos, M.D.;**
**Exhibit J-J:**   **Excerpts of 3/23/17 Deposition of Kirstin Nelson, M.D.;**
**Exhibit J-Q:**   **Excerpts of 7/18/17 Deposition of Mark W. Moritz, M.D.;**
**Exhibit M-A:**   **Selected Medical Records of Debra Mulkey;**
**Exhibit M-C:**   **Excerpts of 4/11/17 Deposition of Roderick Tompkins, M.D.;**
**Exhibit M-D:**   **Excerpts of 2/8/17 Deposition of Debra Mulkey;**
**Exhibit M-E:**   **Debra Mulkey Fact Sheet;**
**Exhibit M-I:**   **Excerpts of 6/1/17 Deposition of Pho M. Nguyen, M.D.**

**8186-Plaintiffs' Omnibus Separate Statement of Facts in Support of Their Response to Defendants' Motion for Summary Judgment in the Bellwether Cases – Filed Redacted**

1  Ramon Rossi Lopez - rlopez@lopezmchugh.com
   (California Bar Number 86361; admitted *pro hac vice*)
2  Lopez McHugh LLP
   100 Bayview Circle, Suite 5600
3  Newport Beach, California  92660
   949-812-5771
4
   Mark S. O'Connor (011029) – mark.oconnor@gknet.com
5  Gallagher & Kennedy, P.A.
   2575 East Camelback Road
6  Phoenix, Arizona  85016-9225
   602-530-8000
7
   *Co-Lead/Liaison Counsel for Plaintiffs*
8
                    UNITED STATES DISTRICT COURT
9
                         DISTRICT OF ARIZONA
10
11  In Re Bard IVC Filters Products          No. MD-15-02641-PHX-DGC
    Liability Litigation
12                                           **PLAINTIFFS' OMNIBUS SEPARATE**
                                             **STATEMENT OF FACTS IN**
13                                           **SUPPORT OF THEIR RESPONSE TO**
                                             **DEFENDANTS' MOTION FOR**
14                                           **SUMMARY JUDGMENT IN THE**
                                             **BELLWETHER CASES**
15
16         Plaintiffs submit this Omnibus Separate Statement of Facts in Support of their

17  Response to Defendants' Motion for Summary Judgment in the bellwether cases.

18  **I.     FACTS COMMON TO ALL CASES**

19         **A.     Bard Departs from A Proven IVC Filter to Make More Money.**

20         1.      Beginning on approximately April 28, 1995, Bard Peripheral Vascular, Inc.

21  ("BPV") and C.R. Bard, Inc. ("C.R. Bard") (collectively "Bard") manufactured and sold an

22  inferior vena cava ("IVC") filter called the Simon Nitinol Filter ("SNF").  *See* 510(k)

23  Premarket Notification, FDA website, *available at* https://www.accessdata.fda.gov/

24  scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K944353 (last accessed Oct. 2, 2017).  Bard

25  marketed the SNF as a device to be implanted in a patient's IVC to trap blood clots to

26  prevent the clots from traveling to the heart and lungs and potentially causing a pulmonary

27  embolism ("PE").  US FDA Clinical Data Summary of the Simon Nitinol Filter, attached

28  as Exhibit 1, BPVE-01-00280772, at 73; Ex. 8, BPVE-01-00066044.

2. The basic performance specifications for Bard IVC filters were that the devices must not migrate, require hook strength for stability and migration resistance, should not break or come apart during their lifetime, and must not fracture as result of corrosion or stresses within the body. Deposition of John McDermott, Feb. 5, 2014, attached as Exhibit 2, at 83:9-92:18; Product Performance Specification Recovery Filter and Femoral Delivery System, Nov. 2003, attached as Exhibit 3, BPVE-01-00010390-416, at 403.

3. The SNF filter largely met these design and patient safety goals, performing very well in patients. Email from David Ciavarella to Brian Barry and Chris Ganser re G2 Caudal Migrations, Dec. 27, 2005, attached as Exhibit 4, BPVE-01-00028224-25.

4. The Simon Nitinol Filter had only 8 fractures out of sales of 80,187 between launch and May 2011. Chart of Filter Fracture Complaints, attached as Exhibit 5, BPVEFILTER-01-00037664. As the predicate device for Recovery, this is the standard of performance against which the Recovery filter is measured for substantial equivalence and safety and effectiveness. Deposition of Donna B. Tillman, June 12, 2014, attached as Exhibit 6, at 101:20-23, 115:23-116:3, 119:23-120; Deposition of Christine Brauer, dated Aug. 2, 2017, attached as Exhibit 7, at 202:19-203:8.

5. Early clinical studies demonstrated that migration of the SNF filter device was rare, with only 2 of 258, or 0.8%, migrations reported for patients who received the SNF between February 1988 and November 1990, while there were no reports of filter fractures observed. Ex. 1, BPVE-01-00280772, at 72, 86; Simon Nitinol Filter/Straight Line Technical File, attached as Exhibit 8, BPVE-01-00066044-109, at 98-99. Since these early clinical studies there have been zero SNF migration deaths and a significantly lower number of SNF migrations compared to Recovery, G2, and Eclipse reported to Bard through May 2011, Ex. 5, BPVEFILTER-01-00037664.

6. Bard wanted to increase its market share in the IVC filter market and believed that developing a retrievable IVC filter would enable it to do so. Product

2

Opportunity Appraisal for Recovery Filter System, Mar. 28, 2003, attached as Exhibit 9, BPV-17-01-00030247, at 249.

7.     Officers at Bard recognized that modifying the design to allow for optional retrieval had the potential to significantly increase BARD's market share of the IVC filter market. *Id.*

## B.     The Recovery Filter.

8.     The Recovery Nitinol Filter ("Recovery" or "RNF"), Bard's first "Optional Filter," was designed as a "permanent filter that you can remove long-term (12 weeks)" which was to have the "same strengths as permanent filters" with "arms designed for centering and caudal migration resistance," one (vena cava) size fits all (up to 28 mm)," "hooks (to) provide migration resistance when the filter is fully occluded," and would "convert to a permanent filter" if not removed within 12 weeks.  NMT Cprdos presentation, June 14, 2000, attached as Exhibit 10, BPVE-01-00001342.

9.     In April 2000, Dr. Murray Asch, an Interventional Radiologist from Canada, began his RNF retrievability study.  Deposition of Murray R. Asch, May 2, 2016, attached as Exhibit 11, at 12:14-24; Murray R. Asch, MD, FRCPC, *Initial Experience in Humans with a New Retrievable IVC Filter*, Radiology 2002; 225:835-844 ("Asch Study Article"), attached as Exhibit 12.  Thirty-four patients who needed IVC filters were selected to receive an RNF between April 2000 and November 2001.  When Dr. Asch's first article regarding the study was published, 16 men and 16 women aged 18-83 years had been implanted with the RNF (2 patients of the original 34 selected were found to have anatomic conditions unfavorable for filter placement).  *Id.* at 835, 837.  The indications for placement were recent deep venous thrombosis, recent pulmonary embolism, and/or prophylaxis.  *Id.*  The mean implantation period was 53 days and the range was 5 to 134 days.  *Id.* at 835.

10.     During Dr. Asch's treatment of the initial 32 patients, his test subjects encountered several complications with the RNF: 1 migration, 2 fractures, 2 tilts, 1

3

perforation, and 19 deployment-related problems.  Ex. 11, Asch Dep., at 26:8-15; Ex. 12, Asch Study Article, at 839-40 (tilts and deployment issues), 843 (perforation).

11.     The Canadian Institutional Review Board (IRB) suspended the study after the filter fractures were reported.  Email from George Cavagnaro to Doug Uelmen and Carol Vierling, April 18, 2002, attached as Exhibit 13, BPV-17-01-00052621 (forwarding email from Dr. Asch stating he had reported RNF fracture to the IRB and "the IRB has suspended the trial effective immediately until the nature of the problem with the device can be better understood").

12.     Dr. Asch testified that his study should never have been used to seek market clearance of the RNF in the U.S.  Ex. 11, Asch Dep. at 23:7-24:19; 195:14-24.

13.     Bard was aware of the Recovery filter's design flaws and told Dr. Asch it would change the design or manufacturing process of the filter to try to prevent fractures.  Bard admitted that pre-marketing fractures were likely due to weakness at the site of the weld, and that it was aware that it needed to increase robustness of the filter by designing it with larger diameter metal.  Ex. 11, Asch Dep., at 40:19-41:11.

14.     Defendants' expert Dr. Donna B. Tillman testified that Bard had an obligation to assure that (a) "the device continues to be safe and effective and that they [sic] meets FDA's quality system requirements throughout the life of the device," (b) "[a]ssessed overall, the safety and effectiveness of the device could not be worse than the predicate device;" and (c) "[the device] needs to be as safe and effective as the predicate device."  Ex. 6, at 101:20-23, 115:23-116:3, 119:23-120:7.

15.     On July 10, 2002, Bard submitted a special 510(k) application (K022236) modifying the SNF (the predicate device to which the filter was to be substantially equivalent) seeking clearance for a new IVC filter that would be known as the Recovery Filter.  *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K022236; Letter from K. Fuller and C. Vierling to Food and Drug Administration, dated July 10, 2002, attached as Exhibit 14, BPV-17-01-00057953;

4

Recovery Filter System Special 510(k) Submission, July 10, 2002, attached as Exhibit 15, BPV-TRIAL-EXHIBIT-0293.

16.     If an IVC filter is cleared to be marketed in the United States based on substantial equivalence to an appropriate predicate device, there is an expectation that the new device will continue to be as safe and effective as the predicate device, post-marketing in the real clinical world.  Ex. 7, 2017 Brauer Dep. at 202:19-203:8.

17.     On November 27, 2002, Bard obtained clearance from the FDA to market the Recovery as a permanent IVC filter.  Department of Health & Human Services letter, Nov. 27, 2002, attached as Exhibit 16, BPV-17-01-00057709.

18.     Bard then bootstrapped this clearance to open the door for a retrievable filter.  On April 25, 2003, Bard submitted an abbreviated 510(k) pre-market notification (K031328) in order to obtain an indication for retrievability for the RNF.  Letter from Mary Edwards to FDA, Apr. 25, 2003, attached as Exhibit 17, BPV-17-01-00054947; *see also* https://www.accessdata.fda.gov/cdrh_docs/ pdf3/K031328.pdf (last accessed Sept. 25, 2017).

19.     Bard's 510(k) applications for the RNF did not disclose that filters at the low end of the leg span set specification only met the migration resistance test when the hooks were engaged but that those hooks were not always engaged.  Recovery Filter System Special 510(k) Submission (K022236), Nov. 27, 2002, BPV-17-01-00057953-55, attached as Exhibit 18; Ex. 15, Recovery Filter System Special 510(k) Submission, July 10, 2002, BPV-TRIAL-EXHIBIT-0293.

20.     Bard was aware that it had an "absence of solid clinical history" and "documented negative clinical experiences" for the RNF but was confident that those obstacles to selling the device could be overcome with "aggressive marketing."  Product Opportunity Appraisal for Recovery Filter System, dated Mar. 28, 2003, BPV-17-01-00030247, Ex. 9, at 249.

21.     In migration testing in 1999, NMT concluded that "the SNF filters were superior [to the Recovery] in 28 mm tubing."  R&D Technical Report, Aug. 5, 1999, attached as Exhibit 19, BPV-17-01-00002650, at 53.

22.     To become a safer product, Recovery required longer arms, larger and stronger hooks by increasing diameter of the wire, and an increased leg span.  Deposition of Robert Carr, Dec. 19, 2014, attached as Exhibit 20, at 120:20–122:1; Deposition of Len DeCant, May 24, 2016, attached as Exhibit 21, at 249:3-14.

23.     Bard could have employed penetration limiters to improve perforations at the time the Recovery was designed and marketed, but did not do so for the Recovery. Transcript of deposition of Andrzej Chanduszko, Oct. 10, 2013, attached as Exhibit 22, at 51:23–52:7.

24.     Bard's IFU for the Recovery Filter device does not include information for physicians that the device failed migration-resistance testing when the hooks were not engaged.  Recovery Filter System for use in the Vena Cava, Information for Use, attached as Exhibit 23, BPVE-01-00435559; Deposition of David A. Kessler, M.D., attached as Exhibit 24, Oct. 5, 2016, at 179:3–181:19.

25.     The failure of Recovery anchor hooks to engage was a marked difference from the SNF, eroding Bard's claim that the device was substantially equivalent to the SNF. Ex. 24, Kessler Dep. at 179:3–181:19.

26.     In ignorance of the design flaws in its product that Bard's testing and experience had identified, FDA cleared the Recovery for a retrievability indication, allowing Bard to market the Recovery as a permanent filter with the option for retrieval on July 25, 2003.  Department of Health & Human Services letter, dated July 25, 2003, attached as Exhibit 25, BPV-17-01-00058122-24.

### 1.     The Recovery Quickly Proves Deadly.

27.     Bard began selling the Recovery filter to a limited market on December 20, 2002; it had full market release in January 2004.  Failure Investigations/R002 History Review, BPVEFILTER-01-00003802-836, attached as Exhibit 26, at 12 (limited); Special

Design Review for Recovery (Project #s 7081 and 8008) – Meeting Minutes, dated Dec. 9, 2003, attached as Exhibit 27, BPVE-01-00407525-527, at 526 (full).

28. Starting in October of 2003, Bard began receiving complaints from real-world patients and physicians of migrations, fracture, and—starting in February 2004—deaths. Ex. 26, Failure Investigations/R002 History Review, at 12-14.

29. On December 9, 2003, less than a month prior to full market release of the Recovery filter, Bard did not have a full understanding of the design elements of the Recovery IVC filter. At that time, the Special Design Review team for the Recovery filter requested "objective evidence" of the following, among other things, (a) to document the criteria (50 mmHg) that Bard used for migration resistance; (b) a study that analyzed the filter's migration resistance in conjunction with tilting and the number of legs/hooks secured; (c) a study that compared Recovery's migration resistance to competitive products; (d) migration resistance of the Recovery with oval and/or D-shaped IVCs. Special Design Review for Recovery (Project #s 7081 and 8008) – Meeting Minutes, dated Dec. 9, 2003, Ex. 27, BPVE-01-00407525, at 26-27. Nonetheless, Bard chose not to conduct such studies prior to full market release of the Recovery. Ex. 21, DeCant Dep. at 195:22-196:19; 204:1-12; 204:22-205:6; 207:1-208:23.

30. Even after the commercial marketing of the Recovery filter began, Bard had many questions that needed to be answered about the performance of the device, but did know that it did not always stay centered in the vena cava even if properly deployed and centered. Email chain between Janet Hudnall to David Rausch, Feb. 26-27, 2004, attached as Exhibit 28, BPVE-01-00373887.

31. Bard learned of the first death from a Recovery filter migrating to the heart of a patient on February 9, 2004, approximately five weeks after full market release. Ex. 26, Failure Investigations/R002 History Review, at 12.

32. In a February 2004 email to Bard's interventional sales force charged with communicating with the interventional radiology public, Bard communicated that testing of the Recovery showed that it performed "just as well as the SNF in terms of migration

resistance." Email from Mary Edwards, February 13, 2004, attached as Exhibit 29, BPV-17-00164702-710, at 704.

33.    At approximately the same time it was telling interventional radiologists that Recovery performed as well as the SNF with respect to migration resistance,

    a.  A February 25, 2004, internal test showed that the Recovery filter did not perform as well as the SNF in Bard's migration resistance testing and in certain instances failed to meet its product performance specifications. Email from Alex Tessmer to Robert Carr, Feb. 25, 2004, BPVE-01-00410985-1019, attached as Exhibit 30;

    b.  In a February 26, 2004, email between Bard employees Janet Hudnall and David Rausch Hudnall explained that "[w]e knew very little about the long-term clinical performance of this device when we launched it. After a year of commercialization, there are still many questions that need to be answered. One thing we do know, however, is that Recovery does not always stay centered in the cava. In fact, physicians will often find that it is tilted quite a bit when they go to retrieve it even though it seemed perfectly centered upon deployment." Ex. 28, at BPVE-01-00373887;

    c.  Rausch agreed: "you are right; now that we have more experience with Recovery the positioning of tilt-resistance should probably be down played." *Id.*

34.    When Bard conducted migration-resistance testing comparing the Recovery filter against the SNF and competitive devices in March 2004, the Recovery performed worse than the SNF on every test, finished last or second to last among all tested devices on every test but one (on which it finished third to last), and failed Bard's own standard for migration resistance on several tests. Characterization of Recovery Filter Migration Resistance in Comparison to Competitive Product Phase 1, BPVE-01-00276094, attached as Exhibit 31, at 97-99.  Indeed, at the 28 millimeter IVC test, the Recovery had migrations at less than 50 mmHg; and at a temperature of 37 degrees Celsius (plus or

1  minus 2 degrees), the average resistance for the Recovery was 47.5 mmHg with a low

2  resistance of 32.1 mmHg (well below Bard's threshold of 50 mmHg).  *Id.* at 99.

3       35.    This March 2004 testing further confirmed that the Recovery did not

4  perform as well as the SNF in Bard's migration-resistance testing, and in certain

5  instances, failed to meet its product performance specifications.  Email from Alex

6  Tessmer to Charlie Benware and others, Mar. 24, 2004, BPVE-01-00330122, attached as

7  Exhibit 32.

8       36.    Bard also knew the Recovery performed worse than competitor filters as

9  well as the SNF.  By March 25, 2004, based on migration resistance comparison testing

10  between the Recovery and competitive filters, Bard reached the following conclusion:

11  "[T]he migration resistance of the RNF appears comparable to the Gunther Tulip Filter

12  throughout all simulated IVC diameters.  The other filters Simon Nitinol Filter, Greenfield

13  SF, Greenfield Ti, Optease and TrapEase seem to have a greater resistance to migration in

14  comparison to the RNF and Gunther Tulip filter."  Ex. 26, Failure Investigations/R002

15  History Review, at 14; Engineering Test Report No. ETR-04-03-02, BPV-17-01-

16  00001198–208, attached as Exhibit 33, at 208.

17       37.    The head of Bard's Research & Development team, its Vice President of

18  Research & Development, did not understand at the time of the March 2004 migration

19  testing that the IVC can expand by 25 to 50 percent and, therefore, Bard's design did not

20  take into account the IVC's real-world performance.  Ex. 21, DeCant Dep. at 70:16-71:17,

21  326:22-328:24.

22       38.    According to Natalie Wong, Bard's Quality Engineering Manager for New

23  Product Development, the Recovery was also worse than the SNF with regard to filter-

24  related deaths and filter fracture.  Deposition of Natalie Wong, Oct. 18, 2016, attached as

25  Exhibit 34, at 77:10-78:12; 111:16-112:18.  Nor was it as safe as competitor filters, since

26  the Recovery had a higher rate of deaths and fractures.  *Id.* at 77:16-78:12; 112:19-22.

27       39.    Concerning the Recovery's performance against its 50 mmHg (50

28  millimeters of mercury) standard, Bard's engineering staff observed "[y]ou will quickly

1    notice that there were values below 50.0 mmHG acceptance criteria for all three Starguide
2    manufactured lots . . . .This points to the fact that there is an issue with the migration
3    resistance testing." Ex. 32, at BPVE-01-00330122.

4         40.    In a Health Hazard Evaluation Bard acknowledged that in 50mmHG
5    migration resistance testing the Recovery "had the lowest mean migration resistance" of
6    all of the IVC filters evaluated.  "Health Hazard Evaluation, dated Dec. 17, 2004, BPVE-
7    01-01019821-25, attached as Exhibit 35, at 01019822.

8         41.    On April 14, 2004, Bard learned of the second death from a Recovery filter
9    migrating to the heart of a patient.  Memo from Uelmen to Palermo dated June 11, 2004,
10   BPV-17-01-00153581-88, attached as Exhibit 36, at 88.  Following that death, Bard
11   understood that the IVC could expand beyond its normal size.  Ex. 21, DeCant Dep. at
12   326:22-327:13.  And, at that time, Bard understood that the Recovery was designed in a
13   way that did not account for how the IVC actually behaved.  *Id.* at 328:2-329:8.

14        42.    On April 14, 2004, in light of this second death, the Recovery was placed on
15   an internal "QA Hold" pending completion of a remedial action plan.  Ex. 26,  Failure
16   Investigations/R002 History Review, at 14; Deposition of Chad Modra, Mar. 28, 2013,
17   attached as Exhibit 37, at 181:1-19.

18        43.    Physicians were not informed that Bard had placed an internal hold on the
19   Recovery.  Ex. 37, Modra Dep. at 183:9-12.

20        44.    Rather than communicating its findings to the medical community, Bard
21   created a "Crisis Communication Plan" which included hiring a public relations firm to
22   handle the negative press if the situation with its failing retrievable filters were to be
23   "exposed" in the media.  *See* Crisis Communication Plan, BPV-17-01-00164733-164788,
24   attached as Exhibit 38.

25        45.     Bard's messaging to the public was to be:  "Bottom line: good filter, severe
26   case, bad outcome, deep regret."  Bard determined that "[t] his [was] the simple story we
27   should repeat again and again. Comparison with other filters is problematic in many ways,
28   and we should avoid/downplay this as much as possible. When pressed, we [Bard] simply

paraphrase … that estimates based on the available data suggest that there is no significant difference in the rates of these complications between any of the devices currently marketed in the U.S., including the Recovery device."  Email from John Lehman, April 15, 2004, BPV-17-01-00165419, attached as Exhibit 39.

46.     Bard described the situation with Recovery failures after the fact as so dire in the 2004-2005 time frame that it needed to be held together with "scotch tape, smoke, mirrors, crying etc."  Email from Jason Greer to Janet Hudnall, Mar. 16, 2006, BPVE-01-00946624, attached as Exhibit 40.

47.     Despite Bard's internal knowledge about the Recovery's problems, the QA Hold was lifted on April 25, 2004, and Bard continued to sell the Recovery filter. Remedial Action Plan, April 21, 2004, BPV-17-01-00153578, attached as Exhibit 41, at 153587.

48.     In all, seven migration deaths associated with the RNF were reported between April and December 2004. (April 13, 2004, May 8, 2004; May 30, 2004; July 24, 2004; August 16, 2004; November 15, 2004; November 28, 2004) Recovery Filter Detached Limbs—Patient Comparison Matrix dated November 1, 2005, BPV-17-01-00035618, attached as Exhibit 42, at 35615-39.

49.     During this critical period, Bard knew that the Recovery:

a.   had a fracture rate that was tens of times higher than other filters on the market.  Health Hazard Evaluation, July 9, 2004, BPV-17-01-00002145 attached as Exhibit 43.

b.   was tilting in up to 30 percent of the implantations. Email chain with John McDermott, Len DeCant, and others, May 13, 2004, attached as Exhibit 44, BPVE-01-00036095-96, at 96.

c.   was measurably less safe than the SNF and competitor devices as it related to death caused by: 1) migration 2) caval perforation 3) caval perforation 4) caval obstruction or 5) PE/acute respiratory event.

11

1
2

        Email from Natalie Wong to Doug Uelemen, May 20, 2004, BPV-01-00511127, attached as Exhibit 45.

3
4
5
6

    d.    had a significantly higher rate of complications from other filters including the SNF at "a 95% confidence." *Id.* (stating that at "a 95% confidence, there IS a significant difference between Recovery, Gunther Tulip, Bird's Nest and SNF.").

7       50.    Bard industry standards and regulatory expert Christine Brauer agreed that a

8 reasonably prudent company should recognize and assume the enormity of a safety signal

9 is *higher* than the actual rate derived from MAUDE and sales data rate analysis.

10 However, Bard took no meaningful action to identify a root cause of failure or warn

11 patients, physicians, or regulators about these deadly problems.  Ex. 7, 2017 Brauer Dep.

12 at 213:11-214:14.

13      51.    Bard's June 30, 2004 Health Hazard Evaluation reports "Migration of a

14 thrombus-encased Recovery (IVC filter) has been reported in 10 patients" among 12

15 migrations reported as of that date.  Four of the 12 resulted in death to the patients.  The

16 author of the HHE, Dr. David Ciavarella, Bard's Medical Director, further states, "The

17 root cause of the thrombus-associated migration events is judged to be thrombus-induced

18 pressure increase in the IVC, leading to acute IVC expansion beyond the design limits of

19 the filter," and as to one of the migrations he states "the 'malfunction' is best understood

20 as a limitation of the ability of the device to carry out its intended function."  Updated

21 Health Hazard Evaluation, June 30, 2004, attached as Exhibit 46, BPVEFILTER-

22 01000014836-39, at 39.

23      52.    Bard stated in an internal Frequently Asked Questions (FAQ) document

24 about the Recovery that it was "rigorously tested for all physical performance

25 characteristics according to [Bard's] established test methods and protocols and was found

26 to meet all test specifications and requirements."  Bard Recovery FAQ, July 15, 2004,

27 BPVE-01-00268921-923, attached as Exhibit 47, at 923.

28

53.     Less than two weeks later, on July 26, 2004, after the Recovery had been on the market for nearly a year, Len DeCant, Bard's Vice President of Research and Development, was told by his employee: "I think we should try to better quantify and understand how much these vessels expand if we are designing a device to anchor on/in the wall."  Email from John McDermott to Len DeCant, July 26, 2004, BPV-DEP-00014246-247, attached as Exhibit 48, at 46  Moreover, Bard as of late August 2004 did not have reliable controlled clinical studies that "most educated individuals and physicians would accept as eveidence [sic] of 'proof'.[sic] the safety and efficacy of the Recovery® Vena Cava Filter."  Internal Q&A, Aug. 30, 2004, BPVE-01-00033810, attached as Exhibit 49, at 12.

54.     Despite its knowledge that the Recovery's overall complication rates were far greater than its competitor devices, Bard told the its employees in a "script" not to be deviated from, that Recovery complication rates were comparable to those reported in the literature and the MAUDE database for other IVC filters, including that migration was not occurring at an excess frequency with the Recovery when compared to competitor filters. *Id.* at BPVE-01-00033815; Ex. 47, at BPVE-01-00268921-23.

55.     Bard marketed the Recovery as a "marked improvement over currently available devices."  2004 Recovery Marketing Brochure, BPV-17-01-00007760-763, attached as Exhibit 50, at 7761.  "Currently available devices" included the SNF and competitor filters at the time Recovery was launched into the market.  Deposition of Jack Sullivan (Vols. I and II), Sept. 16, 2016 and November 3, 2016, attached as Exhibit 51 and 84, at 80:16-81:12.

56.     By September 2, 2004, Bard was aware of 32 incidents of limbs fracturing on implanted Recovery filters.  Remedial Action Plan, Sept. 2, 2004, BPV-17-01-00034860-887, attached as Exhibit 52.  As a result, Bard instituted a Remedial Action Plan to address the problem of fractured arms.  *Id.*  But Bard concluded that there was "no single root cause for the reported limb detachments," so "no field remedial action [was] planned."  *Id.* at 74.

13

57.     Bard's December 17, 2004, Health Hazard Evaluation stated, "An analysis of reporting rates of serious adverse events for all inferior vena cava filters, as determined by analysis of the MAUDE and IMS databases by a consultant, revealed that reporting rates for Recovery are significantly higher than other filters." Ex. 35 at BPVE-01-01019821.  The HHE also noted that "[r]eports of death, filter migration (movement), IVC perforation, and filter fracture associated with Recovery filter were seen in the MAUDE database at reporting rates that were 4.6, 4.4, 4.1, and 5.3 higher, respectively, than reporting rates for all filters.  These differences were all statistically significant." *Id.* at 22.

58.     Regarding the effectiveness of Bard's or any other IVC filter, Bard's Medical Director, Dr. David Ciavarella, stated in the HHE, "The existing literature is of poor quality, with insufficient randomized, controlled trials (RCT) to definitively establish the effectiveness of IVC filters." *Id.*

59.     On January 4, 2005, another Remedial Action Plan observed:  "In the MAUDE dataset, the RNF demonstrated: a consistent, statistically significant and potentially clinically important higher rate of reporting adverse events in the several analyzed categories. . . . the data and [a consultant's] analysis provided two significant signals that further investigation particularly in relation to migration and fracture is urgently warranted. . . . Of greatest concern were reports of migration and fracture. Remedial Action Plan, January 4, 2005, attached as Exhibit 53, BPVE-01-01019773-825, at 19777-78.

60.     On April 19, 2005, Chris Ganser, Corporate V.P. of Regulatory Sciences and Head of Quality Assurance, reported to the CEO and COO of C.R. Bard comparative MAUDE/IMS data which was compiled by Bard for IVC filter fatalities, fractures and migrations (through Q4 2004) showing a higher rate of migration and fatalities with the Recovery versus the SNF and competitor filters.  He also reported on a significantly greater number of fractures compared to SNF's 15 year marketing history.  This data was from Bard's own internal adverse event reports and actual sales data and revealed the

1   following comparisons to the SNF which was Recovery's predicate device:  3300%

2   greater rate of Recovery migrations (34 total); 14 deaths involving Recovery versus zero

3   for SNF, including nine from migrations of the device to the heart and five from

4   pulmonary emboli; and 51 Recovery fractures, 18 with metal struts embolizing to heart or

5   lungs, and three requiring surgery to remove, including one open heart surgeries.  Email

6   from Chris Ganser to T. Ring, April 19, 2005, BPVE-01-00434275-76, attached as

7   Exhibit 54.

8       61.    By July 2005, Bard's sales force discussed internally that the SNF, the

9   predicate to RNF, was the "safest filter on the market."  Email from Jason Greer to Nicole

10  Alpie and others, July 16, 2005, BPV-DEP-00005665-66, attached as Exhibit 55, at 66.

11      62.    Chris Ganser again reported on August 3, 2005, to CR Bard CEO and COO,

12  comparative MAUDE/IMS data for IVC filter fatalities, fractures and migrations

13  compiled by Bard through the second quarter of 2005.  The data showed a higher rate of

14  migration and fatalities with the Recovery versus the SNF and competitor filters, and

15  significantly greater number of fractures compared to SNF's 15-year sales history.

16  Compared to the SNF, the data revealed:  4500% greater rate of Recovery migrations; 16

17  deaths involving Recovery versus zero for SNF, including 11 from migrations of the

18  device to the heart and five from pulmonary emboli the Recovery was intended to prevent;

19  and 68 Recovery fractures, 25 with metal struts embolizing to heart or lungs and 4

20  requiring surgery to remove.  Executive Summary, August 3, 2005, BPV-17-01-

21  00170083-84, attached as Exhibit 56.

22      **C.    The G2 Filter.**

23      63.    Bard then developed a next generation Recovery filter, known first as the

24  "G1A improved recovery filter" and later as the "G2" filter, with the objective of

25  addressing and minimizing problems of filter migration and filter arm fracture with the

26  Recovery.  Janet Hudnall, Avijit Mukherjee, and Robert Carr email chain, August 25-26,

27  2004, attached as Exhibit 57, BPVE-01-00008821; Recovery Filter PowerPoint

28  presentation, August 26, 2004, attached as Exhibit 58, BPVE-01-00009466-85, at 69-70.

1    64.    Bard continued to sell the Recovery while it developed the G2.  Email from

2    Janet Hudnall to John McDermott, Feb. 11, 2005, attached as Exhibit 59, BPVE-01-

3    00167251 (discussing options for "stock recovery/rotation" for Bard's vena cava filters

4    once G1A/G2 filter was cleared for sale); Failure Investigations/R002 History Review,

5    attached as Exhibit 60, BPVEFILTER-01-00003802, at 11 (G2 project started 9/13/04;

6    "9/2005 G2 is released, RNF is discontinued end of the month").

7    65.    The performance standard and predicate device for the G2 is the Recovery

8    filter.  Traditional 510(k) G2 Filter with Femoral Delivery, attached as Exhibit 61, at

9    FDA_PRODUCTION_00000048-49, at 49.

10    66.    There was a "statistically significant difference" between the performance of

11    the G1A/G2 filter and that of the SNF in migration resistance testing when compared to

12    the SNF. G1A Recovery Filter Femoral System Design Verification and Validation

13    Report, attached as Exhibit 62, BPV-17-01-00001134-153, 46.

14    67.    Bard's labeling represented that the G2 Filter was safe and effective for

15    permanent implantation in the human body for the prevention of pulmonary embolism.

16    G2 Filter System Instructions for Use, attached as Exhibit 63, BPV-17-01-00137389-92,

17    at 89.

18    68.    Bard's "Patient Questions & Answers" document for the G2 filter states that

19    the G2 filter is designed to be a permanent implant and will not need to be removed,

20    repositioned, or replaced.  G2 Filter System, Patient & Answers, attached as Exhibit 64,

21    BPV-17-01-00137624-32, at 29.

22    69.    BARD represented in marketing materials including those distributed on the

23    internet directly to patients that the G2 had increased migration resistance, improved

24    centering, and enhanced fracture resistance.  Marketing brochure for G2 Filter System for

25    Permanent Placement, attached as Exhibit 65, BPV-17-01-00142912-15; Marketing

26    Brochure for Recovery G2 Filter System, attached as Exhibit 66, BPV-17-01-00137588;

27    *see also* 2005 G2 Filter-FAQs, attached as Exhibit 67, BPV-17-01-00062020-22, at 22

28

16

1  (G2 Filter System was "more robust design" and represents Bard's "best technology"

2  offered to its customers).

3         70.     Bard expert witness Dr. Brauer testified that documents like those cited in

4  the preceding paragraph require accurate information as they are considered labeling.

5  Deposition of Christine Brauer, May 23, 2014, attached as Exhibit 68, 216:1-217:20.

6         71.     On August 29, 2005, the FDA cleared the G2 device for market with a

7  permanent indication only.  Letter from FDA to Bard Peripheral Vascular, August 29,

8  2005, attached as Exhibit 69, FDA_PRODUCTION_00000055-56.

9         72.     The IFUs for the Recovery and G2 Filter Family failed to warn of the

10  increased risk of adverse events, such as migration or movement of the filter, with those

11  filters versus the SNF and competitor filters—despite Bard knowing this was important

12  information for a physician to be aware of.  Ex. 63, at BPV-17-01-00137389-92; Ex. 34,

13  Wong Dep. at 88:2-89:3; Ex. 84, Sullivan Dep. at 464:25-466:22.

14         73.     Bard's former Western Regional Sales Manager, Jack Sullivan, testified that

15  in marketing the G2 filter Bard represented to physicians, patients and the public that: the

16  Recovery was properly and thoroughly tested, Ex. 51, Sullivan Dep. at 62:7-18; the

17  Recovery filter was just as migration resistant as the SNF, *id*. at 96:10-97:4; migration

18  was not occurring more frequently with the Recovery versus competitor filters, *id.* at

19  68:16-70:20; the Recovery filter was better than the SNF and its competitors, *id*. at 80:16-

20  81:12; the Recovery was more likely to stay centered and avoid tilt than other filters, *id*. at

21  81:13-83:21; and the G2 was even more resistant to fracture and migration than the

22  Recovery, *id*. at 92:21-93:8.

23         74.     The IFUs for the G2 (and Recovery) filters include identical language

24  implying that the risk of various adverse events associated with the G2 Filter Family are

25  the same as all other IVC filters.  Ex. 63, at BPV-17-01-00137389-92 (under "Potential

26  Complications" stating "Movement or migration of the filter is a known complication of

27  vena cava filters."); Recovery Filter IFU, 2004, attached as Exhibit 70, BPV-COMP-

28  00001317-19, at 17 (same).  For example, those IFUs state that migration and movement

17

1    are "known complications of vena cava filters." *Id.*  This is the same language Bard

2    conveyed to physicians in its "Dear Doctor" and "Dear Colleague" letters.  2004 Recovery

3    Filter System Dear Doctor Letter, attached as Exhibit 71, BPVE-01-00303515-16, at 16.

4    There is nothing about that language that advises physicians or patients of the increased

5    risk of those adverse events with the Recovery/G2 Filter Family versus the SNF or

6    competitor IVC filters—it is just a general statement about IVC filters.  Ex. 34, Wong

7    Dep. at 88:2-89:3; Ex. 51 and 84, Sullivan Dep. at 54:10-55:6, 56:2-57:2, 59:15-61:4;

8    460:3-466:22.

9        75.    Dr. Brauer testified that as to increased migration resistance and enhanced

10   fracture resistance the statements in Bard's labeling and marketing materials for the G2

11   were not accurate when comparing the G2 to the SNF.  Ex. 68, 2014 Brauer Dep. at

12   224:6-225:15.

13       76.    Despite advertising the G2 filter as being 12 times more resistant to fracture,

14   Bard did not conduct thorough testing to support that claim.  Bard's engineers did not

15   conduct thorough testing because it concluded that data "would still fall outside of the

16   acceptable range" and the engineers "didn't think the answer would support our design

17   change as a viable option."  Email chain between Micky Graves and Charlie Simpson,

18   March 23, 2006, attached as Exhibit 72, BPVE-01-01225832.

19       77.    By November 2005, Bard was aware of a concerning signal for perforations

20   with the G2 that needed to be investigated. On November 10, 2005, Chris Ganser, Bard's

21   V.P. of Quality Assurance, Environmental Services & Safety, wrote: "It's obvious from

22   the table below and the attached MAUDE summary that there are some major

23   discrepancies regarding the number of complaints, units sold, rates, etc. for G2. Your first

24   cut at MAUDE Analysis sends some signals for caval perforation and deployment that

25   have to be investigated expeditiously."  Email chain between Chris Ganser, Gin Schultz,

26   Cindi Walcott, and others, November 7-14, 2005, attached as Exhibit 73, BPVE-01-

27   01510714-16, at 14.

28

78.     The reported perforation rate for the G2 filter in November 2005 was approximately ten times that of the SNF.  Bard internal spreadsheet of Filter Sales and MAUDE data through November 7, 2005/Q3 2005, attached as Exhibit 74, BPVE-01-01510717 (showing "Caval Perforation" rates of .1336% for G2 and .0090% for SNF).

79.     Bard was also aware by late 2005 that the G2 did not have increased migration resistance over the Recovery or the SNF and in fact appeared to have increased rates of caudal migration than both the Recovery and SNF, despite Bard's representations to the contrary.  Ex. 62, BPV-17-01-00001134-153, at 146, 151 (initial product performance specifications for migration resistance for G2 not equivalent to SNF); Ex. 34, Wong Dep., at 146:13-23, 147:21-148:4 (Recovery and SNF were both more resistant to caudal migration than the G2 Filter); Meridian Vena Cava Filter and Jugular Delivery System Product Performance, attached as Exhibit 75, BPV-17-01-00148748-49, at 48 (Bard notes in internal performance specifications for Meridian filter that its G2 line of filters "have been shown to have undesirable caudal migration resistance"); Ex. 7, Brauer 2017 Dep. at 249:19-250:6 (Based on internal Bard documents, in the first three to six months that the G2 was on the market it showed stability problems that were not an improvement over the SNF).

80.     David Ciavarella, M.D., Bard's medical and clinical affairs director, stated in a December 23, 2005, email, "The G2 is a permanent filter, we also have one (the SNF) that has virtually no complaints associated with it.  Why shouldn't doctors be using that one rather than the G2?"  Email chain between David Ciavarella, Cindi Walcott, and others, December 20-27, 2015, attached as Exhibit 76, at BPVE-01-00028224.

81.     Bard knew from reports by mid-2006 that the G2 had a problem with caudal migration and tilt that it didn't expect when they launched the G2, and these were caused by design problems with the G2 that needed to be fixed before it launched the EVEREST study of its IVC filters.  Ex. 7, Brauer 2017 Dep. at 242:16-243:15; 257:9-258:19.

82.     By February 15, 2006, a Bard Health Hazard Evaluation characterized the "Severity" of the migration problems with the G2 as "Critical" and stated that "the cases

reported in the literature have not been as frequently associated with significant caudal movement (such as down to the iliac veins) or filter tilting and malpositioning as have been reported for the G2 filter" and that a "high percentage of caudal migrations accompanied by significant filter tilting and limb displacement."  Health Hazard Evaluation, Feb. 15, 2006, BPVEFILTER-01-00008355-57, at 55, 57, attached as Exhibit 77.

83.     The G2 failed to perform as well as the SNF and Recovery filters on Bard's caudal migration push test, Project 8049.  The September 19, 2006, report from that testing stated that the SNF was statistically superior to the G2 and Recovery in migration resistance.  Caudal Migration Test Method Development and G2 Filter Resistance Test Report, attached as Exhibit 78, BPVE-01-007895432-55.

84.     On November 30, 2008, a Modified Recovery (G2) filter investigation under a heading "What is G2 Trend Relative to RNF?" contained the following data demonstrating the G2 was inferior to the Recovery as to caudal migration, tilt and perforation:

## What is G2 trend relative to RNF?

|  | G2 | RNF* | Comments |
|---|---|---|---|
| Caudal Migration | 14% | 3% | G2 more caudal than RNF |
| Cephalad Migration | 4% | 4% | Same |
| Tilt | 39% | 16% | G2 more tilt than RNF |
| Perforation | 36% | 9% | G2 more perforation than RNF |

18

* RNF Data is through 7/31/06 which is the majority of RNF Complaint data (n=114/150) due to last major analysis

G2 and G2 X Fracture Analysis, November 30, 2008, attached as Exhibit 79, BPVE-01-01239757-775, at 774.

85.     Caudal migration is a serious complication with an IVC filter that can be associated with serious adverse events and consequences.  Ex. 7, Brauer 2017 Dep. at 240:4-22.

86.     By April 2006, Bard was aware that caudal anchors had been added to the Greenfield IVC filter to deal with caudal migration.  Memo from Natalie Wong re G2 Pre-Product Assessment Team Minutes-Caudal Migration, April 28, 2006, attached as Exhibit 80, BPVE-01-00717924-25, at 24 (discussing that Greenfield filter was redesigned by flipping two hooks to prevent caudal migration after problems with caudal migration emerged during the Greenfield clinical trial).

87.     By March 2, 2006, Bard determined that the G2 filter propensity for caudal migration represented an "unacceptable risk" of serious injury and death.  G2 Caudal Migration report, March 2, 2006, attached as Exhibit 81, BPVE-01-00720835. Nonetheless, Bard took no "preventative action" to warn physicians or patients about the "unacceptable risk."  Wong Dep. at 155:10-25; 156:10-12; 179:4-7; 181:18-22.

88.     Bard did not share with the FDA pertinent safety testing data concerning migration resistance for its IVC filters and upon discovery that this information was not shared with the FDA, Bard contacted its legal counsel instead of the FDA. Memo from Brian Barry to John Weiland re Competitive Filter Data, May 2, 2005, attached as Exhibit 82, BPV-01-00098737.

89.     Bard's own internal complaint tracking data indicates that from market release through July 2010, the G2 Filter had a reported migration failure rate of 0.121% (1.21 out of every 1000) of all devices sold and a reported perforation failure rate of 0.132% (1.3 out of every 1000), which applying the "consensus" of 95-99% of similar events not reported, the actual rates could have been as high as 121 out of every 1000 (12.1%) and 130 out of 1000  (13%), respectively.  This figure was approximately fifteen times greater than the average for all competitor devices of .008% (or .8% if applying the consensus non-reported events rate) for migrations and .013% (1.3%) for perforations. Bard IVC filter model sales and complications comparison spreadsheet, attached as

Exhibit 83, BPVEFILTER-01-00050487-88; Ex. 113, Ciavarella Dep, at 130:14-131:23

("general consensus" that only 1-5% of adverse events are voluntarily reported).

90.    Bard's EVEREST clinical trial revealed that 15 of 85 Patients (18%) experienced filter tilt > 15 degrees, and that there was highly statistically significant relationship between filter tilt and filter migration (p < 0.001).  Binkert, et al., Technical Success and Safety of Retrieval of the G2 Filter in a Prospective, Multicenter Study, J. Vasc. Interv. Radiol. 2009, attached as Exhibit 85, at 1452.

91.    Dr. Kris Kandarpa, the Medical Monitor of the EVEREST trial, expressed his concern about the approximately 20% of reported tilts and "thought that Bard should consider a redesign based on this information."  He wanted to know if those conducting the study were concerned that "almost 50% of patients have a reported AE/SAE" (adverse or serious adverse event).  Medical Monitoring Adjudication Meeting Minutes, August 28, 2006, attached as Exhibit 86, BBA-00012802-821, at 803.  Dr. Brauer agreed Bard should have taken "certain follow-up actions" in response to Dr. Kandarpa's concerns.  Ex. 7, Brauer 2017 Dep. at 274:18-275:4.

92.    The October 26, 2006 Medical Monitoring Adjudication Meeting Minutes states, "Dr. Kandarpa noted that approximately 30% of the patients in this trial had a device observation," and also "expressed concern over the number of device observations but noted that it was not in his charter to determine study stopping."  Dr. Kandarpa also noted that "half the technical observations are tilts."  Medical Monitoring Adjudication Meeting Minutes, October 26, 2006, attached as Exhibit 87, BBA-00013699-715, at 700.

93.    A May 28, 2008, Bard PowerPoint presentation reviewing its IVC filter product line included a Strengths-Weaknesses-Opportunities-Threats (SWOT) analysis which identified among Bard's "Weaknesses" as to IVC filters: (1) "Lack of thorough understand dynamics of caval anatomy impacting test results," (2) "We have historical reactive/evolution design mindset," (3) "Product complications – forcing focus on reactive designing??"  Bard Peripheral Vascular Filter Franchise Review, May 6, 2008, attached as Exhibit 88, BPVE-01-00622862-900, at 67. Dr. Ciavarella agreed that Bard did not "have

22

1    any good models or understanding of what happens to the cava." Ex. 84, Ciavarella Dep.

2    at 374:1-14; *see also* Ex. 21, DeCant Dep. at 70:22-71:17 (Bard continued to learn about

3    the vena cava after its IVC filters were on the market).

4         94.    By June 2008, Bard had identified the need to make material improvements

5    to the G2 filter to reduce migration, tilt, fracture, and perforation.  Bard PowerPoint

6    Presentation, attached as Exhibit 89, Ex. 534 to Chris Ganser Deposition (Oct. 11, 2016),

7    at 3-13; G2 Platinum presentation, June 2008, attached as Exhibit 90, BPVE-01-

8    00624026, at 33.  At the time, Bard tied caudal migrations to causing tilt, perforation, and

9    fractures.  Ex. 85 at 8, 12; Ex. 86, at 41.

10        **D.    The G2X Filter.**

11        95.    On March 10, 2008, Bard submitted a special 510(k) application (K080668)

12   seeking to modify its G2 filter (which was the predicate device) and seeking clearance for

13   what would be known as the G2 Express. G2 EXPRESS™ Filter System – Femoral and

14   Jugular/Subclavian Delivery Kits 510(k) Summary, *available at*

15   https://www.fda.gov/cdrh/510k/K080668.pdf  (last accessed Oct. 2, 2017).

16        96.    The only modification to the G2X from the G2 was the addition of a snare

17   hook to improve retrievability of the filter; the G2 and G2X filters are the same filter.

18   Deposition of Patrick McDonald, July 29, 2016, attached as Exhibit 91, at 103:23-104:1;

19   Ex. 34, Wong Dep. at 182:18 – 182:7; Email chain between Brian Hudson, Kevin Bovee,

20   and Chad Modra, June 28, 2011, attached as Exhibit 92, BPVEFILTER-01-00037661-62.

21        97.    By November 30, 2008, Bard had further test results and information that

22   the G2 and G2X filter had significantly higher rates of caudal migration, tilt, and

23   perforation than even the Recovery.  Ex. 79, BPVE-01-01239757, at 74.

24        98.    A 2009 study demonstrated that after 180 days, the Bard IVC filters began

25   to fracture.  F.C. Lynch & S. Kekulawela, *Removal of the G2 Filter: Differences between*

26   *Implantation Times Greater than and Less than 180 Days*, 20 J. Vasc. Interv. Radiol.

27   1200 (2009), attached as Exhibit 93. Subsequently, in 2010, another study demonstrated

28   that Bard's filters had an increasing fracture rate over time and an expected fracture rate

of approximately 25 percent at 50 months.  W. Nicholson et al., *Prevalence of Fracture and Fragment Embolization of Bard Retrievable Vena Cava Filters and Clinical Implications Including Cardiac Perforation and Tamponade*, 170 Arch. Intern. Med. 1827 (2010), attached as Exhibit 94.

99.     Bard knew that fracture, tilt, and perforation were caused by migration, including caudal migration. Ex. 85, at 8, 12; Bard Idea POA Eclipse Anchor Filter, attached as Exhibit 95, BPVE-01-02077858, at 58 ("This improvement in caudal migration resistance should reduce subsequent tilt, fracture, and penetration.").  Bard knew the G2 and G2X filters had increased rates of caudal migration as compared to the Recovery. Ex. 95, at BPVE-01-02077858.  Bard was aware that the physician perception was that "design sacrifices" were made for its optional filters that led to higher rate of movement or migration, which Bard knew led to an increased risk of fracture. *Id.*

**E.     The Eclipse Filter.**

100.     Bard's next generation filter, the Eclipse, was cleared for sale in the United States on January 14, 2010.  Deposition of Daniel Orms, Aug. 16, 2016, attached as Exhibit 96, at 134:4-134:17.

101.     The Eclipse was predicated on the G2 and G2X, and was represented as an improvement over the G2X filter. *Id.* at 135:19-22; *see also* Ex. 84, Sullivan Dep. at 531:4-8, 533:18-22; Deposition of Christopher Smith, Aug. 3, 2017, attached as Exhibit 97, at 144:16-20; Deposition of Michael Randall, Feb. 2, 2017, attached as Exhibit 98, at 267:11-14.

102.     The Eclipse name change was merely to "break with the baggage associated with the previous versions [Recovery and G2]."  Email from Filter Marketing to Bill Little, Apr. 27, 2010, attached as Exhibit 99, at BPVE-01-00580608.  But, the Eclipse "was the same as G2X in every way but one." *Id.*  That one difference – electropolishing – was to be "consistent with emerging industry standards."  Vail Vena Cava Filter Concept POA, Oct. 14, 2009, attached as Exhibit 101, BPV-17-01-00145692-99, at 95.

24

103.    The Eclipse was marketed at a time when Bard understood that its venture into the retrievable filter space has been a public health disaster and that Bard needed to completely redesign its filter.  Ex. 85, at 13-16.

104.    By August 2010, Bard had identified 172 fractures in G2, G2X, and Eclipse filters.  Filter Fracture Analysis, August 2010, BPV-17-01-00170378-85, at 79, attached as Exhibit 100.  Of those, 60% were discovered at retrieval – meaning most fractures continued not to be discovered without doctor invention.  *Id.*  It also knew that both the number of fractures and rate of fractures had increased since the full market release of the G2.  *Id.* at 81.

105.    Instead of pulling out of the retrievable filter market while it fixed its filters' known design flaws, Bard created the Eclipse (originally named "Vail") as a re-branding.  Ex. 100, BPV-17-01-00145692-99, at 98 ("We will take advantage of the opportunity to rebrand the filter with this launch. We will promote it with a new name, new packaging, and new product codes.").

106.    During this same time period, Bard was also actively engaged in development of its Denali filter.  Deposition of Brett Baird, June 9, 2016, attached as Exhibit 102, at 262:12-20.

107.    Nevertheless, Bard promoted the Eclipse to its sales personnel as more resistant to fracture and as having enhancements to a number of complications seen in prior iterations, which doctors were interested in.  Ex. 97, Smith Dep. at 141:18-24, 126:6-18, 130:6-20, 156:5-156:25, 184:9-21.

108.    However, Abithal Raji-Kubba, Bard's Vice President of Research and Development, confirmed that there was no evidence that the Eclipse improved resistance to fracture, migration or corrosion.  Deposition of Abithal Raji-Kubba, dated July 18, 2016, attached as Exhibit 103, at 167:18-168:2.

109.    The Eclipse Product Performance Specification 3.1.7 addressed the "User Need" that the "filter does not migrate" but included no performance standard or testing relating to caudal migration resistance. Design History File Index,

1  Exhibit 104, BPV-17-01-00108342 at 473; First Supplemental Expert Report of

2  David A. Kessler, M.D. (Mar. 3, 2017), attached as Exhibit 105, at 2.

3  110.   In addition, Bard continued to apply the migration resistance standard of

4  50 mmHg in a simulated IVC diameter of 28 mm, which was inadequate and not

5  comparable to the SNF.  Ex. 106, Design History File Index for the Eclipse, BPV-17-01-

6  00108342, at 473; Exhibit 105, Kessler First Supp Report at 2.

7  111.   Bard represented the Eclipse Filter as designed to be a permanent implant.

8  Ex. 97, Smith Dep. at 155:6-156:4; Eclipse Patient Questions & Answers Brochure,

9  attached as Exhibit 107, BPVEFILTER-01-00001631-32, at 32.

10  112.   An Eclipse patient brochure stated, "The Eclipse Filter does not have a time

11  limit in which it must be removed.  Your physician can determine at which time it may be

12  appropriate to have your Filter removed."  Ex. 97, Smith Dep. at 158:1-159:5.

13  **F.   Problems and Failures with all of Bard's Retrievable IVC Filters.**

14  113.   As part of its response to a deficiency letter Bard received from the FDA on

15  May 13, 2015, Bard stated that "the first SNF 510(k) was cleared on April 20th 1990

16  (K894703) and has been on the US market for 24 years as a permanent Inferior Vena

17  Cava (IVC) filter option.  Throughout its over two decades of clinical use, no evidence

18  has been found to support a link between SNF permanent filter implantation and the

19  serious health consequences that have been an expressed concern from FDA regarding

20  removable IVC filters . . ." SNF Postmarket Surveillance Study Amendment: 522

21  Response, 2015, BPVEFILTER-01-00356101, attached as Exhibit 108, at 106.

22  114.   Bard's June 2011 internal analysis demonstrated that the Recovery filter

23  fractured 55 times more often than the SNF; the G2 fractured more than 12 times as often

24  as the SNF, the G2X fractured 10 times as often as the SNF, and the Eclipse, even after

25  only a little over a year on the market, fractured over three and a half times as often as the

26  SNF.  Ex. 5, BPVEFILTER-01-00037664.

27

28

115.    Chris Ganser was Vice President of Regulatory Sciences and Corporate Head (Vice President) of Quality Assurance, Regulatory Affairs and Medical Affairs testified as summarized below:

a.      Bard knew and should have communicated to physician and patients statistically significant findings that Bard's Recovery filters revealed increased risks and complications compared to the predicate device. Deposition of Christopher Ganser, Oct. 11, 2016, attached as Exhibit 109, at 68:9-69:10; 263:17-264:7.

b.      Bard knew and should have communicated to physician and patients that tilting was a condition that could put a patient at an increased risk of perforations, migrations, fracture, and could adversely affect the device's ability to work for its intended purpose of stopping pulmonary embolisms.  *Id.* at 71:5-72:9; 82:2-5.

c.      Bard knew and should have communicated to physician and patients that tilting could lead to further movement of its filters that results in embedment making it irretrievable via a percutaneous approach.  *Id.* at 72:22-75:4; 76:6-21; 78:11-79:3.

d.      Bard knew but did not communicate to patients that an inability to retrieve a filter percutaneously may necessitate an open procedure. *Id.* at 78:11-18.

e.      Bard knew, but did not, communicate to physician and patients to evaluate devices over time to make sure they stay centered.  *Id.* at 71:5-72:9.

f.      Bard knew physicians and patients did not have access to Bard's Bench testing of Bard filters and also knew that physicians and patients were unable to do their own risk benefit analysis.  *Id.* at 128:2-15.

27

g.      Bard knew, but did not, communicate to physicians and patients its internal analysis concluding G2 products were experiencing undesirable risk of caudal migration.  *Id.* at 292:18-294:9.

h.      Bard knew, but did not, communicate to physicians and patients and the IFU did not say that the Recovery filter design did not have the ability to carry out its intended function of preventing pulmonary embolisms.  *Id.* 268:4-269:6.

i.      Bard knew, but did not, communicate to physicians and patients statistically significant findings of fatalities, the fact that Bard was redesigning and had determined that Recovery was not performing as Bard expected and intended it to perform.  *Id.* at 260:14-261:4.

j.      Bard knew, but did not, communicate to physicians and patients that the G2 filter had an undesirable risk profile based on Dr. Ciavarella's February 2006 Health Hazard Evaluation and needed to be redesigned to address issues.  *Id.* at 292:18-294:9.

k.      Bard knew that the G2 needed to be redesigned to deal with migration, tilt, and penetration to deal with risks and complications identified in the February, 2006 HHE.  *Id.* at 300:5-301:21.

116.    Clement Grassi, MD is a Bard expert who has been involved in developing practice parameter guidelines for the Society of Interventional Radiology (SIR) and the American College of Radiology (ACR).  Dr. Grassi testified:

a.      SIR and ACR consensus statement regarding informed consent for procedures that include IVCFs, and he agrees with the concept that informed consent would require taking into consideration what "a reasonable patient would want to know in the same or similar circumstances.  Deposition of Clement Grassi, M.D, dated July 30, 2014, attached as Exhibit 110, at 232:14-19.

28

b.     The risks and expected benefits of the procedure and the alternatives have to meet not only the perceptions of a physician, but what a reasonable patient would want to know in the same or similar circumstances. *Id.* at 238:2-239:2.

c.     Dr. Grassi agreed that manufacturers should not make decisions about what reasonable patients should know or not know or what reasonable physicians show know or not know regarding risk/benefit decisions. *Id.* at 239:3-17.

d.     Findings that Bard filters experienced complications, including death, migration, perforation, and fracture that were higher than other filters on the market is information that a reasonable patient might want to know. *Id.* at 325:15-326:6.

117.     Natalie Wong, Bard Quality Engineering Manager, testified that the Recovery filter had statistically significant higher rates of filter migration, IVC perforation, and filter facture compared to competitor filters and its own filter.  It should have been important for physicians to have this information.  Ex. 34, Wong Dep. at 17:9-15, 84:21-87:25.

118.     Ms. Wong also testified that Bard did not have an internal system regarding the number of filter fractures during a single month. *Id.* at 17:9-15, 138:15-22.

119.     According to Ms. Wong, physicians and patients were not informed of Bard's internal risk analysis that concluded G2 posed an unacceptable risk of caudal migration. *Id.* at 151:19-155:14; 180:17-181:22.

120.     Ms. Wong confirmed that the G2 and G2X are the same filter design with the exception of a snare hook removal that was added to the G2X.  There were no changes to the filter portion itself. *Id.* at 182:18-183:7.

121.     John McDermott, President of Bard Peripheral Vascular from 1999 to 2008, testified that doctors would want to know information and data, including adverse events of Bard's devices compared to other devices from the perspective of safety and efficacy.

29

He also testified that doctors would want to know the information Bard had about other doctor's experiences with filters.  Mr. McDermott agreed that this data and information are important to doctor's decision making.  Ex. 2, McDermott Dep. at 142:18-144:1; 152:16-154:4; 166:9-168:18; 288:13-289:7; 290:15-291:18.

122.   Mr. McDermott testified that a multi-disciplinary panel of physicians in June 2004 advised him and other managerial members of Bard that "migration should not be different for retrievable filters than for permanent filters;" that a retrievable filter is expected to perform just as well as a permanent filter; and for "prophylactic filter placement, migration of the heart should virtually never happen."  *Id.* at 190:11-195:13; 196:12-197:16; G3 Vena Cava Filter Design Input Summary Report, BPVE-01-0061776, attached as Exhibit 111.

123.   Mr. McDermott agreed that medical device companies have an obligation to provide all relevant information necessary to doctors to make product choices.  He also agreed that the company has an obligation to educate and inform doctors with information about complications and trending of adverse events.  Ex. 2, McDermott Dep. at 228:17-229:8; 349:17-21.

124.   Bard possessed information that the Recovery and G2 filters had a considerably higher rate of fractures than the SNF.  *Id.* at 284:2-286:18; Ex. 92 at BPVEFILTER-01-00037661.

125.   Mr. McDermott monitored the increasing rates of complications of Recovery and G2 on a monthly basis and he acknowledged what he was seeing was underreported and that the numbers of adverse events—including deaths, migrations and fractures—kept going "up and up and up" month after month.  Ex. 2, McDermott Dep. at 306:14-308:10.

126.   Bard's regulatory and industry standard expert, Dr. Brauer agreed if a device as cleared and designed does not meet its performance requirements or acceptance criterion for caudal migration the company should stop selling it.  Ex. 7, 2017 Brauer Dep. at 386:10-19.

127.    Dr. Brauer also agreed "[i]t is important for medical device manufacture to understand healthcare professionals' expectations for performance of a product."  Ex. 7, 2017 Brauer Dep. at 334:4-14.

128.    Bard's retrospective analysis of fractures in its G2, G2X, and Eclipse filter groups shows that both the number of fractures and the cumulative fracture rate increased consistently over time.  Filter Fracture Analysis, May 2016, attached as Exhibit 112, BPVEFILTER-01-00303182-89, at 82-86.

### G.    The Sir Quality Improvement Guidelines do not Establish a Safety Standard.

129.    The SIR Quality Improvement Guidelines predate all of Bard's optional filters, including among others the Recovery, G2 and G2X.  Ex. 110, Grassi Dep. at 69:23-70:10; Deposition of David Ciavarella, dated November 12, 2013, attached as Exhibit 113, at 220:16-221:15.

130.    Bard's former medical director from 2004-2008, David Ciavarella testified that the SIR Quality Improvement Guidelines did not create safety thresholds for the filters.  Ex. 113, Ciavarella Dep. at 220:16-221:15.

### H.    Bard Kept its Sales Staff in the Dark About the Problems with its Retrievable IVC Filters.

131.    Robert Cortelezzi was a Bard regional sales manager from 2004 to 2008. Deposition of Robert Cortelezzi, Nov. 11, 2016, attached as Exhibit 114, at 15:21-16:24.

132.    As a regional sales manager, Mr. Cortelezzi was not privy to each and every event reported to or collected by Bard that concerned filter perforation, migration, tilt or fracture. *Id.* at 276:2-272:2.

133.    Mr. Cortelezzi expected and relied that Bard would thoroughly, accurately and completely test each and every product for any known or potential complication before it was launched and went into the market launched. *Id.* at 289:15-290:4.

134.    Bard represented the G2 Filter as a filter that would remain centered and less likely to tilt and migrate and was improved compared to other filters, including the Recovery Filter. *Id.* at 306:1-307:7.

31

135.    Mr. Cortelezzi expected that Bard would thoroughly evaluate the safety of its products before launching them into the market and failure to do so would be contrary to his reasonable expectations as a regional manager.  *Id.* at 308:13-23.

136.    Mr. Cortelezzi never received a Health Hazard Evaluation or document that compiled all complications or adverse events.  *Id.* at 320:22-324:5.

137.    The Bard sales force was not armed with a Health Hazard Evaluation to provide doctors information when promoting Bard products.  *Id.* at 323:15-324:5.

138.    Mr. Cortelezzi was not aware of specific events in which "[s]erious injury or potential serious injury was seen in nine cases where fragments migrated to the heart or lung." *Id.* at 324:6-327:7; *see also* Health Hazard Evaluation, dated Nov. 17, 2004, BPV-17-01-00103875, attached as Exhibit 115.

139.    Referring to an e-mail from Janet Hudnall to Shari Allen, dated January 19, 2005, reporting deaths in bariatric patients associated with Recovery Filter migration, Mr. Cortelezzi did not receive the information and did not arm his sales force with the information.  Ex. 114, Cortelezzi Dep. 327:9-331:22.

140.    Daniel Orms was a Bard regional sales manager from 2008 to 2012.  Ex. 96, Orms Dep. at 14:8-23.

141.    Mr. Orms testified that information in Bard's possession about Recovery Filter events which caused injury or potential injury would have been helpful in discussions with doctors.  *Id.* at 173:14-174:24.

142.    Mr. Orms testified it would have been reasonable for him and his sales people to be advised by Bard about tracking of events.  However, the practice of communicating Bard tracking events to sales did not occur.  Ex. 96, Orms Dep. at 175:1-10.

143.    Regional sales manager Jack Sullivan testified that he expected Bard to share all information that was relevant to Filter safety with the sales force.  Ex. 84, Sullivan Dep. at 468:18-469:3.

1      144.    Mr. Sullivan expected Bard to communicate any information relevant to

2  safety or the lack thereof so that he and his sales force could communicate the information

3  to physicians.  *Id.* at 469:4-15.

4      145.    Tim Fischer was employed by Bard between 2000 to 2006.  He was a

5  territory manager then field sales manager.  Deposition of Tim Fischer, Mar. 29, 2017,

6  attached as Exhibit 116, at 7:16-24.

7      146.    As a former sales representative, Timothy Fischer was never provided by

8  Bard information regarding numbers of events concerning the Recovery Filter.  *Id.* at

9  281:13-283:1.

10      147.    Mr. Fischer testified that once Bard tracked event information, if Bard

11  thought it was important, he would have wanted to have it to present to physicians.  *Id.* at

12  282:4-283:3.

13      148.    Bard did not provide tracked Filter events to Mr. Fischer.  *Id.* at 283:3.

14      149.    Defense medical expert Mark Moritz testified in reviewing reports of

15  plaintiffs' experts he saw references to Bard internal documents which spoke to serious

16  injuries and even death caused by failure modes of Bard filters.  This is information a

17  medical doctor would want to know from a medical device company when making

18  decisions about which types of devices to use for patients.  Deposition of Mark Moritz,

19  M.D., dated July 18, 2017, attached as Exhibit 117, at 85:12-86:3.

20  **II.**     **FACTS RELATED TO *HYDE V. BARD***

21      150.    A Bard G2X IVC filter was implanted in Plaintiff, Lisa Ann Hyde on

22  February 25, 2011 ████████████████████████████████████████████

23  ████████████       [Ex. H-A, Selected Plaintiff Medical Records at

24  HYDE_████_MDR00172; Ex. H-B, April 6, 2017 Deposition, ███████████

25  Deposition Transcript at 65:9-11.]

26      151.    Plaintiffs were █████████ residents at the time Ms. Hyde had her filter

27  implanted.  [Ex. H-D PFS at § I.5.]

28

33

1    152. ███████████████████████████████ IVC filter implantation. [Ex.

2    H-A, Selected Plaintiff Medical Records at HYDE_████_MDR00172.]

3    153. ██████████, M.D. was the ████████████ and testified that he believes

4    Ms. Hyde's filter was a G2X IVC filter. [Ex. H-B, ████ Deposition at 11:22-24.]

5    154. ███████████████████████████████████████

6    ██████████████████████████████████████. [Ex. H-A,

7    HYDEL_██████_RAD00009-10.]

8    155. ████████████████████████████████████████████

9    █████████████████████████████████████████████

10   ██████████████████. [Ex. H-A, HYDEL_██████_RAD00009-10;

11   HYDEL_SHC_MDR00019 to 20.]

12   156. ████████████████████████████████████████

13   ██████ [Ex. H-C, Lisa Hyde Deposition Transcript at 18:9-22; Ex. H-D, PFS at I.5.]

14   157. █████████████████████████████████████

15   ████████████████████████████████████████

16   ██████████████████████████████████████. [Ex. H-A,

17   HYDEL_██████_RAD00008.]

18   158. ████████████████████████████████████

19   ███████████████████████████████████████████

20   ████████████████████████████████████████

21   ██████ [Ex. H-A, HYDEL_████████_MDR00075-76.]

22   159. ████████████████████████████████████████████

23   ████. [Ex. H-A, HYDEL_██████_MDR0002-04.]

24   160. ██████████████████████████████████████

25   █████████████████████████████████████████

26   ██████████████████████████████████████████. [Ex. H-

27   A, HYDEL_██████_MDR0002-04.]

28

1    161. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ G2X filter ▮▮▮▮▮▮▮▮▮

2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. [Ex. H-D PFS at § II.10(a)-(c).]

3    162. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Bard G2X in his

4    records.  [Ex. H-E, Deposition of ▮▮▮▮▮▮▮▮ at 23:12-15, 48:21-24.]

5    163. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a Bard

6    G2X filter.  [Ex. H-A, HYDEL_▮▮▮_MDR00055.]

7    164. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  [Ex. H-B, ▮▮▮▮ Dep. Tr. at 46:1-25.]

10   165. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12   ▮▮▮▮  [Ex. H-B, ▮▮▮▮ Dep. Tr. at 56:17-18.]

13       166.    There is no design difference between the G2 and G2X filters. [Ex. H-F,

14   McMeeking Dep. Tr. at 37:9-39:8.]

15       167.    Bard failed to design the G2 and G2X filters in a way that reduces the risks

16   of tilting, perforation, migration and fracture by fatigue. [Ex. H-F, McMeeking Dep. Tr. at

17   23:14-23.]

18       168.    Bard could have redesigned the filter configuration to find a better

19   combination of phenomena that improved the behavior of the filter in terms of the risks

20   involved.  They could have developed caudal anchors and penetration limiters sooner than

21   they ultimately did.  [Ex. H-F, McMeeking Dep. Tr. at 32:14-33:8.]

22       169.    Anchors and limiters are a reasonable concept for how the tilt and migration

23   behavior of a filter can be limited.  [Ex. H-F, McMeeking Dep. Tr. at 129:24-130:1.]

24       170.    Bard should have considered other a different design of the G2/G2X that

25   included using a tubing material, arms with different diameters and dimensions, or a

26   different number of arms.  [Ex. H-F, McMeeking Dep. Tr. at 30:23-31:5; 34:13-23.]

27

28

171.     Bard did inadequate testing in assessing the performance of the design and consequences of the design of the G2 and G2X filters.  [Ex. H-F, McMeeking Dep. Tr. at 308:1-9.]

172.     It is the design of the G2 and G2X filters itself that causes the dangerous failures. [Ex. H-F, McMeeking Dep. Tr. at 23:12-15.]

173.     Bard's Director of Quality Assurance, Chris Ganser, said that there were design issues with the G2 filter that needed to be addressed.  [Ex. H-G, October 11, 2016 Deposition of Chris Ganser at 301:16-21.]

174.     The G2 and G2X subsequently tilted after placement.  [Ex. H-H, April 17, 2013 Deposition of Robert Carr at 94:11-19.]

175.     Bard tried to ultimately decide to include an anchor system so that the known causes for tilt would be reduced.  [Ex. H-H, Carr Dep. Tr. at 95:22-96:6.]

176.     SNF is more migration resistant due to the combination of the stiffness of its pedals and the stiffness of its legs as compared to the other Bard filters.  [Ex. H-F, McMeeking Dep. Tr. at: 203:9-22.]

177.     The SNF is a safer and better filter than the other Bard filters.  [Ex. H-F, McMeeking Dep. Tr. at 321:11-15; 221:20-24.]

178.     The G2 device was intended for permanent placement. [Ex. H-I, Patient Brochure for the G2 Filter System, BPV-17-01-00142912.]

179.     All of the G2 era filters are truly permanent filters.  [Ex. H-H, Carr Dep. Tr. at 32:18-23.]

180.     ███████ testified that he understood ████████████████████. [Ex. H-B, ████ Dep. Tr. at 72:23-73:1.]

181.     ████████ testified that he trusts the FDA more than medical device companies and that he is comfortable using any filter that is FDA approved. [Ex. H-B, ████ Dep. Tr. At 45:23-24 and 25:13-25.]

182.     ███████     also testified that in 2011, it was his understanding that all FDA-cleared IVC filters had the same performance and comparable risks of complications, such as migrations and fractures. [Ex. H-B, ███ Dep. Tr. At 27:25-28:10.]

183.     ███████     testified that he has read the Bard G2X instructions for use document. [Ex. H-B, ███ Dep. Tr. At 86:3-7.]

184.     ████████████████████████████████████████████████. [Ex. H-D, PFS at § II.15.]

185.     Bard's own expert, Dr. Donna Tillman, states that when you design a device and you have a risk, the best thing to do to mitigate that risk is to design around it. You have to design the device so that the risk goes away. If you can't do that, Tillman says that you must implement some kind of way to protect the user against the risk. And finally, if you can't accomplish that either, you must "label around it" and tell patients there is a risk here. Tillman feels that these are "standard design considerations." [Ex. H-J, Tillman Dep. Tr. at 193:6-194:20].

186.     Kay Fuller, a Bard Regulatory Affairs Specialist handling the Recovery 510(k) application, testified that a Truthfulness and Accuracy Statement must be signed when she would submit a 510(k) application to the FDA. This document says that to the best of the signatory's knowledge, the information in the 510(k) is truthful, accurate, and does not contain any material information omitted. [Ex. H-K, Kay Fuller Dep. Tr. 46:8-22].

187.     Ms. Fuller did not sign the Truthfulness and Accuracy statement because she was concerned that Bard would not be able to address the FDA's questions and she did not believe that the company understood the failure modes, specifically fatigue resistance, to the level that they were representing to the FDA. [Ex. H-K, Kay Fuller Dep. Tr. 125:6-25].

188.     Additionally, Ms. Fuller did not sign because she did not feel like Bard had adequately addressed the fracture failure mode and had not put in adequate corrective actions. [Ex. H-K, Kay Fuller Dep. Tr. 129:22-130:11].

189.   This was the first time in Ms. Fuller's career that she was not comfortable singing the Truthfulness and Accuracy statement in an application to the FDA. [Ex. H-K, Kay Fuller Dep. Tr. 131:24-132:8].

190.   Since Ms. Fuller would not sign the Truthfulness and Accuracy statement, Carol Vierling, without permission, signed Ms. Fuller's name for her. [Ex. H-K, Kay Fuller Dep. Tr. 276:7-277:11].

**III.   FACTS RELATED TO *MULKEY V. BARD***

191.   ████████████████ Ms. Mulkey ████████████ IVC filter. (Ex. M-D, Mulkey Dep. Tr. at 77:20-23; Ex. M-C, ████ Dep. Tr. at 71:12-18).

192.   ██████████ an IVC filter ██████████ placement in Ms. Mulkey ██████████. (Ex. M-B, Hurst Report at p. 4 ¶3(a)).

193.   Ms. Mulkey was implanted with a Bard Eclipse IVC filter ████████ ██. (Ex. M-B, Hurst Report at p. 4 ¶3(a)).

194.   ██████████████████████████████ ██████████████████ (Ex. M-D, Mulkey Dep. Tr. at 88:5-16).

195.   ██████████ Eclipse filter in Ms. Mulkey.  (Ex. M-C, ████ Dep. Tr. at 88:23-25).

196.   The Bard Eclipse filter was implanted ████ Ms. Mulkey by █. ██████ (Ex. M-B, Hurst Report at p. 5, ¶3(b)).

197.   ████████████████████ Eclipse Filter in Ms. Mulkey, ██ ██████ had seen the IFU for the Bard Eclipse filter, and it is his practice to review the IFU for new devices prior to implanting them in patients.  (Ex. M-C, ██████ Depo at 105:11-23).

198.   ████████ is familiar with the instructions for use for vena cava filters. (Ex. M-C, ██████ Dep. Tr. at 102:16-23).

199.   Bard sales representatives attended the placement of filters ████████ ██████████████████ provide him information if he had questions.  (Ex. M-C, ████ Dep. Tr. at 210:1-13; 105:15-18).

38

1    200. ███████████ does not remember ever being told by any Bard sales

2    representative that IVC filters ███████████████████. (Ex. M-C,

3    ██████ Dep. Tr. at 55:14-17).

4    201. ██████████ told Ms. Mulkey that her Eclipse filter ████████████

5    ███████████████████████████ (Ex. M-D, Mulkey Dep. Tr.

6    at 79:3-7).

7    202. ████████████████ Ms. Mulkey's Eclipse filter ██████████

8    ██████████ (Ex. M-D, Mulkey Dep. Tr. at 85:20-23).

9    203. It was Dr. ██████████████████████████

10   █████████████. (Ex. M-C, ██████ Dep. Tr. at

11   86:24 – 87:2).

12   204. Ms. Mulkey had the opportunity to ask ██████ questions about the

13   filter.  (Ex. M-D, Mulkey Dep. Tr. at 81:19-21).

14   205. Dr. ██████ testified that he did not consent ███████████

15   ███████████████████████████████

16   ███████████████ (Ex. M-C, ██████ Dep. Tr. at

17   80:22 – 86:2; 94:21 – 95:25).

18   206. ████████████████████████

19   ████████████ Eclipse IVC filter. (Ex. M-D, Mulkey Dep. Tr. at

20   182:4-8).

21   207. ██████████ agreed Ms. Mulkey███████████

22   ████████ Eclipse filter █████████████████. (Ex. M-C,

23   ███s Dep. Tr. at 85:9-16).

24   208. Ms. Mulkey████████████████████ Eclipse filter

25   ████████████. (Ex. M-D, Mulkey Dep. Tr. at 182:9-13).

26   209. Ms. Mulkey██████████████ Eclipse filter ████

27   ████████ (Ex. M-D, Mulkey Dep. Tr. at 182:14-16; Ex. M-C, ██████ Dep. Tr. at

28   83:20 to 84:4).

210.    Ms. Mulkey ███████████████████ Eclipse filter.  (Ex. M-D, Mulkey Dep. Tr. at 182:18-20).

211.    Ms. Mulkey ███████████████████ ████████. (Ex. M-D, Mulkey Dep. Tr. at 182:21-24).

212.    Ms. Mulkey ██████████████████████ (Ex. M-D, Mulkey Dep. Tr. at 182:25 to 183:3).

213.    Ms. Mulkey ███████████████████████ Eclipse filter ██████. (Ex. M-D, Mulkey Dep. Tr. at 183:4-7).

214.    Ms. Mulkey █████████ Eclipse filter ██████ (Ex. M-D, Mulkey Dep. Tr. at 183:8-10).

215.    ████████████ Ms. Mulkey ████████ Eclipse IVC filter ███████████████████████. (Ex. M-C, ████████ Dep. Tr. at 82:3-8; 84:5-10).

216.    █████████ ██████████ Ms. Mulkey that her Eclipse IVC filter ████████ ███████████████████████████████████. (Ex. M-C, ██████s Dep. Tr. at 84:11-15).

217.    ████████████ Ms. Mulkey ████████████ Eclipse filter ██████████████████ (Ex. M-C, ████████ Dep. Tr. at 84:17-23).

218.    ████████████ Ms. Mulkey ████████████ Eclipse ██████████████████ (Ex. M-C, ████████ Dep. Tr. at 84:24 to 85:3).

219.    ████████████ Ms. Mulkey ███████████████ █Eclipse filter ██████████████████. (Ex. M-C, ████████ Dep. Tr. at 82:9-25).

220.    ████████████████████ Ms. Mulkey ████████████ ██████ Eclipse filter.  (Ex. M-C, ████████ Dep. Tr. at 83: 3-5).

1      221.                              Ms. Mulkey

2  Eclipse IVC filter ████████████████████████ (Ex. M-C, ████ Dep.

3  Tr. at 83:6-19).

4      222.    If the IFU included pertinent warnings, that is something ██████

5  would pass on to his patients.  (Ex. M-C, ████████ Dep. Tr. at 106:7-10).

6      223.    The Eclipse IFU did not inform ██████████ of an increased risk of

7  movement, migration or tilt with Bard filters versus competitor filters.  (Ex. M-C,

8  ██████████ Dep. Tr. at 107:17-21).

9      224.    The Eclipse IFU did not inform ██████████ of an increased risk of

10  movement, migration or tilt with Bard optional filters versus Bard permanent filters.  (Ex.

11  M-C, ████████ Dep. Tr. at 107:22 to 108:2).

12      225.    The Eclipse IFU did not inform ██████████ that the Eclipse had a higher

13  risk of movement, migration or tilt than any other filter.  (Ex. M-C, ██████████ Dep. Tr. at

14  108:3-9).

15      226.    If the Eclipse had an increased risk of migration over other filters, that is

16  something that ██████████ would have wanted to know.  (Ex. M-C, ██████████ Dep. Tr.

17  at 108:10-15).

18      227.    If the Eclipse had an increased risk of migration over other filters, that is

19  something ██████████ would have wanted to know and something he would have taken

20  into account in his risk benefit analysis on whether to use the filter.  (Ex. M-C, ██████████

21  Dep. Tr. at 108:10-19).

22      228.    If the Eclipse had an increased risk of migration over other filters, that

23  would affect ██████████ prescribing habits and, if it was a significant difference, he

24  wouldn't use the filter.  (Ex. M-C, ████████ Dep. Tr. at 108:20 to 109:1).

25      229.    ██████████ expected Bard to notify him immediately if it was aware of

26  problems with the design of one of its filters that was causing complications and problems

27  for patients, or if it was in the process of redesigning its filter to reduce complications.

28  (Ex. M-C, ████████ Dep. Tr. at 125:2-14).  ██████████ wanted to know this

1  information because it would help him decide whether he even wanted to use the filter.

2  (Ex. M-C, ▮▮▮▮▮ Dep. Tr. at 125:2-18).

3         230.    There were risks and problems with Bard's filters that Bard did not tell ▮▮

4  ▮▮▮▮ about.  (Ex. M-C, ▮▮▮▮▮ Dep. Tr. at 216:3-8).

5         231.    ▮▮▮▮▮▮ also would have expected Bard to inform him of problems

6  with filters such as the Eclipse, and to provide him with accurate and thorough

7  information as it became aware of problems with its filters. (Ex. M-C, ▮▮▮▮ Dep. Tr.

8  at 57:6-11; 157:22-25).

9         232.    ▮▮▮▮▮▮ wanted to use the safest available IVC filter that would

10  accomplish the goal of stopping pulmonary embolisms.  (Ex. M-C, ▮▮▮▮ s Dep. Tr. at

11  109:2-6).

12         233.    ▮▮▮▮▮▮ testified, "I wouldn't use the filter if I was aware that deaths

13  were occurring concurrently with me placing these filters."  (Ex. M-C, ▮▮▮▮ Dep. Tr.

14  at 53:7-23).

15         234.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮ (Ex. M-C, ▮▮▮▮ s Dep. Tr. at 97:25 – 98:3).

17         235.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. M-C, ▮▮▮▮

19  Dep. Tr. at 98:17-25).

20         236.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21  ▮▮▮ (Ex. M-C, ▮▮▮▮▮ Dep. Tr. at 99:1-5).

22         237.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮. (Ex. M-C, ▮▮▮▮ Dep. Tr. at 101:3-8).

24         238.    ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮ (Ex. M-C, ▮▮▮▮ Dep. Tr. at 101:9-13).

26         239.    ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. M-C, ▮▮▮▮ Dep. Tr.

28  at 101:14-18).

42

240. Ms. Mulkey ███████████████████ or her Bard Vena Cava Filter System. (Ex. M-A, Detailed Bill for Debra Mulkey).

241. ████████████ ultimately sent Ms. Mulkey █████████████████. (Ex. M-C, ███████ Dep. Tr. at 112:1-3).

242. ██████████████, Ms. Mulkey ████████████████████ █████████████████████████ (Ex. M-D, Mulkey Dep. Tr. at 93:1-25).

243. Ms. Mulkey ██████████████████████████. (Ex. M-D, Mulkey Dep. Tr. at 94:20-24).

244. ████████████████████████ Ms. Mulkey █████████████ ████████████████████████████████. (Ex. M-I, █████ Dep. Tr. at 83:13-17).

245. According to █████████ medical records, Ms. Mulkey's Eclipse IVC filter █████████████████████████████████████████ ███████████████████████████ (Ex. M-H, Muehrcke Report at p. 7).

246. Ms. Mulkey did █████████████████████████ █████████████████████████████. (Ex. D, Mulkey Dep. Tr. at 142:8-17 and 143: 14-22; Ex. M-E, Plaintiff Fact Sheet of Plaintiff Debra Mulkey (hereinafter "PFS"), at Section II.13(b) on page 14).

247. Ms. Mulkey ███████████████████████████. (Ex. M-D, Mulkey Dep. Tr. at 98:4-6).

248. ████████████ ████████████████████████ filter. (Ex. M-D, Mulkey Dep. Tr. at 180:11-13).

249. ████████████████████████████████████ █████████████. (Ex. M-D, Mulkey Dep. Tr. at 113:12-20).

250. In fact, █████████████████ Ms. Mulkey that IVC filters ████████ ██████████████████████. (Ex. M-D, Mulkey Dep. Tr. at 137:14-25).

1    251. ████████████ did not ever tell Ms. Mulkey that her IVC filter was defective.

2    (Ex. M-C, ████ Dep. Tr. at 115:19-21).

3    252. ████████████ did not ever tell Ms. Mulkey that the manufacturer of the IVC

4    filter had injured her or caused her harm.  (Ex. M-C, ████ Dep. Tr. at 115:22-25).

5    253. ████████████ did not ever tell Ms. Mulkey that her IVC filter was unsafe.

6    (Ex. M-C, ████ Dep. Tr. at 116:1-3).

7    254. ██████████████████████████ Ms. Mulkey did

8    not believe she had been injured.  (Ex. M-D, Mulkey Dep. Tr. at 179:21 – 180:1).

9    255. ██████████████████████████ Ms. Mulkey did

10   not believe there was anything defective about her filter.  (Ex. M-D, Mulkey Dep. Tr. at

11   180:2-5).

12   256. ██████████████████████████ Ms. Mulkey did

13   not believe she had been wronged by the manufacturer of the IVC filter, Bard.  (Ex. M-D,

14   Mulkey Dep. Tr. at 180:5-10).

15   257. ████████████ Ms. Mulkey ████████████

16   ████████████ Bard IVC filter.  (Ex. M-D, Mulkey Dep. Tr. at

17   147:23-148:4).

18   258.████████ Ms. Mulkey ████████████████

19   ██████████████████████████████████████

20   ██████████████████████████████████

21   ████████████████████ IVC filters. (Ex. M-D, Mulkey Dep. Tr. at 185:3-14).

22   259.   In the fall of 2015, Ms. Mulkey saw an ad on TV about IVC filters.   (Ex.

23   M-D, Mulkey Dep. Tr. at 57:23 to 58:2).

24   260.   When Ms. Mulkey saw the Internet and television ads in October 2015, this

25   caused her to be concerned about her filter.  (Ex. M-D, Mulkey Dep. Tr. at 138:14-20).

26   261.   It was in late 2015 when Ms. Mulkey first realized that she may have been

27   wronged by Bard and may have a lawsuit.  (Ex. M-D, Mulkey Dep. Tr. at 180:21 –

28   181:2).

44

262.     When Ms. Mulkey saw the ad on TV in October 2015, that's when she realized that not being able to remove her IVC filter was the result of a defect in the IVC filter.  (Ex. M-D, Mulkey Dep. Tr. at 144:19-145:3).

263.     Due to the inadequate design of Ms. Mulkey's Bard Eclipse IVC filter, ██ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ (Ex. M-H, Muehrcke Report at p. 7; Ex. M-B, Hurst Report at pp. 5-7, 12).

## IV.     FACTS RELATED TO *JONES V. BARD*

### A.     Implantation Facts

264.     ████████████████, Doris Jones ███████████████████ ███████████████████████████████████ Jones Medical Records, attached as Exhibit J-A, at DORISJONES000004.

265.██████████████████████████████████████████████ ████████████████████████████ *Id.* at DORISJONES000021.

266.     ████████████████████████████████████████████ ████████████████. *Id.* at DORISJONES000002.

267.     ████████████████████████████████████████████ ████████████████████ *Id.* at DORISJONES000026.

268.     ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████. *Id.*

269.     ██████████████████████████████████████ ████████████████████████████████████████████. Transcript of Deposition of ████████████████ ("███████.), attached as Exhibit J-B, at 50:15-51:16.

270.     ████████████████████████████████████████. Jones Consent Form Dated ████████████, attached as Exhibit J-C, at JONESD████████████; ████ Dep, Exhibit J-B, at 55:14.

45

271. ██████████ implanted a Bard Eclipse IVC filter in Doris ██████████ Exhibit J- A at DORISJONES000026 - 000027; ██████ Dep, Exhibit J-B, at 59:2-11.

272. Doris Jones ████████████████████████████████ Eclipse IVC filter ████████████. Bard Peripheral Vascular's Supplemental Responses to Plaintiffs Doris and Alfred Jones's First Set of Requests for Admissions to Bard Peripheral Vascular, Inc., attached as Exhibit 116 hereto, at 8, supplemental response to RFA 13.

273. The Eclipse is a "retrievable" IVC filter, meaning that while the Eclipse can be removed if clinically necessary or appropriate; Bard promotes the filter as safe for permanent implantation. Eclipse Vena Cava Filter, Femoral Vein Approach, Instructions for Use ("Eclipse IFU"), attached as Exhibit 117, at BPV-17-01-00142881; *see also* Exhibit D at 5, supplemental response to RFA 7.

274. ████████████████████ ████ ████████████████████ ███████████████████████████. ██████ Dep, Exhibit J-B, at 54:3-13.

275. At the time, Bard's SNF was available on the market for implantation as a permanent IVC filter.

B.  ██████████████████████ **Was Familiar with Bard's IVC Filter** W ███████████████████ ones's Eclipse IVC Filter.

276. ██████████ did not recall reading the Eclipse IFU, but he had read IFUs for IVC filters:

> Q.  And do you read the IFU?
> A.  Sometimes.  I mean, I have read them.  I don't -- certainly don't read them on every package, because they're the same from the same device, but -- you know, not -- not all the time, but it does come up, for example, at meetings, or you're reading about and someone's discussing an issue with an IFU.  You know, if something is within the IFU or not, to help define things that might be outside of the IFU but still medically indicated.
> Q.  Do you know if you ever read the IFU for the Eclipse IVC filter?
> A.  Not that I recall.
> Q.  Okay.  And IFUs have warnings on them of side effects, complications, things like that, also?
> A.  Yes.

46

Q.   And even if you haven't read the Eclipse IFU, you're probably generally familiar with IVC filter IFUs, if they warn of things like fractures, migration, perforation, tilt; complications like that.  Right?

A.   Yes.  Yes.

█████ Dep, Exhibit J-B, at 47:11-48:7.

277.   █████ and his practice have "predominantly" used the Bard IVC filters. *Id.* at 33:21-34:6.

278.   Significantly, the Eclipse IFU warnings are the same as those in the G2 and G2X.  As between the Eclipse IFU and the G2X IFU, with two exceptions,[1] the only difference between the two documents is the use of the terms "Eclipse" in one and "G2X" in the other.  See Exhibit J-E; G2X Vena Cava Filter, Femoral Vein Approach, Instructions for Use ("G2X IFU"), attached as Exhibit J-G.

279.   Under the heading "Warnings," both the G2X IFU and Eclipse IFU state:

11.  Filter fractures are a known complication of vena cava filters. There have been some reports of serious pulmonary and cardiac complications with vena cava filters requiring the retrieval of the fragment utilizing endovascular and/or surgical techniques.

12.  Movement, migration or tilt of the filter are known complications of vena cava filters.  Migration of filters to the heart or lungs has been reported.  There have also been reports of caudal migration of the filter. Migration may be caused by placement in IVCs with diameters exceeding the appropriate labeled dimensions specified in this IFU.  Migration may also be caused by improper deployment, deployment into clots and/or dislodgement due to large clot burdens.

…

See Potential Complications section for further information regarding other known filter complications.

Exhibit J-E at BPV-17-01-00142881; Exhibit J-G at BPV-17-01-00137404.

280.   The G2 IFU states under "Warnings":

8.  Filter fractures are a known complication of vena cava filters. There have been some reports of serious pulmonary and cardiac complications with vena cava filters requiring the retrieval of the fragment utilizing endovascular and/or surgical techniques.

9.  Movement, migration or tilt of the filter are known complications of vena cava filters.  Migration of filters to the heart or lungs has been

---

[1] The two other differences are: (1) the G2X IFU names one section as "MRI Safety" whereas the Eclipse IFU names the section "MRI Information"; and (2) In the section "Directions for Use," the two IFUs use different terminology in step 14 (which is utterly unrelated to warnings and complications).  See Exhibit J-G at BPV-17-01-00137403, 00137406; Exhibit J-E at BPV-17-01-00142880, 00142883.

47

1    reported.  There have also been reports of caudal migration of the filter.
     Migration may be caused by placement in IVCs with diameters exceeding
2    the appropriate labeled dimensions specified in this IFU.  Migration may
     also be caused by improper deployment, deployment into clots and/or
3    dislodgement due to large clot burdens.
     …
4    See Potential Complications section for further information regarding other
     known filter complications.
5
     G2 Filter System, Femoral Vein Approach, Instructions for Use, ("G2 IFU"), attached as
6
     Exhibit J-H, at BPV-17-01-00118398.
7
8           281.    Under the heading "Potential Complications," the G2 IFU, G2X IFU, and
9    Eclipse IFU all state:
10          •       Movement, migration or tilt of the filter are known complications of
     vena cava filters.  Migration of filters to the heart or lungs has been
11   reported.  There have also been reports of caudal migration of the filter.
     Migration may be caused by placement in IVCs with diameters exceeding
12   the appropriate labeled dimensions specified in this IFU.  Migration may
     also be caused by improper deployment, deployment into clots and/or
13   dislodgement due to large clot burdens.
14          •       Filter fractures are a known complication of vena cava filters.  There
     have been some reports of serious pulmonary and cardiac complications
15   with vena cava filters requiring the retrieval of the fragment utilizing
     endovascular and/or surgical techniques.
16          …
17   All of the above complications may be associated with serious adverse
     events such as medical intervention and/or death.  There have been reports
18   of complications, including death, associated with the use of vena cava
     filters in morbidly obese patients.  The risk/benefit ratio of any of these
19   complications should be weighed against the inherent risk/benefit ratio for a
     patient who is at risk of pulmonary embolism without intervention.
20
     Exhibit J-E at BPV-17-01-00142882; Exhibit J-G at BPV-17-01-00137405; Exhibit J-H at
21
     BPV-17-01-00118399.
22
23          282.    Under the heading "Clinical Experience," the G2 IFU, G2X IFU, and
24   Eclipse IFU all reference and contain identical information regarding a clinical study
25   involving 100 patients to assess the safety of removal of the G2 Filter.  Exhibit J-H at
26   BPV-17-01-00118400; Exhibit J-G at BPV-17-01-00137406 - 00137407; Exhibit J-E at
27   BPV-17-01-00142883.
28          283.    ███████ was aware that fracture was a possible complication of IVC
     filters. ██████ Dep, Exhibit J-B, at 48:2-7.

                                                48

284. ███████ knew the G2 had problems with migrations and fractures. *Id.* at 40:18-21.

C. ███████ **Was Not Aware of Adverse Information Regarding the Rates and of Complications of Bard's IVC Filters That Bard Did Not Report to Him.**

285. ███████ was not aware of specific rates of fracture for IVC filters for Bard or other manufacturers. *Id.* at 62:24-64:7.

286. ███████ understanding at the time was that the rates were very low but then within the last four years or so ███████ ███████) learned that they were higher. *Id.* at 64:8-17.

D. ███████ **Would Have Wanted to Know if Bard's IVC Filter Fracture Rates a Complication Rates Were Greater Than Those of Its Competitors.**

287. ███████ ███████ *Id.* at 48:20-49:4.

288. Since then, ███████ has learned more about IVC filters and their complications. *Id.* at 49:5-9.

289. ███████ would have wanted to know before he implanted the Eclipse IVC in Doris Jones what Bard knew about complications with its IVC filters. *Id.* at 49:10-14.

290. ███████ testified that he would have wanted to know if the fracture rates for the Recovery, a predicate device for the Eclipse, exceeded the fracture rates of IVC filters from other manufacturers. *Id.* at 81:13-24.

291. ███████ admitted that "[a]ll of the fracture information rate [for Bard's IVC filters] is something that was important to consider in the decision [to use Bard IVC filters]." *Id.* at 89:20-22.

292. ███████ testified that it would have been important to him to know that the Recovery filter had reporting rates for death, filter migration, IVC perforation, and filter that were substantially higher than all other filters. *Id.* at 82:14-24.

49

293.  ███████ believed that comparative information as between filters was important: "all information is helpful, if there's -- if it is information regarding concern about one filter being better than the other."  *Id.* at 90:19-22.

294.  ███████ also testified he would expect a medical device company to report to doctors when the company learns that its device is less safe than alternative treatments or other alternative products.  *Id.* at 21:2-9.

295.  ███████ testified he would need to know that information to make informed decisions about using products.  *Id.* at 21:10-13.

296.  ███████ testified that patients cannot make informed-consent decisions if the doctors do not receive the information to inform them.  *Id.* at 21:14-18.

E.  ████████████████████████████████████

297.  ███████████████████████████████████.  Exhibit J-A at DORISJONES000104 – 000105.

298.  ████████████████████████████.  *Id.* at DORISJONES000073.

299.  ████████████████████████████████████████████████████████  Transcript of deposition of ███████, ███████, attached as Exhibit J-I, at 44:12-23 (██████████████████████████████████);  47:2-15.

300.  █████████████████████████████████████████.  Exhibit J-A at DORISJONES000096.

301.  ███████████████████████████.  *Id.* at DORISJONES000096.

302. ████████████████████████████████

████████████████████████. Transcript of deposition of █████

██, attached as Exhibit J-J, at 25:7-24.

303. ███████████████████████████████

████████████████████████████████████████. *Id.* at

46:13-47:21.

304. ████████████████████████████████

█████████████████████████ Exhibit J-A at

DORISJONES000073.

305. ███████████████████████████████

████████████████████████████. *Id.* at DORISJONES000104 –

000105.1

306. ████████████████████████████████

███. *Id.* at DORISJONES000073.

307.    Plaintiffs' experts have subsequently determined that Doris's Filter █████

████████████████████████████. Transcript of deposition of Dr. Darren

Hurst, Aug. 19, 2016, at 55:7-10 (███████████████████ G2 devices);

excerpts of Report of Robert McMeeking, PhD on Bard Inferior Vena Cava Implanted in

Mrs. Doris Jones, June 9, 2017, attached as Ex. J-K, at 2; excerpts of Expert Report of

Darren R. Hurst, M.D., dated June 2, 2017, attached as Ex. J-L, at 10; excerpts of Report

of Robert Muehrcke, M.D., dated June 6, 3017, attached as Ex. J-M, at 1.

308.    In December 2005, internal Bard reports determined that the "reported rate

of fractures [was] judged to be serious (Critical R002 rating)."  Email from G. Schultz to

K. Shifrin and J. Hudnall dated Dec. 19, 2005, BPVEFILTER-01-00002447, attached as

Ex. J-N.

309.    Plaintiffs' physician experts have testified that information regarding

complication rates and comparative complication rates is important to treating physicians

to determine the risk/benefit of using the device and in order to obtain appropriate

51

1   informed consent from patients.  Transcript of deposition of Dr. Kinney, July 17, 2017,

2   attached as Ex. J-O, at 39:18-40:20, 101:21-102:18, 191:4-13, 193:8-25, 196:1-10, 204:7-

3   205:3, 231:25-232:23; transcript of deposition of Dr. Roberts, July 7, 2017, attached as

4   Ex. J-P, at 210:22-214:15, 237:15-238:14, 240:1-25. 294:9-295:9, 296:6-19.

5          310.    Bard's expert, Dr. Mark Moritz, agreed that a medical doctor would want to

6   know from a medical device company the type of information contained in Bard's internal

7   documents that spoke to serious injuries and death caused by failure modes of the Bard

8   filters.  Transcript of deposition of Mark Moritz, M.D., July 18, 2017, attached as Ex. J-Q,

9   at 85:12-86:3.

10  **V.     ADDITIONAL FACTS**

11         311.    Bard's labeling and marketing materials represent that the G2 Filter was

12  safe and effective for permanent implantation in the human body for the prevention of

13  pulmonary embolism. Ex. 63, BPV-17-01-00137389; G2 IFU, attached as Exhibit 118,

14  BPV-17-01-00118398; G2 IFU, attached as Exhibit 119, BPV-17-01-00137437.

15         312.    Bard represented to the FDA that the "Design, material, components,

16  fundamental technology and intended use" of the G2 were substantially equivalent to the

17  predicate device, the Recovery Filter.  Letter from FDA to Bard re marketing of G2 Filter,

18  attached as Exhibit 120, K050558.

19         313.    Bard further represented that no material changes or additional components

20  had been incorporated in the G2 Filter from the Recovery Filter and that modifications

21  were just dimensional changes. Ex. 120, K050558.

22         314.    Bard's internal documents reveal (after the G2 was FDA-cleared) that while

23  pertinent safety data was not revealed to FDA regarding migration resistance, BARD

24  continued to discuss its competitive activity including that the Recovery Filter was still

25  being placed in patients and the most probable Medicare codes that return payment for

26  placement of the BARD devices were exchanged. Email from J. Greer to J. Hudnall dated

27  7/22/2005, BPVE-01-001797300, attached as Exhibit 121.

28

RESPECTFULLY SUBMITTED this 13th day of October, 2017.

GALLAGHER & KENNEDY, P.A.

By: */s/Mark S. O'Connor*
    Mark S. O'Connor
    2575 East Camelback Road
    Phoenix, Arizona  85016-9225

LOPEZ McHUGH LLP
    Ramon Rossi Lopez (CA Bar No. 86361)
    (admitted *pro hac vice*)
    100 Bayview Circle, Suite 5600
    Newport Beach, California 92660

*Co-Lead/Liaison Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of October, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

*/s/ Gay Mennuti*

53

# REDACTED DOCUMENTS RELATED TO DOCKET 8186

Exhibit H-A - REDACTED



HYDEL_WFHF_MDR00099



HYDEL_WFHF_MDR00100



of 290

HYDEL_WFHF_MDR00101



HYDEL_WFHF_MDR00169



HYDEL_WFHF_MDR00170



116 of 290

HYDEL_WFHF_MDR00118

HYDEL_WFHF_MDR00172



HYDEL_WFHF_MDR00173



HYDEL_WFHF_MDR00105



HYDEL_WFHF_MDR00106



HYDEL_WFHF_MDR00107



HYDEL_WFHF_MDR00083

HYDEL_WFHF_MDR00084



HYDEL_WFHF_BIL00002



HYDEL_WFHF_BIL00003



HYDEL_WFHF_BIL00004



HYDEL_WFHF_BIL00005

HYDEL_WFHF_BIL00006



HYDEL_WFHF_MDR00056



55 of 290

HYDEL_WFHF_MDR00057



HYDEL_WFHF_MDR00058



HYDEL_WFHF_MDR00064



HYDEL_WFHF_MDR00027



HYDEL_WFHF_MDR00028

HYDEL_WFHF_MDR00029

28 of 290

HYDEL_WFHF_MDR00030



HYDEL_WFHF_MDR00031



HYDEL_WFHF_MDR00042



HYDEL_WVI_RAD00002



HYDEL_WVI_RAD00003

HYDEL_SPARKFM_MDR00032



HYDEL_SPARKFM_MDR00007

HYDEL_SPARKFM_MDR00008

HYDEL_SPARKFM_MDR00009



HYDEL_SPARKFM_MDR00131



HYDEL_SPARKFM_MDR00004

HYDEL_SPARKFM_MDR00005

HYDEL_SPARKFM_MDR00006

Case 2:15-md-02641-DGC   Document 8385-7   Filed 10/24/17   Page 95 of 381



HYDEL_SDMIC_RAD00009



HYDEL_SDMIC_RAD00010



HYDEL_SDMIC_RAD00008



HYDEL_SDMIC_MDR00001

HYDEL_SDMIC_MDR00002

HYDEL_SPARKFM_MDR00002



HYDEL_SPARKFM_MDR00003

HYDEL_SPARKFM_MDR00133



HYDEL_SPARKFM_MDR00075



HYDEL_SPARKFM_MDR00076



HYDEL_NHVC_MDR00002



HYDEL_NHVC_MDR00003



HYDEL_NHVC_MDR00004



HYDE_LISA_000582



HYDEL_NHVC_MDR00006



HYDEL_NHVC_MDR00007



HYDEL_NHVC_MDR00008



HYDEL_NHVC_MDR00009



HYDEL_NHVC_MDR00010



HYDEL_SLEHR_MDR00088



HYDEL_SLEHR_MDR00089



HYDEL_SLEHR_MDR00090



HYDEL_SLEHR_MDR00091



HYDEL_SHC_MDR00037



HYDEL_SHC_MDR00038



HYDEL_SHC_MDR00039



HYDEL_SHC_MDR00040



HYDEL_SHC_MDR00010



HYDEL_SHC_MDR00011



HYDEL_SHC_MDR00012



HYDEL_SHC_MDR00017



HYDEL_SHC_MDR00018



HYDEL_SHC_MDR00019



HYDEL_SHC_MDR00020



HYDEL_SHC_MDR00213



HYDEL_SHC_MDR00214



HYDEL_SHC_MDR00054



HYDEL_SHC_MDR00055



HYDEL_SHC_MDR00056



HYDEL_SHC_MDR00042



HYDEL_SHC_MDR00043



HYDEL_SHC_MDR00061



HYDEL_SHC_MDR00062



HYDEL_SHC_PAT00002



HYDEL_SHC_MDR00044



HYDEL_SHC_MDR00035



HYDEL_SHC_BIL00001



HYDEL_SLEHR_MDR00093



HYDEL_SLEHR_MDR00094



HYDEL_SLEHR_MDR00095



HYDEL_SLEHR_MDR00096

# REDACTED DOCUMENTS RELATED TO DOCKET 8186

# Exhibit H-B - REDACTED

```
 1              UNITED STATES DISTRICT COURT
 2                   DISTRICT OF ARIZONA
 3     *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
 4
       In Re Bard IVC Filters Products
 5     Liability Litigation
 6                         No. MD-15-02641-PHX-DGC
 7
 8
       *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
 9
10        DO NOT DISCLOSE - SUBJECT TO FURTHER
                  CONFIDENTIALITY REVIEW
11
        VIDEOTAPED DEPOSITION OF  ███████████████
12
               TAKEN AT: Leib Knott Gaynor
13       LOCATED AT: 219 North Milwaukee Street
                     Milwaukee, WI
14
                    April 6, 2017
15           10:07 a.m. to 12:28 p.m.
16          REPORTED BY ANITA K. FOSS
            REGISTERED PROFESSIONAL REPORTER
17
18
19
       *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
20
21
22
23
24
25
```

1   interventional radiology procedures during that 13

2   to 14 years in Ohio?

3        A.   Yes.

4        Q.   About what percentage or practice, while

5   you were in Ohio for those 14 years, was

6   interventional radiology as opposed to general

7   radiology?

8        A.   Maybe 25 percent, 30 percent.

9        Q.   Did that include implanting IVC filters?

10        A.   Yes.

11        Q.   Now, do you recall a patient of yours, my

12   client, Lisa Hyde?

13        A.   I do not.

14        Q.   Have you had an opportunity to review any

15   medical records to refresh your recollection about

16   that patient?

17        A.   I was here yesterday and I had -- I

18   reviewed a one -- my -- I think my -- my report of

19   the procedure.

20        Q.   That procedure was what?

21        A.   Placement of an IVC filter.

22        Q.   Was it a G2X IVC filter?

23        A.   I believe it may have been, but I'm not

24   sure.

25        Q.   Was that procedure -- or did that

1    Q.   And then you also apply your knowledge as

2    to what possible procedures or devices are

3    available to treat that condition; right?

4    A.   Yes.

5         MS. DALY:  Objection.  Objection,

6    leading.

7    BY MR. SAELTZER:

8    Q.   And Doctor, in coming and exercising your

9    clinical discretion, do you perform a risk-benefit

10   analysis?

11   A.   I get an informed consent, which includes

12   risks, benefits, and alternatives.

13   Q.   When you are choosing which IVC filter to

14   implant in a patient, can you describe for me what

15   thought process you go to as to which filter you

16   select from the various options that are out there

17   in the marketplace?

18        MR. LEIB:  We're talking about in or

19   ███████████  as a custom and practice pertaining to

20   your client, ███████████

21        MR. SAELTZER:  Yes, in and around

22   February of 2011.

23        THE WITNESS:  I look for any filter

24   that's FDA approved, that I'm familiar with

25   placing.

---

Golkow Technologies, Inc.                          Page 25

1  custom and practice at the time that he implanted

2  on Mr. Saeltzer's patient -- client.  So I didn't

3  view it as invading privilege.  It was historical

4  as to his thought process.  So that's why I didn't

5  assert a privilege, and I wouldn't instruct him.

6         MS. DALY:  I'm sorry, just again note my

7  objection.

8         MR. LEIB:  Yeah, okay.  And Taylor, I

9  just didn't want to -- the reason why I asked you

10  to elaborate because I -- you know, I assume that

11  you're going to be asking some questions, and I

12  want to be, as I say, evenhanded as to asserting

13  the privilege to make sure that I understand what

14  your objection is so if other objections come down

15  the pike during your questioning, you know, I'll

16  instruct him evenly between both parties.

17         MS. DALY:  Thank you.

18  BY MR. SAELTZER:

19     Q.   Do you have the question in mind, Doctor?

20  Would you like it read back to you?

21     A.   I'm sorry, what am I being asked?

22     Q.   That tells me we should probably read you

23  the question.  So we'll have the question read to

24  you, Doctor.

25         COURT REPORTER:  "███████████████████

1    ████ , was it your understanding that all

2    FDA-cleared IVC filters had the same performance?

3    They all performed the same?"

4            THE WITNESS:  I think that they -- they

5    were -- they were all very comparable.

6    BY MR. SAELTZER:

7        Q.   Did you believe that they were all

8    comparable in terms of risk of complications, such

9    as migrations or fractures?

10       A.   Yes.

11       Q.   Doctor, going back to your state of mind

12   ████████████████████████████████████████████

     ██ ████████████████████████████████████ , if an IVC

14   filter carried with it a significant potential for

15   serious injury or death, that would be important

16   information for you to know as a clinician?

17           MR. LEIB:  Yeah, and I think that does

18   call for an expert opinion, and I would instruct

19   him not to answer.  And I would invite you to

20   re-frame the question to avoid invading the

21   privilege and --

22           MS. DALY:  Join in the objection.

23   BY MR. SAELTZER:

24       Q.   So Doctor, I want to go -- again, we'll

25   go back, we time travel back to your thought

```
 1              MS. DALY:  Same objections.

 2              MR. LEIB:  He doesn't want you to

 3     speculate.  If you have to guess, you have to tell

 4     him.  If you -- based upon the information you've

 5     been given, if you can state ▮▮▮▮▮▮▮▮, you can

 6     go ahead and historically tell him that.

 7              THE WITNESS:  Right or wrong, I felt that

 8     the risks for all of the FDA-approvable devices

 9     were -- were reasonable and customary, and that I

10     probably wouldn't have deferred or postponed the

11     filter placement in a patient who I felt really

12     needed it.

13     BY MR. SAELTZER:

14         Q.  As I'm understanding your answer, right

15     or wrong, you assumed that the complication rates

16     among the FDA cleared or approved IVC filters was

17     roughly equivalent?

18         A.  Yes.

19         Q.  If you had learned differently, that

20     would be the type of information that you would

21     have used in your clinical practice, true?

22              MS. DALY:  Same objections.

23              THE WITNESS:  I tend to trust the FDA

24     more than individual companies.

25     BY MR. SAELTZER:
```

1          Q.   Sure.   Understanding that you have some

2    more trust of the FDA than individual companies, if

3    you actually learned that the complication rates

4    among filters was not equivalent, even though they

5    had all been cleared, that's the type of

6    information, as a treating doctor, you would have

7    been interested in and considered -- at least

8    considered when making your treatment decisions?

9               MR. LEIB:   Well --

10              MS. DALY:   Objection.   Same objection as

11   before, leading, and now it's argumentative.

12              MR. LEIB:   It's -- it's clearly a

13   hypothetical, but I think unless it's tethered to

14   this patient, it is invading the privilege.   So I

15   would invite you to rephrase it to tether it this

16   to patient.

17   BY MR. SAELTZER:

18         Q.   And I had intended to mean that's the

19   type of information you would have considered in

20   making your treatment decision for ███████

21              MR. LEIB:   Okay.   If you know that, you

22   can say yes.   And if you don't know, you say you

23   don't know.   If you have to speculate -- he doesn't

24   want you to guess at any of these answers.

25              THE WITNESS:   Yeah, I don't know.

 1   that would have been something he would have

 2   factored into his clinical judgment.

 3          MR. LEIB:  You've tethered it to the

 4   article, that's the problem.  The form of the

 5   question invades his privilege, and that's why I'm

 6   instructing him not to answer.

 7   BY MR. SAELTZER:

 8      Q.   If Bard knew that the G2X filter ███

 9   ███████████████████████████ was not performing as well as

10   the other competitors' IVC filters, and it knew

11   that before███████  ███████ is that the type of

12   information you would have considered if Bard had

13   brought that to your attention?

14          MS. DALY:  Same objection.

15          THE WITNESS:  I don't particularly pay

16   attention to everything that's published or comes

17   my way.  And so if I had read the article, I -- I

18   may or may not have been swayed by its contents.

19   BY MR. SAELTZER:

20      ██    ████████████████████████████████

    ██  ██████████████████████████████████████

    ██  █████████████████████████████████████

    ██  ███████████████████

24      ██    ████

    ██    ██    ███████████████████████████████



Do Not Disclose - Subject to Further Confidentiality Review

1    in addition to the medication?

2         A.   Well, we're not always certain how the

3    body will react to blood thinning medication.  And

4    if the patient has a pattern of -- of getting

5    clots, there's concern that one more clot could --

6    could be devastating.  You err on the side of

7    caution, and you want to make sure that somehow the

8    patient is protected.  And henceforth the notion of

9    a filter would serve that purpose.

10        Q.   Somewhat of a belt-and-suspenders

11   approach here with the medicine and the filter?

12        A.   Yes.



```
 1    is that true?

 2         A.   Yes.

 3         Q.   Did you ever have an opportunity to read

 4    the instructions for use document that accompanied

 5    the Bard G2X filter ████████████████████████

      █  ████████████████

 7         A.   Yes.

 8         Q.   Are you aware that the IFU, or the

 9    instructions for use for that filter, lists, among

10    the complications that -- that may occur, fracture,

11    movement, and perforation of the filter?

12         A.   Could you repeat the first part of the

13    question?  Am I --

14         Q.   Yes.  Are you aware that the instructions

15    for use includes a section on complications that

16    one might experience with a Bard G2X filter?

17         A.   Yes.

18         Q.   And that that -- those precautions

19    included what we just talked about with

20    complications, which would be fracture, movement of

21    the filter, embolization of filter fragment pieces?

22         A.   Yes.

23         Q.   And also that the filter can perforate;

24    correct?

25              MR. LEIB:  The question is --
```

# REDACTED DOCUMENTS RELATED TO DOCKET 8186

Exhibit H-C  - REDACTED

Lisa A. Hyde

Vol. 1

01/25/2017

```
 1        A     If they did, I don't remember.  The only

 2   thing I heard was IVC filters.

 3        Q     About how many commercials would you say you

 4   saw before you found out your filter fractured?

 5        A     I have no idea.

 6        Q     Did you ever contact any attorneys in

 7   response to the advertisement you saw?

 8        A     No.

 9        Q     How did your husband come to find O'Steen

10   and Harrison, those attorneys?

11        A     I thought he had found it from an attorney

12   that he knew, but I believe he just Googled on his own

13   and found this company.

14        Q     And where are they located, I'm sorry.

15        A     O'Steen?

16        Q     Yes.

17        A     Phoenix.

18        Q     Now, let's just discuss some of your

19   background information.  What is your date of birth?

20        A     ████████████

21        Q     And where were you born?

22        A     █████████████████

23        Q     What is your ethnicity?

24        A     █████████████

25        Q     And where did you grow up?
```

# REDACTED DOCUMENTS RELATED TO DOCKET 8186

Exhibit H-D - REDACTED

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

*MDL No. 2641
In Re Bard IVC Filter Products Liability Litigation*

---

**PLAINTIFF FACT SHEET**

Each plaintiff who allegedly suffered injury as a result of a Bard Inferior Vena Cava Filter must complete the following Plaintiff Fact Sheet ("Plaintiff Fact Sheet"). In completing this Fact Sheet, you are **under oath and must answer every question.** You must provide information that is true and correct to the best of your knowledge. If you cannot recall all of the details as requested, please provide as much information as you can and then state that your answer is incomplete and explain why, as appropriate. If you select an "I Don't Know" answer, please state all that you do know about that subject. If any information you need to complete any part of the Fact Sheet is in the possession of your attorney, please consult with your attorney so that you can fully and accurately respond to the questions set out below. If you are completing the Fact Sheet for someone who cannot complete the Fact Sheet for himself/herself, please answer as completely as you can.

The Fact Sheet shall be completed in accordance with the requirements and guidelines set forth in the applicable Case Management Order. A completed Fact Sheet shall be considered interrogatory answers pursuant to Fed. R. Civ. P. 33 and responses to requests for production pursuant to Fed. R. Civ. P. 34 and will be governed by the standards applicable to written discovery under Fed. R. Civ. P. 26 through 37. Therefore, you must supplement your responses if you learn that they are incomplete or incorrect in any material respect. The questions and requests for production of documents contained in this Fact Sheet are non-objectionable and shall be answered without objection. This Fact Sheet shall not preclude Bard Defendants from seeking additional documents and information on a reasonable, case-by-case basis, pursuant to the Federal Rules of Civil Procedure and as permitted by the applicable Case Management Order.

In filling out this form, "healthcare provider" shall mean any medical provider, doctor, physician, surgeon, pharmacist, hospital, clinic, medical center, physician's office, infirmary, medical/diagnostic laboratory, or any other facility that provides medical care or advice, along with any pharmacy, x-ray department, radiology department, laboratory, physical therapist/physical therapy department, rehabilitation specialist, chiropractor, or other persons or entities involved in your diagnosis, care and/or treatment.

In filling out this form, the terms "You" or "Your" refer to the person who received a Bard Inferior Vena Cava Filter manufactured and/or distributed by C. R. Bard, Inc. or Bard Peripheral Vascular, Inc. ("Bard Defendants") and who is identified in Question 1(a) below.

To the extent that the form does not provide enough space to complete your responses or answers, please attach additional sheets as necessary, Information provided by Plaintiff will only

be used for the purposes related to this litigation and may be disclosed only as permitted under the protective order in this litigation.

2



3



4

5450502v2/26997-0001



5

5450502v2/26997-0001



6



7



5450502v2/26997-0001



5450502v2/26997-0001



10



11



12



5450502v2/26997-0001



14

5450502v2/26997-0001



15



16



17



5450502v2/26997-0001



19



20



5450502v2/26997-0001



5450502v2/26997-0001



23



24



25



26



27





31

# REDACTED DOCUMENTS RELATED
# TO DOCKET 8186

# Exhibit H-E - REDACTED

```
 1              UNITED STATES DISTRICT COURT
 2                  DISTRICT OF ARIZONA
 3
 4    IN RE BARD IVC FILTERS    ) No. MD-15-02641-PHX-DGC
      PRODUCTS LIABILITY         )
 5    LITIGATION                 )
                                 )
 6    This document pertains to  )
                                 )
 7    Lisa Ann Hyde and Mark     )
      Hyde,                      )
 8                               )
             Plaintiffs,        )
 9                               )
          vs.                    )
10                               )
      C.R. Bard, et al.,         )
11                               )
             Defendants.        )
12                               )
13         DO NOT DISCLOSE - SUBJECT TO FURTHER
                  CONFIDENTIALITY REVIEW
14
15      VIDEOTAPED DEPOSITION OF ███████████████
              THURSDAY, MARCH 23, 2017
16               PALO ALTO, CALIFORNIA
17
18
19
20
21    Reported by:  Shelley M. Sailor, CSR No. 10254
22
23
24            GOLKOW TECHNOLOGIES, INC.
         877.370.3377 ph | 917.591.5672 fax
25               deps@golkow.com
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1              MR. NORTH:  No.  You're just leading.
 2   BY MR. LOPEZ:
 3        Q.  Is that what it states there, Doctor?
 4        A.  Yes.
 5        Q.  Okay.  Let's go back to the fact that you
 6   have identified this as an Eclipse IVC filter.  How
 7   did you identify it as an Eclipse IVC filter?
 8        A.  The appearance.  The -- mainly the
 9   appearance of it on the x-ray.
10        Q.  On the scan?
11        A.  Yeah.
12        Q.  In reviewing your records, you'll notice
13   that you later describe it as a Bard G2X.  Do you
14   recall that?
15        A.  Yes.
16        Q.  Is that because once you were actually able
17   to see the device, you were able to distinguish it
18   between a G2X and an Eclipse?
19        A.  It's the same filter.  One of them is just
20   another name for when they added an electro-polish
21   on the device.  But it's pretty much the same
22   filter.
23        Q.  Okay.  Do you know where that filter is?
24        A.  I don't.
25        Q.  Were you able to distinguish that this was
```

```
1          Q.  All orders and results?

2          A.  Yes.

3          Q.  The date -- I don't know whether that's --

4     is that a date ████████

5          A.  What was the question?

6          Q.  Well, there's a date it looks like

7     electronically signed and it says results -- let's

8     start it says, █████████████████████  and it

9     says completed on ████████  ████████████████████

██    ████████████████████

11         A.  I'm not sure what that date refers to.

12         Q.  Okay.  And then there it shows you as the

13    attending physician, and you had three other of your

14    colleagues with you at the deposition -- at the

15    deposition -- at the surgery.  Correct?

16         A.  Yes.

17         Q.  Okay.  Now go to the next page, 55.  And

18    under Findings it says, █████████████████████████

██    ████████████████████████  Do you see that?

20         A.  Yes.

21         Q.  And is that based on your experience of

22    having dealt with that device before, that you were

23    able to identify it as a G2X filter?

24         A.  Yes.

25              MR. NORTH:  Objection to the form.  Asked
```

# REDACTED DOCUMENTS RELATED TO DOCKET 8186

Exhibit H-F - REDACTED



Deposition of:

## Robert McMeeking , Ph.D.

*July 6, 2017*

In the Matter of:

## In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 23

1     market.

2     BY MS. DALY:

3         Q    Is it your opinion that Bard failed to

4     reduce as far as reasonably practicable the

5     remaining risks by taking adequate protection

6     measures?

7         A    Can you repeat the question, please.

8         Q    Yes.

9              Is it your opinion that Bard failed to

10    reduce as far as reasonably practicable the

11    remaining risks by taking adequate protection

12    measures?

13             MR. O'CONNOR:  Form and foundation.

14             THE WITNESS:  In certain of the designs of

15    the filters those risks, in my opinion, were not

16    reduced to the extent practicable, and I would say

17    that that applies to all of the models that we are

18    discussing in the -- in the present case.

19    BY MS. DALY:

20        Q    And which risks do you identify -- that

21    you have an opinion that Bard failed to reduce?

22        A    The risks of tilting, perforation,

23    migration and fracture by fatigue.

24        Q    Have you determined by any research or any

25    other method that any other manufacturer of

Robert McMeeking , Ph.D.                          July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 30

1      developed any bench tests.

2           Q    And you just said you hadn't done any

3      animal testing and you didn't --

4           A    No.

5           Q    -- have any ideas of protocols?

6           A    I don't do animal testing and I --

7           Q    Okay.  With respect to the comment you

8      just made about Bard should have taken certain

9      measures sooner, we've talked about some of these

10     before.  The electropolishing issue, for example,

11     you've testified before that you thought they

12     should have done that earlier?

13          A    I believe I said I rely on prof- --

14     Dr. Richie in regard to the question of

15     electropolishing the wires that are in the filters.

16          Q    Okay.  So with respect to an opinion that

17     Bard could have electropolished its retrievable

18     filters before it did so in the Eclipse, you're not

19     going to give that opinion, you defer to

20     Dr. Richie?

21          A    Well, I --

22               MR. O'CONNOR:  Form and foundation.

23               THE WITNESS:  I'll defer to his opinion in

24     terms of the wires, but a point I would like to

25     make is that they could have switched to using tube

Robert McMeeking , Ph.D.                                July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 31

1      materials sooner, and they could have made the

2      material out of tube material which they could --

3      which they could have electropolished at the stage

4      of -- of making the filters from tube material

5      rather than wires.

6      BY MS. DALY:

7           Q    I'm sorry, I'm missing what that word is.

8      What materials?

9           A    Oh, so --

10          Q    You said troop?

11          A    Tube.

12          Q    Tube materials.

13          A    Tube, yeah.

14          Q    Got it.

15          A    T-u-b-e.

16          Q    Okay.  Do you know of any manufacturer

17     that was using tube materials to make IVC filters

18     before the time that Bard came out with the

19     electropolished Eclipse?

20          A    No.

21          Q    Do you have any papers you can cite me to

22     that that -- that one could electropolish wire

23     adequately to have it improve any characteristic of

24     an IVC filter before Bard did so in the Eclipse?

25               MR. O'CONNOR:  Form.

Robert McMeeking , Ph.D.                                July 6, 2017
In Re: Bard IVC Filters Products Liability

                                                    Page 32

1              THE WITNESS:  I've -- I've not

2       investigated that aspect of the situation, and as I

3       said before, I defer to Dr. Richie in regard to

4       electropolishing wires.

5       BY MS. DALY:

6          Q    Are there any other changes that you think

7       Bard later made to its filters that it could have

8       made earlier --

9          A    Yes.

10         Q    -- to -- to impact resistance to

11      complications?

12         A    Yes.

13         Q    All right.  And what are those?

14         A    They could have developed caudal anchors

15      sooner than they ultimately did.  They could have

16      developed penetration limiters sooner than they

17      ultimately did.  And they could have redesigned the

18      filter configuration to try and find a better -- a

19      better combination of -- of -- of phenomena that

20      would improve the behavior of the filter in terms

21      of the risks involved.

22         Q    All right.  So let's talk about caudal

23      anchors and limiters.  On what do you base your

24      opinion that Bard could have added caudal anchors

25      and limiters earlier than it did?

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 33

1        A      Well, the -- the reason is that they

2        eventually did put caudal anchors on the filters,

3        and so my point is simply that they could have

4        started to consider that possibility sooner than

5        they -- they did, once they realized that caudal

6        migration was contributing to tilt and tilt was

7        contributing to other failures that the filter was

8        experiencing.

9        Q      Okay.  Do you know of any other IVC filter

10       manufacturer who incorporated anchors or limiters

11       earlier than Bard did?

12               MR. O'CONNOR:  Form and foundation.

13               THE WITNESS:  Not to my knowledge.

14       BY MS. DALY:

15       Q      Okay.  Do you know any -- do you know in

16       any in-depth way what the process was internally in

17       Bard to develop these anchors and limiters?

18               MR. O'CONNOR:  Form.

19               THE WITNESS:  I've read some of the

20       documents that describe activities that were

21       involved, but I -- I wouldn't say that I know in

22       detail what the processes were that were involved

23       in developing those caudal anchors.

24       BY MS. DALY:

25       Q      Do you know -- do you know of design

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 34

1      efforts that Bard made to add these anchors and

2      limiters that were unsuccessful initially and more

3      changes had to be made?

4              MR. O'CONNOR:  Form.

5              THE WITNESS:  I do know that some of the

6      designs of the caudal anchors that they

7      investigated did not work as well as others.

8      BY MS. DALY:

9          Q    The other thing you talked about was that

10     Bard could have redesigned the configuration of its

11     filters.  It was a little vague to me.  What do you

12     mean by that?

13         A    Well, I mean the -- the shape of the

14     limbs, the dimension of the limbs, in other words

15     their -- their diameter, they could have considered

16     different numbers of limbs, they could even have

17     considered moving to a different material.  So

18     there's a fairly large number of design choices

19     that could have been considered, and they could

20     well have come up with a combination of features in

21     the design that gave them a better combination

22     of -- of phenomena in terms of how the filter

23     behaved.

24         Q    Do you know -- are you aware of any steps

25     that Bard took along the way from Recovery to

Robert McMeeking , Ph.D.                              July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 37

1    BY MS. DALY:

2        Q    You talk about the changes to the G2X cap,

3    and I want to know what your opinion is on the

4    chamfer design in the G2X compared to the G2.

5            MR. O'CONNOR:  You can refer to your

6    report, too, it's in there.

7    BY MS. DALY:

8        Q    Sure.

9        A    In my opinion, the chamfer was changed

10   very little in going from the G2 to the G2X, and

11   the reason is that although the cap was bead

12   blasted, the chamfer area was masked during the

13   bead blasting and as a consequence of that, the

14   bead blasting would not have broken the sharp

15   edges, which are the -- the problem that is

16   associated with the chamfer.  And this is contrary

17   to Dr. Fasching's claim that the bead blasting

18   would have softened that particular sharp edge.

19           The next point is that after the bead

20   blasting, there was a process of tumbling the cap

21   in a bed of ceramic particles, and that would have

22   removed some material by a process of pol- --

23   essentially polishing, mechanical polishing, but in

24   my assessment it would not have removed a great

25   deal of material and, therefore, would not have

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 38

1        changed the shape of the chamfer very much.

2                And as information that's consistent with

3        that, we can look at Figure -- Figure 187 in

4        Dr. Fasching's report, which the report dated May

5        11 of 2017, where it can be seen that there are two

6        rounded edges at the bottom of the cap; one of them

7        is very gradual, which is the one on the outside,

8        and my assessment is that that edge was broken by

9        the bead blasting; whereas the one on the inside of

10       the cap adjacent to the limb you can see is much

11       sharper in the sense that the radius of curvature

12       is much smaller than the other curved surface.

13               And I did an estimate of the radius of

14       curvature and I found that the radius of curvature

15       for that chamfer is about 20 microns.  Now, I would

16       defer to those who measure the -- the radius of

17       curvature directly in images on the electron

18       microscope and so on, so I'm not going to say this

19       is a definitive measure of the radius of curvature,

20       but it leaves me with the impression that the

21       radius of curvature is about 20 microns.  And the

22       radius of curvature that was measured by

23       Dr. Fasching on a Recovery filter quite some time

24       ago was 15 microns.

25               And so it's my inference that there was

Page 39

1      not a big change to the radius of curvature of the

2      chamfer in the processes that were used in the

3      manufacture of the G2X.  And that, therefore, the

4      strain concentration which would be associated with

5      that chamfer was not reduced significantly,

6      although if some material was removed, it would

7      have reduced the strain concentration to some

8      extent.

9          Q    Okay.  So, first of all, let me start with

10     that last thing first.  You have not done any

11     specific modeling or FEA to determine what the

12     change in chamfer that you're willing to say

13     occurred to this 20 millimeters -- microns,

14     would -- what that impact would be on fracture

15     resistance?  You have not done any of that work

16     specifically?

17         A    Well, I've -- I've considered the

18     difference between a radius of curvature of 5

19     microns and one in which, if you like, the radius

20     of curvature is very large, but in between -- which

21     spans the range from a radius of curvature of 5

22     microns to ones which are much larger.  But other

23     than that, I've not done a specific calculation.

24             But I should point out that the reduction

25     is proportional to the degree of change of the

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 129

1      severe stiffness constraint on whether the relative

2      motion of the arms and the legs can be accommodated

3      as the filter, if you like, tries to stretch.  So

4      that -- that's a possibility.

5          Q    Do you have any case that you can point to

6      that you have worked on where there was imaging

7      evidence of perforation, tilt or migration that

8      occurred before a leg fracture?

9          A    I haven't looked into that.

10             MR. O'CONNOR:  Belated objection to the

11     form of the question.

12     BY MS. DALY:

13         Q    Have you done any work to determine what

14     modifications Bard could have made to the legs

15     themselves to improve on those legs' contribution,

16     if any, to tilt, perforation, fracture or

17     migration?

18         A    No, I haven't looked into that.

19         Q    We've talked a little bit about the

20     anchors and limiters present on the Meridian.  Is

21     it your opinion that those are reasonable

22     modifications by Bard to -- to improve resistance

23     to migration, tilt and perforation?

24         A    It's a reasonable concept for how the tilt

25     and migration behavior can become -- can be

Robert McMeeking , Ph.D.                        July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 130

1      limited.

2           Q    Would -- do you have an opinion whether

3      those anchors or limiters on the Meridian would add

4      fracture resistance to that filter?

5           A    I have no opinion on that.

6           Q    Same questions with Denali, do you think

7      that the limiters that the Denali has will act to

8      improve resistance to migration, tilt, perforation

9      and fracture?

10               MR. O'CONNOR:  Form.

11               THE WITNESS:  It's -- it is reasonable to

12     expect that there will be some effect on -- on tilt

13     and migration and that those would have possible

14     knock-on consequences to perforation and fracture.

15     And so I'd like to revise my answer about the

16     Meridian in the same way, that the caudal anchors,

17     to the extent they limit tilt and migration, they

18     could have beneficial effects on perforation and

19     fracture.

20     BY MS. DALY:

21          Q    Okay.  What modifications to the G2 filter

22     assisted in resistance to cephalic migration?  Do

23     you have an opinion on that?

24               MR. O'CONNOR:  Form.

25               THE WITNESS:  I'm not aware of any changes

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 203

1    but does not change its orientation relative to the

2    vena cava wall, then the stiffness will be four

3    times, which means that the force will -- that you

4    apply will be four times that which you got when

5    you did not constrain the rotation.

6         Q    Okay.  And that stiffness in the petal

7    area may make folding that back down, once it's in

8    the patient to put it in a sheath for retrieval,

9    more difficult?

10        A    It would mean --

11             MR. O'CONNOR:  Form.

12             THE WITNESS:  It would mean --

13             MR. O'CONNOR:  Foundation.

14             THE WITNESS:  It would mean that you have

15   to pull on the filter with a bigger force relative

16   to the Recovery catheter to put into that Recovery

17   catheter.

18   BY MS. DALY:

19        Q    And what that might translate into insofar

20   as patient injury, you do -- you have not done an

21   analysis of that?

22        A    I have not done an analysis of that.

23        Q    All right.  Now, this is what I wrote down

24   about your conclusions from the SNF report, and I

25   want to talk about these separately and tell me if

Robert McMeeking , Ph.D.                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 221

1      that?

2           A    No.

3                MR. O'CONNOR:   Form.

4      BY MS. DALY:

5           Q    Nor did you do it with the Denali

6      laser cut from a nitinol tube that also has

7      anchors?

8                MR. O'CONNOR:   Form.

9                THE WITNESS:   I didn't do any of those

10     analyses because it's my assessment that those

11     changes did not make a significant difference

12     to the -- to the filters in terms of reducing

13     the danger that they present because of their

14     failures.

15     BY MS. DALY:

16          Q    Are you giving the opinion that the Simon

17     nitinol is an alternative safer product than the

18     Bard retrievable products?

19                MR. O'CONNOR:   Form.

20                THE WITNESS:   I'm offering the opinion

21     that in the setting of permanent use of a filter,

22     which the Recovery and the G2 and its successors

23     can -- can be used as, that the Simon nitinol is a

24     safer alternative.

25     BY MS. DALY:

Robert McMeeking , Ph.D.                                    July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 308

1        Q     And when you talk about worst-case

2     scenario, is that a standard that engineers are

3     required to follow?

4        A     Yes, in dealing with this kind of problem,

5     engineers are expected and required to identify the

6     worst-case conditions and then take that into

7     consideration when assessing the performance of

8     their design and the consequences of -- of the

9     design.

10        Q     Now I want to -- I want to move around a

11     little bit.  Well, let me ask you about

12     calculations and analyses.  You talked about the

13     ones you've performed.  In your work in this case,

14     did you look at and review the types of

15     calculations, the engineering analyses, that Bard

16     performed?

17        A     I reviewed finite element calculations

18     that they performed.

19        Q     And do you have an opinion about whether

20     those were sufficient or adequate?

21        A     Almost all of them were inadequate for

22     various reasons.

23        Q     What were the reasons, among the reasons,

24     please?

25        A     Well, some of the reasons were that it was

Robert McMeeking , Ph.D.                          July 6, 2017
In Re: Bard IVC Filters Products Liability

Page 321

```
 1      various -- of the two filters that play similar
 2      roles in the two filters.
 3          Q    The medical articles that you've reviewed
 4      about the Simon nitinol filter, including the
 5      Poletti, have those affected your opinions at all?
 6          A    No, they have not affected my opinions.
 7          Q    Do those articles support your opinion
 8      that the Bard is a better filter -- I mean that the
 9      Simon nitinol is a better filter in terms of
10      failures?
11          A    Since the Poletti article comments that
12      the Simon nitinol filter is a safe filter, I use
13      that information in the paper to support my view
14      that the Simon nitinol is a safer filter than the
15      other ones.
16          Q    All right.  Now, let's talk about your
17      case-specific opinions.  To arrive at the opinions
18      you did in each of the five Bellwether cases, ████
        ███████████████████████████████████████████████,
20      correct?
21          A    Correct.
22          Q    Was it necessary for you to do any
23      calculations specific to those patients?
24          A    No, because the failures that were
25      observed in them were consistent with the
```

# REDACTED DOCUMENTS RELATED TO DOCKET 8186

# Exhibit J-A - REDACTED

PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:
DATE OF BIRTH:



DISCHARGE SUMMARY

DATE OF ADMISSION:

DATE OF DISCHARGE:

RESIDENT

DATE OF BIRTH

DISCHARGE DIAGNOSIS

OTHER DISCHARGE DIAGNOSES

PRINCIPAL PROCEDURES PERFORMED

BRIEF HOSPITAL COURSE

DISCHARGE SUMMARY- Page 1 of 3

PRINTED BY: HUGHESH1
DATE    11/17/2015

CONFIDENTIAL

PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:
DATE OF BIRTH:





DISCHARGE SUMMARY



DISCHARGE DISPOSITION

DISCHARGE SUMMARY- Page 2 of 3

PRINTED BY: HUGHESH1
DATE      11/17/2015

CONFIDENTIAL

PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:
DATE OF BIRTH:




DISCHARGE SUMMARY



_____


_____
Attending Physician

CD/dfg
D:
T:
Job
cc:

DISCHARGE SUMMARY- Page 3 of 3

Authenticated by
Authenticated by



PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:
DATE OF BIRTH:



HISTORY AND PHYSICAL

DATE OF ADMISSION:

ATTENDING PHYSICIAN

RESIDENT PHYSICIAN

INTERN PHYSICIAN

CHIEF COMPLAINT

HISTORY OF PRESENT ILLNESS



PAST MEDICAL HISTORY

HISTORY AND PHYSICAL- Page 1 of 5

CONFIDENTIAL

PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:
DATE OF BIRTH:

HISTORY AND PHYSICAL

MEDICATIONS

ALLERGIES

PAST SURGICAL HISTORY

SOCIAL HISTORY

FAMILY HISTORY

REVIEW OF SYSTEMS
CONSTITUTIONAL:
EYES:
EARS, NOSE, AND THROAT:
CARDIOVASCULAR:
RESPIRATORY:
GASTROINTESTINAL:

GENITOURINARY:
MUSCULOSKELETAL:

NEUROLOGIC:
ENDOCRINE:
PSYCHIATRIC:
INTEGUMENT:
HEME/LYMPH:

LABS

HISTORY AND PHYSICAL- Page 2 of 5



```
PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:
DATE OF BIRTH:
```

HISTORY AND PHYSICAL



PHYSICAL EXAMINATION
VITAL SIGNS:

CONSTITUTIONAL:

EYES:

EARS, NOSE, AND THROAT:

NECK:
CARDIOVASCULAR:
RESPIRATIONS:

MUSCULOSKELETAL:

INTEGUMENT:
LYMPH:
NEUROLOGIC:

PSYCH:

GU:
BREAST:

ASSESSMENT AND PLAN
1.

HISTORY AND PHYSICAL- Page 3 of 5

PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:
DATE OF BIRTH:




HISTORY AND PHYSICAL



HISTORY AND PHYSICAL- Page 4 of 5



CONFIDENTIAL

PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:
DATE OF BIRTH:




HISTORY AND PHYSICAL

LO/ft
D:
T:
Job
cc:

HISTORY AND PHYSICAL- Page 5 of 5
Authenticated and Edited by
Authenticated by

PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:
DATE OF BIRTH:

OPERATIVE REPORT

DATE OF OPERATION:

PREOPERATIVE DIAGNOSIS

POSTOPERATIVE DIAGNOSIS

PROCEDURE PERFORMED

ANESTHESIA

ATTENDING SURGEON

RESIDENT SURGEON

FINDINGS

COMPLICATIONS

DRAINS/PROSTHESIS

OPERATIVE NOTE- Page 1 of 5

CONFIDENTIAL



```
PATIENT NAME:
MEDICAL RECORD #:       
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:
```

OPERATIVE REPORT

SPECIMEN
██████

ESTIMATED BLOOD LOSS
████████████████████

IV FLUIDS
██████████████████████

URINE OUTPUT
███████

MONITORING LINES
██████

CONDITION POSTOPERATIVELY
█████████████████████████████

INDICATIONS FOR PROCEDURE



DESCRIPTION OF PROCEDURE
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████

OPERATIVE NOTE- Page 2 of 5

███████████████████
███  ██████████████

CONFIDENTIAL                    ████████████████

PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:





OPERATIVE REPORT



OPERATIVE NOTE- Page 3 of 5



CONFIDENTIAL



```
PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:
```



OPERATIVE REPORT



AC/zpc

OPERATIVE NOTE- Page 4 of 5

CONFIDENTIAL

PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:




OPERATIVE REPORT

D:
T:
Job
cc:

OPERATIVE NOTE- Page 5 of 5

Authenticated and Edited by
Authenticated by

CONFIDENTIAL

PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:
DATE OF BIRTH:

OPERATIVE REPORT

DATE OF OPERATION:

PREOPERATIVE DIAGNOSIS

POSTOPERATIVE DIAGNOSIS

PROCEDURES PERFORMED

INDICATIONS

DESCRIPTION OF PROCEDURE

INTERPRETATION OF CAVAGRAM:

OPERATIVE NOTE- Page 1 of 2

CONFIDENTIAL

PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:




OPERATIVE REPORT





AJA/zlg
D:
T:
Job
cc:

OPERATIVE NOTE- Page 2 of 2

Authenticated by

PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:
DATE OF BIRTH:




DISCHARGE SUMMARY

DATE OF ADMISSION:

DISCHARGE DATE:

INTERN:

ADMITTING DIAGNOSIS(ES):

DISCHARGE DIAGNOSIS(ES):

CONSULTANTS INVOLVED:

LABORATORY DATA:

IMAGING:

DISCHARGE SUMMARY - Page 1 of 3

CONFIDENTIAL

PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:
DATE OF BIRTH:

DISCHARGE SUMMARY



DISCHARGE MEDICATIONS:

DISCHARGE SUMMARY - Page 2 of 3

CONFIDENTIAL

PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:
DATE OF BIRTH:



## DISCHARGE SUMMARY



DISCHARGE FOLLOWUP:

FOLLOWUP ISSUES:

DC/MODL
D:
T:
Job
cc:

DISCHARGE SUMMARY - Page 3 of 3

Electronically Authenticated and Edited by:

Electronically Authenticated by:

CONFIDENTIAL

**Imaging Results**



Result time:

**Final result**

Please enter a Disposition for this patient

CONFIDENTIAL

PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:
DATE OF BIRTH:



OPERATIVE REPORT

DATE OF OPERATION:

POSTOPERATIVE DIAGNOSIS(ES):

OPERATION(S) PERFORMED:

SURGEON:

CLINICAL HISTORY:

DESCRIPTION OF OPERATION:

Operative Report - Page 1 of 2

```
PATIENT NAME:
MEDICAL RECORD #:
BILLING #:
DICTATING PHYSICIAN:
CO-SIGNING PHYSICIAN:
ROOM AND BED:
DATE OF BIRTH:
```

OPERATIVE REPORT

IMPRESSION:

KN/MODL
D:
T:
Job
cc:

Operative Report - Page 2 of 2

Electronically Authenticated by:

CONFIDENTIAL

# REDACTED DOCUMENTS RELATED TO DOCKET 8186

# Exhibit J-B - REDACTED

1                 UNITED STATES DISTRICT COURT

                     DISTRICT OF ARIZONA

2

3

4    IN RE:  BARD IVC FILTERS       ) Case No.

     PRODUCTS LIABILITY LITIGATION  ) MD-15-02641-PHX-DGC

5    _____

6

7

8                    DO NOT DISCLOSE

9        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11

12    VIDEOTAPED DEPOSITION OF ███████████████████████

13                  March 23, 2017

14                 Savannah, Georgia

15                   4:06 p.m.

16

17

18

19

20

21

22

23   Reported by:  Karen Kidwell, RMR, CRR

24              GOLKOW TECHNOLOGIES, INC.

          877.370.3377 ph | 917.591.5672 fax

25               deps@golkow.com

```
 1    BY MR. COMBS:

 2        Q.   If a medical device manufacturer learns

 3    that a device is less safe than alternative

 4    treatments or other alternative products by other

 5    competitors, would you expect them to report that to

 6    you and other doctors?

 7        A.   I mean, we certainly always expect that

 8    they report anything that's not safe to the FDA and

 9    to the physicians.

10        Q.   And you need to know information about

11    safety to make informed decisions about using

12    products?

13        A.   True.

14        Q.   And because you're advising patients, and

15    they can't make informed consent about using products

16    unless you have all the information to inform them.

17    True?

18        A.   True.

19        Q.   And the information that a medical device

20    manufacturer provides to you about their product, you

21    would expect that to be accurate and complete.  True?

22        A.   Sure, to the best -- you know, certainly

23    to the best of whatever knowledge they have acquired

24    regarding safety and problems.

25        Q.   Right.  They can't leave out, though,
```

     1    rest of their life.

     2              So it really becomes a spectrum of a

     3    risk/benefit ratio.  Which is really what -- true

     4    with all surgery and all medical devices:  What's the

     5    risk of doing it and the risk of not doing it?

     6         Q.   And for the retrievable filters, I'll ask

     7    kind of a compound question.  When are they removed,

     8    and who decides to remove them?

     9         A.   Well, in general, in the country and the

    10    world, frequently no one.  A lot of times they're

    11    just left in place.  I mean, the majority of them are

    12    left in place.

    13              More recently, it could be whoever, you

    14    know, comes to the awareness that the filter is in

    15    place and might not any longer have a risk, a

    16    favorable risk/benefit ratio, and so that could be

    17    anyone.  It could be the implanting physician.  It

    18    could be the patient.  It could be the primary care

    19    physician.  You know, could be any of their

    20    specialists.

    21         Q.   And I guess, since you've been here in

    22    this practice, Savannah, for -- since completing your

    23    training, since you've been here, what IVC filter

    24    models have you used, including up until today?

    25    Which ones do you use?

```
 1        A.   We have predominantly always used -- I
 2   won't say "always"; we have predominantly used the
 3   Bard filters.  The G2 and the Simon Nitinol was the
 4   nonretrievable, and the Meridian and now the Denali.
 5   And a couple in between.  They've changed every few
 6   years.
 7             Now there's even a nifty app for the
 8   iPhone, because it's gotten so complicated with all
 9   the different filter devices.
10        Q.   And why have -- well, when you say -- when
11   you talk about using predominantly Bard IVC filters,
12   does that go for your whole practice group here?
13        A.   Predominantly.  You know, there's Cook
14   filters, and there's other competitors' filters.
15   There's the original Greenfield IVC filter.  But we
16   have mostly always stocked -- I would say yes,
17   definitely yes, the majority of them that we see
18   placed by myself and all my partners have always been
19   the Bard filters.
20        Q.   And why is that?
21        A.   They've just always had the reputation of
22   having the best filters.  There has been the most
23   data on them, and I think they're likely -- it's
24   certainly variable from institution to institution,
25   but everywhere I've been, they've been the
```

1    and what -- and what the complications were.  But,

2    you know, the hard part is telling you what the exact

3    time frame of all that was.

4         Q.   Okay.  That's fair.  And we'll get to it

5    shortly, but the --

9         Q.   Do you recall any conversations with

10   Ms. Vilece or anyone else at Bard about the Eclipse,

11   specifically, and if so, what they told you about the

12   Eclipse?

13        A.   I really don't.  I don't have specific

14   recollection about the individual devices, except

15   that, you know, the G2 I think was the one that was

16   known to be the biggest problem, whenever that became

17   evident, and then was quickly replaced.

18        Q.   And when you say the G2 became the biggest

19   problem, what was the problem with the G2?

20        A.   That's the device that had the biggest

21   reports about migrations and fractures in the device.

22        Q.   And was it a kind of thing where you guys

23   collectively, at the practice, liked using the Bard

24   IVC filters, and so whenever they came out with a new

25   one, you would just kind of incorporate and adopt the

Do Not Disclose - Subject to Further Confidentiality Review

1   out of an IFU, cautiously, and just have become

2   standard of care.

3          There's lots of examples of things we

4   still use appropriately that might not be in the IFU.

5   But, in general, we certainly consider the IFU, and

6   -- because that's what the research was done on for

7   certain devices, and that's what the FDA is

8   recommending, and that's what the company -- and

9   typically, that's very strongly what the company

10  recommends.

11         Q.   And do you read the IFU?

12         A.   Sometimes.  I mean, I have read them.  I

13  don't -- certainly don't read them on every package,

14  because they're the same from the same device, but --

15  you know, not -- not all the time, but it does come

16  up, for example, at meetings, or you're reading about

17  and someone's discussing an issue with an IFU.  You

18  know, if something is within the IFU or not, to help

19  define things that might be outside of the IFU but

20  still medically indicated.

21         Q.   Do you know if you ever read the IFU for

22  the Eclipse IVC filter?

23         A.   Not that I recall.

24         Q.   Okay.  And IFUs have warnings on them of

25  side effects, complications, things like that, also?

1        A.   Yes.

2        Q.   And even if you haven't read the Eclipse

3   IFU, you're probably generally familiar with IVC

4   filter IFUs, if they warn of things like fractures,

5   migration, perforation, tilt; complications like

6   that.  Right?

7        A.   Yes.  Yes.

8        Q.   But is it your understanding these

9   complications are rare, for IVC filters?

10       A.   Well, depends how you define "rare."  I

11  mean, back -- originally, when we were implanting

12  filters 15, 20 years ago, everyone thought they were

13  rare.

14            Now people think they're -- reached a

15  peak, and reached a peak in frequency, and then we

16  think that now they're -- they're less frequent than

17  they were before.  So it's been a migrating target in

18  terms of what the risks are or what our understanding

19  of the risks are.

20       Q.   If you can recall your mindset in

█████  ████████████████████████████████████████████████

█████  ████████  what was your understanding of the rarity of

23  complications from IVC filters then?

24       A.   I don't have independent recollection of

25  placing that particular filter, but the best I can

1    tell from that date and from my note, is that that

2    is -- that predates the peak of my concern and the

3    release of the warnings about the complications of

4    filters.

5        Q.   You've learned more about filters since

6    then --

7        A.   Right.

8        Q.   -- and their complications?

9        A.   Right.

10        Q.   If Bard knew about complications with its

11    filters at that time, ████████████████████████

██    ██████████████  you would have wanted to know that,

13    right?

14        A.   Yes.

15        Q.   I may have asked you this already, but do

16    you have a specific recollection of ██████

17        A.   No.

18        Q.   And that's certainly understandable for

19    someone you saw briefly seven years ago, right?

20        A.   Right, right.

21             MR. COMBS:  I think we already marked the

22        op notes, right, 4017?  Here we are.

23        (Exhibit 4017 was previously marked for

24    identification.)

25

```
 1   BY MR. COMBS:

 2        Q.   Doctor, throughout the rest, I'll

 3   probably show you a bunch of exhibits.  We'll start

 4   with your op notes, and I may have some other things

 5   that go with that we'll mark.  If we can, let's just

 6   go ahead and mark --

 7             MS. DALY:  Just tell me the Bates numbers

 8        on the bottom of where you're going.

 9             MR. COMBS:  We'll start with just the

10        Exhibit 4017, on the op report, but I'm also

11        going to look at 1292 and 1506 and 7, the

12        consent forms, and then another of the -- the

13        label.  And that will be it.

14   BY MR. COMBS:

15        Q.   So in front of you now, Doctor,

16   Exhibit 4017, ██████████████████████████████████

██   ████████████████████████  Correct?

18        A.   Yes.

19        ████   ███████████████████████████

██        ████   ██████████████████████

21        Q.   And, again, as far as you know, that's the

22   only time you ever saw her or interacted with her or

23   treated her, that date?

24        ████   ██████████████████████████████████████

██   █████████████████████████████████████████
```

 1    There probably would be some note in the medical

 2    record from the hospital, but I never -- it's not

 3    part of our record, our medical record.

 4         (Exhibit 4018 was marked for identification.)

 5    BY MR. COMBS:

 6         Q.   And I think you're actually right.  And

 7    what you've been handed here, Exhibit 4018, is some

 8    other medical records, including the consent forms

 9    for the procedure.  ████████████████████████████

██   ████████████████████████████   ████████████████

11         A.   Yes.  So I -- there is almost always a

12    consultation, though, before, just when we see the

13    patient, make the decision, talk to the patient,

14    consider the data in order to communicate back to the

15    other physicians.  So there would have been some

16    other note.

17         Q.   ██████████████████████████████████████████

██   ███████████████████████████████████████████

██   ██████████████████████████████████   And so to the

20    extent you need to refer back to any of this -- and

21    I'll ask you some specific questions about this,

22    too -- but if you need to look at any of this to

23    refresh your recollection, go ahead.

24         ████████████████████████████████████████████████

██   ███████████████████████████████████

5        A.    Just slightly short of that, because it

6    retains the option to remove it, because if a filter

7    does clot off, it's a problem if you can't remove it.

8    So there's some advantages to having a retrievable

9    filter, if you, even if you think it's going to stay

10   in long term.

14        Q.    And then around that same section we were

15   just looking at there, maybe the same sentence,

16   there, in the indications, on the first page of your

17   op report, it says:

1        A.    Not really, because some people have

2    very -- I would say the majority of people have a

3    more clear indication for permanent filter or have a

4    more clear indication for a temporary filter.  ■

■    ████████████████████████████████████████████████████

■    ████████████████████████████████████████████████████

■    ██████████████████████████████████████████████

■    ████████████████████████████████████████████████████

9        Q.    And I want to ask about a little bit -- a

10   different portion of that sentence, though.  ██████

■    ████████████████████████████████████████████████

■    ████████████████████████████████████

■       ████   ████████████████████████████████████

■    ████████████████████████████████████    ████████████

■    ████████████████████

16       Q.    Okay.

17       A.    ████████████████████████████████████████████

■    ███████████████    ██████████████████████████

■    ████████████████████████████████████████████

■    ███████████████    ███████████████████████████████

■    ████████████████████████████████████████

■    ██████████████████████████████████████████

■    ████████████████████████████████████████████████████

■    ██████

25       Q.    And that would be your practice, right?

1    anymore.



```
 1    BY MR. COMBS:
 2         Q.   Sure.  No, no problem.  I'll withdraw the
 3    question.
 4              Other than myself and my colleagues, have
 5    you talked about ████████████████████████████
      ██ ██████████████████████████████████
 7         A.   Briefly with ███████████ who -- I think
 8    she was the one who told me that, you know, there was
 9    an e-mail that we -- that was sent to us about █
      ██ ██████████████████████████████████
      ██ ██████████████████████████████████
      ██ ████████████ and that -- you know, that there was
13    this litigation.
14         Q.   Okay.
15         A.   That was about -- about the extent of it,
16    and that it was -- ██████████████████████████
      ██ ██████████████████████████████████
      ██ ████████████ and that's all she knew.
19         Q.   Anyone else that you've talked to besides
20    her?
21         A.   No.
22         Q.   Okay.  We can move those aside, because
23    I'm going to show you some other documents.
24              We've talked about the different models of
25    the Bard IVC filters over the years.  Were you aware
```

Do Not Disclose - Subject to Further Confidentiality Review

1    that one of the reasons that Bard came out with the

2    different versions of its IVC filters was to try to

3    address problems with its filters fracturing?

4         A.   Yes.   In that, you know, there were

5    always -- we know there were always complications,

6    some complications of them and that they were -- you

7    know, it just seemed like the filters were similar to

8    all of the stents we used, the -- basically, there's

9    always one out in the market and there's one always

10   under R&D that's the next generation, trying to

11   improve upon either patency or lower complications

12   or -- so we knew there was always one, you know, just

13   from this pattern, it became evident that there was

14   always another -- another one -- another one coming.

15   If that answers your questions.

16        Q.   Another model of the Bard IVC filters

17   coming?

18        A.   Right, right.

19        Q.   Do you have any idea what those rates of

20   complications or fractures were for Bard IVC filters

21   or any other manufacturer?

22        A.   I mean, we were given different -- you

23   know, you would hear different numbers from different

24   sources.   You'd hear a different presentation at a

25   talk, that might talk about certain complications

Do Not Disclose - Subject to Further Confidentiality Review

1    based on one study, and then there's retrospective

2    studies; there's the meta-analyses of combining

3    multiple studies.

4         So there is -- there just is no one

5    answer, you know, to tell you that there was any

6    specific number.  But I don't have a specific number

7    in my mind.  But certainly not back years ago.

8         Q.   Right.  Do you -- do you have any, like,

9    ballpark in your head of what would be an acceptable

10   rate of fractures for an IVC filter?

11        A.   No.  I mean, obviously we want it to be

12   very low.  Our initial understanding was that the

13   fracture rate was very low, in the 5 percent range;

14   and then at some point, you know, maybe in the last

15   four years or so, is when we learned that they were

16   higher than that.  Or maybe six years, or three,

17   or ...

18        Q.   Let's see here.  Get stuff together here.

19        (Exhibit 4019 was marked for identification.)

20   BY MR. COMBS:

21        Q.   And you know what, we'll make it easy --

22   we can use that one.  That's fine.

23        MR. STOLLER:  It's been previously marked.

24   You can use the same number, but that's okay.

25        MR. COMBS:  Are we using the same number?

1       have changed anything, because I'd assume -- I

2       didn't assume they did know a cause of the limb

3       detachments, because if they did, I thought that

4       would be something that was fixed.  It just

5       wasn't my understanding that they -- it was kind

6       of my understanding that they didn't know the

7       cause of it, just like the limitations of stents

8       and other devices.

9   BY MR. COMBS:

10      Q.   Understood.  Turn to the right -- the

11  lower right corner of 884.

12      A.   Okay.

13      Q.   And there's a box up towards the top of

14  the page, and either the last or second-to-last

15  sentence there, in the top paragraph of the box,

16  says:  "Recovery filter fracture rates exceed the

17  rates reported by other manufacturers in the MAUDE

18  database."

19           Do you see that?

20      A.   Yes.

21      Q.   Is that information you would have wanted

22  to know in 2004?

23      A.   Yes, if there's a higher fracture rate,

24  yes.

25           (Exhibit 4024 was marked for identification.)

```
 1   BY MR. COMBS:

 2        Q.   Turning to the next one, if you could,

 3   with me, Doctor, so we can move things along.  And I

 4   would be happy to leave you copies of this

 5   afterwards.  I've got copies for you if you want.

 6             If you want to turn to the next one,

 7   Doctor?

 8        A.   Oh, the next document?

 9        Q.   That's marked 4024.

10        A.   Okay.

11        Q.   And this is a Health Hazard Evaluation,

12   December 17th, 2004, Bard?

13        A.   Agreed.

14        Q.   And on the second page, under number 2, A,

15   see there, it says:  "Reports of death, filter

16   migration (movement), IVC perforation, and filter

17   fracture associated with Recovery filter were seen in

18   the MAUDE database at reporting rates that were 4.6,

19   4.4, 4.1 and 5.3 higher, respectively, than reporting

20   rates for all other filters."

21             Is that information you wanted, that Bard

22   knew in December 2004, and that would have been

23   important to you?

24        A.   Yes.

25        Q.   And then number 3, just below that, the
```

 1          specific sentences.

 2                  First of all, the sentence begins if it --

 3          "If one were to extrapolate our observed

 4          prevalence of filter fractures ..."

 5                  I mean, that, right off the bat, in our

 6          training, is to not extrapolate observed

 7          prevalence rates of something, because there's a

 8          lot of other error and factors in that.

 9                  So this, again, in general, yes; in

10          particular, the sentence -- you know, I don't

11          know what to make of that sentence, because it's

12          very vague.

13     BY MR. COMBS:

14          Q.   And -- but the fracture rates they're

15     reporting here aren't vague.  True?

16          A.   Correct.  You're right.

17          Q.   And is that information that would have

18     been important for you in deciding to use Bard IVC

19     filters?

20          A.   Yes.  All of the fracture information rate

21     is something that was important to consider in the

22     decision.

23          (Exhibit 4026 was marked for identification.)

24     BY MR. COMBS:

25          Q.   And the next one here is another e-mail

1    chain between David Ciavarella and some other Bard

2    people.  And I will -- I don't know if it says it in

3    this chain or not; I think -- it doesn't look like it

4    does, but I'll represent to you that David Ciavarella

5    was the medical director for Bard at this time

6    period, in December 2005.

7            And at the bottom of the first page, he

8    states:  "The G2 is a permanent filter; we also have

9    one (the SNF) that has virtually no complaints

10   associated with it.  Why shouldn't doctors be using

11   that one rather than the G2?"

12           And my question is:  Is that information

13   that would have been important to you, to know that

14   the medical director for Bard in 2005 was questioning

15   why Bard was pushing the G2 as a permanent filter

16   when they already had the SNF one?

17           MS. DALY:  Object to the form.  Lack of

18       foundation.

19           THE WITNESS:  You know, again, all

20       information is helpful, if there's -- if it is

21       information regarding concern about one filter

22       being better than the other.

23   BY MR. COMBS:

24       ██      ████████████████████████████████████

     █  ██████████████████████████████████████████

# REDACTED DOCUMENTS RELATED TO DOCKET 8186

# Exhibit J-C - REDACTED



5900T

Name of Patient: ██████████████

Physician provider of information about procedure: ████████████

(A) (1) I acknowledge and understand that the following procedure(s) (including procedures and/or additional services, such as anesthesia, radiology, pathology and the like) including which has (have) been described to me is (are) to be performed on the patient,

Procedure: ████

and that as a result of the performance of the procedure(s) there is a material risk that the patient may suffer infection, allergic reaction, severe loss of blood, loss or loss of function of any limb or organ, paralysis, paraplegia or quadriplegia, disfiguring scar, brain damage, cardiac arrest, or death. In addition to the above, anesthetic procedures may also result in dental or nerve injury, headache or backache.

(2) I acknowledge and understand that during the course of the procedure(s) described in subparagraph (A) (1) above, conditions may develop which may reasonably necessitate an extension of the original procedure(s) or the performance of procedure(s) which are unforeseen or not known to be needed at the time this consent is obtained. I therefore consent to and authorize the persons described in the last paragraph of this consent to make the decisions concerning the performance of and to perform such procedure(s) as they may deem reasonably necessary or desirable in the exercise of their professional judgement, including those procedures that may be unforeseen or not known to be needed at the time this consent is obtained. This consent shall also extend to the treatment for all conditions which may arise during the course of such procedures including those conditions which may be unknown or unforeseen at the time consent is obtained.

(B) The anesthesia considered suitable for this type of surgery/procedure has been presented to me in general terms through methods such as direct communications, videotapes, audiotapes, pamphlets or booklets. The Anesthetic Plan, including the method of administration, will be discussed with me by a member of the anesthesia group before the administration of any anesthetic medication. My anesthetic will be administered by an anesthesiologist, or an anesthetist under the direct supervision and control of an anesthesiologist.

(C) I acknowledge and understand and duly evidence in writing by executing this form that I have been informed in general terms of the following,

    (1)  A diagnosis of the condition requiring the procedure(s)

    (2)  The nature and purpose of the procedure(s)

    (3)  The material risks of the procedure(s) (see paragraph (A) above)

    (4)  The likelihood of success of the procedure(s)

    (5)  The practical alternatives to such procedure(s), if any, and

    (6)  The prognosis if the procedure(s) is (are) rejected and that all were provided through the use of video tapes, audio tapes, pamphlets, booklets, or other means of communication or through conversations with the responsible physician, or other medical personnel under the supervision and control of the responsible physician, other medical personnel involved in the course of treatment, nurses, physician's assistants, trained counselors, or patient educators.

(D) I acknowledge that there are practical alternatives to the procedure(s) described in paragraph (A) which alternatives reasonably prudent physicians generally recognize and accept.

(E) I acknowledge and understand that this request for and consent to surgical or diagnostic services and anesthesia procedures shall be valid for the responsible physician, all medical personnel under the direct supervision and control of the responsible physician, and for all other medical personnel otherwise involved in the course of treatment.

I have been given ample opportunity to ask questions and any questions I have asked have been answered or explained in a satisfactory manner.

By signing below, I acknowledge that I have read or had it read or explained to me and I understand this form and I voluntarily consent to allow Dr. _____ or any physician(s) designated or selected by him or her and all medical personnel under the direct supervision and control of such physician and all other personnel which ma██████████████████████procedures to perform the procedures described or otherwise referred to herein.

Sig██████████████████████████████    ██████████████    ████████

 

| Relationship of Authorized Person | Date | Time |
|---|---|---|

## WAIVER OF RIGHT TO BE INFORMED

I fully and completely **waive the right to be informed** of the information specified in paragraph (B) above **and request that such information not be disclosed to me.**

| Signature of Patient or Authorized Person | Witness |
|---|---|

| Relationship of Authorized Person | Date | Time |
|---|---|---|

DOB ████████████████

██████████████████

1022600161

Patient ID Area

## CONSENT TO SURGICAL OR DIAGNOSTIC AND ANESTHESIA PROCEDURE(S)

PRINTED BY: ████████
DATE      12/28/2016

Form # NS180 (04/04)    Page 1 of 2

## CONSENT FOR TRANSFUSION OF BLOOD OR BLOOD PRODUCTS

1. I consent to have blood and/or blood products transfusion(s) as may be deemed advisable by Dr. ███████ or his/her designee and the risks, of refusal, benefits, and alternatives to blood or blood product transfusions have been explained to me.

2. I understand that no guarantee has been given by anyone as to the results that may be obtained.

3. Potential benefits of receiving blood or blood products include:

   • Restoring blood volume
   • Replacing clotting factors; and
   • Improving oxygen delivery to the body.

4. Potential risks of not receiving blood or blood products include:

   • Death
   • Heart attack
   • Stroke
   • Bleeding.

5. I understand that reactions are very unusual. The potential risks of blood or blood products include, but are not limited to:

   • Temporary transfusion reactions such as headache, fever, chills, rash, and difficulty breathing;
   • Hepatitis;
   • Severe transfusion reactions potentially resulting in death;
   • HIV (Human Immunodeficiency virus) (AIDS); and
   • Other infectious agents.

6. Potential alternatives to receiving community supplied blood or blood products include:

   • Donating my blood several weeks in advance;
   • Friends/relatives with compatible blood donating blood for me, if donated weeks in advance;
   • Cell saving technology (capturing and returning my own blood); and
   • Intravenous (IV) fluids to increase volume.

I, the undersigned, have had this blood / blood component and transfusion consent explained to me and fully understand the contents of this authorization.

███████████████████████████        ████████████████████████

Signature of Patient or Authorized Person

███████████████████        ████████████        █████████

Relationship of Authorized Person          Date                    Time

---

## REFUSAL OF BLOOD OR BLOOD PRODUCTS

I refuse the use of any blood and/or blood products. I understand the risks of not receiving blood and/or blood products.

Signature of Patient or Authorized Person          Witness

Relationship of Authorized Person          Date                    Time

DOB ████████████████

1022600161

Patient ID Area

PRINTED BY: LAMBESA1

DATE    12/28/2016   Page 2 of 2

Form # NS180 (04/04)

    

# REDACTED DOCUMENTS RELATED TO DOCKET 8186

# Exhibit J-I - REDACTED

Do Not Disclose  Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT

 2                     DISTRICT OF ARIZONA

 3

 4   IN RE:  BARD IVC FILTERS        ) Case No.

     PRODUCTS LIABILITY LITIGATION  ) MD-15-02641-PHX-DGC

 5   _____

 6

 7

 8                     DO NOT DISCLOSE

 9        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11

12   VIDEOTAPED DEPOSITION OF ███████████████████

13                     August 5, 2017

14              Winston-Salem, North Carolina

15                       8:03 a.m.

16

17

18

19

20

21

22

23   Reported by:  Karen Kidwell, RMR, CRR

24              GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

25                  deps@golkow.com
```



```
 5        Q.    How did that direct the course that you

 6    took?
```

```
19    my medical experience, albeit limited,
```

Again, it's hard to say, because in all of

```
 1    especially with contrast, such as this.
```

█    █    ████████████████████████

█    ████████████████████████████

█    ██████████████████████████

█    ████████████████████████████

█    ████████

```
 7         A.    I will say that again, having never seen a
 8    presentation like this, and the medical literature
 9    not being very robust on these types of
10    presentations,
```
████████████████████████████

█    ███████████████████████████

█    █████████████    ████████████████

█    ███████████████████████████

█    ██████████████████████████

█    ████████████████████

```
16         Q.    So what was your next step?  Did you order
17    additional tests, or what did you order?
```

█    █    ████████████████████████

█    ████████████████████████████

█    ████████████████████████████

█    ████████████████████████████

█    ████████████████████████████

█    ██████████████████████████████

█    ████████████████████████████

█    ██████████████████████████

# REDACTED DOCUMENTS RELATED TO DOCKET 8186

Exhibit J-J - REDACTED

1                    UNITED STATES DISTRICT COURT

                        DISTRICT OF ARIZONA

2

3

4     IN RE:  BARD IVC FILTERS        ) Case No.

      PRODUCTS LIABILITY LITIGATION  ) MD-15-02641-PHX-DGC

5     _____

6

7

8                         DO NOT DISCLOSE

9          SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11

12     VIDEOTAPED DEPOSITION OF ███████████████████

13                     March 23, 2017

14                    Savannah, Georgia

15                      1:41 p.m.

16

17

18

19

20

21

22

23   Reported by:  Karen Kidwell, RMR, CRR

24              GOLKOW TECHNOLOGIES, INC.

            877.370.3377 ph | 917.591.5672 fax

25                  deps@golkow.com

1        A.    Correct.

█        █     ███    ███████████████████████

█        ████████████████████████████████████

█        █     ███

█        █     ██████████████████████████████

█        █     ██████

7        Q.    And how did you, to the best of your

8    recollection, get involved in the care and treatment

9    of ███████████

█        █     ██████████████████████████████

█    █████████████████████████████████████

█    ███████████████████████████████████████

█    █████████████████████████████████████

█    ██████████████████████████████████████

█    ██████████████████████████████████

█    ███████████████████████████████████████

█    ████████████████████████████████████

█        █     ███████████████████████████████

█    ███████ as an interventional radiologist, where you

20   have some special expertise and abilities to actually

21   act on this, as opposed to the radiologist who took

22   the original films, who's not interventional, to use

23   the word you used?

24       A.    Correct.

25       Q.    Let me ask you if you would turn to page 3

Do Not Disclose - Subject to Further Confidentiality Review





2          And I'm a little bit more conservative, I

3     suppose, than a lot of people in my approach to a lot

4     of different things. ████████████████████████████

14         Q.   Okay.  And I was focusing a bit on just --

15    the last question, ███████████████████ Did you --

16    my -- let me make sure I understand.

21         A.   Yes.

22         Q.   Okay.  And did you discuss -- well, let me

23    come back to that point.

24         A.   Okay.

25         Q.   We will come back to that after.  After

# REDACTED DOCUMENTS RELATED TO DOCKET 8186

# Exhibit J-Q - REDACTED

1          IN THE UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF ARIZONA
3                      -  -  -
4

     IN RE:  BARD IVC          :
5    FILTERS PRODUCTS          :   NO.
     LIABILITY LITIGATION      :   MD-15-02641-
6                              :   PHX-DGC
                               :
7                              :
8                      -  -  -
9                   July 18, 2017
10                     -  -  -
11

12      DO NOT DISCLOSE - SUBJECT TO FURTHER
13           CONFIDENTIALITY REVIEW
14

                 Videotaped deposition of
15   MARK W. MORITZ, M.D., taken pursuant to
     notice, was held at the offices McCarter
16   & English, LLP, 100 Mulberry Street,
     Newark, New Jersey, beginning at 9:07
17   a.m., on the above date, before Michelle
     L. Gray, a Registered Professional
18   Reporter, Certified Shorthand Reporter,
     Certified Realtime Reporter, and Notary
19   Public.
20

                         -  -  -
21

22         GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
23            deps@golkow.com
24

Do Not Disclose - Subject to Further Confidentiality Review

1          Q.     Failures of Bard filters

2     include tilting?

3          A.     Correct.

4          Q.     Failure of Bard filters

5     include fracture?

6          A.     Yes.

7          Q.     Embolization?

8          A.     Yes.

9          Q.     And failures also include

10    penetration into other organs, correct?

11         A.     Correct.

12         Q.     And you have seen at least

13    in reviewing the plaintiff experts that

14    there were internal documents in Bard

15    which spoke to serious injuries, and even

16    death caused by failure modes of Bard

17    filters?

18         A.     Correct.

19         Q.     And certainly that's

20    something I think you would agree that a

21    medical doctor would want to know from a

22    medical device company in making

23    decisions about which type of devices to

24    use for patients, fair?

Do Not Disclose - Subject to Further Confidentiality Review

1              MR. BROWN:  Object to the

2       form.

3              THE WITNESS:  Yes.

4    BY MR. O'CONNOR:

5       Q.    And certainly from what

6    you've told me before, you certainly

7    cannot discuss what if anything Bard did

8    by way of warning of its knowledge of the

9    types of filters and complications that

10   Bard became aware of, true?

11      A.    Well, I remember a letter

12   around 2005 that I think I got.

13      Q.    All right.  So you got some

14   kind of "Dear Colleague" or "Dear Doctor"

15   letter?

16      A.    "Dear Doctor" letter.

17      Q.    You're not going to be

18   talking about that letter in this trial,

19   fair?

20             MR. BROWN:  Object to the

21      form.

22             THE WITNESS:  No, I didn't

23      intend to.

24

# REDACTED DOCUMENTS RELATED TO DOCKET 8186

# Exhibit M-A - REDACTED

███████████████████████████

Ph: ███████████████████

Account ID

████████████

Visit ID

████████████

Detailed Bill For

Patient Name:
Account Class:
Attending Physician:

Guarantor Name & Address

████████████████████████

SurgeAdmission Date:
Discharge Date:

Charges
=====================================================================
Service  Cost      Rev.   Proc.        Description           Qty.  Amount
Date     Ctr.      Code   Code
=====================================================================

████████████████████████████████████████████████████████████

Total hospital charges:

Payments
=====================================================================

# REDACTED DOCUMENTS RELATED TO DOCKET 8186

# Exhibit M-C - REDACTED

Do Not Disclose - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

                   DISTRICT OF ARIZONA

 2              No. MD-15-02641-PHX-DGC

 3

 4    In Re: Bard IVC Filters Products

      Liability Litigation

 5

              DO NOT DISCLOSE - SUBJECT TO FURTHER

 6                 CONFIDENTIALITY REVIEW

        _____

 7

              WITNESS:  ████████████████████

 8      _____

 9              Pursuant to Fed. R. Civ. P. 26 and 30

10      the videotaped deposition of Roderick Tompkins,

11      M.D. was taken before Janine N. Leroux,

12      Stenographic Court Reporter and Notary Public -

13      Special Commission in and for the State of

14      Kentucky at Large, at the 613 23rd Street, Suite

15      440, Ashland, Kentucky on Tuesday, April 11,

16      2017, commencing at the approximate hour of 4:45

17      p.m.  Said deposition was taken pursuant to

18      Notice.

19

20

21

22

23

24

25
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1          be -- I will be doing the same thing on my

 2          objections.

 3     BY MR. DeGREEFF:

 4          Q     Has anyone from Bard ever made you

 5     aware of deaths caused by the Bard IVC filters?

 6          A     No.

 7          Q     If there were deaths caused by Bard IVC

 8     filters that you were using in patients, is that

 9     something you'd want to know?

10               MS. HELM:  Object to the form.

11          A     Yes.

12          Q     It would be important for you to know,

13     right?

14          A     Yes.

15          Q     Something you would consider in making

16     your decisions about which filter to use?

17               MS. HELM:  Object to the form.

18          A     If it -- yes.

19          Q     And is that something that you would

20     pass on to your patients?

21          A     I wouldn't use the filter if I was

22     aware that deaths were occurring concurrently with

23     me placing these filters.

24          Q     Okay.  Are you aware that -- that

25     perforation is progressive in nature?
```

Do Not Disclose - Subject to Further Confidentiality Review

1    accounts, yes.

2              MS. HELM:   Object to the form.

3       A    And so what was the question?

4       Q    I'll withdraw it.

5              We were talking earlier about sales

6    representatives being present when you were doing

7    IVC placements in bariatric patients.  Do you

8    remember that?

9       A    Yes.

10      Q    Did you ever have any specific

11   discussions with those reps about the use of IVC

12   filters in bariatric patients?

13      A    I don't recall.

14      Q    Okay.  Do you remember ever being told

15   by any Bard sales representative that IVC filters

16   should not be used in bariatric patients?

17      A    No.

18      Q    Would you expect the -- the information

19   that a -- that a medical device sales rep was --

20   was providing to you to be honest, accurate and

21   complete?

22      A    Yes.

23      Q    And would the same be true of a medical

24   device company in general?

25      A    Yes.

Do Not Disclose - Subject to Further Confidentiality Review

```
 1     product?

 2          A     Yes.

 3          Q     And something that you would use when

 4     meeting with patients?

 5          A     Yes.

 6          Q     If there were problems with one of

 7     Bard's IVC filters such as the Eclipse for

 8     example, would you have expected the Bard sales

 9     rep to inform you of those problems?

10               MS. HELM:  Object to the form.

11          A     Yes.

12          Q     And were you ever told by any Bard

13     sales representative about problems with the

14     Eclipse filter?

15               MS. HELM:  Object to the form.

16          A     No.

17          Q     Were you ever told by any Bard sales

18     representative about any -- any problems or

19     complications associated with any of their

20     filters?

21               MS. HELM:  Object to the form.

22          A     No.

23          Q     Sir, let's go through some of your

24     records, and I'm going to try to -- I tried to

25     find the earliest I could find.
```

Do Not Disclose - Subject to Further Confidentiality Review



```
 4              Did I read that correctly?
 5      A       Yes.
 6      Q
25      A       Yes.
```

Do Not Disclose - Subject to Further Confidentiality Review

 ████      █████████         █████████████████████ █

 ██      ████████

3          A      Yes.

4          Q      And what is the proximal duodenum?

5          A      There's four parts to the duodenum.

6    The proximal duodenum is the first part.

7          Q      Okay.  Am I saying it correct or wrong

8    when I say duodenum?

9          A      It depends on what country you're from.

10         Q      Okay.  What country says is that way?

11         A      England.

12         Q      So how should I be saying it?

13         A      Duodenum.

14         Q      That's what I used to say but then --

15                MR. O'CONNOR:  I told you.

16         Q      -- everybody else said duodenum.  So I

17   should go with duodenum?

18         A      In America it's normally duodenum.

19         Q      Perfect.  I am definitely from America.

20                All right.  So looking at Page 13, this

21   appears to be a ████████████    ██████    ██████████████

 ██        ████████████████████████        is that correct?

23         A      Yes.

24         Q      ████████████████████████████████████████

25   ██████████████

Do Not Disclose - Subject to Further Confidentiality Review



```
 1   ████████   ████████████████   ██████
 2        A     Yes.
 3        Q     And then ██████   ██████████   ██████
 4   ████████████████████   ██████████
 5        A     Yes.
 6        Q     ████████████████████████   ■
 7   ████████████████████████
 8              MS. HELM:   Object to the form.
 9        A     ████████████████████████
10   ██████
11     ■   ██████   ██████   ■  ██████████
12   ████████████████████
13     ■   ██████████████████████████
14        Q     Okay.  And then looking at -- at plan
15   on that page it says, ████████████
16   ████████████████████████
17   ████████████████████████████   Procedure
18   and risks" --
19              I guess did I read that first sentence
20   correctly?
21        A     Yes.
22        Q     And then you went on to say, ██████
23   ████████████████████████████
24   ████████████████   ██████████   ██████
25   ██████   ████████████████
```

Do Not Disclose - Subject to Further Confidentiality Review



5      A      What's typed right there.

8      A      What is right there.

9      Q

All right.  Well --

Do Not Disclose - Subject to Further Confidentiality Review



1          MS. HELM:  Object to the form.

2     Q    Yeah, that's a -- fair enough.

Do Not Disclose - Subject to Further Confidentiality Review



```
 9        A     Well --

10              MS. HELM:  Object to the form.

11        A     -- if I can go back to the last

12   question, I mean I -- I see what's here.  But many

13   times I relate that if it couldn't be retrieved --

█████  ████████                               But if it

15   couldn't be retrieved, but prior to that they were

16   all permanent anyway.

17        Q     Okay.

██  █████  ██████

19        A     No.

20        Q     And -- and so did -- I guess my

21   question is:  ███

███

██  ██████

24              MS. HELM:  Object to the form.

25        A     In what's documented here, yes.
```

Do Not Disclose - Subject to Further Confidentiality Review



1        Q

9                    MS. HELM:  Object to the form.

10

16                    MS. HELM:  Object to the form.

19                    MS. HELM:  Object to the form.

20

21        Q       And did you ever --

22        A

24

25

Do Not Disclose - Subject to Further Confidentiality Review



1

2         MS. HELM:  Object to the form.

3    A

4    Q

5                           --

6                           --

12        MS. HELM:  Object to the --

13   Q    -- is that correct?

14        MS. HELM:  Object to the form.

15   A

17   Q    I do.  And we'll -- we'll talk about

18   that.

19        But isn't the -- would the consent form

20   essentially have the same -- is it essentially a

21   statement of -- of what you discussed

22   A    Yes.

23        MS. HELM:  Object to the form.

24   Q    Would there be things in the consent

25   form that would be different than what you've

Do Not Disclose - Subject to Further Confidentiality Review



```
 1    listed here?

 2         A    No.

 3         Q    ████████████████████    ██████████

 4    ██████████████████████████████████████████

 █    ██████████████████████████████████████████

 █    ██████████████████████        █

 █              ██████████████████████████████

 8         A    What is there, an FDA statement had

 9    come out shortly prior to this that we began to

10    inform the patients that the FDA said it should be

11    removed.

12         Q    Are you talking about the July 2010 FDA

13    statement?

14         A    Are there others?

15         Q    (Laughter).  Do you remember

16    specifically when they --

17         A    No.

18         Q    Okay.  And what did the FDA say about

19    removal of IVC filters?

20         A    They should be retrieved if possible.

21         Q    And why?

22              MS. HELM:  Object to the form.

23         A    I don't recall.

24         Q    ███████████████████████████████████

 █    ████████████████████████████████████████
```

Do Not Disclose - Subject to Further Confidentiality Review

```
1                    And so this was a record from

2        April 11th of 2012; is that correct?

3            A    Yes.

4                 MS. HELM:  Exactly five days ago today.

5                 MR. DeGREEFF:  Hey, you were married

6            exactly --

7                 MS. HELM:  25 years ago today.

8                 MR. DeGREEFF:  That's right.  Happy

9            anniversary by the way.

10                MS. HELM:  Where is my bottle of

11           champagne?

12                MR. DeGREEFF:  I know who would you

13           rather be with?

14                MS. HELM:  On the advice of counsel I

15           decline to answer.

16                MR. DeGREEFF:  There you go.  All

17           right.  I'm sure I'm super high on that list.

18       BY MR. DeGREEFF:

19           Q    So -- so in -- in deciding which --

20       which filter to use, do you rely on information

21       from the manufacturer?

22           A    No.

23           Q    Okay.

25           A    That's what I'm looking for.
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1          A     Okay.

 2          Q     All right.  You state that the risks --

 3    under indications and findings it says, "The risks

 4    and benefits were discussed with the patient and

 5    consent was obtained."

 6                Did I read that correctly?

 7          A     Yes.

 8          Q     ███████████     ████████████████████

    █   ███████████████████████████████████████

    ██   ████████████████

    ██     ██   ████

12          Q     And is this -- is this consent that was

13    obtained, is that a reference to the consent

14    document?

15          A     Yes.

16                MR. DeGREEFF:  9?

17                COURT REPORTER:  Yes.

18                MR. DeGREEFF:  Thank you, ma'am.

19                (DEPOSITION EXHIBIT 9 WAS MARKED.)

20    BY MR. DeGREEFF:

21          Q     I'm handing you what's been marked as

22    Deposition Exhibit 9.  ████████████████████

██   ██████████████████████████████████████

██   █████████████████████████████████████

25          A     Yes.
```

Do Not Disclose - Subject to Further Confidentiality Review



```
 1          Q      And if you'll look at the -- and this
 2     is a consent -- this is titled 'Consent to
 3     Operation or Other Procedures', correct?
 4          A      Yes.
 5          Q      So is this a consent to the
 6     complications -- potential complications
 7     associated with the -- with the actual procedure
 8     for implantation?
 9          A      Yes.
10          Q
11
12
13
14
15
16
17
18
19
20          Q      And again, is that the same
21     information that -- or strike that.
22
23
24
25
```

Do Not Disclose - Subject to Further Confidentiality Review



1

2

3

4       Q     Okay.  You wouldn't have -- I guess

5   strike that.

6            Would you have implanted it if there

7   was any indication of damage or a problem with the

8   filter?

9       A     No.

10      Q

11

12

13      Q     Is it fair to say that you -- strike

14   that.

15

16

17

18            MS. HELM:  Object to the form.

19

20

21

22            MS. HELM:  Object to the form.

23

24

25

Do Not Disclose - Subject to Further Confidentiality Review



```
 1     f
 2
 3        A     No.
 4              MS. HELM:  Object to the form.
 5
 6
 7              MS. HELM:  Object to the form.
 8
 9
10
11
12              MS. HELM:  Object to the form.
13
14
15        Q     No, okay, strike that.  No, that's not
16     what I meant.
17
18
19
20
21              MS. HELM:  Object to the form.
22
23
24
25
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1          Q       Would you -- if you expected those --

 2     those issues to occur, would you have used the

 3     filter?

 4                  MS. HELM:   Object to the form.

 5          A       No.

 6          Q       And is it -- in your opinion is it

 7     reasonable for a patient to expect those

 8     complications not to occur?

 9                  MS. HELM:   Object to the form.

10          A       Unfortunately there's complications

11     with any product.

12          Q       Well, if -- if a patient is not

13     informed of those complications, they can't

14     reasonably make a decision whether -- strike that.

15     Move on.

16                  The IVC filter complications can occur

17     even if -- even if the implanting physician does

18     everything correctly; is that correct?

19                  MS. HELM:   Object to the form.

20          A       Yes.

21          Q       Doctor, would you agree that a -- that

22     a perforation of the vena cava filter is -- is not

23     within a patient's reasonable expectations?

24                  MS. HELM:   Object to the form.

25          A       The perforation of the vena cava
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1        Q     Strike that.  Let me see if I can say

 2    that a better way.

 3              Is it reasonable for a -- for a patient

 4    to expect a vena cava filter not to penetrate its

 5    -- their vena cava?

 6              MS. HELM:  Object to the form.

 7        A     It's reasonable that they wouldn't

 8    expect that, yes.

 9        Q     Okay.  And would it -- is it reasonable

10    for a patient to expect an IVC filter not to

11    penetrate their organs?

12              MS. HELM:  Object to the form.

13        A     That is what they should expect.

14        Q     In your -- and in your experience would

15    it be a rare and unusual circumstance where a vena

16    cava filter would perforate a patient's organs?

17              MS. HELM:  Object to the form.

18        A     Yes.

19        Q     That's not something that you would

20    expect to occur, correct?

21              MS. HELM:  Object to the form.

22        A     It's certainly within the realm of

23    small risks.

24        Q     Is it -- when you're putting a filter

25    into a patient, that's not something you would
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    expect to occur; is that fair?

 2               MS. HELM:  Object to the form.

 3         A     It's something that can occur, but it's

 4    not something I would expect to occur.

 5         Q     Okay.  Doctor, what is -- that would

 6    not be within your reasonable expectation of an

 7    outcome from a -- from a future implantation -- of

 8    a future outcome from an implanted IVC filter,

 9    fair?

10               MS. HELM:  Object to the form.

11         A     It would be a possible but not likely

12    outcome.

13         Q     Okay.  Doctor, are you -- do you know

14    what an IFU is?

15         A     I have heard but I've forgotten.

16         Q     Are you familiar with the instructions

17    for use for vena cava filters?

18         A     Yes.

19               (DEPOSITION EXHIBIT 10 WAS MARKED.)

20         Q     I'm handing you what's been marked as

21    Exhibit 10.  Have you seen the instructions for

22    use for the Eclipse filter before?

23         A     Yes.

24               MS. HELM:  Are you representing that

25         this is the IFU filter at issue?
```

Do Not Disclose - Subject to Further Confidentiality Review

1    to be contraindicated for something?

2        A      Those are the situations in which it's

3    not advisable to place it.

4        Q      If a -- if a -- if something was listed

5    as a contraindication for use in the IFU, would

6    you implant the filter in -- in those situations?

7        A      No.

8        Q      Contraindications for use does not

9    include bariatric surgery, does it?

10       A      No.

11       Q      If -- if contraindications for use in

12   the Eclipse IFU had listed bariatric surgery,

13   would you use the filter in bariatric patients?

14       A      No.

15       Q      Do you review the IFU for medical

16   devices that you use?

17       A      I have seen this.  I don't know that

18   I've read every word in it.

19       Q      Okay.  Is it your practice, though, to

20   review the IFU for devices that you're implanting

21   into your patients?

22       A      If it's a new device, I would look it

23   over.

24       Q      And is -- and part of the reason you

25   review an IFU is so that you can properly inform

Do Not Disclose - Subject to Further Confidentiality Review

```
 1     patients; is that correct?

 2               MS. HELM:  Object to the form.

 3     A     No.

 4     Q     You wouldn't -- you wouldn't inform

 5     patients of warnings that are listed in an IFU?

 6     A     If they were pertinent.

 7     Q     Okay.  If the IFU included pertinent

 8     warnings, is that something that you would pass on

 9     to your patients?

10     A     Yes.

11     Q     I want you to look at the -- at the

12     warnings section.  If you look on it's Page 881.

13     12 says, "Movement" --

14     A     Which 12, the upper?

15     Q     The upper --

16     A     The top 12?

17     Q     The upper 12, sorry, under the warnings

18     sections it says, "Movement, migration or tilt of

19     the filter are known complications of vena cava

20     filters.

21               Migration of the filters to the heart

22     or lungs has been reported.  There have also been

23     reports of the caudal migration of the filter."

24               Did I read that correctly?

25     A     Yes.
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1          Q      This section -- strike that.
 2                 Does this make any differentiation
 3      between Bard filters and competitor filters?
 4          A      I don't know.
 5          Q      Would you read it to make any
 6      differentiation between Bard filters and
 7      competitor filters?
 8                 MS. HELM:  Object to the form.
 9          A      Would I read what?
10          Q      The language we just talked about.
11      "Movement, migration or tilt of the filter are
12      known complications of vena cava filters."
13                 That's discussing all vena cava
14      filters, correct?
15                 MS. HELM:  Object to the form.
16          A      That's how I would read it, yes.
17          Q      Is there anything about that statement
18      that informs you of an increased risk of movement,
19      migration or tilt with Bard filters versus
20      competitor filters?
21          A      No.
22          Q      Is there anything about that statement
23      that warns you of an increased risk of movement,
24      migration or tilt with Bard filters versus -- Bard
25      optional filters versus Bard's permanent filters?
```

Do Not Disclose - Subject to Further Confidentiality Review

```
1                    MS. HELM:  Object to the form.

2          A    No.

3          Q    There's -- is there anything that would

4     -- about that language that would lead you as a

5     physician to believe that the Eclipse had a higher

6     risk of movement, migration or tilt than any other

7     filter?

8                    MS. HELM:  Object to the form.

9          A    No.

10         Q    If the -- if the Bard filter, the

11    Eclipse, had an increased risk of migration over

12    other filters, is that something you would want to

13    know?

14                   MS. HELM:  Object to the form.

15         A    Yes.

16         Q    Is that something you would take into

17    account in your risk benefit analysis on whether

18    to use the filter?

19         A    Yes.

20         Q    Would it effect your prescribing

21    habits?

22         A    Yes.

23         Q    Is it something you would pass on to

24    the patient?

25         A    If it's a significant difference, I
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1      wouldn't use the filter.
 2           Q      Doctor, as a -- as a physician, would
 3      you want to use the safest available IVC filter
 4      that would establish the goal of stopping PEs?
 5                  MS. HELM:  Object to the form.
 6           A      Yes.
 7           Q      And, Doctor, just below that there's
 8      a -- in bold it says, "See potential complications
 9      section for further information regarding other
10      known filter complications."
11                  Did I read that correctly?
12           A      I don't see that.
13           Q      It's the bold right below No. 14.
14                  MS. HELM:  My copy is so bad you can't
15           tell that it's bolded.
16           A      Yeah, I don't know that it's bold.
17      Yeah, I see what you're saying.
18           Q      And it says, "See potential
19      complications section for" -- and for the record
20      this is how it was produced to us, so there's not
21      a lot we can do about it.
22                  And it says, "See potential
23      complications for further information regarding
24      other known filters complications."
25                  Did I read that correctly?
```

Do Not Disclose - Subject to Further Confidentiality Review



9       A

10          Q      Okay.  And when a -- when a filter

11    becomes embedded and irretrievable, the patient

12    continues to have the risk of tilt -- I mean the

13    risk of perforation of the filter, correct?

14              MS. HELM:  Object to the form.

15          A      I'm not an expert on the long-term

16    consequences of filters.

17          Q      Okay.  So as you sit here, you're not

18    -- you're not -- you don't consider yourself an

19    expert on any long-term complications of filters?

20          A      No.

21          Q      Okay.  Have you spoken to the

22    interventional radiologist who tried to remove the

23    filter?

24          A      Not that I'm aware of.

25              MR. DeGREEFF:  Go ahead.  No, wait.  I

Do Not Disclose - Subject to Further Confidentiality Review



1    penetration of the IVC filter into the duodenum

2    could cause chronic abdominal pain?

3              MS. HELM:   Object to the form.

4         A    Perforated intraluminally into the

5    duodenum?

6         Q    Yes.

7         A    Potentially.

8         Q    What about tenderness of the abdomen?

9         A    If the vena cava filter were visible

10   within the lumen of the duodenum, then it may

11   cause some ulceration.

12        Q    Which would leave the tenderness of the

13   abdomen?

14        A    Yes.

15        Q    And what about abdominal cramping?

16        A    Yes.

17        Q    What about nausea?

18        A    Well, your -- yes.

25

Do Not Disclose - Subject to Further Confidentiality Review

```
 1          ███   ████   ████████████████
 ██   ████████████████████████
 3      A   ████
 4                 MR. DeGREEFF:  Go ahead.
 5                 DIRECT EXAMINATION
 6      BY MR. O'CONNOR:
 7         Q     All right.  Doctor, I'm Mark O'Connor
 8      and I'm another lawyer representing the Plaintiff
 9      in this matter.  I have some additional questions.
10                 I've sat here and listened to you and
11      it sounds to me as though you are a medical doctor
12      who places your patients' interest and safety and
13      their well-being as a No. 1 priority; is that
14      fair?
15                 MS. HELM:  Object to the form.
16         A     That and having a outcome, yes.
17         Q     And is it fair to say, Doctor, that you
18      would expect that a medical device manufacturer
19      would similarly place a patient's interest and
20      safety first as a priority when it is promoting a
21      medical device?
22                 MS. HELM:  Object to the form.
23         A     Sometimes there are risks to devices
24      but...
25         Q     As a general rule, though, is it your
```

Do Not Disclose - Subject to Further Confidentiality Review

```
1       I'm not a marketing expert.  I don't know --
2          Q      Setting marketing aside, if Bard was
3    aware that there were rates of complications
4    stemming from caudal migration in the Eclipse
5    filter, I think we've agreed that that's something
6    you would have expected them to tell you?
7                 MS. HELM:  Object to the form.
8          A      Yes.
9          Q      And told you as soon they knew, right?
10                MS. HELM:  Object to the form.
11         A      As soon as they verified there was a
12   significant issue.
13         Q      And if they were receiving feedback
14   from other doctors that there were problems in the
15   Eclipse with caudal migration as early as 2010, is
16   that something you also would have expect to
17   notify you as a doctor who was using the Eclipse?
18                MS. HELM:  Object to the form.
19         A      I -- I wouldn't expect that from A
20   marketing standpoint.  I would assume they would
21   improve the filter.
22         Q      Well, you would expect Bard to provide
23   you with accurate and through information as it
24   became aware of problems with the filter, right?
25         A      Yes.
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1        A     Yes.

 2        Q     If Bard was aware that there were

 3   problems with the designs of a filter that was on

 4   the market that was causing complications and

 5   problems with patients, would you expect Bard to

 6   notify you about that immediately?

 7              MS. HELM:  Object to the form.

 8        A     Yes.

 9        Q     And would you expect Bard to notify you

10   immediately if it was in the process of

11   redesigning the filter in a manner to reduce or

12   avoid the complications?

13              MS. HELM:  Object to the form.

14        A     Yes.

15        Q     Because that information would help you

16   decide whether you even wanted to use the filter

17   in the first place, true?

18        A     Yes.

19              MS. HELM:  Object to the form.

20        Q     Did you have an understanding, Doctor,

21   you -- you had the Eclipse filter.  Did you have

22   an understanding that there were filters that were

23   launched by Bard that were predecessors to the

24   Eclipse filter?

25        A     Was I aware there were predecessors?
```

Do Not Disclose - Subject to Further Confidentiality Review



11      Q      Okay.  If you would turn the page of

12   this IFU, which marked I've as Exhibit 17, and on

13   the next page under G you see where it says,

14   "Potential complications"?

15      A      Yes.

16      Q      And it says, "Possible complications

17   include but are not limited to the following."  Do

18   you see where I am?

19      A      Yes.

20      Q      And again -- again they tell you

21   "Movement, migration or tilt the filter are known

22   complications of vena cava filters," correct?

23      A      Yes.

24      Q      And they also tell you that "Migration

25   of filters to the heart or lungs have been

Do Not Disclose - Subject to Further Confidentiality Review

```
 1      intervention."
 2                  Did I read that correctly?
 3          A      Yes.
 4          Q      At the time ███████████     ███
 █  ████████████████████ Bard told you -- had
 6      told you that there had -- that complications
 7      could result in medical intervention and/or death,
 8      correct?
 9          A      They provided me with this literature.
10          Q      Yes, they provided you with
11      information.
12          A      Yes.
13          Q      And they told you that there had been
14      reports of complications including death
15      associated with the use of IVC filters in morbidly
16      patients, correct?
17          A      They provided me with literature that
18      stated that, yes.
19          Q      Yes, okay.  And they provided you with
20      literature that stated you needed to take that
21      into consideration when doing your risk-benefit
22      analysis ████████████████████████
 █  ████ ████ ████
24          A      Yes.
25          Q      Okay.  And this information was
```

Do Not Disclose - Subject to Further Confidentiality Review

1    available to you when you made that risk-benefit

2    analysis?

3        A    Yes.

4        Q    Okay.  Today you were shown a number of

5    internal documents from Bard.  Do you recall

6    those?

7        A    Yes.

8        Q    Some e-mails and some other internal

9    documents.  Do you recall those?

10       A    Yes.

11       Q    During the course of your practice, has

12   any medical device company ever shown you their

13   internal documents?

14       A    No.

15       Q    During the course of your practice, has

16   any internal -- any medical device company ever

17   shown you a draft e-mail?

18       A    No.

19       Q    Okay.  It is important to you to have

20   reliable information when making a risk-benefit

21   analysis on whether to use a medical device.  Do

22   you agree with me on that?

23       A    Yes.

24       Q    Okay.  As you sit here today, you don't

25   know the context of any of these internal Bard

Do Not Disclose - Subject to Further Confidentiality Review

1    Q    Doctor, a Bard representative sat with

2    you and helped you place filters in bariatric

3    surgery patient, correct?

4    A    He --

5         MS. HELM:  Object to the form.

6    A    He was present.

7    Q    He was present while you were doing it?

8    A    Yes.

9    Q    And why did you want him there?  Why

10   did you -- why was he is present?  What was the

11   purpose of him being there?

12   A    To provide information if I had

13   questions.

14   Q    Okay.  To help you if you needed it?

15   A    To provide information.  He wouldn't

16   physically help me.

17   Q    At any point did he tell you, hey, you

18   shouldn't use that IVC filter with bariatric

19   patients?

20   A    Not that I recall.

21   Q    If -- if there was some concern within

22   Bard about -- about using IVC filters with -- with

23   bariatric patients, would you have expected him to

24   tell you that?

25        MS. HELM:  Object to the form.

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    filter --
 2         A     Yes.
 3         Q     -- you did not have all the -- based on
 4    the documents you've seen here today, there are
 5    things that Bard didn't tell you about risks and
 6    problems with its filters, fair?
 7              MS. HELM:   Object to the form.
 8         A     Yes.
 9         Q     Now, Doctor, your care and treatment
10    with regard to the filters was to implant the
11    filters, fair?
12         A     Yes.
13         Q     You didn't do explants of the filters?
14         A     No.
15         Q     You didn't -- you didn't CT scan
16    filters and check for complications?
17         A     No.
18         Q     So when it comes to complications that
19    your patients may or may not have had, the
20    person -- you may not be the right person to talk
21    to; is that fair?
22         A     If they return for follow-up, then I
23    would think that they would make me aware.
24         Q     And we talked about the fact that --
25    that eventually as many as 85 percent stop
```

# REDACTED DOCUMENTS RELATED TO DOCKET 8186

# Exhibit M-D - REDACTED



Deposition of:
## Debra Mulkey

*February 8, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 57

1          toll-free number is attorney-client privilege?

2               MR. DEGREEFF:  To an attorney law firm, yeah.

3               MS. HELM:  Okay.  Before you retain them, okay.

4     BY MS. HELM:

5          Q    Do you know how you got to Mr. Degreeff's

6     firm?

7          A    I was transferred.

8          Q    Was your call physically transferred to his

9     firm, or did you have to hang up and call back?

10         A    No.  Neither.

11         Q    Okay.  Did someone from Mr. Degreeff's firm

12    call you?

13         A    I received a letter.

14         Q    And without the -- I don't want to know the

15    contents of the letter.

16         A    I couldn't tell you anyway.

17         Q    Okay.  From whom did you receive a letter,

18    someone in Mr. Degreeff's firm?

19         A    The firm, yes.

20         Q    Mr. Degreeff's law firm?

21         A    Yes.

22         Q    Okay.  You -- I'm not going to go into the

23    substance, but I'm entitled to know the event.  You saw

24    an ad in the fall of 2015; is that right?

25         A    Yes.

Debra Mulkey                                    February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 58

1          Q      And it was an ad about IVC filters; is that

2     right?

3          A      Yes.

4          Q      And the ad said if you have an IVC filter, you

5     may be entitled to compensation, call this number; is

6     that right?

7                 MR. DEGREEFF:   Object to form.

8          Q      Generally?

9          A      Generally.

10         Q      Okay.  You called the toll-free number, you

11    spoke to someone, and then without going into the

12    substance of the conversation, the next event was you

13    received a letter from Mr. Degreeff's firm; is that

14    right?

15         A      Correct.

16         Q      Okay.  Have you signed an agreement or a

17    contract of some kind with Mr. Degreeff's law firm?

18                MR. DEGREEFF:   If you know.

19         A      I'm not -- I'm not sure.

20         Q      Okay.  When did Mr. Degreeff or his law firm

21    become your lawyers?

22                MR. DEGREEFF:   Object to the form.

23         A      Shortly after -- after calling the number. I'm

24    not certain of the date.

25         Q      I think in your information you provided to us

Debra Mulkey                                    February 8, 2017
In Re: Bard IVC Filters Products Liability

1    you -- you're welcome to look and correct me.  It's on

2    page 2 of Exhibit 2, the big one.  And on page 2 under

3    paragraph 1E, it says you first retained a lawyer on

4    October 14, 2015.  Does that sound right?

5        A    That does.

6        Q    Okay.  So you saw the ad sometime before

7    October 14, 2015; is that right?

8        A    Just a matter of a week or so, yes.

9        Q    Okay.  Saw the ad, you made the phone call,

10   and subsequently got a -- at least got a letter from Mr.

11   Degreeff's firm; is that right?

12       A    Correct.

13       Q    Okay.  Okay.  Other than that one phone call,

14   the one toll-free number from the ad you saw, did you

15   reach out to any other lawyers or law firms?

16       A    No.

17       Q    Okay.  And did you make the call after --

18   after you saw the ad for the very first time?

19       A    No.

20       Q    Okay.  You had seen the ad more than once?

21       A    Yes.

22       Q    Or had you seen more than one ad?

23       A    I don't believe I saw more than one ad.

24       Q    Okay.  And when did you first start seeing the

25   ads?

Debra Mulkey                                    February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 77



Page 79



Debra Mulkey                    February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 81



2          A     Dr. Thompkins.

3          Q     Dr. Thompkins did both?   What kind of doctor

4    is Dr. Thompkins, do you know?

5          A     I'm not certain exact.

6          Q     Okay.   Days and time.

Debra Mulkey
February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 85



Debra Mulkey                                    February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 88



3       Q       Okay.   So sometime in that time period?

4       A       Correct.

5       Q

-- you understood that there were risks

7       with it, correct?

8               MR. DEGREEFF:   Object to form.

9       A       I assumed there was.   There are with

10      everything.

23      Q       Okay.   Did you know anyone that had ever been

24      treated by him before?

25      A       No.

Debra Mulkey                                    February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 93



Page  94



Debra Mulkey                                February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 95



Debra Mulkey                                    February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 96



Debra Mulkey                                        February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 97



Debra Mulkey                              February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 98

7        Q    Okay.  In Exhibits 1 and 2 that you signed,

8    you say that part of your claim is that your filter has

9    tilted.  Do you remember seeing those in Exhibits 1 and

10   2?

11       A    I do remember seeing that.

12       Q    Okay.  Why is that included in Exhibit 1 and

13   Exhibit 2, the information about tilt?

14           MR. DEGREEFF:  Just to the extent that that

15       would require you to discuss conversations you had

16       with your attorneys, then I instruct you not to

17       answer.

18   BY MS. HELM:

19       Q    Can you answer that question without revealing

20   conversations you had with your attorney?

21       A    No.

Debra Mulkey                                  February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 103

1            MS. HELM:  Okay.

2     BY MS. HELM:





Page 113

1      A    No.

2      Q    So you saw the ad -- you saw the popup and you

3  saw the ad, and you said you became concerned about your

4  filter; is that right?

5      A    Correct.

6      Q    Okay.  And so you called a lawyer, correct?

7      A    Correct.



24      Q    And after you saw the ads and the popup on the

25  Internet about the alleged problems with the filters,

Debra Mulkey                                    February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 137

1    have now is caused by that.  Not knowing, you know,

2    whether, you know, I might have to have a surgery, could

3    be life-threatening.  I worry about, you know, pieces of

4    it tearing up.  I don't know, I just -- I just worry

5    daily about -- where before I didn't have this worry.  I

6    worry daily about -- to some extent every day about it.

7    If I have pains that are different than what normal

8    pains I have, then I wonder if it's caused by the

9    filter.

14        Q    Okay.  So once you saw the ads and the

15   pop-ups, and did the research on the Internet sometime

16   in mid to late 2015, until late 2016,

Debra Mulkey                                    February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 138

8        Q     Okay.  And you found out it was harming people

9    bad before you hired Mr. Degreeff, right?

10        A     Yes.

11        Q     Okay.  So we know that was in October of 2015,

12    because you told us that in Exhibit 2, correct?

13        A     I believe so.

14        Q     Okay.  So from at least October of 2015, until

15    the very end of 2016, in October of 2015, you had

16    through the Internet and television ads information that

17    told you -- that caused you to be concerned about your

18    filter, right?

19            MR. DEGREEFF:  Object to form.

20        A     Right.

25        Q     Okay.  So you just spent that -- you just

Page 142

1    asked about bodily injuries as a result of the

2    implantation of the filter, and do you see your answer

3    there?

4         A    Yes.

5         Q    It's basically the same as your answer on

6    Exhibit 1, isn't it?

7         A    Correct.

8         Q    Okay.  And then, in paragraph 2, it says "When

9    was the first time you experienced symptoms of any

10   bodily injuries you claim in your lawsuit to have

11   resulted from that Bard inferior vena cava filter?"  Do

12   you see that question?

13        A    Yes.

Debra Mulkey                                    February 8, 2017
In Re: Bard IVC Filters Products Liability

6              MR. DEGREEFF:  Object to form.

7         A    I don't know, it just seems like symptoms

8     isn't the correct word to use for that, I don't know.

9         Q    Well, okay.  Ms. Mulkey, when you helped

10    answer and swore that the answer to question 13B on page

11    14 of Exhibit 2 was correct, did you understand the

12    question?

13        A    I did.  I did, but --

14        Q    Okay.  And the question is when was the first

15    time, correct?  Do you see that?  That's the very first

16    five words.

17        A    It is.

20             MR. DEGREEFF:  Object to form.

21        A    Yes.  But I went on to say that I didn't

22    realize at that time it was an injury.  I didn't.

23        Q    Okay.  But that's not the question.  The

24    question is when was the first time you experienced

25    symptoms?

Page 144

1        A     That's what I'm saying.  Symptom is -- is I

2    don't know.  I didn't pay no attention, I guess when it

3    said symptoms maybe.  Symptoms, now, just don't seem

4    like the right, appropriate word to be there.

5        Q     Well --

6        A     But it is.

7        Q     -- with all due respect, ma'am, the question

8    -- we were entitled to ask the question, and your

9    responsibility was to answer the question under oath.

10       A     Right.

11       Q     So you -- this is your answer under oath --

12       A     That is my answer.

13       Q     Okay.  Okay.  On 13C, when it says "When did

14   you first attribute the injuries to your filter," the

15   symptoms of the -- we've talked about the injuries in A,

16   the pain, suffering and mental anguish and loss of

17   enjoyment of life.  We talked about when you started

18   experiencing those symptoms in B, and then in C, the

19   question is "When did you attribute those to your

20   filter," and you said "When I saw an ad on TV in 2015 --

21   in October 2015," right?

22       A     Correct.

23

Page 147



16      Q      Okay.

17      A      It just seemed better to put they in there.

18      Q      Okay.  But that's not the question.  You agree

19  with me, right?  That's not the question?

20      A      Yeah, that's kind of right up there with the

21  symptom one, yeah.

22      Q      Okay.  And then let's look at 13E on page 15

23  of Exhibit 2.  It says "To the best of your knowledge

24  and recollection, has any healthcare provider ever told

25  you orally or in writing that any symptoms related to

Page 148

1   bodily injury are related to the Bard Inferior Vena Cava

2   filter?" █████████████ ████████████ ████████████

    ████████ ███████████████████ ███████████

      █ ████████

5      Q   Okay.  Okay.  Then it gets to F and it says

6   "Are you currently experiencing symptoms related to your

7   claimed bodily injuries," and you said "Yes," correct?

8      A   Correct.

9      Q   And then you've said "I have mental anguish

10   that the filter remains in my body, and that it can

11   fracture or migrate causing me bodily injury in the

12   future."  Is that -- are those your words?

13      A   I don't think I used the word migrate.  I put

14   move or shift.

15      Q   Okay.  So somebody changed your words?

16      A   Sounded more professional.

17      Q   Okay.  And then you said "I worry about having

18   a second removal of the IVC filter and whether it will

19   be able to remove without causing me bodily injury," and

20   we've talked about that, right?

21      A   Right.  Correct.

22      Q  █████ ██████████████████ ████████

    ████████████████████████████████

    ███████████████████████████████████

    ███████

Debra Mulkey                                    February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 179



Page 180

1        A     No.

2        Q     At that point, did you believe that there was

3    anything defective about your filter?

4              MS. HELM:   Object to the form.

5        A     No.

6        Q     At that point, did you believe that you had

7    been wronged by the defendant manufacturer, Bard, or any

8    other manufacturer of a filter?

9              MS. HELM:   Object to the form.

10       A     No.

11

14       Q     When did you first become aware that you were

15   injured by the filter?

16       A

17       Q     Okay.   And that was the date that defense

18   counsel continually asked you about, right?

19             MS. HELM:   Objection to the form.

20       A     Yes.

21       Q     And when did you first realize that there may

22   be something defective about the filter?

23       A     Late 2015.

24       Q     And when did you first realize that you may

25   have been wronged by the defendants, in this case, Bard,

Debra Mulkey                                    February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 182



Debra Mulkey                              February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 183



17      Q    You were asked some questions about Exhibit 1

18    and 2, which is the plaintiff's profile form and the

19    plaintiff's fact sheet; do you remember that?

20      A    Yes.

21      Q    And defense counsel spent a lot of time trying

22    to insinuate that somehow there was something

23    inappropriate about how those were filled out.  We

24    helped you fill out your plaintiff's profile form and

25    your plaintiff's fact sheet, right?

Debra Mulkey                                    February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 185

1     allowed to claim and what you're not allowed to claim?

2          A     No.



# REDACTED DOCUMENTS RELATED TO DOCKET 8186

# EXHIBIT M-E - REDACTED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

*MDL No. 2641*
*In Re Bard IVC Filter Products Liability Litigation*

## PLAINTIFF FACT SHEET

Each plaintiff who allegedly suffered injury as a result of a Bard Inferior Vena Cava Filter must complete the following Plaintiff Fact Sheet ("Plaintiff Fact Sheet"). In completing this Fact Sheet, you are **under oath and must answer every question.** You must provide information that is true and correct to the best of your knowledge. If you cannot recall all of the details as requested, please provide as much information as you can and then state that your answer is incomplete and explain why, as appropriate. If you select an "I Don't Know" answer, please state all that you do know about that subject. If any information you need to complete any part of the Fact Sheet is in the possession of your attorney, please consult with your attorney so that you can fully and accurately respond to the questions set out below. If you are completing the Fact Sheet for someone who cannot complete the Fact Sheet for himself/herself, please answer as completely as you can.

The Fact Sheet shall be completed in accordance with the requirements and guidelines set forth in the applicable Case Management Order. A completed Fact Sheet shall be considered interrogatory answers pursuant to Fed. R. Civ. P. 33 and responses to requests for production pursuant to Fed. R. Civ. P. 34 and will be governed by the standards applicable to written discovery under Fed. R. Civ. P. 26 through 37. Therefore, you must supplement your responses if you learn that they are incomplete or incorrect in any material respect. The questions and requests for production of documents contained in this Fact Sheet are non-objectionable and shall be answered without objection. This Fact Sheet shall not preclude Bard Defendants from seeking additional documents and information on a reasonable, case-by-case basis, pursuant to the Federal Rules of Civil Procedure and as permitted by the applicable Case Management Order.

In filling out this form, "healthcare provider" shall mean any medical provider, doctor, physician, surgeon, pharmacist, hospital, clinic, medical center, physician's office, infirmary, medical/diagnostic laboratory, or any other facility that provides medical care or advice, along with any pharmacy, x-ray department, radiology department, laboratory, physical therapist/physical therapy department, rehabilitation specialist, chiropractor, or other persons or entities involved in your diagnosis, care and/or treatment.

In filling out this form, the terms "You" or "Your" refer to the person who received a Bard Inferior Vena Cava Filter manufactured and/or distributed by C. R. Bard, Inc. or Bard Peripheral Vascular, Inc. ("Bard Defendants") and who is identified in Question 1(a) below.

To the extent that the form does not provide enough space to complete your responses or answers, please attach additional sheets as necessary. Please identify any documents that you are

producing responsive to a question with Bates Stamp identifiers.  Information provided by Plaintiff will only be used for the purposes related to this litigation and may be disclosed only as permitted under the protective order in this litigation.

## I. BACKGROUND INFORMATION

1.  Please state:

    (a)    Full name of the person who received the Bard inferior vena cava filter, including maiden name: ███████ - Maiden Name: ██████

    (b)    List all names by which you have ever been known, if different from that listed in 1(a): ████████

    (c)    Full name of the person completing this form, if different from the person listed in 1(a) above, and the relationship of the person completing this form to the person listed in 1(a) above: _____

    (d)    The name and address of your primary attorney:

        David C. DeGreeff

        Wagstaff & Cartmell LLP

        4740 Grand Ave., Ste. 300

        Kansas City, MO 64112

    (e)    When did you first retain an attorney to represent you in your lawsuit against Bard?

        10/14/2015

2.  Your Social Security Number: ██████

3.  Your Date of Birth: ██████

4.  Your current residential address:

    ████████████

5.  If you have lived at this address for less than 10 years, provide each of your prior residential addresses from 2000 to the present:

| Prior Residential Address | Dates You Lived At This Address |
| --- | --- |
| | |

|  |  |
|---|---|
| ████████████████████████████ | |
| | |
| | |
| | |
| ████ | |

6.    Have you ever been married? Yes ████    No ████

If yes, provide the names and addresses of each spouse and the inclusive dates of your marriage to each person:

████████████████████████

_____

7.    Do you have children?  Yes ████    No ████

If Yes, please provide the following information with respect to each child:

| Full Name of Child | Date of Birth | Home Address | Whether Biological/Adopted |
|---|---|---|---|
| ██████████████████████████████████████ | | | |
| | | | |
| | | | |
| | | | |

8.    Identify the name and age of any person who currently resides with you and their relationship to you:

████████████████████

_____

_____

9.    Identify the name and age of any person who has resided with you at any point over the past ten (10) years:

████

_____

_____

3

10. Identify all secondary and post-secondary schools you attended, starting with high school, and please provide the following information with respect to each:

| Name of School | Address | Dates of Attendance | Degree Awarded | Major or Primary Field of Study |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

11. Please provide the following information for your employment history over the past 10 years up until the present:

| Employer Name | Address | Job Title/Description of Duties | Dates of Employment | Salary/Rate of Pay |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

12. Have you ever served in any branch of the military? Yes_____    No___X___
    If Yes, please provide the following information:

    (a)    Branch and dates of service, rank upon discharge, and type of discharge received:

    _____

    (b)    Were you discharged from the military at any time for any reason relating to your medical, physical, or psychiatric condition? Yes_____    No_____

4

If Yes, state what that condition was:_____

_____

13. Within the last ten years, have you been convicted of, or plead guilty to, a felony and/or crime of fraud or dishonesty? Yes_____   No__X___

If Yes, please set forth where and when and identify the felony and/or crime:

_____

14. Before contacting any attorney regarding this lawsuit or claim, had you ever seen any television or print advertisements regarding possible claims against inferior Vena Cava Filter manufacturers?   Yes_X_____   No_____

If Yes, set forth the approximate date and nature of any such advertisement, whether the advertisement included the name of a law firm, whether the advertisement specifically mentioned C. R. Bard, Inc., Bard Peripheral Vascular, Inc., or "Bard", and other details that you recall. _____Yes, latter part of 2015, but do not remember the name of the law firm or if Bard was mentioned. I do not remember if it mentioned Bard._____

## II. CLAIM INFORMATION

1. Have you ever received a Bard Inferior Vena Cava Filter? Yes█████   No█████

If Yes, please check the box(es) for each type of Bard Inferior Vena Cava Filter you have received:

█ Recovery®

█ G2®

█ G2®X

█ G2®Express

█ Eclipse®

█ Meridian®

█ Denali®

█ Simon Nitinol

☐    Other (please identify):_____

2.    For each Bard Inferior Vena Cava Filter identified above, please provide the following information:

    (a)    The date each Bard Inferior Vena Cava Filter was implanted in you:

____ ████████ _____

    (b)    The product code and lot number of each Bard Inferior Vena Cava Filter implanted in you:

_____ ████████████████████ _____

    (c)    Current location of the Bard Inferior Vena Cava Filter, including any portion thereof, if known:

____ ████████████████ _____

_____

_____

3.    Describe your understanding of the medical condition for which you received the Bard Inferior Vena Cava Filter(s):

____ ████████████████ _____

4.    Give the name and address of the doctor who implanted the Bard Inferior Vena Cava Filter(s):____ ██████████████████████ _____

_____

5.    Give the name and address of the hospital or other healthcare facility where the Bard Inferior Vena Cava Filter was implanted:____ ██████████████ 
████████ _____

6.    Have you ever been implanted with any other vena cava filters or related product(s) besides the Bard Inferior Vena Cava Filter(s) for the treatment of the same or similar condition(s) identified in your response to question 3 above? Yes ████ No ████ If Yes:

    (a)    Please identify any such device(s) or product(s)._____

_____

    (b)    When was this device or product implanted in you?_____

(c)    Did the implantation take place before, at the same time, or after the procedure during which you were implanted with a Bard Inferior Vena Cava Filter? _____

_____

_____

(d)    Who was the physician who implanted this other device or product?

_____

(e)    At what hospital or facility was this other device or product implanted in you?

_____

(f)    Why was this other device or product implanted in you?

_____

7.    Other than the Bard Inferior Vena Cava Filter device that is the subject of your lawsuit or identified in response to question 6 above, are you aware of any other Vena Cava Filter(s) implanted inside your body at any time?    Yes ▓▓▓    No ▓▓▓
If yes, please provide the following information:

(a)    Product name: _____

(b)    Date of procedure placing it and name and address of doctor who placed it:

_____

(c)    Condition sought to be treated through placement of the device:

_____

(d)    Any complications you encountered with the medical product or procedure:

_____

(e)    Does that product remain implanted inside of you today?    Yes _____    No _____

8.    Prior to implantation with a Bard Inferior Vena Cava Filter, did you receive any written and/or verbal information or instructions regarding the Bard Inferior Vena Cava Filter, including any risks or complications that might be associated with the use of the same?
Yes ▓▓▓    No ▓▓▓    Don't Know ▓▓▓

If Yes:

(a) Provide the date you received the written and/or verbal information or instructions:

_____

_____

(b) Identify by name and address the person(s) who provided the information and instructions:

_____

_____

(c) What information or instructions did you receive?

_____

(d) If you have copies of the written information or instructions you received, please attach copies to your response.

_____

(e) Were you told of any potential complications from the implantation of the Bard Inferior Vena Cava Filter(s)? Yes ███   No ███   Don't Know ███

(f) If yes to (e), by whom?

_____

(g) If yes to (e), what potential complications were described to you?

_____

9. Do you believe that the Bard Inferior Vena Cava Filter(s) remains implanted in you?
Yes ███   No ███   Don't Know ███

If Yes:

(a) Has any doctor recommended removal of the Bard Inferior Vena Cava Filter(s)?
Yes ███   No ███

If Yes:

(i)   Identify by name and address every doctor who recommended removal of the Bard Inferior Vena Cava Filter(s): ██████████████

██████████████████

(ii)   For each doctor identified in response to question 8(a)(i) above, state your understanding of why the doctor recommended removal._____

████████████████

(iii)   For each doctor identified in response to question 8(a)(i) above, state when the doctor recommended removal._____

████████████

10.   Has the Bard Inferior Vena Cava Filter(s) implanted in you been removed, in whole or in part?

Yes████     No███     Don't Know_██████

If Yes:

(a)   Where, when, and by whom was the Bard Inferior Vena Cava Filter(s), or any portion of it, removed?_____

_____

(b)   What portion of the Bard Inferior Vena Cava Filter(s) was removed on the date indicated in response to question 9(a) above?_____

_____

(c)   Please check all that apply regarding the removal procedure(s):

☐   Removed percutaneously

☐   Removed via an open abdominal procedure

☐   Removed via an open chest procedure

☐   Other, Describe: _____

☐   Unknown

9

(d)    Does any portion of the Bard Inferior Vena Cava Filter(s) remain implanted in you?   Yes _____     No _____     Don't Know _____

If Yes, explain what portion of the Bard Inferior Vena Cava Filter(s) you believe is still implanted in you:_____

(e)    Explain why you consented to have the Bard Inferior Vena Cava Filter(s), or any portion thereof, removed?

_____

(f)    Does any medical provider, physician, entity, or anyone else acting on your behalf have possession of any portion of the Bard Inferior Vena Cava Filter that was previously implanted in you and subsequently removed?

Yes_____     No_____     Don't Know_____

If Yes, please state the name and address of the person or entity having possession of same._____

_____

11.    Has any doctor or healthcare provider unsuccessfully attempted to remove the Bard Inferior Vena Cava Filter(s) implanted in you?

Yes ▮▮▮▮    No ▮▮▮▮    Don't Know ▮▮▮▮

If Yes:

(a)    How many attempts have been made to remove the Bard Inferior Vena Cava Filter(s) implanted in you? ▮▮▮▮▮▮▮▮▮▮

(b)    Provide the name and address of the doctor who removed (or attempted to remove) the <u>filter strut(s)</u> and the hospital or medical facility at which it was removed (or attempted to be removed).

        <u>Filter Removal/Attempted Removal #1</u>

        Doctor:__▮▮▮▮▮▮▮▮_____

        Hospital/Medical Facility:__▮▮▮▮▮▮▮▮_____

        Date:____▮▮▮▮▮▮_____

        <u>Filter Removal/Attempted Removal #2</u>

        Doctor:_____

Hospital/Medical Facility:_____

Date:_____

<u>Filter Removal/Attempted Removal #3</u>

Doctor:_____

Hospital/Medical Facility:_____

Date:_____

(c)    Please check <u>all</u> that apply regarding attempted removal procedure #1:

☐    Attempted but unsuccessful percutaneous removal procedure

Attempted but unsuccessful open abdominal procedure

Attempted but unsuccessful open chest procedure

Other, Describe: _____

_____

Unknown

(d)    Please check <u>all</u> that apply regarding attempted removal procedure #2:

☐    Attempted but unsuccessful percutaneous removal procedure

☐    Attempted but unsuccessful open abdominal procedure

☐    Attempted but unsuccessful open chest procedure

☐    Other, Describe: _____

_____

☐    Unknown

(e)    Please check <u>all</u> that apply regarding attempted removal procedure #3:

☐    Attempted but unsuccessful percutaneous removal procedure

☐    Attempted but unsuccessful open abdominal procedure

☐    Attempted but unsuccessful open chest procedure

☐    Other, Describe: _____

_____

11

☐　　Unknown

12.　　Do you claim that your Bard Inferior Vena Cava Filter(s) fractured?

Yes ▉　　　No ▉

If Yes:

(i)　　Please state the number of fractured struts retained in your body?

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

(ii)　　Please identify the location(s) within your body of each retained filter strut.

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

(iii)　　Please provide the date or approximate date when you were first informed of each fractured strut.

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

(iv)　　Has any health care provider recommended to you that a retained filter strut(s) should be removed?

Yes ＿＿＿＿＿　　No ＿＿＿＿＿

If Yes, provide the name and address of any such healthcare provider, as well as the approximate date on which the communication occurred.

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

(v)　　Has any health care provider recommended to you that a retained filter strut should <u>not</u> be removed?

Yes ＿＿＿＿＿　　No ＿＿＿＿＿

If Yes, provide the name and address of any such healthcare provider, as well as the approximate date on which the communication occurred.

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

(vi)    Have any fractured struts been removed, or attempted to have been removed, from your body?

Yes _____    No_____

If Yes:

(1)    If any fractured filter strut has been removed (or a doctor has attempted to remove any strut), please check <u>all</u> that apply regarding the removal/attempted removal procedure(s):

☐    Removed percutaneously

☐    Removed via an open abdominal procedure

☐    Removed via an open chest procedure

☐    Attempted but unsuccessful percutaneous removal procedure

☐    Attempted but unsuccessful open abdominal procedure

☐    Attempted but unsuccessful open chest procedure

☐    Other, Describe: _____

☐    Unknown

(2)    Provide the name and address of the doctor who removed (or attempted to remove) the <u>filter strut(s)</u> and the hospital or medical facility at which it was removed (or attempted to be removed).

<u>Filter *Strut* Removal/Attempted Removal #1</u>

Doctor:_____

Hospital/Medical Facility:_____

Date:_____

<u>Filter *Strut* Removal/Attempted Removal #2</u>

Doctor:_____

Hospital/Medical Facility:_____

Date:_____

13

13.   Do you claim that you suffered bodily injuries as a result of the implantation of the Bard Inferior Vena Cava Filter(s)? Yes ▮▮▮▮   No ▮▮▮▮

If Yes:

(a)   Describe the bodily injuries, including any emotional or psychological injuries that you claim resulted from the implantation, attempted removal and/or removal of the Bard Inferior Vena Cava Filter(s)?

(b)   When was the first time you experienced symptoms of any of the bodily injuries you claim in your lawsuit to have resulted from the Bard Inferior Vena Cava Filter(s)?

(c)   When did you first attribute these bodily injuries to the Bard Inferior Vena Cava Filter(s)?

(d)   To the best of your knowledge and recollection, please state the approximate date when you first saw a health care provider for any of the bodily injuries, or symptoms related thereto, you claim to have experienced related to the Bard Inferior Vena Cava Filter(s)?

14

███████████████████████████████

(e)   To the best of your knowledge and recollection, has any health care provider ever told you orally or in writing that any symptoms related to bodily injury are related to the Bard Inferior Vena Cava Filter(s)?

Yes ████      No ████

If Yes, please state the name and address of any such health care provider, as well as providing the approximate date the statement was made, and provide the details of the communication:_____

_____

_____

_____

_____

(f)   Are you currently experiencing symptoms related to your claimed bodily injuries?

Yes ████      No ████

If Yes, please describe your symptoms in detail:

███████████████████████████████

(g)   Are you currently seeing, or have you ever seen, a doctor or healthcare provider for any of the bodily injuries or symptoms listed above?

Yes ████      No ████

If Yes, please list all doctors you have seen for treatment of any of the bodily injuries you have listed above.

| Provider Name and Address | Condition Treated | Approximate Dates of Treatment |
|---|---|---|
|  |  |  |
|  |  |  |

15

| | | |
|---|---|---|
| | | |

h)   Were you hospitalized at any time for the bodily injuries you listed above?

Yes ███   No ███

If Yes, please provide the following:

| Hospital Name and Address | Condition Treated | Approximate Dates of Treatment |
|---|---|---|
| | | |
| | | |
| | | |

14.   Are you making a claim for lost wages or lost earning capacity?

Yes_____   No__X___

(a)   If yes, state the annual gross income derived from your employment for each year, beginning five (5) years prior to the implantation of the Bard Inferior Vena Cava Filter(s) until the present: _____

_____

_____

(b)   If yes, for what period of time are you claiming lost wages?_____

_____

_____

(c)   If you are claiming lost earning capacity, do you claim that you have a claim for future lost wages?

Yes_____   No_____

If yes, for what period of time do you claim you have lost future wages?

_____

_____

_____

15.   Are you making a claim for lost out-of-pocket expenses?   Yes__X__   No_____

If yes, please identify and itemize all out-of-pocket expenses you have incurred.

Past medical bills and expenses, future medical care and expenses including without limitation removal surgery (or surgeries) and medical monitoring, and any other damages revealed during discovery.

16. Has anyone filed a loss of consortium claim in connection with your lawsuit regarding the Bard Inferior Vena Cava Filter(s)?

Yes_____     No _X___

If yes, identify by name and address the person who filed the loss of consortium claim ("Consortium Plaintiff") and state the relationship of that person to you and state the specific nature of the Consortium Plaintiff's claim._____

17. Please indicate whether the Consortium Plaintiff alleges any of the damages set forth below: Not Applicable

| Claims | Yes/No |
|---|---|
| Loss of services of spouse | |
| Impaired sexual relations | |
| Lost wages/lost earning capacity | |
| Lost out-of-pocket expenses | |
| Physical injuries | |
| Psychological injuries/emotional injuries | |
| Other | |

18. Please list the name and address of any healthcare providers the Consortium Plaintiff has sought treatment for any physical, emotional, or psychological injuries or symptoms alleged to be related to his/her claim._____Not applicable_____

17

19.    Have you or anyone acting on your behalf had any communication, oral or written, with any of the Bard Defendants and/or their representatives?

Yes _____     No __X__     Don't Know _____

If yes, set forth: (a) the date of any communication, (b) the method of communication, (c) the name of the person with whom you communicated, and (d) the substance of the communications. _____

_____

_____

## III. MEDICAL BACKGROUND

1.    Provide your current: Age ▮▮▮▮     Height ▮▮▮▮ ,     Weight ▮▮▮▮

2.    Provide your: Age ▮▮▮▮    Weight ▮▮▮▮ (approximate, if unknown) at the time the Bard Inferior Vena Cava Filter was implanted in you.

3.    In chronological order, list any and all surgeries, procedures and/or hospitalizations you had in the ten (10) year period BEFORE implantation of the Bard Inferior Vena Cava Filter(s). Identify by name and address the doctor(s), hospital(s) or other healthcare provider(s) involved with each surgery or procedure; and provide the approximate date(s) for each:

| Approximate Date | Description of Surgery or Hospitalization | Doctor or Healthcare Provider Involved (including address) |
|---|---|---|
| ███████████ | ███████████ | ███████████ |
| | | |
| | | |
| | | |

*[Attach additional sheets as necessary to provide the same information for any and all surgeries and hospitalizations leading up to the implantation of the Bard Inferior Vena Cava Filter.]*

4.  In chronological order, list any and all surgeries, procedures and/or hospitalizations you had AFTER implantation of the Bard Inferior Vena Cava Filter(s).  Identify by name and address the doctor(s), hospital(s) or other healthcare provider(s) involved with each surgery or procedure; and provide the approximate date(s) for each:



| Approximate Date | Description of Surgery or Hospitalization | Doctor or Healthcare Provider Involved (including address) |
|---|---|---|
| | | |

*[Attach additional sheets as necessary to provide the same information for any and all surgeries and hospitalizations after the implantation of the Bard Inferior Vena Cava Filter.]*

5.  To the extent not already provided in the charts above, provide the name, address, and telephone number of every doctor, hospital or other health care provider from which you have received medical advice and/or treatment from ten (10) years before the date the filter was implanted to the present:

| Name and Specialty | Address | Approximate Date/Years of Visits |
|---|---|---|
| | | |

6.   *Before the implantation* of the Bard Inferior Vena Cava Filter(s), did you regularly exercise or participate in activities that required lifting or strenuous physical activity? (Please include all physical activities associated with daily living, physical fitness, household tasks, and employment-related activities.)

Yes _____   No __x___

If yes, please describe each activity in detail. _____

_____

_____

_____

7.   *Since the implantation* of the Bard Inferior Vena Cava Filter(s), have you regularly exercised or participated in activities that required lifting or strenuous physical activity? (Please describe all range of physical activities associated with daily living, physical fitness, household tasks, and employment-related activities.)

Yes __X___   No _____

If yes, please describe each activity in detail. _____

_____Walking, household chores_____

_____

_____

8.   During the past ten (10) years, what have been your primary hobbies or recreational activities? _____

_____Cake Making/Decorating, reading, TV, crafts, coloring, playing with my grandchildren, outdoor concerts and festivals_____

_____

_____

(a)   Do you claim that you are unable to participate in any of the hobbies or recreational activities listed in response to question 8 above as a result of you having been implanted with a Bard Inferior Vena Cava Filter(s)?

Yes_____   No__X___

(b)   If yes, what hobbies or recreational activities do you claim that you are unable to participate in as a result of having been implanted with a Bard Inferior Vena Cava Filter(s)?_____

20

(c)     For what period of time do you claim that you were or have been unable to participate in any hobbies or recreational activities as a result of having been implanted with a Bard Inferior Vena Cava Filter(s)?

_____N/A_____

9.     To the best of your knowledge, have you ever been told by a doctor or another health care provider that you have suffered, may have suffered, or presently do suffer from any of the following:

Lupus

Crohn's Disease

Factor V Leiden

Protein Deficiency

Spinal Fusion or Other Back Procedures

Anti-thrombin Deficiency

Prothrombin Mutation

Deep Vein Thrombosis

Pulmonary Embolism

Auto Immune Disorder

Varicose Veins

Heart Procedures

Blood Disorder

Please Describe:_____

Bariatric Surgery

Anticoagulation Medication (e.g., Coumadin, Warfarin, etc.)

Ulcerative Colitis/Inflammatory Bowel Disease (IBD)

Cancer

Please Describe:_____

* * * * * * * * *

THE FOLLOWING QUESTIONS ARE CONFIDENTIAL AND SUBJECT TO THE PROTECTIVE ORDER APPLICABLE TO THIS CASE.

(A)   Have you been diagnosed with and/or treated for any drug, alcohol, chemical and/or other addiction or dependency during the five (5) years prior to the filing of this lawsuit through the present?   Yes ████   No ████

If yes, specify type and time period of dependency, type of treatment received, name of treatment provider, and current status of condition:

_____

_____

_____

_____

(B)   Have you experienced, been diagnosed with or received psychiatric or psychological treatment of any type, including therapy, for any mental health conditions including depression, anxiety, or other emotional or psychiatric disorders during the five (5) years prior to the filing of this lawsuit through the present?   Yes ████   No ████

If yes, specify condition, date of onset, medication/treatment, treating physician and current status of condition:

████████████████████████████████████████████████████

_____

\* \* \* \* \* \* \* \* \* \*

10.   Do you now or have you ever smoked tobacco products?   Yes __X__   No _____

If yes:

22

How long have/did you smoke?   10 years, quit for a year, 3 years

11. List each prescription medication you have taken for more than three (3) months at a time during the timeframe beginning five (5) years prior to implantation of the Bard Inferior Vena Cava Filter and continuing to the present, giving the name and address of the pharmacy where you received/filled the medication, the reason you took the medication, and the approximate dates of use.

| Medication and Dosage | Prescribing Physician | Pharmacy Name and Address | Reason for Taking Medication | Approximate Date(s) of Use |
|---|---|---|---|---|
| | | | | |

## IV. INSURANCE INFORMATION

1. Provide the following information for any past or present medical insurance coverage from the timeframe beginning five (5) years prior to implantation of the Bard Inferior Vena Cava Filter and continuing to the present:

| Insurance Company Name and Address | Policy Number | Name of Policy Holder/Insured (if different than yourself) | Approximate Dates of Coverage |
|---|---|---|---|
| Medicare | 233903055W6 | | 2011 to present |
| Medicaid | 00700209054 | | 2011 to present |
| No health insurance 2007 to 2010 | | | |

2.  To the best of your knowledge, have you ever been approved to receive or are you currently receiving Medicare/Medicaid benefits due to age, disability, condition, or any other reason or basis?

Yes __X__   No_____

If yes, please specify the date on which you first became eligible: __2011_____

*[Please note: if you are not currently a Medicare-eligible beneficiary, but become eligible for Medicare during the pendency of this lawsuit, you must supplement your response at that time. This information is necessary for all parties to comply with Medicare regulations. See 42 U.S.C. 1395y(b)(8), also known as Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 and 42 U.S.C. 1395y(b)(2) also known as the Medicare Secondary Payer Act.]*

## V. PRIOR CLAIM INFORMATION

1.  Have you filed a lawsuit or made a claim in the last ten (10) years, other than in the present suit relating to any bodily injury?

Yes_____   No __X___

If yes, please specify the following:

(a)  Court in which the lawsuit/claim was filed or initiated:_____

_____

(b)  Case/Claim Number:_____

(c)  Nature of Claim/Injury:_____

_____

2.  Have you ever applied for Workers' Compensation (WC), Social Security disability (SSI or SSD) benefits, or other State or Federal disability benefits?

Yes __X__   No_____

If yes, please specify the following:

(a)  Date (or year) of application: __2009 or 2010_____

(b)  Type of benefits sought: ____SSD_____

(c)  Agency/Insurer from which you sought the benefits: __SSA_____

_____

(d)  Nature of the claimed injury/disability: __Depression, weight, back injury____

(e)  Whether the claim was accepted or denied: _____Accepted_____

## VI.  FACT WITNESSES

1.   Identify by name, address, and relationship to you, all persons (other than your healthcare providers) who possess information concerning your injuries and/or current medical condition:

| Name | Address | Relationship to You | Information You Believe Person Possesses |
|---|---|---|---|
| Angelic Thompson | Fort Gay, WV | Daughter | My mental anguish of fear of future injury |
| Lorelei Thompson | West Van Lear, KY | Daughter | My mental anguish of fear of future injury |
| Joshua Thompson | Fort Gay, WV | Son | My mental anguish of fear of future injury |

## VII. IDENTIFICATION OF DOCUMENTS AND OTHER ELECTRONICALLY STORED INFORMATION

For the period beginning three (3) years prior to the implantation of the Bard Inferior Vena Cava Filter until the present, please identify all research, including on-line research, that you conducted regarding the medical complaints or condition for which you received the Bard Inferior Vena Cava Filter (pulmonary thromboembolism, anticoagulant therapy, etc.)  Identify the date, time, and source, including any websites visited.  (Research conducted subsequent to and for the purpose of understanding the legal and strategic advice of your counsel is not considered responsive to this request.)

N/A

## VIII. DOCUMENT REQUESTS

1.   RELEASES.

NOTE:      Please sign and attach to this Fact Sheet the authorizations for the release of records appended hereto.

2.   DOCUMENTS.  State whether you have any of the following documents in your possession, custody, and/or control.  If you do, please provide a true and correct copy of any such documents with this completed Fact Sheet.  Please ensure that the production of documentation includes specific reference to the questions to which the document is provided in response, and please identify any documents you are producing responsive to a question with Bates Stamp identifiers.

(a)   If you were appointed by a Court to represent the plaintiff in this lawsuit, produce any documents demonstrating such appointment.

  (i)   Not applicable _____X_____

  (ii)   The documents are attached_____   [OR]  I have no documents_____

(b)   If you represent the Estate of a deceased person in this lawsuit, produce a copy of the decedent's death certificate and autopsy report (if applicable).

  (i)   Not applicable____X_____

  (ii)   The documents are attached_____   [OR]  I have no documents_____

(c)   Produce each and every medical record of each and every medical facility, pharmacy, or practitioner of the healing arts identified by you in response to the questions in Sections II and III above regarding your medical care and history for the time period beginning ten (10) years prior to the implantation of the Bard Inferior Vena Cava Filter and continuing to the present.

  (i)   Not applicable_____

  **Records requested but not received.  They will be provided when received.**

  (ii)   The documents are attached: _____   [OR]  I have no documents___X__

(d)   Produce any communication (sent or received) in your possession, which shall include materials accessible to you from any computer on which you have sent or received such communications, concerning the Bard Inferior Vena Cava Filter(s) or subject of this litigation, including, but not limited to all letters, emails, blogs, Facebook posts, Tweets, newsletters, etc. sent or received by you.  (Research conducted subsequent to and to understand the legal and strategic advice of your counsel is not considered responsive to this request.)

  (i)   Not applicable_____X_____

  (ii)   The documents are attached_____   [OR]  I have no documents_____

(e)     Produce all documents, including journal entries, lists, memoranda, notes, diaries, photographs, video, DVDs or other media, discussing or referencing the Bard Inferior Vena Cava Filter(s), the injuries and/or damages you claim resulted from the Bard Inferior Vena Cava Filter(s), and/or evidencing your physical condition from three (3) years prior to the implantation of the Bard Inferior Vena Cava Filter(s) to present. (Research conducted subsequent to and to understand the legal and strategic advice of your counsel is not considered responsive to this request.)

    (i)     Not applicable_____X_____

    (ii)    The documents are attached_____   [OR]   I have no documents_____

(f)     Produce any Bard Inferior Vena Cava Filer product packaging, labeling, advertising, or any other product-related items in your possession, custody or control.

    (i)     Not applicable_____

    (ii)    The documents are attached__X___   [OR]   I have no documents_____

(g)     Produce all documents concerning any communication between you, your attorney(s), your agent(s), your expert(s), or your representative(s) and the Food and Drug Administration (FDA), or between you and any employee or agent of the Bard Defendants, regarding Bard Inferior Vena Cava Filters.

    (i)     Not applicable_____X_____

    (ii)    The documents are attached_____   [OR]   I have no documents_____

(h)     Produce all documents that you, your attorney(s), your agent(s), your expert(s), or your representative(s) provided to the Food and Drug Administration (FDA) and/or the Department of Health and Human Services regarding Bard Inferior Vena Cava Filters.

    (i)     Not applicable_____X_____

    (ii)    The documents are attached_____   [OR]   I have no documents_____

(i)     Produce all documents concerning any communication between you, your attorney(s), your agent(s), your expert(s), or your representative(s) with anyone at any television station, radio station, newspaper, periodical, magazine, weblog, internet website, or any other media outlet regarding Bard Inferior Vena Cava Filters.

       (i)     Not applicable_____X_____

       (ii)    The documents are attached_____    [OR]  I have no documents_____

(j)    Produce all documents that you, your attorney(s), your agent(s), your expert(s), or your representative(s) provided to anyone at any television station, radio station, newspaper, periodical, magazine, weblog, internet website, or any other media outlet regarding Bard Inferior Vena Cava Filters.

       (i)     Not applicable_____X_____

       (ii)    The documents are attached_____    [OR]  I have no documents_____

(k)    Produce all documents in your possession, custody, or control evidencing or relating to any correspondence or communication between C. R. Bard, Inc. or Bard Peripheral Vascular, Inc. (or any related companies or divisions) and any of your doctors, healthcare providers, and/or you relating to Bard Inferior Vena Cava Filters, except as to those communications which are protected by the attorney-client privilege or attorney work product doctrine.

       (i)     Not applicable_____X_____

       (ii)    The documents are attached_____    [OR]  I have no documents_____

(l)    Produce all documents in your possession, custody, or control reflecting, describing, or in any way relating to any instructions or warnings you received prior to implantation of any Inferior Vena Cava Filter(s) concerning the risks and/or benefits associated with Inferior Vena Cava Filter(s), including but not limited to the Bard Inferior Vena Cava Filter implanted in you.

       (i)     Not applicable_____

       (ii)    The documents are attached_____    [OR]  I have no documents__X___

(m)    Produce any and all documents reflecting the model number and lot number of the Bard Inferior Vena Cava Filter(s) you received.

       (i)     Not applicable_____

       (ii)    The documents are attached__X___ [OR]  I have no documents_____

(n)    If you underwent surgery or any other procedure to remove, in whole or in part, the Bard Inferior Vena Cava Filter(s), produce any and all documents, other than documents that may have been generated by expert witnesses retained by your

counsel for litigation purposes, that relate to any evaluation of the Bard Inferior Vena Cava Filter(s) removed from you.

(i)     Not applicable_____

(ii)    The documents are attached___X___ [OR]  I have no documents_____

(o)   If you claim lost wages or lost earning capacity, produce copies of your Federal and State tax returns for the five (5) years prior to implantation of the Bard Inferior Vena Cava Filter(s) to the present redacting irrelevant information.

(i)     Not applicable_____X_____

(ii)    The documents are attached_____ [OR]  I have no documents_____

(p)   Produce all documents in your possession, custody, or control concerning payment by Medicare on behalf of the injured party and relating to the injuries claimed in this lawsuit.  This includes, but is not limited to Interim Conditional Payment summaries and/or estimates prepared by Medicare or its representatives regarding payments made on your behalf for medical expenses relating to the subject of this litigation.

(i)     Not applicable_____

**Medical bills have been requested and will be provided.**

(ii)    The documents are attached_____ [OR]  I have no documents___X___

*[Please note: if you are not currently a Medicare-eligible beneficiary, but become eligible for Medicare during the pendency of this lawsuit, you must supplement your response at that time. This information is necessary for all parties to comply with Medicare regulations.  See 42 U.S.C. 1395y(b)(8), also known as Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 and 42 U.S.C. 1395y(b)(2) also known as the Medicare Secondary Payer Act.]*

(q)   Produce all screenshots of all webpages of each type of social media used by you (including, but not limited to, Facebook, Twitter, Instagram, Vine, Snapchat, YouTube, LinkedIn) showing any and all "posts" and/or "messages" from the date of implantation to the present.

(i)     Not applicable_____X_____

(ii)    The documents are attached_____ [OR]  I have no documents_____

(r)   Produce the Bard Inferior Vena Cava Filter(s) or any and all components thereof previously implanted in you.

Not Applicable

29

## VERIFICATION

I, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, declare under penalty of perjury, subject to all applicable laws and in the presence of the below named witness, that I have carefully reviewed the final copy of this Plaintiff Fact Sheet dated __7-21-16__ and verified that all of the information provided is true and correct to the best of my knowledge, information and belief.

*Deanna Porter*
Signature of Witness

*Deanna Porter*
Name of Witness

30

# REDACTED DOCUMENTS RELATED TO DOCKET 8186

# Exhibit M-I - REDACTED

Do Not Disclose - Subject to Further Confidentiality Review

```
 1                  UNITED STATES DISTRICT COURT

                       DISTRICT OF ARIZONA

 2                    No. MD-15-02641-PHX-DGC

 3

 4       In Re: Bard IVC Filters Products

         Liability Litigation

 5

             DO NOT DISCLOSE - SUBJECT TO FURTHER

 6                 CONFIDENTIALITY REVIEW


 7
                                 _____
                 WITNESS:  ██████████████████████
 8       _____

 9              Pursuant to Fed. R. Civ. P. 26 and 30

10       the videotaped deposition of Pho M. Nguyen, M.D.

11       was taken before Janine N. Leroux, Stenographic

12       Court Reporter and Notary Public - Special

13       Commission in and for the State of Kentucky at

14       Large, at Kings Daughter's Medical Center

15       located at 2201 Lexington Avenue, Ashland,

16       Kentucky on Thursday, June 1st, 2017, commencing

17       at the approximate hour of 8:19 a.m.  Said

18       deposition was taken pursuant to Notice.

19

20

21

22

23

24

25
```

Do Not Disclose - Subject to Further Confidentiality Review

1        Q      And if you would, would you explain

2     actually the anatomy of the inferior vena cava,

3     what is that?

4        A      The inferior vena cava it's a large

5     vein.  It's a confluence of veins that drain back

6     to the heart from your lower extremity inferiorly,

7     go back towards the heart.

8        Q      Are you currently placing IVC filters?

9        A      Yes.

10       Q      How often do you place those?

11       A      Not as often as we used to but once or

12    twice a month.

13       Q      And for what reasons?

14       A      Here at King's Daughters Medical Center

15    we work a lot with the cancer patients, so

16    patients who have high hypercoagulable state

17    typically include cancer patients.

18              Patients who have recent trauma or

19    recent orthopedic surgery that's going to be

20    immobilized that have high risk for deep venous

21    thrombosis, specifically from the lower extremity,

22    a patient who cannot be on anti-coagulation that

23    needs to be prophylactically put on an IVC filter.

24       Q      When you -- when did you first start

25    placing IVC filters?  And when we talk about IVC

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    filters, we're talking about filters that go into

 2    the inferior vena cava, the large vein of the

 3    body, correct?

 4         A    Yes.

 5         Q    When did you start?

 6         A    During my training at the University of

 7    Tennessee in Knoxville first year residency, I

 8    assisted my attending physician to place those

 9    during my training, and then continue through my

10    residency at University of Cincinnati and also my

11    fellowship.

12         Q    Have you placed permanent filters?

13         A    I have placed less than five permanent

14    filters.

15         Q    And the other filters that you've

16    placed are what are known as optional filters or

17    retrievable?

18         A    They're called retrievable filters,

19    that's correct.

20         Q    How many of those have you placed?

21         A    I do not know the exact number.  I

22    think definitely more than 50 and less than --

23    less than 300, I guess.

24         Q    And back in 2012, what type of filters

25    were you placing, do you remember?
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1          A     2012.  I think at King's Daughters we
 2    have -- there are several filters they have
 3    available for us to use.
 4               I think we have -- I'm not sure at that
 5    time.  The Bard have like G2® or is it ECLIPSE™?
 6    I'm not sure what was the name of the filter.  We
 7    also have Gunther Tulip®.  We also have -- I think
 8    we still have the Optease®, and we have like
 9    several others, but those are the more common ones
10    that's available at that time.
11          Q     Have you ever placed an ECLIPSE™ filter
12    that's made by Bard?
13          A     Yes.  Now, I may get confused because
14    that generation of Bard filters they changed the
15    name, so I have placed Bard filters I think during
16    my residency fellowship from G2® to -- I'm sorry,
17    from Recovery to G2® to ECLIPSE™ and another
18    filter that's from Bard.  I also place some other
19    filter, also.
20          Q
      ▮
      ▮
23          A     ▮
24          Q     And is that consistent with your
25    medical record?
```

```
 1        A     Yes.

 2        Q     ████████████████████████████

 █  ████████████████████████████████ ████████

 █  ████████

 5        A     ████

 6        Q     In that period of time, how many -- how

 7    often were you removing filters?

 8        A     Again, I don't remember the exact

 9    number, more than 50.  I don't know the exact

10    number.

11        Q     And again, those filters range with the

12    different product lines that you just mentioned?

13        A     That's correct.

14        Q     And when you talk about a retrievable

15    filter, what do you mean by that?

16        A     A retrievable filter is a filter that

17    you can place temporarily and give a patient a

18    chance to get over an episode where they need to

19    have a filter to prophylactically or be able to

20    catch all the clots because they have high risk of

21    deep venous thrombosis from their lower extremity.

22              Once they are back to their normal

23    activity when they are no longer in need of an IVC

24    filter, then you can go inside the inferior vena

25    cava and try to retrieve or take the IVC filter
```

Do Not Disclose - Subject to Further Confidentiality Review

1    out.

2        Q    And in terms of the Bard line of

3    filters, they were implanted how, through the

4    femoral or the jugular?

5        A    Yes, you can go either way.

6        Q    And -- and the way that they were

7    implanted -- and when we talk about the femoral

8    approach or the jugular approach -- first of all,

9    let's talk about the femoral approach.

10            If you'll explain to the jury what is

11    that?

12        A    Femoral approach is the patient is

13    lying in a supine position.  I typically use an

14    ultrasound machine and take a look and make sure

15    the left or right femoral veins are open.  And if

16    they are open, we'll use a sterile technique.  We

17    get access under ultrasound guide and using a

18    micropuncture set.

19            Once we get inside the vein, we dial it

20    up to a 5 French Catheter Micro Access Kit.  We

21    inject contrast, make sure everything is open, and

22    put the wire in and that's how you get the access.

23        Q    And then the jugular?

24        A    Similar concept.  We'll ultrasound the

25    right neck.  Typically I like to go in the right



9        Q       Have you referred other patients whose

10    filters you could not remove to other facilities

11    for a removal attempt?

12        A       No.

25        Q       I want to clarify back in -- I got