1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3            _____

4

5   **In Re: Bard IVC Filters**          ) MD-15-02641-PHX-DGC
    Products Liability Litigation        )
6                                        )
                                         ) Phoenix, Arizona
7                                        ) October 5, 2017
                                         )
8   _____)

9

10

11

12

13        BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  <u>SCHEDULING CONFERENCE</u>

16

17

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257

24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2

 3   Plaintiffs' Leadership Committee:

 4           Gallagher & Kennedy
             By: MARK S. O'CONNOR, ESQ.
 5           2575 E. Camelback Rd., Ste. 1100
             Phoenix, AZ  85016
 6
             Lopez McHugh, LLP
 7           By: RAMON R. LOPEZ, ESQ.
             100 Bayview Circle, Ste. 5600
 8           Newport Beach, CA  92660

 9

10   For the Plaintiffs:

11           Gallagher & Kennedy
             By: PAUL L. STOLLER, ESQ.
12           2575 E. Camelback Rd., Ste. 1100
             Phoenix, AZ  85016
13
14           Nations Law Firm
             By: HOWARD L. NATIONS, ESQ.
15           3131 Briarpark Dr., Ste. 208
             Houston, TX  77042
16
17           Lopez McHugh, LLP
             By: AMORINA P. LOPEZ, ESQ.
18           100 Bayview Circle, Ste. 5600
             Newport Beach, CA  92660
19
20           Heaviside Reed Zaic
             By: JULIA REED ZAIC, ESQ.
21           312 Broadway, Ste. 203
             Laguna Beach, CA  92651
22
23           Dalimonte Rueb, LLP
             By: JOHN A. DALIMONTE, ESQ.
24           85 Devonshire St., Ste. 1000
             Boston, MA  02109
25
```

1              **A P P E A R A N C E S**   **(continued)**

2

3              Goldenberg Law, PLLC
               By: **STUART GOLDENBERG**, ESQ.
4              800 LaSalle Ave., Ste. 2150
               Minneapolis, MN  55402
5

6              Faraci Lange, LLP
               By: **HADLEY L. MATARAZZO**, ESQ.
7              28 E. Main St., Ste. 1100
               Rochester, NY  14614
8

9              Babbitt & Johnson, PA
               By: **JOSEPH R. JOHNSON**, ESQ.
10             1641 Worthington Rd., Ste. 100
               W. Palm Beach, FL  33409
11

12             Hausfeld, LLP
               By: **STEVEN ROTMAN**, ESQ.
13             1700 K St. NW, Ste. 650
               Washington, DC  20006
14

15

16

17     For the Defendants:

18             Nelson Mullins Riley & Scarborough
               By: **RICHARD B. NORTH, JR.**, ESQ.
19             By: **MATTHEW B. LERNER**, ESQ.
               By: **BRANDEE J. KOWALZYK**, ESQ.
20             201 17th Street NW, Suite 1700
               Atlanta, GA  30363
21
               Snell & Wilmer
22             By: **JAMES R. CONDO**, ESQ.
               400 East Van Buren
23             Phoenix, AZ  85004

24

25

**P R O C E E D I N G S**

14:56:52   1

2

3    THE COURT:  Counsel, let's talk about a number of

4    issues.  The first thing I want to mention is the information

15:03:55   5    I asked Bard to file about this recent disclosure of Vanguard

6    ownership of Bard.

7    The reason I asked the question is because Vanguard

8    Group appeared in a supplemental disclosure statement a month

9    or so ago, and through an investment adviser, I own, I think,

15:04:23  10    interests in two Vanguard mutual funds.  And so when the name

11    popped up, the conflict popped up given what I've got in the

12    system for conflicts.

13    I was hoping to learn more about the nature of where

14    Vanguard owns its interest.  I inferred from what you

15:04:42  15    provided, Mr. North, that this 10.73 percent of Bard stock is

16    owned in different Vanguard funds.  Is that the idea?

17    MR. NORTH:  That's our understanding, Your Honor.

18    THE COURT:  Okay.  Well, there is a judicial ethics

19    opinion, it is Advisory Opinion Number 106 from the Committee

15:05:07  20    on Codes of Conduct.  Canon (C)(1)(c) of the Code of Judicial

21    Conduct requires a judge to disqualify himself or herself when

22    the judge knows that he or she "has a financial interest in

23    the subject matter in controversy or in a party to the

24    proceeding."  Or when the judge has "any other interests that

15:05:35  25    could be affected substantially by the outcome of the

15:05:39  1    proceeding."

2              But later in the canons there is a definition of what

3    a financial interest is, and it says, "Ownership in a mutual

4    or common investment fund that holds securities is not a

15:05:58  5    'financial interest' in such securities unless the judge

6    participates in the management of the fund."  And that is

7    Section 3(C)(3)(c)(i).  And I certainly don't participate in

8    the management of Vanguard funds.

9              However, in Ethics Opinion 106 what it goes on to say

15:06:26  10   is even if a mutual fund is the nature of the judge's

11   investment, then the judge should consider whether the value

12   of the fund itself could be affected by a ruling in the case.

13   And it says whether or not that's true will depend on, I'm now

14   reading from the opinion, "whether litigation might have a

15:07:00  15   substantial effect on the judge's interest in a fund will

16   often turn on the size and diversity of the funds'

17   investments.  The value of the mutual fund that invests in

18   many companies in a variety of industries would rarely be

19   substantially affected by the outcome of litigation involving

15:07:20  20   one particular company.  In contrast, a mutual fund that

21   invests in only a few companies in a particular industry would

22   be more likely to be substantially affected by certain types

23   of litigation."

24             So what I will do, since it appears Bard doesn't

15:07:40  25   know, is I will ask my investment adviser to give me a better

15:07:47  1    sense.  And the funds I own an interest in I think are just

       2    general corporate funds.  They're not health care company

       3    funds or manufacturing funds.  I think one is large cap

       4    growth.  And there's other one.  I will get a sense whether

15:08:04  5    Bard is more than a small holding in those funds.  And if it's

       6    not, then I think the ethics opinion says it's okay.  If it is

       7    for some reason, then I will talk to you all, but I'll likely

       8    tell my adviser to sell that fund and put me in something that

       9    doesn't involve Bard holdings.

15:08:24  10          I explain that all to you so you can think about it,

      11    let me know if you have additional thoughts or concerns

      12    arising from this.  I'm happy to get input from you.

      13          Mr. North.

      14          MR. NORTH:  Your Honor, I wanted to note for the

15:08:36  15    Court, too, of course, that the acquisition of Becton

      16    Dickinson of Bard is scheduled to take place in the fourth

      17    quarter, and assuming that that acquisition does go forward --

      18    that's the explanation for the volatility in the Bard stock

      19    now.  If that goes forward, then Vanguard's share of the

15:08:53  20    merged company will be very diluted, and who knows where it

      21    will end up.  And that could happen within two months or so.

      22          THE COURT:  Okay.

      23          Mr. Lopez, did you have any thoughts on this issue?

      24          MR. LOPEZ:  My thoughts are, Your Honor, that we

15:09:13  25    certainly don't, based on what Your Honor's just outlined for

15:09:17  1   us, we certainly don't see any reason why you should recuse

2   yourself or why we should ask you to.

3   THE COURT:  Okay.  Well, I do think I should look to

4   make sure that there's not something unusual about Vanguard's

15:09:33  5   holding in Bard that means it has a disproportionate effect on

6   the fund.  I'd be very surprised.  I think the Vanguard funds

7   are pretty broadly invested.  But if there's anything like

8   that, I will let you know so we can decide what ought to

9   happen, and if somebody has an objection they can certainly

15:09:52  10   make it.

11   I'd like to talk last about scheduling of the

12   bellwether trials, which is one of the issues you raised in

13   the joint report.

14   Here's what I'd like to talk to you about.  Well,

15:10:15  15   actually, let's take up the discovery issue first and then

16   come back to how we do the hearings on the motions for summary

17   judgment and the *Daubert* motions.

18   As I read your joint report, I was uncertain as to

19   what the parties' positions -- not what their positions were

15:10:42  20   but how to square them.  Here was my uncertainty:  One of the

21   issues that's been raised concerns expert communications with

22   experts where an attorney might be involved.  And at the

23   bottom of page 13 of your joint report the plaintiffs say, I'm

24   reading line 25, "Plaintiffs' counsel has reviewed the

15:11:05  25   communications involving experts and produced expert-to-expert

15:11:10  1  communications regardless of whether attorneys were copied on

2  the e-mails."

3       When I get over to page 15 and Bard's position, it

4  says at the bottom of page 15, line 24, "Plaintiffs should

15:11:26  5  produce or log any e-mail communication 'From:' an expert

6  where another expert is recipient of the e-mail regardless of

7  the lawyer's presence on the e-mail."

8       Sounds like the plaintiffs are saying we've produced

9  those.  Bard is saying you should produce them or log them.

15:11:45 10       MR. STOLLER:  Your Honor, might I explain?

11       THE COURT:  Yeah.  Please.

12       MR. STOLLER:  I'll tell you, because I'm the one who

13  did the review and I went back again last night and reviewed

14  the e-mails, the reference on page 13 is we have produced any

15:12:00 15  what I would characterize as expert-to-expert communications.

16  One expert talking to another expert, even if lawyers were

17  copied on that.

18       I distinguished that from, and I think this is where

19  the rub is between the parties, most of these e-mails are

15:12:16 20  multiple experts, multiple lawyers.  Typically starting with

21  lawyer to experts, maybe another lawyer cc'd on it, and then

22  series of replies and responses back and forth in a longer

23  e-mail chain.  In that context, there's To's, From's, cc's,

24  and they change.  I would equate that with a conversation in a

15:12:39 25  room where we're all talking.  The fact that who's on any

15:12:44  1    particular line may not have any significance because who's on

2    what line has more to do with the e-mail below than the e-mail

3    itself, if that makes sense.

4        In that context there are e-mails, I believe, at

15:12:57  5    least that have an expert on the From line and an expert on

6    the To line, as well as lawyers either in the cc line or also

7    in the To line.

8        The analysis we did -- or I should say the analysis I

9    did was to read all of the substance of those e-mails and

15:13:14 10    determine are those really just communications from Expert A

11    to Expert B and the lawyers just happen to be on the e-mails?

12    Or is it part of a larger conversation involving the experts

13    and the lawyers back and forth?

14        With respect to the former category, if it was just

15:13:32 15    Expert A talking to Expert B, we produced those.  Even if the

16    lawyers were on the cc line or on a To line.  And they should

17    at least know that because a number of the e-mails that we

18    produced that were expert to expert have lawyers on them.

19        I distinguish that from those larger communications

15:13:50 20    that are expert to attorney or attorney to expert but that To

21    and From lines don't necessarily reflect who it's from and who

22    it's to.

23        Does that make sense?

24        THE COURT:  Yes.

15:14:03 25        MR. STOLLER:  Okay.  That's the distinction I draw.

15:14:06  1    We have produced all of the ones that are truly Expert A

2    talking to Expert B.  We have not produced all of the

3    experts -- excuse me, all the communications where you may

4    have an expert on the From line and also on the To line.

15:14:19  5            THE COURT:  And the distinction you've drawn, as I

6    understand it, is your judgment that the topic of those

7    e-mails you have not produced are essentially attorney-expert

8    communications?  Is that --

9            MR. STOLLER:  Yes.  And I can give you some solid

15:14:35 10    examples.  One example will be lawyer sends an e-mail to

11    Experts 1 through 4 copies Lawyer 2 on it.  So From line is

12    Lawyer A, To line is Expert 1, 2, 3, 4, cc line is Lawyer 2.

13    And perhaps it asks a question:  Experts, tell me what you

14    think on this.

15:14:57 15            Expert 1 responds.  So the next e-mail will say From

16    Expert 1 To Lawyer 1, and cc'd all of the other folks.

17    Experts 2, 3, 4, and Lawyer 2.

18            Expert 2 then responds.  In the chain of e-mails his

19    response would be to the e-mail just from Expert 1, but what

15:15:19 20    he's actually doing is responding to the question in the first

21    e-mail.  But his e-mail would read From Expert 2 To Expert 1,

22    and maybe Attorney 1 as well, I'm not sure, I could pull up

23    some examples, with cc's of all the other folks.

24            The From and To line don't necessarily tell you to

15:15:36 25    whom the communication is being made.  And in that case the

expert is responding to the lawyer question.  Right?  Which

was, because of the way e-mail plays out, the From and To

lines look as if he's responding to the first expert but

that's not what the response is; you have to actually read the

substance to understand it's a response here.

In a larger context, these are communications that

don't say, hey -- because the To and From lines aren't

necessarily indicative, they don't say in the body of the

e-mail, Expert 1 tell me this, Expert 2 tell me this, Lawyer 1

tell me this.  They're more akin to a conversation where

Mr. Lopez asks a question, the experts respond, perhaps I

chime in in the next e-mail and say what about these things,

Expert 2 may respond to me or to Ramon's original e-mail or,

in fact, to clarify something that Expert 1 said in response

to his first one.

I have -- all I can tell Your Honor, in the same way

that if it didn't involve multiple experts, when you go

through and you review those communications you have with your

experts and you do your 26(b)(4)(C) analysis to see, does this

fall under exceptions of 1, 2 or 3, and you look to say what's

the content of it, that's what we did here is determine what

is the content and who is the communication actually between.

We produced the ones actually between the experts and

where lawyers just happen to be on the e-mails.  We did not

produce the ones where the lawyers were active participants in

15:17:11   1    the conversation.

2              THE COURT:  Okay.

3              Mr. North.

4              MR. NORTH:  Mr. Lerner is going to address this.

15:17:19   5    MR. LERNER:  Your Honor --

6              THE COURT:  Pull the mic over, would you.

7              MR. LERNER:  At the last -- can you hear me?

8              THE COURT:  Yeah.

9              MR. LERNER:  At the last conference the Court ordered

15:17:27  10   the privilege log.  And there very well may be some of the

11             communications are protected, but without a privilege log we

12             can't really test that.  It's a very unique situation when you

13             have joint experts.  I've looked at the case law, there's not

14             really a discussion about this particular issue with joint

15:17:45  15   experts.

16             So what I was going to propose, since we've kind of

17             reached an impasse about this issue, is the reason why the

18             privilege log is helpful, I was going to suggest like when you

19             did a privilege log review when they were challenging Bard's

15:18:00  20   privilege log, you did an in-camera review of a limited amount

21             of documents.

22             In this situation it might be helpful for you to

23             review, if you're able to do it, 10 or 15 of the e-mail chains

24             to provide some guidance to the parties.

15:18:14  25   The reason why a privilege log would be helpful with

15:18:16   1   that is we can do a randomization of that so you have a

2   sampling of 10 or 15 documents.

3            I'm not sure if the privilege log would give us

4   enough information or not to be able to tell whether the

15:18:29   5   communications are protected or not.  But this is a very

6   fact-intensive exercise and that's why, in thinking about a

7   solution to this, I thought the solution we came up with last

8   time for Bard's privilege log would be an in-camera inspection

9   of a limited number of documents that provides guidance to the

15:18:48  10   parties, and that may help resolve the issue like you did last

11   time.

12            THE COURT:  Okay.

13            Mr. Stoller, what are the numbers we're talking

14   about?

15:18:56  15            MR. STOLLER:  Dozens if not hundreds of e-mails,

16   which is why I said -- the privilege log issue for me is one

17   of it doesn't provide any information that's helpful to this

18   analysis, right?  If the To, From, and cc lines aren't

19   telling, the only other thing you're going to have is it's an

15:19:11  20   e-mail, the date.  The subject matter of the conversation is

21   protected under 26(b) whatever, (4)(C), anyway and doesn't

22   make a distinction in terms of discoverability unless it's one

23   of the exceptions of 1, 2, and 3, which we've already given to

24   them.  So that line doesn't make any difference.

15:19:30  25            And then the only other thing you're going to get is

15:19:31  1    we're withholding it based on 26(b)(4)(C).

2              So a privilege log won't make a difference.  All that

3    will do is identify the e-mail.  It won't provide the

4    information to the challenge they're purporting to make.

15:19:44  5    If you ask me the number of e-mails, I couldn't tell

6    you because, for example, given the threading, I may have four

7    copies of the same e-mail at different stages and times.  But

8    there are dozens if not 100, 100-plus e-mails.

9              Categorically, again, I'll tell you, I did it twice.

15:20:01  10   I did it weeks ago when we did the first production, I did it

11   again last night to make sure, okay, is there anything in here

12   that's expert to expert that might be subject to it?  And I've

13   got to go do a couple confirmations on two e-mails with my

14   co-counsel to see if there's an issue there, but beyond that,

15:20:18  15   Your Honor, they're group conversations and the lawyers are

16   intimately and integrally involved in them.

17             THE COURT:  What is your thought on Mr. Lerner's

18   suggest of an in-camera review?

19             MR. STOLLER:  Your Honor, I -- here's the thing, Your

15:20:34  20   Honor.  We could do this on everything.  We could do this on

21   everything we subpoena from them and subpoena from us and

22   throw things at you.  I don't think it's a use of time.

23   Either -- either we trust the process and the people producing

24   documents or we don't.  If they tell me they don't trust me,

15:20:54  25   then I suppose the only way to resolve that is to have an

15:20:57   1    in-camera review.

2         THE COURT:  Any other thoughts?  I'm not going to ask

3    you if you trust Mr. Stoller, Mr. Lerner, but do you have any

4    other thoughts?

15:21:07   5         MR. LERNER:  I've enjoyed working with Mr. Stoller on

6    this privilege issue over last month and I do trust him and

7    just as I hope he trusts us, we still had to produce thousands

8    of pages of privilege logs ourselves.  They didn't completely

9    trust us.  And I'm okay with that.

15:21:21  10         But at the end of the day, I think a limited -- it's

11   very fact intensive.  So I think different people's opinions

12   could change the analysis.  So I think it would be helpful to

13   have a limited review.  I understand Your Honor has a lot of

14   stuff going on.  Whatever you think is reasonable.  If it's

15:21:37  15   ten e-mails, so be it.  If it's -- I think that would help

16   resolve the issue.

17         THE COURT:  And I think your point is the reason you

18   want a privilege log is so you can choose at random the 10?

19         MR. LERNER:  I also think -- I don't know --

15:21:48  20   Mr. Stoller said that the privilege log that they would create

21   would not be of any help.  In your order you said provide the

22   privilege log that specifically provided specific basis on

23   which the plaintiffs conclude that the communications are

24   protected.  I understand they don't necessarily want to do a

15:22:06  25   privilege log.  We didn't necessarily want to do a privilege

15:22:08  1    log for all the documents we logged.  It's part of the

2    process.

3          MR. STOLLER:  If I might, Your Honor.  I think the

4    difference here is these are single objection.  It's

15:22:16  5    categorical.  The log's not going to make a difference between

6    whether I say e-mails --

7          THE COURT:  I understand --

8          MR. STOLLER:  Let me make a second point, if I might,

9    Your Honor.  On the privilege, what they're proposing, the

15:22:28  10   in-camera inspections you did were to addressing categories of

11   things and make a decision, is this privileged or not, that

12   could be applied across a larger number.  That's not what

13   would happen here.  You would look at one and say "I disagree

14   with Mr. Stoller's analysis" or "I agree," and all that's

15:22:46  15   going to tell you about is that single e-mail.

16         Unless you're going to review all of them, there's no

17   way to apply whatever you're going to do in that in-camera

18   review across the greater --

19         THE COURT:  When you started, Mr. Stoller, you held

15:22:59  20   up a folder.  Is that all of them?  Is that all of them?

21         MR. STOLLER:  That is all of them.

22         THE COURT:  Rather than -- it seems to me we could

23   do -- if we're going to take up Mr. Lerner's suggestion, we

24   could do it in one of two ways.  You can write those out in a

15:23:11  25   privilege log and he can pick ten or you could produce that in

15:23:14 1    camera and we'll pick ten.  And we'll look through them and

2    see if we agree with you that those are privileged.  And if

3    so, we'll say so.

4         MR. STOLLER:  I'm happy to give it to you, Your

15:23:26 5    Honor.  I'll have to make another set --

6         THE COURT:  It saves you the time --

7         MR. STOLLER:  I'm much happier to give it to you and

8    have you randomly draw.

9         THE COURT:  It makes it random for your purposes.

15:23:37 10   We'll go through and pick every third and look at ten, and

11   that resolves the issue and you don't have to spend time

12   writing a privilege log.

13        MR. STOLLER:  We'll do that, Your Honor.  I'll have

14   to make a new set of these, but I'll do that.

15:23:51 15        THE COURT:  If you can get it to us by the end of

16   next week, we'll do that.

17        MR. STOLLER:  Okay.

18        MR. LERNER:  Thank you, Your Honor.

19        THE COURT:  Now, there's a different privilege log

15:24:02 20   issue, I think, that the defendants are raising, which is the

21   sufficiency of the plaintiffs' obtaining communications from

22   their experts.

23        MR. LERNER:  Your Honor, the issue again, the issue

24   with the joint experts, with Northwestern doctors, there's

15:24:20 25   four doctors, and we have some concerns they haven't looked at

15:24:22  1   all the places they need to look at in order to determine what

2   e-mails exist.

3           The issue is that plaintiffs made the point that the

4   Northwestern doctors work together and so they communicate all

15:24:32  5   the time by e-mail and so it would be a burden on them to go

6   through all of the e-mails to try to figure out what documents

7   may be responsive, relevant, for purposes of this case.  So

8   instead what the plaintiffs did is they looked at their own

9   servers and determined that.

15:24:50  10          THE COURT:  Right.

11          MR. LERNER:  The problem with that is they actually

12   produced one document that is communications just among the

13   experts.

14          For them to look at their own servers, I think we're

15:24:59  15   missing some documents.  And if they want to impose some

16   limitations or restrictions to look at a certain time period,

17   certain keywords, kind of things we had to do for our

18   employees' ESI, I'm happy to discuss that.  Keywords, date

19   restrictions, so we get a more limited and reasonable set of

15:25:16  20   documents for them to review.

21          I'm just concerned if they only reviewed the

22   plaintiffs' e-mail server that documents haven't been

23   reviewed.

24          MR. STOLLER:  Your Honor, Mr. Rotman who dealt

15:25:27  25   directly with the experts can correct me if I'm wrong, but we

15:25:30   1   confirmed with the experts.  They said every e-mail they had

2   relevant to this litigation and to their -- and to their

3   engagement, they copied the lawyers on.  And so it became a

4   question of they have their e-mail servers --

15:25:43   5          THE COURT:  I understand that, Mr. Stoller.  They

6   made the assertion in the paper and again that you produced

7   e-mails among those four doctors that don't copy a lawyer.  I

8   think his point is if the doctors told you that, it's not

9   accurate because they've got an e-mail that doesn't include a

15:25:59  10   lawyer.

11          MR. STOLLER:  If you point it out to me I can

12   probably address it, but to my knowledge we had all -- that

13   wouldn't be possible because we collected the e-mails from the

14   hospital --

15:26:12  15          THE COURT:  Do you have it, Mr. Lerner?  Show it to

16   Mr. Stoller, would you.

17           (Counsel confer.)

18          MR. STOLLER:  I've seen it, Your Honor.  And Steve

19   can correct me if I'm wrong, we talked with the doctors and

15:27:05  20   they said to their knowledge everything's done, they have

21   given us everything they have.  And that e-mail he's referring

22   to didn't come from somewhere else, it came from Hausfeld

23   servers.

24          THE COURT:  Is Hausfeld copied on that e-mail?

15:27:23  25          MR. STOLLER:  The email he -- no, it got forwarded to

15:27:24  1    them after.

2             THE COURT:  Forwarded to Hausfeld?

3             MR. STOLLER:  Correct.

4             THE COURT:  So it was internal communication among

15:27:34  5    the experts without Hausfeld and then one of them forwarded it

6    to Hausfeld?

7             MR. STOLLER:  Correct.  Apparently they fixed it

8    after the fact.

9             THE COURT:  Will you follow up with them on that,

15:27:44  10   because it sounds like there was an e-mail that was just among

11   the experts and no lawyer copied and then one of them

12   forwarded it.

13            MR. STOLLER:  That's correct.

14            THE COURT:  It sounds like there has been e-mails

15:27:52  15   just among the experts not copied to Hausfeld.  I think you

16   should follow up and just make sure since it happened in that

17   instance that it didn't happen in others that weren't

18   forwarded.

19            MR. STOLLER:  We will do so, Your Honor.

15:28:04  20            THE COURT:  Provide -- you got the number?

21            MR. STOLLER:  I have it, Your Honor.

22            THE COURT:  I'll ask them to do that, and I think

23   they'll find out and address the issue and it will be

24   resolved.

15:28:13  25            MR. LERNER:  Thank you, Your Honor.

15:28:14  1          THE COURT:  Okay.

       2          You also mentioned in the case management report that

       3    I had not ruled on the retaking of Dr. Henry's deposition.

       4    Frankly, I forgot about this after the last case management

15:28:30  5    conference.  This wasn't put on my desk when it came in, so I

       6    missed it.  I'll get you a ruling on Dr. Henry's deposition in

       7    the next week.

       8          Let's talk then about other motions.  It seems to me

       9    we've got four categories of motions.  We've got the

15:28:49 10    preemption motion that is now fully briefed as of last week.

      11    We've got what I'll call *Daubert* motions.  I think there's 13

      12    of them, ten filed by the defense and three filed by the

      13    plaintiffs, which ask that experts not be permitted to

      14    testify.  We've got motions to disqualify experts based upon

15:29:19 15    their involvement with other parties earlier in the case.

      16          And I think, if I remember correctly, that most of

      17    those motions to disqualify concern testifying experts,

      18    although one includes some consulting experts.

      19          And then we've got motions for summary judgment that

15:29:42 20    seem to me to be related to the bellwether cases.  Some are

      21    directed at the bellwether plaintiffs, some are directed at

      22    affirmative defenses.

      23          MR. STOLLER:  On that last point, Your Honor, I

      24    believe the response on the affirmative defense was -- you all

15:29:57 25    have withdrawn the affirmative defense; is that correct?  I

15:30:01   1   think that's not an issue any more, based on our review of

2   your reply.  Or response.

3        MR. LERNER:  I think the issue was -- I think that's

4   resolved.  For the Jones case we were just preserving our

15:30:15   5   right to -- preserve the right for plaintiffs to meet their

6   burden of proof as to causation.

7        THE COURT:  Well, let's identify it.

8        MR. STOLLER:  Your Honor, Plaintiffs' Motion for

9   Partial Summary Judgment re Affirmative Defense Number 13.

15:30:33  10   It's Docket 7363, I believe.  I think that's been resolved by

11   virtue of their response to that in which they withdraw the

12   affirmative defense.

13        THE COURT:  So you are withdrawing that affirmative

14   defense?

15:30:46  15        MR. LERNER:  Yes, Your Honor.

16        THE COURT:  Okay.  So do you want us to grant that

17   motion or just deem the affirmative defense withdrawn?  Both

18   have the same effect --

19        MR. STOLLER:  I'd like you to grant my motion because

15:31:00  20   that always means I won, Your Honor.

21        THE COURT:  All right.  I'm going to grant that

22   motion so Mr. Stoller's feeling good.  We'll grant that as

23   uncontested as Docket 7363.

24        There are some other case-specific motions that have

15:31:15  25   been filed, I think not by lead counsel, and Nancy was going

15:31:19    1    to talk to you all to see if there was any issue we need to

            2    resolve.

            3         So here's the question I have for you with respect to

            4    the four categories of motions:  It seems to me we should set

15:31:31    5    an oral argument on the preemption motion.  And the question I

            6    then have is whether you have views on the best way to hold

            7    hearings on the *Daubert* motions.

            8         I do not think we should try to hold one hearing on

            9    all 13 *Daubert* motions because I try to be prepared before a

15:31:54   10    hearing and, frankly, if we wait until I'm prepared on all 13

           11    motions I will have forgotten the first seven by the time we

           12    get to that hearing.  It will just take too long.

           13         So my thought is perhaps we should put the *Daubert*

           14    motions into some sort of categories and address them in

15:32:11   15    groups where I can be prepared at the hearing to address all

           16    of them in a group.  And maybe we include with some of those

           17    *Daubert* hearings specific -- well, I think we ought to include

           18    motions to disqualify experts when we're addressing the

           19    *Daubert* motion on those experts, but I don't know whether we

15:32:32   20    should include summary judgment motions on bellwether

           21    plaintiffs' cases.  My sense is we really ought to deal with

           22    those in advance of trials rather than to tackle them while

           23    we're tackling *Daubert* motions.

           24         Another question I have, because I just haven't read

15:32:49   25    them all, is whether there are *Daubert* motions that don't go

15:32:52  1    to the case as a whole and are really bellwether plaintiff

        2    specific and we ought to hold off and rule on those before a

        3    bellwether trial.

        4            I'm interested in thoughts you have about the best

15:33:04  5    way to organize these hearings.

        6            Pull the mic up, would you, Mr. O'Connor.

        7            MR. O'CONNOR:  Just thinking, I don't have them all

        8    in front of me, some of the *Daubert* motions did address

        9    general issues that are across the board and also may address

15:33:27 10    one or two or three of the bellwether plaintiffs.  If you're

       11    going to cut them anyway to categorize them right here and

       12    right now, I think there's *Daubert* motions against medical

       13    witnesses and nonmedical witnesses.  How many of each, I don't

       14    know.

15:33:46 15            THE COURT:  Okay.

       16            MR. NORTH:  Your Honor, my recollection, and this is

       17    off the top of my head, there's no more than one or two that

       18    have bellwether-specific things in it --

       19            MR. O'CONNOR:  That may be right.

15:33:55 20            MR. NORTH:  -- most are general.

       21            But my suggestion would be if the Court could tell us

       22    roughly, like, do you want to do three to five in one hearing?

       23    Five to seven?  Some range?

       24            I suspect the two teams could get together and

15:34:08 25    classify them real quick because it might not be exactly

15:34:12   1   efficient to do medical versus nonmedical because some of the

2   medical and nonmedical have the same issue.  Like how much can

3   witnesses talk about corporate documents.  And that crosses

4   the board, and we can probably do several that have that same

15:34:29   5   issue at one time.

6            I think we could group them by agreement if the Court

7   would give us parameters.  Looking at doing them in two

8   hearings?  Three hearings?  Or what.

9            THE COURT:  Okay.  Give me just a minute.

15:35:08   10           I'm going to be right back.  I'm going to grab my

11   iPad.  It's easier to look at the calendar there.  I'll be

12   right back in.

13           (Pause in proceedings.)

14           THE COURT:  Please be seated.

15:38:36   15           Counsel, let me talk out loud for a minute and get

16   your reaction.

17           I'm looking at the calendar going forward.

18           We, I think, could have a hearing on some of the

19   motions on Friday, November 17th, which is about a little over

15:39:02   20   a month from now.  Between now and then I'm completely booked.

21   We could hold a hearing then on some of the motions.

22           I think we could hold another hearing on Friday,

23   December 15th.  I'm scheduled to be in a criminal case,

24   criminal trial, in the middle of an eight-day criminal trial

15:39:33   25   that day, but based on developments in the case I'm reasonably

15:39:37  1    confident it will plead out.  So I think that will be

2    available.

3         I've got a very large criminal case which is

4    scheduled to start January 23rd.  If it goes, that will take

15:39:56  5    three weeks or a month.  I just don't know if that's going to

6    go.  But we could have probably another hearing the week

7    before that, maybe on January 19th.

8         February, the second half of the month I'm going to

9    be in a civil trial that's going.

15:40:23  10        March is relatively open.

11        April is completely booked.

12        And May I have some flexibility.

13        My thought coming in today was that I would like to

14    try the first bellwether case in March because it's a pretty

15:40:42  15    open month.  The question in my mind is can we get through all

16    of these motions and get them decided by March, just because

17    of the rest of my docket.

18        If we held -- tell me if I'm crazy on this.  If we

19    held a hearing on November 17th, on December 15th, on

15:41:09  20    January 19th, then that would have us hearing, if we're going

21    to do the preemption motion and the 13 *Daubert* motions and the

22    three disqualification motions and the first one or two

23    bellwether summary judgment motions, that's 16 motions.  That

24    means we'd be arguing five or six each month.  I just don't

15:41:37  25    know if I'll be able to get ready for all of that given how

15:41:42  1    the rest of these months are filled in.  But that would be one

2    possibility.

3        Another possibility would be to say we'll do the

4    first bellwether trial in May, which would give us more time

15:41:53  5    for the motions to be decided, but that's pushing us,

6    obviously, later into the year.

7        By the way, Judge Brodman told me you all have a

8    trial scheduled in front of him on August 6th and he intends

9    to hold that trial date.  So that's going to interfere with

15:42:08  10   our ability to do bellwether trials, I presume, because I

11   assume many of you will be involved in that.

12       So give me your thoughts in light of those calendar

13   realities.

14       MR. LOPEZ:  Well, Your Honor, I don't know if this is

15:42:30  15   on the agenda --

16       THE COURT:  Can't hear you, Mr. Lopez.

17       MR. LOPEZ:  Apologize.

18       If we could get the Court to select, if you're in a

19   position to do that, the first two -- I think -- I think -- I

15:42:40  20   could be wrong, but I thought we were going to pick two and

21   those were going to be the ones we were going to focus our

22   attention on.  Are we going to wait --

23       THE COURT:  Two what?

24       MR. LOPEZ:  Two of the five bellwether cases.  Are we

15:42:52  25   going to wait for summary judgment on those and some of the

15:42:55   1   case-specific motions?  Or might we lessen the load --

2              THE COURT:  My intent is when we pick the dates to

3   plug in the trials.  And what we'll need to do is set a final

4   pretrial conference.  I assume there will be case-specific

15:43:11   5   motions in limine and other motions we'll need to address in

6   advance of that trial.  So I think I intend to do that.  But

7   the question is -- I mean, are you suggesting, depending which

8   we pick, we may not have to address some of these more

9   general --

15:43:24  10             MR. LOPEZ:  Not right away.  I mean, we can lessen at

11   least the immediate load if we can put three of the cases that

12   are not going to be in the first two, you know, kind of --

13             THE COURT:  But don't -- isn't it almost certain the

14   *Daubert* motions will relate to the first two?

15:43:38  15             MR. LOPEZ:  The *Daubert*s do.  I mean, nothing's going

16   to affect the *Daubert* motions.

17             THE COURT:  Those plus the motions to disqualify are

18   16 motions, and we've got the preemption motion.  That's 17.

19   I don't see any way to avoid having to decide 17 motions

15:43:52  20   before the first bellwether trial.

21             MR. LOPEZ:  No, that's true.  That's true.

22             THE COURT:  Okay.  I interrupted you.  Go on with

23   your thought.

24             MR. LOPEZ:  I was just thinking, because I thought

15:44:03  25   you added the MSJ motions, too.  But that's something you're

15:44:07  1    talking about doing as we're getting closer --

2         THE COURT:  Right.  Obviously it needs to be far

3    enough in advance so you all can frame the case, but I don't

4    see a reason to decide the motions for summary judgment on

15:44:17  5    Case Number 5 before we try Case Number 1.

6         MR. LOPEZ:  Well, we want to keep the March date for

7    sure.  And the August date I will tell you, Judge Brodman's

8    won't affect our ability to try a case here, or anywhere else

9    for that matter.  Even remands of cases at that point.  We've

15:44:36 10    got plenty of trial teams ready to try cases.  So I wouldn't

11    let that date affect us, at least.  I cannot speak for defense

12    counsel.  They may not have the same ability to do that.  But

13    we're ready to try more than one case at any given time

14    anywhere.  So we've kind of mapped out what that might look

15:44:54 15    like next year and we're prepared to have trial teams ready to

16    do that.  We could -- the number's large.  25 to 30 cases

17    we're hoping to get tried next year in state court, early

18    remands and the like.

19         But obviously preemption is one we'd like the Court

15:45:14 20    to address first.  And then Dr. Kessler is important.  I'll

21    tell you why.  A lot of people depend on and rely on

22    Dr. Kessler's findings, his factual -- the bases of his

23    opinions, including some of the defense lawyers -- I mean

24    defense experts actually have said they didn't need to look at

15:45:35 25    the internal corporate documents because they relied on

15:45:37  1    Dr. Kessler because he was so thorough in his review and spent

2    hundreds of hours, which might explain his bill.  He actually

3    spent 700 hours, 770 hours, working on the case.

4         But I mean I understand that's -- I would say for the

15:45:55  5    parties, I can speak for the plaintiffs, it won't overburden

6    us if we could spread all 15 or 16 of those over three

7    hearings.  But I --

8         THE COURT:  I'm not worried about you.

9         MR. LOPEZ:  I didn't think so.

15:46:08  10        THE COURT:  I'm not worried about them.

11        MR. LOPEZ:  Okay.

12        THE COURT:  We have a two-person law firm here that

13    has 400 other cases and a lot of things scheduled.  The

14    question is can I do justice to those motions and get it done

15:46:22  15    by March.

16        MR. LOPEZ:  Well, I guess the only thing I can say,

17    Your Honor, we'd like to, if the Court can handle that many

18    motions over three hearings, we would like to keep that March

19    date if we could.

15:46:34  20        THE COURT:  Okay.

21        MR. NORTH:  Your Honor, we are perfectly fine with

22    the March date also and would like to see if we could, of

23    course if the Court is able to do that.

24         It may not be as intimidating as it sounds in the

15:46:50  25    number of motions because there is a lot of overlap.  I can

15:46:54  1    think of three *Daubert* motions that essentially raise the same

2    issue, for the most part.  The two motions to disqualify are

3    the same legal standard, slightly different facts but the same

4    legal standard.  Those two can be treated in tandem, I think,

15:47:10  5    quite easily.

6         My suggestion would be we maybe plan with these

7    dates, that we come up with a scheme in the next week or so,

8    if not sooner, to, in collaboration Mr. Stoller and I can talk

9    about how to group these, maybe, over the three hearings, and

15:47:25 10    then the Court can look at that and see if you think that's

11    feasible.  Maybe we can do a little blurb as to why we think

12    these motions are related to each other or there might be some

13    efficiencies that way.

14         MR. LOPEZ:  I actually think that's a really good

15:47:41 15    idea.  I didn't think about the fact you're going to see a lot

16    of the same stuff in a lot of these motions.  It's not like

17    you're going to put this aside and start with a whole new set

18    of facts and law and things.  We could do that.  We could side

19    by side -- actually, it may look -- may make five motions look

15:48:02 20    like two to you, Your Honor, because the issues do overlap.

21    So just give us a time when you'd like us to make that

22    proposal and we'll get it to you.

23         THE COURT:  All right.  Let's then set hearings for

24    Friday, November 17th at 1 p.m., Friday December 15th at 1

15:49:33 25    p.m., and Friday, January 19th at 1 p.m. for hearings,

15:49:40   1    recognizing that the 15th may get bumped if that criminal

2    trial goes.

3                And what I'd like to do is have you by a week from

4    Friday, if you can, a week from tomorrow, propose the best

15:49:58   5    grouping -- if you can jointly, that would be great -- on how

6    to address these motions, both in terms of what's going to be

7    most informative to you all as we work toward a March trial

8    date, but also what you think is going to be the best

9    allocation of workload.  We'll be looking at the same issue.

15:50:23  10                I do think we should address the preemption motion at

11    the November 17th hearing and get that decided up front.  But

12    we can do more than that, I think, at that hearing.  And if

13    you can get me by a week from Friday your suggestions, then

14    we'll look them over and issue an order that actually sets out

15:50:40  15    the schedule.

16                When we talked about the trials, I think the thought

17    was we needed three weeks for each trial.  Is that still the

18    case?

19                MR. LOPEZ:  Yes, Your Honor.

15:51:07  20                MR. NORTH:  Yes, Your Honor.

21                THE COURT:  Because of our criminal docket, I usually

22    have ten or so sentencings on Mondays so I try not to schedule

23    trial days on Mondays.  We can do it if we need to, but it

24    really jams up sentencings the weeks before and after.

15:51:31  25                Can we do three weeks of trial if we're doing four

15:51:34  1    hours -- I mean four days per week, five and a half hours of

       2    trial time per day?  So that would be 22 hours of trial time a

       3    week.  66 hours total trial time for the cases.  Is that

       4    workable?

15:51:53  5         MR. LOPEZ:  That works for us, Your Honor.

       6         MR. NORTH:  Yes, Your Honor.

       7         THE COURT:  Okay.  Then let's set the first

       8    bellwether trial for Tuesday, March 13th, and we will hold the

       9    13th through the 16th, the 20th through the 23rd, and the 27th

15:52:38 10    through the 30th for that trial.

      11         Traci, do you see any problems with that?

      12         THE COURTROOM DEPUTY:  No.  We're fine.

      13         THE COURT:  And that means that we will need to set a

      14    final pretrial conference ahead of that.  I think I'd like to

15:53:07 15    do that at the November 17th hearing because I will have a

      16    better sense for what else is on the calendar.  As I

      17    mentioned, I'm going to be in another civil trial in the last

      18    half of February that I'm sure is going.

      19         So we'll hold those trial days and work toward being

15:53:24 20    ready for that in terms of the other motions that we're going

      21    to resolve.

      22         I don't want to today put -- well, maybe we should.

      23         I think what I'd like to do --

      24         Is Szilagyi scheduled to start on June 5th?

15:53:54 25       (The Court and the courtroom deputy confer.)

15:54:08  1        THE COURT:  All right.  I think I'd like to set the

2   second bellwether trial to go May 15th through the 18th, 22nd

3   through the 25th, and 29th through June 1st.

4        Defense counsel, can you try a case that overlaps what's

15:54:44  5   happening in state court?  I'm just wondering how much we need

6   to steer around what Judge Brodman's going to be doing.

7        MR. NORTH:  You know, ideally we'd prefer not to, but

8   we can if we need to.

9        THE COURT:  All right.  I've got several big, complex

15:55:16 10   criminal cases.  I don't know when I'm going to have to set

11   those in 2018 for trial, so I'll wait to set the third

12   bellwether trial until I have a clearer picture on that.  And

13   there is a possibility, which I will try to avoid, that the

14   May date could get bumped by one of those big, complex

15:55:32 15   criminal cases, which takes precedence.  But I don't know yet

16   for sure which are going and exactly when they'll be ready.

17        I would like to make the November 17th hearing

18   another status conference as well.  So we will put in the

19   order that comes out after today that you should file a status

15:55:53 20   report ahead of that so we can just talk about where we are in

21   the case.

22        In terms of the two bellwether trials to be tried in

23   March and May, I didn't go back and read the bellwether order

24   about what we said about picking which goes first.  Remind me

15:56:14 25   what's in that order.

15:56:15   1           MR. NORTH:  Your Honor, I'd have to go back and

2      figure out which order it is, but I believe the Court in a

3      footnote in choosing the bellwether cases suggested the Jones

4      case would go first, most likely, and the Booker case would go

15:56:27   5      second.

6           THE COURT:  Anybody remember which case management

7      order that was?

8           MR. LOPEZ:  I don't remember the order, but I

9      remember the Booker and Jones cases.

15:56:36  10           MR. NORTH:  Your Honor, I can find it in one second

11      here.

12           MR. LOPEZ:  If it says that, I read it the other way.

13           THE COURT:  Let me read -- let me find it.

14           It is Case Management Order Number 23.  I picked five

15:56:55  15      bellwether trials:  Mulkey, Hyde, Jones, Kruse, and Booker.

16           MR. NORTH:  My recollection it was a footnote.

17           THE COURT:  I said in Footnote 1, "Although the Court

18      declines to order the trials now, it makes sense to try Jones

19      and Booker first in order to facilitate a more informed

15:57:16  20      selection of the sixth case."

21           And I think -- well, I won't try to recreate my

22      thinking.

23           What are your thoughts on that, Jones and Booker as

24      the first two?

15:57:25  25           MR. LOPEZ:  Well, I noticed the word "first" came

15:57:27  1   right after the word "Booker," so that would be --

2        THE COURT:  "Jones and Booker first."

3        MR. LOPEZ:  Oh, comma "first."

4        THE COURT:  No, no comma.

15:57:38  5        MR. LOPEZ:  No comma.  All right.  Then Booker first.

6        THE COURT:  I think those are the two cases we ought

7   to try first.

8        You want Booker?

9        MR. LOPEZ:  Yes, Your Honor.

15:57:44  10       THE COURT:  You probably want Jones?

11       MR. NORTH:  I want Jones, Your Honor, because

12  Booker's the only one of the five with an open surgery, which

13  represents such a small percentage of the overall MDL.  We all

14  on our side want to try a nonsurgical case because that's the

15:57:59  15  vast majority of the inventory.

16       THE COURT:  Is there a particular reason you think

17  Booker should go first?

18       MR. LOPEZ:  Well, I mean, there are a lot of reasons.

19  The reason you do bellwether cases is to see whether or not

15:58:23  20  the cases are going to lead to something other than continue

21  to try 27 other cases over the next century.

22       So Booker's a G2.  Jones is Eclipse.  I mean, G2 has

23  a seven-year history of devices on the market, maybe eight.

24  It sold way beyond the time it got taken off the market.

15:58:46  25  That's probably 50 percent of the cases filed.  I know even in

15:58:49  1    cases that --

2              THE COURT:  We're going to try them both.  Why does

3    this matter to the two sides?

4              MR. LOPEZ:  It matters because if we're looking at

15:58:58  5    the rationale for trying -- we'll get a good value of a G2

6    case.

7              THE COURT:  We're going to try it as one of the first

8    two.  I'm just -- I have a coin.

9              MR. LOPEZ:  Oh, we do?

15:59:10  10           THE COURT:  Yeah.  Heads we'll try Jones first,

11   Booker we'll try -- I mean heads we'll try Jones first, Booker

12   we'll try tails first.  No.

13             MR. LOPEZ:  It's like heads I win, tails you lose.

14             THE COURT:  Heads we try Jones first, tails we try

15:59:27  15   Booker first.  All right?

16             Want me to re-flip it?

17             Heads Jones, tails Booker.

18             It is tails.  Booker first.

19             That's an indication how important I thought that

15:59:40  20   decision was.

21             We're going to try them both, and we're going to try

22   them both within a three-month period.  You'll have verdicts

23   in the two.

24             Okay.  So which one just won?  Booker, right?

15:59:57  25           MR. LOPEZ:  Booker.

15:59:58  1          THE COURT:  We'll try Booker in March, Jones in May.

2          And factor that in as you think about the order in

3    which we should address these motions at the three hearings

4    that are coming up in November, December, and January.

16:00:23  5          What else do we need to address?

6          Oh, I know what we need to address.  We need to

7    address the question of other judges trying bellwether cases.

8          Whether I can try the third bellwether case really

9    depends on what happens to the rest of my docket from the

16:00:56  10   first two, so I won't make that decision until probably early

11   next year.  We'll try to pick a date in November.  I am

12   guessing there are some judges in this courthouse that would

13   take the case.  We've got a number of senior judges who could

14   help out.  If not, we can bring somebody in.

16:01:17  15         What we do at the next two, my thought we ought to

16   address that as we get closer to the beginning of the year.

17   If we can try all five cases in 2018, that would be great.

18   But I will tell you now, if we do that it will need to be with

19   the help of some other judges.

16:01:36  20         I don't know that we need to slay that dragon today.

21   Why don't we plan to address that as we get closer to 2018.

22   And I'm certainly open to having other judges come in.  I

23   would rather get other judges to help and get them tried more

24   quickly than do them all myself and stretch it out into 2019

16:01:52  25   if we can avoid it just because I think it would be helpful to

16:01:57  1    get the bellwethers resolved.

2                  Are there any other matters that we need to address?

3                  MR. STOLLER:  Judge, do you want to set a pretrial

4    conference date on Jones now that we have a trial date --

16:02:08  5                  MR. LOPEZ:  He meant Booker.

6                  MR. STOLLER:  No, he's going to set the pretrial

7    conference at the next hearing for Booker.  I'm looking

8    further ahead.

9                  THE COURT:  You mean set the one in May now?  No, I

16:02:21 10    don't.  I'll need to work around my schedule when we set that.

11                 Anything else from anybody?

12                 MR. NORTH:  Nothing from the defendants, Your Honor.

13                 MR. LOPEZ:  Thank you, Your Honor.

14                 THE COURT:  Okay.  Thank you all.

16:02:34 15         (End of transcript.)

16                         *  *  *  *  *

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion

9   of the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control, and to the best

12  of my ability.

13

14         DATED at Phoenix, Arizona, this 13th day of October,

15  2017.

16

17

18

19

20                          s/ Patricia Lyons, RMR, CRR
                            Official Court Reporter
21

22

23

24

25