1  Ramon Rossi Lopez - rlopez@lopezmchugh.com
   (California Bar Number 86361; admitted *pro hac vice*)
2  Lopez McHugh LLP
   100 Bayview Circle, Suite 5600
3  Newport Beach, California  92660
   949-812-5771
4
   Mark S. O'Connor (011029) – mark.oconnor@gknet.com
5  Gallagher & Kennedy, P.A.
   2575 East Camelback Road
6  Phoenix, Arizona  85016-9225
   602-530-8000
7
   *Co-Lead/Liaison Counsel for Plaintiffs*
8
                    UNITED STATES DISTRICT COURT
9
                        DISTRICT OF ARIZONA
10

| 11 | In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC |
|---|---|---|
| 12 | | **PLAINTIFFS' OMNIBUS SEPARATE STATEMENT OF FACTS IN SUPPORT OF THEIR RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN THE BELLWETHER CASES** |

16      Plaintiffs submit this Omnibus Separate Statement of Facts in Support of their

17  Response to Defendants' Motion for Summary Judgment in the bellwether cases.

18  **I.      FACTS COMMON TO ALL CASES**

19          **A.      Bard Departs from A Proven IVC Filter to Make More Money.**

20          1.      Beginning on approximately April 28, 1995, Bard Peripheral Vascular, Inc.

21  ("BPV") and C.R. Bard, Inc. ("C.R. Bard") (collectively "Bard") manufactured and sold an

22  inferior vena cava ("IVC") filter called the Simon Nitinol Filter ("SNF").  *See* 510(k)

23  Premarket Notification, FDA website, *available at* https://www.accessdata.fda.gov/

24  scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K944353 (last accessed Oct. 2, 2017).  Bard

25  marketed the SNF as a device to be implanted in a patient's IVC to trap blood clots to

26  prevent the clots from traveling to the heart and lungs and potentially causing a pulmonary

27  embolism ("PE").  US FDA Clinical Data Summary of the Simon Nitinol Filter, attached

28  as Exhibit 1, BPVE-01-00280772, at 73; Ex. 8, BPVE-01-00066044.

2.      The basic performance specifications for Bard IVC filters were that the devices must not migrate, require hook strength for stability and migration resistance, should not break or come apart during their lifetime, and must not fracture as result of corrosion or stresses within the body.  Deposition of John McDermott, Feb. 5, 2014, attached as Exhibit 2, at 83:9-92:18; Product Performance Specification Recovery Filter and Femoral Delivery System, Nov. 2003, attached as Exhibit 3, BPVE-01-00010390-416, at 403.

3.      The SNF filter largely met these design and patient safety goals, performing very well in patients.  Email from David Ciavarella to Brian Barry and Chris Ganser re G2 Caudal Migrations, Dec. 27, 2005, attached as Exhibit 4, BPVE-01-00028224-25.

4.      ████████████████████████████████████████ ████████████████ Chart of Filter Fracture Complaints, attached as Exhibit 5, BPVEFILTER-01-00037664.  As the predicate device for Recovery, this is the standard of performance against which the Recovery filter is measured for substantial equivalence and safety and effectiveness.  Deposition of Donna B. Tillman, June 12, 2014, attached as Exhibit 6, at 101:20-23, 115:23-116:3, 119:23-120; Deposition of Christine Brauer, dated Aug. 2, 2017, attached as Exhibit 7, at 202:19-203:8.

5.      ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████Ex. 1, BPVE-01-00280772, at 72, 86; Simon Nitinol Filter/Straight Line Technical File, attached as Exhibit 8, BPVE-01-00066044-109, at 98-99.  Since these early clinical studies there have been ████████████████ ████████████████████████████████████ reported to Bard through May 2011, Ex. 5, BPVEFILTER-01-00037664.

6.      Bard wanted to increase its market share in the IVC filter market and believed that developing a retrievable IVC filter would enable it to do so.  Product

1  Opportunity Appraisal for Recovery Filter System, Mar. 28, 2003, attached as Exhibit 9,

2  BPV-17-01-00030247, at 249.

3       7.      Officers at Bard recognized that modifying the design to allow for optional

4  retrieval had the potential to significantly increase BARD's market share of the IVC filter

5  market. *Id.*

6       **B.     The Recovery Filter.**

7       8.      The Recovery Nitinol Filter ("Recovery" or "RNF"), Bard's first "Optional

8  Filter," ███████████████████████████████████████████████████████

9  ████████████████████████████████████████████

10 ██████████████████████████████████████████████████

11 ███████████████████████████████████████████

12 ███████████████████████████████████ NMT Cprdos

13 presentation, June 14, 2000, attached as Exhibit 10, BPVE-01-00001342.

14      9.      In April 2000, Dr. Murray Asch, an Interventional Radiologist from Canada,

15 began his RNF retrievability study.  Deposition of Murray R. Asch, May 2, 2016, attached

16 as Exhibit 11, at 12:14-24; Murray R. Asch, MD, FRCPC, *Initial Experience in Humans*

17 *with a New Retrievable IVC Filter*, Radiology 2002; 225:835-844 ("Asch Study Article"),

18 attached as Exhibit 12.  Thirty-four patients who needed IVC filters were selected to

19 receive an RNF between April 2000 and November 2001.  When Dr. Asch's first article

20 regarding the study was published, 16 men and 16 women aged 18-83 years had been

21 implanted with the RNF (2 patients of the original 34 selected were found to have

22 anatomic conditions unfavorable for filter placement).  *Id.* at 835, 837.  The indications

23 for placement were recent deep venous thrombosis, recent pulmonary embolism, and/or

24 prophylaxis.  *Id.*  The mean implantation period was 53 days and the range was 5 to 134

25 days.  *Id.* at 835.

26      10.     During Dr. Asch's treatment of the initial 32 patients, his test subjects

27 encountered several complications with the RNF: 1 migration, 2 fractures, 2 tilts, 1

28

3

perforation, and 19 deployment-related problems.  Ex. 11, Asch Dep., at 26:8-15; Ex. 12, Asch Study Article, at 839-40 (tilts and deployment issues), 843 (perforation).

11.    The Canadian Institutional Review Board (IRB) suspended the study after the filter fractures were reported.  Email from George Cavagnaro to Doug Uelmen and Carol Vierling, April 18, 2002, attached as Exhibit 13, BPV-17-01-00052621 (forwarding email from Dr. Asch stating he had reported RNF fracture to the IRB and "the IRB has suspended the trial effective immediately until the nature of the problem with the device can be better understood").

12.    Dr. Asch testified that his study should never have been used to seek market clearance of the RNF in the U.S.  Ex. 11, Asch Dep. at 23:7-24:19; 195:14-24.

13.    Bard was aware of the Recovery filter's design flaws and told Dr. Asch it would change the design or manufacturing process of the filter to try to prevent fractures. Bard admitted that pre-marketing fractures were likely due to weakness at the site of the weld, and that it was aware that it needed to increase robustness of the filter by designing it with larger diameter metal.  Ex. 11, Asch Dep., at 40:19-41:11.

14.    Defendants' expert Dr. Donna B. Tillman testified that Bard had an obligation to assure that (a) "the device continues to be safe and effective and that they [sic] meets FDA's quality system requirements throughout the life of the device," (b) "[a]ssessed overall, the safety and effectiveness of the device could not be worse than the predicate device;" and (c) "[the device] needs to be as safe and effective as the predicate device."  Ex. 6, at 101:20-23, 115:23-116:3, 119:23-120:7.

15.    On July 10, 2002, Bard submitted a special 510(k) application (K022236) modifying the SNF (the predicate device to which the filter was to be substantially equivalent) seeking clearance for a new IVC filter that would be known as the Recovery Filter.  *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/ pmn.cfm?ID=K022236; Letter from K. Fuller and C. Vierling to Food and Drug Administration, dated July 10, 2002, attached as Exhibit 14, BPV-17-01-00057953;

4

1  Recovery Filter System Special 510(k) Submission, July 10, 2002, attached as Exhibit 15,

2  BPV-TRIAL-EXHIBIT-0293.

3      16.    If an IVC filter is cleared to be marketed in the United States based on

4  substantial equivalence to an appropriate predicate device, there is an expectation that the

5  new device will continue to be as safe and effective as the predicate device, post-

6  marketing in the real clinical world.  Ex. 7, 2017 Brauer Dep. at 202:19-203:8.

7      17.    On November 27, 2002, Bard obtained clearance from the FDA to market

8  the Recovery as a permanent IVC filter.  Department of Health & Human Services letter,

9  Nov. 27, 2002, attached as Exhibit 16, BPV-17-01-00057709.

10      18.    Bard then bootstrapped this clearance to open the door for a retrievable

11 filter.  On April 25, 2003, Bard submitted an abbreviated 510(k) pre-market notification

12 (K031328) in order to obtain an indication for retrievability for the RNF.  Letter from

13 Mary Edwards to FDA, Apr. 25, 2003, attached as Exhibit 17, BPV-17-01-00054947; *see*

14 *also* https://www.accessdata.fda.gov/cdrh_docs/ pdf3/K031328.pdf (last accessed Sept.

15 25, 2017).

16      19.    Bard's 510(k) applications for the RNF did not disclose that filters at the

17 low end of the leg span set specification ███████████████████████████████████████

18 █████████████████████████████████████████████ Recovery Filter

19 System Special 510(k) Submission (K022236), Nov. 27, 2002, BPV-17-01-00057953-55,

20 attached as Exhibit 18; Ex. 15, Recovery Filter System Special 510(k) Submission, July

21 10, 2002, BPV-TRIAL-EXHIBIT-0293.

22      20.    ██████████████████████████████████████████████

23 ████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████ Product

25 Opportunity Appraisal for Recovery Filter System, dated Mar. 28, 2003, BPV-17-01-

26 00030247, Ex. 9, at 249.

27

28

21.     In migration testing in 1999, NMT concluded that "the SNF filters were superior [to the Recovery] in 28 mm tubing."  R&D Technical Report, Aug. 5, 1999, attached as Exhibit 19, BPV-17-01-00002650, at 53.

22.     To become a safer product, Recovery required longer arms, larger and stronger hooks by increasing diameter of the wire, and an increased leg span.  Deposition of Robert Carr, Dec. 19, 2014, attached as Exhibit 20, at 120:20–122:1; Deposition of Len DeCant, May 24, 2016, attached as Exhibit 21, at 249:3-14.

23.     Bard could have employed penetration limiters to improve perforations at the time the Recovery was designed and marketed, but did not do so for the Recovery. Transcript of deposition of Andrzej Chanduszko, Oct. 10, 2013, attached as Exhibit 22, at 51:23–52:7.

24.     Bard's IFU for the Recovery Filter device does not include information for physicians that the device failed migration-resistance testing when the hooks were not engaged.  Recovery Filter System for use in the Vena Cava, Information for Use, attached as Exhibit 23, BPVE-01-00435559; Deposition of David A. Kessler, M.D., attached as Exhibit 24, Oct. 5, 2016, at 179:3–181:19.

25.     The failure of Recovery anchor hooks to engage was a marked difference from the SNF, eroding Bard's claim that the device was substantially equivalent to the SNF.  Ex. 24, Kessler Dep. at 179:3–181:19.

26.     In ignorance of the design flaws in its product that Bard's testing and experience had identified, FDA cleared the Recovery for a retrievability indication, allowing Bard to market the Recovery as a permanent filter with the option for retrieval on July 25, 2003.  Department of Health & Human Services letter, dated July 25, 2003, attached as Exhibit 25, BPV-17-01-00058122-24.

### 1.     The Recovery Quickly Proves Deadly.

27.     Bard began selling the Recovery filter to a limited market on December 20, 2002; it had full market release in January 2004.  Failure Investigations/R002 History Review, BPVEFILTER-01-00003802-836, attached as Exhibit 26, at 12 (limited); Special

Design Review for Recovery (Project #s 7081 and 8008) – Meeting Minutes, dated Dec. 9, 2003, attached as Exhibit 27, BPVE-01-00407525-527, at 526 (full).

28.     Starting in October of 2003, Bard began receiving complaints ████ ████████████████████████████████████████████████████████████ ██████ Ex. 26, Failure Investigations/R002 History Review, at 12-14.

29.     On December 9, 2003, less than a month prior to full market release of the Recovery filter, Bard did not have a full understanding of the design elements of the Recovery IVC filter.  At that time, the Special Design Review team for the Recovery filter requested "objective evidence" of the following, among other things, (a) to document the criteria (50 mmHg) that Bard used for migration resistance; (b) a study that analyzed the filter's migration resistance in conjunction with tilting and the number of legs/hooks secured; (c) a study that compared Recovery's migration resistance to competitive products; (d) migration resistance of the Recovery with oval and/or D-shaped IVCs. Special Design Review for Recovery (Project #s 7081 and 8008) – Meeting Minutes, dated Dec. 9, 2003, Ex. 27, BPVE-01-00407525, at 26-27.  Nonetheless, Bard chose not to conduct such studies prior to full market release of the Recovery.  Ex. 21, DeCant Dep. at 195:22-196:19; 204:1-12; 204:22-205:6; 207:1-208:23.

30.     Even after the commercial marketing of the Recovery filter began, Bard had many questions that needed to be answered about the performance of the device, but did know that it did not always stay centered in the vena cava even if properly deployed and centered.  Email chain between Janet Hudnall to David Rausch, Feb. 26-27, 2004, attached as Exhibit 28, BPVE-01-00373887.

31.     ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Ex. 26, Failure Investigations/R002 History Review, at 12.

32.     In a February 2004 email to Bard's interventional sales force charged with communicating with the interventional radiology public, Bard communicated that testing of the Recovery showed that it performed "just as well as the SNF in terms of migration

7

resistance." Email from Mary Edwards, February 13, 2004, attached as Exhibit 29, BPV-17-00164702-710, at 704.

33.     At approximately the same time it was telling interventional radiologists that Recovery performed as well as the SNF with respect to migration resistance,

  a.  A February 25, 2004, internal test showed that the Recovery filter did not perform as well as the SNF in Bard's migration resistance testing and in certain instances failed to meet its product performance specifications. Email from Alex Tessmer to Robert Carr, Feb. 25, 2004, BPVE-01-00410985-1019, attached as Exhibit 30;

  b.  In a February 26, 2004, email between Bard employees Janet Hudnall and David Rausch Hudnall explained that "[w]e knew very little about the long-term clinical performance of this device when we launched it. After a year of commercialization, there are still many questions that need to be answered. One thing we do know, however, is that Recovery does not always stay centered in the cava. In fact, physicians will often find that it is tilted quite a bit when they go to retrieve it even though it seemed perfectly centered upon deployment." Ex. 28, at BPVE-01-00373887;

  c.  Rausch agreed: "you are right; now that we have more experience with Recovery the positioning of tilt-resistance should probably be down played." *Id.*

34.     When Bard conducted migration-resistance testing comparing the Recovery filter against the SNF and competitive devices in March 2004, the Recovery performed worse than the SNF on every test, finished last or second to last among all tested devices on every test but one (on which it finished third to last), and failed Bard's own standard for migration resistance on several tests.  Characterization of Recovery Filter Migration Resistance in Comparison to Competitive Product Phase 1, BPVE-01-00276094, attached as Exhibit 31, at 97-99.   Indeed, at the 28 millimeter IVC test, the Recovery had migrations at less than 50 mmHg; and at a temperature of 37 degrees Celsius (plus or

1   minus 2 degrees), the average resistance for the Recovery was 47.5 mmHg with a low

2   resistance of 32.1 mmHg (well below Bard's threshold of 50 mmHg).  *Id.* at 99.

3        35.    This March 2004 testing further confirmed that the Recovery did not

4   perform as well as the SNF in Bard's migration-resistance testing, and in certain

5   instances, failed to meet its product performance specifications.  Email from Alex

6   Tessmer to Charlie Benware and others, Mar. 24, 2004, BPVE-01-00330122, attached as

7   Exhibit 32.

8        36.    Bard also knew ████████████████████████████████

9   ████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████

14  ████████████████████████████ Ex. 26, Failure Investigations/R002

15  History Review, at 14; Engineering Test Report No. ETR-04-03-02, BPV-17-01-

16  00001198–208, attached as Exhibit 33, at 208.

17       37.    The head of Bard's Research & Development team, its Vice President of

18  Research & Development, did not understand at the time of the March 2004 migration

19  testing that the IVC can expand by 25 to 50 percent and, therefore, Bard's design did not

20  take into account the IVC's real-world performance.  Ex. 21, DeCant Dep. at 70:16-71:17,

21  326:22-328:24.

22       38.    According to Natalie Wong, Bard's Quality Engineering Manager for New

23  Product Development, ████████████████████████████████████████

24  ████████████████████████ Deposition of Natalie Wong, Oct. 18, 2016, attached as

25  Exhibit 34, at 77:10-78:12; 111:16-112:18. ████████████████████████

26  ████████████████████████████████████ *Id.* at 77:16-78:12; 112:19-22.

27       39.    Concerning the Recovery's performance against its 50 mmHg (50

28  millimeters of mercury) standard, Bard's engineering staff observed "[y]ou will quickly

1   notice that there were values below 50.0 mmHG acceptance criteria for all three Starguide

2   manufactured lots . . . .This points to the fact that there is an issue with the migration

3   resistance testing." Ex. 32, at BPVE-01-00330122.

4       40.     In a Health Hazard Evaluation Bard acknowledged that in 50mmHG

5   migration resistance testing the Recovery "had the lowest mean migration resistance" of

6   all of the IVC filters evaluated.  "Health Hazard Evaluation, dated Dec. 17, 2004, BPVE-

7   01-01019821-25, attached as Exhibit 35, at 01019822.

8       41.     On April 14, 2004, Bard learned ███████████████████████████

9   ██████████████████████████████████████████████████████████████████████

10   BPV-17-01-00153581-88, attached as Exhibit 36, at 88.  ████████████████████

11   ██████████████████████████████████████████████  Ex. 21, DeCant Dep. at

12   326:22-327:13. ████████████████████████████████████████████

13   ███████████████████████████████████  *Id.* at 328:2-329:8.

14       42.  ██████████████████████████████████████████████████████

15   ██████████████████████████████████████████  Ex. 26,  Failure

16   Investigations/R002 History Review, at 14; Deposition of Chad Modra, Mar. 28, 2013,

17   attached as Exhibit 37, at 181:1-19.

18       43.  ████████████████████████████████████████████

19   ██████  Ex. 37, Modra Dep. at 183:9-12.

20       44.     Rather than communicating its findings to the medical community, Bard

21   created a "Crisis Communication Plan" which included hiring a public relations firm to

22   handle the negative press if the situation with its failing retrievable filters were to be

23   "exposed" in the media.  *See* Crisis Communication Plan, BPV-17-01-00164733-164788,

24   attached as Exhibit 38.

25       45.      Bard's messaging to the public was to be:  "Bottom line: good filter, severe

26   case, bad outcome, deep regret."  Bard determined that "[t] his [was] the simple story we

27   should repeat again and again. Comparison with other filters is problematic in many ways,

28   and we should avoid/downplay this as much as possible. When pressed, we [Bard] simply

10

1  paraphrase … that estimates based on the available data suggest that there is no significant

2  difference in the rates of these complications between any of the devices currently

3  marketed in the U.S., including the Recovery device."  Email from John Lehman, April

4  15, 2004, BPV-17-01-00165419, attached as Exhibit 39.

5          46.     Bard described the situation with Recovery failures after the fact as so dire

6  in the 2004-2005 time frame that it needed to be held together with "scotch tape, smoke,

7  mirrors, crying etc."  Email from Jason Greer to Janet Hudnall, Mar. 16, 2006, BPVE-01-

8  00946624, attached as Exhibit 40.

9          47.     Despite Bard's internal knowledge about the Recovery's problems, the QA

10  Hold was lifted on April 25, 2004, and Bard continued to sell the Recovery filter.

11  Remedial Action Plan, April 21, 2004, BPV-17-01-00153578, attached as Exhibit 41, at

12  153587.

13          48.     In all, seven migration deaths associated with the RNF were reported

14  between April and December 2004. (April 13, 2004, May 8, 2004; May 30, 2004; July 24,

15  2004; August 16, 2004; November 15, 2004; November 28, 2004) Recovery Filter

16  Detached Limbs—Patient Comparison Matrix dated November 1, 2005, BPV-17-01-

17  00035618, attached as Exhibit 42, at 35615-39.

18          49.     During this critical period, Bard knew that the Recovery:

19          a.     ███████████████████████████████████████████

20                 ██████   Health Hazard Evaluation, July 9, 2004, BPV-17-01-00002145

21          attached as Exhibit 43.

22          b.     ████████████████████████████████████   Email chain with

23          John McDermott, Len DeCant, and others, May 13, 2004, attached as

24          Exhibit 44, BPVE-01-00036095-96, at 96.

25          c.     ███████████████████████████████████████████

26          ██████████████████████████████████████████████

27          ███████████████████████████████████████████

28

11

Email from Natalie Wong to Doug Uelemen, May 20, 2004, BPV-01-00511127, attached as Exhibit 45.

       d.   

50.     Bard industry standards and regulatory expert Christine Brauer agreed that a reasonably prudent company should recognize and assume the enormity of a safety signal is *higher* than the actual rate derived from MAUDE and sales data rate analysis. However, Bard took no meaningful action to identify a root cause of failure or warn patients, physicians, or regulators about these deadly problems.  Ex. 7, 2017 Brauer Dep. at 213:11-214:14.

51.     Bard's June 30, 2004 Health Hazard Evaluation reports "Migration of a thrombus-encased Recovery (IVC filter) has been reported in 10 patients" among 12 migrations reported as of that date.  Four of the 12 resulted in death to the patients.  The author of the HHE, Dr. David Ciavarella, Bard's Medical Director, further states, "The root cause of the thrombus-associated migration events is judged to be thrombus-induced pressure increase in the IVC, leading to acute IVC expansion beyond the design limits of the filter," and as to one of the migrations he states "the 'malfunction' is best understood as a limitation of the ability of the device to carry out its intended function."  Updated Health Hazard Evaluation, June 30, 2004, attached as Exhibit 46, BPVEFILTER-01000014836-39, at 39.

52.     Bard stated in an internal Frequently Asked Questions (FAQ) document about the Recovery that it was "rigorously tested for all physical performance characteristics according to [Bard's] established test methods and protocols and was found to meet all test specifications and requirements."  Bard Recovery FAQ, July 15, 2004, BPVE-01-00268921-923, attached as Exhibit 47, at 923.

53.     Less than two weeks later, on July 26, 2004, after the Recovery had been on the market for nearly a year, Len DeCant, Bard's Vice President of Research and Development, was told by his employee: ███████████████████████████████

███████████████████████████████████████████████████████████

██████████   Email from John McDermott to Len DeCant, July 26, 2004, BPV-DEP-00014246-247, attached as Exhibit 48, at 46  Moreover, Bard as of late August 2004 did not have reliable controlled clinical studies that "most educated individuals and physicians would accept as eveidence [sic] of 'proof'.[sic] the safety and efficacy of the Recovery® Vena Cava Filter."  Internal Q&A, Aug. 30, 2004, BPVE-01-00033810, attached as Exhibit 49, at 12.

54.     Despite its knowledge that the Recovery's overall complication rates were far greater than its competitor devices, Bard told the its employees in a "script" not to be deviated from, that Recovery complication rates were comparable to those reported in the literature and the MAUDE database for other IVC filters, including that migration was not occurring at an excess frequency with the Recovery when compared to competitor filters. *Id.* at BPVE-01-00033815; Ex. 47, at BPVE-01-00268921-23.

55.     Bard marketed the Recovery as a "marked improvement over currently available devices."  2004 Recovery Marketing Brochure, BPV-17-01-00007760-763, attached as Exhibit 50, at 7761.  "Currently available devices" included the SNF and competitor filters at the time Recovery was launched into the market.  Deposition of Jack Sullivan (Vols. I and II), Sept. 16, 2016 and November 3, 2016, attached as Exhibit 51 and 84, at 80:16-81:12.

56.     ███████████████████████████████████████████████

████████████████████████   Remedial Action Plan, Sept. 2, 2004, BPV-17-01-00034860-887, attached as Exhibit 52.   █████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████   *Id.* at 74.

13

1    57.    

2

3

4

5

6

7

8

9

10    58.

11

12

13

14    59.    On January 4, 2005, another Remedial Action Plan observed: "In the

15    MAUDE dataset, the RNF demonstrated: a consistent, statistically significant and

16    potentially clinically important higher rate of reporting adverse events in the several

17    analyzed categories. . . . the data and [a consultant's] analysis provided two significant

18    signals that further investigation particularly in relation to migration and fracture is

19    urgently warranted. . . . Of greatest concern were reports of migration and fracture.

20    Remedial Action Plan, January 4, 2005, attached as Exhibit 53, BPVE-01-01019773-825,

21    at 19777-78.

22    60.    On April 19, 2005, Chris Ganser, Corporate V.P. of Regulatory Sciences

23    and Head of Quality Assurance, reported to the CEO and COO of C.R. Bard comparative

24    MAUDE/IMS data which was compiled by Bard for IVC filter fatalities, fractures and

25    migrations (through Q4 2004) showing a higher rate of migration and fatalities with the

26    Recovery versus the SNF and competitor filters.  He also reported on a significantly

27    greater number of fractures compared to SNF's 15 year marketing history.  This data was

28    from Bard's own internal adverse event reports and actual sales data and revealed the

following comparisons to the SNF which was Recovery's predicate device:  3300%

greater rate of Recovery migrations (34 total); 14 deaths involving Recovery versus zero

for SNF, including nine from migrations of the device to the heart and five from

pulmonary emboli; and 51 Recovery fractures, 18 with metal struts embolizing to heart or

lungs, and three requiring surgery to remove, including one open heart surgeries.  Email

from Chris Ganser to T. Ring, April 19, 2005, BPVE-01-00434275-76, attached as

Exhibit 54.

61.     By July 2005, Bard's sales force discussed internally that the SNF, the

predicate to RNF, was the "safest filter on the market."  Email from Jason Greer to Nicole

Alpie and others, July 16, 2005, BPV-DEP-00005665-66, attached as Exhibit 55, at 66.

62.     Chris Ganser again reported on August 3, 2005, to CR Bard CEO and COO,

comparative MAUDE/IMS data for IVC filter fatalities, fractures and migrations

compiled by Bard through the second quarter of 2005.  The data showed a higher rate of

migration and fatalities with the Recovery versus the SNF and competitor filters, and

significantly greater number of fractures compared to SNF's 15-year sales history.

Compared to the SNF, the data revealed:  4500% greater rate of Recovery migrations; 16

deaths involving Recovery versus zero for SNF, including 11 from migrations of the

device to the heart and five from pulmonary emboli the Recovery was intended to prevent;

and 68 Recovery fractures, 25 with metal struts embolizing to heart or lungs and 4

requiring surgery to remove.  Executive Summary, August 3, 2005, BPV-17-01-

00170083-84, attached as Exhibit 56.

**C.     The G2 Filter.**

63.     Bard then developed a next generation Recovery filter, known first as the

"G1A improved recovery filter" and later as the "G2" filter, with the objective of

addressing and minimizing problems of filter migration and filter arm fracture with the

Recovery.  Janet Hudnall, Avijit Mukherjee, and Robert Carr email chain, August 25-26,

2004, attached as Exhibit 57, BPVE-01-00008821; Recovery Filter PowerPoint

presentation, August 26, 2004, attached as Exhibit 58, BPVE-01-00009466-85, at 69-70.

64. Bard continued to sell the Recovery while it developed the G2.  Email from Janet Hudnall to John McDermott, Feb. 11, 2005, attached as Exhibit 59, BPVE-01-00167251 (discussing options for "stock recovery/rotation" for Bard's vena cava filters once G1A/G2 filter was cleared for sale); Failure Investigations/R002 History Review, attached as Exhibit 60, BPVEFILTER-01-00003802, at 11 ███████████████

███████████████████████████

65. The performance standard and predicate device for the G2 is the Recovery filter.  Traditional 510(k) G2 Filter with Femoral Delivery, attached as Exhibit 61, at FDA_PRODUCTION_00000048-49, at 49.

66. ██████████████████████████████████████████

████████████████████████████████████████████

█████████ G1A Recovery Filter Femoral System Design Verification and Validation Report, attached as Exhibit 62, BPV-17-01-00001134-153, 46.

67. Bard's labeling represented that the G2 Filter was safe and effective for permanent implantation in the human body for the prevention of pulmonary embolism. G2 Filter System Instructions for Use, attached as Exhibit 63, BPV-17-01-00137389-92, at 89.

68. Bard's "Patient Questions & Answers" document for the G2 filter states that the G2 filter is designed to be a permanent implant and will not need to be removed, repositioned, or replaced.  G2 Filter System, Patient & Answers, attached as Exhibit 64, BPV-17-01-00137624-32, at 29.

69. BARD represented in marketing materials including those distributed on the internet directly to patients that the G2 had increased migration resistance, improved centering, and enhanced fracture resistance.  Marketing brochure for G2 Filter System for Permanent Placement, attached as Exhibit 65, BPV-17-01-00142912-15; Marketing Brochure for Recovery G2 Filter System, attached as Exhibit 66, BPV-17-01-00137588; *see also* 2005 G2 Filter-FAQs, attached as Exhibit 67, BPV-17-01-00062020-22, at 22

(G2 Filter System was "more robust design" and represents Bard's "best technology" offered to its customers).

70.   Bard expert witness Dr. Brauer testified that documents like those cited in the preceding paragraph require accurate information as they are considered labeling. Deposition of Christine Brauer, May 23, 2014, attached as Exhibit 68, 216:1-217:20.

71.   On August 29, 2005, the FDA cleared the G2 device for market with a permanent indication only.  Letter from FDA to Bard Peripheral Vascular, August 29, 2005, attached as Exhibit 69, FDA_PRODUCTION_00000055-56.

72.   The IFUs for the Recovery and G2 Filter Family failed to warn of the increased risk of adverse events, such as migration or movement of the filter, with those filters versus the SNF and competitor filters—despite Bard knowing this was important information for a physician to be aware of.  Ex. 63, at BPV-17-01-00137389-92; Ex. 34, Wong Dep. at 88:2-89:3; Ex. 84, Sullivan Dep. at 464:25-466:22.

73.   Bard's former Western Regional Sales Manager, Jack Sullivan, testified that in marketing the G2 filter Bard represented to physicians, patients and the public that: the Recovery was properly and thoroughly tested, Ex. 51, Sullivan Dep. at 62:7-18; the Recovery filter was just as migration resistant as the SNF, *id*. at 96:10-97:4; migration was not occurring more frequently with the Recovery versus competitor filters, *id.* at 68:16-70:20; the Recovery filter was better than the SNF and its competitors, *id*. at 80:16-81:12; the Recovery was more likely to stay centered and avoid tilt than other filters, *id*. at 81:13-83:21; and the G2 was even more resistant to fracture and migration than the Recovery, *id*. at 92:21-93:8.

74.   The IFUs for the G2 (and Recovery) filters include identical language implying that the risk of various adverse events associated with the G2 Filter Family are the same as all other IVC filters.  Ex. 63, at BPV-17-01-00137389-92 (under "Potential Complications" stating "Movement or migration of the filter is a known complication of vena cava filters."); Recovery Filter IFU, 2004, attached as Exhibit 70, BPV-COMP-00001317-19, at 17 (same).  For example, those IFUs state that migration and movement

17

are "known complications of vena cava filters." *Id.*  This is the same language Bard conveyed to physicians in its "Dear Doctor" and "Dear Colleague" letters.  2004 Recovery Filter System Dear Doctor Letter, attached as Exhibit 71, BPVE-01-00303515-16, at 16. There is nothing about that language that advises physicians or patients of the increased risk of those adverse events with the Recovery/G2 Filter Family versus the SNF or competitor IVC filters—it is just a general statement about IVC filters.  Ex. 34, Wong Dep. at 88:2-89:3; Ex. 51 and 84, Sullivan Dep. at 54:10-55:6, 56:2-57:2, 59:15-61:4; 460:3-466:22.

75.     Dr. Brauer testified that as to increased migration resistance and enhanced fracture resistance the statements in Bard's labeling and marketing materials for the G2 were not accurate when comparing the G2 to the SNF.  Ex. 68, 2014 Brauer Dep. at 224:6-225:15.

76.     Despite advertising the G2 filter as being 12 times more resistant to fracture, ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████  Email chain between Micky Graves and Charlie Simpson, March 23, 2006, attached as Exhibit 72, BPVE-01-01225832.

77.     By November 2005, Bard was aware of a concerning signal for perforations with the G2 that needed to be investigated. On November 10, 2005, Chris Ganser, Bard's V.P. of Quality Assurance, Environmental Services & Safety, wrote: "It's obvious from the table below and the attached MAUDE summary that there are some major discrepancies regarding the number of complaints, units sold, rates, etc. for G2. Your first cut at MAUDE Analysis sends some signals for caval perforation and deployment that have to be investigated expeditiously."  Email chain between Chris Ganser, Gin Schultz, Cindi Walcott, and others, November 7-14, 2005, attached as Exhibit 73, BPVE-01-01510714-16, at 14.

78.     The reported perforation rate for the G2 filter in November 2005 was approximately ten times that of the SNF.  Bard internal spreadsheet of Filter Sales and MAUDE data through November 7, 2005/Q3 2005, attached as Exhibit 74, BPVE-01-01510717 (showing "Caval Perforation" rates of .1336% for G2 and .0090% for SNF).

79.     Bard was also aware by late 2005 ██████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████     Ex. 62, BPV-17-01-00001134-153, at 146, 151 ██████████████ ████████████████████████████████████████████████████████; Ex. 34, Wong Dep., at 146:13-23, 147:21-148:4 ████████████████████████████ ████████████████████████     Meridian Vena Cava Filter and Jugular Delivery System Product Performance, attached as Exhibit 75, BPV-17-01-00148748-49, at 48 ████████████████████████████████████████████████████ ██████████████████████████████████████████     Ex. 7, Brauer 2017 Dep. at 249:19-250:6 ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████

80.     David Ciavarella, M.D., Bard's medical and clinical affairs director, stated in a December 23, 2005, email, "The G2 is a permanent filter, we also have one (the SNF) that has virtually no complaints associated with it.  Why shouldn't doctors be using that one rather than the G2?"  Email chain between David Ciavarella, Cindi Walcott, and others, December 20-27, 2015, attached as Exhibit 76, at BPVE-01-00028224.

81.     Bard knew from reports by mid-2006 that the G2 had a problem with caudal migration and tilt that it didn't expect when they launched the G2, and these were caused by design problems with the G2 that needed to be fixed before it launched the EVEREST study of its IVC filters.  Ex. 7, Brauer 2017 Dep. at 242:16-243:15; 257:9-258:19.

82.     By February 15, 2006, ████████████████████████████████ ████████████████████████████████████████████████████████████████

19

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ██████████████████████████████████████████

4 ████████████████████████████████ Health Hazard

5 Evaluation, Feb. 15, 2006, BPVEFILTER-01-00008355-57, at 55, 57, attached as Exhibit

6 77.

7        83.   ███████████████████████████████████

8 ████████████████████████████████████

9 ████████████████████████████████████████████

10 █████████ Caudal Migration Test Method Development and G2 Filter Resistance Test

11 Report, attached as Exhibit 78, BPVE-01-007895432-55.

12        84.   On November 30, 2008, ████████████████████████

13 ████████████████████████████████████████████

14 ████████████████████████████████████████████

15 ████████████████████████████████████████████

16

17 **What is G2 trend relative to RNF?**

18 ████████████████████████████████████████████

19 ████████████████████████████████████████████

20 ████████████████████████████████████████████

21 ████████████████████████████████████████████

22 ████████████████████████████████████████████

23        * RNF Data is through 7/31/06 which is the majority of RNF Complaint data (n=114/150) due to last major analysis          18

24

25 ███████████████████████████ November 30, 2008, attached as Exhibit 79, BPVE-01-

26 01239757-775, at 774.

27

28

85.     Caudal migration is a serious complication with an IVC filter that can be associated with serious adverse events and consequences.  Ex. 7, Brauer 2017 Dep. at 240:4-22.

86.     By April 2006, ██████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████ April 28, 2006, attached as Exhibit 80, BPVE-01-00717924-25, at 24 ███████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████

87.     By March 2, 2006, ████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████ March 2, 2006, attached as Exhibit 81, BPVE-01-00720835. Nonetheless, ████████████████████████████████████████████ ████████████████████ Wong Dep. at 155:10-25; 156:10-12; 179:4-7; 181:18-22.

88.     Bard did not share with the FDA pertinent safety testing data concerning migration resistance for its IVC filters and upon discovery that this information was not shared with the FDA, Bard contacted its legal counsel instead of the FDA. Memo from Brian Barry to John Weiland re Competitive Filter Data, May 2, 2005, attached as Exhibit 82, BPV-01-00098737.

89.     Bard's own internal complaint tracking data indicates that from market release through July 2010, the G2 Filter had a reported migration failure rate of 0.121% (1.21 out of every 1000) of all devices sold and a reported perforation failure rate of 0.132% (1.3 out of every 1000), which applying the "consensus" of 95-99% of similar events not reported, the actual rates could have been as high as 121 out of every 1000 (12.1%) and 130 out of 1000  (13%), respectively.  This figure was approximately fifteen times greater than the average for all competitor devices of .008% (or .8% if applying the consensus non-reported events rate) for migrations and .013% (1.3%) for perforations. Bard IVC filter model sales and complications comparison spreadsheet, attached as

21

1    Exhibit 83, BPVEFILTER-01-00050487-88; Ex. 113, Ciavarella Dep, at 130:14-131:23

2    ("general consensus" that only 1-5% of adverse events are voluntarily reported).

3          90.    Bard's EVEREST clinical trial revealed that 15 of 85 Patients (18%)

4    experienced filter tilt > 15 degrees, and that there was highly statistically significant

5    relationship between filter tilt and filter migration (p < 0.001).  Binkert, et al., Technical

6    Success and Safety of Retrieval of the G2 Filter in a Prospective, Multicenter Study, J.

7    Vasc. Interv. Radiol. 2009, attached as Exhibit 85, at 1452.

8          91.    Dr. Kris Kandarpa, the Medical Monitor of the EVEREST trial, expressed

9    his concern about the approximately 20% of reported tilts and "thought that Bard should

10   consider a redesign based on this information."  He wanted to know if those conducting

11   the study were concerned that "almost 50% of patients have a reported AE/SAE" (adverse

12   or serious adverse event).  Medical Monitoring Adjudication Meeting Minutes, August 28,

13   2006, attached as Exhibit 86, BBA-00012802-821, at 803.  Dr. Brauer agreed Bard should

14   have taken "certain follow-up actions" in response to Dr. Kandarpa's concerns.  Ex. 7,

15   Brauer 2017 Dep. at 274:18-275:4.

16         92.    The October 26, 2006 Medical Monitoring Adjudication Meeting Minutes

17   states, ███████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████

20   ██████████████████████████████████████ Medical Monitoring Adjudication

21   Meeting Minutes, October 26, 2006, attached as Exhibit 87, BBA-00013699-715, at 700.

22         93.    A May 28, 2008, Bard PowerPoint presentation reviewing its IVC filter

23   product line included a Strengths-Weaknesses-Opportunities-Threats (SWOT) analysis

24   which identified among Bard's "Weaknesses" as to IVC filters: (1) "Lack of thorough

25   understand dynamics of caval anatomy impacting test results," (2) "We have historical

26   reactive/evolution design mindset," (3) "Product complications – forcing focus on reactive

27   designing??"  Bard Peripheral Vascular Filter Franchise Review, May 6, 2008, attached as

28   Exhibit 88, BPVE-01-00622862-900, at 67. Dr. Ciavarella agreed that Bard did not "have

22

1   any good models or understanding of what happens to the cava." Ex. 84, Ciavarella Dep.

2   at 374:1-14; *see also* Ex. 21, DeCant Dep. at 70:22-71:17 (Bard continued to learn about

3   the vena cava after its IVC filters were on the market).

4       94.   ███████████████████████████████████████████████████████████

5   ████████████████████████████████████████████ Bard PowerPoint

6   Presentation, attached as Exhibit 89, Ex. 534 to Chris Ganser Deposition (Oct. 11, 2016),

7   at 3-13; G2 Platinum presentation, June 2008, attached as Exhibit 90, BPVE-01-

8   00624026, at 33.  At the time, Bard tied caudal migrations to causing tilt, perforation, and

9   fractures.  Ex. 85 at 8, 12; Ex. 86, at 41.

10      **D.    The G2X Filter.**

11      95.   On March 10, 2008, Bard submitted a special 510(k) application (K080668)

12  seeking to modify its G2 filter (which was the predicate device) and seeking clearance for

13  what would be known as the G2 Express. G2 EXPRESS™ Filter System – Femoral and

14  Jugular/Subclavian Delivery Kits 510(k) Summary, *available at*

15  https://www.fda.gov/cdrh/510k/K080668.pdf  (last accessed Oct. 2, 2017).

16      96.   The only modification to the G2X from the G2 was the addition of a snare

17  hook to improve retrievability of the filter; the G2 and G2X filters are the same filter.

18  Deposition of Patrick McDonald, July 29, 2016, attached as Exhibit 91, at 103:23-104:1;

19  Ex. 34, Wong Dep. at 182:18 – 182:7; Email chain between Brian Hudson, Kevin Bovee,

20  and Chad Modra, June 28, 2011, attached as Exhibit 92, BPVEFILTER-01-00037661-62.

21      97.   ███████████████████████████████████████████████████████

22  █████████████████████████████████████████████████████████

23  ██████████████████████████████ Ex. 79, BPVE-01-01239757, at 74.

24      98.   A 2009 study demonstrated that after 180 days, the Bard IVC filters began

25  to fracture.  F.C. Lynch & S. Kekulawela, *Removal of the G2 Filter: Differences between*

26  *Implantation Times Greater than and Less than 180 Days*, 20 J. Vasc. Interv. Radiol.

27  1200 (2009), attached as Exhibit 93. Subsequently, in 2010, another study demonstrated

28  that Bard's filters had an increasing fracture rate over time and an expected fracture rate

23

1    of approximately 25 percent at 50 months.  W. Nicholson et al., *Prevalence of Fracture*

2    *and Fragment Embolization of Bard Retrievable Vena Cava Filters and Clinical*

3    *Implications Including Cardiac Perforation and Tamponade*, 170 Arch. Intern. Med. 1827

4    (2010), attached as Exhibit 94.

5         99.   ███████████████████████████████████████████████████

6    ████████████████████████   Ex. 85, at 8, 12; Bard Idea POA Eclipse Anchor Filter,

7    attached as Exhibit 95, BPVE-01-02077858, at 58 ████████████████████

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ███████   Ex. 95, at BPVE-01-02077858.  ████████████████████████████

11   ████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████   *Id.*

13        **E.      The Eclipse Filter.**

14        100.   Bard's next generation filter, the Eclipse, was cleared for sale in the United

15   States on January 14, 2010.  Deposition of Daniel Orms, Aug. 16, 2016, attached as

16   Exhibit 96, at 134:4-134:17.

17        101.   The Eclipse was predicated on the G2 and G2X, and was represented as an

18   improvement over the G2X filter. *Id.* at 135:19-22; *see also* Ex. 84, Sullivan Dep. at

19   531:4-8, 533:18-22; Deposition of Christopher Smith, Aug. 3, 2017, attached as Exhibit

20   97, at 144:16-20; Deposition of Michael Randall, Feb. 2, 2017, attached as Exhibit 98, at

21   267:11-14.

22        102.   The Eclipse name change ███████████████████████████████████

23   ██████████████████████████████████   Email from Filter Marketing to Bill

24   Little, Apr. 27, 2010, attached as Exhibit 99, at BPVE-01-00580608.  But, the Eclipse

25   "was the same as G2X in every way but one." *Id.*  That one difference – electropolishing

26   – was to be "consistent with emerging industry standards."  Vail Vena Cava Filter

27   Concept POA, Oct. 14, 2009, attached as Exhibit 101, BPV-17-01-00145692-99, at 95.

28

103.    The Eclipse was marketed at a time when Bard understood that its venture into the retrievable filter space has been a public health disaster and that Bard needed to completely redesign its filter.  Ex. 85, at 13-16.

104.    By August 2010, ███████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

G2.  *Id.* at 81.

105.    ███████████████████████████████████████████

███████████████████████████████████████████████████████

Ex. 100, BPV-17-01-00145692-99, at 98 ████████████████████

███████████████████████████████████████████████████████

████████████████████

106.    During this same time period, Bard was also actively engaged in development of its Denali filter.  Deposition of Brett Baird, June 9, 2016, attached as Exhibit 102, at 262:12-20.

107.    Nevertheless, Bard promoted the Eclipse to its sales personnel as more resistant to fracture and as having enhancements to a number of complications seen in prior iterations, which doctors were interested in.  Ex. 97, Smith Dep. at 141:18-24, 126:6-18, 130:6-20, 156:5-156:25, 184:9-21.

108.    However, Abithal Raji-Kubba, Bard's Vice President of Research and Development, ███████████████████████████████████████████████

████████████████████████████████ Deposition of Abithal Raji-Kubba, dated July 18, 2016, attached as Exhibit 103, at 167:18-168:2.

109.    The Eclipse Product Performance Specification 3.1.7 addressed the ████

███████████████████████████████████████████

███████████████████████████████████████████

Exhibit 104, BPV-17-01-00108342 at 473; First Supplemental Expert Report of David A. Kessler, M.D. (Mar. 3, 2017), attached as Exhibit 105, at 2.

110.    In addition, ████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████ Ex. 106, Design History File Index for the Eclipse, BPV-17-01-00108342, at 473; Exhibit 105, Kessler First Supp Report at 2.

111.    Bard represented the Eclipse Filter as designed to be a permanent implant. Ex. 97, Smith Dep. at 155:6-156:4; Eclipse Patient Questions & Answers Brochure, attached as Exhibit 107, BPVEFILTER-01-00001631-32, at 32.

112.    An Eclipse patient brochure stated, "The Eclipse Filter does not have a time limit in which it must be removed.  Your physician can determine at which time it may be appropriate to have your Filter removed."  Ex. 97, Smith Dep. at 158:1-159:5.

**F.    Problems and Failures with all of Bard's Retrievable IVC Filters.**

113.    As part of its response to a deficiency letter Bard received from the FDA on May 13, 2015, Bard stated that "the first SNF 510(k) was cleared on April 20th 1990 (K894703) and has been on the US market for 24 years as a permanent Inferior Vena Cava (IVC) filter option.  Throughout its over two decades of clinical use, no evidence has been found to support a link between SNF permanent filter implantation and the serious health consequences that have been an expressed concern from FDA regarding removable IVC filters . . ." SNF Postmarket Surveillance Study Amendment: 522 Response, 2015, BPVEFILTER-01-00356101, attached as Exhibit 108, at 106.

114.    Bard's June 2011 internal analysis demonstrated that the Recovery filter fractured 55 times more often than the SNF; the G2 fractured more than 12 times as often as the SNF, the G2X fractured 10 times as often as the SNF, and the Eclipse, even after only a little over a year on the market, fractured over three and a half times as often as the SNF.  Ex. 5, BPVEFILTER-01-00037664.

1       115.   Chris Ganser was Vice President of Regulatory Sciences and Corporate

2  Head (Vice President) of Quality Assurance, Regulatory Affairs and Medical Affairs

3  testified as summarized below:

4         a.   Bard knew and should have communicated to physician and patients

5              statistically significant findings ████████████████

6            ███████████████████████████████████████

7              Deposition of Christopher Ganser, Oct. 11, 2016, attached as Exhibit

8              109, at 68:9-69:10; 263:17-264:7.

9         b.   Bard knew and should have communicated to physician and patients

10            ███████████████████████████████████

11            ████████████████████████████████████████

12            ██████████████████████████████████

13            ████████████████ *Id.* at 71:5-72:9; 82:2-5.

14         c.   Bard knew and should have communicated to physician and patients

15              that ████████████████████████████████

16            ████████████████████████████████ *Id.*

17            at 72:22-75:4; 76:6-21; 78:11-79:3.

18         d.   Bard knew but did not communicate to patients that an inability to

19              retrieve a filter percutaneously may necessitate an open procedure.

20            *Id.* at 78:11-18.

21         e.   Bard knew, but did not, communicate to physician and patients to

22              evaluate devices over time to make sure they stay centered.  *Id.* at

23            71:5-72:9.

24         f.   Bard knew physicians and patients did not have access to Bard's

25              Bench testing of Bard filters and also knew that physicians and

26              patients were unable to do their own risk benefit analysis.  *Id.* at

27              128:2-15.

28

g.  Bard knew, but did not, communicate to physicians and patients its

██████████████████████████████████████

████████████████████████ *Id.* at 292:18-294:9.

h.  Bard knew, but did not, communicate to physicians and patients and

the IFU did not say that the Recovery filter design did not have the

████████████████████████████████████

███████ *Id.* 268:4-269:6.

i.  Bard knew, but did not, communicate to physicians and patients

████████████████████████████████████████

████████████████████████ *Id.* at 260:14-261:4.

j.  Bard knew, but did not, communicate to physicians and patients that

the ████████████████████████████████

████████████████████████████████

████████████████ *Id.* at 292:18-294:9.

k.  Bard knew that the ████████████████████

████████████████████████████████████

████████████████ 2006 HHE.  *Id.* at 300:5-301:21.

116.  Clement Grassi, MD is a Bard expert who has been involved in developing

practice parameter guidelines for the Society of Interventional Radiology (SIR) and the

American College of Radiology (ACR).  Dr. Grassi testified:

a.  SIR and ACR consensus statement regarding informed consent for

procedures that include IVCFs, and he agrees with the concept that

informed consent would require taking into consideration what "a

reasonable patient would want to know in the same or similar

circumstances.  Deposition of Clement Grassi, M.D, dated July 30,

2014, attached as Exhibit 110, at 232:14-19.

28

b.    The risks and expected benefits of the procedure and the alternatives have to meet not only the perceptions of a physician, but what a reasonable patient would want to know in the same or similar circumstances. *Id.* at 238:2-239:2.

c.    Dr. Grassi agreed that manufacturers should not make decisions about what reasonable patients should know or not know or what reasonable physicians show know or not know regarding risk/benefit decisions.  *Id.* at 239:3-17.

d.    Findings that Bard filters experienced complications, including death, migration, perforation, and fracture that were higher than other filters on the market is information that a reasonable patient might want to know.  *Id.* at 325:15-326:6.

117.    Natalie Wong, Bard Quality Engineering Manager, testified that the ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 34, Wong Dep. at 17:9-15, 84:21-87:25.

118.    Ms. Wong also testified that ███████████████████████████████████████ *Id.* at 17:9-15, 138:15-22.

119.    According to Ms. Wong, physicians and patients were not informed of ███████████████████████████████████████████████████ *Id.* at 151:19-155:14; 180:17-181:22.

120.    Ms. Wong confirmed that the G2 and G2X are the same filter design with the exception of a snare hook removal that was added to the G2X.  There were no changes to the filter portion itself.  *Id.* at 182:18-183:7.

121.    John McDermott, President of Bard Peripheral Vascular from 1999 to 2008, testified that doctors would want to know information and data, including adverse events of Bard's devices compared to other devices from the perspective of safety and efficacy.

He also testified that doctors would want to know the information Bard had about other doctor's experiences with filters.  Mr. McDermott agreed that this data and information are important to doctor's decision making.  Ex. 2, McDermott Dep. at 142:18-144:1; 152:16-154:4; 166:9-168:18; 288:13-289:7; 290:15-291:18.

122.    Mr. McDermott testified that a multi-disciplinary panel of physicians in June 2004 advised him and other managerial members of Bard that "migration should not be different for retrievable filters than for permanent filters;" that a retrievable filter is expected to perform just as well as a permanent filter; and for "prophylactic filter placement, migration of the heart should virtually never happen."  *Id.* at 190:11-195:13; 196:12-197:16; G3 Vena Cava Filter Design Input Summary Report, BPVE-01-0061776, attached as Exhibit 111.

123.    Mr. McDermott agreed that medical device companies have an obligation to provide all relevant information necessary to doctors to make product choices.  He also agreed that the company has an obligation to educate and inform doctors with information about complications and trending of adverse events.  Ex. 2, McDermott Dep. at 228:17-229:8; 349:17-21.

124.    Bard possessed information that the Recovery and G2 filters had a considerably higher rate of fractures than the SNF.  *Id.* at 284:2-286:18; Ex. 92 at BPVEFILTER-01-00037661.

125.    Mr. McDermott monitored the increasing rates of complications of Recovery and G2 on a monthly basis and he ███████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████ Ex. 2, McDermott Dep. at 306:14-308:10.

126.    Bard's regulatory and industry standard expert, Dr. Brauer agreed if a device as cleared and designed does not meet its performance requirements or acceptance criterion for caudal migration the company should stop selling it.  Ex. 7, 2017 Brauer Dep. at 386:10-19.

127.   Dr. Brauer also agreed "[i]t is important for medical device manufacture to understand healthcare professionals' expectations for performance of a product."  Ex. 7, 2017 Brauer Dep. at 334:4-14.

128.   ███████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████ May 2016, attached as Exhibit 112, BPVEFILTER-01-00303182-89, at 82-86.

**G.     The Sir Quality Improvement Guidelines do not Establish a Safety Standard.**

129.   The SIR Quality Improvement Guidelines predate all of Bard's optional filters, including among others the Recovery, G2 and G2X.  Ex. 110, Grassi Dep. at 69:23-70:10; Deposition of David Ciavarella, dated November 12, 2013, attached as Exhibit 113, at 220:16-221:15.

130.   Bard's former medical director from 2004-2008, David Ciavarella testified that the SIR Quality Improvement Guidelines did not create safety thresholds for the filters.  Ex. 113, Ciavarella Dep. at 220:16-221:15.

**H.     Bard Kept its Sales Staff in the Dark About the Problems with its Retrievable IVC Filters.**

131.   Robert Cortelezzi was a Bard regional sales manager from 2004 to 2008. Deposition of Robert Cortelezzi, Nov. 11, 2016, attached as Exhibit 114, at 15:21-16:24.

132.   As a regional sales manager, Mr. Cortelezzi was not privy to each and every event reported to or collected by Bard that concerned filter perforation, migration, tilt or fracture.  *Id.* at 276:2-272:2.

133.   Mr. Cortelezzi expected and relied that Bard would thoroughly, accurately and completely test each and every product for any known or potential complication before it was launched and went into the market launched.  *Id.* at 289:15-290:4.

134.   Bard represented the G2 Filter as a filter that would remain centered and less likely to tilt and migrate and was improved compared to other filters, including the Recovery Filter.  *Id.* at 306:1-307:7.

135.    Mr. Cortelezzi expected that Bard would thoroughly evaluate the safety of its products before launching them into the market and failure to do so would be contrary to his reasonable expectations as a regional manager. *Id.* at 308:13-23.

136.    Mr. Cortelezzi never received a Health Hazard Evaluation or document that compiled all complications or adverse events. *Id.* at 320:22-324:5.

137.    The Bard sales force was not armed with a Health Hazard Evaluation to provide doctors information when promoting Bard products. *Id.* at 323:15-324:5.

138.    Mr. Cortelezzi was not aware of specific events in which ██████████ ████████████████████████████████████████ ██████ *Id.* at 324:6-327:7; *see also* Health Hazard Evaluation, dated Nov. 17, 2004, BPV-17-01-00103875, attached as Exhibit 115.

139.    Referring to an e-mail from Janet Hudnall to Shari Allen, dated January 19, 2005, ████████████████████████████████████████████ Mr. Cortelezzi did not receive the information and did not arm his sales force with the information. Ex. 114, Cortelezzi Dep. 327:9-331:22.

140.    Daniel Orms was a Bard regional sales manager from 2008 to 2012. Ex. 96, Orms Dep. at 14:8-23.

141.    Mr. Orms testified that information in Bard's possession about Recovery Filter events which caused injury or potential injury would have been helpful in discussions with doctors. *Id.* at 173:14-174:24.

142.    Mr. Orms testified it would have been reasonable for him and his sales people to be advised by Bard about tracking of events.  However, the practice of communicating Bard tracking events to sales did not occur. Ex. 96, Orms Dep. at 175:1-10.

143.    Regional sales manager Jack Sullivan testified that he expected Bard to share all information that was relevant to Filter safety with the sales force. Ex. 84, Sullivan Dep. at 468:18-469:3.

144.    Mr. Sullivan expected Bard to communicate any information relevant to safety or the lack thereof so that he and his sales force could communicate the information to physicians.  *Id.* at 469:4-15.

145.    Tim Fischer was employed by Bard between 2000 to 2006.  He was a territory manager then field sales manager.  Deposition of Tim Fischer, Mar. 29, 2017, attached as Exhibit 116, at 7:16-24.

146.    As a former sales representative, Timothy Fischer was never provided by Bard information regarding numbers of events concerning the Recovery Filter.  *Id.* at 281:13-283:1.

147.    Mr. Fischer testified that once Bard tracked event information, if Bard thought it was important, he would have wanted to have it to present to physicians.  *Id.* at 282:4-283:3.

148.    Bard did not provide tracked Filter events to Mr. Fischer.  *Id.* at 283:3.

149.    Defense medical expert Mark Moritz testified in reviewing reports of plaintiffs' experts he saw references to Bard internal documents ██████████████ ████████████████████████████████████  This is information a medical doctor would want to know from a medical device company when making decisions about which types of devices to use for patients.  Deposition of Mark Moritz, M.D., dated July 18, 2017, attached as Exhibit 117, at 85:12-86:3.

## II.    FACTS RELATED TO *HYDE V. BARD*

150.    A Bard G2X IVC filter was implanted in Plaintiff, Lisa Ann Hyde on February 25, 2011 in an effort to prevent recurrent pulmonary emboli and recurrent deep vein thrombosis. [Ex. H-A, Selected Plaintiff Medical Records at HYDE_WFHF_MDR00172; Ex. H-B, April 6, 2017 Deposition, David Henry, M.D. Deposition Transcript at 65:9-11.]

151.    Plaintiffs were Wisconsin residents at the time Ms. Hyde had her filter implanted.  [Ex. H-D PFS at § I.5.]

152.     There were no complications at the time of the IVC filter implantation. [Ex. H-A, Selected Plaintiff Medical Records at HYDE_WFHF_MDR00172.]

153.     David Henry, M.D. was the implanting doctor and testified that he believes Ms. Hyde's filter was a G2X IVC filter. [Ex. H-B, Henry Deposition at 11:22-24.]

154.     On May 16, 2014, Ms. Hyde underwent a CT scan of the abdomen to evaluate right lower quadrant abdominal pain and tenderness. [Ex. H-A, HYDEL_SDMIC_RAD00009-10.]

155.     The May 16, 2014 scan of Ms. Hyde's abdomen revealed that her IVC filter had penetrated into her retroperitoneum and one fractured strut had migrated and become lodged in the right ventricle.  [Ex. H-A, HYDEL_SDMIC_RAD00009-10; HYDEL_SHC_MDR00019 to 20.]

156.     Plaintiffs were Nevada residents at the time Ms. Hyde's fractured filter was realized. [Ex. H-C, Lisa Hyde Deposition Transcript at 18:9-22; Ex. H-D, PFS at I.5.]

157.     On May 21, 2014, in Nevada, Ms. Hyde underwent a chest x-ray to better visualize the fractured strut and the linear metallic density was seen overlying the right ventricle, consistent to what was visualized on the May 16, 2014 CT scan.  [Ex. H-A, HYDEL_SDMIC_RAD00008.]

158.     On June 3, 2014, in Nevada, a high resolution chest CT further examined the fractured IVC filter and showed a portion of the filter oriented in the upright position within the right ventricle; there was no IVC filter present within the vena cava on this study.  [Ex. H-A, HYDEL_SPARKFM_MDR00075-76.]

159.     On June 9, 2014, Ms. Hyde was seen for a cardiology consult in the State of Nevada.  [Ex. H-A, HYDEL_NHVC_MDR0002-04.]

160.     At the June 9, 2014 cardiology consult, taken in Nevada, it was determined that removal would only be indicated if the broken strut was interfering with the heart valve, if it was large enough, or if it appeared to be floating free in the ventricle.  [Ex. H-A, HYDEL_NHVC_MDR0002-04.]

34

161.    On August 26, 2014, Dr. William Kuo removed the G2X filter and fractured strut. This procedure took place in California. [Ex. H-D PFS at § II.10(a)-(c).]

162.    Dr. Kuo testified that he described Ms. Hyde's filter as a Bard G2X in his records.  [Ex. H-E, Deposition of William T. Kuo, M.D. at 23:12-15, 48:21-24.]

163.    Spot radiograph of the IVC demonstrated Ms. Hyde's filter to be a Bard G2X filter.  [Ex. H-A, HYDEL_SHC_MDR00055.]

164.    Ms. Hyde's implanting physician, Dr. Henry, testified that he does not know whether he would have considered the fact that the complication rates among filters were not equivalent, had it been disclosed to him.  [Ex. H-B, Henry Dep. Tr. at 46:1-25.]

165.    Dr. Henry testified that he may have been swayed by information that Bard knew the filter implanted in Ms. Hyde was not performing as well as competitors' IVC filters.  [Ex. H-B, Henry Dep. Tr. at 56:17-18.]

166.    There is no design difference between the G2 and G2X filters. [Ex. H-F, McMeeking Dep. Tr. at 37:9-39:8.]

167.    Bard failed to design the G2 and G2X filters in a way that reduces the risks of tilting, perforation, migration and fracture by fatigue. [Ex. H-F, McMeeking Dep. Tr. at 23:14-23.]

168.    Bard could have redesigned the filter configuration to find a better combination of phenomena that improved the behavior of the filter in terms of the risks involved.  They could have developed caudal anchors and penetration limiters sooner than they ultimately did.  [Ex. H-F, McMeeking Dep. Tr. at 32:14-33:8.]

169.    Anchors and limiters are a reasonable concept for how the tilt and migration behavior of a filter can be limited.  [Ex. H-F, McMeeking Dep. Tr. at 129:24-130:1.]

170.    Bard should have considered other a different design of the G2/G2X that included using a tubing material, arms with different diameters and dimensions, or a different number of arms.  [Ex. H-F, McMeeking Dep. Tr. at 30:23-31:5; 34:13-23.]

171.     Bard did inadequate testing in assessing the performance of the design and consequences of the design of the G2 and G2X filters.  [Ex. H-F, McMeeking Dep. Tr. at 308:1-9.]

172.     It is the design of the G2 and G2X filters itself that causes the dangerous failures. [Ex. H-F, McMeeking Dep. Tr. at 23:12-15.]

173.     Bard's Director of Quality Assurance, Chris Ganser, said that there were design issues with the G2 filter that needed to be addressed.  [Ex. H-G, October 11, 2016 Deposition of Chris Ganser at 301:16-21.]

174.     The G2 and G2X subsequently tilted after placement.  [Ex. H-H, April 17, 2013 Deposition of Robert Carr at 94:11-19.]

175.     Bard tried to ultimately decide to include an anchor system so that the known causes for tilt would be reduced.  [Ex. H-H, Carr Dep. Tr. at 95:22-96:6.]

176.     SNF is more migration resistant due to the combination of the stiffness of its pedals and the stiffness of its legs as compared to the other Bard filters.  [Ex. H-F, McMeeking Dep. Tr. at: 203:9-22.]

177.     The SNF is a safer and better filter than the other Bard filters.  [Ex. H-F, McMeeking Dep. Tr. at 321:11-15; 221:20-24.]

178.     The G2 device was intended for permanent placement. [Ex. H-I, Patient Brochure for the G2 Filter System, BPV-17-01-00142912.]

179.     All of the G2 era filters are truly permanent filters.  [Ex. H-H, Carr Dep. Tr. at 32:18-23.]

180.     Dr. Henry testified that he understood Ms. Hyde's filter could be permanent. [Ex. H-B, Henry Dep. Tr. at 72:23-73:1.]

181.     Dr. Henry testified that he trusts the FDA more than medical device companies and that he is comfortable using any filter that is FDA approved. [Ex. H-B, Henry Dep. Tr. At 45:23-24 and 25:13-25.]

182.   Dr. Henry also testified that in 2011, it was his understanding that all FDA-cleared IVC filters had the same performance and comparable risks of complications, such as migrations and fractures. [Ex. H-B, Henry Dep. Tr. At 27:25-28:10.]

183.   Dr. Henry testified that he has read the Bard G2X instructions for use document. [Ex. H-B, Henry Dep. Tr. At 86:3-7.]

184.   Ms. Hyde suffered pecuniary loss as she had to pay for her retrieval surgery. [Ex. H-D, PFS at § II.15.]

185.   Bard's own expert, Dr. Donna Tillman, states that when you design a device and you have a risk, the best thing to do to mitigate that risk is to design around it. You have to design the device so that the risk goes away. If you can't do that, Tillman says that you must implement some kind of way to protect the user against the risk. And finally, if you can't accomplish that either, you must "label around it" and tell patients there is a risk here. Tillman feels that these are "standard design considerations." [Ex. H-J, Tillman Dep. Tr. at 193:6-194:20].

186.   Kay Fuller, a Bard Regulatory Affairs Specialist handling the Recovery 510(k) application, testified that a Truthfulness and Accuracy Statement must be signed when she would submit a 510(k) application to the FDA. This document says that to the best of the signatory's knowledge, the information in the 510(k) is truthful, accurate, and does not contain any material information omitted. [Ex. H-K, Kay Fuller Dep. Tr. 46:8-22].

187.   Ms. Fuller did not sign the Truthfulness and Accuracy statement because she was concerned that Bard would not be able to address the FDA's questions and she did not believe that the company understood the failure modes, specifically fatigue resistance, to the level that they were representing to the FDA. [Ex. H-K, Kay Fuller Dep. Tr. 125:6-25].

188.   Additionally, Ms. Fuller did not sign because she did not feel like Bard had adequately addressed the ███████████████████████████████████
████████ [Ex. H-K, Kay Fuller Dep. Tr. 129:22-130:11].

189.   This was the first time in Ms. Fuller's career that she was not comfortable singing the Truthfulness and Accuracy statement in an application to the FDA. [Ex. H-K, Kay Fuller Dep. Tr. 131:24-132:8].

190.   Since Ms. Fuller would not sign the Truthfulness and Accuracy statement, Carol Vierling, without permission, signed Ms. Fuller's name for her. [Ex. H-K, Kay Fuller Dep. Tr. 276:7-277:11].

## III.   FACTS RELATED TO *MULKEY V. BARD*

191.   Dr. Tompkins discussed with Ms. Mulkey the possibility of an IVC filter. (Ex. M-D, Mulkey Dep. Tr. at 77:20-23; Ex. M-C, Tompkins Dep. Tr. at 71:12-18).

192.   Dr. Tompkins prescribed an IVC filter for prophylactic placement in Ms. Mulkey prior to bariatric surgery.  (Ex. M-B, Hurst Report at p. 4 ¶3(a)).

193.   Ms. Mulkey was implanted with a Bard Eclipse IVC filter on April 11, 2012.  (Ex. M-B, Hurst Report at p. 4 ¶3(a)).

194.   Ms. Mulkey was following Dr. Tompkins' professional medical advice by proceeding with insertion of the IVC filter. (Ex. M-D, Mulkey Dep. Tr. at 88:5-16).

195.   Dr. Tompkins used an Eclipse filter in Ms. Mulkey.  (Ex. M-C, Tompkins Dep. Tr. at 88:23-25).

196.   The Bard Eclipse filter was implanted properly in Ms. Mulkey by Dr. Tompkins.  (Ex. M-B, Hurst Report at p. 5, ¶3(b)).

197.   Prior to his decision to implant the Eclipse Filter in Ms. Mulkey, Dr. Tompkins had seen the IFU for the Bard Eclipse filter, and it is his practice to review the IFU for new devices prior to implanting them in patients.  (Ex. M-C, Tompkins Depo at 105:11-23).

198.   Dr. Tompkins is familiar with the instructions for use for vena cava filters. (Ex. M-C, Tompkins Dep. Tr. at 102:16-23).

199.   Bard sales representatives attended the placement of filters in bariatric surgery patients by Dr. Tompkins to provide him information if he had questions.  (Ex. M-C, Tompkins Dep. Tr. at 210:1-13; 105:15-18).

200.     Dr. Tompkins does not remember ever being told by any Bard sales representative that IVC filters should not be used in bariatric patients.  (Ex. M-C, Tompkins Dep. Tr. at 55:14-17).

201.     Dr. Tompkins told Ms. Mulkey that her Eclipse filter could be a temporary filter that can be taken out, or it could be left in permanently.  (Ex. M-D, Mulkey Dep. Tr. at 79:3-7).

202.     Dr. Tompkins recommended Ms. Mulkey's Eclipse filter be removed when she no longer needed it.  (Ex. M-D, Mulkey Dep. Tr. at 85:20-23).

203.     It was Dr. Tompkins' intention and expectation that the IVC filter he was going to place into Ms. Mulkey would be removed.  (Ex. M-C, Tompkins Dep. Tr. at 86:24 – 87:2).

204.     Ms. Mulkey had the opportunity to ask Dr. Tompkins questions about the filter.  (Ex. M-D, Mulkey Dep. Tr. at 81:19-21).

205.     Dr. Tompkins testified that he did not consent Ms. Mulkey to complications and injuries caused by failure of her Eclipse filter; instead, he consented her only to certain risks associated with the implant surgery itself.   (Ex. M-C, Tompkins Dep. Tr. at 80:22 – 86:2; 94:21 – 95:25).

206.     Ms. Mulkey did not believe that she was consenting to long-term complications associated with her Eclipse IVC filter.  (Ex. M-D, Mulkey Dep. Tr. at 182:4-8).

207.     Dr. Tompkins agreed Ms. Mulkey was not consenting to future complications of her Eclipse filter unrelated to the implant procedure itself.  (Ex. M-C, Tompkins Dep. Tr. at 85:9-16).

208.     Ms. Mulkey did not believe she was consenting to have her Eclipse filter become embedded in her inferior vena cava.  (Ex. M-D, Mulkey Dep. Tr. at 182:9-13).

209.     Ms. Mulkey did not consent to being stuck with her Eclipse filter in her permanently.  (Ex. M-D, Mulkey Dep. Tr. at 182:14-16; Ex. M-C, Tompkins Dep. Tr. at 83:20 to 84:4).

210.    Ms. Mulkey did not consent to tilting of her Eclipse filter.  (Ex. M-D, Mulkey Dep. Tr. at 182:18-20).

211.    Ms. Mulkey did not consent to the possible future complication of filter perforation. (Ex. M-D, Mulkey Dep. Tr. at 182:21-24).

212.    Ms. Mulkey did not consent to her Eclipse filter migrating within her body. (Ex. M-D, Mulkey Dep. Tr. at 182:25 to 183:3).

213.    Ms. Mulkey did not consent to additional surgeries to have her Eclipse filter removed.  (Ex. M-D, Mulkey Dep. Tr. at 183:4-7).

214.    Ms. Mulkey did not consent to her Eclipse filter fracturing.  (Ex. M-D, Mulkey Dep. Tr. at 183:8-10).

215.    Dr. Tompkins did not talk to Ms. Mulkey about the risk of her Eclipse IVC filter perforating the vena cava at any time after surgical insertion.  (Ex. M-C, Tompkins Dep. Tr. at 82:3-8; 84:5-10).

216.    Dr. Tompkins did not advise Ms. Mulkey that her Eclipse IVC filter could, in the future, penetrate the inferior vena cava and, potentially, surrounding organs.  (Ex. M-C, Tompkins Dep. Tr. at 84:11-15).

217.    Dr. Tompkins did not advise Ms. Mulkey of the potential for her Eclipse filter to migrate caudally following surgical insertion.  (Ex. M-C, Tompkins Dep. Tr. at 84:17-23).

218.    Dr. Tompkins did not advise Ms. Mulkey of the potential for her Eclipse filter to migrate cranially after placement.  (Ex. M-C, Tompkins Dep. Tr. at 84:24 to 85:3).

219.    Dr. Tompkins did not talk to Ms. Mulkey about the risk of dislodgment of her Eclipse filter at any time after surgical insertion.  (Ex. M-C, Tompkins Dep. Tr. at 82:9-25).

220.    Dr. Tompkins did not inform Ms. Mulkey about the potential irretrievability of her Eclipse filter.  (Ex. M-C, Tompkins Dep. Tr. at 83: 3-5).

221.    Dr. Tompkins did not inform Ms. Mulkey about the potential that her Eclipse IVC filter may perforate the vena cava in the future.  (Ex. M-C, Tompkins Dep. Tr. at 83:6-19).

222.    If the IFU included pertinent warnings, that is something Dr. Tompkins would pass on to his patients.  (Ex. M-C, Tompkins Dep. Tr. at 106:7-10).

223.    The Eclipse IFU did not inform Dr. Tompkins of an increased risk of movement, migration or tilt with Bard filters versus competitor filters.  (Ex. M-C, Tompkins Dep. Tr. at 107:17-21).

224.    The Eclipse IFU did not inform Dr. Tompkins of an increased risk of movement, migration or tilt with Bard optional filters versus Bard permanent filters.  (Ex. M-C, Tompkins Dep. Tr. at 107:22 to 108:2).

225.    The Eclipse IFU did not inform Dr. Tompkins that the Eclipse had a higher risk of movement, migration or tilt than any other filter.  (Ex. M-C, Tompkins Dep. Tr. at 108:3-9).

226.    If the Eclipse had an increased risk of migration over other filters, that is something that Dr. Tompkins would have wanted to know.  (Ex. M-C, Tompkins Dep. Tr. at 108:10-15).

227.    If the Eclipse had an increased risk of migration over other filters, that is something Dr. Tompkins would have wanted to know and something he would have taken into account in his risk benefit analysis on whether to use the filter.  (Ex. M-C, Tompkins Dep. Tr. at 108:10-19).

228.    If the Eclipse had an increased risk of migration over other filters, that would affect Dr. Tompkins' prescribing habits and, if it was a significant difference, he wouldn't use the filter.  (Ex. M-C, Tompkins Dep. Tr. at 108:20 to 109:1).

229.    Dr. Tompkins expected Bard to notify him immediately if it was aware of problems with the design of one of its filters that was causing complications and problems for patients, or if it was in the process of redesigning its filter to reduce complications.  (Ex. M-C, Tompkins Dep. Tr. at 125:2-14).  Dr. Tompkins wanted to know this

1   information because it would help him decide whether he even wanted to use the filter.

2   (Ex. M-C, Tompkins Dep. Tr. at 125:2-18).

3          230.    There were risks and problems with Bard's filters that Bard did not tell Dr.

4   Tompkins about.  (Ex. M-C, Tompkins Dep. Tr. at 216:3-8).

5          231.    Dr. Tompkins also would have expected Bard to inform him of problems

6   with filters such as the Eclipse, and to provide him with accurate and thorough

7   information as it became aware of problems with its filters. (Ex. M-C, Tompkins Dep. Tr.

8   at 57:6-11; 157:22-25).

9          232.    Dr. Tompkins wanted to use the safest available IVC filter that would

10  accomplish the goal of stopping pulmonary embolisms.  (Ex. M-C, Tompkins Dep. Tr. at

11  109:2-6).

12         233.    Dr. Tompkins testified, "I wouldn't use the filter if I was aware that deaths

13  were occurring concurrently with me placing these filters."  (Ex. M-C, Tompkins Dep. Tr.

14  at 53:7-23).

15         234.    At the time it was implanted, Dr. Tompkins did not expect the filter to tilt

16  and become irretrievable.  (Ex. M-C, Tompkins Dep. Tr. at 97:25 – 98:3).

17         235.    At the time it was implanted, Dr. Tompkins did not expect the filter to

18  perforate Ms. Mulkey's vena cava or other organs in the future.  (Ex. M-C, Tompkins

19  Dep. Tr. at 98:17-25).

20         236.    If Dr. Tompkins had expected these issues to occur, he would not have used

21  the filter.  (Ex. M-C, Tompkins Dep. Tr. at 99:1-5).

22         237.    Dr. Tompkins believes it is reasonable for a patient to expect a vena cava

23  filter not to penetrate their vena cava.  (Ex. M-C, Tompkins Dep. Tr. at 101:3-8).

24         238.    Dr. Tompkins believes it is reasonable for the patient to expect an IVC filter

25  not to penetrate their organs.  (Ex. M-C, Tompkins Dep. Tr. at 101:9-13).

26         239.    In Dr. Tompkin's experience, it would be a rare and unusual circumstance

27  where a vena cava filter would perforate a patient's organs.  (Ex. M-C, Tompkins Dep. Tr.

28  at 101:14-18).

240.   Ms. Mulkey was charged $2,031.25 for her Bard Vena Cava Filter System. (Ex. M-A, Detailed Bill for Debra Mulkey).

241.   Dr. Tompkins ultimately sent Ms. Mulkey to have her IVC filter removed. (Ex. M-C, Tompkins Dep. Tr. at 112:1-3).

242.   On October 4, 2012, Ms. Mulkey returned to Kings' Daughters to have her IVC filter removed by Dr. Pho Nguyen.  (Ex. M-D, Mulkey Dep. Tr. at 93:1-25).

243.   Ms. Mulkey was under anesthesia during the procedure.  (Ex. M-D, Mulkey Dep. Tr. at 94:20-24).

244.   On October 4, 2012, Dr. Nguyen told Ms. Mulkey that he was not able to retrieve the IVC filter and that his recommendation was that it be left in the body.  (Ex. M-I, Nguyen Dep. Tr. at 83:13-17).

245.   According to Dr. Nguyen's medical records, Ms. Mulkey's Eclipse IVC filter could not be retrieved because it had tilted, was abutting the medial wall of the IVC, and "probable fibrin sheath development covering the IVC filter."  (Ex. M-H, Muehrcke Report at p. 7).

246.   Ms. Mulkey did not realize at the time, October 4, 2012, that she had sustained an injury or that anything was wrong with her filter.  (Ex. D, Mulkey Dep. Tr. at 142:8-17 and 143: 14-22; Ex. M-E, Plaintiff Fact Sheet of Plaintiff Debra Mulkey (hereinafter "PFS"), at Section II.13(b) on page 14).

247.   Ms. Mulkey was not informed that her filter was tilted at that time.  (Ex. M-D, Mulkey Dep. Tr. at 98:4-6).

248.   Dr. Nguyen did not ever tell Ms. Mulkey that there was anything wrong with the IVC filter.  (Ex. M-D, Mulkey Dep. Tr. at 180:11-13).

249.   Ms. Mulkey was not informed there would be any problem with the filter remaining in her body.  (Ex. M-D, Mulkey Dep. Tr. at 113:12-20).

250.   In fact, Dr. Tompkins informed Ms. Mulkey that IVC filters could be left permanently in the body, if need be.  (Ex. M-D, Mulkey Dep. Tr. at 137:14-25).

251.    Dr. Tompkins did not ever tell Ms. Mulkey that her IVC filter was defective. (Ex. M-C, Tompkins Dep. Tr. at 115:19-21).

252.    Dr. Tompkins did not ever tell Ms. Mulkey that the manufacturer of the IVC filter had injured her or caused her harm.  (Ex. M-C, Tompkins Dep. Tr. at 115:22-25).

253.    Dr. Tompkins did not ever tell Ms. Mulkey that her IVC filter was unsafe. (Ex. M-C, Tompkins Dep. Tr. at 116:1-3).

254.    At the time of her failed IVC removal in October of 2012, Ms. Mulkey did not believe she had been injured.  (Ex. M-D, Mulkey Dep. Tr. at 179:21 – 180:1).

255.    At the time of her failed IVC removal in October of 2012, Ms. Mulkey did not believe there was anything defective about her filter.  (Ex. M-D, Mulkey Dep. Tr. at 180:2-5).

256.    At the time of her failed IVC removal in October of 2012, Ms. Mulkey did not believe she had been wronged by the manufacturer of the IVC filter, Bard.  (Ex. M-D, Mulkey Dep. Tr. at 180:5-10).

257.    No health care provider told Ms. Mulkey that any of her symptoms related to bodily injury were related to the Bard IVC filter.  (Ex. M-D, Mulkey Dep. Tr. at 147:23-148:4).

258.    Although Ms. Mulkey was upset when she found out the IVC filter could not be removed, she testified she depended on her doctor who told her that the filter can be permanent and did not have any worries until late 2015, when she found out people were having problems with their IVC filters. (Ex. M-D, Mulkey Dep. Tr. at 185:3-14).

259.    In the fall of 2015, Ms. Mulkey saw an ad on TV about IVC filters.   (Ex. M-D, Mulkey Dep. Tr. at 57:23 to 58:2).

260.    When Ms. Mulkey saw the Internet and television ads in October 2015, this caused her to be concerned about her filter.  (Ex. M-D, Mulkey Dep. Tr. at 138:14-20).

261.    It was in late 2015 when Ms. Mulkey first realized that she may have been wronged by Bard and may have a lawsuit.  (Ex. M-D, Mulkey Dep. Tr. at 180:21 – 181:2).

262.    When Ms. Mulkey saw the ad on TV in October 2015, that's when she realized that not being able to remove her IVC filter was the result of a defect in the IVC filter.  (Ex. M-D, Mulkey Dep. Tr. at 144:19-145:3).

263.    Due to the inadequate design of Ms. Mulkey's Bard Eclipse IVC filter, that filter failed and injured her by tilting, becoming embedded in her vena cava, penetrating her vena cava and surrounding organs and structures, and fracturing.  (Ex. M-H, Muehrcke Report at p. 7; Ex. M-B, Hurst Report at pp. 5-7, 12).

## IV.    FACTS RELATED TO *JONES V. BARD*

### A.    Implantation Facts

264.    On August 14, 2010, Doris Jones was admitted to Memorial Health University Medical Center in Savannah, Georgia ("MUMC") with complaints of abdominal pain, dizziness, nausea, and vomiting.  Jones Medical Records, attached as Exhibit J-A, at DORISJONES000004.

265.    She was diagnosed with afferent loop syndrome and surgery was performed to revise a prior gastrojejunostomy on August 26, 2010.  *Id.* at DORISJONES000021.

266.    On August 23, 2010, day 10 of her stay at MUMC, Doris developed a deep vein thrombosis (DVT) in her left leg.  *Id.* at DORISJONES000002.

267.    Due to a history of a prior DVT at a previous hospitalization, Doris was felt to be at high risk of pulmonary embolism.  *Id.* at DORISJONES000026.

268.    Because she had potential gastric bleeding issues and an upcoming surgery such that she could not receive anticoagulants, it was determined that Doris should receive a consult for an IVC filter.  *Id.*

269.    Vascular surgeon Dr. Anthony Avino met with Doris and her husband, Alfred Jones, on August 24, 2010, and discussed the IVC filter with them.  Transcript of Deposition of Dr. Anthony Avino ("Avino Dep.), attached as Exhibit J-B, at 50:15-51:16.

270.    Alfred, on Doris's behalf, signed the consent form for the procedure.  Jones Consent Form Dated August 23, 2010, attached as Exhibit J-C, at JONESD_MUMC_MDR01506; Avino Dep, Exhibit J-B, at 55:14.

45

271.    Dr. Avino implanted a Bard Eclipse IVC filter in Doris later that day. Exhibit J- A at DORISJONES000026 - 000027; Avino Dep, Exhibit J-B, at 59:2-11.

272.    Doris Jones met the indications for use for implantation of an Eclipse IVC filter on August 24, 2010.  Bard Peripheral Vascular's Supplemental Responses to Plaintiffs Doris and Alfred Jones's First Set of Requests for Admissions to Bard Peripheral Vascular, Inc., attached as Exhibit 116 hereto, at 8, supplemental response to RFA 13.

273.    The Eclipse is a "retrievable" IVC filter, meaning that while the Eclipse can be removed if clinically necessary or appropriate; Bard promotes the filter as safe for permanent implantation.  Eclipse Vena Cava Filter, Femoral Vein Approach, Instructions for Use ("Eclipse IFU"), attached as Exhibit 117, at BPV-17-01-00142881; *see also* Exhibit D at 5, supplemental response to RFA 7.

274.    Dr. Avino intended that Doris could keep the Eclipse in permanently, although it could be removed as an option if it filled with clots.  Avino Dep, Exhibit J-B, at 54:3-13.

275.    At the time, Bard's SNF was available on the market for implantation as a permanent IVC filter.

B.      Dr. Avino, Doris's Implanting Doctor, Was Familiar with Bard's IVC Filter Warnings When He Implanted Doris Jones's Eclipse IVC Filter.

276.    Dr. Avino did not recall reading the Eclipse IFU, but he had read IFUs for IVC filters:

> Q.  And do you read the IFU?
> A.  Sometimes.  I mean, I have read them.  I don't -- certainly don't read them on every package, because they're the same from the same device, but -- you know, not -- not all the time, but it does come up, for example, at meetings, or you're reading about and someone's discussing an issue with an IFU.  You know, if something is within the IFU or not, to help define things that might be outside of the IFU but still medically indicated.
> Q.  Do you know if you ever read the IFU for the Eclipse IVC filter?
> A.  Not that I recall.
> Q.  Okay.  And IFUs have warnings on them of side effects, complications, things like that, also?
> A.  Yes.

46

Q.   And even if you haven't read the Eclipse IFU, you're probably generally familiar with IVC filter IFUs, if they warn of things like fractures, migration, perforation, tilt; complications like that.  Right?
A.   Yes.  Yes.

Avino Dep, Exhibit J-B, at 47:11-48:7.

277.    Dr. Avino and his practice have "predominantly" used the Bard IVC filters.

*Id.* at 33:21-34:6.

278.    Significantly, the Eclipse IFU warnings are the same as those in the G2 and G2X.  As between the Eclipse IFU and the G2X IFU, with two exceptions,[1] the only difference between the two documents is the use of the terms "Eclipse" in one and "G2X" in the other.  See Exhibit J-E; G2X Vena Cava Filter, Femoral Vein Approach, Instructions for Use ("G2X IFU"), attached as Exhibit J-G.

279.    Under the heading "Warnings," both the G2X IFU and Eclipse IFU state:

11.  Filter fractures are a known complication of vena cava filters. There have been some reports of serious pulmonary and cardiac complications with vena cava filters requiring the retrieval of the fragment utilizing endovascular and/or surgical techniques.
12.  Movement, migration or tilt of the filter are known complications of vena cava filters.  Migration of filters to the heart or lungs has been reported.  There have also been reports of caudal migration of the filter. Migration may be caused by placement in IVCs with diameters exceeding the appropriate labeled dimensions specified in this IFU.  Migration may also be caused by improper deployment, deployment into clots and/or dislodgement due to large clot burdens.
…
See Potential Complications section for further information regarding other known filter complications.

Exhibit J-E at BPV-17-01-00142881; Exhibit J-G at BPV-17-01-00137404.

280.    The G2 IFU states under "Warnings":

8.  Filter fractures are a known complication of vena cava filters. There have been some reports of serious pulmonary and cardiac complications with vena cava filters requiring the retrieval of the fragment utilizing endovascular and/or surgical techniques.
9.  Movement, migration or tilt of the filter are known complications of vena cava filters.  Migration of filters to the heart or lungs has been

---

[1] The two other differences are: (1) the G2X IFU names one section as "MRI Safety" whereas the Eclipse IFU names the section "MRI Information"; and (2) In the section "Directions for Use," the two IFUs use different terminology in step 14 (which is utterly unrelated to warnings and complications).  See Exhibit J-G at BPV-17-01-00137403, 00137406; Exhibit J-E at BPV-17-01-00142880, 00142883.

reported.  There have also been reports of caudal migration of the filter.
Migration may be caused by placement in IVCs with diameters exceeding
the appropriate labeled dimensions specified in this IFU.  Migration may
also be caused by improper deployment, deployment into clots and/or
dislodgement due to large clot burdens.

…

See Potential Complications section for further information regarding other
known filter complications.

G2 Filter System, Femoral Vein Approach, Instructions for Use, ("G2 IFU"), attached as

Exhibit J-H, at BPV-17-01-00118398.

281.   Under the heading "Potential Complications," the G2 IFU, G2X IFU, and

Eclipse IFU all state:

- Movement, migration or tilt of the filter are known complications of
vena cava filters.  Migration of filters to the heart or lungs has been
reported.  There have also been reports of caudal migration of the filter.
Migration may be caused by placement in IVCs with diameters exceeding
the appropriate labeled dimensions specified in this IFU.  Migration may
also be caused by improper deployment, deployment into clots and/or
dislodgement due to large clot burdens.

- Filter fractures are a known complication of vena cava filters.  There
have been some reports of serious pulmonary and cardiac complications
with vena cava filters requiring the retrieval of the fragment utilizing
endovascular and/or surgical techniques.

…

All of the above complications may be associated with serious adverse
events such as medical intervention and/or death.  There have been reports
of complications, including death, associated with the use of vena cava
filters in morbidly obese patients.  The risk/benefit ratio of any of these
complications should be weighed against the inherent risk/benefit ratio for a
patient who is at risk of pulmonary embolism without intervention.

Exhibit J-E at BPV-17-01-00142882; Exhibit J-G at BPV-17-01-00137405; Exhibit J-H at

BPV-17-01-00118399.

282.   Under the heading "Clinical Experience," the G2 IFU, G2X IFU, and

Eclipse IFU all reference and contain identical information regarding a clinical study

involving 100 patients to assess the safety of removal of the G2 Filter.  Exhibit J-H at

BPV-17-01-00118400; Exhibit J-G at BPV-17-01-00137406 - 00137407; Exhibit J-E at

BPV-17-01-00142883.

283.   Dr. Avino was aware that fracture was a possible complication of IVC

filters.  Avino Dep, Exhibit J-B, at 48:2-7.

48

284.    Dr. Avino knew the G2 had problems with migrations and fractures.  *Id.* at 40:18-21.

C.    <u>Dr. Avino Was Not Aware of Adverse Information Regarding the Rates and Frequency of Complications of Bard's IVC Filters That Bard Did Not Report to Him.</u>

285.    Dr. Avino was not aware of specific rates of fracture for IVC filters for Bard or other manufacturers.  *Id.* at 62:24-64:7.

286.    Dr. Avino's understanding at the time was that the rates were very low but then within the last four years or so (and after implanting Ms. Jones's filter) learned that they were higher.  *Id.* at 64:8-17.

D.    <u>Dr. Avino Would Have Wanted to Know if Bard's IVC Filter Fracture Rates and Other Complication Rates Were Greater Than Those of Its Competitors.</u>

287.    Dr. Avino testified that August 2010, when he implanted the Eclipse IVC filter in Doris Jones, predates the "peak" of his concern regarding IVC filters.  *Id.* at 48:20-49:4.

288.    Since then, Dr. Avino has learned more about IVC filters and their complications.  *Id.* at 49:5-9.

289.    Dr. Avino would have wanted to know before he implanted the Eclipse IVC in Doris Jones what Bard knew about complications with its IVC filters.  *Id.* at 49:10-14.

290.    Dr. Avino testified that he would have wanted to know if the fracture rates for the Recovery, a predicate device for the Eclipse, exceeded the fracture rates of IVC filters from other manufacturers.  *Id.* at 81:13-24.

291.    Dr. Avino admitted that "[a]ll of the fracture information rate [for Bard's IVC filters] is something that was important to consider in the decision [to use Bard IVC filters]."  *Id.* at 89:20-22.

292.    Dr. Avino testified that it would have been important to him to know that the Recovery filter had reporting rates for death, filter migration, IVC perforation, and filter that were substantially higher than all other filters.  *Id.* at 82:14-24.

49

293.    Dr. Avino believed that comparative information as between filters was important: "all information is helpful, if there's -- if it is information regarding concern about one filter being better than the other."  *Id.* at 90:19-22.

294.    Dr. Avino also testified he would expect a medical device company to report to doctors when the company learns that its device is less safe than alternative treatments or other alternative products.  *Id.* at 21:2-9.

295.    Dr. Avino testified he would need to know that information to make informed decisions about using products.  *Id.* at 21:10-13.

296.    Dr. Avino testified that patients cannot make informed-consent decisions if the doctors do not receive the information to inform them.  *Id.* at 21:14-18.

E.    Discovery of the Filter's Fracture and Broken Strut Lodged in Doris's Pulmonary Artery.

297.    The Filter fractured sometime between August 2013 and April 2015. Exhibit J-A at DORISJONES000104 – 000105.

298.    On April 21 and 22, 2015, Doris returned to the ER at MUMC with complaints of lightheadedness, sweating, and bilateral arm pain.  *Id.* at DORISJONES000073.

299.    Dr. David Chodos, one of Doris's attending physicians, testified that the symptoms could have been related to the filter fragment lodged in Doris's pulmonary artery.  Transcript of deposition of David Chodos, Aug. 5, 2017, attached as Exhibit J-I, at 44:12-23 (metallic embolism in pulmonary artery can explain her presenting symptoms); 47:2-15.

300.    A chest x-ray and CT scan revealed that Doris's IVC filter had fractured and a piece of the filter had embolized into the middle lobe of her right pulmonary artery. Exhibit J-A at DORISJONES000096.

301.    Prior imaging on August 14, 2013, did not show any complications with the IVC filter including any fracture.  Id. at DORISJONES000096.

302.     Doris was referred to endovascular interventional radiologist Dr. Kirstin Nelson for a surgical consult on April 22, 2015.  Transcript of deposition of Dr. Kirstin Nelson, attached as Exhibit J-J, at 25:7-24.

303.     Dr. Nelson recommended and Doris agreed that Dr. Nelson should remove the damaged filter because of the risk of additional struts breaking and embolizing.  *Id.* at 46:13-47:21.

304.     The fractured strut in Doris's pulmonary artery was not retrieved because it was "in a dangerous area and was not suitable for removal."  Exhibit J-A at DORISJONES000073.

305.     The procedure was performed the next day, April 23, 2015, and Doris's Eclipse IVC filter was removed with no complications.  *Id.* at DORISJONES000104 – 000105.1

306.     The fractured piece of the Eclipse remains lodged in her pulmonary artery today.  *Id.* at DORISJONES000073.

307.     Plaintiffs' experts have subsequently determined that Doris's Filter fracture began with tilt and caudal migration of the Filter.  Transcript of deposition of Dr. Darren Hurst, Aug. 19, 2016, at 55:7-10 (tying tilt and migration to fracture in G2 devices); excerpts of Report of Robert McMeeking, PhD on Bard Inferior Vena Cava Implanted in Mrs. Doris Jones, June 9, 2017, attached as Ex. J-K, at 2; excerpts of Expert Report of Darren R. Hurst, M.D., dated June 2, 2017, attached as Ex. J-L, at 10; excerpts of Report of Robert Muehrcke, M.D., dated June 6, 3017, attached as Ex. J-M, at 1.

308.     In December 2005, internal Bard reports determined that the "reported rate of fractures [was] judged to be serious (Critical R002 rating)."  Email from G. Schultz to K. Shifrin and J. Hudnall dated Dec. 19, 2005, BPVEFILTER-01-00002447, attached as Ex. J-N.

309.     Plaintiffs' physician experts have testified that information regarding complication rates and comparative complication rates is important to treating physicians to determine the risk/benefit of using the device and in order to obtain appropriate

informed consent from patients.  Transcript of deposition of Dr. Kinney, July 17, 2017, attached as Ex. J-O, at 39:18-40:20, 101:21-102:18, 191:4-13, 193:8-25, 196:1-10, 204:7-205:3, 231:25-232:23; transcript of deposition of Dr. Roberts, July 7, 2017, attached as Ex. J-P, at 210:22-214:15, 237:15-238:14, 240:1-25. 294:9-295:9, 296:6-19.

310.   Bard's expert, Dr. Mark Moritz, agreed that a medical doctor would want to know from a medical device company the type of information contained in Bard's internal documents that spoke to serious injuries and death caused by failure modes of the Bard filters.  Transcript of deposition of Mark Moritz, M.D., July 18, 2017, attached as Ex. J-Q, at 85:12-86:3.

## V.   ADDITIONAL FACTS

311.   Bard's labeling and marketing materials represent that the G2 Filter was safe and effective for permanent implantation in the human body for the prevention of pulmonary embolism. Ex. 63, BPV-17-01-00137389; G2 IFU, attached as Exhibit 118, BPV-17-01-00118398; G2 IFU, attached as Exhibit 119, BPV-17-01-00137437.

312.   Bard represented to the FDA that the "Design, material, components, fundamental technology and intended use" of the G2 were substantially equivalent to the predicate device, the Recovery Filter.  Letter from FDA to Bard re marketing of G2 Filter, attached as Exhibit 120, K050558.

313.   Bard further represented that no material changes or additional components had been incorporated in the G2 Filter from the Recovery Filter and that modifications were just dimensional changes. Ex. 120, K050558.

314.   Bard's internal documents reveal ███████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████ Email from J. Greer to J. Hudnall dated 7/22/2005, BPVE-01-001797300, attached as Exhibit 121.

RESPECTFULLY SUBMITTED this 13th day of October, 2017.

GALLAGHER & KENNEDY, P.A.

By: */s/Mark S. O'Connor*
    Mark S. O'Connor
    2575 East Camelback Road
    Phoenix, Arizona  85016-9225

LOPEZ McHUGH LLP
    Ramon Rossi Lopez (CA Bar No. 86361)
    (admitted *pro hac vice*)
    100 Bayview Circle, Suite 5600
    Newport Beach, California 92660

*Co-Lead/Liaison Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of October, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

*/s/ Gay Mennuti*

53