# Exhibit C-1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

- - -

IN RE BARD IVC FILTERS : NO. MD-15-02641-PHX-DGC
PRODUCTS LIABILITY LITIGATION :

- - -

MARCH 21, 2017

- - -

DO NOT DISCLOSE - SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

Videotape deposition of MARCUS D'AYALA, M.D., taken pursuant to notice, was held at the law offices of Aaronson Rappaport Feinstein & Deutsch, LLP, 600 Third Avenue, New York, New York 10016, beginning at 12:45 p.m., on the above date, before Amanda Dee Maslynsky-Miller, a Certified Realtime Reporter and Notary Public in and for the State of New York.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

APPEARANCES:

MATTHEWS & ASSOCIATES
BY: DAVID P. MATTHEWS, ESQUIRE
2905 Sackett Street
Houston, Texas 77098
Dmatthews@dpmlawfirm.com
Representing the Plaintiff,
Sherr-Una Booker

AARONSON RAPPAPORT FEINSTEIN AND DEUTSCH, LLP
BY: PHILIP D. LERNER, ESQUIRE
600 Third Avenue
5th Floor
New York, New York 10016
(212) 593-6700
Pdlerner@arfdlaw.com
Representing the Witness,
Marcus D'Ayala, M.D.

NELSON MULLINS RILEY & SCARBOROUGH LLP
BY: ELIZABETH C. HELM, ESQUIRE
Atlantic Station
201 17th Street NW
Suite 1700
Atlanta, Georgia 30363
(404) 322-6000
Kate.helm@nelsonmullins.com
Representing the Defendant,
C.R. Bard, Inc. and Bard Peripheral Vascular

APPEARANCES: (Continued)

THE NATIONS LAW FIRM
BY: SHELLEY J. BLAS, PARALEGAL
1512 Larimer Street
Suite 710
Denver Colorado 80202
(720) 287-5300

VIA TELECONFERENCE:

NELSON MULLINS RILEY & SCARBOROUGH LLP
BY: CHRISTOPHER "SHAUN" POLSTON, ESQUIRE
Atlantic Station
201 17th Street NW
Suite 1700
Atlanta, Georgia 30363
(404) 322-6000
Shaun.polston@nelsonmullins.com
Representing the Defendant,
C.R. Bard, Inc.

LOPEZ McHUGH, LLP
BY: RAMON ROSSI LOPEZ, ESQUIRE
100 Bayview Circle
Suite 5600
Newport Beach, California 92660
(949) 737-1501
Rlopez@lopezmchugh.com
Representing Plaintiffs

ALSO PRESENT: Kevin Pollard, Videographer

\- - -

INDEX

\- - -

Testimony of: MARCUS D'AYALA, M.D.

| | |
|---|---|
| By Mr. Matthews | 7, 122 |
| By Ms. Helm | 77, 127 |

\- - -

EXHIBITS

\- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit-1 | Curriculum Vitae, Marcus D'Ayala | 17 |
| Exhibit-2 | BPVE-01-01019821-825 Health Hazard Evaluation, Dated 12/17/04 | 36 |
| Exhibit-3 | BPVE-01-01019773-784 Recovery Filter Migration, Dated 1/4/05 | 37 |
| Exhibit-4 | IFU, G2 Filter System | 47 |
| Exhibit-5 | Eastern Vascular Society, Concurrent Prophylactic Placement of Inferior Vena Cava Filter In Gastric Bypass and Adjustable Banding Operations in the Bariatric Outcomes Longitudinal Database | 55 |
| Exhibit-6 | NEJM, A Clinical Trial of Vena Caval Filters in the Prevention of Pulmonary Embolism in Patients With Proximal Deep-Vein Thrombosis | 58 |

\- - -

EXHIBITS

\- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit-7 | AMA, Prevalence of Fracture and Fragment Embolization of Bard Retrievable Vena Cava Filters And Clinical Implications Including Cardiac Perforation and Tamponade | 64 |
| Exhibit-8 | BOOKERS_NYMH_MDR00057-461 Medical Records | 71 |
| Exhibit-9 | *Skipped* | |
| Exhibit-10 | *Skipped* | |
| Exhibit-11 | BPV-DEP-00004804-4806 12/27/05 E-Mail from David Ciavarella to Brian Barry | 73 |
| Exhibit-12 | Fractured Bard Recovery, G2, and G2 Express Inferior Vena Cava Filters: Incidence, Clinical Consequences, and outcomes of Removal Attempts | 123 |
| Exhibit-13 | Evidence-Based Evaluation of Inferior Vena Cava Filter Complications Based on Filter Type | 124 |

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer

Page Line Page Line Page Line

None

Request for Production of Documents

Page Line Page Line Page Line

None

Stipulations

Page Line Page Line Page Line

7 1

Question Marked

Page Line Page Line Page Line

None

- - -

(It is hereby stipulated and agreed by and among counsel that sealing, filing and certification are waived; and that all objections, except as to the form of the question, will be reserved until the time of trial.)

- - -

VIDEO TECHNICIAN: We are now on the record. My name is Kevin Pollard, and I'm a videographer for Golkow Technologies. Today's date is March 21, 2017, and the time is 12:45 p.m.

This video deposition is being held in New York, New York, in the matter of CR Bard IVC Filters Products Liability Litigation. The deponent is Marcus D'Ayala, MD.

Counsel will be noted on the stenographic record. The court reporter is Amanda Miller and will now swear in the witness.

- - -

MARCUS D'AYALA, M.D., after having been duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. MATTHEWS:

Q. Could you state your name, please?

A. Marcus D'Ayala.

MS. HELM: Dave, before we get started, I have to address the failure to -- I just want to address on the record very quickly the failure to comply with the CMO relating to the identification of documents.

It appears that it may not be an issue, based on conversations we had prior to the deposition. But on March 14th, I received a letter identifying documents that have been or may be provided to Dr. D'Ayala pursuant -- prior to his deposition. On March 17 at 1:50 a.m., less than five days before this deposition, I received a list from plaintiffs' counsel of 27 documents that you identified that you intended to use at the deposition, including an expert report that contains hundreds of documents.

On Sunday, March 19th at 11:30 p.m., less than two days before the deposition, I received another list of 13 documents that plaintiffs may use during the deposition. In all, plaintiffs identified more than 40 documents, which the CMO only allows for 40, and they've identified at least

40 of them after the deadline set by the court.

Finally, we were served with a deposition notice that said the deposition was at 10:00 a.m., and the subpoena to the doctor was for 1:00 p.m., and we received an amended notice yesterday that was dated March 16th that cleared it up.

Again, I don't think it's going to be an issue, based on the conversation we had prior to the start of the deposition. But to the extent it becomes an issue, obviously, Bard is reserving our rights and, unfortunately, the right to reconvene if we have to.

Doctor, I hope we don't have to, but we are under procedures and orders in this case and, unfortunately, they haven't been followed. So I have to take that position.

MR. MATTHEWS: I understand. I did try to clear up, prior to the deposition, the documents that we anticipate using, which are quite a bit fewer than the documents identified. Some of those identified might be used in rebuttal, if, for instance, you ask about a certain document.

That said, we anticipate using approximately ten documents today.

MS. HELM: And I understand that. But I think you understand that it is our position that the plaintiffs have failed to comply with the CMO. And, as a result, to the extent there's any prejudice to Bard, I have to reserve any rights that we have.
MR. MATTHEWS: I understand.
Are we ready to go?
THE WITNESS: Yes.
BY MR. MATTHEWS:
Q. Let's start over.
Doctor, could you state your name, please?
A. Marcus D'Ayala.
Q. And what do you do, sir?
A. I'm a vascular surgeon in clinical practice in Brooklyn, New York.
Q. And you live in Brooklyn?
A. I live in Long Island and Brooklyn, correct.
Q. Okay. Have you given a deposition before today?
A. I have.
Q. All right. In what matter or matters?

A. I have been called to give depositions in legal matters involving several patients. I don't have any specific recollection of any of them. None of these matters ever came to court or were dealt with in any other way other than just being disposed.
I'm not so sure as to what the legal term is, but a couple of depositions, and that was the extent of it. No more than two or three, I would say.
Q. Have you ever testified in a case involving a medical device?
A. No.
Q. Have you ever consulted with any medical device companies?
A. I'm not so sure I understand your question.
Q. Have you been a consultant to any company that manufacturers medical devices?
A. In terms of providing them with expert advice regarding their products? No.
Q. Are you currently a consultant with any medical device company?
A. I am not.
Q. Where do you practice medicine?

A. I practice at New York-Presbyterian Brooklyn Methodist Hospital, which was formerly known as New York Methodist Hospital. We were recently acquired and, hence, the name change.
Q. Okay. Is that the only hospital that you have privileges?
A. It is.
Q. Today I think we'll just call it New York Methodist, if that's okay.
A. Perfectly fine.
Q. It seems quite a bit easier.
MR. LERNER: I'm sure they'll be happy if you just call it Methodist.
MR. MATTHEWS: All right. We'll just call it Methodist then. Fair enough.
BY MR. MATTHEWS:
Q. Are you a full-time clinician?
A. I am.
Q. You do not teach?
A. I do teach.
Q. What percentage of your time do you spend teaching?
A. I would estimate it to be about 20 percent.
Q. So Methodist is a teaching hospital?

A. It is.
Q. All right. The other 80 percent of the time, you are a clinician; that is, you spend time treating patients?
A. Correct.
Q. All right.
A. With a small amount of that time dedicated to administration of our division.
Q. Okay. Doctor, I represent Sherr-Una Booker. She was a patient of yours back in 2007. You, at that time, implanted a G2, Bard G2 IVC filter.
I suspect you do not recall her personally?
A. I do not.
Q. Have you had a chance to look at the records, your records, of the implant and the procedure that took place back in 2007?
A. I have.
Q. Other than the review of the medical record, your medical record wherein you implanted this Bard G2 in Ms. Booker, did you look at any other medical records?
A. I did.
But for the sake of clarity, I must

Page 14

say it's not my record, it's the hospital's record.
Q. So you reviewed some hospital record as well as your own medical record --
MR. LERNER: No. No.
BY MR. MATTHEWS:
Q. -- at one point?
MR. LERNER: It's not his records, it's only the hospital record. He doesn't have his own personal private records for the patient.
BY MR. MATTHEWS:
Q. Right. So you only reviewed the hospital records?
A. Correct.
Q. Okay. Any --
A. Just so as to be clear in this regards, I saw her as an inpatient, in hospital, and I had an opportunity to review those records. I did not see her as an outpatient or in my private practice.
Q. Okay. In reviewing those records, were you able to identify the doctor who actually ordered the implant?
A. I'm not so sure I fully understand that question. I can tell you that I know the doctor that asked us to see this patient in

Page 15

consultation.
Q. Who was that doctor?
A. Dr. Dean Martin.
Q. And what type of doctor is Dr. Dean Martin?
A. He is an obstetrician/gynecologist.
Q. Had he referred or consulted with you prior to that time?
MR. LERNER: About different patients, you mean?
MR. MATTHEWS: Yes, about other patients.
THE WITNESS: Yes.
BY MR. MATTHEWS:
Q. Had he consulted with you about the use of IVC filters on prior occasions?
A. Yes.
Q. Today I'm here to ask you, really, about three areas of inquiry; your treatment of Ms. Booker, the decision to use the G2 filter, and then what warnings you had, prior to implanting the filter, about the risks and the benefit of the G2 filter.
Do you understand those three areas?
A. Yes.

Page 16

Q. Have you reviewed anything else in preparation for your deposition today? You told is about the Methodist medical record.
Any other documents or anything at all prior to this deposition?
A. There are two documents that I reviewed just this morning, the Methodist medical record and the medical record from, I believe it was Gwinnett Hospital.
MS. HELM: Gwinnett.
THE WITNESS: Gwinnett Hospital.
MR. MATTHEWS: Do you have those with you.
MR. LERNER: I have them in my office, yes. They were copies that you guys provided to us.
MR. MATTHEWS: All right. I just wanted to make sure what we were talking about. If there's something else in there, I would --
MR. LERNER: On the record, they were provided to me by your office.
MS. HELM: In the flurry?
MR. LERNER: Yes.
MR. MATTHEWS: Very good.
BY MR. MATTHEWS:

Page 17

Q. Doctor, you brought a C.V. with you today. We're going to mark that as Exhibit-1 to your deposition.
MR. MATTHEWS: And I will mark in succession deposition exhibits, and we'll attach those to your deposition today, all right?
A. Sure.

- - -

(Whereupon, Exhibit-1, Curriculum Vitae, Marcus D'Ayala, was marked for identification.)

- - -

BY MR. MATTHEWS:
Q. Is Exhibit-1 a current, up-to-date, accurate copy of your C.V.?
A. Yes.
Q. It says you're the chief of vascular surgery at Methodist Hospital, previously at University of Texas Health Science Center in San Antonio. Prior to that, chief of vascular surgery, Bronx VA Hospital.
That's all correct?
A. Yes.
Q. In terms of IVC filter literature, that is, a study or medical document that you

produced, I have seen that you have two studies concerning the IVC filters; is that correct?

MR. LERNER: Are you talking about in his publication list?

MR. MATTHEWS: His publication section of his C.V.

THE WITNESS: Yes, that is correct.

BY MR. MATTHEWS:

Q. You don't have anything more current that may be not listed on here?

A. No, I do not.

Q. You were provided a copy of a confidentiality or protective order, and I think we had asked your attorney if you had signed that prior to this deposition. And I don't know if that occurred.

MR. LERNER: He wasn't provided with it, I was. And I didn't ask him to sign it. I apologize, that's just my omission. So if you have one, I suspect he's happy to sign it now.

I looked at it, Doctor, there's --

THE WITNESS: If Mr. Lerner is happy, I'm happy.

MR. LERNER: I'm never happy, so don't go by that standard.

MR. MATTHEWS: We are going to -- I am handing this to your lawyer Mr. Lerner.

MR. LERNER: For your benefit, I was amused on your client's questionnaire answer, it says Carnarsie High School in the Bronx; Carnarsie's in Brooklyn. No one in New York would ever accept that as accurate. You guys should know that.

MR. MATTHEWS: Note taken. I'm from Wisconsin, so what do I know?

MR. LERNER: So he's signing Page 16, correct, is that what you'd like? Or do you want 18?

MS. HELM: He needs to sign --

MR. LERNER: 18 or 16 or both?

MS. HELM: I'm sorry. It's just 16.

MR. LERNER: Doctor, at the bottom, it's self-explanatory.

Do you have a pen?

THE WITNESS: No, I do not.

Thank you.

MR. LERNER: So what you're signing away is don't talk about this outside of this room.

THE WITNESS: Understood.

MR. LERNER: Except to me, I guess.

THE WITNESS: The 21st?

MS. HELM: Yes, sir. He's going to be shown -- apparently going to be shown some internal documents from Bard, and he just has to agree to maintain that confidentiality.

MR. LERNER: Yes. I said you're never going to talk about this outside the room.

MR. MATTHEWS: Thank you, Doctor.

BY MR. MATTHEWS:

Q. Doctor, before we talk about Sherr-Una Booker, I'd like to talk about your experience and knowledge of IVC filters prior to the implant in June of 2007, okay?

A. Okay.

Q. I know that's asking you to look quite a bit back in the past. At the same time, it's important that we explore what you knew and when you knew it, okay?

Is it fair to say before you use any medical device, the benefits have to outweigh the risk of that device; is that a fair statement?

A. Yes.

Q. And that's how you practice medicine?

A. Yes.

Q. You look at benefits versus risks?

A. Yes.

Q. You have to know the extent of the risks in order to make an assessment of whether that product, whether you're placing it in a person, is going to outweigh the risk, that is, the benefits outweigh the risks?

MS. HELM: Object to the form.

THE WITNESS: That is correct.

BY MR. MATTHEWS:

Q. If there are significant risks, you need to give informed consent to your patients if there's potential for a serious injury or death, correct?

A. Yes.

Q. That type of information is crucial for you, if there is a significant potential for serious injury or death, to communicate to your patient?

MS. HELM: Object to the form.

THE WITNESS: Yes.

BY MR. MATTHEWS:

Q. All right. Let me ask you about the frequency of risk, and that is, the risk of serious injury or death.

Is it important to you, as a treating doctor that implants devices in a patient, what the

frequency of that risk is, whether it's one in a million or one in ten? Is that an important -- is that important information for you in determining the risk versus benefit analysis?

A. Yes.

MS. HELM: I need to object to the form.

MR. LERNER: You need to let him finish his question before you give an answer.

THE WITNESS: My apologies.

MR. MATTHEWS: Do you need to take a call?

THE WITNESS: Could I, please? I'm so sorry. I'll be right with you.

MR. MATTHEWS: We'll take a break.

VIDEO TECHNICIAN: We are now off the record. The time is 1:02.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN: We are now back on the record. The time is 1:06.

BY MR. MATTHEWS:

Q. Doctor, there was an objection. I

want to make clear the question to you.

Is it important to you, as a clinician that implants medical devices, to know the frequency of which a device fails?

A. Yes.

MS. HELM: Objection to the form.

BY MR. MATTHEWS:

Q. It's important because you have to weigh that potential for failure and serious injury with the benefit that the patient may have from the product, correct?

MS. HELM: Object to the form.

THE WITNESS: Yes.

BY MR. MATTHEWS:

Q. All right. What about the risk of serious injury, that is, the severity of the injury? Is that also important for you to know, when doing a risk/benefit analysis, whether you use a product or not?

A. Yes.

Q. And those two individual points of analysis, that is, frequency and severity of adverse events, both of those are used in your prescribing decisions?

MS. HELM: Object to the form.

THE WITNESS: Yes.

BY MR. MATTHEWS:

Q. Doctor, you only saw Ms. Booker in June of 2007; is that correct?

A. Yes.

Q. Prior to getting contacted about this case, for this case, you had no idea of the condition of her; is that true?

A. Yes.

Q. You did not know that she had multiple filter fractures and fragments that embolized and traveled to her heart?

MS. HELM: Object to the form. Mischaracterizes testimony.

MR. LERNER: And I don't -- when did he have the knowledge -- I'm a little confused by your question.

BY MR. MATTHEWS:

Q. Let me ask it this way: Prior to today, have you had any information given to you that she had fracture -- a fracture of that G2 that embolized and traveled to her heart?

MS. HELM: Object to the form.

THE WITNESS: No.

BY MR. MATTHEWS:

Q. You've not heard that?

A. No.

Q. You had not heard she had open heart surgery?

A. No.

Q. Had you heard of other patients or read medical records of prior patients of yours that have had filter fractures?

A. Yes.

Q. Have those patients suffered from factors that have embolized to their heart?

A. Yes.

Q. Do they suffer from pericarditis when this occurs? Have your prior patients suffered from pericarditis?

A. No.

Q. Now, I want to be clear so the jury understands.

The typical scenario when you're contacted by, in this case Dr. Dean Martin, who is an OB/GYN, who contacted you to consult with whether Dean's patient -- Dr. Martin's patient needed a filter or not. That is kind of the typical scenario.

You're not treating the patient. You

Do Not Disclose - Subject to Further Confidentiality Review

don't own the patient, but you're consulting with a doctor who is treating the patient; is that a normal scenario?

MS. HELM: Object to the form.

THE WITNESS: Yes.

BY MR. MATTHEWS:

Q. So oftentimes, you'll treat a patient and implant a filter, as an example, or a stent, and that may be the only time that you see that patient?

A. Yes, but that's not the norm.

Q. It's not the norm.

That's what happened with Ms. Booker, though, correct?

A. I'm not entirely sure. What I would say, that is customary for me is to see a patient before a procedure, make an assessment regarding whether or not that procedure is necessary, and that, as you alluded to, typically involves a complex risk/benefit analysis.

And there are many factors that come into play when we make those risk/benefit analyses, and they include things like the natural history of their disease process, their age, their comorbidities and their life expectancy, the proposed risks of whatever intervention we have or

are planning for them and so on.

So my practice is such that I will see somebody before, make an assessment as to what is best, discuss treatment options with them, move forward if a procedure is required, and then see them, typically within a day afterwards to make sure that there were no complications as a result of our procedure.

It's also customary for us to -- for me, at least, to ask my patients to come back for follow-up visits, at least one, within 30 days of surgery or discharge from hospital.

Q. Okay. So to summarize, I think, what you just said, you will typically see a patient pre-operatively?

A. Correct.

Q. You will make a risk/benefit analysis, you will perform the procedure, you will see a patient post-op, and then you will want to see that patient at least once within 30 days post-op?

A. Correct.

Q. Did I get that pretty much right?

A. Pretty much right.

Q. Okay. Now, oftentimes is it typical, let me ask this, that after the 30 day follow-up you

will not treat that patient, in other words, that patient is being treated by someone else?

A. Yes.

Q. All right. And if there's a decision to remove a filter, that decision is often someone else's, whether it's a primary care physician, whether it's the orthopedic surgeon, whether it's the internist that's treating that patient, that decision oftentimes isn't even yours?

MS. HELM: Object to the form.

BY MR. MATTHEWS:

Q. Is that true? Is that basically true?

MS. HELM: Same objection.

THE WITNESS: I'm not entirely sure that I agree with that. I think we play an important role in retrieving these filters, or at least we try to.

So the whole issue of filter retrieval is one that has been an evolution over the years. And today it's part of our practice to advise these patients to return for follow-up to have filters retrieved, if it's possible to do so and do so safely.

So a number of requirements must be

met for us to retrieve these filters.

BY MR. MATTHEWS:

Q. I'm going to back up, if I could, because now we're talking about 2017 --

A. Correct.

Q. -- and 2007 is the time frame. So I'm going to ask a different question.

A. Okay.

Q. Back in 2007 when you were implanting in particular the G2, the G2 had only been cleared for permanent implantation; is that correct?

A. Correct.

Q. So you were implanting this filter as a permanent filter in 2007, correct?

A. Correct.

Q. At that time in 2007, that filter, when you implanted it in Ms. Booker, was intended as a permanent filter, correct?

MS. HELM: Object to the form.

THE WITNESS: Correct.

BY MR. MATTHEWS:

Q. All right. Well, let's talk about, then, a different subject, and that is your history with the use of filters.

Can you tell the jury when you first

Do Not Disclose - Subject to Further Confidentiality Review

started using inferior vena cava filters, IVC filters?

A. Sure. During my vascular training.

Q. What year was that?

A. That would have been at the Mount Sinai Hospital in '97, '98.

Q. Do you recall which filters you used at that time?

A. Not particularly.

Q. Do you recall any of the filters you used prior to the Bard G2?

A. Yes, I do.

Q. Could you tell us what you used?

A. Before using the Bard filter, we used a filter by the Cordis Corporation, a division of Johnson & Johnson, known as the TRAPEASE. We moved away from using the TRAPEASE filter when it became clear that it was associated with a high incidence of caval thrombosis.

Q. Any other filters that you used?

A. I believe we transitioned away from the Bard filter towards the Cook filter after it became clear to us that there were certain problems with the Bard filter as well.

I cannot specifically recall the

timelines as to when these things were done.

Q. Did you ever use the Bard Recovery filter?

A. I believe I did.

Q. All right. So you used the Bard Recovery, the Bard G2, the Cordus TRAPEASE. And you said the Cook filters.

Do you recall which Cook filters you used?

A. We use the Günther Tulip and right now it's a variation of it called the Cook Celect, C, as in Charles, E-L-E-C-T.

Q. You said you moved away from the Bard filter because of problems associated with it, correct?

A. Yes.

MS. HELM: Object to the form.

BY MR. MATTHEWS:

Q. What were the problems associated with the Bard that -- the reason that you moved away from it?

A. There is a database known as the MAUDE database and it was becoming clear that there were numerous reports in the literature of filter fragmentation and filter migration with these

filters.

Q. Do you recall the time frame when you moved away from Bard filters?

A. I do not.

Q. Clearly it was after 2007, because you were still implanting the G2 in 2007, correct?

A. Correct.

Q. Were you called upon by a sales rep or somebody that's known as a detailer from Bard that came to your hospital to talk to you --

A. Yes.

Q. -- about their filters?

Do you recall that sales rep?

A. We had a number throughout the years from different corporations, so if you could be a little bit more specific.

Q. Well, I guess I'm referring to a sales rep by the name of Ferrara.

Do you recall a sales rep by the name of Ferrara?

A. Robert Ferrara?

Q. Ferrara, I'm sorry.

A. I do.

Q. Was he in your offices from time to time to talk about the Recovery and the G2?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. I'm sorry. You've got to answer aloud for her.

A. Yes.

Q. Were you ever told by Mr. -- is it Ferrara?

A. Uh-huh.

Q. -- Mr. Ferrara that Bard had a crisis management plan, as early as 2004, to deal with the high rates of AEs, that being, adverse events, perforation, fracture and migration?

MS. HELM: Object to the form.

THE WITNESS: No.

BY MR. MATTHEWS:

Q. Were you ever told that Bard conducted an investigation in 2004 into the high number or large number of adverse events of the Recovery done by an independent investigator?

MS. HELM: Object to the form.

THE WITNESS: No.

BY MR. MATTHEWS:

Q. Were you ever sent a letter by the company that talked to you or -- I'm sorry, that

informed you about the results of this investigation, this independent investigation by Bard?

MS. HELM: Object to the form.

THE WITNESS: No.

BY MR. MATTHEWS:

Q. Were you ever told, either by letter or by Mr. Ferrara, that there was a 530 percent higher fracture rate than other filters on the market with the Bard Recovery?

MS. HELM: Object to the form.

THE WITNESS: No.

BY MR. MATTHEWS:

Q. Were you ever told that there was a 1,200 percent higher risk of death from the Recovery fracture and embolization to the heart than other filters on the market?

MS. HELM: Object to the form.

THE WITNESS: No.

BY MR. MATTHEWS:

Q. In 2004 and 2005, clearly two years prior to implanting Ms. Booker with the G2, would that have been important information for you to know? Assuming that that was information that was known to Bard, is that something that you would want

to have known?

A. Yes.

MS. HELM: Object to the form.

THE WITNESS: Can I interrupt for one second? I just wanted to clarify one other point.

Previously you asked me how many publications I had regarding filters. And there's actually a third publication that I had forgotten, and I see it here in my C.V. It's one in which a filter migrated to the heart. And with your question before, I remember you asking me about filters migrating to the heart.

BY MR. MATTHEWS:

Q. That was a case study, correct?

A. That was a case report, that's correct.

Q. Yes, case report. I did read that. Thank you.

MS. HELM: Do you mind telling us which number that is?

THE WITNESS: That would be 28 to 32 under publications.

BY MR. MATTHEWS:

Q. Let me show you what's been marked as Exhibit Number 2.

MS. HELM: Do you have a copy for me?

MR. MATTHEWS: This is a health hazard evaluation dated December 17th, 2004.

- - -

(Whereupon, Exhibit-2, BPVE-01-01019821-825, Health Hazard Evaluation, Dated 12/17/04, was marked for identification.)

- - -

THE WITNESS: Thank you.

BY MR. MATTHEWS:

Q. Let me show you, if you could turn. Just so we're clear on the record, this is a health hazard evaluation from David Ciavarella, MD, who I believe was the vice president of clinical trials -- clinical affairs, dated December 17th, 2004, to Doug Uelmen, BPV QA. And this is Recovery Filter Consultants Report, and I would turn your attention to the second page --

A. Okay.

Q. -- under Number 2. It says that, The consultant's analysis of the reports of Bard -- to Bard of adverse events associated with the Recovery, along with competitors' information available via the MAUDE and IMS databases, showed the following: Reports of death, filter migration, IVC perforation

and filter fracture associated with the Recovery filter were seen in the MAUDE database at reporting rates that were 4.6, 4.4, 4.1 and 5.3 higher, respectively, than reporting rates for all other filters.

Doctor, this is dated December 17th, 2004. Would this have been important information for you to know, that is, a doctor who is implanting Recovery filters, that those filters had a greater risk of fracture that's four and five times higher than the competitor filters?

MS. HELM: Object to the form.

THE WITNESS: Yes.

BY MR. MATTHEWS:

Q. Is that the type of information that would influence your prescribing habits, whether you would use that filter, a Bard filter, or another filter?

MS. HELM: Object to the form.

THE WITNESS: Yes.

BY MR. MATTHEWS:

Q. Let me show you what's been marked as Exhibit-3, which is the Recovery filter migration, Remedial Action Plan, dated January 4, 2005.

- - -

(Whereupon, Exhibit-3, BPVE-01-01019773-784, Recovery Filter Migration, Dated 1/4/05, was marked for identification.)

- - -

BY MR. MATTHEWS:

Q. Again, this is a full two and-a-half years prior to implanting Ms. Booker with the G2.

And I would turn your attention to the first, second, third, fourth, fifth page. It says, actually, 1 of 7 on the fifth page of that document.

A. I'm sorry, could you --

Q. At the bottom under Roman III.

It says, Identification of the problem: As part of the ongoing evaluation of RNF, Recovery Nitinol filter, Bard requested an independent study of the risks and benefits of the RNF, with an emphasis on its use in bariatric surgery and trauma patients. A consultant was retained for this purpose and reported the following: The MAUDE database maintained by the FDA was reviewed. The reporting rates between the RNF and aggregates of the other commercialized vena cava filters were compared.

A, in the MAUDE dataset, the RNF

demonstrated a consistent statistically significant and potentially clinically important higher rate of reporting of adverse events in several analyzed categories.

B, given the pattern of reported events, a higher rate of death reports seem related to filter movement and filter embolization.

You referenced the MAUDE database earlier in questions, Doctor. Is that information important to you as a doctor that is implanting the Recovery filter?

MS. HELM: Object to the form.

MR. LERNER: Which information?

MR. MATTHEWS: That is A and B that I just read.

MS. HELM: Object to the form.

MR. LERNER: But you questioned him, you said you referenced the MAUDE database before. Your question then becomes confusing. I'm asking you to clarify it.

MR. MATTHEWS: All right. I'll strike it and ask another question.

BY MR. MATTHEWS:

Q. In looking at A and B, Doctor, is that the type of information that's important to you

to know prior to implanting a Recovery filter?

A. Yes.

MS. HELM: Object to the form.

BY MR. MATTHEWS:

Q. Do you know what the term "statistically significant" means?

A. I do.

Q. And that's an important epidemiological statement, correct?

MS. HELM: Object to the form.

THE WITNESS: Statistical statement, yes.

BY MR. MATTHEWS:

Q. Doctor, at the Methodist Hospital in 2007, did you have more than one filter at your disposal? That is, you talked about, I think you told me, you had the TRAPEASE, you had the Tulip, and you had the Recovery, and you had the select.

Were all of those available back in 2007, do you recall?

A. No.

Q. Do you know which were available?

A. The G2.

Q. That was the only one available in the hospital?

A. It's very likely, although I could not say with certainty that a single filter would be stocked, yes.

Q. You couldn't say that a single filter was used at the time; is that what your testimony is?

A. My testimony is that it is common for us to, for certain periods, do business with a particular vendor and that vendor stock whichever product we're using at the time, whether it be a filter or a stent or something other.

It's possible that other devices were in the hospital, but it's more likely that a single product was being bought, stocked and used at the hospital for IVC filters.

Q. Let me ask you this: As chief of vascular surgery at Methodist Hospital, did you have input on the formulary or -- in the formulary as to which products would be stocked or which filters would be used at the hospital?

A. Yes.

Q. So if you, the head of vascular surgery said, you know, I don't want this filter but I want these other two filters, or what have you, you could have had an impact on that decision?

Do Not Disclose - Subject to Further Confidentiality Review

A. I could have, yes.
Q. Can you tell the jury about how many filters you would place annually starting in the early 2000s?
And I admit that's a tough question, I know. But if you could give me a ballpark, let's say starting in 2005, two years prior to implanting Ms. Booker?
A. I would have to go back and look at those numbers, which I'm sure are available. But I would say over 100 --
Q. You personally --
A. -- annually.
Q. -- or your department?
A. Our division, of which I do roughly 70 percent of the clinical volume. So a significant number.
Q. Do you have a medical opinion on which filter failure, if you will, was considered the most serious --
MS. HELM: Object to the form.
BY MR. MATTHEWS:
Q. -- between filter failures, that is, KILT, fracture, perforation, migration?
MR. LERNER: Are you talking -- what

time period are you talking about now?
MR. MATTHEWS: Well, that was kind of a general question as to filters in general. So I will leave that open.
BY MR. MATTHEWS:
Q. Whether you have a medical opinion from your practice, from your reading, from your research, from your treatment of patients, as to which filter failure would be the most dangerous, producing the most serious injury to a patient.
MS. HELM: Object to the form.
THE WITNESS: I do.
BY MR. MATTHEWS:
Q. What's your opinion?
A. Obviously, all complications are bad, although caval thrombosis can be devastating in terms of lower extremity edema and dysfunction. I think that migration or fracture are more serious events.
Q. Were you ever told, at any time prior to today and being shown some documents about the MAUDE database, that Bard evaluated specifically the MAUDE database to compare their filter with others in 2004?
MS. HELM: Object to the form.

THE WITNESS: No.
BY MR. MATTHEWS:
Q. Is that the type of information you would expect a manufacturer that sets out to make a decision, or at least look at the MAUDE information to determine filter fracture compared to other filters on the market, is that the type of information you want to know about?
MS. HELM: Object to the form.
THE WITNESS: Yes. But it's a bit more complicated in the sense that my understanding of the MAUDE database is that it is a voluntary database. It's not legally required for a physician to report a problem with an implant or a product, although you could argue that it is ethically required. As with any database, it has problems with regards to vetting of data, with regards to accuracy of data.
So if a concern existed regarding a particular product, yes, I think that should be brought forth and studied, scientifically studied and addressed.
BY MR. MATTHEWS:
Q. At a bare minimum, the MAUDE database would be a signal, a red flag --

MS. HELM: Object to the form.
BY MR. MATTHEWS:
Q. -- a red flag that should cause and promote more research into whether a product is safe and effective?
A. Agree.
Q. Doctor, you obviously have read IFUs, instructions for use, in your practice?
A. I have.
Q. I'm sure you probably have read more than you care to talk about today, and I'm really only going to talk about one.
A. Okay.
Q. In that regard, though, how many products, medical devices, do you think that you implant in your practice? And maybe I should just talk about 2007 because that was the time frame in which you implanted this filter.
In 2007, how many different medical devices were you using in your practice to implant in patients?
A. I'm trying to come up with some crude numbers in my head to answer your question accurately. I would say that it's exceedingly common for us to use -- well, I would say that it

Do Not Disclose - Subject to Further Confidentiality Review

depends upon what you consider to be a product, right?

If you're talking about sutures, well, obviously, that goes into everybody. If you're talking about implants, grafts, stents, filters, stent grafts, I would say it occupies a very prominent role in our practices today, as well as in 2007. I would estimate well over 50 percent of our cases requires some sort of implant, if not 75 percent. So a large number of our patients have prosthetic implants, yes.

Q. So probably more than 50 different products?

A. Yes, that's safe to say.

Q. To that extent, when you look at an IFU, in part you rely on that because that comes from the manufacturer and you expect that to include the risks and benefits of the product; is that true?

MS. HELM: Object to the form. You're leading, Dave.

MR. MATTHEWS: I am leading.

MS. HELM: Yeah, but you don't -- you don't have him on cross.

MR. MATTHEWS: Well, we can talk about that.

BY MR. MATTHEWS:

Q. But let me ask you, then, this question, just so we're clear.

Do you rely, in part, on IFUs, that is, instructions for use, with the products you implant in patients?

A. Yes.

Q. That would include --

A. In part.

Q. That would include implants, grafts, stents, filters and other permanent devices?

A. Yes.

MR. MATTHEWS: All right. I would like to mark as Exhibit-4 an IFU from the G2 filter system that, on the last page, is dated 10/06. And I presume this was the effective IFU in place at the time of implant in 2007.

\- - -

(Whereupon, Exhibit-4, IFU, G2 Filter System, was marked for identification.)

\- - -

MR. LERNER: Just so we're clear, that last thing was a statement, not a question, correct?

MR. MATTHEWS: That was a statement.

I can't prove beyond the shadow of a doubt that there wasn't one after that, but I don't think there was.

MR. LERNER: I wasn't arguing with you. I just wanted to make clear that that was a statement and not a question.

MR. MATTHEWS: It was. And it will be stricken at the time of reading this deposition to a jury, I'm certain.

BY MR. MATTHEWS:

Q. Doctor, I'd like to -- I don't mean to interrupt you, but I would like to ask a couple of specific questions about this.

A. Please do.

Q. On the second -- on the right-hand column, under 7, there is a -- under E, warning, G2 Filter implantation, it says, Filter fracture is a known complication of vena cava filters.

Do you see that?

A. I do.

Q. It says, There have been -- There have been reports of embolization of vena cava filter fragments resulting in retrieval of the fragment using endovascular and/or surgical techniques. Most cases of filter fracture, however,

have been reported without any adverse clinical sequelae.

I'd like to ask you about the first sentence: Filter fracture is a known complication of vena cava filters.

Doctor, do you read that in the IFU to mean that the rates of filter fracture are similar with all filters?

MS. HELM: Object to the form.

THE WITNESS: I don't read anything about rate. I read something about complications and about the potential for fracture. So it makes no specific statements with regards to the incidence of this occurrence.

BY MR. MATTHEWS:

Q. If there is evidence that the company had, in 2006 or prior to that publication being sent to you with the filter, and there was a showing within the company of a 500 percent greater risk with Bard filter compared with other filters, is that the information -- the type of information that you would want to know about?

MS. HELM: Object to the form.

THE WITNESS: Yes.

BY MR. MATTHEWS:

Do Not Disclose - Subject to Further Confidentiality Review

Q. Would you have informed your patient, based on your own ethics and your own consenting habits, would you have informed your patient about that, if it had said that in that IFU?
MS. HELM: Object to the form.
THE WITNESS: If I thought that a particular problem -- I'm sorry, a particular filter was a problem, was defective in some way, I unlikely would use that product.
BY MR. MATTHEWS:
Q. Do you expect medical device manufacturers to monitor the safety of their devices through appropriate testing before sale of the product?
MS. HELM: Object to the form.
THE WITNESS: Yes.
BY MR. MATTHEWS:
Q. Do you expect medical device companies to do and perform adequately powered studies looking at the safety and the efficacy of a product prior to its sale?
A. Yes.
Q. Do you expect a medical device manufacturer to do proper postmarket surveillance of that product once it gets on the market and sold

en masse, to follow that and inform doctors about what they see in the marketplace?
A. Yes.
Q. Were you ever told by Bard, Mr. Ferrara or anybody at Bard, that they had observed higher rates of complications with Recovery, that they placed it on a temporary commercial hold? Did you ever know that?
MS. HELM: Object to the form.
THE WITNESS: No.
BY MR. MATTHEWS:
Q. Were you ever told why Bard withdrew the Recovery from the market?
A. No.
Q. Were you ever told why Bard withdrew G2 from the market?
A. No.
Q. Do you know Dr. Murray Ash?
A. No.
Q. Dr. Ash testified in this case that he conducted a pilot study for the Recovery filter and Bard advised him it would subsequently do a larger safety study.
Let me ask you, do you know what a pilot study is versus a clinical trial or --

A. I do --
Q. -- clinical study?
A. Yes.
Q. When it wasn't done, it was never done, Dr. Ash testified that he had been misled by the company.
Have you ever heard that about Dr. Ash and the Recovery filter?
MS. HELM: Object to the form.
THE WITNESS: No.
BY MR. MATTHEWS:
Q. Doctor, have you ever reported a filter failure to the FDA MAUDE database?
A. I have not.
Q. And, in fact, and you said this earlier, one of the important aspects of the MAUDE database, it's voluntary reporting system and the only group, company or individual that has to absolutely report is the manufacturer; you know that, correct?
A. Yes.
Q. So the reporting system of doctors like you who are very busy oftentimes don't report to the MAUDE database filter failures --
A. Yes.

Q. -- such as fracture?
MS. HELM: Object to the form.
THE WITNESS: Yes. But you have to understand that there's -- there's other reasons for that. I would just want to clarify by saying that these problems are not oftentimes seen immediately. So it takes some time for you to see a problem with regards to fracture and/or migration. So it is not uncommon for your patient to be seen or evaluated by another physician in another hospital in another location.
So the fact that I have not reported any events to MAUDE implies that I have not seen any immediate failures with the filters that I have used in my practice, which is the case.
BY MR. MATTHEWS:
Q. If I understood what you just said, that oftentimes the failure will happen down the -- down the line --
A. Correct, yes.
Q. -- and you won't know about the failure?
A. Correct.
Q. Which is exactly like Ms. Booker, you didn't know anything about her failure?

Page 54

A. That's exactly right.
Q. And you have not undertaken to determine how many Recovery filters or G2 filters you have implanted; is that fair?
A. That's very fair.
Q. And you have not undertaken the task of determining what's happened with those patients into the future?
A. Correct.
Q. You could never tell us, like, you know, I implanted 100 and half of them or 80 percent of them are great without problems, because you just don't know?
A. That's right.
Q. Have you ever received a -- what's called a Dear Doctor letter, sometimes called a Dear Healthcare Provider letter, from Bard concerning its Recovery or G2 filters?
A. Not that I recall.
Q. You know what that is, a Dear Doctor letter, Dear Healthcare Provider letter, safety alert?
A. I would make some assumptions, but not truly.
Q. We talked about risk/benefit analysis

Page 55

of using filters. I'd like to talk about the benefit or the efficacy, if I could, about filters; or, in other words, do they work.
In 2012, you wrote a paper, I think it was called Concurrent Prophylactic Placement of IVC Filter in Bariatric Patients.
Do you recall that?
A. I do.
Q. And you wrote that along with Dr. Gorecki, Semaan, Briggs, Tortolani, correct?
A. Yes.
Q. Are they in your department?
A. Some of them, yes; some of them, no longer.
Q. I'm going to mark this as Exhibit-5.
- - -
(Whereupon, Exhibit-5, Eastern Vascular Society, Concurrent Prophylactic Placement of Inferior Vena Cava Filter In Gastric Bypass and Adjustable Banding Operations in the Bariatric Outcomes Longitudinal Database, was marked for identification.)
- - -
THE WITNESS: Thank you.
MS. HELM: Do you have a copy?

Page 56

MS. BLAS: I do.
BY MR. MATTHEWS:
Q. And this is a paper you wrote along with these other doctors, correct?
A. Yes.
Q. All right. Have you seen this in a while?
A. No, I haven't looked at it in quite some time.
Q. Well, this isn't a test. I just wanted to ask a couple of questions about it.
A. Sure.
Q. Concurrent Prophylactic Placement Inferior Vena Cava Filter in Gastric Bypass, what we're talking about is during and after placement of inferior vena cava with patients that have had lap bands or band surgery, whether there was a benefit with the use of a filter with those patients; is that correct?
A. Yes.
Q. And you found in the conclusion, this was actually presented in the Eastern Vascular Society in DC in September of 2011, you found that CPIVCF was associated with specific clinical features, increased healthcare resource utilization

Page 57

and higher mortality in patients undergoing bariatric operations. Although selected patient characteristics influenced surgeons to perform CPIVCF, this study was unable to establish an outcome benefit for CPIVCF.
That was a mouthful.
A. Yes.
Q. But can you tell us what that means?
A. What that means is that there appears to be no benefit for morbidly obese patients undergoing these procedures to undergo concurrent placement of an IVC filter.
Q. So this filter in these -- in this particular study was used prophylactically --
A. That is correct.
Q. -- to prevent PE post surgery from a patient, correct?
A. Correct.
Q. And you found, with your other authors, that there was no benefit of the filter?
A. Correct.
Q. That's an important finding.
Do you agree?
MS. HELM: Object to the form.
THE WITNESS: Yes.

Do Not Disclose - Subject to Further Confidentiality Review

BY MR. MATTHEWS:

Q. Do you think it was a minor finding?

MS. HELM: Same objection.

THE WITNESS: No, I think that was an important finding and, hence, the reason why it was published in the medical literature.

BY MR. MATTHEWS:

Q. All right. There was a study in 1998 by Dr. Decousus called the PREPIC 1 study.

Are you familiar with that study?

A. I am.

Q. When were you first familiar with the study? When did you first see the study?

A. I don't know that I could answer that accurately. I would assume in training or shortly thereafter. The early years of clinical practice.

Q. There was a finding in that study -- and this was a randomized control trial --

A. Uh-huh.

Q. -- correct?

MS. HELM: Do you have a copy?

MS. BLAS: Yes.

THE WITNESS: Thank you.

- - -

(Whereupon, Exhibit-6, NEJM, A

Clinical Trial of Vena Caval Filters in the Prevention Of Pulmonary Embolism in Patients With Proximal Deep-Vein Thrombosis, was marked for identification.)

- - -

BY MR. MATTHEWS:

Q. I would turn your attention to the second-to-the-last page, the bottom right-hand corner, last paragraph.

A. Second-to-last page?

Q. Yes. And the last full paragraph on the bottom right-hand column.

This was a randomized control trial that found, and I'm quoting this study, This study demonstrated the initial efficacy of filters for the prevention of pulmonary embolism in patients presumed to be at high risk who had proximal deep vein thrombosis and were receiving you anticoagulants. However, because of the observed excess rate of recurrent deep vein thrombosis and the absence of any effect on mortality among patients receiving filters, their systematic use cannot be recommended in this population. In addition, this study showed that low-molecular-weight heparin was as effective and

safe as unfractionated heparin for the initial treatment of proximal deep vein thrombosis in patients presumed to be at high risk.

Do you recall reading this -- about this study?

A. I do.

Q. Have you ever talked to Decousus or any of his co-authors from the thrombosis hospital in France?

A. I have not.

Q. Looking at this study, and there was a follow-up, I think, eight years later, but strike that --

A. There was.

Q. I'm sorry?

MR. LERNER: He said there was.

THE WITNESS: I said I'm familiar with that.

BY MR. MATTHEWS:

Q. Are you familiar with the follow-up study that, for all practical purposes, agreed with the original study?

MS. HELM: Object to the form.

THE WITNESS: I am familiar with the PREPIC 2 trial, yes.

MS. HELM: I'm sorry, can the folks on the phone, can you please mute the phones? We're getting all kinds of noise.

Thank you.

BY MR. MATTHEWS:

Q. Knowing about the lack of efficacy and the fact there was no reduction mortality in PREPIC 1 nor PREPIC 2, with the information I've shown you that there was a fivefold increased risk for fracture with the G2, if you had known that prior to implanting Ms. Booker in 2007, would you have implanted that G2?

MS. HELM: Object to the form. Mischaracterizes the prior testimony.

MR. LERNER: It's unclear, are you talking about any filter or this particular filter?

MR. MATTHEWS: I was talking about taking into account the lack of efficacy and the fact there were no reduction in mortality in PREPIC 1 and PREPIC 2, coupled with the fact that the G2 had a fivefold increased risk for fracture compared to other filters.

BY MR. MATTHEWS:

Q. In 2007 would you have implanted that filter?

Do Not Disclose - Subject to Further Confidentiality Review

MS. HELM: Object to the form.

MR. LERNER: That particular filter?

MR. MATTHEWS: That particular filter.

THE WITNESS: The PREPIC 1 trial is a great study, and it's a very interesting study. But there are problems in this study, as there are problems with every study. And the fundamental problem that you have with this trial is that it randomized patients who were candidates for caval interruption or not; in other words, all patients were treated with blood thinners. It doesn't really address the question of what to do with those patients that cannot be treated with blood thinners.

And from my review of the chart on Ms. Booker, it was clear that she could not be treated with blood thinners. The reason for that was she had bleeding complications. She was, if I recall, anemic, and she was to undergo subsequent surgical interventions.

So her anticoagulation had to be held, hence, PREPIC doesn't really apply to a patient like Ms. Booker. It applies to a different set of patients.

With regards to the Bard filter,

would I have used a different device if I knew at the time that the Bard filter was not ideal or as good as some of the other implants? The answer would have to be yes.

BY MR. MATTHEWS:

Q. You would have used --

A. I would have used a different filter if there was a different filter that I knew of that was better, in terms of its safety profile.

Q. In terms of the documents that you have, I think they are Exhibit-2 and 3, the health hazard report and then the investigation conducted by Bard that showed a fivefold increased risk for fracture and embolization of that fracture, and you told us that would be the type of information you would want to know in your benefit/risk analysis, knowing that --

A. Yes.

Q. -- and seeing that today, would that have been enough to use another filter?

MS. HELM: Object to the form.

THE WITNESS: Difficult to say with certainty. It would depend upon what other filters we had at the time and what their problems would have been. But it would have been a very important

piece of information, as far as making decisions regarding this or any other patient, yes.

BY MR. MATTHEWS:

Q. And it would have influenced your prescribing habit?

MS. HELM: Object to the form.

THE WITNESS: Yes.

BY MR. MATTHEWS:

Q. Let me show you a study, I'm going to mark this as D'Ayala Exhibit Number 7. And this is entitled, The Prevalence of Fracture -- I'm sorry, let me hand that to you.

A. Sure.

Q. The Prevalence of Fracture and Fragment Embolization of Bard Retrievable Vena Cava Filters and Clinical Implications Including Cardiac Perforation and Tamponade.

- - -

(Whereupon, Exhibit-7, AMA, Prevalence of Fracture and Fragment Embolization of Bard Retrievable Vena Cava Filters and Clinical Implications Including Cardiac Perforation and Tamponade, was marked for identification.)

- - -

BY MR. MATTHEWS:

Q. The first author in this study is William Nicholson.

Do you see that?

A. I do.

Q. He is from Penn State, Hershey, Pennsylvania, as we see in the bottom left corner.

A. Uh-huh.

Q. Do you know Dr. Nicholson?

A. I do not.

MR. LERNER: I apologize, is there a date on this?

MR. MATTHEWS: Yes. This was published in -- on August 9th, 2010.

MR. LERNER: Thank you.

BY MR. MATTHEWS:

Q. I'm sorry, did I ask you, have you seen this study before?

A. I do not believe I have.

Q. Under the method, it says that these doctors sought to determine the prevalence of fracture and embolization of the Bard Recovery and the Bard G2 vena cava filter.

That's the filter you implanted in Ms. Booker, correct?

A. Correct.

Q. A retrospective single-center cross-sectional study was conducted by evaluating all patients who received either a Bard Recovery or Bard G2 filter from April 2004 until January 2009.

Under the results it says, 13 of 80 patients had at least one strut fracture. At least one strut in 7 of the 28 Bard Recovery filters fractured and embolized. In 5 of the 7 cases, patients had at least one fragment embolize to the heart, 71 percent of those that fractured. Three patients experienced life-threatening symptoms of ventricular tachycardia and/or tamponade, including one patient who experienced sudden death at home. Six of 52 Bard G2 filters fractured, 12 percent. In 2 of these 6 cases, the patients had asymptomatic end-organ fragment embolization.

Did I read that correctly?

A. Yes, sir.

Q. Okay. The conclusion of this study by Dr. Nicholson and other doctors in different fields of medicine found the Bard Recovery and Bard G2 filters had high prevalence of fracture and embolization with potentially life-threatening sequelae.

Doctor, if you had been warned prior

to June of 2007 of this information, I know this is dated 2010, but I'm going to ask you the question for purposes of a hypothetical, that is, had you known this information of this conclusion, that the G2 had a high prevalence of fracture and embolization with life-threatening sequelae, would that have influenced your prescribing habits and the use of the G2 with Ms. Booker?

MS. HELM: Object to the form.

THE WITNESS: Yes.

BY MR. MATTHEWS:

Q. Do you know of any reason back after the pilot study in 2002 why Bard could not have conducted a clinical trial with its G2 and done follow-up with patients from the original pilot study?

MR. LERNER: I'm not sure how --

MS. HELM: Object to form.

MR. LERNER: I'm not sure how he's supposed to be able to answer a question like that. That doesn't seem like a fair question for this doctor.

MS. HELM: I object to the form.

BY MR. MATTHEWS:

Q. I ask you because you have conducted

studies. I ask you because you use these products. I ask you because you are a researcher to the extent that you have published studies specific to IVC filter.

MR. MATTHEWS: I don't really think it's an unfair question.

BY MR. MATTHEWS:

Q. My question is, do you know of anything that would have presented Bard from conducting the same type of study with the G2 prior to the sale of the G2?

MS. HELM: Object to the form.

MR. LERNER: Again, I don't know how he could answer. But if he can answer it, he can answer it. I'm not going to fight with you about it.

MR. MATTHEWS: If you're uncomfortable with it, I'm going take it back.

MR. LERNER: I'm not here to argue with you. I just don't think it's a fair question for this doctor to answer what a corporation could or couldn't do at a certain period of time.

MR. MATTHEWS: Well, all right, then, I'll withdraw it.

MR. LERNER: Thank you.

BY MR. MATTHEWS:

Q. On the third page of this study, if you could turn to -- I'm sorry, I think I'd like to turn to the fourth page.

A. Okay.

Q. It says E4 on the bottom of it.

A. Okay.

Q. On the left-hand column, the first full paragraph. Left hand, first full.

A. I see it.

Q. It says, We would contend that the fracture prevalence seen by Cantwell might have been significantly higher if the filter was allowed to remain in place for a longer period. If one were to extrapolate our observed prevalence of Bard G2 filter fractures to 50 months, the prevalence of fracture would be identical to that observed for the Bard Recovery filter, thus challenging the hypothesis that the Bard G2 filter represents an improvement in fracture resistance.

The finding of the fracture rate of the Recovery was 25 percent within this study; 25 percent of the filters fractured of the Bard Recovery. These authors, after this study, determined that the fracture rate would be the same

Do Not Disclose - Subject to Further Confidentiality Review

if you extrapolate indwelling time with the G2 filter, that making it a 25 percent filter fracture rate for the G2.

Do you understand that premise within the paper?

A. I think I understand the premise. I'm not so sure that I understand the science behind it.

Q. Well, let me ask you this question, then, Doctor: If you knew back in 2007 when you were implanting that filter that there was even a 12 percent probability of fracture with that filter, would you have used a G2?

MS. HELM: Object to the form.

THE WITNESS: Unlikely.

BY MR. MATTHEWS:

Q. If there was a 25 percent risk of filter fracture, can we safely say you would not have used that filter?

A. Most likely. But you have to understand that you have to have a way of treating these difficult patients. So some filter has to be used. And it becomes a matter of deciding which filter is best, so to speak. And sometimes that's not entirely clear.

MR. MATTHEWS: I'm going to object to the last part of that as nonresponsive.

BY MR. MATTHEWS:

Q. Doctor, I have pulled medical records from Methodist Hospital to try to pinpoint, so we don't have all of them, and I put them together and made them into an exhibit. And I'll mark it as Exhibit Number 8.

\- - -

(Whereupon, Exhibit-8, BOOKERS_NYMH_MDR00057-461, Medical Records, was marked for identification.)

\- - -

BY MR. MATTHEWS:

Q. Just so we're clear, these are select medical records that were pulled that I thought had relevance, and I would like to ask you about some of them.

A. Sure.

Q. Some of them have your name on them, so I can't read them and I'm hoping you can read your writing.

A. Let's try.

MS. HELM: For the record, these have red boxes on them. Those red boxes were not part of

the original.

MR. MATTHEWS: That's correct. They're not.

MS. HELM: The red boxes were added by --

MR. MATTHEWS: The red boxes were added by me for purposes of questioning the witness, and they can be taken out at the time of trial.

MS. HELM: I'm just making sure the record is clear --

MR. MATTHEWS: No, that's --

MS. HELM: -- the red boxes on Exhibit-8 are not part of the original, they were added by plaintiff's counsel.

MR. MATTHEWS: Exactly.

MR. LERNER: Can we go off the record for just a second?

MR. MATTHEWS: Sure.

\- - -

(Whereupon, a discussion off the record occurred.)

\- - -

VIDEO TECHNICIAN: We are now back on the record. The time is 2:13.

BY MR. MATTHEWS:

Q. Doctor, let me show you what has been marked as Exhibit-11 to your deposition, which is an internal document from Bard.

\- - -

(Whereupon, Exhibit-11, BPV-DEP-00004804-4806, 12/27/05 E-Mail from David Ciavarella to Brian Barry, was marked for identification.)

\- - -

MS. BLAS: I skipped 9.

MR. MATTHEWS: That's all right.

MS. HELM: It's 11 now.

BY MR. MATTHEWS:

Q. Doctor, have you had a chance to look at that?

A. Uh-huh.

Q. I don't want to interrupt you, but --

A. Okay.

Q. First let me ask you, did you ever use in your practice the Simon Nitinol filter, referred here with an acronym SNF?

A. I have.

Q. And that is a filter, a permanent filter that was in existence for many years prior to the G2 being cleared by the FDA, correct?

A. Correct.

Q. There is a statement here in the middle, this is an internal document, I'll submit to you, it's an internal document between Bard personnel and the subject matter is the G2 Caudal migrations.

In the middle of the page it says, I would like to look more generally at the G2 complaints. I have seen problems with caudal migration, tilting, perforation, mis-deployment and maybe one or two additional things. Can you tell me the total number of complaints and total number of units distributed?

Then in the final line it says, The G2 is a permanent filter. We also have one (the SNF) that has virtually no complaints associated with it. Why shouldn't doctors be using that one rather than the G2? Can you also send me the total complaint rate and MDR complaints of the SNF?

Do you know why -- strike that.

If the Simon Nitinol filter was available in the hospital, knowing what you know of the documents that I've shown you today, what this company is saying internally to each other within the company, would you have used the Simon Nitinol

filter instead of the G2 back in 2007 when you implanted Ms. Booker?

MS. HELM: Object to the form.

MR. LERNER: I'm going to ask you to rephrase that. You had a blip in the middle that made the question unclear.

BY MR. MATTHEWS:

Q. Knowing what you know today in viewing Exhibit-11, had you the choice in 2007, would you have used the Simon Nitinol filter instead of the G2?

MR. LERNER: When you say "the choice," what do you mean by "the choice"?

MR. MATTHEWS: Would you have used it instead?

MS. HELM: Object to the form.

MR. LERNER: Do you understand the question?

THE WITNESS: I don't.

MR. LERNER: I don't, either.

BY MR. MATTHEWS:

Q. If you had the Simon Nitinol filter available in 2007, knowing what you know today from these documents that I've shown you, the studies that I've shown you, and this internal document,

would you have used the Simon Nitinol instead of the G2 back in 2007?

MS. HELM: Object to the form.

MR. LERNER: So if he had that document in 2007, is that the preface of the question?

MR. MATTHEWS: No. Had he known the information within that document, as well as the information of the other documents that I've shown him today, would he use the Simon Nitinol filter?

MS. HELM: Object to the form.

THE WITNESS: When I look at this document, Exhibit-11, that you gave me, all I see is a group of individuals from a particular company questioning a device, in particular its safety with regards to what they're calling caudal migration. It really makes no mention as to complication rates, and the information that is asked for is not included in this document.

So it would be difficult for me to look at this document and say, boy, this is truly incriminating, at least in my mind. I just look at it as a series of questions between individuals regarding a particular product and its safety.

I can make nothing of it. If I knew

that one filter was better than the other, as I said before, absolutely, I would use it. I mean, ultimately I don't work for industry, I work for my patients and their -- their interests are my interests.

BY MR. MATTHEWS:

Q. Do you know the material in the Simon Nitinol filter and how it's different from the G2?

A. I'm not sure that the material would be any different, in all honesty. I don't recall. But if my memory serves me right, all these filters were made out of nitinol, which is an alloy of nickel, titanium and aluminum.

Q. Were the adverse events associated with the nitinol filter or the G2 ever discussed with you by any of the sales reps that called on you?

MS. HELM: Object to the form.

THE WITNESS: No. No. But if you ask me to speculate, I would think that it was more the design and not the material of the filter that led to some of these problems that we later saw with fracture and migration.

BY MR. MATTHEWS:

Q. Have you --

Page 78

MS. HELM: Excuse me, I have to move to strike the answer as nonresponsive.
MR. MATTHEWS: Just object as nonresponsive and you're good.
BY MR. MATTHEWS:
Q. Have you looked at design documents or looked at design studies concerning the G2?
A. No.
Q. Where do you get the information that you believe it is a design as opposed to a material issue with the G2 fracturing?
MS. HELM: Object to the form.
THE WITNESS: If you were to look at pictures of these two filters, they differ substantially in terms of their design. The G2 filter has a conical design and the struts all come together at a center point.
If I remember the Simon Nitinol filter, it's sort of more of a mesh of constant wire, which then attaches to an anchor. So it's a very different design principle. And by virtue of it being, I would suppose, more robust, I think the likelihood of it embolizing is much lower.
BY MR. MATTHEWS:
Q. Did you ever have any centering --

Page 79

A. But I don't know that to be a fact. That's not something that I particularly studied. I'm just making assumptions.
Q. Fair enough. And I just want to know if there's something I needed to find out that you knew.
But let me ask this: Did you ever have any centering issues with the G2?
A. All filters have centering issues and they, in part, depend on -- or are determined by the patient's anatomy.
Q. Were there less centering issues with the Simon Nitinol than there were with the conical G2s?
MS. HELM: Object to the form.
BY MR. MATTHEWS:
Q. In your practice?
A. I would likely say yes.
Q. All right. If we could turn to the first page that I see with your name on it.
A. Okay.
Q. Because I just want to put on the record what you recognize as your own notes.
A. Okay.
Q. And I see that on the bottom

Page 80

right-hand column, I'll read out the Bates stamp number, it's MBR93. And I'll tell you it's about the --
MR. LERNER: The numbers on the bottom right-hand corner of the pages, the Bates stamp.
MR. MATTHEWS: Yes. It's about the tenth page.
MS. HELM: They're not in order.
MR. MATTHEWS: Like I say, I took this many and tried to make it simple.
MS. HELM: So we're in Exhibit-8, just for the record?
MR. LERNER: Can you hold it up and show him the page? It might be quicker that way, unless you have it already, Doctor.
MS. BLAS: It's Exhibit-8, yes.
THE WITNESS: I am. I'm at Page 63.
MS. HELM: 93.
MR. MATTHEWS: Let me do this for you, Doctor, I'm going to make it easier. I'm going to put little stickies on the pages, and that way --
BY MR. MATTHEWS:
Q. If we could turn to page Bates stamp MDR93.

Page 81

Are you there?
A. Uh-huh.
MR. MATTHEWS: Is everybody there?
BY MR. MATTHEWS:
Q. There's some handwritten notes here.
Are these yours?
A. No.
Q. Is the bottom right-hand corner yours?
A. No.
Q. If we could move to the next one, which is MDR69.
A. Uh-huh.
Q. Any of those notes yours?
A. Yes, that's all written by me.
Q. Okay. It says, that I can read, Preoperative diagnosis. It's the pre-op note. DVT PE procedure planned, IVC filter. And then pertinent medical history, physical finding.
A. Uh-huh.
Q. Can you read that?
A. It says, Patient with history of DVT PE.
Q. And then to significant status changes noted. And indication is what?

Page 82

A. Prevention of PE.
Q. And then that's your signature?
A. It is.
Q. 6/21/07 at 7:30?
A. Uh-huh.
Q. All right. And the next entry that may or may not be yours, Page 71.
A. No, that's -- that's mine.
Q. It is? Okay.
A. Unmistakable.
Q. All right. I think that says, 37-year-old with history of DVT PE.
A. I'd be happy to translate into English --
Q. Yes, please.
A. -- if you'd like.
6/21/07, vascular attending, 37-year-old with history of DVT PE.
Q. I'm sorry. On top of that, what does that say? Does that say duplex?
A. I'm sorry, you're in the second box? Yes, that says, Duplex chronic left superficial femoral DVT.
Q. I apologize. Can we start over on the first box?

Page 83

A. The top box?
Q. Yes, I messed up.
A. Sure. 6/21/07, vascular attending, 37-year-old with history of DVT PE. Uterine fibroids, vaginal bleed with DVT, despite anticoagulation. Awaiting surgical intervention.
Q. Now, it says that, Agree with need for IVC filter.
A. Uh-huh.
Q. And I believe you told us that that was Dr. Martin with whom you were agreeing with; is that right?
A. Yes. Well, to read that entire box it says, 37-year-old awaiting GYN surgery with chronic DVT and PE. Agree with need for IVC filter. Will schedule for insertion of retrievable filter today. Risk/benefits discussed with patient, husband, who agreed to proceed.
Q. And when it says, Duplex showed chronic superficial DVT, is that a duplex ultrasound?
A. Correct.
Q. And that's done -- how is that done?
A. Using ultrasound.
Q. All right.

Page 84

A. So the way duplex --
Q. Externally --
A. Correct, it's a non-invasive procedure.
Q. Is that the gold standard for determining DVT, would you say?
A. It depends upon the clinical scenario. But, yes, it's the imaging modality of choice for lower extremity DVT.
Q. If we turn to the next page, this appears to be your op report, correct?
A. That is correct.
Q. Dated 6/21/07?
MS. HELM: For the record, can we identify it by the Bates number, please?
MR. MATTHEWS: Yeah, Bates stamped 108 and 109. It's a two-page document.
MS. HELM: Thank you.
BY MR. MATTHEWS:
Q. I think this is all legible.
A. Indeed.
Q. There is a pre-operative diagnosis of DVT and PE. Post-op diagnosis, insertion -- operation, insertion of retrievable IVC.
That actual -- is that actually

Page 85

correct, that it was a retrievable IVC in 2007?
A. I can tell you that we had retrieved a number of these G2 filters. I'm not so sure if the company had FDA approval for retrieval of that particular filter.
By the IFU, it is incorrect.
Q. All right. However, I think it was your testimony that this was implanted as a permanent filter?
MS. HELM: Object to the form.
THE WITNESS: It was.
BY MR. MATTHEWS:
Q. A few pages past that, MDR70, there is another note that might be yours.
A. Uh-huh.
Q. And I believe this says, pre-op, post-op diagnosis DVT PE procedure, IVC filter. No venous anomalies, no caval thrombosis --
A. Uh-huh.
Q. -- patient's condition stable.
I can read that.
And then finally on MDR77, the last one, I believe I saw with your name?
A. Uh-huh.
Q. Can you read that --

A. Sure.
Q. -- for the record, please?
A. 6/22/07, vascular attending. No complaints. Afebrile. Stable vitals. Groin with no hematoma. No complaints.
My apologies. That says, Tolerating IVC filter well. Compression stockings.
Q. So she went back on anticoagulation and stockings post implant?
A. The anticoagulation part, I'm not sure about. The stockings, yes.
MR. MATTHEWS: I'll pass the witness.
MS. HELM: Do you mind if we take a break? I think it will go a lot faster if we take a break and you give me a few minutes to get organized.
VIDEO TECHNICIAN: We are now off the record. The time is 2:32.
- - -
(Whereupon, a brief recess was taken.)
- - -
VIDEO TECHNICIAN: We are now back on the record. The time is 2:44.
- - -

EXAMINATION
- - -
BY MS. HELM:
Q. Doctor, my name is Kate Helm, and I represent CR Bard and Bard Peripheral Vascular in this lawsuit.
We have not met before; is that right?
A. That's correct.
Q. You mentioned that you had reviewed records from Methodist Hospital and that you had also reviewed records from Gwinnett Medical Center in Georgia.
Those were provided to you by your attorney; is that right?
A. Yes, ma'am.
Q. And do you know how he got them?
A. No.
Q. Have you had any conversations with any attorneys representing Ms. Booker in this lawsuit?
A. No. Other than today, no.
Q. And do you -- were you provided, through your attorney, with any other documents other than the Methodist records and the Gwinnett

Medical Center records?
A. No.
Q. I believe you mentioned previously that you also retrieve IVC filters; is that correct?
A. I do.
Q. And you also mentioned previously that you have retrieved the G2 filter; is that correct?
A. I have.
Q. And do you also place filters that are not retrievable filters? Do you also place permanent filters?
A. No longer.
Q. When did you stop placing permanent filters?
A. It would be difficult for me to say with certainty. The practice of IVC filter use has been an evolution over the last several years. There's been a push away from using IVC filters in a small measure based on studies like PREPIC, which question the survival advantage associated with the use of these filters.
Today, I would think, across the country, far fewer filters are being placed. And when they are placed, they are placed, more often

than not, for absolute indications as opposed to relative indications, which prompted their use in the past.
Q. Did you ever place the Simon Nitinol filter?
A. I did, yes.
Q. I want you to go ahead -- let's go ahead and look at Exhibit-8, which is the records from Methodist Hospital.
A. Okay.
Q. And, specifically, Page 71, which is one of your handwritten notes. It probably has a sticker on it. It's immediately before the report.
MR. MATTHEWS: The third sticky.
MS. HELM: There you go.
THE WITNESS: Okay.
BY MS. HELM:
Q. In the bottom red box that was made by the plaintiff's counsel, when you read your note it says "retrievable" -- where it says -- the sentence that says "retrievable," what does that sentence say?
A. Scheduled for insertion of retrievable filter today.
Q. And in 2007 when you were implanting

Page 90

the filter in Ms. Booker, the G2 filter, you indicated in your note, in your handwritten note, that you were implanting it as a retrievable filter; is that right?
A. Yes.
Q. And on the next page, on Page 108, which is your op note, under the description of operation, it says, Insertion of retrievable IVC filter.
Is that right?
A. Uh-huh.
Q. And so, again, your operation was the insertion of a retrievable IVC filter; is that right?
A. Yes.
Q. And the filter that you chose for Ms. Booker was a Bard G2 filter; is that right?
A. That's right.
Q. And you testified previously that you have retrieved a number of Bard G2 filters?
A. I have.
Q. Okay. I think you -- it was mentioned earlier that at the time you inserted the Bard G2 filter in Ms. Booker, it had not been cleared by the FDA for retrievability.

Page 91

Were you aware of that?
A. Yes.
Q. But you were also aware that it was a filter that you were able to retrieve percutaneously; is that right?
A. Yes.
Q. You testified earlier that you implanted it as a permanent filter, yet your op notes and your handwritten notes clearly say that you were inserting it as a retrievable filter.
So was it implanted as a retrievable filter?
A. When --
MR. MATTHEWS: Object to the form.
THE WITNESS: When I stated that earlier, that was based on my review of the medical record. And my bias, I can tell you today, is to use only retrievable filters and make every effort at retrieving these filters, if possible. Even permanent filters are potentially retrievable with proper techniques, more often than not percutaneously.
BY MS. HELM:
Q. Looking at the records from Methodist Hospital and the history of Ms. Booker, and I'm

Page 92

asking you to think back in time and I understand that, but based on what -- your review of your records and the history you had available to you, do you believe, and the language that you used in your op note and in your handwritten notes, you intended that this filter be retrieved when she was no longer contraindicated for anticoagulants; is that right?
A. Yes, based on what I wrote there.
MR. MATTHEWS: Object to the form.
BY MS. HELM:
Q. And I assume that you don't know whether there was any discussion with Ms. Booker or any of her healthcare providers, after you implanted the filter, as to whether it could or should be retrieved; is that right?
A. I can tell you that if I intended it to be a retrievable implant, that conversation would have taken place with Ms. Booker.
Q. And based on your notes that you discussed the risks and benefits -- again, I'm back on 71 -- with Ms. Booker and that you were scheduling her for a retrievable filter, is it your testimony that it would have been your practice to discuss with her the fact that the filter was retrievable and should be retrieved when she was no

Page 93

longer contraindicated for anticoagulants?
MR. MATTHEWS: Object to the form.
THE WITNESS: Yes.
BY MS. HELM:
Q. And as you sit here today, you don't know why her filter wasn't retrieved before 2014, do you?
A. I can only guess.
Q. We're not asking you to guess.
In 2007 when you implanted Ms. Booker's G2 filter, you were aware of the potential complications associated with that filter, were you not?
MR. MATTHEWS: Object to the form.
THE WITNESS: Of the G2 filter?
BY MS. HELM:
Q. Yes.
A. The reported complications at the time I was aware of, I'm sure.
Q. And, in fact, you previously looked at Exhibit-4, which was the IFU --
A. Yes.
Q. -- for the G2 filter.
And you would have had that IFU available to you before you implanted Ms. Booker's

filter, correct?
A. Yes.
Q. And, specifically, in Section G of the IFU, it discusses that one of the known complications of the G2 filter is movement or migration; is that right?
A. It does.
Q. And it also specifically addresses that filter fracture is a known complication of vena cava filters, does it not?
A. It does.
Q. And, in fact, fracture is a complication of all vena cava filters, isn't it?
A. It is. As is migration.
Q. Thank you.
And the G2 -- and the IFU for the G2 filter that you implanted in Ms. Booker specifically says that, There have been reports of embolization of vena cava filter fragments resulting in retrieval of the fragment using endovascular and/or surgical techniques. Most cases a filter fracture, however, have been reported without any adverse clinical sequelae.
Is that right?
A. Uh-huh.

Q. And so before treating Ms. Booker in 2007, you were aware, as you've stated, that filter fracture was a risk associated with a G2 and all filters; is that right?
A. Yes.
Q. And you took that into consideration when weighing the risk/benefit for implanting a G2 filter in Ms. Booker; is that right?
A. Yes.
Q. You testified earlier that Ms. Booker, because of what was going on in her medical condition, was contraindicated for anticoagulants at the time you inserted the filter, correct?
A. Yes.
Q. But she had a history of both PE and DVT, correct?
A. Correct.
Q. And she was about to undergo surgery for a cervical mass; is that right?
A. Right.
Q. And so she had to be removed from the anticoagulant medication?
A. Right.
Q. But it was your -- was it your understanding that post surgery that medication

would be resumed, or did you have an understanding of that?
A. I'm not entirely sure that that is clear to me from the record. I can tell you that it would be my practice to discuss resumption of anticoagulation with all of the physicians involved in her care.
In this particular case, it would depend on no small measure as to the comfort level regarding her potential for rebleeding. Keep in mind, she came in anemic with a vaginal bleed and she came in with DVTs and a pulmonary embolism despite anticoagulation.
Q. Back on Page -- and I apologize, I'm jumping around -- but back on Page 71 --
A. Sure.
Q. -- in your handwritten note it says, Risk/benefits discussed with patient.
Is that right? I hope that's what it says.
A. Yes.
Q. Schedule for insertion --
A. Yes.
Q. -- of retrievable filter today?
A. Yes. Risks/benefits discussed with

patient, husband, who agreed to proceed.
Q. And what was your practice at the time, do you recall -- at the time in 2007, what risk/benefits would you have discussed with Ms. Booker relating to the insertion of the retrievable filter?
A. Right. What I would discuss with any young patient regarding any implant is concerns regarding durability, procedural complications. I would discuss the potential for bleeding, infection; a dye reaction, very unlikely, some degree of renal insufficiency as the complication of the use of dye.
And as far as long-term complications, as I stated, durability and the potential for caval thrombosis, migration, fragmentation. Hence, the importance for follow-up and attempt at retrieval in the future.
Q. Was it your practice in 2007, at the time you treated Ms. Booker, to inform patients that the filter might have to be left permanently or --
A. Yes.
Q. -- might be there permanently?
And because you had identified it as a retrievable filter, would you have discussed with her how the retrieval of the filter would be

accomplished, if that was to be done?

MR. MATTHEWS: Object to the form.

THE WITNESS: Usually, we would tell them that that would be a percutaneous procedure, similar to the insertion procedure, although sometimes not possible.

BY MS. HELM:

Q. Did you -- was it your practice in 2007 to provide the plaintiff or her family member with any written materials about the filter or the procedure?

A. No.

Q. And would you ever give a patient a copy of the IFU?

A. No.

Q. Why not?

A. I've never done so. It's just not my practice to do so. I think that as a physician when you're dealing with a patient, it's really on you to make some important decisions for them. And I think an IFU is a complicated document. You may correct me if I'm wrong, but I think the IFU is mostly intended for legal purposes. I'm not so sure it's intended to guide medical practice. And I don't think its intent is in any way to guide a patient in

their decision-making process.

Q. And I know you have no recollection of Ms. Booker and --

A. No.

Q. -- no one is questioning that.

But your notes don't indicate that she had any specific questions or concerns, do they?

A. No.

Q. Based on your op note and looking back at what you can recreate using it, did you feel like this was a successful implantation of a G2 filter?

A. Yes.

Q. It appears to be uncomplicated; is that right?

A. Yes.

Q. And she seemed to have tolerated it well?

A. Yes.

Q. And there were no post implant complications?

A. Nope.

Q. As far as you were --

A. As far as I know.

Q. Okay. Based on your review of the

medical records, did you see, treat Ms. Booker after the implantation of the filter?

A. No. I saw her the day afterwards, based on these records, which, as we discussed previously, is customary.

I have no personal office records of Ms. Booker ever seeing me after hospital discharge.

Q. Would it have -- was it your practice in 2007 to recommend that a patient come back and see you at least once after discharge?

A. Yes.

Q. But as far as your records indicate, Ms. Booker never did that?

A. Yes.

Q. Doctor, at the beginning of the deposition you were shown a handful of internal documents from Bard, specifically you were shown two Bard internal documents and an e-mail.

Do you recall those?

A. I do.

Q. Have you ever been shown internal documents from any other device manufacturer?

A. No.

Q. Have you ever requested internal documents from a device manufacturer in performing a

risk/benefit analysis --

A. No.

Q. -- of a product?

Do you know -- was today the first time you had ever seen Exhibits-2 and 3?

A. Yes.

Q. And you did not have the opportunity to read those exhibits in their entirety, did you?

A. No.

Q. But both of the exhibits on their face indicate that they are about the Recovery filter, do they not?

A. Indeed.

Q. And, in fact, the filter that you implanted in Ms. Booker was not a Bard Recovery filter, was it?

A. That is correct.

Q. It was a Bard G2 filter, correct?

A. Yes.

Q. And do you -- are you aware of what action Bard took as a result of its evaluation of the Recovery filter?

A. No.

Q. And it looks like Bard was doing an internal analyzation of its Recovery filter,

correct?
A. It does.
Q. And you don't know what Bard did in response to this internal evaluation; is that right?
A. I do not.
Q. And you don't know what changes Bard made between the Recovery filter and the G2 filter, do you?
A. No.
Q. I have to ask you very briefly about Exhibit Number 11.
You don't have the context of this e-mail, do you?
A. I have no idea.
Q. And you don't know what -- how it's been explained by company witnesses or anything like that, do you?
A. I do not.
Q. So there's no way for this internal e-mail to -- taken out of context to have any impact on your prescribing decisions in making a determination about a filter, does it?
A. No. I think I made that clear previously. To me, it seems like a proper discussion amongst company officials regarding

concerns that are arising regarding a particular product.
Q. Fair.
Are you aware that in this litigation that Bard has produced over two million pages of documents?
A. No.
Q. And Mr. Matthews showed you just a handful of pages, didn't he?
A. Uh-huh.
Q. And you don't know what the explanation is, what the outcome is, what the context is of any of these documents, do you?
A. No.
Q. And when he asked you previously, if you had known certain information would you have made a different decision, you don't know whether the information he was providing to you was accurate or not, do you?
A. I do not.
Q. So when he was telling you, for example, that the G2 had a five times risk rate for fracture compared to other filters, you don't know if that's accurate or not, do you?
A. I have not seen the data that would

substantiate that claim; no, I have not.
Q. Have you ever been provided with comparative rate data from manufacturers regarding any product that you use, any medical device that you use?
A. Not to my knowledge.
Q. Have you ever asked for comparative rate data on any product or medical device that you implant from any manufacturer?
MS. HELM: Do you need to take that?
THE WITNESS: Could you excuse me for just a moment, please? Thank you.
MS. HELM: Sure. We'll go off the record.
VIDEO TECHNICIAN: We are now off the record. The time is 3:05.
- - -
(Whereupon, a brief recess was taken.)
- - -
VIDEO TECHNICIAN: We are now back on the record. The time is 3:08.
BY MS. HELM:
Q. Doctor, I was talking to you about Exhibits-2, 3 and 11, but particularly 2 and 3.

And I assume that you're also not aware that a number of Bard witnesses and employees have had their depositions taken --
A. I am not.
Q. -- about these documents and the actions and information in these documents?
You're not aware of that, are you?
A. No.
Q. And plaintiff's counsel didn't show you any of that testimony, did he?
A. No.
Q. When it comes to making decisions for your patients and weighing the risk and benefits of medical devices that you use with your patients, you rely on a number of sources, don't you?
A. I do.
Q. You rely on the FDA?
A. Yes.
Q. You rely on your partners and colleagues?
A. Yes.
Q. You rely on available medical literature regarding the device or the product?
A. Yes.
Q. You rely on your own experiences?

A. I do.
Q. And you work with a number of different medical devices, I think you said as many as 50; is that right?
A. Off the top of my head I would say yes.
Q. And what you rely on is the manufacturer of medical devices to provide you with reliable information about the device; is that fair?
A. Yes.
Q. And you would not want to receive unreliable or preliminary or internal investigations without knowing the outcome or the results; is that right?
A. That's right.
Q. Because getting unreliable or incomplete information could harm your patient care, couldn't it?
A. It could be misleading, yes.
Q. And it could negatively impact your practice, couldn't it?
A. Yes.
Q. So in making treatment decisions for patients, you are not -- you don't rely on information contained in internal documents from the

medical -- let me start that over. I got lost in my own question.
In making treatment decisions for your patients, you're not relying on information contained in internal documents from manufacturers of medical devices, are you?
A. No.
Q. It has been suggested to you today that Bard Recovery and G2 filters have complication rates that are significantly higher than other filters.
Do you recall that being suggested to you?
A. Yes.
Q. In your own experience, did the G2 filter have an unexpectedly high complication rate over other filters?
A. In the short-term, no; in the long-term, I think it is well recognized that those filters are associated with a high incidence of fracture and fragment migration. Based on my experience, I have not seen a lot of filters fragment or migrate.
Q. In fact, in one of the articles you wrote in 2012 -- was it this one or the other one --

you stated that complications from filters -- let me make sure I find your language.
IVC filter placement is generally considered to be a benign procedure with a low complication rate.
Is that right?
A. That is right.
Q. And then you said, Its association with significant cost and long-term complications is being increasingly recognized.
Right?
A. Yes, ma'am.
Q. And, in fact, that's why you recommend to patients that you follow-up and that they have their filters retrieved when they're no longer needed, correct?
A. Yes.
Q. Have you ever seen any peer-reviewed literature saying that the G2 filter has complication rates that are significantly higher than other filters?
A. No.
Q. So sitting here today, you're not aware of any medical literature that shows that the complication rates for the G2 filter are higher than

any other filters that were available; is that right?
A. I would rephrase that by saying I have not seen any literature that directly compares the G2 filter to any other filter and states that that filter is more dangerous or less efficacious.
Q. Thank you.
Have you ever seen any FDA denouncement saying the G2 filter has complication rates that are significantly higher than other filters?
A. I have not.
Q. When we talked about Exhibits-2 and 3, you indicated that it appeared that Bard was doing some internal investigation of the Recovery filter; is that right?
A. Yes.
Q. And do you -- in the case of this internal assessment, do you know anything beyond what you were able to briefly look at today?
A. No.
Q. So you don't know how Bard -- what conclusions Bard reached or what actions Bard took; is that right?
A. That's right.

Q. And you don't know whether the FDA was fully satisfied with information it received from Bard and with its continuing to market the Recovery filter despite analysis of complications; is that right?
A. That's right.
Q. And you were asked if you knew why the Recovery filter was taken off the market.
Do you recall that question?
A. Yes.
Q. And do you understand that the G2 filter is a second generation?
A. I do.
Q. And, in fact, it replaced the Recovery filter?
A. Indeed.
Q. So does it make sense to you that when they put the G2 on the market they took the Recovery off the market?
A. Yes.
Q. And are you aware that there was a filter that replaced the G2?
A. I've since stopped using the Bard filters, so I'm not familiar with that particular product.

Q. Did you ever use the Bard Eclipse filters?
A. I couldn't say. Perhaps.
Q. Do you recall when you stopped using Bard filters?
A. No.
Q. But if the Eclipse filter was a later generation of the G2, would it make sense to you that Bard took the G2 off the market when it brought the Eclipse to market?
A. Sure.
Q. That's something that medical device manufacturers do all the time, right?
A. Indeed, improve their products, sure.
Q. And you would expect them to, correct?
A. I would hope so.
Q. You would expect them to be looking at reports of adverse events from the -- from patients and analyzing their filters and continuously looking to improve the product; is that right?
A. Yes.
Q. And you would agree with me that that's part of the risk/benefit analysis that a

manufacturer should do before bringing a product to market, correct?
A. Yes.
Q. You would also agree with me that within -- with any medical device there are risks?
A. Absolutely.
Q. And with any medical device there are risks that are -- that are going to be -- that are -- let me not get caught in my own question again -- there are risks that may come to light after the product is on the market?
A. Yes.
Q. And the manufacturer's responsibility in that instance is to evaluate those risks and evaluate the product, correct?
A. Yes.
Q. And to warn about the risks; is that right?
A. Yes.
Q. You were asked previously about whether you ever received a Dear Doctor or Dear Colleague letter from Bard relating to the Recovery filter.
Do you recall those questions?
A. I do.

Q. If Bard's database indicates that a Dear Doctor letter that went out in December 2004 relating to the Recovery filter was sent to you and to Methodist Hospital, you don't have any reason to dispute that, do you?
MR. MATTHEWS: Object to the form.
THE WITNESS: I do not.
BY MS. HELM:
Q. You just simply don't recall receiving it?
A. That's exactly right. I simply don't recall receiving it. As you can imagine, I receive a lot of letters, a lot of documents, a lot of e-mails, a good number of which go unread.
Q. You made a comment earlier about that it was your -- and I can't remember what word you used, but you said that you thought that maybe it was the design of the G2 or the Recovery filter that was different than the SNF that caused it to have different adverse events once it was implanted.
Do you remember that?
A. Uh-huh, I do.
Q. Is that speculation on your part?
A. Yes.
Q. And just to make sure, you have never

designed --
A. No.
Q. -- an IVC filter, correct?
A. No.
Q. And you've never built one?
A. I just do my best to put them in.
Q. Thank you.
Do you recall any specific discussions you had with the sales reps from Bard regarding the G2 filter?
A. No.
Q. Do you recall ever raising any questions or concerns with the sales reps regarding the G2 filter?
A. No.
Q. Your decision to stop using Bard filters was based on your review of literature; is that right?
A. It would be based on multiple -- multiple factors. As I told you before, my personal experience was that initially the complication rate was low and acceptable. But long-term durability of these implants became clear based on reports published in the literature, based on discussions with colleagues.

Q. I want to circle back around, and specifically relating to Exhibit-2.
Do you know if medical device manufacturers -- and Exhibit-2, we're talking about frequency of adverse events, comparing the Recovery filter to other filters.
Do you know if medical device manufacturers are even permitted to provide doctors with alleged complication rates, comparative complication rates under the FDA guidelines?
A. I do not.
Q. And that's not something anyone has ever provided to you, though, is it?
A. No, it is not.
Q. No sales rep has ever come in and said, look at us compared o your competitor; is that right?
A. That is incorrect. Most sales reps will come in with the intent of selling a product, so they will say, look at us compared to our competitor. But, of course, in a more favorable light.
Q. Have they ever shown you alleged complication rates comparing the two products?
A. Which two products?

Q. A Bard filter and another filter.
A. I have not seen that, no.
Q. Based on this, you know, the limited time you've had with Exhibit-2 and Exhibit-3, do you have any reason to believe that Bard wasn't actively investigating the incidents at the time it wrote these documents in 2004 and January of 2005?
MR. MATTHEWS: Object to the form.
THE WITNESS: No.
BY MS. HELM:
Q. You were shown a study by Dr. Nicholson, it's Exhibit-7.
And, again, you were not familiar with this study; is that right?
A. I think it's fair to say that that is correct.
Q. And when you implanted the G2 filter as a retrievable filter in Ms. Booker in 2007, this information from 2010 obviously wasn't available to you; is that fair?
A. Yes.
Q. Doctor, are you aware that in this litigation Dr. Nicholson and his research coordinator have had their depositions taken?
A. No.

Q. Are you aware that he has produced his study documents in this litigation?
A. No.
Q. If the testimony of Dr. Nicholson, the testimony of his research coordinator and the study documents showed that the fractures reported in this published study are largely attributable to one single implanting physician, that could impact the reliability of the conclusions, couldn't it?
MR. MATTHEWS: Object to the form.
THE WITNESS: I don't know. I don't think I have enough information to be able to answer that question. I could think of a number of different reasons why one physician would have a higher incidence of such complications, the most obvious one being he was the principal implanter of these devices.
BY MS. HELM:
Q. If the patients in the study whose filters did not fracture were excluded and only patients whose filters fractured were included, that would impact the reliability of the conclusions of the study, wouldn't it?
MR. MATTHEWS: Object to the form.
THE WITNESS: I'm sorry, could you

Do Not Disclose - Subject to Further Confidentiality Review

rephrase that for me?

MS. HELM: Sure.

THE WITNESS: I'm not sure I understand the question.

BY MS. HELM:

Q. If the study -- if in the study they only looked at patients whose filters fractured and they excluded patients who were part of a study but whose filters did not fracture, that would impact the reliability of the conclusions, wouldn't it, if they self-selected out patients?

A. Could you further explain that?

Q. Sure. If the study only analyzes the fracture -- the patients whose filters fractured --

A. Yes.

Q. -- and did not include the patients who were in the study but whose filters did not fracture --

A. Yes.

Q. -- that would impact the reliability of the conclusions; do you agree?

MR. MATTHEWS: Object to the form.

THE WITNESS: I'm not sure. I don't know that I have enough information to be able to answer that question.

You have to keep in mind that this is a retrospective review of a particular practice and their experience with these filters with a relatively small number of patients and also a relatively small number of complications.

I don't know that you can base your practice off this one report. I think a report like this has to be looked at, considered. I haven't had enough time to go through it, through their statistical methods, through their results to be able to give you any intelligent opinion as to whether or not I would alter my practice based on this one report.

Just by virtue of the design of the study, I would have to say no. It would be something that might potentially raise some concerns and cause me to think twice, but I'm not so sure that this is something that I would take to the bank, so to speak.

BY MS. HELM:

Q. Fair enough.

MR. MATTHEWS: Object as nonresponsive.

BY MS. HELM:

Q. If you were -- would it be important

for you to know, in evaluating Exhibit-7, that in 2012 Dr. Nicholson published a correction to this study?

A. Yes.

Q. And in -- and if in that correction he acknowledges various errors in the study, that is something you would want to know in evaluating it, wouldn't you?

A. Yes. But I think that an educated observer should be able to read a paper like this and draw those conclusions himself. But, yes, that would be pertinent information, and I would like to have that, absolutely.

Q. Are you still implanting filters today?

A. Yes, I am.

Q. And has your practice changed today from 2007?

MR. LERNER: You'd have to clarify that question.

MS. HELM: Sure. That's fair enough.

BY MS. HELM:

Q. As far as follow-up of your patients, has your practice changed today from 2007?

A. Little. Has my practice changed in

general? Yes, of course. I think we alluded to that previously in the sense that we have pushed away from using filters and make sure that when we use them, we use them in those patients who have absolute indications for implantation.

Q. Doctor, you were asked a number of times today, if something is true, would that have impacted your decision of whether to use a certain filter or not.

Do you recall those questions?

A. Yes, I do.

Q. What you have not been provided today is with any peer-reviewed or reliable information showing that those "ifs" are, in fact, true; is that right?

MR. MATTHEWS: Object to the form.

MR. LERNER: That's more a statement than a question, don't you think?

THE WITNESS: I agree.

BY MS. HELM:

Q. And for you to make an evaluation and to make a decision relating to whether you would have done something or not, it would be important for you to have reliable and complete information; is that right?

A. Yes.
MS. HELM: That's all I have right now.
MR. MATTHEWS: I have just some quick follow-ups.
THE WITNESS: Okay.
- - -
EXAMINATION
- - -
BY MR. MATTHEWS:
Q. You were just asked about peer-reviewed information that's been put in front of you.
A. Yes.
Q. The Nicholson article is a peer-reviewed journal article; is that correct?
A. It is.
Q. And let me show you the next exhibit, which is the VJ study, which is called --
MS. HELM: What exhibit?
MS. BLAS: 12.
- - -
(Whereupon, Exhibit-12, Fractured Bard Recovery, G2, and G2, Express Inferior Vena Cava Filters: Incidence, Clinical Consequences, and outcomes of Removal Attempts, was marked for identification.)
- - -

BY MR. MATTHEWS:
Q. It's called, Fractured Bard Recovery, G2 and G2 Express Interior Vena Cava Filters, Incidence, Clinical Consequences and Outcomes of Removal Attempts.
This is in the Journal of Vascular and Interventional Radiology, 2012. That's also a peer-reviewed journal article, correct?
A. It is.
Q. And the results is -- the results are, A total of 63 fractured Recovery, G2, G2 Express were identified, for an overall fracture rate of 12 percent.
So this is a second peer-reviewed journal that talks about the fracture rate of the G2, correct?
A. Correct.
Q. Let me show you the Deso study, which is also a peer-reviewed journal article comparing the filters, G2, with other filters, in terms of their fracture rate. And we're going to mark this as Exhibit-13.

- - -
(Whereupon, Exhibit-13, Evidence-Based Evaluation of Inferior Vena Cava Filter Complications Based on Filter Type, was marked for identification.)
- - -
BY MR. MATTHEWS:
Q. This is in Interventional Radiology, also a peer-reviewed journal article, by Deso, Idakoji and William Kuo.
If I could turn your attention to the Table 2.
A. Sorry about that, I just wanted to read that first paper.
Q. It's okay.
I was just trying to move it along, but you can take as long as you want.
Have you seen this article before?
A. I have not.
Q. All right. This is from the Division of Vascular and Interventional Radiology at Stanford University. And this was published in 2012.
And if I could turn your attention to Table 2 on the fifth page.
A. Okay.

Q. This table, Doctor.
A. Okay.
Q. I think it's the fifth page or so, Page 97.
A. Okay.
Q. Have you seen the comparison of filters and the fracture rate between filters before today?
MR. LERNER: Are you talking about that page?
THE WITNESS: No.
MR. MATTHEWS: I'm sorry?
MR. LERNER: Are you talking about that page?
BY MR. MATTHEWS:
Q. Well, actually, the question is more general than that.
Have you seen a comparison of filters, the fracture rates between published journal articles, such as we see in Table 2?
A. I have not seen this particular paper before, and I have not seen data like this before.
Q. Is that a peer-reviewed journal article as well?
A. It is.

Do Not Disclose - Subject to Further Confidentiality Review

Q. Just a few more questions, Doctor, in response to some questions that you were just asked.
Doctors such as yourself, to a certain extent, have to rely on industry to do the proper tests and studies to show safety and efficacy before a product is sold; is that true?
MS. HELM: Object to the form.
THE WITNESS: I would say yes.
BY MR. MATTHEWS:
Q. Had you known at the time of implant that there was up to a 25 percent risk of a fractured filter in the G2, would you have taken steps to ensure that that filter was retrieved from Ms. Booker after implant?
A. Yes.
Q. If you would have known there was up to a 25 percent risk of filter fracture in that G2, as we've seen in the articles in front of you, you would have taken greater steps than what were taken to make sure that filter was removed after implant with that patient on that -- in that year, correct?
MS. HELM: Object to the form.
THE WITNESS: Knowing what I today, I think it's safe to answer that question as yes. Given the information we had at hand back then, I'm

not so sure anything would have changed. But, yes, we make an effort to follow our patients back then as now.
BY MR. MATTHEWS:
Q. Let me ask you about that, in terms of the fracture rate.
Has Bard ever suggested a protocol for your hospital, knowing what we know today, to follow those patients that had Recovery and G2 filters to make sure that they are retrieved once the risk of PE has subsided?
MS. HELM: Object to the form.
THE WITNESS: No.
MR. MATTHEWS: Pass the witness.
- - -
EXAMINATION
- - -
BY MS. HELM:
Q. Doctor, the decision of whether or how to treat a follow-up patient, you would agree with me that's a medical decision, wouldn't you?
A. Yes.
Q. And it needs to be made by a medical doctor with medical training?
A. Yes.

Q. And not by a device manufacturer?
A. Yes.
Q. These two articles that you've just been asked about, Exhibits-12 and 13, you have not had an opportunity to review or examine them, have you?
A. I have not.
Q. And I don't know which is which, the Deso evidence based --
A. That would be 13.
Q. Okay. That article is a -- are you aware that that article is actually a literature review and not a study?
A. That's briefly what it looks like, yes, ma'am. But I have not had a chance to read this yet.
Q. And that article -- and I -- this is a statement not a question.
A. Yes.
Q. That article also cites to an article by Dr. Lynch relating to a perforation rate of G2 filters.
I assume you've never spoken with Dr. Lynch about --
A. I have not.

Q. -- this article or his study; is that right?
A. That's right.
Q. So you don't have any way of knowing whether Dr. Lynch actually agrees with the representation of his study in the Deso, Kuo article, do you?
A. I have not.
Q. And the other article, the one that starts, Fractured Bard Recovery, we talked about it previously, that's a retrospective case series, is it not?
A. Yes.
Q. And you have not had an opportunity to evaluate that or determine whether these doctors' experience was the same as yours with the Recovery or G2 filter; is that right?
A. That's right.
Q. So, again, it's a source of information out there, but it's a source of information that you would have to study and evaluate and determine its reliability and impact on your decision-making; is that right?
A. That's fair to say, yes.
Q. And you can't -- have not had the

opportunity to do that today?

A. That's right.

MS. HELM: That's all I have.

MR. MATTHEWS: I think we're done. Thank you.

THE WITNESS: Thank you.

VIDEO TECHNICIAN: This concludes today's deposition. The time is 3:37. We are off the record.

\- - -

(Whereupon, the deposition was concluded at 3:37 p.m.)

\- - -

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

Amanda Maslynsky-Miller
Certified Realtime Reporter
Dated: March 27, 2017

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

\- - - - - -
E R R A T A
\- - - - - -

PAGE LINE CHANGE

____ ____ ______________________
REASON: ______________________
____ ____ ______________________
REASON: ______________________
____ ____ ______________________
REASON: ______________________
____ ____ ______________________
REASON: ______________________
____ ____ ______________________
REASON: ______________________
____ ____ ______________________
REASON: ______________________
____ ____ ______________________
REASON: ______________________
____ ____ ______________________
REASON: ______________________
____ ____ ______________________
REASON: ______________________
____ ____ ______________________
REASON: ______________________

I,______________________, do hereby certify that I have read the foregoing pages, 1 - 130, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_________________________________________
MARCUS D'AYALA, M.D. DATE

Subscribed and sworn to before me this _____ day of _______________, 20____.

My commission expires:_______________

_______________________________________
Notary Public

LAWYER'S NOTES

PAGE LINE

____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________