1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3                    _____

4

5   **In Re: Bard IVC Filters**          ) MD-15-02641-PHX-DGC
    Products Liability Litigation         )
6                                         )
                                          ) Phoenix, Arizona
7                                         ) December 15, 2017
                                          )
8   _____)

9

10

11

12

13        BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    <u>MOTION HEARING</u>

16

17

18

19

20

21  Official Court Reporter:
    Patricia Lyons, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Ste. 312
    401 West Washington Street, SPC 41
23  Phoenix, Arizona  85003-2150
    (602) 322-7257
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared with Computer-Aided Transcription

1                          **A P P E A R A N C E S**

2

3      Plaintiffs' Leadership Committee:

4              Lopez McHugh, LLP
               By: **RAMON R. LOPEZ**, ESQ.
5              100 Bayview Circle, Ste. 5600
               Newport Beach, CA  92660
6
               Gallagher & Kennedy
7              By: **MARK S. O'CONNOR**, ESQ.
               By: **C. LINCOLN COMBS**, ESQ.
8              2575 E. Camelback Rd., Ste. 1100
               Phoenix, AZ  85016
9
               Lieff Cabraser Heimann & Bernstein
10             By: **DONALD ARBITBLIT**, ESQ.
               275 Battery St., 29th Fl.
11             San Francisco, CA  94111

12             Hausfeld, LLP
               By: **STEVEN ROTMAN**, ESQ.
13             1700 K St. NW, Ste. 650
               Washington, DC  20006
14

15     For the Plaintiffs:

16             Heaviside Reed Zaic
               By: **JULIA REED ZAIC**, ESQ.
17             By: **LAURA E. SMITH**, ESQ.
               312 Broadway, Ste. 203
18             Laguna Beach, CA  92651

19
               Williams Love O'Leary & Powers, PC
20             By: **LESLIE W. O'LEARY**, ESQ.
               9735 SW Barnes Rd., Ste. 450
21             Portland, OR  97225

22

23

24

25

1              **A P P E A R A N C E S    (continued)**

2

3    For the Defendants:

4              Nelson Mullins Riley & Scarborough
              By: **RICHARD B. NORTH, JR.,** ESQ.
5              By: **ELIZABETH C. HELM,** ESQ.
              201 17th Street NW, Suite 1700
6              Atlanta, GA  30363

7              Nelson Mullins Riley & Scarborough
              BY: **JAMES F. ROGERS,** ESQ.
8              1320 Main St.
              Columbia, SC  29201

9

10             Nelson Mullins Riley & Scarborough
              BY: **MATTHEW E. BROWN,** ESQ.
              1 Post Office Sq.
11             Boston, MA  02109

12             Snell & Wilmer
              By: **AMANDA C. SHERIDAN,** ESQ.
13             By: **JAMES R. CONDO,** ESQ.
              400 East Van Buren
14             Phoenix, AZ  85004

15

16

17

18

19

20

21

22

23

24

25

1                          **P R O C E E D I N G S**

2

3              THE COURTROOM DEPUTY:  In the matter of MDL

4       2015-2641, Bard IVC Filters Products Liability Litigation, on

5       for motion hearing.

6              Will the parties please announce.

7              MR. LOPEZ:  Good afternoon, Your Honor.  Ramon Lopez

8       on behalf of Plaintiffs' Leadership Committee.

9              MR. O'CONNOR:  Your Honor, Mark O'Connor for

10      Plaintiffs' Leadership Committee.

11             MR. ARBITBLIT:  Your Honor, Donald Arbitblit for

12      Plaintiffs' Leadership Committee.

13             MS. SMITH:  Your Honor, Laura Smith for Plaintiffs'

14      Leadership Committee.

15             THE COURT:  All right.  Good afternoon.

16             MR. ROTMAN:  Steve Rotman, Plaintiffs' Steering

17      Committee.

18             MS. O'LEARY:  I'm Leslie O'Leary.  I'm not part of

19      the Plaintiffs' Steering Committee, but I'm going to be

20      arguing a motion today, and I've been admitted pro hac vice.

21             MR. NORTH:  Good afternoon, Your Honor.  Richard

22      North on behalf of defendants, and I'm joined by Jim Condo and

23      my partners James Rogers, Matthew Brown, and Elizabeth Helm.

24             THE COURT:  All right.  Good afternoon.

25             MULTIPLE VOICES:  Good afternoon, Your Honor.

1       THE COURT:  All right.  We are going to be addressing

2   today the motion to disqualify Dr. Kinney; the motion to

3   disqualify Drs. Resnick, Vogelzang, and Desai; the motion to

4   exclude Dr. Parisian; the motion to exclude Dr. Kessler; and

5   the motion to exclude Kinney, Roberts, and Kalva.  Those are

6   the five motions that we've got teed up for today.

7       What I want to talk to you about as well today is the

8   timing for the rest of the expert motions that are still

9   pending; I want to talk about trial scheduling issues in terms

10  of amount of time and specific day issues I've got in March

11  just so we can work around them; and I want to talk about the

12  defendants' motion to certify the preemption ruling for

13  appeal.

14      I understand that some of you, I think Mr. Condo and

15  Mr. Lopez, need to leave by 3:00 or a little bit after.  I'm

16  hoping we're done by then, I'm not sure we'll need more time,

17  but to make sure we cover what is most important while you

18  gentlemen are here, is there anything in particular you want

19  to take up first?

20      MR. LOPEZ:  Not from my -- everything else is

21  covered, Your Honor, with respect to what's on the Court's

22  calendar.

23      THE COURT:  Okay.

24      MR. LOPEZ:  So I'm fine.

25      MR. NORTH:  Your Honor, we're at the Court's

1     discretion as well.

2             THE COURT:  Okay.  All right.

3             Let's talk first, then, about the motions to

4     disqualify Dr. Kinney and Drs. Resnick, Vogelzang, and Desai.

5     It's the same issue, in effect, with respect to the experts.

6             On all of these motions I've read the briefs, I've

7     read relevant exhibits.  When it comes to experts, I've read

8     portions of the expert reports; I've not read them all.  Nor

9     could I, I don't think.  I tried to read relevant cases.  I

10    haven't read all of the cases the defendant cites on a portion

11    of the fifth motion about what an expert can or can't say on a

12    reasonable physician's view.  There's a long string, so I want

13    to read those cases.

14            My point is I'm pretty familiar with what the issues

15    are and arguments are.  You don't need to walk me through the

16    basics.  I'm really most interested in what you think are the

17    key points now that the briefing is done.

18            So let's start with those two motions to disqualify

19    and take those together.

20            MR. NORTH:  Your Honor, Ms. Helm will present

21    argument on those.

22            THE COURT:  All right.

23            MS. HELM:  Thank you, Your Honor.

24            As the Court has recognized, the basic law is the

25    same as -- almost as the same as it relates to these two

1   motions and the courts have applied two tests.  Either the

2   bright-line test or the two-part test.  And I think the issue

3   under both of those tests, based on the briefing, is whether

4   the expert -- and I'm going to start with Dr. Kinney --

5   received confidential information.

6           Under the bright-line test there's no question that

7   Dr. Kinney was retained by Bard in IVC filter litigation.

8           Under the two-part test, there's no question that

9   Dr. Kinney was retained by Bard in IVC filter litigation and

10  that Dr. Kinney had multiple consulting agreements with Bard

11  that included confidentiality provisions.  So under the

12  two-part test there doesn't seem -- the plaintiffs don't

13  challenge that there were confidential relationships under

14  each test.

15          So the question becomes, under the bright-line test,

16  did he receive confidential information?  And under the

17  two-part test, did he receive confidential information?  If he

18  did, he has a conflict.

19          And our position is that he in fact did receive

20  confidential information.  The plaintiffs' position is that he

21  did not receive confidential information that is relevant to

22  this litigation.  And so I'm going to address what

23  confidential information that he did receive and what evidence

24  the Court has.

25          One thing I think is important to note with

1    Dr. Kinney, in his report he lists as one of his

2    qualifications -- the report is broken down in different

3    categories and they have their qualifications, and he lists as

4    his qualification the fact that he has done consulting work

5    with Bard.

6           He then, now that we have filed a motion raising that

7    very issue, tries to back off of it and say, oh, no, no, no,

8    it was nothing important, I didn't do anything.  But it was

9    important enough for him to list it as a qualification.

10          When he was retained by counsel he was retained and

11   had conversations with Mr. North in the two cases in which he

12   was retained.

13          In at least one of the cases Mr. North made the

14   decision of what documents to send to him and what opinions

15   Mr. North wanted him to evaluate and give in the case.  That

16   in and of itself right there is work product.  The choice of

17   what documents to provide to an expert, the choice of

18   discussing what opinions the expert should or should not offer

19   is work product.  Everyone in this litigation has taken that

20   position as it relates to the experts.  Except in the context

21   of this motion they're saying, no, no, no, I didn't get any

22   work product.

23          More importantly, if you look at what Dr. Kinney did

24   when he was consulting with Bard, he touched in the very areas

25   that they criticize in the expert report.  He touched in

1    testing.  He was involved in testing of IVC filters.  The very

2    filters that are at issue in this case.  We then have a report

3    that says Bard didn't adequately test their filters.

4           He was involved in analysis of adverse events,

5    responding to adverse events.  Then we have an opinion that

6    says Bard didn't adequately respond to adverse events.

7           He was involved in analysis of failure modes of

8    filters.  He had a conversation with the president of Bard

9    Peripheral Vascular about failure modes of filters and what

10   was going on and the complications that could come from that

11   that was then incorporated in an analysis of the filters.

12          In their expert report, they challenge failure modes.

13   Bard didn't do enough, Bard didn't analyze what was going on

14   with the filters.  His very work as a consultant.  He was

15   provided test protocols.  They challenge testing.  He was

16   provided and discussed information regarding adverse events.

17   They challenge adverse event analysis.  He was involved in

18   discussion of failure analysis.  They say Bard didn't do

19   enough.

20          He was involved and received information from the

21   company on very areas on which they opine in their report.

22          Dr. Kinney -- we don't have to show -- for the

23   conflict to exist, we don't have to show that he used that

24   information or that he relayed it to other people.  He has a

25   conflict.  And we believe because of that conflict, because he

1    received confidential information, which is the second prong

2    on whichever test the Court chooses to apply, because he had

3    that confidential information, he had the conflict.  He should

4    have never been involved in this litigation.

5           And interestingly, he didn't report, at least in the

6    report and it appears plaintiffs' counsel didn't know that he

7    had prior -- previously been retained by Nelson Mullins to

8    serve as an expert until our motion was filed.

9           He mentioned his prior consulting in his report but

10   did not mention his prior employment as a medicolegal expert

11   for Nelson Mullins.

12          Dr. Kinney received confidential information.

13   Dr. Kinney has a conflict.

14          We are not seeking to exclude Dr. Kalva or

15   Dr. Roberts because through Dr. Kinney's testimony we're able

16   to delineate what he did.  He testified about what portions of

17   the report he wrote and what portions of the report the other

18   doctors were involved in.  So they can still testify.  We're

19   not trying to impugn, and frankly we don't have the evidence

20   to impugn his conflict to them, so we are not seeking to

21   exclude Dr. Roberts or Dr. Kalva.  That's what makes the two

22   situations a little different.

23          The plain evidence before the Court is he sat down

24   either by telephone or in person and met with the defense

25   lawyer who made decisions about what information to provide

1      him.  He received that information and provided information

2      back to -- in the form of a draft report back to defense

3      counsel.  All of that falls into the very definition of work

4      product.

5             He consulted with the company.  He received test

6      protocols.  He received confidential internal information

7      that's not available outside to the public.  And he did it not

8      once, not twice, but he did it six times.  He had six

9      different consulting agreements relating to IVC filters.

10            Dr. Kinney has a conflict.  Dr. Kinney should not be

11     involved in this litigation and the plaintiffs should be

12     allowed to go forward with Dr. Roberts and Dr. Kalva.

13            Do you want me to go ahead and address the other one?

14     THE COURT:  Let me ask you one question first.

15     You've just described what -- you've just described what

16     Mr. North did and shared with Dr. Kinney.  There's no

17     declaration or affidavit in the record regarding that, is

18     there?

19     MS. HELM:  No, Your Honor, there's no declaration in

20     the record.  Mr. North is here.  He can state in his place.

21     Dr. Kinney actually admits that he received certain

22     information from Mr. North.  So even using Dr. Kinney's

23     declaration, it's in the record that he received information

24     from defense counsel.

25            THE COURT:  Okay.  Why don't you address the other

1    motion.

2         MS. HELM:  Your Honor, we have the same test to start

3    with, with Dr. Resnick.  A little bit of -- what makes this

4    one a little bit different is a couple things.  Number one,

5    I'm going to refer to them as the Northwestern doctors rather

6    than stumbling over each of their names.  The Northwestern

7    doctors made a decision to create an entity.  A legal entity.

8    They're operating under an entity node as SBBK.  They're all

9    four equal partners in this legal entity.  The entity is who

10   bills for the work that they did.  The entity has some sort of

11   a tax ID number or W-9, because if you look at the invoices

12   they're all in the name of the entity SBBK Consultants LLC.

13        So you don't have three independent doctors doing

14   their work and getting paid for what they do, you have four

15   doctors that have formed one entity.

16        Regardless of how much each of them works, they're

17   going to split the profits one fourth, one fourth, one fourth.

18   That's been testified to by Dr. Vogelzang.

19        And what you have here is a situation where

20   Dr. Resnick, again, should have never been involved.

21   Dr. Resnick was retained as an expert witness in a Bard case

22   after this MDL was filed.  He met with Mr. Rogers in 2015 for

23   three hours in a case that's not in the MDL but after the MDL

24   was pending and filed.

25        Mr. Rogers, and he admits it in his declaration,

1    Mr. Rogers chose what information to provide to him and what

2    information he wanted him to review.

3            Again, Mr. Rogers made a work-product decision of

4    what information to provide to Dr. Resnick and provide it to

5    him.  Dr. Resnick also previously served as a consultant for

6    Bard.  Obviously Bard is talking to doctors who had previously

7    worked for the company as consultants as potential experts.

8    We're not out trying to conflict out interventional

9    radiologists where you -- working with people who had worked

10   with the company before.

11           Dr. Resnick did not tell plaintiffs' counsel he had

12   been retained by Bard and apparently didn't tell plaintiffs'

13   counsel he had consulted with Bard.  Plaintiffs' position in

14   their papers is they learned it when we filed the motion.  And

15   they have admitted that he shouldn't be involved, because

16   they've taken the position in their papers that -- to use

17   their term, they've walled him off.  They have told the other

18   three Northwestern doctors not to consult with him any more.

19           If there was no problem with Dr. Resnick's

20   involvement, if he didn't -- if he had not been exposed to

21   confidential -- and received confidential information, there

22   was no need to wall him off.

23           Plaintiffs implicitly admit that there's a problem

24   there and admit -- and they're going to say it was boots and

25   suspenders.  But if there's no problem, why take him out?  The

1    prob- -- and, in fact, the problem is they took him out too

2    late.

3         If you look at what Dr. Resnick did, he met with

4    Mr. Rogers for three hours about a case that was pending in

5    2015.  He received information that Mr. Rogers chose to send

6    to him.  This is all in Dr. Resnick's deposition, and

7    Mr. Rogers can state it in his affidavit or declaration.

8    Mr. Rogers can state it in his place.

9         If you look at the consulting he did, he was likewise

10   involved in testing of filters.  Directly involved in the kind

11   of work and the kind of issues that are in this case.

12        Here's the difference, though:  The Northwestern

13   doctors, the SBBK report, is, as Dr. Vogelzang testifies at

14   length in his deposition, a collaborative report.

15   Dr. Vogelzang cannot tell you who wrote what or who did what.

16        Dr. Resnick testifies in his declaration that his

17   role was modest.  That's his word that he uses in paragraph 8

18   of his declaration.

19        But Dr. Vogelzang's own testimony is contradicted by

20   the invoices from SBBK.

21        The other thing that's very important is

22   Dr. Vogelzang testified, and Dr. Desai testified, that it's

23   Dr. Resnick who wrote the invoices.  He was in charge of the

24   billing.

25        So Dr. Resnick's own invoices show that he was

1    involved in every aspect of the work that these -- the SBBK

2    doctors did, except one phone call.  There's one phone call

3    that was Dr. Vogelzang alone.

4          Every other entry has Dr. Resnick involved and

5    there's at least one entry where he's the sole person who

6    billed for the work.

7          So unlike Drs. Kinney, Kalva, and Roberts where you

8    can parse out, frankly, based on their testimony who did what,

9    in this case it is, to use Dr. Vogelzang's own testimony, it

10   is a collaborative effort and you cannot divide out what

11   Dr. Resnick influenced, what he didn't, what Dr. Resnick wrote

12   and what he didn't.  And it was interesting because

13   Dr. Vogelzang seemed to want to emphasize that because he said

14   it over and over again, and he said "This was a collaborative

15   effort, I cannot say who did what."  Dr. Resnick contributed

16   to every aspect in some part.

17         So we have a situation here where we have an entity

18   where these four doctors have chosen to make themselves an

19   entity, where the entity has a part of it Dr. Resnick, who the

20   plaintiffs admit was involved in confidential relationships

21   with Bard and who his own testimony shows received

22   confidential information, even more so while the MDL was

23   pending.  And you can't -- there's no way to, using the

24   doctors own testimony, to parse out and say, well, Resnick was

25   involved in this or he wasn't involved in that.

1          Resnick's a non-testifying -- he's a consulting

2     expert who had his hands in everything.  And so there's no way

3     to resolve this for Bard or to avoid the conflict without

4     disqualifying the entity as a whole.  As opposed to trying to

5     parse it out.  Dr. Vogelzang makes that impossible because,

6     frankly, it was a collaborative effort.

7          And plaintiffs are going to argue again that there's

8     prejudice and that the Court shouldn't do this because they're

9     prejudiced if they lose Dr. Desai and Dr. Vogelzang, who are

10    the testifying witnesses.

11         Plaintiffs still have Dr. Kinney and Dr. Roberts as

12    interventional radiologists.  These are all interventional

13    radiologists.  There's also another interventional radiologist

14    who is designated and has testified in all of the bellwether

15    cases in Dr. Hurst.  So the plaintiffs are not left without a

16    medical doctor in that area of expertise in these cases.

17         The flip side of it is if these three -- if those

18    four doctors and Dr. Kinney are left in, Bard is faced with

19    experts who have Bard -- had Bard confidential information

20    with whom Bard had anticipated and expected confidential

21    relationship, documented in writing through various consulting

22    agreements, who have now testified -- who are now either

23    testifying or participating in testifying against the company.

24         Through the judicial balance and the integrity of the

25    system, we believe that the right thing to do is to disqualify

1   Dr. Kinney, let Dr. Roberts and Dr. Kalva go forward, pending

2   the *Daubert* motion on them, but the entire SBBK doctors should

3   all four be disqualified.

4            Thank you.

5            THE COURT:  Okay.  Thank you.

6            MR. ROTMAN:  May it please the Court.  Good

7   afternoon, Your Honor.

8            THE COURT:  Good afternoon.

9            MR. ROTMAN:  I'm Steve Rotman and I will be

10  addressing the Northwestern Group on the facts and the legal

11  standards for all of the disqualification issues, and then

12  Laura Smith will be addressing the specific facts and

13  arguments relating to Dr. Kinney.

14           I'd like to start by a housekeeping matter.

15  Yesterday for the first time, in looking over the papers, I

16  realized that it was possible that we never filed the Resnick

17  declaration.  So we filed it yesterday.  It wasn't clear, but

18  out of abundance of caution, we filed it yesterday.  The

19  reason it wasn't clear is because in looking at the defense

20  briefs, they responded to comments in the Resnick declaration.

21  Perhaps we served it and didn't file it.  Perhaps we did both.

22  But the record wasn't clear.  So now, Your Honor, we just want

23  to make sure it's part of the record.  We did refer to it in

24  our brief, in our opposition brief.  I have a copies of it

25  with me, hard copies of it with me here today, so I can also

1    provide a copy to Your Honor --

2                THE COURT:  There's no need.  Thank you.

3                MR. ROTMAN:  -- if there's any need for that.

4                I'd like to start by just giving an overview of some

5    important issues that were perhaps not clear and would not be

6    clear to the Court from reading the defendants' brief.

7                Although Bard cited four times to the *Hewlett Packard*

8    case, which is a case decided by the Northern District of

9    California, part of the Ninth Circuit, cited four times in

10   their initial brief, there's -- there's important legal

11   standards in the *Hewlett Packard* case that govern how the

12   Court should be thinking about both motions.  I will start by

13   pointing out that the court stated the following:  That

14   disqualification is a drastic measure that courts should

15   impose only hesitantly, reluctantly, and rarely.

16               They go on and say -- talk about the two-prong test

17   that is in -- that is in the briefs, but they make the point

18   that the two prongs are both separate and distinct and you

19   must prove both.

20               You can't prove one and then presume the second one.

21   You can't assume the second one or bootstrap to the second one

22   from proving the first.  So if you prove that there was a

23   confidential relationship, you can't just assume that there

24   was confidential information transferred.  And the

25   confidential information has got to be a particular type of

1    confidential information, protected information, the type that

2    is work product, attorney client, not discoverable, and

3    related to the specific case.

4            THE COURT:  Are you saying only work-product and

5    attorney-client privileged materials counts?

6            MR. ROTMAN:  Those are -- I'm not saying -- that's

7    what the court said in *Hewlett Packard*.

8            THE COURT:  Doesn't it begin the statement by saying

9    "Information of particular significance or attorney-client

10   work product"?  I mean "attorney work product."

11           MR. ROTMAN:  You might be correct on that, Your

12   Honor.

13           So -- so we need to have -- the other thing that's

14   clear from reading this case as well as all the others is that

15   the burden's on the moving party.  So our main point here

16   today is that they have to prove both prongs and they have the

17   burden.  And there's no presumption or assumption.  There

18   needs to be specific proof.  There wasn't any provided for

19   prong number 2.

20           Let's just look at Dr. Vogelzang.  There's no

21   evidence of any confidential relationship, that's prong one,

22   nor any evidence that he received confidential information.

23   All of the evidence relates to Dr. Resnick.  We took Resnick

24   off the table.  Not because we were admitting that he should

25   be disqualified, because we could be standing here arguing

1   about Dr. Resnick and make the argument they haven't met their

2   burden that any confidential information was ever provided to

3   him.

4          Yes, he had a -- there was a potential for

5   confidential relationship in that three-hour meeting, but he

6   submitted a declaration, as did Drs. Vogelzang and Desai,

7   saying they never received any confidential information from

8   him, and his declaration states he never provided any to them

9   nor did he receive any.  He had a three-hour meeting in which

10  they provided him medical records of a plaintiff.  That's not

11  confidential to us.  We have the same medical records.  It's

12  our client, this woman, this plaintiff, in the Austin case.

13  The medical literature, their own experts provide their

14  medical literature along with their expert reports.  That's

15  not protected confidential information that gives us any

16  advantage.

17         If I go to any -- any one of several of their expert

18  reports and flip to the section on materials relied on and

19  citations and references, I get over 170 papers cited.

20         So in -- whereas Dr. Resnick, Vogelzang, and Desai

21  submitted declarations denying that there was confidential

22  information, whether or not you call that meeting of three

23  hours a confidential relationship, there was nothing from

24  Bard.  No declaration.

25         Now, the fact that Mr. Rogers is here today is a

1    little bit late.  We wrote our brief, we wrote our opposition.

2    They had plenty of opportunity to submit.

3          We wrote in our opposition they hadn't met their

4    burden.  They did a reply brief.  They had an opportunity at

5    that time.

6          In addition, for Vogelzang -- and on the Vogelzang

7    issue, they took the deposition of Drs. Vogelzang and Desai.

8    They didn't ask for the deposition of Dr. Resnick.  And asked

9    neither one of them in two-full day depositions any questions

10   at all about what information Dr. Resnick did or did not

11   provide to them that came out of any prior confidential

12   relationship.

13         They want the Court to presume that there was

14   confidential information because there was the opportunity for

15   it.  But they provide no specifics, no declaration.  They

16   didn't inquire in their opportunity to do so to develop a

17   record, and so their burden is not met.

18         In addition, Your Honor, in the Vogelzang

19   Northwestern doctors situation, they received notice on March

20   2nd in the initial report and then two additional reports

21   after that, later in March and then in April, all making it

22   clear that Resnick was a part of the collaboration with

23   Vogelzang and Desai.  And yet they did not provide a letter

24   notifying us of any concern about conflict until June 29,

25   after it was too late for us to do anything other than spend a

considerable amount of money on these experts' fees and time
and resources developing three expert reports, preparing them
for their deposition, and at a point in which it's then too
late for us to name any other alternative experts or rebuttal
experts.

So they had all the information they needed on day 1,
March 2nd, to know that Resnick was involved.

In the Kinney case, 12 days after they received the
Kinney report they wrote such a letter.  But in the
Northwestern Group case, nothing came until June 29.

So what happened with Resnick is on the meeting in
October of 2015 that lasted about three hours, they talked
about they had about 50 cases they might get him involved in.
In this particular meeting in which his declaration states he
was not provided any insight into legal strategies, legal
defense strategies, and so forth, he did impart to Mr. Rogers,
who was the lawyer from Nelson Mullins that met with him, what
he thought about the Bard filters.  Critical of the Bard
filters.  And he told -- and his declaration states that he
never heard from them again.

All through 2016, when this litigation was in full
throttle and Bard was naming a number of experts on a number
of different cases, Resnick was not part of that.

So I question whether there was a confidential
relationship, even prong one, with Resnick.  It looks more

1    like it was a screening interview.  They were feeling him out.

2    They were interviewing him.  They were trying to decide, was

3    he going to be one of their experts?  He told them something

4    they didn't want to hear, his opinion about their design,

5    their filter design, and his experience with their filters

6    being problematic.  The meeting ended and they never heard

7    from him again.

8         When we hired Vogelzang, he told us he works with

9    this group.  He never mentioned to us, because he didn't know,

10   about this meeting in October of 2015.  And when we learned

11   about it after they filed their motion, wrote their letter

12   filed their motion, I asked Resnick, why didn't you tell us?

13   He said he didn't even remember it.  He didn't -- it didn't --

14   that was just -- that was how significant it was, this

15   three-hour meeting.

16        So we have -- and there's language, by the way, in

17   this *Hewlett Packard* case about how the courts want to be

18   vigilant about the situation where potential experts at a

19   nominal fee will be disqualified by having meetings such as

20   this one.

21        THE COURT:  You've talked all about that three-hour

22   meeting.  He was a consultant with Bard between 2003 and 2014;

23   right?

24        MR. ROTMAN:  He was.  And as he states in his

25   declaration, most of that had nothing to do with IVC filters.

1          THE COURT:  But are you disputing there was a

2     confidential relationship?  That seems to be what you're

3     arguing with respect to Dr. Resnick.

4          MR. ROTMAN:  What I'm arguing about Resnick is that

5     we don't have to spend time on Resnick because we took him

6     out.

7          THE COURT:  That's fine.  We just spent a lot of time

8     on him and I wasn't quite sure --

9          MR. ROTMAN:  Well, I spent time on him because they

10    want to bootstrap from Resnick to Vogelzang and Desai and

11    Lewandowski.  They have to prove prong 1 and prong 2 for

12    Vogelzang and Desai and Lewandowski.  And so where was the

13    confidential relationship with each of those three, and

14    where's the evidence from Bard there was not only a

15    confidential relationship with each of them but that each of

16    them received confidential information from Resnick?  Which

17    they deny and he denied, and they only put it in a brief that

18    confidential information was provided to Resnick, but they

19    have no idea whether, if that -- if that is even true whether

20    he then transferred that information to Vogelzang and Desai

21    and Lewandowski, and the Court cannot presume that.  Is it

22    possible?  That's not the standard.  Remember what the court

23    said, it's a drastic remedy and stringent burden.  Courts are

24    very reluctant and very demanding.  It's not nonchalant to

25    cross over the specific requirements and the burdens.

1          I'm going to pass to Ms. Smith who will address the

2     other experts.

3          THE COURT:  Okay.

4          MS. SMITH:  Good afternoon, Your Honor.  I have a

5     brief PowerPoint presentation to go along with my argument.

6     Is that all right?

7          THE COURT:  Sure.

8          MS. SMITH:  Your Honor, I'm here to discuss

9     Dr. Kinney's motion regarding disqualification.  My name is

10    Laura Smith.

11         First and foremost, what I want to point out is Bard

12    has not met their burden.  They have provided no evidence

13    there was actual confidential relationship that is relevant to

14    the current litigation and that is not subject to discovery

15    that's already been issued in this litigation.  They have not

16    provided any documents, they've not provided any description

17    of information.

18         Furthermore, when they found out that Dr. Kinney was

19    one of plaintiffs' experts they did send us a letter.  I have

20    a copy of the letter here.  And initially we asked them right

21    away to send us information about Dr. Kinney and if he was

22    exposed to confidential information, please let us know, and

23    to give us some of that -- to provide us with the information

24    so that we could then make an assessment of whether we

25    believed it was confidential and we could move forward.

1          There was an opportunity in the very beginning to

2     mitigate this and the defendants never provided any

3     information.  This was back in March of 2- -- March 22nd,

4     2017.

5          You can see here we have a follow-up letter and even

6     at Dr. Kuo's deposition, Ramon spoke to the attorney there and

7     asked him to provide this information to us.

8          If they're going to accuse Dr. Kinney of switching

9     sides, which is such a serious allegation, they could then

10    provide us with what confidential information he had been

11    disclosed with.

12         They never even mention the manner in which they give

13    it to Dr. Kinney.  There was no request for in-camera review.

14    There's been no declaration from Bard, although there was an

15    assertion that Mr. North would be willing to make that today.

16    And even furthermore, in the expert report they have not

17    identified any portions of it that they believe came from

18    confidential information that Dr. Kinney received while he was

19    an expert.  I'm sorry, while he was a consultant for Bard.

20         After Dr. Kinney's deposition, they did not

21    supplement their motion with any information and at this point

22    Bard provided nothing but vague statements.

23         As I said, Bard has not met their burden.  Today I'm

24    focusing on the second prong of the part 2 test.  The

25    bright-line test tends to apply when there's more of a clear

1    and blatant side switching, and then when there's a dispute

2    the courts tend to apply the two-part test.

3         We are not arguing about the confidential

4    relationship, but we are arguing that no confidential

5    information that is relevant to this litigation that merits

6    disqualification was disclosed to Dr. Kinney.

7         One thing is clear, is that courts do require that

8    parties provide concrete, hard evidence.  They're not willing

9    to look at vague and ambiguous statements, and they need to

10   represent it with specific facts.  And here, as I said, Bard

11   has yet to provide this evidence.

12        Furthermore, Bard noticed Dr. Kinney's deposition two

13   months after receiving their motion, after filing this motion

14   to disqualify.  At that deposition they had the perfect

15   opportunity to ask Dr. Kinney any kind of questions that would

16   relate to this.  They had the opportunity to get the actual

17   evidence that they needed, and they chose not to.  Dr. Kinney

18   even provided his report of Mattes at the litigation, his

19   summary, medical summary.  He had it there with him.  And I

20   have it here today.  We offered it for in-camera review so it

21   can be very clear the type of information he was looking at

22   was only from medical records, and you can see that there's no

23   other discussion within those papers than medical records.

24        One thing the plaintiffs have done, because there is

25   conflicting information here, is we have provided the Court

1    with a sworn declaration from Dr. Kinney, and Dr. Kinney has

2    testified under oath.  Courts have found that a sworn

3    declaration is sufficient to alleviate any concerns and deny a

4    motion for disqualification.

5           Further, courts have also found at this late stage

6    that in order for the parties not to suffer a hardship, the

7    expert -- for an expert to be disqualified, they can rely on

8    an expert's declaration.

9           Here is a copy of the declaration.  I know it was an

10   exhibit and you have reviewed it, but one part I would like to

11   emphasize is that Dr. Kinney states, "The work I performed for

12   the plaintiffs is not based on any information I derived or

13   received when I was a consultant for Bard.  The expert report

14   where I list documents, data, information, facts I considered

15   for my opinions, none of which I reviewed when I was a

16   consultant.  In fact, I was not even aware of the existence of

17   this material."

18          So here we have Bard's assertions that when

19   Dr. Kinney -- when Dr. Kinney worked for them as a consultant

20   for two and a half years about ten to 12 years ago, they claim

21   he received confidential information that is relevant to this

22   litigation.

23          Dr. Kinney, from the agreements that we've seen, he

24   helped implant and teach doctors how to implant and remove

25   filters.  He did work in a lab under two animal studies, which

1    Elizabeth Helm mentioned.  In that he recorded data.  He never

2    got to see the results.  He never was a party to making

3    decisions about those results.  He merely was acting as a lab

4    assistant.

5           Further, when Dr. Kinney worked on providing medical

6    summaries for the Mattes and Ennis case, it's clear by looking

7    at the facts, and we put this in our brief, that there was

8    little to no information exchanged between the parties.  He

9    was provided with medical records and then wrote his summary

10   for Mattes.  That case settled before any expert disclosures

11   happened.

12          And then for the Ennis case, Dr. Kinney only billed

13   one hour of time for it and it settled before there was a case

14   management conference.

15          It is clear there would be no need at this point in

16   time for Bard to provide Dr. Kinney with any of their work

17   product, any mental impressions, any strengths and weaknesses

18   of their case.  These cases weren't even developed to get to

19   that stage in the litigation.

20          So as I said, Bard has had many opportunities to

21   provide supportive evidence for this motion.  Documents --

22   they could provide their billing records to show us the time

23   they've worked with Dr. Kinney, request an in-camera review,

24   at his deposition they could have elicited testimony.  Submit

25   a sworn affidavit or declaration from any of the attorneys

 1    that worked on Ennis or Mattes, from any attorneys in the MDL,

 2    or from any Bard employees.

 3         So, once again, Bard has not -- has no authority

 4    right here.  None of the cases that plaintiff or defendant

 5    cite is analogous to the position here.  They all require some

 6    sort of evidence.  And in the absence of evidence, a sworn

 7    declaration is sufficient.

 8         One thing I noted when I was reading the cases is

 9    that the longest period of time between when an expert worked

10    as a consultant and worked for another party was about four

11    years.  Right now we're dealing with a time period of 10 to 12

12    years.

13         This is greatly prejudicial to the plaintiffs.

14    Disqualifying Dr. Kinney would be fundamentally unfair and

15    serve as a severe sanction there currently is no time to

16    repair.

17         And Dr. Kinney offers a very unique value as an

18    expert with Dr. Kalva and Dr. Roberts.  He is highly

19    specialized in his field.  Besides having a medical degree, he

20    is a mechanical engineer and he has a degree in physics.  He's

21    designed medical devices.  And he is -- was our lead attorney

22    in this project.  He was responsible for involving Dr. Roberts

23    and Dr. Kalva.

24         Dr. Roberts is his supervisor and boss and Dr. Kalva

25    he's known for years, 13 years, and they worked in the angio

1     clinic in San Diego.  And because of their experiences with

2     Bard filters and their complications, that is why he reached

3     out to them and got them involved in this.

4           So, in summary, Bard has not met their burden, they

5     have not produced any evidence, it's very prejudicial to

6     plaintiffs.  Dr. Kinney has signed a sworn declaration and

7     testified under oath.  The Mattes and Ennis cases only

8     involved medical summaries.

9           For the expert report, the Kinney-Kalva-Roberts

10    report does not reflect or reveal any confidential

11    information, nor as Bard asserted that, nor does it reveal

12    Bard's mental impressions, and it does not discuss any of the

13    topics that Dr. Kinney consulted on.

14          Dr. Kinney has been transparent from the very

15    beginning by outlining his role as a Bard -- his role working

16    with Bard and his involvement.  And any indication that

17    confidentiality still exists has either been extinguished by

18    time or by publication.

19          So we believe it is clear Dr. Kinney should not be

20    disqualified because Bard has not met their burden and

21    Dr. Kinney did not receive any confidential information that

22    is relevant to this lawsuit that was not subject to discovery

23    in this case.  Thank you.

24          THE COURT:  All right.  Thank you.

25          MS. HELM:  Your Honor, may I briefly address --

1          THE COURT:  Yes.

2          MS. HELM:  I'm going to start with, Your Honor,

3   Dr. Kinney and plaintiffs continue to argue there's no

4   evidence that the expert used confidential information he

5   received.

6          THE COURT:  I think the argument was there is no

7   evidence he received confidential information.

8          MS. HELM:  I'll address that first, Your Honor.

9          The evidence is in the form of the declaration of

10   Dr. Kinney.  In his declaration he testifies that he worked as

11   a consultant for Bard relating to IVC filters, that he

12   performed an animal study evaluating filters, that he was

13   asked to evaluate various performance characteristics of IVC

14   filters, that he was asked to provided advice and consultation

15   regarding the use of filters to other people, that he, again,

16   was asked to perform another animal study and, in fact, the

17   consulting agreement that he refers to there includes the test

18   protocol, which is clearly confidential information.  He was

19   asked to provide research related to another animal study and

20   asked to evaluate various performance characteristics of a

21   filter, another IVC filter.

22          He admits he had access to test protocol, he had

23   access to analysis of Bard's product.  He admits he met with

24   the president of Bard Peripheral Vascular and talked about

25   adverse events.  Dr. Kinney himself admits in his declaration

1    that he had access to and received confidential information

2    from Bard while working as a consultant.

3            He also admits that he received work product while

4    working as a medicolegal expert for Bard because he admits

5    that he reviewed documents provided to him by defense counsel.

6            Documents chosen by defense counsel to give to an

7    expert are work product.  That fact alone shows that he

8    received work product information in his capacity as a

9    medicolegal expert for Bard.

10           All of this is in Dr. Kinney's declaration:  "I met

11   with John McDermott, the president of BPV.  We talked about

12   issues related to IVC filter fractures."

13           Those are the very issues in this case.

14           He asked questions about whether fragment filters

15   could cause additional issues.  Those are very issues in this

16   case, can fracture lead to something else.

17           He was involved in confidential internal information,

18   internal conversations, in the company about the company's

19   filters and its performance of its filters.  He had access to

20   test protocol.  He had access to company documents.

21           So, again, the test is not did he use it.  They admit

22   he had a confidential relationship.  The test is, in that

23   confidential relation did he receive confidential information?

24   And he also admits that in his declaration.

25           Interestingly, Ms. Smith argued Dr. Kinney has been

1   transparent.  Apparently he wasn't transparent until he got

2   caught because he either didn't tell plaintiffs' counsel or

3   they didn't ask him if he had previously worked for Bard or

4   for Nelson Mullins as a medicolegal expert, and in fact he

5   had.  And then once we raised the issue, once we learned about

6   it and raised the issue, he remembered it.

7           Now I'm going to switch to Dr. Resnick because the

8   issue is a little different.  Again the test is the same.  As

9   to Dr. Resnick himself, did he have access -- did he have a

10  confidential relationship?  There's no question he did.  He

11  admits to it.

12          Did he receive confidential information?  Again, the

13  very simple, very easy one is Mr. Rogers chose what medical

14  records to send to him to review.  That is work product in and

15  of itself.

16          In the analysis of the Austin case, which, by the

17  way, Your Honor, is still pending and many of the lawyers in

18  the room are attorneys of record in the Austin case.  The

19  Austin case is the case which Mr -- Dr. Resnick met with

20  Mr. Rogers.

21          We did not know Dr. Resnick's full involvement and

22  how intertwined he was in the SBBK reports until the

23  depositions of Dr. Desai and Dr. Vogelzang and until we

24  received the invoices, and it was at those depositions that we

25  received the invoices.  And the invoices are exhibits to our

1   motion.

2           Those invoices --

3           THE COURT:  I've read them.

4           MS. HELM:  And it was at that deposition of

5   Dr. Vogelzang that Dr. Vogelzang testified over and over and

6   over again that his reports, their reports, are a

7   collaborative effort that all four of them were involved in

8   and you can't parse out who wrote what.  And looking at the

9   invoices, clearly Dr. Resnick had his hand in every aspect of

10  their expert work.

11          Dr. Resnick, according to Mr. Rotman, didn't remember

12  that he'd served as a consultant at Bard and didn't remember

13  that in 2015 he'd met for three hours with Mr. Rogers.  Again,

14  that begs the question why wasn't he asked?  And also, when

15  asked to write a declaration, Dr. Resnick suddenly remembered

16  all of the details of those meetings and his consulting

17  agreements.

18          But, again, if you look at his declaration, he says,

19  "I met with Mr. Rogers.  We discussed the Austin case.

20  Mr. Rogers -- we talked about causation, we discussed the

21  case."

22          The Austin case is a G2 Express or G2X case, like

23  many of the cases in the MDL.

24          He also testified that when he worked for Bard he did

25  a product line review.  He had discussions with Bard about

1     filters.  He did an animal study.  He participated in a

2     preexisting animal study on two separate occasions.

3               Again, to participate in the study he had to have

4     access to test protocol, test requirements, test results, all

5     of that is conf- --

6               THE COURT:  Let me interrupt you for a minute.

7               Even if we assume he had all of that information, and

8     even if we know that he collaborated on the report, don't we

9     have to make an assumption that he shared the confidential

10    information with the others?

11              MS. HELM:  No, Your Honor, because they're an

12    entity --

13              THE COURT:  What's the proof he shared it?

14              MS. HELM:  We don't have to prove that he shared it.

15    We have to prove they had access to it.

16              THE COURT:  Well --

17              MS. HELM:  Under both tests the standard is

18    confidential information and -- I'm sorry.  Confidential

19    relationship and did you receive confidential information.

20              THE COURT:  Well, did you receive.  My point is what

21    is the proof that Vogelzang and Desai received confidential

22    information, other than the assumption that they learned it

23    during this collaborative effort?

24              MS. HELM:  I think -- Your Honor, I think you have to

25    make an assumption if you treat Vogelzang and Desai as

1    separate from Dr. Resnick but --

2           THE COURT:  I want to talk about the entity issue in

3    a minute.  I just want to focus on that first.

4           MS. HELM:  Okay.

5           You are correct that we don't have evidence showing

6    that Dr. Resnick shared confidential information directly with

7    Vogelzang and Desai.  What we have is that his hand was in

8    everything and that they -- I mean, other than one phone call,

9    if you look at the billing records, other than one phone call

10   there is nothing that Vogelzang or Desai did on the their own.

11          THE COURT:  Right.  I understand that.  But there's

12   still an assumption that that led to the sharing of

13   information, if I'm looking at Vogelzang and Desai

14   individually.

15          MS. HELM:  Yes, Your Honor.

16          THE COURT:  The Ninth Circuit handed down a decision

17   on this issue last week.  It's an unpublished decision, but it

18   adopts the *Hewlett Packard* test --

19          MS. HELM:  Yes, Your Honor.

20          THE COURT:  -- and says the information that

21   confidential information was shared has to be proven with

22   specific and unambiguous evidence.

23          And it seems to me if I focus on them as individuals,

24   there is no specific and unambiguous evidence that they ever

25   received Bard confidential information.  Do you agree with

1      that?

2              MS. HELM:  Your Honor, I think I have to agree with

3      that.

4              THE COURT:  On the entity issue, which I wanted to

5      talk to you about and where you were going a minute ago, I

6      read, I think, the three entity cases that you cited.  They

7      absolutely talk about an entity being disqualified, but I

8      didn't see in any one of them an analysis or discussion of why

9      that works or whether everybody in the entity is disqualified

10     and, if so, how that's consistent with this requirement that

11     the drastic remedy requires specific and unambiguous evidence.

12              My question is, are you aware of a case that's

13     wrestled with the question of how the entity doctrine applies

14     in this setting, and why it is that it would be fair to say

15     that everybody in the entity is disqualified?

16              MS. HELM:  Your Honor, the first part is other than

17     the cases we cited, I'm not aware of any other case.

18              The second part of your question is why does it make

19     sense to disqualify the entity for the acts of one doctor.

20     And I think in the facts of this case it doesn't make sense to

21     do any other.  To reach any other result.  And I think, again,

22     Dr. Vogelzang tells you that.  And in his deposition, and it's

23     page 28 and page 40, he says over and over again this was a

24     collaborative effort.  And you have a situation here where if

25     you let Dr. Vogelzang and Dr. Desai testify, the entity is

1     going to benefit from that.

2            Dr. Resnick, who everyone admits shouldn't have been

3     involved and apparently is no longer involved, is a one-fourth

4     owner in the entity.  The entity is who's billing, the entity

5     is who's set up to do the consulting work in this case.  So

6     you have a situation where you're going to let two people

7     testify but the entity benefit.

8            And I think in this situation, based on

9     Dr. Vogelzang's testimony "we did this together," based on the

10    evidence that is before the Court that it's clear "we did this

11    together," that you can't benefit part of the entity and you

12    have to treat them as a whole.  They acted as a whole.  They

13    collaborated.  They billed as whole.  They all worked on it

14    together.  And so the entity itself has to be disqualified.

15    Thank you.

16           THE COURT:  Okay.  Thanks.

17           Let's talk about the motions to exclude Parisian and

18    Kessler.

19           MR. ROTMAN:  There is nothing further we can add on

20    to the entity issue.

21           THE COURT:  I don't think you need to.  I think I

22    understand your position and what your arguments are on that.

23           I will tell you that what I don't need to hear

24    argument on are the number of cases that have disqualified

25    Dr. Parisian and why; we've read them all.  Or the number of

1    cases where she's been permitted; we've looked at those, too.

2            I don't need to hear argument about whether or not

3    narrative testimony is permissible or about whether experts

4    can venture outside of their area of expertise.  None of that

5    is controversial.

6            It seems to me with respect to Parisian there are

7    those general arguments and there's -- it's virtually

8    impossible for me to do line drawing now and say what would or

9    would not be a permissible description of the facts in an

10   answer or to try to enumerate all of the places in her

11   testimony or Kessler's testimony where they might be stepping

12   outside of the bounds of their expertise.  There's just too

13   many of them in the 547 pages of expert reports that the two

14   of them produced.

15           So what I'm going to end up doing on those issues is

16   some general statements.  I'll say that an expert can give an

17   opinion and can explain the factual, the medical, the

18   technical basis for the opinion.  Where that kind of an

19   explanation crosses the line between properly supporting an

20   opinion and venturing into a narrative about the facts or

21   gratuitous argument about the facts can only be determined at

22   trial in the middle of a question.  I'm not going to let

23   experts wander all over the map.  I'm not going to let them

24   give gratuitous narratives or comment on evidence or argue

25   evidence to the jury.  But they've got to be able to support

1    their opinions and explain to the jury why their opinions are

2    justified.

3            So it seems to me, given the fact that I'm going to

4    provide that general guidance and we're just going to have to

5    draw those lines at trial, with respect to Parisian there's an

6    argument defendants have made that she doesn't identify her

7    methodology.  I've read her methodology description in her

8    report.  I've read it in her deposition.  I understand the

9    argument.  That may be a point that folks want to address

10   further.

11           There is this argument with respect to both Parisian

12   and Kessler about what is or is not a legal conclusion.  I

13   might as well share with you some thoughts now so you can

14   address them -- you can come to the lectern -- when you make

15   the argument.

16           On the legal conclusion issue, there is some

17   unhelpful and unilluminating case law out there, including a

18   very recent case from the Ninth Circuit.

19           I'll tell you my view of legal conclusions.  If

20   you're going to have an FDA expert on the stand and the FDA

21   expert is going to be describing how the FDA works, how the

22   510(k) process works, whether or not Bard complied with it,

23   and I want to talk in a minute in response to questions about

24   whether that's relevant, but if an expert's going to do that,

25   the expert's going to be talking about legal issues.  All of

1    those procedures are set by regulations.  You can't talk about

2    procedures without talking about the law, the regulations,

3    that creates them.

4         And so it's going to be impossible for us to try this

5    case in a way, I think, unless we get the FDA out of it

6    entirely, which I don't think is going to work, without having

7    experts on the stand who are discussing concepts and standards

8    and procedures that are set by law, and are in the

9    regulations, and probably are opining on whether Bard did or

10   did not comply with certain of those.

11        Those are not improper legal opinions, in my view.

12   That's an expert in a regulated area giving opinions on a

13   regulated area.

14        Obviously the expert can't instruct the jury on the

15   standards that apply, but those will be state law standards.

16   In the Booker case they'll be the Georgia law standards for

17   the two claims that remain:  Design defect and failure to

18   warn.

19        I think it is impermissible for an expert to give an

20   ultimate opinion on a question of law that answers a liability

21   question for the jury.  But the Ninth Circuit has just held

22   that an expert can use the very language that's in the jury

23   instructions in an element of a claim in describing their

24   opinion and why it's met.  That's not inappropriate.

25        And I say all of that so you can help me understand

1    this area, but I'll tell you, I think that's another area

2    where we've just got to make calls at trial.  We can't say

3    none of it can happen, we can't say all of it can happen,

4    we're just going to have to make judgments as we go forward.

5         So with that monologue, let's hear your argument.

6         MR. ROGERS:  Thank you, Your Honor.  Jim Rogers on

7    behalf of C.R. Bard here to address Dr. Parisian and

8    Dr. Kessler.  And I'm assuming Your Honor would like for us to

9    do that all together; there's no reason to parse out those two

10   individual motions?

11        THE COURT:  I agree with you.  I agree.  And I do

12   have some real specific questions for both sides about their

13   opinions, about strategies in the case that will inform my

14   decision, but I want to make sure you first get to cover the

15   points you think are most important.

16        MR. ROGERS:  Thank you, Your Honor.  And it's very

17   helpful to have your framework of how you're viewing this

18   moving into the argument.  And I will take you up a little bit

19   to talk about the methodology for Dr. Parisian since you kind

20   of invited me to do so.

21        And, Your Honor, I'm sure you've probably seen in

22   both the case law and in Dr. Parisian's report where there are

23   these narrative portions of her -- both the report and then

24   the testimony that she gives which are long recitations of

25   various bits and pieces of documents and then kind of

1   concludes all of this in a very sort of Grisham-like fashion

2   to sort of weave a story of corporate malfeasance.

3          And, Your Honor, the things that sort of need to be

4   there as the glue to hold those opinions together just are

5   absent.  And Your Honor has probably noticed that in her

6   report she will often start with these general opinions and

7   sort of give a brief summary of what they are, and then below

8   each of those there's just sort of a string cite of federal

9   statutes from the FTCA and also from FDA regulations, and

10  there's really nothing that connects those things.  And that's

11  really the problem with the methodology, that it's really not

12  there --

13         THE COURT:  Let me interrupt you and have you address

14  something specific.

15         I agree that's an accurate description.  And somebody

16  ought to help Dr. Parisian learn how to write an expert

17  report.  I mean, the problem she has in this report is exactly

18  the problem judges have stumbled over again and again where

19  she'll announce an opinion, she'll have a one-paragraph

20  description that says nothing about legal standards, she'll

21  have a string cite of regulations and then 50 pages of factual

22  discussion.  It is very hard to figure out where she's coming

23  from.

24         However, if you read the 30 some odd pages at the

25  beginning of her opinion where she talks about the FDA process

1    as well as her qualifications where she says where she worked

2    in that process and she says in that description that what

3    these different divisions that review 510(k) proposals do is

4    review various categories of information, if you put that in

5    your mind and then you start reading her opinion and her

6    factual discussion, it makes more sense as to how she is

7    coming up with her opinion.  I think she's saying I'm doing

8    here what the FDA taught me to do in the 510(k) process and

9    here are all of the problems I see.

10           So the question is can I -- why can't I look to that

11   description of FDA procedures, her role in it, and then look

12   at her opinion, factual basis, and see if they mesh to close

13   the analytical gap?

14           MR. ROGERS:  Your Honor, I would certainly agree with

15   you, and we're certainly familiar with your opinion in the

16   *Placencia* case *versus I-Flow* where Dr. Parisian nor

17   Dr. Kessler was at issue but Peggy Pence was, who is a similar

18   type regulatory expert.  And Your Honor held that there was

19   certainly things about the FDA regulatory process that are

20   beyond the ken of your average juror, that it would be helpful

21   for them to hear about that process.  And I think that that is

22   correct, that it would be perfectly okay for regulatory

23   experts to talk about how these products come to market, what

24   they look at, what FDA evaluates.

25           But the disconnect that I see with what you're

1    talking about as setting up that as the framework and sort of

2    filtering the rest of the report through that framework is

3    that Dr. Parisian, the vast majority of what she addresses in

4    her report are not things that the FDA typically ever sees and

5    probably doesn't want.

6         I mean, she does not talk about FDA regulatory

7    filings.  Instead, Your Honor, it is a litany of internal

8    documents, e-mails, PowerPoints, deposition testimony, things

9    of that nature, that are not ever part of an FDA regulatory

10   record and that are not things that FDA would ever -- would

11   ever cross anybody's desk at the FDA.  And so it is sort of an

12   after the fact thematic presentation of the plaintiffs'

13   theories and themes in the litigation and how it all ties up.

14   And, really, Your Honor, what is, in effect, essentially it's

15   doing a attorney argument or closing argument in the middle of

16   trial.

17        THE COURT:  Well, let me -- let me ask you a question

18   based on that.  Absolutely an expert can't give a lawyer's

19   closing argument at trial, and if you read just some of those

20   narrative portions, it looks like that's what she's doing.

21        I have assumed, and I want to know if this assumption

22   is correct, that what Bard wants to do at trial, part of what

23   Bard wants to do, is help the jury understand that the device

24   in issue went through the FDA 510 clearance process, was

25   cleared by the FDA, the warning that was given was cleared by

1    the FDA, and that what Bard wants to assert to the jury

2    through that information is we did exactly what we're supposed

3    to do and a federal agency confirmed that we'd done what we're

4    supposed to do.

5          I'm assuming Bard wants to say that to the jury.

6          If that assumption is correct, it seems to me it's

7    entirely appropriate for the plaintiffs to then say to the

8    jury, no, they didn't do exactly what they're supposed to do

9    with the FDA, and here's why.  Here's the information they

10   should have told the FDA that they didn't tell the FDA.

11   Here's what should have been a warning on these issues that

12   they never raised with the FDA.

13         If Bard is going to use the FDA as part of its

14   defense, isn't it appropriate for the plaintiffs to say they

15   didn't comply with what the FDA requires?

16         MR. ROGERS:  Your Honor, I think they go much, much

17   further than that, and that kind of also dovetails into what

18   you said earlier about legal opinions.  And it's not just

19   here's this piece of information that I think FDA would have

20   liked to have known that FDA was not provided.  I mean it

21   moves into these legal determinations as to the violation of

22   regulations, the determination that products were adulterated

23   and misbranded and, Your Honor, I believe that moves into the

24   province of the fact finder and not the expert.

25         I mean those are legal determinations that should be

1  left up to the jury to determine if there is some sort of

2  violation or some sort of determination that a product should

3  be adulterated or misbranded.

4      THE COURT:  Will you have an expert at trial that

5  will say to the jury Bard complied with the FDA 510(k)

6  process?

7      MR. ROGERS:  We certainly have experts that walk

8  through the process and describe what the regulatory filings

9  were, how the process worked, and what the ultimate

10  determination was by the FDA.

11      THE COURT:  And will they give opinions that Bard

12  complied with what the FDA required?

13      MR. ROGERS:  Your Honor, there are probably things

14  like that that are in their reports right now, but, you know,

15  that's also -- they were prepared also in response to the

16  reports of Dr. Parisian and Dr. Kessler.  Obviously those

17  types of issues, our folks have to respond to.

18      But I don't think that it is necessarily appropriate

19  for anybody to really determine for the jury if there was

20  compliance or not compliance.

21      THE COURT:  Well, let me try give you a hypothetical.

22      Let's assume that the Bard expert testifies, perhaps

23  without stating an express opinion on compliance, that this is

24  what the 510(k) process is, these various steps, this is what

25  Bard did at each of those steps.  The result was the FDA

1    cleared this product.  The clear implication to the jury being

2    Bard complied with the FDA 510(k) process.

3           And let's say the plaintiffs then want to put an

4    expert on the stand to say at the time Bard engaged in this

5    step that the defense expert described, it knew a lot of

6    information about failure rates and harmed patients that it

7    did not disclose to the FDA, and under FDA requirements or

8    regulations it was required to disclose that information.

9           Is that objectionable for them to do those two

10   things?

11          MR. ROGERS:  I certainly think the latter part is,

12   Your Honor.  If you're talking about perhaps things that here

13   is a part of information that I as a regulatory expert believe

14   that the FDA would have liked to have known, I think that that

15   is much more on the side of acceptable methodology as far as a

16   legal opinion is concerned versus compliance or noncompliance

17   with the regulation.

18          THE COURT:  Let's assume the expert says that but

19   then says Bard was required to disclose these additional

20   failure rates under the regulation which reads as follows,

21   which is part of the 510(k) process.

22          Objection from the defense.

23          What's the basis upon which I sustain the objection?

24          MR. ROGERS:  That the -- the evidence that the jury's

25   about to hear states a legal conclusion and that that violates

1    the province of the fact finder as well as to whether or not

2    there was a violation.

3              THE COURT:  Are you suggesting that at trial I'm

4    going to be instructing the jury on all of the regulations

5    that apply in the 510(k) process, and I'm going to be telling

6    the jury you have to decide whether or not Bard complied with

7    the 52 pages of regulations that make up the 510(k) process?

8              MR. ROGERS:  Your Honor, I agree with you that that

9    would be unwieldy.  But recently, and I don't know if Your

10   Honor followed it but there was a another trial involving a

11   different defendant in Indiana --

12             THE COURT:  I didn't follow it.

13             MR. ROGERS:  -- in the Cook IVC filter MDL.  And,

14   Your Honor, in that case, as I understand it, Dr. Kessler

15   testified and he was allowed to talk about the regulatory

16   standards.

17             In other words, he was allowed to put up for the jury

18   here is the statute that says what "adulteration" is under the

19   regulatory scheme and here's the statute that says what

20   "misbranded" is under the regulatory scheme, but he was not

21   allowed to tell the jury in a conclusory opinion fashion that

22   this statute was violated by Cook and hence the products were

23   adulterated or misbranded.

24             THE COURT:  Well, okay.  Going back to my

25   hypothetical, would it be all right, then, for a plaintiffs

1    expert to say FDA regulations requires a 510(k) applicant to

2    provide the following three categories of information, and

3    here is information in those three categories that Bard had,

4    describe all three categories, that was not disclosed.  Is

5    that okay?  Never states at the end it's my opinion the

6    regulation's violated.

7              MR. ROGERS:  Understand, Your Honor.  I think that

8    falls into the much more acceptable category as opposed to

9    saying this was a violation of a regulatory standard.

10             THE COURT:  The quid pro quo for that would have to

11   be no Bard expert can say Bard did comply with the 510(k)

12   process.  Do you agree?

13             MR. ROGERS:  Absolutely, Your Honor.  I think we're

14   going to have to recognize the well-known and loved

15   goose-gander rule, that I don't think that either party is

16   going to be able to do something that the other party's not

17   going to be allowed to do.

18             THE COURT:  Well, obviously I'll hear from the

19   plaintiffs in a minute, but assuming that's where we draw the

20   line at trial, that experts can describe the legal standard

21   and describe the facts in each of those categories and let the

22   jury draw the conclusion as to whether the standard was or was

23   not violated, there certainly would seem to me to be ample

24   materials on that very approach in both the Kessler and

25   Parisian reports so that if they were to follow that approach,

1    they're not lacking on information with which to do that.

2              MR. ROGERS:  Your Honor, I would have to agree with

3    you in that regard.

4              THE COURT:  So isn't this really, then, a matter of

5    our deciding how FDA experts should testify on each side?

6              MR. ROGERS:  I think you're right.

7              THE COURT:  Let me ask you one other question.  And

8    this is going to be a question for the plaintiffs as much as

9    for you.

10             As I'm sure you know from that *Placencia* decision

11   that I issued, Arizona law, when it's addressing the standard

12   of care in a case, allows a jury to hear about federal law

13   requirements, federal regulations, to help establish the

14   standard of care.

15             I don't know what Georgia law says on that subject.

16   But if Georgia law, like Arizona law, says a jury can consider

17   federal legal standards in deciding what the standard of care

18   is, then do you agree that experts on each side should be able

19   to testify about what the federal legal standards or

20   requirements are under the FDA?

21             MR. ROGERS:  Your Honor, I don't know the answer in

22   Georgia, either.  I think you're certainly correct that -- you

23   know, as far as today is concerned, I think we're kind of

24   talking about these issues sort of globally, but when it gets

25   down to the case-by-case determination, obviously there's

1    going to be individual differences in state law that will

2    determine some of these issues that we'll have to address via

3    motions in limine or other lawyer argument down the road.

4         But to address your question, if there is a specific

5    state law that says that federal standards can be considered,

6    I think that obviously the jury's going to be allowed to hear

7    something about the federal standards.  And then it depends on

8    what that is that the jury actually gets to hear.

9         And, Your Honor, I believe in the *Placencia* case, I

10   mean, obviously you were dealing with it from an FDA

11   perspective, but the underlying case law that came from the

12   Ninth Circuit dealt with it from a OSHA perspective, is my

13   understanding of the reading of that case.  And, again, there

14   may be some differences.  Meaning that I think your opinion

15   relied on a Ninth Circuit opinion that dealt with the

16   admissibility of some OSHA standards.

17        THE COURT:  I can't remember.  I don't doubt you're

18   right.  What I do remember --

19        MR. ROGERS:  I wouldn't bet on it, Your Honor, my

20   memory's not that good.

21        THE COURT:  What I do remember, though, and I think

22   this is important for this case going forward, is specifically

23   to be looking at Arizona law and asking, since it was Arizona

24   law governing the claim, are federal legal standards relevant

25   in this state that that was a negligence claim, and the

1      Arizona case law said yes, they are, that goes to the standard

2      of care.

3              If Arizona law had said no, then I don't think any of

4      that FDA stuff could go to the standard of care.  Now, it

5      might still go to the defense issue we were talking about a

6      minute ago.

7              And, yeah, I don't remember the Ninth Circuit law I

8      was looking at.

9              Did you have other points you wanted to make?  And

10     I'm happy to hear your thoughts as well after I hear from

11     plaintiffs on this issue.

12             MR. ROGERS:  Your Honor, the only thing I will do

13     that might be helpful for the Court, I think Your Honor's

14     clearly got the legal issues perhaps not completely sorted out

15     in your own mind but I think you have really read what you

16     needed to read and I think you have arrived at sort of a

17     construct of the way you think this ought to look.  And, Your

18     Honor, what I will hand up, if it's okay, is a couple of

19     charts that we had prepared that really just sort of bucket by

20     bucket of the various legal arguments that we made by expert

21     that really identifies, using their reports, the specific

22     portions of their report that we believe fall into each of

23     those buckets.

24             THE COURT:  That's fine.

25             Mr. Rogers, did you have other points you wanted to

1   make besides those?

2          MR. ROGERS:  Your Honor, I really don't.  I think

3   Your Honor obviously realizes we're not plowing any new ground

4   here.  There's a lot of cases that you can find regarding both

5   of these experts that go each way and it's really a question

6   of trying to dial it in appropriately for this case, and I

7   think Your Honor's done that.

8          THE COURT:  Okay.  Thank you.

9          MR. ROGERS:  Thank you.

10          MR. ARBITBLIT:  Good afternoon, Your Honor.  May it

11   please the Court.  Don Arbitblit for plaintiffs.

12          I think I will not use the PowerPoint I had prepared

13   because most of it Your Honor covered in your preliminary

14   remarks.  I would like to respond to some of the colloquy that

15   just took place.  I'll start with the last point, which was

16   Mr. Rogers' assertion that you could find cases going both

17   ways on both of these experts.

18          I'm not aware of any case that's ever said

19   Dr. Kessler's excluded.  There have been cases in the past

20   that have excluded Dr. Parisian entirely, and Your Honor has

21   stated what the issues have been and some of the concerns that

22   you have.

23          However, in my research on Dr. Kessler, which I tried

24   to be as thorough as possible, I have seen occasional

25   opinions, such as Judge Goodwin in West Virginia and a recent

1    Indiana case, that have guided what he can and can't testify

2    to, in particular as to the issue you raised concerning what

3    is and is not a legal conclusion, as to which I agree there

4    are cases that are not particularly helpful.  But there's no

5    case out there I'm aware of where anyone has said Dr. Kessler

6    can't testify, and I think that is important for the Court to

7    understand.  Thank you.

8         On the particular issue of what is or is not a legal

9    conclusion, I do think that the *Placencia* case is relevant and

10   not only *Placencia* itself but the case Your Honor relied upon,

11   which is the *Wendland* case.  That's one of two that were cited

12   for the proposition --

13        THE COURT:  What's the court for that one?  Is that

14   Ninth Circuit or is that an Arizona --

15        MR. ARBITBLIT:  That is the Arizona case involving

16   failure to put up OSHA standard protection around the --

17        THE COURT:  That's the one that said federal law can

18   inform the standard of care?

19        MR. ARBITBLIT:  Yes, but it went beyond that, Your

20   Honor.  And specifically, the important part that went beyond

21   for our purposes today goes to another point that was

22   discussed a few minutes ago, and that was how far can the

23   expert go in testifying.  And what the court allowed in the

24   *Wendland* case was specifically that the expert testified that

25   the defendant, quote, did not comply with OSHA standards, end

1    quote.  That was permitted.

2         And I agree with Mr. Rogers' characterization of what

3    happened in the Indiana Cook filter case, which is that the

4    judge allowed Dr. Kessler to put up the regulations, say what

5    they meant as far as adulteration, meaning it's not what it

6    purports to be, misbranding, meaning it was misleading in some

7    particular relevance to the doctors and patients and to the

8    FDA, and to describe the conduct, but he wasn't allow to make

9    the connection and say I believe that this product was

10   misbranded or this product was adulterated or this product was

11   not substantially equivalent, which would be the counterpart

12   aspect for the 510(k) process of regulations.

13        I think that was a mistake in ruling.  I think that

14   if you look at other cases, such as the *Phillips* case, which

15   is a specific case involving Bard and Judge Jones in Nevada,

16   Judge Jones specifically said, and this is with Dr. Parisian

17   as the expert, "This Court" -- "The Court disagrees that

18   Dr. Parisian's conclusions that defendants violated this or

19   that regulation amount to legal conclusions on ultimate

20   issues.  Defendants are not charged in the present case with

21   violations of any regulations.  Their alleged violations of

22   regulations are merely relevant to whether they satisfied the

23   standard of care, and" --

24        THE COURT:  Let me interrupt you for just a minute.

25   I've read Judge Jones' decision, and I know him and I have a

1     high regard for him.

2          MR. ARBITBLIT:  Yes.

3          THE COURT:  But it seems to me this is an area where

4     when you're doing legal research you're just searching for

5     friends.  You can find a case that will support almost any

6     position when it comes to what is or is not a legal

7     conclusion.

8          What's the guiding principle?

9          MR. ARBITBLIT:  Fair enough, Your Honor.  I've been

10    trying to wrestle with that question myself.  I've even read a

11    couple law review articles on the subject.  One was from

12    Cleveland State law review.  Basically the author's position

13    was that Rule 704 had not gone far enough in clarifying that

14    the ultimate issues that are not inappropriate for testimony

15    should include legal conclusion so long as the expert is aware

16    what the Court will instruct and issues opinions that are in

17    conformity, in congruence with the Court's instructions.  As

18    long as -- if the expert's qualified and the opinion is

19    helpful to the jury, those would be the standards this

20    particular reviewer -- definitely would be a friend to the

21    plaintiffs, Your Honor, since we're looking for friends.

22          But the standard I think has been applied by several

23    courts that I think can draw the line is that the legal

24    conclusions have to do with the state law that applies to the

25    plaintiffs' claims.

1          In other words, in the Actos litigation where

2    Dr. Kessler testified to the violation of 201.57, had the duty

3    to warn, the court said that's not a legal conclusion because

4    the legal conclusion is whether the product was defective

5    under New York state tort law or whether the defendant was

6    negligent under New York state tort law.

7          I believe Judge Jones was saying pretty much the same

8    thing in the Nevada District Court case, and in particular

9    said that Dr. Parisian was permitted to testify to the FDA

10   regulations and whether defendants violated them.

11         That's also the case in the *Tillman v Bard* case in

12   the Middle District of Florida where the expert was permitted

13   to testify to his opinion as to whether Bard complied with all

14   regulatory requirements applicable to the G2 filter.

15         So the line that I've seen drawn that I think is

16   helpful, to the extent there can be some clarity, is that the

17   legal conclusions have to do with how the court instructs the

18   jury on the elements of a state law tort claim.

19         THE COURT:  I assume you agree that if a judge

20   allowed those kinds of opinions that -- well, you'd agree on

21   two things, I think.  One, it's got to be reciprocal.  Both

22   sides can have that opinion given.  So Bard can have their

23   experts say Bard did comply.

24         MR. ARBITBLIT:  Yes, Your Honor.

25         THE COURT:  But, secondly, it seems I would need to

1   instruct the jury that whether or not Bard did or did not

2   comply with an FDA regulation, or an expert's opinion on that,

3   should not control your verdict in this case; you may consider

4   it only in deciding whether or not Bard failed to warn within

5   the meaning of the Georgia state law explanation.  Or designed

6   defectively within the meaning.

7           I mean, there would have to be a careful limiting

8   instruction on that.  Don't you agree?

9           MR. ARBITBLIT:  I do agree, Your Honor, and I think

10   that that is consistent with the *Wendland* case that Your Honor

11   referred to in *Placencia* to the extent that the court there

12   said that the violation of the OSHA regulation as to which the

13   expert said you can testify that the defendant did not comply,

14   that was only evidence toward the legal standard and that the

15   defendant was permitted to put on its own case as to why that

16   was not a sufficient basis or the only evidence that the jury

17   could consider.

18           So, yes, I do think that that is an appropriate

19   limiting instruction as Your Honor has stated.

20           THE COURT:  Well, let me ask this question to both

21   sides:  It seems on this issue, and this is painting with a

22   broad brush, but we could either say experts can do what was

23   allowed in the Cook case, they can lay out the standard, they

24   can lay out the parallel facts, and let the jury line them up,

25   or they can add to that, "and I think it did comply" or "I

1   think it didn't comply," but then I instruct the jury very

2   carefully what to do with that opinion.

3          As between those alternatives, is that something on

4   which the parties could reach agreement as to which of those

5   approaches makes the most sense?

6          MR. ARBITBLIT:  I would be very doubtful about it,

7   Your Honor.  My guess is the plaintiffs would argue strongly

8   for having the experts be able to say that there was a

9   violation of applicable regulations.  And I think it goes --

10          THE COURT:  You say they would argue to it?

11          MR. ARBITBLIT:  The plaintiffs' experts would argue

12   for the position they be permitted.  The plaintiffs' lawyers

13   would argue for the position --

14          THE COURT:  I know what you're arguing for.  I

15   understand.

16          MR. ARBITBLIT:  The experts should be permitted to

17   say the regulations were violated because --

18          THE COURT:  With a limiting instruction.

19          MR. ARBITBLIT:  With a limiting instruction, but

20   specifically because of the laws saying -- the precedent

21   saying that compliance is part of that overall presentation

22   and because of the complexity of the entire area, which, as

23   Your Honor pointed out in the *Placencia* case, and many other

24   as well have, this is a very complicated area.

25          So to ask the jury to take the facts -- they've got

1    an 800 paragraph, 800-pound gorilla, of a declaration they

2    submitted to Your Honor for the preemption motion.  We've got

3    the 540 pages of expert reports.  It's not a simple matter to

4    just line up the facts with those regulations.

5                THE COURT:  Time limits are going to help on both of

6    those.

7                MR. ARBITBLIT:  It's on us to make the presentation

8    reasonable.  And I did want to mention that I actually looked

9    at the time at one of Dr. Kessler's direct examinations and it

10   was two hours including voir dire.

11               THE COURT:  Let me interrupt you for a minute because

12   Mr. Rogers has been standing to say something.

13               MR. ROGERS:  Your Honor, I stood up because you said

14   you were asking both sides.  And as I understand your

15   question, you were asking whether or not the parties could at

16   least potentially agree on a system by which both sides would

17   have an expert who would testify that here's what the standard

18   is, it was either violated or it was not, and that there be a

19   limiting instruction as to what that means.

20               THE COURT:  Right.

21               MR. ROGERS:  Your Honor, I think that's something we

22   can talk about.  I wouldn't just out of hand say it's not

23   possible that we would ever agree.  But I also think, Your

24   Honor, as we move closer and closer towards trial and there

25   are going to be probably additional rulings about the

1    regulatory world as it is going to be presented to the jury, I

2    think inevitably the parties are going to have to have

3    discussion about, you know, what the world is going to look

4    like as various issues start to sort out.

5              THE COURT:  I agree with that.  It will have to

6    happen.

7              And I am not going to try to decide on the basis of

8    today's argument which of these two approaches makes sense.  I

9    need to know more about the case if I'm going to be making

10   that decision.  I'll obviously make it before trial.  But I

11   would encourage you to think about that because, well --

12             MR. ARBITBLIT:  If I could make one more point, Your

13   Honor.  And it has to do with the argument made by defense

14   counsel having to do with information that would not -- that

15   the FDA would never normally see, and because it's not

16   required under the regulations.

17             There's -- there are a few specific areas where that

18   should be looked at in a different light, and that has to do

19   with something that happened in the Actos litigation that's in

20   the ruling that we provided to the Court, and that has to do

21   with an analogy -- an analogous internal assessment of adverse

22   events.  Analogous to what Bard had done here.

23             And having done that analysis Takeda, the defendant

24   in that case, found some things it didn't like, in particular

25   that there was a higher reporting rate of bladder cancer,

which was the alleged injury associated with that drug.

When they submitted to the FDA six months later a
summary of information about bladder cancer, they had done a
revised analysis that left out some of the important facts.
And so the FDA never knew that Takeda had analyzed the
information in a different way and found a statistically
significant increased reporting rate for bladder cancer.  So
that -- and their defense was, we didn't have to do it so
there's no reason why there should be a problem and
Dr. Kessler should not be allowed to testify to it.

The court disagreed and said that regardless of
whether they had to do it, they did it, and having done it,
they should have provided it.  And Dr. Kessler was permitted
to testify to that effect.

And same thing holds true with a number of things in
this case:  The statistical analysis of May 2004 showing
statistically significantly higher reporting rates of deaths
with the Recovery filter; the bench testing at the same time
that showed weaker migration resistence; and the internal
worrying about the fact you had those two contemporaneous
signals of a problem at the same time, the weaker migration on
bench testing supporting and mutually reinforcing the higher
reports of death, the bench testing in the G2 case showing
failure on the caudal migration in 2006.

Those are not required and they weren't required to

1    produce them.  But having done them, it's hard to think that

2    the FDA wouldn't have wanted to know or doctors and patients

3    wouldn't have wanted to have known about those results.

4              THE COURT:  Okay.

5              MR. ARBITBLIT:  Thank you.

6              THE COURT:  Let me ask you a couple of other

7    questions.

8              MR. ARBITBLIT:  Yes, Your Honor.

9              THE COURT:  I have long had a rule in trials that I

10   don't allow more than one expert on a subject.  There is a lot

11   of overlap between the Kessler and Parisian reports and

12   between some of the other reports I've seen so far.

13             I guess the question is, was that done out of

14   abundance of caution?  Or does either side think you should be

15   allowed in a trial to have two experts get on the stand and

16   express the same opinion?

17             MR. ARBITBLIT:  Certainly with the regulatory experts

18   I cannot imagine a situation in which both Dr. Kessler and

19   Dr. Parisian would be asked to testify.  I think the situation

20   with MDL's is multiple experts are useful for multiple trials

21   and you can't count on one to be present on all occasions.

22             I wouldn't want to speak too much on the other

23   experts that are not my bailiwick because they may have other

24   areas of expertise to address the same subject.  For example,

25   a radiologist or some other expertise might be talking about

1    the same thing from a slightly different perspective.  And

2    others my address that more properly than I.

3              THE COURT:  Do defendants have a disagreement -- any

4    disagreement on --

5              MR. ROGERS:  No, Your Honor.  We agree.  I don't

6    think we envision a scenario where you'll have two regulatory

7    experts testifying at one trial.

8              THE COURT:  Let me -- let me ask a couple specific

9    questions about Kessler that I was thinking about in trying to

10   start formulating my views on where lines should be drawn in

11   all of this.  I'll pick examples.  There are a number of

12   these.

13             But, for example, there are several different places

14   in his report where Dr. Kessler states the opinion that the

15   Recovery filter and the G2 filter should not or could not have

16   been legally marketed.  Why is that relevant in a case of

17   failure to worn and design defect?

18             MR. ARBITBLIT:  Well, it's relevant to at least

19   punitive damages because the conduct in keeping it on the

20   market for profit would be relevant at least to that extent.

21   Obviously, if it weren't on the market there wouldn't be any

22   reason to warn because no one could use it.  I don't know if

23   that's the point Your Honor was trying to make with that

24   question.

25             THE COURT:  Well, setting aside punitive damages, and

1    it's apparent to me there's much in here that may be argued to

2    go to punitive damages, whether or not a filter could or

3    should have been on the market, how does that help the jury

4    decide whether there was a failure to warn to cause the injury

5    or whether there was a design defect that caused the injury?

6        MR. ARBITBLIT:  Well, I think it goes back to the

7    argument about relevance of the regulation and its violation

8    to the standard of care.

9        In the case of legally marketed, the reason it can't

10   be legally marketed is because it's adulterated and that is

11   the consequence of adulteration.  Adulteration itself means

12   the item is not what it's purported to be or represented to

13   be.  So that the violation of that regulation is part and

14   parcel of the relevance to the standard of care that --

15       THE COURT:  How?  The standard of care, I assume,

16   will be on the failure to warn claim, Georgia law, which says,

17   if I remember it correctly from a Booker motion, I think it

18   says that if there's a significant increase in the risk, then

19   the manufacturer has a duty to make an adequate disclosure.

20   Something like that.

21       How does the fact that the product could or could not

22   have been on the market say anything about that standard of

23   care?

24       MR. ARBITBLIT:  Well, I do think that the violation

25   of the regulation in itself is relevant to the standard of

1    care.  I can see I haven't convinced you of that position.

2    But I would also add to that that in the case of the G2, the

3    fact -- and I imagine Your Honor's familiar with this position

4    either from these motions or previous motions, that the

5    plaintiffs' position is that if the Recovery could no longer

6    be legally marketed, then the G2 had no predicate to which it

7    could be called substantially equivalent and shouldn't have

8    been on the market either.  So there's a larger issue in the

9    case, especially since, as I understand it, G2 is in the

10   bellwether cases as well as the plaintiff population as a

11   whole.

12          THE COURT:  All right.  This will be a discussion

13   that will continue.  I'm not going to come to any final

14   conclusion, I'm just trying to understand positions.

15          I mean, it seems to me an opinion that it couldn't be

16   legally marketed, whether expressed in that term, may be

17   relevant to a defense that Bard is making that this was all

18   FDA cleared.  But I'm having trouble seeing how a number of

19   these things go to at least the claims in the Booker case.

20          Let me give you a second example.  I'm reading --

21   actually, I'm reading from your summary of his opinions, but

22   they're consistent with what I saw in his opinions.  And I

23   don't know that you need to look at it, but what it says at

24   the bottom of page 4 of your brief is Dr. Kessler will give

25   the opinion that Bard had an obligation to share the testing

1    information with patients and physicians.  And throughout his

2    report, Dr. Kessler says similar things, Bard had an

3    obligation.

4           When I hear that my question is, an obligation under

5    what law?  Is he saying he had an obligation because

6    reasonable interventional radiologists would want to know it?

7    And, if so, is he qualified to give that opinion?  Is he

8    saying Bard had a duty to disclose under Georgia law?  And

9    isn't that a legal opinion?  Is he somehow saying Bard had an

10   obligation under the FDA regulations to tell the physician and

11   patient something?

12          Can you help me with that?

13          MR. ARBITBLIT:  Okay.  There are a number of

14   responses.  I'll try not to forget any in my answer.

15          On the issue of federal regulations, it goes to

16   substantial equivalence and lack thereof.  If there are

17   problems with the Recovery vis-a-vis SNF or if there's

18   problems with the G2 vis-a-vis Recovery in the sense G2 had a

19   much higher rate of caudal migration than Recovery did, it

20   raises new questions of safety and efficacy, which means that

21   it violates the substantial equivalence requirement for

22   clearance of that product.

23          From the sense of an obligation, as opposed to a

24   duty, he's not going to testify as to a legal duty, but his

25   expertise is not limited to FDA regulatory matters.  He serves

1    on the board of private device and drug companies and advises

2    them on compliance issues and has been permitted to testify on

3    the standard of care generally.  Not simply as a matter of

4    regulatory law, but also as a matter of whether there was a

5    failure to warn under a state law standard.

6            So the -- these go to whether doctors and patients

7    would have wanted to know that there was a higher rate of

8    failure with the Recovery than SNF, whether there was a higher

9    rate of failure with the G2 than SNF or Recovery as far as

10   caudal migration.

11           THE COURT:  So when he says Bard had an obligation to

12   disclose this to doctors, what's the source of the obligation

13   he's talking about?

14           MR. ARBITBLIT:  I think the source is the standard of

15   care for a reasonably prudent manufacturer would be to

16   disclose to doctors and patients information that would be

17   relevant to their prescribing decisions.

18           THE COURT:  So your view is that he is qualified to

19   step out of the FDA box and give opinions about what medical

20   product manufacturers should and should not do as a matter of

21   standard of care?

22           MR. ARBITBLIT:  Yes, Your Honor.  He has done that in

23   the past and I believe that as a -- he is a physician.  He has

24   testified in his deposition to what he's read about the

25   subject.  He is not a radiologist, but there are -- there's an

1    interesting quote, I think it actually has to do with a

2    defense expert in the *Marina* case that the defense cited.  If

3    I may just take a look for that.  On the very question of

4    qualifications -- let's see if I can find it.  In the *Marina*

5    case, the plaintiffs challenge the qualifications of the

6    defense expert, Dr. Feigal, who is a defense expert in this

7    litigation, and the court said at 169 F.Supp. 3d 396 at 463,

8    Dr. Feigal is opining on the adequacy of the Marina label from

9    a regulatory perspective, a field in which he is qualified,

10   which means he does not need to have equally specialized

11   knowledge in a particular medical field.

12         I think that even though that was particularly about

13   the regulations, the take-home message from that is that if

14   your expertise is in the federal regulations and standard of

15   care and what doctors would want to know and you look at bunch

16   of information that says this product's not as good as what

17   you could have used, which is the issue in the Booker case,

18   that the doctor would have wanted to know, is there a safer

19   filter, and that's -- that's the kind -- that is what

20   Dr. Kessler's testimony would go to, in addition to

21   regulatory.  It would be what does the doctor want to know

22   when the company knows that it has information that the

23   product's not as good.

24         THE COURT:  Okay.  We probably could do this all

25   afternoon, but let me ask one more.

1          MR. ARBITBLIT:  I'm not sure I could, but I

2     appreciate the opportunity.

3          THE COURT:  It's got two parts to it.  He testifies

4     in a number of places in his report something Bard did was

5     misleading, he uses that word.  Misrepresentation/fraud claim

6     is out of this case for Booker.

7          And he also testifies in a number of places that Bard

8     engaged in off-label marketing.

9          If Ms. Booker's use was not off label, why is that

10    relevant?  Why is any testimony about what is or is not

11    misleading relevant?

12         MR. ARBITBLIT:  So, again, more than one answer.

13    I'll try not to take all afternoon.  On the question of

14    whether it's about the Booker case or globally, I use the

15    Booker case as an example, but as defense counsel said, we're

16    sort of here on global issues.  If there's no off-label

17    marketing happening in a particular plaintiff's case, whether

18    Booker or someone else, I don't think that he would testify to

19    off-label marketing, but I see Ramon thinking he might

20    disagree.

21         Again, Your Honor, I don't want to make that

22    representation if lead counsel's going to stand up and say we

23    think it's relevant because it goes to bad behavior.  It

24    might.  It might well go to bad behavior.

25         THE COURT:  Meaning punitive damages?

1          MR. ARBITBLIT:  Yes.

2          THE COURT:  Bad behavior is not a basis for proving a

3   claim.  It may be relevant on punitive damages.

4          MR. ARBITBLIT:  Fair enough.

5          Now, there was another aspect to your question?

6          THE COURT:  Misleading.

7          MR. ARBITBLIT:  Misleading is misbranding, which is a

8   violation of regulation.

9          THE COURT:  Why is that relevant?

10          MR. ARBITBLIT:  Again, it's relevant globally.

11          THE COURT:  Why is it relevant in Booker where there

12   is no misrepresentation claim remaining?

13          MR. LOPEZ:  Your Honor --

14          THE COURT:  Go ahead, Mr. Lopez.

15          MR. LOPEZ:  There's still exists a negligence claim.

16   I know we've been focusing on failure to warn and design

17   defect --

18          THE COURT:  Those are the only two claims left in

19   Booker; right?

20          MR. LOPEZ:  They didn't challenge our negligence

21   cause of auction, just negligence per se.

22          THE COURT:  Negligent what?  Negligent design defect,

23   negligent failure to warn.  I think those are the only --

24          MR. LOPEZ:  I think we have a general negligence

25   cause of action.

1          THE COURT:  My order doesn't -- it identifies what's

2    left in the case at the end, and it doesn't mention any sort

3    of general negligence.

4          MR. LOPEZ:  But they didn't challenge general

5    negligence in the their motion for summary judgment.  I

6    don't -- I'm going to have to check the record, but I'm fairly

7    certain their master complaint --

8          THE COURT:  Let's assume --

9          MR. LOPEZ:  -- includes general negligence --

10         THE COURT:  Let's assume there is a negligence claim.

11   Negligent what?

12         MR. LOPEZ:  Negligent conduct.  That could embrace a

13   whole host of things with respect to what a reasonable

14   manufacturer would do under the same or similar circumstance.

15         THE COURT:  Well, if you're going to have Dr. Kessler

16   as part of a negligence claim, if it exists in the case, opine

17   that what Bard did in a particular instance was misleading,

18   aren't you going to have to prove that misleading statement

19   caused Mrs. Booker's doctor to implant the device?  And isn't

20   that exactly why I knocked out the misleading claim in Booker,

21   because you couldn't prove that he relied on anything for

22   purposes of a misrepresentation or misleading claim?

23         MR. LOPEZ:  Well, I think you knocked out the

24   misrepresentation cause of action.  There's misleading -- it

25   could be negligent.  If something is misleading, then it's --

1    it's conduct that we believe, under the negligence cause of

2    action, is what a reasonably prudent manufacturer would not

3    do.

4           For example, if they're going to write a label --

5    there is a federal regulation that says you're not supposed to

6    be misleading when you --

7           THE COURT:  Let's assume --

8           MR. LOPEZ:  -- in Dr. Kessler's report.

9           THE COURT:  I'm not making my question clear.

10          Even if we assume for a minute I allowed him to say

11   it was misleading, wouldn't you have to prove for the

12   causation part of negligence that that misleading statement

13   caused Mrs. Booker's doctor to put the filter in her?

14          MR. LOPEZ:  Well, we have to relate it to causation.

15   I think we can.  I'm not sure I'm prepared to try that part or

16   argue that part of the case right now --

17          THE COURT:  Again, we don't need to debate this

18   further --

19          MR. LOPEZ:  It goes to the label.  It really does

20   relate to what's in the label, whether or not the label was

21   misleading, whether or not the information the doctor had in

22   the label was misleading with respect to the true risks and

23   the effectiveness of the device.  That's a negligence cause of

24   action.

25          THE COURT:  Okay.  I don't -- I don't want to spend

1     more time on this.  I know we could talk about it at length.

2     I don't know whether there's a negligence claim left.  I

3     didn't think there was --

4              MR. LOPEZ:  I know they didn't challenge it.

5              THE COURT:  I guess you can tell from this line of

6     questioning that when we get to trial relevancy is something I

7     believe in.  And either side, if you're going to be putting in

8     evidence, I'm going to want to know how it is relevant to a

9     claim you are proving in the case or defense you are

10    asserting, rather than something atmospheric that I'm seeing

11    in these expert reports.

12             MR. LOPEZ:  We understand that completely, Your

13    Honor.

14             MR. ARBITBLIT:  Thank you, Your Honor.

15             THE COURT:  Did I cut you off?

16             MR. ARBITBLIT:  I was going to ask, at the risk of

17    extending my appearance, whether omission has been also ruled

18    out by Your Honor's ruling.

19             THE COURT:  Failure to warn is an omission, in my

20    view.  You omitted saying something.  In that respect --

21             MR. ARBITBLIT:  That goes back to what Dr. Kessler's

22    report is about on certain things being misleading because

23    they omitted to state important facts in addition to what was

24    stated.

25             THE COURT:  I understand that point.

```
 1              MR. ARBITBLIT:  Thank you, Your Honor.
 2              THE COURT:  All right.  We've been talking a lot
 3     about all these issues.  I don't know if the defendants want
 4     to say anything on these things.
 5              MR. ROGERS:  Your Honor, I get the strong sense you
 6     probably heard all you want to hear on those issues.
 7              THE COURT:  This has been more for my education in
 8     the last 20 minutes.
 9              MR. ROGERS:  Right.
10              MR. COMBS:  Your Honor, I wanted to address
11     Dr. Parisian you talked about with Mr. Rogers.
12              THE COURT:  What are you going to say?  You're not
13     going to stand up and say we should allow liberal narrative
14     testimony from Dr. Parisian, are you?
15              MR. COMBS:  If you want to hear what I have to say
16     I'm happy to say it.
17              THE COURT:  I thought I understood the point, but go
18     ahead.
19              MR. COMBS:  Couple quick points, Your Honor.  Number
20     one, I think the Court's characterization of her report is a
21     little unfair.  I know there is a format to it of citing --
22     giving an opinion, listing some regulations and getting into
23     the narrative, but I went through it and flagged, green
24     flagged, all the other times in the body of the report where
25     she cites a regulation.  "Bard was required to," and then
```

1    cites a regulation.  So I think her methodology in her report

2    is fine.  To say this isn't enough gets into the defense

3    writing our reports for us.  I think that's going a little too

4    far.

5            But in the big picture, Your Honor –– I'm sorry.

6    Lincoln Combs for the plaintiffs, if I didn't say that at the

7    beginning.  I know we're short of time and trying to do this a

8    little informally.

9            Dr. Parisian's opinions and her testimony is not a

10   secret in this case.  In this litigation.  You know she was

11   admitted in *Phillips*, she testified, and it was fine.  We're

12   happy to submit the transcript if you want to review it.  I

13   think I counted 22 or 25 objections in about 140 pages of

14   testimony.  Some of them were sustained, some of them were

15   overruled.

16           So she comes in and testifies and they're free to

17   make objections.  And I know Your Honor generally has a

18   preference going by your past *Daubert* rulings and motion in

19   limine rulings for reviewing it as it comes in in trial.  And

20   that was the case in *Placencia* with Dr. Pence, who's a very

21   similar expert to Dr. Parisian.

22           So I think a lot of this is premature in the big

23   picture.  Bard is well positioned.  Mr. North cross-examined

24   her and objected at trial and it came in and it was fine.

25   There wasn't just an overwhelming abundance of objections.  It

1    was normal testimony.  And certainly we can now, with the

2    benefit of that transcript in Judge Jones' rulings on her

3    testimony as it came in, as well as guidance from the Court,

4    I'm sure we can have her testimony come in properly without

5    being narrative or anything like that regardless what's in her

6    report, which is not a legal brief or evidence.

7            THE COURT:  All right.  Thank you.

8            Let's talk for a minute, and then do a break for the

9    benefit of the court reporter, just about some of those issues

10   I put at the end before we talk about the final motion.

11           I'd like to talk to you about what we're doing from

12   here on out in terms of expert motions.  And here are my

13   thoughts on that:  In January we have a hearing.

14   January 19th.  My intention would be to hear the motions on

15   Muehrcke, M-U-E-H-R-C-K-E, Hurst, H-U-R-S-T, Eisenberg,

16   Betensky, and McMeeking.  M-c-M-E-E-K-I-N-G.  Those five

17   motions.

18           You've already indicated you don't think we need oral

19   argument on Morris, Grassi, the Garcia and Streiff opinion,

20   and on the criminal law standard.  And so that would leave

21   only one other motion, which would be the Ritchie motion.

22           I don't know if we can be ready to hear six motions

23   by January 19th or not.  It depends what happens with a trial

24   I've got the two weeks before that.

25           And then we would just rule on the motions submitted

1    without oral argument as we can get to them.  I suspect we'll

2    get better at it and move more quickly as we get through the

3    *Daubert* motions.

4           Is there any concern about that schedule, taking up

5    those motions January 19?  We'll just have to find a place to

6    do Ritchie when we can.  Any thoughts on all of that?

7           MR. NORTH:  No, Your Honor.  That sounds fine.  And

8    we will go back and take a look at Ritchie one more time and

9    see if that perhaps could be submitted without argument.

10          THE COURT:  Ritchie or one of the other five I just

11   mentioned for January 19.

12          MR. NORTH:  Okay.

13          THE COURT:  Any thoughts from plaintiffs on that?

14          MR. LOPEZ:  Plaintiff will be prepared with whatever

15   the Court ends up having on that day.

16          THE COURT:  Okay.

17          In terms of timing, when we set these trials, the

18   ones in March and May, I set three weeks, that was your

19   thought about what it would take.  I have a small conflict the

20   first week in March.  We're set to begin on March 13th and I

21   have to be in Washington, D.C. on March 13th at the meeting of

22   the Judicial Conference of the United States, which is the

23   governing body for the federal courts.  I'll get back that

24   night.  So we could start on the 14th and miss a day, which

25   would be my intention.  If we could miss two days, there's

1    other meetings on the 14th that I don't have to be at but it

2    would be helpful.  Which means we'd start on the 15th.

3           I guess my question to you is if we do three weeks of

4    trial four days week, that's 12 days of trial total.  As I

5    mentioned before, I do five and a half hours of trial time a

6    day.

7           Can we lose a day or two at the beginning or is that

8    going to create problems?  I'll tell you at the end I have no

9    availability.  The week after we end trial I'm out of town all

10   week in rules committee meetings.

11          MR. LOPEZ:  I missed that, Your Honor, that last

12   thing that you just said.

13          THE COURT:  I have no flexibility to push it into

14   April.  The first week of April I've got meetings out of town

15   all week.  So we've got to do it in March.  Which means if we

16   start on the 14th or 15th we're compressing the time.

17          MR. LOPEZ:  I don't want -- I don't have a calendar.

18   Is there a day beyond that last day you have that's still

19   March?  I don't know.

20          THE COURT:  No.  Trial would end on Friday,

21   March 30th, and I'm out of town on Monday, April 2nd.  So

22   there's -- we've got to get the case concluded by Friday,

23   March 30th.

24          MR. LOPEZ:  Mr. O'Connor's going "we can do it, we

25   can do it."  I think we can live with that, Your Honor.  I'd

 1    rather keep that and discipline ourselves to squeeze it in to

 2    one less day.

 3              MR. NORTH:  Certainly, Your Honor, I think as long as

 4    the time, of course, is split evenly, which I know it will be,

 5    we'll be fine.

 6              MR. LOPEZ:  We may get a couple more hours; we get

 7    rebuttal.

 8              THE COURT:  Okay.  So we'll start the trial on

 9    March 14th.  I'll come back on the evening of the 13th,

10    American Airlines willing.

11              On the hours point, as I think I might have mentioned

12    to you before, I allocate hours and I keep track of them.  I

13    tell you at noon each day and end of the day how much time

14    you've used so you can budget your time.

15              Typically when I divide time between plaintiffs and

16    defendants, because plaintiffs have the burden of proof I give

17    plaintiffs a couple more hours than I give defendants.  So

18    that would be my intent, to take these remaining days and

19    allocate it in that way.  Are there any concerns about that?

20              MR. LOPEZ:  No, Your Honor.

21              MR. NORTH:  None, Your Honor.

22              THE COURT:  You mentioned in your joint report a jury

23    questionnaire.

24              MR. O'CONNOR:  We filed those this morning.  I have

25    copies for you, Your Honor.  We have a joint set we agreed to

```
 1    and then we filed a separate set where we couldn't reach

 2    agreement on part of the plaintiffs.

 3              THE COURT:  That's been filed?

 4              MR. O'CONNOR:  Yes.  I have copies for you, if you

 5    like.

 6              THE COURT:  Okay.  You can leave them with Traci.

 7    I'll look at those next week.  We have to decide if we're

 8    going to do it.  If we're going to do it we've got to get it

 9    out mid-January, I think, Traci?  So it's not something I can

10    sit on very long.

11              THE COURTROOM DEPUTY:  Yes.

12              THE COURT:  I will look at it.  If I think we need to

13    talk over whether or not we ought to do it I'll get you on the

14    phone so we can get it decided in time to get it out if we're

15    going to use it.

16              MR. NORTH:  Your Honor, we sort of resolved most of

17    this last night as far as how we were going to submit it and

18    we haven't had the time to prepare formal objections to the

19    questions we couldn't agree upon.  If the Court needs us to we

20    can.  If not, we're fine.

21              THE COURT:  You don't need to.

22              MR. NORTH:  Thank you.

23              THE COURT:  In a three-week trial I would sit an

24    eight or nine person jury so we can lose two or three and

25    still have enough for verdict at the end.  If the flu season
```

1    continues to progress as it has, I'll probably seat nine.  Is

2    there any concern about that?  And the reason I ask that is

3    that will influence my thought on jury questionnaires and how

4    long it will take us to pick a jury.

5            MR. LOPEZ:  We're okay with that, Your Honor.

6            MR. NORTH:  Certainly, Your Honor.

7            THE COURTROOM DEPUTY:  There's nothing on the docket

8    about jury questionnaires.

9            THE COURT:  There's been no jury questionnaire put on

10   the docket yet, so you might want to make sure it got filed.

11           MR. LOPEZ:  Not to take back what I said earlier

12   about the time, but might there be times in that three weeks

13   if we needed -- maybe I should ask this outside of the

14   presence of your staff, but where if we needed an extra hour

15   we can start early, end maybe an hour early.

16           THE COURT:  Yeah, I'll try to be flexible.  The

17   limiting factor, in addition to our physical energy, is all

18   the other cases that we've got.  And when I'm in trial I tend

19   to schedule hearings starting at 4:00 and 4:30 at the end of

20   the trial day because I've got to do hearings during those

21   weeks.  But, yeah, I'll try to be flexible.  If we need to

22   start a little earlier some days, like 8:30, we can work with

23   that.

24           THE COURTROOM DEPUTY:  We found the questionnaires.

25           THE COURT:  Okay.  We found the questionnaires.

1    They're on the docket.

2           All right.  Let's take a break for the benefit of

3    Tricia and then come back and talk about the motion to exclude

4    Kinney, Roberts, and Kalva, and the motion to certify the

5    preemption ruling, and any other matters you want to take up.

6    We'll come back at quarter after 3:00.

7           (Recess taken from 3:02 to 3:15.)

8           THE COURT:  Defense counsel -- plaintiffs' counsel, I

9    forgot to ask this during the earlier discussions, but it's a

10   matter I'm curious about.  In the joint report for today's

11   hearing, you indicate that you want to file a motion under the

12   *Cisson* case, C-I-S-S-O-N, which I infer would be a motion

13   saying I should preclude Bard from talking about the FDA?

14          MS. REED ZAIC:  Yes, Your Honor.  Well, two aspects

15   of it, Your Honor.  The 510(k) clearance process and any

16   evidence suggesting any lack of follow up or enforcement by

17   the FDA.

18          THE COURT:  And if I were to grant that motion would

19   Dr. Kessler and Dr. Parisian become irrelevant?

20          MS. REED ZAIC:  Unfortunately, because of flights, my

21   two colleagues that could probably better answer that are no

22   longer here, so I'm not prepared to say they're not completely

23   relevant, but obviously relevance with regard to FDA would be

24   limited.

25          THE COURT:  If I granted that motion, I'm assuming

1   the plaintiffs would be agreeable that you don't mention the

2   FDA warning letter.

3          MS. REED ZAIC:  I believe, Your Honor, I believe so.

4   With regard to follow up and enforcement it would seem to come

5   under that, but I would have to give that some more thought.

6          THE COURT:  I assume you don't put Kay Fuller on the

7   stand to talk about her concerns with FDA compliance?

8          MS. REED ZAIC:  Again, I'm not prepared to give an

9   absolute on that, but any premarket activity would seem less

10  relevant, Your Honor, absolutely.

11         THE COURT:  And why is it you think we should be

12  filing or hearing that motion now?

13         MS. REED ZAIC:  I believe that it would be more

14  efficient for the parties to have that ruling now, Your Honor,

15  because with regard to preparing deposition cuts and things

16  like that, pretrial preparations, we would have a better sense

17  of the scope of the evidence and order of proof.

18         THE COURT:  Okay.

19         MS. REED ZAIC:  Gives us more time, Your Honor.  And,

20  again, I believe in the joint statement we included the

21  plaintiffs would be ready to file that relatively immediately,

22  and the only request, which I believe was a joint request, is

23  some additional pages, which I believe the plaintiffs could

24  make that motion, and I know Your Honor prefers three pages, I

25  think we can probably do it in eight.

1        THE COURT:  Okay.  Mr. North, you were going to say

2   something on this?

3        MR. NORTH:  No, Your Honor, I don't think so.

4        THE COURT:  Do you agree getting that issue decided

5   sooner rather than later would be a good idea?

6        MR. NORTH:  It might make our jobs a little bit

7   easier when it comes to deposition cuts and things of that

8   nature, but I worry about trying to expedite a motion with

9   everything else on the Court's plate.  I think that's your

10  choice because it is a meaty motion and there are obviously

11  about ten more *Daubert* motions to be decided at this point.

12        THE COURT:  Okay.  Let's talk about the motion to

13  exclude Kinney, Roberts, and Kalva.

14        MR. NORTH:  Your Honor, my colleague, Matt Brown, is

15  going to address this motion.

16        MR. BROWN:  Thank you, Your Honor.

17        Given what you've said previously about some issues

18  that you've already thought about, I was going to limit the

19  motion to just a couple of issues that I think may be helpful

20  for the Court.

21        THE COURT:  Okay.

22        MR. BROWN:  The first being Dr. Kinney, Roberts, and

23  Kalva's reliance on the reports of Drs. Kessler, Betensky, and

24  McMeeking, which we think should be excluded under two

25  independent grounds, the first under Rule 703 and the second

 1   under Rule 702.

 2         Taking Rule 703 first and reliance on these

 3   litigation consultants' opinions, Dr. Kessler, Betensky, and

 4   McMeeking, whose opinions were formed solely for purposes of

 5   this litigation, under Rule 703 it's the plaintiffs' burden to

 6   be able to prove that experts other than Drs. Kinney, Roberts,

 7   and Kalva would rely and act upon those litigation

 8   consultants' opinions for matters other than litigation.

 9         THE COURT:  Let me -- let me ask you a question on

10   that.

11         If I look at the language of Rule 703, the first

12   sentence says, "An expert may base an opinion on facts or data

13   in the case that the expert has been made aware of or

14   personally observed," period.

15         That would seem to include a report from Dr. Kessler

16   discussing facts in the case.

17         The part you're relying upon says if experts in a

18   particular field would reasonably rely on those kinds of facts

19   or data in forming an opinion on the subject, they need not be

20   admissible for the opinion to be admitted.

21         It seems to me the requirement that facts be the kind

22   that an expert relies upon in a particular field only applies

23   if they're inadmissible.  Do you agree with that?

24         MR. BROWN:  I don't agree with that, Your Honor.  And

25   looking at Judge Weinstein's treatise on this rule --

1    THE COURT:  I've read his treatise.  He doesn't

2    address this issue.

3    MR. BROWN:  We do identify it in our -- I believe

4    it's the reply brief.  But it's Judge Weinstein's treatise, he

5    writes, quote, Rule 703 is concerned with the trustworthiness

6    of the resulting opinions.  The proponent of the expert must

7    establish that experts other than the proposed witness would

8    act upon the information relied upon and would do so for

9    purposes other than testifying in a lawsuit.  And that's

10   really the heart of the issue.

11   And in addition, Your Honor, the Central District of

12   California addressed this issue in In Re Imperial Credit

13   Industries Securities Litigation in 2003, and in that case

14   there was the accountant who was needing to provide a residual

15   evaluation opinion for a securities case and he relied upon an

16   expert's report filed in another case related to a residual

17   evaluation --

18   THE COURT:  I read that case.  That seems to me to be

19   a different problem because what he -- the accountant was

20   taking the valuation that another expert gave and using it as

21   the valuation in this case and the court said you can't do

22   that, you didn't form that valuation opinion.

23   MR. BROWN:  Yes.  That goes to the other issue, which

24   is under Rule 702.  But specifically Central District of

25   California excluded that opinion under Rule 703 because it was

1    an expert -- an expert opinion formed for litigation and that

2    is something that's not appropriate to rely upon under

3    Rule 703.

4        And that's the same issue here, which is that

5    Drs. Kessler, Betensky, and McMeeking formed their opinions

6    specifically for litigation and interventional radiologists

7    would not be relying on that type of information generally in

8    their private practices and there's been no evidence in the

9    record to suggest otherwise.

10       The plaintiffs cite several portions of Dr. Kinney's

11   deposition in their response.  That doesn't bear on the issue.

12   And then they make an unsupported assertion of counsel that

13   interventional radiologists would have welcomed this

14   additional information, which we don't think is sufficient

15   under Rule 703.

16       THE COURT:  Well, doesn't this happen all the time in

17   cases?  For example, I had a case where a tire defect expert

18   opined that the tire was improperly designed, was defective

19   and dangerous, and then I had a separate industry standard

20   expert who said assuming it's defective, I will assume it's

21   defective as the first expert said and, if so, there should

22   have been disclosures.  Are you saying that second expert

23   couldn't rely upon the first expert to establish the defect

24   for purposes of his opinion?

25       MR. BROWN:  I think that that's an issue the parties

1    could raise, certainly, whether an opinion that's formed

2    specifically for litigation is something that can be relied

3    upon.

4              Now, if that second expert is relying on the first

5    expert's opinion-considered material other than that initial

6    expert's opinion in forming his opinion, then that may be

7    something that the expert could do under Rule 702, which is

8    what we get to next with Drs. Kinney, Roberts, and Kalva.

9              Under Rule 702 we think that Drs. Kessler, Betensky,

10   and McMeeking should not be able to have their reports relied

11   upon by Dr. Kinney, Roberts, and Kalva because under multiple

12   decisions within the Ninth Circuit and Central District of

13   California the discussions about an expert relying upon

14   opinions of others if other evidence supports the opinion and

15   the record demonstrates that the expert undertook an

16   independent evaluation of that evidence.  And the record here

17   suggests strongly that there was no independent evaluation of

18   the evidence that Drs. Kinney, Roberts, and Kalva performed.

19             THE COURT:  Let me interrupt you one more time.  What

20   I have understood those cases to mean is that the second

21   expert cannot testify to the opinion of the first expert as

22   though it's the second expert's opinion unless the second

23   expert did the work necessary to form the opinion.  For a

24   whole host of reasons.

25             Is that what you think Kinney, Kalva, and Roberts are

1    doing here?

2          MR. BROWN:  That's exactly what we think they're

3    doing and the record, I think, supports our thoughts on that

4    process.  Dr. Kinney testified repeatedly at his deposition

5    the primary source that he used to write the first 110 pages

6    or so of the Rule 26 report was Dr. Kal- -- Dr. Kessler's

7    report, rather, and that --

8          THE COURT:  Was he saying "I looked to Dr. Kessler's

9    report to develop the factual basis upon which I now state my

10   interventional radiologist opinion?"  Or was he saying

11   "Dr. Kinney opined to Proposition A and I'm opining to

12   Proposition A"?

13         MR. BROWN:  It's a mixture of both, Your Honor.

14   There are large portions of the reports of Drs. Kinney,

15   Roberts, and Kalva that are copied and pasted from the report

16   of Dr. Kessler.

17         For example, beginning portions of the Rule 26

18   report, Dr. Kinney writes that Dr. Kessler said so-and-so and

19   provides a long block quotation and says we fully endorse that

20   opinion.  Similarly -- and they go on and make similar long

21   block quotes of Dr. Kessler, Betensky, and McMeekings reports.

22         THE COURT:  If we were in trial and Dr. Kinney was

23   attempting to do that on the stand and said "Let me describe

24   to you jurors now the ten paragraphs Dr. Kinney wrote on this

25   subject" and started reciting, I'd sustain that objection in a

1    hot second because he can't be the mouthpiece for Dr. Kessler.

2           I can understand why they might do it in a report, so

3    that they're disclosing to you what he took into account in

4    forming his separate opinions.  Clearly he couldn't do it at

5    trial.

6           If that's a correct statement of the law, then is

7    there a basis for excluding what Kinney could testify from his

8    own expertise?

9           MR. BROWN:  I think so, Your Honor, because the issue

10   is does Dr. Kinney have the baseline level of information that

11   he evaluated in forming his opinions as expressed in the

12   Rule 26 report that he arrived at independently after his

13   independent evaluation, and the answer to that is no.  All he

14   did was review the reports of Dr. Kessler, largely, followed

15   by Dr. Betensky and Dr. McMeeking.

16          The Facts and Data Considered list of their Rule 26

17   reports list only 42 internal Bard documents and all but two

18   of those documents are also identified in other experts

19   reports, principally Dr. Kessler's report.  Dr. Kinney also

20   testified in his deposition that he didn't even read all 42 of

21   those internal Bard documents because he relied so heavily on

22   Dr. Kessler's report and that material was provided to him as,

23   quote/unquote, backup material.  We think that is what the key

24   issue is.  Drs. Kinney, Roberts, and Kalva also identify a

25   number of depositions they reviewed but, again, Dr. Kinney

1    said that material was backup material and there's not been

2    any type of showing by the plaintiffs in the response brief as

3    to how that deposition material independently supports the

4    opinions that Drs. Kinney, Roberts, and Kalva arrive at as

5    identified in their Rule 26 report.

6         Turning now to the second issue which I think may be

7    helpful for the Court is this issue of informed consent and

8    what a reasonable physician would want, how a reasonable

9    physician would think, and how a reasonable physician would

10   act and we think those opinions should be excluded under

11   Rule 702 because they're not based on any objective standards

12   but, rather, their just the ipse dixit of Drs. Kinney,

13   Roberts, and Kalva.

14        This presents a classic joiner issue for the Court

15   and something that the Ninth Circuit has addressed in the

16   post-*Daubert* remand where they wrote, quote, We've been

17   presented only with the experts' qualifications, their

18   conclusions, and their assurances of reliability.  And under

19   *Daubert*, that's not enough.  But this is exactly what Drs.

20   Kinney, Roberts, and Kalva are purporting to offer the Court

21   and the jury with regard to what a reasonable physician would

22   think, how a reasonable physician would act, if provided

23   additional information from Bard.

24        This fails every *Daubert* factor that we have.

25   There's no methodology that they've identified to arrive at

1   those opinions, there's no scientific principle to support

2   their opinions, other than informed consent, which I'll get to

3   in a moment.  The opinions haven't been tested, there's no

4   known rate of error, they haven't been peer reviewed, there is

5   nothing to suggest the opinions they provide are generally

6   accepted in the community of interventional radiologists.

7          What they do is point to an informed consent document

8   entitled ACR SIR Practice Parameter on Informed Consent for

9   Image Guided Procedures, which we attached as Exhibit D to the

10  reply brief as their, quote/unquote, scientific principle to

11  get over the 702 hurdle.  We think this is a red herring for

12  several reasons.  First is that informed consent is strictly a

13  medical malpractice concept.  It's a different issue, there's

14  a different legal test than what constitutes a duty in a

15  failure to warn case, which is what's left in Ms. Booker's

16  case, for example.

17         In the plaintiffs' response brief, they go on at

18  length about the informed consent process and the informed

19  consent doctrine and why it's important.  But notably absent

20  from that lengthy discussion is a single case that discusses

21  informed consent in the context of a product liability failure

22  to warn case.

23         Secondly, if you look at the guidance documents

24  Drs. Kinney, Roberts, and Kalva cite, it's a guidance document

25  that talks about the informed consent process, not the

1   informed consent content.  And it's an important distinction

2   because the language of the guidance document itself as it

3   pertains to risks says physicians should inform patients

4   about, quote, the risks, complications, and expected benefits

5   or effects of such procedures or treatment, close quote.

6          But there's nothing in that guidance document that

7   speaks to what is sufficient to satisfy that informed consent

8   process.

9          For example, does a risk of 0.1 percent need to be

10  disclosed to a patient?  What about 5 percent?  Or 10 percent?

11  The guidance document simply doesn't say, and so Drs. Kinney,

12  Roberts, and Kalva are using this process related informed

13  consent document as a vehicle to put their personal opinions

14  about what is sufficient to arrive at an informed consent

15  process before the jury.  We think that that is not

16  appropriate because it's not based on any type of objective

17  standard.  They're simply saying, well, this is what we think

18  having looked at this document and looked at the material that

19  we've been -- received from Bard.

20         And finally, you alluded to this at the beginning of

21  today about the long string cite that we provide in the motion

22  as relates to the informed consent doctrine.  The three most

23  important decisions there are the Rezulin case from 2004 from

24  the Southern District of New York and the two in re diet drug

25  MDL decisions from the Eastern District of Pennsylvania from

1    the early 2000s.

2           The courts there confronted a very similar issue

3    where the experts for the plaintiffs purported to say that had

4    physicians across the country had additional information from

5    the manufacturer, they would not have prescribed Rezulin, for

6    example.  And the courts in those cases said that that is

7    impermissibly speculative, you can't do that under Rule 702,

8    those are personal opinions, they're not reliable, and you

9    can't make them.

10          The plaintiffs don't say a thing about any of those

11   decisions in the response brief.

12          The remainder of the long string cite is a CF

13   citation where we're citing to additional cases where the

14   courts have said you need some type of objective standard to

15   be able to offer opinions to the jury.

16          Unless the Court has any specific questions about the

17   other portions of the motion, that's all I wanted to address

18   with you.

19          THE COURT:  Okay.  Thank you.

20          MR. BROWN:  Thank you, Your Honor.

21          MS. O'LEARY:  Good afternoon, Your Honor.  I'm Leslie

22   O'Leary.  I think I've been before you one time in a pain pump

23   case, other than that I'm new here.

24          I would like to address the reliance on other experts

25   argument.  I think I can make it a little bit clearer what

1    happened.

2         In our response brief we did present testimony by

3    Drs. Kinney and Kalva and Roberts saying in addition to

4    reading the reports of these other experts, they also looked

5    at their underlying documents, all their references, too, and

6    so that's part of the record.

7         To make it clear, the plaintiffs' counsel provided

8    them a Dropbox database and it included not just the reports

9    but all of the references.  So if they wanted to look up a

10   reference to Dr. Kessler's report at page -- at paragraph 55,

11   they could click on that and have all the documents.  So

12   that's what they did.  They looked at the documents that

13   supported their opinions.

14        In fact, they reviewed a lot of them.  Dr. Kinney

15   said in addition to looking at all of the medical literature

16   which he pulled and reading the 510(k)s and studies supporting

17   the 510(k)s for these devices, he also looked at the

18   underlying references in these reports.

19        So when you look at the cases the defendant cited

20   saying that these are the examples of how experts are not

21   allowed to rely on other experts' reports and testimony, those

22   cases made exceptions where, and I think you pointed this out,

23   Your Honor, where they're not just basically adopting

24   wholesale their reports and acting as their mouthpiece but

25   they actually looked at the underlying data to make sure it

1    was coherent with what they were saying.  So they did rely on

2    all of that.

3          Unfortunately, their List of Facts and Data

4    Considered list was only the documents that they referenced in

5    their reports.  They actually looked at a much larger

6    collection than that.  So I just wanted to make that clear,

7    that they aren't just blindly looking at reports and just

8    accepting them at face value.  They actually did look at the

9    documents supporting them.

10          THE COURT:  I read the deposition sections you cited.

11    It seemed to me the one exception to what you just said was

12    Dr. Roberts.  She said, I looked at some of the documents that

13    Kinney cited -- or Kessler cited to satisfied myself that he

14    was being accurate.  That's all she really said, I think.

15          MS. O'LEARY:  And her role in drafting the report

16    itself was a little bit different because she didn't actually

17    do the drafting.  She worked with the other experts and she

18    reviewed what they said and went back and fact checked and

19    looked at the underlying documents and things like that, but

20    she wasn't actually writing the report itself.

21          But one thing that's interesting is that defense

22    experts had testified that they had looked at Dr. Kessler's

23    report and Dr. Kinney's, Roberts', and Kalva's reports and

24    were asked if they looked at any underlying documents, just to

25    make sure that the factual basis for their opinions were

1    correct, and these -- I think it was Dr. Moritz said, Oh, I

2    did look at them.  I looked at both of their reports, and they

3    were so detailed that I had no question to -- no reason to

4    question the factual basis for them.

5           And I think what happens to make -- I think these

6    other cases the defendants relied upon had a major concern

7    which was the factual basis for the reports they're relying on

8    might be unreliable.  But if defense experts don't have any

9    basis to question that and if Dr. Kessler's underlying facts

10   are reliable, then we're not looking at something that's shady

11   or irrelevant to begin with.

12          So this is just a huge compilation of factual data

13   that they did look at.  They didn't -- they didn't ignore it.

14   They had a lot of it that they sifted through.  Unfortunately,

15   they didn't keep track of what they looked at and decided not

16   to include in their reports versus what they just glanced at.

17   But they did look at a tremendous volume of data, and also

18   looked at expert -- at employee witness depositions and their

19   underlying documents.  So they had a big trove of materials

20   that they looked at and then they culled them down when they

21   wrote their report.

22          So the bottom line is this really comes down to the

23   factual basis for their opinions, which is more a matter of

24   cross-examination than it would be for exclusion.

25          In terms of reasonable expectations, the standard of

1    care they articulate, I think that the defendants have

2    raised -- they seem to express confusion over informed

3    consent.

4          Counsel had talked about how informed consent is

5    really an individual judgment not a collective one.  But there

6    are two sides to informed consent, and I think they're

7    confusing what the manufacturer must disclose to the physician

8    versus what the physician has an obligation to disclose to the

9    patient.

10          So there's two parts of the equation.  There's how

11    does a physician become informed enough to give -- obtain

12    informed consent from the patient and so it's the first part

13    of the equation that Drs. Roberts, Kalva, and Kinney are

14    talking about.  They're not talking about what they would have

15    done or what any particular individual physician would have

16    done with that information.  That's more of a question that

17    would come up at trial.  That's more of a causation question.

18    The question is what is the type of information that

19    physicians in this field of interventional radiology need to

20    know in order to do what these experts do.

21          They train their colleagues on how to insert these

22    devices, the types of patients they're indicated for, under

23    what circumstances certain types of these filters should be

24    used.  It's that body of information they need to be able to

25    inform themselves and help inform their colleagues and then

1    inform their patients and make that decision.  But it's really

2    hard to get proper informed consent if you're not informed.

3         So that's -- that's the -- that's the first half of

4    the informed consent equation that they're offering their

5    expertise in.

6         And it may very well be that an informed physician

7    may decide in light of all of the information on all of the

8    complication rates and everything else, might decide in a

9    particular patient, you know, I know all of this but I'm going

10   to recommend putting this filter in any way, and that's an

11   individual judgment.  And -- but that's not what we're talking

12   about here.  These experts aren't going to come and talk about

13   what I would have done with my individual patients.  They're

14   saying this is the information we rely on because otherwise we

15   lack the ability to do our jobs as physicians and give our

16   patients important information that they would want to know.

17        So that's where they're coming from.  And there's

18   also similar confusion over this learned intermediary

19   doctrine.  The defendants in their reply brief cited *Fields*

20   *versus Eli Lilly,* which is a Ninth Circuit decision, and

21   they're saying this really -- that it really has to do with,

22   well, had I gotten that information what would I have done

23   with it?

24        Again, we're talking about the duty to give adequate

25   information, the duty to warn the physician first.  That's a

duty and a breach question, and that's what the experts are
here to talk about.  Whether or not -- what an informed
physician would have done with that information is a causation
question and our experts aren't here to testify about
causation.

This is not a make believe standard that the experts
have come up with.  The sources of this are implicit in their
SIR guidelines that we -- that they had mentioned informed
consent for one thing.  They explain that the patients have to
have every opportunity to fully understand the treatment and
procedure and its reasonable risks.  But those patients won't
get the informed consent they need unless physicians get the
information they need to fulfill their obligations.

So, again, it's the first side of the equation, not
the second side of the equation.

Another source is their quality improvement standards
that the SIR developed, and they've developed these for other
physicians.  It wasn't developed for manufacturers, but it was
basically to help them determine when and how to use these
filters and under what circumstances based on the information
they had available to them from the manufacturers and all of
the studies.

But they also issued publications and articles
strongly encouraging manufacturers to come forward and do
studies, more studies were needed, because there isn't enough

1    to be able to compare the safety and efficacy of all these

2    different filter types.

3           So the statement that was in these SIR guidelines

4    that these weren't intended to establish legal duties of care

5    was directed at the second step of that informed consent which

6    is we're not meaning these regulations or these standards to

7    be duties of care to determine the liability of a physician

8    who makes a decision on behalf of one particular patient.  It

9    was never intended to be that way.  So that cautionary note is

10   really irrelevant to the discussion.

11          Another source of this reasonable expectation, this

12   duty of care to interventional radiologists and cardiologists

13   is from Bard's own internal documents.  We had cited this in

14   our brief, but basically Bard had put -- had brought together

15   a group of physicians, interventional radiologists and

16   cardiologists and said, hey, what do you think about the

17   design of our products?  And they came away with the

18   understanding that these doctors insist on knowing what the

19   failure rates are of their devices and they need to know if

20   there's any problem with them, that there's zero tolerance for

21   complications that arise and they need to know about them.

22          Another source of this is from Bard's own employees.

23   They testified that of course physicians have a reasonable

24   expectation that they will be informed of any risks or

25   complications as they arise.  And so they were -- they were

1    aware of that.  That was something that they adopted.

2          In addition, defendants' own experts have articulated

3    this standard.  Dr. Feigal, who's one of Bard's experts,

4    actually published an opinion piece in the New England Journal

5    of Medicine, and this was basically about the importance of

6    forthcoming and honest of disclosure of risks and

7    complications of implantable cardiac devices.  And he stated

8    from the perspective of physicians and patients' expectations,

9    corporate responsibility and public perception, we believe

10   active communication policies centering on the proper use of

11   active and passive transparency should be the norm.  So this

12   is a statement that just wasn't drawn out of thin air.

13         I'd also like to address the criticism that defense

14   raises about the reliability under Rule 702 of this standard.

15   They basically attack it because it doesn't meet the four

16   *Daubert* criteria, but the case *U.S. v Hankey* really addresses

17   this issue and it's when an expert's testimony isn't based on

18   a scientific principle but on their own experience and

19   knowledge.  Then these *Daubert* factors are not really

20   applicable.  The four *Daubert* criteria are helpful but when

21   the reliability depends on the knowledge and experience of the

22   expert rather than methodology behind it, then those factors

23   don't come into play so much.

24         I might add that this duty to warn, this standard of

25   care is consistent with other duties and concepts in common

1    law.  It's certainly similar to the duty under FDA regulations

2    to adequately inform physicians -- adequately inform the FDA

3    and also prescribing physicians, but, again, under learned

4    intermediary and informed consent doctrines this duty to be

5    forthcoming and provide relevant material information is

6    entirely consistent with this duty of care.  And it's not

7    simply a medical malpractice standard.  This is a standard

8    that I've had cases involving what -- you know, what a

9    physician would expect under the circumstances, what they

10   expect to be told.

11        So this isn't something that is ipse dixit, it's a

12   duty that common law and that imposes on any manufacturer, any

13   reasonable manufacturer, to convey information that is

14   important to their practice.

15        So these experts testimony on the standard of care

16   provide a helpful framework for the jury to decide in

17   determining whether Bard breached its duties of care in

18   disclosing important safety information about the

19   complications and so Bard's criticism of that is best left to

20   cross-examination but not exclusion.

21             THE COURT:  Okay.  Thank you.

22             MS. O'LEARY:  Any other questions?

23             THE COURT:  No.  Thank you.

24             MR. BROWN:  Your Honor, I think we've adequately

25   responded to all of the points that plaintiffs' counsel made

1    in our reply brief.

2             THE COURT:  All right.  Thank you.

3             Counsel, let's talk about briefly the motion to

4    certify the preemption ruling.  And I'd like to address it to

5    Bard, particularly in light of a couple of facts that you may

6    already be aware of.

7             This week I received two Ninth Circuit rulings on

8    decisions I had made.  One I made in September of 2014, second

9    I made in April of 2015.  Two and a half plus years.

10            I certified -- I had a big securities fraud class

11   action.  I certified the class but then came upon a loss

12   causation issue that was very confused in Ninth Circuit law.

13   I certified that issue to the Ninth Circuit in August of 2015,

14   telling them that I wasn't going to hold trial until I knew

15   what the -- actually, depending which way they went, I would

16   either grant summary judgment or not and we were going to hold

17   off until they answered.  I still don't have a decision.  That

18   was 28 months ago.  And they took it.  They took it within a

19   month.  I thought great, we'll get a quick decision.  28

20   months and nothing.

21            It's not unusual.  I had a case recently that was a

22   2013 decision that was just affirmed.

23            I am confident if I certify this issue to the Ninth

24   Circuit, we will be here two or two and a half years from

25   now -- well, I don't know if we will be, but it will be two or

1    two and a half years before we get a decision.  That's just

2    unfortunately the workload they face and the pace at which

3    they get things decided.

4         I don't know how much that affects -- and there's one

5    other question I'd appreciate your thoughts on, Mr. North, is

6    if the jury in the Booker case or the Jones case were to rule

7    against Bard, presumably I enter a judgment, you appeal and

8    that takes with it the preemption motion so it would get there

9    then as well.  Obviously, if you win at those two cases, that

10   wouldn't be situation.

11        In light of those Ninth Circuit realities, would you

12   tell me why you think it's a good idea to certify the matter.

13        MR. NORTH:  Well, I was not familiar with that sort

14   of backlog, Your Honor.

15        I would recognize, based on what the Court has

16   reported, that is a risk and probably a substantial risk.

17   With all due respect to this Court, my client is determined to

18   present this case -- issue at some point to the U.S. Supreme

19   Court and invite that court to address the very problems in

20   this area of the law that then-Judge Gorsuch mentioned in the

21   *Caplinger* case.  The question is how do we get there.

22        We're not asking, of course, for any stay of

23   proceedings in this court.  We recognize that's not a prudent

24   thing to do with an MDL of this magnitude.  But what we are

25   looking for is what avenue we pursue this issue -- again, with

1    due respect to the Court's ruling -- up to the U.S. Supreme

2    Court.

3            THE COURT:  It doesn't bother me you want to appeal

4    it.

5            MR. NORTH:  Okay.  Thank you, Your Honor.

6            THE COURT:  I could have guessed that you disagree

7    with the decision.  That's fine.

8            MR. NORTH:  I once clerked for an Eleventh Circuit

9    judge who didn't have that same view necessarily, I'll just

10   say that.

11           And what I'm concerned about, too, is given the

12   nature of an MDL, and I think that's why a lot of cases have

13   said 1292(b) appeals are so important in the MDL context --

14   for example, we can find ourselves pursuing this issue in a

15   number of circuits, to be honest with you.  I think three of

16   the mature cases are in Florida and Georgia.  So if those were

17   to be remanded at some point this year and tried, we would

18   either -- could have an appeal if we lost or a cross-appeal if

19   we won and they appealed, raising that issue in front of the

20   Eleventh Circuit.

21           There are a couple cases in the Fifth Circuit.

22           It's -- we are going to pursue this case, or intend

23   to pursue this issue in whatever forum we first receive the

24   opportunity to.

25           I would submit to the Court that, while recognizing

1    the realities of what the Court said and what's happened

2    before, that we could at least try with the Ninth Circuit.  As

3    opposed to trying to piecemeal it.  And it may be a race to

4    see which case court addresses the issue first, appellate

5    court circuit, and it ends up in the Supreme Court or on a

6    certiorari petition to see if that court is interested in

7    reviewing it.

8          But I guess what I'm thinking, even though I

9    understand the impediment the Court says as far as timing, I

10   don't know that I see a negative in at least presenting it to

11   the Ninth Circuit since it's not going to stay proceedings

12   here.  Maybe this is one of those times they move quickly.

13   Who's to say.

14         THE COURT:  Okay, I understand that.  There's also

15   the question of whether I think reasonable jurists could

16   disagree.  But I understand your argument on that,

17   particularly in light of the Tenth Circuit decision from

18   Justice Gorsuch.

19         Plaintiffs, did you want to saying anything on this

20   motion?

21         MS. REED ZAIC:  Your questions were addressed to the

22   defense.  We have nothing additional to add to our papers.

23         THE COURT:  That covers everything on my list.  Do

24   you all have matters you want to take up before we break?

25         MR. O'CONNOR:  I think we covered everything.  I

1      think on plaintiffs end we're good, Your Honor.

2              MR. NORTH:  Nothing further for the defense, Your

3      Honor.

4              THE COURT:  Okay.  Thank you all.  Have a great

5      holiday.  We'll see you in January.

6              MR. NORTH:  Thank you, Your Honor.

7              MR. O'CONNOR:  Thank you, Your Honor.

8         (End of transcript.)

9                              *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14         DATED at Phoenix, Arizona, this 17th day of January,

15   2018.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25