Ramon Rossi Lopez – rlopez@lopezmchugh.com
(California Bar Number 86361; admitted *pro hac vice*)
Lopez McHugh LLP
100 Bayview Circle, Suite 5600
Newport Beach, California 92660
949-812-5771

Mark S. O'Connor (011029) – mark.oconnor@gknet.com
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
602-530-8000

*Co-Lead/Liaison Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC |
| SHERR-UNA BOOKER, an individual,<br><br>                    Plaintiff,<br><br>v.<br><br>C.R. BARD, INC., a New Jersey corporation and BARD PERIPHERAL VASCULAR, an Arizona corporation,<br><br>                    Defendants. | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 4 TO EXCLUDE TESTIMONY AND EVIDENCE REGARDING PHOTOGRAPH OF BARD EMPLOYEE MICHAEL RANDALL**<br><br>(The Honorable David G. Campbell)<br><br>(Oral Argument Requested) |

Plaintiff hereby responds in opposition to Defendants' Motion and Memorandum in Support of Motion *in Limine* No. 4 to Exclude Testimony and Evidence Regarding Photograph of Bard Employee Michael Randall. For reasons set forth below, Plaintiff respectfully requests that the Court deny Defendants' Motion *in Limine* No. 4 in full.

In context, Mr. Randall's middle finger picture reflects Bard's corporate culture of disregard for the seriousness of the problems with its IVC filters. The picture was not plucked from Mr. Randall's personal photo album or Facebook page. It is the second

slide in a Bard internal PowerPoint presentation that is a key exhibit. *See* Exhibit "A". Bard's decision not to attach the picture and PowerPoint to its motion is telling.

The PowerPoint is titled "Objective of Meeting" and describes a meeting whose purpose would be to "analyze EVEREST and MAUDE data and provide justifications for proposed changes to G2 filter." *Id.* at 1. The PowerPoint goes on to describe the complications that Bard's G2 filter was experiencing based on MAUDE reporting and EVEREST (a clinical study that produced data related to retrievability of the G2 filter), the goals of the proposed new and improved platform, the necessary design changes to achieve those goals, and the risks of the changes requiring Bard to conduct a long-term clinical trial to evaluate safety and efficacy of long-term use. Problems with the G2 and their causes were discussed. The G2 "often does not have the ability to prevent movement" and "Filter Design" was the top "potential cause of the complications . . . ." *Id.* at 15. Specifically, the G2 lacked sufficient caudal anchoring and "IVC wall apposition," among other conclusions, which meant the filter could move caudally (away from the heart towards the feet). *Id.* And "caudal migration leads to tilts, perforations and fractures." *Id.* at 16. Proposals to improve the G2 Platinum[1] included electropolishing to reduce fractures and unspecified "design changes" to reduce "tilt/penetration/migration." *Id.* at 17.

Bard's response to the "complications" associated with the G2 was to attempt a redesign of the G2 "without [a] clinical trial." *Id.* at 3. This would take a lot of time, and Bard was concerned about "timeline challenges based on changes." *Id.* Bard's goal was to make "design changes" to the G2 that might address its problems while avoiding too much FDA scrutiny.

Although expressed in neutral corporate-speak, Bard's admissions in the PowerPoint are shocking. IVC filters are sharp metallic objects marketed to doctors and patients as safe to be implanted *permanently* in the largest vein in the body, inches from

---

[1] Just as the "G1A" and "Recovery G2" are known as the G2 filter, the G2 Platinum became known as the Eclipse filter.

2

1  the heart and surrounded by other vital organs.  The benign term "complications"
2  minimizes that G2 malfunctions/failures were damaging and scarring the IVC, moving
3  throughout the recipient's body cavity, and fracturing sharp pieces of metal to scatter
4  throughout the most sensitive area of the body.  The consequences of Bard's design
5  defects weren't just numbers in a spreadsheet, but pain, permanent internal scarring and
6  organ damage, additional medical procedures including open heart surgery, and death. Yet
7  the internal conduct surrounding the treatment of such failures and resulting harm, the
8  same sorts of failures that Ms. Booker endured, is not only relevant it reflects the exact
9  purpose of conducting discovery; to discover how the manufacturer was conducting itself
10 when no one was looking. This is particularly relevant to Plaintiff's punitive damages
11 claim.

12     In the context of a project attempting to quietly fix a flawed Bard medical device
13 injuring and killing patients while avoiding excessive FDA scrutiny and cost, Bard's
14 employees chose to introduce Mr. Randall in the PowerPoint as the project leader with a
15 picture of him 'giving the finger' to the camera.  Bard's description in its motion of what
16 this gesture means is accurate, but what we don't know is to whom this gesture was
17 directed.  Was the message to the team intended to be that Mr. Randall and Bard were
18 giving the finger to IVC filter competitors?  The FDA?  Patients injured by the G2?  Bard
19 and Mr. Randall characterize the picture as a "joke," but that Bard would make a joke in a
20 PowerPoint meant to be displayed to many as a representation of addressing such a
21 serious issue is demonstrative of a corporate culture within Bard that trivialized design
22 issues, FDA scrutiny, and patient safety.

23     This demonstration of Bard's cavalier attitude towards the flaws in its product and
24 the harm it had caused is relevant to a host of issues in this case: the adequacy of Bard's
25 design, testing, and failure analysis processes; Bard's compliance with FDA regulations;
26 its failure to warn doctors, patients, and the public of the known risks of its filters both
27 before and after putting them on the market; and punitive damages.  As such, the middle
28 finger picture is relevant and admissible under Fed. R. Evid. 401 and 402.

It is also admissible under Rule 403.  Although the middle finger picture is indeed inflammatory as Bard concedes and thus prejudicial to Bard, there is nothing *unfairly* prejudicial about it.  It was Bard that put such a vulgar photo into the middle of a critical internal document, one that could have been edited before it was shown.  There is also no unfair prejudice when Bard will have the opportunity at trial to offer Mr. Randall's explanation that the middle finger picture was a harmless joke.  *See United States v. Smith*, 502 F.3d 680, 687 (7th Cir. 2007) (holding that district court's admission of picture of defendant making obscene gesture was "well within its discretion" where defendant "had an opportunity to put the photograph into context for the jury, ameliorating any prejudicial effect").[2]  Even if there was any unfair prejudice to Bard from admitting the PowerPoint in full including the photo, such unfair prejudice does not "substantially outweigh" the picture's probative value under Rule 403.[3]

Bard's corporate culture of ignoring patient safety to focus on maximizing revenues is a direct cause of Bard's failure to adequately design and test its products and its failure to properly warn patients and doctors about the risks of its products. The middle finger picture within a crucial Bard internal document addressing the defects in its G2 filter is important evidence of that twisted corporate culture.  As such its probative value far outweighs any risk of unfair prejudice, Exhibit A including the picture in slide 2 is admissible under Fed. R. Evid. 401-403, and Plaintiff respectfully requests that Defendants' Motion *in Limine* No. 4 be denied in full.

---

[2] Bard cites to *Mems v. City of St. Paul Dep't of Fire & Safety Svcs.*, 2001 WL 1640034 (D. Minn. Nov. 12, 2001), but that case involved a Plaintiff argument that a picture of two of the defendants' employees giving the finger to the camera communicated a racial epithet. *Id.* at *4.  The district court properly excluded the picture because the plaintiff's subjective perception of the picture was substantially outweighed by the "inflammatory racial invective" he felt the picture represented, not the picture itself. *Id.*

[3] Bard also argues Rule 404, but Mr. Randall is not on trial and Plaintiff does not intend to use the picture to attack his character.  It is the placement of the picture of the "project leader" giving the finger in a PowerPoint on such a serious topic that is relevant and important, not that Mr. Randall posed for the picture.

4

RESPECTFULLY SUBMITTED this 1st day of February, 2018.

GALLAGHER & KENNEDY, P.A.

By: */s/ Mark S. O'Connor*
    Mark S. O'Connor
    2575 East Camelback Road
    Phoenix, Arizona 85016-9225

LOPEZ McHUGH LLP
    Ramon Rossi Lopez (CA Bar No. 86361)
    (admitted *pro hac vice*)
    100 Bayview Circle, Suite 5600
    Newport Beach, California 92660

*Co-Lead/Liaison Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of February, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

    */s/ Gay Mennuti*