# EXHIBIT B



Deposition of:

# Thomas Kinney , M.D.

*June 17, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Case 2:15-md-02641-DGC   Document 9914-2   Filed 02/01/18   Page 3 of 6
Thomas Kinney, M.D.                                    June 17, 2017
In Re: Bard IVC Filters Products Liability

Page 98

1       Q.   Are these your personal opinions about what
2   actions you would have taken?
3       A.   Yes.
4            MR. JOHNSON:   Form.
5            THE WITNESS:   Yes, they are.  You know, when I
6   read Dr. Asch's deposition, I felt very much like he did.
7   Because he felt like -- like I did, actually.  We felt
8   like we had personal -- we had a personal one-on-one
9   relationship with the Bard colleagues we were working with
10  and a level of trust, and he -- he felt -- he had been
11  promised that Bard was going to do a permanent -- more
12  permanent long-term functionality study, and that actually
13  never occurred.  I remember hearing the same thing myself
14  from Bard, "We're going to do study and look at the
15  long-term fulfillment characteristics."  Well, those never
16  actually got done.
17          I actually used my representation as an
18  interventional radiologist to educate people about these
19  filters because we were promised that these filters were
20  going to act like -- like our permanent filters that we
21  had.  They could stay in as long as we needed or
22  indefinitely; or if we wanted to, we could take them out
23  when we no longer needed those.
24          And yeah, there were reports of complications coming
25  in that we heard from our angio clubs, but the Bard people

1  would never specifically show me any of this stuff.  They
2  never -- I was never shown any documents.  I would get
3  asked vague questions like, is a fracture -- "Is
4  fracturing a problem?"  What does that mean?  If a
5  fracture stays in the caval wall, is that okay?  What's an
6  acceptable rate for fracturing?
7        And so those were -- those were kind of vague
8  questions for me that were kind of disappointing.
9        Our sales guys from Bard would come in to me, and
10 they'd ask, "Tom, do you know what's going on at Bard
11 because they don't tell us anything?"  Which made me feel
12 that they weren't being so straightforward with their
13 sales guys.  This was Chris Goodrow, whose deposition I
14 read, because I know Chris well, and I actually helped him
15 get his job after he left -- left Bard.
16        So I guess the reason I decided to get involved with
17 this, this was a question you asked me before, I mean
18 there's obviously a compensation issue, but basically I
19 felt this was the right thing to do.  You know, as a -- as
20 a physician and as a person that was involved with this
21 early, that I -- I think patients were hurt, a lot of
22 patients were hurt by the Bard filters.  And there's -- by
23 my count, there is 30,000 Recovery Nitinol filters, and I
24 think there is 50,000 G2 filters in patients.  For all I
25 know, these guys are walking around not even knowing that

1    they even have the filter in there.
2            You know, I always find myself or my residents and
3    fellows I train, I always ask them the more -- the moral
4    barometer I ask them is, "What if that was you or your
5    family member?  How would you feel about that?"
6            And I find that that always makes me -- I think it
7    makes me come, Matthew, to the closest -- to the right
8    decision.  I don't always make the right decisions.  I'm,
9    you know, like any other person.  We sometimes make the
10   wrong decision, but I find that that moral barometer works
11   for me.  And when I look at the -- when I look at this, I
12   get very concerned.
13       BY MR. BROWN:
14       Q.   You said several things in there that I want to
15   ask you about.
16           But the first is, I thought you may have said it at
17   the beginning, but I just want to make sure of your
18   previous answer.  The opinions that you include in
19   Paragraph 26, those are your personal opinions; is that
20   right?
21       A.   Yes.
22       Q.   You mentioned that you were promised that Bard
23   would perform a long-term study on the Recovery Filters;
24   is that right?
25       A.   What does "promise" mean?

1   certain things, vague sort of questions about we think our
2   fracture rate is this.  Is that a good thing or is that a
3   bad thing?  And I -- I was very concerned about that rate.
4   Although if you look at the document, it doesn't convey
5   that.  I mean, it's verbiage, so it doesn't convey my
6   concern in the field.
7        What I was worried about is that in the short period
8   of time that data had accrued, that the rate may
9   eventually go above a rate that I thought was safe.  It
10  was going to be beyond what was the standard for the
11  generation of devices at that time.  We already looked at
12  tables that show really high numbers, and those are some
13  old numbers that is across multiple different filters and
14  maybe decades of data.  But as we get further along, I
15  think the devices should get better.
16       And so maybe I'm unique because I was a consultant
17  with Bard, and I thought I should have had the information
18  shared with me.  But I think that there is other
19  physicians that are in difficult situations with patients
20  that have Bard filters, and I suspect if you ask them,
21  they might say they wished they had known.
22      BY MR. BROWN:
23       Q.  You mentioned in the beginning of your answer
24  that you think that the company should be providing
25  information when it receives signals; is that right?