1  **WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation, | No. MDL 15-02641-PHX DGC<br><br>**ORDER** |

This multidistrict litigation proceeding ("MDL") involves thousands of personal injury cases related to inferior vena cava ("IVC") filters manufactured and marketed by Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively, "Bard"). Plaintiffs have filed a motion to exclude the opinions of Dr. Christopher Morris. Doc. 7320. The motion is fully briefed, and the parties agree that oral argument is not necessary. The Court will deny the motion.

**I.  Background.**

The IVC is a large vein that returns blood to the heart from the lower body. IVC filters are small metal devices implanted in the IVC to catch blood clots before they reach the heart and lungs. This MDL involves seven different versions of Bard filters – the Recovery, G2, G2 Express, G2X, Eclipse, Meridian, and Denali.

Each Plaintiff in this MDL was implanted with a Bard filter and claims it is defective and has caused serious injury or death. Plaintiffs allege that Bard filters are more dangerous than other IVC filters because they have a higher risk of tilting, perforating the IVC, or fracturing and migrating to vital organs. Plaintiffs further allege

that Bard failed to warn physicians and patients about the higher risks. Plaintiffs assert a host of state law claims, including manufacturing and design defects, failure to warn, breach of warranty, and consumer fraud and unfair trade practices. Doc. 303-1. Bard disputes Plaintiffs' allegations, contending that Bard filters are safe and effective and that the medical community is aware of the risks associated with IVC filters.

Defendants have identified Dr. Morris, an interventional radiologist, as an expert witness on various issues related to Bard filters. Dr. Morris graduated from Case Western Reserve University School of Medicine in 1985. He completed his residency in diagnostic radiology at Ohio State University, and his fellowship in vascular and interventional radiology at Massachusetts General Hospital. He currently serves as a professor of radiology and surgery at the University of Vermont, and is a member of the American College of Radiology and the Society of Interventional Radiology. Doc. 7800-1 at 2-3.[1]

Plaintiffs do not dispute that Dr. Morris has expertise in the field of interventional radiology and the use of IVC filters. Rather, Plaintiffs ask the Court to exclude his opinions that (1) Bard filters are safe and effective, and (2) medical imaging should not be part of a patient's routine follow-up care and has no bearing on the decision to remove a filter. Doc. 10070 at 7-18. The Court will address each opinion.[2]

## II. Legal Standard.

Under Rule 702, a qualified expert may testify on the basis of "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence," provided the testimony rests on "sufficient facts or data" and "reliable principles and methods," and "the witness has reliably applied the principles and methods

---

[1] Page citations are to the numbers placed at the top of each page by the Court's electronic filing system.

[2] Plaintiffs also challenge Dr. Morris's opinion in a related class action that the risks of late-stage retrieval outweigh the risk of leaving the filter in place. *Id.* at 18-19 (citing Doc. 7322 at 13). This issue is moot because the class action has been dismissed. *See* Docs. 105-08, *Barraza v. C. R. Bard, Inc.*, No. CV-16-01374-PHX-DGC.

- 2 -

to the facts of the case." Fed. R. Evid. 702(a)-(d). An expert may be qualified to testify based on his or her "knowledge, skill, experience, training, or education." *Id.*

The proponent of expert testimony has the ultimate burden of showing that the expert is qualified and the proposed testimony is admissible under Rule 702. *See Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). The trial court acts as a gatekeeper to assure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

**III. Discussion.**

**A. Opinion on Safety and Effectiveness.**

In rebutting the report of one of Plaintiffs' experts, Dr. Morris opines that Bard filters are safe and effective. Doc. 7800-1 at 22. Dr. Morris states that this opinion is based on his "review of the available literature and [his] personal experience." *Id.*

Plaintiffs contend that the opinion is unreliable because Dr. Morris discounted studies showing high complication rates and did not consider Bard's internal data showing that the filters were subject to failure. Doc. 10070 at 8-13. Defendants counter that the opinion is sufficiently reliable because Dr. Morris relies on both his personal experience with IVC filters and his interpretation of the relevant literature, and that Plaintiffs' mere disagreement with the opinion is no basis for exclusion under Rule 702. Doc. 7800 at 2-13. The Court agrees with Defendants.

Plaintiffs do not dispute that a doctor's experience can serve as a sufficient foundation for opinions about the medical devices the doctor uses in his clinical practice. Doc. 7812 at 14 (citing *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)). Dr. Morris has been treating patients with IVC filters for more than 25 years. Doc. 7800-1 at 2. His team has implanted and removed hundreds of such filters, including more than 200 Bard filters. *Id.* at 3; Doc. 7800-2 at 4-5. This clinical experience is sufficient to satisfy the threshold reliability requirements of Rule 702. *See Primiano*, 598 F.3d at 567 ("Dr. Weiss's background and experience, and his explanation of his opinion, leave

room for only one conclusion regarding its admissibility. It had to be admitted."); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 420-21 (S.D.N.Y. 2016) (the expert's "experience as a medical doctor specializing in OB/GYN and his familiarity and experience in placing and teaching how to place IUDs . . . are indicative of the reliability of his opinions").

Moreover, Dr. Morris considered the relevant medical literature, including studies showing that Bard filters have high complication rates. Doc. 7800-1 at 22-28. Plaintiffs argue that Dr. Morris improperly disregarded several specific studies (Doc. 10070 at 8-9), but Dr. Morris's report specifically addresses those studies and explains why he views them as flawed (Doc. 7800-1 at 25-26). Plaintiffs may find his reasoning unpersuasive (Doc. 8210 at 5-7), but that is no basis for excluding his opinions. Plaintiffs can cross examine Dr. Morris about his evaluation of the studies at trial. *See In re Mirena*, 169 F. Supp. 3d at 419 (finding that the expert's rejection of the leading study on which the plaintiffs relied was a basis for cross examination but not exclusion).

Plaintiffs argue that Dr. Morris's opinions are unreliable because he did not review internal Bard documents on which Plaintiffs' experts relied. But Dr. Morris explained that interventional radiologists never rely on internal corporate documents for their clinical decisions, and that he considers such documents to be a less reliable source of information than his clinical practice or the peer-reviewed studies he cites. Doc. 7800 at 10. Again, Plaintiffs can assert in argument and cross examination that Dr. Morris did not consider internal Bard data. These criticisms are fair game for trial, but they do not render his opinions inadmissible under Rule 702. *See In re Mirena*, 169 F. Supp. 3d at 427 ("To whatever extent Defendants' public or internal statements conflict with its experts' opinions[,] . . . that will be a problem for Defendants that Plaintiffs may exploit via cross-examination and argument. But Defendants' experts' failure to confront alleged conflicting statements made by Bayer does not warrant exclusion under *Daubert*.").

Plaintiffs' reliance on *In re Bextra & Celebrex Marketing Sales Practices and Product Liability Litigation*, 524 F. Supp. 2d 1166 (N.D. Cal. 2007), is misplaced. The

expert in that case sought to provide a causation opinion based on two observational studies which were contrary to epidemiological studies that included 97% of the adverse event reports. *Id.* at 1176. The court found that the expert was not qualified to give the opinion in part because he had no experience with the medical risks at issue, had no epidemiological training or experience, and had never participated in an observational study. *Id.* The expert's lack of relevant experience and training, among other problems, led the court to conclude that his causation opinion was not "good science." *Id.* at 1176-78. The same cannot be said of Dr. Morris's opinions.

The other cases Plaintiffs cite are inapposite. *See In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1250-51 (W.D. Wash. 2003) (excluding "scattershot" causation opinion where the expert failed to cite evidence in support of the 35 different biological mechanisms he claimed could have caused the plaintiffs' injuries); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1067-68 (C.D. Cal. 2013) (excluding opinion that the NHTSA was biased toward finding mechanical and driver error where the expert failed to describe his role in investigations or otherwise explain how his experience as an attorney for the agency provided a sufficient basis for his opinion); *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 984 F. Supp. 2d 1021, 1040 (C.D. Cal. 2013) (excluding opinion where 90% of the loans included in the sample size were at issue in the litigation and the methodology failed to account for selection bias and systematic error); *Wise v. C. R. Bard, Inc.*, No. 2:12-CV-01378, 2015 WL 521202, at *15 (S.D. W. Va. Feb. 7, 2015) (finding a design expert's reliance on internal documents not to be problematic where he used them to reinforce his opinion rather than to narrate corporate conduct); *Trevino v. Bos. Sci. Corp.*, No. 2:13-cv-0167, 2016 WL 2939521, at *12-13 (S.D. W. Va. May 19, 2016) (excluding design-related opinions where the expert did not review the defendant's design protocols).

/ / /

/ / /

### B. Opinions on Medical Imaging.

Dr. Morris offers opinions rebutting Plaintiffs' claim that medical imaging is a necessary follow-up procedure for all patients who have Bard filters. Doc. 7800-1 at 13-17. Plaintiffs challenge as unfounded the following statements in Dr. Morris's report:

- "To my knowledge, no appropriate medical society or consensus group has recommended medical imaging as a specific component of the recommended follow-up protocol." Doc. 7800-1 at 15.

- "It is notable that no authoritative society or organization has specifically recommended imaging as part of a surveillance or medical monitoring program regarding [IVC filters]." *Id.* at 17.

- "Medical imaging of the [IVC filter], other than determining whether or not the [IVC] and indwelling [filter] are patent and free of thrombus, has no bearing on whether or not the [filter] should be removed." *Id.* at 13.

- "[I]n an asymptomatic patient with an [IVC filter], the status of the filter has no bearing on whether or not it should be removed . . . . Therefore, imaging does not contribute to the clinical decision on whether or not to remove a [filter]." *Id.* at 16.

Doc. 10070 at 13-18. Plaintiffs accuse Dr. Morris of failing to recognize that a guideline published by the Society of Interventional Radiologists ("SIR") recommends "[i]maging of [the] vena cava prior to retrieval." *Id.* at 14 (citing Doc. 7321-1 at 83). Plaintiffs also cite certain medical studies that recommend close monitoring of implanted IVC filters, noting that one of the studies suggests the use of imaging for patients with Recovery filters. *Id.* at 15.

Defendants counter that Plaintiffs mischaracterize Dr. Morris's opinions and the medical literature. Doc. 7800 at 13-20. According to Defendants, Dr. Morris believes that patients with IVC filters should receive clinical follow-up care but that asymptomatic patients do not require routine imaging. *Id.* at 14-15. Defendants also note that the SIR guidelines set forth reporting standards for medical literature purposes,

not recommendations for clinicians to follow in treating patients with IVC filters. *Id.* at 15-18.

Having read the quoted statements in the context of Dr. Morris's full report, the Court finds no basis for excluding them under Rule 702. The parties and their experts vigorously disagree on whether the medical literature suggests that imaging should be part of routine follow-up care. Plaintiffs may cross examine Dr. Morris on this point and elicit relevant testimony from their own experts, but they have not shown that Dr. Morris's interpretation of the medical literature is so unreliable that it should be excluded under Rule 702.

Similarly, Plaintiffs may disagree with the opinion that imaging has no bearing on the decision to remove a filter from an asymptomatic patient, but they have not shown that the opinion is based on Dr. Morris's mere "*ipse dixit*." Doc. 10070 at 18. Dr. Morris explained that the decision to remove a filter is a clinical one that "makes a specific determination of whether or not there is ongoing indication for [IVC] filtration." Doc. 7800-1 at 14. And he provided the reasons that, in his opinion, this determination is independent of the status of the filter. *Id.* Given this explanation and Dr. Morris's experience removing IVC filters, the Court cannot conclude that his opinion is so unreliable that it should be excluded under Rule 702.

**IT IS ORDERED** that Defendants' motion to exclude the opinions of Dr. Christopher Morris (Doc. 7320) is **denied**.

Dated this 21st day of February, 2018.

_____
David G. Campbell
United States District Judge