MARCH 14, 2018 P.M.

1              **UNITED STATES DISTRICT COURT**

2              **FOR THE DISTRICT OF ARIZONA**

3                    _____

4

5  **In re: Bard IVC Filters,**          )
   **Products Liability Litigation**     )
                                         )
6                                        )
                                         )  MD-15-02641-PHX-DGC
7  _____ )
   **Sherr-Una Booker, an individual,**  )
8                                        )  Phoenix, Arizona
                   Plaintiff,            )  March 14, 2018
9              v.                        )  1:06 p.m.
                                         )
10 **C.R. Bard, Inc., a New Jersey**     )
   **corporation; and Bard Peripheral**  )  CV-16-00474-PHX-DGC
11 **Vascular, Inc., an Arizona**        )
   **corporation,**                      )
                                         )
12                 Defendants.           )
13 _____ )

14

15        **BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16           **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

16              **JURY TRIAL - DAY 1 P.M.**

17

18              (Pages 115 through 215)

19

20

Official Court Reporter:
21 **Elaine Cropper, RDR, CRR, CCP**
   Sandra Day O'Connor U.S. Courthouse
22 401 West Washington Street
   Suite 312, SPC 35
23 Phoenix, Arizona  85003-2150
   (602) 322-7245
24

25 Proceedings Reported by Stenographic Court Reporter
   Transcript Prepared by Computer-Aided Transcription

              United States District Court

MARCH 14, 2018 P.M.

**APPEARANCES**

For the Plaintiffs:
    **RAMON ROSSI LOPEZ, ESQ.**
    Lopez McHugh, L.L.P.
    100 Bayview Circle, Ste. 5600
    Newport Beach, CA  92660
    949.812.5771/(fax) 949.737.1504

    **MARK S. O'CONNOR, ESQ.**
    Gallagher & Kennedy, P.A.
    2575 East Camelback Road
    Phoenix, AZ  85016
    602.530.8000/(fax) 602.530.8500

    **JULIA REED ZAIC, ESQ.**
    Heaviside Reed Zaic
    312 Broadway, Ste. 203
    Laguna Beach, CA  92660
    949.715.5228

For the Defendants:
    **JAMES R. CONDO, ESQ.**
    Snell & Wilmer, L.L.P - Phoenix, AZ
    One Arizona Center
    400 East Van Buren
    Phoenix, AZ  85004-2202
    602.382.67000

    **RICHARD B. NORTH, JR., ESQ.**
    **ELIZABETH C. HELM, ESQ.**
    Nelson, Mullins, Riley & Scarborough, L.L.P.
    201 17th St., N.W., Ste. 1700
    Atlanta, GA  30363
    404.322.6000

United States District Court

MARCH 14, 2018 P.M.

1

## I N D E X

2

**TESTIMONY**

3

**WITNESS**          **Direct    Cross    Redirect    Recross**

4   ANDRZEJ CHANDUSZKO        189

5

6

7

## MISCELLANEOUS NOTATIONS

8   Item                                              Page

9   Preliminary jury instructions                     119
    Stipulated facts                                  129
10  Plaintiff's opening statement                     130
    Proceedings outside the presence of the jury      159
11  Defendants' opening statement                     160
    Proceedings outside the presence of the jury      214

12

13

14

## RECESSES

15                                              Page    Line

16  (Recess at 2:35; resumed at 2:51.)          159     21

17

18

19

20

21

22

23

24

25

United States District Court

118

MARCH 14, 2018 P.M.

1                    **P R O C E E D I N G S**                     12:00:59

2          (Court was called to order by the courtroom deputy.)

3          (Proceedings begin at 1:06.)

4          (Jury not present.)

5          THE COURT:  Thank you.  Please be seated.          01:06:31

6          Counsel, we're missing one of the jurors.  We're

7    waiting for this juror to return.  Hopefully, she'll be in in a

8    moment so we're just going to wait.

9          While we're waiting, let me mention something else.

10   Nancy will be filing this afternoon a proposed verdict form to   01:07:01

11   go along with the jury instructions, so please take those into

12   account when you look at things over the weekend and be

13   prepared to talk about those on the 22nd as well.

14         Any issues or questions before we start when the jury

15   gets in here?                                             01:07:22

16         MR. O'CONNOR:  Nothing from the plaintiff, Your

17   Honor.

18         MR. NORTH:  Nothing, Your Honor.

19         THE COURT:  Okay.  Hopefully the juror will be up

20   soon.                                                     01:07:29

21         (Jury enters at 1:11.)

22         THE COURT:  Thank you.  Please be seated.  All right,

23   ladies and gentlemen, as indicated, I'm going to give you some

24   initial instructions and then we will turn to the opening

25   statements of the parties.                                01:12:04

United States District Court

MARCH 14, 2018 P.M.

1        You are now the jury in this case and it is my duty          01:12:07

2  to instruct you on the law.  It your duty to find the facts

3  from all of the evidence in the case.  To those facts you will

4  apply the law as I give it to you.  You must follow the law as

5  I give it to you, whether you agree with it or not, and you          01:12:24

6  must not be influenced by any personal likes or dislikes,

7  opinions, prejudices, or sympathy.  That means that you must

8  decide the case solely on the evidence before you.  You will

9  recall that you took an oath to do so.

10       At the end of the trial, I will give you final          01:12:44

11  instructions.  It is the final instructions that will govern

12  your deliberations and your duties as jurors.

13       Please do not read into these instructions or the

14  final instructions or anything I may say or do that I have an

15  opinion regarding the evidence or what your verdict should be.          01:13:02

16       To help you follow the evidence, I will give you a

17  brief summary of the positions of the parties.  This is a

18  personal injury case against a medical product manufacturer.

19  The plaintiff, Sherry Booker, had a Bard G2 filter placed in

20  her inferior vena cava, which we'll refer to throughout the          01:13:27

21  trial as the IVC, the vein that carries blood back to the

22  heart.  An IVC filter is intended to catch a blood clot before

23  they reach the heart or lungs.  Defendants C.R. Bard, Inc.,

24  Bard Peripheral Vascular designed, manufactured and sold the G2

25  filter.          01:13:52

United States District Court

MARCH 14, 2018 P.M.

1     Ms. Booker alleges that the filter was defectively

2  designed and that the defendants failed to warn about its

3  risks.  She alleges that she was injured by the filter and she

4  seeks to recover money from defendants to compensate for her

5  injuries and to punish defendants for their allegedly wrongful

6  conduct.

7     Defendants deny that their filter was defectively

8  designed or that they failed to warn of its risks.  Defendants

9  contend that the risks associated with the Bard IVC filter are

10  understood by the medical community and are considered by

11  doctors when deciding whether to use them.  Defendants assert

12  that they are not responsible for any injuries or damages

13  suffered by Ms. Booker.  There are two defendants in this case,

14  C.R. Bard, Inc., and Bard Peripheral Vascular.  From time to

15  time the parties may refer to them as Bard or BPV.

16     You should decide the case as to each defendant

17  separately.  Unless otherwise stated, the instructions apply to

18  all of the parties.

19     The evidence you are to consider in deciding what the

20  facts are will consist of the sworn testimony of the witnesses,

21  the exhibits that are admitted into evidence, any facts to

22  which all of the lawyers have agreed, and those will be

23  identified for you as agreed upon or stipulated facts, and any

24  facts that I may instruct you to accept as proved.

25     In reaching your verdict, you may consider only the

United States District Court

MARCH 14, 2018 P.M.

1    testimony and exhibits received in evidence.  Certain things                    01:15:37

2    are not evidence and you may not consider them in deciding what

3    the facts are.  I will list them for you.

4           First, arguments and statements by lawyers are not

5    evidence.  The lawyers are not witnesses.  What they may say in          01:15:50

6    their opening statements this afternoon, their closing

7    arguments at the end of the trial, or at other times is

8    intended to help you interpret the evidence but it is not

9    evidence.

10          If the facts as you remember them differ from the way            01:16:08

11   the lawyers have stated them, your memory of the facts

12   controls.

13          Second, questions and objections by lawyers are not

14   evidence.  Attorneys have a duty to their clients to object

15   when they believe a question is improper under the rules and        01:16:24

16   regulations of evidence.  You should not be influenced by any

17   lawyer's objection or by my ruling on it.

18          Third, testimony that is excluded or stricken or that

19   I instruct you to disregard is not evidence and must not be

20   considered.  In addition, some evidence may be received only       01:16:43

21   for a limited purpose.  If I instruct to you consider certain

22   evidence only for a limited purpose, you must do so and may not

23   consider that evidence for any other purpose.

24          Finally, anything you may see or hear when the Court

25   is not in session is not evidence.  You are to decide the case      01:17:07

United States District Court

MARCH 14, 2018 P.M.

1   solely on the evidence that will be received during the trial.          01:17:10

2          Evidence may be direct or circumstantial.  Direct

3   evidence is direct proof of a fact such as testimony by a

4   witness about what that witness personally saw or heard or did.

5   Circumstantial evidence is proof of one or more facts from          01:17:35

6   which you can find another fact.  You should consider both

7   kinds of evidence.  The law makes no distinction between the

8   weight to be given to either direct or circumstantial evidence.

9   It is for you to decide how much weight to give to any

10  evidence.          01:17:51

11          There are Rules of Evidence that control what can be

12  received into evidence during the trial.  When a lawyer asks a

13  question or offers an exhibit into evidence and a lawyer on the

14  other side thinks that it is not permitted by the Rules of

15  Evidence, that lawyer may object.          01:18:10

16          If I overrule the objection, the question may be

17  answered or the exhibit received.  If I sustain the objection,

18  the question cannot be answered and the exhibit cannot be

19  received.  Whenever I sustain an objection to a question, you

20  must ignore the question and must not guess at what the answer          01:18:30

21  might have been.

22          Sometimes, as I've already indicated, I may order

23  that evidence be stricken from the record and that you

24  disregard or ignore that evidence.  That means that when you

25  are deciding the case, you must not consider the stricken          01:18:46

United States District Court

123

MARCH 14, 2018 P.M.

1   evidence for any purpose.                                     01:18:49

2          In deciding the facts in this case, you may have to

3   decide which testimony to believe and which testimony not to

4   believe.  You may believe everything a witness says or part of

5   it or none of it.                                            01:19:05

6          In considering the testimony of any witness, you may

7   take into account the opportunity and ability of the witness to

8   see or hear or know the things testified to, the witness's

9   memory, the witness's manner while testifying, the witness's

10  interest in the outcome of the case if any, the witness's bias  01:19:24

11  or prejudice if any, whether other evidence contradicted the

12  witness's testimony, the reasonableness of the witness's

13  testimony in light of all of the evidence, and any other

14  factors that bear on believability.

15         Sometimes a witness may say something that is not      01:19:45

16  consistent with something else he or she said.  Sometimes

17  different witnesses will give different versions of what

18  happened.  People often forget things and make mistakes in what

19  they remember.  Also, two people may see the same event but

20  remember it differently.  You may consider these differences    01:20:03

21  but do not decide the testimony is untrue just because it

22  differs from other testimony.

23         However, if you decide that a witness has

24  deliberately testified untruthfully about something important,

25  you may choose not to believe anything that witness said.  On   01:20:22

United States District Court

MARCH 14, 2018 P.M.

1  the other hand, if you think the witness testified untruthfully          01:20:25

2  about some things but told the truth about others, you may

3  accept the part you think is true and ignore the rest.  The

4  weight of the evidence as to a fact does not necessarily depend

5  on the number of witnesses who testify about it.  What is        01:20:41

6  important is how believable the witnesses were and how much

7  weight you think their testimony deserves.

8          I will now say a few words about your conduct as

9  jurors.  First, please keep an open mind throughout the trial

10  and do not decide what the verdict should be until you and your          01:21:02

11  fellow jurors have completed your deliberations at the end of

12  the case.

13          Second, as I've already mentioned, because you must

14  decide this case based only on the evidence received in the

15  case and on my instructions as to the law that applies, you          01:21:18

16  must not be exposed to any other information about the case or

17  to the issues it involves during the course of your jury duty.

18  Thus, until the end of the case or unless I instruct you

19  otherwise, do not communicate with anyone in any way and do not

20  let anyone else communicate with you in any way about the          01:21:39

21  merits of the case or anything to do with it.

22          This includes discussing the case in person, in

23  writing, by phone or electronic means, via email, text

24  messaging or any Internet chat room, blog, website or

25  application including, but not limited to, Facebook, YouTube,          01:22:00

United States District Court

MARCH 14, 2018 P.M.

1    Twitter, Instagram, LinkedIn, Snapchat, or any other forms of          01:22:06

2    social media.

3           This applies to communicating with your fellow jurors

4    until I give you the case for deliberation, and it applies to

5    communicating with everyone else, including your family              01:22:20

6    members, your employer, the media or press, and the people

7    involved in the trial although, obviously, you can notify your

8    family and your employer that you have been seated as a juror

9    in this case and how long you expect the trial to last.

10          But if you are asked or approached in any way about            01:22:39

11   your jury service or anything about this case, you must respond

12   that you have been ordered not to discuss the matter and report

13   the contact to the Court immediately.

14          Because you will receive all of the evidence and

15   legal instruction you properly may consider to return a verdict     01:22:55

16   during this trial, do not read, watch, or listen to any news or

17   media accounts or commentary about the case or anything to do

18   with it.  Do not do any research such as consulting

19   dictionaries, searching the Internet or using other reference

20   materials and do not make any investigation or in any other way     01:23:18

21   try to learn about the case on your own.  Do not visit or view

22   any place discussed in this case and do not use Internet

23   programs or other devices to search for or view anyplace

24   discussed during the trial.

25          Also, do not do any research about the case, the law,          01:23:37

United States District Court

MARCH 14, 2018 P.M.

1    or the people involved including the parties, the witnesses, or        01:23:41

2    the lawyers until you have been excused as jurors.

3           If you happen to read or hear anything touching on

4    this case in the media, please turn away immediately and report

5    the contact to me as soon as possible.                                 01:23:56

6           We have these rather detailed rules to protect each

7    party's right to have this case decided only on the evidence

8    that is presented here in court.  Witnesses in court take an

9    oath to tell the truth and the accuracy of their testimony is

10   tested through the trial process.                                      01:24:15

11          If you do any research or investigation outside of

12   the courtroom or gain any information through improper

13   communication, then your verdict may be influenced by

14   inaccurate, incomplete or misleading information that has not

15   been tested by the trial process.  At least it will be based on       01:24:33

16   information that these parties never had an opportunity to

17   address during the trial.  Each of the parties is entitled to a

18   fair trial by an impartial jury and if you decide the case

19   based on information not presented in the Court, you will have

20   denied the parties a fair trial.                                       01:24:52

21          Please remember that you have taken an oath to follow

22   these rules and it is very important that you do so.

23          A juror who violates these restrictions jeopardizes

24   the fairness of this trial and a mistrial could result that

25   would require the entire trial process to start over again.  If       01:25:08

United States District Court

MARCH 14, 2018 P.M.

1   any of you is exposed to any outside information, please notify    01:25:13

2   me immediately.

3           I urge you to pay close attention to the trial

4   testimony as it is given.  When you deliberate at the end of

5   the case, you will not have a transcript of what was said.       01:25:30

6   Even though we have a court reporter taking down everything

7   that is said, it takes several days after a trial is over for

8   the court reporter to go back and clean up that transcript and

9   compare it with the recording and get it completely accurate.

10  And that process won't be finished by the time you're           01:25:46

11  deliberating so you will not have a transcript of the trial and

12  as a result, we urge you to pay close attention to the evidence

13  as it is given.

14          If you wish, you may take notes to help you remember

15  the evidence.  If you do take notes, please keep them to        01:26:01

16  yourself until you go to the jury room to decide the case.  Do

17  not let note-taking distract you.  When you leave each day or

18  during a break, your notes should be left in the courtroom on

19  your chair.  Nobody will read your notes.  Whether or not you

20  take notes, you should rely on your own memory of the evidence.  01:26:21

21  Notes are only to assist your memory.  You should not be overly

22  influenced by your notes or those of other jurors.

23          From time to time during the trial it may become

24  necessary for me to talk to the lawyers outside of your

25  hearing, either by having a conference here at the side of the   01:26:41

United States District Court

MARCH 14, 2018 P.M.

1   bench as we did this morning or by calling a recess and                     01:26:46

2   excusing you from the courtroom.  We will do our best to keep

3   such conferences to a minimum.  Please understand that the

4   purpose of those conferences is not to keep relevant

5   information from you, but to decide how certain evidence is to  01:27:00

6   be treated under the Rules of Evidence and to avoid confusion

7   and error.

8            I may not always grant a lawyer's request for a

9   conference.  Please do not consider my granting or denying a

10  request for a conference as any indication of my opinion of    01:27:17

11  what your verdict should be.

12           Trials proceed in the following way:  First each side

13  may make an opening statement.  An opening statement is not

14  evidence.  It is simply an outline to help you understand what

15  that party expects the evidence will show.  The plaintiff will 01:27:37

16  then present evidence and counsel for the defendant may

17  cross-examine.  Then the defendant may present evidence and

18  counsel for the plaintiff may cross-examine.

19           After all of the evidence has been presented, I will

20  give you instructions on the law that apply to this case and   01:27:55

21  the attorneys will make their closing arguments.  After that

22  you will go to the jury room to deliberate on your verdict.

23           Counsel, are there any additions or corrections to

24  the instructions?

25           MR. O'CONNOR:  None from the plaintiff, Your Honor.    01:28:16

United States District Court

MARCH 14, 2018 P.M.

1        MR. NORTH:  Nothing from the defendants, Your Honor.    01:28:18

2        THE COURT:  Okay.

3        Ladies and gentlemen, before we have the opening

4   statements, I am going to read to you some facts that the

5   parties have agreed to.  So these are what we call stipulated    01:28:26

6   facts and you should treat them as having been proven.  They

7   are basic background facts but it will save a little time in

8   presenting evidence.

9        The defendants in this case are C.R. Bard, Inc., and

10  Bard Peripheral Vascular, Inc., referred to sometimes as BPV.    01:28:46

11  BPV is a wholly zoned subsidiary of C.R. Bard, Inc., the parent

12  company.  Throughout this case, including the opening

13  statements the lawyers may make, we may refer to them

14  collectively as "Bard" or "the defendants."

15       The product that is the subject of this lawsuit is    01:29:13

16  the Bard G2 IVC filter that was designed, manufactured,

17  marketed and sold by the defendants.  The G2 filter is conical

18  in shape and consists of a main shaft to which 12 struts are

19  attached.  Six of the struts are arms and six are referred to

20  as legs.  G2 filter is constructed of a nickel-titanium alloy    01:29:41

21  called Nitinol.  The G2 filter is a medical device that is

22  implanted in the inferior vena cava, the largest vein in the

23  human body.  The United States Food and Drug Administration

24  cleared the G2 filter for commercial availability through what

25  is known as the 510(k) process outlined in the Food, Drug and    01:30:10

United States District Court

MARCH 14, 2018 P.M.

1    Cosmetic Act which is a federal statute.                      01:30:16

2            The G2 filter was cleared for commercial availability

3    in the United States for use in patients as a permanent device

4    on August 29 of 2005.  The G2 IVC filter was cleared for

5    commercial availability in the United States for use in         01:30:39

6    patients as a permanent device with the option of percutaneous

7    retrieval, meaning the ability to retrieve the filter, on June

8    15, 2008.

9            The plaintiff, Ms. Booker, was under the care of

10   Dr. Dean Martin who recommended that Ms. Booker receive an IVC  01:31:06

11   filter.  On June 21 of 2007, a vascular surgeon, Dr. Marcus

12   D'Ayala, implanted a G2 filter in Ms. Booker's interior vena

13   cava.  On July 24, 2014, Dr. Brandon Kang, K-A-N-G, retrieved

14   the main body of plaintiff's G2 filter percutaneously as well

15   as one of the struts.  He attempted but was unable to retrieve  01:31:42

16   a second strut located in her inferior vena cava or a strut

17   located in the right ventricle of her heart.

18           On July 28 of 2014, the strut located in Ms. Booker's

19   right ventricle was removed by Dr. Richard Harvey via open

20   heart surgery.  One strut remains in the wall of Ms. Booker's   01:32:07

21   inferior vena cava.

22           All right.  Plaintiff's counsel, you may proceed with

23   your opening statement.

24           MS. REED ZAIC:  Thank you, Your Honor.

25           Good afternoon.  Welcome.  We went through a process    01:32:33

United States District Court

MARCH 14, 2018 P.M.

1   this morning with jury selection and you were selected and I    01:32:51

2   have the pleasure of being the first attorney to address you

3   after you formally have been impaneled and I want to thank you

4   on behalf of my client, Sheri Booker, and our trial team for

5   your service today.    01:33:04

6            The judge has just charged you with a certain set of

7   preliminary rules, not necessarily rules of your own choosing

8   but ones that you must follow and you'll be asked to follow

9   throughout the course of this trial.  You'll be asked to apply

10  the law and the rules of society with regard to choices that    01:33:21

11  people and companies make.

12           And when I say "choices," I mean deliberate choices

13  that Bard, the defendant identified in this courtroom, made.

14  And those choices resulted in consequences that harmed

15  Ms. Sheri Booker.    01:33:36

16           The evidence we'll present throughout the trial

17  primarily consists of documents internal at Bard.  They are

18  confidential documents that remained there and you will see for

19  the first time.  You'll also hear from witnesses that come in

20  and testify live about some of those documents and sometimes    01:33:55

21  they will appear by videotape.  Of course evidence will also

22  come from Sheri Booker herself with her background and her

23  medical treatment.  In the process of a jury trial, we get to

24  tell Ms. Booker's story and I'm going to walk through an

25  introduction of her story.  I'm going to get into the chapters    01:34:14

United States District Court

MARCH 14, 2018 P.M.

1    of her story.

2         And part of the introduction is to orient you to

3    Sheri, Ms. Booker.  You met her earlier during the process of

4    impaneling the jury.  She's seated right here.  Sheri.

5         I would like to tell you a little bit about her and

6    what brought her to her day in court.  Sheri is a project

7    coordinator at Home Depot in Georgia where she lives.  She

8    works in the Exterior Department and she helps coordinate and

9    put together teams to evaluate projects and implement projects

10   for siding and roofing and things like that.  She's a mom.  Two

11   boys, two grown boys, and she has hobbies and one of them is

12   acting.  That is a skill most recently that she provided on a

13   voluntary basis which she does this weekend in a community play

14   where proceeds are donated back to the community.

15        Sheri has suffered from health problems in the past.

16   They include cardiac problems but particularly of note here, in

17   2007 Sheri was diagnosed with cervical cancer and she needed

18   surgery.  And relevant to that surgery was the fact that she

19   had also suffered from blood clots in the past.  Blood clots,

20   if they come loose, can travel up to the lungs and cause damage

21   to the lungs.  Now, Bard's own witnesses and former employees

22   will testify and tell you that there's no way to tell that if a

23   clot does occur, that it will break off and it will travel and

24   their products will protect you from that, protect Sheri from

25   that phenomenon.

United States District Court

MARCH 14, 2018 P.M.

1    In fact, the testimony will show there's no way to

2    show the percentage of clots that form that may ever travel

3    outside the area of where the clot forms in the leg.  But out

4    of the concern for that history that she had of blood clots, it

5    was decided by her doctors to implant her with an IVC filter.

6    IVC, as the judge explained in sort of the preliminary fact or

7    facts, which I'll go over and orient you with some visual aids

8    as well as we go, because there's a lot of numbers and IVC

9    stands for inferior vena cava.  It's the largest vein in the

10   human body that returns blood back to the heart.  It's the

11   highway to the heart and a filter, by nature of the sense of

12   the word, filters and catches things.  So an IVC filter is

13   placed within this vein with the hopes it that will catch clots

14   if they form and if they travel.

15   The IVC filter that Sheri received was a Bard filter.

16   There are several companies, the evidence will show, that sell

17   IVC filters but she received a Bard -- a filter made by Bard.

18   So in September of 2007 when she was diagnosed with

19   cervical cancer and before her surgery, she was implanted with

20   Bard's IVC filter called a G2, and this is important because

21   Bard had more than one in its history of making filters.  It

22   was implanted in the largest vein in her body, again the IVC,

23   and she was treated for cancer with chemotherapy and radiation

24   and she survived and she went on with her life and the filter

25   remained implanted in her.  It was a permanent filter.

United States District Court

MARCH 14, 2018 P.M.

1      Over the next seven years, from 2007 until 2014,      01:37:44

2  Sheri had gone back and forth to doctors and had hospital

3  visits for various ailments over the time post her cancer

4  surgery; but in 2014 she went to her doctor with pain in her

5  abdomen and it was revealed to her that Bard's filter, that the   01:38:01

6  evidence will show, should have remained in place, especially

7  because of the area where this filter is implanted with blood

8  flow to the heart was implanted in her and it broke into

9  pieces.  It tilted, it tore her vein and some of those

10  fractured pieces went to the heart.      01:38:23

11      Sheri underwent two different procedures to remove

12  the filter and the pieces that broke off.  One was a

13  percutaneous procedure to remove the filter where a piece of

14  the fragment of the filter remains in her IVC today in her

15  vein.  She had two pieces that had gone to her heart and after   01:38:43

16  that initial attempt to remove the filter in her vein.  They

17  also, during that first procedure, tried to remove the

18  fractured pieces from her heart.  And the doctor was

19  unsuccessful.  And it was not a clean surgery when it happened.

20      Going through the tricuspid valve, it was damaged      01:39:05

21  during the process.  She had to go in for a second open heart

22  surgery, not just to remove the fractured pieces, but also to

23  treat the fact that this fractured filter needed to be treated

24  in the first place.

25      The evidence will show that Bard knew, based on the      01:39:21

United States District Court

MARCH 14, 2018 P.M.

1    design of the filter and the design of the filter that came          01:39:24

2    before it upon which this design was predicated, or based on or

3    compared, to use a few different synonyms, they knew that this

4    filter put people like Sheri and did put Sheri at a higher risk

5    of the these failures and these injuries.  It was occurring at       01:39:42

6    rates higher than its competitors.

7           As I said, there were other IVC filters on the market

8    and the evidence will show that the laboratory testing that

9    Bard conducted will show that Bard knew that the filter that

10   Sheri was implanted with had a bad history of being able to          01:40:00

11   resist pressures within that vein where blood was flowing

12   through.

13          The evidence will also show that Bard did not conduct

14   a long-term clinical trial on this device before it went into

15   Sheri Booker.  They conducted a pilot clinical trial that did        01:40:18

16   not evaluate long-term safety and efficacy.  It evaluated the

17   ability to place the filter and to retrieve it.  This was new

18   technology.  Filters, up until this point of this line of

19   filters, were permanent and not normally retrieved.  So the

20   pilot study evaluating this IVC filter or -- the predecessor to      01:40:38

21   this IVC filter upon which this design was based was only 12

22   weeks, had 35 patients, and was only to evaluate the placement

23   and the retrieval.  There was no long-term clinical study

24   evaluating the seven years that it was in Sheri before it

25   failed and no long-term study at that time looking at leaving        01:41:00

United States District Court

MARCH 14, 2018 P.M.

1    there permanently, which it was intended to be for Sheri.        01:41:03

2          Ultimately, the evidence will show that Sheri's

3    doctor stopped using IVC filters, not because Bard told her

4    about these issues of fracturing and migration and tilting and

5    the things that happened in Sheri, but he began reading and     01:41:22

6    seeing how this filter was performing in the public through

7    reports and medical literature and that's why he stopped using

8    it after he had placed this in Sheri.   The reports the medical

9    literature, the evidence will show, are not complete in the

10   sense that not every time an adverse event happens, it is not   01:41:42

11   immediately reported to a manufacturer or the FDA, if ever.

12   Not every event is reported.

13         All medical devices carry risks when placed in the

14   body.   And when a device company knows that its device

15   increases those risks, harm occurs.   And it did.               01:42:00

16         Now, I have been talking about these filters sort of

17   in the abstract and what I'm showing you right now is a picture

18   of three different filters manufactured by Bard.   To your

19   right, all the way on the right-hand side, is the G2 filter

20   that was implanted in Sheri Booker but that's not the beginning  01:42:26

21   of the story of the IVC filters.   All the way on the left is a

22   filter that Bard acquired the technology for.   It was a

23   permanent filter called the Simon Nitinol filter.   Sometimes

24   you'll hear witnesses referred to it as Simon or SNF.   That was

25   a permanent filter.                                             01:42:49

United States District Court

137

MARCH 14, 2018 P.M.

1       And the start of Bard's poor choices is when it had                01:42:50

2   this permanent filter, which worked and the evidence will show

3   had a good safety profile, it intended to redesign it so that

4   they could make the filter in the middle called a Recovery that

5   was a permanent filter but designed to also have the option to        01:43:15

6   go in and retrieve it.  In other words, the Recovery filter.

7   You could go in and recover it from the body.

8       The evidence will show that the negative clinical

9   experience that Bard had with that filter in the middle, which

10  they based the design of Sheri's filter on, should have               01:43:31

11  informed them, and it did not that it would put patients at

12  higher risks of these injuries.

13      Let's look at them one by one.  The Simon Nitinol

14  filter, the permanent filter.  It was technology acquired from

15  a company called NMT.  It was a permanent filter.  And when           01:43:49

16  Bard acquired this technology, the development of the Recovery

17  filter, that first retrievable filter, was already developed.

18  When they acquired this, they also acquired the engineer that

19  was within the same time period that was working on these

20  particular filters.                                                   01:44:07

21      And the evidence will show that the SNF, or the Simon

22  filter, was a permanent filter with an impressive safety record

23  acknowledged by Bard's own witnesses, employees and former

24  employees, including their former medical director.

25      You'll hear from Mr. Carr himself, an engineer.                   01:44:25

United States District Court

MARCH 14, 2018 P.M.

1    He'll come and testify live in this trial that Bard wanted to                01:44:27

2    enter into a new area of technology, so this first permanent

3    filter that was performing well, again, was not retrievable.

4    And Bard wanted doctors and the medical community wanted, the

5    evidence will show, a retrievable filter.                                    01:44:44

6          Looking at the Simon Nitinol filter on the bottom

7    now, when they redesigned it and made the Recovery, Rob Carr

8    was involved and the Recovery was in the works when they

9    acquired this technology.  And in order to get it approved --

10   excuse me.  In order to get it cleared for market, they had to              01:45:13

11   show that it was substantially equivalent to the Simon Nitinol

12   filter.

13         Now, let's talk about that term for a moment,

14   substantially equivalent.  These filters are not FDA approved.

15   They are FDA cleared.  In order to get approval from the FDA,              01:45:29

16   it is a very rigorous process.  Bard did not go through that

17   process.  Bard went through the clearance process where,

18   instead of having to show independently that a device is safe

19   and effective, they went through a comparative process where

20   they had to show that they are as good as another filter on the            01:45:49

21   market.  They are substantially equivalent to another filter.

22         And that is how and that is why I lined these filters

23   up for you, starting with the Simon Nitinol filter.  There was

24   a clearance for the Recovery filter that was shown to be

25   substantially equivalent to the Simon Nitinol and then the G2              01:46:07

United States District Court

MARCH 14, 2018 P.M.

1   filter that Ms. Booker received, also known as the Recovery G2,   01:46:10

2   because it was another version of the Recovery filter also

3   known as the modified Recovery filter.  They build on each

4   other like building blocks.

5        Bard chose to use these devices and show substantial   01:46:25

6   equivalence.  It was in control of that choice and it chose the

7   products that it had to show substantial equivalence to.  It

8   chose its own products.  So going from the Simon Nitinol

9   filter, which was the permanent filter, the developments of the

10  Recovery filter was a new era for Bard.  And testimony in this   01:46:46

11  case will show that in order to develop a new medical device

12  product, you need to understand the environment in which it is

13  being used.

14       You'll hear from an engineer who will probably

15  testify this week.  In fact, experts are hired on both sides of   01:47:04

16  this matter.  Not surprisingly, they don't always agree.

17  You'll hear from an engineer that the very first step of

18  designing a medical device to put in the human body is to

19  understand where it goes, to understand the environment of use.

20       If you would look at your screens, I would like to   01:47:25

21  take you a little more up close and personal to the inferior

22  vena cava and the environment in which these filters are

23  placed.  There are the lungs surrounding the heart and the vena

24  cava is the large blue vein returning blood.  And if you look

25  at the proximity of the vena cava, which is the blue vein -- on   01:48:01

United States District Court

MARCH 14, 2018 P.M.

1   the right is the red.  That's the aorta.  And you can see how          01:48:07

2   close these filters are placed and the proximity to the organs

3   and the aorta.

4           As I said, it's the highway to the heart and the

5   evidence will show this is an area where blood flows through          01:48:20

6   and the environment and understanding the environment of

7   knowing that whatever hits that filter or the filter itself is

8   headed towards the heart, understanding the environment of use.

9           Bard knew an IVC filter could expand and contract.

10  Bard knew that the IVC filter could expand and contract up to         01:49:03

11  50 percent of its size, but its testing didn't look at that.

12  It didn't examine the environment of use and how that vein

13  would expand and contract.  They tested these filters in

14  simulated vena cavas as wide as 28 millimeters -- thinking of

15  millimeters like the ticks on a thermometer -- prior to putting      01:49:22

16  a Recovery on the market.  It never tested for the dynamic

17  changes occurring in the vena cava that you've seen in this

18  representation or the changes in the size of the vena cava with

19  simple movements or activities like sneezing and coughing and

20  other common events.                                                 01:49:38

21          And the reason you test, the testimony will show, the

22  reason you test is that you can understand what can happen

23  before you market a product that is to be placed in humans and

24  sold widely.  And the expert testimony you'll hear will explain

25  that it's not just Bard's filters that had a higher instance of      01:50:01

United States District Court

MARCH 14, 2018 P.M.

1    migration, tilt, fracture, and perforation, all of which Ms.                  01:50:05

2    Booker suffered.  It's also the fact that there's a cascade of

3    complications when three happen together like they happened in

4    Ms. Booker.  And you'll be able to evaluate the evidence that

5    Bard did not warn adequately about the interaction of these                   01:50:27

6    events and how one can lead to the next with harmful effects.

7              Let's look at each one individually.  This is a still

8    shot of the video that you've just seen with the filter placed

9    in the vena cava.  And when a filter tilts, it loses its

10   centering.  And the testimony will show when these are placed,                01:50:46

11   they need to stay centered, and they need not to move.  They

12   can become embedded in the vena cava wall when they tip.  It

13   can change the blood flow and it can lead to fractures,

14   migration, perforation, clot creation, and something called

15   caval thrombosis.                                                              01:51:06

16             Migration, there are two different kinds, one called

17   cephalad, which is a fancy word for towards the heart, and one

18   for caudal, which is a downward movement.  So the filter can

19   migrate north, so to speak, up towards the heart, or downward

20   towards the feet.  Ms. Booker suffered from a caudal migration                01:51:23

21   but she also suffered from tilt migration, fracture, and

22   perforation.  As I've said, the evidence will show that a tilt

23   can lead to those future failures.

24             I have another animation to show you that Greg will

25   help with.                                                                     01:51:47

United States District Court

MARCH 14, 2018 P.M.

1          So this animation actually shows a tilt and a                  01:51:48

2    fracture with the filter tipping embedding in the side of the

3    caval wall.  The evidence will show when this happens, there

4    can be a lack of efficacy and the pressure on the components

5    can lead to a fracture.  Again, largest vein in the body          01:52:14

6    returning blood to the heart.  Sheri suffered a fracture and,

7    as I explained, it traveled to her heart.

8          Sheri also suffered from a perforation.  This depicts

9    the filter tilting, embedding, and perforating through the side

10   of the vena cava wall.                                             01:53:43

11         And as I pointed out earlier, right next to the vena

12   cava is the aorta which also appeared -- Sheri Booker's aorta,

13   and this is actually an overlay of Sheri's x-ray showing the

14   tip, the tilt and the perforation to her aorta.

15         The evidence will show that when it comes to these          01:54:18

16   problems, Bard conducted bench testing starting with its first

17   retrievable filter, the Recovery filter.  And when I refer to

18   bench testing, a bench is simply a piece of furniture in the

19   lab where the equipment sits and laboratory testing, you'll

20   hear throughout the trial through testimony and documents.        01:54:38

21   Bard conducted bench testing.  It conducted bench testing for

22   migration resistance and that means that it tested the ability

23   of a filter to resist the migration of the blood flow and the

24   forces in the environment where that filter is placed.  And to

25   do that, they used PVC piping and sausage casing.                 01:54:57

United States District Court

MARCH 14, 2018 P.M.

1          The evidence will show that Bard also conducted tests          01:55:03

2    on sheep, migration resistance testing, and saw higher levels

3    than were actually being reported from the bench in clinical

4    trials.

5          Bard also, as I mentioned, did an initial clinical          01:55:19

6    study, a pilot study, of 35 patients to test retrievability.

7    Rob Carr, the engineer that came with the technology from NMT

8    to Bard, hired Dr. Murray Asch who you will see in court

9    potentially this week testifying about this initial pilot

10   study.          01:55:42

11         When Dr. Asch conducted his clinical trial for

12   retrievability, it consisted of 35 patients and the results of

13   that study included 22 procedural difficulties; five tilts, for

14   which no root cause analysis was conducted by Bard; one

15   perforation; one caudal migration, meaning downward; one          01:56:13

16   cephalad migration, upwards; arm fractures, meaning the tops of

17   the filter that you saw; and leg fractures, meaning the bottom

18   of the filter.

19         After the fractured leg hook that you see at the

20   bottom of the slide, the study was suspended to investigate          01:56:36

21   what happened.  After the investigation was concluded, the

22   study continued.  Dr. Asch advised, and his testimony will

23   prove, that he advised Bard that although implantation and

24   retrievability was successful in his 35-patient study, there

25   were multiple failure modalities requiring a long-term clinical          01:57:00

United States District Court

144

MARCH 14, 2018 P.M.

1    trial to determine safety and efficacy and that Recovery was        01:57:04

2    not ready for market.

3            Coincidentally, the testimony and evidence will also

4    show that when Bard acquired this technology from the company

5    that it bought it from, at that time that company had a          01:57:17

6    long-term clinical trial planned to occur in Europe which never

7    took place and not before Sheri Booker received her filter.

8            So let's talk about Bard's choices.  Considering all

9    of that, why did they market it?  And the testimony and

10   evidence in this trial will show that they had an opportunity.    01:57:45

11   They had the opportunity to be first to market with the first

12   retrievable IVC filter in the form of the Recovery filter.

13   That middle filter I showed you on the first slide.  The first

14   product on the market holds the market share.

15           And recall these are not FDA approved.  These are FDA      01:58:11

16   cleared.  And you'll hear during the trial that the FDA

17   clearance process is an exemption to the approval process.

18   You'll also hear it referred to as the 510(k) process as His

19   Honor mentioned to you in the facts stipulated to at the

20   beginning of the trial.                                           01:58:35

21           The 510(k) clearance process, the number 510(k) is

22   the code section.  It's a regulatory number showing the code in

23   the regulations.  An analogy would be those that have access to

24   401(k)s, that is a tax code section.  510(k) is a regulatory

25   code section.                                                     01:58:54

United States District Court

MARCH 14, 2018 P.M.

1         So 510(k) is the regulation that allows medical        01:58:56

2    devices to be cleared to market, not approved, based on a

3    comparison to another device on the market, like I said

4    earlier; and Bard chose this path of clearance, not approval,

5    by comparing its products to its own products in order to get     01:59:10

6    them cleared.  It's an honor system.  FDA does not test.  FDA

7    does not have hospitals to test in.  FDA does not verify the

8    data that the manufacturer provides.

9         Expert testimony in this case will tell you that you

10   must -- a manufacturer must assure the FDA that any device        01:59:34

11   submitted under this 510(k) route, because it's an exception,

12   is comparatively as safe and effective.  It has to be compared

13   to another device, not independent safety and efficacy, but a

14   comparison is it as safe and effective.

15        When Bard submitted its 510(k) submissions for its          02:00:07

16   retrievable filter and the G2 after it, there was a quote.

17   They had to assure the FDA that the data and information

18   submitted in the premarket notification are truthful and

19   accurate and that no facts material for review of the

20   substantial equivalence of this device have been knowingly       02:00:25

21   omitted from this submission.  And that's because it's an honor

22   system.  Again, the FDA does not test.

23        So let's go back through the regulatory history

24   before we move on.  The Bard had a permanent filter, the Simon

25   Nitinol.  It wanted to enter the retrievable IVC filter market.   02:00:52

United States District Court

MARCH 14, 2018 P.M.

1    They went through the 510(k) process and showed the FDA that          02:00:57
2    the Recovery filter was substantially equivalent to its
3    permanent Simon Nitinol filter.  After that, after reports of
4    adverse events, they redesigned the Recovery filter with a new
5    Recovery filter also called the G2.                                    02:01:16

6          The G2 was initially cleared with the FDA as a
7    permanent device, as was the Recovery, and later given the
8    ability by the FDA to retrieve it.  But the claim here is it
9    was substantially equivalent initially to the SNF.

10         I think the evidence will show that it was not.  The            02:01:36
11   depiction I have up on the screen right now is the information
12   that Bard had internal about its testing.  It tested the
13   migration resistance, again, the ability for a filter in this
14   environment to resist migrating out of place, to resist
15   movement, and they had data that the Simon Nitinol filter could       02:01:56
16   resist migration at 80 millimeters of mercury.  That's a
17   pressure measurement.  80.  Their data showed that the Recovery
18   filter could only resist migration at 50.

19         The standard that they set internally was their own.
20   What they reported to the FDA is that it was substantially            02:02:18
21   equivalent with setting a standard of 50 millimeters of
22   mercury, knowing that what they were comparing it to could
23   resist as high as 80.  That means the Recovery filter could
24   move more easily.  And the evidence will show that Bard knew
25   that but they did not provide the raw data to the FDA.  Their         02:02:37

United States District Court

MARCH 14, 2018 P.M.

1   bench testing showed it.  Their sheep study showed it.  And                02:02:41

2   eventually when they did a clinical trial, the pilot study,

3   just for retrievability, there were incidents of migration

4   fracture, and perforation in that study.  Bard's own employees

5   will testify to that as well as Dr. Asch.                                  02:02:56

6        Again, 510(k) clearance process is an honor system.

7   There's no testing that the FDA does themselves on medical

8   devices, specifically on field devices.  Let me make that

9   clarification.  And the FDA relies on accurate data provided by

10  manufacturers.  Bard made the claim of a 50 millimeter of        02:03:16

11  mercury standard knowing that comparing it to the permanent

12  filter, that was inaccurate.  Bard chose to keep the important

13  information to themselves.  Not only did they not share it with

14  the FDA, they didn't share it with their sales staff.  And the

15  evidence and testimony will show that sales staff in a hospital  02:03:42

16  and doctor's office is a primary mode of communication between

17  the company and the physician.  It was not shared with the

18  medical profession and it was not shared with the end users of

19  the filter.

20       Now, you've seen Bard's choices and the evidence will       02:04:02

21  show the truth which is that in 2008, a year after Sheri Booker

22  received her filter internally, Bard was getting together and

23  looking back at their device regulatory history with the

24  mounting adverse events that were being reported.  If they

25  decided that they were device focused, they had a lack of        02:04:23

United States District Court

MARCH 14, 2018 P.M.

1    thorough understanding of dynamics of caval anatomy, meaning          02:04:27

2    the anatomy of the vein, the IVC, and that impacted their

3    testing methods.  They had a limited understanding of user

4    needs and that they have a historical reactive evolution design

5    mind set.  Recall that they first produced the Recovery filter,      02:04:46

6    then they redesigned it as adverse events were coming in.

7    Product complications force the focus onto reactive designing.

8            This was their choice.  Bard chose to do this.  They

9    canceled the plans for the long-term study in Europe by the

10   predecessor company that owned the original technology.  They        02:05:10

11   relied on data from the public rather than doing a long-term

12   clinical trial themselves.  Data being reported in from the

13   public, the voluntary reporting system that doctors have in

14   this country of reporting to the manufacturer, they were

15   looking at that in order to redesign their products.  They           02:05:25

16   ignored the cause of obvious Recovery failures prior to

17   designing the G2 and those failures were migration, fracture,

18   tilt, and perforation, all of the failure modalities that Ms.

19   Booker suffered.

20           Bard knew that the Recovery was not safe for market          02:05:45

21   and they had not solved their obvious problems.  And knowing

22   that, they chose to continue to ignore filter failures.

23   Recovery was cleared for market based on the FDA honor system

24   and Bard had never tested the environment of use.

25           And how did they handle that?  How did they do it?           02:06:08

United States District Court

MARCH 14, 2018 P.M.

1   The evidence will show it was marketing.  Their own internal            02:06:11

2   documents will reveal, and testimony will reveal, that the

3   message they were sending out to the medical community was how

4   does Bard deal with untested failure modes?  And the answer

5   was:  Users can be swayed by aggressive marketing in spite of           02:06:23

6   negative clinical experience.

7           Bard continued to ignore and not solve the multiple

8   failures that were coming in and kept their products on the

9   market and the consequences are tilt, migration, perforation,

10  and fracture, all of which Sheri Booker suffered.                        02:06:50

11          To look at specific consequences, the Recovery

12  filter, which was the predecessor to the G2, went on the market

13  for full market release in 2003.  By December of that year they

14  had adverse events of migration, caudal and cephalad, downward

15  and to the heart, and fracture.                                          02:07:11

16          And within the same month they were putting together

17  a product design team to look at -- to question the design of

18  the Recovery filter.  Related to the issue of migration, the

19  review team would like to see objective elements of the

20  following elements:  Documentation that explains the                     02:07:30

21  establishment of the 50 millimeters of mercury acceptance

22  criteria for migration resistance.  The evidence will show that

23  as early as 2003 this line of filters internally, without

24  sharing, they were questioning the design.

25          Two months later, the Recovery filter experienced its            02:07:50

United States District Court

MARCH 14, 2018 P.M.

1    first death in the field.  There was a migration death reported          02:07:52

2    with the filter migrating to the heart, February of 2004.

3              During the Asch study, after the investigation of the

4    fracture that I mentioned that stopped the study, the standard

5    was that if another major migration were to occur, they would           02:08:09

6    stop the study and reevaluate the entire filter design.  But

7    once it was on the market, four years later, in February of

8    2014, after the first migration death of the same filter that

9    had been tested in Dr. Asch's hospital, they changed the

10   standard.  If a migration requires surgical intervention during          02:08:30

11   the course of this investigation, the Recovery filter will be

12   placed on hold, not redesigned, on hold.

13             Two months later the Recovery filter experienced a

14   second death in the field, a migration of the filter to the

15   heart and Bard put it on hold.  But the evidence will show they          02:08:49

16   didn't tell anybody.  They put it on hold internally and

17   continued to sell the product.

18             The next day, instead of making an announcement that

19   the product was on hold, the evidence will show that Bard hired

20   a PR firm.  They created a crisis communication plan as the              02:09:25

21   word got out that people were dying from this filter; and their

22   consulting physician, the evidence will show, stated that on

23   migration resistance testing, I wouldn't raise this subject if

24   at all possible.

25             A few days later Bard engaged in a Remedial Action             02:09:47

United States District Court

MARCH 14, 2018 P.M.

1    Plan and the same physician who said we shouldn't mention          02:09:49

2    migration filter resistance said that there were no design or

3    manufacturing defects found to be associated with the filter.

4           And not long after that, within days, the hold was

5    lifted and Bard continued to sell.  But two days after that,       02:10:07

6    the evidence will show that Bard was already in a meeting

7    trying to redesign the Recovery filter, redesign to the G2, the

8    next generation of Recovery filter that went into Ms. Booker.

9    They realized at that time that this 80 millimeters of mercury

10   pressure versus 50 millimeters of mercury pressure was a          02:10:33

11   problem and that G2 had to match, it had to be substantially

12   equivalent to the Simon Nitinol filter which could resist a

13   higher pressure in that vein as shown to them in their

14   simulated bench testing.

15          Additionally, about a month after their consulting        02:10:50

16   physician, who said don't mention migration testing, the

17   evidence will show that a quality engineer named Natalie Wong,

18   who will testify via videotape in this trial, had looked at the

19   same data and found that there was a statistically significant

20   difference between the Recovery and its predecessor device, the   02:11:09

21   Simon Nitinol.

22          By July of 2004 Bard is still questioning their

23   design.  Why migration deaths did not lead to a product hold.

24   The message was the Recovery filter has been tested to verify

25   that it meets the migration resistance parameters that have        02:11:32

United States District Court

MARCH 14, 2018 P.M.

1  been used for the Simon Nitinol filter.                          02:11:35

2          Similar to the way they had gotten around their

3  issues prior to that with the Recovery filter, the evidence

4  will show, they turned to marketing.

5          The same physician consultant that said don't discuss   02:11:48

6  migration resistance, he did a comparative test, comparative

7  meaning looking at Bard devices with its competitors, and the

8  reports of death were 4.6 times higher than all other filters.

9  Filter migrations were 4.4 times higher.  And filter

10  perforation was 4.1 times higher.  Filter fracture was 5.3     02:12:11

11  times higher and these differences were statistically

12  significant.

13          During the process of moving from what they called a

14  crisis for which they developed a communication plan, Bard was

15  in the midst of redesigning to create the Recovery G2 filter.   02:12:33

16  And one of their caudal migration tests, which is a bench test,

17  a laboratory test showed that the G2 could not perform as well

18  as the Simon Nitinol.  And using the Simon Nitinol as a

19  predecessor predicate filter to compare like the Recovery

20  filter had done, like they had done with the Recovery filter,   02:12:57

21  it failed.

22          In looking at the bottom of the graph, it may be

23  difficult to see but the line with the triangles is the G2 and

24  its performance.  And when comparing to it their first

25  permanent filter, the one that the medical director, the        02:13:10

United States District Court

MARCH 14, 2018 P.M.

1   evidence will show, said had a good safety profile, so you can   02:13:14

2   see at the top the SNF and the pink squares was performing

3   better.

4         So in order to get clearance of the G2 device, the

5   evidence will show that Bard packaged this up for another   02:13:32

6   510(k) application and instead of comparing it to the Simon

7   Nitinol filter, they changed it and made the predicate the

8   Recovery device.

9         If you recall, those three filters that I showed you,

10  Simon Nitinol, Recovery, G2, the building blocks, the Recovery   02:13:48

11  did not perform as well as the Simon Nitinol and as it was

12  failing, the redesign showed that the G2 could not perform as

13  well so it compared it to the Recovery filter and it was

14  cleared.

15        And as I mentioned before, the evidence of Bard   02:14:18

16  employees saying that marketing could solve the issues that

17  they were having, this is the G2 brochure, the marketing

18  brochure that Bard created for its new G2 filter, the one that

19  went in Sheri Booker.  It says:  We're taking strength and

20  stability to a new level.   02:14:36

21        And the testimony in this case will show that it did

22  take to it a new level, a lower level.

23        It also represented that the G2 increased migration

24  resistance and improved centering and enhanced fracture

25  resistance.  That was in August of 2005.  By December of 2004   02:14:51

United States District Court

MARCH 14, 2018 P.M.

1   the acting medical director at Bard, after looking at the          02:15:01

2   reports of injuries coming in associated with the G2 filter,

3   which was the modified Recovery, said I would like to look more

4   generally at the G2 complaints.  I have seen problems with

5   caudal migration, tilting, perforation, mis-deployment and       02:15:15

6   maybe one or two additional things.

7           The medical director also went on, the evidence and

8   testimony will show, to question the consequences of these

9   migrations and it concerned him with regard to efficacy of

10  these filters, not only the safety but the efficacy.  The same   02:15:35

11  medical director went on to say, the evidence will show, the

12  G2, which is implanted in Ms. Booker, is a permanent filter.

13  We also have the SNF.  That has virtually no complaints

14  associated with it.  Why shouldn't doctors be using that one

15  rather than the G2?                                              02:15:57

16          And the evidence will show this was not shared.  This

17  belief, this comment by the medical director at Bard, was not

18  shared with the medical community and it was not shared with

19  the FDA.  In 2006 a product design testing protocol was run.

20  And you can see on the graphs on your screen on the right-hand   02:16:19

21  side where it's blown up, caudal migrations for the G2 filter,

22  all the way to the left, were higher than both the Recovery and

23  the Simon Nitinol filter.

24          Bard continued to trend its products and you can see

25  on the screen that you're looking at now the evidence will show  02:16:42

United States District Court

MARCH 14, 2018 P.M.

1    that when comparing the Recovery filter with the G2, caudal      02:16:45

2    migrations with the G2 were higher, tilt was higher, and

3    perforation was higher.

4         In March of 2006, Natalie Wong who, again, you will

5    hear testify via videotape, began do investigate and determined    02:17:04

6    that the number of G2 caudal migrations, the downward

7    migrations which Sheri Booker suffered, represented an

8    unacceptable risk due to their failure mode effects analysis

9    that they looked at.  That means that caudal migration was

10   determined to be an unacceptable risk, a failure that           02:17:27

11   contributes to death, severely injury, permanent significant

12   disability or severe occupational illness.

13        Now, Bard did conduct another clinical trial, not

14   before the G2 was marketed, at the time it was marketed, and at

15   the time it was inserted in Sheri Booker, there still was the    02:17:43

16   single pilot clinical trial study performed by Murray Asch with

17   the 35 patients to look at retrievability.

18        But after it went on the market, Bard began to

19   recruit for another clinical trial called the EVEREST study and

20   the intent, again, was to look at retrievability.  It was not a    02:18:02

21   long-term safety and efficacy study.  It did not look at the

22   long-term effects.  It looked at retrievability and the purpose

23   of doing that test is that when it hit the market, the G2 was

24   cleared only for permanent placement.  And, again, this option,

25   the opportunity of having a retrievable filter, was valuable.    02:18:21

United States District Court

MARCH 14, 2018 P.M.

1        The slide in front of you, I apologize, is small but            02:18:29

2   it presents the filter complications that were shown in the

3   EVEREST trial.  Caudal migrations were high, fractures, tilts,

4   penetrations.  The evidence will show that there were 83 people

5   in this test.  100 were enrolled.  Only 83 completed the            02:18:45

6   protocol and the test and, as you can see, the evidence will

7   show the incidence of caudal migration, tilts, and penetrations

8   were high.

9        Again, back to the cascade of failures Sheri Booker

10  suffered:  Tilt, migration, perforation, and fracture.  The         02:19:14

11  evidence will show that Bard was seeing this at higher rates.

12  In the Recovery filter, the predecessor prior to Sheri Booker

13  receiving her G2, and then afterwards with the reactive mind

14  set that they had.

15        She suffered individual caudal migration.  Her filter         02:19:35

16  tilted 18 to 20 percent according to the evidence.  She had six

17  perforations:  An eight millimeter penetration into her any

18  aorta, which you saw the depiction of on the screen;

19  penetration into her spine; and perforation of the psoas

20  muscle, which is the muscle in the lower abdomen.  She suffered     02:19:56

21  three fractures:  One surgically removed, one removed through

22  open heart surgery in the right atrium, and, as I said, one

23  piece remains in her vena cava today.

24        Sheri Booker endured two removal procedures for a

25  filter that was supposed to be permanent seven years after she      02:20:22

United States District Court

MARCH 14, 2018 P.M.

1   received it with no clinical trial showing long-term safety and          02:20:24

2   efficacy.

3          This is her first surgery percutaneously with an

4   attempt to remove the filter pieces from her heart and the

5   filter from her vena cava.                                               02:20:45

6          This is an x-ray of her filter and a depiction of the

7   procedure she endured.  Her doctor was unsuccessful at the

8   first attempt to remove it and the second time he used a

9   different tool.  He was able to collect the filter but the

10  filter fragments remained behind.                                        02:22:30

11         And this depicts the successful removal of one of the

12  pieces that was perforating her aorta and a piece still remains

13  in her vena cava.  This is a depiction of the surgery I

14  described to you earlier with the filter fragment that had

15  traveled to her heart and Dr. Kang's attempted retrieval which           02:23:30

16  was not a clean surgery in attempting to remove it.

17         And the evidence and testimony that you'll hear in

18  this trial is when Dr. Kang was attempting to remove this

19  filter, as I said, it was not a clean surgery.  His attempts to

20  remove it, there was damage to some of the structures in her             02:24:43

21  heart while attempting to remove the filter that had migrated

22  to her heart.  And with one piece still remaining in her heart

23  at that time and the damage due to the attempts to retrieve the

24  filter fracture, a piece in the first place, Sheri then

25  underwent open heart surgery.                                            02:25:39

United States District Court

MARCH 14, 2018 P.M.

1          During this surgery you'll hear testimony about it          02:28:49

2     that Sheri was put on the heart-lung machine to bypass during

3     this procedure.

4          The fracture is still embedded, seen at the bottom of

5     the screen.  And this scan is a cross-section looking from the          02:30:36

6     bottom of the body up.  Whereas the first attempt of the

7     percutaneous matter was unsuccessful, the open heart procedure

8     was successful to remove the fragment from Sheri's heart and

9     the damage and the difficult surgery of attempting to retrieve

10    it the first time was repaired.          02:32:08

11         The evidence will show that Sheri suffered a lot and

12    along with those risks that she endured without knowing it

13    leads to future complications.  And the testimony in this case

14    and evidence will show that she is at a future risk of

15    deterioration of the tricuspid valve potentially requiring          02:32:46

16    valve repair in the future.  She has a 60 percent mortality

17    rate survival right at ten years and there is an irretrievable

18    filter fragment as of now in her vena cava putting her at

19    future risk for embolization of that fragment to her heart as

20    it still remains in the vena cava which returns blood back to          02:33:07

21    the heart.

22         I've talked you through an introduction and the

23    chapters of Sheri's story, of Bard's choices, and the next

24    chapter is up to you.  Your role as jurors, you'll be

25    evaluating evidence as the judge has charged you.  You'll be          02:33:28

United States District Court

MARCH 14, 2018 P.M.

 1  making the decisions based on what you see and deciding the              02:33:33
 2  outcome at this point.

 3          All medical devices implanted in the body carry
 4  risks.  And when a company knows its new medical device
 5  increases the risks but sells it anyhow, harm occurs.  And all          02:33:49
 6  IVC filters carry risk.

 7          But Bard knew its IVC filters increased the risks but
 8  sold them anyway, and Sheri Booker suffered permanent injuries,
 9  risks of deterioration of her tricuspid valve due to the
10  attempts to repair the damage that was done by the fractured            02:34:10
11  piece that went to her heart and may have future surgeries.

12          Again, I thank you for your service.

13          THE COURT:  All right.  Thank you.  Members of the
14  jury, we will take an afternoon break at this point.  We will
15  plan to resume at ten minutes to the hour.  Please remember not         02:34:32
16  to discuss the case and we will excuse you at this time.

17          You can go ahead and go right out the door.

18          (Jury departs at 2:34.)

19          THE COURT:  All right.  We will see you at ten
20  minutes to the hour.  Thank you.                                        02:35:10

21          (Recess at 2:35; resumed at 2:51.)

22          (Jury enters at 2:51.)

23          (Court was called to order by the courtroom deputy.)

24          THE COURT:  Thank you.  Please be seated.

25          Mr. North, you may proceed.                                     02:52:50

United States District Court

MARCH 14, 2018 P.M.

1          MR. NORTH:  Thank you, Your Honor.                          02:52:54

2          May it please the Court, ladies and gentlemen of the

3    jury, good afternoon.  As I introduced myself at the beginning

4    of the case, my name is Richard North.  And by coincidence, I

5    come from Atlanta, Georgia -- if you hear a little twang in the    02:53:05

6    accent -- the same place that Ms. Booker lives.  And my

7    partner, Elizabeth Helm, also resides in Atlanta with me.  And

8    we are joined with Mr. Jim Condo who practices law here in

9    Phoenix.

10          For the rest of the my presentation today, I would         02:53:26

11   like to tell you what we think the evidence will show which is

12   the other side of the story here.  The evidence you will hear

13   during this trial goes far beyond the bits and pieces we

14   believe that you were just presented with.  The evidence in

15   this trial over the next three weeks will go far beyond the       02:53:46

16   selected documents that may be taken out of the context that

17   you've seen.

18          And the evidence will also go far beyond the snippets

19   of testimony you've heard.  And taken in context, we believe

20   that the whole story, all of the evidence, will demonstrate to    02:54:01

21   you that the G2 filter, the filter at issue in this case, is a

22   life-saving device and that because of that and because of that

23   whole story, that Bard stands wrongly accused in this

24   courtroom.

25          The key issue throughout this case through the             02:54:21

United States District Court

MARCH 14, 2018 P.M.

1   testimony, through the witnesses, through the documents and          02:54:24

2   even ending I believe in the judge's charge about or

3   instructions to you about the law is going to be the

4   risk-benefit analysis, whether the risks associated with this

5   G2 filter outweigh its benefits.                                     02:54:40

6          Now, for the last hour plus you have heard a lot of

7   evidence about the so-called risks associated with inferior

8   vena cava filters.  You did not hear much about the benefits.

9   And let's talk for a moment at the outset what the evidence

10  will demonstrate concerning the benefits of this device in a        02:55:04

11  patient like Ms. Booker.

12         Ms. Booker, unfortunately, has had a complicated

13  medical history.  She had two heart attacks by the age of 32.

14  At the age of 32 she had her first pulmonary embolism,

15  something that you will hear during the course of this case,        02:55:27

16  could have easily killed her.  Five years later, in 2007, she

17  had a second pulmonary embolism also involved with deep vein

18  thrombosis, or clotting, in the legs before it went up to the

19  lungs.

20         Only a few months -- and once she had that second           02:55:47

21  pulmonary embolism, her doctors tried to prevent another one

22  from occurring.  And knowing that another pulmonary embolism

23  could kill her, put her on anticoagulants, which we know of

24  often, those of us not in the medical field, often refer to as

25  blood thinners, things like Coumadin.  They put her on a blood     02:56:10

MARCH 14, 2018 P.M.

1    thinner trying to prevent a third clotting episode which could      02:56:12

2    be fatal.

3           But then several months later she was, unfortunately,

4    diagnosed with cervical cancer and she had to have a surgical

5    procedure done to treat that cancer and her doctors were in a       02:56:26

6    quandary.  What are they going to do?  She cannot be on these

7    blood thinners and anticoagulants and undergo a surgical

8    procedure.  She might bleed to death.  What could they do to

9    protect her about the possibility of a third pulmonary embolism

10   which could have killed her also?                                   02:56:52

11          What they did was they implanted a Bard G2 filter in

12   2007 and that filter remained in Ms. Booker for seven years and

13   not once in that seven years did she ever have another

14   pulmonary embolism.

15          I submit to you, ladies and gentlemen, that's the           02:57:15

16   best evidence of the benefits and the life-saving benefits of

17   this device.

18          As I mentioned to you, my purpose today is to try to

19   present to you what we believe the whole story is not just an

20   occasional chapter, missing other chapters, not an occasional      02:57:34

21   page, missing other pages, but to summarize for you the whole

22   story.  And we are going to ask you to please keep an open mind

23   during all of this case until you have heard all of the

24   evidence and the whole story.  And we believe that when you

25   hear the whole story, and not the bits and pieces that you         02:57:56

United States District Court

MARCH 14, 2018 P.M.

1    heard earlier, it's going to tell you a different story.                02:57:59

2              Some chapters were missing today, chapters such as

3    the notion that they claim evidence that Bard's marketing

4    expenditures exceeded their research and development

5    investment.  There will be no evidence of that.  They seem to          02:58:16

6    suggest Bard's testing was flawed, but the whole story will

7    show you that the testing was comprehensive and that the

8    testing was not just rubber-stamped but was reviewed in detail

9    by the United States Food and Drug Administration.  And we ask

10   you to keep an open mind until you have heard, by the                  02:58:38

11   conclusion of this case, the whole story.

12             The purpose of opening statement is to provide you a

13   roadmap, a sense of where we're going, I plan to go along the

14   way, and I would like to talk to you today and give you the

15   roadmap.  Four stops along the way.                                    02:58:58

16             First I wanted to talk to you about the defendants.

17   I want you to know who my clients are.  Then I want to talk to

18   you more about the device, G2 filter, then I would like to talk

19   to you a little bit more about Ms. Booker's medical history and

20   then I would like to talk to you about the plaintiff's burden,         02:59:20

21   the elements they have to show to recover in this case and what

22   the evidence says regarding each of those elements.

23             Let's begin with the defendants, Bard, C.R. Bard, and

24   Bard Peripheral Vascular and I have the honor to represent the

25   men and women of those two companies.                                  02:59:42

United States District Court

MARCH 14, 2018 P.M.

1         Bard was found more than 100 years ago by a physician   02:59:47

2  by the name of Charles Russell Bard who became interested in

3  treating urinary discomfort and developed what was called

4  the -- or still is called today the Foley catheter, a device

5  I'm sure many of you have been exposed to in the hospital   03:00:04

6  setting.  The company has been around for over 100 years.  The

7  company is located in Murray Hill, New Jersey, and it has a

8  number of specialty areas:  Vascular, urology -- that's how I

9  first got involved with Bard, they have a Urology Division

10  outside of Atlanta -- oncology, surgical specialty.   03:00:28

11        And then here in Tempe, Arizona, is the Vascular

12  Division, Bard Peripheral Vascular.  And during the course of

13  is trial, you're going to meet a lot of the men and women from

14  Bard Peripheral Vascular.

15        This company develops vascular and oncology devices.   03:00:48

16  It's one of the leading seller in the country of biopsy needles

17  for the treatment of breast cancer.  It sells stents,

18  drug-eluding stents for the treatment of coronary artery

19  disease.  It sells filters.  It sells ports.  It sells a lot of

20  medical devices used to treat very serious conditions but Bard   03:01:09

21  is not a nameless, faceless corporation.  It's made up of men

22  and women professionals, many of whom you'll meet.  It's made

23  up of engineers, one who will be I think the first witness,

24  Andre Chanduszko.  It's made up of physicians.  It's made up of

25  regulatory specialists.  It's made up of clinical study   03:01:34

United States District Court

MARCH 14, 2018 P.M.

1    analysts and quality assurance specialists, men and women        03:01:37

2    seeking to follow core values to introduce innovative medical

3    products for the treatment of serious illnesses and conditions.

4          Let's go to the second stop on this road trip, the

5    roadmap, the device itself.  It's called the G2 and it's pretty   03:01:58

6    easy to figure out that's because it's Bard's second generation

7    retrievable filter, the G2.

8          What is it designed to treat?  I think most of us are

9    familiar with these conditions but just to be certain, deep

10   vein thrombosis, that's where clots develop in the legs.  You     03:02:21

11   often hear of people complaining or suffering from that after

12   long airplane rides, for example.

13         Deep vein thrombosis, when the clots break loose, can

14   become a pulmonary embolism.  That is when the clot travels

15   generally to the heart, brain or lungs and it can be a fatal      03:02:39

16   event.  Each year, because of deep vein thrombosis,

17   approximately two million Americans are affected.  Statistics

18   and the evidence will show up to 600,000 are hospitalized.

19   Estimates are that 300,000 of our fellow Americans die every

20   year from pulmonary embolism.  Estimates show that almost a       03:03:05

21   third of the patients who have had a pulmonary embolism like

22   Ms. Booker did first in 2002, will have a recurrent one within

23   ten years.

24         And this is a statistic that I always find startling.

25   That DVT related pulmonary embolisms, in other words, pulmonary   03:03:26

United States District Court

MARCH 14, 2018 P.M.

1  emboli caused by the deep vein thrombosis is the leading cause        03:03:33

2  of preventable death in American hospitals.  This is not a

3  cosmetic problem.  This is not a superficial condition.  This

4  is a life-threatening condition that this filter is intended to

5  be treating.                                                         03:03:49

6          The United States Surgeon General has recognized that

7  pulmonary embolism is a major health issue in this country and

8  in 2008 he issued a call to arms to the medical community to

9  mobilize, to treat this disease.

10         So what is the IVC filter?  As Ms. Zaic told you, and       03:04:19

11 showed you in her animation, it's placed into the interior vena

12 cava and its purpose is to block clots coming from the legs to

13 the heart and lungs.  It is inserted, and I'm going to show you

14 how that's done, what's called percutaneously.  It's not an

15 open surgical procedure but it's usually through an incision in   03:04:46

16 the groin or in the jugular and it's inserted through a

17 catheter and it's a procedure that only takes about 30 minutes

18 to put this filter inside someone.

19         And the filter is intended and cleared by the FDA for

20 the treatment of individuals who, for whatever reason, cannot     03:05:04

21 be taking anticoagulants because if you have a clotting issue,

22 anticoagulants are the first line of defense in medical

23 treatment.  But if you can't be on anticoagulants just like

24 Ms. Booker could not when she had to have that surgical

25 procedure for the cervical cancer, then a filter is a device      03:05:26

United States District Court

MARCH 14, 2018 P.M.

1   intended to prevent clots and work the same way or a similar      03:05:31

2   way in that scenario.

3           And what the filter is supposed to do is just like a

4   strainer.  You might have at home in the kitchen.  It's

5   supposed to strain the blood of the clots and to break them up    03:05:48

6   as they strike.

7           Now I would like to show you a little animation of a

8   filter showing the clot.  This is not the exact G2 filter but

9   it's the same configuration, but we had this animation and it

10  shows the same way that any filter would be breaking up clots.     03:06:04

11  Like a strainer.

12          Let me tell you a little bit about the history of the

13  G2 filter.  You heard a lot about the Simon Nitinol filter

14  developed by a well-known physician in Boston by the name of

15  Dr. Morris Simon.  It was introduced in 1990 and it was a          03:06:41

16  permanent filter.

17          Once you put it into a person, it was there for a

18  lifetime.  The only way it could be removed would be with some

19  open, extremely invasive, potentially dangerous surgery.  Bard

20  acquired the rights to the Recovery filter which was under         03:07:05

21  development at the time by the NMT company and the Simon

22  Nitinol filter in October of 2001 and then in January of 2003

23  Bard introduced, after it was cleared by the US FDA the

24  Recovery filter.

25          Within two years and will you hear how Bard is -- its      03:07:27

United States District Court

MARCH 14, 2018 P.M.

1    business approach to things, constantly trying to innovate and          03:07:31
2    improve its products, began work on the second generation
3    filter called the G2.  The FDA cleared the G2 filter for use as
4    a permanent filter in 2005.  And then between August of 2005
5    and October of 2007, in consultation with the FDA, Bard          03:07:55
6    conducted the EVEREST clinical trial for the G2 filter and then
7    in January 2008, the FDA cleared the G2 filter as a retrievable
8    filter.
9            Retrievable filters were a revolutionary development
10   as a tool for doctors to treat pulmonary emboli.  Before          03:08:20
11   retrievable filters, IVC optional filters had to be removed
12   within 10 to 14 days.  And if you had a patient that needed the
13   filter for longer than 10 to 14 days, your only alternative was
14   a permanent filter.
15           On the other hand, doctors did not want to put          03:08:46
16   permanent filters in younger people the age of Ms. Booker.  A
17   doctor would have not have wanted to have done that where that
18   filter has to stay there for a lifetime.  In fact, will you
19   hear the testimony of the physician who implanted the filter in
20   Ms. Booker who says I wanted to implant a filter that I knew          03:09:04
21   could be retrieved.  He wanted a retrievable filter.
22           There were many sorts of patients, young oncology
23   patients, young trauma patients for whom filters were never an
24   option beforehand because no doctor would put a permanent
25   filter in a 19-year-old motorcycle accident victim who's only          03:09:25

United States District Court

MARCH 14, 2018 P.M.

1    going to have a clotting risk for, let's say, two or three          03:09:30

2    months while they are healing.  But with the Bard Recovery

3    filter, the first on the market, doctors could retrieve these

4    filters after a lengthy period of time.  It's called an indwell

5    time, after it had been in the body for a long period of time.    03:09:49

6          You're going to hear doctors, experts, tell you that

7    there are many reports in literature of the G2 filter being

8    successfully retrieved a year, two years, five years after it's

9    implanted.  And until Bard started introducing to the market

10   these retrievable filters, that was an option that physicians     03:10:09

11   did not have to treat their patients.

12         And the G2 filter the doctor could choose.  It was

13   designed to be left in permanently if the doctor so chose or to

14   retrieve, be retrieved.

15         And, again, it was a especially beneficial for             03:10:29

16   patients with only temporary need for filter and it reduced the

17   problems that might be associated with the long-term

18   implantation of a filter, particularly in someone who no longer

19   needed it.

20         These filters are also unique because they are made       03:10:48

21   of a very unusual substance called Nitinol.  It is an acronym

22   for something called Nickel-titanium Naval Ordinance Laboratory

23   and why is it called that sort of strange name?  Because Navy

24   scientists developed this substance or this material in 1962.

25   What is unique about it is it has a shape memory.  Once you        03:11:14

United States District Court

MARCH 14, 2018 P.M.

1    cast the device, go through the heat treatment to cast it in          03:11:19

2    the shape you want it, you then can compress it but it

3    remembers its original shape.  And I say remember of course in

4    quotations.  But it will then, when released, spring back to

5    its original shape.  And that is why it's such a unique          03:11:38

6    substance and it was designed initially by the Navy for

7    military publics.

8            This is an animation that shows you how the filter is

9    implanted and, again, it's through a catheter through the

10   groin.  The wire is brought up.  The catheter is brought up,          03:11:58

11   the filter is loaded, released and you see it.  It springs back

12   to its original shape the way it had been cast in.  That's the

13   shape memory.  And there's a separate way it can be implanted

14   with a similar sort of process but through the jugular vein and

15   it just depends on the patient and their anatomy which          03:12:51

16   direction the doctors like to use.

17           Now, when it's retrieved in what they call the

18   percutaneous procedure, it's always done from the jugular.  And

19   here is an animation and this has -- this is the same filter

20   but a later version with a little hook on it.  That's what we          03:13:08

21   have for the animation.  The guidewire comes down and comes

22   through the filter and then a separate device called the

23   recovery cone comes.  It collapses the filter and draws it into

24   the catheter and then the catheter and the guidewire are

25   removed.          03:13:55

United States District Court

MARCH 14, 2018 P.M.

 1          Again, as I mentioned earlier, the G2 is the second          03:14:02
 2    generation Bard retrievable filter.  Much of the evidence
 3    you're going to hear in this case, however, is going to concern
 4    the Recovery filter, the first generation filter.  Maybe 90
 5    percent of what I believe you just heard in opening statement     03:14:21
 6    by the plaintiff concerned the Recovery filter.  But when the
 7    case is actually decided and goes to the jury, what you will be
 8    deciding is what is the evidence concerning a defect not in the
 9    Recovery filter but in the G2 filter.

10          And the G2 filter, the evidence will show, deserves          03:14:44
11    to be judged on its own merits.  It is a different filter.
12    Sure there are similarities.  Sure it was built off the
13    original platform of the Recovery filter; but when Bard put the
14    first retrievable filter out there on the market and began
15    seeing the clinical experience, there were some reports of        03:15:04
16    complications just as you'll learn there are reports of
17    complications with every inferior vena cava filter on the
18    market, the same complications:  Migration, tilt, perforation,
19    fracture.  Those are not complications unique to Bard filters.
20    Those are risks with all filters and risks that the medical       03:15:25
21    community knows about and has known about long before the
22    Recovery filter ever came onto the market.

23          But this -- Bard started assessing the clinical
24    experience with the Recovery filter.  It was also beginning the
25    development of the second generation filter, the G2.  And it      03:15:44

United States District Court

MARCH 14, 2018 P.M.

1   made specific changes and you're going to hear about those                03:15:49

2   changes in great detail, specific changes to make this filter

3   more fracture-resistant and more migration-resistant.  And then

4   the evidence will show that the question is, did those changes

5   to the G2 filter succeed?  And we submit to you the evidence is    03:16:11

6   going to show overwhelmingly that they did.

7           Bard stopped selling the Recovery filter in 2005, two

8   years before Ms. Booker ever received her filter.  At that time

9   the G2 had been on the market for almost two years and had a

10  proven track record of low complications.  And Bard designed     03:16:35

11  the G2 filter to improve its migration resistance and to

12  improve its fracture resistance and the evidence will show that

13  it was a success.

14          This is a compilation of all the reports that Bard

15  has received up through the end of 2016 regarding the Recovery   03:17:02

16  filter applications and the G2 applications.  Look how much

17  better the fracture rate is for the G2 than it was for the

18  recovery.  Look how much better the migration rate was or is

19  for the G2 than it was for the recovery.  And also, as you will

20  learn, the migrations with the G2 were very different than the   03:17:32

21  migrations with the Recovery filter.  They showed you evidence

22  of migration deaths, some reports of those with the Recovery

23  filter and, yes, there were some reports of those, just like

24  there had been reports of migration deaths with virtually all

25  the filters in the market.  But what there hasn't been is a      03:17:51

United States District Court

MARCH 14, 2018 P.M.

1   report of a migration death with regard to the G2 filter.                          03:17:57

2         When Bard redesigned the Recovery into the G2, it

3   succeeded in preventing that filter from migrating to the

4   heart.  There were reports of that filter migrating downward or

5   the caudal direction on occasion, but you'll also hear           03:18:17

6   testimony as to how caudal migration is often or most of the

7   time not a significant clinical event.  A filter can go upward

8   to your heart and it can kill you.  It goes downward a little

9   bit and most doctors say that's not a serious problem.  And the

10  medical literature supports that.                                 03:18:39

11        What does that data show?  That based on the reports

12  of complications to Bard, 99 percent plus of G2 filters sold

13  had no reported fractures, no reported migrations, and no

14  reported perforations.  That is the data that this case will

15  turn on, I submit, and not the Recovery filter.                   03:19:06

16        Now, let's look at the evidence concerning

17  Ms. Booker.  Ms. Zaic gave you a little bit of background from

18  Ms. Booker.  She graduated from high school in 1988.  She

19  worked as a paralegal and actress.  She currently lives in

20  Atlanta and works at the Home Depot.  And here's that medical     03:19:30

21  history I talked to you about earlier.  She suffered a heart

22  attack in 2001.  She suffered a second heart attack in 2002.

23  She suffered her first pulmonary embolism at the age of 32 in

24  the year 2002.

25        Five years later, in May of 2007, she was                   03:20:01

United States District Court

MARCH 14, 2018 P.M.

1    hospitalized due to a second pulmonary embolism and she was          03:20:03

2    diagnosed with deep vein thrombosis.  She was hospitalized one

3    month later due to cervical bleeding.  She was diagnosed with

4    cervical cancer and her doctors had to stop the anticoagulants,

5    as I said, before undergoing a surgery procedure.  And the G2        03:20:25

6    filter was placed to prevent a subsequent PE.  She had had one

7    just a month before.  And her physician specifically wanted a

8    filter that could be retrieved.

9            Now, you will hear that at that time, the FDA had

10   only cleared the G2 filter for permanent use, not for               03:20:47

11   retrievable use; but you will also hear FDA experts say that

12   physicians may use devices how ever they think is appropriate

13   for their patients.

14           And all the doctors out there knew that the G2 was

15   under this clinical study and was capable, going to be capable      03:21:04

16   and cleared eventually for retrieval.  So many doctors were,

17   quite lawfully and quite appropriately, and consist with the

18   standard of medical care, retrieving this filter at that time.

19           Now, this is a very interesting event that you didn't

20   hear anything about in the plaintiff's presentation.  Two years     03:21:25

21   after that filter was implanted, Ms. Booker was in the hospital

22   for something unrelated and the fracture was observed on a

23   film.  This is a film taken in March of 2009.  You can see the

24   fractured arm adjacent to the filter and that arm is not in her

25   ventricle.  It is not in her heart.  It is right next to the        03:22:00

United States District Court

MARCH 14, 2018 P.M.

1    filter.  Right there.                                        03:22:04

2          Unfortunately, what happened was that the

3    radiologist, Dr. Amer, wrote in his report, all he said was IVC

4    filter is noted.  Even though that arm to a layperson, lay

5    people like us, is so apparent as being fractured right there, 03:22:22

6    this trained radiologist did not tell -- say anything to

7    Ms. Booker's treating physicians, the doctors who had ordered

8    the scan.  He didn't tell them, "Oops, you better look at this

9    filter.  There's been a fractured arm."  He didn't tell them,

10   "You might want to consider retrieving it."  That was,         03:22:42

11   unfortunately, a missed opportunity that could have prevented

12   everything that subsequently happened to Ms. Booker, because if

13   the doctors had noted that fracture at that point, the experts

14   will tell you that, including the plaintiff's own experts, that

15   filter could have been retrieved in one of these very quick and 03:23:02

16   easy percutaneous procedures and that strut that later went up

17   to her heart could have been retrieved at that time.  Not only

18   is the strut obvious but look how it compares to the normal

19   posture of the filter.  Something has happened to her filter

20   and you are going to hear testimony from experts that say that  03:23:28

21   whatever happened to Ms. Booker's filter is highly unusual as

22   far as what could be the cause of it.

23         But look at the normal configurations of a filter in

24   the body and how compressed hers is and turned like that.

25   Something happened there.  But regardless of what happened,     03:23:46

United States District Court

MARCH 14, 2018 P.M.

1   that is what the doctor saw in 2009 and all he reported to the    03:23:49

2   doctors treating her was, "IVC filter noted."  It was a missed

3   opportunity.

4           Five years later, coincidentally in an incidental

5   finding, the fractured filter in the heart was finally    03:24:08

6   identified.  But Ms. Booker cannot associate any symptoms with

7   that filter.  None of her physicians concluded that the filter

8   strut ever caused her pain and the incidental finding in -- the

9   finding in June 2014 was incidental when they were actually

10   testing her for kidney stones.    03:24:33

11           And what happened then?  Dr. Kang removed the filter

12   percutaneously.  You saw their animation of that.  He went

13   through the jugular vein and was able to remove that filter and

14   one of the struts there.  The other strut is completely encased

15   in the tissue, or what's called endothelialized, and is not at    03:24:53

16   risk, you will hear, for further movement.

17           He also tried percutaneously just through the

18   catheter to pull the strut out of the ventricle.  Unfortunately

19   during that procedure he damaged her tricuspid valve.  Her

20   tricuspid valve was not damaged by the strut of the filter.  It    03:25:15

21   was damaged by Dr. Kang in attempting to remove that strut.

22   Thereafter, she had to have heart surgery to repair the tear to

23   her tricuspid valve and also to remove the strut that Dr. Kang

24   was unable to remove.

25           Two months later she hired a lawyer and that will    03:25:43

United States District Court

MARCH 14, 2018 P.M.

1    become important later in this case, we submit to you, as you          03:25:45

2    see how -- listen to the doctors talk about their conversations

3    with her lawyers.

4           Now, the final stop in this road trip and on the

5    roadmap is the plaintiff's burden.  At the conclusion of the          03:26:02

6    case, Judge Campbell will instruct you concerning the law and

7    the plaintiff's claims and this is just an outline of what

8    those claims are:  They allege that the G2 filter has a design

9    defect.  They allege that it has a warning defect, that we

10   failed to warn doctors of the risks.  They have to prove             03:26:22

11   causation.  They have to prove that one of those defects,

12   either a design defect or a warning defect, was the cause of

13   the injuries.  And then you will have to assess what role

14   Dr. Amer, the radiologist that noted the filter, but didn't

15   tell anyone else about its status, what role he played and what     03:26:47

16   contribution that made to her injuries.

17          And throughout this all, throughout these claims, the

18   plaintiff will bear the burden of proof by a preponderance of

19   the evidence and you will have to determine, as I indicated

20   earlier, whether by a preponderance of the evidence the risks      03:27:13

21   of this device outweighed its life-saving benefits as the

22   plaintiffs have argued or will argue.

23          What are the benefits?  I told you about the benefits

24   of this filter in Ms. Booker.  Let's talk about the benefits of

25   these filters generally.                                             03:27:31

United States District Court

MARCH 14, 2018 P.M.

1          Estimates suggest there's a 30 percent death rate                  03:27:35

2     with a recurrent PE.  A patient who, like Ms. Booker, has had

3     one pulmonary embolism and then has another.  Anticoagulants,

4     which are the preferred method for treating these, are not

5     foolproof themselves.  A number of people die from                       03:27:50

6     anticoagulants often from bleeding incidents from bleeding too

7     much from the anticoagulants.

8          The statistics that Bard has compiled based on

9     reports to us, to the company, of complications over time show

10    that a minuscule, unfortunate but minuscule percentage of                03:28:11

11    patients who receive a Bard filter are then diagnosed with a

12    subsequent pulmonary embolism.  And an even smaller percentage

13    of Bard -- of patients receiving Bard filters suffer a fatal

14    pulmonary embolism.

15         What do these statistics mean?  I submit to you and I               03:28:36

16    believe that the experts will tell you during the course of

17    this trial that this means and shows that filters can save

18    lives.  That is their benefit.  And this data shows that Bard

19    filters are 99.99 percent effective in preventing subsequent

20    pulmonary emboli.  And this isn't just Bard and this just isn't          03:29:03

21    marketing hype.  This is the testimony you will hear from the

22    plaintiff's experts and the plaintiff's treating physicians,

23    all who agree that IVC filters just like the G2 filter save

24    lives.

25         This explains why doctors use these devices, because               03:29:28

MARCH 14, 2018 P.M.

1   they can be life-saving and should be life-saving even though          03:29:31

2   they all come with certain risks, all of them.

3            Why, you may ask, are there risks?  Why can't you

4   design a risk-free, complication-free filter?  It's because the

5   inferior vena cava is a dynamic area part of the anatomy.  It          03:29:52

6   is not static and still.  It moves.  There's blood flow,

7   there's pressures.  There's movement, there's coughing.

8   There's compression.  There are many different things that

9   affect the shape, size on a daily basis of the inferior vena

10  cava.                                                                   03:30:15

11           The plaintiffs have suggested that Bard never

12  understood that environment.  The evidence is going to show

13  you, ladies and gentlemen, that the men and women, the

14  engineers at Bard, are proven pioneers in understanding and

15  gaining knowledge about a part of the human anatomy that 15 to         03:30:32

16  20 years ago was not that well understood, that they have been

17  at the forefront of working with doctors and medical

18  specialists to develop the scientific understanding of that

19  part of the body.

20           These unusual pressures and conditions in the                03:30:55

21  inferior vena cava make it very difficult and a challenge for

22  design engineers who have to look at a lot of balancing because

23  if you want to make a filter able to retrieve, you still have

24  to have the anchors strong enough so that the filter won't

25  migrate or tilt frequently.                                            03:31:17

United States District Court

MARCH 14, 2018 P.M.

1       If you want to make the filter where it can be     03:31:22
2  retrieved, which physicians want these filters to be retrieved
3  for the most part in 2018 America and even earlier back in 2007
4  as Ms. Booker's doctor wanted, he wanted that filter to be able
5  to be retrieved, you can't have the arms and legs too thin.  If  03:31:42
6  they are too thin, they will fracture.  If they are too thick
7  and rigid, you can't retrieve it.  And the same thing with the
8  arms and leg spans.  They are design balances that have to be
9  made and the Bard engineers have worked for years and have
10  constantly worked to understand the best way to balance and the  03:32:05
11  G2 was their second effort in that regard and a success
12  according to the data.

13       Now, as I said, these risks are well-known in the
14  medical literature.  They have been reported by the Society of
15  Interventional Radiologists.  There are thousands of medical     03:32:26
16  articles reporting on complications with inferior vena cava
17  filters and very few -- well, some of those involve Bard
18  filters but many, many more involve other manufacturers'
19  filters.

20       The medical community knows that, unfortunately,           03:32:43
21  these complications with IVC filters are going to result in
22  death in a small number of people themselves.

23       And the medical community understands that these
24  filters, a certain number of them are going to penetrate, are
25  going to migrate, are going to fracture, that there are going    03:33:03

United States District Court

MARCH 14, 2018 P.M.

1   to be other complications.  This particular publication which          03:33:09

2   will you hear about comes from 2001, four years before the G2

3   filter was on the market, two years before the Recovery filter

4   was on the market.  These complications, unfortunately, occur

5   with all such devices.                                                03:33:24

6          Now, Bard doesn't produce and go out and sell these

7   filters in a vacuum.  This is a highly regulated industry and

8   you're going to hear about the FDA's involvement in reviewing

9   the G2 filter and you're going to see that the evidence shows

10  that it's much more than the rubber stamp that the plaintiffs        03:33:50

11  attempt to characterize.  The FDA, as early as 1999, published

12  a guidance for companies seeking to develop an inferior vena

13  cava filter.  This guidance from the FDA provides for testing.

14  It suggests that these manufacturers such as Bard do testing

15  for simulated deployment, clot trapping ability, filter            03:34:20

16  fracture, caval perforation, filter migration and more.  And

17  Bard did that testing with the G2 and you're going to hear

18  about it in detail.

19         And that testing showed that Bard had substantially

20  improved its retrievable filter over the Recovery filter in        03:34:40

21  doing this testing.

22         This is a chart that shows a comparison of the

23  fracture resistance between the G2, which is on the right, and

24  in the earlier days of the G2, they called it different things

25  when it was a prototype.  At this time they were calling it        03:35:00

United States District Court

MARCH 14, 2018 P.M.

1    modified RF, Recovery filter.  Look how much better the                    03:35:03

2    fracture resistance is for the G2 filter than it was for the

3    Recovery filter.

4           Similarly, the testing showed the same thing when it

5    comes to migration.  The migration percentage is much less in         03:35:17

6    the testing, the ability to avoid migration is much greater for

7    G2 than it ever was for the Recovery filter but there's more.

8    The guidance and what Bard did pursuant to the guidance, and

9    even going beyond what the FDA guidance required, included

10   many, many different types of studies.  Bard worked hand in          03:35:41

11   hand with the FDA.  You'll see the submissions Bard made to the

12   agency.  Pages and pages of test summaries and data and the FDA

13   didn't just say, "Okay, fine.  Go sell it."  The FDA came back

14   with questions, many questions, requiring additional data.

15          And only after Bard answered all of their questions          03:36:08

16   did the FDA eventually clear the device and it cleared the G2

17   three times effectively essentially.  First in August of 2005,

18   as I indicated, for permanent use.  Several months later it

19   approved a jugular delivery system for the G2 filter, and then

20   for retrievable use in January of 2008.                                  03:36:32

21          Bard's collaboration with the FDA did not end there.

22   Bard conducted what was called the EVEREST study.  The study

23   protocol had to be reviewed and approved by the FDA.  Bard

24   provided updates to the FDA on the progress of the study.  Bard

25   provided the FDA, and you will see it, with data about every        03:36:56

MARCH 14, 2018 P.M.

1  adverse event that occurred in the study.  And only after the          03:37:00

2  completion of that study and only after reviewing all of that

3  data, including the data of the adverse events that occurred,

4  did the FDA clear the device for retrievable use.

5          The plaintiffs will present you a great deal of                03:37:25

6  evidence concerning the Simon Nitinol filter and suggest that

7  it has a better track record and might be a safer alternative

8  design.  But that comparison is based on flawed data because as

9  you will hear, it is hard for physicians to monitor permanent

10 filters the same way they do retrievable filters because          03:37:43

11 doctors usually go back and see or often go back and see the

12 condition of retrievable filters where once a permanent filter

13 is placed, often in an elderly person, they may never be seen

14 again, the filter itself.

15         This is really an apples to oranges comparison.  A          03:38:00

16 doctor like the doctor who implanted the filter in Ms. Booker,

17 who wanted a retrievable filter for a woman who was in her

18 thirties at the time would never have implanted the Simon

19 Nitinol filter ever or any other permanent filter.

20         What's the clearest evidence that doctors don't want         03:38:22

21 to use these filters?  It's the sales data.  This shows the

22 sale of Bard, the G2 filter, versus the Simon Nitinol filter

23 over the years.

24         Very few doctors are buying the permanent filter from

25 Bard once the retrievable filter is available.  The plaintiff's    03:38:42

United States District Court

MARCH 14, 2018 P.M.

1    opening focuses mostly on the Recovery filter.  You will hear          03:38:56

2    during the course of this trial well-paid experts that they

3    will bring, experts that rely on just a few documents, and

4    you'll also hear that Bard has produced in this litigation

5    hundreds of thousands of pages of documents and you will see          03:39:16

6    only a few of those from the plaintiff, often out of context.

7    There are hundreds of medical articles out there in the medical

8    literature.  You will hear from the plaintiffs only citation to

9    a few of those and not the whole story and we believe that the

10   whole story will contradict a lot of what the evidence you're         03:39:39

11   going to hear in the plaintiff's claim.  And most of all, we

12   believe that the plaintiff's claim is contradicted by those

13   numbers.

14          Now, Bard's calculations of the reported complication

15   rates are not in a vacuum.  You're going to hear testimony            03:40:01

16   during this trial that only recently there was a medical

17   article published that looked at studies of retrievable filters

18   over a 32-year period, all published studies.  They tried to

19   figure out -- it's a called a meta analysis where you look at a

20   bunch of studies together and it showed that the rate of             03:40:34

21   fracture of Ms. Booker's primary complaint about her filter

22   with the G2 was .2 percent, much better than the Recovery

23   filter and almost identical to what Bard's internal data shows.

24          Let's talk quickly about the other claim, the warning

25   defect.  As I indicated to you earlier, the medical community        03:41:02

United States District Court

MARCH 14, 2018 P.M.

1    is well aware of these risks associated with inferior vena cava        03:41:05
2    filters.  But in every filter that is provided, in the box is
3    what's called instructions for use.  It's a document required
4    by the FDA.  The draft of it is submitted to the FDA when Bard
5    seeks clearance and in this IFU are warnings, a specific            03:41:23
6    warning about filter fracture.  And you'll see the IFU.  It
7    will be introduced as an exhibit.  It's a known complication of
8    vena cava filters.  Movement or migration of the filter,
9    perforation or other acute or chronic damage of the IVC wall.

10           Every doctor receiving one of these filters is warned       03:41:57
11   of -- you'll hear they all know about these risks from the
12   medical literature.  They are still warned that this can occur.
13   And Bard reminds doctors that all of these complications have
14   been associated with serious adverse events such as medical
15   intervention and/or death and they encourage doctors to do what     03:42:16
16   the doctor did in this case, make a risk-benefit analysis of
17   any of these complications should be weighed against the
18   inherent risk-benefit ratio for a patient who is at risk of
19   pulmonary embolism without intervention, and that's exactly
20   what Ms. Booker's doctor did.  Knowing the risks associated         03:42:41
21   with IVC filters, he decided that the threat of a third
22   pulmonary embolism outweighed those risks.

23           So how did the plaintiff say we didn't warn?  They
24   said we should have gone to the MAUDE database.  That's the
25   FDA's database of all records of complications with devices and     03:43:03

United States District Court

MARCH 14, 2018 P.M.

1    we should have compared our rate of complications based on that       03:43:07

2    data to other plaintiff's rate of complications.  They suggest

3    we should have -- we had do exactly what the evidence will show

4    the FDA says should not be done and that is to compare data

5    using the MAUDE database.                                             03:43:27

6           There will be issues of causation for you to

7    consider.  Did the filter cause the heart surgery?  There will

8    be some testimony that that piece that was in her heart.  If

9    her tricuspid valve had not been damaged, could have been left

10   there.  Many doctors would have left it there.  It was not         03:43:52

11   producing symptoms.  It was encased.  It was not in danger of

12   moving and as strange as it is for us as those of us who are

13   lay people to understand, and I was kind of surprised by this

14   when I first heard it, doctors don't consider it a serious

15   issue if people are carrying around metal bits sometimes in       03:44:14

16   their body.  Most people who have pacemakers have little metal

17   parts of the lead that are sometimes retained in the body.  You

18   will hear testimony that this could have been left.  You will

19   hear testimony, too, as I indicated earlier, that the doctors

20   had more than five years to discover the fractured strut next     03:44:37

21   to the IVC filter when it could have been removed

22   percutaneously.

23          You will hear that it was Dr. Kang's attempt to

24   remove strut and not the strut itself that damaged her

25   tricuspid valve.  And you will hear no evidence that the          03:45:04

United States District Court

MARCH 14, 2018 P.M.

1   warning was somehow a cause of this incident.  Dr. D'Ayala          03:45:06

2   testified -- never said in his deposition -- actually said he

3   read the IFU.  He said it was available to him, the

4   instructions for use.  But just because something is available

5   to you doesn't mean you've read it.  And he didn't seem to          03:45:24

6   recall it and there will be a serious question as to whatever

7   we had put in that IFU could have caused this injury if he did

8   not rely upon it.

9           And then we will also have an issue for you to

10  consider concerning Dr. Amer's fault.  That's again what I           03:45:42

11  mentioned.  What should he have said?  What should he have done

12  in 2009 when he saw that strut presumably?  It's so obvious but

13  said nothing to the doctors that were treating her.  And then

14  she will have to meet her burden of proof of showing what her

15  damages are.                                                         03:46:05

16          Ladies and gentlemen, as I said earlier, I hope you

17  will keep an open mind until you have heard the whole story.

18  And I believe that when you have heard the whole story, the

19  evidence is going to show you that these filters certainly have

20  risks but with the G2 filter, those were very low risks, as the     03:46:30

21  data shows, and these filters have very huge benefits.  They

22  can save your life just like they most likely saved

23  Ms. Booker's life.  The evidence will demonstrate that low

24  risk.

25          And, ladies and gentlemen, at the conclusion of the         03:46:57

United States District Court

MARCH 14, 2018 P.M.

1  case, I submit to you that all of the evidence taken together,  03:46:58

2  the whole story, will show you that Bard in this case has been

3  wrongly accused.  And at that time, I will ask you, as members

4  of a responsible jury, to please return a verdict in favor of

5  my clients, Bard and Bard Peripheral Vascular.  03:47:13

6          Thank you very much for your attention.

7          THE COURT:  All right.  Thank you, Mr. North.

8          Ladies and gentlemen, that concludes the opening

9  statement but we're going to keep going until 4:30 so we can

10  make progress in getting the case to you and so the next step  03:47:28

11  is going to be the plaintiff's first witness.

12          Counsel, if you want to move that lectern, you can.

13          Ladies and gentlemen, if you want to stand up for a

14  couple of minutes while they get organized for the first

15  witness, feel free to do that.  03:47:42

16          All right.  Counsel, your first witness?

17          MR. O'CONNOR:  Yes, Your Honor.  Andrzej Chanduszko.

18          THE COURT:  Is he here in the courtroom yet?

19          COURTROOM DEPUTY:  Sir, if you'll please come forward

20  and raise your right hand, please.  03:49:12

21          (ANDRZEJ CHANDUSZKO, a witness herein, was duly sworn

22  or affirmed.)

23          COURTROOM DEPUTY:  Sir, could you see please spell

24  your last name for us?

25          THE WITNESS:  Spell it?  03:49:26

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1    COURTROOM DEPUTY:  Yes, please.                      03:49:27

2    THE WITNESS:  C-H-A-N-D-U-S-Z-K-O.

3    THE COURT:  There's no K?

4    THE WITNESS:  Z-K-O.

5    COURTROOM DEPUTY:  Thank you, sir.  Please come have   03:49:41

6    a seat.

7    THE COURT:  Go ahead, Mr. O'Connor.

8    MR. O'CONNOR:  Thank you, Your Honor.

9                    **DIRECT EXAMINATION**

10   BY MR. O'CONNOR:                                      03:50:04

11   Q.   Would you please state your full name?

12   A.   My full name is Andre Chanduszko.

13   Q.   Mr. Chanduszko, my name is Mark O'Connor.  You and I have

14   never met before; is that correct?

15   A.   Correct.                                         03:50:20

16   Q.   You understand I'm one of the lawyers that represents

17   Sheri Booker?

18   A.   Yes.

19   Q.   Where do you currently work, Mr. Chanduszko?

20   A.   I work at Bard Peripheral Vascular.              03:50:28

21   Q.   And what is your position there?

22   A.   My position is principal engineer.

23   Q.   Principal engineer?

24   A.   Yes, that's correct.

25   Q.   And when did you first come to Bard?             03:50:39

United States District Court

190

ANDRZEJ CHANDUSZKO - Direct

1    A.    In 2004.                                                03:50:42

2    Q.    And you came from a company called Nitinol Medical

3    Technology, NMT?

4    A.    That's correct.

5    Q.    And you were an engineer there; is that right?     03:50:52

6    A.    Yes.

7    Q.    And when you were at NMT, you were involved in the

8    recovery project, the Recovery filter project?

9    A.    Yes, that's correct.

10   Q.    The Recovery was developed after the Simon Nitinol filter;  03:51:04

11   correct?

12   A.    That is correct, yes.

13   Q.    And Bard had purchased the Recovery and the Simon Nitinol

14   filter.  Is that fair?

15   A.    Could you repeat that, please, sir.                 03:51:19

16   Q.    Sure.  Eventually, the Simon Nitinol filter and the

17   Recovery filter became products of Bard; true?

18   A.    Yes, that's correct.  That's true.

19   Q.    And when you went over to Bard, you became involved in

20   2004 in the Recovery G1A project.  Is that fair?        03:51:35

21   A.    Yes, that's fair.

22   Q.    And the Recovery G1A is the G2?

23   A.    Yes.

24   Q.    Second generation of the Recovery filter?

25   A.    That is correct.                                    03:51:49

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1   Q.    Thank you.   Now, initially, you were a project leader of          03:51:50

2   the G2 project when you arrived at Bard in August of 2004; is

3   that correct?

4   A.    Yes, I was.

5   Q.    And eventually you were replaced?          03:52:09

6   A.    Yes.   So the -- when I came, the team was in the process

7   of being hired so then once the team was complete, I focused

8   more on the technical side and there was another person who

9   became the project leader.

10  Q.    The G1A project was an effort to redesign the Recovery          03:52:32

11  filter.   Fair?

12  A.    That's one way to describe it.

13  Q.    And when you were involved in the G2 project, the goal was

14  to make the G2 more migration-resistant -- resistant to

15  migration compared to the Recovery filter; true?          03:52:58

16  A.    That was one of the goals, yes.

17  Q.    And another goal was to redesign the G2 so that it would

18  be more resistant to fracture compared to the Recovery.   Is

19  that correct?

20  A.    So, yes, to design the G2 so it would be more          03:53:16

21  fracture-resistant to the Recovery filter.

22  Q.    There were two goals for the G2:   To make it more

23  resistant to migration and make it more resistant to fracture

24  compared to the earlier, the predicate device, the Recovery

25  filter.   Fair?          03:53:36

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1   A.   Those were the main two goals, yes.                    03:53:38

2   Q.   Now, you are an engineer; correct?

3   A.   Yes, I am.

4   Q.   And you have attended engineering school?

5   A.   Yes.                                                   03:53:49

6   Q.   You are not licensed in any state, are you?

7   A.   No, I'm not.

8   Q.   Since you got out of school, you have been working for

9   medical device companies; is that correct?

10  A.   Yes.                                                   03:53:59

11  Q.   You do agree, Mr. Chanduszko, that there are safety

12  responsibilities that a device manufacturer has?

13  A.   Yes, absolutely.

14  Q.   For one, the manufacturer must make a device that is as

15  safe and effective as possible; true?                      03:54:19

16  A.   So I don't know.   That sounds to me like legal term maybe.

17  I think we all strive to design a device that is as safe as

18  possible but I don't know if I can answer that in a legal

19  capacity.

20  Q.   Well, based upon your engineering background and what    03:54:47

21  you've testified to before, do you agree with the basic concept

22  that a manufacturer must make a device as safe and as effective

23  as possible?   Does that make sense to you?

24  A.   Generally speaking, as an engineer, yes.

25  Q.   A medical device manager should never put profits over  03:55:10

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1   patient safety; correct?                                          03:55:14

2   A.   Yes.  In my opinion, yes.

3   Q.   Patient safety should be a priority for companies like

4   Bard; true?

5   A.   Yes, absolutely.                                             03:55:21

6   Q.   So if Bard is bringing a product or a device to the

7   market, it must take steps that it is putting patient safety

8   number one when it brings that product.  Do you agree with

9   that?

10  A.   That would be my opinion, yes.                               03:55:37

11  Q.   And for medical devices that go in the human body, you

12  agree, don't you, Mr. Chanduszko, that a manufacturer like Bard

13  must conduct the necessary research and testing to understand

14  the anatomical environment where the device will be placed?

15  A.   Yes, generally speaking, yes.                                03:56:08

16  Q.   Essentially, the manufacturer, before it places a device

17  like an IVC filter on the market, must have an understanding of

18  the anatomy where that device is going to be?

19  A.   Yes, as much as possible.

20  Q.   Well, you agree with that, don't you?                        03:56:27

21  A.   Yes.

22  Q.   Now, you told us that design goals of the G2 were to be

23  more resistant to migration and more resistant to fracture

24  compared to the Recovery; correct?

25  A.   Yes, that is correct.                                        03:56:54

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1   Q.   But the design goals of -- involved in the G2 did not          03:56:59

2   include improvement of tilt resistance compared to the

3   Recovery; fair?

4   A.   I'm not sure if that's a true statement.

5   Q.   All right.  Let me get your deposition.                        03:57:20

6            MR. O'CONNOR:  May I approach the witness, Your

7   Honor?

8            THE COURT:  Is that with a copy of the deposition?

9            MR. O'CONNOR:  This is a copy of his deposition that

10  was taken on October 10, 2013.                                      03:57:47

11           THE COURT:  Why don't you bring it to Traci if you

12  would and she'll put it in front of the witness.

13  BY MR. O'CONNOR:

14  Q.   All right.  Mr. Chanduszko, do you recall going -- being

15  deposed on October 10, 2013, in a case against Bard, the           03:58:34

16  company you work for?

17  A.   Yes, I do.

18  Q.   And you've reviewed that deposition, have you?

19  A.   I have.

20  Q.   And if you would, would you please go to page 36 and go to    03:58:47

21  line ten and the question to you was:  You didn't answer my

22  question.  Was one of the project goals for redesigning the

23  Recovery filter into the G2 filter to improve its performance

24  in respect to tilting?

25           And your answer was:  Generally speaking, No.             03:59:16

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1              Now, did I read that correct?                          03:59:20

2    A.    I'm sorry.  Could you repeat the page number?

3    Q.    Oh.  I'm sorry.  Go to page 36.  I thought you were there.

4    A.    Yes, I am now.

5    Q.    And I am beginning to read on page 36 at line 10.  Are you  03:59:30

6    there?

7    A.    Yes.

8    Q.    All right.  Let me just make sure that I am reading this

9    correctly, okay?

10            The question began:  You didn't answer my question.    03:59:41

11   Was one of the project goals for redesigning the Recovery

12   filter into the G2 filter to improve its performance in respect

13   to tilting?

14            Now, did I read that question correctly?

15   A.    Yes.                                                       03:59:58

16   Q.    And would you please read to the jury your answer at line

17   14?

18   A.    Generally speaking, no.

19   Q.    Thank you.

20            And also one of the design goals of designing the       04:00:18

21   Recovery into the G2 did not include resistance to perforation;

22   is that correct that?

23   A.    Wouldn't be completely my understanding, no.

24   Q.    So you're saying I was not correct with that statement?

25   A.    So --                                                      04:00:41

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1   Q.   Let's go to your deposition.                                          04:00:43

2   A.   So there are --

3   Q.   Hold on.  We'll go to your deposition.  Go to page 38.  At

4   line one.  Let me know when you're there.

5   A.   Yes, I'm there.                                                       04:00:56

6   Q.   The question beginning at page 38, line one -- and, again,

7   we're looking at your deposition dated October 10, 2013;

8   correct?

9   A.   Yes, that's correct.

10  Q.   The question was:  Mr. Chanduszko, was one of the project            04:01:14

11  goals in redesigning the Recovery filter into the G2 filter to

12  improve its performance in respect to perforation?

13          Now, did I read that question correctly, sir?

14  A.   Yes.

15  Q.   And your answer was again:  Generally speaking, no.                  04:01:29

16          Did I read that correctly?

17  A.   That's part of the answer.

18  Q.   Yes.  And you go on to say:  The project goals were

19  stated, it is my best recollection, as to improve migration

20  resistance and improve fracture resistance.  Those were the two        04:01:45

21  goals.

22          True?

23  A.   That was my answer, yes.

24          MR. CONDO:  Your Honor, can we have the following

25  question and answer read, please.                                        04:01:55

United States District Court

ANDRZEJ CHANDUSZKO - Direct

```
 1            THE COURT:  You can do that on cross-examination.   04:01:57
 2            MR. CONDO:  Thank you.
 3   BY MR. O'CONNOR:
 4   Q.   Mr. Chanduszko, let me talk to you about a different area.
 5   I'm done with that.  Thank you --                              04:02:18
 6   A.   You're welcome.
 7   Q.   -- for looking at that for me.
 8            I want to talk to you about the concept of worst case
 9   condition, okay?
10   A.   Sure.                                                     04:02:31
11   Q.   To be safe and effective, a manufacturer like Bard must
12   understand the worst case conditions where a device -- that a
13   device will be exposed to.  Do you agree with that?
14   A.   So as reasonably expected, yes.  I don't know if it's
15   possible to know every worst case condition but these certainly 04:02:49
16   need to be researched.
17   Q.   Do you agree, Mr. Chanduszko, that in designing and
18   developing a device, that a manufacturer must understand the
19   worst case scenarios, yes or no, please.
20   A.   To the extent possible, yes.                              04:03:09
21   Q.   And to be safe and effective, a manufacturer like Bard
22   should test the device under reasonably foreseeable worst case
23   conditions.  Do you agree with that?
24   A.   Yes.
25   Q.   Knowing, understanding and testing for the worst case     04:03:38
```

ANDRZEJ CHANDUSZKO - Direct

1   scenario protects patient safety; true?                    04:03:41

2   A.   It might, yes.

3   Q.   Isn't that the goal?  To know the worst case conditions,

4   test for it, research it and the goal there is to put the

5   patient safety as a priority?                              04:03:58

6   A.   So the patient safety is a priority and, yes, the research

7   needs to be done to look at the worst case scenario.

8   Q.   I think we can just agree that one reason that engineers

9   like you who work for companies like Bard study research and

10  test for reasonable foreseeable worst case conditions among   04:04:23

11  others is for patient safety.  Do you agree with that concept,

12  sir?

13  A.   Yes.

14  Q.   Now, in terms of understanding the vena cava, that is the

15  part of the anatomy that is affected by an IVC filter; true?  04:04:51

16  A.   I'm sorry.  You said is affected by IVC filter.

17  Q.   Let me try again.  IVC filters are designed and developed

18  to be placed in the vena cava; correct?

19  A.   Yes, that is correct.

20  Q.   And the vena cava is the largest vein in the human body;   04:05:13

21  true?

22  A.   It is true.

23  Q.   And you agree that Bard should understand the anatomy of

24  the vena cava to understand what type of conditions a filter,

25  an IVC filter, will be exposed to after it's implanted?  Do you  04:05:31

ANDRZEJ CHANDUSZKO - Direct

 1   agree with that concept?                                              04:05:37

 2   A.   Yes.  Generally speaking, yes.

 3   Q.   So, for example, one thing Bard should have been aware of

 4   before ever putting the Recovery or the G2 on the market was

 5   distention and how that worked on the vena cava.  Do you agree       04:05:54

 6   with that?

 7   A.   Yes.

 8   Q.   How the vena cava would expand, how it would contract.

 9   That's something that Bard was required to know before it put

10   an IVC filter on the market.  Do you agree with that?               04:06:12

11   A.   So I don't know if that's a legal question.

12   Q.   Sir, can you answer the question yes or no?

13   A.   So I'm not sure.

14        MR. CONDO:  Your Honor, can he be permitted to finish

15   his answer?                                                         04:06:25

16        THE COURT:  Let's say this:  Sir, if he asks you to

17   answer yes or no, try to do that.  If you can't, you can tell

18   him, "I can't answer that question yes or no," and he can put a

19   different question to you.

20        Go ahead.  Reask the question if you would, Mr.               04:06:37

21   O'Connor.

22        MR. O'CONNOR:  Sure.

23   BY MR. O'CONNOR:

24   Q.   Do you agree that before putting the filter on the market,

25   Bard was required to research and have an understanding as to       04:06:51

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1   how the vena cava expanded and contracted?  Do you agree with          04:06:59

2   that concept?

3   A.    Yes.

4   Q.    Thank you.  And when you came to Bard and when you were

5   deposed, you did not know what, if anything, Bard knew about           04:07:15

6   distention of the vena cava; is that correct?

7   A.    So when I came to Bard, it was 2004 and when I was

8   deposed, was much later so I'm not sure if I understand the

9   question.  Maybe you can rephrase.

10  Q.    Well, let's just make sure we understand a couple of              04:07:41

11  concepts.  Distention means what as it relates to the vena

12  cava?  That's a term you're familiar with; true?

13  A.    Yes.  So distention means that it's an expansion of the

14  diameter.

15  Q.    And that is an important concept to know when you are             04:07:54

16  going to design a filter that is represented will stay in place

17  and stay centered in the vena cava; correct?

18  A.    So I agree to at least parts of what you said, yes, it is

19  an important concept to understand when you design a filter.

20  Q.    And as I understand what you have gone and testified              04:08:40

21  about, Mr. Chanduszko, you don't know what Bard did, if

22  anything, that the company did to understand the concept of

23  distention.  Is that fair?

24  A.    Yes, that's fair.  I was not with Bard at the time.

25  Q.    And you don't know what Bard knew or understood about            04:09:06

United States District Court

ANDRZEJ CHANDUSZKO - Direct

 1  distention before it released the Recovery correct?                    04:09:09

 2  A.   Yes, that's based on my understanding, yes, that's

 3  correct.

 4  Q.   And at the same time, you do not know what, if anything,

 5  Bard knew about distention of the vena cava before it released  04:09:26

 6  the G2 filter; true?

 7  A.   I know there was some work done because the filter was

 8  redesigned to accommodate that.  So, yes, there was knowledge

 9  about it.

10  Q.   Well, let's go to your deposition at 134.                         04:09:49

11            MR. CONDO:  Same deposition?

12            MR. O'CONNOR:  Yes, sir.

13  BY MR. O'CONNOR:

14  Q.   So if you begin at line ten, the question was:  And with

15  respect to the G2, you acknowledge that you don't know what     04:10:24

16  Bard actually did to determine how far the vena cava could

17  distend?

18            And your answer was:  I don't recall anything

19  specific.

20            Now, did I read that correctly?                              04:10:36

21  A.   Yes.

22  Q.   Now, while you were at Bard and you were involved in the

23  G2, you did become involved in some testing; correct?

24  A.   Yes, that is correct.

25  Q.   And is it fair that you used a computer analysis known as  04:11:27

ANDRZEJ CHANDUSZKO - Direct

1    the Finite Element Analysis?                                     04:11:33

2    A.    So I didn't use it myself but we hired other people to run

3    these tests.

4    Q.    Now, you became aware, didn't you, that the G2 was having

5    issues with fracture among others; correct?                     04:11:49

6    A.    At what time point?

7    Q.    Well, during the period you were at Bard after the G2 was

8    released you became aware that the G2 was migrating, tilting,

9    perforating and fracturing; correct?

10   A.    Yes, there were some reports that reported these kind of   04:12:09

11   accidents, yes.

12   Q.    And you received those reports; correct?

13   A.    So I wouldn't receive them personally but we had -- we

14   would look at these reports during team meetings.

15   Q.    And you came to learn that the G2 filter could migrate     04:12:26

16   caudally; true?

17   A.    Yes, that's correct.

18   Q.    Migrate downwards; right?

19   A.    Yes.

20   Q.    You came to learn that the G2 filter could tilt off center 04:12:36

21   into the vena cava; true?

22   A.    Yes.  It would tilt occasionally.

23   Q.    And you learned that not only could it tilt but it could

24   also perforate through the wall of the vena cava; right?

25   A.    So perforate or penetrate, yes, it's --                    04:12:56

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1  Q.   That's something you learned, you came to know?                    04:12:59

2  A.   Yes.

3  Q.   And you also learned that in addition to tilting and

4  perforating, that the legs, the arms on the G2 filter, could

5  fracture; true?                                                          04:13:12

6  A.   Yes, low rates but yes.

7  Q.   And a finite and element analysis is a way that engineers

8  go about resolving engineering problems; true?

9  A.   That's one of the tools, yes.

10 Q.   And, sir, the FEA was the only test done at Bard, the only   04:13:32

11 test done to investigate the likelihood of fracture in the G2

12 filter.  Do you agree with that?

13 A.   That's not my understanding, no.

14 Q.   All right.  Then let's look at another deposition.

15          MR. CONDO:  Could I have the date, please, Mark?          04:14:09

16          MR. O'CONNOR:  Yes.  It is going to be June 21 of

17 2013.

18 BY MR. O'CONNOR:

19 Q.   All right.  Mr. Chanduszko, do you recall having your

20 deposition taken on June 21, 2013?                                       04:15:03

21 A.   Yes, I do.

22 Q.   And I perhaps should have explained this before but can

23 you and I agree that a deposition is a procedure where you are

24 asked questions by a lawyer.  There's a court reporter that

25 puts you under oath and you're sworn to tell the truth just         04:15:21

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1   like you are here in this court.  Is that fair?                     04:15:24

2   A.   Yes, that's a proper description.

3   Q.   And at your depositions, you were represented by the

4   attorneys representing Bard, your company; correct?

5   A.   Yes.                                                           04:15:35

6   Q.   And you look like you were at that deposition that day for

7   a long time in New York City; is that right?

8   A.   Yes.

9   Q.   All right.  So, Mr. Chanduszko, if you can go to page 237

10  of this deposition, sir, and let me know when you're there.        04:16:12

11  A.   Yes, I'm there.

12  Q.   All right.  Thank you.

13          At that time, the attorney that was representing the

14  plaintiff in that case was asking you questions in New York

15  City; right?                                                        04:16:38

16  A.   Yes.

17  Q.   And at line ten he asked you a question:  Please describe

18  all stress analysis that was carried out to investigate the

19  likelihood of fatigue failure and/or fracture of the G2 IVC

20  filter.                                                             04:16:55

21          Did I read that question correctly?

22  A.   Yes.

23  Q.   And you responded with a clarification.  You said:  At the

24  time of development?

25          And his answer was.  Yes.                                   04:17:05

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1    A.    Yes.                                                    04:17:08

2    Q.    You understood that this attorney's question was directed

3    to your role at the time that the G2 filter was being

4    developed; right?

5    A.    Yes.                                                    04:17:18

6    Q.    And he asked you about the tests that were carried out to

7    investigate the likelihood of fatigue failure and fatigue

8    fracture and your answer was:  That's the computer-aided

9    engineering study that I mentioned.

10          He said:  The FEA, yes.                                04:17:36

11          He asked you then:  Anything else?

12          And you said:  Not to my recollection.

13          Now, did I read the questions and answers accurately

14   today?

15   A.    Yes.                                                    04:17:48

16   Q.    So at that time you were asked about what was done to

17   investigate fatigue failure and how that would result in

18   fatigue fracture of the G2 arms and the G2 legs and you

19   understood that was the point of the question; true?

20   A.    As I understood, he asked me specifically about analysis  04:18:08

21   as opposed to everything that was done.

22   Q.    All right.  And what your answer was is that you did do

23   the FEA; correct?

24   A.    As far as the analysis, yes.

25   Q.    All right.  Thank you.                                  04:18:21

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1          Now, one thing that you knew back before the G2 was          04:18:22

2     ever released was you knew about the concept of

3     electropolishing; correct?

4     A.   As a concept, yes.

5     Q.   And you knew as an engineer, a Bard engineer who became     04:18:40

6     aware that Bard filters were fracturing, you were aware that

7     there were ways to use electropolishing to make a filter more

8     resistant to fracture, didn't you?

9     A.   So that's a very general statement and it may or may not

10    be true.                                                          04:19:03

11    Q.   Well, do you agree electropolishing can help with fracture

12    resistance, yes or no?

13    A.   I'm afraid I can't answer it yes or no.  I know it can

14    help and I also know it can hurt.

15    Q.   Let's go to your June 21 deposition at 241.                  04:19:31

16          THE COURT:  Is that the same one you just had him

17    look at?

18          MR. O'CONNOR:  Yes, Your Honor.

19    BY MR. O'CONNOR:

20    Q.   June 21, not the October.  The New York deposition.  The    04:19:38

21    one we just talked about.

22    A.   Yes.

23    Q.   And if you go down to 241 at line 19, the New York

24    attorney asked you:  Would you agree that electropolishing is

25    good because it helps with fracture resistance?                  04:20:20

ANDRZEJ CHANDUSZKO - Direct

1                And your answer was:  It helps, yes.                      04:20:23

2                    Now, did I read the question and answer accurately?

3     A.    So the way I heard is actually incorrect.

4     Q.    Did I read it incorrectly?

5     A.    I believe so.                                                 04:20:35

6     Q.    Let me try it again.  The question was:  Would you agree

7     that electropolishing is good because it helps with fracture

8     resistance?

9                    Now, did I read that question correctly?

10    A.    Yes.                                                          04:20:44

11    Q.    And your answer was:  If it helps?

12                And your answer was:  Yes.

13    A.    That's correct.

14    Q.    Okay.  So now we have read your -- the question and answer

15    accurately; right?                                                 04:20:55

16    A.    Yes.

17    Q.    And just so you and I can leave this point, back before

18    the G2 was released, you, as an engineer, were aware of methods

19    and things that could be done with help like making a device

20    like a filter resistant to fracture; true?                        04:21:22

21    A.    If I knew of the things that could make it more

22    fracture-resistant.

23    Q.    Like electropolishing; correct?

24    A.    So, again, I can't say that I knew that electropolishing

25    would help G2 filter as it was being developed.  I cannot say I   04:21:36

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1    knew that.                                                          04:21:41

2    Q.   But you knew that that was something that could be

3    considered to help with fracture resistance back at that time.

4    Fair?

5    A.   Just as a general consideration among other things, yes.      04:21:50

6    Q.   Thank you.

7         Well, you were aware of electropolishing when you did

8    the research for the development of the G2; true?

9    A.   I just know about electropolishing, yes.

10   Q.   And you testified that electropolishing can help with         04:22:18

11   respect to both corrosion and making something more resistant

12   to fracture.   You agree?

13   A.   It can but it also can hurt these things.

14   Q.   Well, let's go to page 245, just so you can see where I

15   got your testimony from and how you answered it then; okay?        04:22:38

16   And same deposition again, the June 21 New York deposition.

17        All right.   And the question and answer goes to 247,

18   Mr. Chanduszko, but you were asked about a document and I can

19   show it to you when we have probably more time, where somebody

20   was talking and made a representation about electropolishing       04:23:35

21   and the point is you knew about electropolishing as a concept

22   when the G2 filter was being developed; true?

23   A.   Just electropolishing as a concept, yes, I knew that.

24   Q.   Now, just I think we're getting --

25        MR. O'CONNOR:   Your Honor, I probably am going to go          04:24:22

United States District Court

209

ANDRZEJ CHANDUSZKO - Direct

1    into another area that is going to take some time.  Would this    04:24:24

2    be a good time to --

3             THE COURT:  Not yet.  Let's go for five more minutes,

4    right to 4:30.

5             MR. O'CONNOR:  All right.  Thank you.    04:24:35

6    BY MR. O'CONNOR:

7    Q.   All right.  Mr. Chanduszko, you were charged to design out

8    the risk of the failure modes in the G2 filter.  Was that one

9    of your responsibilities?

10   A.   I'm sorry.  I did not understand that question.    04:24:59

11   Q.   In the G2 project, among your responsibilities was to

12   design out the risk of complications in the G2; correct?

13   A.   No.  That's -- I don't think that's correct.

14   Q.   Well, let's go to your deposition again on June 21 at 267

15   and I'm looking at 267, line 25, on to 268 on the New York    04:25:44

16   deposition.  Tell me when you're there.  June 21.

17   A.   Yes, I'm there.

18   Q.   All right.  So the question was:  Were you asked to work

19   on a design or to develop a design for the G2 that would design

20   out that risk?    04:26:00

21             Do you see where I read?

22   A.   Yes.

23   Q.   And your answer was:  I was asked to minimize any risk

24   possible.

25             Did I read your answer correctly?    04:26:11

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1   A.   That is a correct answer.                                      04:26:13

2   Q.   And is it fair to say, Mr. Chanduszko, before we wrap it

3   up today -- we'll continue tomorrow -- that you agree after the

4   Bard was designed researched and released to market that the G2

5   was still experiencing tilting?                                    04:26:36

6   A.   After the filter was designed and released?

7   Q.   Yes.

8   A.   Yes.

9   Q.   And the filter was experiencing migration?

10  A.   Yes, that's correct.                                          04:26:50

11  Q.   And that the filter was experiencing fractures?

12  A.   True.

13  Q.   And you were aware of that?

14  A.   Yes.

15  Q.   And you were aware that doctors and patients were            04:27:02

16  reporting to Bard that the G2 was fracturing, that the G2 was

17  migrating, and that the G2 was tilting?

18  A.   Yes.

19  Q.   And you knew that early into the release; true?

20  A.   I'm sorry.  Could you rephrase it, please.                    04:27:18

21  Q.   Sure.  You became aware of that after the Bard filter was

22  released into the market; correct?

23  A.   Yes.  After it was on the market for whatever long time I

24  did get reports, yes.

25  Q.   You knew and Bard was aware that the G2 had issues           04:27:45

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1   migrating downward caudally; correct?                          04:27:48

2   A.   Yes.

3   Q.   And you agree that the design of the G2, the design that

4   you were involved in, predisposes the filter to caudal

5   migration?                                                      04:28:04

6   A.   I'm not sure if I agree with that statement.

7   Q.   Well, did you testify to that in October of 2010?

8   A.   I'm not sure.

9   Q.   Well, let's find out.

10        I'm looking at your October 2010 deposition, sir.        04:28:29

11        MR. CONDO:   '10 or '13?

12        MR. O'CONNOR:   I'm sorry.   October 10 of 2013, yes.

13        MR. CONDO:   Thank you.

14   BY MR. O'CONNOR:

15   Q.   So the question to you was at line 16.   Can you go there, 04:29:04

16   page 275, line 16?

17   A.   I'm sorry.   I don't know if I have the correct one.

18   Q.   The October 10.   You have two depositions.

19   A.   I have June.

20        THE COURT:   Do you have the October one?               04:29:19

21        COURTROOM DEPUTY:   I do.

22   BY MR. O'CONNOR:

23   Q.   So I'm looking at page 275, Mr. Chanduszko, and, again,

24   we're talking about your October 10, 2013 deposition.   Let me

25   know when you get there and I'm looking to start the question  04:29:45

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1    at line 16.                                                    04:29:48

2    A.    275 and line 16?

3    Q.    Yes, sir.  And let's look at it together.  The question

4    was:  So what would predispose the G2 filter to caudal

5    migration over the Recovery filter?                            04:30:17

6             Do you see where I'm reading from?

7    A.    Yes, I do.

8    Q.    And your answer was:  I think the hypothesis is that since

9    the -- Recovery filter arms, they engage in the cava wall,

10   which, you know, occasionally causes the saluting arm, the G2,  04:30:29

11   they don't engage as readily, and therefore, they'd be less

12   resistant to caudal migration.

13            Now, did I answer that correctly -- I mean, did I

14   read that correctly?  Excuse me, sir.

15   A.    Yes.                                                      04:30:49

16   Q.    And what you were explaining to the lawyer in New York was

17   your theory why the G2 filter migrated downward compared to the

18   Recovery which was known to go upward in the vena cava;

19   correct?

20   A.    So I'm not sure --                                       04:31:04

21   Q.    You were asked questions about caudal migration?

22   A.    Yes, caudal which is down.

23   Q.    And that is something that you're aware of was occurring

24   with the G2 filter?

25   A.    Yes.                                                      04:31:13

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1   Q.   And you gave your theory why that was happening, that the          04:31:14

2   arms of the G2 were not attaching like the arms of the Recovery

3   to the vena cava wall; correct?  That's a fair reading of that

4   testimony?

5   A.   So that was the difference -- that was the change that          04:31:31

6   made the G2 filter less resistant to the caudal migration.

7   Q.   And, sir, my question is just clarifying so you and I can

8   make our point here today and so the jury can understand what

9   your theory was is that the reason that the G2 migrated

10  downward was because it was not fixing itself to the vena cava          04:31:58

11  walls the same way the Recovery filter was; correct?

12  A.   So that's not exactly correct.

13  Q.   Hang on.  Let me just --

14          THE COURT:  Mr. O'Connor, let's address this tomorrow

15  morning.          04:32:16

16          MR. O'CONNOR:  All right.

17          THE COURT:  I think this might take a few minutes and

18  we're beyond 4:30.

19          MR. O'CONNOR:  Thank you.

20          THE COURT:  Ladies and gentlemen, we're going to          04:32:23

21  break for the day.  Let me mention two things.  It's the same

22  reminder.  Please don't talk to anybody about the case or do

23  any research.

24          Secondly, please, if you would factor in traffic and

25  things like that in getting to the courthouse tomorrow to make          04:32:33

United States District Court

ANDRZEJ CHANDUSZKO - Direct

1  sure you're here a few minutes before nine so that we can start          04:32:36

2  right at nine.  We're going to try to really run things on time

3  so we can get all of the evidence in the time we've told you it

4  will take in this trial.  And we will plan to see you in the

5  morning.  Thanks very much.                                              04:32:50

6          (Jury departs at 4:33.)

7          THE COURT:  All right.  Sir, you can step down.

8          THE WITNESS:  Thank you.

9          THE COURT:  Please be seated.

10         All right.  Counsel, for your information, as of the            04:33:37

11  close of today, plaintiff has used one hour and 47 minutes.

12  Defendant has used 55 minutes.

13         We'll plan to get started at 8:30.  If you'll be in

14  here tomorrow morning, I'll come in to see if there's any

15  issues we need to address.  One thing I didn't mention earlier         04:34:00

16  that I think you already understand is when we're questioning

17  witnesses, we'll use a one-lawyer rule, meaning the lawyer who

18  is going to do the questioning does the objecting as well.

19         Are there any other matters we need to take up before

20  we break for the day?                                                  04:34:14

21         MR. NORTH:  Nothing for the defendant, Your Honor.

22         MR. O'CONNOR:  I don't think we have anything else.

23         THE COURT:  Okay.  We'll see you at 8:30.  Thanks.

24         (Whereupon, these proceedings recessed at 4:34 p.m.)

25


United States District Court

ANDRZEJ CHANDUSZKO - Direct

1          C E R T I F I C A T E                                    04:34:28

2

3          I, ELAINE M. CROPPER, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of       04:34:28

6    Arizona.

7

8          I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled     04:34:28

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control, and to the best of

13   my ability.

14

15         DATED at Phoenix, Arizona, this 15th day of March,        04:34:28

16   2018.

17

18

19

20                              s/Elaine M. Cropper                  04:34:28

21                         _____

22                         Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                   04:34:28

United States District Court