1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3          _____

4  **In Re: Bard IVC Filters**         )   MD-15-02641-PHX-DGC
   **Products Liability Litigation**    )
5                                       )   Phoenix, Arizona
                                        )   **March 15, 2018**
6  _____)
   **Sherr-Una Booker, an individual,** )
7                                       )
                    Plaintiff,          )
8                                       )   CV-16-00474-PHX-DGC
            v.                          )
9                                       )
   **C.R. Bard, Inc., a New Jersey**    )
10 **corporation; and Bard Peripheral** )
   **Vascular, Inc., an Arizona**       )
11 **corporation,**                     )
                                        )
12                  Defendant.          )
   _____)
13

14

15        **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16        **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

17              <u>**TRIAL DAY 2 A.M. SESSION**</u>

18              (Pages 216 - 336)

19

20

21 Official Court Reporter:
   Patricia Lyons, RMR, CRR
22 Sandra Day O'Connor U.S. Courthouse, Ste. 312
   401 West Washington Street, SPC 41
23 Phoenix, Arizona  85003-2150
   (602) 322-7257
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared with Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2    For the Plaintiff:

3            Lopez McHugh
             By: **RAMON ROSSI LOPEZ**, ESQ.
4            100 Bayview Circle, Suite 5600
             Newport Beach, CA  92660
5
             Gallagher & Kennedy
6            By: **MARK S. O'CONNOR**, ESQ.
             2575 East Camelback Road, Suite 1100
7            Phoenix, AZ  85016

8            Heaviside Reed Zaic
             By: **JULIA REED ZAIC**, ESQ.
9            312 Broadway, Ste. 203
             Laguna Beach, CA  92651
10
             Snyder & Wenner, PC
11           By: **DAVID A. WENNER**, ESQ.
             2200 E. Camelback Rd., Ste. 213
12           Phoenix, AZ  85016

13

14   For Defendants:

15           Nelson Mullins Riley & Scarborough
             By: **RICHARD B. NORTH, JR.**, ESQ.
16           By: **ELIZABETH C. HELM**, ESQ.
             201 17th Street NW, Suite 1700
17           Atlanta, GA  30363

18           Snell & Wilmer
             By: **JAMES R. CONDO**, ESQ.
19           400 East Van Buren
             Phoenix, AZ  85004
20

21

22

23

24

25

1                         **I N D E X**

2                        **EXAMINATION**

3  **WITNESS**                                          **PAGE**

4  ANDRE CHANDUSZKO

5          Direct Examination (Cont'd) By Mr. O'Connor   229

6          Cross-Examination By Mr. Condo                258

7          Redirect Examination By Mr. O'Connor          286

8  MURRAY ASCH

9          Direct Examination By Mr. Lopez               291

10

11

12                          **EXHIBITS**
   **NUMBER**    **DESCRIPTION**                          **PAGE**

13  932          Ciavarella Deposition,                   237
                 11/12/2013 – Exhibit 41 –
14               BPV's 5/6/2008 PowerPoint
                 presentation entitled "Filter
15               Franchise

16  2249         Wong Deposition, 10/18/2016 –            249
                 Exhibit 544 – 5/18/2006
17               Natalie Wong meeting
                 documents, email re "Caudal
18               Investigation" with
                 attachments of G2 Caudal
19               Report 05.18.06 and Caudal
                 Pre-PAT minutes
20
    5233         RD-SOP-054.00 (Recovery                  264
21               Filter EnduraTEC Fatigue
                 Testing SOP NMT)
22
    5234         RD-RPT-099 (Recovery Filter              267
23               EnduraTEC Fatigue Testing
                 Report NMT)
24

25

**(Index of Exhibits Continued)**

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 4332 | Updated Curriculum Vitae – Murray Asch, MD | 295 |
| 4330 | Asch Deposition, 05/02/2016 – Exhibit 206 , July 21, 1999 letter to Dr. Freeland from Dr. Asch | 308 |
| 2090 | Tillman, 08/04/2017, Exhibit 1064 – NMT Medical, Inc. Document | 314 |
| 552 | Asch Deposition, 05/02/2016 – Exhibit 202 – 5/18/1999 Letter from Thomas Kinst, Product Manager of Filters at NMT Medical, to Monica Coutanche, Marketing Manager at Bard Canada, Inc. | 324 |
| 556 | Asch Deposition, 05/02/2016 – Exhibit 207 – 1/26/2000 Letter from Mount Sinai Hospital to Dr. Asch Re. "Assessment of a New Temporary/Removable IVC Filter" – and – 11/8/2001 Letter from Mount Sinai Research Ethics Board Re. "MSH Reference #01-0161-U | 330 |

**P R O C E E D I N G S**

10:01:31  1

2          (Proceedings resumed in open court outside the presence

3      of the jury.)

4

08:30:26  5          THE COURT:  Please be seated.

6          All right.  Good morning, everybody.

7          MR. LOPEZ:  Good morning, Your Honor.

8          MR. NORTH:  Morning.

9          THE COURT:  Counsel, do you have matters you want to

08:30:48 10      raise before we start this morning?

11          MR. LOPEZ:  I don't think so, Your Honor.  I think

12      maybe the defense wants to talk about the idea of us providing

13      them with exhibits before witnesses.  And you suggest that

14      might be a good idea, but we would prefer not to do that,

08:31:06 15      Judge.  I mean, I still think that's work product.  If, for

16      example, when we take depositions in this case and we ask for

17      exhibits or documents that they've used with their witnesses

18      to prepare the witness or to refresh their recollection, they

19      maintain a work product privilege to that, because that is a

08:31:23 20      lawyer's impressions on information that may or may not be

21      important.  We think that is the same here.

22          More importantly, I mean, this is -- sometimes we

23      don't decide until 2:00 in the morning what documents we may

24      or may not use.  And this is a dynamic situation.  We would

08:31:42 25      prefer not to have to do that, because, for the most part,

08:31:44   1    these witnesses that are being deposed -- that are testifying

2    in court, the documents -- 90-plus percent of the documents

3    we're going to be using have been used in the deposition.  So

4    it's not like there's any surprises or any disadvantage or

08:31:59   5    anything like that.

6            Bottom line is we want to maintain our work product

7    privilege to our impressions about what documents we think

8    might be important for a particular witness.

9            MR. NORTH:  Your Honor, our recollection is at the

08:32:13  10    pretrial conference, the Court said it might be a good idea to

11    facilitate matters if the parties disclose 24 hours in advance

12    of a witness or the testimony as to what exhibits they were

13    going to use.  We obviously recognize there are last minute

14    changes, and you can't give an ironclad disclosure.

08:32:34  15            We asked Mr. Lopez yesterday if he would advise us as

16    to the documents that would be used today generally within --

17    again, understanding there might be additions.  He recognized

18    that the Court had suggested it was a good idea.  Told us,

19    though, he would not do it because he considered it work

08:32:53  20    product.

21            I'm not sure I understand the basis of the work

22    product claim, particularly when you're 24 hours away from

23    putting a witness on.  It's just a matter of trial logistics.

24    I think it would help both sides to facilitate the matter to

08:33:06  25    have as much advanced notice as possible as to the exhibits

08:33:10  1    being used to prevent us from scrambling.  So I don't know if

       2    that is something the Court is willing to enter an order on,

       3    or if it's just sort of an aspirational thing for the parties.

       4             THE COURT:  What kind of access do you have to

08:33:24  5    exhibits, Mr. North?

       6             MR. NORTH:  I'm sorry, Your Honor, what kind of

       7    access?

       8             THE COURT:  Yeah.  Do you have them on your computer

       9    or --

08:33:34 10             MR. NORTH:  Yes.  We have thumb drives with them on.

      11    We had some difficulty last night determining how to identify

      12    the exhibits.  My understanding is that that's been worked out

      13    this morning.  But we do have the exhibits electronically.

      14             THE COURT:  My view on this issue is that you should

08:34:18 15    provide them 24 hours in advance.

      16             I understand your argument, Mr. Lopez, but I think at

      17    this stage, when we're in trial, when the issues have been

      18    squarely framed, when witnesses and documents have been

      19    identified, motions in limine have been ruled upon, there are

08:34:35 20    few secrets between you on trial strategy, and that the

      21    convenience to each side of knowing generally what documents

      22    are going to be used a day in advance will move the trial

      23    along.

      24             That doesn't mean it's an ironclad disclosure.  I

08:34:49 25    mean, if you decide at 2:00 in the morning you want to use

08:34:53 1   five documents you didn't disclose, you can do that.  I'm not

2   going to say you're precluded from adding to the list or

3   subtracting from the list.  I think it's a good faith effort

4   on each side to identify the documents.  I'm guessing

08:35:05 5   95 percent of the documents that will be shown to witnesses

6   are matters that were shown to them in their depositions.

7   It's not a surprise.

8        So it's aspirational.  It's not going to be a

9   preclusion if you fail to make a disclosure.  But let's make

08:35:20 10  our best efforts to tell each side 24 hours in advance what

11  documents will be used.  And I think that will move things

12  along a little more quickly during the trial.

13       Are there other matters you all want to raise?

14       MR. NORTH:  Nothing for the defense, Your Honor.

08:35:36 15  MR. CONDO:  I'm sorry.  Your Honor, two points.

16  Number one, we talked about this during the pretrial.  There

17  are going to be some witnesses we thought we would put on our

18  direct at the times they were called by the plaintiff,

19  Mr. Chanduszko is one of those.  There are a number of

08:35:59 20  subjects that were raised yesterday that would be part of the

21  direct in any event, so I would intend to do my direct of

22  Mr. Chanduszko so he can be released, and do it as part of the

23  cross-examination.

24       THE COURT:  How long do you think that would take,

08:36:16 25  Mr. Condo?

08:36:16  1          MR. CONDO:  Well, we've got 40 --

       2          THE COURT:  The direct part of your examination.

       3          MR. CONDO:  The direct part, probably about 40

       4     minutes.

08:36:30  5          MR. O'CONNOR:  That's the problem, Your Honor,

       6     because we've got experts that are coming into town.  We've

       7     got people scheduled tight to comply with this and, you know,

       8     they haven't given us -- they did give us documents yesterday

       9     for Chanduszko, but they listed him separately in their

08:36:49 10     witnesses.

      11          He's here in Phoenix, and we don't see any reason

      12     that our case should be taken off track, especially since we

      13     have people from out of town that are going to be put on today

      14     and this evening.  We've got experts coming in tonight and

08:37:07 15     tomorrow.

      16          THE COURT:  Mr. Condo, is Mr. Chanduszko located in

      17     town?

      18          MR. CONDO:  He is, sir.

      19          THE COURT:  My concern when we talked about that was

08:37:16 20     more for out-of-state folks who are brought in, to get them on

      21     and off.  I think if he can drive over from Tempe for your

      22     direct, we ought to have him do that and allow plaintiffs to

      23     stay on schedule with their witnesses.  So let's hold the

      24     direct until your case.

08:37:30 25          MR. CONDO:  I will try to do that, but some of what I

08:37:32  1   wanted to --

        2           THE COURT:  Clearly there will be overlap, I know.

        3           MR. CONDO:  Okay.  Some of what I wanted to address

        4   will.  For example, they talked about fatigue testing.  I

08:37:41  5   would like to introduce some of the fatigue tests that were

        6   done.

        7           THE COURT:  I think that's within the scope of

        8   cross-examination.

        9           MR. CONDO:  Yeah.

08:37:49 10           THE COURT:  That's a topic they've clearly asked

       11   about.

       12           MR. CONDO:  Thank you.

       13           THE COURT:  Okay.

       14           MR. O'CONNOR:  Except, you know, I don't want to be

08:37:56 15   standing up and interfering.  The question was a very limited

       16   question.  We didn't go into --

       17           THE COURT:  You can object at the time.  But if I

       18   think it's within the scope, I'm going to allow it, even if it

       19   involves putting another exhibit in if it is fairly within the

08:38:07 20   scope of what you covered.

       21           All right.  Are there other matters we need to take

       22   up?

       23           MR. O'CONNOR:  I would just ask, Your Honor, if in

       24   fact we do go through the courtesy of trying to give exhibits,

08:38:22 25   that we could have some objections in advance so we're not

08:38:25  1    wasting time with a witness.

2        THE COURT:  Objections?  How do we do that?

3        MR. O'CONNOR:  If they're going to object to us using

4    an exhibit for a witness after we provide it to them, we would

08:38:36  5    like them to give that to us before we put the witness on if

6    we give them the exhibits in advance.

7        MR. NORTH:  Your Honor, I think that's impossible to

8    do in a vacuum.  I mean, an exhibit may be nonobjectionable

9    depending on how it is used with a witness.

08:38:49  10        THE COURT:  I don't think we ought to try to exchange

11    objections ahead of time.  It will be the same for both sides.

12    You'll get the exhibits ahead of time.  You can decide to

13    object.  But I can't rule on an objection until I have a

14    witness on with a document in front of him.  So we're going to

08:39:05  15    exchange exhibits, but not objections.

16        Anything else we need to address?

17        MR. CONDO:  Your Honor, just one personal item.  I am

18    getting over a cold and some bronchitis, and I am sucking on

19    cough drops.  I don't mean to be disrespectful to the Court or

08:39:24  20    to the jury, but from time to time I may be up there

21    unwrapping one and --

22        THE COURT:  That's fine.

23        MR. O'CONNOR:  Now we know why Mr. Nations isn't

24    feeling well.

08:39:37  25        THE COURT:  Is he the follow who got sick?

08:39:39  1          MR. LOPEZ:  Yes.

        2          THE COURT:  How is he doing?

        3          MR. LOPEZ:  I think he's out of bed.  He may show up

        4   and sit in the back.

08:39:50  5          THE COURT:  The other thing I wanted to mention is I

        6   would like, if I can find the time, to review my ruling on

        7   expert motions in limine before experts get on the stand so at

        8   least what I said was fresh.

        9          So the question I have for plaintiffs is when do you

08:40:05 10  think your first expert will be on and who that will be?

       11          MR. O'CONNOR:  We could start as early as this

       12   afternoon with Dr. McMeeking.

       13          THE COURT:  McMeeking will be first?

       14          MR. O'CONNOR:  Yes.

08:40:15 15          THE COURT:  Do you anticipate getting to any other

       16   experts today?

       17          MR. O'CONNOR:  No.  And then tomorrow, assuming

       18   McMeeking carries over, then there will be Dr. Michael

       19   Streiff.

08:40:22 20          THE COURT:  All right.  So McMeeking today, Streiff

       21   tomorrow.

       22          Any others you expect tomorrow?

       23          MR. LOPEZ:  None, Your Honor.

       24          MR. O'CONNOR:  No.

08:40:30 25          THE COURT:  Okay.  That will help me to try to do

DIRECT EXAMINATION - ANDRE CHANDUSZKO

08:40:32  1    that review, if I can.

2           Okay.  We will bring the jury in at 9 o'clock, and

3    I'll come in when they're ready.

4        (Recess was taken from 8:40 to 9:00.  Proceedings resumed

08:40:50  5    in open court with the jury present.)

6           THE COURT:  Thank you.  Please be seated.

7           Good morning, ladies and gentlemen.  Thank you for

8    being here this morning.

9           We're going to pick up where we left off yesterday.

09:01:10  10           Mr. Chanduszko, you can come back to the witness

11   stand.

12           And, Mr. O'Connor, you may proceed.

13           MR. O'CONNOR:  Thank you, Your Honor.

14                        ANDRE CHANDUSZKO,

09:01:15  15   recalled as a witness herein, after having been previously

16   sworn or affirmed, was examined and testified as follows:

17       D I R E C T   E X A M I N A T I O N   (CONTINUED)

18   BY MR. O'CONNOR:

19   Q   Good morning, Mr. Chanduszko.

09:01:46  20   A   Good morning.

21   Q   Thank you for coming back.

22           Let's resume where we were yesterday.  We talked

23   about environment of use, and specifically vena cava dynamics

24   in the context of distention.  Do you remember that

09:02:05  25   discussion?

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:02:06  1    A    Yes, I do.

2    Q    And, again, for the jury, distention means the expansion

3    of the vena cava; correct?

4    A    That's correct.

09:02:15  5    Q    And that is the anatomy that a company should be aware if

6    they're going to manufacture a device that will be implanted

7    in the vena cava.  True?

8    A    Yes, they should be aware.

9    Q    Were you aware, Mr. Chanduszko, that Bard did not do any

09:02:34  10   bench testing for distention on the Recovery filter before it

11   went to market?

12   A    That's correct.  My understanding is that NMT did all the

13   testing.

14   Q    No, but are you aware there was no bench testing, period,

09:02:50  15   on distention before the Recovery went to market?

16   A    In general, that's -- that's probably correct.

17   Q    So just so you and I are on the same page, there was no

18   testing for distention before the Recovery went on the market.

19   True?

09:03:10  20   A    So I can't say categorically because the filter is tested

21   in different sizes of cava.  So if the distended size is

22   within the test range, the test would automatically account

23   for this.

24   Q    I'm going to show you Exhibit 2066.

09:03:40  25        You know who Mr. McDermott is?

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:03:43  1    A   Yes, I do.

2              THE WITNESS:  I'm sorry, I think the cup is leaking.

3              THE COURTROOM DEPUTY:  Oh.  I'll get it.

4              I'll get you some paper towels.

09:04:12  5              THE WITNESS:  Sorry about this.

6    BY MR. O'CONNOR:

7    Q   You know who Mr. McDermott is; is that correct?

8    A   Yes, I do.

9    Q   And you see that this is an e-mail from -- excuse me,

09:04:23  10   Len DeCant, do you recall who he is at Bard?

11   A   Yes.  He was vice president of R&D at that time.

12   Q   And as you look through this e-mail exchange, it talks

13   about the issue of distention.

14   A   So they use the word in the first sentence, yes.

09:04:45  15   Q   And go to the second page, please.

16             MR. CONDO:  602.

17             THE COURT:  Well, there isn't a question pending yet.

18             MR. CONDO:  I'm just --

19   BY MR. O'CONNOR:

09:04:58  20   Q   So you see there --

21             THE COURT:  Hold on just a minute.  Hold on just a

22   minute.

23             MR. CONDO:  I think they're going to be asking

24   questions about the content of the document.

09:05:08  25             THE COURT:  Okay.  Let's see what the question is and

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:05:10  1    you can certainly object again.

        2    BY MR. O'CONNOR:

        3    Q    You see there that Mr. McDermott asked the question to Len

        4    to, Please make sure we're doing some kind of testing to

09:05:19  5    determine distensibility of cavas.  And that is on July 26,

        6    2004.

        7         MR. CONDO:  Your Honor, that's the basis of the

        8    objection.  Reading from a document that's not admitted into

        9    evidence.

09:05:31 10         THE COURT:  Sustained.  It's not in evidence.

       11         MR. O'CONNOR:  Well, at this time I would move it in

       12    evidence, Your Honor.

       13         MR. CONDO:  Can we have the foundation, Your Honor?

       14    I would object.

09:05:39 15         THE COURT:  Sustained without foundation.

       16    BY MR. O'CONNOR:

       17    Q    Is it your testimony that Bard was not aware -- did not do

       18    any distention testing before the Recovery went to market?

       19    A    That would be my understanding.

09:05:52 20    Q    So you agree with that?

       21    A    So I was not at Bard at the time.  So I can't say I have

       22    any particular knowledge that that was something done in that

       23    area.

       24    Q    If the evidence shows there was no testing of distention

09:06:09 25    before the Recovery went to market, you would not disagree

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:06:13  1    with that; correct?

2    A   I'm not sure lack of evidence prove that there was nothing

3    done, but I can certainly say that I'm not aware of any

4    particular evidence of that testing.

09:06:34  5    Q   Now, even after the G2 was released, or before the G2 was

6    released, there was no testing or thorough understanding of

7    the dynamics of the vena cava.  Do you agree with that?

8        Bard did not have a thorough understanding of the

9    vena cava dynamics, including distention, before the G2 was

09:06:57  10   released.

11   A   I'm not sure if the word "thorough" fully describes it.

12   We had -- or Bard, according to my knowledge, had an

13   up-to-date understanding of what the cava can do.

14   Q   Would you be surprised if there was a document dated

09:07:18  15   May 6, 2008, from Bard that indicated that Bard had a lack of

16   thorough understanding of dynamics of the caval anatomy which

17   impacted test methods?

18           MR. CONDO:  Same objection.

19           THE COURT:  Which is?

09:07:34  20           MR. CONDO:  602.  Foundation.

21           THE COURT:  Sustained.

22   BY MR. O'CONNOR:

23   Q   Would you be surprised that Bard was unaware and did not

24   have a thorough understanding as of May 2008 of vena cava

09:07:45  25   dynamics?

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:07:49  1    A    So without seeing the document and without knowing

2    actually what was said, I can't really make a comment on this.

3    Q    Now let's go to Exhibit Number 932.

4              This is -- I'm showing you a Bard Peripheral Vascular

09:08:15  5    document filter franchise review.  Do you see that?

6    A    Yes.

7    Q    And it is a document from Bard.  Do you see that?

8    A    Yes, that's correct.

9    Q    It's dated May 6, 2008.  Do you see that?

09:08:25 10    A    Yes.

11    Q    And if you go to 867, do you know what SWOT was?

12              You were aware that Bard had objectives to increase

13    revenue and capture more of the market share when it was

14    marketing filters?

09:08:50 15              MR. CONDO:  Objection.  602.  Reading from the

16    document not in evidence.

17              THE COURT:  I don't think that question was reading

18    from the document, it was just asking him.  So overruled.

19              Sir, you're to just answer from your own memory, not

09:09:02 20    from the document.

21              THE WITNESS:  So I was not involved directly in any

22    of these activities, so I can't really comment on that detail.

23              MR. O'CONNOR:  Okay.  But you can see in a Bard

24    document that there was a statement by Bard?

09:09:18 25              MR. CONDO:  602.

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:09:20  1        THE COURT:  Sustained.

2  BY MR. O'CONNOR:

3  Q    Well, this is a Bard document; correct?  And you were

4  employed at Bard on May 6, 2008; correct?

09:09:34  5  A    It's a Bard document and yes, I was an employee of Bard at

6  that time.

7  Q    You were involved in the G2 filter program; correct?

8  A    Yes, as an engineer.

9  Q    All right.  And what was important to engineers was the

09:09:49 10  knowledge, what Bard's understanding of vena cava dynamics

11  was.  True?

12  A    Yes, that's true.

13  Q    And do you agree that Bard did not have a thorough

14  understanding of vena cava dynamics as of May 6, 2008, after

09:10:06 15  the G2 was released to market?

16  A    So I read that Bard knew lots of things about vena cava,

17  but also I cannot say that we knew everything.

18  Q    And do you agree there was no testing at that time for

19  distensibility as it relates to the G2 that was done before

09:10:31 20  the G2 was released?

21  A    So --

22  Q    Do you agree with that or not?

23  A    So the testing, the filter design certainly addressed that

24  issue and I believe there was some testing done to it as well.

09:10:52 25  So it was addressed in two different ways.

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:10:55   1   Q   If there is a Bard document that says that Bard did not

        2   have a thorough understanding of vena cava anatomy that

        3   impacted test methods, would you disagree with that?

        4   A   So, again, I think if that means that --

09:11:16   5   Q   Sir, would you disagree if there is a Bard document out

        6   there that indicates that Bard lacked a thorough understanding

        7   of dynamics of caval anatomy?

        8          MR. CONDO:  Objection.  602 again.

        9          THE COURT:  I think you ought to ask the question

09:11:31  10   directly, Mr. O'Connor.  You're asking him if he disagrees

       11   with a document he hasn't seen.

       12   BY MR. O'CONNOR:

       13   Q   Do you disagree that Bard lacked a thorough understanding

       14   of the dynamics of caval anatomy, that impacted test methods?

09:11:52  15   A   At what time?

       16   Q   After the G2 was released, as of May 6, 2008.

       17   A   So as I said, we obviously don't know everything, but

       18   based on my knowledge, we had a sufficient understanding and

       19   testing to address that.

09:12:14  20          MR. O'CONNOR:  Your Honor, I move to admit the

       21   document May 6, 2008.

       22          THE COURT:  What is the exhibit number?

       23          MR. O'CONNOR:  Excuse me.  932.

       24          MR. CONDO:  We would object.

09:12:24  25          THE COURT:  Basis?

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:12:25  1      MR. CONDO:  No foundation.  602.

       2      THE COURT:  602 is not a basis for objecting to

       3  admission of a document?

       4      MR. CONDO:  There is no foundation that this witness

09:12:32  5  has seen this document.

       6      THE COURT:  He doesn't have to have for a document to

       7  be admitted.

       8      MR. CONDO:  It's also a draft document, not the final

       9  document.

09:12:41 10      THE COURT:  I don't think that's a valid basis

      11  either, so I'm going to overrule those objections and admit

      12  932.

      13      (Exhibit 932 admitted.)

      14      MR. O'CONNOR:  May I publish this to the witness and

09:12:50 15  the jury, Your Honor?

      16      THE COURT:  You may.

      17      MR. O'CONNOR:  Let's go to the first page of 932.

      18      The first page, Greg.

      19  BY MR. O'CONNOR:

09:13:06 20  Q   What I'm showing you is Exhibit 932, and it is a document

      21  entitled "Bard Peripheral Vascular Filter Franchise Review."

      22      Do you see that?

      23  A   Yes, I do.

      24  Q   And that document is dated May 6, 2008.

09:13:21 25      Do you see that?

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:13:22  1    A    Correct.

2    Q    And the G2 filter was released to the market in 2005;

3    correct?

4    A    I don't have an exact recollection, but, yes, roughly

09:13:36  5    around that time.

6    Q    All right.  And if we go to Bates 867 --

7              MR. O'CONNOR:  Will you go there, Greg.

8              And, Greg, can you call out the Weaknesses section of

9    this SWOT document, increased revenue and capture more market

09:13:56 10    share.

11    BY MR. O'CONNOR:

12    Q    And, sir, do you see where this document that's been

13    produced by Bard states "Weaknesses."  Under the term

14    "Weaknesses," "Lack of full understanding dynamics caval

09:14:09 15    anatomy impacting testing methods."

16              Did I read that correctly?

17    A    Yes.

18    Q    The document goes on to state that Bard:  We have a

19    historical reactive/evolution design mindset.

09:14:31 20              Did I read that correctly?

21    A    Yes, that's correct.

22    Q    It goes on to say:  Product complications-forcing focus on

23    reactive designing.

24              Did I read that correctly?

09:14:45 25    A    Yes.

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:14:48  1    Q    And yesterday when we talked about the responsibility to

2    understand user needs as of May 6, 2008, Bard stated in this

3    Exhibit 932 that there was a limited understanding of user

4    needs.

09:15:10  5         Did I read that correctly?

6    A    Yes, sir, you did.

7    Q    And that is almost three years after the filter was

8    released for patients in the market; correct?

9    A    If '05 is correct, then yes.

09:15:50  10   Q    Do you agree before putting the G2 on the market that

11   there was no caudal migration test on the G2 that was done at

12   Bard?

13   A    Before putting G2 on the market?

14   Q    Yes.

09:16:04  15   A    No, I don't agree.

16   Q    So you -- it's your position today that there was caudal

17   migration testing of the G2 before it was released in 2005?

18   A    Yes.  That was one of the aspects that was evaluated.

19   Q    Okay.  So if there is a statement by Bard that indicates

09:16:24  20   otherwise, you would disagree with that statement?

21   A    Probably.  I have to see the statement.

22         MR. O'CONNOR:  Greg, put up 4327.

23         THE COURTROOM DEPUTY:  Hang on for a second.

24         MR. O'CONNOR:  Exhibit 4327.

09:16:48  25        Do you have -- is it up?

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:16:54   1        MR. WOODY:  Page what?

        2        MR. O'CONNOR:  Just the first page so I can introduce

        3    it.

        4    BY MR. O'CONNOR:

09:16:58   5    Q    We're looking at Exhibit 2347.  Mr. Chanduszko, you see

        6    that this is a memorandum to Tim Ring and John Weiland from

        7    John McDermott dated February 10, 2006?

        8        Do you see that?

        9    A    That's correct.

09:17:11  10    Q    And who are Mr. Ring and Mr. Weiland?  They're pretty

       11    important people at Bard; right?

       12    A    Yes.  President and CEO of Bard.

       13    Q    And John McDermott, he was a vice president; right?

       14    A    He was the president of our division.

09:17:26  15    Q    Your division is Bard Peripheral Vascular?

       16    A    Yes, that's correct.

       17    Q    So Mr. McDermott was a very important man at this time.

       18    A    Yes, of course.

       19    Q    Somebody that you understood made it his business to know

09:17:39  20    about Bard products and how they were doing on the market?

       21    A    Yes, that would be my understanding.

       22    Q    All right.

       23        MR. O'CONNOR:  Greg, please go to 19 -- excuse me,

       24    9573, the Bates number.

       25

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:18:01   1    BY MR. O'CONNOR:

        2    Q   Do you see this page that's entitled "Product

        3    Development/Launch Schedule"?

        4    A   Yes, I do.

09:18:19   5    Q   And there's discussions about the G2 and caudal

        6    improvements.  Do you see that?

        7    A   Yes, I do.

        8        MR. O'CONNOR:  Your Honor, at this time I move to

        9    admit Exhibit 4327.

09:18:34  10        MR. CONDO:  802, Your Honor.

       11        THE COURT:  Sustained.

       12    BY MR. O'CONNOR:

       13    Q   Well, if there is -- if Bard contended that it was

       14    developing a team to test -- it was developing a test method

09:18:58  15    for evaluating caudal migration resistance as of February 10,

       16    2006, do you have any reason to disagree with that?

       17    A   No, I don't --

       18        THE COURT:  Hold on, sir.

       19        What's the objection?

09:19:12  20        MR. CONDO:  802 and 602.

       21        THE COURT:  Sustained.  The document's not in

       22    evidence.

       23    BY MR. O'CONNOR:

       24    Q   I'm asking you, would you disagree if Bard was still

09:19:22  25    developing or was developing a test for -- a test method for

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:19:26  1   caudal migration in February of 2006 for the G2?

2   A    Yes, so it looks like --

3           THE COURT:  Excuse me, sir.  The question is not

4   about the document because it's not in evidence.  He's asking

09:19:37  5   about your knowledge.

6           Would you re-ask the question, Mr. O'Connor.

7           MR. O'CONNOR:  Sure.

8   BY MR. O'CONNOR:

9   Q    If Bard was developing a test method for evaluating caudal

09:19:51 10   migration resistance of the G2 after it was released around

11   the time period of February 2006, would you disagree with

12   that?

13   A    No, I wouldn't.

14   Q    And were you aware that Bard had caudal migration failure

09:20:12 15   investigations under way to determine the design or the issues

16   relating to design and physiological causes of caudal

17   migration?

18   A    Yes, I was aware of an investigation.

19   Q    All right.  So is it fair to say that Bard had not tested

09:20:32 20   the G2 for caudal migration before it was released to the

21   market?

22   A    That wouldn't be my understanding.

23   Q    Pardon me?

24   A    That would not be my understanding.

09:20:43 25   Q    All right.

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:20:43  1      MR. O'CONNOR:  Then I move to admit 4327, which

        2  states something on that issue.

        3      MR. CONDO:  802.

        4      THE COURT:  Sustained.

09:20:53  5      MR. O'CONNOR:  Well, Your Honor, this is --

        6  BY MR. O'CONNOR:

        7  Q   This is a document from Bard; correct?

        8  A   This one?

        9  Q   Yes.

09:21:01 10  A   Yes, that's correct.

       11  Q   And it's a document that was developed by Bard through its

       12  president of Bard Peripheral Vascular; correct?

       13  A   I'm not sure that that's the case.  Just looking at the

       14  document.

09:21:13 15  Q   Well, on the first page, do you have any reason to

       16  disagree this is a Bard document?

       17  A   It is Bard document, yes.

       18  Q   And, sir, that was a document prepared by the vice

       19  president, and it contains on it a product development and

09:21:30 20  launch schedule; correct?

       21  A   So I can't really say that he prepared that document.

       22  Q   Well, do you have any reason to dispute it's a Bard

       23  document?

       24  A   No.  But you asked a different question.

09:21:43 25  Q   Do you have any reason to dispute this was a document by

DIRECT EXAMINATION – ANDRE CHANDUSZKO

09:21:46  1  Bard?

2  A   No, I don't.

3  Q   And so just so we're clear, as of 2006, Bard had been

4  released to the market; correct?  Bard had -- the G2 had

09:21:57  5  already been on the market.  True?

6  A   In 2006?

7  Q   Yes, sir.

8  A   I think it was, but I'm not hundred percent sure.

9  Q   And as of 2006, there were still -- there were tests being

09:22:12  10  developed to evaluate and test caudal migration of the G2.

11  True?

12  A   True.

13  Q   And that was after the filter had already been implanted

14  in patients; correct?

09:22:30  15  A   That is correct.

16  Q   Let's go to -- you were a member of the G2 design team as

17  of May 18, 2006; correct?

18  A   Yes.

19  Q   And at that time -- and -- and you --

09:23:26  20  A   So, I'm sorry, if the filter was already released, then I

21  wasn't.

22  Q   Well, you were still an engineer at Bard; correct?

23  A   Yes, that's correct.

24  Q   And you were still receiving communications from other

09:23:37  25  people in Bard.  True?

DIRECT EXAMINATION – ANDRE CHANDUSZKO

09:23:40  1    A    True.

2    Q    And at that time Bard had realized that they'd had

3    problems with caudal migration in the G2 filter; correct?

4    A    So, yes, we had reports of caudal migrations and, yes,

09:23:54  5    there was an investigation into the cause, is my recollection.

6    Q    And that by that time the filter had been implanted in

7    hundreds of patients; right?

8    A    That would be my best guess, yes.

9    Q    And Bard was receiving complaints that the filter was

09:24:10  10   caudally migrating; correct?

11   A    Yes.

12   Q    And Bard was receiving complaints that not only was the

13   filter caudally migrating, but it was also tilting and

14   perforating through the vena cava; correct?

09:24:24  15   A    Yes, there were some complaints like that.

16   Q    And there were complaints that it migrated, tilted,

17   perforated, and fractured; right?

18   A    I don't know if it was all the same time, but, yes, these

19   were complaints I'm aware of.

09:24:40  20   Q    And Bard, after the filter was released, the G2 was

21   released, started to deal with, after the release, the issue

22   of caudal migration; correct?

23   A    As it pertains specifically to the G2 filter, yes.

24   Q    And Bard was aware of designs that could prevent or

09:25:03  25   minimize caudal migration even before the filter was released.

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:25:07  1   True?

2   A   So I'm not sure if that's the case.  I mean, as a general

3   rule, the filter's designed to be stable in the vena cava.

4   Q   But --

09:25:26  5   A   And it's different for every filter.

6   Q   The G2 filter was migrating downward; right?

7   A   Yes, some of them.

8   Q   And that was a problem that Bard started to address after

9   the filter was released to the market, the G2; correct?

09:25:45 10   A   As a particular response to the medical reports, yes, but

11   caudal migration is always consideration on design too.

12           MR. O'CONNOR:  Move to strike that response.

13           THE COURT:  Denied.

14   BY MR. O'CONNOR:

09:26:05 15   Q   Well, Mr. Chanduszko, let's take a look at 544.

16           This was an e-mail from Natalie Wong of Bard.  You

17   know who she was; correct?

18   A   Yes, I do.

19   Q   And it's dated May 18, 2006, and it's included to a number

09:26:40 20   of members of Bard, including yourself.  Do you see that?

21   A   No, I don't.

22   Q   Look at --

23           MR. LOPEZ:  Hold on.

24           THE COURT:  It's not on the screen.

09:26:50 25           MR. O'CONNOR:  2249, I'm sorry.  Let's get that up on

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:26:51   1   the --

         2          MS. REED ZAIC:  Mark, it's not up yet.

         3          MR. WOODY:  Which one?

         4          MR. O'CONNOR:  2249.  I apologize.

09:27:02   5   BY MR. O'CONNOR:

         6   Q    This is an e-mail from Natalie Wong that's addressed to

         7   recipients including you; correct?

         8   A    Yes, that's correct.

         9   Q    And it's entitled G2 Caudal Report of 5/8/2006.  True?

09:27:17  10   A    Actually, no, that's not the title.

        11   Q    It has that attachment.  The subject is "Caudal

        12   Investigation"; right?

        13   A    That is correct.

        14   Q    As of May, you were aware of the investigation going on

09:27:29  15   about caudal migration in the G2 filter; correct?

        16   A    I'm not sure of the exact timing, but, yes, roughly around

        17   that time.

        18   Q    Well, according to this document, you at least were

        19   notified in -- with this e-mail and were aware as of the date

09:27:45  20   of this e-mail about the caudal investigation that was going

        21   on as of May 18, 2006; correct?

        22   A    So it's a limited information I can see, but it sounds

        23   about right.

        24   Q    And there it was discussions at that time what could you

09:28:03  25   do at Bard to prevent or reduce caudal migration; correct?

DIRECT EXAMINATION – ANDRE CHANDUSZKO

09:28:10  1   A    As it pertains to G2 filter, yes.

2   Q    And at that time there were discussion about putting

3   caudal anchors on filters that would stop or prevent caudal

4   migration, filters from going down.  True?

09:28:25  5   A    So I don't remember any specific activities, but it's

6   possible.

7   Q    All right.  Well, let's go to page 924 to refresh your

8   recollection.  This is the attachment that was on the e-mail

9   that is marked as Exhibit 2249.

09:28:48  10          All right.  And you see that is an attachment to the

11   e-mail and you are a recipient.

12          Do you see that?

13   A    So I assume that's the attachment, and, yes, I'm a

14   recipient.

09:29:01  15   Q    And at that time the subject was "Preproduct Assessment

16   Team Minutes – Caudal Migration."

17          Do you see that?

18   A    Yes, I do.

19   Q    And it refers to a meeting that occurred on April 28,

09:29:14  20   2006.

21          MR. CONDO:  Could we have the document admitted,

22   please?

23          THE COURT:  Objection sustained.  It's not in

24   evidence.

09:29:19  25          MR. O'CONNOR:  But I move to admit it now,

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:29:20  1    Your Honor, to refresh his recollection, among other things.

        2              MR. CONDO:  No objection.

        3              THE COURT:  All right.  2249 is admitted.

        4          (Exhibit 2249 admitted.)

09:29:30  5    BY MR. O'CONNOR:

        6    Q    You see there was a meeting held on April 28, 2006?

        7    A    Yes, I do.

        8    Q    And do you recall that meeting as you sit here?

        9    A    No, I don't.

09:29:40 10    Q    Let's scroll down and see what was discussed at that time.

       11              THE COURT:  Do you want this displayed to the jury,

       12    Mr. O'Connor?

       13              MR. O'CONNOR:  Please, Your Honor.

       14              THE COURT:  All right.

09:29:56 15              MR. O'CONNOR:  Move to admit 2249 and ask it be

       16    published to the jury.

       17              THE COURT:  It is already admitted, but if you want

       18    it displayed, please ask for that separately.

       19              MR. O'CONNOR:  Thank you, I will.

09:30:08 20    BY MR. O'CONNOR:

       21    Q    At your meeting there was an event reporting data slide.

       22    Do you remember that?

       23    A    No, I don't.

       24    Q    But according to this document, that happened at your

09:30:26 25    meeting in April of 2006; right?

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:30:34  1    A   So it looks like an action item.  I don't know if that

2    was --

3    Q   Well, sir, according to this memo there was a discussion

4    about the Greenfield caudal migration situation and how it was

09:30:48  5    dealt.

6            Do you see that?

7    A   Yes.

8    Q   And Greenfield was a filter that was out even before the

9    G2.  Fair?

09:31:00  10   A   It was -- I'm sorry?

11   Q   It was a retrievable filter that was out even before the

12   G2.  True?

13   A   That is not correct.

14   Q   Well, was it obviously out before April 28, 2006?

09:31:16  15   A   The filter was, but it was not retrievable.

16   Q   Okay.  But there was a caudal migration issue with the

17   Greenfield; correct?

18   A   Yes, that's what it looks like.

19   Q   And according to this document, the way Greenfield dealt

09:31:33  20   with that issue was redesigning it by flipping two hooks to

21   prevent caudal migration.

22            Do you see that?  Did I read that correctly?

23   A   Yes, I do.

24   Q   And that was a design that you were aware of that could

09:31:46  25   address the caudal migration issue.  Fair?

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:31:50  1    A    Looking at this, yes.

       2    Q    Pardon me?

       3    A    So it --

       4    Q    Is that a design that you were aware of that could reduce

09:31:57  5    or minimize caudal migration, flipping two hooks to prevent

       6    caudal migration?

       7    A    For the Greenfield filter, yes.

       8    Q    And it was something that was done on later versions of

       9    filters at Bard.  True?  Caudal anchors?

09:32:16 10    A    Yes, but that's a completely different solution, so it was

      11    not Greenfield solution.

      12    Q    But the point is, sir, you were meeting on the G2 filter

      13    and you were addressing a problem of caudal migration;

      14    correct?

09:32:28 15    A    That is correct.

      16    Q    And the first time that was ever addressed by Bard was

      17    after the G2 was released to the market; correct?  Caudal

      18    migration.

      19    A    I don't think that's correct.

09:32:41 20    Q    Are you saying there were tests that were done before the

      21    filter was released that dealt with caudal migration?

      22    A    No.  What I'm saying is this is not a test.  This is just

      23    looking at -- it's a part of investigation looking at

      24    different filters that had similar issue, but obviously they

09:33:01 25    were different designs.

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:33:03  1    Q   Well, I'm asking you a different question.  After the G2

       2    filter was released to the market, the people at Bard became

       3    aware that it was experiencing caudal migration.  True?

       4    A   Yes, that's true.

09:33:19  5    Q   And you knew as an engineer that caudal migration was

       6    problematic for a filter that was intended to stop blood

       7    clots; correct?

       8    A   So I'm not sure if we knew it was problematic for clot

       9    trapping.  We knew it was undesirable.

09:33:40  10   Q   It was a problem for a patient.  Fair?

       11   A   It could be.

       12   Q   And you were aware that Bard had looked at -- was

       13   receiving complaints and was looking at a number of

       14   complications it was aware of that dealt with caudal

09:33:56  15   migration; correct?

       16   A   Yes.  After the filter was released on the market.

       17   Q   So the filter was released, there was caudal migration,

       18   you were getting complaints from patients and doctors, and

       19   Bard starts to investigate at that time.  True?

09:34:10  20   A   That's about right, yes.

       21   Q   And what you learned was that caudal migration could lead

       22   to other complications; correct?

       23   A   Possibly, yes.

       24   Q   You were aware and Bard was aware that caudal migration

09:34:27  25   could lead to tilting; correct?

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:34:37  1   A   So I'm not sure that's exactly the case, but, yes, one

2   thing I can say is that some of the filters that migrated

3   caudally had tilt as well.

4   Q   And tilt was another issue that Bard was dealing with with

09:34:53  5   the G2 filter; correct?

6   A   Well, yes.  We certainly didn't want to have any tilt.

7   Q   And tilt in the G2, Bard was aware, could lead to

8   additional problems, including perforation of the vena cava;

9   right?

09:35:12  10  A   So I'm not sure that we knew for a fact that that was the

11  case.

12  Q   But certainly those -- that was what was being

13  investigated; right?  Bard was aware of tilting, Bard was

14  aware of perforation, and Bard became aware of fracture of the

09:35:28  15  G2 filter after it was put on the market; correct?

16  A   Yes, that's correct.

17  Q   And then when Bard started getting those complaints, Bard

18  had started having investigations and meetings as to whether

19  there were relationships between those complications.  True?

09:35:44  20          MR. CONDO:  403, Your Honor.

21          THE COURT:  Overruled.

22          THE WITNESS:  So I'm not sure whether that was

23  exactly the -- among other things that we looked at, we also

24  tried to figure out whether there was some association with

09:36:04  25  different complications.

DIRECT EXAMINATION – ANDRE CHANDUSZKO

09:36:06  1   BY MR. O'CONNOR:

2   Q    So you were looking at associations between complications

3   which included migration, included tilt, included perforation,

4   included fracture; correct?

09:36:16  5   A    That's correct.  Among other things with it, yes.

6   Q    And those investigations started after you receiving --

7   received complaints from patients and doctors.  True?

8   A    Yes, that's true.

9   Q    And as the complaints came, Bard continued to sell the G2

09:36:33 10   filter on the market; correct?

11   A    Yes, that's correct.

12   Q    So even as early as 2006, when Bard became aware of

13   complaints of this filter migrating and this filter tilting,

14   and perforating, Bard left the filter on the market to be

09:36:51 15   implanted in patients.  True?

16   A    Yes, that's correct.  These are known complications for

17   vena cava filters.

18   Q    And Bard did nothing to redesign the filter or take it off

19   the market at that time; correct?

09:37:04 20   A    We did eventually, yes, we did redesign it.  We did not

21   take it off the market, no.

22   Q    As of 2006, were you aware of caudal migration and all of

23   the other complications, Bard kept it on the market?

24   A    Yes, that's correct.

09:37:18 25   Q    And patients continued to receive this filter that Bard

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:37:20  1    knew had these complications that may be related to each

2    other; correct?

3    A    Yes, that's correct.

4    Q    And so knowing that, Bard didn't tell doctors that its

09:37:31  5    filter was experiencing cascades of complications, did it?

6    A    I'm not sure if that statement is accurate.

7    Q    Certainly you didn't, from the engineering department,

8    tell Bard, You should notify doctors and patients that we have

9    a filter that's caudally migrating, experiencing tilt,

09:37:49 10    perforating, and fracturing?  You didn't suggest to Bard they

11    should be contacting doctors or they should stop selling the

12    filter, did you?

13    A    That is not my role.  There are procedures to this kind of

14    communication.

09:38:03 15    Q    And you're not aware of anybody making that type of

16    communication, are you?

17    A    So I believe the clinical trial on the filter, it list all

18    the complications, and these were also posted in the

19    instructions for use.

09:38:23 20    Q    Sir, my question is different.  When Bard started as early

21    as 2006 investigating caudal migration and started looking at

22    the inner relationship with other complications, you're not

23    aware of anybody from Bard that warned doctors that that was

24    going on within Bard?

09:38:40 25    A    I don't have specific recollection that this happened.

DIRECT EXAMINATION - ANDRE CHANDUSZKO

09:38:45   1   Q   And Bard, knowing that the filter was migrating, tilting,

2   perforating, and fracturing, it was still being sold to

3   patients and being implanted in patients; correct?

4   A   Yes, it was still sold.  Yes.  That's correct.

09:39:02   5   Q   And knowing that the filter was migrating downward,

6   tilting, perforating, and fracturing, it was sold to patients

7   well into 2007.  True?

8   A   I think the filter was on the market longer than that.

9   Q   And that filter continued to migrate, the G2; right?

09:39:31  10   A   Continued after -- I'm sorry?

11   Q   The complaints continued to come as long as the G2 was on

12   the market; right?

13   A   That would be my best guess.

14   Q   And as long as that filter was on the market, Bard

09:39:47  15   continued to receive complaints while the filter was being

16   implanted in patients --

17          THE COURT:  Mr. O'Connor, please ask the question to

18   the witness.

19   BY MR. O'CONNOR:

09:39:58  20   Q   That the filter was migrating, the filter was tilting, the

21   filter was perforating, and the filter was fracturing;

22   correct?

23   A   I'm very sorry.  Could you repeat the question, please.

24   Q   Sure.  Bard continued to receive complaints about the

09:40:13  25   failure modes as long as the G2 was on the market; correct?

DIRECT EXAMINATION – ANDRE CHANDUSZKO

09:40:18  1    A    Yes, that's correct.

2    Q    And even when Bard started receiving those complaints

3    after it released the filter in 2005, it left it on the

4    market, and Bard was well aware that it was being implanted,

09:40:31  5    the G2 was being implanted in patients.   True?

6    A    Yes, that's true.

7    Q    And you, sir, as an engineer, understood that a tilted

8    filter could be harmful to a patient; correct?

9    A    Yes.

09:40:53  10   Q    You, sir, understood that a G2 filter that tilted and

11   perforated through the vena cava could be harmful to a

12   patient.   True?

13   A    Yes.   I'm not a doctor, obviously, but, yes, these are

14   known complications.

09:41:06  15   Q    You, sir, were aware that the Bard G2 filter was

16   experiencing all the failure modes we talked about, migration,

17   tilting, perforation, and fracture; correct?

18   A    That is correct.

19   Q    And you knew that this filter was capable of doing all

09:41:26  20   those in a single patient.   True?

21   A    I don't have a specific recollection whether that's the

22   case or not.

23   Q    Something that would make sense to you based upon what you

24   know about the filter?

09:41:39  25   A    It's possible, but I just don't remember any particular

CROSS-EXAMINATION - ANDRE CHANDUSZKO

09:41:42  1  case like this.

2  Q   Okay.  Well, certainly when patients were complaining

3  after -- before 2007, you were aware that this filter was

4  causing harm because of its failure modes.  True?

09:41:59  5  A   Yes.  In some patients, yes.

6          MR. O'CONNOR:  That's all I have.

7          THE COURT:  Is that it, Mr. O'Connor?

8          MR. O'CONNOR:  No more questions, Your Honor.

9          THE COURT:  All right.  Cross-examination.

09:42:22  10          MR. CONDO:  Yes, Your Honor.

11          Your Honor, may I approach the clerk?  I'm not sure

12  if copies of the deposition transcripts are still available --

13          THE COURT:  Yes, you can.

14          THE COURTROOM DEPUTY:  They are.

09:42:59  15          MR. CONDO:  They are?  Then I don't need them.  Okay.

16                  C R O S S - E X A M I N A T I O N

17  BY MR. CONDO:

18  Q   Good morning, Mr. Chanduszko.

19  A   Good morning.

09:43:12  20  Q   I apologize.  Apologies if I cough.  I'm sucking throat

21  lozenges and trying to recover from a cold.

22          Yesterday Mr. O'Connor started with a little bit

23  about your background, and I'd like to tell the ladies and

24  gentlemen -- have you tell the ladies and gentlemen of the

09:43:32  25  jury a little bit more about your background.

CROSS-EXAMINATION - ANDRE CHANDUSZKO

09:43:36   1          First, where were you born, sir?

2    A    I was born in Poland.

3    Q    And how old were you when you came to the United States?

4    A    I was 24.

09:43:47   5    Q    And why did you come to the United States?

6    A    I came to study in the United States of America.

7    Q    Mr. O'Connor asked you a little bit about your educational

8    background, your training and experience.  Where did you get

9    your first engineering training, sir?

09:44:05  10    A    So my first engineering training, I got in Poland.  I

11   studied environmental protection for four years.

12   Q    And when you came to the United States, did you study

13   engineering?

14   A    Yes, I did.  I studied mechanical engineering technology

09:44:21  15   at Northeastern University.

16   Q    Did you get a degree?

17   A    Yes, I did.  I got a bachelor of science degree.

18   Q    And when you came to the United States, could you speak

19   English?

09:44:33  20   A    Just a little bit.  I learned my first 200 words before I

21   came.

22   Q    Now, do you still have or still struggle with the English

23   language?  Certain concepts?  Terms?  Words?

24   A    Not the technical part.  But other words, yes, they have

09:44:53  25   their nuances.

CROSS-EXAMINATION - ANDRE CHANDUSZKO

09:44:54   1   Q   And how do you try to manage when you answer questions,

       2   for example, in this courtroom, with nuance questions or

       3   things that you find difficult?

       4   A   Ideally --

09:45:09   5           MR. O'CONNOR:  Objection.  Irrelevant.

       6           THE COURT:  Overruled.

       7           THE WITNESS:  Ideally, I'll try to reduce it to more

       8   technical terms which are much more precise.

       9   BY MR. CONDO:

09:45:23  10   Q   Why did you become an engineer, sir?

      11   A   So I decided to be an engineer when I was five years old.

      12   So I'm not sure what the reason was, but math and physics

      13   always came easy to me, were my favorite subjects, and I went

      14   to school to study engineering.  And also like

09:45:50  15   problem-solving, so I think it was a good choice.

      16   Q   Now, most of your professional career since college has

      17   been spent with medical devices; is that correct?

      18   A   100 percent.

      19   Q   Mr. O'Connor asked you yesterday a little bit about

09:46:10  20   whether you are a licensed engineer, and you said no; correct?

      21   A   That is correct.

      22   Q   Do you need to be a licensed engineer in order to do what

      23   you do, designing medical devices and conducting tests and

      24   designing tests and doing test protocols?

09:46:28  25   A   No, I don't.

CROSS-EXAMINATION - ANDRE CHANDUSZKO

09:46:29    1    Q    And have you been, in your own mind at least, successful

            2    as a mechanical engineer designing IVC filters, for example?

            3    A    I think I am.  I was.

            4    Q    Do you hold patents?

09:46:43    5    A    Yes.  I hold many patents.

            6    Q    Give the ladies and gentlemen of the jury an appreciation

            7    for how many patents you've been issued.

            8    A    Around 70.

            9    Q    And how many of those deal with IVC filter features?

09:47:02   10    A    Probably about a quarter or a third of them.

           11    Q    Thank you.

           12          Now, you first began working with IVC filters right

           13    out of college at NMT; correct?

           14    A    That is correct.

09:47:17   15    Q    When did you move to Bard?

           16    A    In 2004.

           17    Q    And in what capacity did you join Bard?

           18    A    I was a staff engineer.

           19    Q    And when you joined the company, Bard, what were your

09:47:36   20    first assignments, generally?

           21    A    To work on the new generation Recovery filter.

           22    Q    Is that what was referred to I think in testimony

           23    yesterday as the G1?

           24    A    G1A.

09:47:53   25    Q    G1A.  That ultimately became what we've been talking

CROSS-EXAMINATION - ANDRE CHANDUSZKO

09:47:57   1   about, the G2?

2   A    That is correct.

3   Q    Now, did any of the work that you did at NMT before you

4   joined Bard, any of the kinds of tests or testing that you did

09:48:06   5   at NMT, did that play a role in the design and development of

6   the G2 filter when you arrived at Bard later?

7   A    Yes, it did.

8   Q    And can you give the ladies and gentlemen of the jury an

9   example of the kinds of tests that were done at Bard which

09:48:24   10   informed you and others that -- excuse me.  Can you tell the

11   ladies and gentlemen of the jury the kinds of tests that were

12   done at NMT that informed your design decisions at Bard when

13   you were working on the G2?

14   A    So without thinking much, I -- I think all of them.

09:48:48   15   Q    Okay.  Let's talk about some specifics.  Were bench tests

16   done at NMT?

17   A    Yes, that's correct.

18   Q    And what's the purpose of bench testing?

19   A    So bench testing typically try to simulate a particular

09:49:08   20   aspect of clinical experience or patient anatomy.

21   Q    And were clinical tests done at NMT on the Recovery

22   filter, the first generation filter?

23   A    Yes, they were.

24   Q    In fact, I should clarify.  All of the tests done at NMT

09:49:31   25   were on the Recovery filter?

CROSS-EXAMINATION - ANDRE CHANDUSZKO

09:49:33   1    A    Yes, that's correct.

           2    Q    And how about animal tests?  Were animal tests done?

           3    A    Yes.  So there were bench tests, animal tests, and

           4    clinical tests.

09:49:45   5    Q    Now, were any of the bench tests that were done at NMT

           6    tests that were -- that informed your engineering decisions at

           7    Bard with respect to the design of the G2 filter?  In other

           8    words, anything from Recovery, any kinds of bench tests at

           9    Recovery that helped provide information to improve the G2?

09:50:13  10    A    Yes, that's correct, because automatically the filters are

          11    similar.

          12    Q    Now, I want to talk a little bit about the fatigue testing

          13    done on the Recovery filter at NMT.  Yesterday, Mr. O'Connor

          14    asked you a lot of questions about fracture resistance, and I

09:50:33  15    think he also asked you about whether or not FEA testing was

          16    done and whether that was the only testing done for fracture

          17    resistance.  So let's break this down a little bit, if we can.

          18             What is an FEA test?

          19    A    So FEA stands for finite element analysis.  It is a

09:50:59  20    computer simulation.  It typically looks at responses, in this

          21    case, of an implantable device to external forces or

          22    deformations.

          23    Q    And were other tests done at NMT, specifically fatigue

          24    testing, on the Recovery filter?

09:51:24  25    A    Yes, there was a test like that.

CROSS-EXAMINATION – ANDRE CHANDUSZKO

09:51:26  1  Q   Would you look at, I believe it's Defense Exhibit 5233,

2  which should be in a red manila folder.  And it should have a

3  blue cover on it.  Or face sheet.

4  A   5233?

09:52:02  5  Q   5233.  Exhibit 5233.  Do you have that in front of you,

6  sir?

7  A   Yes, I do.

8  Q   Can you identify that exhibit?  What is the title and the

9  date?

09:52:18  10  A   It's titled EnduraTEC Corrosion and Fatigue Testing of RNF

11  Filters Design Verification, and the date is June 28, 1999.

12  Q   And are you the author of this exhibit?

13  A   Yes, I am.

14        MR. CONDO:  Your Honor, we would offer Exhibit 5233.

09:52:44  15        MR. O'CONNOR:  No objection.

16        THE COURT:  5233 is admitted.)

17     (Exhibit 5233 admitted.)

18        MR. CONDO:  May it be published?

19        THE COURT:  Yes.

09:52:51  20        MR. CONDO:  Thank you.

21  BY MR. CONDO:

22  Q   We put up the first page so the ladies and gentlemen of

23  the jury can see the title of the test.

24        Now, this is also called a standard operating

09:53:01  25  procedure?

CROSS-EXAMINATION - ANDRE CHANDUSZKO

09:53:02    1    A    Yes.

2    Q    Is this a test protocol?

3    A    Yes, that's what it says.

4    Q    Now, was a test run according to this test protocol that

09:53:22    5    you authored?

6    A    Yes, that's what it looks like.

7    Q    All right.  Well, let's turn, if we can, to the next page

8    of Exhibit 5233.

9         MR. CONDO:  And if we could highlight, please, the

09:53:42    10    purpose, and bring it forward so it is a little clearer.

11    BY MR. CONDO:

12    Q    What was the objective of this test, sir?

13    A    The objective of this test was to accurately evaluate ten

14    years equivalence of corrosion/fatigue endurance of 16 RNF,

09:54:05    15    removable Nitinol filters, by inducing a cyclic stress state

16    in a simulated physiological environment.  The duration of the

17    experiment will be equivalent to ten years of pulmonary

18    output, which is 32 million cycles.

19    Q    Why was NMT interested in running a ten-year equivalent

09:54:30    20    study of the endurance of the filter?

21    A    So the filter, when it's implanted in a vena cava, it

22    undergoes cyclic compressions.  This has to do with the fact

23    that when we're breathing, that causes the cava to expand and

24    contract.  And this is a standard test for implantable device

09:54:57    25    to test to ten years, and it's time to make sure that the

CROSS-EXAMINATION - ANDRE CHANDUSZKO

09:55:00  1  filter would not break due to these deformations.

2  Q   And what does it mean in the objective where it is written

3  that you are inducing a cyclic stress state in a simulated

4  physiological environment?

09:55:22  5  A   Because the testing has to be -- before the filter can be

6  implanted, the testing needs to be done in a laboratory.  So

7  there is a special machine that also has saline to simulate

8  blood, and the test is simulating about the deformations, and

9  also the corrosive environment of the blood.

09:55:50 10  Q   Now, let's look at the test results.  Can you look at

11  Exhibit 5234, please.  It should be in that red manila folder.

12  A   I have it.

13  Q   Can you identify the title of that report and the date

14  please, sir?

09:56:09 15  A   The title is "EnduraTEC Corrosion/Fatigue Testing of RNF

16  Filters Design Verification," and the date is August 4, 1999.

17  Q    Is this the report that reports the results of the testing

18  from the standard protocol we just looked at?

19  A   Yes, it does.

09:56:36 20  Q   And does your signature appear as approving this report?

21  A   Yes.

22       MR. CONDO:  Your Honor, we would offer Exhibit 5234.

23       MR. O'CONNOR:  No objection.

24       MR. CONDO:  May it be published?

09:56:50 25       THE COURT:  I'm sorry, I couldn't hear what you said,

CROSS-EXAMINATION - ANDRE CHANDUSZKO

09:56:52   1    Mr. O'Connor.

           2             MR. O'CONNOR:  No objection.

           3             THE COURT:  5234 is admitted, and you may publish.

           4          (Exhibit 5234 admitted.)

09:57:03   5    BY MR. CONDO:

           6    Q   I want to move quickly, sir, and I want to turn to the

           7    next page, page 2.

           8             MR. CONDO:  And, Scott, if you could enlarge and

           9    bring forward the extract paragraphs -- excuse me, the

09:57:17  10    abstract paragraphs.

          11    BY MR. CONDO:

          12    Q   Yesterday you were asked a lot of questions, and today,

          13    about the knowledge of the inferior vena cava and how it

          14    operated.  I want to talk a little bit about the findings of

09:57:37  15    this report and what that information provided, what kind of

          16    information is provided to you in the design of the G2 filter.

          17    Even though this was done for Recovery.

          18             You understand me?

          19    A   Yes.

09:57:51  20    Q   That was a little long, so I'll try to do a better job.

          21             Let's look at the first paragraph.

          22             You are -- the report recites that:  Pulmonary

          23    functions produce a measurable IVC diameter change of about

          24    one millimeter.

09:58:15  25             Do you see that?

CROSS-EXAMINATION - ANDRE CHANDUSZKO

09:58:22  1    A    Yes, I do.

          2    Q    Is that measurable IVC diameter change distention?

          3    A    Yes, that's measurable.

          4    Q    And when we talk about diameter change, we're talking

09:58:37  5    about the concept of distention; correct?

          6    A    Yes.

          7    Q    All right.  So what pulmonary functions produce the

          8    measurable diameter change or distention in the IVC filter?

          9    A    Just breathing.

09:58:52 10    Q    Inhaling, exhaling?

         11    A    Yes, that's correct.

         12    Q    Now, the extract also says that the IVC filter is a

         13    corrosive environment.  Do you see that?

         14    A    Yes, I do.

09:59:11 15    Q    Why is the IVC filter a corrosive environment?

         16    A    So if I'm correct, it's not IVC filter.

         17    Q    I'm sorry, the IVC itself, the inferior vena cava.  Thank

         18    you for correcting me.

         19    A    Yes.  The blood in the vena cava, yes.

09:59:32 20    Q    So why is it corrosive?

         21    A    It's not very corrosive, but it's corrosive enough to be

         22    of consideration because there are different salts that are in

         23    blood, and effectively water and salt will produce a corrosive

         24    environment.

09:59:51 25    Q    So what was the result of this testing?

CROSS-EXAMINATION - ANDRE CHANDUSZKO

09:59:58  1    A    So my recollection is the result was all filters passed

2    the test.

3    Q    All right.  And all 16 filters were subjected to

4    36 million cycles?

10:00:10  5    A    Yes, that's correct.  Of compression and expansion.

6    Q    And that was equivalent of ten years of normal breathing

7    and cardiac function?

8    A    Yes.  So if I remember correctly, to be exact, I think it

9    was the 32 million that was the equivalency, and the test was

10:00:32 10    just upped to 36, which is a little bit more.

11    Q    And as an engineer, is this a reasonable test, in your

12    opinion, to perform in order to understand the vena cava

13    environment?

14    A    Yes.  It's a reasonable test to perform to understand how

10:00:51 15    the filter would react to breathing, yes.

16    Q    And after you completed this test, did you end the test

17    there?

18    A    No.  In fact, we didn't.

19    Q    What did you do?

10:01:06 20    A    So once we met the acceptance criteria, which was no

21    fractures, no pits, so effectively no signs of corrosion, we

22    decided to continue with the test to 400 million cycles, which

23    is above and beyond what was required for this test.

24    Q    And what is the equivalence in years of a 400 million

10:01:34 25    cycle test?

CROSS-EXAMINATION - ANDRE CHANDUSZKO

10:01:37   1   A    So depending on the respiratory rate, it would be

2   roughly -- it would be at least, I'd say, 50 years or more of

3   a human life equivalency.

4   Q    What do you mean by respiratory rate?

10:01:54   5   A    So just breathing.

6   Q    How fast you breathe?  Inhale, exhale?

7   A    Yes, for the whole cycle.  Breathe in, breathe out is one

8   cycle.  So that was 400 million breathing in and breathing

9   out, effectively.

10:02:08   10   Q    Now, this EnduraTEC fatigue and corrosion testing of the

11   Recovery filter, was it repeated for the G2 filter?

12   A    This particular test was not.

13   Q    Why not?

14   A    There's a number of different reasons I can think of.  So

10:02:29   15   one reason was that the Recovery filter and the G2 filter,

16   they shared the same material and the same manufacturing

17   methods, so that was one.

18        Two, the Recovery filter was already subjected to

19   400 million cycles.  We knew that there were some changes in

10:02:52   20   the G2 filter that would affect fatigue life.  And the main

21   changes for this particular test, I'm going to say that it was

22   the change in the filter arm geometry, and then change in the

23   filter hook.

24        So just based on sound engineering judgments, we knew

10:03:18   25   these changes were beneficial, but nevertheless we ran a

CROSS-EXAMINATION - ANDRE CHANDUSZKO

10:03:25  1   computer simulation, which is the FEA, to both compressed and

2   expanded configuration in the vena cava of the same size as

3   the fatigue test on the Recovery filter, and we found that the

4   stresses in both the arms and the hooks were significantly

10:03:48  5   reduced in G2 relative to the Recovery filter.

6        There was one more test that we did, which was an

7   actual physical test that looked at larger, much larger,

8   deformations than the fatigue test on the Recovery filter, so

9   we tested both G2 and the Recovery filter side by side.  And

10:04:13  10  what we found, that in this test, the G2 filter had a fracture

11  resistance that was 12 times higher than the Recovery filter

12  in the arms.

13  Q    Thank you.

14       Now, we'll get into those specific tests a little

10:04:31  15  later in your testimony.  I want to change subjects now, if I

16  can.

17       We talked a lot about -- you were asked a lot about

18  the changes yesterday in the G2 filter.  I have prepared a

19  demonstrative exhibit, and that is Exhibit Number 7875.  If

10:04:52  20  you would put that in front of you, sir.

21  A    I have it.

22  Q    Now, at my request, did you look at Exhibit 7875 to

23  determine if the information in that exhibit is correct and

24  fairly and accurately depicts both the Recovery filter and the

10:05:41  25  G2 filter?

CROSS-EXAMINATION - ANDRE CHANDUSZKO

10:05:43  1    A    I did.

2    Q    And would this demonstrative help you to explain your

3    testimony to the jury, to explain the changes that were made

4    and the reasons for the changes?

10:06:00  5              MR. O'CONNOR:  Your Honor, this is beyond the scope

6    of my examination of this witness.

7              THE COURT:  Overruled.

8              THE WITNESS:  Yes, very much so.

9              MR. CONDO:  Your Honor, may we publish the

10:06:13 10    demonstrative exhibit to the jury?

11             THE COURT:  Any objection?

12             MR. O'CONNOR:  No objection.

13             THE COURT:  Yes, you may.

14             MR. CONDO:  Thank you.

10:06:22 15    BY MR. CONDO:

16    Q    There are several pages to this exhibit, and I want to

17    take them individually, but I do want to move quickly,

18    Mr. Chanduszko.

19             Can you explain what the jury is looking at on the

10:06:38 20    first page of Exhibit 7875, the side-by-side comparison of the

21    Recovery and G2.

22    A    Yes.

23    Q    Would you do so.

24    A    I'm sorry?

10:06:53 25    Q    Would you please do so.

CROSS-EXAMINATION - ANDRE CHANDUSZKO

10:06:54  1   A    Yes.  So what you see is comparison of the Recovery

       2   filter, which is the actual image of the filter on the left,

       3   and then an image of the G2 filter on the right.

       4   Q    And there are a number of indications on the G2 image of

10:07:16  5   changes from the Recovery filter; correct?

       6   A    Yes, that's correct.

       7   Q    On this slide -- first of all, this slide doesn't reflect

       8   all of the changes, does it?

       9   A    That's correct.

10:07:29 10   Q    There will be a later slide that has additional changes.

      11   But what changes are shown on this slide?

      12   A    So it shows changes to the hook, the leg span, and the

      13   arms.

      14   Q    And in filter language, we have adopted, or the company

10:07:47 15   has adopted, sort of human traits to refer to different

      16   elements of the feature?

      17   A    That's correct, yes.  Should I explain?

      18   Q    Yeah, go ahead.

      19   A    So generally speaking, we can say there's three different

10:08:01 20   components.  One is the tip, then you have two other features.

      21   One, they're called legs.  So these are the longer parts that

      22   end with hooks, and the other one is the arms.  So these are a

      23   little shorter and have a bend toward the top.

      24   Q    So the shorter elements are the arms?

10:08:28 25   A    Yes.  And then if you look at the arms, right below the

CROSS-EXAMINATION - ANDRE CHANDUSZKO

10:08:31  1    tip is something we call the neck area.  And then the bend we

       2    will call either a shoulder -- probably shoulder, and then the

       3    very bottom of it where there is a little bend on the G2, we

       4    call that a wrist.

10:08:56  5    Q    All right.  Let's walk the jury through, for all of our

       6    benefits, the terminology.

       7              The tip is what part of the filter in the image?

       8    A    The very top of it, the sleeve.

       9    Q    And the neck area is immediately below the tip?

10:09:07 10    A    That's correct.

      11    Q    Then we have the arms?

      12    A    Yes.

      13    Q    And at end of the arms we have a bend.  And what is that

      14    feature called?

10:09:18 15    A    So at the very end, we call it a wrist.

      16    Q    And then we have legs, the longer features?

      17    A    Yes, which end with hooks.

      18    Q    So on this image, what were the changes between G2 and

      19    Recovery?

10:09:37 20    A    So specifically or generally?

      21    Q    As shown on this image.

      22    A    So elastic hooks making the hooks stronger is one change.

      23    Then increasing the leg span, making it wider, and then

      24    increasing the length of the arms.

10:09:54 25    Q    All right.

CROSS-EXAMINATION - ANDRE CHANDUSZKO

10:09:54    1          MR. CONDO:  Let's go to the next slide, please.

2       BY MR. CONDO:

3       Q    Why was the leg span increased?

4       A    So in response to some of the migration complaints, we

10:10:13    5       wanted to make sure that the hooks can always be engaged even

6       if the cava distends beyond its indicator range.  So that was

7       the main -- that was the main reason.

8       Q    To improve what kind of characteristic, unfavorable

9       characteristic?

10:10:41   10       A    Migration resistance.

11      Q    Were the hooks also intended to resist or affect caudal

12      migration?

13      A    Yes, that's correct.

14      Q    And how do these hooks, how were they intended to affect

10:10:56   15       caudal migration?

16      A    So the legs have a wider span and more radial force than

17      what they had on the Recovery filter.  And also the hooks

18      being stronger, they would engage more readily post

19      implantation and would stabilize the filter in both

10:11:17   20       directions.

21      Q    Now, were the primary complaints of migration of the

22      Recovery filter cranial migration?

23      A    Yes, that's correct.

24      Q    Not caudal migration?

10:11:29   25       A    That's correct.  So cranial is up and caudal is down.  So

CROSS-EXAMINATION - ANDRE CHANDUSZKO

10:11:32  1   cranial.

2   Q    So let's turn to the next page, if we can.

3        Why were the hooks thickened?

4   A    So the hooks were thickened to increase the cranial

10:11:51  5   migration resistance.  So increasing the thickness would make

6   the hooks stiffer.

7   Q    Is designing a filter a series of balancing different

8   decisions and characteristics?  If you want to a retrievable

9   filter, you have to balance those which permit retrievability

10:12:13 10   with those that perhaps influence migration resistance and

11   centering and all the other characteristics?

12   A    It always is.  There is a lot of conflicting requirements

13   for this device.

14   Q    And I think you said several times to Mr. O'Connor that

10:12:34 15   when you were designing the G2, you were considering all of

16   the harmful characteristics of the -- that may be present in a

17   filter.

18   A    That is correct.

19   Q    And you were trying to address multiple complications that

10:12:49 20   had been reported.

21   A    Yes.  We always do.

22   Q    And Mr. O'Connor asked you a series of questions right at

23   the end about you knew about perforation and fracture

24   resistance and migration resistance.  Do you remember those

10:13:04 25   questions?

CROSS-EXAMINATION - ANDRE CHANDUSZKO

10:13:05  1   A   Just roughly, yes.

2   Q   All right.  You've known about each of those items,

3   fracture resistance, migration resistance, tilting,

4   perforation, for as long as you've been working in filters;

10:13:19  5   correct?

6   A   That is correct.  The filters have been on the market

7   since at least the 1970s, and they're well-established devices

8   and these are known complications.

9   Q   They're known complications to designers?

10:13:33  10  A   That's correct.

11  Q   Known complications to people who utilize the filters?

12  A   Yes.

13  Q   Now, let's turn, if we can, to the next page, the increase

14  in the curvature of the arms.

10:13:53  15          You referred to this earlier as the neck?

16  A   Yes, that's correct.

17  Q   Why did you increase the curvature of the arm wires coming

18  out of the tip?

19  A   So we wanted to improve our fracture resistance of the

10:14:09  20  Recovery filter, and we looked at different possible ways to

21  do it, and that was one way that would distribute the loads

22  that were put on the arm over a larger area, and therefore

23  would lower strains and stresses in the arms and hands.  It

24  would increase the fracture resistance of the filter.

10:14:32  25  Q   So the Recovery had arms and legs, but particularly arms,

CROSS-EXAMINATION – ANDRE CHANDUSZKO

10:14:38  1   that came out at a greater angle below the tip; correct?

2   A    Yes.  I would describe it, I think better, as a smaller

3   radius at the neck.

4   Q    All right.  And by radius, what do you mean?

10:14:55  5   A    So the arm comes out from the tip as a straight piece of

6   wire, and then the way its manufactured, it is bent around

7   a -- effectively a round part of the fixture, and then it

8   joins another straight part.  So the part where it bends, it

9   actually follow a circle.

10:15:19  10   Q    Now, was the change in the curvature of the arm wires

11   intended to improve fracture resistance in the G2 in that

12   area?

13   A    Yes, that's correct.

14   Q    But that style change was not the only change that was

10:15:31  15   made to improve fracture resistance overall in the G2 filter;

16   correct?

17   A    Yes, that's correct.

18   Q    Now, did the changes to the G2 over the Recovery require

19   redesigning the deployment system for the G2?

10:15:47  20   A    Yes, they did.

21   Q    And why?

22   A    So the main difficulty was after we increased the

23   thickness of the hooks, the way the hooks were loaded on the

24   Recovery filter, they were effectively straightened out and

10:16:05  25   they would sit, and there was a special part of the delivery

CROSS-EXAMINATION – ANDRE CHANDUSZKO

10:16:09   1    system that held the straight hooks apart so the legs wouldn't

2    get entangled during delivery.  So these much stronger hooks,

3    we couldn't just straighten them out the same way as we did

4    with the Recovery filter, so we had to find a different way to

10:16:28   5    deliver the filter.

6           MR. CONDO:  Now let's go to the very last slide on

7    this exhibit, please.

8    BY MR. CONDO:

9    Q   Why was the arm length of the G2 increased, and why was

10:16:43  10    there a curved arm end added to the -- or a wrist added, to

11    the G2?

12    A   So the Recovery filter arms, because they were relatively

13    short, they would engage more readily in a vena cava wall.

14    And then we had some observations that when the arm engages

10:17:12  15    this way, sometimes it may lead to the arm catching on

16    adjacent anatomy, such as another vessel that was connected to

17    the vena cava.  So -- and that may lead to increased stresses

18    and potentially a fracture.  So we increased the length of the

19    arm and added the wrist to -- so the arm would be parallel to

10:17:43  20    the wall of the vena cava and would not engage as readily.

21    Q   In your opinion, were all of these changes that you've now

22    discussed intended to make the G2 filter a better filter?

23    A   Yes.  Hundred percent.

24    Q   Now I want to change subjects again.

10:18:04  25           MR. CONDO:  You can take that off, please.

CROSS-EXAMINATION – ANDRE CHANDUSZKO

10:18:06  1   BY MR. CONDO:

2   Q    And I want to talk about some of the deposition testimony

3   that Mr. O'Connor read to you yesterday.

4        If you have your deposition of October 10, 2013, in

10:18:19  5   front of you.  That's one of those large exhibits.

6   A    Yes, I have it.

7   Q    Okay.  Now, my notes show that he asked you a question

8   that started on page 36, lines 10 through 14.

9   A    I see it.

10:19:08  10   Q    He asked you:  Was one of the project goals for

11   redesigning the filter to improve in respect to tilting?

12        And you said:  Generally speaking.

13        MR. O'CONNOR:  Excuse me, Your Honor, I don't think

14   the entire question was read.

10:19:25  15        THE COURT:  Please reread it, Mr. O'Connor.

16        MR. CONDO:  Sure.  I apologize.  The danger of trying

17   to go faster than I should.

18   BY MR. CONDO:

19   Q    "Question:  You didn't answer my question.  Was one of the

10:19:37  20   project goals for redesigning the Recovery filter into the G2

21   filter to improve its performance in respect to tilting?"

22        What was your answer?

23   A    "Generally speaking, no."

24   Q    Now, why did you use the term "generally speaking, no"?

10:19:55  25   A    So first of all, I had to rely on my recollection of

CROSS-EXAMINATION - ANDRE CHANDUSZKO

10:19:59  1    events, and my recollection is that there were two main goals

        2    to redesign the Recovery filter.  One was to improve migration

        3    resistance, and the second one was to improve fracture

        4    resistance.  And these are my recollection were the main

10:20:21  5    goals.  And, however, in the design process, we don't ignore

        6    any other characteristics, so we take into consideration

        7    everything else.  That's why generally speaking, no, but

        8    knowing that we test for everything and we couldn't build a

        9    filter that would simply ignore some of the other things.

10:20:46 10    Q   Now, I'd like to show the jury a different part of that

       11    same deposition testimony.  These are the questions and

       12    answers that immediately precede, that are in front of what

       13    you've just read.

       14            MR. CONDO:  Can we go to page 35, line 16, please.

10:21:01 15            And can you put page 36 side by side.

       16            Page 35, line 16, through page 36, line 9.

       17    BY MR. CONDO:

       18    Q   All right, I'm going to ask the questions, you read the

       19    answers.  Is that fair?

10:21:55 20    A   Yes.

       21    Q   Question:  Line 16, page 35.  "And what were the goals of

       22    the G2 filter, the redesign of the Recovery filter into the G2

       23    filter?"

       24            Ignore the objection.  You may read.

10:22:10 25    A   "My best recollection as far as the project goals for G2

CROSS-EXAMINATION - ANDRE CHANDUSZKO

10:22:15  1    was to -- that's my best recollection, to make a filter that's

        2    more migration resistant and more fracture resistant than the

        3    Recovery filter."

        4  Q    "And that was it?"

10:22:28  5  A    "That's my best recollection."

        6  Q    "Question:  Had nothing to do with tilting?"

        7  A    "Not as a main goal, is my recollection."

        8  Q    "Question:  Did it have anything to do with tilting?"

        9  A    "It was always a consideration for any performance, so

10:22:45 10    generally speaking, every new filter that would be developed

       11    would be a consideration for tilting."

       12  Q    And that's what you told Mr. O'Connor yesterday when you

       13    testified; correct?

       14  A    That's what I meant when I testified, yes.

10:23:05 15  Q    Now, I want to go to another section.  This is also in the

       16    October 10, 2013, deposition.  This is page 275.  Lines 16

       17    through 23.

       18         Yesterday you were asked this question, and this was

       19    the answer that was read by Mr. O'Connor.  He asked you:

10:23:44 20    "What would predispose the G2 filter to caudal migration over

       21    the Recovery filter?"

       22         Read your answer, please.

       23  A    "I think the hypothesis is that since the Recovery filter

       24    arms, they engage in the cava wall, which, you know,

10:24:03 25    occasionally causes the saluting arm, the G2, they don't

CROSS-EXAMINATION - ANDRE CHANDUSZKO

10:24:08  1   engage as readily, and, therefore, they be less resistant to

2   the caudal migration."

3   Q   Why did you start with "I think the hypothesis is" in your

4   answer?

10:24:21  5   A   Because we don't know that for a fact.

6   Q   This is just one theory that was being explored?

7   A   Yes.  We looked at any possible explanation.

8         MR. CONDO:  Now if we could turn to the June 21

9   deposition.  Page 241.

10:25:19 10         Lines 19 through 22, please.

11   BY MR. CONDO:

12   Q   I believe this was a question and answer that was read

13   yesterday.  "Question:  Would you agree that electropolishing

14   is good because it helps with fracture resistance?

10:25:36 15         "Answer:  If it helps?  Yes."

16   Q   Now, I'd like to go on and show the ladies and gentlemen

17   of the jury the balance of the questioning that immediately

18   followed that question and answer.

19         MR. CONDO:  Can you show the ladies and gentlemen of

10:25:47 20   the jury on page 241, starting at line 23, down through page

21   242, line 8.

22   BY MR. CONDO:

23   Q   All right.  Immediately after we saw the question and

24   answer that we just read to the ladies and gentlemen of the

10:26:29 25   jury, you were asked this question -- I'll ask the questions,

CROSS-EXAMINATION - ANDRE CHANDUSZKO

10:26:32    1   you read the answers, please.

2            "Question:  Do you know -- were you aware in 2005

3   when the G2 was being developed that it did?"

4            Then there was an objection to form.

10:26:46    5            "That is" -- and you read the answer.

6   A   "I've seen evidence that it does and I've seen evidence

7   that it doesn't.  Part of it is from my professional

8   experience, I have seen both.  It's very difficult to say up

9   front that it would actually help."

10:27:05   10   Q   So there is a question, there was a question in the design

11   and development of the G2 as to whether electropolishing would

12   be helpful or harmful; correct?

13   A   Yes, that's correct.

14   Q   And that's what you were explaining to Mr. O'Connor

10:27:20   15   yesterday?

16   A   Yes.

17            MR. CONDO:  Now, I'd like to go to page 267 of the

18   same exhibit.  Excuse me, same deposition.  June 21, 2013.

19   BY MR. CONDO:

10:27:33   20   Q   And you were asked a question, the end of 267, line 25,

21   continuing on to the top of page 268, line 5.

22            "Question:  You were asked -- were you asked to work

23   on a design or to develop a design for the G2 that would

24   design out that risk?"

10:28:19   25            What was your answer?

CROSS-EXAMINATION - ANDRE CHANDUSZKO

10:28:21  1   A   "I was asked to minimize any risk possible."

2   Q   "Could you design out the risk?"

3   A   "It is not possible to design out every risk."

4         MR. CONDO:  Now, I want to show the jury what the

10:28:36  5   next question and answer was right after this question and

6   answer.  Lines 6 and 7 from page 268, please.

7         MR. O'CONNOR:  I'm sorry, what page?

8         MR. CONDO:  268, lines 6 and 7.  Same page we're on.

9         MR. O'CONNOR:  No, that's the next page.

10:29:09 10        MR. LOPEZ:  Right here.

11        MR. O'CONNOR:  Okay.  Thank you.

12   BY MR. CONDO:

13   Q   Question, page 268 line 6:  "Did you succeed?"

14         Would you read your answer.

10:29:25 15   A   "I think I did."

16   Q   Thank you.

17         THE COURT:  All right.  Mr. Condo, we're going to

18   break at this point.

19         Ladies and gentlemen, we'll take a 15-minute break

10:29:35 20   and plan to resume at a quarter to the hour.  Please remember

21   not to discuss the case.  We'll see you then.

22         (The jury exited the courtroom at 10:30.)

23         THE COURT:  All right.  We'll see you in 15 minutes.

24         (Recess taken from 10:30 to 10:46.  Proceedings resumed

10:46:39 25   in open court with the jury present.)

REDIRECT EXAMINATION – ANDRE CHANDUSZKO

10:47:55  1          THE COURT:  Thank you.  Please be seated.

        2          Go ahead, Mr. Condo.

        3          MR. CONDO:  Your Honor, that concludes my examination

        4    at this time of Mr. Chanduszko.

10:48:01  5          THE COURT:  All right.

        6          Redirect?

        7          MR. O'CONNOR:  Yes, Your Honor.

        8          Pull exhibit 932 back up.  Greg, will you just go

        9    back to the first page.

10:48:26 10          MR. LOPEZ:  Mr. O'Connor, make sure you -- you have

       11    to ask to let it be shown to the jury.

       12          MR. O'CONNOR:  Your Honor, may I again publish

       13    Exhibit 932 for this question?

       14          THE COURT:  I'm sorry, which --

10:48:42 15          MR. O'CONNOR:  I want to ask him questions about 932,

       16    which I believe is admitted into evidence.

       17          THE COURT:  You may, and it may be displayed.

       18          MR. O'CONNOR:  Thank you.

       19          R E D I R E C T   E X A M I N A T I O N

10:48:56 20    BY MR. O'CONNOR:

       21    Q   Mr. Chanduszko, this is one of the documents we talked

       22    about before.  This is the filter franchise review that's

       23    dated May 6, 2008.  Do you recall when we talked about that

       24    earlier on your direct?

10:49:10 25    A   Yes, I do.

REDIRECT EXAMINATION - ANDRE CHANDUSZKO

10:49:14   1   Q   And you just talked to your attorney about the changes

2   that were made to the G2 to address various risks and

3   complications; correct?

4   A   Yes, that's correct.

10:49:29   5   Q   And, again, that testimony that you -- and showing your

6   diagram, that filter was released in 2005.

7   A   Roughly around that date.

8   Q   But after it was released, there were still discussions --

9        MR. O'CONNOR:  Greg, can you go to page 2867.

10:49:53  10   BY MR. O'CONNOR:

11   Q   But even after release, Bard still had a lack of thorough

12   understanding of dynamics of the caval anatomy which impacted

13   test methods; right?  According to this document?

14   A   That is the statement that is in this document.

10:50:15  15   Q   Thank you.

16        Now, sir, we talked about bench testing that you did

17   relative to both the Recovery and G2.  Do you recall that

18   testimony?

19   A   Yes, I do.

10:50:30  20   Q   And your point was that testing that was done in a

21   laboratory using filters and tubes showed you that there were

22   no fractures, no migrations -- or few; correct?

23   A   That was one of the tests, and there were no fractures for

24   the EnduraTEC test, which is the pulmonary cycles.

10:50:55  25   Q   But you do know that after both the Recovery and the G2

REDIRECT EXAMINATION - ANDRE CHANDUSZKO

10:50:59    1    were released, both those filters did fracture in human

2    beings; true?

3    A    Yes, that's true.

4    Q    And isn't a purpose of a bench test -- well, whatever

10:51:15    5    bench testing you did, it certainly didn't transfer to the

6    realties of the filter being in the human being because you

7    found out that that was different, that the filter was

8    fracturing, unlike what your bench tests showed you; correct?

9    A    I'm not sure if that is an accurate statement.

10:51:33   10    Q    Well, you did your bench test, but once it was put in

11    humans, you found out both filters, the Recovery and the G2,

12    were fracturing.  True?

13    A    Yes, that's true.

14    Q    Now, Mr. Chanduszko, before the G2 was ever released to

10:52:00   15    the market, how many people participated in any type of

16    clinical study before the G2 was released to the market?

17    A    If you can clarify what you mean by any type of animal --

18    I'm sorry, clinical study.

19    Q    There was no clinical study with the G2 in humans before

10:52:25   20    the G2 was released to the market.  True?

21    A    Before it was released, no.

22    Q    You agree with that?

23    A    That's my understanding.

24    Q    And in your role as an engineer with Bard -- that's where

10:52:41   25    you still were; correct?

REDIRECT EXAMINATION - ANDRE CHANDUSZKO

10:52:43   1    A    Yes, that's correct.

           2    Q    You didn't participate in providing any information to

           3    marketing so that marketing could share with the public what

           4    you were learning in your testing and what you learned about

10:52:55   5    the complaints that you were receiving.   True?

           6    A    You said, sir, I did not participate?

           7    Q    You weren't providing information that marketing could use

           8    based upon what you were hearing in terms of complaints from

           9    the public?

10:53:13  10    A    So I, as an engineer, don't get the complaint data

          11    directly.   There's a special department called field

          12    assurance, and all the complaints are directed to them, and

          13    then this information is shared, would be shared to the filter

          14    team.

10:53:36  15    Q    Okay.   But my point is you, as an engineer for Bard, did

          16    not participate in any marketing of Bard products.   Fair?

          17    A    Generally speaking, no.

          18    Q    And you, in engineering, you didn't provide any warnings

          19    to doctors out there that were using the filters, did you?

10:53:57  20    A    No.   That would be outside of my role.

          21    Q    And you talked about the design process and what you were

          22    trying to do to make improvements on complications in the G2

          23    before it was released to the market; correct?

          24    A    No, not correct.   It was complication of the Recovery

10:54:37  25    filter.

DIRECT EXAMINATION - MURRAY ASCH

10:54:38  1    Q    I know, but what you were doing is you had the Recovery

          2    filter and the G2.  The purpose of the G2 was to improve what

          3    you were learning about the Recovery filter after it was out

          4    in the market and in human beings.

10:54:51  5    A    Yes.

          6    Q    And you started that while the Recovery was on the market;

          7    correct?

          8    A    That is correct.

          9    Q    And you knew that the problems the Recovery was

10:55:02  10   demonstrating in terms of the failures and complications had

          11   to be improved in the new generation filter; correct?

          12   A    So that was the goal of the project, to improve these

          13   things.

          14   Q    And with that goal, knowing when that goal started, Bard

10:55:20  15   still continued to sell the Recovery; true?

          16   A    That is correct.

          17            MR. O'CONNOR:  That's all I have.

          18            THE COURT:  All right.

          19            Thank you, sir.  You can step down.

10:55:42  20            All right.  Your next witness, Counsel.

          21            MR. LOPEZ:  Plaintiffs at this time would like to

          22   call Dr. Murray Asch.

          23            THE COURTROOM DEPUTY:  Sir, if you'll please come

          24   forward and raise your right hand.

          25

DIRECT EXAMINATION - MURRAY ASCH

**MURRAY ASCH,**

called as a witness herein, after having been first duly sworn
or affirmed, was examined and testified as follows:

D I R E C T   E X A M I N A T I O N

BY MR. LOPEZ:

Q   Good morning, Dr. Asch.

A   Good morning.

Q   It is Dr. Asch; correct?

A   Yes, correct.

Q   And you are a medical doctor?

A   Yes, I am.

Q   And you currently practice medicine somewhere?

A   Yes.

Q   And where is that?

A   That's in Oshawa, Ontario, a small city just outside of
Toronto.

Q   Did you travel here from the Toronto area to testify in
this case?

A   Yes, I did.

Q   What did you have to do to facilitate your being here
today?

A   This being March break, vacation is a little bit difficult
to come by, so I had to arrange for people to cover my work in
my absence so I could be here today.

Q   And did we, being the lawyers representing the plaintiff

DIRECT EXAMINATION - MURRAY ASCH

10:57:56  1  in this case, Ms. Booker, agree to reimburse you for those

2  expenses?

3  A    Yes, you did.

4  Q    Including your travel expenses?

10:58:05  5  A    Yes.

6  Q    And what it cost you to get someone to cover for you?

7  A    Yes.

8  Q    Before we get into your background and why you're here and

9  some of the specifics about that, would you just tell the

10:58:21  10  Judge and jury generally what your prior relationship was with

11  NMT and Bard.

12  A    So when you say prior, what -- when -- what time period

13  are you referring to?

14  Q    Talking about the time period when the Recovery filter had

10:58:45  15  not been released to the market and you were involved in doing

16  some testing for them.

17  A    Well, so the initial relationship related to this filter

18  started in approximately 1999, when I was approached by a team

19  composed of people from both Bard and NMT, when they asked if

10:59:05  20  I would be involved in using their filter as a first -- as a

21  first human use.

22  Q    And prior to that, had you used Bard products?

23  A    Yes, I had used Bard products for a number of years.

24  Q    And had you prior to that used a IVC filter?

10:59:26  25  A    Yes, I used the permanent IVC filter manufactured or sold

DIRECT EXAMINATION - MURRAY ASCH

10:59:31  1    by Bard prior to that, yes.

        2    Q    And did you have a good experience with that filter?

        3    A    Yes, I did.

        4    Q    Did you experience any complications with that filter in

10:59:41  5    your practice that caused you concern about patient safety?

        6    A    No complications that were unexpected.

        7    Q    Had you ever had a Simon Nitinol filter in the years you

        8    were using it be challenged by a clot and migrate towards the

        9    heart?

11:00:00 10    A    No.  I had a number of filters that were challenged by

       11    clots, but none of them migrated.

       12    Q    And let's learn a little bit more, get some details about

       13    you, Dr. Asch.  You provided us with your curriculum vitae.  I

       14    think it's current.  And it's Exhibit 5332.  I'll ask you to

11:00:24 15    look at that.  It should be on your screen, hopefully, and on

       16    mine.

       17    A    I don't see it.

       18    Q    It's coming.

       19             4332.

11:00:42 20             MR. WOODY:  Oh, 43?

       21             MR. LOPEZ:  Did I say it wrong?

       22             THE COURT:  What's the number?

       23             MR. LOPEZ:  I said it wrong, Your Honor.  I said 53.

       24    It's 4332.

11:00:55 25             THE COURT:  All right.

DIRECT EXAMINATION - MURRAY ASCH

11:00:55  1    BY MR. LOPEZ:

2    Q    Dr. Asch, is that a copy of your curriculum vitae that you

3    provided us with within the last few days?

4    A    Yes.  That is the most current version, yes.

11:01:04  5    Q    You can probably rattle off some of this stuff without

6    looking at it.  If you need to reference it, we'll go to it.

7              You went to medical school; correct?

8    A    Correct.

9    Q    Where did you go to medical school?

11:01:14 10    A    London, Ontario University of Western Ontario.

11    Q    Did you do what we commonly call an internship and a

12    residency after medical school?

13    A    Yes.

14    Q    Looks like you did internal medicine residency for a

11:01:33 15    while, and then did a radiology residency?

16    A    Yeah.  At the time I graduated there was no direct path

17    into radiology, so I did two years of internal medicine as

18    pretraining, if you will, before I was accepted -- or I was

19    able to be accepted into the radiology residency training

11:01:53 20    program.

21              MR. LOPEZ:  Your Honor, may I offer up 4332 into

22    evidence at this time.

23              MR. NORTH:  Objection, Your Honor.  Cumulative.

24              THE COURT:  Overruled.

11:02:02 25              4332 is admitted.

DIRECT EXAMINATION – MURRAY ASCH

09:25:03   1        (Exhibit 4332 admitted.)

2    BY MR. LOPEZ:

3    Q   If you look at -- why don't we go to page 2 of that

4    exhibit.  I think it's page 2.  Yes.  Looks like you did

11:02:18   5    radiology residency, which I think you just talked about.

6    Tell me about -- tell us about the Armed Forces Institute of

7    Pathology at Walter Reed Medical Center.  What was that all

8    about?

9    A   So that's an educational experience that many radiologists

11:02:34  10    from around the world attend.  It's a six-week intensive

11    course on pathology and radiology correlation.  So it's a

12    really great way to put everything together and it's a great

13    educational experience, and I was lucky enough to be able to

14    attend that.

11:02:49  15    Q   So you did a four-year residency in radiology, and then it

16    looks like after that, in 1989, you did a fellowship in

17    abdominal imaging and interventional radiology?

18    A   That's correct.  So after my initial four years of

19    radiology training, I felt that I wanted to get more training,

11:03:06  20    specifically in my areas of interest, which were

21    interventional radiology and body imaging.  For example, CT,

22    MR, and ultrasound.

23        MR. LOPEZ:  I made the same mistake that I reminded

24    Mr. O'Connor about.  May we publish this to the jury,

11:03:26  25    Your Honor?

DIRECT EXAMINATION - MURRAY ASCH

11:03:27  1        THE COURT:  You may.

        2        MR. LOPEZ:  Thank you.

        3   BY MR. LOPEZ:

        4   Q   Then if you go down just past the middle of that page, I

11:03:37  5   notice you're a member of American Board of Radiology.  You're

        6   a Canadian physician but -- does that mean you're

        7   board-certified in radiology in the United States?

        8   A   Yes, that's correct.

        9   Q   Then you did a certification at Harvard Medical School.

11:03:55 10   Everyone likes to brag about going to Harvard, so I'm going to

       11   let you do it too.  In 1999.  What is that all about?

       12   A   I thought that was an important opportunity.  Crisis

       13   occurs every day in all of our lives, particularly in the

       14   interventional radiology suite where bad things can happen

11:04:11 15   quickly, so I wanted to obtain additional training.  And they,

       16   Harvard, has a great training program, hands-on training

       17   program, that runs us through crisis scenarios and gives us

       18   opportunity to practice, not on humans, but to practice so

       19   that we're prepared to deal with these kinds of bad events.

11:04:31 20   Q   So is there a difference between a diagnostic radiologist

       21   and an interventional radiologist?

       22   A   Yes, there is.  A diagnostic radiologist is someone who

       23   would read a CAT scan, read an X-ray if you go to the

       24   emergency room when you twist your ankle.  A diagnostic

11:04:48 25   radiologist would read those.

DIRECT EXAMINATION - MURRAY ASCH

11:04:49   1      An interventional radiologist is someone who does

         2   procedures.  Does biopsies, does angioplasties, does tumor

         3   ablation.  There's really been a very wide breadth and

         4   continued development of specialized procedures that we use in

11:05:10   5   a different way than a surgeon would use it.

         6      We use X-rays, some form of X-ray or ultrasound or

         7   CT, to guide us placing a catheter, a tube, positioning a

         8   needle into someone in order to minimally invasively treat a

         9   patient.  So instead of performing operations and opening

11:05:29  10   someone up and draining an abscess, I can just use an

        11   ultrasound and put a small needle in and put a small tube in.

        12   Q   So would it be within the field of interventional

        13   radiology that the placement and retrieval, potential

        14   retrieval, of IVC filters would be included?

11:05:48  15   A   Yes.  One of the main -- well, the main people who place

        16   and receive IVC filters are interventional radiologists.

        17   Q   To be a radiologist, it doesn't mean you have experience

        18   placing or retrieving filters.  Is that true?

        19   A   That's correct.  The average diagnostic general

11:06:10  20   radiologist does not have experience or expertise in placing

        21   these devices or retrieving these devices.

        22   Q   So there could be a diagnostic radiologist that would look

        23   at film that may -- where there may be a filter, but that

        24   radiologist might not necessarily have any experience in the

11:06:30  25   placement or retrieval of devices; correct?

DIRECT EXAMINATION - MURRAY ASCH

11:06:37  1   A   That's an important point because not only do they not

2   have experience in placing or retrieving, but they also have

3   less understanding of some of the dynamics of what can happen

4   with a filter or things to look for on radiographs or CT scans

11:06:50  5   that may identify a complication before it becomes a more

6   serious complication.

7   Q   So if a medical device company like Bard who was selling

8   IVC filters asked you, if I was going to call on professions,

9   medical specialists, would you recommend they focus on

11:07:09  10  interventional radiologists and maybe not spend as much time

11  with the diagnostic radiologists?

12  A   Yes, I would.

13          MR. NORTH:  Objection, Your Honor.  I believe this is

14  expert opinion.

11:07:20  15          THE COURT:  Overruled.

16  BY MR. LOPEZ:

17  Q   Okay.  I'm not going to take us through every single item

18  on this CV, but there's categories.  If you could just

19  describe for us what they would entail.  For example, we've

11:07:34  20  already gone through your academic history.

21          We don't have to go through your employment other

22  than to ask you, at one time were you affiliated with -- where

23  was it -- Toronto, University of Toronto, in some way?

24  A   So I initially went on staff at University of Toronto in

11:08:01  25  July 1991, and then I left the University of Toronto to go to

DIRECT EXAMINATION - MURRAY ASCH

11:08:06  1   my current hospital in May of 2003.

2   Q   Okay.  If we could look at, I think it's page 3, executive

3   positions.  What's the CIRA?

4   A   That is the Canadian Interventional Radiology Association.

11:08:23  5   So that's the Canadian association that allows all of us

6   interventionalists to work together, to learn together, to

7   create policies and protocols, to educate each other, to

8   educate noninterventional radiologists about procedures and

9   devices in order to best serve our patients.

11:08:43  10  Q   And at one time you were the president -- I assume it's a

11  national association in Canada?

12  A   Yes, correct.

13  Q   Go to the next page.  You've listed your medical societies

14  there as a category, and you've had some honors and awards.

11:09:01  15  Then research endeavors and grants on the next page.  You've

16  served on a number of committees.  True?

17  A   That's correct.

18  Q   It's all listed here; right?

19  A   Yes.

11:09:13  20  Q   If anybody wanted to know anything about the professional

21  career of Dr. Murray Asch, they would look at this exhibit we

22  just marked; correct?

23  A   That's correct.

24  Q   And there were some -- I thought this was misspelled, but

11:09:26  25  refereed publications?  Is there such a thing as refereed

DIRECT EXAMINATION - MURRAY ASCH

11:09:34   1   publications?

2   A    I think that is another term for peer-reviewed.  So that

3   demonstrates an element of -- I'm not sure which word to use.

4   Sophistication.  It means I didn't just write down an article

11:09:48   5   and said whatever I wanted and had it published, kind of like

6   the internet.  What it meant was the articles under that

7   category were scientifically and rigorously reviewed by other

8   experts from around the world to ensure that what I was

9   saying, what I was trying to publish, were honest and

11:10:06  10   appropriate and real statements.

11   Q    Okay.  Here we call it -- is that the equivalent of being

12   peer-reviewed here in the United States?

13   A    Yes.

14   Q    And in addition to the professional career in dealing with

11:10:24  15   these various committees, has your career also brought you to

16   work with medical device companies in helping to design and

17   test new products?

18   A    Yes.  So I've been very lucky in my career as a result of

19   my early clinical experience and successes and my educational

11:10:44  20   and teaching experience at the university.  I had been

21   approached over the years by a number of device companies,

22   device manufacturers, and been asked to work with them as

23   consultant to help them with research and development and

24   developing new devices and bringing new devices to market.  To

11:11:04  25   market.  To get them into everyday use.

DIRECT EXAMINATION - MURRAY ASCH

11:11:08  1    Q    Could you be more -- can you describe how that
         2    relationship works.  I mean, you as a physician practicing, or
         3    maybe in a university, and then a medical device company comes
         4    to you and you develop some type of relationship, partnership
11:11:23  5    or some type of arrangement with them.  Just describe that how
         6    that interaction is.
         7    A    I think partnership is a great word.  It's the word I like
         8    to use.  So as a physician, I know what my patient needs and I
         9    have an idea what kind of tools I may need to treat them, but
11:11:42 10    I don't have the expertise to design -- to design a device.
        11    Whereas the research and development people, the engineers,
        12    the brilliant people out there who are involved in designing
        13    these devices, need some guidance in terms of what does the
        14    world need?  What does the device need to do?  How does it
11:12:05 15    need to function?  What is its role?
        16         By working together, I would have meetings with the
        17    R&D teams of a number of companies, and we would talk about
        18    what do we need?  I need this device or I need something that
        19    maybe will do that, something that will kill a tumor,
11:12:21 20    something that will stop blood clots.  Some device I can
        21    remove after it stopped the blood clots.
        22         By telling them what I need, they can tell me what
        23    the restrictions/requirements are, and we would work together
        24    to take it through various stages of testing to ensure at the
11:12:36 25    end of the day safe devices are available to our patients.

DIRECT EXAMINATION - MURRAY ASCH

11:12:40  1    Q    So from what you described, it's a very close working

2    relationship where both sides are trusting what the other side

3    is doing and you're sharing information and make sure both

4    sides reach a common goal?

11:12:52  5    A    Absolutely.

6    Q    And communication is an important part of that

7    relationship?

8              MR. NORTH:  Your Honor, I'm going to object.  He's

9    leading the witness.

11:13:03 10              THE COURT:  Sustained.

11    BY MR. LOPEZ:

12    Q    Is communication an important part of that relationship?

13    A    Yes, it is.

14    Q    And why is that?

11:13:11 15    A    They need to know what I need and I need to know what

16    their product will do, how it will function, what the

17    limitations and concerns of their product are.

18    Q    Now, in some of your prior experiences where you worked

19    with medical device companies, and you say you've been

11:13:25 20    involved in the medical aspects, clinical aspects of it, and

21    the company's been involved in maybe some of the technical

22    engineering and preclinical testing, have there been times

23    when, because of some of the things you've done, they've done,

24    that you didn't reach that goal?

11:13:42 25    A    In my experience, we pretty much -- well, we usually reach

DIRECT EXAMINATION - MURRAY ASCH

11:13:46  1    the goal.  Sometimes there have been different iterations.  I
2    mean, say I've been working with a company and we came up with
3    device X to stop someone from bleeding after a gunshot wound.
4    So they design something, we test it out, it doesn't seem to
11:14:00  5    work, then they'll go back to the drawing board and make some
6    changes in it.  We keep retesting and retrying until it serves
7    both of our needs:  It's a safe product and it's a product
8    that does what I need it to do on my patient.
9    Q    So are there situations where, for example, the company
11:14:19 10    has done certain what we call -- oh. You know what, before I
11    do that, would you explain to the Judge and the jury, the
12    Judge probably knows, but would you explain to the jury what
13    preclinical testing is.
14    A    Well, preclinical testing means just that.  Taking a new
11:14:36 15    device and testing it in -- typically on the benchtop.  So in
16    jars, in a non- -- trying to think how to word this, I'm
17    sorry.  Testing on the benchtop, let's -- I'll just say that.
18    If you need more clarification, I can.  As number one, to see
19    does the device break?  Does the device do what we think it
11:15:03 20    does?  And then after it's been deemed to be safe and
21    functional in that setting, then we take it typically to an
22    animal model where we try and find an animal model that will
23    simulate as close as possible like human -- the human person,
24    and then we test it out in there because, again, we want to do
11:15:21 25    everything -- we, as a team, want to do everything we can to

DIRECT EXAMINATION – MURRAY ASCH

11:15:24  1    ensure that this device is safe and functions before we

2    subject a person to it.

3    Q    So when you do preclinical testing, whether it be on the

4    bench or in animals, is the idea to try to design that testing

11:15:39  5    so that it comes as close as possible to duplicating the human

6    condition?

7              MR. NORTH:  Objection.  Leading.

8              THE COURT:  Sustained.

9    BY MR. LOPEZ:

11:15:51 10    Q    Well, when you design -- when preclinical testing is

11    designed, what is the protocol with respect to its

12    relationship to a human condition?

13    A    We -- we try and think of devices, tubes, or anything that

14    will as closely simulate both a part of the human body and the

11:16:25 15    disease that we're trying to treat, and we take those things

16    together in order to create something that we can try and

17    benchtop again without subjecting an animal or human to it.

18    Q    Okay.  Let's go immediately now to your involvement with

19    Bard and NMT as it relates to the Recovery filter.  How did

11:16:48 20    that come about?

21    A    That came about one year at one of the national

22    interventional radiology meetings.  I was approached by a

23    group of people, I don't remember exactly who it was, but some

24    combination of some Bard people that I knew and had worked

11:17:06 25    with previously and the people from NMT, and they said, We

DIRECT EXAMINATION – MURRAY ASCH

11:17:10  1   have an interesting proposition, and they briefly explained

2   that they had been working on, on the benchtop and in animals,

3   a newly designed filter or modification of a previously

4   existing filter that would be, could be, of great benefit to

11:17:27  5   my patients, and they asked if I would like to be involved in

6   the initial human testing of that device.

7   Q    Okay.  And what was your next step in that process?  Did

8   you approach them to find out what their preclinical results

9   were?  Did you visit any of those facilities before you

11:17:46 10   decided it would be appropriate to do a study?

11   A    Yes.  So after a little discussion, the next thing was for

12   me to visit the NMT facility, where I was given a presentation

13   by the engineers and the team who had been working on this,

14   and I was shown the benchtop data and the animal data that

11:18:09 15   they had, as well as given some background into the device and

16   where they had started and where they were now and what the

17   planned next steps would be.

18   Q    What did they tell you about the results of their benchtop

19   and animal studies?

11:18:25 20   A    They told me that the device performed as expected, so as

21   everyone knows we're talking about the IVC filter here, the

22   main role of the IVC filter is to protect someone from blood

23   clots.  What they had done is modified a previous device to

24   allow that device to be removed, and so they had told me that

11:18:44 25   in their animal experience, they were successful in safely

DIRECT EXAMINATION - MURRAY ASCH

11:18:49   1   removing this IVC filter.

2   Q   Did they share with you any concerns they had about the

3   thresholds they had set for any of their testing?

4   A   No, they did not.  They did not express any concerns at

11:19:02   5   all.

6   Q   Did they express anything to you about their not testing

7   in animals or on the bench to worst case scenarios?

8   A   They didn't give me quite all of those details.  They

9   basically said this is how we tested it and these were our

11:19:19  10   results, and they were satisfied -- they expressed they were

11   satisfied with the results and they felt it was appropriate to

12   proceed to the human model.

13   Q   And you accepted that representation when you agreed to do

14   whatever study it was that you did in Canada?

11:19:35  15   A   Yes.  Again, honesty and communication is -- are

16   paramount.  I don't have the biomechanical background to check

17   up on the data and information they gave me.  I trusted them

18   as I had trusted other corporations that I had worked with

19   when we were developing different types of devices.

11:19:56  20   Q   Now, did they -- did someone -- strike that.

21       The facility you went to was NMT, Nitinol Medical

22   Technologies; is that correct?

23   A   That's correct.

24   Q   And what was your understanding of the relationship

11:20:11  25   between NMT and Bard?

DIRECT EXAMINATION - MURRAY ASCH

11:20:14  1    A   It's my understanding NMT had manufactured this device,

2    and other devices sold by Bard and other companies, and they

3    were positioning themselves for a partnership to either

4    ultimately go into business with respect to this device or

11:20:26  5    potentially, down the road in the future, have Bard acquire

6    the device.  I saw it as a partnership.

7    Q   What is the next step now?  Let me ask you this question

8    first:  Did anyone say to you why they were going to Canada to

9    do this study?

11:20:44 10    A   Yes.  They did admit that, and this is relatively common

11    knowledge, at different times the pathway to approval for a

12    device or the pathway to trialing a new device is easier in

13    Canada.  And they came to Canada -- they came to me, they came

14    to Canada knowing that this would be an easier to get through

11:21:05 15    the ethics committees and the licensing committees.

16    Q   And then what did you do to help -- I mean to help further

17    this process to get it approved so you could do this study in

18    Canada?

19    A   So working with them and the documents that they provided

11:21:22 20    me, I went to our hospital vice president, our hospital ethics

21    committee, and the Health Canada board to get approval, both

22    from the health -- from both places in order to have this

23    filter released to me and in order to be able to have

24    permission to place this filter into patients.

11:21:47 25    Q   Did you also have to contact what's known as Health

DIRECT EXAMINATION - MURRAY ASCH

11:21:52  1    Protection Branch in Canada?

2    A    Yes.  So that's -- yes.  Those are the people I was

3    referring to, Health Protection Branch.  Yes.

4    Q    Exhibit 4330, please.

11:22:13  5         Do you have that in front of you, Dr. Asch?

6    A    Yes, I do.

7    Q    Is that the letter you wrote to Health Protection Branch

8    to seek their permission to do this study?

9    A    Yes.

11:22:24 10   Q    And this was going -- was this study the first time any

11   human being was going to be implanted with a Bard retrievable

12   filter?

13   A    Yes, that's correct.

14   Q    And this is to Dr. William Freeland.  Do you see that?

11:22:40 15   A    Yes.

16        MR. LOPEZ:  May I offer this into evidence,

17   Your Honor?  Let me say I would offer this into evidence.

18        MR. NORTH:  No objection, Your Honor.

19        THE COURT:  4330 is admitted.

11:22:48 20      (Exhibit 4330 admitted.)

21        MR. LOPEZ:  May we publish this to the jury, please?

22        THE COURT:  Yes.

23   BY MR. LOPEZ:

24   Q    If you look at the top part of that that's being shown, it

11:22:59 25   states:  Request for compassionate release of

DIRECT EXAMINATION – MURRAY ASCH

11:23:02  1    temporary/retrievable inferior vena cava manufactured by

2    Nitinol Technologies Medical, Inc., in Boston, distributed by

3    Bard Canada.

4             Do you see that?

11:23:14  5    A    Yes, I do.

6    Q    And what's a compassionate release?

7    A    So compassionate release allows Health Protection Branch

8    to allow me to use a device that is not otherwise approved,

9    either at all or approved for a specific function.

11:23:29 10           MR. LOPEZ:  Could we go down to the next paragraph,

11   Mr. Woody.

12   BY MR. LOPEZ:

13   Q    And is this document to Health Protection Branch some of

14   your activities prior to making this request?

11:23:45 15   A    Yes.

16   Q    For example, you visited NMT's facility, which you just

17   talked about; correct?

18   A    Yes.

19           MR. LOPEZ:  Could we highlight that, please.

11:23:55 20   BY MR. LOPEZ

21   Q    And you had a personal opportunity of inserting and

22   removing these devices in their sheep model.

23           Do you see that?

24   A    Yes, that's correct.

11:24:03 25   Q    You got to practice on sheep before you put it in humans;

DIRECT EXAMINATION - MURRAY ASCH

11:24:06  1    correct?

       2    A    Yes.

       3    Q    And you've seen -- and you talk about seeing the testing

       4    facilities.

11:24:13  5              MR. NORTH:  Objection.  Leading.

       6              MR. LOPEZ:  Well, it's right in the document.

       7              THE COURT:  Overruled.  The document's in evidence.

       8    BY MR. LOPEZ:

       9    Q    And you reviewed the data at NMT, as the document says;

11:24:25 10    correct?

      11    A    I was presented the data.  I didn't scientifically

      12    reanalyze it or assess it for its validity.  But I was given

      13    the data, yes.

      14    Q    Then the next sentence, you're telling Health Protection

11:24:39 15    Branch that you were satisfied with what you saw at NMT, that

      16    the device was safe and efficacious.  True?

      17    A    Yes.

      18    Q    And that it represents a significant improvement in

      19    technology.

11:24:54 20    A    Yes.

      21    Q    And then let's go down to where it says -- where it reads:

      22    Currently NMT is planning similar testing.

      23         Do you see where I am?

      24    A    Yes.

11:25:11 25    Q    Following 12 weeks of filter insertion.

DIRECT EXAMINATION - MURRAY ASCH

11:25:12  1          See where I am?

       2    A    Yes.

       3    Q    So was your study -- why don't you tell the jury, what was

       4    the purpose of your study?  What were you trying to find out

11:25:25  5    by putting this device in human beings for the first time?

       6    A    The purpose of this study was to see if this filter could

       7    be removed after a prolonged period of being in place.

       8          Prior to this, although there had been a number of

       9    removable filters released on the market, the -- there was a

11:25:47 10    significant limitation, which created clinical issues and

      11    restrictions, and that limitation was approximately ten to 12

      12    days.  And so the advantage of this is, by this device, was to

      13    provide a much longer window in order to increase the number

      14    of patients who could benefit from this.

11:26:05 15          And so we were simply looking at this filter.  This

      16    study was meant to look the at the filter.  Can we take the

      17    filter out?  That's really the single question that was asked

      18    by this -- that was meant to be asked by this study.

      19    Q    If you drop down to the bottom of that paragraph which

11:26:25 20    begins "This filter has been found to withstand" -- do you see

      21    where I am? -- "50 millimeters of mercury pressure" --

      22    A    Yes.

      23    Q    -- "exerted across the filter in fully occluded

      24    15-millimeter and 28-millimeter diameter vessels without

11:26:46 25    evidence of migration."

DIRECT EXAMINATION - MURRAY ASCH

11:26:46  1          Did I read that correctly?

        2   A    Yes.

        3   Q    Did Bard -- was this something that you established as the

        4   appropriate pressures for testing and appropriate size, or was

11:26:53  5   this something that had been done by either NMT or Bard?

        6   A    This was something done by, presumably, NMT, with the

        7   assistance of Bard, and this is information, as I say, that

        8   was presented to me.  I was not involved in any of their

        9   benchtop or animal studies.

11:27:09 10   Q    Did Bard ever share with you any internal -- or NMT ever

       11   share with you any internal documentation they had that that

       12   was actually too low of a threshold to test this device on the

       13   bench?

       14   A    No.  No information like that was shared with me.

11:27:29 15   Q    They didn't tell you that they had done some research in

       16   the literature and done some of their own sheep testing that

       17   suggested that the testing for migration resistance should

       18   have been more like 70 to 80 millimeters of mercury?

       19   A    No, that was not discussed.

11:27:50 20   Q    Okay.  Then the very bottom.  "My use of" -- it says

       21   "produce."  I assume you meant "product."  I hate to point out

       22   your typographical error, but I think you meant "product";

       23   correct?

       24   A    Yes.

11:28:07 25   Q    "Will likely constitute the first human use worldwide."

DIRECT EXAMINATION - MURRAY ASCH

11:28:11  1          Correct?

2    A    That's correct.

3    Q    Now, before we move on, there's another exhibit I want to

4    show you.

11:28:29  5          MR. LOPEZ:  2090.  I'm hoping it's in here.

6          I need 2090.

7          THE COURT:  I've got a copy if you want it.

8          MR. LOPEZ:  You got one, I didn't.

9          THE COURT:  Yeah.

11:29:22  10         MR. LOPEZ:  Thank you, Judge.

11         I might have it, actually.

12         I do.  I take it back.  The tab was hiding.

13   BY MR. LOPEZ:

14   Q    2090.  And do you recognize this document, Dr. Asch?

11:29:42  15   A    Yes, I do.

16   Q    And is it -- just describe what it is.

17   A    So this is a slide show, general overview, introduction to

18   the filter in terms of the background of the filter,

19   background of NMT Medical, and some information about the

11:30:02  20   testing that they had done.  And this was the slide show that

21   was shown to me at the time of my first visit to NMT when we

22   were reviewing, again, the background, the safety, the value,

23   the plan for this new filter.

24   Q    Okay.

11:30:19  25         MR. LOPEZ:  I offer at this time, Your Honor, into

DIRECT EXAMINATION – MURRAY ASCH

11:30:22   1   evidence.

2            MR. NORTH:  No objection, Your Honor.

3            MR. LOPEZ:  I'd like to publish it to the jury.

4            THE COURT:  2090 is admitted, and you may publish.

09:25:03   5        (Exhibit 2090 admitted.)

6            MR. LOPEZ:  Thank you.

7            MR. LOPEZ:  Let's go to page 7.

8            Let's go to Page 6 first of this document.

9            Actually, let's go to page 7.  We've seen that

11:30:46  10   picture before.  Let's go to page 7.

11   BY MR. LOPEZ:

12   Q    This is on the 14th of June, 2000.  Do you see that?

13   A    Yes.

14   Q    And this describes the Recovery filter as an optional

11:31:02  15   filter.  What does that mean, optional filter?

16   A    The term "optional filter" had been developed around the

17   time that this and some other filters came out.  So initially

18   when IVC filters were developed, they were called permanent

19   filters.  People realized that there was a value in having the

11:31:23  20   filters removed and not staying there permanently.  So the

21   next generation, if you will, was something called a removable

22   filter, which had to be removed because it was tethered and

23   essentially the filter was inside the person, there was a bit

24   of it extending outside the patient, so that filter needed to

11:31:42  25   be removed.

DIRECT EXAMINATION – MURRAY ASCH

11:31:43  1          This generation of filters, where the filter is
        2    placed and then can be removed, is called an optional filter
        3    because when it can be removed, the aim is to remove it, but
        4    if, for a variety of reasons, the filter can't be removed,
11:31:57  5    there is the option of leaving the filter in place.
        6    Q    Now, when this presentation was given to you, were there
        7    individuals there from both NMT and Bard?
        8    A    Yes, there were.
        9    Q    And this was done at the NMT facility?
11:32:13 10    A    That's correct.
       11    Q    Do you remember the names of any of the people that were
       12    there?
       13    A    I remember a few names.  Rob Carr.  Tom Kinst.  Monica
       14    Coutanche.  Morris Simon was there.
11:32:25 15          I don't remember any other names at this point.
       16    Q    Did Tom Kinst ever share with you the literature search he
       17    had done about the pressures within the vena cava that he
       18    found in doing a research -- in doing research to determine
       19    what an appropriate threshold, minimum threshold, should have
11:32:46 20    been in testing an IVC filter in -- on the bench?
       21    A    Not that I recall.
       22    Q    So the Recovery filter, if you look at the second -- the
       23    third bullet point, the purpose was it would be the ideal vena
       24    cava filter; correct?
11:33:08 25    A    Yes.

DIRECT EXAMINATION – MURRAY ASCH

11:33:11  1    Q   And it should have the same strengths as permanent

2    filters?

3    A   Absolutely.  That's essential.

4    Q   I mean, they didn't have to write that down for you to

11:33:23  5    agree with that.  True?

6    A   Correct.

7    Q   Accurate placement, enhanced centering, small sheath;

8    correct?

9    A   Yes.

11:33:29 10    Q   Why is centering so important?

11    A   From early on in the design and use of filters, it was

12    recognized that if a filter is not centered, if it's tilted

13    like the Tower of Pisa, the filter can be unstable, the filter

14    may not function in terms of protecting and stopping blood

11:33:48 15    clots, the filter may be more difficult to be removed, and the

16    filter is also going to be subjected to different

17    biomechanical forces which then could increase the risk of the

18    filter fracturing.

19    Q   Okay.  And was the design and goal of this filter, as far

11:34:05 20    as you understood it, to be removable at 12 weeks?

21    A   The testing they had done up to this point, they had

22    chosen a 12-week time.  So the number 12 weeks came up because

23    they just picked a number out of a hat, they tested it in

24    sheep up to 12 weeks with the assumption that 12 weeks is a

11:34:26 25    great advance over the current retrievable optional filters,

DIRECT EXAMINATION – MURRAY ASCH

11:34:31  1    which are approximately ten days.

2    Q    And was the idea that it would be retrievable within 12

3    weeks, but if it was not retrieved within 12 weeks, it would

4    then convert to a permanent device?

11:34:45  5    A    Yes.  Again, the number 12 weeks was there so, although we

6    put 12 weeks there, or 12 weeks was put there, there was still

7    an aim to potentially, whenever we could, remove the filter,

8    even if it was beyond the 12-week window.  But if for clinical

9    or technical reasons the filter couldn't be removed, the

11:35:06 10    intention of this filter was to be left in as a permanent

11    filter.

12    Q    Was your pilot study designed to test its safety and

13    effectiveness as a permanent filter?

14    A    No.  The study was only designed to assess removability.

11:35:21 15    Q    And if you go to the next -- to page 9, there's another

16    PowerPoint.  Actually, if you look at Page 8.  Sometimes you

17    should look at the PowerPoint before the PowerPoint.  This is

18    a cover PowerPoint that says "Recovery Filter System Design

19    Attributes."  True?

11:35:43 20    A    Yes.

21    Q    I apologize for the lines.  When you OCR documents so you

22    can highlight them, it does that.

23         MR. LOPEZ:  Can we go to the next page, please, 9.

24    BY MR. LOPEZ:

11:35:52 25    Q    Arms.  Designed for centering.  There's that word again.

DIRECT EXAMINATION – MURRAY ASCH

11:35:55  1   The arms are, what, the upper portion of the device?

2   A   Yes, correct.

3   Q   And according to this document, they were designed to help

4   the centering of the filter; correct?

11:36:04  5   A   Yes.

6   Q   And then it says "and caudal migration resistance."

7           The arms; right?

8   A   Yes.

9   Q   And what is caudal migration?  Not that the jury doesn't

11:36:15  10  know that already, but --

11  A   So "caudal" is a fancy word meaning down south, towards

12  the feet.  And because of the design of the arms, you can see

13  they're really almost needle like.  And so they would

14  potentially get embedded in the caval wall to stop the filter

11:36:32  15  from moving down towards the feet.

16  Q   So you want the filter -- is the idea that once you put

17  the filter in, you want it to stay where you put it?

18  A   Yes.  That's an important feature of a filter.  You want

19  it to stay where you put it because as soon as it starts

11:36:45  20  moving around, it will function differently.  Less

21  effectively.  It may fail.  And it may, by moving somewhere

22  else, could cause different complications.

23  Q   So you don't want to compromise moving in one direction to

24  compromise moving in the other direction?

11:37:04  25  A   That's correct.

DIRECT EXAMINATION – MURRAY ASCH

11:37:06   1   Q    Stay where you put it.

2   A    Exactly.

3   Q    If you're going to represent you've taken stability to a

4   new level, you better make sure you've taken stability to a

11:37:14   5   new level.  True?

6   A    Yes.

7            MR. NORTH:  Objection.  Leading.

8            THE COURT:  Overruled.

9   BY MR. LOPEZ:

11:37:23   10  Q    And:  One size fits all, up to 28-millimeters.

11           Do you see that, Doctor?

12  A    Yes.

13  Q    That means what?

14  A    That is standard IVC filter jargon.  Someone years ago

11:37:34   15  decided that the average IVC, average vena cava, was less than

16  28-millimeters in corrected transverse dimension, and so

17  really all the filters were designed to be -- to fit in a cava

18  that size and be stable in a cava that size.

19  Q    Let's talk about that for one moment.  When it says one

11:37:53   20  size fits all, that means when you place it, at the time

21  you're placing it, it should be at 28-millimeters or less;

22  correct?

23  A    Yes.

24  Q    And that doesn't take into consideration the stent's

11:38:09   25  ability, or the contraption that makes the IVC, the vena cava,

DIRECT EXAMINATION - MURRAY ASCH

11:38:15  1    larger; true?

2    A    That's correct.  That's also a very important point

3    because the IVC is a living structure and it varies.  It

4    depends upon the hydration state of the patient, it depends on

11:38:28  5    the pressure gradients in the body.  Are they walking around?

6    Are they lifting something?  Are they lying?  Are they

7    sitting?  Are they standing?  So the size of the IVC can vary

8    quite a bit depending upon patient factors and what they're

9    doing.

11:38:44 10    Q    So if I were to, like, bend over and pick up a heavy box,

11    would that have an effect on my -- might have an effect on my

12    vena cava if it was really, really heavy?

13    A    Yes.  That would make your vena cava much larger than it

14    would if you were lying flat in bed.

11:39:00 15    Q    So the idea is if you were going to recommend or design

16    this thing to be in a 28-millimeter vena cava, you have to

17    take into consideration that people who have these could pick

18    things up or do things that might make the vena cava go beyond

19    28-millimeters?

11:39:15 20    A    Yes.

21                MR. NORTH:  Objection.  Leading.

22                THE COURT:  Sustained.

23                MR. LOPEZ:  Okay.  Let's look at page 20 of Exhibit

24    2090.

25

DIRECT EXAMINATION - MURRAY ASCH

11:39:45 1    BY MR. LOPEZ:

2    Q    What is an in-vivo study?

3    A    In-vivo means in life.  In a living organism, whether it

4    be an animal or human.

11:40:02 5    Q    Does this describe an animal study Bard had done, or NMT

6    had done?

7    A    Yes.  I believe this refers to the initial sheep animal

8    work that was done.

9    Q    And does this refresh your recollection -- you can look at

11:40:15 10   the next slide too, number 21, if you need it -- as to the

11   type of animal study that was done prior to you doing your

12   pilot study in humans?

13   A    Yes.  Those are images of the sheep cava with -- you can

14   see the markings there.  Filter arms, filter feet are labeled

11:40:41 15   and indicated.

16          So this was after six weeks.  So they wanted to look

17   at the cava with the filter in position to see were there

18   issues?  Was there damage to the cava as a result of this

19   filter being in place?

11:40:57 20   Q    So was this animal study designed to test whether or not

21   the filter, if it got challenged by a clot, would migrate up

22   toward the heart?

23   A    No.  This animal study was simply designed to look at the

24   filter in position and to look at the cava, if there was

11:41:13 25   damage after the filter was removed.  There was no -- there's

DIRECT EXAMINATION - MURRAY ASCH

11:41:18  1   no part of that study did they look at migration.  They didn't

2   test it to see if the filter stopped blood clots.  There were

3   no blood clots that were administered to the sheep.  It was

4   simply does this filter -- can the filter be removed and what

11:41:33  5   does the cava look like.

6   Q    Are you aware of any animal studies they did to determine

7   the long-term performance of the Recovery filter?

8   A    I'm not aware of any.

9   Q    According to this exhibit, it looks like, if you look at

11:41:51 10   page 20, the longest was eight weeks, I think it was, in the

11   sheep before they were sacrificed.

12        Do you see that there?

13   A    Yes.

14   Q    Do you know if they ever did any animal studies to

11:42:12 15   determine the long-term effects on a Recovery filter in any

16   animal model to determine whether it would stay centered in

17   the cava over extended periods of time?

18   A    No.  I don't believe a study like that was ever done.

19   Q    Did they ever do any study to determine the dynamics of

11:42:32 20   just an animal's everyday living might have on whether the

21   device could fracture over time?

22   A    No, they didn't look at that either.

23   Q    How about whether or not it would tilt or probably migrate

24   and potentially perforate into other organs?  Was there ever

11:42:51 25   an animal test like that with the Recovery filter, as far as

DIRECT EXAMINATION – MURRAY ASCH

11:42:55   1   you know?

2   A   Not as far as I know.

3   Q   So the first animal that the Recovery filter was implanted

4   in to see whether or not it would behave and be safe was your

11:43:11   5   pilot study with humans.   True?

6   A   Yes.

7   Q   So let's go to Exhibit -- I think we talked about 4330,

8   and that was July 21, 1999.  Your letter to Health Protection

9   Branch in Ottawa.  Let's look at -- I think it's 552.

11:44:06   10          THE COURT:  What's the number?

11          MR. LOPEZ:  552, Your Honor.

12   BY MR. LOPEZ:

13   Q   Do you see that, Dr. Asch?

14   A   Yes, I do.

11:44:21   15   Q   Do you recall seeing this document when your deposition

16   was taken in May of 2016?

17   A   Yes.

18   Q   And does this -- are you familiar with this letter?

19   A   Yes.

11:44:39   20   Q   And does this letter describe some of the questions you

21   had prior to performing this study in Canada?

22   A   Yes, it does.

23   Q   And do you know who Monica -- I can't pronounce it.  It's

24   a French name.  You could probably pronounce it; right?

11:44:50   25   A   Coutanche.

DIRECT EXAMINATION - MURRAY ASCH

11:44:52  1   Q   Coutanche.  Do you know who she is?

2   A   At that time she was the marketing manager for my

3   division, and she was the person that I most closely worked

4   with, with respect to this device.

11:45:06  5   Q   This is a letter from Tom Kinst.  I think you mentioned

6   him earlier?

7   A   Yes.

8   Q   And he's identified as the product manager of vena cava

9   filters at NMT Medical; correct?

11:45:17 10   A   Yes.

11        MR. LOPEZ:  I'd like to offer this exhibit into

12   evidence at this time, Your Honor.

13        MR. NORTH:  No objection, Your Honor.

14        THE COURT:  552 is admitted.

09:25:03 15      (Exhibit 552 admitted.)

16        MR. LOPEZ:  Could I publish it to the jury, please?

17        THE COURT:  Yes.

18   BY MR. LOPEZ:

19   Q   So this is a letter from Tom Kinst, you'll see it on the

11:45:37 20   second page.

21        MR. LOPEZ:  If you can show Dr. Asch that, and the

22   jury.

23        Let's go back to the first page, please.

24   BY MR. LOPEZ:

11:45:54 25   Q   And this was regarding some questions that you had; right?

DIRECT EXAMINATION - MURRAY ASCH

11:45:59  1   A    Yes.

2   Q    And the first question was:  What are the U.S. physicians

3   who will be implanting on compassionate ground doing about, A,

4   patient consent, B, IRB approval and, C, hospital ethics

11:46:18  5   approval?

6          Did I read that correctly, Doctor?

7   A    Yes.

8   Q    I think we all know what patient consent is.  What is IRB

9   approval?

11:46:28  10   A    Internal review board.  So these are just different words,

11   different corporations, different hospitals have, actually,

12   ethics.  So ethics and IRB in my world are synonymous.

13   Q    And hospital ethics approval, is that basically -- I think

14   you just said that's synonymous.

11:46:47  15   A    Yes.

16   Q    Okay.  And Tom wrote:  It turns out that the regulatory

17   burden for using the filter on compassionate grounds are too

18   great at this time.  Our U.S. physicians will not be using the

19   device on compassionate grounds in the U.S. in the immediate

11:47:04  20   or foreseeable future.

21          Did I read that correctly?

22   A    Yes.

23   Q    Then it mentions Dr. John Kaufman and Dr. Tony Venbrux.

24   Are you familiar with those two doctors?

11:47:16  25   A    Yes, I am.

DIRECT EXAMINATION - MURRAY ASCH

11:47:19  1    Q    And this is where it mentions:  We are all interested in

2    performing the first human implantations with Dr. Asch in

3    Canada.

4            Correct?

11:47:28  5    A    Yes.

6    Q    And it says:  The regulatory burden for using the device

7    under compassionate use is greater in the U.S. and performing

8    the first implants with Dr. Asch in Canada can provide us all

9    with benefits:  A reduced regulatory burden, earlier implants,

11:47:46  10   and Dr. Asch's involvement with the first implants.

11           Did I read that correctly?

12   A    Yes, you did.

13   Q    If you go to the next page, the question reads:  How many

14   patients do you want Dr. Asch to do?

11:48:06  15           And then the next question:  What types of patients?

16           And then the next question:  Are there any exclusion

17   criteria?

18           Do you see that, Dr. Asch?

19   A    Yes.

11:48:18  20   Q    The jury has this and it's been admitted, but I'm going to

21   go down to the very last sentence of the first paragraph:  It

22   is the removal of the device that we would like to get

23   clinical experience.  True?

24   A    Yes.

11:48:33  25   Q    And that's what your understanding was of this study?

DIRECT EXAMINATION - MURRAY ASCH

11:48:36 1    A    Correct.

2    Q    Number 3.  How long should -- I'll wait until Greg gets

3    there.

4         Number 3.  How long should the devices remain in

11:48:46 5    patients?  Does it have to be removed or can it be left in

6    permanently?

7         You see the answer there from Tom Kinst:  The devices

8    can remain in patients up to six weeks.

9         Did I read that correctly?

11:49:01 10   A    Yes, you did.

11   Q    Then it says:  The device does not have to be removed; it

12   can be left in permanently.

13        That's what Tom wrote; correct?

14   A    Yes.

11:49:11 15   Q    And that was based on the animal and bench test data that

16   they had at the time?

17   A    Yes.

18   Q    And then what test -- number 4:  What tests should be done

19   while the RVF -- does that stand for Recovery vena filter?

11:49:30 20   A    Yes, it does.

21   Q    Then a VQ scans for efficacy.  What does VQ scans mean?

22   A    Ventilation/perfusion study.  It's a nuclear medicine test

23   that's commonly used to assess patients for pulmonary emboli.

24   It's one of the standard things that could replace a CT scan

11:49:47 25   if --

DIRECT EXAMINATION - MURRAY ASCH

11:49:48   1   Q   Then let's just go to the answer part of this.

2           A follow-up abdominal radiograph should be taken to

3   check for filter positioning, centering, and migration.

4           Did I read that correctly?

11:50:00   5   A   Yes.

6   Q   Explain what that means to the jury, please.

7   A   Again, since this was a new device, after we placed the

8   device, the plan is to obtain routine follow-ups.  This is a

9   study, so normally in current standard practice, somebody gets

11:50:22  10   sick, they need an IVC filter, the doctor puts an IVC filter

11   in, and that's it.  The patient doesn't get any regular

12   checkups, if you will, to look at that filter.

13           But because this is a new filter that had never been

14   used before, we thought it was important to follow these

11:50:37  15   patients up in a way that normal patients wouldn't be followed

16   up.  So these patients were subjected to additional scrutiny

17   so we could identify any potential complication before it

18   became too severe.

19   Q   It was an experimental device at the time that you needed

11:50:53  20   to watch closely.  Is that why?

21   A   That's correct.

22   Q   And, 5 says:  Abdominal radiograph should be taken to

23   assess the presence of thrombus within the filter prior to

24   removing it.

11:51:06  25           Did I read that correctly?

DIRECT EXAMINATION - MURRAY ASCH

11:51:09  1   A   Yes.

2   Q   So that's how you can find out whether or not there might

3   be a clot in the filter?

4   A   That's what it says.  That's actually not an entirely true

11:51:19  5   statement.  You need to do a CAT scan or inject X-ray dye, or

6   do a venogram that was referred to in another document, I

7   believe, to assess for thrombus.

8   Q   Okay.  Thank you, Doctor.

9       You set a protocol, I take it, for this study once

11:51:40  10   you got an IRB and the hospital ethics board agreed and the

11   health organization in Canada, the equivalent of the FDA in

12   Canada, said you could do this test; right?

13   A   Yes.

14       MR. LOPEZ:  556, please.

11:52:24  15       If you look at Bates number 586, Greg, if you could

16   show that to Dr. Asch.

17   BY MR. LOPEZ:

18   Q   And ask if that is a summary or an outline of the study

19   protocol?

11:52:42  20   A   Yes.  That is the study protocol that was submitted to

21   Health Canada and to the hospital research ethics board in

22   order to give them the information that would allow them to

23   allow me to place the filter.

24       MR. LOPEZ:  I'd like to offer this exhibit, 556, into

11:53:00  25   evidence at this time, Your Honor.

DIRECT EXAMINATION - MURRAY ASCH

11:53:01  1          MR. NORTH:  No objection, Your Honor.

          2          THE COURT:  Admitted.

          3       (Exhibit 556 admitted.)

          4    BY MR. LOPEZ:

11:53:06  5    Q   Okay.  Let's just go to this.  So this is -- it sets forth

          6    the goals of this study.

          7          THE COURT:  Do you want this displayed?

          8          MR. LOPEZ:  Oh, yes, I do, Your Honor.  Thank you.

          9    Please publish it to the jury.

11:53:17 10          THE COURT:  All right.

         11    BY MR. LOPEZ:

         12    Q   And then it gives the background.

         13          MR. LOPEZ:  Greg, can you show that first paragraph,

         14    please.

11:53:28 15          MR. WOODY:  Background or Goals?

         16          MR. LOPEZ:  The first paragraph under Background.

         17    BY MR. LOPEZ:

         18    Q   And who wrote the protocol, Dr. Asch?

         19    A   Some combination of the team from NMT and Bard.  I believe

11:53:43 20    it was predominantly the NMT people, but, again, the lines

         21    were blurred and I wasn't certain exactly what roles

         22    individuals had.  I looked at them as a unit working together.

         23    Q   And if you look at the second paragraph:  There have been

         24    a variety of designs.  However, the perfect filter is yet to

11:54:02 25    be found.

DIRECT EXAMINATION - MURRAY ASCH

11:54:04  1    A    Correct.

2    Q    Do you see that?

3         That is probably true today?

4    A    Yeah.

11:54:08  5    Q    Long-term complications such as filter strut fracture or

6    perforation cause hesitancy to use these devices in children

7    and young adults as there are no true long-term studies

8    available.

9         Right?

11:54:23  10   A    That's correct.

11   Q    And then:  More recently there have been attempts to

12   design a filter that can be removed or retrieved after the

13   period of risk of pulmonary embolism is over.  In this way,

14   the potential risk of long-term complication --

11:54:51  15        THE COURT REPORTER:  Excuse me, Counsel.  You're

16   reading too fast.

17        MR. LOPEZ:  I'm sorry.  I'm going to withdraw that

18   anyway and go to the next paragraph just for time purposes.

19        Greg, the second paragraph in that section.

11:54:59  20   BY MR. LOPEZ:

21   Q    The new filter design -- and that would be the Recovery

22   filter.  True?

23   A    Yes.

24   Q    -- represents a significant benefit to patients in that it

11:55:08  25   may be removed anytime up to four weeks following insertion.

DIRECT EXAMINATION – MURRAY ASCH

11:55:14  1    In parentheses, 12 week removal data will be available

2    shortly, end paren.

3          Did I read that correctly?

4    A    Yes, you did.

11:55:23  5    Q    And your study was going to provide the 12-week removal

6    data; is that right?

7    A    Yes.  No.  So the 12-week removal data was the sheep that

8    were still waiting.  So there was a second group of sheep that

9    had 12 -- that they were going to remove the filters and

11:55:37 10    examine after 12 weeks.  So we were waiting -- we had gotten

11    this submission prepared and in place with the plan to, once

12    the 12-week data from NMT was available, to change our window

13    to 12 weeks.

14    Q    And then if you go to the second page of this document,

11:55:58 15    Exhibit 556 --

16          MR. WOODY:  Second page or --

17          MR. LOPEZ:  I'm sorry.  Next page.  Thank you.

18    BY MR. LOPEZ:

19    Q    Informed consent.  Could you explain to the jury what is

11:56:23 20    informed consent when it comes to doing a study like this.

21    A    Well, anytime we do any procedure on a patient, you've all

22    had operations or things, I'm sure, the doctor, the person

23    performing the procedure, needs to explain to you what the

24    risks of that procedure are.  And in this case that's divided

11:56:44 25    into two components.  One is what is the risk of the procedure

DIRECT EXAMINATION – MURRAY ASCH

11:56:48  1    itself, and the second is what the risk of the specific

2    device.

3              So that's an important conversation that needs to

4    occur with the patient so that they can decide what risk do I

11:56:59  5    want to take?  Do I want to accept the risks that were

6    explained to me and do I want to have this filter placed?

7              The only way for that -- for me to be able to relate

8    to the patient what that risk is, is based on knowledge

9    provided to me -- information provided to me by the device

11:57:17 10    manufacturer, who knows about how their filter, their device,

11    performs.  And so using all that information together, I have

12    a conversation with the patient to let them know what the

13    risks are for having this procedure.

14             In this case, it was even more complicated because

11:57:37 15    this was a brand-new device that had never -- for patient

16    number one, this device had never been used in a human before,

17    so we were really in a little bit of uncharted territory.

18    Q    So, for example, your patients that were going to be

19    entering this study were being told there was a lack of

11:57:53 20    experience with this precise device in humans.

21             Do you see where I am?

22    A    Yes.  That's correct.

23    Q    And they were also being told:  During the discussion with

24    patients, I will clearly state that this filter has never, or

11:58:16 25    seldom, following the first patient, been used in humans

DIRECT EXAMINATION - MURRAY ASCH

11:58:21  1    before.

2              True?

3    A    That's correct.

4    Q    I will clearly offer the patient an alternative, paren, a

11:58:27  5    currently approved permanent filter, end paren, with the

6    understanding that there is no scientific knowledge of the

7    results of having a filter in place for a long period of time.

8              Bard and NMT collaborated with you to write this

9    consent form; true?

11:58:46 10    A    That's correct.

11    Q    In fact, that's true today, that there's really no

12    scientific knowledge of the results of having a filter in

13    place for a long period of time.

14    A    That's correct.

11:58:56 15    Q    By scientific knowledge, there's no -- what do you mean by

16    that?  So I don't get accused of leading.

17    A    The only way to answer that question is there's also the

18    fancy scientific study term we call long-term.  "Long-term" is

19    obvious.  So we want to take the filter -- we would want to

11:59:15 20    create a study where we, say, put filters into a number of

21    patients and follow those patients for many, many years,

22    long-term, and evaluate those patients rigorously, as opposed

23    to everyday practice which doesn't involve follow up.

24              We want to follow patients up and look and see, does

11:59:31 25    the filter fracture?  Did it move?  Does the filter occlude

DIRECT EXAMINATION – MURRAY ASCH

11:59:36   1   and cause other symptoms or complications.

2           Only by doing a long-term study like that can we

3   truly answer this question and be able to explain to patients

4   what's going to happen.  I'm going to put in a filter in you

11:59:49   5   today, what's going to happen 15 years later with that filter

6   in place.

7           MR. LOPEZ:  I have one more page in this exhibit.  I

8   know it's past 12:00.  Could I just finish this exhibit?

9           THE COURT:  You may.

11:59:58  10           MR. LOPEZ:  Let's go to the next page, please, under

11  Follow-up.

12          First paragraph.  Can you highlight that, Greg, and

13  make it large for us.

14  BY MR. LOPEZ:

12:00:09  15  Q   This was part -- is this part of the protocol for the

16  study that you were going to apply to all patients, Dr. Asch?

17  A   Yes.  This is the protocol, yes.

18  Q   Standard -- you were going to do routine follow-up

19  abdominal radiographs to assess for filter migration obtained

12:00:28  20  at 1 and 7 days and then at 30 and 60 days.

21          True?

22  A   That was the plan for the study, yes.

23  Q   And that additional follow-up will be performed on the

24  physician's direction.

12:00:43  25          Is that how that reads?

DIRECT EXAMINATION – MURRAY ASCH

12:00:45  1  A   Yes.

2        MR. LOPEZ:  And then the very last paragraph, which

3  is actually a sentence.  Could you highlight that, please.

4  BY MR. LOPEZ:

12:00:53  5  Q   Also, part of the protocol was that any device-related

6  adverse events or adverse events that are serious in nature

7  will be reported immediately to the NMT Medical, Inc., and to

8  Bard Canada, Inc.  In addition these events will be reported

9  to HBP, comma, Ottawa, immediately.

12:01:13  10        True?

11  A   That's true.

12  Q   We'll talk about those type of events after lunch.

13        THE COURT:  All right.

14        We're going to break for lunch, ladies and gentlemen.

12:01:22  15  We'll plan to resume at 1 o'clock.  We'll excuse you at this

16  time.

17      (The jury exited the courtroom at 12:01.)

18        THE COURT:  All right.  Counsel, for your

19  information, as of noon, plaintiffs have used three hours and

12:01:59  20  44 minutes; defendants one hour and 42 minutes.

21        We'll see you at 1 o'clock.

22        MR. LOPEZ:  Thank you, Your Honor.

23      (Recess taken at 12:02.)

24      (End of a.m. session transcript.)

25                  *  *  *  *  *

1                        **C E R T I F I C A T E**

2

3            I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7            I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14           DATED at Phoenix, Arizona, this 16th day of March,

15   2018.

16

17

18

19

20                            s/ Patricia Lyons, RMR, CRR
                              Official Court Reporter
21

22

23

24

25