MARCH 15, 2018 P.M.

1                **UNITED STATES DISTRICT COURT**

2                **FOR THE DISTRICT OF ARIZONA**

3                     _____

4
**In re:  Bard IVC Filters,**          )
5  **Products Liability Litigation**     )
                                         )
6                                        )
                                         ) MD-15-02641-PHX-DGC
7  _____   )
**Sherr-Una Booker, an individual,**     )
8                                        ) Phoenix, Arizona
                     Plaintiff,          ) March 15, 2018
9              v.                         )
                                         )
10 **C.R. Bard, Inc., a New Jersey**      )
   **corporation; and Bard Peripheral**  ) CV-16-00474-PHX-DGC
11 **Vascular, Inc., an Arizona**        ) 12:59 p.m.
   **corporation,**                      )
12                                       )
                     Defendants.         )
13 _____   )

14

15          **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16          <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

17              <u>**JURY TRIAL - DAY 2 P.M.**</u>

18              (Pages 337 through 444)

19

20

21 Official Court Reporter:
   **Elaine Cropper, RDR, CRR, CCP**
22 Sandra Day O'Connor U.S. Courthouse
   401 West Washington Street
23 Suite 312, SPC 35
   Phoenix, Arizona  85003-2150
24 (602) 322-7245

25 Proceedings Reported by Stenographic Court Reporter
   Transcript Prepared by Computer-Aided Transcription

                United States District Court

MARCH 15, 2018 P.M.

1                               **APPEARANCES**

2

3      For the Plaintiff:
            **RAMON ROSSI LOPEZ, ESQ.**
4           Lopez McHugh, L.L.P.
            100 Bayview Circle, Ste. 5600
            Newport Beach, CA  92660
5           949.812.5771/(fax) 949.737.1504

6      For the Plaintiff:
            **MARK S. O'CONNOR, ESQ.**
7           Gallagher & Kennedy, P.A.
            2575 East Camelback Road
8           Phoenix, AZ  85016
            602.530.8000/(fax) 602.530.8500

9
       For the Plaintiff:
10          **JULIA REED ZAIC, ESQ.**
            Heaviside Reed Zaic
11          312 Broadway, Ste. 203
            Laguna Beach, CA  92660
12          949.715.5228

13     For the Defendants:
            **JAMES R. CONDO, ESQ.**
14          Snell & Wilmer, L.L.P - Phoenix, AZ
            One Arizona Center
15          400 East Van Buren
            Phoenix, AZ  85004-2202
16          602.382.67000

17     For the Defendants:
            **RICHARD B. NORTH, JR., ESQ.**
18          **ELIZABETH C. HELM, ESQ.**
            Nelson, Mullins, Riley & Scarborough, L.L.P.
19          201 17th St., N.W., Ste. 1700
            Atlanta, GA  30363
20          404.322.6000

21

22

23

24

25

                    United States District Court

MARCH 15, 2018 P.M.

1                          **I N D E X**

2

3                            **TESTIMONY**

4      **WITNESS**                **Direct    Cross    Redirect    Recross**

5      MURRY R. ASCH, M.D           345       366       387
       ALEX TESSEMER               402
6

7

8                        **E X H I B I T S**

9      Number                                    Ident  Rec'd

10     553  Asch Deposition, 05/02/2016 - Exhibit 203   353    354
            - 9/14/2002 Memo from Thomas Kinst to
11          Recovery Filter Design History File Re.
            Recovery Filter Compassionate Use,
12          Subject: "Conference call with Bard
            Peripheral Technologies regarding clinical
13          assessment of Recovery Filter removal #5"

14     555  Asch Deposition, 05/02/2016 - Exhibit 205   382
            - 2005 article by Asch and Cheung et al.,
15          entitled "Temporary inferior vena cava
            filter use in pregnancy"
16
       557  Asch Deposition, 05/02/2016 - Exhibit 208   375    376
17          - 8/28/2000 E-mail from Paul Stagg to
            Cavagnaro, Mellen, Uelmen, Vierling, and
18          Field Re. "Fwd[2]: compassionate IVC
            filters (from Asch)",
19
       558  Asch Deposition, 05/02/2016 - Exhibit 209   379
20          - Article by Dr. Murray Asch, entitled
            "Initial Experience in Humans with a New
21          Retrievable IVC Filter"

22     559  Asch Deposition, 05/02/2016 - Exhibit 210   361    362
            - 4/17/2002- Email from George Cavagnaro
23          to Doug Uelmen and Carol Vierling, dated
            April 18, 2002
24
       567  Asch Deposition, 05/02/2016 - Exhibit 223   385
25          - 3/10/2003 Letter from Dr. Asch Re
            support for RF

                    United States District Court

340

MARCH 15, 2018 P.M.

1              **E X H I B I T S** (Continued)

2    Number                                    Ident  Rec'd

3

4    760  Carr Deposition, 11/05/2013 - Exhibit 07 -  346
         NMT Medical's 9/1/2000 R&D Technical
5        Report, No. RD-RPT-128, entitled
         "Investigation Report of a Migrated
6        Recovery Filter in the Human Use
         Experience at [Redacted]"; unsigned by
7        Robert Carr, Program Director

8    925  (Not identified or used)                   401

9    927  (Not identified or used)                   401

10   931  (Not identified or used)                   401

11   1006 DeCant Deposition, 05/24/2016 - Exhibit  409  409
         254 - 12/9/2003 Meeting Minutes Memo from
12       Brian Hudson  to Len DeCant, Mike
         Casanova, Robert Carr, and Alex Tessmer
13       Re. "Special Design Review for Recovery
         (Project #'s 7081 and 8008)"

14   1216 (Not identified or used)                   401

15   1221 (Not identified or used)                   401

16   1369 Hudson deposition, 01/17/2014 - Exhibit 16  434  440
         - 3/24/2004 E-mail from Alex Tessmer to
17       Charlie Benware and Ed Fitzpatrick Re.
         "Starguide Filter Migration Test Results"

18

19   2059 Tessmer Deposition, 06/12/2013 - Exhibit  416  417
         02 - Project Status Report Form for the
20       Recovery Filter, Project No. 7081,
         initiated 7/1/2002 with the goal to
21       "Investigate Migration"; FM0700160, Rev.
         1.

22   2061 Tessmer Deposition, 06/12/2013 - Exhibit  418  419
         05 - 2/4/2004 E-mail from Alex Tessmer to
23       Several Re. "Updated: Filter Migration
         Flow Loop Test Fixture"

24

25

United States District Court

MARCH 15, 2018 P.M.

1              **E X H I B I T S** (Continued)

2    Number                              Ident   Rec'd

3    2063 Tessmer Deposition, 06/12/2013 - Exhibit   420    422
         08 - 2/25/2004 E-mail from Alex Tessmer to
4        Robert Carr and Brian Hudson Re. "Filter
         Migration Test Results
5

6

7              **MISCELLANEOUS NOTATIONS**

8    Item                                      Page

9    Proceedings outside the presence of the jury      342
     Deposition Instruction read to jury              395
10

11

12                 **RECESSES**

13                            Page   Line

14   (Recess at 2:32; resumed at 2:47.)      399    14

15

16

17

18

19

20

21

22

23

24

25

                 United States District Court

MARCH 15, 2018 P.M.

# P R O C E E D I N G S

1

2          (Court was called to order by the courtroom deputy.)

3          (Proceedings begin at 12:59.)

4          THE COURT:  Please be seated.

5          Mr. Lopez, you wanted to raise an issue?                    12:59:26

6          MR. LOPEZ:  Yes, Your Honor.  There are two exhibits,

7   one that I intend to offer that makes reference to the Simon

8   Nitinol filter and one that counsel intends to offer I think in

9   his cross-examination and I'm going to object to the document

10  as being beyond the scope.  Both documents make reference to     12:59:43

11  the Simon Nitinol filter having a 14 percent fracture rate I

12  think it is and then this one that talks about the migration

13  that happened in Dr. Asch's study references also I think a

14  clinical trial or something as it relates to the SNF.  I've got

15  CMO10, I think it's 10, where we wanted discovery on the Simon  01:00:15

16  Nitinol filter, specifically the --

17         THE COURT:  Hold on, Mr. Lopez.  I don't want to keep

18  the jury waiting about issues we could have talked about

19  earlier.  They are assembled waiting to walk in here.  Is this

20  going to require me to go back into that --                      01:00:34

21         MR. LOPEZ:  Well, I'm sorry, Your Honor.  I didn't

22  let you finish asking your question.

23         THE COURT:  Well, do I need to go back and look at

24  case management orders?

25         MR. LOPEZ:  I have it right here.                          01:00:46

United States District Court

MARCH 15, 2018 P.M.

1    THE COURT:  Well, I don't want to keep them waiting          01:00:47

2 for more than a minute.  When are you intending to raise this

3 issue?

4    MR. LOPEZ:  I'm going to put this document that --

5 I'm going to put in but I want to redact a portion of it that   01:00:54

6 was consistent with CMO10.

7    THE COURT:  So you wanted to introduce the document

8 and redact a portion of which you are presenting?

9    MR. LOPEZ:  Well, maybe I just won't offer the

10 document.  I'll just use to it refresh his recollection.        01:01:08

11    THE COURT:  Well, I'm just trying to understand what

12 the issue is.  Is it that you want to present a redacted

13 document and the defendants don't want you to?

14    MR. LOPEZ:  No.  In the document, it references

15 information about the Simon Nitinol filter that we wanted to    01:01:19

16 get discovery on and they objected to and we have a CMO that

17 says that we can't have it.  So I don't know how to handle it

18 other than the fact that it would be unfair now for them to

19 introduce evidence through a document or otherwise about the

20 Simon Nitinol filter's clinical performance when we didn't get  01:01:43

21 any complaint files.  They objected to us getting all of that

22 and now they are going to get in through a hearsay document,

23 you know, percentage of the fracture.  We would have loved to

24 have seen the --

25    THE COURT:  Okay.  I understand your point.              01:01:57

United States District Court

MARCH 15, 2018 P.M.

1          What were you going to say in response?                    01:01:58

2          MR. NORTH:  Your Honor, I really don't understand

3  what's going on.  I have not been consulted about this

4  beforehand.  I'm not even sure what documents he's talking

5  about.  I'm certainly willing to --                                01:02:05

6          THE COURT:  You ought to confer before raising these

7  issues.  I'm not going to rule on it now.  What you can do is

8  you can use the document to refresh his memory.  If you want to

9  put it in and not show it to the jury and we can argue about

10  redactions later, we can do that; but I don't want to keep the   01:02:24

11  jury waiting while we address an issue that you haven't

12  conferred about or that requires further reaching, so we'll go

13  ahead and bring the jury in.

14          Mr. Lopez, you can raise that at the start of the

15  break or at the end of the day.  I'll be happy to talk to you    01:02:56

16  about it.

17          MR. LOPEZ:  I apologize, Your Honor.  I should have

18  raised it this morning.

19          THE COURT:  That's all right.

20          (Jury enters at 1:03.)                                    01:03:25

21          THE COURT:  Please be seated.

22          All right.  Ladies and gentlemen, we're going to

23  continue with testimony of Dr. Asch.

24          Mr. Lopez, you may continue.

25          MR. LOPEZ:  Thank you, Your Honor.                        01:03:48

MURRY R. ASCH, M.D - Direct

1          (MURRY R. ASCH, M.D., a witness herein, was duly          01:03:49

2    sworn or affirmed.)

3                **DIRECT EXAMINATION** (Continued)

4    BY MR. LOPEZ:

5    Q.   Okay.  Dr. Asch, let's now talk about the actual pilot          01:03:52

6    study that you performed.  Was this performed at one location?

7    A.   It was performed at a number of locations.  The radiology

8    group that I belong to serviced a number of hospitals in the

9    downtown corridor all within a few blocks of each other.  So

10   there were three or four different institutions under one          01:04:14

11   umbrella.

12   Q.   And while you were in the course of monitoring the

13   patients that were in the study, did you take radiographs of

14   them as we had seen in an earlier document so you could monitor

15   the device itself?          01:04:35

16   A.   Yes.  Radiographs were routinely obtained and in addition

17   to the radiographs that were obtained as part of the study,

18   because I wanted to keep a close eye on these patients, many of

19   them were in hospital and ill and had CAT scans and radiographs

20   for other reasons.  So I would personally review all of those          01:04:51

21   studies again to be sure that they were being as closely

22   monitored as possible.

23   Q.   And Dr. Asch, during the course of this study, did you

24   have a patient whose Recovery filter was challenged by a clot?

25   A.   Yes, there was.          01:05:09

United States District Court

MURRY R. ASCH, M.D - Direct

1   Q.   And was it the type of clot that the device was designed                01:05:10

2   to prevent from moving the device beyond where it was inserted?

3   A.   Yes.  An IVC filter, in my view, should be able to trap

4   any size clot and yet remain stable in position.

5   Q.   Okay.  What happened to the very first patient in your                  01:05:29

6   study whose Recovery filter was challenged by a large clot?

7   A.   Well, fortunately, as I say, because I was monitoring

8   these patients, I discovered that his IVC filter had migrated

9   even though it hadn't been reported by the diagnostic imaging

10  radiologist who was reading those radiographs.  So as soon as I             01:05:54

11  discovered that, after a few phone calls and thinking, then we

12  made arrangement to have the filter removed for fear that once

13  it started to migrate, as soon as it moves we'll call it north

14  towards the heart, the cava gets wider at that point in the

15  patient's body.  So the risk of migration would be even higher             01:06:17

16  so as soon as I noted that, I acted on it immediately.

17  Q.   Do you have any recollection as to whether or not the

18  device moved caudally before it moved towards the heart?

19  A.   I don't recall that it moved caudally.  The most important

20  factor in my mind is that it moved cranially towards the heart.            01:06:38

21          MR. LOPEZ:  Could we have Exhibit 760, please, and

22  just show it to Dr. Asch.

23  BY MR. LOPEZ:

24  Q.   And Dr. Asch, do you recognize this report?

25  A.   Yes.                                                                   01:07:01

United States District Court

MURRY R. ASCH, M.D - Direct

1    Q.   Is it the investigation report of the migration that we're

2    talking about?                                                      01:07:02

3    A.   Yes, it is.

4    Q.   If you go to page three of this report, if you look

5    underneath the images, the pre-insertion and post-insertion         01:07:18

6    images, does this help refresh your recollection that this same

7    patient actually had a caudal filter migration?

8    A.   Okay.  I see that it says that, yes.

9    Q.   Okay.  And then was it after that -- caudal meaning it

10   moved down first?                                                    01:07:42

11   A.   Correct.

12   Q.   And is that evidence of instability of the filter?

13   A.   Yes.  Any movement is evidence of instability.  The filter

14   should stay where its put.

15   Q.   And then later you discovered that the device had moved         01:07:57

16   towards the heart; correct?

17   A.   That's correct.

18   Q.   And when you say four centimeters beyond where it was

19   originally inserted?

20   A.   Yes, correct.                                                   01:08:06

21   Q.   Now, just from the distance from where it was inserted to

22   where the heart is located, so how far from the heart was this

23   device when it was found?

24   A.   It's going to vary in different people but let's say four

25   inches, three inches.                                                01:08:21

MURRY R. ASCH, M.D - Direct

1    Q.    Okay.  But it was -- it originally moved down and then        01:08:23

2    when you looked at it next time, it was moving up?

3    A.    Yes.

4    Q.    Did that concern you?

5    A.    Yes, very much.                                               01:08:30

6    Q.    Okay.  Was there a meeting and discussions among the

7    people from Bard and NMT and even Dr. Kaufman about that, about

8    this?

9    A.    Yes.  I think as I recall what happened, we planned on

10   removing it because we were concerned about migration.  I think   01:08:50

11   what happened later, the meeting was after the initial attempt

12   at removing it when I discovered that there was a big clot

13   there.  Now we were faced with how do we deal with a migrated

14   filter that has a large clot in it because this is the first

15   time that we had been faced with a situation like that.  So       01:09:08

16   initial plan was filter moved, let's get it out, complicated by

17   some new information.  Now filter's all full of clot.  What do

18   we do in order to safely get it out?

19   Q.    And if you look at page, the Bates number is 545, page six

20   of seven of the document, do you recall there being a meeting     01:09:26

21   among folks from NMT and Bard about this migration?

22   A.    I'm sorry.  A meeting at the time or afterwards?

23   Q.    The follow-up communication where you're looking at on the

24   document regarding this observation of a migration.

25   A.    Yes.  So there were -- there was discussion and meetings,    01:09:53

United States District Court

MURRY R. ASCH, M.D - Direct

| | | |
|---|---|---|
| 1 | telephone conversations and electronic communication between | 01:09:58 |
| 2 | the people involved in the study in order to figure out what do | |
| 3 | we do going forward from here. | |
| 4 | Q.   And what did you do at that point?  What was the decision | |
| 5 | with respect to the pilot study? | 01:10:12 |
| 6 | A.   Well, the decision was to have the NMT people look at the | |
| 7 | device and see if there was any obvious reason or look at -- | |
| 8 | review patient records and radiographs to see if we could | |
| 9 | identify what caused the filter to migrate in order to be aware | |
| 10 | of what the likely risk would be in subsequent patients; and | 01:10:34 |
| 11 | after all of those discussions, we felt as a group that we | |
| 12 | should continue using close monitoring and continue placing | |
| 13 | these devices. | |
| 14 | Q.   Was the study at least stopped pending some additional | |
| 15 | steps to take to protect the rest of the patients in the study? | 01:10:53 |
| 16 | A.   Yes.  It was stopped temporarily while there could be | |
| 17 | information gained, as I say, with respect to the filter and | |
| 18 | patient factors. | |
| 19 | Q.   Was Dr. Kaufman concerned about this incident? | |
| 20 | A.   Yes.  I think we all shared similar concern, yes. | 01:11:08 |
| 21 | Q.   And what was -- do you recall Dr. Kaufman's concerns that | |
| 22 | he expressed to you and the folks at Bard and NMT? | |
| 23 |             MR. NORTH:  Objection, Your Honor.  802. | |
| 24 |             THE COURT:  Sustained. | |
| 25 |             MR. LOPEZ:  Exception, Your Honor.  Notice, effect on | 01:11:31 |

United States District Court

MURRY R. ASCH, M.D - Direct

1   the defendants' reactions to that information.                          01:11:33

2           THE COURT:  These are communications to the defendant

3   you're asking for?

4           MR. LOPEZ:  It's Dr. Kaufman was at the meeting with

5   Bard and NMT folks.                                                     01:11:45

6           THE COURT:  Mr. North seems to disagree that there

7   was such a meeting.  Well, let's tie it down to specific

8   communications that you believe were directed to the defendant

9   and if so, I'll give the jury instruction on limited admission.

10  BY MR. LOPEZ:                                                           01:12:02

11  Q.   So this meeting that took place, without looking at the

12  document, do you recall who was at the meeting?  And if you

13  need to look at it to refresh your recollection, you're allowed

14  to do that.

15  A.   I don't actually remember the specifics where the meeting        01:12:14

16  was or who attended the meeting.  My main recollection was that

17  there was a number of telephone conversations between several

18  of us.  My main conversation was with Dr. Kaufman to try and

19  get a sense, as I say, of how do we decide whether or not to

20  proceed.                                                                01:12:34

21  Q.   And if you look at page seven of seven, does this help

22  refresh your recollection as to what the decision was going to

23  be if there was another migration that occurred that would be

24  greater than two centimeters?

25          THE COURT:  You're asking him to look at the document         01:13:00

United States District Court

MURRY R. ASCH, M.D - Direct

1    and then see if it refreshes his memory?                                    01:13:02

2            MR. LOPEZ:  I withdraw that, Your Honor.  It's not a

3    proper question.

4            THE COURT:  All right.

5    BY MR. LOPEZ:                                                               01:13:09

6    Q.   Do you recall whether there was any decision among the

7    group what would happen if there was another migration of at

8    least two centimeters with another filter?

9    A.   Yes.  So the decision was that the study would be stopped.

10   Again, being early on in the experience, and only this was       01:13:27

11   patient number nine, so we didn't really know did this

12   represent -- what true percentage of complication this

13   represented.

14           So we thought we could accept this at that point but

15   if the event was to occur again, that would raise significant    01:13:41

16   concerns that this was a trend rather than I'll call it an

17   isolated event.  So, yes, the plan was to look very carefully,

18   follow up all of our patients even more carefully and not

19   tolerate any subsequent migration.

20   Q.   Did the discussion include Bard and NMT looking at          01:13:59

21   redesigning the device?

22   A.   At that point, I don't recall there was discussion about

23   redesigning the device because it was not communicated it to me

24   that any design factor was at fault here.

25   Q.   I am going to try to refresh your memory about that on      01:14:22

United States District Court

MURRY R. ASCH, M.D - Direct

1    page seven of this document that has been marked as an exhibit.    01:14:25

2    The first sentence there.  Does that help refresh your

3    recollection as to whether or not there would be a reevaluation

4    of the filter design?

5              THE COURT:  So the question Doctor is, after you read    01:14:37

6    that sentence, is your memory refreshed?  And if so, you can

7    testify from your memory.

8              THE WITNESS:  I'm not certain which sentence.

9    BY MR. LOPEZ:

10   Q.   The very first sentence in the end, "Everyone agreed."  Do    01:14:48

11   you see where I am?

12   A.   Okay.  Yes.

13   Q.   Read that and does that helps refresh your recollection

14   that the discussion or the agreement include a filter --

15   reevaluating the filter design?    01:15:00

16   A.   Yes, exactly.  So if the event occurred again, then the

17   study would stop and they would re-evaluate filter design, yes.

18             MR. LOPEZ:  Per our discussion, I'm going to reserve

19   moving that document into evidence at this time.

20   BY MR. LOPEZ:    01:15:25

21   Q.   Okay.  If you look at -- let's put up 533.  533 is a memo

22   dated September 14, 2000, from Thom Kinst; and if you look at

23   it, you're not on the cc of that.  Do you see that, Dr. Asch?

24   A.   Yes.

25   Q.   But if you look down four paragraphs, it does mention you    01:15:45

United States District Court

353

MURRY R. ASCH, M.D - Direct

| | | |
|---|---|---|
| 1 | as being involved in the conference call that is referenced in | 01:15:48 |
| 2 | this email.  Does that refresh your recollection that you were | |
| 3 | involved in the conference call that is described in this | |
| 4 | document? | |
| 5 | A.   I can't see the document from here.  I do clearly recall | 01:16:00 |
| 6 | that I was involved in conference calls regarding the | |
| 7 | migration. | |
| 8 | Q.   Look at -- okay.  I want to make sure we have it in | |
| 9 | relationship to this document.  The fourth paragraph? | |
| 10 | MR. WOODY:  Start over with which document? | 01:16:17 |
| 11 | MR. LOPEZ:  533.  Did I say it wrong? | |
| 12 | MR. WOODY:  What's the Bates number? | |
| 13 | THE COURT:  Folks, while they are doing that, | |
| 14 | somebody in the courtroom has your cell phone on.  Would you | |
| 15 | please turn them all off?  Having them just on mute doesn't | 01:16:48 |
| 16 | help.  We still get interference with the sound system.  Or put | |
| 17 | them on airplane mode.  That also would work. | |
| 18 | MR. LOPEZ:  My apologies, Your Honor.  It was | |
| 19 | actually 553.  Can we have 553, please. | |
| 20 | THE COURT:  Is 553 the December 14, 2000, memo, | 01:17:52 |
| 21 | Mr. Lopez? | |
| 22 | MR. LOPEZ:  Yes, sir. | |
| 23 | THE COURT:  Okay. | |
| 24 | BY MR. LOPEZ: | |
| 25 | Q.   Okay.  Now we can look at the fourth paragraph of the | 01:18:02 |

1  right exhibit where it mentions your name there.  Does this          01:18:06

2  help refresh your recollection -- go down four where it says,

3  "Thom Kinst led the discussion."

4            Do you see that, Dr. Asch?

5  A.  Yes.                                                              01:18:23

6  Q.  And is this a summary of those discussions that you had

7  after you experienced the migration of patient number nine in

8  your study?

9  A.  Yes, it is.

10           MR. LOPEZ:  I would like to offer this into evidence        01:18:33

11  at this time, Your Honor.

12           MR. NORTH:  No objection, Your Honor.

13           THE COURT:  553 is admitted.

14           (Exhibit Number 553 was admitted into evidence.)

15  BY MR. LOPEZ:                                                        01:18:47

16  Q.  Okay.  If you go to the second paragraph.

17           THE COURT:  Do you do want this displayed?

18           MR. LOPEZ:  Yes, please publish to the jury.  Thank

19  you.

20           THE COURT:  All right.                                      01:18:54

21           MR. LOPEZ:  Second paragraph.  Present at the

22  conference call.

23  BY MR. LOPEZ:

24  Q.  And those are folks from NMT.  Do you see that?

25  A.  Yes, I do.                                                       01:19:15

MURRY R. ASCH, M.D - Direct

1  Q.   And do you recognize there are also folks there from Bard
2  as well; true?                                                        01:19:15

3  A.   Correct.

4  Q.   And then the third paragraph states:  The purpose of the
5  conference call was to inform the Bard group of the conference        01:19:36
6  call from 12 September 2000, the physicians' clinical
7  assessment and NMT's plans in continuing the compassionate use
8  experience with Dr. Asch.

9       Do you see that, Doctor?

10 A.   Yes, I do.                                                       01:19:51

11 Q.   And then the next paragraph, there's Tom Kinst is
12 mentioned again and he refers to -- he says:  Please refer to
13 the memo dated 12 September 2000 recording the conference call.

14      Do you see where I am?

15 A.   Yes.                                                             01:20:08

16 Q.   And then below that --

17      MR. LOPEZ:  Could you highlight that, Greg, and bring
18 it out?

19 Q.   Given the compassionate use data to date, it can be stated
20 that the Recovery filter has a 10 percent migration rate.            01:20:21
21 NMT's response was that we suffering from the N, equals sign,
22 one syndrome.

23      What does that mean?

24 A.   Well, it basically means that only a single N is the
25 number of events that something occurred.  So one event             01:20:40

United States District Court

MURRY R. ASCH, M.D - Direct

1   occurred.  But because it was so early in the experience and        01:20:43
2   there were only nine -- this was patient number nine, it was
3   hard to know what true relative risk filter migration held
4   because is it going to occur in one in ten patients or is it
5   going to occur in 10 in 100 patients or more than that?           01:20:58
6   Q.   And it says:  We cannot conclude if the event is due to
7   Recovery filter design issues, is reflective of the normal
8   migration rate of all filters, or is an idiosyncratic event.
9   Did I read that correctly?
10  A.   Yes.                                                          01:21:18
11  Q.   And then it states:  Only a large, controlled clinical
12  study can definitively assess it.
13          Did I read that correctly?
14  A.   Yes, that's correct.
15  Q.   And that was an agreement among all the people that were      01:21:26
16  at this meeting?
17  A.   Yes.
18  Q.   Now, this 10 percent migration rate, let's talk about
19  that.  Were there any other patients in your study whose
20  filters were challenged by the type of clot that you saw in        01:21:39
21  patient number nine that put the device at risk of moving from
22  its location?
23  A.   No, there were not.
24  Q.   So.
25          So really in your study, insofar as the type of clot       01:21:52

United States District Court

MURRY R. ASCH, M.D - Direct

1   that the device was supposed to stop from moving towards the

2   heart, that migration rate was one out of one,100 percent?

3          MR. NORTH:  Objection, leading.

4          THE COURT:  Sustained.

5   BY MR. LOPEZ:

6   Q.   Well, there was only one -- there was one out of one of

7   the devices that were challenged by the -- by a clot that was

8   of the quality that put the patient at risk of maybe a

9   pulmonary embolism; true?

10  A.   That's correct.

11  Q.   Okay.  Let's go to page two, number three -- I'm sorry,

12  number two on page two:  Dr. Asch has informed the HPB --

13  that's the regulatory body in Canada correct?

14  A.   Correct.

15  Q.   -- and Hospital Ethics Board of the event and the

16  compassionate use experience to date.

17         Correct?

18  A.   Yes.

19  Q.   So you reported this to both the regulatory body and to

20  the ethics board that were involved in this study?

21  A.   Yes.

22  Q.   Dr. Asch will draft an addendum to the patient consent

23  form summarizing the compassionate experience.  This will be

24  similar to the summary sent to the HPB and ethics boards.

25         What did you mean by that?

United States District Court

01:21:55

01:22:07

01:22:23

01:22:58

01:23:07

01:23:23

MURRY R. ASCH, M.D - Direct

 1  A.   Well, now that we had experienced a complication, we had      01:23:30
 2  more new, updated information as to the specifics of this
 3  filter and so it's essential to share that information with
 4  patients so that moving forward, we can ethically obtain an
 5  informed consent because now we have new information.   That      01:23:44
 6  information needs to be provided to the patients.
 7  Q.   So in other words, all the other patients in this study,
 8  according to the ethics board, had the right to know about that
 9  experience so they could make a decision on whether to continue
10  in the study?                                                     01:24:00
11  A.   That's correct.
12  Q.   And then number three:  It was agreed by the physicians
13  and NMT that it is reasonable and prudent to require periodic
14  biweekly abdominal x-rays to monitor the location of the
15  filter.                                                           01:24:14
16          Do you see that, Doctor?
17  A.   Yes.
18  Q.   And is that what you did throughout the balance of this
19  study?
20  A.   Yes.                                                         01:24:20
21  Q.   And of course throughout the balance of the study, the
22  device had not been challenged again like it was -- like
23  patient number nine was challenged; true?
24  A.   That's correct.
25  Q.   And then number four, paragraph four:  It was established    01:24:29

United States District Court

359

MURRY R. ASCH, M.D - Direct

1   that if, one, the filter moved four centimeters, one filter                        01:24:38
2   length, or, two, the filter moved in a suprarenal location --
3   what's a suprarenal location?
4   A.   So supra is a fancy word for above and renal is a fancy
5   word for kidney so the kidney vessels veins are the standard           01:24:56
6   landmark for where we place filters.   We normally place them
7   below the renal veins because above the renal veins, the IVC
8   gets larger.   So we discussed before the fact that these
9   filters are meant to go into a cava less than 28 millimeters in
10  diameter.   As you get above the renal veins, cava gets larger         01:25:19
11  and, therefore, the risk of migration will be higher because
12  now you've exceeded the requirements for caval diameter.
13  Q.   And then when you read past that, the compassionate use
14  experience would be immediately stopped and the filter design
15  challenged.   What does that mean, Doctor?                             01:25:40
16  A.   So again out of concern, if another episode was to occur
17  or an episode where the filter migrated above the level of the
18  renal veins, then we would stop it out of concern for -- that
19  this was a more real and not an unexpected or low-incidence
20  complication.   And so that we would then, for patient safety          01:26:06
21  reasons, stop the study, allow the device to be redesigned so
22  that the risk of migration would be reduced.
23  Q.   And then it continues:   Filter implants would be halted,
24  but filter removals of indwelling filters would continue until
25  all remaining filters were removed.                                    01:26:27

United States District Court

MURRY R. ASCH, M.D - Direct

1   A.   Yes.                                                           01:26:29

2   Q.   And that was an agreement among everybody that was

3   involved in this conference call that we've just been

4   discussing?

5   A.   That's correct.                                               01:26:35

6   Q.   And then, Doctor, was there also an occasion within your

7   study where one of your patients experienced a filter fracture?

8   A.   Yes, that's correct.

9   Q.   Would you describe that event for the jury, please.

10  A.   So this was a woman who was pregnant and had the filter      01:26:51

11  placed while she was pregnant for standard reasons and it was

12  noted, again, because of monitoring, because she was in the

13  study, she was having radiographs that other patients wouldn't

14  normally have.  And during the course of those routine

15  radiographs, it was found that her filter had been fractured.    01:27:10

16        So, again, as soon as I found this, I made

17  arrangements to have the filter removed for fear that with a

18  filter fracture where the filter is unstable and the component

19  or the filter could migrate to the heart.

20  Q.   And I think you referred to that as patient number 33.       01:27:34

21  A.   That's correct.

22  Q.   By the way, let's go back to patient number nine.  I mean,

23  this -- I think you said this was the type of clot that, you

24  know, might have caused a PE in that patient?

25  A.   Yes.                                                         01:27:50

361

MURRY R. ASCH, M.D - Direct

1   Q.   And we don't know were whether or not it would have been a    01:27:51
2   fatal PE.  We just know it was working its way in that
3   location; right?
4   A.   Correct.
5   Q.   And technically, did that event, at least up to four    01:27:58
6   centimeters, save the patient's life?
7   A.   Well, the filter did part of its job in terms of trapping
8   the clot, but the filter failed in that it migrated.  And as we
9   know and as we previously talked about, as the filter moves
10  more towards the hearts, risk of migration is higher.  And    01:28:21
11  outside of a clinical study where someone is being closely
12  monitored, my concern is that that filter would have ultimately
13  killed that patient.
14  Q.   So was it the monitoring that potentially saved this
15  patient from the filter continuing to go to his heart?    01:28:37
16  A.   Yes.
17  Q.   Okay.  Let's look at Exhibit 559, please and 559 is dated
18  April 18, 2002, and do you see it looks like it's a memo that
19  was forwarded that was authored by you?  Do you see that,
20  Dr. Asch?    01:29:07
21  A.   Yes, I do.
22  Q.   And this was an email that you sent to whom?  Do you
23  recall?
24  A.   I believe it's to HPB, Health Protection Branch, Canada
25  and the Ethics Department as per my requirement as ethical    01:29:27

United States District Court

MURRY R. ASCH, M.D - Direct

1  performance of the research study, I need to report any

2  adverse -- I potentially serious adverse events and this email

3  was part of that reporting.

4  Q.    Okay.  And do you know who George Cavagnaro is?

5  A.    I don't remember his position.  He worked at Bard.  He may

6  have been Monica's manager but I don't recall specifically.

7  Q.    How about Doug Uelmen and Carol Vierling, do you recall

8  those names?

9  A.    Carol I believe was part of -- she worked for the head

10  office of Bard.  I don't have her exact.

11          MR. LOPEZ:  Your Honor, I would like to move 559 into

12  evidence and have it shown to the jury, please.

13          MR. NORTH:  No objection, Your Honor.

14          THE COURT:  Admitted.  You may display.

15          (Exhibit Number 559 was admitted into evidence.)

16  BY MR. LOPEZ:

17  Q.    And this is an email -- I'm not sure it's an email but

18  it's something that you write?

19  A.    Yes.  I think it was an email.

20  Q.    Okay.  It's your email address.

21          Now, let's look at the first part of that.  It's kind

22  of weird because the way it got cut and pasted, it's going to

23  be kind of a struggle to read.  It doesn't go in a straight

24  line.  I'm going to read it and just let me know whether I've

25  read it correctly, Dr. Asch.

01:29:30
01:29:47
01:30:11
01:30:20
01:30:34
01:30:52

MURRY R. ASCH, M.D - Direct

1          Starting at the top, this I, meaning you, compelled       01:30:54
2     to report this week's adverse event, RNF fracture to HPB and to
3     our IRB.  I have not heard back from Ottowa, however, as
4     expected, the IRB has suspended the trial effectively
5     immediately until the nature of the problem with the device can  01:31:13
6     be better -- until the nature of the problem with the device
7     can be better understood.
8          Did I read that correctly?
9     A.   Yes, up.
10    Q.   Does that mean the study was stopped?                       01:31:24
11    A.   Yes.
12    Q.   And then if you drop down a little more beginning with the
13    word "hopefully."  Well, there's more than one hopefully.  I'm
14    sorry.  The first hopefully.  It's hard to read.  It's about
15    five lines down from what you have highlighted right now.        01:32:00
16         And then you write:  Hopefully Monday, Monica --
17    Monica is the Bard representative?
18    A.   Yes.
19    Q.   -- can drop by to pick up the filter so that it can be
20    sent to Atlanta or Boston to be analyzed.  Did you have a        01:32:27
21    chance to look at the filter images I sent yesterday?  It seems
22    to me that the filter hook broke off at the attachment to the
23    leg.
24         Is that what you reported to Bard?
25    A.   Yes.                                                        01:32:42

United States District Court

MURRY R. ASCH, M.D - Direct

1    Q.   Hopefully --                                                    01:32:47

2              MR. LOPEZ:   Now we can go down to the next hopefully,

3    Greg.

4              Hopefully you can come up with a good explanation for

5    the problem and that it would not be expected to recur.            01:32:59

6              Do you see that?

7    A.   Yes.

8    Q.   And then you write down two lines:   It might be

9    interesting -- it might be interesting to test hooks from other

10   filters.                                                           01:33:22

11             Did I read that correctly?

12   A.   Yes.

13   Q.   And that's advice or information you provided to people at

14   Bard about the fracture; correct?

15   A.   Yes.                                                          01:33:34

16   Q.   All right.   Did Bard make you any promises or represent to

17   you what they were going to do with respect to the Recovery

18   filter after having experienced this migration and these

19   fractures in your pilot study?

20   A.   Yes.   So after this fracture occurred, Bard assured me      01:34:01

21   that they would evaluate the filter which was returned to them

22   and NMT to decide could they identify a manufacturing problem

23   or a design issue which then would consult in a redesign of the

24   filter in order to prevent these types of events from occurring

25   again.                                                            01:34:24

United States District Court

MURRY R. ASCH, M.D - Direct

1   Q.   Were they specific about the type of design things that          01:34:26

2   they had in mind to make it more fracture- and

3   migration-resistant?

4   A.   They did mention a few things.  As I said, it appeared

5   that the filter fractured where all of the elements come in           01:34:38

6   towards the hook so they talked about changing the welding

7   pattern there.  They talked about making the device is a bit --

8   the metal -- the metal legs and arms a bit thicker so that they

9   would be a bit stronger and they talked about strengthening the

10  hooks in order to reduce the ease that they could be displaced        01:34:58

11  from the cava wall.

12  Q.   And was that basically the last communication you had with

13  anyone from Bard or NMT about the Recovery filter, at least

14  with respect to the issues we have been talking thus far today?

15  A.   Yes.                                                             01:35:20

16  Q.   Now, did you ever -- let me ask this question:  Did your

17  data from this study relative to complications during filter

18  placement, recurrent pulmonary embolism, death, filter

19  migration, et cetera, provide clinical data to support a

20  determination of substantial equivalence as a permanent filter?       01:35:42

21            MR. NORTH:  Objection, Your Honor.  701 and '2.  No

22  qualification.

23            THE COURT:  Hold on just a minute.

24            Are you asking about an FDA determination, Mr. Lopez?

25            MR. LOPEZ:  No, just whether or not his data --            01:36:08

United States District Court

MURRY R. ASCH, M.D - Cross

1      THE COURT:  I think you need to rephrase it then
2  because it sounds like you did.
3      MR. LOPEZ:  Okay.
4  BY MR. LOPEZ:
5  Q.  Did Bard ask you to do any comparison between its device
6  and any other device?
7  A.  No, they did not.
8  Q.  This was a study just about the Recovery filter?
9  A.  About the retrievability of the Recovery filter, yes.
10 Q.  Was your study designed to establish any clinical data to
11 support its permanent use safely and effectively?
12 A.  No, it was not.
13 Q.  And was there any data that came out of your study that
14 would support its use as a safe and effective permanent filter?
15 A.  No.
16     MR. LOPEZ:  Those are the only questions I have, Your
17 Honor.
18     Thank you, Dr. Asch.
19     THE COURT:  Cross-examination?
20     MR. NORTH:  Yes, Your Honor.
21         **CROSS - EXAMINATION**
22 BY MR. NORTH:
23 Q.  Good afternoon Dr. Asch.
24 A.  Good afternoon.
25 Q.  I believe you and I have met on one previous occasion when

01:36:11
01:36:15
01:36:28
01:36:49
01:36:57
01:37:28

MURRY R. ASCH, M.D - Cross

1  you were deposed in this case; correct?                            01:37:32

2  A.    That's correct.

3  Q.    Let me be sure one thing is straight.  Your work with Bard

4  in the development or testing -- or the clinical study of

5  filters had to do with the Recovery filter; correct?             01:37:44

6  A.    That's correct.

7  Q.    You never had any involvement with the design or

8  development of what is the G2 filter, did you?

9  A.    That is correct.

10  Q.    And you never conducted a clinical study about the G2      01:37:55

11  filter, did you?

12  A.    That is correct.

13  Q.    Are you aware that the plaintiff, Ms. Booker in this case,

14  was implanted with a G2 filter and not a Recovery filter?

15  A.    I am not aware of that.                                     01:38:07

16  Q.    How many IVC filters by any manufacturer have you placed?

17        (Court Reporter interrupted for clarification.)

18        THE COURT:  Reask the question.

19  BY MR. NORTH:

20  Q.    How many IVC filters have you placed in your clinical      01:38:26

21  practice over the years?

22  A.    400 or 500.

23  Q.    And do you still place filters today?

24  A.    Yes, I do.

25  Q.    And you agree that IVC filters are an important device to  01:38:38

United States District Court

MURRY R. ASCH, M.D - Cross

```
 1   have available for the care of your patients?              01:38:42
 2           MR. LOPEZ:  Your Honor, I'm going to object as beyond
 3   the scope of my examination of this witness.
 4           THE COURT:  Your response, Mr. North?
 5           MR. NORTH:  I think I'll move along, Your Honor.     01:38:56
 6           THE COURT:  All right.
 7   BY MR. NORTH:
 8   Q.   You did testify earlier, Dr. Asch, that you had reviewed a
 9   number of the tests and studies performed on the Recovery
10   filter by NMT?                                              01:39:06
11   A.   I was presented with the information.  I didn't review it
12   as such.
13   Q.   That was my question.  You did not review each and every
14   study that NMT had conducted on that test, did you?
15   A.   I did not.                                             01:39:19
16   Q.   And you did not review the test reports for each test, did
17   you?
18   A.   I did not.
19   Q.   And did you see all of the migration studies performed by
20   NMT?                                                        01:39:31
21   A.   No.
22   Q.   Did you see all of the fracture and fatigue tests
23   performed by NMT?
24   A.   No.
25   Q.   And did you see all of the simulated use tests?        01:39:35
```

United States District Court

MURRY R. ASCH, M.D - Cross

1    A.    No.                                                          01:39:39

2    Q.    And the radio strength tests?

3    A.    No.

4    Q.    I believe you testified in response to one of Mr. Lopez's   01:39:46

5    questions that you were not concerned during your study with --

6    if that was a caudal migration in patient number nine; is that

7    correct?

8    A.    No.   I said I couldn't remember if there was a caudal

9    migration.

10   Q.    Were you concerned as to whether there was a caudal        01:40:05

11   migration?

12   A.    As I believe I said, I am concerned about any migration in

13   any direction when the filter should stay where I put it.

14   Q.    Dr. Asch, you flew in to Phoenix today from eastern Canada

15   to give your testimony correct?                                   01:40:21

16   A.    That's correct.

17   Q.    And you have been paid a consulting fee or a fee by the

18   plaintiffs for appearing today; correct?

19   A.    I'm not being paid a fee.   I am being reimbursed for the

20   income that I lost by being here today.                           01:40:32

21   Q.    And what -- are you being compensated or reimbursed at an

22   hourly rate?

23   A.    No.   I'm being paid essentially at the daily rate to

24   replace the income that I would have earned had I stayed at

25   home.                                                             01:40:47

MURRY R. ASCH, M.D - Cross

| 1 | Q.   And how much is that? | 01:40:48 |
| 2 | A.   It's approximately $5,000 a day. | |
| 3 | Q.   And you have been paid in the past by these same | |
| 4 | plaintiff's attorneys which you've met with them, haven't? | |
| 5 | A.   Several years ago when we last met, yes. | 01:40:58 |
| 6 | Q.   And when you gave a deposition in this case, they took | |
| 7 | your deposition, the one I attended, you were paid an hourly | |
| 8 | rate for attending that deposition; is that correct? | |
| 9 | A.   That's correct. | |
| 10 | Q.   And my understanding is at that time, you were paid at a | 01:41:10 |
| 11 | rate of $600 an hour? | |
| 12 | A.   That's correct. | |
| 13 | Q.   And it is also my understanding or recollection that | |
| 14 | several years ago you consulted with Mr. Lopez and some other | |
| 15 | lawyers to prepare a declaration they submitted in some | 01:41:24 |
| 16 | litigation pending in Los Angeles; is that correct? | |
| 17 | A.   Yes, it is. | |
| 18 | Q.   And you were paid for that at the rate of $600 an hour; | |
| 19 | correct? | |
| 20 | A.   That's correct. | 01:41:38 |
| 21 | Q.   You have not used a Bard filter since 2005; correct? | |
| 22 | A.   That's correct. | |
| 23 | Q.   Have you even spoken with a Bard employee since 2005? | |
| 24 | A.   Yes, I have. | |
| 25 | Q.   You have not published a paper on IVC filters since 2005, | 01:41:57 |

MURRY R. ASCH, M.D - Cross

1   have you?

2   A.   I believe that's correct.

3   Q.   And it is true, isn't it, Dr. Asch, that after you left

4   Toronto and began working in the other hospital where you now

5   work that you -- after you quit working with Bard filters, you

6   started working with a company that is a competitor of Bard's

7   called Cook; correct?

8            MR. LOPEZ:  Beyond the scope, Your Honor.

9            THE COURT:  Overruled.

10           THE WITNESS:  I had worked with Cook for many, many

11   years.  I work alongside many companies.  I have worked with

12   Cook since the beginning of my career.

13   BY MR. NORTH:

14   Q.   And you have conducted studies for Cook regarding their

15   competitive filters; correct?

16   A.   That's correct.

17   Q.   You worked closely I believe with Mr. Carr, Rob Carr, from

18   Bard; correct?

19   A.   Yes, that's correct.

20   Q.   And based upon your previous testimony, it's my

21   understanding that you had no complaints with Mr. Carr and how

22   he interacted professionally with you?

23   A.   That's correct.

24   Q.   And I believe, as you told us before, he was helpful and

25   supportive of your work?

United States District Court

01:42:00

01:42:17

01:42:31

01:42:42

01:43:06

01:43:22

MURRY R. ASCH, M.D - Cross

1    A.    Yes, that's correct.                                        01:43:24

2    Q.    Now, your initial study that you published about involved

3    32 patients correct?

4    A.    Yes.

5    Q.    And then you went home to do -- to perform afterwards the   01:43:36

6    same procedure on another 26 patients for a total of 58;

7    correct?

8    A.    Yes.

9    Q.    And in those 58 patients, there was the one situation of a

10   migration that you discussed; correct?                           01:43:52

11   A.    Yes.

12   Q.    And in those 58 patients, there was one instance of a

13   fracture that you reported; correct?

14   A.    Yes.

15   Q.    And both that migration and that fracture were             01:44:03

16   asymptomatic events; correct?

17   A.    They were asymptomatic at the time they were discovered,

18   yes.

19   Q.    In other words, the patients didn't have any symptoms or

20   pains or any outward manifestations of the complication;         01:44:16

21   correct?

22   A.    That's correct.

23   Q.    And after you completed the study with all 58 patients,

24   you went on to implant a number of Bard Recovery filters in the

25   course of your private practice for the next two or three        01:44:34

MURRY R. ASCH, M.D - Cross

1  years; correct?                                                          01:44:37

2            MR. LOPEZ:  I'm sorry.  It's beyond the scope.

3            THE COURT:  Overruled.

4            THE WITNESS:  Yes, that's correct.

5  BY MR. NORTH:                                                            01:44:41

6  Q.   And I believe I've heard estimates that you think you may

7  have ultimately implanted as many as 200 filters?

8  A.   Well, I think the question was asked was in my career so

9  my career started in 1989.

10 Q.   I'm sorry.  With regard to Recovery filters, approximately   01:45:00

11 how many do you think that you implanted?

12 A.   After this study when I moved to my current hospital,

13 maybe 10 or 15.

14 Q.   But you continued to implant them after you completed the

15 study?                                                                    01:45:20

16 A.   Yes.

17 Q.   And you continued to implant them after you had had that

18 one incident of fracture in your study; correct?

19 A.   That's correct.

20 Q.   And you continued to implant them after you had that one    01:45:38

21 incident of migration in your study?

22 A.   Yes.

23 Q.   And after you completed your study or after those two

24 events occurred, in none of the Recovery filters that you

25 implanted did you ever observe another fracture or another     01:45:51

United States District Court

MURRY R. ASCH, M.D - Cross

1   migration; is that correct?                                01:45:54

2            MR. LOPEZ:  Objection.  Lacks foundation.

3            THE COURT:  Overruled.

4            THE WITNESS:  When I came to my current hospital, my

5   practice was to place filters on clinical need outside of a   01:46:03

6   study so these patients were not followed up.  So the fact that

7   I didn't detect it doesn't mean it didn't occur.  It just means

8   I didn't follow the patients to the same rigors as I did during

9   the study.

10  BY MR. NORTH:                                               01:46:21

11  Q.   But regardless of whether your follow-up protocol changed,

12  the fact is, you have never saw another fracture or another

13  migration in the Recovery filters that you implanted.  Is that

14  right?

15           MR. LOPEZ:  Your Honor, lacks foundation.          01:46:33

16           THE COURT:  Overruled.

17           THE WITNESS:  I never saw an event but that doesn't

18  mean it didn't occur.

19  BY MR. NORTH:

20  Q.   Let's talk a moment about your study.  When you conducted   01:46:45

21  this study, and I believe in one of the exhibits that was

22  previously admitted by Mr. Lopez, when you wrote to the board

23  and Dr. Freeland (phonetic) seeking permission to do this

24  study, you reported them -- to them that you are satisfied.

25  You said:  I am satisfied that this is a safe and efficacious   01:47:09

United States District Court

MURRY R. ASCH, M.D - Cross

1   device; is that correct?                                           01:47:14

2   A.   Yes, it is.

3   Q.   And you felt that a retrievable IVC filter could assist

4   patients and that's part of why you conducted this study?

5   A.   That's correct.                                               01:47:22

6   Q.   And the Canadian authorities approved your study and the

7   protocols for the study; correct?

8   A.   Correct.

9   Q.   And after you began this study, you reported several times

10  that the filter was easy to implant and easy to retrieve;         01:47:39

11  correct?

12  A.   That's correct.

13  Q.   Now, one event of course that you mentioned is patient

14  number nine which was the migration.  Migration of filters had

15  been ordered in the literature before your study with the         01:47:52

16  Recovery filter; correct?

17  A.   That's correct.

18          MR. NORTH:  And if we could pull up Exhibit 557,

19  please.

20  BY MR. NORTH:                                                      01:48:15

21  Q.   I would ask you, Dr. Asch, to look at Exhibit 557 which is

22  an email chain, appears to be, but you see it appears to be

23  forwarding an email written by you to people regarding the

24  patient number nine.  Do you see that?

25  A.   Yes, I do.                                                    01:48:30

376

MURRY R. ASCH, M.D - Cross

1  Q.   And do you agree that that is forwarding an email          01:48:35
2  concerning you wrote of that patient?
3  A.   I don't see the email in its completion here but, yes, I
4  believe that that is mine.
5          MR. NORTH:   Your Honor, at this time we would offer   01:48:50
6  557.
7          MR. LOPEZ:   No objection, Your Honor.
8          THE COURT:   Admitted.
9          MR. NORTH:   Can it be displayed to the jury, Your
10 Honor?                                                          01:48:58
11         THE COURT:   Yes.
12         (Exhibit Number 557 was admitted into evidence.)
13 BY MR. NORTH:
14 Q.   If we could, let's look down probably the second or third
15 paragraph where it begins, "I believe."                        01:49:13
16 A.   Okay.
17 Q.   You said:   I believe that the filter migrated due to the
18 impact of the large thrombus -- and a thrombus is a clot;
19 correct?
20 A.   Yes.                                                       01:49:31
21 Q.   -- and in doing so, likely saved this patient's life.
22         Is that what you were reporting?
23 A.   Yes.
24 Q.   And so it was your view at the time that while that filter
25 migrated, it probably saved the patient's life because of the  01:49:42

United States District Court

MURRY R. ASCH, M.D - Cross

1    size of that clot?                                                      01:49:47

2    A.   Yes but, again, the concern is that the filter could have

3    continued to migrate because now it was in a potentially

4    unstable position.

5    Q.   And a couple of lines down you also indicated that you            01:49:59

6    believe that this is an isolated event, that filter migration

7    is a known complication of all currently approved devices.

8             Is that accurate?

9    A.   That is what I said, yes.

10   Q.   And then you also, as we discussed, mentioned patient 33         01:50:21

11   and that was the patient who had the fracture correct?

12   A.   Correct.

13   Q.   And I believe, as you mentioned, the study was stopped and

14   an investigation was conducted when that fracture occurred;

15   correct?                                                               01:50:37

16   A.   Correct.

17   Q.   And Rob Carr, led that investigation, didn't he?

18   A.   I believe so.

19   Q.   And he published a lengthy report concerning that

20   investigation?                                                         01:50:47

21   A.   I don't recall.  I assume he did.  I don't recall.

22   Q.   Did you and Mr. Carr in investigating that fracture,

23   conclude that it may have been the forces of the female

24   patient's labor and deliver that could have contributed to the

25   fracture?                                                              01:51:12

MURRY R. ASCH, M.D - Cross

1  A.   That was one of my hypothesis, yes.  We were working on a          01:51:12

2  number of hypotheses, the patient factors and filter factors,

3  so that was one potential.

4  Q.   And are you aware of the fact that based upon that

5  experience and that event in your clinical study, Bard took the    01:51:25

6  affirmative step to add instructions in the instructions for

7  use about how filters should be placed in pregnant patients?

8  A.   Yes, I'm aware of that but those are standard instructions

9  for use for all filter manufacturers in pregnant women.

10  Q.   Are you aware of the fact that Bard provided the FDA with     01:51:52

11  the data concerning both the migration and the fracture event

12  in your study?

13         MR. LOPEZ:  Objection, Your Honor.  Vague and

14  ambiguous.

15         THE COURT:  Overruled.                                     01:52:06

16         THE WITNESS:  I am not aware of what they provided to

17  the FDA.

18  BY MR. NORTH:

19  Q.   Are you aware of the fact that in the instructions for

20  use, your study was described, the instructions for use given    01:52:14

21  out to every physician that received a Recovery filter, your

22  study was described and the event of migration and fracture

23  were mentioned in that description?

24         MR. LOPEZ:  Objection, Your Honor.  Best evidence.

25         THE COURT:  Overruled.                                     01:52:32

United States District Court

MURRY R. ASCH, M.D - Cross

 1          MR. LOPEZ:  Hearsay.                                    01:52:33

 2          THE COURT:  Well, hold on.  I can't hear the second

 3   part of what you're saying.

 4          MR. LOPEZ:  I'm sorry, Your Honor.  Best evidence and

 5   hearsay.                                                       01:52:40

 6          THE COURT:  Overruled on best evidence.

 7          What's your response to the hearsay objection,

 8   Mr. North?

 9          MR. NORTH:  I just asked him if he was aware of

10   whether that occurred.                                         01:52:51

11          THE COURT:  Whether there was an out-of-court

12   communication?

13          MR. NORTH:  Right.

14          THE COURT:  I think that's hearsay.  Sustained.

15          MR. NORTH:  Okay.  Thank you, Your Honor.               01:52:59

16   BY MR. NORTH:

17   Q.   Do you recall whether there was any reference to those

18   events in the IFU?

19   A.   I do not recall.

20   Q.   Now, if we could look at Exhibit 558.  Could you identify  01:53:13

21   for the members of the jury what 558 is?

22   A.   That is a published manuscript that summarizes the

23   experience that I had with this new Recovery filter.

24   Q.   And that is an article that you yourself published; is

25   that correct?                                                  01:53:53

MURRY R. ASCH, M.D - Cross

| | |
|---|---|
| 1 | A.    Yes, that is. | 01:53:55 |
| 2 | Q.    And in what journal was it published? |
| 3 | A.    "The Journal of Radiology." |
| 4 | Q.    And do you consider that a reliable publication? |
| 5 | A.    Yes, I do. | 01:54:08 |
| 6 | Q.    Would the study have been peer reviewed? |
| 7 | A.    Yes, it would. |

1    A.    Yes, that is.                                          01:53:55

2    Q.    And in what journal was it published?

3    A.    "The Journal of Radiology."

4    Q.    And do you consider that a reliable publication?

5    A.    Yes, I do.                                             01:54:08

6    Q.    Would the study have been peer reviewed?

7    A.    Yes, it would.

8          MR. NORTH:  Your Honor, at this time I would tender

9    into evidence Exhibit 558.

10         MR. LOPEZ:  I'm going to object to the hearsay        01:54:19

11   portion of this Your Honor.

12         THE COURT:  What's your response on hearsay?

13         MR. NORTH:  First of all, it's an admission by him.

14   These are statements that he authored.  And then, secondly,

15   it's a learned treatise.  He's already admitted under 803.18 I  01:54:29

16   believe it is meets the criteria.

17         THE COURT:  Well, even if it's an admission by him,

18   he's not a party opponent so that doesn't get you around the

19   hearsay problem.  803.18.  803.18 does not allow an admission

20   of an exhibit.                                              01:55:03

21         MR. NORTH:  Your Honor, I'm sorry, my understanding

22   was that the contents in it can be admitted to the jury but the

23   exhibit not sent back to the jury room.

24         THE COURT:  Well, the exhibit does not come in.  The

25   contents can be read at 803.18.  I thought you were moving the  01:55:16

MURRY R. ASCH, M.D - Cross

1    exhibit into evidence.                                          01:55:20

2            MR. NORTH:  I'm sorry.  In some courts they move it

3    into evidence but don't send it back.

4            But may I display to it jury?

5            THE COURT:  What's your response on 803.18?           01:55:30

6            MR. LOPEZ:  I'll object, Your Honor.

7            THE COURT:  On what basis?

8            MR. LOPEZ:  It's hearsay.  I don't know what he's

9    going to read from.

10           THE COURT:  But he's using this to avoid the hearsay  01:55:38

11   problem.  Do you disagree that it satisfies the learned

12   treatise exception?

13           MR. LOPEZ:  Well, I don't think it's been

14   established.

15           THE COURT:  I'm going to overrule that objection.     01:55:48

16   803.18 applies not only to learned treatises but periodicals.

17   This seems to me to be a periodical that is -- that satisfies

18   the requirements.  So the contents can be read but the exhibit

19   itself won't go into evidence to the jury.

20           MR. NORTH:  Right.                                     01:56:07

21           So may I display it, Your Honor, on the screen?

22           THE COURT:  You can have him read it into evidence

23   but the exhibit doesn't come into evidence to be seen by the

24   jury under 803.18.

25           MR. NORTH:  Okay.                                      01:56:19

United States District Court

MURRY R. ASCH, M.D - Cross

BY MR. NORTH:                                          01:56:23

Q.   If we could turn, Dr. Asch, on page 843, do you see in the

middle column, there is a paragraph that begins with the word

"there."  Could you read the first couple of sentences there?

A.   There was a single occurrence 3 percent of asymptomatic   01:56:45

filter migration in this series of 32 patients.  Migration is

typically defined in the literature as movement greater than

two centimeters.  The reported incidence --

Q.   Okay.  That's all I needed you to.

        And then if you could go over to the next page, 844,    01:57:04

and read the last paragraph beginning first few sentences that

begin, "In conclusion."

A.   In conclusion, this preliminary special access use of the

Recovery Nitinol filter, a retrievable IVC filter, suggests

that the filter can easily be delivered via the femoral vein.   01:57:30

Q.   Two more sentences down beginning with, "No substantial."

What do you see?

A.   I said:  No substantial complications were encountered in

this series.

Q.   So even after acknowledging that a migration had occurred  01:57:48

in the initial part of your study, you published an article

that said no substantial complications were encountered in this

series; correct?

A.   That is what I said, yes.

Q.   Now if we could look at Exhibit 555.  This is a second     01:58:22

United States District Court

MURRY R. ASCH, M.D - Cross

1   article or a letter to the editor in a medical journal that you      01:58:34
2   published; correct?
3   A.    That's correct.
4   Q.    And you had a couple of co-authors with this; is that
5   correct?                                                             01:58:41
6   A.    Yes, it is.
7   Q.    And who were they?
8   A.    One was a hematologist and one was an obstetrician
9   gynecologist.
10  Q.    Did they work with you on your study?                          01:58:53
11  A.    No, they did not.
12  Q.    And in what journal was this published in?
13  A.    In the International Society on Thrombosis and
14  Haemostasis.
15  Q.    And do you consider that to be a reliable medical journal?     01:59:11
16  A.    Yes, I do.
17        MR. NORTH:  Your Honor, at this time, I would seek
18  permission to have him read certain parts of the content
19  pursuant to the same exception.
20        MR. LOPEZ:  Pursuant to the same exception, Your               01:59:23
21  Honor.
22        THE COURT:  All right.  You may.
23        MR. NORTH:  Thank you.
24  BY MR. NORTH:
25  Q.    Now, just to give the jury a little bit of the background,     01:59:28

| | | |
|---|---|---|
| 1 | this second paper was after the entire study, all 58 patients, | 01:59:30 |
| 2 | were completed; correct? | |
| 3 | A.   I believe that's correct. | |
| 4 | Q.   And this was reporting on your experience with the | |
| 5 | Recovery filter in all 58, including the migration and fracture | 01:59:43 |
| 6 | patient; correct? | |
| 7 | A.   No.  This was -- no.  This was really a summary of two | |
| 8 | complications with filters in pregnant patients. | |
| 9 | Q.   But out of those 58 that you had studied; right? | |
| 10 | A.   Out of those, yes, 58. | 02:00:03 |
| 11 | Q.   Now, turning to the last page on page 1097, read for us | |
| 12 | the paragraph in the right-hand column about halfway down that | |
| 13 | begins with, "There were no significant." | |
| 14 | A.   There were no significant complications in the use of the | |
| 15 | IVC filter in our patients.  The filter fracture that occurred | 02:00:27 |
| 16 | in the RNF patient was the only fracture that occurred in our | |
| 17 | institution's series of 58 filters. | |
| 18 | Q.   And then go on to say what you said next, please. | |
| 19 | A.   This is a commonly accepted complication of IVC filters, | |
| 20 | and has been previously reported with the Simon Nitinol filter | 02:00:45 |
| 21 | in up to 14 percent. | |
| 22 | Q.   So even in -- at the conclusion of the study, even in | |
| 23 | reporting on the migration and fracture incident in your study, | |
| 24 | you published an article in a reliable journal that said there | |
| 25 | were no significant complications in the use of the IVC filter | 02:01:05 |

MURRY R. ASCH, M.D - Cross

1    in our patients; correct?                                                02:01:10

2    A.    That is what I said, yes.

3            MR. NORTH:   Could we have Exhibit 567, please.

4    BY MR. NORTH:

5    Q.    Doctor, you have seen the letter that is Exhibit 567               02:01:32

6    before; correct?

7    A.    Yes.

8    Q.    And it is a letter that you yourself wrote and signed?

9    A.    Yes.

10   Q.    And it's dated March 10 of 2003; correct?                         02:01:42

11   A.    Correct.

12   Q.    And it regards the Recovery filter?

13   A.    Yes.

14   Q.    And who did you write this letter to?

15   A.    I wrote this letter to Bard at their request so that they         02:01:57

16   could use it to obtain whatever approvals were required in

17   order to conduct the study that they had initially informed me

18   they were going to conduct, a long-term safety study on this as

19   a permanent filter.

20   Q.    And when writing this letter, you knew that they -- it may        02:02:20

21   be presented to the United States Food and Drug Administration;

22   correct?

23   A.    Yes.

24           MR. NORTH:   Your Honor, at this time I would tender

25   for admission Exhibit 567.                                              02:02:31

MURRY R. ASCH, M.D - Cross

1          MR. LOPEZ:  I object.  It's hearsay, Your Honor.          02:02:35

2          THE COURT:  Your response, Mr. North?

3          MR. NORTH:  It is a letter that he wrote himself,

4     Your Honor.

5          THE COURT:  It's an out-of-court declaration.  Is          02:02:41

6     there a hearsay exception that applies?

7     BY MR. NORTH:

8     Q.   Let me ask you this, Dr. Asch.  At that time, were you

9     willing to represent to the FDA, knowing that it would be

10    presented to the FDA, that you strongly believed that the          02:02:58

11    development of the retrievable IVC filter was an important

12    advance?

13    A.   Yes, it was an important advance that needed further

14    study.

15    Q.   And you also were willing to tell the U.S. FDA that it was          02:03:12

16    a device that you needed for the treatment of patients in

17    Canada at that time correct?

18    A.   A device like that, yes.

19    Q.   And in fact, you continued during this same time period to

20    use that device for the treatment of your patients in Canada          02:03:30

21    correct?

22    A.   Yes, I did.

23    Q.   Thank you, sir.  That's all I have.

24          THE COURT:  Redirect?

25          MR. LOPEZ:  Yes, Your Honor.          02:03:39

United States District Court

MURRY R. ASCH, M.D - Redirect

**REDIRECT EXAMINATION**

BY MR. LOPEZ:

Q.    Okay.  Dr. Asch, let's look at your study -- I'm sorry.
Let's look at Exhibit 558 and if we look over on the left-hand
side of the article where it says from the Department of
Medical Imaging.  Do you see where I am?

A.    Yes.

Q.    And was this article supported in part with NMT medical
and C.R. Bard?

A.    Yes, it was.

Q.    And what does that mean?

A.    It means that they paid me for my time, any time that I
devoted to working on the study, the proposal, gathering,
follow-up information, that they paid me an hourly rate for all
the work that I did.

Q.    And this was -- actually, it was published in 2002.  Does
that mean that the work was done sometime prior to that?

A.    Yes.  So, essentially, the work started after the initial
meeting in 1999.

Q.    In fact, if you look, it says received November 14, 2001.
Do you see where I am?

A.    Yes.

Q.    And it was after that that you experienced the fracture
that caused Canadian Government and the Ethics Board to stop
the study?

United States District Court

MURRY R. ASCH, M.D - Redirect

1    A.    I believe that's correct.                                    02:05:31

2    Q.    Let's look at --

3               THE COURT:  Is this the last -- which one is it?

4               MR. LOPEZ:  It was the --

5               MR. NORTH:  I think it was the next-to-the-last.       02:05:49

6               MR. LOPEZ:  The 2005, next-to-the-last one, Your

7    Honor.

8               THE COURT:  That's 555.  The letter to the medical

9    journal.

10              MR. LOPEZ:  Yes.                                        02:05:58

11              THE COURT:  Yes.  That's 555.

12   BY MR. LOPEZ:

13   Q.    Can we put it 955 (sic).  And let's look at the last page

14   of that article, please.  And the bottom of the

15   second-to-the-last paragraph that talks about there was a        02:06:21

16   minimal degree of filter migration in the second case.  So

17   there was a second migration in the study?

18   A.    Yes.

19   Q.    Which had no clinical consequences.  And then it says:

20   Routine abdominal radiography is thus recommended for all         02:06:36

21   filter patients in order to identify filter fracture, slash,

22   migration.  Do you see that?

23   A.    Yes.

24   Q.    Mr. North didn't read that, did he?

25   A.    No.                                                         02:06:50

United States District Court

MURRY R. ASCH, M.D - Redirect

1   Q.    What does that mean, Doctor?  Why would you recommend that   02:06:50

2   for the Recovery filter based on the history that you had with

3   the Recovery filter?

4   A.    Well, again, we wanted to be sure that these patients are

5   monitored forward and complications of the filter are detected   02:07:06

6   while the patient is asymptomatic before they develop what

7   could be a lethal complication, so follow-up is important.

8   Follow-up is essential.

9   Q.    There being no clinical consequences in your study, this

10   study had an average implantation I believe of 58 days; right?   02:07:27

11   A.    Yes.

12   Q.    And do we know what would have happened in that fractured

13   piece in patient 33 had she not been monitored and that piece

14   be allowed to flow freely in her vena cava?

15   A.    Well, based on what we know since the -- those filters   02:07:44

16   have become used in standard clinical practice.  The

17   expectation is that that filter or the filter fragment would

18   have migrated to the heart with a good likelihood of killing

19   the patient.

20   Q.    This idea about asymptomatic, shouldn't doctors be   02:08:06

21   concerned that these patients could be experiencing a fracture

22   or a migration in their body if they are not being monitored

23   that an asymptomatic situation could actually be kind of a

24   silent killer?

25   A.    Exactly.   02:08:24

390

MURRY R. ASCH, M.D - Redirect

1   Q.   So the fact that something is asymptomatic should be of          02:08:25

2   concern to a company like Bard?

3   A.   Yes, very much.  It's a sign to look out for something

4   worse to happen.

5   Q.   And do you think it would be prudent if Bard would include       02:08:36

6   in their instruction for use or when their salespeople call on

7   doctors to say, "By the way, we've got an issue with fractures

8   and migrations and tilting and perforations.  We suggest that

9   you closely monitor these patients to make sure you find those

10  things before they become symptomatic"?                              02:08:54

11  A.   Yes.  Bard should have said that.

12  Q.   Now, sometime after you wrote this article in 2001 and

13  then you shared the experience of the fracture with other folks

14  in a letter to the editor where you recommend abdominal

15  radiography to deal with fractures and migrations, did you have     02:09:25

16  experiences in learning -- I'm sorry.  Did you learn things

17  about the clinical experiences of your colleagues with the

18  Recovery filter?

19  A.   Yes.  Subsequent to that most recent article I did learn

20  that from talking to other colleagues and from reading more        02:09:45

21  recent publications that as the filter usage increased around

22  the world, there were more and more complications.

23           MR. NORTH:  Your Honor, objection.  I believe this is

24  hearsay.

25           THE COURT:  Sustained.                                      02:10:03

United States District Court

MURRY R. ASCH, M.D - Redirect

BY MR. LOPEZ:                                                              02:10:03

Q.    Okay.  Now, did there come a point after your study was

over and after Bard had said that they were going to look at

the design and make some design changes to this device that you

became concerned about your own patients that had Recovery      02:10:16

filters?

A.    Yes, that's correct.

Q.    And, again, these are patients that were not in the study.

These were patients when you were in a different hospital where

other doctors were referring them to you to put in a device and  02:10:27

then these patients would go back into their health care with

other physicians to be treated; true?

A.    Yes.

Q.    And when you became concerned about some of these patients

in whom you had placed a Recovery filter after this study, did   02:10:46

you contact Bard?

A.    Yes, I did.

Q.    And what did you ask Bard to do under those circumstances?

A.    So I asked them to help me and facilitate me and my

institution in contacting all of the patients that I had placed  02:11:01

their filter into in order to follow them up and evaluate them

in the ways that I had suggested in my research project, do

abdominal radiographs, assess for the integrity and position

and try to ensure that we could get the filters out of these

patients to avoid the long-term complications, potential         02:11:20

United States District Court

MURRY R. ASCH, M.D - Redirect

1    long-term complications, because this filter had never been          02:11:24
2    tested for long-term stability.
3    Q.   So were you concerned about some of your patients that had
4    now gone out of your care and gone back into the community or
5    located somewhere elsewhere, you might not see them again?          02:11:37
6    A.   Yes, I was very concerned.
7    Q.   And did you ask Bard to help you locate these patients so
8    that you can have them in to be evaluated in case they were
9    asymptomatic and had fractures and migrations in them as a
10   result of having a Recovery filter?                                 02:11:51
11              MR. NORTH:  Objection, 402.
12              THE COURT:  Overruled.
13              THE WITNESS:  Yes, I did ask Bard for assistance in
14   locating my patients and following them up and they declined.
15   BY MR. LOPEZ:                                                       02:12:05
16   Q.   And they said no; right?
17   A.   They said no.
18   Q.   Now, let's talk about your compensation.  When you were
19   doing this study for Bard and NMT, did they compensate you for
20   that?                                                               02:12:16
21   A.   Yes.
22   Q.   Did they pay your expenses?
23   A.   Yes.
24   Q.   When you had meetings with them, did they pay for your
25   time?                                                               02:12:21

United States District Court

MURRY R. ASCH, M.D - Redirect

1   A.   Yes.                                                           02:12:22

2   Q.   And when you -- any time you spent in this study or doing

3   work for Bard, did you charge them an hourly rate just like

4   you're charging your hourly rate to be here today?

5   A.   Yes, I did.                                                    02:12:33

6   Q.   And you wouldn't have expected anything other than for

7   Bard to be -- to pay you for your services correct?

8   A.   I expect to be paid for any services as would anyone else

9   who is providing services.

10  Q.   And they did that?                                            02:12:56

11  A.   They did.

12          MR. LOPEZ:   Those are the only questions I have, Your

13  Honor, at this time.

14          THE COURT:   All right.   Thank you.   You can step

15  down.                                                              02:13:16

16          MR. LOPEZ:   Your Honor, I'm sorry.   I apologize.   I

17  have one follow-up question.

18          THE COURT:   You may not step down.   You can step back

19  up, please.

20  BY MR. LOPEZ:                                                      02:14:20

21  Q.   Dr. Asch, Mr. North asked you some questions about the

22  representation of your study in the 510(k) application.   Do you

23  recall that?

24  A.   Yes, I recall his question, yes.

25  Q.   Did they ever consult you about doing that?                   02:14:35

United States District Court

MURRY R. ASCH, M.D - Redirect

1   A.   No.                                                          02:14:37

2   Q.   Did they have your permission to represent in an FDA

3   document that your study established safety and efficacy as a

4   long-term device, as a permanent device?

5   A.   They did not request that and I would not have given that   02:14:53

6   permission.  I wrote that letter at their request with the

7   assumption that they were going to use that as we discussed in

8   the very first meeting in 1999, to use that to create a

9   long-term safety study to see how that filter functioned as a

10  permanent device.  That's why I wrote that letter, in order to  02:15:13

11  open the pathway for further study to occur.

12  Q.   Now, Dr. Asch, if they represented, Bard represented to

13  our FDA that your study established the same safety and

14  effectiveness in the Recovery device as existed in the Simon

15  Nitinol device, would that be false and misleading?            02:15:38

16  A.   Yes, it would.

17          MR. NORTH:  Objection, Your Honor.  701, 702.

18  Regulatory expert.

19          THE COURT:  Overruled.

20  BY MR. LOPEZ:                                                   02:15:49

21  Q.   I'm sorry.  Your answer, Dr. Asch?  Would that be false

22  and misleading?

23  A.   That would be false and misleading, yes.

24  Q.   Thank you, sir.

25          MR. LOPEZ:  No further questions.                       02:15:56

United States District Court

1           THE COURT:  Okay.  Thanks.                          02:15:57

2           Doctor, you can step down.

3           (Witness excused.)

4           THE COURT:  All right.  Your next witness?

5           MR. LOPEZ:  We're going to break -- I think we're   02:16:19

6    going to break into a video now, Your Honor, to kind of break

7    the ice here and show a video and give everybody a break from

8    our voices.  We have a video deposition to show.

9           THE COURT:  And that's what you want to do next?

10          MR. LOPEZ:  Yes, sir.                                02:16:32

11          THE COURT:  Okay.  Members of the jury, we're still

12   going to break at 2:30 but let me give you an instruction about

13   what you are about to see.

14          A deposition is sworn testimony of a witness taken

15   before trial.  The witness is placed under oath to tell the     02:16:54

16   truth and lawyers for each party may ask questions.  The

17   questions and answers are recorded by a court reporter or also

18   by a video recording.  And when a person is unavailable to

19   testify at trial, the deposition of that person may be used at

20   the trial.                                                      02:17:14

21          You're about to see a portion of a deposition of a

22   witness taken before the trial in this case.  Insofar as

23   possible, you should consider this deposition testimony

24   presented to you by videotape in lieu of live testimony here in

25   court in the same way as if the witness presented it here       02:17:32

| | | |
|---|---|---|
| 1 | during the trial. | 02:17:36 |
| 2 | Please do not place any significance on the behavior | |
| 3 | or tone of voice of any person reading the questions or answers | |
| 4 | if that happens in the presentation of any deposition.  And | |
| 5 | this instruction will apply not only to the video we're about | 02:17:49 |
| 6 | to see but to a number of other presentations that will be made | |
| 7 | to you during the trial of deposition testimony. | |
| 8 | All right.  You may -- which witness is this? | |
| 9 | MR. LOPEZ:  Dr. David Ciavarella. | |
| 10 | THE COURT:  All right.  So you're going to play it? | 02:18:12 |
| 11 | MS. REED ZAIC:  Yes, but I believe we have an agreed | |
| 12 | summary of the background and credentials, Your Honor, in order | |
| 13 | to save time on the tape. | |
| 14 | THE COURT:  Okay. | |
| 15 | Are you getting a copy of the background? | 02:18:54 |
| 16 | MS. REED ZAIC:  We are getting a copy of it. | |
| 17 | THE COURT:  All right.  Counsel, let me make sure we | |
| 18 | understand what you're doing. | |
| 19 | MR. LOPEZ:  Do you have a copy of the summary of his | |
| 20 | background? | 02:19:04 |
| 21 | MR. NORTH:  No.  We've never seen it. | |
| 22 | MR. LOPEZ:  We can read the background information | |
| 23 | after the video, Your Honor. | |
| 24 | THE COURT:  All right.  That's fine. | |
| 25 | MR. LOPEZ:  Let me just say he's a former medical | 02:19:12 |

1    director from Bard.  He was there from 2004 through 2008 or '9                    02:19:14

2    but he was there during the period.

3            MR. NORTH:  My only correction is he's still employed

4    there today.

5            MR. LOPEZ:  Oh.  Okay.                                                     02:19:28

6            THE COURT:  You can begin playing the deposition.

7            This should be on your screen, ladies and gentlemen

8    and you should be able to hear it.

9            (Whereupon, videotaped deposition of Dr. David

10   Ciavarella was played for the jury.)                                              02:20:52

11           THE COURT:  All right.  Let's stop the deposition at

12   this point.

13           Latches, we'll take the afternoon break.  We will

14   plan to resume at a quarter to three.  We'll excuse you at this

15   time.                                                                             02:29:46

16           (Jury departs at 2:29.)

17           THE COURT:  Counsel, let me remind you of what I said

18   in an order that came out last week.  We're not having the

19   court reporters transcribe what is being played on the

20   deposition.  So you should be sure to put in the record an                        02:30:22

21   agreed-upon statement of what portions of the depositions were

22   read so that it's clear on appeal.

23           This portion we just watched showed a document which

24   the jury has seen and it was asked about.  There's been no

25   discussion that I know of moving that into evidence.  If so,                      02:30:40

United States District Court

 1    which exhibit number.  What are your thoughts on that?          02:30:45

 2         MR. LOPEZ:  Actually, Your Honor, after your rulings,

 3    I meant to actually offer to move all of the documents that

 4    have been referenced in the depositions into evidence but we've

 5    got to give you the exhibit numbers.                            02:30:57

 6         THE COURT:  And you need to talk as well to see if

 7    there's any objection about that.  But, yeah, at that point,

 8    the jury is going to need to understand that what was just

 9    referred to as Exhibit 21 in this deposition is either

10    Exhibit 21 that's come into evidence or if it has a new number, 02:31:14

11    what the new number is.

12         So you might confer about how to do that with all the

13    depositions.

14         MR. LOPEZ:  Okay.

15         THE COURT:  I wanted to mention one thing.  You          02:31:26

16    objected several times, Mr. Lopez, to beyond the scope during

17    the cross-examination.  I overruled it.  Every time I overruled

18    it, it was because the question was going to credibility, in my

19    view, which is not beyond the scope.  That's always fair game

20    on cross-examination.                                          02:31:41

21         The last thing I wanted to mention is I have two

22    hearings at 4:30.  Do we need time to talk through the issue

23    that came up earlier today about the Simon Nitinol information

24    or can we run right up to, say, 4:20 or 4:25 and break?

25         MR. LOPEZ:  We can do that in the morning.              02:32:02

1          THE COURT:  Well, do we need to do it at some point?    02:32:04

2     If we're going to do it this afternoon, we'll need to break

3     before 4:20 probably to address it.  I'm just wondering, how

4     far we should go?

5          MR. LOPEZ:  I'm ready to address it this afternoon,     02:32:17

6     Your Honor.

7          THE COURT:  Have you all conferred about it?

8          MR. NORTH:  I still don't know what documents he's

9     talking about.

10         THE COURT:  You need to talk about it.  So let's        02:32:25

11    rather than do it, let's take this after -- let's take it up at

12    8:30 tomorrow and we'll go to 4:20 with the jury today.

13         Okay.  Thanks.

14         (Recess at 2:32; resumed at 2:47.)

15         (Jury enters at 2:47.)                                  02:47:29

16         (Court was called to order by the courtroom deputy.)

17         THE COURT:  Thank you.  Please be seated.

18         MR. LOPEZ:  Your Honor, I'm wondering if I could read

19    off the exhibit that is going to be listed in the video and let

20    the jury write down the trial exhibit number.  Would that be   02:48:20

21    possible?

22         THE COURT:  Yes.

23         Is there any objection to its admission?

24         MS. HELM:  Your Honor, we do have objection to the

25    admission of one exhibit.                                    02:48:30

                      United States District Court

1    MR. LOPEZ:  I think we took it out.  What number was    02:48:32
2    it?
3        MS. HELM:  It's Ciavarella 28, Trial Exhibit 925.
4        MR. LOPEZ:  It's part of the deposition that you
5    allowed to be played.  I don't think we're showing -- if we    02:48:56
6    do --
7        THE COURT:  Well, is this part of what was
8    designated, Ms. Helm?
9        MS. HELM:  Your Honor, the foundation for the exhibit
10   was not designated.    02:49:09
11       THE COURT:  Was there an objection made in the
12   transcript to the questions about the document?
13       MS. HELM:  No, Your Honor.
14       THE COURT:  All right.  Then I'm going to allow you
15   to play it.  What are the exhibit numbers?    02:49:20
16       MR. LOPEZ:  Exhibit 21 is Trial Exhibit 1216.
17   Exhibit 28 is Trial Exhibit 925.  Exhibit 33 is Trial Exhibit
18   991.  Exhibit 35 is Trial Exhibit 927.  Exhibit 39 is Trial
19   Exhibit 931.  And Exhibit 40 is Trial Exhibit 1221.
20       THE COURT:  1221?    02:49:53
21       MR. LOPEZ:  1221.
22       THE COURT:  And are you moving all of those into
23   evidence?
24       MR. LOPEZ:  Yes, Your Honor.
25       THE COURT:  Besides 925, is there any objection?    02:49:59

1          MS. HELM:  No, Your Honor.                                        02:50:04

2          THE COURT:  Okay.  Then those other exhibits will be

3    admitted and you can play the transcript.

4          MR. LOPEZ:  And the future transcripts, Your Honor,

5    we'll have something like this for the jury.                            02:50:11

6          THE COURT:  Okay.

7          (Exhibit Numbers 925, 927, 931, 1216, and 1221 were

8    admitted into evidence.)

9          (The deposition of Dr. Ciavarella continued to be

10   played.)                                                               02:50:37

11         MR. LOPEZ:  That concludes that deposition.

12         THE COURT:  All right.

13         Your next witness?

14         MR. LOPEZ:  At this time, plaintiff will call Alex

15   Tessmer.                                                               03:20:23

16         MR. CONDO:  Your Honor, may I be excused to bring him

17   in?

18         THE COURT:  Sure.

19         If you want to stand up, ladies and gentlemen, while

20   the witness is coming in, feel free.                                   03:20:31

21         COURTROOM DEPUTY:  Sir, if you'll please come

22   forward.  Stand right here and raise your right hand, please.

23         (ALEX TESSMER, a witness herein, was duly sworn or

24   affirmed.)

25         COURTROOM DEPUTY:  Could you spell your last name for           03:21:07

United States District Court

1    us, please.                                                           03:21:08

2              THE WITNESS:  Tessmer.  T-E-S-S-M-E-R.

3              COURTROOM DEPUTY:  Great.  Thank you.

4              Please have a seat.

5                      **DIRECT EXAMINATION**                               03:21:16

6    BY MR. LOPEZ:

7    Q.   Good afternoon.

8    A.   Good afternoon.

9    Q.   You and I have never met before; is that true?

10   A.   That's true.                                                     03:21:46

11   Q.   I know your deposition was taken but it wasn't me.

12   A.   Got it.

13   Q.   Okay.  And are you still employed by Bard?

14   A.   Yes, ma'am.

15   Q.   And what is your current position there?                         03:21:55

16   A.   Ideation Marketing Manager.

17   Q.   When you first started there, I think it was in January of

18   1997, was that right?

19   A.   That is correct.

20   Q.   And you went to the university -- you got a master's             03:22:06

21   degree in business administration at the University of Phoenix;

22   true?

23   A.   Yes.

24   Q.   And you got a degree in chemistry from ASU and at your

25   deposition, you weren't sure whether it was '96 or '97.  Which        03:22:22

                     United States District Court

ALEX TESSEMER - Direct

1   is it?                                                                03:22:25

2   A.   I think it was 1996 but I could have to look it up again.

3   Q.   So in January of 1997 you went to work for Bard Peripheral

4   Vascular here I guess it was in Tempe; right?

5   A.   Yes.                                                             03:22:40

6   Q.   And your position there was a microbiologist and you did

7   some testing?

8   A.   Yes, that is correct.

9   Q.   And then a year later you got an entry level engineering

10  position?                                                            03:22:51

11  A.   Yes.

12  Q.   And then in 2005 you left Bard for a sales position at a

13  medical device company?

14  A.   Yes.

15  Q.   And then in January of 2012 you returned to Bard in a           03:23:02

16  marketing position?

17  A.   That is correct.

18  Q.   And that's what you do now --

19  A.   Yes.

20  Q.   -- marketing?                                                   03:23:14

21           Okay.  And have you had any involvement with IVC

22  filters since you returned?

23  A.   Not with exception to the deposition.

24  Q.   Okay.  I think you may have told us earlier in your

25  deposition that you do pay attention to the sales figures?          03:23:29

United States District Court

ALEX TESSEMER - Direct

| | | |
|---|---|---|
| 1 | A.   Oh, yes. | 03:23:32 |
| 2 | Q.   Of IVC filters? | |
| 3 | A.   Well, across the board we look at all the sales figures, | |
| 4 | so I wouldn't -- I would once in a while look at the IVC filter | |
| 5 | sales, yes. | 03:23:42 |
| 6 | Q.   And what is the first time you got involved with an IVC | |
| 7 | filter that was being manufactured and sold by Bard? | |
| 8 | A.   I believe or what I can recollect from 15 years ago, | |
| 9 | sometime in, like, 2002 I believe. | |
| 10 | Q.   And what occasioned you to get involved with the Recovery | 03:24:05 |
| 11 | filter at that time? | |
| 12 | A.   So my primary purpose when I was working with the Recovery | |
| 13 | filter was manufacturing a jugular delivery system.  So a | |
| 14 | delivery system that they would approach from the jugular vein | |
| 15 | in the neck and deploy the filter.  And then I also helped the | 03:24:21 |
| 16 | team as needed with the different testing that they had, so | |
| 17 | they pulled me into some aspects of the filter with regards to | |
| 18 | testing. | |
| 19 | Q.   Now, was that testing done after the device was already on | |
| 20 | the market? | 03:24:38 |
| 21 | A.   I believe so. | |
| 22 | Q.   And so were there some issues with the performance of the | |
| 23 | device when it was on the market?  They asked you to come you | |
| 24 | in and test? | |
| 25 | A.   What I can recollect is I was pulled in I think to a | 03:24:50 |

United States District Court

ALEX TESSEMER - Direct

| | | |
|---|---|---|
| 1 | design review at one point where they wanted me -- the quality | 03:24:53 |
| 2 | person said, "Hey, we want to perform some characterization | |
| 3 | testing on the filter," and so forth and they asked me -- they | |
| 4 | needed my help to help with some of that testing and that's | |
| 5 | what I did. | 03:25:09 |
| 6 | Q.   Now, had you had any familiarity with the Recovery filter | |
| 7 | before it went on the market? | |
| 8 | A.   I had some basic knowledge of the filter that was made out | |
| 9 | of Nitinol and the design and so forth.  And plus, because I | |
| 10 | was developing the jugular delivery system, obviously, I had to | 03:25:29 |
| 11 | know the dimensions and so forth to put it within the system to | |
| 12 | deliver it using a jugular approach.  So I knew of the filter | |
| 13 | when I was developing the jugular delivery system. | |
| 14 | Q.   You were there when NMT and Bard took over or acquired | |
| 15 | NMT? | 03:25:52 |
| 16 | A.   Yeah.  I believe I was at Bard.  It's hard for me to | |
| 17 | recollect because it's 15 years ago, because I was working on | |
| 18 | stent graphs and they they pulled me over to the filter team. | |
| 19 | So I'm not sure if they had already started to bring it over | |
| 20 | from NMT or the exact time. | 03:26:10 |
| 21 | Q.   Okay.  But what you do know is that whenever it came over | |
| 22 | from NMT and before Bard marketed it, they didn't ask you to do | |
| 23 | any testing then; right? | |
| 24 | A.   Well, they asked me to do some characterization testing. | |
| 25 | I believe it was like post-market of when they launched the | 03:26:24 |

United States District Court

406

ALEX TESSEMER - Direct

1   product.

2   Q.   I meant -- it was probably my problem.  I meant before it

3   was launched.  They didn't ask you to do any testing before it

4   was launched; right?

5   A.   Not that I recall.

6   Q.   Do you recall what was called the filter franchise team?

7   A.   The filter franchise team?  Yes.

8   Q.   And were you on that team?

9   A.   I believe I was on the filter franchise team but to be

10  honest with you, you would have to put a document in front of

11  me for me to recollect exactly whether I was on that team.  I

12  mean, I was on the filter team itself.

13  Q.   And was Rob Carr the director of that team?

14  A.   Yes, he was.

15  Q.   And did you work for Rob Carr?

16  A.   Yes.  I worked for Rob Carr and I also worked for other --

17  at one point I worked for Rob Carr but then there was others

18  that took a leadership position and I worked for them who

19  worked for Rob Carr.

20  Q.   And Rob Carr was also an engineer?

21  A.   Yes, Rob Carr was an engineer.

22  Q.   But when Rob Carr came over from NMT, did he have a

23  business role as opposed to an engineering role?

24  A.   Well, he was a director of engineering so he was guiding

25  engineers I would say.  In regards to a business role, I'm not

03:26:29

03:26:41

03:27:02

03:27:17

03:27:30

03:27:51

United States District Court

ALEX TESSEMER - Direct

1    sure if he was part of R&D so he wasn't part of the sales team          03:27:55

2    so I'm not sure if I'm clear on the question.

3    Q.   Okay.  It wasn't that important.

4    A.   Okay.

5    Q.   So when you were asked to get involved with the Recovery          03:28:07

6    filter and to look at some of the testing, the Recovery filter

7    was already on the market; right?

8    A.   I believe so.

9    Q.   And was the Recovery filter experiencing some performance

10   issues that they asked you to maybe look at the testing to see          03:28:21

11   whether or not some of the testing may have been the reason for

12   these performance issues?

13   A.   I was asked specifically -- they wanted me to do some

14   characterization testing to show the differences for migration

15   for Recovery filters versus other permanent filters on the          03:28:41

16   market.  So that's what I recall.

17             MR. LOPEZ:  Excuse me one second.

18             THE WITNESS:  Sure.

19   BY MR. LOPEZ:

20   Q.   Do you remember your deposition being taken in this case          03:29:37

21   on the date June 12, 2013?

22   A.   Yes, I do.

23   Q.   You have it.  From time to time I may refer you to your

24   deposition to maybe remind you of what you may have testified

25   to almost four years ago or actually five years ago.          03:29:51

United States District Court

ALEX TESSEMER - Direct

1    A.    That's helpful, yes.                                            03:29:56

2    Q.    Okay.  So you have it there if you need it.

3          So when you were working on Recovery, Bard was in the

4    process of redesigning it, weren't they?

5    A.    When I was there, we're always trying to re-innovate    03:30:07

6    devices so part of innovation is we're always trying to make

7    the best thing, whether it's an angioplasty balloon.  So in

8    this case a filter.  So, yes, I was aware that they were trying

9    to work on a subsequent design.

10   Q.    Okay.  Well the truth is they were working on a subsequent  03:30:25

11   design because they were concerned about its current design.

12   True?

13   A.    That I do not -- that I was not made aware of.  I mean,

14   our goal at Bard is to make safe and effective devices.  So

15   they did not say, "Hey" -- I was never told as far as I'm aware  03:30:42

16   that, "Hey, we're designing a new filter because we don't have

17   one that works."

18   Q.    I mean, my question is, they just decided one day that

19   let's just look at the Recovery filter and see if we can make

20   it better or is the truth that they were having problems,    03:30:59

21   patient safety problems, with the Recovery which is why they

22   were looking at it with respect to its design?

23   A.    Yeah.  And for that particular question, I would really

24   have to defer you to Rob Carr because he was making those type

25   of decisions.  But, you know, based off my 20 years of        03:31:17

United States District Court

ALEX TESSEMER - Direct

| | |
|---|---|
| 1 | experience in medical device history, we're always innovating | 03:31:23 |
| 2 | and coming up with new designs. |
| 3 | Q.   Okay.  Let's look at Trial Exhibit 1006, please. |
| 4 | Is it up there now, Mr. Tessmer.  Do you see it? |
| 5 | A.   Yes, I do. | 03:32:00 |
| 6 | Q.   Do you see that this is a December 3, 2003 email? |
| 7 | A.   Yes. |
| 8 | Q.   And it's from Brian Hudson and you're included in this |
| 9 | email; correct? |
| 10 | A.   That is correct. | 03:32:09 |
| 11 | Q.   And the subject of this is a special design review for |
| 12 | Recovery-meeting minutes? |
| 13 | A.   Yes, that's correct. |
| 14 | Q.   So this was -- these were minutes of a meeting that you |
| 15 | attended in December of 2003? | 03:32:21 |
| 16 | A.   Yeah, that is what this email says. |
| 17 | Q.   Okay. |
| 18 | MR. LOPEZ:  Your Honor, I would like to offer this |
| 19 | into evidence at this time. |
| 20 | MR. CONDO:  No objection. | 03:32:31 |
| 21 | THE COURT:  1006 is admitted. |
| 22 | (Exhibit Number 1006 was admitted into evidence.) |
| 23 | BY MR. LOPEZ: |
| 24 | Q.   Now, the Recovery filter was on the market most of 2002. |
| 25 | Do you remember that or is that testing your memory too much? | 03:32:44 |

United States District Court

ALEX TESSEMER - Direct

1    A.   It's difficult to recall that far back so I don't know the          03:32:48

2    exact timing or dates.  But I know it was on the market at the

3    specified time right around there.

4    Q.   Let me ask you, when was the big party that they had to

5    launch the device into the open marketplace, what they call a          03:33:00

6    full market release?  When did that happen?

7    A.   I do not know.

8    Q.   If I were to tell you it was in January of 2004, that

9    wouldn't refresh your recollection?

10   A.   That does not.  I just don't recall.                               03:33:14

11   Q.   All right.  So this is special design review for

12   Recovery-meeting minutes and if we go to the memorandum that is

13   the next page --

14              THE COURT:  Do you want this displayed?

15              MR. LOPEZ:  Oh.  Yes, Your Honor.  Please display it          03:33:27

16   to the jury.

17   BY MR. LOPEZ:

18   Q.   And you'll see that your name is on this memorandum;

19   correct?

20   A.   That is correct.                                                    03:33:39

21   Q.   Now, let's look at the first paragraph and let's highlight

22   that entire paragraph, please.  This was a special design

23   review meeting that happened on December 5, 2003, to discuss

24   the Recovery filter and cone projects.  The purpose of this

25   special review was to gain further understanding related to the          03:34:02

United States District Court

ALEX TESSEMER - Direct

1   design elements of these products in anticipation of the up and        03:34:06

2   coming full market release in January of 2004.

3           Does that help refresh your recollection that the big

4   launch of the Recovery filter into the marketplace with your

5   marketing and sales was in January of 2004?                            03:34:20

6   A.   Yes, that does.  Thank you.

7   Q.   And this is that month before.  I assume plans were

8   already made with marketing and sales about how they were going

9   to come out with the Recovery filter onto the U.S. marketplace

10  sometime in January of 2004?                                           03:34:40

11  A.   I would not -- I did not know about those plans because I

12  was a lowly level engineer but I'm sure they were making some

13  sort of plans.

14  Q.   Okay.  Let's look at the note.  A special review will be

15  held prior to launch that will cover these topics.  Do you see         03:35:01

16  that, sir?

17  A.   Yes, I do.

18  Q.   Let's look at what the topics are.  The next paragraph

19  down.  The elements that were reviewed during the meeting and

20  outlined in an earlier memorandum entitled "Special Design             03:35:14

21  Review for Recovery filter Objectives" dated December 4, 2003.

22  As defined in the previous memorandum, the level of review was

23  based upon the degree of risk obtained from the Design Failure

24  Modes and Effect Analysis, DFMEA, for the Recovery filter.

25          Did I read that correctly?                                     03:35:40

United States District Court

ALEX TESSEMER - Direct

1    A.   That is correct.                                                        03:35:41

2    Q.   What is a DFMEA, do you know?

3    A.   Design Failure Modes and Effects Analysis.

4    Q.   And so they had had a report regarding the degree of risk

5    after having that report run.  Is that what that says?           03:35:52

6    A.   So the DFMEA is part of the overall design process to

7    understand the risks, the inherent risks, of what would could

8    go wrong with a medical device.

9    Q.   So let's look at what happened at this meeting, the

10   following action items that resulted from the meeting.  Let's    03:36:15

11   look at number one.  There was -- it says related to the issue

12   of deployment force.  Do you see that?

13   A.   Yes.

14   Q.   And that is an issue with the delivery device.  Would that

15   be an issue with the delivery device?                             03:36:32

16   A.   Yes.  So the deployment force, I would conclude from this

17   it would be from the delivery device.

18   Q.   And then let's go down to number three, please, on this

19   page.

20        MR. LOPEZ:  Can you highlight that, Greg, please.          03:36:45

21   Q.   Related to the issue of migration, the review team would

22   like to see objective evidence of the following elements:  A,

23   documentation that explains the establishment of the 50

24   millimeter mercury acceptance criteria for migration

25   resistance.                                                       03:37:05

United States District Court

413

ALEX TESSEMER - Direct

1      Correct?                                                        03:37:07

2   A.   Correct.

3   Q.   Why did they need that in December of 2003?

4   A.   I do not recall why they were -- needed that because we

5   had -- that came from the 50 millimeters of mercury is, if I     03:37:17

6   recall correctly, came from NMT.

7   Q.   So somebody was questioning the validity of that criteria?

8   A.   It sounds like it from this document from what I'm reading

9   here.

10  Q.   Could it be because by that time, there had already been    03:37:36

11  four clinically significant migrations of this device both

12  caudally and cranially before full market release?

13  A.   I did not have -- I don't know about that but, you know,

14  for this particular document, what I'm reading in front of me,

15  it's just telling me that -- but I didn't know what you're       03:37:57

16  talking about now, I don't recall that.

17  Q.   All right.  We'll look at more documents here in a bit.

18       Please go to page two, B.  And this is an action

19  item; right?  And this is the one relating to migration.

20  Looking back at the page before to see objective evidence of     03:38:25

21  the following elements, B is a migration resistance study that

22  analyzes the performance of the Recovery filter in conjunction

23  with tilting and quality of legs/hooks.

24       Did I read that correctly?

25  A.   Correct, yes.                                                03:38:43

United States District Court

ALEX TESSEMER - Direct

1        THE COURT:  Not quite.  You said quality instead of      03:38:44

2   quantity.

3        MR. LOPEZ:  You're right.  I did.  Quantity of legs

4   and, slash, hooks.

5        THE WITNESS:  Correct.                                    03:38:54

6        MR. LOPEZ:  With that correction.

7        Thank you, Your Honor.

8   BY MR. LOPEZ:

9   Q.   And they didn't tell you that at this meeting that they

10  needed to look at that because they already had reports before  03:39:02

11  full market release that there were issues with tilting and

12  they were concerned about the legs and the hooks of the

13  Recovery filter?

14  A.   I don't recall that from this particular meeting that they

15  told me that.                                                   03:39:15

16  Q.   And they also wanted to do a migration resistance, number

17  C, Greg, study that compares the Recovery filter to competitive

18  products, for example Greenfield.

19        Did I read that correctly?

20  A.   Correct.                                                   03:39:34

21  Q.   And they wanted to do a radio force study that compares

22  the Recovery filter to competitive products.  Another example

23  would be Greenfield; correct?

24  A.   Yes, that's correct.

25  Q.   And F, migration resistance study that analyzes the       03:39:44

United States District Court

ALEX TESSEMER - Direct

1   performance of the Recovery filter in conjunction with oval          03:39:50

2   and, slash, or, D-shaped IVC tracks, paren, and transitions

3   between these configurations, end paren.

4          Did I read that correctly?

5   A.   Yes, you did.                                                    03:40:05

6   Q.   Are we talking about the environment of use there, the

7   distensibility and the dynamics of where this is device is

8   being implanted?

9   A.   I think for this particular thing with the D-shaped and

10  the oval, they were thinking about the various ways that            03:40:18

11  anatomy could present itself.

12  Q.   In other words, they weren't talking about PVC pipe and

13  sausage casing any more as a standard to see how it would work

14  in a human being.  They were actually talking about something

15  that more closely mimicked what was in the human body; true?       03:40:34

16  A.   Well, for this particular, what they were talking about,

17  or what I recollect, is they wanted to create this D-shaped and

18  oval shaped tubing and then put sausage casing in it to

19  experiment with these filters.

20  Q.   And then five related to the issue of hook dimensions, the     03:40:52

21  review team would like to see objective evidence in regards to

22  the design input history of the hook dimensions.

23         Did I read that correctly?

24  A.   You read that correctly.

25  Q.   So when you were at this meeting, no one said to you while     03:41:17

United States District Court

ALEX TESSEMER - Direct

1   you were there that we need to do all this because we have some          03:41:19
2   performance and safety issues that relate to the Recovery
3   filter before the full --
4   A.   To be quite honest, it has been 15 years so I do not
5   recall.                                                                  03:41:31
6   Q.   Okay.  Now, eventually, they asked you to do some testing;
7   right?
8   A.   That is correct.
9   Q.   I would like you to look at what has previously been
10  marked as Trial Exhibit 2059.  This is called a project status          03:42:12
11  report.  Do you see that, sir?
12  A.   Yes.
13  Q.   And this involves, if you look at project milestones -- do
14  you see where I am there, project milestones?
15  A.   Yes, I see this.                                                    03:43:21
16  Q.   And by the way, you're on this as a project member.  Do
17  you see that where it says Alex Tessmer?
18  A.   Yes, I do.
19  Q.   So you would have gotten a copy of this, sir?
20  A.   I think I should have gotten a copy of it if my name is on          03:43:30
21  it.
22           MR. LOPEZ:  I would like to offer this into evidence
23  at this time, Your Honor.
24           MR. CONDO:  No objection.
25           (Exhibit Number 2059 was admitted into evidence.)              03:43:39

ALEX TESSEMER - Direct

1        THE COURT:  Admitted.                                      03:43:39

2   BY MR. LOPEZ:

3   Q.   Okay.  Before we go to project milestones, this also --

4        MR. LOPEZ:  If you go to the box above that, Greg,

5   and to the left.                                               03:43:51

6        MS. REED ZAIC:  Do you want this published,

7   Mr. Lopez?

8        MR. LOPEZ:  I do.  I'll get this right, Your Honor.

9   By tomorrow I'll --

10       THE COURT:  You've used your nine warnings from me.       03:44:09

11       MR. LOPEZ:  In other words, you've helped me for last

12  time.

13  BY MR. LOPEZ:

14  Q.   So this -- again, this is -- the launch date is January

15  26, 2004.  There's no question about that; right?  We've seen  03:44:19

16  two documents that say that.

17  A.   When was this document dated?

18  Q.   If you go down to the bottom of the page, you'll see that

19  it's dated October 27, 2003.

20  A.   Okay.  Because what it's saying right here is original    03:44:42

21  date for the launch is the 26th and the latest best estimate is

22  the 26th.

23       So it could be that date could be changed again.  I'm

24  not sure.

25  Q.   Okay.                                                     03:45:00

United States District Court

ALEX TESSEMER - Direct

1   A.   But this is -- because it was dated in 2003, that's the          03:45:00

2   latest best estimate.

3   Q.   All right.  Now, let's go down to the -- just that whole

4   section all the way across the page from milestones through

5   items impacting target, slash, LBE dates.                            03:45:17

6           Now, sir, they are already talking about redesigning

7   this device in October of 2003.  Do you see that?  Choose

8   redesign.

9   A.   Yes.

10  Q.   I mean, this thing is not launched yet and they are            03:45:40

11  talking about the fact that we ought to look at redesigning it.

12  Isn't that true?

13  A.   Yeah, that's what it appears by this document.

14  Q.   Let me tell you, when the sales force went out with the

15  Recovery filter, did they tell doctors or put in the brochure,      03:45:53

16  "Here's our Recovery filter; but what you should know is we're

17  redesigning it to deal with some of our design issues that

18  we've experienced before full market release."

19          Did that happen?

20  A.   I'm not sure what the sales force was told, to be honest        03:46:07

21  with you.

22  Q.   Okay.  Can I have 2061, please.

23          Sir, looking at Exhibit 2061, this is an email from

24  you dated February 4, 2004; right?

25  A.   That is correct.                                                03:46:41

United States District Court

ALEX TESSEMER - Direct

1   Q.   I think the date on the last document for full market

2   release was January 24.  So if 31 days in January, so this is

3   11 days later; right?

4   A.   Yes.

5   Q.   And they are talking about -- you are writing an email to

6   everyone who is on this email about updated filter migration

7   flow loop test fixture; true?

8   A.   From what I read here, yes, that's true.

9          MR. LOPEZ:  Your Honor, I would like to offer this

10  into evidence and have the jury -- have it be displayed to the

11  jury.

12         MR. CONDO:  No objection.

13         THE COURT:  Admitted.  And you may display it.

14         (Exhibit Number 2061 was admitted into evidence.)

15  BY MR. LOPEZ:

16  Q.   And, sir, if you look down at your message to everyone --

17  and by the way, before we do that, there are other people on

18  here at Bard.  There's Brian Hudson, I think was he also in

19  engineering or R&D?

20  A.   Yeah, Brian Hudson was a quality engineer.

21  Q.   And then Robert Carr who we've heard about today.

22  A.   He was my boss.

23  Q.   And what you've done looks like ten days after this device

24  is in full market release, you're talking about doing a

25  critical test to determine the pressure of when inferior vena

03:46:42

03:46:54

03:47:17

03:47:27

03:47:40

03:48:00

United States District Court

ALEX TESSEMER - Direct

1    cava filters migrate; true?                                    03:48:05

2    A.    I'm talking about, yeah, fixture that is a critical test

3    to determine the pressure of when inferior vena cava filters

4    migrate.

5    Q.    But even by then, no one told you they were having to look   03:48:24

6    at these tests because in 2003 they had experienced a migration

7    just like they had seen in the Asch report and that they

8    actually had three or four other migrations of this filter?

9    A.    So I don't recall whether they talked about these

10   migrations or not.  What I recall is, I was pulled into the     03:48:41

11   team to the characterize our filter in comparison with some of

12   the other filters.

13   Q.    Okay.  Let's look at those.

14   A.    Sure.

15   Q.    2063, please.  Again, this is from you -- by the way, why   03:48:57

16   are these from you?  Why are these emails from you?  Are you

17   conducting these tests?

18   A.    So I'm the -- so, basically, I was assigned by Rob to

19   help.  They needed to pull me in to perform some of these

20   testing.  So, obviously, as I stated, before my main goal was   03:49:25

21   this jugular delivery system I was creating.  So they put me in

22   to help out with testing and I had some technicians that worked

23   underneath me that actually performed the tests themselves.

24   But they pulled me to in take documentation from NMT to kind of

25   re-create some of the migration testing they did there and      03:49:48

United States District Court

ALEX TESSEMER - Direct

1   repeat it, you know, at our facility at Bard.                           03:49:52

2   Q.   Okay.  And was there a concern about maybe the results

3   from the testing at NMT that maybe there were some false

4   readings or results that maybe weren't accurate?

5   A.   At NMT, what I recall from documentation I've seen,           03:50:12

6   because of this trial, they passed everything with flying

7   colors.

8   Q.   Okay.  So let's look at the testing that was run and this

9   was reason on February 25, 2004.  This is almost precisely a

10  month after full market release; correct, sir?                    03:50:34

11  A.   So this date right here, are you asking me about the email

12  that was on 2-25-2004?

13  Q.   We can just go on to the next page.  This is like a month

14  later; right?  That's all I wanted to know, a month after full

15  market release?                                                   03:50:51

16  A.   This page.  Yeah, this is probably a month after,

17  approximately, after the launch.

18  Q.   Let's look -- so you ran these tests; right?

19  A.   My technicians did the tests but I reported on them.

20  Q.   Tell us about the tests.  What was the purpose of this       03:51:07

21  particular test?

22  A.   I need to actually see the document because -- is this the

23  comparison test where we did the one between other filters?

24  Q.   Let's go to the next page, please.  Maybe this will help

25  refresh your recollection.  Does that help or do you need to      03:51:33

United States District Court

ALEX TESSEMER - Direct

| | | |
|---|---|---|
| 1 | see more pages of it? | 03:51:36 |
| 2 | MR. LOPEZ:  Keep going there, Greg.  If you zoom | |
| 3 | in -- go to the next page, the next page.  Next page.  There | |
| 4 | you go. | |
| 5 | BY MR. LOPEZ: | 03:51:51 |
| 6 | Q.   Does that help refresh your recollection that this was a | |
| 7 | study to see how you stacked up against your competitors when | |
| 8 | it came to migration resistance? | |
| 9 | A.   It appears so.  I don't know if all the results are on | |
| 10 | these pages, though. | 03:52:04 |
| 11 | Q.   Well, let's find out.  Let's go back to the first page. | |
| 12 | Actually, the second page of the exhibit where we have some of | |
| 13 | the results.  Before we get into that, we'll talk about it a | |
| 14 | little bit. | |
| 15 | MR. LOPEZ:  I would like to offer 2063 into evidence, | 03:52:22 |
| 16 | Your Honor. | |
| 17 | MR. CONDO:  No objection. | |
| 18 | THE COURT:  Admitted. | |
| 19 | (Exhibit Number 2063 was admitted into evidence.) | |
| 20 | MR. LOPEZ:  And I would like to have it published to | 03:52:32 |
| 21 | the jury. | |
| 22 | THE COURT:  You may. | |
| 23 | BY MR. LOPEZ: | |
| 24 | Q.   Okay.  Let's look at -- | |
| 25 | MR. LOPEZ:  If you can blow it up just so we can | 03:52:38 |

United States District Court

ALEX TESSEMER - Direct

1   actually see it on the screen, just that top half.  There we          03:52:40
2   go.
3   Q.   Now, RF is the sample.  What does RF stand for in this
4   test?
5   A.   I would assume that would stand for Recovery filter.           03:52:52
6   Q.   Okay.  And there were -- if you go all the way down to the
7   bottom of the page, you don't have to move off the screen.
8   Well, you do.  You don't have a hard copy.  If you can move it
9   down to the bottom of the screen, you'll see that there are,
10  what, 20 samples of Recovery filter that were run?               03:53:07
11  A.   That appears to be correct, yes.
12  Q.   And then if we can go back to the top -- by the way, was
13  there anything wrong with your equipment that day?
14  A.   I would have to see the whole full report.
15  Q.   Well, if there was a problem, you would have put that in a    03:53:26
16  report somewhere; right?
17  A.   Yeah.  I would put something in the report most likely,
18  yes.
19  Q.   And these are the results of -- let's look at the first
20  ten samples of the Recovery filter and I note there are run      03:53:42
21  one, two and three.  Does that mean the same device was
22  challenged three different times?
23  A.   That is correct.
24  Q.   And if you look at -- by the way, was the company still
25  using 50 millimeters of mercury as the safety threshold for      03:53:58

United States District Court

ALEX TESSEMER - Direct

1  migration at this time?                                                        03:54:03

2  A.   So depending on what testing we were doing, we would have

3  acceptance criteria or not.  For our design verification and

4  validation qualification that we did, all our filters tested

5  above that acceptance criteria, 50 millimeters of mercury, and   03:54:19

6  we did what is called characterization testing.

7           So from this document that I'm seeing right here, I'm

8  not sure which exact characterization testing was done, whether

9  this was filters that were repeatedly used or, you know, bent

10 up or out of shape but so -- does that answer your question?    03:54:39

11 Q.   Well, kind of.  But you threw something in that's not in

12 this exhibit.  You're talking about whether or not they were

13 bad filters, whether or not they were used again.  If that

14 happens, wouldn't an engineer who was paying close attention to

15 what he was doing actually record that somewhere?               03:54:55

16 A.   Yeah.  We record that in the engineering report.

17 Q.   Okay.  Was there any such report of that happening in this

18 test, that there were problems with the filters?

19 A.   Well, you would have to show me the entire engineering

20 document because all you're showing me is a data table, so I    03:55:11

21 have no idea what report this is coming from or what I'm

22 exactly testing, if that makes sense.

23 Q.   Let's just look at the results right now of this testing.

24 A.   Sure.

25 Q.   In the first 10 filters that were challenged a total of 30  03:55:23

ALEX TESSEMER - Direct

1    times, what was the average migration resistance of those 10          03:55:31

2    filters?

3              MR. LOPEZ:  Greg, can you go over to the right-hand

4    side?

5              THE WITNESS:  The average, I see it right here, 45.2        03:55:43

6    millimeters of mercury.

7    BY MR. LOPEZ:

8    Q.   That is below 50, isn't it?

9    A.   That is below 50.

10   Q.   It's below 80 for sure.                                         03:55:53

11   A.   It is below 80.

12   Q.   And you actually record -- by the way, before I go any

13   further, what's 37 plus or minus two?

14   A.   That is the temperature at which the test was tested.

15   Q.   Is that -- what's the Fahrenheit?                               03:56:07

16   A.   That would be approximately 98.6 degrees Fahrenheit.

17   Q.   And the size of the diameter of the tubing was 28

18   millimeters?

19   A.   That is correct, 28 millimeters.

20   Q.   The indicated diameter for Recovery filters?                    03:56:22

21   A.   That is correct, 28 millimeters.

22   Q.   And if you look at some of these results, a lot of them

23   are under 50; right?  There's a -- there's some forties,

24   there's some 32s, 30s, 40s.  I mean, most of these are under

25   50?                                                                  03:56:44

ALEX TESSEMER - Direct

1   A.   Yes, that's correct.                                      03:56:48

2   Q.   And then if you go down -- then we took another ten

3   filters, right, in the next set down on this page.

4            Did you share this with everybody by the way, the

5   results of these tests?                                        03:57:11

6   A.   Yeah.  I mean, the tests would be shared with -- to Rob

7   Carr and the other people, yeah.

8   Q.   Did you have a meeting to discuss these findings?

9   A.   I can't recollect if we had a meeting specifically about

10  this document from 15 years ago but we could have.            03:57:26

11  Q.   And this was done at Bard, right, these tests?

12  A.   I believe this was done at Bard.

13  Q.   Okay.  If we look at the next group, we see that while the

14  average was 51.5 for this next ten samples of Recovery filter,

15  we still see a number of runs, whether it be the first run or  03:57:59

16  the third run, that are under 50, in the forties and thirties,

17  don't we?

18  A.   Yes, we do.

19  Q.   You just had a couple high ones in there that brought the

20  average over 51.5; right?                                      03:58:18

21  A.   Yes.

22  Q.   But you happened to get one of the filters that had the

23  43.4, another a device that was being sold that was below your

24  minimum 50 millimeters of mercury threshold; true?

25  A.   Or if these were the manufactured filters from the line,  03:58:38

United States District Court

ALEX TESSEMER - Direct

| | |
|---|---|
| 1 | then, yes, but I'm not -- again, because you haven't shown me | 03:58:43 |
| 2 | the whole report, was this an experiment we ran on different |
| 3 | types of filters?  I mean, do you know what I'm saying?  We ran |
| 4 | various experiments.  So were we testing parameters, the |
| 5 | osinite, martensite, (phonetic) you know, doing some things. | 03:58:59 |
| 6 | So I'm not clear what this actually is. |
| 7 | Q.   Okay.  Let me remind you, the first page of this, the |
| 8 | subject is filter migration test results; right? |
| 9 | A.   Yeah.  That's exactly what it says but I don't know what |
| 10 | these samples are from this document. | 03:59:20 |
| 11 | Q.   You don't think they are from Bard's filters?  You didn't |
| 12 | make these yourself, did you, and bring them from home? |
| 13 | A.   No.  No.  But what I'm saying is, I don't know what these |
| 14 | were.  Were these a ranging study that were performing with |
| 15 | different parameters and so forth.  So that is what I'm trying | 03:59:37 |
| 16 | to communicate. |
| 17 | Q.   Sounds to me like they were migration resistance tests. |
| 18 | A.   Well, it was definitely a migration resistance test.  I'm |
| 19 | just wondering, did these actually come from the manufacturing |
| 20 | line or was this some type of side experiment we were running? | 03:59:52 |
| 21 | From this document I don't know. |
| 22 | Q.   You know, I'm going to let Mr. Condo worry about that |
| 23 | part, okay? |
| 24 | A.   Okay. |
| 25 | Q.   Let's go to the second page because this is what was given | 04:00:01 |

United States District Court

428

ALEX TESSEMER - Direct

| 1 | to us about these tests; all right?  So let's look at the | 04:00:07 |

1  to us about these tests; all right?  So let's look at the          04:00:07
2  second page.  What does SF stand for?
3  A.   I would imagine that would mean Simon Nitinol filter.
4  Q.   Okay. and the Simon Nitinol filter was another device that
5  was being sold by Bard?                                             04:00:25
6  A.   That is correct.
7  Q.   And you wanted to see how the migration resistance, at
8  least on the bench with the new protocol you had for this
9  testing, stacked up against the Simon Nitinol filter; correct?
10 A.   Yes, that is correct.                                          04:00:40
11 Q.   Let's see how it stacked up against the Simon Nitinol
12 filter.  We did -- you did ten runs -- I mean, ten filters,
13 three runs.  Do you see that, sir?
14 A.   Yes.
15 Q.   And the average was 76.3; correct?                             04:00:53
16 A.   That is correct.
17 Q.   Almost 30 points higher than the first run of the Recovery
18 filter; right?
19 A.   That is correct.
20 Q.   And if we go down to the next five samples of the Simon       04:01:07
21 Nitinol filter, the migration resistance in 40 degrees -- I'm
22 sorry, I should have pointed out in the last one of the reason
23 these are separated is because one is at normal body
24 temperature and the one below is if you have a higher body
25 temperature; true?                                                  04:01:26

ALEX TESSEMER - Direct

1   A.   That is true.                                                        04:01:27

2   Q.   Thank you.  And the average in a higher body temperature

3   for the Simon Nitinol filter was 89.1?

4   A.   That is correct.

5   Q.   All right.  Now let's go to the next page.  Actually,              04:01:36

6   there's -- there were ten in that group.  It's just that it

7   spills over to the next page.  Let me just show him that.

8              Do you see, that sir?

9   A.   Yes, I do.  Thank you.

10  Q.   Now, let's go to the next page.  And what does VT stand            04:01:53

11  for?

12  A.   That I'm not sure.  I think there was one maybe called the

13  VenaTech but I would have to look back at the report.

14  Q.   All right.  Let me ask you -- you're not sure, is that

15  what you just said?                                                     04:02:12

16  A.   Yeah, because I can't remember the acronym VT.  There was

17  a Tulip and there was another type of device so I'm trying to

18  remember which one this was.

19  Q.   Let me ask you this:  You were presented with this exhibit

20  at your deposition.  Do you remember this?                             04:02:26

21  A.   I did not see it in this form that I recall.  Oh, at my

22  deposition?

23  Q.   Yes, at your deposition.

24  A.   Okay.

25  Q.   And you knew that you were going to be asked about this           04:02:37

United States District Court

1    document in this trial in front of this jury; true?          04:02:38

2              MR. CONDO:  Objection, Your Honor.  Argumentative.

3              THE COURT:  Overruled.

4              THE WITNESS:  I had my deposition, yeah, but I did

5    not have a chance to go through my entire deposition prior to    04:02:51

6    this.

7    BY MR. LOPEZ:

8    Q.   So, in other words, to be prepared to come here in front

9    of this jury to talk about important issues that relate to the

10   testing of the Recovery filter, you didn't go back and look at   04:03:02

11   this test to see whether or not you could tell us what VT stand

12   for?

13   A.   I don't know what it stands for.

14   Q.   It might stand for VenaTech.  Let's assume it does for the

15   moment.                                                          04:03:17

16   A.   Okay.

17   Q.   Let's look at the result of the migration resistance

18   testing for the VenaTech, a competitor of the Recovery filter;

19   correct?

20   A.   That is correct.                                            04:03:27

21   Q.   And what was the average score for migration resistance

22   testing of the VenaTech?

23   A.   84.5 millimeters of mercury.

24   Q.   And by the way, this wasn't VenaTech's company giving you

25   their test results.  This was you running tests on the          04:03:40

ALEX TESSEMER - Direct

1   VenaTech; right?                                                      04:03:44

2   A.    That is correct.

3   Q.    Next page, please.  GS1, can you tell us what that stands

4   for?

5   A.    Maybe the Greenfield Stainless.                                 04:04:05

6   Q.    Okay.  Let's just assume it's the Greenfield for the

7   moment.  Another competitor device of the Recovery and the

8   Simon Nitinol filter.  True?

9   A.    True.

10  Q.    In fact, the Greenfield was a predicate device that Bard        04:04:18

11  used to get 510(k) clearance of its Recovery, isn't it?

12  A.    I do not recall.

13  Q.    Okay.  But let's assuming it was.  Let's assume that the

14  Greenfield -- that the Recovery filter had to be substantially

15  equivalent from a migration resistance standpoint to the            04:04:36

16  Greenfield filter.  Does this test show that it is not

17  substantially equivalent at least from this test to the

18  Recovery filter?

19  A.    So from this test from a migration resistance, it appears

20  that it's a higher average number than the Recovery filter, but     04:04:54

21  I'm not sure how it statistically stacks up with the

22  statistical significance.  One thing with this test is you

23  notice it has a high range.  You can see 59 to 112, so it could

24  be statistically equivalent.  I'm not sure.

25  Q.    Are you saying the results of this test have no meaning at     04:05:16

United States District Court

ALEX TESSEMER - Direct

| | | |
|---|---|---|
| 1 | all that we should just ignore them? | 04:05:20 |
| 2 | A.   Oh, No.  I'm not saying that at all.  I'm just saying I | |
| 3 | don't know what the statistical significance is; but the | |
| 4 | average in this test, as we talked about, is greater than the | |
| 5 | Recovery filter, correct. | 04:05:33 |
| 6 | Q.   Let's look at the next page, please, and GT, do you think | |
| 7 | that means Günther Tulip? | |
| 8 | A.   Yes, I believe it doe s. | |
| 9 | Q.   It's a retrievable device, right, sold by Cook? | |
| 10 | A.   That is correct, yeah. | 04:05:47 |
| 11 | Q.   And a competitor of the Recovery filter? | |
| 12 | A.   Correct, a competitor. | |
| 13 | Q.   And what are the results of the tests that you ran on the | |
| 14 | Günther Tulip in February in 2004? | |
| 15 | A.   It shows here that it was 110 millimeters of mercury. | 04:06:04 |
| 16 | Q.   And then 89.6 was the average; right? | |
| 17 | A.   That is correct. | |
| 18 | Q.   Next page.  TP.  What is TP? | |
| 19 | A.   Oh, that's a TRAPEASE. | |
| 20 | Q.   So TRAPEASE still on the market? | 04:06:25 |
| 21 | A.   I believe so. | |
| 22 | Q.   And it looks like the Recovery is pretty close to the trap | |
| 23 | piece as far as migration resistance; right? | |
| 24 | A.   That is correct. | |
| 25 | Q.   Is the TRAPEASE a retrievable device? | 04:06:42 |

United States District Court

ALEX TESSEMER - Direct

1    A.    The TRAPEASE is not a retrievable device.   It's a          04:06:45

2    permanent filter.

3    Q.    And is it indicated for a vena cava size as large as 28

4    millimeters?   Do you know?

5    A.    I do not know.                                                04:06:59

6    Q.    And then the next page, T, what does that stand for?

7    A.    I do not recollect.

8    Q.    Well, let's find out from another means.   This is another

9    competitor; right?

10   A.    I would think so.                                            04:07:21

11   Q.    And then the average migration resistance for this test

12   that you ran on this competitive product was 122 average

13   millimeters of mercury; correct?

14   A.    That is correct.

15   Q.    And then the next page, O, I'm going to take a wild guess    04:07:31

16   and say that's OptEase?

17   A.    I believe you would be correct.

18   Q.    And that is a retrievable filter; true?

19   A.    That is correct.

20   Q.    And the average migration resistance of the OptEase was      04:07:44

21   136.6; correct?

22   A.    That is correct.

23   Q.    When you share these results with Rob Carr and others, do

24   you recall whether any of them expressed some concern about

25   these comparative results?                                         04:08:04

United States District Court

ALEX TESSEMER - Direct

1  A.   I don't recall because it was 15 years ago.  But certainly     04:08:07

2  there would be discussion about these results.

3  Q.   I know there's other tests we're going to go through and

4  there's issues in this case; but just based on that bench

5  testing alone, would it be appropriate for Bard to tell doctors     04:08:23

6  that their device was performing just like every other device

7  on the market from the standpoint of migration, no better, no

8  worse?

9          MR. CONDO:  Objection, Your Honor.  There's no

10  foundation.  He doesn't know what these tests were.     04:08:41

11          THE COURT:  Sustained on foundation.  I think you

12  need to lay foundation about marketing statements.

13          MR. LOPEZ:  I'll move on, Your Honor.

14          Can we look at Exhibit 1369?

15  BY MR. LOPEZ:     04:09:02

16  Q.   Before we do that, the results of those tests that we just

17  saw were passed on to Mr. Chanduszko, Mr. Carr, and Mr. Hudson;

18  correct?

19  A.   That was at the previous email I sent you showed me.

20  Q.   If you need to be remind -- refreshed, you can look at     04:09:17

21  page 148, page 20 of your deposition.

22  A.   What line?

23  Q.   148, line 20 through 22.  I'm having you do that because I

24  want to make sure that we know who you sent the test to.

25  A.   Yes.  So I'm not sure if it's -- this is referring to that     04:09:59

ALEX TESSEMER - Direct

1   document there but I would certainly, you know, typically send    04:10:04

2   these results to Brian Hudson and Rob Carr.

3   Q.   Okay.   And how about Mr. Chanduszko?

4   A.   He would probably be included as well I would think but

5   definitely Rob Carr, my superior, and then Brian Hudson.   I'm    04:10:19

6   not sure if Andre saw all of these results or not.

7   Q.   Well, after the results of this test, did you or did

8   anyone say, "Well, we ought to look into this more thoroughly

9   and decide whether or not we ought to reconsider having this

10  filter on the market until we can figure out whether or not      04:10:40

11  these tests are valid"?   Did anyone say that?

12  A.   So, you know, I don't recall the exact specifics of what

13  this testing was and what exactly those were, those filters,

14  but we would certainly discuss any of these items and, you

15  know, we always want to have a safe and effective device.   But,  04:10:59

16  again, I was a testing person, so a lot of those conversations

17  I would default to Rob Carr.

18  Q.   Let me ask you this question:   Can you think of anything

19  as you sit here today, based on your memory or based on

20  anything you may have reviewed before you came here to testify,   04:11:18

21  that you think would invalidate the results of the test results

22  we just went through?

23  A.   That could invalidate these results?

24  Q.   Right.

25  A.   Well, if these filters were not -- if this was an           04:11:32

United States District Court

ALEX TESSEMER - Direct

1   experiment that we were testing out at different -- you know, a          04:11:35

2   whole different filter design, then that would invalidate all

3   of these because these weren't the manufactured filters that we

4   put out there, if that makes sense.

5   Q.   Do you know today whether or not that's the case, that             04:11:47

6   they were not, you know, manufactured?

7   A.   Yes.  So for this particular set of samples, you know,

8   because I don't have the engineering report right here to look

9   at, I don't know what those came from.  That's all I'm saying.

10  I'm just trying to be honest about that.  I don't know --              04:12:04

11  because we performed experiments, right.  And sometimes we

12  would tweak different parameters to find out how the filter

13  would behave.

14       I don't know if this was an experiment to try out

15  different things.  Was this an actual filter that we sent to          04:12:17

16  the market is what I'm saying.  You know, that is questionable

17  because I don't --

18  Q.   Is Mr. Condo going to surprise me with a document that

19  explains all that?

20       MR. CONDO:  Objection.                                            04:12:34

21       THE COURT:  Sustained.

22       MR. NORTH:  Move to strike the question, please.

23       THE COURT:  There's no answer.  Questions are not

24  evidence.

25       MR. CONDO:  Thank you, Your Honor.                               04:12:41

United States District Court

ALEX TESSEMER - Direct

BY MR. LOPEZ:                                                    04:12:43

Q.   If you're trying to see how you stack up against

competitors, you don't think you would, like, try to find the

best possible samples you could possibly find to run those

tests?                                                          04:12:54

A.   What I'm saying is I don't know if this was a ranging

study that wasn't the final design of the product.  That's all

I'm saying.  That's why I'm -- it would be great to see the

report in context to see what these filters were exactly, how

they were manufactured and were they the ones that we actually  04:13:10

sent out into market.

Q.   Well, how about the competitive products?  Aren't those

products that were actually being sold by those companies?

A.   That is correct.

Q.   And you went out and actually got real devices that were  04:13:25

being sold by the company; right?

A.   Yeah.  We would go out and get competitive samples because

we wanted to test and see how we compared.

Q.   And don't you think that the appropriate protocol for a

test like that would be for you to use a similar sampling from  04:13:41

the Recovery filter?  In other words, the filters that you

would actually be selling and maybe even boxed?

A.   So, again, I just don't know where these samples came

from.

Q.   I understand but don't you think from the standpoint --    04:13:55

United States District Court

ALEX TESSEMER - Direct

1    just as an engineer.  I know you probably don't remember doing                04:13:58

2    these steps.  But you went out and got competitive samples --

3    A.    Correct.

4    Q.    -- of devices that were really being sold.

5          In order to get a fair comparison, don't you think                     04:14:06

6    that the Recovery samples should have also been devices that

7    were really being sold at the time?

8          MR. CONDO:  Again, objection.  There's no foundation.

9    He's testified several times.

10         THE COURT:  Overruled.                                                  04:14:18

11         THE WITNESS:  So I think there's other studies, too,

12   that we did a comparison study that was different from this and

13   that is why I'm having trouble here.

14   BY MR. LOPEZ:

15   Q.    All right.  I'm just going to move on.  Do we have 1369 up             04:14:38

16   there, going?

17         MR. WOODY:  Yes.

18         THE COURT:  Thank you.

19   BY MR. LOPEZ:

20   Q.    1369 is now we're in March 24, 2004.  Do you see that?                 04:14:47

21   A.    Yes, I do.

22   Q.    And that -- this is another memo from you?

23   A.    That's correct.

24   Q.    To Rob Carr, Brian Hudson, Charlie Benware, and Ed

25   Fitzpatrick; correct?                                                        04:15:11

ALEX TESSEMER - Direct

1    A.    That's correct.                                                          04:15:13

2    Q.    And these relate to Starguide filter migration test

3    results.   Do you see that, sir?

4    A.    Yes, I do.

5    Q.    And is this a document you were able to review before you    04:15:20

6    showed up today?

7    A.    Yes, I was is.

8    Q.    Can we look at this document, please.   If we can look at

9    the -- first of all, what is Starguide?

10   A.    So Starguide was a manufacturer of the Nitinol wire.         04:15:38

11   Q.    And what was the purpose of doing the test on the

12   Starguide material?

13   A.    So what I recollect is Glens Falls, we had a wire we were

14   already using to make the filter and so they were pulling in

15   another manufacturer for either cost-savings reasons or to --    04:16:02

16   maybe they liked this Nitinol wire better for some reason.   For

17   whatever reason, they were trying to bring in this other

18   manufacturer so they wanted to test to see how this Starguide

19   wire would perform.

20         MR. LOPEZ:   Your Honor, I would like to move 1369          04:16:22

21   into evidence and have it shown to the jury.

22         MR. CONDO:   No objection.

23         THE COURT:   Admitted.

24         And you may display it.

25         (Exhibit Number 1369 was admitted into evidence.)          04:16:30

United States District Court

ALEX TESSEMER - Direct

BY MR. LOPEZ:                                                           04:16:31

Q.   Okay.  So let's go down to the body of this one-page

document.  And is this another test you were asked to run?

A.   That is correct.

Q.   Whatever happened -- are there any memos that you've seen   04:16:50

or any further discussions or meeting minutes that you've seen

since the February 2004 migration resistance testing versus

competitors and the Simon Nitinol filter?  Do those exist?

A.   After this document?

Q.   No.  Before.                                                04:17:08

A.   There should have been some emails or different

communication, yeah, or characterization testing performed.

Q.   So this deals with another set of migration resistance

tests?

A.   That is correct.                                            04:17:29

Q.   And you tested a total of 40 filters?

A.   Yes.

Q.   Each filter was tested three times for a total of 120

runs?

A.   Yes, that is correct.                                       04:17:42

Q.   And then if you go down -- so what you did here is you

compared -- is it a comparison between the wire you got at

Starguide versus wire you got at somewhere else?

A.   That is correct.

Q.   And then what you found out was that if you look where it   04:18:00

United States District Court

ALEX TESSEMER - Direct

1    says:  You will quickly notice that there were values below 50                04:18:06

2    millimeters of mercury acceptance criteria for all the three

3    Starguide manufactured lots; correct?

4    A.    Yes, that is correct.

5    Q.    Since this was the case, we tested filters manufactured                  04:18:19

6    using the current supplier wire to determine whether the issue

7    was the filters or the migration resistance testing.

8              Correct?

9    A.    That is correct.

10   Q.    And what you discovered quickly was that there were values               04:18:32

11   below 50 millimeters of mercury when testing the filters

12   manufactured using the current supplier; right?

13   A.    That is correct.

14   Q.    So whether or not it came from Starguide, whether or not

15   it came from the current supplier, below 50 millimeters of                      04:18:46

16   mercury?

17   A.    That is correct.

18   Q.    And this points to the fact that there is an issue with

19   migration resistance testing.  That's what it says; right?

20   A.    Yep, that's what it says.                                                 04:19:00

21   Q.    I'm sorry?

22   A.    Yeah, that's exactly what it says.

23   Q.    The conclusion was there must be something wrong with the

24   testing.  There's not something wrong with our filters.

25   A.    So prior to this report, we had just run an exhaustive                   04:19:11

United States District Court

ALEX TESSEMER - Direct

1   test and they all passed, not the Starguide group wasn't        04:19:15
2   included in that but the group with the other wire that we got
3   manufactured.

4          And so I was trying to understand what was going on
5   because why had it passed in the previous report and not now.    04:19:28
6   So I was concluding, hey, is there something wrong with the
7   test, how it's set up?  There's a lot of variability in the
8   whole test apparatus.

9          THE COURT:  Mr. Lopez, we're at 4:20 so I think we
10  need to break at this point.                                     04:19:45

11         Ladies and gentlemen, I've got 4:30 hearings so we
12  need to break today at 4:20.  We'll plan to start tomorrow at 9
13  o'clock.  Please remember not to discuss the case or do any
14  research and we'll see you in the morning.  Thank you.

15         (Jury departs at 4:20.)                                   04:20:00

16         THE COURT:  Counsel, for your information,
17  plaintiffs, as of the end of the day, have used six hours and
18  17 minutes.  Defendants have used two hours and nine minutes.

19         MR. O'CONNOR:  Excuse me, Your Honor.  Did you split
20  the time up in the depositions?                                  04:22:26

21         THE COURT:  No, I did not.

22         MR. O'CONNOR:  We need to do that.

23         And the other thing we would ask, Your Honor, you
24  know, when we play the deposition, the agreement is that we're
25  playing both sides in the case.  So in fairness, we think that   04:22:36

443

ALEX TESSEMER - Direct

1   the jury should be told that this is both parties' submission      04:22:39

2   of the deposition as opposed to the plaintiff's.

3            THE COURT:  Why should they be told that?  It's the

4   witness's testimony.

5            MR. O'CONNOR:  Well, because we're putting on theirs      04:22:51

6   at the same time, but we do need to make sure that the time is

7   counted.

8            THE COURT:  How do you --

9            MR. LOPEZ:  We have a run that actually keeps track

10  of the time.                                                       04:23:02

11           THE COURT:  You can give me the time and I'll make an

12  adjustment.

13           MS. HELM:  Your Honor, I would love to see the run

14  time.

15           THE COURT:  Why don't you talk about that and see if     04:23:09

16  you can agree on the adjustment that needs to be made, but I

17  attributed all of that depo time to you so get me that

18  adjustment.

19           MR. LOPEZ:  We will.

20           (Whereupon, these proceedings recessed at 4:24 p.m.)     04:23:55

21                       *  *  *  *  *

22

23

24

25

United States District Court

ALEX TESSEMER - Direct

C E R T I F I C A T E                              04:23:55

I, ELAINE M. CROPPER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of             04:23:55 Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled             04:23:55 cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 16th day of March,             04:23:55 2018.

s/Elaine M. Cropper                                        04:23:55

_____
Elaine M. Cropper

United States District Court