MARCH 16, 2018 - A.M.

1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3                    _____

4
   **In re:  Bard IVC Filters,**            )
5  **Products Liability Litigation**        )
                                            )
6                                           )
                                            ) MD-15-02641-PHX-DGC
7  _____        )
   **Sherr-Una Booker, an individual,**     )
8                                           ) Phoenix, Arizona
                    Plaintiff,              ) March 16, 2018
9               v.                          )
                                            )
10 **C.R. Bard, Inc., a New Jersey**        )
   **corporation; and Bard Peripheral**     ) CV-16-00474-PHX-DGC
11 **Vascular, Inc., an Arizona**           ) 8:59 a.m.
   **corporation,**                          )
12                                          )
                    Defendants.             )
13 _____        )

14
          **BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE**
15
          <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>
16
               <u>**JURY TRIAL - DAY 3 A.M.**</u>
17

18               (Pages 445 through 579)

19

20
   Official Court Reporter:
21 **Elaine Cropper, RDR, CRR, CCP**
   Sandra Day O'Connor U.S. Courthouse
22 401 West Washington Street
   Suite 312, SPC 35
23 Phoenix, Arizona  85003-2150
   (602) 322-7245
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

               United States District Court

MARCH 16, 2018 - A.M.

1                          **APPEARANCES**

2

3    For the Plaintiff:
         **RAMON ROSSI LOPEZ, ESQ.**
         Lopez McHugh, L.L.P.
4        100 Bayview Circle, Ste. 5600
         Newport Beach, CA  92660
5        949.812.5771/(fax) 949.737.1504

6    For the Plaintiff:
         **MARK S. O'CONNOR, ESQ.**
7        Gallagher & Kennedy, P.A.
         2575 East Camelback Road
8        Phoenix, AZ  85016
         602.530.8000/(fax) 602.530.8500

9
     For the Plaintiff:
10       **JULIA REED ZAIC, ESQ.**
         Heaviside Reed Zaic
11       312 Broadway, Ste. 203
         Laguna Beach, CA  92660
12       949.715.5228

13   For the Defendants:
         **JAMES R. CONDO, ESQ.**
14       Snell & Wilmer, L.L.P - Phoenix, AZ
         One Arizona Center
15       400 East Van Buren
         Phoenix, AZ  85004-2202
16       602.382.67000

17   For the Defendants:
         **RICHARD B. NORTH, JR., ESQ.**
18       **ELIZABETH C. HELM, ESQ.**
         Nelson, Mullins, Riley & Scarborough, L.L.P.
19       201 17th St., N.W., Ste. 1700
         Atlanta, GA  30363
20       404.322.6000

21

22

23

24

25

                    United States District Court

MARCH 16, 2018 - A.M.

1                          **I N D E X**

2

3                          **TESTIMONY**

4  **WITNESS**              **Direct**  **Cross**  **Redirect**  **Recross**

5   ALEX TESSEMER            467       491       495
    MICHAEL STREIFF, M.D.    497       521       539
6   ROBERT MCMEEKING         544

7

8                      **E X H I B I T S**

9  Number                                        Ident  Rec'd

10 1369 Hudson deposition, 01/17/2014 - Exhibit 16  467
        - 3/24/2004 E-mail from Alex Tessmer to
11      Charlie Benware and Ed Fitzpatrick Re.
        "Starguide Filter Migration Test Results"
12
   1383 Hudson deposition, 01/17/2014, Exhibit 13  482  483
13      -  BPV Engineering Test Report -
        Characterization of Recovery Filter
14      Migration Resistance in Comparison to
        Competitive Product - Phase 1,
15      ETR-04-03-02, Rev 0.

16 2065 Tessmer Deposition, 06/12/2013 - Exhibit   472  473
        11 - BPV Engineering Test Report -
17      Characterization of Recovery Filter
        Migration Resistance When Legs are Crossed
18      or Hooks Removed - Phase 2, ETR-04-03-10,
        Rev 0
19
   2450 Duplicate -See Ex 2449 - Robert           547
20      McMeeking's CV

21 2468 See Ex 2467 - CV of Streiff               499

22 4147 Medical Article - 2015 Mismetti, et al.,  507
        Effect of a Retrievable Inferior Vena Cava
23      Filter Plus Anticoagulation vs
        Anticoagulation Alone on Risk of Recurrent
24      Pulmonary Embolism: A Randomized Clinical
        Trial, JAMA Volume 313, Number 16;
25      1627-1635 Garcia & Streiff


                  United States District Court

MARCH 16, 2018 - A.M.

1

## E X H I B I T S (Continued)

2

| Number | Ident | Rec'd |
|---|---|---|
| 4283 Demonstrative: Exemplar G2X Filter | 560 | |
| 4340 Demonstrative: Fig20Briant(Revised) | 559 | |
| 4349 Demonstrative: Figure18_McMeeking(B) | 570 | |

6

7

8

## RECESSES

9

| | Page | Line |
|---|---|---|
| (Recess at 10:31; resumed at 10:46.) | 530 | 10 |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court

MARCH 16, 2018 - A.M.

| | | |
|---|---|---|
| 1 | **P R O C E E D I N G S** | 12:00:59 |
| 2 | (Court was called to order by the courtroom deputy.) | |
| 3 | (Proceedings begin at 8:31.) | |
| 4 | THE COURT:  Thank you.  Please be seated. | |
| 5 | Good morning, everybody. | 08:31:27 |
| 6 | Mr. Lopez, you wanted to discuss an issue this | |
| 7 | morning? | |
| 8 | MR. LOPEZ:  Yes, Your Honor.  May I approach here? | |
| 9 | It may be easier. | |
| 10 | THE COURT:  You may. | 08:31:36 |
| 11 | MR. LOPEZ:  So we're referencing a docket number 1161 | |
| 12 | and -- | |
| 13 | THE COURT:  I have it in front of me. | |
| 14 | MR. LOPEZ:  Okay, good.  Docket 1319, which is CMO | |
| 15 | 10.  So in looking at defense counsel's exhibits and some of | 08:31:49 |
| 16 | the demonstratives they intend to use, they are going to | |
| 17 | introduce -- at least it appears they are going to introduce | |
| 18 | evidence about the Simon Nitinol filter's history for which we | |
| 19 | were not allowed to do discovery.  For example, there are some | |
| 20 | early articles about the migration rate, the perforation rate, | 08:32:11 |
| 21 | the fracture rate of the Simon Nitinol filter. | |
| 22 | That was the kind of discovery we sought when we were | |
| 23 | looking to broaden the scope of what we had already produced to | |
| 24 | us by way of discovery on the Simon Nitinol filter.  For | |
| 25 | example, we don't have complaint files for the Simon Nitinol | 08:32:28 |

United States District Court

MARCH 16, 2018 - A.M.

1    filter.  We don't have -- there was an article written I think    08:32:33

2    in 1989, 1990 that is cited.  In fact, one of the cites that

3    you saw, that I'm trying to exclude from one of the exhibits

4    and one of the -- that's referenced again in a medical article

5    that Mr. North used yesterday.  It talks about a clinical    08:32:49

6    trial.  It talks about a retrospective study that was done by a

7    doctor in Italy.

8           Under different circumstances we would want to do

9    some discovery on what did Bard do with respect to those

10   studies and those individual cases?  Did they go through and    08:33:09

11   adjudicate those individual cases like they are supposed to do?

12   Did they prepare complaint files to serve into the MAUDE

13   database?  We have the MAUDE database on SNF and there's not

14   much in there.

15          There's a lot of stuff that I think they are going to    08:33:32

16   try to put in front of the Court that we can't get but we don't

17   even know if they have for us to be able to count it.  I

18   brought up CMO -- I mean docket 1161.  Has Your Honor read it?

19          THE COURT:  I'm about halfway through it.

20          MR. LOPEZ:  Okay.  But it's clear that we were    08:33:51

21   seeking to broaden the scope of the type of evidence that we

22   wanted to get on SNF and we wanted to get whatever they had

23   with respect to its history and complaints and performance.

24          The defendants objected that -- if you look in the

25   second paragraph of docket 1161, "Most telling, the Simon    08:34:15

MARCH 16, 2018 - A.M.

1  Nitinol filter is a permanent filter..."  Then you go down and          08:34:23
2  it says, they write, "In view of that distinction in the use of
3  the devices, there are necessarily fundamental design
4  differences between the Simon Nitinol filter and the subsequent
5  retrievable filters, and the FDA had been fully apprised of            08:34:36
6  those distinctions in every pertinent regulatory submission.
7  Given those circumstances, the Simon Nitinol filter has
8  marginal relevance in this litigation (which involves only the
9  retrievable filters), and the mere for identification of that
10  earlier device as a predicate device for the regulatory filings       08:34:52
11  does not somehow conflate those very different devices.  Any
12  'head to head' comparison between permanent Simon Nitinol
13  filter and the retrievable devices is tantamount to the
14  proverbial "apples and oranges" comparison.

15          "Despite the marginal relevance of the Simon Nitinol          08:35:14
16  filter, Bard has already produced some documents," which they
17  have, and then they go and state that -- if you go down to
18  paragraph I think it's four, Your Honor, where it says, "Bard
19  has never conducted testing regarding the device, other than
20  some comparative tests with the Recovery and G2 filters (which        08:35:33
21  already been produced during this litigation).  Nor has Bard
22  assembled a distinct team to handle the Simon Nitinol filter;
23  instead, that device has always been the responsibility of the
24  same team handling the retrievable filters, comprised of the
25  same individuals whose files and ESI have already been                08:35:50

MARCH 16, 2018 - A.M.

1   collected and searched."                                          08:35:54

2           Now, I read that because that is the evidence.  We

3   have Bard's internal comparisons by looking at their internal

4   complaint data against their actual.  This is not MAUDE data.

5   This actually internal data on Simon Nitinol complications     08:36:09

6   versus the G2 and Recovery and that's the data we have been

7   working on and doing discovery in this case.

8           They want to bring in data that they have never

9   produced to us.  They want to bring in clinical trials.  They

10  want to bring in articles that have been written where comments  08:36:25

11  have been made about the Simon Nitinol filter all of a sudden

12  having a migration rate of 12 percent.

13          They just told you that the only thing they do

14  between the Simon Nitinol and the G2 and Recovery filter are

15  internal analysis with the complaint data.                    08:36:41

16          That should be the only thing that's fair game in

17  this case as it relates to the Simon Nitinol filter.  We're

18  happy with that.  This whole case has been discovered on -- as

19  of whatever date, how is the Recovery filter with respect to

20  its comparison of rates that are being reported by doctors     08:37:00

21  comparing to migration, perforation, all of the complication

22  rates to the Simon Nitinol filter.

23          Those differences are ten -- Dr. Lehmann's analysis

24  was done on adverse event data, on reporting rates, on looking

25  at their actual data.  All of their trending has been done on   08:37:19

United States District Court

MARCH 16, 2018 - A.M.

1    their actual data and actual sales.                    08:37:21

2         So when this company was making decisions on whether

3    or not they had a safer device or as safe a device as the Simon

4    Nitinol filter, they weren't looking at medical literature.

5    They weren't looking at patients who were reported in a 1989 or   08:37:34

6    1990 Italian study.  They were looking at their internal data.

7         That was their state of mind when they were making

8    decisions on substantial equivalence.  And that is how we want

9    to try this case, based on what their frame of mind was and

10   what they were looking at at the time, not litigation          08:37:54

11   created -- look how bad the Simon Nitinol filter really was, on

12   evidence that we were kept from or evidence that we can't

13   cross-examine.

14        So that's our position, Your Honor.

15        THE COURT:  Okay.                                  08:38:09

16        MR. NORTH:  Your Honor, with all due respect to

17   Mr. Lopez, I'm not sure I understand the nature of the dispute

18   here for this reason.  In CMO No. 10 there was a discussion

19   about the parameters of what discovery would be permitted

20   regarding the Simon Nitinol filter.  The Court ruled in that   08:38:38

21   order that we need not produce documents regarding the original

22   design and development of the Simon Nitinol filter because

23   there was no allegation in the litigation that that filter

24   itself was defective and the Court even noted at that time that

25   the plaintiffs were trumpeting the Simon Nitinol filter as a   08:38:58

MARCH 16, 2018 - A.M.

1  safer alternative design.                                          08:39:03

2          The Court ordered the production there of sales and

3  marketing material regarding the Simon Nitinol filter.  It

4  suggested that the parties negotiate the scope of what should

5  be produced.  The Court also noted that we had produced all     08:39:16

6  regulatory communications regarding the Simon Nitinol filter.

7  Separately, Bard has produced all the complaint data I believe

8  we can find regarding the Simon Nitinol filter.

9          There are 24 Excel spreadsheets that were produced,

10 the last one was produced I think in October of 2016 concerning  08:39:40

11 pre-2000 -- the year 2000 complaint data or reports.  They are

12 not the actual complaint files as I understand it.  We did not

13 have those or couldn't locate those because we didn't acquire

14 the Simon Nitinol filter until 2002.  But we had 24 Excel

15 spreadsheets of complaint data prior to that time and that was   08:40:05

16 all produced.  I can give Mr. Lopez the Bates numbers for that.

17 I've got them in an email right here.

18         I think those were actually disclosed to them.  They

19 were reminded of those in the briefing on the *Daubert* motion

20 regarding Dr. Betensky.  But also, the Court in CMO No. 10,      08:40:19

21 document 1319, suggested that the parties meet and negotiate

22 regarding the further scope of any SNF or Simon Nitinol

23 discovery.  And we did so.

24         The document in 1483 reported to the Court that

25 all -- an agreement had been reached.  I don't remember,         08:40:45

United States District Court

MARCH 16, 2018 - A.M.

```
 1  looking back on that, because that was almost two years ago,    08:40:48
 2  the exact scope but the parties in a pleading filed by
 3  Mr. Boatman from Gallagher & Kennedy represented to the Court
 4  that all remaining issues regarding the scope of Simon Nitinol
 5  discovery had been completed.                                    08:41:03
 6         Now, the evidence we are trying to put in is vital to
 7  refute their claim that the Simon Nitinol is a perfect filter
 8  and the G2 or the Recovery, which they are focused on, that all
 9  of these problems compared to the Simon Nitinol, we're citing
10  medical literature that shows studies indicating problems with  08:41:24
11  the device, that it has complaints, it has complications just
12  like every other inferior vena cava filter.  We think that's
13  essential to our defense and we don't think there's anything in
14  this Court's previous discovery order that in any way hampers
15  them from doing whatever rebuttal they want.                     08:41:47
16         The only limitation this Court put on was the
17  original design and development of the Simon Nitinol filter and
18  whether -- how that was designed is not an issue.  It's the
19  performance of the filter that has been put at issue in this
20  case and they have the evidence they are entitled to and that   08:42:04
21  was available on that issue.  So we really do not understand
22  the basis of their complaint but do not believe we should be
23  hampered in what we have been putting on thus far.
24         THE COURT:  Well, counsel for both sides, it's
25  difficult for me to assess your arguments without knowing       08:42:28
```

United States District Court

MARCH 16, 2018 - A.M.

1   exactly what the evidence is that you want to exclude,                08:42:31
2   Mr. Lopez, and that you want to use, Mr. North.  Can you be
3   more specific in -- I haven't seen any of it so I don't have a
4   sense for exactly what it is -- well, the defendants want to
5   use and that you want them to be precluded from using,               08:42:46
6   Mr. Lopez.

7             MR. LOPEZ:  I think it will come out when you see the
8   document that I reserved.

9             THE COURT:  Well, but my point is, I need to see it
10  before I can rule on it.  I can't rule in anticipation of            08:42:57
11  seeing it at some point because I don't understand what exactly
12  the evidence is that they are actually intending to use that
13  you want to preclude.

14            MR. LOPEZ:  They are basically medical articles that
15  look at -- retrospectively at the Simon Nitinol filter and do       08:43:12
16  an analysis of its complications.

17            THE COURT:  So your concern is they are going to say
18  to the jury the Simon Nitinol filter had the same kind of
19  problems that the plaintiffs claim the Recovery and G2 had?

20            MR. LOPEZ:  Or they are going to imply that by using       08:43:32
21  a medical article, yes.

22            THE COURT:  Are you going to do that, Mr. North?  Are
23  you going to be presenting evidence to show that the problems
24  that you allege are common to all filters were also common to
25  the Simon Nitinol filter?                                            08:43:43

United States District Court

MARCH 16, 2018 - A.M.

1     MR. NORTH:  Yes, Your Honor.                          08:43:46

2     THE COURT:  That's the point of the evidence?

3     MR. NORTH:  Yes, Your Honor.

4     THE COURT:  Let me think for a minute.

5     Here's the problem.  Maybe you can help me think      08:44:05

6  through this.  When I went back and reread my ruling and read

7  document 1161, the argument you were making, Mr. Lopez, was the

8  mere image of this concern.  What you were saying then, and I

9  think you're still saying now, is the Recovery and the G2 were

10 not substantially equivalent to the Simon Nitinol.  The        08:44:29

11 Recovery and G2 had more problems than the Simon Nitinol and

12 then I'm now reading from 1161.  It's on page three from your

13 column, the third paragraph in your column.  It says:  Each

14 requested category of discovery is designed to obtain

15 information to refute defendants' contention of substantial     08:44:58

16 equivalence as well as their representation -- their

17 representations -- I'm now jumping down a line -- that the IVC

18 filters that are the subject of this MDL are equivalent or

19 superior to the SNF in their safety profiles and effectiveness.

20     And what I ruled in CMO 10 is if you are going to be    08:45:23

21 asserting that the SNF is a better filter, a better design,

22 then there's no need for you to do discovery into its testing

23 and development because you're not challenging its testing and

24 development.  In fact, you're saying it's good and the problem

25 was with the later versions.  That was the -- I think the sort   08:45:46

MARCH 16, 2018 - A.M.

1   of idea at the heart of what I ruled.                        08:45:49

2           It now sounds like you're saying -- and I may be

3   wrong on this -- is that you want discovery about problems with

4   the Simon Nitinol.  You wanted to inquire into what problems it

5   had so that you could refute their assertion as to what          08:46:09

6   problems it had.

7           MR. LOPEZ:  That's not -- I must be misstating myself

8   then, Your Honor.

9           THE COURT:  I don't know that you are.  But I think

10  what you're saying is they should be precluded today from       08:46:23

11  saying there were problems with the Simon Nitinol filter

12  because you weren't allowed to do discovery into problems with

13  the Simon Nitinol filter but you weren't asking for that.  That

14  is the issue I'm wrestling with.

15          MR. LOPEZ:  Okay.  Here's the issue, the main issue:     08:46:40

16  We wanted to do a deep dive into the Simon Nitinol filter.

17  They -- I think it's clear now that the Simon Nitinol filter,

18  as a predicate device, becomes pretty important in -- with

19  respect to the regulatory process whether or not it was

20  substantially equivalent.                                        08:46:59

21          What we have been -- what has been produced to us by

22  Bard in that regard and in their frame of mind when they were

23  going through this process was an analysis of the Simon Nitinol

24  filter based on head-to-head comparisons of complaints that

25  were being reported from the field against the sales and         08:47:16

United States District Court

MARCH 16, 2018 - A.M.

1    looking at the differential.  When Dr. Lehmann did his          08:47:21
2    report -- of course we don't have his report but when he was
3    reporting to Bard about the differences, the statistically
4    significant differences between the Simon Nitinol filter and
5    the Recovery filter, he was using that data.  He was not using  08:47:38
6    medical literature.  He wasn't -- you can't do that.  You can't
7    do a medical literature to a MAUDE database comparison to
8    determine whether or not, at least in their mind there is
9    substantial equivalence.

10          My concern is really the hearsay aspect of them being    08:47:54
11   able to now use medical articles.  When their frame of mind
12   when they were looking at whether or not they had an
13   adulterated product, there's no document that says, "By the
14   way, our migration rates are pretty close to the Simon Nitinol
15   filter."  They didn't give this article to FDA in establishing  08:48:12
16   substantial equivalence.  So why do they now get to come in
17   here is really the question and have the jury make a decision
18   on whether or not there is substantial equivalence to this
19   device when nobody at Bard considered that, when nobody at FDA
20   considered it?                                                  08:48:29

21          Now if they can show us that they gave this clinical
22   data as part of the substantial equivalence 510(k) to get
23   clearance and to keep -- if they can show that they kept it on
24   the market because of those comparisons, I've got a problem.
25   I've got to deal with it.                                       08:48:44

United States District Court

MARCH 16, 2018 - A.M.

1    But the truth is that never happened.  So I'm going      08:48:45

2 to have to argue against the substantial equivalence based on

3 data that the FDA didn't even consider, based on data that they

4 didn't even consider when they were making representations

5 about substantial equivalence.  So now they want to come in and  08:48:57

6 say, well, yeah there's substantial equivalence.  The Simon

7 Nitinol filter was just as bad as the Recovery filter.  Now, it

8 wasn't but they are going to show that this thing had problems,

9 too.  My position is, it was not a perfect filter, that it was

10 a safer alternative design.  My position is that these          08:49:15

11 comparisons, for purposes of determining substantial

12 equivalence for the purpose for which this device was allowed

13 to be marketed, should be restricted to the evidence that was

14 given to FDA and not evidence that, all of a sudden, the jury

15 is going to have to decide, geez, that looks like substantial   08:49:33

16 equivalence to me.  I just don't think that's fair.

17          I've seen the charts --

18          THE COURT:  If I had permitted you to do the

19 discovery that you wanted to do back at the time of this order,

20 what you were asking for were design materials for the SNF,     08:50:07

21 testing materials for the SNF, regulatory communication, sales

22 and marketing which I did let you get.  I think it was

23 primarily the design, the testing materials of the SNF.

24    What I hear you saying I think is that if you had

25 been allowed to do that, you still wouldn't have found the      08:50:30

United States District Court

MARCH 16, 2018 - A.M.

1   stuff they are now using to argue that the SNF had problems        08:50:33

2   because that's medical literature.  That's other articles.

3          MR. LOPEZ:  Right.

4          THE COURT:  So how would the discovery have helped

5   you find the information that you are now concerned about          08:50:45

6   confronting here in Court?

7          MR. LOPEZ:  I'll answer that question but the most

8   important thing is what Mr. North said.  We agreed that we

9   would -- we did stipulate and we stipulated because I said

10  okay.  I'm going to live with the Simon Nitinol evidence that      08:51:01

11  you have given to us with respect to the comparisons to your

12  G2, Recovery, and all the other devices.  I'm going to live

13  with that.

14         And that -- those comparisons were comparisons of

15  reporting rates and internal data from Bard.  That's fine.        08:51:17

16  They now want to bring in evidence that goes beyond the scope

17  of what we agreed to.  We didn't pursue whether or not -- to

18  this -- I don't know, Your Honor, whether or not they took --

19  someone at NMT or Bard visited Dr. Poletti.  They visited

20  Dr. Nicholson who came out with a study that said they were 20     08:51:38

21  and 30 percent fracture rate to talk to him about it.  There's

22  no evidence that they have ever produced that they did an

23  adjudication of those events and determined, by the way, these

24  aren't true migrations and, by the way, these aren't true this

25  or that.  So that's my concern about the article.                 08:51:54

United States District Court

MARCH 16, 2018 - A.M.

1      The testing that we wanted is, as you can see now    08:51:57
2  from the testing that has come into this case, maybe they used
3  a different threshold than 50 millimeters of mercury to test
4  it.  Maybe they used a different device.  Maybe they used a
5  different product performance specification for the Simon       08:52:13
6  Nitinol filter which, frankly, I wish I had for this case.  I
7  don't think I need it but I would have liked to have had it.

8      So I think the point I'm trying to make is, we --
9  both sides need to live with the Simon Nitinol filter evidence
10 that exists in this case as it relates to substantial          08:52:28
11 equivalence and their decision and, frankly, the FDA's decision
12 to clear the device.

13     THE COURT:  We're down to six minutes left.  Let me
14 ask this question of you.  If I had allowed all of this
15 discovery here, how would any of it have turned up this Italian 08:52:45
16 study article?

17     MR. LOPEZ:  I don't know.  They may have done a test
18 that said by the way, we got a migration problem that we just
19 found out from Dr. Poletti in Italy that is test on migration
20 resistance and maybe let's change a leg or foot or maybe let's  08:53:00
21 expand it or change or labeling or make our hooks a little
22 stiffer.  I don't know.  That's the point.

23     THE COURT:  Mr. North?

24     MR. NORTH:  Your Honor, the point he just made,
25 though, would go to whether there was a defect in the Simon     08:53:16

United States District Court

MARCH 16, 2018 - A.M.

1   Nitinol filter.  He has not been precluded of any discovery          08:53:19

2   regarding the adverse events associated with the Simon Nitinol

3   filter.  He has received all of the data we have with regarding

4   adverse events both before and after Bard acquired the SNF, 24

5   spreadsheets preceding the year 2000.  He has received all the      08:53:38

6   regulatory information.  He has received all of the marketing

7   and sales information.

8            The only little area he hasn't received is the

9   original design and development testing.  And that is not what

10  we're talking about.  That's not evidence we're trying to put      08:53:56

11  in and, therefore, we believe we ought to be entitled to rebut

12  this argument that the Simon Nitinol filter has a better

13  performance history based on reports in the medical literature

14  that directly contradict that.

15           THE COURT:  Do you agree, Mr. North, with his             08:54:14

16  assertion that all of the internal Bard documents that were

17  produced to plaintiffs suggest that the Simon Nitinol did have

18  a better performance history than the Recovery and G2?

19           MR. NORTH:  Based on the reports that the company had

20  received.  But it's an apples and oranges comparison.  You'll      08:54:33

21  hear some expert testimony about that.  Because the

22  post-implant monitoring of permanent filters differs much more

23  than with retrievable filters.  But, yes, based on the reported

24  complaints to the company, that is true.

25           THE COURT:  All right.  When is this issue going to       08:54:55

MARCH 16, 2018 - A.M.

1    come to a head in front of the jury?                        08:54:57

2            MR. LOPEZ:  Well, I don't know how they are going to

3    cross-examine our experts, Your Honor.  So I don't know.

4            THE COURT:  Well, do you have an expert on today that

5    is going to address this subject?                           08:55:08

6            MR. LOPEZ:  Well, they sent us some documents that as

7    part of the exhibits I think for one of them which suggests

8    they may be doing that.

9            THE COURT:  Which one?  How is it coming up today?

10           MR. LOPEZ:  Dr. Streiff actually wrote an article     08:55:20

11   where he cites an SNF -- he cites the SNF, not for purposes of

12   which he's testifying, but I don't want that all of a sudden to

13   be free game.

14           In fact, Mr. North just said it.  We're not concerned

15   about the complaint data.  We'll live with the data that they  08:55:35

16   gave us and the comparisons they gave with respect to the

17   comparisons between the Simon Nitinol and the Recovery filter.

18           This is a substantial equivalence case, Judge.  It

19   wasn't before the 510(k) became relevant but it is --

20           THE COURT:  The problem I have with that argument,     08:55:52

21   Mr. Lopez, is the discovery you were seeking to do back then

22   wouldn't have got the information you now are saying you seek.

23   I might be wrong about that but based on what I'm hearing, you

24   weren't asking for the stuff you are now saying you don't have.

25           MR. LOPEZ:  Your Honor, let's assume that's true.      08:56:14

United States District Court

MARCH 16, 2018 - A.M.

1   The most important part of my argument or my position is really   08:56:17

2   the second part.  This company's frame of mind on substantial

3   equivalence, this company's frame of mind when they are doing

4   comparisons and determining whether or not their device was

5   substantially equivalent was on their internal complaint data.   08:56:35

6   He just said that.  There's no other data that exists -- my

7   point is, they are now going to try to have a different

8   substantial equivalent argument that they didn't give to FDA,

9   they didn't give to us, they didn't discuss internally about

10  whether or not their device was -- as a matter of fact, there   08:56:57

11  are documents like this.  For example, with Dr. Ciavarella.

12        THE COURT:  Let me interrupt you because we've got

13  two minutes to go.  I think I need to hear more about this to

14  make a fully informed decision and I think I need to see the

15  exhibits that are going to be used.   08:57:12

16        I don't want to take the jury's time to do that now.

17  I would say let's get started.  If you could, Mr. North,

18  identify or get me copies of the exhibits that you intend to

19  use that talk about complication rates in the SNF so that I can

20  look at them.  Get me, if you can, electronically or otherwise,   08:57:34

21  the 24 sheets you produced about internal complaints.  I will

22  try to look at them over the lunch hour.  I suspect we're not

23  going to get to it before noon.

24        MR. LOPEZ:  We're going to finish with Mr. Tessmer

25  and then Dr. Streiff.   08:58:01

United States District Court

MARCH 16, 2018 - A.M.

1    THE COURT:  Well, if it's going to come up during      08:58:03

2    Streiff -- let's say this:  If you come to a point, Mr. North,

3    where you want to ask Dr. Streiff questions or put in an

4    exhibit that talks about the complication rates of the SNF

5    being comparable to other filters, let's have a sidebar before   08:58:13

6    you do that.

7          MR. NORTH:  And I will tell you, Your Honor, unless

8    he says something I don't expect, I can't imagine I would with

9    that particular witness.

10         MR. LOPEZ:  In addition to that, Your Honor, we want    08:58:26

11   to give you some documents that show what the company was doing

12   with respect to the -- their comparative analysis to the SNF

13   and you won't see what it is that they --

14         THE COURT:  That's fine.  But I think to make a fully

15   informed decision, I need to see those things and I don't want   08:58:39

16   to take the time to do it now.

17         So we're okay this morning.  You'll raise that with

18   me before you raise it in front of the jury and see if you can

19   identify these documents by noon.  If you can't, then by the

20   end of the day, and I'll look at them over the weekend.         08:58:52

21         Okay.

22         Anything else we need to address before we bring the

23   jury in?

24         MR. LOPEZ:  No, Your Honor.

25         MR. NORTH:  Nothing, Your Honor.                          08:59:01

United States District Court

ALEX TESSEMER - Direct

| | | |
|---|---|---|
| 1 | THE COURT:  Okay. | 08:59:02 |
| 2 | (Jury enters at 8:59.) | |
| 3 | THE COURT:  Good morning, ladies and gentlemen. | |
| 4 | Thanks for being here this morning.  Everybody have a seat. | |
| 5 | We are going to pick up where we left off yesterday, | 09:00:16 |
| 6 | counsel. | |
| 7 | MR. LOPEZ:  Thank you, Your Honor. | |
| 8 | (ALEX TESSEMER, a witness herein, was previously duly | |
| 9 | sworn or affirmed.) | |
| 10 | **DIRECT EXAMINATION** (Continued) | 09:00:21 |
| 11 | BY MR. LOPEZ: | |
| 12 | Q.   Good morning, Mr. Tessemer. | |
| 13 | A.   Good morning. | |
| 14 | Q.   Thanks for coming down. | |
| 15 | I think we left off yesterday we were talking about | 09:00:45 |
| 16 | Exhibit 1369.  Can you put that back up. | |
| 17 | MR. LOPEZ:  And can I publish that also, Your Honor? | |
| 18 | I think it's already been admitted. | |
| 19 | THE COURT:  Yes. | |
| 20 | BY MR. LOPEZ: | 09:01:03 |
| 21 | Q.   Just to orient us from yesterday, we had just gone through | |
| 22 | comparative test results that you had run, correct, comparing | |
| 23 | the Recovery to the Simon Nitinol filter and a host of other | |
| 24 | devices; right? | |
| 25 | A.   That is correct. | 09:01:16 |

United States District Court

ALEX TESSEMER - Direct

1   Q.   And you were doing this with respect to the Recovery        09:01:17

2   filter because there was some experience with the Recovery

3   filter while it was on the market having some potential design

4   issues that related to its migration?

5   A.   I was doing the testing because I was asked to do the       09:01:32

6   testing in regards to the statement of exactly why.  I was just

7   a test guy.

8   Q.   All right.  So let's blow up the highlighted second,

9   please.  And, again, the company was using the 50 millimeters

10  of mercury acceptance criteria and whether or not you were       09:01:53

11  using one manufacturer's Nitinol filter or another's, the

12  testing showed values below 50 millimeters of mercury; correct?

13  A.   Can you show me the data again?

14  Q.   I'm sorry.  What would you like me to show you?

15  A.   You said that there were values below 50 --                 09:02:19

16  Q.   Well, it says, "You will quickly notice" --

17  A.   Oh, yeah.  I see where you're saying right here, the first

18  line.

19  Q.   And then you thought the issue was the way the tests were

20  run; correct?                                                    09:02:32

21  A.   That is correct.

22  Q.   And then did something happen where you actually went on

23  and redid this test to see if you got different values?

24  A.   Not that I recall.

25              (Interruption for telephone ringing.)                09:02:46

United States District Court

ALEX TESSEMER - Direct

1           MR. LOPEZ:  I'm sorry.  I thought I turned it off.          09:02:49

2   I'm sorry.  It happened in front of you.  I really thought I

3   turned it off.

4   BY MR. LOPEZ:

5   Q.   Did you rerun the test?                                        09:03:08

6   A.   Not that I recall.

7           MR. LOPEZ:  Okay.  Can we go down to the next

8   paragraph, please, Greg.

9   BY MR. LOPEZ:

10  Q.   And then you wrote that you had previously tested filters     09:03:20

11  compared to the NMT data, and all of the values were above 50

12  millimeters of mercury; correct?

13  A.   That is correct.

14  Q.   Now, just so it's clear, your company had not by then

15  decided that 50 millimeters of mercury was the wrong threshold    09:03:39

16  and raised it to 80 or 70 or -- you didn't bring it up to the

17  Simon Nitinol threshold; true?

18  A.   I'm unaware if they brought it up or not.

19  Q.   Now, did you question the results of the 50 millimeters of

20  mercury acceptance criteria when you passed as to whether or       09:03:56

21  not the testing may have been wrong?

22  A.   So when I was examining the data, I previously, according

23  to this email, too, did some testing with the GFO manufactured

24  filter and NMT data where we distinctively passed a probably

25  more controlled test.  This test I'm not sure -- I was getting     09:04:20

United States District Court

470

ALEX TESSEMER - Direct

1    different values so I think I came to the conclusion what's          09:04:23
2    going on here?   Is there -- I even mention I guess sausage
3    casing.
4    Q.   Yes.   We'll get to that.   In fact, let's get to that right
5    now.                                                                  09:04:35
6    A.   Okay.
7    Q.   The sentence that begins:   It is important to note -- do
8    you see where I am?
9    A.   Okay.   Yes.
10   Q.   -- that a new batch of sausage casing had been purchased       09:04:41
11   to complete the testing.
12   A.   Correct.
13   Q.   However, the operators did not notice any difference with
14   the new casing in comparison to what had been previously used?
15   A.   That is correct.                                                09:04:55
16   Q.   And this is how they determined that, right, the next
17   sentence:   The sausage casing was packaged the same and came
18   from the same supplier.
19             And in order to make sure you had good sausage casing
20   somebody looked at it; right, appearance?                            09:05:09
21   A.   M'hum.
22   Q.   They felt it, and they smelled it?
23   A.   Correct.
24   Q.   And now we knew we had good sausage casing for the test;
25   right?                                                               09:05:19

United States District Court

ALEX TESSEMER - Direct

1   A.   Hopefully.  I'm not sure -- it doesn't say in here whether          09:05:20

2   they did some type of wall thickness; but from what they are

3   stating here, they felt that it was similar to what they had.

4   Q.   Now when you were using sausage casing and PVC pipe, did

5   anyone ever tell you that that really doesn't in any way              09:05:40

6   suggest that this is what a human vena cava looks like or feels

7   like or smells like or how you should test it?

8   A.   So this was a test that came directly over from NMT that I

9   just repeated?

10  Q.   Right.  So you used the same test methods that they used          09:05:58

11  at NMT when they thought they had migration resistance and that

12  no device would migrate once you put it in humans, which later

13  was determined to migrate in a short pilot study, and then had

14  more migrations after you marketed it, you went back and used

15  the same testing to see if there was a migration problem with        09:06:19

16  the Recovery filter after launch.   True?

17  A.   I would have to defer to Rob Carr for that.

18  Q.   But in any event, this is now, since the December design

19  meeting until after launch and now we are in March.  You've run

20  another group of tests on whether or not the Recovery filter         09:06:38

21  can pass this 50 millimeter threshold and you had tests that

22  failed; true.   Second time?

23  A.   Well, the tests here that we were working was to qualify a

24  new guidewire as far as I recall.

25  Q.   All right.  Let's look at -- well, let me ask you this:          09:06:59

United States District Court

472

ALEX TESSEMER - Direct

1  Did those results get looked at by other people at Bard, this    09:07:03

2  second group of tests where you failed your own product

3  performance specification?

4  A.   So this data would have got looked at by other people.

5  For instance, my superior, Rob Carr, would have looked at this    09:07:15

6  data, correct.

7  Q.   Did anyone share with you that there had already been a

8  migration death from the Recovery filter after a clot had

9  challenged it and the device didn't stay where it was put and

10  the clot and the device went into someone's heart and they    09:07:27

11  died?  Did anyone tell you that?

12  A.   At this particular time, it has been 15 years, I don't

13  recall if I did or did not.  Obviously I know that today

14  but . . .

15  Q.   Well, let me ask you what you do know.  You do know that    09:07:43

16  no one said, "Stop.  Stop selling the Recovery filter because

17  we can't even pass in many of our tests, our own performance

18  specification testing."  No one said, "Stop."

19  A.   So --

20  Q.   Sir did anyone say, "Stop"?    09:08:02

21  A.   -- I never heard anyone say, "Stop," correct.

22  Q.   2065, please.  You're familiar with this test, sir?

23  A.   Yes, I am.

24  Q.   And the ETR-04-03-10, does that tell us that the date is

25  on or about March 10 of 2004?    09:08:31

United States District Court

ALEX TESSEMER - Direct

1   A.   I believe that's correct.                                              09:08:34

2   Q.   Okay.  And this is a test that you're familiar with and

3   that you -- did you actually help perform this test?

4   A.   So that, again, my technicians would have one this test.

5   Q.   All right.                                                             09:08:46

6           MR. LOPEZ:  I would like to admit and publish this

7   document at this time, Your Honor.

8           MR. CONDO:  No objection.

9           THE COURT:  2060 -- what's the number?

10          MR. LOPEZ:  2065.                                                   09:08:59

11          THE COURT:  All right.  2065 is admitted and you may

12  publish it.

13          (Exhibit Number 2065 was admitted into evidence.)

14  BY MR. LOPEZ:

15  Q.   Okay.  So now, sir, let's look at the first page, the jury  09:09:04

16  did see it and this is called Characterization of Recovery

17  Filter Migration Resistance When Legs are Crossed or Hooks

18  Removed.  Do you see where I am, sir?

19  A.   Yes, I do.

20  Q.   Now, you would only test that if in, in fact, there was a   09:09:26

21  concern that the device might be behaving that way in a human

22  being and you wanted to see if it -- if that did occur, whether

23  the device would maintain migration resistance; true?

24  A.   So for me, again, I was pulled in as a test guy so I

25  simply was following orders of Rob to test this.                 09:09:43

United States District Court

ALEX TESSEMER - Direct

1  Q.   Okay.  Gotcha.                                          09:09:46

2           Okay.  Let's go down to under Introduction,

3  background information, and just the very bottom line there

4  where it says 50 millimeters of mercury.  Just highlight that

5  one line right there where it says predefined acceptance       09:10:12

6  criteria, predefined meaning that the company had determined

7  that this was going to be the -- continue to be the acceptance

8  criteria for migration resistance of the Recovery filter; true?

9  A.   As far as I understand, yeah, from this document, it was

10  predefined acceptance criteria that they were continuing to    09:10:31

11  move forward with.

12  Q.   So the company when they were deciding to test this, the

13  company is who said we're going to use 50 millimeters of

14  mercury as our acceptance criteria?

15  A.   So one thing is with characterization test that we're    09:10:50

16  looking at right now, there is no acceptance criteria.  If you

17  look at the protocol, it says no acceptance criteria because

18  for this particular type of data set, we're doing -- filters

19  are being reused and so forth, if I recall correctly.

20  Q.   But I'm not even sure what you just said so I'm going to  09:11:07

21  ask a simple question.

22  A.   Sure.

23  Q.   The tests were run to see under what pressures the device

24  would migrate under various conditions; true?

25  A.   That is correct, yeah.                                   09:11:21

United States District Court

ALEX TESSEMER - Direct

1   Q.   And you were using the 50 millimeters of mercury to          09:11:22

2   determine whether or not these tests passed; true?

3   A.   For this particular one, no.  We were trying to

4   characterize the filter and just see the different thresholds

5   because when you start removing hooks --                          09:11:36

6   Q.   Right.  We'll get to that.

7   A.   -- the pressures are not going to be fit.

8   Q.   But the threshold you were comparing to it was to see

9   whether or not they would pass 50?

10  A.   Well, what we were doing is comparing, hey, we were trying   09:11:51

11  to understand in the characterization what happens if a pair of

12  legs were crossed or if a hook was removed.

13  Q.   All right.  Let's go down to the next line, please.

14          MR. LOPEZ:  Could you highlight that entire sentence,

15  please.  If you just drop down one -- it's a paragraph but it's   09:12:07

16  only one sentence.

17  BY MR. LOPEZ:

18  Q.   Okay.  We talked about this yesterday.

19  A.   Yes.  Okay.

20          MR. LOPEZ:  Would you highlight that, please, Greg.       09:12:21

21  BY MR. LOPEZ:

22  Q.   Recent field activities, what are field activities?

23  A.   Those are the field activities probably information coming

24  from the sales force?

25  Q.   Right.  Well, and field activities meaning what is           09:12:33

United States District Court

ALEX TESSEMER - Direct

1  happening in the real world when patients are having this                    09:12:35

2  device implanted in them?

3  A.   That would be correct.

4  Q.   According to this document, recent field activities

5  indicate that migration failures have been reported for the RF              09:12:49

6  product, that's the Recovery filter correct?

7  A.   That's correct.

8  Q.   Therefore, further testing of this specific

9  characterization is warranted.  Did I read that correctly?

10  A.   That is correct.                                                        09:13:01

11  Q.   I mean, don't you think doctors, hospitals, patients would

12  want to know that your company is selling a device and you're

13  questioning the testing and you're still testing it to see

14  whether or not it's performing safely from a migration

15  standpoint?                                                                  09:13:15

16  A.   Yeah, absolutely.

17  Q.   And do you know if anyone told doctors, hospitals,

18  patients about that, that, "By the way, we at Bard are still

19  testing this device.  We're not sure whether or not it has a

20  safe migration resistance profile."  Did anyone tell doctors,               09:13:31

21  hospitals or patients that?

22  A.   I'm unaware if that was communicated or not.

23  Q.   Okay.  Let's go to the next paragraph.  This talks about

24  the design review meeting that was held on December 5, 2003, to

25  gain a further understanding of the design elements of this                  09:13:55

United States District Court

ALEX TESSEMER - Direct

| 1 | product; right? | 09:13:58 |

A.   Correct.

Q.   So in January when Bard launched this device, they had
some confusion about the design elements of this device.  They
needed to understand it more?

A.   Well, we're always trying to understand our devices when
we launch more and more.  So I was pulled in to do the testing
for this specific device; but in regards to, you know, there
was a battery of testing that was done which -- with design
verification, qualification, that it passed this criteria and I
was called in to do this test, to simply look at, hey, if we
removed a hook, crossed the legs, what would happen.

Q.   Can you think of a worse risk that this device would have
than if it got challenged by a clot which the device was
supposed to protect from going anywhere and the clot actually
dislodged the device and drove it into someone's heart?  Can
you imagine a riskier profile than that in a device like this?

A.   So when I'm thinking about a massive PE and what this
device is protecting against, that's a one of the biggest
risks, yeah.

Q.   A major failure?

A.   Absolutely.  There's a big clot but it moves up.  It does
happen.

Q.   It didn't perform as intended?

A.   For the --

United States District Court

ALEX TESSEMER - Direct

1    Q.   Did it perform as it was intended to perform if that

2    happens?

3    A.   So I would say, you know, it's trying to prevent those

4    massive clots but, you know, a lot of filter devices, if you

5    look at the data --                                          09:15:39

6    Q.   Sir.

7    A.   -- they migrate.

8    Q.   We're just going to be talking about Bard.  Bard Recovery

9    filter right now.

10   A.   Sure.                                                   09:15:48

11   Q.   Did this device perform as intended or as expected if when

12   challenged by a clot that was supposed to protect the patient

13   from, actually resulted in the device going into a patient's

14   heart and killing them?

15   A.   So, no, it did not.                                     09:16:06

16   Q.   Okay.  Let's go to the test results here.

17            MR. LOPEZ:  Page eight here, please, Greg.  That

18   would be -- could you show Figure 8, below that, please, on the

19   screen.  It says Figure 8 at the bottom of page eight.  That's

20   page nine.                                                   09:17:17

21   BY MR. LOPEZ:

22   Q.   Can you describe or design for the jury what a

23   Box-and-Whisker plot is?

24   A.   Essentially, a Box-and-Whisker plot is just showing the

25   mean standard deviation of the actual devices.  If you have    09:17:38

United States District Court

ALEX TESSEMER - Direct

|  | |  |
|---|---|---|
| 1 | everything kind of grouped and averaged, it's a representative | 09:17:45 |
| 2 | of the devices that were tested. | |
| 3 | Q.   Okay.  And so the box reflects the low and the high of | |
| 4 | what was recorded from this test? | |
| 5 | A.   That is correct. | 09:17:59 |
| 6 | Q.   And then the line in the middle is the mean? | |
| 7 | A.   Yes.  That is correct. | |
| 8 | Q.   And what the company did here is they tested the device | |
| 9 | with one hook disengaged from the sausage casing? | |
| 10 | A.   Yes.  So what they did is they actually cut the hook off | 09:18:15 |
| 11 | physically with a pair of cutters and then we would put that | |
| 12 | inside the inferior vena cava to see what would happen if one | |
| 13 | hook was gone. | |
| 14 | Q.   It was not engaged? | |
| 15 | A.   Oh.  No.  It was not engaged as far as I understand.  I | 09:18:28 |
| 16 | mean, if you don't have a hook -- yeah. | |
| 17 | Q.   For example, you were trying to see if in a patient where | |
| 18 | the foot broke or the foot was disengaged while in the | |
| 19 | patient's body, whether under those conditions if that patient | |
| 20 | got hit with a clot, whether or not would it withstand 50 | 09:18:43 |
| 21 | millimeters of mercury pressure.  True? | |
| 22 | A.   Yes.  We were trying to basically see what would happen if | |
| 23 | we cut off a hook and if it wasn't engaged. | |
| 24 | Q.   For example, if Dr. Asch's pregnant patient who had a | |
| 25 | broken foot got hit with a clot, it would have been important | 09:19:00 |

ALEX TESSEMER - Direct

1   for Bard back then and NMT to know whether or not under those          09:19:04

2   conditions whether or not this device was at risk of migrating;

3   true?

4   A.   I would believe they would want to understand that and

5   that's why we ran this test.                                           09:19:15

6   Q.   Right.  And that test was never done until after Recovery

7   was launched onto the open American public?

8   A.   As far as I recall, but I'm not aware that they did any --

9   again, that was 15 years ago.  I can't recollect everything.

10  Q.   You now have data.  You've run another test.  I assume it         09:19:36

11  would be a reasonably foreseeable maybe worst case scenario but

12  a potential situation in a patient who might have a broken foot

13  on the filter or the foot doesn't engage appropriately in the

14  side of the vena cava and you've determined in doing your bench

15  testing that that device will not withstand 50 millimeters of          09:19:55

16  mercury resistance; true?

17  A.   Well, again, one caveat with all of these is these filters

18  are potentially reused so it was a characterization whether

19  absolute value was 50 or not.

20  Q.   Sir, you may have a lot of reasons and excuses why it             09:20:11

21  failed 50 millimeters of mercury but the tests that you ran

22  that you gave to people who you worked for showed that if you

23  have one hook that's not engaged in the vena cava wall, this

24  device has a migration resistance of a mean in the thirties?

25          MR. CONDO:  Your Honor, I object to the initial                09:20:36

United States District Court

ALEX TESSEMER - Direct

1  introductory characterization of the testimony.                    09:20:38

2         THE COURT:  Sustained.

3         Please reask the question.

4  BY MR. LOPEZ:

5  Q.   Sir, the tests that you ran -- by the way, did you           09:20:45

6  question these results somewhere in your report that they may

7  not be valid?

8  A.   I would have to see the report to recall.

9  Q.   What we know is that the results of your migration

10 resistance testing showed that if a patient should have a         09:20:59

11 broken foot on the device or if the foot just disengages

12 because it didn't properly affix or because day-to-day

13 activities, maybe it came loose, that the device would not

14 withstand 50 millimeters of mercury pressure if it got hit with

15 a clot.  Is that true?                                            09:21:18

16 A.   I would say that what we do know is anytime you cut off a

17 hook, cross legs, the migration resistance goes down.

18 Q.   And it goes down into a mean in the thirties?

19 A.   I would have to look closer.  Is it 30 or 35?

20 Q.   And that's in a 28 millimeter vena cava; right?              09:21:44

21 A.   That's correct, in our simulated 28 millimeter cava.

22 Q.   And the Recovery filter was indicated for vena cavas up to

23 28 millimeters.  Is that true?

24 A.   That is correct.

25 Q.   Okay.  Exhibit 1383, please.                                 09:21:58

United States District Court

ALEX TESSEMER - Direct

1            While he's doing that, do you know whether Bard, in                    09:22:23

2    their IFU or in any communication, regardless of form, that

3    there is the potential risk that the foot of one of our filters

4    may not engage or may become disengaged or that one foot of our

5    filter may fracture and then under those circumstances, this          09:22:41

6    device will not withstand our minimum product performance

7    specification for migration?

8    A.   I would have to look at the IFU to be exact.   I don't

9    recall that but I need to look at the IFU.

10   Q.   Okay.   Looking at 1383, are you familiar now with this          09:23:04

11   test?

12   A.   Yes, I am.

13   Q.   And this is a characterization of Recovery filter

14   migration resistance in comparison to competitive products.   Do

15   you see that?                                                          09:23:20

16   A.   Yes, I do.

17   Q.   We talked about that yesterday with respect to a different

18   test; correct?

19   A.   Yes, in respect to a different test, we were talking about

20   a comparison as well.                                                  09:23:29

21   Q.   Now, you're doing another compare between competitors;

22   true?

23   A.   I believe so, yes.

24   Q.   Okay.   Let's look at page two.   Actually, why don't we

25   just --                                                                09:24:00

United States District Court

ALEX TESSEMER - Direct

```
 1              MR. LOPEZ:  To save time, Greg, let's go to page      09:24:01

 2    three and we can look at the top graph -- I mean the top chart

 3    first under 5.2.

 4    Q.    These are all competitors, right, of Bard?

 5    A.    That is correct.                                          09:24:24

 6    Q.    And this lists all the competitive products except for the

 7    fact that the Simon Nitinol filter and the Recovery filter is

 8    on there as well; correct?

 9    A.    That is correct.

10    Q.    And then if you go down to the next box under 5.3, we were 09:24:38

11    struggling yesterday a little bit on what some of these symbols

12    stand for.  Now we see that GS is the Greenfield and O was the

13    OptEase.  TP, Günther Tulip.  Anyway, the bottom line is that

14    this does show what devices were actually tested; true?

15    A.    Yes, it does.                                             09:25:11

16              MR. LOPEZ:  Your Honor, can I move -- I would like to

17    move in 1383 into evidence and have it published to the jury.

18              MR. CONDO:  No objection.

19              THE COURT:  Admitted.  You may publish.

20              (Exhibit Number 1383 was admitted into evidence.)     09:25:24

21              MR. LOPEZ:  Okay.  Let's go to page six, Greg,

22    please.

23    BY MR. LOPEZ:

24    Q.    Now, this particular test -- at least as far as I know,

25    the first time anybody tested the Recovery filter in a tube     09:26:01
```

United States District Court

484

ALEX TESSEMER - Direct

| | |
|---|---|
| 1 | diameter greater than 28 -- that wasn't even a question.  That | 09:26:06 |
| 2 | was a statement.  So let me just ask a question. |
| 3 | Is this the first time that you're aware of that Bard |
| 4 | or NMT or anyone actually tested the Recovery filter with |
| 5 | distensibility in mind beyond 28 millimeters? | 09:26:25 |
| 6 | A.   That I don't recall or I'm unaware if there was testing |
| 7 | prior to that. |
| 8 | Q.   And do you know what the purpose was of testing the |
| 9 | Recovery and its competitors in a vena cava -- at least a |
| 10 | simulated vena cava greater than 28 millimeters? | 09:26:43 |
| 11 | A.   So we were doing a characterization test and we wanted to |
| 12 | understand is, you know, let's say there's -- from what I |
| 13 | understand is let's say you had a 30 millimeter vena cava or |
| 14 | you had a 32 or you had a 34, because most of them are smaller |
| 15 | than that.  But if you did have that size, what would happen to | 09:27:04 |
| 16 | these filters as a results. |
| 17 | MR. LOPEZ:  If you can go down to -- I'm sorry, the |
| 18 | very top of this chart and one, two, three, four, five rows |
| 19 | across, could you highlight that, please, and bring that up? |
| 20 | BY MR. LOPEZ: | 09:27:41 |
| 21 | Q.   So here are the samples that were used and this is the 28 |
| 22 | millimeter data.  Do you see that? |
| 23 | A.   Yes, I do. |
| 24 | Q.   And RF is what, Recovery filter? |
| 25 | A.   Yes, it is Recovery filter. | 09:27:57 |

United States District Court

ALEX TESSEMER - Direct

1    Q.   Does it say one through ten meaning there were ten    09:27:58

2    different lots of Recovery filters that were tested?

3    A.   I think that's ten samples.

4    Q.   Ten samples and then RF 32 through 34 are another four

5    samples?    09:28:09

6    A.   That is correct.

7    Q.   Why different lots or samples?  Were they taken from

8    different manufacturers off of different production lines?

9    A.   So I think I would have to go back and reread the test

10   report for sure; but what I can understand is some of these    09:28:22

11   filters were retested inside the tubing and because they were

12   retested, they were put in and when we would have put a major

13   clot with the sausage casing, it could distort -- when it

14   migrated, when we got to it migrate at whatever pressure, it

15   could distort the legs or the feet and then if that happened    09:28:45

16   and it was totally bent, then we might have had to replace some

17   of the samples.

18   Q.   So you wanted to make sure you had a good sampling to do

19   this test, bottom line?

20   A.   Well, bottom line, we wanted to make sure we -- you know,    09:28:59

21   we brought in a filter that the leg wasn't all the way bent up.

22   Q.   Let's look at the results of the test.

23   A.   Sure.

24   Q.   So in a 28 millimeter tube with sausage casing, it was --

25   the mean was 47.5.  Do you see that?    09:29:14

United States District Court

ALEX TESSEMER - Direct

1    A.    I do see that.                                              09:29:18

2    Q.    And there were some as low as 32 and then some as high as

3    64.8; correct?

4    A.    That is correct.

5    Q.    Below that, does SF stand for Simon Nitinol filter?        09:29:26

6    A.    Yes, it does.

7    Q.    And the mean for the Simon Nitinol filter 76.3 with a

8    minimum of 65 to 105.8; right?

9    A.    That is correct.

10   Q.    Now, let's look at that entire first part of this chart    09:29:46

11   under 28 millimeter tube and let's see how the Recovery

12   compared to the rest of the competitors on migration

13   resistance.

14          MR. LOPEZ:   Can you highlight the column that says

15   mean, please, Greg.                                             09:30:07

16   Q.    There's another run of the Simon Nitinol filter where it

17   was 89; correct?

18   A.    Correct.

19   Q.    And CT, can you remind the jury, what does CT stand for?

20   I think that says CT.                                           09:30:25

21   A.    It's kind of chopped off.

22   Q.    I think it's GT.

23   A.    That would be Günther Tulip then.

24   Q.    That was a competitor retrievable device; right?

25   A.    I don't recall there being a retrievable device at the    09:30:47

ALEX TESSEMER - Direct

1    time but I could be incorrect.                                    09:30:49

2    Q.   Let's make sure the record is clear.   There's a Greenfield

3    device that is not retrievable?

4    A.   That's what I believe.   It's a Greenfield.   It's a

5    permanent.                                                        09:30:59

6    Q.   And the Recovery filter was a permanent device, too?

7    A.   That is correct.

8    Q.   Then let's just go to VT, VenaTech, 76.   And then TP is a

9    Günther Tulip, that was a competitor, and that was below 50

10   millimeters of mercury.   But this case isn't about the Cook     09:31:21

11   filter, right?   It's about the Recovery filter.

12   A.   Correct.

13   Q.   And then O, the OptEase, that is a competitor, 136.6; and

14   then the TRAPEASE, also retrievable device, 122.9; true?

15   A.   So the TRAPEASE was not retrievable.   That was a permanent  09:31:41

16   indication.

17   Q.   Okay.   The OptEase was are retrievable?

18   A.   Correct, the OptEase was.

19   Q.   In fact, the OptEase had a higher mean migration

20   resistance than the TRAPEASE on your test?                       09:31:53

21   A.   Correct.

22   Q.   So is this now the fourth migration resistance test that

23   you've done since December of 2003 where you've come up with

24   mean values below 50 millimeters of mercury pressures?

25   A.   So the mean values, the one thing you have to pay           09:32:14

United States District Court

ALEX TESSEMER - Direct

1   attention to of course is some of these we were looking at 37        09:32:17

2   degrees.   But, in fact, when we ran the NMT test and all of

3   that, we were told to run it at 40.

4          So -- and this was all a characterization.

5   Q.   I'm not sure you've answered my question.   Is this now the    09:32:37

6   fourth test where you've come up with results using multiple

7   devices, samples, where the mean is below 50 millimeters of

8   mercury?

9   A.   For this particular one, it's below 50 and there's another

10  one you mentioned before it was below 50.   I can't recall the     09:32:55

11  other -- and then are you talking about the cross --

12  Q.   You know what, I'll withdraw the question.   We can count

13  later.

14  A.   Okay.

15         MR. LOPEZ:   Let's go to the 30 millimeter of mercury,       09:33:05

16  Greg, please.   I'm sorry, the 30 millimeter tubing.

17  Q.   Do you see where I am, sir?

18  A.   Yes, I do.

19  Q.   So once Recovery is exposed to a vena cava that expands

20  just two millimeters beyond its indicated use, does this test      09:33:29

21  tell us that it does not resist migration at 50 millimeters of

22  mercury, the top line, 39.6?

23  A.   So for this characterization, it is under 50.

24  Q.   And does this test also show that all of the other

25  devices, including competitive devices and the Simon Nitinol       09:33:53

United States District Court

ALEX TESSEMER - Direct

1   filter, all exceed the 50 millimeters of mercury threshold and     09:33:57

2   some by triple -- by double and triple values?

3   A.   For the mean that is above 50 millimeter of mercury.

4   Q.   Let's go down to the box that has 32 millimeter tubing.

5   And, again, if you look at the mean values in the middle, 34,     09:34:24

6   beginning with 34 compared to the Simon Nitinol filter -- first

7   of all, this -- it fails if this device is in a human being

8   where the vena cava distends from 28 millimeters -- let me

9   strike that.

10        This test tells you will that a Recovery filter may,     09:34:49

11  because we can't tell from looking at the sausage tubing

12  whether or not that's actually going to happen in a human

13  being, but this gives you an indication that maybe in a human

14  being where the vena cava expands from 28 to 32, it's not going

15  to resist the minimum threshold of your product's     09:35:06

16  specifications for migration resistance; true?

17  A.   So this would -- you know, as you mentioned, it's not the

18  inferior vena cava filter itself.   It's a mock simulation.   But

19  it does have a lower migration resistance than 50.

20  Q.   Number one, much lower than every other device that's on     09:35:29

21  there except for TP; true?

22  A.   That is correct.

23  Q.   And still under 50 millimeters of mercury?

24  A.   That is correct.

25  Q.   And you have tested this because the company finally --     09:35:46

United States District Court

ALEX TESSEMER - Direct

1    let me ask it differently.                                        09:35:48

2            You tested it that way because the company was aware

3    that in real human beings that the vena cava can actually

4    distend way beyond 28 millimeters of mercury, especially when

5    challenged by a clot?                                             09:36:04

6    A.   So I was testing this specifically because, you know, my

7    supervisor, Rob Carr, wanted me to test this.  I don't know if

8    I had all of the recollection of the vena cava, you know,

9    information there.

10   Q.   But what you do know is that when you were done with these   09:36:20

11   tests and everything that you had done, the report, the values,

12   you made sure Rob Carr and others that were above you received

13   the results of the test; right?

14   A.   Yeah, that is correct.

15   Q.   And did you then move on to do something different or did    09:36:33

16   you continue to work on the Recovery project?

17   A.   I remember -- as I mentioned before, my main job was to

18   work on the jugular delivery system that delivers the device

19   from the jugular vein and below the vein.  That was my main

20   thing.  But did I work on -- you said did I work on other        09:36:58

21   things after this with the Recovery filter itself?

22   Q.   Sounds to me like you worked on a delivery system.

23   A.   That's right.  The delivery system.

24   Q.   Whatever Rob Carr told you to do next, that's what you

25   did?                                                              09:37:11

United States District Court

ALEX TESSEMER - Cross

1  A.   That's what I did, you're right.                          09:37:12

2  Q.   And did they invite you to any discussions, after all of

3  these tests that we just went through yesterday and today, to

4  get your input on the values and the findings that you had with

5  respect to all of these migration tests to see maybe if you had  09:37:28

6  an opinion on what the company should do about the fact that

7  this device was on the market?

8  A.   So it was 15 years ago.  I don't recall exactly.  I would

9  imagine I would be in his office talking to him about these

10  results but I can't recall the specifics of that.               09:37:44

11  Q.   Do you remember his reaction to that any of this?  I'm

12  talking about Mr. Carr.

13  A.   No.

14  Q.   He didn't look at these and say, you know, "Uh-oh, we've

15  got a problem," or anything like that?                          09:37:57

16  A.   I do not recall and don't recollect a major reaction

17  but -- again, I don't recall.

18          MR. LOPEZ:  Pass the witness, Your Honor.

19          THE COURT:  Mr. Condo?

20          MR. CONDO:  Thank you, Your Honor.                     09:38:12

21              **CROSS - EXAMINATION**

22  BY MR. CONDO:

23  Q.   Good morning, Mr. Tessmer.

24  A.   Good morning.

25  Q.   Just a few quick questions.  You left Bard in 2005?        09:38:30

United States District Court

ALEX TESSEMER - Cross

1  A.    That is correct.                                       09:38:33

2  Q.    And from that date until today, you've not had any

3  involvement in IVC filters or IVC testing or IVC filter testing

4  design; correct?

5  A.    That is correct.                                       09:38:42

6  Q.    And from that date in 2005 until you were deposed in June

7  of 2013 you put IVC filters in your rearview mirror so to

8  speak?

9  A.    That would be correct.

10 Q.    Eight years of that period you were with an entirely    09:38:57

11 different company.  You had left Bard and were working in an

12 entirely different company with entirely different devices?

13 A.    That is correct.

14 Q.    Different products?

15 A.    That is correct.                                       09:39:11

16 Q.    And you took your assignments from Rob Carr; correct?

17 A.    That is correct.

18 Q.    In fact, I think you described yourself as the test guy,

19 just the test guy?

20 A.    That is correct.                                       09:39:27

21 Q.    Would Rob Carr call you in from time to time to give you

22 assignments?

23 A.    Yes.

24 Q.    So if he had a need, as your boss, he would call you in,

25 pull you off of whatever else you might be working on and ask   09:39:40

ALEX TESSEMER - Cross

1   you to run a test?                                                    09:39:43

2   A.   That is correct.

3   Q.   And were you relatively junior in the research and

4   development group at Bard at that time?

5   A.   That would be a correct statement, yes.                          09:39:52

6   Q.   The you didn't have authority to initiate tests, did you?

7   A.   No, I did not.

8   Q.   And after you completed the test, you faithfully reported

9   the test and all of the data to Mr. Carr; correct?

10  A.   That is correct.                                                 09:40:07

11  Q.   Okay.  And all of the tests that you have been asked about

12  yesterday and today by Mr. Lopez, each and every one dealt with

13  the Recovery filter; correct?

14  A.   That is correct.

15  Q.   None of them dealt wit a G2 filter; correct?                     09:40:26

16  A.   That is correct.

17  Q.   And do you understand that this case involves a G2 filter?

18  A.   Yes, I do.

19  Q.   I think you just testified just at the very end about your

20  involvement after the test reports were reported to Mr. Carr.        09:40:47

21  So after you reported your tests, were the decisions that were

22  made with respect to any of the test data that you reported,

23  were those decisions made above your pay grade by Mr. Carr and

24  others in the company?

25  A.   Yes, they were.                                                  09:41:08

United States District Court

ALEX TESSEMER - Cross

1   Q.   And those decisions were decisions that you weren't          09:41:09
2   directly involved in; correct?
3   A.   That is correct.
4   Q.   Let me just ask a few more questions.  Were you involved
5   at any point in time in any of the regulatory filings that Bard   09:41:28
6   made on behalf of the company with the FDA involving the G2
7   filter?
8   A.   No, I was not.
9   Q.   Were you involved in the design of any kinds of clinical
10  studies done with respect to the G2 filter?                       09:41:43
11  A.   I was not.
12  Q.   Were you involved in any migration testing related to the
13  G2 filter?
14          MR. LOPEZ:  Your Honor, this is beyond the scope and
15  I believe been asked and answered.                                09:41:55
16          THE COURT:  Overruled.
17          THE WITNESS:  I was not.
18  BY MR. CONDO:
19  Q.   Okay.  Were you involved with the EVEREST study?
20  A.   No, I was not.                                               09:42:07
21  Q.   Were you involved with any fatigue testing done on the G2
22  filter?
23  A.   I was not.
24  Q.   And have you been involved in any analysis of published
25  medical literature about the G2 filter?                          09:42:17

United States District Court

ALEX TESSEMER - Redirect

1   A.   I was not.                                                      09:42:21

2   Q.   I have no further questions.   Thank you.

3              THE COURT:   Any redirect?

4              MR. LOPEZ:   Briefly, Your Honor.

5                    **REDIRECT EXAMINATION**                            09:42:26

6   BY MR. LOPEZ:

7   Q.   With respect to the tests, whatever tests you were asked

8   to run, you ran those to the best of your ability; correct?

9   A.   My technicians would run the tests to the best of their

10  ability.                                                            09:42:42

11  Q.   Did anyone criticize you or your technicians for any of

12  the tests that we talked about today?

13  A.   Not that I recall.

14  Q.   And the Recovery filter and its relationship to G2, do you

15  know that the G2 is called the descendant, a descendant of the      09:42:54

16  Recovery filter by Mr. Carr?

17  A.   I just heard it for the first time today --

18  Q.   Okay.

19  A.   -- that I'm aware of.

20  Q.   But the G2 filter was the result of changes that were made     09:43:06

21  to the Recovery filter; correct?

22  A.   They were always innovating so I guess -- is that why they

23  called it the G2?

24  Q.   Mr. Condo asked you these questions about whether this

25  case was about the Recovery or the G2.                              09:43:28

United States District Court

1          The company, when they were designing testing, when

2     they were taking their approaches to determine how to design

3     and test the G2, weren't they doing that by lessons they were

4     learning or should have learned from their experience and their

5     testing with the Recovery filter?

6     A.   Well, I would think they would be looking at anything that

7     they were learning and proving and improving upon whatever

8     science they could.

9     Q.   And he asked you about the 510(k) for the G2.  Do you know

10    whether or not the Recovery filter could have been used as a

11    predicate device for purposes of the G2 getting cleared to be

12    marketed if the Recovery filter was not on the market?

13    A.   I'm not aware of that.

14    Q.   That's one more thing that might be in a different

15    department; correct?

16    A.   That is correct.

17    Q.   All right.  Thank you.

18         THE COURT:  All right.  Thank you, sir.  You can step

19    down.

20         THE WITNESS:  Thank you.

21         (Witness excused.)

22         THE COURT:  All right.  Plaintiff's next witness?

23         MR. O'CONNOR:  Dr. Michael Streiff.

24         COURTROOM DEPUTY:  Dr. Streiff, if you will please

25    come forward and raise your right hand.

497

| | | |
|---|---|---|
| 1 | (MICHAEL STREIFF, M.D., a witness herein, was duly | 09:45:28 |
| 2 | sworn or affirmed.) | |
| 3 | COURTROOM DEPUTY:  Could you please spell your last | |
| 4 | name, sir. | |
| 5 | THE WITNESS:  S-T-R-E-I-F-F. | 09:45:37 |
| 6 | COURTROOM DEPUTY:  Thank you, sir.  Please come up | |
| 7 | and have a seat. | |
| 8 | MR. O'CONNOR:  May I proceed, Your Honor? | |
| 9 | THE COURT:  Yes. | |
| 10 | MR. O'CONNOR:  Thank you. | 09:46:07 |

**DIRECT EXAMINATION**

BY MR. O'CONNOR:

Q.   Good morning.  Would you introduce yourself to the jury, please.

A.   Hello.  I'm Mike Streiff.  I'm a hematologist from Johns Hopkins.  I run the anticoagulation service there.  And I spent the last 20 years or so of my clinical practice focusing on DVT and PE treatment and prevention.

Q.   And so you're a medical doctor?

A.   Yes, sir.

Q.   And you told the jury you're a hematologist?

A.   Yes.

Q.   Are you board certified?

A.   Yes, sir.

Q.   Dr. Streiff, in your practice, do you -- are you involved

MICHAEL STREIFF, M.D. - Direct

1   in illnesses that pertain to blood clots?                    09:46:41

2   A.   Yes, every day.

3   Q.   Tell the jury what you do along those lines.

4   A.   So I run our anticoagulation service at Hopkins.  We see

5   about four or 5,000 patients a year in the clinic.  And then I    09:46:54

6   see probably another -- maybe a thousand patients on the

7   outpatient or inpatient basis.  Say about 75 percent of my case

8   load is -- either focuses on blood clot treatment or prevention

9   or in bleeding disorders.  So the major focus of my practice is

10  bleeding or clotting diseases.                                09:47:18

11       And in the anticoagulation clinic, I oversee about 12

12  pharmacists that manage warfarin.  We also manage all the new

13  direct oral anticoagulants.  On the inpatient side, we have a

14  consultative service that is pharmacy driven also that we

15  basically developed a training program for the pharmacists and    09:47:37

16  then they give consultations to the doctors on the medical and

17  surgical services about managing warfarin, managing low

18  molecular weight heparins.  And as part of a -- I guess, about

19  ten years or so ago we set up a venous thromboembolism

20  collaborative which -- it was me, a trauma surgeon, we have    09:47:57

21  some nurses and some pharmacists where we put together

22  evidence-based order sets of DVT prevention that have been put

23  into our --

24       THE REPORTER:  Wait, wait, wait.  Can you slow down a

25  little bit.                                                   09:48:11

United States District Court

MICHAEL STREIFF, M.D. - Direct

1        THE WITNESS:  It's a subject I'm passionate about.                09:48:15

2        So we put together some evidence-based order sets to

3   guide doctors in assessing their patients.

4        Okay.  This person is -- just had hip surgery, these

5   are their clotting risk factors.  These are their bleeding risk       09:48:25

6   factors.  What should I give this patient to prevent blood

7   clots?  What does the evidence say in the literature?  So

8   that's kind of the focus of my clinical practice.  And my

9   research also all revolves around that.

10  Q.   We'll talk about that in a minute.  I'm going ask for you        09:48:40

11  to take a look at Exhibit 2487.

12       2468, Dr. Streiff, what is that?

13  A.   So this is a copy of my CV.

14  Q.   And how many pages is it approximately?

15  A.   35, 40.  I don't know.  I have to have all the categories        09:49:23

16  that Hopkins wants us to have.

17  Q.   Do you conduct research and clinical studies?

18  A.   Yes, sir.

19  Q.   And have you been published?  Have you written on subjects

20  including blood clots?                                                09:49:40

21  A.   Yes, I -- all the time on blood clot prevention, blood

22  clot treatment with anticoagulants, with filters.

23  Q.   And that was my next question.  Have you written medical

24  literature on the use of IVC filters?

25  A.   Certainly, yeah.  During my fellowship, my mentor,               09:49:54

MICHAEL STREIFF, M.D. - Direct

1   Dr. Bell, had very strong opinions about filters and I wanted          09:50:00

2   to know what the evidence was during my fellowship and so that

3   kind of brought me to do that comprehensive review I wrote in

4   2000 was driven by my experience.

5   Q.   Have you dedicated your professional life to researching          09:50:14

6   and trying to find causes and treatments for blood clot

7   disorders?

8   A.   Yeah.  Yeah.

9   Q.   How many articles do you think you've written altogether?

10  A.   The last time I checked, I guess, about 108 or 110 or            09:50:33

11  something the last time I updated of original research and then

12  there's a section on review articles.  I probably have got 20

13  or so; guidelines, about 20; and then book chapters, 20 or 30.

14  So maybe, you know, 150 to 200 total publications.

15  Q.   And you say you're at Johns Hopkins.  Where is that?            09:50:54

16  A.   It's in Baltimore, Maryland.

17  Q.   Where did you receive your medical degree?

18  A.   Johns Hopkins.

19  Q.   And then you went through a residency and a fellowship?

20  A.   Yes, I had an internal medicine residency at University of      09:51:06

21  Florida where I worked with Craig Kitchens and then went to

22  John Hopkins for my hematology/oncology fellowship.

23  Q.   All right.  Does the CV that we've marked as Exhibit 2468

24  set forth your background, qualifications and your education?

25  A.   Yes, sir, I believe does it.                                    09:51:24

United States District Court

MICHAEL STREIFF, M.D. - Direct

1   Q.   Does it identify the literature, the studies that you have          09:51:26
2   been involved in?
3   A.   Yes, sir.
4            MR. O'CONNOR:  At this time, I would move for the
5   admission of 2468.                                                        09:51:34
6            MR. NORTH:  Your Honor, objection.  Cumulative and
7   Rule 802.
8            THE COURT:  Sustained.  It's hearsay.
9   BY MR. O'CONNOR:
10  Q.   Dr. Streiff, how many times have your articles been cited           09:51:47
11  in other research?
12  A.   So I would say, I guess, some single articles up to as
13  many as four or 500 times.  My comprehensive review from 2000
14  that has been out, I published on PubMed for a long time so it
15  has been cited many times.  So it's -- all my articles together          09:52:17
16  probably a number of thousand times.  I don't know exactly.  I
17  haven't looked at the stats on Google recently.
18  Q.   Dr. Streiff, you were retained by us in this matter?
19  A.   Yes, sir.
20  Q.   And can you tell the jury what you were requested to do,            09:52:40
21  what have you done in this case?
22  A.   So I was requested to give my, I guess, evidence-based
23  opinion on what are the data that support the use of vena cava
24  filters for prevention of pulmonary embolism in people that
25  already have a blood clot so in people that have a DVT or                 09:53:00

United States District Court

MICHAEL STREIFF, M.D. - Direct

1    pulmonary embolism.                                                09:53:03

2           I was also asked to look at the literature that

3    supports their use in people that don't have blood clots yet so

4    people that are after surgery.  They don't have a known blood

5    clot, what is the evidence supporting that use.                   09:53:17

6           And then also requested to opine on what I thought

7    were the reasonable expectations a physician would have from a

8    drug company, from a device company as to what information we

9    should have to make decisions when we're talking about patients

10   in hospital or in the clinic, what data do you need to give      09:53:35

11   good advice to patients.

12   Q.   And based upon your work in this case, did you arrive at

13   opinions?

14   A.   Yes.

15   Q.   And are those opinions to a reasonable degree of medical    09:53:44

16   probability?

17   A.   Yes, sir.

18   Q.   Can you tell the jury your opinions in this case?

19   A.   So focusing on the first area, my opinion in regards to

20   people that if they already have a blood clot, a DVT or          09:53:57

21   pulmonary embolism, although there are, I would say, several

22   thousands articles focusing on vena cava filters, there really

23   are only two good articles that -- two randomized trials

24   looking at vena cava filters in the prevention of a pulmonary

25   embolism in someone that already has a DVT or PE.  And that      09:54:15

United States District Court

MICHAEL STREIFF, M.D. - Direct

1   those articles do not suggest that they prevent fatal pulmonary          09:54:20

2   embolism.  The studies are too small.  They also include people

3   that are already on anticoagulation.  So it's not a

4   head-to-head study.

5        But the ideal study, which I don't believe could be              09:54:36

6   done, would be one where you have patients that are not getting

7   anything and you want to prove only what intervention you want

8   to do which in this case would be a vena cava filter placement

9   and show that's better than nothing at all.  Obviously, that

10  study you could never do because we already know, from many           09:54:50

11  years ago, in the '60s, 1960s or so, that if you have a DVT,

12  you're at high risk for pulmonary embolism so you couldn't do

13  that study.

14       But the studies that have been done have shown that

15  if you have people that have a blood clot in their leg or in          09:55:05

16  their lung and everybody gets anticoagulation, if you add a

17  filter to that, that they don't significantly reduce the

18  incidence of fatal pulmonary embolism, especially the last

19  study that was done.  The PREPIC 2 study shows no evidence of

20  any of difference in any pulmonary embolism.  I would say           09:55:24

21  that's probably the best done study, because it focuses on what

22  we're doing now with the anticoagulation, what we've done since

23  2000, the first study.  The PREPIC 1 study was done in the

24  early 1990s so I think it's an older study.

25  Q.   Thank you.  Let me just stop you there.  Now, you say          09:55:40

MICHAEL STREIFF, M.D. - Direct

1   PREPIC.  There were two studies.  Would you just explain to the   09:55:43

2   members of the jury what PREPIC means?

3   A.   So it's a French word.  I don't know French.  But a French

4   word that basically it's a study where they took patients --

5   it's a randomized trial so they randomly sorted people into two   09:55:58

6   groups and they selected people that they thought were at very

7   high risk for having a pulmonary embolism.

8        Everybody in that study had a DVT and/or a pulmonary

9   embolism already so there were people that needed to be

10  treated.  It was not -- they did not think it ethical, and I   09:56:14

11  agree, that they withhold anticoagulation.  So everybody in the

12  study, about 200 in each group, so 400 patients total,

13  everybody got anticoagulation that was, I guess, standard of

14  care 1990 or so, later 1980s.

15       And then in one group, they were randomly sorted to   09:56:35

16  get a filter as well, a permanent filter, and then they

17  followed those people over time and that study was conducted in

18  the early 1990s.

19  Q.   And you said there was a second study?

20  A.   Yeah, and then so that study -- the early PREPIC study   09:56:50

21  used a lot of filters that are no longer used to a great deal,

22  so old European filters, so filters we don't use a lot.  The

23  Greenfield filter was used in some patients.  The newer study,

24  PREPIC 2, was a study that took a more contemporary patient

25  population that was done between 2005 and 2010 or so.   09:57:15

United States District Court

MICHAEL STREIFF, M.D. - Direct

1   Q.   Was there a different type of filter that was used for          09:57:18

2   PREPIC 1?

3   A.   Yes.   There they focused on retrievable filters.   But I

4   think the movement of the market, the movement of providers was

5   that we wanted -- we should test filters that you can place and     09:57:30

6   retrieve.   And so this -- the PREPIC 2 study tested one

7   retrievable filter, which was the ALN filter, and it was

8   basically same study.

9   Q.   So did that study divide two groups?

10  A.   Yes.   So everybody, again, had a blood clot in their leg      09:57:48

11  and were considered to be at high risk for having a blood clot

12  in their lungs.   Everybody got anticoagulation and then half

13  the group got a filter, in this case the ALN filter, which is a

14  different filter.

15  Q.   And what did that study conclude?                              09:58:06

16  A.   That study found there was no difference in pulmonary

17  embolism when they looked after three months of treatment.

18  Q.   And just to clarify, what does that mean?

19  A.   They said the same number -- well, there was no

20  significant difference in pulmonary emboli in the two groups.       09:58:21

21  They were looking only at symptomatic events in that study.   So

22  they were only looking for events that caused the patient's

23  symptoms, but they followed everybody through three months of

24  treatment.   Everybody on anticoagulation had found that the

25  filter group didn't have any fewer events than the non-filter      09:58:38

United States District Court

MICHAEL STREIFF, M.D. - Direct

1   group, the people that didn't get filters.                        09:58:42

2   Q.   Now, based upon that, you arrived at your opinion to the

3   first area; correct?

4   A.   Correct.  I think that that study, I think we weigh it a

5   little bit more heavily because it's more contemporary to what   09:58:50

6   our practice is first in anticoagulation.  Anticoagulation

7   therapy has move dramatically from the late 1980s to early

8   1990s to when the PREPIC 2 study was started in 2005.  There

9   have been big changes.

10  Q.   And what was the opinion you arrived at from that study?   09:59:07

11  A.   That, basically, that we don't have good data that show

12  that IVC filters prevent fatal pulmonary embolism or, you know,

13  when you have in conjunction with anticoagulation prevent

14  pulmonary embolism.

15  Q.   Is there any study out there that would support a           09:59:26

16  statement that filters will save lives?

17  A.   We have no data to support that because there are very few

18  fatal pulmonary emboli in any of the studies.

19  Q.   I'm going to ask that Exhibit 4070 be displayed to you and

20  I.                                                                 09:59:52

21       Can you identify Exhibit 4070, please.

22  A.   So this looks like a correlation between intravascular

23  ultrasound and CT scan measurements --

24  Q.   Oops.  I think that's the wrong one.  Excuse me.  I'm

25  looking for the PREPIC 2 study which I show as 4070.              10:00:07

MICHAEL STREIFF, M.D. - Direct

1        All right.  Can we go to the conclusion here?                    10:00:22

2        MR. O'CONNOR:  I apologize, Dr. Streiff, for some

3    reason I have got the wrong exhibit number.  I'm trying to find

4    the PREPIC 2 study.

5    BY MR. O'CONNOR:                                                     10:01:01

6    Q.   Can you just tell when you say that study was published?

7    A.   That was published I believe 2014 or so in JAMA.  That's

8    my recollection, 2014, 2015.

9        MR. O'CONNOR:  Your Honor, I believe that the study

10   is marked as an exhibit but I'm just having a hard time          10:01:21

11   identifying the exhibit number now.  Somehow my notes are

12   incorrect on the exhibit number.

13       May I approach the witness and show him my copy?

14       THE COURT:  Well, not unless you can identify the

15   exhibit number.  You need to have in the record what exhibit    10:01:36

16   he's seeing.

17       THE WITNESS:  It came up.  It's here.

18       MR. O'CONNOR:  What exhibit number is this, Greg?

19       MR. WOODY:  4147.

20       MR. O'CONNOR:  All right.  I was off by --               10:01:46

21   BY MR. O'CONNOR:

22   Q.   It's 4147.  Can you identify 4147, please.

23   A.   Yes.  So this is the publication outlining the results of

24   the PREPIC 2 study.

25   Q.   And, quickly, when you talk about studies, is there a      10:01:59

United States District Court

MICHAEL STREIFF, M.D. - Direct

1    hierarchy of studies that -- in terms of strength reliability?    10:02:02

2    A.    Certainly.  That, I guess, the lowest level of evidence

3    would be anecdotal evidence in a doctor's practice.  You know,

4    I've seen so many patients.  My recollection and I think people

5    don't do well with aspirin for headaches or something like    10:02:21

6    that.

7        A little bit higher level of evidence would be where

8    you've collected a large number of patients retrospectively, so

9    you collected them over time, and then look and see okay, how

10   did these people that are warfarin do for their pulmonary    10:02:37

11   embolism?

12       A little bit better study would be one that you have

13   prospective follow-up.  So you basically say, okay, I'm going

14   to follow everybody that has a pulmonary embolism.  I'm going

15   to collect data prospectively, which is good, because if you    10:02:53

16   look retrospectively, sometimes you forget to get -- you forget

17   to collect certain pieces of data, like this person had heart

18   failure or this person had a history of arthritis which may

19   influence how many pulmonary emboli happened during treatment.

20       But if you do a study where you say, okay, I'm going    10:03:11

21   to collect a thousand patients that have pulmonary embolism.

22   I'm going to get all of this data, age, sex, all of this data

23   that you have, and then go forward and see how they do with a

24   particular treatment.  Then you don't have missing data like

25   you do with a retrospective study, so that's a little bit    10:03:26

United States District Court

MICHAEL STREIFF, M.D. - Direct

1    better, higher level of evidence.                          10:03:31

2            And then above that you'd have open, randomized

3    trials.  What does open mean?  It means that doctors and

4    patients know what group they are in.  And that is -- like the

5    PREPIC studies are like that, that basically the doctors knew   10:03:42

6    which patients got filters and the patients also knew which --

7    you know who got a filter and who didn't get a filter.

8            Why is that a problem?  Well, as humans we behave --

9    if we know something about somebody, we know they have got a

10   filter, we may change the way we evaluate symptoms going       10:04:01

11   forward.  So let's say they are in the filter group and we know

12   they got a filter and so we may change the way we investigate

13   symptoms like shortness of breath or leg pain.  So we may, for

14   instance, do a CT scan and say, "Oh, we're wary that they may

15   have a pulmonary embolism," or would they be less likely to do  10:04:19

16   a CT scan, so open label studies are less --

17   Q.   Eliminate bias?

18   A.   Yes.  So there's bias.  So open label studies, there's

19   investigative bias, there's some investigative bias,

20   surveillance bias.                                             10:04:34

21           And then the highest level is where you have a

22   double-blinded study so patients don't know what they got,

23   doctors don't know what they got, and then you don't have that

24   bias.  You don't know what treatment they got.

25           And so all your approaches to symptoms are completely  10:04:47

United States District Court

MICHAEL STREIFF, M.D. - Direct

1    without bias and that is the highest level of study.         10:04:52

2    Unfortunately, we don't have any of those.  We don't have any

3    studies in the filter space like that.  We have lots of studies

4    in the anticoagulation space that are completely double-blind.

5    We don't know if they got warfarin or Zarelto or Eliquis and so  10:05:04

6    those are the highest-level studies because you eliminate bias

7    in that regard.

8    Q.   Just so we're clear, in these PREPIC studies and

9    specifically the study you're looking at, was there a type of

10   filter that was used?  Was it a retrievable filter?        10:05:21

11   A.   Yes.  So that was the ALN filter which is French

12   retrievable filter.

13   Q.   And for your opinions today, is that -- this article

14   reliable?  Is it authority that hematologists like you would

15   rely upon in rendering opinions, whether they are here in court  10:05:36

16   or in your actual practice with your patients?

17   A.   I think we think this is the most reliable study that has

18   been done on retrievable filters.

19          MR. O'CONNOR:  And if we could, Greg, can we go to

20   the conclusion of the -- Exhibit 4171?              10:05:54

21          MR. NORTH:  Your Honor, I'm going to object to

22   reading part of the document until it's admitted.

23          MR. O'CONNOR:  I haven't read it yet.

24          THE COURT:  He hasn't read it yet.

25          MR. NORTH:  I'm sorry.  I thought he asked him to.   10:06:10

MICHAEL STREIFF, M.D. - Direct

1    BY MR. O'CONNOR:                                                    10:06:12

2    Q.   So, Dr. Streiff, is Exhibit 4171 the Mismetti study which

3    is known as PREPIC 2, is it all authoritative and reliable?

4    A.   Yes.

5              THE COURT:   Could you restate the number of the         10:06:25

6    exhibit?

7    BY MR. O'CONNOR:

8    Q.   I believe it's 4171.

9              MR. WOODY:   4147.

10             MR. O'CONNOR:   All right.                                10:06:36

11   BY MR. O'CONNOR:

12   Q.   4147 and that's actually how I did write it down.  My

13   tracking numbers in order sometimes is an issue.  So we're

14   looking at 4147.

15   A.   M'hum.                                                         10:06:46

16   Q.   Is that an article that is reasonably relied upon by

17   medical doctors who treat patients for blood clots?

18   A.   Yes, sir.

19             MR. O'CONNOR:   At this time, I would move for

20   admission of 4147, Your Honor.                                     10:06:59

21             MR. NORTH:   Your Honor, this -- he has established I

22   think the prerequisites of 803.18 but it would be subject to

23   those limitations.

24             THE COURT:   Right.  So we're not going to put the

25   document in evidence, but you may read from it.                    10:07:11

United States District Court

MICHAEL STREIFF, M.D. - Direct

1      MR. O'CONNOR:  I would just like to draw his          10:07:13

2  attention to the conclusion and publish that to the jury.

3      THE COURT:  No.  We're not publishing.  You can

4  have -- we're doing what we did yesterday.  You can have him

5  read from it but we're not admitting the document for review by   10:07:23

6  the jury.

7      MR. O'CONNOR:  Okay.  I thought we were able to

8  display a part of it.  I understand.

9  BY MR. O'CONNOR:

10 Q.   Dr. Streiff, could you just go ahead and look at the       10:07:33

11 conclusion of the Mismetti article?

12 A.   So the conclusion states that among hospitalized patients

13 with severe acute pulmonary embolism, the use of a retrievable

14 inferior vena cava filter plus anticoagulation compared with

15 anticoagulation alone did not reduce the risk of symptomatic    10:07:51

16 recurrent pulmonary embolism at three months.  These findings

17 do not support the use of this type of filter in patients who

18 can be treated with anticoagulation.

19 Q.   All right, sir.  Thank you.

20      Now, your second opinion.  What is your opinion on        10:08:08

21 the second issue you looked at?

22 A.   Yes.  So the second issue that they asked me to look at

23 was the utility of filters in prevention of pulmonary embolism

24 in patients that didn't have a clot already and there are a

25 number of high-risk patient groups at risk for developing DVT   10:08:25

MICHAEL STREIFF, M.D. - Direct

1    or PE, many surgical patients such as trauma patients,          10:08:29

2    bariatric surgery patients, where there have been some studies

3    done for looking at filters.

4          Unfortunately, there are no randomized, open              10:08:42

5    randomized or blinded randomized studies in this space so it's,

6    generally, retrospective observational studies so a lower level

7    of evidence that have looked at it.

8          And the evidence is very -- there's a very low level

9    of evidence.  There could be a lot of biases in those studies.

10   So my opinion was that we don't have very good evidence that     10:09:00

11   they prevent pulmonary embolism in those patient populations.

12   Q.   Is that an opinion that you hold to a reasonable degree of

13   medical probability?

14   A.   Yes.  I think that's the data we have.

15   Q.   And would you explain to the members of the jury what      10:09:17

16   supports that opinion, Dr. Streiff?

17   A.   So that there are a number -- as I said, a number of

18   studies that have been done looking at outcomes of people that

19   did and didn't get filters in the setting of trauma surgery or

20   bariatric surgery, and really the level of evidence is so low    10:09:35

21   that it's hard to know whether filters are doing anything or

22   not in that because there are differences between the patient

23   population.

24         So, really, to say that with a high degree of

25   certainty, you need either an open label randomized study,       10:09:49

United States District Court

514

MICHAEL STREIFF, M.D. - Direct

1   which is -- could be easily designed where you take -- you do          10:09:53

2   the same thing as the PREPIC study.  You would take trauma

3   surgery patients all getting prophylactic anticoagulation

4   because you couldn't leave them unprotected.  You would have to

5   give them standard of care and then add filters into that          10:10:08

6   situation and do filters reduce the number of pulmonary emboli?

7          And you could look at symptomatic events.  And you

8   could look with CT scans to see if they had a pulmonary

9   embolism.  That's a study that has been suggested a number of

10  times, has not been done in a sizable population.  So I think          10:10:20

11  that's the evidence we need right now.  We're left with a level

12  of evidence that doesn't give us a lot of certainty that they

13  do anything.

14  Q.   So, again, is there any support for a statement that

15  someone would make that filters save lives?          10:10:35

16  A.   Not in that patient population, no.  We don't have good

17  level of -- I mean I think we can't conclude that from the

18  evidence that we have because there's so many limitations to

19  the evidence.

20  Q.   Would that be an incorrect statement?          10:10:50

21  A.   Yes.

22  Q.   Thank you.

23         You had a third issue that you addressed in this case

24  and I think you said that was reasonable expectations of

25  doctors when they are looking at medical devices for medical          10:11:00

515

MICHAEL STREIFF, M.D. - Direct

1   device companies; correct?                                    10:11:06

2   A.   Yeah.

3   Q.   And let me just get a little more foundation from you.

4   A.   Sure.

5   Q.   In your practice -- well, you teach medical students;    10:11:11

6   correct?

7   A.   Yes.  I just finished doing a hematology course.  I just

8   finished the hematology course for the med students.

9   Q.   And you also operate a clinic at Johns Hopkins?

10  A.   Yes, sir.                                                 10:11:26

11  Q.   And is that a world-renowned clinic?

12  A.   Yes.

13  Q.   Do you consult with doctors in different disciplines?

14  A.   Certainly, all the time.

15  Q.   Do you consult with cardiovascular surgeons?            10:11:33

16  A.   All the time.

17  Q.   Do those doctors come to you and interventional

18  radiologists?

19  A.   Yes, sir.  I have a very close relationship.

20  Q.   And when you practice, do you make recommendations on how 10:11:43

21  to treat people who have blood clot disorders?

22  A.   All the time.  Every week -- you know, if I'm on service,

23  every day.

24  Q.   And are you knowledgeable about IVC filters and what are

25  out there in the market?                                      10:11:56

United States District Court

516

MICHAEL STREIFF, M.D. - Direct

1  A.   Yes, I -- I have read -- I know the literature very well.      10:11:57

2  Q.   Now, in this case, your work pertained to Bard; is that

3  correct?

4  A.   Yes, sir.

5  Q.   Could you tell us what your opinion, is what reasonable      10:12:09

6  expectations do doctors have in information that should be

7  provided by a medical device company that provides IVC filters?

8  A.   So, you know, I think if I'm in clinic or seeing a patient

9  in the hospital service and I'm asked all the time to give

10 advice regarding how do we treat this patient?  When you're      10:12:30

11 sitting down with a patient, what you want is you want good

12 data to go to them to tell them what are the risks and benefits

13 of any intervention.

14       Anticoagulation, you want to know what is the risk of

15 bleeding with the anticoagulation, how efficacious is the      10:12:45

16 anticoagulation, you want it to work.  You want the same thing

17 with a device, to be able to sit down with them and say, "This

18 device is -- has -- you know, the data show it prevents

19 pulmonary embolism to this degree and it is associated with

20 these risks."      10:13:03

21       Unfortunately, given the literature we have right

22 now, we don't have that data.  We don't -- if you look in

23 the -- if you look -- we don't have the information.  We don't

24 have percentages of outcomes to a reasonable degree.  We don't

25 have certainty.  Certainty is not there.      10:13:19

United States District Court

MICHAEL STREIFF, M.D. - Direct

1   Q.   And Dr. Streiff, if a company like Bard had information          10:13:21

2   regarding internal information about whether -- how its filter

3   compared to others or even its own filters in terms of failure

4   rates, is that something that physicians like you reasonably

5   expect to learn from a medical device company like Bard?          10:13:34

6   A.   Sure.  How do you sit down -- how do you give a patient

7   advice about any treatment if you don't have the risks and

8   benefits?  If you don't have that, then you can't give good

9   advice to patients and the physician can't make a reasoned

10  judgment and the patient can't make their own reasoned          10:13:50

11  judgment, yeah, I want to do that or no, I don't want to do

12  that because I'm an adviser to them when I'm sitting in clinic.

13  I'm telling them this is my judgment of the literature.  This

14  is what I would do.

15  Q.   Just for filters, do you have an opinion whether -- where          10:14:03

16  the risks relate to benefits.

17  A.   So I think, as I stated before, I think our evidence basis

18  right now shows us if you can use anticoagulation, there's no

19  reason to use a filter for prevention of pulmonary embolism.

20  There's no reason at all to use that.  And the level of          10:14:22

21  evidence is -- except for the PREPIC study is low as far as the

22  negative outcomes of it.  There are a number of negative

23  outcomes associated with filters that, again, the level of

24  evidence on those is quite low because we haven't done the

25  studies.          10:14:41

United States District Court

MICHAEL STREIFF, M.D. - Direct

1          And I think there are a lot of studies that could be        10:14:41

2    done to establish more precisely the estimates of this filter,

3    how many of these filters migrate.  How many of these filters

4    cause perforation.  How many of these filters fracture.  And

5    right now we look -- we're basically having to deal with small    10:14:53

6    retrospective reports.

7    Q.   That's something that you would want and expect from the

8    medical device company?

9    A.   Sure.  Just like you do from -- when you're sitting down

10   to talk about Coumadin or rivaroxaban or any anticoagulant.       10:15:05

11   These are the risks, these are the benefits.  These are the

12   benefits on both sides so that you can make a reasoned

13   decision.

14   Q.   Is it your opinion if a medical device company like Bard

15   has information about its rates of failures and how they          10:15:22

16   compared to other filters, including its own that, that

17   information must be disclosed to doctors?

18   A.   Certainly.  Otherwise, how could we practice -- how can we

19   advise patients accurately?

20   Q.   Is that an opinion that you hold to a reasonable degree of   10:15:34

21   medical probability?

22   A.   Yes, sir.

23   Q.   Now something I forgot to ask you at the beginning.

24   You're compensated for your time here?

25   A.   Yes, sir.                                                    10:15:43

United States District Court

MICHAEL STREIFF, M.D. - Direct

1   Q.   How much?                                                        10:15:44

2   A.   So $700 an hour for reviewing -- doing depositions,

3   reviewing medical information, yeah.

4   Q.   And how much time have you put in this case?

5   A.   Say about 10 to 15 hours, something like that.  Maybe --        10:15:56

6   you know, somewhere in that.

7   Q.   And from time to time are you asked to consult outside of

8   litigation?

9   A.   Certainly.  I have been involved in medical malpractice

10  cases.                                                               10:16:11

11  Q.   Things that don't involve court matters.  Have you been

12  approached by medical device companies?

13  A.   Oh.  So medical device companies, yeah.  We just -- we're

14  finishing a study with a point-of-care monitor for Roche.

15  Q.   Do you charge for your time when you are approached by          10:16:25

16  medical device companies?

17  A.   Certainly, yeah, for our involvement in that study.

18  Q.   Have you ever been approached by Bard?

19            MR. NORTH:  Objection, Your Honor.  402.

20            THE COURT:  Sustained.                                     10:16:40

21            MR. O'CONNOR:  Well, Your Honor, he had discussions

22  with Bard and his testimony is going to explain those

23  discussions.

24            THE COURT:  Well, we better talk of that at sidebar

25  because I've already made a ruling on that issue with respect        10:16:53

United States District Court

MICHAEL STREIFF, M.D. - Direct

| | | |
|---|---|---|
| 1 | to experts.  If you want to be approach. | 10:16:54 |
| 2 | (At sidebar 10:17.) | |
| 3 | THE COURT:  Where are you going? | |
| 4 | MR. O'CONNOR:  He testified he was asked by defense | |
| 5 | counsel if he ever met with Bard.  He said yes.  They met with | 10:17:16 |
| 6 | him about doing work for their company.  He suggested they do a | |
| 7 | study and he never heard from them again. | |
| 8 | THE COURT:  What's the relevancy? | |
| 9 | MR. O'CONNOR:  That Bard hasn't done any clinical | |
| 10 | studies even though they have been advised by a top expert in | 10:17:31 |
| 11 | the field. | |
| 12 | THE COURT:  Did he tell them to do a study? | |
| 13 | MR. O'CONNOR:  He suggested that they do a study. | |
| 14 | MR. NORTH:  That's the first I've heard about that. | |
| 15 | MR. O'CONNOR:  It's in his deposition. | 10:17:42 |
| 16 | MR. NORTH:  I just don't recall that.  I don't see | |
| 17 | how that's relevant and I think under 403 -- | |
| 18 | THE COURT:  Well, we're going to take a break in 12 | |
| 19 | minutes.  Don't go into it now.  Let's have you show it to him. | |
| 20 | MR. O'CONNOR:  I'm going to wrap up with him. | 10:17:55 |
| 21 | THE COURT:  Well, that's fine.  You can do it on | |
| 22 | redirect, if I let you do it, but show him where it is in the | |
| 23 | deposition over the break.  And if there's an issue, then we'll | |
| 24 | talk about it after the break and if I allow it, you can do it | |
| 25 | in redirect. | 10:18:08 |

United States District Court

MICHAEL STREIFF, M.D. - Cross

1    MR. O'CONNOR:  It's just two to three questions.          10:18:12

2    THE COURT:  I know that but your point is you're

3  trying to prove that he told Bard to do a study and they didn't

4  do it.

5    MR. O'CONNOR:  Yes.                                       10:18:19

6    THE COURT:  Okay.

7    MR. O'CONNOR:  He suggested that they do it.

8    THE COURT:  If that's in the deposition, I'll let you

9  ask it.  You need to show him it is.

10   MR. O'CONNOR:  I'll take care of that.                    10:18:27

11       (End of sidebar discussion.)

12   THE COURT:  Thank you, ladies and gentlemen.

13 BY MR. O'CONNOR:

14 Q.  All right.  Doctor, just to conclude, your opinions today,

15 are they to a reasonable degree of medical probability, medical  10:18:59

16 certainty?

17 A.  Yes, sir.

18 Q.  And have we covered your opinions in this case?

19 A.  Yeah.  M'hum.

20 Q.  All right.  Thank you.                                  10:19:11

21 A.  Sure.

22   THE COURT:  All right.  Cross-examination?

23   MR. NORTH:  Yes, Your Honor.

24            **CROSS - EXAMINATION**

25 \\\

                  United States District Court

MICHAEL STREIFF, M.D. - Cross

BY MR. NORTH:                                                    10:19:19

Q.   Good morning, Dr. Streiff.  I don't believe you and I have

ever met each other before.

A.   That's true.

Q.   But you have been deposed in this case by one of my         10:19:42

colleagues; correct?

A.   Yes, sir.

Q.   Now, I believe you told the members of the jury a moment

ago that it is your opinion that if you can use the

anticoagulation as a treatment, then there is no reason to use   10:19:52

an inferior vena cava filter; is that correct?

A.   True.

Q.   But conversely, if for some reason a patient cannot be on

anticoagulation for some period of time, then you consider a

filter a proper method of treatment correct?                     10:20:09

A.   I think it depends on the situation.  If I am -- if you

have someone -- because the risk of a pulmonary embolism is

very high right after you have a blood clot.  If you have a new

blood clot in your leg and it's a proximate blood clot, so it's

above the knee, those clots we know are at very high risk for    10:20:33

causing a pulmonary embolism.  So if you just have this blood

clot, then -- and you can't use anticoagulation for whatever

reason, usually massive bleeding in some location or recent

surgery in a location where you can't afford bleeding, then of

course you have to use a filter to prevent pulmonary embolism    10:20:50

United States District Court

MICHAEL STREIFF, M.D. - Cross

1    in that situation.                                                    10:20:53

2              That is usually in the first month or so after you

3    have -- after you have had your blood clot.  As you get further

4    and further out from a proximal deep vein thrombosis, the risk

5    of occurrence goes down.  So often as you get into months two   10:21:08

6    or three the risks are a lot less.  If you're only going to be

7    off for a day or two, a few days, we often don't put filters in

8    in those situations.

9              And certainly if it's been years since your blood

10   clot, there's no reason to put -- if you're off for a week or    10:21:22

11   you know there's no reason to put a filter in that situation,

12   so it's really in that acute DVT situation where you are

13   concerned about someone being off because the risk of

14   recurrence goes way down after you get further out.

15   Q.   And because there are situations like that where someone    10:21:40

16   has had a very recent DVT or pulmonary embolism and has to be

17   taken off of anticoagulation for surgery, that you yourself, as

18   a hematologist, recommend the implant of a filter in certain

19   patients that meet those criteria; correct?

20   A.   Sure.  It depends on a case-by-case basis depending on      10:22:00

21   how -- you know what's the bleeding risk of the procedure, how

22   long do they have to be off.  Our worst case scenario was you

23   have someone that has just had a DVT and they need neurosurgery

24   for a brain tumor or -- when you obviously can't give that

25   person a full dose anticoagulation for at least a week or often  10:22:20

MICHAEL STREIFF, M.D. - Cross

1  two weeks.  So in that case, if you just had a blood clot in          10:22:24
2  your leg, you can't leave him unprotected.  You know, if they
3  have a proximal DVT, you can't leave them unprotected.

4        Now, lesser surgeries where, you know, you can put
5  them right back on, then I would be less inclined to use a          10:22:38
6  filter.  Also if it's been a little bit longer, that first few
7  weeks, up to about four weeks is when you're really worried
8  about it, particularly if it's going to be a long period of
9  time off the anticoagulation, then you don't want to take the
10 chance.                                                             10:22:54

11       So it's kind of a sliding scale.  It's not like an
12 all or none kind of a thing.
13 Q.   You did not place IVC filters yourself as a hematologist;
14 correct?
15 A.   That's correct.  Everybody I see that I'm asked to give an     10:23:05
16 opinion on, I advise them to contact -- they ask me, "How do we
17 treat this patient?"

18       I say, "This person is too close to neurosurgery.  We
19 can't use, safely use full dose anticoagulation.  I think you
20 should contact my interventional radiology colleagues," and       10:23:21
21 then they would place the filter.  So I've never placed a
22 filter.
23 Q.   And so you have, throughout the course of your career,
24 never placed a filter as I understand it?
25 A.   That is true, yes.                                             10:23:35

United States District Court

MICHAEL STREIFF, M.D. - Cross

1  Q.   And you've never removed or retrieved an inferior vena                    10:23:36

2  cava filter?

3  A.   No, I've never retrieved an inferior vena cava.  I refer a

4  lot of patients from my clinic.  If I see they have a filter

5  and don't need it any more, I have colleagues in interventional    10:23:49

6  radiology that I refer them to who are very good at it.

7  Q.   You would agree that a pulmonary embolism is a very

8  serious health event; correct?

9  A.   Yes, pulmonary embolism is very serious.

10 Q.   And, in fact, you've devoted a large part of your career      10:24:03

11 to the treatment of that condition?

12 A.   Yes, sir.

13 Q.   And pulmonary emboli can be associated with death?

14 A.   Certainly in a small number of cases, yes.

15 Q.   And you're aware of statistics that show that several         10:24:19

16 hundred thousand people in this country suffer from blood clots

17 every year?

18 A.   Yeah.  I mean, there are a number of epidemiologic studies

19 have been done.  The CDC has done one, Mayo Clinic has done

20 one.  Researcher in California has done one where they show the    10:24:34

21 rates of anywhere 600,000 to 900,000 DVT and pulmonary emboli

22 every year and, you know, a few hundred thousand PE, about

23 two-thirds of them are DVT and about a third are PEs.

24 Q.   And thousands of people die from blood clots every year;

25 correct?                                                           10:24:58

United States District Court

MICHAEL STREIFF, M.D. - Cross

1    A.    Yeah.  No, I think that's true.                    10:24:59

2    Q.    And some patients are at higher risk for developing deep

3    vein thrombosis and pulmonary embolism than others; correct?

4    A.    That's very true.

5    Q.    And cancer patients are particularly prone to developing    10:25:11

6    DVT or pulmonary emboli; correct?

7    A.    Yes, sir.

8    Q.    And you're familiar with some studies that estimate that

9    up to 20 percent of cancer patients will have some sort of

10   thrombotic or clotting event?                              10:25:29

11   A.    That's true, yes.

12   Q.    And that number is about four times the number of somebody

13   that is not being treated for cancer?

14   A.    True, yes.

15   Q.    You spend most of your time professionally administering    10:25:46

16   or prescribing and dealing with anticoagulation; correct?

17   A.    That's true.

18   Q.    But you would agree that anticoagulants themselves are not

19   without risk.

20   A.    No.  No.  There's -- I mean, every medication and     10:25:57

21   procedure, there's a risk-benefit ratio which is why you sit

22   down and look at that individual patient's risk factors.  If

23   they have low platelets, you can't use an anticoagulant.  If

24   their platelet count is good, you can.  It's on a case-by-case

25   using the literature as your evidence guide.                10:26:14

United States District Court

MICHAEL STREIFF, M.D. - Cross

1  Q.   And there are sometimes fatal bleeding events associated        10:26:19

2  with the taking of anticoagulants; correct?

3  A.   That's true.

4  Q.   And that can be -- do you have an estimate on how many

5  patients that are taking anticoagulation can die from bleeding        10:26:30

6  events?

7  A.   So percentage-wise, I think that the -- if you're using

8  either warfarin or Coumadin as -- and more people know about it

9  by that name or any of these new anticoagulants, the Xareltos

10 or Eliquises, about two percent of people every year that are         10:26:50

11 on those drugs will have a major bleed and a fraction of one

12 percent, .5 percent, with warfarin and maybe .3 percent with

13 the newer anticoagulants will have a fatal bleeding event every

14 year that they are on that.

15         So those randomized trials that those -- that the            10:27:08

16 manufacturers did, that was the rate.  So those are probably

17 the best estimates of the outcomes with anticoagulation.

18 Q.   And the number of patients, at least a small number of

19 patients on anticoagulation, even though they are on that

20 medication may suffer a pulmonary embolism anyway; correct?         10:27:25

21 A.   True.  I would say it's rare but it definitely does occur.

22 There's -- I would say the cancer patient population, not every

23 anticoagulant is effective for them, that some patients --

24 warfarin is not good enough for some patients who have cancer

25 and they have to be either on a low molecular weight heparin or      10:27:44

United States District Court

MICHAEL STREIFF, M.D. - Cross

1   maybe one of the newer drugs.  It's a small percentage but                    10:27:48

2   there is a percentage of patients that have cancer, percentage

3   of patients with some clotting diseases like antiphospholipid

4   syndrome that are resistant to some treatments like Coumadin

5   for instance.                                                                 10:28:01

6   Q.   And I think, as you've suggested in some of your previous

7   testimony, you would agree that patients cannot always be

8   treated with anticoagulants; correct?

9   A.   Yeah.  I believe it's a small -- as I said, we talked

10  about before, it's a small percentage.  I would say that if      10:28:14

11  you've got someone in a situation where they are actively

12  bleeding.  They have an active bleed from somewhere that is

13  life-threatening, you can't thin their blood.  That will make

14  that bleed worse.  So you couldn't safely do that.

15        If they have an acute clot, then I think that's where       10:28:29

16  you have to consider filters.  That's your -- that's your

17  second line of defense, I would say, against pulmonary

18  embolism.  If you can't thin their blood to prevent a pulmonary

19  embolism from recurring, then you have to put a physical

20  barrier there.  And that's when I think hematologists agree       10:28:42

21  that that would be the situation you would use filters in.

22  Q.   And for that subset of patients, you would agree that the

23  development of inferior vena cava filters has been an important

24  advancement in medicine; correct?

25  A.   I think that for that specific patient population, when       10:29:00

United States District Court

MICHAEL STREIFF, M.D. - Cross

1    you can't use anticoagulation, you need to use something and          10:29:03

2    that's where we use filters.

3    Q.    And in that subset of patients, those that have had recent

4    clotting and are going to undergo surgery, you believe that

5    filters provide some benefits to those patients; correct?          10:29:17

6    A.    I would say, again, that certainly there are a subset of

7    patients that are having surgery that have had just an acute

8    event where you can't use anticoagulation or they are going to

9    have to be off anticoagulation for too long where you would

10   want to place a filter.                                             10:29:37

11   Q.    And in those instances with that situation, you would

12   agree that filter could be a life-saving device; correct?

13   A.    Well, I think we -- potentially, I guess that's an area

14   where we don't have a lot of data.  You know, as far as if you

15   look at all the studies and there's no significant difference      10:29:54

16   in fatal pulmonary emboli on the studies between the PREPIC

17   trials between the two groups.  So that's where I think it

18   would be nice to have more data to support that.  I think you

19   could suggest that in the old PREPIC trial that there were

20   fewer -- if you look at all pulmonary emboli, ones they picked     10:30:11

21   up on scans and ones that were symptomatic, that in that old

22   study that had older anticoagulation, older filters, that there

23   did seem to be fewer pulmonary emboli in that open randomized

24   trial.

25          In the more recent trial, the PREPIC 2 study, there         10:30:28

United States District Court

1    wasn't any difference.  So I think that right now we're left     10:30:31

2    with if you can anticoagulate, there's not a reason to use a

3    filter.

4              THE COURT:  We've reached 10:30.  We're going to take

5    a break, Mr. North.                                               10:30:43

6              MR. NORTH:  Thank you, Your Honor.

7              THE COURT:  Ladies and gentlemen, we'll resume at a

8    quarter to.  We'll excuse the jury.

9              (Jury departs at 10:30.)

10             (Recess at 10:31; resumed at 10:46.)                    10:31:07

11             (Jury enters at 10:46.)

12             (Court was called to order by the courtroom deputy.)

13             THE COURT:  Thank you.

14             THE WITNESS:  Please be seated.

15             You may continue, Mr. North.                            10:46:46

16             MR. NORTH:  Thank you, Your Honor.

17   BY MR. NORTH:

18   Q.   Dr. Streiff, before the break, I had asked you about

19   whether, in your opinion, filters were life-saving devices for

20   that particular subset of patients that you described where you  10:46:58

21   yourself would recommend a filter.  You talked to us then in

22   response about the PREPIC studies.

23   A.   Right.

24   Q.   But be the PREPIC studies, as I understand it, all of the

25   patients were simultaneously on anticoagulation and received a   10:47:13

United States District Court

MICHAEL STREIFF, M.D. - Cross

1    filter; is that correct?                                        10:47:19

2    A.    That's true, yeah.

3    Q.    And the subset of patients that you would recommend

4    filters for are those that can't be on anticoagulation;

5    correct?                                                        10:47:29

6    A.    Correct.

7    Q.    So in that subset of patients, when you yourself would

8    recommend a filter, do you believe the device is potentially

9    life-saving?

10   A.    Possibly.  I mean, I hate to be equivocating but we don't  10:47:50

11   have -- there are no studies to kind of support in a situation

12   where you can't do anything else that they help.  My assumption

13   is it's good to do that because it will provide a physical

14   barrier to a pulmonary embolism, but do we -- you know, that's

15   based on belief, not based on data because we don't have        10:48:10

16   studies, you know, in patients that are not getting anything.

17   Q.    So when you recommend a filter, you do so because you're

18   hoping to provide protection for a potentially fatal pulmonary

19   embolism; correct?

20   A.    We're doing that on the belief that they may help us in    10:48:32

21   that regard.  We just -- as I said, we would like to have

22   evidence to support that.  We don't have any evidence right

23   now.

24   Q.    When you first started practicing medicine in the late

25   1980s or early 1990s, the only kind of filters available were   10:48:48

United States District Court

MICHAEL STREIFF, M.D. - Cross

1    permanent; correct?                                                    10:48:52

2    A.    That's correct, sir.

3    Q.    And you would agree with me that it's a good thing now to

4    have available a filter that can be retrieved like the Bard G2

5    filter?                                                                10:49:02

6    A.    Well, I think if it works as well as the permanent

7    filters, yes.  And I believe the primary reason you place a

8    filter is to provide a barrier as we talked about, as a barrier

9    to pulmonary embolism occurring in a patient you can't

10   anticoagulate.  So if the retrievable filters are as safe and    10:49:18

11   efficacious as permanent filters I would say yes, that you --

12   it's nice to have something that you could remove.

13   Q.    Now, when someone is unable to be on anticoagulation for a

14   short period of time but, nevertheless, it would be a patient

15   that you would recommend a filter for, wouldn't you prefer that   10:49:42

16   a retrievable or optional filter be used in that circumstance

17   so it can be removed after the patient can go back on

18   anticoagulation?

19   A.    Certainly.  If it's safe and effective.  I mean, I think

20   if it doesn't have at lot of side effects and it could be        10:49:58

21   easily removed, then, yes, assuming it fulfills all of those

22   requirements.

23   Q.    Now, at Johns Hopkins where you are currently working, IVC

24   filters continue to be used to this day; correct?

25   A.    Yes, sir.                                                       10:50:12

MICHAEL STREIFF, M.D. - Cross

Q.   And can you estimate for us how many filters are implanted    10:50:19
at Johns Hopkins each year?

A.   This is a rough estimate.  I would say 150 maybe,
something like that.  I don't know because I don't keep tabs on
the number that are being placed.  My interventional colleagues    10:50:34
would know better but I'm guessing around 100, 150, maybe 200.
It's decreased.  At one point I think we were at 400 a year.

Q.   And I believe you told us previously that you yourself
recommend the placement of an inferior vena cava filter in
roughly 12 patients a year?                                         10:50:55

A.   Yeah.  I would guess that, something on that.  It's a
rough guess.  In those situations again that I described where
you have someone that you feel like -- as a physician, you
don't want any harm to come to somebody and you don't -- it's
better than nothing right now.  And I think it makes sense to      10:51:13
me it might provide a barrier to pulmonary embolism occurring.
And if you can't use anticoagulation, you can't do nothing in
that situation.  So I think our personal ethics would be that
you have to do something.

Q.   Now, you have told us what your personal criteria or        10:51:31
professional criteria for prescribing or recommending an IVC
filter is?

A.   M'hum.

Q.   You would agree, though, that some of the major physician
organizations have differing criteria for when it's appropriate   10:51:46

United States District Court

MICHAEL STREIFF, M.D. - Cross

1    to implant filters; correct?                                          10:51:51

2    A.    Certainly.   There has been evolution over time if you look

3    at organizations that -- ACCP, the American College of Chest

4    Physicians, which is primarily hematologists and pulmonary

5    docs, have much stricter criteria than, I would say, surgeons      10:52:03

6    and interventional radiologists so it varies.

7    Q.    So the Society of Interventional Radiologists, for

8    example, have broader criteria than you do for when filters are

9    appropriate?

10   A.    Yes, and we had lots of discussions about those criteria,     10:52:21

11   yeah.

12   Q.    And also the United States Food and Drug Administration

13   has cleared filters for indications that are broader than what

14   you would recommend; correct?

15   A.    I guess it's possible.   I don't know, you know, the FDA --   10:52:37

16   what the indication, the specific FDA indications for filters

17   are off the top of my head.

18   Q.    And so various types of physicians have disagreements or

19   at least differing criteria as to when IVC filters should be

20   implanted?                                                          10:53:03

21   A.    Yeah, depending on their interpretation of the literature,

22   looking at the literature.   I think that in areas where you

23   have differing opinions, it's -- this is my opinion but it's

24   often because you don't have definitive data that suggests one

25   strategy is definitely safer than another.                         10:53:21

MICHAEL STREIFF, M.D. - Cross

1       We have that for all of these new oral                    10:53:24
2   anticoagulants, you have blinded, randomized, controlled trials
3   that definitely the data show you what their efficacy and
4   safety is in the patients that were enrolled in those studies.
5   We don't have -- that's a deficit that we have in the filter    10:53:41
6   world that I think if you had that data, I think it would be
7   fewer -- the disparity of opinion or the differences of opinion
8   would be less because you could point it out and say, "This
9   study here shows such-and-such."

10      But right now we have two pretty good studies and          10:53:57
11  then a lot of other studies that are -- that have lots of bias
12  and so you can't be certain as to whether the conclusions those
13  studies came to are based on solid ground because they are not
14  blinded, randomized studies.

15  Q.  Dr. Streiff, you would agree that physicians who practice   10:54:18
16  in the area of hematology like you do generally have a more
17  narrow view of when filters are appropriate than interventional
18  radiologists, for example?

19  A.  I think that on the whole, that that is correct, yes, and
20  maybe it's because we see people that have complications from    10:54:37
21  filter.  We also have a lot more familiarity with
22  anticoagulants than the interventional radiologists.

23  Q.  Now, you have talked at length about these PREPIC studies
24  and I believe you acknowledged a few moments ago that both
25  PREPIC studies involved patients who were simultaneously taking  10:54:56

1   anticoagulants and also had a filter implanted; correct?   10:55:02

2   A.    That's true.

3   Q.    And neither study looked at patients who only had a filter

4   without the accompanying medication?

5   A.    That's true, just because -- we don't have -- at this   10:55:13

6   point we think it would be unethical to have randomized

7   patients to one where they wouldn't get anything.  We don't

8   have any way to make certain that they wouldn't have a bad

9   outcome.  So I think the only studies that you could do in that

10  regard would be prophylaxis studies like in high-risk trauma   10:55:30

11  patients, you could randomize people who are at high risk for

12  events but get standard DVT prevention therapy and could

13  randomize them both getting DVT prevention therapy, low-dose

14  anticoagulation, and then one-arm filters, you could do that

15  study I think ethically.   10:55:50

16          And I think someone -- a colleague of mine, Anita

17  Rajasekhar, did a small pilot study in that regard.

18  Q.    Now, the PREPIC 1 study examined only permanent filters;

19  correct?

20  A.    That's true.   10:56:03

21  Q.    And the PREPIC 2 study examined or looked at only one type

22  of filter manufactured by a company called ALN; correct?

23  A.    That's true.

24  Q.    And neither one of these studies addressed Bard filters,

25  did they?   10:56:18

MICHAEL STREIFF, M.D. - Cross

| | | |
|---|---|---|
| 1 | A.   That's true. | 10:56:18 |
| 2 | Q.   In this case, Dr. Streiff, you have not been asked to | |
| 3 | offer any opinions that are specific to Ms. Booker, have you? | |
| 4 | A.   That's correct. | |
| 5 | Q.   And, therefore, you are not offering any opinions critical | 10:56:47 |
| 6 | of her physicians for implanting an IVC filter? | |
| 7 | A.   True. | |
| 8 | Q.   And you are not offering any opinions regarding whether | |
| 9 | the benefits of placing an IVC filter for Ms. Booker outweigh | |
| 10 | the risks given her specific medical condition and history? | 10:57:02 |
| 11 | A.   Yeah, because I'm not focusing specifically on that case. | |
| 12 | More -- I think they asked me to provide an overview of what | |
| 13 | the literature -- what is the status of the current literature | |
| 14 | for filters supportingly their efficacy and safety. | |
| 15 | Q.   And you were not asked to provide a particular opinion as | 10:57:17 |
| 16 | to whether a filter was appropriate in this individual case? | |
| 17 | A.   True. | |
| 18 | Q.   Thank you, sir. | |
| 19 |         MR. NORTH:   That's all the questions I have. | |
| 20 |         THE COURT:   Any redirect? | 10:57:31 |
| 21 |         MR. O'CONNOR:   When do you want to address the issue | |
| 22 | we raised earlier with you? | |
| 23 |         THE COURT:   Is there an issue? | |
| 24 |         MR. O'CONNOR:   Yes. | |
| 25 |         THE COURT:   All right.   We'll talk about it now. | 10:57:38 |

MICHAEL STREIFF, M.D. - Cross

1           You can stand if you want, ladies and gentlemen.                    10:57:45

2           (At sidebar 10:57.)

3           THE COURT:  I don't want to read it.  Tell me what

4     the situation is.

5           MR. NORTH:  It's my objection.  All he says is that          10:58:00

6     he was there with another physician and had some discussions in

7     the 2006 time frame about doing a trauma filter study

8     specifically and that nothing came of those discussions.  He

9     had a nice, pleasant discussion and that was it.  I just think

10    it's prejudicial.                                                        10:58:18

11          THE COURT:  Your objection was relevancy initially;

12    right?

13          MR. NORTH:  And 403 also.

14          THE COURT:  How is this information relevant to his

15    expert opinion?                                                          10:58:28

16          MR. O'CONNOR:  First of all, it wasn't -- his

17    testimony was:  I mentioned an interest, that it would be great

18    to do a study like a trauma study or something.  It's relevant

19    because Bard approached him.  They were looking for people that

20    would support their filters.  When they told them, "Yeah,               10:58:46

21    great, do a study," they did never talk to him again.

22          THE COURT:  What has that got to do with his expert

23    opinions?

24          MR. O'CONNOR:  Because this company has never done a

25    study.  He has talked about the importance of studies.  He's           10:58:55

United States District Court

MICHAEL STREIFF, M.D. - Redirect

1   just been cross-examined on the limited studies that are out          10:58:58

2   there and this company had an opportunity to do the right thing

3   and they chose not to do it.

4           THE COURT:  Did you list him as a fact witness on

5   this issue?                                                           10:59:10

6           MR. NORTH:  No.

7           MR. O'CONNOR:  Well, I think he's just designated --

8   we disclosed him consistent with his report and this is what he

9   was deposed on, that they asked about.

10          THE COURT:  This isn't part of his expert opinion;           10:59:25

11  right?  This is a fact piece of evidence you want to get in

12  about Bard not doing a study.  I think he's an expert witness

13  and needs to stick to his opinions.  I don't think it's

14  relevant to those opinions so I'm going to sustain the

15  objection.                                                            10:59:37

16          MR. O'CONNOR:  All right.  Thanks.

17          (End of sidebar discussion.)

18                      **REDIRECT EXAMINATION**

19  BY MR. O'CONNOR:

20  Q.   Dr. Streiff, you were just asked on cross-examination           11:00:08

21  about a subset of patients that you would recommend filters

22  for; is that correct?

23  A.   Yes.

24  Q.   But would a doctor expect to know and have the information

25  so he or she could decide on what the safest filter to use?          11:00:11

MICHAEL STREIFF, M.D. - Redirect

1   A.   Certainly.  I think, again, as I said before, with                11:00:17
2   anticoagulants, you have lots of studies to compare which one
3   is the best one to use.  If you have the relevant data, you can
4   advise a patient correctly that I want this or that filter or I
5   want this or that anticoagulant based on the published data and    11:00:34
6   I think that's one of the deficiencies we have in the
7   literature.

8         For anticoagulants, you look at package inserts for
9   any of the drugs out on the market, name them.  There are
10  percentages of all of the risks and the benefits, how it works    11:00:48
11  for pulmonary embolism or DVT.

12        You look at the same thing for the instructions for
13  use for filters and you don't have that data.  There are no
14  data.  They just have these things could happen but no
15  percentages, no guidance.  So you don't have that data to guide    11:01:03
16  the patient as to what's the best filter to choose.
17  Q.   So you would want one that the company has proven was safe
18  and effective?
19  A.   Yes.
20  Q.   And if you were going to recommend an implant, fair to say    11:01:17
21  you would not want one that was defective or dangerous?
22  A.   Of course not.
23  Q.   Now, you were asked questions about your opinions on the
24  short term and when filters are indicated.
25        Given your review of the medical literature regarding        11:01:36

United States District Court

MICHAEL STREIFF, M.D. - Redirect

1    the risk of filters and long-term risks, do you have an opinion    11:01:40

2    based upon your knowledge and scientific research whether a

3    company like Bard should be warning doctors to closely monitor

4    filters after they're implanted?

5    A.   I would think that would be appropriate.    11:01:56

6            MR. NORTH:  Objection, Your Honor.  That's beyond the

7    scope of his expert report.

8            THE COURT:  Is that in his report?

9            MR. O'CONNOR:  About what doctors expect?  Yes.

10           THE COURT:  No.  About the specific issue you just    11:02:05

11   asked.  Is that part of his expert report?

12           MR. O'CONNOR:  About the short-term use of filters,

13   yes.

14           THE COURT:  No.  You asked about a specific warning

15   from Bard, is that in his report?    11:02:17

16           MR. O'CONNOR:  No.

17           THE COURT:  The objection is sustained.

18   BY MR. O'CONNOR:

19   Q.   In your work in this case, did you do research that

20   included articles on Bard?    11:02:25

21   A.   Yes, sir.  I looked at the literature for all the filters.

22   Q.   And was there literature that compared filters that you

23   looked at in terms of which one had higher complication rates?

24   A.   Yes.  With the limited data that are there, you can get a

25   sense of what the complication rates are.    11:02:42

United States District Court

542

MICHAEL STREIFF, M.D. - Redirect

1    Q.   And did you look at Bard filters specifically?          11:02:44

2    A.   Yes.  They were one of the types of filters I looked at as

3    far as complication rates.

4    Q.   I'm sorry?

5    A.   Yes.  I looked at Bard filters, ALN filter, all the        11:02:53

6    different -- as part of my research, I would do that.

7    Q.   And what did your research show you about Bard filters?

8              MR. NORTH:  Objection, Your Honor.  Outside the scope

9    of his expert report.

10             THE COURT:  And I sustained an objection of this      11:03:04

11   kind --

12             MR. O'CONNOR:  Well, he asked him specifically on

13   cross, Your Honor, that the articles were limited to ALN and

14   that's not true and they know that.

15             THE COURT:  He asked about the PREPIC studies being    11:03:14

16   limited to ALN, not all articles.  The objection is sustained.

17   BY MR. O'CONNOR:

18   Q.   Is the goal of the filter to reduce the risk?  Should that

19   be the goal?

20   A.   Yes.  A filter should be -- one, be effective in           11:03:29

21   prevention of pulmonary embolism.  That's the primary goal of

22   the filter.  And, then, two, should be safe in accomplishing

23   that goal.

24   Q.   Are you critical of any doctor that uses filters in this

25   case?                                                           11:03:44

United States District Court

1   A.   Of course not, no.

2   Q.   But what you are here to tell the jury is that doctors

3   have expectations of companies?

4   A.   True, that when you're giving advice to patients, that you

5   can't give good advice if you don't have good data.

6   Q.   And so if a company -- a medical device company like Bard

7   has information that its filters are failing at higher rates

8   than other filters, what should that company be telling

9   doctors?

10  A.   I expect that they would tell doctors and patients that

11  there are problems and that they would remove the filter from

12  the market and make corrections just like you would for, you

13  know, an airbag or something on a car.

14  Q.   And have you seen that done in this case?

15  A.   No.

16          MR. O'CONNOR:   I think that's all I have.

17          THE COURT:   Okay.   Thank you, Doctor.   You can step

18  down.

19          (Witness excused.)

20          THE COURT:   All right.   Plaintiff's counsel, your

21  next witness?

22          MR. O'CONNOR:   Robert McMeeking.

23          COURTROOM DEPUTY:   Sir, if you'll please come

24  forward.   If you'll please stand right here and raise your

25  right hand, please.

11:03:44

11:03:55

11:04:10

11:04:27

11:04:45

11:06:24

1          (ROBERT MCMEEKING, PH.D., a witness herein, was duly          11:06:27

2     sworn or affirmed.)

3          COURTROOM DEPUTY:  Could you please state and spell

4     your name for the record?

5          THE WITNESS:  Robert McMeeking.          11:06:39

6          COURTROOM DEPUTY:  Could you spell your last name,

7     sir?

8          THE WITNESS:  M-C-M-E-E-K-I-N-G.

9          COURTROOM DEPUTY:  Thank you, sir.  Please come have

10    a seat.          11:06:50

11                    **DIRECT EXAMINATION**

12    BY MR. O'CONNOR:

13    Q.   Good morning.  Would you introduce yourself to the members

14    of the jury, please.

15    A.   I'm Robert McMeeking.          11:07:17

16    Q.   And where do you live at the current time?

17    A.   I live in Santa Barbara, California.

18    Q.   Where are you from?

19    A.   Well, I'm from Scotland originally.  I was born in

20    Scotland.          11:07:29

21    Q.   Thank you.

22          Dr. McMeeking, what is your profession?

23    A.   I am a professor of mechanical engineering and I'm a

24    professor of material science and engineering.

25    Q.   And where do you do your work as a professor in mechanical          11:07:41

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1   engineering?                                                            11:07:50

2   A.    At the University of California Santa Barbara.

3   Q.    Thank you.

4            Dr. McMeeking, were you retained by our side, the

5   plaintiff in this case, to look at issues and arrive at     11:07:59

6   opinions?

7   A.    Yes, that's correct.

8   Q.    Could you explain to the members of the jury what you were

9   asked to do in this case, please.

10  A.    I'm here to testify about the engineering and design of    11:08:09

11  Bard IVC filters, specifically the Recovery and the G2 filter.

12  I'm here to tell you about the testing or the lack of it that

13  Bard carried out on those filters, and I'm here to tell you

14  about the impact that the design and testing had on Ms.

15  Booker's filter.                                                   11:08:34

16  Q.    And let's just go through.  Can you tell us what you found

17  on each of those subjects with respect to the Bard, G2, and

18  Recovery filter in terms of design?

19  A.    My opinion is that the Recovery and the G2 filters are

20  defectively designed.  The design causes them to tilt, causes    11:08:52

21  them to perforate the wall of the vena cava which means that

22  they cut through the wall of the vena cava.  The design causes

23  the filters to move in the vena cava and the design also causes

24  fractures of the filters.

25  Q.    And, Dr. McMeeking, in terms of Bard's testing of the       11:09:18

United States District Court

546

ROBERT MCMEEKING, PH.D. - Direct

1   Recovery and G2, what did you find and what did you conclude?                    11:09:21

2   A.   I found that -- I concluded that they did not adhere to

3   standards of safe and reliable design.   They did not carry out

4   tests in an adequate manner to investigate failure modes of the

5   filters.   They did not carry out a root cause analysis of why     11:09:40

6   the Recovery filter failed, especially in terms of its

7   fractures, and they did not carry out tests that they did do to

8   worst case conditions which is a fundamental aspect of what one

9   should do when testing devices to prepare them for the market.

10          In addition, I concluded that the failure of              11:10:10

11  Ms. Booker's filter was caused by these deficiencies in design

12  and testing.

13  Q.   So when you say you have also a third area of opinions on

14  the impact that the design and the lack of testing had on

15  Ms. Booker, that's your opinion?                                  11:10:33

16  A.   That's right.

17  Q.   And what is your opinion in that regard?

18  A.   Oh, my opinion is that because of the inadequacies of the

19  design and of the testing of the filter, that those

20  inadequacies led to the failure of Ms. Booker's failure after    11:10:47

21  it was implanted in her.

22  Q.   All right.   Now let's just talk about your qualifications

23  so the jury can learn more about you.

24          MR. O'CONNOR:   Greg, can you put up Exhibit 2450,

25  please.                                                           11:11:04

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1  BY MR. O'CONNOR:

2  Q.  Dr. McMeeking, we're looking at Exhibit 2450.  Would you

3  tell us what that is, please?

4  A.  That's a copy of my curriculum vitae.

5  Q.  How many pages is it?                                  11:11:32

6  A.  It's about 35 or more I believe.

7  Q.  Well, first of all, just tell us briefly what is a

8  mechanical engineer.  A mechanical and materials engineer?

9  A.  A materials engineer is someone who assesses and studies

10 materials, especially in the context of how they are used in  11:11:51

11 engineering devices and other devices such as medical implants

12 and also looks at the failures of those materials and how they

13 occur.  A mechanical engineer is someone who assesses, studies,

14 designs and creates mechanical devices and machines and similar

15 components that have a mechanical characteristic.             11:12:17

16 Q.  Are mechanical engineers called on to review and solve

17 problems?

18 A.  Well, their two primary purposes are to create new devices

19 and to solve problems with existing devices.

20 Q.  Are there principles that mechanical engineers follow to   11:12:40

21 carry out those goals that you talked about, to carry out those

22 objectives of analyzing, designing, and creating devices in

23 mechanical machines?

24 A.  Yes.  They are to carry out a careful study of the

25 intended use of a component.  They thoroughly test the          11:12:59

United States District Court

548
ROBERT MCMEEKING, PH.D. - Direct

1   component to identify whether it will suffer failures in the          11:13:04
2   setting in which the device is to be used.  And of course to be
3   able to do that, they have to be make assessments of the
4   conditions in which the device will be used, so they will carry
5   out assessments of those things.  They also will carry out          11:13:28
6   tests to investigate the behavior and performance and the
7   failure modes of the device.  And they will carry out
8   calculations to make assessments of the same things.
9   Q.   Does that involve evaluating, assessing, and studying
10  forces, movements, stresses and strains?                            11:13:45
11  A.   That's correct.  The -- some of the main phenomenon, some
12  of the main things that are involved in the work that we do as
13  mechanical engineers is to look at forces and motions of
14  objects and to assess the stresses and strains which components
15  experience.                                                         11:14:08
16  Q.   Now, you're a professor?
17  A.   Yes.
18  Q.   First of all, you're a Ph.D.  What does that mean?
19  A.   It means that I have doctor of philosophy degree which is
20  a degree in which you are trained to undertake research and to      11:14:20
21  undertake the kind of investigations that I was just talking
22  about.  I was educated to an advanced level to be able to have
23  the knowledge and the understanding of the techniques and
24  methods which one would use in the processes that I just
25  described.                                                          11:14:47

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1   Q.   Tell us about your educational history, how you went to be          11:14:47
2   Engineer McMeeking to Dr. McMeeking?
3   A.   Well, I did my bachelor of science in engineering at the
4   University of Glasgow in Scotland where I am what is called the
5   First Class Honors Degree which is the highest category of the          11:15:04
6   degree.  And then I went to graduate school at Brown University
7   in Providence, Rhode Island, and I earned a Master of Science
8   degree there and my Doctor of Philosophy degree, all the time
9   in mechanical engineering and engineering with an orientation
10  towards materials.                                                       11:15:24
11  Q.   So you teach students who are wanting to become engineers?
12  A.   Yes.  I teach mostly mechanical engineers and materials
13  engineers and I teach them the principles of how to investigate
14  and analyze and understand mechanical devices and how to assess
15  their performance and their potential failure and to give them          11:15:51
16  the knowledge and skill to take that activity into their own
17  careers.
18  Q.   Do you also do engineering work yourself?
19  A.   Yes.  I consult for a variety of companies including
20  medical implant companies and I carry out engineering work for          11:16:12
21  those companies in the course of my activities.
22  Q.   How long have you been teaching?
23  A.   I have been teaching for over 45 years including my time
24  as a teaching assistant at Brown University when I was a
25  graduate student.                                                        11:16:30

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1   Q.   And have you, in the course of your career, received any        11:16:32

2   professional awards or honors?

3   A.   Yes, I have.

4   Q.   What have you received?

5   A.   Well, I have been elected to three bodies which are very        11:16:40

6   selective in terms of who gets into those organizations.   I was

7   elected to membership of the National Academy of Engineering of

8   the United States.   I was located as a fellow of the Royal

9   Academy of Engineering which is the United Kingdom equivalent

10  of the U.S. National Academy of Engineering.   I am also a          11:17:06

11  fellow of the Royal Society of Edinburgh.

12          In addition, I won the Timoshenko Medal of the

13  American Society of Mechanical Engineers.   The Timoshenko Medal

14  is the highest honor which is given to mechanical engineers who

15  are working in the area of solid mechanics, stress analysis,        11:17:28

16  and the analysis of mechanical devices.

17  Q.   Have you published articles in mechanical engineering?

18  A.   Yes, I have.

19  Q.   And you told us you've done consulting work for medical

20  device companies.   Does that mean you review designs and do the    11:17:48

21  work that you -- similar to work that you've done in this case?

22  A.   That's correct.   I make assessments of the intended use of

23  the devices which I'm asked to provide advice on.   I

24  consider -- I make an assessment of the environment in which

25  the device will be used.   I make an assessment of the failure      11:18:09

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1   modes which are likely to occur in those devices, and I will          11:18:17
2   carry out calculations to help me advise the companies as to
3   what they should do to improve their designs or to make
4   assessments of their designs.  I also review the tests that the
5   companies carry out and I will review the calculations that       11:18:37
6   they carry out as well and I will given them my advice as to
7   how they can do those calculations and tests better to be more
8   certain about the performance of their components and medical
9   implants.
10  Q.   Do you charge companies that retain you to consult on         11:19:01
11  medical devices and engineering?
12  A.   Yes, I do.
13  Q.   And in this case, do you charge for your time to come in
14  and talk about your work done in this case regarding the Bard
15  filters?                                                           11:19:13
16  A.   Yes, I am being paid for the work that I am doing on the
17  Bard filters.
18  Q.   Okay.  And how do you go about charging for your time?
19  A.   Well, I charge $400 an hour for the regular work which is
20  involved in these cases and then when I am testifying or I am      11:19:29
21  being deposed, I charge $800 an hour.
22  Q.   And how often do you do this type of work where you get
23  involved in device cases that are court cases?
24  A.   I do it rarely.
25  Q.   Are you involved in any other cases at the present time?      11:19:47

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1    A.   I am involved in the Bard cases.  I'm involved in cases to        11:19:50

2    do with another IVC filter, namely the Cook litigation, and

3    that is all that I am involved in at the moment.  But 25 years

4    ago I did some work on a bicycle accident and a failed knee

5    implant but over about -- 25 years ago and until about -- until     11:20:12

6    a few years ago I did no consulting work in the context of

7    litigation.

8    Q.   Have you had any involvement at all with the FDA?

9    A.   Yes.

10   Q.   Tell us about your involvement.                                 11:20:28

11   A.   Well, I've testified to the FDA on behalf of companies,

12   both formally and informally, and what I've testified about are

13   the loading conditions that devices experience when they are

14   implanted in the human body.  I have testified about the

15   stresses and strains and forces and motions that devices          11:20:52

16   experience when they are implanted in the human body.  I've

17   testified about fatigue behavior of devices which are implanted

18   and other aspects of how the devices interact with the human

19   body.

20   Q.   All right.  So let's apply that to things we're going to      11:21:15

21   talk about in this case.

22        Could you explain to the members of the jury what is

23   a stress and strain analysis?

24   A.   Well, a stress and strain analysis is a calculation of the

25   stresses and strains that are component experiences.  And to       11:21:30

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1  help you understand what that means, I've brought along a                          11:21:36

2  rubber band to explain to you the meaning of stress and strain.

3          Strain is related to motions that body experiences.

4  I'm holding the rubber band loosely and in that situation, we

5  would say that there is zero strain in the object.  If I         11:21:57

6  stretch the body, I've strained the body.  And, therefore, my

7  calculations would be to determine how much strain has occurred

8  in the body because the longer I pull the rubber band, the

9  bigger the strain.  But when I'm pulling the rubber band, I

10  also have to stretch it using my fingers by applying forces to    11:22:20

11  the rubber band.  And the concept of stress tells me how much

12  force is being applied to the body related to its shape and

13  size.  And, again, the more force I apply to the body, the

14  bigger is going to be the stress.

15          And so any stress analysis and my strain analysis    11:22:45

16  done by calculation is intended to figure out the level of

17  those quantities which are present in a body when it's subject

18  to forces and motions being applied to it.

19  Q.  And how are those analyses done?  You said calculations.

20  Do you also do bench testing or recommend bench testing?    11:23:06

21  A.  Well, I review and recommend bench testing but I do not

22  carry out bench testing myself.

23  Q.  All right.  But you understand bench testing and have made

24  recommendations on how a device should be bench tested?

25  A.  Yes, that's correct.    11:23:22

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1   Q.   By the way, can you just tell us quickly what type of          11:23:25
2   implantable devices you have worked on as a consultant?
3   A.   The implantable devices that I've worked on have been
4   prosthetic heart valves.  I've worked on stents of the type
5   that are placed in arteries and so on and I've worked on breast   11:23:37
6   implants.
7   Q.   Now, tell us in this case the process, the method, what
8   you did to arrive at the opinions that you have arrived at here
9   in the case of Sheri Booker's?
10  A.   Well, I did the things that I described a few minutes ago.   11:24:02
11  Namely, I made an assessment of the intended use of the filter.
12  I made an assessment of the conditions that the filter would
13  experience, and the environment in which it would be placed
14  once it was implanted in the patient.  I looked at the behavior
15  in terms of the failure modes that the filter could potentially  11:24:26
16  experience and I did calculations of the stresses and strains
17  and the forces and motions that would be associated with the
18  behavior of the filter to assess whether those failure modes
19  were likely to be problematic during the time that the filter
20  was implanted in a patient.                                       11:24:49
21          And in addition, I reviewed tests, bench tests, that
22  were carried out on the filters to understand what they were
23  telling us about the behavior of the filter.
24  Q.   Now, in performing engineering analysis and working out
25  engineering problems and doing engineering functions like         11:25:11

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1  designing devices, are there basic rules or principles that you          11:25:14

2  teach engineers and that engineers should follow when designing

3  a device?

4  A.   Yes.  And specifically in the case of medical implants,

5  the first principle is that patient safety is paramount.  A          11:25:30

6  second principle is that devices should be thoroughly assessed

7  and thoroughly tested to make sure that the behavior is fully

8  understood and that failure modes are identified carefully so

9  that they can be considered in the design and testing of the

10  device.  And also that in the testing of the device and the          11:25:59

11  calculations that one does, that worst case conditions must be

12  looked at to make sure that one fully understands the

13  conditions that the device might experience.

14  Q.   Well, we've heard from some witnesses in this case that

15  worst case scenario and worst case condition has come up in          11:26:20

16  different times in this trial.  What does that mean and why do

17  you look at that as an engineer?

18  A.   Well, the worst case condition is the one which is most

19  likely to cause a problem for the device.  So the worst case

20  condition is the one that is most likely to cause high          11:26:37

21  stresses, high strains, high levels of instability and,

22  therefore, are most likely to compromise the device which is

23  being considered.

24  Q.   Sounds like engineers are always planning for the worst or

25  should be.          11:26:55

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1    A.    Well, they should be, yes.                                    11:26:55

2    Q.    As opposed to hoping?

3    A.    Exactly.  It's a prescription for not doing things

4    properly.  If one is optimistic about how a device will

5    perform, one must be careful to ensure that the worst case    11:27:14

6    conditions are thoroughly considered.

7    Q.    Now, this case involves the Bard G2 filter.  You're aware

8    of that?

9    A.    That's correct.

10   Q.    And you've also done work and work in this case you've    11:27:26

11   looked at other filters including the Recovery filter?

12   A.    Yes, that's correct.

13   Q.    We have heard testimony about what a filter should do.

14   Would you explain to the jury from an engineering perspective,

15   what a filter should do and how you can go about accomplishing  11:27:42

16   that goal?

17   A.    Well, what a filter should do is it should be able to trap

18   blood clots which are -- when the filter is in the inferior

19   vena cava, it should trap blood clots which may come up from

20   the lower part of the body.  And if they are not trapped, they  11:28:02

21   can continue on to the heart or the lungs.  So the purpose of

22   the filter is to do that.  But additional considerations are

23   that the filter should remain in place and that it should not

24   fail in a way that is a problem.

25   Q.    What about stability, how does that work?                  11:28:27

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

| | | |
|---|---|---|
| 1 | A.   Well, stability means that the filter should stay in the | 11:28:30 |
| 2 | location where it's supposed to be located and that it should | |
| 3 | stay in the configuration that it's supposed to have when it's | |
| 4 | implanted. | |
| 5 | Q.   Now, in your work in this case, going back, you said | 11:28:48 |
| 6 | patient safety should be paramount? | |
| 7 | A.   Yes. | |
| 8 | Q.   And in your work in this case, you have looked at what | |
| 9 | Bard did with respect to the design and testing and development | |
| 10 | of the filters, including the G2; is that correct? | 11:29:01 |
| 11 | A.   That's correct. | |
| 12 | Q.   Did you, in the course of your work in what you looked at, | |
| 13 | find indications of failure modes that were pertinent to the G2 | |
| 14 | filter? | |
| 15 | A.   Yes, I did. | 11:29:18 |
| 16 | Q.   What did you find? | |
| 17 | A.   I found that the G2 filter tilts, it perforates or cuts | |
| 18 | through the wall of the vena cava.  It moves within the vena | |
| 19 | cava and it suffers fractures when it's in the vena cava. | |
| 20 | Q.   And did you arrive at any opinions whether the G2, because | 11:29:43 |
| 21 | of its design, is prone to those failure modes? | |
| 22 | A.   Yes.  That was my conclusion, that its design is what | |
| 23 | makes it prone to those failures. | |
| 24 | Q.   So -- and you talked that the G2 does lead to | |
| 25 | complications including tilt, puncture, movement, and fracture? | 11:30:06 |

ROBERT MCMEEKING, PH.D. - Direct

1  A.   That's correct.

2  Q.   Did you find in your work that there was a relationship in

3  the G2 between one failure to another?

4  A.   Yes.  The failure modes are interrelated and tilt can lead

5  to perforation.  Perforation can lead to tilt and tilt and

6  perforation can lead to the fracture of the filter and it can

7  lead to the movement of the filter as well, especially in the

8  tilt.

9  Q.   How did you come about those conclusions?  What types of

10  analysis did you perform?

11  A.   Well, I carried out an extensive series of calculations by

12  mathematics and by computer and this is what enabled me to come

13  to these conclusions.

14  Q.   Did you look at the environment of use of the anatomy of

15  where the filter would be implanted?

16  A.   Yes, that's correct.

17  Q.   Is that something that engineers that work with medical

18  devices should do?

19  A.   Yes.  The engineer who is participating in the design and

20  development of a medical implant should be thoroughly familiar

21  with the environment within which the implant will operate.

22  Q.   Well, here you said that this is a device that goes into

23  the inferior vena cava.  Is there anything about the inferior

24  vena cava that will impose stresses or strains or forces on an

25  IVC filter?

11:30:11

11:30:28

11:30:49

11:31:09

11:31:19

11:31:40

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1   A.   Yes, there is.  And I can illustrate that with -- by                11:31:41

2   showing a picture of something if I am able to do so.

3   Q.   Well, I think you're talking about Exhibit 4340.

4   A.   Yes, 4340.

5            MR. O'CONNOR:  Your Honor, I have a board.  What                 11:32:01

6   would be the preference?

7            THE COURT:  If it's displayed for the jury, I think

8   they can see it better there than on the board.  Is this a

9   demonstrative exhibit?

10           MR. O'CONNOR:  This is a demonstrative and we are               11:32:13

11  showing it and would like to display it to the jury to help

12  Dr. McMeeking explain his opinions.

13           THE COURT:  Any objection?

14           MR. NORTH:  No objection, Your Honor.

15           THE COURT:  All right.  You may display it.                     11:32:26

16  BY MR. O'CONNOR:

17  Q.   So Dr. McMeeking, could you explain to the members of the

18  jury what we're looking at?

19           THE REPORTER:  I'm sorry.  It's Exhibit 4340?

20           MR. O'CONNOR:  4340, right.                                     11:32:41

21  BY MR. O'CONNOR:

22  Q.   So Dr. McMeeking, please explain to us what we're looking

23  at here.

24  A.   What we're looking at are two images of the same filter

25  and the filter has been implanted in the vena cava.  And you            11:32:51

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1    can see that on the right, the width of the vena cava is          11:32:59

2    smaller than the width of the vena cava on the left.

3           What happens is that when you breathe in, that causes

4    your organs to squeeze the vena cava which forces it to become

5    smaller and that is the situation which you see on the right.     11:33:20

6           Then when you breathe out, that allows the vena cava

7    to expand again and that is the situation you can observe on

8    the left.

9           And there are two aspects to what is important in

10   regard to the filter.  One is that it's already being squeezed    11:33:38

11   into the vena cava.  The filter itself is wider than the vena

12   cava.

13          MR. O'CONNOR:  May I approach?  I have 4283.  It's an

14   exemplar filter.  Can I show this to Dr. McMeeking so he can

15   show this to the jury?                                            11:34:05

16          THE COURT:  Yes, you may.

17          MR. O'CONNOR:  May I approach him?

18   BY MR. O'CONNOR:

19   Q.   Exhibit 4283 --

20          THE COURT:  But you can't talk over there.  You've         11:34:12

21   got to be at a mic.

22          MR. O'CONNOR:  Thank you.

23   BY MR. O'CONNOR:

24   Q.   So I think you have in front of you a G2 filter; is that

25   right?                                                            11:34:24

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1   A.   Well, it's actually a G2 Express but it's almost the same          11:34:25

2   as a G2.  The only difference is that it has a hook on top.

3   It's probably difficult for you to see but you can see what it

4   looks like and of course it looks very similar to the

5   illustration on the screen.                                            11:34:43

6            Now, this is the natural shape of the filter and when

7   it's put into the vena cava, it has to be squeezed down so that

8   it's narrow enough to fit into the vena cava because the vena

9   cava is narrower than the filter itself.

10           That process causes stresses and strains on the              11:35:05

11  filter.

12           MR. O'CONNOR:  Your Honor, there is a juror who has

13  his hand up.

14           JUROR:  I could not see anything from what they are

15  showing.                                                               11:35:27

16           MR. O'CONNOR:  May he step down?

17           THE COURT:  Yes.

18           Doctor, you can step down right in front of the jury.

19           JUROR:  I heard her the explanation but I couldn't

20  see it.                                                                11:35:36

21           THE COURT:  I think you've got loud enough voice.

22  Why don't you go ahead and talk to them?

23           THE WITNESS:  So this is a good.  It's almost the

24  same as a G2 filter and it has a certain width but that width

25  is wider than the vena cava.  So when it's put into the vena           11:35:59

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1  cava, it has to be squeezed so that it's narrower and it          11:36:03

2  functions like a spring.  It's just like compressing a spring.

3          So the process of putting it in the vena cava will

4  squeeze it down to a narrower width and that will cause

5  stresses and strains to be induced in the filter.               11:36:21

6          Now, before I go back to the witness stand, I will

7  comment that when the vena cava expands, that will change the

8  stresses and strains which are in the filter and then when the

9  vena cava contracts, that will change them again.

10          So the process of expansion and contraction will,      11:36:47

11 over and over again, many times, will change the stresses and

12 strains which are in the filter.

13          I can go back to the --

14          THE COURT:  Yes.  Thank you.

15 BY MR. O'CONNOR:                                                 11:37:12

16 Q.   So Dr. McMeeking, are you saying that just where the

17 filter is placed, that area will cause stresses and strains?

18 A.   That's correct.

19 Q.   And why is that important for a company like Bard to know

20 when it's designing a filter?                                    11:37:26

21 A.   Well, that's important because in almost all materials

22 that are used, there is a process that is called fatigue.  And

23 that process occurs when stresses and strains and loads and

24 deformations of the component or the device are changed again

25 and again and again.                                             11:37:51

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1    And I think you're probably all familiar with this                    11:37:52
2  situation because I'm sure you've all bent paper clips back and
3  forth and done that over and over again until they eventually
4  break.  So that's exactly the process of fatigue which damages
5  the material and eventually leads it to break.                          11:38:11

6    And there's two comments I wish to make.  One of them
7  is if I bend just little bit, I have to bend it back and forth
8  many, many, many, many times before the paper clip will break.
9  If I do very big bendings of the paper clip -- I'm not sure if
10  I can do it soon enough for this purpose.  But if I make very          11:38:38
11  big motions, then I can break the paper clip relatively large.

12    What is happening is that when I am bending it just a
13  little bit, the strains and the strain changes are sufficiently
14  small that it will take a long time to cause the damage in the
15  material to break it.  But if I bend the paper clip a lot by           11:39:01
16  big amounts, the stresses and strain changes are very big in
17  the material and that will cause the fatigue fracture quite
18  quickly.
19  Q.   Well, I think we'll talk about it in more detail but what
20  is that filter made out of?                                            11:39:24
21  A.   The filter is made out of a metal called Nitinol.  It's an
22  alloy and it has some special characteristics but it is a metal
23  that is known to experience fatigue fracture.
24  Q.   All right.  Now, Dr. McMeeking, the filter you just showed
25  us, what is it about the design that will cause it to tilt once        11:39:49

United States District Court

564

ROBERT MCMEEKING, PH.D. - Direct

1   it's in the vena cava?                                            11:39:52

2   A.   Well --

3   Q.   I mean, first of all, is the filter, the Bard filter, the

4   G2 filter, did you determine whether it was designed in any way

5   that would avoid tilt?                                            11:40:03

6   A.   Well, it was designed in such a way that it tends to tilt.

7   So I investigated that situation and it would be useful for me

8   to show another illustration which is number 4342.

9          THE COURT:  Excuse me, Doctor.  We need to proceed by

10  question and answer.                                              11:40:26

11         THE WITNESS:  Oh.

12  BY MR. O'CONNOR:

13  Q.   All right.  Well, you're reading my mind.  Is there an

14  illustration that will help you explain your opinion about tilt

15  to the jury?                                                      11:40:36

16  A.   Yes.  I have an illustration which will help me do that.

17         MR. O'CONNOR:  All right.  Can we display

18  Exhibit 4342?

19  BY MR. O'CONNOR:

20  Q.   So you were showing us before how the filter be acts like   11:41:04

21  a spring?

22  A.   Correct.

23  Q.   And now we have the illustration that is being displayed

24  to everybody here in the courtroom.  So what is it about

25  your --                                                           11:41:16

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1    THE COURT:  You want this displayed?                      11:41:17

2         MR. O'CONNOR:  Is it displayed?  May I display it,

3    Your Honor?

4         THE COURT:  Yes.

5         What is it about the design, the filter?  What are we   11:41:32

6    looking at?

7    BY MR. O'CONNOR:

8    Q.   What is it about the design and how does that help explain

9    your opinions to the jury, please.

10   A.   This shows the difference between the filter that is not   11:41:42

11   tilted, which is the one on the left, and a filter which is

12   tilted, which is the one on the right.  So you can see the

13   tilting has made the filter not be straight up and down in the

14   vena cava.

15        Now, the reason why the filter tilts is that it is   11:41:57

16   simply a spring.  As I mentioned before, I'm not sure whether I

17   need to come close to you to explain this but -- because I

18   already did some of the things that I wanted to do which is

19   that when I squeeze the filter, it's acting like a spring.

20   It's just like a spring that I'm trying to compress between my   11:42:24

21   fingers and a spring always wants to go back to its

22   uncompressed state.

23        So when you let the spring go, it will expand back to

24   its original length and that is what is happening when I put my

25   fingers on the arms to squeeze it.  That is a squeezed spring.   11:42:49

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1   And then when I let the arms go, it's a spring which is       11:42:53

2   expanding back to its full width.

3   Q.   The springing tendency, how does that result in a tilt?

4   A.   Well, so the spring always wants to do this and the way

5   that it can go back to its or get closer to its original length   11:43:11

6   is by tilting.   And I can explain that with another

7   illustration.

8   Q.   All right?   And which illustration would help you explain

9   your opinion?   Are you talking about 4373?

10  A.   That's correct.                                            11:43:31

11  Q.   All right.

12         THE COURT:   You can go ahead and display it, Traci.

13  BY MR. O'CONNOR:

14  Q.   All right.   Dr. McMeeking, we're looking at 4373 I

15  believe.                                                        11:43:50

16  A.   That's correct.

17  Q.   Would you explain to us what we're looking at and what

18  this -- how this helps you explain your opinions about tilting

19  to the -- to us in the courtroom?

20  A.   Okay.   Well, this is a drawing that I made myself so it's   11:44:01

21  not as pretty as the other ones that I was showing.   But what

22  I've done is I've looked at two arms of the G2 filter and on

23  the left, the filter is not tilted and on the right, the filter

24  is tilted.

25         And the way to think of this is that the line           11:44:23

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1  A-B with the dashed line across from A to B represents the          11:44:28
2  width of the spring when it's compressed, when it's squeezed.
3  And when tilting occurs, which you see on the right, the hand
4  which is at A has stayed where it is and not moved whereas the
5  hand that is at B at the end of the arm has moved downwards in    11:44:52
6  the vena cava and it has moved --
7  Q.    And it has an increase in its length.  I'm sorry, I
8  interrupted you.  So is the distance between A and C greater
9  than the distance between A and B on the right?
10 A.    That's correct.  You think you can see that by the eye but  11:45:11
11 another way of understanding it is that if you go straight
12 across the road, you go across on a short distance.  But if you
13 go diagonally across the road, then it's a much longer distance
14 that you have to walk.
15            And so the same process is happening here.  When the   11:45:26
16 filter tilts, the distance between the hands, it increases and
17 that is the same as a spring expanding to its original shape
18 and that is what the spring, which is the filter, wants to do
19 and that process drives the tilting that occurs in practice for
20 this filter.                                                      11:45:51
21 Q.    Now, you know, we've heard testimony and there's been
22 discussion about how the filter, to be effective and safe, must
23 stay stable or centered.  Is that your understanding?
24 A.    That's my understanding.
25 Q.    Is there anything about the G2 filter, Dr. McMeeking, that  11:46:02

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

11:46:07
1    a company like Bard would know or should know before it ever

2    went to the market just by looking at it that would cause

3    concern that it may tilt?

4    A.   Well, it would be just what I described, that the filter

11:46:21
5    is simply a spring and springs want to expand and there's not

6    anything built into this spring which helps it resist the

7    process of expansion which leads to the tilting.

8    Q.   So it sounds as though that a filter that is a spring has

9    something of a mind of its own.  It's going to keep moving

11:46:44
10   until it reaches its full distance?

11   A.   That's correct.  The filter will -- as a spring, will

12   always want to expand to its relaxed state.  It will always

13   want to get back to this shape which it has when it's

14   completely free in the air.  So the process is ongoing until it

11:47:08
15   reaches that state.

16   Q.   Is that basic engineering?

17   A.   That's basic engineering.

18   Q.   And you said to us a while ago that you found in your work

19   that the design of the filter -- and we're going to get to

11:47:23
20   testing, but the design of this filter shows that once it goes

21   into one failure, a tilt, that can lead to another?

22   A.   That's correct.

23   Q.   So in your work, what did you find?  What were the

24   problems you found that are associated with this filter when it

11:47:38
25   tilts?

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1    A.   Well, I found that when it tilts, it makes it more likely          11:47:40

2    that it will perforate the wall of the vena cava.  And there's

3    a couple of reasons for that.  One of them is that when the

4    tilting occurs, the forces which the filter applies or some of

5    the limbs of the filter applies to the wall of the vena cava.          11:48:04

6    Some of those forces go up and it's a fairly straightforward

7    principle that the bigger the force that you apply to

8    something, the more likely you are to cut into that object.

9           And so that's one of the consequences of the tilting

10   in terms of it tending to perforation of the limbs through the          11:48:27

11   wall of the vena cava more likely.

12          In addition --

13   Q.   Well, go ahead.

14   A.   In addition, there's a phenomenon that I can illustrate

15   with my hand and a pen.  So if the filter is not tilted, the           11:48:49

16   tip of a limb rests against the wall in something like that but

17   if some tilting occurs, there's a tendency for the -- the limb

18   to look more like that (Indicating), adjacent to the wall of

19   the vena cava, and that makes it behave much more like a needle

20   which is trying to puncture through the wall of the vena cava.          11:49:12

21          So those two things together make it more likely that

22   the filter will perforate the wall of the vena cava.

23   Q.   When you apply what you just told us, when you apply the

24   principle that patient safety must be paramount, do you have an

25   opinion -- well, should a filter that is going to go into the          11:49:33

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1   vena cava be designed in a way to avoid tilt and also                    11:49:35

2   perforation?

3   A.    In my opinion, yes.

4   Q.    And in your opinion, was the Bard G2 filter designed in a

5   way that would avoid tilt and perforation?                               11:49:50

6   A.    It was not designed in a way that would either avoid

7   tilting or reduce it to a level that was practical.

8   Q.    All right.  Is there an illustration that you have -- I

9   don't want to get ahead of myself.  Are we looking at -- excuse

10  me.  I just lost it.  Is there an illustration that will enable          11:50:17

11  you or assist you in explaining to the jury this issue of

12  perforation?

13  A.    Yes.  If we can look at illustration 4349.

14  Q.    Pardon me.  4341?

15  A.    No.  4349.                                                         11:50:37

16  Q.    All right.

17        MR. O'CONNOR:  May we see 4349, please.

18  Q.    All right.  Now, how does this --

19        MR. O'CONNOR:  May we display this -- we are.  Thank

20  you.                                                                     11:50:52

21  BY MR. O'CONNOR:

22  Q.    How does this illustration help you to explain to us here

23  in this courtroom the design of the G2 filter and why it also

24  perforates when it tilts?

25  A.    Well, what it illustrates is a situation in which the              11:51:05

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1    filter has perforated the wall of the vena cava and you can see    11:51:08

2    in this case it's also tilted.  But I want to focus on the fact

3    that the perforation has occurred and some of the legs in this

4    case have cut through the wall of the vena cava and some

5    portion of those legs are outside of the vena cava.    11:51:28

6            I should comment that the arms can also cut through

7    the wall of the vena cava.  So that can happen as well.

8    Q.   Well, Dr. McMeeking, you have that filter in your hand.

9    Based upon what you've seen and felt and touched that filter,

10   should Bard have known that those legs could cut through tissue    11:51:49

11   that comprises the vena cava wall?

12   A.   Yes.  They should have known because, first of all, the

13   filter wants to expand as a spring in the way that I described,

14   and the limbs of the filter are rather narrow, so that makes it

15   a fairly sharp object which is more likely to cut through the    11:52:15

16   wall of the vena cava.  There are no features on the limbs

17   which will help to limit the tendency for that cutting process

18   to take place.

19   Q.   And that's perforation?

20   A.   That's perforation.    11:52:40

21   Q.   Now, just so we can apply it to case that we're here at,

22   have you reviewed the information in Sheri Booker's case?

23   A.   Yes, I have.

24   Q.   And did her G2 filter do the failures you've described so

25   far?    11:52:51

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1  A.   Yes.  Her G2 filter, it experienced tilt, it experienced          11:52:51
2  perforation in which eight of the limbs were perforated through
3  the wall of the vena cava, and it experienced something else
4  which is caudal migration.  And in the illustration I can
5  describe caudal migration which is the motion of the filter           11:53:15
6  towards the feet just by pointing out that some of the -- some
7  of the filter, because the filter has rotated when it
8  perforated the wall of the vena cava, it has tended to move
9  downwards in the vena cava.
10  Q.   Was there anything about the design that should have put         11:53:35
11  Bard on notice before the G2 ever went out in the market that
12  the G2 was going to migrate downward?
13  A.   Well, the fact that it can tilt should have made it clear
14  to Bard that such migration was possible because tilting very
15  often involves the motion that I just described of the filter        11:53:59
16  moving downwards in the vena cava.
17  Q.   Did Sheri Booker's G2 filter fracture and break?
18  A.   Yes, it did.
19  Q.   How many places?
20  A.   It experienced fracture in three of its limbs, two legs         11:54:15
21  and one arm.
22  Q.   And tell us what is it about the design of the G2 filter.
23  Was it designed to avoid perforation -- I mean, fracture?
24  A.   No, it was not adequately designed to avoid fracture and
25  the reason is that the process of tilting and perforation are        11:54:35

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1   those that tend to make fracture more likely by the process of   11:54:44

2   fatigue that I already described to you.

3   Q.   You described to us by showing us the filter that you

4   squeezed and then by breaking that paper clip?

5   A.   Yes, that's correct.   11:54:58

6   Q.   And we have more if you need them.

7   A.   Sorry?

8   Q.   We have more paper clips if you need them later.

9   A.   Okay.

10   Q.   All right.  So when you were looking at this filter and   11:55:06

11   when you were analyzing it and knowing what you know based upon

12   your education, your training, do you have an opinion -- well,

13   do you have an opinion whether the filter was designed to avoid

14   breaking and fracturing?

15   A.   It's my opinion that it was inadequately designed in terms   11:55:46

16   of it being likely to fracture by fatigue.

17   Q.   All right.  And you showed us before you demonstrated with

18   the paper clip, you talked about fatigue and I think that's

19   fatigue that is relevant to materials that you mentioned.

20   A.   Correct.   11:56:09

21   Q.   And is there a way that a company like Bard can assess

22   whether a filter is going to experience stress and strains and

23   fatigue and be broken to breaking before it ever puts it out on

24   the market?

25   A.   Yes.  They can do tests of the device in what's called a   11:56:22

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1   bench test and they can do calculations to make that                        11:56:30

2   assessment.

3   Q.   All right.  And what type of calculations are available to

4   medical device companies and their engineers?

5   A.   Well, you can carry out mathematical calculations and you            11:56:41

6   can carry out computer calculations.

7   Q.   And is there a term for that?

8   A.   These are stress analysis and strain analysis

9   calculations.

10  Q.   What is a Finite Element Analysis?                                      11:56:55

11  A.   So a Finite Element Analysis is a computer method of

12  analysis in which the stresses and strains can be calculated by

13  processes which are essentially similar to the ones that one

14  uses when doing mathematical calculations.  So in that regard,

15  there's no distinction between the mathematical calculations            11:57:18

16  that one would do by pencil and paper and the finite element

17  calculations that one would do on the computer.  The only

18  difference is carrying them out on the computer as opposed to a

19  piece of paper.  They achieve the same objective.

20  Q.   And will those calculations demonstrate to a company like          11:57:38

21  Bard whether it has a device like a filter that will be

22  susceptible, prone, will forseeably break after its implanted?

23  A.   Yes.  Because those calculations will enable the company

24  to establish how big the stresses and strains are and to assess

25  whether they are big enough for the fatigue fracture to take            11:58:00

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1    place as a consequence of what the implant experience is.                11:58:05

2    Q.   Did you yourself perform any mathematical calculations

3    that engineers should and would perform to analyze stresses and

4    strains of the G2 filter that led you to your opinions in this

5    case?                                                                     11:58:22

6    A.   Yes, I did.

7    Q.   And what calculations -- what did you do, Dr. McMeeking?

8    A.   Well, I did calculations both by mathematical methods and

9    by using the finite element method and I carried out those

10   calculations to make assessments of the stresses and strains         11:58:36

11   that were present in the filter because of the expansion and

12   contraction of the vena cava and because of processes such as

13   tilt and perforation that can influence those levels of stress

14   and strain.

15   Q.   And should a medical device company like Bard carry out        11:58:59

16   those calculations against the worst case scenarios?

17   A.   Yes, they should.   Yes.

18   Q.   And did you do that?

19   A.   I did that.   I always made sure that I made a careful

20   assessment of what would be the worst case conditions and I        11:59:12

21   factored them into the calculations that I did.

22   Q.   And so based upon your calculations, what did you

23   conclude?

24   A.   I concluded that in the worst case conditions, that the G2

25   filter can be expected to fail by fracture because of the          11:59:28

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

```
 1   environment that it is experiencing.                          11:59:35
 2             THE COURT:  All right.  We are at the noon hour.
 3   We're going to break at this point, Mr. O'Connor.
 4             Ladies and gentlemen, we'll break until 1 o'clock and
 5   plan to see you then.  Thank you.                              11:59:44
 6             (Jury departs at 11:59.)
 7             THE COURT:  All right.  Counsel, as of noon today,
 8   without adjustment for the deposition yesterday, plaintiff has
 9   used eight hours and 33 minutes; defense, two hours and 36
10   minutes.                                                       12:00:21
11             Did you have information you wanted me to look at on
12   that Simon Nitinol issue?
13             MR. LOPEZ:  Your Honor, I also have the deposition.
14             THE COURT:  Tell me what you've got.
15             MR. LOPEZ:  Exhibit 992.  Do you want me to identify  12:01:02
16   them, Judge?
17             THE COURT:  Tell me what they are and what I'm
18   supposed to do with them.
19             MR. LOPEZ:  It's just evidence of Bard's use of the
20   SNF data that they had for purposes of their internal          12:01:14
21   evaluations and with respect to the substantial equivalence
22   issue.
23             THE COURT:  This is the evidence that you're going to
24   use?
25             MR. LOPEZ:  Well, it's stuff that you wanted to see.  12:01:26
```

ROBERT MCMEEKING, PH.D. - Direct

1   THE COURT:  Is it stuff you are going to use?          12:01:29

2   MR. LOPEZ:  Yes.

3   THE COURT:  Okay.

4   And what do you have, Mr. North?

5   MR. NORTH:  Your Honor, it's overkill on this but       12:01:35

6  this is the medical articles are primarily what we want to

7  introduce.  We have them on a thumb drive.  I can have them

8  printed out.

9   THE COURT:  Are they labeled with exhibit numbers?

10  MR. LERNER:  They have exhibit numbers, Your Honor,      12:01:51

11 and they also have the spreadsheets that we talked about and

12 also excerpts from the plaintiff's expert reports where some of

13 those things are referenced.

14  MR. NORTH:  Those same medical articles are

15 referenced in all of the plaintiff's expert reports.         12:02:01

16  THE COURT:  All right.  Are you intending to get to

17 this this afternoon?

18  MR. NORTH:  I am not, Your Honor.  Unless he says

19 something after lunch that I do not expect, I don't think it

20 will come up for the rest of the day.                          12:02:14

21  THE COURT:  Okay.  You can go ahead and give them to

22 Traci.  But if you're not expecting to get to them this

23 afternoon, I'm going to spend lunch preparing for my 4:30

24 hearing instead of looking at this.

25  MR. LOPEZ:  I'm going to do the same, to put them on    12:02:29

United States District Court

578

ROBERT MCMEEKING, PH.D. - Direct

1    a thumb drive to make it easier.  I can even describe it and                    12:02:31

2    give you a title.

3              THE COURT:  Okay.  That's fine.

4              MR. O'CONNOR:  I'm sorry.  I didn't follow that.

5    What are we not expected -- is this something pertinent to Dr.                   12:02:37

6    McMeeking?  And I apologize.

7              MR. LOPEZ:  No.

8              THE COURT:  Okay.  We'll see you at 1 o'clock.

9              MR. LOPEZ:  Your Honor, did we give you the split

10   times on Dr. Ciavarella?  Anyway, I have them.                                   12:02:51

11             THE COURT:  Have you agreed with them on that?

12             MR. LOPEZ:  Yes.  We have.  Should I give them to

13   Traci?

14             MS. HELM:  It's 13 minutes.  You should add 13 to the

15   defendant and subtract 13 from the plaintiff.                                    12:03:07

16             THE COURT:  Okay.  We can go on the record.

17             (Whereupon, these proceedings recessed at 12:03 p.m.)

18                          *  *  *  *  *

19

20

21

22

23

24

25

United States District Court

ROBERT MCMEEKING, PH.D. - Direct

1        C E R T I F I C A T E                                    12:03:17

2

3           I, ELAINE M. CROPPER, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of      12:03:17

6    Arizona.

7

8           I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled    12:03:17

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control, and to the best of

13   my ability.

14

15          DATED at Phoenix, Arizona, this 17th day of March,      12:03:17

16   2018.

17

18

19

20                          s/Elaine M. Cropper                     12:03:17

21                          _____

22                          Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                  12:03:17

United States District Court