1            UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ARIZONA

3            _____

4   In Re: Bard IVC Filters          )   MD-15-02641-PHX-DGC
    Products Liability Litigation     )
5                                     )   Phoenix, Arizona
                                      )   **March 21, 2018**
6   _____)
    **Sherr-Una Booker, an individual,**   )
7                                     )
                  Plaintiff,          )
8                                     )   CV-16-00474-PHX-DGC
          v.                          )
9                                     )
    **C.R. Bard, Inc., a New Jersey**     )
10  **corporation; and Bard Peripheral**  )
    **Vascular, Inc., an Arizona**        )
11  **corporation,**                      )
                                      )
12                Defendants.         )
    _____)

13

14

15      BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

16      REPORTER'S TRANSCRIPT OF PROCEEDINGS

17         TRIAL DAY 5 A.M. SESSION

18            (Pages 900 - 950)

19

20

21  Official Court Reporter:
    Patricia Lyons, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Ste. 312
    401 West Washington Street, SPC 41
23  Phoenix, Arizona  85003-2150
    (602) 322-7257
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared with Computer-Aided Transcription

```
1                    A P P E A R A N C E S

2      For the Plaintiff:

3              Lopez McHugh
               By: RAMON ROSSI LOPEZ, ESQ.
4              100 Bayview Circle, Suite 5600
               Newport Beach, CA  92660
5
               Gallagher & Kennedy
6              By: MARK S. O'CONNOR, ESQ.
               2575 East Camelback Road, Suite 1100
7              Phoenix, AZ  85016

8              Heaviside Reed Zaic
               By: JULIA REED ZAIC, ESQ.
9              312 Broadway, Ste. 203
               Laguna Beach, CA  92651
10
               Watkins Lourie Roll & Chance, PC
11             By: ROBIN P. LOURIE, ESQ.
               Tower Place 200
12             3348 Peachtree Rd. NE
               Atlanta, GA  30326
13
               Faraci Lange, LLP
14             By: HADLEY L. MATARAZZO, ESQ.
               28 E. Main St., Ste. 1100
15             Rochester, NY  14614

16             Babbitt & Johnson, PA
               By: JOSEPH R. JOHNSON, ESQ.
17             1641 Worthington Rd., Ste. 100
               W. Palm Beach, FL  33409
18

19     For Defendants:

20             Nelson Mullins Riley & Scarborough
               By: RICHARD B. NORTH, JR., ESQ.
21             By: ELIZABETH C. HELM, ESQ.
               By: BRANDEE J. KOWALZYK, ESQ.
22             201 17th Street NW, Suite 1700
               Atlanta, GA  30363
23
               Snell & Wilmer
24             By: JAMES R. CONDO, ESQ.
               400 East Van Buren
25             Phoenix, AZ  85004
```

1                               **I N D E X**

2                              **EXAMINATION**

3  **WITNESS**                                              **PAGE**

4  Video Testimony of Dr. D'Ayala                          924

5  Video Testimony of Dr. Patel                            926

6  Video Testimony of Dr. Kang                             926

7  Video Testimony of Dr. Harvey                           928

8  MICHAEL RANDALL

9          Direct Examination By Mr. Lopez                 929

10

11

12                               **EXHIBITS**

13  **NUMBER**    **DESCRIPTION**                          **PAGE**

14  2368        Medical Record: Radiology                  926
               Consult Report 07/23/2014
15             (Kang's report re IR
               procedure)
16
   2349        Medical Record: X-ray chest                 926
17             Gwinnett Medical
               07/03/2014-report
18
   1811        Patel Deposition, 03/22/2017,               926
19             Exhibit A5 - Hospital chart,
               part of chart dealing with
20             procedure by Kang

21  2355        Medical Record: Medical                    926
               Records Gwinnett Medical
22             -informed consent for IVC
               filter removal 07/23/2014
23

24

25

**(Index of Exhibits Continued)**

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 1806 | Patel Deposition, 03/22/2017, Exhibit A13 – Office notes, Dr. Harvey re pleural effusion and pus in the jugular site 08/14/2014 | 926 |
| 1807 | Patel Deposition, 03/22/2017, Exhibit A14 – Office notes, visit for chest pain 02/23/2015 | 926 |
| 2350 | Medical Record: Medical Records Gwinnett Medical 07/03/2014-Consultation Notes of Kang | 927 |
| 2361 | Medical Record: Medical Records Gwinnett Medical-Op Note of Dr. Harvey open heart surgery 07/28/2014 | 928 |
| 2364 | Medical Record: Medical Records Gwinnett Medical-Pathology Report – 07/29/2014 | 928 |
| 1332 | Harvey Deposition, 06/20/2017, Exhibit 13 – Medical Record, Radiology report Gwinnett 07/24/2014-CT | 928 |
| 1222 | Ganser Deposition, 10/11/2016 – Exhibit 534 – PowerPoint Presentation for a meeting to analyze EVEREST and MAUDE data and provide justifications for proposed changes to G2 filter | 941 |

**P R O C E E D I N G S**

10:01:31  1

2     (Proceedings resumed in open court outside the presence

3 of the jury.)

4

08:30:26  5     THE COURT:  Thank you.  Please be seated.

6     All right.  Plaintiff's counsel, you wanted to raise

7 the FDA warning letter issue.

8     MS. REED ZAIC:  Yes, Your Honor.  In the Court's

9 order with regard to defendants' motion in limine to exclude

08:30:45  10 the FDA warning letter of 2015, the Court's ruling excluded

11 the letter with the potential exception of topics 3, 7, and 8.

12     We have met and conferred.  I met and conferred with

13 counsel for Bard.  We've not been able to reach an agreement.

14     First issue I wanted to address is just some

08:31:06  15 confusion with my reading of the Court's order.

16     On page 7 it states that the warning letter did not

17 concern the G2 line of filters.  However, the warning letter

18 in section 3 mentions the G2 line of filters six or seven

19 times.  So with that regard, the warning letter did deal with

08:31:35  20 the exact filter Ms. Booker received.

21     The last part of the Court's sentence says that the

22 letter was issued long after Ms. Booker received her G2

23 filters.  However, when I went back and pulled these complaint

24 files dealing with these G2 filters, they were reports to Bard

08:31:55  25 after Ms. Booker received her filter, yet it was still

08:32:00  1    retrospective.  The complaints went back to 2010, of the ones

2    in the report.  The further investigation, they reviewed

3    further complaints going back.

4         However, these complaints of G2 filter failures are

08:32:14  5    almost exactly the scenario of what Ms. Booker experienced in

6    that section or topic 3, paragraph C, deals with failed

7    attempts for removal and the lack of followup on subsequent

8    surgeries.

9         Also, during this time period of the complaints that

08:32:30  10   are pointed out in the warning letter, Ms. Booker still had

11   the filter in her.  There's been testimony thus far in the

12   case about the lack of monitoring followup.

13        THE COURT:  Still had the filter in when?

14        MS. REED ZAIC:  Ms. Booker had her filter implanted

08:32:48  15   in 2007.  The complaints that are in the warning letter are

16   after, but she still had it implanted in 2014.

17        THE COURT:  Are you talking about the complaints

18   referred to in paragraph 3B?

19        MS. REED ZAIC:  And 3C, Your Honor.

08:32:59  20   THE COURT:  Okay.  I obviously couldn't tell from

21   just the numbers what complaints they are.  You're saying some

22   of those are G2 complaints?

23        MS. REED ZAIC:  Yeah.  So in paragraph B it's

24   embedded in there and it's a little hard to read and mixed in

08:33:10  25   with other filters, but in paragraph 3B they do -- the first

08:33:12  1    complaint is a G2 filter.

2         THE COURT:  Yeah, I've got four -- I've got four G2s

3    highlighted in paragraph 3B.

4         MS. REED ZAIC:  Correct.  And in 3C, the complaints

08:33:21  5    are -- I've been able to identify the very first one by

6    looking at the complaint file.  That is a G2.

7         This paragraph is a report of ten failures from the

8    same -- reported by the same provider.  I was not able to

9    determine, because Bard's records don't reflect the followup

08:33:38  10   that reached a conclusion of which filters these were, but

11   it's the same provider reported at the exact same time and the

12   first one is verified as a G2.  With that distinction, I have

13   to admit I cannot verify nine of the ten -- or, I'm sorry,

14   everything except the first one, which I did find was the G2.

08:33:56  15   But it is the same provider.

16        THE COURT:  And that is 507112?

17        MS. REED ZAIC:  Yes, sir.  Yes, Your Honor.

18        I actually have a copy of the complaint if the Court

19   would look at it, if you would like to, but I did pull it and

08:34:09  20   find it.

21        So that was the first topic.  I have a couple other

22   issues if we're going to take it topic by topic.

23        THE COURT:  Well, let me give you a reaction on that

24   and let you respond.

08:34:19  25        When I looked at paragraph 3 back when the order was

08:34:21   1   entered, this is a letter that was written in 2015.  At the

2   beginning of the second sentence in paragraph 3 it says, "Your

3   current procedures governing complaint investigations do not

4   ensure adequate evaluation."

08:34:40   5       So it looked to me as though it was talking about

6   whatever procedures were in place in 2015.  And so it looked

7   to me like the criticism the FDA was giving Bard was the

8   complaint procedures you have in place today don't ensure

9   adequate evaluation.

08:34:58   10       The reason I said in the order it didn't concern the

11   G2 was there was nothing in the letter saying there's a

12   problem with the G2 or you haven't submitted enough

13   information on the G2.

14       Clearly 3B mentions four G2 filter complaints.  But

08:35:17   15   it looked like to me when I read it as though it was talking

16   about 2015 procedures.  But I'm interested in your thoughts on

17   that.

18       MS. REED ZAIC:  So their SOPs for following up on

19   complaints are current.  I would imagine, although I can't

08:35:30   20   say, the FDA was looking at the current one, but this is a

21   retrospective analysis and these complaints, although they had

22   one SOP in place in 2015 that maybe the FDA evaluated, these

23   complaints go back to implants as far back as 2010.  And they

24   have a continuing duty to warn.

08:35:50   25       So although this warning letter didn't come out until

08:35:53  1   2015, and maybe they were looking at what they had in place

2   currently, these reports are relevant and the FDA pointing out

3   that they didn't do the appropriate followup and mismanaged

4   and didn't do root cause analysis, this goes back to

08:36:07  5   complaints that are the same filter and in section 3C deal

6   with the same injury that Ms. Booker experienced.

7        THE COURT:  So let me ask you another question, if I

8   can.  The earliest G2 complaint mentioned in paragraph 3B

9   appears to me, at least assuming numbers track

08:36:27  10  chronologically, would be complaint 443237, which is in the

11  second line of page 5.  That's the lowest numbered complaint I

12  can see for a G2.  Do you know when that complaint was

13  received by Bard?

14       MS. REED ZAIC:  On march 19, 2013.  There was no

08:36:48  15  record I could find within that complaint file that they were

16  able to collect an implantation date, so I don't know when

17  that was implanted with the G2 filter.  It could have been as

18  early as 2005.

19       THE COURT:  Did you say a moment ago that the

08:37:01  20  earliest complaints referred to in paragraph 3 are 2010?

21       MS. REED ZAIC:  The implant dates were 2010.  In

22  paragraph 3B, complaint number 446809, I show an implant date

23  I collected from the complaint file of April 2nd, 2010.  That

24  was a G2X filter.  Same delivery mode as Ms. Booker received.

08:37:27  25       THE COURT:  When was the complaint received?

08:37:28   1          MS. REED ZAIC:  Awareness date was March -- excuse

           2     me.  April of 2013.  According to the records.

           3          THE COURT:  Okay.  So here's the question I guess I

           4     have for you:  As I understand the letter in light of the

08:37:46   5     additional information you provided, we have the FDA in 2015

           6     telling Bard that its current procedures for following up on

           7     complaints are inadequate and the earliest complaint its

           8     dealing with is a 2013 complaint of the G2, as far as we know.

           9     Explain to me your view of why inadequate handling of

08:38:15  10     complaints in 2013 through 2015 are relevant to Ms. Booker's

          11     case.

          12          MS. REED ZAIC:  Because she still had her filter

          13     implanted in her.  The FDA is going back and seeing a problem

          14     that retrospectively has been going on for quite some time

08:38:31  15     during the period that the plaintiff had the filter implanted

          16     in her.

          17          We've had testimony about their lack of warning to

          18     doctors to continue to monitor.  The FDA is going in and

          19     finding a problem with the way that they're collecting their

08:38:43  20     complaints and our witnesses are being cross-examined on rates

          21     and numbers, and only a certain amount of numbers that have

          22     been reported at a certain time I think becomes relevant.

          23     They're not collecting the appropriate information and an

          24     agency has to come in and tell them retrospectively that

08:39:01  25     they've been doing it going back several years.

08:39:04  1        I would also add, Your Honor, that with regard to --

          2   I also believe this is relevant to punitive damages.  A lack

          3   of compliance with the federal regulation is relevant to a

          4   punitive damages claim and it's probative whether Bard acted

08:39:17  5   with conscious indifference to the dangers posed by the

          6   device.  There's specifically a regulation pointed out in

          7   topic 3 that they're clearly in violation of.

          8        THE COURT:  Where are you looking at in topic 3?  Are

          9   you talking about before paragraph A?

08:39:38 10        MS. REED ZAIC:  Yes, the opening paragraph that

         11   addresses paragraphs A, B, C.  It says failure to establish

         12   and maintain procedures for receiving, reviewing, and

         13   evaluating complaints as required by 21 CFR 820.198(a).

         14        THE COURT:  So let me make sure I understand your

08:39:56 15   argument.

         16        It seems to me you are making two points.  Maybe

         17   more.  But one is you would want to argue to the jury that

         18   while Ms. Booker still had her filter before it was removed in

         19   2014, Bard was receiving complaints about the G2 and was not

08:40:17 20   handling them properly, as was indicated in 2015 when the FDA

         21   told them that, which is evidence that during the time the

         22   filter was in Ms. Booker Bard was not adequately tracking and

         23   dealing with the problems of the G2.

         24        The second argument, I think, is that this section 3

08:40:41 25   shows that Bard was not complying with regulations governing

08:40:47  1    complaint-handling procedures, which bears on the punitive

2    damages question.

3              MS. REED ZAIC:  Yes, Your Honor.  And the first point

4    with regard to that aspect of failing to warn, Mr. North was

08:40:57  5    saying yesterday, cross-examining witnesses, nothing was

6    preventing doctors from removing these devices while they were

7    in violation of these regulations, which the agency didn't

8    discover until 2015.

9              THE COURT:  Okay.  Were there other points you wanted

08:41:11 10    to make on the letter?

11             MS. REED ZAIC:  Well, there are two other paragraphs.

12    They're not as robust as what we're pointing out here.  The

13    paragraph number 7 is with regard to -- pardon me; the

14    government says a lot.  Paragraph 7 is a similar argument.

08:41:35 15    They're in violation of medical device reporting standards,

16    specifically U.S.C. 352 section T, as in tango, 2.

17             This is specific to the Denali filter.  I wanted to

18    bring it to Your Honor's attention in that our expert

19    yesterday was cross-examined on the fact that he still uses

08:41:57 20    Bard products, and it was the Denali filter.

21             And then, quickly, paragraph 8 deals with failure to

22    obtain information, again in violation of regulations, on

23    simple things such as age, time of the event, date of birth.

24    So it sort of wraps back into paragraph 3 as this is a

08:42:16 25    continuing problem.

08:42:18   1          THE COURT:  When I read paragraph 8, it appeared to

           2    me what they were saying is you submitted MBRs -- MDRs, you

           3    just didn't include all of the relevant information, such as

           4    age of the patient; is that right?

08:42:35   5          MS. REED ZAIC:  Yes, Your Honor, but I think it

           6    indicates they're not collecting it.  They're not acting in a

           7    manner to be able to vigilantly collect this information,

           8    which is part of the problem in paragraph 3.

           9          THE COURT:  And tell me what you think you should be

08:42:48  10    allowed to do with this warning letter.

          11          MS. REED ZAIC:  If it comes up with regard to our

          12    failure to warn argument, like I said, this dovetails back

          13    into paragraph 3 in that this is a continuing process.

          14          If they're going to continue to cross-examine our

08:43:02  15    witnesses about still using Bard products and Denali in this

          16    day and age, even after 2015, as of 2015 they were still in

          17    violation of doing the appropriate post-marketing surveillance

          18    and collection methods.

          19          THE COURT:  And would you be seeking to put this

08:43:16  20    letter in evidence?  Is that what you're proposing?

          21          MS. REED ZAIC:  Yes, Your Honor.

          22          THE COURT:  Or at least the portions that are

          23    relevant.

          24          MS. REED ZAIC:  Yes, Your Honor.  When appropriate.

08:43:24  25          THE COURT:  Okay.  All right.  Thank you.

08:43:28  1         MR. NORTH:  Thank you, Your Honor.  I'd like to start

       2   off by addressing the timing issue the Court raised.  This is

       3   criticisms of the current practices.  I think that is very

       4   important because this is not the first and only FDA

08:43:40  5   inspection Bard has had, and if this Pandora's box regarding

       6   this letter comes out or is opened, what is going to happen is

       7   we're going to be presenting a lot of evidence of many

       8   inspections that have occurred in the past involving Bard's

       9   complaint procedures where the FDA found no problems, no

08:44:00 10   citations, no warning letters.

      11         This is, in fact, focused on the current practice,

      12   practices, at the time of these inspections, long after the

      13   implant in this case.

      14         Now, it is difficult to treat these alleged

08:44:15 15   violations with a broad brush, I believe, because all of them

      16   are very specific with very specific issues surrounding them.

      17   And I believe when you look at the specific issues on each of

      18   these citations or points raised by the FDA, it becomes clear

      19   that they're not relevant in the least to Ms. Booker's design

08:44:36 20   or failure to warn claims.

      21         Turning first to 3A, 3A has to do with inadequate

      22   procedures, allegedly, about evaluating root cause of

      23   complaints regarding component suppliers.

      24         This is not -- the FDA doesn't say this specifically,

08:44:54 25   but this almost certainly has to do with Denali.  Denali is

08:44:59  1   manufactured by parts brought on from component suppliers.

2   The G2 was manufactured from scratch in house.  For the most

3   part.

4          So it appears that 3A has to do with the Denali and

08:45:15  5   not the G2.

6          Further, 3A does not involve any failure to report

7   incidents to the FDA.  It merely talks about how the company's

8   investigating root cause regarding component suppliers.  And,

9   again, we fail to see how that has to do with a design defect

08:45:35 10   claim or the warning claim with the G2.

11          In 8B, this involves eight complaints that were,

12   according to the FDA, mischaracterized as a malfunction when

13   they should have been a serious injury or death.  And only one

14   involved a death.  And if we have to get into this, the

08:45:55 15   evidence will show that in that complaint file it marked

16   "malfunction" in one portion of the complaint file and "death"

17   in another portion.  It was a clerical error.

18          But importantly, all eight complaints referenced in

19   3B were, in fact, reported to the FDA and were in the MAUDE

08:46:16 20   database.  The only question was, with those, how Bard had

21   characterized it on the complaint file.

22          Again, this is in the 2013-onward time period, far

23   beyond the implant in this case.

24          8C all involved unsuccessful retrieval procedures.

08:46:40 25   All came from a single doctor.  All involved attempted

08:46:43  1  percutaneous removals.  And all involved no patient injury

2  when the investigation was complete.

3  If you look at all of the follow-up materials Bard

4  produced, none of these involve a patient injury.  All of

08:46:59  5  these are six to eight years after the implant here.  And it's

6  difficult to see how this has any relevance to the warning

7  claim or the design defect claim.

8  As Ms. Zaic just mentioned with topic number 7 in the

9  FDA warning letter, that has to do with the Denali filter.

08:47:24  10  The four complaints referenced there all had to do with

11  deployment issues where there were difficulty in deploying the

12  filter and there were no patient injuries in any of those.

13  And then when you turn to 8, as the court just

14  mentioned, those were all complaints that were reported to the

08:47:43  15  FDA, and the FDA's criticism was that they lack sufficient

16  information concerning the age or date of birth and similar

17  type attributes of the patient involved.

18  None of these issues raised by the FDA have to do

19  with whether the Bard filter was defective when it was

08:48:04  20  designed and whether Bard failed to warn.

21  Also, Your Honor, I don't think it's appropriate to

22  try to justify this on the basis it supports some punitive

23  damage claim.

24  Punitive damages are supposed to be based, and I

08:48:20  25  think this is a constitutional principle represented by the

08:48:23  1    Supreme Court, on conduct related to the injury to the

       2    particular plaintiff.  That's the conduct of Bard regarding

       3    the design and warning to Ms. Booker.  With regard to

       4    Ms. Booker.

08:48:39  5          What the FDA may have said or done regarding

       6    complaint procedures in 2015 is simply not relevant to the

       7    conduct that allegedly injured her.

       8          If we were arguing that our compliance with the FDA

       9    regulations in 2015 with regard to Denali was somehow

08:49:03 10    probative as to our defense of punitive damages, maybe they

      11    would have an argument there.  But when we're going to present

      12    our compliance defense, it is based upon our conduct up until

      13    what happened with Ms. Booker.  And the fact that -- and

      14    regarding the G2 filter and not whether complaint file issues

08:49:25 15    existed in 2015.

      16          Lastly, Your Honor, I think the most important point

      17    here is regardless of the criticisms of the FDA, Bard's

      18    internal data, Bard's trending of complaints, and the

      19    testimony is unequivocal and uncontradicted on this point,

08:49:46 20    Bard's trending always included every single complaint

      21    mentioned by the FDA, every single type of complaint mentioned

      22    by the FDA.  Bard trends on complaints, whether it's

      23    ultimately reported to the FDA or not reported to the FDA;

      24    whether there's a serious injury or not a serious injury;

08:50:05 25    whether it's characterized as a malfunction, a death, a

08:50:10  1   serious injury.  However characterized, Bard's trending

2   includes the entire universe of complaints here.

3          We believe this is -- therefore, all of these issues

4   are irrelevant under 402.

08:50:28  5          And even if there was some minimal probative value,

6   this is a highly inflammatory issue and I think that it would

7   warrant exclusion under Rule 403.

8          If it would help the Court, we would be happy to

9   file, like, a two-page brief in the next 24 hours detailing

08:50:47  10   the minutia I just tried to summarize about each of these

11   categories as far as what they deal with.  But otherwise,

12   that's our argument.

13          THE COURT:  All right.

14          MS. REED ZAIC:  Your Honor, I agree with Mr. North

08:50:59  15   that what happened to Ms. Booker up until -- what happened up

16   until the time Ms. Booker had her injury and her surgery is

17   relevant, and that includes complaints that are mentioned in

18   the FDA warning letter.

19          And I want to point out that in reviewing the FDA

08:51:15  20   warning letter, these are inspections.  As far as we know,

21   these are random selections of complaints.  These aren't they

22   walked in and reviewed every single complaint or got into

23   their TrackWise database and looked through.  These are random

24   selections.  There was then a retrospective review going back

08:51:32  25   and there were over 200 mischaracterizations between

08:51:35  1  malfunction and serious injuries.

2  Defendants go back and forth whether MAUDE is

3  relevant, not relevant.  There's cross-examination and there's

4  direct examination with physicians with regard to MAUDE and if

08:51:49  5  something is in MAUDE as a malfunction and not a serious

6  injury, that is certainly relevant, and the fact an agency had

7  to point it out is highly probative of that matter.

8  More specifically in this case, Bard is trying to

9  shift the blame to the nonparty physicians.  At the same time

08:52:06 10  they're saying there's no reason why these doctors couldn't

11  take these out.  Meanwhile, they weren't collecting the

12  complaint information that defendants are saying they were

13  tracking and trending.  They were not sharing their tracking

14  and trending with physicians.  The MAUDE database is public

08:52:20 15  and it was not -- and their complaint handling system was not

16  making it an accurate representation of what was going on

17  inside the company.  They weren't sharing their tracking and

18  trending.  MAUDE would have been appropriate.  The FDA found

19  it.

08:52:34 20  Also, I believe the defendants have opened the door

21  on this issue when they're cross-examining expert witnesses

22  with regard to their credibility and the current devices that

23  they use, presumably to make the argument that if they're

24  still using Bard devices then everything should be okay, then

08:52:50 25  these sections about Denali become more relevant because of

08:52:53  1    there were issues with the way they were tracking and trending

2    and dealing with their Denali safety profile.

3         I believe that's it.

4         THE COURT:  Okay.  I want to think about this issue.

08:53:06  5         Yes, Mr. North.

6         MR. NORTH:  Can I make two very quick points, Your

7    Honor?

8         THE COURT:  Yes.

9         MR. NORTH:  The first is that, contrary to what

08:53:13  10   Ms. Zaic said, these inspectors downloaded the entire

11   complaint database and took it with them and reviewed -- they

12   had access to everything.

13        The second point is I'm concerned about what allowing

14   the warning letter in -- the predicament it puts us in, into

08:53:31  15   potentially what is, frankly, an unsavory topic, but there is

16   clear evidence in the FDA documents we have received that this

17   inspection occurred after calls from various plaintiffs'

18   attorneys to the FDA saying that we weren't reporting

19   thousands of complaints.  And there is evidence of a clear

08:53:54  20   cause and effect there.  We don't really want to get into

21   that.  I don't think it's helpful to the trial.  But it's

22   going to be a difficult predicament for us to consider if

23   evidence of this warning letter comes in since we have such

24   clear evidence from the FDA that not long beforehand they were

08:54:12  25   approached by Mr. Dalimonte and other plaintiffs' lawyers with

08:54:17    1    complaints about our trending and tracking.

2                    THE COURT:  All right.  Let me think about this.

3                    MS. REED ZAIC:  Your Honor --

4                    THE COURT:  I probably will come back with additional

08:54:25    5    questions.

6                    Did you want to say one final thing?

7                    MS. REED ZAIC:  Yes, Your Honor.  I cannot

8    cross-examine the FDA on what they did and didn't do and what

9    happened inside Bard when they showed up for an inspection.

08:54:36   10          With regard to the unsavory nature, I believe, time

11   permitting, Ms. Booker's going to take the stand today and

12   we'll talk about a lot of unsavory things that happened to her

13   because of this filter and the issues that are pointed out in

14   the FDA letter.

08:54:48   15          Also, with regard to attorney involvement in this, I

16   believe discovery was served and answered and whether that --

17   the people sitting here at counsel table responded to

18   discovery.  That shouldn't even be an issue.  This letter was

19   issued.  It is relevant.  If you'd like a two page, Your

08:55:07   20   Honor, that's fine as well.

21                    Thank you, Your Honor.

22                    THE COURT:  Okay.  I'm going to take this under

23   advisement.

24                    Are there any other matters we need to address before

08:55:16   25   we get the jury?

08:55:17 1    MR. LOPEZ:  There are, Your Honor.  I don't want

2    delay the jury, but I just want give the Court a heads up.

3        You'll recall that we had a conversation before the

4    trial started and I was -- we were very concerned on the

08:55:29 5    plaintiff side about the time available to us and I asked for

6    extra time, I asked for another day, asked for several more

7    hours.  We've got a problem with time.  I know we can't talk

8    about it now, but I'd like to talk about it at the noon hour.

9        We've already taken down three experts in this case

08:55:45 10    that we wanted to call because we're trying to squeeze this

11    case into a very tight window.

12        We can finish our case probably by tomorrow, but it's

13    going to leave us about four hours for the defense case and to

14    final argue and do the punitive damage phase.

08:56:02 15    We need, at a minimum, another three hours for us to

16    be able to squeeze what we think is the most important

17    evidence in this case.  Otherwise we're not going to be able

18    to put on a complete case nor be able to cross-examine

19    appropriately in the defense part of the case.

08:56:18 20    I know it's not something we can talk about now, Your

21    Honor, but if we can talk about it after today, at the end of

22    the day or during the noon hour or maybe break a little early.

23    I can tell you -- I mean, I'll start with the fact we took

24    down three experts, including our FDA expert, to try to fit

08:56:34 25    this case into a very, very tight window.

08:56:36  1        And I know we got that extra day back on Monday.  I

2    know the purpose for which you did that.  And we're trying.

3    But it's not going to happen.  I mean, we've cut our

4    depositions four, five times.  We've taken out probably eight

08:56:50  5    or nine that we intended to play.  And we can't do it.  I

6    mean, I've got to cross-examine two really important witnesses

7    today and I don't want to worry about whether or not I can

8    have a full cross-examination of them.  I'm worried about

9    that.  Because if I do that then it's going to sacrifice what

08:57:05 10    we want to do in the last two or three hours of our trials.

11        THE COURT:  Well, I understand what you've said.  You

12    know the constraints we're up against in terms of being locked

13    into these days.

14        MR. LOPEZ:  I do.

08:57:16 15        THE COURT:  I do want to have time for the jury to

16    deliberate.

17        I will say there's been some repetition in your case.

18    I think for the most part it's been efficient, but there's

19    been many repetitive questions and some cumulative evidence.

08:57:28 20    I think you could have saved some time.  But that's easy for

21    me to say; I'm not in your chair.

22        We are gaining about 15 or 20 minutes a day, so we'll

23    have a few extra hours by the time we get to next week.  But

24    we do have the constraints we're up against.

08:57:48 25        MR. LOPEZ:  I understand.

08:57:49  1          THE COURT:  I can't hold court on Saturday.

       2          MR. LOPEZ:  I can reassure you one thing.  The issues

       3     you just mentioned about us being repetitive and going over

       4     our time, we're paying the price for that.  We're cutting out

08:57:59  5     things because -- and it is true, when you get up and start

       6     cross-examining someone, the last thing you think about is the

       7     clock.

       8          We recognize that because of some of that we probably

       9     could have saved several minutes there, but certainly not

08:58:15 10     enough to warrant us being able to put on a full case.

       11          Like I said, we've already taken down three experts.

       12     We've sent two of them home this week.

       13          THE COURT:  Okay.

       14          MR. LOPEZ:  Thank you, Your Honor.

08:58:27 15          MR. NORTH:  Your Honor, I understand what Mr. Lopez

       16     is saying, I just want to make a couple comments.

       17          They've made strategic choices as to what they put on

       18     along the way.  Some of them -- they have their strategy, it's

       19     not mine to question them.  They spent two hours

08:58:42 20     cross-examining an engineer whose involvement was only with

       21     two tests regarding the Recovery filter.  That was their

       22     choice.

       23          The problem I have is any change in the time

       24     allocations of any significance now unduly prejudices the

08:58:56 25     defendant, in my view, because we have made strategic choices

08:59:00  1  all along as to how long we would cross-examine witnesses, how

2  long we would spend doing certain deposition designations with

3  these time constraints in mind.

4          THE COURT:  Okay.  I understand what you both have

08:59:12  5  said.

6          We're going to bring the jury in at this time.

7          Go ahead, Traci.

8          Are we going to start with the same deposition being

9  played?

08:59:20  10          MR. LOPEZ:  Yes, Your Honor.

11       (The jury entered the courtroom.)

12          THE COURT:  Morning, ladies and gentlemen.

13          JURORS:  Morning.

14          THE COURT:  Thank you for being here.  Go ahead and

09:00:32  15  have a seat.

16          We're going to pick up this morning where we left off

17  last evening, which is with the deposition of Dr. D'Ayala

18  being played.

19          So plaintiff's counsel, you may proceed.

09:00:42  20       (Video testimony played.)

21          MR. LOPEZ:  That concludes that video.

22          THE COURT:  All right.  Your next witness.

23          MS. REED ZAIC:  Yes.  It is Dr. Patel, by video.  I'm

24  going to do an intro as soon as I find it.  I apologize.

09:31:35  25          Your Honor, again, this is our agreed upon

09:31:38  1    introduction, to save time on the tape.

      2         Dr. Salil Patel is board certified in internal

      3    medicine, cardiovascular diseases, nuclear cardiology, and

      4    cardiovascular CT, and is employed at Gwinnett Cardiology

09:31:53  5    Services in Lawrenceville, Georgia, since 2016.

      6         He's served as chief of the Department of Medicine at

      7    Gwinnett Medical Center.

      8         Dr. Patel graduated from Ohio State University

      9    College of Medicine in 1996 and completed fellowships in

09:32:07 10    cardiovascular diseases and cardiac MRI in 2002.

     11         Dr. Patel is Sheri Booker's cardiologist.

     12         At this time, Your Honor, I'd like to list the

     13    exhibits that will be displayed in the video and move them

     14    into evidence.

09:32:23 15         Trial Exhibit 2368, Deposition Exhibit A, as in

     16    alpha, 2.

     17         Trial Exhibit 2349, Deposition Exhibit A3.

     18         Trial Exhibit 1811, Deposition Exhibit A5.

     19         Trial Exhibit 2355, Deposition Exhibit A7.

09:32:48 20         Trial Exhibit 2368, which is Deposition Exhibit A10.

     21         Trial Exhibit 1806, which is Deposition Exhibit A13.

     22         And Trial Exhibit 1807, Exhibit A15.

     23         Thank you.

     24         THE COURT:  And you're moving all of those into

09:33:10 25    evidence?

09:33:11  1          MS. REED ZAIC:  Yes, Your Honor.

        2          THE COURT:  Is there any objection?

        3          MS. HELM:  No, Your Honor.

        4          THE COURT:  All right, those exhibits are admitted.

09:33:20  5       (Exhibits 2368, 2349, 1811, 2355, 1806, 1807 admitted.)

        6       (Video testimony played.)

        7          MS. REED ZAIC:  Apologize, Your Honor.  I believe my

        8  co-counsel took the summary out the door.

        9          THE COURT:  Ladies and gentlemen, if you want to

10:13:45 10  stand up for a minute, feel free, while we're finding the

       11  documents.

       12          MS. REED ZAIC:  The next --

       13          THE COURT:  All right.  Thanks.

       14          MS. REED ZAIC:  The next witness will be by video.

10:14:16 15  It is Dr. Brandon Kang.  He's a board certified radiologist

       16  and diagnostic radiologist.  He is chief of radiology and

       17  director of interventional radiology at North Metropolitan

       18  Radiology Associates in Georgia.

       19          Dr. Kang graduated from the University of Tennessee

10:14:32 20  Medical School in 1999 and completed a fellowship at Emory

       21  University Hospital in 2005.

       22       (Video testimony played.)

       23          THE COURT:  Counsel, let's stop the video, please.

       24          We'll take our morning break, ladies and gentlemen,

10:30:04 25  and resume at 9:45.

10:30:07  1        (The jury exited the courtroom at 10:30.)

        2        (Recess taken from 10:30 to 10:45.  Proceedings resumed

        3    with the jury present.

        4            THE COURT:  Thank you.  Please be seated.

10:46:14  5            You may continue, Counsel.

        6        (Video testimony resumed.)

        7            MS. REED ZAIC:  Your Honor, I'd like to move into

        8    evidence three exhibits during the Kang deposition.

        9            Trial Exhibit 2350, Deposition Exhibit 4.

11:05:37 10            Trial Exhibit 2368, Deposition Exhibit 7.

       11            And trial Exhibit 2349, Deposition Exhibit 10.

       12            THE COURTROOM DEPUTY:  Two of those have been

       13    previously admitted.

       14            THE COURT:  Apparently two of those have been

11:05:54 15    admitted.

       16            Which of those?

       17            THE COURTROOM DEPUTY:  2368 and 2349.

       18            THE COURT:  Any objection to 2350?

       19            MS. HELM:  No, Your Honor.

11:06:04 20            THE COURT:  All right.  That exhibit is admitted.

       21        (Exhibit 2350 admitted.)

       22            MS. REED ZAIC:  Thank you, Your Honor.

       23            The next witness by videotape will be Dr. Richard

       24    Harvey.  He's a specialist in cardiac, vascular, and thoracic

11:06:13 25    surgery at the cardiovascular and thoracic surgeons Gwinnet

11:06:17  1    Medical Group.

2         He went to medical school at University of

3    Mississippi School of Medicine and he completed his general

4    surgery training at Mercer University.  He returned to the

11:06:27  5    University of Mississippi to complete his residency in

6    cardiothoracic surgery.

7         Dr. Harvey is a diplomat of the American Board of

8    Thoracic Surgery as well as a member of the American College

9    of Surgeons, Society of Thoracic Surgeons, and Alpha Omega

11:06:45 10    Alpha.

11         I'd like to move into evidence three exhibits

12    associated with his deposition.

13         Exhibit 2361, which is Deposition Exhibit 7.

14         2364, Deposition Exhibit 8.

11:07:05 15         And 1332, Deposition Exhibit 13.

16         THE COURT:  Any objection?

17         MS. HELM:  None, Your Honor.

18         THE COURT:  Those exhibits are admitted.

19       (Exhibits 2361, 2364, and 1332 admitted.)

11:15:47 20         MS. REED ZAIC:  Thank you.

21       (Video testimony played.)

22         MR. LOPEZ:  Your Honor, at this time plaintiffs call

23    Mr. Michael Randall.

24         THE COURT:  If you'd like to stand up, ladies and

11:37:55 25    gentlemen, while he's coming in, feel free.

DIRECT EXAMINATION – MICHAEL RANDALL

11:38:31  1        THE COURTROOM DEPUTY:  If you'll stand right here and

        2   raise your right hand, please.

        3        MR. LOPEZ:  May I proceed Your Honor?  Thank you.

        4                        **MICHAEL RANDALL,**

11:38:46  5   called as a witness herein, after having been first duly sworn

        6   or affirmed, was examined and testified as follows:

        7                D I R E C T   E X A M I N A T I O N

        8   BY MR. LOPEZ:

        9   Q   Good morning.

11:39:04 10   A   Good morning.  How are you?

       11   Q   I think we may have met, but maybe not.  You had your

       12   deposition taken in this case?

       13   A   I had a deposition taken.  I don't know if it was for this

       14   case.

11:39:15 15   Q   Have you had more than one deposition taken in a Bard IVC

       16   filter case?

       17   A   Two.

       18   Q   I apologize.  Could you introduce yourself to the jury and

       19   tell them who you are, where you work.

11:39:36 20   A   Sure.

       21   Q   And your position.

       22   A   I'm Michael Randall.  I currently am the director of

       23   research and development for Bard Peripheral Vascular.  I

       24   started with Bard back in 2006 and I worked on vena cava

11:39:53 25   filters.  Came over as a senior engineer and progressed and

DIRECT EXAMINATION – MICHAEL RANDALL

11:39:57  1    now I'm a director.

2    Q    And you're still employed there?

3    A    Yes, I am.

4    Q    And before today were you provided with some documents we

11:40:07  5    had given to counsel for Bard that were the type --

6    potentially the documents we would be using with you today?

7    A    Yes.

8    Q    And you've had a chance to look at those?

9    A    Yes.

11:40:18  10   Q    You've had a chance to prepare today for potentially

11   responding to some of those documents?

12   A    Yes.

13   Q    So the documents I'm going to show you, as long as they

14   were in the same material, they're not going to be a surprise

11:40:31  15   to you, today; right?

16   A    They shouldn't.

17   Q    You've had had an opportunity to read them from cover to

18   cover?

19   A    It was a lot of information, so I tried to do my best to

11:40:41  20   get through it as fast as I could.

21   Q    I promise we're not going to use nearly all of those.

22        MR. LOPEZ:  Your Honor, this is his deposition.

23   BY MR. LOPEZ:

24   Q    That's your February 2nd, 2007, deposition, and that's the

11:41:02  25   one that we'll probably be referring to today.  And you have

DIRECT EXAMINATION – MICHAEL RANDALL

11:41:05  1    it available to you in the event you need to refer to it or I

2    need to remind you of something, okay?

3    A    Okay.

4    Q    So when you joined Bard in 2006, was there an immediate

11:41:20  5    issue or crisis with respect to one of its IVC filters they

6    assigned you to?

7    A    No, there was no crisis when I joined Bard.  When I came

8    over I worked in two franchises.  I was doing PTA and because

9    I had experience in Nitinol, which is what the filters are

11:41:39 10    made of, I was able to work on the filter franchise.

11    Q    And when did you actually start getting assignments or

12    given some responsibility to deal with the Bard IVC filters?

13    A    I think it was 2007, 2008 when I started working on an

14    actual project.  That was the G2 Express project.

11:42:05 15    Q    And at the time there was already an IVC filter

16    manufactured by Bard and sold by Bard called the G2; correct?

17    A    Correct.

18    Q    So let's -- I want to make something -- you can make

19    something clear for us.  Any retrievable device that Bard

11:42:22 20    sells is first and foremost a permanent device; right?

21    A    Yes, I believe they all have permanent indication first.

22    Q    And the most important thing about whether you call it a

23    permanent device or retrievable device, it's the strength and

24    stability and safety within a patient.  True?

11:42:42 25    A    I'm sorry, can you repeat that.

DIRECT EXAMINATION – MICHAEL RANDALL

11:42:44  1   Q   Most important thing about these filters, whether they're

2   permanent or retrievable, once they get implanted they need to

3   stay where they're put and not break and not cause harm.

4   Agree with that?

11:42:56  5   A   That's one of the things that is important for filters.

6   Q   I asked you whether or not it was the most important

7   thing.

8   A   I don't necessarily think it is the most important thing.

9   I think it's one of them.

11:43:09  10   Q   Well, would you agree with me that it's important that

11   when you're trying to prevent a risk that you don't introduce

12   new risks into the patient?  Maybe a risk that might be worse

13   than the risk you're trying to prevent?

14   A   That's our goal is to really design something that's going

11:43:28  15   to be efficacious but then also safe.  So we're striving for

16   that.

17   Q   Now, you mentioned the G2X.  The G2X is a G2 filter with a

18   hook on top?

19   A   Yes, it is.

11:43:43  20   Q   And in order for you to work on the G2X, wouldn't you have

21   had to have educated yourself on what was going on with the

22   G2?

23   A   So my scope on the G2X project was essentially taking the

24   G2 filter, which had like a bullet tip on it, and instead of

11:44:01  25   having a bullet tip we had a tip that had a hook and to put

DIRECT EXAMINATION - MICHAEL RANDALL

11:44:06  1   that on the filter.  So from an engineering perspective, I was

2   concerned with how to attach it and weld it.

3   Q   Okay.  I don't think you answered my question.  Maybe it

4   was my fault.

11:44:16  5   A   Sorry.

6   Q   I asked you since you were going to be working on the G2X

7   project did you spend some time educating yourself on the

8   history and some of the details about the G2X itself -- I'm

9   sorry about the G2 device?

11:44:30  10  A   No, not at that time.

11  Q   And at some point in time did you?

12  A   Yes, when it was the next filter platform that we were

13  going to start working on and improve.

14  Q   When did you look at the platform of the G2 when you were

11:44:46  15  going to start working on the next generation beyond the G2X?

16  A   That would be the project called Eclipse.

17  Q   Okay.  And were you in charge of that project?

18  A   I was project leader at one point and so was -- and then

19  it went to someone else.  So I didn't have sole responsibility

11:45:04  20  for it, but I was one -- I was the initial project leader.

21  Q   When you were working -- prior to that time, and when you

22  first started at Bard, did you know that there was a clinical

23  trial going on for the retrievability of the G2?

24  A   Yes, I knew there was a clinical trying going on.

11:45:26  25  Q   Called EVEREST?

DIRECT EXAMINATION – MICHAEL RANDALL

11:45:27   1   A   Yes.

2   Q   Did you have any participation in that trial?

3   A   No.

4   Q   And then was Bard successful in getting clearance for the

11:45:39   5   G2X?

6   A   Yes.

7   Q   And you were involved in that; right?

8   A   Yes.

9   Q   And the G2X required a submission to the FDA under 510(k)

11:45:48   10   to get clearance for the G2X to become the new generation of

11   the G2; correct?

12   A   It was a variation of the G2, yes.

13   Q   So the G2's been on the market, what, since late 2005 and

14   the next time you go to the FDA with a change in the design of

11:46:14   15   the G2X is in 2008; is that right?

16   A   That sounds right.  I'm not sure exactly when we got

17   approval for it.  During that time frame.

18   Q   And so during that period of time between late 2005 and

19   2008 when you designed the G2 so you could put a hook at the

11:46:38   20   end of it, were there any other discussions going on at Bard

21   that maybe there ought to be some other design changes to

22   incorporate into the G2 since we're going to be submitting

23   something to the FDA in 2008 anyway?

24   A   So I started at Bard in 2006, in April, so I don't know

11:46:56   25   from 2005 to April 2006.  And I'm not sure what the

DIRECT EXAMINATION - MICHAEL RANDALL

11:47:02  1  discussions were at the time when I first started.  I was a

2  senior engineer.  I really didn't have a whole lot of

3  responsibility.  I was an individual contributor.

4  Q    But there was a point in time when you were looking at

11:47:14  5  redesigning the G2 and the G2X to make it the Eclipse that you

6  went back and you looked at the G2, the history of the G2, to

7  see what you might need to do to it to make it a safer and

8  better product; right?

9  A    Yeah.  I believe that's in the 2008-ish kind of time

11:47:33 10  frame.

11            MR. LOPEZ:  Could I have, please, Exhibit 4327.

12            Greg, if you could go to page 5.

13            First, before you do that --

14  BY MR. LOPEZ:

11:47:53 15  Q    Are you familiar with monthly Global PV reports --

16  A    No.

17  Q    Who's Tim Ring?  Do you know who Tim Ring is?

18  A    Yeah, CEO of the company.

19  Q    And who is John Weiland?

11:48:11 20  A    I think the CFO.

21  Q    Do you know who John McDermott is?

22  A    He was the president of Bard Peripheral Vascular.

23  Q    Doesn't get much higher than that in the company, right?

24  You have two highest guys, two highest gentlemen in the

11:48:29 25  corporate offices in New Jersey and you have the president of

DIRECT EXAMINATION - MICHAEL RANDALL

11:48:31   1   the facility or the -- here in Tempe; right?

2   A    Um-hmm.

3   Q    Now, this is dated February 10, 2006.  Do you see that?

4   A    Yes.

11:48:41   5   Q    Let's -- and the G2 device that you were looking at to

6   make design changes on was being sold about, what, four or

7   five months, by February of 2006?  That sound about right?

8   A    I'll take your word for it.  Like I said, I started in

9   2006 in April, so I really am not sure when that was

11:49:07  10   introduced into the market.

11   Q    You don't know -- so the device that you worked on to

12   improve its design, you're telling us you don't know when that

13   device entered the marketplace, the G2?

14   A    I don't recall the exact date.

11:49:18  15   Q    Well, was it -- can you give us a month?

16   A    Seriously, I don't remember.  That was on the market

17   before I even joined the company.

18        MR. LOPEZ:  Can we please go to page 5 of this

19   exhibit.

11:49:31  20        First of all, Your Honor, I'd like to offer this into

21   evidence at this time.

22        MR. CONDO:  602.  Foundation.

23        THE COURT:  Well, 602 isn't the objection to the

24   document coming in.  Is there an objection to the document

11:49:46  25   being admitted?

DIRECT EXAMINATION - MICHAEL RANDALL

11:49:50  1          MR. CONDO:  It is both hearsay and a 402 objection to

2      the document.

3          THE COURT:  Sustained on hearsay.

4          MR. LOPEZ:  Your Honor, it's official Bard documents.

11:50:02  5          THE COURT:  You have to satisfy 803(6).

6          MR. LOPEZ:  I'll just show it to the witness, then.

7      BY MR. LOPEZ:

8      Q   Sir, you have a screen right there.

9          You see where it's highlighted?  "G2 with caudal

11:50:15 10      improvements initiated."  See where I am?

11     A   Yes.

12     Q   "Project initiated to modify the G2 filter to minimize

13     caudal migration."

14         MR. CONDO:  Your Honor, I would object to reading

11:50:28 15      from the document.

16         THE COURT:  Sustained.  It's not in evidence.

17         MR. LOPEZ:  I'm going to cite 801(d)(1)(C) and (D).

18     I mean this is -- I don't think this is hearsay.  It's a

19     document that was produced to us in this litigation with

11:51:01 20      Bard's Bates numbers on it.

21         THE COURT:  It's an out-of-court declaration offered

22     for the truth of the matter asserted.  That satisfies the

23     hearsay requirement under Rule 801.

24         MR. LOPEZ:  I'm suggesting 801(d)(1)(2) would suggest

11:51:24 25      it's not.  But I understand, Your Honor.

DIRECT EXAMINATION – MICHAEL RANDALL

11:51:31  1  BY MR. LOPEZ:

2  Q   Let me ask you this, without looking at a document:  When

3  you got involved in the G2 when you were talking -- when it

4  was going to be redesigned to the next generation, whatever

11:51:41  5  design fixes it required, it was the same design, other than

6  the hook on top, that existed since Bard started marketing the

7  G2 correct?

8  A   My initial project was adding a snare hook.  It was

9  essentially the same filter.

11:52:00  10  Q   And all those problems that existed in whenever it was you

11  started talking about making fixes in August of 2008 existed

12  in 2005.

13  A   The improvements that I worked on, looking at this, the

14  first time I'm seeing this, it looks like maybe there was some

11:52:20  15  information --

16        MR. LOPEZ:  You can take this down.

17  BY MR. LOPEZ:

18  Q   My question is, all of the things that -- the design of

19  the G2 that you looked at in 2008 where you were going to make

11:52:32  20  it better, you were going to make it safer, you were going to

21  make design changes, is the exact same device that was on the

22  market in 2005 with the exception that it had a hook at the

23  top of it; correct?

24  A   The device that I put the hook on was essentially the same

11:52:50  25  G2.

DIRECT EXAMINATION - MICHAEL RANDALL

11:52:52  1    Q    And that's -- I'm sorry.

2    A    In terms of it being safe, it was still a safe device.

3    We're making enhancements.  We weren't necessarily fixing

4    issues.

11:53:02  5    Q    Well, my question is simply this:  Whatever it is you were

6    doing as -- you were the project leader; right?

7    A    You're talking about for the G2X?

8    Q    No.  For the enhancement of the G2X.  You were the project

9    leader?

11:53:18 10    A    Yeah, initially.

11    Q    And the device you were looking at to enhance was the G2X;

12    correct?

13    A    Correct.

14    Q    And the G2X was the G2 with a hook at the top of it;

11:53:29 15    correct?

16    A    Correct.

17         MR. LOPEZ:  Could we have Exhibit 1878, please.

18    BY MR. LOPEZ:

19    Q    Sir, this is an exhibit that you saw before today; right?

11:53:47 20    A    Yes.

21    Q    It's addressed to you; correct?

22    A    Yes.

23    Q    And it's from Andre Chanduszko.

24    A    Right.

11:53:56 25    Q    Who is Mr. Chanduszko?

DIRECT EXAMINATION – MICHAEL RANDALL

11:53:59   1   A   Andre is an engineer on the vena cava filter franchise.

2   Q   And did you work for him?

3   A   No.

4   Q   And the subject is EVEREST and MAUDE desktop PowerPoint;

11:54:12   5   correct.

6   A   Correct.

7           MR. LOPEZ:  Can we have 1222, please, trial exhibit.

8   BY MR. LOPEZ:

9   Q   Do you recognize this document?

11:54:24  10   A   Yes, I've reviewed it.

11   Q   Did you help prepare this document?

12   A   I reviewed it.  Andre prepared it.

13   Q   If we go to the next page of this document, you'll see

14   there's a blank there.  That was a picture of you as the G2

11:54:43  15   Platinum project leader, correct, at one time?

16   A   There was a picture of me, yes.

17   Q   And you were in fact the G2 Platinum project leader;

18   correct?

19   A   Initially.

11:54:56  20           MR. LOPEZ:  If we go back to the beginning of this

21   PowerPoint.

22           THE WITNESS:  Actually, let me clarify.  Yes, I was

23   project leader for this one.  We had a different project that

24   became Eclipse where I started it and someone else took over.

25

DIRECT EXAMINATION - MICHAEL RANDALL

11:55:11  1  BY MR. LOPEZ:

2  Q    And this is a PowerPoint presentation you're familiar

3  with, with respect to the meeting that's being discussed here

4  and the e-mail I just showed you from Mr. Chanduszko; correct?

11:55:20  5  A    Yes.  This was a draft presentation he sent to me.

6          MR. LOPEZ:  I'd like to offer this into evidence at

7  this time, Your Honor.

8          MR. CONDO:  No objection.

9          MR. LOPEZ:  May we publish it to the jury?

11:55:30  10          THE COURT:  By "this," you mean 1222?

11          MR. LOPEZ:  I'm sorry.  Yes, Your Honor.  Exhibit

12  1222.

13          THE COURT:  Admitted.

14        (Exhibit 1222 admitted.)

11:55:37  15          MR. LOPEZ:  And may I publish it to the jury?

16          THE COURT:  Yes.

17          MR. LOPEZ:  Thank you.

18  BY MR. LOPEZ:

19  Q    Now, this PowerPoint, it's about a meeting that was going

11:55:47  20  to take place.  True?

21  A    Yes.

22  Q    When a company gets ready for a meeting, they're going to

23  be discussing the important things contained in the

24  PowerPoint, do you all sit down and discuss the things that

11:55:59  25  should be on a PowerPoint or presentation to help guide you

DIRECT EXAMINATION - MICHAEL RANDALL

11:56:03  1   through a meeting like that?

2   A    Yes.

3   Q    And you participated in this; right?

4   A    In the creation or in the meeting?

11:56:10  5   Q    Well, no, in just the development of the meeting, the

6   agenda, and what it was you all were going to be talking

7   about.

8   A    Yes.

9   Q    And who else did?  Mr. Chanduszko?

11:56:20  10   A    Yes.

11   Q    How about Rob Carr?

12   A    I don't remember.

13   Q    Who else do you remember that was on this team that would

14   have been involved in this meeting?

11:56:36  15   A    So it was probably a cross-functional team, so whoever was

16   in Quality at the time.  I don't know if it was John Conway.

17   He might have been involved in that meeting.  The marketing

18   person, which I think was Bret Baird.  He was probably in that

19   meeting.  Some other cross-functional people.  Regulatory or

11:57:00  20   something.

21   Q    I'm sorry, I should have done this with Trial Exhibit

22   1878.  The date on that was June 9, 2008.  Does that sound

23   about the time period this PowerPoint was being created and

24   discussed at Bard?

11:57:14  25   A    Yeah, sounds like --

DIRECT EXAMINATION – MICHAEL RANDALL

11:57:15  1   Q   If you need to look at the e-mail to refresh your

2   memory -- let's put up 1878.  I think the date is important.

3   I want you to confirm that for us.

4        MR. LOPEZ:  Put 1878 back up real quickly for us.

11:57:31  5   BY MR. LOPEZ:

6   Q   That refresh your recollection that this was on June 9,

7   2008?

8   A   June 9.  Yeah.

9        MR. LOPEZ:  Let's go back, Greg, please, to Trial

11:57:41  10  Exhibit 1222.

11  BY MR. LOPEZ:

12  Q   Okay.  The objective of the meeting is to analyze EVEREST.

13  What's EVEREST?

14  A   EVEREST was the clinical study that was performed on the

11:57:51  15  G2 filter to, I believe, give retrievability indication.

16  Q   Let's make sure we're all on the same page about clinical

17  study.  This was a clinical study that was done after the G2

18  was already on the market as a permanent device and the

19  purpose and the design of this study was to see if the G2

11:58:13  20  could be retrieved.

21  A   I believe so.  Yes.

22  Q   And by this had -- do I understand you to say that the

23  details and the results of the EVEREST study were discussed at

24  this meeting?

11:58:30  25  A   Andre put together some slides on the EVEREST data and it

DIRECT EXAMINATION – MICHAEL RANDALL

11:58:34   1   was discussed.

2   Q   Okay.  And the objective was to analyze EVEREST and MAUDE

3   and to provide justifications for proposed changes to G2

4   filter; correct?

11:58:45   5   A   Yeah, we're looking to see how we can improve the product.

6   Q   Yeah.  And the new improved filter platform was going to

7   be called the G2 Platinum?

8   A   Correct.

9   Q   Why Platinum?

11:59:01   10   A   We called it G2 Platinum because the scope of this project

11   was to take the filter and we were going to electropolish it.

12         Electropolishing is a like electrical chemical

13   removal of the surface finish on the outside and it leaves the

14   color of the filter almost looking like platinum.  So we

11:59:22   15   picked the name G2 Platinum just because it would look like

16   that.

17         MR. LOPEZ:  If we can go to the next slide, please,

18   Greg.

19         Next one after that, please.

11:59:34   20   BY MR. LOPEZ:

21   Q   Here is the objective of this meeting, right?  It says it

22   right here, was to improve the G2 platform to address current

23   complications without a clinical trial.  Right?

24   A   Yes.

11:59:46   25   Q   In other words, you wanted to be able to do something to

DIRECT EXAMINATION — MICHAEL RANDALL

11:59:49   1    the G2 filter to improve it without having to engage in a

           2    clinical trial; correct?

           3    A    Yeah, because there were several projects going on.  One

           4    would involve a clinical trial, which was being led by another

12:00:03   5    team.  And what I was tasked with doing was seeing if we can

           6    make improvements early on and faster.

           7              So we had parallel paths.  One project with a

           8    clinical trial, and then another one where what can we do

           9    immediately.

12:00:18  10              THE COURT:  We're going to break at this point,

          11    counsel.

          12              Ladies and gentlemen of the jury, we'll excuse you

          13    till 1 o'clock.

          14         (The jury exited the courtroom at 12:00.)

12:00:47  15              THE COURT:  Please be seated.

          16              Mr. Lopez --

          17              MR. LOPEZ:  Yes, sir.

          18              THE COURT:  -- explain to me that hearsay argument

          19    you were making.

12:01:00  20              MR. LOPEZ:  I'm just looking at 801(d)(2), opposing

          21    party statement.  The statement is offered against an opposing

          22    party --

          23              THE COURT:  So you're seeking to admit it as an

          24    opposing party admission --

12:01:14  25              MR. LOPEZ:  Yes.

DIRECT EXAMINATION – MICHAEL RANDALL

12:01:14  1          THE COURT:  -- is that right?

      2          MR. LOPEZ:  Yes, Your Honor.

      3          THE COURT:  Okay.  You first cited 801(c) --

      4          MR. LOPEZ:  I know.

12:01:21  5          THE COURT:  Then you cited (d)(1).

      6          MR. LOPEZ:  I was trying to read fast.

      7          THE COURT:  That's all right.  I just wasn't certain.

      8          What is your response, Mr. Condo, on 801(d)(2)?  And

      9  this is with respect to Exhibit 4327, the February 10th, 2006,

12:01:40 10  memo among Bard management.

     11          MR. CONDO:  None of the elements for that have been

     12  established, nor can they be established through this witness.

     13          THE COURT:  What elements?

     14          MR. CONDO:  (a), (b), (c), (d) --

12:01:58 15          THE COURT:  Well, those are disjunctive.  It can be

     16  any one of those.

     17          MR. CONDO:  Right.

     18          THE COURT:  So how is -- what is your argument as to

     19  why this memo is not a statement by Bard?

12:02:15 20          MR. CONDO:  Well, you've given me a tough question to

     21  answer.

     22          THE COURT:  Why don't you think about it.  You both

     23  can think about it.  I'll be happy to talk to you about it

     24  when we come back from the lunch break.

12:02:26 25          MR. CONDO:  Thank you.

DIRECT EXAMINATION - MICHAEL RANDALL

12:02:27  1        THE COURT:  And the question that's going to be

       2    related to that is whether under Rule 901(a) the fact that

       3    it's on Bard letterhead from Bard management to Bard

       4    management is sufficient to authenticate it as such a

12:02:54  5    document.  And, if so, why then would it not be a statement of

       6    Bard under 801(d)(2).

       7        MR. CONDO:  Understood.

       8        THE COURT:  So why don't you look at that and I'll be

       9    happy to hear from you.

12:03:05 10        Let me ask another question.  When we talked about

      11    time this morning, Mr. Lopez, and defense counsel, what are

      12    your thoughts on the time that's going to be reserved by each

      13    side for the punitive damages presentation if the jury finds

      14    punitive damages are appropriate?  How much time are you going

12:03:26 15    to hold in reserve for that?

      16        MR. LOPEZ:  I'm thinking 45 minutes, Your Honor, for

      17    the plaintiff.

      18        MR. NORTH:  Your Honor, I was, in abundance of

      19    caution, going to reserve between one and two hours.

12:03:43 20        THE COURT:  Well, if -- if Bard reserves two hours

      21    and plaintiff reserves 45 minutes, that means whenever we send

      22    the jury out to deliberate we have to build in the possibility

      23    that once they're done we need two hours and 45 minutes of

      24    evidence and argument before they go back out to deliberate.

12:04:03 25    Do you all agree with that?

DIRECT EXAMINATION - MICHAEL RANDALL

12:04:06  1        MR. LOPEZ:  If I only take forty -- yeah.

2        MR. NORTH:  Yes.

3        THE COURT:  What is your -- as I look at the

4   calendar, what are your thoughts about splitting the argument

12:04:16  5   between one day and the next?  Because that would be -- for

6   example, having plaintiff's opening at the end of the day and

7   defense next morning.  Because that's going to affect the

8   timing near the end of the trial as well.

9        MR. LOPEZ:  I'm sorry, I didn't follow that.  Your

12:04:30  10  Honor.  When you say split, you mean plaintiff do --

11       THE COURT:  Yeah.  For example, you start -- I

12  referred to it as opening -- your closing at, say, 3:30 to

13  4:30, we break for the day, and defendants go the next

14  morning.

12:04:45  15       Parties usually like to do them back to back.  But if

16  we're trying to juggle time something like that might be

17  needed.

18       MR. LOPEZ:  That's for the first argument?  We're not

19  talking about punitives --

12:04:57  20       THE COURT:  Not talking -- right.

21       MR. LOPEZ:  Whatever it takes.  I'd rather argue the

22  same day, but I get rebuttal, so --

23       MR. NORTH:  Your Honor, also I believe there will be

24  at least one witness.  I mean, it will be a brief witness

12:05:11  25  before the arguments.

12:05:13  1              THE COURT:  I'm not talking -- I'm just talking about

        2     splitting closings.  Not in punitives but at the end of --

        3              MR. NORTH:  Oh, regular closings.

        4              THE COURT:  Yeah.

12:05:22  5              MR. NORTH:  I think we'd have to do what we have to

        6     do with the schedule, Your Honor.

        7              THE COURT:  Okay.  All right.  I'll think this over.

        8              MR. LOPEZ:  Thank you, Your Honor.

        9              THE COURT:  Let's plan to be back here at five to

12:05:32 10     1:00 so we can talk about 801(d)(2).

       11          (Recess taken at 12:05.)

       12          (End of a.m. session transcript.)

       13                          *  *  *  *  *

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

1                        **C E R T I F I C A T E**

2

3            I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7            I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14           DATED at Phoenix, Arizona, this 21st day of March,

15   2018.

16

17

18

19

20                           s/ Patricia Lyons, RMR, CRR
                             Official Court Reporter
21

22

23

24

25