March 21, 2018 P.M.

1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3          _____

4

| | |
|---|---|
| **In re: Bard IVC Filters,** | ) |
| **Products Liability Litigation** | ) |
| | ) |
| | ) |
| | ) MD-15-02641-PHX-DGC |
| _____ | ) |
| **Sherr-Una Booker, an individual,** | ) |
| | ) Phoenix, Arizona |
| Plaintiff, | ) March 21, 2018 |
| v. | ) 12:54 p.m. |
| | ) |
| **C.R. Bard, Inc., a New Jersey** | ) |
| **corporation; and Bard Peripheral** | ) CV-16-00474-PHX-DGC |
| **Vascular, Inc., an Arizona** | ) |
| **corporation,** | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |


BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>

<u>JURY TRIAL - DAY 5 P.M.</u>


(Pages 951 through 1078)



Official Court Reporter:
**Elaine Cropper, RDR, CRR, CCP**
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street
Suite 312, SPC 35
Phoenix, Arizona  85003-2150
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

March 21, 2018 P.M.

1                              **APPEARANCES**

2

For the Plaintiff:
3         **RAMON ROSSI LOPEZ, ESQ.**
          Lopez McHugh, L.L.P.
4         100 Bayview Circle, Ste. 5600
          Newport Beach, CA  92660
5         949.812.5771/(fax) 949.737.1504

6   For the Plaintiff:
          **MARK S. O'CONNOR, ESQ.**
7         Gallagher & Kennedy, P.A.
          2575 East Camelback Road
8         Phoenix, AZ  85016
          602.530.8000/(fax) 602.530.8500
9
    For the Plaintiff:
10        **JULIA REED ZAIC, ESQ.**
          Heaviside Reed Zaic
11        312 Broadway, Ste. 203
          Laguna Beach, CA  92660
12        949.715.5228

13  For the Defendants:
          **JAMES R. CONDO, ESQ.**
14        Snell & Wilmer, L.L.P - Phoenix, AZ
          One Arizona Center
15        400 East Van Buren
          Phoenix, AZ  85004-2202
16        602.382.67000

17  For the Defendants:
          **RICHARD B. NORTH, JR., ESQ.**
18        **ELIZABETH C. HELM, ESQ.**
          Nelson, Mullins, Riley & Scarborough, L.L.P.
19        201 17th St., N.W., Ste. 1700
          Atlanta, GA  30363
20        404.322.6000

21

22

23

24

25

                    United States District Court

March 21, 2018 P.M.

1                        **I N D E X**

2

3                        **TESTIMONY**

4   **WITNESS**                 **Direct   Cross   Redirect   Recross**

5     MICHAEL RANDALL            960
      DANIEL ORMS (Video)       1003
6     ROBERT M. CARR, JR.       1003

7

8                    **E X H I B I T S**

9   Number                                        Ident Rec'd

10  422  10/24/2007 Email re Recovery G2 Filter   1039
         Study (Everest) Final Study Report,
11       TD00456, between 12/7/2005 and 7/24/2006,
         Protocol BPV-RC- 1332, IDE G050134
12
    704  Brauer, 08/02/2017, Exhibit 1039 - Bard  1048
13       Everest Medical Monitor Adjudication
         Meeting Minutes, August 28, 2006
14
    800  Carr Deposition, 12/19/2014 - Exhibit 18 - 1015 1015
15       NMT RNF PDT Meeting Notes re Product
         Development Team, 01/13/1998
16
    1033 Deford Deposition, 06/02/2016 - Exhibit   1019
17       289 - Handwritten Notes on concerns about
         the HHE and design issues
18
    1222 Ganser Deposition, 10/11/2016 - Exhibit    963
19       534 - PowerPoint Presentation for a
         meeting to analyze EVEREST and MAUDE data
20       and provide justifications for proposed
         changes to G2 filter
21
    1452 Kaufman, 01/04/2017, Exhibit 595 - Written 1016
22       notes from the Recovery Filter/Clinical
         Panel Review with Dr. Kaufman, Dr. Anthony
23       Venbrux, and H. Houstard, Esq. detailing
         issues with thrombus/clots, migration
24       resistance, and radial force

25

                United States District Court

March 21, 2018 P.M.

1

**E X H I B I T S** (Continued)

2  Number                                                    Ident  Rec'd

3  1517 Kessler Report - Based on the Fishbone       1039 1040
         analysis insufficient caudal anchoring is
4        likely the root cause of caudal tilts and
         caudal migrations, and indirectly of
5        penetrations and fractures."

6  1578 Kessler Report ETR-06-28-29, revision 0,     1054 1057
         project #8049, Caudal Migration Test
7        Method Development and G2 Filter
         Resistance Test Report, 11/27/06
8
   2248 Wong deposition, 10/18/2016 - Exhibit 543    1034
9        - PAT PowerPoint Presentation entitled "G2
         Caudal Migration Update," dated 3/2/2006,
10       which Wong circulated via e-mail on
         3/2/2006 to several for the presentation
11       that afternoon

12 4327 Monthly Global PV Report - January 2006,      960   960
         date of memo, 02/10/2006 (First 7 pages
13       only admitted)

14 5303 G1A Recovery Filter Femoral System Design    1065 1066
         Verification and Validation Report
15

16

17               **MISCELLANEOUS NOTATIONS**

18 Item                                                    Page

19  Proceedings outside the presence of the jury          955
    Sidebar conference                                    1020
20

21                      **RECESSES**

22                                              Page   Line

23 (Recess at 2:31; resumed at 2:45.)          1009    11

24

25

United States District Court

March 21, 2018 P.M.

# P R O C E E D I N G S

1

2       (Court was called to order by the courtroom deputy.)

3       (Proceedings begin at 12:54.)

4       THE COURT:  Thank you.  Please be seated.

5       Mr. Condo, what are your thoughts?                    12:54:53

6       MR. CONDO:  I'm not going to take credit for all of

7  my thoughts, Judge.  This was a tougher problem than I had

8  expected.  I believe simply stated, Rule 901 is not implicated.

9  We're not suggesting it's not an authentic Bard document.

10      I do think under Rule 801(d)(2) there are elements of  12:55:20

11 the exhibit that are probably properly admissible as a

12 statement against a party.  But that doesn't solve the hearsay

13 problem in other sections of the document.  We have an 805

14 hearsay within hearsay problem because in the back half of the

15 document, it wasn't the part that was shown to the -- shown on  12:55:53

16 the monitor.

17      That part is probably admissible but on the back

18 part, there are reports of various adverse events, all of which

19 are hearsay because they are reports from doctors or hospitals

20 or other unknown individuals being relayed to an individual, in  12:56:18

21 turn, being relayed by that individual to Mr. McDermott in his

22 preparation of this exhibit.

23      So I think at least with respect to pages eight,

24 nine, ten, all of those are hearsay within hearsay.

25      THE COURT:  Okay.                                      12:56:38

March 21, 2018 P.M.

1          Mr. Lopez?                                                    12:56:40

2          MR. LOPEZ:  Yes, Your Honor.  It's easier if I stand

3    up here.

4          THE COURT:  That's fine.

5          MR. LOPEZ:  I'll probably have to show you the            12:56:46

6    exhibit just to give you a better sense of what it is.  I mean,

7    it's clearly -- they recognize there's been a foundation laid.

8    It's clearly a business record.  I mean, the Bard Peripheral

9    Vascular logo all over it.  And I think more importantly, Your

10   Honor, the cover email is between the CEO and the CFO of one    12:57:04

11   defendant and the president of another defendant.  It's

12   clearly -- and it does contain a ton of admissions under

13   801(d)(2), (C) and (D).  It was made by a person by whom the

14   party authorized to make this.

15         THE COURT:  Let me just save some time.  I don't          12:57:29

16   think the defendants are disputing that the memo written by the

17   officer satisfies 801(d)(2) --

18         MR. LOPEZ:  The entire document --

19         THE COURT:  -- so the question is what about those

20   last three pages that the defendants assert are hearsay within  12:57:42

21   hearsay?

22         MR. LOPEZ:  The entire document is a monthly global

23   pharmacovigilance report between the CEO and CFO of the company

24   from the president and attached to it is a summary of the

25   adverse events as they relate to the filter involved in this    12:58:05

United States District Court

March 21, 2018 P.M.

1   case.  We have this knowledge now with the CEO and COO of the          12:58:09

2   corporate entity and the president of the entity and this

3   notice to them which suggests -- I mean, a lot of things but

4   this is their report that they get on a monthly basis.  It's

5   called a monthly global PV report.  It's about this.          12:58:27

6           THE COURT:  All right.  Because we only have one

7   minute left, clearly I'm going to need to look at the document

8   to see whether I agree with Mr. Condo's assertion that pages

9   eight, nine, and ten are hearsay within hearsay.  So can

10   somebody provide me with a copy?          12:58:45

11           MR. LOPEZ:  We can, Your Honor.  On that point

12   hearsay within hearsay, it still satisfies all the exceptions

13   under 801(d)(2).

14           THE COURT:  If it's hearsay within hearsay, you have

15   to have an exception for the second hearsay, that is, the          12:58:57

16   statements in pages eight, nine, and ten.  So that's the

17   argument that is being made by the defendant.

18           MR. LOPEZ:  I mean, even if it doesn't satisfy under

19   the non-hearsay section, Your Honor, there's clearly an

20   exception to the hearsay rule here.  This is an official          12:59:19

21   business record.  This is a monthly report.

22           THE COURT:  To satisfy 803(6) you've got to lay

23   foundation through a custodian which you haven't done.  This

24   witness cannot lay the foundation for 803(6) that it was made

25   at or about the time, that it was kept in the ordinary course          12:59:35

United States District Court

March 21, 2018 P.M.

1   of business, et cetera.  So you might be able to do it through     12:59:39

2   another witness but not through this witness.  So 803(6) isn't

3   your answer now.

4          It seems to me 801(d)(2)(A) applies to the first

5   seven pages and it sounds like defendants are agreeing.  And     12:59:51

6   the question is, do you -- number one, do you agree that the

7   last three pages are hearsay within hearsay?  And, number two,

8   if they are, what is the exception for that separate hearsay?

9          MR. LOPEZ:  All right.

10         THE COURT:  But I'm happy to look at it to see if I     01:00:06

11  agree with the proposition that it's hearsay within hearsay and

12  I can do that while we're continuing with Mr. Randall.

13         MR. LOPEZ:  I'll just say it's been produced to us.

14  It has been used at depositions.  These come out every month

15  and it's a business record.     01:00:19

16         THE COURT:  But that's 803(6) and you have to meet

17  the requirements of that rule which you can't do through this

18  witness.  So I don't think that solves the problem now.

19         MR. LOPEZ:  Well, okay.  I think it's

20  self-authenticating.     01:00:32

21         THE COURT:  Still it has to satisfy a hearsay

22  exception and they are conceding it's self-authenticating for

23  purposes of Rule 901, but that doesn't satisfy 803(6) and it

24  doesn't satisfy hearsay within hearsay if the last three pages

25  are separate hearsay.     01:00:48

United States District Court

959

March 21, 2018 P.M.

1              MR. LOPEZ:  All right.                                01:00:50

2              THE COURT:  Is there a copy that I can look at from

3      somebody?

4              MR. LOPEZ:  Yes.

5              THE COURT:  Let's go ahead and have Mr. Randall come   01:00:58

6      in and get the jury in.

7              MR. LOPEZ:  And, Your Honor, what portion of this can

8      I use at least right now?

9              THE COURT:  Well, Mr. Condo, you're not objecting to

10     the admission of the first seven pages; is that right?        01:01:12

11             MR. CONDO:  I believe that's -- let me just check the

12     page number and make sure, Judge, but I think that's -- yes.

13     We're not objecting to the first seven pages of the exhibit.

14             THE COURT:  Okay.  So I will admit pages one through

15     seven of this exhibit and we'll address the other three pages 01:01:29

16     later.

17             (Jury enters at 1:02.)

18             THE COURT:  All right.  Please be seated.

19             Mr. Lopez, what is the number of that exhibit?  Was

20     that 4327?                                                    01:02:44

21             MR. LOPEZ:  4327.

22             THE COURT:  All right.  Ladies and gentlemen, there

23     was a motion to admit Exhibit 4327.  We've had a discussion

24     while you were out.  I'm going to admit the first seven pages

25     of that exhibit at this time.                                 01:02:57

United States District Court

MICHAEL RANDALL - Direct

```
 1              (Exhibit Number 4327, first 7 pages only, was       01:02:58
 2   admitted into evidence.)
 3              MR. LOPEZ:  Thank you, Your Honor.
 4              THE COURT:  And when one of you gets a copy, go ahead
 5   and bring it up to Traci.  I'll go ahead and look at the rest   01:03:05
 6   of it.
 7              MR. LOPEZ:  Will do.
 8              (MICHAEL RANDALL, a witness herein, was previously
 9   duly sworn or affirmed.)
10              MR. LOPEZ:  Let's go ahead and deal with 4237.  And  01:03:13
11   at this time, Your Honor, I'll offer those seven -- those first
12   seven stipulated pages.
13              THE COURT:  All right.  Those are admitted.
14              MR. LOPEZ:  Can we publish this to the jury, Your
15   Honor?                                                          01:03:48
16              THE COURT:  Yes, you may.
17              DIRECT EXAMINATION (Continued)
18   BY MR. LOPEZ:
19   Q.   Mr. Randall, I know you were not at Bard yet in February
20   of 2006 but I would like to show you page five of Exhibit 4327, 01:03:57
21   okay?
22   A.   Okay.
23   Q.   This is more just to orient us in time.  This was in
24   February of 2006; correct?
25   A.   Correct, that's the date of it.                            01:04:20
```

961

MICHAEL RANDALL - Direct

1   Q.   What is a global PV report?                                01:04:22

2   A.   I'm not sure what this report is.

3   Q.   You've never seen a global PV report?

4   A.   No.

5   Q.   Does PV stand for pharmacovigilence?                      01:04:35

6   A.   I don't know.  I'm not sure what it stands for.  Maybe

7   peripheral vascular?  I'm not sure.

8           MR. LOPEZ:  Let's look at that box that is

9   highlighted, Greg, please, call that out.

10  BY MR. LOPEZ:                                                   01:04:59

11  Q.   So on February 10 of 2006, the president of Bard

12  Peripheral Vascular Division of C.R. Bard to the CEO and

13  COO received this, right, according to this document?

14  A.   Yes.

15  Q.   And this is because the G2 with caudal improvements.  Do  01:05:15

16  you see that?

17  A.   Yes.

18  Q.   And this project was initiated to modify the G2 filter to

19  minimize caudal migration.  Do you see that bullet point?

20  A.   Yes.                                                       01:05:28

21  Q.   Is that a redesign of the G2?

22  A.   I'm not sure what this project is.

23  Q.   Let me ask you, if you're modifying something to minimize

24  the risk, are you agreeing that the device is being redesigned?

25  A.   That is different than redesign so modification to a       01:05:43

United States District Court

MICHAEL RANDALL - Direct

1  design would be considered.                                              01:05:46

2  Q.   And then it states in bold point number two:   Caudal

3  migration failure investigation under way to determine the

4  design and physiological root causes.

5          Do you see that, sir?                                          01:05:56

6  A.   Yes, I see that.

7  Q.   And the team is developing a test method for evaluating

8  caudal migration resistance.

9          Do you see that?

10 A.   Yes.                                                              01:06:07

11 Q.   The device is on the market already; right?

12 A.   G2, yes, is on the market.

13 Q.   And then this was in January of '06 and sometime in I

14 think it was June of 2008 you're on a team that is still

15 discussing these modifications and design changes to the exact  01:06:22

16 same device; correct?

17 A.   Yeah, February 6 and -- in 2008, correct, that's one of

18 the things we were discussing.

19 Q.   All right.

20          MR. LOPEZ:   Greg, if we go backwards to the second   01:06:46

21 page of this document.

22 Q.   Do you see this is the key product line trends?  Do you

23 see that, sir, what I've highlighted in yellow?

24 A.   Yes.

25 Q.   And those filters, does that mean IVC filters?  Sir?       01:07:03

United States District Court

MICHAEL RANDALL - Direct

1   A.   I'm reading.   It's the first time I'm seeing the document.   01:07:11

2   Yep, it says filters.

3   Q.   Okay.   They didn't give you -- this was in the packet that

4   was given to them yesterday.   You didn't look at this

5   particular document before today?   01:07:21

6   A.   Is this still the memo from the president of --

7   Q.   From Mr. McDermott to Mr. Ring.

8   A.   No, I haven't seen this.

9   Q.   So it's pretty clear here that as of this time, the

10   company's top executives know that they are continuing to sell   01:07:40

11   the G2 device; right?

12           MR. CONDO:   Objection.   602.

13           THE COURT:   Sustained.

14           MR. LOPEZ:   All right.   Let's go back to the exhibit

15   we had in front of the jury before we broke for lunch and that   01:07:59

16   was 1222.

17   Q.   If my timing is correct, you had already successfully gone

18   to FDA and cleared the G2 by putting a hook at the top; right?

19   A.   Timing correct in terms of what?

20   Q.   With respect to this meeting.   In other words, you could   01:08:30

21   now move on to whatever you were going to talk about next about

22   the G2.

23   A.   Yes.   We had approval on G2 Express or G2X.

24   Q.   And let's look at the next slide after where there was

25   once your picture; correct?   01:08:53

United States District Court

MICHAEL RANDALL - Direct

| | | |
|---|---|---|
| 1 | THE COURT:  Do you want this displayed? | 01:08:55 |

2      MR. LOPEZ:  Oh, yes, Your Honor.  I do.  It was

3  displayed when we left.  I'm sorry.  Please display to the

4  jury.  I need a bigger sign.

5      Next slide.  Slide number three.          01:09:20

6  BY MR. LOPEZ:

7  Q.   We talked about that right before we broke; correct?

8  A.   Correct.

9  Q.   And then the next page, this is the agenda for the

10  meeting; correct?                            01:09:31

11  A.   I don't know if this is the final agenda but this is --

12  because this is a draft but I think those would be discussed.

13  Q.   Well, it's the only agenda that you've seen about this

14  meeting; correct?

15  A.   From the document provided to me, correct.    01:09:45

16  Q.   And were you provided with a different agenda that is

17  different than the agenda that is being displayed right now?

18  A.   Not a document that was provided to me.

19  Q.   And by the way, yesterday there was some discussion about

20  just a few documents that were provided to one of our experts   01:10:02

21  and they were hundreds and hundreds of thousands of other

22  documents that the company had.  Did you go through any of

23  those documents before you showed up here today that might

24  counter any of the evidence that has been introduced into this

25  trial thus far?                              01:10:19

MICHAEL RANDALL - Direct

1  A.   I'm not even sure how to answer that.  What does that   01:10:23

2  mean?

3  Q.   In other words, did you go through a bunch of documents,

4  thousands and thousands of documents for the purpose of putting

5  a different perspective on the evidence that has already been   01:10:34

6  introduced in this case?

7           MR. CONDO:  Objection, Your Honor.  Both

8  argumentative and there's no foundation.

9           THE COURT:  Overruled.

10          THE WITNESS:  I've reviewed a bunch of documents that   01:10:46

11 were provided.  I'm not sure.  Does that answer your question?

12 BY MR. LOPEZ:

13 Q.   I think it does.  I think it was no, you didn't do that.

14 You just looked at the stuff that was given to you by your

15 lawyer; right?                                                   01:11:00

16 A.   Yes.  Yes.

17 Q.   So I want to make sure we're clear about this.  The

18 documents that you were given to prepare for your deposition

19 were chosen by the lawyers representing Ms. Booker that were

20 then given to you?                                               01:11:13

21 A.   Correct.

22 Q.   And that's all you thought you needed to review for

23 purposes of preparing yourself to give important factual honest

24 testimony in this case?

25 A.   Yes.  That's all that was provided to me.                  01:11:25

United States District Court

MICHAEL RANDALL - Direct

1    MR. LOPEZ:  All right.  Can we go to the next page,                          01:11:27

2    please, Greg.

3    BY MR. LOPEZ:

4    Q.   And these are the complication definitions and we've

5    talked about these before about migration, tilt, penetration.               01:11:35

6    Do you see those definitions?

7    A.   Yes.

8    Q.   Let's look at the next page.  Now, the jury hasn't seen

9    the EVEREST data yet or the data.  They saw some yesterday but

10   is this the first time that you were familiarizing yourself                  01:11:59

11   with the EVEREST trial?

12   A.   Yes.

13   Q.   And you see this is the complication that is within the

14   EVEREST trial; correct?

15   A.   Correct.                                                                01:12:12

16   Q.   And the people that you identified earlier were discussing

17   this at the meeting; right?

18   A.   Correct.

19   Q.   Did you prepare this particular slide, slide six of this

20   exhibit?                                                                     01:12:24

21   A.   No, I did not prepare this PowerPoint at all.

22   Q.   I assume you understand what it depicts?

23   A.   Yes.

24   Q.   And this reveals to us that the total patients that had

25   follow-up in the EVEREST trial were 83; correct?  Is that                   01:12:37

United States District Court

MICHAEL RANDALL - Direct

1    right?                                                                    01:12:43

2    A.    That's what it says down here at the bottom.

3    Q.    And then we have three circles, one for tilt, one for

4    penetration and one for caudal migration.  Do you see that?

5    A.    Yes.                                                                 01:12:54

6    Q.    And explain to the jury if you will the significance of

7    those three circles intersecting?

8    A.    So what this is it's called a Venn diagram and a Venn

9    diagram is used to try and see if there's any relation between

10   different events or in this case complications.  So the circles  01:13:13

11   that have overlap.  If there's a number that is inside, say,

12   the tilt circle, for instance, that two versus that penetration

13   that is inside of that circle, it meant that that particular

14   filter had tilt and penetration.  So it's not just one

15   complication.  There was two noted on that.  So it's used to     01:13:41

16   just try and see relationships.

17   Q.    For example, if you look at the four that is between the

18   blue, the yellow and the orange -- it looks orange to me.  Do

19   you see the four?

20   A.    The four, yes.                                              01:14:00

21   Q.    That means that there were four patients who had caudal

22   migration, tilt, and penetration; correct?

23   A.    No.  They had caudal migration and tilt.  Because it's not

24   in the circle for penetration.

25   Q.    Oh.  You're right.  So four patients had both caudal        01:14:18

MICHAEL RANDALL - Direct

1    migration and tilt; correct?                                    01:14:22

2    A.   Correct.

3    Q.   And if you look at the three in the middle of this Venn

4    diagram, it has an asterisk by it.  Do you see that?

5    A.   Yes.                                                        01:14:34

6    Q.   Now that one does say that there were three patients out

7    of 83 who had tilt, caudal migration and penetration; true?

8    A.   Correct.

9    Q.   And there was one patient out of 83 in this trial that had

10   all three of those things and a fracture of an arm and a leg;   01:14:55

11   true?

12   A.   Correct.

13   Q.   And by the way, when did the data of the EVEREST study

14   become available for the company to see what is depicted in

15   this exhibit?                                                    01:15:12

16   A.   I'm not sure.  I'm assuming when it got approved.  I

17   wasn't part of that project so I don't know.

18   Q.   Do you know if that happened before June of 2007 when Ms.

19   Booker received her G2 filter?

20   A.   That the data got released?                                 01:15:34

21   Q.   That the company was aware of the data, the clinical data,

22   from the EVEREST trial.

23   A.   I don't know.

24   Q.   Okay.

25           MR. LOPEZ:  Let's go to slide eight.                     01:15:49

United States District Court

MICHAEL RANDALL - Direct

BY MR. LOPEZ:                                          01:15:56

Q.   And I assume when people are sitting around talking about

this data that they have done a lot of research and you're

getting accurate data about what is being reported; true?  We

can assume that?                                       01:16:04

A.   I'm sorry.  Can you say that again?

Q.   We can assume this data is accurate because it's

well-researched and a lot of people contributed to what's in

this particular document.  Is that true?

A.   Yeah.  I mean, it's the information that we found, yes.   01:16:19

Q.   So filter complications, again, we're talking about the

EVEREST trial.  The greatest number of complications is

associated with penetrations, followed by tilts and caudal

migrations.  Do you see that?

A.   Yes.                                              01:16:33

Q.   There's a strong relationship between caudal migrations

and tilts.  Do you see that?

A.   Yes.

Q.   And then there was no relationship was found between IVC

diameter and migrations, tilts, and perforations; correct?    01:16:43

A.   Correct.

Q.   This is an official report from the company about its

review of the EVEREST data; right?

A.   No.  This is not an official report.  This is a PowerPoint

put together by one of our engineers which we were going to     01:17:00

United States District Court

970

MICHAEL RANDALL - Direct

1    review.                                                                 01:17:04

2    Q.   And was he working at Bard at the time he did this?

3    A.   Yes.

4    Q.   Was he in charge of evaluating the design of the G2 filter

5    at the time he did this?                                                01:17:10

6    A.   He was in charge of gathering this information.

7    Q.   Was he in charge of looking at some of the complications

8    that were being caused by the G2 filter?

9    A.   He was tasked with doing that.

10   Q.   And he was charged with looking at all of the data that is     01:17:23

11   represented in this PowerPoint presentation; correct?

12   A.   Correct.

13   Q.   Sounds pretty official to me.

14           THE COURT:  Is that a question?

15   BY MR. LOPEZ:                                                           01:17:34

16   Q.   Is that -- would you agree that this is an official

17   document based on how I just described it?

18   A.   Official -- it was generated by a Bard employee, Bard

19   engineer.  But when I think of report, I think of something

20   that goes through and has multiple sign-offs so I think it's      01:17:48

21   just the definition.

22   Q.   Okay.  Well, I don't want --

23   A.   But it was generated by an engineer.

24   Q.   It was sent by Mr. Andre Chanduszko to you; correct?

25   A.   Correct.                                                          01:18:03

United States District Court

MICHAEL RANDALL - Direct

1   Q.   To you, a senior engineer at Bard?              01:18:03

2   A.   Yes.

3   Q.   Okay.  Slide number nine, please.

4         This is another one of those Venn diagrams and this

5   is from the MAUDE database; right?            01:18:14

6   A.   Yes.

7   Q.   And the MAUDE database is where companies and doctors can

8   report adverse events that gets put in a database that is

9   controlled by FDA or I should say made available by FDA?

10   A.   Correct.                     01:18:35

11   Q.   Okay.  Now, if you look at the MAUDE, what's being

12   reported in MAUDE, again, this is somebody in the company that

13   is looking at the adverse events that have been reported on the

14   G2 filter?

15   A.   Yes.                       01:18:49

16   Q.   As of -- in fact, this even tells us that it's data as of

17   January 7, 2008?

18   A.   Yes.

19   Q.   Now we're not going to go through every one of these but

20   you can see that this one talks about penetration, tilt, and   01:18:59

21   caudal migration; right?

22   A.   Correct.

23   Q.   I think that's what the EVEREST -- just like what we just

24   saw in EVEREST; right?

25   A.   Correct.                     01:19:17

MICHAEL RANDALL - Direct

1  Q.   And just by way of an example, we have 31 cases of caudal          01:19:21

2  migration that included tilt; right?  I want to make sure I'm

3  looking at these Venn diagrams correctly.   31 cases of patients

4  where it was reported to MAUDE, 31 caudal migrations and 31

5  tilts?                                                                  01:19:48

6  A.   31 caudal migrations in tilt only.

7  Q.   In the same patient?

8  A.   Correct.

9  Q.   And six patients where there was penetration, tilt, and

10 caudal migration; correct?                                             01:19:59

11 A.   Correct.

12 Q.   And then 13 patients that had tilt associated with

13 penetration.   Same patient?

14 A.   Yep, 13 with penetration and tilt.

15 Q.   Okay.  Let's go to the next page, please.  This one           01:20:13

16 includes fractures which we haven't seen before.   This is from

17 the MAUDE database.   In this we have six patients where it's

18 been reported as of January 7, 2008, in the MAUDE database with

19 caudal migration, tilt, and fractures; correct?

20 A.   Right.  Correct.                                               01:20:41

21 Q.   And three that involve fractures and tilt?

22 A.   Correct.

23 Q.   Basically, what we've seen thus far, we've seen a number

24 of patients have been reported in, both the EVEREST trial and

25 from doctors voluntarily out in the field, a number of patients    01:21:02

United States District Court

MICHAEL RANDALL - Direct

1  with a constellation of complications after having received G2      01:21:06

2  filter; correct?

3  A.   Yeah.   There's reports of complications in patients that

4  have multiple complications within it.

5  Q.   In fact, we can see that on the next slide.   What does       01:21:22

6  complications mutually exclusive mean?   Let me ask you, what

7  does that mean?

8  A.   I actually don't remember what that means.   I'm trying to

9  figure that out myself.

10 Q.   Now, let me ask you, of all the documents that you thought    01:21:51

11 I was going to ask you about today, you knew this was probably

12 going to be the number one document; true?   Before you got

13 here?

14 A.   No, not necessarily.   I looked at all of them.

15 Q.   In your deposition which was about six or seven hours --       01:22:04

16 do you remember that?

17 A.   Yes.

18 Q.   -- about three hours were spent on this document.   Does

19 that sound right?

20 A.   I don't remember.   That was a long day.   There was a lot     01:22:14

21 of stuff.

22 Q.   It was a long day, a long time was spent on this document

23 that we're seeing here, Trial Exhibit 1222.   Do you remember

24 that?

25 A.   I remember spending time on this during the deposition,       01:22:31

MICHAEL RANDALL - Direct

1    yes.  How much time, I don't remember.                        01:22:33

2    Q.   How much time did you spend before you got here today

3    reviewing it so that you could answer questions about

4    everything and anything that was on it?

5    A.   This particular one, maybe 20 minutes or so, just kind of   01:22:46

6    went through it.

7              MR. LOPEZ:  Could we go to the next slide, please,

8    Greg.

9    BY MR. LOPEZ:

10   Q.   Filter complications.  Again, this is MAUDE:  The greatest  01:23:01

11   number of complications is associated with tilts and

12   migrations, followed penetrations.  This is contrary to the

13   EVEREST data.

14             Do you see that?

15   A.   Yes.                                                     01:23:27

16   Q.   Sir?

17   A.   Yes.

18   Q.   And then the next sentence:  One possible explanation is

19   that some asymptomatic penetrations are not reported.

20             Did I read that correctly?                          01:23:40

21   A.   Yes.

22   Q.   And that means that there may be an unknown number of

23   people who have a G2 filter where the filter has penetrated

24   through the vena cava wall and the company has no idea and the

25   patients have no idea who they are; true?                     01:23:56

United States District Court

MICHAEL RANDALL - Direct

1   A.   Yeah.   This is saying that there could be asymptomatic           01:24:00

2   penetrations.

3   Q.   Has Bard, at least by this time, ever organized and

4   conducted a survey asking any doctor who may have prescribed a

5   lot of G2 filters to have their patients come back in to have a   01:24:16

6   radiograph or some kind of an x-ray, 50 patients, to see how

7   many of those asymptomatic patients may have had penetrations

8   they didn't know because about because they don't feel

9   anything?  Did the company ever do that?

10  A.   I was not in charge of communicating to physicians.   I      01:24:36

11  don't know what the company did in regards.

12  Q.   And then the next bullet point:   MAUDE shows more

13  fractures than EVEREST.   One possible explanation is that some

14  tilts and caudal migrations are not reported.

15           The company knew that; right?                             01:24:54

16  A.   I'm sorry.   Can you repeat your question?

17  Q.   The company knew what was in bullet point number two?

18  A.   That MAUDE shows more fractures than EVEREST.

19  Q.   And that a possible explanation is that some tilts and

20  caudal migrations are not reported.                                01:25:15

21  A.   It says the possible so, yeah, that could be a possible

22  explanation.

23  Q.   Well, let me ask you, how many people that had G2 filters

24  as of this date had asymptomatic tilts and a caudal migration

25  and they didn't know about it?                                     01:25:34

United States District Court

MICHAEL RANDALL - Direct

1    A.    I don't know that.

2    Q.    How many of these tilts and caudal migrations that were

3    not reported did the company know about?

4    A.    I don't know that information or where to get that.

5    Q.    Every patient with a G2 filter would have been

6    experiencing this and we just don't know, do we?

7    A.    An asymptomatic complication?

8    Q.    A tilt and a caudal migration that was asymptomatic?

9    A.    I wouldn't say everyone but in terms of the company

10   knowing, that data does not exist.

11   Q.    Right.  And it doesn't even exist in a small survey that

12   the company could have done of one or two of IVC higher volume

13   interventional radiologists to have maybe 50 of their patients

14   come back in to see what that percentage might be.  The company

15   never did that; right?

16   A.    Not to my knowledge.

17   Q.    Would it be appropriate for your company to represent that

18   just because it wasn't reported, penetrations, tilts,

19   migrations, that it does not exist?

20   A.    I'm sorry.  Could you repeat that?

21   Q.    Yes.  In other words, the mere fact that it's not reported

22   does not mean it does not exist in a patient with a G2 filter

23   who is asymptomatic; correct?

24   A.    Correct.  I think that the asymptomatic part is even that

25   it's not causing symptoms.

MICHAEL RANDALL - Direct

1   Q.   We know that.  That -- isn't that one of the problems, is      01:27:14

2   that these patients may have all of these conditions and they

3   have no idea because they don't feel anything that would

4   suggest they go to a doctor to find out?

5   A.   Yeah, so if it's tilted and you don't know it's tilted,      01:27:30

6   it's not causing harm per se so it's like -- a tilt just means

7   the filter is 15 degrees off of its neutral axis.

8   Q.   How about if the company included in their instructions

9   for use or they just had salespeople go out with, you know,

10  just something to leave off at the doctor's office and said, "I      01:28:00

11  want you to monitor your G2 patient for the next two years and

12  I want you to look for silent perforations, migrations,

13  fractures," if the company had done that, don't you think the

14  company would have more information about the true number of

15  these people or the true percentage of these people that      01:28:26

16  actually have that condition with that implant?

17  A.   I'm aware that they put in the IFU the results of the

18  clinical study.

19          MR. LOPEZ:  Move to strike, Your Honor.  It's

20  nonresponsive.      01:28:41

21          THE COURT:  Sustained.

22          Please respond to the question.

23          THE WITNESS:  Can you repeat the question one more

24  time?  I'm sorry.

25  \\\

United States District Court

MICHAEL RANDALL - Direct

BY MR. LOPEZ:

Q.   I just want to know if the company had advised doctors

that because of some complications with the design of their

filter, that if you're going to put one of these in, you want

to monitor these patients periodically, six months, every year,

and do that, you know, for a two- or three-year period and

report back to us what you find, would the company be in a

better position to say how many of these filters are out there

where this is actually occurring in a patient and the patient

doesn't know?

A.   I suppose they could do that but I don't know how valuable

that information would be necessarily.

Q.   Let me suggest to you -- how about this value?  The

company says to doctors that they are selling the G2 to and

they tell the doctor, "In a year, I want you to take -- after a

year you put it in, and I want to you look for tilts,

fractures, migrations, and penetrations."  Do you follow me so

far?  Are you, sir?

A.   Yes.

Q.   And let's assume when that patient comes in a year later,

this device is tilted, it's perforated and it's migrated but it

hasn't fractured yet.  Are you following me?

A.   Okay.

Q.   What if under those circumstances, because the doctor was

monitoring the patient, that device was able to be

United States District Court

01:28:46

01:28:57

01:29:16

01:29:41

01:29:56

01:30:14

MICHAEL RANDALL - Direct

1   percutaneously retrieved.  Do you follow me so far?  Wouldn't      01:30:19
2   that have potentially saved that patient from further
3   migration, further penetration, further -- and the potential
4   risk of a fracture?
5   A.   Yeah.  I'm not sure if I follow all of that entirely.      01:30:41
6   They do a clinical study and that's how that information is
7   communicated to the physician, because it's a prospective
8   study.  Patients are brought in.  They are imaged.  That's the
9   way to kind of analyze the data.
10  Q.   How about the people that are out there that aren't in a      01:31:05
11  study?
12  A.   So you're saying have an ongoing study?
13  Q.   No.  I've said -- you know what I asked you.  I asked you
14  whether or not if the company had recommended periodic
15  monitoring so that if the device was starting to tilt, so if      01:31:18
16  the device was starting to penetrate, so if the device was
17  starting to migrate, that it would give the patient and the
18  doctor an opportunity to have it removed before it did more
19  harm, isn't that something that would be -- would have been a
20  good thing for the company to have recommended with respect to      01:31:36
21  the G2 filter?
22  A.   I don't know if it would have been a good thing.  I don't
23  know how effective that -- what you're saying would have been.
24  Usually tilt and migration, those usually happen -- if they
25  happen, they happen early on and then usually it's done and the      01:31:54

United States District Court

MICHAEL RANDALL - Direct

1   filter is in that position forever.                                      01:32:01

2            MR. LOPEZ:  Move to strike the nonresponsive portion.

3            THE COURT:  Overruled.

4   BY MR. LOPEZ:

5   Q.  Well, the reason you don't know what good it would have    01:32:07

6   done is because Bard never did that; right?

7   A.   I'm not aware of that for the G2, no.

8            MR. LOPEZ:  Let's look at the next slide, please.

9   This is slide number 13.

10  BY MR. LOPEZ:                                                  01:32:32

11  Q.   And this reads:  Caudal migration, tilt, perforation and

12  fractures are the most commonly occurring complications

13  associated with the filter.

14           Did I read that correctly, sir?

15  A.   Yes.                                                      01:32:42

16  Q.   Eliminating these failure modes would reduce the number of

17  filter complaints by 78 percent.

18           Do you see that?

19  A.   I see that.

20  Q.   And that hadn't been done yet; right?                    01:32:55

21  A.   No.

22  Q.   Those failure modes had not been reduced as of mid-2008;

23  correct?

24  A.   For the G2, no.

25  Q.   So let's look at the next slide, number 14.  I'm not going  01:33:20

United States District Court

MICHAEL RANDALL - Direct

1  to run through this.  I'll probably get dizzy.  But do you see    01:33:24
2  where it says design?  Design?

3  A.    Yes.

4  Q.    So, obviously, the company was looking at design as being
5  a cause of everything we've talked about thus far; correct?    01:33:35

6  A.    Let me just get my bearings here with what this is.  Okay.

7  Q.    And then, again, I don't want to walk you all the way
8  through it but one of the design problems could have been
9  insufficient caudal anchoring.  Do you see that?

10 A.    Yes, I do.    01:34:02

11 Q.    Did anyone at the company tell you that they knew that
12 that was a problem with the design about three or four months
13 after they put it on the market, that it required caudal
14 anchoring?

15 A.    No.    01:34:16

16 Q.    And as of the date that we're talking about here in
17 mid-2008, there had been no caudal anchoring added to the G2
18 filter to prevent caudal migration; true?

19 A.    Yeah, there was no caudal anchors added.

20 Q.    As a matter of fact, before we go through the rest of this    01:34:32
21 slide, none of that was done even in response to this project;
22 true?

23 A.    None of what was done in response?

24 Q.    In other words, these fixes, the caudal anchors, this G2
25 Platinum plan was abandoned wasn't it?    01:34:45

MICHAEL RANDALL - Direct

1   A.   Yeah.   We actually failed on this project.   We tried to          01:34:50

2   make it work and we couldn't.   So we scrapped this and then

3   there was another design that we went with.

4   Q.   You couldn't figure out how to turn the hooks upside down?

5   A.   It's not as simple as that.                                          01:35:03

6   Q.   Well, you know Greenfield did that.

7   A.   The Greenfield is a titanium device that is single level.

8   Our device is a bilevel filter so -- and it's a conical shape.

9   So when you put it in different diameters, the contact angle to

10  the wall changes.   So putting a caudal anchor on the filter,           01:35:22

11  it's extremely tough to do.

12  Q.   Okay.   Now, let me see if I understand what you're saying.

13  You're saying that you actually took steps to design a filter

14  that had all of these fixes on it for caudal migration,

15  penetration, and fracture?   You did all of that?                       01:35:40

16  A.   There was projects under way to improve those things you

17  talked about.

18  Q.   Projects is different than whether or not you took steps.

19  My question is very precise.

20  A.   Okay.                                                              01:35:55

21  Q.   You said that you couldn't do it.   That means you tried to

22  do it.   Did you try to do it in 2008 and 2009?

23  A.   Yes.

24  Q.   You actually have mock-up models where you tried to put a

25  caudal anchor and tried to prevent this thing from penetrating         01:36:08

MICHAEL RANDALL - Direct

1   into the vena cava?                                          01:36:12

2   A.   In the G3 project, that is what that was supposed to be.

3   Remember I told you there was parallel paths.   There were many

4   projects going on so the G3, there was a ton of filters that

5   were created, put into animals, assessed, and this is one that    01:36:28

6   would have required a clinical study.

7           But the devices caused something else to happen so

8   instead of now the device is not moving caudally, what we saw

9   in animals was that it was penetrating.   So it's one of these

10  things you try and fix something but it can make something       01:36:50

11  worse so you have to be careful when you're designing.

12  Q.   Okay.   Let me see if I can understand what you're saying.

13  So you knew all of these things had to happen to the G2 filter

14  to create all of these problems because that's what was

15  discussed at this meeting?                                      01:37:07

16  A.   We knew that there were some improvements that we could do

17  to our product, yes.

18  Q.   Right.   And you tried and you failed for a number of years

19  before you were able to do that; correct?

20  A.   The G2 Platinum project failed.   But then we came back      01:37:19

21  with a project called Eclipse and that one we were successful.

22  And then Meridian, we were successful.   We were running that in

23  parallel as well.   And then we had another one called G3, that

24  one failed.   And then we also had another one called Denali

25  which ultimately is what we sell now.                           01:37:40

United States District Court

984

MICHAEL RANDALL - Direct

1  Q.   Well, everything you just said, how is that going to help    01:37:43

2  any patient who had a G2, the fact that you were trying and

3  failing and trying and failing and you were fixing one thing

4  and then fixing another thing, how that going to help anybody

5  with a G2 filter who was experiencing caudal migration, tilt,    01:37:56

6  fracture, and perforation?

7  A.   So I think -- so you keep using the word -- like issue.

8  All filters, all filters on the market have complications.

9        MR. LOPEZ:   Move to strike Your Honor.  That's not

10 responsive.                                                       01:38:12

11       THE COURT:   Overruled.

12       THE WITNESS:   They are very low rates so it's not

13 like this device is bad.  It was a good filter.

14       So it's while that filter was in the market, we

15 looked and said, "Hey, how can we make it better?  We want to    01:38:25

16 be the leaders."  So we had multiple projects on what can we

17 deliver first to the customer and what were some long-term

18 things that we could deliver and that is essentially one of

19 the -- I think the best things about Bard.  We were constantly

20 innovating.  We had a lot of engineers working in filters.       01:38:42

21 BY MR. LOPEZ:

22 Q.   Sir, my question was:  How does the fact that this company

23 could not figure out how to fix the G2 filter help people that

24 had a G2 filter from increased risk of caudal migration,

25 perforation, fracture, and penetration?                          01:39:02

United States District Court

MICHAEL RANDALL - Direct

1        MR. CONDO:  Objection, Your Honor.  It's                    01:39:05

2   argumentative.

3        THE COURT:  Overruled.

4        THE WITNESS:  So those complications still exist.

5   They are in a low amount so we're making improvements and we     01:39:13

6   were able to make improvements in the future and future

7   generations.

8        MR. LOPEZ:  I'm going to move to strike as

9   nonresponsive, Your Honor.

10       THE COURT:  Sustained.                                      01:39:29

11       Please respond to the question.

12       THE WITNESS:  Can you say it one more time?

13  BY MR. LOPEZ:

14  Q.   The truth that -- all of these failures, to fix all of

15  these problems, in the meantime we've got patients with G2      01:39:38

16  filters in them and they still are exposed to all of these

17  complications and design defects in the G2 filter; true?

18  A.   There are still complications in filters?

19       MR. LOPEZ:  Okay.  Let's go to the next slide,

20  please.                                                         01:40:00

21  BY MR. LOPEZ:

22  Q.   Do you know if Bard put out an APB or safety alert to

23  people with the G2 filters and said, "By the way, we know we've

24  got to fix caudal migration.  We know we've got to fix tilt.

25  We know we've got to fix penetrations and perforations and       01:40:13

MICHAEL RANDALL - Direct

1   fractures but we're still trying to figure it out."  Did they        01:40:17

2   put out an alert like that?

3   A.   I'm not aware of it.

4   Q.   Don't you think that might have been a good idea for

5   people who you were just gathering data from to help design          01:40:28

6   your next device that they should have known that that was

7   going on?

8   A.   Are you asking me do I think it would have been a good

9   idea to put out an alert?

10  Q.   Yeah.                                                            01:40:41

11  A.   No.  I think we had enough data.  We knew how we could

12  improve the design.

13  Q.   Well, the data you were getting from the complications

14  that were being experienced in people like Ms. Booker, that's

15  where you were getting the data; right?                              01:40:54

16  A.   The MAUDE database as well as the EVEREST.

17  Q.   Right.  And did they know that they were providing you

18  data for you to help design the next model of your G2 filter --

19  I mean, of your IVC filters?  Did they know that?  Did the

20  patients who had the G2 filter know that they were providing         01:41:14

21  data for purposes of fixing the device that they had in them?

22  A.   Yeah, I don't think patients know that they are providing

23  data because the hospital usually reports the data and

24  physicians.

25  Q.   Okay.  Let's look at slide 15.                                  01:41:34

United States District Court

MICHAEL RANDALL - Direct

 1          G2 filter operates in a dynamic environment over a          01:41:40
 2  wide IVC diameter.
 3          Do you see that, sir?
 4  A.    Yes.
 5  Q.    And let's go down to the last sentence of that full          01:41:46
 6  paragraph where it begins:  The following are potential causes
 7  of the complications.
 8          Do you see where I am?
 9  A.    Yes.
10  Q.    Filter design, caudal migration, filter instability,          01:41:57
11  mainly insufficient caudal anchoring.
12          Did I read that correctly?
13  A.    Correct.
14  Q.    There was a design defect that you recognized that needed
15  to be fixed to prevent caudal migration?          01:42:10
16  A.    I wouldn't use those words.
17  Q.    Well, if it requires a redesign to fix the dangerous
18  performance or safety profile of your device, you don't think
19  that's a redesign or a fix?
20  A.    I wouldn't use those words.          01:42:28
21  Q.    You wouldn't use the word "fix"?
22  A.    I wouldn't use fix or the other words you said.
23  Q.    Do you know if patients who had these devices knew that
24  the device was not designed to prevent caudal migration?
25  A.    The design had -- it's a filter so it has radial strength.          01:42:57

United States District Court

MICHAEL RANDALL - Direct

1   Q.   I just want to know if your patients knew this, sir.          01:43:01
2   That's all I'm asking you, sir.   Did patients know that?   Did
3   the patients know what you knew about what was going on with
4   the G2 factor and the fact that it needed all of these design
5   fixes?                                                              01:43:13
6   A.   The patients did not know about the enhancements we were
7   working on.
8   Q.   Did they know that about tilt, filter instability, mainly
9   insufficient IVC wall apposition and/or caudal anchoring, did
10  they know that was going on with the G2 device that was in        01:43:28
11  their bodies?
12  A.   I do not believe that information was given to the
13  patients.   Information for complications were listed in the
14  IFU.
15  Q.   Were doctors told that we need caudal anchoring for our G2  01:43:44
16  filter and we need better apposition and/or caudal anchoring to
17  prevent tilt in the G2 filter?
18  A.   You asked did doctors say that?
19  Q.   Did you tell doctors that?
20  A.   Did we tell doctors that they --                              01:44:00
21  Q.   That your device had needed caudal anchoring because it
22  was insufficient to deal with caudal migration?
23  A.   What this is saying is that there is --
24  Q.   Sir, I just want to know whether doctors knew what I just
25  asked you.   That's all I'm asking.                                01:44:23

United States District Court

MICHAEL RANDALL - Direct

1   A.   I think in the IFU, migration, caudal migration is listed          01:44:25

2   as a complication and the rates from EVEREST.   That's what was

3   communicated.

4             MR. LOPEZ:   Move to strike as nonresponsive, Your

5   Honor.                                                                  01:44:37

6             THE COURT:   Overruled.

7   BY MR. LOPEZ:

8   Q.   Sir, did you tell doctors that your company was selling G2

9   filters to that we have insufficient caudal anchoring on the G2

10  which was causing caudal migration?   Can you answer that yes or        01:44:48

11  no?

12  A.   I'm not in charge of communicating with physicians.   I'm

13  an engineer so I can answer what's in my world, but you're

14  saying what's being communicated to physicians.   I don't know.

15  Q.   Now, what is insufficient IVC wall apposition?                     01:45:07

16  A.   In the context of tilt, this means the amount of the vena

17  cava filter in contact with the IVC wall.   The more filter in

18  contact with the wall, then probably the more stable.

19  Q.   And because this is under filter design, that was a design

20  issue and problem in the G2 filter; correct?   What you just           01:45:49

21  described.

22  A.   So this is basically a hypothesis.   It says "potential

23  causes."   It's not saying that it had insufficient.   It's

24  saying there's an opportunity here to potentially put more wall

25  apposition of the filter and that might help improve                    01:46:13

MICHAEL RANDALL - Direct

| | |
|---|---|
| 1 | resistance. | 01:46:18 |

1   resistance.

2   Q.   You've had almost three years to investigate whether or

3   not that might be a problem with the filter.  Don't you think

4   that you may have come up with at least a reasonable reason why

5   that was happening three years later?

6   A.   Three years later about the tilt?

7   Q.   Let me strike the question.

8   A.   I don't understand the question.

9   Q.   I'm sorry.  If you can just cooperate and answer my

10  question, we'll get through this a lot faster.

11  A.   I'm trying to.

12          THE COURT:  Excuse me.  Counsel, hold on.

13          Mr. Lopez, if you want him to answer a question yes

14  or no, please tell him when you ask the question.

15          MR. LOPEZ:  Okay.  I'll do that.

16          THE COURT:  And Mr. Randall, if you can't answer it

17  yes or no you can tell him you can't answer it yes or no.

18          THE WITNESS:  Thank you.

19  BY MR. LOPEZ:

20  Q.   Insufficient wall apposition was a possible cause of a

21  complication of tilt that your company was discussing in June

22  of 2008; right?

23  A.   Yes.

24  Q.   And perforation -- what is radial pressure?

25  A.   Radial pressure, if you look at the filter, it's the

01:46:28

01:46:44

01:46:56

01:47:03

01:47:21

United States District Court

MICHAEL RANDALL - Direct

1    amount of force that is exerted by the filter on the ID                          01:47:23

2    (phonetic) of the vena cava, so it basically holds it in place.

3    Q.   So this company in 2008 thought that radial's pressure

4    might be what was causing perforations; right?

5    A.   No.   It's a possibility.                                                   01:47:45

6    Q.   Right.   You were thinking that at the time?

7    A.   It was a potential.

8    Q.   And then perforation, another possibility that you were

9    thinking about was filter instability that was resulting in

10   tilt; right?   Was causing perforations?   In other words, the                  01:48:00

11   fact that this device was unstable and was tilting actually

12   could be causing perforation?

13   A.   That was a potential cause.

14   Q.   And you saw that in the EVEREST study where there was

15   tilting related to perforation.   You saw that in the EVEREST                    01:48:17

16   study, right, results?

17   A.   We saw results where a tilt and a perforation existed in

18   the same filter.

19   Q.   Okay.   Let's look at the next slide, please.

20        Now this is more than a hypothesis.   It's a belief,                        01:48:36

21   right, when you say it is believed that caudal migration leads

22   to tilts, perforations, and fractures; correct?

23   A.   I don't know if that was the final --

24   Q.   Sir, is that what it says.

25   A.   But in this Lidek, it says that.                                            01:48:51

MICHAEL RANDALL - Direct

1    Q.    In other words, if you fix caudal migration by anchoring          01:48:56

2    it with caudal hooks, it might just fix the tilt, perforation,

3    and fracture problem with the G2.   You were thinking about that

4    at the time; right?

5    A.    We were thinking caudal migration, if you improve caudal          01:49:09

6    migration, it can improve a lot of complications.

7    Q.    And that didn't happen with the G2 filter before it got

8    taken off the market, none of that.   No caudal anchors, that

9    you can to fix perforations, migrations, fractures before the

10   G2 was taken off the market; right?                                     01:49:31

11   A.    Well, you said nothing happened to the G2 filter.   The

12   improvements we made were to the G2 filter.

13   Q.    I want to talk about the G2 filter that remained on the

14   market.   No new designs until what, about 2011?

15   A.    It's when Eclipse came out.   I think it was -- you're            01:49:53

16   talking caudal specifically?   Because there was an

17   electropolishing project.   That was I think 2009, 2010.

18   Q.    Sir, I'm talking about the G2 filter that was -- that has

19   been on the market since January of 2005.   That stayed on the

20   market unaltered except for the hook put on the top until about        01:50:12

21   2011; is that correct?

22   A.    Yeah.   Eclipse is also essentially a G2 filter with a hook

23   and then electropolishing.   And Meridian is the G2 filter with

24   the hook, electropolishing and caudal anchor so that's how the

25   filter evolved.                                                         01:50:39

MICHAEL RANDALL - Direct

1    Q.    But Ms. Booker never got those devices.   They got the G2.            01:50:40
2    She got the G2.
3    A.    I don't think those were available at that time.
4    Q.    Okay.   Let's look at the solutions slide which is the next
5    one.                                                                        01:50:55
6              G2 Platinum will be developed with the following
7    improvements relative to the current G2 platform in order to
8    reduce complaints:   Reduced fractures, electropolished filter
9    surface, low inclusion, wire.
10             Correct?                                                          01:51:08
11   A.    Correct.
12   Q.    And electropolishing was not a new phenomenon to assist
13   metals in reducing their fracture rates; true?   Can you answer
14   that yes or no, sir?   Electropolishing was not a new phenomenon
15   that would assist a metal like Nitinol to become more                      01:51:26
16   fracture-resistant?
17   A.    No.
18   Q.    That's true; right?
19   A.    For Nitinol?   It helps Nitinol.
20   Q.    Yes.   Be more fracture-resistant?                                    01:51:39
21   A.    I believe does it.
22   Q.    And Ms. Booker did not get an electropolished IVC filter;
23   true?
24   A.    G2 was not electropolished.
25   Q.    And then the next one:   Reduced tilt, penetration,                   01:51:50

United States District Court

994

MICHAEL RANDALL - Direct

| | |
|---|---|
| 1 | migration, design changes.  That was the solution? | 01:51:55 |

1    migration, design changes.  That was the solution?          01:51:55

2    A.   For this particular project, we believed we would address

3    those potential complications with a design change.

4    Q.   Okay.  And the design changes were on the G2; right?

5    A.   The improvements we were going to make.                 01:52:16

6    Q.   Because the current design of the G2 is what resulted in

7    increased tilt, increased penetration and increased migration.

8    Is that true, sir?  Can you answer that yes or no?

9    A.   No, I cannot.  I don't understand the question.  You said

10   increased, the G2 increased that relative to what --          01:52:35

11   Q.   I said increased because if you reduce something, that

12   means it must have been higher at one time.  So the idea

13   that -- the reason why G2 had the level of tilt, penetration,

14   migration, and fractures was because of design issues that

15   needed to be changed; true?                                   01:52:55

16   A.   I can't respond to true or false on this but I can answer

17   that further if you like.

18   Q.   No.  That's okay.  I just need you to answer that

19   question.  You can't answer that whether or not that's true?

20   A.   No.                                                      01:53:12

21   Q.   Okay.  Let's go to the next page for solutions.

22         The following tests will be performed to test new

23   filter designs.

24         So you're looking at redesigning the G2; correct?

25   This is not about Eclipse.  This is about the G2.             01:53:25

United States District Court

MICHAEL RANDALL - Direct

1    A.    Yeah, we were making improvements to our current filter on    01:53:38

2    the market which was G2 at the time.

3    Q.    Did you tell doctors that?

4    A.    That we're constantly making improvements?

5    Q.    Did you tell doctors that the G2s in patients that they    01:53:48

6    had put them in required some design changes that take care of

7    caudal migration, tilt resistance, radial strength,

8    perforation, and fatigue.  Did you tell doctors?

9    A.    That it requires design change to improve that?  No.  We

10   don't necessarily tell people how we improve every product    01:54:11

11   line.

12   Q.    I'm just talking about the G2.  Did doctors know that

13   there was some design issues with the G2 that needed to be

14   fixed because of what you saw in MAUDE and what you saw in the

15   EVEREST study regarding migration, tilt, perforation, and    01:54:25

16   fractures?  Can you answer that yes or no?

17   A.    No.

18   Q.    No, that you did not tell doctors; right?

19   A.    No, I cannot answer your question with a yes or no.

20   Q.    So you can't tell me, as you sit there today, whether or    01:54:39

21   not the company advised doctors of something?

22   A.    That if the company advised doctors of?

23   Q.    That there were some design issues with the G2 that needed

24   to be fixed.

25   A.    Can I say that the company told -- I'm sorry.    01:54:56

United States District Court

MICHAEL RANDALL - Direct

1  Q.   My question is simple.  Did the company tell doctors,          01:55:00

2  "We've got a design problem with the G2 that is causing

3  migrations, fractures, perforations, and tilts that we need to

4  fix"?

5  A.   To my knowledge, I don't think so but I'm not in charge of    01:55:14

6  communicating with the physician.  I'm an engineer so I don't

7  talk or deal with the physician like that.

8  Q.   So what happened with the G2 is the company continued to

9  gather information about caudal migration, tilts, fractures,

10 and perforation to help them design their next device?  Is that  01:55:35

11 what happened?  They just continued to gather information from

12 patients who were being hurt --

13 A.   No.

14 Q.   -- where the device was failing to help them design the

15 next device?                                                      01:55:56

16 A.   No.  I do not agree with that statement.

17 Q.   Okay.  Now, did Bard have an option to take the G2 and the

18 G2X off the market until it could get a safer filter on the

19 market?  Did they have that option?

20 A.   Can we take a device off the market?  Is that what you're    01:56:28

21 asking?  Because it's almost --

22 Q.   They had option?

23 A.   Yes.  Any company can remove any device that they put on

24 the market.

25 Q.   And, sir, at your deposition that was taken on February 2,    01:56:38

United States District Court

MICHAEL RANDALL - Direct

1  2017, let me ask you if you still agree with this.  Page 263,          01:56:44
2  line 19:  In order to know if a filter is safer versus another
3  you need to have a clinical study in which both filters are
4  placed and they have appropriately powered and a comparison is
5  made with them.  But there was no study done; correct?          01:57:34
6         You testified to that in February of 2017?
7  A.   That there was no studies done between the G2 versus
8  Denali.
9  Q.   Or comparing any two devices.  The company never did that?
10 A.   No.          01:57:53
11 Q.   Is that true that the company did not do that?
12 A.   Run two filters in the same clinical study?  No, they did
13 not do that.
14 Q.   And, sir, one of the reasons you didn't want to do a
15 clinical trial, which we saw in one of the earlier slides, is          01:58:17
16 because that was going to delay getting the next iteration of
17 the Bard filter on the market; true?
18 A.   For that particular project, like I said, there were
19 multiple filter projects ongoing.  One was going to require a
20 clinical study.  The other one was meant to deliver          01:58:44
21 improvements quickly or faster.  So that's what we did.
22 Q.   Sir, would you just answer my question?  My question is
23 simple.  That one of the reasons you didn't want to do a
24 clinical trial on the G2 was because it was going to delay
25 getting the next iteration of the Bard filter on the market?          01:59:00

United States District Court

MICHAEL RANDALL - Direct

1   A.   No.   That is not correct.                                          01:59:06

2   Q.   Okay.   Can you look at page 189 of your deposition.   Line

3   12.   Do you see where I am and you were asked this question:

4            And assuming that this is in or around June of 2008

5   or after, the only way you're going to have a 2009 launch date   01:59:32

6   is without a clinical trial; right?

7            And you answered:   Yes, that makes sense.

8            And then were you asked:   If you have a clinical

9   trial, it's going to delay that substantially; right?

10            Answer:   It would -- I believe it would take longer   01:59:50

11   than Q4 2009 if a clinical were involved.

12            Did I read that correctly?

13   A.   Yes.   That's what it says here.   I'm not sure in context

14   what project we're talking about, though.

15   Q.   And all of the things we just talked about on that last   02:00:08

16   exhibit, this G2 Platinum, that project was abandoned; correct?

17   A.   Yeah.   We failed that project.

18   Q.   You abandoned?

19   A.   I wouldn't say abandoned.   We couldn't make it work.   We

20   found another project work.                                    02:00:28

21   Q.   I'm not understanding that.   Did you actually take steps

22   as part of the G2 Platinum to test a device that would have

23   fixed all of those things?

24   A.   Yeah.   Do you want me to tell you what progressed with

25   that project?                                                  02:00:43

MICHAEL RANDALL - Direct

1   Q.   No.   The G2 -- let me ask you this.   When did you abandon      02:00:44

2   the G2 Platinum project?

3   A.   I don't know if it was in 2008.   I think it was

4   relatively -- we knew relatively in a quick amount of time that

5   when we electropolished the entire filter, that's what we were    02:01:00

6   trying to do.   That's why we called it platinum.   We were going

7   to electropolish the entire filter and it removes basically

8   thin layers of the Nitinol surface, makes it more polished and

9   it was eating away the weld to hold the device together.   So we

10  couldn't go with that solution.   And then that's when we went     02:01:21

11  and we did the project called Veil which became Eclipse and

12  instead of electropolishing the whole filter, we

13  electropolished every single component, which was even more

14  challenging, and then we got that project out.   And then in

15  parallel we did Meridian because we couldn't get it on the        02:01:39

16  Eclipse design where we added the caudal anchor.   There was a

17  lot of filter activity going on.

18  Q.   But I'm talking about the G2 filter right now.   The G2

19  filter that you were talking about in that last exhibit that

20  described all of those design changes, described all of those     02:01:56

21  complications, the G2 --

22  A.   M'hum.

23  Q.   -- remained unfixed and remained the same design from 2005

24  until it got taken off the market in 2011; correct?

25  A.   I wouldn't use those words.   I cannot say -- I can't give    02:02:11

United States District Court

MICHAEL RANDALL - Direct

1    you a yes-or-no answer.                                          02:02:15

2    Q.    Did it stay on the market as designed in 2005 until 2011?

3    A.    Yes.

4    Q.    Did any of the patients that had a G2 filter, were any of

5    them told any of the information that was contained in that      02:02:29

6    PowerPoint slide we just went through, that that device

7    required all of those design changes to fix some issues, some

8    safety issues, with the device?

9    A.    I wouldn't use that terminology or the way you are wording

10   it, no.                                                          02:02:47

11   Q.    How would you phrase it?  I'm asking you a simple

12   question.  Were any of the patients who had a G2 filter told of

13   anything about the information that you had in that PowerPoint

14   slide we just went through?

15   A.    We did not communicate our PowerPoint slide to any         02:03:01

16   patients.

17   Q.    Were any of the doctors that were prescribing G2 filters

18   or who had patients with G2 filters advised of any of the

19   information that was contained in that PowerPoint slide that

20   you and I just struggled going through?                          02:03:14

21   A.    No.  That slide was an internal document.

22   Q.    Right.  None of that information got out to doctors.

23   A.    The hypothesis in that PowerPoint slide did not get out

24   to --

25   Q.    Sir, there was more than a hypothesis in there.  There     02:03:32

United States District Court

MICHAEL RANDALL - Direct

1    were plans and solutions and data about the complications that          02:03:35

2    were experienced with that device; true?

3    A.    There was data on the complications and there were

4    potential solutions that were potential improvements that we

5    were contemplating on doing.                                            02:03:51

6    Q.    Now, I don't know how many slides there were, 61.  My

7    voice is hoarse so it must have been a lot.  I didn't see the

8    word "hypothesis" in there once.  You brought that word to this

9    courthouse, hypothesis.

10             THE COURT:  Is that a question?                               02:04:08

11             MR. LOPEZ:  Yes.

12   BY MR. LOPEZ:

13   Q.    Sir, is that true?

14   A.    It's actually in a lot of our documents when we talked

15   about this.                                                            02:04:14

16   Q.    I'm talking about the PowerPoint slide that you and I just

17   went through.  This doesn't talk about hypothesis, does it?

18   A.    It uses the word "potential."

19   Q.    Yeah.  And it also uses the word "solutions"; right?

20   A.    If you say so.                                                    02:04:30

21   Q.    And it uses a lot of other words in here but not the word

22   "hypothesis"; true?

23   A.    I don't recall in that particular PowerPoint but in other

24   PowerPoints, when we discuss it, we use the word "hypothesis."

25   Q.    But not today?                                                    02:04:49

United States District Court

```
 1   A.    Not in that -- I don't think so in that 2008 slide.   02:04:51
 2   Q.    All right.
 3              MR. LOPEZ:   That's all the questions I have for now,
 4   Your Honor.
 5              THE COURT:   Cross-examination?                     02:04:57
 6              MR. CONDO:   No questions, Your Honor.
 7              THE COURT:   All right.   Thank you, sir.   You can step
 8   down.
 9              (Witness excused.)
10              THE COURT:   All right.   Your next witness, counsel?   02:05:09
11              If you want to stand up, ladies and gentlemen, feel
12   free.
13              All right.   Counsel, your next witness, please.
14              MR. LOPEZ:   We're going to play a short video, Your
15   Honor.   I'm putting on the next witness and I'm going to try to   02:06:26
16   get my voice back a little bit.   It's a short video.
17              THE COURT:   All right.
18              MS. REED ZAIC:   The next videotaped witness will be
19   Daniel Orms.   In 1988 Daniel Orms received his bachelor's
20   degree in business with a specialization in marketing.            02:06:59
21   Mr. Orms began selling medical devices for Johnson & Johnson
22   subsidiary Ethicon in 1991.   Mr. Orms worked for a number of
23   medical device companies selling their devices before he
24   started working for what is now Bard Peripheral Vascular in
25   1997 as a sales representative.   He became a district sales     02:07:18
```

```
 1    manager in 2001 and then a regional sales manager in 2008.      02:07:22
 2    During this time at Bard, Mr. Orms sold Bard's Simon Nitinol
 3    Recovery and G2 filters and oversaw the district and regional
 4    sales representatives who sold these filters.
 5            Mr. Orms was laid off from Bard in December of 2012      02:07:40
 6    and is currently employed as a regional manager for Abbott
 7    Vascular, another medical device maker.
 8            (Whereupon the video deposition of Daniel Orms was
 9    played.)
10            MR. LOPEZ:  At this time, Your Honor, plaintiffs call    02:14:03
11    Mr. Rob Carr.
12            COURTROOM DEPUTY:  Sir, if you would please come
13    forward and stand right here and raise your right hand.
14            (ROBERT M. CARR, JR., a witness herein, was duly
15    sworn or affirmed.)                                             02:20:28
16            COURTROOM DEPUTY:  Could you please state your name
17    and spell your last name?
18            THE WITNESS:  Robert Michael Carr, Jr.  C-A-R-R.
19            COURTROOM DEPUTY:  Thank you, sir.  Please come have
20    a seat.                                                         02:20:47
21                        DIRECT EXAMINATION
22    BY MR. LOPEZ:
23    Q.   Good afternoon.
24    A.   Good afternoon.
25    Q.   Introduce yourself to the jury, please.                    02:21:07
```

ROBERT M. CARR, JR. - Direct

1    A.   Hi.  My name is Robert Carr.                          02:21:09

2    Q.   And I'm not sure what we want to do with these but these

3    are copies of all of the depositions and some trial testimony

4    you've given in the past regarding IVC filters.

5         MR. LOPEZ:  Can I have this up there?                 02:21:25

6    BY MR. LOPEZ:

7    Q.   I tried to put them in chronological order to make it a

8    little easier for you in case you need it.

9         Okay.  Mr. Carr, you actually started with NMT,

10   right, Nitinol Medical Technologies?                       02:21:58

11   A.   Yes, I did.

12   Q.   And I think you have been designated many times as the

13   person most knowledgeable about Bard IVC filters by the

14   company; true?

15   A.   Yes.                                                  02:22:15

16   Q.   On a number of issues; correct?

17   A.   Yes.

18   Q.   And when you were at NMT, you were working on the Recovery

19   filter project; correct?

20   A.   Among others, yes.                                    02:22:27

21   Q.   In fact, we saw your name come up with Dr. Asch.  You were

22   involved in the Asch study?

23   A.   I was.

24   Q.   And your name was mentioned in the migration report that

25   happened in the Asch study.  Do you recall that?          02:22:39

United States District Court

ROBERT M. CARR, JR. - Direct

1   A.   Yes.                                                        02:22:43

2   Q.   And you also got a lot of exposure while at NMT to the

3   Simon Nitinol filter; right?

4   A.   Yes.  I worked very closely with Dr. Simon.

5   Q.   During the time that you were at NMT which at least,       02:22:58

6   according to one or more of your depositions, was in 1996 until

7   NMT was sold to Bard?

8   A.   The filters were sold to Bard.  The whole company was not.

9   But, yes, from '96 to 2002.

10  Q.   All right.  Thanks for that correction.  But NMT sold the  02:23:23

11  technology of their filters to Bard; correct?

12  A.   Yes.

13  Q.   And that transaction was happening while the Recovery

14  filter was being tested and it was while the Asch study was

15  going on; true?                                                 02:23:43

16  A.   I'm not sure if the study was completed by then but around

17  the same time.

18  Q.   Now, the original decision to start looking at a

19  retrievable device happened while NMT was still the company

20  that was -- I guess you could say owned the technology; true?   02:24:02

21  A.   Yes.  In fact, it was Dr. Simon's idea to develop a

22  removable filter.

23  Q.   But Bard had an interest in that project as well, didn't

24  they, during that period of time?

25  A.   Ultimately, yes.                                           02:24:21

United States District Court

ROBERT M. CARR, JR. - Direct

1    Q.   Well, I mean, actually, when the Asch study was going on,            02:24:24
2    there was a lot of participation by both NMT folks and Bard
3    folks?
4    A.   Bard's participation was they brought Dr. Asch to our
5    knowledge.  We didn't know Dr. Asch.  He was the -- a client of          02:24:39
6    Bard Canada's at the time.
7    Q.   Did you do work on the Simon Nitinol filter while you were
8    at NMT?
9    A.   I worked on a project to bring the manufacturing of the
10   Simon Nitinol filter to NMT.  We had prior to that had                   02:24:57
11   contracted another company to actually make the device for us.
12   Q.   While you were at NMT -- as a matter of fact, let's just
13   talk about the entire time that you had exposure to the Simon
14   Nitinol filter, whether at NMT or Bard.
15        Was there ever a health hazard evaluation prepared               02:25:20
16   for any adverse events related to the Simon Nitinol filter?
17   A.   Not to my knowledge, no.
18   Q.   How about Remedial Action Plans?
19   A.   No, not to my knowledge.
20   Q.   Did you ever have to contact a PR media firm to deal                02:25:40
21   with --
22   A.   (Witness coughing).  I'm sorry.  I have water.  The first
23   cup of water was the problem.  I have water.  I'm good.
24   Thanks.
25   Q.   Was there ever a reason to hire a media firm or a PR firm           02:26:04

United States District Court

ROBERT M. CARR, JR. - Direct

1   to deal with the potential of a crisis communication plan          02:26:08

2   because of issues involving the Simon Nitinol filter?

3   A.   No.

4   Q.   Now, before the actual transaction where NMT's technology

5   was sold to Bard, there was a dispute between the two companies     02:26:34

6   about whether or not NMT could sell to someone else or whether

7   or not they had to sell it to Bard?  Do you remember that?

8   A.   I do, yes.

9   Q.   And do you also remember that that dispute lasted for a

10  year or more before it was resolved?                               02:26:50

11  A.   I don't know the timing of it.

12  Q.   Do you remember that during that period of time that other

13  than the Asch study, that research and development essentially

14  shut down with respect to the Recovery filter?

15  A.   I wouldn't characterize it as shut down.  The development     02:27:07

16  of the filter was completed and the Asch study was either

17  ongoing or had just finished.

18  Q.   And is the main reason that NMT thought that a -- selling

19  the device and the technology to Bard is because Bard had

20  commercial contacts with doctors.  They had a sales force and      02:27:29

21  they had relationships with hospitals?

22  A.   I'm sorry.  I think I misunderstood your question.

23  Q.   In other words, while you were at NMT, one of the reasons

24  they thought selling it to Bard was a good idea is because they

25  had a huge sales force and they had relationships with doctors     02:27:48

1008

ROBERT M. CARR, JR. - Direct

1   and hospitals; true?                                                02:27:52

2   A.    Bard was the commercial arm, if will you, the distributor

3   of the Simon Nitinol filter for, at that point, probably at

4   least six or seven years.  So they were certainly a reasonable

5   and logical partner.                                                02:28:09

6   Q.    And then once the technology and all this litigation

7   resolved and Bard took over the technology, that was sometime

8   in the latter part of 2001.  Does that sound about right?

9   A.    I think it was in the October time frame.

10  Q.    Okay.  And you were an employee of NMT at the time;          02:28:30

11  correct?

12  A.    Yes, I was.

13  Q.    And then did you eventually get hired by Bard?

14  A.    I did, in July of 2002.

15  Q.    Okay.  And were you hired as an engineer?                    02:28:46

16  A.    Yes.

17  Q.    And were you hired primarily to help with the

18  commercialization of the Recovery filter?

19  A.    I was hired and my responsibilities were in vena cava

20  filters and angioplasty balloons and biopsy devices at the        02:29:06

21  time.

22  Q.    You led the commercialization of the product when you got

23  to Bard; right?

24  A.    I wouldn't term it the commercialization.  I led the team

25  that developed and ultimately commercialized the product.         02:29:22

United States District Court

ROBERT M. CARR, JR. - Direct

| | |
|---|---|
| 1 | Q.   And when you got to Bard, anytime after the technology was | 02:29:27 |
| 2 | sold to Bard, did Bard have an opportunity to look at all of |
| 3 | the testing and all of the science and all of the things that |
| 4 | existed with respect to the Recovery filter as part of their |
| 5 | due diligence? | 02:29:47 |
| 6 | A.   Of course. |
| 7 |         THE COURT:  All right.  We're going to break at this |
| 8 | point.  We'll resume at 2:45.  We'll excuse the jury. |
| 9 |         MR. LOPEZ:  Okay.  Thank you, Your Honor. |
| 10 |         (Jury departs at 2:30.) | 02:29:58 |
| 11 |         (Recess at 2:31; resumed at 2:45.) |
| 12 |         (Jury enters at 2:45.) |
| 13 |         (Court was called to order by the courtroom deputy.) |
| 14 |         THE COURT:  Thank you.  Please be seated. |
| 15 |         You may continue, Mr. Lopez. | 02:46:14 |
| 16 | BY MR. LOPEZ: |
| 17 | Q.   Mr. Carr, with respect to the Asch pilot study, again, you |
| 18 | were involved in the investigation regarding the migration.  I |
| 19 | think it was patient number nine. |
| 20 | A.   Yes, I was. | 02:46:32 |
| 21 | Q.   And do you recall that there was a legitimate concern that |
| 22 | patient number nine was not in the study that the Recovery |
| 23 | filter actually could have continued migrating to that |
| 24 | patient's heart? |
| 25 | A.   I'm sorry.  I don't understand the question. | 02:46:49 |

United States District Court

ROBERT M. CARR, JR. - Direct

1    Q.    Well, there was a concern had that patient not been in a          02:46:53
2    study closely monitored and was not in a clinical trial or
3    pilot study that the device could have actually continued to go
4    to his heart and cause his death.

5    A.    I wouldn't put it that way, no.  It was observed through a          02:47:10
6    film study for a different reason and that's how it was
7    observed.  The filter never moved or went to his heart.

8    Q.    Okay.  Let's look at your deposition.  It's November 5 of
9    2013.

10          MR. LOPEZ:  Is that one of the ones that you can put          02:47:33
11   up electronically?  Why don't we just do that and we'll make it
12   easier for you.

13   Q.    Your deposition on November 5, 2013, starting at page 119,
14   line 17?

15          THE COURT:  Do you want him to look at it or are you          02:47:57
16   going to put it up electronically?

17          MR. LOPEZ:  It's easier if we put it in
18   electronically, Your Honor.  He's got it now.  It's in front of
19   him.

20   BY MR. LOPEZ:                                                            02:48:07

21   Q.    Now, you were asked at your deposition -- do you remember
22   having many depositions taken in this case, sir?

23   A.    I have been deposed several times, yes.

24   Q.    And you know that testifying in a deposition is like
25   testifying in court.  You're sworn to tell the truth; right?          02:48:19

ROBERT M. CARR, JR. - Direct

1   A.   Of course.                                                    02:48:23

2   Q.   You were asked on line 17:  Now, going back to this major

3   migration event, nobody knows what would have happened to this

4   patient had it not been discovered?

5          You answered:  Nobody knows what would have happened.    02:48:37

6          And then Mr. Johnson asks again on page 120, line

7   three:  But there is a concern or was a concern on your part,

8   Dr. Kaufman's part, on everybody's part, that if it had not

9   been discovered and if the filter had not been removed, this

10  filter may very well have migrated further and caused serious   02:48:58

11  injury and/or death to this patient?

12         Answer:  I don't recall that.

13         Question:  Well, is that a concern?  Do you recognize

14  that as a legitimate concern?

15         And your answer was:  I do recognize that as a           02:49:12

16  legitimate concern.

17         That was your testimony, sir, on the date of this

18  deposition?

19  A.   Yes.

20  Q.   Now you were familiar with all of the bench testing --     02:49:37

21         MR. LOPEZ:  You can take the deposition down, Greg.

22  BY MR. LOPEZ:

23  Q.   You were familiar with all of the bench testing and the

24  animal testing that was done at NMT prior to the Asch study;

25  correct?                                                         02:49:53

United States District Court

ROBERT M. CARR, JR. - Direct

1  A.   I'm familiar with it, yes.                                      02:49:55

2  Q.   And did you participate in some of that or at least help

3  guide some of it?

4  A.   I didn't perform I don't think any of it personally but I

5  was around and certainly knew what was happening.                    02:50:08

6  Q.   And all that testing that was designed by NMT was to try

7  to mimic what might happen in the human body had that device

8  been exposed to a real vena cava in a real human being; true?

9  A.   Partially.  The goal of all of the testing is to both

10 satisfy the requirements from a regulatory point of view as          02:50:41

11 well as do your best to mimic the first physiological

12 conditions that the device would be under.

13 Q.   Well, isn't the most important of those two things is to

14 mimic a human being to make sure that you minimize the

15 potential risk of actually putting that device in a human            02:51:01

16 being?  That's the most important thing about bench testing and

17 animal testing, wouldn't you agree?

18 A.   To the best of your ability, yes.

19 Q.   Right.  And then once you do the -- you put it in a human

20 being for the first time when you only know how it's working on      02:51:18

21 a workbench with respect to something like migration, the

22 patients need to be very closely monitored; right?

23 A.   In clinical trials the patients are monitored.

24 Q.   And we're talking about the Asch study with respect to the

25 Recovery; correct?                                                   02:51:37

United States District Court

1013

ROBERT M. CARR, JR. - Direct

1    A.    In general.                                              02:51:39

2    Q.    Well, I know I want to talk about just this device and

3    this study by now.   In the Asch study, the bench testing and

4    the animal testing suggested to you that the Recovery filter

5    could resist migration and could actually resist fracturing in  02:51:54

6    a human being; true?

7    A.    The migration resistance has a specification which is 50

8    millimeters of mercury so it's tested to be able to resist that

9    on average.

10          With respect to fracture, that's also a test that is     02:52:14

11   done on the bench and that is taken to an equivalent of ten

12   years life cycle is how it's tested.   I believe they all

13   eventually would break.

14   Q.    Well, I'm not sure you answered my question.   My question

15   was a lot simpler than that and that is that the bench testing  02:52:33

16   results that you got for migration resistance and fracture,

17   based on the parameters of the testing, were suggested to you

18   that if this device were put in a human being, that it would

19   not break and it would not migrate; true?

20   A.    No, that's not true.                                      02:52:54

21   Q.    So you did a pilot study and put them in human beings

22   without any assurances or at least some indication from your

23   bench testing and your animal testing that this device would

24   not migrate or fracture?

25   A.    No.   We never did a pilot study and that's why I explained  02:53:12

United States District Court

ROBERT M. CARR, JR. - Direct

1    what we did in both the migration and the fracture test.          02:53:16

2    Q.    Okay.  How did you convince Dr. Asch to actually implant

3    these in patients unless you had some preclinical studies that

4    suggested that it was safe to implant these in a human being?

5    A.    We had bench testing and animal testing.                    02:53:34

6    Q.    Okay.  That's what I thought.  And once you did the Asch

7    study and you saw that one and only patient that got challenged

8    by a clot of any significance, that the device migrated and in

9    the first 33 patients you had a double fracture, did that tell

10   you or anyone at NMT or Bard that maybe you ought to reconsider   02:53:55

11   the way you're bench and animal testing the Recovery filter?

12   Can you answer that yes or no?

13   A.    I don't think I can answer it yes or no.

14   Q.    I mean, I think you might if you try and that is if the --

15   was there anything about the results of the Asch study?  In       02:54:16

16   other words, there was a migration with a clot challenge and

17   there was a fracture of a foot and a leg.  Did that suggest to

18   you that maybe your animal testing and/or bench testing might

19   not be sufficient to predict what would happen in a human being

20   when it comes to migrations and fractures?                        02:54:35

21   A.    No, I don't remember that, no.

22   Q.    So you didn't learn anything from the Asch study with

23   respect to your bench testing and your animal testing?

24   A.    Yes.

25   Q.    Were you satisfied that your animal testing and your bench  02:54:53

United States District Court

ROBERT M. CARR, JR. - Direct

1  testing was sufficient to predict what was going to happen in          02:54:56

2  humans after you got the results from patient nine and patient

3  32 from the Asch study?

4  A.    Yes.

5  Q.    Let me have exhibit I think it's 800.                             02:55:19

6          Sir, your counsel were provided with a number of

7  documents that we might use today and I believe this was one of

8  them, so did you have a chance to review this before you came

9  to court today, the Exhibit 800?

10  A.    Yes.                                                             02:55:51

11  Q.    And I just want you to look at -- first of all, this is

12  dated January 13, 1993; correct?

13  A.    No.

14  Q.    I'm sorry.  1998.  And your name is on there, Rob Carr.

15  A.    Yes.                                                             02:56:05

16  Q.    And we go down to number three, literature review.  Who is

17  Thom Kinst?

18  A.    Thom was a marketing person at NMT.

19  Q.    And Thom Kinst reports --

20          MR. LOPEZ:  Your Honor, I would like to offer this            02:56:26

21  Exhibit 800 into evidence, please.

22          MR. NORTH:  No objection, Your Honor.

23          THE COURT:  800 is admitted.

24          (Exhibit Number 800 was admitted into evidence.)

25          MR. LOPEZ:  May I publish to the jury?                        02:56:35

United States District Court

1016

ROBERT M. CARR, JR. - Direct

1    THE COURT:  Yes.                                               02:56:37

2  BY MR. LOPEZ:

3  Q.   And Thom Kinst -- or at least this memo reports that he

4  spent a day at the Countway Library digging out papers that

5  help answer the question, quote, how high can the pressure drop   02:56:49

6  across the filter be immediately post occlusion, end quote.

7    Do you see that, Mr. Carr?

8  A.   Yes.

9  Q.   And then:  Steve has made a preliminary review of the

10 papers retrieved.  And the data in those papers pushes us to       02:57:05

11 assume that the delta P-- what is delta P?

12 A.   The pressure.

13 Q.   -- could certainly be 50 millimeters of mercury; some

14 references indicate that even higher pressures might occur in

15 certain circumstances.                                             02:57:26

16    Do you see that, sir?

17 A.   I do.

18 Q.   And for purposes of your determining a threshold starting

19 point in testing migration resistance on the bench at least at

20 NMT and some of the early tests you did at Bard was to assume      02:57:40

21 that that number was 35; correct?

22 A.   Through our conversations with physicians, the number that

23 was -- came to was 35, yes.

24    MR. LOPEZ:  Can I have 1452, please.  Actually.  We

25 should start with -- let's start with 1452.                        02:58:14

United States District Court

ROBERT M. CARR, JR. - Direct

1    BY MR. LOPEZ:                                                    02:58:20

2    Q.   Sir, are you familiar with this document?

3    A.   I saw it yesterday.

4    Q.   Are these notes from a meeting that you had with

5    Dr. Kaufman, Dr. Venbrux and an attorney Howard Holstein?   02:58:32

6    A.   They appear to be but I don't know whose notes these are.

7    Q.   You've never seen these notes before?

8    A.   I saw them yesterday.

9    Q.   For the first time?

10   A.   No.   But I don't know whose they are.               02:58:45

11   Q.   Well, if you go down to the bottom -- you were at this

12   meeting; correct?

13   A.   It says I have a quote at the bottom of the meeting, yes,

14   but I don't recall this meeting.

15   Q.   Okay.   Okay.   And let me -- you don't know whose notes  02:58:56

16   these are?

17   A.   I don't know whose notes they are, no.

18   Q.   They are not your notes?

19   A.   They are not.

20   Q.   Do you remember when this meeting took place?         02:59:11

21   A.   No, I don't.

22   Q.   These were notes that were produced as part of this

23   litigation.   Do you see the Bates numbers there at the bottom?

24   A.   I do, yes.

25            MR. LOPEZ:   I would like to offer 1452 into evidence  02:59:27

United States District Court

ROBERT M. CARR, JR. - Direct

```
 1    at this time, Your Honor.                                    02:59:30

 2              MR. NORTH:  Objection, Your Honor.  802.

 3              THE COURT:  Sustained.

 4    BY MR. LOPEZ:

 5    Q.   Okay.  Now, sir, you remember being at a meeting with   02:59:37

 6    these three individuals; correct?

 7    A.   No, that's not correct.

 8    Q.   You are quoted there at the bottom.  Do you see that?

 9    A.   I do see that.

10    Q.   And do you have a recollection as to whether or not     02:59:55

11    Dr. Venbrux at that time said to you and others at this meeting

12    that you should consider a migration resistance threshold as

13    high as 140 millimeters of mercury?  Does that refresh your

14    recollection?

15    A.   No, it doesn't.  When I read this yesterday is what      03:00:16

16    refreshed my recollection.

17    Q.   Sir, you don't recall this exhibit being used in another

18    trial?

19              MR. NORTH:  Objection, Your Honor.  402.

20              THE COURT:  It's sustained.                         03:00:32

21              And, Counsel, if you're going to refresh

22    recollection, don't read it to him.  Have him read it, set it

23    aside and then ask him if his recollection is refreshed.

24    BY MR. LOPEZ:

25    Q.   Sir, did Dr. Kaufman ever express to you or anyone in your  03:00:47
```

United States District Court

ROBERT M. CARR, JR. - Direct

1  presence that he felt that the Recovery filter was a, quote,                    03:00:50

2  wimpy filter, end quote?

3  A.   Yes.

4  Q.   And, in fact, does this refresh your recollection that

5  that happened at the meeting --                                                 03:01:03

6        THE COURT:   Mr. Lopez, if you're going to refresh his

7  recollection, have him read the document and then set it aside

8  and ask him if his recollection is refreshed.   Don't read him

9  the document or the statements in the document.

10  BY MR. LOPEZ:                                                                  03:01:19

11  Q.   And did you recall Dr. Venbrux, and maybe many of these

12  other doctors that you consulted with, that they felt that the

13  issue should be stability with the Recovery filter, not

14  retrievability early in its marketing?

15  A.   I don't remember other people saying that.  No,            03:01:39

16  Dr. Venbrux did.   It's in this note here.

17  Q.   And did that help refresh your recollection that he said

18  that?

19  A.   No, it doesn't, sir.   I don't recall the meeting.

20  Q.   And then let's look at Exhibit 1033.   Do you see that,    03:01:53

21  sir?

22  A.   Excuse me.   Can you make it wider on the screen?

23  Q.   Wider?

24  A.   Yeah.

25  Q.   I'll tell you what.   The part I'm going to read -- the    03:02:17

United States District Court

ROBERT M. CARR, JR. - Direct

1  part I'm going to draw your attention to is the from the middle          03:02:18

2  down.  Is there anything in here, sir, that refreshes your

3  recollection that you were at a meeting with Drs. Venbrux,

4  Kaufman, and Attorney Howard Holstein?

5  A.   No.                                                                 03:02:37

6  Q.   Did you discuss in the early part of 2004, after the

7  Recovery filter was on the market for a short period of time,

8  some of the problems that Bard was experiencing with the

9  Recovery filter with John Kaufman and Anthony Venbrux and an

10 attorney?                                                                03:03:02

11          THE COURT:  He's calling for your recollection, sir,

12 not what the document says.

13          THE WITNESS:  I don't recall this meeting but I am

14 sure that I had conversations with John Kaufman and Tony

15 Venbrux about the Recovery filter.                                       03:03:14

16 BY MR. LOPEZ:

17 Q.   Did John Kaufman or any of the people at the meeting

18 suggest that the arm fractures were associated with a, quote,

19 caudal shift, close quote?

20          MR. NORTH:  Objection, Your Honor.                             03:03:29

21          THE COURT:  Mr. Lopez, would you approach, please.

22          Ladies and gentlemen, if you want to stand up, feel

23 free.

24          (Counsel meet at sidebar, 3:03.)

25          THE COURT:  That's the third time you've done it.             03:03:41

United States District Court

1021

ROBERT M. CARR, JR. - Direct

1    I've told you not to read from a document that is not in          03:03:43

2    evidence to refresh his recollection.

3          MR. LOPEZ:  I understand, Your Honor.  I know that.

4    I'm asking the question from the document.

5          THE COURT:  You can't do that if it's not in          03:04:14

6    evidence.  What you can do is you can show him the document,

7    have him set aside, ask, "Does it refresh your recollection

8    about a meeting?"  You asked him that and he said no and so

9    then you read a quote from the document.  You can't do that.

10         MR. LOPEZ:  What's happening if he's looking at the          03:04:21

11   screen, if he would just look at me.

12         THE COURT:  Well, let's do it in paper form or take          03:04:27

13   it off the screen.  But don't quote and you even put it in

14   quotes that third time.  Quote.  You can't do that.  So if you

15   want to refresh his recollection, and this goes for both sides,          03:04:27

16   have him look at the document, set it aside, have him look back

17   at you or get it off the screen and ask, "Does that refresh

18   your recollection?"  And if yes, you can ask him questions

19   about the recollection.

20         MR. LOPEZ:  This is a company document.  This          03:04:43

21   document are notes that were kept in the ordinary course of

22   business.  Mr. Carr is quoted on this.  This should be an

23   exception to the hearsay Rule under 801 -- whatever it is.

24   These are declarations against interest.  These are admissions.

25         THE COURT:  What you have to do in order to get this          03:05:05

United States District Court

ROBERT M. CARR, JR. - Direct

1    in under 801(d)(1)(A) is you have to present evidence that the         03:05:07

2    document is a document created by the company that the person

3    who is quoted was authorized to act as an agent for the

4    company.  And if you're going to do it without a witness, you

5    have to do it with the contents of the document.  It can work       03:05:23

6    with the memo or it's a Bard letterhead and a VP writing.

7              Handwritten notes, I can't look at those notes and

8    say, "Yeah, it's evident from looking at the document that it's

9    either a Bard document or by an authorized witness."  But let's

10   argue about this after the jury is not waiting.                     03:05:42

11             I'm not going to rule in your favor on this at this

12   point.  I'll be happy to hear your argument but I don't want to

13   keep the jury waiting on the 801(d)(2)(A).  I just want to make

14   sure that we're square on the procedure for refreshing memory.

15             MR. LOPEZ:  I understand.  I apologize.  I didn't do      03:05:59

16   that on purpose.

17             THE COURT:  Okay.  That's fine.

18             (End of sidebar discussion.)

19             THE COURT:  Thanks, ladies and gentlemen.

20   BY MR. LOPEZ:                                                       03:07:08

21   Q.   Sir, I'm going put a transcript in front of you from a

22   proceeding that happened about three years ago.  Do you have

23   that in front of you?

24   A.   I have something in front of me, yes.  I don't know what

25   it is.                                                              03:07:25

United States District Court

ROBERT M. CARR, JR. - Direct

1   Q.   Well, I'm not -- I don't know.  I'm not supposed to say.          03:07:26

2   So it's a transcript where you were testifying under oath.

3   Okay?

4   A.   Yes.

5   Q.   And you said that the first time you saw that document was       03:07:36

6   yesterday; correct?

7   A.   Yes.

8   Q.   And do you see here -- does this help refresh your

9   recollection that not only did you see it before yesterday, but

10  you actually testified about it three years ago?                      03:07:50

11  A.   No.  I had seen a different version of that document with

12  notes on it.

13  Q.   So you had seen this document before with notes on it?

14  A.   With notes on it, yes.

15  Q.   Okay.  Were those notes your notes?                              03:08:04

16          THE COURT:  Excuse me.  Mr. Carr, when he's asking

17  you a question and you're reading what's on the screen, he'll

18  tell you to do that when he needs you to do that.

19          He wants you to testify from your memory.

20          THE WITNESS:  Okay.                                          03:08:22

21  BY MR. LOPEZ:

22  Q.   You were asked at this proceeding, sir, look at 187, line

23  five:  Did anyone ever raise a concern to you that the device

24  had an inadequate radial force level and that was resulting in

25  migration of the filter?                                              03:08:41

United States District Court

ROBERT M. CARR, JR. - Direct

1          And you answered:  We certainly talked about that          03:08:44

2   with Dr. Kaufman and others, yes.

3          And the question:  And they told you it was a wimpy

4   filter?

5          And you answered:  It feels wimpy in air, yes.          03:08:54

6          Question:  And its radial force was inadequate to

7   prevent migration?

8          Answer:  I think they were concerned about it.  They

9   didn't say it was inadequate.

10          Question:  They also told you your migration          03:09:08

11   resistance specification was inadequate to prevent migration as

12   well, correct?

13          Answer:  I think they said we needed to look at it

14   and address it.

15          Question:  And they suggested raising it to 140          03:09:21

16   millimeters of mercury; is that right.

17          Answer:  I believe Dr. Venbrux put out 140 as a

18   number, yes.

19          Question:  Remind me, what was it before, 50?

20          Answer:  It is 50, yes.          03:09:40

21          Sir, does that help refresh your recollection that

22   yesterday was not the first time that you saw the contents and

23   the notes from a meeting that happened in 2004 with the three

24   individuals I had previously identified?

25   A.   Yes.          03:09:59

United States District Court

ROBERT M. CARR, JR. - Direct

1    Q.    And the notes that we have been going back on, those are          03:10:01

2    the notes; right?

3    A.    They appear to be the notes, yes.

4          MR. LOPEZ:  Your Honor, now I would like to offer

5    1452 and 1033 into evidence.                                            03:10:09

6          MR. NORTH:  Objection.  802.  All he said is --

7          THE COURT:  You don't need to argue it.  Sustained.

8    It's still hearsay even if he remembers it.

9          MR. LOPEZ:  Okay.

10   BY MR. LOPEZ:                                                           03:10:24

11   Q.    But for sure yesterday was not the first day that you saw

12   those notes; true?

13   A.    I said I saw a different version.

14   Q.    Did you bring that version with you by any chance, the

15   different version?                                                     03:10:38

16   A.    No, I didn't bring anything with me.

17   Q.    Okay.

18         MR. LOPEZ:  Can we put 4327 up, please.

19         Your Honor, this is going to be 4337 with the

20   additional material that was removed from -- I'm not sure it          03:11:13

21   was officially removed from the exhibit, trial exhibit, or not

22   or whether or not we're reserving on that.  I won't go into the

23   back part --

24         THE COURT:  This is the one where we admitted seven

25   pages?                                                                 03:11:28

United States District Court

ROBERT M. CARR, JR. - Direct

1      MR. LOPEZ:  Yes, Your Honor.                          03:11:31

2      THE COURT:  Okay.  You said 4337.  I think it says

3  4327.

4      MR. LOPEZ:  It says 4327.

5      THE COURT:  Right.  And I have looked, by the way, at  03:11:38

6  the last three pages and I think they are clearly hearsay

7  within hearsay.  So I'm standing on my ruling that the first

8  seven pages are admitted but not the last three.

9      MR. LOPEZ:  I understand, Your Honor.

10 BY MR. LOPEZ:                                             03:11:49

11 Q.   Now, sir, I want you to look at 4327.  We can show you.

12     MR. LOPEZ:  And may I publish this to the jury, Your

13 Honor?

14     THE COURT:  You may.

15 BY MR. LOPEZ:                                             03:12:01

16 Q.   And this is a monthly global PV report.  Do you see that?

17 A.   Yes.

18 Q.   Do you know what a monthly global PV report is?

19 A.   It looks like John McDermott's monthly report to

20 corporate.                                                03:12:16

21 Q.   And did you, as a matter of course, get copies of these

22 reports and their attachments?

23 A.   No.

24 Q.   Can we look at page four of the exhibit?  I have Chris

25 Ganser highlighted on there because that's from another     03:12:39

United States District Court

1027
ROBERT M. CARR, JR. - Direct

1  deposition; but if you look at the left, you're listed as          03:12:42

2  having been copied on this report.  Do you see that?

3  A.    I do.

4  Q.    Does that refresh your recollection that you were one of

5  the recipients of these monthly reports?                           03:12:51

6  A.    I don't see a cc list but I will accept that.

7  Q.    Well, let's go down to -- let's go to the bottom of page

8  three of the exhibit and you'll see what happens.  They start

9  the cc list there at the bottom.  Do you see?

10  A.    Yes.                                                         03:13:15

11  Q.    And then you go to the next page and it carries over in

12  four columns just like was started on page three.

13  A.    Yes.

14  Q.    So you were someone who would get copies of these monthly

15  reports; right?                                                    03:13:31

16  A.    I got this one.

17  Q.    By the way, what does PV stand for?

18  A.    Peripheral vascular.

19  Q.    Okay.  And as part of those monthly reports, would you get

20  what are known as MDR reports?                                     03:13:46

21  A.    I don't recall these reports so you would have to show me

22  the content.

23  Q.    Okay.

24         MR. LOPEZ:  Don't take it down, Greg, from showing it

25  to the jury.                                                       03:13:59

United States District Court

ROBERT M. CARR, JR. - Direct

1    And show Mr. Carr page eight.                          03:14:03

2         THE COURT:  Are you doing this to refresh his

3    recollection?

4         MR. LOPEZ:  Hopefully to lay a foundation, Your

5    Honor.  He's a recipient of this monthly report.        03:14:14

6    BY MR. LOPEZ:

7    Q.   So, sir, you see this.  Is there anything on there that

8    looks familiar to you like something you would receive in

9    monitoring the adverse events and the complications with the

10   IVC filters?                                            03:14:44

11   A.   Again, I don't recall receiving these.  It's a long time

12   ago but it seems like a list of complications for the filter.

13        THE COURT:  Excuse me, sir.  He's just asking if you

14   remember it, not to describe it.

15        THE WITNESS:  No, I don't remember.                03:15:05

16   BY MR. LOPEZ:

17   Q.   So you don't remember going to -- getting a monthly report

18   where you were kept apprised of the reports of injuries and

19   malfunctions and complications with the products that you were

20   working with?                                           03:15:22

21   A.   I don't remember receiving his report, no.

22   Q.   But you're certainly on here as someone who has received

23   copies of these; true?

24   A.   Of this one, yes.

25   Q.   And, sir, as an engineer, wouldn't it have been important  03:15:33

United States District Court

ROBERT M. CARR, JR. - Direct

1    for you to have been kept apprised of the ongoing trending and          03:15:36
2    injuries that were associated with the Recovery and G2 filter
3    during this period of time?
4    A.    And I believe I was but through different mechanisms.
5          MR. LOPEZ:  Your Honor, I would still like to offer          03:15:54
6    this into evidence at this time in its entirety.
7          THE COURT:  The last three pages?
8          MR. LOPEZ:  Yes, Your Honor.
9          MR. NORTH:  Same objection, Your Honor.  Multiple
10   layers.          03:16:03
11         THE COURT:  All right.  Sustained on hearsay grounds
12   on last three pages.
13   BY MR. LOPEZ:
14   Q.    Well, when you were having problems in the early first few
15   months of the G2 Filter being on the market, I think you told          03:16:20
16   us that you kept pretty close attention to those reports; true?
17   A.    When we were having problems in the first few months?
18   Q.    Yes.
19   A.    I don't know what you're referring to.
20   Q.    You don't know what I'm referring to?          03:16:36
21         MR. LOPEZ:  Could you put that back up, Greg, and see
22   if this helps refresh your recollection about those problems.
23   And go to page seven.  I'm sorry, page eight.
24   Q.    Can you look at the screen, sir?  And I just want to ask
25   you if this helps refresh your recollection about the number          03:17:05

ROBERT M. CARR, JR. - Direct

1 and type of adverse events that Bard had experienced as of the      03:17:08

2 date of this monthly report, February 10, 2006.

3        THE COURT:  So he's asking you to look at the

4 document, then look back at him and tell him whether that

5 refreshes your recollection on those problems.              03:17:23

6        THE WITNESS:  Does it refresh my recollection?  Yes,

7 these are reported complaints and a list of the number of

8 events.

9 BY MR. LOPEZ:

10 Q.   Okay.  And something that, in your regular and ordinary      03:17:41

11 course of business, the type of information you would review to

12 keep up with how the product was performing in the field?

13 A.   Yes, again, but I did it in a different mechanism.   I

14 don't remember these monthly reports.

15 Q.   Now, let's talk about the EVEREST study.  Could you tell      03:18:07

16 the Court and the jury what the EVEREST study is or was?

17 A.    It was a clinical trial for -- to get removability for the

18 G2 filter.

19 Q.   And when did the EVEREST study start?  When did you

20 actually start implanting patients with the G2 filter to see if      03:18:33

21 it could be retrieved?

22 A.   I don't know the specific date but I would say late 2005.

23 Q.   Okay.  The G2 filter was cleared as a permanent filter

24 sometime around September of 2005?

25 A.   Again, I'm bad with the dates but that sounds about right,      03:18:58

United States District Court

ROBERT M. CARR, JR. - Direct

1    yes.                                                                    03:19:02

2    Q.   And then it was decided that because it was a permanent

3    filter, you needed to do a retrievability study to see if you

4    could get an indication to have this permanent device also be a

5    retrievable device?                                                     03:19:17

6    A.   Yes, but I wouldn't say it that way.  It was always

7    designed as an optional device and our original submission was

8    to have it approved as an optional device.  And the FDA asked

9    us to do a trial for removability, but they granted it as a

10   permanent device first.                                                 03:19:37

11   Q.   So we're talking about December 2005.  It was already --

12   the company was already receiving reports that it had caudal

13   migrations and perforations and some problems with the device

14   in the first three or four months it was on the market;

15   correct?                                                                03:19:56

16   A.   That report is from January of '06 so I guess so, yes.

17   Q.   Okay.  And the company had determined that they probably

18   should be putting caudal anchors to eliminate the caudal

19   migration and tilting they were experiencing early in the

20   marketing of the device; correct?                                       03:20:14

21   A.   I don't know that, no.

22   Q.   Let's look at your deposition on April 17, 2013?

23        MR. LOPEZ:  Greg, can you put that on the screen?

24   Page 93.

25   \\\

United States District Court

ROBERT M. CARR, JR. - Direct

BY MR. LOPEZ:                                                      03:20:43

Q.   Do you see where I am?

A.   I see the page.

Q.   And I want you to look at line 11 and I'll read this

question -- question and your answer:                             03:20:49

        The field and our clinical data have shown an

increased frequency of migration in the caudal direction with

the G2 and the G2 Express filters as compared to Recovery.

        Now, were you familiar with that clinical data that's

being referenced there?                                           03:21:06

        Answer:  Yes.

        Question:  The application of caudal anchors would

potentially eliminate this failure mode to reduce tilting of

the filter.

        You answered:  I believe it says and reduce tilting       03:21:15

of the filter.

        Question:  And reduce tilting of the filter.

        Now, was this anchor system ultimately implemented?

        Answer:  Yes.

        Next page, please.  And how would this anchoring           03:21:26

system reduce tilting of the filter?

        If the filter can't move, it can't tilt.

        That was your answer when this deposition was taken

in April of 2017.  True, sir?

A.   My answer to your original question, no.                      03:21:45

United States District Court

ROBERT M. CARR, JR. - Direct

1   Q.   No.   This was your testimony on that day?                    03:21:47

2   A.   But you asked a different question, sorry.

3   Q.   So you know who Natalie Wong is; right?

4   A.   I do.

5   Q.   And you know that she conducted what's called -- known as    03:22:04

6   a DFMEA with respect to the caudal migrations that the company

7   was experiencing in the first five to six months it was on the

8   market; true?

9   A.   I don't know the timing of it, no.

10  Q.   But you know that there was -- I want you to assume that      03:22:19

11  in March that Natalie Wong had conducted a DFMEA on caudal

12  migrations and she determined through that analysis that the G2

13  presented an unacceptable risk of caudal migration and the more

14  serious category and injury numbers for that type of an event.

15  Can you assume that for me?                                        03:22:44

16  A.   No.   If you show to it me, I'll read it.

17  Q.   Okay.

18            MR. LOPEZ:  This has been admitted, Your Honor.

19            THE COURT:  What has?

20            MR. LOPEZ:  2248.                                        03:23:32

21            THE COURT:  Let me see if Traci agrees.

22            COURTROOM DEPUTY:  Yes, it's been admitted.

23            MR. LOPEZ:  May I publish, Your Honor?

24            THE COURT:  You may.

25  \\\

United States District Court

ROBERT M. CARR, JR. - Direct

1   BY MR. LOPEZ:                                                          03:23:47

2   Q.   Sir, do you see that this document is dated March 2, 2006;

3   correct?

4   A.   Yes.

5   Q.   And attached to this is a G2 caudal report PowerPoint.           03:23:53

6   Have you not seen this before?

7   A.   If you show it to me, I can tell you.

8            MR. LOPEZ:   Can we go to the page that has the

9   unacceptable risk?

10  Q.   Do you see that, sir?                                            03:24:17

11  A.   Yes.

12  Q.   And do you see where be this DFMEA determined that for

13  caudal threshold, the G2 posed an unacceptable risk for Type

14  III above threshold.  Do you see that?

15  A.   Yes.                                                             03:24:41

16  Q.   And that was as a permanent device; correct?

17  A.   Yes.

18  Q.   And the company was already discussing at this period of

19  time that they needed to make some design changes to the G2 to

20  correct its caudal migration problem.  Do you remember that?        03:24:56

21  A.   No, I don't.

22  Q.   So the EVEREST study, this study was actually conducted,

23  continued to be conducted after what we just discussed with

24  respect to this March 2006 DFMEA and the fact that the company

25  had determined that they had some trending going in the bad         03:25:26

United States District Court

1035

ROBERT M. CARR, JR. - Direct

1  direction with respect to caudal migration; correct?                    03:25:30

2  A.   I would not put it that way.  I would put it that the Quad

3  Level 3 here, there's a description at the bottom that says you

4  need recommended actions prior to product release.  But this is

5  after the product had been released.                                    03:25:48

6  Q.   Right.  In other words, if this product hadn't been

7  released, this DFMEA is telling the company, "Don't release it

8  yet until we take care of the problem"; right?

9  A.   This document says that you would need to put controls in

10 place to reduce that observation level, yes.                            03:26:04

11 Q.   Controls would include looking the design of the device,

12 maybe retesting it to see what might be wrong with the device

13 to see if this unacceptable risk issue could be resolved?

14 A.   Verification testing usually, yes.

15 Q.   But that wasn't done in response to this; correct?               03:26:27

16 A.   I don't know.

17 Q.   All right.  So EVEREST -- so what we have here is the

18 company, as a permanent device, had made a determination, at

19 least according to this DFMEA, that there was an unacceptable

20 risk of caudal threshold and they were now conducting a              03:26:44

21 retrievability study on the same device?

22 A.   Yes, but this FMEA -- the FMEA is a living document.  It

23 changes over time so when we observed these complaints coming

24 in, this is an update to our DFMEA at the time and there were

25 no controls for that complication because we hadn't seen it          03:27:06

United States District Court

ROBERT M. CARR, JR. - Direct

1  before.                                                              03:27:09

2  Q.  And what didn't change, the discussion in the company that

3  there had to be some design changes made to the G2 to deal with

4  the caudal migration, namely the caudal anchor; true?

5  A.  Ultimately, those conversations were had and that change    03:27:24

6  was made, yes.

7         MR. LOPEZ:  Can we have 4327, please, back up again

8  and let's look at page -- let's look at page five of the

9  exhibit.

10         I would like to publish this to the jury, Your Honor.   03:28:03

11         THE COURT:  You may.

12  BY MR. LOPEZ:

13  Q.  Do you see this?  Do you see what I'm showing you, what's

14  highlighted there?

15  A.  Yes.                                                        03:28:09

16  Q.  So the team was already embarking on trying to figure out

17  through design changes the caudal migration issue with the G2

18  filter; right?

19  A.  Yes.

20  Q.  Were the subjects of the EVEREST trial, meaning the        03:28:28

21  clinical trial subjects, advised that this was going on before

22  they agreed to participate in the EVEREST trial?  In other

23  words, were they told that we have a design issue we're trying

24  to resolve?

25  A.  I don't know.                                               03:28:46

United States District Court

1037

ROBERT M. CARR, JR. - Direct

1    Q.   And the reason that you did the EVEREST trial and          03:28:49

2    continued the EVEREST trial after some of this evidence we've

3    seen was the caudal migration and the design issues was to get

4    an indication for retrievability; right?

5    A.   Yes.                                                       03:29:07

6    Q.   Because retrievability would open up an opportunity to

7    expand the marketability of the G2; true?

8    A.   All filters that we were designing at the time were

9    intended to be optional and I think as I stated before, the

10   initial intent of this device was for it to be optional from   03:29:25

11   the start.  So the permanent to removable pathway became a

12   regulatory process, not our business intent.

13   Q.   Let me ask it a different way.  While this device only had

14   an indication as a permanent device, the company was precluded

15   from marketing it as a retrievable device; true?              03:29:45

16   A.   Yes.  We could not promote it as a retrievable device.

17   Q.   And you couldn't do that until you got retrievability in

18   2008; correct?

19   A.   I don't know the time but until we got approval, yes.

20   Q.   And in order to get clearance to market this device as a   03:30:01

21   retrievable device, you had to complete the EVEREST trial;

22   right?

23   A.   In addition to all our other testing, yes.

24   Q.   And this EVEREST trial was going on while the company was

25   looking at how they were going to fix the caudal migration     03:30:20

United States District Court

ROBERT M. CARR, JR. - Direct

1    perforation and tilt problems with the G2?                          03:30:23

2    A.   We were looking at how to improve the performance of the

3    device.

4    Q.   And you already had signals from what doctors were

5    reporting to you about these issues of caudal migration, tilt,      03:30:34

6    perforation, sometimes those three things in the same patient,

7    you were already getting reports of that in early part of 2006;

8    correct?

9    A.   I don't know that, no.

10   Q.   Well, can you already have reports and complaints of the       03:30:51

11   G2 filter having all of those things and even including a

12   fracture that was caught was causing the device to migrate and

13   embolize in the vena cava?

14   A.   No, I don't know that.

15   Q.   And you were in charge of the G2 and the EVEREST study;         03:31:15

16   right?

17   A.   No, I was not in charge of the EVEREST study.

18   Q.   Didn't you say you were the one that recruited all the

19   doctors and you helped set the whole thing up?

20   A.   Yes, I helped but I was not in charge of the study.            03:31:29

21   Q.   Can we look -- well, you recruited Dr. Venbrux and

22   Dr. Kaufman; right?

23   A.   They were people we worked with at the time so I don't

24   think it took much of a recruiting effort.

25   Q.   Now, as part of the EVEREST study, these individuals were      03:31:52

United States District Court

1039

ROBERT M. CARR, JR. - Direct

1  only to be in the study for, what, 180 days?  There was          03:31:59
2  supposed to be retrievability within 180 days and thereafter it
3  would become a permanent device?
4  A.   I would have to see the protocol.  I haven't read it in a
5  long time.                                                        03:32:12
6  Q.   You didn't know we were going to be talking about the
7  EVEREST trial today?
8  A.   Not in particular, no.
9  Q.   And even though the EVEREST trial was a trial for
10 retrievability just as part of the protocol, just like in the    03:32:32
11 Dr. Asch study, the patients would be medically monitored for
12 complications; true?
13 A.   Again, I would have to see the protocol to know what it
14 said.
15 Q.   All right.  Let's look at Exhibit 422.  Is this the final   03:32:46
16 study report for the EVEREST trial exhibit that you have up
17 there right now?
18 A.   It's the title.  I don't know if it's a draft or the final
19 one.
20 Q.   Let's look at 1517, please.                                 03:33:41
21       Sir, are you familiar with this document?
22 A.   No.
23 Q.   You've never seen it before?
24 A.   I don't recall it, no.
25 Q.   Do you see at the bottom of this document that it states    03:34:08

United States District Court

ROBERT M. CARR, JR. - Direct

1  that it is the property of C.R. Bard, Inc.?                      03:34:10

2  A.    I do.

3  Q.    That's the company that you worked for while the EVEREST

4  study was going on?

5  A.    Yes.                                                       03:34:23

6  Q.    And it also has the logo on some of these pages.  If you

7  go to page -- let's just randomly go to page 38 and tell me

8  whether or not that has the Bard Peripheral Vascular logo on

9  it.

10  A.    I don't have it yet.  Sorry.  Yes, I do see it.           03:34:51

11            MR. LOPEZ:  Your Honor, I would like to offer this

12  Exhibit 1517 into evidence right now.

13            MR. NORTH:  No objection, Your Honor.

14            THE COURT:  1517 is admitted.

15            (Exhibit Number 1517 was admitted into evidence.)     03:35:07

16  BY MR. LOPEZ:

17  Q.    Did you, sir, closely monitor the results of the EVEREST

18  trial as it was going on?

19  A.    No.

20  Q.    You didn't pay close attention to the adverse events      03:35:22

21  that --

22  A.    No.  I had a different responsibility during the tail end

23  of the EVEREST trial and the data was not disseminated widely.

24  Q.    All right.  The trials took place in 2006 and 2007.  Do

25  you recall that?                                                03:36:12

United States District Court

1041

ROBERT M. CARR, JR. - Direct

| | | |
|---|---|---|
| 1 | A.   I thought 2005 so I don't know the time frame. | 03:36:14 |
| 2 |         MR. LOPEZ:  Let's look at Trial Exhibit 1517.  And I | |
| 3 | would like to show this to the jury, Your Honor. | |
| 4 |         THE COURT:  You may. | |
| 5 |         MR. LOPEZ:  Go to the first page, Greg, please. | 03:36:28 |
| 6 | BY MR. LOPEZ: | |
| 7 | Q.   Do you see, sir, that this is -- the subject of this | |
| 8 | PowerPoint presentation is EVEREST and TrackWise Data Review? | |
| 9 | A.   This is the same document you just showed me? | |
| 10 | Q.   Yes. | 03:36:52 |
| 11 | A.   Sorry.  I thought you changed.  Yes. | |
| 12 | Q.   And did you participate in any meetings regarding the | |
| 13 | EVEREST trial and the results? | |
| 14 | A.   I'm sure that I did. | |
| 15 | Q.   And do you recall going to a meeting where the EVEREST | 03:37:07 |
| 16 | results and the TrackWise data was discussed? | |
| 17 | A.   No. | |
| 18 | Q.   And you would agree with me that this is an official Bard | |
| 19 | document that we're looking at? | |
| 20 | A.   I don't know what you mean by that but I have no reason to | 03:37:21 |
| 21 | doubt. | |
| 22 | Q.   For example at the bottom it says confidential:  This | |
| 23 | document contains information that is confidential and | |
| 24 | proprietary property of C.R. Bard, Inc. | |
| 25 |         Do you see that? | 03:37:31 |

United States District Court

ROBERT M. CARR, JR. - Direct

1    A.   Yes.                                                              03:37:32

2    Q.   Okay.   Now, page six.   Actually, let's do this.   Let's go

3    to paragraph -- I'm sorry, slide eight.   We've already seen

4    some of this other stuff with another witness.   And do you see

5    that this has a chart of the different complications that were   03:38:22

6    observed in the EVEREST trial?

7    A.   Yes.

8    Q.   Sometimes there were multiple complications in one

9    patient.   For example, at the far right, caudal, fracture, tilt

10   and penetration?                                                 03:38:38

11   A.   Had happened in one patient, yes.

12   Q.   And then in another patient, caudal, fracture, and

13   penetration without tilt.

14   A.   Yes.

15   Q.   Okay.   Look at the next page of this PowerPoint.   Do you   03:38:50

16   see that this is -- someone charted the migrations of all of

17   the devices that were implanted in this study?   Do you see

18   that?   Do you see those diamonds all over the place?

19   A.   I see the diamonds but I haven't read the slide yet.

20   Q.   Well, zero is where they would have implanted it; correct?  03:39:19

21   A.   Give me a moment to read, please.

22   Q.   Okay.

23   A.   I'm sorry.   Ask me again, please.

24   Q.   Now, this is showing a diagram of the device and the

25   patients in this study and where the device was found in        03:39:43

United States District Court

ROBERT M. CARR, JR. - Direct

1    relationship to where it was implanted; correct?  Do you see          03:39:49
2    the dark line?
3    A.   Yes.
4    Q.   And it looks like more than 50 percent of these -- we can
5    count them but I don't want to take the time to do that --            03:40:03
6    migrated more than one centimeter?
7    A.   No, I don't believe that.
8    Q.   Okay.  Well, it's pretty clear -- if you just look at
9    this, you'll see that there were 50 that migrated somewhere
10   between zero and almost 20 millimeters.                               03:40:24
11   A.   Yes.
12   Q.   And another 10 that went beyond 20 millimeters or beyond
13   two centimeters; right?
14   A.   Which is what is considered migration, yes.
15   Q.   I'm sorry which is considered migration.                         03:40:44
16   A.   Yes.
17   Q.   Well, I understand that but doesn't this graph, just
18   looking at it, wouldn't this tell anybody, especially an
19   engineer, that we've got a stability problem with the G2 filter
20   from our one and only pilot clinical study that we did both           03:40:58
21   going up and going down?
22   A.   No, it wouldn't.
23   Q.   You don't -- do you have another comparison of another
24   study you did that would give us a better baseline as to
25   whether the device should have stayed in the middle?                  03:41:15

United States District Court

ROBERT M. CARR, JR. - Direct

1    A.   To me the device did stay in the middle.  Less than two                03:41:19

2    centimeters is not classified as a migration, so there's only

3    10 of these 81 I believe that we would term as migration.

4    Q.   Well, I know that's the company's determination, right,

5    two centimeters?                                                           03:41:34

6    A.   Which has been accepted by the FDA since 1999 I believe or

7    2000.

8    Q.   Well, in fact, the FDA guidance document calls it

9    migration, five millimeters, doesn't it?

10   A.   The guidance document does call it migration at five                  03:41:48

11   millimeters but, again, when we first spoke to the FDA

12   developing our specifications all the way back in either '99 or

13   2000, we had a conversation with them and decided --

14           MR. LOPEZ:  Objection, Your Honor.  Now, he's just

15   making a speech and it's hearsay.                                          03:42:10

16           THE COURT:  Hold on just a minute.  Well, I can't

17   read the question because my LiveNote is not up.  I thought it

18   was responsive.  So I'm going to let him finish.

19           MR. LOPEZ:  I just asked him if in the guidance

20   document it said five millimeters.                                         03:42:25

21           THE COURT:  No.  You asked him what the FDA standard

22   was and I think he's now responding so I'm going to let him

23   finish the answer.

24           THE WITNESS:  So back in our original conversations

25   with the FDA, we -- Dr. Kaufman and other, Dr. Simon, felt that            03:42:41

ROBERT M. CARR, JR. - Direct

1    the specification should be two centimeters mostly due to the        03:42:48

2    ability to image accurately and that anything less than that

3    was due to either the patient's position or just other imaging

4    specificity.

5            So since that time, two centimeters has been our          03:43:04

6    specification and we have many submissions to the FDA where

7    they have concurred with that.

8    BY MR. LOPEZ:

9    Q.    Okay.  Now, let's just look at this slide.  We don't have

10   to talk about the FDA or anything.  Let's talk about what we're    03:43:15

11   seeing on this slide.  What we know from this slide is that in

12   83 patients who only had this device in for 180 days or less,

13   there are a number of both cephalad and caudal migrations,

14   whether it's five millimeters, it's moving off the center line;

15   correct?                                                            03:43:41

16   A.    Again, no.  You cannot say that it is moved less than that

17   number.  You can't accurately determine how it's moved.  That's

18   why the specification is two centimeters.

19   Q.    Sir, I'm just talking about what's on this chart.  You can

20   see -- we can all see what's on the chart; right?                  03:43:57

21   A.    We can.

22   Q.    Now, these patients had this device in them for no more

23   than 180 days and the device was removed correct?

24   A.    No, I don't think that's accurate.

25   Q.    Let's assume that most of these people, the device was       03:44:12

United States District Court

1046
ROBERT M. CARR, JR. - Direct

1  removed and this is how they found their device.  Do we know                03:44:14
2  what these -- where these diamonds might have been in those
3  patients had the device stayed in them for another year or two
4  years or three years?  Some of these people that are less than
5  two centimeter migrations.  Any idea?                                       03:44:31
6  A.    So I'm not going to assume that these devices were or were
7  not removed.  It doesn't say it.  You said that ten of these
8  devices have moved.  That's what it says.
9  Q.    All right.  Now, do we know what happened to any of these
10  patients had they been followed and kept in this study for                 03:44:52
11  another year or two years where these various diamonds might
12  have gone, any idea?
13  A.    If they were removed, nowhere but I don't know.
14  Q.    If they were kept in, we don't know, do we?
15  A.    If we don't see it we can't know, no.                                03:45:10
16  Q.    And the study was not designed to follow patients into
17  longer periods of time, a year or two years or three years down
18  the road, to see what the migrations may have been with the G2
19  filter; true?
20  A.    No.  There was a period of time that they were followed             03:45:25
21  and I don't know it.  I have to look at the protocol to see
22  where patients were followed.  Every study is truncated at some
23  point.
24  Q.    "Truncated" meaning at 180 days in the EVEREST study?
25  A.    Again, I would need to look at the protocol to know.                03:45:41

ROBERT M. CARR, JR. - Direct

| | | |
|---|---|---|
| 1 | Q.    "Truncated" meaning what, they stopped following the | 03:45:44 |
| 2 | patients? | |
| 3 | A.    Yes.  Unless they came back for removal. | |
| 4 | Q.    Let's look at the next slide, number ten.  This shows | |
| 5 | filter penetrations and these are all patients in the pilot | 03:45:56 |
| 6 | study; right? | |
| 7 | A.    It's not a pilot study, first of all. | |
| 8 | Q.    I'm sorry, in a clinical study for retrievability.  These | |
| 9 | are the penetrations that are noted? | |
| 10 | A.    Can you go back so I can read the slide, please.  Okay. | 03:46:13 |
| 11 | Q.    And then someone plots in the next slide that filter tilts | |
| 12 | in various IVC diameters, do you see that? | |
| 13 | A.    Yes. | |
| 14 | Q.    And then there's a summary on slide 14 of the | |
| 15 | complications in EVEREST.  The greatest number of complications | 03:46:45 |
| 16 | is associated with penetrations, 18 out of 83; followed by | |
| 17 | tilts, 15 out of 83; caudal migrations, 10 out of 83, and a | |
| 18 | single fracture.  80 percent of caudal migrations are | |
| 19 | associated with other complications, namely tilt and | |
| 20 | penetrations. | 03:47:12 |
| 21 |             Did I read that correctly? | |
| 22 | A.    Yes. | |
| 23 | Q.    Meaning that if you had caudal migration, there was a | |
| 24 | pretty strong connection to tilt and penetrations; true? | |
| 25 | A.    I think either, not both. | 03:47:29 |

United States District Court

ROBERT M. CARR, JR. - Direct

1    Q.    Okay.  If you look at -- there's another slide.  We went          03:47:31

2    over this slide with Mr. Randall.  Now, was there a medical

3    monitor that was assigned to keep track of all of these so that

4    this information could be included in the company's evaluation

5    of this device's safety and effectiveness?                             03:48:03

6    A.    Yes, in all clinical trials.

7    Q.    Was that Dr. Kris Kandarpa?

8    A.    I think so, yes.

9    Q.    Do you know Dr. Kandarpa?

10   A.    No, I don't.                                                      03:48:18

11   Q.    Do you know that he was the one in charge of actually

12   monitoring these devices -- I'm sorry, monitoring the patients

13   and making sure that the patients were appropriately monitored

14   and that if there was a reason to stop the study, he could be

15   in a position to do that; right?                                       03:48:35

16   A.    There's a Safety Monitoring Board which he was the chair

17   of I believe.

18   Q.    All right.

19   A.    So not just him.

20   Q.    And did the company get monthly or periodic medical              03:48:44

21   monitoring minutes?

22   A.    I don't know.

23         MR. LOPEZ:  Could we show Exhibit 704, please, just

24   to the witness.

25   \\\

United States District Court

ROBERT M. CARR, JR. - Direct

1    BY MR. LOPEZ:                                                          03:49:22

2    Q.   Now, Mr. Carr, you've seen the adjudicated data from the

3    medical monitoring data service involved in this clinical

4    trial, haven't you?

5    A.   I've seen the final report, if that's what you're         03:49:31

6    referring to, of the clinical study.

7    Q.   Okay.  Will you look at your deposition that was taken on

8    March 4, 2010, page 116?  Do you have that in front of you?

9    A.   I have page 116 in front of me.

10   Q.   Did you see any reports that indicated any possible        03:50:09

11   solutions to the tilting and penetration and you were asked

12   within the trial and your answer was no.

13          Of those three cases in the trial -- question:  Do

14   you know if any such report was generated that would go through

15   the possible causes and possible solutions?                    03:50:24

16          Your answer was:  No.

17          Are you saying you don't know one way or the other?

18          Answer:  No, I don't know that would -- there

19   wouldn't be a report on causes and solutions.

20          Why not?                                                 03:50:39

21          Answer:  Because it's a clinical trial and an

22   individual case report.  So what happened is reported and

23   whatever knowledge a physician had of that patient would be

24   documented there.

25          Question:  Would you go to research and development      03:50:50

ROBERT M. CARR, JR. - Direct

1   so that these events could be taken into consideration?          03:50:53

2               Answer:  Of course.  I'm aware of the trial.

3               Question.  And how were you made aware of it, by an

4   email?  By a letter?  By just actually getting the clinical

5   trial report on the individual subject?  Or just how did you      03:51:05

6   come about to know of it?

7               Answer:  I don't know that I've seen the individual

8   patient report.  I've seen the adjudicated data from the

9   medical monitor data service that does the -- takes all the

10  data in and generates the clinical report, which we then use to   03:51:25

11  file in our 510(k) with the FDA to get removal indication.  So

12  through that review, through the filing of the 510(k) is when I

13  was -- and then you were asked:  This would be a filing of the

14  510(k) after 2005; is that right?

15              And you said:  Correct.                                03:51:43

16              So does this refresh your recollection, sir, that you

17  actually were getting -- you were in communication with the

18  medical monitor and actually looking at these reports that were

19  being generated?

20  A.   Absolutely not.  I've never spoken to the medical monitor    03:51:55

21  or been involved in those communications.  As I said earlier, I

22  did read the final study report.

23  Q.   Okay.  You said I've seen -- I've seen the adjudicated

24  data from the medical monitor data service?

25  A.   Which is the data included in the study report.             03:52:11

United States District Court

ROBERT M. CARR, JR. - Direct

 1   Q.   Okay.  And was that company that provided data service    03:52:13

 2   BBA, known as BBA in Northborough, Massachusetts?

 3   A.   I don't know BBA.

 4   Q.   But you do know Dr. Krishna Kandarpa?

 5   A.   No, I don't.                                              03:52:31

 6   Q.   But you know that he was the medical monitor; correct?

 7   A.   Yes.

 8   Q.   And that he provided reports -- well, at the time he was

 9   acting on behalf as an agent of Bard for purposes of monitoring

10   the patients and reporting to Bard his findings; true?         03:52:43

11   A.   I have no idea.

12   Q.   You really have no idea?

13   A.   I really have no idea.

14   Q.   But you know who Dr. Kris Kandarpa is?

15   A.   I just said I don't.                                      03:52:57

16   Q.   I thought you said earlier that you knew who he was.

17   A.   No, I didn't.

18          MR. LOPEZ:  Your Honor, I would like to show Mr. Carr

19   Exhibit 704.

20   BY MR. LOPEZ:                                                  03:53:20

21   Q.   Do you know who Elizabeth Rutter is?

22   A.   No, I don't think so.

23   Q.   Do you recognize any of the names on this exhibit?

24   A.   Kris Kandarpa.

25   Q.   I thought you said --                                     03:53:32

United States District Court

ROBERT M. CARR, JR. - Direct

1   A.   We've just been speaking about him.                          03:53:34

2   Q.   Okay.  And then if you look at the back page --

3        MR. LOPEZ:  Go to the second-to-the-last page.

4   BY MR. LOPEZ:

5   Q.   Do you see where your company's logo is there?  That's the   03:53:50

6   company logo; right?

7   A.   Yes.

8   Q.   And if you look at page 6 of 20, I'm sorry, page eight of

9   20, do you know what that is?

10  A.   It says Attachment B, Detailed Summary of Selected            03:54:18

11  Patients.

12  Q.   These are about patients in the EVEREST study; right?

13       MR. NORTH:  Objection, 602.

14       THE WITNESS:  I've never seen this document before.

15  I don't know what they are, but I would assume that's what it     03:54:29

16  says.

17  BY MR. LOPEZ:

18  Q.   But this is an official document sent from the medical

19  monitor of the EVEREST trial?

20  A.   I don't know what it is, sir.                                 03:54:38

21       MR. LOPEZ:  Your Honor, I'm going to offer 704 at

22  this time.

23       MR. NORTH:  Objection, Your Honor.  901.  It is not a

24  Bard document.  802, hearsay.

25       THE COURT:  Sustained on hearsay grounds.                     03:54:55

United States District Court

ROBERT M. CARR, JR. - Direct

1    MR. LOPEZ:  It is a Bard document.                    03:54:57

2    THE COURT:  Sustained on hearsay grounds.

3  BY MR. LOPEZ:

4  Q.   Were you ever advised, Mr. Carr, while you were -- while

5  the EVEREST study was going on that the medical monitor,      03:55:10

6  Dr. Kandarpa, suggested that that -- he suggested that the

7  study stop because of all of the complications that were

8  happening within the study?

9  A.   No.

10  Q.   Have you ever read anything that says that?             03:55:25

11  A.   No.

12  Q.   Were you aware that Dr. -- did anyone ever tell you that

13  Dr. Kandarpa suggested that because of what he saw in the

14  study, that the company should redesign the G2 filter?

15  A.   No.                                                     03:55:49

16  Q.   I provided a number of documents to your counsel yesterday

17  or the day before that relate to the medical monitor

18  adjudication meeting minutes.  Did you review those before you

19  came here today to see if they refresh your recollection about

20  whether or not you were aware of any of the information        03:56:12

21  contained within those meeting minutes?

22  A.   No.

23  Q.   Did you, as part of your work on the G2 filter, ask to

24  have done what is known as a caudal Push Test?

25  A.   I believe so, yes.                                       03:56:35

United States District Court

ROBERT M. CARR, JR. - Direct

1    Q.    Pardon me?                                                         03:56:36

2    A.    I believe so, yes.

3    Q.    1578, please.  So before I move on to this, after the

4    results of the EVEREST study, didn't the results of the EVEREST

5    study, the number of tilts, the number of migrations, the           03:56:57

6    number of perforations, and the number of fractures confirm

7    what the signal that the company was getting just from the

8    adverse event reports that were coming in the first three or

9    four months that the device was on the market?

10   A.    I'm not sure what you mean by "confirm."                        03:57:20

11   Q.    In other words, if the company was seeing caudal

12   migrations, tilts and fractures and sometimes in a combination

13   of two or more of those in the first three or four months it

14   was on the market, the EVEREST study confirmed those same types

15   of events, didn't they?                                              03:57:38

16   A.    They are known complications and so all filters have all

17   of those events.

18   Q.    I didn't ask you that.  I asked you whether or not what

19   you were seeing in the adverse events that was causing concern

20   at the company and the concern that the device needed to be         03:57:59

21   redesigned, did you see further confirmation of that in the 83

22   patients that were in the EVEREST study, yes or no?

23   A.    No.

24   Q.    Did the EVEREST study give you a rate significantly higher

25   for tilt high immigration and perforation than what you were        03:58:19

United States District Court

ROBERT M. CARR, JR. - Direct

1  seeing in the reports that were being voluntarily sent to your      03:58:23

2  company by doctors?

3  A.    Yes.

4  Q.    And did that confirm to you when you saw the 12 percent

5  and the 20 percent and those 18 percent complication rates for      03:58:37

6  those things that what you were getting in the field, in other

7  words from doctors, was a much smaller percentage of the

8  reality that was happening in patients?

9  A.    No.

10  Q.    Okay.  So the EVEREST study was a controlled study that       03:58:55

11  had the complications that we've already seen; right?

12  A.    Yes.

13  Q.    Doesn't a clinical study where patients are actually being

14  monitored, doesn't that give you better data on rates than an

15  unknown underreporting and unknown lot of things about adverse      03:59:16

16  event reporting to the MAUDE database and to the company?

17  A.    Yes.

18  Q.    Okay.

19             MR. LOPEZ:  And let's look at 1578.

20  BY MR. LOPEZ:                                                        03:59:33

21  Q.    So if there was any doubt that what was being reported to

22  the company in the three or four months was just the tip of the

23  iceberg, that problem got answered and resolved once you

24  started seeing the results in the EVEREST study; true?

25  A.    Again, I don't know what you're referring to.                 03:59:45

United States District Court

ROBERT M. CARR, JR. - Direct

1  Q.  Well, tip of the iceberg means you're only seeing just a          03:59:47
2  small little percentage of what might actually be happening
3  with this product in patients.  And what the EVEREST study did
4  was to show the company that what they actually were seeing --
5  that was actually causing them concern in the first three or          04:00:04
6  four months that this device was on the market was actually
7  borne out in much higher rates once the company did a clinical
8  trial; true?
9  A.  I don't know the rates that you're referring to in the
10 beginning.  I know there were four and three observations.  The       04:00:18
11 data in the clinical trials stands on its own.  I'm not sure of
12 the question.
13 Q.  Okay.  Let's look at 1578 and is this is Caudal Migration
14 Test Method Development and G2 Filter Resistance Test Report
15 that you're familiar with?                                            04:00:43
16 A.  I don't know if it's the final one but that's what the
17 title says.
18 Q.  Did you bring one that is different than the one that we
19 have on the screen right now?
20 A.  Again, I didn't bring anything.                                   04:00:53
21 Q.  You saw this before you testified?
22 A.  If this is the final one?
23 Q.  If there was a final one that wasn't this one, you have
24 access to it?
25 A.  Me personally?  It would be in our files.                         04:01:07

United States District Court

ROBERT M. CARR, JR. - Direct

1   Q.   When you got this, did you check it out to see if this was          04:01:10
2   not the final report?
3   A.   I don't know what you mean by when I got it.
4   Q.   Well, yesterday when it was shown to you.
5   A.   I don't know that this was shown to me yesterday.          04:01:21
6   Q.   All right.  Let's look at this.  So this is project 8049.
7   What is 8049?
8   A.   The project number.
9          MR. LOPEZ:  I would like to offer 1578 into evidence
10  at this time, Your Honor.          04:01:42
11          MR. NORTH:  No objection.
12          THE COURT:  1578 is admitted.
13          (Exhibit Number 1578 was admitted into evidence.)
14          MR. LOPEZ:  May I publish it to the jury?
15          THE COURT:  Yes.          04:01:48
16  BY MR. LOPEZ:
17  Q.   Okay.  If you look at the bottom, it says date approved,
18  11-27-06?
19  A.   Yes.
20  Q.   Can we agree that this is a final report?          04:01:59
21  A.   Usually it would have a signature page on it.
22  Q.   First of all, tell the jury what is a caudal migration --
23  what this test report is?
24  A.   Can you make it bigger so that I can read it?  The
25  objective of the study was to evaluate multiple caudal          04:02:28

United States District Court

ROBERT M. CARR, JR. - Direct

1  migration resistance test methods and then use these test                    04:02:31
2  methods to evaluate the caudal migration resistance of the G2
3  filter versus other commercially available filters.
4  Q.    Okay.  Is this the first time that the G2 has been
5  subjected to this type of test?                                              04:02:45
6  A.    Maybe.
7  Q.    You say maybe?
8  A.    I did.
9  Q.    Well, I mean, is there another test that you think might
10 exist that we didn't get?                                                    04:02:58
11 A.    No.
12 Q.    Have you seen another test other than this one as it
13 relates to G2?
14 A.    There might be some laboratory notebook stuff that was
15 done prior to this.                                                          04:03:10
16 Q.    The Recovery filter also experienced some issues with
17 caudal migration; true?
18 A.    I don't recall that, no.
19 Q.    And this device had caudal migration where we just saw a
20 document by March I think of 2006 it was determined to have an               04:03:24
21 unacceptable risk of caudal migration.  Do you remember seeing
22 that?
23 A.    I do because there was no control in place at the time to
24 mitigate it.
25 Q.    Okay.  Now we have a caudal Push Test that's done in --                04:03:36

United States District Court

ROBERT M. CARR, JR. - Direct

1   well, we know it's approved November of 2006 so sometime near          04:03:41

2   the end of 2006; correct?

3   A.   It appears so, yes.

4   Q.   And if you look at page seven of 21, you'll see that all

5   of the devices against which the G2 was going to be tested            04:04:03

6   against for caudal migration resistance; true?

7   A.   Okay.  Yes.

8   Q.   There's the Simon Nitinol, Recovery, the Greenfield, and

9   then Tulip and OptEase, the top three being competitors of

10  Bard; right?                                                          04:04:28

11  A.   Yes.

12  Q.   Let's go to page 11 of 21.  And here are some of the

13  results of these tests.

14          MR. LOPEZ:  Can you blow that up, Greg, the graph?

15  It's difficult to see but maybe we can -- actually, it's better       04:04:48

16  blown up.

17  BY MR. LOPEZ:

18  Q.   So that if we look at this, we see that all of the devices

19  that were tested are on this graph; correct?

20  A.   Yes.                                                             04:05:04

21  Q.   And the G2 is the diamond.

22          MR. LOPEZ:  Can I actually do this, Your Honor,

23  circle it on this?

24          THE COURT:  Can you do it?

25          MR. LOPEZ:  I mean, is there a way for me to touch it          04:05:14

1060

ROBERT M. CARR, JR. - Direct

| 1 | or does the witness have to do it? | 04:05:16 |

2         THE COURT:  Traci, can you turn that on?

3         I think if you do it on the monitor to your left, it

4 might work.

5         COURTROOM DEPUTY:  Yes, this one.     04:05:27

6 BY MR. LOPEZ:

7 Q.   Okay.  So the diamond is the G2; correct?  Do you see

8 that?

9 A.   The open diamond, yes.

10 Q.   And then the Recovery -- I'll tell you what, I'm going to     04:05:41

11 let you circle where the Recovery is.  I can't tell.  It looks

12 like it's right above the diamond.

13 A.   I think it's the one right above the diamond.

14 Q.   Okay.  Let me circle it.

15         And Simon Nitinol filter is this square right here;     04:05:58

16 right?

17 A.   The open square, yes.

18 Q.   And this depicts the average load, peak load for caudal

19 migration.  Is it pretty clear that the G2 is lower than the

20 Recovery and the Simon Nitinol filter?     04:06:16

21 A.   Yes.

22 Q.   And it's lower than T, which is TRAPEASE, right, a

23 competitor?

24 A.   It's lower than all but one.

25 Q.   And it's lower than OptEase, another competitor; right?     04:06:29

United States District Court

ROBERT M. CARR, JR. - Direct

| | |
|---|---|
| 1 | A.   Yes. | 04:06:32 |

2   Q.   And if you look at the bottom of this page, it actually

3   gives you the values -- I'm sorry.  Let's go to the next page,

4   page 12 of 21.

5              MR. LOPEZ:  Can you highlight the first three?  Just    04:06:55

6   do the whole table, Greg.  That's fine.

7   BY MR. LOPEZ:

8   Q.   And you see the G2, T for Tulip, the Simon Nitinol filter

9   and OptEase and do you see the values, the mean values --

10  A.   I do.                                                         04:07:09

11  Q.   -- for caudal migration.  I mean, all of these other

12  devices, at least with respect to this test, resist the caudal

13  migration at least almost ten times or more than the G2 filter;

14  correct?

15  A.   Yes.                                                         04:07:28

16  Q.   And that was tested in a 15 millimeter cava and then a 21

17  millimeter cava and let's go to a 28 millimeter cava and you'll

18  see that in every one of these, the G2 filter was significantly

19  less resistant to caudal migration in this testing than any

20  other device that it was tested against; correct?                 04:07:56

21  A.   I've only seen the 15 so far.

22  Q.   Pardon me?

23  A.   The other ones have not come up yet.  Yes.

24  Q.   G2 21 -- let's just quickly show page 13, 21 millimeter.

25  A.   Yes.                                                         04:08:23

United States District Court

1062

ROBERT M. CARR, JR. - Direct

1   Q.   Do you see that?  Not even close, right, in comparison to      04:08:23

2   others?

3   A.   It's less, except for the Greenfield.

4          MR. LOPEZ:  And if you go to page 17 of 21, show us

5   that top box, please.                                              04:08:51

6   Q.   This test actually measured how far each one of these

7   devices would migrate in a caudal direction.  Do you see that?

8   A.   Yes.

9   Q.   And that is that 11 centimeters?

10  A.   I don't know.                                                  04:09:19

11  Q.   But the G2 was clearly outperformed by every other device

12  that it was tested against?

13  A.   No.

14  Q.   Except for which one?

15  A.   Recovery and Greenfield.                                      04:09:29

16  Q.   Well, wait a minute.  The G2 migrated 11 and the Recovery

17  10 and the Greenfield 9.

18  A.   There's no difference between those numbers statistically.

19  Q.   Okay.  But just on the numbers, the migration, the

20  distance of migration as recorded here, the mean, the G2 was      04:09:51

21  the highest?

22  A.   Yes, but not statistically different.

23         MR. LOPEZ:  Okay.  Let's go to page 21 of 21, please.

24  BY MR. LOPEZ:

25  Q.   They call this a Push Test; right?                            04:10:18

United States District Court

ROBERT M. CARR, JR. - Direct

1    A.   Of the tests that were developed, yes, they called it a        04:10:25

2    Push Test.

3           MR. LOPEZ:  Can we have that first full paragraph,

4    Greg, highlighted.  I'm sorry, not highlighted but blown up.

5    BY MR. LOPEZ:                                                       04:10:36

6    Q.   So the Push Test, which is the test that we're talking

7    about, was found to be the most accurate and consistent test

8    method and was best able to evaluate filter caudal migration

9    resistance while at the same time providing quantitative data;

10   correct?                                                           04:10:54

11   A.   That's what it says.

12   Q.   In fact, it says it again in the last paragraph:   In

13   conclusion, the paragraph just below this one:

14           In conclusion, the Push Test was the most successful

15   test method and should be used as the primary test method for      04:11:09

16   evaluating the caudal migration resistance of filters in the

17   future.

18           Correct?

19   A.   That's what it says, yes.

20   Q.   So you didn't find anything wrong with the test.  It was a    04:11:20

21   good test.  It was the kind of test that you thought even in

22   the future should be run on filters to see if there was a

23   problem at least on the bench with caudal migration?

24   A.   The goal was to develop a good test, yes.

25   Q.   And a test that you performed in the latter part of 2006?     04:11:37

United States District Court

ROBERT M. CARR, JR. - Direct

1   A.   That's when this was developed.                          04:11:45

2   Q.   About six months before Sheri Booker got her G2 filter?

3   A.   I don't know.

4   Q.   You don't know when Sheri Booker, the plaintiff in this

5   case, got her G2 filter?                                      04:11:53

6   A.   The date, no.

7   Q.   Do you know what happened to her?

8   A.   Generally.

9   Q.   Tell us what you know about what happened to her.

10          MR. NORTH:   Objection, 402.                          04:12:04

11          THE COURT:   Sustained.

12  BY MR. LOPEZ:

13  Q.   Was Sheri Booker's doctor, her hospital or anyone else in

14  the medical community advised, number one, that even in the

15  bench testing, that your device was much, much worse than both  04:12:18

16  the Recovery filter and the Simon Nitinol filter?

17  A.   No, because it wasn't much, much worse.

18  Q.   Okay.  And was Sheri Booker's doctors, anyone in the

19  medical community advised that in addition to this bench --

20  this caudal Push Test showing the G2 to be inferior to the    04:12:40

21  other devices it was tested against, that the company was still

22  trying to figure out how to redesign it to deal with caudal

23  migration?

24  A.   First off, it wasn't inferior to all of the other filters.

25  And, no, they were not told.                                  04:12:56

United States District Court

ROBERT M. CARR, JR. - Direct

1    Q.   Sir, do you agree that the Simon Nitinol filter is the          04:13:12

2    baseline predicate for safety and effectiveness for both the

3    Recovery and the G2?

4    A.   The SNF is the predicate device for Recovery and Recovery

5    is the predicate device for G2 I believe.                            04:13:28

6    Q.   Okay.  My question is a little different than that.  Are

7    all three devices that are used -- I'm sorry.  Was the Simon

8    Nitinol filter the baseline predicate device for both the

9    Recovery and the G2?

10   A.   I think I answered that.  Sorry.  SNF was the -- one of         04:13:50

11   the predicate devices for Recovery.  Greenfield was the other

12   one.  And for G2, I believe Recovery was the predicate device.

13   Q.   But in reality, regardless of what predicate device was

14   used for the G2, it needed to be substantially equivalent from

15   a safety and effectiveness standpoint as the Simon Nitinol        04:14:26

16   filter?

17   A.   As the predicate device.

18   Q.   Let's look at one more document, 703.  I'm sorry, not 703.

19        5303, please.  Sir, are you familiar with the

20   document that is in front of you right now?                          04:15:48

21   A.   Yes.

22   Q.   G1A Recovery Filter Femoral System Design Verification and

23   Validation Report.  How are you familiar with this?

24   A.   It's the verification and validation report that was used

25   to support the G2 submission to the FDA.                             04:16:08

United States District Court

ROBERT M. CARR, JR. - Direct

1    MR. LOPEZ:  I would like to offer Trial Exhibit 5303    04:16:16

2  into evidence at this time.

3    MR. NORTH:  No objection, Your Honor.

4    THE COURT:  Admitted.

5    MR. LOPEZ:  May I publish to the jury?    04:16:25

6    THE COURT:  Yes.

7    (Exhibit Number 5303 was admitted into evidence.)

8  BY MR. LOPEZ:

9  Q.    How is it you are familiar with this?  Were you involved

10  in these actual studies directing people what to do or not do?    04:16:36

11  A.    I was -- I don't know if I was the still in charge of

12  filters at the time, but I was generally aware of what was

13  going on, yes.

14  Q.    Okay.  Let's quickly go to page 13 of 20.

15    MR. LOPEZ:  Greg, can you just bring up the top two    04:17:04

16  tables at the very top there?  Right.

17  BY MR. LOPEZ:

18  Q.    And, again, this test was being conducted for the purposes

19  of substantial equivalence to support the G2 clearance in the

20  510(k) process; right?    04:17:21

21  A.    Yes.

22  Q.    And acceptance criteria was G1A filter must have

23  equivalent or less variation as SNF; correct?

24  A.    Yes.

25  Q.    And then down below, G1A filter must be statistically    04:17:37

United States District Court

ROBERT M. CARR, JR. - Direct

| | | |
|---|---|---|
| 1 | equivalent or greater than SNF.  Do you see that? | 04:17:40 |
| 2 | A.   Yes, I do. | |
| 3 | Q.   And the G1A -- I think we mentioned this earlier but | |
| 4 | that's actually the G2; right? | |
| 5 | A.   That's correct. | 04:17:52 |
| 6 | Q.   And then go to the next page, please, going, 14 and the | |
| 7 | first two again tables.  One of the filter migration tests, | |
| 8 | acceptance criteria.  G1A filter must have equivalent or less | |
| 9 | variation as SNF; correct? | |
| 10 | A.   Yes. | 04:18:16 |
| 11 | Q.   Because the SNF was going to be the predicate device in | |
| 12 | order to get clearance from 510(k) to be marketed; correct? | |
| 13 | A.   Yes. | |
| 14 | Q.   And then the next one, G1A must be statistically | |
| 15 | equivalent or greater than SNF and that test failed.  Do you | 04:18:35 |
| 16 | see that? | |
| 17 | A.   I do. | |
| 18 | Q.   And then as we go down through this document, we'll see | |
| 19 | other areas where the G1A filter was at least the -- the | |
| 20 | threshold was it was supposed to be statistically greater than | 04:18:57 |
| 21 | the SNF; right? | |
| 22 | A.   Equivalent to or greater and that was the initial | |
| 23 | acceptance criteria. | |
| 24 | Q.   So we saw at least one of these tests had failed in that | |
| 25 | acceptance criteria; right?  We just showed that to the jury. | 04:19:08 |

ROBERT M. CARR, JR. - Direct

1    A.   Yes, and there's an explanation in the paragraph          04:19:12
2    following.
3    Q.   Well, let's look at page 20 of 20.  And the acceptance
4    criteria for purposes of filter migration was originally
5    migration resistance of G1A must be statistically equivalent to  04:19:33
6    or greater than that of the SNF filter; right?
7    A.   Yes, same as before.
8    Q.   And what happened was, there was a decision made that the
9    filter migration resistance would be changed to migration
10   resistance of G1A must be statistically greater than that of    04:19:53
11   the RNF filter in a 28 millimeter diameter simulated IVC.
12   A.   That's correct.
13           THE COURT:  Mr. Lopez, we're at 4:20 so we're going
14   to break at this point.  We'll resume in the morning.
15           Ladies and gentlemen, we'll see you at 9 o'clock.      04:20:14
16   Thank you very much.
17           (Jury departs at 4:20.)
18           THE COURT:  You can step down, sir.
19           Please be seated.  Counsel, how have you allocated
20   the time for the depositions that were played today?           04:20:49
21           MS. HELM:  Your Honor, we've met on it and 62 minutes
22   should be applied to the defendants.
23           THE COURT:  Okay.  Give me just a minute then.
24           All right.  Counsel, as of the end of today,
25   plaintiffs have used 19 hours and 55 minutes; defendants have  04:23:15

United States District Court

1069
ROBERT M. CARR, JR. - Direct

1  used 5 hours and 57 minutes.                                          04:23:20

2       I received this afternoon another deposition

3  designation with more than 30 exhibits in it.  It's the

4  Sullivan deposition designation.  Are you really planning to

5  play Sullivan?  I trust you're going to play every one of the   04:23:39

6  deposition designations that I've spent hours reviewing.  And

7  if that's not true, then I would really rather not keep getting

8  them until you really know you're going to use them.  So my

9  question is, on Sullivan, are we really going to use Sullivan

10 and do I need to rule on the 31 objections in that deposition?  04:23:55

11      MR. O'CONNOR:  I think we are planning on using

12 Sullivan, Your Honor.

13      THE COURT:  That's not a very firm response, Mr.

14 O'Connor.

15      MR. O'CONNOR:  Well, I mean, we have to look at our      04:24:09

16 time now but we plan to play him as a regional sales manager.

17      THE COURT:  And so you are planning to use him?

18      MR. O'CONNOR:  Yes.

19      THE COURT:  How about the other 13 that I've ruled on

20 so far?                                                          04:24:24

21      MR. O'CONNOR:  Well, we'll have to take a look at

22 those.

23      MR. LOPEZ:  I mean, we want to.

24      THE COURT:  When do you think you want Sullivan?

25      I'll tell you I don't think I can get it to you until   04:24:44

United States District Court

ROBERT M. CARR, JR. - Direct

 1   the weekend.  I don't have time this evening, I don't have time          04:24:46

 2   tomorrow night.  I could probably look at it Friday night

 3   maybe, sometime on Saturday but --

 4            MR. LOPEZ:  We're probably going to have to rest

 5   before then, Your Honor.                                                04:24:58

 6            THE COURT:  Based on what you said, you're going to

 7   rest tomorrow?

 8            MR. LOPEZ:  Pardon me?

 9            THE COURT:  I think you said earlier you're going to

10   rest tomorrow so what were you planning to do with Sullivan             04:25:06

11   when it came in today?

12            MR. LOPEZ:  Play it tomorrow.

13            THE COURT:  Well, I'm sorry.  It's too late for me to

14   get you rulings today on Sullivan.  If you want to read

15   portions, I can rule on objections as we read.                          04:25:22

16            MR. LOPEZ:  Maybe we'll do that.

17            THE COURT:  But I think that's the alternative,

18   because we just ran out of time for me to get you anything

19   tonight.

20            Okay.  So I wouldn't plan on doing Sullivan on the             04:25:38

21   weekend unless you let me know but if you want to read portions

22   of Sullivan tomorrow, make sure that you have a copy of the

23   deposition transcript for me to follow along and I'll listen to

24   objections as it's read and I'll rule as we go.

25            I will mention, by the way, you probably aren't                04:25:55

United States District Court

ROBERT M. CARR, JR. - Direct

1   surprised by this, Nancy told me that as the jurors were          04:25:57

2   leaving for lunch, a few of them turned to her and said,

3   "Please, no more video depositions."  I said the jurors made a

4   plea to Nancy as they were leaving at the end of the morning

5   session, "Please, no more video depositions."  I think they are   04:26:13

6   a little tired of watching them just something for you to

7   factor in.

8          All right.  On the FDA warning letter, I think I do

9   need to get some submissions from you on what are the contents

10  and the dates of the complaint so that I can make a more          04:26:37

11  information decision.  I assume this could be used in the

12  rebuttal case if the plaintiff decides to use it.  But it's not

13  something that I think I am going to make an informed decision

14  on without knowing more about the nature of these complaints.

15         I will tell you I'm not persuaded by parts seven and       04:26:55

16  eight.  Those seem to me to be pretty tangential.  To me the

17  key issue is part three that talks about G2 compliance, but I

18  think I need to know more about those to really evaluate

19  relevance.  So the question is, when and how do you want to

20  submit that to me?                                                04:27:13

21         MR. NORTH:  We can have something by the close of

22  business tomorrow.  We can have something Friday morning,

23  whatever the Court's schedule.

24         MS. REED ZAIC:  Friday morning would be better.  I'm

25  just thinking of the jury charge conference tomorrow.             04:27:26

United States District Court

ROBERT M. CARR, JR. - Direct

1    THE COURT:  If it's reserved for the rebuttal, you          04:27:29

2    can even do it over the weekend.  I don't want to press you

3    because you've got other things to do and your trial work, but

4    I want to get you the ruling in as timely a form as I can.

5    MR. LOPEZ:  Maybe we can wait even during the defense       04:27:46

6    case, Your Honor, if it becomes relevant to cross or something

7    like that.  That's fine with us.

8    THE COURT:  Okay.  So don't feel like you need to get

9    to it me Friday morning.  Why don't you all talk and decide

10   when that ought to get to me and I'll be happy to look at it.  04:27:59

11   MS. REED ZAIC:  Thank you, Your Honor.

12   THE COURT:  We are talking about jury instructions

13   tomorrow at 4:30, so please be prepared for that and the

14   verdict form.

15   And on the question that you raised this morning         04:28:10

16   about overall timing, Mr. Lopez, I looked at the time we have

17   remaining.  Before today we had used 20 hours, 20 hours and

18   four minutes.  If we continue to get five hours and 40 minutes

19   a day, which we have been pretty much doing so far, then we

20   will reach 54 hours, which is the total of both sides, by the  04:28:35

21   close of trial next Wednesday.

22   If we then on Thursday, when I wanted to get it to

23   the jury, we could add four hours, we would get it to the jury

24   by 2:15, which I think would be as good as we could hope for.

25   That would give us four additional hours of trial time.  I can  04:29:01

ROBERT M. CARR, JR. - Direct

1   give each side two hours.                                      04:29:05

2            Now, I recognize you're not going to use all of that.

3   It seems to me if we're going to give this jury time to

4   deliberate, that's about as good as we can do.

5            So what I would say is that we ought to -- you ought    04:29:21

6   to assume that you've got two more hours per side.  So a total

7   of 29 rather than 27.  I think we can meet that if we keep

8   going at five hours and 40 minutes per day and get the jury the

9   case by midafternoon on Thursday, which I think is about as

10  late as we can do, especially if we've got to then do some      04:29:40

11  punitive work potentially after the verdict.

12           Any thoughts or comments on that?

13           MR. LOPEZ:  Well, if they don't need all theirs . . .

14           THE COURT:  We can see how it's going next week.  If

15  they finish the defense case with more time remaining than they  04:29:56

16  can use in closing then, yeah, I'll absolutely consider whether

17  that should be given to plaintiffs for rebuttal.  But I

18  think -- I can't tell you now that we're going to do that

19  because they are entitled to use the time they have been

20  allotted.                                                        04:30:11

21           MR. NORTH:  Your Honor, I have one concern about

22  this.  Giving the parties two hours each additionally per se

23  does not concern me.  What concerns me is we've planned our

24  entire case based upon these limits and we have one witness

25  that we have worked out her availability that the only time she  04:30:32

United States District Court

ROBERT M. CARR, JR. - Direct

1  can be here is Friday.  We're prepared to leave -- this Friday.    04:30:35
2  And we thought under the current allocation of hours, there was
3  no question but what we would have the case either tomorrow or
4  Friday.
5          THE COURT:  Let me interrupt you.                          04:30:50
6          I'm assuming you're resting before -- at least before
7  noon on Friday.  Is that fair?
8          MR. LOPEZ:  Our goal is by tomorrow.
9          THE COURT:  I think you're going to be okay for
10 Friday.                                                            04:31:02
11         MR. NORTH:  Okay.  I was just concerned if they
12 tacked two more hours onto their case-in-chief and we didn't
13 get the case until late Friday, we would be in trouble.
14         THE COURT:  I'm assuming you're good still with the
15 estimate.  You'll try to finish tomorrow even with the           04:31:13
16 additional two hours.
17         MR. O'CONNOR:  If we need to pull over and they have
18 to get a witness on before we rest, we have no problem.
19         THE COURT:  Okay.  So I think we're good on that.
20         MR. NORTH:  Okay.  Thank you, Your Honor.                 04:31:27
21         MR. LOPEZ:  Do you have a hearing at 4:30?
22         THE COURT:  I do but I've got some patient lawyers
23 sitting here in the courtroom.  Go ahead and raise the last
24 issue.
25         MR. LOPEZ:  I'm troubled by not being able to get in     04:31:39

United States District Court

ROBERT M. CARR, JR. - Direct

1    documents that are clearly notice documents to the company        04:31:41

2    about a lot of stuff that deals with their risks and the

3    benefits.  I mean, you know, I mean, these are company

4    documents.  They were produced to us by Bard as part of our

5    discovery that these were responses to their adverse events.     04:32:02

6    I've got these meeting minutes that have all of their adverse

7    events on them and I can't cross-examine any witnesses with it

8    unless I find out who it was that created the doggone chart.

9         I mean, I think under that -- because this is a party

10   document and it's really an admission by the company that it --   04:32:19

11   it's not hearsay or it's an exception because, you know, we're

12   offering it for notices.  These are all notice documents to the

13   company about the frequency, severity, and quality of the

14   performance of their device while it was on the market.

15        THE COURT:  Well, when you say you're offering it for       04:32:40

16   notice, you are also offering it for the truth of the matter

17   asserted.  You're saying they learned this true information

18   about the problem with their filter so it's definitely being

19   offered for the truth of the matter asserted.  I have to apply

20   the hearsay rules.  801(d)(2) would allow you to introduce it    04:32:57

21   if you can present evidence that the document was created by

22   somebody who was an agent for the company, authorized to act on

23   behalf of the company.  You have to lay that foundation before

24   I can admit it under 801(d)(2) and that's not a surprise.  That

25   has been a rule of evidence for the last 40 years.               04:33:18

United States District Court

ROBERT M. CARR, JR. - Direct

1        MR. LOPEZ:  Well, I understand but the surprise to   04:33:21

2  me, it's attached to a memo from the president of the company.

3        THE COURT:  You're not talking about meeting minutes.

4  You're switching to the last three pages of 4327.  But as I

5  read that document, it says a rep said this, a doctor said   04:33:37

6  this, a marketing person said this.  It's quoting people so

7  it's clearly a different level of hearsay than the main memo.

8  It's hearsay within hearsay and you've got to have an exception

9  for that second level of hearsay before it comes into evidence.

10  And I haven't heard one articulated yet.   04:34:00

11        MR. LOPEZ:  All right.  We'll get something to you

12  tomorrow morning.

13        THE COURT:  I'll be happy to hear your argument at

14  that point but I understand what you're saying but the hearsay

15  rules apply and they haven't changed in a long time.   04:34:10

16        MR. LOPEZ:  No. I know.  I'm just thinking, you know,

17  under that section that I keep -- there's too many letters.  It

18  looks like alphabet soup to me.

19        THE COURT:  801(d)(2).

20        MR. LOPEZ:  Yes, that it should not be hearsay or   04:34:27

21  there's an exception to hearsay because it's -- the company is

22  on notice.

23        THE COURT:  Well, if you can satisfy the requirements

24  of 801(d)(2), I'll admit the document but you have to satisfy

25  it.  And the fact that they produced it doesn't satisfy it and   04:34:40

United States District Court

ROBERT M. CARR, JR. - Direct

1    that is one of the things that folks try to address in          04:34:45

2    discovery is to cover that ground or by subpoenaing a corporate

3    representative.

4              MR. LOPEZ:  You know, yet we get to read medical

5    articles to the jury like --                                    04:34:57

6              THE COURT:  That's 803(18).  That's a different

7    hearsay rule.

8              MR. NORTH:  Your Honor, we can argue this tomorrow if

9    necessary but I just want the record clear.  A lot of those

10   documents, those minutes, come from this third-party vendor and  04:35:06

11   they are not our company documents.

12             THE COURT:  Well, if you want to argue it tomorrow

13   morning, I'll be happy to hear what you have to say, Mr. Lopez.

14             MR. LOPEZ:  Okay.  Thank you, Your Honor.

15             (Whereupon, these proceedings recessed at 4:35 p.m.)   04:35:19

16                          *  *  *  *  *

17

18

19

20

21

22

23

24

25

United States District Court

ROBERT M. CARR, JR. - Direct

1              C E R T I F I C A T E                          04:35:19

2

3        I, ELAINE M. CROPPER, do hereby certify that I am

4  duly appointed and qualified to act as Official Court Reporter

5  for the United States District Court for the District of        04:35:19

6  Arizona.

7

8        I FURTHER CERTIFY that the foregoing pages constitute

9  a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled     04:35:19

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control, and to the best of

13  my ability.

14

15        DATED at Phoenix, Arizona, this 21st day of March,        04:35:19

16  2018.

17

18

19

20                          s/Elaine M. Cropper                     04:35:19

21                    _____

22                     Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                  04:35:19

United States District Court