March 22, 2018 P.M.

1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3          _____

4
   **In re: Bard IVC Filters,**          )
5  **Products Liability Litigation**     )
                                          )
6                                         )
                                          ) MD-15-02641-PHX-DGC
7  _____       )
   **Sherr-Una Booker, an individual,**  )
8                                         ) Phoenix, Arizona
                   Plaintiff,             ) March 22, 2018
9            v.                           ) 1:00 p.m.
                                          )
10 **C.R. Bard, Inc., a New Jersey**      )
   **corporation; and Bard Peripheral**  ) CV-16-00474-PHX-DGC
11 **Vascular, Inc., an Arizona**         )
   **corporation,**                       )
12                                         )
                   Defendants.            )
13 _____       )

14

15         **BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16         <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

16         <u>**JURY TRIAL - DAY 6 P.M.**</u>

17

18             (Pages 1210 through 1322)

19

20

21 Official Court Reporter:
   **Elaine Cropper, RDR, CRR, CCP**
   Sandra Day O'Connor U.S. Courthouse
22 401 West Washington Street
   Suite 312, SPC 35
23 Phoenix, Arizona  85003-2150
   (602) 322-7245

24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

                United States District Court

March 22, 2018 P.M.

1                          **APPEARANCES**

2

3   For the Plaintiff:
         **RAMON ROSSI LOPEZ, ESQ.**
         Lopez McHugh, L.L.P.
4        100 Bayview Circle, Ste. 5600
         Newport Beach, CA  92660
5        949.812.5771/(fax) 949.737.1504

6   For the Plaintiff:
         **MARK S. O'CONNOR, ESQ.**
7        **PAUL L. STOLLER, ESQ.**
         Gallagher & Kennedy, P.A.
8        2575 East Camelback Road
         Phoenix, AZ  85016
9        602.530.8000/(fax) 602.530.8500

10  For the Plaintiff:
         **JULIA REED ZAIC, ESQ.**
11       Heaviside Reed Zaic
         312 Broadway, Ste. 203
12       Laguna Beach, CA  92660
         949.715.5228
13

14  For the Plaintiffs:
         **ROBIN P. LOURIE, ESQ.**
         Watkins, Lourie, Roll & Chance, P.C.
15       3343 N. Peachtree Rd. N.E.
         Tower Place 200
16       Atlanta, GA  30326
         404.760.7400
17

18  For the Defendants:
         **JAMES R. CONDO, ESQ.**
         Snell & Wilmer, L.L.P - Phoenix, AZ
19       One Arizona Center
         400 East Van Buren
20       Phoenix, AZ  85004-2202
         602.382.6700
21

22  For the Defendants:
         **RICHARD B. NORTH, JR., ESQ.**
         **ELIZABETH C. HELM, ESQ.**
23       Nelson, Mullins, Riley & Scarborough, L.L.P.
         201 17th St., N.W., Ste. 1700
24       Atlanta, GA  30363
         404.322.6000

25

United States District Court

March 22, 2018 P.M.

1

**I N D E X**

2

3

**TESTIMONY**

4

**WITNESS**                          **Direct    Cross    Redirect   Recross**

5

SHERR-UNA BOOKER                         1216     1246
SHOMARI COTTLE               1252
6    GIN SCHULZ (VIDEO)          1270
GUILLERMO ALTONAGA (VIDEO)   1272
7    ROBERT FERRARA (VIDEO)      1273
JASON GREER (VIDEO)          1274
8    CHRISTOPHER GANSER (VIDEO)  1275
FREDERICK ROGERS, M.D.(VIDEO) 1275

9

10

11

**E X H I B I T S**

12

Number                                         Ident Rec'd

13   546  Altonaga Deposition, 10/22/2013, Exhibit   1271 1272
04, Lehmann Deposition 4/2/13, Ex. 14 and
14        Ferarra, Ex. 7, Barry Deposition,
01/31/2014, Exhibit 18 - 4/13-4/15/2004
15        E-mail exchange b/wLee Lynch, Lehmann, and
others Re. "Crisis
16
735  Carr Deposition, 04/17/2013 - Exhibit 07 - 1269 1270
17        Bard Idea POA - Eclipse Anchor Filter,
caudal migration, Rev 0, 4/1/2010 E- mail
18        exchange b/w
905                                            1273
19
1130                                           1273
20
1327                                           1246
21
1912 Romney Deposition, 09/07/2016 - Exhibit   1273 1273
22        2039 3/16/2006 E-mail from Jason Greer to
Janet Hudnall
23
1940 Schulz Deposition, 01/30/2014 - Exhibit 11 1269 1270
24        - Chart of Adverse Events and Deaths for
all competitors from Prior

25

United States District Court

March 22, 2018 P.M.

**E X H I B I T S** (Continued)

| Number | Ident | Rec'd |
|---|---|---|

1941 Schulz Deposition, 01/30/2014 - Exhibit 12  1269 1270
     - 11/30/2005 E-mail exchange b/w Gin
     Schulz and Kellee Jones re Gin, G2 v.
     Maude and attachments, Spread Sheet -
     Filter Sales (IMS Q1 '00 to Q4 '04, +
     Trend Q1 - Q3 '05)

1944 Schulz Deposition, 01/30/2014 - Exhibit 15  1269 1270
     - 5/19/2006 E-mail from Natalie Wong to
     Gin Schulz and Candi Long, attaching the
     PowerPoint

1945                                          1269 1270

1946 Schulz Deposition, 01/30/2014 - Exhibit 17  1269 1270
     - 2/2/2006 E-mail from Gin Schulz to
     Several Re. "Minutes"

1948 Schulz Deposition, 01/30/2014 - Exhibit 2  1269 1270
     - 1/31/2006 E-mail from Gin Schulz to
     Micky Graves and Natalie Wong Re.

1949 Schulz Deposition, 01/30/2014 - Exhibit 21  1269 1270
     - 6/28/2011 Email Chain from Brian Hudson
     to Kevin Bovee and Chad Modra Re Talking
     Points

1950 Schulz Deposition, 01/30/2014 - Exhibit 4  1269 1270
     - Meeting Summary of the IVC Filter Focus
     Group meeting held on 6/1/2006 in Chicago,
     IL at

1951 Schulz Deposition, 01/30/2014 - Exhibit 5  1269 1270
     - 1/31/2005 Memo from Peter Palermo to
     Kerry Chunko Re. "Quality Plan

2299                                                    1246

2301                                                  1246

2302                                                  1246

2303                                                  1246

2304                                                1246

March 22, 2018 P.M.

1            **E X H I B I T S** (Continued)

2    Number                                      Ident  Rec'd

3
     2310                                               1246
4
     2311                                               1246
5
     2312 Medical Records of Gwinnett Consultants in 1227
6         Cardiology running notes from nurse

7    2321                                               1246

8    2345                                               1246

9    2353                                               1246

10   2355                                               1246

11   2361                                               1246

12   2362                                               1246

13   2364                                               1246

14   2368                                               1246

15   2378 Medical records of Gwinnett Medical    1225
          11/05/2014-ER
16
     2426 Photograph of Ms. Booker in the hospital 1261 1262
17        after open heart surgery-hospital bed

18   2427 Photograph of Ms. Booker in the hospital 1263 1263
          after open heart surgery-hospital bed
19
     4328 Ganser Deposition, 10/11/2016 - Exhibit  1274 1274
20        517,  Device Labeling Guidance, General
          Program Memorandum
21
     4377                                               1246
22
     4378                                               1246
23
     4379                                               1246
24
     4380                                               1246
25

                  United States District Court

March 22, 2018 P.M.

1        **E X H I B I T S** (Continued)

| Number | Ident | Rec'd |
|--------|-------|-------|
| 4381 | | 1246 |
| 4382 | | 1246 |
| 6383 2017.06.09 Robert Ritchie Exhibit 01 | 1220 | |
| 6667 ER Visit: Lincoln Medical Center | 1217 | |
| 6668 Lumbosacral Spine X-ray | 1217 | |
| 6681 ER Visit: Gwinnett Medical Center | 1219 | |
| 6693 ER Visit: Eastside Medical Center | 1221 | |
| 6741 ER Visit: Piedmont Hospital-Atlanta | 1229 | |
| 6745 Discharge Summary: Piedmont Hospital-Atlanta | 1230 | |
| 6751 Office visit: Gwinnett Medical Group: Cardiology | 1232 | |

**MISCELLANEOUS NOTATIONS**

| Item | Page |
|------|------|
| Jury instructions discussed | 1278 |

**RECESSES**

| | Page | Line |
|--|------|------|
| (Recess at 2:29; resumed at 2:46.) | 1270 | 19 |
| (Recess at 4:21; resumed 4:30.) | 1276 | 10 |

United States District Court

SHERR-UNA BOOKER - Direct

| | |
|---|---|
| 1 | **P R O C E E D I N G S** | 01:00:29 |

1          **P R O C E E D I N G S**                      01:00:29

2              (Jury enters at 1:00.)

3              (Court was called to order by the courtroom deputy.)

4              (Proceedings begin at 1:01.)

5          THE COURT:  Thank you.  Please be seated.       01:02:20

6          MR. O'CONNOR:  Your Honor, before we get started, we

7    have a stipulation on some exhibits and we agreed that I could

8    offer them into evidence at this time.

9              THE COURT:  All right.

10         MR. O'CONNOR:  They will be 1327 --             01:02:35

11             THE COURT:  Well, hold on just one minute.  Are these

12   needed for the cross-examination?

13             MR. O'CONNOR:  They may be needed on redirect.  They

14   are medical records.

15             THE COURT:  Let's have you do it at the start of     01:02:48

16   redirect.

17             MR. O'CONNOR:  Okay.  Thank you.

18             THE COURT:  All right.  You may proceed, Ms. Helm.

19             MS. HELM:  Thank you, Your Honor.

20             (SHERR-UNA BOOKER, a witness herein, was previously  01:02:56

21   duly sworn or affirmed.)

22                  **CROSS EXAMINATION** (Continued)

23   BY MS. HELM:

24   Q.   Ms. Booker, before we took the lunch break, we were

25   talking about your treatment at Lincoln Medical in March of    01:03:00

United States District Court

SHERR-UNA BOOKER - Direct

1   2009.                                                                          01:03:03

2          MS. HELM:  And, Kyle, would you pull up 6667?

3   BY MS. HELM:

4   Q.   And I have to remember that because you and I can see it,

5   it doesn't mean the jury can see it.                                           01:03:15

6          MS. HELM:  Your Honor, may I publish 6667?

7          THE COURT:  You may.

8   BY MS. HELM:

9   Q.   Just to catch the jury up, this is your admission record

10  at Lincoln Medical on March 26, 2009; is that right?                           01:03:28

11  A.   Yes.

12         MS. HELM:  And Kyle, would you pull up 6668?

13  BY MS. HELM:

14  Q.   And again, Ms. Booker, this is the x-ray report we were

15  talking about from March 26, 2009, at Lincoln Medical; correct?               01:03:46

16  A.   Yes.

17         MS. HELM:  May I publish it, Your Honor?

18         THE COURT:  Yes.

19  BY MS. HELM:

20  Q.   And this is an x-ray of your lumbosacral or your back;                   01:03:57

21  correct?

22  A.   Yes.

23  Q.   And it says there's no evidence of fracture or dislocation

24  in your vertebrae; correct?

25  A.   Correct.                                                                  01:04:09

United States District Court

SHERR-UNA BOOKER - Direct

1   Q.   And then it says IVC filter is noted; correct?                    01:04:09

2   A.   Yes.

3   Q.   Thank you.

4            Ms. Booker, after you had the filter implanted in

5   2007 and after you stopped taking Coumadin sometime before            01:04:24

6   March of 2009, you have not suffered from a pulmonary embolism,

7   have you?

8   A.   No.

9   Q.   You have been concerned a few times and gone to seek

10  medical treatment, haven't you?                                       01:04:36

11  A.   Well, I went because I was having chest pains.

12  Q.   All right.  But you've never been diagnosed as suffering

13  from a pulmonary embolism; correct?

14  A.   Correct.

15  Q.   You moved to Georgia sometime in 2010; is that right?           01:04:48

16  A.   Yes.

17  Q.   And once you moved to Georgia, you started seeking medical

18  care in Georgia; is that correct?

19  A.   Yes.

20  Q.   And for the ladies and gentlemen of the jury who may not        01:04:59

21  have had the benefit of living in the southeast, your body has

22  to get used to the pollen, doesn't it?

23  A.   Yes.

24  Q.   And you've had some issues with sinus infections and as a

25  result, with migraine headaches; correct?                            01:05:13

United States District Court

SHERR-UNA BOOKER - Direct

1  A.   Yes.                                                        01:05:15

2  Q.   And you have been under the care of a variety of doctors;

3  correct?

4  A.   Yes.

5  Q.   In fact, in July of 2011 you went to the emergency room at   01:05:25

6  Gwinnett Medical Center and that was the first time you had

7  been there; is that correct?

8  A.   I'm not sure unless you show me the document.

9  Q.   I'll be happy to.

10         MS. HELM:   6681, please.                                 01:05:36

11  BY MS. HELM:

12  Q.   Do you see this is a medical record for you from Gwinnett

13  Medical Center?

14  A.   Yes.

15         MS. HELM:   Your Honor, may I publish?                    01:05:47

16         THE COURT:   Yes.

17         MS. HELM:   And if you'll go to the next page, Kyle.

18  BY MS. HELM:

19  Q.   You went to Gwinnett Medical Center on July 21, 2011, and

20  told them you had left leg pain; is that correct?              01:06:03

21  A.   Yes, ma'am.

22  Q.   You also told them that you a medical history of cervical

23  cancer, mitral valve prolapse, MI, or heart attack, times two,

24  pulmonary embolism and blood clots; is that right?

25  A.   Yes.   At that time, that was my belief and I told you     01:06:19

United States District Court

SHERR-UNA BOOKER - Direct

1   earlier that Dr. Patel told me that it was not a heart attack          01:06:22

2   either time.

3   Q.    You also told them you had a past surgical history of an

4   appendectomy?

5   A.    Yes.                                                              01:06:31

6   Q.    Foot surgery and hernia repair; is that right?

7   A.    Yes.

8   Q.    Did you ask them to check on your filter?

9   A.    I don't remember.

10  Q.    Okay.  Thank you.                                                 01:06:43

11          You next went to the emergency room on November 11,

12  2011, for chest pain; is that right?

13  A.    Can you show it to me, please.

14  Q.    Sure.

15          MS. HELM:  6383.  May I publish, Your Honor?  It's            01:06:59

16  been admitted.

17          THE COURT:  Yes.

18  BY MS. HELM:

19  Q.    So you went to the emergency room complaining of headache

20  and chest pain; is that right?                                          01:07:14

21  A.    Yes.

22  Q.    And they took an x-ray; is that right?

23  A.    Yes.

24  Q.    Did you ask them to check on your filter?

25          MR. O'CONNOR:  Objection, irrelevant.                         01:07:23

United States District Court

SHERR-UNA BOOKER - Direct

1     THE COURT:  Overruled.                                    01:07:24

2     THE WITNESS:  I don't remember if I did.  Maybe it's

3   in the notes but I don't remember.  There were times I would

4   ask and there were times that I didn't.

5   BY MS. HELM:                                                01:07:34

6   Q.   But until July or June or July of 2014, no one told you

7   that there was any issue with your filter; is that correct?

8   A.   Not that I can remember, no.

9   Q.   That's something you would remember, isn't it?

10  A.   I believe so.                                          01:07:50

11  Q.   Now, Ms. Booker, you testified earlier that Dr. Patel is

12  your cardiologist.

13  A.   Yes, he is.

14  Q.   And we heard from Dr. Patel this week.  You actually first

15  went to see Dr. Patel in approximately 2012 for a possible    01:08:01

16  hernia repair.  Do you recall that?

17  A.   I think so.  I believe so.  It was around that time.  I'm

18  not sure.

19  Q.   So as of approximately 2012, you at least had Dr. Patel as

20  your cardiologist if you needed him; correct?               01:08:19

21  A.   Yes, I believe so.

22  Q.   I want to talk about one more hospital admission before we

23  talk about the filter and the events after the filter.

24        MS. HELM:  Kyle, if you would pull up 6693.

25  \\\

United States District Court

SHERR-UNA BOOKER - Direct

1   BY MS. HELM:                                                          01:08:38

2   Q.   This is an admission where you actually went to a

3   different hospital called Emory Eastside; is that right?

4   A.   Yes, ma'am.

5   Q.   And you went on April 9, 2013?                                   01:08:45

6   A.   Yes.

7   Q.   And you were complaining of abdominal pain; is that right?

8   A.   Yes.

9           MS. HELM:   Kyle, would you skip to page five, please.

10  BY MS. HELM:                                                         01:08:54

11  Q.   And they took a CT scan of your abdomen?  Do you see that?

12  The CT?

13  A.   Yes, I do see that.

14  Q.   Did anyone ever tell you what that CT scan showed?

15  A.   Not that I can recall.                                          01:09:06

16  Q.   Did you ask them to check on your filter?

17  A.   I don't remember.  Like I said, there were times I did ask

18  and there were sometimes I didn't.  But if it's not in the

19  notes, then I can't be sure.

20  Q.   Ms. Booker, I want to ask you a few questions about your        01:09:26

21  interaction with Dr. Kang and the procedures in 2014.

22  A.   Yes.

23  Q.   You heard Dr. Kang testify this week that during the

24  procedure to attempt to remove the strut from your heart, he

25  tore your tricuspid valve; is that right?                           01:09:43

United States District Court

1223

SHERR-UNA BOOKER - Direct

1    A.   I believe that's what I heard, yes.                    01:09:46

2    Q.   But the first time anyone told you that Dr. Kang tore your

3    tricuspid valve was in February of 2017 when I told you; isn't

4    that right?

5    A.   I don't remember.  I really don't remember.  During the    01:10:00

6    surgery that Dr. Kang did, I was groggy and all I remember them

7    telling me honestly is that I still needed the open heart

8    surgery.  Everything else, it sounded like -- like Charlie

9    Brown in my year, you know, the wonk, wonk, wonk thing.  That's

10   all I remember hearing.                                     01:10:22

11   Q.   Ms. Booker, it was your February -- in February of 2017

12   that it was your understanding that the fractured strut had

13   torn your tricuspid valve, wasn't it?

14   A.   I think that's what I did understand.

15   Q.   And, in fact, when I told you that Dr. Kang had admitted   01:10:39

16   that he tore your tricuspid valve, you responded that that was

17   the first time you had heard that; correct?

18   A.   I think that's what I might have said.

19   Q.   So after Dr. Kang performed the procedure, he did not come

20   in and tell you that the complication was because he had torn   01:10:56

21   the tricuspid valve; is that right?

22   A.   I remember him telling me that there were complications.

23   What he told me the complications were, I don't remember.  I

24   was just upset so I don't remember.

25   Q.   When you were discharged by Dr. Harvey, did he tell you    01:11:14

United States District Court

SHERR-UNA BOOKER - Direct

1   that you have pacemaker wires implanted?                        01:11:18

2   A.   I don't remember.

3   Q.   Do you understand today that you have pacemaker wires

4   still inside you?

5   A.   Yes.  Dr. Patel made sure that I understood what that    01:11:29

6   meant.

7   Q.   Have you asked anyone to check on those pacemaker wires?

8   A.   I'm not sure.  I know they can see them when I go to my

9   appointments and I know that they are not in my heart.  I know

10  that they are in my chest which is a lot different from that   01:11:49

11  piece that was in my heart.

12  Q.   When Dr. Harvey discharged you approximately September or

13  October of 2014, he told you to follow up with your

14  cardiologist, Dr. Patel, didn't he?

15  A.   I'm sorry?  Can you were repeat that?                     01:12:06

16  Q.   Sure.  When Dr. Harvey discharged you in September or

17  October of 2014, he told you to follow up with your

18  cardiologist, Dr. Patel; correct?

19  A.   I believe so.

20  Q.   But you didn't do that, did you?                         01:12:24

21        MR. O'CONNOR:  Objection, irrelevant.  There is no

22  claim under that, Your Honor.

23        THE COURT:  Sustained.

24  BY MS. HELM:

25  Q.   Ms. Booker, how long was it before you went to see       01:12:33

United States District Court

SHERR-UNA BOOKER - Direct

1  Dr. Patel after you were discharged in September of 2014 by          01:12:35
2  Dr. Harvey?
3  A.   I don't remember but I do remember seeing some of his
4  partners.   I remember going and seeing some of his partners and
5  they reported back to him.                                          01:12:47
6  Q.   You went to the emergency room on November 5, 2014,
7  complaining of chest pain, didn't you?
8  A.   I'm sorry.  I don't know unless you show me.
9          MS. HELM:  2378.
10 BY MS. HELM:                                                        01:13:07
11 Q.   Is this a medical record from Gwinnett Medical Center?
12          MS. HELM:  Your Honor, may I publish this?  It has
13 been admitted.
14          THE COURT:  Yes.
15 BY MS. HELM:                                                        01:13:16
16 Q.   Dated 11-5-4; is that right?
17 A.   Yes.
18 Q.   And you presented to the emergency room complaining of
19 chest discomfort and a sensation of difficulty breathing; is
20 that right?                                                         01:13:24
21 A.   Yes, ma'am.
22 Q.   The doctors in the emergency room discussed you with
23 Dr. Heller, a cardiologist, and they recommended that you be
24 admitted to the Emergency Department for a stress test.  Do you
25 see that?                                                           01:13:42

United States District Court

SHERR-UNA BOOKER - Direct

1    A.   Yes, I do.                                                    01:13:43

2    Q.   And they discussed that with you and you refused to be

3    admitted.

4              MR. O'CONNOR:   Objection.   Irrelevant.   There's no

5    claim on that.                                                    01:13:50

6              THE COURT:   Overruled.

7    BY MS. HELM:

8    Q.   Ms. Booker, you refused to be admitted, didn't you?

9    A.   It does state that, yes, I did.

10   Q.   And it also says that after discussing the risks of         01:13:59

11   leaving for evaluation is complete, the patient continued to

12   refuse to stay and request to sign out against medical advice.

13   They decided that that was the next best thing and would

14   contact cardiology to follow up with you; is that right?

15   A.   I'm sorry.   You're only reading a portion of it.   If you   01:14:19

16   could just please give me the opportunity to read the whole

17   thing so I can decide what it was that I felt or did on that

18   day.   Thank you.

19              Okay.   I've read it.   I'm sorry.   Can you repeat your

20   question?                                                        01:15:28

21   BY MS. HELM:

22   Q.   The doctors in the Emergency Department at Gwinnett

23   Medical wanted to admit you.   You refused and signed out

24   against medical advice; correct?

25              MR. O'CONNOR:   Objection, Your Honor.   May we have a  01:15:37

United States District Court

SHERR-UNA BOOKER - Direct

1    sidebar, please.                                                              01:15:44

2            THE COURT:  No.  This is in evidence.  She can ask

3    about a document in evidence so the objection is overruled.

4            MR. O'CONNOR:  But I believe this issue is subject to

5    an agreement or that we --                                                    01:15:52

6            THE COURT:  This document is in evidence so she can

7    ask about a document in evidence and it came in with your

8    agreement.  If there's another issue that comes up, I'll be

9    happy to consider it.

10           MR. O'CONNOR:  All right.  Thank you.                                  01:16:04

11   BY MS. HELM:

12   Q.   Ms. Booker, did you follow up with Dr. Heller or Dr. Patel

13   after you left Gwinnett Medical Center on November 5, 2014,

14   against medical advice?

15   A.   Did I follow up against medical advice?                                   01:16:20

16   Q.   Ma'am, did you follow up with Dr. Heller or Dr. Patel,

17   your cardiologist, after November 5, 2014, after you refused to

18   be admitted to Emergency Department?

19   A.   I don't remember.  I can't recall.  I know at some point I                01:16:38

20   went back to the doctor after that but when it was, I don't

21   remember.

22   Q.   Thank you.

23           MS. HELM:  Kyle, would you pull up 2312, please.

24   BY MS. HELM:

25   Q.   Ms. Booker, these are records from Gwinnett Cardiology,                   01:16:51

United States District Court

SHERR-UNA BOOKER - Direct

1  Dr. Heller and Dr. Patel, and you see that those relate to you?    01:16:55
2  A.   Yes, but before you ask me a question, do you mind if I
3  read the whole thing?
4  Q.   You can take your time.
5  A.   Thank you.    01:17:05
6       MS. HELM:  Your Honor, may this be published while
7  she's reading?  It's been admitted.
8       THE COURT:  Yes.
9  BY MS. HELM:
10 Q.   Ms. Booker, maybe I can help you.  This document is small    01:17:44
11 but I'm going to pull up a portion of it.
12      MS. HELM:  Would you pull up page one?
13      THE WITNESS:  The things with portions of it, it
14 leaves off certain things and I want to be able to read the
15 whole thing.  I've learned from this trial that you need to    01:17:55
16 make sure you see everything.
17      MS. HELM:  Thank you.  Page one of 2312, the blow-up.
18 BY MS. HELM:
19 Q.   Ms. Booker, you see that on November 5, the day after you
20 left Gwinnett Medical Center against medical advice,    01:18:19
21 Dr. Patel's office called you to schedule a follow-up
22 appointment but they were unable to contact you.
23 A.   Yes, I see that part.
24      MS. HELM:  Would you pull up page two, please.
25 \\\

United States District Court

SHERR-UNA BOOKER - Direct

1  BY MS. HELM:                                                          01:18:34

2  Q.   They actually had received an email from someone to call

3  you and schedule an appointment but your voicemail was full and

4  they are unable to leave a message; correct?

5  A.   That's what it says, yes, ma'am.                                01:18:47

6  Q.   And, in fact, because they had not been able to get in

7  touch with you on November 21, 2014, they recorded that they

8  mailed you a letter requesting you to contact them.

9  A.   Oh, that date brings back my memory.  Thank you.  I was

10 actually in New York caring for my ill father that was dying      01:19:08

11 from cancer.  That is probably why they couldn't reach me.

12 Q.   But you --

13 A.   And as a matter of fact, in New York I did go to the

14 emergency room, so thank you for reminding me.  That was my

15 father's last Thanksgiving.                                        01:19:24

16 Q.   Now, Ms. Booker, in September of 2015 you went to the

17 emergency room at Piedmont Hospital; correct?

18 A.   I'm sorry, when.

19        MS. HELM:  6741.  Your Honor, may I publish?  It's

20 been admitted.                                                     01:19:48

21        THE COURT:  What's the number?

22        MS. HELM:  6741.

23        THE COURT:  Yes, you may.

24 BY MS. HELM:

25 Q.   Ms. Booker, this is an admission for you at Piedmont          01:19:53

United States District Court

SHERR-UNA BOOKER - Direct

| | | |
|---|---|---|
| 1 | Hospital on September 30, 2015; is that right? | 01:19:56 |
| 2 | A.   Yes, but there was a visit to the hospital prior to that | |
| 3 | one so did you bring that one up. | |
| 4 | Q.   No, ma'am.  I'm going to ask you about this one.  Okay? | |
| 5 | MS. HELM:  And would you go to the discharge summary | 01:20:10 |
| 6 | which is 6745, please. | |
| 7 | Your Honor, may this be published?  It's been | |
| 8 | admitted. | |
| 9 | THE COURT:  Yes. | |
| 10 | MS. HELM:  And would you go to the last page? | 01:20:39 |
| 11 | BY MS. HELM: | |
| 12 | Q.   Ms. Booker, this is the discharge summary from Piedmont | |
| 13 | Hospital and you see where it says to follow up with your | |
| 14 | primary care provider in one week and to follow up with | |
| 15 | Dr. Sigman.  Do you see that? | 01:20:57 |
| 16 | A.   Yes.  Yes, I see that. | |
| 17 | Q.   Do you know who Dr. Sigman is? | |
| 18 | A.   I don't remember him. | |
| 19 | Q.   Dr. Sigman is a cardiologist.  Did you follow up with him? | |
| 20 | A.   I don't remember. | 01:21:09 |
| 21 | Q.   Did you follow up with Dr. Patel after this admission on | |
| 22 | September 30, 2015? | |
| 23 | A.   I don't remember. | |
| 24 | Q.   Well, if Dr. Patel's records show that you did not come | |
| 25 | back and see him until August 8, 2016, you have no reason to | 01:21:24 |

United States District Court

SHERR-UNA BOOKER - Direct

1   dispute that, do you?                                                          01:21:27

2   A.   I have no -- no, if it doesn't show, but I'm sure I've

3   seen other doctors in between then that were affiliated with

4   him.

5   Q.   And who did you see in between that was affiliated with    01:21:38

6   him?

7   A.   I'm not sure.  I'm sure you have all of my records.

8   Q.   Right.  And if the records show that the next visit to

9   Dr. Patel or his partners or anyone at Gwinnett Cardiology was

10  August 8, 2016, you don't dispute that, do you?                  01:21:52

11  A.   If that's what it shows, no, I can't.

12  Q.   In fact, the very first time that you went to see

13  Dr. Patel after being discharged by Dr. Harvey in 2014 was

14  August 8, 2016, wasn't it?

15  A.   Like I had said previously, I did see other doctors.  I    01:22:18

16  did seek treatment at other hospitals.  One, because I was,

17  one, caring for my sick father in another state.  Two, it might

18  have been wherever I was at the time I didn't feel good and I

19  did see other doctors and I -- to my understanding, those were

20  reported and they -- my doctor was called on that.              01:22:39

21  Q.   But the first time you went to physically see your

22  cardiologist after being discharged by Dr. Harvey was August 8,

23  2016; correct?

24  A.   If that's what it shows, yes, ma'am.

25  Q.   Two years after you were discharged; correct?              01:22:55

United States District Court

SHERR-UNA BOOKER - Direct

1   A.   That was like a year and a half.                              01:23:02

2   Q.   And, in fact, you made and canceled appointments with

3   Dr. Harvey over that two-year period and subsequent to that,

4   didn't you?

5   A.   I made and canceled with Dr. Harvey?                          01:23:12

6   Q.   With the cardiologist group.

7   A.   I'm not quite sure.  I think one time I went to them and

8   they told me I no longer needed to come back to them.  I don't

9   know when that was but they told me because they were card --

10  heart surgeons, that I didn't need to see them any more and to   01:23:34

11  go to see a regular cardiologist.

12  Q.   And that's Dr. Patel, your regular cardiologist?

13  A.   Yes, ma'am.

14  Q.   Okay.  That's the doctor that you didn't go see for two

15  years after Dr. Harvey told you to follow up with him; correct?  01:23:49

16  A.   That is the doctor that my other doctors reported to and

17  then I did see him about a year and a half later.

18  Q.   Actually, August 8 of 2016; correct?

19  A.   If that's what it shows, yes, ma'am.

20        MS. HELM:  Would you pull up 6751, please.                   01:24:07

21        Your Honor, may I publish?  It's been admitted.

22        THE COURT:  Yes.

23  BY MS. HELM:

24  Q.   This is your -- this is a medical record showing that you

25  went to see Dr. Patel on August 8, 2016; is that right?          01:24:18

United States District Court

SHERR-UNA BOOKER - Direct

1   A.   Yes, ma'am.                                                    01:24:23

2   Q.   And Dr. Patel on this visit prescribed you some

3   medication, didn't he?

4   A.   Yes, ma'am.

5   Q.   And, in fact, you quit taking the medication on your own,    01:24:33

6   didn't you?

7              MR. O'CONNOR:  Objection.  Irrelevant.  This is not

8   an issue.

9              THE COURT:  Well, you've objected to that several

10  times.  Let's talk about it, Mr. O'Connor.                        01:24:43

11             Go ahead and stand up if you need, to ladies and

12  gentlemen.

13             (At sidebar 1:25.)

14             THE COURT:  I'm not understanding the relevancy

15  objection, Mr. O'Connor.                                          01:25:02

16             MR. O'CONNOR:  Because they have withdrawn any claim

17  of mitigation of damages, number one.  Number two, she's

18  talking about issues that are completely unrelated to this

19  filter.  Three, there was a stipulation she knows real well

20  about where they asked us to agree that we would not bring in     01:25:16

21  the fact that the reason Ms. Booker didn't go see these doctors

22  is because she couldn't afford them.

23             Now, it's one thing to let a record in.  It's another

24  thing to draw the jury's attention to it and make a big deal of

25  the fact that she's doing something that somehow she's            01:25:32

United States District Court

SHERR-UNA BOOKER - Direct

1    negligent or she's not mitigating her damages.                    01:25:35

2           But now they have put us in a position where I have

3    to ask her to explain why she had to leave the emergency room,

4    why she didn't go back to doctors, and it was because she

5    couldn't afford it.  She worked in jobs where she didn't have    01:25:48

6    insurance or she was recovering from this and she didn't have

7    the funds.

8           THE COURT:  What's your thought, Ms. Helm?

9           MS. HELM:  First of all, Your Honor, she has

10   testified that she worries about her filter.  She's worried      01:26:01

11   about it.  She follows up.  This testimony clearly goes to her

12   credibility and to her damages.  This treatment in August of

13   2016, she was actually employed and had insurance at the time.

14          And the collateral source rule, we're not putting in

15   the fact that she didn't pay her bills or that her bills were    01:26:21

16   written off because she didn't pay them because we can't, under

17   Georgia law, and under also Georgia law, the worldly

18   circumstances of the parties, the ability to pay is not

19   admissible.  They are able to chalkboard 271,000 in expenses

20   that she never incurred.  She didn't pay them.                   01:26:37

21          THE COURT:  Well, but that's the law.  There's

22   nothing about that.

23          MS. HELM:  But the law also is that she can't testify

24   that she can't afford medical care.  There's no evidence at

25   this time that she couldn't afford medical care.  It goes to     01:26:49

United States District Court

SHERR-UNA BOOKER - Direct

1    her damages.  "I was worried.  I was worried."  She didn't                01:26:52

2    follow up with her doctor.

3            THE COURT:  Well, let me tell you why I thought this

4    was all relevant, because you are making a pain and

5    suffering --                                                             01:27:00

6            MS. HELM:  Exactly.

7            THE COURT:  Hold on.  A pain and suffering damages

8    claim for this whole period.

9            Hold on.

10           All of these records seem to suggest there were           01:27:07

11   potential other causes, other doctor visits for the pain and

12   suffering.  That seems to me to be fair game if you're seeking

13   pain and suffering for the entire period.

14           MR. O'CONNOR:  Maybe that's forgiven but they are

15   taking it a step further.  I didn't ask her, and she didn't          01:27:21

16   testify, that she continues to follow up with doctors about the

17   filter.  That's evidence that came in that, number one -- and

18   that's a different issue.  But these are different, unrelated

19   conditions she's been going to doctors about.

20           THE COURT:  That's entirely --                               01:27:34

21           MR. O'CONNOR:  She's trying to show she's got bad

22   character of not following up with doctors and we know that you

23   can't do that.

24           THE COURT:  Well, you just said other conditions she

25   went to see doctors about.  That stuff is entirely fair if you     01:27:43

United States District Court

SHERR-UNA BOOKER - Direct

1   are asking the jury to compensate her for all of the pain and                    01:27:46

2   suffering during this period.

3           MR. O'CONNOR:  Sure.  But to take it a step further,

4   to take it a step further and now make that an issue where

5   somehow this patient is not mitigating her damages or she's an                    01:27:56

6   irresponsible patient on an unrelated condition.  It's one

7   thing to say, "Okay.  You've got a myriad of problems," and

8   argue to the jury that they want to do that.  But she's trying

9   to all make it this when she has all of those other problems.

10  That may be fair.                                                                 01:28:11

11          But to take it a step further and to use that reason

12  to get this evidence in to do something as prejudicial as they

13  are doing, something that is clearly against the stipulations,

14  and they are walking close but they haven't opened them

15  already, about her inability to pay and the fact that they                        01:28:28

16  agreed they weren't going to bring in mitigation of damages.

17          But when she goes in for something completely

18  unrelated to this filter and the question is, "You didn't

19  follow up with your doctor about that," that's different than

20  saying, "You were in pain on this day and you went to the                         01:28:42

21  doctor for back pain or a chest pain that was not related to

22  your filter."

23          If that was clear that's what they were drawing the

24  jury's attention to, I wouldn't be up here.  But they are using

25  this in a way that is clearly intended to prejudice our case.                     01:28:53

United States District Court

SHERR-UNA BOOKER - Direct

1        THE COURT:  Okay.  I understand your point.                    01:28:57

2        Hold on.  Hold on.  Let me see the stipulation.

3        MS. LOURIE:  And they did involve mitigation.

4        THE COURT:  Which one?  So what's the stipulation?

5        MS. LOURIE:  The stipulation says that we -- well,            01:29:14

6    this is how you ruled on our motion *in limine* that we couldn't

7    talk about insurance and that's the main reason she didn't go

8    to a lot of these appointments.  She didn't have the funds.

9        THE COURT:  Okay.  I understand your point.

10        MS. HELM:  The admission which she left AMA is on             01:29:26

11    their chart of medical damages.  They are seeking damages,

12    medical expenses, for this treatment, this admission to the

13    hospital.  They claim this is part of her injury and damages

14    because they have put the medical --

15        THE COURT:  What is AMA?                                      01:29:44

16        MS. HELM:  Against medical advice.  The admission we

17    just were talking about at Gwinnett Medical Center when she

18    left, they say that was follow-up because of her heart pain

19    from the surgery.  So the circumstances of that admission are

20    clear.                                                            01:30:01

21        MS. LOURIE:  Then we should be allowed to ask her

22    about them.

23        THE COURT:  Hold on a minute.  So why is it relevant

24    that it was against medical advice?  I'm not understanding

25    that.                                                            01:30:12

United States District Court

SHERR-UNA BOOKER - Direct

1    MS. HELM:  Well, Your Honor, the context of that          01:30:13

2  treatment that they are seeking damages, they are saying she

3  went in that day, goes to her pain and suffering claim.  She

4  went in that day because of damages from the heart surgery but

5  she refused treatment on that day.  That's clearly relevant to  01:30:27

6  her pain and suffering claim and she could have gotten

7  treatment and mitigated her issues and her concerns.

8    THE COURT:  That's a failure to mitigate argument and

9  you've withdrawn a failure to mitigate argument.

10    MS. HELM:  But it goes to her pain and suffering.  It  01:30:40

11  clearly goes to her pain and suffering.

12    THE COURT:  What is your response to plaintiff's

13  counsel suggestion that they should be allowed to have her now

14  testify that the reason she didn't follow up in many of these

15  instances was because she couldn't afford it?              01:30:56

16    MS. HELM:  First of all, there's no evidence.

17    THE COURT:  Hold on.  You better hear this.

18    MS. HELM:  Your Honor, there's no evidence that

19  that's why she wasn't following up.

20    THE COURT:  Well, but if she testifies to that, there  01:31:05

21  will be.

22    MS. HELM:  Then I think that they have opened the

23  door.  It violates the collateral source rule.  And they have

24  opened the door because then we can put in evidence that all of

25  these medical records were written off.                    01:31:16

United States District Court

SHERR-UNA BOOKER - Direct

1    THE COURT:  But if you've intentionally brought out                01:31:18

2 the fact that she didn't go back, haven't you opened the door

3 for an explanation as to why?

4    MS. HELM:  No, Your Honor.  I think it clearly goes

5 to her pain and suffering claim.  She's testified that she was     01:31:26

6 worried about the filter and she was -- she followed up.  This

7 clearly goes to show that she wasn't following up.  She was

8 going to the emergency room.  She was not following up with her

9 cardiologist which she admitted she was told to do.

10    MR. O'CONNOR:  I don't recall her saying anything             01:31:51

11 about her following up with her doctors because she's worried

12 about that filter that's embedded in her.  I really --

13    THE COURT:  Well, she did testify clearly --

14    MR. O'CONNOR:  That she was worried about it.

15    THE COURT:  She thinks about it every day was her             01:32:05

16 testimony.

17    MR. O'CONNOR:  That's different than saying, "I'm

18 going to a doctor to check on it."

19    MS. LOURIE:  There's plenty --

20    THE COURT:  Hold on, please.                                  01:32:15

21    So what are you objecting to now?

22    MR. O'CONNOR:  Well, I'm objecting to it's violating

23 stipulations.  It's opened the door to us that it --

24    THE COURT:  Well, when you say it's violating

25 stipulations, you mean it's boxing you in with a stipulation.     01:32:27

United States District Court

SHERR-UNA BOOKER - Direct

1   Is that your argument?                                           01:32:31

2            MR. O'CONNOR:  Yes.  And that this admission where

3   she left is clearly a 403 improper collateral issue.  And she's

4   done that on a number of these records.  If we let the records

5   in, I get it.  If you want to talk about pain and suffering in   01:32:48

6   other areas, you can argue that.  But to take it this step --

7   had I known it, I would have come up before but I couldn't get

8   up here to talk to you about it.

9            THE COURT:  That's because she was asking document

10  questions.  They were right out of the exhibits that you agreed  01:33:03

11  could come into evidence.  That's why I was sustaining the

12  relevancy objection.  It's in evidence.

13           MS. LOURIE:  Can I comment on that?  We were told

14  that all information that would be covered by a motion *in*

15  *limine* order would have been redacted.  I don't even have the  01:33:18

16  redacted records.  I didn't know what they redacted and didn't

17  redact.

18           THE COURT:  But you stipulated it in.  I mean, there

19  was no objection.  If you had a concern about it, you should

20  have objected.  It's in evidence.                                01:33:31

21           MS. LOURIE:  Well, they represented to us that they

22  redacted all of the documents.

23           THE COURT:  Well, okay.  But you did let it come in

24  without objection.  And I don't know if you even talked about

25  this kind of evidence in redactions.  Did you?                   01:33:45

United States District Court

SHERR-UNA BOOKER - Direct

1    MS. LOURIE:  I didn't have the conversation.                                      01:33:50

2        MS. HELM:  Your Honor, we had a conversation about

3    what should be redacted.  The versions that we presented to the

4    Court and that are being shown are redacted.

5        THE COURT:  Well, okay.  Okay.  We've taken enough         01:33:58

6    time at sidebar.

7        Here are my conclusions:  The documents that are in

8    evidence are in evidence.  They have been admitted into

9    evidence.  If you had a concern about them, I don't think you

10   should have agreed for them to come in.  And so I had felt that   01:34:15

11   asking about documents in evidence is fair game, just like

12   showing to it a jury is fair game.

13       I do think, however, Ms. Helm, in light of this

14   conversation, that some of your questioning is clearly along

15   the line of a failure to mitigate.  And I understand from the    01:34:32

16   sidebar that you have withdrawn that.

17       MS. HELM:  I'll stop.  Yes, Your Honor.  I have.

18       THE COURT:  So the failure to mitigate evidence

19   should stop.  If you want to request a curative instruction on

20   failure to mitigate, I'll be happy to consider it, instructing   01:34:47

21   the jury that they are not to consider that in some way.

22       But going forward, let's stay away from the failure

23   to mitigate evidence.  I do think it's fair for the defendants

24   to present evidence that the complications she is seeking

25   recovery for in the form of pain and suffering were caused by    01:35:08

United States District Court

SHERR-UNA BOOKER - Direct

```
 1   other sources or other events.  That to me is fair because        01:35:10
 2   you're seeking pain and suffering but without the failure to
 3   mitigate angle.
 4              MS. HELM:  Understood, Your Honor.
 5              THE COURT:  Okay.                                        01:35:18
 6              MS. HELM:  Thank you.
 7              MR. O'CONNOR:  There's still that one more series of
 8   hospital --
 9              THE COURT:  And I said if you want a curative
10   instruction, you can certainly request it.  And if you think --    01:35:30
11              What time do we have?
12              If you think -- Ms. Booker is going to be here in the
13   case -- after her testimony is done, you need to recall her to
14   address this issue of compensation, I would rather have that
15   discussion further when we're not keeping the jury waiting.        01:35:47
16   But I'm not closing the door to you raising that again.
17              MR. O'CONNOR:  Okay.  So I will follow your order and
18   I'm not going to try and rehabilitate here right now.
19              THE COURT:  Well, you should rehabilitate in every
20   way you can without eliciting testimony that she couldn't          01:36:04
21   afford it.
22              MR. O'CONNOR:  I will.  I just --
23              THE COURT:  In other words, I'm not saying don't
24   redirect her.  Do all the redirect you can.  But don't go into
25   lack of insurance or lack of money to pay until we've had a        01:36:15
```

United States District Court

SHERR-UNA BOOKER - Direct

1  further discussion after her testimony is over.                          01:36:19

2          MR. O'CONNOR:  And then the other concern I have is

3  they are going to continue to question her about other records

4  where they contend that the filter and its position was missed

5  by radiologists.  They have only claimed one doctor --          01:36:41

6          THE COURT:  Let me interrupt you.

7          Are you going to ask any more questions on that?

8          MS. HELM:  No.

9          MR. O'CONNOR:  Okay.

10         THE COURT:  All right.                                            01:36:50

11         Thank you, ladies and gentlemen, for your patience.

12         (End of sidebar discussion.)

13  BY MS. HELM:

14  Q.  Ms. Booker, I just have a few more questions.  The last

15  time you went to see Dr. Patel was in October of 2017; is that   01:37:16

16  right?

17  A.   I believe so.

18         MS. HELM:  Your Honor, may this be published?  It's

19  been admitted.

20         THE COURT:  Yes.                                                  01:37:37

21         THE WITNESS:  Is my date of birth supposed to be up

22  there?

23         MS. HELM:  We'll make sure that gets redacted.

24         Take it down.

25  \\\

United States District Court

SHERR-UNA BOOKER - Direct

BY MS. HELM:                                                              01:37:45

Q.   Did you go see Dr. Patel in October, sometime last fall in

2017?

A.   Yes.

Q.   And he told you that everything was fine and you didn't      01:37:54

need to come back until next year; correct?

A.   Yes, I have an appointment for next month.

Q.   Okay.  And in January of this is year you went to your

primary care doctor and asked for a referral to have someone

check on the strut that remains in your IVC; is that right?       01:38:11

A.   Yes.  I was having some pain.

Q.   And you went and there was a CT scan of the strut; is that

right?

A.   Yes.

Q.   So that was the first time, in January of 2018, that you     01:38:21

had specifically asked any doctor to check on the strut that

remains in your IVC; is that right?

A.   That's not the first time.  In the past I asked him --

like you asked me before so, yes.

Q.   Okay.  But that was the first time that you had a specific   01:38:38

request to check on the strut; is that right?

A.   No.  That's not right, ma'am.

Q.   Okay.  Who else did you ask to check on the strut --

not -- the strut that remains in your IVC, after your surgery

with Dr. Harvey?                                                  01:38:53

United States District Court

SHERR-UNA BOOKER - Direct

1  A.   I don't know.                                                      01:39:00

2  Q.   The only one that you do recall was the one that was in

3  January of 2018; is that right?

4  A.   Yes.

5  Q.   Thank you.  No further questions.                                 01:39:05

6           THE COURT:  All right.

7           Redirect?

8           MR. O'CONNOR:  Your Honor, before I start, would this

9  be the appropriate time to offer those exhibits?

10          THE COURT:  Yes.                                               01:39:35

11          MR. O'CONNOR:  At this time, plaintiffs would offer

12 1327, 2299, 2301, 2302, 2303, 2304, 2310, 2311, 2321, 2345,

13 2353, 2355, 2361, 2362, 2364, 2368, 4377.

14          MS. HELM:  Your Honor, may I approach the podium?  I

15 left my list up there?                                                 01:40:54

16          THE COURT:  Yes.  That's fine.

17          MS. HELM:  Thank you.

18          MR. O'CONNOR:  Here's where I am.  I read all of

19 those in and I stopped there and I'm starting here.

20          MS. HELM:  Okay.                                              01:41:08

21          MR. O'CONNOR:  4377, 4378, 4379, 4380, 4381, 4382.

22          THE COURT:  Any objection?

23          MS. HELM:  No objection, Your Honor.

24          THE COURT:  All right.  Those records are admitted.

25          (Exhibit Numbers 1327, 2299, 2301, 2302, 2303, 2304,          01:41:30

United States District Court

SHERR-UNA BOOKER - Redirect

1    2310, 2311, 2321, 2345, 2353, 2355, 2361, 2362, 2364, 2368,          01:41:30

2    4377, 4378, 4379, 4380, 4381, 4382. were admitted into

3    evidence.)

4                        **REDIRECT EXAMINATION**

5    BY MR. O'CONNOR:                                                      01:42:28

6    Q.    Sheri, after your filter was implanted by Dr. Kang in

7    2007, did you have any reason to believe or know that that

8    filter would go into complications such as fracture, tilt,

9    migration, perforation?

10   A.    I'm sorry.  You said that the Kang?                            01:42:49

11   Q.    I apologize.  Dr. D'Ayala.  Thank you.  In 2007, the

12   doctor that implanted the filter.  When you had that filter

13   implanted, did you think about it failing or causing

14   complications?

15   A.    No.  I didn't know anything about filters so I had no          01:43:06

16   reason to.

17   Q.    You've heard evidence in this case where Bard was aware of

18   filter failures fractures and tilts and perforations and

19   migrations.  After you received -- before you even had your

20   filter -- after you had your filter in 2007, did you ever           01:43:26

21   receive a letter from Bard telling you that the G2 filter was

22   dangerous or would go into complications?

23   A.    Not at all.  Not at all.

24   Q.    Would you have wanted your doctors to know what we learned

25   in this case, that Bard knew that the G2 was, in fact, failing?     01:43:50

United States District Court

SHERR-UNA BOOKER - Redirect

1   A.   Yes.   I think it would have been the human thing to do.   01:43:54

2   Q.   Would you have wanted to know what Bard knew when you

3   agreed to have that filter implanted?

4   A.   Not that particular one.   Maybe if my doctors had been

5   aware they knew of a better filter.   If they are telling me   01:44:10

6   that that's what I need, then I'm going to do that.   But if

7   they knew that information, I'm sure they would have chose

8   something else.

9   Q.   So if Bard was aware before your filter was ever put in

10  you, the G2, that that G2 was failing, is that something you   01:44:27

11  would have expected Bard to tell your doctors?

12  A.   Absolutely.   I think it's their duty to.

13  Q.   Did you have any indication when you agreed to have your

14  filter put in and you talked to Dr. D'Ayala that some day you

15  would be looking at surgeries to remove the filter from your   01:44:46

16  heart?

17  A.   I'm sorry.   Can you repeat that?

18  Q.   Sure.   The day that he went in in 2007 to have the G2

19  Filter implanted, did you have any reason to know, any reason

20  to believe that some day you would be confronted with the need   01:45:12

21  for a surgery of your heart to remove a piece of that filter

22  out?

23  A.   No, not at all.

24  Q.   Did you ever consent to having a dangerous defective

25  filter that tilted, perforated or migrated to your heart put in   01:45:32

United States District Court

SHERR-UNA BOOKER - Redirect

1    you?                                                                    01:45:37

2    A.    No, I did not.

3    Q.    At any time if you were contacted by doctors who had been

4    contacted by Bard to come back in for your filter to be

5    monitored, would you do that?  Would you have done that?        01:45:53

6    A.    Absolutely.

7    Q.    And from what you've heard here in this trial, this case,

8    have you seen any evidence that Bard, from what they knew, made

9    any effort to tell the doctors to get their patients back in

10   and get those filters monitored, looked at or taken out?        01:46:11

11   A.    No.  I actually heard the contrary.  One doctor, I don't

12   remember his name, said that he requested the names of his

13   patients so he can get them removed.

14   Q.    You were in the hospital when you had your G2 filter; is

15   that right?                                                      01:46:30

16   A.    That is correct.

17   Q.    Did you know or did your doctor have any options to put in

18   any other filters?  Did you even know that?

19   A.    No, I did not.  I didn't know anything about filters.

20   Q.    And when you had your filter put in, the day you made that  01:46:47

21   decision, did you have any knowledge of the risk and

22   complications that you years later experienced about the G2

23   when you had it put in?

24   A.    No, sir.

25   Q.    Did you assume any of the risks -- did you believe you      01:47:04

United States District Court

SHERR-UNA BOOKER - Redirect

1  were going to assume any risk of a complication of that filter    01:47:11

2  that would some day cause you to have heart surgery when you

3  told -- when you agreed that Dr. D'Ayala could put the G2

4  filter in you?

5       MS. HELM:  Your Honor, object to the question.  It    01:47:23

6  calls for a legal conclusion.

7       THE COURT:  Overruled.

8       THE WITNESS:  No, sir.

9  BY MR. O'CONNOR:

10 Q.   Now, early in your cross-examination you were asked a    01:47:56

11 question early on that you asked a doctor to check your filter.

12 Do you recall that?

13 A.   Yes, I remember the question.

14 Q.   Why did you ask that doctor to check your filter?

15 A.   Well, the last time was because I did have pain in my    01:48:13

16 abdomen and I do know that that filter is in that area.  I

17 mean, it's in my --

18 Q.   Early on when you were asked about the PET scan I thought.    01:48:29

19 Is that just because you knew you had a foreign body?

20 A.   That's exactly what I had said -- I mean I had said before    01:48:29

21 in a question, that I had something foreign in my body.  I was

22 curious.

23 Q.   Did you ever have any reason to ask a doctor to check on

24 your filter because you had any knowledge, any reason to

25 believe that that filter was breaking inside of you and    01:48:45

United States District Court

SHERR-UNA BOOKER - Redirect

1  traveling to your heart?                                          01:48:48

2  A.   No.

3  Q.   And if Bard notified doctors and your doctor and you got a

4  call from your doctor to come back in to check your filter,

5  what would you have done?                                        01:49:05

6  A.   I would have done what my doctors requested me to do.

7  Q.   Did you ever ask a doctor if you should have it removed?

8  A.   I don't remember but I think one time I may have asked

9  questions about it.  Actually -- I'm sorry.  It's so hard

10 sometimes to remember things but I do remember maybe a couple    01:49:44

11 much months, maybe within a year of it being placed, if it was

12 going to be removed.  I just asked and I was told at that point

13 it was better to just leave it in.  Which doctor it was I don't

14 know.  I had seen many at that time in between, oncologists and

15 everybody else I needed to see.                                  01:50:05

16 Q.   And Sheri, you heard evidence that that G2 filter that you

17 received, you heard evidence in this case that that was clear,

18 that filter you got was cleared as a permanent filter.  Have

19 you heard that?

20 A.   Yes, I did hear that.                                        01:50:20

21 Q.   As a patient who received a G2 filter that was cleared to

22 be a permanent filter, did you have -- did you have reason to

23 expect that that filter should and could last in your vena cava

24 in exactly the same position that it was when Dr. D'Ayala put

25 it in?  Was that your expectation?                               01:50:43

United States District Court

1    A.   My expectation was it to be the way Dr. D'Ayala put it in,   01:50:45

2    yes.  I didn't expect it to move or do anything else.

3    Q.   To move, to break, to go to your heart?

4    A.   There was no reason -- once again, I didn't know anything

5    about filters.   01:51:05

6    Q.   Those were contrary to any expectation you had about a

7    filter; right?

8    A.   Yes.

9            MR. O'CONNOR:  Thank you, Your Honor.  That's all I

10   have.   01:51:18

11           THE COURT:  All right.  You can step down, Ms.

12   Booker.

13           (Witness excused.)

14           THE COURT:  Ladies and gentlemen, if you want to

15   stand up while we're waiting for the next witness, feel free.   01:51:52

16           MS. REED ZAID:  Our next witness is Shomari Cottle.

17           COURTROOM DEPUTY:  Come on up.  If you'll stand right

18   here and raise your right hand, please.

19           (SHOMARI COTTLE, a witness herein, was duly sworn or

20   affirmed.)   01:52:31

21           COURTROOM DEPUTY:  Could you spell your name for us,

22   please, your first and last name, please.

23           THE WITNESS:  Shomar, S-H-O-M-A-R-I.  Last name,

24   Cottle, C-O-T-T-L-E.

25           COURTROOM DEPUTY:  Thank you, sir.  Please come have   01:52:50

United States District Court

1     a seat.                                                    01:52:52

2                    **DIRECT EXAMINATION**

3     BY MS. REED ZAID:

4     Q.    Good afternoon.

5     A.    Good afternoon.                                     01:53:13

6     Q.    Can you introduce yourself to the jury?

7     A.    Yes.  My name is Shomari Cottle.

8     Q.    And where do you live?

9     A.    In Franklin Lakes, New Jersey.

10    Q.    And how long have you lived there?                  01:53:21

11    A.    For about two years now.

12    Q.    And when did you arrive here in Phoenix?

13    A.    Yesterday.

14    Q.    Did you go to high school there?

15    A.    Yes.  I went to high school in New York.            01:53:32

16    Q.    So not in New Jersey, but in New York?

17    A.    Yes.

18    Q.    Did you grow up in New York?

19    A.    Yes.

20    Q.    Where?                                              01:53:41

21    A.    In the Bronx, in Brooklyn.

22    Q.    So you went to high school in Brooklyn.  What was the name

23    of your high school?

24    A.    Bronx School for Law, Government & Justice.

25    Q.    And did you go to college?                          01:53:51

                    United States District Court

SHOMARI COTTLE - Direct

| | | |
|---|---|---|
| 1 | A.   Yes, ma'am. | 01:53:53 |
| 2 | Q.   And did you get a degree? | |
| 3 | A.   Yes, ma'am. | |
| 4 | Q.   And where did you go to college? | |
| 5 | A.   Gwinnett College in Lilburn, Georgia. | 01:53:55 |
| 6 | Q.   And what was your degree? | |
| 7 | A.   I got my associate's in business and accounting. | |
| 8 | Q.   And do you work now? | |
| 9 | A.   Yes, ma'am. | |
| 10 | Q.   Where do you do? | 01:54:05 |
| 11 | A.   I'm a store manager at Babies "R" Us. | |
| 12 | Q.   Okay.  And needless to say, is Sheri Booker your mother? | |
| 13 | A.   Yes. | |
| 14 | Q.   And do you have any siblings? | |
| 15 | A.   Yes, I do. | 01:54:16 |
| 16 | Q.   All right.  How many? | |
| 17 | A.   Altogether?  Nine.  From my mom, just my little brother, | |
| 18 | Malik. | |
| 19 | Q.   And where does Malik live? | |
| 20 | A.   He lives with me in Franklin Lakes. | 01:54:30 |
| 21 | Q.   Are you close to him? | |
| 22 | A.   Yes. | |
| 23 | Q.   How old is he? | |
| 24 | A.   He's 21. | |
| 25 | Q.   And how old are you? | 01:54:35 |

United States District Court

SHOMARI COTTLE - Direct

|  |  |  |
|---|---|---|
| 1 | A.    I'm 27. | 01:54:36 |
| 2 | Q.    Living in New Jersey, how often do you get to see your | |
| 3 | mom? | |
| 4 | A.    Not as often as I would like.  But whenever I can take a | |
| 5 | trip to see her, I do. | 01:54:45 |
| 6 | Q.    Shomari, what kind of mom was your mother growing up? | |
| 7 | A.    My mom was a strict mom but she was also very fun, very | |
| 8 | energetic. | |
| 9 | Q.    Does she sing? | |
| 10 | A.    Yes.  She does. | 01:55:02 |
| 11 | Q.    Did she sing while you were growing up? | |
| 12 | A.    Yes, she did, a lot. | |
| 13 | Q.    And can you quickly describe for me your best memory of | |
| 14 | being with your mom? | |
| 15 | A.    My best memory, probably the -- one of the first years we | 01:55:11 |
| 16 | were in North Carolina and it had snowed down there.  I never | |
| 17 | knew it snowed down south, first of all, being from New York | |
| 18 | but it was about two or three feet of snow and I remember it | |
| 19 | blocked the entire doorway almost like to the doorknob.  And | |
| 20 | the trees froze over and bent all the way down and they were | 01:55:33 |
| 21 | like sticking to the glass of the house. | |
| 22 | Q.    So you were snowed in will your mom? | |
| 23 | A.    Yeah.  And then we had like a snowball fight outside and | |
| 24 | we went sledding on the hill in the back. | |
| 25 | Q.    How old were you then? | 01:55:47 |

United States District Court

SHOMARI COTTLE - Direct

1    A.    I was about maybe eight years old.                    01:55:48

2    Q.    Can you describe the worst memory of being with your mom?

3    A.    When she went through her heart situation, probably the

4    first time I thought I would actually lose my mother.

5    Q.    Okay.  Let's fast forward a little bit to that.  Were you    01:56:04

6    with your mother when you found out -- when she found out that

7    she needed heart surgery?

8    A.    Yes.

9    Q.    And where was that?

10   A.    It was at the hospital.  She had called me in to go see    01:56:13

11   her and she let me know that the doctor said that they would

12   need to operate on her.

13   Q.    Okay.  And how was she when she got that news, when she

14   shared it with you?

15   A.    She was very sad and down.  You could tell that she was    01:56:31

16   tired, just exhausted from being there and now having to go

17   through a surgery.

18   Q.    She was upset?

19   A.    Yes.

20   Q.    Was she scared?                                         01:56:45

21   A.    Yes.

22   Q.    Were you scared?

23   A.    Yes, very much.

24   Q.    Were you scared in front of her?

25   A.    I tried not to be but I don't think you can really hide    01:56:51

United States District Court

SHOMARI COTTLE - Direct

1    anything from your mother.  You can ask anyone that.                    01:56:55

2    Q.    Okay.  How long were you with her during that visit?

3    A.    For a couple of hours.  I was with her almost the whole

4    day.

5    Q.    And that was the visit where -- was that a visit where she    01:57:10

6    learned she needed heart surgery?

7    A.    Yes.

8    Q.    Okay.  Did you take her home that day?

9    A.    Yes, I did.

10   Q.    Okay.  Were you worried about her?                             01:57:18

11   A.    Yes.  I kept checking on her throughout the night just to

12   even make sure she was still breathing.  I wanted to actually

13   go lay with her in bed but I was probably too old to do that at

14   that point, but I just -- I don't know.  It was a feeling of I

15   may lose my mom.  I was very scared.                                 01:57:39

16   Q.    Were you living with her during that time?

17   A.    Yes.

18   Q.    Who else was living with you at that time?

19   A.    My grandmother and my Uncle Paris, P-A-R-I-S.

20   Q.    And how long between the time that you were with her when    01:57:56

21   she learned she needed heart surgery and the heart surgery?  Do

22   you remember?

23   A.    About two weeks.

24   Q.    And you were with her the whole time?

25   A.    Yes.                                                          01:58:08

United States District Court

SHOMARI COTTLE - Direct

1   Q.   Did you work during that time?

2   A.   Yes, I did.

3   Q.   Did you have to help her with anything?  How was she doing

4   during those two weeks?

5   A.   She was very, I guess, trying to stay happy but you could

6   tell she was sad.  She was tired.  She was having shortness of

7   breath.  So I just tried to do as much as possible, went and

8   did the food shopping, whatever needed to be done in the house,

9   whatever she asked for.

10  Q.   Did she have some good days during that time period?  How

11  long was that between the visit and then the heart surgery?

12  A.   About two weeks.

13  Q.   Okay.  And during that time, did she have any good days?

14  A.   Yes, she did.  She had some good days.  One day we went

15  out to the pool just so she could sit over there and have a

16  change of scenery.  We would go walking in the back.

17  Q.   Okay.  Was she -- did you have a sense that she was afraid

18  during that time period waiting for the surgery?

19  A.   Yeah.  You could tell that she was just anticipating it.

20  You could just see it in her face.  She was trying to smile but

21  the smile was really holding back her sadness.

22  Q.   And let's fast forward those two weeks to the day of the

23  surgery.  Did you take her to the hospital?

24  A.   Yes.

25  Q.   And how was she on the way there?

United States District Court

SHOMARI COTTLE - Direct

1    A.    You could tell she was bothered and worried, scared.   I        01:59:33

2    think anyone that has to get their heart worked on, I think

3    anyone would be scared.   She was trying to put on a very strong

4    front but I don't think it was working, especially with me.

5    Q.    Was she worried about you?                                        01:59:50

6    A.    Yeah.

7    Q.    Was she worried about your brother, Malik?

8    A.    Yes.   She told me if anything happened to her, don't

9    worry, everything would be taken care of, that to just look

10   after my brother and make sure that he's okay, to not worry        02:00:04

11   about her.   But that's kind of hard.

12   Q.    Did you see her before she went back for surgery?

13   A.    What was the question?

14   Q.    I'm sorry.   Did you see her before she went back to

15   surgery?                                                           02:00:16

16   A.    Yes.

17   Q.    And how was she doing?

18   A.    When you say "went back to surgery," do you mean went back

19   for the second time?

20   Q.    No.   I actually mean you took her to the hospital.   Did      02:00:24

21   you see her right before they took her back?

22   A.    Oh.   Yes.   Before she went in, we all stood in the room

23   and we prayed together, gave her a hug and a kiss and

24   everything, just tried to raise her spirits.

25   Q.    And do you recall how long she was in surgery?                02:00:40

United States District Court

SHOMARI COTTLE - Direct

1   A.   No.                                                          02:00:43

2   Q.   But you were there the whole time?

3   A.   Yes.  It was a couple hours probably.  I don't know the

4   exact time.

5   Q.   Okay.  Did you see her when she came out?                    02:00:50

6   A.   Not immediately after but a little while after.  She was

7   still groggy.  You could tell she was heavily sedated.  She was

8   pale, looked exhausted, had all of these wires and tubes in her

9   but yeah.  She didn't look good.

10  Q.   Were you able to talk to her?                                 02:01:14

11  A.   A little bit, not as much.  She was a little groggy and

12  then I didn't want her to have to speak unnecessarily.

13  Q.   Were you with her when she learned that she needed a

14  second surgery?

15  A.   Yes.                                                         02:01:30

16  Q.   And how did she react to that?

17  A.   She sounded a little defeated because everything couldn't

18  be done the first time, the fact that she had to be operated on

19  again.  She was just very down.  She was very down.

20  Q.   How did that affect you and your brother?                    02:01:49

21  A.   It made me very sad.  I didn't know exactly what to do or

22  what to say.  I was just trying to be there for her and my

23  brother and the rest of the family.

24  Q.   Before she went in for her second surgery, did she get her

25  affairs in order?                                                 02:02:07

United States District Court

SHOMARI COTTLE - Direct

1    A.    I believe so because she told me everything was taken care      02:02:08
2    of, so I would assume yes, that she did.  She told me
3    everything was taken care of.
4    Q.    And did that mean to you?  What did you understand that to
5    mean?                                                              02:02:21
6    A.    That if she was to pass, that her will and everything was
7    taken care of and notarized and my grandmother would be taken
8    care of as well.
9    Q.    And she was still in the hospital; correct?
10   A.    Yes.                                                          02:02:35
11   Q.    And how was she feeling before the second surgery?
12   A.    She was still down and sad.  She was trying to be as
13   optimistic as possible, but you could tell she was still
14   worried and scared about what was going on.
15   Q.    Was she worried for you and Malik?                            02:02:54
16   A.    Yes.  I believe she probably actually worried more about
17   us and our well-being than herself, just like any mother.
18   Q.    Did you see her right before she went back in for the
19   second surgery, meaning wheeled back?
20   A.    Yes.                                                          02:03:10
21   Q.    And did she say anything to you?
22   A.    She said just stay positive and just -- she just kept
23   repeating to look after my brother.
24   Q.    How long was she back in surgery?  How long did you way
25   wait for her?                                                      02:03:28

United States District Court

SHOMARI COTTLE - Direct

1  A.   A few hours.  I don't know the exact timing.  I just
2  remember it being in the waiting room.
3  Q.   And what was that like to wait for your mom when she was
4  in heart surgery?
5  A.   It's a drag because you never know what's going to happen.    02:03:37
6  You just are looking at the clock constantly.  You feel like
7  time has passed and it hasn't.  It's only been two minutes and
8  you feel like an hour.
9  Q.   Did anyone update you while you were back in surgery?
10  Were you able to get updates?                                      02:03:54
11  A.   I believe the doctor communicated to my uncle and
12  everything because we just waited in the waiting room and would
13  come out and say she's doing well.  That's about it.
14  Q.   And did you see her when she came out?
15  A.   Yes.                                                          02:04:08
16  Q.   And how did she look?
17  A.   She looked exhausted, drained.  She had this little heart
18  pillow she was holding onto, very sad.  It wasn't the mother I
19  knew.
20  Q.   Shomari, I'm going to show you a photograph of your mother    02:04:26
21  in the hospital.
22        MS. REED ZAID:  2426.  Can you see the picture on the
23  screen yet?
24        THE WITNESS:  No, ma'am.
25  \\\

United States District Court

SHOMARI COTTLE - Direct

1    BY MS. REED ZAID:                                                          02:05:26

2    Q.   Can you see it now?

3    A.   Yes.

4    Q.   And is this a picture of your mother in the hospital right

5    after her second heart surgery?                                           02:05:31

6    A.   Yes.

7    Q.   And does it depict her accurately after her second

8    surgery?

9    A.   Yes, it does.

10   Q.   You see that it's her?                                               02:05:38

11   A.   Yes.

12          MS. REED ZAID:   Your Honor, I would like to offer

13   Exhibit 2426 into evidence and publish it for the jury.

14          MS. HELM:   No objection, Your Honor.

15          THE COURT:   Admitted and you may publish.                         02:05:47

16          (Exhibit Number 2426 was admitted into evidence.)

17   BY MS. REED ZAID:

18   Q.   Do you recall if this was your mother's appearance right

19   after her second surgery?

20   A.   Yes, it was.                                                         02:06:01

21   Q.   Did you go in and actually see her like this?

22   A.   Yes, I did.

23   Q.   Were you able to spend time with her?

24   A.   Yeah.  I was able to spend time with her.

25   Q.   Was she able to perceive you?  Was she able to perceive              02:06:15

United States District Court

SHOMARI COTTLE - Direct

1  you?  Did she know that you were in the room when she was in          02:06:19

2  this state?

3  A.   I believe so, yes.

4  Q.   Shomari, do you know how long she was like this, meaning

5  this depiction of her on machines and breathing tubes?          02:06:28

6  A.   For a couple of hours until they knew she could breathe on

7  her own.

8  Q.   All right.  Shomari, I'm going to show you another

9  photograph of your mother in the hospital.  It's Exhibit 2427.

10  A.   Yes, ma'am.          02:06:53

11  Q.   Do you see that?

12  A.   Yes.

13  Q.   And this is this an accurate depiction of your mother in

14  the hospital after she had been released from the breathing

15  machines?          02:07:02

16  A.   Yes, ma'am.

17  Q.   I would like to move 2427 into evidence, Your Honor, and

18  publish it for the jury.

19          MS. HELM:  No objection, Your Honor.

20          THE COURT:  Admitted.  And you may publish.          02:07:11

21          (Exhibit Number 2427 was admitted into evidence.)

22  BY MS. REED ZAID:

23  Q.   And, again, now that the jury can see this, is this your

24  mother after she was released from the breathing machine?

25  A.   Yes, ma'am.          02:07:26

SHOMARI COTTLE - Direct

| | |
|---|---|
| 1  Q.   Were you able to have your interaction with your mother | 02:07:27 |
| 2  when she was like this? | |
| 3  A.   Yes, ma'am. | |
| 4  Q.   Do you remember how long she was in the hospital after | |
| 5  this, Shomari? | 02:07:41 |
| 6  A.   After the second surgery? | |
| 7  Q.   Yes, sir. | |
| 8  A.   Under a week, a couple days. | |
| 9  Q.   Were you there every day with her? | |
| 10  A.   Yeah.  I came every day after work and if I didn't have to | 02:07:50 |
| 11  work, I was there. | |
| 12  Q.   Okay.  Did you see her doing any sort of rehabilitation | |
| 13  after this surgery, any exercises or anything? | |
| 14  A.   Just trying to walk.  I remember her holding that heart | |
| 15  pillow and the doctors telling her she had to try to walk and | 02:08:09 |
| 16  get some mobility, her going down the hallways and being | |
| 17  stubborn and not wanting help but you could tell she needed it. | |
| 18  Q.   And were you there helping her, walking with her and | |
| 19  everything? | |
| 20  A.   Yes, ma'am. | 02:08:27 |
| 21  Q.   How did that make her feel to have her son helping her | |
| 22  now? | |
| 23  A.   I don't think it made her very happy, especially the | |
| 24  entire time she's been the head of household, the one that | |
| 25  holds everything together and now me, her child, is the one | 02:08:39 |

United States District Court

SHOMARI COTTLE - Direct

1  having to help her.                                                                     02:08:42

2  Q.   How were her spirits in those first few days after she

3  came out of anesthesia and you saw her?

4  A.   She was still a little down but it was getting better.   As

5  the days progressed, you could see her getting a little bit        02:08:56

6  more spirited knowing that at least the second time it was more

7  successful.

8  Q.   Was she more hopeful?

9  A.   Yes.

10 Q.   And did you take her home?                                    02:09:10

11 A.   Yes.

12 Q.   And can you tell the jury her physical state when you got

13 her home generally?

14 A.   She was exhausted.   She couldn't really move.   I know she

15 was in pain.   Just walking to the bathroom was tough.   We had    02:09:22

16 to sometimes help her to get in and out of bed.   It was just a

17 process.

18 Q.   When you say "we," who is "we"?   Who else was with you?

19 A.   Me, my grandmother, my brother while he was there, my

20 uncle, anyone that was there would help.                           02:09:41

21 Q.   They were all helping with her care?

22 A.   Yes.

23 Q.   Did your grandmother do anything specific for her in the

24 home while she was recovering?

25 A.   She did most of the cooking.   She laid with her at night     02:09:53

SHOMARI COTTLE - Direct

1   at times.  She just talked to her, just giving her that                    02:09:59

2   shoulder to lean on.

3   Q.   Did she have to do personal things for her?

4   A.   Yes.  She had to bathe her because she couldn't really do

5   that on her own.  I would help her to the bathroom but as far              02:10:14

6   as being in the bathroom, my grandmother would help with that.

7   That's, yeah, about it.

8   Q.   And how did it make your mother feel to have her mother

9   helping her during that time, helping her with those private

10  activities?                                                                02:10:36

11  A.   She didn't like it very much at all, especially as

12  independent as my mother is to now once again have her mother

13  having to help and nurse her, she didn't like that very much at

14  all.

15  Q.   And how is it for you and your brother during this time               02:10:51

16  watching her recover?

17  A.   It was a tough process but we just had to stay positive.

18  It was sad for both of us.  We just spoke about it in private.

19  It was a tough time.

20  Q.   And did your mom progressively start to recover?                      02:11:09

21  A.   Yeah.  Little by little as the days went on, you could see

22  she could move a little bit more and then as the weeks

23  progressed, you know, she was able to get out of the bed on her

24  own and we could not really walk outside but we would take a

25  short walk, so she was just progressing as time went along.                02:11:32

United States District Court

SHOMARI COTTLE - Direct

1   Q.   Did her confidence get better?                                    02:11:35

2   A.   Yes, it did.  You could see her smile genuinely coming

3   out.  Her laughter was a little bit more even though she

4   couldn't do it very much because it would hurt her chest, but

5   yes.                                                                   02:11:49

6   Q.   And how about her morale, did it gradually increase?

7   A.   Yeah, it did.  Definitely very much so.  You could just

8   feel her energy getting more positive and seeing it in her face

9   and just every day little things.

10  Q.   When you spend time with your mom, is she still concerned        02:12:04

11  about what happened to her?

12  A.   Yes.

13  Q.   She expressed that to you?

14  A.   Yes.

15  Q.   What specifically does she express?                             02:12:12

16  A.   Well, she never knows what can and cannot happen.

17  Tomorrow is never promised.  She worries that there's also a

18  piece still inside of her that can shift at any moment or move.

19  Q.   Do you know your mom hiked Stone Mountain?

20  A.   Yes.                                                            02:12:42

21  Q.   Was that a milestone for her?

22  A.   Yes, it was, very much so because I got a phone call from

23  it when she got up there.  She took a picture and everything.

24  And she had been talking about it for a while and when she

25  finally accomplished it, she was very, very happy.                  02:12:58

United States District Court

1  Q.   And looking at what your mother went through that you were   02:13:01

2  there and you saw and experienced with her and seeing how she's

3  progressed along and as you said remained positive and hopeful,

4  are you proud of your mom?

5  A.   Yes, very much so, especially all she's gone through.   I   02:13:13

6  don't know if I would ever be as strong as she is but she

7  definitely sets a great example.

8            MS. REED ZAID:   I have nothing further.

9            THE COURT:   Cross-examination?

10            MS. HELM:   No questions, Your Honor.   02:13:28

11            THE COURT:   All right.   Thank you.   Sir, you can step

12  down.

13            THE WITNESS:   Thank you.

14            (Witness excused.)

15            MS. REED ZAID:   Our next witness is appearing by   02:13:55

16  videotape.

17            THE COURT:   All right.   If you want to stand up for a

18  minute, ladies and gentlemen, while this gets set up, feel

19  free.

20            MS. REED ZAID:   I apologize to the Court, Your Honor,   02:15:26

21  and to the jury.

22            I apologize, Your Honor.   We don't have a lot of room

23  at that table and things get stacked and folders run away.

24            The next witness by videotape is Gin Schulz.   She

25  received her bachelor's degree in chemical engineering from the   02:16:29

United States District Court

1   University of Missouri in 1981 and received a master's degree      02:16:31

2   in business administration in 2003.  She joined Bard Peripheral

3   Vascular, or BPV, in October of 2005 as Vice President of

4   Quality Assurance.  In this role she was responsible for

5   overseeing the quality systems, ensuring BPV was compliant with   02:16:48

6   regulations and hiring and managing the Quality Assurance

7   staff.

8             In 2011 Ms. Schulz transferred to C.R. Bard to be the

9   Vice President of Quality Operations, a role from which she

10  just recently retired.                                            02:17:05

11            Prior to working at BPV, she had a 15-year career at

12  Johnson & Johnson and its medical device subsidiaries where she

13  held various positions including manager of Quality and

14  Compliant Services.

15            THE COURT:  Would you please spell her lame?            02:17:19

16            MS. REED ZAID:  It's Schulz.  S-C-H-U-L-Z.

17            THE COURT:  All right.

18            MS. REED ZAID:  And we have a list of evidence to

19  move in, Your Honor.  Trial Exhibit 1948, Deposition Exhibit 2;

20  Trial Exhibit 1950 which is Trial Exhibit -- Deposition 4.        02:17:35

21  Trial Exhibit 1951 and the deposition number was five; Trial

22  Exhibit Number 1940.  Deposition Exhibit 11.  Trial Exhibit

23  1941, Deposition Exhibit 12; Trial Exhibit 1944, which is

24  Deposition Exhibit 15; Trial Exhibit 1945 is Deposition Exhibit

25  16; Trial Exhibit 1946 is Deposition Exhibit 17; Trial Exhibit    02:18:19

United States District Court

1   735, Deposition Exhibit 20; and Trial Exhibit 1949, Deposition        02:18:30

2   Exhibit 21.  I would like to move these into evidence at this

3   time, Your Honor.

4               THE COURT:  Any objection?

5               MS. HELM:  No, Your Honor.                                 02:18:43

6               MS. REED ZAID:  Thank you.

7               THE COURT:  All right.  Those exhibits are admitted.

8   And you may play the deposition testimony.

9               (Exhibit Numbers 1948, 1950, 1951, 1940, 1941, 1944,

10  1945, 1946, 735, 1949 were admitted into evidence.)                   02:18:48

11              (Whereupon the deposition of Gin Schulz was played.)

12              THE COURT:  Counsel, can we turn down just a little

13  bit?

14              Let's stop the video there.

15              All right.  Members of the jury, we've reached 2:30.       02:29:44

16  We will plan to resume at 2:45.  We will excuse you at this

17  time.

18              (Jury departs at 2:29.)

19              (Recess at 2:29; resumed at 2:46.)

20              (Jury enters at 2:46.)                                     02:46:33

21              (Court was called to order by the courtroom deputy.)

22              THE COURT:  Thank you.  Please be seated.

23              Counsel, you may continue with the deposition.

24              (The deposition of Gin Schulz continues to be

25  played.)                                                              02:47:20

                    United States District Court

MR. LOPEZ:  That concludes that deposition, Your          03:09:53

2    Honor.

3             THE COURT:  All right.

4             MS. REED ZAID:  The next witness appearing by

5    videotaped is Guillermo, or Bill, Altonaga.  Guillermo Altonaga    03:10:06

6    practiced as an optometrist for 19 years after which he began

7    working for a medical device companies in its Field Assurance

8    Department.  In 2008 he began work with Bard Peripheral

9    Vascular as a consultant and then in 2010 became a full-time

10   employee of BPV working in Quality Assurance and Medical          03:10:30

11   Affairs where his responsibilities included providing clinical

12   input to failure modes and analyses, health hazard evaluation,

13   and promotional materials.  He's not a licensed medical doctor.

14            MS. HELM:  Excuse me, Your Honor.  Just so the record

15   is clear, he's an ophthalmologist, not an optometrist.           03:10:54

16            MS. REED ZAID:  This is the agreed-upon statement to

17   be read into the record.

18            MR. LOPEZ:  Your Honor, he's an optometrist he said

19   at his deposition.

20            MS. REED ZAID:  There's one document to be moved into    03:11:22

21   evidence, Your Honor.  It's Trial Exhibit 546 which is

22   Deposition Number 4.

23            MS. HELM:  No objection.

24            THE COURT:  546 is admitted.

25            (Exhibit Number 546 was admitted into evidence.)         03:11:43

United States District Court

```
 1              (Whereupon the video deposition of Guillermo Altonaga    03:11:58
 2    was played.)
 3              MR. LOPEZ:  Your Honor --
 4              Please stop it.
 5              I don't know that anyone could have heard that          03:21:49
 6    question.  Would you mind if I read?  It.  It was the court
 7    reporter reading the question.
 8              THE COURT:  You can read the question and the answer.
 9              MR. LOPEZ:  Question:  Would it be your expectation
10    that when Bard launched a filter for commercial use that Bard     03:22:02
11    would have an awareness about the long-term clinical
12    performance of that device?
13              Answer:  Yes.
14              (The video deposition of Mr. Altonaga continues to be
15    played.)                                                          03:22:39
16              MS. REED ZAID:  The next witnesses appearing by
17    videotape is Robert Ferrara.  Robert Ferrara has a mechanical
18    engineering degree from Polytechnic University and an
19    M.B.A. from Dowling College.  He was a sales representative at
20    the GlaxoSmithKline from 2002 to 2004.  He worked as a sales      03:31:05
21    representative at C.R. Bard from 2004 to 2011 and during this
22    time sold Bard's IVC filters.  He currently works for
23    Medtronic, another medical device manufacturer.
24              And, Your Honor, I would like to move into evidence
25    Trial Exhibit 1103 (sic, corrected later in trial) which is       03:31:28
```

United States District Court

1   Deposition Exhibit Number 3, and Trial Exhibit Number 905,       03:31:33

2   Deposition Exhibit 19.

3            THE COURT:  Any objection?

4            MS. HELM:  No objection, Your Honor.

5            THE COURT:  All right.  Those are admitted.           03:31:45

6            (Exhibit Numbers 1130 and 905 were admitted into

7   evidence.)

8            (Whereupon the video deposition of Robert Ferrara was

9   played.)

10           MS. REED ZAID:  Next witness appearing by videotape,   03:50:39

11  which is only four minutes long, is Jason Greer.  Jason Greer

12  graduated from the University of Mississippi and became a sales

13  representative at Bell South Mobility in 1991 and worked for

14  two other companies doing sales until he joined Bard Peripheral

15  Vascular in 1999 as a sales representative.  In 2005 he became   03:50:56

16  a district manager and throughout his time at Bard, he sold

17  Bard's IVC filters.  Mr. Greer left Bard in 2007 and currently

18  works at another medical device manufacturer.

19           We would like to move one exhibit into evidence, Your

20  Honor.  It's Trial Exhibit 1912, Deposition Exhibit Number 7.   03:51:16

21           MS. HELM:  Excuse me, Your Honor.  No objection.

22           THE COURT:  1912 is admitted.

23           (Exhibit Number 1912 was admitted into evidence.)

24           MS. REED ZAID:  Thank you.

25           Ladies and gentlemen, if you want to stand up while    03:51:45

United States District Court

1    we start this, go head.  We've got 25 minutes to go and if you      03:51:48

2    need to stretch, feel free and if you don't, that's okay, too.

3              (Whereupon the video deposition of Jason Greer was

4    played.)

5              MS. REED ZAID:  The next witness to appear by             03:56:53

6    videotape is Christopher Ganser.  Christopher Ganser is a

7    graduate of the California State University in Long Beach.  He

8    earned a bachelor of science in industrial technology and

9    quality assurance.

10             He began his career with C.R. Bard in 1994 and worked     03:57:05

11   in Quality Assurance.  Mr. Ganser was Vice President,

12   Regulatory Science, at C.R. Bard from 2005 through 2006 and

13   Vice President, Quality Environmental Services and Safety, from

14   2007 through 2011 when he left Bard.

15             Mr. Ganser currently runs his own consulting firm and     03:57:27

16   consults with medical device manufacturing.

17             There's one exhibit we would like to move into

18   evidence Your Honor.  It's Trial Exhibit 4328, Deposition

19   Exhibit 517.

20             MS. HELM:  No objection, Your Honor.                      03:57:47

21             MS. REED ZAID:  And the tape is 16 minutes.

22             THE COURT:  It is admitted.

23             (Exhibit Number 4328 was admitted into evidence.)

24             (Whereupon the video deposition of Christopher Ganser

25   was played.)                                                        04:01:47

1          MS. REED ZAID:  The next witness appearing by video          04:14:42

2     is Dr. Frederick Rogers.  Dr. Frederick Rogers specializes in

3     critical care and has over 37 years of experience in the field

4     of medicine.  He is board certified in surgery and surgical

5     critical care.  He graduated from the University of Vermont          04:14:57

6     College of Medicine with his medical degree in 1981.

7          In 2008 Dr. Rogers assumed the Trauma Medical

8     Directorship at Lancaster General Hospital, a Level II trauma

9     center in southeastern Pennsylvania; and in January of 2017 he

10    became Director of the Lancaster Hospital Clinical Research          04:15:20

11    Program.

12         He has conducted clinical research involving IVC

13    filters for more than 20 years.  Dr. Rogers is not being

14    presented as an expert witness by either party.

15         There are no exhibits to be entered.          04:15:35

16         THE COURT:  All right.  We'll just go for four

17    minutes and break.  4:20, ladies and gentlemen.

18         (Whereupon the video deposition of Dr. Frederick

19    Rogers was played.)

20         THE COURT:  All right, sir.  Let's stop it, counsel.          04:19:40

21         All right, ladies and gentlemen, thanks for your

22    attention today.  We will plan to start at 9 o'clock tomorrow.

23    We will excuse the jury at this time.

24         (Jury departs at 4:19.)

25         THE COURT:  Please be seated.          04:20:11

                    United States District Court

1          Counsel, how have you allotted time for the

2     depositions played today?

3          MS. HELM:  I sent her the numbers.

4          I apologize, Your Honor.  She took my notes but I

5     have it by email.

6          THE COURT:  Well, counsel, I'll tell you what.  Why

7     don't you work it out.  We're going to take a ten-minute break

8     for the court reporter before we start talking about jury

9     instructions and you can give me those when I come back.

10          (Recess at 4:21; resumed 4:30.)

11          (Court was called to order by the courtroom deputy.)

12          THE COURT:  Please be seated.

13          All right.  Counsel, what did you work out on the

14     time?

15          MS. HELM:  Your Honor, prior to -- and not including

16     the last video that is midway through, 30 minutes for the

17     defendant.

18          THE COURT:  Okay.

19          All right.  So as of the end of the today, plaintiffs

20     have used 24 hours and 18 minutes and defendants have used

21     seven hours and 26 minutes.

22          I know you know from the math that means plaintiffs

23     have four hours and 40 minutes left for everything, closing,

24     punitive time and cross-examinations.  And I can't let you go

25     over that amount of time because we have our whole trial

United States District Court

04:20:15

04:20:39

04:21:44

04:31:06

04:33:18

04:33:40

1 | schedule built on it.

2 |     A question.  You all said that one of the exhibits

3 | being admitted today was 1103 and that is not on the exhibit

4 | list.

5 |     Traci, what did you think it might be?

6 |     COURTROOM DEPUTY:  1130.

7 |     THE COURT:  She thought maybe it was 1130 but it was

8 | read in as 1103.

9 |     MR. O'CONNOR:  Do you know which witness that was?

10 |     THE COURT:  It was during Ferrara.

11 |     MS. REED ZAID:  It is 1103 written on my resource.

12 | Let me double-check.  You think it was three zero?  Okay.  I

13 | will check it.

14 |     THE COURT:  That's fine.  We don't need to worry

15 | about it now but if we could just address that.

16 |     Let me mention one other thing.  I don't think

17 | there's anything we can do about it for this trial but for the

18 | next you might.  There have been two instances I remember

19 | distinctly and probably four or five where an exhibit was shown

20 | on the screen during a deposition excerpt that had not been

21 | moved into evidence in connection with that deposition and the

22 | witness was asked about it.

23 |     I know that's happened twice that I specifically

24 | noted today and I think it happened two or three times before

25 | that.

1       So as you go forward, please double-check your          04:35:37

2  experts against the exhibits that are being moved in.

3       As I say, I don't think there's anything we can do

4  about that now because it when came up on the screen, I

5  couldn't correlate it to any exhibit in evidence because the   04:35:49

6  number didn't -- the deposition number didn't match or it was

7  mentioned a number that hadn't been moved in.

8       So just take that into account if you would when we

9  do depo presentations in the next trial.

10      All right.  Jury instructions.  I don't know of a        04:36:06

11 more efficient way to do this than to just get each side's

12 comments on the instructions, so I think what I want to do is

13 start with plaintiff, get your comments on the instructions

14 that have been proposed and we may talk through some of those

15 and then defendant.                                            04:36:31

16      MS. LOURIE:  Your Honor, we do not have any objection

17 to the instructions contained on pages two through 12.

18      THE COURT:  By the way, let me just make one comment.

19 You'll notice sometimes I've got a question mark in

20 parentheses, that's just to remind me at the end of the trial   04:36:59

21 that the instruction is needed, that there was such evidence

22 presented.  We'll address that after the evidence is in.

23      Okay.  So going to page 13.

24      MS. LOURIE:  On page 13, that charge, we do not have

25 any objection to the language of the charge.  But we feel like   04:37:20

1279

 1    if you direct your attention to page 13 at the bottom where the   04:37:27

 2    paragraph starts "In determining" and goes through the next

 3    page to number six, all of that language is an explanation of

 4    item 12 on your list of considerations for design defect on

 5    page 15.   04:37:47

 6         And then the following paragraph is an explanation

 7    for 13 on the list which is compliance with standards.  We feel

 8    like it would make more sense to move those explanations to

 9    below those numbers 12 and 13 so that it's clear what they go

10    with.   04:38:07

11         THE COURT:  So taking "in determining" through six

12    and then "in determining," the next paragraph, and put them at

13    the end.  Is that the thought?

14         MS. LOURIE:  After number 13 of your list of

15    considerations.   04:38:22

16         THE COURT:  And before that final paragraph?

17         MS. LOURIE:  Yes, sir.

18         I see you nodding, Ms. Helm.  Are you in agreement?

19         MS. HELM:  Yes, Your Honor.  That's actually how the

20    Georgia pattern charge reads so we are in agreement.   04:38:40

21         THE COURT:  Okay.  Let me make a note.

22         MS. LOURIE:  And we actually submitted a charge

23    following that.

24         THE COURT:  Okay.  So then we would take that

25    language and put it in before the final paragraph on page 15;   04:38:52

United States District Court

1    right?                                                      04:38:58

2              MS. LOURIE:  Yes, sir.

3              THE COURT:  Okay.  We'll do that.

4              MS. LOURIE:  The charge that starts on 16, failure to

5    warn, we would ask that you move the third paragraph that    04:39:12

6    starts with "the manufacturer of a medical device," which deals

7    with learned intermediary, to where learned intermediary is

8    discussed below which starts with "C.R. Bard" at the bottom of

9    the page.

10             THE COURT:  So you would put it before that paragraph  04:39:41

11   at the bottom of the page?

12             MS. LOURIE:  What do you think, Kate?

13             MR. STOLLER:  Your Honor, we were going back and

14   forth on this ourselves whether it makes sense to put it in

15   front of the paragraph or after the second sentence of the next  04:39:59

16   paragraph which reads:  C.R. Bard and BPV owe this duty to warn

17   to all physicians whom the manufacturers are to reasonably

18   foresee may use the product, which is where the physician is

19   introduced.

20             THE COURT:  I'm happy to do it.  I want to hear      04:40:16

21   defendants' views.  Let me tell you will why I put it where I

22   did.  The reason I did that was because when we start into the

23   actual instruction to recover damages for strict liability

24   because of an inadequate warning, she must establish -- and

25   we're telling them what Ms. Booker must establish in terms of  04:40:33

1   inadequate warning.  It seemed to me important for the jury to      04:40:36

2   understand that means inadequate warning to the physician.  I

3   thought that was an important context for them to have when

4   they are looking at the elements of proof and that's why I put

5   it up there.                                                         04:40:51

6           If you think it's too disjointed there, we can move

7   it; but you had proposed it later but I moved it up just so

8   that when we're actually setting out the elements of proof,

9   they understand it's the warning that the physician we're

10  talking about, because that idea is not introduced earlier in      04:41:04

11  anyplace in the instructions I don't believe.

12          MR. STOLLER:  The logic, Your Honor, is only to be

13  consistent with the other instruction in terms of the way it's

14  organized which is to introduce the charge or the claim that is

15  being made, a description of it, then the elements, and that is    04:41:33

16  a part of it.  It's probably, you know, six of one, half a

17  dozen of the other.  We felt it flowed better after the

18  elements.

19          THE COURT:  What do defendants think?

20          MR. NORTH:  I think the point that the Court raised        04:41:48

21  is an important one that should be left where it is.

22          THE COURT:  Well, if it's six of one and half-dozen

23  of the other . . .

24          MR. STOLLER:  Understood, Your Honor.

25          THE COURT:  I think I'll leave it where it is just         04:42:04

1    because I really do want the jury to understand when they are          04:42:06

2    hearing or reading the elements, they know this is talking

3    about warnings to physicians.

4            MS. LOURIE:  Okay.  On page 17 of this charge where

5    it starts "The manufacturer's duty" under A and B, at the              04:42:21

6    beginning of the charge, you indicated that requests for

7    instruction number four, plaintiff's version was being given

8    but actually this paragraph is defendants' proposed

9    instruction.

10           Our proposed instruction had an additional sentence            04:42:40

11   that we ask be included at the end of that paragraph.

12           THE COURT:  Is this the one about months, years

13   and --

14           MS. LOURIE:  Yes, sir.

15           THE COURT:  You're right.  Thanks for catching that.           04:42:54

16   I did pull that out.  There's only one reason I did.  It's in

17   the cases you cited.  I think it's in Georgia law.  It's not in

18   the Georgia pattern jury instruction.  That's the only reason I

19   pulled it out.  I was trying to hue as closely as I could to

20   the pattern jury instructions although I departed from them in         04:43:09

21   a number of places as you've seen.  That's the reason that

22   sentence came out and I'm happy to hear your thoughts on it.

23           MS. LOURIE:  Okay.  I understand, Your Honor, and our

24   thoughts are that the way it's worded, it could lead the jury

25   to believe that the duty to warn ends at the time of                   04:43:29

                        United States District Court

1    implantation and in this case, obviously, the filter was in Ms.    04:43:36

2    Booker for seven years.  That duty to warn her physicians,

3    including Dr. Amer who allegations have been leveled against in

4    this case, should -- the jury should understand that that duty

5    continues beyond implantation.  And if we don't tell the jury    04:43:52

6    that, then they won't have any instruction in that regard and

7    they won't know that the duty continues.  And Dr. Amer's

8    actions were two years after implantation.

9              THE COURT:  Defendants, thoughts on that issue?

10             MR. NORTH:  Your Honor, we think the pattern charge    04:44:10

11   as it is is not ambiguous.  It talks about after the product

12   leaves the control of the manufacturer which would include the

13   time Dr. Amer assessed his study.  We think we should stick

14   with the pattern charge as opposed to getting that specific as

15   they want to with the language.    04:44:28

16             THE COURT:  Is your concern that in the second

17   sentence of that -- well, I guess I'm not able to articulate it

18   clearly.  The second sentence says:  It continues after a

19   product has left the control of the manufacturer to be sold or

20   distributed to the consumer.    04:45:29

21             Is your conclusion or your concern that that suggests

22   it goes from after it leaves until it gets into the hands of

23   the consumer?

24             MS. LOURIE:  Yes, sir.  That's exactly my concern

25   because the way it reads now, it says:  To be sold or    04:45:43

                    United States District Court

1    distributed to the consumer.  And that is the end of the          04:45:45

2    instruction.  And that implies that that is the end of the duty

3    to warn.

4              So if you don't instruct the jury on the continuing

5    duty for weeks, months, years, they won't know that.  That law    04:45:59

6    will not be before them; and as you stated, that is the correct

7    law in Georgia.

8              THE COURT:  All right.  Well, it seems to me there's

9    three ways we could address this.  One would be to end that

10   sentence after the word "manufacturer" so that it says:  As a     04:46:19

11   continuing duty to adequately warn of defects in the product

12   even after the product has left the control of the

13   manufacturer, period.

14             We could add language at the end of the sentence

15   which says something like:  And, comma, in the case of medical    04:46:37

16   products, comma, after they have been implanted, period.  Or a

17   third is we could add the weeks, months, and years sentence

18   that was proposed.

19             I'm interested in your thoughts on those three

20   options.                                                          04:46:56

21             MS. LOURIE:  I think the second one would be

22   preferable or the third over the first.

23             MR. NORTH:  Not trying to be difficult but I like the

24   first alternative.  I think it's simpler and avoids too much

25   comment.                                                          04:47:12

                      United States District Court

1285

| | |
|---|---|
| 1 | THE COURT:  Well, one of my concerns is not wanting | 04:47:12 |
| 2 | to comment on the evidence.  If we ended the sentence after the | |
| 3 | word "manufacturer," it's clear the instruction says the duty | |
| 4 | continues after it leaves Bard's control.  There will be no | |
| 5 | argument from the defendants that it ended at some point.  It | 04:47:28 |
| 6 | seems to me in closing you can emphasize the law says the duty | |
| 7 | doesn't end when the filter leaves their hands.  It continues | |
| 8 | after.  And you can make your point with full force and not -- | |
| 9 | there won't be any risk.  The instruction is going to limit the | |
| 10 | jury. | 04:47:46 |

Do you see it differently as how it will play out in
closings?  I know you like the other instruction better but I
want to make sure you're not seeing some ambiguity in that
course.

MR. STOLLER:  I think there's a difference, Your
Honor, between an argument about the facts as they apply to the
law and the law and I think the law is that the duty continues
even after implant.  And I think there's a difference in
arguing to the jury that that duty continues even after it's
implanted, as a matter of law, versus saying the duty continues
without a real end for the jury to understand.

And then they had -- I'm not going to be doing the
closing in this case but then for me to say it's a different
thing to say, "You're going to be instructed by the Judge that
the law requires that duty even after it's been implanted,"

                    United States District Court

1   which is, in fact, the law and me saying the law says it        04:48:34

2   continues after they release it, and you should infer that

3   means even after it's been implanted.  But it is particularly

4   an issue with a medical device because I think unlike me buying

5   something off the shelves there's that -- there's the learned   04:48:49

6   intermediary that you are instructing them on that the doctor

7   is the one who is buying, the doctor is the one they have to

8   warn and there is sort of a break in that continuity between

9   the manufacturer and the ultimate person who is implanted with

10  the product.                                                    04:49:05

11          So I think it's more appropriate, Your Honor, to add

12  that language and your second suggestion than to cut off the

13  language.

14          THE COURT:  Mr. North?

15          MR. NORTH:  Your Honor, with respect to Mr. Stoller,    04:49:14

16  I don't think that is necessarily the law in Georgia.  I think

17  that is undecided.  The Georgia continuing duty to warn cases

18  have generally dealt with motor vehicles and consumer products.

19  I am not aware of a single one that has addressed the

20  continuing duty to warn in the context of a medical implant and 04:49:33

21  whether it would continue after implant.

22          I think there's an argument to be made that that

23  should be treated differently than a consumer product; and if I

24  was in front of the Georgia Court of Appeals, I might be trying

25  that.  But I think we're safer in this right after             04:49:48

United States District Court

1   "manufacturer" since the application of the continuing duty to   04:49:51

2   warn has not been spelled out for medical products in the past

3   to my knowledge.

4           THE COURT:  All right.  I understand both sides'

5   arguments.  I'll think about this.  I want to give this some   04:50:03

6   more thought.

7           MS. LOURIE:  Okay.  Finally in this charge, Your

8   Honor, at the end of the paragraph just beyond that one, our

9   charge had a sentence that stated at the very end of that

10  paragraph:  A warning is inadequate if it does not provide a   04:50:22

11  complete disclosure of both the existence of the risk and the

12  extent of the danger and the severity of any potential injury

13  involved.

14          We would ask that that language be put back into the

15  end of this paragraph.  I think it's important to our facts of   04:50:40

16  the case in that the G2 filter -- IFU, excuse me, did not warn

17  about the extent of injury that could take place here.

18          THE COURT:  Let me -- I'm going to step out for just

19  a second and grab my notes that I left on my desk about that

20  sentence.  I'll be right back.   04:51:08

21          Which instruction or proposed instruction was that

22  in?

23          MS. LOURIE:  It was in plaintiff's request to charge

24  number four.

25          THE COURT:  Okay.  Just a second.   04:51:47

                    United States District Court

 1        The note that I made when I crossed out that sentence    04:52:22
 2   was "too much of a comment on the evidence."  It just seemed to
 3   me to be so close to the evidence that it would sound to the
 4   jury like I was commenting on the evidence.  I'm interested in
 5   your thoughts on that.  And I am sorry but I am forgetting your    04:52:42
 6   name.

 7        MS. LOURIE:  Robin Lourie.  Ms. Lourie.

 8        THE COURT:  Lourie.  Okay.  Ms. Lourie, go ahead.

 9        MS. LOURIE:  Well, I don't see that it's really a
10   comment on the evidence to explain to them that there's a duty    04:52:58
11   that exists to warn of the extent of the severity of the injury
12   that could potentially occur.  I mean, that's a part of the
13   warning that should be given by a manufacturer of any product,
14   especially a medical device.

15        THE COURT:  Okay.    04:53:22

16        Defendants?

17        MR. NORTH:  Your Honor, we do believe that's a
18   comment on the evidence.  Georgia law and the pattern charge is
19   that the warning must be adequate.  I think it's certainly up
20   to them to argue that to adequately apprize a doctor, they    04:53:31
21   need -- the warning should talk about both the extent and the
22   severity.  But, again, I think that's more appropriate for
23   arguments and, in a charge like this, would be commenting on
24   the evidence and it's not part of the pattern charge.

25        THE COURT:  Let me ask whether defendants are going    04:53:57

1  to be recommending changes on page 17 other than the issue I'm            04:54:00

2  addressing in the italics on the bottom.

3          MR. NORTH:  Only with regard to our request number

4  four, Your Honor, that's mentioned at the end.

5          THE COURT:  Okay.                                                  04:54:24

6          All right.  On this issue I'm going to go with my

7  initial instinct.  I think that is too much of a comment or

8  could be perceived as a comment on the evidence by me.  The

9  sentence that is in that paragraph says:  You must decide

10 whether adequate efforts were made by C.R. Bard and BPV to       04:55:01

11 communicate all risks that were known or reasonably should have

12 been known.  I think that's broad as it should be and gives the

13 plaintiffs ample room to make the arguments and for the jury to

14 recognize that Bard had a duty to warn of risk, so I'm not

15 going to include that final sentence that was in request to      04:55:20

16 charge number four.

17         MS. LOURIE:  Okay.  The only other comment we have is

18 I think there's just a typographical issue on page 16 under

19 paragraph -- not paragraph, line item C.  I think that the

20 word -- the third "the" doesn't really belong in that sentence.  04:55:40

21         THE COURT:  Tell me again where we are on page 16.

22         MS. LOURIE:  C, subparagraph C.

23         THE COURT:  Where it says "the inadequate warning"?

24         MS. LOURIE:  Yes, sir, "was the proximate cause

25 of" -- we need to take the out.                                  04:55:59

United States District Court

```
 1              THE COURT:  I see.  We'll take that out.          04:56:01

 2              MR. STOLLER:  Actually, Your Honor, that same issue

 3    appears in the design defect one as well under the same

 4    element, C.  You'll find it there and, unfortunately, it

 5    carries through on the reordered proposed charge we gave you.  04:56:14

 6              THE COURT:  Okay.  So that's on page 13; right?

 7              MR. STOLLER:  Yes, sir.

 8              THE COURT:  Okay.  We'll fix that.

 9              I'll tell you that, before we go on with plaintiffs,

10    because it's going to help me to think about these altogether,  04:56:27

11    let's cover the ground with defendants that we've already

12    covered.

13              Did you have comments, defense counsel, on the strict

14    liability design defect instruction?  We've already talked

15    about moving paragraphs but did you have other comments?      04:56:43

16              MR. NORTH:  No, Your Honor, we did not.

17              THE COURT:  Okay.

18              And what then are your comments on the strict

19    liability, failure to warn?

20              MR. NORTH:  The comments on the strict liability,    04:56:57

21    failure to warn, Your Honor, are, we believe the evidence would

22    support our -- I'm sorry, I'm having trouble with all of these

23    numbers.  Number four, which is the failure to read the

24    warning, we believe that that -- that the Court left open the

25    possibility depending on the evidence and said that the parties  04:57:25
```

United States District Court

1    were disputing.  As we understood Dr. D'Ayala's testimony, he      04:57:28

2    said that the IFU was, quote, available, unquote.  But he never

3    said he read the IFU.  And we believe that is, of course, the

4    plaintiff's burden to show not only a failure to warn but that

5    the failure to warn caused the incident or the injury.            04:57:50

6        And I don't think it meets their burden necessarily

7    and we should be able to argue they haven't met that burden

8    because they -- the testimony is only that it was available to

9    him.  The other testimony was that he did not recall whether he

10   had any discussions with Mr. Ferrara about filters and          04:58:07

11   complications.  So we just believe that evidence is adjusted or

12   does warrant the charge that we recommended which is just one

13   sentence in our proposed number four.

14       THE COURT:  All right.  I'm trying to find it.  What

15   page was it on in your submissions?                             04:58:32

16       MR. NORTH:  The one that is on page 108, the proposed

17   charge --

18       THE COURT:  That's probably why I'm not finding it.

19       MR. NORTH:  -- of the original submission.

20       THE COURT:  Yes.  I must have put it under the            04:58:45

21   negligent failure to warn.  Hold on just a minute.

22       Mr. North, let me ask you a question on this.  This

23   instruction, it seems to me, would tell the jury that they

24   should rule in your favor on the failure to warn claim if

25   Dr. D'Ayala did not read the IFU even if the jury finds that    04:59:38

1292

1   Bard should have and did not send a dear doctor letter or                04:59:48

2   advise its sales force or take some other action to notify

3   Dr. D'Ayala.  Wouldn't that be the effect of this instruction?

4           MR. NORTH:  I think -- Your Honor, I had not thought

5   of that in that way.  I think you are correct but I think the            05:00:10

6   instruction, if I could be given the opportunity, could be

7   reworded to sort of not directing it only in that circumstance

8   because it is an important point to emphasize or to demonstrate

9   that there must be a causal link with the warning and I think

10  that the jury could be instructed that that is one factor to             05:00:30

11  consider in determining whether a failure to warn was the

12  causation here or cause.

13          THE COURT:  Well, you said there needs to be a causal

14  link with the warning.  I think there needs to be a causal link

15  with the failure.                                                        05:00:45

16          MR. NORTH:  Right.  Either way.  The warning or the

17  failure.  Either an inadequacy in the warning that was given or

18  a failure to give some additional warning.

19          THE COURT:  And if the failure they find is that Bard

20  failed to reach out and alert doctors to something that they            05:00:57

21  knew was an increased risk, how can you say Bard's not liable

22  if the doctor didn't hear it when Bard failed to speak it?

23  That's the probable I'm having.

24          MR. NORTH:  I understand.  I'm sorry I'm not being

25  clear.  I did concede that point.  But I also think it's                05:01:18

United States District Court

```
 1   important that they see that if they don't read the IFU, if the    05:01:21
 2   doctor didn't, that is a factor to consider in the causal link
 3   of that aspect of the alleged failure to warn.
 4            THE COURT:  So you're saying it that should be
 5   rephrased as something they should consider?                       05:01:33
 6            MR. NORTH:  Yes.
 7            THE COURT:  Not as a defense?
 8            MR. NORTH:  Right.
 9            THE COURT:  Ms. Helm wants to get your attention.
10            MR. NORTH:  On page 108 --                                05:01:56
11            THE COURT:  Just one second.
12            Go ahead.
13            MR. NORTH:  We could it something -- and I could do
14   this overnight and have it for the Court tomorrow or something
15   as a proposal.  The parenthetical to the *Camden* case which is    05:02:22
16   listed at 108, says:  Where a plaintiff does not read an
17   allegedly inadequate warning, the adequacy of that warning's
18   contents cannot be a proximate cause of the plaintiff's
19   injuries.  I think that could be adapted, something like that,
20   which is what we would propose and I could have that for the       05:02:41
21   Court to look at tomorrow morning.
22            THE COURT:  Well, Ms. Lourie, I know you want to make
23   a comment.  I'm not inclined to do it but I'll be happy to look
24   at language if you will want to propose it and then I'll give
25   plaintiff a chance to comment.                                     05:03:00
```

United States District Court

1   But I've expressed my concern.  I just have trouble   05:03:02

2  thinking of how you say that to the jury without suggesting

3  that the doctor should have been hearing something that wasn't

4  spoken.

5   Okay.  So but you want to submit it, I'll look at it   05:03:17

6  and give plaintiff an opportunity to comment.

7   MR. NORTH:  Okay.

8   THE COURT:  So that was all you had on strict

9  liability, failure to warn?

10   MR. NORTH:  Right.   05:03:28

11   THE COURT:  Okay.  Let's go back to plaintiff's

12  counsel, then, on negligent design defect.  Let me pause for a

13  minute and ask a question of you all.  When I put these

14  together, I separated out Bard and BPV.  You had not done that

15  in your instructions.  You had just called it Bard.  I broke   05:03:48

16  them out here and we did it in the verdict form as well.

17   Do you agree we should be doing that?  We have two

18  defendants but are you of the view we don't need to do that

19  when talking to the jury or preparing a verdict form?

20   MS. LOURIE:  I don't feel like it's necessary, Your   05:04:07

21  Honor, because I don't think the jury is going to understand

22  the difference in the two entities and I think it's going to be

23  confusing.

24   MR. NORTH:  Your Honor, I don't think so,

25  particularly since Bard is -- I mean, BPV is a wholly owned   05:04:23

1   subsidiary of Bard and there's not going to be a situation          05:04:29

2   where if you had a verdict against one but not the other it

3   would make any difference.

4          THE COURT:  Well, maybe what we ought to do, then, is

5   throughout the instructions -- say early on where I already          05:04:41

6   said that there's two defendants in the case but then say they

7   will be referred to collectively as defendants in this

8   instruction.  And then all the rest of the way through where

9   I've broken out Bard and BPV just put in "defendants" and

10  simplify the verdict form in the same way.  Does that sound all      05:04:58

11  right to both sides?

12         MS. LOURIE:  This sounds a little petty, I think, but

13  I would prefer to use "Bard" rather than "the defendants" if

14  we're going to keep using other people's names like Ms. Booker

15  and Dr. Amer and Dr. Kang, because then it might not be clear        05:05:18

16  to the jury who we're talking about.

17         THE COURT:  Well, I could say "collectively referred

18  to as Bard" and then just use "Bard" through the rest.  Is that

19  all right?

20         MR. NORTH:  That's fine Your Honor.                           05:05:37

21         THE COURT:  Okay.  Now, negligence.

22         MS. LOURIE:  Yes, Your Honor, we do not have any

23  problem with the negligence design defect charge.

24         THE COURT:  Okay.  How about from the defendants'

25  point of view?  This is page 18 of the proposed instructions.       05:05:49

United States District Court

05:05:56

 1          MR. NORTH:  No, nothing, Your Honor.

 2          THE COURT:  Okay.  How about negligent failure to

 3  warn from the plaintiff's side?

 4          MS. LOURIE:  No, sir, no objection.

 5          THE COURT:  And from the defendant?            05:06:10

 6          MR. NORTH:  Nothing, Your Honor, other than to note

 7  the typo in the title Failure to Ward.

 8          THE COURT:  Where is that?

 9          MR. NORTH:  Where it says stipulated request to

10  charge number three.  You may be taking that out.       05:06:23

11          THE COURT:  Oh, yeah.  By the way, I'm going to take

12  out all of these titles.  The version the jury gets will be

13  Instruction 1, Instruction 2, Instruction 3.  I just left this

14  in so we could track what we were talking about but good

15  proofreading.                                            05:06:37

16          All right.  Let's just keep working our way through

17  them.  So plaintiff, comparative fault.

18          MS. LOURIE:  Yes, sir.  On number three of page 20 we

19  just have the same problem with the word "the."

20          THE COURT:  Okay.  Good catch.                   05:06:53

21          MS. LOURIE:  And then on the second page, page 21, if

22  you'll look at paragraph D, this language from a Georgia

23  pattern charge and it's -- the first sentence of the charge is

24  improper.  It's not tracking the Georgia charge and the problem

25  with it is that it's phrased in terms of alleged negligence was  05:07:24

```
 1   the proximate cause and requiring expert testimony for that.    05:07:30
 2   But, in fact, what the charge is supposed to require is a
 3   showing of -- that you have expert testimony as to the
 4   negligence and the proximate cause -- or that negligence is the
 5   proximate cause.  So there's two elements that require expert    05:07:49
 6   testimony.
 7           And the way that this is worded makes it sound like
 8   there's only a requirement to show proximate cause by expert
 9   testimony.
10           THE COURT:  So how would you reword it?                  05:08:03
11           MS. LOURIE:  And I think, if I'm not mistaken, that
12   defense agree to this stipulated charge.
13           MR. NORTH:  No.  That's a problem we need to discuss.
14           MS. LOURIE:  Okay.  In order for Bard to show that --
15           THE COURT:  What page are you reading from?             05:08:23
16           MS. LOURIE:  This is stipulated request to charge
17   number one.
18           THE COURT:  Okay.  Give me just a second to find
19   that.
20           MR. NORTH:  Number what?                                05:08:32
21           MS. LOURIE:  One.
22           THE COURT:  Okay.  I've got it.
23           MS. LOURIE:  In order for Bard to show that Dr. Amer,
24   a non-party, was negligent and that his negligence was one of
25   the proximate causes of Ms. Booker's injury, Bard must present   05:08:53
```

United States District Court

1   expert testimony.                                                                05:08:57

2             THE COURT:  Okay.  I see the distinction.

3             Defendants?

4             MR. NORTH:  I'm sorry, Your Honor.  I am totally

5   lost.                                                                            05:09:06

6             THE COURT:  Page 42 of the submission, first sentence

7   compared to the first sentence in paragraph D.

8             MR. NORTH:  Okay.  That part.  Yes.  No problem with

9   that.

10            THE COURT:  Okay.  So you are all right with their        05:09:18

11  proposed change?

12            MR. NORTH:  Right.

13            THE COURT:  Okay.  So everybody look at page 21.

14  What we will say in paragraph D is:  In order to show that

15  Dr. Amer or Amer was negligent, comma, and that his negligence      05:09:34

16  was the proximate cause of Ms. Booker's injury, comma, Bard

17  must present expert testimony.

18            Does that work?

19            MS. LOURIE:  Yes, sir.

20            MR. NORTH:  Yes.  I'm sorry, Your Honor.                   05:10:11

21            THE COURT:  Okay.  All right.

22            Ms. Lourie, anything else on comparative fault?

23            MS. LOURIE:  No, sir.

24            MR. NORTH:  Here is a source of confusion here, Your

25  Honor.  At the top of that charge, the Court correctly notes        05:10:25

1    that it includes stipulated request to charge number six.  But    05:10:29

2    stipulated request to charge number six was part of the

3    plaintiff's charges and was not so stipulated.  I don't know

4    how that word got there and we missed it because at the very

5    end of it on number six, which page six in the original    05:10:43

6    submission, we have our objection to that portion of the

7    charge.

8           So it was not stipulated and I apologize we did not

9    catch that they had typed "stipulated" there because we do have

10   our objection.    05:11:01

11          THE COURT:  I read your objection.

12          MR. NORTH:  What?

13          THE COURT:  I read your objection and then I tried to

14   do the modifying you said hadn't happened.  Maybe I messed up

15   on that.  But show me in the proposed instruction what you're    05:11:14

16   concerned about.

17          MR. NORTH:  Your Honor, I apologize, I did not catch

18   that the change had been made, the part I was concerned about.

19   I see what you've done.  It's fine now.

20          THE COURT:  Okay.    05:11:43

21          All right.  How about intervening cause?  Plaintiff?

22          MS. LOURIE:  Yes, sir.  This charge instructs the

23   jury in several places that Dr. Kang's action can be an

24   intervening cause of all or part of Ms. Booker's injury.

25   Respectfully, that's not the law in the state of Georgia.  I    05:12:16

 1     think what has happened is that the principles of apportionment     05:12:18

 2     and intervening cause have been intertwined.

 3             THE COURT:  Well, can I interrupt you so that you can

 4     address my specific thinking?

 5             MS. LOURIE:  Yes, sir.     05:12:33

 6             THE COURT:  I thought about this issue and I put in

 7     "all or part" intentionally to prompt just this discussion.  We

 8     looked and we could not find any case in Georgia or federal

 9     court applying Georgia law that talked about part or

10     disapproved of part and we actually kicked around hypotheticals     05:12:52

11     about where you can -- well, this case is a good one.  Clearly,

12     even if Dr. Kang were the intervening cause of everything that

13     happened after his attempt to intervene, there would still be

14     some harm to Ms. Booker before he intervened presumably in the

15     form of pain and discomfort and things like that.     05:13:16

16             So I know that every case that's decided that talks

17     about an complete intervening cause; but I couldn't think of a

18     reason, based on the cases we read, that the doctrine wouldn't

19     apply in a fact situation where there's some injury that occurs

20     before the intervening cause rises.     05:13:37

21             So that was the thinking.  And I'm happy to hear your

22     thoughts on what's wrong with that.

23             MS. LOURIE:  Well, what I think that this charge ends

24     up doing is apportioning and Dr. Kang has not been listed as a

25     non-party at fault for purposes of apportionment in this case.     05:13:54

1       And intervening cause is something that only deals

2   with proximate cause.  It breaks the chain of causation.  It's

3   an all-or-nothing proposition.  Either Dr. Kang's action broke

4   the chain and Bard is not responsible at all for any of the

5   resulting injury or it didn't break the chain.

6       And I think that, you know, the Court laying out the

7   three prongs that are set forth in *Zaldivar*, the Supreme Court

8   case of Georgia, I think that's why the standard is so

9   stringent.  You have to meet all three prongs to show an

10  intervening cause, an intervening act breaks the chain.  And I

11  just don't feel like this is proper, a proper statement of

12  Georgia law.

13      THE COURT:  Well, you are right that the effect of

14  this would be the same as if they apportion fault.  We talked

15  about that as well.  And, in fact, as you saw in the -- I guess

16  it was in a motion *in limine*, we wrestled with the question

17  whether intervening cause is a separate doctrine under Georgia

18  law from the comparative fault statute and we concluded it was

19  because of the way the statute was that written and the way the

20  cases have dealt with it.

21      The specific hypothetical we came up with was

22  somebody is crossing the street and the defendant hits him,

23  injures him.  They get knocked to the ground.  A Good Samaritan

24  then drags them off of the road and lays him down on an

25  electrical wire that severely burns their back.  Now, there's

United States District Court

05:13:59

05:14:17

05:14:37

05:14:57

05:15:15

05:15:31

1    an intervening cause there.  Would you be able to argue under          05:15:37

2    Georgia law that even though any injury that could occur to a

3    person, once you've knocked them to the ground and they can't

4    move, would be proximate cause by the accident, in this case

5    the Good Samaritan was an intervenor who would break the chain        05:15:53

6    by dragging the person into a dangerous place?

7            Anyway, there were others we kicked around, too.  And

8    we recognize there's no difference in the outcome than if that

9    individual gets named as a non-party at fault, the Good

10   Samaritan, and the jury apportions the burn damages to that          05:16:12

11   person.  But we couldn't see anything in the intervening cause

12   case law that would disprove the notion that there's a break in

13   the proximate cause by the Good Samaritan.

14           So that's our thinking.

15           MS. LOURIE:  I understand the concern.  It is a               05:16:32

16   confusing interaction between the two items.  But here's one

17   difference:  If you allow the jury to apportion, which is

18   basically what the verdict form is doing now, as to Dr. Kang,

19   and you tell the jury that they don't even have to show

20   wrongful acts or negligence, then they are permitted to              05:16:53

21   basically put an apportionment argument on Dr. Kang without

22   proving negligence or without giving us notice that they are

23   going to try to do that.  And we haven't presented any evidence

24   to --

25           THE COURT:  Well, you are absolutely right about              05:17:15

United States District Court

1   that.  But I assume you agree that under Georgia law, the jury       05:17:16

2   could apportion 100 percent of the fault to Dr. Kang under any

3   intervening cause law without finding him negligent, because

4   Georgia law says you don't have to.

5           MS. LOURIE:  No.  They can't apportion fault.  They          05:17:31

6   can break the chain on causation.

7           THE COURT:  But that's the same effect as

8   apportioning 100 percent of the fault to him; right?

9           MS. LOURIE:  Not really, Your Honor, because we

10  haven't been given notice that he's a non-party at fault.  If       05:17:41

11  they wanted to do that, they should have listed him as a

12  non-party at fault back at that time.

13          THE COURT:  You seem to be arguing that a party can't

14  assert intervening causes as a defense unless they have named

15  that individual as a non-party at fault.                            05:17:57

16          MS. LOURIE:  No, sir.  I'm not asserting that at all.

17  I'm asserting that there are two different principles of law.

18          THE COURT:  I agree they are.  But isn't the

19  effect -- if the jury can determine that somebody who is not in

20  the non-party at fault notice is an intervening cause, the jury     05:18:15

21  can effectively apportion 100 percent of the liability to that

22  person under Georgia law.

23          MS. LOURIE:  I think the problem is the use of the

24  word "apportion."  They can break the chain, the causal chain,

25  which is an element of proving the case.  And once that chain       05:18:31

1304

```
 1   is broken, it let's Bard off the hook.  That's the difference.     05:18:35
 2            THE COURT:  Well, let me try one more just to make
 3   sure I'm understanding.  What is the difference between a jury
 4   saying the causal chain is broken as to this intervening cause,
 5   Bard is not liable, versus looking at the two and saying the      05:18:53
 6   doctor is 100 percent liable and a jury looking at the same
 7   case and saying Dr. Kang broke the causal chain after 50
 8   percent of the harm had been incurred, which would be the same
 9   as apportioning him 50 percent?  I don't see a difference
10   between those two actions.  Granted they come about from these     05:19:16
11   two different doctrines but they are both the application of
12   the different doctrine to the same case.
13            MS. LOURIE:  I agree with you that the bottom-line
14   result might be the same, that the plaintiff might not recover,
15   but the law, as set forth in the state of Georgia, is that you    05:19:30
16   want to apportion fault, you go by the statutory requirements
17   and they have not done that with Dr. Kang.
18            And can I talk about the *Coleman* case that you cited?
19            THE COURT: Sure.  Yes.
20            MS. LOURIE:  Okay.  So the *Coleman* case involved        05:19:48
21   doctor number one that commits malpractice.  He -- because of
22   what he does, injects the plaintiff with a hormone, she doesn't
23   know she's pregnant, so she finds out that she is pregnant.
24   She has to have -- she has to terminate the pregnancy.  So she
25   goes for termination of the pregnancy.  The termination was not   05:20:09
```

United States District Court

1    done properly.  She develops an infection in her pelvis and she      05:20:14

2    then -- the doctor number two that did not perform the

3    termination correctly, he didn't tell the plaintiff.  He knew

4    that she was still pregnant but he didn't tell her.

5          So after she developed the infection, she goes back      05:20:36

6    to the doctor and has a termination of the pregnancy by doctor

7    number three.  So we have three doctors involved now.

8          As a result of the second procedure and the

9    infection, she developed clotting.  The clot broke off in the

10    third operation causing her to have a stroke and causing her      05:21:00

11    severe injury.

12          At trial she sued doctor number one and doctor number

13    two and got a verdict against both of them.  The judge entered

14    a JNOV for doctor number one because he found that the actions

15    of doctor number one were too remote and that doctor number      05:21:24

16    two's actions were what caused all the problems, okay?

17          On appeal the Court said that the Court of Appeals

18    said, no, doctor number one started a chain of events.  He

19    committed malpractice.  Even though doctor number two comes in

20    and commits a completely different and distinct act of      05:21:49

21    malpractice, doctor number one is liable for all damages

22    resulting from his original starting the chain of events.

23          The Court held the defendant may be liable not only

24    for damages resulting directly from his negligent act but also

25    for all damage resulting from the improper or unskillful      05:22:11

United States District Court

1    treatment of the injuries by the physician.                    05:22:15

2              And they found that doctor number one was responsible

3    for all of the injuries.

4              So in your scenario, I guess we could argue that

5    doctor number one forcing her to have to endure a termination   05:22:30

6    of her pregnancy, she was injured by that and she had a

7    distinct injury under your scenario where she had to undergo

8    the procedure again, wasn't told that she -- sorry.  I got

9    mixed up.  Okay.  She would be injured by doctor number one for

10   having to undergo a termination.  She was injured by doctor     05:22:54

11   number two by developing the infection and him not telling her

12   that she was still pregnant.  So the Court held number one

13   responsible for the whole thing.

14             THE COURT:  Did the Court address intervening cause?

15             MS. LOURIE:  Yes, sir.                                05:23:17

16             THE COURT:  And what did it say on this issue we're

17   wrestling with?

18             I read *Coleman* and I'll be happy to go read it again.

19   But what I don't think *Coleman* said is that you can't use

20   intervening cause for doctor number two.                        05:23:39

21             MS. LOURIE:  No.  You can use intervening cause,

22   absolutely.

23             THE COURT:  Well, you can't use intervening cause to

24   just break the chain for the harm caused after doctor number

25   two.  I don't think *Coleman* said that.  In other words, I don't  05:23:57

United States District Court

1    remember *Coleman* in any detail.  But when we looked at that and    05:24:02

2    other cases, I couldn't find any Georgia law -- we might have

3    missed it -- that said intervening cause has to be an

4    all-or-nothing proposition.  It can never be for part of the

5    injury.  That's what we couldn't find.  And logically, it seems    05:24:18

6    to me, it could.  Granted that gets you to the same place as

7    the statute, but I already found that these are sort of

8    independent doctrines under Georgia law.

9           But I'll be happy to go read *Coleman* again.

10          MS. LOURIE:  Well, then in essence you're allowing    05:24:39

11   them to apportion fault to --

12          THE COURT:  I completely agree and the reason that

13   happens is because when the Georgia legislature passed the

14   comparative fault statute, it wrote it narrowly.  And it didn't

15   abrogate intervening cause which was a common law doctrine and    05:24:52

16   which remains in existence under Georgia law.  So you've got

17   two currently viable doctrines in Georgia, comparative fault

18   and intervening cause, and the legislature didn't eliminate the

19   second.  So it seems to me that I've got to apply them both.

20          MS. LOURIE:  But, Your Honor, the converse is also    05:25:14

21   true.  If you haven't found a case that says you can do it this

22   way, you -- you haven't found a case that supports the way

23   you're doing it I don't think.  Isn't that what you said?

24          THE COURT:  You're right, I haven't, but what I have

25   found is that intervening cause is alive and well in Georgia.    05:25:29

United States District Court

```
 1   And it seems to me there can be cases where the intervening        05:25:32
 2   cause intervenes after some harm has occurred and it wouldn't
 3   make sense to say that doctrine doesn't apply in those cases
 4   just because the intervening cause came after some harm
 5   occurred.                                                          05:25:45
 6           MR. STOLLER:  Your Honor, in those occasions, isn't
 7   it cutting off the harm?  I'll give you an example:  If we're
 8   in a car accident and I break your hand as a result of that and
 9   you're in the healing process, in order to stop my liability
10   for it, there has to be an event that cuts off all of my         05:26:09
11   causation to that arm, something that comes in and aggravates
12   it, is an aggravation injury.  I still have responsibility
13   there.  It has to be so severe as to cut it off such as you're
14   out in the yard and your neighbor is whacking their hedges with
15   the hedge whacker and they cut your hand off.                     05:26:32
16           THE COURT:  Okay.  Let's say that happens.  Could
17   that be an intervening cause?
18           MR. STOLLER:  I think you could argue it's an
19   intervening cause and it's a new injury.  But I'm still
20   responsible --                                                    05:26:40
21           THE COURT:  But -- but at that point, can't I sue for
22   all the pain I suffered before my hand got caught off?
23           MR. STOLLER:  Yes.
24           THE COURT:  That's what I'm saying.
25           MR. STOLLER:  But there's no apportionment there.        05:26:50
```

1309

1    There's no apportionment.                                    05:26:52

2         THE COURT:  But the only thing I can recover from you

3    is the pain I suffered up until the time my neighbor cut my

4    hand off.  I can't sue you for that because you didn't cause

5    that.                                                        05:27:01

6         MR. STOLLER:  I think we're in agreement with that

7    but it's a different injury at that point.  See, the problem is

8    the words -- there are two problems.  One is -- and this is not

9    something we've talked about yet but which is that we think

10   there needs to be some expert testimony established that      05:27:14

11   proximate causation here, particularly when you're talking

12   about medical issue.  But the second -- the second point, which

13   is the debate we're engaged in right here, is, those are two

14   distinct injuries.  That's the proximate cause here that we're

15   talking about.  It is not a part of the injury.  You now have a  05:27:30

16   new injury that cuts it off entirely.

17        THE COURT:  So what if the jury in this case says we

18   think the tear in the tricuspid valve is a new injury?

19        MR. STOLLER:  Then they can't award us for damages

20   for this injury.                                             05:27:45

21        THE COURT:  That's exactly what I'm saying.

22        MR. STOLLER:  But that is a distinct injury.  It's

23   not a part of.

24        THE COURT:  It is because of an intervening cause.

25        MR. STOLLER:  But I'm not disagreeing with you on      05:27:54

United States District Court

1310

1  that.  My point is that the language is -- when you talk about    05:27:56

2  "a part of" requires a portion.  They then need to stop and say

3  that Bard is responsible up to this point for the injury and

4  that is it.  They are not supposed to calculate damages beyond

5  that and then start parsing it out.    05:28:09

6  THE COURT:  We can work on the wording -- we can work

7  on the wording, but I think you're agreeing with my notion that

8  there can be an intervening cause after the initial injury and

9  the original defendant isn't responsible for the damages caused

10  by that intervening cause.    05:28:24

11  Mr. O'Connor, I don't know if we'll triple team this

12  but the other concern I have is that -- hold on, we're at 5:28.

13  Do this is in about 60 seconds just because --

14  MR. O'CONNOR:  The only testimony, the only evidence

15  they heard and they heard from a medical doctor.  They have    05:28:41

16  nobody to talk about that.  This is an issue that a trier of

17  fact cannot decide without expert testimony.  The only evidence

18  that is before this jury right now came from Dr. Harvey and

19  Dr. Kang that what happened in that procedure was an

20  unavoidable consequence which never cuts off --    05:28:58

21  THE COURT:  We haven't heard all the evidence yet.

22  MR. O'CONNOR:  Well, I don't think they have listed

23  an expert.

24  THE COURT:  Well, you can make that argument.  If you

25  don't think evidence supports a separation, that's a separate    05:29:09

United States District Court

 1    basis for taking that out, but I have got to hear their

 2    evidence before I can rule on that point.

 3            My concern is we're at 5:30.  Elaine has been going

 4    all afternoon.  We've got some ground to cover.  I understand

 5    the plaintiff's position on this.  I want to think about it

 6    more and read *Coleman*.  I know what the defendants are going to

 7    say, which is I'm thinking brilliantly.  But this is a tough

 8    issue that we've wrestled with before and I want to spend more

 9    time on it.  But let's pause for a minute and see where we are

10    on the overall instructions because we can't go for another

11    half-hour.

12            MR. STOLLER:  Your Honor, we've given to you and the

13    other side a redraft of this instruction as well.

14            THE COURT:  That makes it all or nothing I assume.  I

15    haven't read it.

16            MR. STOLLER:  It takes out "the part."  As we said,

17    "the part" is an issue.

18            THE COURT:  Right.

19            Ms. Lourie, did you have other different issues you

20    wanted to raise on intervening cause?  I assume I can get

21    everything from your proposed instruction.

22            MS. LOURIE:  We do.  We took care of them in our

23    proposed instruction.  It's all interrelated.  We didn't think

24    that the -- one of the paragraphs was worded such that the jury

25    could understand it.

                    United States District Court

1          THE COURT:  Well, let's do this is on this issue.  We          05:30:34

2     clearly have got to revisit this again.  What I will do in the

3     meantime is read *Coleman*.  I'll look at your proposal.  I'll

4     give you my thoughts after that, either in the form of a

5     revised instruction, and we'll find a time next week to talk          05:30:49

6     about it before we charge the jury.

7          Traci, would you look, by the way, and see Monday,

8     Tuesday and Wednesday if we've got 4:30 hearings every day.

9          So we'll come back to it after I've had a chance to

10    read *Coleman* and look at your proposal.          05:31:04

11         MR. NORTH:  Your Honor, I'm very sorry to do this

12    because I know we're in a hurry but going back just one to

13    comparative fault of Dr. Amer, there was one objection that I

14    had that wasn't addressed and I think it's because they

15    submitted two different charges.          05:31:17

16         THE COURT:  Just tell me what it is.

17         MR. NORTH:  It's in D, where it says:  In order to

18    show that Dr. Amer's alleged negligence was the proximate

19    cause.  I believe that should be "one of the proximate causes.

20    That's how their original stipulated thing read.  It should be          05:31:32

21    "one of the proximate causes."

22         MR. STOLLER:  I'm sorry.  I was trying to understand.

23         THE COURT:  The first sentence in D.  It seems to me

24    that's right.  If you've got comparative fault, both people are

25    proximate causes.          05:31:50

United States District Court

1      MR. STOLLER:  I'm sorry, Your Honor.          05:31:53

2      THE COURT:  We could say "a proximate cause" or "one

3  of the proximate causes" but I believe that's clearly right on

4  the law.

5      Do you disagree with that?                    05:32:00

6      MS. LOURIE:  No, sir.

7      MR. STOLLER:  I think the language from the

8  instruction, the pattern instruction, is "a proximate cause."

9  Is that right?

10      THE COURT:  All right.  We'll look at that.    05:32:10

11      Okay.  So let's -- give me a sense for what else

12  you've got issues on that we need to talk about so we can

13  figure out when we're going to do this.  I mean, for example,

14  are you going to have issues on assumption of the risk on

15  damages?                                          05:32:30

16      MS. LOURIE:  We have an issue with one line that was

17  left out of assumption of the risk.  The first damages charge

18  we're fine with.  The punitive damages phase one charge, we

19  have one sentence that was taken out of the pattern charge.

20      THE COURT:  Okay.  Tell me what line was taken out of   05:32:50

21  assumption of the risk that you're concerned about.

22      MS. LOURIE:  If you look in the first paragraph at

23  the end where it says product, comma, the third sentence down.

24      THE COURT:  Right.

25      MR. STOLLER:  Do you want me to read it?  Your Honor,   05:33:08

1    the pattern instruction after the word "product" and comma in          05:33:14

2    line three says:  Taking a risk which, in and of itself,

3    amounts to a failure to exercise ordinary care for her safety.

4              THE COURT:  Okay.  What we're going to do is look at

5    that on the pattern instruction and I'll give reaction and give          05:33:44

6    defendant an opportunity to comment after we've looked at that.

7    So we will look at the pattern instruction additionally.

8              I'm afraid we're just going to have to flag issues

9    for me to look at because we're so short on time.

10             Was there on assumption of risk that the defendants          05:34:11

11   wanted me to look at?

12             MR. NORTH:  Anything on our list, Your Honor -- I'm

13   sorry.  No.

14             THE COURT:  Okay.

15             Ms. Lourie?  Where were you on damages?          05:34:21

16             MS. LOURIE:  We're fine with the first damages on 24

17   and 25.

18             THE COURT:  How about defendants, 24 and 25?

19             MR. NORTH:  On 25 we just had a comment about the

20   language, the last paragraph, whatever condition they find her          05:34:33

21   language, we don't think that's adjusted to the evidence here.

22   There's no real issue about that.

23             THE COURT:  Are you saying that paragraph should come

24   out?

25             MR. NORTH:  Right, because I don't think we're making          05:34:58

United States District Court

1315

1    any argument that there's something about her preexisting         05:35:00

2    injuries that should affect the amount of damages she can

3    recover here.

4            THE COURT:  Well, are you saying that there was           05:35:12

5    nothing about her preexisting condition that exacerbated the

6    harm caused by the filter.  Is that your concern?  I mean, she

7    had lots of preexisting conditions.

8            MR. NORTH:  But the injury that she's suing us for,

9    the migration of the strut to her heart, I don't see how her

10   preexisting -- I mean, the preexisting conditions clearly        05:35:32

11   necessitated the implant of the filter but not particular

12   injuries.

13           THE COURT:  Okay.  Let me get plaintiff's comment.

14           MS. LOURIE:  Well, they spent a lot of time today

15   going into her preexisting conditions and if they are not going  05:35:44

16   to get up there and argue that her chest pain or back pain or

17   any of that preexisted -- she's got pericarditis and chest

18   pain.  If they are not going to try to say that she had chest

19   pain before.

20           THE COURT:  Seems this paragraph is here because of      05:36:04

21   in law school what we called the eggshell plaintiff.  If

22   somebody is particularly susceptible to harm because of a

23   preexisting condition, the defendant still is responsible for

24   that harm even if it was due to their susceptibility.

25           So I will think about this issue in light of the         05:36:24

United States District Court

1    evidence that has come in.  I understand both parties'                   05:36:26

2    position.

3            All right.  Ms. Lourie?

4            MS. LOURIE:  Punitive damages, Phase I, page 26.  The

5    third paragraph down, that's from a pattern charge and at the             05:36:39

6    end of that paragraph, the pattern charge says:  Proof by clear

7    and convincing evidence requires a level of proof greater than

8    a preponderance of the evidence but less than beyond a

9    reasonable doubt.

10           THE COURT:  And I took that out because the jury will             05:36:59

11   have heard nothing about beyond a reasonable doubt.

12           MS. LOURIE:  Well, we all watch television and they

13   hear it all the time.  We don't want them to think that that

14   means beyond a reasonable doubt and that is a part of the jury

15   pattern charge from Georgia.                                              05:37:16

16           THE COURT:  Okay.  Is that the primary concern, was

17   dropping that?

18           MS. LOURIE:  Yes, sir.

19           THE COURT:  Okay.

20           Defendant.                                                        05:37:23

21           MR. NORTH:  Nothing on that particular charge, Your

22   Honor.  I do on the next page.

23           THE COURT:  Okay.  Before we go there, I will look at

24   that issue.

25           Did you have more on punitive damages?                           05:37:34

                       United States District Court

                                                    1317

 1            MS. LOURIE:  Not that charge.                          05:37:38

 2            THE COURT:  Okay.

 3            Defendant, did you on punitives?

 4            MR. NORTH:  On page 27, Your Honor, we do believe the

 5    evidence will support instruction number ten at the end of the   05:37:45

 6    trial so we are going to be pressing for that.

 7            THE COURT:  Okay.  I will keep that in mind as

 8    something we'll need to decide when the evidence is in.

 9            MS. LOURIE:  I'm sorry.  I didn't know you had moved

10    on to that charge.  I do have one comment about punitive        05:38:01

11    damages phase two, that charge.  The Court has included the

12    factors to consider and one of those words in the factors is

13    "reprehensibility" and we would ask the Court to give the

14    Georgia pattern charge that defines reprehensibility.  It's

15    charge 66.760.  Otherwise, the jury will not know how to gauge   05:38:23

16    that word and what reprehensibility means or what factors can

17    be considered.

18            THE COURT:  Was that proposed?

19            MS. LOURIE:  Yes, sir.  It's plaintiff's request to

20    charge number 17.                                               05:38:41

21            THE COURT:  Okay.  Hold on just a sec.

22            I'll tell you why I took that out.  The reason I

23    didn't include that was, seemed to me those three factors were

24    duplicative of what we've already listed on page 27, not in the

25    same words but it covered essentially much of the same ground   05:39:19

                    United States District Court

1318

 1    and I thought it might be confusing to the jury if we're doing          05:39:22
 2    something that's overlapping.
 3            MS. LOURIE:  Well, the one factor that is not stated
 4    earlier, and I think it's important here, is that the jury can
 5    give consideration to the harm being caused was physical as             05:39:42
 6    opposed to economic.  I think that's a huge factor in this
 7    case.
 8            The second one, actually the conduct, showed a
 9    difference to or reckless disregard of the health or safety of
10    others.                                                                 05:40:00
11            THE COURT:  Okay.  I understand that point.
12            Do defendants have a comment on that?
13            MR. NORTH:  Nothing else on that one, Your Honor.
14            THE COURT:  Okay.  All right.
15            Okay.  Then we get into the general duty things.  Are           05:40:23
16    there other instruction issues that either side wants me to
17    think about?
18            MS. LOURIE:  Your Honor, we would like to reiterate
19    that we do want limiting instruction on FDA and we request that
20    the Court give the limiting instruction on mitigation of               05:40:51
21    damages that we discussed.
22            THE COURT:  You need to propose something if you
23    would, please.  I'll be happy to look at language but I would
24    like you to propose it.
25            Okay.  I will -- I think the FDA instruction decision          05:41:03

                        United States District Court

1   is going to need to wait until the end of the case when I've

2   heard the evidence.

3           Are there other instruction matters?

4           MR. NORTH:  Depending on how the FDA evidence goes,

5   Your Honor, we might want to try our hand at doing an

6   alternative charge on the absence of regulatory action that is

7   less a comment on the evidence as concerned the Court with the

8   original submissions.

9           THE COURT:  Okay.  I'll be happy to consider that.

10          Before we break in the last minute here, were there

11  any major concerns about the verdict form, the way we argued

12  it?  Obviously, we're going to simplify it by referring to one

13  defendant rather than two.  You'll see it was more detailed

14  than plaintiff, less detailed than defendants.  I don't believe

15  in asking a series of interrogatories that lead the jury

16  through their thinking.  I don't think that's necessary if they

17  are carefully instructed.

18          So that's why I didn't go with the defendants, but I

19  think we need the information this calls out which is why I

20  didn't go with the plaintiff's verdict form.

21          MS. LOURIE:  I mean, I'm -- not to bring up the whole

22  thing again because I know we're going to revisit but the

23  intervening cause section.

24          THE COURT:  Right.  I agree we'll need to revisit it.

25          MS. LOURIE:  Right.  And then the only other thing,

05:41:08

05:41:16

05:41:32

05:41:54

05:42:08

05:42:23

1  we had a concern about the apportionment of fault, just the way       05:42:24

2  number one is worded does not incorporate a finding of fault as

3  to Dr. Amer.  It says "caused or contributed to" but we feel

4  like it should be worded stronger than that to incorporate the

5  concept of fault.                                                      05:42:47

6         THE COURT:  Okay.  I'll think about that.

7         MR. NORTH:  Your Honor, the only thing we thought is

8  on the punitive damages question, number E, that it should

9  include the clear and convincing evidence phrase.  We think

10 that's a vital protection under Georgia law and should be             05:43:00

11 included there to make certain that the jury realizes it's a

12 different burden.

13        MS. LOURIE:  Well, if we're going to do that, then we

14 have to add the burden in the apportionment of fault.  We have

15 to -- I mean . . .                                                     05:43:14

16        THE COURT:  Yeah.  I mean, if we're going to do that,

17 we should add preponderance throughout and clear and convincing

18 there.

19        I assume you agree with that, Mr. North?

20        MR. NORTH:  Yes.                                                05:43:27

21        THE COURT:  Okay.  We will take a look at that.

22        Okay.  Traci, what's it like in the afternoons?

23        COURTROOM DEPUTY:  We have 4:30s every day except

24 Thursday.

25        THE COURT:  Okay.  I've got hearings every afternoon           05:43:38

United States District Court

1321

1    next week starting at 4:30 and I have one tomorrow, too, so we       05:43:41

2    can't.  But what I will do is talk to Nancy in the morning and

3    I'm going to move one of those hearings on probably Tuesday so

4    that we clear out time to come back to this jury instruction

5    issue.                                                               05:44:00

6             And before then I will get your advice in light of

7    the stuff we talked about.

8             All right.  Anything else before we break?

9             MR. NORTH:  Nothing, Your Honor.

10            THE COURT:  Okay.  We all owe Elaine and Traci a            05:44:10

11   bouquet, so keep that in mind.

12            (Whereupon, these proceedings recessed at 5:44 p.m.)

13                           *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court

1                    C E R T I F I C A T E                              05:44:28

2

3         I, ELAINE M. CROPPER, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of        05:44:28

6    Arizona.

7

8         I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled     05:44:28

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control, and to the best of

13   my ability.

14

15        DATED at Phoenix, Arizona, this 23rd day of March,         05:44:28

16   2018.

17

18

19

20                       s/Elaine M. Cropper                         05:44:28

21                  _____

22                   Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                   05:44:28

                     United States District Court