1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3                    _____

4    **In Re: Bard IVC Filters**        )   MD-15-02641-PHX-DGC
     **Products Liability Litigation**   )
5                                        )   Phoenix, Arizona
                                         )   **March 22, 2018**
6    _____)
     **Sherr-Una Booker, an individual,**  )
7                                        )
                      Plaintiff,         )
8                                        )   CV-16-00474-PHX-DGC
          v.                             )
9                                        )
     **C.R. Bard, Inc., a New Jersey**     )
10   **corporation; and Bard Peripheral** )
     **Vascular, Inc., an Arizona**        )
11   **corporation,**                      )
                                         )
12                     Defendants.       )   Amended
     _____)

13

14

15        **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16        **REPORTER'S AMENDED TRANSCRIPT OF PROCEEDINGS**

17               <u>**TRIAL DAY 6 A.M. SESSION**</u>

18                  (Pages 1079 - 1209)

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2      For the Plaintiff:

 3              Lopez McHugh
                By: RAMON ROSSI LOPEZ, ESQ.
 4              100 Bayview Circle, Suite 5600
                Newport Beach, CA  92660
 5
                Gallagher & Kennedy
 6              By: MARK S. O'CONNOR, ESQ.
                2575 East Camelback Road, Suite 1100
 7              Phoenix, AZ  85016

 8              Heaviside Reed Zaic
                By: JULIA REED ZAIC, ESQ.
 9              312 Broadway, Ste. 203
                Laguna Beach, CA  92651
10
                Watkins Lourie Roll & Chance, PC
11              By: ROBIN P. LOURIE, ESQ.
                Tower Place 200
12              3348 Peachtree Rd. NE
                Atlanta, GA  30326
13
                Faraci Lange, LLP
14              By: HADLEY L. MATARAZZO, ESQ.
                28 E. Main St., Ste. 1100
15              Rochester, NY  14614

16              Babbitt & Johnson, PA
                By: JOSEPH R. JOHNSON, ESQ.
17              1641 Worthington Rd., Ste. 100
                W. Palm Beach, FL  33409
18

19      For Defendants:

20              Nelson Mullins Riley & Scarborough
                By: RICHARD B. NORTH, JR., ESQ.
21              By: ELIZABETH C. HELM, ESQ.
                By: BRANDEE J. KOWALZYK, ESQ.
22              201 17th Street NW, Suite 1700
                Atlanta, GA  30363
23
                Snell & Wilmer
24              By: JAMES R. CONDO, ESQ.
                400 East Van Buren
25              Phoenix, AZ  85004
```

1

2

**I N D E X**

**EXAMINATION**

3

**WITNESS**                                                                    **PAGE**

4

ROBERT M. CARR, JR.

5

       Direct Examination (Cont'd) By Mr. Lopez    1096

6

SHERR-UNA BOOKER

7

       Direct Examination By Mr. O'Connor          1152

8

       Cross-Examination By Ms. Helm               1191

9

**EXHIBITS**

10

**NUMBER**    **DESCRIPTION**                          **PAGE**

11

1062     Edwards Deposition,                         1119
12       01/20/2014 - Exhibit 14 -
         BPV PowerPoint presentation
13       entitled "BPV/AngioMed New
         Product Development Review
14       Meeting - April 26, 2004"

15       730      Carr Deposition, 04/17/2013 -        1123
         Exhibit 01 - Class of
16       Plaintiffs' Notice of Taking
         Rule 30(b)(6) Deposition
17       Duces Tecum in Case No.
         12-80951- CIV-ROSENBAUM

18       5343     Sep. 17, 2004 FDA Contact            1133
         Report re Recovery IFU and
19       DDL

20       764      Carr Deposition, 11/05/2013 -        1145
         Exhibit 14 - 5/27/2004 E-mail
21       b/w Greer, Carr, Hudnall, and
         Sullivan re. "Bariatric
22       patients and filters"

23       4391     Summary of Medical Bills             1187

24

25

1

**(Index of Exhibits Continued)**

2

**EXHIBITS**

3

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 2399 | Billing Record: Cardiothoracic Surgeons billing | 1187 |
| 2400 | Billing Record: MetroAtlanta Ambulance billing | 1187 |
| 2401 | Billing Record: Piedmont Healthcare Atlanta billing | 1187 |
| 2403 | Billing Record: Wellstar North Fulton billing | 1187 |
| 6643 | Hospital Admission History and Physical: Lincoln Medical Center | 1191 |
| 6652 | Consent: IVC filter placement | 1191 |
| 6656 | ER Visit: Lincoln Medical Center | 1191 |
| 6660 | Admission History & Physical: New York Methodist Hospital | 1191 |
| 6667 | ER Visit: Lincoln Medical Center | 1191 |
| 6669 | CT scan: Abdomen/pelvis | 1191 |
| 6681 | ER Visit: Gwinnett Medical Center | 1191 |
| 6683 | ER Visit: Gwinnett Medical Center | 1191 |
| 6693 | ER Visit: Eastside Medical Center | 1191 |
| 6696 | ER Visit: Piedmont Hospital: Henry County | 1191 |

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**(Index of Exhibits Continued)**

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 6699 | ER Visit: Gwinnett Medical center | 1191 |
| 6741 | ER Visit: Piedmont Hospital-Atlanta | 1191 |
| 6748 | ER Visit: Gwinnett Medical Center | 1191 |
| 6751 | Office visit: Gwinnett Medical Group: Cardiology | 1191 |
| 6756 | ER Visit | 1191 |
| 6768 | Office Visit: Gwinnett Medical Group: Cardiology | 1191 |
| 6770 | ER visit | 1191 |
| 6778 | Office Visit: Gwinnett Consultants in Cardiology | 1191 |
| 6780 | Gwinnett Consultants in Cardiology: Letter(s) | 1191 |
| 6668 | Lumbosacral Spine X-ray | 1191 |
| 2312 | Medical Record: Medical Records of Gwinnett Consultants in Cardiology running notes from nurse | 1191 |
| 2378 | Medical Record: Medical records of Gwinnett Medical 11/05/2014-ER | 1191 |
| 6745 | Discharge Summary: Piedmont Hospital-Atlanta | 1191 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**P R O C E E D I N G S**

10:01:31  1
        2    (Proceedings resumed in open court outside the presence
        3    of the jury.)
        4
08:29:54  5        THE COURT:  Thank you.  Please be seated.
        6        Morning, everybody.
        7        EVERYBODY:  Morning, Your Honor.
        8        THE COURT:  Well, let me first mention something.
        9        Counsel, I received -- I received four more
08:30:23 10    deposition designations last night.  I'm afraid those fall
       11    into the same category as Sullivan.
       12        MS. HELM:  Your Honor, those are actually defense
       13    designations.  We're fine.  We don't anticipate using them
       14    until next week.
08:30:37 15        THE COURT:  Okay.  So I can do those on the weekend?
       16        MS. HELM:  Yes, Your Honor.
       17        THE COURT:  Okay.  And I'm assuming Sullivan is this
       18    week or you're not going to use him; is that right?
       19        MS. MATARAZZO:  Yes, Your Honor, we're not going to
08:30:51 20    use Mr. Sullivan's testimony.
       21        MR. LOPEZ:  We may decide to read some, Your Honor,
       22    like you suggested.  We're still making that decision.
       23        THE COURT:  That's fine.  Okay.
       24        Plaintiff's counsel, do you have matters that you
08:31:03 25    want to raise this morning before we get started?

08:31:07  1          MS. MATARAZZO:  Yes, Your Honor.  I have one issue to

2     raise, if you're ready.

3          THE COURT:  Okay.

4          MS. MATARAZZO:  Your Honor, we had an issue with

08:31:14  5     Dr. Rogers.  We had designated testimony of Dr. Rogers.  We

6     sent it to defense counsel, I believe a week ago or more than

7     a week ago.  We followed up twice.  We sent it March 13th.  We

8     followed up twice, once on March 17th and once on March 18th,

9     and we never received their counterdesignations or objections.

08:31:38 10          So we addressed this last night with them, saying we

11     had a very, very short clip, eight-minute clip of Dr. Rogers

12     that we wanted to play.  I'm not sure what the current

13     position on that is.

14          We also created a background summary for Dr. Rogers,

08:31:52 15     and we can't reach agreement on that.  And I think one of the

16     main sticking points on that is we have a sentence in there

17     that says that Dr. Rogers was not compensated by Ms. Booker or

18     her attorneys for his time.

19          So it doesn't say what side Dr. Rogers is an expert

08:32:10 20     for, but every other expert that's been put on the stand so

21     far has been cross-examined about time and payment, and so we

22     think it's important that it's at least understood before

23     Dr. Rogers is played that we're not paying for his testimony.

24          I have a copy of the background statement if you'd

08:32:28 25     like to see it, Your Honor, as well as the run.  I think we

08:32:30 1    were very careful to make sure it doesn't violate your order

2    that the testimony not be cumulative.  It narrowed it strictly

3    to paper that was authored by Dr. Rogers that talks only about

4    the efficacy of filters and what the efficacy finding was.  We

08:32:48 5    took out everything else that's already been discussed by

6    other experts and fact witnesses at this trial.

7              THE COURT:  So is he a former Bard expert?

8              MS. MATARAZZO:  Correct.

9              THE COURT:  Okay.

08:33:01 10             Defense counsel, what are your responses?

11             MR. NORTH:  Yes, Your Honor.  We had some doubt as to

12    whether they've made the showing about cumulative testimony

13    that was set forth in the Court's order about this, but we're

14    not going to argue about eight minutes.

08:33:14 15             The only thing we're going to contest is in this

16    summary, the background summary, they want to say the

17    following line:  He was not compensated by Ms. Booker or her

18    attorneys for his time.  We think that's implicitly trying to

19    suggest to the jury, in violation of the Court's order, that

08:33:34 20    he's a defense expert, which the Court ruled under 403 could

21    not be brought forth in front of the jury.

22             We therefore think that one line should be stricken

23    from the summary, and they can just talk about his background.

24    He's not identified as an expert for either side, and let the

08:33:53 25    jury hear the eight minutes.  But we do believe that saying he

08:33:56  1   was not compensated by Ms. Booker, by inference, is suggesting

2   he was compensated by the other side.

3        MS. MATARAZZO:  Your Honor, to be clear, it's our

4   position there's been questioning of every single expert about

08:34:15  5   who they're paid by.

6        THE COURT:  I understand your point.  It is an

7   interesting issue.  And it is true that every expert has been

8   asked about their compensation.

9        It is also true that I've indicated that I think 403

08:34:26  10  prevents you from indicating that he's a former Bard expert.

11       MS. MATARAZZO:  Your Honor, if I may, we specifically

12  chose language that doesn't say anything about --

13       THE COURT:  Well, I understand your point.  I also

14  understand Mr. North's point.

08:34:50  15       MS. MATARAZZO:  We're prejudiced if the jury thinks

16  we're paying yet another person.

17       THE COURT:  I understand that.  They think they're

18  prejudiced if the implication is they paid him.  There's a

19  reasonable argument on each side here.

08:35:02  20       When are you planning to play this?

21       MS. MATARAZZO:  In the afternoon, Your Honor.

22       THE COURT:  In the afternoon.  I'm not sure thinking

23  about it longer will result in any illumination.  Let me think

24  about it for a minute.  I understand the issue.

08:35:18  25       I take it there's no disagreement on the eight

08:35:20   1   minutes that --

2   MR. NORTH:  No.

3   THE COURT:  It's really just that one question?

4   MS. MATARAZZO:  Yes, Your Honor.  It's just testimony

08:35:28   5   about that one journal article.

6   THE COURT:  But I mean there's just disagreement

7   about the one --

8   MS. MATARAZZO:  Oh, I'm sorry.  Yes, Your Honor.

9   THE COURT:  -- line.

08:35:32   10   Okay.  Yeah, let me think about that for a couple of

11   minutes.

12   Are there other matters the plaintiffs want to raise?

13   MR. O'CONNOR:  I just had one small point.

14   THE COURT:  Go ahead.

08:35:50   15   MR. O'CONNOR:  Your Honor, this is really a minor

16   point.  And today we're putting on the plaintiff --

17   THE COURT:  This courtroom is actually very -- it's

18   very deceptive.  For some reason, when people are speaking

19   they can hear themselves fine, and it's amazing how the sound

08:36:12   20   dies with distance.  So go ahead.

21   MR. O'CONNOR:  Your protocol -- this is a minor

22   point, so I apologize if it sounds naive.  It's not a great

23   question, but your protocol says address everybody as Mr. or

24   Ms.  We have a plaintiff that everybody on our team calls

08:36:32   25   Sheri.  That's who she is.

```
08:36:34   1              THE COURT:  That's fine.  You can call her Sheri.

           2              MR. O'CONNOR:  Pardon me?

           3              THE COURT:  You can call her Sheri.

           4              MR. O'CONNOR:  Thank you.  And her son will be

08:36:41   5    testifying too.

           6              THE COURT:  You can call him by his first name.

           7              MR. O'CONNOR:  Thank you.

           8              THE COURT:  All right.  Do plaintiffs have other

           9    matters you want to raise?

08:36:50  10              MS. REED ZAIC:  Your Honor, a concern.  Yesterday you

          11    shared with us that the jury was not very thrilled about more

          12    video depositions.  We have more to play today, and it struck

          13    me that although we can't discuss there's 3,000 cases filed

          14    here, there's a reason why we're all here and why the

08:37:09  15    plaintiff is from Georgia and -- here -- and why we can't get

          16    some of these witnesses actually into court.  And I just don't

          17    want either side to be prejudiced by the fact that we're

          18    playing videos, because we don't have much choice.

          19              I completely understand.  I don't own a television,

08:37:25  20    but that's -- that can be almost punitive, in my opinion, to

          21    sit for 45 minutes sometimes and watch a screen.

          22              THE COURT:  What are you proposing?

          23              MS. REED ZAIC:  I would propose maybe just an

          24    informal mention, or whatever the Court would think is most

08:37:40  25    appropriate.  But I was struck by that, and I would not want
```

08:37:44  1    that to prejudice either side.

2         THE COURT:  How about if I say this morning to them

3    that I learned through Nancy that some of them are tired of

4    watching video, and we all understand that, but the necessity

08:37:57  5    of this complex trial with lots of witnesses requires us to

6    present some testimony in as concise and direct a form as we

7    can.  There are some witnesses who can't make it here, so some

8    of it has to be by video and we're going to ask them to watch

9    a bit more, please pay close attention.  Something like that.

08:38:16  10        MS. REED ZAIC:  I think that would be -- that would

11   be good.  Maybe the mention of the fact in a complex cases,

12   even if it's all over the country, I think people understand

13   you can't just jump on a plane and --

14        THE COURT:  Any objection to that?

08:38:27  15        MR. NORTH:  No, Your Honor.

16        THE COURT:  Okay.  I'll say that.  And if I forget,

17   remind me, but I'll try to remember to say that when they come

18   in.

19        MS. REED ZAIC:  I will do that.  Thank you.

08:38:35  20        THE COURT:  Okay.  Matters from defendant?

21        MR. NORTH:  The only thing I wanted to mention,

22   Your Honor, is regarding the briefing on the FDA warning

23   letter.  Ms. Zaic and I have agreed, subject to the Court's

24   approval, of course, to submit no more than three-page

08:38:47  25   submissions by 5 o'clock on Saturday.

08:38:53  1      THE COURT:  5 o'clock on Saturday is fine, but I

2    don't work on Sunday.  So I won't look at that until probably

3    Monday night.  I don't know if that is soon enough.  If you

4    want me to look at it on Saturday, then I need to get it

08:39:04  5    earlier than 5 o'clock on Saturday.

6           MR. NORTH:  It doesn't -- that really doesn't matter

7    from our standpoint.  I don't know about Ms. Zaic.  Because

8    we'll be in the middle of our case Monday and Tuesday.  Monday

9    morning?  Sunday afternoon?  Whatever the Court wants.

08:39:19  10      THE COURT:  Well, 5:00 on Saturday is fine.  I just

11    want you to know that I won't be getting you an order out on

12    Sunday afternoon if I get it on --

13           MR. NORTH:  Sure.

14           MS. REED ZAIC:  In other words, you're giving us

08:39:31  15    permission to work on Sunday.

16           THE COURT:  No, I don't want to you work on Sunday.

17    But if you do -- my point is if -- whenever you submit it is

18    fine, but if it gets in Saturday evening, I won't get to it

19    until sometime on Monday, and we'll be in trial on Monday, so

08:39:44  20    it will be sometime Monday evening probably.

21           MR. NORTH:  Okay.

22           MS. REED ZAIC:  Okay.

23           THE COURT:  Anything else?

24           MS. HELM:  Yes, Your Honor.  I spoke with Mr. Lopez

08:39:52  25    this morning.  There's an exhibit, it's Exhibit 2057, which I

08:39:58   1    believe inadvertently has attached to it a document that

2    you've ruled is work product, and we have an agreement that

3    that will be withdrawn from Exhibit 2057.  So -- and the

4    plaintiffs will make sure that the correct exhibit is in the

08:40:12   5    record.

6              MS. REED ZAIC:  I've already communicated that.  It

7    was actually inadvertent.  That was priorly admitted in a

8    previous action, and I think it just got carried forth, I

9    think.  We'll take it out.

08:40:24  10              THE COURT:  I'm assuming there's nothing we have to

11   do in front of the jury; we just have to make sure the correct

12   version is in the electronic form?

13              MS. HELM:  That's right.

14              THE COURT:  Okay.

08:40:34  15              MS. HELM:  Thank you, Your Honor.

16              THE COURT:  Are we continuing this morning with

17   Mr. Carr?

18              MR. LOPEZ:  Yes, Your Honor.

19              THE COURT:  Is that the plan?

08:40:39  20              Okay.  All right.  I will come in a few minutes

21   before -- well, when the jury gets here at 9:00.

22              MR. NORTH:  Thank you, Your Honor.

23              MR. LOPEZ:  Thank you, Your Honor.

24         (Recess was taken from 8:40 to 8:55.  Proceedings resumed

08:40:47  25   in open court outside the presence of the jury.)

08:55:01   1          THE COURT:  Thank you.  Please be seated.

           2          Counsel, on the Dr. Rogers issue, here's a thought

           3   I've had.  His testimony is not being presented as an expert

           4   retained by Bard.  I've said that the plaintiffs can't do

08:55:27   5   that.  But he's not being presented as an expert retained by

           6   plaintiff either.

           7          How about if your sentence simply says Dr. Rogers is

           8   not being presented as an expert retained by either party.

           9   That's true, because it's not being presented by Bard as one

08:55:45  10   of their experts, but it makes clear you haven't retained and

          11   compensated him, but it avoids this implication that the other

          12   side did.

          13          MS. MATARAZZO:  I think that's fine, Your Honor.  My

          14   only other thought was that we could tell the jury don't

08:56:00  15   assume that a person testifying is being compensated by the

          16   other party if there's no testimony about it.

          17          MR. LOPEZ:  That's better.  I like yours better.

          18          THE COURT:  Okay.  So let's just say Dr. Rogers is

          19   not being presented as an expert retained by either party.

08:56:16  20          MS. MATARAZZO:  That's fine, Your Honor.  Thank you.

          21          THE COURT:  Okay.

          22          All right.  Traci, shall we see if the jury happens

          23   to be here early?

          24          THE COURTROOM DEPUTY:  Sure.

08:57:11  25     (The jury entered the courtroom at 8:57.)

08:58:06  1          THE COURT:  Please be seated.

2          All right.  Good morning, ladies and gentlemen.

3     Thanks for being here this morning.

4          We're going to continue with Mr. Carr this morning,

08:58:21  5     but before we do I wanted to mention something.

6          Nancy told me that yesterday when you were exiting

7     through the hall, one or two of you, she didn't say who, said

8     something like, Please, no more video depositions.

9          We want you to know that we understand that

08:58:40 10     sentiment.  We don't get any more thrill out of watching them

11     than you do.  But the reality is that these witnesses are from

12     all over the country, as you can tell, and not all of them can

13     be here for trial and the logistics of trial makes that

14     difficult.  So some of them have to be presented by video

08:58:58 15     deposition.

16          There will be some more.  We're doing our best to

17     keep them to a minimum.  But please do your best to pay

18     attention to that testimony, because it is as important as any

19     other testimony in the case, and that's just the method we

08:59:12 20     need to use to present it.

21          There may also be some deposition testimony that's

22     presented by reading to you.  That's a little even less

23     thrilling than video, but that's done to even move things

24     along more quickly.  So if you can do your best to treat that

08:59:26 25     all as testimony, we would appreciate it.

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

08:59:28   1        Go ahead, Mr. Lopez.

2              MR. LOPEZ:  Thanks, Your Honor.

3                    **ROBERT M. CARR, JR.**,

4    recalled as a witness herein, after having been previously

08:59:31   5    sworn or affirmed, was examined and testified as follows:

6              D I R E C T   E X A M I N A T I O N   (CONTINUED)

7    BY MR. LOPEZ:

8    Q    Good morning, Mr. Carr.

9    A    Good morning.

08:59:35  10    Q    How are you?

11    A    I'm well, thank you.

12    Q    Good.

13              So let's just from yesterday clarify a couple of

14    things.  I asked you whether or not the goal of bench testing

08:59:43  15    was to replicate what would happen in a real human being.  In

16    other words, once you implanted a device in a human being.  Do

17    you remember that?

18    A    Yes, I do.

19    Q    And, in fact, the goal of bench testing is to do that, is

09:00:01  20    to see -- to design that testing as close to the human

21    anatomy, the way a human being functions, the way that --

22    their activities of daily living, so that if you put it in a

23    human being, your testing is telling you that it has a high

24    likelihood of being safe.  True?

09:00:20  25    A    Yes.  You do bench testing to do your best to simulate the

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:00:26 1   environment the device will be used in.  In this case, that's

2   a human, yes.

3   Q    Okay.  Now, when you were at NMT, they had planned a

4   European clinical trial in addition to the study Dr. Asch had

09:00:45 5   done.  True?

6   A    It was talked about, yes.

7   Q    And it was a trial that Dr. Asch was told was going to be

8   done after his pilot study.  True?

9   A    Again, it was talked about.  It was never committed to.

09:01:01 10   Q    Well, it wasn't committed to Dr. Asch?

11   A    I don't believe so, no.

12   Q    But what we do know is that when Bard took over the

13   Recovery filter, the idea of a long-term safety study was

14   abandoned.  True?

09:01:19 15   A    I'm not sure of that, no.

16   Q    Well, has there been one since on the Recovery filter?

17   A    No, there was no more clinical trials on the Recovery

18   filter.

19   Q    Okay.  Yesterday there was some questions I asked you

09:01:32 20   where you had used the word "approval" as relates to the G2

21   filter.  That is, in fact, a violation of federal regulations

22   to suggest that the G2 filter, either as a permanent device or

23   a retrievable device, is approved.  True?

24   A    That it's approved for use?

09:01:55 25   Q    That it was approved by FDA to be marketed.  Approved.

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:02:00  1   A   The FDA concurs with us, yes.

2   Q   It's called clearance, isn't it?

3   A   No, it's called concurrence.

4   Q   Concurrence.  In fact, it's not an approval by the FDA of

09:02:11  5   the long-term safety and effectiveness of the product.  True?

6   A   I'm not sure of that wording, no.

7   Q   Okay.  We talked yesterday about -- and it was

8   Exhibit 5303.

9           MR. LOPEZ:  And if we can put that back up.

09:02:28 10   BY MR. LOPEZ:

11   Q   I think we were right at the end of talking about that

12   when we broke.

13           THE COURT:  Excuse me, folks.  Somebody has their

14   phone on.  Please make sure your phones are turned off or are

09:02:38 15   on airplane mode.

16           MR. LOPEZ:  I learned that the other day.  You hit

17   airplane mode, you have to just hit it again where it says

18   approved.  I didn't do that the other day, Judge.  So I

19   apologize.

09:02:49 20           THE COURT:  That static we're hearing is a phone, so

21   please make sure your phones are off.

22           MR. LOPEZ:  Greg, can we put up 5303, please.

23           And go to the last page.  I think we were right on

24   that last page when we broke yesterday.

25

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:03:14  1  BY MR. LOPEZ:

2  Q   Sir, we talked about this yesterday right before we broke.

3  Do you recall that?

4  A   Yes, I do.

09:03:19  5  Q   And we showed yesterday when the G2 filter was being

6  tested, and one of the tests for migration resistance against

7  the Simon Nitinol filter failed.  Remember that one test?

8  A   Yes, I do.  Failed acceptance criteria.

9  Q   Right.

09:03:38  10      MR. LOPEZ:  Your Honor, can I publish this to the

11  jury, please?

12      THE COURT:  You may.

13  BY MR. LOPEZ:

14  Q   And what Bard did on its own, used their own discretion,

09:03:49  15  decided to change that criteria for that test for the

16  resistance to be statistically greater than the Recovery

17  filter.  True?

18  A   The specification was changed, yes, and we spoke with the

19  FDA about it and they agreed that that was appropriate.

09:04:08  20      MR. LOPEZ:  Move to strike.  Nonresponsive.  Hearsay.

21      THE COURT:  Overruled.

22  BY MR. LOPEZ:

23  Q   Now, the original predicate for the G2 filter was supposed

24  to be the Simon Nitinol filter; correct?

09:04:23  25  A   No.

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:04:24  1    Q   Well, what we do know is that the predicate device that

2    was used to clear the G2 was the Recovery filter.   True?

3    A   I'd have to read the report itself, but yes, Recovery was

4    a predicate.

09:04:39  5    Q   Meaning that, in Ms. Hudnall's words, it just didn't need

6    to be any worse than the Recovery filter for the FDA to clear

7    it.  Isn't that right?

8    A   I don't know what Ms. Hudnall said.

9    Q   Well, let's assume she said that.

09:04:54  10   A   No.

11   Q   Ms. Hudnall said that as long as it wasn't worse than the

12   Recovery filter it would clear through the 510(k) process.

13   Isn't that true?

14   A   I'm not going to assume Mrs. Hudnall said that.

09:05:05  15   Q   Okay.  What we do know is it doesn't have -- it just has

16   to be as safe and effective or substantially equivalent to the

17   predicate device.  In this case that was the Recovery filter.

18   A   So it needs to be substantially equivalent to its

19   predicate, yes.

09:05:23  20   Q   And all you had to do is give the FDA some bench testing

21   about that to show that substantial equivalence?

22   A   No.

23   Q   Did you give them clinical data?

24   A   No, we did not.

09:05:37  25   Q   No clinical data existed; correct?

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:05:40  1    A    Not for the permanent indication, no.

2    Q    In fact, when the G2 entered the market, Bard had no idea

3    how the G2 device was going to behave in a human being.  True?

4    A    No, that's not true.

09:05:56  5    Q    Oh, you knew it was going to caudally migrate, sometimes

6    three, four centimeters, when you marketed it?

7    A    No, we didn't.

8    Q    Did you know it was going to have the tilting and fracture

9    problems that were reported to you in the first three or four

09:06:12 10    months it was on the market?

11    A    We knew that tilting and fracture are complications that

12    are associated with all vena cava filters, including the G2.

13    Q    Okay.  I didn't ask you that.

14    A    Yes, we knew that.

09:06:25 15    Q    I asked you specifically with respect to the G2.  So you

16    knew when you launched and marketed the G2 without a clinical

17    trial that it was going to have an unacceptable risk of caudal

18    migration within the first six months it was on the market?

19    Yes or no?

09:06:42 20    A    No.

21    Q    You didn't change the design of the G2 filter for how many

22    years?

23    A    I'm not sure exactly.  A couple years later we ended up

24    electropolishing the device, and we added a hook to the

09:07:07 25    device.  I don't know the exact timing of those events.

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:07:09  1    Q    I'm talking about the G2 filter.  The only thing you did

2    to the G2 filter in the six years it was on the market was to

3    put a hook at the top of it.  True?

4    A    No.

09:07:19  5    Q    You had another G2 filter that had something other than a

6    hook on it?

7    A    The filter that's called Eclipse was an electropolished

8    version of the G2.

9    Q    Well, sir, that wasn't the G2.  That was the Eclipse.  I'm

09:07:33 10    talking about the G2 that stayed on the market after you had

11    actually launched the Eclipse.  That G2.  No design changes

12    other than a hook at the top of it.  True?

13    A    Not to the filter, no.

14    Q    Now, you're familiar with the 510(k) process?

09:07:55 15    A    Yes.

16    Q    We talked about the predicate device, didn't we, a little

17    bit earlier?  We talked about whether or not it was going to

18    be the G2 or the Recovery filter.  We just talked about it

19    about ten minutes ago.

09:08:06 20    A    No.  You said that, but we didn't talk about it.

21    Q    Okay.

22          A predicate device has to be a legally marketed

23    device.  True?

24    A    Yes.

09:08:16 25    Q    It cannot be an adulterated device, can it be?

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:08:20  1   A   I'd have to read the regulation, but I don't think so, no.

2   Q   And it can't be a device that shouldn't be on the market.

3   True?

4   A   I don't know what that means.

09:08:30  5   Q   All right.  It has to be a legally marketed device.

6   That's clear from the regulations; right?

7   A   Yes.

8   Q   And if it's not being legally marketed, then it should not

9   and cannot be used as a predicate device to get clearance for

09:08:47  10  another device.  True?

11  A   If that were the case, yes, that would be true.

12  Q   And there was some discussions yesterday about the IFU and

13  the labeling and what could be in the labeling and what

14  doctors can be advised of.

09:09:06  15  Well, labeling involves a lot more than an IFU.

16  True?

17  A   I don't remember any conversation about labeling.  I'm

18  sorry.

19  Q   Okay.  Then follow my question:  Labeling is much more

09:09:18  20  than an IFU; right?

21  A   Yes.

22  THE COURT:  Excuse me, Mr. Lopez.  Sorry.

23  Everybody take out your phone.  Everybody take it

24  out.  Double-check it.  We've still got a phone on in the

09:09:31  25  courtroom.  Let's just turn them all off, if you would,

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:09:35  1   please.

2          Okay.  Go ahead, Mr. Lopez.

3   BY MR. LOPEZ:

4   Q    Labeling is more than an IFU.  True?

09:09:55  5   A    Yes.

6   Q    In other words, if the company wanted to use some means of

7   communication to get out some of the information we've talked

8   about here in this courtroom about some of the issues and

9   problems that Bard was having with the G2 filter, they didn't

09:10:11 10   have to put it in fine print in an IFU.  True?

11   A    They didn't have to put it in fine print?  I don't know

12   what you're talking about, but no, you don't to have put it in

13   fine print.

14   Q    Should we open up the -- you want to open up the Recovery

09:10:25 15   box and see how fine and -- strike that.

16          You know that there are other means of communication,

17   is the bottom line; right?

18   A    With respect to what, sir?

19   Q    Just going out and getting messages to doctors about the

09:10:38 20   good things and maybe some of the problems you were having

21   with your filters.

22   A    There are many ways to communicate.

23   Q    That's my point.  You have a sales force that can do that;

24   right?

09:10:50 25   A    Yes.

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:10:51   1   Q   If you had something that was really vital to patient

2   safety, you wouldn't have to wait to redo a multi-page IFU,

3   stick it in the box of the G2, and send it to the doctor.   You

4   could you send that messaging out directly to doctors,

09:11:07   5   couldn't you?

6   A   Not without approval.

7   Q   Not without approval?  You can't go out and tell doctors

8   you have a problem with your device on your own?

9   A   First off, we don't have a problem with our device.  And

09:11:20  10   second off, those types of communications we typically run by

11   the FDA before we would do that.

12   Q   Typically.  But there's nothing to prevent you, sir, if

13   you have a serious safety issue with your product, from

14   getting that message out through your sales force, through

09:11:43  15   E-Blast to physicians, to other forms of communication other

16   than putting it in an IFU.   True?

17   A   I don't know the answer to that in total.

18   Q   You don't know the answer to that.  Okay.

19          How about in part do you know the answer to it?

09:11:59  20   A   There are certain things we can communicate and certain

21   things we go through the FDA for, and I don't know which of

22   those that you're speaking of.

23   Q   Well, you understand that any time you communicate about

24   your product, whether it be in a hospital where you're putting

09:12:16  25   on your displays and having doctors go by, or you're having a

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:12:19  1    convention, a medical convention, or whether or not your

2    salespeople are going into the doctors' offices, it has to be

3    what's called fair balanced.  True?

4    A   I'm not sure what you're saying.

09:12:32  5    Q   You're not familiar with the term "fair balance" when it

6    comes to the marketing of a medical device?

7    A   Yes.

8    Q   What does fair balance mean?

9    A   I think it's self-explanatory.

09:12:43 10    Q   Okay.  I want to know what Bard's definition of fair

11    balance is.

12    A   I don't know what Bard's definition is.

13    Q   Okay.  What is Mr. Carr's definition of fair balance

14    marketing of its medical devices?

09:12:59 15    A   I don't know how to explain it, other than the words

16    "fair" and "balanced."

17    Q   Meaning you can't overstate what you think are the great

18    things about the product and the benefits of the product and

19    downplay the risk; right?

09:13:16 20    A   I don't know for sure, but --

21    Q   Well, I'm trying to figure out what's self-explanatory.

22    So apparently it's not that self-explanatory.

23        Does fair balance mean that when you present your

24    product, you have to give an equal amount of time to the

09:13:33 25    benefit of the product and equal amount of transparency to the

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:13:39  1    risks involved in the product?  That's fair balance; right?

2    A    I don't know.

3              MR. LOPEZ:  Can we bring up the brochure.

4              This is a good time to talk about fair balance.

09:13:58  5              2045, please.

6              I think that's already in evidence, Your Honor, 2045.

7              If it is, I'd like to publish it.

8              THE COURTROOM DEPUTY:  It is in.

9              THE COURT:  You may.

09:14:19 10              MR. LOPEZ:  Thank you.

11   BY MR. LOPEZ:

12   Q    Sir, this is the G2 brochure.  Do you recognize it?

13   A    Yes.

14   Q    I think you helped Ms. Hudnall design this brochure;

09:14:36 15   right?

16   A    I certainly reviewed it.

17   Q    In prior depositions you told us that you and Ms. Hudnall

18   together helped design this brochure.  Do you recall that?

19   A    I'll accept that.

09:14:49 20   Q    And this brochure is labeling; right?  This is a label?

21   A    It is labeling, right.

22   Q    The same requirements for this brochure you have for any

23   other communication that would come under the term "labeling."

24   True?

09:15:09 25   A    I don't know for sure.  I'd have to read the regulation.

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:15:11   1   But it is labeling.

2   Q   And when it comes to a marketing tool like this, this fair

3   balance requirement comes into play; right?

4   A   Again, I'd have to read the regulation.

09:15:33   5   Q   Let's look at page 2.

6           And, by the way, this is the G2 --

7           MR. LOPEZ:  If I didn't ask, Your Honor, may I

8   publish this to the jury?  I think I already asked, but I want

9   to make sure.

09:15:45   10           THE COURT:  It's published.

11           MR. LOPEZ:  Okay.

12   BY MR. LOPEZ:

13   Q   Look at page 2, please.

14           "Introducing G2 vena cava filter for permanent

09:15:53   15   placement.  The G2 combines the best design features of Bard's

16   existing vena cava filters."

17           Did I read that correctly?

18   A   Yes.

19   Q   What were the existing vena cava filters at the time that

09:16:11   20   the G2 was launched?

21   A   They were the Simon Nitinol filter and the Recovery

22   filter.

23   Q   And at one point in time it would not have included the

24   Recovery filter, right, as an existing vena cava filter

09:16:29   25   because you stopped selling it.

DIRECT EXAMINATION (CONT'D) - ROBERT M. CARR, JR.

09:16:33   1   A   I don't understand the question.

2   Q   At one time, the Recovery filter was not an existing vena

3   cava filter.   True?

4   A   It was at the time of this document.

09:16:47   5   Q   At one time in -- in the -- in time, the Recovery filter

6   was no longer an existing vena cava filter that Bard sold.

7   True?

8   A   That's correct.

9   Q   It was very shortly after the G2 filter was launched in

09:17:05  10   2005 that the Recovery filter was no longer, quote, an

11   existing vena cava filter.   Right?

12   A   We no longer sold -- we stopped selling the Recovery

13   filter at some point.

14           MR. LOPEZ:  Greg, could you --

09:17:23  15   BY MR. LOPEZ:

16   Q   And that was before 2006; correct?

17   A   Yes.

18           MR. LOPEZ:  Could we go down -- could you just --

19   we'll come back to this page, but can you go to the last page

09:17:35  20   of this exhibit.  And I hope you can blow it up.  And at the

21   very bottom it has a date.

22   BY MR. LOPEZ:

23   Q   This was in 2005; correct?  This brochure?

24   A   Yes.

09:17:51  25   Q   I think you were designated as Bard's most qualified and

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:17:59  1    most knowledgeable person at a deposition for purposes of

2    discussing this brochure.  Do you recall that?

3    A    Not particularly, no.

4    Q    You were a 30(b)(6) deponent.

09:18:14  5    A    I have been several times.  I don't remember the subject

6    matter each time.

7    Q    We'll come back to that.  I'll remind you about that in a

8    little bit.

9         Did this brochure's content ever change at any time

09:18:25  10   that the G2 filter was on the market?

11   A    I don't know.

12        MR. LOPEZ:  Can we go back to the second page, Greg,

13   please.

14   BY MR. LOPEZ:

09:18:36  15   Q    Now, it also reads after "existing vena cava filters,"

16   "increased migration resistance, improved centering, enhanced

17   fracture resistance."  Correct?

18   A    Yes, it does.

19   Q    And that was against the existing vena cava filters that

09:19:08  20   Bard had sold or was selling.  True?

21   A    No.

22   Q    No?

23   A    No.  It was against Recovery only.

24   Q    So when a doctor got this brochure and he saw "existing

09:19:23  25   vena cava filters," he was automatically supposed to think

DIRECT EXAMINATION (CONT'D) - ROBERT M. CARR, JR.

09:19:27  1   that Bard meant Recovery; right?

2   A    So in the context of how these brochures are distributed,

3   as you mentioned before, is a sales rep --

4   Q    Sir --

09:19:37  5   A    -- who is having a conversation with a physician, and the

6   context is about Recovery.  Yes.

7   Q    Well, sir, this brochure is a label.  It's supposed to be

8   honest.  It's supposed to be fair.  True?

9   A    It is honest and fair.

09:19:53 10   Q    It is supposed to be.  We know that you're obligated to

11   make it fair and balanced; correct?

12   A    And it is.

13   Q    Okay.  Once the Recovery filter was no longer an existing

14   Bard filter, the only existing Bard filter would have been the

09:20:14 15   Simon Nitinol filter; correct?

16   A    And the G2.

17   Q    Other than the G2.

18   A    Yes.  Once we stopped selling Recovery, the Simon Nitinol

19   filter would have been the only other filter we marketed.

09:20:28 20   Q    And even when you were selling Recovery, when this

21   brochure first came out, the only other existing permanent

22   filter, which the G2 was, was the Simon Nitinol filter.  True?

23   A    No.  Recovery is also approved as a permanent filter.

24   Q    Until you took it off the market and it was neither.  Once

09:20:46 25   you took it off the market it wasn't available as a optionally

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:20:51  1    retrievable filter or a permanent filter; correct?

2    A    It wasn't available, yes.

3    Q    And that happened sometime near the end of 2005; correct?

4    A    I believe so, yes.

09:21:01  5         MR. LOPEZ:  Can we go down, there's a section there,

6    Greg, on that page where it says "Data on File."

7    BY MR. LOPEZ:

8    Q    And I should have pointed out, I don't want to go back to

9    it, but those three things I just read had an asterisk next to

09:21:21  10   it; right?

11   A    Yes, they did.

12   Q    And the asterisk is taking you to "Data on File"; right?

13   A    That's correct.

14   Q    Now, if a doctor wanted any of that data to support any of

09:21:42  15   these claims, would Bard share that data with the doctor?

16   A    No, we wouldn't.

17   Q    Why wouldn't you share that with the doctor?

18   A    Because the data is our -- it's based on our

19   specifications, which are our property, if you will.  All of

09:22:04  20   them together kind of make up what makes the filter what it

21   is, and so, no, we would not give somebody our specifications.

22   Q    Okay.  So if a sales -- if a doctor got the brochure and

23   saw those three claims that Bard was making and thought, "Oh,

24   data on file, I want to see what it is that supports these

09:22:28  25   claims," Bard would not give that to the doctor.  True?

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:22:31  1   A   I'm sorry, I don't know that that ever happened.  And, no,

2   we would not give them our proprietary information.

3   Q   Now, what if a doctor wanted Bard's G2 complication rates

4   as it was being marketed?  Would that be something that Bard

09:22:47  5   would give to the doctor?

6   A   No, not necessarily.

7   Q   What if Bard --

8        MR. LOPEZ:  Greg, can you play 1618.

9        Let me tell you exactly.

09:23:09 10        Clip 3 from Mr. Carr's 4/17/13 deposition.

11        MR. WOODY:  Play to the jury or --

12        MR. LOPEZ:  Can I play this to the jury, Your Honor?

13        THE COURT:  Any objection?

14        MR. NORTH:  No, Your Honor.

09:23:41 15        THE COURT:  Yes.

16      (Video clip played.)

17        "Question:  Is there any reason why Bard wouldn't or

18   couldn't provide this distraught physician with the

19   complication rate associated with the G2 filter?"

09:23:57 20        "Answer:  It's not something that we provide, no."

21   BY MR. LOPEZ:

22   Q   Now, what if a doctor wanted G2's fracture resistance

23   testing results to see whether or not the doctor was satisfied

24   that this device, unlike the Recovery device, was more

09:24:14 25   fracture resistant?  Would that be something that Bard would

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:24:18  1    give to the doctor?

2    A   No, I don't think so.

3         MR. LOPEZ:  Same deposition, Greg.  Clip 4.

4       (Video clip played.)

09:24:32  5         "What about if a distraught physician wanted to know

6    how the filter has been tested to see if it can resist

7    fracture?  Is he or she entitled to know that information?"

8         "Answer:  No, it's confidential."

9         MR. LOPEZ:  Can I have 994, please.

09:25:11 10         Traci, is this in evidence?  I think it might be.

11         THE COURTROOM DEPUTY:  994?

12         MR. LOPEZ:  994.

13         THE COURTROOM DEPUTY:  It is in.

14         MR. LOPEZ:  This is in evidence, Your Honor.  I'd

09:25:21 15    like to publish it to the jury.

16         THE COURT:  You may.

17    BY MR. LOPEZ:

18    Q   Sir, do you recognize this as the G2 IFU that we've been

19    talking about?

09:25:36 20         THE WITNESS:  Can you flip to the next page, please.

21         MR. LOPEZ:  Don't put it large right now, leave it

22    small.

23         This is the actual size that's --

24         THE WITNESS:  The last page, please, can you flip

09:25:50 25    to --  yes.

DIRECT EXAMINATION (CONT'D) - ROBERT M. CARR, JR.

09:25:54   1   BY MR. LOPEZ:

2   Q   Now, when I said "fine print" earlier, would you agree

3   with me, when you look at this device -- I mean this IFU,

4   which is probably on actual size on your screen, that's -- I

09:26:05   5   think you would consider that fine print, wouldn't you?

6   A   No, I wouldn't.

7   Q   Okay.  Well, you have better eyes than me.

8        Now, Mr. North was asking questions, I can't remember

9   who it was, it was the other day, and he asked the question

09:26:22  10   that said:  Isn't it true, Doctor, that the results of the

11   Binkert study from the EVEREST trial is in the G2 IFU?

12        And, sir, I want you to tell us now -- I'm going to

13   ask you the same question.

14        Sir, are the results of the EVEREST trial or the

09:26:40  15   Binkert study that was published in 2009 in the G2 permanent

16   IFU that is on that screen in front of you that has been

17   admitted into evidence?

18        THE WITNESS:  Can you please flip through it for me.

19        And the next page.

09:27:06  20        No, it's not.

21   BY MR. LOPEZ:

22   Q   Okay.  And Ms. Booker received her G2 device in June of

23   2007, just to refresh your memory about that.  I think we may

24   have mentioned that yesterday.  And by then, weren't the

09:27:24  25   results of the EVEREST trial, at least with respect to the

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:27:28 1   adverse events, those percentages of tilt and the fracture and

2   the migration and the inability to retrieve, that data was

3   already in at Bard, wasn't it?

4   A   I don't know.

09:27:45 5   Q   And if it was, don't you think that Ms. Booker and her

6   doctor should have known about the findings that were in the

7   EVEREST trial and not wait two or three years for Dr. Binkert

8   to publish it in the medical literature?

9   A   The results of the clinical trial are published in the

09:28:02 10   IFU.

11   Q   Sir, don't you think they had the right -- you're here as

12   a representative of Bard.  You've been a designee as the

13   person most knowledgeable four different times at a

14   deposition.  Don't you think that Ms. Booker and her doctor

09:28:16 15   had the right to know the results of the EVEREST trial before

16   she got her device in June of 2007?

17   A   I don't know the dates.  I don't know if the data was

18   there.

19   Q   But if it was, just as a matter of human decency, her

09:28:34 20   doctor and Ms. Booker should have been advised of that

21   information.  True?

22   A   No, not until it's approved.

23   Q   Approved?

24   A   Yes.  Not until the 510(k) is concurred with.

09:28:51 25   Q   Well, G2 was already on the market when the Binkert study

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:28:56  1   results came in.

2   A   Yes.

3   Q   And you didn't change the brochure that you had given to

4   your salespeople that talked about this improved migration

09:29:09  5   resistance and fracture resistance and centering?  That didn't

6   change for the entire life of the G2 filter.  True?

7   A   I don't know.

8   Q   You don't know?  You really don't know about a device that

9   you monitored whether or not that brochure that you created

09:29:25  10  with Ms. Hudnall ever changed?

11  A   I don't know.

12  Q   Let me ask you this:  Don't you think it should have?

13  A   No, I don't.

14           MR. LOPEZ:  Can I have 1062, Greg, please.

09:29:51  15  BY MR. LOPEZ:

16  Q   Sir, are you familiar with this document?

17  A   I don't remember.

18  Q   Why don't we go to a page to help refresh your

19  recollection about that.

09:30:16  20           MR. LOPEZ:  Greg, if you can go to -- the PowerPoints

21  aren't -- it's probably seven pages in.  It says at the top

22  "Project Reviews."  Might be eight pages.

23  BY MR. LOPEZ:

24  Q   Do you see your name there, Mr. Carr?

09:30:49  25  A   I do.

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:30:51  1   Q   Does this suggest to you that you were probably at this

2   meeting and gave a presentation?

3   A   If I see the rest of the presentation.  I don't -- looks

4   like it.

09:31:03  5   Q   It looks like it?

6   A   It's called BPV Project Reviews, but I don't know the rest

7   of the document.

8   Q   All right.

9        MR. LOPEZ:  And can we go back to the front page,

09:31:14 10   Greg, please.

11   BY MR. LOPEZ:

12   Q   And this is in April of 2004, the Recovery filter had been

13   on the market in full market release for about three months;

14   right?

09:31:28 15   A   I don't think it was ever on full market release.

16   Q   Recovery filter?

17   A   Yes.

18   Q   Well, let's look at the next page, I'm sorry.

19        MR. LOPEZ:  Greg go down two more -- three more, and

09:31:47 20   we'll see a graph of U.S. Sales.  See if this refreshes

21   Mr. Carr's recollection as to whether or not this -- the

22   Recovery filter was on full market release as of April.

23   BY MR. LOPEZ:

24   Q   Does that help refresh your recollection?

09:32:08 25   A   No, it does not.

DIRECT EXAMINATION (CONT'D) - ROBERT M. CARR, JR.

09:32:10  1   Q   Okay.

2            MR. LOPEZ:  And if we go to two more slides down,

3   Greg, where it says "Recovery Filter Generations."

4   BY MR. LOPEZ:

09:32:23  5   Q   Sir, at least as of April 2004, your company was already

6   looking at redesigning the Recovery filter due to migration

7   and fracture issues, as depicted on that slide.  True?

8            THE COURT:  Mr. Lopez, this document is not in

9   evidence.

09:32:45 10          MR. LOPEZ:  I'm sorry, Your Honor.  I'd like to offer

11   this into evidence at this time and publish it to the jury.

12          MR. NORTH:  No objection, Your Honor.

13          THE COURT:  All right.  1062 is admitted.

14        (Exhibit 1062 admitted.)

09:32:55 15          THE COURT:  And may be published.

16          MR. LOPEZ:  Can we go back -- forward, Greg, two

17   slides where the Recovery Filter U.S. Sales graph that I

18   didn't have published to the jury.

19   BY MR. LOPEZ:

09:33:16 20   Q   And this is October.  Would be October, November, December

21   of 2003, and January, February of 2004; right?

22   A   Yes.

23   Q   It's pretty clear that there's a -- in January, all of a

24   sudden the graph starts to trend and spike upward.  True?

09:33:45 25   A   Yes.

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:33:51  1   Q   So if we've seen documents already in this trial, more

2   than one, and have had testimony that full market release

3   happened in January of 2004, the information you have is

4   different than that?

09:34:04  5   A   I don't recall the filter ever being released for full

6   market release.

7   Q   Okay.

8        MR. LOPEZ:  And let's go probably about 15 slides

9   down, Greg.

09:34:23  10       There you go.

11  BY MR. LOPEZ:

12  Q   Sir, yesterday we talked about a meeting you were at that

13  we had -- there was some notes, and then you said you hadn't

14  seen the notes before, but then I had to remind you you

09:34:42  15  actually testified about those notes in another proceeding.

16  Do you remember that?

17  A   I'd seen a different copy of the notes, I believe.

18  Q   And those -- even independent of those notes, you recall

19  discussions from the likes of Dr. Kaufman and Dr. Venbrux that

09:35:01  20  35 or 50 millimeters of mercury was not an appropriate

21  standard, and that the company ought to consider 140.  Do you

22  remember that?

23  A   I don't remember it separately, no.

24  Q   Let's look at this document where -- is this a slide that

09:35:16  25  you prepared?

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:35:19  1   A   I don't know.

2   Q   And this slide, is this slide suggesting that for purposes

3   of testing the Recovery filter, that it ought to be tested at

4   greater than 80 millimeters of mercury at 28 millimeter vena

09:35:36  5   cava?

6           Do you see that?

7   A   I don't know the context of this slide.  If you go back, I

8   would understand what that bullet meant.

9   Q   You know it's in this slide going back?  That would help

09:35:54  10  you?

11  A   No.  I don't know what the context of that statement is.

12  Q   My question to you, at least as of April of 2004, there

13  was a discussion in a meeting that included you, that you

14  ought to be setting the threshold for migration resistance at

09:36:08  15  a number greater than 80 millimeters of mercury.  True?

16  A   No.

17  Q   What does that mean?

18  A   I think I just said I don't know the context of that

19  statement.

09:36:26  20  Q   You don't know what that means on that slide?

21          MR. NORTH:  Objection, Your Honor.  Argumentative.

22          THE COURT:  Sustained on the last question.

23          MR. LOPEZ:  Okay.  We can put that aside.

24          Can I have 730, please.

25

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:36:53  1  BY MR. LOPEZ:

2  Q   Sir, do you see this?  Do you see what that is?  That's a

3  notice of taking rule 30(b)(6) deposition via videotape.

4       MR. NORTH:  Excuse me.  Objection.  402.

09:37:15  5       THE COURT:  I don't know where you're going with

6  this, Mr. Lopez.

7       MR. LOPEZ:  I'm going to show him the subject matter

8  for which he was a designee for Bard.

9       THE COURT:  Overruled.

09:37:24 10  BY MR. LOPEZ:

11  Q   Do you see it, sir?

12  A   I see -- yes.

13  Q   Okay.  And you actually appeared at a deposition as Bard's

14  designee in April of 2003.  True?

09:37:39 15  A   I don't see a date, but --

16  Q   Well, you can see -- there you go.

17  A   It was 2013.

18  Q   I'm sorry, you're right.  My mistake.  2013.  I meant

19  2013, and it was 2013; correct?  So the record is clear.  It

09:38:00 20  was four years -- it was five years ago, and not 15 years ago.

21  A   Yes.

22  Q   Okay.  Let's go to the very last page of this document.

23       MR. LOPEZ:  Your Honor, may I move this into evidence

24  and publish it to the jury at this time?

09:38:21 25       MR. NORTH:  Objection, Your Honor.  402.  A notice of

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:38:24   1   deposition.

2        MR. LOPEZ:  At least the last page, Your Honor.

3        THE COURT:  Well, the objection is relevancy?

4        MR. NORTH:  Yes, Your Honor.  Same objection.

09:38:33   5        THE COURT:  Overruled on relevancy grounds.  730 is

6   admitted.

7            (Exhibit 730 admitted.)

8        MR. LOPEZ:  Thank you, Your Honor.  May I publish it

9   to the jury?

09:38:41  10        THE COURT:  Yes.

11        MR. LOPEZ:  Can you zoom in, Greg, on point numbers 1

12   through 3.

13        Actually, could you give me the paragraph that

14   precedes that.

09:39:02  15   BY MR. LOPEZ:

16   Q   Sir, I've counted one, two, three, four, five, six times

17   that you've been the designee on behalf of Bard.

18        MR. NORTH:  Objection, Your Honor.  402 and 403.  And

19   in violation of stipulation.

09:39:20  20        THE COURT:  I don't know what the stipulation is.

21        MR. NORTH:  Can we approach?

22        THE COURT:  Yes, you may.

23        If you want to stand up, ladies and gentlemen, feel

24   free.

09:39:36  25        (Bench conference as follows:)

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:39:37   1      MR. NORTH:  Your Honor, when we were meeting and

2   conferring about motions in limine, we came up with a

3   stipulation as to those that we agreed upon, and one was about

4   other litigation involving the filter, that that would not be

09:39:49   5   raised without first bringing it up outside of the presence of

6   the jury.  Mr. Lopez is quite artfully injecting the notion of

7   other litigation over and over and over with references to

8   things like this.  We object to it.

9      MR. LOPEZ:  Well, we're not doing it.  The guy's been

09:40:05  10   deposed 11 times, Judge.

11      THE COURT:  You don't mention it if you stipulated

12   not to.

13      MR. LOPEZ:  No, no, I didn't mention --

14      THE COURT:  You just did.  You said "six times you've

09:40:14  15   been designated."

16      MR. LOPEZ:  So.  And that could be one case.  They're

17   all different subject matters.

18      THE COURT:  Mr. Lopez, I think if you stipulated to

19   not talk about litigation outside of this, you clearly

09:40:22  20   shouldn't be referring to -- you know there are not six

21   deposition notices in this case for him.

22      MR. LOPEZ:  Your Honor -- okay, then we're not on the

23   same ground about prior litigation.  I don't want to talk

24   about the case and the lawsuit, but I have the right to talk

09:40:38  25   about the fact he was a --

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:40:40   1          THE COURT:  Was he designated in this case?

2          MR. LOPEZ:  As?

3          THE COURT:  As a 30(b)(6) witness.

4          MR. LOPEZ:  Two or three times.  But he has been in

09:40:45   5   the past.

6          THE COURT:  Then you can talk about it in this case.

7   But if the stipulation is you're not going to inject other

8   litigation, you shouldn't be talking about notices for other

9   litigation.

09:40:52  10          MR. LOPEZ:  No, Your Honor.  Please.  I mean, he's

11   given prior depositions in cases under oath.  When I said

12   prior litigation, I mean we're not going to talk about the

13   case.  I didn't talk about the fact I wasn't going to be able

14   to come here fully loaded with depositions of prior testimony

09:41:10  15   this guy gave.

16          I'd like to see the stipulation.  What does it say?

17          MR. NORTH:  Other lawsuits or claims against the

18   defendants.

19          MR. LOPEZ:  I'm not talking about that.

09:41:20  20          THE COURT:  Mr. Lopez, let's cut to the chase.  It's

21   relevant because he at some time in the past has been put

22   forward by Bard as somebody who can speak about this.

23          MR. LOPEZ:  Right.

24          THE COURT:  You can bring that out for this case.

09:41:29  25          MR. LOPEZ:  Okay.

DIRECT EXAMINATION (CONT'D) - ROBERT M. CARR, JR.

09:41:29  1    THE COURT:  You cannot bring it out for other cases.

2    So you need to rephrase your question to concern his

3    designation in this case.  I've overruled the relevancy

4    objection because I think it is relevant that he's been

09:41:39  5    designated, but I think that's all the jury needs to know.

6    And you should stay away, in this or other ways, from

7    references to other litigation because I think that's the

8    intent of that stipulation.  And if you don't think so, we can

9    talk about it later.  But I came into this trial assuming that

09:41:55 10    the existence of the MDL and all these other cases was not

11    going to be part of what was mentioned in this case because of

12    that stipulation.

13    MR. LOPEZ:  But, Your Honor, again, we -- there was

14    not a meeting -- never did I intend that I wasn't going to be

09:42:08 15    able to show up here with multiple depositions --

16    THE COURT:  Nobody's objected to you impeaching him

17    with other depositions so long as you're not describing them

18    as from another case or another trial.

19    MR. LOPEZ:  That's fair.

09:42:21 20    THE COURT:  Okay.

21    MR. LOPEZ:  I'll do that.

22    THE COURT:  Okay.

23    (Bench conference concludes.)

24    THE COURT:  Thanks, ladies and gentlemen.

25

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:42:35  1   BY MR. LOPEZ:

2   Q   Mr. Carr, in a deposition you gave in April, you were

3   designated as a officer, director, managing agent, employee,

4   or other sufficiently knowledgeable person to testify and

09:42:53  5   provide all responsive documents concerning the following

6   topics.

7            And you see those first three topics that are there?

8   A   Yes.

9   Q   The risks and complications associated with the Bard

09:43:05 10   Recovery filter, IVC filter.   True?

11   A   Yes.

12   Q   The risk and complications associated with the Bard G2 IVC

13   filter.

14   A   Yes.

09:43:19 15   Q   And the risk and complications associated with Bard G2

16   Express IVC filter; correct?

17   A   Yes.

18   Q   And the G2 Express was, from the standpoint of the actual

19   device itself that was implanted in the patient, was the same

09:43:36 20   as the G2 except it had a hook on it?

21   A   Yes.

22   Q   And of all of the people in Bard, you were the one who was

23   designated as the person most qualified to testify on those

24   issues; correct?

09:43:51 25   A   Yes.

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:43:52  1    Q    I'd like to show you trial Exhibit 4327.

2              MR. LOPEZ:  And, Greg, for now you can only display

3         the first page.  In fact, just show the first page and publish

4         it to the jury since that's been admitted, just to give the

09:44:08  5    jury a reminder of what this is.

6              THE COURT:  You want this displayed, Mr. Lopez?

7              MR. LOPEZ:  Yes, please, Your Honor.

8              And then, if you go to page 5 of this document.

9              Again, just to remind us all, this talks about caudal

09:44:38  10   improvements of the G2.

11             And then can you take this down, Greg, and just show

12        Mr. Carr Page 8 of the exhibit.

13        BY MR. LOPEZ:

14        Q    Do you see that, sir?

09:45:03  15             MR. NORTH:  Your Honor -- I'm sorry.

16             MR. LOPEZ:  It's not published.

17             MR. NORTH:  I'm sorry.

18        BY MR. LOPEZ:

19        Q    Sir, look at page 8.  This is in January of 2006; correct?

09:45:15  20             THE COURT:  You can't ask him about a document that's

21        not in evidence.  Are you using it to refresh recollection?

22             MR. LOPEZ:  Yes, Your Honor.

23             THE COURT:  Okay.  Then have him look -- tell him

24        what you want him to look for.

25

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:45:26   1   BY MR. LOPEZ:

2   Q   I want you to look at it, sir, and you can thumb through

3   it, all the pages.  I'm going to ask you a simple question.

4         Do any of those pages deal with risks and

09:45:34   5   complications associated with the Recovery and the G2 filter?

6         THE COURT:  You can't ask him about the document.

7   You can only use it to refresh his recollection since it's not

8   in evidence.

9   BY MR. LOPEZ:

09:45:45  10   Q   Does this document refresh your recollection that this is

11   the type of data that you, as the person most knowledgeable,

12   would have first-hand knowledge of when you were at Bard and

13   certainly showing up at a deposition to be that person?

14         MR. NORTH:  Objection, Your Honor.  He's not using it

09:46:04  15   to refresh the recollection there.  He's describing the

16   document.

17         MR. LOPEZ:  Laying a foundation, Judge.

18         THE COURT:  I think you need to, Mr. Lopez, establish

19   a failure of recollection if you're going to refresh it.  So I

09:46:23  20   think you should ask first what questions you want him to

21   testify to, and if he doesn't remember and you can use this to

22   refresh his recollection, you certainly may do that.

23         MR. LOPEZ:  Well, Your Honor, may I also use it to

24   try to establish further foundation for the document being

09:46:41  25   admissible?

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:46:42  1          THE COURT:  Yeah, if you ask foundation questions.

2    BY MR. LOPEZ:

3    Q    Did you receive, as part of the person who was the most

4    knowledgeable, monthly MDR reports?

09:46:54  5    A    No, not as the person most knowledgeable.

6    Q    Did you look at monthly reports as part of your job just

7    to see how the devices were performing?

8    A    I said yesterday I don't remember getting this document,

9    but I was cc'd on it.

09:47:10 10    Q    You were cc'd on it.  So if you were cc'd on this

11    document, you would have gotten it, and it would have been

12    part of the material that you would have had available to you

13    in preparing for a deposition to talk about risks and

14    complications.  True?

09:47:25 15    A    I don't know what you mean by that.  Documents being

16    prepared?  I'm not sure of your question.

17    Q    Well, when you prepare to be a 30(b)(6) deponent, you

18    prepare; right?  Just to make sure that you are the most

19    knowledgeable person.

09:47:43 20    A    Yes.

21    Q    And wouldn't this, what you see on what's displayed in

22    front of you, be the type of document you would have reviewed

23    to become that most knowledgeable person?

24    A    Not necessarily, no.

09:47:57 25    Q    But you did receive it?

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:48:00 1    A   I was cc'd on it.  I don't remember ever reading or

2    getting the document.

3    Q   In the regular course of business, you would have received

4    this; right?

09:48:08 5    A   Again, I was cc'd on it.

6    Q   If this was a monthly report and your name was on it, this

7    is something Rob Carr would have received, at least in January

8    or February of 2006.  True?

9    A   Yes.

09:48:23 10   Q   And you would have reviewed it?

11   A   Maybe.

12   Q   And you would have looked at the data in here and applied

13   your engineering skills and your engineering sense about the

14   design of the product and whether or not it was performing

09:48:37 15   correctly.  True?

16   A   No, not necessarily.

17   Q   You don't think that would have been a prudent thing to

18   look at, those last four pages, to see whether or not your

19   device, as one of the engineers on the Recovery filter, might

09:48:50 20   have some design issues?

21   A   I have no memory of this document.

22   Q   I know.  But I'm asking you -- I just showed it to you.  I

23   just want to know whether it's the type of document that would

24   have been likely, using your prudence and good judgment as an

09:49:04 25   engineer, to see whether or not the Recovery filter -- I'm

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:49:08  1    sorry, whether the G2 filter was having some design issues.

2    This would be that type of document; right?

3    A   No.  I would know that through different documents.

4        MR. LOPEZ:  I'm still going to move that in evidence

09:49:24  5    at this time.

6        MR. NORTH:  Your Honor, 802.  802.

7        THE COURT:  Sustained as hearsay.

8        MR. LOPEZ:  Exception.  Notice.

9        THE COURT:  No.  We talked about that yesterday.

09:49:34  10   It's still sustained if your argument is notice.

11       MR. LOPEZ:  And I think I laid the foundation, it's a

12   business record kept in the ordinary course of business.

13       THE COURT:  No.  Overruled.  803(6) has not been

14   satisfied.

09:50:11  15       MR. LOPEZ:  Could we have 5343, please.

16   BY MR. LOPEZ:

17   Q   Mr. Carr, do you recognize this document?

18   A   It appears to be a letter from the FDA about our 510(k).

19   Q   This is what your company would have received after

09:51:27  20   submitting whatever it is you submit to get clearance to

21   market the 510(k) -- I'm sorry, the G2?

22   A   Yes.

23   Q   Okay.

24       MR. LOPEZ:  And I'd like to offer this into evidence

09:51:41  25   at this time, Your Honor.

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:51:42   1          MR. NORTH:  No objection, Your Honor.

2          MR. LOPEZ:  I'd like to publish it to the jury,

3     please.

4          THE COURT:  Admitted.  And you may publish.

09:51:50   5        (Exhibit 5343 admitted.)

6          MR. LOPEZ:  Can I have the first paragraph there,

7     Greg, please.

8     BY MR. LOPEZ:

9     Q    Now, this -- a 510(k) is what is called a premarket

09:52:07   10    notification of intent to market the device that is referenced

11    in this clearance letter; correct?

12    A    That's what it says.

13    Q    This is called a clearance letter, not an approval letter.

14    True?

09:52:20   15    A    I don't know what it's called.

16    Q    And the reason it was cleared for marketing is because, as

17    is stated here, it had been determined the device is

18    substantially equivalent for the indications for use stated in

19    the enclosure to legally marketed predicate devices marketed

09:52:41   20    in interstate commerce prior to May 28, 1776 -- 1976.

21          Do you see that?

22    A    Yes.

23    Q    Now, even though -- I don't want there to be any confusion

24    about this when it's read.  It says "to legally market

09:52:59   25    predicate devices."  The company has to choose what predicate

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:53:03  1   device it's going to use when it submits the 510(k), they

2   can't just say every legally marketed device is our predicate

3   device.  They make the choice, then they submit their 510

4   application as to what the predicate device is going to be;

09:53:17  5   correct?

6   A    Yes.

7   Q    And, again, it has to be, and we talked about this

8   earlier, a legally marketed predicate device.  True?

9   A    To a legally marketed predicate device, devices, marketed

09:53:32  10  in interstate commerce prior to May 28, 1976.

11  Q    I understand that.  But I just wanted to make it clear

12  this doesn't take in all of the devices.  This wasn't cleared

13  because of all of the devices that were on the market prior to

14  that.  This specifically, this G2, its predicate was the

09:53:50  15  substantial equivalent predicate for the clearance of the G2.

16  True?

17  A    Substantially equivalent to its predicate, yes.

18  Q    Which was the Recovery filter; right?

19  A    I'd have to read it to know for sure, but I believe so.

09:54:07  20  Q    You would have to read something to remember whether the

21  G2 device -- whether the Recovery device was the predicate

22  device for the G2?

23  A    I know it is a predicate.  I don't remember if SNF or

24  Greenfield were also.

09:54:24  25  Q    I thought you were the person that knew -- we talked, I

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:54:27  1    think in the first ten minutes, that you were probably the

2    person who knew more about Bard IVC filters than anyone else

3    in the company.  Are you not that person today?

4    A    I probably am.

09:54:43  5            MR. LOPEZ:  Let's go to the last page, please.

6            I'm sorry, Greg.  My fault.  The second page.  I

7    forgot that was an attachment.

8            MR. WOODY:  Which paragraph?

9            MR. LOPEZ:  The very last paragraph.

09:55:13  10   BY MR. LOPEZ:

11   Q    Not that this letter needed to do that, but in this

12   clearance letter, misbranding -- you were reminded not to

13   misbrand.  True?

14   A    Yes.  It says:  Also please note the regulation entitled

09:55:43  15   misbranding by reference to premarket notification.

16   Q    And it also tells you you can obtain other general

17   information on your responsibilities, the company's

18   responsibilities, under the act from the division of small

19   manufacturers, et cetera; correct?

09:56:00  20   A    Yes.

21   Q    It's telling you once you get this clearance, you have

22   responsibilities as a manufacturer; right?

23   A    We have responsibilities?

24   Q    Yes.  What is misbranding?

09:56:19  25   A    Misbranding would be -- an example would be marketing a

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:56:26   1   device off label.  So not for its intended indication for use.

2   Q    What else would be misbranding?  Wouldn't overstating the

3   benefits and the quality of a device be misbranding?

4   A    I don't know.

09:56:48   5   Q    Wouldn't a brochure that is false and misleading about its

6   qualities be misbranding?

7   A    I don't know.

8   Q    Wouldn't not providing a fair balanced presentation of the

9   benefits and the risks of your product to doctors, to

09:57:06   10   hospitals, and to the world be misbranding?

11   A    I don't know.

12   Q    So you're a person at Bard who, with the marketing person,

13   Janet Hudnall, gets together and creates a brochure, and you

14   don't know what misbranding means by the regulations?

09:57:31   15   A    I don't know the entire definition of misbranding per the

16   regulation.

17   Q    Okay.  But you should when you're putting together a

18   brochure that's being sent nationwide to doctors to read and

19   to be influenced to use your product, don't you think?

09:57:48   20   A    It's not totally my responsibility.  All of our labeling,

21   marketing brochures included, go through many reviews, both

22   internally at our division here in Arizona, as well as our

23   corporate review in New Jersey.

24   Q    Right.  But they look to you for the G2 brochure, you and

09:58:07   25   Ms. Hudnall, whose deposition we saw played, to create the G2

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:58:10  1    brochure that got distributed to every doctor in America;

2    right?

3    A    No.

4    Q    Not to every doctor in America, but the doctors to whom

09:58:19  5    you wanted to sell the G2 device.

6    A    It was distributed to people, yes.

7    Q    And if you put ads in journals, that would have been --

8    the same content, would have been what was in that brochure;

9    right?

09:58:33 10   A    I don't know.

11   Q    And if you were at a hospital or you went to the Society

12   of Interventional Radiologists annual meeting, which I

13   understand is going on right now in Los Angeles, you might

14   even be there with a big poster of this same brochure, talking

09:58:48 15   about increased migration resistance, tilt, centering, all

16   that would be at a convention.

17   A    I don't remember that.

18   Q    Now, in April and May -- I'm sorry, February, April, and

19   May of 2004, I hope you remember this time period, because it

09:59:10 20   was a pretty critical time --

21        THE COURT:  Mr. Lopez, please don't make comments.

22   Just ask questions.

23        MR. LOPEZ:  I'm sorry.

24   BY MR. LOPEZ:

09:59:19 25   Q    Sir, you would remember the first six months of 2004

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:59:21  1   relating to the Recovery filter, wouldn't you?

2   A   I don't know what you're referring to.

3   Q   You don't know that I'm referring to the fact that there

4   was a crisis communication plan that was in effect to deal

09:59:36  5   with the reports of the monthly deaths from migration of the

6   filter going into patients' heart that were being challenged

7   by clots?  You don't remember that?

8          MR. NORTH:  Objection.  Argumentative.

9          THE COURT:  Overruled.

09:59:49  10         THE WITNESS:  I was not part of that, no.

11  BY MR. LOPEZ:

12  Q   But you knew, sir, in the early part -- when you say you

13  weren't part of it, what do you mean you weren't part of it?

14  You weren't paying attention to it?  You weren't involved in

10:00:01  15  it?

16  A   I didn't know about it.

17  Q   You didn't know about the early deaths?

18  A   No, I didn't know about the crisis communication plan.

19  Q   Oh.  Okay.  I got you.

10:00:09  20         But you knew about the deaths.  In fact, I think

21  there was a death a month after what has been testified to

22  here and shown here earlier within a month after the full

23  market release in January of 2004, there was the first death

24  of a device that got challenged by a clot and went to a

10:00:26  25  person's heart.  Do you remember that?

DIRECT EXAMINATION (CONT'D) - ROBERT M. CARR, JR.

10:00:30   1   A   I don't know the exact time frame, but yes.

2   Q   And I think there was another death in April.  Do you

3   remember that?

4   A   There was another death.  I don't remember the time point.

10:00:41   5   Q   Do you remember some early discussions that the company

6   thought that this might be because this device was being used

7   in bariatric patients, meaning people that were morbidly

8   obese?

9   A   Later, yes.

10:00:54  10   Q   And that there was some concern as to whether or not the

11   company should have put a black box warning on the Recovery

12   filter because they thought that this device was particularly

13   dangerous in the morbidly obese, people that were undergoing

14   bypass surgery who might get a device; correct?

10:01:11  15   A   No, I wouldn't put it that way.  The advent of bariatric

16   surgery at that time was fairly new, and the use of vena cava

17   filters in general in those patients was new.  And we very

18   responsibly put together a panel and tried to learn as much as

19   we can about those patients and how filters were used there.

10:01:37  20   Q   You were very concerned about the bariatric population,

21   weren't you?

22   A   I think we were responsible.

23   Q   I don't have time to show it now, but Dr. Ciavarella's

24   deposition -- I mean, I'm sorry, his HHE from December 2004 is

10:01:54  25   in evidence, you have seen that HHE, health hazard evaluation?

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

10:02:00   1   A   I've seen several.

2   Q   And he mentions in there that among the deaths, it seems

3   to be if there was some trending, there should be some

4   trending in the bariatric population.

10:02:09   5   A   I don't remember that specifically.

6   Q   Okay.

7           MR. LOPEZ:  Now, let's look at Exhibit 764, please.

8   BY MR. LOPEZ:

9   Q   Sir, you recognize this e-mail; right?

10:02:40   10   A   Yes.

11   Q   And this e-mail is dated from you –– at least the way

12   e-mails work, the one on top is the last e-mail in the string,

13   but this e-mail actually started, if you go to the last page,

14   from Jason Greer, who we're going to hear from later today.

10:03:05   15           THE COURT:  Is there a question?

16           MR. LOPEZ:  I'm sorry.  I'm sorry.

17   BY MR. LOPEZ:

18   Q   This originated from Jason Greer on Thursday, May 27,

19   2004; correct?

10:03:14   20   A   Yes.

21   Q   And you received this e-mail and you responded to it;

22   correct?

23   A   Yes.

24   Q   And ––

10:03:21   25           MR. LOPEZ:  Your Honor, I'd like to admit this into

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

10:03:23  1    evidence at this time and publish it.

2         MR. NORTH:  Objection, Your Honor.  402 and 403.

3         THE COURT:  Hold on just a minute, please.

4         Counsel, let's talk for a minute at sidebar.

10:04:12  5         Excuse the interruption, ladies and gentlemen.

6    Please stand if you feel like it.

7         (Bench conference as follows:)

8         THE COURT:  What's the 403 objection?

9         MR. NORTH:  He's trying to introduce that to get that

10:04:25 10    top line in from Mr. Carr that says "Let's stay away from the

11    buffet line."  It was probably an overly glib remark.  He's

12    going to try to -- this happened in another case.  He's trying

13    to make Mr. Carr look bad, insensitive, with that.  It really

14    has no relevance.

10:04:41 15         And morbid obesity is not an issue with Ms. Booker.

16         MR. LOPEZ:  Your Honor, they have a serious problem.

17    He was is the guy that was in charge --

18         THE COURT:  I understand that.  But what about the

19    point what you really want to do is get in front of the jury

10:04:53 20    his comment about "Let's stay away from the buffet line"?

21         MR. LOPEZ:  Well, if you look at the subject matter,

22    Judge -- forget that part.  Just even without that part of

23    the -- this is important information that one of the

24    salespeople is asking him about.

10:05:14 25         THE COURT:  Well, but the objection --

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

10:05:16  1          MR. LOPEZ:  In response --

        2          THE COURT:  The objection is -- okay, why do you

        3   think his response is relevant?

        4          MR. LOPEZ:  Because if he -- this is in May of --

10:05:27  5   people are dying from this device.

        6          THE COURT:  Why is this response relevant?

        7          MR. LOPEZ:  Because he's making a joke out of this

        8   thing, number one.  Number two is he apologized for that when

        9   he testified in trial said, Oh, I had a bad day, I was just

10:05:40 10   making a joke.  Well, he did it a month later.

       11          THE COURT:  Watch the mic.

       12          MR. LOPEZ:  I'm sorry.  He did it a month later.

       13          We're talking about ICD codes to get --

       14          THE COURT:  Hold on a minute.

10:05:52 15          Okay.  So here's my question to you, Mr. Lopez:  What

       16   you want to suggest to the jury is that Mr. Carr was callous

       17   and glib about a very serious problem.  What I want to know is

       18   why is that relevant to the case?  It's like the picture you

       19   wanted to get in of the fellow flipping the bird at the

10:06:14 20   camera.  I'm not understanding.  It seems to me to be similar.

       21          MR. LOPEZ:  I don't think it is.

       22          THE COURT:  Okay.  Explain to me why it's relevant.

       23          MR. LOPEZ:  I understand that, Your Honor.  In fact,

       24   I don't know why that went in, but I knew you were not going

10:06:24 25   to rule --

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

10:06:26  1        THE COURT:  Then why did you have me spend time on

2    it?

3        MR. LOPEZ:  Your Honor, I didn't do all of the

4    motions in limine.

10:06:30  5        THE COURT:  All right.  All right.  Let's stick with

6    this.

7        MR. LOPEZ:  Because I knew when you turned to the

8    second page you'd say --

9        THE COURT:  Why is Mr. Carr's insensitivity toward

10:06:41 10    this issue relevant in this case?

11        MR. LOPEZ:  Your Honor, he's already said, and I

12    think he's going to be called in his case, he's going to stand

13    up there and talk about how much Bard cared and how much they

14    did this and always cared about patients and they always care

10:06:54 15    about what's going on with their devices, and a good company

16    would start redesigning it.  This shows that that character

17    that he's trying to display to the jury, at least as of this

18    time, may not be the case.

19        THE COURT:  Okay.  Here's my ruling on this issue.

10:07:10 20    My ruling is that you can admit the portion of Exhibit 764

21    which does not include the buffet line.  And if, in your

22    rebuttal case, you believe that they have -- or even in

23    cross-examining Mr. Carr, if they call him, you believe that

24    he has been portrayed as a compassionate, caring individual,

10:07:32 25    and you think it needs impeachment, then I'll be happy to hear

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

10:07:36  1  your argument at that time.

2  But it appears to me now, just so I'm clear on the

3  record, that what is apparently a callous and insensitive

4  comment by this individual is marginally relevant to the case.

10:07:49  5  There could be an argument that it's -- somehow reflects a

6  corporate sensitivity, but that is a bit of a stretch.

7  There is some relevance.  I think it is substantially

8  outweighed by the danger of unfair prejudice, so I'm going to

9  grant the 403 objection.  But you can raise it later if you

10:08:06 10  think he's been portrayed in a different way.

11  MR. LOPEZ:  I'll be listening to every word.

12  THE COURT:  I'm sure you will.

13  So if you want to get this exhibit in, you can get

14  in --

10:08:15 15  Well, is there any objection to the e-mail from Jason

16  Greer?

17  MR. NORTH:  No.

18  THE COURT:  You can get in that portion --

19  MR. LOPEZ:  Reserving the right later to --

10:08:25 20  THE COURT:  Yes.

21  (Bench conference concludes.)

22  THE COURT:  Thank you, ladies and gentlemen.

23  MR. LOPEZ:  Okay.  We're trying to deal with the

24  issue we talked about at sidebar, Your Honor.

10:09:11 25  THE COURT:  Okay.  That's fine.

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

10:09:13  1          MR. LOPEZ:  We're going to redact it electronically.

2          THE COURT:  That's fine.

3    BY MR. LOPEZ:

4    Q   Okay.  Mr. Carr, this is trial Exhibit 843.

10:09:37  5          MR. LOPEZ:  Reserving the right we discussed on

6    sidebar, Your Honor, I'd like to offer this in its current

7    form into evidence and display it to the jury.

8          THE COURT:  843 is being moved now?

9          MR. LOPEZ:  Oh, is it 842?  I'm sorry, it is 7 -- is

10:10:02  10   it 764?

11          THE COURT:  The one we've been talking about is 764.

12          MR. LOPEZ:  It is.  I had the wrong file folder on

13   top.  764.

14          THE COURT:  So you're moving the redacted 764 into

10:10:15  15   evidence, as we discussed at sidebar?

16          MR. LOPEZ:  Yes, Your Honor.  Thank you.

17          THE COURT:  All right.  That will be admitted.

18       (Exhibit 764 admitted.)

19   BY MR. LOPEZ:

10:10:24  20   Q   Sir, you recall this e-mail between and you Mr. Greer?

21   A   Yes.

22   Q   I hope this refreshes your recollection that at least as

23   of May of 2007, there were issues with bariatric patients and

24   filters.

10:10:39  25          Does that help refresh your recollection?

DIRECT EXAMINATION (CONT'D) - ROBERT M. CARR, JR.

10:10:43  1   A   Of May 2007?

2          THE COURT:  You said 2007.

3          MR. LOPEZ:  I don't know what's wrong with me.

4   May 27, 2004.

10:10:52  5          May I publish this to the jury, Your Honor?

6          THE COURT:  Yes, you may.

7          Things look distorted when you're shorter at this

8   podium.  I just want you to know, Judge.

9   BY MR. LOPEZ:

10:11:08  10  Q   So May 27th, 2004, the subject is Bariatric Patients and

11  Filters.   True?

12  A   Yes.

13  Q   And who is Jason Greer.

14  A   He was a sales rep or maybe a district manager in Memphis.

10:11:23  15  Q   And who is Janet Hudnall?

16  A   She's a marketing person.

17  Q   And who is Jack Sullivan?

18  A   Jason's boss.

19  Q   And these were being sent -- Jack Sullivan was like a

10:11:36  20  regional person?

21  A   If Jason was a rep then, then Jack would have been a

22  district manager, and if Jason was a district manager, Jack

23  would have been the regional manager.

24  Q   Got you.

10:11:46  25          Janet Hudnall was the national marketing person;

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

10:11:51  1    right?

2    A    Yes.

3    Q    Let's go down to the content of the e-mail from Jason to

4    Janet, Mr. Carr, and Mr. Sullivan.

10:12:02  5          And Mr. Greer is discussing with you in this e-mail

6    some of his experiences that he's had in discussing with some

7    of his customers bariatric patients potentially having larger

8    vena cavas or vena cavas that expand once you put a Recovery

9    filter in it; correct?

10:12:27 10    A    We didn't have a discussion, he sent this e-mail, and I

11    don't know who he was talking to when he wrote this.

12    Q    And he states when they --

13          MR. LOPEZ:  It's in that first paragraph, Greg, last

14    sentence.

10:12:44 15    BY MR. LOPEZ:

16    Q    "When they don't eat or drink they can become dehydrated,

17    very, very dehydrated if they wait too long."

18          And then, the next paragraph.  "When the patient" --

19    again, they're talking about bariatric patients; right?

10:13:00 20    A    Yes.

21    Q    -- "show up in the ER, they pump the patient full of

22    fluids."

23          Do you see that?

24    A    Yes.

10:13:08 25    Q    "Then all the vessels, including the vena cava, are going

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

10:13:11  1    to grow.  If the cava grows over 28 millimeters, I don't care

2    what filter is in the patient, there easily could be a filter

3    migration."

4              Do you see that?

10:13:22  5    A   Yes.

6    Q   And he says:  "This crap is going to happen.  What do we

7    do?"

8              And then, at the bottom:  "My biggest Recovery

9    customer and I had a talk about this yesterday.  It's a little

10:13:40 10   scary.  What chu think?"

11             He wrote that to you; right?

12   A   And others, yes.

13   Q   And you answered him with -- don't tell us what the answer

14   was right now, but this is obviously a situation that was

10:13:55 15   serious and that Mr. Greer was concerned about that, at least

16   with respect to some of the people in -- the customers he was

17   calling on; correct?

18   A   Yes.

19   Q   And he was concerned that the Recovery filter may not be a

10:14:07 20   filter that, if it were to expand beyond 28 millimeters in the

21   vena cava, would stay where you put it; right?

22   A   He says every filter.

23   Q   Well, I know, but -- he says every filter, but the only

24   filter that Bard was selling at this time was the Recovery

10:14:22 25   filter; correct?

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

10:14:24  1   A    No.

2   Q    And the Simon Nitinol filter.

3   A    Yes.

4   Q    Okay.  The only two filters that Bard should have been

10:14:32  5   concerned about safety in response to this letter was nobody

6   else's filter, it should have been Bard's filters.  True?

7   A    We are responsible for our filters.

8   Q    Right.  And I know he says it could be other filters, but

9   we don't know -- we're not going to try that case.  We're

10:14:50  10  talking about the Recovery and the G2 in this case.

11          The filters that you should be concerned about where

12  the vena cava would expand more than 28 millimeters and cause

13  a device to migrate to the heart in a bariatric patient should

14  be the Recovery filter; correct?

10:15:09  15  A    We're concerned about the patient, not the filter.

16  Q    And the patient -- is the patient you should be concerned

17  about are the patients whose Recovery filter is being

18  challenged by a clot, and the filter goes into the heart

19  because it expands beyond the 28-millimeter specification for

10:15:33  20  the Recovery filter.  True?

21  A    Yes.  Or the SNF.

22  Q    And Mr. Greer, a salesman, knew that that was a

23  possibility and that it was actually happening among some of

24  his customers.  True?

10:15:48  25  A    I think he says it's going to happen.

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

10:16:00  1    Q    Did Bard change its specifications, indications for use,

2    for the maximum size of vena cava in which the Recovery filter

3    should be safely implanted to avoid an expansion beyond 28

4    millimeters to put the patient at risk of the device

10:16:18  5    dislodging and going to the heart?  Did they change the IFU,

6    or indications for use?

7    A    No.

8    Q    Did they tell doctors that their device, if it was

9    challenged by a clot and the clot caused the Recovery filter

10:16:32  10   to expand beyond 28 millimeters within the vena cava, that

11   there was a reasonable chance that the filter would become

12   dislodged and not protect the patient and, in fact,

13   potentially cause death because the device went into the heart

14   with the clot?

10:16:51  15   A    Not generally, no.

16   Q    Just kept selling it for the next year and a half; right?

17   A    We did many, many investigations, as I said before.  We

18   convened a panel of experts to learn about bariatric surgery

19   and how filters were used.  We did a tremendous amount of work

10:17:08  20   to understand the situation.

21   Q    I understand.  But my question was you did continue to

22   sell the Recovery filter without any changes to the filter, to

23   the design of the filter.  True?

24   A    Yes.

10:17:22  25   Q    And you continued to sell it for another two years after

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

10:17:28  1   you had two deaths from the device dislodging when it got

2   challenged by a clot and went into a person's heart.  True?

3   A   I don't know the exact time it was off the market, but

4   around there.

10:17:42  5   Q   And how many more times did that happen, sir, over the

6   next year and a half before Recovery was finally taken off the

7   market?

8   A   How many times did what happen?

9   Q   Did the device dislodge when challenged by a clot and go

10:17:56  10  into a patient's heart and kill the patient.

11  A   I don't know how many times that it was associated with

12  that observation.

13  Q   How many times -- you're the risk and complications person

14  from Bard.  You can't tell this jury how many times it was

10:18:12  15  reported to Bard that the Recovery filter, when challenged by

16  a clot, went into a patient's heart and was associated with

17  that patient's death?

18  A   No, I can't.

19  Q   What if I told you it was 19 times, would you argue with

10:18:27  20  me?

21  A   I'm not going to argue, but I could read it somewhere.

22  Q   Would you dispute -- does 19 sound about right?

23  A   I don't know.

24  Q   It was about 19, wasn't it?

10:18:41  25      MR. NORTH:  Objection, Your Honor.  Cumulative.  And

DIRECT EXAMINATION - SHERR-UNAI BOOKER

10:18:43  1   403.

2           THE COURT:  Sustained.

3   BY MR. LOPEZ:

4   Q   But you came to court today not knowing the answer to that

10:18:48  5   question.  True?

6   A   Yes.

7           MR. LOPEZ:  No further questions, Your Honor.

8           THE COURT:  Cross-examination?

9           MR. NORTH:  Your Honor, with the Court's permission,

10:18:55  10  we'd like to reserve our right to present Mr. Carr's testimony

11  as a part of our case in chief.

12          THE COURT:  That's fine.

13          You can step down, sir.

14          THE WITNESS:  Thank you.

10:19:10  15          THE COURT:  All right.  Your next witness, Counsel.

16          MR. O'CONNOR:  Your Honor, at this time we'd call

17  Sheri Booker.

18                    **SHERR-UNA BOOKER,**

19  called as a witness herein, after having been first duly sworn

10:19:48  20  or affirmed, was examined and testified as follows:

21              D I R E C T   E X A M I N A T I O N

22  BY MR. O'CONNOR:

23  Q   Good morning.

24  A   Good morning.

10:20:37  25  Q   Would you introduce yourself to the members of the jury,

DIRECT EXAMINATION - SHERR-UNAI BOOKER

10:20:38  1   please.

2   A    Good morning.  My name is Sheri Booker.  Sherr-Una Booker,

3   but everybody calls me Sheri.

4   Q    You go by Sheri?

10:20:48  5   A    Yes.

6   Q    How are you feeling right now?

7   A    Very nervous.

8   Q    So am I.

9        Where are you from, Sheri?

10:20:59 10   A    I am originally from Brooklyn, New York, born and raised.

11   Q    What year were you born?

12        THE COURT:  We can't hear you, Mr. O'Connor.

13        MR. O'CONNOR:  Sorry.

14   BY MR. O'CONNOR:

10:21:09 15   Q    What year were you born?

16   A    I was born in 1969.

17   Q    And how long did you live in Brooklyn?

18   A    For the majority of my life.

19   Q    Did you go to school in Brooklyn?

10:21:21 20   A    Yes, I did.

21   Q    What was the name of your high school?

22        THE COURT:  Mr. O'Connor, we can't hear you.  Would

23   you please speak up and move the mic up.

24        MR. O'CONNOR:  Sure.

25

DIRECT EXAMINATION - SHERR-UNAI BOOKER

10:21:31  1   BY MR. O'CONNOR:

2   Q   Did you graduate from high school?

3   A   Yes, I did.

4   Q   What year was that?

10:21:36  5   A   1988.

6   Q   Did you go to school after that time?

7   A   Yes, I did.

8   Q   Where did you go to school after high school?

9   A   I went to Brooklyn College.

10:21:44  10   Q   What did you take there?

11   A   Well, I had a full music scholarship for voice.

12   Q   Do you sing?

13   A   I do.

14   Q   Did you finish college?

10:21:54  15   A   No, I did not.

16   Q   Did you go to work?

17   A   Yes, I did.

18   Q   At some point in time you left Brooklyn?

19   A   Yes.

10:22:02  20   Q   Where did you go?

21   A   I moved to Greensboro, North Carolina.

22   Q   And how long did you live there?

23   A   About four years.  I just wanted some fresh air for my

24   sons.  Give them better opportunities.

10:22:21  25   Q   Eventually you wound up in Georgia?

DIRECT EXAMINATION - SHERR-UNAI BOOKER

10:22:24   1   A   Actually, I had moved back to New York.

           2   Q   Okay.  And did you eventually move from there to --

           3   A   Yes.  Eventually I moved there to at Atlanta -- well,

           4   Duluth, Georgia.

10:22:39   5   Q   And when did you move to Georgia?

           6   A   In October 2010.

           7   Q   And do you still live there?

           8   A   Yes, I do.

           9   Q   What do you do there?

10:22:50  10   A   I'm a project coordinator for Home Depot.

          11   Q   Do you have a family?

          12   A   Well, my mother lives there with me now.

          13   Q   What about children?

          14   A   My children, they're both young adults now, and they live

10:23:07  15   in New Jersey.

          16   Q   What are their names?

          17   A   My first son is Shomari and he's 27, and my second son

          18   is -- we call him by his middle name Malik, and he is 21.

          19   Q   And you say they both live in New Jersey?

10:23:25  20   A   Yes, they do.

          21   Q   What do they do?

          22   A   Well, Shomari graduated college about two years ago with a

          23   business degree.  I believe a minor in accounting.  And Malik

          24   graduated high school, went to college for music for

10:23:47  25   production, end up getting two good jobs and he couldn't

DIRECT EXAMINATION – SHERR-UNAI BOOKER

10:23:52  1  resist, so decided to stop for a while, but has assured me

2  that he is going to go back.

3  Q   Do you stay in touch with your boys?

4  A   Absolutely.

10:24:03  5  Q   Sheri, let's talk about some of the things that you like

6  to do in your spare time.

7        Do you have any hobbies?

8  A   First and foremost, I love to spend time with family and

9  friends, as much as I can.  That is very important to me.

10:24:23  10  Outside of that, sometimes I do community work with putting

11  care packages together for, like, the homeless.  I sing.  I do

12  plays in the community center.  Basically around like

13  bullying, stuff like that.  Things that -- trying to -- try to

14  empower those that don't think they have a voice.

10:24:48  15  Q   Now, Sheri, let's talk about your G2 IVC filter.

16        According to records and the evidence, you received

17  the G2 filter in June of 2007?

18  A   Yes.

19  Q   Can you tell us what was going on with you at that time

10:25:06  20  that led you to see Dr. Marcus D'Ayala.  Is that his name?

21  A   Yeah, I believe so.  I don't remember him much, but I

22  believe so.

23  Q   Tell us about what was happening with you.

24  A   At which time I was hemorrhaging severely internally and I

10:25:24  25  was diagnosed with cancer.  And at the time, they really did

DIRECT EXAMINATION - SHERR-UNAI BOOKER

10:25:27  1   not know what type of cancer it was.  I was told by my doctor

2   that I needed to be rushed to the hospital because of the

3   hemorrhaging, and I was taking blood thinners, that it was

4   important for me to get to the hospital immediately to do

10:25:50  5   emergency surgery.

6   Q   And eventually were you referred to a doctor for the

7   filter?

8   A   I was admitted into the hospital, and I eventually was

9   told that I needed a filter, that they would not touch me for

10:26:10  10  treatment at all unless I had this filter placed in.

11  Q   And did you have the filter?

12  A   I had the -- at the point, I was just thinking of

13  treatment.  I just wanted to survive.  So whatever it took at

14  that moment to go to the next step, I was willing to do it.

10:26:31  15  If the doctors told me I needed to stand and hop on one leg

16  ten times and that would help me with treatment, then I would

17  do that.  So when they told me I needed this filter, I agreed

18  to the filter.

19  Q   And did life go on after that?

10:26:48  20  A   Yes.  It did.  I was treated for several months for chemo

21  and radiation, and life went on.

22  Q   All right.  At some point in time did you learn that your

23  filter was causing problems?  That you had a problem with your

24  G2 filter?

10:27:12  25  A   Well, I ultimately learned later on in 2014.

DIRECT EXAMINATION - SHERR-UNAI BOOKER

10:27:16    1    Q    And what happened during that period of time?

2    A    Well, throughout the years I was having abdominal pain and

3    chest pain --

4    Q    But --

10:27:26    5    A    -- prior to that.

6    Q    Eventually you saw doctors, and was there some type of

7    imaging studies done in 2014 --

8    A    Yes.

9    Q    -- where you learned about your filter?

10:27:36   10    A    The end of June, I started to have excruciating pain.  I

11    ultimately went to the ER, and from there I was referred to a

12    urologist and radiologist.

13    Q    And where were you at that time living when you were

14    referred to the urologist?

10:27:59   15    A    I was living in Duluth, Georgia.

16    Q    Where did you see the urologist at?

17    A    In Georgia.  I believe a part of Gwinnett Medical Center.

18    Q    And did the urologist find any problems that you were

19    having?

10:28:19   20    A    Yes.  He had told me that I had had a kidney stone.

21    However, he also told me that they had found something in my

22    abdomen and in my heart, and that I needed to see the

23    radiologist -- sorry, I don't want to get the names wrong --

24    and I did make my appointment because it was very important

10:28:52   25    that I go.

DIRECT EXAMINATION - SHERR-UNAI BOOKER

10:28:53   1   Q   Did you make an appointment?

2   A   Actually, my appointment was the very next day.

3   Q   And who was that with, Brandon Kang?

4   A   That was with Dr. Kang, yes.

10:29:01   5   Q   All right.  So take us to that day with Dr. Kang.  Did you

6   meet him at his office, or where did you meet him?

7   A   I met him in Gwinnett Medical Center in the outpatient

8   area of where they would prep people for surgery and/or where

9   people recover from surgery.

10:29:21  10   Q   And did you go someplace to talk with Dr. Kang?

11   A   I was actually -- I was led to a room where patients would

12   go to be prepped.  It was an actual room that they would go to

13   get prepped for surgery.

14         THE COURT:  Mr. O'Connor, we're going to take the

10:29:45  15   morning break at this time.

16         Ladies and gentlemen, we will resume at 10:45.  We

17   will excuse you.

18      (Recess taken from 10:30 to 10:45.  Proceedings resumed

19   in open court with the jury present.)

10:46:45  20         THE COURT:  Thank you.  Please be seated.

21         You may continue, Mr. O'Connor.

22         MR. O'CONNOR:  Thank you, Your Honor.

23   BY MR. O'CONNOR:

24   Q   Sheri, we were talking about your first meeting with

10:46:51  25   Dr. Kang.  Can you take us to that day.  And just so that

DIRECT EXAMINATION - SHERR-UNAI BOOKER

10:46:55  1    we're clear, it looks as though you first saw Dr. Kang for a

2    consult in June 2007; is that correct?

3    A    That sounds about right, yes.

4    Q    And tell us about that day.

10:47:10  5         Let's step back just so we have your history down.

6    Did you go to the emergency room at some point before you saw

7    Dr. Kang?

8    A    Yes, I did.

9    Q    Which emergency room that was?

10:47:21  10    A    Gwinnett Medical.

11    Q    And from there you saw a urologist?

12    A    Yes.

13    Q    And where was that at?

14    A    Gwinnett Medical.

10:47:34  15    Q    And then you actually saw Dr. Kang at a different office?

16    Or where did you see Dr. Kang at for the first time?

17    A    Well, I went for some, like, scans first.  Had some

18    testing first.

19    Q    Had to have a scan?

10:47:53  20    A    Yes.  And then I went for, I believe -- I guess it was my

21    follow-up to see Dr. Kang.

22    Q    And do you remember when you first saw Dr. Kang?

23    A    Yes, I do.

24    Q    When was that?

10:48:14  25    A    I believe it was that July date.  I know I had -- I went

DIRECT EXAMINATION - SHERR-UNAI BOOKER

10:48:19  1    on the 3rd, because the urologist, I think, was the 2nd.  And

2    then I went to see Kang, or went to his office for the

3    testing, and then I went after that couple of days later.

4    Maybe about a week, five days, something like that, to see him

10:48:36  5    for the results.

6    Q    Okay.  And when you went to Dr. Kang's office for the

7    results, did you go to his office?

8    A    I went to that outpatient service area that I had told you

9    about.

10:48:49  10    Q    And tell us where you met Dr. Kang.  Can you describe the

11    area where you met with him?

12    A    Yes.  It was an area where they prep people for outpatient

13    surgeries, and it was one of the actual rooms.  Like they can

14    close the curtain for privacy.

10:49:06  15    Q    Did you have any idea what you were going to talk to

16    Dr. Kang about?

17    A    I just thought it was the results, that he was going to

18    give me the results of what was -- what the scan --

19    Q    Take us to that.  Dr. Kang, did he come into a room to

10:49:20  20    talk to you?

21    A    No.  He was actually in the room waiting for me, which is

22    not normal to me.  Normally you go into a room or office and

23    then the doctor comes in later.  But he was waiting for me

24    when I got there.

10:49:38  25    Q    And did he have a discussion with you?  What did he do?

DIRECT EXAMINATION - SHERR-UNAI BOOKER

10:49:45   1    A    Well, first he just had a look of concern on his face, and

2    the first thing he asked me was how was I feeling and asked --

3    he asked me if I was still having pain or discomfort.

4    Q    What did you tell him?

10:50:02   5    A    I told him yes, I was still having pain.

6    Q    And then what happened?  Did he show you any studies?

7    A    Actually, no.  He asked me to sit down.  And when I sat

8    down, he told me that he wanted to show me something, that he

9    knew why I was having pain.

10:50:25  10    Q    Did he show you something?

11    A    Yes.  At that point he turned on this -- I don't know the

12    technical term.  This monitor where you can see, like, your

13    X-rays and scans and stuff like that.  He turned it on and --

14    Q    And what did he show you?

10:50:42  15    A    He showed me a film of my heart and of my abdomen.

16    Q    And did he talk to you about it?

17    A    He proceeded to tell me -- show me about my filter.  And

18    he said, "You've had a filter placed in 2007."

19         I said, "Yes."

10:51:03  20         He showed me.  He said, "Well, Ms. Booker, it's

21    broken.  Several pieces are next to the device, but a piece

22    has gone to your heart."

23    Q    And how did you feel when you learned that?

24    A    I was in shock.  I was in disbelief.  And I actually

10:51:35  25    started to look around the room to see if there was like a

DIRECT EXAMINATION - SHERR-UNAI BOOKER

10:51:39   1   candid camera, a bad joke, because I couldn't fathom what he
        2   was really telling me.
        3   Q    Had you even ever thought about that filter before you saw
        4   Dr. Kang in 2014?
10:51:53   5   A    Not at all.
        6   Q    So did Dr. Kang have a discussion with you about anything
        7   that needed to be done medically about the filter?
        8   A    He made it very clear to me that the pieces need to be
        9   removed as soon as possible.  And the reality that I knew it
10:52:18  10   was not a joke or bad dream was the simple fact that he had
       11   then told me he was going to contact a heart surgeon.
       12   Q    Did he tell you why?
       13   A    He told me that he wanted to contact the heart surgeon to
       14   see when I can get in to have surgery, open heart surgery, but
10:52:45  15   that he was also going to discuss with them together the best
       16   way to remove these pieces of the filter out of me.
       17   Q    Did he talk to you at that meeting, the first meeting
       18   where he showed you the filter on an imaging study, did he
       19   talk to you about the types of procedures that might be
10:53:10  20   available to remove the filter and the broken pieces?
       21   A    I -- at this point I think I just broke down, and I don't
       22   think at that moment he really described the types of
       23   procedures.  He just told me I needed to see the cardiac
       24   surgeon.  And then he asked me if I had come alone to the
10:53:42  25   visit.  And I did.  I did.  And then he told me I could not

DIRECT EXAMINATION – SHERR-UNAI BOOKER

10:53:49  1   leave without someone coming to get me.  At which point I was

2   crying, I was trying to grasp everything he was telling me.

3        A nurse came in and asked me if I needed pain meds

4   and/or if I needed a sedative.  At that point I was just --

10:54:17  5   Q   What did you say?

6   A   I had already -- I was still taking pain meds from the ER

7   and I didn't want to take another one.

8   Q   Did you contact anybody that day, Sheri?

9   A   I had called my son, but he was at work and so I couldn't

10:54:38 10   locate him immediately.  So the next person that I could think

11   of was one of my girlfriends that I knew.  She kind of worked

12   part-time.  So I called her.

13   Q   Why did you call her?

14   A   Well --

10:54:51 15   Q   Was that at the request or suggestion of Dr. Kang?

16   A   Yes.  He told me I needed to have someone come and pick me

17   up.

18   Q   And why did he tell -- why -- what was your understanding

19   as to why someone had to come and get you?

10:55:09 20   A   Well, while we waited for either my girlfriend or my son

21   to come get me, he had started to point to the piece that was

22   in my heart and he showed me that it looked like a

23   double-edged sword or needle and that both edges were pointy.

24   He had then told me that if it moved in any way, that it could

10:55:48 25   puncture my heart and ultimately kill me.

DIRECT EXAMINATION - SHERR-UNAI BOOKER

10:55:50   1      He told me that the reason he did not want me to be

2    alone until I could get surgery was because if I was with

3    someone and something happened, one, they can call ahead to

4    the nearest emergency room to my home, which was Gwinnett

10:56:09   5    Medical, so they can let them know what was going on and they

6    would drive me to the ER and not wait for an ambulance because

7    it was a certain amount of timing that if I needed emergency

8    open heart surgery, I needed to get to the hospital

9    immediately.

10:56:32  10   Q   So did you call your friend?

11   A   Yes.

12   Q   How were you feeling when you heard that you were going to

13   have to talk about having a surgery to have the filter

14   removed?

10:56:44  15   A   I was extremely scared.  The first thing that came to my

16   mind were my children.  I think with me, any parent, that's

17   the first thing you think of.  You think of your family, your

18   children, your responsibilities.  So I thought about that.

19      I thought about, oh my God, am I gonna die?  I

10:57:07  20   thought about what is my life going to be like?  Am I going to

21   survive?  I thought about until the surgery, if something

22   happened, would I make it to the hospital in time?  I thought

23   about the fact that I had to put a burden on someone else to

24   babysit me.  I'm a very private person.  I'm a very

10:57:37  25   independent person.

DIRECT EXAMINATION - SHERR-UNAI BOOKER

10:57:39  1   Q   Did you eventually go home?

2   A   Yes, I did.

3   Q   And then you had an appointment with a cardiovascular

4   doctor?

10:57:46  5   A   Yes, I did.

6   Q   When did you go there?  It sounds as though you saw

7   Dr. Kang for the consult on about July 3rd, 2014.  Does that

8   sound right?

9   A   Yes.  July 23rd?  Did you say?  I'm sorry.

10:58:02  10   Q   Pardon me?

11   A   What date did you say?

12   Q   I had the consult down on July 3rd.

13   A   Yes.  Same day.

14   Q   And then you went to the cardiovascular doctor,

10:58:13  15   Dr. Langford.  Does that sound right?

16   A   Dr. Harvey and Dr. Langford.

17   Q   All right.  And when did you see those doctors?

18   A   A couple of days later.

19   Q   Did you go to their office or --

10:58:27  20   A   Yes, I did.

21   Q   Who did you meet with?

22   A   I met with both Dr. Harvey and Dr. Langford.

23   Q   All right.  And we heard from Dr. Harvey.

24          Tell us about that meeting.  What happened during

10:58:41  25   that meeting?

DIRECT EXAMINATION - SHERR-UNAI BOOKER

10:58:43   1    A    They were very comforting and reassuring and saying that

2    they were going to put a plan together with Dr. Kang.   They

3    had also told me that, yes, the piece out of my heart needed

4    to come out, that it could not be left in, and that I was a

10:59:01   5    very lucky person that I got to them in time.

6    Q    Did they describe procedures that you might be looking at

7    when you returned to have your surgery?

8    A    Yes, they did.   They told me that they were going to let

9    Dr. Kang go in through my neck and through my groin area to

10:59:30  10    try to get the pieces out because they didn't want me to have

11    a large or evasive, I don't know if I'm saying that right,

12    surgery. So they wanted me to have something less than

13    evasive, if I'm saying it correctly.   So they were going to

14    try to take steps for me to have the surgery, that it would be

10:59:54  15    easier for me to heal and possibly not have open heart

16    surgery, which I would rather that.

17    Q    So was this the first time that you had a discussion with

18    doctors about the type of procedures, the options that you

19    had?

11:00:12  20    A    Yes.

21    Q    And did they set up a plan for when you would have the

22    surgery?

23    A    I think they told me to go home and they would call me

24    because they were trying to get me in as soon as possible.

11:00:29  25    Q    When you learned that you would have to have the

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:00:32  1    procedures to remove it -- and they were talking to you about

2    two possible procedures; is that right --

3    A    Yes.

4    Q    -- how did you feel at that time?

11:00:42  5    A    I was petrified.  I was still scared.  I was nervous.  I

6    was --

7    Q    Did you -- did you tell your family about what was going

8    on?

9    A    Oh, I had to at that point.  I wanted to let them know

11:00:58  10    what was going on.  I felt my family had a right to know in

11    case anything should happen.  I wouldn't want them to have any

12    bad surprises.  I just wanted to let them know what to expect

13    at that point.

14    Q    Where were your sons living at that time?

11:01:13  15    A    Shomari was living with me and Malik was living in New

16    Jersey with his father, finishing high school.

17    Q    And did you go home and talk to Shomari?

18    A    Yes.  We spoke about it, and between him and friends and

19    neighbors, they all took turns.  They all got their schedules

11:01:38  20    and phones out and calendars and all decided who could be with

21    me at which point in time.  And --

22    Q    And how was Shomari during the time when you came back

23    from Dr. Harvey and Dr. Langford until you had your surgery,

24    which the records indicate was about July 23rd, 2014?  So you

11:02:03  25    were home for a while; is that right?

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:02:05  1   A    Yes.

2   Q    And Shomari was living with you?

3   A    Yes.

4   Q    And how was he during that time?

11:02:13  5   A    Unfortunately, Shomari was very nervous and scared, to the

6   point where he had asked me if he could sleep in my bedroom

7   when he was home with me.  Because I guess he was scared in my

8   sleep if the piece moved, he wanted to make sure he could get

9   me to the hospital in time.  He would -- of course I told him

11:02:36 10   no.  So what he would do is walk into my room at all hours of

11   the night and touch me or feel under my nose to make sure I

12   was breathing.

13   Q    Were you able to sleep during that time?

14   A    Mostly, no.  I wanted to be up if something happened to

11:03:01 15   make sure I could tell somebody I felt something.

16   Q    Talk to us about the day you went to -- is it Gwinnett

17   Medical Center?

18   A    Yes.

19   Q    And is that where you went to have the procedure?

11:03:15 20   A    Yes.  That's the day I went for Dr. Kang to see if he can

21   go through my neck or my groin area to remove the filter and

22   the pieces.

23   Q    Were you actually admitted that day for the procedure?

24   A    Well, at first I came in as an outpatient surgery, so I

11:03:34 25   was not admitted.

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:03:36   1   Q   All right.  And where was the -- did Dr. Kang actually

2   have you prepped, prepared for his procedure?

3   A   Yes, he did.

4   Q   Where was that at?

11:03:47   5   A   In Gwinnett Medical.  In the same outpatient service I had

6   gone to meet him for the results.

7   Q   And so you went there on July 23rd, 2014, for Dr. Kang to

8   perform the procedure?

9   A   Yes.

11:04:04   10   Q   How did you feel about the discussion you had between

11   Dr. Kang, Dr. Harvey, and Dr. Langford that they were going to

12   go through your neck?  Did that sound like a decent option?

13   A   It had seemed like a better option than going directly to

14   my heart.  And I was very hopeful.  And, so, yes.  I had

11:04:25   15   had -- I really didn't want to have open heart surgery because

16   my grandmother died of open heart surgery.  My father's

17   mother.  So at that point I was petrified.  I would rather

18   them go through my neck, my groin.  It just seemed a lot --

19   Q   So you got to Dr. Kang's, to the outpatient procedure, and

11:04:50   20   then did they prep you for his procedure?

21   A   Yes.

22   Q   Did they actually give you -- were you put under and --

23   while the procedure was going on?

24   A   Yes.  I remember I was in the bed laying down.  A nurse

11:05:06   25   came and put the IV in and gave me something to relax me, and

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:05:10  1    they told me I was going to start to get sleepy to go to the

2    ER, at which point --

3    Q    Did Dr. Kang meet with you that morning?

4    A    Yes, he did.

11:05:22  5    Q    And did he talk to you about what he was going to do?

6    A    Yes, he did.

7    Q    And did he reassure you?  Did he talk to you and tell you

8    everything that was going to happen that day?

9    A    Yes, he did.

11:05:36  10   Q    And so obviously the -- you were under and you didn't know

11   what was going on.  After the procedure, what's your first

12   memory?

13   A    My first memory was being put back into one of those rooms

14   in the same area and my name was being called, "Ms. Booker,

11:05:58  15   Ms. Booker."  And I woke up and I saw Dr. Kang.  And he didn't

16   have a smile on his face, so I knew something was wrong.  He

17   then told me that he was successful in removing the large part

18   of the filter.

19   Q    Where?  Did he tell you --

11:06:21  20   A    In my groin.

21   Q    He went down to pull the filter out of your vein?

22   A    Yes.  I don't remember if he got it out the neck or the

23   groin, but he had told me he had been able to get that

24   particular piece out.

11:06:34  25   Q    Did he get the filter out?

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:06:35  1    A    He got the filter out.

2    Q    And then there was a piece other than the piece in your

3    heart?

4    A    Well, he told me that he was able to get one other piece

11:06:44  5    out, but there was another piece still left in my vein, which

6    was --

7    Q    And so --

8    A    -- upsetting.

9    Q    -- what did he say about that piece left in your vein?

11:06:57 10    A    He had told me at that point that it might have been best

11    to just leave it there.

12    Q    And then did he also tell you about the procedure that he

13    did to try to get the piece out of your heart?

14    A    He said that he had tried to go in and remove it but he

11:07:18 15    just wasn't able to do it and that there was some difficulty.

16    Q    And did you learn about any difficulties you had during

17    the procedure or after the procedure?

18    A    I don't really remember, to be honest with you.  I think I

19    was groggy and sleepy still and I was just trying to

11:07:38 20    understand as much as I could.  The only thing I understood,

21    that I needed to have open heart surgery.

22    Q    Okay.  So you went in to see Dr. Kang with the

23    understanding he was going to try to remove the filter out of

24    your vein, the vena cava, and two broken pieces that were in

11:08:02 25    that location; right?

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:08:04  1   A    Yes.

2   Q    And that he was also going to go in and attempt to remove

3   the piece that was in your heart.

4   A    Yes.

11:08:12  5   Q    And what he told you afterwards was that while he was able

6   to get the remaining filter and one of the broken pieces, two

7   remained in you, including the one in your heart?

8   A    Yes.

9   Q    Did you have any idea where in your heart that piece was?

11:08:33 10   A    I don't remember.

11   Q    What about the piece in your vein, did you have any idea

12   where that was at that time?

13   A    The piece in my vein was still in my vena cava.

14   Q    Where did -- what happened next?  Did you go somewhere

11:08:47 15   else?  Did they take you somewhere?  How did they deal with

16   you at that point?

17   A    No.  I recalled seeing Dr. Harvey and I believe

18   Dr. Langford.  They came.

19   Q    They came immediately after you woke from surgery?

11:09:07 20   A    I don't remember.  I know -- I remember seeing them there.

21   I don't remember if it was right after or during.  I know that

22   at that point they told me that I could not go home.

23   Q    Who?  Dr. Harvey or Dr. Kang?

24   A    I think Dr. Kang told me.  He admitted me into the

11:09:26 25   hospital at that point.

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:09:27   1    Q    So was there a point you were talking to all of the

2    doctors together?

3    A    I remember that.

4    Q    And when Dr. Harvey and Dr. Langford came to see you, what

11:09:37   5    did they say?  Do you remember at all?

6    A    They tried to reassure me that they were going to go in

7    and take this piece out of my heart and -- tried to comfort

8    me, let me know that they were going to schedule my surgery as

9    soon as they could get me on the schedule, within the next

11:10:00  10    couple of days, but that I could not go home.

11    Q    Sheri, before you went in for Dr. Kang's procedure and the

12    day that you met Dr. Harvey with Dr. Langford, did they

13    indicate to you that they thought Dr. Kang's approach would be

14    the right approach but they would be available to Dr. Kang if

11:10:20  15    necessary?

16    A    Yes, they did tell me that.

17    Q    And when you came out of surgery and you woke up after

18    Dr. Kang's procedure, they were there?

19    A    Yes.  Like I said, I remember them, seeing them there

11:10:32  20    together.

21    Q    So were you moved to a different location?  Or tell us

22    what happened to you from that point.

23    A    Well, they told me that I was going to be admitted, so

24    they took my belongings and admitted me to the floor where

11:10:53  25    people would have heart surgery.

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:11:00  1   Q   And did they move you to a part of the hospital that --
         2   where were you admitted to?

         3   A   I was admitted to I believe it was the cardiac floor.

         4   Q   And how long were you there before Dr. Harvey's procedure?

11:11:13  5   A   It was a couple, maybe three days.  Three to four days.
         6   Something like that.

         7   Q   Did Dr. Harvey come and see you during those days?

         8   A   Every day.  Couple times a day.

         9   Q   And when he saw you, would he talk to you?

11:11:30 10   A   Yes.

        11   Q   How did he make you feel?

        12   A   He made me feel like he cared.  Like he understood why I
        13   was upset.  Because he's used to it, you know.  He knows.  But
        14   to let me know he's done this several times and that he's
11:11:48 15   going to do his best to get me home to my kids, make sure I go
        16   back home.

        17   Q   When you learned that Dr. Kang couldn't get the piece out
        18   of your vena cava and the other piece out of your heart, how
        19   did you feel?

11:12:10 20   A   I was upset.  Distraught.  I was hurt.  All I could think
        21   about was the fact that my grandmother died of open heart
        22   surgery, so that was not a very good experience for me.  I
        23   knew how I felt losing her, so all I could think about was my
        24   children.  They still need their mother regardless.  They're
11:12:35 25   young still.

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:12:37  1    Q    And when you went over to the hospital and you were

2    admitted, did anybody come to see you before your procedure

3    with Dr. Harvey?

4    A    I had family.  My brothers came, one of my best friends

11:12:54  5    came that I've known since like second or third grade.  He's

6    like a brother to me.  I call him my brother.  He's actually

7    the godfather to my children.  My mother came.  One of my

8    brothers came from Boston, my oldest brother.  And I needed to

9    see them because I didn't know if I was going to go back home.

11:13:18  10           And you just try to be responsible and let everybody

11    know your passwords or your accounts, where things are.  I

12    told my two sons -- my other son came from Jersey.  I told him

13    where everything was, all my paperwork was, where I kept their

14    stuff, you know, memorabilia and stuff like that.  I just

11:13:41  15    wanted everybody to have what was needed in case I didn't make

16    it back.

17    Q    During the time that you were in the hospital waiting for

18    Dr. Harvey's procedure, was there any concern to address any

19    issues with your heart at that time?

11:13:55  20    A    My heart kept having I think they called it AFib, where it

21    just beats rapidly, irregularly.  They kept doing a bunch of

22    tests.  They tell you to rest, and five minutes later you're

23    being rolled into another room or they come get more blood,

24    stuff like that.

11:14:13  25    Q    So while you were waiting for your surgery, were you

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:14:17  1    undergoing testing for your heart and other things?

2    A    Yes.

3    Q    Tell us about the day of Dr. Harvey's surgery.  Looks as

4    though it was July 28th.  Does that sound about right?  2014.

11:14:32  5    A    Yes, it does.

6    Q    Tell us about that day before the surgery.

7    A    Well, my family came into the room and they kept saying

8    you're tough, you can do this.  Anybody's family would tell

9    them that.  That they loved me.  I made sure I told them I

11:14:56 10    loved them.  And they said we're going to see you after the

11    surgery, just stay positive, have faith.  And then they took

12    me into the surgery.

13    Q    And what about Dr. Harvey, did he come in and talk to you

14    before the surgery?

11:15:14 15    A    Oh, absolutely.

16    Q    Did you have an understanding from Dr. Harvey what was

17    going to happen to you during the procedure?

18    A    At that point, they had told me they were going to put me

19    on -- they had to stop my heart in order to do the surgery and

11:15:37 20    that they had to put me on a breathing machine and that I was

21    going to be on several other machines in order for them to do

22    the surgery.  That was the only way that they can do it.

23         Which the average person is only going to know what

24    they know from television.  You don't know how to take it.

11:16:06 25    You know you need it.  You don't want it.  But you have to.  I

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:16:13  1   just trusted that they would do the surgery and be successful.

2   Q    Were you scared?

3   A    Yes.  Scared as I've ever been in my life.

4   Q    Did you have your family there and friends?

11:16:33  5   A    Yes, I did.

6   Q    So when you had the procedure for -- with Dr. Harvey, do

7   you know how long it lasted?

8   A    I don't remember exactly.  I know it was a long time.  I

9   don't know.  I think it was more than four, five hours,

11:16:52  10  something like that.

11  Q    Do you have any idea how long that the machine that your

12  heart was stopped from beating -- how long your heart was

13  stopped?  Excuse me.

14  A    I don't remember.  I don't want to remember.

11:17:12  15  Q    Well, what do you remember after the surgery?

16  A    I don't really remember much.  I don't know if it was the

17  same day or the day after, I remember hearing someone speaking

18  to me and someone grabbing my hand.  And I recognized my

19  oldest brother, Joseph.  I call him Joey.  He was grabbing my

11:17:44  20  hand and squeezing it and he was saying "Sis, I need you to

21  fight."

22         And I remember trying to talk, but I couldn't because

23  I had something in my throat.  I think I was still on the

24  breathing machine.

11:18:04  25         And I remember him starting to scream and yell for a

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:18:07  1   nurse.  And I kept trying to open my eyes, but it was hard.

2             Next thing I remember is hearing sounds of machines

3   going off.  Really loud.  And I passed out.  I don't remember

4   what happened after that.

11:18:28  5   Q   Did you eventually find out what had happened to you?

6   A   My brother told me later on, the next day or couple days

7   later, he was like, "You scared the hell out of me," and I

8   didn't know what he was talking about.  And he had told me

9   that something had gone wrong with my heart, that that's why

11:18:53 10   the machines were going off and that's what I heard, and that

11   they had to come back in the room and stabilize me and give me

12   blood transfusions and some other medications.  And he said

13   that --

14   Q   How long were you in the hospital?

11:19:12 15   A   Total?

16   Q   For that -- following the surgery.  Do you know?

17   A   Following the first one or the second --

18   Q   Dr. Harvey's surgery.

19   A   Dr. Harvey's surgery.  Maybe five or six days.

11:19:28 20   Q   And did they -- did eventually you have to go to some type

21   of rehab, exercises, before you left?

22   A   Yes.  They -- they -- I had to be able to walk a couple of

23   steps.  And they brought in a rehabilitation therapist and

24   they gave me this pillow that I had to hold a certain way

11:19:58 25   across my chest.  Doing anything.  Getting up out of bed.

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:20:03  1  Sitting up.  Walking.  It was a form of, I guess, a barrier to

2  help me grip because it was -- they knew it was extremely

3  painful.

4  And they had brought me this breathing device to

11:20:22  5  breathe because I had to keep the little ball up to strengthen

6  my lungs.

7  And several other things that I needed to do before I

8  could leave the hospital.  And by that time I wanted to just

9  go home.

11:20:38  10  Q    Sheri, when you saw Dr. Kang and Dr. Harvey, did you find

11  out that your filter -- did they tell you that your filter

12  had -- you said it punctured -- that it actually perforated

13  through the vein, the vena cava?

14  A    Yes.  They had told me that some of the legs or arms or

11:21:01  15  whatever it's called punctured through, and I think a piece

16  had punctured through my aorta.

17  Q    Going back in time, on June 21st, 2007, when you had the

18  G2 filter implanted, did you ever have any reason to expect

19  that because of that filter you would wind up in a hospital to

11:21:32  20  have surgeries, including a surgery to your heart?

21  A    Never.  I explained earlier when I had gotten the filter

22  they had told me I could not be treated at all until -- or

23  even know what type of cancer I had until I had this filter.

24  I was led to believe that this filter would save my life.  I

11:21:58  25  was never -- I didn't know anything about filters.  I had

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:22:02  1   never heard about a filter.  And thinking back on that, I was

2   like, wow, the thing that was supposed to have saved me and

3   help me go through my treatment of cancer could have killed

4   me.

11:22:22  5   Q   Did you have any reason to think that -- to know that some

6   day that filter was going to break in three places, perforate

7   into your veins and travel to your heart and cause you to have

8   to go through all these procedures?

9   A   Not at all.  Not at all.  I never gave it a thought.

11:22:40  10  Q   Let's talk about Sheri Booker and how she deals with

11  issues like this.

12          What did you do after you got out of the hospital?

13  A   Well, it was a strenuous process.  I remember taking a lot

14  of medication and sleeping a lot being home.  I couldn't sleep

11:23:05  15  the way I normally slept so -- and the doctors told me I had

16  to have a lot of cushions behind me, sort of to be like when

17  the hospital bed has you sitting in an upright position,

18  because it was easier on me to breathe.  So I wouldn't have to

19  struggle breathing.

11:23:30  20          So my mother had to give me sponge baths because I

21  couldn't bathe myself.  I couldn't lotion myself.  There were

22  a lot of things I couldn't do.

23          My mother had to assist me getting up.  I had to make

24  sure I could walk.  One step felt like ten steps.

11:23:55  25  Q   Did you set any type of goals for yourself?

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:24:01    1   A    Every day.  I just -- I didn't want to be a burden on my

           2   family or my children.  I didn't want my sons to see their

           3   mother weak because I've always been a strong person.  So

           4   every day.  If I took five steps, the next day I wanted to do

11:24:23    5   six or seven steps.  To the point where I was able to bathe

           6   myself, or at least sponge myself down, to the point where I

           7   was able to walk from my bedroom to the living room and the

           8   living room to the kitchen, and then I started walking around

           9   the apartment.

11:24:43   10        It almost felt like a prisoner in my own home.  So I

          11   had to push through, regardless of what I went through.  So I

          12   started walking around my apartment complex.  Family and

          13   friends kept telling me come outside, get some fresh air,

          14   start living like you used to live, be a little bit more

11:25:05   15   active.  Which I did.  So one day --

          16   Q    Let me stop you one second, because I want to ask you to

          17   talk about that, but I also want to ask you, before we go and

          18   we begin to wrap this up and you tell us about how you

          19   overcame this, what happened to that cancer?

11:25:26   20   A    I survived it.

          21   Q    Huh?

          22   A    I survived it.  I'm a survivor.

          23   Q    Congratulations.

          24   A    Thank you.

11:25:33   25   Q    Is that how you live your life?

DIRECT EXAMINATION – SHERR-UNAI BOOKER

11:25:36  1   A   Cancer free.  I do go every six months or so, whenever the

2   doctors tell me, to go get tested.  But I am still cancer

3   free.

4   Q   Now, if anybody here ever wants to travel to Georgia and

11:25:49  5   they look on a map and there's something called Stone

6   Mountain, can you tell us about that.

7   A   Stone Mountain isn't really a mountain, it's a big old

8   rock.  I guess that's why they say stone.  And I believe it's

9   one of the biggest rocks in the country.  It's one of the

11:26:08  10  things that Georgia's known for.

11       Prior to the surgery, I had climbed Stone Mountain

12  several times.  It was something to do for exercise.  I

13  exercise.  I try to exercise at least three times a week.  You

14  know, the older you get, you want to make sure you stay

11:26:30  15  healthy.  So that's what I did.

16       So about two, two and a half months after my surgery

17  and after walking around my complex, I had gone and sat by the

18  pool and tried to enjoy that.  Me and my same girlfriend, we

19  took a picture by the pool showing that I was coming back into

11:26:58  20  myself.

21       I decided to go to Stone Mountain.

22  Q   Did you climb it?

23  A   I did.

24  Q   How did you do?

11:27:07  25  A   It took me forever.  But I did it.

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:27:11  1      And there were people there -- you talk to people,
2   and I told them I had open heart surgery, so they kind of
3   stayed with me.  I don't think -- I don't know if they stayed
4   with me to encourage me or if they stayed with me to make sure
11:27:29  5   something wouldn't happen to me and to dial 9-1-1, but they
6   stayed with me and that was important.

7           And I reached the top of that mountain, and that was
8   the first time I felt like Sheri again.  And that's important
9   you get yourself back.  That you don't feel like you're
11:27:52  10   trapped.  That I can move on.  And I was -- that was
11   empowering to me as a mother, because now I can show my
12   children that regardless of what you go through, you can move
13   on.  You can push through.  You can live as normal life as you
14   can.  It was motivational for me to keep going.  It was
11:28:19  15   inspiring.  I felt like, okay, it's going to be okay.
16   Q   Sheri, let me ask you, you're cancer free now, but that G2
17   filter, is there anything going on with you now from
18   everything you had to go through?
19   A   Well, I've had -- I still get chest pain.  I still get
11:28:44  20   abdominal pain.  I've gone to the doctor.  I've gotten certain
21   illnesses because of the open heart surgery.

22           As a matter of fact, when I had the open heart
23   surgery, I still wasn't in the clear at first because I had
24   gotten fluid in my lungs and they were going to do another
11:29:11  25   procedure.  And I had to go through tests.  And when I -- this

DIRECT EXAMINATION – SHERR-UNAI BOOKER

11:29:17  1   is before Stone Mountain.  About a week or two prior because I

2   had two follow-up visits and the doctors were concerned that I

3   had developed fluid in my lungs.  And then they told me that I

4   was going to have another procedure.

11:29:34  5       At this point I was procedured out.  I was tired of

6   needles and hospitals and doctors.

7   Q   So what happened to the fluid?

8   A   Well, thankfully, when I went in that Monday, I believe,

9   they took more films and exams to see where they were going to

11:29:56  10  puncture my lung to get the fluid out, and they realized that

11  my body had absorbed it.

12      Oh my God.  That felt like I had gotten a piece of

13  heaven.  It felt like, phew, not another procedure.  Thank

14  you.  I was happy.

11:30:14  15  Q   Sheri, you still have a piece of that G2 in you; is that

16  right?

17  A   That is correct.

18  Q   How does that make you feel?  You wanted to get rid of

19  that like you wanted to get rid of cancer, didn't you?

11:30:28  20  A   Yes.  I wanted every piece out of me.  And the fact that

21  it's still in my vena cava, I live every day wondering if that

22  piece is going to find its way into my heart like the other

23  piece.  There's never a day that doesn't go by that I don't

24  think about it.

11:30:48  25      It affects what I do, where I go.  I don't let it

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:30:51  1    control me.  However, I take precautions every day.  Which

        2    means if I go to an event, if I go to see someone graduate, if

        3    I go -- like, I had to fly here to give my testimony.  I

        4    Google where is the nearest hospital because I want to know

11:31:20  5    that if that piece moves, I know what hospital to go to.  So I

        6    Google everywhere I go and I keep it on my phone.

        7    Q    So did you Google Phoenix?  I mean, do you know the layout

        8    here?

        9    A    Actually, the closest hospital that my phone gave me,

11:31:40 10    that's what it gave me, it gave me St. Luke's.  So I asked

       11    around about St. Luke's --

       12    Q    That's all right.

       13    A    Oh.

       14    Q    So you know where you have to go.

11:31:50 15    A    Yeah.

       16    Q    Sheri, you have medical bills, and I believe they've been

       17    stipulated into evidence.  Real quickly, if we could look at

       18    Exhibit 4391.

       19         As I understand, those are stipulated.  The

11:32:03 20    summary --

       21         THE COURT:  You should just move them into evidence,

       22    Mr. O'Connor.

       23         MR. O'CONNOR:  All right.  I will move medical bill

       24    summary, 4391, into evidence, Your Honor.

11:32:15 25         THE COURT:  Any objection?

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:32:17  1          MS. HELM:  Your Honor, the agreement was the summary

       2   and the bills.  So subject to the bills being tendered,

       3   there's no objection.

       4          MR. O'CONNOR:  And we have the bills separately

11:32:27  5   marked, and I'll state what those are.

       6              2399.  2400.  2401.  2403.

       7          THE COURT:  And you're moving all of those in?

       8          MR. O'CONNOR:  Yes, Your Honor.

       9          THE COURT:  Any objection?

11:32:46 10          MS. HELM:  No, Your Honor.

      11          THE COURT:  All right.  Those exhibits, including the

      12   summary, are admitted.

      13        (Exhibits 4391, 2399, 2400, 2401, 2403 admitted.)

      14          MR. O'CONNOR:  If we may, Your Honor, may I display

11:32:55 15   and publish to the jury Exhibit 4391?

      16          THE COURT:  You may.

      17   BY MR. O'CONNOR:

      18   Q    Sheri, you had medical bills because of the G2 filter, to

      19   have it removed and receive treatment for it; is that right?

11:33:16 20   A    That is correct.

      21   Q    And as you look through Exhibit 4391, beginning with the

      22   different health care providers on the left, including the

      23   anesthesiologist, Gwinnett Consultants, Gwinnett Health

      24   System, Gwinnett Medical Group, MetroAtlanta Ambulance, North

11:33:36 25   Metropolitan Radiology, Piedmont Hospital, and Wellstar North

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:33:40  1    Fulton, are those all places where you received care for

2    treatment for the G2 filter?

3    A    Yes.

4    Q    And the total expenses that you had for treatment of your

11:33:50  5    filter are 282,102.99; is that correct?

6    A    282,102.29.  Yes.

7    Q    Thank you.

8         MS. HELM:  Your Honor, can we approach?  We have an

9    issue on this exhibit.

11:34:07  10        THE COURT:  You may.

11        Go ahead and stand up if you need to, ladies and

12    gentlemen.

13      (Bench conference as follows:)

14        MS. HELM:  He's using the wrong exhibit.  We met

11:34:27  15    yesterday and conferred about the amount and plaintiffs

16    admitted the 282 number is wrong and it's actually 267.

17        MR. O'CONNOR:  I didn't realize that adjustment

18    wasn't made on the exhibit, Your Honor.  I can correct that

19    right now and say the actual total is less than that.  The

11:34:44  20    adjusted exhibit --

21        THE COURT:  Well, let's put the correct exhibit in.

22        MR. O'CONNOR:  Do we have the correct exhibit in?

23        THE COURT:  Is 4391?

24        MS. HELM:  I was just handed it without an exhibit

11:34:55  25    number today, so --

DIRECT EXAMINATION - SHERR-UNAI BOOKER

11:34:56   1          THE COURT:  Let's make this 4391.  Is that agreeable?

2          MS. HELM:  Yeah, that's agreeable.

3          THE COURT:  Okay.  So go correct it in front of the

4   jury.  Tell them that that's now 4391 with the new number.  I

11:35:08   5   guess we're going to have to display that on an Elmo.

6          Traci, we'll need to display this different exhibit

7   on an Elmo because you don't have it electronically.

8          So let's make this 4391 and put it on the Elmo to

9   correct what the jury's seeing.

11:35:30  10          MR. O'CONNOR:  I apologize.  I didn't realize -- I

11   was reading from the screen.

12      (Bench conference concludes.)

13          MR. O'CONNOR:  Greg, let's take that one off.

14          Oh, we do have the correct one on now.

11:35:44  15          I think we have the corrected version that we can

16   show on the regular screen now, Your Honor.

17          THE COURT:  All right.

18          MR. O'CONNOR:  Would you prefer it be put on the

19   Elmo?

11:35:57  20          THE COURT:  No.  I just wanted the jury to see the

21   corrected version.

22   BY MR. O'CONNOR:

23   Q   The first one was inaccurate.  Your total bills are

24   actually 267,627.99; is that correct?

11:36:06  25   A   That is correct.

DIRECT EXAMINATION – SHERR-UNAI BOOKER

11:36:06   1          MR. O'CONNOR:  And I apologize for the error in our

        2   document.

        3          So I move to admit now, Your Honor, 4391 as

        4   corrected.

11:36:17   5          THE COURT:  All right.  That is admitted as

        6   corrected.

        7          MR. O'CONNOR:  Thank you.

        8          And I don't have any other questions, Your Honor.

        9          THE COURT:  All right.

11:36:23  10          Cross-examination?

       11          MS. HELM:  Your Honor, prior to beginning my

       12   cross-examination, I'd like to move to admit certain medical

       13   bills that have been stipulated to by the parties.

       14          THE COURT:  Just one second.

11:37:04  15          Okay.  Go ahead.

       16          MS. HELM:  Move to admit Exhibits 6643, 6652, 6656,

       17   6660, 6667, 6669, 6681, 6683, 6693, 6696, 6699, 6741, 6748,

       18   6751, 6756, 6768, 6770, 6778, 6780, 2312, 6668, 2378, 6745.

       19          THE COURT:  And you're moving those all in evidence?

11:38:19  20          MS. HELM:  Yes, Your Honor.

       21          THE COURT:  Is there any objection?

       22          MR. O'CONNOR:  Well, as I understand, there was an

       23   agreement that the records would be redacted.  It appears that

       24   the set that we have has not been --

11:38:31  25          MS. HELM:  The set for the Court and the set that

CROSS-EXAMINATION – SHERR-UNA BOOKER

11:38:32  1    will be displayed is redacted, Your Honor.

2             THE COURT:  All right.

3             Any objection?

4             MR. O'CONNOR:  No objection.

11:38:46  5             MS. LOURIE:  Are they all medical?  We don't have all

6        of them.

7             MS. HELM:  They're all medical records.

8             MR. O'CONNOR:  No objection then.

9             THE COURT:  Those exhibits are admitted.

09:25:03  10       (Exhibits 6643, 6652, 6656, 6660, 6667, 6669, 6681, 6683,

11       6693, 6696, 6699, 6741, 6748, 6751, 6756, 6768, 6770, 6778,

12       6780, 2312, 6668, 2378, 6745 admitted.)

13             C R O S S - E X A M I N A T I O N

14       BY MS. HELM:

11:38:56  15    Q    Morning, Ms. Booker.

16    A    Morning.

17    Q    My name is Kate Helm.  We previously met; correct?

18    A    Yes.

19    Q    When I took your deposition back in February 2017; is that

11:39:04  20    right?

21    A    Yes.

22    Q    Are you feeling better today?  You were having a rough day

23       that day.

24    A    Yes.

11:39:10  25    Q    You were suffering from some Georgia sinus infection and

CROSS-EXAMINATION - SHERR-UNA BOOKER

11:39:15  1   from a migraine headache; is that right?

2   A   Yes.

3   Q   It's been tough for you to sit here and listen to people

4   talk about your medical condition over the las week, hasn't

11:39:27  5   it?

6   A   No.  It's been tough to hear about Bard and what they knew

7   and didn't know.

8   Q   You have a fairly extensive and complicated medical

9   history, don't you?

11:39:35  10  A   No.

11  Q   You don't?

12       You have never been treated for cancer -- you have

13  been treated for cancer?

14  A   Yes.  I beat that in '07.

11:39:45  15  Q   Okay.  You've also had hernia surgery?

16  A   Yes.

17  Q   You've also had a pulmonary embolism?

18  A   Yes.

19  Q   You've also had sciatica?

11:39:57  20  A   Yes.

21  Q   You also have had two heart attacks; correct?

22  A   No.

23  Q   If you testified in your deposition that you had two heart

24  attacks, are you changing your testimony today?

11:40:07  25  A   Well, I learned differently from then until now when I

CROSS-EXAMINATION - SHERR-UNA BOOKER

11:40:10  1   spoke with Dr. Patel, that made it clear to me they were not

2   heart attacks.

3   Q    Until you spoke to Dr. Patel, you reported to medical

4   providers that you had had heart attacks, didn't you?

11:40:22  5   A    That's how I had understood it, unfortunately.

6   Q    And, in fact, what you understood it to be heart attacks

7   and what you've told your doctors were heart attacks, at least

8   one time was a very serious reaction to anesthesia, wasn't it?

9   A    Dr. Patel told me it was anaphylactic shock.

11:40:41  10  Q    And that was anesthesia while you were having an

11  appendectomy; correct?

12  A    Correct.

13  Q    And during that appendectomy -- let me back up.

14       You've also had foot surgery, have you not?

11:40:55  15  A    Yes.

16  Q    In 2006.  In 2006, you fell at your apartment complex;

17  correct?

18  A    Yes.

19  Q    And as a result of that fall you broke your foot?

11:41:06  20  A    Yes.

21  Q    And you had to have surgery from that; correct?

22  A    Yes.

23  Q    And after that foot surgery, you were put on

24  anticoagulants, weren't you?

11:41:19  25  A    Yes.

CROSS-EXAMINATION - SHERR-UNA BOOKER

11:41:19  1  Q   Because you had a history of pulmonary embolism; correct?

2  A   I don't remember.

3  Q   But you agree with me that after your foot surgery in

4  December of 2006, you were put on anticoagulants?

11:41:39  5  A   Yes.

6  Q   You were down for a little while from the foot surgery,

7  couldn't get around; right?

8  A   Yes.  I was in a wheelchair.

9  Q   How long were you in that wheelchair?

11:41:50  10  A   Off and on for about three months.  The wheelchair and

11  crutches.

12  Q   You've also in the past had chest palpitations, haven't

13  you?

14  A   Yes.

11:42:01  15  Q   And when I deposed you, you couldn't tell me -- you

16  couldn't remember if those chest palpitations occurred before

17  you were diagnosed with cancer or after; correct?

18  A   I think so.

19  Q   After you broke your foot in December of 2006, in May of

11:42:21  20  2007 you went to see your gynecologist; correct?

21  A   Yes.

22  Q   And his name is Dr. Dean Martin; correct?

23  A   Yes.  Dean Martin.

24  Q   We've chuckled because --

11:42:38  25  A   That is correct.

CROSS-EXAMINATION - SHERR-UNA BOOKER

11:42:40  1    Q   And when you saw Dr. Martin, you reported to him that you

2    were bleeding vaginally; correct?

3    A   Yes, I did.

4    Q   And you were concerned.  You thought you were bleeding --

11:42:49  5    it was bleeding as a result of the blood thinners or

6    anticoagulants; correct?

7    A   I didn't know what it was, I just know I was bleeding

8    internal -- bleeding.  Hemorrhaging.

9    Q   Let me back up.  I actually missed a date.

11:43:03  10        Before you went to Dr. Martin, in May of 2007 you

11   actually passed out at work, didn't you?

12   A   Yes, I did.

13   Q   And let me make my time line back because I missed one.

14        In December of 2006 you had the foot surgery;

11:43:18  15   correct?

16   A   Yes.

17   Q   And you were on anticoagulants?

18   A   Yes.

19   Q   In May of 2007, while you were on anticoagulants, you

11:43:27  20   passed out at work; correct?

21   A   Yes.

22   Q   And you actually worked at Lincoln Hospital in New York;

23   correct?

24   A   Yes.

11:43:34  25   Q   And you went to the emergency room at Lincoln; correct?

11:43:37  1    A    My own emergency room, yes.

2    Q    Your own hospital, your own emergency room.

3    A    Yes.

4    Q    And when you were in the emergency room, they diagnosed

11:43:45  5    you as having another pulmonary embolism, didn't they?

6    A    I wouldn't say another.  Sorry.  I would say they

7    diagnosed me as having one.  Yes.

8    Q    So in May of 2007, while on anticoagulants, you were

9    diagnosed with having a pulmonary embolism; correct?

11:44:03 10    A    Yes.

11    Q    And then, now we'll get back to Dr. Martin.  Less than one

12    month later, in June of 2007, you went to see Dr. Martin

13    because you were bleeding vaginally; correct?

14    A    Yes.

11:44:18 15    Q    And Dr. Martin sent you to the hospital; correct?

16    A    Yes.

17    Q    And he sent you to the hospital because he was -- he had

18    diagnosed you as having a cervical mass; correct?

19    A    Yes.

11:44:34 20    Q    So one month after you had the pulmonary embolism, you

21    ended up in the hospital with vaginal bleeding and the

22    cervical mass; correct?

23    A    Yes.

24    Q    And it was during that hospital stay or hospital admission

11:44:50 25    that they told you they were going to have to do a surgical

CROSS-EXAMINATION - SHERR-UNA BOOKER

11:44:54  1  biopsy; correct?

2  A    Yes.

3  Q    So when you told us earlier that you had surgery for the

4  cancer, it was -- that's what you were referring to; right?

11:45:02  5  The surgical biopsy?

6  A    Yes.

7  Q    And before they could do that surgical biopsy, they had to

8  take you off your Coumadin; correct?

9  A    Yes.

11:45:12  10  Q    So less than a month after you'd been diagnosed with a

11  pulmonary embolism, you had to go off the Coumadin; right?

12  A    Yes.

13  Q    And that's when Dr. D'Ayala came in to implant the filter;

14  correct?

11:45:32  15  A    Yes.

16  Q    And you don't remember any conversations with Dr. D'Ayala,

17  do you?

18  A    I really don't.

19  Q    You heard him testify here by video; correct?

11:45:44  20  A    Yes.

21  Q    And you heard him testify that he had discussed the risks

22  and benefits of the filter with you, didn't you?

23  A    Actually I heard him say it was my husband.

24  Q    Okay.  You don't remember any of those conversations?

11:46:01  25  A    To be honest, no, I don't.

CROSS-EXAMINATION - SHERR-UNA BOOKER

11:46:03  1    Q    You don't remember whether you asked any questions?

        2    A    I don't.

        3    Q    You don't remember the implant procedure?

        4    A    I remember it was done.

11:46:14  5    Q    And actually you consented and signed a consent for that

        6    implant, didn't you?

        7    A    Yes, I did, after they told me they would not treat me

        8    until I had it.

        9    Q    And you don't remember whether you were told whether it

11:46:26 10    was a permanent filter or a retrievable filter, do you?

       11    A    No, ma'am, I was concerned about the cancer.

       12    Q    And you don't remember whether Dr. D'Ayala told you to

       13    follow up with him, do you?

       14    A    No.  I don't.

11:46:41 15    Q    But you never followed up with Dr. D'Ayala, did you?

       16    A    I followed up with all my other doctors.  I don't remember

       17    seeing him again, though.

       18    Q    You did not go back and see Dr. D'Ayala, did you?

       19    A    I don't remember going to see him again.

11:47:01 20    Q    You went through chemo and radiation for approximately

       21    three months; is that right?

       22    A    I think.  So I know it was from, I think, July to the

       23    first week of November of '07.

       24    Q    Plus or minus three months?

11:47:18 25    A    Um-hmm.

CROSS-EXAMINATION - SHERR-UNA BOOKER

11:47:19  1   Q   And during that chemo and radiation, you had PET scans;

2   right?

3   A   Yes.

4   Q   And you asked your doctors if they could see the filter on

11:47:27  5   the PET scan, didn't you?

6   A   I don't remember.  I might have.  I don't remember.

7   Q   If you testified in your deposition that you asked the

8   doctors if you could see the filter on the PET scan, you agree

9   with that testimony; right?

11:47:42  10   A   Probably, yes.

11   Q   Okay.

12        And at one point you asked them about the filter,

13   didn't you, because you were concerned about having a foreign

14   object in your body?

11:47:52  15   A   Yes.

16   Q   You expect your doctors to be frank with you; correct?

17   A   Yes.

18   Q   And you expect them to -- if they recommend a film or

19   X-ray or scan, you expect them to read that X-ray or scan and

11:48:20  20   tell you what it says, don't you?

21   A   Yes.

22   Q   And you rely on them to read X-rays and scans and to tell

23   you what's going on if they find anything; correct?

24   A   Yes.

11:48:34  25   Q   That's your expectation as a patient; correct?

CROSS-EXAMINATION - SHERR-UNA BOOKER

11:48:38  1   A   Yes.

2   Q   And, in fact, you have quit going to doctors because they

3   didn't properly evaluate a scan or a test; correct?

4   A   No.

11:48:51  5   Q   You didn't quit going to see Dr. Martin because you felt

6   like he had missed your cervical cancer?

7   A   I didn't feel that, he told me that.

8   Q   And after he told you that he missed your cervical cancer,

9   you quit going to see him; correct?

11:49:05  10   A   Actually, I told him I wanted to see another doctor

11   because he missed it, yes.  It's logical.

12   Q   And as a patient, you have some responsibilities; correct?

13   A   Yes.

14   Q   You have a responsibility to provide adequate -- accurate

11:49:19  15   information to your doctors?

16   A   As best of my understanding, yes.

17   Q   And you have a responsibility to ask questions and make

18   sure you understand the treatment and the procedures taking

19   place?

11:49:31  20   A   Yes.

21   Q   And you have a responsibility to follow the doctors'

22   instructions or to accept the consequences for not doing that;

23   correct?

24   A   What do you mean by that?

11:49:46  25   Q   If, for example, a doctors tells you to take a medicine

CROSS-EXAMINATION - SHERR-UNA BOOKER

11:49:49   1   and you don't take it, you have to accept the consequences you

2   might not get well.

3   A    Yes.

4   Q    And you testified earlier that you follow up on a regular

11:50:00   5   basis about your cancer; correct?

6   A    Yes.

7   Q    So it's important if you're told by doctor to follow up,

8   to do those kinds of follow-ups; correct?

9   A    Yes.

11:50:11  10   Q    And it's important, if you're concerned about something,

11   to follow up with your doctor.

12   A    Yes.

13   Q    You would agree with all of those?

14   A    Yes.  On a timely manner, yes.

11:50:27  15   Q    After your cancer treatment, you had other treatment and

16   other hospitals visits in New York before you moved to

17   Georgia, didn't you?

18   A    Yes.

19   Q    Sometimes you were treated at New York Methodist Hospital

11:50:44  20   and sometimes you were treated at what you called "my

21   hospital," Lincoln Memorial; correct?

22   A    Yes.

23   Q    And, in fact, in February of 2008, let me take you back in

24   time a little bit, after the cancer treatment, you went to

11:51:02  25   Lincoln Memorial Hospital; is that right?

CROSS-EXAMINATION - SHERR-UNA BOOKER

11:51:06  1   A    If it's on the record, yes.

2           MS. HELM:  Can you pull up 6656, please.

3   BY MS. HELM:

4   Q   Ms. Booker, can you see on your screen --

11:51:18  5   A    There's nothing on there.

6           Okay.

7   Q   Is this a medical record from Lincoln Memorial Hospital

8   for an emergency admission for you?

9   A    Yes.

11:51:34 10   Q   And if you look on page --

11          MS. HELM:  Your Honor, may I display this?  It's been

12  admitted.

13          THE COURT:  You may.

14          MS. HELM:  Thank you.

11:51:40 15          MR. O'CONNOR:  Hold it, Your Honor.  May we approach

16  the bench?

17          THE COURT:  Yes.

18          Ladies and gentlemen, one more time.  We'll only do

19  this one more time before lunch.  Feel free to stand if you

11:51:52 20  want.

21      (Bench conference as follows:)

22          MS. LOURIE:  None of these are redacted.

23          MS. HELM:  We said birth date, address, social

24  security number.  Her birth date is redacted.

11:52:20 25          MS. LOURIE:  There's a lot more that needs to be

CROSS-EXAMINATION - SHERR-UNA BOOKER

11:52:22  1    redacted subject to the motions in limine.

2         MS. HELM:  There's no insurance information on here.

3    There's no billing.  It's only the ER record.  And this -- if

4    you look on the screen, her birth date is gone.  It's blank.

11:52:42  5         MS. LOURIE:  You didn't give us redacted copies, so

6    we don't have anything --

7         MS. HELM:  I understand.  We'll -- we'll --

8         THE COURT:  That's fine.

9         MR. O'CONNOR:  We're fine with this.

11:52:51 10    (Bench conference concludes.)

11         THE COURT:  Thank you.

12    BY MS. HELM:

13    Q   Ms. Booker, this is a hospital admission for you at

14    Lincoln Memorial -- Lincoln Medical on February 20th, 2008; is

11:53:25 15    that correct?

16    A   Yes.

17    Q   And on that date you went in complaining of abdominal

18    pain; is that right?

19    A   Yes.

11:53:38 20         MS. HELM:  And, Scott, if you'll flip to the third

21    page.

22    BY MS. HELM:

23    Q   They ordered a CT scan; is that right?  See where --

24    A   Yes, I see it.

11:53:50 25    Q   When you went to Lincoln on February 20th, 2008, did you

CROSS-EXAMINATION - SHERR-UNA BOOKER

11:53:54  1  ask them to check on your filter?

2          MR. O'CONNOR:  Objection, Your Honor.  403.  There's

3  no claim that this is relevant to.

4          THE COURT:  Is this related to Dr. Amer?

11:54:09  5          MS. HELM:  Yes, Your Honor, it's related to -- and

6  testimony by our expert.  Yes.

7          THE COURT:  Overruled.

8          THE WITNESS:  I'm sorry, can you repeat the question.

9  BY MS. HELM:

11:54:17  10  Q   When you went to Lincoln Memorial on February 28th, 2008,

11  did you ask them to check on your filter?

12  A   I don't remember.

13  Q   And did you ask them what the CT scan showed?

14  A   I don't remember.

11:54:33  15  Q   But in any event, you have no memory of anyone discussing

16  with you your filter or whether there was anything about --

17          MR. O'CONNOR:  Objection, Your Honor.  Can we

18  approach?

19          THE COURT:  No.

11:54:43  20          MR. O'CONNOR:  Well, this is not the record that is

21  part of the defense.

22          THE COURT:  All right.  We'll talk about at the lunch

23  break.

24  BY MS. HELM:

11:54:53  25  Q   Was there any discussion with you at all about your filter

CROSS-EXAMINATION - SHERR-UNA BOOKER

11:54:55  1   February 28th, 2008?

2   A   I don't remember.  I don't think there was, but I'm not

3   absolutely sure, so my best answer is I don't remember.

4   Q   You also went back to Lincoln on March 29th, 2009, didn't

11:55:11  5   you?

6           Exhibit 6667.

7   A   Yes.

8   Q   And you complained of headaches, right thigh pain, and

9   eventually a back pain; is that correct?

11:55:32  10  A   Yes.

11  Q   And on March 29th, 2009, you were no longer taking

12  Coumadin, were you?

13  A   I don't remember.  If I had stopped taking the Coumadin,

14  then that would mean I had a discussion with a hematologist

11:55:50  15  oncologist.  He had done a genetic testing to make sure that I

16  was not predisposed to have clots and he had told me that I

17  was not, and at that point, that's what the filter was there

18  for anyway, so I didn't need to take any other blood thinners.

19  Q   So you told Lincoln you were no longer taking Coumadin,

11:56:16  20  but you told them you had a filter; correct?

21  A   I believe I did.

22  Q   And on March 29th, 2009, they ordered an X-ray, didn't

23  they?

24  A   Can you show it to me?  I don't see it yet.

11:56:35  25  Q   6668.

CROSS-EXAMINATION – SHERR-UNA BOOKER

11:56:37  1          Do you see this?  March 29th, 2009?

2    A    Yes, I see it.

3    Q    They took an X-ray?

4    A    Yes, ma'am.

11:56:48  5    Q    A radiologist by the name of Dr. Amer read that X-ray.

6          Do you see that?

7    A    Yes, ma'am.

8    Q    And do you see where he says "IVC filter is noted"?

9    A    Yes, I do see that.

11:57:03  10   Q    While you were treated a Lincoln Memorial Hospital on

11   March 26th, 2009, did anyone tell you anything about your IVC

12   filter?

13   A    No.  Not that I remember.

14   Q    Did anyone tell you that, in fact, the X-ray showed that

11:57:17  15   the filter had fractured?

16   A    No, ma'am.

17   Q    That's something you would have wanted to know, isn't it?

18   A    Yes.

19   Q    If you had been told in March of 2009 that there were

11:57:27  20   complications with your filter, you would have gone and

21   followed up with a doctor, wouldn't you?

22   A    Yes.

23   Q    Absolutely; right?

24   A    Yes.

11:57:37  25   Q    And if you learned on March 29th, 2009, that the filter

CROSS-EXAMINATION - SHERR-UNA BOOKER

11:57:44  1   had an arm that was sticking up like this rather than down,

2   that is something you would want to know, wasn't it?

3   A    Yes.

4            THE COURT:  We can't hear you, Mr. O'Connor.

11:57:57  5            MR. O'CONNOR:  Objection.  Lack of foundation.

6            THE COURT:  Overruled.

7   BY MS. HELM:

8   Q    But, in fact, you didn't learn on March 29th, 2009, that

9   the X-ray that Dr. Amer took showed that there were

11:58:13 10   complications with your filter, did you?

11   A    No.

12   Q    And, in fact, it looks like your treating doctors didn't

13   learn it either because all his report is says is "IVC is

14   noted"; correct?

11:58:26 15   A    Yes.  It says "no evidence of fracture" right there.

16   Q    In your back.

17   A    In where?

18   Q    In your back.  This was a back X-ray.

19   A    Well, if it's the same thing you're asking me to read and

11:58:39 20   you pointed out "IVC filter is noted," it says "Impression:

21   No evidence of fracture."  Is that what you're wanting me to

22   read?

23   Q    No.  It just says no -- "IVC filter is noted."  Correct?

24   That's all it says.

11:58:53 25   A    That's not all it says, ma'am.  It says "Impression:  No

CROSS-EXAMINATION - SHERR-UNA BOOKER

11:58:56   1   evidence of fracture."

2   Q   Okay.  So on March 29th, 2009, you were not told anything

3   about your filter; correct?

4   A   Correct.

11:59:06   5   Q   Okay.  And if that X-ray on March 29th, 20- -- 26th, 2009,

6   showed when you looked at the X-ray that your filter was not

7   in the condition it was in when it was originally implanted,

8   that is something you would want to know, isn't it?

9           MR. O'CONNOR:  Objection.  Asked and answered.

11:59:24  10           THE COURT:  Overruled.

11           THE WITNESS:  Yes.

12           THE COURT:  All right.  We're going to break for

13   lunch at this time.

14           Members of the jury, we'll plan to resume at

11:59:35  15   1 o'clock.  We'll excuse you.

16       (The jury exited the courtroom at 11:59.)

17           THE COURT:  Ms. Helm, you need to ask for exhibits to

18   be displayed.

19           MS. HELM:  Oh.  Thank you, Your Honor.

12:00:03  20           THE COURT:  Those were not displayed to the jury.

21           MR. O'CONNOR:  Your Honor, the reason I was objecting

22   before, there is no claim of comparative fault on this

23   plaintiff in this case.

24           THE COURT:  Well, there is for Dr. Amer.

12:00:17  25           MR. O'CONNOR:  For the doctor, but whether or not --

12:00:19   1    what her conduct was or what she would expect is not relevant.

           2            THE COURT:  Well, I disagree with that.  I think it

           3    is relevant because you've been asking all throughout the

           4    trial what patients and doctors would expect, and there's also

12:00:31   5    an assumption of the risk defense in this case.

           6            The reason I didn't have you approach at sidebar is

           7    nothing in those questions was objectionable.

           8            So those are the reasons for my rulings on those

           9    matters.

12:00:48  10            Are there other matters that we need to take up

          11    before we break for lunch?

          12            MS. HELM:  I think I'm supposed to respond.  No,

          13    Your Honor.

          14            MR. O'CONNOR:  Nothing.

12:00:59  15            THE COURT:  Okay.  Would you all please be sure to

          16    confer about redactions so there's no uncertainty on that.

          17            MS. HELM:  Yes, Your Honor.

          18            THE COURT:  Okay.  We'll see you at 1 o'clock.

          19        (End of transcript.)

          20                        *  *  *  *  *

          21

          22

          23

          24

          25

1          **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14         DATED at Phoenix, Arizona, this 22nd day of March,

15   2018.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25