March 26, 2018

1                    **UNITED STATES DISTRICT COURT**

2                   **FOR THE DISTRICT OF ARIZONA**

3                      _____

4
**In re:  Bard IVC Filters,**          )
5  **Products Liability Litigation**      )
                                        )
6                                        )
                                        ) MD-15-02641-PHX-DGC
7  _____ )
**Sherr-Una Booker, an individual,**     )
8                                        ) Phoenix, Arizona
                        Plaintiff,       ) March 26, 2018
9              v.                        ) 12:58 p.m.
                                        )
10 **C.R. Bard, Inc., a New Jersey**        )
   **corporation; and Bard Peripheral**    ) CV-16-00474-PHX-DGC
11 **Vascular, Inc., an Arizona**          )
   **corporation,**                        )
12                                        )
                        Defendants.      )
13 _____ )

14
            **BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE**
15
            <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>
16
                 <u>**JURY TRIAL - DAY 8 P.M.**</u>
17

18              (Pages 1732 through 1875)

19

20
   Official Court Reporter:
21 **Elaine Cropper, RDR, CRR, CCP**
   Sandra Day O'Connor U.S. Courthouse
22 401 West Washington Street
   Suite 312, SPC 35
23 Phoenix, Arizona  85003-2150
   (602) 322-7245
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

                 United States District Court

March 26, 2018

1                              **APPEARANCES**

2

3

4        For the Plaintiff:
                **RAMON ROSSI LOPEZ, ESQ.**
5               Lopez McHugh, L.L.P.
                100 Bayview Circle, Ste. 5600
6               Newport Beach, CA  92660
                949.812.5771/(fax) 949.737.1504
7
         For the Plaintiff:
8               **MARK S. O'CONNOR, ESQ.**
                Gallagher & Kennedy, P.A.
9               2575 East Camelback Road
                Phoenix, AZ  85016
10              602.530.8000/(fax) 602.530.8500

11       For the Plaintiff:
                **JULIA REED ZAIC, ESQ.**
12              Heaviside Reed Zaic
                312 Broadway, Ste. 203
13              Laguna Beach, CA  92660
                949.715.5228
14
         For the Plaintiff:
15              **ROBIN P. LOURIE, ESQ.**
                Watkins, Lourie, Roll & Chance, P.C.
16              3343 N. Peachtree Rd. N.E.
                Tower Place 200
17              Atlanta, GA  30326
                404.760.7400
18
         For the Plaintiff:
19              **JOSEPH R. JOHNSON, ESQ.**
                Babbitt & Johnson, P.A.
20              1641 Worthington Rd., Ste. 100
                P.O. Box 4426 (3302-4426)
21              West Palm Beach, FL  33409
                561.684.2500/(fax) 561.684.6308
22

23

24

25


                    United States District Court

March 26, 2018

**APPEARANCES** (Continued)

For the Defendants:
**JAMES R. CONDO, ESQ.**
Snell & Wilmer, L.L.P - Phoenix, AZ
One Arizona Center
400 East Van Buren
Phoenix, AZ  85004-2202
602.382.67000

For the Defendants:
**RICHARD B. NORTH, JR., ESQ.**
**ELIZABETH C. HELM, ESQ.**
Nelson, Mullins, Riley & Scarborough, L.L.P.
201 17th St., N.W., Ste. 1700
Atlanta, GA  30363
404.322.6000

United States District Court

March 26, 2018

1           **I N D E X**

2              **TESTIMONY**

3

4

WITNESS                    Direct   Cross   Redirect   Recross

5

  AUDREY FASCHING, PH.D.    1738     1744
6  PAUL BRIANT, PH.D.        1755     1797
   ROBERT M. CARR, JR.       1810
7

8

9

10            **E X H I B I T S**

11  Number                                      Ident Rec'd

12  5017   Aug. 5, 1999 R&D Technical Report RNF   1829 1830
           Migration Study, Design Verification
13         (RD-RPT-100)

14  5022   RD-LNB-087 Laboratory Notebook          1826 1828

15  5126   Guidance for Industry and FDA           1831
           Reviewers/Staff - Guidance for
16         Cardiovascular Intravascular Filter
           510(k) Submissions
17
    5164   July 8, 2003 Fax IMPRA to FDA re        1852 1853
18         Recovery Retrievable (K031328)

19  5178   Oct. 25, 2002 Letter IMPRA to FDA re    1848 1849
           Recovery (K022236)
20
    5179   Oct. 4, 2002 Letter FDA to IMPRA re     1847 1847
21         Recovery (K022236)

22  5182   Aug. 30, 2002 Letter IMPRA to FDA re    1845 1846
           Recovery (K022236)
23
    5187   Aug. 5, 2002 Letter FDA to IMPRA re     1842 1843
24         Recovery (K022236)

25


                  United States District Court

March 26, 2018

1          **E X H I B I T S** (Continued)

| 2 | Number | | Ident | Rec'd |
|---|--------|---|-------|-------|
| 3 | 5189 | July 10, 2002 IMPRA Recovery Permanent Special 510(k) (K022236) | 1839 | |
| 4 | | | | |
| 5 | 5232 | ETR-05-01-06 (G2® Femoral System Acute Animal Study Report) (followed TPR-04-12-20) | 1833 | 1834 |
| 6 | | | | |
| 7 | 5252 | ETR-04-03-02 (RNF v. Competitive Product -- migration resistance) | 1835 | 1836 |
| 8 | 5296 | G2 Filter Product Performance Specification, v.2 | 1857 | 1858 |
| 9 | | | | |
| 10 | 5301 | ETR-05-01-06 Animal Model Evaluation of Recovery Filter G1A Femoral System Report | 1860 | 1860 |
| 11 | | | | |
| 12 | 5302 | TPR 05-01-13 G1A Recovery Filter Femoral System Design Verification and Validation Protocol' | 1861 | 1861 |
| 13 | | | | |
| 14 | 5303 | ETR-05-02-05 (G2® DV&V summary testing) | 1862 | |
| 15 | 5304 | ETR 05-02-11 G1A Recovery Filter Femoral System Chronic Animal Study Report | 1861 | 1861 |
| 16 | | | | |
| 17 | 5523 | ETR-04-03-05 (RNF Characterization testing comparing GFO v. NMT manufactured filters) (followed TPR-04-02-02) ETR-04-03-05, Rev. 0 (GFO and NMT Manufactured Recovery; Filters Migration Resistance Comparison, Phase 1) | 1838 | 1838 |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | 5526 | TPR-04-02-02 (Protocol for RNF Migration Testing v. Competitive) Test Protocol Number TPR-04-02-02 (Rev. 0) -- Characterization of the Recovery Filter (RF) - Migration Resistance | 1834 | 1835 |
| 22 | | | | |
| 23 | | | | |
| 24 | 6082 | FDA_PRODUCTION_00001288 -- July 2, 2003 Email chain FDA and BPV re Recovery Retrievable (K031328) | 1850 | |
| 25 | | | | |

United States District Court

March 26, 2018

1

2                      **MISCELLANEOUS NOTATIONS**

3    Item                                                    Page

4     Proceedings outside the presence of the jury          1863

5

6

7                            **RECESSES**

8                                          Page    Line

9    (Recess at 2:30; resumed at 2:45.)     1800      17

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court

AUDREY FASCHING, PH.D.- Direct

**P R O C E E D I N G S**                                          12:58:33

(Jury enters at 12:58.)

(Court was called to order by the courtroom deputy.)

THE COURT:  Thank you.  Please be seated.  You may

continue, Mr. Condo.                                              12:59:42

MR. CONDO:  Thank you, Your Honor.

Ladies and gentlemen of the jury, we were talking

before the break about the arm fracture and I want to

transition to the leg fracture on the Booker filter.

(AUDREY FASCHING, PH.D., a witness herein, was          12:59:57

previously duly sworn or affirmed.)

**DIRECT EXAMINATION** (Continued)

BY MR. CONDO:

Q.    Dr. Fasching, did you photograph the leg filter fracture

to document the evidence you observed that allowed you to form   01:00:11

an opinion as to the type of the fracture observed?

A.    I did.

Q.    Okay.  And did you prepare a demonstrative exhibit to

allow you to explain that to the jury?

A.    I did.                                                      01:00:31

MR. CONDO:  Would you put up Exhibit 7468, please.

BY MR. CONDO:

Q.    Is this your Trial Exhibit or demonstrative exhibit?

A.    It is.

MR. CONDO:  We would offer Exhibit 7468.                01:00:43

United States District Court

AUDREY FASCHING, PH.D.- Direct

1        THE COURT:  As a demonstrative?                        01:00:46

2        MR. CONDO:  As a demonstrative.

3        MR. O'CONNOR:  No objection.

4        THE COURT:  Okay.  It's admitted.  You may display

5    it.                                                        01:00:54

6        MR. CONDO:  Thank you, Your Honor.

7   BY MR. CONDO:

8   Q.   Now, can you explain to the ladies and gentlemen what

9   these two photographs depict and what the evidence of fracture

10  is that you identified on this fracture face from the leg?     01:01:05

11  A.   Okay.  So this is the fracture surface of the leg on the

12  filter side so that was attached to the filter.  Again, it's a

13  pretty classic fatigue fracture surface.

14       As I had pointed out earlier, you can see the river

15  patterns, which I'm marking on here essentially, and they point  01:01:32

16  back to where the fracture initiation site was that I indicated

17  with a red arrow.

18       On this same fracture, the fatigue crack propagates

19  along until the cross-section is no longer able to maintain the

20  stresses and then it will fail quickly by overload.  And that   01:02:05

21  section, I'll draw a line on the demarcation, this is a fatigue

22  fracture and then the back half there, that small part is the

23  overload zone.

24  Q.   Thank you.

25       Now, I want to talk about the other 29 filters             01:02:25

United States District Court

1740

AUDREY FASCHING, PH.D.- Direct

| | | |
|---|---|---|
| 1 | excluding Ms. Booker's filter for purposes of our discussion. | 01:02:29 |
| 2 | So let's talk about the other 29 filters that you examined as | |
| 3 | part of your analysis.  Have you formed an opinion to a | |
| 4 | reasonable degree of engineering and scientific certainty as to | |
| 5 | the types of fractures that you observed in those other 29 | 01:02:44 |
| 6 | filters? | |
| 7 | A.    Yes. | |
| 8 | Q.    And what is that opinion? | |
| 9 | A.    They were bending fatigue fractures with the exception of | |
| 10 | I think two fractures. | 01:02:56 |
| 11 | Q.    And what were the two fractures that were not bending | |
| 12 | fatigue fractures? | |
| 13 | A.    Those two fractures were located in the foot or hook | |
| 14 | portion of legs.  They were all overload so it looked like when | |
| 15 | you would get overload like that, they probably happened during | 01:03:15 |
| 16 | the retrieve process. | |
| 17 | Q.    And did Ms. Booker's filter have any overload fractures in | |
| 18 | the feet or hooks? | |
| 19 | A.    No. | |
| 20 | Q.    Now, did you also form an opinion to a reasonable degree | 01:03:28 |
| 21 | of engineering and scientific certainty as to the likely causes | |
| 22 | of the fractures in those 29 other filters? | |
| 23 | MR. O'CONNOR:  Objection.  Lack of disclosure. | |
| 24 | THE COURT:  All right.  Where is that, Mr. Condo? | |
| 25 | MR. CONDO:  Your Honor, it is in the April 14, 2017 | 01:03:49 |

United States District Court

AUDREY FASCHING, PH.D.- Direct

1  report, Section 5.2 , page 16, the very top in bold.                                01:03:54

2              MR. O'CONNOR:  Okay.  Withdraw the objection.

3              THE COURT:  All right.

4  BY MR. CONDO:

5  Q.    You can answer.                                                              01:04:16

6  A.    Can you repeat it?

7  Q.    Sure.  Did you form an opinion to a reasonable degree of

8  engineering and scientific certainty as to the sources or

9  causes of the fractures in the 29 filters other than Ms.

10 Booker's filter?                                                                   01:04:30

11 A.    I did.

12 Q.    And what is your opinion?

13 A.    My opinion was that there was no one source of loading or

14 feature or -- yeah, feature or design or manufacturing on any

15 of the filters that led to the fractures.                                          01:04:47

16 Q.    Okay.  And have you formed an opinion to a reasonable

17 degree of engineering and scientific certainty as to whether

18 there was any correlation exhibited among the fractures that

19 you examined in the 29 filters?

20             MR. O'CONNOR:  Objection.  Not disclosed, Your Honor.                 01:05:04

21             THE COURT:  All right.

22             Mr. Condo?

23             MR. CONDO:  5.2, page 16, the bottom of the very

24 first paragraph under Section 5.2.

25             THE COURT:  Objection overruled.                                       01:05:33

United States District Court

AUDREY FASCHING, PH.D.- Direct

1        MR. O'CONNOR:  I withdraw, Your Honor.                    01:05:34

2        THE WITNESS:  So there was really no correlation

3   between when I was evaluating the fractures when we were

4   looking at -- I looked at location and direction of bending of

5   the fractures in that type of aspect.  They were all unique.    01:05:53

6   BY MR. CONDO:

7   Q.   And what does the absence of a correlation tell you about

8   those 29 filter failures?

9   A.   That would tell me that each filter was experiencing its

10  own set of forces on it that ultimately led to this type of     01:06:12

11  fracture.

12  Q.   Now, your sample of 29 retrieve filters, included

13  Recovery, G2, and G2X filters; correct?

14  A.   Correct.

15  Q.   Did you make any comparison between the arm and leg         01:06:32

16  fractures in the Recovery filter versus the arm and leg

17  fractures in the G2, G2X, retrieved filters?

18  A.   Yes.

19  Q.   And what were your findings?

20  A.   Well, so in the Recovery filters, I looked at 13 Recovery   01:06:48

21  filters and I don't remember -- 36, I'm sorry, 36 arm fractures

22  in the Recovery filters.  In the G2 and G2X filters, I looked

23  at 16 filters and there were 15 arm fractures.

24  Q.   And what did you conclude from those fractures?

25  A.   There were several design changes made to the arms between  01:07:34

United States District Court

AUDREY FASCHING, PH.D.- Direct

1    the Recovery filter and the G2 filter which included the --    01:07:36

2    sorry, length of the arm and the tipping of the ends and there

3    were fewer fractures per filter between Recovery and G2.  So to

4    me it appeared like the design changes made a difference in the

5    number of fractures I was seeing in the filters.    01:08:05

6    Q.    The G2X and G2 design changes improved the fracture

7    resistance of the filter?

8    A.    Yes.

9    Q.    Now, do you agree that tilt migration and perforation have

10   the potential to change the loading experienced by the filter    01:08:24

11   in the vena cava?

12   A.    Yes, I do.

13   Q.    And did you do a literature search as part of your

14   analysis to determine whether or not there are peer-reviewed

15   studies that have been published to establish a correlation    01:08:36

16   between perforation and fracture of the IVC filter?

17   A.    Yes.

18   Q.    Did you find any peer-reviewed studies that established a

19   correlation?

20   A.    I did not.    01:08:48

21   Q.    From what you observed, did you see any evidence that

22   Booker's filter fractures were caused by design defect?

23   A.    I did not.

24   Q.    No evidence of a design defect that you observed?

25   A.    No.    01:09:02

United States District Court

1744

AUDREY FASCHING, PH.D. - Cross

| | | |
|---|---|---|
| 1 | Q.    That's a correct statement? | 01:09:02 |
| 2 | A.    Yes. | |
| 3 |            MR. O'CONNOR:  Objection, nondisclosure on that, Your | |
| 4 | Honor. | |
| 5 |            THE COURT:  Where is that? | 01:09:06 |
| 6 |            MR. CONDO:  It's in the deposition, Your Honor. | |
| 7 |            MR. O'CONNOR:  No.  It's not -- | |
| 8 |            THE COURT:  It can be in a deposition as well. | |
| 9 | That's what my Reporter says.  Where is it in the deposition? | |
| 10 |            MR. CONDO:  May I approach, Your Honor? | 01:09:19 |
| 11 |            THE COURT:  Yes.  Come on up. | |
| 12 |            (At sidebar 1:09.) | |
| 13 |            THE COURT:  Okay.  Thank you.  I don't know if she | |
| 14 | heard that.  You need to say that so it's on the record. | |
| 15 |            MR. O'CONNOR:  I'm withdrawing the objection. | 01:09:48 |
| 16 |            THE COURT:  Thanks. | |
| 17 |            (End of sidebar discussion.) | |
| 18 |            MR. CONDO:  Thank you, Dr. Fasching.  I have no | |
| 19 | further questions. | |
| 20 |            THE COURT:  Okay. | 01:10:00 |
| 21 | **CROSS - EXAMINATION** | |
| 22 | BY MR. O'CONNOR: | |
| 23 | Q.    Good afternoon, Dr. Fasching.  We've met before, haven't | |
| 24 | we? | |
| 25 | A.    Yes, we have. | 01:10:38 |

United States District Court

AUDREY FASCHING, PH.D. - Cross

1    Q.   And again, I'm Mark O'Connor.  I met you up in California                01:10:39
2    and took your deposition at one time.  Do you recall that?
3    A.   I do recall.
4    Q.   Now, I want to talk to you, first of all, about these 29
5    filters setting aside Sheri Booker's.  Those all came to you at                01:10:51
6    different points in time; fair?
7    A.   Yes, that's true.
8    Q.   And each filter came to you with a specific request from
9    Bard to analyze that individual filter for whatever purpose
10   Bard was looking at; true?                                                      01:11:08
11   A.   The filters came to me and I was asked to do the same
12   thing every time.  I followed the same protocol to analyze the
13   number of fractures and look at what the mode of fracture was,
14   location.
15   Q.   I understand.  So each filter came to you from Bard at                     01:11:27
16   different points in time; true?
17   A.   Yes.
18   Q.   And you individually looked at each filter; correct?
19   A.   Yes.
20   Q.   Bard has not sent you every fractured Recovery or G2 that                  01:11:38
21   it is aware of, has Bard?
22   A.   I don't know.  I don't think they have.  I don't know.
23   Q.   You know that there have been more fractures and more
24   perforations out there that you have ever seen; true?
25   A.   That's true.                                                               01:11:56

United States District Court

AUDREY FASCHING, PH.D. - Cross

1   Q.   And what you have seen are cases of 29 filters where 29      01:11:57

2   patients had failures, had to have surgeries to have those

3   filters removed; right?

4   A.   Yes.

5   Q.   And after they are removed, Bard sent those to you to look   01:12:10

6   at, fair?

7   A.   Well, I don't think -- Bard didn't send them to me.  They

8   were sent to me but Bard requested they were sent to me.

9   Q.   I apologize.  They were sent to you by Bard's lawyers?

10  A.   No.  They were usually sent to me by a third-party lawyer    01:12:29

11  or a cleaning facility or --

12  Q.   Isn't it fair to say that Bard's lawyers are the people

13  that requested you to do the examinations?

14  A.   Yes.

15  Q.   And so it wasn't Bard, the company, was it?               01:12:41

16  A.   No.

17  Q.   It was the lawyers?

18  A.   Yes.

19  Q.   And you don't receive medical records with those filters

20  when you receive them, do you?                                01:12:56

21  A.   No, I don't.

22  Q.   And you can't tell this jury, when you talk about each of

23  the 29 filters, what position those filters were in when the

24  surgery was done on any of those 29 patients to remove the

25  filter, can you?                                              01:13:10

United States District Court

AUDREY FASCHING, PH.D. - Cross

1  A.   That's true, I cannot.                                          01:13:11

2  Q.   And whether the filters were tilted or what position they

3  were in when perforating, you simply don't know?

4  A.   I don't know.

5  Q.   And depending on how a filter was tilted, how it             01:13:24

6  perforated through a vena cava would affect the loads that were

7  placed on that filter; true?

8  A.   It could possibly affect the loads.

9  Q.   But you have not studied loads or stresses in people, have

10 you?                                                                01:13:38

11 A.   No.

12 Q.   Is that correct?

13 A.   That's correct.

14 Q.   And so that's completely outside of your area.  You can't

15 tell the jury what types of loads, what type of stresses, what    01:13:46

16 types of forces happen to a filter in any position after it's

17 implanted in a patient.  Fair?

18 A.   Well, I know that they were bending forces.  That's very

19 clear from the fracture surface.

20 Q.   Understood, because that's what you saw.  Every filter you   01:14:03

21 saw broke because of fatigue; right?

22 A.   Bending fatigue.

23 Q.   But just so you and I are on the same page, you have never

24 analyzed the stresses or strains imposed on a filter after it's

25 implanted in a human being, have you?                              01:14:17

United States District Court

AUDREY FASCHING, PH.D. - Cross

1    A.    I have not.                                          01:14:20

2    Q.    You have not received any documents from Bard regarding

3    statistically significant comparative analyses of the

4    complications between its filters, have you?

5    A.    No.                                                 01:14:39

6    Q.    And Bard has never sent you any type of root cause

7    analysis -- or its lawyers, excuse me, haven't sent you any

8    type of root cause analysis that was done by Bard to

9    investigate failure modes; true?

10   A.    I have not seen those.                              01:14:57

11   Q.    And you told us that you made $300,000 over the years

12   working on these cases, your company has; right?

13   A.    I was going to say, yeah.  I haven't but my company has.

14   Q.    Your company makes that money because you're doing the

15   work?                                                     01:15:11

16   A.    Yes.

17   Q.    But in the time that you have been doing these

18   examinations, Bard has never or its lawyers have never asked

19   you to perform a root cause analysis to determine why its

20   filters are fracturing; fair?                             01:15:25

21   A.    I have not, no.

22   Q.    And Bard has not asked you or your company to do a root

23   cause analysis on the Recovery or G2 to find out why the

24   filters migrate, tilt, or to find out why they perforate; is

25   that true?                                                01:15:48

United States District Court

AUDREY FASCHING, PH.D. - Cross

1   A.   That is true.                                                       01:15:49

2   Q.   In essence, Bard has never come to you or Bard's lawyers

3   have never come to you and said, "Dr. Fasching, would you

4   please analyze for us why filters, the G2 and the Recovery, are

5   fracturing?"  Fair?                                                     01:16:19

6   A.   I analyzed -- well, I analyzed why they fracture.  They

7   fracture due to bending fatigue.

8   Q.   But they have never asked you to do a root cause to assess

9   the issue of fracture for any filter; true?

10  A.   I haven't done a root cause on any filter.                         01:16:37

11  Q.   Now, you mentioned something earlier about microscopic

12  examinations.  You know that one was done on our side; true?

13  A.   Yes.

14  Q.   And you know that Dr. McMeeking is a different type of

15  engineer than you; correct?                                            01:17:00

16  A.   Yes.

17  Q.   And what Dr. McMeeking does is he does things like finite

18  element analyses; correct?

19  A.   Yes.

20  Q.   You don't, do you?                                                 01:17:10

21  A.   No.

22  Q.   You've never even designed a Finite Element Analysis, have

23  you?

24  A.   No, I'm not a mechanical engineer.

25  Q.   And you're certainly not an expert in finite element           01:17:20

United States District Court

AUDREY FASCHING, PH.D. - Cross

1   analysis, are you?                                                        01:17:23

2   A.    I am not.

3   Q.    And you have not done any work or studies to determine

4   what types of stresses and strains are imposed on a Bard IVC

5   filter after it's implanted, have you?                                   01:17:37

6   A.    No.

7   Q.    Correct?

8   A.    That is correct.

9   Q.    You haven't even analyzed Bard's own testing to address

10  stresses and strains imposed on a filter after it's implanted,           01:17:50

11  have you?

12  A.    No.

13  Q.    So in terms of whether -- how that testing works or

14  whether it's effective, you simply can't tell the jury today,

15  fair?                                                                     01:18:03

16  A.    That's right.

17  Q.    You haven't designed an IVC filter?

18  A.    No.

19  Q.    In fact, you haven't performed any tests on IVC filters,

20  have you?                                                                 01:18:14

21  A.    No.

22  Q.    Correct?

23  A.    Correct.

24  Q.    And you yourself have not studied the anatomy and

25  physiology that affects Bard filters after they are implanted,           01:18:23

United States District Court

1751

AUDREY FASCHING, PH.D. - Cross

1    have you?                                                          01:18:28

2    A.    No.

3    Q.    You agree that a medical device company like Bard must

4    understand the worst case scenarios and all potential

5    high-stress loading conditions before it releases the filter in   01:18:42

6    the market?  You agree with that, don't you?

7    A.    I think that medical device companies need to understand

8    the loading conditions to the best of their abilities.

9    Q.    Well, the words you used in your deposition to me was

10   high-stress loading conditions.  Do you remember that?           01:18:55

11   A.    I don't remember specifically but whatever the high-stress

12   loading conditions are.

13   Q.    Simply something you don't know once the filters are

14   implanted; true?

15   A.    What the high-stress loading conditions are?  I don't know  01:19:09

16   what they are.

17   Q.    Thank you.

18         All the fractures that you have seen in the

19   individual 29 that Bard sent you one by one over the years have

20   been fatigue fractures; correct?                                  01:19:22

21   A.    Not all of them have been fatigue fractures.

22   Q.    With the exception of the two, I thought you said the

23   others have been.

24   A.    Yes.

25   Q.    Bard or its lawyers have never provided you with internal   01:19:34

United States District Court

1752

AUDREY FASCHING, PH.D. - Cross

| | | |
|---|---|---|
| 1 | tracking and trending data regarding whether the filters were | 01:19:38 |
| 2 | fracturing at higher rates than their own engineers predicted. | |
| 3 | True? | |
| 4 | A.   I don't have that data. | |
| 5 | Q.   And in fact, Dr. Fasching, you do not know what patterns | 01:20:00 |
| 6 | of fracture exist in Bard's internal tracking and trending of | |
| 7 | the G2 filter; correct? | |
| 8 | A.   I don't know. | |
| 9 | Q.   True? | |
| 10 | A.   That is true. | 01:20:11 |
| 11 | Q.   And you haven't asked Bard's lawyers to provide you with | |
| 12 | any tracking or trending information correct? | |
| 13 | A.   I have not asked.  I think it's -- yeah.  I would need to | |
| 14 | look at the samples myself to do it the same way that I had | |
| 15 | been doing it. | 01:20:30 |
| 16 | Q.   Isn't it true, Dr. Fasching, that if Bard recognized that | |
| 17 | the G2 was failing at rates higher than predicted by its | |
| 18 | engineers, that could impact your opinion whether filter | |
| 19 | fractures were caused by a design defect; correct? | |
| 20 | A.   When I -- what I use to arrive at my opinion on whether | 01:20:48 |
| 21 | the filter's fractured due to a design defect was based on | |
| 22 | the -- my analysis of location, direction of bending, and the | |
| 23 | information that I gathered from looking at the individual | |
| 24 | filters. | |
| 25 | Q.   My question is different.  I'm just going to something you | 01:21:14 |

1753

AUDREY FASCHING, PH.D. - Cross

1   told me in your deposition back in June of 2017.  If Bard, the          01:21:17

2   medical device company that made the Recovery and G2,

3   recognized that the G2 was failing at rates higher than

4   predicted by its engineers, that could impact your opinions on

5   whether filter fractures were caused by a design defect.  Do          01:21:36

6   you agree that you gave me that testimony?

7   A.   I don't remember making that statement.  I don't know how

8   rates would affect my opinion.

9   Q.   I'm going to go to your June 26, '17, deposition.

10          MR. O'CONNOR:  And, Greg, if you could get to page          01:21:50

11   27, please.

12          You know what, I can't find that question so I'll

13   withdraw that question, Your Honor.

14   BY MR. O'CONNOR:

15   Q.   Dr. Fasching, in any of the 29 cases, you have never          01:23:28

16   developed or designed a test to correlate your results with the

17   finite element analysis; fair?

18   A.   I have not.

19   Q.   And you do not know if Bard suggested any types of testing

20   protocol to determine how to eliminate or lower stresses          01:23:48

21   imposed on a filter; fair?

22   A.   I'm not aware of what Bard's testing protocol was.

23   Q.   Now, you do know that Dr. McMeeking reviewed comparative

24   analyses done by Bard?  You're aware of that?

25   A.   Yes.          01:24:10

United States District Court

```
 1    Q.   And you have not?                                        01:24:11

 2    A.   I have not.

 3    Q.   And finally, Dr. Fasching, if you, as an engineer, assumed

 4    that Bard or knew that Bard was aware of failures in its

 5    filters, you would expect Bard to take immediate steps to     01:24:40

 6    protect patient safety if it was aware of its failures and it

 7    is filters; correct?

 8              MR. CONDO:  Outside the scope.

 9              THE COURT:  Sustained.

10              MR. O'CONNOR:  All right.  That's all I have.  Thank 01:25:09

11    you.

12              THE COURT:  Redirect?

13              MR. CONDO:  No further questions.

14              THE COURT:  Okay.  Thank you, ma'am.  You can step

15    down.                                                         01:25:15

16              THE WITNESS:  Thank you.

17              (Witness excused.)

18              MR. NORTH:  Your Honor, at this time we would call

19    Dr. Paul Briant to the stand.

20              COURTROOM DEPUTY:  Sir, if you'll please come forward 01:25:53

21    and raise your right hand.

22              (PAUL BRIANT, PH.D., a witness herein, was duly sworn

23    or affirmed.)

24              COURTROOM DEPUTY:  Could you spell your the last name

25    for us, please.                                               01:26:06
```

United States District Court

1       THE WITNESS:  B-R-I-A-N-T.                           01:26:07

2       COURTROOM DEPUTY:  Thank you, sir.  Please come up

3  and have a seat.

4                    **DIRECT EXAMINATION**

5  BY MR. NORTH:                                             01:26:27

6  Q.   Good afternoon, Dr. Briant.  Could you tell the members of

7  the jury what your profession is?

8  A.   Sure.  I'm a mechanical engineer.

9  Q.   And what is a mechanical engineer?

10 A.   Mechanical engineer is someone who designs and analyzes     01:26:36

11 mechanical structures.

12 Q.   And by whom are you employed?

13 A.   I work at a company called Exponent Failure Analysis

14 Associates.

15 Q.   And where are your offices located?                  01:26:55

16 A.   Our headquarters is in Menlo Park, California.

17 Q.   Is that outside the San Francisco?

18 A.   Yes.

19 Q.   Could you tell the members of the jury your educational

20 background?                                               01:27:06

21 A.   Sure.  So I did my undergrad at Washington University in

22 St. Louis where I got my bachelor of science in mechanical

23 engineering, graduated summa cum laude from there.  I then went

24 on to Stanford University where I got my master's degree again

25 in mechanical engineering and my Ph.D. also in mechanical       01:27:23

                     United States District Court

1756

PAUL BRIANT, PH.D. - Direct

1    engineering.                                                            01:27:26

2    Q.    And what was the topic of your Ph.D. research?

3    A.    For my Ph.D. research I look at tissue mechanics so I was

4    focused on cartilage in the knee and understanding how the

5    stresses and strains apply to knee articular cartilage          01:27:38

6    interact.   The motivation for this was understanding knee

7    osteoarthritis.

8    Q.    Are you a licensed engineer?

9    A.    Yes.   I'm a professional engineer.

10   Q.    Could you tell us what sort of work Exponent Failure        01:27:51

11   Analysis Associates engages in?

12   A.    Sure.   We're a technical consulting firm.   We focus

13   largely on failure analysis and trying to understand why

14   structures are failing.

15   Q.    How long have you been employed with Exponent?             01:28:09

16   A.    I have been there for ten years.

17   Q.    And what is your position there?

18   A.    I'm a principal engineer.

19   Q.    And why do companies generally come to Exponent to perform

20   an analysis?                                                      01:28:21

21   A.    Sure.   They come for a couple of reasons.   I'll speak

22   mostly for medical device work here.   They come either to

23   analyze their devices, test their devices, understand them,

24   either because they don't have the expertise in house or more,

25   importantly, we're often an independent reviewer of their        01:28:36

United States District Court

PAUL BRIANT, PH.D. - Direct

1   device.                                                                    01:28:42

2   Q.   Are you familiar with a substance called Nitinol?

3   A.   Yes.

4   Q.   And have you had any involvement with Nitinol from a

5   professional standpoint?                                                   01:28:50

6   A.   Yes.  I do a lot of work in cardiovascular medical device

7   and a lot of them are made of Nitinol.

8   Q.   Have you -- what sort of work specifically did you do with

9   Nitinol?

10  A.   So I do a lot of work on analyzing the stresses and        01:29:00

11  strains in cardiovascular devices that are made of Nitinol.

12  And I've presented on it at engineering conferences and

13  published papers on it, things like that.

14  Q.   Can you estimate how many papers you've published on

15  Nitinol related topics?                                                    01:29:18

16  A.   In terms of journal articles, one or to.  In terms of

17  conference presentations, three, four, five, something like

18  that.

19  Q.   You mentioned cardiovascular Nitinol products.  What sort

20  of devices were those?                                                     01:29:33

21  A.   It ranges all over the map from stents, which are put into

22  blood vessels, heart valves, IVC filters, things like that.

23  Q.   Are you familiar with a Dr. McMeeking who has testified in

24  this case?

25  A.   Prior to this litigation, I didn't know him but I'm,       01:29:48

United States District Court

1758

PAUL BRIANT, PH.D. - Direct

1   obviously, familiar with him now.                                    01:29:51

2   Q.   Now, you were retained by my law firm in this particular

3   litigation?

4   A.   Yes.

5   Q.   And what were you asked to do?                                   01:29:59

6   A.   I was asked to review the opinions that Dr. McMeeking made

7   and the calculations that he did as a basis for those opinions.

8   Q.   Who determined what your methodology would be in

9   undertaking this analysis?

10  A.   I did.                                                           01:30:15

11  Q.   What percentage of your professional time is currently

12  spent on litigation-related matters?

13  A.   It's about 40 percent of my time.  The other 60 percent of

14  my time is working directly with companies, analyzing their

15  devices in various ways.                                             01:30:32

16  Q.   And what industries do you generally provide failure

17  analyses to?

18  A.   So it's a range of industries for myself personally.  But

19  the two that I focused on mostly are medical devices and then

20  consumer electronics and other technical electronics products.      01:30:45

21  Q.   What documents were you provided to review in this matter?

22  A.   I was provided reports by Dr. McMeeking and other experts

23  and the supporting references that were in those reports.

24  Q.   Were you provided various materials regarding the

25  development of the G2 and Recovery filters?                         01:31:15

PAUL BRIANT, PH.D. - Direct

1    A.    Yes.                                                          01:31:17

2    Q.    What sorts of materials?

3    A.    I was provided the design history files, the 510(k)

4    submission documents, things like that.

5    Q.    Were you provided testing materials?                          01:31:28

6    A.    Within those documents was a summary of testing that was

7    performed.

8    Q.    And how were the documents you received selected?

9    A.    They were generally the references that were in the other

10   expert reports and if I wanted anything in particular, I           01:31:41

11   requested it.

12   Q.    And did you read reports of other experts who have

13   testified in this matter?

14   A.    Yes.

15   Q.    Do you know Dr. Fasching?                                     01:31:55

16   A.    Yes.

17   Q.    Did you rely on any of the reports or depositions taken in

18   this case to form your opinions?

19   A.    So, obviously, Dr. McMeeking's opinion -- or report.

20   Other than that, not really.                                       01:32:12

21   Q.    Did you review every document referenced in

22   Dr. McMeeking's reports?

23   A.    I don't know if I reviewed all of them but certainly most

24   of them.

25   Q.    Now, as a part of your work to analyze the stress and        01:32:27

United States District Court

PAUL BRIANT, PH.D. - Direct

1  strains on these filters, did you conduct a number of tests at          01:32:32

2  your facility?

3  A.   Yes.   We performed both analyses and testing at Exponent.

4  Q.   And did that involve sophisticated equipment?

5  A.   Sure.   Both the calculations that we performed, we used a          01:32:46

6  technique calls finite element analysis which is a numerical

7  analysis technique as well as the laboratory bench testing that

8  we did.

9  Q.   And did -- did other people that work with assist you in

10 conducting these tests and experiments?                                   01:33:00

11 A.   Yes.   A handful of people, engineers at Exponent as well

12 as technical staff.

13 Q.   And have you charged for the testing and efforts you've

14 done performed in this case?

15 A.   Yes.                                                                 01:33:18

16 Q.   And can you tell us approximately how much Exponent has

17 charged for all of its testing?

18 A.   Over the five or so years that we have been involved, I

19 believe the total is about $600,000.

20 Q.   Now, are you an employee or owner of Exponent?                       01:33:34

21 A.   I'm an employee.

22 Q.   Are all of the billings that Exponent has provided for the

23 work on this case over five years, does that reflect only your

24 time?

25 A.   No.   That reflects both myself as well as the team.                 01:33:46

United States District Court

PAUL BRIANT, PH.D. - Direct

1    Q.    Are you a salaried employee of Exponent?                    01:33:54

2    A.    Yes, I am.

3    Q.    Is your compensation in any way contingent on the number

4    of hours you bill?

5    A.    Not really, no.  I get a salary, whatever it is.           01:34:03

6    Q.    Do the billings of Exponent include some costs associated

7    with the equipment used to perform these tests?

8    A.    Yes.  We charge for that as well.

9    Q.    Now, as a result of the work and investigation that you

10   have done in this case, have you reached any opinions?           01:34:23

11   A.    Yes, I've reached some opinions.

12   Q.    Could you tell us what those opinions are briefly?

13   A.    Sure.  To summarize them, so as you probably heard

14   previously, Dr. McMeeking, who is the mechanical engineering

15   expert put forth by the plaintiffs, came up with a series of     01:34:39

16   claims regarding the Bard filters and performed some analyses

17   upon which he bases some of those claims and also had some

18   criticisms of the testing analysis that Bard performed during

19   their design phase.

20         And so my opinions boil down to three main things.         01:34:56

21   Number one is that the analyses that Dr. McMeeking performed

22   are unreliable in that this is due to the assumptions and

23   simplifications that Dr. McMeeking used.  He simplified things

24   in the way he calculated them way down and had to make several

25   assumptions that were beyond physical limits of what the human   01:35:17

United States District Court

1762

PAUL BRIANT, PH.D. - Direct

1   body can do in order to do those calculations.                    01:35:20

2   Q.   And what other opinions did you reach?

3   A.   Sure.   Second opinion is that the criticisms that

4   Dr. McMeeking made regarding the Bard testing and analyses that

5   they did, the testing and analysis that Bard did considered all   01:35:35

6   the relevant complications that are put forth in industry

7   standards and guidance documents from regulatory bodies.   And

8   in addition, Dr. McMeeking, while criticizing the Bard work,

9   didn't put forth any opinions of his own or any ideas of his

10  own about how Bard may have modified those tests.                 01:35:56

11          Lastly, is the Simon Nitinol filter, which I'm sure

12  you've heard about from an opinion from an engineering

13  perspective, the Simon Nitinol filter is not an alternative

14  design for the Bard retrievable filters because it lacks the

15  functionality and benefit of being retrievable.                  01:36:14

16  Q.   Did you prepare a summary of those opinions that you just

17  recited for us?

18  A.   Yes.   I prepared a slide that summarizes that.

19          MR. NORTH:   Could you bring up 7809?

20  BY MR. NORTH:                                                     01:36:40

21  Q.   And, again, was this prepared by you to help illustrate

22  your opinions to the jury?

23  A.   Exactly.

24          MR. NORTH:   Your Honor, at this time we would tender

25  7809.                                                             01:36:49

United States District Court

PAUL BRIANT, PH.D. - Direct

1    THE COURT:  Any objection to this being used as a                01:36:51

2 demonstrative?

3    MR. O'CONNOR:  No objection.

4    THE COURT:  All right.  You may use it for that

5 purpose.                                                            01:36:57

6    MR. NORTH:  Thank you, Your Honor.  Could we display

7 this?

8 BY MR. NORTH:

9 Q.   Did you prepare these pictures or diagrams here to the

10 right?                                                             01:37:20

11 A.   Yes, I did.

12 Q.   And what are those supposed to depict as far as your

13 opinions go?

14 A.   Sure.  Those relate largely to opinion number one and

15 illustrate the general methodology that Dr. McMeeking used and     01:37:31

16 the simplifications that were made relative to the analysis

17 that I performed on the Bard IVC filters.  As we'll discuss

18 later, the calculations I performed in terms of analyzing the

19 filter incorporated the whole filter which is shown in the

20 middle there on the image, the IVC, the surrounding tissues,       01:37:52

21 and everything like that.

22 Q.   Let me ask you this, Dr. Briant.  As part of your work,

23 have you examined an actual Bard filter?

24 A.   Yes, I have.

25 Q.   And what did you do with those Bard filters that you          01:38:06

United States District Court

PAUL BRIANT, PH.D. - Direct

1    examined?                                                          01:38:09

2    A.   So the Bard filters that we received, I received several

3    Recovery filters, G2 filters and Denali filters; and with those

4    filters we performed mechanical bench testing to validate the

5    models of the calculations that we had done.                       01:38:23

6    Q.   Have you reviewed any material specific to Ms. Booker?

7    A.   I've reviewed expert reports specific to her.

8    Q.   Have you reviewed any of her medical records?

9    A.   No, I haven't.

10   Q.   Are you aware of the types of events that Ms. Booker          01:38:38

11   experience with her G2 Filter?

12   A.   Yes, I am.

13   Q.   And what are those?

14   A.   The filter suffered a fracture of one of the arms and one

15   of the legs fractured in two locations and also there was tilt    01:38:49

16   and perforation.

17   Q.   Now, can you further explain -- let's look at your first

18   opinion.  Can you further explain to us why it is that you

19   believe Dr. McMeeking incorporated incorrect assumptions?

20   A.   Sure.  Absolutely.  So the -- as you can see in the          01:39:06

21   picture on the right, Dr. McMeeking performed a series of

22   analytical calculations that incorporated just the upper

23   portion of the filter, which is shown in blue, and the rest of

24   it is omitted as you can see there.

25        He also made several assumptions that were needed in         01:39:24

United States District Court

1765

PAUL BRIANT, PH.D. - Direct

1    order to form his calculations analytically.  He assumed that          01:39:26

2    the IVC was essentially infinitely stiff, essentially rigid,

3    which we know isn't true.  It's about as stiff as a rubber

4    band.

5             He also assumed that the motion of the IVC, because           01:39:42

6    he assumed it was infinitely stiff, didn't change due to the

7    presence of the filter so the motion remained the same.  And

8    also that the rotation of the filter when it contacted the IVC,

9    which is shown by that red X there, that rotation was

10   constrained.                                                          01:40:04

11   Q.   Did you -- did Dr. McMeeking in this case analyze filter

12   arm strain and stress?

13   A.   Yes, he did.

14   Q.   And how did he do that?  Through what vehicle?

15   A.   Through the analytical calculations that I was just             01:40:16

16   describing.

17   Q.   Did he conduct any bench testing?

18   A.   No, he did not do any bench testing.

19   Q.   Did you prepare a demonstrative exhibit to help you

20   explain what stress and strain is as part of the analysis you        01:40:31

21   conducted here?

22   A.   Yes, I did.

23             MR. NORTH:  If we could show 7811.

24             Your Honor, we would tender 7811.

25             MR. O'CONNOR:  No objection to the demonstrative.          01:40:58

United States District Court

PAUL BRIANT, PH.D. - Direct

1          THE COURT:  All right.  You may display it.                01:40:59

2   BY MR. NORTH:

3   Q.   If you would use this demonstrative exhibit, Doctor, to

4   explain for the jury in your particular line of analysis what

5   stress, strain, and stiffness mean?                               01:41:14

6   A.   Sure.  Absolutely.  So these are tree terms we'll be

7   talking about a bunch today.  So stress is the amount of force

8   that you apply to an object.  So it's a measure of how much

9   load you put on it.

10         In the image there on the right, the stress would be       01:41:30

11  essentially the weight that you apply.  We show a rod hanging

12  and then hanging a weight on it and it stretches out.  So the

13  stress would be the amount of force.

14         Strain is how much the object deforms.  So if you

15  have a rubber band and you pull it, it's a measurement of how     01:41:45

16  much it's stretched under a certain force.

17         And lastly is stiffness.  So stiffness is the ratio

18  of those two things, meaning that steel, which is a very stiff

19  structure, if you put a force on it, won't deform nearly as

20  much as if you have a rubber band which is very soft.  So         01:42:01

21  stiffness is a measure of how much strain you get for a given

22  amount of stress.

23  Q.   And what in particular was Dr. McMeeking evaluating about

24  arm strain with a filter?

25  A.   So Dr. McMeeking was calculating the strains in the arm      01:42:14

United States District Court

PAUL BRIANT, PH.D. - Direct

1   filter near the cap or where the arms enter the cap.  And he          01:42:19
2   analyzed the strains and essentially a pair of filter arms, not
3   the entire filter.
4   Q.   And did Dr. McMeeking make an assumption by using only the
5   upper arm of a filter to conduct his analysis?                        01:42:37
6   A.   He made several assumptions that I outlined previously in
7   terms of the motion of the IVC and, obviously, simplified the
8   analysis by only incorporating the upper portion of the arm.
9   Q.   And do you have any criticisms of his focus on only upper
10  arm in doing these calculations?                                      01:42:59
11  A.   Sure.  As well as with the assumptions.  As you'll see
12  when we go through the results of my calculation, when we
13  include the entire filter, include the IVC and the surrounding
14  tissue structures, you get very different results when you
15  don't have to make those assumptions that Dr. McMeeking made.         01:43:15
16  Q.   Did you do anything else in your work other than review
17  and analyze Dr. McMeeking's calculations of arm strength?
18  A.   I did my own calculations and we did bench testing as
19  we've talked about.
20  Q.   Did Dr. McMeeking conducting any bench testing?                  01:43:37
21  A.   No, he did not.
22  Q.   Let's talk about the assumptions or inputs that you used
23  in doing your testing.
24       MR. NORTH:  Could we bring up 7812.
25  \\\

United States District Court

PAUL BRIANT, PH.D. - Direct

1   BY MR. NORTH:                                                    01:43:59

2   Q.   7812, is this an exhibit that you prepared to help

3   demonstrate the assumptions you used in doing your

4   calculations?

5   A.   That's correct.                                            01:44:07

6          MR. NORTH:  Your Honor, at this time we would tender

7   7812 as a demonstrative.

8          MR. O'CONNOR:  No objection.

9          THE COURT:  All right.  You may use it.

10         MR. NORTH:  Could we display it, Your Honor?            01:44:20

11         THE COURT:  Yes.

12  BY MR. NORTH:

13  Q.   What impact on the testing do you believe your analysis

14  did use of the complete filter as opposed to a single strut

15  have?                                                           01:44:37

16  A.   Well, so this allowed us to analyze the strains in the IVC

17  from a variety of different loading conditions.  As you'll see,

18  we analyzed the stresses and the strains from several different

19  ways in order to try and bound the problem and understand what

20  the strains in the arms could be.                               01:44:57

21  Q.   And did you make a different assumption about the

22  surrounding tissue than Dr. McMeeking did?

23  A.   Yes.  So Dr. McMeeking, as I mentioned, in order to

24  simplify the calculations in a way that he did, had to assume a

25  certain amount of motion for the IVC and he essentially assumed  01:45:13

United States District Court

PAUL BRIANT, PH.D. - Direct

1    that the motion of the IVC remains unchanged when you insert a          01:45:16

2    filter.

3            So the IVC naturally is just pulsing back and forth

4    due to respiratory loads that are put on it.  When you put that

5    filter in an IVC, though, this will add something to the system         01:45:29

6    and will stiffen the system and affect the response of the IVC.

7    However, Dr. McMeeking just assumed that the motion of the IVC

8    didn't change and also assumed that the rotation of the arm as

9    it exits -- as it contacts the IVC, that there was no rotation

10   there.                                                                  01:45:50

11           And both of these will increase the strains.  And as

12   you'll see, when I inspected the surrounding issues and used

13   conservative assumptions for those calculations, that you get

14   very different results.

15   Q.   Did you prepare a demonstrative exhibit yourself to help          01:46:02

16   demonstrate the impact of the assumption you made regarding the

17   surrounding tissue of the IVC?

18   A.   Yes, I did.

19           MR. NORTH:  If we could display 7813, please.

20   BY MR. NORTH:                                                          01:46:28

21   Q.   Is this the demonstrative I just referenced?

22   A.   Yes.

23           MR. NORTH:  Your Honor, at this time we would tender

24   as a demonstrative 7813.

25           MR. O'CONNOR:  No objection.                                   01:46:37

PAUL BRIANT, PH.D. - Direct

1        THE COURT:  Admitted.  Well, I'm sorry, not admit.          01:46:38

2  You may use it as a demonstrative.

3        MR. NORTH:  May we display, Your Honor?

4        THE COURT:  You may.

5  BY MR. NORTH:                                                     01:46:52

6  Q.   Dr. Briant, explain for us what this cross-section of the

7  anatomy shows with regard to your assumptions on the tissue of

8  the IVC.

9  A.   Sure.  So what this cross-section is, this is a CT scan.

10  This particular one was taken from a medical journal.  And the    01:47:06

11  IVC is highlighted in that full solid yellow circle that's in

12  the middle there.  And on the right side of the slide you can

13  see the analysis setup that I used where, again, the IVC is

14  shown in blue and then we have surrounding soft tissue that is

15  shown in green.                                                   01:47:28

16        And the corresponding locations for the model are

17  shown by the dashed yellow and the dotted yellow line in the CT

18  scan.

19        As you can see, the IVC is surrounded largely by soft

20  digestive tissues that are quite soft.  Nearby, though, you       01:47:45

21  have the vertebrae which we incorporate into our analysis,

22  that's the orange region in the code plot on the right.

23        And so this just shows the model setup that we used

24  when performing our calculations and how it's representative of

25  the actual human body.                                            01:48:06

United States District Court

PAUL BRIANT, PH.D. - Direct

1  Q.   And how did your assumption again regarding that soft                      01:48:08

2  surrounding tissue differ from what Dr. McMeeking assumed in

3  his calculations?

4  A.   So, again, Dr. McMeeking assumed that the IVC was

5  essentially infinitely stiff, that it could withstand any        01:48:19

6  motion, that that was -- or any force that was imparted by the

7  filter as opposed to surrounding it with soft tissues.  And at

8  least on me, this region is soft.

9  Q.   And as a part of your work in studying mechanical

10 engineering issues with regard to tissue that you talked about   01:48:41

11 earlier, are you familiar with medical literature that

12 substantiates or supports your assumption about surrounding

13 soft tissue on the other hand, the IVC?

14 A.   Yes.  In two ways.  So there's been studies that are

15 published in the literature that measure the stiffness as we     01:49:01

16 talked about of the IVC, so they actually have tissue and they

17 pull on it and measure the stiffness and also they measure the

18 stiffness of the surrounding properties.  And we incorporated

19 those into the analysis.

20       Secondly, there's been studies that have been done         01:49:17

21 with IVC filters and they have shown that at the location of

22 the filter, that the IVC moves less than -- away from the

23 filter.  So both of those are supportive.

24 Q.   What is a hyperelastic stress-strain response?

25 A.   Sure.  So this refers to the way that the stiffness of the  01:49:38

United States District Court

PAUL BRIANT, PH.D. - Direct

1   IVC changes as a function of strain.  I prepared a                    01:49:45
2   demonstrative that shows this.
3           MR. NORTH:  Could we bring up 7685?
4   BY MR. NORTH:
5   Q.   Is this the demonstrative that you prepared that shows           01:50:04
6   hyperelastic stress-strain?
7   A.   Yes, it is.
8           MR. NORTH:  Your Honor, could we tender 7865 at this
9   time?
10          MR. O'CONNOR:  No objection.                                  01:50:14
11          THE COURT:  You may use it.
12          MR. NORTH:  Could we display?
13          THE COURT:  Yes.
14  BY MR. NORTH:
15  Q.   I'm afraid to ask but could you explain to us what this is       01:50:27
16  depicting?
17  A.   Yes.  This is getting very mathy.  So what we're looking
18  at here is the stress-strain response for the IVC.  What we
19  have on the Y axis, or the vertical axis, is stress which is
20  force.  On the X axis we have strain which is, again, is how          01:50:44
21  much is responding.
22          And what you can see is initially you have a soft
23  region.  That's shown by the low slope of the line initially
24  and after a while it gets stiffer.  This is due to the --
25  what's called the collagen fibers in the IVC eventually              01:50:58

United States District Court

PAUL BRIANT, PH.D. - Direct

1    becoming aligned as you stretch it more and more.  And          01:51:03

2    eventually when you start pulling on them in a straight manner,

3    it becomes very stiff, which is why you have this initially

4    soft and then eventually stiff response.

5    Q.    And how did that make -- your consideration of that         01:51:13

6    response make your assumptions different from those of

7    Dr. McMeeking?

8    A.    Well, so this was explicitly incorporated into our

9    calculations as opposed to Dr. McMeeking who assumed that the

10   IVC was infinitely stiff.                                        01:51:29

11   Q.    Now, were there certain attributes about the substance

12   Nitinol that you considered in assumptions that differed from

13   the assumptions made by Dr. McMeeking?

14   A.    Yes.  Nitinol has special properties and you may have

15   heard about these already.  It's what's called a superelastic    01:51:48

16   material where it can stretch a lot under relatively little

17   load.  I, again, prepared a demonstrative if it's possible to

18   show that.

19          MR. NORTH:  Let's pull up 7677 if we could.

20   BY MR. NORTH:                                                     01:52:12

21   Q.    Is this the demonstrative that you prepared to explain the

22   differences of Nitinol?

23   A.    Yes, it is.

24          MR. NORTH:  Your Honor, at this time we would tender

25   7677.                                                            01:52:19

United States District Court

                        PAUL BRIANT, PH.D. - Direct

1              MR. O'CONNOR:  No objection.                        01:52:20

2              THE COURT:  You may display it.

3    BY MR. NORTH:

4    Q.   Now, what is Nitinol constitutive relationship?

5    A.   Nitinol constitutive relationship, very similar to what we   01:52:37

6    were looking at on the last slide.  This is the stress-strain

7    response for Nitinol and so what happens is kind of almost the

8    opposite of what you have in the IVC.  You have an initially

9    stiff region where the slope of the stress-strain curve is high

10   and then you get to what's called a phase transition where you   01:52:58

11   get the slope basically goes to horizontal and you can see the

12   horizontal line in the middle of this curve.  You start off in

13   the bottom corner of 00 and work your way up, so it becomes

14   very stretchy after a certain point.  And then eventually you

15   get through this phase transition and it stiffens.              01:53:15

16           Now, this was incorporated into the analysis that I

17   did and this is very common and standard.  You had asked about

18   Dr. McMeeking.  Dr. McMeeking assumed what's called a linear

19   elastic stress-strain response where he basically just had that

20   first portion and didn't include the superelastic stretchy      01:53:32

21   part.

22   Q.   Is it well-known in the mechanical engineering and

23   materials sciences that Nitinol does have these superelastic

24   properties?

25   A.   Yes.                                                       01:53:47

                        United States District Court

PAUL BRIANT, PH.D. - Direct

1   Q.   Do you believe it is possible to accurately model the        01:53:51

2   stresses and strains on Nitinol without taking that

3   superelastic nature of the substance into consideration?

4   A.   It certainly is important to incorporate this.

5   Q.   Did you prepare a demonstrative that summarizes the          01:54:10

6   various different assumptions that you made in your finite

7   element analysis and calculations compared to what

8   Dr. McMeeking did?

9   A.   Yes, I did.

10          MR. NORTH:   Could we display Exhibit 7814?               01:54:22

11  Q.   Is this the demonstrative that summarizes your different

12  assumptions than those used by Dr. McMeeking?

13  A.   Yes it is.

14          MR. NORTH:   We would like to tender 7814, Your Honor.

15          MR. O'CONNOR:   No objection.                             01:54:53

16          THE COURT:   You may display it.

17  BY MR. NORTH:

18  Q.   We just talked about the first one I believe, Dr. Briant,

19  and what, again, is the second one, filter geometry?

20  A.   Sure.   So this summarizes, as you said, the differences in  01:55:02

21  the calculations for stress and strain between myself and

22  Dr. McMeeking.

23          In the first column in blue, there we have various

24  inputs to the model so we have the Nitinol that we talked

25  about, filter geometry, tissue geometry, and the material      01:55:20

United States District Court

1776

PAUL BRIANT, PH.D. - Direct

1  properties.  And then on the green and the red have the -- what       01:55:25

2  was used in each of the calculations for determining stress and

3  strain.  So as you just mentioned for the Nitinol, I utilized

4  the superelastic stress-strain response based on testing from

5  Bard data whereas Dr. McMeeking just had a linear elastic           01:55:40

6  response.

7          For the filter geometry, as you saw, the analysis

8  included the complete filter as opposed to just the single arm

9  or leg that Dr. McMeeking utilized.

10  Q.   What about tissue geometry, what was the difference there       01:55:57

11  again?

12  A.   Sure.  So in the calculations that you saw in the model

13  setup, my calculations included the IVC and the surrounding

14  soft tissues as well as the vertebrae.

15  Q.   And what about the filter motion, were there differences       01:56:13

16  in the assumptions there?

17  A.   Correct.  So Dr. McMeeking, as we talked about, assumed

18  that the motion was unchanged by the presence of the filter and

19  IVC just kept on pulsing just the way it had been before.  When

20  you incorporate the complete filter and include the IVC and the     01:56:29

21  surrounding soft tissues, you don't have to make that

22  assumption.  You can actually calculate what the response would

23  be and that's what my calculations did.

24  Q.   How is it that we know that the IVC will have motion in

25  that circumstance?                                                   01:56:46

United States District Court

PAUL BRIANT, PH.D. - Direct

1   A.   So we know from literature that the IVC pulses without the    01:56:48

2   filter being present.  And it's going to continue to pulse at

3   some level and it's a question of how much does it continue to

4   pulse when you insert a filter into that situation.

5   Q.   And does the filter impact that movement or pulsation?    01:57:04

6   A.   It depends on the size of the IVC and things like that.

7   But, yes, they certainly can.

8   Q.   And, again, did Dr. McMeeking do any bench testing related

9   to his calculations?

10  A.   Can you repeat that?    01:57:27

11  Q.   Did Dr. McMeeking do any bench testing related to his

12  calculations?

13  A.   No, he did not.

14  Q.   Did your calculations using these assumptions differ from

15  the analysis of stress and strain that Dr. McMeeking performed?    01:57:43

16  A.   Yes, for all the reasons that we talked about.

17  Q.   And did you prepare a demonstrative exhibit that

18  illustrated the difference between the calculations you made

19  using those assumptions and the calculations Dr. McMeeking

20  made?    01:58:03

21  A.   Yes, I did.

22          MR. NORTH:   If we could bring up 7816, please.

23  BY MR. NORTH:

24  Q.   Is this the demonstrative exhibit you created to

25  illustrate the differences between your two calculations?    01:58:16

United States District Court

PAUL BRIANT, PH.D. - Direct

1    A.   Yes, it is.                                                    01:58:21

2            MR. NORTH:  Your Honor, at this time we would tender

3    7816.

4            MR. O'CONNOR:  No objection.

5            THE COURT:  You may display it.                             01:58:28

6    BY MR. NORTH:

7    Q.   First of all, tell us what the significance is of the

8    diagrams on the left of a perforated and not perforated filter.

9    A.   Sure.  This is showing results from the calculations from

10   the finite element analysis I did.                                 01:58:52

11           So, again, we had the whole filter geometry.  We have

12   the IVC which is the blue region.  We have the surrounding

13   issues and we calculate the corresponding stresses and strains.

14           We can also visualize the deformed shape of the

15   filter under these loads and that's what is shown here on the      01:59:08

16   left.  This is showing the results of the finite element

17   analysis and what the filter looks like after you deploy it

18   into the IVC.

19           So on the left we have a non-perforated case.  You

20   can see the arms in the upper region and the legs sticking down    01:59:19

21   below.  And particularly you'll notice that the arms are

22   pushing the IVC out a little bit.  It's bulging where the arms

23   made contact.

24           And then in the perforated case, we've simulated what

25   we call a fully perforated and, again, you can see under the       01:59:37

United States District Court

PAUL BRIANT, PH.D. - Direct

1   motions a bulging where the arms start to penetrate through.        01:59:40

2   Q.   So did you do your calculations on the filter with the

3   assumption that it was not perforated and then repeat the

4   calculations with the assumptions that it was perforated?

5   A.   Exactly.  We looked at both conditions.                        01:59:54

6   Q.   And does the chart or the graph on the right of this 7816,

7   does this demonstrate the difference in the test results or

8   calculation results that you had compared to Dr. McMeeking?

9   A.   Correct, exactly.  What's shown in the bar graph on the

10  right is for three different amounts of IVC motion.  So the       02:00:15

11  first pair of bars is for one millimeter of motion so a small

12  amount.

13  Q.   I'm sorry if I could interrupt.  What do you mean by

14  motion in that context?

15  A.   Sure.  So this is how much the IVC is pulsing back and        02:00:28

16  forth, how much it's moving.  So that's the motion again that

17  we're talking about.

18       So we looked at one millimeter, we looked at 18

19  percent and a 50 percent pulsation so quite a lot of motion.

20  And what is shown on the -- for each of the pairs of bars in      02:00:44

21  the red is, if you assume the values that Dr. McMeeking

22  calculated, you get those corresponding strains whereas if

23  you -- in the calculations that I did, where we're using the

24  setup that I showed you, you get the blue bars.  And so as you

25  can see, the assumptions that were made by Dr. McMeeking had a    02:01:02

United States District Court

PAUL BRIANT, PH.D. - Direct

1    large influence on the results.                                           02:01:06

2    Q.   Now, did Dr. McMeeking make an assumption having to do

3    with the Nitinol wire beyond just a superelastic or not

4    considering superelasticity?  Was there something else about

5    the wire that he considered?                                             02:01:40

6    A.   Sure.  Once we do these calculations, we can -- we

7    compared the results or can compare the results to what is

8    called the fatigue strength of the Nitinol which is basically

9    how strong the material is, how much stress or strain it can

10   tolerate.                                                                02:01:54

11        And so Dr. McMeeking, for that fatigue strength of

12   the material, used a value that came from medical literature

13   rather than using data that was available from testing that had

14   been done by Bard on its own wire.

15   Q.   And why is that significant?                                       02:02:12

16   A.   Sure.  So the fatigue strength of Nitinol can depend

17   highly on the way the material is processed and so utilizing a

18   fatigue strength that was done on the wire that you're actually

19   interested and that you're actually trying to assess is

20   important so you capture all of that.                                   02:02:27

21   Q.   Was that data available to him for the actual Nitinol wire

22   if he wanted to use that in his calculations?

23   A.   Yes, that was.

24   Q.   And did you use that data?

25   A.   In my calculations, those results do not come into play in   02:02:42

United States District Court

PAUL BRIANT, PH.D. - Direct

1  particular but we did reference them and discuss them.                    02:02:45

2  Q.    Now, did you also review some analysis that Dr. McMeeking

3  did regarding tilt?

4  A.    Yes, I did.

5  Q.    And what was it that Dr. McMeeking did concerning tilt?      02:03:02

6  A.    So Dr. McMeeking again did some analytical calculations

7  and I apologize, analytical calculations are calculations kind

8  of by hand, so writing out the equations.  He also did some

9  finite element analysis work regarding tilt.

10 Q.    What assumptions did he use on the calculations that he     02:03:26

11 did and in the finite element analysis he performed with regard

12 to tilt?

13 A.    So, again, he made several assumptions in the calculations

14 that he did or -- didn't include various factors in the

15 calculations.  To summarize those, there were three main        02:03:41

16 things.  Number one, he assumed that the interaction between

17 the filter and the IVC was frictionless so there was no

18 friction of that interaction and we know friction obviously

19 exists.

20        In addition, he modeled the IVC again as rigid which      02:03:56

21 doesn't allow for deformation of the IVC or tenting where the

22 filter arms poke in, again, as you can see here, which would

23 resist tilting of the filter.

24        And, lastly, in the calculations he did, didn't look

25 at the effect of incorporating the -- having the foot           02:04:16

United States District Court

PAUL BRIANT, PH.D. - Direct

1    disengaged from the wall.                                              02:04:21

2    Q.   And with regard to tilt, did he do any actual bench

3    testing of a Bard filter in coming to his conclusions?

4    A.   No, he didn't.

5    Q.   And with regard to tilt, does his analysis provide any    02:04:30

6    information or data to determine how frequently Bard filters

7    may tilt?

8    A.   No.  It wouldn't.

9    Q.   Now, did you conduct your own analysis of tilt?

10   A.   Yes, I did.                                                      02:04:44

11   Q.   Tell the members of the jury what you did to try to

12   analyze tilt.

13   A.   So, again, it was in a similar spirit to the calculations

14   we talked about, used the same model setup as I used for the

15   strain calculations.  In this case we purposely displaced the    02:04:58

16   tip of the filter, the cap, and looked at how much force it

17   took to do that to get a sense of how easy it would be for it

18   to tilt.

19   Q.   And did you do any bench testing with regard to tilt?

20   A.   Yes.  We also did some bench testing again to validate the   02:05:15

21   models that we had done.

22   Q.   Did you prepare a demonstrative exhibit to demonstrate or

23   explain the analysis you did with regard to tilt?

24   A.   Yes, I did.

25   \\\

United States District Court

PAUL BRIANT, PH.D. - Direct

1          MR. NORTH:  If we could bring up 7702.                02:05:31

2    BY MR. NORTH:

3    Q.    Is this the demonstrative exhibit concerning your tilt

4    analysis?

5    A.    Yes, it is.                                           02:05:46

6          MR. NORTH:  Your Honor, we would tender 7702.

7          MR. O'CONNOR:  No objection.

8          THE COURT:  You may display.

9          MR. NORTH:  Thank you, Your Honor.

10   BY MR. NORTH:                                               02:05:51

11   Q.    Dr. Briant, can you explain to us what these two diagrams

12   depict?

13   A.    Sure.  This shows the overall model setup.  It's very

14   similar to what we did before where we start off with the

15   filter straight and displace the cap to the right and looked at  02:06:10

16   how much force it would take to do that.

17   Q.    And what do you mean when you say both rigid and

18   deformable IVC's analyzed?

19   A.    That was part of looking at the validation work that we

20   did, the experimental testing, and I prepared a demonstrative    02:06:25

21   for that as well.

22   Q.    And that would show the bench testing that you did?

23   A.    That's correct.

24         MR. NORTH:  Could we bring up 7936, please.

25   Q.    Is this the demonstrative that explains the bench testing   02:06:45

United States District Court

PAUL BRIANT, PH.D. - Direct

1  you performed regarding tilt?                                    02:06:48

2  A.   Yes.

3           MR. NORTH:  Your Honor, at this time we would tender

4  7936.

5           MR. O'CONNOR:  No objection.                            02:06:58

6           THE COURT:  You may display.

7  BY MR. NORTH:

8  Q.   Dr. Briant, tell us first what we're looking at on the

9  left when we see this.

10  A.   Sure.  So what we're looking at is a picture of a filter   02:07:13

11  that we used for our laboratory testing; and the filter as you

12  can see, is deployed into just a tube, that white PVC tube that

13  we have there.  And so we loaded this into what's called a

14  tensile testing machine or an Instron machine.  And we have a

15  rod that is coming down from the tester.  That is the silver    02:07:38

16  rod that you see coming down from the top in the middle.  And

17  it was -- it displaced downward and then we pushed on the tip

18  of the filter in order to measure the force displacement

19  response.

20  Q.   So it's measuring the force of what?  I'm sorry.           02:07:56

21  A.   The force displacement.  And that's what is shown on the

22  graphs on the right.  So we have the Recovery and the G2

23  filters, we did testing on both of those.  And we did them in

24  different sizes of tubes.  We have 15 and 21 millimeters here.

25  And so what we have is we come down on our machine and we did   02:08:14

United States District Court

1785

PAUL BRIANT, PH.D. - Direct

1    all of this at 37 C, a temperature of 37 degrees Celsius, and          02:08:18

2    we measured the force that is required to displace the cap.

3            And so our experimental data is shown by all of the

4    blue lines and then we simulate those in our tests and --

5    sorry, in our models; and as you can see, we got very similar         02:08:38

6    and good agreement between the models that we did in the

7    testing.

8            I'll also mention, we didn't talk about it before but

9    we did testing similar to this in terms of validating our

10   strain calculations in terms of the bench testing that we did.        02:08:52

11   Q.   Let me ask you this.  Did it take more force or less force

12   to tilt the G2 than it did the Recovery?

13   A.   It took a little bit more force for the G2 compared to the

14   Recovery.

15   Q.   And what did this test suggest to you regarding               02:09:15

16   Dr. McMeeking's analysis of tilt?

17   A.   So the purpose of this test is to validate our model so we

18   did our calculations.  We want to make sure that our

19   calculations are representative of reality.  And so that is

20   what -- that is what this testing is really motivated by, to         02:09:32

21   demonstrate that our models can represent what's actually

22   happening if you were to do this in real life.

23           So this goes to validates the calculations and the

24   approach that we were using and the corresponding conclusions

25   that I came up with.                                           02:09:47

United States District Court

PAUL BRIANT, PH.D. - Direct

1   Q.   Did you -- in reviewing Dr. McMeeking's work, did he reach   02:09:54
2   any other conclusions related to tilt?
3   A.   Yes.  So Dr. McMeeking made several claims regarding the
4   role of tilt in this relation with perforation and strain in
5   the filter.   02:10:09
6   Q.   And are you critical of those findings?
7   A.   Yes.  I have some criticisms of those.
8   Q.   And why?  Tell us what those criticisms are.
9   A.   Sure.  So Dr. McMeeking made claims that if a filter
10  tilts, it will necessarily perforate.  That will directly lead   02:10:25
11  to perforation and vice versa.  He made the claim that if a
12  filter perforates, it's going to tilt.  And in addition, he
13  made a claim that if a filter tilts, the strain is going to
14  increase in the filter.
15       And so I did a series of calculations as well as   02:10:41
16  review of the medical literature that demonstrate
17  inconsistencies with those claims.
18  Q.   And did you reach any opinion of Dr. McMeeking's
19  conclusion that tilt increases the strain on the filter to the
20  extent that it could lead to fracture of the filter?   02:11:04
21  A.   I'm sorry.  Could you repeat the question?
22  Q.   Did you reach any opinion of Dr. McMeeking's conclusion
23  that tilt increases a strain on the filter so as to lead to
24  fracture?
25       MR. O'CONNOR:  Objection, Your Honor.  Irrelevant.   02:11:20

United States District Court

PAUL BRIANT, PH.D. - Direct

| | | |
|--|--|--|
| 1 | Can we approach for a minute? | 02:11:23 |
| 2 | THE COURT:  Yes. | |
| 3 | Feel free to stand up, ladies and gentlemen. | |
| 4 | (At sidebar 2:11.) | |
| 5 | MR. O'CONNOR:  I don't think it's relevant or | 02:11:48 |
| 6 | appropriate for one expert to come in and just base all of his | |
| 7 | opinions criticizing another expert. | |
| 8 | THE COURT:  Why isn't that rebuttal evidence? | |
| 9 | MR. O'CONNOR:  Well, I mean, he's telling the jury | |
| 10 | how or who to believe. | 02:12:04 |
| 11 | THE COURT:  Are you saying that one expert can't | |
| 12 | criticize the analysis of another expert? | |
| 13 | MR. O'CONNOR:  That's the limit of law.  I don't | |
| 14 | think that's appropriate. | |
| 15 | THE COURT:  Based on what rule of evidence or what? | 02:12:15 |
| 16 | MR. O'CONNOR:  It just seems to me like it's not | |
| 17 | relevant. | |
| 18 | THE COURT:  The flaws in the other expert's analysis | |
| 19 | are not relevant? | |
| 20 | MR. O'CONNOR:  Well, I think those are relevant but, | 02:12:25 |
| 21 | I mean, that's all he's talking about here today. | |
| 22 | THE COURT:  But it's relevant. | |
| 23 | MR. O'CONNOR:  Okay. | |
| 24 | THE COURT:  It seems to me that if one expert's | |
| 25 | analysis has flaws, the other side can point them out and | 02:12:36 |

PAUL BRIANT, PH.D. - Direct

1   pointing them out is relevant to whether or not you believe the    02:12:39

2   other side's experts.

3            MR. O'CONNOR:   Okay.

4            THE COURT:   Okay.

5            (End of sidebar discussion.)    02:12:47

6   BY MR. NORTH:

7   Q.   Let me ask you this, Doctor.   Did you reach any opinion

8   yourself as to how tilt might increase or decrease the strain

9   on the filter and whether that could lead to fracture?

10  A.   Yes.   So I performed calculations in addition to what we    02:13:14

11  discussed before regarding strain in both a tilted and a

12  non-tilted filter.

13  Q.   And what did those calculations demonstrate?

14  A.   Those calculations demonstrated that the -- in a tilted

15  filter, that the strains -- we actually calculated slightly    02:13:32

16  lower strains in a tilted filter.   And this was in a G2 under

17  the same conditions that we talked about previously compared to

18  an untilted filter.

19           And this, again, is -- Dr. McMeeking claimed before

20  that tilting, a filter will increase the strains in the filter    02:13:49

21  considerably whereas the calculations with the complete IVC and

22  the surrounding issues, you have about the same but a slight

23  instruction in the strains.

24  Q.   Did you see any evidence that Dr. McMeeking -- well, did

25  he present any calculations in his report to support the    02:14:08

United States District Court

PAUL BRIANT, PH.D. - Direct

1  opinion that tilt leads to increased strain on the filter?                    02:14:12

2  A.   So Dr. McMeeking stated in his report that you would get

3  an increase in strain but didn't actually present any

4  calculations or produce any calculations to back up that claim.

5  Q.   And did you prepare a demonstrative exhibit that reflects          02:14:28

6  your tests and calculations regarding whether tilt creases

7  strain on a filter?

8  A.   I did.

9          MR. NORTH:   Could we bring up 7935, please.

10 BY MR. NORTH:                                                           02:14:47

11 Q.   Is this the demonstrative piece of evidence that you

12 prepared?

13 A.   Yes, it is.

14          MR. NORTH:   We would tender 7935 as a demonstrative,

15 Your Honor.                                                             02:14:58

16          MR. O'CONNOR:   No objection.

17          THE COURT:   You may display it.

18          MR. NORTH:   Thank you.

19 BY MR. NORTH:

20 Q.   Tell us what this depicts, Dr. Briant.                            02:15:09

21 A.   Surely.   This is, again, similar to what we were looking

22 at before.   We're looking at here the output from the finite

23 element analysis that I performed.   We're looking at the

24 deformed shapes of the filter under load after it's been

25 deployed into the IVC.   And so the two right -- sorry, the two      02:15:23

United States District Court

PAUL BRIANT, PH.D. - Direct

| | |
|---|---|
| 1 | left images are tilted filter.  As you can see, it didn't tilt | 02:15:27 |
| 2 | very much despite trying to tilt it in a non-perforated case. |
| 3 | And then on the right we have a perforated filter |
| 4 | where you can see we tilted it over and allowed it to perforate |
| 5 | and, again, pulsed the IVC and looked at the strains that | 02:15:45 |
| 6 | result from when you have the tilted filter like this. |
| 7 | Q.   And what does this mean over on the right, peak strain |
| 8 | amplitude?  What is that telling us here? |
| 9 | A.   Sure.  So what that is, that is the primary output from |
| 10 | the model that we really care about.  That's how much the | 02:16:03 |
| 11 | strain is cycling back and forth every time the IVC pulses. |
| 12 | That's what I was talking about, an amplitude, how much it's |
| 13 | cycling.  And what you can see in the numbers there on the |
| 14 | bottom in the table are for -- on the next to the right most |
| 15 | column, we have the not tilted results and then in the right | 02:16:19 |
| 16 | column we have the tilted results.  And, again, you can see the |
| 17 | strains are lower in the tilted case. |
| 18 | Q.   I'm sorry, the strain what? |
| 19 | A.   The strains are lower in the tilted case. |
| 20 | Q.   Did you come up with any hypothesis as to why that would | 02:16:39 |
| 21 | be? |
| 22 | A.   I expect it's likely due to additional stiffening that you |
| 23 | would get when the filter is tilted.  You can see in the tilted |
| 24 | case how the arms, especially the one on left is straighter so |
| 25 | it provided a stronger stiffening effect on the filter and | 02:16:56 |

United States District Court

1791

PAUL BRIANT, PH.D. - Direct

1    induced less bending.                                              02:17:01

2    Q.    And was this test performed -- were these calculations or

3    a bench test or both?

4    A.    These were calculations.

5    Q.    Do you have an opinion, based on this analysis, as to       02:17:17

6    whether Dr. McMeeking's work on tilt provides an explanation

7    for the leg fractures in Ms. Booker's filter?

8    A.    So I don't think that Dr. McMeeking's work would provide

9    an explanation for the leg fractures.  And that's for two

10   reasons.  Number one is, all the results that we've talked      02:17:36

11   about already and then it's the locations of the fractures that

12   have been in Ms. Booker's filter were not the same as the

13   high-strain points that Dr. McMeeking identified in his

14   calculations.

15   Q.    Did you also review Dr. McMeeking's criticism of Bard's    02:17:59

16   testing of the filter and the development process?

17   A.    I did.

18   Q.    Have you developed, over the course of your career

19   testing, protocols in your work with Exponent?

20   A.    Yes.  Testing of medical devices is a big part of what I    02:18:16

21   do.

22   Q.    What types of testing have you been involved with over the

23   course of your career?

24   A.    So it's a range of things.  I do a lot of fatigue testing,

25   again, where we're looking to analyze the fatigue performance    02:18:30

PAUL BRIANT, PH.D. - Direct

1    of the device and how much it can cycle back and forth.  This        02:18:32

2    is important for cardiovascular devices because you get cyclic

3    loading either from the respiratory cycle as you will breathe

4    or the pumping of the heart.  Both of those can induce cyclic

5    loading on devices.  Also I've done tensile testing and other       02:18:46

6    things like that.

7    Q.   And what is your understanding of Dr. McMeeking's

8    criticism of Bard's testing?

9    A.   He was critical of it.

10   Q.   And do you agree with his criticisms?                          02:19:00

11   A.   No.  And for the reasons that we talked about that I

12   mentioned early on.  Dr. -- sorry, the testing was done by

13   Bard, considered the relevant complications that are put forth

14   by guidance documents from both the medical device community as

15   well as from FDA that testing was performed.  And in addition,      02:19:18

16   Dr. McMeeking -- well, criticizing the work that Bard did

17   didn't put forth any new ideas of his own or provide any

18   alternative methods that Bard might have used during their

19   testing.

20   Q.   He say anything or do you have any comment about Bard's        02:19:35

21   use or consideration of the superelastic nature of Nitinol in

22   its testing?

23   A.   Yes.  So Dr. McMeeking, while reviewing Bard's FDA,

24   criticized them for using superelastic properties for the

25   Nitinol even though that's what the material actually is.           02:19:55

United States District Court

PAUL BRIANT, PH.D. - Direct

1  Using superelastic properties for Nitinol is certainly standard       02:19:58
2  practice since that's what Nitinol does.
3  Q.   And do you have -- did he have some criticisms regarding
4  the pulsation rates used by Bard in its testing?
5  A.   Yes.  He was critical of them for using pulsations other       02:20:12
6  than one millimeter.  That is what was stated in his report as
7  the pulsation that should be used, but Bard actually did
8  testing analyses that were at one millimeter but also at larger
9  than one millimeter.
10 Q.   Did Bard do testing that took the filters all the way to a       02:20:31
11 failure mode?
12 A.   Yes.  They did fatigue testing where they cycled the
13 filter struts to the point at which they fracture, and this is
14 important in order to be able to understand what material can
15 actually tolerate, what it actually takes to break it.       02:20:44
16 Q.   Is that standard testing to perform in developing a
17 medical device?
18 A.   Yes, it is.
19 Q.   Did Dr. McMeeking offer any suggested alternative test
20 protocols in his analysis?       02:21:01
21 A.   No, he didn't.
22 Q.   You also said I believe that your fourth opinion related
23 to the Simon Nitinol filter; is that correct?
24 A.   That's correct.
25 Q.   Would you tell us that opinion again?       02:21:12

United States District Court

PAUL BRIANT, PH.D. - Direct

1   A.   Sure.  So the opinion is that the Simon Nitinol filter,          02:21:14
2   from an engineering perspective, is not an alternative design
3   because it lacks the functionality or benefit of being able to
4   retrieve the filter.
5   Q.   And what is the basis of your opinion?                           02:21:32
6   A.   The functionality of it and the benefit of being able to
7   retrieve it.  The two products are not the same if you can't do
8   that.
9   Q.   Dr. Briant, Dr. McMeeking described his work in this case
10  as -- has described his work to be done to worst case                02:21:45
11  conditions.  What does that term mean in the engineering field?
12  A.   Sure.  When medical device companies are designing a
13  product and making a product, it's important for them to
14  understand the conditions that their device will be put into
15  and to analyze and to test their device under aggressive            02:22:05
16  conditions.  So, essentially, it's sort of a foreseeable or
17  realistic worst case that a device could see.
18  Q.   Do you believe that Dr. McMeeking conducted his analysis
19  to worst case conditions?
20  A.   No.  So Dr. McMeeking went beyond worst case and               02:22:21
21  incorporated many assumptions, as we've talked about, that we
22  know are just inaccurate and not correct such as making the IVC
23  way stiffer than it actually is and other assumptions like
24  that.  So he went well beyond it and going beyond worst case
25  isn't useful either.                                                 02:22:41

United States District Court

1795

PAUL BRIANT, PH.D. - Direct

1    Q.    If Dr. McMeeking were to criticize your assumptions as          02:22:42

2    best case as opposed to worst case, would you agree with that

3    characterization?

4    A.    Not at all.   We used conservative assumptions all over the

5    place in terms of the stiffness of the tissues.   We looked at        02:22:55

6    loading from three different ways that the IVC could be loaded

7    from an internal pressure, from the whole thing being exceeded

8    so we analyzed it from a bunch of different ways to try to

9    bound the problem and use conservative assumptions.

10   Q.    Did Dr. McMeeking, from what you've seen, do any kind of         02:23:16

11   analysis specific to the events that Ms. Booker's filter

12   experienced?

13   A.    He did not.

14   Q.    Explain that, please.

15   A.    He didn't do any patient-specific analysis, didn't utilize      02:23:26

16   any medical records or anything like that to analyze the

17   stresses in the filter in this particular case.

18   Q.    Other than his calculations and his computer modeling,

19   have you seen any evidence of testing performed by

20   Dr. McMeeking to support his opinions?                                02:23:44

21   A.    No.   He didn't do any testing to support.

22   Q.    In your experience consulting for medical device companies

23   designing and developing new products, do you recommend to

24   those companies that they design or manufacture a device based

25   solely on calculations of the type performed by Dr. McMeeking?        02:24:02

United States District Court

1796

PAUL BRIANT, PH.D. - Direct

1    A.    No.  As I mentioned, it's important to do testing of your       02:24:07
2    device and in addition to the calculations that are performed.
3    Calculations like these, these strain calculations, I mean they
4    are a piece of the puzzle.  They are part of a tapestry of data
5    that you create when analyzing a device in order to assess its       02:24:24
6    performance.
7    Q.    In your analysis of Dr. McMeeking's work, did you see any
8    evidence that he attempted to redesign the G2 filter to
9    eliminate the risks he identified or otherwise come up with an
10   alternative design?                                                  02:24:41
11   A.    No.  He didn't put forth any alternative design changes.
12   Q.    Thank you, Doctor.  That's all the questions I have.
13   A.    Thank you.
14         THE COURT:  Cross-examination?
15         MR. NORTH:  Oh, I'm sorry.  Can I ask one quick              02:25:26
16   question?
17         THE COURT:  You can ask one follow-up question.
18         MR. NORTH:  I'm sorry.
19   BY MR. NORTH:
20   Q.    Doctor, are all of the opinions you've offered today here      02:25:33
21   given to be a reasonable degree of engineering certainty?
22   A.    Yes, they are.
23   Q.    Thank you.
24         THE COURT:  All right.  Mr. O'Connor?
25

United States District Court

PAUL BRIANT, PH.D. - Cross

**CROSS - EXAMINATION**

BY MR. O'CONNOR:

Q.   All right.  Dr. Briant, how have you been?  It has been, what about a year and a half since we met?

A.   Something like that.

Q.   Thanks for coming here today.

A.   No problem.

Q.   Now, you told us that your company doing work for the lawyers representing Bard has made $600,000; right?

A.   Our bills over the course of the five years has totaled about $600,000.

Q.   And in this case, what you've come here to tell the jury is your focus has been on the analysis and testing conducted by Dr. McMeeking; correct?

A.   That has been the focus, yes.

Q.   Your focus was not on what Bard did by way of analysis or testing in the design process; true?

A.   So I did review to some degree the work that Bard did during their design process.  We've talked about that.  But the purpose of that was, again, to review the criticisms that Dr. McMeeking had made.

Q.   All right.  Well, just so you and I are on the same page, I wasn't at the deposition this last year, but didn't you say that your focus was not on testing or the analysis that Bard did in the design process?  Your focus was on Dr. McMeeking;

United States District Court

PAUL BRIANT, PH.D. - Cross

1  right?                                                            02:27:03

2  A.   Yes.  As I said, Dr. McMeeking made criticisms about what

3  Bard did so I went back to review what Bard had done to

4  understand the criticisms that he had made.

5  Q.   Now, you do agree that a medical device company and the       02:27:13

6  engineers that work for it should evaluate a device against the

7  worst case analysis; correct?

8  A.   It's important for device companies to understand the

9  conditions for their devices and to analyze them under

10 foreseeable worst case conditions, yes.                           02:27:29

11 Q.   And that's how medical device companies can predict how a

12 device like a filter will perform and behave once it's out

13 there; right?

14 A.   It's part of the general assessment of a performance for a

15 device.                                                           02:27:50

16 Q.   Well, certainly patient safety has to be number one for a

17 medical device company; right?

18 A.   Patient safety is certainly important, absolutely.

19 Q.   And the reason engineers get involved is to make sure that

20 the company knows that there are tests and ways to analyze a      02:28:03

21 device to make sure it performs safely once it's released;

22 true?

23 A.   Companies strive to analyze their device under foreseeable

24 worst case conditions to analyze it and understand it.

25 Q.   And when you're saying foreseeable, really what has to        02:28:18

PAUL BRIANT, PH.D. - Cross

1   happen is that testing and analyses have to be developed that      02:28:21
2   give companies like Bard some predictability about what the
3   device is going to do once it's in a patient.  Fair?
4   A.   I would say that's fair.  You want to understand what it's
5   going to do, yes.                                                  02:28:37
6   Q.   And you know from all your work working for the attorneys
7   for Bard that both the Recovery and G2 have failed out there in
8   patients; right?
9   A.   Yes.  There have been complications in the field.
10  Q.   You know that the G2 has caudally migrated downward;          02:28:55
11  right?
12  A.   Yes, I'm aware of that.
13  Q.   And you know from your work that the G2 has tilted in
14  many, many patients; correct?
15  A.   I'm aware that it's tilted, yes.                              02:29:13
16  Q.   And you're aware that those filters that have tilted in
17  many, many patients have perforated through the vena cava
18  walls; correct?
19  A.   I'm aware that perforation occurs, yes.
20  Q.   And you're aware that in many, many patients that the G2     02:29:26
21  filter has tilted, has perforated and has fractured; correct?
22  A.   I'm aware that fractures have occurred, yes.
23  Q.   Did you receive Sheri Booker's records?
24  A.   Not medical records, just expert records that were related
25  to her.                                                           02:29:46

PAUL BRIANT, PH.D. - Cross

1   Q.   Do you know what happened to her?                                    02:29:47

2   A.   Yes.  She had an arm fracture, one leg fracture in two

3   locations, and there was tilting and perforation.

4   Q.   And a strut went to her heart.  Were you aware of that?

5   A.   I would have to go back and review.                                  02:29:59

6   Q.   Something you weren't aware of, were you?

7   A.   I don't recall it as I sit here right now.

8   Q.   Well, that would be pretty important for you to know how

9   this filter performed if you had accurate information about

10  what happened to this patient, wouldn't it?                               02:30:11

11              MR. NORTH:  Objection, Your Honor.  Argumentative.

12              THE COURT:  Sustained.

13              We're going to take a break at this point.  We're at

14  2:30.  We will begin at 2:45, ladies and gentlemen.

15              (Jury departs at 2:30.)                                       02:30:22

16              THE COURT:  Okay.  Thank you.

17              (Recess at 2:30; resumed at 2:45.)

18              (Jury enters at 2:45.)

19              (Court was called to order by the courtroom deputy.)

20              THE COURT:  Thank you.  Please be seated.                     02:46:13

21              COURTROOM DEPUTY:  Mr. O'Connor, you may continue.

22              MR. O'CONNOR:  Thank you.

23  BY MR. O'CONNOR:

24  Q.   All right.  Dr. Briant, I'm going to keep moving along

25  here.  You have the expertise to actually go in and the analyze  02:46:24

United States District Court

PAUL BRIANT, PH.D. - Cross

1   Bard's testing and assessments of the filter, don't you?          02:46:34

2   A.   Yes, I have expertise in that area.

3   Q.   I mean, if you were requested, you could have performed a

4   more in-depth analysis of Bard's design testing and its finite

5   element analysis of the Bard filters; true?                        02:46:52

6   A.   I could have review it more.

7   Q.   But you weren't asked to do that?

8   A.   I wasn't asked to do that, no.

9   Q.   Bard has never come to you or its lawyers have never come

10  to you and asked you, Dr. Briant, to form a root caught           02:47:03

11  analysis on why its filters were failing; true?

12  A.   I'm sorry, did you say root cause analysis?

13  Q.   Yes.

14  A.   No, that hasn't been requested.

15  Q.   True; correct?                                                02:47:18

16  A.   Correct.

17  Q.   You're certainly qualified to do one, though; right?

18  A.   Root cause analysis is something that I do.

19  Q.   So if requested, you could go through all the analysis and

20  tell Bard why the filters are failing the way they have been;     02:47:29

21  true?

22  A.   I could have gone through and looked at it and attempted

23  it.

24  Q.   But you didn't?

25  A.   No, I did not.                                                02:47:37

United States District Court

1802

PAUL BRIANT, PH.D. - Cross

```
1   Q.   You have not done an analysis on Bard's filter fracture        02:47:38
2   rates; correct?
3   A.   No, I haven't.
4   Q.   You have not communicated with any engineers at Bard;
5   true?                                                               02:47:46
6   A.   Correct.
7   Q.   You do not know what Bard's predicted failure rates were
8   for the G2 at the time the filter was launched; correct?
9   A.   No, I don't.
10  Q.   And by the way, do you know -- are you aware that the G2       02:47:57
11  when it was first launched was a permanent filter?
12  A.   My understanding is it was marketed or indicated for that
13  use.
14  Q.   And if it was marketed and launched as a permanent filter,
15  that's what the Simon Nitinol filter was, was a permanent          02:48:18
16  filter; correct?
17  A.   The Simon Nitinol filter is a permanent filter.
18  Q.   And in this case, do you know what Sheri Booker's filter
19  was?
20  A.   It was a G2.                                                   02:48:29
21  Q.   Do you know that she received it at the time that it was
22  cleared as a permanent device?
23  A.   I don't know that.
24  Q.   You don't know whether the G2 exceeded Bard's
25  predictability rates; is that correct?                             02:48:45
```

United States District Court

PAUL BRIANT, PH.D. - Cross

1   A.   No.                                                          02:48:46

2   Q.   True?

3   A.   Correct.

4   Q.   You never asked to look at that data, did you?

5   A.   No, I didn't.                                               02:48:52

6   Q.   And you don't have an opinion on what is an acceptable

7   fracture rate for a filter, do you?

8   A.   Correct, I don't have an opinion on that.

9   Q.   And certainly you don't have an opinion whether the G2 is

10  prone to fracture; correct?                                      02:49:13

11  A.   I'm sorry.  Can you repeat the question?

12  Q.   You don't have an opinion one way or the other as to

13  whether the G2 is prone or susceptible to fracture; true?

14  A.   As a filter, no.

15  Q.   You don't have that opinion?                                02:49:23

16  A.   Correct.  Dr. McMeeking has that opinion and he bases it

17  on analyses and I have criticism also of the analyses as we've

18  talked about this whole time.

19  Q.   But you haven't looked at that issue from your own

20  analyses; correct?                                               02:49:35

21  A.   So -- correct.

22  Q.   Now, you do and have seen some internal communications

23  among Bard personnel, haven't you?  For example, at the

24  deposition you and I met at you were shown an email from

25  Dr. Ciavarella, the medical director.  Do you remember that?    02:50:10

United States District Court

PAUL BRIANT, PH.D. - Cross

| | | |
|---|---|---|
| 1 | A.   I don't remember the specific email but I have seen some, | 02:50:15 |
| 2 | yes. | |
| 3 | Q.   And do you remember where Dr. Ciavarella noted that the | |
| 4 | Simon Nitinol filter didn't have complications but the G2 did? | |
| 5 | Do you recall that email that we talked about in 2016? | 02:50:25 |
| 6 | A.   I recall the general email. | |
| 7 | Q.   And he was asking the question why wouldn't doctors want | |
| 8 | to use a Simon Nitinol filter as opposed to the G2?  You recall | |
| 9 | that; right? | |
| 10 | A.   I recall that, yes. | 02:50:36 |
| 11 | Q.   Dr. Briant, you do agree if a manufacturer like Bard has | |
| 12 | reason to be concerned about a potential complication, it | |
| 13 | should address the complication before releasing the device to | |
| 14 | the market; correct? | |
| 15 | A.   I think they should do testing to evaluate their devices. | 02:51:01 |
| 16 | Q.   Before it's released; true? | |
| 17 | A.   Yes.  They should do testing before a device is put on the | |
| 18 | market. | |
| 19 | Q.   And that is certainly true if a company like Bard has | |
| 20 | reason to know that its filter may fail once it is released to | 02:51:15 |
| 21 | the market; correct? | |
| 22 | A.   Correct.  If there are complications known, they should | |
| 23 | look at it. | |
| 24 | Q.   Now, you have never looked at any Bard filters positioned | |
| 25 | in the IVC filter through imaging; correct? | 02:51:33 |

United States District Court

1805

PAUL BRIANT, PH.D. - Cross

1    A.   Just what's in medical literature.                        02:51:36

2    Q.   You've never looked at individual imaging of patients to

3    see if that diagram you did where the filter was perforating on

4    each side of the vena cava wall was, in fact, a realistic

5    condition, have you?                                           02:51:53

6    A.   Well, I've seen, through my review of the medical

7    literature, numerous pictures of filters in the IVC.

8    Q.   As it relates to the Bard filters, though, the ones that

9    you have seen perforated have been filters that tilted;

10   correct?                                                       02:52:07

11   A.   I don't think that that is necessarily true.

12   Q.   Well, you have seen that, though, haven't you?

13   A.   That if a filter is perforated, it's also tilted?

14   Q.   Yes.

15   A.   I've seen images of that.                                 02:52:17

16   Q.   And you do agree that a leg that perforates through the

17   vena cava wall can lead to additional tilting?  You agree with

18   that concept, don't you?

19   A.   I think that it could but it doesn't necessarily mean that

20   it does.                                                       02:52:37

21   Q.   But it's something you haven't ruled out; fair?

22   A.   I wouldn't say I've ruled it out.  As I said, I think it

23   could but it doesn't necessarily mean that it does.

24   Q.   Now, let me just ask you a question about linear and

25   superelastic.  Isn't it true that Dr. McMeeking used linear    02:52:55

United States District Court

PAUL BRIANT, PH.D. - Cross

1  because -- or for small strains and small increments of          02:52:59

2  strains?

3  A.   He used linear elastic in his strain calculations.

4  Q.   And when engineers like you go and do these calculations,

5  doesn't linear apply first before superelastic?                  02:53:14

6  A.   Not if the material is made of superelastic.

7  Q.   Dr. McMeeking looked at articles, too, about the dynamics

8  of the anatomy; correct?

9  A.   I think he reviewed those, yes.

10 Q.   He looked at things such as Murphy and Laborda; true?       02:53:36

11 A.   Correct, yes.

12 Q.   And he had looked at Laborda which talked about the IVC

13 filter and suggested that filters do not resist motions of the

14 IVC wall.  Do you recall -- you've seen that article as well;

15 true?                                                            02:53:58

16 A.   I've seen that article and it shows that the IVC filters

17 that they studied resisted the motion of the IVC wall.

18 Q.   All right.  But you have not seen any studies related to

19 the G2; correct?

20 A.   Correct.  The G2 was not used in that study.               02:54:12

21 Q.   And what you do know about the G2 is that it's known to

22 caudally migrate; correct?

23 A.   Caudal migration occurs, yes.

24 Q.   Meaning it separates itself from the vena cava wall?

25 A.   I don't know if I would say separates itself but it        02:54:24

United States District Court

PAUL BRIANT, PH.D. - Cross

1  travels downward.                                                      02:54:26

2  Q.   And you do understand how that can lead to complications

3  such as tilt; fair?

4  A.   I think it could lead to tilt, yes.

5  Q.   And then of course while you can't rule it out, you can    02:54:34

6  envision scenarios where tilt will lead to other complications

7  including perforation; correct?

8  A.   I think that it could but, again, I don't think it

9  necessarily does and I think there are other conditions that

10 come into play.                                                       02:54:51

11 Q.   But you haven't done any testing one way or the other to

12 rule that in or out.  Fair?

13 A.   That tilt leads to perforation?

14 Q.   Yes.

15 A.   So I did work in my calculations where we looked at the    02:55:00

16 forces that filter stress applied to the IVC at a variety of

17 different diameters.  So we looked at large diameters, medium

18 diameters, and small diameter IVCs.  And the forces that the

19 filter struts apply obviously go up as you decrease the

20 diameter of the IVC.  You have to squish the filter down more.  02:55:22

21 It puts on more force.

22       Studies have also shown, though, with filters in them

23 that have not shown any correlation between IVC diameter and

24 increased perforation rate.  So, again, changes in force I

25 don't think necessarily corresponds with perforation.          02:55:37

United States District Court

1808
PAUL BRIANT, PH.D. - Cross

1   Q.   Now, I thought I heard you say that in the worst case      02:55:40
2   scenario you think Dr. McMeeking went too far; right?
3   A.   Yes.  I think he went beyond the worst case.
4   Q.   But you haven't seen any internal documents from Bard
5   reflecting how many failure modes Bard's been aware of that     02:55:53
6   have occurred out there in patients, have you?
7   A.   I'm sorry.  Could you repeat that?
8   Q.   Sure.  You haven't seen internal documents about what Bard
9   knew about how many patients were having failed filters, G2s?
10  A.   That's correct, I haven't seen that.                       02:56:10
11  Q.   And what Dr. McMeeking's calculations predicted is that
12  the G2 filter would fail; true?
13  A.   Dr. McMeeking says that his calculations indicate the G2
14  filter is prone to failure and, obviously, I disagree with that
15  for all the reasons that we've talked about.                    02:56:27
16  Q.   But certainly depending on what's happening out there in
17  the real world and if patients like Sheri Booker have had a
18  filter, G2, that migrated, tilted, perforated, and fractured,
19  then Dr. McMeeking was looking at those type of failure modes
20  when he did his calculations; right?                            02:56:47
21  A.   I don't think that's true.  I don't think that the
22  calculations that Dr. McMeeking did necessarily showed what
23  happened in any one particular patient.
24  Q.   But he was addressing failure modes that could occur
25  because of the design; correct?                                 02:57:01

United States District Court

PAUL BRIANT, PH.D. - Cross

1   A.   He was calculating the strains in the filter just like I      02:57:03
2   did.
3   Q.   And looking at how they would manifest into failure modes.
4   Fair?
5   A.   And then comparing those to the fatigue strength, yes.        02:57:11
6   Q.   And in terms of to what extent they have occurred out
7   there, that certainly is significant on what the worst case
8   scenarios are in patients; true?
9   A.   I'm sorry.  Could you repeat that?
10  Q.   Sure.  The fact that they are failing out there means        02:57:26
11  that's something, going back in time, Bard engineers should
12  have taken steps tested to predict; right?
13  A.   Well, I think that one tries to understand the environment
14  that you're going to put a medical device in to the best of
15  your abilities and do testing accordingly.                        02:57:39
16  Q.   And if they don't understand the anatomical environment at
17  the time they are testing the filter, that will put patients'
18  safety at risk; correct?
19  A.   I think that you should try to understand it as best you
20  can.  It is absolutely true that our understanding in the         02:57:52
21  medical device community, IVC has improved over the time over
22  the years.
23  Q.   Well, I'm talking back in time of the G2.  You agree that
24  if a medical device company doesn't have a good understanding
25  of the anatomy and the physiology where a device is going to be   02:58:10

United States District Court

1810
ROBERT M. CARR, JR. - Direct

1  implanted, that can impact patient safety.  You agree with        02:58:14
2  that; true?
3  A.   Again, I think that a company should try to understand to
4  the best of your abilities through imaging or medical
5  literature review, however they can.                              02:58:25
6  Q.   Patient safety should always come first, yes?
7  A.   It should absolutely be.
8  Q.   And meaning it's important to understand the anatomy,
9  true?
10 A.   Yes.                                                         02:58:35
11          MR. O'CONNOR:  That's all I have.
12          THE COURT:  Redirect?
13          MR. NORTH:  Nothing further, Your Honor.
14          THE COURT:  Okay.  Thank you, sir.  You can step
15 down.                                                             02:58:41
16          (Witness excused.)
17          MR. NORTH:  Your Honor, at this time we would recall
18 Mr. Rob Carr to the stand.
19          THE COURT:  All right.
20          Mr. Carr, you're still under oath for purposes of the   02:59:26
21 trial so you can come directly back to the witness stand.
22          (ROBERT M. CARR, JR., a witness herein, was
23 previously duly sworn or affirmed.)
24              **DIRECT EXAMINATION**
25 \\\

United States District Court

1811

ROBERT M. CARR, JR. - Direct

1   BY MR. NORTH:                                                    02:59:52

2   Q.   Good afternoon, Mr. Carr.

3   A.   Good afternoon.

4   Q.   I don't want to repeat a lot of the background information

5   that you have testified to last week but can you just briefly    02:59:57

6   tell us your educational background?

7   A.   I have a bachelor's in biomedical engineering from the

8   Catholic University of America.

9   Q.   And what sort of courses made up your major in biomedical

10  engineering?                                                      03:00:15

11  A.   All your mechanical engineering classes as well as some

12  nursing type classes.

13  Q.   Has most of your professional career since college been

14  involved with medical devices?

15  A.   Yes, all of it.                                              03:00:29

16  Q.   What was your first job after graduating from college in

17  the biomedical engineering field?

18  A.   I worked for a start-up in Boston called Organogenesis.

19  That was a company that developed products from collagen which

20  is a protein in your body.                                        03:00:45

21  Q.   And what were those products designed to treat?

22  A.   We had a vascular graft which was a surgical device.  We

23  had a living skin equivalent which we sold to cosmetic

24  companies to do testing on as well as some hernia repair

25  devices.                                                          03:01:06

1812

ROBERT M. CARR, JR. - Direct

1   Q.   And what was your next job after Organogenesis?                    03:01:13

2   A.   I worked for Nitinol Medical Technologies.

3   Q.   And is that also known as NMT?

4   A.   Yes, it is.

5   Q.   And when did you join that company?                              03:01:25

6   A.   1996.

7   Q.   And what positions did you hold with that company?

8   A.   I had various R&D level positions and ended up as the

9   director of R&D, Research and Development.

10  Q.   And what product did you spend most of your time on at            03:01:42

11  NMT?

12  A.   Filters.

13  Q.   When you started working with IVC filters in the 1990s,

14  what type of filters were available?

15  A.   They were just permanent devices available.                      03:01:58

16  Q.   And when you first started working with IVC filters, did

17  you have the opportunity to work with Dr. Morris Simon?

18  A.   Yes, his office was right next to mine.

19  Q.   And who was Dr. Simon?

20  A.   Dr. Simon was a pioneer in interventional radiology.  His        03:02:13

21  interests were in imaging as well as in vena cava filters.

22  Q.   And what was his role in the development of the Simon

23  Nitinol filter?

24  A.   He was instrumental in the design of it.  He and a group

25  of engineers worked on developing that device.                        03:02:35

United States District Court

ROBERT M. CARR, JR. - Direct

1   Q.   Did you eventually start to work with Dr. Simon on          03:02:41
2   developing a retrievable IVC filter?

3   A.   Yes, we did.

4   Q.   And why were you and Dr. Simon working on a different sort
5   of filter when you already had the Simon Nitinol filter on the   03:02:56
6   market?

7   A.   Dr. Simon in particular realized that if you could make a
8   vena cava filter that could be removed at any time, then that
9   would treat an entirely new patient population, people who at
10  that time really couldn't get a vena cava filter to help them    03:03:19
11  if they were permanently implanted.  That treated a subset of
12  patients when they really were a whole other set of patients
13  who deserved to be able to get a filter.

14  Q.   Were you and Dr. Simon, and your entire team at NMT,
15  passionate about the possibility of developing a retrievable     03:03:40
16  filter?

17  A.   Yes.  It was a very exciting opportunity.  It had never
18  been done and we were really proud once we accomplished it.

19  Q.   Are there aspects of the inferior vena cava itself that
20  make designing an implantable device for that vessel             03:04:02
21  challenging?

22  A.   Sure.

23  Q.   And can you tell us what some of those are?

24  A.   It's a dynamic vessel.  It has flow into the heart so it's
25  a pretty big vessel and it sits just below the renal veins or    03:04:18

United States District Court

1814

ROBERT M. CARR, JR. - Direct

1    the veins that go to your kidneys, so there's flow things you          03:04:25

2    need to take care of and it moves a little bit.

3    Q.    Is there a potential for flattening in the inferior vena

4    cava?

5    A.    Yes.                                                             03:04:39

6    Q.    What about expansion?

7    A.    Yes.

8    Q.    And what about stretching?

9    A.    Yes.

10   Q.    What are some of the challenges on developing a long-term        03:04:45

11   retrievable filter that you and your team faced?

12   A.    Mostly was being able to remove it and to us the most

13   important thing was after the patient no longer needed it.  So

14   that means that there wasn't a particular time frame.  It

15   wasn't 30 days or 40 days or 50 days that everybody needs a           03:05:10

16   filter.  Everybody is different and so our goal was to design

17   something that could be removed when you, the individual,

18   didn't need it any more.

19   Q.    Were there any particular challenges with developing the

20   hooks or the anchoring mechanism for the filter?                      03:05:27

21   A.    Yes.  So one of the major things to consider is when

22   you -- these devices become incorporated into the wall of the

23   vena cava, and once they become incorporated and you intend to

24   remove it, you have to be able to remove it without doing

25   sufficient damage to that wall.                                       03:05:48

United States District Court

1815

ROBERT M. CARR, JR. - Direct

1    Q.    And what about the thickness of the arms and legs?  Are          03:05:51
2    there particular challenges in designing a retrievable filter
3    with that aspect?
4    A.    Yes.  There's a balance between the size of the filter and
5    then these are delivered through a small tube called               03:06:04
6    percutaneously and so you want to make that tube as small as
7    possible also.
8    Q.    Are there challenges in designing a retrievable filter
9    particular to the width of the legs?
10   A.    Yes.  And it's the same sort of reason.  The larger the       03:06:21
11   device, the larger the tube it needs to go through and that can
12   cause different complications unto itself.
13   Q.    How did you and the others at NMT with whom you worked
14   address and tackle those challenges?
15   A.    Through a lot of trial and error, through a lot of            03:06:43
16   prototypes.  We talked to a lot of physicians.  Having
17   Dr. Simon there was an incredible benefit as well as the other
18   physicians that we worked with in the Boston area who were
19   passionate about filters.  We did a tremendous amount of
20   testing and, like I said, a lot of trial and error.               03:07:08
21   Q.    In addition to Dr. Simon, were there a couple of other
22   medical doctors that you worked closely with in the development
23   of the first retrievable filter?
24   A.    Yes.  Primarily John Kaufman who was at Mass General
25   Hospital at the time and Tony Venbrux who was at Johns Hopkins      03:07:27

United States District Court

1816

ROBERT M. CARR, JR. - Direct

1    at the time.                                                          03:07:34

2    Q.   And what were their roles in helping to develop the

3    Recovery filter?

4    A.   Consultative as well as Dr. Kaufman was just down the

5    street from our office so he was involved on a pretty often    03:07:43

6    basis.  He would come see the testing we were designing.  He

7    would do the animal labs with a lot of the filters, prototypes

8    that we would test prior to the ultimate design.  And

9    Dr. Venbrux was involved in all the animal testing as well.

10   Q.   And you mentioned Dr. Kaufman's affiliation.  Where was   03:08:06

11   Dr. Venbrux affiliated with at the time?

12   A.   He was at Johns Hopkins at the time.

13   Q.   At some point did NMT sell its rights to the Recovery

14   filter as well as the Simon Nitinol filter to C.R. Bard?

15   A.   Yes.  In late 2001.                                       03:08:24

16   Q.   And you eventually moved to Bard?

17   A.   I did, in July of 2002.

18   Q.   And why did you decide to move to Bard, Mr. Carr?

19   A.   A lot of reasons.  The opportunity to work for a larger

20   company with clearly more career advancement opportunities.    03:08:40

21   Bard had a history of very significant product innovation.  The

22   people that I worked with who were at Bard at the time I

23   enjoyed working with very much.  And then personally it kind of

24   all worked out.  Our kids were about to start kindergarten.  My

25   wife had graduated school and so it was just a good time.       03:09:06

United States District Court

1817

ROBERT M. CARR, JR. - Direct

1  Q.   And when you moved to Bard, did you have an opportunity to          03:09:11

2  continue working with IVC filters?

3  A.   Yes.  When I moved to Bard, I ran our IVC filter as well

4  as our angioplasty and biopsy development.

5  Q.   And what was your position when you first moved to Bard?          03:09:26

6  A.   It was a director of R&D.

7  Q.   And did any of your other colleagues from NMT move with

8  you, either before you or after you, to Bard also?

9  A.   About a year later I brought one of our engineers, Andrzej

10  Chanduszko.          03:09:49

11  Q.   And is Mr. Chanduszko still with the company today?

12  A.   He is.

13  Q.   When you came over to Bard, did you continue to work with

14  Dr. Venbrux and Dr. Kaufman?

15  A.   Yes, we did.          03:09:59

16  Q.   Let's talk about the development of a new medical device.

17          MR. NORTH:   Would you pull up 6089, please.  And if

18  we could go to the second slide.

19  BY MR. NORTH:

20  Q.   Did you put together a demonstrative exhibit that explains          03:10:40

21  the development process for a new medical device?

22  A.   Yes.

23  Q.   And was this personally prepared by you?

24  A.   Yes.

25  \\\

United States District Court

ROBERT M. CARR, JR. - Direct

1          MR. NORTH:  At this time I would tender 6089.        03:10:55

2          MR. LOPEZ:  As a demonstrative, it's fine, Your

3    Honor.

4          THE COURT:  All right.  You may display it.

5    BY MR. NORTH:                                               03:11:11

6    Q.   Does this set forth the general points that you are

7    covering as far as a new product development process?

8    A.   Yes.

9    Q.   If we could display the next slide.  Explain for us what

10   the new product development process involves in creating a new  03:11:27

11   medical device.

12   A.   So our process is similar to most companies in our field

13   where we break it down into phases; and at each of those phases

14   there are what we call design reviews, or some people call them

15   stage gate reviews, where more senior people would review the   03:11:48

16   work to be done and then either approve or have questions for

17   the product development team.  And so our phases of development

18   are what we call idea generation which is fairly

19   self-explanatory.  It's a phase where we develop different

20   ideas based on user needs and so user needs that, be they       03:12:18

21   patients or physicians, that are unmet, so we collect those

22   ideas.

23   Q.   Let's move to the next slide.  I think it talks more about

24   that.

25   A.   I believe one more.                                        03:12:34

United States District Court

ROBERT M. CARR, JR. - Direct

1   Q.   And then let's go to the next slide if we could.          03:12:34

2   A.   So like I was saying, those unmet needs we develop then

3   hypotheses for how we can solve those needs or can we provide a

4   solution to them, be they a technical one if it's something we

5   could never overcome we pass on it probably.  If it's something   03:12:52

6   we have ideas around, we would then develop a business case for

7   a potential project which we call a POA or a product

8   opportunity assessment.

9   Q.   And let's go to the next slide if we could.  What is a

10  concept phase?                                                    03:13:09

11  A.   It's a next step of literally developing prototypes,

12  trying to learn as much as we can about the use environment and

13  then kind of honing down hopefully multiple set of different

14  devices that were then be honed down into potential solutions.

15         MR. NORTH:  Next slide, please.                            03:13:36

16  Q.   And are there various steps that have to be undertaken as

17  part of the concept phase?

18  A.   Yes.  We develop a lot of documents.  The design and

19  development plan is an outline for the project itself.  I spoke

20  a minute ago of product opportunity assessment which is a        03:13:53

21  business document.  We do a design input summary which is a

22  summary of all of the things we've learned up to that point, a

23  risk assessment and a DFMEA as well as a draft of potential

24  specifications.

25  Q.   Let's move to the next slide.                                03:14:15

United States District Court

1820
ROBERT M. CARR, JR. - Direct

1    Do various different groups within the medical device  03:14:20
2  company get involved in the concept phase, development?
3  A.   Yes.  Our teams are multi-disciplined and always involve
4  these four groups which is marketing, research and development,
5  quality, and regulatory and may involve other groups in the  03:14:36
6  company as well.
7  Q.   Let's go to the next slide and then the next slide.  What
8  is the purpose of the feasibility phase?
9  A.   It's to further test your designs to see if they will
10  ultimately meet your specifications to fine-tune your  03:14:55
11  specifications, to develop draft labeling, packaging, those
12  sorts of things and also develop any new test methods that are
13  going to be necessary in your next stage which is verification.
14    MR. NORTH:  And the next slide, please.  And the next
15  slide.  03:15:17
16  Q.   What is the development phase for a new medical device?
17  A.   It's called a development or qualification phase in a lot
18  of places where you do testing to verify and validate that your
19  output, the design -- that you have met your design input
20  requirements.  03:15:39
21  Q.   And the next slide, it's final stage launch, post launch.
22  A.   Is I think self-explanatory.  In a pre-launch, that's
23  usually your regulatory phase and then once the device is
24  launched, there's a post-launch phase which involves complaint
25  handling and active things.  03:16:00

United States District Court

1821

ROBERT M. CARR, JR. - Direct

1   Q.   Now, when the G2 Filter was being developed, was this        03:16:10
2   general product development cycle followed?
3   A.   Yes.
4   Q.   And was it generally followed for the Recovery filter
5   also?                                                             03:16:21
6   A.   Yes.
7   Q.   Mr. Carr, do you know approximately how much money has
8   been spent by Bard over the years in research and development
9   with filters?
10           MR. LOPEZ:   Your Honor, foundation.                     03:16:39
11           THE COURT:   Sustained.   I think you need to lay
12   foundation for that.
13   BY MR. NORTH:
14   Q.   Have you been involved extensively with the development of
15   research -- well, development of filters over the years --       03:16:48
16   A.   Yes.
17   Q.   -- at Bard?
18           And has that been in the -- as a part of the research
19   and development department of the company?
20   A.   Yes.                                                        03:16:59
21   Q.   And at times have you -- many of the times have you been
22   the director of the company -- I mean of that department?
23   A.   Yes.
24   Q.   Are you generally familiar with the budgets and
25   expenditures of the department in research and development?      03:17:10

United States District Court

1822

ROBERT M. CARR, JR. - Direct

1   A.   Yes.                                                        03:17:14

2   Q.   And have you been -- do you have access to the information

3   in the business records of the company that show you how much

4   money has been spent in research and development over the years

5   with IVC filters?                                                03:17:27

6   A.   Yes.

7            MR. NORTH:  Your Honor --

8            THE COURT:  Go ahead and ask your question and see if

9   there's an objection.

10  BY MR. NORTH:                                                    03:17:35

11  Q.   Based upon your position, your knowledge and your

12  familiarity, do you have -- do you know how much the company

13  has spent over the years in research and development for IVC

14  filters?

15  A.   Yes.                                                        03:17:49

16           MR. LOPEZ:  Sorry.  Your Honor.  That's not the

17  question I guess I need to object to.

18           THE COURT:  So you didn't object to the one that was

19  just asked.

20           MR. LOPEZ:  Well, I'm going to object to foundation    03:17:59

21  and then speculation and the hearsay.  That information can

22  only be based on documents that we don't have.

23           THE COURT:  Overruled.

24  BY MR. NORTH:

25  A.   Yes.                                                        03:18:14

United States District Court

1823

ROBERT M. CARR, JR. - Direct

1    Q.   And can you tell the members of the jury how much money          03:18:15

2    has been spent by the company in research and development with

3    inferior vena cava filters?

4            MR. LOPEZ:   Same objection, Your Honor, as well as

5    best evidence and hearsay, foundation.                                03:18:24

6            THE COURT:   Overruled.

7            THE WITNESS:   About $18 million.

8    BY MR. NORTH:

9    Q.   Now, over the years have you worked closely with the

10   Marketing Department as well as activities regarding the             03:18:38

11   filters?

12   A.   Yes.

13   Q.   And many times did you partner with people in the

14   Marketing Department on various initiatives and meeting with

15   doctors and conducting clinics, training, things of that nature      03:18:49

16   regarding filters?

17   A.   Yes.

18   Q.   And are you currently a Vice President of Bard Peripheral

19   Vascular?

20   A.   Yes.                                                            03:19:00

21   Q.   And do you sit on the management board of the company?

22   A.   Yes, I do.

23   Q.   And in that role, do you have access to the budget

24   information and expenditures of other departments in the

25   company?                                                            03:19:12

United States District Court

1824

ROBERT M. CARR, JR. - Direct

1   A.   Yes.                                                          03:19:12

2   Q.   And based upon your familiarity and your access to the

3   data, do you know, happen to know how much money has been spent

4   over the years by the company in the marketing of inferior vena

5   cava filters?                                                      03:19:26

6   A.   About $6 million.

7   Q.   Now, did you begin with NMT in 1996?

8   A.   Yes.

9   Q.   And was the Recovery filter already under development at

10  that time?                                                         03:19:47

11  A.   Yes.

12  Q.   Do you know when development had started on the Recovery

13  filter?

14  A.   Not exactly, no, but prior to that.

15  Q.   While you were at NMT, did the company develop a number of   03:20:03

16  prototypes for the retrievable filter?

17  A.   Yes, many.

18  Q.   And tell us why some of the prototypes were rejected or

19  not used.

20  A.   Well, ultimately they were all rejected until the final      03:20:18

21  one because they didn't pass one test or another along the

22  development cycle.

23       Some were removed from consideration very quickly and

24  others made it all the way to animal studies and failed there.

25  So different ones for different reasons.                           03:20:37

United States District Court

1825

ROBERT M. CARR, JR. - Direct

1    Q.    When was the initial design of what ultimately became the          03:20:41
2    Recovery filter created or invented?

3    A.    In 1998 time frame.

4    Q.    Once that initial design was conceptualized, what did you

5    do next?                                                                  03:20:59

6    A.    We built some and then we tested them both in the bench

7    and in the animals.

8    Q.    And what is the purpose of bench testing?

9    A.    Well, there's a guidance document for vena cava filters of

10   tests that you need to do to satisfy your regulatory filing, so          03:21:19

11   of course we did those.  And then once you get past those, we

12   put them in animals.  Some of the things we were trying to test

13   couldn't really be done on a bench so we would use animal

14   models to test those things.

15   Q.    Did your testing include a bench test for fatigue testing?         03:21:39

16   A.    Yes.  That's one of them.

17   Q.    And did your bench testing include a test for migration

18   resistance?

19   A.    Yes.

20   Q.    What type of animal tests did the company perform?                 03:21:51

21   A.    We did two different types of tests.  We called one acute

22   or chronic or longer term.  The acute testing was really to

23   test the deployment or the placement of the filter, how

24   accurately could it be deployed, could you deploy it at all,

25   centering of the device whereas the chronic or the longer term          03:22:14

United States District Court

ROBERT M. CARR, JR. - Direct

1    set of animals was to test the removability of the filter and      03:22:21
2    any damage to the vena cava that might have happened.
3    Q.   Did Drs. Kaufman and Venbrux participate in that animal
4    testing?
5    A.   Yes, they did.                                                03:22:38
6    Q.   And are animal studies fairly typical in the industry?
7    A.   Yes, when needed.
8    Q.   Did the company also conduct a clinical study regarding
9    the Recovery filter?
10   A.   Yes.  We did a special access study in Canada.               03:22:51
11   Q.   And did that involve Dr. Murray Asch?
12   A.   Yes.
13   Q.   In your experience in the industry, are clinical studies
14   as common for these types of medical devices?
15   A.   At the time they were not but since they have become         03:23:08
16   common for optional filters.
17   Q.   Let's talk about the fatigue testing if we could.
18           MR. NORTH:   And let's pull up Exhibit 5022.
19   BY MR. NORTH:
20   Q.   Do you recognize 5022?                                       03:23:49
21   A.   Yes.  It's a lab notebook from NMT.
22   Q.   Now, when Bard took over the -- or bought the rights to
23   the Recovery filter and the Simon Nitinol filter, did the
24   development materials for the filters, those products, get
25   transferred to Bard from NMT at that time?                        03:24:08

United States District Court

1827

ROBERT M. CARR, JR. - Direct

1   A.   Yes.                                                              03:24:13

2   Q.   And did the development materials, including the testing

3   materials, then were those maintained as a part of Bard's

4   business records?

5   A.   Yes.                                                              03:24:23

6   Q.   What is the date or date range for this laboratory

7   notebook from NMT?  Can you tell?

8   A.   6-30-99.

9   Q.   And whose laboratory notebook was this?

10  A.   Andrzej Chanduszko.                                               03:24:38

11  Q.   Now, did Mr. Chanduszko work under your direction while at

12  NMT?

13  A.   Yes.

14  Q.   And then when he came to Bard, did he work under your

15  direction?                                                             03:24:52

16  A.   Yes.

17  Q.   So if Mr. Chanduszko was conducting bench testing in 1999

18  at NMT on the Recovery filter, would that have been generally

19  under your supervision?

20  A.   Yes.                                                              03:25:08

21  Q.   And would you have had had access to his laboratory

22  notebooks?

23  A.   Yes.

24  Q.   And would those notebooks have been maintained in the

25  regular course of business for first NMT and then later Bard?        03:25:15

United States District Court

                                                                1828
ROBERT M. CARR, JR. - Direct

1   A.   Yes.                                                    03:25:19

2           MR. NORTH:   Your Honor, at this time we would tender

3   Exhibit 5022.

4           MR. LOPEZ:   No objection, Your Honor.

5           THE COURT:   Admitted.                               03:25:26

6           (Exhibit Number 5022 was admitted into evidence.)

7           MR. NORTH:   May we display, Your Honor?

8           THE COURT:   Yes.

9           MR. NORTH:   If we could turn to the second page,

10  please.                                                      03:25:45

11  BY MR. NORTH:

12  Q.   Does this indicate generally when the fatigue testing --

13  or let me ask you this first:   Does this laboratory notebook

14  concern fatigue testing?

15  A.   Yes.                                                    03:25:57

16  Q.   And does it indicate the general time period when the

17  testing began?

18  A.   Yes, June 30, '99, or July 1.

19  Q.   And then if we could go to page 142, looking that the top,

20  does this give you some indication as to how long a period this  03:26:20

21  testing lasted?

22  A.   Yes.   Until February 10, 2000, February 11.   Sorry.

23  Q.   According to your review of the laboratory notebook and

24  your familiarity with that test, do you know approximately how

25  many times the Recovery filter was cycled in the fatigue test   03:26:43

1829
ROBERT M. CARR, JR. - Direct

1  and that was documented in this notebook?                    03:26:48

2  A.   Around 417 million.

3  Q.   And what does that mean to cycle the filter 417 million

4  times as a part of this test over that eight-month period?

5  A.   So it's -- to fatigue it is to move it, compress it, and   03:27:08

6  expand it or let it return to its normal diameter for -- just

7  to keep doing that literally for 417 million times.

8  Q.   Let's talk a moment about migration-resistance testing.

9          MR. NORTH:   If we could pull up 5017.

10 Q.   Do you recognize 5017?                                   03:27:51

11 A.   Yes.

12 Q.   And what is this?

13 A.   It's a design verification report for the Recovery

14 migration study.

15 Q.   And was this conducted at NMT?                           03:28:01

16 A.   Yes.

17 Q.   In what time period generally?

18 A.   It looks like August 1999.

19 Q.   And did Mr. Chanduszko participate in this testing?

20 A.   He's listed as an approver.                             03:28:20

21 Q.   And were you familiar with this test being performed and

22 the results while you were at NMT?

23 A.   Yes.

24 Q.   And were you familiar with this document while at NMT?

25 A.   Yes.                                                    03:28:29

United States District Court

1830

ROBERT M. CARR, JR. - Direct

1  Q.   And was this document maintained in the regular course of          03:28:30
2  NMT's business?
3  A.   Yes.
4  Q.   And would this have been part of the materials that were
5  transferred to Bard when Bard acquired the rights to the                 03:28:39
6  product?
7  A.   Yes.
8           MR. NORTH:  Your Honor, at this time I would tender
9  5017.
10          MR. LOPEZ:  No objection, Your Honor.                            03:28:49
11          THE COURT:  Admitted.
12          (Exhibit Number 5017 was admitted into evidence.)
13  BY MR. NORTH:
14  Q.   What was the purpose of the migration-resistance testing?
15  A.   To determine the pressure at which the vena cava filter            03:29:01
16  would move due to a clot burden.
17  Q.   And for this testing, did you assume or utilize different
18  diameter mock inferior vena cavas?
19  A.   Yes.
20  Q.   And do you recall what those were?                                  03:29:20
21  A.   28, 15 and I don't remember in between sizes.
22  Q.   And you, obviously, weren't testing these on human beings.
23   This was a bench test.  So what sort of mechanism or machine
24  did you use to actually test the migration resistance?
25  A.   We built a system to test them which consisted of a flow           03:29:46

United States District Court

ROBERT M. CARR, JR. - Direct

1  loop and then an area that we could implant the filter and we          03:29:52
2  used a sausage casing material to try and simulate the vena
3  cave where we would place the filter and then we would -- had a
4  recirculating bath and would use a different piece of sausage
5  casing to try and occlude the filter and, therefore, stop flow       03:30:13
6  and create a pressure underneath and record the pressure at
7  which the filter moved.
8  Q.   And why did you use sausage casing?
9  A.   Well chose it to implant the filter into it because it was
10 a natural material and it was available at the time.                   03:30:34
11 Q.   And why did you choose the 15 millimeter and 28 millimeter
12 diameters as the parameters to test?
13 A.   We chose 15 as the lower boundary of vena cava sizes and
14 28 was our maximum indicated diameter size.
15 Q.   Were those spelled out in the FDA guidance document?             03:31:00
16 A.   To test your maximum diameter is spelled out.
17         MR. NORTH:   If we could bring up 5126 which I believe
18 is already in evidence.  I believe it's already in evidence.
19         COURTROOM DEPUTY:   Yes, it's admitted.
20         THE COURT:   You may.                                          03:31:45
21 BY MR. NORTH:
22 Q.   Let's turn to page six if we could.  Under number five,
23 caval perforation, filter migration, first of all, are you
24 familiar with the FDA guidance?
25 A.   Yes.                                                              03:32:07

United States District Court

ROBERT M. CARR, JR. - Direct

1    Q.    What does the guidance say about the test for migration          03:32:07
2    resistance?
3    A.    It says this test should demonstrate that the filter fixes
4    itself within the vena cava at the deployment site and
5    undergoes sufficient endotheliolization.  The force necessary          03:32:19
6    for device fixation should be characterized over the range of
7    labeled inferior vena cava diameters.  In addition, this force
8    should not suggest a tendency to perforate the caval wall.
9    Q.    Is that reference to the range of labeled inferior vena
10   cava diameters that led to the selection of the 28 -- 15 and 28        03:32:40
11   millimeter parameters?
12   A.    Yes.
13   Q.    Now, how were you able to determine -- in conducting this
14   migration-resistant testing, how was the team at NMT able to
15   determine whether it passed the test, the filter?                      03:33:16
16   A.    We have an acceptance criteria that it passed.
17   Q.    And what was the acceptance criteria for the filter, for
18   that migration-resistance testing?
19   A.    It was 50 millimeters of mercury at the 28 millimeter
20   diameter.                                                              03:33:36
21   Q.    Now, was that an absolute pass/fail number or was are it a
22   mean for the test?
23   A.    It's a mean.
24   Q.    And explain to the jury what that means in that context.
25   A.    The mean of a population is the average, if you will, of         03:33:53

United States District Court

1833

ROBERT M. CARR, JR. - Direct

1    the populations.                                                  03:33:56

2    Q.    Was that the only migration resistance test that NMT or

3    Bard conducted?

4    A.    No.

5                MR. NORTH:   If we could bring up Exhibit 5232.        03:34:24

6    BY MR. NORTH:

7    Q.    Do you do recognize this document?

8    A.    Yes.

9    Q.    And what is this document?

10   A.    It's the study of our process -- after our process          03:34:34

11   validation.

12   Q.    And what is process validation?

13   A.    Do you make the product as it was intended to be made?  So

14   do you follow all the instructions?  And is what you made what

15   you intended to have done?                                        03:34:53

16   Q.    And I see that you were supposed to be -- provide a

17   signature of approval on this particular test report?

18   A.    Yes.

19   Q.    And was this test conducted by Mr. Chanduszko?

20   A.    I think he wrote the protocol.  I don't know if he did the  03:35:09

21   test.

22   Q.    Did you review this test report when it was completed?

23   A.    I'm sure that I did.

24   Q.    Do you know why this particular version is not signed?

25   A.    No, I don't.                                                03:35:24

United States District Court

1834

ROBERT M. CARR, JR. - Direct

1    Q.   Have you reviewed this defendant report?                   03:35:30

2    A.   Not in a while.

3              MR. LOPEZ:  Your Honor, not going to object -- if

4    he's laying a foundation, I'm not going to object to the

5    admission of this documents.                                   03:35:38

6              THE COURT:  All right.

7              MR. NORTH:  We'll tender for admission 5232, Your

8    Honor.

9              THE COURT:  Admitted.

10             (Exhibit Number 5232 was admitted into evidence.)    03:35:46

11   BY MR. NORTH:

12   Q.   And what were the general results of that testing, do you

13   recall?

14   A.   I can't see it.  Sorry.

15   Q.   Did Bard also continue to perform migration testing after 03:36:10

16   it began selling the Recovery filter?

17   A.   Yes.

18             MR. NORTH:  If we could show 5526.

19   BY MR. NORTH:

20   Q.   Do you recognize this particular document?                03:36:35

21   A.   Yes.

22   Q.   And what is this, Mr. Carr?

23   A.   It's a characterization test of another migration test.

24             MR. NORTH:  Your Honor, we would tender for admission

25   5526.                                                          03:36:51

United States District Court

1835

ROBERT M. CARR, JR. - Direct

1    MR. LOPEZ:  No objection, Your Honor.                    03:36:54

2    THE COURT:  Admitted.

3    (Exhibit Number 5526 was admitted into evidence.)

4    MR. NORTH:  Let's look at page nine and display that

5    to the jury.                                            03:37:03

6    BY MR. NORTH:

7    Q.   What were the acceptance criteria for this particular

8    test?

9    A.   There weren't any.  It was just a comparative test.

10   Q.   And what is the significance of not having acceptance  03:37:32

11   criteria?

12   A.   It was just to compare.  It was for information.

13   Q.   And what was the purpose of conducting competitive

14   migration testing?

15   A.   To learn -- to get more information about how filters were  03:37:57

16   performing.

17   Q.   Well, I guess what I'm asking is with the word

18   "competitive" in the title, what were you comparing the

19   Recovery filter against?

20   A.   Other vena cava filters.                           03:38:10

21   Q.   And if we could look at 5252.  Do you recognize 5252?

22   A.   Yes.

23   Q.   And what is this?

24   A.   This is the test we were talking about.

25   Q.   And do you recall what filters you were comparing the  03:38:44

United States District Court

1836

ROBERT M. CARR, JR. - Direct

1    Recovery filter to?                                                    03:38:46

2    A.    We compared it to the available filters on the market at

3    the time.

4              MR. NORTH:  Your Honor, at this time we would tender

5    5252.                                                                  03:38:58

6              MR. LOPEZ:  No objection, Your Honor.

7              THE COURT:  Admitted.

8              MR. NORTH:  If we could display to the jury.

9              THE COURT:  You may.

10             MR. NORTH:  Page 12, please.                                 03:39:05

11             (Exhibit Number 5252 was admitted into evidence.)

12   BY MR. NORTH:

13   Q.    What was the conclusion?

14   A.    The conclusion was that the migration resistance of the

15   Recovery filter appeared comparable to the Günther Tulip, which        03:39:26

16   is another removable filter, throughout all simulated IVC

17   diameters.  And the other filters seemed to have a higher -- a

18   greater resistance to migration in comparison to the Recovery

19   filter, the Günther Tulip.

20   Q.    Were the other filters that it was compared to permanent         03:39:46

21   filters?

22   A.    Yes, with the exception of the OptEase which is also a

23   short-term optional filter.

24   Q.    What do you mean by short-term optional filter?

25   A.    It has a very short window of the time that it can be            03:40:00

United States District Court

ROBERT M. CARR, JR. - Direct

1  removed.   I believe it's in the 12-day time frame.                     03:40:04
2  Q.   Did the Recovery filter -- when the test was run properly,
3  was the migration resistance above 50 millimeters of mercury
4  for that filter?
5  A.   Yes.                                                               03:40:21
6  Q.   And the second paragraph on that same page, there's a
7  reference to a large amount of test variation.
8  A.   Yes.
9  Q.   What was the circumstance that led to that, if you recall?
10 A.   So we observed a greater variation than we had seen in our         03:40:43
11 previous testing, meaning that the data wasn't as centered as
12 it had been prior.   So we did an investigation to find out
13 why -- if something had changed in the test or the person doing
14 it or whatever it was and we came up with the following, that
15 they were introducing more than one piece at a time which is        03:41:09
16 not how the test is done.   And also to create more of a layer
17 where the filter itself could implant so by creating more than
18 one layer of sausage casing.
19 Q.   Now, was this in the earlier days of the time period after
20 Bard had acquired the rights to the Recovery filter?                03:41:31
21 A.    Yes.
22 Q.   And had Bard begun to manufacture the Recovery filter at
23 one of its own facilities?
24 A.    Yes.   The manufacturing was moved from NMT to Glens Falls,
25 New York.                                                               03:41:48

United States District Court

ROBERT M. CARR, JR. - Direct

1   Q.   And when you say to Glens Falls, New York, is that a Bard          03:41:49

2   facility there?

3   A.   Yes, sorry.   It's an operations facility.

4   Q.   So did your team conduct a test to try to compare filters

5   manufactured at Bard to the performance of filters that had          03:42:04

6   previously been manufactured at NMT to make sure they were

7   meeting the performance criteria with migration resistance?

8   A.   Yes, we did.

9   Q.   All right.

10          MR. NORTH:   If we could bring up 5523, please.             03:42:18

11  BY MR. NORTH:

12  Q.   Do you recognize 5523?

13  A.   Yes.

14  Q.   And what is this?

15  A.   It is the report of the tests that you just mentioned.          03:42:32

16          MR. NORTH:   Your Honor, at this time we would tender

17  5523.

18          MR. LOPEZ:   No objection, Your Honor.

19          THE COURT:   Admitted.

20          (Exhibit Number 5523 was admitted into evidence.)           03:42:43

21          MR. NORTH:   If we could display this to the jury.

22          THE COURT:   You may.

23          MR. NORTH:   And go to page five.

24  BY MR. NORTH:

25  Q.   Did this test, again, test the migration resistance for          03:43:01

United States District Court

ROBERT M. CARR, JR. - Direct

1    two different diameters of simulated inferior vena cavas?          03:43:04

2    A.    Yes.   For 15 and 28 millimeters.

3    Q.    And then if we could go to page seven, please.   And what

4    was the conclusion?

5    A.    That Recovery filters manufactured at Glens Falls          03:43:29

6    operations, is what GFO stands for, meet the migration

7    acceptance criteria and sample population mean is equivalent to

8    the NMT sample population mean in the 28 millimeter diameter

9    cava.   Sample populations tested using the 15 millimeter

10   diameter simulated IVC were not statistically compared since     03:43:48

11   the NMT and the Nitinol Medical and the Glens Falls fixtures

12   had a different maximum pressure that could be obtained which

13   distorted the data.

14   Q.    After you conducted these various tests, how -- did Bard

15   then begin selling this product to doctors?                      03:44:15

16   A.    Yes.

17   Q.    And did Bard receive clearance from the FDA to begin

18   selling the Recovery filter as a permanent device initially?

19   A.    Yes.

20         MR. NORTH:   If we could bring up 5189.   I am not          03:44:29

21   certain if this has been admitted yet.

22         COURTROOM DEPUTY:   5189 is admitted.

23         MR. NORTH:   It is admitted?

24         MR. LOPEZ:   Your Honor, may I just ask, is this

25   subject to the agreement, though, to review it for purposes of   03:45:06

United States District Court

1840

ROBERT M. CARR, JR. - Direct

1   other hearsay?                                                                    03:45:09

2             COURTROOM DEPUTY:  Yes, it is.

3             THE COURT:  Yes, it is.

4             MR. LOPEZ:  Thank you, Your Honor.

5   BY MR. NORTH:                                                                     03:45:14

6   Q.   Is this the submission to the FDA regarding -- let's look

7   at the second page if we could actually.  Seeking the initial

8   clearance of the device as a permanent filter?

9   A.   Yes.

10  Q.   And were you involved in the preparation of this 510(k)?    03:45:31

11  A.   Yes.

12            MR. NORTH:  If we could turn to page 18.  If we could

13  just display this page.

14            THE COURT:  Any objection to this page, Mr. Lopez?

15            MR. LOPEZ:  No, Your Honor.                                             03:45:56

16            THE COURT:  You mail.

17  BY MR. NORTH:

18  Q.   What does page 18 demonstrate here?

19  A.   It is the summary of the design control activities that

20  were done to support this submission.                                            03:46:08

21  Q.   And does it provide you, provide an actual list of the

22  tests that had been performed there on the right?

23  A.   Yes.

24  Q.   And had all of those tests been performed on the Recovery

25  filter?                                                                          03:46:26

United States District Court

1841

ROBERT M. CARR, JR. - Direct

1    A.    Yes.                                                    03:46:27

2    Q.    What is clot trapping efficiency testing?

3    A.    It is how well a filter traps the clots that are coming

4    from below.  So the object of a filter is to prevent those

5    clots.                                                       03:46:52

6    Q.    And we talked about migration studies; correct?

7    A.    Yes.

8    Q.    What about weld integrity, what is that testing for?

9    A.    It tests the joints and the bonds of different parts of

10   the system on the delivery system as well as the filter.     03:47:01

11   Q.    And what about hook strength?

12   A.    Measures the force required to straighten the hook.  The

13   hook is a half a circle, if you will, shaped and the way it

14   comes out of the vena cava is to truly straighten out and so we

15   measure that force.                                           03:47:23

16   Q.    And we talked about the corrosion or fatigue testing;

17   correct?

18   A.    Yes.

19   Q.    What about radial strength, what does that test?

20   A.    Radial strength tests the outward force of the elements, 03:47:34

21   so as they are constrained, they have an opposite force that's

22   applied outward.

23   Q.    And what is spline glue joint tensile test?

24   A.    It is the test of the glue joint.  It is a test where we

25   measure a bond of a piece we call the spline that is glued onto 03:48:03

United States District Court

1842

ROBERT M. CARR, JR. - Direct

1    a wire and that piece can't move so we pull it to measure that        03:48:09

2    force.

3    Q.    And a simulated use study?

4    A.    Is the animal studies.

5    Q.    Now, did Bard provide the FDA with actual information          03:48:27

6    concerning those studies?

7    A.    Yes.

8    Q.    Did they provide test reports or summaries or what was the

9    form of the information provided?

10   A.    Might have been summaries at first and ultimately the          03:48:41

11   reports.

12              MR. NORTH:   If we could look at 5187, please.

13   BY MR. NORTH:

14   Q.    Once the 510(k) was submitted in the summer of 2002 to the

15   FDA for clearance of the device Recovery filter as a permanent       03:49:22

16   filter, did the FDA pose a number of questions to the company?

17   A.    Yes, they did.

18   Q.    And did they -- did the company receive those questions

19   from the agency?

20   A.    Yes.                                                           03:49:42

21   Q.    And were the questions shared to you -- with you once they

22   arrived.

23   A.    Yes.

24   Q.    And did a number of those questions deal with the testing

25   of the filter?                                                       03:49:53

ROBERT M. CARR, JR. - Direct

1  A.   Yes.                                                          03:49:54

2  Q.   And do you recognize the letter dated August 5 of 2002

3  that is Exhibit 5187?

4  A.   Yes.

5  Q.   And did the company receive this as a part of its routine     03:50:03

6  business practices?

7  A.   Yes.

8  Q.   And did you maintain this letter in your business files?

9  A.   Yes.

10         MR. NORTH:  Your Honor, at this time we would tender        03:50:15

11 5187.

12         MR. LOPEZ:  No objection, Your Honor.

13         THE COURT:  Admitted.

14         (Exhibit Number 5187 was admitted into evidence.)

15 BY MR. NORTH:                                                       03:50:26

16 Q.   And what involvement did you have personally in preparing

17 the response to this letter?

18 A.   I was very much involved in both answering questions,

19 reviewing the answers that I didn't write.

20 Q.   Do you recall how many different questions the agency          03:50:50

21 asked Bard regarding the Recovery filter submission?

22 A.   I think 17.

23 Q.   Let's start and look at page two if we could.

24         MR. NORTH:  Could we display this to the jury, Your

25 Honor?                                                              03:51:03

United States District Court

ROBERT M. CARR, JR. - Direct

| | | |
|---|---|---|
| 1 | THE COURT:  You may. | 03:51:03 |
| 2 | BY MR. NORTH: | |
| 3 | Q.   Did the agency ask some questions about the bench | |
| 4 | performance testing Bard had conducted? | |
| 5 | A.   Yes. | 03:51:16 |
| 6 | Q.   What sorts of things were they inquiring about? | |
| 7 | A.   The first one or question three is about the clot-trapping | |
| 8 | efficiency and the center one is about clot-trapping efficiency | |
| 9 | again. | |
| 10 | Q.   Let's go down to number eight.  What were they asking | 03:51:41 |
| 11 | about there? | |
| 12 | A.   It's about caval perforation, does the filter go through | |
| 13 | the caval wall? | |
| 14 | Q.   What about in question number nine, what was the agency | |
| 15 | asking about? | 03:51:58 |
| 16 | A.   Corrosion and fracture resistance. | |
| 17 | Q.   Did they request additional data? | |
| 18 | A.   They did. | |
| 19 | Q.   Concerning what? | |
| 20 | A.   The integrity of the device. | 03:52:10 |
| 21 | Q.   Let's go to the next page and look at question 12.  What | |
| 22 | were they inquiring about there? | |
| 23 | A.   The weld integrity of the device which is at the tip of | |
| 24 | the filter. | |
| 25 | Q.   Let's look at question 14.  What were they inquiring about | 03:52:39 |

United States District Court

1845

ROBERT M. CARR, JR. - Direct

1    there?                                                      03:52:41

2    A.    The radial strength.

3    Q.    And what about in question 15 and 16?

4    A.    Those refer to biocompatibility testing.

5    Q.    And what is that test for, biocompatibility?           03:52:52

6    A.    To show that the device doesn't have a reaction in the

7    body essentially.

8    Q.    In question 15, did the agency specifically refer you to

9    the IVC filter guidance we had discussed?

10   A.    Yes.                                                   03:53:09

11   Q.    Did Bard respond to these questions?

12   A.    Yes, we did.

13         MR. NORTH:   Let's pull up Exhibit 5182 if we could.

14   Q.    Do you recognize 5182?

15   A.    Yes.                                                   03:53:35

16   Q.    And what is that?

17   A.    It is our response to their questions.

18   Q.    And who actually prepared this response?

19   A.    Many people helped prepare it.

20   Q.    And is this maintained in Bard's business records?      03:54:06

21   A.    Yes.

22         MR. NORTH:   Your Honor, at this time we would tender

23   5182.

24         MR. LOPEZ:   Subject to our agreement to discuss,

25   hearsay within hearsay.                                      03:54:14

United States District Court

ROBERT M. CARR, JR. - Direct

1    THE COURT:  All right.  Admitted subject to that                  03:54:15

2  agreement.

3    (Exhibit Number 5182 was admitted into evidence.)

4  BY MR. NORTH:

5  Q.    If we could display page 11.  I don't believe this will      03:54:29

6  implicate the agreement.

7    MR. LOPEZ:  No objection, Your Honor.

8    THE COURT:  You may display it.

9  BY MR. NORTH:

10  Q.    Is this where the company is providing information to the    03:54:53

11  agency in response to questions concerning fatigue and

12  corrosion testing?

13  A.    Yes, question nine.

14  Q.    If we could go to the next page.

15    Did you talk here and provide the agency with any               03:55:25

16  details about the cycles that had been done with the some of

17  the fatigue testing?

18  A.    Yes.  All filters at the bottom there met the acceptance

19  criteria after ten years, pulmonary output greater than 32

20  million cycles.                                                    03:55:46

21  Q.    As we discussed earlier, did the company go beyond 32

22  million cycles?

23  A.    Yes.  We carried it out to about 417 million.

24  Q.    Did the company provide the agency with actual test

25  reports and test protocols that were attached to this letter?     03:56:03

United States District Court

ROBERT M. CARR, JR. - Direct

1  A.   Yes.                                                    03:56:08

2  Q.   Did they provide the agency with actual test results for

3  simulated use testing?

4  A.   Yes, we would have provided everything they asked for.

5  Q.   So after Bard sent this letter in the end of August of   03:56:23

6  2002, did the FDA come back with additional questions to Bard

7  concerning the Recovery filter?

8  A.   Yes.

9          MR. NORTH:  If we could look at Exhibit 5179.

10 BY MR. NORTH:                                                 03:56:47

11 Q.   Do you recognize Exhibit 5179?

12 A.   Yes.

13 Q.   And is it a letter received October 4 of 2002?

14         MR. LOPEZ:  No objection to foundation, Your Honor,

15 or admission subject to our hearsay discussion.               03:56:59

16         MR. NORTH:  I will tender the exhibit, Your Honor.

17         THE COURT:  All right.  Admitted subject to the

18 parties' review.

19         (Exhibit Number 5179 was admitted into evidence.)

20         THE WITNESS:  I'm sorry.  What was the question?      03:57:12

21 BY MR. NORTH:

22 Q.   Was the letter received on October 4, 2002?

23 A.   Yes.

24 Q.   A little over a month after Bard had sent its responses to

25 the FDA?                                                      03:57:22

United States District Court

1848

ROBERT M. CARR, JR. - Direct

1    A.   Yes.                                                          03:57:24

2    Q.   And did the FDA ask some additional questions as a part of

3    this letter?

4    A.   Yes, they did.

5    Q.   Let's look at question one if we can.                         03:57:37

6             MR. NORTH:  If we could display this, Your Honor.

7             THE COURT:  You may.

8    BY MR. NORTH:

9    Q.   Did the agency ask you questions then about -- further

10   questions about the clot-trapping deficiency testing?             03:57:54

11   A.   Yes, they did about the size of the clots used.

12   Q.   And if we could go down to number two.  Did they ask you

13   questions about radial strength testing?

14   A.   Yes, they did.

15            MR. NORTH:  Now if we could go to Exhibit 5178.           03:58:20

16   BY MR. NORTH:

17   Q.   Did Bard respond approximately three weeks later to the

18   agency's second set of questions regarding the Recovery filter?

19   A.   Yes.

20   Q.   And is this letter the response that was sent to the FDA     03:58:48

21   concerning its questions?

22   A.   Yes.

23   Q.   And, again, were you involved in fashioning this response?

24   A.   Yes.

25            MR. NORTH:  Your Honor, we would tender 5178.            03:59:03

United States District Court

ROBERT M. CARR, JR. - Direct

1      MR. LOPEZ:  No objection, Your Honor.                    03:59:06

2      MR. NORTH:  If we could display this, please.

3      THE COURT:  Yes.

4      (Exhibit Number 5178 was admitted into evidence.)

5      MR. LOPEZ:  May I see the signature page before we       03:59:14

6  move on?

7      THE COURT:  Yes.

8      MR. LOPEZ:  And, again, this is still subject to our

9  agreement on these type of documents?

10     THE COURT:  All right.  Admitted subject to that         03:59:21

11 agreement.

12     MR. NORTH:  Could we display page two, please.

13 BY MR. NORTH:

14 Q.   So did the company provide the FDA with additional

15 information in response to its various inquiries?            03:59:41

16 A.   Yes, we did.

17 Q.   After the company submitted this additional information,

18 did the FDA then clear the Recovery filter for permanent use?

19 A.   We received concurrence, yes.

20 Q.   Now, thereafter, the next year, the company then sought  04:00:18

21 clearance of the Recovery filter for use as a retrievable

22 device; correct?

23 A.   Yes.

24 Q.   And did the agency again ask a series of questions of the

25 company when you sought clearance for retrievability?         04:00:29

1850

ROBERT M. CARR, JR. - Direct

1    A.   Yes.                                                          04:00:34

2              MR. NORTH:   If we could look at Exhibit 6082.

3    BY MR. NORTH:

4    Q.   Did the agency sometimes communicate with Bard in posing

5    questions by email as opposed to formal letter?                   04:00:50

6    A.   Yes.

7    Q.   And do you recall getting email requests from the FDA

8    regarding this particular 510(k) submission or do you recall

9    the company getting emails?

10   A.   Yes.                                                          04:01:12

11   Q.   And would you have been involved in responding to those

12   emails?

13   A.   Yes.

14   Q.   And would those emails then have been kept as a part of

15   the formal correspondence file and business records of the        04:01:20

16   company for the 510(k)?

17   A.   Yes.

18              MR. NORTH:   Your Honor, at this time we would submit

19   6082.

20              MR. LOPEZ:   I think we have a 602 issue as well as an  04:01:34

21   802.   I don't think he's on the emails.

22              THE COURT:   To establish this as a business record,

23   Mr. North, I think he has to have knowledge with respect to

24   this specific document and I don't think you've established

25   that.                                                             04:01:56

United States District Court

ROBERT M. CARR, JR. - Direct

1  BY MR. NORTH:                                                    04:01:57
2  Q.   Mr. Carr, did you see this particular document when it
3  arrived at the company, these emails?
4  A.   I'm sure that we reviewed it.
5  Q.   Did you assist the company in responding to the emails?   04:02:07
6  A.   Yes.
7  Q.   And do you specifically recall having worked on those
8  responses?
9  A.   Yes.
10         MR. NORTH:  Your Honor, at this time we would tender    04:02:18
11  it.
12         MR. LOPEZ:  I'm still not sure he satisfied 602, Your
13  Honor.
14         THE COURT:  I'm going to overrule 602.  And you made
15  an 802 objection?                                              04:02:29
16         MR. LOPEZ:  Yes, I did.  I'll add that.
17         THE COURT:  Okay.  What's the defect on the business
18  records in your view?
19         MR. NORTH:  I'm sorry, Your Honor?
20         THE COURT:  I'm asking this to Mr. Lopez.  What's the   04:02:39
21  defect on the business records foundation?
22         MR. LOPEZ:  Well, I'm not sure it's a business
23  record.  It's an email communication between two people whose
24  names I don't recognize.  If we can establish who these people
25  are, maybe it would help a little bit.                         04:02:57

United States District Court

ROBERT M. CARR, JR. - Direct

BY MR. NORTH:                                                    04:03:04

Q.    Do you know who Lisa Kennell is?

A.    Yes.  She was an FDA reviewer.

Q.    Was she the FDA person in charge of reviewing the Recovery

filter applications or submissions, to your knowledge?       04:03:12

A.    I don't know if she was in charge but she was the

reviewer.

Q.    And do you know who Aymee Berry is or was?

A.    I think she still is.  She was a regulatory person at

Bard.                                                           04:03:28

        MR. LOPEZ:  Your Honor, I just noticed this is not

even a Bard document.

        THE COURT:  Well, rather than keep the jury waiting,

why don't we continue this discussion after we're finished and

that way I can hear you out fully without keeping them waiting. 04:03:43

If you can move on with other questions, Mr. North.

        MR. NORTH:  Sure.

        If we could bring up 5164, please.

BY MR. NORTH:

Q.    Do you recall seeing 5164, Mr. Carr?                      04:04:07

A.    Yes.

Q.    And what is this document?

A.    It's a fax at the time back to the FDA for the stability

protocol, the test report, the adoption rationale and the

accelerated aging protocol for the filter.                     04:04:28

United States District Court

1853

ROBERT M. CARR, JR. - Direct

1   Q.   Were you involved in any way in preparing --                     04:04:34

2             MR. NORTH:  Let's go to the next page if we could.

3   The next page after that.

4   Q.   -- in preparing this information, collecting this

5   information?                                                          04:04:49

6   A.   Yes.

7   Q.   And was this in response to the FDA's latest round of

8   questions that we were just reviewing?

9   A.   Yes.

10  Q.   And is this response maintained in the business records of       04:04:57

11  the company?

12  A.   Yes.

13  Q.   Ed?

14            MR. NORTH:  Your Honor, at this time I would tender

15  5164.                                                                 04:05:05

16            MR. LOPEZ:  No objection, Your Honor.

17            THE COURT:  Admitted.

18            (Exhibit Number 5164 was admitted into evidence.)

19            MR. NORTH:  If we could go back to the first page

20  and, Your Honor, publish that to the jury.                            04:05:17

21            THE COURT:  You may.

22  BY MR. NORTH:

23  Q.   What test reports were you furnishing the FDA at the

24  agency's request in response to these questions?

25  A.   A Stability Protocol and the associated report, a what we        04:05:36

United States District Court

1854

ROBERT M. CARR, JR. - Direct

1    call a SPAR, a Stability Product Adoption Rationale, and an          04:05:43
2    Accelerated Aging Protocol.
3    Q.    What are the stability reports and tests, what do those
4    concern?
5    A.    We have what's called a shelf life of the product, so how     04:05:57
6    long from the date it's manufactured to the time it can be used
7    by the physician.
8    Q.    After you finished this additional information to the
9    agency, did the FDA clear the Recovery filter for retrievable
10   use?                                                                04:06:15
11   A.    As an optional filter, yes.
12   Q.    Mr. Carr, when did you start the development process for
13   the G2 filter?
14   A.    I think in 2004.
15   Q.    And why did Bard decide to start developing the G2 filter?    04:06:38
16   A.    We always want to replace yourselves and as we see
17   opportunities to make next generation or advancements to our
18   products, we do that so others don't.
19   Q.    And what were the specific design attributes that Bard was
20   seeking to improve upon?                                            04:07:01
21   A.    Migration resistance, also fatigue resistance and
22   centering.
23   Q.    During the time the Recovery filter was on the market,
24   were you involved in the investigation of reports of patient
25   death?                                                              04:07:22

United States District Court

1855

ROBERT M. CARR, JR. - Direct

1   A.   Yes.                                                     04:07:25

2   Q.   And we've heard testimony in this trial about the first

3   report coming in in February of 2004 about a patient death in

4   Miami.  Did you get involved in the investigation of that

5   event?                                                        04:07:39

6   A.   Very.

7   Q.   Tell me what role you played personally in that

8   investigation, Mr. Carr.

9   A.   About a day or two after it happened, I personally flew to

10  Miami and met with the physician who implanted the device,     04:07:52

11  their Risk Management group at the hospital, and we began an

12  investigation to figure out everything we could about what

13  happened in that case.

14  Q.   And what did you learn as part of your investigation of

15  that event?                                                   04:08:17

16  A.   The filter was overcome by massive clot.

17         MR. LOPEZ:  Your Honor, I think this is asking for a

18  narrative that may include a lot of hearsay, so I'm going to

19  object on those grounds.

20         THE COURT:  Well, there has been no hearsay            04:08:28

21  requested.  He just asked a question so I'm going to overrule

22  that objection.

23         THE WITNESS:  So we were at the hospital and saw the

24  actual clot that had overcome the filter; and as I said, it was

25  massive and the physician who we were working with was also    04:08:47

United States District Court

1856

ROBERT M. CARR, JR. - Direct

1    very surprised at the size that it was.  And so the filter was          04:08:55

2    nearly completely encased in the clot and, unfortunately, it

3    was in the patient's heart.

4              After that we did a complete evaluation of the device

5    itself, the manufacturing, was it made to specification, all of         04:09:13

6    those kinds of things.

7    Q.   Has the company received a few additional reports of

8    patients who died with the Recovery filter in place?  Did you

9    notice any trend in attributes of those patients?

10   A.   Yes.  They were -- most had been overcome by a large clot          04:09:47

11   and several were bariatric patients or patients having gastric

12   bypass surgery.

13   Q.   What sort of investigative activities did the company and

14   you yourself conduct in those -- during that time period as

15   these reports came in?                                                  04:10:10

16   A.   We were speaking with our consultants on a very routine

17   basis, that would be Dr. Kaufman and Venbrux.  We convened a

18   panel of physicians to talk to them about what we were

19   observing and was there anything in particular to learn about

20   those patients that we didn't know before and we tried to learn         04:10:33

21   everything that we could.

22   Q.   So what specific changes just in general were made to see

23   the Recovery filter to become the G2?

24   A.   So we made the base of the filter wider so -- arms and

25   legs is how I refer to the two levels of the filter.  And where         04:11:04

United States District Court

ROBERT M. CARR, JR. - Direct

1    the arms came out of the tube at the top, we changed that angle    04:11:09

2    and made it -- we removed the stress from that paint.

3              As I said, we made the base of the filter wider.  We

4    made the arms longer and we also increased the diameter of the

5    wire that makes the hook.                                          04:11:30

6    Q.    Now, if we could display, show 5296.  What is a PPS,

7    Mr. Carr?

8    A.    It is a Product Performance Specification.

9    Q.    And what does that mean?

10   A.    It defines the different specifications or attributes that   04:11:57

11   any device -- in this case a filter -- must meet.

12   Q.    And what is the purpose of the PPS?

13   A.    To identify potential causes of complications and then to

14   mitigate those through design and testing.

15   Q.    This PPS appears to be for the modified Recovery filter.     04:12:32

16   What is that?

17   A.    It's what became the G2.

18             MR. NORTH:  Your Honor, at this time I would tender

19   5296.

20             MR. LOPEZ:  Can I just see the rest of the document,     04:12:44

21   Your Honor.

22             MR. NORTH:  Can you scroll to the next page?

23             MR. LOPEZ:  Just two pages?

24             MR. NORTH:  It's 30 papers.

25             MR. LOPEZ:  Oh, I don't need to see them all.            04:13:02

United States District Court

ROBERT M. CARR, JR. - Direct

| | | |
|---|---|---|
| 1 | There's no objection, Your Honor.  I've seen this document | 04:13:04 |
| 2 | before. | |
| 3 | THE COURT:  All right.  5296 is admitted. | |
| 4 | (Exhibit Number 5296 was admitted into evidence.) | |
| 5 | MR. NORTH:  Could we display, Your Honor? | 04:13:11 |
| 6 | THE COURT:  You may. | |
| 7 | MR. NORTH:  Could we turn to page 17, please. | |
| 8 | BY MR. NORTH: | |
| 9 | Q.   Does this document reference the tests that had been | |
| 10 | performed in the development of the G2? | 04:13:27 |
| 11 | A.   Yes.  The right most column where it says reference | |
| 12 | documents, those are the actual documents that support that row | |
| 13 | or design characteristic. | |
| 14 | Q.   And this reflects tests concerning what attributes of the | |
| 15 | G2 filter? | 04:13:53 |
| 16 | A.   On this page, filter migration, radial strength, weld | |
| 17 | strength, and hook creep resistance. | |
| 18 | Q.   And did the device pass or fail those tests? | |
| 19 | A.   Ultimately, it passed them all. | |
| 20 | MR. NORTH:  Let's look at the next page if we could. | 04:14:14 |
| 21 | BY MR. NORTH: | |
| 22 | Q.   Does this reflect additional tests that were performed? | |
| 23 | A.   Yes. | |
| 24 | Q.   What are those tests? | |
| 25 | A.   Fatigue resistance, two different ways to test it, filter | 04:14:26 |

United States District Court

1859

ROBERT M. CARR, JR. - Direct

| | |
|---|---|
| 1 | centering, the removal force of the filter and also kink | 04:14:31 |
| 2 | resistance of the delivery system. |
| 3 | Q.   And did the device, the G2, pass or fail those tests? |
| 4 | A.   It passed. |
| 5 |         MR. NORTH:  If we could go to the next page. | 04:14:51 |
| 6 | BY MR. NORTH: |
| 7 | Q.   Does this reflect additional tests that had been |
| 8 | conducted? |
| 9 | A.   Yes. |
| 10 | Q.   Do most of these tests concern -- what do they concern? | 04:14:57 |
| 11 | A.   The delivery system. |
| 12 | Q.   And did the device pass or fail the test? |
| 13 | A.   It passed. |
| 14 |         MR. NORTH:  Next page, please. |
| 15 | BY MR. NORTH: | 04:15:12 |
| 16 | Q.   Are these additional tests that the filter passed? |
| 17 | A.   The delivery system in particular, yes. |
| 18 |         MR. NORTH:  And the next page, please. |
| 19 | Q.   Is this, again, in the delivery system? |
| 20 | A.   Yes. | 04:15:31 |
| 21 | Q.   And did the filter pass all of these tests? |
| 22 | A.   Yes. |
| 23 | Q.   Was animal testing performed on the G2? |
| 24 | A.   Yes. |
| 25 | Q.   And were there two types of animal testing again? | 04:15:46 |

United States District Court

1860

ROBERT M. CARR, JR. - Direct

1    A.   Yes.   The same battery of tests.                                    04:15:49

2             MR. NORTH:   If we could pull up 5301.

3    BY MR. NORTH:

4    Q.   Do you recognize this document, Mr. Carr?

5    A.   Yes.                                                                 04:16:10

6    Q.   And what is this?

7    A.   It's the animal report for G2.

8    Q.   Now, it says for the Recovery filter G1A.   Is that what

9    eventually became the G2?

10   A.   It is.                                                               04:16:24

11            MR. NORTH:   Your Honor, at this time we would tender

12   5301.

13            MR. LOPEZ:   No objection, Your Honor.

14            THE COURT:   Admitted.

15            (Exhibit Number 5301 was admitted into evidence.)             04:16:32

16   BY MR. NORTH:

17   Q.   And, again, what sorts of attributes were these animal

18   tests?

19   A.   There was the acute testing which, again, tested

20   deployment accuracy and centering and the ability to -- for the        04:16:47

21   delivery system to get to the intended site and then the

22   chronic testing which tested the removability of the device

23   longer term.

24            MR. NORTH:   And if we could put up 5304, please.

25   Q.   Is this another test, the chronic animal test, performed          04:17:12

United States District Court

1861

ROBERT M. CARR, JR. - Direct

1   on the G2?                                                          04:17:16

2   A.   Yes, it's the report from chronic the test.

3            MR. NORTH:   Your Honor, at this time we would tender

4   5304.

5            MR. LOPEZ:   No objection.                                 04:17:24

6            THE COURT:   Admitted.

7            (Exhibit Number 5304 was admitted into evidence.)

8   BY MR. NORTH:

9   Q.   Did the filter, the G2, pass all of these animal tests?

10  A.   Yes.                                                           04:17:33

11           MR. NORTH:   Now if we could, let's look at 5302.

12           MR. LOPEZ:   No objection, Your Honor.

13           MR. NORTH:   It may have been admitted.  I'm not sure.

14           COURTROOM DEPUTY:   5302 is not admitted.

15           MR. NORTH:   Okay.  Yes.                                   04:17:56

16           THE COURT:   Are you moving it into evidence?

17           MR. NORTH:   Yes, Your Honor.  I'm sorry.

18           THE COURT:   All right.  It's admitted.

19           (Exhibit Number 5302 was admitted into evidence.)

20           MR. NORTH:   Could we display this to the jury?           04:18:08

21  BY MR. NORTH:

22  Q.   Tell the members of the jury what this particular report

23  concerns.

24  A.   This is the protocol for the testing for the design

25  verification and validation of the G2 filter.                      04:18:30

United States District Court

ROBERT M. CARR, JR. - Direct

1    Q.    How does design verification and validation fit into the          04:18:33

2    product development cycle we discussed earlier?

3    A.    It's the ultimate testing prior to submission, it's the

4    battery of tests that are used to satisfy the guidance

5    documents and incorporate it in the regulatory submission.           04:18:53

6          MR. NORTH:   And then if we could show 5303 which I do

7    think has been admitted.

8          THE COURT:   It's in evidence.

9          MR. NORTH:   And if we could display that to the jury,

10   please.                                                               04:19:15

11         THE COURT:   Yes.

12   BY MR. NORTH:

13   Q.    I believe you said the last document we looked at was the

14   protocol.  Is this the actual test document itself?

15   A.    Yes.  This is the report.                                       04:19:26

16         MR. NORTH:   If we could look at page nine, please.

17   BY MR. NORTH:

18   Q.    Does this begin a lengthy discussion of the test results

19   and summary of the data regarding the development of the G2

20   filter?                                                               04:19:49

21   A.    Yes.  We go through each and every test.

22   Q.    If we go to the next page, 10, does this show more tests?

23   A.    Yes.

24   Q.    Page 11, please.  And more?

25         Page 12.  Are these additional tests?                          04:20:08

United States District Court

1863

ROBERT M. CARR, JR. - Direct

1   A.   Yes.                                                    04:20:13

2   Q.   Page 13?

3   A.   Yes.

4   Q.   Did the G2 filter pass all of these tests?

5   A.   Ultimately, yes.                                        04:20:26

6            THE COURT:  We are at 4:20 Mr. North so we are going

7   to break for the day.  Ladies and gentlemen, we'll plan to see

8   you at nine tomorrow morning.  Thanks for your attention today.

9            We will excuse the jury.

10           (Jury departs at 4:20.)                             04:20:42

11           THE COURT:  Go ahead and step down.  Let me give you

12  your time, counsel, and then I just want to talk about a couple

13  of other matters.

14           All right.  Counsel, as of the end of today,

15  plaintiff has used 27 hours and two minutes; defendants have    04:22:43

16  used 16 hours and seven minutes.  We entered an order this

17  morning that ruled on the three deposition designations that

18  the defendants asked that I rule on over the weekend.

19           I have not had time yet to read the FDA letter

20  briefs.  I'll look at those this evening.  We need to talk       04:23:10

21  about Exhibit 6082 which is the one that we were discussing

22  while the jury was waiting.

23           MR. NORTH:  Your Honor, I'm sorry.  I can

24  short-circuit that.  I'll withdraw it because I think the

25  response handled everything I need.                             04:23:31

United States District Court

1864
ROBERT M. CARR, JR. - Direct

1    THE COURT:  Okay.  And then, lastly, we have jury          04:23:33

2   instructions to give you.  I'm going to give you a set that is

3   red-lined so that you can see what I changed from the last

4   version and a clean set so that you can review those, too.

5    When you look through them, you'll note that a number       04:23:56

6   of them are things that we more or less agreed on when we

7   talked last.  I am still considering what we ought to do on the

8   intervening cause instruction.  We did make one overall change

9   and that is we reworded it to match the wording in the

10  restatement which we thought was just clearer.  The restatement  04:24:20

11  talks about a superseding cause which comes about by an

12  intervening act rather than an intervening cause, and I thought

13  that was more consistent with the notion of intervening cause.

14  It has to, in effect, supersede any proximate cause that was

15  attributable to the defendant.  But look at that language and    04:24:39

16  see what you think.

17    We found nothing in the restatement on this question

18  of whether intervening cause can be for part or all.  We found

19  one case, one old case, where the instruction was given that it

20  can be for part.  It's not a Georgia case.  There seems to be a   04:24:55

21  date of birth of authority on this issue.

22    I've reread *Coleman* today.  I want to think about it

23  a bit.  So my point on that is, I'm still interested in your

24  comments tomorrow evening on the intervening cause instruction.

25  We changed Bard to singular throughout the instructions, made a   04:25:15

United States District Court

ROBERT M. CARR, JR. - Direct

1    number of other changes that we had talked through with you.          04:25:20

2    We modified the verdict form to match that and include the

3    burdens of proof on each of the issues that the jury is asked

4    to rule on.

5         So please given those a careful review because          04:25:31

6    tomorrow evening will be really the full opportunity I'll have

7    to hear any other comments you have.  I'm not going to have

8    time Wednesday evening; and, in fact, we may, depending on how

9    long the cases take, present the instructions to the jury

10   before the close of the day on Wednesday.          04:25:47

11        If you have proposed instructions you want me to

12   consider tomorrow, you need to hand them to me in writing

13   rather than just talk about concepts.  If you just talk about

14   concepts, we're going to have to do some drafting and find

15   another time to meet and confer and I don't think we'll have          04:26:07

16   that opportunity on Wednesday.  So I know one of the issues

17   from both sides will be what to do with FDA instructions.  If

18   you think something different from what you submitted on that

19   issue should be given, please have a draft of that ready for me

20   to look at and any other instructions you want me to consider          04:26:20

21   please have those ready for me to review.

22        Any questions on jury instructions?

23        Have I left anything out, Jeff?  Anything?

24        Okay.

25        MR. LOPEZ:  Your Honor, I know you have a hearing but          04:26:42

United States District Court

1866

ROBERT M. CARR, JR. - Direct

1   we need to address this time issue.  I have too much to say          04:26:43
2   about that right now.
3           THE COURT:  What do you mean the time issue?
4           MR. LOPEZ:  The amount of time that we have left to
5   finish this mini-trial on the FDA which is of concern to us.          04:26:50
6   We're not going to have an opportunity to finish
7   cross-examining these people and have time to argue the case,
8   it's clear.
9           THE COURT:  Well, I've given you two additional
10  hours.                                                               04:27:04
11          MR. LOPEZ:  Well, you know, I mean, again, when we
12  agreed for this to be a 12-day trial, we didn't anticipate --
13  we both -- look it, both sides I think read the tea leaves
14  wrong.  We had a case in Florida where both sides -- defense
15  didn't want to stipulate to your ruling, what your ruling was        04:27:21
16  going to be on that issue.
17          So, I mean, we're living this mini-trial right now
18  that the Fourth Circuit and the 11th Circuit talk about and
19  keeping this kind of evidence out.  If this was just a case
20  about 510(k) clearance process, we would be fine with that.          04:27:36
21  We're having to deal with every single communication back and
22  forth between FDA, whether or not FDA issued a recall.  We've
23  got to figure out a way to deal with that, ask lots of
24  questions about that.
25          All I'm telling you, Your Honor, is we've gotten rid         04:27:58

ROBERT M. CARR, JR. - Direct

1   of three experts to try to squeeze this case into the time          04:28:00
2   allotment and we've taken down six or seven depositions we
3   would have loved to have played and which means that we're not
4   getting in a lot of the documents that we were hoping to get
5   in.                                                                  04:28:13

6          You know, we feel okay about our case, don't get me
7   wrong, but there's no way that we're going to be able to
8   appropriately cross-examine the folks that are left, including
9   Mr. Carr, in 30 minutes and leaving us an hour and a half to
10  argue the case and maybe do a little bit of rebuttal and have a     04:28:33
11  few minutes left to argue punitive damages.  It's just not
12  going to happen.  We're going to be faced with a situation
13  where if this time is imposed upon us as strictly as it
14  currently is, we're just going to have to sit here for the last
15  two or three witnesses and not cross-examine them and not argue     04:28:51
16  our case.

17         THE COURT:  Mr. Lopez, my view of this trial is that
18  you have wasted six or seven hours in repetitious work in the
19  trial.  On Friday afternoon I watched two hours of deposition
20  testimony that you presented.  I watched the clock to see how       04:29:11
21  much of that was new and, by my view, 15 minutes of that two
22  hours was evidence that had not already been presented multiple
23  times.

24         On one of the witnesses today, the defense attorney
25  asked the exact same question six times, and I counted them.        04:29:26

United States District Court

ROBERT M. CARR, JR. - Direct

1    There's been that kind of repetitious from the beginning so I    04:29:32
2    cannot accept the proposition that you have been short-changed
3    on time.  You've chosen to emphasize the things you have I
4    think for good strategic reason.  But you knew coming in you
5    had 27 hours.  I've increased that to 29.  We don't have the    04:29:45
6    ability to invent time and come up with it.  And so if we're
7    going to get this case to the jury on the time I told them we
8    would get it to them, there is no additional time.

9              MR. LOPEZ:  Well, Your Honor, they didn't ask for
10   more time and we did.    04:30:04

11             THE COURT:  And I gave it to you.

12             MR. LOPEZ:  You gave half to them.

13             THE COURT:  You think I should have just given it to
14   you?

15             MR. LOPEZ:  Well, we have the burden of proof in this    04:30:11
16   case, Your Honor.  I have done time cases before where we got a
17   significantly more amount of time.

18             THE COURT:  You have never mentioned that until now.
19   In all of our discussions of time, you've never once suggested
20   that plaintiff should have more time than defendants and this    04:30:24
21   is the first time you've raised that.

22             MR. LOPEZ:  Well, but here's the point.  We're now
23   seeing today, Friday, this FDA, FDA, FDA.  We have to deal with
24   that.  We weren't -- I mean, again, this is the mini-trial that
25   the Fourth Circuit and 11th Circuit talk about.  We had no idea    04:30:46

United States District Court

ROBERT M. CARR, JR. - Direct

 1  that the kind of evidence -- we can deal with it but not in the    04:30:50
 2  next two hours or the next hour.

 3          THE COURT:  The problem I have with that, Mr. Lopez,
 4  is that you waited to bring the Cisson motion, which had a
 5  massive effect if I would have granted it, on the nature of    04:31:04
 6  this case until we got to motions *in limine*.  You never raised
 7  it earlier as something that could focus the discovery when we
 8  were talking about trial times.

 9          I can't accept the proposition that the plaintiffs'
10  group prepared this case on the assumption that the FDA    04:31:23
11  evidence wouldn't be in the trial.

12          MR. LOPEZ:  Well, we did.  We did.  I mean, the
13  consistent rulings --

14          THE COURT:  And why did you designated FDA experts?
15          MR. LOPEZ:  Well, I mean, the ruling hadn't come out.    04:31:36
16          THE COURT:  You hadn't asked for it earlier either.
17          MR. LOPEZ:  You don't need an FDA expert just on --
18  we're not calling an FDA expert.
19          THE COURT:  I know but you designated one suggesting
20  you knew the FDA issues were in the case.    04:31:47
21          MR. LOPEZ:  Well, because they were.  They were at
22  the time that we designated them.
23          THE COURT:  And they were at the time we set the
24  hours.  They were at the time you told me this was a three-week
25  trial.    04:32:01

United States District Court

1870

ROBERT M. CARR, JR. - Direct

1    You can I can debate this all day.                    04:32:02

2         MR. LOPEZ:  We could.

3         THE COURT:  And there's no point.  My concern is we

4    have stretched this case to the point where if we're going to

5    get -- if there's a ruling in favor of punitive damages and   04:32:12

6    we're going to get that issue to the jury and give them time to

7    deliberate, I don't think there's a way to find more time in

8    this case.

9         MR. LOPEZ:  Well, Your Honor, let me put it this way.

10   Originally we got 12 days to try this case and this is day     04:32:24

11   nine.  Is it day nine?  No.  Three plus four -- this is day

12   eight.  We were given 12 days to try this case.

13        THE COURT:  Which included jury selection and which

14   included jury deliberation.

15        MR. LOPEZ:  I counted that.  I counted the three          04:32:45

16   days, Wednesday, Thursday, Friday, last week four, and today.

17   That is eight days.

18        And, you know, we asked for 12 and, in fact, when you

19   took one away, we had a phone call.  I called you because I was

20   concerned about that.  And I said, no, Your Honor, we need that  04:33:01

21   day back.

22        THE COURT:  And I have gave it to you back this last

23   Monday.

24        MR. LOPEZ:  Well, okay.  I understand we've added

25   minutes and we've added hours to it but we're at day eight and  04:33:13

United States District Court

ROBERT M. CARR, JR. - Direct

1    we agreed to a 12-day trial and I didn't know -- there was          04:33:19

2    never any discussion about that including deliberations until

3    about two or three weeks ago.  That was 12 days I thought to

4    try this case because we can't tell how long this jury is going

5    to deliberate.  They could deliberate for a week.                   04:33:34

6          When we agreed to a 12-day trial, we thought we were

7    going to have 12 trial days including argument and including

8    instruction and including opening, all of that.  But to be part

9    of the case before it went to the jury.  Right now we're going

10   to get ten because you're talking about maybe instructing         04:33:50

11   Wednesday.

12         THE COURT:  When we sent out the jury questionnaire

13   that said this trial would end on Friday, I heard no objection

14   from you that your anticipation was that we would finish

15   closings on Friday and the jury would start deliberating on       04:34:05

16   Monday and we told the jury in the questionnaire the trial

17   would last through Friday.

18         Again, we could debate this all day and I don't want

19   to do that.

20         MR. LOPEZ:  Well, Your Honor, I'm doing this because        04:34:19

21   I think it's in the best interest of Ms. Booker and I have to

22   advocate for her.

23         THE COURT:  I understand that but as I've indicated,

24   I think there's been lots of time that could have been saved

25   along the way in the plaintiff's case.                            04:34:30

United States District Court

ROBERT M. CARR, JR. - Direct

1      MR. LOPEZ:  Well, the last thing I want to do is

2  argue with the judge sitting on my case.                        04:34:34

3      THE COURT:  You can argue with me.  I'm not taking

4  offense at it.  I'm just telling you why I don't think you have

5  been treated unfairly on the matter of timing.                  04:34:44

6      MR. LOPEZ:  Well, the depositions that we've played,

7  there were a lot of them, different pieces of evidence came in

8  in each one of those depositions.  They were played

9  specifically to get into evidence certain documents.  We didn't

10 even -- we cut out the discussion on some of those documents to  04:34:56

11 the extent that we would have liked to have played that.

12     Maybe we haven't been as efficient as we could have

13 been but I don't think that we've wasted a lot of time.  I

14 mean, we're advocates.  We're trying to advocate.  Sometimes

15 the witnesses, you know, they are not quite as cooperative with  04:35:17

16 us as they are with counsel on the defense side.  Sometimes

17 we've got to go at them two or three times before we get an

18 answer.  We have to stop and read a deposition.

19     THE COURT:  Let's talk about the schedule for a

20 minute.  If we use all of the time that has been allotted, we    04:35:31

21 will get the case to the jury at about -- without the punitive

22 damages issue having been addressed, including the potential

23 deliberation on that, by mid-afternoon on Thursday and then if

24 they agree to punitive damages, we'll need to do argument and

25 evidence on that as well.                                        04:35:53

United States District Court

1873

ROBERT M. CARR, JR. - Direct

1        Where are you suggesting we find the additional time?   04:35:55

2        MR. LOPEZ:  Well, why can't we argue the case, you

3   know, Thursday afternoon?

4        THE COURT:  You're going to and they will walk out of

5   the courtroom at 2:30 according to my calculation of the time   04:36:07

6   that has been allowed.

7        MR. LOPEZ:  All I'm saying is, when we agreed to

8   12-day trial, we thought it was going to include putting on

9   evidence.  And, again, I agree it was going to include jury

10  selection, opening and closing.  But never did I take -- did I   04:36:22

11  think that was going to include deliberation because who knows

12  how long that's going to be?

13       THE COURT:  Well, I understand what you've said.  I

14  want to stick with the schedule that we've got.  If you want to

15  raise it again as we go along, you are welcome to do that but I   04:36:42

16  have been giving you time every day so you have been able to

17  allocate it.  And I think there has been ample time for you to

18  get in your evidence and have time to cross-examine defense

19  witnesses and argue.

20       MR. LOPEZ:  Well, Your Honor, if they don't use all   04:36:56

21  their time, just so we can have -- we can have a fair

22  opportunity to cross-examine during the defense case.

23       THE COURT:  We'll have to cross that bridge when we

24  get there because at this point, I don't know.

25       Do you know, Mr. North, if you're going to use all   04:37:10

United States District Court

1874

ROBERT M. CARR, JR. - Direct

1   your time?                                                    04:37:12

2            MR. NORTH:  I think we will, Your Honor.  I mean, we

3   are going to reserve some time, which I think we should be

4   entitled to, for closing argument, of course, and we have to

5   save time for rebuttal, closing, and the punitive phase, but,  04:37:21

6   yes.

7            MR. LOPEZ:  So two hours from now we're going to get

8   shut down?  I just need to know.

9            THE COURT:  Well, you have an hour and 58 minutes

10  that you've allotted.                                          04:37:37

11           We can talk about it at the end of tomorrow and see

12  where you are, but I'm not going to push this argument into

13  Friday and without us having even gotten to punitive damages.

14  As I indicated, I think there has been ample time to try the

15  case.                                                          04:37:57

16           MR. LOPEZ:  Okay.

17           THE COURT:  All right.  Are there other matters that

18  we need to address before we break?

19           MR. LOPEZ:  No, Your Honor.  Thank you.

20           MR. NORTH:  Nothing, Your Honor, other than if the    04:38:04

21  Court ever were to be so inclined to change the time

22  allocations, I would want to be heard at that point.

23           THE COURT:  I assume you would.  I understand that.

24  Okay.  Thank you.

25           (Whereupon, these proceedings recessed at 4:38 p.m.)  04:38:13

United States District Court

1875

ROBERT M. CARR, JR. - Direct

1    C E R T I F I C A T E                                04:38:13

2

3        I, ELAINE M. CROPPER, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of    04:38:13

6    Arizona.

7

8        I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled   04:38:13

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control, and to the best of

13   my ability.

14

15       DATED at Phoenix, Arizona, this 26th day of March,    04:38:13

16   2018.

17

18

19

20                        s/Elaine M. Cropper                 04:38:13

21                        _____

22                        Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                            04:38:13

United States District Court