1                    **UNITED STATES DISTRICT COURT**

2                      **FOR THE DISTRICT OF ARIZONA**

3                    _____

4    **In Re: Bard IVC Filters**          )   MD-15-02641-PHX-DGC
     **Products Liability Litigation**     )

5                                          )   Phoenix, Arizona
                                           )   **March 27, 2018**
6    _____)
     **Sherr-Una Booker, an individual,**   )

7                                          )
                          Plaintiff,       )

8                                          )   CV-16-00474-PHX-DGC
              v.                           )

9                                          )
     **C.R. Bard, Inc., a New Jersey**      )

10   **corporation; and Bard Peripheral**   )
     **Vascular, Inc., an Arizona**         )

11   **corporation,**                       )
                                           )

12                        Defendants.      )
     _____)

13

14

15         **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16           **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

17              <u>**TRIAL DAY 9 A.M. SESSION**</u>

18                  (Pages 1876 – [[ )

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2     For the Plaintiff:

 3             Lopez McHugh
               By: RAMON ROSSI LOPEZ, ESQ.
 4             100 Bayview Circle, Suite 5600
               Newport Beach, CA  92660
 5
               Gallagher & Kennedy
 6             By: MARK S. O'CONNOR, ESQ.
               2575 East Camelback Road, Suite 1100
 7             Phoenix, AZ  85016

 8             Heaviside Reed Zaic
               By: JULIA REED ZAIC, ESQ.
 9             312 Broadway, Ste. 203
               Laguna Beach, CA  92651
10
               Watkins Lourie Roll & Chance, PC
11             By: ROBIN P. LOURIE, ESQ.
               Tower Place 200
12             3348 Peachtree Rd. NE
               Atlanta, GA  30326
13
               Faraci Lange, LLP
14             By: HADLEY L. MATARAZZO, ESQ.
               28 E. Main St., Ste. 1100
15             Rochester, NY  14614

16             Babbitt & Johnson, PA
               By: JOSEPH R. JOHNSON, ESQ.
17             1641 Worthington Rd., Ste. 100
               W. Palm Beach, FL  33409
18

19     For Defendants:

20             Nelson Mullins Riley & Scarborough
               By: RICHARD B. NORTH, JR., ESQ.
21             By: ELIZABETH C. HELM, ESQ.
               201 17th Street NW, Suite 1700
22             Atlanta, GA  30363

23             Snell & Wilmer
               By: JAMES R. CONDO, ESQ.
24             400 East Van Buren
               Phoenix, AZ  85004
25
```

**I N D E X**

**EXAMINATION**

| WITNESS | PAGE |
|---|---|

ROBERT M. CARR, JR.

      Direct Examination By Mr. North — 1901

      Cross-Examination By Mr. Lopez — 1919

DAVID W. FEIGAL, MD

      Direct Examination By Mr. Condo — 1935

      Cross-Examination By Mr. O'Connor — 1956

Video Testimony of Dr. John DeFord — 1960

CLEMENT GRASSI, M.D.

      Direct Examination By Mr. North — 1960

      Cross-Examination By Mr. Johnson — 1986

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 5037 | ETR-05-02-02 (Effects of Changes to the Recovery Filter & The Femoral Delivery System on Filter Stresses Based on FEA Analysis) | 1907 |
| 5949 | ETR-06-05-02 (Test report re G2® Clot Trapping Efficiency) | 1910 |
| 5315 | ETR-04-10-21 (G2® Acute Animal Feasibility Study) | 1911 |
| 5316 | Phase 3 Design Review (Design Review 3 & 4) G1A Recovery Filter Femoral Delivery System | 1913 |

1    **(Index of Exhibits Continued)**

2                        **EXHIBITS**

3    **NUMBER**      **DESCRIPTION**                    **PAGE**

4    1680           McDonald Deposition,               1925
                    07/29/2016 – Exhibit 21 –
5                   7/13/2015 Warning Letter from
                    the FDA regarding the
6                   11/25/2014 Inspection of the
                    C.R. Bard facility in NY and
7                   the 11/18/2014–1/5/2015
                    Inspection of the BPV
8                   facility in AZ

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

10:01:31    1

2      (Proceedings resumed in open court outside the presence

3    of the jury.)

4

08:29:46    5      THE COURT:  Please be seated.

6      Morning, everybody.

7      MR. NORTH:  Morning, Your Honor.

8      MR. LOPEZ:  Morning.

9      THE COURT:  Counsel, you saw the order I entered

08:30:04   10    last night indicating my inclination to grant plaintiff one

11    additional hour without subtracting it from defendants' time.

12      Mr. North, did you want to be heard on that issue?

13      MR. NORTH:  If I could briefly, Your Honor.

14      Your Honor, the defendants certainly understand the

08:30:26   15    Court's concern expressed in the order yesterday about any

16    miscarriage of justice, but we are also concerned that a

17    miscarriage of justice can go both ways in this circumstance.

18      We believe that changing the game rules at this point

19    prejudices my client with any further adjustment.  We have

08:30:42   20    understood clearly the Court's instructions from the

21    beginning.  I think the instructions of the Court have been

22    crystal clear.  Repeatedly, at various conferences, hearings,

23    *Daubert* hearings, the Court has time and time again discussed

24    the time limitations, how they would work, what they would

08:31:00   25    include, including closing.

08:31:02   1      I believe in the Court's order accepting the parties'

2      stipulation to bifurcate the punitive damages, the Court once

3      again reiterated that the time for the punitive phase would

4      need to come out of the overall time limits.

08:31:15   5      Bard has made strategic choices in the pursuit of the

6      defense of this case from the beginning, based on our

7      understanding of the time limitations.  We have done many

8      things that we might not have done earlier if we knew that

9      these time limitations were not going to be strictly enforced.

08:31:37  10      For example, Dr. McMeeking, the plaintiff's one and

11      only true design expert.  I cross-examined him for 27 minutes.

12      That's a decision we probably would not have made, to curtail

13      that cross-examination to that extent, if additional time had

14      been available.

08:31:54  15      We made many, many cuts to depositions, probably to

16      the benefit of the jury and everyone involved, but we made

17      many cuts that we originally were going to go with because of

18      our concern for time limitations.

19      And our determination to abide within those time

08:32:12  20      limitations affected strategic choices every step of the way

21      in our handling of the plaintiff's case in chief and the

22      handling of our case thus far.

23      There are at least two Ninth Circuit cases that I

24      have seen; one the *General Signal Corporation versus MCI* case

08:32:30  25      at 66 F.3d 1500, and the *Amarel versus Connell* case, 102 F.3d

08:32:38  1    1494, both of which, in both cases, the Ninth Circuit has

2    recognized that the fact that one party made strategic choices

3    all along based upon time limitations imposed by the Court is

4    a factor in determining whether the Court abused its

08:32:57  5    discretion in not affording additional time.

6            At the same time we've made these strategic choices,

7    we respectfully suggest the plaintiffs have not.  In addition

8    to the repetitive questioning that the Court cited yesterday,

9    there have been things that it's their choice, it's their

08:33:16 10    case, but that baffled us given time limitations.

11            They put Alex Tessmer, a Bard employee who was

12    essentially just a tech test guy, who ran two tests on the

13    Recovery filter, which is not the device in this case, and did

14    the direct examination of him about those two tests for over

08:33:34 15    an hour and 45 minutes.  And we believe the record is replete

16    with other instances where they made strategic choices that I

17    don't understand.  It's not my choice to understand them.  But

18    they made those choices to use up their time.

19            We believe that the eleventh hour as we're coming

08:33:53 20    into the end of this trial to expand these time limitations is

21    simply unfair, and we cannot roll back the clock and change

22    the strategic choices the defendant made from the beginning

23    based on the Court's time limitations.

24            So for that reason, we oppose the a extra hour.

08:34:15 25            THE COURT:  All right.  Thank you.

08:34:15    1              Mr. Lopez.

            2              MR. LOPEZ:  First, Your Honor, I think Mr. Tessmer's

            3    probably a good example of how difficult it was for me to get

            4    straight answers out of a witnesses that I had to ask him

08:34:27    5    multiple questions.  We got five very important tests, I

            6    think was important to our case, that was early in the case.

            7              The next -- Your Honor, when we first agreed, I said

            8    this yesterday, I found the transcript from October 5th, 2017,

            9    where it was agreed that we would have three weeks to try this

08:34:48   10    case, 66 hours total time for the cases.  You asked if that

           11    was workable, and I said yes, it was.

           12              And this is the Court:  My thought would be with a

           13    three-week jury trial.

           14              And we've always thought that should be the case.

08:35:06   15    We -- even with the FDA in this case, we could have

           16    appropriately addressed some of these issues that are coming

           17    in in the defense case.

           18              You can't plan for everything during a trial

           19    Your Honor.  When you look at your -- the motion, our FDA

08:35:19   20    exclusion motion, our *Cisson* motion, we can't -- we could not

           21    tell from your language how much of this additional evidence

           22    was coming in, other than the clearance issue.  In other

           23    words, how these devices got cleared.  It says you're leaving

           24    open the enforcement, some of the other activity that goes

08:35:42   25    beyond just the 510(k) clearance process.

08:35:44    1         The 510(k) clearance process is not that big a deal.

2    I mean, it's just a document being submitted.  That would be

3    easily dealt with.  We did not anticipate the kind of evidence

4    that's coming into this case on FDA.

08:36:02    5         I don't think -- with due respect, Your Honor, I

6    understand you think that we've wasted time.  I don't think

7    so.  I mean, we've cut a lot of the stuff out of this case.

8    You've heard me say that before.  We've had depositions.

9    We've got a number of exhibits we are not going to get into

08:36:16   10    evidence that we need in this case because we had to take down

11    some of the depositions that we designated.  And I told you we

12    sent three experts home that we're not calling in this case.

13         And, again, for the most part, the -- most of the

14    difficulty we've had with time is trying to get the

08:36:39   15    cooperation, I think, of some of their witnesses.  It's

16    amazing how cooperative they are under direct examination.

17         We did start nitpicking, Your Honor, here and there,

18    about time.  But the truth is if we did not efficiently use

19    our time in the time we had, we're already paying that price.

08:36:57   20    We've had to take down -- we've penalized ourselves by taking

21    down evidence that we think is necessary for this case.

22         And we could not anticipate what was coming into

23    evidence in the case and how much time to reserve until we

24    actually started the defense case.  And I'm just going to be

08:37:14   25    honest, I -- in my wildest dreams, I didn't think that that

08:37:17 1    type of evidence was coming into this case.  Certainly your

2    order didn't indicate one way or the other.

3         I thought -- I mean, I understand the Court's

4    reasoning, not that I agree with it, but for allowing FDA

08:37:30 5    because of the Georgia law federal regulations.  I mean, this

6    could be about federal regulations and violations of federal

7    regulations, but I -- the 403 objections, 402 objections we've

8    made to the hearsay, the FDA's enforcement, lack of

9    enforcement, all these communications going back between Bard

08:37:51 10   and FDA, I mean, if anything, it's confusing to a jury.  More

11   concerning is it's misleading to a jury.  And there's no way

12   that we have the time to address that.  We won't if you gave

13   us another day or two.

14        All we're trying to do is finish this case.  We have

08:38:11 15   to restrict ourselves in cross-examining experts.  We

16   understand that.  We don't want to find ourselves not being

17   able to argue this case.

18        But I think it's important for the Court to know that

19   when we first agreed to a three-week trial, it was 66 hours,

08:38:23 20   and we were going to get 35 of that.  And we could do that

21   with 35 hours.  But we can't do it with the time that we have

22   left, which is going to be essentially 30 hours.  Can't do it.

23        THE COURT:  All right.  Well, what I'm going to say

24   on the record is I disagree with the description of what

08:38:43 25   happened in that discussion of 66 hours.  But that's not the

08:38:48  1    point to be decided.

2         I'm going to grant the plaintiff one additional hour

3    for the reasons I stated in the order last night.

4         All right.  The warning letter, FDA warning letter,

08:39:00  5    I've read the briefs on both sides.  Do you have additional

6    points you want to make with respect to the FDA warning

7    letter?

8         MS. REED ZAIC:  Your Honor, I would just supplement

9    the briefing with the testimony that came in yesterday after

08:39:12 10   the briefs were due in the morning.  We've heard about FDA

11   and alerts and such.  I think it goes to our 403 argument

12   that we would be prejudiced if we cannot get this letter in.

13        In addition to the testimony we continue to hear that

14   everything went to the FDA, there's FDA memos, you know,

08:39:26 15   blessing everything that has happened that Bard has done.

16   However, this letter says the exact opposite, and I think it

17   would go to the weight of the evidence at this point.

18        THE COURT:  All right.

19        MR. NORTH:  Your Honor, we would essentially stand

08:39:41 20   on our brief, but I would point out that we have made --

21   tried to be very careful not to open the door and make broad

22   statements that the FDA has never taken a regulatory action

23   or something of that nature and focused the questions about a

24   recall, which that warning letter has nothing to do with.

08:39:59 25        We believe, for the reasons set forth in the brief,

08:40:02 1    that those individual complaints really have no relevance to

2    the issues in this case.  And you couple that with the fact

3    that Bard's internal trending, and the testimony will be

4    undisputed, Bard's internal trending of complaints includes

08:40:20 5    everything.  Whether it's reported to the FDA, how it's

6    characterized as serious injury versus malfunction.  And we

7    believe, therefore, that this evidence is simply irrelevant

8    and should be excluded under 402 and 403.

9              MR. LOPEZ:  Your Honor, may I just -- I'm sorry.  I

08:40:38 10   thought you were done.

11             MS. REED ZAIC:  Your Honor, they're saying that

12   everything has gone to the FDA, but, again, it goes to the

13   weight of the evidence that the FDA actually went back and

14   realized that they weren't doing it right and it was in

08:40:50 15   violation of a federal regulation.

16             Moreover, there was evidence yesterday that the FDA

17   alerts -- I'm sorry, questioning that elicited testimony that

18   these FDA alerts in 2010 went to all companies, and that

19   leaves out a piece of the picture, which is that the FDA acted

08:41:09 20   specifically to Bard.

21             THE COURT:  All right.  In my order on March 1st, I

22   did not decide whether Section 3, Section 7, and Section 8 of

23   the FDA letter should come in.  I said that that was a

24   decision that would be need to be made at trial once I

08:41:28 25   understood the relevancy of the evidence that is contained in

08:41:32  1    the letter in light of the overall facts at trial.

2         My conclusion, now that I've heard the evidence, is

3    that Section 3 of the warning letter is relevant to this case.

4    I reach that conclusion for a few reasons:

08:41:50  5         The argument that was made by the defendants in the

6    brief was largely a causation argument, that none of the

7    complaints could have caused Ms. Booker's injuries because

8    they were either after the implant or the doctors who removed

9    the filter had no knowledge of those complaints.

08:42:07 10         I agree with that.  I don't think it goes to

11   causation.  But I think the relevancy of Section 3 of the

12   warning letter goes to a few other issues that have been

13   addressed.

14         There has been much evidence before the jury about

08:42:23 15   the MAUDE database, about the data upon which Bard relied,

16   upon reports to the FDA.  There has been evidence about root

17   cause analysis and when it was or was not done.  There has

18   been evidence about the fact that the FDA has not submitted

19   questions, other than those that were identified in documents

08:42:46 20   that were put in evidence, has not taken recall action.

21         I believe the implication, if not the express

22   argument to the jury, is that the FDA never took any action

23   with respect to Bard.

24         And yet Section 3 of this letter does concern Bard's

08:43:05 25   handling and reporting of adverse events with respect to the

08:43:09  1   G2 filter in at least four different instances, as well as the

2   adequacy of Bard's evaluation for root cause of the

3   violations.  Root cause is in Section 3A, the G2 filter is

4   mentioned in Section 3B.  3C includes other filters which

08:43:29  5   apparently largely are unidentified, but which plaintiffs at

6   least assert includes one G2 filter.

7          I think it's relevant in light of the information

8   that's been presented to the jury.  And, therefore, I'm going

9   to permit the following portions of the G2 letter to be

08:43:45 10   presented:

11          Page 1, which is largely introductory information.

12          Page 4, starting with the heading "Quality System

13   Regulation Violations of Tempe, Arizona Facility and

14   Queensbury, New York Facility."  That heading can be included,

08:44:07 15   as can the rest of the page, which is Section 3.

16          Page 5 through the end of the third paragraph.  So it

17   should not include the heading "Quality System Regulation

18   Violations at Queensbury, New York," which is a different set

19   of violations.

08:44:24 20          So that essentially leaves in all of Section 3.

21          And page -- the version of the exhibit I have

22   actually has the page numbers out of order.

23          Page 10, beginning with the paragraph at the bottom

24   that reads "Your firm should take prompt action to correct the

08:45:17 25   violations addressed in this letter," that paragraph at the

08:45:21  1    bottom can be left in.  All of page 11 and all of Page 12,

       2    which is just the closing and the signatures, and all of

       3    page 13, which is simply the cc's.

       4         So my ruling is that portion of the FDA warning

08:45:37  5    letter is relevant.

       6         I do not believe Sections 7 and 8 are relevant.  I

       7    previously indicated that.  But, again, I don't think that's

       8    relevant because they relate to the Denali filter systems,

       9    which are not at issue in this case.

08:45:53 10         And I previously ruled in the order dated March 1st

      11    that this is not hearsay, that it's admissible under

      12    Rule 803(8).

      13         So I will leave it to plaintiff to introduce the

      14    letter when you choose to do so.  If there are other

08:46:10 15    objections, they can be made, but relevancy, 403, and hearsay,

      16    I'm ruling against defendant on their argument.

      17         I'll tell you one of the thoughts, though, that I do

      18    have that we all ought to consider is I think I should give an

      19    instruction to the jury about redacted exhibits, because

08:46:30 20    there's going to be other redactions.  And the essence of the

      21    instruction would be to tell them that there are portions of

      22    the exhibits that have been redacted, that those are based on

      23    my conclusions that the information redacted is not relevant

      24    or admissible for other reasons, the jury should disregard

08:46:47 25    those portions and not speculate as to what they might

08:46:50   1   contain.

2        Any disagreement with the need for that kind of an

3   instruction?

4        MR. LOPEZ:  That's fine, Your Honor.

08:47:00   5        MS. REED ZAIC:  No, Your Honor.

6        MR. NORTH:  That's fine, Your Honor.

7        And I'm not arguing with the Court, but I just wanted

8   to point out one thing to make sure the Court did understand

9   that 3A of the warning letter by -- automatically deals with

08:47:12  10   Denali filters only, because that's the only filter ever

11   manufactured by Bard that relied on component suppliers.

12        THE COURT:  I've read it again, and I understand

13   your point.

14        What is plaintiff's response?

08:48:01  15        MS. REED ZAIC:  Your Honor, my response to that is

16   that the issue is stated in the first paragraph of Topic 3,

17   before you even get to A, B, or C, which are only cited as

18   examples.

19        Section A is an example, and the SOPs, I'll call

08:48:17  20   them, the standards that they're listing out, such as

21   CQA-STD-55, they're cited in both paragraphs.  So where it

22   starts "Failure to establish and maintain procedures for

23   receiving, reviewing, and evaluating complaints as required by

24   21 CFR 820.198(a)," the next sentence describes the same SOPs

08:48:40  25   that are in paragraph A and goes on to say "These below are

08:48:44 1    just examples of all of your violations under 21 CFR

2    820.198(a)."

3         And we have meticulously gone through and submitted

4    to the Court that these SOPs were in place during the time

08:48:56 5    that Ms. Booker had her filter.

6         THE COURT:  Is it your argument that the standards

7    and SOPs cited in paragraph 3A apply to more than components

8    manufactured elsewhere?

9         MS. REED ZAIC:  Since it's cited as simply an

08:49:26 10   example, I would have no idea because I have not deposed

11   anyone who drafted this letter to Bard.

12        THE COURT:  Is that what you're arguing, Mr. North,

13   that these standards and SOPs only relate to components?

14        MR. NORTH:  No, Your Honor, not at all.  All I'm

08:49:48 15   talking about is in 3A, where it's talking specifically about

16   the root cause, it's talking about complaints involving

17   components made by other suppliers and the failure to figure

18   out the root cause sufficiently.  That specifically deals

19   with the Denali filter and not the other filters.

08:50:08 20        THE COURT:  Okay.  I understand the argument.

21   Because it is an example of what's in the first paragraph,

22   I'm going to leave the designation that I indicated before as

23   to what is admissible.

24        Jeff, would you remind me on that instruction.  We'll

08:50:23 25   need to draft something up and include it.

08:50:26  1        All right.  Plaintiff, do you have matters you want

2    to raise this morning?  We've get got about eight minutes.

3        MR. LOPEZ:  I'm going to use those precious eight

4    minutes off our clock, Your Honor, if you don't mind.

08:50:37  5        Exhibit 4327, the Court will recall, this was the

6    exhibit where four pages at the back --

7        THE COURT:  I remember the exhibit.

8        MR. LOPEZ:  Okay.  I'd like to make an offer of

9    proof, Your Honor, on that, if I could right now as to why

08:50:52 10   it's a business record and should be included.  It will take

11   me two minutes with you, or maybe ten minutes with Mr. Carr.

12        May I?

13        THE COURT:  Yeah.

14        MR. LOPEZ:  Mr. Carr testified on December 19th,

08:51:08 15   2013, that complaints -- that their company collects

16   complaints, it's put in a database and collected through

17   their field assurance group, that many of these come in

18   through their sales reps, and that the information is tracked

19   by Bard relative to the Recovery and G2 devices.

08:51:25 20        And the information collected is maintained in what

21   Bard refers to as a complaint file.  And those complaint files

22   are kept in electronic format -- database, rather, and

23   summaries of those complaints can be downloaded and printed.

24        What you will see on this attachment, Your Honor, is

08:51:46 25   rep report, rep report, rep report, rep report.  Those are the

08:51:50  1   sales reps that are reporting this pursuant to the business

        2   practices of Bard.  These reps are agents of Bard that are

        3   reporting these.

        4          We've cross-referenced the language that's in this

08:52:05  5   against the complaint files, and the language, at least from

        6   the summary, is almost precisely the same.  So I think we've

        7   now satisfied our requirement under the evidence code that

        8   these are statements, comments, made by an agent or employee

        9   of Bard and under the direction of Bard in their regular

08:52:26  10   course of business.

        11          And I'd like to --

        12          THE COURT:  You're mixing two hearsay exceptions

        13   there.  One is business record, one is an admission of a

        14   party or statement of a party opponent through an agent.

08:52:40  15   Which are you arguing?

        16          MR. LOPEZ:  Well, I can barely hear you, Judge.

        17          THE COURT:  Traci, would you see if this can be

        18   turned up.

        19          My question is this:  You've mixed two exceptions.

08:52:55  20   One is the business records exception, and the other is the

        21   statement of a party opponent through an agent.  They're

        22   different parts of the hearsay rules.

        23          MR. LOPEZ:  Right.  I think they both apply.  But

        24   this is clearly an agent on behalf of the company that's

08:53:09  25   making these statements.  It says rep report.  We looked at

08:53:12   1   the backup complaint files for these.  These are sales reps.

2   THE COURT:  Well, but -- I understand the argument

3   you're making, Mr. Lopez, but I can't apply that exception on

4   the basis of your argument.  There has to be evidence of what

08:53:25   5   you just described.  That is, that the statements are

6   statements from the reps that are the same as in their

7   complaints.  There hasn't been any evidence like that

8   presented.

9   MR. LOPEZ:  That's why I made the offer of proof.

08:53:39  10   THE COURT:  Well, but the offer of proof has to be

11   followed up with actual proof.  How do you intend to present

12   that evidence?

13   MR. LOPEZ:  The evidence that these are sales reps?

14   THE COURT:  No, the evidence that you made in your

08:53:51  15   offer has to actually come from that witness stand at some

16   point.  How do you intend to present that?

17   MR. LOPEZ:  Well, he just testified at deposition

18   that it's the sales reps --

19   THE COURT:  I can't rely on his deposition.  It has

08:54:03  20   to be trial testimony.

21   MR. LOPEZ:  All right.  I'll do it.

22   THE COURT:  Are you saying you're going to elicit

23   that from him?

24   MR. LOPEZ:  Well, if he doesn't say it on the stand,

08:54:10  25   I'll read his deposition.  I was hoping to short-circuit that

08:54:14  1  by showing the Court --

2       THE COURT:  I can't short-circuit it on the basis of

3  evidence that's not presented at trial.  So it has to come in

4  at trial.

08:54:21  5       MR. LOPEZ:  I understand.  It's just my effort to

6  save a few minutes, Your Honor.

7       THE COURT:  Well, I can't save time by disregarding

8  the requirement that it has to be an evidentiary basis for

9  the admission of the exhibit.

08:54:32 10       MR. LOPEZ:  Very well.  Thank you.

11       THE COURT:  Well, before you leave, though, are you

12  going to -- are you making the business record argument as

13  well?

14       MR. LOPEZ:  Well, yes.  I mean --

08:54:42 15       THE COURT:  What's the basis for satisfying 803(6)

16  with respect to this?

17       MR. LOPEZ:  Whether or not this is kept in the

18  ordinary course of business?

19       THE COURT:  And the other elements in 803(6).

08:55:03 20       There's four of them.

21       And by the way, let me go ahead and say this now, I

22  was going to say this before the next trial, when we get to

23  business records, we are on both sides uniformly not touching

24  all four of the bases in 803(6).

08:55:15 25       Now, when the defendant hasn't done that, there

08:55:19    1    usually hasn't been a hearsay objection, so I've admitted the

            2    exhibit.  But if the plaintiff was objecting, I would sustain

            3    the objection until all four of the elements of 803(6) are

            4    met.

08:55:28    5         So please keep that in mind as we go forward, because

            6    all of those have to be met for 803(6) to apply.

            7         Okay.  Sorry for the interruption.  Go ahead.

            8         MR. LOPEZ:  I'll give that my best shot, Your Honor.

            9    But I think under 801(d)(2)(C) and (D) and (A), all they have

08:55:56   10    to do is establish that those statements were made by an

           11    agent of the company.

           12         THE COURT:  No, you have to do more than that.

           13         MR. LOPEZ:  Was made by the party in an individual

           14    representative capacity.  That's (A).  (C), was made by a

08:56:08   15    person whom the party authorized to make a statement on the

           16    subject.  (D), was made by the party's agent or employee on a

           17    matter within the scope of that relationship and while it

           18    existed.

           19         THE COURT:  Exactly.  So --

08:56:22   20         MR. LOPEZ:  Those are --

           21         THE COURT:  (C) and (D) are the relevant ones.

           22         MR. LOPEZ:  Right.

           23         THE COURT:  For (C), if it's going to be an agent,

           24    then there has to be evidence that the person was authorized

08:56:33   25    to make the statement.  And for (D), if it's an agent or

08:56:39 1   employee, there has to be evidence it was a matter within the

2   scope of the employee or the agent relationship and while it

3   existed.

4          MR. LOPEZ:  Right.  I get that.  Except that I

08:56:47 5   think -- I mean, I've read testimony that suggests that, and

6   I'll do it with Mr. Carr.

7          THE COURT:  Okay.  I understand what you're going to

8   argue.  But I'll wait to hear that before I rule because I

9   need the evidence.

08:57:00 10         MR. LOPEZ:  All right.

11         THE COURT:  Okay.  Defendant --

12         MR. NORTH:  Your Honor, I just have one additional

13   charge right now, the jury instruction proposed that I was

14   just going to leave with the Court.

08:57:10 15         THE COURT:  Is that for this evening?

16         MR. NORTH:  Yeah.

17         THE COURT:  Why don't you hold onto it.  I'm not

18   going to have time to look at it during the day.  Let's take

19   it up tonight when we get to the jury instructions.

08:57:19 20         Anything else from plaintiff?

21         Mr. Condo?

22         MR. CONDO:  Your Honor, the second witness,

23   Dr. Feigal, is a clinical epidemiologist.  He's going to talk

24   about the types of studies reported in the medical

08:57:31 25   literature.  He would prefer to come down and use the white

08:57:35  1    board to list the types of studies, then return to the stand

       2    to explain all of the types of studies.  I wanted to alert

       3    the Court to that and ask if that is permissible.

       4         THE COURT:  It is permissible.  But what you'll need

08:57:50  5    to do is bring the white board over to about where this

       6    projector is so I can stand over here and see what he's

       7    writing.

       8         And whoever is the defense counsel that's going to

       9    cross him, you can step over into that side of the jury box so

08:58:03 10    you can see it.

      11         And he can list it.  If you're going to have him

      12    testify about it after he lists it, let's get him back in the

      13    witness chair so the sound is good.  But, yeah, you can do

      14    that.  You can have him --

08:58:16 15         MR. CONDO:  And by defense counsel, you're talking

      16    about plaintiff's counsel --

      17         THE COURT:  Yeah.  Sorry.  I meant plaintiff's

      18    counsel who is going to cross.  If you want to come over into

      19    the end of the jury box to see what he's writing, that's

08:58:26 20    fine.

      21         MR. CONDO:  Thank you, Your Honor.

      22         THE COURT:  Okay.

      23         MS. MATARAZZO:  One other issue.  Defendants filed a

      24    brief this morning regarding the admissibility of the SIR

08:58:38 25    guidelines.  I don't know if Dr. Grassi's testifying today,

08:58:41  1    but that issue is going to come up --

2              THE COURT:  I have not seen that brief.

3              MS. MATARAZZO:  We've --

4              THE COURT:  When are you calling Dr. Grassi?

08:58:49  5    MR. NORTH:  Probably after lunch, Your Honor.

6              THE COURT:  Okay.  I don't know if I'll have time to

7    read the brief before then.

8              MR. NORTH:  I understand.  I mean, we'll just argue

9    it orally, if need be.  But I just -- they may object.  But I

08:58:58  10   wanted to put that in the record.

11             MS. MATARAZZO:  That's fine, Your Honor.

12             The other option would be to argue it, just come back

13   five minutes early from lunch and address it.  It's with

14   regard to whether or not the SIR guidelines can come into

08:59:12  15   evidence due to notice and knowledge to the medical community.

16             THE COURT:  All right.  Let's cross that bridge when

17   we come to it.

18             Okay.  Traci, let's bring in the jury.

19         (The jury entered the courtroom at 9:00.)

09:00:36  20   THE COURT:  Please be seated.

21             Good morning, ladies and gentlemen.  Thanks for being

22   here this morning.

23             We're going to continue with the testimony of

24   Mr. Carr.

09:00:49  25   Mr. North, you may proceed.

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:00:52   1    MR. NORTH:  Thank you, Your Honor.

2                    ROBERT M. CARR, JR.,

3    recalled as a witness herein, after having been previously

4    sworn or affirmed, was examined and testified as follows:

5         D I R E C T   E X A M I N A T I O N   (CONTINUED)

6    BY MR. NORTH:

7    Q   Good morning, Mr. Carr.

8    A   Good morning.

9    Q   I believe when we broke yesterday we were discussing

09:01:01  10   Exhibit 503.

11                   I'm sorry, 5303.  And do you recall that?

12   A   Yes.

13   Q   And what is that again?

14   A   It is the verification and validation report for the G2

09:01:23  15   filter.

16                   MR. NORTH:  Your Honor, I believe this was admitted

17   yesterday or earlier.  If we could display it to the jury.

18                   THE COURT:  5303?

19                   MR. NORTH:  Yes.

09:01:34  20                   THE COURT:  You may.

21                   MR. NORTH:  And if we could turn to page 14.

22   BY MR. NORTH:

23   Q   Down below this chart, what does this show regarding the

24   migration testing performed on the G2?

09:02:03  25   A   It shows the results of the test at 15 and 28-millimeters.

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:02:07   1   That's the diameter of the tube.  And for the G2 filter.

2   Q    And were these values for the G2 filter an improvement

3   over what you had found with the Recovery filter?

4   A    Yes, they are.

09:02:31   5             MR. NORTH:  If we could turn to page 15.

6             And if we'd look at the chart at the bottom of the

7   page.

8   BY MR. NORTH:

9   Q    Does that compare the migration resistance values for the

09:02:50  10   Simon Nitinol, the G1A or G2, and the Recovery filter?

11   A    Yes, it does.

12   Q    And how did the G2 compare to the Recovery as far as the

13   mean went?

14   A    It's 15-millimeters less.

09:03:12  15   Q    I'm sorry, the G2 compared to the Recovery filter as far

16   as migration resistance under the mean, how did the G2 compare

17   to the Recovery filter again?

18   A    I'm sorry.  It's 50 millimeters of mercury more.

19   Q    Did the G2 reflect an improvement?

09:03:35  20   A    Yes.  Nearly double.

21   Q    Let me ask you this:  Did the G2 at any point fail

22   migration testing?

23   A    As we discussed before, the initial specification was to

24   be equivalent to the SNF filter, and that specification was

09:04:01  25   changed to a more appropriate specification, which was to be

DIRECT EXAMINATION (CONT'D) - ROBERT M. CARR, JR.

09:04:06  1   significantly improved over Recovery.  And that's documented a

2   little bit later, I believe.

3          MR. NORTH:  Let's look at Page 21 of this exhibit,

4   if we could.

09:04:18  5   BY MR. NORTH:

6   Q   Under the conclusion, did the company explain how the

7   standard was modified to compare the G2 to the Recovery

8   filter?

9   A   Yes.

09:04:37  10  Q   And was this report actually submitted to the FDA?

11  A   Yes.

12         MR. NORTH:  If we could look at Exhibit 5252.

13         Your Honor, I believe this has already been admitted.

14  If we could display it to the jury?

09:05:24  15        THE COURT:  You may.

16  BY MR. NORTH:

17  Q   We talked a little bit yesterday, I believe, about the

18  competitive or comparison testing.  Is this the report that --

19  of that testing that you performed, or the company performed?

09:05:39  20  A   Yes.

21         MR. NORTH:  If we could look at page 6.

22  BY MR. NORTH:

23  Q   Does this demonstrate the various migration resistance

24  that you found for the various products?

09:05:58  25  A   Yes, it does.

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:06:01    1    Q   Where on this chart can we find the G2?

2    A   I don't see it.

3    Q   Well, did we see earlier -- what did we see earlier that

4    the mean value was for the G2 in migration resistance?

09:06:39    5    A   I believe it was 106.

6    Q   And how does that compare?

7         MR. NORTH:  If we could look at the column that says

8    "Mean."

9         THE WITNESS:  Yes.

09:06:51   10    BY MR. NORTH:

11    Q   How does 106 compare to most of the other filters?

12    A   It's more than almost all.

13    Q   And just so we know, do you know what some of these

14    abbreviations over under the sample ID stand for?

09:07:09   15    A   Yes.

16    Q   Could you tell us what some of those are.

17    A   The NMT is Recovery filters made at Nitinol Medical

18    Technologies.

19         The RF are Recovery filters made at Glens Falls.

09:07:24   20         SF is Simon Nitinol.

21         GT is the Greenfield titanium filter.

22         GS is the Greenfield stainless steel.

23         VT is vena tech.

24         TP is the tulip.

09:07:43   25         O is the OptEase.

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:07:45   1          And T is the TrapEase.  Two filters made by Cordis.

       2    Q    And those are competitive filters to the G2?  Or would

       3    have been?

       4    A    Yes.

09:08:08   5    Q    Did the company also, as a part of the development of the

       6    G2, perform a finite element analysis?

       7    A    Yes.

       8          MR. NORTH:  Let's turn to Exhibit 5037, if we could,

       9    please.

09:08:32  10    BY MR. NORTH:

      11    Q    Do you recognize what this document is?

      12    A    Yes.

      13    Q    And would you identify what it is.

      14    A    It's the process FMEA for the G2 filter.

09:08:44  15    Q    Was this record made at or near the time it was dated by

      16    someone with knowledge from the company?

      17    A    I don't see a date.  Sorry.

      18    Q    Well, do you recall when this would have been --

      19          MR. NORTH:  Let's go to the second page, if we

09:08:58  20    could.

      21          No date there.  Try the third.

      22    BY MR. NORTH:

      23    Q    Do you recall approximately when this was prepared?

      24    A    Sometime around May 2005.

09:09:16  25    Q    And would this report have been created by someone with

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:09:21  1  knowledge of the contents?

2  A    Yes.

3  Q    And would this record have been kept in the course of

4  Bard's regularly conducted activities?

09:09:29  5           MR. LOPEZ:  I'll agree to it, its admission.

6           MR. NORTH:  We tender it, then, Your Honor.

7           THE COURT:  All right.  5307 is admitted.

8  BY MR. NORTH:

9  Q    And is this the report of the finite element analysis that

09:09:45  10  you discussed, or mentioned?

11  A    No.

12           MR. NORTH:  Well, let's go to the title page, if we

13  could.

14           Let's turn to page 07, if we could.

09:10:03  15  BY MR. NORTH:

16  Q    Do you know if Bard conducted this FEA itself, or did it

17  work with a vendor to do so?

18  A    I know the FEA was contracted out to a vendor.

19  Q    And why did you contract out FEAs?

09:10:29  20  A    Because of the skill set that they have to do it.

21  Q    And did you --

22           MR. NORTH:  I'm sorry, I see the source of

23  confusion.  This is supposed to be 5037 and this looks like

24  it's 5307.

09:10:57  25           5037.

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:10:59  1        THE COURT:  I think you had said 5307.

2        MR. NORTH:  I'm sorry, Your Honor.

3        THE COURT:  And so did you not intend to admit 5307?

4        MR. NORTH:  I did not.  I apologize.

09:11:09  5        THE COURT:  So that exhibit won't be admitted.

6    Let's go to 5037.

7    BY MR. NORTH:

8    Q    And what is this document, Mr. Carr?  Can you tell?

9    A    This is the effects of changes to the Recovery filter and

09:11:30 10   the femoral delivery system on filter stresses based on FEA

11   analysis.

12   Q    And was this prepared by –– well, is this an approval form

13   signed off on by your team?

14   A    Yes.

09:11:45 15        MR. NORTH:  Your Honor, at this time we tender 5037.

16        MR. LOPEZ:  No objection, Your Honor.

17        THE COURT:  Admitted.

18      (Exhibit 5037 admitted.)

19        MR. NORTH:  Now, if we could turn to page 4 of this

09:11:58 20   exhibit.

21        And could we display this to the jury, Your Honor?

22        THE COURT:  Yes.

23   BY MR. NORTH:

24   Q    Does this describe the test rationale?

09:12:11 25   A    Yes.

DIRECT EXAMINATION (CONT'D) - ROBERT M. CARR, JR.

09:12:12    1    Q    And what was the purpose of this test?  This finite

            2    element analysis that Bard had conducted on the G2?

            3    A    To evaluate the stresses in both the loaded and the

            4    deployed condition of the filter.  So meaning when it's in the

09:12:27    5    delivery system, and then when it's in a vessel.

            6    Q    Why did you want to do this in both configurations?

            7    A    Because the filter is stored in the delivery system from

            8    the time it's made to the time it's used, so you have to test

            9    those conditions, and then in the as-used condition also.

09:12:57   10    Q    And would this finite element analysis have assessed the

           11    worst case scenario for the filter?

           12    A    Yes.

           13              MR. NORTH:  If we could turn to page 5.

           14    BY MR. NORTH:

09:13:08   15    Q    What was the conclusion of this finite element analysis

           16    performed on the G2?

           17    A    That the modified filter showed substantially lower peak

           18    stresses compared to the original design, up to 90 percent

           19    lower, with an exception being the legs, as the legs of the G2

09:13:28   20    filter are wider than the legs of the Recovery filter, so you

           21    would expect a little more stress there.  However, the

           22    increase is minimal and the resulting deformation is well

           23    within the Nitinol's elastic range.

           24    Q    Would that stress found on the legs have affected the

09:13:53   25    fracture resistance of the filter?

DIRECT EXAMINATION (CONT'D) - ROBERT M. CARR, JR.

09:13:56  1   A    No.

2   Q    Are the tests contained in the design verification and

3   validation report the only bench test that Bard performed on

4   the G2 filter?

09:14:17  5   A    No.

6          MR. NORTH:  Let me bring up 5949, if we could.

7   BY MR. NORTH:

8   Q    Do you recognize this document?

9   A    Yes.

09:14:40 10   Q    And what is this?

11   A    It's a clot trapping efficiency report.

12   Q    And what was the purpose of this test?

13   A    To measure the clot trapping of the G2 filter, I believe,

14   in various configurations.

09:14:57 15   Q    And when was this test conducted?

16   A    I would guess in May of '06.

17   Q    And what was the purpose of conducting this test after

18   Bard had already started selling the G2 filter?

19   A    To evaluate, again, the ability of the filter to trap

09:15:16 20   clots in different orientations, not just straight

21   orientation.

22   Q    Did this test try to compare the G2 filter clot trapping

23   ability to that of the Greenfield filter?

24   A    Yes.

09:15:32 25   Q    And why did you choose the Greenfield filter as a frame of

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:15:37  1   reference for comparison?

2   A   Because it was the filter that we have always compared to

3   historically for clot trapping.  First Recovery, and then G2.

4   Q   Well, why did you choose that to compare for clot

09:15:52  5   trapping?

6   A   It was the gold standard at the time.

7           MR. NORTH:  Your Honor, at this time we would tender

8   5949.

9           MR. LOPEZ:  No objection, Your Honor.

09:16:01 10           THE COURT:  Admitted.

11       (Exhibit 5949 admitted.)

12   BY MR. NORTH:

13   Q   After -- in the development of a product such as the G2,

14   after the company completes the design verification and

09:16:16 15   validation testing, what is the next step?

16   A   We have a design review to review all of the data.

17   Q   And what does a design review consist of as a procedure or

18   process?

19   A   As I outlined yesterday in those processes of product

09:16:38 20   development, it is a review by, typically, senior people to

21   walk through everything and make sure that everything was done

22   to our quality documentation.

23           MR. NORTH:  If we could bring up 5315, please.

24   BY MR. NORTH:

09:17:00 25   Q   Do you recognize this document?

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:17:02  1    A    Yes.

2    Q    And what is that?

3    A    It's the design review for the G2 filter femoral delivery

4    system.

09:17:11  5         MR. NORTH:  If we could look at page 3, please.

6    BY MR. NORTH:

7    Q    Does this indicate when the design review took place?

8    A    Yes.  February 22nd, 2005.

9         MR. NORTH:  Your Honor, at this time we would tender

09:17:25  10   5315.

11        MR. LOPEZ:  No objection, Your Honor.

12        THE COURT:  Admitted.

13      (Exhibit 5315 admitted.)

14        MR. NORTH:  If we could display this page,

09:17:37  15   Your Honor?

16        THE COURT:  You may.

17   BY MR. NORTH:

18   Q    Does this show who all attended the design review for the

19   G2?

09:17:47  20   A    I don't know if it shows all the attendees, but it shows

21   the team members and reviewers.

22   Q    Do you recall whether you attended that meeting?

23   A    I don't recall offhand, no.

24        MR. NORTH:  If we could turn to page 4, please.

25

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:18:05   1   BY MR. NORTH:

2   Q    What is the -- is identified as the objective of this

3   meeting?

4   A    The objective is to critique the final design with respect

09:18:19   5   to the design requirements and specifications.  The review

6   team will determine if the G2, G1A, Recovery, is suitable to

7   move into Phase III or process qualification.

8   Q    And what did the design review team, what do they

9   typically review as a part of this analysis?

09:18:40   10   A    I believe if you take away the highlight, all of the

11   documentation there in the agenda.  All of the documentation

12   that's required there.

13   Q    Do they -- does the design review team look at all of the

14   testing that has been done to develop the product?

09:19:01   15   A    Yes.

16           MR. NORTH:  If we could turn to Page 21, please.

17   BY MR. NORTH:

18   Q    What were the conclusions of the design team?  Design

19   review team?

09:19:13   20   A    That the filter demonstrated superior performance in

21   fatigue resistance to the Recovery.  The filter demonstrated

22   acceptable performance in all tests, except for the migration

23   resistance we talked about before.  And that the G1A

24   demonstrated superior performance in migration resistance

09:19:33   25   compared to Recovery.

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:19:37  1   Q   Is this Phase II the only design review you conducted with

2   regard to G2?

3   A   No.

4         MR. NORTH:   Let's bring up 5316, if we could.

09:19:53  5   BY MR. NORTH:

6   Q   Are you familiar with this document?

7   A   Yes.

8   Q   And what's -- what's the title?

9   A   Phase III Design Review for the G2 Recovery Femoral

09:20:06  10  Delivery System.

11  Q   And what would be the distinction between this design

12  review and the one that we just talked about?

13  A   I believe this one goes over the process of documentation.

14        MR. NORTH:   If we could look at the 6th page.

09:20:22  15  Page 6.

16  BY MR. NORTH:

17  Q   Does this indicate who -- what date this took place?

18  A   March 28th, 2005.

19  Q   And does it list the people that attended?

09:20:36  20  A   Again, there might have been other attendees, but it lists

21  the project team and the design review team, yes.

22  Q   And are you a part of that -- listed as part of that

23  project team?

24  A   I am.

09:20:46  25        MR. NORTH:   Your Honor, at this time we would tender

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:20:48   1   5316.

2   MR. LOPEZ:  No objection, Your Honor.

3   THE COURT:  Admitted.

4   (Exhibit 5316 admitted.)

09:20:53   5   MR. NORTH:  If we could display, Your Honor?

6   THE COURT:  You may.

7   MR. NORTH:  If we could turn to page 7, please.

8   BY MR. NORTH:

9   Q   And what was the objective of this March meeting?

09:21:14   10   A   To review all the testing and documentation, to ensure

11   compliance to design specifications, and to ensure that the

12   device will perform in a reliable, safe, and effective manner

13   prior to full market release.  And the review team will also

14   determine if the system is suitable to move to Phase IV,

09:21:35   15   market release.

16   MR. NORTH:  If we could go to Page 9, please.

17   Let's back up to 8, if we can.

18   BY MR. NORTH:

19   Q   What were the conclusions of this particular design

09:22:06   20   review?  Do you know?

21   A   That we could move forward.

22   Q   And as a part of this design review, did you validate the

23   processes?

24   A   Yes.

09:22:21   25   Q   And what does that mean, to validate the processes for the

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:22:25   1   development of the G2?

2   A   To ensure that the instructions and how you make the

3   filter is how it was intended.

4   Q   As part of your work with filters over the last 20 years

09:22:58   5   or so, Mr. Carr, have you spent a lot of time with doctors and

6   visiting hospitals?

7   A   Yes.

8   Q   And have you had many discussions with the doctors

9   regarding their use of filters?

09:23:12  10   A   Yes.

11   Q   And as a part of your research and development and

12   experience with filters, have you gained an appreciation of

13   the types of patients who typically receive a permanent

14   filter?

09:23:24  15   A   Yes.

16   Q   And what are the attributes of patients that doctors, in

17   your experience, generally utilize permanent filters with?

18         MR. LOPEZ:  Foundation.  Speculation.

19         THE COURT:  Overruled.

09:23:37  20         THE WITNESS:  Typically it's in older patients whose

21   life expectancy is not very long, and they would get a

22   permanent filter.  Or, stated better, they would not need an

23   optional filter because they would probably never have it

24   removed.  Or they have a permanent need for a vena cava

09:23:59  25   filter.

DIRECT EXAMINATION (CONT'D) - ROBERT M. CARR, JR.

09:24:00  1   BY MR. NORTH:

2   Q   Since the advent of retrievable filters in the early

3   2000s, has Bard seen the sales of its permanent filter,

4   Simon Nitinol, decline?

09:24:13  5   A   Yes, it declined year over year.

6   Q   And as someone in the company who's worked closely with

7   these filters in developing them, did you see reasons or

8   have -- were you able to identify reasons why that was

9   happening?

09:24:32  10   A   Again, optional filters are permanent --

11          MR. LOPEZ:  He just asked him if -- because I might

12   have an objection to the narrative he's about to give.  So I

13   object.  He's going beyond the scope of the question.

14          THE COURT:  Reask the question, would you, please.

09:24:51  15   BY MR. NORTH:

16   Q   With your work in filters, Mr. Carr, and the development

17   of them, talking to doctors, visiting hospitals, what is your

18   impression as to why the sales of the Simon Nitinol has

19   declined?

09:25:12  20          MR. LOPEZ:  Your Honor, objection.  802.

21   Foundation.  Speculation.

22          THE COURT:  Overruled.

23          THE WITNESS:  With the advent of optional filters,

24   they are permanent filters also.  So the number or the people

09:25:29  25   who received a permanent filter was going down, and new

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:25:35  1   technology has come along over time.  The SNF is an old

2   device.  And so with the option of being able to remove a

3   filter, that's what most people choose.

4   BY MR. NORTH:

09:25:50  5   Q   Have you, in your work, identified certain characteristics

6   of the Simon Nitinol filter that make it less desirable,

7   besides the fact that it's only a permanent filter?

8           MR. LOPEZ:  Again, Your Honor, lacks foundation.

9   Seems to be asking for an opinion of an expert.

09:26:09  10          THE COURT:  Overruled.

11          THE WITNESS:  Yes.  Many people don't like how the

12   Simon Nitinol filter deploys.  It is a very long device

13   inside the tube and inside the delivery system, and when it's

14   deployed into the vena cava, some people are not very

09:26:25  15   accurate with how it forms and -- which is very important to

16   a lot of people is to be able to place the filter where they

17   want it to go.  So that's probably the biggest reason.

18   BY MR. NORTH:

19   Q   Mr. Carr, are you aware of any IVC filter on the market

09:26:45  20   today that does not have reports of filter fracture?

21   A   No.

22   Q   Are you aware of any IVC filter on the market today that

23   does not have reports of filter migration?

24   A   No.

09:26:55  25   Q   Are you aware of any IVC filter on the market today that

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:26:58  1    does not have reports of filter perforation?

2    A    No.

3    Q    And are you aware of any IVC filter on the market today

4    that does not have reports of filter tilt?

09:27:08  5    A    Probably not the Bird's Nest, which was a very old device

6    and probably couldn't tilt.

7    Q    Other than that one, are you aware of any?

8    A    No.

9    Q    If the G2 has had reports of fracture, as we've heard

09:27:25  10   during this trial, why did Bard continue to market the filter?

11   A    Because of the benefit that it provides patients.

12   Q    What is your understanding, as someone involved in the

13   development of filters, regarding the typical clinical

14   consequences of a fracture?

09:27:46  15   A    The vast majority of cases, they are asymptomatic.

16   Q    Mr. Carr, at any point in time in the development of the

17   G2 filter, did Bard rush the filter to market or otherwise

18   compromise the design and development process?

19   A    No.

09:28:14  20   Q    And do you believe yourself that the G2 is and was

21   reasonably safe?

22   A    Absolutely.

23        MR. NORTH:  Thank you, sir.  That's all the

24   questions I have.

09:28:25  25        THE COURT:  Cross-examination.

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:28:26  1        MR. LOPEZ:  Yes, Your Honor.  Thank you.

        2              C R O S S - E X A M I N A T I O N

        3   BY MR. LOPEZ:

        4   Q   Morning.

09:28:34  5   A   Good morning.

        6   Q   Mr. Carr, you talked a lot about testing, and I want to

        7   make sure that the evidence in this case is clear.

        8        You have previously testified that it's important for

        9   people to know that the FDA does not test; correct?

09:28:52 10   A   I don't recall that.

       11        MR. LOPEZ:  Greg, could you please put up the

       12   June 6th, 2017, deposition of Mr. Carr, page 51, lines 12

       13   through 17.

       14   BY MR. LOPEZ:

09:29:06 15   Q   Remember your deposition was taken in June of last year?

       16        Sir?

       17   A   Yes.

       18   Q   You were asked, "So your testimony would be that Bard

       19   fully responded to the FDA but that the FDA was not satisfied

09:29:26 20   with Bard's response?"

       21        Your answer was, and I quote, "And I think it's

       22   important to know that the FDA doesn't -- doesn't test --

       23   doesn't tell you how to test, they just tell you you need to

       24   test."

09:29:40 25        Remember that testimony?

CROSS—EXAMINATION – ROBERT M. CARR, JR.

09:29:42 1   A   Yes.

2   Q   And isn't it also your testimony that with respect to any

3   IVC filter, that the FDA conducted none of its own testing on

4   these filters?

09:29:54 5   A   I don't believe the FDA's conducted testing on filters,

6   no.

7   Q   And so you get to choose what tests you do, and you send

8   those results to FDA; correct?

9   A   No.  There's a guidance document.

09:30:06 10   Q   I understand.  But you still choose what test you do on

11   these devices.

12   A   Yes.  But if you didn't fulfill the guidance, you wouldn't

13   receive approval.

14   Q   Now, you were asked a question about ten or 15 minutes

09:30:22 15   ago:  Did the G2 ever fail migration testing in any of the

16   tests you performed?  Do you recall that?

17   A   I do.

18   Q   And the truth is, sir, that the G2 did fail migration

19   testing once they were implanted in humans.  True?

09:30:42 20   A   No.

21   Q   So these devices acted exactly the way you expected and

22   intended them to happen once they were implanted in human

23   beings?

24   A   Yes.  Migration is a known complication of all vena cava

09:30:59 25   filters, including G2.

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:31:01   1    Q    So you expected 18 people to die from migrations when you

2    marketed the Recovery filter?

3    A    No.

4    Q    Did you expect five people to die when you marketed the

09:31:14   5    Recovery filter from migrations?

6    A    No.

7    Q    Did you expect that the G2 filter would have had an

8    unacceptable risk of caudal migration within the first three

9    or four months that it was on the market?

09:31:29   10   A    No.

11   Q    The truth is, when the testing of these devices, including

12   the G2, let's just say the G2, once you started testing these

13   devices in human beings in the open market, it was failing the

14   migration testing that you would have expected in human

09:31:53   15   beings.  True?

16   A    No.  And we don't test migration resistance in human

17   beings.

18   Q    Well, you're not supposed to; correct?

19   A    And we don't.

09:32:03   20   Q    And when you first started marketing the G2, you had no

21   clue how the G2 device was going to respond to -- within human

22   beings.  True?

23   A    Absolutely not.

24   Q    You knew that it -- you were going to have those caudal

09:32:21   25   migration problems, those perforation problems, those tilting

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:32:25  1  problems, those fracture problems that were reported to you in

2  the early four to five months it was on the market?  Did you

3  know that was going to happen?

4  A    Again --

09:32:35  5  Q    Sir, did you know that was going to happen?  That data?

6            MR. NORTH:  Your Honor, I'm sorry.

7            THE COURT:  Please let him answer the question,

8  Mr. Lopez.

9            THE WITNESS:  Again, all filters have known

09:32:43 10  complications of which each of those that you listed are

11  known.  So, yes, we knew they were going to happen.

12  BY MR. LOPEZ:

13  Q    All those things that were reported to you that caused

14  Dr. Ciavarella to say, why are we using the G2 when we have

09:32:56 15  the SNF, you expected all that to happen?

16  A    Again --

17  Q    Sir, that -- did you expect all that to happen that caused

18  him to say, why are we using the G2 when we have the SNF that

19  has virtually no safety problems?

09:33:11 20  A    Again, yes.  Those are all known complications of vena

21  cava filters.

22  Q    And you expected the results that you got in the EVEREST

23  study when you first started marketing the device?

24  A    I don't understand.  Sorry.

09:33:24 25  Q    The results in the EVEREST study, the tilting, the

CROSS-EXAMINATION - ROBERT M. CARR, JR.

09:33:26   1   migrations, the fractures, the perforations, the difficulty to

2   remove these devices because they were embedded in the wall of

3   the vena cava, did you expect that?

4   A    Yes.  And I believe they're known complications written in

09:33:39   5   the protocol of the clinical trial.

6   Q    And did you tell doctors about that expectation, that the

7   G2 filter was willing to behave the way it was reported to

8   this company in the first four or five months it was on the

9   market?

09:33:52  10   A    Yes.  The IFU instructs physicians of all of those known

11   complications.

12   Q    And you told doctors and patients about the results of the

13   EVEREST study -- you did not tell doctors and patients about

14   the results of the EVEREST study until sometime after

09:34:11  15   Ms. Booker got her device, her G2 device.  True?

16   A    Yes.

17            MR. LOPEZ:  Could we pull up 1680, please.

18            Show it to the witness.

19            Please.

09:34:40  20   BY MR. LOPEZ:

21   Q    Sir --

22            THE COURT:  Hold on just a minute.  What's the

23   number?

24            MR. LOPEZ:  1680.

09:34:50  25            THE COURT:  We're checking to confirm it's in

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:34:51   1   evidence.

2          MS. REED ZAIC:  It's not.  It's the redacted issue

3   we dealt with this morning, Your Honor.

4          THE COURT:  Oh.  Okay.

09:35:01   5   BY MR. LOPEZ:

6   Q   Sir, do you recall your company getting a warning letter

7   from the Department of Health and Human Services dated

8   July 13, 2015?

9   A   Yes.

09:35:13  10   Q   Were you involved in the activities that happened at Bard

11   once this letter was received?

12   A   No, I was not.

13   Q   Do you recognize this, though, as the warning letter that

14   you received?  The company received?

09:35:29  15   A   I don't know that I've ever seen the warning letter, but

16   it certainly looks like a warning letter to Tim Ring, yes.

17   Q   And Tim Ring is the chairman and chief executive officer

18   of C.R. Bard?

19   A   Yes.

09:35:43  20   Q   And could you verify for us, please, if you look at

21   page 11 of this Bates -- yeah, Bates page 11, 5715, that that

22   is a signature of a director from the Los Angeles district of

23   the FDA.

24   A   It appears to be, yes.

09:36:06  25          MR. LOPEZ:  Your Honor, at this time, subject to the

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:36:07  1    redactions that we discussed, I'd like to offer 1680 into

2    evidence.

3         THE COURT:  Other than the objections we've

4    addressed, are there any others from defendants?

09:36:18  5         MR. NORTH:  Your Honor, I would object to -- with

6    this witness under 602.  He hasn't been able to identify

7    this.

8         THE COURT:  All right.  I'm going to overrule it.  I

9    believe this is self-authenticating under Rule 901 and 902.

09:36:29  10        Exhibit 1680 is admitted in its redacted form.

11        (Exhibit 1680 admitted.)

12        MR. LOPEZ:  Thank you, Your Honor.

13        You can take that down now, Greg.

14   BY MR. LOPEZ:

09:36:41  15   Q   Sir, your company maintains what are known as complaint

16   files; right?

17   A   Yes.

18   Q   And those complaint files are collected by field assurance

19   representatives?

09:36:52  20   A   Yes.

21   Q   And they can also be sent in by doctors and other folks;

22   right?  There's no restriction.

23   A   Anyone can complain.

24   Q   In fact, you instruct your sales reps if a doctor

09:37:04  25   registers a complaint to them that they -- that complaint gets

CROSS-EXAMINATION - ROBERT M. CARR, JR.

09:37:08  1    reported to the company; correct?

       2    A    Yes.

       3    Q    And that information is tracked in a database that Bard

       4    maintains that includes both the Recovery and the G2 devices?

09:37:22  5    A    Yes.

       6    Q    And those are kept in electronic database?

       7    A    Yes.

       8    Q    And those are kept in the ordinary course of business;

       9    right?

09:37:34 10    A    Yes.

      11    Q    And the sales reps are authorized and in fact they're

      12    instructed to make sure they report any complaints that happen

      13    in the field; correct?

      14        MR. NORTH:  Your Honor, I'm going to object.  This

09:37:43 15    is beyond the scope of direct testimony.

      16        MR. LOPEZ:  Your Honor --

      17        THE COURT:  Hold on just a minute.

      18        Overruled.

      19    BY MR. LOPEZ:

09:37:58 20    Q    True, sir?

      21    A    Yes.

      22    Q    And, in fact, when you have a complaint file, you indicate

      23    who it was that reported it.  True?

      24    A    I believe so.

09:38:12 25    Q    And if it was reported by a sales rep, you put on the

CROSS-EXAMINATION - ROBERT M. CARR, JR.

09:38:15 1    complaint file a rep report or a sales rep report; correct?

2    A    I don't do anything.  I don't deal --

3    Q    That's --

4    A    -- with complaint forms.

09:38:24 5    Q    I'm sorry, I didn't mean to interrupt.

6         But when you look at these complaint files, if a

7    sales rep reports it, you'll see something like rep reported,

8    that type of information?

9    A    Probably.

09:38:37 10   Q    Okay.

11        MR. LOPEZ:  Your Honor, I'd like to now show the

12   witness 4327.  However, I want it to include the last four

13   pages of that original exhibit.

14        THE COURT:  That's fine.  You can show it to the

09:38:51 15   witness.

16        MR. LOPEZ:  Yes.  Just show it to the witness,

17   please.

18        Greg, that would be Page 8.

19   BY MR. LOPEZ:

09:39:03 20   Q    Do you see that, sir?

21   A    I do.

22   Q    Now, you see on this chart rep report, rep report, rep

23   report, rep report, rep report, all up and down that first

24   page?

09:39:19 25   A    Yes.

CROSS-EXAMINATION - ROBERT M. CARR, JR.

09:39:20  1    Q    And these are complaints from the field; correct?

2    A    Yes.

3    Q    When it says "rep report," that means a sales

4    representative who's an agent or employee of Bard reported

09:39:31  5    these events to Bard; correct?

6    A    Probably.

7    Q    And if you go to the next page, I think you'll see other

8    areas where it says rep report and rep report.

9         Right?

09:39:50 10    A    Yes.

11    Q    And you've seen summaries like this before from the

12    complaint files, have you not, that are indicated here on this

13    Exhibit 4327?

14    A    I saw this table the other day when you showed it to me.

09:40:12 15         MR. LOPEZ:  Your Honor, at this time I'd like to

16    move in the remaining four pages of 4327.

17         MR. NORTH:  Same objection, Your Honor.  Hearsay

18    within hearsay.

19         THE COURT:  All right.  Let's address this for a

09:40:22 20    minute at sidebar.

21         If you want to stand up, ladies and gentlemen, feel

22    free.

23      (Bench conference as follows:)

24         MR. LOPEZ:  Your Honor --

09:41:37 25         THE COURT:  That can't help me unless it's in

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:41:39  1    evidence.

2            MR. LOPEZ:  Okay.

3            THE COURT:  Mr. North, the question I have is, is

4    why you think 801(d)(2)(C) has not been satisfied by

09:41:52  5    Mr. Carr's testimony?

6            MR. NORTH:  Because I believe that the mere fact

7    that it says "rep report" is just the tip of the iceberg of

8    the layers of this hearsay.  No selling representative

9    knows -- may I look at this one second, Your Honor?

09:42:09 10            THE COURT:  Yes, you can.

11            MR. NORTH:  -- details such as on follow-up imaging

12   the filter was found to have dropped, vertebral bodies link,

13   doctor reported that one hook -- these may be coming from the

14   sales rep and -- on some level, but there are many layers of

09:42:28 15   hearsay beneath.

16            The sales rep was not in the operating room.  The

17   sales rep is hearing about this from the doctor, is hearing

18   about this from the physician, and so this is just a statement

19   where the sales rep is reporting hearsay.  It's not a

09:42:42 20   statement that he has personal knowledge of.  And I don't

21   think it would qualify under that -- not exception, but -- to

22   fail to be identified as hearsay there because of that.

23            THE COURT:  Well, the one you pointed out, which is

24   the fourth bullet on Page 8 of Exhibit 4327, actually that

09:43:04 25   begins "marketing manager reported."

CROSS-EXAMINATION - ROBERT M. CARR, JR.

09:43:08  1          MR. LOPEZ:  I can ask him that question too.

       2          THE COURT:  But it specifically says "doctor

       3   reported that one hook was in a vein."  That is clearly

       4   stating what the doctor said.

09:43:18  5          MR. LOPEZ:  And this is clearly notice to the

       6   company.

       7          THE COURT:  Well, but there's a hearsay issue.  How

       8   is that not -- the doctor's statement in that sentence not

       9   hearsay?

09:43:27 10          MR. LOPEZ:  Well, it is.  But there's -- I mean,

      11   it's obviously -- but this is -- this is him reporting to the

      12   company, Your Honor.

      13          THE COURT:  What a doctor said.

      14          MR. LOPEZ:  Well, okay.

09:43:39 15          THE COURT:  What the doctor said is hearsay.

      16          MR. LOPEZ:  Isn't it also notice to the company?

      17   This is --

      18          THE COURT:  There's no notice exception to the

      19   hearsay rule.

09:43:47 20          MR. LOPEZ:  There's a notice exception to the

      21   hearsay rule.

      22          THE COURT:  No, there isn't.

      23          MR. LOPEZ:  Well, then, we won't offer it for the

      24   truth, and then it goes to their state of mind and

09:43:54 25   information they had when they were monitoring this device.

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:43:57  1        THE COURT:  What's your response on that?

2            I mean, that would be accompanied by an instruction

3    that they're not to take this information for the truth of

4    what is said, but simply as notice to the company of what was

09:44:15  5    purportedly said.

6            MR. LOPEZ:  I can live with that.

7            MR. NORTH:  Your Honor, he just spent the last ten

8    minutes answering his questions saying there's notice to the

9    company of all these sorts of complications occurring.  He's

09:44:26 10    trying to get this in for the truth of the matter asserted

11    because he wants to get in that there's notice to the company

12    of these specific details of events.  I mean, he wants -- he

13    wants evidence that the company -- well, that these events

14    with these particular specifics occurred.  He's already got

09:44:45 15    plenty of evidence of notice of complications occurring.

16            THE COURT:  Well, but he can put in more evidence of

17    notice.

18            MR. NORTH:  That's true.

19            THE COURT:  I'm not understanding that objection.

09:44:56 20            MR. NORTH:  I think my point is that I don't believe

21    that's why he's putting it in.  He's putting it in to get the

22    truth of these events before the jury.

23            THE COURT:  Well, let me ask you this question,

24    Mr. Lopez:  Let's say you're in closing and you put this

09:45:08 25    exhibit on the screen, what are you going to argue from the

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:45:12   1   statements in this exhibit?

2           MR. LOPEZ:  Whether the company had notice of the

3   reports from their sales reps about what was happening with

4   the device in the market.

09:45:25   5           THE COURT:  Well --

6           MR. LOPEZ:  It --

7           THE COURT:  Hold on just a minute.

8           Here's the issue.  Doesn't that, for the jury to say,

9   okay, the company had notice that the filter was tilted

09:45:35   10  90 degrees against the caval wall, have to assume the filter

11  was tilted 90 degrees against the caval wall?  For the jury to

12  attach significance to that, don't they have to assume the

13  filter was actually that filter?

14          MR. LOPEZ:  What they have to assume is what did the

09:45:53   15  company do in reaction, in response to that.

16          THE COURT:  Why did the company have to do anything

17  if it wasn't true?

18          MR. LOPEZ:  Well, that -- well, one of the issues is

19  they need to find out.

09:46:01   20          THE COURT:  But it seems to me your argument

21  implicitly asserts that these things really happened.  That's

22  why I'm wrestling with it's not offered for the truth of the

23  matter asserted.

24          MR. LOPEZ:  Alls I heard, all we heard in this case

09:46:12   25  is fracture rates.  Those are all reports -- everything in

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:46:15  1   this case with respect to --

2        THE COURT:  Let's focus on hearsay.

3        MR. LOPEZ:  I know, but --

4        THE COURT:  That's the issue.

09:46:21  5        MR. LOPEZ:  Everything that relates to what -- this

6   is -- clearly goes to the company's state of mind and the

7   notice to them about --

8        THE COURT:  I understand that, and I agree that it

9   does.  But it seems to me the only significance is if it's

09:46:36 10   true information, if these filters were tilting in this way,

11   were fracturing in this way.  That's what I'm wrestling with.

12        MR. LOPEZ:  Why can't I cross-examine someone and

13   say, by the way, your sales rep reports that there was a

14   device that went into someone's heart, or that a piece of the

09:46:51 15   device went into someone's heart, what did you do to

16   investigate that to see if it was true?  Why can't -- I can't

17   ask that question?

18        THE COURT:  Well, you're not wanting to ask a

19   question, you're wanting to put a document in evidence.

09:47:02 20   There's a difference.

21        MR. LOPEZ:  Okay.  But it still doesn't stop me from

22   finding out what kind of investigations --

23        THE COURT:  You can ask him questions about

24   investigations, and if there's an objection, I'll rule on it.

09:47:15 25   What you want to do is put these statements in evidence.

CROSS-EXAMINATION - ROBERT M. CARR, JR.

09:47:19   1          MR. LOPEZ:  Well, Your Honor, I would like to file a

         2    brief on this, obviously, because there's other cases where

         3    these come in to evidence as exception to the hearsay rule.

         4          THE COURT:  Well, let's do this:  I think you've

09:47:32   5    laid the foundation.  If you want to lay more, such as a

         6    marketing manager, you can go ahead and do that now.

         7          And I'd like to see the cases.  I'd like to consider

         8    that argument.

         9          MR. NORTH:  I think we have some, too, Your Honor.

09:47:45  10          MR. LOPEZ:  Pardon me?

        11          MR. NORTH:  We have some cases too.

        12          THE COURT:  Okay.  So I'm -- just for the record,

        13    I'm not going to admit it at this point, but it's subject to

        14    my hearing these additional legal arguments.

09:47:54  15       (Bench conference concludes.)

        16          THE COURT:  Thank you, ladies and gentlemen.

        17    BY MR. LOPEZ:

        18    Q   Sir, marketing managers can also report these adverse

        19    events, too, or regional managers.  Anyone out in the sales

09:48:23  20    force that's with doctors.  True?

        21    A   Anyone in the company can report any of them.

        22          MR. LOPEZ:  Those are all the questions I have at

        23    this time, Your Honor.

        24          THE COURT:  All right.  Redirect?

09:48:37  25          MR. NORTH:  Nothing further, Your Honor.

DIRECT EXAMINATION - DAVID W. FEIGAL, MD

09:48:38  1        THE COURT:  All right.  Thank you, Mr. Carr.  You

      2  can step down.

      3        MR. LOPEZ:  Your Honor, subject to our discussions,

      4  I'd like to move into evidence, I think it was 4327, but that

09:49:11  5  includes the -- to include the last four pages.

      6        THE COURT:  All right.  That motion's been made.  As

      7  indicated, we're going to discuss that later.

      8        And that was 4327.  Is that --

      9        MR. LOPEZ:  4327.

09:49:27 10        MR. CONDO:  Your Honor, we would call Dr. David

     11  Feigal.

     12        THE COURTROOM DEPUTY:  Dr. Feigal, if you'll please

     13  come forward and stand right here and raise your right hand,

     14  sir.

09:49:39 15                **DAVID W. FEIGAL, MD,**

     16  called as a witness herein, after having been first duly sworn

     17  or affirmed, was examined and testified as follows:

     18              D I R E C T   E X A M I N A T I O N

     19  BY MR. CONDO:

09:49:57 20  Q    Good morning, Doctor.  Would you please introduce yourself

     21  and tell the ladies and gentlemen of the jury where you live.

     22  A    My name is David William Feigal, Junior, and I live in

     23  Thousand Oaks, California.

     24  Q    And what is your profession, sir?

09:50:31 25  A    I'm a physician.  I'm also an epidemiologist, and I have

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

09:50:37 1    spent the majority of my career, some 30, 35 years, involved

2    in developing medical products.

3    Q    And what is an epidemiologist?

4    A    Epidemiology is the study of the patterns of diseases in

09:50:52 5    populations.  So the word comes from epidemic, but it is

6    broader than just studying infections.  But that was the

7    original use it was put towards.  So it's a -- it's a field of

8    study that looks at how things occur and what kinds of people

9    and what are risk factors that explain the occurrences.

09:51:17 10   Q    And is a clinical epidemiologist someone who is trained

11   both in clinical medicine and in the research tools of

12   epidemiology?

13   A    Yes, that's right.  So as a physician epidemiologist, I

14   look at the epidemiology of the safety of medical products,

09:51:33 15   the patterns of diseases.  I've done studies of specific

16   diseases and conditions over my career.

17   Q    And in this case what were you asked to do?

18   A    I was asked to look to see if the studies that were in the

19   medical literature could establish the rates and the extent of

09:51:55 20   the adverse events that were occurring with Bard filters and,

21   to an extent, other filters as well.

22   Q    And when you talk about studies referenced in medical

23   literature, are you talking about peer-reviewed studies and

24   medical publications?

09:52:11 25   A    Yes, I am.

DIRECT EXAMINATION - DAVID W. FEIGAL, MD

09:52:12   1    Q    And have you formed an expert opinion on that subject on

2    which you were asked to do?

3    A    Yes.

4    Q    And are all of your opinions formed to a reasonable degree

09:52:21   5    of scientific certainty?

6    A    Yes, they are.

7    Q    What education and training do you have in the field of

8    clinical epidemiology?

9    A    Well, I began my training as a -- at a medical school at

09:52:33  10    Stanford University.  I did a residency in internal medicine

11    at the University of California Davis.  And then I did a

12    fellowship in clinical epidemiology at a joint program between

13    University of California San Francisco and UC Berkeley.  So

14    that was my formal educational training.  I got a lot more

09:52:54  15    training in the field, actually working in the -- working in

16    the profession.  But that was my formal training.

17    Q    And have you consulted with medical device companies as a

18    clinical epidemiologist?

19    A    Yes, I have.  I think with respect to medical products,

09:53:09  20    one focus of a great deal of my research and consulting is

21    around the safety of products and methods of determining the

22    safety of those products.

23    Q    And have you taught general medicine and epidemiology to

24    graduate or undergraduate level students?

09:53:26  25    A    Yes, I have.  I was on the faculty of the University of

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

09:53:29  1    California San Francisco, both in the departments of

2    epidemiology and the department of medicine.  And there I was

3    the associate director of the clinical epidemiology fellowship

4    program.  Actually, the program I was trained in, I became the

09:53:45  5    deputy director of that.  And so I taught graduate students

6    and medical students at San Francisco.  I continued that.  I

7    moved to the faculty at University of California San Diego,

8    and taught there as well.

9    Q    And have you practiced medicine?

09:54:02  10    A    I have.  I was very actively a member of the faculty

11    practicing in the department of medicine at the university

12    hospitals where I was.  Generally those were county hospitals.

13    And I spent probably about a third of my time in direct

14    patient care.

09:54:16  15    Q    And in your practice, your medical practice, did you ever

16    implant an IVC filter?

17    A    No, I didn't implant one, but I had patients who had --

18    one of my fields of study was actually risks for pulmonary

19    embolism.  And I had a patient who had one of the very early

09:54:36  20    filters implanted by someone else.  But I'm not someone who

21    can implant the filters.

22    Q    Does your lack of experience actually implanting filters

23    inhibit your ability to evaluate the sufficiency of

24    information in medical literature to determine whether there

09:54:51  25    are reliable adverse rates reported?

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

09:54:55  1    A    No, it does not.

2    Q    Do you still hold an active medical license?

3    A    I do.  I've been continuously licensed in the State of

4    California since 1976.

09:55:05  5    Q    Are you board-certified in any medical discipline?

6    A    Yes, internal medicine.

7    Q    And in your background, in your experience, have you ever

8    worked with the FDA, the Food and Drug Administration?

9    A    I did.  After about almost 15 years in different

09:55:21 10    University of California medical schools, I went to the FDA in

11    1992 and worked there for the next 12 years.

12    Q    And can you briefly summarize the positions you held with

13    the FDA over that period and describe for us generally what

14    your responsibilities were in each position?

09:55:38 15    A    Sure.

16         Well, my first position, to back up just a little, I

17    was at San Francisco General Hospital when the AIDS epidemic

18    came along.  It came along and we didn't even know what it

19    was.  And I got involved with developing drugs and products

09:55:53 20    for the HIV epidemic.

21         And I was invited to be on advisory panels to the

22    FDA, and when the position opened in 1991 to be the director

23    of the division responsible for all of the AIDS drugs, my

24    family and I packed up and we went to Washington, and I stayed

09:56:10 25    at FDA the next 12 years.  And I worked on drugs for about

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

09:56:14  1    five and a half years, and during that time we approved the

2    cornerstone HIV drugs that changed the epidemic.

3            Then for two years I was the deputy director at the

4    Center for Biologics.  Those are blood and vaccines and other

09:56:32  5    kinds of biological proteins.

6            And then for the last five years, I was the director

7    of the Center for Devices and Radiological Health.  And

8    reported directly to the commissioner.  But then I was

9    responsible for medical devices.  So I did that another five

09:56:44 10    years.

11           So those were my -- those, in brief, were my 12 years

12    at FDA.

13    Q    In the last position, what was -- what is the role of the

14    Center for Devices and Radiological Health?

09:56:56 15    A    Well, it's the -- that's the center that's responsible for

16    all of the surgical equipment, all the implants, the Bard

17    filters is an example of a medical device.  Also, all of the

18    radiology equipment, the X-ray equipment, the surgical tables.

19    Everything from tongue depressors to very, very high tech

09:57:15 20    pacemakers.

21           The radiological health part of it, we were also

22    responsible for products that emit radiation, not just

23    medical, but also cell phones and theft detection devices and

24    so forth.  So very -- a very broad group of responsibilities.

09:57:31 25    And I was the overall director for that center.  We had about

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

09:57:35  1  1200 employees.

2  Q    And in your professional career have you lectured or

3  presented lectures to professional organizations on topics

4  involving medical devices?

09:57:46  5  A    Yes, I have.  Particularly since I was the director the

6  device center.  But even a bit before that, because I

7  developed a couple medical devices back when I was an

8  academic.  But I've lectured to professional groups, I've

9  lectured at universities, I still lecture here in Arizona from

09:58:06  10  time to time.

11  Q    Are you still a part-time resident here in Arizona?

12  A    I am.  I've got a house in Ahwatukee.  We came here after

13  we left FDA to -- my wife accepted a position at TGen, a few

14  blocks from here, the Translational Genomics Center, and I

09:58:27  15  followed her.  And we -- at that time I started a consulting

16  practice and also teaching on -- as a member of the volunteer

17  faculty at the law school here.

18  Q    Now, as a physician and epidemiologist, have you conducted

19  medical research studies yourself?

09:58:46  20  A    Yes, I have.

21  Q    Can you describe for the ladies and gentlemen of the jury

22  generally the types of medical studies that you have

23  conducted.

24  A    Within kind of a broad range.  I have conducted and am

09:58:59  25  involved in a number of randomized controlled clinical trials.

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

09:59:05 1   These are studies that are planned in advance and where you've

2   got a treatment group and a control group, and people randomly

3   are assigned to the two, and then you follow them forward and

4   see what the effect is of the new product you're studying, for

09:59:17 5   example.

6           I've also designed studies that are observational,

7   where you identify a group of people, and then you have

8   regular follow-ups and -- and collect the information in that

9   way.

09:59:32 10          And I've also been involved in studies where I

11   actually start with problems, and then look backwards and see

12   if you can determine what those are.

13          So just about every kind of epidemiology study

14   category there is, I've participated in, designed, and in

09:59:46 15   addition to the ones I've designed, I've reviewed many, many

16   more.

17   Q   And have the results of the research, the medical studies

18   you've conducted been published?

19   A   Yes, in peer-reviewed literature.  Some of them for FDA

10:00:00 20   products and have resulted in studies that led to approval of

21   products.

22   Q   And have you yourself served as a peer reviewer for

23   professional journals?

24   A   I have.

10:00:11 25   Q   Can you give us an example or two of the kind of materials

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:00:16   1   that you peer reviewed?

2   A    I was a peer reviewer for the Journal of Medicine at one

3   point.   They would typically send me clinical trials in

4   epidemiology studies.   There's a journal once called

10:00:28   5   Controlled Clinical Trials, now called the Journal of Chronic

6   Disease, I was peer-review editor for studies submitted there.

7   Sometimes methodology studies.   Other times clinical studies.

8   Q    And in your professional career, have you had

9   responsibility for evaluating studies of adverse events

10:00:47   10   associated with drug and medical devices?

11   A    Yes.   And actually several different ways.   First I was an

12   investigator, so I was responsible for filing safety reports

13   to the FDA when I was an investigator.   Then, when I was at

14   FDA, we were responsible for evaluating the safety reports for

10:01:02   15   products we were responsible for in all three divisions and

16   taking appropriate actions.

17        Then, when I became a consultant, I actually worked

18   with companies setting up their reporting systems.   For four

19   years through the time I was a consultant, I was actually a

10:01:16   20   company official for two pharmaceutical companies.   And in one

21   of them I was directly responsible for the safety reporting.

22   So I've been doing safety reporting for 35 years.

23   Q    And are you drawing on that collective body of experience

24   you've assembled over the last 30, 35 years in forming your

10:01:37   25   opinion in this matter?

DIRECT EXAMINATION - DAVID W. FEIGAL, MD

10:01:38  1  A    Yes, I am.

2  Q    Now, are you being compensated for the time you've spent

3  at our request --

4  A    Yes.

10:01:44  5  Q    -- to evaluate studies?

6  A    Yes, I am.

7  Q    And what are you charging?

8  A    My current rate is $650 an hour.

9  Q    And does it change as to whether you're sitting at your

10:01:54  10  desk reading a medical literature or sitting here testifying?

11  A    No.

12  Q    And how much have you billed in total in connection with

13  your study of the medical literature of the IVC filters?

14  A    I began working on this in December of 2010, and since

10:02:15  15  that time I've billed approximately $225,000.

16  Q    Let's talk about some of the types of medical literature

17  that you reviewed in doing your work in this matter.  Can you

18  tell us generally what it was, what body of materials you

19  looked at.

10:02:32  20  A    So I began -- there are search engines that allow you to

21  actually find the medical literature.  And they're run by the

22  National Library of Medicine.  So I began looking for the

23  studies that had studied the Bard filters, and I pulled a

24  collection of those studies, obtained the original papers, and

10:02:51  25  then began sorting those into different sorts of categories,

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:02:56  1   whether they were prospective trials, meaning that they

2   started at the time of implantation and began following the

3   patients, or whether they were retrospective studies that

4   started later and looked back.  Sorted them into different

10:03:10  5   categories and began to analyze them.

6   Q   And do you know how many studies you actually looked at in

7   forming your opinions?

8   A   There's well over 100 studies that have –– the filters

9   that are relevant to –– to Bard.  There's actually over 2,000

10:03:28  10  papers about interven– –– caval filters.  I made sure that I

11  saw all the studies that I could find about Bard, and then I

12  looked at some of the other studies just for comparison.

13  Q   And as I understand what you've told us at the beginning,

14  you were asked to see whether the medical literature was

10:03:52  15  sufficient to determine whether there were reliable rates for

16  adverse events in Bard filters; correct?

17  A   Yes, that's correct.

18  Q   All right.  What is your opinion, sir?

19  A   Well, my opinion is that the adverse effects of IVC

10:04:09  20  filters, and Bard in particular, are well-known, and well

21  described in the medical literature, but none of the studies

22  have been designed in a way that they capture the information

23  that allows them to actually say what the rate is.  We know

24  it's low, but there isn't information about –– none of the

10:04:28  25  studies are designed in a way that you can actually determine

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:04:32  1  the rate of overall complications or even specific

2  complications like fracture or tilt.  So the studies do not

3  provide that information.

4  Q    And with respect to that opinion, do you hold it to a

10:04:46  5  reasonable degree of scientific certainty?

6  A    I do.

7  Q    Let's talk, then, about as a clinical epidemiologist, what

8  kind of information is needed to calculate a reliable rate for

9  any adverse event in a particular medical device?

10:05:01  10  A    It's actually quite simple in concept; it is just hard to

11  do in practice.  In concept you have to identify a population

12  that got the filter.  So let's say you were trying to do a

13  study to determine the rate.  You first want to start with

14  everybody who got the filter, because that is going to be your

10:05:18  15  population to determine the rate.

16      A rate means that you also have the dimension of time

17  accurately measured so that you know when things occurred and

18  how many of them occurred.

19      And so that means that you have to have a study that

10:05:32  20  has regular follow-up.  And because many of these

21  complications can only be seen with X-rays of various kinds,

22  you actually have to have scheduled X-ray follow-up to

23  actually see, you know, what's happened to the filters at

24  different points in time.

10:05:51  25      Instead, what the literature mostly has is a

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:05:55   1    collection of people that may have come to a hospital, but we

2    don't know what population they represent.  They may have

3    complications, we don't have any idea of what time they

4    occurred.  And we have many, many missing data.  There are

10:06:09   5    very few studies where they actually conduct the X-rays to

6    look for them.  So they use the X-rays that were taken as part

7    of regular medical care and see what they can do.

8        So the studies just aren't designed in a way that

9    provides that information where you can generate a rate.

10:06:25   10   Q   Would you describe the various types of medical studies

11   that researchers do if they're trying to evaluate medical

12   devices.

13   A   Sure.

14       You can think of studies kind of in a hierarchy, from

10:06:38   15   the most reliable to the least reliable.  You learn something

16   from all of them, but the most reliable ones are the ones that

17   actually can give you quantitative data and rates to -- and

18   the others give you just sort of more descriptions of things

19   that have happened.

10:06:52   20       So at the top of the hierarchy are --

21   Q   Dr. Feigal, let me interrupt you, if I can.  Would it be

22   helpful for you to step down, with the Court's permission, and

23   provide the list of studies, writing it out on the board, and

24   then returning to the seat to talk about each of them?

10:07:07   25   A   I'd be happy to do that.

DIRECT EXAMINATION - DAVID W. FEIGAL, MD

10:07:11   1        MR. CONDO:  Your Honor, may he do that?

2        THE COURT:  He may.

3        THE WITNESS:  Handwriting test.

4   BY MR. CONDO:

10:07:20   5   Q   Let me ask you the question:  What is it that you are

6   going to be writing on the white board, sir?

7   A   I'm going to list the studies from the most reliable

8   designs to the least reliable and the least helpful.

9   Q   Okay.  Thank you.  Would you please do so.

10:08:12  10   A   So the first is -- the perennial problem is finding a

11   marker that's not --

12   Q   Try this one.

13   A   Here's an RCT, which stands for randomized control trial.

14        And here you start with a population, and you

10:08:40  15   basically -- the fancy way of flipping a coin, and you divide

16   them into two groups, and then you follow them forward to see

17   what happens to this group and what happens to that group.

18   And some of them may have side effects in both, and you look

19   at the differences.  And this is very reliable because you are

10:09:01  20   starting with people who are all the same.

21        The next best are prospective cohort studies.  And

22   here, you take two groups, but you don't randomize them.  In

23   this case you might take patients with different filters.

24   They might have different filters for different reasons.  It

10:09:25  25   may be a certain filter that's used in cancer patients more

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:09:28   1   frequently, for example, or by one operator, one surgeon or

2   another.  And then you follow them.  And then you see, again,

3   if there's a difference between the two.

4        Then there are the prospective uncontrolled studies.

10:09:59   5   So now we just have one group.  And we don't have a

6   comparison, but we just have one group.  And we can at least

7   say -- and these are still very useful.  You can say of all of

8   the people that use this, if we follow them systematically to

9   find out what the complications are, we can at least find out

10:10:15  10   what happens if you get this filter.  We won't know about any

11   other filter.

12        Then there are the studies that are just case

13   collections.  And a lot of those are retrospective.  In fact,

14   start out here, and they look back to see what kind of -- you

10:10:42  15   know, if they have patients that are in their clinic, they can

16   take just a sampling of all of the patients that are still in

17   the clinic and look back, how long have they had the filter?

18   What kind of problems have they had?

19        Problem here is you get a lot of lost follow-up, a

10:10:58  20   lot of patients that are missing.  And there are people who

21   actually try and do these prospective studies retrospectively.

22   So that's another list on the list, the retrospective.

23        And there are examples of that that we can see in the

24   literature, where they look backwards.  Everything has already

10:11:22  25   happened.  Again, they're really bedeviled by missing data.

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:11:27  1    And then you have some studies that just study cases

2    and just report on what's happened on those cases.  So that's

3    common.  Like retrieval studies.  People come in, they're

4    going to have their filter out, people look at the filters and

10:11:42  5    say, what shape are the filters in?  They don't have any

6    information about people not coming in for retrieval, and the

7    retrievals are all different times.  They don't have any real

8    ability to do rates.  But you learn something.  You learn a

9    lot about how to do retrievals.

10:11:56  10    And then, finally, you have single cases.

11    MR. O'CONNOR:  I'm sorry, I didn't hear that,

12    Your Honor.

13    THE WITNESS:  Single cases.

14    MR. O'CONNOR:  Thank you, Doctor.

10:12:14  15    THE WITNESS:  There are databases of collections of

16    single cases.  And there are some single case reporting that

17    has to go to the FDA.  Those actually tell you very little,

18    except what happened to a single patient.  You can't really

19    generate rates or comparisons, and FDA talks about that.

10:12:29  20    So this is the rough hierarchy of studies.

21    MR. CONDO:  May I move this board back just a little

22    bit?

23    THE COURT:  Yes.

24    MR. CONDO:  Thank you.

25

DIRECT EXAMINATION - DAVID W. FEIGAL, MD

10:12:45  1   BY MR. CONDO:

2   Q   For reliability in determining reliable rates for adverse

3   events, how would you describe the randomized control trial?

4   How is it referred to generally?

10:13:08  5   A   It's referred to the gold standard of clinical evidence

6   because you've controlled for the differences in patients at

7   baseline, and because they're prospective studies where you

8   have a planned data collection over time and you're collecting

9   it the same on all the patients.  And when they're well

10:13:25 10   executed, that's the best source of data.

11   Q   And in your review of the medical literature, has there

12   ever been a randomized controlled trial for IVC filters?

13   A   There has not.  The challenge is you have to randomize

14   patients to perhaps not get a filter, and you'd have to find

10:13:44 15   patients who you could either not put a filter, put a filter

16   in, and it would be ethical to do either one.

17          So it is very difficult to do a randomized controlled

18   trial for some types of products, and this is one of them.

19   Q   Can you calculate rates or occurrences from each of these

10:14:04 20   types of studies?

21   A   You can calculate them from the randomized control trial

22   for the duration of the trial.  You can calculate them from

23   the prospective cohort studies, where you have a control group

24   and you have systematic collection over time.  But

10:14:20 25   unfortunately there aren't any of those either that have

DIRECT EXAMINATION - DAVID W. FEIGAL, MD

10:14:24  1    compared two products.

2              So with all the rest what you have is you have a

3    report of adverse events that have occurred in a group of

4    patients, but you don't have the time element, and you're

10:14:35  5    often missing patients.  There just isn't a way to calculate

6    the rates in those types of studies.

7    Q    As a clinical epidemiologist, what does one need to do in

8    order is to design a study that would generate reliable rates

9    for adverse events for an implantable device like an IVC

10:14:57  10   filter?

11   A    You have to have a population you define.  So that is sort

12   of obvious, it's the people that need an implanted filter.

13   And it would probably be at participating institutions.

14   Ideally you'd like everybody, particularly if it is an

10:15:10  15   observational study.  But patients do have to consent to be in

16   a study.

17             Then you'd have to have outcomes that you're going to

18   measure, and a good measuring technique.  You'd want it to be

19   the same across different patients.  So you could use a CT

10:15:23  20   scan, for example.  You could use other kinds of -- other

21   kinds of X-rays.  And you'd want to have a reliable

22   methodology to do the statistical analyses and calculate all

23   of these things.  It would basically be a prospective

24   protocol.  The best would be at the time of implantation.

10:15:47  25   Q    Do you have to have a defined population of participants

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:15:51  1    in the study?

2    A    Well, you do.  For example, if a center just reports its

3    retrievals, they don't know where those patients all came from

4    and they don't know all the patients that didn't come in for

10:16:04  5    retrieval.  So you can't get a rate from retrieval studies,

6    for example.

7    Q    Do you need a defined group of representative patients for

8    a reliable study?

9    A    Yes.  You need to have the patients that are typical of

10:16:21  10   the patients that receive the device.

11   Q    Yesterday, or perhaps two days ago, there was some

12   questioning of Mr. Van Vleet about a published study known as

13   the Nicholson study.  Is that one of the medical literature,

14   part of the medical literature that you examined as part of

10:16:53  15   your investigation in this matter?

16   A    I did, yes.

17   Q    What was that study about?

18   A    This was a study at York Hospital in Pennsylvania.  A

19   cardiologist there had seen an unusual patient who had a

10:17:12  20   fracture that had gone to her heart, and he decided to

21   actually call back the patients who had had filters placed at

22   his hospital for a period of time.  And then he published the

23   results of what his findings were from that study.

24   Q    Were there problems with that study?

10:17:44  25   A    There were a lot of problems with that study.  First we

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:17:49  1    start with the population.  He stated, and some of this was

2    later -- what actually was done in the study was actually

3    later discovered by requesting the records from the study as

4    part of the trial process.  But what -- what he did was he not

10:18:11  5    only did not have all of the patients from York Hospital, he

6    only had about two thirds of them, and he deliberately

7    excluded patients from certain implantation areas, such as the

8    intensive care unit.  Sometimes they were placed at the

9    bedside in the intensive care unit.

10:18:29  10       But he also not only didn't have all the patients, he

11    had groups of patients we know didn't have fractures.  And he

12    excluded them from his study.  He should have included them if

13    he wanted the rate.  But he deliberately excluded them.

14       And then he added other patients in who weren't from

10:18:51  15    York Hospital to his study who he knew had fractures.  And so

16    the numbers just -- you know, at the end of that, you just

17    didn't really know what he had done because he had both

18    increased the number of fractures, decreased the number

19    without fractures, was missing a large amount of data.  He

10:19:09  20    didn't even accurately represent how many different surgeons

21    were involved in placing the devices.

22    Q    What do you mean he didn't accurately represent the number

23    of surgeons involved in placing the devices?

24    A    When he published the study, he said one of the strengths

10:19:25  25    of the study was that many, many different operators, many

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:19:30   1   different surgeons had been involved in placing the

2   fractures -- placing the devices that had fractured, placing

3   all of the devices.

4   What was later shown was 85 percent of them were a

10:19:43   5   single operator.  Single surgeon.  He actually published a

6   retraction for his published paper after saying that he had

7   been mistaken about that with the earlier publication.

8   But rather than the inexperience of multiple people

9   implanting these, it was really a study of a single hospital,

10:20:02   10   and largely of a single surgeon, and that is not one you would

11   sort of say, gee, I bet that is representative of the results

12   everybody's going to get.

13   Q   In your opinion, was the Nicholson study -- can it be

14   relied upon for scientifically reliable data?

10:20:21   15   A   No.  The only use of the study is that he has some

16   detailed descriptions of the individual patients, and I think

17   he accurately represented the experience of those individual

18   patients.  But as a study to estimate rates or proportions,

19   it's not useful.  It's -- you can't rely on those numbers.

10:20:43   20   Q   Now, final question:  In the studies, the hundred or so

21   studies you reviewed or looked at involving IVC filters, did

22   you find any studies that met all of the requirements that you

23   said are necessary to determine an accurate rate for the

24   adverse events that existed?

10:21:04   25   A   There is one study that was limited because it's very

CROSS-EXAMINATION - DAVID W. FEIGAL, MD

10:21:06  1    short-term, but one of the studies that the company sponsored

2    was the study on how to retrieve the filters.  And so in

3    multiple institutions approximately 100 people were followed

4    until the time of removal, which was between three and six

10:21:23  5    months.  At the time of removal, for example, they found one

6    fracture.

7           That's the only study.  And it only tells us about

8    the experience over a very short, short time period.  But

9    that's the only study that actually had a systematic

10:21:39  10    enrollment, and then a defined follow-up, but it's small.

11    This is not a very common -- these are not very common events.

12    You have to do large studies to find very many of these.

13           And so it doesn't really give us -- that one fracture

14    doesn't tell us what the fracture rate is even at three months

10:21:57  15    because it's just not enough information.

16    Q   So there really was no study that you found that allowed

17    you to identify a reliable fracture rates for IVC filters;

18    correct?

19    A   That's correct.  Not for Bard and not for the other

10:22:13  20    filters that are used.

21           MR. CONDO:  Thank you.

22           No further questions, Your Honor.

23           THE COURT:  Cross-examination?

24           MR. O'CONNOR:  Yes, Your Honor.

25

CROSS-EXAMINATION – DAVID W. FEIGAL, MD

10:22:21  1          C R O S S - E X A M I N A T I O N

2    BY MR. O'CONNOR:

3    Q    Hi, Dr. Feigal.  My name is Mark O'Connor.

4    A    Good morning.

10:22:33  5    Q    I think what you just said, and I appreciate what you told

6    us about the hierarchy of studies, but you do agree that

7    regardless of the hierarchy, studies are relied upon by

8    both -- by the medical community; correct?  Doctors do read

9    them and rely upon them?

10:22:52 10    A    For different purposes, yes.

11    Q    And medical device companies should keep itself apprised

12    of the current status of medical literature.  Is that fair?

13    A    Yes, that's fair.

14    Q    Thank you.

10:23:05 15          Now, Nicholson is still cited in literature today;

16    correct?

17    A    Yes.  Unfortunately, although he retracted the information

18    about the multiple surgeons, he actually never published a

19    correction to his paper that actually identified all the other

10:23:26 20    errors.  So, yes, it is still cited.

21    Q    And he did, as you said, send a retraction.  Fair?

22    A    Yes, on one very small point -- well, it a very important

23    point, on the point that he was actually reporting the

24    experience of a single surgeon.

10:23:40 25    Q    And I think what you told us that at least Nicholson did

CROSS-EXAMINATION – DAVID W. FEIGAL, MD

10:23:46  1   provide a detailed description of the failures that were seen

2   in the study for the Recovery and the G2 filter; correct?

3   A   There's a detailed case for a couple of the patients, and

4   then a description of some of the others, yes.

10:23:58  5   Q   And his conclusion was that there was a high prevalence of

6   fracture and embolization in both the Recovery and G2.  Fair?

7   A   I don't recall if that was -- if that was his conclusion,

8   but there was no data in his study that would have allowed him

9   to estimate the prevalence or the incidence or the rates,

10:24:17  10  three different ways of talking about how often things happen,

11  from the patient population even at York Hospital, because he

12  didn't study them all or didn't study them properly.

13  Q   I understand.  But there's a difference between observing

14  events in patients and rates; correct?

10:24:34  15  A   Yes.  You can simply count up the number of patients that

16  you have, and so I'm not disputing the number of patients that

17  had fractures, it's just you can't get rates or proportions

18  out of those.

19  Q   So you're not disputing that Dr. Nicholson didn't see

10:24:49  20  patients that had failures in both the Recovery and the G2; is

21  that correct?

22  A   Well, by failure, you mean he observed fractures, which,

23  in some cases, migration, yes.  I'm not disputing.  He did

24  observe that and he did describe that in a little over a dozen

10:25:03  25  patients.

CROSS-EXAMINATION – DAVID W. FEIGAL, MD

10:25:04  1   Q   All right.  And, as a matter of fact, there is literature

2   out there that talks about fractures and migration of both the

3   Recovery and G2; correct?

4   A   Yeah.  There are multiple papers that describe individual

10:25:17  5   patients who are -- or collections of patients.  And these

6   aren't papers where you get rates or proportions.

7   Q   But, again, papers that describe those failures by doctors

8   who observed them with patients with G2 and Recovery?

9   A   Yes, that's correct.

10:25:30  10              MR. O'CONNOR:  That's all I have.  Thanks.

11              THE COURT:  Redirect?

12              MR. CONDO:  No redirect, Your Honor, but for the

13   trial record, may we have marked the hierarchy of events as

14   Exhibit 7949 and offer it as a demonstrative exhibit only?

10:25:46  15              THE COURT:  Any objection to this being a

16   demonstrative?

17              MR. O'CONNOR:  No objection.

18              THE COURT:  All right.  What's the number?

19              MR. CONDO:  7949.

10:25:54  20              THE COURT:  Okay.

21              MR. CONDO:  Thank you, Your Honor.

22              May I move this?

23              THE COURT:  Yes, you may.

24              Thank you, sir.

10:25:58  25              THE WITNESS:  You're welcome.

DIRECT EXAMINATION - CLEMENT GRASSI, M.D.

10:26:21  1        MS. HELM:  Your Honor, at this time we call Dr. John

2    DeFord by video.

3        Dr. John DeFord is a senior vice president for

4    science, technology and clinical affairs at C.R. Bard, Inc.

10:26:42  5    In this role, Dr. Ford is responsible for the research and

6    development functions at the various divisions of C.R. Bard.

7    Dr. DeFord obtained both master's -- I'm sorry, both

8    bachelor's and master's degrees in engineering before

9    obtaining his Ph.D. in electrical biomedical engineering in

10:27:02  10    1990.

11        Prior to joining Bard in 2004, Dr. DeFord held

12    various positions at other medical device manufacturers,

13    including serving as president and CEO of Cook, Inc.

14        (Video testimony played.)

10:29:41  15        THE COURT:  Let's stop the video.

16        We'll take the morning break, ladies and gentlemen.

17    We will resume at 10:45.

18        (Recess taken from 10:29 to 10:46.)

19        THE COURT:  Thank you.  Please be seated.

10:47:30  20        You may continue with the deposition.

21        (Video testimony played.)

22        MR. NORTH:  Your Honor, at this time we call

23    Dr. Clement Grassi to the stand.

24

25

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

**CLEMENT GRASSI, M.D.,**

called as a witness herein, after having been first duly sworn

or affirmed, was examined and testified as follows:

D I R E C T   E X A M I N A T I O N

BY MR. NORTH:

Q   Good morning, Dr. Grassi.  Could you please tell the

members of the jury what your profession is.

A   Yes.  I am a practicing interventional radiologist.

Q   And have you been retained by Bard as an expert witness in

this particular matter?

A   Yes.

Q   And what is the focus of your opinions in this particular

case?

A   The focus of my opinions is to speak to the guidelines for

percutaneous inferior vena cava permanent placement.

Q   Where did you attend college, Doctor?

A   Harvard College.

Q   Where did you go to medical school?

A   Tufts University School of Medicine.

Q   After medical school did you complete an internship for

additional training?

A   Yes, I did.  Following medical school I was at the

Massachusetts General Hospital.

Q   And is Massachusetts General Hospital, is it affiliated

with a university?

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:00:33   1   A    It is.  It is one of the teaching hospitals of Harvard

2   Medical School.

3   Q    And did you complete a residency in radiology?

4   A    I did.  That was at the Beth Israel Deaconess Hospital in

11:00:46   5   Boston.

6   Q    And did you complete fellowship training after that?

7   A    Yes.

8   Q    And where was that?  Where did that take place?

9   A    That was at Brigham and Women's Hospital in Boston, also

11:01:00  10   an affiliate of Harvard Medical School.

11   Q    After completing your fellowship training, did you hold

12   any academic appointments?

13   A    I did.  I was an instructor in radiology with Harvard

14   Medical School, and subsequent to that an assistant professor

11:01:20  15   in radiology with Harvard Medical School.

16   Q    Now, tell us where you currently work, Dr. Grassi.

17   A    I'm currently with Hallmark Health, which is a group of

18   two hospitals in the Greater Boston area.

19   Q    And what do you do with those hospitals right now?

11:01:38  20   A    I practice interventional and vascular radiology.

21   Q    Are you licensed to practice medicine?

22   A    Yes, in the State of Massachusetts.

23   Q    And are you board-certified?

24   A    Yes, I am.  I'm board-certified with the American Board of

11:01:55  25   Radiology, and I have a certificate of added qualifications in

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:01:58  1    interventional and vascular radiology.

2    Q    And what does is it mean to be board-certified, Doctor?

3    A    It means that the physician has passed a series of

4    education and testing so that he or she fulfills the

11:02:16  5    qualifications of the profession.

6    Q    And how long have you been practicing medicine?

7    A    About 38 years.

8    Q    Today, as a practicing interventional radiologist, what

9    sorts of procedures do you handle on a routine basis?

11:02:32  10   A    I handle vascular procedures of a wide variety, including

11   inferior vena cava filters, placement and retrieval, as well

12   as a wide variety of nonvascular procedures in the abdominal,

13   biliary, and other systems.

14   Q    Have you held leadership positions, professional

11:02:58  15   leadership positions, during the course of your practice?

16   A    Yes.  I have been a director with the Boston VA system.

17   As well I've been a director of vascular and interventional

18   radiology with the UMass Memorial System.  And as well as

19   that, previously I have been a coordinator for residents and

11:03:29  20   fellows in their training with the Harvard Medical School

21   System at Brigham and Women's Hospital.

22   Q    Dr. Grassi, are you familiar with the organization called

23   Society of Interventional Radiology?

24   A    Yes.

11:03:46  25   Q    Can you tell us briefly what that organization is.

DIRECT EXAMINATION - CLEMENT GRASSI, M.D.

11:03:50  1   A   Society of Interventional Radiology is an international

2   organization and it works to educate, promote, and deal with

3   issues in the profession of interventional radiology.

4   Q   Are you a senior fellow of that organization?

11:04:08  5   A   Yes, I am.

6   Q   What does it mean to be a senior fellow of the Society of

7   Interventional Radiology?

8   A   To be a senior fellow, one must have achieved academically

9   and in medical practice certain parameters, and by application

11:04:27  10  and review with peers in the society, one submits an

11  application and then is accepted for that position.

12  Q   And for how many years have you been a senior fellow of

13  the Society of Interventional Radiology?

14  A   I would have to check the exact date, but it's been for

11:04:49  15  over 25 years now.

16  Q   Now, is the Society of Interventional Radiology sometimes

17  referred to by its acronym, SIR?

18  A   Yes, it is.

19  Q   Have you served on any committees over the years with the

11:05:07  20  SIR?

21  A   I have.  I've been a member of the Standards of Practice

22  Committee and also with the Technology Assessment Committee of

23  the SIR.

24  Q   And how long have you been a member of the Standards of

11:05:21  25  Practice Committee for the SIR?

DIRECT EXAMINATION - CLEMENT GRASSI, M.D.

11:05:25  1    A    Again, I have been, on a rotating basis, a member of that

2    committee per their policy for over about 20 years now.

3    Q    What does the Standards of Practice Committee for the SIR

4    do?

11:05:45  5    A    The Standards of Practice Committee directs itself to

6    educate, promote, and organize information for the society

7    members, that is interventional radiologists, as well as all

8    interventional radiologists on various topical areas in the

9    profession.

11:06:10  10   Q    Now, have you ever served as the chairperson of the

11   Standards of Practice Committee for the SIR?

12   A    Yes.

13   Q    In what time frame did you serve as the chairperson?

14   A    It was subsequent to 2002.

11:06:29  15   Q    Now, while you were the chairperson of the Standards of

16   Practice Committee, did that committee develop or publish any

17   guidelines regarding IVC filters?

18   A    Yes.  During the time period that we're talking about, and

19   that is prior to 2001, the SIR commissioned and developed the

11:06:58  20   guidelines for percutaneous permanent inferior vena cava

21   placement.

22   Q    Now, was that your first experience with IVC filters?

23   A    No, it wasn't.

24   Q    Tell us a little bit about your professional experience

11:07:13  25   with IVC filters over the years.

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:07:17  1  A   Well, as a diagnostic radiologist, which I am, I started

2  looking at IVC filters on an observational basis, and as an

3  interventional radiologist I have placed the devices, as well

4  as retrieved the optional retrievable type of filters in many

11:07:40  5  patients.

6  Q   Over the years, have you published articles concerning IVC

7  filters and venous thromboembolic disease?

8  A   Yes.

9  Q   Can you estimate for us approximately how many articles

11:07:53  10  regarding that device and disease state that you have

11  published?

12  A   It would be now approximately a dozen.

13       MR. NORTH:  If we could bring up Exhibit 7312.

14  BY MR. NORTH:

11:08:16  15  Q   Dr. Grassi, while you served as chairperson of the

16  Standards and Practices Committee for the SIR, did you and

17  your committee develop the guidelines that are now being shown

18  on the screen in front of you as 7312?

19  A   Yes, we did.

11:08:43  20  Q   And tell us what the official title of these guidelines

21  were.

22  A   The official title is Quality Improvement Guidelines for

23  Percutaneous Permanent Inferior Vena Cava Filter Placement for

24  the Prevention of Pulmonary Embolism.

11:08:58  25  Q   Prior to the development of these guidelines, were there

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:09:01 1    any guidelines for the placement of IVC filters?

2    A    Although there was certainly a lot of commentary in the

3    medical literature, hundreds and hundreds of articles on the

4    subject of IVC filters, there was no dedicated synopsis or

11:09:21 5    summary for practitioners or those who work with IVC filters

6    in the field.

7    Q    And were these guidelines eventually published?

8    A    Yes, these were.

9    Q    And where were they published, Doctor?

11:09:36 10    A    They were published in the JVIR, which is the Journal of

11    Vascular and Interventional Radiology, which is the official

12    journal and publication of the SIR.  That is, the Society of

13    Interventional Radiology.

14    Q    And do you consider the JVIR journal to be a reliable

11:09:57 15    journal?

16    A    Yes, I do.

17    Q    Are the articles that are published in that journal

18    peer-reviewed?

19    A    Yes.

11:10:06 20    Q    Were you joined by another -- a number of other

21    interventional radiologists on this committee in developing

22    these guidelines?

23    A    Yes, I was.

24    Q    Can you tell us briefly a little bit about the other

11:10:21 25    members of the committee that worked with you on this project?

DIRECT EXAMINATION - CLEMENT GRASSI, M.D.

11:10:24  1   A   The other members were colleagues and very talented

2   interventional radiologists from across the country who worked

3   as a committee group for the development of these standards.

4   Q   Tell us a little bit about the process of developing these

11:10:46  5   standards.  How long did it take to do so?

6   A   Well, this was a rigorous process because, as one can

7   understand, the SIR, as an international committee, wanted the

8   committee to give its full efforts on this project.  It

9   extended over a minimum of 18 months.  It started with the SIR

11:11:14  10  staff looking for all of the available medical literature that

11  is by PubMed, Google Scholar, and other search engines.

12  Hundreds of articles were identified.

13          The committee then --

14          MR. JOHNSON:  Excuse me, Your Honor.  This is

11:11:36  15  nowhere contained in this expert's report; it's not in his

16  deposition.

17          THE COURT:  Is it in the report, Mr. North?

18          MR. NORTH:  Yes, Your Honor.  Page 11, there's an

19  entire paragraph about the development of these standards.

11:11:49  20          THE COURT:  Could I get a copy, please.

21          Objection is overruled.  The testimony so far, I

22  believe, has been within the large middle paragraph on page 11

23  of the report.

24  BY MR. NORTH:

11:12:35  25  Q   At the time that the guidelines were being developed, were

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:12:38  1   there any retrievable filters available on the market?

2   A    No.  In this time frame, permanent vena cava filters were

3   the devices which we were using because the retrievable or

4   option type filters came later.

11:12:55  5   Q    As a part of this effort to develop the guidelines, did

6   you and your colleagues look at the medical literature

7   concerning complications and trackable events?

8   A    Yes, we did.

9   Q    And were complications and trackable events regarding

11:13:17 10   filters known to you and your colleagues at the time that you

11   were developing these guidelines?

12   A    Yes.  We were well familiar with them because of the fact

13   that there were complications or other events that had been

14   encountered by practicing interventional radiologists.

11:13:40 15   Q    What is the difference between complications and trackable

16   events?

17   A    Well, a complication as defined in the guidelines document

18   was an adverse event which would have a patient effect.

19        In the course of our going through, as you can

11:14:00 20   understand, this abundant scientific literature, there were

21   other parameters we studied, and it was the committee's

22   decision to call these trackable events because it must be

23   understood that they would be events that either might cause

24   an adverse event or might cause no adverse event for the

11:14:23 25   patient.  That is, the patient would be asymptomatic.

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:14:25  1          For the purpose of completeness of the paper, we felt

2     it was important to also include these in the publication.

3     Q   As a part of your paper, did you publish tables regarding

4     the complication rates and the trackable event rates?

11:14:50  5     A   Yes, we did.

6          MR. NORTH:  If we could -- let's go to the next

7     page.

8          I'm sorry, the next page.

9          Your Honor, at this time we would like to have

11:15:04  10    permission to talk about the content of this pursuant to

11    803(18).  We may separately move for admission of the entire

12    document at the conclusion of the testimony.

13         THE COURT:  Well, I don't know what you're asking

14    when you say "talk about."

11:15:18  15         MR. NORTH:  I would like to tender this as an

16    exhibit with the understanding right now that it's coming in

17    under 803(18).  It would come in under that and therefore

18    could not be displayed to the jury.

19         THE COURT:  803(18) doesn't allow it to be

11:15:32  20    displayed.  Are you asking it be displayed?

21         MR. NORTH:  No.  No.

22         THE COURT:  What do you mean when you say you're

23    tendering it as an exhibit?

24         MR. NORTH:  Well, to be able to have him talk about

11:15:41  25    the content of the document.

DIRECT EXAMINATION - CLEMENT GRASSI, M.D.

11:15:43  1        THE COURT:  So you want to ask him questions about

2    the content of the table?

3        MR. NORTH:  Exactly.

4        MR. JOHNSON:  No objection, Your Honor.

11:15:49  5        THE COURT:  All right.

6        MR. NORTH:  Thank you, Your Honor.

7    BY MR. NORTH:

8    Q   If we look at table 1 in this document, what does this

9    table list?

11:16:01  10   A   This table lists different complications which have been

11   reported in the literature and associated with patients who

12   have received inferior vena cava filters.

13   Q   And how did your committee go about determining what had

14   been reported in the literature?

11:16:21  15   A   Well, from the hundreds of articles which I've mentioned,

16   the group of articles was reviewed by the committee and

17   summarized or boiled down to a more select group of citations

18   and references.  We grouped these which we felt were the most

19   pertinent to the document.  And those are some of the

11:16:44  20   citations and references in the parenthesis that you see

21   listed.

22   Q   What -- you list by these various complications reported

23   rates.  Are those the ones that you saw in the medical

24   literature?

11:16:59  25   A   Yes.  Correct.

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:17:01  1   Q   And then you also list for each complication a threshold

2   percentage.  What is that?

3   A   That is, in the context of the document, a threshold

4   number which we included in order to be helpful and useful to

11:17:17  5   those who work with inferior vena cava filters.

6            So as stated in the text portion of this document,

7   the numbers that you see under the threshold would be used by

8   an individual working with IVC filters, such as an

9   interventional radiologist, and that would trigger that person

11:17:38  10  to see if in his or her practice they should conduct their own

11  quality assurance or further review as to the types of

12  complications that was occurring.  And we felt this was

13  necessary for patient safety.

14  Q   And in the committee's investigation, what did you

11:17:59  15  determine were the reported rates of death associated with IVC

16  filters?

17  A   The reported rate was 0.12 percent.

18  Q   Did you also determine reported rates for filter

19  embolization?

11:18:18  20  A   Yes.

21  Q   What is filter embolization?

22  A   Filter embolization would be a movement with -- abnormal

23  movement of the filter device to a different location than its

24  intended position.

11:18:34  25  Q   Would that include migration of the filter to the heart?

DIRECT EXAMINATION - CLEMENT GRASSI, M.D.

11:18:37  1   A    Yes.

2   Q    And what did you see as the rate -- reported rate, you and

3   your committee, of filter embolization in the literature?

4   A    2 to 5 percent.

11:18:55  5   Q    If we could look at table 2, please.

6            And what does table 2 present as a part of the SIR

7   guidelines?

8   A    Table 2 represents other trackable events.  And as I had

9   mentioned earlier, these would be events which, for

11:19:19 10  completeness of the paper, we included.  They may have been

11  associated in the world literature with an event from a

12  patient or they may be things which were observed

13  scientifically, but the patient had suffered no injury and had

14  no symptoms or signs.

11:19:37 15  Q    And, again, did you look at -- did you and your committee

16  look at the medical literature to determine the reported rates

17  for each of these trackable events?

18  A    Yes, we did.

19  Q    And what did you determine was the reported rate for

11:19:55 20  fracture of filters?

21  A    The reported rate for fracture was between 2 and

22  10 percent.

23  Q    Did you determine a reported rate for migration?

24  A    Yes.  Between zero and 18 percent.

11:20:12 25  Q    And did you determine a reported rate for IVC penetration?

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:20:20   1   A    Yes.  Zero to 41 percent.

2   Q    Did your committee -- did you and your committee make any

3   observations as to whether penetration and migration events

4   were customarily significant from a clinical perspective?

11:20:40   5   A    The committee recognized, since it was composed of

6   practicing interventional radiologists, that these are

7   commonly observed events, seen when inferior vena cava filters

8   are used.

9   Q    Do you know what -- in determining the reported rates for

11:21:04  10   filter fracture, what medical articles you cited for that?

11   A    Well, originally there were many articles referred to, and

12   two articles were cited here on table 2 for filter fracture,

13   references number 17 and 24.

14          MR. NORTH:  Could we look at the final page at what

11:21:31  15   those articles were, the citations.

16          Let's go back one page, please.

17   BY MR. NORTH:

18   Q    What is citation 17 that the committee cited as a basis

19   for -- one of the bases for the reported rates for fracture of

11:21:50  20   2 to 10 percent in filters?

21   A    That would be the article written with the first author,

22   Dr. Ernest Ferris, and others, titled Percutaneous Inferior

23   Vena Cava Filters, a Followup of Seven Designs in 320

24   Patients.

11:22:10  25   Q    Are you familiar with that article?

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:22:12  1  A   Yes, I am.

2          MR. NORTH:   Could we show 7002 to the witness,

3  please.

4          7002.

11:22:27  5  BY MR. NORTH:

6  Q   Is this a copy of the Ferris article we just referenced?

7  A   Yes.

8  Q   If we could turn to table 2 in that article.

9          Did the Ferris -- well, first of all, where was the

11:22:48 10  Ferris article published, do you know?

11  A   Yes.  That was published in the Journal of Radiology, the

12  so-called Gray Journal of radiology, which is the major

13  publication for the Radiological Society of North America,

14  commonly referred to as the RSNA.

11:23:08 15  Q   And do you consider that a reliable journal?

16  A   Yes, most definitely.

17  Q   Are the articles published in that journal peer-reviewed?

18  A   Yes.

19  Q   Now, in reviewing various types of filters, do you know

11:23:27 20  what these abbreviations Dr. Ferris is using for, let's say,

21  BN-1?

22  A   Yes, I do.

23  Q   What is that?

24  A   That would be the so called Bird's Nest or Gianturco-Roehm

11:23:44 25  Bird's Nest filter version number 1.

DIRECT EXAMINATION - CLEMENT GRASSI, M.D.

11:23:47   1   Q   And what fracture rate did he find for the Bird's Nest?

        2   A   A rate of 4 percent is reported.

        3   Q   And what is the BN-II?  Is that another Bird's Nest?

        4   A   Correct.  The Bird's Nest filter version number 2.

11:24:05   5   Q   And what did he find in his study the fracture rate for

        6   the Bird's Nest II filter to be?

        7   A   3 percent.

        8   Q   Do you know what the A filter is referring to?

        9   A   That refers to the so-called Amplatz filter, which is not

11:24:24  10   clinically used.  That is, in use today in the United States.

       11   Q   And do you know what he was referring to with the N

       12   abbreviation?

       13   A   Yes, I do.  That's a short abbreviation for the

       14   Simon Nitinol filter.

11:24:41  15   Q   Doctor, tell us what Dr. Ferris found as the fracture rate

       16   in his study for the Simon Nitinol filter.

       17   A   The fracture rate is 12 percent.

       18   Q   Is that higher than the range reported in the SIR

       19   guidelines?

11:25:00  20   A   It is slightly higher because, as we've seen previously,

       21   the range was cited as up to 10 percent.  And that is

       22   basically because the committee felt in viewing ranges that

       23   the most common range that we observed was up to approximately

       24   10 percent.  So it is slightly higher in the exact number.

11:25:27  25   Q   Did the Ferris article in table 2 also discuss various

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:25:32  1   rates of -- reported rates of IVC penetration by various

2   filters?

3   A    Yes, it did.

4   Q    And what did it report to be the penetration rate for the

11:25:43  5   Simon Nitinol filter?

6   A    The Simon Nitinol filter penetration rate is reported at

7   33 percent.

8   Q    And, again, what did the SIR guidelines that you

9   spearheaded the development for, what did they report as the

11:25:59  10   reported rate for IVC penetration?

11   A    That range, as I remember from our previous table, this

12   number in the -- in the range reporting.

13   Q    Were these complications and trackable events that you

14   reported about in the SIR guidelines, were they known to you

11:26:25  15   in the medical community prior to developing those guidelines?

16   A    Yes, they were.

17   Q    Are those, the potential for those complications and

18   adverse events, taught to residents and fellows as a part of

19   their medical training?

11:26:46  20   A    They are, and I was one of those persons, since I've

21   worked in academic hospitals, who had the privilege of working

22   with residents and fellows and trainees.  And so we would go

23   through these numbers and this data with them to help with

24   teaching.

11:27:06  25   Q    What happened once your committee developed a draft of

DIRECT EXAMINATION - CLEMENT GRASSI, M.D.

these guidelines?

A    Once a draft was produced by the committee -- and I might say this method included telephone conversations, in-person meeting at two national annual society meetings -- the draft was then submitted to the executive committee of the SIR. Simultaneously, the guidelines were posted on the SIR website. Commentary was invited.

This was accessible to SIR members, that is interventional radiologists, non-SIR members, and basically anyone working with IVC filters who would like to read about it on the website.

After the commentary, the comments were collected and the guidelines draft, plus commentary, was passed on then to the JVIR, which I mentioned is the official journal.  And that was reviewed by the editor and his staff among peers.

Q    So was the article peer-reviewed before it was published?

A    Yes, it was.  In addition to our committee reviewing it.

Q    And you say it was made accessible to the members of the SIR.  Can you tell us approximately how many radiologists -- interventional radiologists belong to the organization?

A    Yes.  Well, thinking back to the time period of about 2001, at the time of the guidelines, there were over 5,000 members.

Q    And in what year were these guidelines published, Doctor?

A    They were published in 2001.

DIRECT EXAMINATION - CLEMENT GRASSI, M.D.

11:29:01  1   Q   Does membership in the SIR entitle you to a free

2   subscription to the JVIR?

3   A   It does because members previously received a print

4   version of the journal as well as online access.

11:29:17  5   Q   So would all 5,000-plus members of the Society of

6   Interventional Radiology at the time in 2001 that your

7   guidelines were published, would they have received a copy of

8   the Journal of Vascular and Interventional Radiology

9   publishing those guidelines?

11:29:37  10  A   Yes, that's right.

11  Q   Doctor, has the SIR updated those guidelines since 2001?

12  A   Yes, they have.

13  Q   Were the ones that you were the chairperson of the

14  committee and developing, were those republished in 2003?

11:29:55  15  A   That's correct.  In what was called a supplement to JVIR,

16  they were published once again.

17  Q   And was the most recent update published in 2017?

18  A   Yes.

19  Q   Dr. Grassi, were the SIR guidelines ever intended to

11:30:14  20  establish acceptable thresholds for IVC filter complications?

21  A   No.  The purpose of the committee and of the guidelines

22  document was to educate, inform, and basically summarize

23  information for those working with IVC filters.  We felt that

24  by publishing this information it would be very helpful to

11:30:43  25  those practitioners.

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:30:48  1    Q   And what was your committee's expectation as to how the

2    guidelines would be utilized once they were published?

3    A   We intended that they would be a resource to anyone

4    working with IVC filters, and specifically for interventional

11:31:14  5    radiologists it would allow them to look at our numbers,

6    review their own practice, and see, practically speaking, if

7    there was any reason for them to do their own personal quality

8    review and whether it was necessary for them to review their

9    day-to-day practice.

11:31:40  10               MR. NORTH:  Could we display 6842.

11    BY MR. NORTH:

12    Q   Do you recognize the document that is being displayed in

13    front of you, 6842?

14    A   Yes.

11:32:04  15    Q   And what is this?

16    A   This is the joint ACR, SIR, and SPR -- ACR stands for the

17    American College of Radiology, a major radiological

18    organization.  SIR, we've talked about.  And SPR is the

19    Society of Pediatric Radiology.  These are practice parameters

11:32:28  20    for the performance of inferior vena cava placement for the

21    prevention of pulmonary embolism.

22    Q   And are these essentially an update of the guidelines you

23    first published in 2001?

24    A   Yes.

11:32:43  25               MR. NORTH:  And let's go to the next page, if we

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:32:45   1   could.

2         Let's go to the last page, if we could.

3         Back one.

4   BY MR. NORTH:

11:32:55   5   Q   Doctor, I'm having a hard time finding it.  Where is the

6   list of authors?  Would that be at the conclusion before the

7   citations?

8   A   I believe you have it displayed now.

9   Q   The Comments Reconciliation Committee, what would that

11:33:16   10   have been?

11   A   That would be the committee that dealt with this document.

12   To put this in a little bit of context, the ACR, American

13   College of Radiology, would draw on the expertise of SIR

14   members such as myself in formulating these documents.  So

11:33:41   15   this group of doctors with the names listed would have

16   reviewed and then also looked at comments and incorporated

17   those comments in the final document.

18         MR. NORTH:  If we could go back one page, I believe

19   there's another list.

11:34:05   20   BY MR. NORTH:

21   Q   Does this provide the names of various physicians who

22   worked -- from all of these different organizations that

23   worked on these guidelines?

24   A   Yes, it does.

11:34:21   25   Q   From the SIR, would it have been the practice -- Standards

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:34:25  1   and Practices Committee that you had formerly been the chair

2   of?

3   A    Yes.  The ACR committee would have drawn on interventional

4   radiologists, as I mentioned, with their names included in

11:34:39  5   this second paragraph, as well as elsewhere, and they made use

6   of their input in formulating the ACR document proper.

7   Q    And where were these guidelines, or parameters, as they're

8   called, published?

9   A    This goes out as a separate publication, as I understand,

11:35:03  10  in booklet from the American College of Radiology.  So it is a

11  stand-alone publication on practice parameters as a guide to

12  doctors and those working with these procedures.

13  Q    Would you consider this to be a peer-reviewed publication?

14  A    Yes.

11:35:22  15  Q    And would you consider the American College of

16  Radiologists as the publisher of these guidelines to be a

17  reliable source?

18  A    Yes, they are.

19  Q    If we could look back, I believe there is a table 1 and

11:35:38  20  table 2 in this article.

21          Did this particular group updating these guidelines

22  also look at complications reported in the literature?

23  A    Yes.

24  Q    And did they publish a similar table than the one you had

11:36:05  25  published?

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:36:05  1    A    Yes, it is.

2    Q    And did they publish a reported rate for death involving

3    IVC filters?

4    A    Yes.

11:36:16  5    Q    Was it -- did it differ from the rate that you had

6    published in your guidelines 16 years earlier?

7    A    No, it doesn't.  It is also 0.12 percent.

8    Q    And did they also set forth a threshold for death in these

9    guidelines?

11:36:39 10    A    Yes, they did.  They set a threshold of less than

11    1 percent.

12    Q    And then if we could look at table 2 in the 2017

13    parameters.

14         What did the authors in the updated parameters or

11:37:00 15    guidelines identify as the reported rate of filter fracture in

16    the medical literature review?

17    A    Yes.  They reported a filter fracture rate with a range of

18    zero to 50 percent.

19    Q    And what rate did they report in these 2017 guidelines for

11:37:23 20    migration of the filter?

21    A    The rate of migration of the filter is reported at zero to

22    25 5 percent.

23    Q    And at what rate did they report regarding IVC

24    penetration?

11:37:41 25    A    The reported rate of IVC penetration is zero to

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:37:46  1   100 percent.

2   Q   Are these reported rates based on all types of filters or

3   just certain filters?

4   A   These would be based on a variety of many different

11:37:59  5   filters.

6   Q   And do these updated guidelines, with the advent of

7   retrievable filters, do they include both permanent and

8   retrievable filters?

9   A   Well, our original guidelines were geared, as I mentioned,

11:38:17  10  to permanent inferior vena cava filters.  And it's my

11  understanding from this document, and I would have to

12  double-check the exact date, that these dealt with permanent

13  filter devices, or at least with the filters available as of

14  the exact date of this publication.

11:38:43  15  Q   And would retrievable filters have been available as of

16  that date?

17  A   Well, you'd have to actually help me out on the reference

18  date of this particular document.

19        MR. NORTH:  Let's look at the final page of this.

11:39:08  20        Go back one.

21  BY MR. NORTH:

22  Q   Let's look at, for example, number 9.  Reference number 9.

23        That includes a citation to an article dealing with

24  retrievable filters; correct?

11:39:39  25  A   Yes, it does.

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:39:44  1        So that our having double-checked -- and thank you --

2    this document would include permanent devices but would also

3    by its date include by incorporation retrievable type IVC

4    filters.

11:40:04  5    Q   Doctor, have you reviewed the references in the 2017

6    parameters here that we've been looking at?

7    A   I have either seen, read, or encountered many of the

8    articles and citations which are referenced, yes.

9    Q   Do you know whether any of the articles talking about

11:40:29  10   fracture and reporting a rate of zero to 50 percent involve

11   the Bard G2 filter?

12   A   Yes.  They would include the Bard G2, as well as others.

13   Q   Now, you had told us that the American College of

14   Radiologists was involved in this particular parameters being

11:40:50  15   developed.

16   A   Correct.

17   Q   Do you know approximately how many members, doctors or

18   physicians, belong to the American College of Radiology?

19   A   I would have to check myself as to the exact number, but

11:41:05  20   just to give you an estimate, the American College of

21   Radiology, since it includes thousands of diagnostic

22   radiologists as well as interventional radiologists, would be

23   even a larger society group than the SIR.

24   Q   And would this particular parameter -- parameters, as a

11:41:31  25   separate publication, have been distributed to all of those

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:41:35  1   physicians that belong to that organization?

2   A    Yes.   These parameters in print or electronic form would

3   be available to all American College of Radiology members.

4   Q    Doctor, do you hold the opinions you've given today to a

11:41:50  5   reasonable degree of medical certainty?

6   A    Yes.

7   Q    And do you charge us an hourly rate for your consultation

8   in this matter?

9   A    Yes.

11:42:02  10   Q    And what is that rate?

11   A    A rate of $350 an hour.

12   Q    Thank you, Doctor.

13        MR. NORTH:  Your Honor, we would tender as

14   substantive evidence the SIR guidelines, 7312.

11:42:17  15        THE COURT:  You're moving them into evidence?

16        MR. NORTH:  Yes, Your Honor.

17        MR. JOHNSON:  Judge.  We object.  803(18) does not

18   permit the admission of these into evidence.

19        THE COURT:  What's your response, Mr. North?

11:42:26  20        MR. NORTH:  My response is, Your Honor, and I know

21   the Court hasn't seen the brief yet, they're not being

22   offered for the truth of the matter asserted, they're being

23   offered to show the general notice and knowledge in the

24   medical community, and therefore are not hearsay.

11:42:39  25        THE COURT:  All right.  I'm not going to admit it at

CROSS-EXAMINATION – CLEMENT GRASSI, M.D.

11:42:41  1    this point.  I'll be happy to hear you further on that issue.

2         MR. NORTH:  Thank you, Your Honor.

3         THE COURT:  Cross-examination?

4         MR. JOHNSON:  Yes, sir.

11:42:54  5              C R O S S - E X A M I N A T I O N

6    BY MR. JOHNSON:

7    Q    Good morning, sir.

8    A    Good morning.

9    Q    You indicated you are charging $350 per hour for your

11:43:02 10   time?

11   A    Yes.

12   Q    And are you able to tell us how much you have charged Bard

13   for all of your work in the filter litigation?

14   A    Well, I can update you as to the most recent billing,

11:43:18 15   which encompassed a period of over a year for many different

16   cases, and that was this past year, and that was a total for

17   medical records, chart review, image review, and multiple

18   other patients, total of $39,212.

19   Q    Well, sir, you've been doing this work for Bard for many,

11:43:43 20   many years, haven't you?

21   A    To the best of my memory, since approximately 2010.

22   Q    And are you able to tell us what the total amount of

23   compensation you've earned since 2010 to the present?

24   A    No, Counselor.  I'd have to actually go back and check

11:44:04 25   those records.  I don't have that total amount memorized, but

CROSS-EXAMINATION - CLEMENT GRASSI, M.D.

11:44:08  1    I think I gave you at least an estimate of what the recent

         2    billing has been.

         3    Q   All right.  So you know that this litigation involves the

         4    Bard G2 filter?

11:44:18  5    A   Yes.

         6    Q   We're here to talk about Bard, not other filters.  Do you

         7    know that?

         8    A   Yes, I do.

         9    Q   And are you aware that there has never, ever been a

11:44:28 10    determination that the Bard G2 filter is safe or effective?

        11    A   Well, I'm not aware of that.  What I can say --

        12    Q   Sir, yes or no?

        13    A   Could you just repeat the question, please.

        14    Q   Sure.  Are you aware that there has never been a

11:44:48 15    determination by the FDA or any source that the Bard G2 filter

        16    is safe and effective?

        17             MR. NORTH:  Objection.  Outside the scope of direct.

        18             THE COURT:  Overruled.

        19             And, Doctor, answer yes or no if you can.  If you

11:45:01 20    cannot, just tell Mr. Johnson you cannot answer it yes or no.

        21             THE WITNESS:  Yes.  Thank you.

        22             I'd have to say I cannot answer that, and I can

        23    elaborate if you wish.

        24             MR. JOHNSON:  Okay.

11:45:17 25             Greg, can you locate Exhibit 6842 and just publish it

CROSS-EXAMINATION - CLEMENT GRASSI, M.D.

11:45:24  1    to the witness.

2            And if you would go to page 2 of that exhibit.

3    BY MR. JOHNSON:

4    Q    Sir, you're familiar with this document?  That's the

11:45:39  5    recent and current guidelines regarding filters.

6    A    Yes.

7    Q    And do you see about three quarters of the way down where

8    it says, "Although retrievable filters are often placed as

9    permanent devices, no long-term safety and efficacy of these

11:45:59  10   devices as a class" --

11           THE COURT:  I think you -- I think you misread that,

12   Mr. Johnson.  Why don't you try it again.

13           MR. JOHNSON:  Oh, I'm sorry.

14   BY MR. JOHNSON:

11:46:07  15   Q    "The long-term safety and efficacy of these devices as a

16   class have not been established."

17   A    I would agree with your reading of that sentence.

18   Q    So there has never been a determination of efficacy and

19   safety for the Bard G2 filter.  Agreed?

11:46:34  20   A    No, sir, only because it's my understanding as in the U.S.

21   all filter devices must be accepted.  There is a presentation

22   of data for safety, efficacy --

23           MR. JOHNSON:  Judge, this is going outside of the

24   scope of my question.  I object.

11:46:59  25           THE WITNESS:  -- for the USFDA --

CROSS-EXAMINATION - CLEMENT GRASSI, M.D.

11:47:04  1          MR. JOHNSON:  Sir --

        2          THE COURT:  Hold on just a minute, sir.

        3          Overruled.

        4          Next question.

11:47:12  5          MR. JOHNSON:  Yes, sir.

        6   BY MR. JOHNSON:

        7   Q   With regard to the SIR guidelines that you were a part of,

        8   that article itself is not a Level 1 article, is it?

        9   A   That article is a guideline by consensus committee so that

11:47:35 10   in the sense that you're using, usually the term Level 1

       11   evidence applies to clinical trials.  So that would be a

       12   committee consensus document.

       13   Q   All right.  Not a Level 1 study; correct?

       14   A   When -- when using the term in the sense that I believe

11:47:56 15   you're meaning, yes.

       16   Q   All right.  And reference was made to the Ferris article,

       17   which is a part of the article you were the lead author on.

       18   Do you remember that?

       19   A   I do.

11:48:07 20   Q   The Ferris article is not a Level 1 study either, is it?

       21   A   The Ferris article is a center or multi-center type, so

       22   would not be considered Level 1 because, to the best of my

       23   knowledge, it did not start as a randomized clinical trial.

       24   Q   All right.  So the short answer to my question is it is

11:48:34 25   not a Level 1 study.

CROSS-EXAMINATION – CLEMENT GRASSI, M.D.

11:48:36   1   A    Correct.

2   Q    And the Ferris article did not study any retrievable

3   filter, did it?

4   A    That's true.

11:48:46   5   Q    That is, it studied old technology compared to the G2

6   filter, for example.

7   A    Well, it studied permanent inferior vena cava filters,

8   that's correct.  I would not myself consider permanent

9   inferior vena cava filters to be old because they're still in

11:49:04  10   clinical use.

11   Q    All right.

12        And with regard to all of the medical literature that

13   your committee looked at with respect to table 1 and table 2,

14   none of those articles involved Level 1 studies, did they?

11:49:25  15   A    I would have -- actually have to check back to see whether

16   there were any citations in the multitude of references that

17   were Level 1 evidence.  But I think I can say this:  That

18   many, many of the citations in that article, that's correct,

19   were not, strictly speaking, Level 1.

11:49:47  20   Q    All right.

21        And with regard to your work with that committee that

22   published that article, did Bard provide you or your committee

23   members with any internal information?

24   A    No, they did not.

11:50:02  25   Q    And with regard to all of the literature that you've

CROSS-EXAMINATION – CLEMENT GRASSI, M.D.

11:50:05  1   reviewed as an expert in this case, have you seen any

2   indication that Bard has provided any authors with any

3   internal information?

4   A   I do not personally know of internal or proprietary

11:50:21  5   information that was provided to authors.  I can only speak

6   for myself personally.

7   Q   With regard to the complication rates that are found in

8   table 1 of your article, can we agree that complications are

9   highly dependent upon and influenced by patient selection?

11:50:52  10   A   No, I don't think I could completely agree with that

11   statement.

12   Q   Would you agree that the complication rates are highly

13   dependent upon patient selection?

14   A   No, I don't believe I could agree completely with that

11:51:07  15   statement, only because of the fact that patient selection is

16   one factor, and the rate of complications depends, in

17   fairness, on a variety of factors:  The device, the scenario

18   of the inferior vena cava placement, and others.

19   Q   Okay.  So it also depends on the particular device used;

11:51:26  20   correct?

21   A   It would.

22   Q   All right.

23        With regard to the other trackable events that you

24   mentioned, can we agree that the data in that table represents

11:51:39  25   reported outcomes from various publications and not the SIR

CROSS-EXAMINATION – CLEMENT GRASSI, M.D.

11:51:44  1  standard for complications?

2  A    The article does represent the literature at the time in

3  2001 which was reported in medical publications, yes.

4  Q    But it does not represent the SIR, the Society of

11:52:05  5  Interventional Radiology, standard for complications.  You

6  would agree with that?

7  A    No, I wouldn't, sir, only because the SIR official

8  publication as of the year of 2001 was the guidelines for

9  percutaneous filter placement.

11:52:28  10  Q    What about as of 2016?  Would you agree that the trackable

11  events are not the SIR standards for complications?

12  A    As of 2016, again, in fairness, the events and trackable

13  events would be those reported in the most recent SIR

14  guidelines from the committee, which, as you know, was

11:52:57  15  updated.

16  Q    All right.

17           MR. JOHNSON:  Greg, would you pull up Exhibit 6842,

18  page 13.

19  BY MR. JOHNSON:

11:53:06  20  Q    Let's read the language under table 2, the other trackable

21  events.  Let's read that together, okay?

22  A    Yes.

23  Q    All right.

24           It says, "The data in the table represents reported

11:53:23  25  outcomes from various publications."

CROSS-EXAMINATION – CLEMENT GRASSI, M.D.

11:53:25  1          Did I read it correctly so far?

2    A    Yes.

3    Q    And here's the ending:  "And not the SIR standard for

4    complications."

11:53:40  5          Did I read that correctly?

6    A    Yes, you did.

7    Q    Okay.  So this is not the SIR standard for complications.

8    Agreed?

9    A    I have to answer that question as a relative no because,

11:53:54 10   by way of explanation, the SIR guidelines and the publications

11   by the SIR were intended, as I had described earlier, to be

12   educational, informative, and helpful for those working with

13   IVC filters.

14          The goal was not to create a specific, rigid,

11:54:19 15   definitive threshold; it was to help practitioners.

16          And so in the sense of your question to me I would

17   have to say that the guidelines are just that, they're a

18   series of guidelines.

19   Q    All right.  And these guidelines did not imply that the

11:54:38 20   rates in the ranges referenced were fine, acceptable, or okay.

21   Do you agree with that?

22   A    Well, I can only say that the ranges referenced were those

23   what we had found, what were in the medical literature, what

24   we as physicians in the field experienced, and what our

11:55:06 25   colleagues experienced.  And so in that regard, we relied on

CROSS-EXAMINATION – CLEMENT GRASSI, M.D.

11:55:13  1    published data and we relied on our own day-to-day practical

2    experience with patients.

3    Q    Tell you what, let's see what you had to say about that in

4    August of 2014 at page 524 of your deposition.

11:55:28  5                MR. JOHNSON:  May I publish it, Your Honor?

6                THE COURT:  To the witness.

7                MR. JOHNSON:  Yes.

8                THE COURT:  Just to the witness.

9                Oh, you mean generally?

11:55:39  10               MR. JOHNSON:  Yes.

11               THE COURT:  Oh, it's a video?

12               MR. JOHNSON:  It is.

13               THE COURT:  You may.

14          (The following video testimony was played:)

11:55:47  15               THE WITNESS:  "And certainly I can say that in the

16   quality improvement guidelines for IVC filter placement

17   through the SIR, for which I was the first author, we did not

18   imply that rates in that range are fine or acceptable or

19   okay.  We simply said that those were trackable events and

11:56:09  20   that responsible individuals should look at any adverse

21   event, trigger a review, and do a quality assurance

22   monitoring to make sure that they understand some of the root

23   causes behind such a serious problem."

24   BY MR. JOHNSON:

11:56:29  25   Q    Do you remember giving that answer?

CROSS-EXAMINATION - CLEMENT GRASSI, M.D.

11:56:31   1   A    I do.

2   Q    Okay.  And would you agree with me that the SIR guidelines

3   do not create safety thresholds for filters that relate to

4   embolization, tilt, perforation, fracture, and the inability

11:56:49   5   to remove the filter?

6   A    I can certainly say that the guidelines have attempted and

7   I think in a very reasonable way have documented what our

8   total considered experience was in this field.

9        As I mentioned on the video, our intent was to be

11:57:15  10   informative, instructive, and to offer these as a set of

11   guidelines for those working with vena cava filters.  And the

12   guidelines are what they are.

13   Q    All right.  Let's go back to your deposition given on

14   September 24 of 2014 at page 770.

11:57:32  15        MR. JOHNSON:  With the Court's permission, I'd like

16   to play that video.

17        THE COURT:  You may.

18        (The following video testimony was played:)

19        QUESTION:  "Just so we're clear, that exhibit and the

11:57:44  20   committee that you're a part of did not create safety

21   thresholds with respect to the filters study that relate to

22   perforation, fracture, migration, tilt, or the inability to

23   remove the filter.  Is that correct or not correct?"

24        ANSWER:  "Yes, that's fair."

25

CROSS-EXAMINATION - CLEMENT GRASSI, M.D.

11:58:13  1   BY MR. JOHNSON:

2   Q    Do you recall that answer to that question?

3   A    I do in the context of the question which was asked of me.

4   Q    All right.  And would you agree with me that the SIR

11:58:24  5   guidelines are not intended as an instruction manual for

6   filter manufacturers like Bard?

7   A    They were not an information for users manual or an

8   instruction manual.  I think that that's clear.  They were a

9   set of guidelines drawn up by the SIR in a committee to those

11:58:50 10   working with filter devices --

11   Q    They're not -- I'm sorry.

12   A    -- so in answer to your question, that's correct, they

13   were not an instruction manual.

14   Q    They were not to be used by manufacturers like Bard;

11:59:05 15   correct?

16   A    Well, I can't offer an opinion on that.  The SIR

17   guidelines are widely available online and in print.  It's not

18   for me to say who should or should not use them.  And

19   certainly by way of education or to be informative in the

11:59:22 20   field, anyone could read them.

21   Q    Let's see what you had to say back in July --

22        THE COURT:  Mr. Johnson, we'll do that after lunch.

23   We've reached the 1 o'clock -- I'm sorry, the noon hour.

24        Ladies and gentlemen, we will break now and resume at

11:59:36 25   1 o'clock.

CROSS-EXAMINATION - CLEMENT GRASSI, M.D.

11:59:37  1    (The jury exited the courtroom.)

2         THE COURT:  Please be seated.

3         Counsel, I understand that we don't have the

4    redactions on the exhibits yet that you all have been working

12:00:14  5    on.  I understand defendants have identified some and are

6    waiting for plaintiffs.

7         Just an update on where that is, please.

8         MS. MATARAZZO:  Yes, Your Honor.

9         We went back and forth on the first round of

12:00:26 10    redactions and we have a couple of sticking points that I

11    wasn't able to work out or had time to work out with Mr. North

12    yesterday.  And then we provided also some redactions on

13    Sunday night for some of the exhibits we knew were going to be

14    an issue yesterday and we haven't heard back on those yet.  So

12:00:44 15    we're working it out.

16         I do have a list of six -- sorry, five exhibits that

17    we don't have any objections on and they can just go in as-is.

18    And I can either tell you those now or --

19         THE COURT:  No, I don't think you need to tell me

12:00:56 20    those now.  I just want to make sure that we're staying on

21    this.  Because what we don't want to do is have this come up

22    on Wednesday when we're about to close and have to deal with

23    those issues.  So if you could try to work it out, say, by

24    tomorrow morning.  That way, if there's something for me to

12:01:11 25    rule on, we'll know.

12:01:14   1            MS. MATARAZZO:  Yes, Your Honor.  That's what we're

           2   planning to do.

           3            THE COURT:  Okay.

           4            And for your information, this morning -- well, I

12:01:24   5   haven't allocated any time in the deposition.  But short of

           6   that, plaintiff has used 33 minutes and the defense has used

           7   two hours and seven minutes.  Subject to some reallocation in

           8   the deposition, I presume.

           9            All right.  See you at 1 o'clock.

          10        (Recess taken at 12:02.)

          11        (End of a.m. session transcript.)

          12                        *  *  *  *  *

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1                       **C E R T I F I C A T E**

2

3              I, PATRICIA LYONS, do hereby certify that I am duly

4       appointed and qualified to act as Official Court Reporter for

5       the United States District Court for the District of Arizona.

6

7              I FURTHER CERTIFY that the foregoing pages constitute

8       a full, true, and accurate transcript of all of that portion

9       of the proceedings contained herein, had in the above-entitled

10      cause on the date specified therein, and that said transcript

11      was prepared under my direction and control, and to the best

12      of my ability.

13

14             DATED at Phoenix, Arizona, this 27th day of March,

15      2018.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25