2001

March 27, 2018 P.M.

1              **UNITED STATES DISTRICT COURT**

2             **FOR THE DISTRICT OF ARIZONA**

3                  _____

4
   **In re:  Bard IVC Filters,**                )
5  **Products Liability Litigation**            )
                                                )
6                                                )
                                                )  MD-15-02641-PHX-DGC
7  _____  )
   **Sherr-Una Booker, an individual,**         )
8                                                )  Phoenix, Arizona
                       Plaintiff,               )  March 27, 2018
9              v.                                )  1:00 p.m.
                                                )
10 **C.R. Bard, Inc., a New Jersey**            )
   **corporation; and Bard Peripheral**         )  CV-16-00474-PHX-DGC
11 **Vascular, Inc., an Arizona**               )
   **corporation,**                             )
12                                              )
                       Defendants.              )
13 _____  )

14
            **BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE**
15
            **REPORTER'S TRANSCRIPT OF PROCEEDINGS**
16
                  **JURY TRIAL - DAY 9 P.M.**
17

18              (Pages 2001 through 2160)

19

20
   Official Court Reporter:
21 **Elaine Cropper, RDR, CRR, CCP**
   Sandra Day O'Connor U.S. Courthouse
22 401 West Washington Street
   Suite 312, SPC 35
23 Phoenix, Arizona  85003-2150
   (602) 322-7245
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

                  United States District Court

March 27, 2018 P.M.

1                        **APPEARANCES**

2

For the Plaintiff:

3       **RAMON ROSSI LOPEZ, ESQ.**
        Lopez McHugh, L.L.P.
4       100 Bayview Circle, Ste. 5600
        Newport Beach, CA  92660
5       949.812.5771/(fax) 949.737.1504

6

For the Plaintiff:

7       **MARK S. O'CONNOR, ESQ.**
        **PAUL L. STOLLER, ESQ.**
8       Gallagher & Kennedy, P.A.
        2575 East Camelback Road
9       Phoenix, AZ  85016
        602.530.8000/(fax) 602.530.8500
10

11  For the Plaintiff:

        **JULIA REED ZAIC, ESQ.**
12      Heaviside Reed Zaic
        312 Broadway, Ste. 203
13      Laguna Beach, CA  92660
        949.715.5228
14

15  For the Plaintiff:

        **ROBIN P. LOURIE, ESQ.**
16      Watkins, Lourie, Roll & Chance, P.C.
        3343 N. Peachtree Rd. N.E.
17      Tower Place 200
        Atlanta, GA  30326
18      404.760.7400

19

For the Plaintiff:

20      **JOSEPH R. JOHNSON, ESQ.**
        Babbitt & Johnson, P.A.
21      1641 Worthington Rd., Ste. 100
        P.O. Box 4426 (3302-4426)
22      West Palm Beach, FL  33409
        561.684.2500/(fax) 561.684.6308
23

24

25

United States District Court

March 27, 2018 P.M.

1                    **APPEARANCES** (Continued)

2    For the Defendants:
          **JAMES R. CONDO, ESQ.**
3         Snell & Wilmer, L.L.P - Phoenix, AZ
          One Arizona Center
4         400 East Van Buren
          Phoenix, AZ  85004-2202
5         602.382.67000

6    For the Defendants:
          **RICHARD B. NORTH, JR., ESQ.**
7         **ELIZABETH C. HELM, ESQ.**
          Nelson, Mullins, Riley & Scarborough, L.L.P.
8         201 17th St., N.W., Ste. 1700
          Atlanta, GA  30363
9         404.322.6000

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    United States District Court

March 27, 2018 P.M.

1                          **I N D E X**

2

3                          **TESTIMONY**

4   **WITNESS**                  **Direct   Cross    Redirect   Recross**

5    CLEMENT GRASSI, M.D.                  2006
     SCOTT O. TREROTOLA, M.D. (VIDEO)  2012
6    DANIEL COUSIN, M.D.           2013    2029
     CHRISTOPHER MORRIS, M.D.      2038    2099      2110
7    STAVROS W. STAVROPOULOS, M.D., (VIDEO)  2111

8

9                       **E X H I B I T S**

10  Number                                  Ident  Rec'd

11  994    D'Ayala Deposition, 03/21/2017,      2096
           Exhibit 04 - IFU, G2 Filter System ,
12         10/2006, Rev. 5, PK5100030

13  6667   ER Visit: Lincoln Medical Center     2021

14  6668   Lumbosacral Spine X-ray              2022

15  6825   Lincoln Medical Center records       2024  2012

16  6842   ACR-SIR-SPR Practice Parameter for the   2007
           Performance of Inferior Vena Cava
17         (IVC) Filter Placement for the
           Prevention of Pulmonary Embolism.
18         Revised 2016

19  7226   Poletti PA, Becker CD, Prina L, Ruijs    2089
           P, Bounameaux H, Didier D, Schneider
20         PA, Terrier F. Long-term results of
           the Simon nitinol inferior vena cava
21         filter. Eur Radiol. 1998;8(2):289-94.

22  7357   Trerotola SO, Stavropoulos SW.          2106
           Management of Fractured Inferior Vena
23         Cava Filters: Outcomes by Fragment
           Location. Radiology. 2017
24         Sep;284(3):887-896. doi:
           10.1148/radiol.2017162005. Epub 2017
25         Apr 19


                    United States District Court

March 27, 2018 P.M.

1                    **E X H I B I T S** (Continued)

2   Number                                      Ident   Rec'd

3   7411    2008 Surgeon General's Call to Action   2052 2054
            re PE and DVT

4

5

6                  **MISCELLANEOUS NOTATIONS**

7   Item                                          Page

8    Proceedings outside the presence of the jury    2113

9

10

11                        **RECESSES**

12                                          Page   Line

13  (Recess at 2:31; resumed at 2:44.)        2059    7
    (Recess at 4:24; resumed at 4:34.)        2113    2

14

15

16

17

18

19

20

21

22

23

24

25

                    United States District Court

CLEMENT GRASSI, M.D. - Cross

1                    **P R O C E E D I N G S**                    12:58:34

2          (Jury enters at 1:00.)

3          (Court was called to order by the courtroom deputy.)

4          (Proceedings begin at 1:01.)

5          THE COURT:  Thank you.  Please be seated.          01:01:07

6          You may continue, Mr. Johnson.

7          MR. JOHNSON:  Thank you.

8          (CLEMENT GRASSI, M.D., a witness herein, was duly

9   sworn or affirmed.)

10              **CROSS - EXAMINATION** (Continued)          01:01:12

11  BY MR. JOHNSON:

12  Q.   Dr. Grassi, when we broke for lunch, we were talking about

13  the uses of the, SIR information by manufacturers by Bard's and

14  we were about to play a clip from your deposition that was

15  given in July of 2014.                                   01:01:31

16          MR. JOHNSON:  With the Court's permission, I would

17  like to play his testimony at page 89.

18          THE COURT:  All right.

19          (Video clip of Dr. Grassi's deposition was played.)

20  BY MR. JOHNSON:                                          01:02:34

21  Q.   Doctor, with respect to your work on the SIR committee,

22  you folks did not study a situation where there was a cascading

23  set of adverse events where a filter migrates in a caudal

24  fashion leading to tilt, leading to multiple perforations of

25  the vena cava, leading to multiple penetrations of nearby vital  01:02:57

CLEMENT GRASSI, M.D. - Cross

1    structures, leading to multiple fractures of the filter and                    01:03:03

2    filter fragment embolization, that was that you never studied

3    by you in your committee; correct?

4    A.    No.   There was never the studying of that specific

5    multiple part example that you just mentioned.   We dealt with    01:03:21

6    individual topics.   They were included in what you described.

7    Q.    You looked at individual adverse events, not a cascading

8    series of adverse events greed?

9    A.    Agreed.

10           MR. JOHNSON:   Greg.   If you would pull up                              01:03:46

11   Exhibit 6842 again, page 13.

12   BY MR. JOHNSON:

13   Q.    And doctor, with respect to that table, we've already

14   established that the other trackable events that are referenced

15   in here and the reported rates are not the SIR standard for       01:04:01

16   complications.   But your committee I believe also established

17   that the rate of clinically significant penetration is not

18   precisely known.   Would you agree with that?

19   A.    If I may clarify your question.   My committee prior to the

20   2001 guidelines?                                                                 01:04:25

21   Q.    Yes, sir.

22   A.    And what was your question again, please.

23   Q.    If you would look at your screen, I think you'll

24   understand the question.   There was never a determination by

25   any SIR committee regarding the rate of clinically significant    01:04:37

CLEMENT GRASSI, M.D. - Cross

1    penetrations because that was not precisely known?                    01:04:41

2    A.   I'll say this, that the rate of IVC penetration described

3    on this standard which is a newer standard table than my own,

4    is quoted as the 100 percent rate; and when we reviewed it

5    prior to 2001, we based our rates upon what was available in   01:05:04

6    the medical literature.

7    Q.   Well, if it wasn't precisely known in 2016, would you

8    agree it probably wasn't known back when you and your committee

9    met?

10   A.   I'm not quite sure I understand exactly what you mean by  01:05:23

11   "not precisely known."

12   Q.   Well, the 2016 committee stated that the rate of

13   clinically significant penetration is not precisely known.  I

14   assume you understand what that phrase means?

15   A.   Yes.  I'll take your word for that.                       01:05:44

16   Q.   Okay.  If it wasn't known in 2016, can we agree it

17   probably wasn't known by you and your committee members back in

18   the early 2000s?

19   A.   I think we can agree that as we said in the guidelines of

20   2001 that there was a range over which -- a range over which    01:06:04

21   penetration had been observed in the medical literature and

22   also by people working on the committee.

23   Q.   And just so we understand this literature review that you

24   and your committee did, you folks just surveyed articles that

25   were not Level 1 articles and you reported what amounts to a    01:06:24

United States District Court

CLEMENT GRASSI, M.D. - Cross

1  low and a high.  There's -- there was no averaging, there was          01:06:29

2  no statistical analysis that was done; agreed?

3  A.  No.  I wouldn't agree with that.  We surveyed the world

4  literature that was known at that time and as I mentioned,

5  although there were set references and citations quoted in the      01:06:45

6  2001 guidelines, the process started by reviewing literally

7  hundreds of different articles in the world literature.

8  Q.  But all you folks ended up doing was reporting what the

9  low rate was and the high rate?

10  A.  That's correct for the purpose of this table.                   01:07:08

11  Q.  All right.  Because common sense tells us, does it not,

12  that you, Dr. Grassi, and any other reasonable interventional

13  radiologist would not put a filter in that has a clinically

14  significant penetration rate of 100 percent.  Agreed?

15  A.  Yes.  I think that's fair.  It would be logical to turn to      01:07:26

16  a device that had a better rate.

17  Q.  And the disclaimer that we have been talking about that's

18  found at the bottom of that table indicating that the SIR

19  standard for complications is not set forth in this table was

20  created because manufacturers were improperly using this            01:07:44

21  information.  Would you agree?

22  A.  No, I can't offer that opinion.  I can't essentially say

23  whether manufacturers were using it correctly or not correctly.

24  I can just say based on the data, what I knew from our

25  investigation.                                                      01:08:07

United States District Court

2010

CLEMENT GRASSI, M.D. - Cross

1   Q.   Okay.  We're coming down the home stretch.  I've got a          01:08:08

2   couple more questions.  We talked about the fact that there has

3   never been a long-term Level 1 safety study for Bard G2

4   Filters.  We've established that.  Do you agree?

5   A.   Yes.                                                            01:08:23

6   Q.   And when we do or -- I'm sorry, not when we do.  But when

7   a safety study is done of that nature, there are strict

8   controls that are in place to include safety controls.  Agreed?

9   A.   It would depend upon the exact study design.

10  Q.   But typically there would be monitoring, there would be        01:08:43

11  protocols in place to look for problems that might in some

12  fashion jeopardize the safety and the well-being of the

13  patients that are in that study.  Would you agree with that?

14  A.   Well, let me say in answer to your question in the

15  upcoming Preserve Trial --                                          01:09:05

16  Q.   Sir, I'm not asking about the Preserve Trial.  I'm asking

17  conceptually about safety studies.

18  A.   In answer to your question, in many studies, both from the

19  start of the study design and also because of hospital policy

20  and regulations, there is a safety factor built in so that        01:09:21

21  patients who participate in these studies can do so freely,

22  voluntarily, and not be concerned about poor safety events.

23  Q.   This is a yes-or-no question.  Are you aware that with

24  respect to the G2 filter, this filter was tested in sheep, it

25  was tested on the bench in PVC piping with sausage casing, and    01:09:48

1    from there, it went to the real world and it was implanted in          01:09:53

2    people like Ms. Booker?

3    A.   I'm not aware of those sequence of events.

4    Q.   If that happened, would you agree that would be a human

5    experiment?                                                            01:10:11

6    A.   In fairness, that's a hypothetical question and I can't

7    really ask -- answer a purely hypothetical like that.

8    Q.   Okay.  Thank you very much.

9              THE COURT:  Redirect?

10              MR. NORTH:  No, nothing further, Your Honor.                01:10:26

11              THE COURT:  All right.  Thank you, sir.  You can step

12    down.

13              THE WITNESS:  Thank you.

14              (Witness excused.)

15              MS. HELM:  Your Honor, at this time we call Dr. Scott       01:10:44

16    Trerotola by deposition -- by video deposition.  Scott

17    Trerotola is a medical doctor who is a board certified

18    radiologist with a specialty in interventional radiology.  He

19    maintains a clinical practice in interventional radiology at

20    the Hospital of the University of Pennsylvania where he has           01:11:13

21    been Chief of the Interventional Radiology Department since

22    2001.  He graduated from the University of Pennsylvania Medical

23    School in 1986 and has been implanting IVC filters since the

24    1990s and retrieving optional IVC filters since they first came

25    on the market in the early 2000s.                                     01:11:40

United States District Court

1              (Whereupon the video deposition of Dr. Trerotola was          01:13:38

2    played.)

3              THE COURT:  Is that the end?

4              MS. HELM:  Yes, Your Honor.

5              Your Honor, at this time we call Dr. Daniel Cousin.          01:23:29

6              Your Honor, before Dr. Cousin takes the stand, we

7    would like to admit 6825 which is part of Ms. Booker's medical

8    record that has previously been stipulated to and has been

9    provided to the plaintiffs.

10             MR. JOHNSON:  Is that the ER record?          01:23:56

11             MS. HELM:  No.  It's that --

12             MR. JOHNSON:  No objection.

13             THE COURT:  What's that number?

14             MS. HELM:  6825.

15             THE COURT:  All right.  That document is admitted.          01:24:04

16             (Exhibit Number 6825 was admitted into evidence.)

17             COURTROOM DEPUTY:  Doctor, if you'll please come

18    forward and raise your right hand.

19             (DANIEL COUSIN, M.D., a witness herein, was duly

20    sworn or affirmed.)          01:24:11

21             COURTROOM DEPUTY:  Please have a seat, sir.

22             MS. HELM:  Your Honor, may I consult with Mr. Johnson

23    about one redaction before we get started?

24             THE COURT:  Yes.

25             (Counsel confer.)          01:25:00

United States District Court

|    |                                                         |          |
|----|---------------------------------------------------------|----------|
| 1  | MS. HELM:  Thank you, Your Honor.  We were able to      | 01:25:22 |
| 2  | resolve that.                                           |          |

**DIRECT EXAMINATION**

BY MS. HELM:

Q.   Dr. Cousin, would you please introduce yourself to the jury.

A.   Sure.  My name is Daniel Cousin.  I'm a diagnostic radiologist.

Q.   And Dr. Cousin, where did you go to college?

A.   Harvard University.

Q.   And what was your major at Harvard?

A.   It was cognitive neuroscience.  It was a double major, joint honors between biology and psychology.

Q.   And after college did you attend medical school?

A.   Yes.

Q.   And where did you go to medical school?

A.   Albert Einstein.

Q.   And where is Albert Einstein Medical School?

A.   New York.

Q.   And following medical school, did you continue to pursue your training in medicine?

A.   Yes.

Q.   And what was your next training after medical school?

A.   I did my internship.  That was at Mt. Sinai's internship program, also in New York.

United States District Court

2014

DANIEL COUSIN, M.D. - Direct

1    Q.    And what was that in?                                    01:26:16

2    A.    Internal medicine.

3    Q.    And following your internship in internal medicine, did

4    you pursue a residency in diagnostic radiology?

5    A.    Yes.                                                     01:26:25

6    Q.    And where did you complete -- where did you do your

7    residency in diagnostic radiology?

8    A.    Sure.  I went to the Yale Norwalk program to do the first

9    two years of my radiology residency and then I completed the

10   last two years of my radiology residency at University of     01:26:40

11   Florida Shands Hospital in Gainesville.

12   Q.    And why did you move back to Florida in the middle of your

13   residency?

14   A.    Family.

15   Q.    And following your residency, were you licensed or during 01:26:51

16   your residency, were you licensed as a medical doctor --

17   A.    Yes.

18   Q.    -- in the state of Florida?

19   A.    Yes.

20   Q.    Are you also licensed as a medical doctor in the state of 01:27:00

21   New York?

22   A.    Yes.

23   Q.    And I interrupted your training.  After you finished your

24   residency at the University of Florida Medical Center, did you

25   pursue further training?                                      01:27:12

United States District Court

2015

DANIEL COUSIN, M.D. - Direct

| | | |
|---|---|---|
| 1 | A.    Yes. | 01:27:14 |
| 2 | Q.    And where was that? | |
| 3 | A.    I did a fellowship at Columbia in New York City. | |
| 4 | Q.    And what was the emphasis of your fellowship? | |
| 5 | A.    The emphasis was whole body imaging including PET, CT and | 01:27:25 |
| 6 | nuclear radiology. | |
| 7 | Q.    While you were at Columbia pursuing your fellowship, did | |
| 8 | you work as a radiologist? | |
| 9 | A.    While I was in training? | |
| 10 | Q.    Yes. | 01:27:42 |
| 11 | A.    Yes. | |
| 12 | Q.    And where did you work as a radiologist when you were at | |
| 13 | Columbia? | |
| 14 | A.    Well, as part of the training itself, I worked as a | |
| 15 | radiologist; and after that I stayed in the Columbia system and | 01:27:52 |
| 16 | worked at Columbia's Harlem affiliate.  I was the program | |
| 17 | director for the Radiology Residency Program. | |
| 18 | Q.    And once you finished working with -- in Harlem in the | |
| 19 | radiology program, did you move back to Florida? | |
| 20 | A.    Yes. | 01:28:14 |
| 21 | Q.    During your training in medical school and in your | |
| 22 | residency and your fellowship in diagnostic radiology, were you | |
| 23 | trained and made aware of IVC filters? | |
| 24 | A.    Yes. | |
| 25 | Q.    Are you an interventional radiologist? | 01:28:28 |

United States District Court

2016

DANIEL COUSIN, M.D. - Direct

1   A.   No.   I have interventional radiology training but it's not          01:28:30

2   part of my active daily practice.

3   Q.   Your active daily practice is that of a diagnostic

4   radiologist; right?

5   A.   Yes.          01:28:39

6   Q.   Would you explain to the members of the jury what a

7   diagnostic radiologist does, please.

8   A.   Sure.   While I do some light interventional procedures, my

9   main focus of what I do from day to day is to interpret CT,

10  x-ray, MRI, mammograms, DEXA scans, fluoroscopy.   These are          01:28:55

11  each different modalities in radiology.

12  Q.   And are those scans x-rays, CT scans, MRIs, are those

13  things that are ordered by physicians who are hands-on treating

14  patients?

15  A.   Yes.          01:29:16

16  Q.   And is it your responsibility as a diagnostic radiologist

17  to provide information to those treating physicians so that

18  they can accurately diagnose the patient and work with the

19  patient on medical options?

20  A.   Yes.          01:29:28

21  Q.   Are you board certified?

22  A.   Yes.   I'm certified by the American Board of Radiology and

23  also by the National Board of Physicians and Surgeons.

24  Q.   Okay.   And what does it mean to be board certified?

25  A.   There's a series of tests that you have to pass.          01:29:45

United States District Court

2017

DANIEL COUSIN, M.D. - Direct

1    Q.    Do you currently practice diagnostic radiology on a          01:29:52
2    day-to-day basis today?
3    A.    Yes.
4    Q.    And where do you practice?
5    A.    Currently I am the clinical director at Bayview Radiology    01:29:59
6    in Tampa.
7    Q.    Is that a hospital-based radiology practice?
8    A.    No.
9    Q.    Is it an outpatient-based radiology practice?
10   A.    Yes.                                                         01:30:11
11   Q.    What is the difference -- some radiologists practice in
12   hospitals; correct?
13   A.    Correct.
14   Q.    What is the difference between what you do as an
15   outpatient-based diagnostic radiologist and what a diagnostic     01:30:22
16   radiologist does in a hospital?
17   A.    They are pretty similar.  We're seeing patients that can
18   present with abnormalities and we have to just diagnose them
19   and communicate these abnormalities, or lack thereof, to the
20   ordering physicians.                                              01:30:42
21   Q.    Dr. Cousin, you also do some work with what we call
22   medical-legal work; is that right?
23   A.    Where yes?
24   Q.    And what is medical-legal work?
25   A.    It's radiology consultation as applied to legal cases.      01:30:54

United States District Court

2018

DANIEL COUSIN, M.D. - Direct

1  Q.   And that's exactly what we asked you to do in this case;  01:31:02
2  is that right?
3  A.   Yes.
4  Q.   You were retained by my law firm; is that right?
5  A.   Yes.                                                     01:31:08
6  Q.   Prior to being retained to do some work on this case, had
7  you ever worked with my law firm before?
8  A.   No.
9  Q.   Have you ever done any consultation for Bard?
10  A.   No.                                                     01:31:19
11  Q.   Are you being paid by my law firm for your time?
12  A.   Yes.
13  Q.   Do you know the total charges that you have charged us for
14  your work?
15  A.   Not off the top of my head.                            01:31:29
16  Q.   What were you asked to do in this case as it pertains to
17  imaging taken of Ms. Booker?
18  A.   I was asked to look at the imaging and determine whether
19  or not it was interpreted correctly.
20  Q.   Were you specifically asked to look at an x-ray taken in  01:31:47
21  March 2009 at Lincoln Memorial Hospital?
22  A.   Yes.
23  Q.   And Lincoln Memorial Hospital is in New York; correct?
24  A.   I believe so.
25  Q.   Is the standard of care for radiologists in New York the  01:32:01

United States District Court

DANIEL COUSIN, M.D. - Direct

1    same as the standard of care for radiologists in every other

2    state in the United States?                                          01:32:05

3    A.    Yes.   The standard is the same.

4    Q.    And we've talked about standard of care.  What does that

5    mean?                                                                01:32:14

6    A.    Well, what would be expected to be performed by a

7    reasonably prudent radiologist.

8    Q.    And before we go forward and get into your opinions, would

9    you explain to the jury what an incidental finding is in the

10   world of diagnostic radiology?                                       01:32:35

11   A.    Sure.  An incidental finding is one that may not be the

12   reason for the study but you happen to see it and it's

13   important and many times that you report it.

14   Q.    Does the standard of care for a diagnostic radiologist

15   require that the diagnostic radiologist report incidental           01:32:53

16   findings?

17   A.    Yes, but only if they are important to be reported.

18   Q.    And how do you make that determination of whether they are

19   important or not?

20   A.    If there is something that you happen to see that could       01:33:06

21   have potentially negative effects, if you don't report it, then

22   I would consider that to be important.

23   Q.    As a diagnostic radiologist in examining or reviewing

24   x-rays, CT scans, MRIs and the other type of imaging that you

25   review, have you seen implanted devices in patients?                 01:33:27

2020

DANIEL COUSIN, M.D. - Direct

1    A.    Yes.                                                          01:33:32

2    Q.    As a diagnostic radiologist, do you need to know the

3    purpose of a device to be able to determine whether its

4    appearance is normal or abnormal?

5    A.    Not really.  I mean, by looking at the device, you often      01:33:44

6    know what the purpose is but the answer to your question is you

7    don't have to know.

8    Q.    You said you're a member of the American College of

9    Radiology.  Did I get that right?

10   A.    Yes.                                                          01:34:00

11   Q.    If the American College of Radiology says that it can be

12   difficult to find incidental findings on an x-ray or CT scan,

13   do you agree that all incidental findings are difficult to

14   find?

15   A.    No, not at all.                                               01:34:16

16   Q.    Are there incidental findings that are very obvious?

17   A.    Absolutely.

18   Q.    Did you form an opinion in this case about whether

19   Dr. Amer, who read the x-ray of Ms. Booker on March 26, 2009,

20   complied with the standard of care for diagnostic radiologists?  01:34:36

21   A.    I did form an opinion.

22   Q.    And what is your opinion?

23   A.    My opinion is that the read was below the standard of

24   care.

25   Q.    So it's your opinion he did not comply with the standard     01:34:46

United States District Court

DANIEL COUSIN, M.D. - Direct

| | | |
|---|---|---|
| 1 | of care; correct? | 01:34:48 |
| 2 | A.    That's correct. | |
| 3 | Q.    In forming that opinion, did you review medical records in | |
| 4 | this case? | |
| 5 | A.    I did. | 01:34:57 |
| 6 | Q.    Did you review the emergency room record for Ms. Booker at | |
| 7 | Lincoln Medical and Mental Health Center on March 26, 2009? | |
| 8 | A.    I believe so. | |
| 9 | MS. HELM:  Can we pull up 6667, please. | |
| 10 | Your Honor, this is already in evidence I believe? | 01:35:16 |
| 11 | THE COURT:  Let's have Traci confirm that. | |
| 12 | COURTROOM DEPUTY:  6667? | |
| 13 | MS. HELM:  Yes, ma'am. | |
| 14 | COURTROOM DEPUTY:  No. | |
| 15 | MS. HELM:  It's not in evidence? | 01:35:36 |
| 16 | COURTROOM DEPUTY:  No, ma'am. | |
| 17 | THE COURT:  Actually, Traci, my notes show it was. | |
| 18 | COURTROOM DEPUTY:  I apologize.  It was admitted on | |
| 19 | the 22nd. | |
| 20 | THE COURT:  It is in evidence. | 01:35:46 |
| 21 | MS. HELM:  Your Honor, may I display to it jury? | |
| 22 | THE COURT:  You may. | |
| 23 | BY MS. HELM: | |
| 24 | Q.    Dr. Cousin is this the emergency room record for Ms. | |
| 25 | Booker for March 26, 2009, from Lincoln Medical Center that you | 01:35:54 |

United States District Court

DANIEL COUSIN, M.D. - Direct

1  reviewed?                                                        01:35:59

2  A.   I believe so.

3  Q.   And specifically on her admission in the hospital on March

4  26, 2009, down towards the bottom, do you see where the

5  emergency room doctor indicated had IVC filter placed as well?   01:36:10

6  A.   Yes, I do.

7  Q.   So based on that, is it your understanding that either Ms.

8  Booker told or somehow the emergency room doctor was aware that

9  Ms. Booker had an IVC filter?

10 A.   Yes.                                                         01:36:35

11 Q.   And if you would turn to page four, please.  And on page

12 four, under Assessment, did the emergency room doctor order a

13 lumbar x-ray of Ms. Booker?

14 A.   Yes.

15 Q.   And did you have an opportunity to review you that x-ray    01:36:55

16 report in forming your opinions in this case?

17 A.   Yes, I did.

18 Q.   Would you please pull up 6668?

19         MS. HELM:  And, Your Honor, I'm sure this one is in

20 evidence only to stand corrected.                                01:37:08

21         COURTROOM DEPUTY:  It's in evidence, yes.

22         MS. HELM:  May I publish 6668 to the jury, Your

23 Honor?

24         THE COURT:  Yes.

25 \\\

United States District Court

DANIEL COUSIN, M.D. - Direct

BY MS. HELM:                                                        01:37:20

Q.   Dr. Cousin, is this the x-ray report for the lumbosacral

spine x-ray of Ms. Booker taken on March 26, 2009?

A.   Yes.

Q.   And did you review this in forming your opinion?  I        01:37:28

already asked you that.

A.   Yes, I did.

Q.   Okay.  Would you report to the jury what Dr. Amer stated

in his report about the condition of Ms. Booker's spine?

A.   Sure.  I'll just read the report:  Multiple views of the   01:37:43

lumbosacral spine demonstrate normal disc spaces.  The spinous

processes and pedicles are within normal limits.  There is no

evidence of fracture or dislocation.  The vertebral body

heights are well-preserved.  Soft tissues are unremarkable.

IVC filter is noted.                                              01:38:06

Q.   So you just read that Dr. Amer stated "IVC filter is

noted"; is that right?

A.   Yes, I did.

Q.   And making a statement that the IVC filter is noted, what

did Dr. Amer tell Ms. Booker's treating physician at Lincoln    01:38:15

Medical about the condition of her filter?

A.   That there's no abnormality essentially.  It's describing

a normal -- that you think it's a normal study.

Q.   Okay.  He did not tell her treating physician that the

filter had any abnormality at all; correct?                      01:38:36

United States District Court

DANIEL COUSIN, M.D. - Direct

1    A.    That's right.                                                          01:38:39

2    Q.    Okay.  Did you have an opportunity to look at the actual

3    x-rays taken by Dr. Amer on March 26, 2009?

4    A.    Yes.

5              MS. HELM:  Would you please pull up 6825?                          01:38:49

6              Your Honor, this was admitted immediately prior.  May

7    we publish this to the jury?

8              THE COURT:  Yes.

9    BY MS. HELM:

10   Q.    Dr. Cousin, are these two of the views of the x-rays taken            01:39:05

11   by Dr. Amer on March 26, 2009, of Ms. Booker at Lincoln Medical

12   Center in New York?

13   A.    Yes.  They are two of the four views.

14   Q.    Two of the four views.  And in forming your opinion on the

15   standard of care, what do you see on this x-ray that makes you              01:39:24

16   believe that Dr. Amer did not comply with the standard of care

17   when he stated "IVC filter is noted"?

18   A.    The reason why I say this is because you can see the IVC

19   filter very clearly.  However, there is one strut that is not

20   like the others.                                                            01:39:45

21             MR. JOHNSON:  Excuse me, Your Honor.  We need to

22   approach.  This is not in his report.  It's not in his

23   testimony.  I know where he's going.

24             THE COURT:  Well, let's bring the reports with us.

25             (At sidebar 1:40.)                                                01:40:03

United States District Court

2025

DANIEL COUSIN, M.D. - Direct

1    THE COURT:  What is not in the report?                    01:40:19

2        MR. JOHNSON:  He's about to describe a fracture --

3        MS. HELM:  No, he's not.  No, he's not.

4        THE COURT:  Tell us where you're going with it.

5    Hold on.                                                  01:40:28

6        MS. HELM:  All he's going to say is that the strut

7    pointing straight up is an abnormality of the filter that shows

8    it's not like the others and it should have been reported.

9    That is all he's going to say.  He is not going to say it's

10   fractured.                                                01:40:38

11        THE COURT:  All right.

12        MR. JOHNSON:  Your Honor, I don't see that in here.

13        THE COURT:  Can you show me where that is in your

14   report?

15        MS. HELM:  Yes.                                      01:40:54

16        MR. JOHNSON:  It's right here.  There's no

17   interpretation of it.

18        THE COURT:  Okay.  So tell me what you're going to

19   elicit besides that statement.

20        MS. HELM:  Nothing.                                  01:41:08

21        MR. JOHNSON:  He's going to describe a strut that

22   is --

23        THE COURT:  Well, he can say there's a prong that

24   extends towards the abdominal aorta.  That's clearly within his

25   report.                                                   01:41:21

United States District Court

                    DANIEL COUSIN, M.D. - Direct

 1              MR. JOHNSON:  Okay.                                        01:41:21

 2              MS. HELM:  He's not going to say it's fractured, Joe.

 3              THE COURT:  Okay.  Well I think she can ask the

 4     question.  If you think the answer is inappropriate in light of

 5     this, let me know.                                                 01:41:30

 6              Is there anything else in the report on this subject?

 7              MS. HELM:  The violation of the standard of care.

 8              THE COURT:  Okay.  But in terms of describing the

 9     x-ray that is in the report.

10              MS. HELM:  Yes, but he was asked about the x-ray in      01:41:41

11     his deposition.

12              THE COURT:  And what did he say?

13              MS. HELM:  That it shows an abnormality which is all

14     he's going to say today.

15              THE COURT:  Okay.                                         01:41:49

16              MR. JOHNSON:  But as long as we're not going to say

17     there's a fracture.

18              MS. HELM:  He is not going to say there's a fracture.

19              THE COURT:  Okay.

20              (End of sidebar discussion.)                              01:41:57

21              THE COURT:  Thank you.

22     BY MS. HELM:

23     Q.   Dr. Cousin, referring back to 6825 and the appearance of

24     the filter, does the x-ray and the two views of the x-ray shown

25     on 6825 show and demonstrate an abnormality in the filter?        01:42:22

                    United States District Court

DANIEL COUSIN, M.D. - Direct

1   A.   Yes, it does.                                          01:42:29

2   Q.   And was that abnormality in the filter -- and are you

3   talking about the strut that is pointing up towards the aorta

4   while the others are pointing down?

5   A.   Honestly, I think it's -- the lights here would be better  01:42:39

6   if we turned them off if we were looking up there.

7          THE COURT:  They have all got screens in front of

8   them.

9   BY MS. HELM:

10  Q.   Dr. Cousin, are you talking about one strut that is    01:42:47

11  pointing in the opposite direction of all the others?

12  A.   Yes, I am.

13  Q.   And did Dr. Amer report to Ms. Booker's treating

14  physicians the condition of the strut pointing in the opposite

15  direction of all the others of the IVC filter?             01:43:04

16  A.   No.  There was no abnormality described involving the

17  filter.

18  Q.   Okay.  And why was it a violation of the standard of care

19  to fail to describe the abnormality in the condition of Ms.

20  Booker's filter?                                           01:43:17

21  A.   The reason why it's below the standard is because this is

22  a pertinent finding.  First of all, it's a prominent finding to

23  the eye that you can see when one of the struts is up and all

24  the others are down so it jumps out at you.  And the second

25  reason is because it has potential worrisome consequences if  01:43:40

United States District Court

DANIEL COUSIN, M.D. - Direct

| | | |
|---|---|---|
| 1 | something were to happen involving where that strut were to | 01:43:48 |
| 2 | embolize to, for example, and for the fact that the device may | |
| 3 | not function properly if it's broken. | |
| 4 | Q.   Did Ms. Booker's treating physician at Lincoln Medical | |
| 5 | have the necessary information to assess her medical condition | 01:44:06 |
| 6 | regarding her IVC filter on March 26, 2009, based on Dr. Amer's | |
| 7 | report stating IVC filter is noted? | |
| 8 | A.   No.   The read did not characterize appropriately the | |
| 9 | findings that were present at the time. | |
| 10 | Q.   Now, Dr. Cousin, you would agree that because he was | 01:44:29 |
| 11 | looking at her spine, the presence of the IVC filter and the | |
| 12 | condition of the IVC filter would be an incidental finding? | |
| 13 | MR. JOHNSON:  Leading, Your Honor. | |
| 14 | THE WITNESS:  Technically -- | |
| 15 | THE COURT:  Hold on. | 01:44:45 |
| 16 | Sustained. | |
| 17 | BY MS. HELM: | |
| 18 | Q.   Dr. Cousin, was the abnormality in the IVC filter an | |
| 19 | incidental finding? | |
| 20 | A.   It was an incidental finding in that the indication for | 01:44:53 |
| 21 | the study wasn't, for example, evaluate the filter.   It was | |
| 22 | back pain, something to that effect.   So technically it's an | |
| 23 | incidental finding. | |
| 24 | Q.   Based on your experience as a diagnostic radiologist, is | |
| 25 | that an incidental finding that was difficult to see? | 01:45:11 |

United States District Court

DANIEL COUSIN, M.D. - Cross

1   A.    No.  I do not believe that was difficult to see.                    01:45:14

2   Q.    Based on your experience as a diagnostic radiologist, is

3   that an incidental finding that should have been reported?

4   A.    Yes.

5   Q.    And based on your experience as a diagnostic radiologist,          01:45:25

6   was it below the standard of care to fail to report that

7   incidental finding to Ms. Booker's treating physicians?

8   A.    Yes.

9   Q.    Dr. Cousin, are all the opinions you offered today offered

10  to a reasonable degree of medical certainty?                             01:45:42

11  A.    Yes.

12          MS. HELM:  Nothing further, Your Honor.

13          THE COURT:  Cross-examination?

14          MR. JOHNSON:  Yes, sir.

15                    **CROSS - EXAMINATION**                                01:45:57

16  BY MR. JOHNSON:

17  Q.    Good afternoon, Dr. Cousin.

18  A.    Hell local.

19  Q.    I think I heard you say that you practice in Florida?

20  A.    I practice in Florida.                                             01:46:02

21  Q.    As a diagnostic radiologist; is that correct?

22  A.    Correct.

23  Q.    And you used the term "imaging studies" and I want to make

24  sure everybody understands what that is.  That would be the

25  full compliment of what we call x-ray type studies ranging from          01:46:14

United States District Court

DANIEL COUSIN, M.D. - Cross

| | | |
|---|---|---|
| 1 | plain x-rays to CT scans, to MRIs as examples? | 01:46:20 |
| 2 | A.   You say x-ray type studies? | |
| 3 | Q.   Yes. | |
| 4 | A.   Some of them use sound waves like ultrasounds.  Some of | |
| 5 | them use x-rays like CT and radiography.  Some of them use | 01:46:32 |
| 6 | magnets like MRI. | |
| 7 | Q.   All right.  But it does include x-rays, MRI, and CT | |
| 8 | imaging? | |
| 9 | A.   Yes. | |
| 10 | Q.   As I understand it, you do not in your private practice | 01:46:43 |
| 11 | implant or remove IVC filters? | |
| 12 | A.   Correct. | |
| 13 | Q.   You never published anything about IVC filters; correct? | |
| 14 | A.   No. | |
| 15 | Q.   You are employed in Tampa, Florida, at a family-owned | 01:46:55 |
| 16 | business.  I believe your father owns that business? | |
| 17 | A.   Yes. | |
| 18 | Q.   All right.  And you are not on staff at any hospital in | |
| 19 | the state of Florida; is that correct? | |
| 20 | A.   I don't believe so. | 01:47:11 |
| 21 | Q.   All right.  And unlike working at the family business, in | |
| 22 | order to read imaging studies at a hospital, you have to make | |
| 23 | application and be credentialed; correct? | |
| 24 | A.   I'm sorry? | |
| 25 | Q.   In order for a doctor to read imaging studies at a | 01:47:27 |

United States District Court

DANIEL COUSIN, M.D. - Cross

1   hospital in Florida, that doctor would have to make an          01:47:30

2   application and would have to be accepted on staff at that

3   hospital?

4   A.   I believe so.  It's up to the hospital.

5   Q.   All right.  That is you don't just show up and say,        01:47:43

6   "Hello, everybody.  I'm Dr. Cousin and I would like to come in

7   and start reading x-rays."  You don't do that?  That's not the

8   way it's done?

9   A.   Correct.

10  Q.   All right.  And the Bayview Radiology where you work does   01:47:53

11  not have any contracts with hospitals to read imaging studies

12  in Florida; is that right?

13  A.   Correct.

14  Q.   Your contracts are with insurance companies?

15  A.   Correct.  We also have contracts with other providers as   01:48:09

16  well.

17  Q.   And just so we're clear, you've never set foot in a

18  hospital in Florida as a private practice physician to read any

19  imaging studies.  Is that a fair statement?

20  A.   In Florida only or also in New York?                       01:48:30

21  Q.   In Florida.

22  A.   Not as a credentialed radiologist, just as a consultant.

23  Q.   Sir, and when Ms. Booker was implanted with her filter in

24  2007, you had not yet graduated medical school; is that

25  correct?                                                        01:48:50

United States District Court

DANIEL COUSIN, M.D. - Cross

1    A.    That's correct.  Oh, no, that's not correct.  No.  I          01:48:53

2    graduated medical school in 2005 so, yes, I had graduated.

3              MR. JOHNSON:  Can we look at page 168 of the

4    deposition given by Dr. Cousin?

5              And with the Court's permission, I would like to play    01:49:22

6    the video clip from page 168.

7              THE COURT:  You may.

8              (Video clip of Dr. Cousin's deposition played.)

9    BY MR. JOHNSON:

10   Q.    As part of your private practice, you're not involved in     01:49:47

11   the decision to monitor patients with filters, nor are you

12   involved in the decision whether to remove the filter; is that

13   correct?

14   A.    I'm still going back to trying to understand that clip.  I

15   feel like maybe we talked after that about the clarification.      01:50:01

16   It's just a moment in time.

17              I'm sorry.  Let me go on to your next question.

18   Q.    Sure.  In your private practice, you are not involved in

19   the decision whether to monitor a patient that has an IVC

20   filter or whether to remove that filter.  Is that a fair          01:50:20

21   statement?

22   A.    Correct.  I currently am not doing that aspect of clinical

23   radiology.

24   Q.    All right.  So you're not involved in performing the

25   risk-benefit analysis to implant a filter or remove a filter.     01:50:32

United States District Court

DANIEL COUSIN, M.D. - Cross

1   Fair statement?                                                          01:50:36

2   A.   Correct.  We can make recommendations but, like, for

3   example, if I saw an abnormality, I might make a recommendation

4   but as a general rule, we're not the ones who are finally

5   making the ultimate decision with the patients and discussing    01:50:49

6   the risks and alternatives and benefits of one management

7   decision or another.

8   Q.   All right.  And your assignment in this case was to look

9   at a series of imaging studies to determine whether there were

10  any abnormalities or misreads by radiologists interpreting       01:51:06

11  those studies; correct?

12  A.   Yes.

13  Q.   And I believe you looked at approximately six imaging

14  studies, the first of which was performed in February of 2008,

15  the last of the which was performed on December 2 of 2011 as     01:51:25

16  part of your assignment?

17  A.   I would have to refer to my initial report.  I don't have

18  the dates memorized.

19  Q.   All right.  And I gather when you received this

20  assignment, you knew there was a lawsuit?                         01:51:39

21  A.   That's usually what happens in these cases but I didn't

22  really make any assumptions.

23  Q.   And you would agree that back in 2009 Dr. Amer, who read

24  the lumbar spine x-rays that you discussed a little while ago,

25  at that time there was no lawsuit.  You know that?               01:52:01

DANIEL COUSIN, M.D. - Cross

1   A.   I really don't have an opinion on that.  I was just asked          01:52:03

2   to do something without being told anything about -- that

3   there's a lawsuit.

4   Q.   Was there any indication that Dr. Amer knew that there was

5   a lawsuit?                                                             01:52:14

6   A.   I don't have any indication.

7   Q.   Do you know whether there was any indication that Dr. Amer

8   was aware of a problem with Ms. Booker's IVC filter?

9   A.   I don't have any indication.

10  Q.   And he was not looking specifically at the filter with           01:52:30

11  respect to the x-ray study that he reviewed; correct?

12  A.   Dr. Amer?

13  Q.   Yes.

14  A.   I don't really understand what you're saying.

15  Q.   Sure.  The reason for the x-ray was not to assess the            01:52:43

16  filter.  You would agree with that?

17  A.   The reason -- the indication was not to assess the filter.

18  Q.   All right.  And with respect to your review of that x-ray,

19  you don't even mention tilt in your report, do you?

20  A.   In my report on this case?  Did I mention tilt?                  01:53:05

21  Q.   Yes.

22  A.   I did not mention tilt in my report.

23  Q.   And do you know that this filter ultimately fractured at

24  some point in time?

25  A.   Yes.                                                            01:53:18

United States District Court

DANIEL COUSIN, M.D. - Cross

1  Q.   And you have no idea when it fractured, do you?        01:53:19

2  A.   I don't really have an opinion on when it fractured.

3  Q.   All right.   And this was a plain x-ray that Dr. Amer

4  looked at; right?

5  A.   A plain x-ray?                                         01:53:33

6  Q.   Yes.

7  A.   Yes.   There were four plain x-rays.

8  Q.   There was absolutely no contrast that was used as part of

9  this study?

10 A.   Correct.                                               01:53:44

11 Q.   And the x-ray does not define the inferior vena cava, the

12 contours of that vessel, nor does it define the contours of the

13 aorta which lies adjacent to the vena cava; is that correct?

14 A.   Yeah.   On x-ray you can't see soft tissues really well.

15 You can only see hardware and high-density devices really well. 01:54:01

16 Q.   All right.   And for all you know, at that point in time,

17 this filter or piece of it had fractured and had traveled to

18 the heart?   You don't know that?

19 A.   Is that a question?

20 Q.   Yes, it is.                                            01:54:24

21 A.   Did I know that there was a fracture?

22 Q.   No, sir.   The question was:   For all you know, a part of

23 that filter had already fractured and a metal piece had already

24 traveled to Ms. Booker's heart?

25 A.   If that's the question you're asking me, I really don't   01:54:41

United States District Court

DANIEL COUSIN, M.D. - Cross

1    have an opinion on that.                                              01:54:43

2    Q.   And I guess the point of my question is, you have no idea

3    when the filter fractured and that one fragment then migrated

4    to Ms. Booker's heart.  That's a fair statement; correct?

5    A.   I don't have an opinion on the chronology.  I only have an      01:54:56

6    opinion on the abnormality that we just looked at.

7    Q.   All right.  In your private practice as a diagnostic

8    radiologist, am I correct that Bard has never provided you with

9    any information to assist you when looking at x-rays and

10   assessing filters that there's a relationship between tilt of       01:55:15

11   the filter, perforation of the vena cava, penetration into

12   adjacent vital structures, and fracture of the Bard G2 filter.

13   Is that a correct statement?

14        MS. HELM:  Your Honor, object.  It exceeds the scope

15   of the direct examination.                                          01:55:34

16        THE COURT:  Sustained.

17   BY MR. JOHNSON:

18   Q.   Doctor, you have not been provided as an expert with any

19   Bard internal documents or internal information; is that

20   correct?                                                            01:55:46

21        MS. HELM:  Your Honor, I object.  Same objection.

22        THE COURT:  Overruled.

23        THE WITNESS:  I haven't been provided anything by

24   Bard.

25   \\\

United States District Court

DANIEL COUSIN, M.D. - Cross

1   BY MR. JOHNSON:                                           01:55:57

2   Q.   You have not even looked at the instructions for use or

3   the IFU for the G2 filter implanted in Ms. Booker correct?

4           MS. HELM:   Your Honor, same objection.

5           THE COURT:   Sustained.                          01:56:05

6   BY MR. JOHNSON:

7   Q.   With respect to your criticisms of Dr. Amer, you have no

8   idea how Ms. Booker's doctors would have treated Ms. Booker

9   with respect to the abnormality you identified; is that

10  correct?                                                 01:56:27

11  A.   I have no opinion on management or treatment options, just

12  on the actual diagnostic evaluation.

13  Q.   And you would agree with me that Dr. Amer did not cause

14  the G2 Filter that was implanted in Ms. Booker to have this

15  filter strut out of place and pointed in the direction of the   01:56:45

16  aorta; correct?

17  A.   Are you asking me if by reading the x-ray, Dr. Amer

18  somehow caused the fracture -- the device to malfunction and

19  break?

20  Q.   That is another way to ask the question.            01:57:03

21  A.   I do not believe that happened.

22  Q.   All right.  And you wouldn't feel very good, would you,

23  doctor, if you were blamed by a filter manufacturer for a

24  defective filter, would you?

25  A.   I have no opinion on how I would feel.               01:57:23

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1  Q.   Would you -- you would not like to be blamed as a doctor          01:57:28

2  if one of the devices you implanted in a patient was defective,

3  would you?

4  A.   I really don't have an opinion on that.

5             MR. JOHNSON:  May I have one minute?                        01:57:47

6             THE COURT:  Yes.

7             MR. JOHNSON:  That's all I have, Your Honor.

8             THE COURT:  Redirect?

9             MS. HELM:  No, Your Honor.

10            THE COURT:  All right.  Thank you, sir.  You can step        01:58:22

11  down.

12            (Witness excused.)

13            MR. NORTH:  Your Honor, at this time the defendants

14  would call Dr. Christopher Morris to the stand.

15            COURTROOM DEPUTY:  Dr. Morris, if you'll come forward        01:59:02

16  and stand right here and raise your right hand, please.

17            (CHRISTOPHER S. MORRIS, M.D., a witness herein, was

18  duly sworn or affirmed.)

19            COURTROOM DEPUTY:  Please have a seat, sir.

20                         **DIRECT EXAMINATION**                         01:59:21

21  BY MR. NORTH:

22  Q.   Good afternoon, Dr. Morris.  Could you tell the ladies and

23  gentlemen of the jury, where you are from?

24  A.   I'm from Burlington, Vermont.

25  Q.   And what is your profession, sir?                                01:59:39

CHRISTOPHER S. MORRIS, M.D. - Direct

| | | |
|---|---|---|
| 1 | A.   Interventional radiology. | 01:59:41 |
| 2 | Q.   And where do you work? | |
| 3 | A.   University of Vermont College of Medicine. | |
| 4 | Q.   And can you tell us a little bit about your educational | |
| 5 | background? | 01:59:49 |
| 6 | A.   I went to medical school at Case Western Reserve | |
| 7 | University School of Medicine in Cleveland.  From there I did | |
| 8 | my internship also in Cleveland at Case Western Reserve at | |
| 9 | Cleveland Metropolitan General Hospital.  And then I went to | |
| 10 | Columbus, Ohio, at the Ohio State University Hospitals to do | 02:00:03 |
| 11 | diagnostic radiology residency.  I ended up then doing my | |
| 12 | fellowship in vascular and interventional radiology at Mass | |
| 13 | General Hospital in Boston.  And then ever since then I have | |
| 14 | been at the University of Vermont College of Medicine. | |
| 15 | Q.   In addition to a medical degree, did you obtain a master | 02:00:24 |
| 16 | of science? | |
| 17 | A.   Yes, I did. | |
| 18 | Q.   And where was that from? | |
| 19 | A.   That was also at the Ohio State University. | |
| 20 | Q.   And in what area was the master of science? | 02:00:31 |
| 21 | A.   It was in radiological sciences, primarily radiation | |
| 22 | biology and radiation physics. | |
| 23 | Q.   Can you describe the difference for us between diagnostic | |
| 24 | radiology and interventional radiology? | |
| 25 | A.   Certainly.  Diagnostic radiology is a specialty involved | 02:00:47 |

United States District Court

2040
CHRISTOPHER S. MORRIS, M.D. - Direct

1  with making diagnosis through medical imaging and                    02:00:51

2  interventional radiology is a specialty that uses imaging

3  techniques to perform minimally invasive procedures.

4  Q.   And how long have you been practicing medicine?

5  A.   Well, I have been at the University of Vermont for about        02:01:07

6  27 years, almost 27 years.  But I started -- you know, after

7  graduating in 1985, I have been practicing medicine to some

8  degree so almost 33 years.

9  Q.   So do you practice interventional radiology on a daily

10 basis?                                                                02:01:26

11 A.   Yes, I do.

12 Q.   And do you have any academic responsibilities?

13 A.   Yes.

14 Q.   And what are those?

15 A.   I am a professor of radiology and surgery at the Larner         02:01:31

16 College of Medicine at the University of Vermont.

17 Q.   Are you licensed to practice medicine?

18 A.   Yes.

19 Q.   In what states do you have current licenses?

20 A.   Active licenses in Vermont, New York, California.               02:01:44

21 Q.   And do you have inactive licenses in several states?

22 A.   Yes.

23 Q.   And what are those?

24 A.   Inactive in Ohio, Massachusetts, New Hampshire, and

25 Nevada.                                                               02:02:00

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1   Q.   Are you board certified?                                    02:02:04

2   A.   Yes.

3   Q.   In what areas?

4   A.   I have a dual certificate in diagnostic radiology and

5   vascular and interventional radiology.                          02:02:10

6   Q.   Are you a member of any professional societies?

7   A.   Yes.

8   Q.   And please tell us what those are.

9   A.   Society of Interventional Radiology, American College of

10  Radiology, Radiological Society of North America.  I think      02:02:23

11  American Heart Association.  I can't remember if -- if I'm

12  still active in several others but I have been members of many

13  others as well.

14  Q.   Over the years, have you held any leadership positions

15  within the Society of Interventional Radiology?                 02:02:38

16  A.   Yes.  I am on the Standards of Practice Committee and

17  several subcommittees of that committee.  I was also the chair

18  of the Inferior Vena Cava Filter Workshop during the mid-2000s

19  and that lasted for three years.

20  Q.   And what was the purpose or nature of that workshop?       02:02:57

21  A.   That was a hands-on learning experience for participants

22  at the annual Society of Interventional Radiologists.  It

23  basically taught interventional radiologists all the nuances

24  about inferior vena cava filters.

25  Q.   Describe for us just to little bit the nature of your      02:03:18

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1   present clinical practice.                                          02:03:20

2   A.   I'm a full-time interventional radiologist meaning a

3   full-time clinical practice.  Basically, every day except maybe

4   occasionally one-half day a week, which we consider an academic

5   day, I'm doing interventional radiology procedures.  Another     02:03:36

6   half day a week I'm actually in our clinic seeing patients in

7   our interventional radiology clinic.  So the bulk of my time is

8   actually the clinical practice of interventional radiology

9   performing procedures on patients.

10  Q.   What type of procedures do you perform on a routine basis?  02:03:54

11  A.   We do more than 100 different discrete types of

12  procedures.  These are a wide variety of types of procedures.

13  The commonly known types of procedures that I do include

14  angioplasty of arteries and veins throughout the body except

15  for the heart.  Cardiologists do that.  We do drainage          02:04:13

16  procedures of blocked organs, you know, blocked kidneys,

17  percutaneous drainages of blocked liver ducts, things of that

18  nature.  We drain abscesses.  We perform procedures such as

19  vertebral augmentation.  There's literally like over 100 types

20  of procedures that require this image-guided technique that we  02:04:34

21  do.

22  Q.   You mentioned that you started practicing medicine

23  approximately 27 years ago.  Can you estimate when you first

24  began work with inferior vena cava filters?

25  A.   When I was a first-year resident at the Ohio State         02:04:47

United States District Court

2043

CHRISTOPHER S. MORRIS, M.D. - Direct

1  University residency so that would have been 1986.                02:04:50

2  Q.   And in the roughly 27 years that have followed, have you

3  continued to use inferior vena cava filters?

4  A.   Yes.

5  Q.   As a part of your medical practice, do you still treat        02:05:05

6  patients with IVC filters today?

7  A.   Yes.

8  Q.   Have you published any medical articles during the course

9  of your career?

10 A.   Several.                                                      02:05:18

11 Q.   And do any of these publications involve inferior vena

12 cava filters?

13 A.   I think six or seven do, yes.

14 Q.   Tell us some of the types of articles you've published.

15 A.   The most recent was published in 2017 in a journal called     02:05:28

16 "Vascular Medicine" and it had to do with follow-up of

17 retrievable filters using a multidisciplinary system that we

18 put in place beginning in 2006 and we showed that it doubled

19 our retrieval rate of retrievable filters.

20       We were actually one of the first group to perform          02:05:52

21 studies on the prophylactic use of filters in trauma patients

22 in 19 -- that was published in 1993.

23 Q.   Have you been retained by my law firm to consult with us

24 regarding this litigation?

25 A.   Yes.                                                          02:06:10

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1   Q.   And do you charge for your consultation work?          02:06:11

2   A.   Yes.

3   Q.   What amount do you charge?

4   A.   I charge a flat fee of $500 an hour.

5   Q.   Prior to working as an expert witness in the area of IVC   02:06:19

6   filters with my firm, have you ever served as an expert witness

7   in a case involving C.R. Bard?

8   A.   No.

9   Q.   Prior to working as an expert witness in the area of IVC

10  filters, have you ever had a relationship with Bard where you   02:06:32

11  were paid by the company?

12  A.   Yes.

13  Q.   Tell us about that.

14  A.   Briefly for a few years, in early 2000s to mid-2000s, I

15  was a consultant for Bard and was there during the advent of   02:06:44

16  retrievable filters.  And at that time, most interventional

17  radiologists were not familiar with them.  And so I acted as a

18  clinical monitor which meant that I supervised the retrieval

19  process.  I went to University of Albany, Albany Medical Center

20  and another hospital in Albany called St. Peter's and I        02:07:06

21  essentially taught them how to retrieve filters at that time.

22       I also gave a few talks around the region on

23  retrievable filters sponsored by Bard but they were general

24  talks about retrievable filters, you know, generically.  And

25  then I served on several focus groups for Bard, one was in     02:07:26

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1   Chicago and another one was in I believe here in Scottsdale or        02:07:30

2   Phoenix.

3   Q.   And what filters was Bard selling at the time you were

4   consulting with them?

5   A.   It was certainly the Recovery early on and it may have          02:07:42

6   extended into the years of the G2.

7   Q.   Do you recall when the last time was that you received

8   some payment from Bard for speaking or participating in

9   meetings?

10  A.   I can't remember exactly but I want to say around 2006.         02:07:55

11  It could have been 2007 but probably 2006.

12  Q.   Are you here today to provide opinions specific to Ms.

13  Booker's medical course and treatment?

14  A.   No.

15  Q.   What are you here to talk about today, Dr. Morris?              02:08:14

16  A.   Well, I have four opinions that I would like to express.

17  Q.   Did you create a demonstrative slide that outlines those

18  opinions?

19  A.   Yes.   Yes.

20       MR. NORTH:   If we could pull up 7933.                          02:08:30

21  Q.   Doctor, why don't you summarize for the jury what your

22  four opinions are in this litigation?

23  A.   Well, pulmonary embolism is a significant public health

24  problem and a life-threatening disease.   IVC filters are

25  effective in preventing PE deaths and this is specifically in        02:08:50

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1   patients that have pulmonary embolism that can't receive                02:08:54

2   anticoagulation.  IVC filter risks are well-known and familiar

3   by interventional radiologists.  Those include thrombosis, not

4   only of the inferior vena cava but the access site that we use

5   to place the IVC filter.  In addition, IVC filter                         02:09:11

6   complications --

7             MR. O'CONNOR:  Your Honor --

8             THE COURT:  Excuse me, sir.

9             MR. O'CONNOR:  No.  I'm sorry. Go ahead.

10            THE WITNESS:  -- complications include tilt,                     02:09:22

11   perforation, and penetration of the filter components, the

12   migration of the filter, fracture, and then filter and fracture

13   embolization, meaning moving to another location.

14            And then my last opinion is that the Bard G2 filter

15   is safe and effective.                                                   02:09:39

16            MR. O'CONNOR:  Your Honor, I object to the last

17   opinion.  It's not disclosed anywhere in his report.

18            THE COURT:  All right.  Could you show me where that

19   is in the report, Mr. North?

20            MR. NORTH:  Yes, Your Honor.                                     02:09:52

21            Do you want me to just read the portion to you or

22   show it to you?

23            THE COURT:  You can just hand the report up.

24            MR. NORTH:  In the second paragraph under the heading

25   about Dr. Vogelzang there are several comments.                          02:10:26

CHRISTOPHER S. MORRIS, M.D. - Direct

| | | |
|---|---|---|
| 1 | THE COURT:  Okay.  Hold on just a minute. | 02:10:31 |
| 2 | MR. O'CONNOR:  What page? | |
| 3 | MR. NORTH:  Page 21. | |
| 4 | THE COURT:  The objection is overruled.  The last | |
| 5 | opinion is disclosed in a long paragraph on page 21. | 02:10:57 |

BY MR. NORTH:

7  Q.   I'm sorry, Doctor, what was your fourth opinion?

8  A.   That the Bard G2 filter is safe and effective.

9       MR. NORTH:  Your Honor, at this time we would like to

10  display Demonstrative Exhibit 7933 to the jury.    02:11:20

11       THE COURT:  Any objection?

12       MR. O'CONNOR:  No objection for a demonstrative.

13       THE COURT:  You may.

14       MR. NORTH:  Thank you, Your Honor.

15  BY MR. NORTH:    02:11:38

16  Q.   Doctor, is this the slide that you prepared to summarize

17  your opinions?

18  A.   Yes.

19  Q.   And does that set forth the four opinions you just stated

20  for us?    02:11:44

21  A.   Yes.

22  Q.   Dr. Morris, tell us, turning to the first opinion about

23  PE, what is a DVT?

24  A.   A DVT stands for deep venous thrombosis and that

25  represents clot formation in the deep veins of the legs or the    02:11:58

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1    pelvis and that clot is clot that can stay local and it's                02:12:06

2    commonly then referred to as DVT or it can break off and travel

3    to the lungs and that is known as then a pulmonary embolism.

4    Q.   And have you treated patients over the course of your

5    practice who have DVT?                                                   02:12:27

6    A.   Yes.

7    Q.   And have you treated patients who have pulmonary emboli?

8    A.   Yes.

9    Q.   Where do these large blood clots that become pulmonary

10   emboli, where in the body do they usually originate?                    02:12:39

11   A.   They can originate lots of different places in the veins

12   of the legs and the pelvis; but, generally, they are considered

13   to be originating in smaller veins that propagate or extend

14   into the larger veins.  We call them proximal DVT, which are

15   the most dangerous type of DVT, when they extend above the knee         02:12:59

16   joint.  And when they extend into the big vein above the knee

17   joint, called the femoral vein, or the big veins in the pelvis,

18   called the iliac vein, they can be quite sizable.  So at that

19   point when they break off and cause a pulmonary embolism, that

20   can be a major event for the patient.                                   02:13:17

21   Q.   In the course of your career, have you had patients who

22   have died from pulmonary embolism?

23   A.   Yes.

24   Q.   In the course of your career, are you aware of any of your

25   patients who had a filter and, nevertheless, died from                  02:13:29

CHRISTOPHER S. MORRIS, M.D. - Direct

1    pulmonary embolism?                                              02:13:33

2    A.    Since 1981 we have placed roughly around 2000 filters and

3    I cannot remember a PE after placing a filter in our patients.

4    There may have been some incidental asymptomatic type of

5    pulmonary emboli that have occurred that may have required, on   02:13:54

6    a very rare basis, a second filter.  That's an indication for a

7    second filter on top of the original filter, but those have

8    been precious few and I can't even remember individual cases in

9    that regard.

10   Q.    Do you consider pulmonary embolism to be a significant     02:14:10

11   health risk in the American population?

12   A.    Yes, I do.

13   Q.    Do you have any information concerning how many deaths

14   pulmonary embolism causes in this country per year?

15   A.    Studies have shown that PE causes anywhere between 50,000  02:14:27

16   and 200,000 deaths annually in the United States and autopsy

17   studies have shown that up to 10 to 11 percent of in-hospital

18   or inpatient deaths are attributed to pulmonary embolism.

19   Q.    When somebody has had one pulmonary embolism and then has

20   a recurrent PE, what are the chances of death in that            02:14:52

21   circumstance?

22   A.    I don't really know that statistic but if they have had a

23   pulmonary embolism that is untreated, they are at risk of dying

24   30 percent of the time.

25   Q.    And did you prepare a slide that summarizes some of these  02:15:16

CHRISTOPHER S. MORRIS, M.D. - Direct

1  statistics that you have just testified to?                    02:15:19

2  A.    Yes.

3           MR. NORTH:  Your Honor, at this time we would like to

4  show Exhibit 7933.0002 and we would like to publish this to the

5  jury.                                                          02:15:33

6           THE COURT:  Any objection?

7           MR. O'CONNOR:  Well, it's cumulative.  The doctor

8  just testified about this.  It's a repeat of his testimony.

9           THE COURT:  Objection overruled on that basis.

10          You can display it.                                   02:15:46

11          MR. NORTH:  Thank you, Your Honor.

12  BY MR. NORTH:

13  Q.    Are these the statistics you just were mentioning?

14  A.    Yes.

15  Q.    Explain to me again what this 10 to 11 percent that you 02:15:55

16  mentioned of in-hospital deaths, what does that represent?

17  A.    These are from some older autopsy studies where the

18  investigators looked at a large number of deaths occurring in

19  hospitalized patients and they found the cause of death to be

20  10 to 11 percent from pulmonary embolism in those patients.    02:16:20

21  Q.    Which condition is more prevalent, DVT or PE?

22  A.    DVT.

23  Q.    And is there a reason for that?

24  A.    Well, first of all, there can't be a pulmonary embolism

25  unless there has been a precursor DVT.  So it's the chicken or 02:16:36

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1   the egg type of situation.  And not all DVTs break off and                    02:16:41

2   travel to the lung and cause a pulmonary embolism.  So it's

3   just a matter of, you know, math trying to determine -- trying

4   to realize that there are more DVTs than PE.

5   Q.   What are some of the factors that increase the risk for              02:16:58

6   pulmonary embolism?

7   A.   There are many factors.  One of the largest groups in the

8   sort of the emerging knowledge about risk factors for DVT are

9   in the genetics arena.  And we call those patients that have a

10  predisposition to develop clots patients that have a                       02:17:18

11  hypercoagulable state.  So they, unfortunately, have inherited

12  a gene that predisposes them to develop clots and particularly

13  DVT.  And some of these genes are called the protein

14  S deficiency, protein C deficiency, Leiden V Factor.  There's a

15  whole slew of these genetic abnormalities.                                 02:17:40

16       So then the patients that don't have that genetic

17  predisposition, that group includes any patient that's

18  immobilized for a period of time, that immobilization may be as

19  simple as, you know, being subjected to a long airplane ride or

20  sick patients that are immobilized in a hospital bed.  Trauma        02:18:01

21  patients that are put to bedrest for a long time, spinal cord

22  injury patients, those types.

23       And then another major group are cancer patients,

24  either diagnosed or undiagnosed cancer.  Certain cancers are

25  even more prone to causing DVT than others.  The cancers that       02:18:19

CHRISTOPHER S. MORRIS, M.D. - Direct

1   are really prone to developing DVT are those that involve the        02:18:23

2   brain that interrupt what we call the blood brain barrier.  It

3   has something to do with releasing phospholipids into the

4   bloodstream that becomes very thrombogenic to the patient.

5   Urologic type cancers are also very thrombogenic, predispose        02:18:35

6   patients to DVT.

7           And then the other group -- I mean, there's lots of

8   other additional groups but injury and just in general like

9   trauma, particularly trauma involving extremities also

10  predisposes patients to DVT.                                        02:18:58

11  Q.   What about bariatric surgery patients, are they at risk

12  for pulmonary emboli?

13  A.   Obesity is another one of those others that I mentioned

14  briefly.  That's another risk factor, yes.

15  Q.   Has the federal government taken any action or made any        02:19:19

16  pronouncement regarding the public health risk associated with

17  pulmonary embolism?

18  A.   Yes.  In 2008 the U.S. Surgeon General submitted a call to

19  action on pulmonary embolism and deep venous thrombosis.

20          MR. NORTH:  If we could pull up Exhibit 7411.              02:19:41

21  BY MR. NORTH:

22  Q.   Is this the Government publication that you just

23  referenced?

24  A.   Yes.

25  Q.   And are you familiar with that publication?                    02:19:57

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1  A.   I have read it.  Not recently but I am familiar with it,     02:19:59

2  yes.

3          MR. NORTH:  Your Honor, we would tender 7411 as an

4  exhibit.

5          MR. O'CONNOR:  Objection.  Hearsay, Your Honor.        02:20:12

6          THE COURT:  What's your response, Mr. North?

7          MR. NORTH:  803(8) I believe is a public record.

8          THE COURT:  Your response on 803(8), Mr. O'Connor?

9          MR. O'CONNOR:  Well, Your Honor, I mean, is he going

10 to just read from it or is he going to publish the entire        02:20:55

11 document?

12         THE COURT:  He's moving the whole thing into evidence

13 under 803(8).

14         MR. O'CONNOR:  Objection.  Lack of foundation, Your

15 Honor.                                                           02:21:07

16         THE COURT:  Okay.

17         So are you changing the objection from hearsay to

18 lack of foundation?

19         MR. O'CONNOR:  Well, foundation for the public

20 records exception hasn't been met.                               02:21:19

21         THE COURT:  Okay.

22         I'm going to overrule that.  I think it is

23 sufficiently authenticated under Rule 901(a) and, therefore,

24 I'm going to overrule the objection based on lack of

25 authentication and admit Exhibit 7411.                           02:21:41

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1          MR. NORTH:  Thank you, Your Honor.                    02:21:44

2          (Exhibit Number 7411 was admitted into evidence.)

3          MR. NORTH:  If we could publish this to the jury,

4    Your Honor.

5          THE COURT:  You may.                                  02:21:53

6    BY MR. NORTH:

7    Q.   So is this the publication we have been talking about from

8    the Surgeon General?

9    A.   Yes, it is.

10   Q.   If we could turn to page nine.  In the first paragraph,   02:22:03

11   about midway down the Surgeon General talks about estimates of

12   PE.  Do you see that?

13   A.   Yes, I do.

14   Q.   Is that generally consistent with your understanding of

15   the current --                                              02:22:23

16   A.   Yes, it is.

17   Q.   -- current rates in this country?

18          You told us just a few minutes ago I believe that you

19   believe there are 50,000 to 200,000 deaths per year from PE in

20   the United States.  Here the Surgeon General says 100,000.  We  02:22:38

21   have seen lots of different numbers.  Do you have any idea why

22   there is this large range of numbers here?

23   A.   Well, different studies have used different, you know,

24   parameters looking at those numbers and they have come up with

25   different numbers.  So, you know, some of the studies were done  02:22:56

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1   quite a while ago and others more recently.  So they have come    02:23:03

2   up with a range of figures.

3   Q.   If we could turn to page 11, please, and on the second

4   paragraph, the Surgeon General here suggests that estimates

5   indicate that PE causes more deaths each year than breast       02:23:30

6   cancer, AIDS, or motor vehicle incidents, illnesses or injuries

7   that are well understood.

8           Do you agree with that?

9   A.   Yes, I do.

10          MR. NORTH:  And then if we could turn to page 19.        02:23:50

11  BY MR. NORTH:

12  Q.   Let me ask you this, Doctor.  What is the standard

13  treatment for pulmonary embolism?

14  A.   Systemic anticoagulation.

15  Q.   And in those patients where anticoagulation is not an       02:24:24

16  option, what is alternative treatments that are available?

17  A.   IVC filtration or an IVC filter.

18  Q.   Tell me some of the specific patient types where you would

19  recommend in your practice using an IVC filter.

20  A.   I mentioned before that we would in the nineties and        02:24:51

21  actually up to about the mid-2000s, one of our patient groups

22  that we placed filters in were those that did not have a

23  documented diagnosis of venous thromboembolism, meaning DVT or

24  PE.  Those are called prophylactic filters.  But more than ten

25  years ago we stopped placing IVC filters in that group for       02:25:16

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1   various reasons.                                                                    02:25:19

2            And so we have restricted our indications to what I

3   call the classic indications for IVC filtration.  And those

4   include patients that have a documented DVT or PE by imaging

5   studies and that have either a contraindication to            02:25:35

6   anticoagulation or been on anticoagulation and then have a

7   complication such as bleeding or those patients that have been

8   treated initially with anticoagulation and then have a failure

9   of anticoagulation, they either have another pulmonary embolism

10  on therapeutic anticoagulation or their DVT extends            02:25:54

11  significantly above where it was even though they were on

12  anticoagulation.

13           So complication, contraindication, or failure of

14  anticoagulation.

15  Q.   Is the inferior vena cava a stable part of the environment  02:26:13

16  in the anatomy?

17  A.   That's sort of a difficult question to answer as far as

18  stability.  It is a thin-walled vascular structure.  It is

19  subjected to intraabdominal pressures more than, say, the

20  thicker walled aorta but it does return blood from the lower    02:26:35

21  body to the heart.  So I don't know if that is what you are

22  referring to.

23  Q.   Has the knowledge of the interventional radiology

24  community concerning the anatomical environment of the dynamics

25  of the inferior vena cava evolved over time?                   02:26:56

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1   A.   It has been an evolution over many decades actually going    02:26:58

2   back to the 1950s up until, you know, recent time periods.   It

3   has been a continuous area of investigation and interest and

4   not only the interventional radiology community but surgery and

5   other specialties as well.   And the knowledge base keeps    02:27:17

6   growing as we learn more information about the inferior vena

7   cava.   So it's like a lot of parts of medicine.   We don't know

8   everything about it and we continue to learn.   It's called the

9   evolution of scientific knowledge.

10  Q.   Over the course of your career and your practice, have you   02:27:35

11  had occasion to measure the pressures within the IVC?

12  A.   Routinely, yes.

13  Q.   And what sort of ranges have you found of pressures in

14  your measurement of IVCs?

15          MR. O'CONNOR:   Objection, Your Honor.   Nondisclosure.   02:27:47

16          THE COURT:   Is that in the report, Mr. North?

17          MR. NORTH:   It's not specific.   It's about his

18  private practice.

19          THE COURT:   Objection sustained.

20  BY MR. NORTH:    02:28:01

21  Q.   Doctor, do you have an opinion to a reasonable degree of

22  medical certainty as to whether inferior vena cava filters are

23  effective in stopping clots?

24  A.   Yes, I do.

25  Q.   And what is that opinion?    02:28:11

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1   A.   That they are very effective in stopping clots in patients    02:28:14

2   that cannot be anticoagulated who do have either a DVT or

3   pulmonary embolism.

4   Q.   And what is your opinion based on?

5   A.   First and foremost, my personal experience and then review    02:28:27

6   of the literature as well as speaking with colleagues that have

7   similar experiences around the country, discussions and

8   scientific colloquia and meetings and all of those types of

9   venues.

10   Q.   Do you also base your opinion on the medical literature?    02:28:49

11   A.   Yes.

12   Q.   In general, how does that help you form your opinion?

13   A.   So that topic is very difficult to investigate as far as

14   high-level scientific evidence, you know, Level 1 or Level 2

15   type studies because it would be unethical to do a randomized    02:29:08

16   controlled trial of IVC filters versus no IVC filters because

17   in patients that have pulmonary embolism because the group that

18   would not receive an IVC filter would be subjected to about a

19   30 percent mortality rate and that would be untenable to

20   perform a study like that.    02:29:31

21        So we have to rely on some other types of data to

22   come to that conclusion.  And the PREPIC 1 study was a study of

23   permanent filters that was published in 1998 that looked at

24   patients with proximal DVT, some of them also had PE but the

25   common denominator was that they had proximal DVT.  They were    02:29:54

CHRISTOPHER S. MORRIS, M.D. - Direct

1   all --

2           THE COURT:  Excuse me, Doctor, just because we're   | 02:29:57

3   staying on a pretty firm schedule.

4           We're going to break, ladies and gentlemen, until

5   2:45.  We'll excuse the jury at this time.   | 02:30:04

6           (Jury departs at 2:30.)

7           (Recess at 2:31; resumed at 2:44.)

8           (Jury enters at 2:44.)

9           (Court was called to order by the courtroom deputy.)

10          THE COURT:  Thank you.  Please be seated.   | 02:45:30

11          You may continue, Mr. North.

12          MR. NORTH:  Thank you, Your Honor.

13  BY MR. NORTH:

14  Q.   Dr. Morris, before the break, I believe you were talking

15  about the PREPIC 1 study.  How many PREPIC studies were there?   | 02:45:40

16  A.   There have been two.

17  Q.   And tell us about the second one if you could.

18  A.   The PREPIC 2 was a study that came out a few years ago

19  that looked at retrievable filters only, specifically one type

20  of a filter called the ALN retrievable filter, and it was done   | 02:45:55

21  a little bit differently than the PREPIC 1 which was only

22  dealing with permanent filters.  PREPIC 2 looked at patients

23  that are pulmonary embolism with several other criteria that

24  they considered selection criteria.  They looked at almost 400

25  patients, randomized them to filter and no filter and all of   | 02:46:20

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1    those patients received anticoagulation just like PREPIC 1.          02:46:24

2          That does not represent the type of patients that we

3    place filters in.  We place filters in patients that can't

4    receive anticoagulation but, as I mentioned before, to do a

5    randomized controlled study of those two types of situations,       02:46:43

6    filter/no filter would be unethical so that's why they had to

7    rely on the study design that they did.

8          The big difference between PREPIC 2 and PREPIC 1,

9    because PREPIC 1 showed decreased pulmonary embolism with the

10   filter group at day 12 and at eight years follow-up compared to     02:47:02

11   the group that did not receive a filter.  So that showed that

12   filters unquestionably, on top of anticoagulation, decrease --

13   the permanent filters decrease the pulmonary embolism rate.

14         In PREPIC 2 they did not look for pulmonary emboli.

15   PREPIC 1 with the permanent filters, they did imaging on all        02:47:25

16   their patients either VQ radionuclide imaging or CT angiography

17   looking for pulmonary emboli.  And in PREPIC 2, they did not

18   perform imaging.  They only looked at symptomatic pulmonary

19   embolism as their outcome.

20         So they did not show a benefit of IVC filters over no        02:47:44

21   IVC filters.  But the study was not designed to look for

22   pulmonary embolism.  That was my main problem with the PREPIC

23   2.

24   Q.   Has there ever been a Level 1 study conducted that

25   compared a group of patients at risk for PE that received a         02:48:02

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1    filter versus a group of patients at risk for PE who received          02:48:06

2    no protection at all?

3    A.    No, because that would be unethical to do.

4    Q.    Have you reviewed additional literature regarding the

5    effectiveness of IVC filters in reducing the number of                02:48:19

6    pulmonary emboli?

7    A.    Yes.

8    Q.    And how would you characterize those studies?

9    A.    Those studies were basically retrospective database

10   studies.   There's probably, you know, close to 10 of them that       02:48:30

11   I reviewed and they invariably showed a benefit of IVC filters

12   versus no filters by showing a decrease in the case fatality

13   rate in the patients that received an IVC filter versus the

14   ones that did not receive an IVC filter.

15   Q.    And are all of those studies that you've reviewed on that        02:48:51

16   topic, the efficacy of filters, published in the medical

17   literature?

18   A.    Yes.

19   Q.    And are those published in peer-reviewed journals?

20   A.    Yes.                                                             02:49:06

21   Q.    Did you prepare a slide that summarizes the filters -- I

22   mean the articles that you have reviewed that talk about the

23   effectiveness of filters?

24   A.    Yes.

25   Q.    Let's look at 7933 if we could.                                  02:49:28

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1        MR. NORTH:  Your Honor, at this time we would like to  02:49:38

2  display 7933.10 as a demonstrative exhibit.

3        MR. O'CONNOR:  Objection, 803(18).

4        THE COURT:  He's not moving it into evidence.  He's

5  using it as a demonstrative to show articles reviewed.  02:49:51

6        MR. O'CONNOR:  But these have statements, summaries

7  from these studies that aren't in evidence, Your Honor.

8        THE COURT:  This does include summaries.  Do you

9  agree?

10        MR. NORTH:  Yes, Your Honor.  02:50:10

11        THE COURT:  I'm going to sustain the objection.

12  BY MR. NORTH:

13  Q.  Let me ask you, do you recall the article by Stein?

14  A.  Yes.

15  Q.  And what did that study basically show?  02:50:16

16  A.  That is basically a retrospective database study of the

17  national inpatient sample which is a big database of

18  hospitalized patients, over 3 million patients, with pulmonary

19  embolism and they showed that basically the patients that

20  received a filter had a lower fatalities rate compared to the  02:50:37

21  patients that did not receive a filter.

22        MR. O'CONNOR:  Objection.  That's hearsay, Your

23  Honor.

24        THE COURT:  What's your response on hearsay?

25        MR. NORTH:  My response is, Your Honor, first of all,  02:50:59

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1    I think he's established the requisite for 803(18).  But,      02:51:03

2    secondly, under 703, I think he is an expert, can talk about

3    the sorts of data that an expert normally would rely upon even

4    if it is hearsay.

5            THE COURT:  Well, you have to satisfy the last           02:51:36

6    sentence of 703 in order to disclose the evidence to the jury

7    that it was relied upon.

8            MR. NORTH:  May I try to set a foundation, Your

9    Honor.

10           THE COURT:  Yes.                                         02:51:52

11   BY MR. NORTH:

12   Q.   Dr. Morris, as a part of your review and reliance or

13   your -- reaching your opinion on the efficacy of filters, do

14   you rely on medical literature that discusses various studies?

15   A.   That's one component, yes.                                 02:52:08

16   Q.   Do you believe that those studies provide assistance in

17   evaluating your opinion and why you believe filters to be

18   defective?

19   A.   Yes.

20   Q.   What other sources of information do you rely on to reach  02:52:26

21   your conclusions about effectiveness?

22   A.   My personal experience, first and foremost, and then the

23   data presented at national meetings, discussions with

24   colleagues, teaching medical students, residents and fellows

25   all about inferior vena cava filters and -- but primarily I    02:52:50

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

 1  rely on my personal experience which is pretty extensive.                           02:52:58

 2  Q.  Well, let me ask you this:  In your field of medicine do

 3  practitioners generally rely upon medical literature as a

 4  significant basis in making determinations as to what will be

 5  effective in treating their patients?                                               02:53:13

 6  A.   It's a major component, yes.

 7          MR. NORTH:  Your Honor, at this time we would ask

 8  that he be permitted to testify.

 9          MR. O'CONNOR:  Still going to embrace -- it's still

10  going to involve hearsay, Your Honor.                                               02:53:29

11          THE COURT:  All right.  Come up for a minute if you

12  would, please.

13          Feel free to stand up.

14          (At sidebar 2:53.)

15          THE COURT:  Mr. O'Connor, under 703 it can be                               02:53:46

16  hearsay.  It can come in.  It doesn't need to be admissible to

17  come in under 703.

18          MR. O'CONNOR:  I just saw it.

19          THE COURT:  It says they need not be admissible for

20  the opinion to be admitted and if the facts or data would                          02:54:03

21  otherwise be inadmissible -- so if it's hearsay, for example --

22  the proponent of the opinion may disclose them to the jury only

23  if their probative value in helping the jury evaluate the

24  opinion substantially outweighs their prejudicial effect.

25          MR. O'CONNOR:  He still has to satisfy 803(18).                             02:54:20

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1          THE COURT:  No, he doesn't.                          02:54:24

2          MR. O'CONNOR:  He can't just come in and summarize an

3   out-of-court statement.

4          THE COURT:  He can under 703.  That's what 703 says.

5          MR. O'CONNOR:  I don't read it that way.            02:54:33

6          THE COURT:  The last sentence says:  If the facts or

7   data would otherwise be inadmissible, for example, if it's

8   hearsay, it can still be disclosed if their probative value in

9   helping the jury evaluate the opinion substantially outweighs

10  their prejudicial effect.                                  02:54:51

11         It's well-established that hearsay can come in under

12  that sentence so the question is, do you think that sentence is

13  not satisfied?

14         MR. O'CONNOR:  I don't think that sentence is

15  satisfied because I still think that you cannot overcome or go  02:55:01

16  around this rule that he can come in here and summarize for the

17  jury and now they want to publish his summary statements to the

18  jury.

19         THE COURT:  No.  He wants to just ask the questions.

20  He's not talking about publishing it.                      02:55:17

21         MR. O'CONNOR:  Okay.

22         THE COURT:  I agreed with you on the publishing.

23         MR. O'CONNOR:  Look it, I understand your point about

24  that rule.  It's just that I think at some point we're going to

25  get into a problem with what he wants to tell the jury about  02:55:28

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1   the articles.  That's a different story.  It's one thing to                    02:55:31

2   say, "I reviewed a number of articles.  This is the name of the

3   articles and they support my opinion."  But it's another thing

4   to go in and start restating what the articles are and

5   publishing them to the jury.                                                   02:55:44

6          THE COURT:  Well, there will be no publishing.

7          Okay.  My ruling based on this exchange is that under

8   the last sentence of 703, the facts and the data, meaning the

9   summaries of the studies, would help the jury evaluate this

10  expert's opinion and I guess I need to hear you explain,                       02:56:02

11  Mr. North, if that is satisfied, why that probative value

12  substantially outweighs the prejudicial effect of his sharing

13  this information with the jury.  It's the reverse 403.

14         MR. NORTH:  Exactly.  First of all, Your Honor, I'm

15  not sure that there is a prejudicial effect.  Juries hear all                  02:56:27

16  the time and have throughout this trial about learned treatises

17  and the content of articles.  That is not a prejudicial sort of

18  thing.  So to understand why he reaches the opinion as to the

19  effectiveness of filters, I think it's highly probative for the

20  jury to -- all they have heard about are those two PREPIC                      02:56:51

21  articles so far -- to hear about the other articles there.  So

22  it's got a great deal of probative value and I am having a hard

23  time in the course of this trial or any trial about scientific

24  evidence seeing how it's prejudicial.

25         The other point I would make, Your Honor, is I                          02:57:06

CHRISTOPHER S. MORRIS, M.D. - Direct

 1  believe that he has established, or I certainly could establish    02:57:08

 2  it if you don't think so with a couple more questions, that

 3  each of these articles are learned treatises anyway.

 4      THE COURT:  Well, even if you did that, all that

 5  would allow you to do is read portions of them or have him do    02:57:19

 6  so to the jury.  That's not what you're asking me to do.

 7  You're asking him to summarize the whole study I believe.

 8      But do you have any argument on the probative value

 9  versus the prejudicial effect, Mr. O'Connor?

10      MR. O'CONNOR:  Well, I mean, you pointed out the rule    02:57:37

11  where obviously, I mean, I can't object to that.  So I

12  understand your ruling on that.

13      My concern is when they start trying to publish

14  things and then I'm having to stand up and object at that

15  point.    02:57:54

16      THE COURT:  By publish, do you mean answer questions

17  or do you mean put visuals up?

18      MR. O'CONNOR:  Both.  If he starts narrating what

19  these out of court statements say, I don't think that's

20  appropriate.    02:58:04

21      THE COURT:  If you think its inappropriate, by all

22  means, object.  But my conclusion is that the probative value

23  in helping the jury evaluate this expert opinion, substantially

24  outweighs the prejudicial effect of summarizing the studies.

25  And so under Rule 703 you can do that, Mr. North.    02:58:17

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1          Subject to any objections you have, Mr. O'Connor.                    02:58:21

2          MR. O'CONNOR:  While we're here, just one moment.

3   Earlier you overruled an objection.  This report that this

4   expert gave us also included areas where he responded to

5   experts and they never came here to testify.  The opinions were  02:58:34

6   in rebuttal to experts that have not put opinions --

7          THE COURT:  I agree with that.  But my conclusion was

8   his opinion was clearly disclosed because he said "my opinion"

9   right here.  I think it's the third sentence.  "My opinion that

10  Bard retrievable filters are safe and effective," and he          02:58:58

11  explains it.

12          So he disclosed that opinion.

13          MR. O'CONNOR:  I saw that.  I'm just concerned about

14  other areas coming in that we didn't have anybody to come in

15  and testify to a point that now he's going to be allowed to       02:59:10

16  rebut here today.

17          THE COURT:  Well, he certainly shouldn't be saying I

18  disagree with the opinion of so-and-so if so-and-so hasn't

19  testified.  I agree with you.

20          MR. O'CONNOR:  But if it hadn't come into issue, it        02:59:20

21  doesn't seem to me it would be relevant.

22          THE COURT:  Well, but this opinion was disclosed.

23  That's my point.

24          MR. O'CONNOR:  I reread it.  I understood your point

25  on that.  But I am concerned about other areas.                   02:59:33

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1        THE COURT:  Object if they come up.                          02:59:35

2        MR. O'CONNOR:  All right.

3        (End of sidebar discussion.)

4        THE COURT:  Thank you, ladies and gentlemen.

5   BY MR. NORTH:                                                     02:59:54

6   Q.   Why don't you just tell us briefly, Dr. Morris, what some

7   of the other studies are that you relied upon in forming your

8   opinion regarding the effectiveness of filters in preventing

9   pulmonary embolism?

10  A.   Well, these studies are essentially retrospective database  03:00:09

11  studies.  Dr. Stein has performed a number of these over the

12  years but the earlier one that I relied upon is

13  Dr. Greenfield's studies from 1997 where he looked at

14  in-hospital deaths in a large patient sample and found that the

15  patients that did not receive a filter had a 44 percent death   03:00:37

16  rate and those that did receive a filter had an 18 percent

17  death rate.

18       Another one was published in 2010 by Spencer and that

19  group found that the three-year PE rate with patients that had

20  a filter was only 1.7 percent whereas those that didn't receive 03:01:00

21  a filter was 5.3 percent.  There are lots of others similar

22  studies that basically all show that filters have either a

23  lower PE rate compared to patients without filters or they have

24  a lower case fatality rates than patients that did not receive

25  a filter.                                                        03:01:23

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1   Q.   Now, you have told us that another basis of your opinion          03:01:24

2   is your personal experience with filters.  How has that

3   impacted your opinion regarding the effectiveness of filters?

4   A.   Well, as of this year, you know, going back to 1991 when I

5   started at University of Vermont, we placed around 2000 filters       03:01:45

6   just in general and I cannot remember any case of a PE-related

7   death after placing an IVC filter.

8           MR. O'CONNOR:  Objection, Your Honor.  This has not

9   been disclosed.

10          THE COURT:  Is that in his report, Mr. North?                  03:02:06

11          MR. NORTH:  Your Honor, I believe it is.

12          Your Honor, not that specific instance but he talks

13  about the filters in his practice being successful.

14          THE COURT:  Can I see that, please.

15          MR. NORTH:  I'm sorry?                                         03:03:07

16          THE COURT:  Could I see that, please.

17          MR. NORTH:  About the fourth line down.  Again, in

18  the second paragraph under Dr. Vogelzang, about the fourth line

19  down he mentioned our experience.

20          MR. O'CONNOR:  What page?                                      03:03:27

21          THE COURT:  Page 21.

22          I'm going to sustain the objection.  The facts that

23  you just shared are not in the report so the jury should

24  disregard the last answer.

25  \\\

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

BY MR. NORTH:                                                      03:03:59

Q.   Doctor, out of the 2000 or so filters that your group has

implanted, can you tell us approximately how many you have

implanted?

A.   I estimate that I've implanted -- throughout my career,      03:04:09

I've implanted about 800 IVC filters.

Q.   Let's talk about some of the filters that you've implanted

over the years.  What was the first filter that you implanted?

A.   The Greenfield filter.

Q.   Well, what was the original predecessor on the market        03:04:28

before the Greenfield?

A.   It was called the Mobin-Uddin Umbrella.  They didn't even

really refer to it as a filter at that time.  But it was

basically developed in 1967 and it was available for use in

1970.  It was a surgically placed device that functioned just    03:04:43

like modern day filters except that it had a pretty high

complication rate, more than a 50 percent IVC thrombosis or

occlusion rate.

      So it was eventually displaced by the Greenfield

filter which was a new concept, a new design, a conical filter   03:05:04

that would -- I'm sorry.

Q.   I'm sorry.  If I could, could we display 7933.0004.  Was

the Mobin-Uddin -- how do you say that?

A.   Uddin.

Q.   -- Uddin Umbrella the first filter of which you were         03:05:29

CHRISTOPHER S. MORRIS, M.D. - Direct

1   familiar?                                                        03:05:31

2   A.   I was familiar with it but by the time I started into

3   radiology, it was replaced by the Greenfield filter.

4   Dr. Mobin-Uddin was a surgeon at Ohio State and -- although he

5   developed the filter I think at Florida when he was there.  But   03:05:46

6   we saw a lot of patients that had the Mobin-Uddin filter in

7   place.  And so we did imaging on those patients as well as

8   other types of procedures on them because there were a large

9   number of those at Ohio State when I was a resident there.

10          MR. NORTH:  Your Honor, at this time we would like to     03:06:05

11   display as a demonstrative 7933.4.

12          MR. O'CONNOR:  Objection.  Irrelevant and these

13   photographs are nowhere in his report or a discussion about

14   these photographs.

15          MR. NORTH:  Your Honor, the photograph.                   03:06:21

16          THE COURT:  Is the illustration in the report?

17          MR. NORTH:  The illustration is not.  There's a long

18   narrative discussion of all of these filters.

19          THE COURT:  Objection is sustained on displaying it.

20   BY MR. NORTH:                                                    03:06:39

21   Q.   Tell us about the Greenfield filter.

22   A.   So the Greenfield filter was the first conical device that

23   was designed to trap, it was designed to counteract the high

24   thrombosis rate of the Mobin-Uddin filter because it would

25   allow a fair amount of clots to fill up the filter in a          03:06:54

CHRISTOPHER S. MORRIS, M.D. - Direct

1    longitudinal fashion and then maintain patency of blood flow       03:06:58

2    around that clot because the clot would be extended into the

3    cone part.

4              And so the outside of the clot was still moving

5    blood.  So it was shown to have a much higher IVC patency rate      03:07:14

6    or a much lower thrombosis rate of five percent or less which

7    was a major improvement over the Mobin-Uddin.

8    Q.   Was there a difference in how the Greenfield filter could

9    be implanted versus the Mobin-Uddin?

10   A.   It first started out as a surgically placed filter,           03:07:33

11   meaning the groin access into the vein needed a surgical

12   cut-down because it was a very large delivery device; but

13   interventional radiologists soon developed a percutaneous

14   technique to place this large delivery device directly into the

15   vein without using a scalpel so they would use a needle and        03:07:52

16   guidewire system to get the filter in.

17             And Ohio State was one of the institutions that

18   developed that technique and they would argue that they were

19   the first and that Brown University sort of stole their idea

20   and published like six months or a year before they did.  But      03:08:05

21   they both basically were working on that technique together at

22   the same time.

23   Q.   Did you implant Greenfield filters yourself as a part of

24   your practice?

25   A.   Yes.                                                          03:08:16

CHRISTOPHER S. MORRIS, M.D. - Direct

1    Q.    And then after the introduction of the Greenfield, were          03:08:18

2    there a number of other permanent filters introduced to the

3    market?

4    A.    There certainly were, yes.

5    Q.    And can you tell us what the they were?                          03:08:30

6    A.    The probably the next one was a Cook Bird's Nest Filter

7    which was another totally different design.  It was four very

8    long monofilament steel filaments that sort of wrapped up into

9    a ball in the inferior vena cava, looked like a Bird's Nest.

10   That's why they called the Bird's Nest Filter.                        03:08:50

11        The other was the VenaTech which came out of France

12   which was a conical design.  And then right around the same

13   time, late eighties, the Simon Nitinol was marketed.

14   Q.    Now, did you ever in your personal practice implant any of

15   those filters?                                                         03:09:05

16   A.    All of them, yes.

17   Q.    And what was the first retrievable filter that you recall

18   being introduced to the market?

19   A.    The Cook Tulip filter.

20   Q.    And when was that introduced?                                    03:09:20

21   A.    That was used in Europe for quite a while and then it made

22   its way to the United States in -- I want to say the 2001, 2002

23   time frame.

24   Q.    Were there any limitations on the Cook Tulip filter as far

25   as how long it could remain implanted before being removed?          03:09:35

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1          MR. O'CONNOR:  Objection.  Nondisclosure.                    03:09:41

2          THE COURT:  Okay.  I've actually got a copy of the

3    report.  Just tell me where it is, Mr. North.

4          MR. NORTH:  Your Honor, page three.

5          THE COURT:  Okay.  Can you point me to where it talks    03:10:00

6    about how long the Cook could be implanted?

7          MR. NORTH:  I'm sorry, Your Honor.  I'm not seeing a

8    reference -- and I apologize -- to the specific Cook Tulip

9    filter.  There's virtually every other one.  Woah.  Woah.

10   Woah.  At the bottom paragraph.                                 03:10:13

11         THE COURT:  The objection is overruled based on the

12   paragraph at the bottom of page three.

13         MR. NORTH:  Thank you, Your Honor.

14   BY MR. NORTH:

15   Q.   So what were the limitations on the implant of the Cook   03:10:36

16   Tulip filter?

17   A.   The Cook Tulip filter was a good filter but we believed,

18   as well as all of the interventional radiologists in the

19   country, that it could only stay in place for anywhere between

20   14 days and 21 days.                                           03:10:51

21         MR. O'CONNOR:  Excuse me, Your Honor.  I object to

22   this witness testifying what every interventional radiologist

23   in the country thought.  Lack of foundation and hearsay.

24         THE COURT:  Overruled.

25   \\\

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

03:11:04

1    BY MR. NORTH:

2    Q.    You may continue.

3    A.    It was common practice to leave it in place 14 to 21 days

4    if it was to be used as a retrievable filter and then we had to

5    make a decision whether we were going to take that filter out    03:11:15

6    after 14 or 21 days.  Most of these patients were not in any

7    condition to have their filter retrieved at that time, so we

8    would have to repeatedly do repositioning procedures which

9    would basically mean we would have to essentially remove the

10   filter but not actually take it out of the patient, move it up    03:11:32

11   a centimeter or down a centimeter and redeploy it to form a new

12   attachment site.  And then that cycle would continue repeatedly

13   sometimes up to six months, so we would to bring these patients

14   down, expose them to radiation, perform angiography, inferior

15   vena cavography, which is x-ray exposure, and do an invasive     03:11:51

16   procedure under sedation multiple time.

17          Some of these trauma patients needed their filters in

18   for quite a long time during their convalescence period.  So it

19   became very onerous and, quite frankly, dangerous to keep doing

20   that to these patients.                                           03:12:09

21   Q.    And was it soon after that the Recovery filter for Bard

22   was introduced to the market?

23   A.    Yes, it was.

24   Q.    And did you implant the Recovery filter?

25   A.    Yes, we did.                                                03:12:20

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1    Q.    And what was the reaction among the interventional          03:12:21

2    radiology community to the introduction of the Recovery filter

3    and then soon afterward other retrievable filters?

4    A.    Very favorable, at least for the Recovery filter.  It was

5    introduced right around the same time as the OptEase filter,      03:12:37

6    which was also a retrievable filter, and the Recovery filter

7    was unique in that it was shown to be able to remain in place

8    for much longer periods of time.  We believed initially up to

9    six months and soon after reports were coming out that it could

10   be retrieved after a year or longer and so that filter did not   03:12:56

11   need those repositioning procedures performed on it before it

12   could be removed.

13   Q.    Are you familiar with the Bard G2 filter?

14   A.    Yes.

15   Q.    Is the Bard G2 filter a filter that can be retrieved?       03:13:38

16   A.    It can be retrieved, yes.

17   Q.    Did you use the G2 filter in your personal practice?

18   A.    Yes.

19   Q.    Can you estimate how many G2 filters you placed over the

20   years?                                                            03:13:55

21   A.    Personally, I placed somewhere between 100 and 200 G2

22   filters.  It was of all the Bard retrievable filters, it was --

23   it was the one that we placed more of than any other

24   iterations.

25              MR. NORTH:  If we could bring up 7833, please.         03:14:14

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1    BY MR. NORTH:                                                          03:14:22

2    Q.   Do you recognize this photograph, Doctor?

3    A.   Yes.

4    Q.   And what is this?

5    A.   This is a Bard Georgia filter?                                    03:14:25

6    Q.   And --

7           MR. NORTH:  Your Honor, at this time could we display

8    this to the jury as a demonstrative exhibit?

9           THE COURT:  Any objection?

10          MR. O'CONNOR:  No objection.                                    03:14:36

11          THE COURT:  You may.

12   BY MR. NORTH:

13   Q.   Doctor, would you briefly explain to the jury how the G2

14   filter works?

15   A.   Certainly.                                                        03:14:45

16          THE WITNESS:  May I use a laser pointer on the wall

17   over there?

18          THE COURT:  Yes.

19          THE WITNESS:  If it works.

20          THE COURT:  If it burns the wall, you have to --               03:14:52

21          THE WITNESS:  So this first version of the G2 filter

22   had what's called a nose cone.  I'm sorry, it had a nose and

23   off the nose were six arms.  These are the short ones and there

24   were also six legs and this is known as a two-tier filtration

25   device or conical filter.                                              03:15:17

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1          So that a clot would meet that came out of the leg          03:15:20

2    veins, an embolus would meet two lawyers of filtration.  If it

3    by any chance got through the leg cone, it would still have to

4    get through the arm cone up here where it wouldn't continue on

5    to the lungs and cause a pulmonary embolism.  So just like its          03:15:37

6    predecessor, the Simon Nitinol filter, it was a two-tiered or

7    dual layer conical filter and that's how it worked.

8    BY MR. NORTH:

9    Q.    Are there advantages from your view as an interventional

10   radiologist to the two-tier filtering approach of the G2          03:15:55

11   filter?

12   A.    I believe so, yes.

13   Q.    And what are those?

14   A.    Well, I think there's two chances for the filter to catch

15   the clot not just one chance.          03:16:06

16   Q.    And how does that differ from the Greenfield filter?

17   A.    The Greenfield filter was only a one-tier filter.  If a

18   clot passed through the six legs of that Greenfield filter,

19   there was nothing else stopping it.  It would continue on

20   sailing to the lungs and causing a pulmonary embolism.          03:16:27

21   Q.    Can you briefly describe how the G2 filter is implanted

22   into a patient?

23   A.    Certainly.  We can use either the neck or the jugular vein

24   approach or the femoral vein or the groin approach.  The

25   patient is usually sedated although sometimes we do it without          03:16:44

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1    sedation and it's often an outpatient procedure and we stick a          03:16:47

2    needle into the vein using ultrasound guidance.  Through that

3    needle -- it's called a Seldinger technique -- we advance a

4    wire into the inferior vena cava, which is the big vein in the

5    abdomen, over that wire.  Then we can take the needle out and           03:17:02

6    then slide in a catheter, which is like a pigtail catheter with

7    multiple side holes, and we can advance that into the lower

8    inferior vena cava and then take what's called an inferior vena

9    cava gram picture by injecting x-ray dye or the contrast media,

10   iodinated, which allows the x-rays to show up the lumen of the          03:17:18

11   inferior vena cava.

12          The main reason we're doing that is to look at the

13   diameter of the inferior vena cava, make sure it's the right

14   size and also to localize the level of the renal veins because

15   the ideal position of the filter is to deploy it just below the        03:17:31

16   level of the renal veins.

17          Once we have localized those, we can use that as a

18   roadmap image.  And then over that same wire, we push it back

19   in through the catheter, remove that catheter and then slide up

20   the introducer sheath.  And I'm describing this from a groin            03:17:47

21   approach but it's just reverse from the neck approach.

22          The introducer sheath is a larger tube that will

23   allow then the IVC filter, which is constrained, elongated and

24   very narrowed and calibered, to be pushed through that sheath.

25   We put that nose that we're seeing, that the leading edge of            03:18:07

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1    that filter just below the level of the renal veins and then          03:18:12

2    slowly uncover the filter by pulling the sheath back and that

3    allows those legs and the arms to spring out and attach to the

4    wall of the inferior vena cava and stabilize it in position at

5    that point.                                                           03:18:31

6    Q.   And in your practice, how long does this procedure

7    generally take?

8    A.   It can take me as little as eight to ten minutes or, in

9    challenging anatomy, it can be 30 to even 60 minutes but I'm

10   average anywhere from about ten to 20 minutes.                       03:18:45

11   Q.   Is the patient sedated?

12   A.   Usually sedated yes.  Usually sedated although we have

13   done them with just local lidocaine anesthesia.

14   Q.   If the only procedure a patient is having that day is a

15   placement of inferior vena cava filter, is it usually necessary      03:19:03

16   to be hospitalized that night?

17   A.   No.

18   Q.   When the G2 was first cleared by the FDA -- do you recall

19   that?

20   A.   Yes.                                                            03:19:18

21   Q.   -- what was the indication that it was cleared for

22   initially?

23   A.   As a permanent filter.

24   Q.   Even though it was cleared only as a permanent filter, did

25   interventional radiologists use it as a retrievable filter?          03:19:26

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1    A.    Routinely, yes.                                           03:19:30

2    Q.    If a doctor implanted the G2 filter when it was only

3    cleared for permanent use but with the intention of retrieving

4    it later, would that have been an acceptable medical practice?

5            MR. O'CONNOR:  Objection.  Nondisclosure.              03:19:46

6            THE COURT:  Can you show me where that is, Mr. North?

7            MR. NORTH:  Yes, Your Honor.

8            I'm sorry, Your Honor.  I can't find it right now.

9            THE COURT:  All right.  The objection is sustained.

10   BY MR. NORTH:                                                  03:20:25

11   Q.    Doctor, I wanted to discuss the removal of a retrievable

12   inferior vena cava.  When should a doctor generally consider

13   removing one?

14   A.    When continued IVC filtration is no longer indicated?

15           And that often is the same time when the patient can   03:20:40

16   be placed back or onto anticoagulation for the first time.

17   Q.    And what factors do doctors consider when deciding whether

18   to remove an inferior vena cava filter?

19   A.    Well, whether or not they can be treated with

20   anticoagulation or whether the duration of treatment has        03:20:58

21   expired.  And by that I mean most doctors will treat a DVT or a

22   pulmonary embolism for three months, sometimes up to six months

23   with anticoagulation and then stop anticoagulation because they

24   believe at that point the clot has stabilized.

25           And so if the patient has an ongoing contraindication   03:21:19

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1    to anticoagulation and that three-month period or six-month          03:21:22
2    period as expired, then many doctors will say it's time to
3    remove that filter.
4    Q.    What are the main reasons for not retrieving an inferior
5    vena cava filter?                                                    03:21:45
6    A.    There are multifold.  One of the more common reasons cited
7    in the literature is the indication for permanent filtration
8    which I don't necessarily agree with because I think the
9    indications for permanent IVC filters in this day and age are
10   very small.  But some doctors still believe there is a --            03:22:01
11           MR. O'CONNOR:  This opinion hadn't been disclosed.
12           MR. NORTH:  Your Honor, page six, paragraph one.
13           MR. O'CONNOR:  Your Honor, objection, irrelevant.  If
14   you look at the title of that section, it's not an issue in
15   this case.                                                           03:22:44
16           THE COURT:  Well, the question is whether this answer
17   was disclosed, not whether the title in the report is relevant.
18           The paragraph you referred me to, Mr. North, is about
19   when they should be removed.  The question is about when they
20   should not be removed.                                               03:23:19
21           MR. NORTH:  Turning back over to page five at the
22   bottom of the page mentioning ongoing indications.
23           THE COURT:  But it doesn't describe anything you've
24   called for.
25           MR. NORTH:  And then in the middle of the first              03:23:56

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1    paragraph on page six where it says:  The initial decision on                03:23:57

2    whether or not to remove an IVCF is individualized and made

3    solely on clinical parameters.

4              THE COURT:  That still doesn't describe the kinds of

5    information called for by your question which are what are the              03:24:09

6    various reason for not disclosing it, so I'm going to sustain

7    the objection.

8              MR. NORTH:  Thank you, Your Honor.

9    BY MR. NORTH:

10   Q.   Doctor, have you at your hospital instituted a program for            03:24:23

11   patients with retrievable IVC filters?

12             MR. O'CONNOR:  Objection.  Irrelevant.

13             THE COURT:  Overruled.

14             THE WITNESS:  Yes, we have.

15   BY MR. NORTH:                                                              03:24:34

16   Q.   And what sort of program is that?

17   A.   We since 2006 have begun a multidisciplinary IVC filter

18   follow-up program that is performed in collaboration with our

19   hematology experts who are world-renowned thrombosis experts in

20   addition to our trauma surgeons because they used to place some            03:24:54

21   filters.  They don't really now but they started that program

22   with us.  And then of course interventional radiology and we --

23   that was the basis of the paper that we published last year,

24   our five-year experience early on with that filter follow-up

25   program.                                                                   03:25:15

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1   Q.   Have you seen over the course of your career an evolution          03:25:16

2   in the approaches that the community of interventional

3   radiologists take with regard to monitoring of patients?

4   A.   Yes.   Early on a lot of patients were lost to follow-up.

5   That was another reason why we weren't removing many of these           03:25:36

6   filters.   That was, again, multi-- the reasons were multifold.

7   Interventional radiology trauma surgery, the implanters were

8   often not very diligent in getting these patients back to

9   clinics to follow them up including the primary care physicians

10  as well.                                                                03:26:00

11           MR. O'CONNOR:  Well, Your Honor, this line of

12  testimony is irrelevant because this is not an issue in this

13  case.

14           THE COURT:  Overruled.

15           THE WITNESS:  And -- you are losing my train of                03:26:10

16  thought a little bit.

17  BY MR. NORTH:

18  Q.   Let me ask.   Let's change gears a little bit.   We've

19  talked lot about your opinions on benefits of filters.   Let's

20  talk some about the risks of complications.   Are there risks or        03:26:21

21  complications associated with all IVC filters?

22  A.   Yes.

23  Q.   In the course of your practice, have you ever seen a

24  perfect filter that had no complications?

25  A.   No, because it doesn't exist.                                      03:26:34

United States District Court

2086
CHRISTOPHER S. MORRIS, M.D. - Direct

1   Q.   Have you used virtually all the filters on the market over      03:26:38

2   the years?

3   A.   Not all of them.  The notable filters I've not used is the

4   ALN and the Option filter.  Most of the others I have used,

5   yes.                                                                  03:26:48

6   Q.   Do the complications you have seen that you've also seen

7   reported in the literature occur with both permanent and

8   retrievable filters?

9   A.   Yes.

10  Q.   Is it difficult to compare the complication rates in your       03:27:05

11  opinion between permanent and retrievable filters?

12  A.   Yes, very difficult.

13  Q.   Why is that?

14  A.   Well, because a head-to-head trial, a randomized

15  controlled trial, would be very difficult to perform.  Not           03:27:18

16  impossible but it has never been performed, to my knowledge.

17  There's an ongoing prospective registry called the Preserve

18  Trial that is going on but a head-to-head randomized controlled

19  trial is very expensive, time-intensive and difficult to

20  perform.                                                             03:27:41

21  Q.   In your clinical practice, have you ever implanted a Simon

22  Nitinol filter?

23  A.   Yes.

24  Q.   And what was your experience with that filter?

25  A.   We thought it had a role but it was not our favorite           03:27:51

CHRISTOPHER S. MORRIS, M.D. - Direct

1    filter.  We thought it had a fair amount of complications                  03:27:54

2    associated with it.  The one reason we did like it is because

3    it was very low profile.  We could place it through an arm

4    vein.  It was that small so patients that didn't have any

5    access -- say both their femoral veins may have been clotted        03:28:06

6    off so we couldn't go from a groin access and maybe their --

7    they had central lines in their jugular veins so we couldn't

8    use that as an access.  So we could place it in through an arm

9    vein but it was fraught with some problems.

10   Q.    What sort of complications did you see in your practice        03:28:23

11   with a Simon Nitinol filter?

12               MR. O'CONNOR:  Nondisclosure, Your Honor.

13               THE COURT:  Where is this, Mr. North?

14               MR. NORTH:  Your Honor, let me get you a copy of the

15   deposition.  Beginning at the bottom of page 150 going through      03:28:33

16   153 he is asked his opinions and experience.

17               THE COURT:  The objection is overruled.  What he's

18   just testified to is covered in the deposition.

19   BY MR. NORTH:

20   Q.    I believe my question, Dr. Morris, was what sort of           03:29:47

21   complications did you see with the Simon Nitinol filter in your

22   practice?

23   A.    Well, the biggest complication we saw was that the Simon

24   Nitinol filter had a tendency to deform itself so it might be

25   the equivalent of tilt in a conical type filter.  The daisy --      03:30:00

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1   I don't know if everyone knows what the Simon Nitinol filter                03:30:07
2   looks like but it has -- it's a two-level filter also with a
3   daisy wheel up on top made of loops of Nitinol material and
4   below that is a conical filter.  That daisy wheel would tend to
5   involute or deform and turn in on itself and cause basically a              03:30:26
6   metallic obstruction of the IVC.  And we found that there were
7   quite a few IVC thromboses and occlusions with that filter as
8   did some studies in the literature.  We also saw quite a few
9   perforations of the leg, I mean, major perforations, Grade 3
10  perforations of the struts of the filter.  So it was not our               03:30:53
11  favorite filter.
12  Q.   What is an occlusion of the IVC or thrombosis of the IVC?
13  A.   That is when the -- then when clot is formed or blocks up
14  the IVC and impedes blood flow so blood cannot return to the
15  heart from the leg veins and that may or may not be a major                03:31:15
16  problem for the patients.  Some patients never even know that
17  happens but many of them are symptomatic from that.  They
18  develop leg swelling.  Sometimes it can be life-threatening.
19  It's called phlegmasia cerulea dolens is the name for the
20  life-threatening term for that.  But it can be a major problem             03:31:37
21  and certainly a source of long-term morbidity and misery for
22  the patient.
23  Q.   Are you aware of medical literature that has examined
24  these complications with the Simon Nitinol filter?
25  A.   Yes.                                                                  03:31:56

United States District Court

2089
CHRISTOPHER S. MORRIS, M.D. - Direct

1            MR. NORTH:  If we could bring up 7226, please.                    03:31:57

2   BY MR. NORTH:

3   Q.    And if you could identify for the record what this is.

4   A.    This is a study first author named Poletti which is termed

5   "The Long-term Results of the Simon Nitinol Inferior Vena Cava              03:32:12

6   Filter."

7   Q.    And where was this study published?

8   A.    This was published I believe in "Cardiovascular Radiology"

9   which is the big interventional radiology journal of Europe

10  equivalent to our journal called the JVIR.                                  03:32:28

11  Q.    Are you familiar with that journal?

12  A.    Yes.

13  Q.    Do you consider it a reliable source for medical

14  discussion and articles?

15  A.    Yes.  I have published in it myself.                                  03:32:37

16  Q.    Is it a peer-reviewed journal?

17  A.    Yes.

18  Q.    What was your understanding of the basic design of the

19  Poletti study?

20  A.    It was a prospective study.  They looked at 114 patients             03:32:57

21  that received the Simon Nitinol filter.  Many of those patients

22  during their study period died because filters are placed into

23  very sick patients.  They ended up with only 38 patients that

24  they investigated and they investigated those 38 patients at

25  almost a three-month -- a three-year time frame so it was                   03:33:18

CHRISTOPHER S. MORRIS, M.D. - Direct

1    almost a three-year follow-up.                              03:33:22

2    Q.   What's unusual about that, a three-year follow-up?

3    A.   A lot of IVC filter studies do not have direct image

4    investigation of complications of the filter longer than six

5    months to a year.  So that's somewhat unusual.              03:33:37

6         And these 38 patients all received a battery of

7    imaging tests, including an ultrasound called a duplex

8    ultrasound, that looked at whether or not the inferior vena

9    cava IVC was open or clotted off.  They also received an

10   abdominal x-ray and that looked for fractures and other types  03:33:55

11   of complications, what they called eccentric positioning.  And

12   then the third set they all received was a CAT scan so they

13   compiled all the complication data of those 38 patients based

14   on those three studies.

15        MR. NORTH:  If we could turn to page 291 of the        03:34:16

16   article, Table 2.

17   BY MR. NORTH:

18   Q.   Did the authors report their findings regarding

19   complications with the Simon Nitinol filter?

20   A.   Yes, they did.                                         03:34:46

21   Q.   And what number of patients or percentage of the patients

22   did they find IVC perforation in?

23   A.   95 percent.

24        THE COURT:  Hold on just a minute.

25        MR. O'CONNOR:  Objection.  Hearsay, Your Honor.        03:34:57

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1          THE COURT:  Overruled under 803(18).                    03:34:59

2          THE WITNESS:  95 percent and 76 percent of those have

3   what we called Grade 3 perforations meaning the perforated

4   strut was interacting with a structure outside the inferior

5   vena cava.                                                      03:35:14

6   BY MR. NORTH:

7   Q.   And how many -- what total percentage of the Simon Nitinol

8   filters were perforating?

9   A.   95 percent.

10  Q.   What percentage of the Simon Nitinol filter in this       03:35:26

11  particular study had evidence of strut fracture?

12  A.   16 percent and that is of the legs, not the daisy wheels,

13  so 16 percent were fractured legs of the Simon Nitinol filter

14  which those are the dangerous types of fractures because those

15  may or may not be stable.  But the daisy wheel fracture is --   03:35:49

16  because it's a loop, it's still attached to the filter so it's

17  not going to embolize; but if the leg fractures, it can

18  embolize.

19  Q.   Of the 38 patients that were examined, however, with these

20  complications, did these patients have symptoms with these     03:36:07

21  perforations or fractures?

22  A.   Remarkably they did not have symptoms.

23  Q.   We've talked about known risks.  Is perforation or

24  penetration into other organs a known risk of all inferior vena

25  cava filters?                                                   03:36:37

CHRISTOPHER S. MORRIS, M.D. - Direct

1  A.   Yes.                                                          03:36:39

2  Q.   And is tilt a known risk of all filters?

3  A.   Yes.  Well, I should say all conical filters.  Some

4  filters are designed so they are really difficult to tilt.  For

5  instance, the TRAPEASE and the OptEase, because of their unique   03:36:53

6  design, they really can't tilt although I have seen them

7  somehow end up sideways.  That's a very, very rare event in the

8  vena cava.

9  Q.   Were perforation, tilt, migration, and fracture all known

10 risks in the interventional radiology community in June of       03:37:10

11 2007?

12 A.   Yes.

13 Q.   And as a part of your practice over the years, have you

14 kept abreast of the medical literature and studies related to

15 IVC filters?                                                      03:37:21

16 A.   Yes.

17 Q.   And have you seen these various risks associated with the

18 filters discussed and reflected in the medical literature over

19 the years?

20 A.   Yes.                                                          03:37:36

21 Q.   Over the years have you discussed these risks associated

22 with IVC filters with your interventional radiology colleagues?

23 A.   At various times and at various venues.  We have periodic

24 sessions called journal clubs, where we review and critically

25 analyze studies and we have other types of small groups,          03:37:59

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1    regional groups called angio clubs where we discuss these          03:38:04

2    issues and at national meetings and venues such as those.

3    Q.   Doctor, let's turn now to your fourth opinion concerning

4    the G2 filter specifically.  In your personal practice, what

5    was your experience with regard to the G2 filter?               03:38:27

6    A.   It was very favorable.

7    Q.   Did you experience any complications with the G2 filter as

8    a part of your practice?

9    A.   We may have seen a few fractures but -- and certainly some

10   perforations.  All filters seem to perforate.  Bards are no      03:38:45

11   exception as far as perforations.  But we did not see any

12   symptomatic perforations and although we did see a few struts,

13   Grade 3 type perforations, they seemed to be -- we were lucky

14   to not have symptoms associated with those.  So, yes.

15   Q.   Can you estimate how many Bard's G2 filters your group has   03:39:09

16   removed over the years?

17   A.   Removed.  It was our most popular filter and this would

18   just be a guess.  I would say that we probably removed

19   somewhere between 100 and 200 G2 Filters.

20   Q.   And do you recall how many instances where the IVC had       03:39:31

21   fractured, IVC filter had fractured that you noticed during the

22   retrieval?

23           MR. O'CONNOR:  Objection, nondisclosure.

24           THE COURT:  Where is that in the report?

25           MR. NORTH:  Your Honor, page 21, fourth line from the     03:39:44

2094
CHRISTOPHER S. MORRIS, M.D. - Direct

1    bottom to the page 22, second line.                          03:39:46

2              MR. O'CONNOR:  I'll withdraw the objection, Your

3    Honor.

4              THE COURT:  All right.

5    BY MR. NORTH:                                                 03:40:23

6    Q.   I believe the question was, what you had seen, how many

7    instances of fracture you had seen with G2 filters in the

8    course of your group's practice?

9    A.   I can't address the G2 specifically although that was our

10   most popular filter of all the G2 retrievable filters.  But out  03:40:35

11   of the 800 or so that we have placed, we have seen maybe seven

12   or eight fractures and that is an increased number since we --

13   I wrote that expert report where I said maybe four or so

14   because I dove into my teaching files very deeply to find a

15   couple others and we had another couple since I wrote that      03:41:02

16   report.

17             Now, some of those, at least two of those fractures

18   we don't know whether they preexisted or they occurred during

19   the retrieval process because at least one of my cases and

20   another one of my partner's cases, our fellow that was doing    03:41:22

21   the procedure did not get an image before he manipulated a

22   catheter through the filter so it's possible that his catheter

23   manipulation fractured the filter.  But in both cases we

24   removed the entire filter and the fractured segment at the same

25   time.  So that's why I say I don't know if it was up to seven    03:41:41

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1    or eight.  It could have been as low as six.                      03:41:46

2    Q.   Were any of those instances of fracture symptomatic with

3    the patients?

4    A.   We have had several that have fractured struts that had

5    embolized to the heart and/or lungs and they have been           03:42:01

6    symptomatic in the sense that at some point they ended up in

7    the emergency room with chest pain; but we don't know yet

8    whether that chest pain occurred after they knew that they had

9    a fractured filter or not.  Neither of those were deemed to be

10   indicated for retrieval by our cardiovascular surgeons because   03:42:22

11   they did not think they were truly symptomatic in those

12   patients.

13   Q.   What is your understanding of what instructions for use

14   are?

15   A.   Any medical device has a document called the instructions   03:42:36

16   for use associated with it in the delivery box that arrives

17   with the device.  And that document helps the operator

18   understand indications, contraindications of use of that device

19   as well as proper and recommended deployment procedures as well

20   as some of the -- some of the complications that can be          03:43:03

21   expected, potential use of that device.  So it's sort of a

22   general information document related to the device for the

23   operator.

24   Q.   When you used the G2 filter with your patients, did the

25   filter come with an IFU?                                          03:43:23

CHRISTOPHER S. MORRIS, M.D. - Direct

1   A.   Each and every one, yes.                                    03:43:25

2   Q.   And did you read the instructions that accompanied the G2

3   filter?

4   A.   I did initially, yes.

5   Q.   As part of your medical practice, do you customarily read  03:43:35

6   the instruction manuals or instructions for use that accompany

7   all the medical devices that you utilize?

8   A.   Not every -- well, after placing, you know, several

9   hundred, we stop reading it.  So I'll read it once or twice

10  early on if it's a new device that we have never used, for      03:43:52

11  instance, but it gets repetitive after a while so we don't

12  continue to read them, no.

13           MR. NORTH:  If we could bring up Exhibit 994.

14           And, Your Honor, I believe this has been admitted.

15           COURTROOM DEPUTY:  Yes.                                 03:44:35

16           THE COURT:  It has been admitted.

17           MR. NORTH:  Could we display it to the jury, Your

18  Honor?

19           MR. O'CONNOR:  But this isn't mentioned in his

20  report, this IFU.                                                03:44:40

21           THE COURT:  Is this mentioned in the report,

22  Mr. North?

23           MR. NORTH:  Pages 10 -- just a second, Your Honor.

24  Let me find the exact portion on page 10, Your Honor.

25  Beginning on page 10, carrying over to 11 he lists all of the   03:45:10

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1   complications of -- all of the stuff on the Denali IFU and then     03:45:14
2   at the sentence on the bottom of page 11 starting
3   "interestingly" confirms that the same language was in the G2.
4           THE COURT:  But do you identify the IFU as an exhibit
5   to be used during his testimony, the G2 IFU?                        03:45:39
6           MR. NORTH:  Your Honor, I'm sorry.  I don't have the
7   reliance list here with me to be able to say.  I mean, we gave
8   them notice yesterday that this was an exhibit.
9           THE COURT:  Well, under Rule 26 you need to identify
10  the exhibits to be used by the expert in the report.  Was that      03:45:59
11  done for the IFU?
12          MR. NORTH:  Your Honor, we don't have that list with
13  us so I'll just move on.
14          THE COURT:  All right.
15  BY MR. NORTH:                                                       03:46:26
16  Q.  Doctor, have you generally read the warnings in the G2 --
17  A.  Yes, I have.
18  Q.  -- IFU?
19      Do you believe that those warnings about risk of
20  movement, fracture, and perforation afford fair and adequate        03:46:42
21  notice of the possible consequences of using the G2 filter?
22  A.  They are well described, yes.
23  Q.  Doctor, do you have an opinion as to whether the G2 filter
24  tilts, migrates, perforates, or fractures more than other
25  filters that were available while the G2 was on the market?         03:47:04

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Direct

1          MR. O'CONNOR:  Objection, Your Honor.  This was not                03:47:08

2    disclosed.

3          THE COURT:  Mr. North?

4          MR. NORTH:  Beginning on page 21, fourth line from

5    the bottom, talks about the complications and his experience             03:47:24

6    with the Bard filters.

7          THE COURT:  There's no comparison to other filters?

8          MR. NORTH:  Not specifically.

9          THE COURT:  Objection sustained.

10   BY MR. NORTH:                                                            03:48:05

11   Q.   Did you review generally the medical literature concerning

12   the G2 filter?

13   A.    Yes.

14   Q.   And what did that literature indicate to you over all

15   regarding the filter?                                                    03:48:15

16   A.    There are studies, some studies that have stated and found

17   based on their methodology, that the G2 filter had some high

18   complication rates and then there are studies that have shown

19   low complication rates of the G2 filter.

20   Q.   And in your personal experience, were the complication            03:48:39

21   rates associated with the G2 low, medium or high?

22   A.    We found them to be low.

23          MR. NORTH:  Thank you, Doctor.  That's all I have.

24          THE COURT:  Cross-examination?

25

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Cross

1                        **CROSS - EXAMINATION**                        03:49:09

2    BY MR. O'CONNOR:

3    Q.    Dr. Morris, hi.  My name is Mark O'Connor.  This is the

4    first time we've met.

5            Let me ask you a question.  You haven't received      03:49:52

6    internal documents from Bard, have you?

7    A.    No.

8    Q.    And so what Bard's -- the medical director at Bard, his

9    opinion regarding the Simon Nitinol filter you just don't know,

10   do you?                                                       03:50:05

11   A.    No.

12   Q.    If he has come out and stated in a document that the Simon

13   Nitinol filter had virtually no complaints, you have no way to

14   address that because you did not see the document or talk to

15   the medical director at Bard.  Fair?                         03:50:20

16   A.    I did not, no.

17   Q.    Thank you.

18           And when you talk about studies, I thought I saw

19   something on page eight of your report.  Let me ask you this:

20   There are no randomized control studies showing the efficacy of  03:50:42

21   IVC filters in preventing recurrent or acute pulmonary embolism

22   compared to no treatment in patients without a filter.  Is that

23   true?

24   A.    That's true, yes.

25   Q.    And basically, that is the conclusion from PREPIC 2?     03:50:56

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Cross

1    A.    No.   Because both PREPIC studies -- no.  They did not          03:51:01

2    because all those patients were treated.

3    Q.    I understand the distinction.  But basically to your

4    point, if -- there's been no study comparing filter -- if

5    filters will prevent PE compared to patients that did not have       03:51:16

6    a filter.  Was that your point before?

7    A.    Yes correct.

8    Q.    Thank you.

9          Now the Simon Nitinol filter was the predicate device

10   that to the Recovery; correct?                                       03:51:41

11   A.    Correct.

12   Q.    But you don't know -- in terms of comparing the Recovery

13   versus the Simon Nitinol filter regarding failures, you haven't

14   seen anything to that extent?

15   A.    There's been no direct comparison between the two.             03:51:54

16   Q.    What you do know from reading the literature is that the

17   Recovery filter had been failing in terms of migrating,

18   perforating, tilting and injuring patients; correct?

19   A.    All filters --

20   Q.    I'm just asking about the Recovery.                            03:52:07

21   A.    There are some studies that show complications with the

22   Recovery, yes.

23   Q.    And just staying on the Recovery.  You're aware that

24   patients were -- there were deaths associated with the Recovery

25   filter, too; correct?                                                03:52:19

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Cross

1    A.    Yeah.   I know about the reported migrations of the entire          03:52:20

2    filter into the heart that caused some deaths, yes.

3    Q.    All right.   And also as you said, there is literature

4    talking about the complications of the G2; correct?

5    A.    Yes.                                                                 03:52:34

6    Q.    Now, you have not reviewed Sheri Booker's's medical

7    records, have you?

8    A.    No.

9    Q.    You weren't asked to look at her records; fair?

10   A.    No, correct.                                                         03:52:44

11   Q.    And I went and looked through your reliance list.   You

12   never look at the IFU that applied to her case in preparing

13   your report?

14   A.    Oh, not in preparing the report.   I have read that IFU,

15   yes.                                                                       03:52:54

16   Q.    You know that her filter -- she received her filter when

17   it was cleared to be permanent only?

18   A.    I don't even know that.

19   Q.    So you have no reason to dispute that statement?

20   A.    No.                                                                  03:53:07

21   Q.    You stay apprised of the literature, do you?

22   A.    I try to, yes.

23   Q.    And you agree that the knowledge among the medical

24   community began to become more prevalent about fractures

25   including fractures of the G2 and the Recovery, around 2010;              03:53:52

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Cross

1   right?                                                              03:53:56

2   A.   Well before that.

3   Q.   Well, 2010 is when a communication came out from the FDA;

4   true?

5   A.   Right.   Right.   Correct.                                     03:54:04

6   Q.   And there's been medical literature that has been written

7   about the timing when there was more and more increasing

8   awareness of filter failures; correct?

9   A.   Yes.

10  Q.   And you told us that you had been a consultant with Bard      03:54:21

11  going years back; right?

12  A.   Yes.

13  Q.   And it was -- was that for filters?

14  A.   Yes.

15  Q.   And so you have been involved with Bard for how long?         03:54:32

16  A.   I want to estimate probably between maybe 2003 and 2006,

17  something like that, and it wasn't just filters.   I was

18  involved in a focus group about stents and stent graphs and

19  other products as well.

20  Q.   That's right.   I recall you saying that.                     03:54:51

21        Now, one thing it would seem to me, Dr. Morris, that

22  you would agree with, that a medical device company like Bard

23  has to put patient safety first and foremost; correct?

24  A.   Yes.

25  Q.   And certainly they do have to communicate accurate and        03:55:03

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Cross

1    truthful information to members of the medical community like          03:55:08
2    yourself; true?  I mean, you rely on their information to a
3    certain extent anyway; correct?
4    A.    To a certain extent?  That's not my primary source of
5    medical information, the company, no.                                 03:55:21
6    Q.    When you talk about fractures being asymptomatic, what
7    you're talking about, a patient not necessarily having symptoms
8    that he or she can perceive or relate to a physician; correct?
9    A.    So a symptom is a subjective parameter, so the patient has
10   to report a symptom, yes.                                             03:55:45
11   Q.    Certainly you agree that a filter can fracture and be in a
12   location that may be dangerous to a patient and the patient not
13   have any symptoms?
14   A.    Yes.
15   Q.    And that is a danger of a filter fracture; true?               03:55:56
16   A.    None of us would want a filter fracture, correct.
17   Q.    A filter can break and migrate and a patient may never
18   know until it's too late; right?
19   A.    By "too late," you mean develop a symptom?
20   Q.    Well, a patient may have a filter fracture and not have        03:56:16
21   any symptoms and finally when symptoms evolve, find out or
22   learn that that fragment migrated to her heart and that would
23   be dangerous correct?
24   A.    That could be potentially, yes.  Rarely, yes.
25   Q.    And so I don't think -- you're not here to tell the jury       03:56:34

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Cross

1  that a fracture that is not causing symptoms, you're not saying          03:56:36
2  that's not a serious condition, are you?
3  A.    It's not a serious condition but I believe it's rare for
4  that to cause a symptom and become a life-threatening
5  situation.                                                                03:56:51
6  Q.    But there have been no studies on filter fragments and the
7  length that they will remain asymptomatic.  Is that true?
8  A.    That's true, yes.
9  Q.    And what you and other members of the medical community
10 are becoming more and more aware about -- of is that there are           03:57:06
11 filters breaking, including Bard filters, that are leaving
12 fragments in patients and now what you're faced with in the
13 medical community is how to get those fragments out.  Fair?
14 A.    Not necessarily.  That needs to be determined on an
15 individual basis.  For instance, I just testified that our last         03:57:23
16 two patients that we found -- where we found fragments, one in
17 the heart, one in the pulmonary artery, we collectively -- not
18 me personally my partners and the cardiothoracic surgeons --
19 decided to leave those alone, to not remove them percutaneously
20 or surgically.                                                           03:57:43
21 Q.    But the issue is, you can't ignore them.  You need to make
22 a decision about what to do about a fragment; right?
23 A.    Well, to the extent that they are being followed
24 clinically, yes, those patients should continue to be followed,
25 yes.                                                                     03:57:55

United States District Court

CHRISTOPHER S. MORRIS, M.D. - Cross

1    Q.   It's something that you, Dr. Morris, take seriously if you          03:57:55

2    see a fragment anywhere in a patient's body regardless of

3    whether it's causing symptoms or not; correct?

4    A.   Yes, I take that seriously.

5    Q.   Very seriously?  True?                                              03:58:08

6    A.   Yes.  Yes.

7    Q.   And you would urge medical device companies to take that

8    seriously as well.  Fair?

9    A.   Yes.

10   Q.   Thank you.                                                          03:58:19

11           MR. O'CONNOR:  That's all I have.

12           Well, let me make sure.

13           No more questions, Your Honor.

14           THE COURT:  Any redirect?

15           MR. NORTH:  One second, Your Honor.                              03:58:39

16           Nothing further, Your Honor.

17           THE COURT:  All right.  Thank you, sir.  You can step

18   down.

19           MR. O'CONNOR:  Oh, wait a minute.  I do have one more

20   question if I may.                                                       03:58:59

21           MR. NORTH:  And I have one redirect.

22           THE COURT:  Go ahead, Mr. O'Connor.

23   BY MR. O'CONNOR:

24   Q.   Are you aware of the study that Dr. Trerotola and Dr.

25   Stavropoulos just published in 2017?                                     03:59:22

United States District Court

1    A.    About fragment retrievals?                                    03:59:27

2    Q.    Yes.

3    A.    Yes.

4    Q.    And you're aware that they stated in that study that it

5    was 2010 when the medical community became more increasingly    03:59:33

6    aware of filter fractures, including G2 and Recovery fractures?

7    A.    They stated that, yes.

8    Q.    So it was in that era of 2010 where it really became known

9    to the medical community, according to Trerotola and

10   Stavropoulos?                                                    03:59:57

11   A.    Yes.   Because of the Hall and the VJ studies but we knew

12   about the fractures before they actually published those.

13   Q.    They said that the medical community on a whole --

14   A.    Oh.   Okay.   Well, I don't know about that.

15   Q.    Well, the IRs, you saw that.   And I can put it up there.   04:00:12

16            MR. O'CONNOR:   Do we have it.   7357.   And go to page

17   seven.

18   BY MR. O'CONNOR:

19   Q.    Well, first of all, Doctor, are you familiar with the

20   article that we're showing?   And it's Exhibit 7357?            04:00:30

21   A.    Yes.   I've read it.   Not recently but I've read it.

22   Q.    And I take it that this is literature that you would

23   regard as being authoritative?

24   A.    Yes.   It's a good study.

25   Q.    All right.                                                 04:00:43

United States District Court

1          MR. O'CONNOR:  Greg, let's go to page eight.  How          04:00:45

2   about page seven, excuse me.  I don't have my notes in front of

3   me.  And under Discussion, Greg, that sentence, "fracture of

4   optional," do you see that?  If you could highlight that and

5   then go up to the top of the next column to continue along the     04:01:16

6   paragraph.

7   BY MR. O'CONNOR:

8   Q.   Well, let's read this, Doctor.  According to Drs.

9   Trerotola and Stavropoulos, fracture of optional IVC filters

10  began to be recognized in the late 2000s.                          04:01:32

11         Did I read that correctly?

12  A.   Yes.

13  Q.   And we're going to have to go up the column.  It says:

14  However, large-scale recognition of filter fracture began in

15  2010 with publication of a filter fracture series by Nicholson     04:01:43

16  and a subsequent United States Food and Drug Administration

17  warning.

18         Did I read that correctly?

19  A.   Yes.

20  Q.   All right.  Thank you.                                        04:01:56

21         THE COURT:  You must be finished, Mr. O'Connor.

22         MR. O'CONNOR:  I think so.

23         Well, I guess I have one more question.  Excuse me.

24  BY MR. O'CONNOR:

25  Q.   And in that Stavropoulos-Trerotola study, they talked        04:02:31

United States District Court

1    about the G2 and the fractures that were occurring in the G2;     04:02:35

2    correct?

3    A.   Yes.

4    Q.   Do you see where I'm looking?

5    A.   Yes.     04:02:47

6    Q.   And G2, according to their study, had the highest number

7    of fractures and fragments retained locally.  Do you see that?

8    A.   Oh, yeah.

9    Q.   So the G2 was highest of the filters that they were

10   looking at in terms of fractures and fragments?     04:03:02

11   A.   It was also the filter with the largest N, so they saw

12   more G2s than any other filter.  So, I mean, that is one reason

13   why they saw so many G2 filters, because they saw 37 G2

14   filters.  The next most popular filter was the Celect at 20.

15   Remember they are a tertiary care referral center so they are     04:03:30

16   getting filters from all around the -- filter fragments --

17   fractured filters from all around the country.

18   Q.   Well, if you look at Table 3, Filter Fragments Embolize to

19   Lungs According to Brand and Element Embolized.  Do you see

20   there?     04:03:45

21   A.   Yes.

22   Q.   And G2 had 11.  Do you see that?

23   A.   Yes.  11 out of 52.

24   Q.   And then going over, it talks about arms and legs.  Do you

25   see that?     04:04:01

United States District Court

1   A.   Yes.                                                            04:04:02

2   Q.   And it talks about ten relating to the embolization to the

3   lungs according to brand and element embolized.  Do you see

4   that?

5   A.   Yes.                                                            04:04:17

6   Q.   Do you see that?

7   A.   Yes.

8   Q.   Let's go to Table 5.  And Table 5 has to deal with filter

9   fragments embolized to the heart according to brand and

10  element.  Do you see that?                                          04:04:28

11  A.   Yes.

12  Q.   And at the top of that list is the Recovery with six out

13  of 67.  Do you see that?

14  A.   Yes.

15  Q.   And then when it talks about the arms and legs going to        04:04:37

16  embolize to the heart, the Recovery had six; correct?

17  A.   Yes.

18  Q.   And then right under that, the next one under that is the

19  G2 with filter fragments embolized to the heart.  In

20  Trerotola's study there were two of 22 they found went to the       04:04:56

21  heart and two that related to the arms and legs.  Is that fair?

22  A.   Yes.

23  Q.   Thank you.

24           MR. O'CONNOR:  That's all I have I think.

25           THE COURT:  Redirect?                                      04:05:07

                    United States District Court

CHRISTOPHER MORRIS, M.D. - Redirect

**REDIRECT EXAMINATION**                                    04:05:08

BY MR. NORTH:

Q.    Doctor, when Mr. O'Connor had you read the parts of that

article about widespread recognition of filter structure, that

was not specific to Bard filters?                          04:05:20

A.    No.   That was about retrievable filters in general.   And

the reason my belief -- and this is my opinion -- that the

reason that occurred was because these retrievable filters for

the first time were being investigated very thoroughly by

imaging because we were retrieving them.  We never did that   04:05:41

with permanent filters.   We placed permanent filters and never

saw those filters ever again.   We may have seen them with

random imaging here and there but we were not following them

with imaging.

            Now we had this big group and this was the largest   04:05:54

group of filters ever placed in the history of the world

because we were placing these in trauma patients

prophylactically and we could take them out after a period of

time.  So this huge group of filters now we were investigating

with fluoroscopy trying to take them out and now we had all of   04:06:10

this follow-up on all of these filters.

            Now, if you go back and look at imaging, in a lot of

these permanent filters, there's quite a few of those that are

fractured as well so that's why I am -- I think that the

retrievable filters were for the first time investigated very   04:06:25

United States District Court

1    thoroughly and the permanent filters were not investigated that        04:06:28

2    thoroughly on a widespread basis.

3    Q.    Doctor, do you hold all of the opinions that you have

4    given here today to a reasonable degree of medical certainty?

5    A.    Yes.        04:06:40

6    Q.    Thank you.

7              MR. NORTH:  That's all I have, Your Honor.

8              THE COURT:  Okay.  Thank you.

9              Now you can step down.

10             (Witness excused.)        04:06:45

11             MS. HELM:  Your Honor, we call Dr. Stavros William

12   Stavropoulos by video.

13             Dr. Stavropoulos is a medical doctor who is a board

14   certified radiologist with a specialty in interventional

15   radiology.  He maintains a clinical practice in interventional        04:07:34

16   radiology at the Hospital of the University of Pennsylvania and

17   is a professor of surgery and radiology in the medical college

18   there.

19             He graduated from Loyola University Chicago Stritch

20   School of Medicine and has implanted and retrieved IVC filters        04:07:55

21   for over 20 years.

22             (Whereupon the video deposition of Dr. Stavropoulos

23   was played.)

24             THE COURT:  Is that the end of the video?

25             MR. NORTH:  Yes, Your Honor.        04:20:45

United States District Court

```
 1              THE COURT:  All right.  Then we'll make that the end    04:20:46
 2     of the day as well.
 3              Ladies and gentlemen, we will plan to begin tomorrow
 4     morning at 9 o'clock and we'll excuse the jury.
 5              (Jury departs at 4:21.)                                  04:20:55
 6              THE COURT:  All right.  Please be seated, or leave if
 7     you want to leave.
 8              Counsel, what's the adjustment for today on the
 9     deposition time?
10              MR. NORTH:  Where did Ms. Helm go?                       04:21:32
11              MS. HELM:  I had it written down, Your Honor.  Total
12     of six minutes should be allocated to the plaintiff.  A total
13     of six minutes should be allocated to the plaintiff.
14              THE COURT:  Okay.
15              MS. HELM:  For all three -- total for all three         04:21:46
16     videos.
17              THE COURT:  Okay.  Give me just a moment.
18              All right.  Counsel, as of the end of today,
19     plaintiff has used 28 hours and 18 minutes and defendants have
20     used 20 hours and 35 minutes.                                    04:23:44
21              I think -- actually, I need to grab some papers for
22     jury instructions.  Do you all need a break before we talk
23     about those?
24              MS. HELM:  Yes, please.
25              THE COURT:  So we'll take a ten-minute break and        04:24:08
```

1    we'll resume at 25 to the hour.                                    04:24:10

2                    (Recess at 4:24; resumed at 4:34.)

3                    (Court was called to order by the courtroom deputy.)

4              THE COURT:  Go ahead and be seated.  Thank you.

5         Mr. Lopez, come on up for a minute.  Let me ask you a     04:36:44

6    question.  This may or may not solve the issues that we had

7    today.  There were issues that came from the plaintiff wanting

8    to put in the last three pages of 4327 and an argument made at

9    sidebar by you, Mr. Lopez, was that it can be admitted for

10   notice and not for the truth of the matter asserted.              04:37:03

11        You, Mr. North, wanted to put in the SIR guidelines.

12   There was a hearsay objection and you suggested that that come

13   in for notice, not for the truth of the matter asserted.  It

14   seems to me one solution is to admit them both for notice with

15   an instruction that it's not to be considered for the truth of   04:37:23

16   the matter asserted.

17        I'm not saying you have to agree to that but I

18   thought since you're both making that argument with respect to

19   an exhibit, that might avoid the need for further argument on

20   hearsay within hearsay and other issues.                          04:37:36

21             MR. NORTH:  You should take over the Mideast peace

22   talks.  I'll go with that.

23             MR. LOPEZ:  We haven't ceded yet, Judge.  On the

24   issue of my -- I'll consider that.  I will, Judge.

25             But on the issue of the document that I want to get     04:37:56

1    in, 4327, I should have it memorized by now.  I'm working on        04:37:58

2    the evidence code subsections.  I think it actually is

3    non-hearsay, Your Honor, because I understand that some of

4    those where it says reports that doctor says but some of them

5    just says rep reports or marketing manager reports.  So there's    04:38:19

6    no -- there's no in between hearsay.

7          THE COURT:  Well, on that, I looked at Weinstein's on

8    evidence over the lunch hour.  It contains this statement under

9    805 which is hearsay within hearsay:  The problem of multiple

10   hearsay often arises when a party seeks to introduce a business    04:38:38

11   record and the person who made the record has no personal

12   knowledge of the underlying event and has based the entry on

13   information supplied by another.

14         It seems to me there's four different categories of

15   evidence in 4327 that fall into that description.  One is --       04:38:56

16   well, some is more explicit.  Some says the doctor stated,

17   actually quotes what the doctor said.  Others are where it's a

18   report of a rep and the rep is saying the doctor had difficulty

19   manipulating this or finding this or grasping the strut.  That

20   information had to have come from the doctor.                      04:39:23

21         A third is actually a different category which is DM.

22   Didn't get any evidence as to who DM is.  So there's several

23   different categories I think, all of which fall within this

24   situation of the person being quoted having no personal

25   knowledge and having necessarily gotten it from others.  That's    04:39:46

1    hearsay within hearsay according to Weinstein's under Rule 805.    04:39:50

2         So, I mean, if you want to argue this more, we won't

3    do it now.  I'll be happy to hear from you.  But seems that's

4    tough not to conclude that we've got different categories of

5    hearsay within hearsay in Exhibit 2738.    04:40:06

6         MR. LOPEZ:  I looked at some of those.  On its face,

7    it does say that the rep reports.  I mean, we don't know

8    whether or not the rep had personal knowledge of those events

9    or not.

10        THE COURT:  Exactly.    04:40:23

11        MR. LOPEZ:  But on its face, you can't say he didn't

12   because it says that he's the one who is --

13        THE COURT:  How can we think that the rep knew that

14   the doctor had difficulty managing the deployment, that doctor

15   met resistance?    04:40:38

16        MR. LOPEZ:  He viewed medical records.  I'm

17   speculating, Your Honor.

18        THE COURT:  Exactly.  I need by a preponderance of

19   the evidence to conclude that this was based on the personal

20   knowledge of the rep if I find the rep was an agent authorized    04:40:51

21   to speak under 801(d)(2).

22        MR. LOPEZ:  My position on that is if this is

23   something that is done in the regular course of business, it's

24   part of their business practices, that sales reps are supposed

25   to return that type of information they get to the company.    04:41:04

1    That is still something that is reported by the sales rep.  It    04:41:07

2    should not be hearsay.  Certainly it's notice.  I mean, it's

3    notice to the company.

4            THE COURT:  That's where I started.  I think it is

5    hearsay but if you want to use it for notice, do you have an    04:41:19

6    objection to their using the SIR guidelines for notice.

7            MR. LOPEZ:  Can we tell you at 8:30?

8            THE COURT:  Yes.  If you don't want to agree to that,

9    then we'll deal with the hearsay within hearsay issue.  I

10   thought that might be a way to avoid it.    04:41:34

11           MR. LOPEZ:  I'll say this:  It's tempting but I don't

12   want to make a spontaneous decision.

13           THE COURT:  Give it some thought.  That's fine.

14           Okay.  Jury instructions.  We've handed you a

15   redacted documents instruction.  Any concerns about that?  We    04:41:59

16   made this up.  We didn't get it from some source so feel free

17   to criticize it.

18           MS. LOURIE:  We have no objection.

19           MS. HELM:  Neither do we.

20           THE COURT:  Okay.  See we'll include that.    04:42:27

21           We had left out in the original proposal model

22   instruction 3.5 on return of verdict.  Seems to me we need to

23   include that.  I don't think there's a problem with that.  It's

24   just the standard language.

25           Is that acceptable to both sides?    04:42:44

United States District Court

 1            MS. LOURIE:  Yes.  The instruction is fine.          04:42:50

 2            MS. HELM:  Same, Your Honor.

 3            THE COURT:  Okay.  So we'll include that, too.

 4        Now, I think what we ought to do is talk through the

 5    instructions that we gave you yesterday with red-line changes   04:43:06

 6    and a clean copy to see where you have concerns and we're still

 7    going to take all of these headings off in the final set.  So

 8    it will just be an instruction number.  But working through

 9    that set, I do think we -- well, let's stop on 1.8.  That's

10    where we combine the parties to Bard and we said you should    04:43:36

11    decide the case for the two defendants jointly.

12            Any concerns about that change?

13            MS. LOURIE:  No concerns from us.

14            MS. HELM:  None, Your Honor.

15            THE COURT:  Okay.  We still have a question mark on     04:43:54

16    1.10 that we think we now should remove.  I had left it on

17    because I hadn't given any limiting instruction, but we're

18    about to get to one on redacted evidence.  So it seems to me

19    that we should just give all of what's in 1.10.  And I left the

20    question mark in to see if we should take anything out of       04:44:17

21    paragraph three.  We've excluded some testimony and we're now

22    instructing them as to redacted documents, so it seems to me

23    the whole thing should come in.

24            Any disagreement?

25            MS. LOURIE:  No, sir.                                  04:44:30

                    United States District Court

1          MS. HELM:  No, sir.

2          THE COURT:  2.14, I can't think of any chart or

3  summary that has been put in evidence as a summary of other

4  evidence like under 1006.  Certainly there's been lots of

5  charts in different documents that have come in.  I guess the

6  question is, do you think we need to give 2.14?  Oh, I'm sorry.

7  This is it's one for demonstratives.  Clearly we need to give

8  the one for demonstratives.  I'm talking about 2.15.

9          MS. LOURIE:  I believe we introduced a summary chart

10  of the medical bills into evidence.

11          THE COURT:  And did that come into evidence?

12          MS. LOURIE:  Yes, sir.

13          THE COURT:  Okay.  Then we should give 2.15 and 2.14.

14          MS. HELM:  Yes, sir.

15          THE COURT:  Okay.

16          That takes me up to page 13, strict liability/design

17  defect.  Do any of you have concerns about anything before

18  that?

19          MS. LOURIE:  We don't.

20          MS. HELM:  No, sir.

21          THE COURT:  Okay.  Any comments on the strict

22  liability/design defect instruction?

23          MS. LOURIE:  Yes, sir.  We see that you moved the

24  requested paragraphs and we appreciate that.  Our only comment

25  would be that we think you moved it a little bit too low.  It

United States District Court

04:44:31

04:44:56

04:45:23

04:45:35

04:46:02

04:46:17

1   goes below number 13 on page 14.  I believe that paragraph          04:46:21

2   immediately below 13 is more like a concluding paragraph that

3   should go to the end of the instruction.

4             THE COURT:  Do you agree, Ms. Helm?

5             MS. HELM:  I do, Your Honor.                              04:46:44

6             THE COURT:  So you're talking about the paragraph

7   that begins "If you decide"?

8             MS. LOURIE:  Yes, sir.

9             THE COURT:  Okay.  So we'll move that to the end.

10            Any other comment, Ms. Lourie?                            04:46:52

11            MS. LOURIE:  No, sir.

12            THE COURT:  Ms. Helm, do you have other comments on

13  that instruction?

14            MS. HELM:  No, Your Honor.

15            THE COURT:  Okay.  How about strict liability,           04:46:59

16  failure to warn?

17            MS. LOURIE:  I don't know if you want me to perfect

18  the record now.  We had asked for an added sentence.  You did

19  not indicate you were going to add it so just to perfect the

20  record, I don't know if you will want me to address that now.      04:47:16

21            THE COURT:  If you want to put it on the record.  I

22  assume you're talking about the first full paragraph on page

23  17.  You wanted to add a sentence after that?

24            MS. LOURIE:  No.  We agree with the way you did that

25  one.  We agreed to that the other day.  It's actually the          04:47:33

                    United States District Court

 1   second full paragraph that begins with "You must decide," we

 2   asked that the sentence, "A warning is inadequate if it does

 3   not provide a complete disclosure of both the existence of the

 4   risk and the extent of the danger and the severity of any

 5   potential injury involved," we asked that that be added to the

 6   end of that paragraph and we just want to perfect that.

 7           THE COURT:  And remind me, Ms. Lourie, of the source

 8   of that.

 9           MS. LOURIE:  That is all case law, Your Honor.  It's

10   from our plaintiff's request to charge number four.

11           THE COURT:  You're right.  Yes, I did look at that.

12   I did conclude not to include it because I thought it was too

13   much of a comment on the evidence, but your objection to that

14   is preserved.

15           Ms. Helm?

16           MS. HELM:  Yes, Your Honor.  We have no issue with

17   the language of the charge but we believe that defendants'

18   request to charge number four relating to failure to read the

19   IFU is warranted by the evidence.

20           THE COURT:  You were going to come up with an

21   alternative I think when we talked before because I made the

22   point when we talked last time that we can't say the jury has

23   to rule for the defendant if the doctor failed to read because

24   the allegation is there were other ways in which the defendants

25   failed to warn the doctor.

 1          MS. HELM:  I actually have an alternative, Your        04:49:15

 2    Honor, that Mr. North didn't know about and I've given it to

 3    the plaintiffs.

 4          THE COURT:  Do you have a copy?

 5          MS. HELM:  Yes, Your Honor.  May I approach?           04:49:22

 6          THE COURT:  Yes.

 7          MS. HELM:  Your Honor, the failure to read goes to

 8    the element of adequacy of the warning, not the ability to

 9    communicate the warning or how it was communicated.  That's the

10    *Wilson* case specifically says that.  So I rewrote it to go to  04:49:52

11    the element of adequacy of the warning.

12          THE COURT:  So I think what you're suggesting,

13    Ms. Helm, is that if you look at the instruction, the top of

14    page 17 indicates two ways in which the duty to warn can be

15    breached.  One is with failing to provide an adequate warning.  04:51:15

16    The second is by failing to adequately communicate the warning.

17          MS. HELM:  Correct, Your Honor.

18          THE COURT:  And your proposed instruction would say

19    if Dr. D'Ayala did not read the IFU, then the jury should find

20    for the defendants on the first of those two.                04:51:39

21          MS. HELM:  Correct, Your Honor, and that's exactly

22    the *Wilson Foods v. Turner* case which we cite.  In that case,

23    the plaintiffs alleged both failure -- both the adequacy of the

24    warning.  And failure to adequately communicate the warning and

25    Georgia is a directed verdict state and in that case, the Court  04:51:56

                     United States District Court

 1   directed a verdict as to the adequacy of the warning but said          04:51:59
 2   that failure to adequately communicate the warning went to the
 3   jury so they gave a partial directed verdict based on the
 4   failure to read the warning.

 5          THE COURT:  Was that a case where the plaintiff               04:52:12
 6   alleged that there were multiple avenues of warning that should
 7   have been pursued?

 8          MS. HELM:  Your Honor, actually, the adequacy of the
 9   warning cases in Georgia all relate to -- at least all of the
10   ones that I have been able to find or we have been able to find    04:52:29
11   relate to the failure to communicate an adequate warning based
12   on things like the location of the warning, the presentation of
13   the warning, you know, font, color size.  The example is you
14   put the warning under the seat of the bike and no one looks
15   under the seat of the bike.                                          04:52:47

16          THE COURT:  That's the failure to communicate.

17          MS. HELM:  Yes, Your Honor.  That's the type of cases
18   that there are.  There are some outside of Georgia cases
19   talking about other ways to communicate.  But all of the case
20   law in Georgia says if there was a warning and you didn't read     04:53:02
21   the warning or you didn't prove that the warning was read, that
22   breaks the causation for the adequacy of the warning.

23          So we understand the Court's position that there were
24   other ways to communicate although I don't think there was
25   any -- I don't know that the evidence proves that here in this     04:53:20

United States District Court

1   case as the experts all testified about the adequacy of the          04:53:24

2   warning.  If you look at Dr. Hurst's testimony, it was:  Was

3   this in the IFU?  Was this in the IFU?  Was this in the IFU?

4   But it's an "or" standard; and if they haven't established that

5   the IFU was read, then the first part of the "or" fails.          04:53:43

6          THE COURT:  All right.

7          MR. STOLLER:  Your Honor, I addressed this in two

8   parts.  I think first off, it's an inaccurate statement on its

9   face which is a direct verdict in favor of the defendants if we

10  are -- the doctor purportedly did not read the warnings.  The          04:54:01

11  testimony here has been that the warnings come in multiple

12  different ways, not just the IFU but through brochures, through

13  sales reps, through all kinds of communicating and Dear Doctor

14  letters and those sort of things.  It is not a black and white.

15  It is in the IFU and, therefore, failing to provide it in the          04:54:20

16  IFU is the question under A of those two prongs.  The adequate

17  warning is in every way they communicated and failed to

18  communicate to those doctors and you heard that from the stand

19  from most of the doctors on our side who testified.

20          Their instruction, as I read it, would also ignore          04:54:40

21  the or.  It says if you find that they failed to prove that

22  Dr. D'Ayala read the warning, you must find for them regardless

23  of B.  It's not an O.  That's an end of story.

24          THE COURT:  I think Ms. Helm intended to have that

25  say you must find for Bard on part A of the two-part test.          04:54:58

United States District Court

 1          MR. STOLLER:  Well, that's not what it says.  That's          04:55:04

 2     not what it says.

 3          THE COURT:  I know you don't think it says that.  But

 4     I think that's your intent.

 5          MS. HELM:  Absolutely, Your Honor.  We understand          04:55:11

 6     there's still a question --

 7          THE COURT:  So if I were to agree with them, we could

 8     rework that wording.

 9          MR. STOLLER:  Well, I think it would be a comment on

10     the evidence in the sense that it's telling them to do          04:55:19

11     something specific with the other instruction based on "read."

12     I think as, again -- and I hate to cite you to Your Honor.  But

13     I'm going to cite you to yourself in the order that you gave on

14     the motion for summary judgment in the *Jones* case where they

15     made this exact argument in *Jones* where they said our treating          04:55:36

16     doc, they claim said he didn't read the IFU and you went

17     through the evidence in that case and said, look, this is not

18     just an IFU issue.  There's a number of ways these doctors get

19     warnings from the manufacturer here.  And I distinguished this

20     and we just got this so I haven't read *Wilson* in a while but I          04:55:54

21     know I read it when we did the briefing on the summary

22     judgment, both in this case and in *Jones*.

23          And that is a much different story than we have here.

24     There were not multiple avenues of warnings and communications

25     there between the manufacturer and the user that there are in          04:56:08

                      United States District Court

 1    this case.  That simply does not apply here on the facts of          04:56:12
 2    this case that are far different.
 3              THE COURT:  All right.  I understand that argument.
 4              Final word, Ms. Helm.
 5              MS. HELM:  Yes, Your Honor.  At the risk of              04:56:25
 6    repeating, that issue was not raised in the *Booker* case, the
 7    issue that was addressed in *Jones*.
 8              Also, the evidence --
 9              THE COURT:  But the question is whether it's been
10    raised by the evidence in the trial.                              04:56:37
11              MS. HELM:  Fair, Your Honor.  The only -- and expert
12    testimony is not always required but it is often considered for
13    complicated instructions.  And if you look at the evidence in
14    this case, the expert who testified about the warning was
15    Dr. Hurst and every single question to Dr. Hurst, was this        04:56:53
16    information in the IFU?  Did this IFU meet the expectations of
17    physicians?  If a company like Bard didn't do a long-term
18    clinical study, would you expect it to say so in the IFU?  If a
19    company like Bard --
20              THE COURT:  You've read enough examples.              04:57:18
21              MS. HELM:  Okay.  My horse is dead, Your Honor.
22              THE COURT:  Pardon?
23              MS. HELM:  My horse is dead.
24              THE COURT:  But where you started on that thought was
25    they don't have to have an expert and there has been other        04:57:30

                    United States District Court

1   evidence that has been presented to the jury that Bard didn't          04:57:34

2   send a Dear Doctor letter, didn't advise its salespeople to

3   notify them.

4          So I don't think I can conclude there's no evidence

5   with which a jury might find there were other methods to          04:57:44

6   communicate.

7          MS. HELM:  That is fair, Your Honor.  But to the

8   extent that they are going to rely on the adequacy of the IFU,

9   it's our position, and the evidence shows, that there is no

10  evidence that Dr. D'Ayala read the IFU.          04:58:01

11         So for them to stand up at closing and say the IFU

12  was defective, the IFU was defective, this wasn't in the IFU,

13  all of the testimony that I was just reading to you under

14  Georgia law, if Dr. D'Ayala didn't read the IFU, there's no

15  causation there as a matter of law.          04:58:19

16         THE COURT:  From the IFU?

17         MS. HELM:  Correct, Your Honor.

18         THE COURT:  Well, okay.  I understand the parties'

19  positions.  I will look at this case.  It does seem to me,

20  Ms. Helm, that you will be free to make exact that argument.          04:58:30

21  We try to emphasize the need for proximate cause and you can

22  make the point if he did not read it, it could not have

23  proximately caused the injury.

24         It also seems to me that if I were to follow that

25  line, would he need to change this instruction to say something          04:58:47

United States District Court

1   like if he didn't read the IFU, then you can't rely upon the   04:58:50

2   IFU as one of the methods by which the warning was inadequate

3   but you may consider others.  That is getting to be a pretty

4   detailed comment on the evidence.  But I will read the case and

5   take into account the arguments you've made.   04:59:09

6          MR. STOLLER:  Again, Your Honor, I just make a point.

7   I don't think the testimony supports what they said about

8   Dr. D'Ayala and, again, you've heard it.  There's many sources

9   of these warnings.

10          THE COURT:  Okay.  Any other comments on strict   04:59:24

11   liability, failure to warn?

12          MS. HELM:  Your Honor, I do have a copy of

13   Dr. D'Ayala's transcript if you would like it.

14          THE COURT:  I've got every day's transcript on my

15   computer.   04:59:35

16          MS. HELM:  Actually, these are the videos so they are

17   not in the transcript.

18          THE COURT:  Oh.  I've got him, too.  I've got him on

19   my iPad.

20          MS. HELM:  Okay.   04:59:43

21          THE COURT:  Thanks.

22          I'm keeping all of these depositions so I can go back

23   and read them again in my leisure time.

24          Okay.  The next instruction is negligent design

25   defect.  Any comments from either side?   04:59:59

United States District Court

1          MS. LOURIE:  None from us.                          05:00:05

2          MS. HELM:  No, Your Honor.

3          THE COURT:  You all can sit down as you talk.  Pull

4    the mics down and talk right into them.

5          How about negligent failure to warn?  I assume the   05:00:15

6    same instruction is requested by defendant on that one.

7          MS. HELM:  Yes, Your Honor.  I won't repeat my

8    argument.

9          THE COURT:  Any other arguments on negligent failure

10   to warn?                                                   05:00:31

11         MS. LOURIE:  No, sir.

12         THE COURT:  Okay.  How about comparative fault, pages

13   20 and 21?

14         MS. LOURIE:  Yes, sir.  I thought on last Thursday

15   that we had agreed to add in paragraph D the language from the   05:00:42

16   pattern charge in the first sentence.  We were going to say in

17   order to show that Dr. Amer's --

18         THE COURT:  Let me just cut you off, really so I can

19   explain why we didn't do that and you can respond.

20         We looked at the Georgia pattern jury instruction and   05:01:05

21   it's not in the pattern jury instruction in that place.

22         If you look at C and it talks about whether Dr. Amer

23   treated Ms. Booker in an ordinarily skillful manner and D it

24   seems whether the question is whether if he didn't, his

25   negligence was the proximate cause.                        05:01:41

United States District Court

```
1          MS. LOURIE:  So you're saying that you split it up          05:01:53
2    between C and D?
3          THE COURT:  Well, that's the way it was when we
4    proposed it.  I'm sorry.  Just a second.  I need to check with
5    my lawyer.                                                         05:02:02
6          THE CLERK:  Do you have the pattern jury instruction
7    in there?
8          THE COURT:  No.  It's not in the comments.
9          Anyway, go ahead and you will want that back in I
10   take it?                                                           05:02:29
11         MS. LOURIE:  Yes, sir.  We would like for D to
12   read --
13         THE COURT:  Well, let me interrupt you.  I just had
14   the other thought I had.  The first sentence of D says:  Bard
15   must present expert testimony to prove what's in that sentence    05:02:43
16   which, if we add negligence, it would say, Bard must present
17   expert testimony to prove negligence and yet C, which is from
18   the pattern instruction, says they don't have to.
19         MS. LOURIE:  That they don't have to.
20         THE COURT:  Yes.  It says expert testimony is usually       05:03:01
21   required to overcome the presumption.
22         MS. LOURIE:  That's a different concept, Your Honor.
23   It specifically says in the pattern charge that you have to
24   present expert testimony to show negligence on the part of a
25   non-party.                                                         05:03:19
```

United States District Court

1          THE COURT:  Where are you reading from?           05:03:20

2          MS. LOURIE:  62.300.

3          THE COURT:  Well, don't you agree the last sentence

4    of C, which I think is from the pattern instruction, suggests

5    you don't always have to use expert testimony to prove           05:03:37

6    negligence which is breach of the standard of care?

7          THE CLERK:  In the presumption to overcome the

8    standard of care it says expert testimony is usually required

9    to overcome the presumption.  We have it correct.

10         THE COURT:  We think we're being true to the pattern       05:04:10

11   instruction but if we're not, I absolutely -- I don't know how

12   we can say in C it's usually required to prove breach of the

13   standard of care and in D say you have to use expert testimony

14   to prove breach of the standard of care.

15         MS. LOURIE:  So under Georgia law, you always have to      05:04:26

16   have expert testimony for medical negligence unless it's

17   pronounced results.  This is my med mal attorney back here.

18         THE COURT:  That's fine.  I guess, so are you

19   thinking that the standard jury instruction -- that the Georgia

20   model jury instruction is incorrect?  I mean if you're right,   05:04:44

21   then --

22         MS. LOURIE:  I'm not sure if C is from a pattern jury

23   charge or not.

24         MS. HELM:  Your Honor, I think -- if I may.  I think

25   the distinction is that the pattern charge says expert          05:05:02

2131

 1    testimony is usually required to overcome the presumption of          05:05:06

 2    negligence.  And then it says that expert testimony is required

 3    for proximate cause.

 4              THE COURT:  That's the difference between C and D in

 5    this instruction.                                                     05:05:18

 6              MS. HELM:  Exactly, Your Honor.  So it's our position

 7    that those instructions -- it mirrors the instruction.

 8              THE COURT:  Let me look at the pattern for a second.

 9              Our paragraph C and D follow the standard instruction

10    which is why we didn't make the change you had recommended.          05:05:58

11              MS. LOURIE:  So you're saying that D follows the

12    pattern instruction?

13              THE COURT:  Yes.  C and D.  The pattern instruction,

14    when it's talking about negligence, says expert testimony is

15    usually required.  Pattern instruction, when it's talking about      05:06:15

16    proximate cause, says Bard must present expert testimony.

17              MS. LOURIE:  It says in D you have to show that the

18    non-party was negligent and that his negligence was one of the

19    proximate causes of the injury.

20              THE COURT:  Where are you reading?                         05:06:37

21              MS. LOURIE:  The first sentence:  In order for Bard

22    to show that Dr. Amer, a non-party, was negligent and --

23              THE COURT:  What are you reading?

24              MS. HELM:  You're reading the wrong page.

25              MS. LOURIE:  I'm reading from my charge.  My               05:06:50

1   stipulated request to charge number one.

2           THE COURT:  Oh, I thought you were reading from what

3   I submitted to you yesterday.

4           MS. LOURIE:  I'm sorry.  This is what tracks the

5   language from the jury charge.

6           MS. HELM:  No.  I don't think it does.

7           THE COURT:  What's the number on that, Jeff.

8           THE CLERK:  62.300.

9           THE COURT:  62.300 we think is the Georgia pattern

10  instruction that this follows so why don't you look at that,

11  Ms. Lourie, and we can talk about that tomorrow if we're

12  misreading that pattern instruction.  That's the reason we

13  didn't make that request.

14          MR. STOLLER:  That's the reference to C as well is

15  62.300.  Because I know that C is.

16          THE COURT:  Yes, they are both in there.

17          THE CLERK:  They are both the standard of care and

18  causation.

19          MR. STOLLER:  Thank you.

20          THE COURT:  Okay.  So look at that.  You can sure

21  raise it tomorrow if you think we're misrepresentation reading

22  that standard instruction.

23          Did you have other comments, plaintiff's counsel, on

24  comparative fault?

25          MS. LOURIE:  No.

United States District Court

```
 1              THE COURT:  How about from defendant?                    05:08:05
 2              MS. HELM:  No, Your Honor.
 3              THE COURT:  Okay.  The next one is intervening cause
 4    or superseding cause.
 5              Ms. Lourie, I think you've given us a proposal which     05:08:17
 6    I haven't read yet.  Do you want to explain what you're
 7    recommending?
 8              MS. LOURIE:  Well, Mr. Stoller drafted that so I'm
 9    going to let him explain.
10              THE COURT:  That's fine.                                 05:08:28
11              MR. STOLLER:  I will, Your Honor.  In particular,
12    here's the concern we have with the instruction that you
13    drafted which is that it suggests that an intervening act which
14    this becomes a superseding cause, can apply only to a part of
15    an injury.                                                         05:08:45
16              And under -- both in their statement and in Georgia
17    law, it's an intervening act that cuts off proximate causation.
18    It can't be part of the cause for part of an injury.  You can't
19    take a broken arm and say, well, the intervening cause is
20    partly at fault and Paul Stoller is partly at fault.              05:09:06
21              THE COURT:  What about your hypothetical that you
22    gave when we were here last?
23              MR. STOLLER:  I'm sorry, the hypothetical that I gave
24    last time where the neighbor comes in and cuts -- I've broken
25    my arm in a car accident and neighbor comes in and cuts off my   05:09:23
```

1    arm.  Well, the injury there --                         05:09:26

2              THE COURT:  At the wrist.

3              MR. STOLLER:  -- at the wrist.  That's fine.

4    Wherever he does it.

5              THE COURT:  That's important because the broken arm    05:09:34

6    remains.

7              MR. STOLLER:  I would agree with you, Your Honor, and

8    I would say that those are two distinct injuries.  The loss of

9    my hand is an injury that the question under proximate cause

10   and under intervening cause or intervening act becoming a       05:09:47

11   superseding cause as to that injury is one of foreseeability

12   and did the car accident that caused the harm to my arm, is the

13   subsequent harm the cutting off of my hand a reasonably

14   foreseeable act or proximately caused by that?  In that case, I

15   would argue the answer is no.                            05:10:08

16             But if Ms. Lourie is the one who hit me in the car

17   accident, she is still responsible for the injury up to my

18   wrist.  That superseding intervening act doesn't change that so

19   it's not part of the injury.  It's a distinct injury and if you

20   read the --                                             05:10:23

21             THE COURT:  Let's assume hypothetically for a minute

22   that one of the consequences of the broken arm would be that

23   you lose the use of your thumb.  I think what you're saying is

24   that injury for lost use of the thumb could not be attributed

25   to Ms. Lourie if she's the one that hit you because the         05:10:42

United States District Court

1    neighbor's intervening act of cutting off your arm at the wrist        05:10:46

2    superseded in which event part of the injury she caused is

3    being eliminated by an intervening superseding cause.

4            MR. STOLLER:  It's -- the statement uses the word

5    "harm" and it depends upon how you're going to interpret the           05:11:02

6    singular of that word.  If everything done to me is a single

7    harm, I don't think that is correct because I don't think it's

8    a correct interpreted as a single harm.

9            I think in your analogy, I have a harm which is that

10   I have a broken arm and I also have a harm which is a loss of          05:11:20

11   the use of my thumb.  And when somebody comes with a hedge

12   whacker and cuts off either my hand or a thumb, I still have a

13   separate injury for the pain and suffering and medical

14   treatment to my arm other than now the loss of my hand or the

15   loss of the thumb, but I think they are distinct injuries.            05:11:42

16           THE COURT:  So how would you instruct the jury in

17   that case on intervening cause?

18           MR. STOLLER:  In your case I would take out the

19   references that -- well, what we've tried to do in the

20   instruction we gave you was take out all or part and talk about       05:11:55

21   it as injury rather than injuries.  It's not a plural concept,

22   it's a singular, and break it down to the singular.  And we'll

23   talk about this I think when we get to the verdict form.  But

24   to the extent that the jury sits back in the jury room and is

25   making determinations of what has been proven on our causes of       05:12:13

United States District Court

1    action, they are going to look at and I'm going to probably not          05:12:16

2    get this all right in this case but they will look at Ms.

3    Booker and say she had a filter that broke in her IVC.  As a

4    result of that, she had a perforation of her IVC.  Did we prove

5    proximate cause that the design defect or the failure to warn          05:12:32

6    caused that and is there an intervening act there?

7              There's no allegation there is.  But that is a harm

8    and she had to have a surgery for it and so she has

9    out-of-pocket expenses for it.  She has pain and suffering

10   associated with it.  She has a separate --                             05:12:50

11             THE COURT:  Go on to the tricuspid valve.

12             MR. STOLLER:  Well, she has a separate problem that

13   that filter piece migrates to her heart and the question is,

14   was it foreseeable and we have to prove proximate causation for

15   damages associated with different injuries.  Open heart               05:13:04

16   procedure, pericarditis, damage to her tricuspid valve.  Those

17   are separate and distinct injuries and the jury is going to

18   have to determine whether we've proven proximate cause for

19   those different injuries.

20             THE COURT:  Well, so let me ask you this.                     05:13:22

21             MR. STOLLER:  I don't think you can lump them all in

22   one because they are not singular.

23             THE COURT:  Let me ask you this question.  If the

24   jury were to find that Dr. Kang's damage to the tricuspid valve

25   was not foreseeable by Bard, was not triggered by Bard and was        05:13:35

                        United States District Court

1    sufficient of itself to cause the injury to the tricuspid          05:13:41

2    valve, do you agree that the jury could say, "Oh, we are not

3    going to hold Bard liable for the injury to the tricuspid

4    valve"?

5            MR. STOLLER:  If we cannot prove proximate cause,           05:13:58

6    which is a foreseeability as you identified it, and they come

7    in and prove that there's an intervening cause to that injury,

8    then we have not made our case and they should not award

9    damages on that injury.

10           THE COURT:  So how is that possible outcome explained        05:14:17

11   to the jury in this proposed instruction?

12           MR. STOLLER:  By being singular.  It's going to

13   get -- this is going to get argued to the jury I assume and

14   damages the way we argue most cases to the jury.  Ladies and

15   gentlemen of the jury, we've got -- we suffered several           05:14:33

16   injuries here.  My client had a broken leg and for that, he had

17   to seek medical treatment on such-and-such a date and pain and

18   suffering associated with that, but it is a jury argument.

19   It's not something that gets resolved in the instruction.

20           The argument to the jury is going to be based on the        05:14:49

21   instruction that says if there's an intervening cause for an

22   injury.  And, again, the statement talks about an intervening

23   act as a superseding cause to a harm, singular, that you

24   argue -- the way it's going to get argued to the jury is that

25   they are going to say, I presume -- and I don't think we're       05:15:07

United States District Court

```
 1   going to get there because we'll talk about that at the close      05:15:09
 2   of evidence.  But I presume they would argue that, look, they
 3   haven't proven that this element of damage is something we're
 4   responsible for.  This injury is something we're responsible
 5   for because --                                                     05:15:22
 6            THE COURT:  I understand.  Why do you have injuries
 7   in the first sentence and injury throughout the rest of the
 8   instruction?
 9            MR. STOLLER:  Because I missed it.
10            THE COURT:  So you would make injuries injury?  Isn't     05:15:36
11   that instructing the injury that there is an injury that is
12   being claimed?
13            MR. STOLLER:  Well, I think that --
14            THE COURT:  While you're doing that, let me hear
15   defendants thoughts on that.                                       05:15:49
16            MR. STOLLER:  I can quickly tell you why.  If you
17   look down in the second or third sentence, one or more of the
18   injuries.  It's singular.  They could argue --
19            THE COURT:  Where are you pointing?
20            MR. STOLLER:  Third sentence of our proposed              05:16:04
21   instruction:  Superseding cause of one or more of Ms. Booker's
22   injuries.  They could argue that the superseding cause applies
23   to multiple injuries but -- in other words they could say that
24   superseding cause did not -- it intervened and stopped the
25   chain of causation as to this injury and this injury but they     05:16:21
```

United States District Court

1    are separate and distinct.  Does that make sense?                    05:16:23

2              THE COURT:  Well, it seems to me what you are

3    suggesting I say to the jury -- these are my words, not

4    yours -- is, in effect, among the injuries claimed to Ms.

5    Booker, if you find that Dr. Kang's action was the superseding   05:16:40

6    cause for one or more of those and the other elements of

7    intervening cause are satisfied, then you should not hold Bard

8    liable for those.

9              MR. STOLLER:  I believe that's correct, Your Honor.

10             THE COURT:  All right.  I will read this with that       05:16:56

11   explanation in mind but I want to hear your --

12             MR. STOLLER:  And there's another point that we'll

13   need to come back.

14             THE COURT:  On this instruction?

15             MR. STOLLER:  On this instruction, yes, sir.            05:17:07

16             THE COURT:  Okay.  Ms. Helm, why don't you comment on

17   this issue?

18             MS. HELM:  I'm going to confess, Your Honor.  I'm a

19   little bit confused at what Mr. Stoller was arguing.  I think

20   we don't have any issue with the charge as written as a          05:17:18

21   superseding cause charge.  I think Mr. Stoller is mixing up

22   injury and injuries and I'm concerned that if I got confused,

23   that the jury is also going to be confused by it.

24             So we have no issue with the charge as written.

25             THE COURT:  Meaning as I wrote it?                      05:17:38

                    United States District Court

1          MS. HELM:  Yes, Your Honor.

2          THE COURT:  All right.  What's the second issue that

3    you wanted to raise about this, Mr. Stoller?

4          MR. STOLLER:  The sentence immediately following the

5    elements.  We tried to rewrite it as -- there's a double

6    negative in there and I think it's likely to confuse the jury

7    so we tried to rewrite it as an affirmative sentence.

8          THE COURT:  Okay.  I understand your point on that.

9    Okay.

10         All right.  I'm going to think about this and read it

11   with that in mind.

12         Ms. Lourie?

13         MS. LOURIE:  I don't know if you want me to address

14   this right now.  But along the lines of the superseding

15   intervening cause analysis, it really comes into effect where

16   we're looking at the verdict form and that's where we had the

17   real issue with this whole concept.  I don't know if you want

18   to discuss it while we're talking about it.

19         THE COURT:  Since I can't find my copy, let's come

20   back to that.  I understand the point.  Well, I guess I have a

21   copy.  Tell me what your concern is.

22         MS. LOURIE:  Okay.  So our concern, I've got three

23   arguments to make with respect to having superseding or

24   intervening cause on the verdict form.  First of all, we asked

25   the jury, after listening to the Court's instruction, to

United States District Court

1   analyze liability on the part of Bard in Section A of the          05:19:07

2   verdict form and when they analyzed that, they are going to

3   consider duty, breach, proximate cause and damages.  The Court

4   will have instructed them on proximate cause and in the general

5   sense and also on the superseding intervening cause.              05:19:24

6           So they will be considering proximate cause on that

7   when they are making their decision on liability.

8           So let's say they find liability and they check one

9   or more of the boxes "yes" in Section A.  And they have already

10  been through the --                                               05:19:48

11          THE COURT:  I think I understand your point.  They

12  wouldn't do that if they thought Dr. Kang was a proximate cause

13  of some part of it.  Is that your point?

14          MS. LOURIE:  No.  My point is they will have already

15  considered that.                                                  05:20:01

16          THE COURT:  Right.  I think I understand your point

17  but that leads to the question how, then, do we reflect in the

18  verdict form the possible outcome where they find Dr. Kang to

19  be a superseding cause for an injury?

20          MS. LOURIE:  Because I think you're instructing them     05:20:18

21  in the instructions that if they find that he is a superseding

22  cause of -- I'm confused on how we're going to actually word

23  it.  But if they find that he is for some part of the injury

24  they are not to award any damages for that.

25          THE COURT:  Right.  So the question is, how do we        05:20:34

United States District Court

1   reflect that in the verdict form?                         05:20:36

2          MS. LOURIE:  It doesn't need to be reflected in the

3   verdict form because they are going to be following your

4   instructions in part A and then in part B they are not going to

5   award any money for those -- that part of the damages.      05:20:48

6          THE COURT:  So you're saying we should just assume

7   that if they found Dr. Kang to be a superseding cause, that

8   that finding is incorporated into whatever number they put in

9   B?

10         MS. LOURIE:  Absolutely.  And then I also feel like    05:21:04

11  if after they have made that full analysis of proximate cause

12  and they have not awarded any money on line B for that part of

13  her injury, by putting in section C, the Court is now telling

14  them to reevaluate proximate cause and it's basically saying,

15  oh, wait, are you sure you made the right decision in A and B?  05:21:27

16  Let's take another look at proximate cause and that's really

17  giving the defendant two bites at the proximate cause apple so

18  to speak.

19         It also, by putting a line in part C where they are

20  allowed to designate some amount of money that they attribute   05:21:47

21  to Dr. Kang when presumably they have not awarded any money for

22  what Dr. Kang did, then the Court is going to go back and

23  deduct that from line B.  So there again, the defendants are

24  going to have the money taken out again.  So it's out twice.

25         THE COURT:  Okay.  I understand that point.           05:22:13

05:22:17

 1                Ms. Helm, do you have thoughts on this?

 2                MS. HELM:  Well, Your Honor, I think that because

 3     it's -- we have more than one injury here, this issue of

 4     superseding cause as you've charged them needs to be a part of

 5     the verdict form.  When I was listening to Ms. Lourie, I was     05:22:28

 6     wondering if maybe sections B and C of the verdict form should

 7     be switched but then I'm not sure I get there.  But we have one

 8     possible change to the verdict form on superseding cause but

 9     feel like in light of the evidence in this case, it should stay

10     on the verdict form.                                             05:22:51

11                THE COURT:  All right.  I understand the issue you've

12     raised and I think it's a legitimate issue.  I don't know what

13     the answer is but I want to think about that some.

14                MS. LOURIE:  May I make one more comment, Your Honor?

15     Well, two actually.  I think I already addressed that by        05:23:07

16     allowing the jury to do this in part C, it's really equitable

17     apportionment which I think I explained last week.

18                THE COURT:  Right.  I understand that argument.

19                MS. LOURIE:  And then one more point if you don't

20     mind.  We anticipate, and I don't know because we haven't heard  05:23:25

21     all the testimony in the case, but we anticipate, based on the

22     pleadings and the opening statement, that defense is going to

23     argue more than one intervening cause.  We think they are going

24     to argue that Dr. Amer is an intervening cause and they

25     possibly could argue that Dr. Harvey is an intervening cause     05:23:42

 1     because he didn't leave the strut in the heart.                05:23:45

 2              If that occurs, then --

 3              THE COURT:  Well, let's find out.

 4              Are you going to make that argument, defense counsel?

 5              MS. HELM:  No, Your Honor.                             05:23:58

 6              THE COURT:  You're only going to argue Dr. Kang as an

 7     intervening cause?  Is that right?

 8              MS. HELM:  Correct.  We're going to argue that

 9     Dr. Amer is a separate act of negligence that impacted Ms.

10     Booker, the proximate cause.                                   05:24:11

11              THE COURT:  Okay.  I think that answers that concern.

12              Okay.  I will think about the verdict form and the

13     intervening cause issues that have been raised.

14              All right.  Anything else on the superseding cause

15     instruction that we need to consider?                          05:24:31

16              Okay.

17              Assumption of the risk, page 23.

18              MS. LOURIE:  Well, other than the fact that we don't

19     think that that has been shown by the evidence, but I guess

20     we'll argue that later.                                        05:24:53

21              THE COURT:  Right.  These are instructions to be used

22     if they are supported by the evidence.

23              Any comments on that?

24              MS. HELM:  No, Your Honor.

25              THE COURT:  Damages, pages 24 and 25.                  05:25:06

                         United States District Court

1        MS. LOURIE:  No, sir, no objection.                    05:25:10

2        MS. HELM:  Nothing, Your Honor.

3        THE COURT:  All right.  How about punitive damages,

4   pages 26, 27, and 28?

5        MS. LOURIE:  No, sir.                                  05:25:38

6        MR. NORTH:  Your Honor, the thing on punitive damages

7   is we still believe Bard's proposed number 10 originally

8   regarding the applicability of dissimilar conduct with regard

9   to any punitive award should be given under the facts of this

10  case.  It's pattern charge 66.772.                          05:26:00

11       THE COURT:  It was number 10 that you proposed?

12       MR. NORTH:  In our original, the joint filing of

13  February 28, document 10254 it was page 117 and 118 in that

14  filing.

15       THE COURT:  Right.  What is the dissimilar conduct to   05:26:25

16  which this instruction would be directed?

17       MR. NORTH:  I understand Your Honor may disagree with

18  me but I believe things such as the warning letter they are

19  going to hear about tomorrow, failure to report several

20  particular complaints, all of this Recovery death evidence is  05:26:45

21  not applicable to the design of the G2 filter implanted in Ms.

22  Booker and they are going to try to argue to this jury to award

23  an extravagant punitive award based on what I think is

24  dissimilar conduct.

25       So in that way, I recognize it's a repeat of the        05:27:05

                    United States District Court

1    argument we made at the motion *in limine* stage but I don't

2    believe under the law and I don't believe under the Supreme

3    Court precedent that talks about how the punitive -- the

4    conduct that will warn a punitive award must be directly

5    related to a plaintiff and what occurred with that plaintiff.

6    I don't think it's appropriate here.  So I think that the jury

7    needs to be instructed to that effect.

8            THE COURT:  Any comments?

9            MR. STOLLER:  Your Honor, we don't think there's any

10   dissimilar conduct in this trial.  You know our position on

11   this.  We've argued it in the summary judgment motions and

12   we've argued it again and again but the conduct is all related

13   to the filter that was implanted in Ms. Booker.  The failures

14   by Bard to -- from the get-go of the Recovery all the way

15   through the G2 are highly related to what's here and they are

16   certainly related to our claim for punitive damages in this

17   case.

18           THE COURT:  All right.  I will consider that.  I

19   understand the argument.

20           MR. NORTH:  Can I make one more point, Your Honor?  I

21   think this record is clear that no witness, including the

22   plaintiff's experts, could indicate that they had any awareness

23   of any death from a migration of a G2 filter, the filter at

24   issue in this case.  There is no evidence that the sort of

25   migration deaths that so much of the evidence is focused on

United States District Court

05:27:07

05:27:23

05:27:39

05:27:57

05:28:05

05:28:23

```
 1   with regard to Recovery filter ever happened with this device    05:28:27
 2   and I think that strengthens our position that that is
 3   dissimilar conduct.
 4             THE COURT:  Okay.  I understand that.
 5             MR. STOLLER:  Your Honor, would you like a response    05:28:37
 6   from us now?
 7             THE COURT:  I'm pretty sure I know what it is.
 8             MR. STOLLER:  Okay.  That's why I asked the question.
 9             THE COURT:  It's essentially what you just said;
10   right?                                                          05:28:45
11             MR. STOLLER:  Essentially, yes.  I think you've heard
12   our case on this.
13             THE COURT:  All right.  Anything on the final
14   instructions, the jury deliberation instructions?
15             Okay.  Now, I've been handed several proposed          05:29:06
16   instructions by plaintiff.  Do you want to make any comments on
17   those, Ms. Lourie?  I think I understand the intent of them but
18   I'm happy to hear any comments you wish to make on them.
19             MS. LOURIE:  With respect to the limiting charge, I
20   think that in light of what was brought out in evidence during   05:29:49
21   cross-examination of Ms. Booker, her failure to follow up with
22   doctors' appointments and her leaving without medical advice,
23   since the mitigation of damages and contributory negligence
24   defenses have been withdrawn by the defendants in this case, we
25   feel like that we should be given this -- the jury should be     05:30:15
```

1    given this charge.                                                      05:30:19

2          THE COURT:  Is there any objection to that charge?

3          MS. HELM:  Your Honor, I don't think there's any

4    objection.  I do think that the evidence actually went to her

5    pain and suffering and the severity and nature of her injuries     05:30:30

6    rather than to mitigation.  And I understood the Court's

7    admonishment to me at the sidebar but under Georgia law, proof

8    is required for mitigation.  We weren't offering the evidence

9    for the purpose of mitigation.

10         I think this comments on the evidence.  I think we           05:30:48

11   did not assert assumption of the risk -- I'm sorry,

12   contributory negligence or mitigation.  They are not in the

13   case.

14         The evidence and the testimony went to claims that

15   are in the case.  I don't think the charge is needed.            05:31:02

16         THE COURT:  Well, my concern, Ms. Helm, is that there

17   were two or three, maybe four specific questions asked before

18   we had the sidebar from the medical records to suggest that Ms.

19   Booker never came back, never reported when there was a

20   follow-up request made.                                          05:31:26

21         I could see the jury getting back in the jury room

22   and talking about that and saying, well, she partly caused her

23   own problem.  If she had followed up, maybe this would have

24   been caught.  And that I think under the defense that is being

25   asserted would not be an appropriate basis for the jury to       05:31:43

United States District Court

1    reduce or eliminate her damages.                                    05:31:47

2           MS. HELM:  Your Honor, alternatively, the jury could

3    say she didn't go to the doctor.  She didn't follow up.  She

4    left because she really wasn't hurting, she really wasn't

5    suffering any pain at the time or --                                05:31:59

6           THE COURT:  Well, but doesn't this instruction focus

7    rather narrowly on my concern by saying there's no contention

8    that she is at fault for her injuries in the case?  You can't

9    blame her for the injuries.

10          MS. HELM:  Your Honor, the instruction does address       05:32:15

11   your concern.  I think I'm arguing that I disagree with your

12   concern.  But, yes, the instruction addresses your concern.

13          THE COURT:  Okay.  I'm going to give this

14   instruction.

15          So Jeff, let's include that.                               05:32:27

16          Did you want to comment on others, Ms. Lourie?  I

17   think I understand them all but I want to make sure if you have

18   other points, to make sure we do it quickly only because it's

19   5:32 and Elaine has been going --

20          MR. STOLLER:  I'll do it quickly, Your Honor.  On the    05:32:46

21   FDA, what I'll call the FDA instructions, which are the first

22   three, are just to give the jury some understanding of what

23   those terms are -- that they have heard have been used.  These

24   come from the statutes of, you know, adulterated, misbranded

25   and understanding the obligations of a medical device company    05:33:02

1    with respect to those and what those terms mean.                         05:33:05

2           The fourth request, testimony by Food and Drug

3    Administration employees, is to let the jury know why they are

4    not hearing from those folks in this trial.  They have heard a

5    lot about the FDA but they are not going to hear from the FDA     05:33:16

6    folks because they can't come here and testify.  And you know

7    the purpose of the limiting instruction, this is taken

8    pretty -- if not verbatim, pretty close verbatim from your

9    order and the FDA preemption motion.

10          THE COURT:  All right.  Defense comments on these          05:33:33

11   proposals?

12          MR. NORTH:  Yes, Your Honor.  We strongly object to

13   these.  First of all, I'm not sure that there has been actual

14   evidence here that this device was misbranded or adulterated

15   except to the extent it might be tangentially suggested in the    05:33:48

16   warning letter regarding complaint files.  But with regard to

17   the claims in this case as to whether the design is defective

18   or the warning is defective or inadequate warning, I don't

19   think there's been any testimony that it was adulterated or

20   misbranded.                                                       05:34:07

21          Secondly, I think these are argumentive, particularly

22   on the adulterated and misbranded ones, and I think they are

23   covered completely by the testimony.  Both sides had the

24   opportunity to put on testimony as to any defect in the product

25   and there's a general standard on design defect and warning.      05:34:29

United States District Court

1      I also don't think it's appropriate to instruct the
2  jury about the FDA not being able to give testimony.  I think
3  that raises more questions with the jury than it answers.  I
4  mean, you know, both sides could be faulted by the jury.  It's
5  not a one or another side that the jury might necessarily blame
6  for not bringing in an FDA person, so I think that is
7  inappropriate.
8          The last one seems to be a fair statement of what the
9  Court has ruled in the past but we have been very, very careful
10  I think in this case to use the word "clearance," to avoid the
11  word "approval" and there's been a full explanation by our
12  expert on what that meant and the plaintiffs had the
13  opportunity to present their own and they did not.
14          THE COURT:  Okay.  I understand the parties'
15  positions.
16          MR. NORTH:  And I've got a couple of charges to give
17  the Court.
18          THE COURT:  Okay.  I think I've covered all of the
19  plaintiff's proposed charges.
20          MR. STOLLER:  Yes, we have.
21          THE COURT:  Okay.  Let's quickly take up the
22  defendants'.
23          There's two of them; is that right?
24          MR. NORTH:  Yes, Your Honor.  Number 11 and number
25  12.

```
 1              THE COURT:  All right.  So the question, plaintiff's      05:36:25
 2    counsel, is, do you object to the first proposed instruction
 3    which, since it's not in the record elsewhere, I'll read.  And,
 4    incidentally, plaintiff's counsel, actually both of you, would
 5    you please just file a notice in the docket attaching your        05:36:36
 6    proposed instructions that we discussed today so it's in the
 7    record?
 8              MR. STOLLER:  Yes, Your Honor.
 9              THE COURT:  But this one would say that under Georgia
10    law, whether the FDA instituted any regulatory action is a        05:36:47
11    factor you may consider.
12              Is there an objection from plaintiff on that?
13              MS. LOURIE:  Our objection would be that that is
14    already contained in the charge twice.  It doesn't say under
15    Georgia law but in the Georgia pattern instruction on design      05:37:06
16    defect, strict liability, it's prong 13 and prong 13 is further
17    explained in what is currently the last paragraph of the
18    charge.
19              THE COURT:  So page 14, paragraph 13 you're referring
20    to and then the paragraph on page 15 is what you're referring     05:37:39
21    to, Ms. Lourie?
22              MS. LOURIE:  Yes, sir.
23              THE COURT:  Why isn't it covered by that?
24              MR. NORTH:  Your Honor I think it's a slightly
25    different concept.  There's one thing -- this is talking about    05:37:58
```

United States District Court

1    the manufacturer's conduct in complying.  The *Browning v.*  05:38:01

2    *PACCAR* case under Georgia, looking at from it the agency

3    perspective, says that the absence of a regulatory action with

4    regard to the design of a mass-produced product is some

5    evidence.  05:38:15

6              THE COURT:  We're not talking about -- oh, I'm sorry.

7    I understand your point.  You're saying this doesn't have to do

8    with the company's compliance.  This has to do with the

9    agency's failure to act?

10             MR. NORTH:  Right.  05:38:32

11             THE COURT:  Okay.  I understand it now.

12             MR. STOLLER:  Your Honor, this goes too far.  I mean,

13   there's a pattern instruction.  It lists out the relevant

14   factors for the jury to consider.  This is effectively a

15   comment on the evidence and telling them that if they haven't  05:38:44

16   seen anything here that somehow that the design wasn't

17   defective or negligent is particularly inappropriate in a case

18   like this where we went through 510(k) clearance and not a PMA.

19             I mean, we had a long set of briefing and argument on

20   what does -- what do the actions of the FDA mean in this case,  05:39:02

21   and an instruction like this would suggest that somehow the FDA

22   was looking at this device and monitoring it for its safety and

23   effectiveness of the design, which we all know is simply not

24   the case.  This goes way too far.  To the extent the jury needs

25   to -- is allowed to consider the regulatory conduct, we believe  05:39:20

United States District Court

1   that is already baked into the pattern instruction that you're     05:39:24

2   giving, plus you're giving the supplemental pattern instruction

3   that addresses, you know, what -- well, the relevant regulatory

4   considerations here.

5          THE COURT:  Okay.                                            05:39:38

6          Mr. North, any brief comment on your proposed 12?  I

7   understand why you're giving it or why you're proposing it.

8          MR. NORTH:  Right, Your Honor.  I just think the jury

9   needs to be -- it need to be clear.  I mean, the Court made its

10  ruling after our regulatory expert has been excused and we       05:39:54

11  can't get her back at this late point.  And I think the legal

12  consequence of a warning letter needs to be made clear to the

13  jury.

14         MR. STOLLER:  Suffice to say, Your Honor, we

15  disagree.  We think it's, again, an improper comment on the      05:40:09

16  evidence in the case and the value or the lack thereof of that

17  letter in front of the jury is something that they are to

18  determine on its face.

19         THE COURT:  Okay.

20         I understand the parties' positions.                       05:40:24

21         What have we left out?  Is there anything we have not

22  covered?

23         MR. STOLLER:  I think you've covered everything from

24  us, Your Honor.

25         MR. NORTH:  You have with respect to the jury              05:40:33

                   United States District Court

1    instructions, Your Honor.  There's another matter that is of          05:40:36
2    great concern to us.

3          The Court has instructed the parties to give each
4    other 48 hours notice regarding witnesses appearance and we
5    have been doing that religiously until now and plaintiffs did,          05:40:46
6    too, in all fairness, but they have declined to tell us if they
7    are bringing anybody for rebuttal by saying they don't know yet
8    and they have to know if they are going to bring someone, who
9    it may be, and I think we're entitled to notice.

10          MR. LOPEZ:  He did ask me this morning, Your Honor.          05:41:03
11   I told him, I said, "Look, I have to wait for the day."  It's
12   probably not going to be a witness.  At the most it would
13   probably be us designating maybe a deposition.  We'll make that
14   decision tonight.  I mean, the case is not in yet.

15          THE COURT:  Well, why don't you share with Mr. North          05:41:19
16   the possibility so at least they can be doing some preparation
17   tonight?

18          MR. LOPEZ:  I will.

19          THE COURT:  Tell him what the possibilities are.
20   That doesn't mean you have to use them, but at least he can do          05:41:27
21   some preparation.

22          MR. LOPEZ:   We huddle up every night, Your Honor.
23   We can do that.

24          MR. NORTH:  Can I assume then that there's no live
25   witness tomorrow?          05:41:34

United States District Court

 1          MR. LOPEZ:  We may -- someone that is on the subpoena      05:41:35

 2   list.  It's not going to be an expert.  It's not going to be an

 3   expert.  At most it would be someone that's on the subpoena

 4   list for -- Bard employee or it would be another video.

 5          MR. NORTH:  Your Honor, the only other thing is at        05:41:50

 6   some point -- and I know now is not the time again -- I would

 7   like to make my Rule 50 motion.  And I will be brief when that

 8   time comes.

 9          THE COURT:  How brief?

10          MR. NORTH:  I think i need 10 or 15 minutes to make a      05:42:01

11   record.

12          THE COURT:  All right.  We're not going to do that

13   now.

14          MR. LOPEZ:  Your Honor, what's our schedule?  Is

15   there a chance we're going to argue tomorrow?                    05:42:09

16          THE COURT:  Argue what?

17          MR. LOPEZ:  I mean, do our final argument tomorrow?

18          THE COURT:  Of the case?  Well, it depends, I

19   suppose, on how much additional time defendants take.

20          You've got enough time remaining.  You could take all     05:42:30

21   day tomorrow.  How much time do you think you're going to take?

22          MR. NORTH:  We will not take all day because I want

23   to save some time for closing and rebuttal and whatever.  I

24   suspect that we'll go at least until after lunch, Your Honor.

25          THE COURT:  Okay.  But if you finish shortly after        05:42:44

United States District Court

 1    lunch, we would have time for argument tomorrow; right?  And I          05:42:49

 2    don't want to lose that afternoon.  If the evidence ends at

 3    1:30, I don't want to say, "Go home for the day, jury," because

 4    we have been very careful trying to schedule in that time.

 5            MR. LOPEZ:  I just don't -- I don't want to give my          05:43:04

 6    argument and then they are halfway through theirs and they get

 7    to go home.

 8            THE COURT:  Well, that is an issue we've got to deal

 9    with, as I think I raised that before, about the possibility

10    that we could end up splitting the argument overnight.  Some          05:43:17

11    lawyers love to have the jury think about their argument

12    overnight.

13            MR. LOPEZ:  Your Honor, are you okay if more than one

14    person does, like, different parts of the argument?  Like

15    someone does the opening and someone does the rebuttal on          05:43:33

16    plaintiff's side?

17            THE COURT:  I don't have a problem with somebody

18    doing the first argument and somebody doing the rebuttal

19    argument, somebody else.  That's okay.  We shouldn't have tag

20    team on the main argument.          05:43:45

21            MR. LOPEZ:  No.  No.  And then punitives could be

22    someone different?

23            THE COURT:  Yes.  That's a separate part of the

24    trial.

25            So I'm going to ask you to be as -- your best guess,          05:43:53

                    United States District Court

1    Mr. North, as to how long you think the evidence will go          05:43:57

2    tomorrow?

3              MR. NORTH:  I would suspect it will go until 2

4    o'clock to 2:30, Your Honor, at least.

5              THE COURT:  How many witnesses do you have?            05:44:05

6              MR. NORTH:  We have two but they are both very

7    important witnesses.

8              THE COURT:  Well, on the possibility that we could

9    get done earlier, you should be prepared to argue tomorrow and

10   what that means is that I will get you the final jury           05:44:19

11   instructions before the noon hour.  I mean, I may not -- we may

12   not have all the headings changed and things because I'm not

13   going to have Nancy stay and do that tonight, but we'll get you

14   the final jury instructions tomorrow morning sometime.

15             MR. NORTH:  Does the Court have a 4:20 stop tomorrow?  05:44:43

16             THE COURT:  We've got a 4:30 hearing tomorrow.  What

17   is it, Traci?

18             COURTROOM DEPUTY:  Rule 16.

19             THE COURT:  The answer is yes but if we're at 2

20   o'clock and we're starting argument, I may just --             05:45:06

21             MR. NORTH:  Would the Court instruct the jury before

22   argument?

23             THE COURT:  Yes.  I will instruct before argument so

24   they will have heard the instructions and that allows you to

25   incorporate the instructions into your argument.  I'm intending  05:45:24

United States District Court

1   to stop at 4:20.  But if in order to get the argument done          05:45:26

2   efficiently we need to kick that hearing off and go until 5, we

3   will.

4               Okay.  We'll see you -- well, tomorrow morning then

5   we need to talk about 4327 and the SIR guidelines.                  05:45:41

6               COURTROOM DEPUTY:  Exhibit 7312.

7               THE COURT:  Okay.  Thank you all.

8               (Whereupon, these proceedings recessed at 5:46 p.m.)

9                           *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court

1                    C E R T I F I C A T E                                    05:45:55

2

3          I, ELAINE M. CROPPER, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of        05:45:55

6   Arizona.

7

8          I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled      05:45:55

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control, and to the best of

13  my ability.

14

15         DATED at Phoenix, Arizona, this 28th day of March,        05:45:55

16  2018.

17

18

19

20                         s/Elaine M. Cropper                       05:45:55

21                    _____

22                      Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                   05:45:55


                    United States District Court