1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3              _____

4   In Re: Bard IVC Filters              )   MD-15-02641-PHX-DGC
    Products Liability Litigation        )
5                                        )   Phoenix, Arizona
                                         )   **March 28, 2018**
6   _____ )
    **Sherr-Una Booker, an individual,** )
7                                        )
                        Plaintiff,       )
8                                        )   CV-16-00474-PHX-DGC
            v.                           )
9                                        )
    **C.R. Bard, Inc., a New Jersey**    )
10  **corporation; and Bard Peripheral** )
    **Vascular, Inc., an Arizona**       )
11  **corporation,**                     )
                                         )
12                      Defendants.      )
    _____ )

13

14

15     BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

16         REPORTER'S TRANSCRIPT OF PROCEEDINGS

17             <u>TRIAL DAY 10 A.M. SESSION</u>

18                (Pages 2160 – 2296)

19

20

21  Official Court Reporter:
    Patricia Lyons, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Ste. 312
    401 West Washington Street, SPC 41
23  Phoenix, Arizona  85003-2150
    (602) 322-7257
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared with Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2    For the Plaintiff:

3              Lopez McHugh
               By: **RAMON ROSSI LOPEZ**, ESQ.
4              100 Bayview Circle, Suite 5600
               Newport Beach, CA  92660

5
               Gallagher & Kennedy
6              By: **MARK S. O'CONNOR**, ESQ.
               2575 East Camelback Road, Suite 1100
7              Phoenix, AZ  85016

8              Heaviside Reed Zaic
               By: **JULIA REED ZAIC**, ESQ.
9              312 Broadway, Ste. 203
               Laguna Beach, CA  92651

10
               Watkins Lourie Roll & Chance, PC
11             By: **ROBIN P. LOURIE**, ESQ.
               Tower Place 200
12             3348 Peachtree Rd. NE
               Atlanta, GA  30326

13
               Faraci Lange, LLP
14             By: **HADLEY L. MATARAZZO**, ESQ.
               28 E. Main St., Ste. 1100
15             Rochester, NY  14614

16             Babbitt & Johnson, PA
               By: **JOSEPH R. JOHNSON**, ESQ.
17             1641 Worthington Rd., Ste. 100
               W. Palm Beach, FL  33409

18
               Lopez McHugh
19             By: **JOSHUA M. MANKOFF**, ESQ.
               214 Flynn Ave.
20             Moorestown, NJ  08057

21   For Defendants:

22             Nelson Mullins Riley & Scarborough
               By: **RICHARD B. NORTH, JR.**, ESQ.
23             By: **ELIZABETH C. HELM**, ESQ.
               By: **BRANDEE J. KOWALZYK**, ESQ.
24             201 17th Street NW, Suite 1700
               Atlanta, GA  30363

25

1

2                        **A P P E A R A N C E S   (continued)**

3

4     For Defendants:

5                  Snell & Wilmer
                   By: **JAMES R. CONDO,** ESQ.
6                  400 East Van Buren
                   Phoenix, AZ  85004
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**I N D E X**

2

**EXAMINATION**

3

**WITNESS**                                                                 **PAGE**

4

PIOTR SOBIESZCZYK

5              Direct Examination By Ms. Helm                    2198

6              Cross-Examination By Mr. Johnson                  2234

7              Redirect Examination By Ms. Helm                  2247

8

CHAD MODRA

9              Direct Examination By Mr. North                   2250

10

11

**EXHIBITS**

12

**NUMBER**     **DESCRIPTION**                                        **PAGE**

13

6710       CT Angiogram of the heart                          2198

14

6822       Emory Eastside Medical Center                      2198

15

6823       Gwinnett Medical Center                            2198

16

6826       Northside Hospital                                 2198

17

6827       NY Methodist Hospital                              2198

18

5691       Standard for Product                               2259
           Complaint Handling, 2/9/15

19

5706       Standard for Medical Device                        2271
           Reporting

20

5991       FM1287100 Rev. 5 (MDR                              2284
           Reportability Guidelines)

21

22

23

24

25

# P R O C E E D I N G S

10:01:31  1

2     (Proceedings resumed in open court outside the presence

3   of the jury.)

4

08:30:22  5         THE COURT:  Thank you.  Please be seated.

6              Morning, everybody.

7              EVERYBODY:  Morning, Your Honor.

8              THE COURT:  We are going to get you later this

9   morning the final jury instructions for your review and

08:30:52 10  comment.  We probably ought to just get any final comments on

11  those sometime during the lunch hour.

12             We think we'll have them to you before then, but I'm

13  not sure you'll have time to look at them until the lunch

14  hour.

08:31:08 15             What matters do plaintiff want to raise this morning?

16             MR. MANKOFF:  We have some questions about the

17  admission of two documents still, the Grassi paper and the

18  last four pages of the monthly report.

19             THE COURT:  All right.  What are the issues?

08:31:34 20             MR. MANKOFF:  So there's still a dispute about

21  whether the Grassi papers should come in and whether it's

22  hearsay, so plaintiffs are objecting to the admission of that

23  document.  And we are still trying to argue that the last four

24  pages of the monthly report come in under various exceptions

08:31:51 25  to the hearsay rule.

08:31:52  1          THE COURT:  Okay.  We need to identify those by

2      exhibit number.

3          MR. MANKOFF:  The Grassi paper, I mean, there's

4      several versions so I'm not sure which versions the defendants

08:32:03  5      have proffered, but I believe it is 7312.

6          MR. NORTH:  Yeah, I think that's right.

7          MR. MANKOFF:  And then the monthly report is 4327.

8          THE COURT:  All right.  I don't remember what the

9      issues are on the Grassi paper.  Is that the SIR guideline?

08:32:26 10          MR. NORTH:  Yes, Your Honor.  That's what it is.

11          THE COURT:  That's what we talked about last night.

12          Okay.  So last night Mr. Lopez said he was going to

13      think about the question of whether both ought to come in

14      simply for notice and not for the truth of the matter

08:32:39 15      asserted, and he was going to respond this morning.

16          What are your thoughts on that?

17          MR. MANKOFF:  So we don't agree they should come in

18      for notice.  As far as the SIR guidelines, the purpose that

19      they're trying to use them for is to show that they complied

08:32:56 20      with the rates that are listed in tables 2 and 3.  And so if

21      they wanted to just say they sent the SIR guidelines to the

22      FDA and show the cover page, that would be acceptable.  But

23      the information in those tables is actually embedded hearsay

24      within hearsay within hearsay because it comes from citations

08:33:20 25      to a number of other medical articles.  And when you look at

08:33:25  1    those medical articles, they're summarizing information from

2    even more medical articles going back in time.  And there's

3    been no showing that any of those are not hearsay.

4              THE COURT:  All right.

08:33:36  5            MR. NORTH:  Your Honor, as the Court mentioned, you

6    proposed an agreement last night.  We were initially told the

7    agreement was acceptable, that both documents could come in.

8    We were later told there had been a change of mind.

9              We believe the Court discussed yesterday that the

08:33:51 10    last four pages of that report that summarized -- that they

11    want to offer that summarizes complaint files is clearly

12    hearsay within hearsay as far as reports of what the doctors

13    said, what the sales rep heard, what the marketing person

14    heard or found out.  So the question is does it come in on

08:34:10 15    notice as they have proposed.  I think that's a close call.

16             I think it's less a close call as to whether the SIR

17    guidelines come in on notice.  We have cited several cases

18    that have found that learned treatises can, in fact, be

19    admissible as substantive evidence because they're not being

08:34:33 20    offered for the truth of the matter asserted when they're

21    generally just being introduced to show the general knowledge

22    or notice of the medical community.

23             And we have outlined that in the trial brief we filed

24    very early yesterday morning.

08:34:49 25             I think my ultimate point is it seems to me that if

08:34:52   1   their document 4237 or 4327, I get that mixed up, comes in on

2   the issue of notice, then the SIR guidelines should come in as

3   substantive evidence on the issue of general knowledge or

4   notice to the medical community.  So --

08:35:12   5        MR. MANKOFF:  I understand that you proposed a quid

6   pro quo yesterday, but the issues are actually distinct.  So

7   just because one might be notice doesn't mean that the other

8   one qualifies in the same way.

9        The MDR reports are -- the reports are regularly

08:35:28  10   conducted in the ordinary course of business, and we laid that

11   foundation.  Now I understand that you're saying that some of

12   the information may have come from doctors.

13        But the Ninth Circuit *Childs* case and *Reilly* case

14   stand for the proposition that where that information is

08:35:46  15   there's a duty to report it and it's relied on by the party

16   and investigated by them, then it satisfies the exception.

17        THE COURT:  Those cases have never been mentioned

18   before.  What are those cases?

19        MR. MANKOFF:  So the *Childs* case involved --

08:36:04  20        THE COURT:  Just give me the citations, is what we

21   with need.

22        MR. MANKOFF:  Okay.  So *Childs* is F.3d 1328.

23        THE COURT:  Well, what F.3d.?

24        MR. MANKOFF:  Oh.  Sorry.  5 F.3d 1328.

08:36:24  25        THE COURT:  And what page cite?

08:36:28  1        MR. MANKOFF:  1333.

2        THE COURT:  Okay.

3        MR. MANKOFF:  And *Reilly* is 33 F.3d 1396, page 1414.

4        I apologize, I misspoke.  That's a Third Circuit

08:36:40  5  case.

6        THE COURT:  Which one is Third?

7        MR. MANKOFF:  *Reilly* is the Third Circuit case.

8        THE COURT:  And the first one is a Ninth Circuit

9  case?

08:36:52 10        MR. MANKOFF:  Correct.

11        THE COURT:  All right.  Well, I've never had those

12  cites given to me before, so we've obviously not looked at

13  those cases.  I did look at the cases that the defense cited,

14  particularly the *Buttice*, B-U-T-T-I-C-E, *versus G.D. Searle*

08:37:15 15  case, which does reflect what Mr. North said it did.  We'll

16  need to look at those cases.

17        As I indicated to Mr. Lopez last night, my view is

18  that the last four pages of 4327 include at least four

19  different categories of hearsay within hearsay.  And I haven't

08:37:42 20  read these authorities and how they deal with that, so I don't

21  know what they say.

22        I don't agree with the argument that they don't

23  contain hearsay within hearsay, which is what has been argued

24  so far.  I can't remember if it was said at sidebar or in the

08:37:54 25  court, but those four categories are that there are some

08:37:58  1   statements in this exhibit from DM.  It says DM report.

2   There's been no evidence as to who or what DM is.

3        There are quotes from doctors where it says the

4   doctor reported this or the doctor said this.  That is clearly

08:38:12  5   hearsay within hearsay.

6        There are reports from representatives that appear to

7   be based on what the doctors told them because they will say

8   things like, the doctor had difficulty during deployment, the

9   doctor encountered resistance, the doctor did this or that.  I

08:38:29  10   don't know how the sales reps got that except from the

11   doctors.

12        And then there are some direct reports from doctors

13   recounted where it says "a doctor reported."  Those are all

14   hearsay within hearsay.  I haven't been able to reach any

08:38:45  15   other conclusion than that.

16        As I said to Mr. Lopez, I wrestle with the notice

17   argument because it seems to me the relevancy of the company

18   being on notice only exists if these are true statements, if

19   they're taken for the truth of what's asserted in them.  So I

08:39:04  20   don't know how you divorce relevancy from truth of the matter

21   asserted.  But I'll look at these cases and see what they say.

22        I have the same issue on notice with the SIR

23   guidelines.  I think they are relevant only if you accept the

24   reported rates as true, as accurate.

08:39:22  25        I do understand what is said in the *Buttice* case and

08:39:29  1    I will think about that, but I think I've got to look at these

2    two cases to make a decision.

3              MR. MANKOFF:  If I could just make one factual point.

4              The statements in those last four pages of 4327, they

08:39:40  5    match the statements in the -- what we call the MDR reports,

6    the reports that the company compiled and investigated and

7    they're under a duty to investigate and report to the FDA.

8              And we have the exhibit numbers of that, that show

9    that they match.  And perhaps we'll need to show that.

08:40:01  10             THE COURT:  Well, I can only base admissibility

11   rulings on information in evidence.

12             MR. MANKOFF:  To get them in evidence to show that.

13   But I just wanted to raise that issue that that is further

14   indicia of reliability of those statements.

08:40:14  15             THE COURT:  Well, nobody's been arguing the

16   reliability issue, I don't think.  It's just been a matter of

17   hearsay within hearsay.

18             When you say they match, are you saying they match

19   word for word some other document?

08:40:26  20             MR. MANKOFF:  Correct.

21             THE COURT:  Those other documents are not in

22   evidence, though; right?

23             MR. MANKOFF:  Right.

24             THE COURT:  And there's been no testimony about them.

08:40:33  25             MR. MANKOFF:  So there has been some foundation about

08:40:35   1   how the MDR reports are handled, that they are investigated

2   and reported to the FDA.

3              THE COURT:  Okay.

4        Mr. North.

08:40:42   5              MR. NORTH:  Your Honor, I would just like to briefly

6   address the Court's notion or statement a moment ago that the

7   problem you had with the SIR guidelines and the truth, that

8   they're only relevant if those statements are true.  I would

9   take a different position on that view, Your Honor.

08:40:53  10              We are not saying that the actual -- for example, the

11  guidelines say that fracture is reported 2 to 10 percent of

12  the time in the cases.  That's the table, 2 to 10 percent.  We

13  are not saying or suggesting or using that SIR guidelines to

14  suggest that the actual fracture rate out of all of the

08:41:16  15  universe of filters is 4 percent, 8 percent, or whatever,

16  within that range or even above or below that range.

17              What we are showing is that the general understanding

18  and knowledge and notice in the medical community is that

19  fracture occurs at some level and doctors still consider it

08:41:39  20  acceptable to continue using filters.

21              And on that basis we believe it does show the general

22  knowledge of the medical community, and is not being offered

23  to say that that rate, 2 to 10 percent, is the true rate out

24  there.

08:41:57  25              THE COURT:  And tell me, if you would, the relevancy

08:41:59  1    in your view of that general knowledge in the medical

       2    community.

       3         MR. NORTH:  I think the relevancy goes to the

       4    risk/benefit, Your Honor.  That is the heart of this case

08:42:08  5    under Georgia law as to whether there is a design defect, is

       6    whether the risks outweigh the benefits.  And this is a major

       7    reflection, the understanding in the medical community, that

       8    there are risks associated with these devices.  And yet they

       9    are still acceptable and widely used.

08:42:29 10         THE COURT:  Here, again, is where I'm wrestling.  And

      11    maybe I'm just not thinking about it clearly.  But it seems to

      12    me in the risk/benefit analysis, which the jury does, the jury

      13    is asked to determine whether the benefits outweigh the risks.

      14    It seems to me the jury, then, needs to decide what are the

08:42:45 15    risks.

      16         And you're asking them, I think, or with this

      17    evidence you would suggest to them the risks are fracture at 2

      18    to 10 percent.  That's truth of what's asserted in the table.

      19         So that's what I'm wrestling with.  I mean, I thought

08:43:03 20    what you were going to say when I asked you about relevancy is

      21    it goes to the failure to warn.  If the doctor already knew in

      22    the community that it was 2 to 10 percent, then Bard's failure

      23    to tell them their rate was within that wasn't a failure to

      24    warn.  But my question was going to be but what about the

08:43:19 25    design defect claim and how do we have them not consider it

08:43:22  1   for the truth of the matter when they're addressing a design

2   defect claim?

3        MR. NORTH:  Well, I agree with, obviously,

4   Your Honor, that it is relevant to the general knowledge of

08:43:32  5   the medical community for the failure to warn claim.  And I

6   agree that, not more difficult, but what requires more

7   analysis is the design defect claim.

8        I still would take the position that we're not

9   telling this jury and not asking this jury to decide that a

08:43:49 10   2 percent or -- that the guidelines are saying risk or

11   fracture happens 2 percent of the time or that it's 8 percent

12   or 10 percent.  Just that there is a general understanding in

13   the medical community that there is some level of fracture

14   risk, and yet the doctors consider it acceptable to use.

08:44:08 15        And I think that is evidence, yes, you're right,

16   they've got to make their own risk/benefit calculus.  But in

17   doing so, they have to decide if we acted reasonably in

18   choosing the design.  If we acted reasonably in putting out a

19   device that had a known level of risk of fracture.  And in

08:44:27 20   that regard I think the reasonableness of our conduct can only

21   be assessed against the framework of the general knowledge of

22   the medical community.  And the general knowledge of the

23   medical community is that some level of risk is acceptable,

24   and the SIR guidelines show that without saying that it is

08:44:44 25   definitely a 2 percent risk or definitely a 5 percent risk.

08:44:49  1          THE COURT:  All right.  Well, I've explained why I

       2     have difficulty with both exhibits, but I'll read these

       3     additional cases and I'll get you a ruling sometime before the

       4     close of evidence.  I've got to look at those cases, and I

08:45:03  5     don't know when exactly I'll have time to do that.

       6          Jeff, you're pulling those up?  Okay.

       7          All right.  Does plaintiff have other matters you

       8     wish to raise?

       9          MR. MANKOFF:  No, Your Honor.

08:45:11 10          THE COURT:  How about defendants?

      11          MR. NORTH:  Nothing, Your Honor.

      12          THE COURT:  Okay.  You're still planning on --

      13          MR. O'CONNOR:  I apologize.  I think we do have an

      14     issue with Dr. Sobieszczyk that we wanted to bring to your

08:45:24 15     attention.

      16          THE COURT:  You need to get to a mic, Mr. O'Connor.

      17          MR. O'CONNOR:  I'm sorry.

      18          We do have an issue about Dr. Sobieszczyk, I believe,

      19     that we wanted to raise before he comes on to testify.

08:45:35 20          THE COURT:  What's that?

      21          MR. O'CONNOR:  I'm waiting for Joe Johnson, who is

      22     going to handle him.  I thought he was in the courtroom.  I

      23     apologize.

      24          THE COURT:  Well, we need to address it now.  What's

08:45:45 25     the issue?

08:45:50  1          MR. O'CONNOR:  Is Joe around?

2          Well, the issue, as I understand it, is going to be

3     that they're going to have a number of different imaging

4     studies to show to the jury, and that they're going to have

08:45:59  5     Dr. Sobieszczyk testify that those are missed opportunities.

6          Now, again, the inference here is that there are more

7     doctors who are nonparty at fault.  And I know we've been

8     going back and forth on this, but to establish fault of a

9     doctor -- first of all, in Georgia, there has to be notice.

08:46:21 10          Secondly, to establish the fault of a doctor, you

11    just don't get to say things like it was a missed opportunity.

12    You've got to show that there was a standard of care out there

13    and that it was breached and that the breach caused the

14    injury.

08:46:39 15          I'll let him take over.

16          But I -- we know that they are never going to be able

17    to tie all that up.  They've missed the notice on the other

18    imaging studies.  They are going to try to inject prejudice by

19    maybe calling it a missed opportunity.  But the inference they

08:46:59 20    want the jury to draw is that somehow a missed opportunity of

21    seeing a filter that appears failed in one way or the other

22    caused injuries to Mrs. Booker.

23          THE COURT:  Well, let me ask a question of defense

24    counsel.

08:47:11 25          What do you intend to present through the doctor on

08:47:14  1    missed opportunities?

2         MS. HELM:  Your Honor, simply that through the course

3    of her medical -- he is not offering a standard of care

4    opinion.  He is going to show that there were -- as we've

08:47:27  5    already briefed and this has been addressed to the Court, that

6    there were three or four opportunities where the imaging

7    showed the condition of the filter.  These are the same

8    conditions of the filter that the plaintiff experts,

9    plaintiff's experts, have testified about, and he is going to

08:47:44  10   offer the opinion that those were opportunities to retrieve

11   the filter.

12        He is not offering a standard of care opinion.  We

13   are not offering any of those, other than Dr. Amer, as a

14   intervening cause.  But the jury is entitled to know the

08:48:02  15   course of her treatment and to know what the imaging showed

16   along the way.

17        THE COURT:  What is -- what is the relevancy of those

18   other missed opportunities?

19        MS. HELM:  Your Honor, clearly --

08:48:13  20        THE COURT:  What does it go to in terms of the claim

21   or defense in this case?

22        MS. HELM:  It clearly goes to her damages, it goes to

23   the issue --

24        THE COURT:  Okay.  Let me have you pause there.

08:48:25  25        How does it go to her damages?  Let's say the jury

08:48:28   1   was convinced by the testimony there were four missed

2   opportunities in addition to Dr. Amer.  How does that have any

3   effect on the damages she can claim?

4           MS. HELM:  Well, Your Honor, it clearly goes to the

08:48:40   5   fact that there's issues that she didn't need the open heart

6   surgery and there were opportunities prior to the surgery to

7   address the filter before the strut migrated to her heart.

8           THE COURT:  Well, are you suggesting that you can

9   argue that because of a missed opportunity -- and I'll make it

08:48:58  10   up -- in 2010, Ms. Booker can't recover for the heart surgery

11   if they find that Bard was the proximate cause?

12           MS. HELM:  No, Your Honor.  But I think they can

13   consider that as an intervening cause.

14           THE COURT:  Well, have you ever identified these

08:49:15  15   other doctors as intervening causes?

16           MS. HELM:  Your Honor, we don't have to identify

17   intervening cause under the statute unless we're asking for

18   them to be put on the verdict form.  The only nonparty at

19   fault -- and this has been addressed before the Court.  The

08:49:31  20   only nonparty at fault who we are asking to have on the

21   verdict form is Dr. Amer.

22           But as the Court's aware, we don't have to prove

23   fault to show other intervening causes.  Under Georgia law,

24   you don't have to prove a violation of the standard of care.

08:49:46  25           THE COURT:  Well, let me interrupt you for just a

08:49:49  1    minute.  It sounds like what you want to be able to argue to

          2    the jury in closing is that besides Dr. Kang, there were other

          3    intervening superseding causes.

          4         Is that what you want to argue?

08:50:02  5         MS. HELM:  Yes, Your Honor.

          6         THE COURT:  How can you argue that if that's not

          7    going on the verdict form?

          8         MS. HELM:  Well, Your Honor, I actually think maybe

          9    the verdict form, as we have it addressed, may have to be

08:50:17 10    changed from Dr. Kang to other opportunities or other

         11    intervening causes.

         12         THE COURT:  When did you first notify the defense --

         13    I'm sorry, the plaintiff, that you were going to be arguing

         14    that doctors other than Dr. Kang were intervening causes?

08:50:32 15         MS. HELM:  Your Honor, it's clear as a bell in

         16    Dr. Sobieszczyk's report that was served months ago.  His

         17    report and their opportunity to depose him.  It's in his

         18    report.  He talks about over and over again the missed

         19    opportunities.  We briefed it in the motion in limine.  And

08:50:53 20    all through the motions in limine we discussed missed

         21    opportunities.  So --

         22         THE COURT:  Did you talk about this argument in the

         23    motion in limine on intervening cause?  I don't remember it.

         24    I only remember Dr. Kang being discussed.

08:51:11 25         You don't have to look it up.  I'm just asking for

08:51:13  1    your memory.

2         MS. HELM:  Your Honor, we definitely discussed missed

3    opportunities in the motions in limine.

4         THE COURT:  Okay.  So --

08:51:17  5         MS. HELM:  And that's been a phrase word that we've

6    all been using --

7         THE COURT:  So just so we're clear, the relevancy,

8    then, in your view, of this testimony is that the jury can

9    conclude that one or more of these other missed opportunities

08:51:32 10   was an intervening cause that broke the chain of causation and

11   eliminates Bard's liability.

12        MS. HELM:  Yes, Your Honor.  And under Georgia law,

13   under the Supreme Court case in October, we don't have to

14   prove that those missed opportunities were a violation of the

08:51:50 15   standard of care for them to be an intervening cause --

16        THE COURT:  All right.

17        MS. LOURIE:  Your Honor, this is exactly what we

18   discussed yesterday, and my concern about them raising all

19   these other intervening causes, and they sat there and said

08:52:05 20   they did not plan to argue that.  That was discussed

21   yesterday.

22        THE COURT:  I don't remember that from yesterday.

23   When was that?  How was that discussed?

24        MS. LOURIE:  When we were talking about intervening

08:52:15 25   superseding causes, and I was arguing that by singling out

08:52:20  1   Dr. Kang, it was a comment on the evidence because they were

2   going to get up and argue, presumably, that there were all

3   these other intervening causes.  And you said, well, let's

4   clear this up, and you looked right at them and said, are you

08:52:34  5   going to be making that argument?  And they said no.

6              THE COURT:  Was this last night?

7              MS. LOURIE:  Yes, sir.

8              THE COURT:  I'm afraid it's all become a blur.

9              MS. LOURIE:  I completely understand.

08:52:46 10              THE COURT:  Did you say that last night, Mr. North or

11   Ms. Helm?

12              MS. HELM:  I don't recall saying that, Your Honor.

13              MS. LOURIE:  Well, I would ask that we look at the

14   transcript.

08:52:56 15              THE COURT:  I'll look at the transcript.

16              Mr. Johnson or Mr. O'Connor, did you want to make any

17   other comments?

18              MR. O'CONNOR:  Yes, Your Honor.  And it's this:  You

19   know, had we seen this -- on a summary judgment, the ruling

08:53:10 20   would be reasonable minds couldn't differ on this, because

21   here's the problem:  To suggest that to a jury is causing

22   laypeople to speculate, to speculate that somehow the filter

23   was for sure to fail, to speculate somehow that somewhere in

24   the medical community, if that was reported, a decision would

08:53:27 25   have been made to stop it and pull it out, remove it right

08:53:31   1    then.  It is something that only experts are qualified to talk

           2    about and bring to this jury.  And that is a flaw in that

           3    argument.

           4            THE COURT:  Well, but they're going to do this

08:53:43   5    through an expert.

           6            MR. O'CONNOR:  Pardon me?

           7            THE COURT:  They're going to do this through an

           8    expert, Dr. Sobieszczyk.

           9            MR. O'CONNOR:  They're not going to disclose him to

08:53:53  10    say it would have been removed, they're saying it's a missed

          11    opportunity.  To take the next step is going to inject and

          12    cause this jury to speculate about what would have happened in

          13    the medical community in, say, 2009, 2010.  Yesterday there

          14    was evidence that it wasn't even until 2010 where the medical

08:54:09  15    community started having heightened awareness.

          16            THE COURT:  I understand your point.

          17            Mr. Johnson, you look like you want to say something.

          18            MR. JOHNSON:  The only point I wanted to make was

          19    that I suspect what's going to happen is we're going to hear

08:54:22  20    testimony that there are two ways to skin a cat, both of which

          21    are within the standard of care.  And they want to take that

          22    testimony and say that is a missed opportunity to have removed

          23    this filter.

          24            From my perspective, they need expert testimony to

08:54:33  25    say the standard of care would have required the removal of

08:54:37 1    this filter.  They don't have that testimony.  And that's why

2    this isn't admissible on the issue of causation.

3            THE COURT:  Well, Ms. Helm, if this doctor says there

4    was a missed opportunity, do you have any evidence that the

08:54:51 5    opportunity that was missed was that a doctor would have

6    removed the filter?

7            MS. HELM:  Yes.

8            THE COURT:  Who's going to give that testimony?

9            MS. HELM:  The expert's opinion is that he would have

08:55:01 10   removed the filter -- that a doctor would have removed the

11   filter.  He is entitled to express that opinion.

12           THE COURT:  Is that in his report?

13           MS. HELM:  Yes.

14           THE COURT:  I have to admit this comes as a surprise

08:55:10 15   to me, because up until this morning I don't remember ever

16   hearing the suggestion that the defense was going argue more

17   than one intervening cause.

18           MS. HELM:  Actually, Your Honor, if I may?

19           THE COURT:  Um-hmm.

08:55:20 20           MS. HELM:  In Docket 10258, which is the Court's

21   ruling on the motion in limine, the Court ruled:  Defendants

22   may assert the separate legal doctrine of intervening cause

23   with respect to Dr. Kang or other nonparties not named in the

24   notice.

08:55:45 25           And you further ruled that we did not have to show

08:55:57   1   that it was fault.

2           So the issue of --

3           THE COURT:  Well, but do I say anything more than

4   those four words?

08:56:04   5           MS. HELM:  The Court may assert --

6           THE COURT:  Nonparties not named.  I mean, did I --

7   did you argue that I consider others besides Dr. Kang?  I

8   don't remember doing that.  And I might have, I just -- I know

9   we haven't talked about it in connection with the jury

08:56:18   10  instructions.

11          MS. HELM:  Your Honor, you specifically held, first,

12  with respect with the exception of Dr. Amer, defendants may

13  not assert at trial that other medical providers, including

14  Dr. Kang, should be apportioned under OCGA 511233.

08:56:34   15          We are not seeking to do that.  We are only seeking

16  to -- we have only offered to a standard of care --

17          THE COURT:  I know, on comparative fault --

18          MS. HELM:  And then you said second:  Defendants may

19  assert the separate legal doctrine --

08:56:47   20          THE COURT:  That's what you just read; right?

21          MS. HELM:  Yes, Your Honor.

22          So it was addressed in Motion in Limine Number 6 and

23  ruled on by the Court.  That is the motion in limine where we

24  cited *Jordan versus* --

08:56:59   25          THE COURT:  Why is it this hasn't come up in our

08:57:02  1   discussions of jury instructions on the intervening cause

2   instructions?

3        MS. HELM:  Your Honor, frankly -- I apologize.  When

4   we were arguing the jury instructions, I didn't -- it didn't

08:57:10  5   come to my mind.  I was not intentionally omitting it, I was

6   focused on the issue at hand.  So that's my omission.

7        THE COURT:  When is this doctor going to be put on?

8        MS. HELM:  First up.

9        THE COURT:  This issue gets raised 15 minutes before

08:57:33 10  the doctor comes on.

11       I mean, you've known about this report a long time,

12  presumably.

13       Well --

14       MS. LOURIE:  Can we present the Court with the

08:57:47 15  testimony from yesterday --

16       MR. JOHNSON:  No, no, this is the deposition

17  testimony of the witness who is going to be called.

18       MS. LOURIE:  Oh.  Sorry.

19       MR. JOHNSON:  May I?

08:57:59 20       THE COURT:  How is this relevant, Mr. Johnson?

21       MR. JOHNSON:  Because he was specifically asked

22  whether he was going to render an opinion as to whether

23  Dr. Kang and the other doctors breached the standard of care

24  with respect to their treatment of Ms. Booker.

08:58:10 25       THE COURT:  Well, but the *Zavala* case says they don't

08:58:13  1   have to prove a breach of the standard of care.

2           MR. JOHNSON:  But they still have to prove that a

3   doctor -- the standard of care would have required the removal

4   of this filter.

08:58:22  5           THE COURT:  Well, she says that without the words

6   using -- without using "standard of care," this doctor will

7   say had this opportunity not been missed, the filter would

8   have been removed.

9           Is that in his report?

08:58:34  10           MR. JOHNSON:  I don't believe that's in his report.

11   I think what he is saying is that while I might have chosen to

12   remove it, it would have been appropriate for these doctors

13   not to remove it.  That's the problem.

14           THE COURT:  What's in his report, Ms. Helm?

08:58:47  15           MS. HELM:  Your Honor, he specifically calls them

16   missed opportunities to retrieve the filter.  His opinion --

17           THE COURT:  And what does he say about that?  What is

18   the explanation?

19           MS. HELM:  Well, Your Honor, in his report, that the

08:58:59  20   events that we talk about -- I'm sorry -- he says were missed

21   opportunities to retrieve the filter.  He was not deposed --

22   this was part of our motion in limine.  He was not deposed on

23   what that meant at his deposition.

24           THE COURT:  Well, but so the only thing he says is it

08:59:16  25   was a missed opportunity to retrieve the filter?

08:59:19  1          MS. HELM:  He says each of these incidents was a

       2   missed -- and that's what you cited to in your order, were

       3   that they were a missed opportunity to retrieve the filter.

       4          THE COURT:  Okay.

08:59:28  5          MS. HELM:  His opinion is going to be that he would

       6   have retrieved the filter.

       7          THE COURT:  Does he say that in his report, "I would

       8   have retrieved the filter"?

       9          MS. HELM:  Your Honor, he doesn't specifically say "I

08:59:37 10   would have retrieved the filter."  He says "These were missed

      11   opportunities to retrieve the filter."

      12          THE COURT:  Does he say that a reasonable doctor in

      13   this situation would have retrieved the filter?

      14          MS. HELM:  Your Honor, I think his opinion will be

08:59:50 15   that -- he doesn't -- no, Your Honor, he does not use those

      16   words in the report.

      17          THE COURT:  Okay.  Then you can't use -- he can't say

      18   that in the testimony if it's not in the report.

      19          MS. HELM:  Your Honor, I understand.  But can he

09:00:02 20   testify that it's his opinion that the filter could have been

      21   removed at the time?

      22          THE COURT:  Well, could have been removed.  I guess

      23   the question is do you have any evidence to this jury that had

      24   these opportunities not been missed, the filter would have

09:00:15 25   been removed?  Which, it seems to me, is necessary for any

09:00:19    1    intervening cause.

            2           MS. HELM:  Your Honor, you're asking us to prove a

            3    negative because this information was not provided to the

            4    medical -- to the treating physicians.  That's part of the

09:00:34    5    problem.  He should be able to state within a reasonable

            6    degree of medical certainty, which he can, that had this

            7    information been conveyed, the filter could have been removed.

            8           THE COURT:  Well, let's say -- let's say he says

            9    that, and the jury's back in the jury room deliberating and

09:00:50   10    they say, okay, we have evidence that the filter could have

           11    been removed.  We don't have evidence that the filter would

           12    have been removed.  How can "could have been" be an

           13    intervening superseding cause?

           14           MS. HELM:  Your Honor, in *Moore versus Singh*, 326

09:01:08   15    Georgia Appeal 805, the court addressed this very issue.  In

           16    that case one expert offered a standard of care opinion,

           17    another expert said this could have happened, and the court

           18    ruled that that was sufficient to get the issue to the jury.

           19           THE COURT:  Well, we are at two minutes after 9:00 on

09:01:28   20    the morning we're going to call him and I've never read that

           21    case before.

           22           MS. HELM:  Actually, Your Honor, you have.  It was

           23    cited at length and --

           24           THE COURT:  On this point?

09:01:35   25           MS. HELM:  Yes, Your Honor.  It was cited --

09:01:38   1          THE COURT:  On this issue?

          2          MS. HELM:  In the motions in limine.

          3          THE COURT:  Were you arguing the "could have" versus

          4    "would have" in the motion in limine?

09:01:45   5          MS. HELM:  Actually, Your Honor, I have my --

          6        (The Court and the law clerk confer.)

          7          MS. HELM:  Actually, Your Honor, yes, I did argue

          8    "could have" in the motion in limine.

          9          THE COURT:  Read to me what you wrote.

09:02:19  10          MS. HELM:  "If asked, Dr. Sobieszczyk would have

         11    testified that had the condition of her device fracture been

         12    discovered and the information been properly reported,

         13    Ms. Booker's filter could have been timely retrieved avoiding

         14    her complicated surgery."

09:02:34  15          It is on page 4 of docket 10066, which is our

         16    response to their motion in limine.  We addressed it head-on.

         17          THE COURT:  Well, but that doesn't address the

         18    question whether "could have" is sufficient for intervening

         19    cause.

09:02:53  20          MS. HELM:  It's sufficient on -- in the *Moore versus

         21    Singh* case, they held that the testimony that it could have

         22    been done was sufficient to establish proximate cause to get

         23    it to the jury.

         24          So, respectfully, Your Honor, this has been briefed

09:03:09  25    at length and we actually --

09:03:11   1          THE COURT:  No, no, we haven't -- what you're reading

2     me doesn't address whether "could have" is sufficient for

3     intervening cause.

4          MS. HELM:  Your Honor, the *Moore versus Singh* case --

09:03:21   5          THE COURT:  But that wasn't argued; right?  Nobody

6     raised the question in the briefing as to whether "could have"

7     is sufficient for intervening cause.

8          I know you're arguing that's what *Moore* stands for,

9     but I don't think that issue has been raised before today.

09:03:37  10          MS. HELM:  Respectfully, Your Honor, I disagree.  I

11    think it's been raised and you held that he could testify to

12    that for --

13          THE COURT:  But the basis for that whole motion in

14    limine was not that his evidence will be insufficient to prove

09:03:51  15    intervening cause.  The whole basis for the motion was they

16    can't argue intervening cause because they didn't identify

17    these doctors as nonparties at fault.

18          And I disagreed with that, because there's a separate

19    doctrine in Georgia for intervening cause.  And I concluded

09:04:05  20    both doctrines apply; one requires notice, the other doesn't.

21    And you could assert intervening cause.  But I don't remember

22    anybody arguing his testimony won't prove intervening cause

23    for the non Dr. Kang events.

24          Am I -- do you think that was briefed and argued

09:04:23  25    somewhere?

09:04:25   1          MS. HELM:  Yes, Your Honor, because the Court ruled,

2    in Docket 10258, on page 12:  The Court will instruct the

3    jury, making clear that the fault or actions of Dr. Kang or

4    similarly situated nonparties may be considered only if the

09:04:41   5    three elements of intervening cause set forth --

6          THE COURT:  Okay.  You've made that the point that

7    the order talks about other potentials, other potential

8    intervening causes.  That doesn't consider the question of

9    whether "could have" is enough for intervening cause.

09:04:54  10          My point is we are five minutes into when his

11    testimony is supposed to be given and I've never read the case

12    law.  Well, if I looked at *Moore*, I didn't look at it on this

13    issue.

14          Jeff, do you have the intervening cause instruction?

09:05:07  15          MS. HELM:  Your Honor, I have a copy.

16          Your Honor, also on page 10 of his report,

17    Dr. Sobieszczyk states that retrieval should have been

18    considered and then -- in 2007, and it goes on and talks about

19    the missed opportunities to retrieve.

09:05:43  20          THE COURT:  Well, I can't rule on this issue without

21    looking at the case law.  I'm not going to keep the jury

22    waiting while I look at the case law.  This is not an issue

23    that needed to be raised just before the witness came on.

24          I think what I'm going to do is I'm going to allow

09:06:00  25    him to testify.  We'll look at the case law while he is

09:06:03  1      testifying.  If I agree with plaintiffs, I will instruct them

2      to disregard that testimony and I will instruct them that

3      there's only one possible intervening cause, which is

4      Dr. Kang.

09:06:15  5           If I disagree with plaintiff, then we'll probably go

6      with the instructions as they are because defendant hasn't

7      requested a broader instruction.

8           But I'm not going to keep this jury waiting on an

9      issue we could have raised long before five minutes to 9

09:06:30  10     o'clock on the morning this doctor is set to testify.

11          MS. LOURIE:  It was raised yesterday, Your Honor, and

12     they clearly said they were not going to do that.

13          THE COURT:  I know.  I know that you've said that.  I

14     don't remember it.  I don't have the transcript.  And I can't

09:06:41  15     get it from this reporter because it was a different reporter,

16     but I'll look at that as well.  And if you're right, then I

17     will take that into account.  But I don't want the jury

18     waiting while we try to track down Elaine Cropper in another

19     courtroom, get her out of the courtroom, ask her to go find

09:06:55  20     the transcript and get it to me, which would take a long time.

21          Okay.  So we don't keep the jury waiting, we're going

22     to go ahead and let him testify on this issue.  And in the

23     meantime, let's look -- we need the citation for that case,

24     Ms. Helm.

09:07:14  25          MS. HELM:  Your Honor, I have a copy of the case.

09:07:16  1          THE COURT:  Would you give it to Jeff.

       2          And, Trish, can you e-mail Elaine and see if she can

       3  get us --

       4          THE COURTROOM DEPUTY:  I'm doing it.

09:07:25  5          THE COURT:  Okay.

       6          MS. HELM:  Your Honor, may I be excused for just a

       7  minute before we get started?

       8          THE COURT:  Yeah.

       9          Okay.  It should be on LiveNote, right?  How can I

09:08:59 10  call it up?

      11      (The Court and the court reporter confer.)

      12          THE COURT:  All right.  Ms. Lourie, are you here?  I

      13  found the exchange from last evening that I think you're

      14  talking about.

09:10:17 15          You said this.  You said:  And then one more point if

      16  you don't mind.  We anticipate, and I don't know because we

      17  haven't heard all the testimony in the case, but we anticipate

      18  based on the pleadings and the opening statement that defense

      19  is going to argue more than one intervening cause.  We think

09:10:35 20  they're going to argue that Dr. Amer is an intervening cause

      21  and they possibly could argue that Dr. Harvey is an

      22  intervening cause because he didn't leave the strut in the

      23  heart.

      24          I then said:  Well, let's find out.  Are you going to

09:10:51 25  make that argument, defense counsel?

09:10:53  1          And they said:  No, Your Honor.

       2          And then I said:  You are only going to argue

       3   Dr. Kang as an intervening cause; is that right?

       4          And Ms. Helm responded:  Correct.  We're going to

09:11:09  5   argue that Dr. Amer is a separate act of negligence that

       6   impacted Ms. Booker's proximate cause.

       7          So you were talking about Dr. Harvey.  But I did ask

       8   you, Ms. Helm, I said:  You're only going to argue Dr. Kang as

       9   an intervening cause; is that right?

09:11:32  10         And you said:  Correct.  We're going to argue that

      11   Dr. Amer is a separate act of negligence that impacted

      12   Ms. Booker's proximate cause.

      13         MS. HELM:  Your Honor, I understand my statement.

      14   I -- at the time I didn't -- I was thinking about Dr. Harvey

09:11:48  15   and Dr. Kang.  I apologize.  I wasn't trying to mislead.  I

      16   frankly was focused on the issue immediately above that.

      17         THE COURT:  Well, the argument you made, Ms. Lourie,

      18   was that they would argue Dr. Harvey was an intervening cause.

      19   I understand now you probably intended that more broadly, but

09:12:07  20   that's what's said.

      21         So I can't conclude from that exchange that it was

      22   absolutely ruled out.  I think that is ambiguous.

      23         MR. STOLLER:  Your Honor, in fairness, if there had

      24   been anything from the other side alerting us to this, we

09:12:20  25   would have raised the point at that time because the

09:12:23  1   particular language in the instruction is limited to Dr. Kang.

2   That's the issue we have here, is that we thought this was a

3   settled issue leaving the courthouse yesterday, that the only

4   intervening cause we're dealing with was Dr. Kang.

09:12:35  5        THE COURT:  I can understand why you reached that

6   conclusion.  I don't think that's unreasonable.  But given the

7   fact the argument was they're going to argue Harvey as

8   intervening cause, and that's what prompted the exchange, I

9   can't conclude the defendants were thinking and saying we

09:12:50  10  won't argue the Sobieszczyk -- I don't know how it is

11  pronounced, but this other doctor's testimony.

12        So I think we need to go forward as I described.

13  We're going to hear the testimony, we're going to look at the

14  case law in the meantime, and I'll make it clear to the jury

09:13:03  15  at the end if I agree with plaintiff.

16        But I'm not going to keep the jury waiting while I go

17  do legal research.  We're already 15 minutes overdue.

18        So let's bring them in.

19     (The jury entered the courtroom at 9:13.)

09:14:30  20        THE COURT:  Good morning, ladies and gentlemen.

21  Please be seated.

22        We apologize for keeping you waiting 15 minutes.

23  We've been in here working since 8:30 in an effort to get

24  things clarified so we can get through the evidence, we hope,

09:14:41  25  today.  And we're sorry we kept you waiting during that time.

09:14:44  1          Okay.  We are going to proceed with the defense

        2  testimony.

        3          MS. HELM:  Your Honor, at this time -- and I can't

        4  pronounce his first name, so I'm not even going to try -- we

09:14:53  5  call Dr. Sobieszczyk.

        6          THE COURT:  All right.

        7          Sir, would you please come forward, please.

        8          THE COURTROOM DEPUTY:  If you would stand right here

        9  and raise your right hand.

       10               **PIOTR SOBIESZCZYK, M.D.,**

       11  called as a witness herein, after having been sworn or

       12  affirmed, was examined and testified as follows:

       13          THE COURTROOM DEPUTY:  Doctor, would you mind please

       14  spelling your name for the record.

09:15:07 15          THE WITNESS:  P-I-O-T-R, last name is

       16  S-O-B-I-E-S-Z-C-Z-Y-K.

       17          THE COURTROOM DEPUTY:  Thank you.

       18          MS. HELM:  Your Honor, before we proceed I would like

       19  to admit into evidence certain medical records of Ms. Booker.

09:15:55 20  They're Exhibits 6827, 6826 --

       21          THE COURT:  Hold on, if you would, just one minute,

       22  please.

       23          MS. HELM:  I'm sorry.

       24          THE COURT:  Okay.  Say those again.

09:16:15 25          MS. HELM:  6827, 6826, 6822, 6823, and 6710.

09:16:27   1          THE COURT:  Any objection?

           2          MR. JOHNSON:  Judge, those are excerpts from large

           3  imaging studies.  I would prefer that the entire imaging study

           4  be admitted into evidence as opposed to just these select

09:16:39   5  portions of those studies.

           6          THE COURT:  What's your response, Ms. Helm?

           7          MS. HELM:  Your Honor, it's impossible to show the

           8  entire imaging.  We'll be happy to tender the discs into

           9  evidence.

09:16:50  10          THE COURT:  How large are those studies, Mr. Johnson?

          11          MR. JOHNSON:  Judge, I don't know how large they are,

          12  but as the Court probably knows, a CT imaging study consists

          13  of many, many, many separate images.  And to pull one image

          14  out to the exclusion of the other is, I think, a little

09:17:06  15  misleading.  They can certainly isolate those for purposes of

          16  the doctor's testimony, but I would prefer that the entire

          17  study be admitted as opposed to a single image.

          18          THE COURT:  Well, I'm going to go ahead and admit

          19  these exhibits with the proviso that if you all can reach

09:17:18  20  agreement, we will put the rest of it in, and I'll be happy to

          21  rule on that if you can't reach agreement.  So I'm not

          22  foreclosing the opportunity, but I'm going to let them

          23  introduce these exhibits.

          24          MR. JOHNSON:  Okay.

09:17:30  25          MS. HELM:  Your Honor, I don't think there's any

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:17:31  1   dispute.  We'll be happy to tender the entire set of images,

2   tender the entire discs into evidence.

3        THE COURT:  Okay.  We'll deal with that when we're

4   not keeping the jury waiting on that issue.

09:17:44  5        MS. HELM:  Thank you.

6        (Exhibits 6710, 6822, 6823, 6826 and 6827 admitted.)

7            D I R E C T   E X A M I N A T I O N

8   BY MS. HELM:

9   Q    Dr. Sobieszczyk, you heard me say I can't pronounce your

09:17:50 10   first name.  Would you please introduce yourself to the jury.

11   A    Good morning.  My name is Piotr Sobieszczyk.  It's a

12   Polish name, hence difficult.  I am a practicing

13   cardiovascular specialist at Brigham and Women's Hospital and

14   Harvard Medical School in Boston.

09:18:07 15   Q    Would you please tell the jury where you're originally

16   from?

17   A    I was born in Poland, and came to the United States when I

18   was a teenager.

19   Q    And what were the circumstances that brought you to the

09:18:16 20   United States?

21   A    At that time Poland was still under communist rule, and my

22   parents left and took us with them for political reasons.

23   Q    Did you go to high school or graduate from high school in

24   the United States?

09:18:34 25   A    I did.

DIRECT EXAMINATION - PIOTR SOBIESZCZYK, M.D.

09:18:35  1    Q    And did you go to college in the United States?

       2    A    Yes.

       3    Q    Where did you go to college?

       4    A    I went to college at Harvard College in Boston.

09:18:44  5    Q    And did you receive a degree from Harvard?

       6    A    Yes, I did.

       7    Q    And what is your degree from Harvard?

       8    A    It was bachelor of arts in biochemistry.

       9    Q    And following college, did you go to medical school?

09:18:58 10    A    Yes.  I moved to New York City and attended Columbia

      11    University Medical School.

      12    Q    Did you graduate from Columbia Medical School with honors?

      13    A    Yes, I did.

      14    Q    Tell us about your formal training following medical

09:19:10 15    school.

      16    A    I moved back to Boston and completed residency in internal

      17    medicine at Massachusetts General Hospital.  And from there

      18    moved across town to Brigham and Women's Hospital, where I

      19    completed training in cardiology, followed by additional

09:19:30 20    training in vascular medicine, and then completed additional

      21    fellowship in interventional cardiology and also in additional

      22    interventional training in diseases or in blood vessels, veins

      23    or arteries, outside the heart.

      24    Q    Do you currently hold any academic appointments?

09:19:58 25    A    Yes.  I am -- I have a teaching appointment at Harvard

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:20:04  1   Medical School.

2   Q    And what do you teach?

3   A    I teach cardiovascular medicine, vascular medicine, to

4   residents and fellows.  And also procedures in the heart

09:20:20  5   arteries, heart valves, and blood vessels in the body to

6   advanced fellows.

7   Q    Does that include the implantation and retrieval of IVC

8   filters?

9   A    Yes, it does.

09:20:32  10   Q    Do you also practice, actively practice medicine?

11   A    I am -- I practice at Brigham and Women's Hospital, yes.

12   Q    And is Brigham and Women's Hospital affiliated or

13   associated with Harvard Medical School?

14   A    Yes.  It's one of the major teaching hospitals of that

09:20:51  15   medical school.

16   Q    Do you hold any leadership positions in your

17   interventional cardiology practice?

18   A    So within the scope of my practice I am an associate

19   director of the cardiac catheterization laboratory, and I'm a

09:21:05  20   director of the vascular diagnostic laboratory at Brigham,

21   where we perform ultrasounds of veins and arteries to diagnose

22   vascular disease.

23   Q    I should have asked this previously.  Are you licensed to

24   practice medicine?

09:21:22  25   A    I am.

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:21:23  1    Q    And in what state?

2    A    In Massachusetts.

3    Q    Have you been certified by any boards of medicine?

4    A    Yes.  I was -- I took board examination in internal

09:21:33  5    medicine, cardiovascular medicine, and interventional

6    cardiology, and passed those boards.

7    Q    Approximately how long have you been practicing medicine?

8    A    I started my residency in 1997, so it's just about 20

9    years.

09:21:51  10   Q    All right.  As part of your interventional cardiology

11   practice at Brigham and Williams, do you work with IVC

12   filters?

13   A    I do.

14   Q    Approximately how many IVC filters do you estimate you

09:22:02  15   have implanted and retrieved over the course of your medical

16   career?

17   A    I don't know the exact number, but it's well over hundred.

18   Q    Does that include Bard filters?

19   A    It does.

09:22:12  20   Q    Does that include other manufacturers' filters?

21   A    Certainly.

22   Q    And does that include the Bard G2 filter?

23   A    It did, yes.

24   Q    Have you treated and followed patients who have had

09:22:23  25   filters implanted and/or retrieved?

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:22:25  1    A    Yes.

2    Q    In preparing your opinions in this case, did you review

3    the medical records for the plaintiff, Ms. Booker?

4    A    I have, yes.

09:22:35  5    Q    Did your review of the medical records include reviewing

6    X-rays, CT scans, and other imaging of Ms. Booker?

7    A    It did.

8    Q    Doctor, before we get to your opinions, in the records of

9    Ms. Booker that you reviewed, did you see an indication that

09:22:54  10   she had experienced a heart attack or heart attacks prior to

11   receiving her G2 filter?

12   A    There was a mention of that in the admission note when she

13   presented with her pulmonary embolism, yes.

14   Q    And you -- am I correct that you have not had an

09:23:11  15   opportunity to go back and look at the actual medical records

16   relating to that diagnosis of a heart attack?

17   A    No.  Those records were not available.

18   Q    At the time Ms. Booker received her filter in 2007, had

19   she experienced prior pulmonary embolism?

09:23:30  20   A    According to the admission note, yes, she suffered

21   pulmonary embolism a few years before that presentation.

22   Q    And she had also suffered a pulmonary embolism

23   approximately a month before the implant; is that --

24   A    That is correct.

09:23:44  25   Q    And at the time she was admitted at New York Methodist

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:23:49  1    Hospital for the implant of the filter, was she taking

2    anticoagulants?

3    A    At that time she was treated with blood thinners,

4    anticoagulants, for the pulmonary embolism, yes.

09:24:08  5    Q    Based on your review of the medical records, did she have

6    to stop taking the anticoagulants when she was admitted to

7    New York Methodist in June of 2007?

8    A    Yes.

9    Q    And why did she have to stop taking the anticoagulants?

09:24:18  10    A    She developed bleeding complication and her hematocrit

11    decreased and she developed anemia, and so the blood thinners

12    had to be stopped.

13    Q    Dr. Streiff testified in this case that a patient with a

14    pulmonary embolism approximately a month before the implant of

09:24:36  15    the filter, an active bleed who had to stop anticoagulants and

16    was diagnosed with cancer, is an appropriate candidate for an

17    IVC filter.

18         Do you agree with that?

19    A    I do.

09:24:48  20    Q    Do you agree that Ms. Booker was an appropriate candidate

21    for an IVC filter?

22    A    Yes.

23         MS. HELM:  Can we pull up 6827.1, please.

24    BY MS. HELM:

09:24:59  25    Q    Doctor, can you see this image on the screen?

DIRECT EXAMINATION - PIOTR SOBIESZCZYK, M.D.

09:25:05   1   A   Yes, I can.

2   Q   Can you tell the ladies and gentlemen of the jury what

3   this is?

4   A   This is a scout radiograph performed as part of a CT scan

09:25:15   5   on June 21st, 2007.  So it is basically an X-ray which is

6   performed in the initial stage of obtaining a full CAT scan,

7   and it's used as a bird's-eye view image to time and determine

8   which part of the body's going to be imaged by the CAT scan.

9   Q   Wait, Doctor, let me interrupt you.

09:25:39   10      MS. HELM:  Your Honor, this has been admitted.  May

11   it be published to the jury?

12      THE COURT:  Yes.

13      MS. HELM:  Thank you.

14   BY MS. HELM:

09:25:47   15   Q   Dr. Sobieszczyk, is this the scout scan of the CT that was

16   taken the day after Ms. Booker's filter was implanted?

17   A   Yes.

18   Q   And would you show the jury -- you don't have a laser

19   pointer?

09:26:05   20   A   I do not.

21   Q   Does the -- we're --

22      THE COURTROOM DEPUTY:  He can write on the screen.

23   BY MS. HELM:

24   Q   You can circle on the screen, you can show the jury

09:26:12   25   where --

DIRECT EXAMINATION - PIOTR SOBIESZCZYK, M.D.

09:26:13  1   A   So in the circle you can see the actual filter.  On the

2   upper part of the circle you may notice a brighter white tip

3   of the filter, which was more visible, and the same image

4   somewhat enlarged is on the right part of the -- of the slide.

09:26:37  5   And you can see that the filter is straight up and down along

6   the vertebral column in the IVC without any evidence of

7   tilting.  And this is right after placement of the IVC filter.

8          MS. HELM:  You can take it down.

9   BY MS. HELM:

09:27:00 10   Q   At the time Ms. Booker's G2 filter was implanted in June

11   of 2007, do you have any understanding about whether that

12   filter was cleared for permanent or optional use?

13   A   At that time the filter was cleared for permanent use.

14   Q   Back in 2007, were you retrieving G2 filters that had --

09:27:18 15   before they were cleared for retrievability?

16   A   Yes.

17   Q   Are you aware that Dr. D'Ayala, who implanted the filter,

18   testified that he wanted a retrievable filter?

19   A   Yes, I am.

09:27:31 20   Q   Did you agree -- do you agree with that assessment for

21   Ms. Booker?

22   A   Yes.

23   Q   Are you also aware that Dr. D'Ayala testified that it was

24   important for Ms. Booker to return for follow-up regarding her

09:27:41 25   filter?

DIRECT EXAMINATION - PIOTR SOBIESZCZYK, M.D.

09:27:42   1   A    Yes.

2   Q    Doctor, do you have an opinion as to whether Ms. Booker's

3   filter should have been retrieved in 2007 or 2008?

4            MR. JOHNSON:  Disclosure, Your Honor.

09:27:54   5            THE COURT:  Is this in the report?

6            MS. HELM:  Yes, Your Honor, page 10 --

7            THE COURT:  Could I have a copy, please.

8            MS. HELM:  Your Honor, I provided a copy.

9            THE COURT:  Okay.

09:28:04  10            MS. HELM:  Page 10, opinion number 1, "The filter

11   would have been retrieved once anticoagulation was resumed and

12   tolerated."

13            THE COURT:  Where on page 10?

14            MS. HELM:  Paragraph -- opinion number 1.

09:28:33  15            THE COURT:  Page 10 doesn't have a opinion number 1.

16            MR. JOHNSON:  Page 11, Your Honor.

17            MS. HELM:  I'm sorry.

18            THE COURT:  Okay.

19            MS. HELM:  My copy, for some reason it's page 10.

09:28:43  20   Opinion number 1.

21            THE COURT:  All right.  Let me read that.

22            Would you please rephrase the question.

23            MS. HELM:  Yes, Your Honor.

24   BY MS. HELM:

09:29:18  25   Q    Dr. Sobieszczyk, after Ms. Booker's biopsy for her

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:29:24 1  cervical cancer in 2007, would you have resumed her

2  anticoagulation therapy?

3  A   I would have, yes.

4  Q   And if that anticoagulation therapy had been resumed,

09:29:41 5  would you have recommended that the filter be retrieved?

6           MR. JOHNSON:  Same objection, Your Honor.

7           THE COURT:  Overruled.

8           THE WITNESS:  I would have.

9  BY MS. HELM:

09:29:54 10  Q   And if anticoagulation therapy could not have been

11  resumed, would you have still recommended that the filter be

12  retrieved?

13  A   I would have waited for six months, which is the usual

14  treatment for pulmonary embolism deep vein thrombosis with

09:30:13 15  blood thinners, and when that time period was completed, I

16  would have retrieved the filter.

17  Q   Do you see any evidence from the medical records for

18  Ms. Booker that you reviewed that retrieval of the filter was

19  considered before 2014?

09:30:30 20  A   Not in the records I reviewed.

21  Q   Doctor, in review of the records and imaging, did you

22  identify times where you felt like there were signals that the

23  filter should have been retrieved?

24  A   Yes, I have.

09:30:47 25  Q   And do you refer to those as missed opportunities?

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:30:50   1   A   I think you could call them that, yes.

2   Q   What do you mean by a missed opportunity?

3   A   I think there are several imaging studies which provide

4   information that the filter changed its position, and those

09:31:09   5   imaging studies should have prompted reconsideration and

6   consideration of filter retrievable.

7   Q   And when was one of those first -- when was the first

8   missed opportunity?

9   A   I believe the first one was in February of 2008.

09:31:29   10        MS. HELM:  Would you please pull up 6827.003.

11   BY MS. HELM:

12   Q   Your Honor -- excuse me.  Dr. Sobieszczyk, can you explain

13   to the jury what this image is?

14   A   Yes.  This is an actual CAT scan obtained on

09:31:47   15   February 24th, 2008, and you can see here the vertebral

16   column.  And in bright white you can see parts of the filter

17   struts.  The circle in gray here is the aorta, and you can see

18   a bright white line right over the vertebral column, which

19   extends out of --

09:32:18   20        THE COURT:  Ms. Helm, he's drawing on the screen, but

21   this is not in front of the jury.

22        MS. HELM:  Your Honor, I apologize.  May it be

23   published, please?

24        THE COURT:  Yes.

09:32:25   25        MS. HELM:  I apologize.

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:32:30  1      THE WITNESS:  So the striking feature or finding here

2    is that you can see -- and I'll draw another arrow here -- you

3    can see that one of the filter struts extends out of the IVC

4    towards the gray circle, which is the aorta.  And this filter

09:32:53  5    is tilted and one of the legs extends out of the IVC and

6    touches on the aortic wall.

7    BY MS. HELM:

8    Q   Dr. Sobieszczyk, did you also review the written report

9    relating to the CT scan?

09:33:08  10   A   I have.

11   Q   And did that report indicate whether there was any foreign

12   body in Ms. Booker's right ventricle or in her heart?

13   A   No.

14   Q   In March of 2008, when this CT scan was taken, could

09:33:24  15   Ms. Booker's filter have retrieved percutaneously?

16   A   I believe it could have.

17   Q   Let's go on to the next missed opportunity.  Do you recall

18   when that was?

19   A   I believe it in was March of 2009.

09:33:42  20      MS. HELM:  Could you please pull up 6825.003.

21      Your Honor, this was previously admitted.  May it be

22   published?

23      THE COURT:  Yes.

24   BY MS. HELM:

09:34:05  25   Q   Would you explain to the ladies and gentlemen of the jury

DIRECT EXAMINATION - PIOTR SOBIESZCZYK, M.D.

09:34:06  1    what this is, please?

2    A   Yes.  This is an X-ray of the lower spine, lower vertebral

3    column, which you can see here.  To the left of it you can see

4    the IVC filter.  And the important finding here is that one of

09:34:27  5    the struts or arms of the filter, rather than pointing down,

6    is now pointing straight up.  It's fractured.

7         And another finding here is that here is another

8    fragment, this one.  If you trace it all the way up, you can

9    see that it ends right here, and it's no longer connected with

09:34:50  10   the tip of the filter, just like the other legs.

11        So you have two fragments or two pieces of the filter

12   which are no longer attached to the tip of the filter.

13            MS. HELM:  Scott, would you pull up 6825.4, please.

14            Your Honor, this is another image of this that's been

09:35:15  15   admitted.  May I publish it?

16            THE COURT:  Yes.

17   BY MS. HELM:

18   Q   Dr. Sobieszczyk, is this an enlarged view of the X-ray we

19   were just talking about?

09:35:24  20   A   Yes, it is.

21   Q   Does this show more clearly the fractures or the

22   separations that you had previously discussed?

23   A   Yes.  You can again see the strut pointing up rather than

24   down and it's separated from the tip of the filter.  And,

09:35:41  25   again, you can see the leg -- I'm sorry, the other fragment

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:35:46   1    right here, and you can see that it ends at this level and

2    it's also not connected to the circled tip of the filter.

3    Q    Doctor, did you have an opportunity to review the X-ray

4    report, the written report, about this X-ray?

09:36:02   5    A    Yes, I did see it.

6              MS. HELM:  Would you please pull up 6668.

7              Your Honor, this was previously admitted.  May I

8    publish?

9              THE COURT:  Yes.

09:36:18   10   BY MS. HELM:

11   Q    Dr. Sobieszczyk, would you explain to the jury what this

12   is?

13   A    This is the radiologist's interpretation of the X-ray we

14   just reviewed and the official report of the study.

09:36:38   15   Q    And what does the radiologist say about the condition of

16   the filter in this X-ray report?

17   A    The report reads that the IVC is noted.  But it does not

18   comment on its location or condition.

19   Q    The report does not mention that it's fractured?

09:36:58   20   A    It does not.

21   Q    The report does not mention that one of the struts is

22   pointing in the opposite direction of the others?

23   A    No.

24   Q    As a treating physician, when you receive an X-ray report

09:37:07   25   such as this, how would you interpret the words "IVC filter is

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:37:11  1   noted"?

2   A   I would have assumed that it's in the IVC and it looks

3   fine.

4   Q   Doctor, even though the filter is fractured, is it your

09:37:26  5   opinion that the entirety of the filter is present --

6           MS. HELM:  Would you go back to 6825.004, please.

7           And, again, Your Honor, may I publish?

8           THE COURT:  Yes.

9   BY MS. HELM:

09:37:40  10  Q   Doctor, let me ask it again since I got caught in my

11  publishing.

12          Even though the filter is fractured, is it your

13  opinion that the entirety of the filter is present in this

14  image?

09:37:50  15          MR. JOHNSON:  Leading, Your Honor.

16          THE COURT:  Sustained.

17  BY MS. HELM:

18  Q   Dr. Sobieszczyk, would you tell the ladies and gentlemen

19  of the jury what you can see about the filter in this image?

09:37:57  20  A   I believe that the filter is otherwise intact.  That is,

21  all of the fragments of the filter are accounted for in this

22  image.

23  Q   In March of -- on March 26, 2009, could Ms. Booker's

24  filter and the fractured struts have been retrieved

09:38:19  25  percutaneously?

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:38:21  1    A    I believe that they could have been, yes.

2    Q    Let's discuss one more missed opportunity.

3              MS. HELM:  Would you please pull up 6826.001.

4              Again, Your Honor, this is admitted.  May I publish?

09:38:42  5              THE COURT:  Yes.

6    BY MS. HELM:

7    Q    Dr. Sobieszczyk, this is another one of those blob images.

8    Would you explain to the jury what this is, please?

9    A    Absolutely.  So this is another CAT scan of the abdomen,

09:38:51  10   which was obtained in December of 2011.  And here the image

11   slices start a little bit above the diaphragm and we're

12   basically looking at the slices going from top to bottom.  You

13   can see the vertebral column here, the IVC with the bright

14   dots being the legs of the filter is in the circle here, and

09:39:23  15   in this circle here you can see the kind of white-gray circle,

16   that's the aorta.  And what you can also see is that there is

17   a bright white line extending from the direction of the IVC

18   towards the aorta, and that's this strut that we previously

19   saw touching the aorta.  It is now well within the lumen or

09:39:52  20   within the aorta.  It's entered the vessel.

21   Q    And, Dr. Sobieszczyk, does this CT scan or did your review

22   of this CT scan reveal whether any portion of Ms. Booker's

23   filter was in her heart or in her right ventricle?

24   A    In the visualized parts of the heart, there was no

09:40:14  25   evidence of any foreign body there.

DIRECT EXAMINATION - PIOTR SOBIESZCZYK, M.D.

09:40:17   1    Q    And in December of 2011, when this CT scan was taken,

2    could Ms. Booker's IVC filter and the fractured struts have

3    been retrieved percutaneously?

4    A    I believe they could have.

09:40:41   5    Q    We have heard evidence in this case that Ms. Booker had a

6    strut, a fractured strut from her filter that moved to her

7    right ventricle.  Do you know when that occurred?

8    A    I don't know which day exactly this event took place, but

9    we can say that it happened sometime between when this CT scan

09:41:04  10    was obtained and when another CT scan was obtained in April of

11    2013, I believe.

12    Q    So sometime between December 2011 and April of 2013 is the

13    best from the imaging that you're able to narrow that down; is

14    that right?

09:41:21  15    A    That is correct.

16    Q    Okay.

17             MS. HELM:  Would you please pull up 6822.001, please.

18             Your Honor, this is admitted.  May I publish?

19             THE COURT:  You may.

09:41:39  20    BY MS. HELM:

21    Q    Dr. Sobieszczyk, is this the CT scan from April of 2013

22    that you reviewed regarding Ms. Booker?

23    A    Yes.  This is the study from April 9th, 2013.

24    Q    And what does this CT -- what is that of and what does

09:41:55  25    that show?

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:41:56  1    A    In this image we see a cross-section of or slice of the

2    heart here in gray.  And what you notice is a very bright line

3    right there.  That's the fragment of the filter which here

4    lies along the septum or along the thick wall separating the

09:42:22  5    right ventricle from the left ventricle, the two pumping

6    chambers of the heart.

7    Q    And, again, that is the first image you saw where any

8    portion of the filter was in the heart; correct?

9    A    That is correct.

09:42:39 10    Q    Let's shift gears.

11              MS. HELM:  You can take that down.

12    BY MS. HELM:

13    Q    Let's talk about the retrieval or removal of Ms. Booker's

14    filter.  Do you recall when that occurred?

09:42:48 15    A    That was either took place on June 24th or -- 24th, I

16    believe, of 2014.

17    Q    And that procedure was done by a Dr. Kang in Georgia;

18    correct?

19    A    Correct.

09:43:05 20    Q    Do you agree --

21    A    It was July, I think.  Sorry.

22    Q    Do you agree with Dr. Kang's decision to remove the filter

23    percutaneously from Ms. Booker's inferior vena cava?

24              MR. JOHNSON:  Disclosure, Your Honor.

09:43:20 25              THE COURT:  Where is that in the report?

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:43:27  1        MS. HELM:  Page 11, opinion number 3, the first

2    sentence, "The decision" --

3        THE COURT:  I see it.

4        Objection overruled.

09:43:40  5        THE WITNESS:  I would have not -- sorry.  Can you

6    restate the question?

7    BY MS. HELM:

8    Q    Absolutely.  I apologize.

9        Do you agree with Dr. Kang's decision to retrieve

09:43:50  10   Ms. Booker's filter percutaneously?

11   A    The filter, yes.  I do.

12   Q    And do you agree with Dr. Kang's decision to attempt to

13   retrieve the struts that were still in her inferior vena cava

14   percutaneously?

09:44:06  15   A    I do.

16   Q    Was the filter itself successfully removed by Dr. Kang

17   percutaneously?

18   A    Yes, it was.

19   Q    And would you -- the jury has heard, but would you remind

09:44:16  20   the jury what "percutaneously" means?

21   A    Yes.  Percutaneously means essentially that you are doing

22   a procedure without making an incision in the skin and,

23   rather, entering the body through a needle or -- and then if

24   you place a wire through a needle and over that wire when you

09:44:37  25   get into the artery or vein, you place a little tube which

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:44:42   1    allows you to then advance different equipment or devices into

2    the vessels.  So you're going through the skin percutaneously,

3    but without making a surgical incision with a scalpel.

4    Q    Your Honor -- I mean Dr. Sobieszczyk, the strut that

09:45:05   5    Dr. Kang was able to retrieve from Ms. Booker's filter

6    percutaneous- -- from her IVC percutaneously, was that the

7    strut that was perforating her abdominal aorta?

8    A    I believe that's the case.

9    Q    And would you anticipate her having any further -- any

09:45:23  10    issues relating to that strut perforating the abdominal aorta?

11    A    I do not.

12    Q    Were there any complications with the retrieval of the

13    filter and the one strut that Dr. Kang was able to retrieve

14    percutaneously?

09:45:41  15    A    No.

16    Q    Before Dr. Kang retrieved the filter, was it tilted?

17    A    Yes.

18    Q    In fact, we know it had been tilted since 2008; correct?

19    A    That is correct.

09:45:53  20    Q    And before Dr. Kang retrieved the filter, had it

21    perforated the IVC?

22    A    Yes.

23    Q    Until the time of the retrieval by Dr. Kang in July of --

24    in July of 2014, was Ms. Booker receiving any benefit from the

09:46:17  25    filter even though it had tilted and perforated?

DIRECT EXAMINATION - PIOTR SOBIESZCZYK, M.D.

09:46:24  1   A   I think she was, yes.

2   Q   And why -- on what do you base that?

3           MR. JOHNSON:  Disclosure, Your Honor.

4           MS. HELM:  His deposition, page 104, lines 13 to 25,

09:46:36  5   Your Honor.

6           THE COURT:  Okay.  Hold on just a minute.

7           104?

8           MS. HELM:  Yes, Your Honor.

9           THE COURT:  I think you need to rephrase the question

09:47:02  10  consistent with the language in the deposition, please.

11          MS. HELM:  Sure, Your Honor.

12  BY MS. HELM:

13  Q   Until the time of retrieval in 2014, was Ms. Booker

14  receiving any benefit from the filter even though it had

09:47:15  15  tilted?

16  A   I believe she was.

17  Q   And on what do you base that opinion?

18  A   Well, before the filter was placed, she suffered two

19  episodes of pulmonary embolism and -- I think five years

09:47:32  20  before the filter was placed.  And after the filter was

21  placed, we have no clinical evidence that she had any

22  recurrent pulmonary embolism.

23  Q   Dr. Sobieszczyk, we know that Dr. Kang was not able to

24  retrieve the strut that was in Ms. Booker's heart; correct?

09:47:55  25  A   Correct.

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:47:56  1    Q    I want to talk about the attempt and the decision to

2    retrieve the filter -- the strut that was in Ms. Booker's

3    heart.  In your practice, have you had any patients who have

4    had a strut or a piece of an IVC filter that embolized to the

09:48:12  5    heart?

6    A    I have.

7    Q    Have you also published a case report on a patient who

8    experienced a fragment of a filter that migrated to the right

9    ventricle?

09:48:26  10              MR. JOHNSON:  Leading, Your Honor.

11              THE COURT:  Overruled.

12              THE WITNESS:  I have.

13   BY MS. HELM:

14   Q    And in what publication did you publish this report?

09:48:34  15   A    It was in the Journal of Vascular and Interventional

16   Radiology.

17   Q    And do you recall the date of that report?

18   A    I believe it was in 2010.

19   Q    And would you explain to the jury the circumstances, the

09:48:48  20   medical circumstances of the patient in that study?

21   A    Yes.  This was a patient who, several years before she

22   developed this problem in question, had a very large pulmonary

23   embolism which ultimately required a surgical procedure where

24   the blood clots were extracted from the pulmonary arteries.

09:49:14  25   And as part of that surgery, she received an IVC filter to

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:49:19  1   protect her from any possible recurrent pulmonary embolism in

2   the future.

3         Several years later, it was noticed that fragments of

4   that filter had fractured and then moved to the lung arteries

09:49:40  5   and into the right ventricle.

6   Q   And have you followed that patient since 2009 or '10?

7   A   She was followed by one of my partners, and is still

8   followed in our general practice, yes.

9   Q   And are you aware of her current medical condition?

09:49:56  10  A   She's doing well.

11  Q   And does she still have a strut in her right ventricle?

12  A   She has two fragments in her right ventricle.

13  Q   And they've been there for seven years, eight years?

14  A   Almost nine, as far as we can tell, yes.

09:50:20  15  Q   Do you agree with Dr. Kang's decision to attempt to

16  retrieve the strut in Ms. Booker's right ventricle?

17  A   I would have opted for leaving it in place.

18  Q   And why would you have made that decision?

19  A   I think the decision is based on several factors.  Number

09:50:44  20  one, my experience that patients can do well with a fragment

21  in the right ventricle.  Based on the evidence that the

22  position, orientation, of that filter fragment hasn't changed

23  or moved between the study from 2013 to 2014.  And also

24  because of the appearance of that strut and where it is in the

09:51:19  25  heart on a CT scan, which was obtained during the admission

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:51:23  1   for filter retrieval procedure.  And on that study, the filter

2   strut is positioned parallel to the septum, or that wall

3   separating the right -- it's an internal wall separating the

4   right from left ventricle, and it appears to -- and that wall

09:51:47  5   and the entire inside of the heart, you can think of it maybe

6   as the mountains and valleys right outside, and so it's not a

7   flat, smooth wall, it's up and down, the mountains and

8   valleys.  And on the CT scan, the strut, again, is parallel to

9   the main -- to that wall, and it's in one of the valleys

09:52:13 10   embedded, or the ends of it are stuck against the mountains.

11   Q   Dr. Sobieszczyk, are you referring to the CT scan taken in

12   June of 2014?

13   A   I'm referring to the CT scan that was obtained in, I

14   believe, July of 2014.

09:52:33 15   Q   Okay.

16        MS. HELM:  Would you pull up 6823.002, please.

17        Your Honor, this is admitted.  May we publish it?

18        THE COURT:  Yes.

19   BY MS. HELM:

09:52:45 20   Q   Is this the CT scan you're referring to?

21   A   Yes.

22   Q   Is this the CT scan taken of Ms. Booker on July 24, 2014?

23   A   Yes.  So the date is here, just to confirm.

24        And you can see the left ventricle or the main

09:53:09 25   pumping chamber here.  This is the right ventricle, and this

DIRECT EXAMINATION - PIOTR SOBIESZCZYK, M.D.

09:53:12  1    here is the septum in gray, that thick wall separating those

2    two chambers.

3         And what you can see here is part of that gray wall

4    extending into the right ventricle.  You can think of it as a

09:53:29  5    mountain coming up, and right in the middle of that, or in it,

6    you can see a much brighter spot, and that's the end of that

7    filter strut which you saw -- which I showed previously lying

8    alongside that septum, and you can see that that bright end is

9    embedded or, you know, stuck in that piece of muscle, in that

09:53:55 10    mountain.  And if you look at the other end of the -- of that

11    filter, that fragment, which is on the next image --

12         MS. HELM:  Would you go to 6823.003, please.

13         And, Your Honor, again, may we publish?

14         THE COURT:  You may.

09:54:16 15         THE WITNESS:  You can see here, again, you have a

16    piece of the gray muscle extending into the wider chamber --

17    I'm sorry, more white-contrast-containing chamber of the right

18    ventricle here, and you can see that inside that muscle you

19    again have a bright dot.  That is the other end of the -- of

09:54:42 20    the filter fragment.

21         And so it appears to be well wedged in between, into

22    those two muscle fragments right along the septum, and that

23    suggests that this is incorporated into the heart muscle, into

24    the septum, and unlikely to, in my opinion, to go anywhere and

09:55:11 25    cause any problems.  And I think that this finding and the

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:55:19  1    description of it in the radiologist's report would have made

2    me concerned about the success of such a procedure.

3    Q   Let's look at that radiologist report, if you don't mind.

4          MS. HELM:  Can you pull up 6710, please.

09:55:43  5          Your Honor, this is admitted.  May I publish?

6          THE COURT:  Yes.

7    BY MS. HELM:

8    Q   Dr. Sobieszczyk, is this the radiologist report from

9    July 24, 2014, that refers to the images we were just

09:55:54  10   discussing?

11   A   Yes, it is.

12   Q   And what does the radiologist who read those CT scans say

13   about the position of the strut in Ms. Booker's right

14   ventricle?

09:56:10  15   A   The radiologist here commented that the ends of the strut

16   are clearly embedded in the trabeculations and that the rest

17   of the length of the strut is, again, parallel to the septum.

18   There's very little contrast around it, suggesting that it's

19   flat against the wall and endothelialized, or incorporated,

09:56:46  20   covered by the inner lining of the heart.  And essentially

21   well incorporated into that septum wall.

22   Q   Do you agree with the radiologist's finding in this report

23   based on your review of the CT scan?

24   A   I do.  It's also important to note that this wire fragment

09:57:15  25   here on this CAT scan was not interfering with the valvular

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

09:57:21   1    structures in the heart.

           2    Q   Dr. Sobieszczyk, did Dr. Kang have the opportunity to

           3    review this report prior to his attempt to retrieve the strut

           4    from Ms. Booker's heart?

09:57:33   5    A   If my timing is correct, I think this was -- this study

           6    was performed a day after the retrieval attempt.

           7    Q   Without the benefit of the information from this CT scan,

           8    would Dr. Kang have been able to fully assess whether the

           9    strut was embedded in the heart and whether he could have

09:57:53  10    successfully retrieved that strut?

          11            MR. JOHNSON:  Disclosure and leading, Your Honor.

          12            THE COURT:  Where is this in the report?

          13            MS. HELM:  Your Honor, the statement in the report

          14    regarding Dr. Kang is not there.  I'll rephrase the question.

09:58:09  15            THE COURT:  All right.  Objection is sustained.

          16    BY MS. HELM:

          17    Q   Dr. Sobieszczyk, do you have an opinion as to the

          18    likelihood of success or the chances of success of Dr. Kang

          19    being able to retrieve the strut percutaneously?

09:58:30  20            MR. JOHNSON:  Disclosure, Your Honor.

          21            MS. HELM:  Your Honor, page 11, opinion number 3.

          22            THE COURT:  All right, I'll read that.

          23            MS. HELM:  The phrase says "so the likelihood" --

          24            THE COURT:  Let me look.

09:59:08  25            MS. HELM:  Your Honor, I'll be happy to back up and

DIRECT EXAMINATION - PIOTR SOBIESZCZYK, M.D.

09:59:10   1    ask --

2             THE COURT:  Just rephrase the question, if you would.

3    BY MS. HELM:

4    Q   The approach by Dr. Kang to attempt to retrieve the strut

09:59:17   5    percutaneously, would you refer to that as an endovascular

6    approach or a procedure?

7    A   Yes.

8    Q   Do you have an opinion as to the likelihood of success of

9    Dr. Kang attempting an endovascular or percutaneous procedure

09:59:35  10    to retrieve the strut from Ms. Booker's heart?

11   A   Yes.  I would have been concerned that the likelihood of

12   success was very low.

13   Q   Despite that, you understand that Dr. Harvey --

14             MS. HELM:  You can take this down.

09:59:54  15   BY MS. HELM:

16   Q   -- Ms. Booker's surgeon testified that he was going to

17   retrieve the strut from Ms. Booker's heart through an open

18   procedure if Dr. Kang was not successful.  Do you recall that

19   testimony?

10:00:05  20   A   Yes.

21   Q   Do you agree with that opinion?

22   A   My --

23             MR. JOHNSON:  Objection, Your Honor.  That's an

24   improper question.

10:00:17  25             THE COURT:  That's a what?

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

10:00:17  1          MR. JOHNSON:  Improper question.

        2          THE COURT:  On what basis?

        3          MR. JOHNSON:  Commenting on the opinion of another

        4  expert.

10:00:23  5          MS. HELM:  Your Honor, he's not tendered as an

        6  expert.

        7          THE COURT:  Hold on just a minute.

        8          MR. JOHNSON:  Also not in the report, Your Honor.

        9          THE COURT:  Pardon?

10:00:30 10          MR. JOHNSON:  It's also not in the report.

       11          THE COURT:  All right.  The first objection is

       12  overruled.  I don't think it is commenting on another expert.

       13          And where is the disclosure?

       14          MS. HELM:  Page -- I have to check my page numbers

10:00:51 15  because they're different than yours.

       16          I apologize, Your Honor, I thought I had them all

       17  marked.

       18          It's on page 7 of mine.  It is probably on page 8 of

       19  yours.  It's in a paragraph that starts "On July 28th" --

10:01:50 20          THE COURT:  All right.  Let me look at that.

       21          MS. HELM:  -- and it's the third sentence.

       22          THE COURT:  Would you rephrase the question

       23  consistent with that sentence.  I think your question was a

       24  bit broader.

10:02:20 25          MS. HELM:  Yes, Your Honor.

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

10:02:21   1   BY MS. HELM:

2   Q    Based on your review of Ms. Booker's medical records,

3   including the records from Dr. Kang and Dr. Harvey, do you

4   believe that there was a clear clinical indication for the

10:02:36   5   surgery that Dr. Harvey performed to retrieve the strut from

6   her heart?

7   A    Well, I would say that in my opinion, in my practice, I

8   would have chosen a more conservative approach and not pushed

9   to have the fragment retrieved.

10:02:55  10   Q    And on what do you base that opinion?

11   A    Again, it's the aspects of her imaging and my experience

12   that I alluded to a little bit earlier.  The appearance of

13   this filter strut on that CT scan, the lack of it having

14   moved, the absence of any involvement with the tricuspid valve

10:03:23  15   from this strut.  I think these would have been my leading

16   reasons for not pushing forward.

17   Q    And do you have that opinion even though Ms. Booker's

18   heart is beating, even though Ms. Booker is moving around,

19   going through her day-to-day life?

10:03:43  20   A    Yes.

21   Q    And, again, it's your opinion that the strut had not moved

22   and would not move; correct?

23   A    That is my opinion.  I think -- yes.

24   Q    Now, what we do know is that Dr. Kang did attempt to

10:03:59  25   retrieve the strut from Ms. Booker's right ventricle

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

10:04:03    1    percutaneously; correct?

2    A    We do know that, yes.

3    Q    And we also know that during that attempt he damaged or

4    tore Ms. Booker's tricuspid valve; correct?

10:04:16    5              MR. JOHNSON:   Judge, that's a leading question.

6              THE COURT:   Sustained.

7    BY MS. HELM:

8    Q    During that procedure, did Dr. Kang tear Ms. Booker's

9    tricuspid valve?

10:04:27   10    A    Yes.

11    Q    Did you see anything in the records to indicate that there

12    was any damage to her tricuspid valve prior to the procedure

13    by Dr. Kang to attempt to retrieve the strut percutaneously?

14    A    No.

10:04:44   15    Q    And did that torn tricuspid valve require a surgical

16    repair?

17    A    It did.

18    Q    And was that part of the repair, part of the surgery that

19    Dr. Harvey subsequently did, the minimally invasive procedure?

10:05:03   20    A    Yes.

21    Q    And would you explain to the ladies and gentlemen of the

22    jury what a minimally invasive procedure means in the context

23    of heart surgery?

24    A    That usually refers to a less invasive way of entering the

10:05:22   25    chest and accessing the heart.  The traditional heart surgery

DIRECT EXAMINATION - PIOTR SOBIESZCZYK, M.D.

10:05:27   1   is performed by opening the breastbone up and gaining access

2   to the chest through a rather large incision.  Minimally

3   invasive valve repair, be it --

4               MR. JOHNSON:  Your Honor, I need to interrupt.  This

10:05:47   5   is not in the report.

6               THE COURT:  Ms. Helm?

7               MS. HELM:  Your Honor, he's a cardiovascular surgeon.

8   He's qualified to testify what a minimally invasive --

9               THE COURT:  The question isn't whether he's

10:05:58  10   qualified, the question is where is it in the report.

11               MS. HELM:  That she received a minimally invasive

12   procedure?

13               THE COURT:  And what is a minimally invasive

14   procedure.

10:06:09  15               MS. HELM:  You know what, Your Honor, I'll just

16   withdraw the question.

17               THE COURT:  All right.

18   BY MS. HELM:

19   Q   Dr. Sobieszczyk, did you have an opportunity to review

10:06:14  20   Dr. Harvey's operation note relating to the minimally invasive

21   heart procedure he performed on Ms. Booker?

22   A   Yes.

23               MS. HELM:  Would you please pull up 2361.

24               Your Honor, this was tendered by the plaintiffs and

10:06:27  25   accepted into evidence a few days ago.

DIRECT EXAMINATION - PIOTR SOBIESZCZYK, M.D.

10:06:30  1        THE COURT:  2361?

2        MS. HELM:  Yes, Your Honor.

3        THE COURT:  We'll just confirm it's in evidence.

4     My notes show that it is.  All right.  You may.

10:06:46  5        MS. HELM:  May I publish it, Your Honor?

6        THE COURT:  Yeah.  You can.

7    BY MS. HELM:

8    Q    Dr. Sobieszczyk, is this the operation note from

9    Dr. Harvey's -- or part of Dr. Harvey's procedure notes

10:06:58  10   relating to his surgery on Ms. Booker?

11   A    It is.

12   Q    And this relates to the procedure that took place on

13   July 28th, 2014?

14   A    Yes.

10:07:09  15   Q    And in this note, Dr. Harvey states that he successfully

16   repaired the tricuspid valve?

17   A    Correct.

18   Q    Did he also retrieve the strut from the right ventricle?

19   A    Yes.

10:07:21  20   Q    Did he have trouble finding the strut?

21   A    That's what he indicated, yes.

22   Q    And --

23        MS. HELM:  Would you go to the portion of the report

24   under Findings at the time of the surgery.

25

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

BY MS. HELM:

Q   Do you see that, where he says there was also a foreign body in the RV.  Do you understand that to be right ventricle?

A   Yes.

Q   And that's where he reports that he removed it?

A   Correct.

Q   And what did he say about how -- about that wire that he found in the right ventricle?

A   Well, he indicated in his report here that it was quite difficult to find within these trabeculations and that it was embedded, incorporated in the muscle, and it was difficult and that -- you know, if there was anything else left behind, it should be left alone because it's embedded, incorporated in the heart muscle.  And he indicated that the risk of going after it wasn't worth it.

Q   Thank you.

Based on your review of the CT scan taken in July -- on July 24, 2014, do you agree with Dr. Harvey's analysis that the piece of wire was embedded in the subvalvular structures of the heart?

A   Well, so it wasn't embedded in the subvalvular structures, it was embedded in the septum.  At least on the CT scans.  So what he means here is it was under the valve.  Subvalvular is under the valve.  Beyond the valve.  On the other side of the valve.  But, yes, the findings here correspond with his

DIRECT EXAMINATION – PIOTR SOBIESZCZYK, M.D.

10:09:23   1   description of what he saw corresponds with the findings on

2   that CT scan, yes.

3   Q    Thank you.

4        Have you had an opportunity to review Ms. Booker's

10:09:37   5   post minimally invasive heart procedure, her medical records

6   since then?

7   A    Yes, I have.

8   Q    And how would you describe her recovery and prognosis

9   since that surgery?

10:09:51  10   A    Well, she had an uneventful hospital stay and went home

11   after four days.  As to her overall prognosis, in my opinion,

12   it's actually very good.

13   Q    The jury has heard testimony about a survival rate from a

14   tricuspid valve repair.  If the tricuspid valve had not been

10:10:19  15   damaged by Dr. Kang, would we even be discussing survival

16   rates relating to that repair?

17   A    No.

18   Q    Do you have an opinion as to the survival rate of her

19   tricuspid valve repair?

10:10:34  20   A    I do.

21   Q    And what is that opinion?

22   A    I think that it's very favorable and approaching survival

23   rates of general population her age.

24   Q    Thank you.

25        Now, Ms. Booker also has a strut retained in or near

CROSS-EXAMINATION – PIOTR SOBIESZCZYK

10:10:54  1   her IVC; correct?

2   A    Yes.

3   Q    The strut that Dr. Kang was not able to retrieve

4   percutaneously and left; correct?

10:11:02  5   A    Correct.

6   Q    Do you agree with his decision to leave that strut?

7   A    Absolutely.

8   Q    Have you treated patients who have retained struts from

9   fractured IVC filters in your practice?

10:11:14  10   A    Yes.

11   Q    Do you have an opinion of what the likelihood is, whether

12   that strut would cause any injury to Ms. Booker in the future?

13   A    I think that likelihood is exceedingly low.

14   Q    Overall, what is your opinion regarding Ms. Booker's

10:11:30  15   overall prognosis?

16   A    I think it's very good.

17   Q    Doctor, the opinions you've offered today, have they been

18   offered to a reasonable degree of medical certainty?

19   A    Yes.

10:11:41  20        MS. HELM:  No further questions, Your Honor.

21        THE COURT:  Cross-examination.

22        MR. JOHNSON:  Kate, we don't have these studies in

23   our system.  Might we borrow your IT guy?

24        MS. HELM:  That's fine.

25

CROSS-EXAMINATION - PIOTR SOBIESZCZYK

10:12:01  1            C R O S S - E X A M I N A T I O N

2     BY MR. JOHNSON:

3     Q    Good morning, Doctor.

4     A    Hello.

10:12:10  5     Q    You have not been provided with any documents, internal

6     documents, or information from Bard, have you?

7     A    No.

8     Q    Ms. Helm mentioned a minute ago and told everybody in this

9     courtroom you are a cardiovascular surgeon.  You are not a

10:12:27  10    cardiovascular surgeon, are you?

11    A    I'm a cardiovascular specialist, I'm not a surgeon.

12    Q    You are not a cardiovascular and thoracic surgeon;

13    correct?

14    A    I'm not a surgeon.

10:12:38  15    Q    You are not the kind of doctor that Dr. Harvey is;

16    correct?

17    A    Correct.

18    Q    You don't perform the kind of surgery that Dr. Harvey

19    performs, do you?

10:12:45  20    A    I do not.

21    Q    You don't perform open heart surgeries, just so we're

22    clear?

23    A    Correct.

24    Q    You don't perform valve repairs or replacements; is that

10:12:53  25    correct?

CROSS-EXAMINATION - PIOTR SOBIESZCZYK

10:12:54   1   A   No, it's not.  I perform percutaneous valve replacements.

2   Q   But you don't perform open heart surgery of the type that

3   was performed on Ms. Booker?

4   A   I do not.

10:13:05   5   Q   And when you referred to this as minimally invasive

6   surgery, you were referring to the manner of access to the

7   chest cavity; correct?

8   A   That's what -- yes.

9   Q   That is, the incision was in between ribs, the ribs were

10:13:21   10   spread open, but nonetheless Dr. Harvey had to incise

11   Ms. Booker's heart; correct?

12   A   Yes.

13   Q   So there was nothing minimal about the heart surgery

14   itself.  Agreed?

10:13:36   15   A   Well, the access and entry into the heart chest cavity was

16   minimally invasive, according to Dr. Harvey.  In that sense,

17   yes, it was.

18   Q   But --

19   A   But the rest of the work inside of the heart is just like

10:13:57   20   with any other surgery.

21   Q   Very invasive and very complex.  Agreed?

22   A   It's complex, yes.

23   Q   And invasive?

24   A   It is.

10:14:07   25   Q   Doctor, to the extent that these folks over here have been

CROSS-EXAMINATION – PIOTR SOBIESZCZYK

10:14:16  1   privy to internal Bard documents and information, they know

2   more about the inner workings of Bard than you do; correct?

3            MS. HELM:  Your Honor, object.

4            THE COURT:  What's the basis?

10:14:25  5            MS. HELM:  Your Honor, first of all, it exceeds the

6   scope of the direct, and second of all, it is commenting --

7            THE COURT:  Sustained.  It exceeds the scope.

8   BY MR. JOHNSON:

9   Q   Just so everybody's clear, you are not providing any

10:14:41  10  opinion that any doctor that treated Ms. Booker, whether it be

11  a radiologist or a treating physician, breached the standard

12  of care with respect to their care and treatment of

13  Ms. Booker.  Agreed?

14  A   Agreed.  I'm not providing that opinion on that.

10:14:59  15  Q   And that's a big fancy legal term, "standard of care."

16  That simply means that there is no doctor in this case that

17  you rendered an opinion on that has committed medical

18  malpractice or medical negligence.  Would you agree?

19            MS. HELM:  Your Honor, I object to this question.

10:15:17  20  He's commenting on the evidence, and Dr. Sobieszczyk has

21  testified he's not offering a standard of care opinion.

22            THE COURT:  Overruled.

23            Reask the question, if you would, Mr. Johnson.

24            MR. JOHNSON:  Sure.

25

CROSS-EXAMINATION - PIOTR SOBIESZCZYK

10:15:29  1   BY MR. JOHNSON:

2   Q   Just so we're clear, Doctor, you are not rendering an

3   opinion in this case that any doctor that treated Ms. Booker

4   committed medical malpractice or medical negligence.  Can we

10:15:41  5   agree?

6   A   We can agree.

7   Q   And we can agree that different doctors have different

8   approaches to clinical situations.  Agreed?

9   A   Agreed.

10:15:52  10   Q   You might decide to treat Ms. Booker different than

11   another doctor, but that doesn't make the treatment by the

12   other doctor wrong or negligent.  Would you agree?

13   A   I would agree.

14   Q   With respect to the filter that was implanted, I believe

10:16:30  15   in June of 2007, you understand that was a G2 filter?

16   A   Correct.

17   Q   It was properly placed.  You would agree?

18   A   I would.

19   Q   That filter went on to fail in a cascading fashion in the

10:16:43  20   sense that it tilted, there were multiple perforations of the

21   vena cava, there were multiple penetrations into adjacent

22   structures to include the aorta, there were fractures of the

23   filter, and one of those fractures migrated to the right

24   ventricle of Ms. Booker's heart.  Would you agree?

10:17:01  25   A   So all of those observations are true, yes.

CROSS-EXAMINATION – PIOTR SOBIESZCZYK

10:17:06  1  Q   And that happened despite the fact that this filter was

2  implanted and placed the way it was supposed to be placed;

3  correct?

4  A   Yes.

10:17:27  5       MR. JOHNSON:  Are you able to pull up image 6826?

6  BY MR. JOHNSON:

7  Q   Doctor, you referred to that image earlier in your

8  testimony.  Do you remember that?

9  A   Yes.

10:17:47  10  Q   And I believe that image was actually obtained in December

11  of 2011?

12  A   Yes.

13  Q   And that image is below the heart, is it not?

14  A   Yes.

10:17:58  15       MR. JOHNSON:  May we publish this, Your Honor?

16       THE COURT:  Yes.

17       MR. JOHNSON:  I apologize.

18  BY MR. JOHNSON:

19  Q   That image is below the heart.  Agreed?

10:18:07  20  A   Yes.

21  Q   We see multiple structures there.  And, if you would,

22  identify the aorta for us.

23  A   The aorta is the gray-white circle within the red circle.

24  Q   And because this image is below the heart, we cannot

10:18:25  25  definitively determine whether there is a fracture or a metal

CROSS-EXAMINATION - PIOTR SOBIESZCZYK

10:18:30  1   fragment in Ms. Booker's heart at this time.  Agreed?

2   A   Looking at this CT, we can count the fragments, and so we

3   know that they're all accounted for.  And the CT, if I

4   remember correctly, included cuts of the heart which didn't

10:18:50  5   show any fragment there.  That's what I would say.

6   Q   Sir, are you not aware of the fact that there was one

7   strut that actually fractured in half, so that there were two

8   struts that fractured but there were three pieces?

9   A   It's my understanding there were one strut that fractured

10:19:10  10   and there were two pieces.

11   Q   There were a total of three pieces; correct?

12   A   Well, down -- at which point in time?

13   Q   You tell me.

14   A   Well, down the road, you can see that there was another

10:19:25  15   leg that broke up and went up to the heart.  So --

16   Q   You -- go ahead.

17   A   So there was one fragment, one leg, in the heart and then

18   another strut which broke into two pieces and that fragment

19   was at the level of the IVC around the filter.

10:19:44  20   Q   But because this image does not capture the heart, you

21   cannot definitively tell us whether there is a metal fragment

22   in the heart in December of 2011?

23   A   It is my recollection that looking at the entire CT here,

24   you can actually count all the struts, even the fractured one,

10:20:05  25   and there were 12 here, meaning that they were all at the

CROSS-EXAMINATION - PIOTR SOBIESZCZYK

10:20:12  1   level of the IVC, they were all accounted for.

2   Q   You were referring to this particular image.  You're not

3   able to count all the struts on this image, are you?

4   A   This single slice, no.

10:20:24  5   Q   Okay.

6          MR. JOHNSON:  You can pull it down.

7   BY MR. JOHNSON:

8   Q   You told us that these filters are supposed to be

9   implanted percutaneously, and to the extent that there's a

10:20:39 10   decision to remove one of these filters, are they intended to

11   be removed percutaneously as well?

12   A   Correct.

13   Q   All right.  That is, they are not intended to be

14   surgically removed by opening up the heart; is that correct?

10:20:59 15   A   Correct.

16   Q   We know that a Dr. D'Ayala implanted this filter.  Are you

17   aware of that?

18   A   Yes.

19   Q   Dr. Patel ordered the placement of the filter?

10:21:24 20   A   I believe so, yes.

21   Q   Dr. Kang was the interventional radiologist that, using a

22   percutaneous technique, removed the body of the filter and one

23   of the fractured struts; is that correct?

24   A   That is correct.

10:21:38 25   Q   He was unsuccessful at removing the other fractured strut,

CROSS-EXAMINATION - PIOTR SOBIESZCZYK

10:21:44   1   as well as the metal fragment that was in the heart?

2   A   Correct.

3   Q   Can we agree that Dr. Kang never would have had to have

4   performed this procedure had this filter not fractured?

10:21:58   5   A   That is correct.

6   Q   Are you aware that Dr. Harvey and Dr. Langford are heart

7   surgeons and thoracic surgeons?

8   A   Yes.

9   Q   And it was Dr. Harvey who performed the open heart surgery

10:22:13   10   to remove the fracture fragment, the metal fragment that was

11   in the heart?

12   A   Yes.

13   Q   This filter catastrophically failed, didn't it?

14   A   It failed insofar as it fractured and fragments of it went

10:22:34   15   to the heart, yes.

16   Q   Would it be accurate to say it catastrophically failed?

17   A   Well, that depends on what you mean by catastrophically.

18   Q   Let me give some context to my question.

19        This filter tilted, there were multiple struts that

10:22:53   20   perforated the vena cava, there were three struts that

21   penetrated into adjacent vital structures to include the

22   aorta, there were three pieces that fractured, and one of

23   those pieces went to the heart.

24        Do you consider that to be a catastrophic failure?

10:23:13   25   A   I consider it to be a failure, yes.

CROSS-EXAMINATION - PIOTR SOBIESZCZYK

10:23:15  1    Q    Catastrophic?

2    A    For a treating physician, catastrophic usually means when

3    there's a fatal outcome.  But fortunately this wasn't the

4    case.  But I agree with you that this filter failed, yes.

10:23:32  5    Q    In a big way.

6    A    You could say that, yes.

7    Q    And do you understand that when it was determined that

8    this filter had failed in a big way, there was a joint

9    decision by Drs. Patel, Kang, Harvey, and Langford to attempt

10:23:50  10   to retrieve the fragment in the heart using a percutaneous

11   technique?

12   A    I'm not certain whether Dr. Patel, the cardiologist, was

13   involved in the initial decision-making, but you're correct

14   that Dr. Kang and Dr. Harvey formulated the plan together,

10:24:11  15   yes.

16   Q    A plan to attempt to remove the fragment in the heart

17   utilizing a percutaneous technique?

18   A    That's the case.

19   Q    So all of those doctors got together and developed that

10:24:24  20   plan.  Agreed?

21   A    Agreed.

22   Q    And that is an example of what we mentioned earlier where

23   perhaps you might not have wanted to attempt that, but it is

24   not below the standard of care for these doctors to have come

10:24:40  25   up with this game plan and implemented this game plan.

CROSS-EXAMINATION - PIOTR SOBIESZCZYK

10:24:45  1   Agreed?

2   A    Agreed.

3   Q    And you also saw in the materials that you reviewed that

4   Ms. Booker herself understandably wanted this metal fragment

10:24:56  5   out of her heart?

6   A    That's my understanding, yes.

7   Q    She wanted it gone; correct?

8   A    Correct.

9   Q    That's pretty understandable, isn't it?

10:25:04  10   A    I think so.

11   Q    I mean, you wouldn't want a metal fragment in your heart,

12   would you?

13   A    Well, it, you know, depends on the metal fragment.  In

14   clinical practice we implant a lot of metal structures and

10:25:17  15   things in the heart, so sometimes you want a metal fragment in

16   your heart.  But in general, I agree that I would have weighed

17   the risks and benefits and likelihood of success, and if it

18   were something straightforward, I would agree that it's nice

19   not to have it, yes.

10:25:36  20   Q    The question really was whether you would want a metal

21   fragment in your right ventricle?

22   A    Well, it depends on whether it would be possible to

23   successfully and in a low risk manner to remove it.  It

24   depends on the risk/benefit ratio, but --

10:25:58  25   Q    And you understand Drs. Kang and Langford and Harvey

CROSS-EXAMINATION – PIOTR SOBIESZCZYK

10:26:04   1   undertook that risk/benefit analysis in developing their game

2   plan?

3   A    I'm sure they did.

4   Q    And those doctors were faced with a very complex medical

10:26:16   5   surgical situation in developing that game plan.  Would you

6   agree?

7   A    I would.

8   Q    And that problem they were faced with was completely

9   different than the assessment you undertook from the comfort

10:26:27   10   of your office, looking at these facts retrospectively.

11   Agreed?

12   A    What do you mean -- yes.

13   Q    Okay.

14        And just so everybody in this courtroom is clear, you

10:26:47   15   have not formed any opinions that Drs. Patel, Kang, Harvey or

16   Langford breached the standard of care in their treatment of

17   Ms. Booker.  Would you agree?

18   A    I would.

19   Q    And that includes their decision to attempt to remove the

10:27:04   20   filter percutaneously.  Agreed?

21   A    Agreed.

22   Q    And that includes Dr. Harvey's decision to perform open

23   heart surgery to remove this metal fragment.  Agreed?

24   A    Agreed.

10:27:18   25   Q    Doctor, what is pericarditis?

CROSS-EXAMINATION – PIOTR SOBIESZCZYK

10:27:38  1    A    Pericarditis is inflammation of the sac or surrounding

2    tissue outside the heart.

3    Q    And that inflammation is painful?

4    A    It can be, yes.

10:27:53  5    Q    And in the records you reviewed, did you see where

6    Ms. Booker had hospital admissions for chest pain that was

7    ultimately determined to be caused by her pericarditis?

8    A    She had several emergency room visits for chest pain

9    before and after this surgery.  Some of them were

10:28:14  10   characterized as costochondritis and others were given a

11   diagnosis of pericarditis.  Though there were no classic signs

12   of pericarditis, but she was given that diagnosis, yes.

13   Q    Well, let's be accurate about this.  Pericarditis is

14   commonly seen in patients who have undergone open heart

10:28:44  15   surgery.  Agreed?

16   A    It is seen in the first few days after heart surgery in

17   many patients.  It resolves and is very rare afterwards.

18   Q    You're not able to tell us whether Ms. Booker's

19   pericarditis is going to be a lifelong problem, are you?

10:29:05  20   A    Well, her card- -- no.  Pericarditis can come from

21   multiple causes, so everyone is at risk for pericarditis.

22   Q    But in this case, because Ms. Booker had her pericardium

23   incised so Dr. Harvey could gain access to the heart, that

24   would be the likely mechanism by which she has experienced

10:29:31  25   chest pain and pericarditis.  Agreed?

CROSS-EXAMINATION - PIOTR SOBIESZCZYK

10:29:36   1    A    In the initial postoperative recovery, yes.  Long-term,

2    I'm not certain about that.

3    Q    Some people continue to have pain and some people don't,

4    is what you're saying?

10:29:47   5    A    Some people could have continuous daily discomfort after

6    an incision, yes, but it's very rare.

7              MR. JOHNSON:  May I have a minute, Your Honor?

8              THE COURT:  Yes.

9    BY MR. JOHNSON:

10:30:23  10    Q    Doctor, I forgot to ask you what you're charging for your

11    time.

12    A    $400 an hour.

13    Q    And what have you charged to date?

14    A    I -- at the time of deposition I charged, I believe,

10:30:37  15    $4,600.  I have not submitted my bill since that time.

16    Q    Are you able to estimate for us what the remaining bill

17    is?

18    A    I would estimate that I spent another 15 hours working on

19    this on this -- preparing for this.

10:30:55  20    Q    All right.  And you're out here for work, so you travel

21    from Boston to Phoenix.

22    A    Yes.

23    Q    And are you charging by the hour or do you have a daily

24    rate for travel?

10:31:04  25    A    I do not.

REDIRECT EXAMINATION – PIOTR SOBIESZCZYK

10:31:07  1    Q    Don't what?

2    A    I don't have either.

3    Q    How are you going to charge?

4    A    Per hour spent testifying and reading documents and

10:31:15  5    preparing.

6    Q    And you arrived when?

7    A    I arrived yesterday morning.

8    Q    And you intend to leave when?

9    A    Tonight.

10:31:28  10   Q    So you will charge for your travel time as of your

11   departure from Boston yesterday morning and then your arrival

12   back in Boston either tonight or early tomorrow morning?

13   A    I must tell you I'm a horrible businessman.  My intention

14   is to charge for the time reading, studying, and preparing,

10:31:44  15   not for the travel.

16   Q    Not while on the airplane?

17   A    No.

18   Q    Okay.  Thank you.

19   A    You're welcome.

10:31:52  20           THE COURT:  Redirect?

21           MS. HELM:  Just a few questions, Your Honor.

22              R E D I R E C T   E X A M I N A T I O N

23   BY MS. HELM:

24   Q    Dr. Sobieszczyk, in your practice, do you consult with

10:32:07  25   cardiothoracic surgeons?

REDIRECT EXAMINATION – PIOTR SOBIESZCZYK

10:32:10  1   A   All the time.

2   Q   And do you follow patients who are also treated or

3   operated on by cardiothoracic surgeons?

4   A   That's routine.  The cardiothoracic surgeon has the

10:32:22  5   difficult task of operating and sees a patient after the

6   surgery, usually a month later, but it is the cardiologist who

7   follows patients longitudinally over subsequent years.

8   Q   Are you aware and did you -- in the testimony in this

9   case, Dr. Kang had never attempted to retrieve a strut from

10:32:46  10  the right ventricle prior to --

11          MR. JOHNSON:  Your Honor, this is beyond my

12  cross-examination.

13          THE COURT:  Overruled.

14  BY MS. HELM:

10:32:53  15  Q   -- prior to his attempt to retrieve the strut in

16  Ms. Booker's heart?

17  A   I believe -- it is my recollection that was this was the

18  first time he tried this.

19  Q   And are you aware that Dr. Harvey and his partner had

10:33:07  20  never before seen a situation where there was a IVC strut in

21  the right ventricle?

22  A   I believe that is the case.

23  Q   And is it your opinion that prior to performing surgery on

24  the heart, either percutaneously or an open heart surgery,

10:33:24  25  that you should weigh the risks and benefits of the success of

REDIRECT EXAMINATION – PIOTR SOBIESZCZYK

10:33:28   1    that surgery?

2    A    I think that would be standard approach.

3    Q    And in your review of Ms. Booker's medical records, you

4    were asked some questions about pericarditis.  Do you recall

10:33:39   5    when the last time was that there was a diagnosis of

6    pericarditis?

7    A    Well, I recall the last cardiology visit raised concern

8    that she actually didn't have pericarditis, but that she had

9    costochondritis, which is inflammation of the cartilage

10:34:02  10    connecting the ribs to the breastbone.

11    Q    So her last treatment with her cardiologist, he found no

12    concerns or no evidence of pericarditis; correct?

13    A    That's what his note indicated, yes.

14         MS. HELM:  Thank you.  No further questions,

10:34:18  15    Your Honor.

16         THE COURT:  All right.

17         Ladies and gentlemen, we will break at this point.

18    We will plan to resume at ten minutes to the hour.

19         We'll excuse you, Doctor.  Thank you.

10:34:24  20      (The jury exited the courtroom at 10:34.)

21         MR. JOHNSON:  He's not excused; correct?

22         THE COURT:  You're done with your cross.  No,

23    recross.

24         MR. JOHNSON:  Even on that new subject?

10:34:42  25         THE COURT:  You could have objected beyond the scope

DIRECT EXAMINATION – CHAD MODRA

10:34:43  1    and you didn't.  On the one you did, it wasn't beyond the

2    scope, so there's no recross.

3         MR. JOHNSON:  Okay.

4         THE COURT:  Ten minutes to, we'll be back.

10:49:34  5      (Recess taken from 10:35 to 10:49.  Proceedings resumed

6    in open court with the jury present.)

7         THE COURT:  Thank you.  Please be seated.

8         All right.  Your next witness.

9         MR. NORTH:  Your Honor, at this time the defendants

10:50:36  10   would call their final witness, Mr. Chad Modra.

11        THE COURTROOM DEPUTY:  Sir, if you would please come

12   forward, stand right here, raise your right hand.

13                    **CHAD MODRA,**

14   called as a witness herein, after having been first duly sworn

10:51:08  15   or affirmed, was examined and testified as follows:

16             D I R E C T   E X A M I N A T I O N

17   BY MR. NORTH:

18   Q    Good morning, Mr. Modra.  Could you tell the ladies and

19   gentlemen of the jury by whom you are employed.

10:51:36  20   A    C.R. Bard.

21   Q    And how long have you worked for Bard?

22   A    17 and a half years.

23   Q    And what is your current title with Bard?

24   A    Continuous improvement leader.  Formerly vice president of

10:51:50  25   quality.

DIRECT EXAMINATION - CHAD MODRA

10:51:51  1    Q   Tell us what a continuous improvement leader does.   What

2    is your job function?

3    A   Because I'm aware of a lot of the different systems of

4    C.R. Bard, I'm involved in identifying and conducting projects

10:52:07  5    that continuously improve the way we do things.

6    Q   And how long have you been in that present position?

7    A   About three months.

8    Q   And prior to that what was your position?

9    A   Staff vice president of operations.

10:52:25 10    Q   And what did you do in that function?

11    A   I had a number of manufacturing sites where we make all

12    kinds of different products report to me.   The quality

13    function reported to me.   Different places around the world.

14    Q   Now, at some point in your career with Bard have you

10:52:46 15    worked directly as an employee of Bard Peripheral Vascular in

16    Tempe?

17    A   Yes.

18    Q   And what was your position at Bard Peripheral Vascular?

19    A   Vice president of quality assurance.

10:52:59 20    Q   And what years did you hold that position?

21    A   2011 through the end of 2015.

22    Q   And while you have taken on other positions with Bard now,

23    do you still maintain your office at Bard Peripheral Vascular?

24    A   I do.   I'm still here in Phoenix.

10:53:21 25    Q   What products do you work on, or did you work on, when you

DIRECT EXAMINATION – CHAD MODRA

10:53:25  1    were at Bard Peripheral Vascular?

2    A   IVC filters; PTA balloons, which are angioplasty balloons;

3    implantable ports for cancer treatment; dialysis catheters;

4    biopsy needles; stents; grafts; artificial vessels.

10:53:45  5    Q   Tell us what your responsibilities were at Bard Peripheral

6    Vascular as the vice president of quality.

7    A   As the vice president of quality, all of the quality

8    function reports to me.  And it's broken into several areas.

9    It's field assurance, or the folks that take experiences from

10:54:05  10   customers and complaints from customers.  It's quality

11   engineering that develops new products.  So they speak to

12   doctors and gather design inputs.  And then we have quality

13   systems.  So they deal primarily with dealing with regulation.

14   Understanding that, making sure we're complying with

10:54:29  15   procedures that meet the regulation of both FDA and around the

16   world.

17   Q   We've heard earlier about engineers working in the

18   research and development department of Bard peripheral.  What

19   is different between them and the quality engineers that would

10:54:49  20   have reported to you?

21   A   Those also report to me as the quality function.  There

22   may be more specialized biomechanical engineers, mechanical

23   engineers.  They have been trained to work on new designs,

24   interface with customers to understand what doctors want, what

10:55:10  25   patients want.  So those still reported to me.

DIRECT EXAMINATION - CHAD MODRA

10:55:14   1          We have other quality engineers in different areas,

           2   as I mentioned, that do similar function but maybe deal with

           3   complaints or continuous improvement.

           4   Q   As the vice president of quality assurance at Bard

10:55:35   5   Peripheral Vascular, were you involved over the years with

           6   tracking and trending complication reports regarding various

           7   products?

           8   A   Yes.  Certainly.

           9   Q   As part of that function and job responsibility, were you

10:55:47  10   involved in tracking and trending complication reports related

          11   specifically to Bard's IVC filters?

          12   A   Yes.

          13   Q   And was that done on an ongoing basis at the company?

          14   A   Yeah.  IVC filters, as well as every other products, we

10:56:02  15   have monthly reports.  Sometimes even more frequent than that.

          16   From how they're performing in the field, we do all -- a

          17   pretty elaborate set of trending on all those.

          18   Q   Tell us a little bit about your background, Mr. Modra.

          19   Where did you grow up?

10:56:22  20   A   In the midwest.  Near Chicago.

          21   Q   And how long have you been in Arizona?

          22   A   Since 2011.

          23   Q   And tell us about your educational background.

          24   A   I grew up in the midwest, went to Purdue University.

10:56:37  25   Graduated with mechanical engineering degree.  Moved out to

DIRECT EXAMINATION – CHAD MODRA

10:56:42  1    the west shortly after with another device company, and have

2    worked in Salt Lake and Phoenix since 1994.

3    Q    Let's talk a little bit more about your work history.

4    After you graduated from college in 1993, what was your first

10:57:03  5    job?

6    A    I was on an engineering development program and I worked

7    in Columbus, Ohio, with baby formula manufacturing.  So I

8    learned amazing things there.  Spent time for six months

9    learning that, but then moved back to Chicago working on a

10:57:28 10    pharmaceutical for six months, and then I moved out here in

11    '94 working for another division of that company.

12    Q    And what was that company, your first medical device

13    company you worked for?

14    A    Abbott Laboratories.

10:57:44 15    Q    How many years were you with Abbott?

16    A    Seven years.

17    Q    And what sort of products did you work on while you were

18    with Abbott?

19    A    I worked on cardiac catheters.  So they're pretty

10:57:57 20    complicated catheters with fiber optics; thermocoil, a

21    temperature measurement device on them; a balloon.  Primarily

22    those.  And they get placed in the heart to measure different

23    things about the heart.

24    Q    And during your years at Abbott, what sort of job titles

10:58:18 25    or responsibilities did you have with those products?

DIRECT EXAMINATION – CHAD MODRA

10:58:22  1    A    I was quality engineering.  Quality engineer for

2    manufacture.  So I learned a lot about the manufacturing of

3    those devices.  I was an internal auditor for a period of

4    time.  I wrote softwares.  I was a software quality engineer,

10:58:35  5    so I did programming and testing of software related to those

6    devices.

7    Q    And when did you first move to Bard?

8    A    In August of 2000.

9    Q    And did you go straight from Abbott to Bard?

10:58:54  10    A    I did.

11    Q    And what division or area of Bard did you first work with?

12    A    I worked in new product development quality engineering,

13    which gave me the opportunity to be part of the design of

14    brand-new products.  So that was very exciting.

10:59:09  15    Q    But what division was that?

16    A    Oh, I'm sorry.  Bard Access Systems in Salt Lake City.

17    Q    The jury's heard a lot about Bard Peripheral Vascular but

18    not about Bard Access.  Tell us a little bit about what Bard

19    Access in Salt Lake City does.

10:59:25  20    A    Bard Access is another division of Bard.  They handle just

21    different groupings of products, different family of products.

22    Primarily at that time dialysis catheters, catheters that they

23    placed in the lower or upper arm to get cancer drugs into your

24    body, ports which get implanted to do the same thing.

10:59:49  25    Q    And what sorts of positions did you have while at Bard

DIRECT EXAMINATION – CHAD MODRA

10:59:53  1   Access?

2   A   I started as a senior quality engineer, became the quality

3   engineering manager, senior manager, and then director in 11

4   years there.

11:00:03  5   Q   And when did you leave Bard Access Systems?

6   A   In March of 2011.

7   Q   And is that when you moved to Bard Peripheral Vascular?

8   A   That's correct.

9   Q   And what position did you take when you came to Bard

11:00:17 10   Peripheral Vascular?

11   A   Vice president of quality at Bard.  BPV.

12   Q   Was that a promotion?

13   A   Yes.

14   Q   Is there any particular reason you decided to devote your

11:00:32 15   career to the field of medical devices?

16   A   Well, I've thought about that a lot and I give advice to

17   young engineers all the time, and I really tell them if you

18   want to make something, there's a lot of places you can make

19   something.  If you want to make something that helps people,

11:00:49 20   there's no better place to do that.  Medical devices is a

21   great industry.  You can come to work knowing that you've done

22   something good each day.  It isn't just about making

23   something.

24   Q   When you started work at Bard Peripheral Vascular, when

11:01:06 25   did you start working at projects involving IVC filters?

DIRECT EXAMINATION – CHAD MODRA

11:01:10  1    A    At the time I transitioned from Salt Lake down to here, my

2    predecessor began transitioning my knowledge of the kinds of

3    products that BPV was required -- or oversaw.  So she began

4    giving me information, helping me understand the nature of the

11:01:29  5    products, the -- what they're used for, the design elements,

6    the key complications, the key benefits, the risk assessment

7    of each of those devices.  So it was over a period of months

8    right after I moved here that we had a lot of discussions

9    about that sort of transition.  The first really 90 days --

11:01:51 10    Q    Was your predecessor in that role at Bard Peripheral

11    Vascular Ms. Gin Schulz that we've seen by videotape during

12    this trial?

13    A    Yeah, yeah it was.

14    Q    Over the course of your career with medical devices, have

11:02:07 15    you ever seen any devices that did not carry with it some risk

16    of complications?

17    A    Not in my experience, no.

18    Q    What is the general task or charter of the quality

19    department at Bard Peripheral Vascular?

11:02:36 20    A    The quality department maintains an independent voice, if

21    you will, of overseeing the other departments.  They don't

22    report to us but we're part of the team where we need to

23    understand the regulation, understand the latest expectations

24    from regulators, meaning FDA or around the world, and we help

11:03:03 25    modify procedures, make sure that the procedures are being

DIRECT EXAMINATION – CHAD MODRA

11:03:07   1   executed in the right way.  We conduct internal audits of each

2   department.  We make sure that they're being followed.  And

3   then we investigate those and make corrections if we feel like

4   they're not.

11:03:21   5   Q   As the vice president of that department, did you have a

6   role or responsibility in developing policies and procedures

7   for the quality function?

8   A   Yeah.  Certainly.  That would be one of my primary jobs is

9   making sure that those policies and procedures are in

11:03:37   10   accordance with what expectations are.

11   Q   And did you have responsibility to fulfill that role to

12   become familiar with the policies and procedures that had

13   existed in the past, the history of those policies?

14   A   Yes.  Yes.

11:04:01   15   Q   Now, we have heard a lot about complaints in this case.

16   Does Bard have policies and procedures that govern how

17   complaints are handled?

18   A   Yes.  Quite a few.

19        MR. NORTH:  If you could bring up Exhibit 5691,

11:04:23   20   beginning on page 12.

21   BY MR. NORTH:

22   Q   Do you recognize this document, 5691.0012?

23   A   I do.  It's the standard we have for complaint handling.

24   The primary standard.

11:04:53   25   Q   And was this created by the company as part of its regular

DIRECT EXAMINATION – CHAD MODRA

11:04:57  1   business practices?

2   A   Yes.

3   Q   And was this policy in effect while you were working

4   there?

11:05:05  5   A   Yes.  An earlier version of this was there, yes.

6   Q   And are these policies updated occasionally over time?

7   A   Yes.  As we understand more of expectations, as industry

8   learns more about what additional expectations may be had from

9   regulators, from the government, this gets updated fairly

11:05:36  10   frequently.

11   Q   Is it a regular practice of the company to create policies

12   of this nature?

13   A   Yes.

14          MR. NORTH:  Your Honor, at this time we would tender

11:05:52  15   5691, pages 12 through 32, which are this policy.

16          MR. O'CONNOR:  No objection.

17          THE COURT:  Admitted.

18       (Exhibit 5691 admitted.)

19   BY MR. NORTH:

11:06:06  20   Q   Mr. Modra, what is Bard's overarching or ultimate goal for

21   processing incoming complaints?

22   A   It's really about understanding the customer experience.

23   Certainly it's required by regulation, so that's one aspect.

24   But it's really understanding the customer feedback.

11:06:27  25          And it can be a complaint from something minor to

DIRECT EXAMINATION – CHAD MODRA

11:06:33  1  something more significant, but when you have that

2  information, the goal is to really understand how the product

3  is performing and how you can improve the next generation of

4  product.

11:06:44  5         So we've always seen it as, you know, yes, it's a

6  requirement, but it's an opportunity to hear what your

7  customers are saying.  So that's pretty important.

8  Q   Does the complaint investigation and handling process also

9  permit the company to monitor safety issues that may arise

11:07:02  10  with its products?

11  A   Yes, of course.  The tracking and trending that's done

12  along with this is understanding how people are using the

13  product, how it's performing in those, understanding the

14  safety levels; are there new things that are being discovered

11:07:20  15  or understood about the product, whether it's safety or

16  performance.

17  Q   Does this policy apply to IVC filters in addition to other

18  products?

19  A   Yes.  It applies to all the products we have across all of

11:07:36  20  the divisions within Bard.

21  Q   Now, let's talk about Bard's practices in receiving and

22  investigating complaints.

23         What are the various sources of where you receive the

24  information that leads to complaints?

11:07:54  25  A   We get it, certainly, directly from doctors.  We get it

DIRECT EXAMINATION – CHAD MODRA

11:07:58   1   from sales reps from the company.  We get -- we often review

2   and read literature.  So there's published studies that we

3   look through and if we see our product mentioned, even though

4   it may have limited information, we include that as a

11:08:13   5   complaint record.  It may be -- I mean, those are the primary

6   inputs.  Customers themselves can call them in as well.

7   Q   Does the company sometimes investigate reports of

8   complications that you may see in the medical literature?

9   A   Yeah.  As I had mentioned, there's often new studies

11:08:40  10   published by doctors, institutions, and so when we see those

11   things being published, it -- we log it first and then we have

12   an obligation to conduct an investigation on it.  Find out

13   more information, find out what was the nature of the issue

14   and get to the root cause, if possible, if there was alleged

11:09:03  15   failure.

16   Q   Does the company maintain a 1-800 number that it

17   publicizes to encourage physicians and others to report any

18   complications or complaints?

19   A   Yeah.  It's included on instructions for use, packages,

11:09:19  20   boxes.  So -- a website.  So yes.

21   Q   Now, over the years did the company maintain a group in

22   Covington, Georgia, called MS&S?  Explain to the jury what

23   MS&S -- first of all, what does that acronym stand for?

24   A   Medical service and support, if I remember correctly.

11:09:47  25        They're the people that answer most of the customer

DIRECT EXAMINATION - CHAD MODRA

11:09:50   1   service calls, so it's great.  It could be everything from,

2   hey, I can't find the instructions for use, can you give me a

3   copy, or do you have a product that's this size, this shape,

4   or if they have questions about the product itself, can you

11:10:06   5   use it in this circumstance.  They field all of those

6   questions.

7          But then they also field if there's any allegation of

8   the device not performing the way they intended it, the way

9   they want it to perform.  They take that and transfer it to

11:10:20  10   the appropriate division complaint handling department.  So

11   they field all those and then shuttle them over to

12   expertise -- people with expertise in dealing with complaints.

13   Q   So if MS&S, that department, in Covington, Georgia,

14   received a telephone call from a physician saying that some

11:10:42  15   IVC filter he had been implanting had perforated, for example,

16   what would the MS&S department do with that report?

17   A   They would note that in their records, but then they would

18   transfer that call to the department here at the BPV to ask

19   additional questions, to get more information to find out what

11:11:05  20   was the nature of the issue.  You know, what, when, where,

21   who.  All the details we can.

22   Q   What department at Bard is responsible -- for Bard

23   Peripheral Vascular is responsible for receiving complaints?

24   A   It's called field assurance.  But complaint handling is

11:11:23  25   the same, but we called it field assurance.

DIRECT EXAMINATION – CHAD MODRA

11:11:26  1   Q   And was field assurance under your jurisdiction as vice

2   president of quality?

3   A   Yes.

4   Q   Now, do other employees in other departments have any role

11:11:39  5   and responsibility in reporting complaints?

6   A   Every employee in every department.  In fact, every

7   employee in every department in every division has

8   responsibility, and we're trained on it.  In fact, I've

9   conducted training on it at company meetings.

11:11:58  10          Our responsibility is if you hear about an alleged

11   issue, you need to turn around and send it -- send the

12   information, get field assurance on the phone, give them that

13   information right away because there's a time requirement.

14   We've got to get to the bottom of what happened, what was the

11:12:17  15   allegation, what was the product involved very quickly.

16   Q   Well, let's assume -- or in this scenario a sales

17   representative for Bard Peripheral Vascular in Atlanta, for

18   example, if that sales representative was at a hospital, saw a

19   doctor and the doctor mentioned to him or her about some

11:12:38  20   incident involving an IVC filter, what would that sales

21   representative's responsibility be in that circumstance?

22   A   Within 24 hours they need to contact the field assurance

23   group.  They often follow up with maybe an e-mail.  They leave

24   voice mails for field assurance.  We have some staggered hours

11:12:58  25   because we're in the west, so we have some early and late

DIRECT EXAMINATION – CHAD MODRA

11:13:03   1   people on the phone to take calls at off hours.  They can call

2   MS&S as well and have that fed through to DPV.

3   Q   Does the field assurance department not only receive the

4   complaints but also analyze and investigate them?

11:13:20   5   A   They do.  They first try to get as much information as

6   they can, and then if they can get the device back, which

7   isn't often, but we have a field assurance lab that has test

8   methods, ways to test the device, measurement ability to make

9   sure that it's conforming to the original specifications, and

11:13:45  10   other tests to evaluate it to see how it performed.

11   Q   In your experience with IVC filters at Bard Peripheral

12   Vascular, was there a pattern to when the complaints or issues

13   might first be discovered by the doctor or patient?

14   A   Related to IVC filters specifically?

11:14:03  15   Q   Yes.

16   A   It's really my understanding and that it's upon

17   discovery -- there's really two times when they primarily

18   report them.  It's either during deployment, or placing the

19   device originally, or when they go to retrieve the device.  Or

11:14:23  20   if there's a symptom involved.  So it's really those areas.

21   Q   In your experience with IVC filters, were more of the

22   complaints received by your department involving asymptomatic

23   complications or symptomatic complications?

24   A   I'd say symptomatic because they were -- they had a

11:14:54  25   symptom so they knew something was going on.

DIRECT EXAMINATION – CHAD MODRA

11:15:00   1    Symptomatic after the implant.  So once it's placed

2    then it would primarily be symptomatic.

3    Q    Over the years, did the company receive as many complaints

4    with the Simon Nitinol filter as it did with the retrievable

11:15:14   5    filters?

6    A    Over the total of the years?

7        MR. O'CONNOR:  Objection.  Lack of foundation.

8        THE COURT:  I think you need to lay foundation for

9    that.

11:15:27  10    BY MR. NORTH:

11    Q    Do you know generally about the number of complaints --

12    did you track and trend the number of complaints received

13    regarding the Simon Nitinol filter in addition to the

14    retrievable filters?

11:15:39  15    A    Yes.

16    Q    And do you have a general understanding of sort of the

17    volume of complaints, comparatively speaking, between the

18    permanent versus retrievable filters?

19    A    Yes.

11:15:51  20    Q    Based on that understanding and your tracking and trending

21    of that data, did there appear to be more complaints involving

22    the retrievable filters or the Simon Nitinol filter?

23    A    Retrievable.

24    Q    And as a part of your analysis as the vice president of

11:16:10  25    quality, did you identify any reasons why you thought that to

DIRECT EXAMINATION - CHAD MODRA

11:16:14   1   be the case?

2   A    Because if they were asymptomatic, as in Simon Nitinol,

3   you don't notice it.  You kind of don't know that it's there.

4   It's performing well, it's doing it's job.  Compared to

11:16:30   5   retrievable, if there's symptoms after deployment then -- then

6   you have an event, you have a complaint event.

7   Q    Was there anything you noticed as the vice president of

8   quality and monitoring the tracking and trending with

9   complication rates about the patient population with regard to

11:16:50  10   Simon Nitinol filters that might impact the different

11   complaint rates?

12   A    Well, the Simon Nitinol being a permanent filter, I

13   remember a study, I think one of the original studies of the

14   Simon Nitinol, that they were placed in very sick patients.

11:17:10  15   So -- ask the question again.  Can you ask the question again,

16   I --

17   Q    Let's go on.

18        Let me ask you about this:  Is it only the field

19   assurance department that's involved with patients -- I'm

11:17:26  20   sorry, involved in investigating complaints or do other

21   departments of the company become involved sometimes?

22   A    Yeah.  I mean, we start with the field assurance group.

23   They have quality engineers, trained and degreed engineers as

24   part of the staff.  Again, they get as much information as

11:17:47  25   they can about the event.  But then we get the R&D folks

DIRECT EXAMINATION – CHAD MODRA

11:17:50  1   involved, research and development.  So the people who

2   designed the devices that know the intent, the why behind the

3   performance of the product.  So we'll get them involved as

4   subject experts on the device itself.  So they were the ones

11:18:08  5   that originally helped design it and put the specifications

6   together, so it's helpful to have them involved.

7          We may get manufacturing.  For every complaint we

8   also do a manufacturing interview.  So we want to understand

9   if there was something related to manufacturing that may have

11:18:27 10   caused the event.  So there's a lot of people involved just

11   beyond field assurance.

12   Q   I think we've heard this testimony, but where were the IVC

13   filters or are the IVC filters manufactured?

14   A   In New York at one of our sites.  Glens Falls.  Glens

11:18:46 15   Falls.

16   Q   And are there quality engineers and other people on-site

17   at Glens Falls?

18   A   Yes.  Yes.  There's manufacturing engineers, quality

19   engineers, quality department structure, quality head who

11:19:02 20   reported to me as well.

21   Q   Walk us through the process, if you will, when the company

22   receives a complaint.

23   A   We'll receive a description of an event from any number of

24   multiple sources.  And we may receive just a little bit of

11:19:23 25   information or may receive detailed information.  What we do

DIRECT EXAMINATION — CHAD MODRA

11:19:27  1   is have someone follow up with the person who recorded that or

2   reported that to us and we ask a series of questions.

3        In particular, for our IVC filters we'll ask when it

4   was implanted?  What's the patient's details?  What are

11:19:44  5   physiological conditions?  Name the hospital.  Who's the

6   reporting person?  Name of the patient.  And then the details

7   of the device.  Like I said, when was it implanted?  How is it

8   implanted?  Because there's different ways to put it in.  When

9   did you first see an issue?  When was the first experience of

11:20:10 10   something not being right?  All those questions as part of the

11   investigation.  Then we'll say is the device explanted?  Can

12   we receive it back?

13        And if we should happen to get it back, we have that

14   lab that we can do all sorts of analysis on it.

11:20:31 15        So we'll decontaminate it first and then take it to

16   the lab, make sure we're measuring it, trying to analyze

17   whether it's within specification or not.

18        We take that same information, record the lot number

19   that the device was from, meaning each one of our devices is

11:20:54 20   made in a certain batch.  We take that lot number, give it to

21   manufacturing, and they look through all their records, is

22   there anything related what's in the paperwork that was used

23   to make the device related to what this allegation of the

24   failure was.

11:21:08 25        And so we take all of that information together, we

DIRECT EXAMINATION – CHAD MODRA

11:21:11  1    prepare all that to the risk assessment.  We get a -- and then

2    when we have all that information, then we can code it.  And

3    we use FDA device codes, which are just alphanumeric numbers

4    that really summarize what is the failure.  If it's a device

11:21:35  5    breakage or device leak in other devices.  If it's tearing of

6    something.  There's a numerical value that we can put multiple

7    number of codes in, and that way it sort of summarizes the

8    entire event so you can track and trend it easier rather than

9    having to look through the narrative of every event we get.

11:21:54 10    Q   Mr. Modra, does the field assurance people, folks that are

11    investigating these complaints, do they attempt on occasion to

12    talk to the physician involved in the procedure or with the

13    device?

14    A   Every time.  We make at least three attempts to try to get

11:22:11 15    additional information from the physician, either through the

16    hospital contact, through a sales rep, or through them

17    directly.  We try to get their experience because they're the

18    ones that can give us their opinion on really what went on.

19    Q   Does the company on occasion attempt to obtain medical

11:22:31 20    records?

21    A   We ask for those as well because those are useful in --

22    they'll have the complete narrative of what happened during

23    the event, leading right up to it, right afterward, and then

24    how is the patient doing, what's the outcome of the device.

11:22:51 25    So, yeah, we have medical records; we ask for those as well.

DIRECT EXAMINATION – CHAD MODRA

11:22:55  1  Q   Does Bard Peripheral Vascular have policies or procedures

2  for when to report these complaints that have been

3  investigated to the FDA?

4  A   Yes.  Per regulation we have a series of questions.  A

11:23:12  5  questionnaire that gets filled out with every complaint and it

6  helps walk the person through what would be reportable to the

7  FDA and what isn't.

8  Q   So if you determine a complaint is reportable to the FDA

9  and you make that report, what's the term that the FDA uses

11:23:28  10  for that sort of complaint?

11  A   Medical device reports.  So MDR is the short -- short

12  version.

13       MR. NORTH:  If we could bring up Exhibit 5706,

14  beginning at page 48.

11:23:42  15  BY MR. NORTH:

16  Q   Mr. Modra, can you tell the members of the jury what

17  you're looking at now, which is Exhibit 5706, beginning at

18  page 48.

19  A   It's the Standard for Medical Device Reporting CQA

11:24:02  20  standard 54.

21  Q   And was this particular policy or standard in place, or a

22  similar version of it, at the time you were vice president

23  there?

24  A   Yes.

11:24:19  25  Q   And is this an official business record of Bard?

DIRECT EXAMINATION – CHAD MODRA

11:24:22  1    A    Yes.

2    Q    Is it kept in the course of the regularly -- regular

3    business of the company?

4    A    It is.

11:24:28  5    Q    And was it a routine practice of the company to maintain

6    such a policy?

7    A    Yes.

8    Q    In fact, was such a policy -- having such a policy

9    required by the United States Food and Drug Administration?

11:24:39  10   A    It is.

11              MR. NORTH:  Your Honor, at this time we would tender

12   Exhibit 5706, pages 48 to 61.

13              MR. O'CONNOR:  One moment, I've got to talk to my

14   lawyer.

11:24:54  15             No objection.  Thank you.

16              THE COURT:  Admitted.

17           (Exhibit 5706 admitted.)

18   BY MR. NORTH:

19   Q    Does Bard investigate only complaints that are reported

11:25:09  20   from the United States?

21              Well, let me back up and ask this:  Are Bard's

22   products sold internationally?

23   A    Yes.

24   Q    Does Bard -- if Bard receives a complaint from overseas,

11:25:21  25   let's say Australia or Belgium, does your division investigate

DIRECT EXAMINATION - CHAD MODRA

11:25:28   1   those complaints also?

2   A   Yes.  If it's a product that's from Bard Peripheral

3   Vascular, yes, we would be required to investigate that as

4   well.

11:25:47   5           MR. NORTH:  If we could look at --

6           First of all, could I display this, Your Honor?  I'm

7   sorry.

8           THE COURT:  Yes.

9   BY MR. NORTH:

11:26:04   10   Q   Does the policy for complaint reporting define the term

11   "malfunction"?

12   A   Yes.

13   Q   And how is that defined?

14   A   In 4.9.  Malfunction.

11:26:23   15   Q   And what's the point of having -- well, is "malfunction"

16   sort of a term of art in the reporting to the FDA of various

17   complaints?

18   A   Yes.

19   Q   And explain to us what that -- what the significance of

11:26:37   20   that is.

21   A   When you report an event to FDA, they ask you to report it

22   in one of two ways, either malfunction or serious injury.  So

23   there's a definition for both of those.

24           MR. NORTH:  And if we could look at 4.20.

25

DIRECT EXAMINATION – CHAD MODRA

BY MR. NORTH:

Q    And is that the definition in your report for "serious injury"?  I mean in your policy.

A    That is.

Q    And are these definitions made up by Bard Peripheral Vascular?  Or where do they originate?

A    No.  They're intended to be consistent with the regulation.  That's why they're in there.

Q    Is there a clear-cut line between what constitutes a malfunction and what constitutes a serious injury, in your experience?

A    There's -- in my experience, it's easy, obviously, to determine what a serious injury is.  Those -- when injury's reported, that's very easily understood.  Malfunction is a little less clear because there isn't a clear injury of -- alleged in the event.

Q    How many Bard Peripheral employees are involved in investigating a single complaint when it arrives?

A    At least three, but many more than that typically.  There's quality engineers, there's field assurance oversight and management, quality assurance.

Q    Well, let's talk about sort of a basic complaint where there would only be three people.  Walk us through those steps, how three different people get involved in reviewing a single complaint.

DIRECT EXAMINATION – CHAD MODRA

11:28:44   1   A   If person number 1 takes the event from the doctor, writes

2   down that information, follows up on getting as much

3   information as they can -- like I said, the date it was

4   implanted, for instance, what were the circumstances leading

11:29:00   5   up to the experience, the event -- follows up with conducting

6   the investigation themselves, like looking at the product if

7   we get it back, writes up the summary, does the other analysis

8   and steps, compares it to the risk assessments, and then

9   they'll at least have another person where there's a field

11:29:21  10   assurance review that reviews did they document all that they

11   should.

12        So they will review the records, and then a third

13   person, that's why I said a minimum of three, is a quality

14   assurance person, who's different from the other two folks,

11:29:35  15   will also look at the records to make sure that they're

16   complete.

17        MR. NORTH:  I'm sorry, I darkened the exhibit too

18   quickly.  Could we pull that back up and display it,

19   Your Honor?

11:29:49  20        THE COURT:  Yes.

21        MR. NORTH:  If we could look at 5706, page 55.

22        And look at section 6.6.1.1.

23   BY MR. NORTH:

24   Q   Mr. Modra, if Bard, in conducting this review, after three

11:30:19  25   people have looked at a complaint, are somehow in that

DIRECT EXAMINATION – CHAD MODRA

11:30:23  1    instance still unsure as to whether it qualifies for reporting

2    to the FDA, what does the policy require?

3    A   If there's some ambiguity, some things unknown with regard

4    to whether or not it is MDR reportable, we report it.

11:30:44  5    Q   Now, if Bard receives additional information after

6    submitting the initial complaint to the FDA, what does the

7    policy require Bard to do then?

8    A   When you get additional information, which a lot of times

9    you will, you'll request all that information up-front, like

11:31:01 10    maybe the medical records, and there's a requirement that

11    within the first 30 days of receiving that event you have to

12    make a decision of whether or not it's reportable.  So you

13    make that decision based on the information you have.

14         And then sometime later, if you get additional

11:31:17 15    information, maybe the doctor was busy or there was -- the

16    information in the records weren't available, they may send

17    that to you later.  And if we get that, then we link that to

18    an existing record that we filed.

19         We re-review the information and say before, was it

11:31:35 20    reported?  How was it reported?  And then does this new

21    information change that requirement?  And if it does, then we

22    have to re-report it.  So we send an addendum to FDA.  There's

23    a check box on the 3500A form that we check addendum to or

24    update to the original MDR so it links them together.

11:31:58 25    Q   Now, the tracking and trending that the company does, does

DIRECT EXAMINATION – CHAD MODRA

11:32:02  1   that generally determine the best evidence you have of various

2   types of complication rates with devices?

3   A   I would say so.

4   Q   And I believe you told us you compute those on a regular

11:32:18  5   basis with products?

6   A   At least monthly, and we can run ad hoc whenever we want.

7   But there's quite an extensive set of graphs, trends,

8   summaries, analysis, that we present to management every

9   month.

11:32:33  10   Q   Now, the adverse event rates that you calculate, do you

11   generally share those with physicians?

12   A   No.

13   Q   And why is that?

14   A   You can't -- you can't just share information about that

11:32:49  15   with physicians.  It could be construed as you trying to sway

16   them that maybe you have great rates and you're trying to

17   convince them of the great performance of your device.  You

18   have to have clinically based evidence to share with doctors.

19   Q   On occasion, has Bard reviewed data from the MAUDE

11:33:12  20   database related to competitive filters on the market?

21   A   Yeah.  I mean, we review that data.  We try to get as much

22   information about competitors as we can.  I mean, we'll look

23   at literature, we'll review the FDA database, MAUDE, but then

24   also if there's any information about the performance of their

11:33:36  25   devices in other publications.  Lot of times there's trade

DIRECT EXAMINATION – CHAD MODRA

11:33:40   1   shows and things.  So we try to gather up all of that

2   information to make assessments of the performance of the

3   devices.

4   Q   Is Bard able to actually determine a rate of complication

11:33:54   5   for a competitor's filter from the MAUDE database alone?

6   A   Not from MAUDE alone.  I mean, it even has a disclaimer on

7   there that you can't do that.  But it's -- it's still subject

8   to what did they report to the FDA.  So, yeah, it's a bit of

9   information, but you can't go solely on that.

11:34:22  10   Q   Well, the MAUDE -- does the MAUDE database give you how

11   many adverse events have been reported with a competitive

12   filter?

13   A   It does.

14   Q   Does it give you, however, how many competitive filters of

11:34:39  15   that particular filter have been sold in the marketplace?

16   A   No.  It just gives account of the events of a certain

17   type.

18   Q   So if you wanted to get a denominator to determine a rate

19   of a competitor's filter, where would you go?  Or what sources

11:34:56  20   are there to try to find that?

21   A   We might use IMS, which is a service -- I don't know what

22   that acronym stands for -- but where we would get estimates of

23   sales from competitors.  But they're always time lag and

24   there's some variability, I guess, in the business

11:35:19  25   intelligence of those.  So we have that ability.

DIRECT EXAMINATION – CHAD MODRA

11:35:23   1          I guess you could try to find out their revenue of a

2   certain product line and back calculate.  But there's limited

3   sources of getting truly accurate data from anyone else.  I

4   mean, intentionally so.  It's competitors.

11:35:40   5   Q   Well, does Bard try to compute competitive rates using

6   that crude data at times?

7   A   We do.

8   Q   Based on your experience, do you ever share those

9   estimates of competitive rates with physicians?

11:36:00  10   A   No.  Not in my experience.

11   Q   Why is that?

12   A   Well, it's sort of dirty pool, if you will.  You don't

13   want -- you don't -- you don't do that.  I mean, you don't

14   share someone else's rates.  It's -- besides the fact you

11:36:21  15   can't really do that accurately and it would not be allowed by

16   FDA really to be publishing that sort of thing.

17   Q   Based on your experience, why do you believe it would not

18   be allowed by FDA?

19   A   Just the advertising rules.  When you have -- if you're

11:36:40  20   advertising about your own product, you have to have a fair

21   and balanced message.  So even down to like the font size.  So

22   you can't say the product has this great performance and then

23   put all of the warnings and all of that in micro font.  I mean

24   you have to have -- you can see them on TV.  Fair and balanced

11:37:00  25   communication of the risks and benefits of the device.

DIRECT EXAMINATION – CHAD MODRA

11:37:04   1          So similarly, in my experience, you'd have to have

           2   something like that.  And we're not going to do that about a

           3   competitor's device.

           4   Q    Well, based on your experience with the FDA -- well, let

11:37:17   5   me ask you this:  Have you dealt with the FDA frequently in

           6   your role in quality assurance over the years?

           7   A    I would term it frequently, yes.

           8   Q    Based on your experience, do you believe that it would be

           9   permissible to publicize complication rates that were based on

11:37:37  10   MAUDE data?

          11   A    No.

          12   Q    And why is that?

          13   A    One, because their disclaimer says that.  Two, I wouldn't

          14   publish rates because of the potential inaccuracies.  It would

11:37:50  15   be pure speculation on our part on the denominator, so it

          16   wouldn't be appropriate to do that.

          17          MR. NORTH:  If we could look at Exhibit 7795.

          18   BY MR. NORTH:

          19   Q    Could you identify what this is.

11:38:29  20   A    Looks like the front page of the MAUDE database.  You can

          21   search for a number of different things.

          22   Q    Are you familiar with that with your work with medical

          23   devices and the FDA?

          24   A    I am.

11:38:41  25          MR. NORTH:  Your Honor, I believe this has already

DIRECT EXAMINATION – CHAD MODRA

11:38:42   1   been admitted.  If we could display it to the jury?

2            THE COURT:  You may.

3            MR. NORTH:  And if you could look down at the second

4   bullet point, please, Mr. Russell.

11:38:54   5   BY MR. NORTH:

6   Q   Is that the disclaimer by the FDA you were mentioning

7   earlier about the use of the MAUDE database to determine

8   comparative rates?

9   A   Yeah.  That's what I would call the disclaimer.

11:39:19  10            MR. NORTH:  You can take that down.

11   BY MR. NORTH:

12   Q   Over the 20 years or so you have worked in the medical

13   device industry, Mr. Modra, are you aware of any device

14   manufacturer that has included its internal complication rates

11:39:31  15   within its instructions for use?

16   A   No.  No.  The only thing I've ever seen instructions for

17   use are clinical study data, which is run by FDA before we can

18   even put it in the instructions for use, and they require it

19   of PMA products.  High-risk products.

11:39:52  20   Q   Are you familiar with what a DFMEA is?

21   A   I am.

22   Q   What is that?

23   A   Device failure modes and effects and analysis document.

24   Q   And are there certain rates calculated within a DFMEA?

11:40:07  25   A   There are certain rates estimated within there for each

DIRECT EXAMINATION – CHAD MODRA

11:40:11  1   type of failure mode that a device is believed to have.

2   Q    Over the 20 years or so you have worked in the medical

3   device industry, are you aware of any device manufacturer that

4   has included its estimated rates from a DFMEA in its

11:40:30  5   instructions for use?  Or in other materials disseminated to

6   physicians?

7            MR. O'CONNOR:  Objection.  Lack of foundation.

8            THE COURT:  Overruled.

9            THE WITNESS:  No.  It would be inappropriate to

11:40:44 10   include some numbers from our internal tool for risk

11   management.  It wouldn't be appropriate.  I've never seen it

12   done.

13            MR. NORTH:  If we could bring up Exhibit 5991.

14   BY MR. NORTH:

11:41:12 15   Q    Do you recognize this document?

16   A    Yes.

17   Q    If could you tell us what this is.

18   A    This is a FM or a form that's used to help guide through

19   when you're given an event type.  So when someone calls in an

11:41:32 20   event of an alleged failure of a device, that's along the

21   left-hand side.  And then it helps walk a person through

22   whether that's automatically reportable as an MDR or whether

23   there's some other things you have to ask or find out to

24   determine if it's reportable, and then also how it's

11:41:52 25   reportable.  Meaning as malfunction or serious injury.  And

DIRECT EXAMINATION – CHAD MODRA

11:41:57  1   then also the related codes.  So it helps tie together what

2   the experience is and make the coding more consistent.

3   Q   Is 5991, the guideline, is that specific to IVC filters

4   themselves?

11:42:14  5   A   Yes, that's the one for IVC filters.  You can see it at

6   the top.

7   Q   And is this a record that was created and is kept as a

8   regular course of Bard's business?

9   A   It is.

11:42:26  10   Q   And is it created by your department, your former

11   department, under the supervision of the vice president of

12   quality?

13   A   It is.

14   Q   And is it a routine practice of the company to make

11:42:41  15   guidelines -- create guidelines such as this?

16   A   Create and update.  Yes.

17        MR. NORTH:  Your Honor, at this time we tender

18   Exhibit 5991.

19        MR. O'CONNOR:  Your Honor, just a minor objection as

11:42:57  20   to when was this first created.

21        THE COURT:  Would you lay that foundation, please.

22        MR. NORTH:  Yes, Your Honor.

23   BY MR. NORTH:

24   Q   Do you know when this was created, Mr. Modra?

11:43:07  25   A   This -- the first revision of this document?

DIRECT EXAMINATION – CHAD MODRA

11:43:10  1    Q    Yes.

        2    A    Generally.  I don't know the exact date.

        3    Q    Well, this was -- were these guidelines in place at the

        4    time that you worked there?

11:43:20  5    A    Yes.

        6    Q    And this is revision, what, 5?

        7    A    That's correct.

        8    Q    And were you involved ever in revising these particular

        9    guidelines?

11:43:38  10   A    I didn't actually make the redlines, but I was involved in

        11   the discussions about the details of those, so, yes.

        12         MR. NORTH:  Your Honor, if I could let the witness

        13   look at the entire 5991 to address any questions.

        14         THE COURT:  You may.

11:44:07  15         Is that marked?

        16         MR. NORTH:  It has 5991 on the bottom.

        17         THE COURT:  So that's part of the exhibit?

        18         MR. NORTH:  Yes.

        19         THE COURT:  Okay.  Yes.  Traci can give it to the

11:44:20  20   witness.

        21         MR. NORTH:  Thank you.

        22         MR. O'CONNOR:  I'm sorry, is this the same one we

        23   have on the screen?

        24         THE COURT:  Yeah.  It's the fuller document.

11:44:33  25         MR. O'CONNOR:  Thank you.

DIRECT EXAMINATION — CHAD MODRA

11:44:34   1   BY MR. NORTH:

2   Q    Look at the last page, if you would, Mr. Modra.

3        Does this indicate you yourself, as the VP of

4   quality, approved this particular document?

11:44:50   5   A    It does.

6   Q    And this particular version of the guidelines?

7   A    It does.

8        MR. NORTH:  Your Honor, again we would tender the

9   document at this time.

11:45:06  10        MR. O'CONNOR:  No objection.

11        THE COURT:  Admitted.

12     (Exhibit 5991 admitted.)

13   BY MR. NORTH:

14   Q    In developing the latest version of these guidelines, did

11:45:19  15   Bard work directly with the FDA to shape these guidelines?

16   A    We did.

17        MR. NORTH:  If we could turn -- first of all, if we

18   could display this, Your Honor?

19        THE COURT:  You may.

11:45:37  20        MR. NORTH:  And if we could turn to page 9.

21   BY MR. NORTH:

22   Q    If you would look down at the bottom, the final revision

23   number, 5, and I believe -- did we establish earlier,

24   Mr. Modra, this particular exhibit is revision 5 of this

11:46:04  25   document?  Or guidelines?

DIRECT EXAMINATION - CHAD MODRA

11:46:06  1   A    Yes, we did.

2   Q    And where it says description for revision 5, what does it

3   say?

4   A    Revised based on outcome of Bard's meeting with FDA.  And

11:46:19  5   references two technical documents.

6   Q    Mr. Modra, is Bard's complaint analysis process and

7   procedures highly regulated by the FDA?

8   A    Yes.

9   Q    Periodically, does the company do internal audits of its

11:46:45  10   own complaint handling systems?

11   A    It does.  It does through someone on-site who is

12   designated as an internal auditor that operates independently

13   from any of the rest of the quality department, and they

14   report directly to me in that position.  We also have Bard

11:47:04  15   corporate-level auditors that are independent from the

16   division themselves.  So they will come and review that field

17   assurance department.  And, also, we have outside auditors and

18   we've had consultant experts come in and review specifically

19   the field assurance department at least yearly.  More

11:47:26  20   frequently lately.

21   Q    And how often do -- does the company undertake these

22   audits?

23   A    At least once a year from each of those individuals.

24   Field assurance is multiple times, more likely two.  But at

11:47:44  25   least once a year.

DIRECT EXAMINATION – CHAD MODRA

11:47:47  1   Q   What sort of outside entities do you call in to

2   participate in the audit process on occasion?

3   A   We have consultants, experts, that -- to give an

4   independent view of, you know, maybe we're too close to the

11:48:02  5   process, maybe we don't see everything that they would see

6   because they're unfamiliar with it.

7        So we call on and hire experts to come in and give us

8   an audit, go through samples of records, talk to the people,

9   make sure that they're following the procedure independently.

11:48:18  10       So it gives us an independent view of whether we're

11   performing per the procedure and up to expectations.

12   Q   Now, after the FDA clears a product for sale on the

13   market, does the agency remain involved and conduct periodic

14   audits of a manufacturer like Bard Peripheral?

11:48:45  15   A   Yes.

16   Q   What sort of audits does the FDA do?

17   A   They do unannounced audits primarily.  They will come in

18   on a periodic basis, typically about every two years, come in

19   and just show up at your door one day and then just ask to be

11:49:02  20   shown to the manufacturing floor, to a conference room where

21   you're going to start pulling records, and they'll go through

22   whatever they want to go through.

23   Q   Did you say these audits sometimes occur unannounced?

24   A   In my experience most of them are unannounced.

11:49:20  25   Q   What's it like at Bard Peripheral when FDA shows up

DIRECT EXAMINATION – CHAD MODRA

11:49:25  1  unexpectedly one day?

2  A    It is all hands on deck.  So when you have -- when you get

3  the notice that FDA has shown up to your front door, there is

4  a call to me, there is -- I call all my directors, and then

11:49:38  5  there's a notification sent out that whatever they want, they

6  get top priority.  So pretty much all of the things you were

7  doing, if you're involved as a subject matter expert or

8  somebody who knows about a product that they're going to ask

9  about, you need to be ready to go into a conference room and

11:49:57 10  answer their questions.  So it's all hands on deck.

11  Q    As part of an FDA audit, do they sometimes review the

12  company's internal complaint files?

13  A    In my experience, almost every time.

14  Q    Do they review the company's procedures and policies like

11:50:18 15  the ones we've just shown, the guidelines and the MDR

16  reportability and things of that nature?

17  A    Yeah.  The nature of their reviews are first they want to

18  see the procedures, they want to see the guidelines,

19  everything that you have that says how you're going to do this

11:50:34 20  process.  And they familiarize themselves with that very

21  quickly, and then they ask people questions about it.  What do

22  you do in this circumstances?  What do you do after that?  And

23  then they want to see the records.  Do your records match what

24  you say you're doing and do they match what the procedure

11:50:50 25  tells you to do?  And they go through a lot of records.

DIRECT EXAMINATION — CHAD MODRA

11:50:55  1   Q   Does the FDA, as part of their audit process, review

2   Bard -- the company's design methods?

3   A   They do.  It's called design controls under FDA

4   regulation, but they want to understand -- back in the mid

11:51:09  5   '90s they had an emphasis on proper design controls because

6   they determined a lot of the product issues were related to

7   that.  So they instituted these steps that you should follow

8   for design control.  So they're going to go back and want to

9   see your design, it's called design history file.  And it just

11:51:29  10  gives the entire history of the decisions you made, why you

11  made those, what you tested, the extensive tests that you did,

12  your risk management, how did you determine how risky the

13  device was, and how you brought it to market.

14  Q   As a part of the FDA audits, will they look at a company's

11:51:44  15  root cause analysis that might be done regarding any failure

16  or complication mode?

17  A   Right.  It might be called CAPA, or corrective and

18  preventive actions.  But in a CAPA, root cause analysis is the

19  end goal.  You want to be able to prove that you can recreate

11:52:04  20  that failure and prevent that failure.

21       So we conduct those root cause analysis and they have

22  a practice where in the past they've done CAPA plus one.  So

23  they always come in and look at CAPA, or root cause analysis,

24  plus one other area.  Typically field assurance or complaints.

11:52:23  25  Sometimes design, sometimes quality systems.

DIRECT EXAMINATION – CHAD MODRA

11:52:25   1    Q    And approximately how often do these FDA surprise audits

2    occur, in your experience?

3    A    Typically two years is about the timing.  So here at the

4    facility in Tempe it's about every two years.  Pretty routine.

11:52:43   5    Q    Now, are these every-two-year audits unique to Bard

6    Peripheral Vascular?

7    A    No.  No.  The industry knows that every two to three years

8    you're going to get an audit.  And I've been to seminars with

9    FDA where they've said, well if you -- certain criteria, they

11:53:07  10    can bump that up.  And they can comp in any time they want.

11    They can come in every six months if they want.  So you just

12    have to be ready, know that have you everyone available.

13    That's why we have follow-ups on vacation and everything else.

14    Q    Does the agency conduct these audits of all medical device

11:53:28  15    companies, to your knowledge?

16    A    To my knowledge, yes.

17    Q    And do they sometimes conduct them of manufacturing

18    facilities of medical device companies?

19    A    Yeah.  Yes, they would.  Not just the design center, but

11:53:37  20    the manufacturing locations for sure.

21    Q    Do they sometimes conduct these audits of manufacturing

22    facilities overseas for a medical device manufacturer?

23    A    Yes.  And in the last few years they've actually ramped

24    that up as well.  They've staffed up, is my understanding, and

11:53:54  25    spent a lot of time looking at suppliers, people that are

DIRECT EXAMINATION – CHAD MODRA

11:53:56  1  providing parts or components or materials to the U.S. as a

2  point of emphasis.

3  Q   Does the -- these audits every two years, do they

4  sometimes result in FDA warning the company about possible

11:54:16  5  deficiencies in policies, procedures, practices, things of

6  that nature?

7  A   They do.  Obviously the goal is always not to have any

8  nonconformances, but these days it's understood FDA uses that

9  as a tool to communicate to the companies that these are the

11:54:34  10  expectations, these are the new levels of expectations.  So

11  they're pretty frequent.

12  Q   Does the FDA, when they find apparent deficiencies, do

13  they issue what is called a warning letter?

14  A   They do.  They start with nonconformances and then they'll

11:54:54  15  cite these deficiencies.  And it's formally titled a warning

16  letter.

17  Q   And once a warning letter is issued, what is the process

18  between the company that's received the warning letter and the

19  FDA after that?  What's the next step after receipt of a

11:55:14  20  warning letter following an audit?

21  A   Well, within 15 days you have to have complete answers to

22  their questions.  You have to respond to them and tell them

23  what you're going to do.  And it's not just -- in my

24  experience, not just what they cited, but it's important for a

11:55:31  25  company to communicate the full commitment of looking around

DIRECT EXAMINATION – CHAD MODRA

11:55:36  1    at the other processes.  So if there's a specific item cited,

2    you don't want to just say, oh, we fixed that.  You want to

3    look at that and is that an example of something similar that

4    could have happened in another area.  So you need to look

11:55:50  5    around and then you need to put corrective actions in place to

6    prevent those from occurring as well.

7            So it's very intensive immediately right after

8    receiving that letter because within 15 days you have to have

9    actions done and a plan that says how you're going to improve

11:56:07 10    those other areas as well.

11    Q   As a quality assurance professional in the industry for

12    20-plus years, are you generally familiar with FDA warning

13    letters?  Do you sort of monitor those?

14    A   Yeah.  One of the things that is important to keep on tab,

11:56:26 15    tabs of, is others.  Other companies' warning letters.  So

16    understanding what the FDA is saying and -- I mean, my

17    personal understanding of why they may do that is they can

18    send messages to companies industry-wide because everyone is

19    watching those warning letters.  So when they're published on

11:56:50 20    the FDA website, there's services that will actually go out

21    and publish them right to your doorstep the minute somebody

22    else gets a warning letter, and it becomes public knowledge.

23    They use that as the new standard.

24            So if FDA wants to communicate to us -- this is the

11:57:07 25    way I look at it.  If they want to tell us some way to do

DIRECT EXAMINATION – CHAD MODRA

11:57:09  1    that, they don't have to tell us.  We're monitoring warning

2    letters from other folks.  So when we see that another company

3    has received one, we often do a gap analysis.  So we'll look

4    at our processes versus what another company was cited in, and

11:57:25  5    do we feel like we're doing it the same way?  Do we feel like

6    it we're doing it differently?  And then we also do continuous

7    improvement projects on those things as well.

8    Q    In your experience, are FDA warning letters rare

9    occurrences?

11:57:39  10    A    Not really so much.

11    Q    Before 2015, had FDA conducted audits of Bard's complaint

12    handling systems at Bard Peripheral Vascular?

13    A    Before 2015?

14    Q    Right.

11:57:54  15    A    Yes.

16    Q    And can you -- was that approximately every two years, as

17    you --

18    A    Yes, it was.

19    Q    And over the course of your time with the Bard Peripheral

11:58:04  20    Vascular and your time at Bard Access, did you meet on

21    occasion with FDA auditors?

22    A    I did.

23    Q    And prior to 2015, had there been an audit at Bard

24    Peripheral Vascular that you had been involved with?

11:58:24  25    A    There was.

DIRECT EXAMINATION – CHAD MODRA

11:58:26  1    Q    How many before 2015?

2    A    I believe there were two.  I think 2011 and 2013.

3    Q    And before 2015, had Bard BPV, Bard Peripheral Vascular

4    ever received a warning letter, to your knowledge?

11:58:44  5              MR. O'CONNOR:  Objection.  Irrelevant.

6              THE COURT:  Overruled.

7              THE WITNESS:  No, not to my knowledge.

8    BY MR. NORTH:

9    Q    Now, in the summer of 2015, did Bard receive a warning

11:58:54 10    letter from the FDA?

11    A    Yes.  In July of 2015.

12    Q    And you were the vice president of quality at that time?

13    A    I was.

14    Q    And was it your responsibility to investigate and respond

11:59:08 15    to the FDA's warning letter?

16    A    It was.

17    Q    Want to focus on the warning letter with regard to

18    complaint handling.  Were you surprised when Bard Peripheral

19    received that warning letter?

11:59:29 20    A    Yes, because I really felt like we had responded pretty

21    thoroughly to nonconformances cited, and we had undertaken

22    systemic -- a lot of changes, a lot of improvements, really

23    addressing what we thought were their expectations.

24              So, yes, I was surprised to get it because I thought

11:59:57 25    we had really done all that they would have expected and more.

DIRECT EXAMINATION – CHAD MODRA

12:00:02   1   But in the end I know that it's a reality of the way that that

        2   is -- the process.

        3           So on one hand surprised, but not entirely surprised.

        4   Q   Let me ask --

12:00:17   5           THE COURT:  We're going to break at this point,

        6   Mr. North.

        7           Ladies and gentlemen, we'll plan to resume at

        8   1 o'clock.  We will excuse you at this time.

        9       (The jury exited the courtroom at 12:00.)

12:00:41  10           THE COURT:  You can step down, Mr. Modra.

       11           Please be seated.

       12           Mr. North, how much longer do you think you have with

       13   Mr. Modra?

       14           MR. NORTH:  Your Honor, I think I've got at least an

12:00:51  15   hour more.

       16           MS. REED ZAIC:  Huh?

       17           THE COURT:  An hour.

       18           MS. REED ZAIC:  Thank you.

       19           THE COURT:  And he's your last witness?

12:01:01  20           MR. NORTH:  Yes.

       21           THE COURT:  What is your best estimate, plaintiff's

       22   counsel, as to amount of time you'll use for rebuttal?

       23           MR. O'CONNOR:  I -- I don't think we have plans for

       24   rebuttal right now.  But, honestly, with another hour of this

12:01:23  25   testimony, I'd have to see.  But I don't think we have plans

DIRECT EXAMINATION - CHAD MODRA

12:01:28   1   for any rebuttal up to now.

2               THE COURT:  No rebuttal evidence?

3               MR. O'CONNOR:  Not at this point, Your Honor.

4               THE COURT:  Okay.  So when Mr. Modra finishes, at

12:01:40   5   present you're not planning on putting on any evidence; is

6   that right?

7               MR. O'CONNOR:  Mark O'Connor sitting here, no.  But I

8   don't think we are --

9               THE COURT:  Well, last night --

12:01:48  10               MR. O'CONNOR:  No, I agree --

11               THE COURT:  I was told last night you were going to

12   be calling --

13               MR. O'CONNOR:  No, no, we don't have any plans.  I

14   just have to wait and see what's going to happen this next

12:01:55  15   hour.

16               THE COURT:  I understand.  I understand.  Okay.

17               All right.  Why don't we -- I want to get your

18   comments on the jury instructions that I've handed out.  Not

19   now, but why don't we come back here at ten to 1:00 so I can

12:02:10  20   get your comments at that time.

21               And I will also do my best to give you my rulings on

22   the two exhibits that we've talked about.  I've got the case

23   up that was cited by plaintiff this morning.  I haven't read

24   it, but I'll read it over the lunch hour.

12:02:25  25               And we can also talk about what -- about the issue we

12:02:29   1    talked about this morning before Dr. S. testified.  That's a

           2    lot to do in ten minutes, but everybody needs to have a lunch

           3    break.  So let's be back at ten to 1:00.

           4          MR. O'CONNOR:  Very good.

12:02:45   5       (Recess taken at 12:02.)

           6       (End of transcript.)

           7                        *  *  *  *  *

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1                        **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14         DATED at Phoenix, Arizona, this 28th day of March,

15   2018.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25