1          **UNITED STATES DISTRICT COURT**

2            **FOR THE DISTRICT OF ARIZONA**

3          _____

4    **In Re: Bard IVC Filters**          )   MD-15-02641-PHX-DGC
     **Products Liability Litigation**    )

5                                          )   Phoenix, Arizona
                                           )   **March 27, 2018**

6    _____)
     **Sherr—Una Booker, an individual,**  )

7                                          )
                       Plaintiff,          )

8                                          )   CV-16-00474-PHX-DGC
           v.                              )

9                                          )
     **C.R. Bard, Inc., a New Jersey**     )

10   **corporation; and Bard Peripheral**  )
     **Vascular, Inc., an Arizona**        )

11   **corporation,**                      )
                                           )

12                     Defendants.         )   Amended
     _____)

13

14

15       **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16       **REPORTER'S AMENDED TRANSCRIPT OF PROCEEDINGS**

17              **TRIAL DAY 9 A.M. SESSION**

18                (Pages 1876 – 2000)

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR

22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41

23   Phoenix, Arizona  85003-2150
     (602) 322-7257

24

25   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared with Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2    For the Plaintiff:

3            Lopez McHugh
             By: **RAMON ROSSI LOPEZ**, ESQ.
4            100 Bayview Circle, Suite 5600
             Newport Beach, CA  92660

5
             Gallagher & Kennedy
6            By: **MARK S. O'CONNOR**, ESQ.
             2575 East Camelback Road, Suite 1100
7            Phoenix, AZ  85016

8            Heaviside Reed Zaic
             By: **JULIA REED ZAIC**, ESQ.
9            312 Broadway, Ste. 203
             Laguna Beach, CA  92651

10
             Watkins Lourie Roll & Chance, PC
11           By: **ROBIN P. LOURIE**, ESQ.
             Tower Place 200
12           3348 Peachtree Rd. NE
             Atlanta, GA  30326

13
             Faraci Lange, LLP
14           By: **HADLEY L. MATARAZZO**, ESQ.
             28 E. Main St., Ste. 1100
15           Rochester, NY  14614

16           Babbitt & Johnson, PA
             By: **JOSEPH R. JOHNSON**, ESQ.
17           1641 Worthington Rd., Ste. 100
             W. Palm Beach, FL  33409

18

19    For Defendants:

20           Nelson Mullins Riley & Scarborough
             By: **RICHARD B. NORTH, JR.**, ESQ.
21           By: **ELIZABETH C. HELM**, ESQ.
             201 17th Street NW, Suite 1700
22           Atlanta, GA  30363

23           Snell & Wilmer
             By: **JAMES R. CONDO**, ESQ.
24           400 East Van Buren
             Phoenix, AZ  85004

25

**I N D E X**

**<u>EXAMINATION</u>**

| <u>WITNESS</u> | <u>PAGE</u> |
|---|---|
| ROBERT M. CARR, JR. | |
|     Direct Examination By Mr. North | 1901 |
|     Cross-Examination By Mr. Lopez | 1919 |
| DAVID W. FEIGAL, MD | |
|     Direct Examination By Mr. Condo | 1935 |
|     Cross-Examination By Mr. O'Connor | 1956 |
| Video Testimony of Dr. John DeFord | 1960 |
| CLEMENT GRASSI, M.D. | |
|     Direct Examination By Mr. North | 1960 |
|     Cross-Examination By Mr. Johnson | 1986 |

**<u>EXHIBITS</u>**

| <u>NUMBER</u> | <u>DESCRIPTION</u> | <u>PAGE</u> |
|---|---|---|
| 5037 | ETR-05-02-02 (Effects of Changes to the Recovery Filter & The Femoral Delivery System on Filter Stresses Based on FEA Analysis) | 1907 |
| 5949 | ETR-06-05-02 (Test report re G2® Clot Trapping Efficiency) | 1910 |
| 5315 | ETR-04-10-21 (G2® Acute Animal Feasibility Study) | 1911 |
| 5316 | Phase 3 Design Review (Design Review 3 & 4) G1A Recovery Filter Femoral Delivery System | 1913 |

1

**(Index of Exhibits Continued)**

2

**EXHIBITS**

3

**NUMBER**       **DESCRIPTION**                                      **PAGE**

4      1680      McDonald Deposition,                                   1925
                 07/29/2016 – Exhibit 21 –
5                7/13/2015 Warning Letter from
                 the FDA regarding the
6                11/25/2014 Inspection of the
                 C.R. Bard facility in NY and
7                the 11/18/2014–1/5/2015
                 Inspection of the BPV
8                facility in AZ

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

08:29:46

(Proceedings resumed in open court outside the presence
of the jury.)


THE COURT:  Please be seated.

Morning, everybody.

MR. NORTH:  Morning, Your Honor.

MR. LOPEZ:  Morning.

THE COURT:  Counsel, you saw the order I entered last
night indicating my inclination to grant plaintiff one
additional hour without subtracting it from defendants' time.

Mr. North, did you want to be heard on that issue?

MR. NORTH:  If I could briefly, Your Honor.

Your Honor, the defendants certainly understand the
Court's concern expressed in the order yesterday about any
miscarriage of justice, but we are also concerned that a
miscarriage of justice can go both ways in this circumstance.

We believe that changing the game rules at this point
prejudices my client with any further adjustment.  We have
understood clearly the Court's instructions from the
beginning.  I think the instructions of the Court have been
crystal clear.  Repeatedly, at various conferences, hearings,
*Daubert* hearings, the Court has time and time again discussed
the time limitations, how they would work, what they would
include, including closing.

08:31:02   1          I believe in the Court's order accepting the parties'

2     stipulation to bifurcate the punitive damages, the Court once

3     again reiterated that the time for the punitive phase would

4     need to come out of the overall time limits.

08:31:15   5          Bard has made strategic choices in the pursuit of the

6     defense of this case from the beginning, based on our

7     understanding of the time limitations.  We have done many

8     things that we might not have done earlier if we knew that

9     these time limitations were not going to be strictly enforced.

08:31:37  10          For example, Dr. McMeeking, the plaintiff's one and

11    only true design expert.  I cross-examined him for 27 minutes.

12    That's a decision we probably would not have made, to curtail

13    that cross-examination to that extent, if additional time had

14    been available.

08:31:54  15          We made many, many cuts to depositions, probably to

16    the benefit of the jury and everyone involved, but we made

17    many cuts that we originally were going to go with because of

18    our concern for time limitations.

19          And our determination to abide within those time

08:32:12  20    limitations affected strategic choices every step of the way

21    in our handling of the plaintiff's case in chief and the

22    handling of our case thus far.

23          There are at least two Ninth Circuit cases that I

24    have seen; one the *General Signal Corporation versus MCI* case

08:32:30  25    at 66 F.3d 1500, and the *Amarel versus Connell* case, 102 F.3d

08:32:38  1    1494, both of which, in both cases, the Ninth Circuit has

          2    recognized that the fact that one party made strategic choices

          3    all along based upon time limitations imposed by the Court is

          4    a factor in determining whether the Court abused its

08:32:57  5    discretion in not affording additional time.

          6              At the same time we've made these strategic choices,

          7    we respectfully suggest the plaintiffs have not.  In addition

          8    to the repetitive questioning that the Court cited yesterday,

          9    there have been things that it's their choice, it's their

08:33:16  10   case, but that baffled us given time limitations.

          11             They put Alex Tessmer, a Bard employee who was

          12   essentially just a tech test guy, who ran two tests on the

          13   Recovery filter, which is not the device in this case, and did

          14   the direct examination of him about those two tests for over

08:33:34  15   an hour and 45 minutes.  And we believe the record is replete

          16   with other instances where they made strategic choices that I

          17   don't understand.  It's not my choice to understand them.  But

          18   they made those choices to use up their time.

          19             We believe that the eleventh hour as we're coming

08:33:53  20   into the end of this trial to expand these time limitations is

          21   simply unfair, and we cannot roll back the clock and change

          22   the strategic choices the defendant made from the beginning

          23   based on the Court's time limitations.

          24             So for that reason, we oppose the a extra hour.

08:34:15  25             THE COURT:  All right.  Thank you.

08:34:15 1          Mr. Lopez.

2          MR. LOPEZ:  First, Your Honor, I think Mr. Tessmer's

3   probably a good example of how difficult it was for me to get

4   straight answers out of a witnesses that I had to ask him

08:34:27 5   multiple questions.  We got five very important tests, I think

6   was important to our case, that was early in the case.

7          The next -- Your Honor, when we first agreed, I said

8   this yesterday, I found the transcript from October 5th, 2017,

9   where it was agreed that we would have three weeks to try this

08:34:48 10   case, 66 hours total time for the cases.  You asked if that

11   was workable, and I said yes, it was.

12          And this is the Court:  My thought would be with a

13   three-week jury trial.

14          And we've always thought that should be the case.

08:35:06 15   We -- even with the FDA in this case, we could have

16   appropriately addressed some of these issues that are coming

17   in in the defense case.

18          You can't plan for everything during a trial

19   Your Honor.  When you look at your -- the motion, our FDA

08:35:19 20   exclusion motion, our *Cisson* motion, we can't -- we could not

21   tell from your language how much of this additional evidence

22   was coming in, other than the clearance issue.  In other

23   words, how these devices got cleared.  It says you're leaving

24   open the enforcement, some of the other activity that goes

08:35:42 25   beyond just the 510(k) clearance process.

08:35:44   1          The 510(k) clearance process is not that big a deal.

2    I mean, it's just a document being submitted.  That would be

3    easily dealt with.  We did not anticipate the kind of evidence

4    that's coming into this case on FDA.

08:36:02   5          I don't think -- with due respect, Your Honor, I

6    understand you think that we've wasted time.  I don't think

7    so.  I mean, we've cut a lot of the stuff out of this case.

8    You've heard me say that before.  We've had depositions.

9    We've got a number of exhibits we are not going to get into

08:36:16  10    evidence that we need in this case because we had to take down

11    some of the depositions that we designated.  And I told you we

12    sent three experts home that we're not calling in this case.

13          And, again, for the most part, the -- most of the

14    difficulty we've had with time is trying to get the

08:36:39  15    cooperation, I think, of some of their witnesses.  It's

16    amazing how cooperative they are under direct examination.

17          We did start nitpicking, Your Honor, here and there,

18    about time.  But the truth is if we did not efficiently use

19    our time in the time we had, we're already paying that price.

08:36:57  20    We've had to take down -- we've penalized ourselves by taking

21    down evidence that we think is necessary for this case.

22          And we could not anticipate what was coming into

23    evidence in the case and how much time to reserve until we

24    actually started the defense case.  And I'm just going to be

08:37:14  25    honest, I -- in my wildest dreams, I didn't think that that

08:37:17 1  type of evidence was coming into this case.  Certainly your

2  order didn't indicate one way or the other.

3      I thought -- I mean, I understand the Court's

4  reasoning, not that I agree with it, but for allowing FDA

08:37:30 5  because of the Georgia law federal regulations.  I mean, this

6  could be about federal regulations and violations of federal

7  regulations, but I -- the 403 objections, 402 objections we've

8  made to the hearsay, the FDA's enforcement, lack of

9  enforcement, all these communications going back between Bard

08:37:51 10  and FDA, I mean, if anything, it's confusing to a jury.  More

11  concerning is it's misleading to a jury.  And there's no way

12  that we have the time to address that.  We won't if you gave

13  us another day or two.

14      All we're trying to do is finish this case.  We have

08:38:11 15  to restrict ourselves in cross-examining experts.  We

16  understand that.  We don't want to find ourselves not being

17  able to argue this case.

18      But I think it's important for the Court to know that

19  when we first agreed to a three-week trial, it was 66 hours,

08:38:23 20  and we were going to get 35 of that.  And we could do that

21  with 35 hours.  But we can't do it with the time that we have

22  left, which is going to be essentially 30 hours.  Can't do it.

23      THE COURT:  All right.  Well, what I'm going to say

24  on the record is I disagree with the description of what

08:38:43 25  happened in that discussion of 66 hours.  But that's not the

08:38:48  1   point to be decided.

2   I'm going to grant the plaintiff one additional hour

3   for the reasons I stated in the order last night.

4   All right.  The warning letter, FDA warning letter,

08:39:00  5   I've read the briefs on both sides.  Do you have additional

6   points you want to make with respect to the FDA warning

7   letter?

8   MS. REED ZAIC:  Your Honor, I would just supplement

9   the briefing with the testimony that came in yesterday after

08:39:12  10  the briefs were due in the morning.  We've heard about FDA and

11  alerts and such.  I think it goes to our 403 argument that we

12  would be prejudiced if we cannot get this letter in.

13  In addition to the testimony we continue to hear that

14  everything went to the FDA, there's FDA memos, you know,

08:39:26  15  blessing everything that has happened that Bard has done.

16  However, this letter says the exact opposite, and I think it

17  would go to the weight of the evidence at this point.

18  THE COURT:  All right.

19  MR. NORTH:  Your Honor, we would essentially stand on

08:39:41  20  our brief, but I would point out that we have made -- tried to

21  be very careful not to open the door and make broad statements

22  that the FDA has never taken a regulatory action or something

23  of that nature and focused the questions about a recall, which

24  that warning letter has nothing to do with.

08:39:59  25  We believe, for the reasons set forth in the brief,

08:40:02  1    that those individual complaints really have no relevance to

      2    the issues in this case.  And you couple that with the fact

      3    that Bard's internal trending, and the testimony will be

      4    undisputed, Bard's internal trending of complaints includes

08:40:20  5    everything.  Whether it's reported to the FDA, how it's

      6    characterized as serious injury versus malfunction.  And we

      7    believe, therefore, that this evidence is simply irrelevant

      8    and should be excluded under 402 and 403.

      9         MR. LOPEZ:  Your Honor, may I just -- I'm sorry.  I

08:40:38 10    thought you were done.

     11         MS. REED ZAIC:  Your Honor, they're saying that

     12    everything has gone to the FDA, but, again, it goes to the

     13    weight of the evidence that the FDA actually went back and

     14    realized that they weren't doing it right and it was in

08:40:50 15    violation of a federal regulation.

     16         Moreover, there was evidence yesterday that the FDA

     17    alerts -- I'm sorry, questioning that elicited testimony that

     18    these FDA alerts in 2010 went to all companies, and that

     19    leaves out a piece of the picture, which is that the FDA acted

08:41:09 20    specifically to Bard.

     21         THE COURT:  All right.  In my order on March 1st, I

     22    did not decide whether Section 3, Section 7, and Section 8 of

     23    the FDA letter should come in.  I said that that was a

     24    decision that would be need to be made at trial once I

08:41:28 25    understood the relevancy of the evidence that is contained in

08:41:32   1   the letter in light of the overall facts at trial.

           2           My conclusion, now that I've heard the evidence, is

           3   that Section 3 of the warning letter is relevant to this case.

           4   I reach that conclusion for a few reasons:

08:41:50   5           The argument that was made by the defendants in the

           6   brief was largely a causation argument, that none of the

           7   complaints could have caused Ms. Booker's injuries because

           8   they were either after the implant or the doctors who removed

           9   the filter had no knowledge of those complaints.

08:42:07  10           I agree with that.  I don't think it goes to

          11   causation.  But I think the relevancy of Section 3 of the

          12   warning letter goes to a few other issues that have been

          13   addressed.

          14           There has been much evidence before the jury about

08:42:23  15   the MAUDE database, about the data upon which Bard relied,

          16   upon reports to the FDA.  There has been evidence about root

          17   cause analysis and when it was or was not done.  There has

          18   been evidence about the fact that the FDA has not submitted

          19   questions, other than those that were identified in documents

08:42:46  20   that were put in evidence, has not taken recall action.

          21           I believe the implication, if not the express

          22   argument to the jury, is that the FDA never took any action

          23   with respect to Bard.

          24           And yet Section 3 of this letter does concern Bard's

08:43:05  25   handling and reporting of adverse events with respect to the

08:43:09   1   G2 filter in at least four different instances, as well as the

2   adequacy of Bard's evaluation for root cause of the

3   violations.  Root cause is in Section 3A, the G2 filter is

4   mentioned in Section 3B.  3C includes other filters which

08:43:29   5   apparently largely are unidentified, but which plaintiffs at

6   least assert includes one G2 filter.

7              I think it's relevant in light of the information

8   that's been presented to the jury.  And, therefore, I'm going

9   to permit the following portions of the G2 letter to be

08:43:45  10   presented:

11             Page 1, which is largely introductory information.

12             Page 4, starting with the heading "Quality System

13   Regulation Violations of Tempe, Arizona Facility and

14   Queensbury, New York Facility."  That heading can be included,

08:44:07  15   as can the rest of the page, which is Section 3.

16             Page 5 through the end of the third paragraph.  So it

17   should not include the heading "Quality System Regulation

18   Violations at Queensbury, New York," which is a different set

19   of violations.

08:44:24  20             So that essentially leaves in all of Section 3.

21             And page -- the version of the exhibit I have

22   actually has the page numbers out of order.

23             Page 10, beginning with the paragraph at the bottom

24   that reads "Your firm should take prompt action to correct the

08:45:17  25   violations addressed in this letter," that paragraph at the

08:45:21  1    bottom can be left in.  All of page 11 and all of Page 12,

2    which is just the closing and the signatures, and all of

3    page 13, which is simply the cc's.

4         So my ruling is that portion of the FDA warning

08:45:37  5    letter is relevant.

6         I do not believe Sections 7 and 8 are relevant.  I

7    previously indicated that.  But, again, I don't think that's

8    relevant because they relate to the Denali filter systems,

9    which are not at issue in this case.

08:45:53  10        And I previously ruled in the order dated March 1st

11    that this is not hearsay, that it's admissible under

12    Rule 803(8).

13        So I will leave it to plaintiff to introduce the

14    letter when you choose to do so.  If there are other

08:46:10  15    objections, they can be made, but relevancy, 403, and hearsay,

16    I'm ruling against defendant on their argument.

17        I'll tell you one of the thoughts, though, that I do

18    have that we all ought to consider is I think I should give an

19    instruction to the jury about redacted exhibits, because

08:46:30  20    there's going to be other redactions.  And the essence of the

21    instruction would be to tell them that there are portions of

22    the exhibits that have been redacted, that those are based on

23    my conclusions that the information redacted is not relevant

24    or admissible for other reasons, the jury should disregard

08:46:47  25    those portions and not speculate as to what they might

08:46:50  1    contain.

2                    Any disagreement with the need for that kind of an

3         instruction?

4                    MR. LOPEZ:  That's fine, Your Honor.

08:47:00  5                    MS. REED ZAIC:  No, Your Honor.

6                    MR. NORTH:  That's fine, Your Honor.

7                    And I'm not arguing with the Court, but I just wanted

8         to point out one thing to make sure the Court did understand

9         that 3A of the warning letter by -- automatically deals with

08:47:12  10       Denali filters only, because that's the only filter ever

11        manufactured by Bard that relied on component suppliers.

12                   THE COURT:  I've read it again, and I understand your

13        point.

14                   What is plaintiff's response?

08:48:01  15                   MS. REED ZAIC:  Your Honor, my response to that is

16        that the issue is stated in the first paragraph of Topic 3,

17        before you even get to A, B, or C, which are only cited as

18        examples.

19                   Section A is an example, and the SOPs, I'll call

08:48:17  20       them, the standards that they're listing out, such as

21        CQA-STD-55, they're cited in both paragraphs.  So where it

22        starts "Failure to establish and maintain procedures for

23        receiving, reviewing, and evaluating complaints as required by

24        21 CFR 820.198(a)," the next sentence describes the same SOPs

08:48:40  25       that are in paragraph A and goes on to say "These below are

08:48:44 1    just examples of all of your violations under 21 CFR

2    820.198(a)."

3         And we have meticulously gone through and submitted

4    to the Court that these SOPs were in place during the time

08:48:56 5    that Ms. Booker had her filter.

6         THE COURT:  Is it your argument that the standards

7    and SOPs cited in paragraph 3A apply to more than components

8    manufactured elsewhere?

9         MS. REED ZAIC:  Since it's cited as simply an

08:49:26 10   example, I would have no idea because I have not deposed

11   anyone who drafted this letter to Bard.

12        THE COURT:  Is that what you're arguing, Mr. North,

13   that these standards and SOPs only relate to components?

14        MR. NORTH:  No, Your Honor, not at all.  All I'm

08:49:48 15   talking about is in 3A, where it's talking specifically about

16   the root cause, it's talking about complaints involving

17   components made by other suppliers and the failure to figure

18   out the root cause sufficiently.  That specifically deals with

19   the Denali filter and not the other filters.

08:50:08 20        THE COURT:  Okay.  I understand the argument.

21   Because it is an example of what's in the first paragraph, I'm

22   going to leave the designation that I indicated before as to

23   what is admissible.

24        Jeff, would you remind me on that instruction.  We'll

08:50:23 25   need to draft something up and include it.

08:50:26    1            All right.  Plaintiff, do you have matters you want

            2    to raise this morning?  We've get got about eight minutes.

            3            MR. LOPEZ:  I'm going to use those precious eight

            4    minutes off our clock, Your Honor, if you don't mind.

08:50:37    5            Exhibit 4327, the Court will recall, this was the

            6    exhibit where four pages at the back --

            7            THE COURT:  I remember the exhibit.

            8            MR. LOPEZ:  Okay.  I'd like to make an offer of

            9    proof, Your Honor, on that, if I could right now as to why

08:50:52   10    it's a business record and should be included.  It will take

           11    me two minutes with you, or maybe ten minutes with Mr. Carr.

           12            May I?

           13            THE COURT:  Yeah.

           14            MR. LOPEZ:  Mr. Carr testified on December 19th,

08:51:08   15    2013, that complaints -- that their company collects

           16    complaints, it's put in a database and collected through their

           17    field assurance group, that many of these come in through

           18    their sales reps, and that the information is tracked by Bard

           19    relative to the Recovery and G2 devices.

08:51:25   20            And the information collected is maintained in what

           21    Bard refers to as a complaint file.  And those complaint files

           22    are kept in electronic format -- database, rather, and

           23    summaries of those complaints can be downloaded and printed.

           24            What you will see on this attachment, Your Honor, is

08:51:46   25    rep report, rep report, rep report, rep report.  Those are the

08:51:50   1   sales reps that are reporting this pursuant to the business

2   practices of Bard.  These reps are agents of Bard that are

3   reporting these.

4        We've cross-referenced the language that's in this

08:52:05   5   against the complaint files, and the language, at least from

6   the summary, is almost precisely the same.  So I think we've

7   now satisfied our requirement under the evidence code that

8   these are statements, comments, made by an agent or employee

9   of Bard and under the direction of Bard in their regular

08:52:26  10   course of business.

11        And I'd like to --

12        THE COURT:  You're mixing two hearsay exceptions

13   there.  One is business record, one is an admission of a party

14   or statement of a party opponent through an agent.  Which are

08:52:40  15   you arguing?

16        MR. LOPEZ:  Well, I can barely hear you, Judge.

17        THE COURT:  Traci, would you see if this can be

18   turned up.

19        My question is this:  You've mixed two exceptions.

08:52:55  20   One is the business records exception, and the other is the

21   statement of a party opponent through an agent.  They're

22   different parts of the hearsay rules.

23        MR. LOPEZ:  Right.  I think they both apply.  But

24   this is clearly an agent on behalf of the company that's

08:53:09  25   making these statements.  It says rep report.  We looked at

08:53:12  1    the backup complaint files for these.  These are sales reps.

2    THE COURT:  Well, but -- I understand the argument

3    you're making, Mr. Lopez, but I can't apply that exception on

4    the basis of your argument.  There has to be evidence of what

08:53:25  5    you just described.  That is, that the statements are

6    statements from the reps that are the same as in their

7    complaints.  There hasn't been any evidence like that

8    presented.

9    MR. LOPEZ:  That's why I made the offer of proof.

08:53:39  10   THE COURT:  Well, but the offer of proof has to be

11   followed up with actual proof.  How do you intend to present

12   that evidence?

13   MR. LOPEZ:  The evidence that these are sales reps?

14   THE COURT:  No, the evidence that you made in your

08:53:51  15   offer has to actually come from that witness stand at some

16   point.  How do you intend to present that?

17   MR. LOPEZ:  Well, he just testified at deposition

18   that it's the sales reps --

19   THE COURT:  I can't rely on his deposition.  It has

08:54:03  20   to be trial testimony.

21   MR. LOPEZ:  All right.  I'll do it.

22   THE COURT:  Are you saying you're going to elicit

23   that from him?

24   MR. LOPEZ:  Well, if he doesn't say it on the stand,

08:54:10  25   I'll read his deposition.  I was hoping to short-circuit that

08:54:14  1   by showing the Court --

2        THE COURT:  I can't short-circuit it on the basis of

3   evidence that's not presented at trial.  So it has to come in

4   at trial.

08:54:21  5        MR. LOPEZ:  I understand.  It's just my effort to

6   save a few minutes, Your Honor.

7        THE COURT:  Well, I can't save time by disregarding

8   the requirement that it has to be an evidentiary basis for the

9   admission of the exhibit.

08:54:32  10       MR. LOPEZ:  Very well.  Thank you.

11       THE COURT:  Well, before you leave, though, are you

12  going to -- are you making the business record argument as

13  well?

14       MR. LOPEZ:  Well, yes.  I mean --

08:54:42  15       THE COURT:  What's the basis for satisfying 803(6)

16  with respect to this?

17       MR. LOPEZ:  Whether or not this is kept in the

18  ordinary course of business?

19       THE COURT:  And the other elements in 803(6).

08:55:03  20       There's four of them.

21       And by the way, let me go ahead and say this now, I

22  was going to say this before the next trial, when we get to

23  business records, we are on both sides uniformly not touching

24  all four of the bases in 803(6).

08:55:15  25       Now, when the defendant hasn't done that, there

08:55:19    1   usually hasn't been a hearsay objection, so I've admitted the

2   exhibit.  But if the plaintiff was objecting, I would sustain

3   the objection until all four of the elements of 803(6) are

4   met.

08:55:28    5        So please keep that in mind as we go forward, because

6   all of those have to be met for 803(6) to apply.

7        Okay.  Sorry for the interruption.  Go ahead.

8        MR. LOPEZ:  I'll give that my best shot, Your Honor.

9   But I think under 801(d)(2)(C) and (D) and (A), all they have

08:55:56   10   to do is establish that those statements were made by an agent

11   of the company.

12        THE COURT:  No, you have to do more than that.

13        MR. LOPEZ:  Was made by the party in an individual

14   representative capacity.  That's (A).  (C), was made by a

08:56:08   15   person whom the party authorized to make a statement on the

16   subject.  (D), was made by the party's agent or employee on a

17   matter within the scope of that relationship and while it

18   existed.

19        THE COURT:  Exactly.  So --

08:56:22   20        MR. LOPEZ:  Those are --

21        THE COURT:  (C) and (D) are the relevant ones.

22        MR. LOPEZ:  Right.

23        THE COURT:  For (C), if it's going to be an agent,

24   then there has to be evidence that the person was authorized

08:56:33   25   to make the statement.  And for (D), if it's an agent or

08:56:39  1    employee, there has to be evidence it was a matter within the

       2    scope of the employee or the agent relationship and while it

       3    existed.

       4            MR. LOPEZ:  Right.  I get that.  Except that I

08:56:47  5    think -- I mean, I've read testimony that suggests that, and

       6    I'll do it with Mr. Carr.

       7            THE COURT:  Okay.  I understand what you're going to

       8    argue.  But I'll wait to hear that before I rule because I

       9    need the evidence.

08:57:00 10            MR. LOPEZ:  All right.

      11            THE COURT:  Okay.  Defendant --

      12            MR. NORTH:  Your Honor, I just have one additional

      13    charge right now, the jury instruction proposed that I was

      14    just going to leave with the Court.

08:57:10 15            THE COURT:  Is that for this evening?

      16            MR. NORTH:  Yeah.

      17            THE COURT:  Why don't you hold onto it.  I'm not

      18    going to have time to look at it during the day.  Let's take

      19    it up tonight when we get to the jury instructions.

08:57:19 20            Anything else from plaintiff?

      21            Mr. Condo?

      22            MR. CONDO:  Your Honor, the second witness,

      23    Dr. Feigal, is a clinical epidemiologist.  He's going to talk

      24    about the types of studies reported in the medical literature.

08:57:32 25    He would prefer to come down and use the white board to list

08:57:37  1    the types of studies, then return to the stand to explain all
       2    of the types of studies.  I wanted to alert the Court to that
       3    and ask if that is permissible.
       4            THE COURT:  It is permissible.  But what you'll need
08:57:50  5    to do is bring the white board over to about where this
       6    projector is so I can stand over here and see what he's
       7    writing.
       8            And whoever is the defense counsel that's going to
       9    cross him, you can step over into that side of the jury box so
08:58:03 10    you can see it.
      11            And he can list it.  If you're going to have him
      12    testify about it after he lists it, let's get him back in the
      13    witness chair so the sound is good.  But, yeah, you can do
      14    that.  You can have him --
08:58:16 15            MR. CONDO:  And by defense counsel, you're talking
      16    about plaintiff's counsel --
      17            THE COURT:  Yeah.  Sorry.  I meant plaintiff's
      18    counsel who is going to cross.  If you want to come over into
      19    the end of the jury box to see what he's writing, that's fine.
08:58:27 20            MR. CONDO:  Thank you, Your Honor.
      21            THE COURT:  Okay.
      22            MS. MATARAZZO:  One other issue.  Defendants filed a
      23    brief this morning regarding the admissibility of the SIR
      24    guidelines.  I don't know if Dr. Grassi's testifying today,
08:58:41 25    but that issue is going to come up --

08:58:43   1          THE COURT:  I have not seen that brief.

           2          MS. MATARAZZO:  We've --

           3          THE COURT:  When are you calling Dr. Grassi?

           4          MR. NORTH:  Probably after lunch, Your Honor.

08:58:51   5          THE COURT:  Okay.  I don't know if I'll have time to

           6    read the brief before then.

           7          MR. NORTH:  I understand.  I mean, we'll just argue

           8    it orally, if need be.  But I just -- they may object.  But I

           9    wanted to put that in the record.

08:59:02  10          MS. MATARAZZO:  That's fine, Your Honor.

          11          The other option would be to argue it, just come back

          12    five minutes early from lunch and address it.  It's with

          13    regard to whether or not the SIR guidelines can come into

          14    evidence due to notice and knowledge to the medical community.

08:59:18  15          THE COURT:  All right.  Let's cross that bridge when

          16    we come to it.

          17          Okay.  Traci, let's bring in the jury.

          18        (The jury entered the courtroom at 9:00.)

          19          THE COURT:  Please be seated.

09:00:43  20          Good morning, ladies and gentlemen.  Thanks for being

          21    here this morning.

          22          We're going to continue with the testimony of

          23    Mr. Carr.

          24          Mr. North, you may proceed.

09:00:52  25          MR. NORTH:  Thank you, Your Honor.

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:00:52   1              ROBERT M. CARR, JR.,

2    recalled as a witness herein, after having been previously

3    sworn or affirmed, was examined and testified as follows:

4          D I R E C T   E X A M I N A T I O N   (CONTINUED)

09:01:35   5    BY MR. NORTH:

6    Q    Good morning, Mr. Carr.

7    A    Good morning.

8    Q    I believe when we broke yesterday we were discussing

9    Exhibit 503.

09:01:07  10          I'm sorry, 5303.  And do you recall that?

11    A    Yes.

12    Q    And what is that again?

13    A    It is the verification and validation report for the G2

14    filter.

09:01:25  15          MR. NORTH:  Your Honor, I believe this was admitted

16    yesterday or earlier.  If we could display it to the jury.

17          THE COURT:  5303?

18          MR. NORTH:  Yes.

19          THE COURT:  You may.

09:01:46  20          MR. NORTH:  And if we could turn to page 14.

21    BY MR. NORTH:

22    Q    Down below this chart, what does this show regarding the

23    migration testing performed on the G2?

24    A    It shows the results of the test at 15 and 28-millimeters.

09:02:07  25    That's the diameter of the tube.  And for the G2 filter.

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:02:17  1    Q   And were these values for the G2 filter an improvement

2    over what you had found with the Recovery filter?

3    A   Yes, they are.

4            MR. NORTH:  If we could turn to page 15.

09:02:33  5            And if we'd look at the chart at the bottom of the

6    page.

7    BY MR. NORTH:

8    Q   Does that compare the migration resistance values for the

9    Simon Nitinol, the G1A or G2, and the Recovery filter?

09:02:57 10    A   Yes, it does.

11    Q   And how did the G2 compare to the Recovery as far as the

12    mean went?

13    A   It's 15-millimeters less.

14    Q   I'm sorry, the G2 compared to the Recovery filter as far

09:03:16 15    as migration resistance under the mean, how did the G2 compare

16    to the Recovery filter again?

17    A   I'm sorry.  It's 50 millimeters of mercury more.

18    Q   Did the G2 reflect an improvement?

19    A   Yes.  Nearly double.

09:03:44 20    Q   Let me ask you this:  Did the G2 at any point fail

21    migration testing?

22    A   As we discussed before, the initial specification was to

23    be equivalent to the SNF filter, and that specification was

24    changed to a more appropriate specification, which was to be

09:04:06 25    significantly improved over Recovery.  And that's documented a

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:04:10  1   little bit later, I believe.

2        MR. NORTH:  Let's look at Page 21 of this exhibit, if

3   we could.

4   BY MR. NORTH:

09:04:18  5   Q   Under the conclusion, did the company explain how the

6   standard was modified to compare the G2 to the Recovery

7   filter?

8   A   Yes.

9   Q   And was this report actually submitted to the FDA?

09:04:41 10   A   Yes.

11        MR. NORTH:  If we could look at Exhibit 5252.

12        Your Honor, I believe this has already been admitted.

13   If we could display it to the jury?

14        THE COURT:  You may.

09:05:25 15   BY MR. NORTH:

16   Q   We talked a little bit yesterday, I believe, about the

17   competitive or comparison testing.  Is this the report that --

18   of that testing that you performed, or the company performed?

19   A   Yes.

09:05:39 20        MR. NORTH:  If we could look at page 6.

21   BY MR. NORTH:

22   Q   Does this demonstrate the various migration resistance

23   that you found for the various products?

24   A   Yes, it does.

09:06:01 25   Q   Where on this chart can we find the G2?

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:06:23  1    A   I don't see it.

2    Q   Well, did we see earlier -- what did we see earlier that

3    the mean value was for the G2 in migration resistance?

4    A   I believe it was 106.

09:06:43  5    Q   And how does that compare?

6            MR. NORTH:  If we could look at the column that says

7    "Mean."

8            THE WITNESS:  Yes.

9    BY MR. NORTH:

09:06:51  10   Q   How does 106 compare to most of the other filters?

11   A   It's more than almost all.

12   Q   And just so we know, do you know what some of these

13   abbreviations over under the sample ID stand for?

14   A   Yes.

09:07:10  15   Q   Could you tell us what some of those are.

16   A   The NMT is Recovery filters made at Nitinol Medical

17   Technologies.

18           The RF are Recovery filters made at Glens Falls.

19           SF is Simon Nitinol.

09:07:28  20           GT is the Greenfield titanium filter.

21           GS is the Greenfield stainless steel.

22           VT is vena tech.

23           TP is the tulip.

24           O is the OptEase.

09:07:45  25           And T is the TrapEase.  Two filters made by Cordis.

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:07:53   1   Q    And those are competitive filters to the G2?  Or would

2   have been?

3   A    Yes.

4   Q    Did the company also, as a part of the development of the

09:08:11   5   G2, perform a finite element analysis?

6   A    Yes.

7         MR. NORTH:  Let's turn to Exhibit 5037, if we could,

8   please.

9   BY MR. NORTH:

09:08:32  10   Q    Do you recognize what this document is?

11   A    Yes.

12   Q    And would you identify what it is.

13   A    It's the process FMEA for the G2 filter.

14   Q    Was this record made at or near the time it was dated by

09:08:49  15   someone with knowledge from the company?

16   A    I don't see a date.  Sorry.

17   Q    Well, do you recall when this would have been --

18         MR. NORTH:  Let's go to the second page, if we could.

19         No date there.  Try the third.

09:09:08  20   BY MR. NORTH:

21   Q    Do you recall approximately when this was prepared?

22   A    Sometime around May 2005.

23   Q    And would this report have been created by someone with

24   knowledge of the contents?

09:09:23  25   A    Yes.

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:09:24  1   Q   And would this record have been kept in the course of

2   Bard's regularly conducted activities?

3           MR. LOPEZ:  I'll agree to it, its admission.

4           MR. NORTH:  We tender it, then, Your Honor.

09:09:35  5           THE COURT:  All right.  5307 is admitted.

6   BY MR. NORTH:

7   Q   And is this the report of the finite element analysis that

8   you discussed, or mentioned?

9   A   No.

09:09:50  10          MR. NORTH:  Well, let's go to the title page, if we

11  could.

12          Let's turn to page 07, if we could.

13  BY MR. NORTH:

14  Q   Do you know if Bard conducted this FEA itself, or did it

09:10:19  15  work with a vendor to do so?

16  A   I know the FEA was contracted out to a vendor.

17  Q   And why did you contract out FEAs?

18  A   Because of the skill set that they have to do it.

19  Q   And did you --

09:10:37  20          MR. NORTH:  I'm sorry, I see the source of confusion.

21  This is supposed to be 5037 and this looks like it's 5307.

22          5037.

23          THE COURT:  I think you had said 5307.

24          MR. NORTH:  I'm sorry, Your Honor.

09:11:04  25          THE COURT:  And so did you not intend to admit 5307?

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:11:08   1          MR. NORTH:  I did not.  I apologize.

        2          THE COURT:  So that exhibit won't be admitted.  Let's

        3   go to 5037.

        4   BY MR. NORTH:

09:11:20   5   Q   And what is this document, Mr. Carr?  Can you tell?

        6   A   This is the effects of changes to the Recovery filter and

        7   the femoral delivery system on filter stresses based on FEA

        8   analysis.

        9   Q   And was this prepared by -- well, is this an approval form

09:11:41  10   signed off on by your team?

       11   A   Yes.

       12          MR. NORTH:  Your Honor, at this time we tender 5037.

       13          MR. LOPEZ:  No objection, Your Honor.

       14          THE COURT:  Admitted.

09:28:06  15      (Exhibit 5037 admitted.)

       16          MR. NORTH:  Now, if we could turn to page 4 of this

       17   exhibit.

       18          And could we display this to the jury, Your Honor?

       19          THE COURT:  Yes.

09:12:07  20   BY MR. NORTH:

       21   Q   Does this describe the test rationale?

       22   A   Yes.

       23   Q   And what was the purpose of this test?  This finite

       24   element analysis that Bard had conducted on the G2?

09:12:20  25   A   To evaluate the stresses in both the loaded and the

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:12:23  1    deployed condition of the filter.  So meaning when it's in the

       2    delivery system, and then when it's in a vessel.

       3    Q    Why did you want to do this in both configurations?

       4    A    Because the filter is stored in the delivery system from

09:12:41  5    the time it's made to the time it's used, so you have to test

       6    those conditions, and then in the as-used condition also.

       7    Q    And would this finite element analysis have assessed the

       8    worst case scenario for the filter?

       9    A    Yes.

09:13:05 10              MR. NORTH:  If we could turn to page 5.

      11    BY MR. NORTH:

      12    Q    What was the conclusion of this finite element analysis

      13    performed on the G2?

      14    A    That the modified filter showed substantially lower peak

09:13:19 15    stresses compared to the original design, up to 90 percent

      16    lower, with an exception being the legs, as the legs of the G2

      17    filter are wider than the legs of the Recovery filter, so you

      18    would expect a little more stress there.  However, the

      19    increase is minimal and the resulting deformation is well

09:13:44 20    within the Nitinol's elastic range.

      21    Q    Would that stress found on the legs have affected the

      22    fracture resistance of the filter?

      23    A    No.

      24    Q    Are the tests contained in the design verification and

09:14:12 25    validation report the only bench test that Bard performed on

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:14:16   1   the G2 filter?

2   A    No.

3           MR. NORTH:   Let me bring up 5949, if we could.

4   BY MR. NORTH:

09:14:25   5   Q    Do you recognize this document?

6   A    Yes.

7   Q    And what is this?

8   A    It's a clot trapping efficiency report.

9   Q    And what was the purpose of this test?

09:14:52  10   A    To measure the clot trapping of the G2 filter, I believe,

11   in various configurations.

12   Q    And when was this test conducted?

13   A    I would guess in May of '06.

14   Q    And what was the purpose of conducting this test after

09:15:07  15   Bard had already started selling the G2 filter?

16   A    To evaluate, again, the ability of the filter to trap

17   clots in different orientations, not just straight

18   orientation.

19   Q    Did this test try to compare the G2 filter clot trapping

09:15:28  20   ability to that of the Greenfield filter?

21   A    Yes.

22   Q    And why did you choose the Greenfield filter as a frame of

23   reference for comparison?

24   A    Because it was the filter that we have always compared to

09:15:43  25   historically for clot trapping.  First Recovery, and then G2.

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:15:48   1   Q   Well, why did you choose that to compare for clot

2   trapping?

3   A   It was the gold standard at the time.

4        MR. NORTH:  Your Honor, at this time we would tender

09:15:58   5   5949.

6        MR. LOPEZ:  No objection, Your Honor.

7        THE COURT:  Admitted.

8      (Exhibit 5949 admitted.)

9   BY MR. NORTH:

09:16:08  10   Q   After -- in the development of a product such as the G2,

11   after the company completes the design verification and

12   validation testing, what is the next step?

13   A   We have a design review to review all of the data.

14   Q   And what does a design review consist of as a procedure or

09:16:30  15   process?

16   A   As I outlined yesterday in those processes of product

17   development, it is a review by, typically, senior people to

18   walk through everything and make sure that everything was done

19   to our quality documentation.

09:16:52  20        MR. NORTH:  If we could bring up 5315, please.

21   BY MR. NORTH:

22   Q   Do you recognize this document?

23   A   Yes.

24   Q   And what is that?

09:17:05  25   A   It's the design review for the G2 filter femoral delivery

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:17:10  1   system.

2          MR. NORTH:  If we could look at page 3, please.

3   BY MR. NORTH:

4   Q   Does this indicate when the design review took place?

09:17:19  5   A   Yes.  February 22nd, 2005.

6          MR. NORTH:  Your Honor, at this time we would tender

7   5315.

8          MR. LOPEZ:  No objection, Your Honor.

9          THE COURT:  Admitted.

09:17:32  10       (Exhibit 5315 admitted.)

11          MR. NORTH:  If we could display this page,

12   Your Honor?

13          THE COURT:  You may.

14   BY MR. NORTH:

09:17:42  15   Q   Does this show who all attended the design review for the

16   G2?

17   A   I don't know if it shows all the attendees, but it shows

18   the team members and reviewers.

19   Q   Do you recall whether you attended that meeting?

09:17:57  20   A   I don't recall offhand, no.

21          MR. NORTH:  If we could turn to page 4, please.

22   BY MR. NORTH:

23   Q   What is the -- is identified as the objective of this

24   meeting?

09:18:16  25   A   The objective is to critique the final design with respect

DIRECT EXAMINATION (CONT'D) — ROBERT M. CARR, JR.

09:18:19  1   to the design requirements and specifications.  The review

2   team will determine if the G2, G1A, Recovery, is suitable to

3   move into Phase III or process qualification.

4   Q   And what did the design review team, what do they

09:18:33  5   typically review as a part of this analysis?

6   A   I believe if you take away the highlight, all of the

7   documentation there in the agenda.  All of the documentation

8   that's required there.

9   Q   Do they -- does the design review team look at all of the

09:18:57 10   testing that has been done to develop the product?

11   A   Yes.

12        MR. NORTH:  If we could turn to Page 21, please.

13   BY MR. NORTH:

14   Q   What were the conclusions of the design team?  Design

09:19:11 15   review team?

16   A   That the filter demonstrated superior performance in

17   fatigue resistance to the Recovery.  The filter demonstrated

18   acceptable performance in all tests, except for the migration

19   resistance we talked about before.  And that the G1A

09:19:29 20   demonstrated superior performance in migration resistance

21   compared to Recovery.

22   Q   Is this Phase II the only design review you conducted with

23   regard to G2?

24   A   No.

09:19:45 25        MR. NORTH:  Let's bring up 5316, if we could.

DIRECT EXAMINATION (CONT'D) - ROBERT M. CARR, JR.

09:19:53  1    BY MR. NORTH:

2    Q    Are you familiar with this document?

3    A    Yes.

4    Q    And what's -- what's the title?

09:20:01  5    A    Phase III Design Review for the G2 Recovery Femoral

6    Delivery System.

7    Q    And what would be the distinction between this design

8    review and the one that we just talked about?

9    A    I believe this one goes over the process of documentation.

09:20:20 10         MR. NORTH:  If we could look at the 6th page.

11   Page 6.

12   BY MR. NORTH:

13   Q    Does this indicate who -- what date this took place?

14   A    March 28th, 2005.

09:20:32 15   Q    And does it list the people that attended?

16   A    Again, there might have been other attendees, but it lists

17   the project team and the design review team, yes.

18   Q    And are you a part of that -- listed as part of that

19   project team?

09:20:45 20   A    I am.

21         MR. NORTH:  Your Honor, at this time we would tender

22   5316.

23         MR. LOPEZ:  No objection, Your Honor.

24         THE COURT:  Admitted.

09:25:03 25       (Exhibit 5316 admitted.)

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:20:53  1          MR. NORTH:  If we could display, Your Honor?

2          THE COURT:  You may.

3          MR. NORTH:  If we could turn to page 7, please.

4   BY MR. NORTH:

09:21:08  5   Q   And what was the objective of this March meeting?

6   A   To review all the testing and documentation, to ensure

7   compliance to design specifications, and to ensure that the

8   device will perform in a reliable, safe, and effective manner

9   prior to full market release.  And the review team will also

09:21:32 10   determine if the system is suitable to move to Phase IV,

11   market release.

12          MR. NORTH:  If we could go to Page 9, please.

13          Let's back up to 8, if we can.

14   BY MR. NORTH:

09:22:03 15   Q   What were the conclusions of this particular design

16   review?  Do you know?

17   A   That we could move forward.

18   Q   And as a part of this design review, did you validate the

19   processes?

09:22:20 20   A   Yes.

21   Q   And what does that mean, to validate the processes for the

22   development of the G2?

23   A   To ensure that the instructions and how you make the

24   filter is how it was intended.

09:22:55 25   Q   As part of your work with filters over the last 20 years

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:22:58  1   or so, Mr. Carr, have you spent a lot of time with doctors and

2   visiting hospitals?

3   A    Yes.

4   Q    And have you had many discussions with the doctors

09:23:09  5   regarding their use of filters?

6   A    Yes.

7   Q    And as a part of your research and development and

8   experience with filters, have you gained an appreciation of

9   the types of patients who typically receive a permanent

09:23:23  10  filter?

11  A    Yes.

12  Q    And what are the attributes of patients that doctors, in

13  your experience, generally utilize permanent filters with?

14        MR. LOPEZ:  Foundation.  Speculation.

09:23:35  15        THE COURT:  Overruled.

16        THE WITNESS:  Typically it's in older patients whose

17  life expectancy is not very long, and they would get a

18  permanent filter.  Or, stated better, they would not need an

19  optional filter because they would probably never have it

09:23:56  20  removed.  Or they have a permanent need for a vena cava

21  filter.

22  BY MR. NORTH:

23  Q    Since the advent of retrievable filters in the early

24  2000s, has Bard seen the sales of its permanent filter,

09:24:12  25  Simon Nitinol, decline?

DIRECT EXAMINATION (CONT'D) - ROBERT M. CARR, JR.

09:24:13  1   A   Yes, it declined year over year.

2   Q   And as someone in the company who's worked closely with

3   these filters in developing them, did you see reasons or

4   have -- were you able to identify reasons why that was

09:24:29  5   happening?

6   A   Again, optional filters are permanent --

7            MR. LOPEZ:  He just asked him if -- because I might

8   have an objection to the narrative he's about to give.  So I

9   object.  He's going beyond the scope of the question.

09:24:47  10            THE COURT:  Reask the question, would you, please.

11   BY MR. NORTH:

12   Q   With your work in filters, Mr. Carr, and the development

13   of them, talking to doctors, visiting hospitals, what is your

14   impression as to why the sales of the Simon Nitinol has

09:25:09  15   declined?

16            MR. LOPEZ:  Your Honor, objection.  802.  Foundation.

17   Speculation.

18            THE COURT:  Overruled.

19            THE WITNESS:  With the advent of optional filters,

09:25:23  20   they are permanent filters also.  So the number or the people

21   who received a permanent filter was going down, and new

22   technology has come along over time.  The SNF is an old

23   device.  And so with the option of being able to remove a

24   filter, that's what most people choose.

25

DIRECT EXAMINATION (CONT'D) – ROBERT M. CARR, JR.

09:25:50  1    BY MR. NORTH:

2    Q   Have you, in your work, identified certain characteristics

3    of the Simon Nitinol filter that make it less desirable,

4    besides the fact that it's only a permanent filter?

09:26:01  5            MR. LOPEZ:  Again, Your Honor, lacks foundation.

6    Seems to be asking for an opinion of an expert.

7            THE COURT:  Overruled.

8            THE WITNESS:  Yes.  Many people don't like how the

9    Simon Nitinol filter deploys.  It is a very long device inside

09:26:18 10    the tube and inside the delivery system, and when it's

11    deployed into the vena cava, some people are not very accurate

12    with how it forms and -- which is very important to a lot of

13    people is to be able to place the filter where they want it to

14    go.  So that's probably the biggest reason.

09:26:36 15    BY MR. NORTH:

16    Q   Mr. Carr, are you aware of any IVC filter on the market

17    today that does not have reports of filter fracture?

18    A   No.

19    Q   Are you aware of any IVC filter on the market today that

09:26:51 20    does not have reports of filter migration?

21    A   No.

22    Q   Are you aware of any IVC filter on the market today that

23    does not have reports of filter perforation?

24    A   No.

09:27:03 25    Q   And are you aware of any IVC filter on the market today

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:27:06  1    that does not have reports of filter tilt?

2    A    Probably not the Bird's Nest, which was a very old device

3    and probably couldn't tilt.

4    Q    Other than that one, are you aware of any?

09:27:19  5    A    No.

6    Q    If the G2 has had reports of fracture, as we've heard

7    during this trial, why did Bard continue to market the filter?

8    A    Because of the benefit that it provides patients.

9    Q    What is your understanding, as someone involved in the

09:27:41 10    development of filters, regarding the typical clinical

11    consequences of a fracture?

12    A    The vast majority of cases, they are asymptomatic.

13    Q    Mr. Carr, at any point in time in the development of the

14    G2 filter, did Bard rush the filter to market or otherwise

09:28:08 15    compromise the design and development process?

16    A    No.

17    Q    And do you believe yourself that the G2 is and was

18    reasonably safe?

19    A    Absolutely.

09:28:22 20             MR. NORTH:  Thank you, sir.  That's all the questions

21    I have.

22             THE COURT:  Cross-examination.

23             MR. LOPEZ:  Yes, Your Honor.  Thank you.

24

25

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:28:26   1              C R O S S – E X A M I N A T I O N

          2   BY MR. LOPEZ:

          3   Q    Morning.

          4   A    Good morning.

09:28:35   5   Q    Mr. Carr, you talked a lot about testing, and I want to

          6   make sure that the evidence in this case is clear.

          7         You have previously testified that it's important for

          8   people to know that the FDA does not test; correct?

          9   A    I don't recall that.

09:28:53  10         MR. LOPEZ:  Greg, could you please put up the

         11   June 6th, 2017, deposition of Mr. Carr, page 51, lines 12

         12   through 17.

         13   BY MR. LOPEZ:

         14   Q    Remember your deposition was taken in June of last year?

09:29:11  15         Sir?

         16   A    Yes.

         17   Q    You were asked, "So your testimony would be that Bard

         18   fully responded to the FDA but that the FDA was not satisfied

         19   with Bard's response?"

09:29:27  20         Your answer was, and I quote, "And I think it's

         21   important to know that the FDA doesn't -- doesn't test --

         22   doesn't tell you how to test, they just tell you you need to

         23   test."

         24         Remember that testimony?

09:29:42  25   A    Yes.

CROSS-EXAMINATION — ROBERT M. CARR, JR.

09:29:43    1    Q    And isn't it also your testimony that with respect to any

        2    IVC filter, that the FDA conducted none of its own testing on

        3    these filters?

        4    A    I don't believe the FDA's conducted testing on filters,

09:29:58    5    no.

        6    Q    And so you get to choose what tests you do, and you send

        7    those results to FDA; correct?

        8    A    No.  There's a guidance document.

        9    Q    I understand.  But you still choose what test you do on

09:30:11   10    these devices.

       11    A    Yes.  But if you didn't fulfill the guidance, you wouldn't

       12    receive approval.

       13    Q    Now, you were asked a question about ten or 15 minutes

       14    ago:  Did the G2 ever fail migration testing in any of the

09:30:28   15    tests you performed?  Do you recall that?

       16    A    I do.

       17    Q    And the truth is, sir, that the G2 did fail migration

       18    testing once they were implanted in humans.  True?

       19    A    No.

09:30:44   20    Q    So these devices acted exactly the way you expected and

       21    intended them to happen once they were implanted in human

       22    beings?

       23    A    Yes.  Migration is a known complication of all vena cava

       24    filters, including G2.

09:31:01   25    Q    So you expected 18 people to die from migrations when you

CROSS-EXAMINATION - ROBERT M. CARR, JR.

09:31:04  1    marketed the Recovery filter?

2    A    No.

3    Q    Did you expect five people to die when you marketed the

4    Recovery filter from migrations?

09:31:17  5    A    No.

6    Q    Did you expect that the G2 filter would have had an

7    unacceptable risk of caudal migration within the first three

8    or four months that it was on the market?

9    A    No.

09:31:33 10    Q    The truth is, when the testing of these devices, including

11   the G2, let's just say the G2, once you started testing these

12   devices in human beings in the open market, it was failing the

13   migration testing that you would have expected in human

14   beings.   True?

09:31:55 15    A    No.   And we don't test migration resistance in human

16   beings.

17   Q    Well, you're not supposed to; correct?

18   A    And we don't.

19   Q    And when you first started marketing the G2, you had no

09:32:06 20    clue how the G2 device was going to respond to -- within human

21   beings.   True?

22   A    Absolutely not.

23   Q    You knew that it -- you were going to have those caudal

24   migration problems, those perforation problems, those tilting

09:32:25 25    problems, those fracture problems that were reported to you in

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:32:28  1    the early four to five months it was on the market?  Did you

2    know that was going to happen?

3    A    Again --

4    Q    Sir, did you know that was going to happen?  That data?

09:32:37  5          MR. NORTH:  Your Honor, I'm sorry.

6          THE COURT:  Please let him answer the question,

7    Mr. Lopez.

8          THE WITNESS:  Again, all filters have known

9    complications of which each of those that you listed are

09:32:46  10   known.  So, yes, we knew they were going to happen.

11   BY MR. LOPEZ:

12   Q    All those things that were reported to you that caused

13   Dr. Ciavarella to say, why are we using the G2 when we have

14   the SNF, you expected all that to happen?

09:33:00  15   A    Again --

16   Q    Sir, that -- did you expect all that to happen that caused

17   him to say, why are we using the G2 when we have the SNF that

18   has virtually no safety problems?

19   A    Again, yes.  Those are all known complications of vena

09:33:14  20   cava filters.

21   Q    And you expected the results that you got in the EVEREST

22   study when you first started marketing the device?

23   A    I don't understand.  Sorry.

24   Q    The results in the EVEREST study, the tilting, the

09:33:26  25   migrations, the fractures, the perforations, the difficulty to

CROSS-EXAMINATION - ROBERT M. CARR, JR.

09:33:29   1   remove these devices because they were embedded in the wall of

2   the vena cava, did you expect that?

3   A   Yes.  And I believe they're known complications written in

4   the protocol of the clinical trial.

09:33:40   5   Q   And did you tell doctors about that expectation, that the

6   G2 filter was willing to behave the way it was reported to

7   this company in the first four or five months it was on the

8   market?

9   A   Yes.  The IFU instructs physicians of all of those known

09:33:56   10   complications.

11   Q   And you told doctors and patients about the results of the

12   EVEREST study -- you did not tell doctors and patients about

13   the results of the EVEREST study until sometime after

14   Ms. Booker got her device, her G2 device.  True?

09:34:16   15   A   Yes.

16        MR. LOPEZ:  Could we pull up 1680, please.

17        Show it to the witness.

18        Please.

19   BY MR. LOPEZ:

09:34:40   20   Q   Sir --

21        THE COURT:  Hold on just a minute.  What's the

22   number?

23        MR. LOPEZ:  1680.

24        THE COURT:  We're checking to confirm it's in

09:34:51   25   evidence.

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:34:53  1    MS. REED ZAIC:  It's not.  It's the redacted issue we

2    dealt with this morning, Your Honor.

3    THE COURT:  Oh.  Okay.

4    BY MR. LOPEZ:

09:35:04  5    Q   Sir, do you recall your company getting a warning letter

6    from the Department of Health and Human Services dated

7    July 13, 2015?

8    A   Yes.

9    Q   Were you involved in the activities that happened at Bard

09:35:18 10    once this letter was received?

11    A   No, I was not.

12    Q   Do you recognize this, though, as the warning letter that

13    you received?  The company received?

14    A   I don't know that I've ever seen the warning letter, but

09:35:31 15    it certainly looks like a warning letter to Tim Ring, yes.

16    Q   And Tim Ring is the chairman and chief executive officer

17    of C.R. Bard?

18    A   Yes.

19    Q   And could you verify for us, please, if you look at

09:35:48 20    page 11 of this Bates -- yeah, Bates page 11, 5715, that that

21    is a signature of a director from the Los Angeles district of

22    the FDA.

23    A   It appears to be, yes.

24    MR. LOPEZ:  Your Honor, at this time, subject to the

09:36:07 25    redactions that we discussed, I'd like to offer 1680 into

CROSS-EXAMINATION - ROBERT M. CARR, JR.

09:36:12  1  evidence.

2          THE COURT:  Other than the objections we've

3  addressed, are there any others from defendants?

4          MR. NORTH:  Your Honor, I would object to -- with

09:36:19  5  this witness under 602.  He hasn't been able to identify this.

6          THE COURT:  All right.  I'm going to overrule it.  I

7  believe this is self-authenticating under Rule 901 and 902.

8          Exhibit 1680 is admitted in its redacted form.

9          (Exhibit 1680 admitted.)

09:36:35  10         MR. LOPEZ:  Thank you, Your Honor.

11         You can take that down now, Greg.

12  BY MR. LOPEZ:

13  Q   Sir, your company maintains what are known as complaint

14  files; right?

09:36:45  15  A   Yes.

16  Q   And those complaint files are collected by field assurance

17  representatives?

18  A   Yes.

19  Q   And they can also be sent in by doctors and other folks;

09:36:56  20  right?  There's no restriction.

21  A   Anyone can complain.

22  Q   In fact, you instruct your sales reps if a doctor

23  registers a complaint to them that they -- that complaint gets

24  reported to the company; correct?

09:37:10  25  A   Yes.

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:37:12   1    Q    And that information is tracked in a database that Bard

2    maintains that includes both the Recovery and the G2 devices?

3    A    Yes.

4    Q    And those are kept in electronic database?

09:37:29   5    A    Yes.

6    Q    And those are kept in the ordinary course of business;

7    right?

8    A    Yes.

9    Q    And the sales reps are authorized and in fact they're

09:37:36  10    instructed to make sure they report any complaints that happen

11    in the field; correct?

12         MR. NORTH:  Your Honor, I'm going to object.  This is

13    beyond the scope of direct testimony.

14         MR. LOPEZ:  Your Honor --

09:37:50  15         THE COURT:  Hold on just a minute.

16         Overruled.

17    BY MR. LOPEZ:

18    Q    True, sir?

19    A    Yes.

09:38:00  20    Q    And, in fact, when you have a complaint file, you indicate

21    who it was that reported it.  True?

22    A    I believe so.

23    Q    And if it was reported by a sales rep, you put on the

24    complaint file a rep report or a sales rep report; correct?

09:38:20  25    A    I don't do anything.  I don't deal --

CROSS-EXAMINATION - ROBERT M. CARR, JR.

09:38:22    1    Q    That's --

            2    A    -- with complaint forms.

            3    Q    I'm sorry, I didn't mean to interrupt.

            4           But when you look at these complaint files, if a

09:38:30    5    sales rep reports it, you'll see something like rep reported,

            6    that type of information?

            7    A    Probably.

            8    Q    Okay.

            9           MR. LOPEZ:  Your Honor, I'd like to now show the

09:38:40   10    witness 4327.  However, I want it to include the last four

           11    pages of that original exhibit.

           12           THE COURT:  That's fine.  You can show it to the

           13    witness.

           14           MR. LOPEZ:  Yes.  Just show it to the witness,

09:38:53   15    please.

           16           Greg, that would be Page 8.

           17    BY MR. LOPEZ:

           18    Q    Do you see that, sir?

           19    A    I do.

09:39:05   20    Q    Now, you see on this chart rep report, rep report, rep

           21    report, rep report, rep report, all up and down that first

           22    page?

           23    A    Yes.

           24    Q    And these are complaints from the field; correct?

09:39:24   25    A    Yes.

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:39:25   1    Q    When it says "rep report," that means a sales

2    representative who's an agent or employee of Bard reported

3    these events to Bard; correct?

4    A    Probably.

09:39:39   5    Q    And if you go to the next page, I think you'll see other

6    areas where it says rep report and rep report.

7         Right?

8    A    Yes.

9    Q    And you've seen summaries like this before from the

09:39:54  10    complaint files, have you not, that are indicated here on this

11    Exhibit 4327?

12    A    I saw this table the other day when you showed it to me.

13         MR. LOPEZ:  Your Honor, at this time I'd like to move

14    in the remaining four pages of 4327.

09:40:18  15         MR. NORTH:  Same objection, Your Honor.  Hearsay

16    within hearsay.

17         THE COURT:  All right.  Let's address this for a

18    minute at sidebar.

19         If you want to stand up, ladies and gentlemen, feel

09:40:25  20    free.

21      (Bench conference as follows:)

22         MR. LOPEZ:  Your Honor --

23         THE COURT:  That can't help me unless it's in

24    evidence.

09:41:40  25         MR. LOPEZ:  Okay.

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:41:41 1          THE COURT:  Mr. North, the question I have is, is why

2    you think 801(d)(2)(C) has not been satisfied by Mr. Carr's

3    testimony?

4          MR. NORTH:  Because I believe that the mere fact that

09:41:58 5    it says "rep report" is just the tip of the iceberg of the

6    layers of this hearsay.  No selling representative knows --

7    may I look at this one second, Your Honor?

8          THE COURT:  Yes, you can.

9          MR. NORTH:  -- details such as on follow-up imaging

09:42:12 10   the filter was found to have dropped, vertebral bodies link,

11   doctor reported that one hook -- these may be coming from the

12   sales rep and -- on some level, but there are many layers of

13   hearsay beneath.

14         The sales rep was not in the operating room.  The

09:42:31 15   sales rep is hearing about this from the doctor, is hearing

16   about this from the physician, and so this is just a statement

17   where the sales rep is reporting hearsay.  It's not a

18   statement that he has personal knowledge of.  And I don't

19   think it would qualify under that -- not exception, but -- to

09:42:51 20   fail to be identified as hearsay there because of that.

21         THE COURT:  Well, the one you pointed out, which is

22   the fourth bullet on Page 8 of Exhibit 4327, actually that

23   begins "marketing manager reported."

24         MR. LOPEZ:  I can ask him that question too.

09:43:10 25         THE COURT:  But it specifically says "doctor reported

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:43:12   1    that one hook was in a vein."  That is clearly stating what

2    the doctor said.

3                MR. LOPEZ:  And this is clearly notice to the

4    company.

09:43:20   5                THE COURT:  Well, but there's a hearsay issue.  How

6    is that not -- the doctor's statement in that sentence not

7    hearsay?

8                MR. LOPEZ:  Well, it is.  But there's -- I mean, it's

9    obviously -- but this is -- this is him reporting to the

09:43:34  10    company, Your Honor.

11                THE COURT:  What a doctor said.

12                MR. LOPEZ:  Well, okay.

13                THE COURT:  What the doctor said is hearsay.

14                MR. LOPEZ:  Isn't it also notice to the company?

09:43:42  15    This is --

16                THE COURT:  There's no notice exception to the

17    hearsay rule.

18                MR. LOPEZ:  There's a notice exception to the hearsay

19    rule.

09:43:50  20                THE COURT:  No, there isn't.

21                MR. LOPEZ:  Well, then, we won't offer it for the

22    truth, and then it goes to their state of mind and information

23    they had when they were monitoring this device.

24                THE COURT:  What's your response on that?

09:44:01  25                I mean, that would be accompanied by an instruction

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:44:03   1   that they're not to take this information for the truth of

2   what is said, but simply as notice to the company of what was

3   purportedly said.

4         MR. LOPEZ:  I can live with that.

09:44:17   5         MR. NORTH:  Your Honor, he just spent the last ten

6   minutes answering his questions saying there's notice to the

7   company of all these sorts of complications occurring.  He's

8   trying to get this in for the truth of the matter asserted

9   because he wants to get in that there's notice to the company

09:44:30  10   of these specific details of events.  I mean, he wants -- he

11   wants evidence that the company -- well, that these events

12   with these particular specifics occurred.  He's already got

13   plenty of evidence of notice of complications occurring.

14         THE COURT:  Well, but he can put in more evidence of

09:44:51  15   notice.

16         MR. NORTH:  That's true.

17         THE COURT:  I'm not understanding that objection.

18         MR. NORTH:  I think my point is that I don't believe

19   that's why he's putting it in.  He's putting it in to get the

09:45:00  20   truth of these events before the jury.

21         THE COURT:  Well, let me ask you this question,

22   Mr. Lopez:  Let's say you're in closing and you put this

23   exhibit on the screen, what are you going to argue from the

24   statements in this exhibit?

09:45:15  25         MR. LOPEZ:  Whether the company had notice of the

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:45:18  1    reports from their sales reps about what was happening with

2    the device in the market.

3            THE COURT:  Well --

4            MR. LOPEZ:  It --

09:45:27  5            THE COURT:  Hold on just a minute.

6            Here's the issue.  Doesn't that, for the jury to say,

7    okay, the company had notice that the filter was tilted

8    90 degrees against the caval wall, have to assume the filter

9    was tilted 90 degrees against the caval wall?  For the jury to

09:45:45  10   attach significance to that, don't they have to assume the

11   filter was actually that filter?

12           MR. LOPEZ:  What they have to assume is what did the

13   company do in reaction, in response to that.

14           THE COURT:  Why did the company have to do anything

09:45:57  15   if it wasn't true?

16           MR. LOPEZ:  Well, that -- well, one of the issues is

17   they need to find out.

18           THE COURT:  But it seems to me your argument

19   implicitly asserts that these things really happened.  That's

09:46:06  20   why I'm wrestling with it's not offered for the truth of the

21   matter asserted.

22           MR. LOPEZ:  Alls I heard, all we heard in this case

23   is fracture rates.  Those are all reports -- everything in

24   this case with respect to --

09:46:18  25           THE COURT:  Let's focus on hearsay.

CROSS-EXAMINATION – ROBERT M. CARR, JR.

09:46:19   1            MR. LOPEZ:  I know, but --

           2            THE COURT:  That's the issue.

           3            MR. LOPEZ:  Everything that relates to what -- this

           4     is -- clearly goes to the company's state of mind and the

09:46:27   5     notice to them about --

           6            THE COURT:  I understand that, and I agree that it

           7     does.  But it seems to me the only significance is if it's

           8     true information, if these filters were tilting in this way,

           9     were fracturing in this way.  That's what I'm wrestling with.

09:46:43  10            MR. LOPEZ:  Why can't I cross-examine someone and

          11     say, by the way, your sales rep reports that there was a

          12     device that went into someone's heart, or that a piece of the

          13     device went into someone's heart, what did you do to

          14     investigate that to see if it was true?  Why can't -- I can't

09:46:55  15     ask that question?

          16            THE COURT:  Well, you're not wanting to ask a

          17     question, you're wanting to put a document in evidence.

          18     There's a difference.

          19            MR. LOPEZ:  Okay.  But it still doesn't stop me from

09:47:06  20     finding out what kind of investigations --

          21            THE COURT:  You can ask him questions about

          22     investigations, and if there's an objection, I'll rule on it.

          23     What you want to do is put these statements in evidence.

          24            MR. LOPEZ:  Well, Your Honor, I would like to file a

09:47:21  25     brief on this, obviously, because there's other cases where

CROSS-EXAMINATION - ROBERT M. CARR, JR.

09:47:23  1  these come in to evidence as exception to the hearsay rule.

2       THE COURT:  Well, let's do this:  I think you've laid

3  the foundation.  If you want to lay more, such as a marketing

4  manager, you can go ahead and do that now.

09:47:38  5       And I'd like to see the cases.  I'd like to consider

6  that argument.

7       MR. NORTH:  I think we have some, too, Your Honor.

8       MR. LOPEZ:  Pardon me?

9       MR. NORTH:  We have some cases too.

09:47:47 10       THE COURT:  Okay.  So I'm -- just for the record, I'm

11  not going to admit it at this point, but it's subject to my

12  hearing these additional legal arguments.

13     (Bench conference concludes.)

14       THE COURT:  Thank you, ladies and gentlemen.

09:48:06 15  BY MR. LOPEZ:

16  Q   Sir, marketing managers can also report these adverse

17  events, too, or regional managers.  Anyone out in the sales

18  force that's with doctors.  True?

19  A   Anyone in the company can report any of them.

09:48:32 20       MR. LOPEZ:  Those are all the questions I have at

21  this time, Your Honor.

22       THE COURT:  All right.  Redirect?

23       MR. NORTH:  Nothing further, Your Honor.

24       THE COURT:  All right.  Thank you, Mr. Carr.  You can

09:48:40 25  step down.

DIRECT EXAMINATION - DAVID W. FEIGAL, MD

09:49:03  1        MR. LOPEZ:  Your Honor, subject to our discussions,

2    I'd like to move into evidence, I think it was 4327, but that

3    includes the -- to include the last four pages.

4        THE COURT:  All right.  That motion's been made.  As

09:49:16  5    indicated, we're going to discuss that later.

6        And that was 4327.  Is that --

7        MR. LOPEZ:  4327.

8        MR. CONDO:  Your Honor, we would call Dr. David

9    Feigal.

09:49:31 10        THE COURTROOM DEPUTY:  Dr. Feigal, if you'll please

11    come forward and stand right here and raise your right hand,

12    sir.

13                  **DAVID W. FEIGAL, MD,**

14    called as a witness herein, after having been first duly sworn

09:49:39 15    or affirmed, was examined and testified as follows:

16              D I R E C T   E X A M I N A T I O N

17    BY MR. CONDO:

18    Q    Good morning, Doctor.  Would you please introduce yourself

19    and tell the ladies and gentlemen of the jury where you live.

09:50:21 20    A    My name is David William Feigal, Junior, and I live in

21    Thousand Oaks, California.

22    Q    And what is your profession, sir?

23    A    I'm a physician.  I'm also an epidemiologist, and I have

24    spent the majority of my career, some 30, 35 years, involved

09:50:42 25    in developing medical products.

DIRECT EXAMINATION - DAVID W. FEIGAL, MD

09:50:45  1    Q    And what is an epidemiologist?

        2    A    Epidemiology is the study of the patterns of diseases in

        3    populations.  So the word comes from epidemic, but it is

        4    broader than just studying infections.  But that was the

09:50:59  5    original use it was put towards.  So it's a -- it's a field of

        6    study that looks at how things occur and what kinds of people

        7    and what are risk factors that explain the occurrences.

        8    Q    And is a clinical epidemiologist someone who is trained

        9    both in clinical medicine and in the research tools of

09:51:25 10    epidemiology?

       11    A    Yes, that's right.  So as a physician epidemiologist, I

       12    look at the epidemiology of the safety of medical products,

       13    the patterns of diseases.  I've done studies of specific

       14    diseases and conditions over my career.

09:51:40 15    Q    And in this case what were you asked to do?

       16    A    I was asked to look to see if the studies that were in the

       17    medical literature could establish the rates and the extent of

       18    the adverse events that were occurring with Bard filters and,

       19    to an extent, other filters as well.

09:52:03 20    Q    And when you talk about studies referenced in medical

       21    literature, are you talking about peer-reviewed studies and

       22    medical publications?

       23    A    Yes, I am.

       24    Q    And have you formed an expert opinion on that subject on

09:52:15 25    which you were asked to do?

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

09:52:17  1   A   Yes.

2   Q   And are all of your opinions formed to a reasonable degree

3   of scientific certainty?

4   A   Yes, they are.

09:52:25  5   Q   What education and training do you have in the field of

6   clinical epidemiology?

7   A   Well, I began my training as a -- at a medical school at

8   Stanford University.  I did a residency in internal medicine

9   at the University of California Davis.  And then I did a

09:52:41  10  fellowship in clinical epidemiology at a joint program between

11  University of California San Francisco and UC Berkeley.  So

12  that was my formal educational training.  I got a lot more

13  training in the field, actually working in the -- working in

14  the profession.  But that was my formal training.

09:53:00  15  Q   And have you consulted with medical device companies as a

16  clinical epidemiologist?

17  A   Yes, I have.  I think with respect to medical products,

18  one focus of a great deal of my research and consulting is

19  around the safety of products and methods of determining the

09:53:17  20  safety of those products.

21  Q   And have you taught general medicine and epidemiology to

22  graduate or undergraduate level students?

23  A   Yes, I have.  I was on the faculty of the University of

24  California San Francisco, both in the departments of

09:53:32  25  epidemiology and the department of medicine.  And there I was

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

09:53:38  1  the associate director of the clinical epidemiology fellowship

2  program.  Actually, the program I was trained in, I became the

3  deputy director of that.  And so I taught graduate students

4  and medical students at San Francisco.  I continued that.  I

09:53:53  5  moved to the faculty at University of California San Diego,

6  and taught there as well.

7  Q    And have you practiced medicine?

8  A    I have.  I was very actively a member of the faculty

9  practicing in the department of medicine at the university

09:54:08 10  hospitals where I was.  Generally those were county hospitals.

11  And I spent probably about a third of my time in direct

12  patient care.

13  Q    And in your practice, your medical practice, did you ever

14  implant an IVC filter?

09:54:22 15  A    No, I didn't implant one, but I had patients who had --

16  one of my fields of study was actually risks for pulmonary

17  embolism.  And I had a patient who had one of the very early

18  filters implanted by someone else.  But I'm not someone who

19  can implant the filters.

09:54:41 20  Q    Does your lack of experience actually implanting filters

21  inhibit your ability to evaluate the sufficiency of

22  information in medical literature to determine whether there

23  are reliable adverse rates reported?

24  A    No, it does not.

09:54:56 25  Q    Do you still hold an active medical license?

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

09:54:59   1   A   I do.  I've been continuously licensed in the State of

2   California since 1976.

3   Q   Are you board-certified in any medical discipline?

4   A   Yes, internal medicine.

09:55:11   5   Q   And in your background, in your experience, have you ever

6   worked with the FDA, the Food and Drug Administration?

7   A   I did.  After about almost 15 years in different

8   University of California medical schools, I went to the FDA in

9   1992 and worked there for the next 12 years.

09:55:28  10   Q   And can you briefly summarize the positions you held with

11   the FDA over that period and describe for us generally what

12   your responsibilities were in each position?

13   A   Sure.

14       Well, my first position, to back up just a little, I

09:55:44  15   was at San Francisco General Hospital when the AIDS epidemic

16   came along.  It came along and we didn't even know what it

17   was.  And I got involved with developing drugs and products

18   for the HIV epidemic.

19       And I was invited to be on advisory panels to the

09:55:58  20   FDA, and when the position opened in 1991 to be the director

21   of the division responsible for all of the AIDS drugs, my

22   family and I packed up and we went to Washington, and I stayed

23   at FDA the next 12 years.  And I worked on drugs for about

24   five and a half years, and during that time we approved the

09:56:22  25   cornerstone HIV drugs that changed the epidemic.

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

09:56:26   1        Then for two years I was the deputy director at the

2   Center for Biologics.  Those are blood and vaccines and other

3   kinds of biological proteins.

4        And then for the last five years, I was the director

09:56:35   5   of the Center for Devices and Radiological Health.  And

6   reported directly to the commissioner.  But then I was

7   responsible for medical devices.  So I did that another five

8   years.

9        So those were my -- those, in brief, were my 12 years

09:56:48  10   at FDA.

11   Q    In the last position, what was -- what is the role of the

12   Center for Devices and Radiological Health?

13   A    Well, it's the -- that's the center that's responsible for

14   all of the surgical equipment, all the implants, the Bard

09:57:03  15   filters is an example of a medical device.  Also, all of the

16   radiology equipment, the X-ray equipment, the surgical tables.

17   Everything from tongue depressors to very, very high tech

18   pacemakers.

19        The radiological health part of it, we were also

09:57:21  20   responsible for products that emit radiation, not just

21   medical, but also cell phones and theft detection devices and

22   so forth.  So very -- a very broad group of responsibilities.

23   And I was the overall director for that center.  We had about

24   1200 employees.

09:57:37  25   Q    And in your professional career have you lectured or

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

09:57:39  1   presented lectures to professional organizations on topics

2   involving medical devices?

3   A    Yes, I have.  Particularly since I was the director the

4   device center.  But even a bit before that, because I

09:57:52  5   developed a couple medical devices back when I was an

6   academic.  But I've lectured to professional groups, I've

7   lectured at universities, I still lecture here in Arizona from

8   time to time.

9   Q    Are you still a part-time resident here in Arizona?

09:58:13  10   A    I am.  I've got a house in Ahwatukee.  We came here after

11   we left FDA to -- my wife accepted a position at TGen, a few

12   blocks from here, the Translational Genomics Center, and I

13   followed her.  And we -- at that time I started a consulting

14   practice and also teaching on -- as a member of the volunteer

09:58:37  15   faculty at the law school here.

16   Q    Now, as a physician and epidemiologist, have you conducted

17   medical research studies yourself?

18   A    Yes, I have.

19   Q    Can you describe for the ladies and gentlemen of the jury

09:58:49  20   generally the types of medical studies that you have

21   conducted.

22   A    Within kind of a broad range.  I have conducted and am

23   involved in a number of randomized controlled clinical trials.

24   These are studies that are planned in advance and where you've

09:59:07  25   got a treatment group and a control group, and people randomly

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

09:59:11  1   are assigned to the two, and then you follow them forward and

2   see what the effect is of the new product you're studying, for

3   example.

4           I've also designed studies that are observational,

09:59:19  5   where you identify a group of people, and then you have

6   regular follow-ups and -- and collect the information in that

7   way.

8           And I've also been involved in studies where I

9   actually start with problems, and then look backwards and see

09:59:37  10  if you can determine what those are.

11          So just about every kind of epidemiology study

12  category there is, I've participated in, designed, and in

13  addition to the ones I've designed, I've reviewed many, many

14  more.

09:59:51  15  Q   And have the results of the research, the medical studies

16  you've conducted been published?

17  A   Yes, in peer-reviewed literature.  Some of them for FDA

18  products and have resulted in studies that led to approval of

19  products.

10:00:04  20  Q   And have you yourself served as a peer reviewer for

21  professional journals?

22  A   I have.

23  Q   Can you give us an example or two of the kind of materials

24  that you peer reviewed?

10:00:18  25  A   I was a peer reviewer for the Journal of Medicine at one

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:00:22  1    point.  They would typically send me clinical trials in

2    epidemiology studies.  There's a journal once called

3    Controlled Clinical Trials, now called the Journal of Chronic

4    Disease, I was peer-review editor for studies submitted there.

10:00:37  5    Sometimes methodology studies.  Other times clinical studies.

6    Q   And in your professional career, have you had

7    responsibility for evaluating studies of adverse events

8    associated with drug and medical devices?

9    A   Yes.  And actually several different ways.  First I was an

10:00:52  10   investigator, so I was responsible for filing safety reports

11   to the FDA when I was an investigator.  Then, when I was at

12   FDA, we were responsible for evaluating the safety reports for

13   products we were responsible for in all three divisions and

14   taking appropriate actions.

10:01:06  15        Then, when I became a consultant, I actually worked

16   with companies setting up their reporting systems.  For four

17   years through the time I was a consultant, I was actually a

18   company official for two pharmaceutical companies.  And in one

19   of them I was directly responsible for the safety reporting.

10:01:23  20   So I've been doing safety reporting for 35 years.

21   Q   And are you drawing on that collective body of experience

22   you've assembled over the last 30, 35 years in forming your

23   opinion in this matter?

24   A   Yes, I am.

10:01:39  25   Q   Now, are you being compensated for the time you've spent

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:01:42  1    at our request --

2    A    Yes.

3    Q    -- to evaluate studies?

4    A    Yes, I am.

10:01:47  5    Q    And what are you charging?

6    A    My current rate is $650 an hour.

7    Q    And does it change as to whether you're sitting at your

8    desk reading a medical literature or sitting here testifying?

9    A    No.

10:01:59  10   Q    And how much have you billed in total in connection with

11   your study of the medical literature of the IVC filters?

12   A    I began working on this in December of 2010, and since

13   that time I've billed approximately $225,000.

14   Q    Let's talk about some of the types of medical literature

10:02:23  15   that you reviewed in doing your work in this matter.  Can you

16   tell us generally what it was, what body of materials you

17   looked at.

18   A    So I began -- there are search engines that allow you to

19   actually find the medical literature.  And they're run by the

10:02:41  20   National Library of Medicine.  So I began looking for the

21   studies that had studied the Bard filters, and I pulled a

22   collection of those studies, obtained the original papers, and

23   then began sorting those into different sorts of categories,

24   whether they were prospective trials, meaning that they

10:03:00  25   started at the time of implantation and began following the

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:03:03  1    patients, or whether they were retrospective studies that

2    started later and looked back.  Sorted them into different

3    categories and began to analyze them.

4    Q    And do you know how many studies you actually looked at in

10:03:18  5    forming your opinions?

6    A    There's well over 100 studies that have -- the filters

7    that are relevant to -- to Bard.  There's actually over 2,000

8    papers about interven- -- caval filters.  I made sure that I

9    saw all the studies that I could find about Bard, and then I

10:03:42 10    looked at some of the other studies just for comparison.

11    Q    And as I understand what you've told us at the beginning,

12    you were asked to see whether the medical literature was

13    sufficient to determine whether there were reliable rates for

14    adverse events in Bard filters; correct?

10:04:00 15    A    Yes, that's correct.

16    Q    All right.  What is your opinion, sir?

17    A    Well, my opinion is that the adverse effects of IVC

18    filters, and Bard in particular, are well-known, and well

19    described in the medical literature, but none of the studies

10:04:17 20    have been designed in a way that they capture the information

21    that allows them to actually say what the rate is.  We know

22    it's low, but there isn't information about -- none of the

23    studies are designed in a way that you can actually determine

24    the rate of overall complications or even specific

10:04:36 25    complications like fracture or tilt.  So the studies do not

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:04:40  1   provide that information.

2   Q   And with respect to that opinion, do you hold it to a

3   reasonable degree of scientific certainty?

4   A   I do.

10:04:49  5   Q   Let's talk, then, about as a clinical epidemiologist, what

6   kind of information is needed to calculate a reliable rate for

7   any adverse event in a particular medical device?

8   A   It's actually quite simple in concept; it is just hard to

9   do in practice.  In concept you have to identify a population

10:05:10  10  that got the filter.  So let's say you were trying to do a

11  study to determine the rate.  You first want to start with

12  everybody who got the filter, because that is going to be your

13  population to determine the rate.

14       A rate means that you also have the dimension of time

10:05:22  15  accurately measured so that you know when things occurred and

16  how many of them occurred.

17       And so that means that you have to have a study that

18  has regular follow-up.  And because many of these

19  complications can only be seen with X-rays of various kinds,

10:05:38  20  you actually have to have scheduled X-ray follow-up to

21  actually see, you know, what's happened to the filters at

22  different points in time.

23       Instead, what the literature mostly has is a

24  collection of people that may have come to a hospital, but we

10:05:58  25  don't know what population they represent.  They may have

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:06:02  1    complications, we don't have any idea of what time they

2    occurred.  And we have many, many missing data.  There are

3    very few studies where they actually conduct the X-rays to

4    look for them.  So they use the X-rays that were taken as part

10:06:15  5    of regular medical care and see what they can do.

6         So the studies just aren't designed in a way that

7    provides that information where you can generate a rate.

8    Q    Would you describe the various types of medical studies

9    that researchers do if they're trying to evaluate medical

10:06:31 10    devices.

11   A    Sure.

12        You can think of studies kind of in a hierarchy, from

13   the most reliable to the least reliable.  You learn something

14   from all of them, but the most reliable ones are the ones that

10:06:45 15   actually can give you quantitative data and rates to -- and

16   the others give you just sort of more descriptions of things

17   that have happened.

18        So at the top of the hierarchy are --

19   Q    Dr. Feigal, let me interrupt you, if I can.  Would it be

10:06:58 20   helpful for you to step down, with the Court's permission, and

21   provide the list of studies, writing it out on the board, and

22   then returning to the seat to talk about each of them?

23   A    I'd be happy to do that.

24        MR. CONDO:  Your Honor, may he do that?

10:07:13 25        THE COURT:  He may.

DIRECT EXAMINATION - DAVID W. FEIGAL, MD

10:07:18  1          THE WITNESS:  Handwriting test.

2    BY MR. CONDO:

3    Q    Let me ask you the question:  What is it that you are

4    going to be writing on the white board, sir?

10:08:01  5    A    I'm going to list the studies from the most reliable

6    designs to the least reliable and the least helpful.

7    Q    Okay.  Thank you.  Would you please do so.

8    A    So the first is -- the perennial problem is finding a

9    marker that's not --

10:08:21  10    Q    Try this one.

11    A    Here's an RCT, which stands for randomized control trial.

12          And here you start with a population, and you

13    basically -- the fancy way of flipping a coin, and you divide

14    them into two groups, and then you follow them forward to see

10:08:49  15    what happens to this group and what happens to that group.

16    And some of them may have side effects in both, and you look

17    at the differences.  And this is very reliable because you are

18    starting with people who are all the same.

19          The next best are prospective cohort studies.  And

10:09:15  20    here, you take two groups, but you don't randomize them.  In

21    this case you might take patients with different filters.

22    They might have different filters for different reasons.  It

23    may be a certain filter that's used in cancer patients more

24    frequently, for example, or by one operator, one surgeon or

10:09:34  25    another.  And then you follow them.  And then you see, again,

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:09:38  1   if there's a difference between the two.

2        Then there are the prospective uncontrolled studies.

3   So now we just have one group.  And we don't have a

4   comparison, but we just have one group.  And we can at least

10:10:05  5   say –– and these are still very useful.  You can say of all of

6   the people that use this, if we follow them systematically to

7   find out what the complications are, we can at least find out

8   what happens if you get this filter.  We won't know about any

9   other filter.

10:10:18  10       Then there are the studies that are just case

11   collections.  And a lot of those are retrospective.  In fact,

12   start out here, and they look back to see what kind of –– you

13   know, if they have patients that are in their clinic, they can

14   take just a sampling of all of the patients that are still in

10:10:50  15   the clinic and look back, how long have they had the filter?

16   What kind of problems have they had?

17       Problem here is you get a lot of lost follow-up, a

18   lot of patients that are missing.  And there are people who

19   actually try and do these prospective studies retrospectively.

10:11:04  20   So that's another list on the list, the retrospective.

21       And there are examples of that that we can see in the

22   literature, where they look backwards.  Everything has already

23   happened.  Again, they're really bedeviled by missing data.

24       And then you have some studies that just study cases

10:11:30  25   and just report on what's happened on those cases.  So that's

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:11:38  1    common.  Like retrieval studies.  People come in, they're

2    going to have their filter out, people look at the filters and

3    say, what shape are the filters in?  They don't have any

4    information about people not coming in for retrieval, and the

10:11:48  5    retrievals are all different times.  They don't have any real

6    ability to do rates.  But you learn something.  You learn a

7    lot about how to do retrievals.

8            And then, finally, you have single cases.

9            MR. O'CONNOR:  I'm sorry, I didn't hear that,

10:12:09  10   Your Honor.

11           THE WITNESS:  Single cases.

12           MR. O'CONNOR:  Thank you, Doctor.

13           THE WITNESS:  There are databases of collections of

14   single cases.  And there are some single case reporting that

10:12:18  15   has to go to the FDA.  Those actually tell you very little,

16   except what happened to a single patient.  You can't really

17   generate rates or comparisons, and FDA talks about that.

18           So this is the rough hierarchy of studies.

19           MR. CONDO:  May I move this board back just a little

10:12:42  20   bit?

21           THE COURT:  Yes.

22           MR. CONDO:  Thank you.

23   BY MR. CONDO:

24   Q   For reliability in determining reliable rates for adverse

10:12:58  25   events, how would you describe the randomized control trial?

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:13:05  1  How is it referred to generally?

2  A   It's referred to the gold standard of clinical evidence

3  because you've controlled for the differences in patients at

4  baseline, and because they're prospective studies where you

10:13:18  5  have a planned data collection over time and you're collecting

6  it the same on all the patients.  And when they're well

7  executed, that's the best source of data.

8  Q   And in your review of the medical literature, has there

9  ever been a randomized controlled trial for IVC filters?

10:13:35  10  A   There has not.  The challenge is you have to randomize

11  patients to perhaps not get a filter, and you'd have to find

12  patients who you could either not put a filter, put a filter

13  in, and it would be ethical to do either one.

14       So it is very difficult to do a randomized controlled

10:13:57  15  trial for some types of products, and this is one of them.

16  Q   Can you calculate rates or occurrences from each of these

17  types of studies?

18  A   You can calculate them from the randomized control trial

19  for the duration of the trial.  You can calculate them from

10:14:13  20  the prospective cohort studies, where you have a control group

21  and you have systematic collection over time.  But

22  unfortunately there aren't any of those either that have

23  compared two products.

24       So with all the rest what you have is you have a

10:14:27  25  report of adverse events that have occurred in a group of

DIRECT EXAMINATION - DAVID W. FEIGAL, MD

10:14:31  1   patients, but you don't have the time element, and you're

2   often missing patients.  There just isn't a way to calculate

3   the rates in those types of studies.

4   Q   As a clinical epidemiologist, what does one need to do in

10:14:47  5   order is to design a study that would generate reliable rates

6   for adverse events for an implantable device like an IVC

7   filter?

8   A   You have to have a population you define.  So that is sort

9   of obvious, it's the people that need an implanted filter.

10:15:03 10   And it would probably be at participating institutions.

11   Ideally you'd like everybody, particularly if it is an

12   observational study.  But patients do have to consent to be in

13   a study.

14        Then you'd have to have outcomes that you're going to

10:15:17 15   measure, and a good measuring technique.  You'd want it to be

16   the same across different patients.  So you could use a CT

17   scan, for example.  You could use other kinds of -- other

18   kinds of X-rays.  And you'd want to have a reliable

19   methodology to do the statistical analyses and calculate all

10:15:40 20   of these things.  It would basically be a prospective

21   protocol.  The best would be at the time of implantation.

22   Q   Do you have to have a defined population of participants

23   in the study?

24   A   Well, you do.  For example, if a center just reports its

10:15:59 25   retrievals, they don't know where those patients all came from

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:16:02  1  and they don't know all the patients that didn't come in for

2  retrieval.  So you can't get a rate from retrieval studies,

3  for example.

4  Q  Do you need a defined group of representative patients for

10:16:17  5  a reliable study?

6  A  Yes.  You need to have the patients that are typical of

7  the patients that receive the device.

8  Q  Yesterday, or perhaps two days ago, there was some

9  questioning of Mr. Van Vleet about a published study known as

10:16:44  10  the Nicholson study.  Is that one of the medical literature,

11  part of the medical literature that you examined as part of

12  your investigation in this matter?

13  A  I did, yes.

14  Q  What was that study about?

10:17:03  15  A  This was a study at York Hospital in Pennsylvania.  A

16  cardiologist there had seen an unusual patient who had a

17  fracture that had gone to her heart, and he decided to

18  actually call back the patients who had had filters placed at

19  his hospital for a period of time.  And then he published the

10:17:30  20  results of what his findings were from that study.

21  Q  Were there problems with that study?

22  A  There were a lot of problems with that study.  First we

23  start with the population.  He stated, and some of this was

24  later -- what actually was done in the study was actually

10:17:58  25  later discovered by requesting the records from the study as

DIRECT EXAMINATION - DAVID W. FEIGAL, MD

10:18:03    1    part of the trial process.  But what -- what he did was he not

2    only did not have all of the patients from York Hospital, he

3    only had about two thirds of them, and he deliberately

4    excluded patients from certain implantation areas, such as the

10:18:24    5    intensive care unit.  Sometimes they were placed at the

6    bedside in the intensive care unit.

7         But he also not only didn't have all the patients, he

8    had groups of patients we know didn't have fractures.  And he

9    excluded them from his study.  He should have included them if

10:18:42   10    he wanted the rate.  But he deliberately excluded them.

11         And then he added other patients in who weren't from

12    York Hospital to his study who he knew had fractures.  And so

13    the numbers just -- you know, at the end of that, you just

14    didn't really know what he had done because he had both

10:19:02   15    increased the number of fractures, decreased the number

16    without fractures, was missing a large amount of data.  He

17    didn't even accurately represent how many different surgeons

18    were involved in placing the devices.

19    Q   What do you mean he didn't accurately represent the number

10:19:19   20    of surgeons involved in placing the devices?

21    A   When he published the study, he said one of the strengths

22    of the study was that many, many different operators, many

23    different surgeons had been involved in placing the

24    fractures -- placing the devices that had fractured, placing

10:19:38   25    all of the devices.

DIRECT EXAMINATION – DAVID W. FEIGAL, MD

10:19:40  1        What was later shown was 85 percent of them were a

2    single operator.  Single surgeon.  He actually published a

3    retraction for his published paper after saying that he had

4    been mistaken about that with the earlier publication.

10:19:57  5        But rather than the inexperience of multiple people

6    implanting these, it was really a study of a single hospital,

7    and largely of a single surgeon, and that is not one you would

8    sort of say, gee, I bet that is representative of the results

9    everybody's going to get.

10:20:12  10  Q    In your opinion, was the Nicholson study -- can it be

11   relied upon for scientifically reliable data?

12   A    No.  The only use of the study is that he has some

13   detailed descriptions of the individual patients, and I think

14   he accurately represented the experience of those individual

10:20:33  15   patients.  But as a study to estimate rates or proportions,

16   it's not useful.  It's -- you can't rely on those numbers.

17   Q    Now, final question:  In the studies, the hundred or so

18   studies you reviewed or looked at involving IVC filters, did

19   you find any studies that met all of the requirements that you

10:20:55  20   said are necessary to determine an accurate rate for the

21   adverse events that existed?

22   A    There is one study that was limited because it's very

23   short-term, but one of the studies that the company sponsored

24   was the study on how to retrieve the filters.  And so in

10:21:15  25   multiple institutions approximately 100 people were followed

CROSS-EXAMINATION – DAVID W. FEIGAL, MD

10:21:20  1  until the time of removal, which was between three and six

2  months.  At the time of removal, for example, they found one

3  fracture.

4         That's the only study.  And it only tells us about

10:21:32  5  the experience over a very short, short time period.  But

6  that's the only study that actually had a systematic

7  enrollment, and then a defined follow-up, but it's small.

8  This is not a very common -- these are not very common events.

9  You have to do large studies to find very many of these.

10:21:50  10         And so it doesn't really give us -- that one fracture

11  doesn't tell us what the fracture rate is even at three months

12  because it's just not enough information.

13  Q   So there really was no study that you found that allowed

14  you to identify a reliable fracture rates for IVC filters;

10:22:10  15  correct?

16  A   That's correct.  Not for Bard and not for the other

17  filters that are used.

18         MR. CONDO:  Thank you.

19         No further questions, Your Honor.

10:22:19  20         THE COURT:  Cross-examination?

21         MR. O'CONNOR:  Yes, Your Honor.

22            C R O S S - E X A M I N A T I O N

23  BY MR. O'CONNOR:

24  Q   Hi, Dr. Feigal.  My name is Mark O'Connor.

10:22:33  25  A   Good morning.

CROSS-EXAMINATION - DAVID W. FEIGAL, MD

10:22:33 1  Q  I think what you just said, and I appreciate what you told

2  us about the hierarchy of studies, but you do agree that

3  regardless of the hierarchy, studies are relied upon by

4  both -- by the medical community; correct?  Doctors do read

10:22:50 5  them and rely upon them?

6  A  For different purposes, yes.

7  Q  And medical device companies should keep itself apprised

8  of the current status of medical literature.  Is that fair?

9  A  Yes, that's fair.

10:23:04 10  Q  Thank you.

11      Now, Nicholson is still cited in literature today;

12  correct?

13  A  Yes.  Unfortunately, although he retracted the information

14  about the multiple surgeons, he actually never published a

10:23:21 15  correction to his paper that actually identified all the other

16  errors.  So, yes, it is still cited.

17  Q  And he did, as you said, send a retraction.  Fair?

18  A  Yes, on one very small point -- well, it a very important

19  point, on the point that he was actually reporting the

10:23:37 20  experience of a single surgeon.

21  Q  And I think what you told us that at least Nicholson did

22  provide a detailed description of the failures that were seen

23  in the study for the Recovery and the G2 filter; correct?

24  A  There's a detailed case for a couple of the patients, and

10:23:56 25  then a description of some of the others, yes.

CROSS-EXAMINATION – DAVID W. FEIGAL, MD

10:23:58  1   Q   And his conclusion was that there was a high prevalence of

2   fracture and embolization in both the Recovery and G2.  Fair?

3   A   I don't recall if that was -- if that was his conclusion,

4   but there was no data in his study that would have allowed him

10:24:14  5   to estimate the prevalence or the incidence or the rates,

6   three different ways of talking about how often things happen,

7   from the patient population even at York Hospital, because he

8   didn't study them all or didn't study them properly.

9   Q   I understand.  But there's a difference between observing

10:24:31 10   events in patients and rates; correct?

11   A   Yes.  You can simply count up the number of patients that

12   you have, and so I'm not disputing the number of patients that

13   had fractures, it's just you can't get rates or proportions

14   out of those.

10:24:45 15   Q   So you're not disputing that Dr. Nicholson didn't see

16   patients that had failures in both the Recovery and the G2; is

17   that correct?

18   A   Well, by failure, you mean he observed fractures, which,

19   in some cases, migration, yes.  I'm not disputing.  He did

10:25:01 20   observe that and he did describe that in a little over a dozen

21   patients.

22   Q   All right.  And, as a matter of fact, there is literature

23   out there that talks about fractures and migration of both the

24   Recovery and G2; correct?

10:25:13 25   A   Yeah.  There are multiple papers that describe individual

CROSS-EXAMINATION – DAVID W. FEIGAL, MD

10:25:17  1  patients who are -- or collections of patients.  And these

2  aren't papers where you get rates or proportions.

3  Q    But, again, papers that describe those failures by doctors

4  who observed them with patients with G2 and Recovery?

10:25:28  5  A    Yes, that's correct.

6            MR. O'CONNOR:  That's all I have.  Thanks.

7            THE COURT:  Redirect?

8            MR. CONDO:  No redirect, Your Honor, but for the

9  trial record, may we have marked the hierarchy of events as

10:25:40  10  Exhibit 7949 and offer it as a demonstrative exhibit only?

11            THE COURT:  Any objection to this being a

12  demonstrative?

13            MR. O'CONNOR:  No objection.

14            THE COURT:  All right.  What's the number?

10:25:51  15            MR. CONDO:  7949.

16            THE COURT:  Okay.

17            MR. CONDO:  Thank you, Your Honor.

18            May I move this?

19            THE COURT:  Yes, you may.

10:25:57  20            Thank you, sir.

21            THE WITNESS:  You're welcome.

22            MS. HELM:  Your Honor, at this time we call Dr. John

23  DeFord by video.

24            Dr. John DeFord is a senior vice president for

10:26:38  25  science, technology and clinical affairs at C.R. Bard, Inc.

DIRECT EXAMINATION - CLEMENT GRASSI, M.D.

10:26:42   1   In this role, Dr. Ford is responsible for the research and

2   development functions at the various divisions of C.R. Bard.

3   Dr. DeFord obtained both master's -- I'm sorry, both

4   bachelor's and master's degrees in engineering before

10:26:57   5   obtaining his Ph.D. in electrical biomedical engineering in

6   1990.

7           Prior to joining Bard in 2004, Dr. DeFord held

8   various positions at other medical device manufacturers,

9   including serving as president and CEO of Cook, Inc.

10:27:18  10           (Video testimony played.)

11           THE COURT:  Let's stop the video.

12           We'll take the morning break, ladies and gentlemen.

13   We will resume at 10:45.

14           (Recess taken from 10:29 to 10:46.)

10:47:29  15           THE COURT:  Thank you.  Please be seated.

16           You may continue with the deposition.

17           (Video testimony played.)

18           MR. NORTH:  Your Honor, at this time we call

19   Dr. Clement Grassi to the stand.

10:59:23  20                   **CLEMENT GRASSI, M.D.,**

21   called as a witness herein, after having been first duly sworn

22   or affirmed, was examined and testified as follows:

23               D I R E C T   E X A M I N A T I O N

24   BY MR. NORTH:

10:59:32  25   Q   Good morning, Dr. Grassi.  Could you please tell the

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

10:59:37  1   members of the jury what your profession is.

2   A    Yes.  I am a practicing interventional radiologist.

3   Q    And have you been retained by Bard as an expert witness in

4   this particular matter?

10:59:50  5   A    Yes.

6   Q    And what is the focus of your opinions in this particular

7   case?

8   A    The focus of my opinions is to speak to the guidelines for

9   percutaneous inferior vena cava permanent placement.

11:00:07  10  Q    Where did you attend college, Doctor?

11  A    Harvard College.

12  Q    Where did you go to medical school?

13  A    Tufts University School of Medicine.

14  Q    After medical school did you complete an internship for

11:00:20  15  additional training?

16  A    Yes, I did.  Following medical school I was at the

17  Massachusetts General Hospital.

18  Q    And is Massachusetts General Hospital, is it affiliated

19  with a university?

11:00:33  20  A    It is.  It is one of the teaching hospitals of Harvard

21  Medical School.

22  Q    And did you complete a residency in radiology?

23  A    I did.  That was at the Beth Israel Deaconess Hospital in

24  Boston.

11:00:48  25  Q    And did you complete fellowship training after that?

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:00:51  1    A    Yes.

2    Q    And where was that?  Where did that take place?

3    A    That was at Brigham and Women's Hospital in Boston, also

4    an affiliate of Harvard Medical School.

11:01:04  5    Q    After completing your fellowship training, did you hold

6    any academic appointments?

7    A    I did.  I was an instructor in radiology with Harvard

8    Medical School, and subsequent to that an assistant professor

9    in radiology with Harvard Medical School.

11:01:23 10    Q    Now, tell us where you currently work, Dr. Grassi.

11    A    I'm currently with Hallmark Health, which is a group of

12    two hospitals in the Greater Boston area.

13    Q    And what do you do with those hospitals right now?

14    A    I practice interventional and vascular radiology.

11:01:45 15    Q    Are you licensed to practice medicine?

16    A    Yes, in the State of Massachusetts.

17    Q    And are you board-certified?

18    A    Yes, I am.  I'm board-certified with the American Board of

19    Radiology, and I have a certificate of added qualifications in

11:01:58 20    interventional and vascular radiology.

21    Q    And what does is it mean to be board-certified, Doctor?

22    A    It means that the physician has passed a series of

23    education and testing so that he or she fulfills the

24    qualifications of the profession.

11:02:19 25    Q    And how long have you been practicing medicine?

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:02:22  1    A    About 38 years.

2    Q    Today, as a practicing interventional radiologist, what

3    sorts of procedures do you handle on a routine basis?

4    A    I handle vascular procedures of a wide variety, including

11:02:39  5    inferior vena cava filters, placement and retrieval, as well

6    as a wide variety of nonvascular procedures in the abdominal,

7    biliary, and other systems.

8    Q    Have you held leadership positions, professional

9    leadership positions, during the course of your practice?

11:03:01  10   A    Yes.  I have been a director with the Boston VA system.

11   As well I've been a director of vascular and interventional

12   radiology with the UMass Memorial System.  And as well as

13   that, previously I have been a coordinator for residents and

14   fellows in their training with the Harvard Medical School

11:03:35  15   System at Brigham and Women's Hospital.

16   Q    Dr. Grassi, are you familiar with the organization called

17   Society of Interventional Radiology?

18   A    Yes.

19   Q    Can you tell us briefly what that organization is.

11:03:50  20   A    Society of Interventional Radiology is an international

21   organization and it works to educate, promote, and deal with

22   issues in the profession of interventional radiology.

23   Q    Are you a senior fellow of that organization?

24   A    Yes, I am.

11:04:09  25   Q    What does it mean to be a senior fellow of the Society of

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:04:12  1  Interventional Radiology?

2  A   To be a senior fellow, one must have achieved academically

3  and in medical practice certain parameters, and by application

4  and review with peers in the society, one submits an

11:04:34  5  application and then is accepted for that position.

6  Q   And for how many years have you been a senior fellow of

7  the Society of Interventional Radiology?

8  A   I would have to check the exact date, but it's been for

9  over 25 years now.

11:04:52  10  Q   Now, is the Society of Interventional Radiology sometimes

11  referred to by its acronym, SIR?

12  A   Yes, it is.

13  Q   Have you served on any committees over the years with the

14  SIR?

11:05:09  15  A   I have.  I've been a member of the Standards of Practice

16  Committee and also with the Technology Assessment Committee of

17  the SIR.

18  Q   And how long have you been a member of the Standards of

19  Practice Committee for the SIR?

11:05:25  20  A   Again, I have been, on a rotating basis, a member of that

21  committee per their policy for over about 20 years now.

22  Q   What does the Standards of Practice Committee for the SIR

23  do?

24  A   The Standards of Practice Committee directs itself to

11:05:51  25  educate, promote, and organize information for the society

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:05:59  1    members, that is interventional radiologists, as well as all

2    interventional radiologists on various topical areas in the

3    profession.

4    Q    Now, have you ever served as the chairperson of the

11:06:15  5    Standards of Practice Committee for the SIR?

6    A    Yes.

7    Q    In what time frame did you serve as the chairperson?

8    A    It was subsequent to 2002.

9    Q    Now, while you were the chairperson of the Standards of

11:06:31  10    Practice Committee, did that committee develop or publish any

11    guidelines regarding IVC filters?

12    A    Yes.  During the time period that we're talking about, and

13    that is prior to 2001, the SIR commissioned and developed the

14    guidelines for percutaneous permanent inferior vena cava

11:07:05  15    placement.

16    Q    Now, was that your first experience with IVC filters?

17    A    No, it wasn't.

18    Q    Tell us a little bit about your professional experience

19    with IVC filters over the years.

11:07:17  20    A    Well, as a diagnostic radiologist, which I am, I started

21    looking at IVC filters on an observational basis, and as an

22    interventional radiologist I have placed the devices, as well

23    as retrieved the optional retrievable type of filters in many

24    patients.

11:07:41  25    Q    Over the years, have you published articles concerning IVC

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:07:44   1   filters and venous thromboembolic disease?

2   A   Yes.

3   Q   Can you estimate for us approximately how many articles

4   regarding that device and disease state that you have

11:07:56   5   published?

6   A   It would be now approximately a dozen.

7           MR. NORTH:   If we could bring up Exhibit 7312.

8   BY MR. NORTH:

9   Q   Dr. Grassi, while you served as chairperson of the

11:08:26   10   Standards and Practices Committee for the SIR, did you and

11   your committee develop the guidelines that are now being shown

12   on the screen in front of you as 7312?

13   A   Yes, we did.

14   Q   And tell us what the official title of these guidelines

11:08:45   15   were.

16   A   The official title is Quality Improvement Guidelines for

17   Percutaneous Permanent Inferior Vena Cava Filter Placement for

18   the Prevention of Pulmonary Embolism.

19   Q   Prior to the development of these guidelines, were there

11:09:01   20   any guidelines for the placement of IVC filters?

21   A   Although there was certainly a lot of commentary in the

22   medical literature, hundreds and hundreds of articles on the

23   subject of IVC filters, there was no dedicated synopsis or

24   summary for practitioners or those who work with IVC filters

11:09:25   25   in the field.

DIRECT EXAMINATION - CLEMENT GRASSI, M.D.

11:09:28  1    Q    And were these guidelines eventually published?

       2    A    Yes, these were.

       3    Q    And where were they published, Doctor?

       4    A    They were published in the JVIR, which is the Journal of

11:09:39  5    Vascular and Interventional Radiology, which is the official

       6    journal and publication of the SIR.  That is, the Society of

       7    Interventional Radiology.

       8    Q    And do you consider the JVIR journal to be a reliable

       9    journal?

11:09:58  10   A    Yes, I do.

      11   Q    Are the articles that are published in that journal

      12   peer-reviewed?

      13   A    Yes.

      14   Q    Were you joined by another -- a number of other

11:10:10  15   interventional radiologists on this committee in developing

      16   these guidelines?

      17   A    Yes, I was.

      18   Q    Can you tell us briefly a little bit about the other

      19   members of the committee that worked with you on this project?

11:10:24  20   A    The other members were colleagues and very talented

      21   interventional radiologists from across the country who worked

      22   as a committee group for the development of these standards.

      23   Q    Tell us a little bit about the process of developing these

      24   standards.  How long did it take to do so?

11:10:51  25   A    Well, this was a rigorous process because, as one can

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:10:54  1    understand, the SIR, as an international committee, wanted the

2    committee to give its full efforts on this project.  It

3    extended over a minimum of 18 months.  It started with the SIR

4    staff looking for all of the available medical literature that

11:11:20  5    is by PubMed, Google Scholar, and other search engines.

6    Hundreds of articles were identified.

7              The committee then --

8              MR. JOHNSON:  Excuse me, Your Honor.  This is nowhere

9    contained in this expert's report; it's not in his deposition.

11:11:39  10             THE COURT:  Is it in the report, Mr. North?

11             MR. NORTH:  Yes, Your Honor.  Page 11, there's an

12    entire paragraph about the development of these standards.

13             THE COURT:  Could I get a copy, please.

14             Objection is overruled.  The testimony so far, I

11:12:22  15    believe, has been within the large middle paragraph on page 11

16    of the report.

17    BY MR. NORTH:

18    Q   At the time that the guidelines were being developed, were

19    there any retrievable filters available on the market?

11:12:43  20    A   No.  In this time frame, permanent vena cava filters were

21    the devices which we were using because the retrievable or

22    option type filters came later.

23    Q   As a part of this effort to develop the guidelines, did

24    you and your colleagues look at the medical literature

11:13:04  25    concerning complications and trackable events?

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:13:07  1    A    Yes, we did.

2    Q    And were complications and trackable events regarding

3    filters known to you and your colleagues at the time that you

4    were developing these guidelines?

11:13:23  5    A    Yes.  We were well familiar with them because of the fact

6    that there were complications or other events that had been

7    encountered by practicing interventional radiologists.

8    Q    What is the difference between complications and trackable

9    events?

11:13:44  10   A    Well, a complication as defined in the guidelines document

11   was an adverse event which would have a patient effect.

12              In the course of our going through, as you can

13   understand, this abundant scientific literature, there were

14   other parameters we studied, and it was the committee's

11:14:08  15   decision to call these trackable events because it must be

16   understood that they would be events that either might cause

17   an adverse event or might cause no adverse event for the

18   patient.  That is, the patient would be asymptomatic.

19              For the purpose of completeness of the paper, we felt

11:14:30  20   it was important to also include these in the publication.

21   Q    As a part of your paper, did you publish tables regarding

22   the complication rates and the trackable event rates?

23   A    Yes, we did.

24              MR. NORTH:  If we could -- let's go to the next page.

11:14:56  25              I'm sorry, the next page.

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:14:57  1      Your Honor, at this time we would like to have

2      permission to talk about the content of this pursuant to

3      803(18).  We may separately move for admission of the entire

4      document at the conclusion of the testimony.

11:15:15  5      THE COURT:  Well, I don't know what you're asking

6      when you say "talk about."

7      MR. NORTH:  I would like to tender this as an exhibit

8      with the understanding right now that it's coming in under

9      803(18).  It would come in under that and therefore could not

11:15:27  10     be displayed to the jury.

11     THE COURT:  803(18) doesn't allow it to be displayed.

12     Are you asking it be displayed?

13     MR. NORTH:  No.  No.

14     THE COURT:  What do you mean when you say you're

11:15:37  15     tendering it as an exhibit?

16     MR. NORTH:  Well, to be able to have him talk about

17     the content of the document.

18     THE COURT:  So you want to ask him questions about

19     the content of the table?

11:15:47  20     MR. NORTH:  Exactly.

21     MR. JOHNSON:  No objection, Your Honor.

22     THE COURT:  All right.

23     MR. NORTH:  Thank you, Your Honor.

24     BY MR. NORTH:

11:15:53  25     Q   If we look at table 1 in this document, what does this

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:15:59  1    table list?

2    A    This table lists different complications which have been

3    reported in the literature and associated with patients who

4    have received inferior vena cava filters.

11:16:16  5    Q    And how did your committee go about determining what had

6    been reported in the literature?

7    A    Well, from the hundreds of articles which I've mentioned,

8    the group of articles was reviewed by the committee and

9    summarized or boiled down to a more select group of citations

11:16:35 10   and references.  We grouped these which we felt were the most

11   pertinent to the document.  And those are some of the

12   citations and references in the parenthesis that you see

13   listed.

14   Q    What -- you list by these various complications reported

11:16:54 15   rates.  Are those the ones that you saw in the medical

16   literature?

17   A    Yes.  Correct.

18   Q    And then you also list for each complication a threshold

19   percentage.  What is that?

11:17:08 20   A    That is, in the context of the document, a threshold

21   number which we included in order to be helpful and useful to

22   those who work with inferior vena cava filters.

23        So as stated in the text portion of this document,

24   the numbers that you see under the threshold would be used by

11:17:30 25   an individual working with IVC filters, such as an

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:17:35   1   interventional radiologist, and that would trigger that person

2   to see if in his or her practice they should conduct their own

3   quality assurance or further review as to the types of

4   complications that was occurring.  And we felt this was

11:17:51   5   necessary for patient safety.

6   Q   And in the committee's investigation, what did you

7   determine were the reported rates of death associated with IVC

8   filters?

9   A   The reported rate was 0.12 percent.

11:18:14   10   Q   Did you also determine reported rates for filter

11   embolization?

12   A   Yes.

13   Q   What is filter embolization?

14   A   Filter embolization would be a movement with –– abnormal

11:18:27   15   movement of the filter device to a different location than its

16   intended position.

17   Q   Would that include migration of the filter to the heart?

18   A   Yes.

19   Q   And what did you see as the rate –– reported rate, you and

11:18:43   20   your committee, of filter embolization in the literature?

21   A   2 to 5 percent.

22   Q   If we could look at table 2, please.

23       And what does table 2 present as a part of the SIR

24   guidelines?

11:19:09   25   A   Table 2 represents other trackable events.  And as I had

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:19:14  1   mentioned earlier, these would be events which, for

2   completeness of the paper, we included.  They may have been

3   associated in the world literature with an event from a

4   patient or they may be things which were observed

11:19:29  5   scientifically, but the patient had suffered no injury and had

6   no symptoms or signs.

7   Q    And, again, did you look at -- did you and your committee

8   look at the medical literature to determine the reported rates

9   for each of these trackable events?

11:19:47  10  A    Yes, we did.

11  Q    And what did you determine was the reported rate for

12  fracture of filters?

13  A    The reported rate for fracture was between 2 and

14  10 percent.

11:20:06  15  Q    Did you determine a reported rate for migration?

16  A    Yes.  Between zero and 18 percent.

17  Q    And did you determine a reported rate for IVC penetration?

18  A    Yes.  Zero to 41 percent.

19  Q    Did your committee -- did you and your committee make any

11:20:30  20  observations as to whether penetration and migration events

21  were customarily significant from a clinical perspective?

22  A    The committee recognized, since it was composed of

23  practicing interventional radiologists, that these are

24  commonly observed events, seen when inferior vena cava filters

11:20:55  25  are used.

DIRECT EXAMINATION - CLEMENT GRASSI, M.D.

11:20:59  1   Q   Do you know what -- in determining the reported rates for

2   filter fracture, what medical articles you cited for that?

3   A   Well, originally there were many articles referred to, and

4   two articles were cited here on table 2 for filter fracture,

11:21:23  5   references number 17 and 24.

6        MR. NORTH:  Could we look at the final page at what

7   those articles were, the citations.

8        Let's go back one page, please.

9   BY MR. NORTH:

11:21:38  10   Q   What is citation 17 that the committee cited as a basis

11   for -- one of the bases for the reported rates for fracture of

12   2 to 10 percent in filters?

13   A   That would be the article written with the first author,

14   Dr. Ernest Ferris, and others, titled Percutaneous Inferior

11:22:03  15   Vena Cava Filters, a Followup of Seven Designs in 320

16   Patients.

17   Q   Are you familiar with that article?

18   A   Yes, I am.

19        MR. NORTH:  Could we show 7002 to the witness,

11:22:23  20   please.

21        7002.

22   BY MR. NORTH:

23   Q   Is this a copy of the Ferris article we just referenced?

24   A   Yes.

11:22:34  25   Q   If we could turn to table 2 in that article.

DIRECT EXAMINATION - CLEMENT GRASSI, M.D.

11:22:45  1    Did the Ferris -- well, first of all, where was the

2  Ferris article published, do you know?

3  A    Yes.   That was published in the Journal of Radiology, the

4  so-called Gray Journal of radiology, which is the major

11:22:58  5  publication for the Radiological Society of North America,

6  commonly referred to as the RSNA.

7  Q    And do you consider that a reliable journal?

8  A    Yes, most definitely.

9  Q    Are the articles published in that journal peer-reviewed?

11:23:16  10  A    Yes.

11  Q    Now, in reviewing various types of filters, do you know

12  what these abbreviations Dr. Ferris is using for, let's say,

13  BN-1?

14  A    Yes, I do.

11:23:36  15  Q    What is that?

16  A    That would be the so called Bird's Nest or Gianturco-Roehm

17  Bird's Nest filter version number 1.

18  Q    And what fracture rate did he find for the Bird's Nest?

19  A    A rate of 4 percent is reported.

11:23:56  20  Q    And what is the BN-II?  Is that another Bird's Nest?

21  A    Correct.   The Bird's Nest filter version number 2.

22  Q    And what did he find in his study the fracture rate for

23  the Bird's Nest II filter to be?

24  A    3 percent.

11:24:16  25  Q    Do you know what the A filter is referring to?

DIRECT EXAMINATION - CLEMENT GRASSI, M.D.

11:24:19  1   A   That refers to the so-called Amplatz filter, which is not

2   clinically used.  That is, in use today in the United States.

3   Q   And do you know what he was referring to with the N

4   abbreviation?

11:24:36  5   A   Yes, I do.  That's a short abbreviation for the

6   Simon Nitinol filter.

7   Q   Doctor, tell us what Dr. Ferris found as the fracture rate

8   in his study for the Simon Nitinol filter.

9   A   The fracture rate is 12 percent.

11:24:55  10   Q   Is that higher than the range reported in the SIR

11   guidelines?

12   A   It is slightly higher because, as we've seen previously,

13   the range was cited as up to 10 percent.  And that is

14   basically because the committee felt in viewing ranges that

11:25:17  15   the most common range that we observed was up to approximately

16   10 percent.  So it is slightly higher in the exact number.

17   Q   Did the Ferris article in table 2 also discuss various

18   rates of -- reported rates of IVC penetration by various

19   filters?

11:25:37  20   A   Yes, it did.

21   Q   And what did it report to be the penetration rate for the

22   Simon Nitinol filter?

23   A   The Simon Nitinol filter penetration rate is reported at

24   33 percent.

11:25:51  25   Q   And, again, what did the SIR guidelines that you

DIRECT EXAMINATION - CLEMENT GRASSI, M.D.

11:25:55  1   spearheaded the development for, what did they report as the

2   reported rate for IVC penetration?

3   A   That range, as I remember from our previous table, this

4   number in the -- in the range reporting.

11:26:18  5   Q   Were these complications and trackable events that you

6   reported about in the SIR guidelines, were they known to you

7   in the medical community prior to developing those guidelines?

8   A   Yes, they were.

9   Q   Are those, the potential for those complications and

11:26:41  10  adverse events, taught to residents and fellows as a part of

11  their medical training?

12  A   They are, and I was one of those persons, since I've

13  worked in academic hospitals, who had the privilege of working

14  with residents and fellows and trainees.  And so we would go

11:27:00  15  through these numbers and this data with them to help with

16  teaching.

17  Q   What happened once your committee developed a draft of

18  these guidelines?

19  A   Once a draft was produced by the committee -- and I might

11:27:18  20  say this method included telephone conversations, in-person

21  meeting at two national annual society meetings -- the draft

22  was then submitted to the executive committee of the SIR.

23  Simultaneously, the guidelines were posted on the SIR website.

24  Commentary was invited.

11:27:45  25          This was accessible to SIR members, that is

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:27:49  1    interventional radiologists, non-SIR members, and basically

2    anyone working with IVC filters who would like to read about

3    it on the website.

4            After the commentary, the comments were collected and

11:28:05  5    the guidelines draft, plus commentary, was passed on then to

6    the JVIR, which I mentioned is the official journal.  And that

7    was reviewed by the editor and his staff among peers.

8    Q    So was the article peer-reviewed before it was published?

9    A    Yes, it was.  In addition to our committee reviewing it.

11:28:29 10    Q    And you say it was made accessible to the members of the

11    SIR.  Can you tell us approximately how many radiologists --

12    interventional radiologists belong to the organization?

13    A    Yes.  Well, thinking back to the time period of about

14    2001, at the time of the guidelines, there were over 5,000

11:28:50 15    members.

16    Q    And in what year were these guidelines published, Doctor?

17    A    They were published in 2001.

18    Q    Does membership in the SIR entitle you to a free

19    subscription to the JVIR?

11:29:07 20    A    It does because members previously received a print

21    version of the journal as well as online access.

22    Q    So would all 5,000-plus members of the Society of

23    Interventional Radiology at the time in 2001 that your

24    guidelines were published, would they have received a copy of

11:29:31 25    the Journal of Vascular and Interventional Radiology

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:29:35   1   publishing those guidelines?

2   A   Yes, that's right.

3   Q   Doctor, has the SIR updated those guidelines since 2001?

4   A   Yes, they have.

11:29:46   5   Q   Were the ones that you were the chairperson of the

6   committee and developing, were those republished in 2003?

7   A   That's correct.  In what was called a supplement to JVIR,

8   they were published once again.

9   Q   And was the most recent update published in 2017?

11:30:09  10   A   Yes.

11   Q   Dr. Grassi, were the SIR guidelines ever intended to

12   establish acceptable thresholds for IVC filter complications?

13   A   No.  The purpose of the committee and of the guidelines

14   document was to educate, inform, and basically summarize

11:30:31  15   information for those working with IVC filters.  We felt that

16   by publishing this information it would be very helpful to

17   those practitioners.

18   Q   And what was your committee's expectation as to how the

19   guidelines would be utilized once they were published?

11:31:04  20   A   We intended that they would be a resource to anyone

21   working with IVC filters, and specifically for interventional

22   radiologists it would allow them to look at our numbers,

23   review their own practice, and see, practically speaking, if

24   there was any reason for them to do their own personal quality

11:31:31  25   review and whether it was necessary for them to review their

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:31:38  1    day-to-day practice.

2              MR. NORTH:  Could we display 6842.

3    BY MR. NORTH:

4    Q    Do you recognize the document that is being displayed in

11:32:00  5    front of you, 6842?

6    A    Yes.

7    Q    And what is this?

8    A    This is the joint ACR, SIR, and SPR –– ACR stands for the

9    American College of Radiology, a major radiological

11:32:19  10   organization.  SIR, we've talked about.  And SPR is the

11   Society of Pediatric Radiology.  These are practice parameters

12   for the performance of inferior vena cava placement for the

13   prevention of pulmonary embolism.

14   Q    And are these essentially an update of the guidelines you

11:32:40  15   first published in 2001?

16   A    Yes.

17             MR. NORTH:  And let's go to the next page, if we

18   could.

19             Let's go to the last page, if we could.

11:32:51  20             Back one.

21   BY MR. NORTH:

22   Q    Doctor, I'm having a hard time finding it.  Where is the

23   list of authors?  Would that be at the conclusion before the

24   citations?

11:33:04  25   A    I believe you have it displayed now.

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:33:12  1   Q   The Comments Reconciliation Committee, what would that

2   have been?

3   A   That would be the committee that dealt with this document.

4   To put this in a little bit of context, the ACR, American

11:33:31  5   College of Radiology, would draw on the expertise of SIR

6   members such as myself in formulating these documents.  So

7   this group of doctors with the names listed would have

8   reviewed and then also looked at comments and incorporated

9   those comments in the final document.

11:33:55  10         MR. NORTH:  If we could go back one page, I believe

11   there's another list.

12   BY MR. NORTH:

13   Q   Does this provide the names of various physicians who

14   worked -- from all of these different organizations that

11:34:11  15   worked on these guidelines?

16   A   Yes, it does.

17   Q   From the SIR, would it have been the practice -- Standards

18   and Practices Committee that you had formerly been the chair

19   of?

11:34:28  20   A   Yes.  The ACR committee would have drawn on interventional

21   radiologists, as I mentioned, with their names included in

22   this second paragraph, as well as elsewhere, and they made use

23   of their input in formulating the ACR document proper.

24   Q   And where were these guidelines, or parameters, as they're

11:34:56  25   called, published?

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:34:58  1   A    This goes out as a separate publication, as I understand,

2   in booklet from the American College of Radiology.  So it is a

3   stand-alone publication on practice parameters as a guide to

4   doctors and those working with these procedures.

11:35:17  5   Q    Would you consider this to be a peer-reviewed publication?

6   A    Yes.

7   Q    And would you consider the American College of

8   Radiologists as the publisher of these guidelines to be a

9   reliable source?

11:35:31  10  A    Yes, they are.

11  Q    If we could look back, I believe there is a table 1 and

12  table 2 in this article.

13       Did this particular group updating these guidelines

14  also look at complications reported in the literature?

11:36:00  15  A    Yes.

16  Q    And did they publish a similar table than the one you had

17  published?

18  A    Yes, it is.

19  Q    And did they publish a reported rate for death involving

11:36:14  20  IVC filters?

21  A    Yes.

22  Q    Was it -- did it differ from the rate that you had

23  published in your guidelines 16 years earlier?

24  A    No, it doesn't.  It is also 0.12 percent.

11:36:31  25  Q    And did they also set forth a threshold for death in these

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:36:38  1    guidelines?

2    A    Yes, they did.  They set a threshold of less than

3    1 percent.

4    Q    And then if we could look at table 2 in the 2017

11:36:54  5    parameters.

6         What did the authors in the updated parameters or

7    guidelines identify as the reported rate of filter fracture in

8    the medical literature review?

9    A    Yes.  They reported a filter fracture rate with a range of

11:37:16  10   zero to 50 percent.

11   Q    And what rate did they report in these 2017 guidelines for

12   migration of the filter?

13   A    The rate of migration of the filter is reported at zero to

14   25 5 percent.

11:37:38  15   Q    And at what rate did they report regarding IVC

16   penetration?

17   A    The reported rate of IVC penetration is zero to

18   100 percent.

19   Q    Are these reported rates based on all types of filters or

11:37:53  20   just certain filters?

21   A    These would be based on a variety of many different

22   filters.

23   Q    And do these updated guidelines, with the advent of

24   retrievable filters, do they include both permanent and

11:38:11  25   retrievable filters?

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:38:13  1   A   Well, our original guidelines were geared, as I mentioned,

2   to permanent inferior vena cava filters.  And it's my

3   understanding from this document, and I would have to

4   double-check the exact date, that these dealt with permanent

11:38:34  5   filter devices, or at least with the filters available as of

6   the exact date of this publication.

7   Q   And would retrievable filters have been available as of

8   that date?

9   A   Well, you'd have to actually help me out on the reference

11:38:52  10   date of this particular document.

11           MR. NORTH:  Let's look at the final page of this.

12           Go back one.

13   BY MR. NORTH:

14   Q   Let's look at, for example, number 9.  Reference number 9.

11:39:33  15           That includes a citation to an article dealing with

16   retrievable filters; correct?

17   A   Yes, it does.

18           So that our having double-checked -- and thank you --

19   this document would include permanent devices but would also

11:39:50  20   by its date include by incorporation retrievable type IVC

21   filters.

22   Q   Doctor, have you reviewed the references in the 2017

23   parameters here that we've been looking at?

24   A   I have either seen, read, or encountered many of the

11:40:19  25   articles and citations which are referenced, yes.

DIRECT EXAMINATION – CLEMENT GRASSI, M.D.

11:40:26  1  Q   Do you know whether any of the articles talking about

2  fracture and reporting a rate of zero to 50 percent involve

3  the Bard G2 filter?

4  A   Yes.  They would include the Bard G2, as well as others.

11:40:42  5  Q   Now, you had told us that the American College of

6  Radiologists was involved in this particular parameters being

7  developed.

8  A   Correct.

9  Q   Do you know approximately how many members, doctors or

11:40:57 10  physicians, belong to the American College of Radiology?

11  A   I would have to check myself as to the exact number, but

12  just to give you an estimate, the American College of

13  Radiology, since it includes thousands of diagnostic

14  radiologists as well as interventional radiologists, would be

11:41:19 15  even a larger society group than the SIR.

16  Q   And would this particular parameter -- parameters, as a

17  separate publication, have been distributed to all of those

18  physicians that belong to that organization?

19  A   Yes.  These parameters in print or electronic form would

11:41:41 20  be available to all American College of Radiology members.

21  Q   Doctor, do you hold the opinions you've given today to a

22  reasonable degree of medical certainty?

23  A   Yes.

24  Q   And do you charge us an hourly rate for your consultation

11:41:58 25  in this matter?

CROSS-EXAMINATION – CLEMENT GRASSI, M.D.

11:42:01  1   A    Yes.

2   Q    And what is that rate?

3   A    A rate of $350 an hour.

4   Q    Thank you, Doctor.

11:42:08  5            MR. NORTH:  Your Honor, we would tender as

6   substantive evidence the SIR guidelines, 7312.

7            THE COURT:  You're moving them into evidence?

8            MR. NORTH:  Yes, Your Honor.

9            MR. JOHNSON:  Judge.  We object.  803(18) does not

11:42:22 10   permit the admission of these into evidence.

11            THE COURT:  What's your response, Mr. North?

12            MR. NORTH:  My response is, Your Honor, and I know

13   the Court hasn't seen the brief yet, they're not being offered

14   for the truth of the matter asserted, they're being offered to

11:42:33 15   show the general notice and knowledge in the medical

16   community, and therefore are not hearsay.

17            THE COURT: All right.  I'm not going to admit it at

18   this point.  I'll be happy to hear you further on that issue.

19            MR. NORTH:  Thank you, Your Honor.

11:42:52 20            THE COURT:  Cross-examination?

21            MR. JOHNSON:  Yes, sir.

22                 C R O S S - E X A M I N A T I O N

23   BY MR. JOHNSON:

24   Q    Good morning, sir.

11:42:59 25   A    Good morning.

CROSS-EXAMINATION – CLEMENT GRASSI, M.D.

11:42:59  1   Q   You indicated you are charging $350 per hour for your

2   time?

3   A   Yes.

4   Q   And are you able to tell us how much you have charged Bard

11:43:07  5   for all of your work in the filter litigation?

6   A   Well, I can update you as to the most recent billing,

7   which encompassed a period of over a year for many different

8   cases, and that was this past year, and that was a total for

9   medical records, chart review, image review, and multiple

11:43:33 10   other patients, total of $39,212.

11   Q   Well, sir, you've been doing this work for Bard for many,

12   many years, haven't you?

13   A   To the best of my memory, since approximately 2010.

14   Q   And are you able to tell us what the total amount of

11:43:55 15   compensation you've earned since 2010 to the present?

16   A   No, Counselor.  I'd have to actually go back and check

17   those records.  I don't have that total amount memorized, but

18   I think I gave you at least an estimate of what the recent

19   billing has been.

11:44:13 20   Q   All right.  So you know that this litigation involves the

21   Bard G2 filter?

22   A   Yes.

23   Q   We're here to talk about Bard, not other filters.  Do you

24   know that?

11:44:23 25   A   Yes, I do.

CROSS-EXAMINATION - CLEMENT GRASSI, M.D.

11:44:24  1   Q   And are you aware that there has never, ever been a

2   determination that the Bard G2 filter is safe or effective?

3   A   Well, I'm not aware of that.  What I can say --

4   Q   Sir, yes or no?

11:44:43  5   A   Could you just repeat the question, please.

6   Q   Sure.  Are you aware that there has never been a

7   determination by the FDA or any source that the Bard G2 filter

8   is safe and effective?

9        MR. NORTH:  Objection.  Outside the scope of direct.

11:44:58  10       THE COURT:  Overruled.

11        And, Doctor, answer yes or no if you can.  If you

12   cannot, just tell Mr. Johnson you cannot answer it yes or no.

13        THE WITNESS:  Yes.  Thank you.

14        I'd have to say I cannot answer that, and I can

11:45:13  15   elaborate if you wish.

16        MR. JOHNSON:  Okay.

17        Greg, can you locate Exhibit 6842 and just publish it

18   to the witness.

19        And if you would go to page 2 of that exhibit.

11:45:36  20   BY MR. JOHNSON:

21   Q   Sir, you're familiar with this document?  That's the

22   recent and current guidelines regarding filters.

23   A   Yes.

24   Q   And do you see about three quarters of the way down where

11:45:49  25   it says, "Although retrievable filters are often placed as

CROSS-EXAMINATION - CLEMENT GRASSI, M.D.

11:45:54  1   permanent devices, no long-term safety and efficacy of these

2   devices as a class" --

3            THE COURT:  I think you -- I think you misread that,

4   Mr. Johnson.  Why don't you try it again.

11:46:07  5            MR. JOHNSON:  Oh, I'm sorry.

6   BY MR. JOHNSON:

7   Q   "The long-term safety and efficacy of these devices as a

8   class have not been established."

9   A   I would agree with your reading of that sentence.

11:46:28 10   Q   So there has never been a determination of efficacy and

11   safety for the Bard G2 filter.  Agreed?

12   A   No, sir, only because it's my understanding as in the U.S.

13   all filter devices must be accepted.  There is a presentation

14   of data for safety, efficacy --

11:46:55 15            MR. JOHNSON:  Judge, this is going outside of the

16   scope of my question.  I object.

17            THE WITNESS:  -- for the USFDA --

18            MR. JOHNSON:  Sir --

19            THE COURT:  Hold on just a minute, sir.

11:47:06 20            Overruled.

21            Next question.

22            MR. JOHNSON:  Yes, sir.

23   BY MR. JOHNSON:

24   Q   With regard to the SIR guidelines that you were a part of,

11:47:18 25   that article itself is not a Level 1 article, is it?

CROSS-EXAMINATION – CLEMENT GRASSI, M.D.

11:47:28  1   A   That article is a guideline by consensus committee so that

2   in the sense that you're using, usually the term Level 1

3   evidence applies to clinical trials.  So that would be a

4   committee consensus document.

11:47:49  5   Q   All right.  Not a Level 1 study; correct?

6   A   When -- when using the term in the sense that I believe

7   you're meaning, yes.

8   Q   All right.  And reference was made to the Ferris article,

9   which is a part of the article you were the lead author on.

11:48:05  10  Do you remember that?

11  A   I do.

12  Q   The Ferris article is not a Level 1 study either, is it?

13  A   The Ferris article is a center or multi-center type, so

14  would not be considered Level 1 because, to the best of my

11:48:27  15  knowledge, it did not start as a randomized clinical trial.

16  Q   All right.  So the short answer to my question is it is

17  not a Level 1 study.

18  A   Correct.

19  Q   And the Ferris article did not study any retrievable

11:48:42  20  filter, did it?

21  A   That's true.

22  Q   That is, it studied old technology compared to the G2

23  filter, for example.

24  A   Well, it studied permanent inferior vena cava filters,

11:48:57  25  that's correct.  I would not myself consider permanent

CROSS-EXAMINATION – CLEMENT GRASSI, M.D.

11:49:02  1    inferior vena cava filters to be old because they're still in

2    clinical use.

3    Q    All right.

4         And with regard to all of the medical literature that

11:49:12  5    your committee looked at with respect to table 1 and table 2,

6    none of those articles involved Level 1 studies, did they?

7    A    I would have -- actually have to check back to see whether

8    there were any citations in the multitude of references that

9    were Level 1 evidence.  But I think I can say this:  That

11:49:40  10   many, many of the citations in that article, that's correct,

11   were not, strictly speaking, Level 1.

12   Q    All right.

13        And with regard to your work with that committee that

14   published that article, did Bard provide you or your committee

11:49:57  15   members with any internal information?

16   A    No, they did not.

17   Q    And with regard to all of the literature that you've

18   reviewed as an expert in this case, have you seen any

19   indication that Bard has provided any authors with any

11:50:13  20   internal information?

21   A    I do not personally know of internal or proprietary

22   information that was provided to authors.  I can only speak

23   for myself personally.

24   Q    With regard to the complication rates that are found in

11:50:35  25   table 1 of your article, can we agree that complications are

CROSS-EXAMINATION – CLEMENT GRASSI, M.D.

11:50:41  1   highly dependent upon and influenced by patient selection?

2   A   No, I don't think I could completely agree with that

3   statement.

4   Q   Would you agree that the complication rates are highly

11:50:58  5   dependent upon patient selection?

6   A   No, I don't believe I could agree completely with that

7   statement, only because of the fact that patient selection is

8   one factor, and the rate of complications depends, in

9   fairness, on a variety of factors:  The device, the scenario

11:51:20  10   of the inferior vena cava placement, and others.

11   Q   Okay.  So it also depends on the particular device used;

12   correct?

13   A   It would.

14   Q   All right.

11:51:30  15        With regard to the other trackable events that you

16   mentioned, can we agree that the data in that table represents

17   reported outcomes from various publications and not the SIR

18   standard for complications?

19   A   The article does represent the literature at the time in

11:51:57  20   2001 which was reported in medical publications, yes.

21   Q   But it does not represent the SIR, the Society of

22   Interventional Radiology, standard for complications.  You

23   would agree with that?

24   A   No, I wouldn't, sir, only because the SIR official

11:52:19  25   publication as of the year of 2001 was the guidelines for

CROSS-EXAMINATION – CLEMENT GRASSI, M.D.

11:52:26  1    percutaneous filter placement.

2    Q    What about as of 2016?  Would you agree that the trackable

3    events are not the SIR standards for complications?

4    A    As of 2016, again, in fairness, the events and trackable

11:52:47  5    events would be those reported in the most recent SIR

6    guidelines from the committee, which, as you know, was

7    updated.

8    Q    All right.

9          MR. JOHNSON:  Greg, would you pull up Exhibit 6842,

11:53:02  10   page 13.

11   BY MR. JOHNSON:

12   Q    Let's read the language under table 2, the other trackable

13   events.  Let's read that together, okay?

14   A    Yes.

11:53:18  15   Q    All right.

16          It says, "The data in the table represents reported

17   outcomes from various publications."

18          Did I read it correctly so far?

19   A    Yes.

11:53:30  20   Q    And here's the ending:  "And not the SIR standard for

21   complications."

22          Did I read that correctly?

23   A    Yes, you did.

24   Q    Okay.  So this is not the SIR standard for complications.

11:53:46  25   Agreed?

CROSS-EXAMINATION – CLEMENT GRASSI, M.D.

11:53:49  1    A   I have to answer that question as a relative no because,

2    by way of explanation, the SIR guidelines and the publications

3    by the SIR were intended, as I had described earlier, to be

4    educational, informative, and helpful for those working with

11:54:12  5    IVC filters.

6         The goal was not to create a specific, rigid,

7    definitive threshold; it was to help practitioners.

8         And so in the sense of your question to me I would

9    have to say that the guidelines are just that, they're a

11:54:32  10   series of guidelines.

11   Q   All right.  And these guidelines did not imply that the

12   rates in the ranges referenced were fine, acceptable, or okay.

13   Do you agree with that?

14   A   Well, I can only say that the ranges referenced were those

11:54:54  15   what we had found, what were in the medical literature, what

16   we as physicians in the field experienced, and what our

17   colleagues experienced.  And so in that regard, we relied on

18   published data and we relied on our own day-to-day practical

19   experience with patients.

11:55:20  20   Q   Tell you what, let's see what you had to say about that in

21   August of 2014 at page 524 of your deposition.

22        MR. JOHNSON:  May I publish it, Your Honor?

23        THE COURT:  To the witness.

24        MR. JOHNSON:  Yes.

11:55:34  25        THE COURT:  Just to the witness.

CROSS-EXAMINATION – CLEMENT GRASSI, M.D.

11:55:36 1          Oh, you mean generally?

2          MR. JOHNSON:  Yes.

3          THE COURT:  Oh, it's a video?

4          MR. JOHNSON:  It is.

11:55:44 5          THE COURT:  You may.

6       (The following video testimony was played:)

7          THE WITNESS:  "And certainly I can say that in the

8  quality improvement guidelines for IVC filter placement

9  through the SIR, for which I was the first author, we did not

11:55:58 10  imply that rates in that range are fine or acceptable or okay.

11  We simply said that those were trackable events and that

12  responsible individuals should look at any adverse event,

13  trigger a review, and do a quality assurance monitoring to

14  make sure that they understand some of the root causes behind

11:56:26 15  such a serious problem."

16  BY MR. JOHNSON:

17  Q    Do you remember giving that answer?

18  A    I do.

19  Q    Okay.  And would you agree with me that the SIR guidelines

11:56:38 20  do not create safety thresholds for filters that relate to

21  embolization, tilt, perforation, fracture, and the inability

22  to remove the filter?

23  A    I can certainly say that the guidelines have attempted and

24  I think in a very reasonable way have documented what our

11:57:08 25  total considered experience was in this field.

CROSS-EXAMINATION – CLEMENT GRASSI, M.D.

11:57:13   1          As I mentioned on the video, our intent was to be

2     informative, instructive, and to offer these as a set of

3     guidelines for those working with vena cava filters.  And the

4     guidelines are what they are.

11:57:25   5     Q   All right.  Let's go back to your deposition given on

6     September 24 of 2014 at page 770.

7              MR. JOHNSON:  With the Court's permission, I'd like

8     to play that video.

9              THE COURT:  You may.

11:57:37  10      (The following video testimony was played:)

11             QUESTION:  "Just so we're clear, that exhibit and the

12     committee that you're a part of did not create safety

13     thresholds with respect to the filters study that relate to

14     perforation, fracture, migration, tilt, or the inability to

11:58:04  15     remove the filter.  Is that correct or not correct?"

16             ANSWER:  "Yes, that's fair."

17     BY MR. JOHNSON:

18     Q   Do you recall that answer to that question?

19     A   I do in the context of the question which was asked of me.

11:58:21  20     Q   All right.  And would you agree with me that the SIR

21     guidelines are not intended as an instruction manual for

22     filter manufacturers like Bard?

23     A   They were not an information for users manual or an

24     instruction manual.  I think that that's clear.  They were a

11:58:44  25     set of guidelines drawn up by the SIR in a committee to those

CROSS-EXAMINATION – CLEMENT GRASSI, M.D.

11:58:50   1   working with filter devices --

2   Q   They're not -- I'm sorry.

3   A   -- so in answer to your question, that's correct, they

4   were not an instruction manual.

11:59:01   5   Q   They were not to be used by manufacturers like Bard;

6   correct?

7   A   Well, I can't offer an opinion on that.  The SIR

8   guidelines are widely available online and in print.  It's not

9   for me to say who should or should not use them.  And

11:59:19  10   certainly by way of education or to be informative in the

11   field, anyone could read them.

12   Q   Let's see what you had to say back in July --

13          THE COURT:  Mr. Johnson, we'll do that after lunch.

14   We've reached the 1 o'clock -- I'm sorry, the noon hour.

11:59:33  15          Ladies and gentlemen, we will break now and resume at

16   1 o'clock.

17       (The jury exited the courtroom.)

18          THE COURT:  Please be seated.

19          Counsel, I understand that we don't have the

12:00:09  20   redactions on the exhibits yet that you all have been working

21   on.  I understand defendants have identified some and are

22   waiting for plaintiffs.

23          Just an update on where that is, please.

24          MS. MATARAZZO:  Yes, Your Honor.

12:00:23  25          We went back and forth on the first round of

12:00:26  1   redactions and we have a couple of sticking points that I

2   wasn't able to work out or had time to work out with Mr. North

3   yesterday.  And then we provided also some redactions on

4   Sunday night for some of the exhibits we knew were going to be

12:00:40  5   an issue yesterday and we haven't heard back on those yet.  So

6   we're working it out.

7         I do have a list of six -- sorry, five exhibits that

8   we don't have any objections on and they can just go in as-is.

9   And I can either tell you those now or --

12:00:54  10        THE COURT:  No, I don't think you need to tell me

11   those now.  I just want to make sure that we're staying on

12   this.  Because what we don't want to do is have this come up

13   on Wednesday when we're about to close and have to deal with

14   those issues.  So if you could try to work it out, say, by

12:01:09  15   tomorrow morning.  That way, if there's something for me to

16   rule on, we'll know.

17        MS. MATARAZZO:  Yes, Your Honor.  That's what we're

18   planning to do.

19        THE COURT:  Okay.

12:01:16  20        And for your information, this morning -- well, I

21   haven't allocated any time in the deposition.  But short of

22   that, plaintiff has used 33 minutes and the defense has used

23   two hours and seven minutes.  Subject to some reallocation in

24   the deposition, I presume.

12:01:39  25        All right.  See you at 1 o'clock.

12:01:43  1            (Recess taken at 12:02.)

          2            (End of a.m. session transcript.)

          3                             *  *  *  *  *

          4

          5

          6

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1                    **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion

9   of the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control, and to the best

12  of my ability.

13

14         DATED at Phoenix, Arizona, this 27th day of March,

15  2018.

16

17

18

19

20                            s/ Patricia Lyons, RMR, CRR
                              Official Court Reporter
21

22

23

24

25