1                    **UNITED STATES DISTRICT COURT**

2                      **FOR THE DISTRICT OF ARIZONA**

3                        _____

4    **In Re: Bard IVC Filters**          )   MD-15-02641-PHX-DGC
     **Products Liability Litigation**    )
5                                         )   Phoenix, Arizona
                                          )   **March 30, 2018**
6    _____)
     **Sherr-Una Booker, an individual,**  )
7                                         )
                       Plaintiff,         )
8                                         )   CV-16-00474-PHX-DGC
             v.                           )
9                                         )
     **C.R. Bard, Inc., a New Jersey**     )
10   **corporation; and Bard Peripheral**  )
     **Vascular, Inc., an Arizona**        )
11   **corporation,**                      )
                                          )
12                     Defendants.        )
     _____)

13

14

15       **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16         **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

17              <u>**TRIAL DAY 12 (VERDICT)**</u>

18                (Pages 2571 - 2620)

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

1                         **A P P E A R A N C E S**

2      For the Plaintiff:

3              Lopez McHugh
               By: **RAMON ROSSI LOPEZ**, ESQ.
4              100 Bayview Circle, Suite 5600
               Newport Beach, CA  92660

5
               Gallagher & Kennedy
6              By: **MARK S. O'CONNOR**, ESQ.
               2575 East Camelback Road, Suite 1100
7              Phoenix, AZ  85016

8              Heaviside Reed Zaic
               By: **JULIA REED ZAIC**, ESQ.
9              312 Broadway, Ste. 203
               Laguna Beach, CA  92651

10
               Watkins Lourie Roll & Chance, PC
11             By: **ROBIN P. LOURIE**, ESQ.
               Tower Place 200
12             3348 Peachtree Rd. NE
               Atlanta, GA  30326

13
               Faraci Lange, LLP
14             By: **HADLEY L. MATARAZZO**, ESQ.
               28 E. Main St., Ste. 1100
15             Rochester, NY  14614

16

17     For Defendants:

18             Nelson Mullins Riley & Scarborough
               By: **RICHARD B. NORTH, JR.**, ESQ.
19             By: **ELIZABETH C. HELM**, ESQ.
               By: **BRANDEE J. KOWALZYK**, ESQ.
20             201 17th Street NW, Suite 1700
               Atlanta, GA  30363

21
               Snell & Wilmer
22             By: **JAMES R. CONDO**, ESQ.
               400 East Van Buren
23             Phoenix, AZ  85004

24

25

1                          **I N D E X**

2                             **EXHIBITS**

3        <u>**NUMBER**</u>     <u>**DESCRIPTION**</u>                        <u>**PAGE**</u>

4        3572      Securities and Exchange              2584
                   Commission Form 10-K for C.R.
5                  Bard, Inc. for the fiscal
                   year ended December 31st,
6                  2016

7        3573      Securities and Exchange              2584
                   Commission Form 10-Q for C.R.
8                  Bard, Inc. for the quarterly
                   period ended September 30th,
9                  2017

10       3574      Securities and Exchange              2584
                   Commission Schedule 14A,
11                 Definitive Proxy Statement
                   for C.R. Bard, Inc., dated
12                 Mar. 15, 2017

13

14       Video Testimony of Medhi Saadeh               2585

15

16       Plaintiff Argument by Mr. O'Connor            2590

17       Defense Argument by Mr. North                 2598

18       Plaintiff Rebuttal Argument by Mr. O'Connor   2615

19

20

21

22

23

24

25

# P R O C E E D I N G S

10:01:31    1

2          (Proceedings resumed in open court outside the presence

3     of the jury.)

4

09:30:13    5          THE COURT:  Thank you.  Please be seated.

6          Morning, everybody.

7          EVERYBODY:  Morning, Your Honor.

8          THE COURT:  We've been informed that the jury has

9     reached a verdict.  We will bring them in at this time.

09:30:30   10     (The jury entered the courtroom.)

11          THE COURT:  Thank you.  Please be seated.

12          All right.  Which one of you is the foreperson for

13     the jury?

14          All right.  Ma'am, has the jury reached a unanimous

09:32:18   15     verdict?

16          JURY FOREPERSON:  We have, Your Honor.

17          THE COURT:  Would you hand the folder to, Nancy,

18     please.

19          All right.  I'm going to have Traci read the verdict.

09:33:29   20          THE COURTROOM DEPUTY:  Omitting the formal caption:

21     We, the Jury, duly empaneled and sworn in the above entitled

22     action, upon our oaths, find as follows:

23          Liability.  Number 1.  Strict Product Liability

24     Design Defect Claim.

09:33:46   25          Do you find by a preponderance of the evidence that

09:33:49  1    Bard is liable to Ms. Booker on the strict product liability

2    design defect claim?

3              No.

4              Number 2.   Strict Product Liability Failure to Warn

09:34:03  5    Claim.

6              Do you find by a preponderance of the evidence that

7    Bard is liable to Ms. Booker on the strict product liability

8    failure to warn claim?

9              No.

09:34:18  10             Number 3.   Do you find by a preponderance of the

11   evidence that Bard is liable to Ms. Booker on the negligent

12   design claim?

13             No.

14             Number 4.   Negligent Failure to Warn Claim.

09:34:35  15             Do you find by a preponderance of the evidence that

16   Bard is liable to Ms. Booker on the negligent failure to warn

17   claim?

18             Yes.

19             B.   Compensatory Damages.

09:34:52  20             If you found Bard liable on any of the claims set

21   forth above, what amount of damages do you find will

22   reasonably compensate Ms. Booker for her injuries?

23             2 million.

24             C.   Apportionment of Fault.

09:35:07  25             Number 1.   Do you find by a preponderance of the

09:35:10 1    evidence that negligence on the part of Dr. Sarwat Amer caused

2    or contributed to Ms. Booker's injuries?

3         Yes.

4         If you answered yes, please provide the relative

09:35:27 5    degree of fault, if any, that you assign to Bard and Dr. Amer.

6    Your total must equal 100 percent.

7         Bard 80 percent, Dr. Amer 20 percent.

8         Punitive Damages.

9         Do you find by clear and convincing evidence that

09:35:46 10   punitive damages should be awarded against Bard?

11        Yes.

12        Answer to Question Number 2.  If you answered yes to

13   any question identified in part A above, did you reduce the

14   damages awarded in part B based on the fact that either of the

09:36:08 15   following was a superseding cause:

16        Dr. Brandon Kang?  No.

17        Other radiologists?  No.

18        Signed by foreperson Juror Number 3, March 30th,

19   2018.

09:36:21 20        THE COURT:  All right.  Traci, would you please poll

21   the jury.

22        THE COURTROOM DEPUTY:  Juror Number 1, are these your

23   verdicts?

24        JUROR:  Yes.

09:36:27 25        THE COURTROOM DEPUTY:  Juror Number 2, are these your

09:36:28   1    verdicts?

2            JUROR:  Yes.

3            THE COURTROOM DEPUTY:  Juror Number 3, are these your

4    verdicts?

09:36:31   5            JUROR:  Yes.

6            THE COURTROOM DEPUTY:  Juror Number 4, are these your

7    verdicts?

8            JUROR:  Yes.

9            THE COURTROOM DEPUTY:  Juror Number 5, are these your

09:36:36   10    verdicts?

11            JUROR:  Yes.

12            THE COURTROOM DEPUTY:  Juror Number 6, are these your

13    verdicts?

14            JUROR:  Yes.

09:36:41   15            THE COURTROOM DEPUTY:  Juror Number 7, are these your

16    verdicts?

17            JUROR:  Yes.

18            THE COURTROOM DEPUTY:  Juror Number 8, are these your

19    verdicts?

09:36:46   20            JUROR:  Yes.

21            THE COURTROOM DEPUTY:  Juror Number 9, are these your

22    verdicts?

23            JUROR:  Yes.

24            THE COURT:  All right.  The polling has shown that

09:36:53   25    the verdict is unanimous.

09:36:55  1        Ladies and gentlemen, as you know, because you've

2   concluded that punitive damages should be awarded, we need to

3   give you some additional evidence and additional instructions.

4        Let me talk to the counsel at sidebar for a minute

09:37:09  5   and we'll figure out how most quickly and efficiently to get

6   that done.

7        (Bench conference as follows:)

8        THE COURT:  All right.  Plaintiff's counsel, you said

9   yesterday you had 18 minutes of evidence you wanted --

09:37:37 10        MR. STOLLER:  Actually less than that, but I think

11   the total run time is about 16 minutes.

12        THE COURT:  Okay.  And I allotted 35 minutes for the

13   punitive damages case.

14        Do you have evidence that you all are going --

09:37:47 15        MR. NORTH:  We have counter-designations in the

16   same --

17        THE COURT:  It's in the same thing?  So the 16

18   minutes includes both?

19        MR. STOLLER:  Sorry?

09:37:57 20        THE COURT:  Does the 16 minutes include designations

21   and counter-designations?

22        MR. STOLLER:  I don't have it -- it's less than 20

23   minutes.

24        THE COURT:  Okay.  And that's the only evidence to be

09:38:05 25   presented?

09:38:06   1                MR. NORTH:  Yes.

           2                THE COURT:  And then you wish to argue after that,

           3     obviously?

           4                MR. NORTH:  Yes.  Absolutely.

09:38:09   5                THE COURT:  So what I'll tell the jury is that there

           6     is a deposition that's going to be played, both sides have

           7     designated testimony, that will be the evidence, we'll then

           8     have plaintiff's argument and then defense argument on

           9     punitives.

09:38:23  10                Do you want to reserve any time for rebuttal?

          11                MR. O'CONNOR:  Yes.

          12                THE COURT:  Five minutes?

          13                MR. O'CONNOR:  Yes.

          14                THE COURT:  So I will tell you when you have five

09:38:32  15     minutes left on the 35.

          16                MS. HELM:  Before we leave.  We have some objections

          17     to the exhibits under *Gore* and *Campbell versus State Farm*, the

          18     exhibits they told us they intend to use in the punitive

          19     damages phase, so we need to address those.

09:38:54  20                THE COURT:  What are the exhibits?

          21                MS. HELM:  They have a chart --

          22                MR. STOLLER:  I'll grab the exhibits.

          23                MR. O'CONNOR:  Mr. Stoller is going to be offering

          24     the exhibits in.  He took the depositions.

09:39:07  25                THE COURT:  Okay.

09:39:11  1          MS. HELM:  May I grab some papers --

       2          THE COURT:  Yes.

       3          MR. STOLLER:  Do you know what the objections are,

       4  which exhibits are you objecting to?  Are you objecting to the

09:39:49  5  financial documents?

       6          MS. HELM:  No, the sales.

       7          MR. STOLLER:  The demonstrative?

       8          MS. HELM:  Yes, the sales.

       9          MR. STOLLER:  This one?

09:40:01 10          MS. HELM:  There was one -- there was one that showed

      11  sales of the product.

      12          MR. STOLLER:  Your document --

      13          MS. HELM:  Yes.

      14          MR. STOLLER:  -- that we marked?

09:40:13 15          Okay.  I'll find it.  It's in this material here.

      16          Sorry, Your Honor.

      17          What is previously marked as Exhibit 1135?

      18          MS. HELM:  Correct.  We have an objection to this.

      19          THE COURT:  Are you going to be using this?

09:41:02 20          MR. STOLLER:  Mark, I'm not sure whether you're going

      21  to use it or not.  The sales document, are you going to use

      22  it?  By product.

      23          MR. O'CONNOR:  Well, let's put it in and we'll see

      24  how much time we have.

09:41:13 25          THE COURT:  Well, there's an objection to it.  So you

09:41:15   1   do intend to use it?

2          MR. O'CONNOR:  I think so, yes.

3          THE COURT:  Well, you need to decide now because if

4   you don't I'm not going to spend time ruling on the objection.

09:41:23   5          MR. O'CONNOR:  Yes.

6          THE COURT:  Okay.  What's the objection?

7          MS. HELM:  Your Honor, in both *Gore* and *State Farm*

8   *versus Campbell* --

9          THE COURT:  Mr. Stoller, move over so she can be

09:41:35  10   heard.

11          MR. STOLLER:  I apologize.

12          MS. HELM:  In *Campbell versus State Farm*, the Supreme

13   Court held that a defendant cannot be punished for conduct

14   that occurred outside the state.  This exhibit is not the G2

09:41:49  15   product and it's not limited to the state of Georgia.

16          MR. STOLLER:  It actually is the G2 --

17          THE COURT:  Hold on.  Let her finish.

18          MR. STOLLER:  Apologies.

19          THE COURT:  It looks like it includes the G2 at the

09:42:09  20   end along with all the other filters.

21          MS. HELM:  But, Your Honor --

22          THE COURT:  I understand.  So is that the basis for

23   the objection?

24          MS. HELM:  Yes.  I can go on and on, but the basis

09:42:17  25   for the objection is both -- under both *Gore* and *Campbell*

09:42:20  1    *versus State Farm*.   The conduct -- the evidence has to be

2    limited to activity in the state.   In this case it would be

3    the state of Georgia.

4                THE COURT:   What's your response, Mr. Stoller?

09:42:33  5                MR. STOLLER:   We won't use it.

6                THE COURT:   Okay.

7                MR. STOLLER:   Because I don't have time to redact it

8    of the non-state sales.

9                THE COURT:   Were there any other exhibits you

09:42:39  10   objected to?

11                MS. HELM:   Your Honor, if I could just take a look.

12   I was looking at them on my phone this morning.

13                THE COURT:   Mr. Stoller, what other exhibits are you

14   going to use, so she knows if she has objections?

09:42:54  15                MR. STOLLER:   I sent them last night.   These are

16   demonstratives.   The three we're moving admission of are the

17   publicly filed financial documents, which you have no

18   objection.   And the others will be demonstratives, merely

19   demonstratives that have information from this or from the

09:43:09  20   testimony.

21                MS. HELM:   Your Honor, obviously we have to preserve

22   our record.   We have 401 and 403 objections to all of these

23   and, again, to the extent that these relate to income or

24   activity outside the state of Georgia, we think they should be

09:43:25  25   limited to the profit and the income that relates to the

09:43:27  1   activity in the state of Georgia under *Gore* and *Campbell*.

2        THE COURT:  Do *Gore* and *Campbell* talk about profits

3   within the state?

4        MS. HELM:  Your Honor, *Gore* -- they don't

09:43:36  5   specifically address the profits, no.  But they do address

6   that it has to relate to activity within the state, and if you

7   don't have activity in the state -- I mean, if you sell

8   something in California, the profit comes from California, not

9   from Georgia.

09:43:52 10        THE COURT:  Are you aware of any case that has held

11   that evidence on punitive damages is limited to profits earned

12   within the state?

13        MS. HELM:  No, Your Honor, I'm not.

14        THE COURT:  Okay.  So I'm going to overrule that

09:44:02 15   objection.  But it is preserved.

16        MS. HELM:  Thank you.

17     (Bench conference concluded.)

18        THE COURT:  Ladies and gentlemen, we are going to

19   play for you one more deposition video.  Portions of it have

09:44:20 20   been designated by each side.  So that's the evidence that you

21   will see, in effect, from both sides.

22        We're then going to again hear brief arguments from

23   plaintiff, from defendant, and then brief rebuttal from

24   plaintiff.  All of this is on the question of punitive

09:44:37 25   damages.

09:44:38   1          And so let's go ahead and play that video now.

           2          MR. STOLLER:  Your Honor, before we do that,

           3   plaintiffs would move into evidence Exhibits 3572, 3573, and

           4   3574.

09:44:50   5          THE COURT:  Any objection?

           6          MS. HELM:  Subject to the objections made at sidebar,

           7   Your Honor.

           8          THE COURT:  Okay.  Those are admitted subject to the

           9   objections made at sidebar.

09:44:59  10      (Exhibits 3372, 3373, and 3374 admitted.)

          11          THE COURT:  I'm going to grab my computer while we're

          12   doing that.  I'll be right back.

          13          Please be seated.

          14          All right.  Let's begin whenever we are ready to play

09:46:05  15   it.

          16          MR. O'CONNOR:  Excuse me, Your Honor.  Can we just

          17   tell the jury who this is before we get started?

          18          THE COURT:  Yes.

          19          MR. O'CONNOR:  Mr. Stoller took the deposition.

09:46:40  20          THE COURT:  Do you have a stipulation on this?

          21          MR. STOLLER:  We don't.

          22          Kate, would you like to inform the jury?

          23          MS. HELM:  Go ahead.

          24          MR. STOLLER:  The witness is Mehdi Saadeh.  He's one

09:46:52  25   of the higher-ups in the -- I don't know his title.

09:46:56  1          Do you know his title?

2          MS. HELM:  You took his deposition.

3          MR. STOLLER:  He's the financial officer designated

4     by the defendants to testify on these matters in this case.

09:47:05  5          THE COURT:  Okay.  That's fine.

6          (Video of deposition testimony played.)

7          THE COURT:  Is that the end of the video?

8          MR. LOPEZ:  Yes, Your Honor.

9          THE COURT:  Ladies and gentlemen, before we hear the

10:06:41  10    arguments of counsel, I'm going to read to you one other jury

11    instruction.

12          Members of the jury, you have decided that Ms. Booker

13    should be awarded punitive damages.  In order to determine the

14    amount of punitive damages, the parties have presented

10:06:58  15    evidence and will now present brief arguments.

16          The measure of punitive damages is determined by your

17    enlightened conscience as an impartial jury.  Any award you

18    make should be both reasonable and just in light of your

19    previous award of compensatory damages, the conduct and

10:07:19  20    circumstances of Bard, and the purpose of punitive damages.

21          In considering the amount of punitive damages, you

22    may consider the following factors:

23          The nature and reprehensibility of Bard's conduct;

24          The extent and duration of Bard's wrongdoing and the

10:07:43  25    likelihood of its recurrence;

10:07:46  1          The intent of Bard in committing the wrong;

2          The profitability of Bard's wrongdoing;

3          The amount of compensatory damages you have

4     previously awarded;

10:08:00  5          The financial circumstances, that is, the financial

6     condition or net worth of Bard.

7          In making an award of punitive damages, you should

8     consider the degree of reprehensibility of Bard's wrongdoing.

9     You should consider all of the evidence, both aggravating and

10:08:17 10   mitigating, to decide how much punishment, penalty, or

11    deterrence Bard's conduct deserves in the form of punitive

12    damages.

13         In assessing reprehensibility, you may consider

14    whether the harm caused was physical, as opposed to economic;

10:08:36 15   the conduct showed an indifference to or reckless disregard of

16    the health or safety of others; and the conduct involved

17    repeated actions or was an isolated incident.

18         You may have heard evidence of other conduct and

19    procedures of Bard.  For the purposes of punitive damages, you

10:08:55 20   may not consider evidence of any conduct of Bard that is

21    dissimilar to that which resulted in Ms. Booker's injury,

22    unless such dissimilar conduct was related to the specific

23    harm suffered by Ms. Booker in this case.

24         All right.  Plaintiff's counsel, your argument.

10:09:16 25         MS. HELM:  Excuse me, Your Honor, before we begin

10:09:18  1    argument, may we approach at sidebar?

2              THE COURT:  Sure.

3              If you want to stand up, ladies and gentlemen, feel

4    free.

10:09:36  5        (Bench conference as follows:)

6              MS. HELM:  Your Honor, in light of the evidence that

7    was just presented on the punitive damages claim, I believe

8    that we would request a limiting instruction before argument

9    occurs, limiting the jury that they cannot consider evidence

10:09:55  10   of out of Georgia conduct to punish the defendant under *Gore*

11   and *State Farm versus Campbell*.

12             There are a number of cases that have addressed this

13   issue, and we believe that you should instruct them that they

14   should -- I mean, I can read through the cases, but we believe

10:10:19  15   you should instruct them that they cannot consider conduct

16   that occurred outside of the state of Georgia in determining

17   their punitive damages award.

18             THE COURT:  Why wasn't this raised during our

19   discussions of jury instructions?

10:10:32  20             MS. HELM:  Your Honor, at that time we didn't have

21   the evidence.  We didn't know that the evidence was going to

22   be --

23             THE COURT:  But we knew the conduct was from Georgia.

24   There's nothing in the deposition we just heard that said

10:10:43  25   anything about conduct in Georgia.

10:10:47  1        MS. HELM:  Yes, Your Honor.  And I raised that

       2    objection prior to the deposition being raised.  But we

       3    believe that the lawyers -- to protect the record, that you

       4    should give a limiting instruction that they can't punish for

10:10:58  5    activities outside of the state of Georgia.

       6        THE COURT:  Well, the problem I have, Ms. Helm, is

       7    that I haven't read any of the cases you've cited.  We're in

       8    the midst of presentation on punitive damages.  The fact that

       9    the conduct in this case was in Georgia has been apparent from

10:11:13 10    the start of the trial, and so it seems very late in the game

      11    to be asking for a jury instruction that depends on cases I

      12    don't have time to read.

      13        MS. HELM:  Your Honor, I appreciate that.  The actual

      14    pattern charge in Georgia contains this information with

10:11:29 15    conduct in it.

      16        THE COURT:  Well, then why wasn't it requested?

      17        MS. HELM:  It was Your Honor.  The language -- I

      18    apologize.  It's not part -- it's not the words in the pattern

      19    charge, but there's a long discussion of it in the pattern

10:11:41 20    charge, and we included that.

      21        THE COURT:  But you never mentioned that when we were

      22    talking about the punitive damages instruction at any of the

      23    three discussions we had.

      24        MS. HELM:  That's correct, Your Honor.  But I believe

10:11:54 25    under *Gore* and under *State Farm*, and frankly to protect our

10:11:57  1    record, we believe that a limiting instruction is appropriate,

2    and so we're asking for it.

3              THE COURT:  Okay.

4              MR. STOLLER:  Your Honor, I would only reiterate what

10:12:06  5    you said, that this -- what we were going to present has been

6    known since before the trial started.  This deposition, as you

7    know, was specifically authorized by the Court for us to take

8    this deposition before the trial date.  They've known what the

9    testimony's going to be.  This issue has not come up before

10:12:20 10   now.  We've had, as you know, extensive discussions on jury

11   instructions.

12             I've not had an opportunity to review any of these

13   cases either.  But to the extent that the Georgia instruction

14   talks about the net worth of a company, talks about the

10:12:34 15   financial condition of a company is factors to be considered,

16   which, in the evidence we put on, I can't imagine it's correct

17   that we'd have to segregate out the net worth of the company

18   as it's attributable to Georgia.  In fact, I don't know how

19   you do that.

10:12:47 20             THE COURT:  I don't think that's what she's asking.

21             MR. STOLLER:  I understand that.  My point is on

22   certainly the financial information we have presented, it's

23   not segregable.  I think it's consistent with the Georgia

24   instruction.

10:12:58 25             THE COURT:  All right.  Well, I am not going to give

10:13:01  1  the instruction because it's being raised untimely.  We had

2  ample opportunity to settle the punitive damages instruction;

3  in fact, we did, and I added the last paragraph at the

4  defendants' request.  And it would be unfair to add something

10:13:16  5  now on the basis of cases I haven't read and the plaintiff's

6  counsel haven't read, so I'm not going to add that.  But it's

7  on the record.

8           MS. HELM:  Thank you, Your Honor.

9        (Bench conference concludes.)

10:13:30  10          THE COURT:  Thank you, ladies and gentlemen.

11           We will now have argument from plaintiff's counsel.

12           MR. O'CONNOR:  Your Honor, may I move the podium and

13  the board up?

14           THE COURT:  Yeah.

10:14:49  15          MR. O'CONNOR:  Good morning.

16           We need to talk about Bard's conscious indifference.

17  The indifference that Bard showed to the world.  To this

18  country.  To the medical community.  To the patients who

19  received the products.  And the way they went about it.

10:15:22  20          And when we talk about conscious indifference and we

21  talk about reprehensibility, I think that it's important that

22  we go back and look at the workings of Bard.  The suits, the

23  money people versus the science people.

24           Greg, let's put up Exhibit 4327.

10:15:50  25          First page, please.

10:15:51  1          MR. WOODY:  4327?

2          MR. O'CONNOR:  4327.  First page, please.

3          Exhibit 4327, we talked about that yesterday.  This

4     is an example that came out every single month from Bard.

10:16:19  5     Every single month this report was provided to Mr. Ring, who

6     you just learned has been paid by Bard $35 million between

7     2014 and 2016, and Mr. Weiland, the president of this company,

8     who has been paid $20 million between 2014 and 2016.

9          And it's no coincidence that the first page of this

10:16:53 10     report talks about money and where Bard is on its bottom line.

11          And it's no coincidence that the last pages of this

12     report talk about complaints, talk about numbers, talk about

13     patients.

14          And what the evidence has shown in this case is that

10:17:22 15     Bard continued, continued a course of conduct with conscious

16     indifference from the moment the G2 was on the market without

17     ever being subjected to a clinical test.

18          And that Bard made a choice to have patients accept

19     that risk of not having a clinical study that would have told

10:17:46 20     them what they decided, what they chose to wait to see, after

21     the filter was in unsuspecting patients.

22          And Bard did that knowing how important this device

23     was to their bottom line.

24          Go to page 2, Greg.

10:18:05 25          Just in the month of February 10, 2006 --

10:18:08  1          Go to the bottom.

2          -- one of the most important pieces of information

3     that Bard wanted, that Mr. Ring and Mr. Weiland wanted, is how

4     are our profits doing?  How are we doing?  And they were so

10:18:21  5     concerned about what had happened to the Recovery, they were

6     trying to cover that up by bringing in the G2.

7          And in that month, despite what they were already

8     finding out about this filter, they were more concerned about

9     the $2.2 million of profit that they received during that

10:18:41 10     month for the G2.

11          Right down at the bottom there, Greg.

12          And when we look at Bard's reprehensibility, when we

13     look at their conscious indifference and how Bard chose to put

14     profits not just above patient safety, but way above patient

10:19:05 15     safety, 4327 gives us a pretty good idea of what Bard was

16     doing, what they knew they were doing and the danger they were

17     exposing patients to.

18          Greg, go to the page about the caudal migration.  I

19     think it's page 5.

10:19:40 20          Here we are only months after the product is on the

21     market and Bard already knows about caudal migration.  And

22     this is something Bard should have been well aware of had they

23     done the right thing and clinically tested.

24          And it's after this device is being put in patients

10:19:54 25     when Bard finally makes a choice that maybe they should look

10:19:57  1   into the root cause of caudal migration, because Bard knows

2   something that the world will not know until the Sheri Bookers

3   start showing up, that caudal migration is the root to all

4   evil.  That when their filters caudally migrate, they're not

10:20:14  5   doing their job.  They're not staying where they were

6   intended.  They are not acting like a permanent filter.

7   They're moving down.  And when they move down, they tilt.  And

8   when they tilt, they perforate.  And when they perforate, they

9   fracture.  And when they fracture, they go places that the

10:20:26  10  medical community may never have seen.  And they put patients'

11  lives at risk.

12       And it hasn't stopped with Sheri Booker, because a

13  question this Arizona jury has to concern yourselves about is

14  not just Sheri, but how many people are out there like

10:20:55  15  Sheri Booker?  How is this ever going to stop?

16       And we know the simple fix was there.  Don't put it

17  on the market.

18       Mr. Ring, Mr. Weiland, stop this.

19       What price do these people have to pay, the patients

10:21:15  20  have to pay so you can make your gigantic salaries?

21       What price, what cost of blood must be paid so Bard

22  can get to its bottom line?

23       And they came in here and they bragged about

24  asymptomatic.

10:21:34  25       Every patient's asymptomatic.

10:21:38   1          Sheri Booker had cancer.  Cancer came to her without

           2     any symptoms originally.  But then when her cancer was

           3     discovered, she beat it.  She is cancer free, but she is not

           4     free of Bard.

10:21:57   5          And how many other patients are out there that aren't

           6     free of Bard?

           7               Now, what can we do about that?

           8               Go to 2045 -- excuse me.  Go to page 8, Greg.

           9               And go to the top one and the bottom one.

10:22:48  10          These are just two of how many, how many hundreds of

          11     complaints that Bard is aware of.  And it's just two shortly

          12     after the G2 was on the market.  And it's two, two people with

          13     names.  Their names aren't anywhere in here because you know

          14     what, Bard didn't want to know their names.  Mr. Ring,

10:23:09  15     Mr. Weiland didn't want to know their names.  Because when you

          16     know somebody's name, you might have to pay attention.  When

          17     you know a name, you've got to think of them as a human being.

          18     It's so much easier when you're interested in money to look at

          19     words, to look at numbers, to look at complaint files.

10:23:30  20          Bard needs to start looking for names.  Bard needs to

          21     start doing something where it knows the Sheri Bookers that

          22     are out there, who may be asymptomatic, who may be confronting

          23     the life-threatening surgery that Sheri had to go through.

          24               So when Bard --

10:23:53  25               Let's show 2045.

10:24:03   1          2045, Greg.

        2          Page 2.

        3          When Bard released the G2 filter in 2005, and Bard

        4   knew and Bard represented that the G2 had increased migration

10:24:29   5   resistance, when Bard represented that this filter --

        6   represented to the medical community that it had improved

        7   centering, when it represented that the G2 was enhanced in

        8   fracture resistance, when Bard told the medical community and

        9   patients that this filter was bringing strength and stability

10:24:54  10   to a new level, Bard knew that wasn't true.

       11          Nothing is true in medical devices unless you prove

       12   it to yourself and you know the worst case scenario.  But even

       13   after the patients we just saw on the exhibit and the hundreds

       14   and hundreds that followed in those statistics that we saw

10:25:17  15   during the trial, Bard kept it up.  They kept the G2 as long

       16   as they could keep it, and they made a bet.  They made a bet

       17   that somehow they could -- it might show up somewhere, this

       18   day, and they would rather defend than do the right thing.

       19          And I think we all know what the right thing was.  To

10:25:47  20   stop.  I think we all know the right thing was to get out and

       21   warn doctors clearly, unequivocally, that this G2 is dangerous

       22   and pay attention and bring your patients back in and look and

       23   see if it's caudally migrated, look and see if it's tilted,

       24   look and see if it's perforated, because Dr.- -- Dr. D'Ayala,

10:26:17  25   Dr. Hurst, Dr. Muehrcke, whoever and wherever you are in the

10:26:24  1    medical community, if you used our filter, we gave you

2    something dangerous and we need to help you fix it before it

3    causes irreversible damage.

4         And you know what?  When you want to consider how

10:26:38  5    long this conduct, this conscious indifference went, it's

6    still happening today.  It's still going on today.  And it can

7    stop today.

8         And it can stop today.  It can stop right here, right

9    now, by this jury and their message to Bard.

10:27:02  10        And the only way, the only way this company listens

11   is through money.

12        Now, let's just go through a couple slides here just

13   to remind you about the money that Bard was very, very

14   interested in.

10:27:22  15        Go to slide 4338.

16        This is what you just heard the financial officer

17   talk about in terms of Bard's net profit.

18        $2,593,000,000.

19        Go to 4337, Greg.

10:28:00  20        Shareholders investments for 2017.  Over 2 billion.

21        Go to 4334, please, Greg.

22        The people in the boardroom.  This is what they've

23   made.  Mr. Ring in three years has made $35,212,273.  I don't

24   think he knows Sheri Booker's name yet.  It's time he does.

10:28:40  25        Mr. Weiland has made $21 million since 2014.  He

10:28:47  1    needs to hear what Arizona juries think about the way their

       2    conscious indifference in telling the doctors and the medical

       3    community the truth.

       4         And probably most importantly is what Mr. Saadeh

10:29:07  5    talked about when Mr. Stoller asked him the question about one

       6    measure of value and what it would cost to acquire,

       7    $17 billion.  That's what Bard is worth.  That's a nice piece

       8    of an asset.  And it's one that these officers went to all

       9    lengths to protect.

10:29:59 10         THE COURT:  Mr. O'Connor, five minutes.

      11         MR. O'CONNOR:  So you need to send a message.  This

      12    company needs to be punished.  And they need to stop what

      13    they're doing.  And the only way they will learn is if

      14    something gets to the boardroom and something hits their

10:30:17 15    bottom line.

      16         So when you look at 17 billion, think about $17,000.

      17    If a man was worth $17,000 and he caused harm to anybody, and

      18    all you had to do was go by his value to make him stop, would

      19    a fine of $1 do anything?  Of course not.

10:30:36 20         What will it take to get Bard's attention?  If you

      21    look at 17 billion, and this is going to be your decision, but

      22    what is 10 percent of 17 billion?  What is 5 percent?  And is

      23    that enough?  Is that enough to make Bard realize that they

      24    need to know the names of these people?

10:31:10 25         The only way you're going to get their attention is

10:31:14  1   by sending a message to them.  10 percent of 17 billion is

2   $170 million.  Check my math because, as you know, I'm not

3   very good at it.  17 -- 5 percent of 17 billion is 85 million.

4        These are your decisions.  I can only give you

10:31:31  5   guidelines.  But you -- this case is now in your hands.  You

6   are the protectors of safety.  You folks, who gave us your

7   time from your valuable lives, came here, and now it's up to

8   you to serve.  The all important and responsibility you have

9   is to protect, protect the patients out there from Bard.  Show

10:32:00  10   Bard that this conduct will never be tolerated in Arizona, and

11   the Arizona jury that heard this case today will not allow

12   this to be tolerated anywhere in our country.

13        And the only way you can do that, the only thing that

14   gets their attention is money.

10:32:24  15        Thank you.

16        THE COURT:  All right.  Mr. North.

17        MR. NORTH:  Yes, Your Honor.

18        Morning, ladies and gentlemen.

19        I have to be candid with you, and I'm sure you're not

10:32:56  20   surprised, I'm disappointed and my client is disappointed.

21   But you have spoken, as is your duty and as is your right, and

22   we respect that.  We respect the system and we respect your

23   voice.  And we appreciate -- regardless of your ultimate

24   decision, we appreciate the time and the attention you have

10:33:16  25   given to this dispute.

10:33:19   1          Your verdict does send a message.  You have said that

2      we were negligent in failing to warn.  And since, as

3      Judge Campbell instructed you yesterday, a manufacturer's duty

4      is to warn the doctors, not the patients themselves, but to

10:33:37   5      warn the doctors, it is clear from your verdict that you've

6      decided that we did not adequately warn the medical community

7      and the physicians about the risks.  And we hear.  We do hear

8      that message.

9          Now the question is what is the appropriate amount of

10:33:57  10      punitive damages in your enlightened conscience as jurors.

11         And it's hard for me to recommend a number because in

12      my zeal, in my passion for my client and for what they've

13      done, and for the men and women we put on this witness stand,

14      I don't believe that a punitive damage award should be given.

10:34:18  15      But you have spoken and, as I said, we respect that.  And

16      since you have got the task to determine a number, I would

17      like to give you a few considerations to think about.

18         This is what the Judge just instructed you about --

19      and you'll have the instruction back in the room -- as to what

10:34:41  20      are the factors to consider in determining an amount of

21      punitive damages.

22         I'd ask you to look at some of those.  The extent and

23      duration of the wrongdoing, of this failure to warn that you

24      found.

10:34:57  25         The intent of Bard in committing that wrong.

10:35:00  1    And the profitability of Bard's wrongdoing.

2    Ladies and gentlemen, Mr. O'Connor has thrown up a

3    lot of large numbers, 17 billion, suggested 85 million.  But

4    what he did not point out was the very testimony he just

10:35:22  5    played beforehand that said that all of Bard's net sales each

6    year, less than 1 percent of those sales are attributable to

7    filter products.  All the other sales are related to all the

8    dozens of other products, the catheters, the stents, the

9    pacemakers, the angioplasty balloons, the biopsy needles.

10:35:50 10    Less than 1 percent of Bard's profit -- and 17 billion isn't

11    the profit, that's net worth.  That's the value of the

12    buildings and the assets and things of that nature.  Less than

13    1 percent of Bard's profits are related to filters.

14    And there has been no evidence throughout, I submit

10:36:14 15    to you, that Bard made decisions along the way for profit with

16    regard to the G2 filter.  The only evidence of money

17    associated with the filters in this entire three weeks of

18    trial is the evidence of $18 million spent by this company in

19    researching and developing the design of this filter.

10:36:40 20    Another important jury instruction, or part of the

21    jury instruction, is the final part.  You may not consider

22    evidence of any conduct of Bard that is dissimilar to that

23    which resulted in Ms. Booker's injury, unless such dissimilar

24    conduct was related to the specific harm.

10:37:04 25    And why do I want to point that out?  Because a lot

10:37:07   1   of what he just talked about has to do -- they've talked about

2   throughout this trial has had to do with the Recovery filter,

3   and a Recovery filter migrating to a patient's heart.  Conduct

4   that has nothing to do with Ms. Booker's specific injury.

10:37:27   5        In determining the amount of any punitive award that

6   you may make, I would also like for you to think about the

7   impact of the punitive award.  Mr. O'Connor can stand up here

8   and say all day "send a message."  A message has been sent.

9   You sent a message an hour ago when you returned that verdict.

10:37:54  10        And if you send the sort of message that he wants you

11   to send, some huge, huge award, what does that do?  First of

12   all, who are you punishing with a really large award?  You

13   just heard the testimony that 99 -- much more than 99 percent

14   of the shares of CR Bard are owned by individual stockholders.

10:38:25  15   Individual stockholders.  People like you and me and everyone

16   here who have mutual fund investments, 401(k)s, pension funds

17   through your employers.  These funds go out and invest in

18   companies like Bard.  And 99 percent of the shares of Bard,

19   much more than 99 percent, are owned by all of us as

10:38:52  20   individuals.  That's who you're punishing, more than anyone

21   else.

22        He wants you to think it's a bunch of people in suits

23   in a corporate ivory tower that are sitting on these stacks of

24   money.  But that is not it.  It's the people that get 60 cents

10:39:11  25   a quarter on their dividend for each share of that stock that

10:39:16   1   their 401(k) owns.  It's the individual shareholders.  And

           2   that's who your award punishes if you enter a large award.

           3        I would also like for you to think about what the

           4   impact of the sort of huge award he is seeking may have.

10:39:41   5        Medical technology is necessary.  It's not always

           6   done perfectly, as you have found in your verdict here, but

           7   it's necessary.  It's vital for all of us.

           8        Those of you who work in hospitals, those of you who

           9   work with patients, you know that without devices, without

10:40:01  10   medications, we could not treat patients.  Medical care is

          11   vital for all of us.

          12        You know, there are a lot of things in life that are

          13   optional.  But one thing that is almost never optional for any

          14   of us is at some point in our lives we need medical care.  And

10:40:23  15   we need companies like Bard, even if they're flawed and even

          16   if they're imperfect and even if they make mistakes.  We need

          17   companies like Bard making products.  Daring to take a risk to

          18   make a revolutionary product that will change medical

          19   treatment.

10:40:44  20        And the problem is the companies in the world, the

          21   inventors and the engineers, are never, as we've discussed,

          22   ever going to be able to make a product that's risk free.

          23        And if we tell them and if we tell my client and if

          24   we send the message Mr. O'Connor wants to send, that if you

10:41:08  25   put a product out there and it's not risk free, you can really

10:41:14  1    get punished.  Your individual shareholders can get punished.

2    Think about it.  At some point, if the legal system

3    continues -- imposes huge verdicts on companies that are

4    trying to develop technology to make patients' lives better,

10:41:35  5    companies aren't going to do that.  It's a lot easier to make

6    popcorn and sell that.  That's pretty much risk free.  There

7    are a lot of things you can sell that are risk free.  Medical

8    devices are never going to be.

9    So in considering the amount of any punitive award, I

10:41:54  10   would ask you to think about that and think about what impact

11   your verdict might have, not only on Bard, but on every

12   medical device company.  Every medical device company is going

13   to know what you did in this case.  And it's going to be an

14   incentive or disincentive for future technology and work.  And

10:42:17  15   I ask you to keep that in mind.

16   And that's what I was just talking about.  How will a

17   large punitive award affect medical care?  The one thing I

18   submit to you we don't want to do is to deprive physicians of

19   the tools they need to treat us.

10:42:52  20   Yes, companies like Bard can do better in making

21   those tools, in advising about the risks of those tools.  But

22   do we want to send an incentive to these companies to quit

23   making these tools in the first instance?  And that's what

24   large, large awards can do.

10:43:13  25   And then, as I mentioned earlier, as far as

10:43:17  1    considerations go, what evidence has the plaintiff submitted

2    to show that Bard somehow made a big profit off of this G2

3    filter?  With all the testing it did, with all the amounts it

4    spent in that testing, how can they say they haven't shown you

10:43:37  5    evidence, nor could they, that Bard made a huge profit off

6    this device in the first instance?

7        Ladies and gentlemen, you met the men and women of

8    Bard involved in this product.  You met Andre and Mike and

9    Chad and Shari and Rob.  By video you met Natalie, you met

10:43:57  10    John.  I guarantee you, your verdict came out an hour ago and

11    they all already know about it.  They know.  They've heard

12    your message.  And your message has been sent.  And I submit

13    to you, ladies and gentlemen, that it does nothing more to

14    send some huge punitive award on top of that message.

10:44:24  15        You have compensated Ms. Booker for her injuries.

16    You have awarded her $2 million.  What good does it do and

17    what is the potential impact if you add a lot more money on

18    that?  It's not adding anything to the message.  These men and

19    women, they've heard this message.  And they will wrestle with

10:44:50  20    this message and what it means.

21        Yesterday Judge Campbell instructed you that damages

22    must be fair to both parties.  It's in the instructions from

23    the first phase of the case.  That likewise applies here.

24    Damages must be fair to both parties.

10:45:12  25        And they must be fair to us as a community.  They

10:45:16  1    must not harm us as a community.  They must not deprive

2    companies and individuals and inventors of incentives to try

3    to improve technology to treat us as patients and as human

4    beings.

10:45:30  5         So, ladies and gentlemen, if you must, I ask that you

6    enter a punitive award that is reasonable.  That's fair to

7    both parties.  And that considers the impact that anything you

8    do may have because, once again, I assure you, these men and

9    women have and will hear your message.

10:45:52 10         Thank you.

11         THE COURT:  All right.  Thank you, Mr. North.

12         Mr. O'Connor, you have three minutes remaining.

13         MR. LOPEZ:  We have to approach.

14         MR. O'CONNOR:  May we approach?

10:46:01 15         THE COURT:  Does it concern what's going to be

16    argued?

17         MR. LOPEZ:  No.  It involves a motion in limine we

18    feel has been violated.

19         THE COURT:  Well, okay.  Come on up.

10:46:11 20         Stand up, ladies and gentlemen.

21       (Bench conference as follows:)

22         MR. LOPEZ:  In Motion in Limine Number 8, plaintiff

23    asserts that --

24         THE COURT:  Don't read me anything.  What's the

10:46:34 25    point?

10:46:34   1        MR. LOPEZ:  Your Honor, he violated Motion in Limine

2   Number 8, which was granted.  If he was going to want to put

3   in evidence of the impact on the medical community, future

4   medical device research or costs and availability of medical

10:46:49   5   care, his duty was if defendants believe such matters become

6   relevant during trial, they may raise the issue with the Court

7   outside the hearing of the jury.  He just violated that motion

8   in limine.

9        THE COURT:  There was no objection made.

10:47:03  10        MR. LOPEZ:  During his opening statement?

11        THE COURT:  During his argument.

12        MR. LOPEZ:  During his argument?  We can still give

13   an instruction to the jury.

14        THE COURT:  Well, you can.  But if you thought that

10:47:10  15   was violating a motion in limine, why didn't you object?

16        MR. LOPEZ:  It was already out of his mouth.

17        THE COURT:  What's your response?

18        MR. NORTH:  My response is, Your Honor, I apologize.

19   I should have gone and asked the Court's prior permission.  I

10:47:23  20   believe that in the punitive phase it would be warranted under

21   this instruction and the criteria to argue that, but I should

22   have come and asked you that beforehand.  I completely forgot

23   about that.

24        THE COURT:  Hold on just a minute.

10:48:05  25        What's the docket number?

10:48:08   1        MR. LOPEZ:  10075.  10075.

           2        MS. REED ZAIC:  Page 4.

           3        THE COURT:  Well, clearly that was a violation --

           4        MR. NORTH:  I understand.

10:49:26   5        THE COURT:  -- of the motion in limine order.

           6        MR. NORTH:  I apologize.

           7        THE COURT:  The question is what do we do about it?

           8   And what I have to do to decide that is ask if he had raised

           9   it outside of the hearing of jury, would I allowed that

10:49:38  10   argument on the punitive damages phase of the case.

          11        MR. LOPEZ:  I don't think I agree with that.  He

          12   should have done that with that.

          13        THE COURT:  Well, but if he had, we would have had

          14   the discussion we're about to have, which is, is it

10:49:47  15   permissible argument on punitive damages, and I would have

          16   made a decision.  And if I had allowed it, then what he's done

          17   has not prejudiced you because I would have allowed it.

          18        So what I need to hear from you, Mr. Lopez, is why

          19   you believe the argument is inappropriate at the punitive

10:50:05  20   damages stage.

          21        MR. LOPEZ:  Well, Your Honor, here's the thing.  I

          22   think that had he raised this issue, as the motion would have

          23   requested him -- required him to do, your order, that he

          24   should have raised the issue with the Court outside of the

10:50:20  25   hearing of the jury.

10:50:22  1          THE COURT:  Then we would have had this discussion.

       2          MR. LOPEZ:  We would have had this discussion.

       3          THE COURT:  So what's the point you would have made

       4     in that discussion?

10:50:27  5          MR. LOPEZ:  The point I would have made is that the

       6     punitive damage instruction you just gave has nothing to do

       7     with the impact on the medical -- it doesn't even mention it

       8     in the instruction.  There is nothing that segues the

       9     instruction you just gave on punitive damages to what happens

10:50:43 10     to the world, the medical community, the future medical device

      11     research, the costs and availability of medical care.  It's

      12     not in the instruction.  And he inserted that into your

      13     instruction, that they ought to consider these sorts of

      14     things.

10:50:58 15          Again, Your Honor, I can't help but go back to the

      16     fact that he knew he was going to do this.  He has the motion

      17     in limine --

      18          THE COURT:  I want to talk about the merits of the

      19     point.

10:51:10 20          MR. LOPEZ:  Okay.

      21          THE COURT:  You've established he violated the

      22     motion.  I need to decide whether, had he raised it, it would

      23     have been appropriate for him to argue it.

      24          MR. LOPEZ:  Okay.

10:51:17 25          THE COURT:  Do you have anything to else to say on

10:51:18  1    that?

2    MR. LOPEZ:  Other than the fact that had he raised

3    it, we might have had more time to do some research on it and

4    come to you and say you're not supposed to do this in a

10:51:25  5    punitive damage argument.

6    Now we're getting caught by surprise by something

7    that was a violation of a motion in limine.  And we're here

8    not because of what we did, we're here because of what they

9    did.

10:51:35  10    THE COURT:  I understand that.  But I need to make

11    the decision about whether that is appropriate punitive

12    damages argument.  That's what I'm interested in.

13    MR. LOPEZ:  Right.

14    THE COURT:  And you've shared some thoughts on that.

10:51:45  15    Do you have any others on that?

16    MR. LOPEZ:  Just that it's outside of your

17    instruction, Your Honor.  It's prejudice to us that they now

18    have to consider the impact on the rest of the world.  It's

19    just inappropriate.

10:51:55  20    THE COURT:  All right.

21    Mr. North?

22    MR. NORTH:  Your Honor, first of all, I want to, on

23    the record, apologize.  That was not intentional in the least.

24    I'm sorry.  At this moment, somewhat discombobulated by the

10:52:06  25    verdict and the punitive award, I completely overlooked that,

10:52:09  1    and I do apologize.

2              Going on, the whole purpose of punitive damages is to

3    deter.  That is -- and that's what they're trying to do.

4    That's the -- under Georgia law, the principles is deter from

10:52:23  5    future conduct.

6              Mr. O'Connor said "send a message" multiple times in

7    his closing statement.  I believe that it is important for the

8    jury to understand the full consequences of the deterrence

9    they are asking them to bring.

10:52:41  10             This is not a matter of -- at the liability phase

11   where we tried to inject something like that for the finding.

12   This is all in the context of their attempt to say that they

13   need -- the jury needs to deter our conduct.

14             Also, mitigating circumstances are clearly an aspect

10:53:04  15   in the jury's assessment, and I think a mitigating

16   circumstance is the ultimate impact of the jury's verdict.

17             And, Your Honor, I'm sorry.  When I say the

18   principles of deterring, that is the principal purpose of a

19   punitive award, Your Honor has said that at the beginning of

10:53:28  20   this instruction where you talk about "and the purpose of

21   punitive damages," which would have been referenced in the

22   original jury instruction.

23             THE COURT:  Okay.

24             I want to address another issue, Mr. Lopez.  This is

10:54:53  25   what I'm wrestling with.

10:54:56   1          I don't think that the effect on the medical

2     community is part of the instruction, and there's no evidence

3     in front of the jury about that effect.  However,

4     Mr. O'Connor, in effect, asked the jury for a punitive verdict

10:55:11   5     of $1.7 billion when he threw out the 10 percent number.

6          You said 1 percent of 17 billion.  Your math was

7     wrong.  That's $1.7 billion.

8          MR. O'CONNOR:  Math.

9          THE COURT:  Well, that is an extraordinary punitive

10:55:29  10     request.

11          It seems to me if you get up in front of this jury

12     and argue for a billion-dollar-plus punitive amount, it isn't

13     unreasonable for the other side to say consider the effect

14     that will have on this company.  Because that's an

10:55:47  15     extraordinary request.

16          And that was part of what Mr. North was arguing.

17          I'm interested in your response.

18          MR. LOPEZ:  This company, this -- his argument was

19     every company.

10:56:01  20          THE COURT:  I understand.

21          MR. LOPEZ:  The medical community at large, the

22     effect it would have --

23          THE COURT:  I understand.

24          MR. LOPEZ:  Obviously we briefed that, and we have

10:56:07  25     some pretty good case law that would allow you to grant our

10:56:09  1    motion, and that he had a chance to brief it too.

       2           And, you know, I understand -- no offense, they had

       3    that slide prepared in advance, and I think you would have

       4    required me, and I think we are all required, that if there's

10:56:25  5    a motion in limine, Your Honor --

       6           THE COURT:  Don't come back to that, please.

       7    Let's -- I'm trying to make the decision of whether it's right

       8    for this to be argued --

       9           MR. LOPEZ:  He can certainly argue, and he did very

10:56:37  10   effectively, the effect this would have on Bard.  1 percent of

       11   the sales, all these good people, and all the other things

       12   they do, the effects it would have on their company in doing

       13   the research and all these other products.

       14          But then to put in front of the jury the effect this

10:56:51  15   is going to have on the medical community, other medical

       16   device companies, and all things that he said outside of the

       17   effects on Bard is not relevant to the instruction you gave,

       18   and it is in violation of that motion in limine.

       19          I understand what you're saying.  He could argue all

10:57:08  20   day long.  He talked about the shareholders, the effects it's

       21   going to have on shareholders.  Very effective argument, all

       22   those things.

       23          But for him now to scare this jury, oh my God, you

       24   know, whatever we do to Bard is going to affect Gore, it's

10:57:22  25   going to affect Johnson & Johnson, it's going to affect all

10:57:25  1    these other medical device companies, there's no evidence of

2    it.  It's just --

3              THE COURT:  All right.  I understand.

4              Had this been raised, I believe my ruling would have

10:57:57  5    been that it is fair for the defendants to argue about the

6    effect that the requested punitive damages would have on Bard

7    and on Bard's work and on Bard's research, because I think

8    that's all fair.

9              I believe I would have said you cannot argue, in

10:58:19 10    effect, that there's going to be fewer services in the

11    emergency room or in the hospital or less development of

12    product by this verdict.  I think that's where I would have

13    drawn the line.  Clearly, that was a part of the argument that

14    was just made.

10:58:33 15              So I'm going to instruct the jury that in deciding

16    punitive damages, they can consider the effect on Bard and its

17    operations, but they cannot consider the effect that any

18    punitive damages award would have on the larger medical

19    community or development of medical products generally or the

10:58:57 20    availability of medical products or services.

21              And that's the instruction I'll give to cure this

22    error.

23              MR. LOPEZ:  Thank you, Your Honor.

24              THE COURTROOM DEPUTY:  The jury is asking for

10:59:09 25    restroom a break.

10:59:10  1          THE COURT:  Go ahead, let them go.

       2      (The jury exited the courtroom.)

       3          THE COURT:  You've got three minutes, though.  I gave

       4   you 20 when you got up, by the way.  A little more than -- and

10:59:18  5   you used --

       6          MR. O'CONNOR:  Appreciate that.

       7          THE COURT:  You used, actually, 23 and a half.

       8          MR. O'CONNOR:  We already talked about I'm not good

       9   at math.

10:59:28 10          Thank you, Your Honor.

      11      (Bench conference concludes.)

      12          THE COURT:  Counsel, would you approach for a minute,

      13   please.

      14      (Bench conference as follows:)

11:02:20 15          THE COURT:  As I was sketching out what I was going

      16   to say, I am a bit uncomfortable telling the jury what they

      17   can and cannot think about.  I think the proper way to phrase

      18   the instruction is to say that they can consider defendants'

      19   arguments on Bard and its future operations and developments,

11:02:41 20   but they should disregard defendants' arguments on the effect

      21   on other companies, the medical community, et cetera.

      22          So I'm not telling them you can't think about this.

      23   Jurors can think about whatever they choose.  I'm just

      24   correcting what was argued.

11:02:58 25          Any comments on that?

11:02:59  1          MR. LOPEZ:  That's fine.

       2          MR. NORTH:  No.

       3          THE COURT:  Okay.  That's how I'll phrase it.

       4      (Bench conference concludes.)

11:03:02  5      (The jury entered the courtroom.)

       6          THE COURT:  Please be seated.

       7          Ladies and gentlemen, before we hear the brief

       8  rebuttal of plaintiff's counsel, I want to give you one more

       9  instruction in light of a legal ruling that I've made as a

11:05:10 10  result of our conference at sidebar.

      11          With respect to the arguments that were made by

      12  defendants, you may consider defendants' arguments regarding

      13  the effect that any punitive damages award would have on Bard

      14  or its future operations or development, but you should

11:05:31 15  disregard defendants' arguments regarding the effect a

      16  punitive award would have on other companies or on the

      17  development of products by other companies or on the

      18  availability or quality of medical products or services

      19  generally.

11:05:49 20          All right.  Mr. O'Connor.

      21          MR. O'CONNOR:  Thank you, Your Honor.

      22          Members of the jury, I was just reminded that I am

      23  decimal point challenged and math challenged.  But my

      24  discussion before about the value of Bard was just to simply

11:06:07 25  make an analogy on what it may take to get somebody's or

11:06:12   1   something's attention.

2   But that's why you're here.  Because you are the

3   community right now.  You are the enforcers of the rules, and

4   you are the body that can stop this behavior.  And you have

11:06:28   5   sat here and worked hard for us and you have been attentive,

6   and you are the most effective group to enforce the safety and

7   send the message that needs to be sent.

8   And I want you to know that on behalf of the

9   plaintiffs, we do appreciate what you've done here to help us

11:06:53  10   get to this point.  And that we know that the message has to

11   be sent and that you will do the appropriate -- the

12   appropriate work and send the appropriate message that is

13   necessary to get the attention of Bard and the people who make

14   decisions, and to tell them and come up with an amount that is

11:07:17  15   necessary to make it stop and make it start realizing that

16   Arizona juries believe that patient safety must always be

17   placed number one.  And if you're going to spend the amount of

18   money for research and development as they say they do, make

19   sure a good portion of that money goes to clinical studies for

11:07:43  20   filters so that human experimentation stops.  Stops at Bard.

21   Stops right here.  Right today.

22   Thank you.

23   THE COURT:  All right.  Thank you, Mr. O'Connor.

24   Ladies and gentlemen, you can retire to deliberate.

11:07:59  25   We will send you a copy of the instructions I read a few

11:08:02  1   minutes ago and a simple verdict form on punitive damages.

2   Those will be in to you shortly.

3          We will excuse the jury.

4      (The jury exited the courtroom at 11:08.)

11:08:30  5          THE COURT:  All right.  Counsel, we'll let you know

6   soon as we hear something from the jury.

7          MR. NORTH:  Thank you, Your Honor.

8          MR. LOPEZ:  Thank you, Your Honor.

9      (Recess was taken from 11:08 to 11:23.  Proceedings

11:08:35  10  resumed in open court outside the presence of the jury.)

11          THE COURT:  Please be seated.

12          Counsel, I'm told the jury has a verdict, so we will

13  have them return to the courtroom.

14      (The jury entered the courtroom.)

11:25:42  15          THE COURT:  Please be seated.

16          Juror Number 3, has the jury reached a unanimous

17  verdict on punitive damages?

18          JURY FOREPERSON:  We have, Your Honor.

19          THE COURT:  All right.  Please hand the award to

11:25:51  20  Nancy.

21          I'm going to ask Traci to read the verdict.

22          THE COURTROOM DEPUTY:  Omitting the formal caption:

23  We the Jury, duly impaneled and sworn in the above entitled

24  action, upon our oaths, find the amount of punitive damages to

11:26:19  25  be $2 million.

| | | |
|---|---|---|
| 11:26:21 | 1 | Signed by Foreperson Number 3, March 30th, 2018. |
| | 2 | THE COURT:  Would you please poll the jury. |
| | 3 | THE COURTROOM DEPUTY:  Juror Number 1, is this your |
| | 4 | verdict? |
| 11:26:31 | 5 | JUROR:  Yes. |
| | 6 | THE COURTROOM DEPUTY:  Juror Number 2, is this your |
| | 7 | verdict? |
| | 8 | JUROR:  Yes. |
| | 9 | THE COURTROOM DEPUTY:  Juror Number 3, is this your |
| 11:26:33 | 10 | verdict? |
| | 11 | JUROR:  Yes. |
| | 12 | THE COURTROOM DEPUTY:  Juror Number 4, is this your |
| | 13 | verdict? |
| | 14 | JUROR:  Yes. |
| 11:26:36 | 15 | THE COURTROOM DEPUTY:  Juror Number 5, is this your |
| | 16 | verdict? |
| | 17 | JUROR:  Yes. |
| | 18 | THE COURTROOM DEPUTY:  Juror Number 6, is this your |
| | 19 | verdict? |
| 11:26:40 | 20 | JUROR:  Yes. |
| | 21 | THE COURTROOM DEPUTY:  Juror Number 7, is this your |
| | 22 | verdict? |
| | 23 | JUROR:  Yes. |
| | 24 | THE COURTROOM DEPUTY:  Juror Number 8, is this your |
| 11:26:45 | 25 | verdict? |

11:26:46   1          JUROR:  Yes.

           2          THE COURTROOM DEPUTY:  Juror Number 9, is this your

           3   verdict?

           4          JUROR:  Yes.

11:26:49   5          THE COURT:  All right.  The polling has shown this

           6   verdict to be unanimous.

           7          Ladies and gentlemen, that finishes your work in this

           8   trial.

           9          Thank you very much on behalf of the parties and all

11:26:59  10   of us here for the time you've spent on this case and the

          11   careful attention you've given to it.

          12          We're going to excuse you at this time.  You're also

          13   now no longer under the injunction that you can't talk about

          14   the case.  If you want to talk to people, feel free.

11:27:13  15          I've reminded the parties that our local rules do not

          16   allow the parties to contact you without my permission, but if

          17   you want to talk to anybody else, you're welcome to do that.

          18          So we'll excuse you.  If you don't mind waiting for

          19   just a minute in the jury room, I'd like to come back and

11:27:30  20   thank you personally.

          21          We will excuse the jury at this time.

          22     (The jury exited the courtroom at 11:27.)

          23          THE COURT:  Counsel, I don't know if you've seen it,

          24   but I entered an order -- well, I don't know if it's been

11:27:55  25   entered; it should have been entered -- reflecting the things

11:27:58  1    we settled yesterday in terms of the dates that are upcoming.

2    So our next event will be the April 13th hearing on issues

3    related to the Jones case.

4            I think we covered all of the other bases in that

11:28:09  5    order in terms of other things that need to be done.

6            Are there any other matters that we need to raise

7    before we break?

8            MR. NORTH:  Nothing for the defendants, Your Honor.

9            MR. LOPEZ:  Nothing from the plaintiffs, Your Honor.

11:28:21 10    Thank you.

11            THE COURT:  Okay.  We'll see you on April 13th.

12            Thank you.

13        (End of transcript.)

14                            *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion

9   of the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control, and to the best

12  of my ability.

13

14         DATED at Phoenix, Arizona, this 31st day of March,

15  2018.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter

21

22

23

24

25