**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation, | No. MDL 15-02641-PHX-DGC |
| _____ | |
| Doris Jones, an individual, | No. CV-16-00782-PHX-DGC |
| Plaintiff, | |
| v. | |
| C. R. Bard, Inc., a New Jersey corporation; and Bard Peripheral Vascular, Inc., an Arizona corporation, | **ORDER** |
| Defendants. | |

The Court held a hearing with the parties on April 13, 2018, to discuss matters decided for the Booker trial that the parties wish to have reconsidered for the Jones trial. The Court took two matters under advisement: whether evidence of the complications, testing, and design of the Recovery filter should be admitted in the Jones trial, and whether evidence of deaths caused by cephalad migration of the Recovery filter should be admitted. These matters were the subject of briefing before the hearing and argument during the hearing. *See* Docs. 10677, 10707.

Plaintiff Doris Jones was implanted with a Bard Eclipse filter in August 2010. The filter later fractured, and a strut migrated to Ms. Jones' lung. She asserts claims for defective design, failure to warn, fraudulent concealment, and punitive damages.

## A. Evidence of Recovery Filter Complications, Testing, and Design.

Defendants note that the relevant progression of their retrievable filter line is as follows: Recovery, G2, G2X, Eclipse. They argue that the Eclipse filter at issue in this case is three generations removed from the Recovery filter and that complications with the Recovery therefore are not relevant to the alleged design defects or failure to warn related to the Eclipse.

Plaintiff claims that design defects in the Eclipse trace directly back to the Recovery, and that those defects can be understood only in the context of the entire filter-line development. Plaintiff asserts that problems with the Recovery led directly to a poorly-tested set of changes in the G2 filter; that those changes created other problems in the G2, including tilt, fracture, and caudal migration (away from the head); that the G2X and Eclipse filters were essentially the same as the G2, adding only a retrieval hook and electropolishing; and that Bard acted unreasonably in failing to implement effective tests and design changes when developing the G2, and, later, in failing to correct apparent G2 problems, leading directly to the Eclipse defects that caused Ms. Jones' injury. Doc. 10707.

The Court concludes that the Recovery filter's complications, testing, and design are relevant to this case. Those events help explain the testing, development, and design of the G2, and Plaintiff contends that the G2 was essentially the filter she received. The history of the Recovery and how it led to the G2 tends to make a fact in dispute – the allegedly defective design of the Eclipse – more probable. Fed. R. Evid. 401.

The Court cannot conclude that evidence of the Recovery's complications, testing, and design should be precluded under Rule 403. The Court does not find such evidence to be unfairly prejudicial – it is a relevant part of the Eclipse filter's design history. Further, Plaintiff's counsel presented much of the same evidence during the Booker trial. Although the Court felt that Plaintiff's counsel were less efficient in that trial than they could have been, the Court will hold Plaintiff to the established time limits in this case

and concludes that Recovery filter evidence will not result in a waste of time or confusion of the issues. *See* Doc. 10587.

**B.      Evidence of Deaths Caused by Recovery Filter Cephalad Migration.**

Deaths caused by the Recovery filter's cephalad migration (toward the head) present a different question. Such deaths might clear the threshold for relevancy in Rule 401 because, as explained above, they are part of the history of the filter line's development. But for several reasons the Court finds this relevancy to be marginal in Ms. Jones' case.

First, the complication of cephalad migration did not continue in any significant degree beyond the Recovery filter. As Plaintiff's counsel admitted during the April 13 hearing, changes made in response to cephalad migration largely eliminated that direction of migration in the G2 and later filters. The Court's notes from the Booker trial reflect that Plaintiff identified only one instance of cephalad migration by a G2 filter. And Plaintiff's counsel acknowledged during the hearing that they are not aware of any instances of death caused by cephalad migration of G2, G2X, or Eclipse filters.

Second, the cephalad migration deaths all occurred before the Recovery filter was taken off the market in late 2005. Ms. Jones did not receive her Eclipse filter until January of 2010. The passage of more than four years and three filter generations makes the cephalad migration deaths remote in time.

Third, the cephalad migration deaths say nothing about several of Ms. Jones' claims in this case: strict liability design defect, strict liability failure to warn, negligent failure to warn, or fraudulent concealment. Proof of the cephalad migration deaths from the Recovery filter in 2004 and 2005 does not show that the Eclipse filter had a design defect when it left Defendants' control several years later, or that Defendants' later warnings regarding the Eclipse were inadequate or fraudulent.

The cephalad migration deaths arguably are more relevant to Ms. Jones' negligent design defect claim because they help show the extent to which Defendants allegedly failed to exercise reasonable care in designing and testing the G2 filter. But the things

Defendants allegedly failed to do in developing the G2 – perform a viable root cause analysis, test adequately, follow established design principles – can all be shown through Plaintiff's experts and without mention of the cephalad migration deaths. The deaths arguably could make these failures appear even more negligent because Defendants were aware of severe consequences from the Recovery's design, but they do not prove the negligence. Evidence of the deaths remains marginal – it adds some weight to Plaintiff's negligence claim, but it is not central to proof of design negligence.

Fourth, Plaintiff asserts a claim for punitive damages and argues that the cephalad migration deaths are relevant to whether Defendants acted with the state of mind needed for such damages: willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that would raise the presumption of conscious indifference to consequences. Doc. 10588 at 29. Under Georgia law, which governs Plaintiff's claims, "evidence of other incidents involving the product is admissible, and relevant to the issues of notice of a defect and punitive damages, provided there is a showing of substantial similarity." *Gen. Motors Corp. v. Moseley*, 447 S.E.2d 302, 306 (Ga. Ct. App. 1994) (citing *Mack Trucks v. Conkle*, 436 S.E.2d 635 (Ga. 1993)). "'Without a showing of substantial similarity, the evidence is irrelevant as a matter of law.'" *Id.* (quoting *Carlton Co. v. Poss*, 183 S.E.2d 231 (Ga. Ct. App. 1971)); *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) ("A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages.").

In denying Defendants' request for summary judgment on Plaintiff's punitive damages claim, the Court found generally that Plaintiffs have shown a substantial similarity between filters – between the Eclipse filter and the Recovery and G2 filters. Doc. 10404 at 19. But the Court concludes that instances of cephalad migration resulting in death are not substantially similar to complications experienced by the G2, G2X, or Eclipse. As noted above, cephalad migration was largely eliminated by the design of the G2, and Plaintiff has identified no cephalad migration deaths caused by any of the G2

line of filters, including the Eclipse. The deaths therefore do not meet the substantial similarity requirement of Georgia law.

The deaths would be clearly relevant to punitive damages if they were caused by the Eclipse or its predicate device – if Defendants continued to market the Eclipse in the face of unusually high patient deaths. But Defendants did not do that; the cephalad migration deaths stopped when the Recovery was taken off the market in 2005. Plaintiffs do contend that Defendants continued to market the G2, G2X, and Eclipse with knowledge of other complications, but none of those complications included cephalad migration. The deaths shed little light on Defendants' state of mind when marketing different filters with different complications, years later. *See Gen. Motors*, 447 S.E.2d at 307 (finding reversible error where counsel for plaintiffs referenced deaths and other lawsuits during trial without first making a showing of substantial similarity to the incident at issue); *Ray v. Ford Motor Co.*, 514 S.E.2d 227, 230-31 (Ga. Ct. App. 1999) (affirming decision to exclude evidence about a Ford database listing prior instances of inadvertent vehicle movement where the plaintiff failed to establish that the incidents were substantially similar to his accident).[1]

Thus, when all of the issues in this case are considered, the cephalad migration deaths have, at most, marginal relevancy. Given this level of relevancy, the Court finds that the probative value of the death evidence is substantially outweighed by the danger of unfair prejudice. "Unfair prejudice is an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Haischer*, 780 F.3d 1277, 1281 (9th Cir. 2015) (citation and quotation marks omitted). The fact that several patients died when their Recovery filters migrated in a cephalad

---

[1] To the extent Plaintiff suggests that Defendants' alleged indifference during the marketing of the Recovery shows that Defendants were also indifferent when marketing the Eclipse, they suggest a propensity use of the evidence that is prohibited by Rule 404(a) and (b). Plaintiff has not argued that cephalad migration deaths should be admitted under one of the permissible purposes in Rule 404(b)(2). But even if Plaintiff made this argument, the Court can see no permitted use of the death evidence in that rule. And, in any event, Rule 404(b) analysis remains subject to Rule 403, and the Court concludes in this order that admission of the death evidence would violate Rule 403.

- 5 -

direction would have an undue tendency to prompt a jury decision based on emotion. The Court concludes that the danger of this emotional reaction substantially outweighs any marginal relevancy of the death evidence in this case, and therefore will exclude the evidence under Rule 403.

The Court reached a different conclusion in Booker, holding that evidence of cephalad migration deaths could be admitted. Doc. 10323 at 4. But Booker concerned a G2 filter for which the Recovery was the predicate device. Defendants represented to the FDA – and, in essence, to the jury – that the G2 was as safe and effective as the Recovery. This put the safety and effectiveness of the Recovery filter squarely at issue. And even with this greater relevancy, the Court in Booker expressed concern that too heavy an emphasis on the cephalad migration deaths would result in unfair prejudice that substantially outweighed the probative value of the evidence. *Id.*

In this case, the Court finds that deaths caused by a non-predicate device, and by a form of migration that was eliminated years earlier, are of sufficiently limited probative value that their relevancy is substantially outweighed by the danger of unfair prejudice.

**IT IS ORDERED:** At trial, Plaintiff may present evidence of the complications, testing, and design of the Recovery filter, but not of deaths caused by cephalad migration of the Recovery filter.

Dated this 18th day of April, 2018.

_____
David G. Campbell
United States District Judge