**EXHIBIT B**

```
 1         A.      Uh-huh.

 2         Q.      Yes?

 3         A.      Yes.

 4         Q.      I'm sorry.  You've got to answer

 5    aloud for her.

 6         A.      Yes.

 7         Q.      Were you ever told by Mr. -- is it

 8    Ferrara?

 9         A.      Uh-huh.

10         Q.      -- Mr. Ferrara that Bard had a crisis

11    management plan, as early as 2004, to deal with the

12    high rates of AEs, that being, adverse events,

13    perforation, fracture and migration?

14                 MS. HELM:  Object to the form.

15                 THE WITNESS:  No.

16    BY MR. MATTHEWS:

17         Q.      Were you ever told that Bard

18    conducted an investigation in 2004 into the high

19    number or large number of adverse events of the

20    Recovery done by an independent investigator?

21                 MS. HELM:  Object to the form.

22                 THE WITNESS:  No.

23    BY MR. MATTHEWS:

24         Q.      Were you ever sent a letter by the

25    company that talked to you or -- I'm sorry, that
```

As to 33:10-13 & 33:17-20: Bard's Preliminary Objection No. 1 -- Recovery Filter/Cephalad Migration -- Rules 401, 402, and 403

Rule 611(c) leading of witness on direct.

Rule 402, 403. This is not related to the G2 filter.

As to 33:24-35:1: Questions are all leading, Rule 611(c).

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    informed you about the results of this
 2    investigation, this independent investigation by
 3    Bard?
 4             MS. HELM:  Object to the form.
 5             THE WITNESS:  No.
 6    BY MR. MATTHEWS:
 7        Q.    Were you ever told, either by letter
 8    or by Mr. Ferrara, that there was a 530 percent
 9    higher fracture rate than other filters on the
10    market with the Bard Recovery?
11             MS. HELM:  Object to the form.
12             THE WITNESS:  No.
13    BY MR. MATTHEWS:
14        Q.    Were you ever told that there was a
15    1,200 percent higher risk of death from the Recovery
16    fracture and embolization to the heart than other
17    filters on the market?
18             MS. HELM:  Object to the form.
19             THE WITNESS:  No.
20    BY MR. MATTHEWS:
21        Q.    In 2004 and 2005, clearly two years
22    prior to implanting Ms. Booker with the G2, would
23    that have been important information for you to
24    know?  Assuming that that was information that was
25    known to Bard, is that something that you would want
```

- Rule 611 assumes facts not in evidence. Rule 611(c) leading of witness on direct.
- Rule 402, 403 & CMO 31. Rule 611 assumes facts not in evidence. Rule 611(c) leading of witness on direct.
- Rule 611(c) leading of witness on direct. Rule 611 assumes facts not in evidence.

```
 1    and filter fracture associated with the Recovery
 2    filter were seen in the MAUDE database at reporting
 3    rates that were 4.6, 4.4, 4.1 and 5.3 higher,
 4    respectively, than reporting rates for all other
 5    filters.
 6                    Doctor, this is dated December 17th,
 7    2004.  Would this have been important information
 8    for you to know, that is, a doctor who is implanting
 9    Recovery filters, that those filters had a greater
10    risk of fracture that's four and five times higher
11    than the competitor filters?
12                    MS. HELM:  Object to the form.
13                    THE WITNESS:  Yes.
14    BY MR. MATTHEWS:
15         Q.    Is that the type of information that
16    would influence your prescribing habits, whether you
17    would use that filter, a Bard filter, or another
18    filter?
19                    MS. HELM:  Object to the form.
20                    THE WITNESS:  Yes.
21    BY MR. MATTHEWS:
22         Q.    Let me show you what's been marked as
23    Exhibit-3, which is the Recovery filter migration,
24    Remedial Action Plan, dated January 4, 2005.
25                           - - -
```

[Annotation at line 15: Rule 611(c) leading of witness on direct.]

```
 1                  (Whereupon, Exhibit-3,
 2     BPVE-01-01019773-784, Recovery Filter Migration,
 3     Dated 1/4/05, was marked for identification.)
 4                         - - -
 5     BY MR. MATTHEWS:
 6          Q.     Again, this is a full two and-a-half
 7     years prior to implanting Ms. Booker with the G2.
 8                  And I would turn your attention to
 9     the first, second, third, fourth, fifth page.  It
10     says, actually, 1 of 7 on the fifth page of that
11     document.
12          A.     I'm sorry, could you --
13          Q.     At the bottom under Roman III.
14                  It says, Identification of the
15     problem:  As part of the ongoing evaluation of RNF,
16     Recovery Nitinol filter, Bard requested an
17     independent study of the risks and benefits of the
18     RNF, with an emphasis on its use in bariatric
19     surgery and trauma patients.  A consultant was
20     retained for this purpose and reported the
21     following:  The MAUDE database maintained by the FDA
22     was reviewed.  The reporting rates between the RNF
23     and aggregates of the other commercialized vena cava
24     filters were compared.
25                  A, in the MAUDE dataset, the RNF
```

> Rule 403. Document refers to Bariatric and trauma patients. Plaintiff is neither of those.
>
> Incomplete question; also question was stricken see page 39:21-22.

```
 1    demonstrated a consistent statistically significant

 2    and potentially clinically important higher rate of

 3    reporting of adverse events in several analyzed

 4    categories.

 5                    B, given the pattern of reported

 6    events, a higher rate of death reports seem related

 7    to filter movement and filter embolization.

 8              You referenced the MAUDE database

 9    earlier in questions, Doctor.  Is that information

10    important to you as a doctor that is implanting the

11    Recovery filter?

12              MS. HELM:  Object to the form.

13              MR. LERNER:  Which information?

14              MR. MATTHEWS:  That is A and B that I

15    just read.

16              MS. HELM:  Object to the form.

17              MR. LERNER:  But you questioned him,

18    you said you referenced the MAUDE database before.

19    Your question then becomes confusing.  I'm asking

20    you to clarify it.

21              MR. MATTHEWS:  All right.  I'll

22    strike it and ask another question.

23    BY MR. MATTHEWS:

24         Q.        In looking at A and B, Doctor, is

25    that the type of information that's important to you
```

[Annotation: Rule 611(c) leading of witness on direct.]

```
 1    to know prior to implanting a Recovery filter?

 2           A.      Yes.

 3                   MS. HELM:  Object to the form.

 4    BY MR. MATTHEWS:

 5           Q.      Do you know what the term

 6    "statistically significant" means?

 7           A.      I do.

 8           Q.      And that's an important

 9    epidemiological statement, correct?

10                   MS. HELM:  Object to the form.

11                   THE WITNESS:  Statistical statement,

12    yes.

13    BY MR. MATTHEWS:

14           Q.      Doctor, at the Methodist Hospital in

15    2007, did you have more than one filter at your

16    disposal?  That is, you talked about, I think you

17    told me, you had the TRAPEASE, you had the Tulip,

18    and you had the Recovery, and you had the select.

19                   Were all of those available back in

20    2007, do you recall?

21           A.      No.

22           Q.      Do you know which were available?

23           A.      The G2.

24           Q.      That was the only one available in

25    the hospital?
```

> As to 40:8-9: Bard's Preliminary Objection No. 1 -- Recovery Filter/Cephalad Migration -- Rules 401, 402, and 403
>
> Rule 611(c) leading of witness on direct.

```
 1    time period are you talking about now?
 2              MR. MATTHEWS:  Well, that was kind of
 3    a general question as to filters in general.  So I
 4    will leave that open.
 5    BY MR. MATTHEWS:
 6         Q.      Whether you have a medical opinion
 7    from your practice, from your reading, from your
 8    research, from your treatment of patients, as to
 9    which filter failure would be the most dangerous,
10    producing the most serious injury to a patient.
11              MS. HELM:  Object to the form.
12              THE WITNESS:  I do.
13    BY MR. MATTHEWS:
14         Q.      What's your opinion?
15         A.      Obviously, all complications are bad,
16    although caval thrombosis can be devastating in
17    terms of lower extremity edema and dysfunction.  I
18    think that migration or fracture are more serious
19    events.
20         Q.      Were you ever told, at any time prior
21    to today and being shown some documents about the
22    MAUDE database, that Bard evaluated specifically the
23    MAUDE database to compare their filter with others
24    in 2004?
25              MS. HELM:  Object to the form.
```

As to 43:20-24: Bard's Preliminary Objection No. 1 -- Recovery Filter/Cephalad Migration -- Rules 401, 402, and 403.

Rule 403, unrelated to filter at issue.

Do Not Disclose - Subject to Further Confidentiality Review

| | |
|---|---|
| As to 44:3-8: Bard's Preliminary Objection No. 1 -- Recovery Filter/Cephalad Migration -- Rules 401, 402, and 403.<br><br>Rule 403, unrelated to filter at issue.<br><br>Rule 611(c) leading of witness on direct. | 1   THE WITNESS:  No.<br>2   BY MR. MATTHEWS:<br>3       Q.   Is that the type of information you<br>4   would expect a manufacturer that sets out to make a<br>5   decision, or at least look at the MAUDE information<br>6   to determine filter fracture compared to other<br>7   filters on the market, is that the type of<br>8   information you want to know about?<br>9          MS. HELM:  Object to the form.<br>10         THE WITNESS:  Yes.  But it's a bit<br>11  more complicated in the sense that my understanding<br>12  of the MAUDE database is that it is a voluntary<br>13  database.  It's not legally required for a physician<br>14  to report a problem with an implant or a product,<br>15  although you could argue that it is ethically<br>16  required.  As with any database, it has problems<br>17  with regards to vetting of data, with regards to<br>18  accuracy of data.<br>19          So if a concern existed regarding a<br>20  particular product, yes, I think that should be<br>21  brought forth and studied, scientifically studied<br>22  and addressed.<br>23  BY MR. MATTHEWS: |
| As to 44:24-25: Bard's Preliminary Objection No. 1 -- Recovery Filter/Cephalad Migration -- Rules 401, 402, and 403. | 24      Q.   At a bare minimum, the MAUDE database<br>25  would be a signal, a red flag -- |

Golkow Technologies, Inc.                                           Page 44

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    have been reported without any adverse clinical
 2    sequelae.
 3                   I'd like to ask you about the first
 4    sentence:  Filter fracture is a known complication
 5    of vena cava filters.
 6                   Doctor, do you read that in the IFU
 7    to mean that the rates of filter fracture are
 8    similar with all filters?
 9                   MS. HELM:  Object to the form.
10                   THE WITNESS:  I don't read anything
11    about rate.  I read something about complications
12    and about the potential for fracture.  So it makes
13    no specific statements with regards to the incidence
14    of this occurrence.
15    BY MR. MATTHEWS:
16        Q.    If there is evidence that the company
17    had, in 2006 or prior to that publication being sent
18    to you with the filter, and there was a showing
19    within the company of a 500 percent greater risk
20    with Bard filter compared with other filters, is
21    that the information -- the type of information that
22    you would want to know about?
23                   MS. HELM:  Object to the form.
24                   THE WITNESS:  Yes.
25    BY MR. MATTHEWS:
```

Rule 611(c) leading of witness on direct.

As to 49:16-22: Bard's Preliminary Objection No. 1 -- Recovery Filter/Cephalad Migration -- Rules 401, 402, and 403.

Rule 611 assumes facts not in evidence.

Rule 611(c) leading of witness on direct.

Golkow Technologies, Inc.                                          Page 49

As to 51:4-8: Bard's Preliminary Objection No. 1 -- Recovery Filter/Cephalad Migration -- Rules 401, 402, and 403.

Rule 611(c) leading of witness on direct.

```
 1    en masse, to follow that and inform doctors about
 2    what they see in the marketplace?
 3         A.    Yes.
 4         Q.    Were you ever told by Bard, Mr.
 5    Ferrara or anybody at Bard, that they had observed
 6    higher rates of complications with Recovery, that
 7    they placed it on a temporary commercial hold?  Did
 8    you ever know that?
 9               MS. HELM:  Object to the form.
10               THE WITNESS:  No.
11    BY MR. MATTHEWS:
12         Q.    Were you ever told why Bard withdrew
13    the Recovery from the market?
14         A.    No.
15         Q.    Were you ever told why Bard withdrew
16    G2 from the market?
17         A.    No.
18         Q.    Do you know Dr. Murray Ash?
19         A.    No.
20         Q.    Dr. Ash testified in this case that
21    he conducted a pilot study for the Recovery filter
22    and Bard advised him it would subsequently do a
23    larger safety study.
24               Let me ask you, do you know what a
25    pilot study is versus a clinical trial or --
```

Golkow Technologies, Inc.                              Page 51

```
 1   would I have used a different device if I knew at
 2   the time that the Bard filter was not ideal or as
 3   good as some of the other implants?  The answer
 4   would have to be yes.
 5   BY MR. MATTHEWS:
 6        Q.     You would have used --
 7        A.     I would have used a different filter
 8   if there was a different filter that I knew of that
 9   was better, in terms of its safety profile.
10        Q.     In terms of the documents that you
11   have, I think they are Exhibit-2 and 3, the health
12   hazard report and then the investigation conducted
13   by Bard that showed a fivefold increased risk for
14   fracture and embolization of that fracture, and you
15   told us that would be the type of information you
16   would want to know in your benefit/risk analysis,
17   knowing that --
18        A.     Yes.
19        Q.     -- and seeing that today, would that
20   have been enough to use another filter?
21              MS. HELM:  Object to the form.
22              THE WITNESS:  Difficult to say with
23   certainty.  It would depend upon what other filters
24   we had at the time and what their problems would
25   have been.  But it would have been a very important
```

As to 63:19-20: Bard's Preliminary Objection No. 1 -- Recovery Filter/Cephalad Migration -- Rules 401, 402, and 403.

Rule 611(c) leading of witness on direct.

```
 1    piece of information, as far as making decisions

 2    regarding this or any other patient, yes.

 3    BY MR. MATTHEWS:

 4           Q.       And it would have influenced your

 5    prescribing habit?

 6                    MS. HELM:  Object to the form.

 7                    THE WITNESS:  Yes.

 8    BY MR. MATTHEWS:

 9           Q.       Let me show you a study, I'm going to

10    mark this as D'Ayala Exhibit Number 7.  And this is

11    entitled, The Prevalence of Fracture -- I'm sorry,

12    let me hand that to you.

13           A.       Sure.

14           Q.       The Prevalence of Fracture and

15    Fragment Embolization of Bard Retrievable Vena Cava

16    Filters and Clinical Implications Including Cardiac

17    Perforation and Tamponade.

18                              - - -

19                    (Whereupon, Exhibit-7, AMA,

20    Prevalence of Fracture and Fragment Embolization of

21    Bard Retrievable Vena Cava Filters and Clinical

22    Implications Including Cardiac Perforation and

23    Tamponade, was marked for identification.)

24                              - - -

25    BY MR. MATTHEWS:
```

> As to 64:4-5: Bard's Preliminary Objection No. 1 -- Recovery Filter/Cephalad Migration -- Rules 401, 402, and 403.
>
> Rule 611(c) leading of witness on direct.

Do Not Disclose - Subject to Further Confidentiality Review

```
 1        Q.     A retrospective single-center
 2   cross-sectional study was conducted by evaluating
 3   all patients who received either a Bard Recovery or
 4   Bard G2 filter from April 2004 until January 2009.
 5               Under the results it says, 13 of 80
 6   patients had at least one strut fracture.  At least
 7   one strut in 7 of the 28 Bard Recovery filters
 8   fractured and embolized.  In 5 of the 7 cases,
 9   patients had at least one fragment embolize to the
10   heart, 71 percent of those that fractured.  Three
11   patients experienced life-threatening symptoms of
12   ventricular tachycardia and/or tamponade, including
13   one patient who experienced sudden death at home.
14   Six of 52 Bard G2 filters fractured, 12 percent.  In
15   2 of these 6 cases, the patients had asymptomatic
16   end-organ fragment embolization.
17               Did I read that correctly?
18        A.     Yes, sir.
19        Q.     Okay.  The conclusion of this study
20   by Dr. Nicholson and other doctors in different
21   fields of medicine found the Bard Recovery and Bard
22   G2 filters had high prevalence of fracture and
23   embolization with potentially life-threatening
24   sequelae.
25               Doctor, if you had been warned prior
```

Bard's objection: Rule 602 - asking about article he had never seen. The study post dates his care and treatment of the Plaintiff (see line 4 above)

Rule 611(c) leading of witness on direct.

1  to June of 2007 of this information, I know this is
2  dated 2010, but I'm going to ask you the question
3  for purposes of a hypothetical, that is, had you
4  known this information of this conclusion, that the
5  G2 had a high prevalence of fracture and
6  embolization with life-threatening sequelae, would
7  that have influenced your prescribing habits and the
8  use of the G2 with Ms. Booker?
9             MS. HELM:  Object to the form.
10            THE WITNESS:  Yes.
11  BY MR. MATTHEWS:
12       Q.    Do you know of any reason back after
13  the pilot study in 2002 why Bard could not have
14  conducted a clinical trial with its G2 and done
15  follow-up with patients from the original pilot
16  study?
17            MR. LERNER:  I'm not sure how --
18            MS. HELM:  Object to form.
19            MR. LERNER:  I'm not sure how he's
20  supposed to be able to answer a question like that.
21  That doesn't seem like a fair question for this
22  doctor.
23            MS. HELM:  I object to the form.
24  BY MR. MATTHEWS:
25       Q.    I ask you because you have conducted

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    if you extrapolate indwelling time with the G2

 2    filter, that making it a 25 percent filter fracture

 3    rate for the G2.

 4               Do you understand that premise within

 5    the paper?

 6         A.    I think I understand the premise.

 7    I'm not so sure that I understand the science behind

 8    it.

 9         Q.    Well, let me ask you this question,

10    then, Doctor:  If you knew back in 2007 when you

11    were implanting that filter that there was even a 12

12    percent probability of fracture with that filter,

13    would you have used a G2?

14               MS. HELM:  Object to the form.

15               THE WITNESS:  Unlikely.

16    BY MR. MATTHEWS:

17         Q.    If there was a 25 percent risk of

18    filter fracture, can we safely say you would not

19    have used that filter?

20         A.    Most likely.  But you have to

21    understand that you have to have a way of treating

22    these difficult patients.  So some filter has to be

23    used.  And it becomes a matter of deciding which

24    filter is best, so to speak.  And sometimes that's

25    not entirely clear.
```

**Bard's Preliminary Objection No. 1 -- Recovery Filter/Cephalad Migration -- Rules 401, 402, and 403.**

**Rule 611, assumes facts not in evidence.**

**Rule 611(c) leading of witness on direct.**

**Affirmative Designation by Both Parties**