1            UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ARIZONA

3                 _____

4    In Re: Bard IVC Filters          )   MD-15-02641-PHX-DGC
     Products Liability Litigation     )
5                                      )   Phoenix, Arizona
                                       )   **May 15, 2018**
6    _____  )
     **Doris Jones, an individual,**        )
7                                      )
                        Plaintiff,     )
8                                      )   CV-16-00782-PHX-DGC
           v.                          )
9                                      )
     **C.R. Bard, Inc., a New Jersey**     )
10   **corporation; and Bard Peripheral**  )
     **Vascular, Inc., an Arizona**        )
11   **corporation,**                      )
                                       )
12                      Defendants.    )
     _____  )

13

14

15      BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

16         REPORTER'S TRANSCRIPT OF PROCEEDINGS

17            <u>TRIAL DAY 1 – A.M. SESSION</u>

18                (Pages 1 – 124)

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257

24

25   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared with Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2     For Plaintiff:

3             Gallagher & Kennedy
              By: **MARK S. O'CONNOR**, ESQ.
4             By: **PAUL L. STOLLER**, ESQ.
              By: **SHANNON L. CLARK**, ESQ.
5             By: **C. LINCOLN COMBS**, ESQ.
              2575 East Camelback Road, Suite 1100
6             Phoenix, AZ  85016

7             Lopez McHugh, LLP
              By: **RAMON ROSSI LOPEZ**, ESQ.
8             100 Bayview Circle, Suite 5600
              Newport Beach, CA  92660
9
              Lopez McHugh, LLP
10            By: **JOSHUA MANKOFF**, ESQ.
              214 Flynn Ave.
11            Moorestown, NJ  08057

12            Heaviside Reed Zaic
              By: **JULIA REED ZAIC**, ESQ.
13            By: **LAURA E. SMITH**, ESQ.
              312 Broadway, Ste. 203
14            Laguna Beach, CA  92651

15            Snyder & Wenner, PC
              By: **DAVID A. WENNER**, ESQ.
16            2200 E. Camelback Rd., Ste. 213
              Phoenix, AZ  85016

17

18

19    For Defendants:

20            Nelson Mullins Riley & Scarborough
              By: **RICHARD B. NORTH, JR.** ESQ.
21            By: **ELIZABETH C. HELM**, ESQ.
              201 17th Street NW, Suite 1700
22            Atlanta, GA  30363

23            Nelson Mullins Riley & Scarborough.
              BY: **JAMES F. ROGERS**, ESQ.
24            1320 Main St.
              Columbia, SC  29201

25

1          **A P P E A R A N C E S   (CONTINUED)**

2

3          Snell & Wilmer
           By: **JAMES R. CONDO,** ESQ.
4          By: **AMANDA C. SHERIDAN,** ESQ.
           400 East Van Buren
5          Phoenix, AZ  85004

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  MDL 2015-2641, Bard IVC
Filters Product Liability Litigation on for the Jones trial.

Will the parties please announce.

MR. O'CONNOR:  Good morning, Your Honor.
Mark O'Connor for the plaintiff.  Ramon Lopez, co-lead.
Shannon Clark, Lincoln Combs, Paul Stoller.

This is our client, Doris Jones.

Sitting back there we have Julia Reed Zaic and
Josh Mankoff, all part of our trial team.

THE COURT:  I couldn't hear the last few things you
said.  Could you talk into the mic.

MR. O'CONNOR:  Yes.  Laura Smith is not present but
she will also be part of the trial team.  Josh Mankoff, in the
back, and Julia Reed Zaic are here too.

THE COURT:  All right.  Good morning.

Morning, Mrs. Jones.

MR. NORTH:  Good morning, Your Honor.  On behalf of
the defendants, Richard North.  I'm also joined by
Elizabeth Helm, James Rogers, and Mr. James Condo.  And then
from C.R. Bard we have Ms. Candace Camarata, the assistant
general counsel.

THE COURT:  All right.  Good morning.

Good morning, Ms. Camarata.

08:31:15  1          Okay.  Counsel, we will have the jury panel coming up

2     at 9 o'clock.  The plan will be to do what we did in the

3     Booker trial:  I will give some introductory remarks just

4     explaining the process we will be going through, we'll swear

08:31:34  5     the jury panel, and then I will ask the voir dire questions

6     that we previously identified.  There's a total of 11 of them.

7          A thought that occurred to me this morning is on the

8     last question, which is whether anybody has done any research

9     or been exposed to any information about the case since they

08:31:56  10    filled out the jury questionnaire, what we should do is just

11    take the numbers of those jurors.  Have them raise their hand,

12    take down their numbers, but not ask them questions, for the

13    same reason we're not going to talk to Juror 48 about what she

14    read about the trial.  And then, after we excuse the jury

08:32:14  15    panel, come back to those individuals, have them remain and

16    bring them in and ask what it is they learned through research

17    or from the press just so that we don't have them saying

18    things in front of the jury panel that they've read in the

19    press.

08:32:31  20          Is there any objection to that procedure?

21          MR. O'CONNOR:  No.  I have no objection.  But I do

22    have something else I wanted to bring up to the Court.

23    David Wenner isn't here yet but he will also be here to assist

24    us with jury selection.

08:32:44  25          THE COURT:  All right.

08:32:45  1          MR. O'CONNOR:  And then, Your Honor --

        2          THE COURT:  Hold on just a minute.  Let's finish our

        3  business first before you go on to other subjects.

        4          Mr. North, do you have any concerns about that?

08:32:53  5          MR. NORTH:  I don't have any concerns, Your Honor,

        6  but I do think I need to bring to the Court's attention a very

        7  disturbing event that feeds exactly into that point.  We

        8  learned and two members of our team saw that this morning on

        9  Fox News in Phoenix there was an attorney advertisement

08:33:07  10  talking specifically about the $3.6 million verdict,

        11  mentioning specifically that the verdict was rendered on a

        12  negligent failure to warn claim, and also that the device that

        13  issued the filter had not been approved by the FDA.

        14          We know this ran in Phoenix this morning, two people

08:33:26  15  saw it.  We have our company that researches this for us

        16  looking into it further, but we're very disturbed about this

        17  and we think, obviously, the question that the Court just

        18  mentioned is imperative.

        19          We also think to the extent, if they are, the

08:33:42  20  Plaintiffs' Steering Committee, anyone associated with the

        21  steering committee is involved or has knowledge of this, that

        22  they need to stop right away for fear of tainting the jury

        23  pool and the jury.

        24          THE COURT:  Mr. Lopez?  Mr. O'Connor?

08:33:58  25          MR. O'CONNOR:  We have absolutely no knowledge about

08:34:00  1   that and are unaware of anybody who has been involved in that.

2   I haven't seen the commercial, haven't heard anything about

3   it.

4          MR. LOPEZ:  This is -- I'll be honest, first thing --

08:34:12  5   I was wondering what he was going to say.  We have no

6   knowledge of it, Your Honor.  I can assure you there is no one

7   on this trial team who is involved in that or knew anything

8   about it.

9          We will make inquiry of the rest of the people on our

08:34:22  10  leadership committee and make sure that we do whatever the

11  Court tells us to do in that regard.

12         It's usually not a member of the PLC, I can tell you

13  that, Judge.

14         THE COURT:  It seems to me that this is not an

08:34:35  15  appropriate ad to be running while we're in this trial.

16         Do you disagree with that?

17         MR. LOPEZ:  No.  I agree.

18         MR. O'CONNOR:  Agree.

19         THE COURT:  If you would inquire of your committee

08:34:48  20  and find out if anybody has knowledge, see if they can find

21  out who's doing it and get the word out that they shouldn't be

22  running these advertisements during the trial because it's

23  going to potentially affect the jury.

24         MR. LOPEZ:  Your Honor, on that point, though, like I

08:35:00  25  said, I am going to be surprised if it's any member of our

08:35:05   1   PLC.  These are often people we don't even know.  You can't

        2   even identify them in the ad.  What do you want us to do?  Do

        3   you want us to investigate that?

        4          THE COURT:  Well, I think you should inquire of the

08:35:16   5   committee, ask if they might know who it is, see what the

        6   committee can find out.  I think to the extent we can stop the

        7   ads, we've got a better chance of avoiding any potential

        8   influence on the jury that we would have to deal with.  So if

        9   you can do that and report back, I think that would be --

08:35:29  10          MR. LOPEZ:  I want to be clear, Your Honor.  No one

       11   on this trial team, we didn't know about it until just now.

       12          THE COURT:  All right.

       13          Okay.  So that's what we will do on that question.

       14          Now, it's potentially the case that one of the jury

08:35:40  15   panel members, even though we're not asking them, will say

       16   something about that.  If they do, I'll do my best to say

       17   let's talk about that afterward, and we can then talk about

       18   whether there's any sort of instruction I need to give to the

       19   jury panel.  We'll just have to manage that information as we

08:35:56  20   go forward.  But we'll just take numbers in response to

       21   question 11 and then talk to those folks after we've excused

       22   the rest of the jury panel.

       23          It may be that as we're going through the process,

       24   I'll do what I did last week, which is -- or last trial, which

08:36:15  25   is call you up and direct that we only ask follow-up questions

08:36:20  1    of 40 of the 60 to see if we can get a jury more quickly,

2    depending on what kind of responses we get to my voir dire.

3    But I'll call you up to sidebar if we're going to be doing

4    that.

08:36:34  5         After we've got the jury -- well, again, my plan

6    would be, as we did in the Booker case, to go into the noon

7    hour if we need to to get the jury chosen so we can let

8    everybody else go, not keep them over the lunch hour.

9         But we'll then take the lunch break before we have

08:36:51  10   openings and start into the evidence.

11        My plan, as we talked about before, is to read the

12   stipulated facts to the jury before the opening statements.

13        One more reminder.  Please keep in mind that openings

14   are not arguments and avoid argument.  Just discuss what you

08:37:11  15   think the evidence will show.

16        And the plan will be to go until 4:30 today with the

17   evidence that we get started on.

18        All right.  Plaintiff's counsel, do you have matters

19   you want to raise?

08:37:36  20        MR. O'CONNOR:  Your Honor, Juror 48, I just want,

21   again, clarification because I think there's going to be

22   additional questions that we have to that juror that do not

23   relate to that response about the verdict.  How do you want us

24   to approach or to address that?

08:37:54  25        THE COURT:  Well, you know, if there are questions

08:37:56  1    that are unlikely to elicit a comment about what that juror

          2    read, then I think they're fine, like, you know, where was it

          3    that your husband worked, or something like that.  But if you

          4    think there's a chance that the question you're going to ask

08:38:11  5    will elicit that response, then hold it until we question that

          6    juror after we excuse the rest of the jury panel.

          7            MR. O'CONNOR:  And here's the issue.  When we're

          8    going through the questionnaires, it looks like her husband

          9    has had a relationship with Bard, at least that's what we read

08:38:27 10    in the response.  And a question about what he does could -- I

         11    don't have any control over her response, is what I'm saying.

         12            THE COURT:  You can hold that question until we ask

         13    her questions after we've excused the jury panel.

         14            MR. O'CONNOR:  So we'll do that at the end.

08:38:43 15            THE COURT:  That's fine.

         16            MR. O'CONNOR:  All right.

         17            THE COURT:  Do plaintiff's counsel have other matters

         18    you want to raise before we get started this morning?

         19            MR. CLARK:  Good morning, Your Honor.

08:38:52 20            We do have a few narrow, happily, objections to a few

         21    of the slides in defendants' opening PowerPoint.  I don't know

         22    if this is the right time to talk about that.  We do have a

         23    few.

         24            THE COURT:  Yes, let's talk about that now.

08:39:05 25            MR. CLARK:  Your Honor, and we have met and conferred

08:39:10  1    concerning this, so we have substantially winnowed down our

       2    disagreements.  But we do have a few objections.  I assume the

       3    Court --

       4          Do you have an extra copy, Richard?

08:39:21  5    MR. NORTH:  Yes.

       6          May I approach the Court?

       7          THE COURT:  Sure.

       8          MR. CLARK:  Your Honor, the first objection we have

       9    is to slide 38, which is a medical history of Mrs. Jones.

08:39:39 10    There are references on this to unrelated medical conditions.

       11   They have removed a few, but dizziness maintains.  And

       12   pursuant to our motions in limine 1 through 3, our

       13   understanding of the Court's order was that the only condition

       14   that is really relevant here is the anemia condition, which is

08:40:02 15    not one of the ones on here.  So we think that that is going

       16   to be a distraction for the jury as far as getting into

       17   unrelated medical issues.

       18          So I think that this slide can be modified to remove

       19   the reference to the condition for which she presented without

08:40:17 20    having us have to go down that rabbit hole.

       21          THE COURT:  Are you just talking about the April 22nd

       22   reference?

       23          MR. CLARK:  April 22nd, Your Honor, as well as

       24   March 12th.

08:40:26 25          THE COURT:  All right.  Mr. North, what is your

08:40:27  1   thought on that?

2              MR. NORTH:  Your Honor, we did not read the

3        Court's -- well, first of all, I should note that we have

4        removed the references to hypertension in compliance with the

08:40:35  5   Court's order on limine.  This is an earlier draft.

6              As far as dizziness is concerned, we did not read the

7        Court's order as precluding that.  That is a symptom that she

8        claims both before and -- or had before and claims afterward.

9        It does not --

08:40:49  10             THE COURT:  Does she claim that it's caused by the

11       filter?

12             MR. CLARK:  No, Your Honor.

13             MR. NORTH:  Your Honor, she has mentioned that, I

14       believe, that it was related to the filter.

08:40:57  15             THE COURT:  Let's just ask plaintiff's counsel, are

16       you going to be asserting in this case that dizziness is

17       caused by the filter?

18             MR. CLARK:  We are not, Your Honor.  So as long as

19       there's not some effort to make this into a preexisting

08:41:09  20       condition, and that's the insinuation here, if it's just a

21       function of saying this is why she went to the hospital and

22       it's left at that, I don't think we have an objection.  But we

23       just don't want to be some type of evidentiary argument based

24       on this, a condition that we're not putting in at issue here.

08:41:25  25             THE COURT:  Okay.  So dizziness is not going to be

08:41:27  1    claimed to be caused by the filter?

2              MR. NORTH:  We'll remove it, then, Your Honor.

3              THE COURT:  Okay.  We'll take out dizziness.

4              And it seems to me that should be true on both

08:41:35  5    April 22nd and March 12th.  There's a reference to dizziness

6    in both of those.

7              MR. NORTH:  Yes, Your Honor.

8              THE COURT:  Okay.  With those coming out are you okay

9    with slide 38, Counsel?

08:41:47  10             MR. CLARK:  That's all on 38, Your Honor.

11             THE COURT:  Did you hear my question?

12             MR. CLARK:  I'm sorry, no.

13             THE COURT:  With those two taken out are you okay

14   with slide 38?

08:41:55  15             MR. CLARK:  We are, Your Honor.

16             THE COURT:  Okay.

17             MR. CLARK:  With respect to slides 45 and 46, these

18   relate to symptoms about how many Americans die from

19   medications, pulmonary embolism, and other conditions.  And,

08:42:16  20   Your Honor, we think that this is essentially getting into an

21   argument that filters save lives.  And in light of the Court's

22   ruling that we cannot introduce evidence of cephalad migration

23   death, we think it is very unfair to tell the jury that

24   filters save lives without us being able to tell the jury that

08:42:33  25   filters also cost lives.  And that is our objection to --

08:42:34  1          THE COURT:  I ruled on that specifically.  I said you

2     are not precluded from presenting evidence that a filter can

3     cause death.  A filter movement can cause death.

4          What I precluded is evidence of the cephalad

08:42:47  5     migration deaths from the Recovery filter.  But you can have

6     an expert explain that one of the complications of a filter

7     migrating can be death.  That was specifically in an order in

8     response to this argument.

9          So with that in mind, I'm interested in what your

08:43:01  10    view is on this slide.

11         MR. CLARK:  Your Honor, what is happening in practice

12    is we're getting exhibits that are -- that we're being asked

13    to redact basically anything related to death.

14         THE COURT:  That's why I specifically said that in

08:43:12  15    that order.  I tried to be very clear.  I'm not precluding the

16    mention of death in the case.  I'm just precluding cephalad

17    migration death.

18         So if there are exhibits where there's a Bard

19    discussion that this could cause a death, that doesn't have to

08:43:28  20    come out.

21         MR. CLARK:  All right, Your Honor.

22         THE COURT:  But my point is you can go back and put

23    that back in those exhibits.  I haven't ruled that that has to

24    come out.  What I'm interested in is your thought as to

08:43:41  25    whether or not there's a problem with slide 45 in light of the

08:43:45  1   fact that you are allowed to say to a jury, through a witness,

2   that death can be a consequence if a filter migrates to the

3   heart.

4        MR. CLARK:  With that clarification, then, we do

08:43:54  5   think that there really isn't evidence that filters do save

6   lives, but I think that gets more into argument and we

7   wouldn't object on the basis of that for the PowerPoint.

8        THE COURT:  Okay.

9        MR. CLARK:  Next one, Your Honor, is slide 96.

08:44:27  10   Again, this will get back into the issue that we talked about

11   with respect to slide 38 as far as preexisting conditions.

12   Fatigue, we agree, is fair.  We take issue with dizziness.  I

13   think that's been resolved by our agreement earlier.

14        THE COURT:  Is that coming out, Mr. North, of

08:44:45  15   slide 96?

16        MR. NORTH:  Yes, Your Honor.

17        THE COURT:  Okay.

18        MR. CLARK:  And then the other one is shortness of

19   breath, and that gets into tobacco use.  We read your motion

08:44:56  20   in limine ruling that tobacco use would be relevant if we

21   claim shortness of breath.  We will not be making a claim for

22   shortness of breath, so we think that introducing this in

23   opening statement -- obviously, if it comes in and we open the

24   door, that's one thing, but we don't want to inject tobacco

08:45:11  25   use into the case.  It is something that she did complain of

08:45:14  1    before, and we will not be offering evidence that shortness of

2    breath is a complaint that she attributes to her

3    filter-related injuries.

4           THE COURT:  All right.  Mr. North?

08:45:25  5           MR. NORTH:  Your Honor, we can take that out of the

6    slide if she's saying that she's no longer claiming that

7    shortness of breath is a result of the filter use.  But I

8    would note that the Court has also ruled in the motion in

9    limine, or order on the motion in limine, that her smoking

08:45:40 10    history is also relevant to her life expectancy.  So it's not

11    just a matter of them being able to close that door completely

12    as to -- by now saying that symptom is not related.

13           MR. CLARK:  Your Honor, if there were an expert or

14    some evidence in the case that her life expectancy is

08:45:59 15    shortened because of smoking, I think that would be a valid

16    argument, but we don't have any evidence in this case that

17    attributes a shortened life expectancy.  So, essentially, we'd

18    be asking the jury to speculate that because she smokes, her

19    life will be shorter, and we don't think that is appropriate

08:46:15 20    in light of the lack of evidence supporting that.

21           THE COURT:  Are you going to be arguing that the

22    filter fragment could affect Ms. Jones' life expectancy?

23           MR. CLARK:  Your Honor, I mean, not in a specific --

24    we don't have a doctor saying that this is going to make her

08:46:29 25    life shorter, other than the general proposition that if the

08:46:31   1   filter fragment moves, there could be a whole cascade of

        2   issues that could cause her harm.

        3           THE COURT:  So you're not going to have an expert

        4   opine that she should receive damages for a shortened life

08:46:43   5   expectancy?

        6           MR. CLARK:  No, Your Honor.  Our case is about the

        7   uncertainty that she faces every day with what this filter

        8   might cause her to do.

        9           THE COURT:  Mr. North?

08:46:54  10           MR. NORTH:  Your Honor, I don't think -- if they're

       11   not claiming shortness of breath, I think we can take this out

       12   of the slide now and address this at a later time.  I think

       13   I'd like to see how their evidence and her testimony goes

       14   before we address that further.

08:47:07  15           THE COURT:  Well, let's do this, then:  Let's take

       16   this out of the slide.  Plaintiff has made clear that

       17   shortness of breath will not be claimed as a cause of the

       18   filter.

       19           And I'm going to instruct defense counsel that before

08:47:18  20   you mention smoking, to raise it with me.  If you think

       21   something they're arguing puts that back in play, raise it

       22   with me before you present it to the jury.

       23           MR. CLARK:  Thank you, Your Honor.

       24           Last two are related, slides 97 and 98.  These are

08:47:36  25   two slides where a piece of medical literature is displayed on

08:47:41  1   the slide.  And, Your Honor, we think that violates

2   Rule 803(18).  Certainly there could be a reading from medical

3   literature, assuming that the bases are touched or we

4   stipulate to that, but the actual document is not to be

08:47:57  5   published to the jury.  And we think this slide could be cured

6   just by removing the document itself without doing any harm to

7   the content of the presentation.

8            THE COURT:  Mr. North?

9            MR. NORTH:  Your Honor, we didn't think that the

08:48:08 10   cover pages could be read and therefore didn't believe it was

11   displaying the content to the jury.  But if all they want us

12   to do is to remove the picture, we can certainly do that.

13            THE COURT:  Let's do that in both slides because, as

14   we all know, 803(18) permits it to be read but not displayed.

08:48:26 15            MR. NORTH:  Sure.

16            MR. CLARK:  Your Honor, those are the only objections

17   we have with respect to opening statement.

18            One other thing I don't think anybody addressed that

19   we need to perhaps visit with once the -- once we're done with

08:48:40 20   argument -- I'm sorry, opening statements, would be some type

21   of instruction to the jury about depositions, since we don't

22   intend to have any live witnesses today but there may be a

23   number of depositions played.  So perhaps the parties can

24   craft a short instruction over the lunch hour or something.

08:48:55 25            THE COURT:  Well, my plan -- you're welcome to craft

08:48:57 1   one, but my plan otherwise would be to give instruction 2.4,

2   which was in the preliminary instructions.  It explains what a

3   deposition is.  It explains insofar as possible the jury

4   should consider the deposition testimony in the same way they

08:49:21 5   would a witness.  So is there more than that you think they

6   need to be told?

7              MR. CLARK:  The only other thing that might be

8   helpful in this particular case, since so many of the

9   witnesses are from out of state and different things, would be

08:49:32 10  some sentence about travel or unavailability.  But we can talk

11  with defendants about that over the lunch hour.

12             THE COURT:  Well, it says in the last sentence of the

13  second -- the first paragraph, when a person is unavailable to

14  testify at trial, the deposition of that person may be used at

08:49:49 15  trial.

16             MR. CLARK:  That would be fine, Your Honor.

17             THE COURT:  Okay.  So prompt me when you get to the

18  depositions if I forget, and I will give this instruction

19  before you start playing depositions.

08:50:00 20             MR. CLARK:  Thank you, Your Honor.

21         (The Court and the courtroom deputy confer.)

22             THE COURT:  All right.  Defense counsel, do you have

23  matters you would like to raise?

24             MR. NORTH:  Nothing, Your Honor.

08:50:21 25             THE COURT:  Okay.

08:50:22  1          We will get the jurors up in the courtroom and

       2    seated, and then I will come in and we'll get started on jury

       3    selection.

       4          Thank you.

08:50:31  5        (Recess was taken from 8:50 to 9:02.  Proceedings resumed

       6    in open court with the jury panel present.)

       7          THE COURTROOM DEPUTY:  MDL 2015-2641, Bard IVC

       8    Filters Product Liability Litigation, on for the Jones trial.

       9          Will the parties please announce.

09:10:43 10        MR. O'CONNOR:  Good morning, Your Honor.

      11    Mark O'Connor for the plaintiff.  And with me at table --

      12          THE COURT:  I'll actually have you introduce

      13    everybody in just a minute, Mr. O'Connor.

      14          MR. O'CONNOR:  All right.  Thank you.

09:10:52 15        THE COURT:  Okay.

      16          MR. NORTH:  Richard North on behalf of the

      17    defendants.

      18          THE COURT:  All right.

      19          Good morning, ladies and gentlemen of the jury, and

09:11:00 20   thank you all for being with us this morning.  I should say

      21    the jury panel.  You're not on the jury yet.

      22          Traci, quick question.

      23        (The Court and the courtroom deputy confer.)

      24          THE COURT:  All right.  We appreciate all of you

09:11:15 25   being here this morning.  We are here to pick a jury for a

trial in a case that is going to be tried over the next
several days in this courtroom.

And the purpose of what we're going to be doing for
the next few hours is to pick the most fair and impartial jury
that we can to try this case.  Obviously, if you were a
participant in this trial, on either side, that's the kind of
jury that you would want, and our goal today would be to try
and choose such a jury.

In order to choose a fair and impartial jury, what we're
going to do this morning is ask you a number of questions.  I
will ask some questions to begin with, and then the lawyers
may ask you follow-up questions.

Please understand these questions are not intended to pry
unnecessarily into your personal affairs.  They're designed to
help us choose a fair and impartial jury for purposes of this
trial.

Before asking you these questions, we're going to place
all of you under oath to tell the truth.  We do this to make
sure that we have completely accurate information when we're
selecting the jury for this case.

Obviously it is very important that you answer the
questions truthfully and completely.  Please do not withhold
information in order to be seated on this jury.

Please be straightforward in your answers rather than
answering in the way that you feel that I or the lawyers would

expect you to answer.

When I ask you a question this morning, if your answer to the question is yes, please raise your hand.  And we'll then have you stand up so the lawyers can see you answer and we'll bring you a microphone, and I'll probably ask you a follow-up question or two.

If your answer to a question is no, you don't have to do anything.  I'll assume that it was no by virtue of you not having raised your hand.

When you do answer a question, we're going to ask you to identify yourself, but to do it with the number that you've been assigned that you're wearing on your shirt or your blouse, not by your name.  The reason we do that is because everything we say here this morning will be in the public record eventually, and you're going to be giving us some information about yourself.  We don't want that information about you in the public record with your name in this day of identity theft.  So we're going to be impersonal and refer to you by number.  And that way, when somebody reads the transcript of this trial eventually, they'll have no idea who provided the information.  We do that in all of the cases that we try here in federal court.

I recognize that it might not be easy for some to stand and speak in front of a large group such as this.  But please understand that all jurors are in the same situation, and it

09:13:58  1   is important that you answer every question to which you have

2   relevant information.

3       If you would feel more comfortable answering a question

4   in a less-public setting, just tell me that and we'll reserve

09:14:10  5   that answer until we've excused the rest of the jury panel

6   later this morning.

7       Our goal is going to be to choose the jury by noon today

8   so that we can let the rest of you get on about your business

9   and get back to your work or your families.  We may run into

09:14:30  10   the noon hour a little bit.  But I'd rather do that than take

11   an hour break and keep you all waiting while we go to lunch.

12   So it may take us until 12:30 or something like that, but our

13   plan will be to push forward, get the jury selected, and then

14   let all of you head out who are not chosen to be on the jury.

09:14:49  15       All right.  With that explanation, I'm going to ask that

16   the members of the jury panel, that you please stand to be

17   sworn.

18           THE COURTROOM DEPUTY:  Raise your right hands,

19   please.

09:15:05  20       (Jury panel sworn.)

21           THE COURT:  Okay.  Please be seated.

22           As you know, ladies and gentlemen, you filled out a

23   very lengthy questionnaire.  We apologize for the length of

24   that questionnaire.  But that's going to shorten the jury

09:15:28  25   selection process considerably today.  We're not going to have

09:15:31  1    to reask most of those questions.  We're not going to reask

2    you any of those questions.  But the lawyers may have a

3    follow-up question or two based on the answers that you did

4    provide.  So thank you for taking time to fill those out.

09:15:43  5    That saves us several hours today.

6         As mentioned, my name is Dave Campbell.  I'm a

7    United States District Court judge.

8         Traci Abraham is our courtroom deputy clerk.  She's

9    going to be keep us on track and organized throughout the

09:15:56 10    trial.

11        Tricia Lyons is the court reporter.  She's taking

12    down everything that's being said during the trial.  And

13    there's another court reporter who will be helping us named

14    Laurie Adams.

09:16:07 15        I have three law clerks, Joe Drummey,

16    Margo Casselman, and Jeff Kilmark.  Actually a fourth,

17    Patrick Tighe, but he sits in Washington, D.C.

18        And my judicial assistant is Nancy Outley.

19        Do any of you on the jury panel know me or any member

09:16:24 20    of my staff on any basis?  If so, please raise your hand.

21        I see no hands.

22        The plaintiff is represented in this case by

23    Mark O'Connor, as we indicated.

24        Mr. O'Connor, would you introduce, please, your

09:16:41 25    client and the others who will be participating in the trial

09:16:43   1    on your side.

2              MR. O'CONNOR:  Yes.  Thank you.

3              THE COURT:  And speak right into the mic, if you

4    would, please.

09:16:47   5              MR. O'CONNOR:  Thank you, Your Honor.

6              This is our client, Doris Jones.

7              THE COURT:  Go ahead and stand, if you would,

8    Mrs. Jones.

9              Thank you.

09:16:54  10              MR. O'CONNOR:  And then with me here at counsel table

11   and then other the attorneys on our team.  This is

12   Dave Wenner, John Campbell, Lincoln Combs.

13             Then in the back is co-lead Ramon Lopez, Laura Smith,

14   Paul Stoller, Julia Reed Zaic, Josh Mankoff, and

09:17:19  15   Shannon Clark.

16             THE COURT:  All right.  And Mr. O'Connor is with the

17   firm Gallagher & Kennedy here in Phoenix.

18             Do any of you know Mrs. Jones or any of these

19   attorneys or their firm on any basis?

09:17:35  20             I see no hands.

21             All right.  Thank you, Mr. O'Connor.

22             Mr. North, would you make the introductions on your

23   side, please.

24             MR. NORTH:  Yes, Your Honor.

09:17:42  25             I am Richard North, and I am joined by my partners

09:17:45   1   Elizabeth Helm, James Rogers.  We are joined by Ms. Candace

2   Camarata, who is the assistant general counsel for my client,

3   C.R. Bard.  And also with us today are Mark Gerard and

4   Mark Linder.

09:18:00   5         THE COURT:  Do any of you know these individuals on

6   any basis?

7              I see no hands.

8              I would also mention, Mr. North, you also have the

9   local firm of Snell & Wilmer involved in this case as well.

09:18:13  10   We've got two lawyers in the back.  If could you introduce

11   them.

12         MR. NORTH:  Yes, Your Honor.

13         James Condo and Amanda Sheridan.

14         THE COURT:  Okay.  Thank you.

09:18:21  15         Do any of you know any of these individuals or their

16   firm or any basis?

17              I see no hands.

18              Now, we handed you downstairs, at least I hope we

19   did, a witness list.  Fear not, we're not going to call every

09:18:47  20   witness on this list during the trial, but we will call a

21   number of them.  The reason we've handed you this list is to

22   see if you think you might know anybody who would be a witness

23   in the trial.

24              Is there anybody on the jury panel who has not yet

09:19:00  25   had an opportunity to look through this witness list?

09:19:04   1          Okay.  I so see no hands.

2          So my question is:  Do any of you on the jury panel

3   think you know any of the persons listed on this witness list?

4          I see no hands.

09:19:19   5          As we mentioned in the questionnaire that you

6   received, ladies and gentlemen, this trial is going to be a

7   three-week trial.  We will be going -- we will be in trial

8   today through Friday of this week, so that is the 15th through

9   the 18th; Tuesday through Friday next week, that's the 22nd

09:19:37  10   through the 25th; and Tuesday through Friday of the last week

11   of the month, which is May 29th through June 1st.

12          We are confident that we'll get the case resolved by

13   June 1st.  But it will probably take us until June 1st.

14   There's a lot of ground to cover in this case.

09:19:55  15          The daily schedule for the trial will to be start at

16   9 o'clock every morning.  We'll start right on time so we're

17   using your time well.  We'll go to noon, take a one-hour

18   break, come back and go until 4:15 or 4:30, depending on

19   whether I have other hearings I need to have in the afternoon.

09:20:12  20   And we'll take a 15-minute break in the middle of the morning

21   and in the middle of the afternoon.

22          As you know, jury service is probably an

23   inconvenience for you.  It pulls you away from your family and

24   your jobs and other activities of your life.  But jury service

09:20:29  25   is one of the most important duties we have as citizens in

09:20:32  1    this country.  In fact, the Constitution gives individuals a

2    right to trial by jury.  And for this reason, from time to

3    time we ask citizens to make sacrifices and serve on a jury,

4    even if it's inconvenient.

09:20:48  5            If any of you would face undue hardship by serving on

6    this jury, then you can be excused.  By undue hardship, I mean

7    more than inconvenience.  I mean a genuine hardship that would

8    be experienced by you or your family if you were part of this

9    trial.

09:21:03  10           So the question I have for the jury panel is whether

11   the length or the dates of this trial would create an undue

12   hardship for you?  If so, please raise your hand.

13           Sir, if you could just stand so all of the attorneys

14   can see you, please.  Is that possible?

09:21:34  15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  You're okay standing?  Okay.

17           You are Juror 24?

18           PROSPECTIVE JUROR:  Yes, sir.

19           THE COURT:  Could you explain the concern you have.

09:21:42  20           PROSPECTIVE JUROR:  Yes, sir.  I'm a 100 percent

21   disabled, unemployable veteran, and I've had back surgeries,

22   I've had two shoulder surgeries, and I have neuropathy and

23   diabetes and degenerative bone disease, and nightmares, and I

24   can't sleep at night.  There's a lot of things I have, sir,

09:22:04  25   Your Honor.

09:22:05 1          THE COURT:  Okay.  So --

2          PROSPECTIVE JUROR:  I don't feel like I could be a

3    good juror and attentive to the jury.

4          THE COURT:  Okay.  You think that would make it

09:22:14 5    difficult for you to pay attention through the length of this

6    trial?

7          PROSPECTIVE JUROR:  Yes, sir.

8          THE COURT:  Okay.  Thank you for that information.

9          PROSPECTIVE JUROR:  Your Honor, I'm Juror Number 101.

09:22:46 10          THE COURT:  Yes, sir.

11          PROSPECTIVE JUROR:  And my concern is this:  About

12    three weeks ago, I just got MRI scan.  This is for a stroke

13    check, prevention check, and identified an artery, brain

14    artery aneurysm.  It's risky size.  It's 6-millimeter.  And

09:23:06 15    I'm currently going through Mayo Clinic.  I've been there

16    twice, and last Friday was my CT scan, and waiting for Mayo

17    Clinic to call me back so I can have a chance to talk to the

18    doctor about any follow-up procedure if it's need to be.  So

19    I'd like to give this statement for the excuse.

09:23:29 20          THE COURT:  Yeah, that's fine.  So I understand from

21    what you're saying, sir, that you don't know exactly when the

22    follow-up is going to happen or how much it might involve and

23    you need to be able to pay attention to your medical

24    condition; is that correct?

09:23:41 25          PROSPECTIVE JUROR:  That is correct.

09:23:42  1        THE COURT:  Okay.  Thanks for that information.

2        PROSPECTIVE JUROR:  All right.

3        THE COURT:  If you want to hand that sheet to Traci,

4    that's fine.  Thank you.

09:23:50  5        PROSPECTIVE JUROR:  Juror Number 104.

6        THE COURT:  Yes, ma'am.

7        PROSPECTIVE JUROR:  I'm from Pine, Arizona, and we're

8    having a serious wildfire threat.  And my wife is also serving

9    on a jury in Globe, Arizona, a four-week jury.  And there's no

09:24:05  10   one at home.

11        THE COURT:  Okay.  Thank you for that information.

12        Are there other responses to that question?

13        I see no other hands.

14        We have a few follow-up questions that we did not

09:24:29  15   include in the questionnaire, but we concluded afterward we

16   probably should ask you, and there's three or four of them.

17        The first question is whether anybody on the jury

18   panel has ever worked for the United States Food and Drug

19   Administration.  Also referred to as the FDA.

09:24:48  20        If any of you have worked for the FDA or if you have

21   family members who have worked for the FDA, please raise your

22   hand.

23        I see no hands.

24        Is there anyone who has knowledge of or experience

09:25:04  25   with the process of the FDA for having a product or device

09:25:10  1    cleared to be placed on the market?

2              Could you stand, sir, and give us your number.

3              PROSPECTIVE JUROR:  Juror Number 27.

4              THE COURT:  Yes.

09:25:26  5    PROSPECTIVE JUROR:  In my work with bioengineering

6    department at Arizona State University, I was part of multiple

7    applications through the FDA for devices to be approved.

8              THE COURT:  And exactly what was the work that you

9    did at the bioengineering department?

09:25:43  10   PROSPECTIVE JUROR:  It was in -- well, spinal cord

11   injury repair, research through the Center for Adaptive Neural

12   Systems, and so we had different electrical stimulation

13   devices that we were working on, and some prosthetic devices

14   we were working on as well.

09:25:59  15   THE COURT:  Okay.  And you --

16             PROSPECTIVE JUROR:  My team.

17             THE COURT:  -- or the department were making

18   application to the FDA?

19             PROSPECTIVE JUROR:  Yes.

09:26:07  20   THE COURT:  Did you personally get involved in

21   communications with the FDA?

22             PROSPECTIVE JUROR:  No.  I was part of the

23   applications.

24             THE COURT:  Okay.  But I assume, then, you were in

09:26:16  25   the team discussions about the process of applying to the FDA?

09:26:21  1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  How long ago was this?

3          PROSPECTIVE JUROR:  2005 through 2010.

4          THE COURT:  About how many FDA applications would you

09:26:28  5  estimate you were involved with?

6          PROSPECTIVE JUROR:  I'd say probably four, five.

7          THE COURT:  There will be some evidence of FDA

8  involvement in this case.  Do you believe your experience

9  while you were at ASU working in this area would have an

09:26:48  10  effect upon your ability to be fair and impartial to both

11  sides in this case?

12          PROSPECTIVE JUROR:  I don't think so.

13          THE COURT:  Could you set aside your own views of the

14  FDA process and base your decision upon what you hear in the

09:26:59  15  evidence in this case?

16          PROSPECTIVE JUROR:  Sure.

17          THE COURT:  Okay.  Thank you.

18          PROSPECTIVE JUROR:  Your Honor, I'm Juror 67.  I'm

19  currently employed by a medical device company.  It is part of

09:27:24  20  my job to be up to date with FDA regulations.

21          THE COURT:  What is the company you're employed with?

22          PROSPECTIVE JUROR:  Medtronic.

23          THE COURT:  Okay.  Do you have personal involvement

24  in interactions with the FDA?

09:27:46  25          PROSPECTIVE JUROR:  I'm in the circuit board design

09:27:48  1    group for Medtronic.  So I have to be aware of all of the

2    regulations that go with the FDA and other organizations.

3                THE COURT:  Okay.  In addition to being aware of FDA

4    regulations, do you actually get involved in communications

09:28:04  5    with the FDA, or is that somebody else --

6                PROSPECTIVE JUROR:  I need to be prepared, yes.  We

7    have to study guides for that in order for us to comply with

8    the FDA.

9                THE COURT:  Do you ever communicate with FDA

09:28:19  10   personnel yourself?

11               PROSPECTIVE JUROR:  Not yet.

12               THE COURT:  But you have to be ready to --

13               PROSPECTIVE JUROR:  That's correct.

14               THE COURT:  -- if inquiry comes?

09:28:26  15         Okay.

16         And how long have you been involved in the kind of

17   work that requires you to know FDA regulations?

18               PROSPECTIVE JUROR:  20 years.

19               THE COURT:  All right.

09:28:38  20         Let me ask you the same question I asked the last

21   juror.  Do you believe you would be able to be fair and

22   impartial to both sides in this case and base your decision on

23   the evidence that comes in during the trial, not on your

24   independent knowledge and experience?

09:28:53  25               PROSPECTIVE JUROR:  I have to say no.

09:28:55  1          THE COURT:  You think that would be difficult?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Okay.  Thank you for that information.

4          All right.  Are there other responses to that

09:29:10  5  question?

6          I see no hands.

7          This case will include evidence of FDA clearance of

8  medical products.  Do any of you have strong feelings,

9  favorable or unfavorable, about the FDA or its oversight of

09:29:27  10  medical products?  If you have strong feelings on that

11  subject, please raise your hand.

12          I see no hands.

13          One of the things we asked you, I think, in the

14  questionnaire was whether you'd been exposed to any

09:29:50  15  information about this case.

16          The question I have now is whether any of you have

17  been exposed to any information about this case since you

18  filled out the questionnaire?  Have any of you heard anything,

19  read anything in the press, talked to anybody about any

09:30:07  20  subject that could be related in any way to this case?

21          I'm just going to take down your names so we can ask

22  you follow-up questions afterwards.  So, ma'am -- I should say

23  your numbers.

24          PROSPECTIVE JUROR:   39.

09:30:28  25          THE COURT:  Number 39.

09:30:28   1                    Okay.  And was it 67?

           2                    THE COURTROOM DEPUTY:  67.

           3                    THE COURT:  Any others?

           4            I think Juror 48 indicated that he or she had read

09:30:38   5    something as well.  We'll ask a follow-up question of that

           6    individual later.

           7                    Anybody else who has been exposed to any information

           8    about the case?

           9                    Your number, sir?

09:30:47  10                    PROSPECTIVE JUROR:  42.

          11                    THE COURTROOM DEPUTY:  42.

          12                    THE COURT:  All right.  42.

          13                    PROSPECTIVE JUROR:  117.

          14                    THE COURTROOM DEPUTY:  117.

09:30:56  15                    THE COURT:  117.

          16                    Any others?

          17                    Okay.  We'll come back to you ladies and gentlemen

          18    after we've finished questioning the entire jury panel to ask

          19    you some specific follow-up questions.

09:31:09  20                    And obviously the reason we're doing it is not

          21    because you're in trouble or something like that.  It's

          22    information you may have received may or may not be accurate,

          23    and we'd rather not have you repeat it in front of the whole

          24    jury panel since we're trying to preserve the impartiality of

09:31:23  25    the jury panel.  So we'll come back and ask some questions

09:31:25    1    about that later.

2         Do any of you have any other reason that you haven't

3    mentioned, such as a physical difficulty, a health problem, or

4    a home problem, that might interfere with your serving as a

09:31:39    5    fair and impartial juror in this case?

6         PROSPECTIVE JUROR:  117, Your Honor.  It's not a

7    health problem or anything.  I have a cousin's wedding in two

8    weekends from now.  So it's in Dallas.  But it's a cousin's

9    wedding.  It's not a health problem.

09:32:04   10         THE COURT:  Okay.  And which weekend is that?

11         PROSPECTIVE JUROR:  Next weekend.  Not this weekend,

12    but the weekend after.

13         THE COURT:  And were you going to be traveling there?

14         PROSPECTIVE JUROR:  Yeah, I have flights booked and

09:32:17   15    everything.

16         THE COURT:  When do you need to leave?

17         PROSPECTIVE JUROR:  Friday.  Actually Thursday

18    evening, and then return back Sunday.

19         THE COURT:  Okay.  So you will be at the wedding on

09:32:24   20    the 25th of May?

21         PROSPECTIVE JUROR:  Yeah.

22         THE COURT:  That's the Friday.  Okay.  Thanks for

23    that information.

24         Any other responses to that question?

09:32:37   25         Okay.  One question that I'll ask you at the end of

09:32:39  1    the process is whether any of you on the jury panel know any

2    other member of the jury panel.  So might just ask yourself

3    that question as you look around and you hear responses to the

4    follow-up questions of the lawyers.

09:32:53  5            All right.  Counsel, would you approach for just a

6    minute, please.

7            Now, I'm just going to talk to the lawyers for a

8    minute at sidebar.  If you want to stand up, ladies and

9    gentlemen, it will just take about one minute.

09:33:03  10       (Bench conference as follows:)

11            THE COURT:  Counsel, what I suggest is that we ask

12   follow-up questions just through Juror 80, which is on page 4,

13   at this time.  I think because there are so few folks who need

14   to be excused for hardship that that will give us enough to

09:34:04  15   pick the jury and will save some time if we're not questioning

16   the others.  So let's just do Jurors 80 and lower in number in

17   your follow-up questions.  If we don't have enough, we'll

18   obviously come back and ask follow-up questions of the others

19   after that.

09:34:18  20            MR. O'CONNOR:  So is that what we're going to do

21   next, is follow up the questionnaires?

22            THE COURT:  Yeah, you're going to ask follow-up

23   questions next.

24            MR. O'CONNOR:  And then on the Juror 48, do you want

09:34:27  25   me to not question her and wait to the end?

09:34:30  1    THE COURT:  Well, it's up to you.  If you're at all
2    concerned something you might ask would elicit an answer,
3    you're not waiving your right to ask follow-up questions at
4    the end.
09:34:40  5    MR. O'CONNOR:  As I said, the concern is that there
6    is a relationship with Bard, and I don't want that to open up
7    a --
8    THE COURT:  That's fine.
9    MR. O'CONNOR:  So I'll just -- when we're finished,
09:34:48  10   I'll say with the exception of the other questions.
11   THE COURT:  Yeah, that's fine.
12   MR. O'CONNOR:  Will David Wenner be able to consult
13   with me back and forth?
14   THE COURT:  Yeah.
09:35:04  15      (Bench conference concludes.)
16   THE COURT:  All right.  Ladies and gentlemen, we are
17   now going to have the lawyers ask some follow-up questions
18   based on information you provided in the questionnaire.  And
19   we are going to start with plaintiff's counsel.
09:35:18  20   Mr. O'Connor, you may do that.  Let's have you come
21   to the lectern, and if you want to just stand on this side of
22   the lectern so you can face the jury and talk into the
23   microphone.
24   MR. O'CONNOR:  Good morning.  My name is
09:35:37  25   Mark O'Connor, and I'm one of the lawyers that represents

09:35:39   1    Doris Jones.

2              As Judge Campbell told you, our job here today is

3         just to choose a juror -- a jury that is fair and impartial.

4         So there's no wrong question -- I mean, no wrong answer to any

09:35:54   5    question.  What we do need from you is just to be honest and

6         forthright.  My goal here is not to embarrass or pry.  So I'm

7         going to ask follow-up questions based upon answers that we

8         received to our questionnaires.

9              So first of all, Juror Number 5.

09:36:15  10              How are you?

11             PROSPECTIVE JUROR:  Hello.

12             MR. O'CONNOR:  Sir, thank you for answering the

13        questions in our questionnaire.

14             My question is, first of all, you had indicated a

09:36:27  15    response about personal injury lawyers that is low on the

16        range of favorable.  Do you recall that?

17             PROSPECTIVE JUROR:  Yes, I do.

18             MR. O'CONNOR:  And can you tell me about that?

19             PROSPECTIVE JUROR:  I just had friends in the past

09:36:42  20    that seem that there's a lot of auto and -- lawyers that are

21        looking to become rich chasing ambulances.

22             MR. O'CONNOR:  And based upon that, does that mean

23        that -- we're the side, obviously, that represents the person

24        who is claiming injuries here.  You understand that?

09:37:04  25              PROSPECTIVE JUROR:  Right, I do.

09:37:06  1          MR. O'CONNOR:  Is that the side that you have the

2     feelings against?

3          PROSPECTIVE JUROR:  I believe I do.  Yes, I do.

4          MR. O'CONNOR:  And it sounds to me as though those

09:37:14  5     feelings are something that you had long before you came here;

6     is that right?

7          PROSPECTIVE JUROR:  That is correct.

8          MR. O'CONNOR:  And along those lines, you have

9     indicated that you feel that the damage awards in trials are

09:37:25 10     too high.  Did I read that correctly?

11          PROSPECTIVE JUROR:  In certain cases, yes.

12          MR. O'CONNOR:  And you also indicated you feel

13     there's frivolous lawsuits?

14          PROSPECTIVE JUROR:  I did.  Yes, I do.

09:37:40 15          MR. O'CONNOR:  Based upon that, do you think that we,

16     the party representing the plaintiff, who has the burden of

17     proof in this case, are we starting in an uneven playing field

18     with you?

19          PROSPECTIVE JUROR:  I would have to say yes because

09:37:52 20     the way I've had -- I've had surgeries before and, like, say

21     for my eye surgery, I went through and I researched it, and

22     there was all sorts of forms that I signed and they explained

23     all of the issues that could go wrong, even though the chances

24     were very small.  They had me not only sign, but go on video

09:38:17 25     so there was extra evidence for them that said, hey, you

09:38:22  1    signed this, we explained all this, blah, blah, blah.  And so

2    I said, okay, I'm willing to take the chance on this and this,

3    and I did it.  Everything turned out well.

4         But I just think there's too much where lawyers are

09:38:38  5    trying to jump in and make money with certain situations as

6    far as that goes.

7         MR. O'CONNOR:  So is it fair to say you would have

8    difficulty in this case being fair and impartial?

9         PROSPECTIVE JUROR:  I would say that would be true.

09:38:56  10   MR. O'CONNOR:  And you're starting out with bias

11   against plaintiff -- excuse me, the party that's bringing the

12   lawsuit?

13        PROSPECTIVE JUROR:  I would say yes.

14        MR. O'CONNOR:  Thank you.  Appreciate that.

09:39:04  15   PROSPECTIVE JUROR:  Thank you.

16        MR. O'CONNOR:  Juror 9.  Hi.

17        I just wanted to follow up with your response about

18   what you do currently by way of employment.  You work in the

19   insurance business?

09:39:30  20   PROSPECTIVE JUROR:  I work on the banking side for

21   State Farm Mutual.  State Farm Bank.

22        MR. O'CONNOR:  Can you tell us about that?  There's a

23   banking side to the company?

24        PROSPECTIVE JUROR:  There is.  So my employer is

09:39:41  25   State Farm Mutual, but I work on the bank side.  So State Farm

09:39:45  1    has a virtual bank.

2              MR. O'CONNOR:  Do you get involved in the claims

3    process at all?

4              PROSPECTIVE JUROR:  No.

09:39:52  5    MR. O'CONNOR:  Do you evaluate claims?

6              PROSPECTIVE JUROR:  No.

7              MR. O'CONNOR:  Do you interact with the underwriting

8    or the claims department in any way?

9              PROSPECTIVE JUROR:  Rarely.

09:40:00  10   MR. O'CONNOR:  The company you work for, is there

11   anything about that that you think may cause you to have

12   difficulty being fair and impartial in this case?

13             PROSPECTIVE JUROR:  I do not.

14             MR. O'CONNOR:  Thank you.  Appreciate that.

09:40:29  15   Juror Number 10.  Hi.

16             Thank you for answering the questionnaire for us.

17   But I thought we read in your questionnaire that you do

18   support legislative reforms and caps on damages.

19             PROSPECTIVE JUROR:  No, I do not.

09:40:55  20   MR. O'CONNOR:  Did I read that correctly?

21             Excuse me, I might have the wrong juror.

22             I am sorry.  My notes were incorrect.

23             You work in the medical field; is that right?

24             PROSPECTIVE JUROR:  That is correct.

09:41:45  25   MR. O'CONNOR:  What do you do?

09:41:47   1              PROSPECTIVE JUROR:  I work in the information

       2   technology area.

       3              MR. O'CONNOR:  And what does your husband do?

       4              PROSPECTIVE JUROR:  He currently works for Coca-Cola.

09:41:57   5              MR. O'CONNOR:  Pardon me?

       6              PROSPECTIVE JUROR:  He works for Coca-Cola in the

       7   sales industry.

       8              MR. O'CONNOR:  Did he work in the past for a medical

       9   device company?

09:42:06  10              PROSPECTIVE JUROR:  He did, yes.

      11              MR. O'CONNOR:  Which company?

      12              PROSPECTIVE JUROR:  I don't recall the name, but I

      13   know it was durability medical sales.

      14              MR. O'CONNOR:  How long did he do that for?

09:42:14  15              PROSPECTIVE JUROR:  I want to say about nine months.

      16              MR. O'CONNOR:  Do either one of you have any other

      17   involvement with medical devices?

      18              PROSPECTIVE JUROR:  No.

      19              MR. O'CONNOR:  Is there anything about anything you

09:42:23  20   or your husband have done that would cause you to have a bias

      21   against one party or have difficulty being fair and impartial?

      22              PROSPECTIVE JUROR:  No, there is not.

      23              MR. O'CONNOR:  Okay.  Thank you.

      24              Juror Number 14.

09:42:55  25              PROSPECTIVE JUROR:  Morning sir.

09:42:56   1          MR. O'CONNOR:  Good morning.  How are you?

       2          PROSPECTIVE JUROR:  Good, thank you.

       3          MR. O'CONNOR:  I hope I read this correctly, that you

       4     have some experience with quality assurance?

09:43:06   5          PROSPECTIVE JUROR:  Yes, sir.

       6          MR. O'CONNOR:  What do you do?

       7          PROSPECTIVE JUROR:  I'm semiretired and I'm working

       8     for a small avionics company doing quality assurance for

       9     flight aircraft type.  And for the last 35 years beyond that,

09:43:19  10     I was kind of part of a quality group with Honeywell

      11     International.

      12          MR. O'CONNOR:  So do you do engineering type of work?

      13          PROSPECTIVE JUROR:  It's more procedural.  Procedural

      14     quality and product integrity type of --

09:43:35  15          MR. O'CONNOR:  So are you involved in any type of

      16     analysis regarding materials?

      17          PROSPECTIVE JUROR:  Not really, no.  No.  Mostly --

      18     it's mostly approved FAA type products that's already gone

      19     through the analysis.  I don't get involved too much in

09:43:58  20     incidents, you know, plane crashes or anything like that, no.

      21          MR. O'CONNOR:  Okay.  So do you have any interaction

      22     with governmental agencies in your job?

      23          PROSPECTIVE JUROR:  No.  No, sir.

      24          MR. O'CONNOR:  I thought you said you felt there's

09:44:14  25     too many lawsuits.  Did I read that correct- -- too many

09:44:16   1   lawsuits?

2       PROSPECTIVE JUROR:  Too many lawsuits, yeah.  I

3   believe so, yeah.

4       MR. O'CONNOR:  And would you tell me about that.  How

09:44:22   5   do you feel about lawsuits?  What do you mean when you think

6   there's too many?  Does that mean you feel there are lawsuits

7   that are filed that don't have merit?

8       PROSPECTIVE JUROR:  In some cases, yes, I believe.  I

9   mean, you always get, like -- like I believe it was Juror 5

09:44:38  10   saying the ambulance chasers, you know.  I've had an instance

11   one time in a parking lot where a woman behind me banged on

12   the rear bumper and went down on the ground and tried to put a

13   charge against me, you know, in court that I hit her, you

14   know, in the parking lot.  You know, that type of thing I

09:45:02  15   think are frivolous.  People always trying to make extra money

16   in one respect or another, you know.  As far as most of the

17   cases, though, I mean, they're -- I'm not saying that all

18   lawsuits are frivolous, but there are some.

19       MR. O'CONNOR:  Well, do you have a concern that

09:45:20  20   because somebody brings a lawsuit that he or she may be

21   looking for money, an easy way to make money?

22       PROSPECTIVE JUROR:  Hard to tell without evidence to

23   confirm anything like what you're saying, but, yes, there are

24   cases like that, I believe, yeah.

09:45:38  25       MR. O'CONNOR:  The feelings that you have about

09:45:40  1    lawsuits, and that's fair, and thank you for that, is that

2    going to affect how you begin this case?  Are you going to be

3    suspicious or concerned whether this may be one of those

4    lawsuits?  That is, one of the ones you consider are too many?

09:45:54  5         PROSPECTIVE JUROR:  It's possible.  The possibility

6    does exist.  But evidence -- I'm open-minded to the point

7    where I do listen to evidence pertaining.  But, yeah, I'm a

8    cautious individual, yeah.

9         MR. O'CONNOR:  We represent the party that's bringing

09:46:11  10   the lawsuit here, Doris Jones.  Are we starting on an uneven

11   playing field with you?

12        PROSPECTIVE JUROR:  No.  No, not at all.  It's a

13   balanced playing field.  I'm just -- it's -- I got the angel

14   on one shoulder and the devil on the other kind of thing.  You

09:46:32  15   know, my head talks in both directions.

16        MR. O'CONNOR:  Sometimes they switch sides.

17        PROSPECTIVE JUROR:  Yeah.  But I mean, you know, I

18   mean, as time prevails whether or not people are telling the

19   truth or not, you know, and I believe the lawyers are usually

09:46:48  20   very educated about their case and believe in what they're

21   doing, and they kind of answer the questions as the trial goes

22   on, so.  But, yeah, I am leery about things in both

23   directions.

24        MR. O'CONNOR:  Okay.  Thank you.

09:47:05  25        THE COURT:  Let me ask a follow-up question,

09:47:07  1  Mr. O'Connor.

2          MR. O'CONNOR:  Sure.

3          THE COURT:  And I ask this in part for the benefit of

4  all of the jury panel.

09:47:12  5          Obviously, sir, all of us have opinions, thoughts,

6  that we could take into account in deciding a case as a juror

7  if we let ourselves do it.  One of the things the jury will be

8  instructed in this case is to set aside personal opinions and

9  biases and prejudices and decide this case solely on the

09:47:30  10  evidence they hear during the trial.

11          PROSPECTIVE JUROR:  Understood.

12          THE COURT:  Do you think you can do that?

13          PROSPECTIVE JUROR:  Yes, sir.

14          THE COURT:  Okay.  Thank you.

09:47:41  15          MR. O'CONNOR:  Thank you, Juror 14.  I appreciate

16  your openness and honesty today.

17          PROSPECTIVE JUROR:  You're very welcome.

18          MR. O'CONNOR:  Juror Number 20.

19          Good morning, and thanks for being thorough in that

09:48:05  20  questionnaire.

21          PROSPECTIVE JUROR:  Easy to voice your opinions on

22  paper.  Much easier than standing in front of a courtroom full

23  of strangers.

24          MR. O'CONNOR:  I know it's hard.  I'm nervous too.  I

09:48:18  25  don't think you're --

09:48:19  1          PROSPECTIVE JUROR:  I tried to be true with my

2     answers.  True to myself.

3          MR. O'CONNOR:  I appreciate that.  I don't think the

4     microphone's on, though.

09:48:30  5          PROSPECTIVE JUROR:  Hello?

6          MR. O'CONNOR:  There you go.

7          PROSPECTIVE JUROR:  Okay.  Thank you.

8          MR. O'CONNOR:  Thank you.

9          Here's what you had said, that you have some

09:48:40 10    experience with IVC filters.

11         PROSPECTIVE JUROR:  Not hands-on.  I worked as a

12    hospital nurse for about 23 years, and I had a lot of patients

13    who had them placed for various reasons.  As a protectant --

14    protector.  But I didn't actually -- wasn't part of the

09:49:00 15    surgery itself or that procedure in any way.  But I did talk

16    with patients and, you know, was a witness to many

17    conversations about those filters, yes.

18         MR. O'CONNOR:  Did you develop a favorable view about

19    IVC filters?

09:49:18 20         PROSPECTIVE JUROR:  I'd like to say it was more of a

21    neutral view.  I have never known of any injuries or problems

22    with them before now.  I do see the commercials, though, that

23    say, have you received this filter and, if so, call this

24    number, you know, for possible injury case.  But I have never

09:49:40 25    known of a patient who had a problem with one in my history.

09:49:47   1        MR. O'CONNOR:  Well, how do you feel about those --

2    let me ask you this:  You said that -- you mentioned that you

3    have strong feelings and that you feel that greedy people

4    bring lawsuits.  Did I read that correctly?

09:50:02   5        PROSPECTIVE JUROR:  Well, yes, they do.  I do believe

6    that.  I would say my answer is akin to Juror Number 5, that I

7    think many times people make mountains out of molehills, you

8    know, that life is very unpredictable and there is risk

9    involved in many things, especially in medicine, and sometimes

09:50:25  10    bad things happen.

11        MR. O'CONNOR:  It sounds as though this is a feeling,

12    these are feelings that you've had long before you came here

13    today.

14        PROSPECTIVE JUROR:  I believe so.

09:50:37  15        MR. O'CONNOR:  And in fairness, it sounds as though

16    you would have difficulty being fair and impartial to the

17    plaintiff that we represent, the person that's bringing this

18    lawsuit?

19        PROSPECTIVE JUROR:  I would like to say I could be

09:50:50  20    completely impartial and fair, but I'm not sure that that's

21    true, you know, given my experience.

22        MR. O'CONNOR:  And so because you're not sure, that's

23    based upon feelings you've had where you suspect that lawsuits

24    are brought by greedy people.  Is that fair?

09:51:09  25        PROSPECTIVE JUROR:  That's fair assumption, yes.

09:51:12  1        MR. O'CONNOR:  And it sounds as though, with that in

2    mind, and in fairness, that the plaintiff, the party bringing

3    the lawsuit, is not starting in an even playing field in your

4    eyes?

09:51:24  5        PROSPECTIVE JUROR:  I don't think so.  I'm a strong

6    believer in informed consent as well.  You know, if physicians

7    and staff do the job of explaining and talking about risk, you

8    know, and taking that on in the best way that people give

9    consent, and then sometimes things go wrong.  I'm not saying

09:51:47 10    every case doesn't have a case.  There are times when, you

11    know, I think it's a great idea too.  I also believe in being

12    a patient advocate.  And if there is a clear, clear-cut reason

13    for a lawsuit, like that there's an obvious error, obvious

14    mistake, I believe in awarding that person or supporting that

09:52:08 15    person.  But I think I weigh on the side of thinking too many

16    of those lawsuits are not based on a lot of -- a lot of

17    accurate information.  Maybe too quick to judge.

18        MR. O'CONNOR:  It also sounds as though your

19    background, what you did professionally, is going to affect

09:52:27 20    how you hear evidence in a case that may involve a medical

21    device.  Is that fair?

22        PROSPECTIVE JUROR:  That's fair.

23        MR. O'CONNOR:  Meaning that you would not be able to

24    separate your experience in how you hear or receive evidence.

09:52:40 25        PROSPECTIVE JUROR:  That's very possible, yes.

09:52:42 1          MR. O'CONNOR:  All right.  I also saw that you

2     support caps or legislative reforms on damages?

3          PROSPECTIVE JUROR:  Well, I believe the awards should

4     be more equal to the need or the proven need or the proven

09:52:57 5     loss, you know, as accurately as possible, not just be awarded

6     way above that.  Just, you know, for your lifestyle change

7     purpose rather than just what they would need, you know, to

8     live.  Like if it was an injury and they needed health care

9     paid for or equipment or things like that, an estimation on

09:53:22 10     that, you know, would be fair, I think.  You know, if you

11     could prove the need and the cost and things like that.  But

12     not when the costs are maybe more so -- like for a person is

13     just wanting to ensure a safer life, having a pot of money

14     kind of thing to draw from.  That, I don't approve of, don't

09:53:46 15     think that is very fair.

16          MR. O'CONNOR:  Fair enough.  I appreciate that.  So

17     it sounds like you're skeptical.

18          PROSPECTIVE JUROR:  If I'm not explaining it very

19     well.  Hard to put these feelings in --

09:53:56 20          THE COURT:  I think you've been very clear.  Thank

21     you.

22          In the interest of time, Mr. O'Connor, we probably

23     ought to keep moving on to other jurors.

24          MR. O'CONNOR:  All right.  Thank you.

09:54:07 25          PROSPECTIVE JUROR:  Thank you.

09:54:24  1          MR. O'CONNOR:  Juror Number 23.

2          PROSPECTIVE JUROR:  Good morning.

3          MR. O'CONNOR:  Oh, there you are.  Good morning.

4          You answered the questionnaire, appreciate it.  It

09:54:35  5    sounds as though you have favorable views towards medical

6    device companies?

7          PROSPECTIVE JUROR:  Well, yes.  I believe that they

8    help many people under many circumstances.  I agree with a lot

9    of what Juror Number 20 said in regards to at times not

09:54:54 10    everything works out to the benefit of the patient, but I

11    believe that there's definitely more benefit than there would

12    be negativity.

13          MR. O'CONNOR:  Does that mean you're starting out in

14    favor of the medical device company in this case?

09:55:08 15          PROSPECTIVE JUROR:  Not necessarily.

16          MR. O'CONNOR:  You also indicated, though, that you

17    do not believe in paying for emotional damages.  Did I read

18    that correctly?

19          PROSPECTIVE JUROR:  I don't know how to answer that.

09:55:23 20    I think I would have to listen to the entire case.

21          MR. O'CONNOR:  Do you have difficulties with damages

22    that involve pain and suffering, emotional damages?

23          PROSPECTIVE JUROR:  Not necessarily, no.

24          MR. O'CONNOR:  Do you feel there should be

09:55:41 25    limitations on caps or on damages?

09:55:44  1          PROSPECTIVE JUROR:  As Juror 20 said, yeah, I guess

2     it all depends on what's reasonable.  I don't feel that there

3     should be extreme amounts if it's not necessary.  I would have

4     to hear the whole case to understand what the damages would

09:56:04  5     entail.

6          MR. O'CONNOR:  Even after you heard the evidence,

7     though, would you still have some limit in mind where you may

8     disregard certain elements of damages or the notion of

9     compensating for things like pain and suffering?

09:56:16  10          PROSPECTIVE JUROR:  Maybe.

11          MR. O'CONNOR:  And if there are claims of pain and

12     suffering in this case and claims of emotional damages, does

13     that mean that the party bringing case, our client, is

14     starting out with you in somewhat of an uneven playing field?

09:56:35  15          PROSPECTIVE JUROR:  Possible.  I don't know.  I can't

16     answer that.  I'd have to hear it all.

17          MR. O'CONNOR:  But starting now, though, before you

18     came here today, it sounds as though you do have feelings

19     about certain elements of damages that you think may be too

09:56:49  20     high or shouldn't be awarded.  Is that fair?

21          PROSPECTIVE JUROR:  Yes.

22          MR. O'CONNOR:  And those feelings about damages that

23     you think may be too high or shouldn't even be awarded, such

24     as pain and suffering, that is something that you've carried

09:57:04  25     with you long before you came here today?

09:57:07  1          PROSPECTIVE JUROR:  Yes.

2          MR. O'CONNOR:  And that may well -- that would affect

3  your ability to be fair and impartial if you heard evidence

4  along the lines of those damages?

09:57:14  5          PROSPECTIVE JUROR:  Possibly.

6          MR. O'CONNOR:  Do you agree with that?

7          PROSPECTIVE JUROR:  Yes.

8          MR. O'CONNOR:  Thank you.  Appreciate that.

9          May I just approach my bench --

09:57:33 10          THE COURT:  You may.

11          By the way, ladies and gentlemen, we'll go to 10:30,

12  and then we'll take a break for 15 minutes.

13          MR. O'CONNOR:  Juror Number 26.  Good morning.

14          PROSPECTIVE JUROR:  Morning.

09:57:46 15          MR. O'CONNOR:  Thanks for answering our

16  questionnaires.

17          PROSPECTIVE JUROR:  Thank you for having me.

18          MR. O'CONNOR:  Did I read correctly that you're

19  involved in an offering of a class that only happens

09:58:03 20  occasionally?

21          PROSPECTIVE JUROR:  Yes, sir.

22          MR. O'CONNOR:  And it sounds as though that that's on

23  your mind whether you're going to be able -- it sounds like

24  you have a leadership position in that class.  Did I read that

09:58:12 25  correctly?

09:58:13  1          PROSPECTIVE JUROR:  Yes, you did, sir.

       2          MR. O'CONNOR:  What kind of class is it?

       3          PROSPECTIVE JUROR:  I'm a senior at ASU in mechanical

       4   engineering, and I'm taking my senior capstone starting

09:58:25  5   tomorrow.  It will be definitely on my mind, sir.

       6          MR. O'CONNOR:  Understandably, that could be a

       7   distraction to you and it may affect how you listen or can pay

       8   attention to evidence in this case?

       9          PROSPECTIVE JUROR:  Yes, sir.

09:58:40 10          MR. O'CONNOR:  Does that mean you would have

      11   difficulty listening to the evidence and being able to devote

      12   all of your attention to this case?

      13          PROSPECTIVE JUROR:  And trying to be completely

      14   rationale, sir, I do believe it would.

09:58:52 15          THE COURT:  Okay.  That's good, Mr. O'Connor.

      16          MR. O'CONNOR:  Thank you.

      17          Juror 27.

      18          You're from ASU too.

      19          PROSPECTIVE JUROR:  I've worked for ASU.  I don't

09:59:09 20   currently work for them, but I have in the past.

      21          MR. O'CONNOR:  And when was the last time you worked

      22   at ASU?

      23          PROSPECTIVE JUROR:  I have an appointment -- my

      24   full-time appointment is at A.T. Still University, and I

09:59:21 25   have -- I've had an adjunct appointment at Arizona State, I

09:59:23  1    think through 2014.  I've served on dissertation committees

      2    as -- last year I think we finished up the last one I served

      3    on.

      4          MR. O'CONNOR:  You had told us before that you had

09:59:36  5    involvement with medical devices?

      6          PROSPECTIVE JUROR:  Yes.

      7          MR. O'CONNOR:  And you understand this case involves

      8    a medical device?

      9          PROSPECTIVE JUROR:  Um-hmm.

09:59:43 10          MR. O'CONNOR:  Does that mean your experience with

     11    medical device means that you would be more in favor of a

     12    company that makes medical devices?

     13          PROSPECTIVE JUROR:  That's difficult to say.  I mean,

     14    I've worked with companies to make medical devices.  I've been

09:59:56 15    funded for research with companies who make medical devices.

     16    So the interactions I've had with those companies have been

     17    good interactions and fruitful interactions.  I don't have a

     18    predisposed bias that those companies are good or evil.  But

     19    I've had good interactions with multiple companies that I've

10:00:19 20    worked with.

     21          MR. O'CONNOR:  And you had indicated earlier about

     22    your experience with the FDA.

     23          PROSPECTIVE JUROR:  I've had -- I haven't had any

     24    direct communications with the FDA, but I've been part of

10:00:30 25    multiple FDA applications to approve devices.  I've also done

10:00:36 1    research on -- with devices that have been FDA approved.  I've

2    also done research with devices that have been going through

3    the process of FDA approval.

4              MR. O'CONNOR:  So you've been involved pretty

10:00:48 5    detailed with the process.

6              PROSPECTIVE JUROR:  From the data collection, data

7    analysis side.  I've never had any interaction with sending

8    reports to the FDA themselves or communications directly with

9    the FDA, no.

10:01:02 10             MR. O'CONNOR:  The fact that the FDA, there's going

11   to be evidence about the FDA and the interactions the FDA had

12   with the defendant, the medical device company in this case,

13   Bard, do you think that will -- that the way you hear that

14   evidence, you will listen to it with your experience?  In

10:01:20 15   other words, you can't set your experience aside?

16             PROSPECTIVE JUROR:  With the experience I've had and

17   the process I know and the colleagues I've worked with who

18   have gone through the FDA process of getting devices approved,

19   that will obviously be a part of who I am and my knowledge

10:01:36 20   base that I will apply to the evidence that I hear, yes.  I

21   wouldn't be able to completely put that aside, no.

22             MR. O'CONNOR:  You won't be able to put that aside?

23             PROSPECTIVE JUROR:  It's my life experience.  No.

24   That's something I'll be coming to the table with as my life

10:01:52 25   experience.

10:01:54   1          MR. O'CONNOR:  Does that mean that you will have

           2   difficulty listening to evidence about FDA interaction with

           3   the medical device company?

           4          PROSPECTIVE JUROR:  No.

10:02:05   5          MR. O'CONNOR:  Do you feel that if the FDA is

           6   involved, that says something about the device?

           7          PROSPECTIVE JUROR:  That's a good question.  The

           8   process is thorough.  Is it always accurate?  No.

           9          MR. O'CONNOR:  Okay.  The process here may well be

10:02:20  10   different than the process that you're involved in.  Have you

          11   been involved in any other type of process other than

          12   approval?

          13          PROSPECTIVE JUROR:  No, sir.  Well, follow-up, you

          14   know, when the device is -- again, I've never directly

10:02:34  15   communicated with the FDA, but providing data and analysis to

          16   colleagues who are then sending that along.

          17          MR. O'CONNOR:  Do findings or determinations that the

          18   FDA make, does that carry a lot of weight in your mind?

          19          PROSPECTIVE JUROR:  It does carry weight in my mind,

10:02:50  20   yes, sir.

          21          MR. O'CONNOR:  And does that mean you would have

          22   difficulty evaluating objectively any evidence that involves

          23   interactions with the FDA?

          24          PROSPECTIVE JUROR:  No, sir.  Make mistakes.

10:03:06  25          MR. O'CONNOR:  Does that mean, though, that you are

10:03:08  1    starting out in favor of the medical device company if there

2    were interactions with the FDA?

3              PROSPECTIVE JUROR:  Not necessarily.

4              MR. O'CONNOR:  You said that you believe there are

10:03:17  5    too many lawsuits?

6              PROSPECTIVE JUROR:  Yes, sir.

7              MR. O'CONNOR:  Tell me about that.

8              PROSPECTIVE JUROR:  I just think that we gum up our

9    court system with way too many lawsuits of frivolous lawsuits

10:03:29  10   that don't need to be there, and it takes away from those that

11   really should be there.  Yes.

12             MR. O'CONNOR:  And does that mean you are skeptical

13   or suspicious of people that bring lawsuits in the first

14   place?

10:03:42  15             PROSPECTIVE JUROR:  If there's serious injury,

16   serious harm to the person, or their family member, then no.

17   If there's not apparent serious injury, then possibly.

18             MR. O'CONNOR:  And in terms of evaluating injuries,

19   well, you also indicated in your response that you support

10:03:56  20   legislative reforms, caps on damages.

21             PROSPECTIVE JUROR:  Yes, sir.

22             MR. O'CONNOR:  Does that mean that you have in mind

23   certain elements of damages that should not be compensated?

24             PROSPECTIVE JUROR:  No, sir.

10:04:06  25             MR. O'CONNOR:  Does that mean you have feelings about

10:04:08  1    that whatever the damages are, that you have an amount in your

2    mind that is enough?

3              PROSPECTIVE JUROR:  No.  I think they need to be

4    justified, but they're definitely -- in the medical field,

10:04:19  5    there are sometimes that damages -- I've seen awards that I

6    think outweigh what the damages are, and I think that's an

7    issue with our medical system in general, with the cost of

8    malpractice insurance and all of that, to protect health care

9    practitioners from frivolous lawsuits.  Now, when they make

10:04:40  10   mistakes or when there is an issue or there is serious harm to

11   a person, that person does need to be rewarded and need to be

12   taken care of.  Pain and suffering does need to be taken care

13   of and all of that, but there should be some caps, yes.

14             MR. O'CONNOR:  And it sounds like those are feelings

10:04:53  15   you've had long before you came here?

16             PROSPECTIVE JUROR:  Yes, sir.

17             MR. O'CONNOR:  And that those are feelings that are

18   going to stay with you throughout the trial?

19             PROSPECTIVE JUROR:  Possibly, yes, sir.

10:05:00  20             MR. O'CONNOR:  Meaning that that experience and those

21   feelings you have about caps on damages and too many lawsuits,

22   you're going to have that with you as you hear evidence in

23   this case?

24             PROSPECTIVE JUROR:  Possibly, yes, sir.

10:05:12  25             MR. O'CONNOR:  So is it fair to say that knowing that

10:05:15  1    and in fairness that, as you sit here right now, you --

2    there's a good chance that the plaintiff in this case may

3    start somewhat uneven, or on an uneven playing field?

4         PROSPECTIVE JUROR:  I don't think so.  I think it's

10:05:30  5    more on the damage side, not whether or not they are deserving

6    of the -- whether or not -- I mean, if you demonstrate that

7    there was harm done and there should be damages, then you

8    should win the case and there should be damages.  But I don't

9    think those damages should be unlimited.

10:05:48 10         MR. O'CONNOR:  All right.  Can you listen to jury

11   instructions?

12         PROSPECTIVE JUROR:  Yes, sir.

13         MR. O'CONNOR:  And relating to what jurors are

14   permitted to award in damages if the case gets to that point?

10:06:00 15         PROSPECTIVE JUROR:  Yes, sir.

16         MR. O'CONNOR:  Emotional damages, do you have

17   difficulty with that, sir?

18         PROSPECTIVE JUROR:  No, sir.

19         MR. O'CONNOR:  Pain and suffering?

10:06:07 20         PROSPECTIVE JUROR:  No, sir.

21         MR. O'CONNOR:  Thank you.

22         That's all I have.

23         THE COURT:  Counsel, could you approach for just a

24   minute, please.

10:06:10 25         Ladies and gentlemen, if you wish to stand while we

10:06:12    1    talk briefly, that's fine.

            2         (Bench conference as follows:)

            3         THE COURT:  My concern is you've been going for 43

            4    minutes and we've only covered eight jurors.  If we keep

10:06:30    5    going -- I know you've had some topics to cover, but if we

            6    keep going at this pace, you're going to be at it for two

            7    hours and we're going to run way long.  So my request is not

            8    that you forgo any questions you need to ask, but if you can

            9    just kind of move the pace a little faster.

10:06:46   10         MR. O'CONNOR:  I understand.  I've got a few more to

           11    go, but I've written down all of answers to their questions,

           12    and so that's what I just want to make sure I ask --

           13         THE COURT:  Yeah, that's fine.  I'm just a little

           14    concerned that we're only eight jurors in on questioning and

10:07:00   15    you've taken almost 45 minutes.

           16         MR. O'CONNOR:  Okay.

           17      (Bench conference concludes.)

           18         THE COURT:  All right.  Thank you, ladies and

           19    gentlemen.

10:07:24   20         MR. O'CONNOR:  Juror Number 30.

           21         Thank you, and thank for answering the questionnaire.

           22         You indicated that you have negative feelings against

           23    personal injury lawyers.  Did I understand your answer?

           24         PROSPECTIVE JUROR:  Yes.

10:07:40   25         MR. O'CONNOR:  When you say that, are you talking

10:07:41  1   about people like me, people on our side?

2   PROSPECTIVE JUROR:  Well, on TV you see -- every

3   other commercial is a commercial for lawsuits.  You know,

4   lawsuits against either pharmaceutical companies or medical

10:07:57  5   device companies.  I just think there's an awful lot out

6   there.  And what it does is it creates a mindset that if

7   something does go wrong, that it's really easy to sue.

8   MR. O'CONNOR:  And just staying with the personal

9   injury lawyers, obviously I represent a woman that's making a

10:08:26  10   claim against a medical device company.  Does that mean, in

11   your eyes, I stand in a worse position than, say, Mr. North?

12   PROSPECTIVE JUROR:  I wouldn't say you personally,

13   but I -- but like I said, there's so many lawsuits out there

14   now, and it's advertising, it's -- you see it everywhere, that

10:08:45  15   it's hard -- it's hard to determine, you know, what is

16   legitimate or who has a legitimate case or who doesn't.

17   MR. O'CONNOR:  And you're starting this case with

18   those feelings?

19   PROSPECTIVE JUROR:  Yes.

10:08:58  20   MR. O'CONNOR:  And you've had those feelings a long

21   time?

22   PROSPECTIVE JUROR:  Yes.

23   MR. O'CONNOR:  And so it sounds like, in fairness,

24   that the party bringing this lawsuit, the plaintiff, in your

10:09:05  25   mind, would be starting in an uneven playing field?

10:09:08  1            PROSPECTIVE JUROR:  Yes.

       2            MR. O'CONNOR:  You would expect more from her?

       3            PROSPECTIVE JUROR:  Expect more from her or expect it

       4     from me?

10:09:13  5            MR. O'CONNOR:  The uneven playing field.

       6            PROSPECTIVE JUROR:  It's an uneven playing field just

       7     because I don't know the background, and I do have those

       8     feelings.  I've had 11 surgeries, and every time I've had a

       9     surgery, they've given the risks, and more than once.  So I

10:09:31 10     feel that when you have a surgery, and there's a medical

      11     device or whatever involved, that you know the risk going into

      12     it.  And you do sign a form.

      13            MR. O'CONNOR:  And those experiences in your medical

      14     history yourself, fair to say that that will cause you to

10:09:48 15     be -- that would cause difficulties in your ability to be fair

      16     and impartial?

      17            PROSPECTIVE JUROR:  Yes.

      18            MR. O'CONNOR:  Thank you.  Thank you very much.

      19            Juror Number 42.

10:10:30 20            Good morning.

      21            Is it working?

      22            PROSPECTIVE JUROR:  Hope so.

      23            MR. O'CONNOR:  Sir, are you an engineer?

      24            PROSPECTIVE JUROR:  Yes.

10:10:42 25            MR. O'CONNOR:  What do you do?

10:10:44   1          PROSPECTIVE JUROR:  I do software development.

           2          MR. O'CONNOR:  Pardon me?

           3          PROSPECTIVE JUROR:  Software development.

           4          MR. O'CONNOR:  Software development.  Okay.  Thank

10:10:51   5   you.

           6          I think you said you get involved in quality

           7   assurance --

           8          PROSPECTIVE JUROR:  Yes.  In the past, I worked for

           9   an avionic company when I was doing component selection for,

10:10:58  10   you know, lifesaving -- avionics equipment, and I did failure

          11   analysis and testing of the components for reliability.

          12          MR. O'CONNOR:  You also indicated you have experience

          13   in root cause analysis.

          14          PROSPECTIVE JUROR:  Yes.  In order to determine what

10:11:19  15   the rate of failure are on certain components, you have to

          16   have statistical analysis done on it and you have to analyze

          17   the results in order to come out with a outcome.  Besides

          18   that, you have to kind of look under microscope and see what

          19   kind of material failures are there in order to determine what

10:11:38  20   the cause is.

          21          MR. O'CONNOR:  Now, there's going to be testimony

          22   from engineers in this case.  Do you think your experience

          23   will affect how you receive that type of testimony?

          24          PROSPECTIVE JUROR:  Well, it would be interesting to

10:11:49  25   actually hear it.  But, you know, I have my certain things

```
10:11:55   1   that I do as engineer.  You actually look at the statistics

           2   and science, rather than, you know, innuendoes.

           3           MR. O'CONNOR:  All right.  Your experiences, will

           4   that affect your ability, how you listen to evidence in this

10:12:09   5   case that might involve numbers or statistics?

           6           PROSPECTIVE JUROR:  No.  I'll just take it as -- as

           7   information, and based on that information, I will be able to

           8   make a decision one way or the other.

           9           MR. O'CONNOR:  Do you deal with the FDA at all?

10:12:26  10           PROSPECTIVE JUROR:  No, I don't.

          11           MR. O'CONNOR:  It sounds as though you have an issue

          12   or think there should be legislative reforms or caps on

          13   damages?

          14           PROSPECTIVE JUROR:  Yes, I do.

10:12:43  15           MR. O'CONNOR:  Does that mean that you have

          16   difficulty with certain types of damages in personal injury

          17   lawsuits?

          18           PROSPECTIVE JUROR:  Well, my feeling is that, you

          19   know, especially pain and suffering, the person was implanted

10:12:52  20   the particular device, did he or she suffer more before or

          21   after?  So that's my question.

          22           MR. O'CONNOR:  I didn't hear the last --

          23           PROSPECTIVE JUROR:  Let's say, like, you know, people

          24   say, you know, damages for pain and suffering.  So my

10:13:08  25   question, test question is did somebody suffer more before
```

10:13:11  1    they had the device implanted or did they suffer more after

2    they had the device implanted or removed.

3              MR. O'CONNOR:  Do you have a preconceived feeling

4    against pain and suffering damages?

10:13:26  5              PROSPECTIVE JUROR:  Well, this is not objective.

6    It's very subjective item.

7              MR. O'CONNOR:  Fair to say you have difficulty with

8    that type of a damages --

9              PROSPECTIVE JUROR:  Yes.

10:13:36  10             MR. O'CONNOR:  -- pain and suffering?

11             And that is something you felt long before you came

12   here?

13             PROSPECTIVE JUROR:  Oh, yes.

14             MR. O'CONNOR:  And is it fair, sir, that you would

10:13:43  15   have difficulty being fair and impartial when it comes to

16   damages if a component of the damages involved pain and

17   suffering?

18             PROSPECTIVE JUROR:  No, I would not have difficulties

19   making the right decision.

10:13:52  20             MR. O'CONNOR:  Pardon me?

21             PROSPECTIVE JUROR:  I would not have difficulty to

22   come out with the right decision based on the information

23   provided.

24             MR. O'CONNOR:  Are you more skeptical of somebody for

10:14:02  25   pain and suffering damages, a person that brings that type of

10:14:05   1    claim?

2                PROSPECTIVE JUROR:  Well, I'm skeptical in general.

3                MR. O'CONNOR:  I appreciate that.

4                Anything about what you've learned about this case

10:14:17   5    that you think would affect your ability to be fair and --

6    affect your ability to be fair and impartial?

7                PROSPECTIVE JUROR:  No.  Not specifically to this

8    case.

9                MR. O'CONNOR:  All right.  Thank you, sir.  I

10:14:27  10    appreciate it.

11               Juror 43.  Hi.

12               You work with a biomedical engineering department?

13               PROSPECTIVE JUROR:  Yes.

14               MR. O'CONNOR:  What do you do?

10:14:48  15               PROSPECTIVE JUROR:  I'm the academic advising

16    manager.

17               MR. O'CONNOR:  I'm sorry?

18               PROSPECTIVE JUROR:  Academic advising manager.

19               MR. O'CONNOR:  Do you have an engineering background?

10:14:58  20               PROSPECTIVE JUROR:  No.

21               MR. O'CONNOR:  And I think you said that you have

22    been involved or know people who have done internships with

23    Bard?

24               PROSPECTIVE JUROR:  I don't know anybody that's done

10:15:07  25    it.  I just said that we -- our school does have students that

10:15:09  1    do internships there.  So I don't personally know anybody at

       2    Bard.  I don't know any students that have personally done

       3    anything there.  I was just saying that my school does have

       4    interactions with them.  But I don't personally.

10:15:24  5             MR. O'CONNOR:  So you have no involvement with the

       6    medical device company Bard?

       7             PROSPECTIVE JUROR:  No.

       8             MR. O'CONNOR:  All right.  Thank you.

       9             Juror Number 46.

10:15:39 10             How are you?

      11             PROSPECTIVE JUROR:  Good.

      12             MR. O'CONNOR:  I thought I read in your questionnaire

      13    that you have a low opinion of personal injury lawyers.  Did I

      14    read that correctly?

10:15:50 15             PROSPECTIVE JUROR:  Yes.

      16             MR. O'CONNOR:  And that means -- is that referring to

      17    people on my side that represent injured people?

      18             PROSPECTIVE JUROR:  In this case, it seems so, yes.

      19             MR. O'CONNOR:  And is that a feeling you had long

10:16:02 20    before you came here?

      21             PROSPECTIVE JUROR:  Yes.  Similar to the others who

      22    spoke on this topic before.

      23             MR. O'CONNOR:  Does it -- do you think you're going

      24    to have difficulty being fair and impartial to the party that

10:16:13 25    is bringing a lawsuit for injury damages in this case?

10:16:16   1        PROSPECTIVE JUROR:  I don't think I will.  Despite

       2   the low opinion doesn't mean that you're not necessary.

       3        MR. O'CONNOR:  I'm sorry?

       4        PROSPECTIVE JUROR:  Despite my low opinion of trial

10:16:25   5   lawyers or injury lawyers or whatnot, doesn't mean it's not

       6   necessary.  So I don't think I would have difficulty being

       7   impartial.

       8        MR. O'CONNOR:  Okay.  Thank you.

       9        Juror 65.

10:16:55  10        PROSPECTIVE JUROR:  Hello.

      11        MR. O'CONNOR:  Hi, how are you?

      12        PROSPECTIVE JUROR:  Good, how about yourself?

      13        MR. O'CONNOR:  Thanks for answering the

      14   questionnaire.

10:17:05  15        I thought I read you feel that awards in lawsuits are

      16   too high?

      17        PROSPECTIVE JUROR:  In some cases, yes, they are.

      18        MR. O'CONNOR:  Would you explain that quickly for me,

      19   please?

10:17:13  20        PROSPECTIVE JUROR:  I think, like some of the other

      21   people said, some of them are frivolous and they just try to

      22   go for money, but there are some that are needed.

      23        MR. O'CONNOR:  And is that a feeling you've had long

      24   before you've come here?

10:17:24  25        PROSPECTIVE JUROR:  For a while, but not long time.

10:17:27  1          MR. O'CONNOR:  I mean, when you start out in this

       2    case, are you going to be questioning whether this is a

       3    frivolous lawsuit?

       4          PROSPECTIVE JUROR:  No.

10:17:34  5          MR. O'CONNOR:  Your feelings about personal injury

       6    lawyers --

       7          PROSPECTIVE JUROR:  No.

       8          MR. O'CONNOR:  -- you have low -- a low opinion, I

       9    thought you said.

10:17:41 10          PROSPECTIVE JUROR:  Just some of them are.  I have

      11    low opinion for some, but, like, for you guys, you're doing a

      12    case for a medical device or a failure.

      13          MR. O'CONNOR:  And how do you feel about that?  Does

      14    that fall within your low opinion?

10:18:00 15          PROSPECTIVE JUROR:  No.

      16          MR. O'CONNOR:  All right.  Thanks, appreciate that.

      17          Number 66, where are you, sir?

      18          PROSPECTIVE JUROR:  Yes, sir.  I don't know whether I

      19    need it or not.

10:18:21 20          MR. O'CONNOR:  Hi, how are you?

      21          PROSPECTIVE JUROR:  Good, sir.

      22          MR. O'CONNOR:  I thought I read you have strong

      23    feelings against people that file lawsuits.

      24          PROSPECTIVE JUROR:  Well, it's not necessarily the

10:18:29 25    people that file lawsuits.  I have strong feelings against

10:18:32   1   these attorneys that make the commercials, and it's always the

2   same girl who does it for all these different attorneys on TV.

3   It's always the same girl.  She dresses up in something

4   different or she changes her hair color, but it's always the

10:18:46   5   same person.

6           MR. O'CONNOR:  I think you wrote a paper on IVC

7   filters.

8           PROSPECTIVE JUROR:  Yes, I did.

9           MR. O'CONNOR:  And in that paper you developed

10:18:56  10   favorable opinions about IVC filters?

11           PROSPECTIVE JUROR:  No, I developed information about

12   the IVC filters.  I'm an X-ray tech.  That was in school my

13   final year.  Since then I've taken many X-rays of people that

14   I've seen those filters in.  And I've talked to many of the

10:19:14  15   people about it, and they've always been favorable to it.

16   I've never seen one that has been bad.

17           MR. O'CONNOR:  And that's an experience that you have

18   that you're going to be able -- not be able to separate when

19   you listen to evidence in this case.  Is that fair?

10:19:28  20           PROSPECTIVE JUROR:  No.  I'll be able to separate it

21   because I know that they're good, but there's also some bad

22   stuff there too.

23           MR. O'CONNOR:  Do you have any involvement with Bard,

24   Bard IVC filters?

10:19:40  25           PROSPECTIVE JUROR:  Do I have any what?

10:19:42   1           MR. O'CONNOR:  Have you done -- had any involvement

           2    in your professional work --

           3           PROSPECTIVE JUROR:  No, no.

           4           MR. O'CONNOR:   -- with Bard IVC filters?

10:19:48   5           PROSPECTIVE JUROR:  No, I have not.  Not with any of

           6    the different companies, whatever who make it, just the

           7    implant itself.

           8           MR. O'CONNOR:  The fact that you did that report, do

           9    you think that that may affect your ability to be fair and

10:19:56  10    impartial?

          11           PROSPECTIVE JUROR:  No.  It's been 15, 16 years ago.

          12    I don't remember a whole lot about it anymore.

          13           MR. O'CONNOR:  All right.  Thank you.

          14           PROSPECTIVE JUROR:  Uh-huh.

10:20:07  15           MR. O'CONNOR:  I do have another question for you,

          16    sir.

          17           PROSPECTIVE JUROR:  Ah.  Okay.

          18           MR. O'CONNOR:  You actually said --

          19           THE COURT:  Talk into the mic.

10:20:40  20           MR. O'CONNOR:  You did answer in response to a

          21    question that due to your medical experience and background

          22    and the report that you did on IVC filters in college, that

          23    you might be impartial.  Do you recall answering that?

          24           PROSPECTIVE JUROR:  Yes, I do.  But after thinking

10:20:53  25    about what's going on with it, there's the good and there's

10:20:56   1    the bad part of it, and nobody knows exactly what it is.  But

2    like I said, the impartial part is from my experience that

3    I've had with it, and so that doesn't mean my experience is

4    full circle.  It's only half circle.  So I've not had any

10:21:14   5    experience with the bad, so.

6          MR. O'CONNOR:  Is that feeling with you today as you

7    start this lawsuit?

8          PROSPECTIVE JUROR:  Sure it is, um-hmm.

9          MR. O'CONNOR:  The feeling you had about being

10:21:28  10    impartial -- excuse me, that you may be --

11          PROSPECTIVE JUROR:  I would be impartial to it.  I

12    would be impartial to it.

13          MR. O'CONNOR:  All right.  Thank you.

14          Number 67, I have a couple questions for you.

10:22:17  15          I think you told us earlier you work for Medtronics?

16          PROSPECTIVE JUROR:  That is correct.  Medtronic.

17          MR. O'CONNOR:  Medtronic.  And that's a medical

18    device company?

19          PROSPECTIVE JUROR:  That is correct.

10:22:29  20          MR. O'CONNOR:  Does that mean you're starting in

21    favor of medical device companies as a general rule?

22          PROSPECTIVE JUROR:  No.

23          MR. O'CONNOR:  Now, you do have experience with the

24    FDA?

10:22:42  25          PROSPECTIVE JUROR:  Well, yes.  Not dealing directly

10:22:45  1    with them, but through training that we receive through our

       2    company.

       3              MR. O'CONNOR:  I thought you had indicated in

       4    response to a question that you would have difficulty and you

10:22:59  5    could -- that you would have difficulty being fair and

       6    impartial in this case.  I think I said that you might be --

       7    that you would be biased.  Do you recall that answer?

       8              PROSPECTIVE JUROR:  Yes, I do.

       9              MR. O'CONNOR:  And that's a feeling that you had

10:23:08 10    before you even came here today; right?

      11              PROSPECTIVE JUROR:  Yes.

      12              MR. O'CONNOR:  And that's from what you read about in

      13    the questionnaire, knowing that this case involved a medical

      14    device?

10:23:16 15              PROSPECTIVE JUROR:  Correct.

      16              MR. O'CONNOR:  And fair to say that's how you feel

      17    today?

      18              PROSPECTIVE JUROR:  Yes.

      19              MR. O'CONNOR:  All right.

10:23:43 20              Almost there, Your Honor.  Just two more.

      21              THE COURT:  All right.

      22              MR. O'CONNOR:  Juror 76.  Where are you?

      23    Hi.

      24              PROSPECTIVE JUROR:  Hi.

10:25:04 25              MR. O'CONNOR:  Thank you for answering our

10:25:06 1   questionnaire.

2           In response to your -- to the questionnaire, it seems

3   that you had feelings against people filing what you called

4   unnecessary lawsuits and your concern that it may drive up

10:25:26 5   costs for professionals.  Did I read that correctly?

6           PROSPECTIVE JUROR:  Yes.

7           MR. O'CONNOR:  And from what I could tell, that

8   sounds like that's a feeling you've had long before you came

9   here?

10:25:36 10           PROSPECTIVE JUROR:  Yes.

11           MR. O'CONNOR:  Is that something you think will

12   affect your ability to be fair and impartial as you listen to

13   evidence in this case?

14           PROSPECTIVE JUROR:  No, because it just totally

10:25:44 15   depends on the situation and whether or not the -- I believe

16   in people taking accountability, whether they're on the

17   medical side or the patient side, and so it just depends on

18   the situation.

19           MR. O'CONNOR:  In this case there will be claims for

10:26:01 20   injury damages.

21           PROSPECTIVE JUROR:  Right.

22           MR. O'CONNOR:  Do you have feelings against certain

23   types of injury damages?

24           PROSPECTIVE JUROR:  I guess if I -- not on a whole,

10:26:11 25   no.

10:26:12  1          MR. O'CONNOR:  And some people have feelings against

2     damages like pain and suffering.  Is that something you would

3     have difficulty awarding if the evidence proved it?

4          PROSPECTIVE JUROR:  No.  I actually believe mental

10:26:23  5     and emotional health is just as important as physical.

6          MR. O'CONNOR:  All right.  Thank you.

7          Your Honor, that's all the questions we have.

8          THE COURT:  All right.  Thank you, Mr. O'Connor.

9          Ladies and gentlemen, we'll go ahead and take the

10:27:24 10     break.  But before we do that, let me say two things to you.

11          First, please, if you would, put your number, sheet

12     with your number on it, on your seat, so when you come back

13     you're seated in the same order.

14          Secondly, and this is important, please don't talk

10:27:39 15     about this case among yourselves or to anybody else.  That's

16     an instruction I'm going to be giving the jury from now until

17     the end of trial so that everybody keeps an open mind.  So

18     don't discuss the case or let anybody discuss it with you.

19          We will resume at a quarter to.  If you could be back

10:27:55 20     in your seats.  As you go out onto this floor, there are

21     restrooms in both directions, as well as on the two floors

22     below.

23          We'll see you at 10:45.

24       (Recess was taken from 10:28 to 10:47.  Proceedings

25     resumed in open court with the jury present.)

```
10:47:33   1              THE COURT:  Thank you.  Please be seated.
           2              Mr. North, you may proceed.
           3              MR. NORTH:  Thank you, Your Honor.
           4              Good morning, ladies and gentlemen.
10:47:45   5              If we could start with Juror Number 8.  I will try to
           6    be brief.
           7              Good morning.
           8              PROSPECTIVE JUROR:  Good morning.
           9              MR. NORTH:  I understand you work for -- in the
10:47:58  10    hotel --
          11              THE COURT:  Mr. North, we need to have you get the
          12    mic closer --
          13              MR. NORTH:  I'm sorry, Your Honor.
          14              Do you work for a particular hotel site or hotel
10:48:11  15    group in general?
          16              PROSPECTIVE JUROR:  I work for the corporate office
          17    for Best Western Hotel and Resorts.
          18              MR. NORTH:  And how long have you been involved in
          19    the hotel industry?
10:48:17  20              PROSPECTIVE JUROR:  About 11 years.
          21              MR. NORTH:  Thank you.
          22              Juror Number 9, please.
          23              I understand a member of your family has had an
          24    experience with blood clots before?
10:48:33  25              PROSPECTIVE JUROR:  My mother.
```

10:48:34   1          MR. NORTH:  And I believe you indicated that she had

         2    been on Coumadin to treat the blood clots?

         3          PROSPECTIVE JUROR:  Correct.

         4          MR. NORTH:  And was that successful?

10:48:45   5          PROSPECTIVE JUROR:  Yes.

         6          MR. NORTH:  And I also understand that you worked in

         7    the El Paso, Texas, clerk's office for a number of years?

         8          PROSPECTIVE JUROR:  Yes, sir.

         9          MR. NORTH:  What was your position there?

10:48:56  10          PROSPECTIVE JUROR:  I was a clerk in the county court

        11    office.

        12          MR. NORTH:  Did you have much experience in the

        13    courtroom or viewing trials?

        14          PROSPECTIVE JUROR:  Yes.

10:49:04  15          MR. NORTH:  Will that experience in any way affect

        16    your ability to be fair and impartial here?

        17          PROSPECTIVE JUROR:  No, sir.

        18          MR. NORTH:  Thank you.

        19          Juror Number 10, please.

10:49:15  20          Did I read this correctly, that you at some point

        21    owned your own type of business?

        22          PROSPECTIVE JUROR:  Yes.

        23          MR. NORTH:  And what type of business was that?

        24          PROSPECTIVE JUROR:  It was a web design company.

10:49:26  25          MR. NORTH:  And I believe you formerly worked for a

10:49:28  1    company called Cemex, is it?

2            PROSPECTIVE JUROR:  Cemex.

3            MR. NORTH:  Cemex.  What sort of entity is that?

4            PROSPECTIVE JUROR:  It is basically construction

10:49:37  5    based.

6            MR. NORTH:  Okay.  Thank you.

7            Juror Number 13, if we could.

8            Passing the wrong way.

9            PROSPECTIVE JUROR:  Good morning.

10:49:52 10            MR. NORTH:  I believe you also indicated your mother

11   had been on Coumadin.

12            PROSPECTIVE JUROR:  Yes.  Long time.

13            MR. NORTH:  Did she have a history of blood clots?

14            PROSPECTIVE JUROR:  She had a mitral valve

10:50:02 15   replacement, so she was put on Coumadin at that time and was

16   on it since she was 29 years old.

17            MR. NORTH:  And I understand your husband was

18   formerly an investigator with the United Parcel Service.

19            PROSPECTIVE JUROR:  Yes, sir.

10:50:17 20            MR. NORTH:  What sort of investigation did he do for

21   UPS?

22            PROSPECTIVE JUROR:  Internal theft, external theft,

23   drug packages.

24            MR. NORTH:  Thank you.

10:50:27 25            Juror Number 14.

10:50:30  1        PROSPECTIVE JUROR:  Good morning.

2        MR. NORTH:  You mentioned that you're presently

3    semiretired working with an avionics company.

4        PROSPECTIVE JUROR:  Yes, sir.

10:50:38  5        MR. NORTH:  And then you worked at Honeywell for many

6    years, as I understand it?

7        PROSPECTIVE JUROR:  Yes, sir.

8        MR. NORTH:  Did you work with avionics systems there

9    as well?

10:50:45 10        PROSPECTIVE JUROR:  Yes, sir, I did.

11        MR. NORTH:  What sort of work did your spouse do

12    before her retirement?

13        PROSPECTIVE JUROR:  She was a dental assistant,

14    working with my dentist right before we got married.

10:50:59 15        MR. NORTH:  Okay.  Thank you, sir.

16        Witness -- I mean Juror 15, please.  Or 18.  I'm

17    sorry.

18        You work for GoDaddy; is that correct?

19        PROSPECTIVE JUROR:  That's correct.

10:51:22 20        MR. NORTH:  What do you do for that company?

21        PROSPECTIVE JUROR:  Internet sales and tech support.

22        MR. NORTH:  And how long have you been with them?

23        PROSPECTIVE JUROR:  Seven years.

24        MR. NORTH:  Thank you, sir.

10:51:31 25        THE COURT:  Juror 20 had to move her car, so she'll

10:51:36  1  be back in a couple of minutes.

2       MR. NORTH:  Thank you, Your Honor.

3       Juror 23, if we could.

4       PROSPECTIVE JUROR:  Good morning.

10:51:49  5       MR. NORTH:  I believe you said in response to one of

6  the questions on the questionnaire that you had seen some

7  advertisements on TV about medical devices.

8       PROSPECTIVE JUROR:  Yes.

9       MR. NORTH:  Will you be able to put that, what you

10:52:01 10  may have seen on TV, aside and base your verdict here on the

11  evidence that you are presented and the law as the Judge

12  instructs you?

13       PROSPECTIVE JUROR:  Yes.

14       MR. NORTH:  And you were asked a number of questions

10:52:12 15  by Mr. O'Connor about your personal views, but I believe you

16  said at one point you would have to hear the whole case before

17  reaching a determination; is that correct?

18       PROSPECTIVE JUROR:  Yes.

19       MR. NORTH:  And based on what Judge Campbell said to

10:52:25 20  another juror about putting aside your personal views and

21  basing your verdict on the evidence presented and the law as

22  he instructs it, do you believe you can do that?

23       PROSPECTIVE JUROR:  Yes, I can.

24       MR. NORTH:  Thank you.

10:52:40 25       Juror Number 27, if we could.

10:52:56  1          You told us earlier about your work with medical

2     devices.  I think you mentioned it to Judge Campbell, but

3     could you tell me one more time what sort of medical devices

4     you worked with in the past.

10:53:11  5          PROSPECTIVE JUROR:  So most medical devices I've

6     worked with have been either electrical stimulation devices,

7     prosthetic devices, orthotic devices, and vibrotactile

8     feedback devices were some of the main ones.

9          MR. NORTH:  Were some of those actual implants?

10:53:29  10          PROSPECTIVE JUROR:  For some of the prosthetic

11     devices, the group I was working with was looking at neural

12     recording and stimulation, so there was some implant, but more

13     percutaneous implantation and subcutaneous.

14          MR. NORTH:  Thank you, sir.

10:53:46  15          Number 28, please.

16          Sir, I believe you work with IBM; is that correct?

17          PROSPECTIVE JUROR:  Yeah, that's correct.

18          MR. NORTH:  And what sort of -- are there any

19     particular products or systems your job focuses on?

10:53:57  20          PROSPECTIVE JUROR:  No.  My team works on tooling to

21     assist our business partners and sellers in selling our

22     software and solutions, but we don't actually work on any of

23     the IBM software.

24          MR. NORTH:  And how long have you been in that area

10:54:12  25     with IBM.

10:54:14  1        PROSPECTIVE JUROR:  I've been with IBM ten years.

2    I've been in this area for about four years.

3        MR. NORTH:  And what did you do for IBM before you

4    moved into this particular area?

10:54:24  5        PROSPECTIVE JUROR:  I was in product management and

6    program management, development teams working on product.

7            (Juror 20 entered the courtroom.)

8        MR. NORTH:  Thank you, sir, that's all I have.

9        Number 29.

10:54:30 10        THE COURT:  Excuse me, Mr. North.

11        Counsel at plaintiff's table, could you just make

12    room for Juror 20 to get back to her seat.

13        All right.  Let's go ahead with Juror 29.

14        MR. NORTH:  Ma'am, I believe you do work in the legal

10:54:57 15    field?

16        PROSPECTIVE JUROR:  Yes, I do.

17        MR. NORTH:  You're a paralegal?

18        PROSPECTIVE JUROR:  Yes.

19        MR. NORTH:  And did I understand correctly that it's

10:55:02 20    in the area of family law?

21        PROSPECTIVE JUROR:  It is family law.

22        MR. NORTH:  Have you ever done any paralegal or other

23    legal work with product liability litigation?

24        PROSPECTIVE JUROR:  No.

10:55:11 25        MR. NORTH:  Does the office that you work in handle

10:55:13 1    any personal injury litigation?

2            PROSPECTIVE JUROR:  No.

3            MR. NORTH:  Have you ever worked with any law firm

4    that did personal injury litigation?

10:55:23 5            PROSPECTIVE JUROR:  Only internship but it was -- I

6    did not work on any personal injury cases.

7            MR. NORTH:  And I believe at some time in your past

8    you did some work with Congress?

9            PROSPECTIVE JUROR:  Yes, I did.

10:55:33 10           MR. NORTH:  Can you tell us what sort of work that

11   was?

12           PROSPECTIVE JUROR:  I was a congressional staffer for

13   two house members and one U.S. senator.

14           MR. NORTH:  Thank you.  That's all I have.

10:55:44 15           Number 32.

16           Sir, I believe you work at Edward Jones?

17           PROSPECTIVE JUROR:  That's correct, sir.

18           MR. NORTH:  And what sort of work do you do there?

19           PROSPECTIVE JUROR:  Currently I'm in the training and

10:56:02 20   strategy group.

21           MR. NORTH:  And how long have you been with that

22   company?

23           PROSPECTIVE JUROR:  I've been with them for 13 years.

24           MR. NORTH:  Thank you, sir.

10:56:09 25           Your Honor, before we move to the benches, could I

10:56:11  1   circle back to Number 20, please?

2            THE COURT:  Sure, yeah.

3            PROSPECTIVE JUROR:  Hello.

4            MR. NORTH:  Hi.  You were asked a number of questions

10:56:25  5   by Mr. O'Connor and you were very candid in your views.  I

6    believe Judge Campbell has indicated that he will instruct the

7    jury at some point to put aside your personal views and to

8    base your verdict on the evidence you hear in this courtroom

9    and the law as he instructs you about it.

10:56:45 10            Do you believe you are able to do that?

11            PROSPECTIVE JUROR:  I -- I can't say confidently yes.

12   I have some doubt.

13            MR. NORTH:  Thank you.  We do appreciate your candor.

14            If we could go to Number 34, please.

10:57:23 15            Sir, I believe you indicated in your questionnaire

16   that your daughter is a nurse.

17            PROSPECTIVE JUROR:  Yes, that's correct.

18            MR. NORTH:  Do you know what particular area she may

19   work as far as a nurse is concerned?

10:57:35 20            PROSPECTIVE JUROR:  Well, she works in the neurology

21   department of the Mayo Clinic.

22            MR. NORTH:  And how long has she been doing that?

23            PROSPECTIVE JUROR:  She's been a nurse for about two

24   and a half years; she's been at the Mayo Clinic since October.

10:57:50 25            MR. NORTH:  And does she discuss her work with you on

10:57:53   1    occasion?

2         PROSPECTIVE JUROR:  Not particularly.

3         MR. NORTH:  Sounds like my child.

4         Number 36, please.

10:58:04   5         I believe you indicated that you have some knowledge

6    about the FDA, but more focused on its regulation of food

7    products; is that correct?

8         PROSPECTIVE JUROR:  That's correct.

9         MR. NORTH:  Can you tell us about that, what the

10:58:15  10    source of your knowledge is?

11         PROSPECTIVE JUROR:  Working directly with my

12    supervisor at a pizza delivery company.

13         MR. NORTH:  And I believe your spouse works at

14    General Motors?

10:58:30  15         PROSPECTIVE JUROR:  Correct.

16         MR. NORTH:  And what sort of position?

17         PROSPECTIVE JUROR:  He's a Java developer and

18    programmer.

19         MR. NORTH:  And how long has he been with GM?

10:58:41  20         PROSPECTIVE JUROR:  About four years.

21         MR. NORTH:  Thank you.

22         Number 39, please.

23         I believe you indicated in your questionnaire that

24    you have a nursing background?

10:58:52  25         PROSPECTIVE JUROR:  Yes.

10:58:52  1        MR. NORTH:  Did you actually practice as a nurse at

2    some point?

3        PROSPECTIVE JUROR:  Yes.

4        MR. NORTH:  But as I understand it, you're not

10:58:58  5    currently working as a nurse?

6        PROSPECTIVE JUROR:  No.  No.

7        MR. NORTH:  And I believe you indicated you have been

8    involved in a lawsuit in the past?

9        PROSPECTIVE JUROR:  Yes.

10:59:08  10        MR. NORTH:  And what was the nature of that lawsuit?

11        PROSPECTIVE JUROR:  When I finished nursing I went to

12    school to become a machinist, and I was hurt on one of the

13    machines at the machine shop.

14        MR. NORTH:  Was that a claim you filed with your

10:59:23  15    employer under worker's compensation?

16        PROSPECTIVE JUROR:  Yes.

17        MR. NORTH:  Is that the only time you've been

18    involved in a lawsuit?

19        PROSPECTIVE JUROR:  Someone had sued us.

10:59:40  20        MR. NORTH:  I believe you indicated, also, you had

21    seen some television advertisements about medical devices.

22        PROSPECTIVE JUROR:  It was just the one that the

23    attorneys have on there about that device.  As soon as it

24    comes on, I turn it off after I got the questionnaire.

10:59:55  25        MR. NORTH:  Okay.  Thank you.

10:59:56  1          Number 40.

2          Do I understand correctly that your job involves

3     inspecting commercial aircraft?

4          PROSPECTIVE JUROR:  It does.

11:00:10  5          MR. NORTH:  And how long have you been doing that?

6          PROSPECTIVE JUROR:  47 years.

7          MR. NORTH:  Okay.  And I think one of your children

8     is involved in pharmaceutical sales?

9          PROSPECTIVE JUROR:  She is.

11:00:23 10          MR. NORTH:  And what company is that for?

11          PROSPECTIVE JUROR:  So she just changed jobs, but she

12     deals in pharmaceutical sales for prescription medicine for

13     doctors on early stages of cerebral palsy.

14          MR. NORTH:  Is it a particular manufacturer of those

11:00:40 15     products?

16          PROSPECTIVE JUROR:  It is.

17          MR. NORTH:  Which one is that, do you know?

18          PROSPECTIVE JUROR:  I don't know.

19          MR. NORTH:  Okay.  And did I read this correctly that

11:00:45 20     your father died from pulmonary embolism?

21          PROSPECTIVE JUROR:  He did.

22          MR. NORTH:  Was he taking any blood thinners that you

23     know of?

24          PROSPECTIVE JUROR:  He was at the time.

11:01:00 25          MR. NORTH:  Thank you, sir.

11:01:01   1          Number 42, please.

           2          I believe you indicated in your questionnaire that

           3   you have some familiarity with the FDA; correct?

           4          PROSPECTIVE JUROR:  No.

11:01:17   5          MR. NORTH:  No?

           6          Thank you, sir.  That's all I have.

           7          Number 43.

           8          I believe that you -- I wanted to make sure I

           9   understood this.  You work at the College of Medicine?

11:01:34  10          PROSPECTIVE JUROR:  I did formerly.  I work at ASU

          11   now.

          12          MR. NORTH:  But your position is in academic

          13   advising?

          14          PROSPECTIVE JUROR:  Yes.

11:01:43  15          MR. NORTH:  And how long have you been in that role?

          16          PROSPECTIVE JUROR:  Four years.

          17          MR. NORTH:  Thank you.

          18          Number 45.

          19          Sir, I believe you've indicated that you served on a

11:01:52  20   jury before in a medical case?

          21          PROSPECTIVE JUROR:  Yes.

          22          MR. NORTH:  What sort of case was that?  Was that a

          23   medical malpractice against a physician?

          24          PROSPECTIVE JUROR:  Yes.  It was long time ago.  It

11:02:03  25   was back in the '80s.  Yeah, it was something to do with that.

11:02:10  1          MR. NORTH:  Did it involve a pharmaceutical company

2     or medical device company?

3          PROSPECTIVE JUROR:  No, it did not.

4          MR. NORTH:  Thank you, sir.  That's all I have.

11:02:30  5          If we can move over to Number 49.

6          PROSPECTIVE JUROR:  Good morning.

7          MR. NORTH:  I believe you indicated in your

8     questionnaire that your daughter has just completed law

9     school?

11:02:44 10          PROSPECTIVE JUROR:  Yes.

11          MR. NORTH:  And she is studying for the bar?

12          PROSPECTIVE JUROR:  Yes.

13          MR. NORTH:  What sort of law does she want to

14     practice, or do you know?

11:02:53 15          PROSPECTIVE JUROR:  I don't know at this time.  She's

16     undecided at this time.

17          MR. NORTH:  And how -- but she's working in the legal

18     field while she waits for the bar results.

19          PROSPECTIVE JUROR:  Somewhat.  She's doing part-time

11:03:02 20     work with immigration.

21          MR. NORTH:  Is that for an immigration for private

22     lawyers or for the government?

23          PROSPECTIVE JUROR:  It's for private attorneys.

24          MR. NORTH:  Thank you.  That's all I have.

11:03:22 25          Number 52, please.

11:03:23  1          Sir, I believe you indicated in one of the responses

2      to the questionnaire that you believe that the FDA is

3      controlled, at least to some extent, by money.

4              PROSPECTIVE JUROR:  Absolutely.  I think --

11:03:38  5          MR. NORTH:  Tell us the basis of your opinion in that

6      regard.

7              PROSPECTIVE JUROR:  My basis of opinion is growing

8      up, seeing the medical field working from a practice side

9      moving to a business side, which then has fed into the legal

11:03:47 10     side where we now have people who chase after money.  We've

11     lost the morale.

12             MR. NORTH:  What do you think is the source of the

13     money that you think is controlling the FDA?

14             PROSPECTIVE JUROR:  I'm just a regular worker, so

11:04:07 15     that's beyond me.  It's nerve-wracking to think we can let

16     something out to the public if it affects anybody in a manner

17     of cancer, organ failure, or death, and we're putting a value

18     on it.

19             MR. NORTH:  Given your feelings about the FDA, do you

11:04:27 20     believe that you're capable of keeping an open mind in a case

21     that's going to have a lot of testimony about the FDA?

22             PROSPECTIVE JUROR:  Yeah, I'm fairly sure I can.

23             MR. NORTH:  Does your belief about -- beliefs about

24     the FDA cause you to have some sort of bias against either the

11:04:51 25     plaintiff in this case or the medical device manufacturer?

11:04:55   1          PROSPECTIVE JUROR:  No.  I'm here for a case.  I'm

2    not here to choose plaintiff or -- you have to have the

3    details to find out -- I'm looking for truth.  I'm not out to

4    take and favor somebody because it's a medical field or

11:05:07   5    because it's a client who took it.

6          MR. NORTH:  Thank you, sir.

7          Number 63.

8          PROSPECTIVE JUROR:  Yes, sir.

9          MR. NORTH:  I believe you're in the physical therapy

11:05:18  10    field?

11          PROSPECTIVE JUROR:  Correct.

12          MR. NORTH:  And does your practice focus on any

13    particular type of clients or particular type of injuries?

14          PROSPECTIVE JUROR:  Mostly orthopedic, but we see

11:05:27  15    anything from neuro to falls, things like that.

16          MR. NORTH:  And how long have you been doing that?

17          PROSPECTIVE JUROR:  Four months.

18          MR. NORTH:  And previously you were in the

19    United States Navy?

11:05:37  20          PROSPECTIVE JUROR:  Correct.

21          MR. NORTH:  What did you do in the Navy?

22          PROSPECTIVE JUROR:  Information technology.

23          MR. NORTH:  Thank you, sir.

24          If we can go to Number 65.

11:06:06  25          Sir, I believe you indicated you or a member of your

11:06:09  1    family is taking a blood thinner?

2              PROSPECTIVE JUROR:  Yes.  I am and my father is too.

3              MR. NORTH:  Are you still doing so?

4              PROSPECTIVE JUROR:  Yes.

11:06:17  5    MR. NORTH:  Do you have any personal experience with

6    blood clots?

7              PROSPECTIVE JUROR:  No, not yet.

8              MR. NORTH:  And your spouse works in the insurance

9    field?

11:06:28 10    PROSPECTIVE JUROR:  That is correct.

11             MR. NORTH:  What does she do?

12             PROSPECTIVE JUROR:  She's a claims supervisor.

13             MR. NORTH:  And how long has she been in that area?

14             PROSPECTIVE JUROR:  26, 27 years.

11:06:38 15    MR. NORTH:  Thank you, sir.

16             Number 66, please.

17             I believe that you indicated in the questionnaire

18   that you had a hip implant at some point?

19             PROSPECTIVE JUROR:  I had a hip implant, yes.  Well,

11:06:56 20   it wasn't actually a hip implant, it was a pin and plate.

21   Which was removed.

22             MR. NORTH:  And you had some complications with that

23   procedure?

24             PROSPECTIVE JUROR:  Yes, I did.  Yes.

11:07:10 25    MR. NORTH:  Would the fact you had those

11:07:12  1    complications with that procedure in any way affect your

2    ability to be fair and unbiased in this case?

3         PROSPECTIVE JUROR:  No.

4         MR. NORTH:  Thank you, sir.

11:07:19  5         PROSPECTIVE JUROR:  It was my body's problem, not the

6    implant.

7         MR. NORTH:  If we could switch over here now to

8    Number 71.

9         Good morning.

11:07:44 10         My understanding is you formerly worked at the Mayo

11   Clinic.

12         PROSPECTIVE JUROR:  I do work there, yes.

13         MR. NORTH:  What sort of work do you do there?

14         PROSPECTIVE JUROR:  I'm a medical social worker.

11:07:55 15         MR. NORTH:  And I believe you indicated that your

16   grandmother takes Coumadin.

17         PROSPECTIVE JUROR:  Correct.

18         MR. NORTH:  Does she have a history of blood clotting

19   of any sort?

11:08:02 20         PROSPECTIVE JUROR:  No.

21         MR. NORTH:  And you also indicated your father

22   formerly practiced law.

23         PROSPECTIVE JUROR:  Correct.

24         MR. NORTH:  What sort of law did he practice?

11:08:12 25         PROSPECTIVE JUROR:  Family.

11:08:13 1                    MR. NORTH:  To your knowledge, did he ever do

2       personal injury work?

3                    PROSPECTIVE JUROR:  No.

4                    MR. NORTH:  Thank you.

11:08:23 5              Number 72.

6              I believe you indicated you've had positive

7       experiences with personal injury lawyers.

8                    PROSPECTIVE JUROR:  Yes.

9                    MR. NORTH:  What's the basis of that past experience?

11:08:47 10                   PROSPECTIVE JUROR:  From a car accident, and it was

11      pretty much -- they were on my side and it worked out in the

12      end.

13                   MR. NORTH:  Given that experience, do you believe

14      that you can be open-minded in this case, listen to both sides

11:09:03 15      of the presentation?

16                   PROSPECTIVE JUROR:  Yeah.  Absolutely.

17                   MR. NORTH:  And I believe you indicated that your

18      father owns a small business.

19                   PROSPECTIVE JUROR:  Yeah.

11:09:15 20                   MR. NORTH:  What sort of business is that?

21                   PROSPECTIVE JUROR:  It's graphic design.

22                   MR. NORTH:  Thank you.  That's all I have.

23              Number 74.

24                   PROSPECTIVE JUROR:  Morning.

11:09:28 25                   MR. NORTH:  Morning.  I believe you are in the

11:09:29   1    ministry.

  2            PROSPECTIVE JUROR:  I am.

  3            MR. NORTH:  And I just wanted to ask you how long

  4    you've been in that area.

11:09:35   5            PROSPECTIVE JUROR:  Since 1995.

  6            MR. NORTH:  Thank you, sir.

  7            Number 76.

  8            I believe you indicated that a number of people in

  9    your husband's family have either blood clotting or blood

11:09:56 10    thinners --

11            PROSPECTIVE JUROR:  Has a genetic blood disorder.  My

12    husband hasn't been diagnosed yet.  Seems to hit around 40.

13            MR. NORTH:  Have any of those relatives received a

14    filter of any sort?

11:10:09 15            PROSPECTIVE JUROR:  No.

16            MR. NORTH:  Thank you.  That's all I have.

17            Number 78.

18            Ma'am, I believe you indicated that you are retired.

19            PROSPECTIVE JUROR:  Yes.

11:10:24 20            MR. NORTH:  What sort of work did you do before you

21    retired?

22            PROSPECTIVE JUROR:  I was in Rockwell Collins

23    avionics.

24            THE COURT:  Could you say that again, ma'am, please.

11:10:34 25            PROSPECTIVE JUROR:  In avionics.

11:10:37  1                MR. NORTH:  What did you do in avionics?

          2                PROSPECTIVE JUROR:  I was an inspector and a lead and

          3     various things.

          4                MR. NORTH:  And what company did you work for?

11:10:48  5                PROSPECTIVE JUROR:  Rockwell Collins.

          6                MR. NORTH:  Thank you.

          7                And, lastly, Number 80.

          8                Sir, I have the same question for you.  I believe

          9     you're retired also?

11:10:59 10                PROSPECTIVE JUROR:  Correct.

         11                MR. NORTH:  What sort of work did you do before you

         12     retired?

         13                PROSPECTIVE JUROR:  I was in the consulting business

         14     in the trucking industry.

11:11:09 15                MR. NORTH:  What sort of areas or topics would you

         16     consult on in that industry?

         17                PROSPECTIVE JUROR:  Well, we did mergers and

         18     acquisitions.  Other trucking companies would hire us to help

         19     them seek out and acquire companies.  And also general

11:11:21 20     consulting work.

         21                MR. NORTH:  Thank you, sir.  That's all I have.

         22                THE COURT:  Counsel, if you would approach a minute.

         23                Ladies and gentlemen, if you want to stand up, this

         24     will take just a second.

11:11:46 25           (Bench conference as follows:)

11:12:02  1        THE COURT:  Counsel, it looks to me like we have more

      2    than enough folks to pick the jury and we don't need to

      3    question beyond Juror Number 80.  I just wanted to make sure

      4    you're in agreement before we excuse the panel.

11:12:16  5        We need 15 at the end of all of the challenges for

      6    cause and excusals.  Looks to me like we'll have 20 or more.

      7    Even if I were to grant every challenge for cause, I think

      8    we'd have more than 15.

      9        Does anybody disagree with that?

11:12:32 10        MR. NORTH:  I have not done the math, but I believe

     11    that is correct.

     12        THE COURT:  I count 23 who didn't say anything

     13    controversial.  I might be persuaded on a few, but I just

     14    didn't want to excuse them if you think we need to go beyond

11:12:43 15    80 with questions.

     16        MR. WENNER:  Question Juror Number 28 --

     17        THE COURT:  You need to speak into the mic.

     18        MR. WENNER:  Sorry, Your Honor.

     19        We haven't questioned Juror 38 about her knowledge of

11:12:52 20    the verdict in the last case.

     21        THE COURT:  48, you mean.

     22        MR. WENNER:  48.

     23        THE COURT:  I'm still going to ask 39, 48, 67, and 42

     24    to stay behind.  I'm going to let 117 go because we'll never

11:13:06 25    get to him.  They all said they've heard something more.  So

11:13:09  1    I'll ask questions, you can then ask follow-ups of those.

2    But -- and I'm going to ask if they know anybody else on the

3    panel.  But other than that, is there anything else you think

4    we need to cover before we get to challenges for causes?

11:13:22  5            MR. NORTH:  I don't think so, Your Honor.

6            MR. WENNER:  No.  No, Your Honor, except I do think

7    that Juror Number 67 stated sufficient evidence for cause.

8            THE COURT:  I understand you're going to make that

9    challenge.  I just told him I'm going to keep him after.  I

11:13:38  10    also would like to know what he's heard to make sure there's

11    not something else out there we ought to be aware of.

12            MR. WENNER:  Okay.

13            THE COURT:  Okay.  Thanks.

14        (Bench conference concludes.)

11:13:50  15            THE COURT:  All right.  Thank you.

16            Have a seat, ladies and gentlemen.

17            Let me ask the question I told you I would ask

18    earlier, which is do any of you on jury panel know any other

19    member -- did you know any other member of the jury panel

11:14:00  20    before today?

21            I see no hands.

22            Okay.  What we're going to do now is the lawyers and I

23    are going to go through the process of picking the jury, so

24    I'm going to excuse the jury panel.  But I would like Jurors

11:14:17  25    39, 42, 48, and 67 to remain behind in the courtroom for a

11:14:24  1   minute so I can ask follow-up questions.

2        Juror 117, you don't need to stay behind.

3        I'll ask those follow-up questions.  We'll then go

4   through the process of choosing the jury.  That takes a half

11:14:37  5   hour.  So what we're going to do is excuse you and ask you, if

6   you would, to be back outside of the courtroom by ten minutes

7   to 12:00.  Our hope is we'll be done by then, call you in,

8   tell you who is on the jury, and let the rest of you go.

9        Please remember during that period of time not to talk to

11:14:58 10   anybody about the case and don't allow anybody to talk to you.

11        As you leave, you can take your sheets and hand them to

12   Traci.  You don't have to sit in the same seats when you come

13   back.

14        And, again, Jurors 39, 42, 48, and 67, please remain

11:15:14 15   behind.  And we'll excuse the rest of you to ten minutes to

16   the hour.

17        (Excused panel members exited the courtroom.)

18        THE COURT:  All right.  Please be seated.

19        I'm going to ask Jurors 42, 48, and 67, if you would

11:16:55 20   just step outside the door for a minute.  We'll call you in

21   shortly.

22        Juror 39, if you could remain just a moment, please.

23        (Prospective Jurors 42, 48, and 67 exited the courtroom.)

24        THE COURT:  Juror 39, I think you indicated earlier

11:17:16 25   when you raised your hand that you have heard or learned

11:17:20  1    something about this case since you completed the

        2    questionnaire; is that right?

        3              PROSPECTIVE JUROR:  Actually saw it before.  It was

        4    just the advertisement on TV about the lawyers saying there's

11:17:30  5    a class action lawsuit about it.  And then once I got the

        6    paperwork, as soon as the ad would come on TV, we'd shut it

        7    off.

        8              THE COURT:  Do you remember the specific product that

        9    was discussed in the ad?

11:17:42 10              PROSPECTIVE JUROR:  Some sort of device.  I couldn't

       11    even --

       12              THE COURT:  That's a good clue for us.

       13              All right.  So the only thing you've been exposed to

       14    is the TV ad; is that right?

11:17:56 15              PROSPECTIVE JUROR:  Yeah, that's it.

       16              THE COURT:  Have you heard anything specifically

       17    about this case or other cases that might involve those

       18    filters?

       19              PROSPECTIVE JUROR:  Nope.

11:18:04 20              THE COURT:  Okay.

       21              Any follow-up questions, Counsel?

       22              MR. O'CONNOR:  Nothing from us, Your Honor.

       23              MR. NORTH:  Yes, ma'am.  Did you hear anything

       24    specific about C.R. Bard in that advertisement?

11:18:14 25              PROSPECTIVE JUROR:  I don't remember if they said

11:18:15  1    anything.

2            MR. NORTH:  Thank you.

3            THE COURT:  The last question of you, Juror 39:

4    Would your having viewed that ad in any way affect your

11:18:22  5    ability to be a fair juror in this case?

6            PROSPECTIVE JUROR:  No.

7            THE COURT:  Okay.  Thanks.  We'll have you step out.

8            Traci, let's have Juror 42 come in.

9            We'll see you at ten minutes to the hour, Juror 39.

11:18:33 10       (Prospective Juror 39 exited and Prospective Juror 42

11    entered the courtroom.)

12            THE COURT:  Juror 42, thanks for coming back in.

13            I think you raised your hand when I asked if anybody

14    had learned anything more about this case after completing the

11:19:04 15    questionnaire.

16            PROSPECTIVE JUROR:  Only thing after I filled out the

17    questionnaire, I heard the advertising on the radio while

18    driving to work, and the ICV filter was mentioned.

19            THE COURT:  Do you remember what was said in that

11:19:21 20    advertisement?

21            PROSPECTIVE JUROR:  Standard advertising for the

22    lawyers.  If you were implanted with ICV, call us and we can

23    help you out with damages, pretty much.

24            THE COURT:  Okay.  Did you hear any particular party

11:19:32 25    or company named?

11:19:34   1         PROSPECTIVE JUROR:  I don't recall them mentioning

           2    any company name.

           3         THE COURT:  Is there anything about your having heard

           4    that ad that would affect your ability to be a fair juror in

11:19:45   5    this case?

           6         PROSPECTIVE JUROR:  No.

           7         THE COURT:  Okay.

           8         Any follow-up questions, Counsel?

           9         MR. NORTH:  Nothing.

11:19:51  10         MR. O'CONNOR:  Nothing.

          11         THE COURT:  Okay.  Thanks, Juror 42.

          12         Let's have Juror 48 come in, Traci.

          13       (Prospective Juror 42 exited.  Prospective Juror 48

          14    entered the courtroom.)

11:20:13  15         THE COURT:  Juror 48.  Thank you.  You're good right

          16    there.  Thanks for coming back in.

          17         I believe you indicated in your questionnaire that

          18    you had read something about a case involving the same

          19    product; is that right?

11:20:26  20         PROSPECTIVE JUROR:  Yes.

          21         THE COURT:  Could you tell us what you remember

          22    having read?

          23         PROSPECTIVE JUROR:  That the manufacturer had a

          24    rather large payout to the plaintiff.

11:20:39  25         THE COURT:  Okay.  Do you remember who the

11:20:41  1    manufacturer was?

2         PROSPECTIVE JUROR:  I believe it was Bard.

3         THE COURT:  Okay.  And where was it you saw this?

4         PROSPECTIVE JUROR:  I do IT, so it was an article on

11:20:48  5    one of my regular sites that come up.  Either Google or CNN or

6    one of the local -- one of the news stations or channels.

7         THE COURT:  Okay.

8         Anything else you remember about the article?

9         PROSPECTIVE JUROR:  No.

11:21:07  10    THE COURT:  Have you been exposed to any other

11    information that might be related to the case besides that

12    article?

13         PROSPECTIVE JUROR:  Regarding this case, no, I have

14    not.

11:21:14  15    THE COURT:  Do you believe that having read that

16    article would affect you in any way in your ability to be a

17    fair juror in this case?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  I assume you understand this is a

11:21:23  20    different case, different facts, this isn't controlled by any

21    decision in a prior case.  Is that your understanding?

22         PROSPECTIVE JUROR:  Yes.  Correct.

23         THE COURT:  Do you feel you could approach it in that

24    way?

11:21:33  25    PROSPECTIVE JUROR:  Yes.

11:21:34   1          THE COURT:  Okay.  Counsel, do you have follow-up

        2   questions?  I think there were some things you didn't ask

        3   Juror 48 because we were going to have her come back in.

        4          MR. O'CONNOR:  Yes.

11:21:41   5          THE COURT:  Just pull the mic over, Mr. O'Connor.

        6   You can just sit there and ask her.

        7          MR. O'CONNOR:  Hi.  How are you?

        8          So the jury in this case may well deliberate and be

        9   asked to award money in this case.

11:21:58  10          THE COURT:  Sorry, Mr. O'Connor, we can't hear you.

       11   Let's have you just hold the mic in front of you, if you

       12   would.

       13          MR. O'CONNOR:  Pardon me?

       14          THE COURT:  Talk right into the mic.

11:22:06  15          MR. O'CONNOR:  Do you want me to step out front?

       16          THE COURT:  Yeah.  Anywhere is fine just so you can

       17   talk into the mic.

       18          MR. O'CONNOR:  Is what you read, is that going to

       19   affect your ability to deliberate if you were selected as a

11:22:16  20   juror in this case?

       21          PROSPECTIVE JUROR:  Should not, no.

       22          MR. O'CONNOR:  Your husband works for a medical

       23   device company.

       24          PROSPECTIVE JUROR:  No --

11:22:26  25          MR. O'CONNOR:  Excuse me.  He works for a marketing

11:22:27   1    company.

2              PROSPECTIVE JUROR:  Yes.  He's a creative director

3    for a advertising agency here.

4              MR. O'CONNOR:  Does he have any connections or work

11:22:35   5    with Bard?

6              PROSPECTIVE JUROR:  They have worked with Bard.  Most

7    of their clients are medical device companies.

8              MR. O'CONNOR:  And how do you feel knowing your

9    husband has interaction and that's part of his business?  Will

11:22:48  10    that affect your ability to be fair and impartial in this

11   case?

12             PROSPECTIVE JUROR:  That should not, no.

13             MR. O'CONNOR:  You understand we have the party who

14   is bringing this lawsuit, and would you have difficulty if the

11:23:00  15    evidence shows awarding damages against the medical device

16   company?

17             PROSPECTIVE JUROR:  No.  I would have to hear the

18   case.  As the other jurors have said, hear both sides.

19             MR. O'CONNOR:  We thought we saw that your husband

11:23:34  20    actually worked on a campaign for an IVC filter device.  Do

21   you recall that?

22             PROSPECTIVE JUROR:  There's so many that I see and

23   don't see, so it very well could have been.

24             MR. O'CONNOR:  Was it a Bard device?

11:23:48  25             PROSPECTIVE JUROR:  Most likely, yes, because that is

11:23:49  1    one of their clients.

2         MR. O'CONNOR:  And does your husband -- do you know

3    people at Bard?

4         PROSPECTIVE JUROR:  No, I do not.

11:23:56  5    MR. O'CONNOR:  Does your husband socialize or

6    interact with people at Bard?

7         PROSPECTIVE JUROR:  No, not that I'm aware of.

8         MR. O'CONNOR:  Nothing further.

9         THE COURT:  Mr. North.

11:24:07  10   MR. NORTH:  Yes, ma'am.  Do you believe that you will

11   be able in this case, despite what you have read, to be able

12   to deliberate with the jury, if chosen, without discussing

13   what you've read in the past with the other jurors?

14        PROSPECTIVE JUROR:  Most likely, yes.

11:24:23  15   MR. NORTH:  If the Judge were to instruct you to do

16   so, would you be able to follow that instruction?

17        PROSPECTIVE JUROR:  Yes.

18        MR. NORTH:  Thank you.

19        THE COURT:  In case you get put on this jury and I

11:24:33  20   don't remember, Juror 48, if you are put on the jury, I'm

21   going to ask you not to tell anybody about the article you

22   read or to discuss it with them in any way.  Could you follow

23   that instruction?

24        PROSPECTIVE JUROR:  Yes.

11:24:43  25   THE COURT:  All right.  Thanks very much.

11:24:44  1        Let's have Juror 67 come in.

2        (Prospective Juror 48 exited and Prospective Juror 67

3    entered the courtroom.)

4        THE COURT:  All right.  Thanks for your patience,

11:25:08  5    Juror 67.

6        I believe you indicated, when I asked the jury panel

7    generally, that you had encountered some information related

8    to this case after you completed the questionnaire; is that

9    right?

11:25:22  10        PROSPECTIVE JUROR:  Specifics, no.  I did hear about

11    Bard being involved in a lawsuit.  And this is through a

12    newsletter, online newsletter, that our company provides to

13    us.  I did not read it.  However, I did encounter that.

14        THE COURT:  What is it that you saw and learned from

11:25:40  15    that brief encounter?

16        PROSPECTIVE JUROR:  Mostly that -- it's basically a

17    newsletter that's given to the whole corporation and it lists

18    different things that -- different technologies that are out

19    there, anything that has to do with medical device industry

11:26:05  20    and anything that has to do with any lawsuits.  But there are

21    bullets in the newsletter.  You can click on them if you want.

22    I did see, as a news article that was linked elsewhere, which

23    I didn't know where it was linked to, Bard did come up with --

24    in a lawsuit pertaining to the devices in question.

11:26:36  25        THE COURT:  Did you click on the link?

| | |
|---|---|
| 11:26:38 | 1 |

PROSPECTIVE JUROR:  No, I did not.

2          THE COURT:  Did you learn anything about the

3     lawsuit --

4          PROSPECTIVE JUROR:  No, I did not.

11:26:42  5          THE COURT:  -- other than the fact Bard was sued?

6          PROSPECTIVE JUROR:  That is correct, I did not.

7          THE COURT:  Okay.  All right.

8          Counsel, do you have follow-up questions for

9     Juror 67?

11:26:50  10          MR. O'CONNOR:  Just a couple.

11          THE COURT:  In the mic, please, Mr. O'Connor.

12          MR. O'CONNOR:  Yes.  I'm sorry.

13          The answers you gave us before when we were asking

14     questions and responses you gave to the Court, those are still

11:27:01  15     your answers; correct?  Nothing's changed?

16          PROSPECTIVE JUROR:  That is correct.

17          MR. O'CONNOR:  And same with the responses in the

18     questionnaire, they still remain?

19          PROSPECTIVE JUROR:  They still remain.

11:27:13  20          MR. O'CONNOR:  Thank you.

21          MR. NORTH:  No questions, Your Honor.

22          THE COURT:  Okay.  Thanks, Juror 67.

23          (Prospective Juror 67 exited the courtroom.)

24          THE COURT:  All right, Counsel.  Focusing on the

11:27:38  25     Jurors Number 80 and below, as we discussed at sidebar, I'm

11:27:41  1    going to tell you who I will excuse for hardship.

2         They are Jurors 24, 26, and -- that's all.  Those are

3    the only two under Juror Number 80.  There were some above

4    that that could be excused, but we won't get to those.

11:28:07  5        So let's start with the plaintiff and hear your

6    challenges for cause to the jurors below Number 80.

7         MR. WENNER:  Your Honor, let's start with the last

8    jurors.  Juror Number 48, I think she should be excused for

9    cause.  I don't see how she unrings that bell knowing what the

11:28:25 10    verdict was.  Whether she discloses to the jurors in

11   deliberation, you know, we'll never know.  But more

12   importantly, I think, her husband worked on a Bard advertising

13   campaign and it may be the very ones that are at issue in this

14   case.  And I believe there's going to be substantive evidence

11:28:45 15   about what was told to the public and what was not told, and

16   she may have to make a decision that is somehow adverse to her

17   husband or her husband's company.  So I think that she has far

18   too much information to be fair and impartial.  I would move

19   for her to be excused for cause.

11:29:02 20        THE COURT:  All right.

21        Mr. North.

22        MR. NORTH:  Your Honor, we would agree with that fact

23   because of her knowledge of the verdict, particularly in light

24   of the fact that we've now learned there were advertisements

11:29:11 25   about that very verdict today.  I'm very concerned about

11:29:14   1   tainting of this jury at some point in the process.

2          THE COURT:  All right.  I agree.  I will grant the

3   challenge for cause to Juror 48.

4          MR. WENNER:  As far as Juror Number 67, Your Honor, I

11:29:33   5   believe he gave us ample evidence that he could not be fair

6   and impartial in this case.

7          He said he could not --

8          THE COURT:  Before you give your explanation, let's

9   just see if defendants agree.

11:29:52   10         MR. WENNER:  Fair enough.

11         THE COURT:  If they don't, I'll hear your

12   explanation.

13         MR. NORTH:  No objection, Your Honor.

14         THE COURT:  All right.  So I will grant the challenge

11:29:58   15   for cause to Juror 67.  He said in response to my questioning

16   of him that he would be influenced by his experiences with the

17   FDA, so I will grant that challenge.

18         Let's do the same thing, just have you, Mr. Wenner,

19   just identify.  We'll see if they agree.  If not, then I'll

11:30:16   20   hear your reasons.

21         MR. WENNER:  Thank you.

22         Juror Number 5, Your Honor.

23         MR. NORTH:  We're not going to object to that,

24   Your Honor.

11:30:24   25         THE COURT:  All right.  I'm going to grant the

11:30:27 1  challenge for cause to Juror Number 5.  He clearly indicated

2  he would bring into this case his feelings about lawsuits and

3  plaintiffs' lawyers, and it would be an uneven playing field.

4          MR. WENNER:  I believe Juror Number 20, Your Honor.

11:30:51 5          MR. NORTH:  No objection, Your Honor.

6          THE COURT:  I'm going to grant the challenge for

7  cause for Juror 20.  She also indicated she would not be able

8  to be completely fair in her evaluation of the case.

9          MR. WENNER:  Juror Number 26, Your Honor.

11:31:12 10          THE COURT:  That one we excused.

11          MR. WENNER:  Okay.  All right.  Sorry.

12          Juror Number 23.

13          THE COURT:  Let's hear if plaintiff has disagreement.

14          MR. NORTH:  Your Honor, we do object there.

11:31:28 15          THE COURT:  Okay.  Go ahead and give me your reasons.

16          MR. WENNER:  Your Honor, she hemmed and hawed, but

17  she did say that it is possible that she would be influenced

18  and could not be fair and impartial, and that's not much

19  solace when we have plenty of jurors.  And that possibility

11:31:52 20  may, as time goes on and she's listening to the evidence,

21  become a probability, and we have no way to exclude her at

22  that point in time.

23          THE COURT:  All right.

24          Mr. North.

11:32:02 25          MR. NORTH:  Your Honor, I think when opposing counsel

11:32:04  1    says hemmed and hawed, that's an accurate description.  She

2    hedged on a lot of things, but a direct quote at one point is

3    "I would have to hear the whole case."  She said, again, I

4    quote, "I'd have to hear it all."  And in response to my

11:32:16  5    question, she said specifically that she could put aside her

6    personal views, listen to the evidence presented in the

7    courtroom, the Court's instructions, and apply those as given.

8         THE COURT:  I think that's an accurate description of

9    her answers, but I'm going to grant the challenge for cause to

11:32:30  10   Juror 23.  She said a number of times that she would

11   potentially or possibly be affected, that she -- affected by

12   her views, that she might limit damages despite what the

13   evidence showed.  I thought she said enough to make clear she

14   was not confident she could be fair and impartial,

11:32:51  15   notwithstanding the other answers she gave.

16        MR. WENNER:  Juror Number 27, Your Honor.

17        MR. NORTH:  Yes, Your Honor, we do oppose that.

18        THE COURT:  Okay.

19        Go ahead.

11:33:07  20       MR. WENNER:  Juror Number 27 told that the FDA

21   findings carry weight to him.  As I understand it, the only

22   issue about the FDA is whether this product was substantially

23   equivalent, and the fact that the FDA's findings carry weight,

24   I think he starts out with a bias.  He says frivolous cases

11:33:26  25   gum up the court system with frivolous cases.  And,

11:33:29 1    importantly, he said he starts out -- he may start out

2    suspicious in this case given his background.

3              THE COURT:  All right.

4              Mr. North.

11:33:46 5              MR. NORTH:  Your Honor, first of all, he testified

6    that he had no -- in his work, no direct communications with

7    the FDA and had not actually done any submissions to the FDA.

8    He specifically said that he did not start out favoring the

9    manufacturer here.  He said that if there was a serious

11:34:00 10   injury, he would not be suspicious of the plaintiff.  He has

11   no set damages caps in mind.  He said pain and suffering needs

12   to be taken care of.  And he also said that his only belief

13   when they try to get him to say something negative about

14   damages was that damages should not be unlimited.  Which I

11:34:18 15   think is not a biased view.

16             I don't believe he indicated at any point an

17   inability on his part not to be a fair and impartial juror and

18   base his verdict on the evidence at trial.

19             THE COURT:  All right.

11:34:43 20            I'm going to grant the challenge for cause to

21   Juror 27.  He gave some pretty strong statements saying he

22   could be fair, but interspersed with that were a number of

23   comments that I think call that into some question, similar to

24   Juror 23.  He said that he would -- the FDA findings would

11:35:02 25   carry weight.  He said there are too many lawsuits.  He said

11:35:04  1   that he has a favorable view of medical device companies.

2   Granted, he also said that it wouldn't influence him, but he

3   stated his views fairly strongly.  And so I am going to err on

4   the side of granting the challenge for cause to Juror 27.

11:35:22  5            MR. WENNER:  Last one, Your Honor, is Juror

6   Number 30.  Juror Number 30 --

7            THE COURT:  Let's see if defense agrees --

8            MR. WENNER:  Oh.  Apologize.

9            MR. NORTH:  No objection, Your Honor.

11:35:32  10            THE COURT:  All right.  I'm going to grant the

11   challenge for cause to Juror 30.  She clearly said that it

12   would be difficult for her to be fair in this case.

13            All right.  Any others from the plaintiff side?

14            MR. WENNER:  No, Your Honor, not for cause.

11:35:48  15            THE COURT:  All right.

16            Mr. North?

17            MR. NORTH:  Your Honor, we do not have any further

18   challenges.

19            THE COURT:  All right.

11:35:54  20            What we need to do, then, is count up the 15

21   lowest-numbered jurors that remain.  Let's each do that and

22   then I'll give you the number and we'll see if we all agree.

23            I get through Juror 43.

24            MR. WENNER:  That's what we get too, Your Honor.

11:36:48  25            MR. CAMPBELL:  Yes, Your Honor.

11:36:49  1          MR. NORTH:  Yes, Your Honor.

       2          THE COURT:  Okay.  Just so we're clear on the record,

       3  then, the 15 will be Jurors 8, 9, 10, 13, 14, 18, 28, 29, 32,

       4  34, 36, 39, 40, 42, 43.

11:37:14  5          So time for your peremptory strikes.  We'll do it

       6  simultaneously and secretly, so you can confer about that.

       7  Keep in mind we'll have the jurors standing outside in about

       8  12 minutes and it's going to be warming up in the atrium.  You

       9  need to take the time you need to, but keep that in mind so we

11:37:34 10  don't keep them waiting too long.

      11          I'll come back in after you've given Traci your

      12  peremptory strikes.

      13      (Proceedings resume in open court outside the presence of

      14  the jury.)

11:55:35 15          THE COURT:  Thank you.  Please be seated.

      16          All right.  Please be seated.

      17          Counsel, these are the individuals who have been

      18  chosen for the jury:  They're Jurors 8, 9, 10, 13, 29, 32, 34,

      19  36, and 42.

11:56:32 20          Are there any challenges to the exercise of

      21  peremptory strikes?

      22          MR. WENNER:  No.

      23          MR. O'CONNOR:  No challenges.

      24          MR. NORTH:  None, Your Honor.

11:56:43 25          THE COURT:  Okay.  We'll call in the jury panel and

11:56:45  1    invite these jurors to come forward.

        2          While Traci's going out, Counsel, having done this

        3    twice, I think we'll only need 50 jurors for the next trial.

        4    We're not really getting close to 60, and there's a cost

11:56:59  5    associated with bringing folks down, so I'd say let's go with

        6    50 next time.

        7          (The jury panel entered the courtroom.)

        8          THE COURT:  All right, ladies and gentlemen, thank

        9    you for your patience.  Sorry we ran a few minutes over.

11:59:53 10          Traci is now going to call forward the nine of you

       11    who have been chosen to serve on this jury.

       12          THE COURTROOM DEPUTY:  Juror Number 8.  Ma'am, if

       13    you'll come over here, first seat right here.

       14          Juror Number 9.

12:00:29 15          Juror Number 10.

       16          Juror Number 13.

       17          Juror Number 29.

       18          Juror Number 32.  Sir, you're going to be right here.

       19          Juror 34.

12:01:25 20          Juror 36.

       21          Juror 42.

       22          THE COURT:  All right.  Ladies and gentlemen who have

       23    been chosen for the jury, before we excuse the rest of the

       24    jury panel, have any of you thought of anything you didn't

12:02:03 25    mention in the questionnaire or in response to questions this

12:02:06  1    morning that could affect your ability to be a fair and

2    impartial juror in this case?

3              Okay.

4              For the rest of you, thank you very much for being

12:02:16  5    here.  You don't have to report to the jury office back

6    downstairs, you can leave the courthouse directly.  We

7    appreciate you being here to help us choose the jury.  And we

8    will excuse you all at this time.

9              (Excused jury panel members exited the courtroom.)

12:03:16 10             THE COURT:  Please be seated.

11             All right, ladies and gentlemen, I'm going to ask

12    that you stand now to be sworn as jurors in this case.

13             THE COURTROOM DEPUTY:  Please raise your right hand.

14             (The jury was sworn.)

12:03:41 15             THE COURT:  Okay.  Please have a seat.

16             Ladies and gentlemen, even though you've been waiting

17    for about 45 minutes, these folks have been working and so now

18    we need to take a lunch break.  We're sorry to bring you up

19    and go directly into that, but they've been at it steadily

12:03:57 20    since you left.

21             Before we do, I want to mention a couple of things to

22    you.  Please remember not to discuss the case or let anybody

23    else discuss it with you.  You'll hear me say that a number of

24    times just as a reminder.

12:04:09 25             Don't do any research on your own, such as searching

12:04:11  1    the internet or looking into any issues in this case.  This is

2    necessary, of course, because the only information you should

3    take into account in deciding this case is the evidence that

4    you hear during the trial.

12:04:23  5        In your book is a juror badge.  We're going to ask

6    you wear that badge when you're around the courthouse or in

7    the courthouse.  That way folks in the courthouse know you're

8    a juror and they're not going to be talking about something

9    within your earshot that might involve the case.

12:04:41  10       When you leave the courthouse, you don't have to wear

11   the juror badge.  But please wear it when you're around the

12   courthouse.

13       We're going to take a one-hour break for lunch, and

14   when you come back we'll have you assemble in the jury room

12:04:53  15   that's just behind this wall.  So Traci will actually take you

16   out this door, show you the jury room and where you can

17   assemble.

18       And, of course, the admonition not to discuss the

19   case applies to you as jurors when you're in that room as

12:05:05  20   well.  I'm going to be instructing you not to start talking

21   about the case until we get to the end and you've heard all of

22   the evidence.

23       We don't have a cafeteria in the building.  There's a

24   little kiosk downstairs that sells some sandwiches and things.

12:05:23  25   If you go east on Washington in front of the courthouse

12:05:26  1   there's restaurants on both sides of the street on the next

2   block, and there's a number farther down.

3           We will take a break from now until 1:10.  When you

4   come back, I'm going to give you some preliminary

12:05:39  5   instructions.  We're then going to hear opening statements

6   from the lawyers, and then we'll start into the evidence and

7   we'll go until 4:30 today before we break.

8           Counsel, are there any matters we need to address

9   before we excuse the jury for lunch?

12:05:54  10          MR. O'CONNOR:  Nothing from the plaintiff,

11   Your Honor.

12          MR. NORTH:  Nothing, Your Honor.

13          THE COURT:  Okay.  We'll see you at 1:10, and Traci

14   will show you the jury room.

12:06:07  15       (The Jury exited the courtroom.)

16          THE COURT:  All right.  Counsel, do you have any

17   matters you want to raise before we break for lunch?

18          MR. CLARK:  The answer is maybe.

19          MR. LOPEZ:  We may have to play a video, Your Honor,

12:07:05  20   if we finish early.

21          THE COURT:  I couldn't hear what you said, Mr.- --

22          MR. LOPEZ:  We may have to play a video, so I think

23   they're dealing with a redaction issue.  If we finish before

24   4:30 with openings, which we might.

12:07:15  25          MR. CLARK:  We're about 70 percent confident we can

```
12:07:17   1    work it out.  Maybe we can come back in five minutes before --
           2              THE COURT:  What's the issue?
           3              MR. CLARK:  There are two pages -- one page of two
           4    exhibits that have a redaction in light of the cephalad
12:07:27   5    migration ruling.  In light of the guidance you gave us this
           6    morning, we should be able to work it out.
           7              THE COURT:  Are you going to be showing this to the
           8    jury this afternoon?
           9              MR. CLARK:  It would be part of the depo we would
12:07:37  10    offer.
          11              MS. HELM:  Your Honor, I just haven't had an
          12    opportunity to look at it.  I'm going to go do it right now.
          13              THE COURT:  Okay, but this would be near the end of
          14    the evidence today?
12:07:47  15              MR. LOPEZ:  Right.  After the opening.  We're going
          16    to play a vide first, Judge.  We're not going to have a live
          17    witness.
          18              THE COURT:  Right, but is this -- in other words, can
          19    we talk about this after the afternoon break?  Or --
12:07:55  20              MR. LOPEZ:  Sure.  During the -- in the break, during
          21    our afternoon break.  If there's an issue.
          22              THE COURT:  Yeah.
          23              MR. LOPEZ:  Yeah.
          24              MR. O'CONNOR:  The evidence is going to start with a
12:08:03  25    video deposition after the opening.
```

12:08:05  1          THE COURT:  This video deposition?

       2          MR. CLARK:  We can put this in second.  The issue --

       3    we're not trying to make a mountain out of a molehill, but the

       4    video takes the length of the video to render, so for us to be

12:08:16  5    able to play it, we have to know where it is in there --

       6          THE COURT:  I see.

       7          MR. CLARK:  Hopefully we'll be able to work it out

       8    and we'll have plenty of time.

       9          THE COURT:  If you don't -- if you don't work it out

12:08:24 10    and if you're going to start playing -- well, openings will

      11    take us until the afternoon break anyway.  So if you don't

      12    work it out, raise it with me as we break for the afternoon

      13    break so we can get it resolved.

      14          Does that give you enough time to do the video

12:08:37 15    adjustment?

      16          MR. CLARK:  It should, Your Honor.

      17          MS. HELM:  Thank you, Your Honor.

      18          THE COURT:  Okay.  Thanks.

      19       (Recess taken at 12:08.)

12:08:47 20       (End of a.m. session transcript.)

      21                          *  *  *  *  *

      22

      23

      24

      25

## C E R T I F I C A T E

I, PATRICIA LYONS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 15th day of May, 2018.


s/ Patricia Lyons, RMR, CRR
Official Court Reporter