1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3                    _____

4
   In Re:  Bard IVC Filters     ) MD-15-02641-PHX-DGC
5  Products Liability Litigation )
                                 ) Phoenix, Arizona
6  _____) May 15, 2018
   Doris Jones, an individual,   ) 1:11 p.m.
7                                )
                 Plaintiff,      )
8                                ) CV 16-00782-PHX-DGC
         vs.                     )
9                                )
   C.R. Bard, Inc., a New        )
10 Jersey corporation; and Bard  )
   Peripheral Vascular, Inc., an )
11 Arizona corporation,          )
                                 )
12               Defendants.     )
   _____)
13

14
        BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE
15
           REPORTER'S TRANSCRIPT OF PROCEEDINGS
16
              (*Jury Trial - Day 1 - P.M. Session*)
17             (*Pages 125 through 230, inclusive.*)

18

19

20

21 Official Court Reporter:
   Laurie A. Adams, RMR, CRR
22 Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, Spc 43
23 Phoenix, Arizona 85003-2151
   (602) 322-7256
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

```
 1    APPEARANCES:

 2   For the Plaintiff:

 3            GALLAGHER & KENNEDY PA
              By:  Mark S. O'Connor, Esq., Esq.
 4            By:  Paul L. Stoller, Esq.
              By:  Shannon L. Clark, Esq.
 5            By:  C. Lincoln Combs, Esq.
              2575 East Camelback Road, Suite 1100
 6            Phoenix, Arizona 85016

 7            LOPEZ MCHUGH LLP
              BY:  Ramon Rossi Lopez, Esq.
 8            100 Bayview Circle, Suite 5600
              Newport Beach, California 92660
 9
              HEAVISIDE REED ZAIC
10            By:  Julia Reed-Zaic, Esq.
              By:  Laura Elizabeth Smith, Esq.
11            312 Broadway, Suite 203
              Laguna Beach, California 92651
12
     For the Defendants:
13            NELSON MULLINS RILEY & SCARBOROUGH LLP
              By:  Richard B. North, Jr., Esq.
14            By:  Elizabeth C. Helm, Esq.
              By:  James F. Rogers, Esq.
15            By:  Matthew B. Lerner, Esq.
              201 17th Street NW, Suite 1700
16            Atlanta, Georgia 30363

17            SNELL & WILMER LLP
              By:  James R. Condo, Esq.
18            400 East Van Buren Street, Suite 1900
              Phoenix, Arizona 85004
19

20

21

22

23

24

25
```

1                          I N D E X

2    OPENING STATEMENT                                  PAGE
     By Mr. O'Connor                                    141
3    By Mr. North                                       172

4

5    WITNESS:
     GIN SCHULTZ
6    Video Deposition                                    209

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1

1              P R O C E E D I N G S

2         THE COURT:  Ladies and Gentlemen, you are now the

3    jury in this case, and it is my duty to instruct you on the

4    law.  It is your duty to find the facts from all the evidence

5    that will be presented during the trial.  To those facts you          01:11PM

6    will apply the law as I give it to you.

7         You must follow the law as I give it to you, whether

8    you agree with it or not.  And you must not be influenced by

9    any personal likes or dislikes, opinions, prejudices, or

10   sympathy.  That means that you must decide the case solely on          01:12PM

11   the evidence that you hear during the trial.  You have taken an

12   oath promising to do so.

13        At the end of the trial I will give you some final

14   instructions.  Those final instructions will be more detailed

15   discussions of the law and will govern your actual deliberation        01:12PM

16   in the case.

17        Please do not read into any instructions I give or

18   into anything else I may say or do during the trial that I have

19   an opinion regarding the evidence or an opinion about what your

20   verdict should be.                                                     01:12PM

21        To help you follow the evidence, I will give you a

22   brief summary of the positions of the parties.  This is a

23   personal injury case against a medical product manufacturer.

24   The plaintiff, Doris Jones, a 53-year-old woman, had a Bard

25   Eclipse Filter placed in her inferior vena cava, the vein that         01:13PM

—5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1—

1  carries the blood back to the heart.  You will hear these

2  filters referred to as IVC filters or inferior vena cava

3  filters.  An IVC filter is intended to catch blood clots before

4  they reach the heart or lungs.  The defendants in this case,

5  C.R. Bard, Inc., and Bard Peripheral Vascular, designed,          01:13PM

6  manufactured, and sold the Eclipse Filter Mrs. Jones received.

7         Mrs. Jones alleges that the filter was defectively

8  designed and the defendants failed to warn about its risks.

9  She alleges that she was injured by the filter, and she seeks

10  to recover money from the defendants to compensate for her       01:14PM

11  injuries and to punish defendants for their allegedly wrongful

12  conduct.

13         Defendants deny that their filter was defectively

14  designed or that they failed to warn of its risks.  Defendants

15  contend that the risks associated with Bard IVC filters are      01:14PM

16  understood by the medical community.  Defendants assert that

17  they are not responsible for any injuries or damages suffered

18  by Mrs. Jones.

19         Although there are two defendants in this case, C.R.

20  Bard, Inc., and Bard Peripheral Vascular, Inc., you should       01:14PM

21  decide this case as to the two defendants jointly.  As a result

22  in the instructions I give you and the verdict form that you

23  see at the end of the case and even during some of the

24  discussion during the trial, we likely will just refer to the

25  defendants collectively as "Bard."  Unless otherwise stated,     01:15PM

5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1

1    any instructions I give you therefore apply to both of the

2    defendants.

3            The evidence you are to consider in deciding what the

4    facts are will consist of the sworn testimony of the witnesses;

5    the exhibits that are admitted into evidence; any facts to            01:15PM

6    which the lawyers have agreed, and those will be clearly

7    identified for you as stipulated or agreed-upon facts; and any

8    facts that I might instruct you to accept as proven.

9            In reaching your verdict, you may consider only the

10   testimony and exhibits received into evidence or the facts that       01:15PM

11   have been agreed to.  Certain things are not evidence, and you

12   may not consider them in deciding what the facts are.  I will

13   list them for you.

14           First, arguments and statements by lawyers are not

15   evidence.  The lawyers are not witnesses.  What they may say in       01:16PM

16   their opening statements, closing arguments, and at other times

17   is intended to help you interpret the evidence but it is not

18   evidence.  If the facts as you remember them differ from the

19   way the lawyers have stated them, your memory of them controls.

20           Second, questions and objections by lawyers are not           01:16PM

21   evidence.  Attorneys have a duty to their clients to object

22   when they believe a question is improper under the Rules of

23   Evidence.  You should not be influenced by a lawyer's objection

24   or by my ruling on it.

25           Third, any testimony that is excluded or stricken or          01:16PM

1    that I instruct you to disregard is not evidence and must not

2    be considered.  In addition, some evidence may be admitted only

3    for a limited purpose.  If so, I will give you an instruction

4    that this evidence is coming in only for a limited purpose, and

5    you must consider it only for that purpose and not for any                01:17PM

6    other.

7           Fourth, anything you may see or hear when the Court is

8    not in session is not evidence.  You are to decide the case

9    solely on the evidence that is received during the trial.

10          Evidence may be direct or circumstantial.  Direct          01:17PM

11   evidence is direct proof of a fact such as testimony by a

12   witness about what that witness personally saw or heard or did.

13   Circumstantial evidence is proof of one or more facts from

14   which you can find another fact.  You should consider both

15   kinds of evidence.  The law makes no distinction between the        01:17PM

16   weight to be given to either direct or circumstantial evidence.

17   It is for you to decide how much weight to give to any

18   evidence.

19          There are rules of evidence that control what can be

20   received into evidence during the trial.  When a lawyer asks a       01:18PM

21   question or offers an exhibit into evidence and the lawyer on

22   the other side thinks it is not permitted by the rules of

23   evidence, that lawyer may object.  If I overrule the objection,

24   the question may be answered or the exhibit may be received in

25   evidence.  If I sustain the objection, the question cannot be        01:18PM

1    answered and the exhibit cannot be received in evidence.

2         Whenever I sustain an objection to a question, you

3    should disregard the question and must not speculate or guess

4    at what the answer might have been.

5         As indicated earlier, sometimes I may order that          01:18PM

6    evidence be stricken from the record or that you disregard

7    something that actually was presented during the trial.  That

8    means that when you are deciding the case, you must not

9    consider the stricken evidence for any purpose.

10        In deciding the facts in this case, you may have to       01:18PM

11   decide which testimony to believe and which testimony not to

12   believe.  You may believe everything a witness says or part of

13   it or none of it.  In considering the testimony of any witness,

14   you may take into account the opportunity and ability of the

15   witness to see or hear or know the things testified to; the     01:19PM

16   witness's memory; the witness's manner while testifying; the

17   witness's interest in the outcome of the case, if any; the

18   witness's bias or prejudice, if any; whether other evidence

19   contradicted the witness's testimony; the reasonableness of the

20   witness's testimony in light of all the evidence; and any other  01:19PM

21   factors that bear on believability.

22        Sometimes a witness may say something that is not

23   consistent with something else he or she said.  Sometimes

24   different witnesses may give different versions of what

25   happened.  People often forget things or make mistakes in what   01:20PM

1    they remember.  Also two people may see the same event but

2    remember it differently.

3           You may consider these differences, but do not decide

4    the testimony is untrue just because it differs from some other

5    testimony.  However, if you decide that a witness has                    01:20PM

6    deliberately testified untruthfully about something important,

7    you may choose not to believe anything the witness said.  On

8    the other hand, if you think the witness testified untruthfully

9    about some things but told the truth about others, you may

10   accept the part you think is true and ignore the rest.                  01:20PM

11          The weight of the evidence as to a fact does not

12   necessarily depend on the number of witnesses who testify about

13   that fact.  What is important is how believable the witnesses

14   are and how much testimony -- pardon me -- how much weight you

15   think their testimony deserves.                                         01:20PM

16          I will now say a few words about your conduct as

17   jurors.  First, please keep an open mind throughout the trial

18   and do not decide what the verdict should be until you and your

19   fellow jurors have completed your deliberations at the end of

20   the case.                                                               01:21PM

21          Second, because you must decide this case based only

22   on the evidence received in the trial and on my instructions as

23   to the law that applies, you must not be exposed to any other

24   information about the case or to the issues it involves during

25   the course of your jury duty.  Thus, until the end of the case         01:21PM

1   or unless I tell you otherwise, do not communicate with anyone

2   in any way, and do not let anyone else communicate with you in

3   any way about the merits of the case or anything to do with it.

4          This includes discussing the case in person, in

5   writing, by phone or electronic means via e-mail, text          01:21PM

6   messaging, or any internet chat room, blog, website, or

7   application, including but not limited to Facebook, YouTube,

8   Twitter, Instagram, LinkedIn, Snapchat, or any other forms of

9   social media.

10         That's a new instruction, but we have to be very          01:22PM

11  specific.

12         This applies to communicating with your fellow jurors

13  until I give you the case for deliberation.  And it applies to

14  communicating with everyone else, including your family

15  members, your employer, the media or press, and the people      01:22PM

16  involved in the trial although you obviously can notify your

17  family and your employer that you have been seated as a juror

18  in this case.

19         But if you are asked or approached in any way about

20  your jury service or anything about this case, please respond   01:22PM

21  that you have been ordered not to discuss the matter, and

22  please report that contact to me immediately.

23         Because you will receive all of the evidence and legal

24  instruction you properly may consider to return a verdict

25  during the course of this trial, do not read, watch, or listen  01:23PM

1    to any news or media accounts or commentary about the case or

2    anything to do with it.  Do not do any research such as

3    consulting dictionaries, searching the internet, or using other

4    reference materials.  And do not make any investigation or in

5    any other way try to learn about the case on your own.                    01:23PM

6           Do not visit or view any place discussed in this case

7    and do not use internet programs or other devices to search for

8    or view any place discussed during the trial.

9           Also, do not do any research about this case, the law,

10   or the people involved in the case including the parties, the           01:23PM

11   witnesses, or the lawyers until you have been excused as

12   jurors.

13          If you happen to read or hear anything touching on

14   this case in the media, please turn away immediately, and

15   please report it to me as soon as possible.                              01:24PM

16          These rules protect each party's right to have this

17   case decided only on the evidence that has been presented here

18   in court.  Witnesses in court take an oath to tell the truth,

19   and the accuracy of their testimony is tested through the trial

20   process.                                                                 01:24PM

21          If you do any research or investigation outside the

22   courtroom or gain any information through other kinds of

23   communications, then your verdict may be influenced by

24   inaccurate, incomplete, or misleading information that has not

25   been tested by the trial process.  Each of the parties is              01:24PM

1    entitled to a fair trial by an impartial jury, and if you

2    decide the case based on information that was not presented

3    here in court, you will have denied the parties a fair

4    opportunity to address that evidence and to discuss how it

5    affects the case.                                                 01:24PM

6            Remember, you have taken an oath to follow the rules

7    and it is very important that you follow these rules.  A juror

8    who violates these restrictions jeopardizes the fairness of

9    these proceedings, and a mistrial could result that would

10   require the entire trial process going clear back to the jury    01:25PM

11   questionnaires weeks ago to start over again.

12           If any of you is exposed to any outside information,

13   please notify me about it immediately.  And if that happens you

14   can simply tell Traci or Nancy, and they will get it to my

15   attention right away.                                            01:25PM

16           I urge you to pay close attention to the trial

17   testimony as it is given.  You will not have a transcript of

18   what is said during your deliberations as a jury.  Now, you

19   might wonder why that is if it's all being taken down by the

20   court reporters, but the answer is it takes them time to go      01:25PM

21   through the transcript, clean it up, and make sure it's

22   complete and that process will not be finished by the time you

23   are deliberating.  So you will not have a transcript.  You will

24   need to rely upon your memory of the testimony.

25           If you wish, you may take notes to help you remember     01:26PM

1    the evidence.  If you do take notes, please keep them to

2    yourself until you go to the jury room to decide the case.

3    Please do not let notetaking distract you.  When you leave the

4    courtroom at a break or at the end of the day, your notes

5    should be left on your chair here in the courtroom.  Nobody          01:26PM

6    will read your notes.

7           Whether or not you take notes you should rely on your

8    own memory of the evidence.  Notes are only to assist your

9    memory.  You should not be overly influenced by your notes or

10   those of the other jurors.  And I will mention that after the       01:26PM

11   trial is over, your notes will be destroyed.  They won't be

12   retained as any sort of a record.

13          From time to time during the trial, it may become

14   necessary for me to talk with the attorneys outside of the

15   jury's hearing either by having a conference at the bench as we     01:26PM

16   did a couple of times during jury selection or perhaps even by

17   calling a recess and excusing you from the courtroom.  Please

18   understand that while we are having these conferences, we are

19   working and not just trying to keep you waiting.  The purposes

20   of these conferences are to keep -- are not to keep relevant        01:27PM

21   information from you but are to decide how evidence is to be

22   treated under the rules of evidence and to avoid confusion and

23   error.

24          We will do what we can to keep the number and length

25   of these conferences to a minimum.  I may not always grant a        01:27PM

1    lawyer's request for a conference.  Please do not consider my

2    granting or denying their request for a conference as any

3    indication of my opinion of the case or of what your verdict

4    should be.

5           Trials proceed in the following way:  First, each side        01:27PM

6    may make an opening statement.  An opening statement is not

7    evidence.  It is simply an outline to help you understand what

8    that party expects the evidence will prove.  A party is not

9    required to make an opening statement.

10          The plaintiff will then present evidence and counsel          01:28PM

11   for the defendant may cross-examine.  Then the defendant may

12   present evidence, and counsel for the plaintiff may

13   cross-examine.  After the evidence has been presented, I will

14   give you instructions on the law that applies to the case and

15   the attorneys will then make closing arguments.  After that you      01:28PM

16   will go to the jury room to deliberate on your verdict.

17          Counsel, are there any corrections or additions to the

18   instructions?

19          MR. O'CONNOR:  Nothing from the plaintiffs, Your

20   Honor.                                                               01:28PM

21          MR. NORTH:  Nothing, Your Honor.

22          THE COURT:  All right.  Ladies and Gentlemen, before

23   we have the opening statements, the lawyers have agreed that I

24   should read to you some facts to which both sides agree.  These

25   are stipulated facts.  And so you can treat these facts as           01:29PM

─────5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1─────

 1  having been proved.  They are sort of general background facts,

 2  but it will save some time in the presentation of the evidence.

 3         The defendants in this case are C.R. Bard, Inc., and

 4  Bard Peripheral Vascular, Inc., sometimes referred to as BPV.

 5         BPV is a wholly-owned subsidiary of C.R. Bard, Inc.,          01:29PM

 6  the parent company.  As indicated throughout this case, we may

 7  just refer to the defendants collectively as Bard or sometimes

 8  as defendants.

 9         The product that is the subject of this case is the

10  Bard Eclipse IVC Filter.  It was designed, manufactured,          01:29PM

11  marketed, and sold by Bard.  The Eclipse Filter is a conical --

12  is conical in shape and consists of a main shaft which 12

13  struts, six of which are called arms and six of which are

14  called legs, are attached.  And you will see examples of that.

15         The Eclipse Filter is constructed of a nickel titanium  01:30PM

16  alloy called Nitinol.  The Eclipse filter is a medical device

17  that is implanted in the inferior vena cava, which is the

18  largest vein in the human body.  The United States Food and

19  Drug Administration cleared the Eclipse Filter for commercial

20  availability through what is known as the 510(k) process          01:30PM

21  outlined in the Food, Drug, and Cosmetic Act.

22         The Eclipse filter was cleared for a commercial

23  availability in the United States for use in patients as a

24  permanent filter with an optional retrievable procedure on

25  January 14, 2010.  Bard marketed the Eclipse filter for both      01:31PM

─────5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1─────

1    permanent and optional retrievable placement.

2         On August 24th of 2010, a vascular surgeon by the name

3    of Dr. Anthony James Avino, A-V-I-N-O, implanted an Eclipse IVC

4    filter in the plaintiff in this case, Mrs. Jones, at Memorial

5    Health University Medical Center in Savannah, Georgia.          01:31PM

6         Mrs. Jones was properly indicated for placement of the

7    Eclipse filter on August 24th, 2010.  Dr. Avino's placement of

8    the Eclipse filter in Mrs. Jones was appropriate and met the

9    applicable standard of care for doctors in his position.

10        Dr. Avino did not cause, contribute to, and was not a     01:31PM

11   factor in producing any of the injuries claimed by Mrs. Jones

12   in this lawsuit.

13        Subsequent to implantation and after August 14th,

14   2013, Mrs. Jones' Eclipse filter fractured, and a strut

15   embolized to her right pulmonary artery.  On April 22nd, 2015,  01:32PM

16   a chest X-ray and CT angiogram revealed that Mrs. Jones'

17   Eclipse filter had fractured and the fractured strut had

18   embolized to her right pulmonary artery.

19        On April 23rd, 2015, Dr. Kirsten Nelson removed Mrs.

20   Jones' Eclipse filter through a percutaneous procedure.  Dr.    01:32PM

21   Nelson's actions in retrieving the Eclipse filter from Mrs.

22   Jones' IVC were appropriate and met the applicable standard of

23   care for doctors in her position.

24        Dr. Nelson's decision not to attempt to retrieve the

25   Eclipse filter fragment from Mrs. Jones' pulmonary artery was   01:33PM

———5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1———

1    appropriate and met the applicable standard of care for doctors

2    in her position.  Dr. Nelson did not cause, contribute to, and

3    was not a factor in producing any of the injuries claimed by

4    Mrs. Jones in this lawsuit.

5         The broken strut of the Eclipse filter remains in Mrs.     01:33PM

6    Jones' right pulmonary artery.  Mrs. Jones has not sought or

7    received any medical care since March 16th, 2016.

8         Counsel, any additions or corrections to the

9    stipulated facts?

10        MR. O'CONNOR:  Nothing from plaintiff.                     01:33PM

11        MR. NORTH:  Nothing from defendants, Your Honor.

12        THE COURT:  Okay.  We will then proceed with the

13   plaintiff's opening statement.

14        MR. O'CONNOR:  Thank you, Your Honor.  May it please

15   the Court, good afternoon.                                      01:34PM

16        As you just heard, members of the jury, on August

17   24th, 2010, Doris Jones was implanted with a Recovery -- excuse

18   me -- a Bard Eclipse IVC filter.  And that Eclipse filter would

19   go on to break, fracture, and migrate up her vena cava through

20   her heart and into her pulmonary artery, the Eclipse filter.    01:35PM

21        And this case doesn't start then in August 2010.  It

22   actually starts much earlier, several years earlier, as a

23   matter of fact.  It starts in about 1999, 2000.  You see, Bard

24   wanted to be first in a new competitive market, a very exciting

25   market, a market that had the potential for profitability.      01:35PM

1    Bard wanted to be first to the market for retrievable filters,

2    filters that would not remain permanent in a patient but that

3    could be retrieved by the doctors.

4         And the evidence in this case will show to get there,

5    to get to that market and be first, that Bard didn't rely on          01:36PM

6    science.  Bard didn't rely on long term clinical studies.  In

7    fact, the evidence will show that Bard didn't even rely on

8    accurate testing.  What Bard relied on to get to that

9    competitive market was aggressive marketing.  And that's what

10   the evidence will show.                                               01:36PM

11        Now, the evidence will also show that the choices that

12   Bard made were harmful and caused serious harm to patients,

13   including Doris Jones.

14        You, as members of this jury, will see documents.  You

15   will hear testimony for the first time that nobody heard back        01:37PM

16   in the era that Bard was developing, beginning with the

17   Recovery, through the generations of filters, including the

18   Eclipse.  You will see documents that Bard didn't even share

19   with doctors, the FDA, or even its sales force.  And the

20   evidence will show you the choices Bard made to win that race        01:37PM

21   to the market.

22        Now, what I'm going to do here is just stop for a

23   moment.  I just want to talk to you about IVC filters.

24        THE COURT:  Mr. O'Connor, let me just interrupt for a

25   moment.  Is that up on each of your screens, Ladies and             01:37PM

1    Gentlemen?   Okay.   Go ahead, Mr. O'Connor.

2              MR. O'CONNOR:   So what you are seeing is a very

3    simplified diagram of the anatomy, the vena cava, inferior vena

4    cava.   That's where filters are implanted.   And you will see,

5    as you can see it's right next to the aorta.   In addition the      01:38PM

6    vena cava is adjacent to very vital, important organs.   The

7    theory behind an IVC filter is that it can be implanted, they

8    say percutaneously, a retrievable, that is, and sit in the vena

9    cava.   It should remain centered and remain fixed to the side

10   of the walls of the vena cava, and the theory is that it should   01:38PM

11   trap clots or deep vein thrombosis, clots that start somewhere

12   usually in the lower extremity and stop them so they don't go

13   to the lungs.

14             Now, for decades before this race to the market there

15   were permanent filters.   Next slide.                             01:39PM

16             And you are going to hear about the Simon Nitinol

17   Filter.   It was a permanent filter, one that was intended to

18   remain in the patient for the remainder of his or her life.

19   And this was a filter that you will find had a very good track

20   record according to Bard itself.   Bard acquired the technology   01:39PM

21   from a company called NMT, and with that came an engineer,

22   Robert Carr, and you will hear from him.

23             And again, the Simon Nitinol, for years, had a very

24   impressive safety record and that's confirmed by testimony you

25   will hear in this case.   And that's from Bard's own medical      01:39PM

1   director, Dr. Ciavarella.

2           So Bard had an opportunity to be the first to the

3   market of a new competitive market, like I said, the

4   retrievable filters.  And as Bard knows, in competition, the

5   first to the market has a good shot of getting the market        01:40PM

6   share.  They did everything they could to win the race.

7           What was going on at this time early in the 1999/2000

8   period is that the Recovery Filter was being developed.  And

9   NMT, Nitinol Medical Technologies, had plans.  What they

10  planned to do was develop the first retrievable filter and have  01:41PM

11  a clinical trial in Europe to establish substantial

12  equivalence.  And that's with respect to the issue of safety

13  and effectiveness.  That's the process that a device like the

14  filter has to go through to be cleared in the FDA, not

15  approved.  And that's important.  We're going to talk about      01:41PM

16  that in a moment.

17          Next.  So here is a preview of how Bard proceeded.

18  You are going to see that the Simon Nitinol Filter started the

19  process.  It's called a predicate device.  And to bring a new

20  device to the market, a company like Bard needs to show a        01:41PM

21  substantial equivalence.  The Recovery was cleared eventually,

22  and we'll talk about that.  First is a permanent device with

23  the intent to eventually become retrievable.  But the evidence

24  will show that the Recovery was never tested in a long term

25  clinical trial to evaluate whether it was safe and effective in  01:42PM

1    humans for the long term.  As a matter of fact, what the

2    evidence will show is that the first time the Recovery was

3    tested in any type of long term period is when it was released

4    to the market.  When it was released to the market for doctors

5    to implant in patients is when the first time this device had        01:42PM

6    any long term experience in human beings.  And that choice

7    would begin a cascade of problems with patients.

8         Because without knowing the long term safety and

9    efficacy of the Recovery Filter, that being Bard's choice, the

10   filter resulted in a number of failures, failures that caused       01:43PM

11   serious harm to people.

12        Now, to stay in the marketplace, to stay in this

13   competitive market, rather than stop sales, as you will learn

14   from the evidence, of the Recovery, when Bard became aware

15   early on that it had problems, Bard decided to modify it.  And       01:44PM

16   so the next iteration you will hear about was known internally

17   as the Recovery G2, or the Modified Recovery, but it was called

18   the G2.  And we'll talk about that in more detail.

19        And then after the G2, well, when the G2 came into the

20   market, guess what happened?  Without any long term clinical         01:44PM

21   studies, without the right testing, the G2 also experienced

22   many, many failures in patients.  Bard eventually modified the

23   tip of the G2, and you can see a hook.  It was the G2 with a

24   hook so that doctors could eventually retrieve it in a way

25   using that hook as opposed to going in with a device that would      01:45PM

1    pull it from the cap.  But the failures continued.

2            And so the evidence will show you to stay on the

3    market, Bard decided to get rid of the baggage, the baggage

4    that had been created by these filters, predicate filters, and

5    that's how it developed the Eclipse, which the evidence will          01:45PM

6    show you is essentially the G2 with some modifications.

7            And what you are seeing on your screen is the history

8    of the Bard filters up to the Eclipse, which is the filter that

9    Doris Jones received.

10           So with that history, let's start -- or excuse me --        01:45PM

11   with that background, we'll start with the history of Bard's

12   retrievable filters.

13           Back when Bard wanted -- next slide please -- wanted

14   to first go to the market and get into the retrievable market

15   it decided to do a small clinical trial to test the ability to      01:46PM

16   retrieve the Recovery Filter.  It wasn't a long-term study by

17   no stretch of the imagination.  It was about 60 days.  And Dr.

18   Asch, Murray Asch, will be here to talk to you about that

19   clinical study.  This is not a study for safety and

20   effectiveness long term.  It was only for retrievability.  And      01:46PM

21   one nice thing about going to Canada was that the laws, the

22   rules for conducting this type of a study, you will hear from

23   Dr. Murray Asch, was somewhat lax.  It's easy to get through

24   ethics committees.

25           The other important aspect of this study, this small        01:47PM

1    clinical trial to test retrievability, which averaged about 60

2    days, is that patients were closely monitored.  They were under

3    the eye and supervision of trained doctors, interventional

4    radiologists.  They weren't given the filters and then going

5    off on their own.  There were schedules on how they were going        01:47PM

6    to come back so that the doctors in this study could determine

7    whether these filters could be retrieved.

8            The patients in this study, they were watched closely,

9    because essentially what they were undergoing was an

10   experiment.  Well, what was found during the course of the           01:48PM

11   monitoring, Dr. Asch discovered that filters, the Recovery

12   Filters, were not always remaining in position or intact.  Now,

13   why that's important is because to be effective, the filter

14   needs to stay centered.  The cap needs to stay centered in the

15   vena cava, and the legs that spring out, you will hear from          01:48PM

16   engineers, including a Dr. McMeeking, he will show you how the

17   filter works after it's implanted.  It goes through a tube and

18   puts in a spring-like fashion, the legs spread across and

19   around the inside wall of the IVC filter.

20           What Dr. Asch found is that the Recovery Filter wasn't       01:49PM

21   staying in place.  He found that it was migrating.  There's two

22   types you will hear about:  Caudal migration is downward;

23   cephalad or cranial migration is upwards toward the heart.

24   And, of course, that was a concern because that means that the

25   filter is not staying where it's supposed to stay.                   01:49PM

1           The study also found that filters were tilting, not

2    staying centered.  And what you will hear is that when filters

3    migrate and tilt, those can result in other problems like

4    perforation, perforating through the vena cava wall.  And you

5    are going to hear something else that concerned Dr. Asch, is          01:49PM

6    that filter legs look some like an umbrella without the canvas

7    on it were fracturing and breaking and traveling.  So that

8    concerned Dr. Asch.

9           All in all, during the course of the study, Dr. Asch

10   found that the Recovery Filter, which was in place in these          01:50PM

11   patients in the study an average of 60 days, had tilted in five

12   patients, migrated two times, fractured two times, perforated

13   the vena cava once, and fractured two times.  And this all

14   happened in a relatively short time.  And this all happened to

15   patients, fortunately, who were under the watch and care of          01:50PM

16   doctors.

17          Well -- next slide -- as you can imagine, this

18   concerned Dr. Asch.  And you will hear from him and he's going

19   to tell you why.  And while he found that the implanting of

20   these filters, and he will explain how they go through, they go      01:51PM

21   through various parts, jugulars or femoral arteries into the

22   vena cava, all done percutaneously.  And while they were, for

23   the most part, retrievable, in other words, doctors could go in

24   what you will hear is called percutaneous and pull them out, he

25   saw these multiple failure modes, the ones we just saw.  And         01:51PM

1    Dr. Asch told Bard, this filter is not ready for the market.

2    He suggested that the Recovery Filter needs something long

3    term.  After all, what we'll find out is that Bard, to get this

4    cleared on the market through the FDA, first made it a

5    permanent filter, meaning it was supposed to, in theory, stay          01:52PM

6    in place in a patient for a lifetime before they got clearance

7    for it to be retrievable.

8          Well, Dr. Asch warned Bard that the Recovery was not

9    ready for market.  He indicated that these failure modes were

10   concerning and something more had to be done.  And Dr. Asch           01:52PM

11   will tell you that he was basically assured by Bard that it

12   wasn't going to go to the market.  Well, in fact, you will hear

13   that Bard proceeded anyway.

14         Now, here in the United States, there are two ways to

15   get a medical device to the market.  Bard chose to go through         01:53PM

16   the 510(k) clearance process.  That's what you are going to

17   hear about.  This is not approval.  Let me repeat that.  This

18   is not an approval process.  Under 510(k), the FDA relies on

19   truthful -- truth, honesty, and accuracy from the medical

20   device manufacturers.  The FDA itself, you will hear, doesn't        01:53PM

21   perform tests of its own.  It doesn't even, or in this case,

22   didn't even receive the device to inspect.

23         The FDA doesn't conduct any human clinical trials.

24   It's an honor system.  And it's an honor system that the FDA

25   expects that there will be good corporate citizenship and that        01:54PM

1   medical device companies that choose that less-stringent method

2   will do everything right, will do everything truthful, and will

3   do everything accurate.

4          Essentially, clearance is a less rigorous process than

5   what is called an approval process.  Again, FDA doesn't test.          01:54PM

6   They don't even do any verification of data.  They rely that

7   the data that's provided from the company that is seeking

8   clearance, that that data is accurate.  They rely on the

9   company being truthful and accurate.

10          And what happens is -- next slide please -- a device          01:54PM

11   company must give the FDA assurance that the device it is

12   seeking clearance for went through this comparative route.

13   That means that they can show that there is an existing device

14   on the market and that the device they are seeking clearance

15   for is the substantial equivalent.                                   01:55PM

16          And this is important.  The 510(k) clearance is not

17   official approval, nor a clearance by the FDA that the product

18   is safe and effective.  It's a clearance process.  It just

19   clears a device based upon a showing of substantial

20   equivalence.  And again -- next -- what's important from the          01:56PM

21   FDA is that when someone from the device company signs a truth

22   and accuracy statement that it is truthful and accurate and

23   that no facts, material for review of the substantial

24   equivalence of this device have been knowingly omitted.

25          So while dealing with the FDA, Bard made another              01:56PM

1    choice.  It chose to go through the less stringent clearance

2    way to get to the market and did not go through the more

3    stringent approval process.

4         So what happened was that to gain FDA clearance to the

5    market for the Recovery Filter, Bard advised the FDA that the          01:56PM

6    Recovery Filter was substantially equivalent in terms of safety

7    and efficacy to the predicate device, the Simon Nitinol, the

8    filter who had a proven track record of safety, a permanent

9    device.  And you can see here by the arrows that we show, after

10   the Recovery, based on the problems they, Bard didn't get out          01:57PM

11   of the market.  They didn't stop.  They went to the G2.  And

12   from the G2 they went to a retrievable G2 and from the

13   retrievable G2 they went to a G2X filter.  And from that

14   filter, to lose the baggage, they went to the Eclipse which,

15   for all intents and purposes, was the G2.                              01:57PM

16        Next slide.  So Bard has to represent to the FDA and

17   be truthful and accurate that the filter that it is seeking

18   clearance for is substantially equivalent.  But the evidence in

19   this case is going to show that Bard misled the FDA and that

20   the Recovery was never substantially equivalent to the Simon           01:58PM

21   Nitinol Filter.  And we believe the evidence will show you that

22   the Recovery should have never been on the market in the first

23   place.  And because it doesn't get to the market, then there's

24   no G2, there's no G2X, and there's no Eclipse.

25        Now how did Bard start to do this?  Next slide,                   01:59PM

1   please.  You will learn from the evidence that Bard didn't

2   fully, and didn't even study, the Environment of Use in any

3   great detail and really didn't know much about the vena cava

4   itself.  But one thing Bard did know was that the vena cava,

5   the vein itself, the largest vein, which is the highway to the          01:59PM

6   heart, can distend up to 50 percent of its size.  But Bard

7   never chose to test for that dynamic.  They didn't test beyond

8   28 millimeters of diameter of the vena cava.  They didn't test

9   anything beyond that diameter and didn't test for it expanding

10  or distending, which as we will see, resulted in problems               02:00PM

11  including migration.

12          In short, Bard did not understand the Environment For

13  Use because it never tested for dynamic changes occurring in

14  the vena cava, not just the vena cava distending by 50 percent

15  but things from everyday movements, common movements, sneezing,         02:00PM

16  coughing, things like that that can affect the diameter or

17  dynamics of the vena cava.

18          What Bard did was Bard conducted bench testing.  Now,

19  the purpose of that testing should be to predict what will

20  happen in the real world.  But Bard used PVC pipe for the vena          02:00PM

21  cava.  It used sausage casing for the lining of the vena cava.

22  It also conducted animal testing sheep migration in sheep to

23  find out about how it resisted migration in sheep.  And then

24  Bard, as you know, went to Canada for a pilot study on

25  implantation and retrievability.                                        02:01PM

1           But the evidence will show that Bard's testing had

2    nothing to do with the real world of the vena cava and had

3    nothing to do with the Environment of Use this device would be

4    implanted in.

5           Next.  When we talk about substantial equivalence, you          02:01PM

6    are going to hear about a very important test. And this is

7    called migration resistance.  And what we have done to show how

8    this test goes is you will look at a thermometer.  And what

9    happens is to find out if a filter in the IVC and the inferior

10   vena cava can resist migration, you have to know something          02:02PM

11   about the pressures.  Otherwise, the filter will not resist and

12   will migrate, as we learned the Recovery did, upward or can

13   migrate downward.  But the test, the IVC filter migration

14   resistance standard really had no rhyme or reason.

15          You see, Bard knew the Simon Nitinol Filter was able          02:02PM

16   to resist pressures -- the Simon Nitinol was able to resist

17   pressures as high as 80 millimeters of mercury.  The Recovery,

18   though, couldn't.  They found and established their own

19   standards telling the FDA and others that the Recovery could

20   resist 50 millimeters of mercury.  Well, according to Bard,          02:02PM

21   well, of course, if you can resist 80 like the Simon Nitinol,

22   of course it could resist 50 millimeters.  That's how they got

23   to substantial equivalence.  And Bard knew early after the

24   Recovery that the filter has to be able to resist migration if

25   it's going to do its job in catching clots and if it's going to          02:03PM

———5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1———

1    stay safe in patients.

2          What this test meant was that if a vena cava filter

3    became occluded with a clot, the Simon Nitinol could resist the

4    pressures caused by the blood flow in that vena cava up to 80

5    millimeters of mercury.  And what they found was that the          02:03PM

6    Recovery was nowhere close to that.

7          This meant that the Recovery would come loose much

8    easier and would travel and not stay put much easier if it

9    encountered any type of migration, if it could not resist

10   migration in the vena cava.                                       02:04PM

11         Anyway Bard misled the FDA.  It claimed that the 50

12   millimeters of mercury in the Recovery was substantially

13   equivalent in safety and efficacy to the predicate device, the

14   Simon Nitinol Filter, knowing full well that the Simon Nitinol

15   Filter could resist greater pressures.                            02:04PM

16         And Bard chose not to keep that information from the

17   FDA but chose to keep that information to itself.  It didn't

18   share information like this with anybody; not its sales staff,

19   not the medical profession, and certainly not end users, the

20   people who these filters were put in.                             02:05PM

21         But the evidence in this case will show you that Bard

22   would learn quickly that that choice to use 50 millimeters of

23   mercury would result in a number of problems, including

24   migration, and they would find that migration and tilt would

25   lead to other failures, including perforation and fracture.       02:05PM

─────5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1─────

1      Bard learned soon enough that these failures were

2 related to each other, and that they could result in a cascade.

3      Now, just three years after they launched the G2 and

4 just two months before the G2X was launched, Bard acknowledged

5 something in its internal documents that they had been device       02:05PM

6 focused; that they lacked a thorough understanding of dynamics

7 of caval anatomy and that they had a limited understanding of

8 user needs.  They wrote that even though these devices were

9 cleared that they had historical reactive evolution design

10 mindset as evidenced by not stopping sales of Recovery when it       02:06PM

11 was causing harm in people and going straight to the G2 which

12 had a host of problems itself, including caudal migration.  And

13 they knew this two months before they launched the G2X, which

14 was the predicate device for the Eclipse.

15      Bard acknowledged that the product complications that       02:06PM

16 they were learning about and they were receiving and the

17 reports that they were receiving about the problems that they

18 had with the Recovery and the G2 was forcing them into a

19 reactive designing mindset.  Still, as the evidence will show,

20 Bard chose to ignore the filter failures.  The evidence will       02:07PM

21 show that they misused an honor system, and that Bard never

22 tested accurately the Environment of Use.

23      And the next slide shows you, this is what happens in

24 a reactive design mindset.  Bard cancelled plans for a

25 long-term clinical test.  They relied on data from the use they       02:07PM

5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1

1    were learning from use in the public.  And they did this while

2    they were developing the G2 and still selling the Recovery.

3    They ignored and didn't do -- they ignored the cause of obvious

4    Recovery failures and they continued with the reactive mindset

5    to keep their place in the market.                                    02:08PM

6           And still, with all the adverse events that you will

7    learn about that Bard was learning, they did not reevaluate the

8    filter design as they had previously planned.  They continued a

9    reactive design mindset.  And even in December 9 of 2003,

10   Bard's own internal engineers wanted to re-evaluate.  They            02:08PM

11   wanted documentation to explain this 50 millimeter of mercury

12   pressure standard that was created by Bard, the one that the

13   engineers were saying was not substantially equivalent to the

14   predicate device, the Simon Nitinol Filter.

15          So when we talk about aggressive marketing, that's not         02:09PM

16   made up.  That's a fact.  This is a Bard document.  And we

17   believe the evidence will show that this is how Bard dealt with

18   untested failure modes.  Bard bought into this, and this is in

19   their documents, that users can be swayed by aggressive

20   marketing in spite of negative clinical experience.  And that's       02:09PM

21   exactly what the evidence will show, that in confronted with

22   negative clinical experience, Bard, through its sales force,

23   through its marketing department, went about and used

24   aggressive marketing.

25          And the evidence will show that the way the Bard               02:10PM

1    Recovery, the G2, and eventually the Eclipse got to the market

2    was because marketing, aggressive marketing, won over science.

3    Because Bard made choices and choices not to do the appropriate

4    test, choices not to be honest with the FDA about the 50

5    millimeters of mercury.                                              02:10PM

6           Well, consistent with its reactive design mindset,

7    Bard started plans to modify the Recovery.  The Recovery you

8    will find was causing all sorts of problems.  It was migrating

9    up.  It was causing all sorts of serious injuries in patients.

10   And internally, Bard called the new G2 the Modified Recovery.      02:11PM

11   But something happened when they were looking at the next

12   generation to hold their market share.  You see, the G2 was

13   going to have to be cleared as a permanent device first.

14          Well, knowing that it had issues with the Recovery,

15   knowing that it was in this reactive design mindset, knowing,    02:11PM

16   though, that it could rely on aggressive marketing, Bard had a

17   problem.  Because you see when they went to compare the G2 with

18   the Simon Nitinol Filter, the one with the proven safety track

19   record, they found out that they had a problem much similar to

20   the Recovery Filter; that the G2, like the Recovery, could only  02:11PM

21   resist maybe 50 millimeters of mercury.  That the G2 could not

22   meet the standard set by the Simon Nitinol Filter, the

23   permanent filter with the proven track record at 80 millimeters

24   of mercury.

25          So what Bard did was they had to deal with that           02:12PM

1    problem.  And meanwhile, problems are mounting.  It was

2    becoming clear to Bard that the bench standard that they did of

3    the 50 millimeter of mercury in the Recovery was causing

4    problems.  Bard's own quality engineer saw that the injuries

5    that were being reported to Bard were significant and that          02:12PM

6    there was a major difference between the Recovery Filter and

7    the Simon Nitinol Filter.  In fact, the injuries reported that

8    Bard's were so much higher in the Recovery Filter, but Bard

9    still made a choice and they kept the Recovery on the market

10   knowing that Natalie Wong, the quality engineer, had said that     02:13PM

11   at a 95 percent confidence, there is a significant difference

12   between the Recovery and the Simon Nitinol Filter.  You will

13   hear from Natalie Wong and that testimony will come to you via

14   videotape deposition, which is a way we're going to present

15   some of the evidence because people live all over the country     02:13PM

16   and cannot come to court.

17           Knowing that the G2 had the same flaw as the Recovery,

18   Bard had essentially changed the goal post.  And by doing that,

19   Bard had to make a choice and the choice was that the Simon

20   Nitinol Filter could no longer be the predicate.  If they were    02:14PM

21   going to get the G2 in a reactive mindset and keep their share

22   out there in the market knowing that they hadn't done any type

23   of long-term testing, they had to do something to show

24   substantial equivalence.  So what Bard did was they changed it,

25   and they changed the Recovery, the Simon Nitinol, as a            02:14PM

1   predicate to the Recovery.  And rather than reporting the

2   failure that the G2, its filters had experienced during the

3   course of testing, Bard just simply changed the standard and

4   changed the standard itself to this internal standard that 50

5   millimeters of mercury in migration resistance testing was safe      02:14PM

6   and so, therefore, the G2 was the substantial equivalent of the

7   Recovery.  And the Recovery Filter became the predicate device

8   for the G2.

9         And despite knowing the flaws, the deficiencies that

10  the G2 had, after all, it was the generation from the original      02:15PM

11  Recovery.  Nothing changed too much in that family of filters.

12  But instead of stopping, reevaluating, opting for accurate

13  testing, telling the medical community, telling the FDA that

14  the G2 was not going to be any better in terms of migration

15  resistance, Bard relied on its old time tested strategy,           02:15PM

16  aggressive marketing.

17        Now, you heard about the Murray Asch study.  And I

18  believe the defense will talk to you about an Everest study.

19  The Everest study was a study involving G2 and just a

20  short-term study for purposes of retrievability.  It did not        02:16PM

21  evaluate the long term safety of the G2, which was originally

22  cleared as a permanent device, a device represented that would

23  stay in place in patients.  In fact, Bard's sales brochures

24  promised that the G2 was going to take strength and stability

25  to a new level.  You see, Bard was concerned.  Doctors were        02:16PM

1    losing confidence.  They had bad experiences with the Recovery

2    but they had a very good sales force.  The sales force, you

3    will hear, is the face of Bard.  That's how they get their

4    devices out there.  The sales force develops relationships with

5    doctors, and doctors rely on the sales force, as you will hear,    02:17PM

6    for truthful and accurate information.  Credibility is

7    everything in those relationships.  And you will hear that Bard

8    knew that, and knew that well.

9          They knew it so well, that when they knew about some

10   of the deepest, darkest problems they had with filters, they     02:17PM

11   wouldn't share that with the sales force because they didn't

12   want to put their sales force in a position where they might

13   have to be truthful with doctors.  They said about the G2 that

14   it increased migration resistance.  It improved centering and

15   that it had enhanced fracture resistance and Bard would find     02:17PM

16   out sooner than later that it didn't.

17         As a matter of fact -- next slide please -- by

18   December 23rd, 2005, David Ciavarella, who was their medical

19   director, he became concerned about what he was learning about

20   the G2.  He wanted to look at the G2 complaints.  He, himself,   02:18PM

21   saw problems that the G2 was presenting with caudal migration,

22   tilting, perforation, misdeployment, and it kind of sounds

23   familiar because these are the same things that Dr. Asch was

24   saying.

25         Well, Dr. Ciavarella was concerned.  And he had said       02:18PM

1    in this e-mail on December 23rd, 2005, that the biggest

2    worst-case consequence of migrations that they were seeing with

3    the G2, caudal migrations, downward migrations, is that in the

4    majority of the cases the migration was accompanied by tilt.

5    And what you will hear from the evidence is that tilt and          02:19PM

6    migration can lead to other complications like perforation and

7    fracture.  And Bard was becoming more and more aware of that,

8    that tilting itself and migration were serious problems because

9    they could lead to what's called a cascade.

10           And yet, the evidence will show, knowing about caudal      02:19PM

11   migration and the numbers that Bard was receiving, knowing that

12   they had concerns that these failure modalities were related to

13   others, Bard said nothing.  Nothing to the medical community,

14   nothing to the end users.  Dr. Ciavarella brought up a point,

15   he said, well, if it's tilting, how is that going to address       02:19PM

16   efficacy in clot trapping?  Because after all, when we saw the

17   filter before it has to be centered because it would catch a

18   clot just like think of a web from an umbrella.  If it was

19   tilting, Dr. Ciavarella's concern was how can that effectively

20   trap a clot and prevent it?                                        02:20PM

21           But Dr. Ciavarella also felt something very, very

22   important, and he stated it in an e-mail.  Because he knew,

23   just like Bard knew, that they had a filter.  They had a filter

24   with a proven track record of safety, and that was the Simon

25   Nitinol Filter.  And the medical director himself wondered out     02:20PM

1    loud in an e-mail, with the Simon Nitinol Filter still on the

2    market for a permanent filter, why wouldn't doctors rather use

3    that.  After all, the Simon Nitinol Filter had virtually no

4    complaints according to Bard's medical director.

5         Well, Bard learned soon enough about just how bad          02:21PM

6    caudal migration was in the G2, so much so that Natalie Wong

7    did her studies, and she found it to be an unacceptable risk

8    per failure mode and effects analysis, and that had to do with

9    the numbers of G2 migrations that Bard was receiving, just

10   complaints they were receiving.  Yet Bard didn't share this     02:21PM

11   information with people that needed to know.  They didn't tell

12   doctors.  They didn't tell the public and they didn't tell the

13   people who were going to receive these filters.  But right

14   there inside Bard, their own quality engineer Natalie Wong

15   found the caudal migrations by G2 was unacceptable,             02:22PM

16   unacceptable risk.

17        You are going to hear from a Bard employee, Janet

18   Hudnall, who was a person in Bard's marketing, somewhat the

19   architect of marketing launches for the Recovery and the G2.

20   And this is an e-mail exchange between Janet Hudnall and        02:22PM

21   another sales representative, Jason Greer.  And when you hear

22   from Janet Hudnall, and you will hear from her in a video

23   deposition, listen to her because she's going to say something

24   else very, very insightful, something that Bard knew, something

25   that she knew.  Her and Jason Greer were lamenting over the two  02:23PM

1  years prior to this e-mail in 2006 over the problems and how

2  she held it together with Scotch tape, smoke, mirrors, crying,

3  et cetera.  Well, that was the problems with the Recovery and

4  the G2.  And you can imagine that if a company is going to make

5  a choice and use aggressive marketing over science, over          02:23PM

6  studies, well, that's a big chore when you have filters

7  migrating up and down and they are tilting and they are

8  fracturing and they are injuring patient after patient.  It's

9  kind of tough to keep your market share if you make a choice to

10  aggressively market.                                              02:24PM

11        Well, Jason Greer and Janet Hudnall were proud of the

12  way she handled that.  But Janet Hudnall is also going to say

13  something very insightful.  She has stated that there is

14  absolutely -- there is no way to know whether filters have ever

15  stopped a clot.  And this comes from the marketing person.  In   02:24PM

16  other words, the aggressive marketing people were even

17  questioning, while they are setting aside all the dangers,

18  setting aside all the risk, whether the filters they were

19  putting out, they were pushing hard, were even doing what they

20  said they would do.                                               02:24PM

21        Well, what it means in Bard when you have an

22  unacceptable risk, it means that you have a failure that can

23  contribute to the death, severe injury, permanent significant

24  disability, or severe occupational illness.  And this was what

25  was found about the G2.  And keep in mind, the G2 went to the    02:25PM

1    G2X.  The only change was a hook.  And the G2X was the

2    predicate for the Eclipse.  And just back in 2006, a quality

3    engineer in Bard was finding that caudal migrations in the G2

4    was an unacceptable and a dangerous, serious, risk.

5           The Eclipse was launched in January 2010, and the                02:25PM

6    evidence will show you that the Eclipse is essentially the G2X.

7    It has the hook.  They electropolished the legs.  And what that

8    means, well, the evidence will tell you that despite what Bard

9    tried to suggest that it might help with fracture resistance,

10   making the filter more resistant to fracturing the legs, that       02:26PM

11   engineers involved in the development didn't think so.

12          Really the reason the Eclipse was launched was because

13   of aggressive marketing and the need to keep that market share.

14   The name was chosen to break the baggage, the baggage that Bard

15   had experienced from the complication of adverse events, the        02:26PM

16   problems and injuries it had from the predicate devices, the

17   Recovery and the G2.  And so in its endeavor to aggressively

18   market, the Eclipse came and was cleared.

19          And what Bard did was it got to their sales force and

20   really pushed this whole concept of electropolishing.  This is       02:27PM

21   Chris Smith.  He is a sales representative, and he testified,

22   and you will hear him by videotape deposition here, video

23   recorded deposition, that they were promoting both the G2 and

24   Eclipse as being resistant to fracture, and that the sales

25   force, like the medical community, like the patients, expected      02:27PM

─────5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1─────

1    that Bard would have taken steps to improve the G2 and improve

2    the Eclipse in terms of fracture resistance.  But the evidence

3    will show otherwise.

4         In fact, there will be evidence and testimony from Ms.

5    Raji-Kubba, another person who works at Bard, and she was                   02:28PM

6    involved in the development of the Eclipse Filter, the filter

7    that Doris Jones received.  And she admitted in deposition that

8    the question was:  Okay, so you didn't expect to reduce the

9    increase, the migration resistance of the filter?  Her answer

10   was specifically, no.  And you didn't expect to reduce the                  02:28PM

11   fracture rate of the filter?  And she said not -- not the

12   electropolishing itself.  Yet, as you can see, Bard was

13   representing that electropolishing would improve fatigue

14   resistance, which meant would improve stability, which meant

15   Bard was representing that this filter had improvement in being             02:29PM

16   resistant to limbs fracturing.

17        Well, as the evidence has shown, or will show, excuse

18   me, Doris Jones received the Eclipse Filter and she received it

19   in 2010.  Now I want to talk a moment about Doris.

20        She is married to Alfred Jones.  She is a mother.  She              02:29PM

21   has her daughters, Shanice and Sharese.  They live in Savannah,

22   Georgia.  Doris is a proud grandmother.  She has three

23   grandchildren; Chastity, Zi'Yari, and Monae.

24        And here's what Doris has done with her life as a

25   mother and a grandmother.  The evidence will show you that                  02:29PM

1    Doris is intent on having her daughters have a better life than

2    hers.  And what she provides her daughters every day is peace

3    of mind because, see, Shanice and Sharese can go do their jobs

4    every day knowing their babies are in the best of hands, that

5    their babies are going to be safe and with a loving person, the          02:30PM

6    same person who raised them.  And that's what Doris does.  You

7    will hear from her.  That's what she is proud of.  That's what

8    her goal is, and that is what she is intent on doing.

9         Now, in August 2010, Doris went to Memorial University

10   Medical Center in Savannah, Georgia.  She had symptoms                    02:30PM

11   associated with gastrointestinal bleeding.  She was also

12   diagnosed with an acute deep vein thrombosis.  Dr. Anthony

13   Avino performed placement of a Bard Eclipse Filter, and you

14   will hear testimony that it was intended to be permanently in

15   place.                                                                    02:31PM

16        Doris Jones eventually returned, and a CT revealed

17   that the Eclipse Filter in her in 2015 had fractured.  An arm

18   of the filter had fractured.  It had migrated, it embolized,

19   embolized meaning it traveled through the circulatory system in

20   the bloodstream.  You will hear from Dr. Meuhreke and Dr.                 02:31PM

21   Hurst, they will explain how it happened, how the pathway of

22   this fragment went.  As a matter of fact, we've got three quick

23   animations of that we can show you right now.

24        So what you are looking at is the anatomy.  There's

25   the IVC filter.  This shows how the filter moves within the               02:32PM

5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1

1    vena cava.  The vena cava, you will find, is a vein that

2    expands and contracts, and the filter fractured.

3            Next animation.  Again, if you are looking at the

4    screen, we're showing you the fracture embolization.  The

5    fragment breaks, and this is how it eventually gets to the         02:32PM

6    pulmonary artery where it's embedded.  It goes through the

7    heart.  And our doctors will tell you about how the pathway to

8    get to where it is, the pathway that strut had to take.  And it

9    eventually finds itself in Doris's pulmonary artery.

10           Now, she went in and she had the filter removed, but       02:33PM

11   the doctor that removed the filter felt that it was too

12   dangerous to go after the strut in her pulmonary artery.  Let's

13   show the retrieval.  This is how doctors will tell you in this

14   case how filters are retrieved.  And Doris went and underwent

15   this procedure to have the filter removed.  But that strut         02:34PM

16   remains in her.  And that strut remains in her to this day.

17   And she is going to tell you about it.  She's stoic.  She's

18   brave.  She's courageous.  What she doesn't want is she doesn't

19   want her daughters or the grand babies, or her husband, for

20   that matter, to know her fear.  But her fear is what could         02:35PM

21   happen?  What can happen when you have a foreign object

22   embedded in your pulmonary artery?  She fears that she may be

23   caring for the grand babies, and something incapacitating has

24   happened.

25           But what the evidence will show is from Bard's             02:35PM

—5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1—

1   choices, the harmful choices that Bard has made, that now they

2   have imposed a choice on Doris.  And that choice is this:

3   Leave that fragment, not knowing what could happen, or go

4   through a risky surgery.

5           Now, Bard is going to claim in this case that Doris          02:36PM

6   doesn't have symptoms so she must not be hurt.  But what the

7   evidence will show is that Bard in its internal documents is

8   very aware that migrations of fragments to the heart or lung

9   present serious clinical consequences.  You see, that's what

10  they know up there.  But in this courtroom we anticipate they   02:36PM

11  are going to suggest that Doris doesn't have symptoms.  So for

12  some reason, she's not hurt.  And Doris is here today because

13  of Bard's bad choices.

14          MR. NORTH:  Your Honor, I'm objecting.  That's

15  argumentative.                                                  02:37PM

16          THE COURT:  Let's stick to the facts, Mr. O'Connor,

17  please.

18          MR. O'CONNOR:  Sure.

19          Documents that Bard has produced say and admit that

20  they knew little about long term clinical performance of its    02:37PM

21  filters.  Physicians tell Bard that they are more comfortable

22  with a small PE, that's what they said in a focus group, that

23  is asymptomatic than a fracture.  And documents will show that

24  Bard knows that its asymptomatic events probably occur at a

25  much higher rate because they are underreported.                02:37PM

1        Now, what we anticipate is that Bard is going to come

2   here and they are going to present evidence.  They are going to

3   present evidence about their failure rates and try to show that

4   the failure rates are not that significant.  Keep in mind,

5   though, that Bard, the reporting system in the United States is        02:38PM

6   voluntary.  Doctors, hospitals, and patients in the health care

7   community are not required to report injuries associated with

8   medical devices to Bard or the FDA.  Bard, though, is required

9   to report injuries that it becomes aware of.

10        Now, there will be evidence, and this comes from Dr.        02:38PM

11  Ciavarella, who you will hear by video recording, and he will

12  testify about the problems associated with reporting.  And he

13  will testify, and has testified, that the reporting, only

14  probably 1 to 5 percent of what's actually going on out there

15  is being reported.        02:39PM

16        So in the end, we think that while the evidence will

17  show you medical devices implanted inside bodies do carry

18  risks.  But when a company knows that its new medical device

19  increases a risk and sells it anyway, that causes harm.  And

20  while you will hear evidence that IVC filters carry risk, we        02:39PM

21  believe the evidence will show that Bard knew that its IVC

22  filters had increased risks of harm but they sold them anyway.

23  And by making that choice, Doris Jones has a fracture that

24  embolized to her pulmonary artery and remains there.

25        So, in summary, the evidence, we believe, will show        02:40PM

1    this:  Bard wanted to sell its IVC filters.  What research it

2    did beginning with Dr. Murray Asch showed that there were

3    potential problems.  Bard's own testing showed that its filters

4    carried increased risk and, in fact, they weren't better than

5    the predicates.                                            02:40PM

6          What a company should do is not sell it.  And that way

7    nobody can be harmed.  Bard made a choice, despite what the

8    research told it, to continue to market, continue aggressive

9    marketing, and that's how people like -- that's how Doris Jones

10   got hurt.  And that's why we're here.                       02:41PM

11         Now, we believe in this case that we will meet our

12   burden of proof, that at the end we believe that the evidence

13   will show that Bard's choices that you will hear about in this

14   case, choices to ignore science, choices to ignore the need for

15   long term clinical studies, choices to ignore the need for     02:41PM

16   accurate testing, those choices resulted in dangerous filters

17   which cause harm.

18         We believe that the evidence will show that Bard

19   didn't warn the medical community or end users of what it was

20   becoming aware of on a regular basis, that its filters were    02:42PM

21   causing harm.  And we believe that the evidence will show that

22   Bard engaged willfully and made choices that it knew created

23   risk of harm to patients like Doris.

24         At the end of this case, we're going to ask you for a

25   verdict, a verdict that compensates Doris for her injuries and  02:42PM

—5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1—

1    damages and a verdict that will mean something in this case.

2              I want to thank you for your time.  Thank you.

3              Thank you, Your Honor.

4              THE COURT:  Thanks, Mr. O'Connor.

5              Ladies and Gentlemen, we are going to take an        02:42PM

6    afternoon break.  We'll take a 15-minute break and begin again

7    at just before 3:00.  Please remember not to discuss the case

8    and we will excuse the jury at this time.

9              (Jury out at 2:43 p.m.)

10             THE COURT:  Counsel, is there an issue I need to      02:43PM

11   address or are we resolved?

12             MR. CLARK:  Your Honor, we just have one.  It's with

13   respect to -- my colleague was going to argue it -- but with

14   respect to one of the exhibits, Exhibit 1035, I believe, Bard

15   had an objection.  I think the remaining -- is that not the     02:43PM

16   case?

17             MS. HELM:  We do have an objection to Exhibit 1035,

18   Your Honor.  The basis of our objection is that they are

19   attempting to tender it with the deposition of Jason Greer.

20   And Exhibit 1035 is not an exhibit to his deposition.  So it's  02:44PM

21   a document that they are seeking to tender that the witness

22   didn't testify about and it's not a part of his deposition.

23             THE COURT:  Are you saying they are just going to

24   offer it into evidence?

25             MS. HELM:  That's my understanding, that they told me  02:44PM

1    they just wanted to offer it in evidence.

2         MR. COMBS:  That's correct.  We're moving it into

3    evidence under Rule 104.  The only objection they offered is a

4    relevance objection.  It's a fracture report from 2004.  It's

5    clearly relevant on a number of issues.                          02:44PM

6         THE COURT:  It doesn't have anything to do with what's

7    going to be played in the deposition, is that right?

8         MR. COMBS:  That's true.  It's not referenced in the

9    deposition.

10        THE COURT:  Let's talk about it at the end of the day     02:44PM

11   after the jury has been excused.  Thank you.

12             (Recess from 2:44 p.m. until 3:02 p.m.)

13        THE COURT:  Mr. North, you may proceed with your

14   opening statement.

15        MR. NORTH:  May it please the Court, Ladies and           03:02PM

16   Gentlemen of the Jury, good afternoon.  It is my honor and it's

17   my privilege to be here today, and it is for my colleagues to

18   be here to represent the men and women of C.R. Bard and Bard

19   Peripheral Vascular.

20        We are proud to do so, and it is my task today to         03:02PM

21   present to you a summary of what we think the evidence is going

22   to show in the next three weeks, to show you what we believe is

23   the other side of the story from what you just heard.

24        And we do believe that you will hear, over the course

25   of this three weeks, a completely different side of the story.  03:03PM

—5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1—

1   If Bard believed what we just heard from Mr. O'Connor, we would

2   not be here today if the evidence showed that this case long

3   ago would have resolved.  But we believe that the story and the

4   evidence is different from what you just heard.  And then once

5   you hear that evidence, and once you hear the whole story, that   03:03PM

6   you will determine that Bard stands in this courtroom

7   wrongfully accused.

8        The evidence is going to demonstrate one central key

9   issue for your consideration, and that is an issue that we hear

10  about in the medical field all of the time.  We heard about     03:04PM

11  that issue.  Some people discussed it this morning.  It's a

12  risk benefit analysis.  And that's the central issue that the

13  evidence is going to be presented on day in and day out.

14       And it ultimately, after you hear all that evidence,

15  what you are going to have to determine is whether the benefits  03:04PM

16  of the Eclipse Inferior Vena Cava Filter outweighed the risks,

17  and there are risks associated with that device.  And we

18  believe that the evidence is going to show you that these

19  filters have a tremendous benefit.  They save human lives.  I

20  can't imagine what greater benefit there could be.  And yes,     03:04PM

21  while there are risks, we believe that the evidence is going to

22  show you and demonstrate that the lifesaving potential of the

23  Eclipse Filter outweighs the risk of complications that come

24  with the device.

25       Over the course of the next few minutes I'm going to        03:05PM

1   be presenting to you what we believe the other side of the

2   story is, what we believe the evidence will show, you warts and

3   all, will indicate the entire whole story.  The purpose of

4   opening statement here is to provide you a road map, a summary

5   of where we believe the evidence is going to go, where it's          03:05PM

6   going to take us as we listen to the witnesses, as we review

7   the documents, and at the end of the day when we hear the final

8   arguments.

9         First, today, as a part of this road map, I would like

10  to make a brief stop and tell you about my clients C.R. Bard        03:05PM

11  and Bard Peripheral Vascular.  They are not just names.  They

12  are just not monolithic corporations.  They are entities with a

13  history and a function and a community purpose.

14        After talking about Bard and Bard Peripheral, I'd like

15  to tell you more about the device; not the Recovery Filter          03:06PM

16  which we heard about so much this afternoon, not the G2 Filter

17  which we heard so much about this afternoon, but evidence about

18  the Eclipse Filter, the fourth generation retrievable filter

19  developed by Bard and the filter that was implanted in Ms.

20  Jones.                                                               03:06PM

21        And then I would like to talk to you about Ms. Jones,

22  about her medical course, the difficulty she's had and why she

23  needed this filter and why she needed this filter to

24  potentially save her life.  And then I lastly want to talk to

25  you about the plaintiff's burden.  Because at the end of the        03:06PM

1  day I believe the Court will instruct you that it is the

2  plaintiff's burden of proof to prove, by a preponderance of the

3  evidence, her case.  And I would like to talk about the

4  elements that she needs to prove in order to recover and what

5  we believe the evidence will show as to those elements.      03:07PM

6        But first, as I indicated, let's talk about Bard.  Let

7  me tell you a little bit more about the two companies I have

8  the honor of representing.

9        C.R. Bard was founded more than a hundred years ago by

10  a physician and designer, or inventor, by the name of Charles   03:07PM

11  Russell Bard.  He began research on how to treat urinary

12  discomfort.  He was the inventor of the Foley catheter, a

13  device that is still the most widely used urinary catheter and

14  widely sold urinary catheter in America today.

15        But Bard has expanded beyond, over the years, just      03:08PM

16  catheters and urinary treatment products.  Bard is located in

17  Murray Hill, New Jersey.  It manufactures and develops many

18  different types of medical devices.  It makes vascular devices,

19  urological devices, oncology devices, surgical specialty

20  devices.  And then there's Bard Peripheral Vascular which is a   03:08PM

21  division of Bard.  It's located just down the road in Tempe.

22  And there, that company, that division, specializes in two

23  types of products:  Oncology products and vascular products.

24  It makes stents.  It makes filters.  It makes many different

25  products to treat vascular diseases.  And it is a major      03:08PM

1    developer and producer of biopsy products making some of the

2    most widely sold and utilized biopsy, cancer biopsy products

3    used in hospitals throughout this country.

4           But Bard is not just a faceless corporation.  It's

5    made up of men and women that go to work in New Jersey and          03:09PM

6    Tempe every day, that visit hospitals, that talk to doctors,

7    and that attempt and strive to produce medical devices

8    consistent with the core values that the company has developed.

9           Again, it's not just a faceless corporation.  It's

10   made up of biomedical engineers, regulatory specialists,           03:09PM

11   quality assurance specialists, in-house physicians, and many

12   other dedicated professionals.  And these are men and women

13   that you are going to see, virtually all, if not all of them,

14   during the course of this trial, men and women that do work or

15   have worked with Bard or Bard Peripheral in the development of      03:10PM

16   these filters, in discussions with the FDA about these filters.

17   And I believe the evidence is going to show you the pride and

18   care that they have applied in developing and selling these

19   lifesaving devices.

20          Now, let's talk about the device, the Eclipse Filter.       03:10PM

21   But before you can really, I think, at least before I could

22   really appreciate what this device is, how it works, and what

23   it does, it helped me to learn more about the diseased state

24   that it is intended to treat.

25          DVT, or deep vein thrombosis, and pulmonary embolism,       03:10PM

1    I think we have all heard of them.  Most of us have friends and

2    relatives that have suffered from them.  They are a pervasive

3    and life threatening medical condition that unfortunately

4    affects too many of us and too many of the people we love.

5    Deep vein thrombosis are blood clots develop in the legs, the          03:11PM

6    lower extremities.  We often hear about deep vein thrombosis or

7    DVT from people who are riding on airplanes for long distances.

8    We have all been told or read if you are riding on the

9    airplane, get up and walk around, drink lots of water.  It's to

10   avoid that condition, deep vein thrombosis.  It's not just              03:11PM

11   airplane flights.  There are many other things and health

12   conditions that can cause that.

13           Deep vein thrombosis, while usually treatable, can

14   quickly become fatal if it develops into pulmonary embolism.

15   And that's when the blood clots in the leg break free and              03:11PM

16   travel up and clog either the heart or the lungs, this massive

17   clot, and it kills people.  It kills people in this country

18   every day.

19           Each year due to DVT, approximately two million of our

20   fellow citizens are affected.  Up to 600,000 people a year are         03:12PM

21   hospitalized.  And doctors and experts estimate that as many as

22   2- to 300,000 people die from pulmonary emboli caused by deep

23   vein thrombosis every year.  33 percent, one-third of all

24   people who have had an incident of DVT are going to have a

25   recurrent DVT in the future.                                           03:12PM

————5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1————

1        And I have always been shocked by this particular

2   statistic:  DVT-related pulmonary embolism is the leading cause

3   of preventable hospital deaths in United States hospitals.  It

4   is a serious issue, an issue that the medical community and the

5   government recognizes.                                          03:13PM

6        In 2008, the United States Surgeon General issued a

7   call to arms because they were so alarmed about the deaths and

8   the problem of pulmonary embolism in our country.  They noted

9   the seriousness of the disease.  They noted that it causes more

10  deaths in this country each year than breast cancer, than AIDS, 03:13PM

11  or even motor vehicle accidents.  And they said that the status

12  quo is unacceptable.  And they also recognized that inferior

13  vena cava filters, like the Eclipse Filter, are an appropriate

14  method of treating this disease in a number of patients.

15       And it is to treat that disease, that life-threatening 03:13PM

16  disease, that the men and women of Bard developed retrievable

17  inferior vena cava filters, including fourth generation filter,

18  the Eclipse.

19       Now, as Mr. O'Connor indicated, the inferior vena cava

20  is the largest vein in the body.  It's that big blue vein that  03:14PM

21  comes up the center.  The veins from your legs feed into it,

22  merge, and meet into the inferior vena cava and it returns the

23  blood from the lower legs up to the heart.  The filter is

24  implanted, and you can see approximately where it is implanted,

25  not far from the kidneys.  It's implanted in patients to break  03:14PM

1    up the clot.  It's sort of like a strainer when you are cooking

2    something and you are pouring a liquid that has some particle

3    in it to try to strain the particle, to keep the clots from

4    coming to the heart.

5           I'd like to show you an animation that shows a filter     03:15PM

6    breaking up a clot so you can see how it's supposed to work.

7    You see the clot.  The idea is the filter hits it, and it

8    breaks apart, just like with a strainer.

9           Now, let me tell you a little bit about Bard's history

10   with inferior vena cava filters.  The first filter that the     03:15PM

11   company sold was called the Simon Nitinol Filter.  And for

12   years, that filter was developed and manufactured by a

13   different company called NMT, Nitinol Medical Technology.  But

14   Bard was the distributor for that filter.

15          It was very much unlike the Eclipse Filter at issue in    03:16PM

16   this case because it was a permanent filter.  Once you put it

17   in somebody, you could not take it out.  And for that reason,

18   most of the time physicians would just put these permanent

19   filters in terminally ill patients that weren't going to be

20   living much longer or the elderly, who didn't have many years   03:16PM

21   to live.  You would not put it in a young trauma victim, let's

22   say a teenager in a motor vehicle accident that had broken

23   bones and was going to be laid up in the hospital.  Those

24   people are at very high risk, even at the young age, because

25   they can't move and mobilize and have a high risk of DVT or     03:16PM

1    pulmonary embolism.  But doctors didn't want to put permanent

2    filters in those people.  And so they were deprived of a very

3    important treatment option for those patients.

4           Bard acquired the right to the SNF, the Simon Nitinol,

5    and to the Recovery Filter which was still being developed and            03:17PM

6    had not been cleared by the FDA for sale in 2001.  In 2003,

7    Bard introduced the Recovery Filter, and it was initially

8    cleared by the FDA to be used as a permanent filter.  It

9    eventually was cleared by the FDA to be used as a retrievable

10   filter.  And we'll talk a little bit more about that in a              03:17PM

11   minute.

12          But Bard is constantly evolving, constantly

13   innovating, and very quickly began work as it assessed its

14   experience with its first retrievable filter, the Recovery

15   Filter, began work on the G2 filter, the second generation.  It       03:17PM

16   began work on that filter in 2004.  And the FDA cleared the G2

17   Filter as a permanent filter in August of 2005.

18          From August of 2005 to October of 2007, Bard conducted

19   a clinical study concerning the G2 Filter.  It was a two plus

20   year study involving 100 patients, tracking those patients,           03:18PM

21   cataloging their experience, their complications, and reporting

22   the data on a frequent periodic basis to the FDA.

23          In January of 2008, the FDA cleared the G2 to be used

24   as a retrievable filter.  And then after that, Bard developed

25   the G2X Filter, the third generation filter which took the G2         03:18PM

—5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1—

1    Filter and put the hook on the top.  And then in 2009, Bard

2    began developing its fourth generation filter, the Eclipse, the

3    one that is at issue in this case.  And in January of 2010, the

4    FDA cleared the Eclipse Filter as a retrievable filter.

5              Now, what was so special, or what was so unique about          03:19PM

6    the retrievable filters developed by Bard?  The only

7    retrievable filters before Bard introduced the Recovery Filter

8    that existed could be left in the body for no more than 10 to

9    14 days before they had to be removed.  So if you had a

10   patient, lets go back to the example of the trauma patient who         03:19PM

11   is going to have multiple surgeries for broken bones and be

12   laid up in the hospital for a month or so, you couldn't use one

13   of these filters.  And it was a predicament for physicians

14   because these filters are used in patients when for whatever

15   reason they cannot be on blood thinners like Coumadin.  We             03:20PM

16   heard a lot of discussion about that this morning.  Coumadin or

17   other drugs called anticoagulants are the first line of defense

18   for doctors for pulmonary emboli or deep vein thrombosis.  But

19   when a patient has a high risk of bleeding, doctors have to

20   take those patients off blood thinners.  You cannot be on a           03:20PM

21   blood thinner and go into surgery.  So they have to have

22   another method to protect those people of the risk of clots.

23   And until the development of Bard's Recovery Filter and its

24   retrievable filters, they really didn't have that option for

25   any patient that needed a filter more than 10 to 14 days.  It          03:20PM

1        was either a permanent filter or no other option.

2                For Bard's retrievable filters, including the Eclipse

3        Filter, however, there was no limitation on what's called the

4        in dwell time, how long that filter could be kept in the body

5        before it was retrieved.                                            03:21PM

6                There is data, there are studies, that show Bard

7        retrievable filters, including the Eclipse Filter, being

8        retrieved months after they are implanted, years after they are

9        implanted.  There are some doctors that specialize in these

10       filters that say they can retrieve these filters many years        03:21PM

11       after they have been implanted.  And that was a major

12       breakthrough for the medical community.  These filters could

13       either be left there permanently or the doctor had the choice

14       to retrieve them when they were no longer needed.  And again,

15       that was especially beneficial for patients with only a            03:21PM

16       temporary need for the filter.

17               Now, Bard's filters are made of a very unique product

18       called Nitinol.  Nitinol is a substance.  It's a type of metal

19       that was developed by the United States Navy.  In fact, its

20       name is an acronym for Nickel Titanium Naval Ordinance             03:22PM

21       Laboratory where it was developed.  It was developed in 1962.

22       And what makes it unique is that it has what is called shape

23       memory.  Once you forge a device or a product out of this

24       substance, Nitinol, it remembers its shape.

25               So, for example, the filter is manufactured by Bard.       03:22PM

1    It is then compressed.  You saw that a few moments ago when it

2    was being retrieved in their animation and I will show you

3    another one in a minute.  But it's compressed.  And then when

4    it is released from the catheter in the human body, it

5    remembers the shape that it was forged in and springs out to          03:23PM

6    that shape.  And that's what it means by shape memory.  And the

7    temperature is what helps that process to occur.

8           Here is an animation of a filter placement.  There are

9    two ways to implant these filters.  One is through the femoral

10   vein, which is the vein, of course, right in the groin, and one      03:23PM

11   is through the jugular vein in the neck.  Both are done with a

12   small incision.  It's called a percutaneous procedure as

13   opposed to any invasive surgery.  It's a small incision.  The

14   catheter is placed, run up through the inferior vena cava, and

15   then the filter is released.                                         03:23PM

16          Here's what it looks like.  You can see the guidewire

17   coming up.  This is coming from the femoral vein, or from the

18   groin.  Then comes the catheter, and the filter has been

19   compressed inside the catheter.  It is then released.  The

20   filter remembers its shape and springs in to fill the IVC.           03:24PM

21          These procedures, on average, take about 25 minutes,

22   often done under no regular anesthesia, just local anesthesia,

23   done in a clinic or a specialized room in a hospital, usually

24   done on an outpatient basis.  It is a very simple procedure as

25   is the filter retrieval.  If a doctor is ready to retrieve the       03:25PM

1     filter, they then do something very similar.  But this time

2     they go through the jugular vein with a special device in a

3     catheter that collapses the filter.  And here's an animation

4     that depicts that.  Collapsing it back, pulling it into the

5     catheter, and removing the catheter.                          03:25PM

6             Again, this procedure is performed simply with an

7     incision often under local anesthesia.  It is performed

8     percutaneously and a very brief procedure, usually.  Ms. Jones

9     in this particular instance, when the filter was retrieved, the

10    medical notes and chart indicate that the procedure took 34    03:26PM

11    minutes.

12            Much of the plaintiff's evidence which you just heard

13    described in this case concerned the first generation filter,

14    which was sold between 2003 and 2005, the Recovery Filter.  But

15    this case is not about the Recovery Filter.  The Recovery       03:26PM

16    Filter was not implanted in Ms. Jones.

17            The G2 was developed in 2005 with the express purpose

18    of improving the Recovery Filter to try to improve its

19    resistance to migration, to improve its resistance to fracture.

20    And you will hear about the design changes that were made to    03:27PM

21    address much of the problems or issues that Mr. O'Connor just

22    described.  The FDA was alerted and advised of all these design

23    changes.

24            And you will hear how the G2 was designed differently

25    from the Recovery Filter, specifically to make it more          03:27PM

1   resistant to migration and fracture.  But then again, this case

2   is not about the Recovery Filter.  And it's not even about the

3   G2 Filter.  Because the G2 was not implanted in Ms. Jones.

4        This case is about the fourth generation filter, the

5   Eclipse.  And what made the Eclipse different is that it was          03:27PM

6   electropolished, a special treatment performed on the wire that

7   makes up the filter.  Again, Bard stopped selling the Recovery

8   Filter, which you heard so much about in 2005.  It was five

9   years later, three generations of filter later, that Ms. Jones

10  received her device.  Bard had improved the G2 to make it            03:28PM

11  better, more complication free, than the Recovery Filter, and

12  then went further and designed the Eclipse Filter to

13  electropolish it with the goal of further improving fracture

14  resistance.

15       You will hear material specialists and engineers from           03:28PM

16  the company and outside experts talk to you about what

17  electropolishing does.  It smooths out the surface of the wire

18  and it reduces or eliminates surface imperfections.  And Ladies

19  and Gentlemen, I submit to you that some of the most important

20  evidence you are going to hear during the course of this case         03:29PM

21  is how that process and how that work to improve these filters,

22  how it succeeded.

23       And the best evidence of that that you will hear are

24  going to be the reports to Bard of complications.  And those

25  reports are going to show that the reports of complications           03:29PM

1   from the G2 Filter were much better than the reports for the

2   Recovery Filter.  And the reports for the Eclipse Filter were

3   better than those of the G2, that the design changes and

4   improvements in evolution was making a difference.

5          And this is based on all the reports of complication          03:29PM

6   received from Bard from whatever source, whether it's the FDA,

7   whether it's hospitals, doctors, whether it's studies published

8   in the medical literature.  From whatever source it comes, Bard

9   collects that data.  And you look at that data, and it

10  demonstrates that 99.83 percent of Eclipse filters sold had no     03:30PM

11  reports of fractures, which Ms. Jones had occur with her

12  filter.

13         This case is about the data regarding the Eclipse

14  Filter.  That was the filter that was implanted in Ms. Jones.

15  And let's talk a moment about Ms. Jones.                            03:30PM

16         And I want to tell you also one thing that there will

17  be no dispute about in the evidence at all.  And that's the

18  fact that everyone, you, as members of the jury, us as human

19  beings, have sympathy for Ms. Jones.  She has had a difficult

20  medical course, unrelated to the filter even, which you will       03:31PM

21  hear about.  She has had two episodes of deep vein thrombosis.

22  She needed the filter.  She has had a difficult course.  And we

23  are not here to malign her.  The evidence is not going to

24  create an issue about Ms. Jones because she's a human being and

25  we're all human beings.  And we all have sympathy for her.         03:31PM

———5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1———

1          She did have serious medical issues, though.   In

2    October of 2006, she was hospitalized for a gastrointestinal, a

3    stomach-area bleed, and she has a history of bleeding issues,

4    gastric bleeding issues.  She had to have surgery, gastric

5    surgery, in 2006.  And during that time while she was in the          03:32PM

6    hospital, she was diagnosed for the first time with a deep vein

7    thrombosis.  In April of 2009, three years later, she was

8    hospitalized with abdominal pain which was attributed by her

9    doctors to, in part, to anemia, and she had to have additional

10   gastric surgery.                                                      03:32PM

11          In 2010, she was hospitalized with another GI bleed.

12   She had fatigue and severe anemia at that time.  At this point

13   she still did not have a filter, but she was complaining of

14   fatigue.

15          She was diagnosed with another, her second incident of       03:33PM

16   deep vein thrombosis.  And here's where the filter comes into

17   play.  She had just had her second episode of deep vein

18   thrombosis.  But because of her GI bleed, she needed surgery.

19   And the doctors couldn't conduct surgery given the -- with her

20   own anticoagulant because she had previously been prescribed, I      03:33PM

21   believe it was, Coumadin.  They had to make sure she was not on

22   a blood thinner or else they couldn't perform surgery.  And

23   that's when their option became to implant an IVC filter, which

24   the doctor did without any incident, without any complications.

25   And she therefore, two days later, was able to undergo her          03:33PM

1    gastric surgery.

2          In 2010 -- I mean 12, two years later, she was

3    hospitalized with chest pain.  Chest x-rays were performed, and

4    this is important, two years after the filter was implanted,

5    it's still there, and there was no evidence on the x-rays of                03:34PM

6    any fracture with the filter.

7          Again, in 2013, she was hospitalized.  She had another

8    chest X-ray.  And at this point, three years after the implant,

9    she had no evidence of filter fracture.  And then in 2015, she

10   was hospitalized again, and a chest X-ray then showed one strut            03:34PM

11   from the filter had fractured and had traveled through her

12   bloodstream and was then stationary in a pulmonary artery, a

13   larger artery in the lung where it was stationary.

14         So her doctors assessed the situation.  They removed

15   the filter, which was still in place, and they removed it in              03:35PM

16   that 34-minute procedure I described a few minutes ago.  And

17   the radiologist who did that procedure decided to leave the

18   strut in her pulmonary artery.  And this is important, because

19   that radiologist determined that that strut was in a safe

20   location.                                                                  03:35PM

21         And that's hard for us as lay people to understand,

22   but you are going to hear doctors talk about that.  It sounds

23   scary to have a metal strut in your heart -- I mean not your

24   heart, I'm sorry, your pulmonary artery.  But what happens in

25   the vast majority of cases is that the foreign object becomes             03:35PM

─────5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1─────

1   endothelialized.  That's a fancy doctor's word for tissue

2   encases it.  It creates scar tissue and it gets immobilized to

3   where it's stationary and it's not going to move.

4          And you will hear evidence that because of that,

5   struts in the pulmonary arteries are not considered to be                03:36PM

6   significant problems.  The medical literature indicates that as

7   many as 95 percent of those cases, if not more, result in

8   asymptomatic patients, patients that never have a symptom

9   attributed to that strut.

10          And even afterwards, Ms. Jones has still had problems           03:36PM

11  with her gastric bleeding and had -- was hospitalized in 2016,

12  a little over two years ago, for another episode of gastric

13  bleeding.  And as the stipulation read by Judge Campbell

14  indicated, Ms. Jones has had no further medical treatment of

15  any sort since March of 2016.                                            03:37PM

16          Her doctors have not attributed any physical symptoms

17  to her filter or to the fractured strut.  In fact, her doctor

18  called it an incidental finding, a finding they just happened

19  to see the fracture in the filter when they were doing a chest

20  X-ray for other issues.  Her doctors have not identified any             03:37PM

21  symptoms she has related to that strut.  And even the doctor

22  who didn't treat her but the plaintiffs had paid as an expert

23  witness who is going to come and testify, even the paid expert

24  says that, at most, the risk of future complications from that

25  strut in her pulmonary artery are only 1 percent.                        03:38PM

1        Now, let's talk about the plaintiff's burden, what

2    they have to show to recover in this case.  And again, it is

3    the plaintiff's burden by a preponderance of the evidence to

4    prove their case.

5        She is going to attempt to prove an alleged design                03:38PM

6    defect, that something about the Eclipse Filter was defective

7    in how it was designed.  She's going to allege a warning defect

8    that Bard somehow did not adequately warn doctors who are the

9    people we are charged with warning, about the risks with this

10   device.  She's going to have to prove under the law that one of      03:38PM

11   these alleged defects, if they occurred, was the cause of her

12   injuries, of an injury to her.  And she's going to have to

13   prove damages as a result of that.

14       Let's look first at design.  And again, in assessing

15   the design of the Eclipse Filter, the evidence will focus on         03:39PM

16   the risks of the filter and the benefits.  And ultimately, you

17   will be asked as a jury to weigh those risks and those

18   benefits.  We already talked about the danger of pulmonary

19   embolism and what a major health threat it is in this country.

20   Up to 30 percent of people that have a recurrent or second           03:39PM

21   pulmonary embolism die of that.  Even in anticoagulated

22   patients, people that are on blood thinners, as many as 5

23   percent of those people on blood thinners die when they have a

24   second pulmonary embolism.

25       But only .036 percent, according to the reports and              03:39PM

1    data of patients who received a Bard filter, even suffer a

2    recurrent or second pulmonary embolism.  And an even smaller

3    number of patients who received a Bard filter suffer a fatal

4    pulmonary embolism.

5           What do the statistics mean?  I have never been very    03:40PM

6    good particularly when you get into a .00 something percent.

7    So I tried to come up with a graphic that shows.  Here's a

8    graphic depicting 300,000 Americans dying every year from a

9    second pulmonary embolism.  5 percent of those people on the

10   anticoagulation will nonetheless die from another pulmonary   03:40PM

11   embolism.  Only 59 people, according to the data of 300,000

12   with a Bard filter will even have a subsequent PE.  And

13   according to the data, only 16 with a Bard filter died because

14   of a subsequent PE.

15          I submit to you, Ladies and Gentlemen, that that        03:41PM

16   evidence is powerful as to a lifesaving benefit of the device.

17   It shows that these devices are as high as 99.99 percent

18   effective.  Even the plaintiff's own experts have admitted, and

19   you will hear testimony from them during the course of this

20   trial, that IVC filters, such as the Eclipse Filter, are       03:41PM

21   lifesaving devices.

22          Now, these filters do have risks.  And I want to be

23   frank with you and talk about those risks.  There are

24   complications.  But why do the doctors use them knowing that

25   they have these risks?  Because they are potentially lifesaving 03:41PM

1    devices.  You may say why do they have complications?  Why do

2    they fracture?  Why do they migrate in a certain number of

3    instances?  Why do they penetrate?  Why do they tilt?

4        Well, part of the reason, this is a very harsh and

5    dynamic environment in the body.  The inferior vena cava is not    03:42PM

6    just a standard -- it looks like a tree trunk in all our

7    drawings.  It's not a standard stationary tree trunk.  It is

8    moving as we move.  It is compressing.  When we cough it

9    compresses or expands.  Movement, twisting, there are just all

10   sorts of stresses being placed on the inferior vena cava and,    03:42PM

11   therefore, on any device implanted in it.  And the engineers

12   have a daunting task to try to develop this sort of device that

13   can be placed in this unfriendly environment and still remain

14   as stable as possible to perform its lifesaving function.

15       And to make these devices retrievable, they have to    03:42PM

16   weigh many competing issues.  They have to design the anchors

17   carefully.  If you make them too strong, the filter is

18   difficult to retrieve.  If you make them too weak, it's easier

19   for the filter to migrate or tilt.  With the arms and legs, if

20   you make them too thick or rigid, it's difficult to retrieve    03:43PM

21   the catheter.  It can't fit into the retrieval sheath or

22   catheter it's compressed in.  If you make them too thin or

23   flexible it's easier to retrieve but it may fracture.

24       Same thing with arms and legs span.  You have to weigh

25   the design considerations.  But if you make them too much one    03:43PM

1   way, you have a problem and if you make them too much the other

2   way, you have a problem.  And you are going to hear from the

3   engineers, from Andrzej Chanduszko, from Rob Carr and others at

4   Bard and the work they have devoted their lives to trying to

5   assess these design issues to learn about this harsh and          03:43PM

6   dynamic environment and to develop and improve year in and year

7   out these lifesaving devices.

8           Now, doctors recognize, just like Bard does, that no

9   matter how hard Bard attempts to, or any manufacturer attempts

10  to, and Bard is by no means the only manufacturer of IVC         03:44PM

11  filters, there are going to be complications with a certain

12  number of them.  Those complications include things such as

13  fracture, tilt, penetration, migration.  There is a group, the

14  leading also group of doctors that implant these filters are

15  interventional radiologists.  And their main professional         03:44PM

16  society is the Society of Interventional Radiology, actually

17  called SIR.  And they develop guidelines as early as 2001

18  regarding these filters.  And you can see the lead author

19  there, the head of the task force that came up with these

20  guidelines is Dr. Clement Grassi, who at the time was a doctor    03:45PM

21  at Harvard in Boston.  And Dr. Grassi consults with us.  And

22  he's going to come in this courtroom in a couple of weeks and

23  testify and explain to you the process that went into

24  developing these guidelines.

25          And in these -- and they have been updated several        03:45PM

1    times since Dr. Grassi's pioneering work in the original ones.

2    And these guidelines recognize, as the medical community do,

3    that there are complications with these devices, all devices,

4    not just Bard's.

5            And these guidelines show, if you will look at the        03:45PM

6    third line, that filter fracture, the complication that Ms.

7    Jones unfortunately sustained, occur in 2 to 10 percent of

8    patients.  Why the doctors keep implanting these in patients

9    when they know, and the medical community knows they can

10   fracture that often, the evidence will show, you because they   03:46PM

11   decide, day in and day out, that the life-threatening nature of

12   a pulmonary embolism is so great that the lifesaving benefit of

13   the device outweighs its risks.

14           Now, these IVC filters are not just somebody snaps

15   their fingers at Bard Peripheral in Tempe and starts selling    03:46PM

16   them.  It is a long process to get clearance from the FDA to

17   sell these.  Bard must demonstrate that a device that is

18   developing and wants to sell is substantially equivalent to an

19   earlier already cleared device.

20           Now, the FDA has a wealth of experience with inferior    03:46PM

21   vena cava filters.  Two decades ago in 1996 the FDA carefully

22   weighed the risks and benefits of all these devices, not

23   looking at Bard filters but all filters.  And the FDA

24   recognized in assessing these devices that all filters present

25   the risk of complications and recognized that many of these     03:47PM

1    complications can be potentially life threatening.  And the FDA

2    recognized the same complications that Mr. O'Connor was talking

3    about.  They recognized that filters migrate and said that

4    migration was reported in filters 6 to 53 percent of the time.

5    They recognized that filters penetrated and tilted, and they        03:47PM

6    recognized that filters fractured in as much as, according to

7    their data, 2 percent of the time.

8         But the FDA also noted that pulmonary embolism is a

9    serious clinical issue, just like the Surgeon General did more

10   recently.  And they concluded that given the potential             03:48PM

11   benefits, the risk of illness or injury presented by these

12   devices is not unreasonable.  In other words, the risks are

13   outweighed by the benefits.

14        And after that the FDA developed a guidance document.

15   It was a document made published in the Federal Register for       03:48PM

16   use and consultation by manufacturers such as Bard.  And it

17   provided the agency's recommendations of what needed to be done

18   to gain clearance of an IVC filter.  And it required, or

19   suggested, very detailed studies that it thought should be done

20   involving deployment, clot trapping ability, filter fraction,      03:48PM

21   perforation, migration, and more.

22        And that's exactly what Bard did.  Bard conducted, and

23   you will see, study after study after study, first of the

24   Recovery Filter, then of the G2 Filter, then of the Eclipse

25   Filter.  And those studies showed improvement along the way.       03:49PM

1    Here's just one example showing that the fracture resistance

2    for the G2 Filter, look how much greater, according to the

3    tests performed, the fracture resistance for the G2 Filter

4    which is depicted on the right, it's called modified RF or

5    Recovery Filter there, was than the initial Recovery Filter.          03:49PM

6    Learning from the clinical experience with the first generation

7    filter, Bard improved it and tested it and the test

8    demonstrated the improvement.

9            And there were just many examples.  If we had to go

10   through all the testing we would be here for hours.  We would        03:50PM

11   all be asleep, myself included.  But the studies included

12   migration, fracture, fatigue, simulated use, et cetera, et

13   cetera.  And that's just on the G2.  The same things were done

14   with the Recovery Filter.

15           And throughout this process, Bard communicated              03:50PM

16   extensively with the FDA.  It submitted all its test data to

17   the FDA and it answered multiple questions from the FDA.  Mr.

18   O'Connor says this is an honor program.  You will see the

19   evidence that the FDA simply did not see the application and

20   stamp it cleared.  It asked detailed questions.  It asked for       03:50PM

21   additional test results.  It asked for more tests to be

22   performed.  It required a short clinical study with Recovery

23   Filter.  It required a longer clinical study with the G2

24   Filter.

25           Ultimately, as I indicated earlier, the FDA cleared        03:51PM

1   the Recovery Filter on two occasions.  It cleared the G2 three

2   times.  It cleared the G2X, the third generation filter, and

3   then Bard set about to develop the Eclipse to electropolish the

4   filter.  And it conducted a whole new battery of tests.  It

5   tested filter arm fatigue, and that showed a 60 percent                      03:51PM

6   increase in cyclic fatigue life.  In other words, the

7   durability of the Eclipse Filter was 60 percent improved over

8   the G2 Filter which, as you saw, was way improved over the

9   Recovery Filter.

10          There was more testing.  This tested the fatigue life       03:51PM

11  of the electropolish Eclipse wire.  The Eclipse project was

12  initially called Vail, but that was same thing that ultimately

13  became Eclipse.

14          Look at the improvement over the G2, or G2X in this

15  instance.  77 percent; 101 percent; 78 percent.  Evidence, once    03:52PM

16  again, that the evolution and design changes being made by this

17  company over the years were making a good product better every

18  step of the way.

19          Even more testing, corrosion.  And you will hear the

20  engineers talk about all this testing.  Ultimately, the FDA        03:52PM

21  cleared the Eclipse Filter on January 14 of 2010.  And later

22  that same year, as the newest generation filter manufactured by

23  Bard with this long in dwell time where it could be kept in the

24  body for a long time and ultimately retrieved as it was five

25  years later in Ms. Jones' case, her doctor decided to implant      03:52PM

1    that in her.

2         The plaintiffs talk about the Simon Nitinol Filter,

3    but again, that's not an alternative to the Eclipse Filter.  It

4    is a permanent filter that never could have been removed from

5    her.  And doctors don't like permanent filters.  This is the          03:53PM

6    sales history over the years of Bard's retrievable filters

7    compared to the Simon Nitinol Filter.  The lower line is the

8    permanent filter.  You can see how much doctors prefer the

9    retrievable filters because then they have the option to remove

10   these devices.                                                        03:53PM

11        The plaintiff's evidence that you have heard and will

12   hear over the next week or two is not really concerning the

13   Eclipse Filter.  It's focused on the earlier generations.  It

14   will be presented by well-paid experts.  It will consist of a

15   few isolated documents such as those you saw today, which we          03:54PM

16   submit are taken out of context.  One example will be they

17   showed you a document that says that the occurrence of

18   migration with the G2 is unacceptable.  The evidence will show

19   that that assessment was done internally, early in the life of

20   that product after only 13 reports.                                   03:54PM

21        So we will present you evidence throughout to place

22   these individual documents in context and will cite a number of

23   medical articles.  We're going to bring to you a number of

24   epidemiologists and clinicians to talk about the medical wealth

25   of literature.  And we submit the evidence we have will be            03:54PM

1    contradicted by the whole story and the numbers.  And that

2    ultimately in determining the design of this filter, the low

3    risk will be demonstrated by the evidence of the small

4    complication rate associated with the Eclipse Filter.

5           Now, let's talk a little bit about warning, the       03:55PM

6    plaintiff's claim that we failed to warn the doctors.  But in

7    every single Eclipse Filter sold, in that package was what's

8    called an Instructions For Use, an IFU.  That IFU warns the

9    doctor specifically about the complications associated with all

10   filters, including the Eclipse.  And all these doctors are    03:55PM

11   going to tell you is that they didn't need to read the IFU to

12   know about these.  All they have to do are read the medical

13   journals that come across their desk every month.  These are

14   well known in the medical community.

15          But nonetheless, in abundance of caution, Bard warns.  03:55PM

16   It warns that movement, migration, or tilt of the filter are

17   known complications; that migration of filters to the heart or

18   lungs have been reported.  There have been reports of caudal

19   migration, or downward migration of the filter.  The IFU warns

20   specifically about what occurred with Ms. Jones, that filter   03:56PM

21   fractures are a known complication.  There have been some

22   reports of serious pulmonary or cardiac complications with vena

23   cava filters requiring the retrieval of the fragment.  And Bard

24   warned about perforation or other acute damage.

25          So all the complaints the plaintiffs have are          03:56PM

—5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1—

1   concluded and warned about in the IFU:  Migration, fracture,

2   tilt, perforation.  And Bard didn't leave anything to chance.

3   The IFU specifically reminded doctors what they already know,

4   that unfortunately, in a very small number of patients, these

5   complications can be serious.                                    03:57PM

6           Bard told the doctors that all of the above

7   complications may be associated with serious adverse events

8   such as medical intervention and/or death.  And they also,

9   because of that, because that risk of complication is there

10  with all filters, Bard warned doctors that they need to         03:57PM

11  consider the risk/benefit ratio of any of these complications

12  and weigh that against the inherent risk/benefit ratio for a

13  patient who is at risk of pulmonary embolism, in other words,

14  encouraging every doctor, just like Ms. Jones' doctors, to make

15  that risk/benefit calculation.                                  03:57PM

16          Bard also reminded doctors that the SIR, the Society

17  of Interventional Radiologists, recommended these patients be

18  monitored on an ongoing basis to see if the filters need to be

19  retrieved.  But Bard didn't just do the IFU, even though that

20  IFU was in every single package that went out to a doctor with  03:58PM

21  one of these devices.  The evidence will show that Bard also

22  developed a patient brochure and gave this patient brochure to

23  doctors and gave them the option, if they thought it

24  appropriate for their patient, to provide that brochure to the

25  patient.                                                        03:58PM

1    Bard is a medical device manufacturer.  It does not

2    practice machine.  Our doctors practice medicine.  And the

3    evidence will demonstrate that in this country the doctors make

4    the decision on what to give patients and what to do and Bard

5    does not do that, nor does or can any medical device          03:58PM

6    manufacturer.  But Bard gave this resource to doctors who

7    wanted to use it.  And in that brochure, Bard specifically

8    noted, look at the bullet point:  The entire filter or pieces

9    of the filter may break loose and travel to the heart and lungs

10   causing injury or death.  You may need to have additional      03:59PM

11   surgery to retrieve the filter or pieces if they break loose.

12         Again, Bard's not hiding anything.  But the plaintiffs

13   will claim that somehow there's evidence, despite the numbers,

14   that Bard's filters fracture or perforate or migrate more than

15   others and said we should have put in the IFU data concerning  03:59PM

16   these rates.

17         Oh.  I'm sorry.  Before I talk about the rates, I

18   meant to mention that Bard submitted this patient brochure to

19   the FDA for its review and clearance.  In a separate letter,

20   the FDA came -- here's the submission.  It says:  The primary  03:59PM

21   modification from the original Eclipse, the predicate device,

22   is the addition of a patient brochure and implant card to the

23   labeler.

24         The FDA cleared the submission of the patient

25   brochure, but the plaintiffs say you should have put complaint  04:00PM

1    data, complication data, rates.  The only data we have

2    concerning other manufacturers' products comes from the FDA

3    database called MAUDE.  It's an acronym for Manufacturers and

4    Users Data.  It's something where people, doctors, have the

5    right to voluntarily report any complications with devices.          04:00PM

6    Manufacturers, when we learn about them, we are required to.

7    But doctors are advised to, and it's voluntary whether they do.

8         But Bard -- I mean, the FDA makes it clear that this

9    data is not intended to be used either to evaluate rates of

10   adverse events or to compare adverse event occurrence rates          04:01PM

11   across devices.  So the evidence will demonstrate that the FDA

12   tells us we cannot do exactly what the plaintiffs claim we

13   should do.

14        As I mentioned earlier, the plaintiffs also will need

15   to show causation.  The principal complaint that Ms. Jones           04:01PM

16   attributes to the filter is fatigue.  And as I indicated to

17   you, her medical records will demonstrate that she was

18   complaining of fatigue and she was diagnosed with anemia

19   related to her long history of gastric bleeding prior to ever

20   receiving the filter.  No treating doctor will say that she has      04:01PM

21   any symptoms or has ever had any symptoms associated with the

22   filter.  So we submit that the evidence will not demonstrate

23   that any alleged defect caused an injury here.

24        Well, you will say, she has this retained strut.  You

25   are going to hear experts talking about the medical literature       04:02PM

1    with regard to retained struts like struts in the pulmonary

2    artery like Ms. Jones has.

3            This is an important study from the University of

4    Pennsylvania looking at 65 patients with fractured filters.

5    And these aren't all Bard filters, they are all different          04:02PM

6    manufacturers' filters, and concluded that these fragments

7    present little risk of complications or symptoms.  Another

8    study indicates that there's no reports in medical literature

9    of clinically significant consequences, and that fractured

10   struts in the pulmonary artery are thought to be asymptomatic     04:03PM

11   causing no symptoms and usually clinically insignificant.

12           And there will be absolutely no evidence that anything

13   to do with the warnings provided by Bard had any causal

14   relationship with the choices her doctors made to put in this

15   filter.  And then lastly, it will be her burden to show          04:03PM

16   damages.

17           Ladies and Gentlemen, as you hear the evidence and

18   what will be a long, I know, three weeks, and we do appreciate

19   your time and dedication to helping us resolve this dispute, we

20   would ask that you keep an open mind, that every step of the     04:03PM

21   way you wait to hear the whole story.  Because the plaintiffs

22   have the burden of proof, they will always go first.  They will

23   present their opening statement before I do.  They will put on

24   their witnesses before I do.  They will give their closing

25   argument before I can.  And we ask that you keep an open mind    04:04PM

—5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1—

1    throughout the whole process and hear every step of the way to

2    hear the whole story.

3           Again, Ladies and Gentlemen, the evidence at issue in

4    this case that the evidence will focus on is not whether we

5    have sympathy for Ms. Jones.  Because we're all people.  We do.    04:04PM

6    Nobody wants anybody to have a medical problem or a

7    complication.  But the evidence will focus on the risk/benefit

8    and whether this lifesaving device, its potential to save her

9    life after two reports of DVT and a need for surgery because of

10   gastric bleeding, whether that benefit outweighed the very        04:05PM

11   small risk of a complication.

12          We submit to you that when you hear all the evidence,

13   that evidence will demonstrate that, indeed, those benefits

14   outweighed the risks.  And then Ladies and Gentlemen, at the

15   conclusion of the entire trial, after you have heard both        04:05PM

16   sides, and after you have heard the whole story, we will come

17   back here in closing argument and ask you, as sympathetic

18   jurors, but impartial jurors, to render a verdict in favor of

19   my clients, C.R. Bard and Bard Peripheral Vascular.

20          Thank you very much for your time and attention.         04:05PM

21          THE COURT:  All right.  Thank you, Mr. North.

22          Ladies and Gentlemen, as we indicated we're going to

23   go until 4:30.  We're going to try to push through to 4:30

24   every day just to make sure we finish this trial within the

25   amount of time that we have told you we would.                   04:06PM

─────5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1─────

1          So the next step is for the plaintiff to begin

2     presenting evidence.

3          MR. O'CONNOR:  We need to approach for a moment, Your

4     Honor.

5          THE COURT:  Go ahead and stand up.  I will talk to the    04:06PM

6     lawyers just a moment.

7          (Discussion was had at sidebar out of the hearing of

8     the jury:)

9          MR. LOPEZ:  Well, I told you I'd be listening.

10         THE COURT:  Let me interrupt you.  Is this something    04:06PM

11    about the opening?

12         MR. O'CONNOR:  Yes.

13         THE COURT:  Let's not do it now.

14         MR. LOPEZ:  If it affects a document we have to

15    redact, go back and unredact.    04:06PM

16         THE COURT:  Are you going to be showing a document in

17    the next 20 minutes that's been redacted?

18         MR. LOPEZ:  I really don't know, Judge.

19         THE COURT:  If we don't know seems to me we shouldn't

20    take time now from the jury.    04:06PM

21         MR. LOPEZ:  I agree.  I'd like to get started.  If

22    this happens that we can show, actually show it unredacted, we

23    can deal with it later.

24         THE COURT:  Let's deal with that after the jury is

25    excused.    04:07PM

1              (In open court.)

2              THE COURT:  So plaintiff's counsel, you are going to

3      show a deposition, is that right?

4              MR. O'CONNOR:  That's correct.

5              THE COURT:  Ladies and Gentlemen, let me give you one      04:07PM

6      more instruction about what you are about to see.

7              You are going to see a videotape deposition for the

8      next 22 minutes before we break.  A deposition is the sworn

9      testimony of a witness taken before a trial.  The witness is

10     placed under oath to tell the truth, and lawyers for each party   04:07PM

11     may ask questions.  The questions and answers are recorded both

12     by a court reporter and on videotape.  And what you will be

13     seeing is the videotape.  And when a person is unavailable to

14     testify during the trial then the deposition can be used during

15     the trial.                                                        04:08PM

16             So you will see the deposition of a number of

17     witnesses.  Before we start them, typically, and I assume this

18     is what you are going to do, Mr. Clark, will be a brief set of

19     introductory facts shared with you that the parties have agreed

20     on to tell you who the witness is.  And to the best of your       04:08PM

21     ability, you should consider deposition testimony presented in

22     court in lieu of live testimony in the same way as if the

23     witness had been presented to testify.  It's essentially the

24     same evidence, even though you have to watch it by videotape.

25             I will also say that it's likely true during the         04:08PM

1  course of this trial that you are going to see more videotape

2  testimony than you would like.  I can assure you the parties

3  have tried to pare that down to a minimum, but there are some

4  witnesses who just can't come to Arizona for this trial and

5  it's necessary to show their testimony via videotape.          04:08PM

6          Mr. Clark.

7          MR. CLARK:  Your Honor, at this point the plaintiffs

8  would like to move for admission of the following exhibits and

9  then after that, provide a brief background summary.

10          The exhibits --                                       04:09PM

11          THE COURT:  Excuse me, Mr. Clark.  Do these need to

12  come in before the deposition?

13          MR. CLARK:  They do, Your Honor.

14          And for convenience could I approach the lectern?

15          THE COURT:  Yeah.  Absolutely.                        04:09PM

16          MR. CLARK:  The exhibits are Trial Exhibit 1948 which

17  corresponds to Deposition Exhibit 2; 1950, which is deposition

18  Exhibit 2; 1951 --

19          THE COURT:  You said 1948 was Exhibit 2.

20          MR. CLARK:  I apologize.  I misspoke.  1950 is        04:09PM

21  Deposition Exhibit 4.

22          THE COURT:  All right.

23          MR. CLARK:  1951, which is deposition Exhibit 5; 2244,

24  which is Deposition Exhibit 7; 1940, which is Deposition

25  Exhibit 11; 1941, which is Deposition Exhibit 12; 1944, which  04:10PM

—5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1—

 1    is Deposition Exhibit 15; 1946.

 2              THE COURT:  Hold on just a minute.  1944 was 15?

 3              MR. CLARK:  Correct.

 4              THE COURT:  All right.

 5              MR. CLARK:  1946, which is 17; 1947, which is 19; 735,    04:10PM

 6    which is 20; 1949, which is 21.

 7              THE COURT:  You have already said 1941.  What was the

 8    last one you listed?

 9              MR. CLARK:  49, Your Honor.

10              THE COURT:  1949.  And that is --                        04:10PM

11              MR. CLARK:  21.

12              THE COURT:  Okay.  Is there any objection to the

13    admission of those exhibits?

14              MS. HELM:  Your Honor, no objection with the caveat

15    that 2244, 1940, 1941, and 1944 are subject to the Court's        04:10PM

16    prior order and the parties have addressed those.

17              THE COURT:  Okay.  That's fine.  I will admit all of

18    those exhibits in evidence.  And you can play -- well, why

19    don't you give us the summary and then we'll play the

20    deposition.                                                       04:11PM

21              MR. CLARK:  Gin Schultz received her Bachelor's degree

22    in chemical engineering from the University of Missouri in 1981

23    and received a Master's degree in business administration in

24    2003.  She joined Bard Peripheral Vascular or BPV in October of

25    2005 as vice president of quality assurance.  In this role she    04:11PM

——5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1——

1   was responsible for overseeing the quality systems, ensuring

2   BPV was complying with regulations, and hiring and managing the

3   quality assurance staff.

4          In 2011 Ms. Schultz transferred to C.R. Bard to be the

5   vice president of quality operations, a role from which she        04:11PM

6   just recently retired.  Prior to working at BPV she had a

7   15-year career at Johnson & Johnson in its medical device

8   subsidiaries where she held various positions, including

9   manager of quality and compliance services.

10          (Video deposition of witness Gin Schultz played in         04:12PM

11  open court.)

12          THE COURT:  Counsel, let's stop the depo there,

13  please.

14          All right.  Ladies and Gentlemen, we have reached

15  4:30.  We'll break for the day.  Just leave your notes on your     04:29PM

16  chair.  We will be here and ready to start right at 9:00

17  tomorrow, so please factor that in in your commute down.  Take

18  into account traffic as well.  Hopefully you will all be here

19  at 9 and we can get in and get started and stay on time.

20          And please remember again what I have already said         04:30PM

21  several times not to do any research or look into any facts

22  related to the case.

23          Counsel, anything else we need to address before we

24  excuse the jury?

25          MR. O'CONNOR:  Nothing with the jury, Your Honor.         04:30PM

──5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1──

1          MR. NORTH:  Nothing, Your Honor.

2          THE COURT:  Okay.  We'll see you tomorrow morning at

3    9.  Thank you very much.

4          (Jury out at 4:30 p.m.)

5          THE COURT:  All right.  Go ahead and be seated,                04:30PM

6    counsel.

7          For your information, as of the end of today plaintiff

8    has used one hour and 25 -- I'm sorry -- one hour and 29

9    minutes.  Defendants have used one hour and four minutes.

10          Mr. Lopez, you wanted to raise an issue at sidebar and     04:31PM

11    we decided to address that after we let the jury go.

12          MR. LOPEZ:  Yes, Your Honor.

13          As I advised the Court, I would be listening intently

14    with respect to any matter that came up before the jury that

15    might make fatalities as a result of cephalad migrations          04:31PM

16    relevant in the case.  I will say this, Mr. North made a big

17    deal more than once that -- and this was not restricted to the

18    Eclipse Filter.  This was all Bard filters.  Only 16 deaths out

19    of, I forget.  I didn't write down the number.  It was some

20    number over 300,000 units sold, they were all Bard filters.     04:31PM

21    That the fatality rate for all Bard filters was .0098.  And

22    then he said when he was going through the IFU, as if they were

23    doing something they didn't even need to do, we even reported

24    death in the IFU.

25          And for that to come in front of the jury without an        04:32PM

1    explanation as to why maybe death was there -- and one of the

2    things, Your Honor, is this -- I assume that was an Eclipse

3    IFU.

4            MR. NORTH:   Uh-huh.

5            MR. LOPEZ:   There were no deaths as a result of the          04:32PM

6    Eclipse Filter, as far as I know.  I think that's one of the

7    arguments that they made.

8            And that is fairly strong proof that these IFUs, these

9    warnings, they start from the first product in a family of

10   products.  That would have been the Recovery Filter.  And if       04:32PM

11   you come out with another generation, G2, and just because

12   there's not been a report for G2, and if you have had 19 deaths

13   with the Recovery Filter, that's in the label.  That's our

14   position.  That should have been in the label.  They didn't

15   differentiate that they made that label as if that was -- it's    04:33PM

16   what we call a class warning.  That should not have been a

17   class warning.

18           So three times during his opening statement he talked

19   about only 16 deaths, only .0098 fatality rate, and we even

20   reported death.  And I think that opens the door, Your Honor.      04:33PM

21   We now have to be able to explain to the jury, show the jury,

22   that they shouldn't be proud of the low number of deaths that

23   have been reported with all Bard filters, nor should they be

24   proud that they included death in their IFU warning, that

25   there's a really good reason why death is in there.  And          04:33PM

1    there's another explanation, or I'm sorry, there are other

2    reasons why there are fatalities related to Bard filters.  And

3    that's the cephalad migrations to the heart.

4         THE COURT:  So what are you requesting, Mr. Lopez?

5         MR. LOPEZ:  I'm requesting that we now have an          04:34PM

6    opportunity to put in front of the jury that there have been

7    deaths caused by a design of a predecessor device to the

8    Eclipse and that the fatality rate for at least that filter

9    maybe that increases the fatality rate by double or triple.

10   Now instead of them being able to brag about there's only been    04:34PM

11   16 deaths from PE reported with all Bard filters, the number is

12   now 35.

13        So, I mean, that's what's fair.  That's what the jury

14   should know.  They have been misled in opening statement about

15   the safety of all Bard filters as relates to death three times.  04:34PM

16        THE COURT:  Mr. North.

17        MR. NORTH:  Two things, Your Honor:  First of all, the

18   slides that Mr. Lopez is talking about are the same slides we

19   talked about at the beginning when they made their objections.

20   Those were not focused on complication rates.  Those were          04:35PM

21   focused on efficacy.  The slide specifically talked about the

22   number of patients that die from recurrent pulmonary embolism

23   than those who die from recurrent pulmonary embolism while on

24   anticoagulation and then the number of reports of people who

25   died from recurrent pulmonary embolism with Bard filters.  It     04:35PM

─5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1─

1  was talking about the efficacy and the lifesaving potential of

2  the filters and not the complication rate.

3          Secondly, with regard to --

4          THE COURT:  Hold on just a minute.

5          Is it Slide 46 that you are referring to?          04:35PM

6          MR. NORTH:  I believe that's correct, Your Honor.

7  Mine are misnumbered.  I'm having a hard time with the numbers.

8          THE COURT:  On Slide 46 it says only 16, then paren,

9  .0098 percent, close paren, with a Bard filter die because of a

10 subsequent PE.          04:36PM

11         MR. NORTH:  Right, Your Honor, which was the point I

12 was making.  We were comparing that to the number of people

13 that had subsequent PEs that have reports with Bard filters and

14 the previous slide talked about the number of people

15 anticoagulated who died from the subsequent PE.  And then the          04:37PM

16 first chart showed how many people total died of a subsequent

17 PE talking about efficacy again.

18         THE COURT:  So the 16 deaths are people who died from

19 a pulmonary embolism after receiving a Bard filter?

20         MR. NORTH:  Yes, Your Honor.  And I'm sure some of          04:37PM

21 those are wrapped up in the ones he's talking about the

22 migration.  But the focus was on whether the filter was

23 working, the efficacy, not what the complication rate was.

24         THE COURT:  All right.  Did you have -- I interrupted

25 you.  Did you have other --          04:37PM

─5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1─

1      MR. NORTH:  Yes, Your Honor.  I also wanted to talk

2  about the Eclipse IFU.  I think that that statement in there is

3  entirely consistent with the Court's ruling which has told the

4  plaintiffs repeatedly that they can present evidence that these

5  complications have the potential for death.  They just can't          04:37PM

6  talk about the Recovery Filter cephalad migration-specific

7  incidents.  That's what the Eclipse IFU did.  It said these

8  complications have the potential to cause death, which is

9  exactly what the Court has said they can be put in.  I just put

10  that evidence in to say we warned about that.          04:38PM

11      THE COURT:  All right.  Anything else?

12      MR. NORTH:  Nothing else.

13      THE COURT:  Mr. Lopez, did you have other thoughts?

14      MR. LOPEZ:  Yes, Your Honor.  Now, as you know, the

15  majority of the cephalad migrations had a clot that were of the          04:38PM

16  quality of a clot that would cause a PE.  And those are not,

17  despite what Mr. North just stated, called PE deaths when it's

18  reported because it never gets to the lung.  So now we've got

19  19 more deaths caused by, I don't know whether all of them.  I

20  don't want to misrepresent to the Court.  I will just say the          04:38PM

21  majority of those 19.  I think there have been more since.  I'm

22  talking about before it was taken off the market.  I think the

23  number is 27 now.

24      But in the overwhelming majority of those, there are,

25  let's say, 19 or 20 where it was -- there was a clot that never          04:39PM

5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1

1    made it to the lung, and therefore, there is actually double

2    the number, maybe triple the number of deaths that he just told

3    the jury were caused by a PE with any Bard filter.  You know

4    why?  Because of the device and the clot, they were too big to

5    pass through the heart and go to the lungs and cause a PE.                04:39PM

6              And again, Your Honor, this is a regulatory case.  The

7    FDA is here in all its glory, and we have a right to put on

8    evidence that the labeling in the Recovery Filter is inadequate

9    and misleading and false from the standpoint of the way they

10   mention death.                                                           04:39PM

11             THE COURT:  In the Recovery Filter?

12             MR. LOPEZ:  In the Recovery.  Because, Your Honor,

13   regulatory -- same thing with drugs, but especially for devices

14   that are not only in the same class, but this is the same

15   family.  If you look at the warnings they carry themselves           04:40PM

16   through.  The FDA doesn't get involved in warnings on a 510(k)

17   device.  These are their warnings.

18             THE COURT:  Mr. Lopez, what I'm not understanding is

19   why an inadequacy in the Recovery Filter warning is relevant to

20   your failure to warn claim about the Eclipse Filter.                 04:40PM

21             MR. LOPEZ:  Because it should have been in the Eclipse

22   IFU, because it is in the same family of devices.  They should

23   have had in that warning that these devices, this family of

24   conical devices, has had a certain number of deaths, not just

25   death as a death, I mean, that could be from anything.  The          04:40PM

1  fact that they had a death caused by a bad design of their

2  product, they had a fix that didn't stay where they put it and

3  it was caused to dislodge under the circumstances for which it

4  was intended, to actually save a person's life actually

5  resulted in death.  That gets carried through to device after

6  device after device.

7         THE COURT:  Let me make sure I understand your point.

8  I think what you are saying is, and correct me if I'm wrong,

9  you want to argue to this jury that the Eclipse Filter warning

10  was defective, was inadequate because it didn't describe deaths

11  that had occurred with the Recovery Filter by a method of

12  migration that had been eliminated after the Recovery Filter

13  was taken off the market.

14         MR. LOPEZ:  Well, okay.  I think -- I'm not sure I

15  would word the warning that way.

16         THE COURT:  I know you wouldn't word it that way, but

17  isn't that the point?  Aren't you saying they should have told

18  Eclipse Filter doctors that there were deaths caused by an

19  earlier generation of filter by a method of migration that no

20  longer happens with Eclipse Filters?

21         MR. LOPEZ:  But we don't know that, though, Judge.

22  That's the point.

23         THE COURT:  That's what I have asked for is evidence

24  of cephalad migration deaths with Eclipse Filters, and we have

25  been over this ground a lot but there hasn't been any evidence

04:41PM
04:41PM
04:41PM
04:42PM
04:42PM

1    of that.

2         MR. LOPEZ:  But there may never -- there could be 20

3    of them that have happened in the last five years and we may

4    not know about it.  There's no tracking, there's no survey,

5    there's no monitoring of these people.  They haven't paid for a      04:42PM

6    surveyor to do a registry, we don't know.  But what we do know

7    is that the Eclipse Filter was borne out of the design of the

8    Recovery Filter.  And it suggests that the Eclipse kind of

9    stands on its own.  Mr. Carr himself says that the Eclipse is

10   the G2 Filter that we electropolished.                               04:42PM

11        THE COURT:  I understand all those points because we

12   have talked about that a lot.  Just to make sure, what you are

13   saying is based on the opening statement I should allow you to

14   put in evidence of Recovery Filter cephalad migration deaths.

15        MR. LOPEZ:  Yes.  In other words, there's three              04:43PM

16   reasons.  Number one is they bragged about the fact that, in

17   his words, we even put in death, in other words, suggesting to

18   the jury that our filters have never had a history of having

19   put in death but we still put it in the label.  The truth is

20   that label should have details in it about all of the              04:43PM

21   predecessor devices in that family.  That's our position.  And

22   if you see the history of what they have done with their IFU or

23   the warnings or precautions, even though every device is

24   different, whether one has more perforations, one has more

25   fractures, less fractures, more deaths, migrations, caudal,        04:43PM

1    it's the same warning because it all started with the Recovery

2    Filter being an inadequate warning.

3            THE COURT:  What are your second and third points?

4            MR. LOPEZ:  Second and third points are that he said

5    all Bard filters, there have only been 16 deaths by pulmonary      04:44PM

6    embolism and that the rate is .0998 fatality and all Bard

7    filters have been effective in 99. something, I forget what the

8    number was, in all other places where it's been implanted.

9            That is a false and misleading statement to the jury.

10   That is a 403 statement that we have right now to explain that    04:44PM

11   it was, that, no there have been more than 16 deaths from PE,

12   or there have been maybe 16 PE deaths but there have been

13   another 19 that didn't count because the clot never got to the

14   lung because it stopped in the heart with the device wrapped

15   around the clot.                                                  04:44PM

16           THE COURT:  What is your third point?

17           MR. LOPEZ:  Deals with the same thing as the fatality

18   rate.

19           THE COURT:  Okay.

20           MR. LOPEZ:  Again, I know we have made this argument       04:45PM

21   before, Judge.  But again, this is a lifesaving device.  I mean

22   he's talking about filters in general.  He didn't say the

23   Eclipse was a lifesaving device because there's no evidence of

24   that.  We know that.  But he says that Bard -- that filters are

25   lifesaving devices.  And as soon as you say that, I think it      04:45PM

1    opens to door once again to the fact that, no, the only

2    evidence that exists for Bard filters, the only evidence,

3    despite how many times they say this, is that it actually

4    caused death.  They know that.  Their own witnesses say that.

5          THE COURT:  I understand that point.  Let me ask you          04:45PM

6    two other questions, Mr. Lopez:  Have you disclosed in this

7    case an expert who will say that the Eclipse Filter IFU should

8    have disclosed Recovery Filter cephalad migration deaths?

9          MR. LOPEZ:  No.  I doubt it.  I'm saying no but I

10   can -- I haven't read Dr. Parisian's 800-page report.          04:46PM

11         THE COURT:  You are not aware of any?

12         MR. LOPEZ:  No.  But we can still argue that, Judge.

13         THE COURT:  Are you aware of any legal standard FDA

14   guidance or regulation that says, in effect, that Eclipse

15   Filter warning should disclose deaths from an earlier version          04:46PM

16   by a different methodology that hasn't been shown to occur?

17         MR. LOPEZ:  The best I have, Judge, is what was ever

18   in the Recovery Filter, despite the differences that existed

19   after that, are in the Eclipse Filter.

20         THE COURT:  Well --          04:46PM

21         MR. LOPEZ:  Warning.

22         THE COURT:  When you say the best you have --

23         MR. LOPEZ:  In other words, I think that's pretty good

24   circumstantial evidence that whatever warning the first in line

25   has irrespective of the performance of the subsequent devices,          04:47PM

1    the G2, the G2X, the Eclipse, I haven't looked at the Meridian.

2    Maybe that's changed.  It's the same warning.

3         So we certainly have put on evidence that the Recovery

4    Filter should have said something much different.  And if you

5    follow the same pattern of having to carry through the same              04:47PM

6    warning that you have in the -- in, you know, the -- I don't

7    know what to call it, the mother device or the original device

8    or the device out of which all these other devices were borne,

9    then yes.  They wouldn't all of a sudden take that out in

10   subsequent warnings because they don't -- Your Honor, the                04:47PM

11   Eclipse warning does not say the Eclipse Filter.  It talks

12   about filters.  That's the problem we have with it, is that

13   it's a class --

14         THE COURT:  I missed your last sentence.

15         MR. LOPEZ:  It's a class warning.  In other words,                 04:48PM

16   this is another situation where it's all filters, all filters,

17   all filters.  I know what you Your Honor has said, is this is

18   about the Eclipse.  Well, that warning is not about the Eclipse

19   Filter.  It goes back and it covers the history of warnings of

20   events that happen in all filters.  And that's one of the                04:48PM

21   problems with the way they argue this case.  They never talk

22   about Bard filters.  They talk about IVC filters, all filters.

23         I think the most troubling thing is we even report

24   death and the low fatality rate and the low PE rate has now

25   misled this jury about the reality of all filters.                      04:48PM

———5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1———

1        THE COURT:  I understand.

2        Mr. North, what evidence are we going to put before

3   the jury that will state what your chart showed at 16 deaths at

4   a .0098 rate, what witness is going to say that?

5        MR. NORTH:  Your Honor, I believe it is Mr. Modra or          04:49PM

6   Mr. Carr.  I'm going to have to go back and check.  But we did

7   go through that to make sure there was somebody to support that

8   last time.  I do believe it's Mr. Modra and it's based upon the

9   complaint data, the same that gives us the fracture rate and

10  this and that.                                                     04:49PM

11       THE COURT:  Do you agree that if Mr. Modra or Mr. Carr

12  testifies to those facts to the jury plaintiff's counsel can

13  cross-examine them as to what deaths they counted, where they

14  got the deaths, whether they took all deaths into effect or

15  into account?                                                      04:49PM

16       MR. NORTH:  Yes, Your Honor.  I mean, I think that's

17  fair.

18       THE COURT:  Do you think they can ask does this count

19  cephalad migration deaths from the Recovery Filter?

20       MR. NORTH:  I don't know that they would have to do           04:49PM

21  that to make the same point.  I think they could ask for all

22  reported deaths.

23       THE COURT:  Would there be anything improper in that

24  cross-examination in your view, since you are putting out that

25  death number?                                                     04:50PM

1      MR. NORTH:  Your Honor, I don't think there would be

2  anything improper of the cross-examination of the fact of that

3  as far as the statistics to challenge whether the statistic is

4  accurate.  But I don't think that opens the door to go into all

5  of the detailed evidence that we heard about at the last trial.  04:50PM

6      THE COURT:  Okay.  I understand the parties'

7  positions.  I want to think about this issue a bit more.

8      Mr. Combs, there was an exhibit that we needed to

9  address?

10     MR. COMBS:  Yes, Your Honor.  I think it's 1035.  I  04:50PM

11 think I have a copy, Your Honor, if you want to look at it.

12     THE COURT:  If I need to rule.

13     MR. COMBS:  May I approach?

14     THE COURT:  Yeah.

15     MR. COMBS:  And, Your Honor, as we discussed earlier  04:51PM

16 we're just looking to move this into evidence over 401, 402,

17 and 403 objections.  Those are the only objections Bard has

18 offered to us.  If they've got more then I haven't heard them

19 yet.

20     THE COURT:  Ms. Helm, are these relevancy and 403  04:51PM

21 objections?

22     MS. HELM:  Your Honor, this document that they are

23 tendering, they are seeking to admit it through the deposition

24 of Mr. Greer.  At least that's what was communicated to me.

25 This is not an exhibit to Mr. Greer's deposition.  04:51PM

5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1

1          THE COURT:  Well, but the question is, they could move

2     it independent of that deposition into evidence.  The question

3     is, what is the objection you are making?  Is it anything

4     besides relevancy and 403?

5          MS. HELM:  Your Honor, I'm not sure.  The copy of the          04:52PM

6     exhibit that I have has handwriting on it.  And so I can't

7     stipulate that this is a regularly-kept business record because

8     I don't know how the handwriting got on page that has 5646 in

9     the Bates number.

10          THE COURT:  If that handwriting was removed is it only          04:52PM

11     a relevancy and 403 objection?

12          MS. HELM:  Yes, Your Honor.

13          THE COURT:  Mr. Combs, go ahead on relevancy and 403.

14          MR. COMBS:  We have talked a lot about cephalad

15     migration and how that's different and distinct.  This is a          04:52PM

16     fracture document.  And it goes to several issues dealing with

17     fractures.  And this is a fracture case.  And it goes to show

18     that they never fixed the problems of fractures going all the

19     way back to 2004 that they are well aware despite design

20     changes between the Recovery and G2.  And it goes to damages as          04:52PM

21     well.  Just finding my highlighting, Your Honor.

22          On the second page, migration of metal fragments to

23     the heart or lung presents the possibility of cardiac or

24     pulmonary injury with serious clinical consequences.

25          THE COURT:  Where are you reading?          04:53PM

1          MR. COMBS:  Second to the bottom paragraph under,

2     "Likelihood of harm if the problem occurs."

3          THE COURT:  Okay.  I see that.

4          MR. COMBS:  So I think a different iteration of this

5     we even showed in opening that had similar language.  But          04:53PM

6     it's -- there's no way it could be -- the unfair prejudice

7     could substantially outweigh its relevance.  It's directly

8     relevant to a number of issues in the case.

9          THE COURT:  Okay.

10          MS. HELM:  Your Honor, there may have been some          04:53PM

11     confusion.  It was communicated to me that they wanted to

12     tender this with Mr. Greer's deposition and publish it with his

13     deposition.  I don't think it can be published with Mr. Greer's

14     deposition because it's not discussed in that deposition.

15          I also, again, raise this issue of the handwritten          04:54PM

16     notes on it.  So subject to those two issues, we don't have an

17     objection to it being admitted as long as the handwriting is

18     redacted and it's not published during Mr. Greer or any

19     deposition where it's not discussed.

20          THE COURT:  So you agree then Mr. Combs or plaintiff's          04:54PM

21     counsel can move it into evidence outside of a deposition?

22          MS. HELM:  Yes, Your Honor.

23          THE COURT:  Provided the handwriting is redacted?

24          MS. HELM:  Yes, Your Honor, and that it not be

25     published with any deposition in which it was not discussed.          04:54PM

—5-15-18-MD-15-02641-PHX-DGC-Jones-Jury Trial-Day 1—

1          THE COURT:  Does that solve the problem, Mr. Combs?

2          MR. COMBS:  Yes, Your Honor.

3          THE COURT:  Anything else we need to talk about before

4    we break?

5          MR. NORTH:  One thing quickly, Your Honor.  We have --          04:54PM

6    our service has been doing some research about the television

7    advertising today.  They still have not tracked down who

8    actually did the one that we heard, but they have as part of

9    their investigation determined that several dozen, it appears,

10   ads have been aired or sponsored locally in the last three          04:54PM

11   weeks by a Scottsdale firm by the name of The Goldwater Firm.

12   They have filed cases in this MDL.  They filed at least one or

13   more cases in conjunction with a firm called the Capretz firm

14   where the principal is Don Ledgard who is a former colleague of

15   the Lopez firm.  I'm not saying Mr. Lopez knows anything about          04:55PM

16   this.

17          THE COURT:  Hold on.

18          MR. NORTH:  I'm not saying he knew anything about

19   this.  What I am saying is they have a way to get in touch with

20   these people, to contact them to try to at least tap down this          04:55PM

21   advertising during trial.

22          MR. LOPEZ:  Let me -- first of all, I know Mr. Capretz

23   because his office is in Orange County.  Mr. Ledgard was a law

24   clerk for me 20 years ago.  I haven't spoken to him.

25          THE COURT:  There's no connection.          04:55PM

1        MR. LOPEZ:  It feels icky, Judge, when I hear stuff

2   like that.

3        THE COURT:  It's okay.  Take a deep breath.  This

4   isn't going to affect me at all.  What I'd like to do, because

5   I think it creates risk in the trial, is see if we can get them    04:55PM

6   not to run those ads while we have a jury in trial.

7        MR. LOPEZ:  That's what I was going to tell you.  I

8   can tell you this.  I can't speak for everybody, but Goldwater

9   Firm has not been on one POC call.  They are not involved in

10  this thing.  Mr. Capretz and Mr. Ledgard are not.                  04:56PM

11       THE COURT:  So they are not involved in any part of

12  the plaintiff's group.

13       MR. LOPEZ:  Nothing.  I don't want to turn it round

14  that I gave them advice or they called me one time on a Bard

15  filter case.                                                       04:56PM

16       THE COURT:  I'm not asking it because I think you

17  somehow are all behind it.  But if they had any involvement in

18  the plaintiff's group then I think I would have some leverage

19  to say let's not do the advertisements during trial.  If they

20  don't, I can't order them to stop their advertisements.            04:56PM

21  Supreme Court has said commercial speech is protected speech.

22  I can't enter an order saying stop your ads during trial.

23       So seems to me if there isn't some involvement in the

24  group that's trying the case there's no basis for me to tell

25  them to stop.  Do you see that differently, Mr. North?             04:57PM

1      MR. NORTH:  I would like to do some further research

2   as to how many cases in our database they are listed as having.

3   Right now I just have one complaint.  I think if they have a

4   significant number of complaints that the calculus could be

5   different.                                                          04:57PM

6      THE COURT:  I will leave it to you to raise the issue

7   again.  But based on what I have heard I'm not going to do

8   anything at this point.

9      MR. LOPEZ:  I offered earlier, I will work with Mr.

10   North on trying to find out.  I haven't had a chance to send    04:57PM

11   this out to our POC yet because we have been involved all day

12   with this trial.  But I'm happy to hear it's not only someone

13   who is not associated with our POC but I can tell you they have

14   not participated in any aspect of it from day one.

15      THE COURT:  All right.  Let me know if there's more      04:57PM

16   you think we should do.  We'll plan to see you tomorrow morning

17   at 8:30.

18      By the way, counsel.  Sorry, Laurie.  We started out

19   today with the same practice we had in the Booker trial with

20   not having the court reporter trying to transcribe the          04:58PM

21   videotape testimony.  I say that again because it's up to you

22   to get on the record in the form of something you put into the

23   docket exactly what portions of the depositions have been

24   played so there's a clear record of what was presented to the

25   jury.                                                           04:58PM

1       MR. LOPEZ:  So you need an actual written run -- we

2  have been calling them runs -- that become part of the official

3  record.

4       THE COURT:  If we don't do that there's no record of

5  what questions and answers were presented.  So it seems to me          04:58PM

6  it's incumbent on you to agree the following pages and lines of

7  all of these depositions were played during Jones so there's a

8  record for purposes of appeal of exactly what was presented to

9  the jury.

10      MR. LOPEZ:  Whatever we did, if we did it to the             04:58PM

11  Court's satisfaction in Booker we'll do it the same way here.

12      THE COURT:  I haven't seen what you did in Booker.

13  I'm putting the burden on you to do that just because it's very

14  difficult for a court reporter to transcribe the back and forth

15  going on in a videotape.                                          04:59PM

16      MR. O'CONNOR:  We will handle that.

17      MS. SMITH:  In Booker I presented them --

18      THE COURT:  Would you just identify for the court

19  reporter.

20      MS. SMITH:  Yes.  Laura Smith.                               04:59PM

21      In the Booker trial we were told similar instructions

22  on the first day and the next day we brought all of the runs.

23  And then we were told not to bring them and that we would hold

24  onto them.

25      THE COURT:  You brought them to whom?                        04:59PM

1          MS. SMITH:  I believe the court reporter.

2          THE COURT:  There's nothing the court reporter can do

3    with those.  The point is I think you need to file them in the

4    docket.  And when you say the runs, what do you mean?

5          MS. SMITH:  So the run is a transcript of what's          04:59PM

6    played in the depo.

7          THE COURT:  That's fine.  But I think what you need to

8    do is then file it in the docket.  You can do it with a notice

9    of filing, put it in the docket.  That way it's in the Court's

10   record.  Giving it to the court reporter or to Nancy doesn't   05:00PM

11   get it into the record.  Does that make sense?

12         MS. SMITH:  Yes.  You are clear.

13         THE COURT:  Let's do that.  But if we've got to go

14   back and do that in Booker we ought to do it so that the docket

15   includes the runs of all the depositions played.              05:00PM

16         MS. SMITH:  We'll have to go back and do that.

17         All right.  See you in the morning at 8:30.

18         (Proceeding recessed at 5:00 p.m.)

19

20

21

22

23

24

25

1

2

3

4                        <u>C E R T I F I C A T E</u>

5

6          I, LAURIE A. ADAMS, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14             DATED at Phoenix, Arizona, this 15th day of May, 2018.

15

16                             s/Laurie A. Adams

17                             _____
                               Laurie A. Adams, RMR, CRR

18

19

20

21

22

23

24

25