1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3          _____

4   **In Re: Bard IVC Filters**          )   **MD-15-02641-PHX-DGC**
    **Products Liability Litigation**     )

5                                         )   Phoenix, Arizona
                                          )   **May 16, 2018**

6   _____)
    **Doris Jones, an individual,**       )

7                                         )
                    Plaintiff,            )

8                                         )   CV-16-00782-PHX-DGC
          v.                              )

9                                         )
    **C.R. Bard, Inc., a New Jersey**     )

10  **corporation; and Bard Peripheral**  )
    **Vascular, Inc., an Arizona**        )

11  **corporation,**                      )
                                          )

12                  Defendants.           )
    _____)

13

14

15      **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16      **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

17          **TRIAL DAY 2 – A.M. SESSION**

18              (Pages 231 – 344)

19

20

21  Official Court Reporter:
    Patricia Lyons, RMR, CRR

22  Sandra Day O'Connor U.S. Courthouse, Ste. 312
    401 West Washington Street, SPC 41

23  Phoenix, Arizona  85003-2150
    (602) 322-7257

24

    Proceedings Reported by Stenographic Court Reporter

25  Transcript Prepared with Computer-Aided Transcription

```
1                    A P P E A R A N C E S

2     For Plaintiff:

3              Gallagher & Kennedy
               By: MARK S. O'CONNOR, ESQ.
4              By: PAUL L. STOLLER, ESQ.
               By: SHANNON L. CLARK, ESQ.
5              By: C. LINCOLN COMBS, ESQ.
               2575 East Camelback Road, Suite 1100
6              Phoenix, AZ  85016

7              Lopez McHugh, LLP
               By: JOSHUA MANKOFF, ESQ.
8              214 Flynn Ave.
               Moorestown, NJ  08057
9
               Heaviside Reed Zaic
10             By: JULIA REED ZAIC, ESQ.
               By: LAURA E. SMITH, ESQ.
11             312 Broadway, Ste. 203
               Laguna Beach, CA  92651
12

13

14    For Defendants:

15             Nelson Mullins Riley & Scarborough
               By: RICHARD B. NORTH, JR. ESQ.
16             By: ELIZABETH C. HELM, ESQ.
               201 17th Street NW, Suite 1700
17             Atlanta, GA  30363

18             Nelson Mullins Riley & Scarborough.
               BY: JAMES F. ROGERS, ESQ.
19             1320 Main St.
               Columbia, SC  29201
20
               Snell & Wilmer
21             By: AMANDA C. SHERIDAN, ESQ.
               400 East Van Buren
22             Phoenix, AZ  85004

23

24

25
```

```
 1                         I N D E X

 2                       EXAMINATION
```

| WITNESS | | PAGE |
|---|---|---|
| Video testimony of Gin Schultz played | | 249 |
| MURRAY R. ASCH, M.D. | | |
|      Direct Examination | | 250 |
|      Cross-Examination By Mr. North | | 300 |
|      Redirect Examination By Mr. O'Connor | | 331 |

```
                       EXHIBITS
```

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 556 | Asch Exh. 207, BPV-17-01-00052582 -588, 1/26/2001 Letter from Mount Sinai Hospital to Dr. Asch | 261 |
| 2090 | Tillman 08-04-2017 Exhibit 1064 – NMT Medical Inc. Document | 265 |
| 4330 | Asch Deposition, 05/02/2016 – Exhibit 206, July 21, 1999 letter to Dr. Freeland from Dr. Asch | 275 |
| 557 | Asch Exh. 208, BPV-17-01-00056765 -766, /28/2000 E-mail from Paul Stagg to Cavagnaro, Mellen, Uelmen, Vierling, and Field Re. "Fwd[2]: compassionate IVC filters" (from Asch) | 283 |

**(Index of Exhibits Continued)**

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 559 | Asch Exh. 210, BPV-17-01-00052621, 4/17/2002 – Email from George Cavagnaro to Doug Uelmen and Carol Vierling, dated April 18, 2002 | 291 |
| 5189 | July 10, 2002 IMPRA Recovery Permanent Special 510(k) (K022236) | 298 |
| 567 | Asch Deposition, 05/02/2016 – Exhibit 223 – 3/10/2003 Letter from Dr. Asch Re support for RF | 323 |

**P R O C E E D I N G S**

10:01:31    1

2

3    (Proceedings resumed in open court outside the presence

4    of the jury.)

08:30:34    5    THE COURT:  Please be seated.

6    Morning, everybody.

7    EVERYBODY:  Morning, Your Honor.

8    THE COURT:  Counsel, do you have matters we need to

9    address this morning before we get started?

08:30:42   10    MR. O'CONNOR:  Possibly with Dr. Asch.

11    MR. CLARK:  I have a very short one, Your Honor.

12    We have a number of exhibits that we have, I think,

13    agreed can come into evidence and I would like to move those

14    into evidence now.

08:30:59   15    THE COURT:  Let's do it in front of the jury.

16    MR. CLARK:  Is that better?

17    THE COURT:  Well, they need to know they're in

18    evidence.

19    MR. CLARK:  Fair enough.

08:31:05   20    THE COURT:  If there are issues we need to discuss,

21    I'm happy to do that, but I'd like you to move them into

22    evidence in front of the jury so they know they're in

23    evidence.

24    MR. CLARK:  One other thing related to that.  Since

08:31:15   25    most of these relate to deposition exhibits that are now trial

08:31:18  1   exhibits, would it be okay to prepare sort of a chart that we

2   can give to the jury, and perhaps the first time the Court can

3   instruct them for their convenience we've done the conversion

4   from trial exhibit to deposition exhibit?  I noticed they were

08:31:31  5   taking notes when we were talking about that yesterday, and it

6   seems that process is a little cumbersome, so I would like --

7            THE COURT:  So this would just list trial exhibit

8   numbers and the corresponding deposition exhibit numbers?

9            MR. CLARK:  For each witness; correct.

08:31:43 10            THE COURT:  Any objection?

11            MR. NORTH:  No objection, Your Honor.

12            THE COURT:  Yeah, I actually think that would be

13   helpful because even I was having trouble keeping up with

14   which exhibits were which.

08:31:52 15            MR. CLARK:  That will make me not read as fast too.

16   Thank you.

17            THE COURT:  Anything else we need to address?

18            MR. NORTH:  Nothing for the defendants, Your Honor.

19            Oh, I'm sorry, there is one document.

08:32:03 20            MR. O'CONNOR:  Just the issue, Your Honor, Dr. Asch

21   is going to testify.  There's an Exhibit 5247.  We've got the

22   exhibits the defense intends to use with Dr. Asch.  Setting

23   aside the hearsay nature, they have redacted, I think, in

24   accordance with your order, but the redactions, again, they

08:32:34 25   deal with presumably death, but I know we raised the issue

08:32:39  1  yesterday and I know that the issue is being taken under

2  advisement, but over -- for example, the statement in this

3  Dear Colleague letter says overall migration-related fatality

4  rate is below the reported 0.1 percent.  They want to redact

08:33:01  5  "fatality."

6       Again, this is just the same problem with this order.

7  I don't think the jury's going to understand, if this document

8  even gets in, what rate they're talking about that is less

9  than 1 percent.

08:33:12  10       THE COURT:  Is this a document that you understand

11  defendants are going to use in the examination of Dr. Asch?

12       MR. O'CONNOR:  Yes.  We had exchanged them last

13  night.  They were kind enough to show me what they're going to

14  redact.  I had told them back that I was going to raise this

08:33:26  15  issue with you in view of what we talked about yesterday and,

16  really, whether this document really completely falls within

17  your order.  Admittedly, it does talk about migration-related

18  fatalities, and it's a Dear Colleague letter.  They want to

19  show it to Dr. Asch.

08:33:46  20       MS. HELM:  Your Honor, I have a copy of the document,

21  if that would help you.

22       THE COURT:  Yes, that would help.

23       MS. HELM:  I'm happy to hand you a copy with proposed

24  redactions.  That would probably be the most --

08:34:04  25       THE COURT:  Okay.

08:34:10  1          So is it the highlighted material you propose to

2    redact?

3          MS. HELM:  Yes, Your Honor.  Only the first page.

4          THE COURT:  How are you going to use this document,

08:34:17  5    Ms. Helm?

6          MS. HELM:  Actually, Mr. North is not a hundred

7    percent sure he's going to use it, but it's a possibility

8    he'll use it with Dr. Asch on cross, and so we listed it on

9    our exhibit list.

08:34:27 10          THE COURT:  So at some point you'll move it into

11   evidence?

12          MS. HELM:  Possibly, yes.

13          THE COURT:  Okay.  Let me just look at these

14   redactions.

08:34:41 15          Is this a letter sent to doctors?

16          MS. HELM:  Yes, Your Honor.  By Bard.  Relating to

17   the Recovery filter.

18          THE COURT:  Help me understand, Ms. Helm, what it is

19   you believe the relevancy of this document to be.  Or

08:36:23 20   Mr. North.  That's fine.

21          MR. NORTH:  Again, I'm not certain I will use that,

22   but Dr. Asch in the past, who conducted the clinical study on

23   Recovery, has taken the position and testified repeatedly that

24   Bard failed to warn him when adverse events were occurring in

08:36:36 25   the field.  This was a Dear Doctor colleague letter that was

08:36:40  1  sent out to doctors, and we have evidence that it was sent to

2  him.

3  If we decide to use it, it would be to rebut the --

4  his contention that he was never notified and that somehow

08:36:51  5  Bard was hiding the occurrence of adverse events from him.

6  THE COURT:  And the basis for the redactions is what?

7  MR. NORTH:  The reference to migration-related

8  deaths.

9  THE COURT:  And you understand these to be Recovery

08:37:09 10  filter cephalad migration deaths?

11  MR. NORTH:  Yes.

12  THE COURT:  Okay.

13  Mr. O'Connor?

14  MR. O'CONNOR:  I think the problem is broader than

08:37:18 15  that, Your Honor.  And I'm just going by what happened here

16  last time in trial.

17  So Dr. Asch is going to testify that there was a

18  cephalad migration in his study, and that it concerned him.

19  And it concerned him that it could be potentially fatal.  I

08:37:31 20  think that is fair game under your order.

21  His testimony's going to be that he had been told by

22  Bard there was going to be a long-term study, that he had

23  advised Bard that they needed to look at these filters more in

24  view of the complications he saw.

08:37:49 25  The defense, on cross-examination, are going to ask

08:37:52  1    him if he continued to use Recovery filters, and he's going to

2    say yes, he did, and he's going to explain why.

3            But at some point he stopped.  And he stopped because

4    he learned on the streets, not from Bard, but because of the

08:38:07  5    reports that were coming in about the complications, including

6    the fatal complications.

7            So they're going to go into that, and they want to

8    only tell half the story.  And that's what's going to happen

9    with a number of these doctors.  And especially with Dr. Asch

08:38:22 10    here.

11            A reason -- and it's necessary to put all of this

12    testimony in context that he finally stopped using these

13    filters is because he realized it was not a long-term study.

14    And not only that, through sources other than Bard, he heard

08:38:37 15    and found out what the medical community was finding out, that

16    these things were killing people.

17            So at every corner, they can open the door to this.

18            THE COURT:  Well, the argument -- I think the

19    argument you just made, Mr. O'Connor, is a bit different from

08:38:51 20    where we started, which is with this exhibit.  You're now

21    arguing, I think, that you should be able to elicit cephalad

22    migration evidence as part of Dr. Asch's testimony regardless

23    of whether this exhibit issues.

24            MR. O'CONNOR:  I agree.  I think they're somewhat

08:39:10 25    interrelated because they want to use this to show Dr. Asch

08:39:13   1   that there were warnings, that he felt he wasn't warned.  This

2   document was faxed to him.  But along those lines, his

3   testimony would be, and, yes, I stopped using filters not

4   because of necessarily a warning you gave me, because I was

08:39:28   5   finding out about deaths on my own.

6   So I think that these are interrelated.  How they

7   want to use them and the doors that are going to open, and the

8   problem is this jury's never going to hear the complete sense

9   of the complete picture of his testimony explaining why he did

08:39:46   10   things.

11   THE COURT:  Mr. North?

12   MR. NORTH:  Your Honor, I would respectfully submit

13   that this is somewhat of a hypothetical debate right now,

14   because a lot will depend on what Dr. Asch says, what

08:39:56   15   questions are asked him, both on direct and cross.

16   Again, I'm not even certain I'm going to use this

17   document as an exhibit.  If I did, I don't believe that I

18   would need to publish it to the jury.  We certainly can talk

19   about redactions afterwards if we decide to use it.

08:40:17   20   The fact of the matter is, though, I believe they're

21   trying to use Dr. Asch as a way to further seek

22   reconsideration of the Court's order.  Dr. Asch has previously

23   testified that he was concerned about the Recovery filter and

24   did not believe it was ready to go to market, based on his

08:40:34   25   personal experience in his study, clinical study, where there

08:40:39  1   was one asymptomatic migration and one asymptomatic fracture.

2   And he said Bard had promised him they would do a European

3   study before they put this thing on the market.  Yet he

4   continued to use the device in his practice.

08:40:54  5       That's why we're trying to get in the fact that he

6   continued to use the Recovery filter, to refute his testimony

7   and claim that we exploited and misused his clinical study to

8   bring the device to market when it wasn't ready to do so.

9       THE COURT:  Well, I assume you all saw the order I

08:41:19 10   entered last night.  I'm continuing to be of the view that

11   cephalad migration deaths from Recovery filters are

12   inadmissible under Rule 403.  I continue to think the

13   relevancy to this Eclipse case is marginal enough that the

14   danger of unfair prejudice outweighs that relevancy.  I know

08:41:38 15   the plaintiff disagrees with that.  But that's my conclusion

16   after looking at it four times now, I think, including last

17   night again.

18       However, as you also saw in that order, I do think

19   it's going to be fair, when we get to the point of the

08:41:53 20   defendant presenting evidence about the number of deaths and

21   statistics you can conclude from that, for the plaintiff to go

22   into the true number of deaths, and we'll decide the scope of

23   it then.

24       I think I'm going to have to do the same thing at

08:42:05 25   other points in the trial.  If I conclude during the testimony

08:42:08   1    of Dr. Asch that there is some fairness point that needs to be

          2    addressed for his testimony to be accurate, I'll be happy to

          3    consider it at that point.  But I'm not going to -- I can't

          4    conclude this morning that the door's been opened and we can

08:42:22   5    go into cephalad migration deaths.  I'm still of the view

          6    that's barred by Rule 403.

          7            So I think what we ought to do is go forward with

          8    Mr. Asch -- Dr. Asch's testimony.  At this point my ruling

          9    stands.  So the cephalad migration references in this exhibit

08:42:38  10    should be redacted.  But if plaintiff's counsel thinks, during

         11    his testimony or afterward, that a door has been opened that

         12    in fairness ought to allow you to do something, I'd be happy

         13    to hear it at that point, because I want to make sure you

         14    don't have an unfair case to present.  But I'm still convinced

08:42:57  15    that that's a Rule 403 ruling that's correct.

         16            So what I'm saying is I'm not going to rule in your

         17    favor now, Mr. O'Connor.  If you want to raise the issue at

         18    sidebar before redirect after Bard has cross-examined, I'll be

         19    happy to consider what you have to say at that point.

08:43:15  20            MR. O'CONNOR:  All right.  Well, just so we're all --

         21    and I know your order, Your Honor, and you had told us that

         22    nothing precludes us to talk about the risks of death, and he

         23    is going to talk about that.  That was his concern.

         24            My problem now is how do I present him?  Because

08:43:33  25    putting this witness on, do I want to have him explain up

front, when I know what the cross-examination's going to be,
or do I approach the bench with you, because the problem's
going to be that only part of the story's going to be told,
that he continued to use the Recovery.  And he will say he
stopped.  But this jury's never going to understand why he
stopped.  And he stopped because --

THE COURT:  Well, here's my problem with that
argument, Mr. O'Connor, so you understand my thinking.  Your
primary point through Dr. Asch is going to be that on the
basis of his studies, he had serious concerns about the
Recovery filter and he expressed them to Bard, and Bard told
him there would be a larger study, and the larger study never
happened.  That, to me, is the main point you want to get
across.

Now, Bard is going to impeach him in part by saying,
well, with all these concerns, Doctor, you kept using the
filter.  And that is to undercut his credibility he thought
there was a serious problem.

It seems to me your rebuttal to that is he stopped
doing that.  He stopped doing it because he became concerned
about the -- more concerned about the safety of the Recovery,
and so he stopped.

That responds to their rebuttal.

Now, the reason he stopped, whether it's he had
continuing concerns or specifically he heard about cephalad

08:44:54   1   migration deaths, again, to me, isn't as important as the

          2   point that he stopped because he had continuing concerns,

          3   which responds to their point.

          4          So I'm not seeing your unfair advantage at this

08:45:07   5   point.  But if you believe, after you've done your direct and

          6   they've crossed on this issue, that the only fair way to

          7   respond fully to their attempted impeachment is to bring out

          8   the evidence of the deaths, I'll be happy to hear you at that

          9   point.  But right now I can't conclude that that's going to be

08:45:25  10   a necessary fairness point.

         11          MR. O'CONNOR:  If I can just make one point just so

         12   my record's clear.  I understand what you're saying and I

         13   understand your reasoning, Your Honor.  But their argument,

         14   every minute they get, is all filters fail and that the

08:45:37  15   Recovery was failing, Dr. Asch knew it, and he continued to

         16   use it.  He stopped.

         17          The jury's going to wonder, well, that's kind of

         18   self-serving for him to put his testimony -- I just want this

         19   to be clear on the record -- why he stopped.  It's because he

08:45:52  20   learned about something much more serious than Bard was

         21   leading people to believe.  Much more serious than what's

         22   happening in this trial.  And that's what caused him and many

         23   doctors to stop.

         24          So I just want the record to be clear that's why I

08:46:08  25   think it's important, so the jury can hear this witness and

08:46:11   1   evaluate his credibility completely, not with half-truths and

            2   not with half stories.

            3             THE COURT:  I understand your point.

            4             MR. O'CONNOR:  Thank you.

08:46:20   5             THE COURT:  All right.  Any other matters we need to

            6   raise?

            7             MS. HELM:  No, Your Honor.

            8             May I get that exhibit back so we can redact it.

            9             THE COURT:  Yes.

08:46:27  10             Mr. Combs.

           11             MR. COMBS:  Your Honor, just a preview.  We filed a

           12   bench brief last night, somewhat of a response to Bard's bench

           13   brief a night or two before.  Unless you're keeping the same

           14   hours that we are, I doubt you read it, but I think it's

08:46:44  15   something we need to raise tomorrow morning before --

           16             THE COURT:  This is on the Childs issue?

           17             MR. COMBS:  Yes.  But when Mr. Modra testifies, we

           18   want to have that clarified.

           19             THE COURT:  I haven't read your brief.  We've

08:46:56  20   reviewed the government's brief.  We're looking at the cases

           21   you cite that you think counteract the effect of the Childs

           22   case.  I'll look at what you have filed.

           23             So when do you think this is coming up?

           24             MR. COMBS:  I think it's coming up just tomorrow

08:47:12  25   morning, before we call Mr. Modra.

08:47:14  1        THE COURT:  You're calling Modra tomorrow?

       2        MR. COMBS:  I think that's correct, yes.

       3        THE COURT:  So you're hoping to get in those reports,

       4   the MDR, is that what they're called, reports?

08:47:24  5        MR. COMBS:  Monthly management reports.  And then

       6   also a 1006 summary of all of the complaints historically.

       7        THE COURT:  Okay.

       8        All right.  We will -- I will look at your brief,

       9   we'll continue looking at the cases that have been cited.

08:47:40 10        MR. COMBS:  Thank you, Your Honor.

      11        MS. REED ZAIC:  Housekeeping note, Your Honor.  You

      12   said you reviewed the government's brief.  It's actually

      13   Bard's brief.  I'm not trying to call it a misspeak.  I just

      14   wanted to make a record that the government hasn't entered a

08:47:53 15   brief.

      16        THE COURT:  Thanks.

      17        All right.  We'll bring the jury in at 9:00.

      18        MR. COMBS:  I think we all understand we're used to

      19   the government siting over there.

08:48:03 20        THE COURT:  Actually, they actually sit there.

      21   Thanks for trying to help me out.

      22        MR. COMBS:  That's right.

      23        THE COURT:  The burden of proof.

      24        MR. COMBS:  That's right.

08:48:14 25        MR. O'CONNOR:  Your Honor, mind if I step out?

08:48:16  1          THE COURT:  Yeah.

2          (Recess was taken from 8:48 to 9:00.  Proceedings resumed

3     in open court with the jury present.)

4          THE COURT:  Thank you.  Please be seated.

09:01:48  5          Good morning, ladies and gentlemen.  Thanks for being

6     with us this morning.

7          Counsel, I wanted to mention something.  Juror 6

8     mentioned to Traci that he has a bit of color-blindness and

9     has difficulty distinguishing red.

09:02:04  10         Is that right?

11         JUROR:  Yes.  Red text versus black.

12         THE COURT:  Red text versus black.

13         So in illustrations or charts or things like that, if

14    you want to emphasize something, don't do it in red because

09:02:18  15    Juror 6 won't see the emphasis.

16         We will continue the testimony this morning with the

17    deposition testimony we left off yesterday.

18         (Video testimony of Gin Schulz played.)

19         MR. O'CONNOR:  Your Honor, I think that concludes the

09:24:20  20    video.

21         At this time we call Dr. Murray Asch.

22         THE COURT:  All right.

23         THE COURTROOM DEPUTY:  Dr. Asch, if you'll please

24    come forward.  You can stand right here and raise your right

09:24:56  25    hand, sir.

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:25:03  1    **DR. MURRAY ASCH,**

2    called as a witness herein, after having been first duly sworn

3    or affirmed, was examined and testified as follows:

4              MR. O'CONNOR:  May I proceed?

09:25:03  5              THE COURT:  Yes.

6                   D I R E C T   E X A M I N A T I O N

7    BY MR. O'CONNOR:

8    Q    Good morning.  Would you tell the members of the jury your

9    name, please.

09:25:37 10   A    My name is Murray Asch.

11   Q    You're a medical doctor?

12   A    Yes, I am.

13   Q    Dr. Asch, where are you from?

14   A    I'm from Oshawa, Ontario, Canada.

09:25:49 15   Q    And what do you do in Canada?  What type of medicine do

16   you practice?

17   A    I'm an interventional radiologist.

18   Q    Would you explain to the members of the jury what an

19   interventional radiologist is.

09:26:00 20   A    Well, it should be fairly simple.  I'm sure all of you

21   have heard the recent discussion about Mrs. Trump and the

22   procedure she underwent, an embolization of a kidney.  So

23   that's a procedure performed by interventional radiologists.

24   We do procedures using ultrasound and CT and X-ray, and using

09:26:21 25   tools like needles and tubes and specialized devices, we do

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:26:27  1    biopsies, we drain organs, we block blood vessels, and

2    replace IVC filters and remove IVC filters.

3    Q    Is an interventional radiologist different than a

4    radiologist who, say, reads radiographic studies, a clinical

09:26:47  5    or diagnostic radiologist?

6    A    Yes.  So interventional radiologists have specialized and

7    additional training where we spend time working surgical-like

8    suites where we do these kind of procedures.  General

9    radiologists read CATs and have specialized training as well.

09:27:01  10   They read CAT scans, do ultrasounds, and read MRIs, but they

11   don't typically do procedures.

12   Q    Now, you have -- have you set forth your education and

13   professional credentials in what is known as a curriculum

14   vitae?

09:27:18  15   A    Yes.

16              MR. O'CONNOR:  May I display Exhibit 4555.001?

17              THE COURT:  To the witness?

18              MR. O'CONNOR:  To the witness, yes.

19   BY MR. O'CONNOR:

09:27:35  20   Q    Would you describe what you are looking at, Dr. Asch?

21   A    So that is my curriculum vitae, my resume.  Summary of

22   all my education and experience.

23   Q    Dr. Asch, would you tell us your education, what training

24   you received to become a interventional radiologist?

09:27:55  25   A    I'll start with medical school instead of going back

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:27:58  1   further than that.

2   Q   Thank you.

3   A   So I went to medical school, four years of medical

4   school.  I then did two years of additional generalized

09:28:07  5   internal medicine training.  Following that I did four years

6   of a diagnostic radiology residency training program.  And

7   following that I did one year of specialized subspecialty

8   fellowship in interventional radiology.

9   Q   And where -- what institutions did you receive that

09:28:27  10  training at?

11  A   I went to medical school in London Ontario, University of

12  Western Ontario.  I did my internship in Hamilton, Ontario.

13  And all of my radiology residency and fellowship was done at

14  University of Toronto in Toronto.

09:28:44  15  Q   And when you talk about residency and fellowship, can you

16  explain what that means and where that places you as a medical

17  doctor?

18  A   So residency is the basic training that people will get

19  residencies in different specialties to be a radiologist, to

09:29:03  20  become a surgeon, to become an internist, to become a

21  dermatologist.  So that is a generalized training that is the

22  minimum requirement to go out and practice.  Many people,

23  myself included, would want additional training, subspecialty

24  training, in order to become a super specialist, if you will.

09:29:22  25  So that additional year of subspecialty training was called a

DIRECT EXAMINATION - MURRAY R. ASCH, M.D.

09:29:26   1    fellowship.  So that's the year where, after becoming a

       2    diagnostic radiologist, I spent an entire year essentially

       3    doing interventional radiology procedures under the guidance

       4    of a variety of trained experts.

09:29:39   5    Q    In the time period of 1999, 2000, where were you working

       6    at that time?

       7    A    I worked in Toronto at what was then called Mount Sinai

       8    Hospital.

       9    Q    Were you involved in academics at all?

09:29:55  10    A    Yes.  Mount Sinai is one of the University of Toronto

      11    academic teaching hospitals, so I had a variety of roles in

      12    addition to clinical work, doing treating patients, helping

      13    patients.  I taught medical students, and I did a variety of

      14    forms of research.

09:30:12  15    Q    In your practice, have you been published?

      16    A    Yes, I have.  Many publications.

      17    Q    Have you been published in anything that has to deal with

      18    IVC, inferior vena cava filters?

      19    A    Yes.  There are a number of publications I have with

09:30:30  20    respect to a variety of types of permanent and temporary IVC

      21    filters.

      22    Q    And can you just explain for us what it means when a

      23    doctor publishes an article?  Why would a doctor undertake

      24    that and how is that literature generally used in the medical

09:30:50  25    community?

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:31:00  1    A    We do research to try to promote and progress and enhance

2    the knowledge throughout the medical community, to share our

3    experience in a scientific way in order to guide other

4    physicians to change their practice.  Things in -- in

09:31:14  5    particular, interventional radiology really are constantly

6    evolving, and the majority of procedures I do now weren't

7    invented, if you will, when I trained.  So we learn

8    procedures based on reading articles, based on sharing

9    information through societies and at meetings with other

09:31:32  10   physicians.  So I, like others, have chosen to write

11   scientific published manuscript papers in order to share my

12   experience, in order to improve patient care throughout the

13   world.

14   Q    Thank you.

09:31:47  15        Do you consult -- you treat patients as a medical

16   doctor?

17   A    Yes, I do.

18   Q    Do you consult with medical device companies?

19   A    Yes.  I'm a consultant -- I have done and I continue to

09:32:01  20   be a consultant for a variety of medical device companies.

21   Q    And do you -- when you do medical consulting, do you

22   charge for your time?

23   A    Yes, I do.

24   Q    Currently, where do you practice?

09:32:16  25   A    Currently, I practice at a large community academics

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:32:20  1  center in Oshawa, Ontario.

2  Q    And would you just tell us, are you with a group of

3  interventional radiologists?  Or give us an idea of the people

4  you work with.

09:32:30  5  A    So we have a group currently of approximately 13

6  radiologists, interventional radiologists and general

7  radiologists, and we all pool our work and pool our resources

8  and pool our income, so we all work together and share

9  patients and share the workload.

09:32:48  10  Q    Why are you here today?  Do you understand?

11  A    I'm here today because I feel responsible for the

12  widespread use of what was initially called the Recovery

13  filter, and I'm concerned about it and concerned about the

14  damage it's caused some patients.  And I'm here to ensure

09:33:08  15  that I can do everything I can to try and make that better.

16  Q    Now, you, back in the 1999, 2000 time period -- first of

17  all, you are involved in professional societies and

18  associations; correct?

19  A    Yes, I am.

09:33:27  20  Q    And what is SIR?

21  A    SIR is the largest interventional society in the world.

22  It stands for Society of Interventional Radiology.  The head

23  office is in the States.  And I am a fellow and used to be on

24  the board of -- and continue to be a member/fellow of the

09:33:49  25  SIR.

DIRECT EXAMINATION — MURRAY R. ASCH, M.D.

09:33:50 1   Q   Now, Dr. Asch, were you involved in a pilot study for

2   Bard?

3   A   Yes, I was.

4   Q   And when was that?

09:33:57 5   A   The initial discussions began in 1999.

6   Q   And tell us a brief overview of what the intent behind

7   that pilot study was.

8   A   Well, pilot study is a great word.  And the initial

9   intent was to try and assess a brand-new never been used

09:34:15 10  filter in a human to see if it could be safely retrieved.

11  Q   Were you retained at that time as a consultant?

12  A   Yes, I was.

13  Q   And were you paid?

14  A   Yes, I was.

09:34:26 15  Q   By Bard?

16  A   Yes.

17  Q   Now, you've come down here all the way from Canada.  Have

18  you been compensated for your time?

19  A   Yes, I have.

09:34:39 20  Q   Can you explain to the jury how your compensation was paid

21  to you by this side, the plaintiff's side, to get you here.

22  A   Well, the compensation for being here today is identical

23  to the compensation I receive for any other medicolegal work

24  I do and all of the other work I did for Bard and for all

09:34:57 25  other medical device companies that I currently work with,

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:35:00 1    and that's essentially to replace the income that I am

2    missing because I'm here.  Because I work in a group

3    practice, I can't just cancel my patients and not show up to

4    work.  I'm losing income and at the same time I need to make

09:35:14 5    someone available to do the work that I am not doing.  So I'm

6    being compensated for that.

7    Q    And so for consulting medicolegal, what are you charging?

8    A    Depending how many hours it involves or if it's during

9    work or after work, it's either an hourly rate or a daily

09:35:33 10   rate.  Typically it is around $700 per hour.

11   Q    And then if you're going to be gone for -- how many

12   days -- to get here, how many days did this take you away from

13   your practice?

14   A    Four days.

09:35:46 15   Q    And how do you obtain compensation for that?

16   A    So the -- I earn approximately -- I earn a good living.

17   I earn approximately $5,000 a day, so I've been paid to

18   replace my income.

19   Q    Dr. Asch, were your travel expenses paid for?

09:36:05 20   A    Yes, they were.

21   Q    Now, Dr. Asch, let's go back to 1999 or that period, and

22   if you can explain to the jury the circumstances, how you were

23   approached that got you the start of your involvement in the

24   Bard pilot study.

09:36:26 25   A    This all started at one of the SIR annual meetings.  I

DIRECT EXAMINATION - MURRAY R. ASCH, M.D.

09:36:30   1   was attending a meeting, and a group of individuals from Bard

          2   and, at that time, NMT approached me and said, we've got a

          3   novel idea for a new, never been used filter, and we would

          4   like you to be involved in the first human use pilot project

09:36:46   5   to assess the retrievability of this.  And that was the

          6   initial hallway discussion.

          7          Following that, we sat down and met.  And then I was

          8   flown to Boston where, at that time, NMT head office was, and

          9   I met with a group of individuals from Bard and NMT, and they

09:37:08  10   gave me background information about the device and the

         11   planned project so that we could work together and move

         12   forward as a team.

         13   Q   Was there a presentation made to you?

         14   A   Yes.  So they gave me a presentation to give me a

09:37:23  15   background on how the filter was designed.  I hadn't been

         16   involved in filter design.  They came to me with a filter

         17   that was designed and had been in preclinical testing, bench

         18   top testing, and animal testing, so they showed me all of the

         19   data that they had to satisfy my concerns about being the

09:37:41  20   first person to place a device in a human.  Obviously, that's

         21   a scary thing.  I feel responsible for that.

         22          And after answering all those questions, we then

         23   moved forward with a proposal I could bring to my hospital, my

         24   ethics board, my government in order to obtain permission to

09:38:01  25   use the device.

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:38:02  1   Q   Now, when you say your government, that's in Canada?

2   A   Yeah.  In Canada, we have something called the Health

3   Protection Branch, which oversees use of medications and

4   medical devices.

09:38:13  5   Q   Did people from Bard explain to you why they wanted to do

6   this pilot study in Canada?

7   A   Yes.  The feeling I had from them was that because of

8   political differences in the different countries, it would be

9   easier to do a study like this in Canada than it would in the

09:38:29  10   United States.

11   Q   Different regulatory pathway in Canada?

12   A   Yeah.  So the Canadian government is felt at times to be

13   more lenient.  Again, coming with a brand-new filter never

14   been used in a human before, there's lots of potential

09:38:44  15   concern about this, and it was felt that the Canadian

16   government would be more open and welcome to that.

17   Q   So the purpose of the study, as you understood it, was to

18   look at the retrievability of a Bard filter?

19   A   Yes.  That was the single task that I was given, pilot

09:39:02  20   project, assess safety of removal of the device.

21   Q   Was your study to be used at all for any type of long-term

22   clinical study for safety or efficacy?

23   A   No.  The understanding that I had was this was a -- pilot

24   study is a great word.  A pilot study to obtain initial human

09:39:21  25   safety information, and then that information will be taken

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:39:24 1   back to the United States in order to pave the way for

2   performing a long-term multicenter larger study to assess

3   other aspects of the filter, including long-term safety.

4   Q   Was it your understanding that Bard -- did Bard indicate

09:39:42 5   to you that the company intended to a long-term safety study

6   after your study?

7   A   Yes.  In all of our discussions, that was a repeated

8   theme, long-term safety study after my pilot study.

9   Q   So to do this study, how did your -- what was your

09:39:58 10   involvement in the beginning?  Did you design the study?  Were

11   you involved in that?

12   A   I did not design the study or the filter, no.  So Bard

13   and NMT worked together and provided me with all of the

14   documentation that I needed to supply to my ethics department

09:40:15 15   and to the government.  So they gave me the introductory

16   package that I had already been shown at NMT, they gave me a

17   consent form, and they gave me a study protocol, all of which

18   I then submitted to the regulatory bodies.

19        MR. O'CONNOR:  Gay, can you put up and display to the

09:40:45 20   witness Exhibit 556.

21        And can you scroll through each page.

22   BY MR. O'CONNOR:

23   Q   And, Dr. Asch, if you could review it and tell us if you

24   recognize these documents.

09:41:06 25   A   Yes.  This is the package I just described.  So that's

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:41:22  1   what -- you can't see it.  What is up there right now is the

2   study design and the letter, copies of letters that I had

3   written to the ethics department and Health Canada asking for

4   permission to use the device for this pilot study.

09:41:38  5   Q   Are these documents that you received from Bard and

6   related entities to initiate your study?

7   A   Yes.

8        MR. O'CONNOR:  Move for admission of Exhibit 556.

9        MR. NORTH:  No objection, Your Honor.

09:41:53  10       THE COURT:  556 is admitted.

11     (Exhibit 556 admitted.)

12       MR. O'CONNOR:  Thank you.

13       Let's go to --

14       Oh.  May we publish to the jury, Your Honor?

09:42:08  15       THE COURT:  You may.

16       MR. O'CONNOR:  Thank you.

17       Gay, let's go to the third page, please.

18   BY MR. O'CONNOR:

19   Q   Dr. Asch, can you explain to us what we're looking at

09:42:26  20   here?

21   A   So this is a letter of approval from the chair of the

22   Mount Sinai Hospital research ethics board indicating

23   approval, indicating permission for me to use the device.

24   The typical permission, as indicated here, allows for 12

09:42:49  25   months and a limited number of devices, in this case 20, at

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:42:58   1   which time I need to reapply for permission.

2   Q    And did that eventually happen?

3   A    Yes.

4           MR. O'CONNOR:  Go to the next page, Gay.

09:43:07   5   BY MR. O'CONNOR:

6   Q    We're looking at another letter dated November 8, 2001.

7   Could you tell us what this letter is, please.

8   A    That is a letter from the chair of the research ethics

9   board of the hospital allowing me to proceed with the study

09:43:29  10   as requested.

11          MR. O'CONNOR:  And then the next page, Gay.

12          THE WITNESS:  So that is page 1 of the study

13   proposal.

14   BY MR. O'CONNOR:

09:43:45  15   Q    And is this what was an outline of how the study would

16   proceed?

17   A    Yes.

18   Q    And who provided this to you?

19   A    That was provided to me by the team, referred to as the

09:44:04  20   team, the team from NMT and Bard.

21   Q    If you look down below, can you explain to the jury how

22   the study was going to begin with patients and inserting

23   filters in these patients.

24   A    We were going to take patients that had the standard

09:44:30  25   typical indications for IVC filters, and we would approach

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:44:36  1   them and inform them, informed consent, inform them that we

2   were doing this pilot study and they would be the first or

3   early patients, the first ones to receive this new unknown

4   filter.  And we would discuss that with them, and then with

09:44:54  5   their permission, proceed to place the filter, and monitor

6   the patient, and then retrieve the filter.

7   Q    Now, first of all, had you been using Bard filters before

8   this study?

9   A    Prior to this study I had used the Bard permanent filter.

09:45:12  10  Q    Which was the Simon Nitinol filter?

11  A    Yes.

12  Q    And you understood that this was going to be a new device,

13  this Recovery; is that correct?

14  A    Yes.

09:45:20  15  Q    And what was it about the Recovery that was the proposal

16  that was new or different from the Simon Nitinol filter?

17  A    The filter had a number of modifications in order to

18  facilitate having the filter removed.

19  Q    Pardon me?

09:45:38  20  A    It had a number of modifications to allow the filter to

21  be removed.  The other filters on the market, the so-called

22  standard permanent filters, are designed in a way that

23  they're meant to go into the body and stay in the body, and

24  there's not an easy way –– they're not designed to be

09:45:54  25  removed.  Where this new filter has a hook on it to be

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:45:57   1    removed, it's got deformable hooks to allow it to be removed

2    from the caval wall.

3    Q    And how did you feel about that new filter?

4    A    Well, the concept of a temporary retrievable IVC filter

09:46:14   5    has been discussed, had been discussed sometime prior to

6    this, and certainly of great interest to the medical

7    community.  And we believe that, in concept, these filters

8    provide great benefit to patients because that way, instead

9    of having a filter in -- stay in the body for ten, 20 years,

09:46:34  10    the filter can be removed.

11    Q    And when approximately did the study start, begin?

12    A    I'm sorry, can you repeat that.

13    Q    When did the study start?

14    A    I believe it was approximately 2000.

09:46:51  15    Q    And where was the study conducted?

16    A    It was conducted at my hospital, Mount Sinai Hospital.

17    As time went on, there were some mergers between the downtown

18    Toronto hospitals, and so it was conducted as well at Toronto

19    General Hospital and Toronto Western hospitals, which were

09:47:09  20    other hospitals that I worked at.

21    Q    Now, you said that you had met with people from Bard and

22    NMT and you underwent a -- you participated in a presentation;

23    is that correct?

24    A    That's correct.

09:47:28  25         MR. O'CONNOR:  Gay, could you put up Exhibit 2090,

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:47:31  1   please.

2   BY MR. O'CONNOR:

3   Q   Dr. Asch, do you recognize Exhibit 2090?

4   A   Yes.  This is a copy of the PowerPoint presentation that

09:48:11  5   was shown to me at the initial meeting that I attended in

6   Boston.

7           MR. O'CONNOR:  Move to admit Exhibit 2090.

8           MR. NORTH:  No objection, Your Honor.

9           THE COURT:  Admitted.

09:48:23  10       (Exhibit 2090 admitted.)

11   BY MR. O'CONNOR:

12   Q   Now, who was present at the meeting in Boston, do you

13   recall?

14   A   I'm not sure I can recall all their names now.  It was

09:48:35  15   essentially a combination of people from Bard Canada and Bard

16   USA and NMT.  I can name a number of names, if you'd like.

17           MR. O'CONNOR:  First of all, may I publish

18   Exhibit 2090 to the jury, Your Honor?

19           THE COURT:  Yes.

09:48:49  20   BY MR. O'CONNOR:

21   Q   And, again, Dr. Asch, this is the first page.  We will go

22   through this.

23           Was a Robert Carr present?

24   A   Robert Carr was present, yes.

09:48:59  25   Q   Did you know a Dr. John Kaufman?

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:49:02  1   A   Yes, I knew of John's reputation, and he was there as

2   well.

3   Q   What about Dr. -- was it Morris Simon?

4   A   Morris Simon was there as well.

09:49:15  5   Q   Who is Dr. Simon?

6   A   Dr. Simon was, I believe, the founder of Nitinol Medical

7   Technologies, and his name, the Simon Nitinol filter, his

8   name is on the Simon Nitinol filter, which is distributed and

9   sold by Bard.

09:49:33  10          MR. O'CONNOR:  Let's go to page 7 of the exhibit,

11   Gay.

12          And, if you could, highlight the -- in that box

13   Recovery filters that deal with vena cava filter, please.

14   BY MR. O'CONNOR:

09:50:01  15   Q   So is this information that was provided to you, Dr. Asch,

16   to introduce to you this new concept of a retrievable filter?

17   A   Yes.

18   Q   And it says:  Same strengths as a permanent filter.

19          How was that presented to you?

09:50:19  20   A   It was presented to me this filter was really a

21   modification of a currently sold filter, the Simon Nitinol

22   filter, and so it could act, then, both as a permanent

23   filter, based on their presentation, as well as being

24   removable.  So it had the option, in their view, that it

09:50:41  25   could be potentially a permanent filter and a removable

DIRECT EXAMINATION — MURRAY R. ASCH, M.D.

09:50:45   1    filter.

2    Q    And did Bard indicate to you that there had been any

3    testing conducted that established in their mind that the

4    Recovery was the same as, for example, the Simon Nitinol

09:51:01   5    filter?

6    A    No.  This was their hope and, again, I was led to believe

7    that ultimately appropriate scientific testing would be done

8    in terms of larger clinical studies to substantiate their

9    claim, their hope, their ultimate aim.

09:51:18  10    Q    If you look below it says:  Accurate placement, enhanced

11    centering, and a small sheath.

12         Do you see where I'm reading?

13    A    Yes, I do.

14    Q    What does accurate placement mean in the world of IVC

09:51:30  15    filters to an interventional radiologist?

16    A    Well, any medical device we place, it is important to

17    have the device go where we want it to go.  There have

18    historically been some filters where, perhaps as you're

19    deploying it, it may jump or move a little bit.  And,

09:51:46  20    actually, the Simon Nitinol filter, the permanent filter, did

21    sometimes do that and it wouldn't always end up exactly where

22    we wanted, which could have some negative effect in terms of

23    its function and its complications.  Whereas this different

24    filter design was much more accurate in terms of its

09:52:02  25    placement.  And when you deployed it, it would go where you

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:52:06  1    wanted it to go.

2    Q    And enhanced centering, what does that mean?  Could you

3    put that in the context of filters?

4    A    So the IVC, we put these filters, these devices, into a

09:52:17  5    tubular structure, and we want them to be centered.  We want

6    them to be aligned along the axis of the IVC in order to

7    maximize function and reduce complication.  And there's a lot

8    of discussion in literature about filter tilts.  And when a

9    filter does tilt, there is more potential for a complication

09:52:36  10   or filter failure.  So enhanced centering, having the filter

11   go where you want, centered along the axis, is important.

12   Q    And then:  Removable at 12 weeks -- 12 weeks.

13         What was the significance to that statement in this

14   presentation?

09:52:53  15   A    The significance of that was there already was in Canada

16   a device that had been released for sale by another

17   manufacturer that could be retrieved, but the retrieval

18   window for that was in the order of ten to 14 days.  So the

19   advantage of this newly designed filter was that a

09:53:13  20   retrievability at 12 weeks gives much more option in terms of

21   patient care.

22         MR. O'CONNOR:  Gay, go to page 9.

23   BY MR. O'CONNOR:

24   Q    Now, Dr. Asch, maybe just to put some context in what

09:53:34  25   we're going to talk about, if you could just refresh all of us

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:53:37   1    on just a little anatomy and just tell us about the IVC, the

2    vena cava.

3    A   So the inferior vena cava is essentially the largest vein

4    in the body, which brings the blood from the legs, lower

09:53:51   5    extremities, the pelvis, the abdomen, back to the heart.  So

6    it's kind of the opposite of the artery where blood flows

7    down the artery and out into smaller arteries.  The vein has

8    multiple small veins from structures draining into it, which

9    brings blood back to the heart.

09:54:12  10    Q   And a filter, what is its intent?

11    A   As the name suggests, the filter is meant to filter out

12    blood clots, particles larger than red blood cells, and stop

13    them from going to the lungs where, if a large clump, a large

14    piece of blood clot goes to the lungs, it can cause serious

09:54:34  15    injury, shortness of breath, pain, and death.

16    Q   Now, Bard, in its presentation, described the Recovery

17    filter as having arms designed for centering and caudal

18    migration resistance.

19          MR. O'CONNOR:  Gay, can you highlight that.

09:54:51  20    BY MR. O'CONNOR:

21    Q   Do you see where I'm looking?

22    A   I do.  Does the jury see that?  Okay.

23          So the arms of the upper portion of the filter there,

24    and you can see they look like almost sharp little pinpoint

09:55:04  25    needles.  So with a horizontal component, which is meant to

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:55:10  1   align with the IVC and help keep the filter aligned along the

2   IVC axis, and because they're a little bit pointy, not sharp

3   like a needle, but a little pointy at the bottom of the arm,

4   that is meant to reduce the likelihood of the filter migrating

09:55:28  5   caudally, which means downwards, in a downwards direction,

6   towards the feet.

7   Q   And why is that important?

8   A   Well, any time the filter moves, and movement in any

9   direction can also include tilting, the filter then can

09:55:41  10   become unstable.  It's sensitive to new and different forces,

11   which may then cause the filter to fracture or to fail.

12   Q   So when a device company like Bard says its filter is

13   migration resistant, what does that mean?

14   A   Well, those are key words that radiologists like to hear,

09:56:02  15   and it makes it sound like it's a good device, because I want

16   the filter to be centered and I want the filter not to move.

17   So that piques my interest, and that's why I was excited at

18   this presentation and thought, wow, based on this

19   information, this looks like something that would be good for

09:56:20  20   my patients.

21   Q   Now, in relation to the --

22            MR. O'CONNOR:  Gay, scroll down to the next line.

23   One size fits all.

24            No, previous page.  I apologize.  Go back to the page

09:56:32  25   before.  One size fits all.  I'm sorry.

DIRECT EXAMINATION - MURRAY R. ASCH, M.D.

09:56:39  1          MS. MENNUTI:  Here?

2          MR. O'CONNOR:  Yes, please.

3     BY MR. O'CONNOR:

4     Q    The diameter of the vena cava, is that the same in all

09:56:51  5     patients?

6     A    No.

7     Q    What is the range?

8     A    Depending on the age, size, weight of the patient, the

9     range can be from 5 to 8 millimeters up to 35 millimeters.

09:57:02 10     Q    And does the vena cava distend or contract?

11     A    Yes.  The vena cava is a soft tissue structure made of

12     very, very thin walls, very different than an artery that has

13     thick muscular walls that typically don't change that much in

14     diameter.  So a cava can change quite a bit.  It's subjected

09:57:23 15     to a number of forces, both in terms of our -- when we lift,

16     when we change position, when we become dehydrated.  If we

17     don't drink enough, the cava can get smaller.  And, on the

18     other side of the coin, if we do the opposite things, the

19     cava can get larger, which has an impact, then, on the actual

09:57:43 20     caval size.

21     Q    And the vena cava, as it goes from the level of the

22     kidneys upward, does it change in diameter at all?

23     A    Yes.  Typically, the closer you get to the heart, the

24     larger the cava becomes.  And so above the renal veins is the

09:58:00 25     typical anatomic landmark that we use to place filters.  As

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:58:05   1   you get north of the renal veins, closer to the heart, the

2   IVC becomes wider in diameter.

3   Q   When Bard indicated that one size fits all, what did that

4   mean to you?

09:58:19   5   A   Just a bit of a generic statement.  That's really the

6   standard size for IVC filters.  There's a few filters that

7   are manufactured to be placed in cavas that are larger than

8   28 millimeters.  The majority of filters, the kind of

9   industry standard is to make a filter that is meant to be in

09:58:38   10   an average cava up to 28 millimeters.

11               MR. O'CONNOR:  Go to the next page, Gay, page 10.

12               Page 10.  There we go.  And go ahead and highlight

13   both those bullet points.

14   BY MR. O'CONNOR:

09:59:03   15   Q   Now, Dr. Asch, according to this PowerPoint, it says:

16   Hooks strong enough to resist migration, 50 millimeters of

17   mercury in a 28-millimeter IVC.

18               Do you see where I read?

19   A   Yes.

09:59:19   20   Q   Did Bard explain to you anything about testing it had done

21   in terms of migration resistance?

22   A   They did show me some slides and briefly went through

23   their testing process and made the statements, which I wasn't

24   in a position to substantiate.  I took them at their word.

09:59:41   25   They did testing, they provided this number of 50 millimeters

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

09:59:46  1   of mercury.  I didn't question that number.  My assumption is

2   that that is an IVC filter company, they knew what the

3   standard was, they knew what number was important in order to

4   resist migration.

09:59:59  5   Q   And was there animal testing done that you're aware of?

6   A   There was animal testing, but I believe the animal

7   testing was predominantly with respect to does the filter

8   cause damage to the cava wall and can the filter be removed.

9   So before moving from a bench top to humans, they did some

10:00:16  10  animal testing with really, I think, the single question of

11  can this filter be removed without causing caval injury.

12       MR. O'CONNOR:  Gay, go to page 22.

13  BY MR. O'CONNOR:

14  Q   It appears there was a discussion about testing on sheeps;

10:00:51  15  is that -- sheep; is that right?

16  A   That's correct.

17  Q   And is that what you were just talking about?  In other

18  words, Bard never indicated to you -- there was no testing

19  that you're aware of that tested whether the filter was

10:01:04  20  migrating in a sheep; is that correct?

21  A   I'm not aware of any animal testing other than can the

22  filter come out.

23  Q   So the testing on sheep was just limited to putting it in

24  and taking it out.

10:01:16  25  A   I believe so.

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:01:17  1       MR. NORTH:  Your Honor, I object.  I think he's

2       leading the witness.

3       THE COURT:  Sustained.

4       BY MR. O'CONNOR:

10:01:23  5   Q   What was your understanding of the purpose of the sheep

6       study in terms of use of the filter?

7   A   My understanding was it was simply to look at the safety

8       of the device.  Does the device cause caval injury, either

9       while the filter is in position or during or after filter

10:01:39  10      removal.

11  Q   Now, in this document, it has said in different places

12      12-week removal for the Recovery filter.

13          Do you see that?

14  A   Yes.

10:01:50  15  Q   What does that mean to you?

16  A   Well, that meant they had demonstrated in an animal model

17      that the filter could be removed after 12 weeks.  Which is,

18      again, different than the clinical practice of the, at that

19      time, clinically available device which could only -- which

10:02:10  20      the manufacturers had tested and was only removable up to ten

21      to 12 days.

22          MR. O'CONNOR:  Let's look at Exhibit Number 4330,

23      please.

24      BY MR. O'CONNOR:

10:02:40  25  Q   Do you recognize Exhibit 4330?

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:02:56  1    A    Yes.

2    Q    What is Exhibit 4330?

3    A    This is my initial letter to the director of the Health

4    Protection Branch of Canada, giving him the background and

10:03:11  5    information that I had in order to request permission to use

6    the filter on compassionate grounds for this pilot study.

7              MR. O'CONNOR:  Now, I move to admit Exhibit 4330,

8    Your Honor.

9              MR. NORTH:  No objection, Your Honor.

10:03:29 10              THE COURT:  Admitted.

11         (Exhibit 4330 admitted.)

12              MR. O'CONNOR:  May we publish to the jury?

13              THE COURT:  Yes.

14    BY MR. O'CONNOR:

10:03:35 15    Q    So, Dr. Asch, this letter's dated July 21, 1999.  Did you

16    meet with Bard and NMT on more than one occasion?

17    A    Yes.

18    Q    And were there more than one presentations given to you?

19    A    As I recall, there was only a single formal presentation.

10:03:55 20    The other meetings had to do with the logistics and how to

21    move forward on accruing patients, following the patients,

22    and technical aspects of the study.

23    Q    Okay.  In the second paragraph it says that you actually

24    visited NMT's manufacturing facility and you had opportunity

10:04:18 25    of inserting and removing devices in sheep models.

DIRECT EXAMINATION — MURRAY R. ASCH, M.D.

10:04:24  1   A   That's correct.

2   Q   When you say that you were satisfied that this is safe and

3   efficacious device, what was that based upon?

4   A   That was based on the word of the people from NMT and

10:04:39  5   Bard.  They gave me the presentation, they gave me the

6   information, and I took them at face value and believed that

7   they told me they had done the testing and told me the device

8   was safe in their animal use and their bench top use.  I

9   believed what they told me.

10:04:58  10  Q   And if you look down where you write to Dr. Freeland that

11  the filter was found to with withstand 50 millimeters of

12  mercury.  Do you see what I'm talking about?

13  A   Yes.

14  Q   That was something Bard represented to you?

10:05:11  15  A   Yes.  Going back to the prior evidence of this

16  submission, the prior document you just showed, I'm just

17  repeating the information that was provided to me by Bard and

18  NMT.

19  Q   Did you assume that Bard had studied the anatomy and the

10:05:30  20  dynamics of the vena cava before they came to you about this

21  study?

22  A   Yes.

23  Q   And did you assume that their studies had -- and their

24  testing had been to designed in a way to predict how the

10:05:43  25  filter would act in real life?

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:05:45   1   A    Yes.

2   Q    Were those among the reasons that you agreed to do this

3   study?

4   A    Yes, absolutely.

10:05:56   5   Q    So explain to the jury the study itself.  You had how many

6   patients initially?

7   A    The initial published study had 32 patients in it.

8   Q    And tell us how these patients participated in the study.

9   Were they provided with Recovery filters?

10:06:21   10   A    Yes.

11   Q    And were these patients monitored?

12   A    Yes.  These patients were very closely monitored,

13   according to a very strict protocol.  They had regularly

14   scheduled abdominal radiographs to assess the filter in terms

10:06:38   15   of position and integrity, and those -- each of those imaging

16   studies was personally reviewed by myself, even though their

17   radiographs may have been reported by another radiologist.

18   In addition, I personally reviewed any imaging study that

19   they had as part of their medical care, which may have been

10:07:00   20   over and above the rigorous imaging follow-up that we had as

21   part of the study.

22   Q    So the patients that participated signed an informed

23   consent?

24   A    Yes, they did.

10:07:10   25   Q    Did they understand that it was an experiment?

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:07:12  1    A    Yes, they did.

2    Q    And the patients that participated, did they receive

3    Recovery filters?

4    A    Yes, they did.

10:07:21  5    Q    Was there in the protocol a plan as to how long the

6    filters would be in patients before they were removed?

7    A    Patients who were selected, part of the study protocol

8    was to select patients specifically with a view to removing

9    the filter.  So anyone that we thought that we couldn't

10:07:36 10    remove the filter or shouldn't remove the filter, wouldn't

11    get -- wouldn't be entered into the study and wouldn't get

12    this filter.

13          So the plan for the study, again, the pilot study to

14    evaluate filter retrievability, was to place filters in

10:07:52 15    patients with the view to retrieving 100 percent of them.

16    Q    And how were the filters inserted or implanted in the

17    patients?

18    A    They were inserted using standard radiologic techniques.

19    We put a needle in, put a wire in, put a tube in, inject the

10:08:08 20    dye, check the anatomy, and then put the filter in.

21    Q    Can you explain to the jury just quickly, briefly, the

22    percutaneous procedure as to how Recovery filters are placed.

23    A    Different people do things differently, obviously.  So my

24    standard of practice is to put the filter into the vein in

10:08:26 25    the leg, femoral vein.  So I use an ultrasound machine to

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:08:29   1  find the vein.  I clean and diffuse the skin.  I put a small

        2  needle into the vein.  When I'm sure in the right place, I

        3  put a wire into the vein and I put a tube, a catheter, into

        4  the vein in order to inject X-ray dye to assess their

10:08:43  5  anatomy.  Is there a blood clot there?  Is there anatomic

        6  abnormalities?  I want to know where the renal vein is.  I

        7  mentioned that briefly.  I want to know where those are in

        8  order to know where to put the filter.  And once I'm

        9  satisfied -- and measure the cava.  Again, that is key, I

10:08:58 10  want to be sure the cava is less than 28 millimeters.

       11          So once I'm satisfied that it's safe and appropriate

       12  to place the filter, then using the device that comes in the

       13  package, the standard device, I just put the filter in and

       14  release it, all while watching with X-rays.

10:09:17 15  Q   And then you place the filter in a specific location in

       16  the vena cava?

       17  A   Yes.

       18  Q   And then the next step was to wait a period of time --

       19  well, monitor the patients first during the course of the

10:09:30 20  study.

       21          And explain to us specifically how the patients were

       22  monitored.

       23  A   So the patients were monitored with abdominal radiographs

       24  every two weeks.  So we all have X-rays when we have tummy

10:09:44 25  pain, so we just took an X-ray of the patient's abdomen.  And

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:09:47  1   I would look at it to look at the filter, and we compare that

2   with the X-rays I took when I was placing the filter.

3        So is the filter in the same place?  Has it tilted?

4   Has it moved?  Has it fractured?  Looking for those

10:10:00  5   complications in order to identify a complication that may

6   occur in an asymptomatic patient in order to identify it and

7   deal with it before an asymptomatic complication becomes a

8   clinical complication.

9   Q   And then at some point the intent was to retrieve the

10:10:19  10  filter?

11  A   It was always the intent to retrieve the filter.  This

12  was not a long-term study.

13  Q   And could you explain to the members of the jury how the

14  Recovery was intended to be retrieved?  Removed?

10:10:32  15  A   So this was a -- we call it Iannella (phonetic) design,

16  different than some of the other designs, so there was a

17  little nub, if you remember seeing at the top of the filter

18  on the last image, and there's, it's called a cone, it's

19  almost like a space shuttle when it docks with the space

10:10:50  20  station.

21       So through the vein in the neck.  So the cone is at

22  the top of the filter.  So although I place the filter through

23  the leg vein, because the cone is the top, I need to go

24  through the vein in the neck.  So same thing, put a needle in,

10:11:02  25  wire in, tube in, and inject X-ray dye at the beginning,

DIRECT EXAMINATION - MURRAY R. ASCH, M.D.

10:11:05  1  again, to be sure that I know where the filter is, look to see

2  if there is any clot present in the filter, look to see if

3  there's any reason that I can't safely take the filter out.

4          And all things being equal, when it's all safe, I put

10:11:19  5  the special cone device down, essentially grab onto the

6  filter, and then remove the filter through a sheath through a

7  little tube that I've placed in the vein.

8  Q   At some point in time in the study did you learn of any

9  complications?

10:11:35  10  A   Yes.

11  Q   Tell the jury what you learned and how you learned it.

12  A   So in Patient Number 9, again, I was reviewing -- he was

13  quite an ill man.  I was reviewing some radiographs that he

14  had had outside of the study.  So, again, I was paying very

10:11:52  15  close attention to these patients.  I noticed on his X-ray

16  that his filter had moved, and that gave me great concern.

17  Q   Moved in what direction?

18  A   It had moved -- initially it moved down caudally, towards

19  his feet, and then subsequently cranially, up towards his

10:12:13  20  head.

21  Q   Did you note how far it moved?

22  A   Moved approximately 4 centimeters, which is about two

23  inches.

24  Q   And how did you feel when you saw that radiograph?

10:12:23  25  A   I was very -- I was very concerned.  I was concerned for

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:12:26 1  two reasons.  I was concerned because this is a brand-new

2  filter never been used, and now in Patient Number 9 we have a

3  complication, a filter migration, and because, as the

4  filter -- as we discussed before, as the filter moves up

10:12:42 5  towards the heart, the IVC becomes wider, so once it starts

6  migrating, my concern was it would migrate further, migrate

7  into his heart, migrate into his lungs, where it could

8  ultimately kill him.

9  Q    Did the patient that experienced this complication have

10:12:57 10  any symptoms?

11  A    No.  He was completely asymptomatic, and this was found

12  only because he was part of the study and only because I was

13  personally reviewing all of his imaging studies.

14  Q    What did you do when you saw the radiograph?

10:13:14 15  A    I did a bunch of things.  I can't remember exactly what

16  order.  The first thing I did was probably phone the

17  patient's physician and made arrangements to have the filter

18  removed.  And then at some point I contacted the people from

19  Bard and/or NMT to inform them of this complication and let

10:13:33 20  them know what was going on.  And then I subsequently, as per

21  ethics protocol, I contacted my hospital ethics review board

22  and I contacted Health Protection Canada, because this is an

23  unexpected complication, unexpected potentially serious

24  complication, and as a result of all those -- that event, the

10:13:53 25  study was put on hold so that we could investigate.

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:14:03  1          MR. O'CONNOR:  Gay, would you please put up

        2   Exhibit 557.

        3          Thank you, Gay.

        4   BY MR. O'CONNOR:

10:14:35  5   Q   Dr. Asch, do you recognize Exhibit 557?

        6   A   Yes, I do.

        7   Q   What is it?

        8   A   So this is an e-mail that I sent.  I'm a bit unsure who I

        9   sent it to because it looks like it's been copied and pasted

10:14:52 10   and forwarded a number of times.  But essentially this is an

       11   e-mail that I sent to, I think, the ethics board to inform

       12   them of the complication that had occurred and outlined the

       13   plan that I had as to how I was going to deal with it.

       14   Q   So this --

10:15:11 15          MR. O'CONNOR:  Your Honor, move to admit Exhibit 557.

       16          MR. NORTH:  No objection, Your Honor.

       17          THE COURT:  Admitted.

       18          (Exhibit 557 admitted.)

       19   BY MR. O'CONNOR:

10:15:27 20   Q   Now, Dr. Asch, first of all, is this an e-mail that you

       21   authored?

       22   A   Yes, it is.

       23   Q   And it's an e-mail that was sent to whom?

       24          MR. O'CONNOR:  Oh, excuse me.  May I publish to the

10:15:39 25   jury, Your Honor?

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:15:40  1          THE COURT:  Yes.

      2          THE WITNESS:  I believe it was sent to the Health

      3  Canada and to the ethics board.  So this has been forwarded a

      4  number of times, so I can't really tell who exactly was it

10:15:57  5  initially sent to.

      6  BY MR. O'CONNOR:

      7  Q   Is it your belief that initially the e-mail went to the

      8  ethics board?

      9  A   Yes.

10:16:02 10  Q   And why did you do that?

     11  A   Number one, because I was concerned about the safety of

     12  the device, and, number two, because I'm legally required

     13  under the auspices of a research study to inform the ethics

     14  board of a serious adverse complication.

10:16:23 15  Q   Going on down in this letter, you explained your belief as

     16  to why the filter migrated.

     17          Do you see that?  It looks like it's the beginning of

     18  the second full paragraph.

     19  A   Yes.  So I hypothesized that the filter had caught a

10:16:46 20  large clot.  We knew that there was a large clot in the

     21  filter when I removed the filter.  So I hypothesized that the

     22  impact, the stress of catching that clot overwhelmed the

     23  strength of the hooks and caused the filter to migrate.

     24  Q   Now, did you tell Bard your concerns that this may be --

10:17:06 25  that this complication was serious and could have resulted in

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:17:10  1    death to the patient?

2    A    Yes, I did.

3    Q    And what was Bard's response?

4    A    They said they would investigate that filter, which was

10:17:18  5    returned to them, and there were a number of conversations we

6    had trying to decide what do we do.  Does this one patient

7    out of nine filter migration represent a trend or is it an

8    isolated event?  And how do we decide?  Do we -- so there's

9    lots of discussion.  We decided do we halt the study

10:17:41  10   permanently or continue on with the study.

11   Q    Did Bard indicate to you that they were going to look into

12   it?

13   A    They did.

14   Q    And was the study suspended?

10:17:49  15   A    The study was suspended at that time, yes.

16   Q    And was it resumed?

17   A    It was resumed, yes.

18   Q    And how did you -- how was it resumed?

19   A    There were extensive conversations with Bard, NMT, but

10:18:04  20   it's my recollection that, in my view, the -- it was the

21   conversation I personally had with John Kaufman, an American

22   interventional radiologist and experienced in IVC filters,

23   and based on the discussion I had with him, we together

24   agreed that it was reasonable to proceed with caution, with

10:18:27  25   extra monitoring, and with patient information and consent,

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:18:30  1    we would proceed to see if this was an isolated event or if

2    this was going to happen again.

3    Q    In Exhibit 559 -- excuse me, 557, you stated that, "I

4    believe that the filter migrated due to the impact of the

10:18:49  5    large thrombus and in doing so likely saved this patient's

6    life."

7            Can you explain that statement, please?

8    A    Well, a large thrombus has the potential to kill a

9    patient.  Some -- every patient has different sensitivity to

10:19:03 10    thrombus, but a large clot could kill a patient.  So this

11    filter did its job, acted as a filter and trapped that

12    thrombus, preventing it from going to the lungs.  But at the

13    same time the filter failed in that it migrated.  So the

14    filter didn't do its complete job and stay where I had placed

10:19:21 15    it.

16    Q    So earlier when we talked about it staying in place, being

17    stable, is that what failed in this filter?

18    A    Yes.

19    Q    And I think you said that as the vena cava goes up towards

10:19:42 20    the heart, it becomes larger in diameter.

21    A    Yes, it did.

22    Q    And why was that a concern?

23    A    Because if the filter has already migrated, as the cava

24    gets larger in diameter it doesn't have the same resistance,

10:19:58 25    the force of legs that hooks out on the filter wall are going

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:20:05  1    to be reduced, making it easier for that filter to migrate

2    further.

3    Q    Did you talk to Dr. Kaufman at all about this event?

4    A    Yes, I did.

10:20:33  5    Q    Tell us about that conversation.

6    A    Well, he shared -- he mirrored and absolutely shared my

7    concerns that this experience, this migration is very

8    concerning.  But, again, being uncertain as to what the true

9    incidence or frequency of this was, he agreed that the

10:20:57 10    device, in theory, still had potential benefit to patients at

11    large, and with very close monitoring in my study and, again,

12    as Bard had suggested initially, subsequently with a

13    follow-up larger study, the hope is that we can identify the

14    true incidence of these and other types of complications.

10:21:25 15    Q    So you continued with the study?

16    A    Yes.

17    Q    Did you have any other complications?

18    A    Yes.

19    Q    Did you have any complications involving a fracture,

10:21:39 20    Dr. Asch?

21    A    Yes.  There was Patient 33 who experienced a filter

22    fracture, including an arm and a hook.

23    Q    Tell us about that patient.

24    A    So that filter was place into a young woman who was

10:21:53 25    pregnant at the time, and similar to Patient Number 9, her

DIRECT EXAMINATION — MURRAY R. ASCH, M.D.

10:21:59  1   filter complication was only noted by myself after I

2   personally reviewed her imaging studies.  And, again, the

3   scenario was kind of similar.  I found out the complication,

4   the filter fractures in this case, and then made arrangements

10:22:15  5   to have the filter removed as quickly as possible and, again,

6   I contacted the authorities, the Health Protection Branch and

7   my hospital ethics board, informing them of this

8   complication, and I put the study on hold with the support

9   and approval of those governing bodies.

10:22:37  10           MR. O'CONNOR:  Gay, could you please put up

11   Exhibit 559, please.

12   BY MR. O'CONNOR:

13   Q   Dr. Asch, can you look at and identify Exhibit 559.

14   A   Yes.  This is a e-mail that I sent which describes the

10:22:59  15   filter fracture.

16   Q   And, Dr. Asch, was the study suspended after this?

17   A   Yes, it was.

18   Q   Again, is this something that you found when you were

19   reviewing radiographs?

10:23:13  20   A   Yes.  So I reviewed a radiograph that had been reported

21   normal by the regular diagnostic radiologists.  I identified

22   this only because this patient was in the study and I

23   personally reviewed her imaging studies.

24   Q   Did Patient 33 have any symptoms associated with the

10:23:34  25   fractures?

DIRECT EXAMINATION - MURRAY R. ASCH, M.D.

10:23:34  1    A    She was asymptomatic as well.

2    Q    Now, eventually did you -- did your involvement end in the

3    study?

4    A    Yes.  So my -- well, the study came to an end, but I

10:23:52  5    think prior to the study ending I had a change in career, if

6    you will.  I went from working for University of Toronto to

7    working at the hospital where I am now.

8    Q    And after the patient, I think that was Patient Number 9

9    that had the migrating, cephalad migrating filter, and then

10:24:16  10   the patient that had the fracture, did you have any

11   discussions with Bard about any concerns you had about the

12   Recovery filter?

13   A    Yes.  So after each complication I had discussions with

14   Bard and expressed my concern about the filter and repeated

10:24:32  15   the fact that they had promised me from the get-go that there

16   would be a long-term safety study performed on all aspects of

17   the filter.  And, again, my study, this study was simply a

18   pilot program.

19   Q    Did you tell them that whether you -- did you tell them

10:24:51  20   that you did not feel that this filter, the Recovery, was

21   ready to be put on the market?

22   A    Yes, I did.

23   Q    And did Bard -- did anybody from Bard respond to you that,

24   yes, they understood your concerns and that there was going to

10:25:06  25   be a long-term study?

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:25:07   1        MR. NORTH:  Objection, Your Honor.  Leading.

2        THE COURT:  Sustained.

3    BY MR. O'CONNOR:

4    Q    What was -- did you receive a response about your concerns

10:25:13   5    from anybody at Bard?

6    A    It was my understanding they were going to do two things.

7    One is look at the filter again, particularly with respect to

8    the fracture, and see if there was a design issue that needed

9    to be changed.  And, again, always in the background, I was

10:25:26  10    informed that a long-term study was going to be done.

11    Q    And at some point in time did you learn whether a

12    long-term study was done or not?

13    A    I learned that a long-term study had not been done, but

14    this device had been released for use -- for general use.

10:25:54  15    Q    And how did you learn that?

16    A    On the street.  Just through word of mouth.  I heard it

17    from other radiologists who said, well, I just put this

18    filter in.  I said, oh, that's kind of strange, I didn't

19    think the filter was released for use yet outside of a study.

10:26:12  20    Are you doing a study?  The answer was, no, they sold me a

21    filter.

22    Q    How did you feel when you heard that?

23    A    I felt betrayed, I felt frustrated, I felt concerned

24    that, particularly given the two, what I consider serious

10:26:24  25    complications in my limited study, that the filter was now in

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:26:28    1    fairly widespread use without plans for the study that I had

            2    initially been promised.

            3            MR. O'CONNOR:  Gay, could you please put up

            4    Exhibit 558.

10:26:50    5    BY MR. O'CONNOR:

            6    Q   Can you identify Exhibit 558, please.

            7    A   Yes.  That is the scientific manuscript that I wrote and

            8    was published in the Journal of Radiology after completion

            9    of -- which included 32 patients in the study.

10:27:11   10            MR. O'CONNOR:  Excuse me.  Your Honor, I need to go

           11    back to Exhibit 559.

           12            Gay, could you please put 559.

           13    BY MR. O'CONNOR:

           14    Q   Dr. Asch --

10:27:19   15            MR. O'CONNOR:  At this time I move Exhibit 559 into

           16    evidence.

           17            MR. NORTH:  No objection, Your Honor.

           18            THE COURT:  Admitted.

           19        (Exhibit 559 admitted.)

10:27:28   20    BY MR. O'CONNOR:

           21    Q   Dr. Asch, is this a notification that you gave the board

           22    again about the fracture in Patient 33?

           23    A   Yes, it is.

           24    Q   And after this is when you suspended your study?

10:27:40   25    A   Yes.

DIRECT EXAMINATION - MURRAY R. ASCH, M.D.

10:27:44    1          MR. O'CONNOR:  May I publish this to the jury,

           2     please?

           3          THE COURT:  Yes.

           4     BY MR. O'CONNOR:

10:27:47    5     Q   Dr. Asch, with Patient 33, like Patient 9, did you receive

           6     any indication that -- from Bard whether this incident would

           7     be looked into?

           8     A   Yes, they indicated that both incidents would be looked

           9     into.

10:28:20   10     Q   Did you participate in any investigation?

          11     A   No, I did not.

          12     Q   And were you told at some point in time that the

          13     Patient 33 situation was investigated?

          14     A   Yes.

10:28:34   15     Q   Did the study resume after that?

          16     A   Yes, it did.

          17     Q   All in all, how many patients participated in this study?

          18     A   I believe there were approximately 56.

          19          MR. O'CONNOR:  Let's display Exhibit 558.

10:28:48   20     BY MR. O'CONNOR:

          21     Q   And what is Exhibit 558?

          22     A   Again, that is the scientific manuscript that was

          23     published in the Journal of Radiology describing the results

          24     of the first 32 patients in this pilot study.

10:29:14   25          MR. O'CONNOR:  One moment, Your Honor.

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:29:20   1        THE COURT:  We are at the 10:30 point, so we're going

       2   to break for the morning.

       3        Ladies and gentlemen, we will resume at 10:45.

       4   Please remember not to discuss the case, and we will excuse

10:29:29   5   the jury.

       6        (Recess was taken from 10:29 to 10:45.  Proceedings

       7   resumed in open court with the jury present.)

       8        THE COURT:  Thank you.  Please be seated.

       9        You may continue, Mr. O'Connor.

10:46:37  10        MR. O'CONNOR:  Thank you, Your Honor.

      11   BY MR. O'CONNOR:

      12   Q   Dr. Asch, your initial study I think you said involved

      13   thirty-some patients.  32?

      14   A   32 patients were published as far as the initial study,

10:46:51  15   yes.

      16   Q   Did actually more patients participate in your study?

      17   A   Yes.

      18   Q   During your study did you see other complications?

      19   A   Yes, I did.  There were a number of complications, yes.

10:47:01  20   Q   Did you, for example, see a number of procedural

      21   difficulties?

      22   A   Yes.

      23   Q   Were those recorded?

      24   A   Yes, they were.

10:47:07  25   Q   Reported to Bard?

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:47:09    1   A    Yes.

2   Q    Did you see tilts?

3   A    Yes.  There were possibly five filter tilts.

4   Q    And tilt, for the jury, again, is what?

10:47:18    5   A    Tilt is the filter is angled with respect to the caval

6   axis, and for purposes of definition for this study, tilt was

7   greater than 15 degrees.

8   Q    And is there any risk or concerns about tilt as a filter

9   failure?

10:47:36   10   A    Yes.  Tilt has potential serious complications, results,

11   in terms of filter fracture, filter migration, and filter

12   failure.

13   Q    And what is that?

14        MR. NORTH:  Your Honor, objection.  No disclosure as

10:47:48   15   an expert witness.

16        THE COURT:  Overruled.

17        THE WITNESS:  Can you repeat the question?

18   BY MR. O'CONNOR:

19   Q    Sure.  In terms of those risks, what are they?

10:48:00   20   A    Filter fracture, potential migration, potential failure,

21   which means the filter won't trap a clot and it can go to the

22   lungs and cause injury or death.

23   Q    And did you see perforation?

24   A    Yes.

10:48:15   25   Q    Was that a serious complication?

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:48:17  1   A   Yes, that's a potential serious complication.

2   Q   You told us about the cephalad migration you saw in

3   Patient 9.

4   A   Yes.

10:48:25  5   Q   And did you see caudal migration in patients?

6   A   Yes.

7   Q   Was that also in Patient 9?

8   A   Yes.

9   Q   You learned that the filter went down and then up.

10:48:35  10   A   That's correct.

11   Q   And is that a serious complication?

12   A   Yes.  Any filter movement is a potential serious

13   complication.

14   Q   And then you saw an arm fracture and a leg hook fracture

10:48:46  15   in Patient 33?

16   A   That's correct.

17   Q   And that concerned you as well?

18   A   Very much.

19   Q   Is fracture a serious complication?

10:48:54  20   A   Yes.

21   Q   And what types of risks can that present to a patient?

22   A   Well, that renders the filter unstable.  The filter could

23   then fail and allow blood clots to get to the lungs.  The

24   filter fragment could migrate to the heart or the lungs

10:49:10  25   and/or the bulk of the filter could migrate to the heart or

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:49:14  1    the lungs, where it could cause serious problems.

2    Q    In the patients where you observed these failure modes in,

3    these are all on radiographs; is that right?

4    A    Yes.  These are all asymptomatic patients, detected on

10:49:31  5    radiographs.

6    Q    Asymptomatic.  If a patient, from what you're experiencing

7    in this study, had a failure that was asymptomatic, is that

8    any reason that a doctor should not be concerned?

9    A    No.  I consider myself lucky when I find an asymptomatic

10:49:48 10    problem, complication, of the filter or an asymptomatic mass

11    in someone's pancreas because we like to identify it before

12    it becomes symptomatic because once it's symptomatic it's

13    often too late to avoid pain and suffering.

14    Q    Let me switch gears on you, Doctor.  Did Bard at any time

10:50:17 15    ever indicate to you that they would use -- intended to use

16    your study for purposes of establishing substantial

17    equivalence for a 510(k) application to get it cleared by the

18    FDA here in the United States?

19    A    They never informed me of that, no.

10:50:38 20    Q    If Bard had asked you, would you have given them

21    permission?

22    A    I would have denied permission because this study was,

23    again, designed as a pilot study to access retrievability of

24    the device and was not meant to assess safety, long-term

10:50:56 25    in-dwelling safety as a permanent filter.  So this study

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:50:59   1   would not be appropriate to –– for that submission.

2   Q    Did Bard ever contact you and tell you that Bard intended

3   to use your study to establish substantial equivalence for a

4   510(k) application to get the Recovery cleared through the

10:51:16   5   FDA?

6   A    They never spoke with me about that.

7           MR. O'CONNOR:  Gay, would you display Exhibit 5189,

8   please.

9           And, Gay, would you turn to page 0029.

10:51:49  10   BY MR. O'CONNOR:

11   Q    Dr. Asch, have you ever seen this document before?

12   A    I believe I've seen it in prior court, but I had not seen

13   it as part of my clinical practice or in conversation with

14   Bard.

10:52:05  15   Q    Have you ever seen a 510(k) application that included your

16   study and made a statement that Dr. Asch's data relative to

17   complications during filter placement, recurrent pulmonary

18   embolism, death, filter migration, et cetera, provide clinical

19   data to support a determination of substantial equivalence as

10:52:29  20   a permanent filter?

21   A    I was not aware of any of this at the time of the writing

22   of this document.

23   Q    And would you have authorized Bard to use or make any

24   statement to the FDA?

10:52:43  25   A    I would not have done so.

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:52:45  1   Q   And if Bard did, what's your response?

2   A   I would be disappointed and concerned because that opened

3   the door towards the widespread use of a device that hadn't

4   been appropriately tested and puts patients at risk.

10:53:03  5          MR. O'CONNOR:  At this time I would move for

6   admission of 5189, Your Honor.

7          MR. NORTH:  No objection, Your Honor.

8          THE COURT:  Admitted.

9        (Exhibit 5189 admitted.)

10:53:12  10         MR. O'CONNOR:  Publish to the jury?

11         THE COURT:  You may.

12         MR. O'CONNOR:  Gay, could you please go back to the

13   first page.

14   BY MR. O'CONNOR:

10:53:32  15   Q   Dr. Asch, this document's entitled Recovery Filter System

16   Special 510(k) Submission.

17          Do you see that?

18   A   Yes, I do.

19   Q   Are you knowledgeable or have any expertise in the

10:53:45  20   clearance process of 510(k)?

21   A   I have no knowledge or expertise in this area.

22          MR. O'CONNOR:  Gay, turn to page 5189.0029, please.

23          In the third paragraph highlight "however."  The

24   sentence beginning "However," Gay, right there at the end.

10:54:18  25   All the way down.  Thank you.

DIRECT EXAMINATION – MURRAY R. ASCH, M.D.

10:54:20   1   BY MR. O'CONNOR:

       2   Q   Dr. Asch, was your pilot study to study the

       3   implantability, retrievability, of the Recovery filter ever

       4   designed to or intended to establish substantial equivalence

10:54:32   5   for the Recovery as a permanent filter?

       6   A   That was never the aim of the study.  The study was not

       7   designed to do that.

       8   Q   And did you ever authorize Bard to represent to any

       9   government agency here in the United States that the purpose

10:54:48  10   or the intent of your study to was establish substantial

      11   equivalence for clearance in the FDA?

      12   A   I would never have authorized this study to be used for a

      13   submission like this.

      14   Q   Why?

10:55:03  15   A   The study wasn't designed for that.  It's inappropriate

      16   to draw conclusions and make statements about a study when

      17   that wasn't the initial stated goal of a study.  So my study

      18   didn't demonstrate this.

      19   Q   Your study was never intended to be any type of safety and

10:55:22  20   efficacy study.  Is that fair?

      21          MR. NORTH:  Objection.  Leading.

      22          THE COURT:  Sustained.

      23   BY MR. O'CONNOR:

      24   Q   Was your study intended to establish safety or efficacy?

10:55:32  25   A   No.  The single goal of the study was to establish

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

10:55:38  1   whether or not the filter could be safely retrieved.

2           MR. O'CONNOR:  Thank you.  No further questions.

3           THE COURT:  Cross-examination.

4           MR. NORTH:  Yes, Your Honor.

10:55:44  5           C R O S S - E X A M I N A T I O N

6   BY MR. NORTH:

7   Q   Good morning, Dr. Asch.

8   A   Good morning.

9   Q   Your involvement with Bard that you have discussed today

10:56:05  10  concerned the Recovery filter; is that correct?

11  A   That's correct.

12  Q   And your study was conducted in approximately the 2000 to

13  2002 time frame; correct?

14  A   That's correct.

10:56:16  15  Q   And it only involved, that clinical study, the Recovery

16  filter; right?

17  A   Yes.

18  Q   And, in fact, you have had no dealings with Bard, as I

19  understand it, for 13 years, since 2005.

10:56:31  20  A   That's incorrect.  I and -- my department and I use

21  other -- I use a variety of Bard products, so I've got a

22  regular relationship with Bard.

23  Q   But you have had no relation -- you have not spoken with

24  anybody at Bard about filters since 2005, have you?

10:56:48  25  A   No, my sales representatives constantly come around and

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

10:56:51   1   show me the new filters and we talk about filters all the

2   time.

3   Q    But you have done no studies for Bard at all since 2000 --

4   since this study in 2002; correct?

10:57:02   5   A    That's correct.  I have done no studies since that time.

6   Q    And you have not been involved at all in the development

7   of the G2 filter, were you?

8   A    That's correct.

9   Q    And you did not conduct any study of the G2 filter, did

10:57:15   10   you?

11   A    That's correct.

12   Q    And you have not had any involvement with Bard in the

13   development of its third generation retrievable filter, the

14   G2X, have you?

10:57:26   15   A    That's correct.

16   Q    And you did not conduct a clinical study regarding the G2X

17   filter; correct?

18   A    That's correct.

19   Q    And, similarly, you've had no involvement with Bard in the

10:57:37   20   development of the Eclipse filter that was introduced to the

21   market in 2010; correct?

22   A    That's correct.

23   Q    And you did not conduct any clinical study on the Eclipse

24   filter that was the model of filter implanted in Ms. Jones,

10:57:52   25   did you?

CROSS-EXAMINATION - MURRAY R. ASCH, M.D.

10:57:54   1   A    That's correct.

2   Q    And, in fact, as I understand it, you have not even used

3   in your practice a Bard filter since approximately 2005;

4   correct?

10:58:06   5   A    That's correct.

6   Q    Now, you flew from eastern Canada to Phoenix to testify

7   here today; correct?

8   A    Yes, I did.

9   Q    My understanding is you said you were going to be paid

10:58:33  10   $5,000 a day for your time?

11   A    Yes.

12   Q    And that your involvement to come here today to testify

13   will be a total of four days?

14   A    Four.  Equivalent of four days of missed work.

10:58:48  15   Q    So you are going to be charging the plaintiffs $20,000 for

16   this court appearance?

17   A    I'm charging the same amount I charge for any testimony

18   or involvement with any other company I've worked with.

19   Q    And for this particular appearance, that is $20,000;

10:59:07  20   correct?

21   A    Yes, that is what I'm charging.  Yes.

22   Q    In fact, you have appeared to testify for these

23   plaintiffs' attorneys in the past; correct?

24   A    That's correct.

10:59:17  25   Q    And each time you have appeared to testify for these

CROSS-EXAMINATION - MURRAY R. ASCH, M.D.

10:59:21  1  attorneys, you have charged either $5,000 a day or 6- or $700

2  an hour; correct?

3  A   That's the standard rate I've charged for the last 15

4  years of my practice.

10:59:36  5  Q   And as early as 2013, you consulted with Mr. Lopez on the

6  plaintiff's team to prepare a declaration in another matter

7  pending in California; correct?

8  A   Yes.

9  Q   And in working -- in consulting with Mr. Lopez in that

10:59:54 10  case, you likewise charged your normal rate of $5,000 a day or

11  6- or $700 an hour; correct?

12  A   My charges are consistent for anyone I work with.

13  Q   As I understand it, while you continue to utilize IVC

14  filters, you have not published any article concerning IVC

11:00:17 15  filters since at least 2005; correct?

16  A   That's correct.

17  Q   And over the years you've also done some consulting work

18  with one of Bard's competitors that also makes IVC filters,

19  the Cook Medical Group; correct?

11:00:40 20  A   Yes.  I consult and continue to consult with a number of

21  different device companies.

22  Q   And that includes Cook concerning their competitive

23  filters; correct?

24  A   It does, yeah.

11:00:51 25  Q   And you have performed studies for Cook regarding their

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:00:54    1    filters; correct?

2    A    I have performed studies for many different medical

3    device companies, yeah.

4    Q    Now, when you first became involved with the Recovery

11:01:11    5    filter and NMT, Nitinol Medical Technologies, you met with

6    Dr. Morris Simon; correct?

7    A    Yes.

8    Q    And Dr. Simon was the inventor of the Simon Nitinol

9    filter, wasn't he?

11:01:24   10    A    That's my understanding, yes.

11    Q    And you've utilized I believe, as you told us, the

12    Simon Nitinol filter as a part of your practice?

13    A    Yes, I did.

14    Q    But it did not have the added benefit of being a

11:01:38   15    retrievable filter; correct?

16    A    That's correct.

17    Q    And did you consider the use of a retrievable filter to be

18    a positive development in the medical options you had to treat

19    patients?

11:01:51   20    A    Yes.  I believe that temporary filters have great

21    benefits to patients.

22    Q    Now, during the course of your work on this study

23    concerning the Recovery filter, you worked very closely with

24    Mr. Rob Carr from Bard; correct?

11:02:11   25    A    Yes, that's correct.

CROSS-EXAMINATION - MURRAY R. ASCH, M.D.

11:02:13  1   Q   And I believe, as you have told us before, you consider

2   Mr. Carr to be helpful, supportive, creative, and having

3   everybody's best interest in mind; correct?

4   A   That has been my belief, yes.

11:02:26  5   Q   And I believe you also told us that you considered him to

6   be a man of great integrity.

7   A   That was my impression, yes.

8   Q   Your initial study, as I understand it, involved 32

9   patients; correct?

11:02:44  10  A   That was the initial published study, yes.

11  Q   But you continued to look at patients and ultimately, as a

12  part of the formal study, implanted the device in 58 total;

13  correct?

14  A   Yes.   Correct.

11:02:59  15  Q   And after implanting in 58 patients, you continued

16  yourself to utilize the Recovery filter in additional patients

17  as part of your practice for a while; correct?

18  A   Yes, I did.

19  Q   And so is it fair to say that you probably implanted the

11:03:18  20  Recovery filter in as many as 80 patients?

21  A   No.   I would say after I left the study, after I left

22  Mount Sinai Hospital, it was probably on the order of ten

23  filters.

24  Q   So between 65 and 70 total?

11:03:36  25  A   I wasn't the one who inserted all the filters.   Part of

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:03:40  1    the study I had a colleague who worked with me.

2    Q    Well, as part of your study, you at least were familiar

3    with 58 patients that received the Recovery filter, whether

4    you personally implanted the device or not; correct?

11:03:52  5    A    That's correct.

6    Q    And then you implanted it in your own practice in an

7    additional ten paying patients or so?

8    A    Yes.

9    Q    So approximately 68 total patients with the Recovery

11:04:02  10   filter you were familiar with.

11   A    Yes.

12   Q    And of those 68, there was only that one incident of

13   fracture; correct --

14   A    That --

11:04:13  15   Q    -- one patient?

16   A    Yes.

17   Q    Of those 68, there was only that one incident of

18   migration; correct?

19   A    That I'm familiar with.  Again, I left the hospital so I

11:04:24  20   don't have follow-up information on the patients after I

21   left.

22   Q    But based on what you know as you sit here today, out of

23   the 68 patients that you were familiar with and worked with,

24   only one had a migration and only one had a fracture; correct?

11:04:43  25   A    Yes.

CROSS-EXAMINATION - MURRAY R. ASCH, M.D.

11:04:45  1    Q    And you mentioned this with Mr. O'Connor.  Both the

2    patient that had the fracture and the patient that had the

3    migration were asymptomatic; correct?

4    A    Yes, they were.

11:05:01  5    Q    That means they didn't have any pain, any visible injury,

6    anything that made them aware of any complication in that

7    filter.

8    A    Yes, which can be a good thing or a dangerous thing.

9    Q    But, in other words, neither of those patients suffered

11:05:18 10    any physical pain because of the complication with their

11    filter.

12    A    They did not suffer because I was able to intervene and

13    remove the filter prior to them becoming symptomatic.

14    Q    Patient 33 was the patient who had had the fracture;

11:05:48 15    correct?

16    A    Yes.

17    Q    And I believe that was a woman who was pregnant at the

18    time?

19    A    That's correct.

11:05:53 20    Q    And did you have any suspicion or belief in investigating

21    that incident that her pregnancy or childbirth may have had

22    some relationship to the fracture?

23    A    Well, I think in some of the e-mails that I had sent, I

24    think I alluded to that.  But on the other hand, filters are

11:06:13 25    placed in pregnant patients on a widespread basis and yet

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:06:17  1   filter fractures outside of this device had been previously

2   uncommon to the point I've never seen them.

3   Q    After you completed the study or left the hospital in

4   Toronto and went into the private practice, you were no longer

11:06:36  5   participating with Bard in the formal study; correct?

6   A    That's correct.

7   Q    And because of that, you were under no contractual

8   obligation to continue placing Recovery filters; correct?

9   A    That's correct.

11:06:49 10   Q    So when you placed that additional ten filters as part of

11   your practice, you did so knowing that no long-term safety and

12   efficacy study had been performed; correct?

13   A    That's correct.

14        MR. NORTH:  If we could look at Exhibit 556, which

11:07:28 15   has been previously admitted.

16        Your Honor, if we could display that to the jury?

17        THE COURT:  You may.

18        MR. NORTH:  Thank you, Your Honor.

19        And if we could turn to page 5 of this exhibit.

11:07:45 20   BY MR. NORTH:

21   Q    This is the exhibit that Mr. O'Connor discussed with you

22   as a part of your direct examination; correct?

23   A    Yes.  Correct.

24   Q    And this is the protocol for the study that you conducted

11:07:56 25   with regard to the Recovery filter; is that correct?

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:07:59   1   A    That's correct.

2   Q    And if we could look at the first paragraph under the

3   section Background.

4            In the protocol for the study, it was recognized that

11:08:16   5   long-term complications such as filter strut failure or

6   perforation cause hesitancy to use these devices in children

7   and young adults; correct?

8   A    Correct.

9   Q    And it talked about the need to develop a filter that

11:08:36   10   could be left in longer than just a week or two; correct?

11   A    Yes.

12   Q    In fact, it says currently temporary or retrievable

13   devices must be removed prior to two weeks post insertion.

14   A    Yes.

11:08:55   15   Q    And then concludes by saying that without -- with this

16   very narrow window, relatively few patients are truly

17   candidates for temporary filters; correct?

18   A    Correct.

19   Q    And so that was one of the benefits of the Recovery

11:09:10   20   filter, it was going to be the first filter available to

21   doctors that could be left in for an extended period of time

22   and then still retrieved; correct?

23   A    That's correct.

24            MR. NORTH:  If we could look at Exhibit 557, which I

11:09:51   25   believe has been previously admitted, and I would ask this be

CROSS-EXAMINATION - MURRAY R. ASCH, M.D.

11:09:54  1    published to the jury.

2         THE COURT:  You may.

3    BY MR. NORTH:

4    Q   As you mentioned earlier in that second paragraph, you

11:10:09  5    believe that this filter, even though it -- the paragraph

6    below that, I'm sorry -- even though it migrated, you believed

7    it did so because of a large thrombus or clot; is that

8    correct?

9    A   That was my belief, yeah.

11:10:28 10    Q   And you believed it likely saved the patient's life.

11    A   Potentially, yes.

12    Q   And you go on a couple of lines down to note that "I

13    believe that this is an isolated event and that filter

14    migration is a known complication of all currently approved

11:10:48 15    devices."  Correct?

16    A   Correct.

17    Q   Now, Mr. Rob Carr, who we talked about a few moments ago,

18    he was involved in the investigation of this event; correct?

19    A   Yes.

11:11:05 20    Q   Now, and this event was reported to authorities or the

21    administration at the hospital you worked in; correct?

22    A   That's correct.

23    Q   And it was reported to the Canadian authorities from whom

24    you had obtained permission to conduct this study?

11:11:21 25    A   That's correct.

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:11:32  1    Q    And after the investigation was concluded and reported to

2    the Canadian authorities, they permitted you to continue the

3    study; correct?

4    A    Yes.

11:11:40  5    Q    And you were willing to do so; correct?

6    A    With the proviso that patients were informed and there

7    was more rigorous follow-up.

8    Q    As we just saw when looking at this protocol, before you

9    ever started this study, filter fracture was a known

11:12:02  10   complication of IVC filters; correct?

11   A    Yes.

12   Q    And as you did with the migration, when the fracture

13   occurred in Patient Number 33, you reported that to the

14   authorities at your hospital; correct?

11:12:16  15   A    That's correct.

16   Q    And you reported it to the Canadian regulatory authorities

17   that had given you permission to conduct this study?

18   A    That's correct.

19   Q    Are you aware that NMT or Bard conducted an investigation

11:12:45  20   of that incident?

21   A    They informed me they were going to do so.

22   Q    And did they inform you of the results of that

23   investigation?

24   A    Of the fracture?

11:12:53  25   Q    Yes.

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:12:53  1    A    Yes.  It was my understanding that that investigation

2    concluded that there, I'll say, was an issue with respect to

3    the welding of the device and they were going to make changes

4    in the device manufacturing process.

11:13:08  5    Q    Didn't -- did they also tell you or were you aware that

6    their investigation concluded that the natural anatomy,

7    anatomical forces of labor and childbirth precipitated the

8    fracture of the filter?

9    A    I'm not sure their investigation was targeted to make

11:13:31  10   that conclusion.  Again, IVC filters are placed commonly in

11   pregnant women and they don't typically fracture.

12   Q    Do you -- are you aware of the fact that after they

13   concluded their investigation with this and before they ever

14   began selling the Recovery filter on the market, they revised

11:13:49  15   the instructions for use to give specific instructions to

16   doctors as to how to place the filter, if they chose to do so,

17   in a pregnant woman?

18   A    I have become aware of that document and those are the

19   instructions that are the standard instructions for any IVC

11:14:06  20   user for any other device in pregnant women.

21   Q    Well, are you aware of the fact they made that change to

22   their instructions for use specifically based on the

23   investigation they conducted of the incident in your study?

24   A    I'm aware they revised the instructions for use.

11:14:32  25            MR. NORTH:  If we could bring up Exhibit 558, please.

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:14:35  1   BY MR. NORTH:

2   Q   Mr. O'Connor briefly started discussed this publication

3   with you.  Do you recall this publication?

4   A   Yes, I do.

11:14:48  5   Q   And, in fact, you are the author of this publication;

6   correct?

7   A   Yes, I am.

8   Q   And it is entitled Initial Experience in Humans with a New

9   Retrievable Inferior Vena Cava Filter?

11:15:04  10  A   Yes.

11  Q   And this was published in the medical journal called

12  Radiology in 2002; correct?

13  A   Yes.

14  Q   And you're familiar with the medical journal Radiology?

11:15:15  15  A   Yes, I am.

16  Q   I believe, if you look over on the left, you initially --

17  on the first page, initially submitted this to the journal in

18  November of 2001; correct?

19  A   Yes.

11:15:31  20  Q   And a couple of months later, the editors of the journal

21  specifically asked you to revise this; correct?

22  A   Yes, that's correct.

23  Q   And you would agree that the journal, medical journal

24  Radiology, is a well-respected authority in your particular

11:15:54  25  field; correct?

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:15:55  1    A    Yes.

2    Q    It publishes peer-reviewed articles written by doctors

3    like yourself who are reporting on studies or observations

4    they have made in their practices?

11:16:04  5    A    Yes.

6    Q    And people in your field rely upon journals like

7    Radiology; correct?

8    A    Yes, they do.  We all do.

9    Q    Now, at this time when you published this article, you're

11:16:17  10   publishing it on the first 32 patients in your study; correct?

11   A    Yes.

12         MR. NORTH:  If we could look at page 843.

13   BY MR. NORTH:

14   Q    In looking in the middle paragraph, Dr. Asch, middle

11:16:54  15   column, you note for the readers in the Radiology journal that

16   there was a single occurrence of asymptomatic filter migration

17   in this series of 32 patients; correct?

18   A    That's correct.

19         MR. NORTH:  And then if we could turn to the final

11:17:14  20   page and the final paragraph.

21   BY MR. NORTH:

22   Q    Dr. Asch, in this study -- in this article, you state, and

23   let me quote, "In conclusion, this preliminary, special-access

24   use of the RNF," Recovery filter, "a retrievable IVC filter,

11:17:43  25   suggests that the filter can easily be delivered via a femoral

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:17:48   1    vein."  Correct?

2    A    Yes.

3    Q    And you further note it can be removed percutaneously up

4    to 134 days after insertion; correct?

11:18:02   5    A    Yes.

6    Q    And then --

7              MR. NORTH:  If we can show the whole paragraph there.

8    No -- that's fine.  I'm sorry.

9    BY MR. NORTH:

11:18:13  10    Q    And then you state -- in conclusion in this article you

11    state, "No substantial complications were encountered in this

12    series." Correct?

13    A    Well, I did say that, but at the top of that paragraph it

14    clearly says "preliminary study" and "suggests that."  Which,

11:18:35  15    again, in my mind, support the initial feeling that this was

16    a preliminary study meant to pave the way for a long-term

17    study.

18    Q    But even after telling your readers and the readers of

19    this author -- this article, that there had been a migration,

11:18:55  20    the migration you talked about with Mr. O'Connor, you

21    published in this journal "No substantial complications were

22    encountered in this series."  Correct?

23    A    Yes, that was what was written.

24              MR. NORTH:  Let's look, if we could, at Exhibit 555.

25

CROSS-EXAMINATION - MURRAY R. ASCH, M.D.

11:19:34  1  BY MR. NORTH:

2  Q    This is another article or letter to the editor to a --

3  excuse me, to a medical journal that you wrote; correct?

4  A    Correct.

11:19:46  5  Q    And you are one of four authors of this letter; is that

6  correct?

7  A    Yes, I am.

8  Q    And the other three authors are -- were colleagues of

9  yours at the University of Toronto; is that right?

11:19:58 10  A    Yes.

11  Q    And what journal was this published in?

12  A    I think was that the Journal of Thrombosis and

13  Haemostasis.

14  Q    Do you consider that a reliable journal?

11:20:20 15  A    Yes, I do.

16  Q    Is it one you consult on occasion in your practice?

17  A    Yes.

18  Q    And does it publish peer-reviewed articles and other case

19  reports?

11:20:28 20  A    Yes, it does.

21  Q    In this particular letter to the editor of this journal,

22  it's entitled Temporary Inferior Vena Caval Filter Use in

23  Pregnancy; correct?

24  A    Yes.

11:20:50 25  Q    And you talk in this article about Patient Number 33 who

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:20:53  1    had the fracture; correct?

2    A   Yes.

3              MR. NORTH:  And if we could go over to the second

4    page, please, in the right column, the paragraph beginning

11:21:03  5    "There."

6    BY MR. NORTH:

7    Q   After telling the readers in this letter about Patient

8    Number 33, the pregnant woman in your study, and the fracture

9    of her filter, you and your colleagues stated there was --

11:21:19 10    "There were no significant complications in the use of the IVC

11    filter in our patients."  Correct?

12    A   In this limited series of 58 patients, yes.

13    Q   So even though in that 58 patients you had this migration

14    you talked about and you had this fracture that you talked

11:21:40 15    about, you are telling the medical community that you did not

16    consider those to be significant complications; is that

17    correct?

18    A   Yes.  And I have to say I feel embarrassed by these

19    things, and I have to say these articles were written to help

11:21:59 20    pave the way towards a longer term big study, and that's why

21    I wrote them.  And I would have -- I sadly downplayed the

22    complications that did occur that are significant.  And,

23    again, those were stated simply to facilitate a bigger study.

24    Q   So you're telling us that you believe those complications

11:22:22 25    to be significant but you downplayed them, as you just said,

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:22:25  1   to the medical community?

2   A   Well, they were downplayed because early on experience

3   with only 58 patients we don't know, with those complications

4   in 58 patients, two complications in 58, is that the sign of

11:22:41  5   worse things to come in the future with more widespread use

6   of the device?

7   Q   After talking about the filter fracture, you stated that

8   this is a commonly accepted complication of IVC filters; is

9   that correct?

11:22:58  10   A   Yes.  If you read the literature, IVC filter fracture is

11   listed as a complication.  But in my experience prior to this

12   and in 20 years of practice before and after this, I have

13   never seen a filter fracture personally.

14   Q   And your colleagues go on to report that fracture has been

11:23:18  15   previously reported with the Simon Nitinol filter in up to

16   14 percent of patients; correct?

17   A   That is what it says there, yes.

18   Q   In talking about Patient Number 33, the pregnant woman

19   whose filter had fractured, you noted that she remained

11:23:45  20   asymptomatic for 18 months following the filter removal;

21   correct?

22   A   Yes.  She was asymptomatic because the filter had been

23   removed.

24   Q   And then you go on in this article to the medical

11:23:59  25   community and talk about the filter migration incident; right?

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:24:01  1   A    Yes.

2   Q    Patient 9.

3   A    Yes.

4   Q    And you told the medical community there was a minimal

11:24:10  5   degree of filter migration in the second case which had no

6   clinical consequences; correct?

7   A    Yes.

8   Q    And so after this study has been completed and even though

9   you've had this fracture and even though you've had this

11:24:29  10   migration, you tell the medical community that these were not

11   significant complications, that the fracture patient remained

12   asymptomatic, and that the migration patient had no clinical

13   consequences; correct?

14   A    Yes.  I've already apologized for those statements.  But

11:24:48  15   at the end of this I did clearly state that follow-up

16   abdominal imaging is essential to ensure that there is no

17   more serious clinical complication.

18        MR. NORTH:  Okay.  If we can go down to the final

19   paragraph, please.

11:25:08  20   BY MR. NORTH:

21   Q    Towards the end of this you conclude and you tell the

22   medical community in this letter, or article, that "The novel

23   Recovery filter device is an attractive option when peripartum

24   circumstances might extend the duration during which caval

11:25:33  25   interruption should be maintained"; correct?

CROSS-EXAMINATION - MURRAY R. ASCH, M.D.

11:25:35  1    A    Yes.

2    Q    By that you mean in pregnant women; is that correct?

3    A    In this particular case, yes.

4    Q    You're telling the medical community this device is an

11:25:49  5    attractive option for pregnant women, already knowing you had

6    one incident of fracture and one incident of migration in your

7    study?

8    A    Yes.  But, again, these are articles that are written

9    with the understanding Bard was going to perform a larger

11:26:03 10    study and not rely on a case -- case reports from 58

11    patients.

12    Q    But you didn't say that in this article, did you?

13    A    And I apologize for that.

14    Q    And you just told the medical community that despite your

11:26:18 15    experience or based on your experience in your study, you

16    thought this was a viable attractive option for use in

17    patients; correct?

18    A    I did say that.

19    Q    Now, you testified earlier, Dr. Asch, that you did not

11:26:38 20    know that Bard was going to cite your study to the FDA;

21    correct?

22    A    For substantial equivalence for a permanent filter, yes.

23    Q    You have no evidence that Bard misrepresented any aspect

24    of your study to the FDA; right?

11:26:58 25    A    My study wasn't meant to demonstrate permanent safety.

CROSS-EXAMINATION - MURRAY R. ASCH, M.D.

11:27:02  1    Q    That was not my question, Doctor.

       2              You have no evidence or reason to believe that Bard

       3    misrepresented anything about your study to the FDA.

       4    A    Well, the document that has been previously entered as an

11:27:17  5    exhibit makes -- makes an unsubstantiated claim referring to

       6    my study, so, yes, that is evidence.

       7    Q    Are you aware of the fact that Bard advised the FDA of the

       8    fracture incident in your study?

       9    A    No.

11:27:35 10    Q    Are you aware of the fact that Bard advised the FDA of the

      11    migration incident in your study?

      12    A    I'm not aware of what Bard has communicated to the FDA.

      13    Q    Are you aware that Bard, in the instructions for use

      14    provided to every physician who bought the Recovery filter

11:27:55 15    after your study was completed, that they described your study

      16    in the instructions for use?

      17    A    I believe I'm aware of that.

      18    Q    And are you aware that in the instructions for use, Bard

      19    told physicians who were using this filter that in your study

11:28:15 20    there had been a report of one fracture incident?

      21    A    I believe I recall that.

      22    Q    And are you aware that in the instructions for use

      23    provided to every doctor who purchased this or used this, it

      24    referenced the one migration incident in your study?

11:28:34 25    A    I believe so.

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:28:49  1          MR. NORTH:  If we could bring up Exhibit 567.

        2   BY MR. NORTH:

        3   Q   Are you familiar with Exhibit 567?

        4   A   Yes.

11:29:02  5   Q   This is a letter that you wrote and signed; correct?

        6   A   Yes, it is.

        7   Q   And it was written under your letterhead or stationery

        8   from Mount Sinai Hospital in Toronto; correct?

        9   A   Yes.

11:29:20  10   Q   And did you maintain this letter as a part of your files

        11   at Mount Sinai?

        12   A   Yes.  When was I was at Mount Sinai.

        13   Q   And did you prepare this letter as a regular part of your

        14   business or work or practice as a radiologist consulting and

11:29:40  15   performing studies?

        16   A   As a regular part, no.  I was specifically asked to

        17   provide this letter by Bard.

        18   Q   But you would prepare communications for various people as

        19   a routine part of your work as a consultant or conducting

11:29:55  20   studies of various sorts; correct?

        21   A   I have never been asked and I have never provided a

        22   letter of support for any portion of an approval process for

        23   any government agency.

        24   Q   But that's what this letter is, isn't it?  It's a letter

11:30:10  25   of support for a -- to a government agency; correct?

CROSS-EXAMINATION - MURRAY R. ASCH, M.D.

11:30:14  1   A   Yes, it is.

2           MR. NORTH:  Your Honor, at this time we would tender

3   Exhibit 567.

4           MR. O'CONNOR:  No objection.

11:30:23  5           THE COURT:  Admitted.

6         (Exhibit 567 admitted.)

7           MR. NORTH:  Could we display to the jury, Your Honor?

8           THE COURT:  Yes.

9   BY MR. NORTH:

11:30:33  10  Q   This letter was written on March 10 of 2003.  Dated then;

11  correct?

12  A   Yes.

13  Q   And if we could look at the first paragraph.

14          You state "It is with great pleasure that I write

11:30:50  15  this letter in support of Bard's application for approval of

16  its Recovery IVC filter system."  Correct?

17  A   I try to be polite in my letters, yes.

18  Q   I'm sorry, what?

19  A   I try to be polite in my letters.

11:31:19  20  Q   And at the time you wrote this on March 10 of 2003, you

21  had already completed your study of 58 patients; correct?

22  A   Yes.

23  Q   And you had already observed the migration incident and

24  the fracture incident; correct?

11:31:34  25  A   Yes.

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:31:35  1   Q   And you knew that this letter was going to be provided or

2   utilized with the United States Food and Drug Administration

3   as a part of Bard's application; correct?

4   A   Yes.  I believed it was an application for use as a

11:31:50  5   retrievable device, not as a permanent device.

6        MR. NORTH:  Let's look at the paragraph towards the

7   bottom that begins "I strongly believe."

8   BY MR. NORTH:

9   Q   After completing your study, you wrote in a letter that

11:32:12  10  you knew that Bard was going to submit to the FDA, and I

11  quote:  I strongly believe that the development of this

12  retrievable IVC filter represents one of the most important

13  advances in the field of interventional radiology in the past

14  20 years; correct?

11:32:30  15  A   Yes.

16  Q   And you further stated "I further believe that this filter

17  will positively change the way we treat patients with venous

18  thromboembolic disease, a common affliction with significant

19  impact on morbidity and mortality of our nation."  Correct?

11:32:50  20  A   Yes.

21  Q   Even after completing your study and even knowing a

22  long-term study that you talked about had not been undertaken,

23  you put in this letter for government authorities there is a

24  definite need for this device to be readily available to

11:33:12  25  patients in Canada; correct?

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:33:16  1    A    Yes.   There is definite need and there is great potential

2    for benefit.   But, again, all of that is based upon a study

3    demonstrating true safety of the device, and that was the

4    intention of this letter.

11:33:28  5    Q    You did not tell -- in this letter say a word about

6    conditioning your approval or your support of this device

7    until such time as an additional clinical study had been

8    performed; correct?

9    A    That's correct.

11:33:42 10    Q    And, in fact, in the final paragraph you advised the

11    government authorities, "I would be most happy to meet with

12    you to further discuss my experience with this filter, and to

13    answer any questions or concerns that you may have."   Correct?

14    A    Yes.

11:34:03 15    Q    So, Dr. Asch, you knew that Bard was going to cite your

16    study to the FDA in its application for clearance for this

17    device; correct?

18    A    It was my understanding they were going to use it as a

19    temporary device to pave the way for the study that we had

11:34:20 20    talked about from the beginning.

21    Q    But you didn't mention that understanding in this

22    endorsement letter, did you?

23    A    That's correct.   I, at this point, so many years later, I

24    don't recall what extent of coaching may or may not have

11:34:37 25    occurred.   The letter is really fairly vague.   It's

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:34:40  1   enthusiastic in support of the concept of the device, and

2   looking at it now, there are different words that I probably

3   should have used.  But this is the letter.

4   Q   You told us earlier you were downplaying your concerns in

11:34:56  5   articles distributed to the medical community worldwide.  Were

6   you also downplaying your concerns to the federal and Canadian

7   governmental authorities?

8   A   Again, downplaying may be a bit of an overstatement.  I

9   was tempering them based on the potential benefit of the

11:35:18 10   device.  Again, always in the background of the belief that a

11   long-term study was going to be done, and I didn't want to

12   jump to any conclusions and end the potential use of this

13   device without a proper study.  The study I did was not meant

14   to detect complete safety of this device.

11:35:38 15   Q   But nowhere in this letter, Exhibit 567, did you tell the

16   government that you believed a longer term study needed to be

17   conducted before this device was readily available to

18   patients; correct?

19   A   I neglected to say that, that's correct.

11:35:58 20           THE COURT:  Redirect.

21           MR. O'CONNOR:  May we approach?

22           THE COURT:  Yes.

23           If you want to stand up, ladies and gentlemen, while

24   we talk for a minute, feel free.

11:36:03 25       (Bench conference as follows:)

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:36:26  1       MR. O'CONNOR:  Your Honor, I believe the defense has

2   opened the door.  It made a big deal what he did after the

3   study and the fact of the matter is he's not been able to tell

4   his entire story that he stopped using Bard filters and he

11:36:39  5   stopped using them because of reports of death that he was

6   reading about.

7       THE COURT:  What's your response?

8       MR. NORTH:  Your Honor, all I asked him was whether

9   he continued to do those ten filters after he knew about the

11:36:54 10   fracture in the study and the migration in the study.  I did

11   not get into depth -- I didn't even ask him why he ultimately

12   discontinued use of Bard filters.

13       THE COURT:  Let me ask a different question,

14   Mr. O'Connor.

11:37:05 15       During the break I went back to the Booker trial

16   transcript to look at what Dr. Asch said on this.  And at

17   Docket 10 -- 10493, which is the Day 2 afternoon transcript

18   from Booker, you asked him about this issue.  The way you

19   phrased it, there was a longer question, but at the end it

11:37:26 20   was, "Did you learn things about the clinical experiences of

21   your colleagues with the Recovery filters?"

22       Objection, hearsay.

23       I sustained the hearsay objection.

24       So that raised in my mind the question how do you

11:37:40 25   intend to get in evidence that he heard from others that there

CROSS-EXAMINATION - MURRAY R. ASCH, M.D.

11:37:47  1    were death problems?

2         MR. O'CONNOR:  Because he was a member of the medical

3    community.  He reads the literature.  He saw the reports.

4         THE COURT:  That's all hearsay, isn't it?

11:37:55  5         MR. O'CONNOR:  No, not in terms of what it's being

6    used for.  It's being used to show why he stopped.  I'm not

7    using it to prove the truth of the matter asserted.

8         To rehabilitate him, I think he has a right to say

9    what he learned and what he knew and why he stopped.

11:38:15 10        THE COURT:  Tell me what question you intend to ask.

11        MR. O'CONNOR:  "Dr. Asch, did you stop using the

12    filters?  Why?"

13        THE COURT:  What do you think he's going to say?

14        MR. O'CONNOR:  Serious complications including death.

11:38:29 15    That was well-known.

16        THE COURT:  Mr. North.

17        MR. NORTH:  First, I think it's hearsay.

18        Secondly, I do not think I opened the door in the

19    least.

11:38:37 20        Made no issue about why he --

21        THE COURT:  Well, you didn't, but you clearly made an

22    issue about the fact he continued using the filter after the

23    study was over.  That's a big part of your argument to the

24    jury is he kept using this filter.

11:38:52 25        MR. NORTH:  After these two complications in his

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:38:53  1   study --

2           THE COURT:  Right.  Right.

3           MR. NORTH:  -- that he tried to tell this jury made

4   it necessary for a longer term study.

11:39:01  5           I think it's fair to say he continued to implant

6   those.  But I don't think for him to -- I do think there's a

7   definite hearsay problem for him to come in and just say I

8   quit using it because of what I read.  But, secondly, I don't

9   think that opens the door because I didn't make that point.

11:39:20  10          THE COURT:  Well, I think you have opened the door to

11   their asking why he -- whether he stopped and why he stopped.

12          If they introduce his statement that he heard about

13   other complications, including death, and that's why he

14   stopped, how is that being offered for the truth of the matter

11:39:38  15  asserted?

16          MR. NORTH:  It's being offered -- well, certainly he

17   would not stop using it if he did not believe them to be true.

18   Those statements to be true.

19          And why does he need to say "death" anyway?  Because

11:40:25  20  he can't prove those happened.  He either knows they happened

21   or it's just hearsay, he's just hearing it without knowing

22   that they really did occur.

23          I think it's fair game for him to say he's heard of

24   other complications.

11:40:53  25          THE COURT:  I don't think he should be limited to

CROSS-EXAMINATION – MURRAY R. ASCH, M.D.

11:40:55   1   half an answer.  If he's allowed to answer why he stopped, I

2   think he should be allowed to answer.

3          So I'm going to allow you to ask the question.  It is

4   not being offered for the truth of the matter asserted.

11:41:04   5          If you want, I'll give an instruction that they're

6   only to consider it for that purpose.  But that does cast a

7   bit of a light on that answer.  I don't know if you want me to

8   do that.

9          MR. NORTH:  Right.  I don't think so.

11:41:18  10          THE COURT:  But I want to be clear.  What I'm not

11   ruling here is that the 403 ruling I've made repeatedly is

12   being overturned.  I still stand on that.  I think it is

13   relevant for this purpose of rehabilitating this witness, but

14   I'm not opening the door to further inquiries --

11:41:32  15          MR. O'CONNOR:  Understood.

16          THE COURT:  -- you'll have to raise those as they

17   come up.

18          MR. NORTH:  And just so we don't come right up here,

19   I will object on 403 grounds if he continues to go into detail

11:41:41  20   about it because I think it's just the fact he's heard it

21   that's relevant.

22          THE COURT:  I understand the questions that are going

23   to be asked and I think those are appropriate.

24          MR. O'CONNOR:  Thank you.

11:41:51  25          THE COURT:  Thank you all.

REDIRECT EXAMINATION – MURRAY R. ASCH, M.D.

11:41:52  1     (Bench conference concludes.)

2          MR. O'CONNOR:  May I proceed, Your Honor?

3          THE COURT:  You may.

4              R E D I R E C T   E X A M I N A T I O N

11:42:10  5  BY MR. O'CONNOR:

6  Q   Dr. Asch, you were asked questions by defense about your

7  use of Recovery filters after the study.  Do you recall that?

8  A   I do.

9  Q   Did you stop using the Recovery filter?

11:42:23 10  A   I continued to use the Recovery filter at my new hospital

11  because I believe that it offered potential benefits to the

12  patients.  And although I was working at that time outside of

13  the clinical study, I did clearly direct the ordering

14  physician to do the follow-up that I had done in the study.

11:42:41 15  So number one, do routine abdominal radiographs, and, number

16  two, to contact my team at the time when the IVC filter could

17  and should be removed.

18  Q   Different question.  Did you eventually stop using the

19  Recovery filter?

11:42:58 20  A   Yes.  I stopped using them when I had heard word on the

21  street about the increase in the number of reported

22  complications of the Recovery filter.

23  Q   And what complications concerned you?

24  A   The complications that I had experienced in my small

11:43:12 25  trial:  Fractures and migrations and death.

REDIRECT EXAMINATION - MURRAY R. ASCH, M.D.

11:43:19  1    Q    With respect to the Recovery filter?

        2    A    With respect to the Recovery filter, yes.

        3    Q    And did you ever go back to use the Recovery again?

        4    A    I have not.

11:43:36  5    Q    Now, just in fairness, on your compensation, it's

        6    actually -- in addition to what you talked about, there's also

        7    compensation for your colleagues; is that correct?

        8    A    Yes.

        9    Q    And that was 20,000 as well?

11:43:50 10    A    Right.  Again, the compensation structure is identical

       11    now as it has been always in my practice for anyone I'm

       12    working for.  Compensation for me, and if I need to replace

       13    myself by hiring -- I hire someone, I need to pay someone to

       14    do the work to allow me to be here today.

11:44:18 15    Q    Now, Dr. Asch, you were asked about the complications in

       16    your study and including the migration and the -- that you

       17    talked about in Patient 9 and the fracture that you saw in

       18    Patient 33.  Do you recall that?

       19    A    Yes.

11:44:35 20    Q    Now, how long were those patients involved in your study?

       21    A    I don't recall exactly.  I believe Patient Number 9, I

       22    believe his filter had been in a fairly short period of time.

       23    I'm guessing a couple weeks.  Patient 33 with the fracture, I

       24    believe the filter was in approximately 75 days.

11:44:57 25    Q    Did these complications occur in a relatively short period

REDIRECT EXAMINATION – MURRAY R. ASCH, M.D.

11:45:00   1   of time?

2   A   The complications occurred during those periods.  So

3   let's say a couple weeks and 75 days were the approximate

4   length of time from filter insertion to the time of a

11:45:09   5   complication.

6   Q   At any time did you ever reach out to Bard -- you were

7   asked questions before and one thing about the pregnant

8   patient and your letter is you put in there that these

9   patients need to be monitored.  Do you recall that?

11:45:26   10   A   Yes.  Monitoring is essential.

11   Q   After you had your concern that you learned about Bard

12   filters, did you ever contact Bard?

13   A   I did contact Bard.  Now, at that time I was in a

14   community practice.  We didn't have the academic and research

11:45:43   15   support to follow up on all of our patients, so I contacted

16   Bard and I asked them for assistance in allowing me to

17   identify and contact the patients that I had placed their

18   device in so that I could bring them back, follow them up,

19   evaluate them, and retrieve the filter, and they denied that

11:46:04   20   request.

21   Q   And did you contact them because of the concerns you

22   learned about, about how -- the serious consequences of the

23   Recovery filter?

24   A   Yes.  I heard -- after I had heard about the increased

11:46:19   25   number of reports of adverse complications, I contacted Bard

REDIRECT EXAMINATION - MURRAY R. ASCH, M.D.

11:46:23  1  so I could get the filters out of my patients before there

2  was a complication.

3            MR. O'CONNOR:  Now, let me display Exhibit 567,

4  please, Gay.  Thank you.

11:46:39  5  BY MR. O'CONNOR:

6  Q   Dr. Asch, did Bard ask you to write this letter?

7  A   Yes, they did.

8  Q   And did you have any idea who or where Bard intended to

9  send this letter?

11:47:14  10  A   Well, as I say, it was my understanding they were going

11  to use this letter for the FDA in order to support the

12  clinical trial that we talked about way back in my initial

13  meeting with them in 1999 because they came to me initially

14  because of the restriction in using a new device, new

11:47:38  15  untested device, in American -- in the States, and so this

16  letter, I thought, was meant to allow that study to occur.

17            MR. O'CONNOR:  Let's publish this to the jury,

18  please.

19            It's been admitted, Your Honor.  May I publish?

11:47:54  20            THE COURT:  Yes.

21  BY MR. O'CONNOR:

22  Q   Dr. Asch, was this letter written before you stopped using

23  the Recovery filter because of the serious complications you

24  had learned about?

11:48:05  25  A   Yes.

REDIRECT EXAMINATION - MURRAY R. ASCH, M.D.

11:48:10   1   Q   Did this letter concern -- was it limited to retrievable

2   filters?

3   A   This letter was -- again, it's a bit vague, but this

4   letter was meant to support specifically the Recovery filter.

11:48:27   5   But the overall letter was to support the concept of a

6   retrievable filter, but in this case the letter was specific

7   in describing my use with the Recovery filter, again, so that

8   a study could be done.

9            MR. O'CONNOR:  Now, Gay, would you please show 5189.

11:48:55  10   BY MR. O'CONNOR:

11   Q   Keep in mind, Doctor, the date of this letter is March 10,

12   2003.

13   A   Yes.

14   Q   Thank you.

11:49:14  15            And you wrote the letter after the submission that --

16            MR. O'CONNOR:  May I publish this to the jury,

17   Your Honor?  I believe it's admitted.  5189.

18            THE COURT:  You may.

19   BY MR. O'CONNOR:

11:49:25  20   Q   Dr. Asch, this is the submission to the FDA 510(k) that

21   Bard made where they talked about using your study as

22   substantial equivalence.  Do you recall that testimony?

23   A   Yes, I do.

24   Q   Did you have any idea that Bard had used your study to

11:49:39  25   support substantial equivalence for the Recovery's use as a

REDIRECT EXAMINATION - MURRAY R. ASCH, M.D.

11:49:42  1   permanent filter?

2   A   I had no idea that they intended or did actually do that.

3   Q   Would you ever have permitted any study you had done or

4   any letter you had wrote to be used to support the permanent

11:49:57  5   use of the Recovery filter?

6   A   No.  My study wasn't designed to test a permanent filter.

7   I do not believe there is any scientific evidence to support

8   this as a permanent safe filter.

9   Q   Was it your understanding always that Bard intended to

11:50:14  10  have a long-term clinical study?

11  A   Yes.  Yes, that was the constant discussion:  We are

12  looking forward to having a long-term study.

13          MR. O'CONNOR:  Gay, would you please put up

14  Exhibit 558.  And go to the last page --

11:50:38  15          Excuse me, Your Honor.

16  BY MR. O'CONNOR:

17  Q   558, Dr. Asch, this is the report that you wrote following

18  your short-term pilot study for Bard; correct?

19  A   Yes.

11:50:52  20  Q   And you were asked questions about this document by

21  Mr. North.  Do you recall that?

22  A   Yes, I do.

23          MR. O'CONNOR:  Would you go to the last page, Gay,

24  please.

11:51:03  25          And, Gay, can you highlight the last sentence before

REDIRECT EXAMINATION – MURRAY R. ASCH, M.D.

11:51:17  1    the last paragraph.  Do you see where I'm looking?  "A large."

2              Can you narrow that a little bit.

3              Gay, highlight "A large", that sentence, please.

4    BY MR. O'CONNOR:

11:51:38  5    Q   And, Dr. Asch, when you wrote your report, you reported --

6    was it your intent to report to the medical community your

7    findings in the pilot study?

8    A   Yes.

9    Q   Did it also include recommendations?

11:51:54  10   A   Yes.  The recommendation that you've highlighted here, a

11   large multicenter study is warranted.  And, again, I used

12   words like "preliminary" and "suggest that" because you can't

13   base --

14   Q   Can you read what you wrote --

11:52:08  15            MR. O'CONNOR:  Your Honor, may I display this to the

16   jury?

17            THE COURT:  Yes.

18            MR. NORTH:  Your Honor, it's not in evidence.

19            THE COURTROOM DEPUTY:  It's not in evidence.

11:52:14  20            THE COURT:  558?  I show it in evidence.

21            MR. O'CONNOR:  This is Exhibit 558.

22            THE COURTROOM DEPUTY:  He talked about it but never

23   moved it.

24            THE COURT:  I show it as being admitted.  You do not?

11:52:27  25            THE COURTROOM DEPUTY:  I do not.  He never said

REDIRECT EXAMINATION – MURRAY R. ASCH, M.D.

11:52:29  1   admitted.

2          THE COURT:  Okay.  I guess it's not in evidence.

3          MR. O'CONNOR:  And it is a publication, Your Honor.

4   I'm just wondering for purposes of his testimony if we could

11:52:36  5   just show the one highlighted sentence.

6          THE COURT:  Well, are you using it under 803(18)?

7          MR. O'CONNOR:  Yes, sir.

8          THE COURT:  Can't be displayed to the jury, then.

9   BY MR. O'CONNOR:

11:52:50  10  Q   Doctor, would you please read into the record the

11  highlighted statement you wrote.

12  A   "A large multicenter scientific study is warranted to

13  further substantiate the role and value of this retrievable

14  filter."

11:53:04  15  Q   And is that something you had always expected Bard would

16  do, a large multicenter scientific study?

17  A   I had been told repeatedly by Bard and it was my

18  expectation that a large study would be done following this

19  pilot study.

11:53:20  20  Q   And was one ever done as far as you learned?

21  A   I'm not aware that a long-term study has ever been done.

22  Q   Now, you were also asked questions about the letter that

23  you wrote to a publication.

24         MR. O'CONNOR:  Gay, would you please display

11:53:38  25  Exhibit 555.

REDIRECT EXAMINATION – MURRAY R. ASCH, M.D.

11:53:40   1   BY MR. O'CONNOR:

2   Q    And, Doctor, again, what was the purpose of this letter?

3   A    The purpose of this letter was to inform the medical

4   community of a significant complication, in spite of my

11:54:09   5   words, significant complication that occurred in a pregnant

6   woman.  And I wrote this specifically because the timing of

7   this event occurred after the manuscript for the first 32

8   patients had been in progress.  So the initial manuscript

9   that we just looked at didn't describe the filter fracture.

11:54:26  10   So I thought it was of the utmost importance that the

11   community, particularly the obstetric community, was aware

12   there was a new filter out there in the works and that a

13   complication, a significant complication, occurred in a

14   pregnant woman.

11:54:42  15            MR. O'CONNOR:  Gay, would you please go to the second

16   page.

17            And, Gay, please, the last sentence in the

18   second-to-last paragraph, would you highlight that.  Last

19   sentence, Gay.  "Routine."

11:54:58  20   BY MR. O'CONNOR:

21   Q    And, Dr. Asch, when you wrote that letter, did you include

22   recommendations based upon the experience you had in your

23   study?

24   A    Yes.  We altered our study throughout to emphasize and

11:55:22  25   increase the monitoring of these patients to ensure we

REDIRECT EXAMINATION – MURRAY R. ASCH, M.D.

11:55:29  1    identified an asymptomatic complication before it became

2    symptomatic.

3    Q    Would you read the highlighted section to the jury, which

4    includes your recommendation, please.

11:55:37  5    A    "Routine abdominal radiography is thus recommended for

6    all filter patients in order to identify filter fracture and

7    migration."

8    Q    Now, do you recall Mr. North asking you about the Bard IFU

9    and how it mentioned the fracture that you had discovered?

11:55:56  10   A    Yes.

11   Q    Did the Bard IFU ever include a recommendation or

12   instruction or warning to doctors that they should regularly

13   monitor their patients with radiographs?

14   A    I'm not aware that they instructed doctors to monitor

11:56:10  15   their patients.

16   Q    Was that what you were recommending needed to be done?

17   A    Yes.

18   Q    Did Bard ever indicate to you it would follow that

19   recommendation?

11:56:18  20   A    No, they did not.

21   Q    Is it fair to say, Dr. Asch, that in response to

22   Mr. North's question, before you found out about the bad

23   events, did you still feel there was a use for retrievable

24   filters?

11:56:35  25   A    Yes.  Retrievable filters offer great benefit to

REDIRECT EXAMINATION – MURRAY R. ASCH, M.D.

11:56:39  1   patients, but they need to be tested and safe.

2   Q   And was it your feeling they also need to be monitored on

3   a regular basis?

4   A   And they need to be monitored.  Absolutely.

11:56:49  5   Q   Are you aware of Bard ever warning the medical community

6   that if it was going to use the Recovery or retrievable

7   filter, it should regularly monitor and have radiographic

8   imaging done on its patients?

9   A   I'm not aware of any Bard recommendation that states

11:57:03  10  that.

11  Q   Was that your recommendation to Bard?

12  A   That was my recommendation, yes.

13           MR. O'CONNOR:  Gay, go to the very last sentence.

14  BY MR. O'CONNOR:

11:57:12  15  Q   And, again, Mr. North asked you about this writing,

16  Dr. Asch.  And, Dr. Asch, you did make recommendations in

17  everything you wrote when you wrote your literature; correct?

18  A   Yes.

19  Q   Would you read to the jury that last sentence.

11:57:43  20  A   The last sentence in this manuscript states, "Further

21  research is required to evaluate the benefits and risks of

22  this intervention."

23  Q   And was that your recommendation to Bard?

24  A   That was my recommendation to Bard.

11:57:56  25  Q   And did you ever receive any indication from Bard that

REDIRECT EXAMINATION – MURRAY R. ASCH, M.D.

11:57:58  1   they followed your recommendation?

2   A   They did not inform me they followed this recommendation.

3   Q   As a matter of fact, did you learn the opposite?

4   A   I learned that they distributed this for widespread use

11:58:12  5   across North America and Europe.

6   Q   And, Dr. Asch, as we talked about, the complications that

7   you saw, first of all, when you first saw the complications in

8   Patient 9, did that concern you?

9   A   Yes, that concerned me.

11:58:48  10   Q   And did it indicate to you that the Recovery filter was

11   not resisting migration?

12   A   Yes.  That was a sign that the filter was not designed in

13   a way to make it secure and stable in position.

14   Q   And when you had indicated that it saved a life, what did

11:59:04  15   you mean by that?

16   A   Well, I meant that theoretically putting it all together,

17   the filter had trapped a large thrombus which, in the absence

18   of the filter, could have contributed to patient illness.

19   The filter caught the clot and could have saved a life.

11:59:26  20   Could have saved a life.

21   Q   And when you talked to Bard, what did you tell Bard about

22   your concerns about that complication?

23   A   I told them I'm very concerned that we've only put nine

24   filters in and here is a significant migration.

11:59:41  25            THE COURT:  Mr. O'Connor, we reached the lunch hour.

REDIRECT EXAMINATION - MURRAY R. ASCH, M.D.

11:59:43  1        MR. O'CONNOR:  I just have one more, if I may, and
      2    I'll be done.
      3          THE COURT:  One more question?
      4          MR. O'CONNOR:  Yes, sir.
11:59:47  5        THE COURT:  All right.
      6    BY MR. O'CONNOR:
      7    Q   And was your concern serious injury or death?
      8    A   Yes.
      9          MR. NORTH:  Objection, Your Honor.  403.
11:59:57 10        THE COURT:  Overruled.
     11          All right.  Ladies and gentlemen, we're going to take
     12    a one-hour break.  We will plan to resume at 1 o'clock.
     13    Please remember not to discuss the case, and we'll see you
     14    then.
12:00:34 15        (The jury exited the courtroom at 12:00.)
     16          MR. O'CONNOR:  Your Honor -- excuse me.
     17          Those are all the questions I had for Dr. Asch.
     18          THE COURT:  All right.  Counsel, as of the noon hour
     19    today, plaintiff has used three hours and 26 minutes.  Defense
12:01:57 20    has used one hour and 47 minutes.
     21          We'll see you at 1 o'clock.
     22          MS. HELM:  Your Honor, does that include the
     23    allocation of the transcript that was played?
     24          THE COURT:  No.
12:02:09 25        MS. HELM:  Did you give the whole thing to the

12:02:10  1    plaintiff?

          2            THE COURT:  I did.

          3            MS. HELM:  In fairness, 11 minutes of that belongs to

          4    the defendant.

12:02:18  5            THE COURT:  Okay.  So that means plaintiffs are at

          6    three hours and 15 minutes and defendant is at one hour and 58

          7    minutes.

          8            MR. O'CONNOR:  Didn't mean to interrupt you before,

          9    Your Honor.  I just wanted to ask if Dr. Asch may be excused.

12:02:38  10           THE COURT:  Yes.

          11           MR. O'CONNOR:  Thank you.

          12           THE COURT:  All right.  See you at 1 o'clock.

          13        (End of a.m. session transcript.)

          14                        *  *  *  *  *

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1                      **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14         DATED at Phoenix, Arizona, this 16th day of May,

15   2018.

16

17

18

19

20                         s/ Patricia Lyons, RMR, CRR
                           Official Court Reporter
21

22

23

24

25