1                    UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF ARIZONA

3                    _____

4
     In Re:  Bard IVC Filters    ) MD-15-02641-PHX-DGC
5    Products Liability Litigation )
                                   ) Phoenix, Arizona
6    _____) May 16, 2018
     Doris Jones, an individual,  ) 1:00 p.m.
7                                  )
                   Plaintiff,      )
8                                  ) CV 16-00782-PHX-DGC
           vs.                     )
9                                  )
     C.R. Bard, Inc., a New        )
10   Jersey corporation; and Bard )
     Peripheral Vascular, Inc., an )
11   Arizona corporation,          )
                                   )
12                 Defendants.     )
     _____)
13

14
          BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE
15
              REPORTER'S TRANSCRIPT OF PROCEEDINGS
16
                 (*Jury Trial - Day 2 - P.M. Session*)
17               (*Pages 345 through 468, inclusive.*)

18

19

20

21   Official Court Reporter:
     Laurie A. Adams, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc 43
23   Phoenix, Arizona 85003-2151
     (602) 322-7256
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

1    APPEARANCES:

2    For the Plaintiff:

3            GALLAGHER & KENNEDY PA
             By:  Mark S. O'Connor, Esq., Esq.
4            By:  Paul L. Stoller, Esq.
             By:  Shannon L. Clark, Esq.
5            By:  C. Lincoln Combs, Esq.
             2575 East Camelback Road, Suite 1100
6            Phoenix, Arizona 85016

7            LOPEZ MCHUGH LLP
             BY:  Ramon Rossi Lopez, Esq.
8            100 Bayview Circle, Suite 5600
             Newport Beach, California 92660
9
             HEAVISIDE REED ZAIC
10           By:  Julia Reed-Zaic, Esq.
             By:  Laura Elizabeth Smith, Esq.
11           312 Broadway, Suite 203
             Laguna Beach, California 92651
12
     For the Defendants:
13           NELSON MULLINS RILEY & SCARBOROUGH LLP
             By:  Richard B. North, Jr., Esq.
14           By:  Elizabeth C. Helm, Esq.
             By:  James F. Rogers, Esq.
15           By:  Matthew B. Lerner, Esq.
             201 17th Street NW, Suite 1700
16           Atlanta, Georgia 30363

17

18                         I N D E X

19
     WITNESS:                   DIRECT   CROSS   REDIRECT   RECROSS
20   ROBERT MCMEEKING, Ph.D.
     By Mr. Stoller                347                447
21   By Mr. North                           427
                          INDEX OF EXHIBITS
22

     EXHIBIT                                     IDENT      RECEIVED
23   876     BPV-17-01-00009381 -398,
             Pages 30-44 of Notebook No. 7013,
24           Project: Recovery Filter Arm
             Fatigue Testing, Chanduszko
25           Deposition, 04/23/2015             420        420

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1                    P R O C E E D I N G S

2            THE COURT:  Your next witness, counsel.

3            MR. STOLLER:  Your Honor, plaintiffs call Robert

4    McMeeking.

5            (The witness was sworn.)                          01:00PM

6            THE COURTROOM DEPUTY:  Could you state your name and

7    spell it for the record?

8            THE WITNESS:  Robert McMeeking, M-C-M-E-E-K-I-N-G.

9            THE COURTROOM DEPUTY:  Thank you, sir.  Please come

10   have a seat.                                              01:00PM

11           MR. STOLLER:  Your Honor, may I introduce myself to

12   the jury?  They probably don't remember me from the back of the

13   courtroom.

14           THE COURT:  You may.

15           MR. STOLLER:  Good afternoon, Ladies and Gentlemen.  01:01PM

16   My name is Paul Stoller.  I represent Doris Jones.

17           All set, Doctor?

18           THE WITNESS:  I have got some stuff in my bag but I

19   can get it out later.  Thank you.

20                    ROBERT MCMEEKING, Ph.D.,

21   called as a witness herein, having been first duly sworn, was

22   examined and testified as follows:

23                    DIRECT EXAMINATION

24   BY MR. STOLLER:

25   Q.  Would you introduce yourself to the jury?            01:01PM

1   A.  My name is Robert McMeeking.  I'm from Santa Barbara,

2   California.

3   Q.  And you have the title Doctor, but you are not a medical

4   doctor, correct?

5   A.  No.  I'm a Doctor of Philosophy in Engineering.                    01:01PM

6   Q.  So you are an engineering doctor?

7   A.  Correct.

8   Q.  What do you do for a living, Dr. McMeeking?

9   A.  I'm a Professor of Mechanical Engineering at the University

10  of California, Santa Barbara.

11  Q.  What is mechanical engineering?

12  A.  Mechanical engineering is the creation, the design, and the

13  analysis of mechanical devices.

14  Q.  Does that include medical devices?

15  A.  Yes, it does.                                                       01:01PM

16  Q.  We'll talk a bit about your background and qualifications.

17  But would you tell the jury why you are here today?

18  A.  I'm here to testify about Bard's design and testing of its

19  IVC filters, particularly the Recovery, the G2, and the Eclipse

20  Filter, and to discuss the problems I found with the design of     01:02PM

21  those filters and to tell you about the impact that the

22  defective design of the filter had on the filter that is in

23  Mrs. Jones.

24  Q.  Have you prepared a summary of your opinions to help

25  illustrate your opinion to the jury?                                   01:02PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1   A.  I have.

2           MR. STOLLER:  Gay, would you please pull up

3   Demonstrative Exhibit 4557.

4           Thank you.

5   BY MR. STOLLER:

6   Q.  Doctor, is this that demonstrative exhibit?

7   A.  It is, yes.

8           MR. STOLLER:  Your Honor, may I publish this to the

9   jury?

10          THE COURT:  Any objection?                          01:02PM

11          MR. NORTH:  I'm going to object.  I think the witness

12  needs to testify first as to his opinions.

13          THE COURT:  I'm going to sustain the objection.  I

14  think it's leading until he's actually gone through those

15  points.                                                      01:03PM

16          MR. STOLLER:  Let's take it down for a moment and

17  then we'll come back.

18  BY MR. STOLLER:

19  Q.  Doctor, would you tell the jury in summary what your

20  opinions are in this case?                                   01:03PM

21  A.  Yes.  My opinion is that the Eclipse Filter is defectively

22  designed, and that it was inadequately tested.  And the testing

23  that was carried out had deficiencies in it, and some tests

24  were omitted altogether.  And that the company did not identify

25  the root cause of failures that were occurring in the first    01:03PM

1  version of the filter, the Recovery.  And as a consequence,

2  they were not -- they were not completely sure of what was

3  causing those failures, and therefore, they were not able to do

4  a redesign of the filter to adequately address the reduction of

5  the incidence of those failures or to be able to eliminate them    01:04PM

6  completely or to reduce them to the greatest extent feasible.

7  Q.  Do you have any opinions with respect to the effect of

8  those designs and testing failures on the filter that Mrs.

9  Jones had?

10  A.  Yes.  It is my opinion that those defects in the design    01:04PM

11  caused the problems that Mrs. Jones suffered from her filter.

12  Q.  Let's talk a bit about your background.  You are a

13  Professor of Mechanical Engineering and Material Science at

14  UCSB, correct?

15  A.  That's correct, yes.    01:04PM

16  Q.  How long have you taught mechanical engineering and

17  material science?

18  A.  I have taught at University level for 45 years, over 45

19  years.  Sorry.

20  Q.  Excuse me.    01:04PM

21      In addition to UCSB, where else have you taught?

22  A.  As a graduate assistant I taught at Brown University and

23  then I was at Stanford University for two years, 1976 to 1978.

24  Then I moved to the University of Illinois at Urbana-Champaign

25  and I was there from 1978 to 1985, at which stage I moved to    01:05PM

1    Santa Barbara.

2           In addition, I have a part-time appointment at the

3    University of Aberdeen in Scotland.  I have had that

4    appointment since about 2009.

5    Q.  I was going to ask you, you have a little bit different          01:05PM

6    accent than I do.  Where are you from?

7    A.  I was born in Glasgow in Scotland.

8    Q.  When did you move to the United States?

9    A.  I moved to United States in 1972 to do my graduate degrees.

10   Q.  What were your graduate degrees in?                              01:05PM

11   A.  I have a Master of Science and Doctor of Philosophy both in

12   engineering.

13   Q.  Now you teach engineers?

14   A.  I do, yes.

15   Q.  What courses -- do you teach both graduate and                   01:05PM

16   undergraduate students?

17   A.  I do, yes.

18   Q.  And so you are a doctor and you teach people who are

19   becoming doctors of engineering?

20   A.  Yes, I do.                                                       01:06PM

21   Q.  What subjects do you teach?

22   A.  I teach stress analysis; I teach finite element computer

23   methods of analysis; I teach topics to do with the stability of

24   structures.  I teach behavior of materials; I teach strength of

25   materials; I teach fracture of materials; I teach fatigue of        01:06PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1   materials; and I teach design of components and devices.  And

2   these are all issues which are relevant to the trial today.

3   Q.  Are you a member of any professional organizations or

4   honorary societies?

5   A.  Yes.  I'm a member of the National Academy of Engineering.    01:06PM

6   It's a body that elects its members, and you are elected for

7   the significance and impact and high quality of your

8   engineering accomplishments.  There are 2,500 members of the

9   National Academy of Engineering out of approximately 1.5

10  million engineers who are employed in the United States.          01:07PM

11  Q.  So it's a pretty prestigious organization?

12  A.  Yes, it is.

13  Q.  Pretty selective?

14  A.  Yes.

15  Q.  Hard to get into?                                             01:07PM

16  A.  Yes.  I'm very pleased to be a member.

17          MR. NORTH:  Objection.

18          THE COURT:  Sustained on leading.

19          MR. STOLLER:  Fair enough.

20  BY MR. STOLLER:                                                   01:07PM

21  Q.  Are you a member of any other professional organizations or

22  societies?

23  A.  Yes.  I'm a fellow of the Royal Academy of Engineering in

24  the UK; I'm a fellow of the Royal Society of Edinburgh also in

25  the UK; and I'm a life member of the American Society -- life    01:07PM

1  fellow of the American Society of Mechanical Engineers.

2  Q.  What does it take to become a member of those organizations

3  or a fellow of those organizations?

4  A.  Again, it's a matter of the significance and high quality

5  of your contributions in engineering and associated subjects.     01:07PM

6  And in the case of American Society of Mechanical Engineers

7  it's a matter of being both a significant contributor and

8  senior member of the organization.

9  Q.  You have received something called the Timoshenko Medal of

10  the American Society of Medical Engineers.  Would you tell the     01:08PM

11  jury what is?

12  A.  Oh, it's the Timoshenko Medal of the American Society of

13  Mechanical Engineers, and that is the highest medal or award or

14  prize which is given by the American Society of Mechanical

15  Engineers to individuals like myself who work in the area of     01:08PM

16  stress analysis and solid mechanics.

17  Q.  Have you written any articles regarding medical -- I'm

18  sorry -- mechanical engineering?

19  A.  Yes.  I have written over 250 peer-reviewed articles in the

20  area of mechanical engineering that I work in.     01:08PM

21  Q.  What is a peer-reviewed article?

22  A.  A peer-reviewed article is an article that has been

23  submitted to a technical journal, and then it has been

24  reviewed.  It's been read and assessed by individuals who are

25  experts in the relevant area.  And they make a recommendation     01:09PM

1    about whether the paper is good enough and correct enough and

2    significant enough to be published in the technical journal.

3    Q.  And if it doesn't pass the review of those peers, what

4    happens to your article?

5    A.  The article is rejected, and it doesn't get published.                    01:09PM

6    Q.  Do any of the articles of those 250 articles you have

7    published in the peer-reviewed journals, do they have anything

8    to do with the issues you address in this case?

9    A.  Yes, they do.

10   Q.  What?                                                                      01:09PM

11   A.  They address topics to do with stress analysis, finite

12   element method of computer analysis, stability of structures,

13   strength of materials, fatigue of materials, fracture of

14   materials.  I have also published papers on the adhesion of

15   cells and tissue to other surfaces and materials.  And I have   01:09PM

16   published papers on the remodeling of tissues and biological

17   cells in living things.

18          And also I have published a couple of papers on

19   medical implants, namely prosthetic heart valves.

20   Q.  In addition to writing articles for peer-reviewed journals,  01:10PM

21   have you played any other roles with respect to the journals

22   for your profession?

23   A.  Yes.  I was the editor-in-chief of the American Society of

24   Mechanical Engineers Journal of Applied Mechanics, which is

25   their flagship journal, actually, and it's also the journal     01:10PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1  that is most important in the area of stress analysis and solid

2  mechanics.  I was the editor-in-chief for 10 years and,

3  therefore, I supervised the peer review process for selecting

4  and rejecting, which we did most -- we rejected more papers

5  than we accepted to be published in the journal.                    01:10PM

6  Q.  Other than teaching mechanical engineers and writing

7  papers, do you practice mechanical engineering?

8  A.  Yes.  I do that in the form of consulting for companies.

9  Q.  And what kind of consulting do you do?

10 A.  I do -- the consulting that I do is for a variety of        01:11PM

11 companies including medical implant companies.  And the sort of

12 thing that I do is to review the design of the devices that

13 they are producing or contemplating producing, look at the

14 possible ways that those devices can fail, and review the

15 testing and analysis of those devices to make sure that the      01:11PM

16 companies are doing the appropriate things to ensure the safety

17 and reliability and effectiveness of those devices.

18         And I also make recommendations to them on the sort of

19 bench testing or laboratory testing that they should carry out

20 to address the issues that I just discussed.  And some of the    01:12PM

21 work that I do involves doing analysis in calculations for the

22 companies, and in other cases it's a matter of reviewing the

23 kind of calculations and analysis that the companies have done.

24 Q.  For about how many medical device companies have you served

25 as a consultant?                                                 01:12PM

1   A.   About 15.

2   Q.   Over how many years?

3   A.   That's over about 30 years.

4   Q.   What kind of devices have you consulted with those

5   companies about?                                              01:12PM

6   A.   I have consulted with companies on prosthetic heart valves,

7   stents, and breast implants.

8   Q.   You just described a bit about the process that you

9   undertake when you consult with those companies.  Is that

10  similar to what you have done in this case?                   01:12PM

11  A.   Yes.  I approached the work in this case in the same way I

12  would when I'm carrying out consulting work, especially for

13  medical device implant companies.

14  Q.   And you are testifying here today as an expert witness on

15  our behalf.  Have you worked as an expert witness in other     01:13PM

16  cases?

17  A.   Yes, I have.

18  Q.   How often?

19  A.   How often?  I have worked in the Bard cases; I have worked

20  in other litigation concerning Cook IVC Filters and quite      01:13PM

21  sometime ago, about 25 years ago, I worked on a couple of cases

22  concerning a bicycle accident and the failure of a knee

23  prosthesis.

24  Q.   Is expert work for litigation a large amount, I don't know,

25  say 40 percent or more of what you do?                         01:13PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    A.   No.   It's less than that.

2    Q.   How much of your work or income comes from being expert

3    work in these kind of cases?

4    A.   On average, less than 15 percent over the last 8 to 10

5    years.                                                              01:13PM

6    Q.   You have, in fact, provided expert testimony in another IVC

7    filter case, is that correct?

8    A.   That's correct.

9    Q.   And that's the Cook case I mentioned?

10   A.   Yes that's the Cook case, yes.                                 01:13PM

11   Q.   Did you find a problem with the design of the filter in

12   that case?

13   A.   Yes, I did.

14   Q.   Are those findings related to what you did here?

15   A.   No.   They are not related because the filters are           01:14PM

16   different.

17   Q.   You are being paid by us to be here today?

18   A.   I am.

19   Q.   What do you charge us?

20   A.   I charge $400 an hour for regular consulting, and when I'm    01:14PM

21   testifying, or I'm being deposed, like today, I'm testifying

22   today, I charge $800 an hour.

23   Q.   Is that the same rate you charge in all your consulting

24   work?

25   A.   Well, since the other consulting work other than litigation  01:14PM

1    cases doesn't involve testimony, I charge $400 an hour to the

2    companies that I carry out consulting work for.

3    Q.  Let's talk about a little bit about mechanical engineers

4    and how they do their work.

5          Are there principles that engineers generally follow        01:14PM

6    in applying to the design and testing of medical devices?

7    A.  Yes.  There's a variety of principles that they pursue.

8    One of the ones that's paramount is patient safety.  They need

9    to, they should, they must, investigate thoroughly the

10   conditions that the device will operate within when it's        01:15PM

11   implanted in the human body.  They should understand the

12   function and purpose of the device.  And they should identify

13   the ways that the device can fail and how it can be compromised

14   while it's implanted within the human body.

15         Having identified the ways in which the filter --          01:15PM

16   sorry -- the device can fail, they should then carry out what's

17   called worst-case assessments, worst-case testing of the device

18   to make an assessment of the consequences of the worst

19   conditions the device can experience after it's been implanted.

20   Q.  And once they have done that, what must they do?             01:15PM

21   A.  Sorry.  Can you repeat the question?

22   Q.  Once you have followed those rules, is there anything else

23   that engineers must do?

24   A.  They must iterate the design and try and reduce the failure

25   modes to the greatest extent possible in conjunction with the    01:16PM

1    objectives of the device, whatever that might be.

2           MR. STOLLER:  Would you pull up Exhibit 4558 for me,

3    please.

4    BY MR. STOLLER:

5    Q.  And Doctor, hopefully in front of you is Exhibit 4558.  Is     01:16PM

6    this a demonstrative exhibit that you prepared to assist you in

7    illustrating your testimony to the jury?

8    A.  Yes, it is.

9           MR. STOLLER:  Your Honor, may we show 4558 to the

10   jury?                                                              01:16PM

11          MR. NORTH:  Your Honor, same objection.  And leading.

12          MR. STOLLER:  He just testified --

13          THE COURT:  Overruled.  He's covered this.  You may

14   display it.

15          MR. STOLLER:  Thank you.                                    01:17PM

16   BY MR. STOLLER:

17   Q.  Dr. McMeeking, are these the rules you just testified to

18   the jury?

19   A.  Yes, they are.  Yes.

20   Q.  And you have titled this slide, "Standards of Safe and         01:17PM

21   Reliable Design," correct?

22   A.  Correct.

23   Q.  What are the sources of these rules?

24   A.  The sources -- are there's a variety of them.  And

25   generally speaking, organizations like the American Society of     01:17PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    Mechanical Engineers provide guidance and guidelines that these

2    are the appropriate methods to use in reliable and safe design.

3    In addition, somewhat more specialized organizations such as

4    the International Medical Device Regulators Forum has provided

5    guidance on these kind of issues as well.  And there are                    01:17PM

6    several textbooks, and specifically I would mention Dieter and

7    Schmidt, which is a textbook for educating students on the

8    design of devices and components.  And it provides these kind

9    of guidelines as to the appropriate way for engineers to carry

10   out safe and reliable design.                                              01:18PM

11   Q.  You have identified under the "Must Test For Those Problems

12   and Failure Modes" a couple of subrules, I guess I will call

13   them, or indents and you discussed those a bit.  But could you

14   please explain to the jury what those mean?

15   A.  Well, the statements that are made are must replicate the              01:18PM

16   situation of the device as closely as possible.  In other

17   words, you must look at the environment which the device will

18   experience once it's implanted in the human body, and you must

19   try to duplicate that condition when you carry out the tests in

20   the laboratory that you are planning to undertake to bring the             01:18PM

21   device into the conditions that it will experience after it has

22   been implanted.

23        And then the other statement is that you must test for

24   the worst-case scenario.  The worst-case scenario is something

25   you need to identify in the course of the work that you do                 01:19PM

1    looking at the way that the filter -- sorry -- the medical

2    device will experience conditions in the human body and having

3    identified and made an assessment of the worst-case conditions

4    then those are the conditions that you should implement in the

5    testing of the device.                                              01:19PM

6    Q.  Is that a principle that is espoused by the organizations

7    that you identified earlier in the textbook?

8    A.  Yes, it is.  And it's fundamental to safe and reliable

9    design and engineering.

10   Q.  Why must you test for worst-case scenario?                      01:19PM

11   A.  You must test for worst-case scenario so that you

12   understand fully the consequences of the conditions that might

13   occur to the device once it is implanted in the human body.

14   And having understood the consequences of those worst-case

15   conditions, you can then make appropriate decisions about          01:20PM

16   redesign of the device or other steps that you might take to

17   make sure that the device is safe and reliable after it has

18   been implanted.

19   Q.  Kind of like building a car to withstand a car crash?

20   A.  Yes.  That's right.  I mean, if you are building and           01:20PM

21   designing a car, you need to worry about front end collisions,

22   rear end collisions, the car rolling over, other bad things

23   that can happen.  And you should think about the safety

24   features that you can implement in the vehicle whether it's the

25   way that you design the body and the structure or whether it's     01:20PM

1    the features and things you put in the vehicle such as safety

2    belts and air bags.

3    Q.  Doctor, let's talk a little bit more specific about the

4    things you did in this case.

5          What materials did you look at or review in coming to          01:21PM

6    your opinions in this case?

7    A.  I reviewed documents from Bard concerning the design and

8    the testing of the IVC filters; I looked at reports that were

9    produced by experts on both sides of the litigation and

10   reviewed those reports; I also read deposition testimony which          01:21PM

11   was given by employees of Bard in the cases where these

12   employees were involved in design and testing of the filters.

13   Q.  In looking at testing documents and materials from Bard,

14   did you focus on specific kinds of tests?

15   A.  Yes.  I focused on finite element analysis documents, and I          01:21PM

16   focused on documents concerned with bench testing, as it's

17   called, laboratory testing of the behavior of the filter in

18   terms of its resistance to fracture, its resistance to tilting,

19   and its resistance to things like perforation and movement

20   within the IVC.          01:22PM

21   Q.  You used the term "finite element analysis."  Would you

22   explain to the jury what that is?

23   A.  Yes.  Finite element analysis is a computer method of doing

24   calculations.  These are calculations that you can do on a

25   piece of paper, but by doing them in the computer, when these          01:22PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    calculations become complex, it is often quicker and more

2    efficient and more effective to do them by computer.  And when

3    they are done in the correct way, these calculations are also

4    quite accurate and they can be used to crosscheck against other

5    ways of doing the calculations such as where you carry out                    01:23PM

6    calculations on a piece of paper, just as the calculations you

7    do on a piece of paper can be crosschecked with the results of

8    the finite element calculations.

9    Q.  So it's a computer program?

10   A.  It's a computer program, yes.                                             01:23PM

11   Q.  Let me step back for a minute.  As a mechanical engineer,

12   when you are making your determinations about how materials

13   like IVC filters are going to react in certain situations, are

14   you performing mathematical calculations?  How are you

15   determining this?                                                            01:23PM

16   A.  Yes.  These are mathematical calculations that implement

17   principles of physics, mainly, to predict how the device will

18   respond to the environment that it finds itself in and to look

19   at how it will move and how it will experience what are called

20   stresses and strains as a consequence of the condition that the            01:23PM

21   device is operating within.

22   Q.  And I think you said that you can use those finite element

23   analysis, do you sometimes call them FEA?

24   A.  They are often called FEA.

25   Q.  So if I say "FEA" you will know what I'm saying?                         01:24PM

1    A.  I will know what you mean, yes.

2    Q.  Hopefully the jury will follow us.

3         You said when you use the FEA sometimes you use it to

4    check your math.  Did I understand that correctly?

5    A.  You use it in various ways.  You use it to make predictions     01:24PM

6    by itself, but one always wants to have a crosscheck to make

7    sure that things are being done reliably and accurately.  So

8    checking the mathematical calculations you do on a piece of

9    paper is one way that FEA can be used in this setting.

10   Q.  Well, but my point was a bit different.  Does that mean at     01:24PM

11   times you actually do your own calculations by hand?

12   A.  Yes.  I have done extensive sets of calculations by hand

13   for the IVC filters that we're talking about.

14   Q.  In this case, did you do some of those calculations by

15   hand?     01:25PM

16   A.  Yes, I did.

17   Q.  Did you also use finite element analysis, or FEA, for your

18   calculations?

19   A.  Yes.  I did FEA analysis as well as pencil and paper

20   calculations.     01:25PM

21   Q.  And in doing that math, what kind of things can you do or

22   calculate specific to the things we're looking at in this case?

23   A.  Well, one can do things like predict, if you know enough

24   about the device and the material involved, predict how the

25   device might break as a consequence of the loads and the     01:25PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    distortions that it experiences.  And I can get out a paper

2    clip and make a little demonstration if I can find the paper

3    clip.

4              THE COURT:  There's one there.

5              THE WITNESS:  Thank you.                          01:26PM

6              MR. STOLLER:  Can we turn on the ELMO so the jury can

7    see?

8              THE COURT:  Yes.

9              MR. STOLLER:  Thank you, Your Honor.

10             THE WITNESS:  So here's the paper clip.  And if I know  01:26PM

11   enough about the steel that the paper clip is made from, I can

12   do things like predict the force it will take me to apply to

13   straighten it out like that.  And then because I have got it

14   straightened out, now it's easier to do the demonstration.  But

15   what I can do is bend it back and forth, and with a stress     01:26PM

16   analysis either done on a piece of paper or by FEA, I can

17   calculate what are called the stresses and strains in the

18   device.  And from that information I can predict how long the

19   filter will last on average before it breaks.

20   BY MR. STOLLER:                                             01:26PM

21   Q.  Or in this case how long the paper clip?

22   A.  Yes.  How long the paper clip will last before it breaks.

23   Q.  You just mentioned stresses and strains.  What are stresses

24   and strains?

25   A.  Stresses and strains, stress is the intensity of the force  01:27PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    which is applied to an object.  And I'm getting an elastic band

2    out.  And so when I stretch the elastic band then I'm applying

3    a force to the elastic band.  And a measure of that force

4    relative to the object is the stress.  It's the force divided

5    by the area of the object.                                    01:27PM

6         The strain tells me about how much deformation is

7    going on.  So when I stretch the rubber band I'm straining the

8    rubber band.  And so strain is a measure of the intensity of

9    the deformation while stress is the measure of the intensity of

10   the force.                                                    01:27PM

11   Q.  So in doing the calculations to determine the sort of

12   forces that play in these on a rubber band or a paper clip or

13   an IVC filter, how do you use math to make those

14   determinations?

15   A.  Well, there are formulary and there are equations and     01:28PM

16   there's information about the way that materials behave.  And

17   you put that together in a calculation which makes sure that

18   the principles of balance of forces, as it's called, and the

19   way that the system deforms is properly modelled.  And from

20   that modeling you carry out the calculation of the type that I  01:28PM

21   have been describing.  And from the results of that

22   calculation, you can then make predictions about how the device

23   will respond whether it will break or whether it will survive

24   the sort of loads which are being applied to it.

25   Q.  In this case -- well, let me ask this.  So you can use the  01:28PM

1    math and determine what amount of force or stresses and strains

2    will result in the rubber band snapping?

3    A.   Correct.

4    Q.   And to do that sort of mathematical analysis, let's talk

5    specifically about this case, the calculations you did in the          01:29PM

6    finite element analysis.  What sort of information do you need

7    to gather in order to determine how to put together the

8    calculation?

9    A.   Well, what you need to gather is information about the

10   material that the device is composed of and also its shape and         01:29PM

11   dimensions and the environment within which the device will

12   operate.  And one must also have an assessment of the possible

13   failure modes that the device will experience.

14   Q.   When you say "failure modes" what do you mean?

15   A.   I mean whether it will fracture, or in the case of the            01:29PM

16   filter, whether it will tilt; whether it will move within the

17   IVC, away from the position where it is first implanted; or

18   whether it will perforate through the wall of the IVC so that

19   some of it is sticking outside of the vena cava.

20   Q.   Let's start where you started, which is you said the first        01:30PM

21   thing you need to understand is the device.  What do you need

22   to understand about the device?

23   A.   You need to understand the material that the device is made

24   of.  And in the case of the filters that we're talking about,

25   the material is Nitinol.  It's an alloy of nickel and titanium         01:30PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    and it's about 50 percent of each.  And you need to understand

2    the way that that material behaves.  And also concerning the

3    device, you need to know its shape and how the components are

4    assembled into the device as a whole and the dimensions of all

5    those features.                                                    01:30PM

6    Q.  What's important about material in terms of your analysis

7    and your math?

8    A.  Well, in the case of Nitinol, it's a shape memory alloy.

9    It's also important that it's a superelastic material, and it's

10   also important in regard to what will happen to it that it has   01:31PM

11   what is called a fatigue limit so that eventually, it will

12   fracture because of fatigue, which is imposed on the material.

13   Q.  What is fatigue limit?

14   A.  So a fatigue limit, and again, I will demonstrate with my

15   paper clip.  So fatigue is caused by loading and unloading a     01:31PM

16   device many, many times.  So here I'm bending the paper clip,

17   I'm unloading it; I'm bending the paper clip, I'm unloading it.

18   And I can do that over and over again.  If I bend it a lot, it

19   will -- I think you have probably all had this experience.  If

20   you bend it a lot it will break quite quickly because of the     01:32PM

21   process of loading and unloading the material.

22          That process of damaging the material is called

23   fatigue, and the failure that eventually occurs is called

24   fatigue fracture.

25          Now, if I bend the paper clip just a little bit, it       01:32PM

1  will take me many, many unloadings and loadings of the paper

2  clip to cause it to break.  And if I bend it by a very small

3  amount I can take the strains in the material below what's

4  called the fatigue limit.  When the strains are below the

5  fatigue limit, the device, such as this paper clip, will last          01:32PM

6  tens of millions of loadings and unloadings.

7          And so the critical strain at which that becomes a

8  phenomenon of the device lasting tens of millions of loadings

9  and unloadings, that critical strain level is called the

10  fatigue limit.                                                          01:33PM

11  Q.  You have used a couple of times the terms "loading" and

12  "unloading."  What do those mean?

13  A.  Loading and unloading just means that there's some forces

14  applied to the device which cause it to bend or to deform in

15  some way, and then those loads are removed.  It's the process          01:33PM

16  of that loading and unloading that causes the fatigue of the

17  material.

18  Q.  And you mentioned with respect to Nitinol that one of the

19  important characteristics is that is a shape memory material.

20  Correct?                                                                01:33PM

21  A.  Correct.

22  Q.  What does that mean to be a shape memory material?

23  A.  A shape memory material is one that you can deform.  For

24  example, if this was -- if the paper clip was made of Nitinol,

25  I could deform it like this at low temperature, and then if I          01:33PM

1    heat it up it would spring back to its original shape.  In

2    fact, all the things I have been doing to it, it would reform

3    the shape of a paper clip.  So that describes the behavior of a

4    shape memory alloy.

5    Q.  And I believe the jury heard in opening statement that it          01:34PM

6    springs back into shape, is that an accurate portrayal?

7    A.  Yes.  It is also superelastic material, which means that if

8    you bend it a lot, and I have bent this paper clip a lot, it

9    will spring back to its original shape although it's been bent

10   a lot.  That's quite different from the steel that this paper          01:34PM

11   clip is made of.  It is not springing back to its original

12   shape.

13   Q.  What does it mean to be a superelastic material?

14   A.  So superelastic is the phenomenon that I just described,

15   but it is tied to the fact that when the material is deformed        01:34PM

16   the atoms within the material all go into a different order in

17   relation to each other.  If you imagine a whole lot of people

18   standing shoulder to shoulder in a square pattern, if each row

19   takes a step forward it might be a diagonal pattern.  And

20   that's the sort of thing that happens to the atoms when the          01:35PM

21   superelastic phenomenon takes place, and when you unload the

22   material, the atoms all go back to the original location and

23   that gives the material the very extensive springiness that is

24   one of the characteristics of the Nitinol.

25   Q.  So in their different states the atoms are in a different        01:35PM

1    arrangement?

2    A.   Correct.

3    Q.   And they have different fatigue limits and different

4    reactions to strains and stresses in their different stages or

5    states?                                                              01:35PM

6    A.   Yes.   In each state of the material the properties of the

7    material are somewhat different, and the properties in the

8    stretch state are different from the properties in the

9    unstretched state.   And in addition, the question of how it

10   will respond to stress and strain is tied up to -- is tied up    01:36PM

11   with whether it's already stretched or whether it's not

12   stretched.   So the behavior in different circumstances depend

13   on where it is in that superelastic response.

14   Q.   And if we are talking about Nitinol, in particular the IVC

15   filters, what's important about those superelastic qualities?    01:36PM

16   A.   Well, the superelastic quality means that you can put the

17   filter in a delivery tube and when you push it out, it will

18   spring out because it is a relatively -- because of the

19   extensive springiness of the material it will expand into the

20   IVC and press against the wall of the IVC because of its         01:36PM

21   springiness.

22   Q.   And in coming to your opinions in this case about the

23   design of the IVC, the Eclipse IVC Filter and the testing

24   methods employed by Bard, did you take into account the

25   superelastic nature of the device?                               01:37PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    A.  Yes, I did.

2    Q.  Let me ask you, you mentioned fatigue limits moment ago and

3    explained what they are.  Do different materials have different

4    fatigue limits?

5    A.  Yes, they do.                                                       01:37PM

6    Q.  Is that important in terms of the work you do or the

7    processes you undertook here?

8    A.  Yes, it's very important because the fatigue limit is

9    information you need to know to compare the results of your

10   calculations with so that you can decide whether things are bad        01:37PM

11   or whether things are okay.

12   Q.  What did you do to determine the fatigue limit of Nitinol

13   in this case?

14   A.  I reviewed the scientific literature.  I read papers that

15   summarize the results of experiments on Nitinol of similar             01:37PM

16   characteristics to the material that is used in the Bard IVC

17   filters.  I also looked at information from manufacturers of

18   Nitinol and companies that use Nitinol in their devices, and

19   that includes reviewing the information in Bard documents

20   regarding the fatigue limit of Nitinol.                                01:38PM

21   Q.  Now, Bard hired an expert witness in this case, and he has

22   disagreement with you, Dr. Briant, he disagrees with you on the

23   fatigue limit of Nitinol.  Is that correct?

24   A.  That's correct.

25   Q.  And he is critical of you that you didn't use Bard's               01:38PM

1    calculated number for the fatigue number of Nitinol.  Is that

2    correct?

3    A.   That's correct.

4    Q.   Why don't you agree with Dr. Briant on that?

5    A.   Well I disagree with him for a number of reasons.  One of                01:38PM

6    them is that when you have failures occurring which are

7    attributed to fatigue, one must look very carefully at the

8    conditions which are involved in the system that you have

9    designed.  But in addition, if you look at the data in the

10   literature, I found that the data from Bard is at the higher                 01:39PM

11   end of the data concerning fatigue limits.

12        There is a large pool of data in the literature, and

13   what I found is that Bard's numbers were at the high end which

14   means that the material in terms of comparison with similar

15   materials, is more resistant to fatigue fracture than the                    01:39PM

16   similar materials which it is being compared with.  And I also

17   know from experience with other companies who make Nitinol

18   devices, that the conditions that are experienced by devices

19   such as heart valves and IVC filters are such that the fatigue

20   limit is likely to be less than the value that Bard assumed                  01:39PM

21   would be appropriate for analyzing their device, and therefore,

22   I took into account the comprehensive information available in

23   regard to fatigue limit instead of just relying on Bard's data

24   that they obtained after limited testing of their material.

25   Q.   What's the difference between -- I think you said this but              01:40PM

1    just to make the point clear -- what's the difference between

2    the fatigue limit and the data and information that you relied

3    on versus the data and information that Bard used?

4    A.   Well, Bard obtained the data for their Nitinol from tests

5    that their associated organizations carried out for them, and          01:40PM

6    they carried out limited tests in a specific way.  The testing

7    that is recorded in the literature involves a much more diverse

8    set of ways of testing the material and, therefore, gives you a

9    much more comprehensive assessment of the fatigue properties of

10   Nitinol.  And as I said, the indication is that the material or      01:41PM

11   the data that Bard obtained suggested that their material was

12   substantially more fatigue resistant than material which is

13   essentially identical that is used for the tests that are

14   published in the literature and used by other medical device

15   implant companies.                                                    01:41PM

16   Q.   And when you say "more resistant to fatigue" what does that

17   mean?

18   A.   More resistant to fatigue means that the device will last

19   longer at a given level of strain, or that you can apply a

20   higher strain and have the device last for tens of millions of       01:41PM

21   loadings and unloadings.

22   Q.   Is that a reasonable practice or assumption to take when

23   calculating worst-case scenarios?

24   A.   Yes, it definitely is, especially when it is clear that

25   failures by fatigue are happening in a given device that you         01:42PM

1    are trying to redesign.

2    Q.   Let me make sure I understand what my question was.

3          Is Bard's reliance on that higher fatigue resistance

4    number reasonable under worst-case testing conditions?

5    A.   No.  It was not reasonable for them to rely on those data.    01:42PM

6    Q.   Because why?

7    A.   Because it suggested the Nitinol that they were using had a

8    relatively high resistance to fatigue fracture whereas evidence

9    in the literature was contrary to their assumptions and that

10   similar Nitinol would be much more likely to suffer fatigue     01:42PM

11   failures than they were assuming.

12   Q.   More likely to break?

13   A.   More likely to break.

14   Q.   You mentioned that the shape and dimensions of the filter

15   are important.  Why are those important?                        01:43PM

16   A.   Well, the shape and dimensions are important because one

17   needs to look at how the device will respond to loads which are

18   applied to it and the situation that generates those levels of

19   stress which are likely to cause the device to have a problem

20   are associated with its shape.                                  01:43PM

21          And I can demonstrate that with a plastic fork.  If I

22   pull on the tine, it will always break at the top of the tine,

23   and that's associated with the way that the fork is designed

24   and the way that the shape is patterned into the material in

25   such a way that it makes the top of the tine a vulnerable       01:44PM

1    location when I bend the tine in the way that I just

2    demonstrated.

3    Q.  So in your demonstration there, you would predict based on

4    the design and shape and dimensions of the fork that it is

5    going to break where it broke?                                    01:44PM

6    A.  Yes.  That is correct.

7    Q.  Is that important to understand when you are designing an

8    IVC filter?

9    A.  Yes, because the place where it is most probably going to

10   break is the worst location, the worst-case location in the      01:44PM

11   device, and it's important to identify where that location is.

12   And the shape and dimensions of the device, the filter, are

13   what determine that.

14   Q.  What are important about the shape and dimensions of the

15   Eclipse IVC Filter?                                               01:44PM

16   A.  Well, the Eclipse IVC Filter, and I have one here, the

17   features which are important in regard to its dimensions and

18   its shape are that if you look at it from the top, you can see

19   that there's a certain width to the span between its feet at

20   the bottom, and that's approximately 40 millimeters in this      01:45PM

21   case; and also the span between the hands which are at the end

22   of the bent limbs on the filter, so I'm calling them the hands

23   down at this end.  And the span between the hands is an

24   important dimension.  The fact that the arms and the legs are

25   very thin, they are about a third of a millimeter in thickness,  01:45PM

1    and the fact that the limbs have the shape that they do, the

2    arms are slightly bent and the legs are a bit straighter.  And

3    then also, that the limbs are all gathered into the top, which

4    is a cap, which I will lift it up closer to the lens and you

5    can see that the limbs all go into a cap at the top of the          01:46PM

6    filter.

7            And if I draw a quick sketch of the cap where the

8    limbs go in, so I have drawn cross-sectional view, the limbs

9    come in like this and this location here where the limbs are

10   adjacent to the mouth of the cap, can be a very important area.     01:46PM

11   If the limbs move over and press against the edge that can

12   cause a very significant increase in the strains that the limbs

13   experience in a location which is already the worst-case

14   location for the stresses and the strains which are present in

15   the limbs.                                                          01:47PM

16           So in other words, even before you get this

17   concentrating effect, this is already the bad area in terms of

18   likelihood of fracture and the interference between the limb

19   and the cap can make that problem significantly worse.

20   Q.  And in the drawing that you have done there, Doctor, the        01:47PM

21   two lines that are coming out of what I will call the

22   horseshoe, are those the arm?

23   A.  Yeah.  This so this is an arm which is going down below the

24   filter.  And this is the cap at the top.  And I left out the

25   hook which is on the top of the cap.                                01:47PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1   Q.  And so that's a design feature that's important to you in

2   your analysis of this filter?

3   A.  Yes.  Correct.

4   Q.  Let's talk a little bit about the environment because you

5   mentioned the environment in which the device sits or the IVC          01:48PM

6   filter sits.  What's important to understand about the

7   environment?

8   A.  Well, what's important is the configuration of the

9   environment, so what does the vena cava look like in terms of

10  size and shape; what it does in terms of its movement and             01:48PM

11  actions, and it's a very dynamic environment, and for the kind

12  of forces and changes of shape that the IVC can force on the

13  filter while it's implanted in the vena cava.

14  Q.  Is the material of the vena cava important to understand?

15  A.  Yes.  The material of the vena cava and the tissues and           01:48PM

16  organs around it are important to understand in terms of what

17  its interaction with the filter will be and its relative

18  stiffness compared to the stiffness of the filter.

19  Q.  Why is that important?

20  A.  Because the relative stiffness will determine how much the        01:49PM

21  filter gets squeezed when squeezing action takes place in the

22  abdomen.  And the squeezing action takes place even when you

23  breathe because your diaphragm moves up and down and that

24  squeezes the contents of your abdomen and presses on the vena

25  cava and will make the vena cava get smaller when the diaphragm       01:49PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    is going down.

2            So these are all aspects of what is important, and if

3    the surroundings of the vena cava are pressing on the vena

4    cava, if the filter is very, very stiff, it will resist the

5    compression of the organs and tissue around the vena cava.  But    01:50PM

6    if the filter is relatively compliant compared to the contents

7    around the vena cava then the filter will not be able to resist

8    the squeezing action of the contents of the abdomen.

9    Q.  What's important about the shape and dimensions of the

10   inferior vena cava to the -- well, let me step back a minute.    01:50PM

11           The jury saw yesterday in opening statements a couple

12   of different animations of the filter sitting in an IVC and I

13   think they were fairly static and non-movable IVCs.

14           What's significant in terms of your analysis of the

15   design and the testing that was done with respect to the IVC    01:50PM

16   filters about the shape, the dimensions of the IVC, and how it

17   acts?

18   A.  Well, so the IVC, which you can think of as the red circle,

19   is what I have drawn on this diagram.  And the outer blue

20   circle is the width of the filter before it's squeezed into the    01:51PM

21   vena cava.  So you have to squeeze the filter into the vena

22   cava when you are implanting it to get it to fit.  And the

23   phenomenon which are important, or the aspects of this which

24   are important are that the shape and size of the vena cava will

25   be important as to whether the IVC filter will tilt or whether    01:51PM

1    it will perforate the wall of the IVC or whether it will

2    experience loading and unloading to an extent that will cause

3    fatigue fracture problems for the filter.

4    Q.  And I believe Mr. North showed the jury a picture of the

5    IVC and described it as twisting and turning and stretching.          01:52PM

6    Do those have an impact on your analysis and the design of this

7    filter?

8    A.   Yes.   It's a very dynamic environment, and all those

9    movements and actions will cause the filter to do various

10   things.  For example, it can cause the filter to tilt.  It can         01:52PM

11   cause the filter to move, especially downwards in the case of

12   the Eclipse Filter, it tends to move down because of the

13   dynamic environment and the forces which are applied to it.

14   And it can cause -- it can help to induce tilting in the

15   filter.  And then the expansion and contraction that takes            01:52PM

16   place is exactly the kind of loading and unloading that will

17   trigger fatigue problems in the device as a consequence of the

18   environment within which it is implanted.

19   Q.  Are there other -- any other relevant characteristics of

20   the environment which the filter is going to sit that affect          01:53PM

21   your analysis in this case?

22   A.   Well, the one of the features of tissue is that it tends to

23   glue itself to bodies which are present in the human body.  And

24   so the tissue of the wall of the vena cava will tend to glue

25   itself and grow over the limbs of the filter.  And this kind of       01:53PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    behavior can affect how the filter responds.  This kind of

2    feature can affect how the filter responds.

3    Q.  And I believe the jury has heard the term

4    endothelialization, correct?

5    A.  That's what I just described is the phenomenon of                01:53PM

6    endothelialization.

7    Q.  How does that affect the stresses and strains that you have

8    analyzed here?

9    A.  It will generally increase the level of stresses and

10   strains which are present in the device.  And I can demonstrate     01:54PM

11   that using my arm.  If my arm is loose and I try to turn my

12   hand, I can do that quite freely.  But if I glue my left hand

13   to my right hand and now I try and rotate my right hand, I can

14   feel that there are forces within my arm which are generated

15   just because I have stopped my arm from moving.                     01:54PM

16          So it's that kind of effect which can make the strains

17   and stresses higher in the filter compared to when

18   endothelialization is not present.

19   Q.  You talked a bit ago about understanding of failure modes

20   or complications associated with the device.  Why is that          01:54PM

21   important?

22   A.  Could you repeat the question?

23   Q.  Sure.  Earlier when I asked you questions about what are

24   the important things you need to consider in analyzing the

25   testing and designing of a product, one of the things you          01:55PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1   identified was the failure modes or complications.

2       Do you recall that?

3   A.  Yes, I did.  I do.

4   Q.  And my question was, what's important about that for that

5   process?                                                      01:55PM

6   A.  What's important about that is that in carrying out the

7   tests and carrying out the calculations one must have a good

8   idea of the failure modes so that you can assess whether they

9   are likely to occur after the filter has been implanted in the

10  human body.                                                    01:55PM

11      MR. STOLLER:  Gay, would you put up 5447 again?  Thank

12  you.

13      Doctor, this is Exhibit 4557, which is the summary of

14  your opinions that we discussed before.

15      Your Honor, may we now publish this to the jury?          01:56PM

16      MR. NORTH:  No objection, Your Honor.

17      THE COURT:  Yes.

18  BY MR. STOLLER:

19  Q.  This is a summary of your opinions, correct?

20  A.  Correct.                                                   01:56PM

21  Q.  I don't want to go through them again because we talked

22  about them at the outset and I'd like to be conscientious of

23  people's time.

24      I'd like to talk to you about -- start with Opinion

25  Number 1, what is your first opinion in this case?            01:56PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    A.   The filter is defectively designed, and that's what causes

2    it to tilt, perforate, and move within the vena cava and to

3    fracture and lose components by fracture.

4    Q.   We're talking today and here in this case about the Eclipse

5    IVC Filter.  Do you understand that?                          01:56PM

6    A.   Correct.  Yes.

7    Q.   And the example filter you showed the jury, is that an

8    Eclipse?

9    A.   That is an Eclipse.

10   Q.   And there's been talk -- the jury's already heard about the  01:56PM

11   Recovery device, the G2, the G2X, and the Eclipse.  What are

12   the differences between the Eclipse and the G2?

13   A.   The Eclipse is mechanically and materially identical to the

14   G2, the G2 Express.  The G2 express is the device that has the

15   hook on top, and that's the only difference between the Express  01:57PM

16   and the G2.

17          So the only difference between the Eclipse and the G2

18   models apart from the hook at the top absent in the G2 is that

19   the surface of the Eclipse is polished.  It's polished by an

20   electrical method called electropolishing, and it has a        01:57PM

21   slightly different color is another aspect of its appearance.

22          MR. STOLLER:  I was going to ask, can we turn on the

23   ELMO so he can show the jury while he's talking, Your Honor?

24          THE COURT:  Yes.

25          MR. STOLLER:  Thank you.                                01:58PM

1    BY MR. STOLLER:

2    Q.  I'm sorry.  Would you point out those design features again

3    so the jury can see?

4    A.  So in terms of its shape and size and configuration, the

5    Eclipse is identical to the G2 Express.  It's mechanically and          01:58PM

6    materially identical to the G2 Express.  The G2 Express differs

7    from the G2 only by the fact that there's this hook, this

8    retrieval hook on the top of the cap.  And the only difference

9    therefore of significance between the G2 and the Eclipse in

10   terms of my concerns is that the surface is electropolished on          01:58PM

11   the Eclipse.

12   Q.  You mentioned it's also blue?

13   A.  And it's also blue compared to a silvery color in the case

14   of the G2.

15   Q.  Is your analysis of the design defect for the Eclipse the           01:59PM

16   same as it is for the G2?

17   A.  Yes.  In terms of tilt, caudal movement, movement of the

18   filter in the IVC, and fracture, the analysis and the

19   assessment is identical for the G2 and the Eclipse because

20   these features that were changed, the only feature that was             01:59PM

21   changed, the surface polishing, is irrelevant to the question

22   of whether the filter will tilt or whether it will migrate

23   within the vena cava.

24          And I should correct something.  There would be a

25   marginal improvement in the fracture performance of the device         01:59PM

1    because the polishing is meant to address that issue.

2         The question of what the forces are that the filter

3    applies to the wall of the IVC is unchanged in the same

4    circumstances, and therefore, the tendency for the filter to

5    penetrate and perforate through the wall of the IVC is          02:00PM

6    unchanged by the process of electropolishing.

7         The electropolishing smooths the surface of the

8    material which in principle will improve the fatigue properties

9    of the material, however, the improvement in the fatigue

10   properties is relatively small, and it is relatively small      02:00PM

11   compared to the large strains that the filter can experience as

12   a consequence of the kind of displacements and forces which are

13   applied to it by the IVC.  And so my assessment is that the

14   fatigue properties, the fatigue fracture properties are only

15   marginally improved by the process of electropolishing.         02:01PM

16   Q.  Does this change of electropolishing affect your opinions

17   with respect to the design leading to tilt?

18   A.  No.

19   Q.  Does it affect any of your opinions with respect to the

20   design leading to perforation?                                  02:01PM

21   A.  No.  It makes no difference.

22   Q.  How about the design with respect to the moving or

23   migration of the filter?

24   A.  It makes no difference.

25   Q.  Let's talk about those last three first then we'll come      02:01PM

1    back to fracture.

2            What's the basis for your opinion that the design of

3    this filter leads to tilt?

4    A.  Well, the basis is that the filter in this regard is simply

5    a spring.  And I have a coil spring to show you.  I have to be          02:01PM

6    careful so it doesn't spring all over the courtroom.  But you

7    see when we squeeze a spring of course we have to apply forces.

8    And when I let go the spring wants to come back to the length

9    it originally was.  And in that regard, the filter is simply a

10   spring so that when I push the arms together at the hands, I           02:02PM

11   have to apply forces to make that happen.  And when I let go,

12   the arms spring back to the width that they originally had.

13           So the spring in that -- sorry, the filter in that

14   sense is acting simply like a spring and springs always want to

15   expand back to their preferred length, their original length.         02:02PM

16           And again, if I make use of this illustration, as I

17   was saying earlier, think of the red as the wall of the IVC and

18   the outer perimeter of the blue area as the place where the

19   hands of the arms like to sit.  And so when I implant the

20   filter in the IVC, the filter is squeezed, and one way that it        02:03PM

21   can relax itself to try to get back to the original width is by

22   tilting.

23   Q.  The red on the blue is a little hard for me to see, is it

24   possible -- I don't know if it is for anybody else.  Could you

25   perhaps draw that circle and show me what you are talking             02:03PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

 1    about?

 2    A.   Yes.  So there's the two circles, and so this is the IVC

 3    wall.  And the arms, the feet, the hands of the filter, when

 4    it's in its natural shape, would be sitting there and now to

 5    get the filter inside the IVC, it's not long enough, to get the    02:04PM

 6    filter inside the IVC I have to squeeze the hands and the feet

 7    together and it wants to expand back to its original width and

 8    it can do so by tilting.

 9    Q.   And you prepared a demonstrative to show that to the jury,

10    have you, Doctor?                                                   02:04PM

11    A.   Yes, I have.

12            MR. STOLLER:  Gay, would you pull up 4342, please.

13            Doctor, is this that demonstrative?

14            THE WITNESS:  That is.

15            MR. STOLLER:  Your Honor, may we show this to the          02:04PM

16    jury?

17            MR. NORTH:  No objection, Your Honor.

18            THE COURT:  Yes.

19            MR. STOLLER:  Thank you, Gay.

20    BY MR. STOLLER:                                                    02:05PM

21    Q.   Doctor, would you explain to the jury what you're

22    demonstrating with this exhibit?

23    A.   Yes.  What you are seeing on the left-hand side is a filter

24    which is not tilted, and it is sitting nice and straight up and

25    down in the vena cava.  And on the right is a filter that has      02:05PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    tilted, and that's the process that we're talking about in

2    regard to how the filter responds when it tries to expand its

3    width.

4    Q.  And you have done a drawing as well.

5             MR. STOLLER:  Gay, would you pull up 4372?  4373?          02:05PM

6    Mine has 2 but maybe I'm wrong.  If you pull it up maybe we'll

7    see.

8             As usual, you are better than I am.  Thank you, Gay.

9    BY MR. STOLLER:

10   Q.  Doctor, is this an illustration that you have drawn to        02:06PM

11   prove this point?

12   A.  Yes.

13             MR. STOLLER:  Your Honor, may we show this to the

14   jury?

15             MR. NORTH:  No objection.                                02:06PM

16             THE COURT:  Yes.

17             MR. STOLLER:  Thank you.

18   BY MR. STOLLER:

19   Q.  Doctor, what are you showing through this illustration?

20   A.  I'm showing through the illustration I drew myself so they    02:06PM

21   are not as pretty as the previous illustrations, but what this

22   illustrates again is an untilted filter on the left and a

23   tilted filter on the right.  And in the case of the untilted

24   filter on the left, line A-B is the line between the hands of a

25   pair of arms.  And on the right the line that joins the hands     02:06PM

1    of the pair of arms is now a C, and you can see that we are

2    moving at -- we are going across the vena cava in a somewhat

3    diagonal manner.  And as I think you know when you cross a road

4    in a diagonal manner you have to walk a lot farther than when

5    you go straight across the road.                        02:07PM

6            So what that's illustrating is the distance from A to

7    C is bigger than the distance from A to B, so the filter has

8    expanded as a spring in the process of tilting.

9    Q.  How is the filter able to do that >how is it able to move

10   like that?                                              02:07PM

11   A.  Well, the filter is acted on by forces in the vena cava

12   that might jiggle it around and that process might initiate the

13   process of tilting.  And the tilting process drives itself

14   because of the expansion of the spring, but the process of

15   movement of the vena cava and the dynamic environment will aid 02:07PM

16   that instability.

17   Q.  Did you perform mathematical calculations to confirm this

18   opinion that the IVC filter will tilt?

19   A.  Yes, I did.

20   Q.  Did you also perform finite element analysis?       02:08PM

21   A.  Yes, I did.

22   Q.  And did that also confirm that the IVC filter will tilt?

23   A.  Yes, it did.

24   Q.  How did you do that, those calculations and that FEA?

25   A.  Well, in the FEA, I put a filter in the IVC and I implanted 02:08PM

1    it in a way that is illustrated in the previous illustration

2    that you were shown.  And I then pushed on the head of the

3    filter to see how it would respond.  And in the computer I

4    calculated the forces and the deformations that would be

5    required for that process and I found that you actually have to     02:08PM

6    hold the filter back to stop it from tilting.  And that shows

7    that it wants to tilt and it wants to expand, and it wants

8    to -- it is unstable.

9          MR. STOLLER:  Gay, would you bring of 4342 again,

10   please?                                                              02:09PM

11   BY MR. STOLLER:

12   Q.  This is the demonstrative we just looked at before, Doctor.

13   And this drawing is a -- you created a computer model of it, am

14   I to understand that correctly?

15   A.  Yes.  It's a graphic.  It's not exactly my computer model.     02:09PM

16   But it's a graphic that illustrates the computer model that I

17   used.  And you can see that the purple is the wall of the IVC

18   and the IVC model is being relatively stiff in this particular

19   calculation.

20   Q.  And based on all of your calculations that you did by hand     02:09PM

21   and the FEA analysis that you did as well as your engineering

22   background in looking at this design, what conclusion did you

23   come to?

24   A.  I came to the conclusion that the filter wants to tilt and

25   it is very unlikely that it will stay straight up and down in      02:10PM

1    the vena cava.

2    Q.  Let's talk about your opinions with respect to the filter.

3    We used the term perforate.  It means puncturing through the

4    IVC.  What's your opinion with respect to that issue in this

5    case?                                                          02:10PM

6    A.  That the design of the filter makes perforation likely to

7    occur, probably will occur, in the case of this design of the

8    filter.

9    Q.  Why is that?

10   A.  Because it's essentially the same reason that the filter    02:10PM

11   wants to tilt because it wants to expand.  And the way that it

12   can expand is by cutting through the wall of the vena cava.

13   And a feature that contributes to this process is the fact that

14   the limbs of the filter are very thin, and therefore, is

15   relatively easy to make them cut through the wall of the IVC.   02:11PM

16   And in certain situations, the tip of the limbs can interact

17   with the wall of the IVC just as a needle being poked into the

18   wall of the IVC would go into the wall of the IVC and therefore

19   puncture through the wall of the IVC.

20        MR. STOLLER:  Gay, would you pull up 4349, please?         02:11PM

21   BY MR. STOLLER:

22   Q.  Doctor, is this a demonstrative that you have prepared to

23   illustrate your opinions with respect to perforation by the

24   filter?

25   A.  Yes, this is.                                               02:11PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1        MR. STOLLER:  Your Honor, may we display this to the

2   jury?

3        MR. NORTH:  No objection, Your Honor.

4        THE COURT:  Yes.

5        MR. STOLLER:  Thank you.                          02:11PM

6   BY MR. STOLLER:

7   Q.  And would you explain to the jury what this is?

8   A.  Oh.  This is a result from a calculation that I did in the

9   computer, and it shows a filter in the vena cava.  But in this

10  case, three of the legs, and the they are the ones that are    02:12PM

11  sticking outside of the right and side of the diagram, three of

12  the legs have perforated through the wall of the vena cava.

13  There's only two visible because one is hidden behind another

14  one.

15       And the consequence of the -- of this perforation is    02:12PM

16  that the forces on the filter become unbalanced and that is

17  leading to tilting as well as -- leading to tilting that's

18  following the perforation process which has occurred.

19  Q.  So perforation will lead to tilt?

20  A.  Yes.                                                     02:12PM

21  Q.  And tilt will lead to perforation?

22  A.  Correct.

23  Q.  And that's demonstrated by this demonstrative Exhibit 4349?

24  A.  That's correct.

25  Q.  Let's talk next, if you would, about your opinions with   02:13PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    respect to the Eclipse and movement of the filter.  What's the

2    basis for your opinion that the design of the filter leads to

3    migration?

4    A.  Well, can we go back two slides before, please?

5            MR. STOLLER:  Gay, would you please find 4342.                02:13PM

6    BY MR. STOLLER:

7    Q.  This one?

8    A.  Yes.  So my assessment is that tilting contributes to the

9    movement, and what you can see in this illustration is that,

10   well, it's not quite drawn correctly, but that what would        02:13PM

11   happen is that the filter would rotate around one of its feet

12   and that action would move the filter down by a slight amount.

13   And then that process could happen again and again and again,

14   especially in the dynamic environment of the IVC so the

15   conditions could be repeated over and over again such that       02:14PM

16   continued tilting in opposite directions would occur and the

17   filter can walk down the IVC towards your feet.

18   Q.  By "walk down" you mean tilt and tilt and tilt?

19   A.  Tilt, tilt, tilt.

20   Q.  Let's talk, Dr. McMeeking, about your opinions about the    02:14PM

21   Eclipse Filter and its susceptibility to fracture.  What are

22   your opinions with respect to that?

23   A.  My opinion is that the design of the filter leads to its

24   fracture in terms of fatigue as a consequence of the forces and

25   motions that it experiences within the IVC.                      02:15PM

1    Q.   What is the basis for that opinion?

2    A.   The basis of that opinion are calculations that I carried

3    out in which I calculated the strains that the filter would

4    experience in different circumstances and compared them with

5    fatigue limits of the material and found that in some                02:15PM

6    circumstances, in many circumstances, that the strain would

7    exceed the fatigue limit and, therefore, fracture would

8    eventually ensue.

9    Q.   So you did hand calculations and finite analysis?

10   A.   Yes.  I did hand calculations and finite element           02:15PM

11   calculations.

12   Q.   Did you do these based upon worst-case conditions?

13   A.   Yes.  I did them in a variety of worst-case conditions and

14   observed that in many circumstances, the strains were high

15   enough that the fatigue failure would occur within the useful      02:16PM

16   lifetime of the device.

17   Q.   What are the relevant factors leading to your conclusion

18   that these devices are likely to fracture?

19   A.   Well, an observation is that tilting will increase the

20   strains that the filter experiences, and therefore, will make     02:16PM

21   it more likely that the fatigue failure will occur.  And

22   endothelialization will have similar effect and would elevate

23   the strains so that the fatigue fracture will be more likely.

24   And perforation will increase the strains of the filter

25   experiences, and that also will contribute to making fatigue      02:16PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    fracture more likely.

2    Q.  So under situations where a filter is tilted, perforated,

3    and endothelialized you calculated its likelihood of failing to

4    fatigue?

5    A.  That's correct.                                          02:17PM

6    Q.  And concluded what?

7    A.  And concluded that it would eventually break after a

8    certain number of cycles of loading, and the pieces could break

9    off and become separated from the filter.

10   Q.  Do those things actually happen?  Do filters tilt,        02:17PM

11   perforate, and endothelialize?

12   A.  Yes.  There's observations that the G2 family of filters

13   all experience tilting, perforation, and fracture of its limbs.

14   Q.  And if we were to look at the filter that's in Exhibit 4342

15   in front of you, are there places that are more likely to      02:17PM

16   fracture than others?

17   A.  Yeah.  The place that is most likely to fracture in the G2

18   filter is up at the top of the arm where the arm is going into

19   the cap at the top.

20   Q.  And is that also true with the Eclipse?                   02:18PM

21   A.  It's true of the Eclipse as well.

22   Q.  And you said that there were some differences you found in

23   terms of the resistance to fracture in the Eclipse Filter as

24   distinct from the G2 Filter.

25           Did you also conclude that like the G2 Filter the      02:18PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1  Eclipse Filter is likely to break under those situations?

2  A.  Yes.  I concluded that under conditions of tilting and

3  perforation and endothelialization that the strains in the

4  Eclipse Filter would still be high enough that they would

5  exceed the fatigue limit and, therefore, make fatigue fracture      02:18PM

6  occur.

7  Q.  And what difference, if any, does the -- I'm sorry -- does

8  the electropolishing make in this circumstance?

9  A.  Well, the electropolishing increases the fatigue limit by a

10  modest amount, by about .2 percent of strain.  And therefore,      02:19PM

11  compared to the levels of strain which occur in the Eclipse

12  Filter, this increase is quite marginal and, therefore, not

13  enough to fend off the problems of fatigue that the filter was

14  experiencing.

15  Q.  Now, we talked a bit ago about Dr. Briant, Bard's            02:19PM

16  professional -- I'm sorry -- their expert witness.  And he

17  criticizes your analysis of fracture.  Correct?

18  A.  Correct.

19  Q.  And what's his criticism of your analysis?

20  A.  Well, he criticizes my analysis of fracture because he      02:19PM

21  asserts that I use conditions which are beyond the level of

22  what would be expected for worst-case conditions.

23  Q.  Does he criticize your use of -- I think one of the things

24  he said is that you don't use a superelastic property in

25  analyzing this.  Is that correct?                                02:20PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1   A.   That's correct.  He criticizes me for using what's called

2   linearlastic response of the filter rather than using

3   superelastic response of the material.

4   Q.   And how do you respond to Dr. Briant?

5   A.   Well, I respond to that by the observation that --          02:20PM

6   Q.   Before you start, you are showing the filter.

7        MR. STOLLER:  Your Honor, may we use the ELMO for him

8   to show the jury?

9        THE COURT:  Yes.

10        MR. STOLLER:  Thank you.                                    02:20PM

11        THE WITNESS:  So I respond to that by observing that

12   in certain circumstances, that superelastic behavior is clearly

13   important.  For example, when you are compressing the filter

14   severely, and I don't want to compress it too much, but when

15   you are compressing it severely such as when you put it in the  02:21PM

16   delivery tube and then push it back out to the delivery tube,

17   of the significant springiness associated with the superelastic

18   behavior is important.

19        But in other circumstances, for example, once you have

20   got the filter in the vena cava and it is being squeezed by     02:21PM

21   relatively small amounts, then the response of the material is

22   what we call linearlastic which is a smaller strain, it's a

23   smaller movement response of the material that arises in that

24   circumstance.

25        And so for the purpose of doing fatigue calculations,      02:21PM

1    the linearlastic response is what matters, and the superelastic

2    response in this process is irrelevant.

3    BY MR. STOLLER:

4    Q.  So when you were analyzing the fatigue over time, it's

5    based on your calculations of normal breathing activities?                02:22PM

6    A.  That's correct.

7    Q.  And so if the filter becomes tilted, perforated,

8    endothelialized, then normal breathing circumstances themselves

9    can create sufficient stress and strain to ultimately cause a

10   fracture?                                                                  02:22PM

11   A.  That's correct, yes.

12   Q.  Dr. Briant also says that your calculations and your FEA

13   results only take into account a single arm of the filter, is

14   that correct?

15   A.  That's correct, yes.                                                   02:22PM

16   Q.  Is that a problem?

17   A.  No.  It's not a problem.

18   Q.  Why not?

19   A.  Because when doing fatigue calculations, you concentrate on

20   the worst-case location so that you can identify what                      02:22PM

21   conditions there will cause the fatigue fracture.  And as I

22   indicated, the worst-case location in the G2 family of filters

23   is up near the cap in the arms just where the arms come out of

24   the cap.  And to understand what is happening to the arms in

25   that regard, it is sufficient to analyze only one arm, and that           02:23PM

1   one arm is representative of the behavior of all the other

2   arms.  Or to put it another way, by doing a calculation for one

3   arm you are doing a calculation for six arms.  And furthermore,

4   what the legs do is not relevant.

5           So it's a completely valid calculation to look at one                    02:23PM

6   arm at a time and do the calculation.  And, in fact, it's even

7   consistent to leave out bits of the arm and only focus on the

8   portion that is experiencing the strains and stresses that you

9   are worrying about to undertake the calculation which is

10   necessary.                                                                        02:24PM

11   Q.  And Bard conducted some FEA analyses of its own, correct?

12   A.  Yes.

13   Q.  And in some of those did it analyze just a single arm?

14   A.  Yes.  In many of their calculations they analyzed only a

15   single arm.                                                                       02:24PM

16   Q.  When you teach these sort of analyses to students, both

17   undergrad and those who are going to themselves become doctors

18   of engineering, do you teach them the same principles and same

19   method you have used here?

20   A.  Yes, I do.  Yes.                                                              02:24PM

21   Q.  Dr. Briant also criticizes your analysis by saying that you

22   don't explicitly include the surrounding tissue in your

23   analysis.  Is that true?

24   A.  That's correct.

25   Q.  Is it true that you don't include that surrounding material           02:24PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1   in your analysis?

2   A.   No.   That's not true.   What I did was I made an assessment

3   of the relative stiffness of the surrounding environment around

4   the IVC, and I came to the assessment that it is relatively

5   stiff compared to the filter, and therefore, one can treat the          02:25PM

6   environment as an IVC which neglects the possible response of

7   the tissues and organs around it in a way that it interacts

8   with the filter.

9   Q.   We talked earlier about one of the things you need to do in

10  doing these sort of analyses and designing devices is                    02:25PM

11  understanding the environment.   What's the basis for your

12  concluding the stiffness of this environment?

13  A.   Well, there's -- first of all, the abdomen is full of

14  organs and material and tissue and so on.   And so it's fairly

15  -- it's well packed with stuff, and therefore, it is difficult           02:25PM

16  to move things out of the way and have it not compress the vena

17  cava even if a filter is trying to resist that compression.   So

18  that's one observation that enabled me to make the assessment

19  that I did.

20          But in addition, there are data in the literature that           02:26PM

21  indicate that the surrounding tissues and organs are relatively

22  stiff compared to filters when they are interacting with the

23  vena cava filters.

24  Q.   We mentioned Bard did their own FEA analyses.   Did they

25  assume the surrounding area and environment was stiff, or did            02:26PM

1    they assume it was soft like Dr. Briant?

2    A.   They assumed it was stiff.

3    Q.   And if we were to assume the surrounding environment was

4    soft like Dr. Briant, is that best-case or worst-case scenario

5    for the filters?                                              02:26PM

6    A.   That's a best case, a favorable case for the filter.

7    Q.   Less likely to fracture?

8    A.   Less likely to fracture.

9    Q.   And both you and Bard assume in your analysis that it is,

10   in fact, stiff?                                               02:26PM

11   A.   Yes.   Correct.

12   Q.   Is there a fundamental difference between your analysis and

13   Dr. Briant's analysis in this case?

14   A.   There's no fundamental difference in terms of the actual

15   calculations which are carried out in the method used to carry  02:27PM

16   them out.   The fundamental difference is the assumptions that

17   underlie the way that the calculations are done and set up.

18   Q.   And what were Dr. Briant's assumptions?

19   A.   Dr. Briant's assumptions were that nothing very bad would

20   happen to the filter and that the conditions it would          02:27PM

21   experience would be quite favorable in terms of allowing its

22   avoidance of failure modes.

23   Q.   In conducting analysis to determine whether or not a filter

24   is likely to suffer fractures, was that a reasonable analysis

25   by Dr. Briant?                                                 02:27PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1   A.  No.

2   Q.  Why not?

3   A.  Because it didn't make sure that worst-case conditions were

4   present in the way that the filter responded to what was

5   happening to it within the IVC.  It didn't account for the          02:28PM

6   constraints of how severe endothelialization can affect the way

7   that the filter responds.  It didn't account for how

8   significantly the effect of perforation can affect the filter.

9   And it didn't look at how significantly the effect of tilt

10  could affect the strains on the filter.                             02:28PM

11  Q.  Do his assumptions comply with the standards for safe and

12  reliable design?

13  A.  No.

14  Q.  Was your analysis reasonable?

15  A.  Yes.                                                            02:28PM

16  Q.  Was it accurate based on the conditions that you described?

17  A.  Yes.

18  Q.  Let me ask you, if you would, and you have got the filter

19  there, could you describe for the jury the specific design

20  defects that exist in that design of the Eclipse Filter?           02:29PM

21  A.  Well, the conical shape is a basic defect.  The thinness of

22  the arms is a basic defect.  The cap design that I mentioned

23  earlier where the arms enter the cap is a basic defect in the

24  design.  And -- yes.

25  Q.  How about the stiffness or the resistance to movement of       02:29PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    the -- or fatigue of the arms and legs themselves?

2    A.  Well, yeah, the arms and legs are designed so that they are

3    very susceptible to fatigue.  And that's tied up with their

4    shape and orientation and the fact that they can perforate the

5    wall of the IVC.  And that leads to enhanced likelihood of          02:29PM

6    fracture by fatigue.

7            MR. STOLLER:  Gay, would you find Exhibit 4559,

8    please.

9            THE COURT:  We're going to break at this point, Mr.

10   Stoller.  We will take a break until 2:45.  Ladies and             02:30PM

11   Gentlemen, we'll excuse you at this time.

12           MR. STOLLER:  Thank you, Your Honor.

13           (Recess from 2:30 p.m. until 2:47 p.m.)

14           THE COURT:  Go ahead, Mr. Stoller.

15           MR. STOLLER:  Thank you, Your Honor.                        02:47PM

16   BY MR. STOLLER:

17   Q.  Dr. McMeeking, just before we broke we were talking about

18   your opinions with respect to the defective -- the design

19   defects in the Eclipse Filter.  And you identified the conical

20   design, the thin needle-like limbs in the arms and legs that       02:47PM

21   lead to perforation, the design concentration -- the design

22   that concentrates the strain mentioned at the shoulder or the

23   elbow where the filter meets the cap.

24           Are there any alternative design elements that you

25   have identified that would help relieve or ameliorate some of      02:47PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    the issues?

2            MR. NORTH:  Your Honor, objection.  That's outside the

3    scope of the report.

4            THE COURT:  Is that in the report, Mr. Stoller?

5            MR. STOLLER:  It is in the report.                    02:47PM

6            THE COURT:  All right.  Could I have a copy and have

7    you show that to me?  Why don't you approach, counsel, and we

8    can talk about that.

9            Ladies and Gentlemen, if you want to stand up feel

10   free.                                                          02:48PM

11           (Discussion was had at sidebar out of the hearing of

12   the jury:)

13           THE COURT:  By the way, while we're looking for that,

14   the jurors, while they were coming back in, asked Traci if they

15   could hold the filter, if it could be passed around so they    02:48PM

16   could each hold it and look at it.

17           MR. STOLLER:  This is Dr. McMeeking's filter so we

18   will have to ask him.

19           MR. NORTH:  It has to be admitted into evidence,

20   doesn't it?                                                    02:48PM

21           MR. STOLLER:  No.

22           THE COURT:  Do they want to pull the leg off?

23           MR. STOLLER:  I'm not sure I mind if they pull the leg

24   off.  I think he might.  It's fine with us.  I will have Dr.

25   McMeeking give it to them and they can pass it around.         02:48PM

———5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct———

1              THE COURT:  So where are we?

2              MR. STOLLER:  Question was alternative design

3    elements.  One is, he identified a rounded edge of the cap as

4    fixing the issue at least on Page 62 of his report.

5              THE COURT:  Anybody have a copy?                    02:48PM

6              MR. STOLLER:  I do.  Got 80 something pages.

7              MS. HELM:  The report is 25 pages.

8              MR. STOLLER:  This is the March 3, 2017 report.  You

9    are looking at one of the reports from the Barraza case.  He

10   talks about how you can change it to make it better, sharp    02:49PM

11   corner --

12             THE COURT:  Hold on.  Well, he's saying a sharp corner

13   is bad.

14             MR. STOLLER:  He's saying a rounded corner --

15             THE COURT:  Where does it say that?               02:49PM

16             MR. STOLLER:  It's this one, Your Honor.  12.

17   Possibility of a strain concentration.

18             THE COURT:  All right.  I see that.  Do you have a

19   response to that?

20             MR. NORTH:  The demonstrative we have been shown that  02:50PM

21   they intend to use goes far beyond those elements.  And in his

22   deposition he twice disclaimed any alternative design.

23             THE COURT:  So what -- so this is simply talking

24   about --

25             MR. STOLLER:  Talking about --                     02:50PM

———5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct———

```
 1              THE COURT:  Hold on.

 2              MR. STOLLER:  Sorry, Your Honor.

 3              THE COURT:  By curving or chamfering the edge or by

 4    eliminating the connection to the cap.  Okay.  So that's in

 5    there.  What else do you have in the way of alternative design?

 6    Well, let me ask you this.  Are you going to elicit alternative

 7    design testimony besides that?

 8              MR. STOLLER:  Yes.

 9              THE COURT:  What else are you going to elicit?

10              MR. STOLLER:  Based on the examination where he was

11    examined by Ms. Daly we're going to elicit testimony that they

12    could have had caudal anchors to elicit caudal movement.

13              THE COURT:  Where is that?

14              MR. STOLLER:  Page 32.  The July 6, 2017:  Are there

15    any other changes you think could be made to the filters?  He

16    discusses caudal anchors and penetration limiters.

17              THE COURT:  All right.  I see that on Page 32.  What

18    else are you going to elicit?

19              MR. STOLLER:  He also testified, Your Honor, at the

20    last trial that the two tier -- the two tier staging of the SNF

21    is a better design to alleviate tilt.

22              THE COURT:  What is your response on those three

23    points.

24              MR. NORTH:  Your Honor, I think I'm just going to --

25    I'm sorry.  He says the opposite in other places.  I guess I
```

02:51PM

02:51PM

02:51PM

02:52PM

02:52PM

1   just need to impeach him with that.

2          THE COURT:  So the three areas are where the arms and

3   legs leave the cap; the angle while attaching to the cap,

4   caudal anchors, penetration limiters.

5          MR. STOLLER:  Those are two separate things.          02:52PM

6          THE COURT:  I know.  And the two-staged tiered

7   approach of the Simon Nitinol.  That's what you're eliciting?

8          MR. NORTH:  Is the two-tiered fair game just because

9   it was mentioned in the last trial?

10         THE COURT:  Well, when I said how do you feel about    02:53PM

11  that, you didn't state an objection.

12         MR. NORTH:  I'm asking.

13         THE COURT:  Are you asking if I would advise you to

14  object?

15         MR. NORTH:  Fair enough.  We would object because it   02:53PM

16  was not explored in either the deposition or the --

17         THE COURT:  Is the two-tiered in the deposition or

18  report?

19         MR. STOLLER:  He identified the SNF as all ulterior

20  design in his report.                                        02:53PM

21         THE COURT:  Can you show me where?

22         MR. STOLLER:  Your Honor, I will skip that one in the

23  interest of time.  I know I'm not going to deal with it.

24         THE COURT:  Okay.

25         (In open court.)                                       02:53PM

1        THE COURT:  Thanks, Ladies and Gentlemen.

2    BY MR. STOLLER:

3    Q.  Dr. McMeeking, I want to talk about some potential

4    alternative design features that you believe may have fixed

5    some of the issues you have identified.  Let me talk                     02:54PM

6    specifically about the issues you identified about the IVC

7    filter leg coming out of the cap and the concentration of

8    strains there.  Do you understand what I'm talking about?

9    A.  Yes.  Yes, I do.

10   Q.  What sort of design changes could Bard have made that would  02:54PM

11   have fixed or reduced the problems with that design issue?

12   A.  They could have smoothed the sharp corner to make it

13   gentler.

14   Q.  What effect would that have had?

15   A.  That would have the effect of avoiding the severe            02:54PM

16   concentration of strain that can occur at that location.

17   Q.  And in turn result in less fractures?

18   A.  Correct.

19   Q.  Okay.  With respect to the issue of perforation, what are

20   there -- do you have opinions as to what sort of design changes  02:55PM

21   they could have made to either eliminate or reduce the

22   frequency of that occurrence?

23   A.  Yes.  They could have added penetration limiters which

24   would be features on the limbs that would help to slow down or

25   even stop the perforation of the limbs through the wall of the   02:55PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    IVC.

2    Q.  Does that have effect on migration as well?

3    A.  If designed properly, they would have helped to eliminate

4    migration down towards the feet.  The hooks which are on the

5    filter already help to limit the tendency for the filter to          02:55PM

6    move toward your head.  But adding some hook-like features that

7    would point in the opposite direction would help to stop the

8    filter going downwards.

9    Q.  And is there a difference between a design element that you

10   would have added to alleviate the effect of movement down            02:56PM

11   versus the perforation?

12   A.  Well, they could have been the same device.  But in one

13   case it could have -- hook-like features would have worked.  In

14   the other case of penetration limitation, somewhat blunt

15   features would help to slow down the motion of the limb through      02:56PM

16   the wall of the IVC.

17   Q.  And the migration downward here, what the jury has been

18   told is called caudal?

19   A.  Caudal migration.

20   Q.  You would put on something called caudal anchors?               02:56PM

21   A.  They are called caudal anchors.

22   Q.  Where would those be placed?

23   A.  They could be placed either at the feet or the hands of the

24   limbs, and they may be placed elsewhere on the limbs as is

25   convenient for the way that the device is hooked into the IVC       02:56PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    and the way that it's delivered from the delivery tube.

2    Q.  Let's talk for a moment, Doctor, about your opinions with

3    respect to Bard's design processes and testing for the Eclipse

4    Filter in the prior generation.  And I believe you testified

5    earlier that you have opinions with respect to Bard's actions          02:57PM

6    in testing its filters.  What is your opinion?

7    A.  My opinion is that the testing was inadequate.

8    Q.  And why do you hold that opinion?

9    A.  I hold that opinion because in some of the tests that they

10   did do the conditions that were used were not the worst-case          02:57PM

11   conditions that were reasonably foreseeable.  And in other

12   cases, there was no test done at all.  For example, there was

13   no test to look at whether the filter would tilt after it had

14   been implanted.  And there was no test to look at whether the

15   limbs would have a tendency to cut through the wall of the IVC        02:57PM

16   and, therefore, puncture and perforate through the wall of the

17   IVC.

18   Q.  Did you review Bard's bench testing?

19   A.  I did.

20   Q.  Did you review its finite element analysis?                       02:58PM

21   A.  I did.

22   Q.  Was its testing reasonable?

23   A.  No.

24   Q.  Was its testing adequate?

25   A.  No.  It wasn't adequate.  No.                                     02:58PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    Q.  Why not?

2    A.  Because they didn't cover all the worst-case conditions

3    that would be feasible that would be foreseeable in a

4    reasonable manner.  And also, the tests, they omitted some

5    tests and calculations that they should have done to complete          02:58PM

6    the picture of what it was they were dealing with.

7    Q.  Let's talk about things chronologically as they happened

8    over time.

9            You reviewed the testing and analysis they did for the

10   Recovery, correct?                                                      02:58PM

11   A.  Correct.

12   Q.  Did they adequately test the Recovery to ensure that it was

13   safe for known failure modes?

14   A.  No.

15   Q.  What did they fail to do?                                           02:58PM

16   A.  They failed -- as I said a moment ago, they failed to do a

17   field test.  They failed to do a test that would determine

18   whether the limbs would perforate through the wall of the IVC.

19   And the fatigue test that they did was -- did not account for

20   worst-case conditions and was not run for long enough.                 02:59PM

21   Q.  You said the fatigue test is a bench test?

22   A.  Correct.

23   Q.  So they ran a bench test to see how the filter would

24   fatigue over time?

25   A.  That's correct.  They put a filter in a tube and then they          02:59PM

1    squeezed the tube, reducing its diameter by one millimeter each

2    time.  And they did that for 36 million cycles of squeezing and

3    unsqueezing.

4    Q.  What does that test demonstrate?

5    A.  Well, it demonstrates that the filter can last 36 million                02:59PM

6    cycles at one millimeter of diameter change of the IVC.

7    Q.  Was that a worst-case condition test?

8    A.  No.  Because it didn't account for perforation.  They

9    should have pushed the limbs of the filter through the wall of

10   the tube.  It didn't account for tilt, and therefore they                    03:00PM

11   should have done a test where the filter was tilted.  And they

12   should have done a test where the filter feet was, all of them,

13   were glued to the wall of the IVC to represent

14   endothelialization of the limbs to the IVC.  And as I said,

15   they didn't run the test long enough because the objective was              03:00PM

16   to represent 10 years of breathing which would be about 18

17   million cycles.  But instead they ran the test only for 36

18   million cycles which is about four or four and-a-half years.

19   Q.  Well, if they run it out to 80 million cycles would it have

20   made a difference?                                                          03:00PM

21   A.  Well, in the case of the way they did the test, it would

22   not have made any difference because under the benign

23   conditions that we tested in the test, it is unlikely that it

24   would have failed even after tens or millions of cycles.

25   Q.  Well, the jury saw, I believe, in openings, some guidelines            03:01PM

1    from the FDA about testing.  And in there, the FDA talks about

2    worst-case respiratory conditions.

3           Did this test simulate worst-case respiratory

4    conditions?

5    A.  No, it did not.                                          03:01PM

6    Q.  On the spectrum from worst-case to best-case where did this

7    one fall?

8    A.  I would say it was the best-case condition.

9    Q.  Why?

10   A.  Because of the lack of the features that I just described;   03:01PM

11   lack of perforation, lack of endothelialization, lack of tilt.

12   And also the size of the diameter change was relatively small

13   compared to what is understood to be possible during breathing,

14   compressing the IVC.

15   Q.  And you reviewed the FEA that Bard performed on for the     03:02PM

16   Recovery, correct?

17   A.  Yes, I did.

18   Q.  Similar problems with that?

19   A.  Similar problems.  It lacked investigations of perforation,

20   lacked investigations of tilt, and lacked investigations of      03:02PM

21   endothelialization.  And therefore, the calculated results were

22   not representative of worst-case conditions that could arise in

23   the IVC.

24   Q.  Did the math or other assumptions they made other than the

25   worst-case conditions, were those the same math that you used?   03:02PM

1   A.   Yes.

2   Q.   And so if they had assumed some worst-case scenarios would

3   they have come to similar conclusions that you did?

4   A.   Yes.  If they had adopted worst-case conditions they would

5   have come to the same conclusions that I did, which is that the      03:02PM

6   filter is vulnerable to fatigue fracture during its useful

7   lifetime.

8   Q.   Did Bard ever perform for the Recovery Filter a worst-case

9   scenario in testing how it would perform in the IVC?

10  A.   No.                                                             03:03PM

11  Q.   Let's talk about the testing for the G2 device.  And let's

12  talk for a moment about the changes Bard made when moving from

13  the Recovery to the G2.

14        What changes did Bard make to the filter in moving

15  from the Recovery to the G2?                                         03:03PM

16  A.   They widened the base, so they moved to feet farther away

17  from each other.  They lengthened the arms and they introduced

18  a more -- a smoother shape at the top where the arms come out

19  of the cap.  So they made a bigger curve at the place where the

20  arms come out of the cap.  And I'm sorry, they added little          03:03PM

21  wrist extensions on the arms.

22  Q.   What was the effect of widening the base of the filter?

23  A.   Well, it would have increased the radial force that the

24  filter would apply to the wall of the IVC because you are

25  making the spring longer, and therefore, you have to squeeze it      03:04PM

1    more to get it into the filter.  This would have had the effect

2    of making it more firmly secured in the IVC in terms of

3    resisting migration in the towards the head, which was a

4    problem with the Recovery Filter.  But it would have also

5    increased the likelihood that the limbs would cut through the          03:04PM

6    wall of the IVC because an increased force will tend to have

7    that effect.

8    Q.  Did it also have an effect on the issue of tilt as you

9    earlier described?

10   A.  Yes.  The widening the stance would have made tilt a more          03:04PM

11   severe problem for the same reason that it's longer spring

12   which wants to get back to its length and has more strain,

13   stress, and energy stored in it.  But it will make it want to

14   do so.

15   Q.  Similar same effect on migration?                                  03:05PM

16   A.  Yes.  Because the tilt can contribute to caudal migration.

17   It would have had a similar impact on caudal migration.

18   Q.  Why would the filter go down rather than up?

19   A.  Well, the hooks that help to secure it into the wall of the

20   IVC are oriented so that they are designed to stop the filter          03:05PM

21   moving upwards.  They are oriented hooks like this.  But they

22   have little effect on the filter being pushed downwards where

23   the hooks can become disengaged from the wall of the IVC.

24   Q.  Why did Bard make that change?  Why did it widen the base

25   of the IVC filter?                                                     03:05PM

1    A.  Because they were having trouble with migration, movement

2    of the filter towards the head.

3    Q.  In your analysis of Bard's design process, did they

4    determine why the Recovery Filter was migrating up?

5    A.  They never did a complete root cause analysis of the          03:06PM

6    failure of the filter, so they never were sure of exactly what

7    was causing the various effects that they were identifying as

8    failure of the Recovery Filter.

9    Q.  Is that a problem?

10   A.  Yes.                                                          03:06PM

11   Q.  Why?

12   A.  Because to make design changes that would be appropriate

13   and would make sure that they address the problems, they should

14   first know what was causing the problems.  And it is also

15   guiding principle of engineering design that if there are        03:06PM

16   failures occurring that one should identify what is causing

17   those failures so that one can reduce them to the extent

18   feasible.

19   Q.  Did Bard test and analyze other of the failure modes and

20   complications that the Recovery was experiencing in making its   03:07PM

21   design changes to the G2 Filter?

22   A.  In the G2 Filter, which was the modified one, they did not

23   test for all of the failure modes which were foreseeable in the

24   G2.

25   Q.  What tests should they have conducted?                       03:07PM

1   A.   They should have conducted a test to see whether the filter

2   would tilt.  They should have conducted a test to see whether

3   the filter would -- whether the limbs would perforate the wall

4   of the IVC, and they did not perform -- they should have

5   carried out a respiratory fatigue test type that I just                    03:07PM

6   described where you take the filter and you expand and contract

7   the tube by an appropriate amount to test how long it will last

8   before fatigue failure occurs over a 10-year breathing life

9   span.

10  Q.   I think you testified they did one of those for the                    03:08PM

11  Recovery, correct?

12  A.   They did one for the Recovery although it was not adequate

13  because it was not long enough, but they did such a test for

14  the Recovery.

15  Q.   Is it reasonable for Bard to rely on the fatigue test you              03:08PM

16  described for the Recovery as basis for finding that the G2

17  Filter was reasonably and adequately designed?

18  A.   No, it was not.

19  Q.   Why not?

20  A.   Because they had not carried out -- had not succeeded in              03:08PM

21  carrying out a root cause analysis of why the fractures were

22  taking place, and therefore, they were not sure of what design

23  changes would actually address the likelihood or the tendency

24  for fatigue fracture to occur.

25  Q.   Did Bard run a finite element analysis to analyze that                03:08PM

1    issue?

2    A.   They tried to.  They carried out finite element analysis

3    which they then misinterpreted and wrongly used to justify

4    omitting a respiratory fatigue test of the filter, of the G2

5    Filter.                                                          03:09PM

6    Q.   And when you say they wrongly used, what was wrong with

7    those FEAs?

8    A.   Well, the calculation that they did was to take the filter,

9    put it into the delivery tube, and then expand it into an IVC.

10   And they took that as information that they could use to          03:09PM

11   justify an improved fatigue performance of the filter.

12   However, all that does is determine what the -- all that

13   calculation did was determine what the strains were when the

14   filters were introduced into the IVC.  It did not determine

15   what the strain changes were, the loading and unloading that      03:09PM

16   the filter would experience once breathing commenced and it was

17   squeezed and unsqueezed over and over again.

18   Q.   So the FEA only looked at the filter coming out of the tube

19   and being placed?

20   A.   Correct.                                                     03:10PM

21   Q.   Not the lifetime of the filter?

22   A.   That's correct.

23   Q.   Any examination of worst-case foreseeable conditions in the

24   IVC?

25   A.   No.  The calculations that they did were not addressing      03:10PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1   worst-case fatigue conditions that would be foreseeable within

2   the IVC.

3   Q.  They did conduct a fatigue test, did they not?

4   A.  Yes, they did.

5   Q.  What was that?                                                    03:10PM

6   A.  It is one that is referred to as the saluting arm fatigue

7   test.

8   Q.  And what is that test?

9   A.  Well, what they did was they took the filter and they cut

10  its legs off and then they took the arms and --                      03:10PM

11          MR. STOLLER:  Before you go on, Your Honor, could we

12  turn on the ELMO so that the jury could see?

13          THE COURT:  Yes.

14          MR. STOLLER:  Thank you.

15          THE WITNESS:  So they took the G2 Filter and they cut        03:10PM

16  its legs off, and then they held it by the cap in the way that

17  I'm doing and then they pushed a tube up to push the arms up

18  and down.  And so if you now look at me, you can see the effect

19  of the tube being pushed up and down was to cause the arms to

20  go up and down like this, so what was -- to cause the arms to        03:11PM

21  go up and down like this, and they did that several times on

22  both the Recovery and the G2 Filter until the arms broke.

23  BY MR. STOLLER:

24  Q.  So in other words, they flapped the arms up and down like

25  this?                                                                03:11PM

1    A.  Yes.  They flapped the arms up and down like this, like an

2    umbrella that was going inside and outside as the deformation

3    took place.

4    Q.  So what does that test, as somebody who has been a

5    mechanical engineer and a materials engineer and a professor on    03:11PM

6    those subjects for 45 years, what does that test tell you about

7    those devices?

8    A.  Well, it tells you that if you move the arms up and down by

9    the distance you move them it would last a number of cycles

10   that the filter lasted, but it would not give you a general    03:12PM

11   assessment of the fatigue durability of the filter.  It would

12   only be information about that one particular failure mode if

13   that failure mode is one that was is foreseeable.

14        MR. STOLLER:  Gay, would you pull up Exhibit 876,

15   please?    03:12PM

16   BY MR. STOLLER:

17   Q.  Doctor, are you familiar with this document?

18   A.  Yes.

19        MR. STOLLER:  Your Honor, I would move into evidence

20   Exhibit 876.    03:12PM

21        MR. NORTH:  No objection, Your Honor.

22        THE COURT:  Admitted.

23        MR. STOLLER:  Gay, would you go to Page 9397.  Thank

24   you.

25        Your Honor, may be publish this to the jury?    03:12PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

```
1          THE COURT:  Yes.
2          MR. STOLLER:  Thank you.
3   BY MR. STOLLER:
4   Q.  Doctor, I believe the jury has seen this chart before in
5   opening statement.  What does this chart show?                    03:13PM
6   A.  This chart summarizes the results of the saluting arm
7   fatigue test on the current -- on the Recovery which is on the
8   left, the purple box, and the, what is now the G2 called the
9   modified RF on the right-hand side, and what it shows is that
10  in the saluting arm test the Recovery Filter arms lasted on     03:13PM
11  average 57 motions up and down whereas the G2 Filter had its
12  arms last for an average of 628 movements up and down.
13  Q.  Are you familiar with Bard's claim that the G2 Filter was
14  12 times more fracture resistant than the Recovery?
15  A.  Yes, I am.                                                   03:14PM
16  Q.  Is this test the basis for that claim?
17  A.  It is except the data that you are seeing actually is --
18  shows that it's 11 times better.  But there are other data
19  which are slightly different from these which have a factor of
20  12 as the length of -- number of cycles that the G2 lasted     03:14PM
21  compared to the Recovery.  So in that sense this is the backing
22  for the claim that the filter is 12 times more fatigue
23  resistant -- the G2 is 12 times more fatigue resistant than the
24  Recovery.
25  Q.  Whether it's 11 or 12 times, what does this tell you?  What  03:14PM
```

1   do these results tell you in terms of general fracture

2   resistance?

3   A.   Nothing.

4   Q.   Why not?

5   A.   Because it addresses only one particular failure mode which        03:14PM

6   may be significant but does not give you insights into the more

7   general performance of the filter in terms of how it would last

8   for millions and millions of cycles of breathing.

9   Q.   You have seen Bard's internal documents.  Did they expect

10  that the Recovery -- I'm sorry -- that the G2 Filter was going        03:15PM

11  to experience the saluting arm problem?

12  A.   Well, no.  They had some indication that the recovery was

13  experiencing that kind of problem when the arms got trapped in

14  renal veins and so on.  But they expected the lengthening of

15  the arms would help to eliminate that problem.                        03:15PM

16  Q.   Was that a problem with the G2 Filter?

17  A.   You mean the arms being --

18  Q.   Saluting arm?

19  A.   The arm being trapped in the renal vein is a problem?

20  Q.   With the G2?                                                      03:15PM

21  A.   With the G2, not to my knowledge.

22  Q.   Are there tests that can be done to improve general

23  fracture resistance?

24  A.   Yes.

25  Q.   Have you already testified about those?                          03:15PM

1   A.  I have.  It's the respiratory fatigue test in worst-case

2   conditions that would tell you that sort of information.

3   Q.  Based on your experience would it be accurate in any

4   circumstance to say that this test proves that the G2 is 12,

5   11, even 10 times more fracture resistant than the Recovery?      03:16PM

6   A.  No.  It would be completely unreasonable to use this

7   information to make such a claim.

8   Q.  And did Bard ever conduct any tests to demonstrate that the

9   G2 was more fracture resistant than the recovery?

10  A.  Not to my knowledge.      03:16PM

11  Q.  Let's talk next about the changes that they made to the

12  G2X.  Are you familiar with those?

13  A.  I am, yes.

14      MR. STOLLER:  Your Honor, can we use the ELMO again so

15  Dr. McMeeking can display the filter to the jury?      03:16PM

16      THE COURT:  Yes.

17  BY MR. STOLLER:

18  Q.  Would you tell the jury what changes were made to the G2X?

19  A.  Well, the G2X was simply the G2 with the hook where my

20  finger is, the hook at the top added on to the cap with some      03:17PM

21  detail changes to the shape of the cap.  But otherwise it was

22  identical to the G2.

23  Q.  At the time that Bard had put out the G2X or was designing

24  and putting out the G2X, what complications was the G2 Filter

25  experiencing?      03:17PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    A.   In terms of why they added the hook?

2    Q.   No.  I'm asking what complications it was experiencing

3    without regard to the design.

4    A.   So it was experiencing fractures.  It was experiencing

5    caudal migration.  It was experiencing tilt.  And it was          03:17PM

6    experiencing perforation.

7    Q.   So the four things you have testified about already today,

8    correct?

9    A.   Yes.  Correct.

10   Q.   What of those issues does this design change have any         03:17PM

11   effect on?

12   A.   None of them.

13   Q.   Let's talk about what happened when they changed from the

14   G2X to the Eclipse.  What design changes were made there?

15   A.   The Eclipse is the G2 Express electropolished.  So they       03:18PM

16   polished the surface of the metal by an electropolishing

17   methodology.

18   Q.   Any other changes?

19   A.   Well, it became blue.

20   Q.   And we talked about the fact that the G2 was experiencing     03:18PM

21   fracture, tilt, migration and perforation?

22   A.   Correct.

23   Q.   Did this design change have any effect on tilt?

24   A.   No.

25   Q.   Did it have any effect on migration?                          03:18PM

1    A.   No.

2    Q.   Did it have any effect on perforation?

3    A.   No.

4    Q.   Did it have any effect, under your analysis, on fracture?

5    A.   It did not have a meaningful effect on fatigue fracture.     03:18PM

6    Q.   Why not?

7    A.   Because the improvement of the fatigue properties was so

8    small and marginal that it was not enough to deal with the

9    severe conditions that the filter would experience in its

10   worst-case situation.                                             03:19PM

11   Q.   In your analysis and review of Bard's actions in designing

12   and testing the Eclipse Filter, did they conduct adequate root

13   cause analysis to determine why the complications were

14   happening with the G2 Filter?

15   A.   No.   They never carried out a root cause analysis that told  03:19PM

16   them why the recovery was suffering failures, why the G2 was

17   suffering failures, why the G2 Express was suffering failures.

18   Q.   Did they conduct tests to determine whether any of these

19   changes would correct any of those failures?

20   A.   No.   To my knowledge, they conducted no tests that          03:19PM

21   addressed whether these changes would address the problems the

22   filters were having.

23   Q.   The calculations that you have done here, the FEA analysis

24   that you did using the computer program, how difficult are

25   those to conduct?                                                 03:19PM

1   A.  They are quite straightforward.  We teach third and fourth

2   year students to do such calculations during their classes on

3   analysis and design.

4   Q.  Is Bard's failure to conduct root cause analysis as to the

5   complications that were being experienced by the Recovery and          03:20PM

6   then by the G2 reasonable?

7   A.  No.

8   Q.  Is its failure to test to see if its filters adequately

9   addressed those issues and minimized the complications

10  reasonable?                                                            03:20PM

11  A.  No.

12  Q.  Are there any differences, materially, in terms of the

13  problems that that the filters are experiencing between the G2

14  Filter and the Eclipse Filter that was implanted in Mrs. Jones?

15  A.  There's no difference.                                            03:20PM

16  Q.  Doctor, I have asked you a lot of questions today.  Are the

17  opinions that you have expressed here today held to a

18  reasonable degree of engineering and scientific probability?

19  A.  Yes, they are.

20  Q.  And are the methods that you have used in making your              03:21PM

21  determinations and coming to your opinions accepted as standard

22  in the areas of mechanical engineering and materials

23  engineering?

24  A.  Yes, they are.

25          MR. STOLLER:  Thank you, Your Honor.  I have no               03:21PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

 1   further questions at this time.

 2              THE COURT:  Cross-examination?

 3              MR. NORTH:  Yes, Your Honor.

 4              THE COURT:  Before we start for a minute, we talked at

 5   sidebar about the possibility of the jury holding the filter.          03:21PM

 6   Why don't we do that before the cross-examination?

 7              MR. NORTH:  Okay.

 8              MR. STOLLER:  Do you mind, Dr. McMeeking?

 9              THE WITNESS:  No.  I don't mind at all.

10              MR. STOLLER:  May I approach?          03:21PM

11              THE COURT:  You may.

12              If you want to stand up, Ladies and Gentlemen, while

13   we do this feel free.

14              Mr. North, your cross-examination.

15              MR. NORTH:  Thank you, Your Honor.          03:25PM

16                        CROSS-EXAMINATION

17   BY MR. NORTH:

18   Q.  Good afternoon, Dr. McMeeking.

19   A.  Good afternoon.

20   Q.  You and I have met before, haven't we?          03:25PM

21   A.  Yes, we have.

22   Q.  And you told us earlier that you charge $400 an hour for

23   your work in reviewing materials and $800 an hour for

24   testifying.  Correct?

25   A.  That's correct.          03:25PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Cross

1   Q.  And that's whether you are testifying by deposition or in a

2   courtroom?

3   A.  That's correct.

4   Q.  And you have been working with this group of attorneys

5   representing Ms. Jones for a number of years, correct?          03:25PM

6   A.  Yes, I have.

7   Q.  And over the course of those years they have paid you tens

8   of thousands of dollars for your work, correct?

9   A.  That's correct.

10  Q.  And you told us earlier that you also are working in        03:25PM

11  litigation against another filter manufacturer, Cook Medical,

12  correct?

13  A.  That's correct.

14  Q.  And you are working for the same group of attorneys in that

15  proceeding as you are in this proceeding, correct?              03:26PM

16  A.  Well, I don't see any attorneys in the courtroom today that

17  I am working with in the Cook litigation.

18  Q.  But you are aware that some of the attorneys involved in

19  this litigation against Bard are also involved in the

20  litigation against Cook, correct?                               03:26PM

21  A.  I'm not aware of the relationship among all of the

22  attorneys.

23  Q.  And you have been paid tens of thousands of dollars by the

24  attorneys in the Cook litigation, correct?

25  A.  That's correct.                                             03:26PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Cross

1   Q.  And, in fact, you testified in a trial last October in

2   Evansville, Indiana, against Cook regarding an IVC filter,

3   correct?

4   A.  That's correct.

5   Q.  And in that trial, you testified also that you believe the          03:26PM

6   Cook filter was defective in its design, correct?

7   A.  That's correct.

8   Q.  And in that litigation, you have also criticized the

9   testing that Cook Medical performed on its filter, correct?

10  A.  That's correct.                                                       03:27PM

11  Q.  And as a part of that criticism, you have said that Cook

12  failed to conduct adequate fatigue testing of its filter?

13  A.  That's correct.

14  Q.  And you have, like you did here a few minutes ago, you have

15  said in that litigation that Cook failed to conduct worst-case          03:27PM

16  scenario testing just like you fault Bard for, correct?

17  A.  That is correct.

18  Q.  And did you testify yesterday against Cook?

19  A.  No.  I did a deposition about in February which I believe

20  they are using in video form at the Cook trial that's going on         03:27PM

21  right now.

22  Q.  So are you aware that a videotape deposition of you

23  criticizing the Cook filters was played in a courtroom in

24  Houston, Texas yesterday?

25  A.  I am not sure if that was the case, but I am aware of the           03:27PM

1   fact they were planning to show it.

2   Q.  Dr. McMeeking, you have not written any publications

3   specifically on IVC filters, have you?

4   A.  No, I have not.

5   Q.  And the few publications that you have written that          03:28PM

6   specifically mention medical devices concern heart valves, is

7   that correct?

8   A.  That's correct.

9   Q.  And you, yourself, have never designed a medical device?

10  A.  No, I have not.                                              03:28PM

11  Q.  And obviously, then, you have never designed an inferior

12  vena cava filter?

13  A.  That's correct.

14  Q.  And independent of your work as a retained or hired expert

15  witness in this litigation, you have never before performed an  03:28PM

16  analysis of an IVC filter, have you?

17  A.  That's correct.

18  Q.  And other than your work as a paid expert in this

19  litigation, you have never been involved in any testing of an

20  IVC filter, have you?                                           03:28PM

21  A.  That's correct.

22  Q.  And, of course, you have never conducted or been involved

23  in any clinical study of an IVC filter?

24  A.  No, I have not.

25  Q.  And you are not a biomedical engineer, correct?            03:29PM

1    A.   I am not a biomedical engineer.  I'm a mechanical engineer

2    with significant interests in biomedical engineering.

3    Q.   Now, you are not a medical doctor, obviously?

4    A.   I am not.

5    Q.   And you are not an expert on when and in which patients an          03:29PM

6    IVC filter should be used?

7    A.   No, I'm not.

8    Q.   And you have never placed or retrieved an IVC filter,

9    obviously?

10   A.   No, I have not.                                                     03:29PM

11   Q.   Now, in this litigation, Dr. McMeeking, as you have told us

12   earlier, you are not offering any opinions that Bard's filters

13   had higher rates of any particular type of complication

14   relative to other manufacturers' filters, are you?

15   A.   I have not made that assessment so I am not offering such          03:29PM

16   opinions.

17   Q.   And you have similarly not made any assessment as to

18   whether one type of Bard filter has a higher rate of

19   complication than another type of Bard filter, have you?

20   A.   No.  I have not made that assessment.                              03:30PM

21   Q.   And you are aware of the fact that there have been

22   complications including perforation, tilt, fracture, and

23   migration in IVC filters generally, correct?

24   A.   Yes.  They are common problems in IVC filters.

25   Q.   And you have seen those common problems in IVC filters with        03:30PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Cross

1   the Cook filters you have assessed, correct?

2   A.   That's true.

3   Q.   Let's talk about your testing for a minute.   My

4   understanding is that you performed two FEAs, or finite element

5   analyses, correct?                                                      03:31PM

6   A.   I think I may have done three sets of analyses.   I haven't

7   counted them specifically.

8   Q.   The first one you did concerned arm strain on a Recovery

9   Filter.   Is that correct?

10  A.   That's correct.                                                    03:31PM

11  Q.   And let's -- the second one concerned tilting with the G2

12  Filter, correct?

13  A.   That's correct.

14  Q.   And what did the third one concern?

15  A.   Well, it's further tilting calculations, so I'm just          03:31PM

16  counting them as separate types of tilting calculations.

17  Q.   So that we're clear, because I want to talk about each of

18  these individually, your first finite element analysis

19  concerned arm strain in the Recovery Filter?

20  A.   Correct.                                                          03:31PM

21  Q.   Your other two finite element analyses concerned tilting

22  with a G2 Filter, correct?

23  A.   That's true, but I should clarify what I said about the

24  Recovery arm calculation.   I did finite element calculations

25  that represent both the Recovery Filter and the G2.   So I did    03:32PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Cross

1   finite element calculations for the arms of both the Recovery

2   and the G2.

3   Q.  Okay.  So but in these three finite element analyses, none

4   of them specifically concerned the Eclipse Filter, did they?

5   A.  Not directly, but the Eclipse Filter is mechanically and          03:32PM

6   materially the same as the G2, and therefore, the calculations

7   for the G2 were also calculations for the Eclipse.

8   Q.  Did you perform any finite element analyses of the G2X?

9   A.  No.  But the G2X is materially and mechanically the same as

10  the G2 except for the hook.  And therefore, the calculations I     03:32PM

11  carried out for the G2 are also calculations that are valid for

12  the G2X.

13  Q.  Didn't you tell us just a few moments ago that the G2X had

14  some modifications made to the cap as well as the hook?

15  A.  They are small changes to the outside shape of the cap.        03:33PM

16  Q.  Well, regardless whether they are small changes or large

17  changes, the fact of the matter is, you did not perform a

18  finite element analysis specifically on a G2X Filter, correct?

19  A.  It was not a geometry of the cap that was exactly that of

20  the G2X.  But otherwise relevant portions of the calculations     03:33PM

21  were the same.

22  Q.  That wasn't my question.  My question was very simple.

23  Whether you believe the test you performed on the G2 has

24  application to another filter or not, did you specifically

25  perform finite element analysis on a G2X Filter?                   03:33PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Cross

1   A.  I'm going to revise my answer in the following sense, that

2   the cap was not part of the model that was used because it was

3   not necessary to include the cap in the calculation.  So the

4   calculation could equally well have been for the G2X as it was

5   for the G2.                                                      03:34PM

6   Q.  And you have admitted earlier, I believe, that the

7   electropolishing performed on the Eclipse Filter could have at

8   least some impact on the fracture resistance of that device,

9   correct?

10  A.  Yes, it would have improved the fracture resistance to some  03:34PM

11  extent.

12  Q.  And yet you have not performed a finite element analysis

13  specifically on an Eclipse Filter to assess arm strength,

14  correct?

15  A.  I carried out the calculation for the G2 arm shape which     03:34PM

16  did not include the cap or was not -- it was not affected by

17  the question of what the surface polishing was.  So that

18  calculation for the G2 is equally valid for the Eclipse.

19  Q.  Let's talk about these finite element analyses you did for

20  the arm strength.  My understanding is that you calculated on   03:35PM

21  only one arm the strain, is that correct?

22  A.  That's correct, one arm is representative of all six.

23  Q.  And you did not analyze as a part of this finite element

24  analysis the arm -- or the leg strength on any of the legs,

25  correct?                                                         03:35PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Cross

1   A.  I did not analyze the leg strain in my calculations.

2   Q.  And as I understand it, as you said earlier, you had to

3   make a number of assumptions to do this finite element

4   analysis, right?

5   A.  That's correct.                                      03:35PM

6   Q.  Because you are putting these assumptions into the computer

7   to run this program, correct?

8   A.  That's correct.

9   Q.  And you have heard the term garbage in, garbage out, right?

10  A.  I'm aware of that expression, yes.                   03:35PM

11  Q.  And that basically means if you don't put the right data in

12  or the right assumptions in you are not going to get valid

13  responses out, correct?

14  A.  That's what it means, but I did not put garbage in and I

15  did not get garbage out.                                 03:36PM

16  Q.  I'm just asking if you know of the concept.

17  A.  I know of the concept.

18  Q.  Now, when you were making these assumptions using only one

19  arm, you assumed that that one arm was perforating the inferior

20  vena cava, correct?                                      03:36PM

21  A.  No.  That's not completely true.  In some of the

22  calculations I did, the arms were not perforating the vena

23  cava.  In other calculations I did, the arm was indeed

24  perforating the vena cava.  And because of symmetry conditions,

25  that one arm was representative of all six and would behave in  03:36PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Cross

1    the way that it would given the presence of all six arms.

2    Q.  Well in at least some of your calculations, you assume that

3    that one arm was perforated almost halfway through the inferior

4    vena cava, correct?

5    A.  That's correct, because that would be the worst-case                03:37PM

6    condition that could arise.

7    Q.  And my understanding is that this finite element analysis

8    that you conducted on the arm strength of the Recovery -- and

9    did you do the same test for the G2?

10   A.  Sir, could you ask the question again?                             03:37PM

11   Q.  Did you do the same arm strain test for the G2 that you did

12   for the Recovery?

13   A.  I did calculations for the Recovery and the G2 for arm

14   strain in the manner that you have just described.

15   Q.  And for the G2 also, some of the tests had the -- you             03:37PM

16   assumed the arm was perforating the inferior vena cava by up to

17   half of the length of the arm?

18   A.  Yes.  Some calculations were done with that extent of

19   perforation; others were done with less perforation and others

20   were done with no perforation.                                        03:37PM

21   Q.  And my understanding, as you have told us before, is that

22   your test in this finite element analysis showed that in some

23   scenarios, the failure -- I mean the fracture -- I'm sorry, the

24   filter would fail within seven to 10 respiratory cycles.  Is

25   that correct?                                                         03:38PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Cross

1   A.   That would only happen after the processes that lead to

2   perforation and endothelialization of the filter had taken

3   place, and that could be a matter of months or years.  And so

4   the short span of breathing would be only causing the filter to

5   fail after that process had occurred and the worst-case          03:38PM

6   conditions had arisen.

7   Q.   So but what happened is when you put it in the worst-case

8   scenario, made that assumption for the finite element analysis,

9   that had the arm perforating the IVC by halfway.  In that

10  worst-case scenario, the arm was failing within 7 to 10         03:39PM

11  respiratory cycles, correct?

12  A.   That would be the case, yes.

13  Q.   And when we say, of course, 7 to 10 respiratory cycles

14  that's 7 to 10 human breaths, correct?

15  A.   That's correct.                                              03:39PM

16  Q.   And if that was happening out there in the field with

17  filters, most people would be having a fractured filter before

18  they even got off the procedure table, wouldn't they?

19  A.   No, that's not true because the procedure puts in a filter

20  which is entirely inside the vena cava, and it takes time for   03:39PM

21  the vena cava -- for the filter to cut through the wall of the

22  vena cava and get into the condition that you are describing.

23  And that period of time could be months or years.

24  Q.   Your testing demonstrated that the worst-case scenario or

25  highest stresses on these filters would occur when there was    03:39PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Cross

1    perforation, correct?

2    A.   That's correct.

3    Q.   Are you aware of the fact, Dr. McMeeking, that there has

4    been no medical evidence that the filter implanted in Ms. Jones

5    ever perforated the inferior vena cava?                            03:40PM

6    A.   I have seen no reports of perforation.   That's correct.

7    Q.   And, in fact, in the report that you gave in this case, you

8    noted the fracture and other things, but you noted no

9    perforation, correct?

10   A.   That's correct.                                               03:40PM

11   Q.   And you did claim that there was a tilt with Ms. Jones'

12   filter, correct?

13   A.   That's correct.

14   Q.   Are you aware of how great or significant the tilt was?

15   A.   No.   I'm only aware of the fact that it was tilted.         03:40PM

16   Q.   Are you aware of the fact that the estimate of another

17   expert by the plaintiff is that the tilt was only four degrees?

18   A.   I'm not aware of that assessment.

19   Q.   Would you agree that a four-degree tilt is a very slight

20   tilt?                                                              03:40PM

21   A.   That is a slight tilt, yes.

22   Q.   And your report mentions something about this filter

23   migrating in the caudal or downward position, the filter

24   implanted in Ms. Jones, correct?

25   A.   That's correct.                                               03:41PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Cross

1    Q.  But you don't have any independent knowledge of that?

2    A.  No.  I'm relying on Doctors Hurst and Muehrcke for that

3    information.

4    Q.  So you are relying on other experts for that?

5    A.  Correct.                                                         03:41PM

6    Q.  In the testing you did with the G2 Filter regarding tilt,

7    did any of that testing involve tilt with a magnitude, or as

8    small as four degrees?

9    A.  Well, my calculations involved such small amounts of tilt

10   because the process of tilt starts at zero and grows              03:41PM

11   progressively.  So in that sense, yes, it involved -- some of

12   the calculations involved small amounts of tilt of the amount

13   that you are describing.

14   Q.  Now, in the finite element analyses that you were

15   performing, you assumed that when the arm had perforated or       03:42PM

16   penetrated the wall of the IVC that it had, in fact,

17   endothelialized and therefore was rigid and could not move,

18   correct?

19   A.  Well, it was not rigid but it was held firmly so it cannot

20   rotate at the wall.  So that was the outcome of the assessment    03:42PM

21   of endothelialization that I used.

22   Q.  But it was firmly entrenched so it could not move at that

23   point?

24   A.  It was firmly entrenched so over short-term cycles of

25   breathing it would not move.                                      03:42PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Cross

1    Q.  You have not made any assessment or don't have any basis to

2    make a determination as to how often a filter arm perforates

3    the inferior vena cava to the extent that you tested for as

4    your worst-case scenario, do you?

5    A.  No, I have not.                                              03:43PM

6    Q.  So you don't know if that happens 10 percent of the time or

7    .0010 percent of the time?

8    A.  No, I do not know.

9    Q.  In your testing, you also assumed that the movement of the

10   inferior vena cava, the vein itself, was not affected or        03:43PM

11   impacted by the presence of the filter.  Correct?

12   A.  That's correct.

13   Q.  Now, you, as I understand it, did this computer modeling

14   and you did this -- some mathematical calculations, correct?

15   A.  Correct.                                                     03:44PM

16   Q.  You did not do any bench testing of a Bard filter, did you?

17   A.  No, I did not.

18   Q.  You did not do any animal testing of a Bard filter, did

19   you?

20   A.  No, I did not.                                               03:44PM

21   Q.  I think you said this, but I want to make certain.  Under

22   your finite element analysis calculations, the less perforation

23   there was, the less strain there was on the arm, correct?

24   A.  That's correct, for the same amount of motion of the wall

25   of the vena cava.                                               03:44PM

UNITED STATES DISTRICT COURT

1    Q.  For those tests you performed where there was no

2    perforation, there was less strain on the arm than if it was

3    significantly perforated, correct?

4    A.  Correct, for the same motion of the vena cava wall.

5    Q.  And if you had assumed as a part of your calculations that      03:45PM

6    the arm was not immobilized by endothelialization, the stresses

7    would have been less in your calculations, correct?

8    A.  That's correct.

9    Q.  And the reason you made all these assumptions was your

10   effort to test for the worst-case scenario, correct?                03:45PM

11   A.  That's correct.

12   Q.  But you have no way of knowing with what frequency this

13   worst-case scenario actually occurs in patients, do you?

14   A.  No, I do not have that assessment.

15   Q.  You would agree with me that there may are likely patient       03:45PM

16   specific conditions that contribute to events like tilt or

17   fracture in a filter, correct?

18   A.  Well, the anatomy and the physiology is very variable so

19   different patients would have different effects on their

20   filters.                                                            03:46PM

21   Q.  You would agree with me that a manufacturer should not be

22   expected to design a product to withstand all worst-case

23   scenarios, correct?

24   A.  I agree, yes.

25   Q.  Because if you develop a product to withstand all              03:46PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Cross

1  worst-case scenarios, you may eliminate the ability of that

2  product to provide certain benefits, correct?

3  A.  It could eliminate benefits, that's correct.

4  Q.  And therefore, you agree that the risks associated with any

5  implantable device such as an IVC filter cannot be zero?          03:46PM

6  A.  I'm not sure if that's the case, but it's unlikely that the

7  risks could be zero.

8  Q.  Now, you have done no testing to try to quantify the extent

9  of the improvement of the fracture resistance of the filter by

10  electropolishing it to produce the Eclipse, correct?            03:47PM

11  A.  Well I did calculations and then compared the results of

12  the calculations with the improvement in the fatigue

13  properties.

14  Q.  So you did some calculations that made assumptions based on

15  electropolishing?                                                03:47PM

16  A.  Yes.  I took data from Bard which assessed the improvement

17  in the fatigue limit, and I compared the improvement of the

18  fatigue limit with the results from my calculations.

19  Q.  But you did not do any independent assessment as to what

20  the extent of that improvement was, correct?                     03:47PM

21  A.  I'm not sure what you -- can you -- I don't understand your

22  comment "independent."  I'm sorry.

23  Q.  You just said you used Bard's data and then plugged that

24  into your calculations, correct?

25  A.  Correct.  I didn't measure the fatigue limit of the         03:48PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Cross

1    electropolish Nitinol myself.

2    Q.  And again, you did no bench testing with an Eclipse Filter

3    that would help you assess the fatigue limits of that device?

4    A.  That's correct.

5    Q.  Have you made any analysis as to what degree of tilt in          03:48PM

6    your view will lead to perforation or fracture?

7    A.  I have not made any assessment directly of that nature.

8    Q.  Doctor, earlier in response to some questions from Mr.

9    Stoller, you mentioned several things that you thought could be

10   done to the Bard filters to improve their design, correct?          03:49PM

11   A.  Correct.

12   Q.  If we bring up -- do you have his deposition from July 6 of

13   2017?  July 6 of 2017.  We'll get to that later.

14           You have it?  Okay.  If we could pull up Page 36.

15           If we could look at Page 36, Line 10.  And do you            03:50PM

16   recall this deposition on July 6 of 2017 where my partner, Ms.

17   Taylor Daly, took your deposition?

18   A.  Yes, I do.

19   Q.  And at that time, you were asked the following:  "All

20   right.  So we'll set that aside for a moment.  But you -- you        03:50PM

21   have developed no prototype making changes to any of Bard's

22   filters that you think would perform better, correct?"

23   A.  That's correct.

24   Q.  And your answer to that question was:  "No.  I have -- I

25   have developed no prototype to attempt to achieve that              03:50PM

1   objective, correct?"

2   A.   That's correct.

3   Q.   And that is correct today, right?

4   A.   That's correct today, yes.

5   Q.   You are offering some ideas that you think might help, but          03:51PM

6   you have not developed an alternative design and you have not

7   tested an alternative design, correct?

8   A.   That's correct.

9   Q.   You have not run finite element analyses on an alternative

10  design?                                                                  03:51PM

11  A.   That's correct.

12  Q.   And you have not done mathematical calculations on an

13  alternative design?

14  A.   No, I have not.

15  Q.   And if we could turn in the same deposition to Page 150.            03:51PM

16  Looking at Line 4.  At that time point you were asked in this

17  deposition a year ago less, than a year ago, July 6 of 2017:

18  "Do you know of modifications to the Bard filters, any of them,

19  that would have made them unable to fracture, tilt, perforate,

20  or migrate?"                                                             03:51PM

21          And your answer was:  "I haven't studied that."

22  Correct?

23  A.   Correct.

24  Q.   So while you have mentioned several things in response to

25  Mr. Stoller, the fact of the matter is, you have not made an            03:52PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Cross

1    engineering or scientific study or assessment to come up with

2    an alternative design that would eliminate the complications

3    you are talking about here today?

4    A.   I have not, but I would draw your attention to the fact

5    that the question says unable to fracture tilt, perforate, or          03:52PM

6    migrate.  And my assessments have been to look at what would

7    reduce the extent of fracture, tilt, perforate, or migrate.

8    Q.   But as you told -- we looked at that earlier question and

9    answer where you admitted that you have developed no prototype

10   making changes that would perform better, correct?                     03:52PM

11   A.   That's correct.

12   Q.   You recognize, Doctor, that many companies electropolish

13   Nitinol products in this day and age, correct?

14   A.   That's correct.

15   Q.   And in doing so, they do so, I believe you have told us,          03:53PM

16   because it's considered a way of improving the fatigue

17   performance of the material?

18   A.   That's correct.

19   Q.   And, in fact, that's what you have determined occurred

20   here.  The Eclipse did improve the fatigue performance of the          03:53PM

21   G2 Filter, correct?

22   A.   I don't believe I made that direct comparison.  What I said

23   was that the electropolishing was shown to increase the fatigue

24   limit and that would have had an effect on the fatigue life of

25   the filter.                                                            03:53PM

UNITED STATES DISTRICT COURT

1    Q.  Have you done any calculations as to what would cause the

2    fracture of a filter that did not perforate?

3    A.  Yes, because I have looked at Valsalva and phenomena like

4    that.

5    Q.  Did any of your calculations show that a tilt as minimal as    03:54PM

6    four degrees could have an impact on the fatigue resistance?

7    A.  Well, it would have had some effect but not a big effect.

8    Q.  And it could have been a very minor effect if one at all,

9    correct?

10   A.  Correct.                                                        03:54PM

11   Q.  And you certainly are not able to say that a four degree

12   tilt would put a sufficient force of strain on an arm to result

13   in a fracture, correct?

14   A.  Can you ask the question again please?

15   Q.  You are not able to say that a tilt as minor or minimal as    03:55PM

16   four degrees could put sufficient strain on an arm to cause a

17   fracture, can you?

18   A.  It would be the combination of a four degree tilt and

19   whatever was happening to the IVC.  So I don't know if that

20   could be the outcome of the calculation or not.                    03:55PM

21   Q.  So you don't know whether that could result in a fracture

22   or not at this point, just a four-degree tilt?

23   A.  Well, if the compression of the vena cava was big enough

24   and there was enough of them, the four-degree tilt might put it

25   over the critical level that would cause it to begin to have      03:55PM

1   fatigue problems.  That's a possibility.

2   Q.  But you didn't do calculations or finite element analyses

3   that would demonstrate that, correct?

4   A.  No.  That's correct.  I did not.

5   Q.  You have come into court this afternoon and you have talked      03:56PM

6   about your calculations and your computer modeling.  And you

7   have not brought any specific calculations or presented them to

8   this jury, have you?

9   A.  No, I have not.

10  Q.  And you have not presented this jury with any test reports       03:56PM

11  like the Bard test reports that you reviewed, correct?

12  A.  That's correct, yes.

13  Q.  And while you had a lot of criticisms about the Bard test

14  reports you have admitted to us that you personally have never

15  conducted bench testing like that on any medical device,            03:56PM

16  correct?

17  A.  That's correct.

18  Q.  Thank you, sir.  That's all I have.

19          THE COURT:  Redirect?

20                  REDIRECT EXAMINATION                                 03:56PM

21  BY MR. STOLLER:

22  Q.  Dr. McMeeking, you were just asked if you have ever

23  conducted bench testing on a medical device.  Why not?

24  A.  Because I do calculations and I do theory.  I'm not an

25  experimentalist so I don't have a lab and, therefore, I don't       03:57PM

1    do bench tests myself.

2    Q.  You were asked whether you had presented the mathematical

3    calculations that you performed to this jury.

4           Have you presented them to the defendants in this

5    case?                                                          03:57PM

6    A.  Yes, I have.

7    Q.  Where were they?

8    A.  They were in my report.

9    Q.  Have you given them your FEA analysis that you did?

10   A.  I recall that we gave them some input files for FEA.      03:57PM

11   Q.  Okay.  Is the math that you performed here something that's

12   not capable of being done by engineering students?

13   A.  No.  Some of the calculations I did could be done by

14   second-year students.  In fact, we teach second-year students

15   those kind of calculations and others are more complicated.  So  03:58PM

16   maybe a third- or a fourth-year student or a graduate student.

17   Q.  Is the math you did similar to the analysis and math that

18   the Bard engineers did in testing the various IVC filters?

19   A.  Well, the mathematics that goes into finite element

20   analysis is identical to the mathematics that goes into doing  03:58PM

21   an analysis on a piece of paper, so yes.

22   Q.  And what was the difference between your analysis in math

23   and Bard's analysis in math?

24   A.  The assumptions were the difference.

25   Q.  And what were the key distinctions in the differences in   03:58PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Redirect

1  the assumptions?

2  A.  The key distinction is that I always -- I was always

3  concerned to identify the foreseeable worst-case conditions

4  that the filter would experience whereas when Bard carried out

5  their calculations and their testing, they did not seek          03:59PM

6  worst-case conditions for the exercise.

7  Q.  And in your review of their math and their analysis and

8  their finite element analysis tests, did they analyze, in most

9  cases, best-case scenario?

10 A.  Yes, essentially best-case scenarios.                        03:59PM

11 Q.  And all things considered, it's not wrong to do a best case

12 scenario analysis.  True?

13 A.  No.  Correct.  It's a good thing to do an analysis of all

14 sorts of scenarios to get a proper and comprehensive assessment

15 of how a device will perform.  But that should always be        03:59PM

16 accompanied by analyses that that address the foreseeable

17 worst-case conditions that can arise.

18 Q.  And did Bard do the latter?

19 A.  No.

20 Q.  Were the conditions that you were testing for things that    03:59PM

21 they could not have anticipated?

22 A.  They could have anticipated it very easily.  It already was

23 known that filters perforate the vena cava, that they tilt, and

24 that they fracture.

25 Q.  Well, in particular to the testing that Bard did and the     04:00PM

1   analysis that Bard did when they were moving from the Recovery

2   Filter to the G2 Filter, they were very aware of the failures

3   that were going on.  True?

4   A.  Yes.  They knew of the Recovery failures that were taking

5   place.                                                       04:00PM

6   Q.  And did they test their new design to make sure, hey, we're

7   not going to make things worse or are there ways we could

8   improve on those failures we're experiencing with the Recovery?

9   A.  No, they did not.

10  Q.  Is that a problem?                                       04:00PM

11  A.  Yes.  Very much so.

12  Q.  You were asked -- I'm sorry.  Did I interrupt?

13  A.  No.  I just said very much so that was a problem.

14  Q.  You were asked some questions about your electropolishing

15  comparisons for fatigue limit analyses and your use of Bard's  04:00PM

16  numbers.  Do you recall that?

17  A.  I recall it, yes.

18  Q.  The question I have for you about that is, why did you use

19  Bard's numbers?

20  A.  Because that was the only data available that compared     04:01PM

21  previous versions of the condition of the surface with the new

22  conditions of the -- the new conditions of the surface after

23  electropolishing.

24  Q.  Using those numbers, were you able to determine whether the

25  electropolishing would have had an effect on the potential     04:01PM

1  fracture of these devices?

2  A.  It would not have had a meaningful effect because of the

3  very large fatigue strains which the filter was experiencing or

4  could experience in worst-case conditions.

5  Q.  Is it fair to say you calculated fatigue strains and then          04:01PM

6  you were able to compare the values that Bard had determined to

7  see whether they were going to be sufficient to overcome that?

8  A.  That's correct.

9  Q.  And they weren't?

10  A.  They weren't.          04:01PM

11  Q.  So when you did your analyses, your fatigue failure

12  analyses, what more, if you had done them from scratch as

13  apparently Mr. North contends you did not, what more would you

14  have needed to do in order to determine what differences the

15  electropolishing made with respect to the Eclipse as compared          04:02PM

16  to the G2?

17  A.  It's always good to do more testing, but no, there was

18  nothing essential that needed to be done to make that

19  comparison.

20  Q.  Mr. North asked you some questions about your testimony as          04:02PM

21  to whether you had created an alternative design, I think it

22  was prototype.

23       Did you ever model a full new filter that Bard could

24  have designed?

25  A.  Well, I have thought of them in terms of what is feasible          04:02PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Redirect

1   in a design, but I haven't directly modelled new filters.

2   Q.  But you have informed defendants of the elements of design

3   changes that could have been made, correct?

4   A.  Yes, I have.

5   Q.  And you told them that they could have added caudal          04:03PM

6   anchors?

7   A.  Correct.

8           MR. NORTH:  Object.  Leading.

9           THE COURT:  Sustained.

10  BY MR. STOLLER:                                                  04:03PM

11  Q.  What design changes have you told these defendants in this

12  litigation that they could have made to the G2 Filter in the

13  Eclipse to make it safer?

14  A.  I told them they could have added caudal anchors, that they

15  could have added perforation limiters, that they could have     04:03PM

16  introduced a gentler curve at the mouth of the cap.  And I have

17  pointed out that they could have installed a two-tier system

18  much like the Simon Nitinol Filter that was the predicate of

19  the Recovery.

20  Q.  Mr. North asked you, well, questioned you about not         04:03PM

21  analyzing the strain in the legs.  Do you recall that?

22  A.  I recall that, yes.

23  Q.  Why did you not?

24  A.  Because the strain in the legs, because of their shape and

25  length, is going to be less than, even in the worst-case        04:04PM

1    location of the legs compared to the worst-case location in the

2    arm.  And because I am always concerned about worst-case

3    conditions, I focused my attention on what would happen to the

4    arm.

5         I should comment that I did other calculations for          04:04PM

6    legs that were associated with what happens when clots hit

7    them.  So I did do some analysis of leg strain but primarily my

8    focus was on arm strain.

9    Q.  And that focus on the arm strain was because why?

10   A.  Because it's the worst-case location in terms of            04:04PM

11   susceptibility to fatigue failure.

12   Q.  Does that it mean it's the most likely to fail if failure

13   happens?

14   A.  That's correct.

15   Q.  And Mr. North asked you some questions about how often or    04:04PM

16   how frequent these things would occur within what time period

17   assuming all these various events that you have assumed the

18   worst-case scenario would happen.

19        How long would it take under some of your calculations

20   for the filter to break?                                        04:05PM

21   A.  Well, in some cases it would take years of breathing.  In

22   other cases, it could happen quite quickly after the worst-case

23   conditions have set in.  But it always takes time for the

24   worst-case conditions to set in because that involves

25   endothelialization which develops over weeks or months and      04:05PM

1    perforation, which probably takes months or years.

2    Q.  And what are the worst-case conditions?

3    A.  The worst-case conditions for the filter are perforated to

4    the extent that it looks just like this.  Sorry.  Can I put the

5    ELMO on?                                                          04:05PM

6            MR. STOLLER:  Your Honor, may we show the jury the

7    ELMO?

8            THE COURT:  Yes.

9            MR. STOLLER:  Thank you.

10           THE WITNESS:  So the worst-case condition is when the    04:05PM

11   filter has perforated through the wall of the vena cava so that

12   the arms at least look like this.  They have regained their

13   original shape and the filter is tilted and it has

14   endothelialized so that walls of the vena cava grip the arms

15   firmly, and the expansion and contraction of the vena cava is    04:06PM

16   high because of breathing, which is a possibility in some

17   individuals who would receive filters.

18   BY MR. STOLLER:

19   Q.  Does tilting happen in filters?

20   A.  Yes.                                                         04:06PM

21   Q.  Does perforation happen in filters?

22   A.  Yes.

23   Q.  Does endothelialization happen in filters?

24   A.  Yes.

25   Q.  Is that the situation that you tested?                      04:06PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Redirect

1    A.  I tested it in calculations, yes.

2    Q.  And it takes time to get to that condition?

3    A.  That's correct.

4    Q.  But once you reach that condition it is in a critical state

5    where it may fracture?                                          04:07PM

6    A.  That's correct.

7    Q.  And you were not -- were you testing for everyday normal

8    use?

9    A.  No.  I was testing for worst-case conditions.

10   Q.  And those worst-case conditions exist in reality, correct?  04:07PM

11   A.  They can occur in reality, yes, and given the number of

12   individuals who have filters, I'm sure they do, in fact, happen

13   in practice.

14   Q.  You were asked a number of questions about the effect of

15   the cap changes to the G2X on your opinions and the filter      04:07PM

16   fracture and the fact that you did not take those into account.

17   Why did you not take into account the G2X cap changes?

18   A.  Because the change of shape would have no effect on the

19   fatigue strains that would be imposed on the arm.  And so the

20   cap was irrelevant to the calculation that I was doing.         04:08PM

21   Q.  What's the important part of the cap for your calculation?

22   A.  The important part of the cap is where the arm comes out of

23   the cap, and that's the location of the worst-case strains in

24   the arm anyway.  And it's also the location of where the strain

25   concentration can be elevated because of interference between   04:08PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Redirect

1    the arm and the cap.

2    Q.  Do your calculations mask potential reality?

3    A.  Yes.

4    Q.  Do Bard's filters fail in the way that you have calculated

5    and determined they might?                                    04:08PM

6    A.  Yes, they do.

7    Q.  Have you seen real life failures that match the

8    calculations that you have done?

9    A.  I have seen papers which summarize failures of the type

10   that I have described.  And, of course, there are litigation  04:08PM

11   cases about patients who have suffered similar failures.

12   Q.  Mr. North asked you questions about the degree of tilt in

13   this case and whether that might lead to perforation or other

14   adverse events.  In this case, Mrs. Jones had a fracture.  You

15   are aware of that, correct?                                   04:09PM

16   A.  Yes, I am.  Yes.

17   Q.  And you have done a specific analysis of the reason why her

18   filter fractured, correct?

19   A.  Correct.

20   Q.  But did her filter suffer from some of the complications   04:09PM

21   that you calculated and determined were reasonably likely to

22   happen?

23   A.  Yes, it did.

24   Q.  And does even what Mr. North characterized as minor tilt

25   increase the stresses and strains on the vulnerable parts of   04:09PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Redirect

1   the filter?

2   A.  Yes, it would.

3   Q.  Why is that?

4   A.  Because the process is proportional.  A small amount of

5   tilt would make a small change; a big amount of tilt would make   04:10PM

6   a big change.  But if the conditions such as the strain

7   concentration is already severe, a small amount of tilt could

8   be enough to take something which was okay over the critically

9   dangerous condition.

10  Q.  Mr. North asked you some questions about whether you had   04:10PM

11  conducted bench testing or animal testing.  You are familiar

12  with the reports of their expert, Dr. Briant, in this case, are

13  you not?

14  A.  Yes, I am.

15  Q.  Did Dr. Briant do any animal testing?   04:10PM

16  A.  No.

17  Q.  Did Dr. Briant do any bench testing?

18  A.  Oh, he did some bench testing to compare with some of his

19  calculations, but they weren't bench tests that would address

20  filter tilt or perforation or fracture by fatigue.   04:10PM

21  Q.  And did he do any bench testing to duplicate what Bard had

22  done?

23  A.  No.

24  Q.  Did he evaluate Bard's testing?

25  A.  Not to my knowledge.  It's not in the report.   04:11PM

UNITED STATES DISTRICT COURT

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Redirect

1   Q.  Is his report aimed solely at criticizing your results?

2   A.  That appears to be the case, yes.

3   Q.  Have you seen whether Dr. Briant has done any analysis of

4   Bard's FEA analyses and said these were correctly done?

5   A.  I'm not aware of anything in his report that addresses        04:11PM

6   that.  So my answer would be no.

7   Q.  Has Dr. Briant done a root cause analysis and offered any

8   ideas about why Bard's filters are suffering the complications

9   they do?

10  A.  No, he has not.                                               04:11PM

11          MR. NORTH:  Objection, Your Honor.  Outside the scope

12  of cross.

13          THE COURT:  Overruled.

14  BY MR. STOLLER:

15  Q.  I'm sorry?                                                    04:11PM

16  A.  No, he has not.

17  Q.  Has he offered any opinions as to how Bard could improve

18  its filters?

19  A.  No, he has not.

20  Q.  Mr. North has asked you some questions about having done     04:11PM

21  work for the plaintiffs lawyers in this case and other matters

22  and the amounts that were paid to you.  Do you recall that?

23  A.  I do, yes.

24  Q.  Have you charged us the same amounts you charge all of your

25  consulting clients?                                              04:12PM

1    A.  For other than testimony, yes.  The figure is exactly the

2    same.

3    Q.  Have you seen the experts from Dr. Fasching -- I'm sorry --

4    have you seen Dr. Fasching and Dr. Briant in those same

5    litigations?                                                    04:12PM

6    A.  You mean in the Bard litigation?

7    Q.  Yes, sir.

8    A.  Yes.  They are involved in all the Bard litigation that I'm

9    aware of.

10          MR. NORTH:  Your Honor, could we approach, please?       04:12PM

11          THE COURT:  Yes.  You can stand up Ladies and

12    Gentlemen.

13          (Discussion was had at sidebar out of the hearing of

14    the jury:)

15          THE COURT:  After that last objection I started          04:12PM

16    searching my notes.  You were the one who brought up Briant.

17          MR. STOLLER:  I did bring up Briant on direct.

18          THE COURT:  Did you address Briant on cross?

19          MR. NORTH:  I did not.

20          THE COURT:  I remembered Briant so I overruled it.       04:13PM

21    But it seems to me he didn't talk about Briant.

22          MR. STOLLER:  The particular issue here he's

23    questioned the amount of money he's made and his involvement in

24    litigation with them.  I think it's fair game to say have you

25    seen the same experts on the other side, same litigation.  They  04:13PM

1    are challenging his credibility.

2            THE COURT:  I understand your objection.  You don't

3    need to tell me what they are challenging his credibility.

4            What's your response to the objection?

5            MR. STOLLER:  My response is they have opened the door    04:13PM

6    by challenging him on these issues as claiming that he has

7    bought and paid for us because he has appeared in a number of

8    litigations for us.

9            THE COURT:  I understand that point.

10           MR. NORTH:  I had another objection.  I think they are    04:13PM

11   crossing the line on the order in the Motion in Limine about

12   the litigation.  My questions to him were carefully phrased in

13   terms of in this litigation.  And all I said was tens of

14   thousands of dollars in this litigation.  And they are now

15   talking about -- he's already slipped in other cases once.  And    04:14PM

16   I just want didn't want to make a big deal about objecting to

17   it.  I thought it would give it to much prominence.  But that

18   last question is inviting him to talk about other lawsuits.  I

19   mean, he's been involved in this litigation since before Mr.

20   Stoller was.                                                       04:14PM

21           THE COURT:  How do you think you were limited in your

22   questions?

23           MR. NORTH:  I said you have charged tens of thousands

24   of dollars in this litigation.

25           THE COURT:  By "this litigation" did you think he was    04:14PM

1    thinking the Jones case or the Bard MDL?

2            MR. NORTH:  I think he maybe thinking Bard MDL.  But

3    it's generic and it's carefully worded not to give the

4    impression of multiple cases.

5            THE COURT:  Do you agree, then, that the plaintiff can   04:14PM

6    inquire into -- or bring before the jury the fact that Briant

7    has charged comparable amounts in this litigation?

8            MR. NORTH:  Yes.  And I am concerned about this

9    witness has already mentioned in terms of other lawsuits, I

10   believe, and I don't think that is --                          04:15PM

11           THE COURT:  So where are you going with that?

12           MR. STOLLER:  I think Mr. North has not accurately

13   stated his questions on cross-examination.  He did ask that

14   question.  He also asked a follow-up question about being

15   involved with these lawyers in multiple litigations.          04:15PM

16           THE COURT:  And I don't have the testimony.

17           MR. STOLLER:  He talked about the hook.  He also moved

18   to this litigation and talked about paid, by these lawyers,

19   money in multiple litigations.

20           THE COURT:  I don't remember that.                     04:15PM

21           MR. STOLLER:  I think the transcript -- I don't have

22   the transcript in front of me.  What I do have is my notes

23   which said he's opened the door to talking about other

24   engagements by his experts in the same litigation.

25           THE COURT:  Is Briant going to testify?               04:15PM

1    MR. STOLLER:  Yes.

2    THE COURT:  Why isn't this appropriate for Briant on

3    cross?

4    MR. STOLLER:  It is appropriate for Briant on cross.

5    It's also appropriate for a witness who has just been impugned    04:15PM

6    in front of this jury at this time to know now --

7    THE COURT:  It seems to me you are suggesting you

8    should be able to put in front of this jury the fact that there

9    are multiple other lawsuits against Bard.

10    MR. STOLLER:  No.  What I'm saying is to the extent    04:16PM

11    they have examined -- well, let me say I think they have opened

12    the door to multiple other lawsuits with regards to amounts of

13    money he has been paid in other instances.

14    THE COURT:  Hold on, Mr. Stoller.  Their saying he has

15    been paid a lot of money by you guys doesn't necessarily say    04:16PM

16    anything about multiple other lawsuits against Bard.  I don't

17    think that fact has been brought out.  You just said, I think,

18    that you think you should be able to bring out multiple other

19    lawsuits against Bard.

20    MR. STOLLER:  I do.    04:16PM

21    THE COURT:  Why?

22    MR. STOLLER:  Because I think they have opened the

23    door.

24    THE COURT:  I disagree on that, and I ruled on that in

25    a Motion in Limine.  I do think it's fair for you to bring out    04:16PM

1    the fact that Briant has been paid comparable amounts of money

2    but I think you can do that without bringing out the fact that

3    there are multiple lawsuits against Bard, can't you?

4         MR. STOLLER:  I don't think he knows the money, what

5    he knows is Dr. Briant and Dr. Fasching have been in the same          04:17PM

6    litigation against -- not every time but in the Bard.

7         THE COURT:  So it sounds like the only way you can do

8    it is to bring out the fact that there are multiple lawsuits

9    against Bard with this witness?

10        MR. STOLLER:  He can't talk about money.  That's          04:17PM

11   correct.

12        THE COURT:  And I have already ruled on a Motion in

13   Limine we shouldn't get into multiple lawsuits.

14        MR. STOLLER:  I don't disagree with you, Your Honor.

15   I think their questioning opened up by virtue of -- he's          04:17PM

16   interpreted this litigation as being the Bard litigations.  The

17   questions he talked about Cook, he tried not to open the door

18   on theirs and gets into how much the Cook litigation is like

19   this litigation.

20        THE COURT:  My problem is that I can't agree with you          04:17PM

21   without going back and looking at the transcript on this.  I

22   don't know how to do that with the jury waiting and 15 minutes

23   left.  Now, if you want I can quickly search the Livenote to

24   see if I can agree with what you said about other litigations.

25   I don't know if I can find it.          04:18PM

1    MR. STOLLER:  He didn't use the word "other

2  litigations."  He asked him this litigation and I believe he

3  said "other matters."  I believe it was "other matters."

4    THE COURT:  That's what I don't know.  But so just so

5  I understand, when I look at the transcript your argument is       04:18PM

6  that you should be able to ask this witness of whether he has

7  faced Briant in other cases like this against Bard?

8    MR. STOLLER:  Yes.  I think they asked him the

9  questions that he has worked for the lawyers in this case in on

10  other matters.                                                    04:18PM

11    THE COURT:  Okay.  That's what I will go look for.

12    When Mr. North asked the question he said, and this

13  was right at the beginning of the cross-examination, "You have

14  worked with these lawyers for a number of years, haven't you?"

15  And he said yes.  "And they have paid you tens of thousands of    04:22PM

16  dollars."

17    His next question was you have also worked on the Cook

18  litigation with these lawyers, and they had a back and forth

19  about whether it was these lawyers.  So he went from a number

20  of years to the Cook litigation.  The only time my search found  04:22PM

21  where he mentioned other cases was in response to your question

22  on direct when he said I have worked on the other Bard cases.

23  But the cross-examination was limited to these lawyers for a

24  number of years and the Cook litigation.

25    So in light of that, tell me one more time why you      04:22PM

1   think you should be able to bring out other cases against Bard

2   in this redirect.

3           MR. STOLLER:  I recall three things and one of which I

4   may be wrong.  I recall him asking him about aside from the

5   Cook litigation other matters.  Secondly, the number of years            04:23PM

6   this doctor is going to interpret as all of them, second.  And

7   thirdly, I am fairly certain, I believe, that there was a

8   mention of depositions in other matters as well.

9           THE COURT:  The mention of the depositions that I just

10  read was two:  One he said you charged the same amount for               04:23PM

11  testifying in a deposition as in trial.  True.  And then he

12  brought out the fact that he was in effect testifying by

13  deposition videotape in another Cook trial going on right now.

14  I think those were the two references to depositions.  I will

15  go search for "matters" to see --                                        04:23PM

16          MR. STOLLER:  The word matters sticks in my mind.

17  Also I think the years thing is ambiguous.  It opened the door

18  to this completely.

19          THE COURT:  The word "matters" appears only one time

20  this afternoon and it was in your redirect about the fatigue             04:24PM

21  testing.  So in response to your argument, I don't agree that

22  the question about working for years opens the door to bring in

23  the other Bard cases.  I just don't think that opens the door

24  on that.

25          MR. STOLLER:  Your Honor, the only work he has done in           04:25PM

1   this case has been last year and this year.  That's not years.

2          THE COURT:  All the more.  He's just limited his

3   answer to that then.  He said yes I have been paid tens of

4   thousands of dollars.  Now you can go into Briant on the amount

5   he's been paid.                                          04:25PM

6          MR. STOLLER:  This witness doesn't know that.

7          THE COURT:  He doesn't.  And my view is they haven't

8   opened the door on other Bard cases as to what he's been paid

9   over the number of years.  So that's my ruling.

10          MR. STOLLER:  Thank you, Your Honor.              04:25PM

11          (In open court.)

12          THE COURT:  Thank you for your patience, Ladies and

13   Gentlemen.

14   BY MR. STOLLER:

15   Q.  Dr. McMeeking, Mr. North asked you whether the risks in   04:25PM

16   these devices could be reduced to zero.  I believe you said

17   that that was unlikely.  Could the risks in these devices, and

18   particularly the Eclipse, have been less than they were?

19   A.  Yes.

20   Q.  How?                                                04:26PM

21   A.  Well, the addition of perforation limiters and caudal

22   anchors would have helped to reduce the risk of some of the

23   failures without making any significant change to the benefits.

24   Q.  And you have identified some of those changes that you

25   believe could have been made, correct?                  04:26PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Redirect

1    A.   That's correct.

2    Q.   And you testified to them and identified some of them in

3    your reports?

4    A.   I did, yes.

5    Q.   Has Bard ever asked you to consult with them about how they    04:26PM

6    could fix their filters?

7    A.   No.

8    Q.   Have they implemented, to your knowledge -- well, did they

9    implement at the time you gave them the suggestions you have

10   made?    04:27PM

11   A.   Not to my knowledge.

12   Q.   Would those have made for a safer filter?

13   A.   Yes.

14            MR. STOLLER:  No further questions, Your Honor.

15            THE COURT:  Thank you, Dr. McMeeking.    04:27PM

16            Ladies and Gentlemen, we're virtually at the end of

17   the day.  We'll break now.  We'll plan to start at 9:00.

18   Please remember not to discuss the case.  And we'll see you in

19   the morning.  Thank you.  You can step down.

20            THE COURT:  Counsel, for your information, plaintiff    04:29PM

21   has used five hours and 49 minutes.  Defendant has used two

22   hours and 35 minutes as of the end of today.  We will plan to

23   see you tomorrow morning at 8:30.  We've got another hearing

24   starting now.

25            (Proceeding recessed at 4:29 p.m.)    04:29PM

1
2
3
4
5                      C E R T I F I C A T E
6
7           I, LAURIE A. ADAMS, do hereby certify that I am duly
8    appointed and qualified to act as Official Court Reporter for
9    the United States District Court for the District of Arizona.
10          I FURTHER CERTIFY that the foregoing pages constitute
11   a full, true, and accurate transcript of all of that portion of
12   the proceedings contained herein, had in the above-entitled
13   cause on the date specified therein, and that said transcript
14   was prepared under my direction and control.
15          DATED at Phoenix, Arizona, this 16th day of May, 2018.
16
17                              s/Laurie A. Adams
18                              _____
                                Laurie A. Adams, RMR, CRR
19
20
21
22
23
24
25