1                 **UNITED STATES DISTRICT COURT**

2                 **FOR THE DISTRICT OF ARIZONA**

3                 _____

4   **In Re: Bard IVC Filters**      )  **MD-15-02641-PHX-DGC**
    **Products Liability Litigation**  )

5                              )  Phoenix, Arizona
                              )  **May 17, 2018**

6  _____)
   **Doris Jones, an individual,**     )

7                              )
                Plaintiff,    )

8                              )  CV-16-00782-PHX-DGC
             v.              )

9                              )
   **C.R. Bard, Inc., a New Jersey**    )

10  **corporation; and Bard Peripheral** )
   **Vascular, Inc., an Arizona**     )

11  **corporation,**                )
                              )

12               Defendants.   )
  _____)

13

14

15      **BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16        **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

17           <u>**TRIAL DAY 3 - A.M. SESSION**</u>

18             (Pages 469 - 590)

19

20

21  Official Court Reporter:
    Patricia Lyons, RMR, CRR

22  Sandra Day O'Connor U.S. Courthouse, Ste. 312
    401 West Washington Street, SPC 41

23  Phoenix, Arizona  85003-2150
    (602) 322-7257

24

25  Proceedings Reported by Stenographic Court Reporter
    Transcript Prepared with Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2    For Plaintiff:

 3            Gallagher & Kennedy
              By: MARK S. O'CONNOR, ESQ.
 4            By: PAUL L. STOLLER, ESQ.
              By: SHANNON L. CLARK, ESQ.
 5            By: C. LINCOLN COMBS, ESQ.
              2575 East Camelback Road, Suite 1100
 6            Phoenix, AZ  85016

 7            Lopez McHugh, LLP
              By: RAMON ROSSI LOPEZ, ESQ.
 8            100 Bayview Circle, Suite 5600
              Newport Beach, CA  92660
 9
              Lopez McHugh, LLP
10            By: JOSHUA MANKOFF, ESQ.
              214 Flynn Ave.
11            Moorestown, NJ  08057

12            Heaviside Reed Zaic
              By: JULIA REED ZAIC, ESQ.
13            By: LAURA E. SMITH, ESQ.
              312 Broadway, Ste. 203
14            Laguna Beach, CA  92651

15

16    For Defendants:

17            Nelson Mullins Riley & Scarborough
              By: RICHARD B. NORTH, JR. ESQ.
18            By: ELIZABETH C. HELM, ESQ.
              201 17th Street NW, Suite 1700
19            Atlanta, GA  30363

20            Nelson Mullins Riley & Scarborough.
              BY: JAMES F. ROGERS, ESQ.
21            1320 Main St.
              Columbia, SC  29201
22
              Snell & Wilmer
23            By: AMANDA C. SHERIDAN, ESQ.
              400 East Van Buren
24            Phoenix, AZ  85004

25
```

1                              **EXAMINATION**

2       **WITNESS**                                        **PAGE**

3    DAVID GARCIA, M.D.

4              Direct Examination By Mr. Clark              493

5              Cross-Examination By Mr. North              518

6              Redirect Examination By Mr. Clark           526

7    CHAD MODRA

8              Direct Examination By Mr. O'Connor           531

9

10

11                              **EXHIBITS**

12       **NUMBER**    **DESCRIPTION**                      **PAGE**

13       2149        Vierling Deposition,                    529
                     05/11/2016 – Exhibit 231 –
14                   12/13/2001 E-mail from Carol
                     Vierling to
15                   kaufmajo@ohsu.edu, Paul
                     Stagg, and Connie Murray Re.
16                   "RF Protocol"

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

08:16:12   1

2     (Proceedings resumed in open court outside the presence

3   of the jury.)

4

08:29:55   5           THE COURT:  Please be seated.

6           Morning, everybody.

7           EVERYBODY:  Morning, Your Honor.

8           THE COURT:  Counsel, I assume we need to talk this

9   morning about the evidentiary issues that the memos that have

08:30:19   10   been filed on; is that right?

11           MR. COMBS:  That's correct, Your Honor.

12           THE COURT:  What I think I'd like to do is tell you

13   my thoughts, having read the cases, and let you react to it.

14           So it looks to me, as is not all that uncommon, as

08:30:34   15   though we've got some inconsistent cases in the Ninth Circuit.

16   There is the *Childs* case, which I relied on last time when I

17   admitted the kind of exhibit that's being proposed again.

18           The *Childs* case, by my reading, allows for the

19   admission of the hearsay within hearsay if the document was

08:31:09   20   relied upon by Bard and if Bard had a substantial interest in

21   the accuracy of the document.

22           I do not agree with the defendants that *Childs*

23   required that the hearsay within hearsay satisfy the business

24   records exception.  *Childs* didn't address that at all.  Now,

08:31:29   25   granted, they were official type documents, car titles and

08:31:32  1    such things.  But it didn't analyze anything about the nature

       2    of those documents.  It focused on the company's reliance and

       3    upon -- in a footnote, it mentioned that it had a substantial

       4    interest in the accuracy of the document.

08:31:46  5          The *MRT* Construction case, which was decided five

       6    years later, followed that same rationale and said that there

       7    was a three-step test:  One is that the over all document

       8    needed to be kept in the regular course of business, the

       9    information that otherwise would be hearsay had to be relied

08:32:07 10    upon by that business, and the business had to have a

      11    substantial interest in the accuracy of the documents.

      12          So *MRT* seemed to adopt *Childs*.

      13          There have been cases in the Ninth Circuit that have

      14    looked at a different requirement, and that is the requirement

08:32:24 15    that the entity in this case, Bard, verified the accuracy of

      16    the information.  The primary case that was cited by the

      17    defense for that is the *Arteaga*, A-R-T-E-A-G-A, case, but that

      18    discussion is dicta.  Judge Kozinski's opinion goes on to say

      19    that whole discussion is moot because the judge admitted it

08:32:45 20    not for the truth of the matter asserted.  So that is all

      21    dicta.

      22          But there are other cases, like the *Bland* case, that

      23    looked at whether or not the entity that kept the record

      24    verified the accuracy of the information.

08:32:59 25          Those two lines of cases don't talk about each other.

08:33:03  1   And I -- we didn't find any case that tries to synthesize

2   them.

3            So it appears that they are both lines of authority,

4   and I'm not comfortable looking outside the Ninth Circuit to

08:33:15  5   find the answer.  It seems to me I've got to look at

6   Ninth Circuit law.

7            As to whether or not the documents in this case are

8   admissible when those two lines of authority are taken into

9   account I think requires me to do two things:  One is look at

08:33:31 10   the documents, I haven't seen yet the documents that are being

11   proposed; and, second, listen to the testimony that the

12   plaintiff proposes to use for foundation, which I understand

13   will be Mr. Modra's testimony, and then decide whether, in

14   light of these two lines of authority, I think it is

08:33:47 15   admissible.

16            Those are my thoughts on those two lines of cases.

17            There is also an argument made by the plaintiff that

18   I can admit these documents and the hearsay within the

19   documents as an adoptive admission.  Clearly the rules

08:34:05 20   recognize adoptive admissions.  The question is whether Bard

21   took steps that would constitute an adoptive admission.  And I

22   don't know the answer to that yet.  I don't know what Bard did

23   with the information under the testimony.  There are cases

24   suggesting that if an entity acquires information and forwards

08:34:25 25   it as part of its own communication, that is an adoptive

08:34:31   1    admission.  And the *Sea-land Service, Inc.* case, the decision

2    by Judge Graber, seems to support that.  So that is another

3    possible method for these documents to come in.  But, again, I

4    don't know what the testimony will be about how the documents

08:34:47   5    were used.

6              And then, of course, the plaintiff is making an

7    argument that they are admissible for notice to Bard.  That's

8    a difficult argument for me to analyze without looking at the

9    documents and asking the question of whether the jury could

08:35:03  10    follow an instruction that they're to consider this

11    information only for notice and not for the truth of the

12    matter asserted.  I just don't know the answer to that until I

13    look at the documents.

14             So those are my thoughts having read the cases that

08:35:16  15    you all cited.

16             I'm interested in your thoughts, where you think I've

17    got it wrong, what you think I ought to do in terms of the

18    issue.

19             MR. COMBS:  Your Honor, if I may, I've got some

08:35:30  20    samples, and I can show you and kind of walk you through some

21    of these documents and how we intend to use them.

22             I apologize, I don't have them totally matched up,

23    but I think you will -- I think, Your Honor, you will get the

24    gist.

08:35:54  25             Lincoln Combs for the plaintiff, by the way,

08:35:57  1    Your Honor.

2    The documents in question are complaint files.  A

3    sales rep gets a call or a doctor reports in an e-mail, or a

4    sales rep or other Bard contact is directly involved and

08:36:16  5    observes a procedure and learns of a complication with their

6    filters.  This goes into a complaint file, and it's a pretty

7    thick document.

8    And, Your Honor, if I may approach and give a copy to

9    counsel.

08:36:29  10   THE COURT:  You may.

11   MR. COMBS:  And this is a compilation.  All these

12   documents relate to one report.  And there's forms and

13   procedures that Bard follows that go along with this, and I'll

14   show you a couple examples of the forms.  But the procedure,

08:36:54  15   Mr. Modra testified extensively in the Booker trial on the

16   foundation.  We've listed that in our brief about, you know,

17   all of the steps they take to create these, that they're

18   trained in these, and it's a regular part of their business.

19   So I think all the other parts of the business record

08:37:09  20   exception have been met other than this kind of issue in the

21   *Childs* and the other cases.  And I think that's the way

22   Your Honor already ruled in Booker.  I think Bard may be

23   moving to reconsider some of that, but they can address that

24   part of it.  But I'm focusing on the one issue here of the

08:37:28  25   hearsay within hearsay.

08:37:32  1          If you look on the third page --

2          THE COURT:  What's the number of this exhibit?

3          MR. COMBS:  I'm sorry, this is Exhibit 3270.

4          THE COURT:  All right.  This entire thing is 3270?

08:37:48  5          MR. COMBS:  Correct, Your Honor.  It all relates to

6   one complaint.

7          And the third page of that, which is -- last four

8   digits are 1669 of the Bates number, if you look in the middle

9   of that, there's an event description.  And I'm not going to

08:38:04 10   read the whole thing.  The details of these are different.

11   Sometimes it's in an e-mail, like I said, or sometimes it's

12   something directly observed by a sales rep that's sitting in

13   on a procedure.  Or it could be a phone call or whatever.

14          But here's where the complaint is described.  And

08:38:24 15   that text is important because, if you'll turn to it, towards

16   the back of the document, Your Honor, the last four digits are

17   1718.

18          And this is a form that Bard uses to report this

19   information to the FDA.  And if you'll look, the text in the

08:38:57 20   middle of this form describing the event matches the event

21   description that I just referenced on these -- third page of

22   the document.

23          So this same text is then not only relied on by Bard,

24   but then delivered to the FDA virtually verbatim.

08:39:25 25          This text in the event description and in the FDA

08:39:30   1    form, MDR form, is what we want to summarize in a 1006 summary

           2    of all the complaints.

           3            And, Your Honor, I understand there's an argument on

           4    substantial similarity.  And we can slice that as close as you

08:39:52   5    want, down to fractures that go to the lung.  We would argue

           6    they're all relevant for a 1006 summary.

           7            What our 1006 summary is, Your Honor -- if I may

           8    approach, this is -- this is what we're proposing to do, is

           9    just basic information on all these complaints with that exact

08:40:31  10    same text that's in the complaint file and then reported to

          11    the FDA.

          12            THE COURT:  Which -- which of the lines corresponds

          13    to Exhibit 3270 you just gave me?

          14            MR. COMBS:  I think it's the top one.

08:40:50  15            THE COURT:  No, the language is different --

          16            MR. COMBS:  Your Honor, it may not -- that one

          17    exemplar I gave you may not exactly match.

          18            MS. SMITH:  It would be page 827.

          19            THE COURT:  I think it is -- I think it's on

08:41:08  20    page 269.

          21            MR. COMBS:  They will match.  They do match.

          22            THE COURT:  So turn to page 269.  Do you have that?

          23            So the first three sentences correspond word for word

          24    with what is in Exhibit 3270.  Then the rest of the text in

08:41:44  25    269 does not, starting with "The physician is evaluating the

08:41:53  1    course of action."

2           So I'm trying to understand what you've put into the

3    summary from the actual complaint files.

4           MR. COMBS:  I think to the extent it doesn't match,

08:42:05  5    Your Honor, we can certainly make it match.  I think that came

6    from another section of the -- of the complaint file report --

7           THE COURT:  So in what you handed me there's no

8    heading on the columns.  What are the columns?

9           MR. COMBS:  I'm sorry, Your Honor.  Beginning Bates

08:42:26  10   number, complaint number, awareness date, device name, product

11   catalog number, primary FDA code, sex/age, and event

12   description.

13          THE COURT:  What is the fourth -- the fifth column?

14          MR. COMBS:  Primary FDA code.

08:42:51  15          THE COURT:  So 2616, malposition of the device, is an

16   FDA code?

17          MR. COMBS:  That's correct.

18          THE COURT:  And the next column is age and gender?

19          MR. COMBS:  Yes.

08:43:05  20          THE COURT:  And is it your intent, in the event

21   description, to quote word for word from what's in the

22   complaint?

23          MR. COMBS:  Correct, Your Honor.

24          THE COURT:  And in each of these instances will the

08:43:17  25   language you're quoting word for word be found not only in the

08:43:20  1    complaint record detail report, but also in the report to the

        2    FDA?

        3           MR. COMBS:  Correct, Your Honor.  To the extent it

        4    doesn't, we can certainly correct that.

08:43:31  5           THE COURT:  Well, you pointed out in Exhibit 3270

        6    that the wording in the report to the FDA is exactly the same

        7    as what is the event description in the complaint record.

        8           MR. COMBS:  Correct, Your Honor.  To the extent in

        9    our summary it doesn't match that, if there's some additional

08:43:47  10   language like that, record review or whatever, we can fix

        11   that, but that is the intent, yes.

        12          THE COURT:  Is it your understanding that in every

        13   one of these complaint files, the language reported to the FDA

        14   is taken word for word from the complaint description?

08:44:03  15          MR. COMBS:  Yes, Your Honor.

        16          THE COURT:  Okay.

        17          MR. COMBS:  And then that leads --

        18          THE COURT:  Recognize we've got 15 minutes left.  So

        19   let's really zero --

08:44:14  20          MR. COMBS:  I'll be very quick, Your Honor.  I won't

        21   even point anything else out.  That same text goes into the

        22   monthly management reports, which you've seen in the listing

        23   of complaints at the end.  I know that was the issue with the

        24   last three pages of the exhibit that you ruled was admissible

08:44:26  25   under *Childs*.

08:44:29    1          So our position is that is extremely reliable because

            2     it is not only being reported by medical professionals, not

            3     Western Union employees or whatever, people filling out forms

            4     in a gun shop like in the cases they cited.  These are medical

08:44:41    5     professionals reporting serious medical complications to a

            6     medical device company.  Bard not only relies on that

            7     information, but then turns around and actually reports it to

            8     the FDA as if it was reliable.

            9          THE COURT:  And what exactly are you seeking to move

08:44:55   10     into evidence?

           11          MR. COMBS:  We want -- the monthly management

           12     reports.

           13          THE COURT:  So neither of these?

           14          MR. COMBS:  Neither of those.  This is like the third

08:45:03   15     part of the triangle of how this information comes in and is

           16     used by Bard.

           17          THE COURT:  Do you have a copy of the monthly

           18     management report that corresponds to this?

           19          MR. COMBS:  And just to be clear, Your Honor, we're

08:45:36   20     seeking to move in that group of monthly management reports

           21     and our FRE 1006 summary as well.  Correct.

           22          THE COURT:  But not the underlying complaint?

           23          MS. SMITH:  Right.  Which is the intent of the chart

           24     because --

08:45:55   25          MR. COMBS:  Do it as a summary, Your Honor.

08:46:04 1      THE COURT:  Okay.  What is this document number

2    you've handed me?

3          MR. COMBS:  That is a monthly management report.

4          THE COURT:  What's the exhibit number?

08:46:14 5      MS. SMITH:  On the bottom it's Bates stamped.

6          MR. COMBS:  I believe it's on the bottom.  I don't

7    have --

8          THE COURT:  4504?

9          MR. COMBS:  Yeah, that sounds about right,

08:46:21 10  Your Honor.

11         THE COURT:  Okay.  Is there something in here that

12   corresponds to these documents you've given me?

13         MR. COMBS:  I didn't give you the one that exactly

14   corresponds to that complaint file.  But you'll see in the

08:46:31 15  last few pages when they have these listing of complaint

16   events, there's an event description that goes along with

17   those and a complaint number, and those exactly match the same

18   text of the report to the FDA and the complaint file event

19   description.

08:46:45 20        THE COURT:  And do you have something that

21   corresponds your 1006 chart with monthly management reports?

22         MR. COMBS:  It's all the same information.

23         THE COURT:  Well, I know that.  But do you have

24   something that would allow me to look at your 1006 summary and

08:47:02 25  say these 15 events are reflected in this monthly management

08:47:08  1    report?

2             MR. COMBS:  We can definitely do that, Your Honor,

3    yes.

4             THE COURT:  But you haven't done that so far?

08:47:13  5             MR. COMBS:  I just don't have it all compiled here

6    this morning.

7             MS. SMITH:  Based on the complaint ID number, we can

8    certainly take our chart and separate it like that for you.

9             THE COURT:  Okay.  What is the scope of the kinds of

08:47:25  10   complaints that are in your 1006 summary?  Is it just Eclipse?

11   Is it all filters?  Is it all products?

12            MR. COMBS:  Like I said, we can slice it however we

13   want to.  We have one that is 2003 to 2015, all complaints,

14   but --

08:47:40  15            THE COURT:  Meaning all products?

16            MR. COMBS:  All products.  But that can be down to

17   Eclipse or that can be -- it's a spreadsheet, we can sort it

18   however we need to or slice it out --

19            THE COURT:  What are you proposing to do?

08:47:51  20            MR. COMBS:  We'd like to move for all of it,

21   Your Honor.

22            THE COURT:  Why would a complaint about a stent

23   problem be relevant?

24            MR. COMBS:  No, Your Honor, these are all filter --

08:47:58  25   filter problems.

08:48:01   1              MS. SMITH:  Recovery, G2, and Eclipse.

           2              THE COURT:  But it's not all products, it's --

           3              MR. COMBS:  When you said all products, Your Honor,

           4     all retrievable IVC filters.

08:48:08   5              THE COURT:  So what is in your current 1006 chart?

           6              MS. SMITH:  Recovery filters, G2 and Eclipse, with

           7     the relevant injuries and a cascade from perforation.

           8              THE COURT:  So all complications for Recovery, G2,

           9     G2X, and Eclipse?

08:48:25  10              MS. SMITH:  All complications that are relevant to

          11     the MDL.  So it does not include deployment issues or issues

          12     with the catheter.  Only injuries that are relevant here.

          13              THE COURT:  Meaning what?

          14              MS. SMITH:  Perforations, migrations, fractures, and

08:48:37  15     sometimes with things are left in the body and so they're

          16     embedded and aren't able to be removed.

          17              THE COURT:  Okay.  And are you intending to get this

          18     in today through a witness?

          19              MR. COMBS:  We would like to move it into evidence at

08:48:51  20     the beginning of the day, Your Honor.

          21              THE COURT:  You can't move it in until you've laid

          22     the foundation for the business record.

          23              MR. COMBS:  Our position is Mr. Modra laid that

          24     foundation in the last trial.

08:49:02  25              THE COURT:  Had to happen in this trial.

08:49:04  1          MR. COMBS:  I don't think that is correct,

2     Your Honor, under Rule 104.  And I've checked with Weinstein's

3     on that.  You can have an evidentiary hearing pretrial to move

4     in evidence that's otherwise not disputed.  We've already had

08:49:14  5     that.

6          THE COURT:  We've not had any evidentiary hearing

7     that has this 1006 document in question.  All we had -- all we

8     had in the last trial was Mr. Modra's testimony in response to

9     the defense questioning about their complaint handling

08:49:28 10     procedures.  Now, it was after that that I let in that

11     management report.  But there's been no 1004 hearing about

12     this 1006 -- 104 hearing about this 1006 exhibit.

13          MR. COMBS:  Fair enough, Your Honor.  But as to the

14     monthly management reports, I believe there has been.  So we'd

08:49:48 15     like to move those in at the beginning of the testimony today.

16          THE COURT:  Well, I'll tell you now I'm not going to

17     admit them without foundation testimony.  Now, if what you

18     want to do is ask me through a 104 procedure to rely on what

19     Mr. Modra said, then you've got to give me that testimony.

08:50:05 20          MR. COMBS:  We did, Your Honor, in our trial brief.

21          THE COURT:  Well, you cited -- you gave me four cites

22     to his testimony.  I haven't gone and read that record.  I

23     haven't heard anything in response from the defendants about

24     what's --

08:50:14 25          Hold on.  Please don't talk while I'm talking.

08:50:17  1          You haven't allowed the defendants to respond to it,

       2   so I don't think I have an evidentiary basis for admitting

       3   these now.

       4          MR. COMBS:  Okay.  Fair enough, Your Honor.

08:50:26  5          THE COURT:  But in light of that, tell me how you

       6   want to proceed.

       7          MR. COMBS:  Then --

       8          THE COURT:  I'm not saying you can't lay that

       9   foundation.  I'm just saying it hasn't happened up until now.

08:50:34  10          MR. COMBS:  No, I understand, Your Honor.  And so

      11   we'll do that with Mr. Modra today, yes.  That will be our

      12   goal.

      13          THE COURT:  Okay.

      14          MR. O'CONNOR:  May I consult with him for one second?

08:50:41  15          THE COURT:  Well, yeah.  We have nine minutes left,

      16   so I'm going to hear from defendants.

      17          MR. COMBS:  Can we, Your Honor, question Mr. Modra

      18   outside of the presence of the jury --

      19          THE COURT:  No.  No.  I'm not going to take time away

08:50:52  20   from the jury while we do that.

      21          MR. COMBS:  Well, we've asked to do it so we're not

      22   using up time and using the jury's time.

      23          THE COURT:  There is no time to do that.  I mean, the

      24   only time would be during the lunch hour, but I think

08:51:03  25   everybody needs the break.  I've got a hearing starting at

08:51:06 1    4:30 today.  So I think we've got to use trial time to do

2    that.

3         MR. COMBS:  Thank you, Your Honor.

4         THE COURT:  Okay.  We've got eight minutes left,

08:51:13 5    Mr. North, so give me your thoughts on this issue.

6         MR. NORTH:  Your Honor, I agree with the Court on the

7    need to hear further testimony as to resolve the hearsay

8    issue, so I'm not going to address that right now.

9         But I would like to point out that hearsay is only

08:51:28 10    the first problem here.  There are very serious 402 and 403

11    issues with what they are seeking to do.  They are seeking to

12    put in front of this jury hundreds of reports of other

13    incidents.  Often unverified.

14         And what is perhaps most unfair, in the defense's

08:51:47 15    view, about this evidence under 403 is the fact that so much

16    of this evidence has been created by the plaintiff's attorneys

17    themselves by filing lawsuits.

18         We file a complaint form with the FDA, and we

19    investigate, we create one of these complaint files for every

08:52:05 20    lawsuit that's filed here in this Court.  So 3,000-plus of

21    these events and complaint files have to do with these

22    lawsuits.

23         But put that aside, there's plenty of Ninth Circuit

24    precedent which we have cited about limitations on putting

08:52:24 25    other incident evidence in, the need for substantial

08:52:26  1    similarity, the need to limit that evidence to a discrete

       2    number of cases or events, if you're going to let it in,

       3    because of the prejudicial effect of it.

       4              And then, as an aside, I would note with these

08:52:39  5    management reports, there's a plethora of other relevance

       6    issues because each of these reports have volumes of

       7    information about competitor intelligence involving other

       8    products, profits, recalls on stents.  I mean, they're just

       9    full of information unrelated to filters that never should be

08:52:58 10    part of this record.

      11              THE COURT:  In which documents?

      12              MR. NORTH:  The management reports.  They are

      13    proposing to introduce 20 management reports that just have

      14    tons of information about the business of Bard Peripheral

08:53:11 15    Vascular totally unrelated to filters.

      16              But even if you focus only on these other incidents,

      17    we believe under the Ninth Circuit precedent not only are

      18    there hearsay issues that still need to be resolved, but there

      19    are relevance and 403 issues.  If they're able to put in front

08:53:30 20    of this jury this 1006 chart of thousands, or at least

      21    hundreds, of other events involving all of our filters over a

      22    ten-plus-year period without showing substantial similarity to

      23    each event, as they're required to do, without -- at many

      24    points of instances, the information having never been

08:53:56 25    verified by Bard, merely anecdotal reports or reports

08:54:00    1    contained in plaintiff's profile forms filed in this

            2    litigation, I don't see how we can get a fair trial.

            3         And I think this is a perfect situation for the

            4    application of Rule 403.

08:54:13    5         THE COURT:  Well, where in your brief, Mr. North, did

            6    you cite the substantial similarity to case law?

            7         Are you talking about the cases you're citing at the

            8    bottom of page 3 and the top of page 4?

            9         MR. NORTH:  Yes, Your Honor.

08:54:53   10         THE COURT:  You're not talking about substantial

           11    similarity in your discussion, you're talking about cumulative

           12    and prejudicial.

           13         MR. NORTH:  I'm sorry, Your Honor.  In some of the

           14    parentheticals.  For example, in *Arnold versus Sam's Club*.  I

08:55:09   15    think in our haste to get that filed we didn't specify it.  We

           16    did cite the concepts in there.

           17         THE COURT:  Well, I have not focused on that issue

           18    because it wasn't argued.  So I haven't read these cases with

           19    that substantial similarity question in mind.

08:55:24   20         Let me make sure I understand your argument.

           21         Let's assume we could narrow their 1006 exhibit to

           22    nothing but filter complications for the G2 line of the kind

           23    that are at issue in this case, migration, tilt, fracture, and

           24    perforation.  And let's say hypothetically there's 200 of

08:55:45   25    those.  What is your argument as to why that's not relevant?

08:55:51  1          MR. NORTH:  Number one, Your Honor, I think that they

2     have a problem in showing substantial similarity.  First of

3     all, we heard yesterday from Dr. McMeeking he doesn't even

4     think perforation is an issue.  Tilt in this case, the

08:56:03  5     evidence is going to be is four degrees.

6          THE COURT:  I'm sorry to cut you short.  We've only

7     got three minutes left now.

8          So one of your arguments is it's irrelevant because

9     these incidents are not substantially similar.

08:56:14  10          MR. NORTH:  Right.

11          THE COURT:  And you're relying upon the *Arnold* case

12     for that proposition?  And similar authority --

13          MR. NORTH:  And *Daniels* too.

14          THE COURT:  Okay.  So one argument is that even

08:56:29  15     though they're the same line of filter and the same kinds of

16     complications, they have to clear some additional substantial

17     similarity burden?

18          MR. NORTH:  Right.

19          THE COURT:  Okay.  That is one argument.

08:56:39  20          What else do you have in the way of arguments that

21     those categories are not relevant?

22          MR. NORTH:  No, I think that's the ground for the

23     relevance objection.  Then you move to the 403.

24          THE COURT:  Okay.  So let's assume for a minute we

08:56:52  25     narrow the 1006 to G2 line of filters and those four

08:56:57  1   complications.  I'll look at the substantial similarity

2   argument.

3              What is the 403 argument?

4              MR. NORTH:  Your Honor, there are many -- I believe

08:57:05  5   there are a number of Ninth Circuit cases, and those are not

6   cited in the brief, but that talk about the nature of

7   extensive evidence of other incidents being highly prejudicial

8   and imposing limitations on the examples that can be

9   presented.

08:57:21 10              I think we have to remember, too, that we're not

11  arguing that the number of complaints can't be put in front of

12  this jury.  We're talking about all this uncorroborated

13  detail.

14              THE COURT:  Okay.  So you say there are 403 cases

08:57:33 15  that you haven't cited?

16              MR. NORTH:  I believe so.  I will go check.

17              THE COURT:  I obviously can't look at those cases if

18  you've not cited them.

19              MR. NORTH:  Right.

08:57:41 20              THE COURT:  So that's your relevancy and your 403

21  argument.  If we narrow 1006 to filters and these

22  complications.

23              MR. NORTH:  Yes.

24              THE COURT:  And you've got your hearsay argument.

08:57:56 25              MR. NORTH:  Right.

08:57:57   1        THE COURT:  But do you agree with my description of

2   the Ninth Circuit law as it stands with the *Childs* line of

3   cases and the verification line of cases?

4        MR. NORTH:  I think we read the *Childs* case

08:58:07   5   differently than the Court.  We read it as an actual business

6   record of one company being incorporated into the business

7   records of another.

8        THE COURT:  All right.  And I've read that argument

9   and I don't agree with it.  I don't think *Childs* or the other

08:58:20   10   case, *MRT*, says that.

11        Besides those hearsay arguments and your relevancy,

12   substantial similarity, and the 403 cases you're going to give

13   me, do you have any other argument against their 1006

14   document?

08:58:42   15        MR. NORTH:  No, Your Honor, I don't believe so.

16        THE COURT:  Okay.  We're down to one minute

17   beforehand.  Let me tell you what I'd like to do.

18        It seems to me that whatever is in the 1006, it

19   should at least be limited to the G2 line of filters and the

08:58:56   20   four categories of complications we've talked about.

21        And maybe that's what it already is limited to.  But

22   if not, it seems to me anything else should be taken out

23   because it's plainly not relevant to this case.

24        We will look at the substantial similarity cases over

08:59:12   25   the lunch hour.  If you can get somebody to give us the 403

DIRECT EXAMINATION - DAVID GARCIA, M.D.

08:59:16   1   case cites, I'll look at that as well.

2       I'll be happy to look at whatever cases plaintiff

3   wants to identify in response to the substantial similarity

4   cases.

08:59:25   5       And I think what we need to do is have the plaintiff

6   lay whatever foundation you think you can through Mr. Modra,

7   and then we'll have to revisit this issue after I've looked at

8   the case law and I can hear both sides' arguments.

9       MR. NORTH:   Thank you.

08:59:40   10      THE COURT:   Okay.   So let's proceed in that manner.

11   So go ahead and lay the foundation with Mr. Modra.

12      All right.   We're at 9 o'clock.   We'll bring the jury

13   in.

14      (The jury entered the courtroom at 9:00.)

09:01:02   15      THE COURT:   Good morning, ladies and gentlemen.

16   Thanks for being with us this morning.   We're doing a little

17   organizing and solving computer problems, but we're going to

18   get started.

19      So we are continuing with the plaintiff's evidence.

09:01:14   20      MR. CLARK:   We are, Your Honor.   The plaintiff would

21   call Dr. David Garcia.

22      THE COURTROOM DEPUTY:   Dr. Garcia, if you'll stand

23   right here, raise your right hand, please, sir.

24

25

DIRECT EXAMINATION - DAVID GARCIA, M.D.

1              **DAVID GARCIA, M.D.,**

2    called as a witness herein, after having been sworn or

3    affirmed, was examined and testified as follows:

4              MR. CLARK:  May I introduce myself to the jury?

09:01:46   5        THE COURT:  Yes, you may.

6              MR. CLARK:  Ladies and gentlemen, my name is

7    Shannon Clark.  I'm on the team of attorneys who represents

8    Doris Jones.

9              D I R E C T   E X A M I N A T I O N

09:01:54  10   BY MR. CLARK:

11   Q    Dr. Garcia, could you introduce yourself to the jury.

12   A    Good morning.  My name is David Garcia.

13   Q    Tell the jury what you do for a living.

14   A    I'm a hematologist.  I practice at the University of

09:02:02  15   Washington Seattle.

16   Q    What is hematology?  What type of medicine do you

17   practice?

18   A    I specialize in disorders of the blood, and in particular

19   my research and clinical practice focus is in blood clotting

09:02:16  20   and its treatment and prevention.

21   Q    And are you board certified in hematology?

22   A    I am.

23   Q    You mentioned you work at the University of Seattle.  Is

24   that a hospital setting?

09:02:27  25   A    Yes.  University of Washington is a large tertiary care

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:02:30  1    medical center.  I also do some time at the Veterans

2    Administration Hospital in Seattle and the Seattle Cancer Care

3    Alliance.

4    Q    Are you fully accredited at those institutions?

09:02:42  5    A    At all of them, yes.

6    Q    Do you also teach?

7    A    I do.  I teach medical students.  I teach trainees who

8    have just left medical school, they're called residents, or

9    fellows, interns, and across that spectrum.

09:02:57  10   Q    And the jury may be familiar.  There are a number of

11   different types of professors:  Associate professors, adjunct

12   professors, full professors.  What type of professor are you?

13   A    So my title is full professor in the department of

14   internal medicine, division of hematology.

09:03:16  15   Q    Looking at the type work that you do, the jury has already

16   heard a lot of information about blood clots, DVT, pulmonary

17   embolism.  Can you briefly explain why patients develop blood

18   clots?

19   A    Well, it can be the subject of a long lecture, but I'll

09:03:32  20   try to be very brief.

21        Blood clots form in patients' vessels for many

22   reasons, but fundamentally what happens when a patient forms a

23   blood clot is a very complex system in the body, which is

24   designed evolutionarily to help us not bleed to death, goes

09:03:55  25   awry.  And rather than a clot forming in response, let's say

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:03:58  1   to an injury, like cutting yourself shaving, a clot forms

2   spontaneously within a vessel where, ideally, blood should be

3   flowing freely.

4   Q   And what's the difference between DVT and pulmonary

09:04:14  5   embolism?

6   A   DVT means a blood clot is forming in one of the large

7   blood vessels or deep veins, typically of the legs.  And

8   pulmonary embolism refers to a blood clot that is lodged in

9   one of the blood vessels in the lungs, that carries blood

09:04:33 10   through the lungs.

11   Q   Now, in your clinical practice, can you explain to the

12   jury what it is that you do, sort of day in day out, in terms

13   of managing the care of patients who are either at risk of

14   developing DVT or PE or have DVT or PE?

09:04:49 15   A   So I take care of a lot of patients who ask my advice

16   about, for example, the risks and benefits of taking blood

17   thinning medications to either prevent a second or third blood

18   clot from occurring or, in some cases, to prevent a first

19   blood clot from occurring if they're a patient who is at risk

09:05:10 20   but hasn't yet experienced such an event.

21        MR. CLARK:  Gay, would you pull up Exhibit 2467.

22   BY MR. CLARK:

23   Q   Doctor, we're going to show you Exhibit 2467.  Can you

24   identify what this document is.

09:05:26 25   A   This is an expert report that I prepared along with

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:05:29  1   Dr. Michael Streiff as part of my involvement with this

2   litigation.

3   Q    Who is Dr. Michael Streiff?

4   A    He's a hematologist at Johns Hopkins Hospital who also

09:05:40  5   specializes in blood clots.

6         MR. CLARK:  And, Gay, can you please turn to page 12

7   of the report.

8   BY MR. CLARK:

9   Q    Doctor, can you identify what is -- it's a little

09:05:48  10  confusing because the bottom of the page says 2, but in the

11  lower right-hand corner we see .012.  What is beginning on

12  .012?

13  A    This is my curriculum vitae or CV.

14  Q    How long is the CV?

09:06:06  15  A    I don't remember.  I think it is more than 20 pages long.

16  Q    Would 27 pages sound right?

17  A    That could be right.

18  Q    And what does a CV do?

19  A    CV just provides -- it's like a resume.  It provides an

09:06:20  20  overview of jobs that I've held, titles and promotions that

21  I've had, and it also provides a list of various works that

22  I've published over the years, be they book chapters,

23  peer-reviewed papers and articles, national and international

24  meetings at which I've been invited to give presentations.

09:06:39  25  Q    About how many times have you been a published author?

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:06:44  1   A   I think if you just count peer-reviewed papers, it is

2   approaching about 100 peer-reviewed articles that I have been

3   a co-author or author of.

4   Q   And do those generally relate to the treatment of blood

09:06:57  5   clotting disorders?

6   A   Almost all of them.

7   Q   And have you published any information concerning the use

8   of IVC filters?

9   A   Yes.  There's at least one article in which I -- that was

09:07:11 10   the principal subject of the article that was published, I

11   think four, five years ago now, with some co-authors.  And

12   then IVC filters are likely mentioned in several of the other

13   papers, even though that's not their principal focus.

14   Q   Understood.

09:07:27 15       Is it fair to say that you believe, Doctor, that you

16   have a thorough understanding of the use of IVC filters as it

17   relates to the treatment or for DVT/PE?

18   A   Yes, I think it's my job to have such an understanding.

19   Q   And I forgot to ask you, where did you go to medical

09:07:42 20   school?

21   A   I attended medical school at the University of Alabama in

22   Birmingham, and then I did my residency in internal medicine

23   at Johns Hopkins Hospital, and completed my fellowship

24   training in hematology at the University of Washington in

09:07:54 25   Seattle.

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:07:55  1   Q    And in terms of your post training career, is it fair to

2   say that you have dedicated a majority of your professional

3   practice to the study and application for treating DVT and PE?

4   A    Yes.  The treatment of DVT and PE has been the focus of

09:08:12  5   both my clinical practice and my research for essentially my

6   entire career.

7   Q    Doctor, can you tell the jury what you were asked to do in

8   this case.

9   A    Yes.  So I was asked to provide an evidence-based opinion

09:08:28  10   about the -- what is known about the risks and benefits of

11   inferior vena caval filters for the treatment of patients with

12   DVT/PE, as well as the prevention of DVT in patients who may

13   be at risk for such.

14        I was also asked to look at the medical records of

09:08:48  15   Mrs. Doris Jones and determine -- and form an opinion about

16   whether she had suffered an injury as a result of her filter

17   placement and whether she was at risk for complications from

18   that injury.

19   Q    And did you, in fact, formulate opinions concerning those

09:09:04  20   two subjects?

21   A    I did.

22   Q    And are your opinions based upon your training,

23   experience, and education in the area of hematology?

24   A    Yes.

09:09:12  25   Q    And are the opinions that you're going to be expressing

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:09:14   1   here today formulated to a reasonable degree of medical

2   probability?

3   A    They are.

4   Q    Are you being paid for your work in this case?

09:09:21   5   A    Yes, I am.

6   Q    How much per hour?

7   A    I charge $700 per hour for any work related to this or any

8   other legal matter.

9   Q    What about if you have to come to testify for a day,

09:09:31  10   what's -- do you have a daily rate?

11   A    Yes.  I charge $5,000 per day to appear in court.

12   Q    Doctor, is that the same rate you charge for work whether

13   you're working for a plaintiff or a defendant?

14   A    Yes.  For the last several years I've charged that rate

09:09:47  15   for any medical malpractice work in which I'm a consultant.

16   Q    Any other type of legal work, same --

17   A    Any legal work, yes.

18   Q    And are we also paying your travel expenses to come here

19   and talk to the jury?

09:10:00  20   A    Yes.

21   Q    Now, let's talk about your opinions in the case.  Let's

22   focus first on the -- addressing patients who have clots.  And

23   let me make that distinction.

24        You mentioned two things.  You talked about treating

09:10:14  25   patients with clots and also preventing clots.  So can you

DIRECT EXAMINATION - DAVID GARCIA, M.D.

09:10:18   1    explain to the jury what the difference between those are.   I

2    think it is self-evident, but to be sure.

3    A    Sure.   So, in the first case, we're talking about a

4    patient who has been diagnosed with a DVT or PE.   And then

09:10:30   5    we're trying to advise that patient about what intervention or

6    interventions can minimize the likelihood that they have

7    problems related to that DVT or PE.

8         When we talk about prevention or primary prevention,

9    a patient has not yet experienced a blood clot, but may be at

09:10:54  10    such a high risk for a blood clot that the doctors are

11    contemplating some sort of pharmacologic or other intervention

12    in sort of preemptive fashion to prevent the clot from ever

13    happening.

14    Q    In terms of treatment, to your knowledge, is there any

09:11:11  15    generally accepted indication for IVC filter placement for the

16    treatment of blood clots?

17    A    I would say the widely acknowledged rare situation in

18    which filters are considered or possibly indicated is patients

19    who have experienced a fairly recent DVT or PE and have an

09:11:38  20    absolute contraindication to anticoagulant or blood thinning

21    therapy.

22    Q    What do you mean by a contraindication to anticoagulant

23    therapy?

24    A    Well, some examples of that would be a patient is actively

09:11:53  25    bleeding.   We can't give such a patient an anticoagulant

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:11:57   1    because it could make the bleeding that's already happening

2    much worse or catastrophic.  Or a patient whose had very

3    recent surgery and so they have blood vessels that have been

4    traumatized as part of the surgery and are at risk to begin

09:12:11   5    bleeding cannot receive anticoagulants in many situations.  So

6    these would be absolute -- situations where anticoagulants are

7    absolutely contraindicated.

8    Q   Now, would you treat all such patients with IVC filters at

9    any given time?

09:12:30  10    A   I would strongly consider placing an IVC filter in a

11   patient with recent objectively confirmed DVT or PE if he or

12   she had an absolute contraindication to anticoagulant therapy.

13   But if -- but -- once the patient is, let's say, more than

14   roughly a month separated from their DVT or PE, if they then

09:12:59  15   developed a contraindication to anticoagulant therapy, I

16   probably would not suggest an IVC filter in that situation.

17   Q   Why would your opinion about the use of an IVC filter

18   change in that context?

19   A   Well, because, as we're going to, I think, talk about, I'm

09:13:16  20   not convinced that the benefit of IVC filters has been well

21   established, and that once we're beyond one month from the

22   diagnosis of a blood clot, the daily risk of withholding

23   anticoagulation is substantially smaller and gets lower as

24   time goes on.  And so I would not recommend a treatment like

09:13:47  25   filters where there are known complications, no high quality

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:13:53   1   evidence of benefit in a patient where I felt the risk of

2   simply withholding anticoagulant therapy temporarily was

3   fairly low.

4   Q   Okay.  Let's talk about the information that's out there

09:14:06   5   about IVC filter use in terms of treating blood clots.  Can

6   you explain to the jury what types of data or studies are out

7   there.

8   A   Sure.  So when we make medical decisions about how to

9   treat patients or diagnose problems, we tend to look at

09:14:26   10   clinical research, and there are many types of clinical

11   research studies.  The most basic or lowest quality of

12   clinical research would be anecdote, or what we call sometimes

13   case reports.  So this would be, for example, a doctor

14   publishing a paper saying I treated a couple of patients with

09:14:46   15   this condition in this fashion and they seemed to do okay.

16       The next level of quality, moving from down to up,

17   would be larger observational studies.  So these are sometimes

18   called registries, cohorts.  They can be prospective, meaning

19   you start the study and then watch how patients do going

09:15:12   20   forward, or retrospective, meaning we can look at data that

21   already exists, let's say in an electronic health system, or

22   paper medical records, and try to figure out what happened in

23   the past.

24       But the important part is they're observational

09:15:28   25   studies, meaning there was no attempt to control how patients

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:15:35  1    were treated, which patients got which therapy.  We're just

2    observing what happened in so-called real world practice and

3    describing the outcomes.

4         The best type of study is a study where we say we've

09:15:49  5    got a treatment, an intervention, we'll call it, and we want

6    to compare it to some other approach of management, and we'll

7    call that a control.

8         And we randomly assign patients to either receive the

9    intervention or experimental therapy, or the traditional or

09:16:11  10   control therapy.  And we observe whether the outcome that

11   we're trying to prevent or avoid happens more frequently in

12   one group than the other.

13        Ideally, such a study would be double-blinded,

14   meaning neither the patient nor the doctor knows which

09:16:30  15   treatment they got, because that gives it the highest level of

16   scientific rigor.

17   Q   Is that because there is an avoidance of bias in the

18   double-blind?

19   A   Right.  So there are all kinds of biases that can be

09:16:43  20   introduced in clinical research.  And as you move up that

21   hierarchy you just described, I just described, the potential

22   for bias decreases, where at the very top in a double-blind

23   randomized control trial it is the least possible potential

24   for bias.

09:17:01  25   Q   And with respect to IVC filter use, do we have any

DIRECT EXAMINATION - DAVID GARCIA, M.D.

09:17:04  1  double-blind studies like that?

2  A    No.

3  Q    Do we have other studies that would be in that top tier

4  category?

09:17:12  5  A    There are two studies that I'm aware of in which patients

6  were randomly assigned to either receive an IVC filter or not.

7  Q    What are those studies called?

8  A    PREPIC and PREPIC2.

9         MR. CLARK:  Gay, could you please bring up 7230.

09:17:34  10  BY MR. CLARK:

11  Q    Can you identify the document that's listed as

12  Exhibit 7230, sir?

13  A    Yes.  This is a publication describing the long-term

14  follow-up results of the PREPIC study.

09:17:49  15  Q    And what is the publication that this appears in?

16  A    It was published in the journal Circulation.

17  Q    Is that considered -- is this article considered reliable

18  and authoritative in the field?

19  A    Yes.

09:18:05  20  Q    Doctor, could you explain what the PREPIC study was

21  designed to do?

22  A    Yes.

23         So the PREPIC study enrolled about 400 patients, all

24  of them had either pulmonary embolism or were -- or deep vein

09:18:25  25  thrombosis that was felt to put them at high risk for

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:18:27  1    pulmonary embolism, and randomly assigned these patients to

2    either have a filter placed, a permanent filter placed, or

3    not.

4            All the patients in the study received

09:18:43  5    anticoagulation therapy.  So both groups of the study received

6    anticoagulation therapy for a minimum of three months, after

7    which the decision to continue anticoagulation therapy was

8    left up to the local doctor and the patient.

9    Q    And what were the results of the study?

09:19:06 10    A    So the primary outcome of the study was at 12 days all

11    patients in the trial underwent a scan of their lungs to

12    determine whether they had developed a new pulmonary embolism

13    that wasn't there when the study started.  And there was a

14    statistically significant decrease in the rate of detectable

09:19:29 15    pulmonary embolism among the patients who got the filters.

16    However, there was no difference in mortality.  That is,

17    overall rate of death.

18    Q    Was there a difference in the rate of the risk of leg DVT

19    long-term in the study?

09:19:49 20    A    Yes.  So one of the key other outcomes from this study was

21    follow-up that was done two years after filter placement and

22    eight years after filter placement.  And at both time points,

23    the authors found a statistically significant increase in the

24    risk of deep vein thrombosis either involving the legs or the

09:20:14 25    inferior vena cava itself among the patients who had gotten

DIRECT EXAMINATION - DAVID GARCIA, M.D.

09:20:17  1   filters.

2   Q    And, Doctor, you mentioned that this study was looking at

3   the development of new PEs; correct?

4   A    Right.

09:20:24  5   Q    And sometimes the literature refers to recurrent PE.  Are

6   those the same things?

7   A    Yes.  In this context, that's what I'm talking about.

8   Q    Doctor, in your opinion, does this PREPIC1 study establish

9   that retrievable filters reduce the risk of death from PE?

09:20:41  10   A    No.

11   Q    Why not?

12   A    Well, the rate of fatal pulmonary embolism was not found

13   to be different in the two groups at any of the time points.

14   But, furthermore, the study doesn't involve retrievable

09:20:57  15   filters.  It involves permanent filters.  So I don't think we

16   can extrapolate any of its findings to retrievable filters,

17   which is what you asked me about.

18        But there are a couple of other design issues with

19   the study that potentially limit the validity of its findings.

09:21:14  20   One is, what I mentioned a moment ago, the uncontrolled nature

21   of anticoagulation.  Meaning after the first three months, the

22   study protocol did not dictate whether patients could or

23   should receive anticoagulation therapy.  And the challenge is

24   when you leave a decision like that up to the local treating

09:21:37  25   doctor, you lose control over the potential for bias and the

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:21:42  1    way in which anticoagulation is used or not used.  And that

2    could -- since anticoagulation could affect the key outcomes

3    of the trial, namely recurrent pulmonary embolism, it could

4    potentially create confusion in what you're observing and the

09:22:01  5    results between filter and no filter placement.  The variable

6    of interest.

7         The other challenge with this study -- well, I

8    already mentioned the fact that the filters were permanent and

9    not retrievable.

09:22:20  10   Q   So would this study support the proposition that

11   retrievable filters reduce the occurrence of PE in general,

12   separate and apart from death?

13   A   No.  For the reasons I mentioned, I don't think it is -- I

14   don't think it clearly establishes that with certainty.  I

09:22:37  15   didn't mention that there's another challenge with respect to

16   the long-term follow-up results, and that's the lack of

17   blinding.

18        The fact that the physicians and patients in the

19   trial knew whether a filter had been put in or not may have

09:22:53  20   changed their likelihood of ordering diagnostic tests, looking

21   for pulmonary embolism, which was the key outcome.  And that's

22   something we call ascertainment bias.  And so once you

23   introduce ascertainment bias, you -- like that, you reduce the

24   certainty or the validity of the ultimate findings and rates

09:23:17  25   of pulmonary embolism.

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:23:19  1    Q    You mentioned that there's another study, PREPIC2.  Let's

2    look at that for a second.

3               MR. CLARK:  Gay, could you please pull up

4    Exhibit 7230.

09:23:32  5               I apologize.  I meant 4147.  Could you please pull

6    that up.

7    BY MR. CLARK:

8    Q    Doctor, could you identify this document for us.

9    A    Yes.  This is a manuscript describing the results of the

09:24:01  10   PREPIC2 trial.

11   Q    Is this -- what publication does this manuscript appear

12   in?

13   A    The Journal of the American Medical Association.

14   Q    Is that a reliable publication?

09:24:12  15   A    Yes.

16   Q    Is this article considered authoritative and reliable in

17   the field?

18   A    Yes.

19   Q    Let me direct your attention, Doctor, to page 6, table 3.

09:24:22  20              And before we go there, could you explain to the jury

21   what PREPIC2 was designed to do.

22   A    So PREPIC2 is very similar to PREPIC1, with a couple of

23   key differences.  First of all, all the patients here had

24   experienced pulmonary embolism and, in fact, they were

09:24:41  25   selected based on clinical characteristics that the doctors

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:24:45  1   thought made their -- made them at particularly high risk of

2   death from their pulmonary embolism.

3          And the hypothesis they were trying to test in this

4   trial was can we reduce the risk of death in this very high

09:25:02  5   risk population of patients by, in addition to anticoagulating

6   them, inserting an IVC filter.  And in this case, it was a

7   retrievable IVC filter that was studied.

8          Like PREPIC1, there were about 200 patients in each

9   arm.  All patients received anticoagulation but, in this case,

09:25:22 10   they received it for the duration of the study, which is six

11   months.  And half the patients were randomly assigned to get

12   filters, the other half received only the anticoagulant

13   therapy.  And the principal outcome that they were going to

14   look at, principal three outcomes, were death, fatal pulmonary

09:25:44 15   embolism, and nonfatal pulmonary embolism in the two groups at

16   the end of three months.

17  Q   And what did they find when they looked at that?

18  A   So there was no difference in any of those outcomes

19   between the two groups.  At least not a statistically

09:26:03 20   significant difference in any of those outcomes.

21  Q   Did any of the patients in the filter group have a

22   recurrent or new pulmonary embolism?

23  A   Yes.  At three months follow-up, six of the 200 patients

24   who received an IVC filter had experienced recurrent pulmonary

09:26:20 25   embolus.

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:26:24  1  Q   And how many, if any, of those patients died from the

2  pulmonary embolus?

3  A   According to the document, all six patients -- all six of

4  those patients died from fatal PE.

09:26:35  5  Q   Did any of the patients in the group that received only

6  anticoagulation therapy die?

7       I'm sorry, did any of them develop PE?

8  A   Yes.  Three such patients in the anticoagulation group

9  alone experienced recurrent pulmonary embolism.

09:26:51  10  Q   Did any of those patients die?

11  A   Two of them.

12  Q   What conclusions, Doctor, do you draw from this study?

13  A   Well, the first conclusion I draw is that even in this

14  high risk population of patients, anticoagulation therapy

09:27:07  15  alone was highly effective.  The rate of death from pulmonary

16  embolism was 1 percent in the group that did not receive

17  filters.

18       The second conclusion I draw is that filters are not

19  universally effective at avoiding either pulmonary embolism or

09:27:27  20  death.  And, in fact, although these differences are not

21  statistically significant, I would say the observation that

22  more patients died of PE in the filter group than in the

23  control group raises questions about whether filters even do

24  what they're intended to do, which is avoid fatal pulmonary

09:27:47  25  embolism.

DIRECT EXAMINATION - DAVID GARCIA, M.D.

09:27:50  1   Q   Between PREPIC and PREPIC1, in your opinion, does one

2   study have more power or validity compared to the other?

3   A   Well, I think -- while we're talking about retrievable

4   filters, the PREPIC2 is a more applicable study because it did

09:28:07  5   use a retrievable filter.  I think it's also a study I would

6   rely on more because the duration of anticoagulant therapy was

7   more carefully controlled and uniform between the two study

8   groups.  And it's also a much more modern study.  And so if

9   I'm making decisions today about patient care or conclusions

09:28:30 10   today about relative safety and benefits and efficacy, I'd

11   rather use the more modern data.

12   Q   Based on this analysis, Doctor, did you formulate an

13   opinion as to the available data that's out there, what it

14   suggests concerning the use of retrievable IVC filters as a

09:28:50 15   means of treating DVT or PE?

16   A   Concerning all available data about retrievable IVC

17   filters, I don't think there's any high quality evidence that

18   they have a beneficial effect or a net benefit for patients

19   with DVT or PE.

09:29:14 20   Q   Are you aware of any peer-reviewed high quality evidence

21   that would support the statement that filters save lives?

22   A   No.

23       MR. CLARK:  Your Honor, at this point I would move to

24   admit, subject to 803(18), Exhibit 4147.

09:29:29 25       THE COURT:  Well, the document doesn't come in under

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:29:31  1    803(18); right?

       2            MR. CLARK:  I just want to have him read something to

       3    the jury from it.

       4            THE COURT:  Okay.  I think you need to identify where

09:29:39  5    you want to have it read, and then I'll hear if there's an

       6    objection.

       7    BY MR. CLARK:

       8    Q   Doctor, could I ask you to look at page 1 of Exhibit 4147.

       9            And can I direct your attention to the Conclusions

09:29:58 10    and Relevance section of this article.

      11    A   I'm looking at it.

      12            MR. CLARK:  Your Honor, would Dr. Garcia be permitted

      13    to read the Conclusions and Relevance paragraph?

      14            THE COURT:  Any objection?

09:30:12 15            MR. NORTH:  No objection, Your Honor.

      16            THE COURT:  All right.  You may.

      17            THE WITNESS:  "Among hospitalized patients with

      18    severe acute pulmonary embolism, the use of a retrievable

      19    inferior vena cava filter plus anticoagulation compared with

09:30:25 20    anticoagulation alone did not reduce the risk of symptomatic

      21    recurrent pulmonary embolism at three months.  These findings

      22    do not support the use of this type of filter in patients who

      23    can be treated with anticoagulation."

      24    BY MR. CLARK:

09:30:42 25    Q   Do you agree with that conclusion?

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:30:44  1    A    Yes.

2    Q    Doctor, let's shift gears quickly here and go to the use

3    of IVC filters for prevention of PE and DVT.  Are there any

4    high powered quality studies out there that would give support

09:30:55  5    to the idea that it is a good idea to use IVC filters to

6    prevent DVT or PE?

7    A    No, I'm not aware of any high quality data to suggest that

8    filters should be deployed in a preemptive fashion.

9    Q    Based on the absence of that data, do you have an opinion

09:31:11  10   as to whether filters could be claimed to be effective in

11   preventing PE or DVT in patients at risk for those?

12   A    I think that is an unproven hypothesis.

13   Q    Would the statement that filters save lives, in your

14   opinion, be an unproven hypothesis?

09:31:36  15   A    Yes.

16   Q    Now, let's talk about Mrs. Jones.  You have some opinions

17   concerning your review of her records; correct?

18   A    Yes.

19   Q    And what is your understanding of the status of where the

09:31:49  20   filter fragment is in her body?

21   A    My understanding is that she has a fragment of her filter

22   lodged in the artery that supplies the right middle lobe of

23   the lung with the oxygenated blood.

24   Q    How would the filter fragment have gotten there?

09:32:06  25   A    So when blood flows from the inferior vena cava, which is

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:32:12    1    where the filter originally resided, it flows into the right

2    atrium, then the right ventricule, which are two chambers of

3    the heart, and then out into the pulmonary arteries, which are

4    the vessels that take deoxygenated blood to the lungs for it

09:32:32    5    to be reoxygenated.  And the filter would have passed along

6    that course.

7    Q    Based upon your understanding of hematology, do you

8    believe that Mrs. Jones is in any danger from the filter

9    fragment that is in her pulmonary artery?

09:32:48   10    A    Yes.

11    Q    What are the dangers?

12    A    Well, we never want to have a foreign object in the

13    flowing blood because foreign objects, through a variety of

14    mechanisms, can cause clots to form where we don't want them

09:33:04   15    to.

16    Q    What are some of those mechanisms?

17    A    For one thing, in a case like this, the presence of this

18    filter fragment is creating local turbulence, and turbulent

19    blood flow is a well-known cause of, or potential cause of

09:33:28   20    blood clotting.

21          Another issue is that when we expose a foreign

22    material, whether it's a catheter, a stent, a filter fragment,

23    to the flowing blood, it can trigger a biochemical reaction

24    that just occurs naturally in the body that promotes the

09:33:49   25    formation of clots.

DIRECT EXAMINATION - DAVID GARCIA, M.D.

09:33:51  1  Q  So is that the risk that she is exposed to with the

2  fragment of the filter in her pulmonary artery?

3  A  That is the principal risk that I'm concerned about is

4  that this fragment sitting in her pulmonary artery could

09:34:05  5  induce the formation of a blood clot.

6  Q  And if it were to induce the formation of a blood clot,

7  what could happen?

8  A  Well, one possibility is that the artery where the

9  fragment is sitting could become occluded, thereby preventing

09:34:21  10  that portion of her lung from reoxygenating her blood, which

11  could lead to low oxygen levels and be dangerous.

12  Another possibility is that the -- if a clot begins

13  to form, clot can beget clot, and it could enlarge in either

14  direction.  But if it enlarges proximally, that is toward the

09:34:46  15  heart, toward the larger caliber blood vessels, it could

16  actually put stress on the heart, leading to either low blood

17  pressure or potentially even an arrhythmia, like the heart

18  suddenly stopping.

19  MR. NORTH:  I'm sorry to interrupt.

09:35:01  20  I'm going to object.  This is outside of the scope of

21  his report.

22  THE COURT:  Is this in the report, Mr. Clark?

23  MR. CLARK:  Well, we talked about the risk, and it is

24  just a follow-up concerning what could happen if the risk --

09:35:12  25  THE COURT:  Is that the statement in the report?

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:35:13  1       MR. CLARK:  I don't believe so.  We'll move on,

       2  Your Honor.

       3       THE COURT:  The objection is sustained.

       4  BY MR. CLARK:

09:35:19  5  Q   Dr. Garcia, it's my understanding that Bard is going to

       6  bring a witness into this case to tell the jury that because

       7  of the location of this filter being in a high-flow area, that

       8  Mrs. Jones is really not at risk for developing a clot.

       9       Do you agree with that?

09:35:37 10  A   No.

      11  Q   Why not?

      12  A   Well, we see blood clots form in so-called high flow

      13  vessels all the time.  Indeed, 5 percent of patients with IVC

      14  filters can develop local blood clots in the filter, on the

09:35:53 15  filter itself, and the inferior vena cava is certainly at

      16  least as high flow of an area as the pulmonary artery.

      17       Another example of a high flow state where we see

      18  blood clots is patients with coronary artery stents.  There's

      19  high flow through the artery, but those stents, if not

09:36:14 20  properly treated, often form clots --

      21       MR. NORTH:  I'm sorry to interrupt.

      22       I'm going to object again.  Outside of the scope of

      23  his report.

      24       THE COURT:  Mr. Clark?

09:36:23 25       MR. CLARK:  One second, Your Honor.

DIRECT EXAMINATION – DAVID GARCIA, M.D.

09:36:34  1     Your Honor's, this was in response to Dr. Hurst's

2    rebuttal response opinions.  I think that's fair game since

3    that has been injected by Bard.

4         THE COURT:  Was that in the rebuttal, a rebuttal

09:36:44  5    report from this expert?

6         MR. CLARK:  There was no rebuttal report, Your Honor.

7         THE COURT:  Objection is sustained.

8    BY MR. CLARK:

9    Q    Doctor, with respect to -- do you have any other opinions

09:36:54  10   concerning Mrs. Jones' medical course in this case?

11   A    No.

12   Q    Were you asked to look at whether she had an injury to her

13   pulmonary artery?

14   A    Yes.

09:37:05  15   Q    Do you have an opinion whether she did or not?

16   A    Yes.  I think that the lodge -- the fact that a fragment

17   of an IVC filter or any foreign object lodges in a blood

18   vessel like the pulmonary artery is going to create an injury.

19   Blood vessels have very tissue-paper-thin lining, which is

09:37:26  20   intended to be very smooth and pristine, and when it's

21   disturbed by any kind of a foreign object like this, it

22   creates an injury and a reaction.

23   Q    And what is that reaction or what can the reaction be?

24   A    Well, it can be the formation of scar tissue.  It can be

09:37:43  25   inflammation, which itself promotes blood clotting, it

CROSS-EXAMINATION - DAVID GARCIA, M.D.

09:37:46 1   promotes the aggregation of platelets, which are the sticky

2   cells that help the blood to clot.  A whole host of things can

3   happen.

4            MR. CLARK:  Thank you, Doctor.

09:37:57 5            I think Mr. North is going to have a few questions

6   for you now.

7            THE COURT:  All right.  Cross-examination?

8            MR. NORTH:  Yes, Your Honor.

9                  C R O S S - E X A M I N A T I O N

09:38:03 10  BY MR. NORTH:

11  Q   Good morning, Dr. Garcia.

12  A   Good morning.

13  Q   I believe you told us earlier that you charge for your

14  work as an expert witness $5,000 a day when you're testifying?

09:38:20 15  A   I did.

16  Q   And for how many days will you be charging the plaintiff's

17  attorneys for your work appearing here this week?

18  A   Two days.

19  Q   So $10,000 for the week?

09:38:31 20  A   Yes.

21  Q   Now, you have been involved not only in this litigation,

22  but in litigation involving Cook Medical Company and their

23  filters; correct?

24  A   I have.

09:38:42 25  Q   And you have been an expert for some of these same

CROSS-EXAMINATION - DAVID GARCIA, M.D.

09:38:45  1  plaintiffs' attorneys in that litigation; is that correct?

2  A   I have a vague understanding that there is some overlap in

3  the attorneys in the two cases, but I wouldn't be able to say

4  specifics about that.

09:38:56  5  Q   And you have given opinions on behalf of the plaintiffs in

6  that litigation --

7  A   I have indeed.

8  Q   And you issued an expert report in that litigation;

9  correct?

09:39:05  10  A   Yes.

11  Q   And, in fact, you gave your deposition in this particular

12  litigation last summer, on July 21, 2017; correct?

13  A   Yes.

14  Q   And the very following day, with the same attorney

09:39:23  15  assisting you, you gave a deposition in the Cook litigation;

16  correct?

17  A   I believe there was -- there were two attorneys there

18  present for Bard and one for Cook, but there was some overlap,

19  yes.

09:39:37  20  Q   And you were represented or had the same plaintiffs'

21  attorney with you at both depositions; correct?

22  A   Yes.

23  Q   And the opinions that you have offered here today are

24  similar to the opinions you've offered against Cook in that

09:39:50  25  litigation; correct?

CROSS-EXAMINATION - DAVID GARCIA, M.D.

09:39:51  1   A   Yes.

2   Q   Now, you gave some opinions about when you believe the use

3   of IVC filters is appropriate.  You still use or recommend the

4   implant of IVC filters on some occasions; correct.

09:40:17  5   A   In rare occasions, yes.

6   Q   And I believe you told us the scenario where you would

7   recommend an IVC filter be implanted is when someone had a DVT

8   and within a month of a bleeding incident or needing surgery;

9   correct?

09:40:35 10   A   That's right.

11   Q   And that's exactly the situation that Ms. Jones was in

12   when she received her filter; correct?

13   A   Yes.

14   Q   In fact, she had a DVT during a time she was being

09:40:47 15   hospitalized for gastric bleeding?

16   A   Correct.

17   Q   And two or three days after she had the filter implanted,

18   she had to undergo gastric surgery; correct?

19   A   Correct.

09:40:58 20   Q   And she is exactly the sort of patient that, in your

21   practice, you would recommend a filter be implanted in;

22   correct?

23   A   That's right.

24   Q   Now, on direct examination and the questions asked by

09:41:27 25   Mr. Clark, you discussed the two PREPIC studies; correct?

CROSS-EXAMINATION - DAVID GARCIA, M.D.

09:41:31  1    A    Yes.

2    Q    And both of those studies were performed in France?

3    A    They were.

4    Q    And Bard filters were not utilized in either one of the

09:41:37  5    PREPIC studies; correct?

6    A    Correct.

7    Q    And PREPIC1 involved only permanent filters?

8    A    Correct.

9    Q    And PREPIC2 involved only filters manufactured by a single

09:41:53  10   company called ALN; correct?

11   A    Yes.

12   Q    And patients were excluded from those studies if they were

13   contraindicated for anticoagulant therapy; correct?

14   A    That's right.

09:42:15  15   Q    So that would be a patient like Ms. Jones would not

16   qualify for those studies.

17   A    Indeed.  It would be unethical to include patients like

18   that in the judgment of many physicians in a randomized

19   control trial.

09:42:38  20   Q    And you are aware that the FDA has cleared filters for use

21   in this country for patients who are either contraindicated

22   for anticoagulants or who have had a situation where

23   anticoagulants have failed to work in them; correct?

24   A    I'm aware of that.

09:42:54  25   Q    And both of those classes of patients for whom filters

CROSS-EXAMINATION - DAVID GARCIA, M.D.

09:42:58  1  have been cleared by the FDA were not part of these PREPIC

2  studies; correct?

3  A    Correct.

4  Q    Now, you testified on direct about some of your opinions

09:43:25  5  about the efficacy or effectiveness of filters; correct?

6  A    Yes.

7  Q    But you have actually published literature yourself noting

8  that filters can be effective; correct?

9  A    Well, I'm sure I've said something like that there may be

09:43:43 10  situations where they have a benefit that justifies their

11  risks.

12      MR. NORTH:  Could we pull up what's been marked as

13  impeachment Exhibit 5, please.

14  BY MR. NORTH:

09:44:02 15  Q    Dr. Garcia, do you recognize this medical article?

16  A    I do.

17  Q    And I believe you told us in response to one of

18  Mr. Clark's questions that you had published one article that

19  focused on IVC filters with some colleagues; correct?

09:44:17 20  A    Correct.

21  Q    And this is that article, isn't it?

22  A    It is.

23  Q    And this was published as recently as 2014?

24  A    Indeed.

09:44:24 25  Q    And you are listed as one of the authors.

CROSS-EXAMINATION - DAVID GARCIA, M.D.

09:44:27   1   A    Yes.

2   Q    And what publication or journal was this published in?

3   A    Thrombosis and Haemostasis.

4   Q    And do you consider that to be a reliable journal?

09:44:39   5   A    I do.

6   Q    Was this article peer reviewed?

7   A    It was.

8   Q    If you would look in the first paragraph on the first

9   column, about halfway down.  In this article, you and your

09:44:51  10   colleagues stated the following:  In the presence of major

11   contraindications to anticoagulant treatment, including

12   bleeding complications during antithrombotic treatment,

13   interruption of the inferior vena cava, IVC, with a filter may

14   prevent life-threatening pulmonary embolism.  Correct?

09:45:16  15   A    Indeed.  And I would highlight the use of the word "may."

16   Q    But you published that, you and your colleagues, in the

17   medical literature four years ago; correct?

18   A    Yes, we did.

19        MR. NORTH:  And if we can look on page 623.

09:45:36  20   BY MR. NORTH:

21   Q    You and your colleagues included a summary table of the

22   questions, experts' opinions, and recommendations; correct?

23   A    Yes.

24   Q    And under question 2 -- or it says:  Question 2, are vena

09:45:53  25   cava filters able to reduce the incidence of recurrence of PE

CROSS-EXAMINATION – DAVID GARCIA, M.D.

09:45:59  1   in patience with acute VTE?  Correct?

2   A   Yes.

3   Q   And just so we know, what is VTE?

4   A   Oh.  That's a term, it stands for venous thromboembolism.

09:46:10  5   And it just intends to encompass both deep vein thrombosis and

6   pulmonary embolism as one disease.

7   Q   So the question was basically whether IVC filters are able

8   to reduce the incidence of recurrent PE in people who have had

9   DVTs; correct?

09:46:28  10   A   Yes.

11   Q   And your answer on behalf of and you your colleagues was

12   the following:  Compared to anticoagulation therapy alone,

13   there is evidence that IVC filter placement reduces the short

14   and, to a lesser extent, long-term risk of recurrent PE.

09:46:47  15   Correct?

16   A   Yes.

17   Q   And so four years ago, in a respected peer-reviewed

18   medical journal, you and your colleagues published an article

19   saying that there is evidence that IVC filters work; correct?

09:46:59  20   A   Yes.  And I don't think that is inconsistent with anything

21   I've said before.

22   Q   In this case you have not offered any opinions as to -- or

23   any criticisms of Ms. Jones' doctors in deciding to implant

24   the filter; correct?

09:47:28  25   A   Correct.

CROSS-EXAMINATION – DAVID GARCIA, M.D.

09:47:28  1    Q    And, in fact, you have told us that she is precisely the

2    sort of patient that you personally would recommend a filter

3    for.

4    A    Yes.

09:47:43  5    Q    Now, you have talked about the impact or your concerns

6    about the strut of the filter that remains in Ms. Jones;

7    correct?

8    A    I have.

9    Q    As a part of your work in this case, you have not looked

09:47:54 10    at any of the X-rays or CT scans or radiographic imaging, have

11    you?

12    A    Correct.

13    Q    And so you have not looked at any of the imaging that is

14    available to doctors that would show where the strut is

09:48:08 15    located, what position, and where it stands; correct?

16    A    Sir, I'm not a radiologist.  And I've read the report of

17    the images and learned everything I need to know about the

18    strut and its location from that.

19    Q    But you have not looked at the actual --

09:48:26 20    A    But I have not looked at the original images.

21    Q    And you have not looked at the images over time to see

22    whether that strut has remained in a stable location?

23    A    No, I've not.

24    Q    Now, in testifying that you believe there is a risk that

09:48:45 25    the strut could cause a clot to develop in the future, you

REDIRECT EXAMINATION - DAVID GARCIA, M.D.

09:48:49   1   have relied upon the PREPIC article; correct?

2   A   I guess in the sense that the PREPIC article -- I would

3   say both PREPIC studies provide evidence that filters

4   themselves cause clotting, whether it be in the form of leg

09:49:09   5   DVT or vena caval thrombosis, yes, I have.

6   Q   But those articles concern the entire filter.  They did

7   not involve a situation where one small fragment of a filter

8   was producing a clot; correct?

9   A   That's right.  Unfortunately, we don't have any large

09:49:32  10   follow-up studies that I know of of patients with a fragment.

11   Q   So, as you sit here today, you are unaware of any medical

12   study that would indicate that there is a risk of clot

13   development from an individual fragment retained in the

14   pulmonary artery?

09:49:50  15   A   I am not aware of any such study, nor am I aware of any

16   study to the contrary.

17           MR. NORTH:  Thank you, doctor.  That's all I have.

18           THE COURT:  Any redirect?

19           MR. CLARK:  Yes, Your Honor.

09:50:01  20           R E D I R E C T   E X A M I N A T I O N

21   BY MR. CLARK:

22   Q   Doctor, in terms of your compensation, are you taking time

23   away from your clinical practice to be here with us today?

24   A   Oh, yes.  Well, by definition, I'm either taking time away

09:50:17  25   from my normal job, if you will, which includes clinical

REDIRECT EXAMINATION – DAVID GARCIA, M.D.

09:50:20  1   practice, research, teaching, or I'm ultimately taking time

2   away from my weekends and vacation.  But I'm giving up one or

3   the other.

4   Q   And in terms of you were asked some questions about

09:50:32  5   offering opinions that are identical in some respects with the

6   Cook filter litigation.  Do you remember those questions?

7   A   Yes.

8   Q   Now, are your opinions related to IVC filters in general,

9   or are they specific to a particular device?

09:50:45  10  A   They're not specific to any particular device.  I don't

11  know of any high-quality comparisons between device types.  So

12  the only evidence we have to rely on is extrapolated evidence

13  from all filters.

14  Q   And based on that extrapolated evidence, you have similar

09:51:04  15  opinions in both cases?

16  A   I do.

17  Q   Now, you were asked questions about that you would make a

18  recommendation for Mrs. Jones to have an IVC filter placed,

19  given her medical condition at the time it was placed.  Do you

09:51:16  20  remember that?

21  A   Yes.

22  Q   Would there be a time limitation on how long that filter

23  should be placed, in your opinion, based on what we now know?

24  A   Yes.  Indeed, the recommendation I would make is that the

09:51:30  25  filter be removed as soon as a patient like Mrs. Jones could

REDIRECT EXAMINATION – DAVID GARCIA, M.D.

09:51:34 1  safely receive anticoagulation therapy.

2          MR. CLARK:  Could I ask defendants to publish -- not

3  publish, I'm sorry, show Dr. Garcia the PREPIC file, that

4  table.

09:51:56 5  BY MR. CLARK:

6  Q    Doctor, you were asked some questions about this article

7  by Mr. North.

8  A    Yes.

9  Q    And, again, to emphasize, you're talking about that there

09:52:04 10  could be a short-term benefit; correct?

11  A    Right.  So what we say is that there is evidence that IVC

12  filter placement reduces the short-term risk of recurrent PE.

13  But we didn't say there's high quality evidence of that.  We

14  very intentionally said there is evidence.

09:52:28 15  Q    And if you could look at question number 1, are vena cava

16  filters able to reduce mortality in patients with acute VTE,

17  what does it say under number 1?

18  A    There's no evidence to support the hypothesis that IVC

19  filters reduce the death from acute venous thromboembolism.

09:52:50 20  Q    Is that consistent with the opinions you've offered this

21  morning?

22  A    It is.

23  Q    And, again, you are not a radiologist; right?

24  A    Correct.

09:52:55 25  Q    In your practice, if there were radiographs that had to be

REDIRECT EXAMINATION – DAVID GARCIA, M.D.

09:52:58  1   reviewed, would you personally review them in your clinical

2   practice?

3   A    Very rarely.  If I have -- there are some situations where

4   I may go review them with a radiologist.  But I almost never

09:53:06  5   review images independently, because I don't feel trained to

6   do so.

7   Q    And would you always defer to a radiologist in terms of

8   evaluating what was shown in a radiograph?

9   A    Absolutely.  Which is why I tend to mostly read the

09:53:18 10   reports, the detailed reports that radiologists provide,

11   rather than drawing conclusions myself from the films.

12   Q    Thank you, Doctor.  I have no further questions.

13          THE COURT:  All right.  Thank you.  You can step

14   down.

09:53:42 15          MR. CLARK:  Your Honor, at this time the plaintiff

16   would call Carol Vierling via video deposition.  Plaintiff

17   would like to move into evidence trial Exhibit 2149, which is

18   deposition Exhibit 231.

19          THE COURT:  Just that one exhibit?

09:54:09 20          MR. CLARK:  Just that one exhibit, Your Honor.

21          THE COURT:  Any objection to 2149?

22          MS. HELM:  No, Your Honor.

23          THE COURT:  All right.  That exhibit is admitted.

24          (Exhibit 2149 admitted.)

09:54:16 25          MR. CLARK:  And, Your Honor, as we discussed, we have

REDIRECT EXAMINATION – DAVID GARCIA, M.D.

09:54:18  1    prepared a conversion table for the convenience of the jury.

2                THE COURT:  Just for this witness?

3                MR. CLARK:  Just for this witness.

4                THE COURT:  Well, the only exhibit that is going to

09:54:26  5    be shown is 231.

6                MR. CLARK:  Unnecessary?

7                THE COURT:  I don't think it's necessary in this.

8                What we talked about, ladies and gentlemen, is if

9        you're shown a deposition where there's ten different

09:54:36  10    exhibits, for you to understand what trial exhibit is, we'll

11       give you a little table that says the deposition number

12       they're referring to equals trial exhibit such and such so you

13       can at least track that somewhat.  But I think with just one

14       exhibit we don't need that.

09:54:50  15               MR. CLARK:  Fair enough, Your Honor.

16               May I be permitted to read the background summary for

17       Carol Vierling?

18               THE COURT:  Yes, please.

19               MR. CLARK:  Carol Vierling graduated from Indiana

09:54:57  20    University in 1981 with a degree in nursing, and received an

21       MBA from Mercer University in 1998.

22               From 1992 to 2002, she was the director of regulatory

23       affairs for C.R. Bard.  In this role, Ms. Vierling was

24       responsible for developing and implementing regulatory

09:55:16  25    strategies for Bard's peripheral vascular –– sorry, peripheral

DIRECT EXAMINATION – CHAD MODRA

09:55:20  1    vascular devices, including its IVC filters.

2         Since leaving Bard in 2002, Ms. Vierling has

3    continued to work in regulatory affairs in the medical device

4    industry.

09:55:41  5         (Video testimony of Carol Vierling played.)

6         MR. O'CONNOR:  Your Honor, we call Chad Modra,

7    please.

8         THE COURT:  All right.

9         THE COURTROOM DEPUTY:  Mr. Modra, if you would please

10:19:32 10   come forward, raise your right hand.

11                      **CHAD MODRA,**

12   called as a witness herein, after having been first duly sworn

13   or affirmed, was examined and testified as follows:

14        MR. O'CONNOR:  May I proceed, Your Honor?

10:20:04 15        THE COURT:  You may.

16              D I R E C T   E X A M I N A T I O N

17   BY MR. O'CONNOR:

18   Q    Good morning, Mr. Modra.  Thank you for coming.

19   A    Good morning.

10:20:09 20   Q    Would you state your full name, please.

21   A    Chad Michael Modra.

22   Q    Mr. Modra, do you still work for Bard?

23   A    I do.

24   Q    What is your position now?

10:20:17 25   A    I'm the continuous improvement leader.

DIRECT EXAMINATION – CHAD MODRA

10:20:20  1    Q    Pardon me?

2    A    Continuous improvement leader.

3    Q    Do you work in Tempe, Arizona?

4    A    I live in Phoenix, but I work out of the Murray Hill,

10:20:28  5    New Jersey, office.

6    Q    And how long have you been doing that?

7    A    Approximately two years.

8    Q    But your residence is here in Arizona?

9    A    That's correct.

10:20:37  10    Q    Mr. Modra, at one time you were the vice president of

11    quality assurance at Bard Peripheral Vascular?

12    A    Yes, that's correct.

13    Q    And tell the jury what period of time you held that

14    position, please.

10:20:49  15    A    The spring of 2011 through the end of 2015.  So

16    December 2015.

17    Q    And, Mr. Modra, in that capacity, you oversaw quality

18    assurance, field assurance, and other departments?

19    A    That's correct.

10:21:09  20    Q    Your responsibilities included post market surveillance?

21    A    Yes.

22    Q    And you oversaw the regulatory obligations of Bard in

23    terms of handling Complaint Record Detail Reports and MDRs.

24    True?

10:21:24  25    A    That's correct.

DIRECT EXAMINATION – CHAD MODRA

10:21:25  1   Q    MDRs are what?

2   A    Medical device reports.

3   Q    And you have also been produced in various depositions as

4   the person most knowledgeable about how complaints are handled

10:21:39  5   within Bard; correct?

6   A    Within BPV, that's correct.

7   Q    Thank you for that clarification.  And let's just you and

8   I clarify that for the jury.

9          There's different parts of Bard.  Bard Peripheral

10:21:54  10  Vascular?

11  A    That's correct.

12  Q    Thank you for helping me out on that.

13         And Bard Peripheral Vascular is located here in

14  Tempe, Arizona?

10:22:00  15  A    That's correct.

16  Q    And among the devices that happened in Tempe, Arizona,

17  were the IVC filters; correct?

18  A    Yes.

19  Q    And you are knowledgeable about IVC filters as well;

10:22:10  20  correct?

21  A    To a certain extent, yes.

22  Q    And in terms of complaints, Bard was responsible to

23  investigate every type of complaint that came to it

24  regarding -- we'll just stay with filters today.  True?

10:22:28  25  A    Correct.

DIRECT EXAMINATION – CHAD MODRA

10:22:29   1   Q    And as I understand it, there were sources that Bard would

     2   receive complaints from that would include doctors, sales

     3   representatives, and even the medical literature?

     4   A    Correct.  Primarily sales reps, but other sources as well.

10:22:45   5   Q    The primary source was the sales representatives of Bard?

     6   A    Yes.

     7   Q    And sales representatives had ongoing continuous contact

     8   with doctors; correct?

     9   A    As part of their normal jobs; correct.

10:22:59  10   Q    And so sales representatives would develop relationships

    11   with doctors who would use Bard filters for their patients;

    12   right?

    13   A    Yes.  They would -- they would speak to them as frequently

    14   as they could.

10:23:14  15   Q    And just to be clear, if a doctor had a problem with a

    16   filter, what you knew was that frequently that doctor would

    17   contact the sales representative, who then would report it to

    18   somebody in your department; correct?

    19   A    Depending on the event, when they see them next time they

10:23:31  20   would note the event, share information.

    21   Q    Regardless, that would initiate the complaint handling

    22   processes within field assurance at Bard Peripheral Vascular.

    23   True?

    24   A    True.  Once we become aware of it, that's correct.

10:23:48  25   Q    And from that information, there would be investigations

DIRECT EXAMINATION – CHAD MODRA

10:23:53  1  done with Bard; correct?

2  A  We'd go through a standard process to investigate each

3  one; correct.

4  Q  And it was important for Bard to be as accurate as

10:24:01  5  possible and -- in the investigation to learn all the

6  information, because that would eventually go into various

7  reports.  True?

8  A  Correct.

9  Q  And Bard sought to obtain information that was reliable

10:24:16  10  that would go into the reports that could eventually be

11  reported to the FDA.  Fair?

12  A  As reliable as we could.  I mean, we get information

13  provided to us, and then have to try to ver- -- to confirm

14  that what they're reporting to us is true.

10:24:34  15  Q  I thought you said at your deposition, though, you made it

16  a point to say that there's actually different people that may

17  be involved in a single complaint?

18  A  There's three people that are involved in, one, taking the

19  information, but then making sure that we're filling out all

10:24:46  20  the fields in the record, and then making sure there aren't

21  any typos, incorrect items recorded in there.

22  Q  Since 2003, complaint investigations at Bard had been done

23  and medical device report forms have been completed.  Fair?

24  A  I'm sorry, what number was that?

10:25:09  25  Q  I said 2003.  I'm going by your deposition.

DIRECT EXAMINATION – CHAD MODRA

10:25:11  1          Does that sound right?

2     A    Could you repeat the question.

3     Q    Sure.

4          I read in one of your depositions where you testified

10:25:19  5     that since 2003 there have been complaint investigations going

6     on at Bard?

7     A    Of course, yes.

8     Q    And those investigations were for, among other purposes,

9     to complete MDR, medical device report, forms?

10:25:37  10    A    Correct.

11    Q    And it all starts with gathering information and starts

12    with a Complaint Record Detail Report.  True?

13    A    That takes the narrative that we receive; correct.

14    Q    And that's a part of this process that you oversaw?

10:25:52  15    A    Yes, that's correct.

16    Q    And you are the person who is familiar with this process,

17    starting from how the information comes to Bard and then the

18    development of a Complaint Record Detail Report.  True?

19    A    True.

10:26:06  20         MR. O'CONNOR:  Gay, could you please display for

21    Mr. Modra Exhibit 3270.

22         MS. MENNUTI:  3270?

23         Give me one second, I can pull it up.

24         MR. O'CONNOR:  May I approach the witness to keep

10:27:09  25    these things moving with this document?

DIRECT EXAMINATION — CHAD MODRA

10:27:11  1          THE COURT:  Not unless you have an exhibit number for

2     it.

3          MR. O'CONNOR:  I thought it was 3270.

4          THE COURT:  Apparently your team doesn't agree.

10:27:20  5          MS. MENNUTI:  No, it is.

6          THE COURT:  It is 3270?

7          MR. O'CONNOR:  That's my understanding.

8          THE COURT:  All right, you can approach the witness

9     with the understanding that is 3270.

10:27:30 10          MR. O'CONNOR:  Your Honor, I can identify it for the

11    record, too, what I'm going to approach with.  And we can, if

12    necessary, match it up with the correct exhibit.

13          It is a Complaint Record Detail Report, complaint

14    266286, the date created is March 30, 2010.

10:27:56 15          May I show counsel?

16          THE COURT:  Yes.

17          MR. O'CONNOR:  Is that the number you have?

18          MS. HELM:  3270.

19          MR. O'CONNOR:  3270.

10:28:15 20          Do we have it?

21          Oh, we have it.

22          Thank you, Your Honor.

23    BY MR. O'CONNOR:

24    Q   All right, Mr. Modra, we're displaying to you what I've

10:28:25 25    now confirmed, thank goodness, is Exhibit 3270.  Do you

DIRECT EXAMINATION – CHAD MODRA

10:28:29  1    recognize this type of a document?

2    A    Yes, I do.

3    Q    It's a Bard document, correct, as you can tell by the Bard

4    insignia on the upper left-hand corner?

10:28:43  5    A    Yes.

6    Q    And it's a Complaint Record Detail Report.  True?

7    A    That's correct.

8    Q    And this one happens to be complaint 266286; correct?

9    A    Yes.

10:28:57 10         MR. O'CONNOR:  And, Gay, if you could please go to

11    page 3 of 5.

12         Well, let's go to page 2 first, and we can just look

13    through it.

14    BY MR. O'CONNOR:

10:29:11 15    Q    Mr. Modra, we're looking at page 2.

16         Do you see it there?

17    A    I do.

18    Q    And that's information that, following Bard's procedures,

19    Bard employees are responsible to collect in the course of an

10:29:29 20    investigation.  True?

21    A    It includes the narrative of all of the discussions back

22    and forth to whoever we had that was sharing the information

23    with us, that's correct.

24         THE COURT:  We're at 10:30, Mr. O'Connor.  So we're

10:29:41 25    going to break.

DIRECT EXAMINATION — CHAD MODRA

10:29:42   1    We'll resume, ladies and gentlemen, at 10:45.  We'll

2    excuse the jury.

3        (Recess was taken from 10:30 to 10:45.  Proceedings

4    resumed in open court with the jury present.)

10:47:43   5    THE COURT:  Please be seated.

6        You may continue, Mr. O'Connor.

7        MR. O'CONNOR:  Thank you, Your Honor.

8    BY MR. O'CONNOR:

9    Q   Thanks for coming back, Mr. Modra.

10:47:51  10    So what we're doing is we're looking at the Complaint

11   Record Detail Report that is marked as Exhibit 3270.  And we

12   talked about the event information -- excuse me.  We were at

13   page 2 talking about how the information is then generated,

14   recorded, at Bard; is that correct?

10:48:18  15   A   That's correct.

16   Q   And the investigations are conducted by quality engineers

17   with engineering degrees at Bard; is that right?

18   A   They're amongst the team that conducts the investigations.

19   Q   And your charge to them was to get as much information as

10:48:34  20   they can about the event; right?

21   A   Correct.

22   Q   And then employees from research and development and

23   manufacturing were also involved during the investigation.

24   Fair?

10:48:45  25   A   That's correct.

DIRECT EXAMINATION – CHAD MODRA

10:48:46  1    Q    And the reason that's important is because these reports

2    are used not only to generate reports for the FDA, but they're

3    also used internally at Bard; correct?

4    A    That's correct.

10:48:57  5    Q    For things like tracking and trending.

6    A    Yes.  Each one.

7    Q    If we go to page 3.  Are you there?  Oh, we aren't there

8    yet.

9         Page 3 is an event description; correct?

10:49:19  10   A    Event information; correct.

11   Q    By the way, Mr. Modra, back on page 2, the filter we're

12   talking about in this complaint is a G2 filter; right?  You

13   can see that in the complaint.

14   A    Yes, it says G2 filter.

10:49:34  15   Q    And then going to number 3, that is the event description,

16   which is a report of the information that has been obtained by

17   your investigative group at Bard.  True?

18   A    It's a summary of the event.  That's correct.

19   Q    And that summary is used for other reports, including the

10:49:58  20   MDR; correct?

21   A    That or various versions of it; correct.

22   Q    All right.  But certainly this is one area that if you

23   want to give a description of the event to an agency or

24   internal department at Bard, or anybody, this is the place you

10:50:14  25   would go.  Fair?

DIRECT EXAMINATION — CHAD MODRA

10:50:16  1   A   This, as well as the other narrative that we saw on

       2   page 2.

       3   Q   And from this information, Bard would use this

       4   information, as we said, to track and trend; correct?

10:50:28  5   A   We would use the codes that are present in this file for

       6   tracking and trending.

       7   Q   And you would use this information for various summaries

       8   and reports that may go to other departments in Bard.   True?

       9   A   As the basis; correct.

10:50:44  10          MR. O'CONNOR:   Your Honor, at this time I would move

      11   to admit Exhibit 3270.

      12          MR. NORTH:   Your Honor, objection.   402, 403, and

      13   802.

      14          THE COURT:   All right.   I think this goes to the

10:50:53  15   issue we've been talking about this morning.   We're going to

      16   need to look at it further, so I'm not going to rule on it

      17   now.   I'll have to rule after we have further discussions and

      18   I look at the cases that were cited.

      19          MR. O'CONNOR:   All right.   Fair enough.   Then,

10:51:05  20   Your Honor, in accordance with what we said this morning, I'm

      21   going to continue to question along those lines.

      22          THE COURT:   That's fine.

      23          MR. O'CONNOR:   All right.

      24          Gay, could you put up Exhibit 4515, please.

10:51:22  25          THE COURT:   I have a question about where we're going

DIRECT EXAMINATION - CHAD MODRA

10:51:24  1   on that.  Why don't we talk for a minute at sidebar just to

2   make sure we're not taking time we don't need to.

3       If you want to stand up for a minute, ladies and

4   gentlemen.

10:51:44  5   (Bench conference as follows:)

6       THE COURT:  Mr. O'Connor, by what you just said, are

7   you intending to do this with a whole series of documents?

8       MR. O'CONNOR:  No.  I have three sets -- well, I now

9   have three sets that will show the complaint event information

10:52:10  10  is identical to what is contained in the monthly report, and I

11  will give him an example of our FRE chart to show him that the

12  same event is also in the monthly report, is also --

13      THE COURT:  Okay.  I just wanted to make sure you

14  weren't thinking you had to lay foundation document by

10:52:28  15  document for everything you're going to put into a chart.

16      MR. O'CONNOR:  No.  And I don't want to do more than

17  I have to, but I want to be able to make a record because,

18  depending on how this lands, and let's assume there's a ruling

19  in our favor and that we can prove to you later that we have

10:52:43  20  in our summary events that you deem can be part of the chart,

21  we can work the chart any way, but what I want him to show us

22  and you is that eventually our FRE chart matches the event

23  language here, which is also put in the monthly report, and

24  that we have tracked that same language for our report.

10:53:06  25      THE COURT:  Okay, that's fine.

DIRECT EXAMINATION - CHAD MODRA

10:53:07  1        (Bench conference concludes.)

        2            THE COURT:  Thanks, ladies and gentlemen.

        3   BY MR. O'CONNOR:

        4   Q   Now, Mr. Modra, I'm showing you, displaying, Exhibit 4515

10:53:45  5   just for purposes of you to identify this.  And you've seen

        6   this type of a report before; correct?

        7   A   Correct.

        8   Q   This is a -- entitled -- well, it's known as a monthly

        9   management report; correct?

10:53:58 10   A   That's the subject; correct.

       11   Q   And this is an area where people at Bard who were doing

       12   complaints knew that there would be summaries of complaints

       13   received on a monthly basis that would be provided to people

       14   like Mr. Weiland and Mr. Byloos.  True?

10:54:15 15   A   Correct.

       16            MR. O'CONNOR:  And if we go, Gay, to page 13 of

       17   Exhibit 4515.

       18   BY MR. O'CONNOR:

       19   Q   Mr. Modra, if you look at the second entry there, do you

10:54:33 20   see where it says G2 filter system?

       21   A   Yes.

       22   Q   And see the comment section there?  And I don't want you

       23   to read that aloud, but what I would like you to do is confirm

       24   that the language in there is the same identical language that

10:54:49 25   you and I just reviewed in the event description in the

DIRECT EXAMINATION – CHAD MODRA

10:54:53   1    complaint file.

2    A    I didn't commit the other one to memory, but --

3              MR. O'CONNOR:  Your Honor, I can help Mr. Modra and

4    approach with the language in this.

10:55:06   5              THE COURT:  That's fine.  Which exhibit are you going

6    to show him?

7              MR. O'CONNOR:  3270.

8    BY MR. O'CONNOR:

9    Q    And, Mr. Modra, what I'm going to ask you to do is look at

10:55:13  10    page 3.  And just so you know, Mr. Modra, I have put a Post-it

11    there.

12    A    Okay.

13              MR. O'CONNOR:  May I approach him directly?

14              THE COURT:  Yes.

10:55:34  15              THE WITNESS:  There's a line over -- okay.  Thank

16    you.

17    BY MR. O'CONNOR:

18    Q    I'm sorry?

19    A    It's the same as the first portion.

10:56:10  20              MR. O'CONNOR:  May I approach to get my exhibit back?

21              THE COURT:  Yes.

22              MR. O'CONNOR:  Thank you, Mr. Modra.

23              Your Honor, subject to the Court's order, I would

24    move at this time for the admission of Exhibit 4515.

10:56:29  25              THE COURT:  All right.  My response is the same.

DIRECT EXAMINATION - CHAD MODRA

10:56:30  1    We'll need to deal with that when we --

       2            MR. O'CONNOR:  Your Honor, I just want to make sure I

       3    have sufficiently identified the pages for the record and we

       4    know what we need to discuss later.  I can identify it again

10:56:43  5    in this page.  Where I was looking is 4515.  Excuse me.

       6            THE COURT:  I think you said in the record you looked

       7    at page 13 --

       8            MR. O'CONNOR:  Yeah, page 13.

       9            THE COURT:  -- of that document.

10:57:01 10            MR. O'CONNOR:  Thank you.

      11    BY MR. O'CONNOR:

      12    Q   Mr. Modra, this is not going to be the most exciting next

      13    few minutes, but I've got to plug through just so we can talk

      14    about a couple more examples of complaints.  Okay?

10:57:16 15    A   Absolutely.

      16    Q   But one thing I think that we did just illustrate, you and

      17    I, is that information that we saw from the complaint file

      18    under the complaint event description is language that's used

      19    by Bard for other purposes, including summarizing complaints

10:57:38 20    to provide to people who need to know within Bard.  True?

      21    A   True.  And it is my experience that the comments in that

      22    section may match, but sometimes they're summarized even

      23    further to smooth out the language for the report.

      24    Q   But my point, so you and I are on the same page, you can

10:57:59 25    go to the complaint file and you can go to the MDR, you can

DIRECT EXAMINATION – CHAD MODRA

10:58:02  1   find that language, and you have a system, a data system, at

2   Bard where you can match that up, summarize it, and do all

3   sorts of things with it, including setting up summary reports

4   for management.  Fair?

10:58:15  5   A    True, but I'd have to verify that this actually was the

6   language used in the MDR.  I don't know if that's true.

7   Q    All right.  But we did just match up where it was

8   identical to the complaint; correct?

9   A    That portion of the complaint; correct.

10:58:30  10  Q    And I think from the complaint it does go to the MDR.  Is

11  that fair?

12  A    Narrative of that; correct.

13  Q    All right.

14       MR. O'CONNOR:  Gay, would you put up Exhibit 45 --

10:58:58  15  excuse me.  3262.

16  BY MR. O'CONNOR:

17  Q    And, Mr. Modra, I'm looking at 3262.  These are -- were

18  documents produced by Bard.  And do you recognize this as

19  being an MDR file?

10:59:27  20  A    It says MDR on it, so.  I'm not familiar with this one,

21  but, yes.

22  Q    It would not be unusual for you, in your position, to go

23  to MDR reports to look on your data or whatever format it was

24  in when you were the vice president.  True?

10:59:43  25  A    Typically electronic, yes, because I would ask for the

DIRECT EXAMINATION – CHAD MODRA

10:59:46   1    electronic from the database.

2    Q    Thank you.

3         MR. O'CONNOR:   And if we go to the first page, the

4    next page over, Gay, please.

11:00:01   5    BY MR. O'CONNOR:

6    Q    There you see this is the Bard Complaint Record Detail

7    Report.

8         Do you see that?

9    A    I do.

11:00:09  10    Q    And in there, there is a short description.   Right up

11    there.

12         Do you see Short Description?

13    A    Yes.

14    Q    And that's one way that you shorthand and follow codes

11:00:22  15    that identify what happened and what you were investigating to

16    a filter; correct?

17    A    Correct.

18    Q    And that could include a number of things, including limb

19    detachment, fracture, tilt, perforation.   It's a way to

11:00:39  20    identify the failure that's the subject of the complaint file.

21    Fair?

22    A    It's the way to identify, short version; correct.

23    Q    And then your team goes about gathering the information.

24         MR. O'CONNOR:   If we can go to page 3.

25

DIRECT EXAMINATION – CHAD MODRA

11:00:59  1    BY MR. O'CONNOR:

2    Q    That information that gathers will include communicating

3    with people involved such as doctors, also getting medical

4    records and radiographs imaging; correct?

11:01:16  5    A    Yes.  They ask -- sorry.  They ask a series of questions

6    to try to get more information about the event.

7    Q    And when you look at Exhibit 3262 at page 3, this does

8    provide an example of how complaints were generated and

9    recorded within Bard; correct?

11:01:35 10    A    Yes.

11    Q    Thank you.

12         MR. O'CONNOR:  And then if you go to page 4, Gay,

13    please.

14    BY MR. O'CONNOR:

11:01:49 15    Q    And there is the description that is taken from the

16    investigation; correct?  Beginning with the words "It was

17    reported."

18         Do you see that?

19    A    I'm looking for it.

11:02:06 20    Q    Should be page 4 of 6.

21    A    Sorry, there was a different page being shown.

22    Q    Would you like us to highlight what I'm referring to?

23    A    I can see it now.  Correct.

24    Q    And am I correct that's the information, how it's written

11:02:20 25    in there, that may be the form that can be used for other

DIRECT EXAMINATION — CHAD MODRA

11:02:25 1    reports, including MDRs and reports or summaries to corporate?

2    A    Correct.  Typically it starts with "it was reported"

3    because events.  That's all we have.

4    Q    Just going back, when we see the word "detachment" in a

11:02:41 5    complaint record, for purposes of understanding what we mean

6    or what was meant, detachment is a fracture; correct?

7    A    By another term; correct.

8    Q    So if somebody were -- an outsider were to look at a

9    complaint report, wanted to know what happened, they could

11:02:58 10   find the type of filter; correct?  And they could also go on

11   and find out what was the issue with the filter, and if they

12   were to see "limb detachment," that would be fracture;

13   correct?

14   A    The code that's used there is detachment, because it's

11:03:16 15   used across multiple types of products.

16   Q    To include fracture of a filter.

17   A    Correct.  Fracture would be a more specific term related

18   to filters versus another product.

19   Q    When you see "detachment" for a filter, that means

11:03:30 20   fracture; right?

21   A    Typically, yes.

22   Q    Thank you, sir.

23        And then, again, page 4 of 6, I think you confirmed

24   is the statement that is used for other documents and

11:03:41 25   summaries.  True?

DIRECT EXAMINATION – CHAD MODRA

11:03:44  1   A   As the basis for it.  Sometimes there's additional

2   information provided with that.

3   Q   And if you could just look at that where it starts out "It

4   was reported that upon examination."

11:03:53  5           Do you see that?

6   A   Yes.

7           MR. O'CONNOR:  And then, Gay, if you would go to --

8   I've got it as 3662.022.

9           MS. MENNUTI:  I'm sorry, can you say that again.

11:04:12 10       (Mr. O'Connor and Ms. Mennuti confer.)

11           MR. O'CONNOR:  And, Gay if you could go right to the

12   box, box 5, and highlight that for Mr. Modra, please.

13   BY MR. O'CONNOR:

14   Q   First of all, Mr. Modra, I should have you identify what

11:04:41 15   we're looking at.  It's a document titled MedWatch and it's an

16   FDA form; is that correct?

17   A   That's correct.

18   Q   And that is the information that will eventually be

19   comprised as part of a medical device report; right?

11:04:55 20   A   That's correct.

21   Q   And medical device reports, there's also a responsibility

22   where you have to characterize them as either serious injury

23   or malfunction; right?

24   A   That's correct.

11:05:05 25   Q   And Bard -- excuse me, the FDA relies on you folks at Bard

DIRECT EXAMINATION – CHAD MODRA

11:05:11  1    to be accurate in how you characterize the complaints and how

2    you describe them.  Fair?

3    A    That's correct.

4    Q    And so your job as the vice president was to make sure

11:05:21  5    that the people under you were following that directive to be

6    as accurate and thorough as possible.

7    A    That's correct.

8    Q    Thank you.

9            And here you'll see, again, under the MedWatch form,

11:05:38  10   FDA form, another description of the event or problem.  And if

11   you want to compare it to what I just read --

12           MR. O'CONNOR:  Judge, if -- Your Honor, if you'll

13   allow me to approach the witness, I can show him the first

14   page he looked at so he can compare the two?

11:05:54  15           THE COURT:  Of 3270?

16           MR. O'CONNOR:  Yes, sir.

17           THE COURT:  You may.

18           MR. O'CONNOR:  No, this is 3262 -- this is Exhibit --

19           THE COURT:  3262.

11:06:05  20           MR. O'CONNOR:  Yes, sir.

21           THE COURT:  Okay.  That's fine.

22           MR. O'CONNOR:  May I approach?

23           THE COURT:  Yes.

24   BY MR. O'CONNOR:

11:06:08  25   Q    So here, Mr. Modra.

DIRECT EXAMINATION - CHAD MODRA

11:06:44    1    A    They're the same.

        2    Q    Why don't you hold on to it a second.

        3          MR. O'CONNOR:  At this time, Your Honor, I would move

        4    for admission of Exhibit 3262, with the understanding of what

11:06:54    5    your ruling is.

        6          THE COURT:  All right.  Same ruling.  I'll deal with

        7    that after we've talked through the rest of the issues.

        8          MR. O'CONNOR:  Thank you.

        9          Gay, can you put up Exhibit 4515, please.

11:07:06   10    BY MR. O'CONNOR:

       11    Q    Mr. Modra, again, can you identify 4515?

       12    A    It's an example of a monthly management report.

       13    Q    And it's dated April 8, 2010; correct?

       14    A    Correct.

11:07:26   15    Q    And, again, this, as we described -- discussed in the

       16    prior exhibit, is an area where, based upon what the people

       17    under you do by way of describing an event, can be used for

       18    reports and summaries that go to other departments in Bard.

       19    True?

11:07:45   20    A    True.

       21          MR. O'CONNOR:  And, Gay, if you would go to page 12.

       22          And, Gay, highlight the second one down, please.

       23    BY MR. O'CONNOR:

       24    Q    Mr. Modra, what we're looking at is a chart, and what I've

11:08:08   25    highlighted -- what we have highlighted for you begins -- it

DIRECT EXAMINATION – CHAD MODRA

11:08:11   1   talks about the G2 filter system.

2          Do you see that?  Femoral?

3   A   Femoral; correct.

4   Q   And then for the description of the event it says

11:08:18   5   "detachment of component's filter limbs."

6          Do you see that?

7   A   I do.

8   Q   And then to the right is a comment section.

9          Do you see that?

11:08:29   10   A   Yes.

11   Q   And, sir, I would just ask you to read that comment and

12   compare it to what you just read and confirm that they're both

13   accurate so that we can go on with the process of showing how

14   these reports are used internally and for the FDA.

11:09:17   15   A   They're not exactly the same.

16   Q   But do they basically contain the same substance and

17   content?

18   A   Yes.  That was sort of my point, is the person putting

19   these in here would put that information, but then she would

11:09:32   20   use things within the file to summarize that for the report.

21   Q   But is it fair to say that what's described -- fair to say

22   that what's described in the monthly report, Exhibit 4515, is

23   what is described in the event report that I just showed you.

24   Fair?

11:09:47   25   A   Generally.  With a few changes.

DIRECT EXAMINATION – CHAD MODRA

11:09:49   1    Q    Same event, though?

           2    A    Let me make sure.

           3         Yes, same event is referenced.

           4              MR. O'CONNOR:  Thank you.

11:10:02   5              Move to admit 4515.

           6              THE COURT:  You already have and my ruling's the

           7    same.

           8              MR. O'CONNOR:  Okay.  Thank you.

           9              Oh.  Excuse me.  Now, Gay, if you could put up

11:10:19  10    Exhibit 4565 and stay there for --

          11              I'm going to have him make one more comparison, so

          12    I'm going to show him so he has this exhibit as well,

          13    Your Honor --

          14              THE COURT:  The one that's on the screen?

11:10:34  15              MR. O'CONNOR:  4515.  No.  This is what he just

          16    confirmed.

          17              THE COURT:  Okay.  That's fine.

          18              MR. O'CONNOR:  May I approach?

          19              THE COURT:  Yes.

11:10:41  20    BY MR. O'CONNOR:

          21    Q    This is what you just talked about.

          22    A    You want this back?

          23    Q    You might as well keep it.  I'm trying to go paperless.

          24         If you would go to page 267 and look at that.

11:11:03  25         We're showing it to you right now.

DIRECT EXAMINATION - CHAD MODRA

11:11:06  1  A    Okay.

2  Q    And can you confirm that what is written in the summary in

3  Exhibit 4565 is the same as the other two documents you just

4  reviewed, please.

11:11:42  5  A    The one on the screen is different from this one you just

6  handed to me.

7  Q    Pardon me?

8  A    I said the one on the screen is different than the one you

9  handed to me.

11:11:50  10  Q    Is it the same as the adverse event report?

11  A    It is.

12  Q    Pardon me?

13  A    It is.

14  Q    It is?

11:12:03  15  A    Yeah.

16  Q    So all three of the documents you've looked at, you agree

17  all describe the same event?

18  A    All -- the event number references -- is referenced

19  throughout.  That's correct.

11:12:15  20  Q    The descriptions contain the same facts.

21  A    There is one difference, but generally are all filter

22  related and reference that same event.

23  Q    Same -- represent the same event, but all substantially

24  similar in their descriptions?

11:12:31  25  A    Not exactly the same description, but yes.

DIRECT EXAMINATION – CHAD MODRA

11:12:33  1   Q   You would agree with that?

2   A   With some editorial changes, yes.  Because they aren't

3   exactly the same.

4   Q   What would you change?

11:12:46  5   A   The language that is used, all the wording in here on the

6   screen is not the same as what is contained in this management

7   report.

8   Q   But substantially similar in describing the same event?

9   A   It describes the same event, that's correct.

11:12:58  10        MR. O'CONNOR:  May I approach and I'll get my paper

11   back from him, Mr. Modra?

12        THE COURT:  You may.

13        MR. O'CONNOR:  If you want to hand me that back.

14   Thanks.

11:13:09  15        Thank you, sir.  So much.

16        Your Honor, just so I make a record, we would move at

17   least for the admission of Exhibit 4565, subject to the

18   ruling.

19        THE COURT:  Same ruling.

11:13:41  20        MR. O'CONNOR:  All right.  Let's go to Exhibit 3304,

21   please.

22   BY MR. O'CONNOR:

23   Q   3304 is, again, looks like the jacket for an MDR file; is

24   that right?

11:14:07  25   A   The one prepared for you guys; correct.

DIRECT EXAMINATION – CHAD MODRA

11:14:11  1          MR. O'CONNOR:  And if we could go to page 3 of 5.

       2          And highlight the event description.

       3   BY MR. O'CONNOR:

       4   Q   Mr. Modra, this particular Complaint Record Detail Report

11:14:40  5   number is complaint 282326, and it deals with an Eclipse

       6   filter; is that correct?

       7   A   I can't see where it says what type of filter it is.  It

       8   says type of procedure is vena cava filter.

       9          MR. O'CONNOR:  Let's go to page 2, Gay.

11:15:11 10   BY MR. O'CONNOR:

      11   Q   On the preceding page under Product Information, do you

      12   see where it says Eclipse filter?

      13   A   I do.

      14   Q   Thank you.

11:15:17 15          MR. O'CONNOR:  Gay, could you please go back to the

      16   next page we were looking at.

      17          And highlight event description.

      18   BY MR. O'CONNOR:

      19   Q   Mr. Modra, what your team would do would be to gather

11:15:46 20   information, correct, and if a filter -- if they learn about a

      21   filter fracturing, they would also get as much information as

      22   possible from the doctor, the medical records, and the

      23   radiographs; correct?

      24   A   We would go through a series of questions to try to get as

11:16:01 25   much information as we could from the person that contacted

DIRECT EXAMINATION – CHAD MODRA

11:16:04   1   us.

2   Q    An important issue with the fracture is whether the

3   fractured limb went to another place in the body.  True?

4   A    That's correct.

11:16:13   5   Q    That's something that has to be investigated and taken

6   seriously by Bard; correct?

7   A    Correct.

8   Q    And as I understand it in your data system, if you wanted

9   to find out yourself whether a limb fractured and embolized --

11:16:26  10   that's a word you understand; correct?

11   A    Correct.

12   Q    That means after it breaks it moves through the

13   circulatory system; right?

14   A    Correct.

11:16:34  15   Q    And if you wanted to find out if a limb went to a lung, or

16   how many times that happened, you could do that at Bard.

17   True?

18   A    I'd have to search through the documents, that's correct.

19   Q    And what you could do -- you have a basic understanding of

11:16:49  20   anatomy; correct?

21   A    I do.

22   Q    And you want to make sure the people who work under you do

23   so they know what they're looking at so they can determine

24   when things are serious.  True?

11:16:58  25   A    Correct.

DIRECT EXAMINATION – CHAD MODRA

11:16:59    1    Q    And you understood that if a limb fractured and was in the

            2    lung, that meant somehow in the circulatory system it went

            3    through the heart; correct?

            4    A    Correct.

11:17:08    5    Q    And the thing that concerns people and is a concern for a

            6    medical device company, or should be, is if the limb fractures

            7    and embolizes it can go -- and it goes through the heart or

            8    stays in the heart or goes into the lung, that can be a

            9    dangerous injury.   True?

11:17:26   10    A    It has the potential to.

           11    Q    I mean, that's a serious condition and that's why Bard

           12    receives that information; correct?

           13    A    Correct.

           14         MR. O'CONNOR:  So, if you could, I'd like you to,

11:17:43   15    Gay, highlight the event description.

           16    BY MR. O'CONNOR:

           17    Q    And you see the event description here that involves an

           18    Eclipse filter; correct?

           19    A    Correct.

11:18:12   20         MR. O'CONNOR:  And if we go to page 3304.

           21         Again, the event description -- wait until we get

           22    there.

           23         You know what, I'm sorry, Gay.

           24         MS. MENNUTI:  What page are you on?

11:18:36   25         MR. O'CONNOR:  Highlight the event description.  I'm

DIRECT EXAMINATION – CHAD MODRA

11:18:38   1   getting ahead of you.  I apologize.

2   BY MR. O'CONNOR:

3   Q    Now you've read that, sir?

4   A    I have.

11:18:51   5   Q    All right.

6         MR. O'CONNOR:  And then if we go to -- further in the

7   file to the MedWatch form for FDA, to the MedWatch form for

8   FDA as part of this exhibit.

9         I think one more.

11:19:13  10        There you go.  Thanks.  Good work, Gay.

11        And highlight, Gay, if you would, description of

12   event.

13   BY MR. O'CONNOR:

14   Q    And, Mr. Modra, do you agree reading that that that's the

11:19:37  15   same description you just read of the event that is the

16   subject of this investigation we're looking at in

17   Exhibit 3304?

18   A    I'd to have compare it again, I'm sorry.

19        MR. O'CONNOR:  May I approach?

11:19:53  20        THE COURT:  You may.

21   BY MR. O'CONNOR:

22   Q    Here you go.  That's the part we just looked at.

23   A    They're the same.

24   Q    So the same information that's written in the Bard

11:20:32  25   complaint investigation is also the information that is

DIRECT EXAMINATION – CHAD MODRA

11:20:36  1   completed into the MedWatch form at Bard; correct?

2   A    In this instance, yes.

3   Q    And that form is something that Bard sends to the FDA.

4   A    We provide that to them; correct.

11:20:49  5   Q    And completing that form, like any investigation, it's

6   important to be thorough and accurate.  True?

7   A    Of course.

8   Q    You understand that people in your company rely on these

9   reports to be as accurate as possible; correct?

11:21:03  10   A    Correct.

11   Q    You understand, of course, the FDA's going to rely on your

12   company to be accurate in reports to the FDA; right?

13   A    Correct.

14   Q    And as we talked about earlier, let's take a look at --

11:21:16  15        MR. O'CONNOR:  And, again, I would move for admission

16   of Exhibit 3304, subject to the ruling, Your Honor.

17        THE COURT:  Same ruling.

18        MR. O'CONNOR:  And let's go to Exhibit 4519.

19   BY MR. O'CONNOR:

11:21:38  20   Q    4519 is a Bard monthly report of the same type we've

21   looked at just previously, is that correct, Mr. Modra?

22   A    Correct.

23   Q    And it's dated August 9, 2010.

24        Do you see that?

11:21:53  25   A    I do.

DIRECT EXAMINATION - CHAD MODRA

11:21:55  1  Q   And, again, this report goes to Mr. Ring, Mr. Weiland, and

2  Mr. Byloos?

3  A   It does.

4  Q   And who are they?

11:22:04  5  A   The former CEO of Bard, COO of Bard, and I'm not sure who

6  Peter Byloos was at the time.

7  Q   But you knew who John Weiland was?

8  A   Yes.

9  Q   Important people.

11:22:15  10  A   Of course.

11          MR. O'CONNOR:  And let's go to page 14.

12          And, Gay, we're looking at about the fourth down, if

13  you would highlight that for Mr. Modra.

14  BY MR. O'CONNOR:

11:22:29  15  Q   And, Mr. Modra, in this report that was given to Mr. Ring

16  and Mr. Weiland, this contains summaries of events.  And can

17  you confirm for us today that what you're looking at at

18  page 14 matches and has the same information and is the same

19  report of the other document that I just approached you with,

11:22:53  20  the complaint file, please.

21  A   It's the same.

22  Q   Thank you.

23          MR. O'CONNOR:  And, Gay, if we could go to --

24          I would move to admit 4519, Your Honor, understanding

11:23:29  25  subject to the same order.

DIRECT EXAMINATION - CHAD MODRA

11:23:34  1            THE COURT:  Same ruling.

       2            MR. O'CONNOR:  Thank you, sir.

       3            Lets go to Exhibit 4565.

       4    BY MR. O'CONNOR:

11:23:46  5    Q   And what I'm showing to you is a chart summarizing the

       6    adverse events reports and compiling a chart.

       7            Can you confirm that the language is substantially

       8    similar at page 26 --

       9            MR. O'CONNOR:  I'm sorry.  Excuse me.  I think we're

11:24:18 10    going to page 283, Gay.

      11            MS. MENNUTI:  Page what?

      12            MR. O'CONNOR:  283.

      13            4565.

      14            May I approach, Your Honor, with Exhibit 4565?  I can

11:25:27 15    probably show him.  I think we're having a hard time getting

      16    it up on the screen.

      17            THE COURT:  It's up.  Isn't that it?

      18            MR. O'CONNOR:  No, that's not it.

      19            My notes have it at page 283.

11:25:50 20            I can show him the hard copy.

      21            THE COURT:  That's fine.  Go ahead.

      22    BY MR. O'CONNOR:

      23    Q   This is Exhibit 4565, Mr. Modra, and if you'd look at page

      24    283.  Right there.

11:26:15 25    A   Okay.

DIRECT EXAMINATION – CHAD MODRA

11:26:15  1   Q   Are you able to read it?

2   A   Yes.

3   Q   Same event described?

4   A   They're the same.

11:26:51  5   Q   And, Mr. Modra, just, again, if, for example, you received

6   a complaint of a patient who had an Eclipse filter fracture

7   and that fracture was found to have embolized up through the

8   vena cava, through her circulatory system, through her heart,

9   and embedded in her pulmonary artery, or her lung, if you

11:27:14  10  wanted to find out how many events you had for all filters

11  since the beginning of the Recovery or any single filter, you

12  could do that in TrackWise; correct?

13  A   Correct.

14  Q   And that would be a way that Bard could look at what

11:27:30  15  events may be relevant to other events, what events are

16  similar, and get as detailed as Bard would want, depending

17  what they wanted to look at; correct?

18  A   You can sort the data a number of different ways based on

19  the fields.

11:27:45  20  Q   You can do everything from as general as looking at how

21  many leg fractures did you have over time, true, that were

22  reported to Bard?

23  A   Correct.

24  Q   I mean, all you do receive are what's reported to you;

11:27:55  25  correct?

DIRECT EXAMINATION – CHAD MODRA

11:27:57  1    A    Correct.  Or go through literature or --

2    Q    If something's reported or documented, Bard should get

3    ahold of that and put it in this database.   True?

4    A    True.  Even if it's anecdotal.

11:28:11  5    Q    So if you wanted to find out the reports that Bard had

6    received of fractures since the Recovery through the Eclipse,

7    you can do that; correct?

8    A    Correct.

9    Q    You have done things like that.  True?

11:28:24 10    A    Correct.

11    Q    If you wanted to find out how many limbs had fractured and

12    wound up in a patient's lung, you could do that; correct?

13    A    Correct.

14    Q    You could do a compilation of the Recovery all the way

11:28:36 15    through the Eclipse or to the present date.  True?

16    A    Correct.

17    Q    But the only way you get that information is if it's

18    reported to you; right?

19    A    Again, if we see it through literature, that's not

11:28:48 20    necessarily reported to us.  We may -- we review literature

21    periodically to look for those things proactively.

22    Q    But fractures to the lung are something Bard should take

23    seriously; right?

24    A    We do take it seriously.

11:29:03 25    Q    And you are aware, and we talked about it before, that one

DIRECT EXAMINATION – CHAD MODRA

11:29:06   1   reason Bard may not receive a report is because a patient is

2   asymptomatic and doesn't know he or she has a failed filter;

3   right?

4   A   Correct.

11:29:17   5   Q   Sometimes what will happen is you'll receive a report

6   because a doctor, while doing a radiographic study on a

7   different issue or condition, sees or observes the fracture in

8   imaging studies; right?

9   A   We have had that; correct.

11:29:33  10   Q   And that's reported to you; correct?

11   A   If they report it to us; correct.

12   Q   And whether it's symptomatic or asymptomatic, Bard should

13   take that seriously.  True?

14   A   We do.

11:29:44  15   Q   Because you know that a filter piece that's in a lung,

16   whether a patient knows it's there or not, could evolve into

17   danger.

18   A   There's different gradations of severity of that and, per

19   definition of FDA MDRs, we would file them appropriately.

11:30:04  20   Q   You're concerned things could change with a foreign body

21   in a patient's body; right?

22   A   Yes.  You don't know.

23           MR. O'CONNOR:  May I approach and get my paper back?

24           THE COURT:  Yes.

11:30:24  25           MR. O'CONNOR:  One more quickly and we can move to a

DIRECT EXAMINATION - CHAD MODRA

11:30:26   1   different area.

2        Gay, if you would put up Exhibit 3476, please.

3        THE COURT:  Mr. O'Connor, are you going to go through

4   the same steps again?

11:30:50   5        MR. O'CONNOR:  If you're telling me that it's not

6   necessary --

7        THE COURT:  I don't think it's necessary.

8        MR. O'CONNOR:  All right, then I won't.  Thank you,

9   Your Honor.

11:30:57  10   BY MR. O'CONNOR:

11   Q   Mr. Modra, you agree that Bard is responsible to put

12   patient safety first.  True?

13   A   Correct.

14   Q   And as it deals with the FDA, you understand that the FDA

11:31:59  15   operates on an honor system; correct?

16   A   Correct.

17   Q   Meaning that the FDA expects and relies on companies like

18   Bard to be truthful, to be accurate, and always be honest in

19   dealing with them.  True?

11:32:19  20   A   True.  Honor system, but they do verify.

21   Q   Well, if the honor system fails, then the whole system

22   would fail, wouldn't it?

23   A   I'm not sure how to answer that.

24   Q   Well, the system works if Bard is following its

11:32:35  25   responsibility to be honest and forthright; correct?

DIRECT EXAMINATION — CHAD MODRA

11:32:38   1    A    Yes, of course.

2    Q    And that means the responsibility of Bard for its filters

3    doesn't end when the filter leaves Bard's hands, does it?

4    A    No.  Certainly not.

11:32:52   5    Q    An important responsibility Bard has is to continue

6    keeping its ear to the ground on what's happening to its

7    filters out there after they're in patients; correct?

8    A    Correct.

9    Q    And we just talked about one way Bard is required to do

11:33:08  10    that; right?

11    A    Yes.

12    Q    Part of market surveillance means tracking complaints;

13    right?

14    A    Amongst many other things; correct.

11:33:19  15    Q    And the reason, among others, that you want to track and

16    follow complaints is to look for trends; correct?

17    A    Correct.

18    Q    And, also, if you need to advise or warn doctors who are

19    using these filters of problems that you're seeing, that's how

11:33:34  20    the information and how important that responsibility is;

21    correct?

22    A    We use that to continually evaluate risk/benefit and the

23    profile of the device; correct.

24    Q    Now, these documents that generate into these summarized

11:33:48  25    reports that we saw that go to Mr. Weiland and Mr. Ring, you

DIRECT EXAMINATION – CHAD MODRA

11:33:53   1   have told me before that Bard doesn't share those with

2   doctors; correct?

3   A    No.

4   Q    And those summary reports that talk about failures and

11:34:05   5   complications, Bard doesn't even share that information with

6   its sales force.   True?

7   A    Typically, no.

8   Q    But Bard knows that the sales force is the base of Bard.

9   They're the ones that interact with the doctors primarily.

11:34:21  10   True?

11   A    True.

12   Q    And Bard knows that for it to sell its products out there,

13   that it's important that that sales department, that sales

14   force, those sales representatives, have a good, trusting

11:34:36  15   relationship with their doctors who are customers.   Fair?

16   A    True.

17   Q    That makes sense to you; right?

18   A    Yeah, it does.

19   Q    I mean, you understand that doctors rely on the

11:34:47  20   representatives of Bard to be truthful and accurate with them;

21   correct?

22   A    They do.

23   Q    I mean, truth and accuracy is the basis of a good

24   relationship.   And for Bard, a relationship between the sales

11:35:00  25   force and doctors means the ability to promote its devices.

DIRECT EXAMINATION – CHAD MODRA

11:35:05  1    True?

2    A    It has to be true as well as balanced for promotion.

3    Q    I understand that.  But to my point, you know that doctors

4    do rely on the sales force; correct?

11:35:18  5    A    To some extent.  But they don't rely only on the sales

6    force to make decisions on that.  That would be --

7    Q    The sales force is a good way to communicate anything that

8    Bard is aware of to doctors.  One way.

9    A    It's one way of communicating.

11:35:33  10   Q    Thank you.

11              Now, from time to time the FDA can show up at the

12   door at Bard for an inspection and investigation, whatever;

13   right?

14   A    They can.  Unannounced.

11:35:53  15   Q    And one area that the FDA does regulate, as we talked

16   about, are complaints.  True?

17   A    One area compared with many, many others.

18   Q    I -- I understand that.  And for right now all I want to

19   do is focus on that.

11:36:10  20   A    Correct.

21   Q    The FDA expects and relies on Bard to accurately report

22   complaints to the FDA; correct?

23   A    They do.

24   Q    The FDA expects Bard to be accurate and truthful in how it

11:36:21  25   characterizes complaints that it reports to the FDA.  True?

DIRECT EXAMINATION – CHAD MODRA

11:36:25   1    A    For everything that's reported to us; correct.

          2    Q    And the FDA relies on Bard to make sure that when it

          3    characterizes events, that it's characterizing them correctly.

          4    True?

11:36:41   5    A    True.

          6    Q    And there's two basic labels or descriptions that go with

          7    complaints.  One is serious injury; correct?

          8    A    Correct.

          9    Q    And the other is a malfunction.  True?

11:36:54  10    A    True.  I would actually characterize it as three because

         11    some events are not reportable to FDA.

         12    Q    Okay.  But that all is decided right there in the offices

         13    of Bard; right?

         14    A    It's decided on the narrative of the event; correct.

11:37:10  15    Q    But, Mr. Modra, so you and I are on the same page, it's

         16    people that work at Bard that make these decisions:  Serious

         17    injury, malfunction, nonreportable.  True?

         18    A    In accordance with the FDA's definitions, true.

         19    Q    And that is a perfect example of how the FDA relies on the

11:37:29  20    honor system; right?

         21    A    Correct.

         22    Q    Bard, they give Bard a big privilege in doing things

         23    Bard's way, expecting Bard to be truthful and accurate.  Fair?

         24    A    Yes.  They give us the privilege to do it their way, to be

11:37:50  25    truthful and accurate.

DIRECT EXAMINATION – CHAD MODRA

11:37:51   1    Q    But they're not there watching you every day, are they?

2    A    They're not.

3    Q    They're not sitting in that room when people are making

4    decisions as to what is going to be characterized as a serious

11:38:01   5    injury, what's going to be described as a malfunction.  True?

6    A    True.  They provide guidances, regulation to clarify that.

7    Q    And then they expect you to do everything you can to be

8    accurate with them.  Fair?

9    A    True.

11:38:20  10                 MR. O'CONNOR:  May I approach, Your Honor?

11                 THE COURT:  Yes.  Well, what are you going to

12    approach with?

13                 MR. O'CONNOR:  About an issue that I think under an

14    order I need to approach about.

11:38:27  15                 THE COURT:  Oh, you mean over here?

16                 MR. O'CONNOR:  Yes.  I'd like a sidebar.

17                 THE COURT:  Okay.  Well, are you going to be -- we're

18    going with Dr. Modra, Mr. Modra, past the noon hour?

19                 MR. O'CONNOR:  Could happen.

11:38:39  20                 THE COURT:  Let's not take the jury's time on this;

21    let's talk about that when we break for lunch.

22                 MR. O'CONNOR:  But that's where I'm at, where I plan

23    to wrap it up.  Can I talk to my lawyer for a moment?

24                 THE COURT:  Yes, you can talk to your lawyer.

11:38:52  25                 MR. O'CONNOR:  Thank you.

DIRECT EXAMINATION — CHAD MODRA

11:39:00  1          I got a whole bunch of them.

        2      (Counsel confer.)

        3          THE COURT:  If you want to stand up, ladies and

        4   gentlemen, while they're talking, feel free.

11:39:56  5          MR. O'CONNOR:  One more area I was planning this

        6   morning, the other issue, and then I was going to wrap it up

        7   with him.

        8          THE COURT:  How long will the other area take?

        9          MR. O'CONNOR:  I think this could take five minutes.

11:40:06 10          THE COURT:  Okay, then let's talk.

       11          You can stay standing.

       12      (Bench conference as follows:)

       13          MR. O'CONNOR:  Hi.

       14          THE COURT:  Hi.  How are you?

11:40:45 15          MR. O'CONNOR:  I want to admit the warning letter in

       16   the exact form that we had it in Booker.

       17          THE COURT:  So meaning only Section 3(A), (B), and

       18   (C)?

       19          MR. O'CONNOR:  Right.

11:40:58 20          THE COURT:  Okay.  Tell me why you think that should

       21   come in.

       22          MR. O'CONNOR:  Well, it's relevant for a number of

       23   issues.  In opening statement and the way Bard has taken the

       24   position that they are going to start putting up rates they

11:41:12 25   claim are accurate, I think we have a right to show, number

DIRECT EXAMINATION – CHAD MODRA

11:41:15  1    one, they didn't comply with the regulations and the FDA had

2    to come to them because the complaints are part of the way

3    they developed these statistics and trend and track these

4    incidents that they're going to talk about later through this

11:41:32  5    trial.

6            THE COURT:  All right.

7            MR. NORTH:  Your Honor, I think it's premature.  This

8    witness will be back as part of our case in chief.  If they

9    believe a door has been opened at that time, he will be here

11:41:45 10    for them to ask about it.  But at this point I think it's

11    premature, that no door has been opened to admit this

12    document.

13            It's clearly -- there are major 403 concerns with it,

14    and also I think there's an issue about 402 because virtually

11:42:05 15    all of these complaints were actually submitted to the FDA,

16    the question is just whether they were characterized as a

17    serious injury or malfunction.  They were still made part of

18    the MAUDE database regardless how characterized.

19            So it really does -- has, at most, marginal probative

11:42:24 20    value.

21            THE COURT:  Okay.  Hold on just a minute.

22            The problem I'm having, Mr. O'Connor, is I didn't

23    know this issue was going to come up so I haven't gone back

24    and read the orders and I haven't read my notes on my reasons

11:42:47 25    for admitting it before, and I don't remember them.

DIRECT EXAMINATION – CHAD MODRA

11:42:53  1          MR. O'CONNOR:  May I speak for one second?

       2          THE COURT:  Yeah.  Yeah.

       3          MR. O'CONNOR:  Here's the other reason I think it's

       4   important.  Because in opening statement, they have made a big

11:43:01  5   issue out of Doris Jones being asymptomatic.  And that goes to

       6   the issue of how they internally regard these things in terms

       7   of malfunction versus serious injury.

       8          We're going to present evidence, and I think I've

       9   even started the process here, showing that a filter fragment

11:43:21  10   in the lung, in the pulmonary artery, is a serious condition.

      11   That's our case.  Their case is no harm, no foul.

      12          And so I think this is probative of how FDA and the

      13   public rely on Bard to recognize what's serious and what's not

      14   serious in how they even handle complaints in the first place.

11:43:44  15          THE COURT:  Okay.  I understand what you've said.  I

      16   think I need to read the warning letter again and I need to go

      17   back and read my orders on it before I can make a ruling on

      18   that.

      19          MR. O'CONNOR:  Your Honor, I think -- I understand.

11:43:58  20   And I understand we have time, and respect that, and I'm

      21   trying to do everything I can to move things along in this

      22   trial.  My problem, of course, is that putting some of these

      23   things off when I have the witness here --

      24          THE COURT:  Well, I know that, but there's nothing I

11:44:14  25   can do about that.  I can't say I'll admit it because the

DIRECT EXAMINATION - CHAD MODRA

11:44:17  1   witness is here.

2              MR. O'CONNOR:  Do I need to make any more foundation

3   or have I --

4              THE COURT:  There's not a foundation issue on this.

11:44:22  5   MR. NORTH:  No.

6              THE COURT:  It's purely a relevancy and 403 issue.

7              Is that right?

8              MR. NORTH:  Right, Your Honor.

9              THE COURT:  So you don't have to do anything more

11:44:28 10   with this witness to get this in.  I've just got to look back

11   at my previous reasons and decide if I think it's relevant and

12   whether or not 403 bars it.  And I can't do that without

13   refreshing my memory.

14             MR. O'CONNOR:  I understand that.

11:44:39 15             And just for the record, right now I'm talking about

16   Exhibit 1680, which was the warning letter.  Do I need to make

17   any further record on that now?

18             THE COURT:  No.

19             Go ahead.

11:44:51 20             MS. REED ZAIC:  I want to clarify Mr. Modra is coming

21   back.  My understanding is we had to put him on today; we

22   don't have him after this.

23             MR. NORTH:  That's not true.

24             THE COURT:  Okay, we'll --

11:44:58 25             MS. REED ZAIC:  We have time --

DIRECT EXAMINATION – CHAD MODRA

11:45:02  1        THE COURT:  I'll also -- I'll also say this:  If he

2    comes back -- he is coming back in your case?

3        MR. NORTH:  Yes.

4        THE COURT:  I'm not going to limit you because it's

11:45:08  5    not within the scope.  If there's things on this you need to

6    go back into, then I'll let you do that.  So you're not going

7    to get boxed in.

8        MS. REED ZAIC:  Thank you.

9        THE COURT:  Okay.  So I'll look at these issues and

11:45:18 10    then we'll deal with it.  It may be before he comes back, if I

11    can rule.  If not, when he comes back.

12        (Bench conference concludes.)

13        THE COURT:  Thank you, ladies and gentlemen.

14        MR. O'CONNOR:  Oh, I'm sorry.  Exhibit 2048.

11:46:47 15  BY MR. O'CONNOR:

16  Q   Mr. Modra, other documents generated at Bard that Bard

17  uses in its business, in its ordinary course of business, are

18  Failure Investigation Reports; correct?

19  A   They were; correct.

11:47:05 20  Q   Pardon me?

21  A   They were; correct.

22  Q   And Failure Investigative Reports are also known as R002

23  history reviews?

24  A   That's correct.  Typically FIRs, as they're stated, are a

11:47:20 25  subset of the R002 document.

DIRECT EXAMINATION – CHAD MODRA

11:47:27  1   Q   All right.  I'm showing you Exhibit 2048; correct?

2   A   I don't see where that number is.

3   Q   Well, what you're looking at, for the record, is

4   Exhibit 2048, and it is failure investigation R002 history

11:47:50  5   review; correct?

6   A   Correct.

7   Q   And it has a number of tables, including tables describing

8   the G2 and events that happened with the G2; correct?

9   A   Correct.

11:48:04 10   Q   And also the Recovery filter; correct?

11   A   Correct.

12   Q   And if we go to -- and this is a document that you're

13   familiar with.  True?

14   A   In preparing for this.

11:48:25 15   Q   Pardon me?

16   A   In preparing for this testimony; correct.  I'm not sure of

17   its original origin.

18   Q   Well, it's a Bard document, and it's a Bard document that

19   also relies on complaint reports; correct?

11:48:40 20   A   I'd have to look at those individual reports.  It could be

21   for any sorts of reasons why we would conduct an additional

22   investigation.

23   Q   Can you tell the jury what a failure investigation is.

24   A   In this context, it's something even in addition to

11:49:11 25   what -- the kind of investigation we would have done for that

DIRECT EXAMINATION – CHAD MODRA

11:49:14  1    particular event in a complaint record.  We would have gone

2    back and looked at additional records even beyond that single

3    one.  Or if it's related to manufacturing, if there was

4    something we noticed in manufacturing we were interested in,

11:49:28  5    we might conduct an additional investigation there to see if

6    it's anything we need to be concerned about.

7    Q    And failure investigations are memorialized in these type

8    of reports, R002 history reviews; correct?

9    A    In the documents themselves.  This looks like a summary.

11:49:48 10    Q    Okay.

11              MR. O'CONNOR:  Gay, if you could go to page 2 and

12    just scroll slowly so Mr. Modra can familiarize himself with

13    the contents of the report.

14              Or, to expedite it, Your Honor, I can approach the

11:50:10 15    witness with my copy?

16              THE COURT:  That's fine.

17    BY MR. O'CONNOR:

18    Q    Page through it.

19    A    Um-hmm.

11:50:54 20         Okay.

21    Q    Do you recognize that?

22    A    Generally.

23    Q    Do you recognize the form?  It's a Bard document that

24    relates to failure investigations, including failures of Bard

11:51:04 25    filters; correct?

DIRECT EXAMINATION – CHAD MODRA

11:51:06   1   A    It does.

2   Q    And that is another report that relies on people that

3   worked under you in terms of providing complaint information

4   and adverse event information.  Fair?

11:51:20   5   A    It isn't a standard format or report.  It's something --

6   looks like it was summarizing historical events.

7   Q    But you understood that that's another area that summaries

8   of your reports that start with your people is also how that

9   information is used in Bard.  True?

11:51:38   10   A    True.

11               MR. O'CONNOR:  May I approach and get the exhibit

12   back, Your Honor?

13               THE COURT:  Yes.

14               MR. O'CONNOR:  Thank you, sir.

11:51:56   15               I move for admission of 2048, subject, probably, to

16   the same ruling you made before, Your Honor.

17               THE COURT:  All right.  Same ruling.

18   BY MR. O'CONNOR:

19   Q    Mr. Modra, one thing that you did become aware of while

11:52:23   20   you're at Bard is that in filters, there were times where

21   there would be relationships between one failure and another;

22   correct?

23   A    They can be reported at the same time.

24   Q    I mean, it's not unusual to see tilts accompanied by

11:52:41   25   perforation or accompanied by fracture or migration.  Fair?

DIRECT EXAMINATION – CHAD MODRA

11:52:45  1    A    True.  There may be multiple of those failure events at

2    the same instance.

3    Q    And that's something that you and your team at Bard, in

4    addition to complaints, were looking at; correct?  More than

11:52:59  5    one failure in any given patient.

6    A    Yes.  Yes.  We track all of the failures and track and

7    trend them regardless of if there's multiples on a single

8    event.

9    Q    Understanding that the information that you provided to

11:53:13  10   Bard internally, Bard's choice, could be used for failure

11   investigations; correct?

12   A    True.

13   Q    Could be used, if Bard so chose, to trend and track

14   events; correct?

11:53:28  15   A    We do.

16   Q    And if Bard wanted to track a relationship between

17   events -- migration, fracture, embolization -- Bard has the

18   capability to do that; correct?

19   A    We have the reports of those.  I'd have to understand the

11:53:45  20   scientific nature of those relationships, though.

21   Q    And those are internal reports; correct?

22   A    I don't know what reports you're referring to.

23   Q    You have the capability.  That's the point.

24   A    We have all the events reported; correct.

11:53:57  25   Q    And, certainly, to generate whatever type of report Bard

DIRECT EXAMINATION – CHAD MODRA

11:54:01  1    wanted to do, if it wanted to find out how many types of

       2    failure modes are happening that are reported to Bard;

       3    correct?

       4    A    Correct.

11:54:11  5    Q    But Bard also knows that there are more failures out there

       6    in the population that haven't been reported; correct?

       7    A    That's typically what is said in the industry.

       8    Q    In other words, when you do post-market surveillance, you

       9    really should be concerned not just about the reports you're

11:54:36 10    receiving, but whether this is happening to patients and maybe

      11    the patient doesn't know it or her doctor doesn't know it;

      12    right?  That should be a concern of Bard's?

      13    A    Yes.  It is.

      14    Q    In other words, Bard should always be concerned about how

11:54:52 15    many failures are out there that we just don't know about.

      16    A    Yes.  But there's, unfortunately, limited ways to even

      17    obtain that information, if at all.

      18    Q    One reason Bard tracks and trends is so that it can learn

      19    whether there's some predictability among failures; correct?

11:55:15 20    A    We track and trend to see if there's an increase or

      21    decrease in a particular failure mode experience with the

      22    device.

      23    Q    And one reason is because Bard has to be concerned; if

      24    it's happened in these many patients, could it happen again.

11:55:33 25    A    That's the observed rate versus predictability, and that

DIRECT EXAMINATION - CHAD MODRA

11:55:36  1    would be difficult to do outside of a controlled study.

2    Q    And whether it's difficult or not, it's something a

3    medical device company should be concerned about; correct?

4    A    We're concerned about it, but it's -- it could be

11:55:50  5    erroneous, highly erroneous, to predict that.

6    Q    There could also be patients out there who just don't know

7    they have a failed filter.  True?

8    A    True.

9    Q    You just don't know how many; right?

11:56:03 10   A    No.

11                  MR. O'CONNOR:  That's all I have.

12                  THE COURT:  All right.  Are you going to have any

13   cross on this?

14                  MR. NORTH:  No, Your Honor.  We will reserve our

11:56:11 15   opportunity to question him during our case in chief.

16                  THE COURT:  Okay.  So we'll excuse Mr. Modra for

17   today.

18                  Who is your next witness going to be?

19                  MR. O'CONNOR:  Mr. Carr.

11:56:26 20                  THE COURT:  Why don't we take him up after the lunch

21   hour.

22                  Ladies and gentlemen, we will break until 1 o'clock

23   and resume at that time.

24            (The jury exited the courtroom at 11:57.)

11:57:01 25                  THE COURT:  Counsel, how much time is allocated to

DIRECT EXAMINATION – CHAD MODRA

11:57:03  1   the video that was shown?

2              MS. HELM:  Oh.  Your Honor, it's --

3              MR. CLARK:  17 for the plaintiff and six for the

4   defendant.

11:57:16  5              MS. HELM:  I agree with that, Your Honor.

6              THE COURT:  All right.  As of now, plaintiff has used

7   eight hours and eight minutes.  Defendant has used two hours

8   and 53 minutes.

9              Mr. North, did you have 403 cases you wanted me to

11:58:22 10  look at during the lunch hour?

11             MR. NORTH:  Your Honor, I'm sorry, I misspoke this

12  morning.  Those cases are cited in draft -- the brief we

13  provided.  It's the *Nelson versus Brunswick* decision of the

14  Ninth Circuit and the *Schwartz versus New Castle Corporation*

11:58:37 15  decision.  They're cited in the final paragraph of our bench

16  brief that we filed.

17             THE COURT:  All right.  Let me ask you this question,

18  Mr. North:  It seemed to me that the testimony of Mr. Modra

19  established that the event reports or event descriptions that

11:59:03 20  are included in the initial complaint report which Bard makes

21  an effort to collect as much information as it can --

22             MR. NORTH:  Right.

23             THE COURT:  -- are carried forward into the monthly

24  management reports and are carried forward into the MedWatch

11:59:20 25  reports that go to the FDA, either verbatim or with close

DIRECT EXAMINATION – CHAD MODRA

11:59:26   1   language to what's in the original complaint report.

2          MR. NORTH:  Right.

3          THE COURT:  Do you disagree with that?

4          MR. NORTH:  No, I do not.

11:59:33   5          THE COURT:  And it seemed to me, as well, that that

6   basic description of the event is what's been included by the

7   plaintiff in the 1006 summary.

8          MR. NORTH:  I agree with that.  The only exception I

9   would make is back to the MDR reports.  I believe the

11:59:48  10   description in the MDR reports are usually more abbreviated

11   than we've seen in the actual complaint files and in the

12   management reports.  But it's just a summary of the same

13   event.

14          THE COURT:  Okay.  So the question I have for you is

12:00:07  15   if Bard is taking the event description and, in substance, is

16   communicating it to the FDA, and if some Bard employees are

17   taking that event description and communicating it internally

18   to the COO and CEO, why are those not adoptive admissions?

19          MR. NORTH:  Your Honor, I don't believe they should

12:00:33  20   be because they're merely just reports.  Nobody's adopting the

21   truth of what was told.  Nobody is adopting what is in the

22   medical records.  We're merely fulfilling our regulatory

23   function of passing on that information that has been

24   received.  Sometimes they are able to verify it.  Many times

12:00:55  25   they are not.  So how could they possibly be adopting as true

DIRECT EXAMINATION – CHAD MODRA

12:01:01  1    information that they have not been able to verify?

2         THE COURT:  Okay.  I understand that position.

3         Let me ask you one other question.  It seems clear to

4    me from Mr. Modra's testimony that Bard relies upon the event

12:01:16  5    description for purposes of reports to senior management, for

6    purposes of tracking and trending, and for purposes of reports

7    to the FDA.  It also seems it seems to me that Mr. Modra

8    established that Bard has a substantial interest in the

9    accuracy of the reports and does what it can to confirm the

12:01:39  10   accuracy.

11        Do you agree with both of those propositions?

12        MR. NORTH:  Yes, Your Honor, with the caveat they're

13   not always successful in confirming.

14        For example, I know this from personal experience and

12:01:53  15   observations.  With so many of these reports coming in through

16   litigation, basically their only method of corroborating are

17   the plaintiffs' profile forms that are filed.

18        THE COURT:  Have you looked at the  plaintiff's

19   chart to identify which complaints you think were generated by

12:02:16  20   attorneys rather than by doctors or sales representatives?

21        MR. NORTH:  No.  I'm not even positive I could do

22   that.  I can certainly find out if it's possible over lunch.

23        THE COURT:  Well, it seems to me that if I decide

24   that the *Childs* line of cases, well, *Childs* and *MRT*, only

12:02:35  25   requires that the company rely upon it and have a substantial

DIRECT EXAMINATION — CHAD MODRA

12:02:39  1   interest in its accuracy, that what is the foundation that's

2   been laid overcomes the hearsay problem if that's all that's

3   required.

4        I know you don't agree with my relying on that line,

12:02:53  5   but do you agree that under my reading of *Childs* there's not

6   some flaw in the foundation here?

7        MR. NORTH:  I respectfully don't agree with the

8   reading of *Childs*.  But based on your reading as I understand

9   it, I would agree with that, Your Honor.

12:03:07  10       THE COURT:  Okay.

11        The other two arguments I need to look at -- I'll

12   think more about that.  I want to look at *Childs* again.  But

13   the other two arguments, one is the substantial equivalence

14   argument that you've made and the other is the 403 argument

12:03:26  15  based on *Nelson* and *Schwartz*, so I'll look at those cases.

16        I'll not rule until I give plaintiff an opportunity

17   to argue.  I don't want to argue it now, I just want to make

18   sure I understand the defendants' position.

19        MR. NORTH:  If I could just say one more thing.  I

12:03:38  20  also don't believe -- or do believe, as you pointed out this

21   morning, the *Childs* case is somewhat irreconcilable with the

22   other cases we cited.

23        THE COURT:  Well, I don't know I would say

24   irreconcilable.  It's a different test.  There's nothing in

12:03:52  25  the other cases that have rejected *Childs* --

12:03:55  1          MR. NORTH:  No.

       2          THE COURT:  -- they just looked at a different

       3  requirement, which is verification.

       4          MR. NORTH:  Right.

12:04:00  5          THE COURT:  And I'm sure plaintiffs would argue the

       6  testimony shows that Bard does whatever it can to verify.

       7          MR. NORTH:  Right.

       8          THE COURT:  It can't be sure it's got it completely

       9  right, but it does what it can to verify.

12:04:12 10          Okay.  I just want to have those in mind as I look at

      11  the cases over the lunch hour.

      12          Okay.  We'll see you at 1 o'clock.

      13        (End of a.m. session transcript.)

      14                        *  *  *  *  *

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25

1                        **C E R T I F I C A T E**

2

3            I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7            I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14           DATED at Phoenix, Arizona, this 17th day of May,

15   2018.

16

17

18

19

20                          s/ Patricia Lyons, RMR, CRR
                            Official Court Reporter
21

22

23

24

25