```
1                    UNITED STATES DISTRICT COURT
2                     FOR THE DISTRICT OF ARIZONA
3
4                    _____
5    In Re:  Bard IVC Filters    ) MD-15-02641-PHX-DGC
     Products Liability Litigation )
6                                  ) Phoenix, Arizona
     _____) May 17, 2018
7    Doris Jones, an individual,  ) 1:00 p.m.
                                   )
8               Plaintiff,         )
                                   ) CV 16-00782-PHX-DGC
9          vs.                     )
                                   )
10   C.R. Bard, Inc., a New        )
     Jersey corporation; and Bard  )
11   Peripheral Vascular, Inc., an )
     Arizona corporation,          )
12                                 )
               Defendants.         )
13   _____)
14
15        BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE
16           REPORTER'S TRANSCRIPT OF PROCEEDINGS
                (AMENDED TO INCLUDE EXHIBIT DESCRIPTIONS)
17              (Jury Trial - Day 3 - P.M. Session)
                (Pages 591 through 719, inclusive.)
18
19
20
21   Official Court Reporter:
     Laurie A. Adams, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc 43
23   Phoenix, Arizona 85003-2151
     (602) 322-7256
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription
```

```
 1   APPEARANCES:

 2   For the Plaintiff:

 3           GALLAGHER & KENNEDY PA
             By:  Mark S. O'Connor, Esq.
 4           By:  Paul L. Stoller, Esq.
             By:  Shannon L. Clark, Esq.
 5           By:  C. Lincoln Combs, Esq.
             2575 East Camelback Road, Suite 1100
 6           Phoenix, Arizona 85016

 7           LOPEZ MCHUGH LLP
             BY:  Ramon Rossi Lopez, Esq.
 8           100 Bayview Circle, Suite 5600
             Newport Beach, California 92660
 9
             HEAVISIDE REED ZAIC
10           By:  Julia Reed-Zaic, Esq.
             By:  Laura Elizabeth Smith, Esq.
11           312 Broadway, Suite 203
             Laguna Beach, California 92651
12
     For the Defendants:
13           NELSON MULLINS RILEY & SCARBOROUGH LLP
             By:  Richard B. North, Jr., Esq.
14           By:  Elizabeth C. Helm, Esq.
             By:  James F. Rogers, Esq.
15           201 17th Street NW, Suite 1700
             Atlanta, Georgia 30363
16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2
     WITNESS:              DIRECT   CROSS   REDIRECT   RECROSS
 3   ROB CARR
     By Mr. Lopez             594
 4

 5

 6
     EXHIBIT                                        RECEIVED
 7   755     Document re: G2 Road Show                655
     770     Concept POA-Denali                       705
 8   1613    Document re: Recovery Filter
             Detachments                              625
 9   1149    Document re: Line Extension to the
             Simon Nitinol Filter                     622
10   1219    June 2004 HHE                            670
     1578    Caudal Migration Test Method
11           Development and G2 Filter Resistance
             Test Report, 11/27/06                    690
12   2248    PAT PowerPoint Presentation entitled "G2
             Caudal Migration Update," dated 3/2/2006 684
13   4409    G2 brochure 2                            696
     4430    Eclipse Vena Cava Filter Brochure        702
14   4433    Eclipse Vena Cava Filter Patient
             Questions & Answers                      704
15   4438    G2 Express Vena Cava Filter Brochure     700
     4554    Eclipse Vena Cava Filter Concept POA,
16           Revision 2                               632

17

18

19

20

21

22

23

24

25
```

1                          P R O C E E D I N G S

2              THE COURT:  Counsel, you may continue.

3              MR. LOPEZ:  Plaintiffs will call Mr. Rob Carr.

4              THE COURT:  All right.

5              THE COURTROOM DEPUTY:  Mr. Carr, please come forward.   01:00PM

6    Raise your right hand, sir.

7              (The witness was sworn.)

8              MR. LOPEZ:  May I proceed, Your Honor?  Thank you.

9                          ROB CARR,

10   called as a witness herein, having been duly sworn, was

11   examined and testified as follows:

12                     DIRECT EXAMINATION

13   BY MR. LOPEZ:

14   Q.  Good afternoon, Mr. Carr.  Thank you for being here.

15   A.  Good afternoon.                                          01:01PM

16   Q.  You are currently employed by Bard?

17   A.  Yes, I am.

18   Q.  And would it be the Bard Peripheral Vascular Division of

19   C.R. Bard?

20   A.  Yes.                                                     01:01PM

21   Q.  What's your current title or position there?

22   A.  I'm the vice president of international.

23   Q.  What does that mean?

24   A.  It means that I support all of our business outside of the

25   United States.                                              01:01PM

1  Q.  When you say support all of your business, is that -- why

2  don't you just explain to the jury what that means when you say

3  you support all of your business outside the United States.

4  A.  So I literally support all aspects of the business for our

5  division outside of America, be that physician training, sales       01:01PM

6  training, supply, some marketing, some R&D technical questions,

7  so me and my group support that.

8  Q.  So I have just not the word "support" before as a -- does

9  that mean that you work for somebody who gives you direction to

10  then give support to other people that are in your                   01:02PM

11  international division?

12  A.  So the way our business is structured, commercially, those,

13  let's take China, the people who work in China don't report to

14  me so I support their commercial side of their business.

15  Q.  Okay.  So in other words, your position is basically            01:02PM

16  commercial or marketing at this point?

17  A.  No, it's more than that.  It's like I described, all of the

18  above.

19  Q.  Do you have any engineering functions currently at Bard

20  where you are actually doing engineering type of activities?        01:02PM

21  A.  Again, only to answer questions or technical things that

22  someone might have.

23  Q.  Okay.  Now, is it true that there's probably no one at Bard

24  that has been more involved in the aspect of Bard IVC filters

25  than Rob Carr?                                                       01:03PM

1   A.   As a general statement I think that's probably true.

2   Q.   And I think you told us a while back that you know more

3   about Bard IVC filters than anyone else in the company.  Is

4   that true?

5   A.   I don't know if I said that.  I think others have.          01:03PM

6   Q.   Now, in fact, you have had your deposition taken 10, 11, 12

7   times in this litigation, is that right?  Do you remember that?

8   A.   I don't know how many.  Several.

9   Q.   And you know that you have been designated a number of

10  times by Bard or its lawyers to testify as a person most        01:03PM

11  knowledgeable or most qualified on a number of Bard IVC filter

12  related topics.  True?

13  A.   Yes.

14  Q.   You have been designated to be that person most

15  knowledgeable to discuss risks, complications in sales.  True?  01:04PM

16  A.   I don't know specifically.

17  Q.   Do you want to look at -- do we need to look at your

18  depositions to remind you about that?

19  A.   Yes, please.

20  Q.   Well, let me ask you, can we look at 730, then, Exhibit    01:04PM

21  730?  That's the deposition notice.  That was -- I'm sorry it's

22  a deposition taken April 17, 2003.  I'm sorry, 2013.

23        Does this refresh your recollection that your

24  deposition was taken as a person most knowledgeable on that

25  date?  Is there a next page to this?  Keep going.  That lists   01:05PM

1    the subject matter.  Keep going.  There we go.

2           MR. LOPEZ:  Can I admit this, Your Honor, and publish

3    it to the jury as a deposition notice?  This is a deposition of

4    subject matter.

5           MR. NORTH:  Objection 402 and 403 and in violation of      01:05PM

6    the Court's ruling on Motion in Limine./HRO*P /HROP I don't

7    think this page is, Your Honor.

8           THE COURT:  Sustained.

9    BY MR. LOPEZ:

10   Q.  Okay.  Mr. Carr, you were designated as a person most      01:05PM

11   knowledgeable to discuss risks and complications associated

12   with the Recovery, G2, G2 Express Filters in a deposition taken

13   April 17, 2013.  True?

14   A.  I don't know the exact reasons.

15   Q.  Look at the screen.                                         01:05PM

16   A.  Oh.  Yes.

17   Q.  And you were also designated to be a person most

18   knowledgeable to talk about the sales brochure for G2 filters.

19   Do you recall that -- it's not on this.  Don't look at the

20   screen -- at another deposition?                               01:06PM

21   A.  Again, you would have to -- I don't know the specific

22   reasons.

23   Q.  Well, two months ago I asked you this question:  Were you

24   designated as a person most knowledgeable to testify about

25   Bard's sales brochures for the G2 Filter?  Do you remember      01:06PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    that?

2              MR. NORTH:  Objection, Your Honor 402.

3              THE COURT:  Overruled.

4              THE WITNESS:  Not specifically, no.

5    BY MR. LOPEZ:                                                01:06PM

6    Q.  Well, let me ask you, sir, prior to your coming here to

7    today to testify, did you prepare yourself to testify?

8    A.  Yes.

9    Q.  I mean, did you prepare yourself to look at your history of

10   your involvement in giving depositions so you could give the   01:06PM

11   jury the best testimony that you possibly could today and the

12   most truthful testimony?

13   A.  I didn't read every document, if that's what you are asking

14   me.  But yes, I prepared.

15   Q.  And as part of that preparation, you didn't look at any of   01:07PM

16   the prior depositions that you have given in this litigation?

17   A.  I didn't say that.

18   Q.  Did you look at the deposition that you took -- I mean that

19   was taken on October 29, 2014?

20   A.  I don't know.                                             01:07PM

21   Q.  And were you a person most knowledgeable at that deposition

22   on the sales brochure for the G2 Filter?

23   A.  I don't know.

24   Q.  Let's look at 753, please.  That's the deposition taken on

25   10-29-2014.                                                   01:07PM

1      MR. LOPEZ:  Go to the page that describes the subject

2  matter for which Mr. Carr was designated as a person most

3  knowledgeable since he doesn't remember.  There we go.  Keep

4  going one more.

5  BY MR. LOPEZ:                                                  01:08PM

6  Q.  Sir, this deposition was taken on October 29, 2014, just to

7  refresh your recollection.  Does this help refresh your

8  recollection about the subject matter for which you were being

9  deposed on that day?

10 A.  Yes.  But I don't see those words on this page.            01:08PM

11 Q.  Can we go to the exhibit that's attached?

12      Okay.  This is the G2 brochure?

13 A.  Yes.

14 Q.  And you really don't remember that you were designated as a

15 person to talk about the sales material as they relate to the  01:09PM

16 Recovery and G2 Filter three years ago?

17 A.  As you said, I have been deposed many times.

18 Q.  All right.  Let's see if you and I can agree on some

19 things.

20      The Recovery, the G2, the G2 Express, as well as the      01:09PM

21 Eclipse and any other so-called retrievable device that is

22 being marketed by Bard should perform as well as permanent

23 filters.  True?

24 A.  They perform differently than permanent filters, so not in

25 every case, no.                                                01:10PM

1    Q.  But they should perform as well from the patient's safety

2    standpoint, should they not?

3    A.  They must be safe and effective, yes.

4            MR. LOPEZ:  Can we go to Mr. Carr's deposition

5    November 5, 2013, beginning at Page 41, Line 11.  I'm sorry.      01:10PM

6    October 25, 2013, Page 41.

7    BY MR. LOPEZ:

8    Q.  Do you have it in front of you, sir?

9    A.  Yes.

10   Q.  Okay.  This must be the wrong deposition.  Is this 11-5-13   01:11PM

11   or 11-25-13?

12          (Discussion off the record.)

13   BY MR. LOPEZ:

14   Q.  There we go.  Okay.  Sir, see the deposition in front of

15   you, Line 11?                                                    01:12PM

16   A.  Yes.

17   Q.  You were asked this question:  Sir, would you agree that

18   optional filters, the Recovery, the G2, the G2 Express should

19   perform as well as permanent filters?  And your answer was yes.

20   Do you see that?                                                 01:12PM

21   A.  Yes.

22   Q.  Now we go to 41, same deposition, 41:19, I'm going to ask

23   you the same question.  The Recovery era, the G2 era and the G2

24   Express, did Bard have a truly permanent filter that was

25   commercially available?  And your answer is:  All of them are    01:12PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    truly permanent.  Right?

2    A.  Yes.

3    Q.  So when we talk about Bard retrievable filters, they are

4    permanent filters?

5    A.  Some are only permanent and some are optionally removed.        01:13PM

6    Q.  Right.  But as a permanent filter, they should be as safe

7    and effective as any other permanent filter on the market, in

8    particular, its predicate device the Simon Nitinol Filter.

9    True?

10   A.  No.  Different filters have different advantages and          01:13PM

11   disadvantages so not as -- they should all be safe and

12   effective.

13   Q.  Let me ask you, shouldn't the Bard filters perform at least

14   as well from a safety and effectiveness standpoint and as the

15   Simon Nitinol Filter?                                             01:13PM

16   A.  They should all meet their specification which shows that

17   they are both safe and effective.

18   Q.  Can we go to Page 44, Line 14 of the same deposition.

19          Sir, you were asked:  So shouldn't the G2 still

20   perform as well as the Simon Nitinol Filter?  On that day you     01:13PM

21   gave me a simple answer which was yes.  True?

22   A.  Yes.

23   Q.  Now, you don't sacrifice safety when you design a filter to

24   have a retrievable option, do you?

25   A.  No.  Again, all of our devices are both safe and effective.   01:14PM

1    Q.  I didn't ask you that question.  I asked you -- Mr. North,

2    in his opening statement, seemed to indicate that it was a

3    little bit more difficult to design an optional filter.  You

4    had to make some compromises.  Would you agree that you don't

5    make compromises to make a device retrievable in the area of          01:14PM

6    safety?

7    A.  No.  Again, they are all safe and effective.

8    Q.  Would you agree that stability and integrity of the filter

9    should not be different whether or not it's being implanted in

10   a patient to be there permanently or potentially to be removed       01:14PM

11   later?

12   A.  I'm sorry.  Could you say that again?

13   Q.  Well, you know what the word stability means as relates to

14   an IVC filter?

15   A.  Stability?  Yes.                                                  01:15PM

16   Q.  In fact, it's on one of your brochures.  You brag about how

17   the G2 has taken stability to a new level, correct?

18   A.  First of all, we don't brag about anything.

19   Q.  Well, stability is an important word when it comes to the

20   safety of IVC filters.  You would agree with me, wouldn't you?       01:15PM

21   A.  I would.

22   Q.  And integrity, do you know what integrity means as it

23   relates to a filter?

24   A.  I do.

25   Q.  What does integrity mean?                                        01:15PM

1   A.  It means that it stays together.

2   Q.  So it shouldn't break and should stay where you put it.

3   That's the purpose.  That's the idea in designing an IVC

4   filter.  Correct?

5   A.  That is the goal, yes.                                    01:15PM

6   Q.  And that stability, that integrity, should not be different

7   whether or not the device is being implanted to stay in

8   permanently or implanted to potentially be taken out later.

9   True?

10  A.  Again, they are all --                                    01:15PM

11  Q.  Sir, is that true or not?

12  A.  No, it's not.

13  Q.  So they can have different stability and integrities

14  depending upon whether or not it's left in permanently or comes

15  out, say, sometime after it's implanted?  Is that what you are  01:16PM

16  telling the jury?

17  A.  Yes.  I'm saying that they have different performance

18  specifications that all show that they are both safe and

19  effective.

20  Q.  So when you were selling the Eclipse Filter, the G2 Filter, 01:16PM

21  the Recovery Filter, were you telling doctors that if you are

22  going to leave this in permanently it has a different safety

23  profile than if you take it out after a certain period of time?

24  Yes or no?

25  A.  No.                                                       01:16PM

1    Q.  You were telling them that the G2, the Eclipse would

2    perform safely and effectively whether or not you were putting

3    it in short-term or whether or not you were going to leave it

4    in for the life of the patient.  True?

5    A.  Yes, and it does.                                          01:16PM

6    Q.  Other than the Asch pilot study that we heard some

7    testimony about yesterday for retrievability of the Recovery

8    Filter, and the EVEREST trial for retrievability of the G2

9    Filter, there has been no Recovery, G2, G2X, G2 Express, or

10   Eclipse Filter that has undergone a controlled clinical trial   01:17PM

11   where patients are enrolled and monitored.  True?

12   A.  Other than those two, no.

13   Q.  There has never been a long term monitored and controlled

14   clinical trial of any Bard filter from Recovery to and

15   including Eclipse specifically designed to determine safe       01:17PM

16   retrievability beyond 180 days.  True?

17   A.  Not beyond 180 days.  But the time period is very long.

18   Q.  And there never been a long term monitored or controlled

19   clinical trial of any Bard filter, up to and including Eclipse,

20   specifically to determine long term safety and effectiveness as  01:17PM

21   a permanent device.  True?

22   A.  Not past 180 days, no.

23   Q.  The Asch study provided data for retrieval in less than 50

24   patients with an average time to retrieval of 53 days.  True?

25   A.  I don't know.                                              01:18PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    Q.  You don't know anything about the Asch study?

2    A.  I know a lot about the Asch study --

3    Q.  Not about that aspect --

4            MR. NORTH:  Your Honor, could he allow the witness.

5            THE COURT:  Would you please let the witness answer        01:18PM

6    before you interrupt, Mr. Lopez.

7            MR. LOPEZ:  Sorry.

8            THE WITNESS:  I know a lot about the Asch study.  I

9    just don't know exact numbers.

10   BY MR. LOPEZ:                                                      01:18PM

11   Q.  And EVEREST provided data for retrieval in less than 50

12   patients with an average time of retrieval of 140 days.  True?

13   A.  Again, I don't know those numbers, no.

14   Q.  Would you agree with -- do you know who Mr. Chris Ganser

15   is?                                                               01:18PM

16   A.  Yes.

17   Q.  Who is Mr. Chris Ganser?

18   A.  He was a -- I don't know his exact title but he was a head

19   of quality.

20   Q.  He was head of quality at the corporate level at C.R. Bard.   01:18PM

21   True?

22   A.  Yes.

23   Q.  He would have been someone that would have had on the

24   hierarchy a very high position, very close to the president and

25   CEO.  True?                                                       01:19PM

1    A.  I don't know who he reported to, but he worked at the

2    corporate office.

3    Q.  Would you agree with Mr. Ganser if he said that

4    transparency in matters that affect patients' safety should be

5    embraced as a primary corporate obligation.  Do you agree with        01:19PM

6    that?

7    A.  I do.

8    Q.  Now, the ultimate decision about -- would you agree with

9    this, sir:  That the ultimate decision about the acceptability

10   of inherent risks associated with Bard IVC filter rests with         01:19PM

11   the patient who is going to receive the filter?

12   A.  I don't know that.  I think it might be the doctor.

13   Q.  You think -- you are not familiar with the informed consent

14   requirement before one of your medical devices can be implanted

15   in a patient?                                                         01:19PM

16   A.  Yes.

17   Q.  You know that ultimately, the person who needs to make the

18   decision about whether or not to implant something in their

19   body that's potentially dangerous is the patient?

20   A.  I don't know.  I think I listen to my doctors, so I'm            01:20PM

21   not --

22   Q.  I know.  But the decision, I'm talking about.  I mean --

23   A.  Yes.  They sign a consent.

24   Q.  Thank you.  Your wife is a doctor, right?

25   A.  My wife is an immunologist.                                      01:20PM

1    Q.  And you know about informed consent, right?

2    A.  No, she doesn't practice.

3    Q.  When she was practicing she just couldn't treat patients

4    and give them whatever she wanted to give them.  She had to

5    have an informed consent discussion with them and give her all          01:20PM

6    the various options of treatment and the patient had to say

7    yes.  True?

8    A.  No.  My wife never practiced.

9    Q.  Okay.  But you know that as being married to a doctor that

10   that's how it works in the real world, that patients are the          01:20PM

11   ones who have to be informed and be provided with information

12   so that they can make the decision on whether or not they want

13   something implanted in their body.  Right?

14   A.  I know that patients sign consents.

15   Q.  And certainly people at Bard, the marketing department, the        01:21PM

16   sales department, and other departments shouldn't be making

17   decisions on behalf of people like Doris Jones as to whether or

18   not the risks of your devices are acceptable to her.  True?

19   A.  No, I don't believe that.

20   Q.  You don't believe what?                                            01:21PM

21   A.  That we don't make those determinations.

22   Q.  You shouldn't?

23        THE COURT:  Are you saying should or should not?

24   BY MR. LOPEZ:

25   Q.  Bard should not be making decisions about acceptability,           01:21PM

1   about risks that are acceptable to patients like Doris Jones.

2   Do you agree with that?

3   A.  No, I don't.  I don't understand your question maybe.

4   Q.  Maybe you don't.

5          Will you agree with this, sir, that patients are       01:22PM

6   entitled to receive full disclosure of all material information

7   that Bard possesses about safety, performance, design

8   deficiencies, and complications in order to make informed

9   decisions about whether or not to consent to the insertion of a

10  Bard IVC filter in their body.  Do you agree or disagree with   01:22PM

11  that?

12  A.  I don't think I agree with that fully, no.

13  Q.  Sir, do you agree that it is a reasonable expectation of

14  doctors and patients that they treat that medical device

15  companies provide honest, accurate, and updated information     01:22PM

16  about the safety and effectiveness of its potentially dangerous

17  products to allow doctors to fulfill their obligation of

18  informed consent to the patient?

19  A.  Yes, and we do.

20  Q.  In order for a physician caring for patients who are        01:22PM

21  candidates for IVC filters to provide their patients with

22  appropriate informed consent, the companies who manufacture,

23  market, and profit from these devices must provide current and

24  up-to-date information about the frequency, severity, and type

25  of complications associated with their specific filter.  Do you 01:23PM

1  agree with that, sir?

2  A.  No, I don't.

3  Q.  Do you agree that the experiences of other physicians with

4  the use of potentially dangerous medical devices like IVC

5  filters, especially new devices, and particularly when there's     01:23PM

6  no controlled clinical trial that exists that provides data for

7  long term safety and effectiveness is important information to

8  share with other doctors?

9  A.  But there is clinical trial data.

10  Q.  I said long term safety and effectiveness information.     01:23PM

11  A.  There is long term safety and effectiveness.

12  Q.  And where did you get that?

13  A.  From the EVEREST trial.

14  Q.  I'm sorry?

15  A.  EVEREST trial.     01:23PM

16  Q.  The EVEREST trial where you follow a patient for 180 days

17  and didn't follow them after?  That's the long term study that

18  you did?

19  A.  Yes.

20  Q.  That's long term?     01:24PM

21  A.  Yes.

22  Q.  And so that's a study where I think about a third of the

23  people went on and weren't followed and Bard knows nothing

24  about what happened to those people and you consider that a

25  long term safety and effectiveness study.  True?     01:24PM

1    A.  Yes.  All trials have an end point.

2    Q.  I understand.  But that study, sir, the purpose of that

3    study -- and the study was designed to determine whether or not

4    a G2 Filter can be retrieved within 180 days.  True?

5    A.  Among other things.                                      01:24PM

6    Q.  But, sir, that part of it was true.  Right?

7    A.  Yes.

8    Q.  It wasn't designed to follow patients after 180 days.

9    True?

10   A.  That's correct.                                          01:24PM

11   Q.  So you know nothing about what happened to patients like

12   Ms. Jones who had a filter in her for a year, two years, three

13   years, four years after they received a filter like the G2

14   Filter.  True?

15   A.  Unless they came back for a removal.                     01:25PM

16   Q.  But you didn't ask them to, right, you didn't follow them?

17   A.  No.  It's the physician's discretion on when a filter gets

18   removed.

19   Q.  Now, I asked you about the experience of other physicians,

20   and we just heard from Mr. Modra.  And one of the primary ways  01:25PM

21   that Bard finds out about experiences of other physicians is

22   when physicians voluntarily report adverse events to Bard.

23   Correct?

24   A.  Yes.  That's one way.

25   Q.  And we know that -- well, let me ask you.  Isn't it true  01:25PM

1    that Bard has never formally initiated a registry to follow

2    patients among any physician population to see how patients do

3    after one of your devices is implanted in them?

4    A.   I don't think so.

5    Q.   And you know what a registry is, right?                    01:26PM

6    A.   I do.

7    Q.   What is a registry?

8    A.   A study, if you will, done on product that is already on

9    the market.

10   Q.   That's how you gather clinical data on patients who may   01:26PM

11   have one of your devices in long term because you didn't have a

12   long term study for the Eclipse device before you put it on the

13   market, did you?

14   A.   No.   I disagree.

15   Q.   What was the long term study called that related to the   01:26PM

16   Eclipse?

17   A.   The EVEREST trial.

18   Q.   I'm glad you said that.   So what we're talking about with

19   respect to the Eclipse, that the information that was provided

20   in the EVEREST trial is applicable to the Eclipse Filter.      01:27PM

21   True?

22   A.   A lot of it, yes.

23   Q.   Sir, would you agree with me that medical device companies

24   are required to follow federal regulations with or without FDA

25   enforcement?                                                   01:27PM

1  A.  I don't know what that means, but it is a regulated

2  industry, yes.

3  Q.  What was it you didn't understand when I asked you whether

4  or not a medical device company was required to follow federal

5  regulations with or without FDA enforcement?                    01:27PM

6  A.  I don't know what "with or without FDA enforcement" is.

7  Q.  In other words, you have to follow federal regulations

8  whether or not FDA is knocking on your door and saying follow

9  this regulation.  You have to follow your regulations, right?

10  A.  Of course.                                                  01:27PM

11  Q.  Mr. Modra -- Mr. O'Connor asked Mr. Modra, FDA doesn't hang

12  out at Bard, right?

13  A.  No, they don't.

14  Q.  And there's no one at Bard that hangs out at FDA, right?

15  A.  We visit with the FDA often.                                01:27PM

16  Q.  I'm talking about was there for their everyday activities?

17  A.  No.

18  Q.  When you send in one of these Med Watch reports that get

19  into the MAUDE database, you don't know what happens to it when

20  it gets to the FDA, do you?                                     01:28PM

21  A.  It gets put in the MAUDE database.

22  Q.  That's what happens.  What else besides that happens?  You

23  don't know, do you?

24  A.  I don't know.

25  Q.  Sir, would you agree that it's illegal to sell a misbranded  01:28PM

1    or adulterated medical device?

2    A.  I would.

3    Q.  And if a company wanted to know whether or not it was

4    selling a device that was misbranded or adulterated, they just

5    have to look up in the federal regulations as to what those two          01:28PM

6    terms or how those two terms are defined.  True?

7    A.  I don't understand your question.  Sorry.  Yes.  I can look

8    up terms.

9    Q.  I said if a company wanted to know whether or not it was

10   selling a misbranded or adulterated medical device, they could          01:29PM

11   look up those terms in federal regulations to see how they are

12   defined?

13   A.  Yes.  We could look them up.

14   Q.  And if as you look them up, and as they are defined, the

15   device is misbranded or adulterated, it's misbranded or                 01:29PM

16   adulterated even if the FDA isn't telling you that it is.

17   True?  Is that true or not, sir?

18   A.  I guess so.  It's a hypothetical question.  I don't know.

19   Q.  And, sir, would you agree that the safe design of Bard

20   filters are the exclusive responsibility of Bard and no one             01:29PM

21   else?

22   A.  Yes.

23   Q.  If Bard is aware of design deficiencies in any of its IVC

24   filters, in other words, there's data that suggests and there's

25   discussions and analysis of your devices that say, you know            01:30PM

1    what, I think we ought to do something about this design.  It

2    may be increasing the risk of certain complications.  You don't

3    need the FDA to tell you it's defectively designed.  It's your

4    responsibility to know whether or not a device is defectively

5    designed?                                                          01:30PM

6    A.   They are not defectively --

7    Q.   Do you agree?

8    A.   I do not agree they are defectively designed.

9    Q.   I didn't ask you --

10         MR. NORTH:  Your Honor, he's arguing with the witness.      01:30PM

11         THE COURT:  Excuse me.  Mr. Lopez, wait for the

12   answer.  Re-ask the question.

13         MR. LOPEZ:  Your Honor, could I just ask the witness

14   be responsive to my questions?

15         THE COURT:  If you want to have him say yes or no,          01:30PM

16   tell him that.

17         MR. LOPEZ:  If okay.

18         THE COURT:  If he asks you for a yes or no answer, Mr.

19   Carr, you can either say yes or no, or you can say I can't

20   answer that yes or no, in which event he can ask you another     01:30PM

21   question.

22         THE WITNESS:  Thank you.

23   BY MR. LOPEZ:

24   Q.   Sir, if the company -- take this as a hypothetical for now.

25   If Bard determines that it is experiencing increased,            01:31PM

1  unexpected complications with the design of a filter after it's

2  been on the market for a short period of time and that they

3  have determined that the filter needs to be designed

4  differently, you don't wait for FDA to tell you that to know

5  that you need to redesign the filter.  True?  Yes or no?          01:31PM

6  A.  Yes, in that hypothetical.

7  Q.  I think I have asked you this already, but would you agree

8  that expectations and acceptability of the risks and benefits

9  of a Bard IVC filter are exclusively the rights of a doctor and

10  his or her patient?                                              01:31PM

11  A.  I don't understand that question.  I'm sorry.

12  Q.  Well, Dr. Ciavarella understood it when I asked him at his

13  deposition.

14          THE COURT:  Excuse me.  No more commentary on the

15  answers.  Just ask questions.                                    01:32PM

16  BY MR. LOPEZ:

17  Q.  Sir, would you agree with Dr. Ciavarella -- who is Dr.

18  Ciavarella?

19  A.  He is the head of clinical affairs for Bard.

20  Q.  Back at the time of the Eclipse Filter and the G2 Filter,    01:32PM

21  Recovery Filter, he was the only medical doctor on the team

22  involved with actual internal, employed by Bard team, he was

23  the only medical doctor.  True?

24  A.  Maybe.  Yes.

25  Q.  Okay.  If Dr. Ciavarella testified that expectations and     01:32PM

1    acceptability of the risks and benefits of a Bard IVC filter

2    are exclusively the rights of a doctor and his or her patient,

3    would you agree?

4    A.  I don't understand the context.  I'm sorry.  I'm missing

5    something.                                                          01:32PM

6    Q.  Sir, the information you, meaning Bard, provide doctors

7    should be what is important to doctors and ultimately to

8    patients in an informed consent situation about whether or not

9    they choose a Bard IVC filter, a competitor's filter, or some

10   other alternative means of treatment or therapy.  True?           01:33PM

11   A.  Yes.

12   Q.  And there is no higher duty that a device company has than

13   to make sure the doctor has all the risk benefit information he

14   or she needs to decide whether or not to use the company's

15   product, a different product, or to seek other alternatives of    01:33PM

16   treatment for his or her patient.

17        Do you agree with that?

18   A.  I don't understand what you mean by "no higher duty."  Yes.

19   We inform physicians.

20   Q.  But I'm talking about no higher -- do you think of a higher   01:33PM

21   duty you have as a medical device manufacturer than what I just

22   read, and that is to make sure that doctors have all the risk

23   benefit information they need to determine whether or not to

24   use your product, a different product, or to seek other

25   alternatives of treatment for his or her patient?                 01:34PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    A.   I think all the relevant information, yes.

2    Q.   No higher duty.  Would you agree with that?

3    A.   Of the relevant information, yes.

4    Q.   Let's talk a little bit about you and your life with IVC

5    filters.  You started that track when you were employed by          01:34PM

6    Nitinol Medical Technologies.  True?

7    A.   Yes.

8    Q.   And tell us a little bit about that.

9    A.   Nitinol Medical Technologies was a small company in Boston

10   that was developed by a world famous interventional radiologist    01:34PM

11   named Morris Simon.  And we had two primary products that we

12   worked on.

13          One was a device to fix a hole in your heart, and then

14   the other one was a vena cava filter.  So the Simon Nitinol

15   Filter, which is the first Nitinol device, which is what our        01:35PM

16   filters are made of in the world was named after him.  He was

17   very passionate about vena cava filters.  I was fortunate to

18   come there and be one of probably about 15 employees.

19          And so we had the Simon Nitinol Filter and Dr. Simon

20   felt that it was very important to develop a new filter that       01:35PM

21   was removable.  So at the time in the world there were no

22   removable filters.  So a lot of patients who could and should

23   get filters probably weren't.

24          And so we embarked on a journey to develop that filter

25   which the first one became Recovery, which was sold to Bard at     01:35PM

1    some point, 2001, and I moved to Bard in 2002.

2    Q.  Okay.  You came to Bard in 2002 because Bard had acquired

3    NMT, right?

4    A.  I came on my own, but yes.

5    Q.  Well, I mean, Bard had acquired the technology of the          01:36PM

6    Recovery Filter?

7    A.  They had, but they chose to hire me.

8    Q.  And there was a dispute that went on for about a year

9    between Bard and NMT about whether or not Bard was going to buy

10   them or someone else was going to buy that technology.  Do you   01:36PM

11   remember that?

12   A.  Yes, before that.

13   Q.  And during that year, basically the R&D with respect to the

14   Recovery Filter had shut down other than the Asch study, I

15   think, continued.  True?                                         01:36PM

16   A.  It didn't shut down.  It was completed.  The filter was

17   essentially designed and it was being studied in the Asch

18   Study.

19   Q.  Nothing else was going on other than following what was

20   going on with Dr. Asch's patients, correct?                      01:37PM

21   A.  I don't know about nothing else, but no in general.

22   Q.  Then were you part of the due diligence team when Bard was

23   looking at acquiring NMT?

24   A.  I was.

25   Q.  And isn't it true that one of the compelling reasons why     01:37PM

1   NMT chose Bard was because of Bard's relationship in the

2   commercial world with doctors and they had a sales force and

3   they had ins at hospitals?

4   A.   The primary reason was Bard was already selling our Simon

5   Nitinol Filter.  They were already selling the Simon Nitinol          01:37PM

6   Filter so they were a very logical partner to purchase the

7   design.

8   Q.   Do you recall that they had about 100 sales reps during

9   that period of time?

10  A.   I don't know the number.  That sounds high.                      01:37PM

11  Q.   How about 10 district managers and three regional managers.

12  Does that sound too high?

13  A.   I don't know.

14  Q.   Who was the marketing manager at the time?

15  A.   At Bard?                                                          01:38PM

16  Q.   Yes.

17  A.   Paul Stagg, I believe.

18  Q.   And someone named Janet Hudnall later became the marketing

19  manager for the Recovery Filter?

20  A.   After it moved to Arizona.                                        01:38PM

21  Q.   Now, you mentioned the Simon Nitinol filter.  We have heard

22  that a few times here.  And the Simon Nitinol Filter is only a

23  permanent filter, correct?

24  A.   It was only a permanent filter, yes.

25  Q.   Bard stopped selling it, what, about a year ago?                  01:38PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    A.  18 months maybe.  I don't know.

2    Q.  We may talk about that a little bit later.

3           Now, when the Simon Nitinol Filter was being sold by

4    NMT, and then after it was being sold by Bard -- let me

5    rephrase that.                                                    01:38PM

6           Actually, Bard was the marketing arm of the Simon

7    Nitinol Filter even when it was being manufactured by NMT,

8    correct?

9    A.  Yes.

10   Q.  And during that period of time, did Bard and NMT have to    01:39PM

11   follow the same requirements of reporting adverse events to

12   FDA?

13   A.  Yes.

14   Q.  In other words, whether or not it was a permanent filter, a

15   retrievable filter, and whether or not the report went to Bard    01:39PM

16   or whether or not it went to NMT, there was a requirement to

17   report that to FDA, right?

18   A.  I'm not sure of that, actually.

19   Q.  But Bard was able to obtain, before they launched the

20   Recovery Filter, whatever data that NMT had about the Simon        01:39PM

21   Nitinol Filter's safety and performance.  True?

22   A.  Yes.

23           MR. LOPEZ:  Okay.  Could we see Exhibit 1149, please,

24   Gay.  Show it to the witness for now.

25   BY MR. LOPEZ:                                                      01:40PM

1    Q.  Sir, are you familiar with this document?

2    A.  Only from yesterday.

3    Q.  You saw it yesterday for the first time?

4    A.  Yes.

5    Q.  And, sir, if you would look at -- this is a Nitinol Medical    01:40PM

6    Technologies -- do you know what a line extension to the Simon

7    Nitinol Filter refers to?

8    A.  Ultimately the Recovery Filter.

9    Q.  And if you look at Page 17 of this document, in the first

10   paragraph, this would have been a document that Bard would have    01:40PM

11   received as part of its due diligence from Nitinol Medical

12   Technologies.  True?

13   A.  I don't know where Bard got it, but I would assume so.

14   Q.  This was about the Trademark Retrievable Filter.  Isn't

15   that another name for the Recovery Filter?    01:41PM

16   A.  No.  It's not another name.  There was no name to Recovery

17   Filter when this draft was initiated.

18   Q.  My apologies.  That is referring to what ultimately became

19   the Recovery Filter.  True?

20   A.  Yes.    01:41PM

21   Q.  Okay.  And does this document provide information about the

22   reports of filter fracture, the rate of filter fractures that

23   was available to NMT as of July 1997?

24   A.  There's a paragraph in this very early draft document that

25   does say that.  But I don't know what this document is.    01:41PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1   Q.  All right.

2              MR. LOPEZ:  Your Honor, I would still like to offer

3   this into evidence.  And I could lay a foundation that it was

4   produced to us as an NMT document bearing -- this is part of

5   the due diligence.  It bears a Bard Bates stamp number that was    01:41PM

6   produced to us as a document kept in the ordinary course of

7   business.

8              MR. NORTH:  No objection, Your Honor.

9              THE COURT:  1149 is admitted.

10             MR. LOPEZ:  May I publish this to the jury, Your        01:42PM

11  Honor, please?

12             THE COURT:  Yes.

13  BY MR. LOPEZ:

14  Q.  Just to give us some perspective, the Simon Nitinol Filter

15  was the predicate device that allowed the Recovery Filter to be    01:42PM

16  cleared to be marketed in the United States.  Yes or no?

17  A.  Yes.

18  Q.  And which meant that --

19             THE COURT:  Hold on just a minute Mr. Lopez.

20             Check that monitor.                                     01:42PM

21             THE COURTROOM DEPUTY:  Do you mind if they slide over?

22             THE COURT:  Go ahead and slide over just two seats.

23             You can go ahead, Mr. Lopez.

24             MR. LOPEZ:  Thank you, Your Honor.

25  BY MR. LOPEZ:                                                      01:43PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1   Q.  As a predicate device, in order to be cleared, it is

2   required that the Recovery Filter had to be substantially

3   equivalent to the Simon Nitinol Filter from a safety and

4   effectiveness standpoint.  True.

5   A.  As well as the Greenfield Filter.                          01:43PM

6   Q.  As well as the Greenfield.  Both.  Not either but both,

7   right?

8   A.  They were both predicate devices.

9   Q.  And we heard from Carol Vierling earlier today who

10  ultimately testified that even the clinical data as it relates  01:43PM

11  to the Simon Nitinol Filter was important to consider for

12  substantial equivalence.  Do you agree with that?

13  A.  I think all of the data is important.

14  Q.  Here's the data that Bard had in a 1997 document about

15  fractures associated with the Simon Nitinol Filter.            01:44PM

16          As of 1997, how long had the Simon Nitinol Filter been

17  on the market?

18  A.  Six years, I believe.

19  Q.  Actually, it says that NMT --

20  A.  Nine years.                                                01:44PM

21  Q.  Over nine years.  What does in vivo experience mean?

22  A.  In humans.

23  Q.  In people, right?

24  A.  Yes.

25  Q.  And NMT has reviewed their clinical trial database, their  01:44PM

1   post-marketing complaint files, and the literature to identify

2   any fatigue-related issues associated with the SNF.  That's the

3   Simon Nitinol Filter, correct?

4   A.  Yes.

5   Q.  And there were two reports of asymptomatic filter fracture      01:44PM

6   identified for a rate of 0.006 percent.  Did I read that

7   correctly?

8   A.  You did.

9   Q.  Then it cites McCowen 1992.  Do you see that reference?

10  A.  I do.                                                          01:45PM

11  Q.  And NMT has concluded that fatigue of the SNF has not been

12  a clinical problem.  Bard knew that in 1997, right?

13  A.  If they read the document, yes.

14  Q.  They should have read the document if they were doing their

15  due diligence, number one; number two, if they were going to       01:45PM

16  establish substantial equivalence for the SNF they should have

17  known about this clinical history.  Would you agree with me?

18  A.  No, I don't agree because this is a very early draft with

19  very little information in it.

20          MR. LOPEZ:  Let's go to Exhibit 1613, please, Gay.         01:45PM

21  Very first page.

22  BY MR. LOPEZ:

23  Q.  Sir, who is Cindi Walcott?

24  A.  She worked in our quality department.

25  Q.  And you heard me talk about Dr. Ciavarella?                    01:46PM

1    A.   Yes.

2    Q.   And Dr. David Ciavarella was the medical director at Bard,

3    correct?

4    A.   He said he's had various roles.

5    Q.   This is regarding Recovery Filter detachments.  Do you see          01:46PM

6    that?

7    A.   In the subject, yes.

8    Q.   And earlier today Mr. Modra clarified that a detachments

9    mean fractures.  Would you agree with that?

10   A.   I would.                                                             01:46PM

11   Q.   And does this provide additional information to Bard about

12   the history of the Simon Nitinol Filter?

13         MR. LOPEZ:  Gay, could you call out that second full

14   paragraph where it says "today."

15         Your Honor, I'd like to offer this Exhibit 1613 into               01:46PM

16   evidence at this time and ask for --

17         MR. NORTH:  No objection.  I'm sorry.  No objection.

18         THE COURT:  Admitted.

19         MR. LOPEZ:  May I publish it to the jury?

20         THE COURT:  Yes.                                                    01:47PM

21   BY MR. LOPEZ:

22   Q.   This is in 2004.  This is about seven years later, right?

23   A.   Yes.

24   Q.   And if Bard was doing their duty in fulfilling their

25   obligation they would have been tracking the Simon Nitinol               01:47PM

1   Filter just like they were tracking the Recovery Filter with

2   respect to complaints from doctors, right?

3   A.  Yes.

4   Q.  And making sure those got reported to the MAUDE database.

5   True?                                                              01:47PM

6   A.  No.

7   Q.  No?

8   A.  I don't think everything was reported at that point.  The

9   instructions on what to report have changed over time.

10  Q.  In reality, this the data here has nothing to do with       01:47PM

11  MAUDE.  This is data that Bard has.  They didn't have to go to

12  MAUDE to get the information that's contained in this document,

13  right?  This is information that Bard had internally in their

14  own files.  Agreed?

15  A.  Yes.                                                          01:48PM

16  Q.  In fact, this reads:  Today I reviewed all detachments

17  reports as complaints for our Simon Nitinol vena cava filter,

18  SNF.  Our electronic database goes back to 2000.  There were

19  just two reports of fractures/detachments out off 67,800 global

20  units sold during this time frame.                               01:48PM

21          Did I read that correctly?

22  A.  Yes, you did.

23  Q.  And this only goes back to 2000, so we don't know what

24  happened between 1997 and 2000, at least with the documents I

25  have shown you thus far.  Correct?                               01:48PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1   A.  Yes.

2   Q.  But we know as of 1997 the complaint -- the fracture rate

3   was .006?

4   A.  We know the reported fracture rate was 006.

5   Q.  You don't know what the real rate is because you never did      01:49PM

6   a study that would follow patients beyond 180 days to see how

7   many fractures people might have if they had the device in for

8   one year, two years, five years, 10 years.  True?

9   A.  Yes.  We did not do that study.

10  Q.  Thank you.  Now, during the entire time that the Simon          01:49PM

11  Nitinol Filter was on the market, did there ever have to

12  undergo any design changes?

13  A.  Yes.

14  Q.  Any design changes that made it more durable to migration

15  or fractures?                                                        01:49PM

16  A.  I don't know about fracture.  Not migration.

17  Q.  Did you ever have to do a health hazard evaluation with

18  respect to any adverse events that were being reported to Bard

19  about the Simon Nitinol Filter?

20  A.  No.                                                              01:49PM

21  Q.  It was sold internationally, too, wasn't it?

22  A.  Yes, but not very many places.

23  Q.  Were there any internal discussions within Bard about the

24  Simon Nitinol Filter that involved any controversies regarding

25  its design, its safety, or performance?                             01:50PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1   A.   Yes.

2   Q.   And when did that happen?

3   A.   It happened periodically because the design of the filter,

4   many people didn't like the design because of how it was

5   deployed.   It deployed into the vessel differently than other                01:50PM

6   filters.   And some would say it was difficult to put in the

7   right place all the time.

8   Q.   Did anyone ever say that 2 out of 67 fractures was too many

9   fractures and we ought to redesign this thing to take care of

10  fractures?                                                                    01:50PM

11  A.   No.

12  Q.   In fact, how about migration?   There were virtually no

13  reports of migration with the Simon Nitinol Filter?

14  A.   No.   That's not true.

15  Q.   If I were to look in your database, I mean, in your                      01:50PM

16  tracking and trending of the complaints that Bard received on

17  migration, would I see anyone who -- well, let me take that

18  back.   I'm talking about adverse events from the field.   Do you

19  understand what I'm saying?   Complaints that get reported to

20  Bard, anybody who had a serious injury that caused them to be                 01:51PM

21  hospitalized by a migration of a Simon Nitinol Filter?

22  A.   I think there have been, yes.

23  Q.   If there had been it better be in your files.   Right?

24  A.   Unless it happened before 2000, like you said.

25  Q.   And if it's not in your files, you are just making that up.             01:51PM

1   Wouldn't you agree with me?

2   A.  No, I'm not making it up.  There's literature.  There's

3   communication.  There are many ways that complaints come into

4   our system.

5   Q.  When I look at the tracking and trending there are reports        01:51PM

6   that Bard does where they list the Simon Nitinol Filter, there

7   are virtually no migrations reported.  We're talking about

8   single digit migrations, aren't we?

9   A.  I don't know.  I would have to look at it.

10  Q.  You don't know the answer to that question?                       01:52PM

11  A.  Yes.  I don't know the answer to that question.

12  Q.  We'll just let that document number speak for itself,

13  right?

14  A.  This document speaks for itself.

15  Q.  I'm talking about the tracking and trending that actually         01:52PM

16  lists the number of migrations and fractures for a Simon

17  Nitinol Filter.  That's the information you would need to know

18  what that number was.  True?

19  A.  I don't know what you are talking about.  Sorry.  Yes, if

20  there was that document, I would assume it were true.                 01:52PM

21  Q.  Now, we just heard from Dr. Asch.  You know who Dr. Asch

22  is, right?

23  A.  I do.

24  Q.  Have you ever read his deposition or any of his prior sworn

25  testimony?                                                            01:52PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1   A.  Maybe pieces of it.

2   Q.  And you knew Dr. Asch back when he was performing the

3   retrievability study for the Recovery Filter.  Isn't that true?

4   A.  Yes.  I knew him well.

5   Q.  And tell us about your involvement with that pilot study          01:53PM

6   with Dr. Asch.

7   A.  So it's not a pilot study.

8   Q.  That's what he calls it.

9   A.  It's not true.  It's a special access study.  And so I was

10  the person at NMT who liaised with Dr. Asch most of the time.         01:53PM

11  I have spent a lot of time in Toronto at cases supporting him

12  however he needed.

13  Q.  So you were aware of the fractures and the migrations that

14  happened in that study?

15  A.  I was aware of the one fracture and the one migration that        01:53PM

16  happened.

17  Q.  You weren't aware that there were two fractures in that

18  study?

19  A.  I think they were the same filter is my recollection.

20  Q.  Two fractures, though, in the study?                              01:53PM

21  A.  Okay.

22  Q.  For one filter.  Do you remember that?

23  A.  Yes.

24  Q.  And I think you even had meetings with Dr. Asch and Dr.

25  Kaufman about the migration that happened in that study?             01:54PM

1    A.  With others, yes.

2    Q.  Now, when you were at NMT --

3          MR. LOPEZ:  Can we see trial Exhibit 4554 please?

4    Trial Exhibit 4554?

5    BY MR. LOPEZ:                                           01:54PM

6    Q.  You are familiar with this document?

7    A.  I haven't seen it in a long time.

8    Q.  It's been about two months.

9    A.  I don't recall seeing this, no.

10   Q.  Could you go to Page 7 of this document.          01:54PM

11          I'm going to ask you, sir, when NMT was first

12   designing the Recovery Filter and doing its animal study and

13   was going to Dr. Asch to do his special access -- is that what

14   you call it, special access study?

15   A.  Yes.                                               01:55PM

16   Q.  It was designed to have -- to look for whether or not the

17   device could be retrieved safely within 12 weeks.  Would you

18   agree with me?

19   A.  The animal study was.

20   Q.  And wasn't Dr. Asch's study also designed to determine   01:55PM

21   whether or not it could be removed within 12 weeks?

22   A.  I would have to review the protocol.  I don't know for

23   sure.

24   Q.  I believe this one is already in evidence, Your Honor,

25   4554?                                                  01:55PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1           THE COURT:  No, it's not.

2           MR. LOPEZ:  May I offer it at this time?

3           MR. NORTH:  No objection, Your Honor.

4           THE COURT:  Admitted.

5           MR. LOPEZ:  May I publish it to the jury, Your Honor?    01:55PM

6           THE COURT:  Yes.

7           MR. LOPEZ:  Can we look at Page 1, Gay, please, so the

8     jury can get an idea what this is?

9           This is from NMT Medical, Inc., and the date is May

10    22, 2000.                                                      01:55PM

11          Do you see that, sir?

12          THE WITNESS:  Yes, I do.

13          MR. LOPEZ:  Can we go to Page 7, please, Gay?

14          And could you make the actual table there larger?

15    BY MR. LOPEZ:                                                  01:56PM

16    Q.  And this is about the Recovery Filter.  Isn't Dr. Asch's

17    study already ongoing at this time?

18    A.  Yes, I believe so.

19    Q.  And this was -- the Recovery Filter was -- the idea was

20    that it would be a permanent filter that you could remove long   01:56PM

21    term, meaning 12 weeks.  That's how it was defined by NMT when

22    they did this study, right?

23    A.  That was the data we had.  This is a presentation to Boston

24    Scientific back during the time you were talking about when the

25    litigation was going on.                                       01:56PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    Q.  And the Recovery Filter is the ideal vena cava filter

2    because it would have the same strengths as permanent filters.

3    True?

4    A.  That's what it says, yes.

5    Q.  And it would also involve accurate placement, enhanced          01:56PM

6    centering, small sheath.  Do you see where it says that?

7    A.  Yes.

8    Q.  And it would be removable at 12 weeks.  True?

9    A.  Yes.

10   Q.  And, in fact, Dr. Asch's study didn't establish safety of    01:57PM

11   retrievability beyond 12 weeks, did it?

12   A.  I think there were many removals far past 12 weeks.

13   Q.  There were, but the design, the mean period of time,

14   meaning the average period of time for retrievability was less

15   than 12 weeks.  True?                                             01:57PM

16   A.  I don't know.  I would have to see that.

17   Q.  Did it follow patients for more than a year who had the

18   device in them to see if the devices could be safely removed

19   after one year?

20   A.  Yes.  Oh.  I think the longest might have been 183 days.     01:57PM

21   Q.  That was how many patients?

22   A.  That's the longest.

23   Q.  One patient?

24   A.  That one was, yes.

25   Q.  So the best data that Bard had clinically that a Recovery    01:58PM

UNITED STATES DISTRICT COURT

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1   Filter could be safely removed if left in after 12 weeks was

2   one patient where it was left in for 183 days.  True?

3   A.  No. I said that was the longest.

4   Q.  But did you follow any of these patients after 183 days of

5   implantation?                                                01:58PM

6   A.  I don't think so, no.

7   Q.  So you don't know anything about what happened to those

8   other patients who did not have their devices removed after 183

9   days?

10  A.  They weren't part of the study, no. I don't know.       01:58PM

11  Q.  Well, they weren't part of the study because once the study

12  was over they were told if they kept it in they were left to

13  whatever happened to them, right?

14  A.  Yes, like all clinical studies.

15        MR. LOPEZ:  Can we go to Page 9, please, of this        01:58PM

16  exhibit.  Again, this talks about -- that's Page 9.  Let's go

17  to 21 instead, Gay, please.

18  BY MR. LOPEZ:

19  Q.  I think this is the animal study that you mentioned

20  earlier, I think, that we talked about earlier, isn't this in  01:59PM

21  the Recovery Filter In Situ six-week residence?

22  A.  No.

23  Q.  This isn't the animal study?  What is this?

24  A.  This is a animal study.

25  Q.  It's a animal study.  Okay.  But this is an animal study to  01:59PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1   see if it could be removed within six weeks?

2   A.  No.  This is a study to look at the filter implanted at six

3   weeks.

4   Q.  And then it was removed after six weeks?

5   A.  No.  They were not all removed.                          02:00PM

6   Q.  Some of the animals were sacrificed without the device

7   being removed?

8   A.  I don't know in this study.  This isn't our study that we

9   used to support our submission.

10  Q.  What does a six-week residence study mean?              02:00PM

11  A.  It means the filter was implanted for six weeks.

12  Q.  And let's go to the next slide, Page 22.  12 filters

13  removed from 12 animals.  This is a 12-week removal study.

14  That's what this is talking about, right?

15  A.  Yes, it is.                                              02:00PM

16  Q.  And 100 percent of those were successful?

17  A.  Yes.

18  Q.  And was there ever an animal study done where any of those

19  devices were left in beyond 12 weeks?

20  A.  No.                                                      02:01PM

21  Q.  Next slide, please.  One more.

22          Now, the human experience would be the Asch study,

23  correct?

24  A.  Yes.

25  Q.  Let's look at the presentation here.  So this is Dr. Asch.  02:01PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    There had been one removal to date in 10 days.  Do you see

2    that?

3    A.  I do.

4    Q.  Next slide, please.

5           And then this talks about the plan for there to be a        02:01PM

6    European -- I'm sorry -- that this would be submitted for a

7    European -- for a 12-week removal.  Do you see that?

8    A.  I see it says that.  Doesn't say it will be done, was just

9    a potential.

10   Q.  So the regulatory submission in Europe was going to be for     02:02PM

11   a 12-week removal.  That's what it says, correct?

12   A.  Potentially.

13   Q.  And OUS, what does that mean?  Outside the United States?

14   A.  It does.

15   Q.  That was also going to be a regulatory submission for          02:02PM

16   12-week removal, correct?

17   A.  It says following 12-week removal.  I don't know what the

18   indication was.

19           MR. LOPEZ:  Next slide, please.  Go back one.  27.

20   Blow that up, please.                                             02:02PM

21   BY MR. LOPEZ:

22   Q.  This is the U.S. plan for commercialization in 2000.  Would

23   you agree that's what that says?

24   A.  This is a potential plan as we are telling a potential

25   buyer to what could be done with the device.                      02:03PM

1  Q.  Right.  And in every slide that we have seen thus far, the

2  plan was for the Recovery Filter to be safe and effective for a

3  12-week retrievability and thereafter converted to a permanent

4  device.  True?

5  A.  No, I don't believe that.                                    02:03PM

6  Q.  You don't believe that's a fair reading of these slides?

7  A.  No. The only data we had was a 12-week animal data so

8  that's what we were representing here.

9  Q.  And the human data you had was an average implantation of

10  53, 54 days.                                                     02:03PM

11  A.  No. It was actually only four patients at the time with one

12  explant of 10 days.  So this was very early in the Asch study

13  as well.

14  Q.  I'm talking about later after this, after the animal study.

15  Dr. Asch just testified here a couple days ago that the mean     02:03PM

16  retrieval was 53, 54 days.  I don't remember exactly.  That was

17  the average period of time that he retrieved devices safely in

18  his study.

19  A.  I'm sorry.  Is that a question?

20  Q.  Well, do you agree with that?                                02:04PM

21  A.  I have no idea.

22  Q.  Do you disagree?

23  A.  I don't know what he said.

24  Q.  Sir, you came here today.  You knew I was going to ask you

25  about the Asch study, right?  I asked you about it two months    02:04PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    ago.

2    A.   You asked me a lot of questions over time.

3    Q.   You know how important the Asch study is to this case,

4    don't you?

5    A.   To this case?                                          02:04PM

6    Q.   Yeah.

7    A.   No.

8    Q.   Well, you have been asked about the Asch study a lot at

9    depositions and two months ago when you were testifying under

10   oath?                                                       02:04PM

11   A.   That was for a different filter.

12   Q.   Okay.  But you know how important the Asch study is.  Dr.

13   Asch testifies here you knew he was testifying, right?

14   A.   No. I found out he was testifying.

15   Q.   And you didn't think it was important for you to come    02:04PM

16   prepared to discuss the details of the Asch study when I was

17   asking you questions about that, about important information

18   that the jury might want to know and maybe should know.  True?

19          MR. NORTH:  Objection.  Argumentative.

20          THE COURT:  Sustained.                              02:05PM

21   BY MR. LOPEZ:

22   Q.   Now, let me ask you some questions about the Patient 9 and

23   Patient 33 real quickly.

24          There was no root cause analysis ever done on either

25   one of those two patients.  True?                          02:05PM

1    A.  No, I don't think that's true.

2    Q.  Well, root cause analysis would include what the fix would

3    be, what the solution would be.  Wouldn't it?

4    A.  No.  Sometimes you can't find a solution.

5    Q.  Well, the root cause -- and it's not a root cause analysis          02:05PM

6    if you don't come up with a solution.  That's a definition of a

7    root cause analysis.  True?

8    A.  Absolutely not.  A root cause analysis is to try and figure

9    out what happened.  It doesn't mean -- excuse me -- it doesn't

10   mean you will.                                                          02:06PM

11   Q.  Why did the Recovery Filter migrate four centimeters after

12   being challenged by a clot in the Asch study?

13   A.  I don't know.

14   Q.  Why did it fracture?

15   A.  Our hypothesis is that it fractured because of the woman            02:06PM

16   who the filter was in was pregnant and gave birth to a child.

17   And we believe that the forces that were put on the filter at

18   that time probably caused it to fracture.

19   Q.  But you didn't do any bench testing or other testing where

20   you replicated those forces to see if maybe that was the cause         02:06PM

21   of the fracture?

22   A.  I don't remember either way.

23   Q.  And once you had a fracture after that Recovery Filter was

24   on the market, and it was not a pregnant woman, you should have

25   concluded at that time it wasn't because of a pregnancy.  True?        02:06PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1   A.  If the woman wasn't pregnant we would not conclude that it

2   was because of a pregnancy.  True?

3   Q.  And if it happened in a man it certainly wasn't related to

4   a pregnancy.  True?

5   A.  Chances are good, yeah.                                       02:07PM

6   Q.  And then after the Recovery was on the market, it started

7   experiencing similar migrations to the migrations that were

8   experienced in Dr. Asch's study.  True?

9   A.  We had migrations.

10  Q.  Did you ever figure out why any of those devices were       02:07PM

11  migrating?

12  A.  Yes.

13  Q.  And why were they migrating?

14  A.  Different ones for different reasons.  But normally because

15  they were overwhelmed by a massive clot.                        02:07PM

16  Q.  They were relating to the way that the device was designed.

17  Would you agree with me?

18  A.  Yes.

19  Q.  And prior to the Recovery Filter being on the market, other

20  than the Asch study, most of the data that Bard had was done on 02:07PM

21  what we call bench testing.  True?

22  A.  We had bench testing.  We had animal testing.  Then we had

23  the Asch study.  That's the sequence of events.

24  Q.  Would you agree that the goal of bench testing is to

25  replicate a real world.  It was what might actually happen in a 02:08PM

641

1   real person?

2   A.  To the best of your ability for some tests.  You can't do

3   that for everything.

4   Q.  But you need to take into consideration foreseeable

5   circumstances, the environment of use, all of those things.          02:08PM

6   Those should be well studied if you are just going to see

7   whether or not a device is safe in basically a test tube?

8   A.  Yes, to the best of your ability at the time.

9   Q.  And Mr. North yet in his opening statement described that

10  environment, I think, quite accurately and graphically.  The        02:08PM

11  IVC filter is a challenging environment.  Would you agree?

12  A.  The vena cava is a challenging environment.

13  Q.  I'm sorry.  The vena cava is a challenging environment.

14  A.  We've come to learn that, yes.

15  Q.  And he also said that it's a harsh and dynamic environment.      02:09PM

16  Do you agree with that?

17  A.  Yes.

18  Q.  This is not a stationary tree trunk.  Do you agree with

19  that?

20  A.  Sure.                                                            02:09PM

21  Q.  All sorts of stresses happen in the vena cava when you are

22  trying to design one of these filters.  Do you agree with that?

23  A.  Yes.

24  Q.  You have flattening?

25  A.  You can.                                                         02:09PM

UNITED STATES DISTRICT COURT

1   Q.  You have cross-sectional expansion?

2   A.  Yes, you can.

3   Q.  And you have longitudinal stress.  True?

4   A.  Yes.

5   Q.  And those are things that were well known about the vena          02:09PM

6   cava filter 15, 16 years ago.  True?

7   A.  Absolutely not.

8   Q.  When you say "absolutely not" you mean there was no

9   textbook, there was no doctor, there was nothing that you could

10  reference that would show how the vena cava acts in a human          02:10PM

11  body?

12  A.  Not to my knowledge, no.

13  Q.  Did you do any research yourself?

14  A.  We did plenty of research altogether.

15  Q.  And you learned later -- so you learned after you tested         02:10PM

16  and put the device on the market about this dynamic and

17  challenging and harsh environment in which a vena cava was

18  being implanted?

19  A.  We learned new things for sure, and we always do based on

20  new imaging, based on experience.                                   02:10PM

21  Q.  And would you also agree that a PVC pipe with sausage

22  casing as the test environment for an IVC filter is not the

23  type of environment that Mr. North described in his opening

24  statement?

25  A.  I don't understand.  Sorry.                                     02:10PM

1   Q.  Well, in other words, a rigid PVC pipe with a sausage

2   casing is not a challenging, harsh, environment, dynamic

3   environment like Mr. North described in his opening statement.

4   True?

5   A.  If you are speaking of the migration study, it's not a          02:11PM

6   rigid PVC tube.  It does have sausage casing in it which does,

7   in fact, mimic the vena cava as best we can.  And it is a

8   pretty harsh environment, because you are trying to make the

9   device move.

10  Q.  And that's how it should be tested in its Environment of       02:11PM

11  Use?

12  A.  That's how it is tested for the last 20 years.

13  Q.  No, I mean it should be tested -- well, that's not how it

14  was tested after it was put on the market and put in a real

15  human being.  You didn't test it in a test tube in a sausage      02:11PM

16  casing that mimicked the human condition, did you?

17  A.  We tested exactly what I just described long before the

18  filter was ever on the market, yes.

19  Q.  And it's your testimony that PVC pipe and sausage casing is

20  mimicking the real condition of a human being's vena cava?        02:12PM

21  A.  No, I'm not saying that because it didn't use PVC pipe,

22  first of all.

23  Q.  What kind of pipe was it?

24  A.  It's a silicone tube with sausage casing put in, and yes,

25  the sausage casing does mimic the vena cava because it gives       02:12PM

1    the hooks of the filter a place to engage that is a natural

2    material.  It's not a vena cava filter.  But it is the best we

3    can do to make a test that you can do time and time again to

4    compare to.

5    Q.  Okay.  Now, when you ran those tests with the Recovery        02:12PM

6    Filter, the bench test you just described, there was no --

7    there didn't seem you had any issues with migration when

8    challenged by a clot.  True?

9    A.  I don't know what you mean by "issues."

10   Q.  You didn't have the test, run the test, and after you ran     02:12PM

11   the test you say, well, the way this is designed when it gets

12   challenged by a clot it's going to push the filter off its

13   current location?

14   A.  Of course we did.  That's the goal of the test.

15   Q.  So you thought you had migration issues with the Recovery      02:13PM

16   Filter when you were testing it on the bench?

17   A.  No. The goal of the test is to determine the force or

18   pressure at which every filter migrates.  We want it to migrate

19   in that test.

20   Q.  Okay.  I understand.  But after running those tests, you       02:13PM

21   determined that from a migration resistance standpoint the

22   Recovery Filter was safe to implant in a human being?

23   A.  Yes.

24   Q.  Yes or no?

25   A.  Because they met the internal acceptance criteria.           02:13PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    Q.  So you determined after running the test that based on the

2    results of that test, we can implant these in human beings.

3    True?

4    A.  No. We did a lot of other tests first.

5    Q.  Then once you -- but all those other tests that you did          02:13PM

6    resulted in you determining that this device can at least be

7    implanted in patients in Dr. Asch's study.  True?

8    A.  After all of the testing we did on the bench and in the

9    animals, yes.

10   Q.  Okay.                                                            02:14PM

11   A.  We applied for a special access study and were granted

12   that.

13   Q.  All right.  Now, the first time that the device gets

14   challenged by a clot in Dr. Asch's study, it starts to migrate

15   towards the heart.  You are aware of that happening, right?        02:14PM

16   A.  It did migrate, yes.

17   Q.  In fact, I think you agreed when we asked you this question

18   that if this patient wasn't in a clinical study and being

19   closely monitored there was some concern that that clot could

20   have continued up and went into the patient's heart?              02:14PM

21   A.  The concern was if we didn't know what could happen to the

22   filter.

23   Q.  Right.  And it was a good thing that he was being closely

24   monitored in a clinical trial.  Right?

25   A.  Yes.  That's how we observed it.                               02:14PM

1  Q.  Now, sir, this simple question, didn't that human

2  experience give you folks at Bard evidence that however you

3  were testing it in a laboratory was not giving you the kind of

4  results that would happen in a real human being?

5  A.  No.                                                      02:15PM

6  Q.  Okay.  So you were anticipating this migration that

7  happened in Patient Number 9, the first and only patient that

8  was challenged by a clot in the Asch study?  Yes or no, sir.

9  Would you anticipating that happening?

10 A.  I can't answer that question yes or no.                 02:15PM

11 Q.  And Mr. North said in his opening statement that Bard's

12 process is to learn from their clinical experience.  We

13 assessed our experience with Recovery and created the G2.

14        That experience, that clinical experience with the

15 Recovery happened after it was launched on to the open American  02:16PM

16 marketplace.  True?

17 A.  Partially.

18 Q.  When you say "partially," I don't understand what you mean.

19 Was there another clinical trial going on that we don't know

20 about after it was launched?                                02:16PM

21 A.  No. We had the Asch study that we talked about and we had

22 the commercial experience.

23 Q.  I'm talking about after it was launched, the only clinical

24 experience that Bard was using to assess the performance of the

25 Recovery Filter was what was happening in the open marketplace.  02:16PM

1    True?

2    A.   Yes.

3    Q.   And doctors weren't being told to follow these patients so

4    that they could report back to Bard how they were performing.

5    It would be up to a doctor to voluntarily report those events          02:16PM

6    if he or she decided it was something they should report.

7    True?

8    A.   Which is true for everything.

9    Q.   Well, sir, is that true or not, that Bard was not following

10   these patients.  They were relying on doctors, other doctors to        02:17PM

11   follow the patients and maybe report those back to Bard.  True?

12   A.   Yes.  That's true.  Doctors monitor their patients, we

13   don't.  And if they choose to report to us, they will.

14   Q.   Right.  But Bard didn't put out, when they put the Recovery

15   Filter out in the market, tell doctors I want you to monitor           02:17PM

16   these patients and let me know if you see a fracture like we

17   saw in the Asch study.  Let me see if you see a perforation or

18   a tilt like we saw in the Asch study, or let me know if you see

19   fractures like we saw in the Asch study.  Bard never gave those

20   instructions or that information or advice to doctors.  True,          02:17PM

21   sir?  Yes or no?  Can you answer that yes or no?

22   A.   No, I can't.

23   Q.   Before Bard launched the G2, did it have -- did it do any

24   clinical study at all on the G2?

25   A.   Not before we launched as a permanent, no.                        02:18PM

1   Q.  So before it went into the open marketplace, you didn't

2   even do an access, special access study like what you did with

3   the Recovery Filter.  Right?

4   A.  No, we did not.

5   Q.  You did some bench testing.  You made some design changes          02:18PM

6   to it.  You changed the name from the Recovery to the G2, and

7   you launched it?

8   A.  No.  That's not what we did.

9   Q.  You didn't do any clinical trial work, did you?

10  A.  No, we did not.                                                    02:18PM

11  Q.  You had no idea how it was going to react and respond in

12  patients before it was launched.  True?

13  A.  No.

14  Q.  That's not true?

15  A.  Correct.                                                          02:19PM

16  Q.  You actually had -- you actually knew how it was going to

17  react and respond in patients before it was launched?

18  A.  We had testing that showed it was significantly better than

19  its predicate device.

20  Q.  You had bench testing.                                            02:19PM

21  A.  And we had animal testing.

22  Q.  You had animal testing.  What kind of animal testing?

23  A.  The exact same tests we did in Recovery.

24  Q.  Which was?

25  A.  12-week implant and removal for safety.  The idea of the --       02:19PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    Q.  I'm sorry.  I just want to make sure we're on the right

2    page.  Before the permanent device was launched?

3    A.  Yes.  We did animal work to show that when you remove the

4    device that it doesn't significantly damage or in any way harm

5    the vena cava.  That's the risk of removal.                          02:19PM

6    Q.  Okay.  My question was that's to determine whether it's

7    retrievable.  Was there any clinical, human clinical data on

8    its safety and effectiveness as a permanent device?

9    A.  No.

10   Q.  Before it was launched?                                          02:20PM

11          Okay.  So it was launched without any clinical data

12   about long term safety and effectiveness as a permanent device.

13   True?

14   A.  Yes, but it relies on its predicate also.

15   Q.  And then without having any clinical data on the G2 Filter       02:20PM

16   before it was launched, did you advise physicians who might be

17   prescribing the G2 Filter that they ought to monitor those

18   patients closely since -- and see whether or not the G2 is

19   actually going to perform safer than our Recovery Filter?  Did

20   you give that advice to doctors?  Yes or no?                         02:20PM

21   A.  No.

22   Q.  Before -- by the way, we talked a little bit about the

23   sales force and the marketing department.  And Mr. O'Connor

24   talked to Mr. Modra about it a little bit today.  The face of

25   the company, the people that interact most with doctors and        02:21PM

1    hospitals are the sales force, right?

2    A.   Sure.

3    Q.   They are in doctor's offices every day?

4    A.   Hopefully.

5    Q.   And their purpose is to sell Bard products, including IVC          02:21PM

6    filters.   Right?

7    A.   The ones who sell filters, yes.

8    Q.   And if doctors have questions -- by the way, do you know

9    what fair balance means when it comes to marketing and selling

10   medical devices?                                                        02:21PM

11   A.   Yes.

12   Q.   What does that mean?   Explain that to the jury please.

13   A.   That your promotional equipment or your promotional

14   documents are fair and balanced to competition.

15   Q.   And they must be fair and balanced, meaning you can't just         02:22PM

16   tell them how wonderful the device is.   If you have information

17   about risks that doctors don't know about, you have to tell

18   them about those risks so that they can do a risk benefit

19   analysis themselves.   True?

20   A.   Not in a marketing brochure, no, I don't think so.                 02:22PM

21   Q.   No, but I thought when you are marketing, when your

22   salespeople are having conversations with doctors?

23   A.   Those are in the IFU.

24   Q.   When they are having conversations with doctors,

25   salespeople should be armed with data about Bard filters in            02:22PM

1  case the subject comes up about the safety and effectiveness of

2  Bard filters.  True?

3  A.  Generally, yes.

4  Q.  And if there is information that might influence a doctor

5  to not use a Bard filter over safety concerns, and only Bard      02:22PM

6  has that information, Bard ought to arm their salespeople with

7  that information to share with doctors.  Yes or no?

8  A.  Can't answer that yes or no.  It's a hypothetical question.

9  Q.  Mr. North's comments about clinical experience, how the

10 company learns how a product's performing because they are       02:23PM

11 getting information about their clinical experience as it's

12 being sold, that clinical experience that Bard's learning about

13 is probably clinical experience that doctors ought to know

14 about, too.  Don't you agree?

15 A.  In general.                                                   02:23PM

16 Q.  And you have information.  We went over some complaint

17 files earlier today.  Bard doesn't only get reported, we had a

18 fracture, they are supposed to investigate fractures.  They are

19 supposed to contact the health care provider and learn as much

20 as they can about these complications.  True?                    02:24PM

21 A.  About every complaint, not just fracture.

22 Q.  Right.  And the reason they do that is because they might

23 learn something about their performance of their device that

24 may cause them to maybe reconsider the design of the product.

25 True?                                                             02:24PM

1   A.  Of course.  We use that data all the time to improve

2   devices constantly, no matter what the device is.  That is the

3   primary form of feedback when the device is commercial.

4   Q.  And, sir, wouldn't you agree that if it was important

5   information for Bard to learn about for purposes of whether or   02:24PM

6   not they might want to redesign their product for a safety

7   reason that that same information would be important to pass on

8   to doctors and patients.  Yes or no?

9   A.  If it were for safety, yes.  But we're not talking about

10   safety for every complaint.   02:25PM

11   Q.  But certainly if it dealt with a safety concern, an injury

12   that doctors may not appreciate about your device, that's

13   certainly something that you ought to pass on to doctors so

14   that they know about it.  Right?

15   A.  No. I don't agree with that in general.   02:25PM

16   Q.  Well, sir, aren't you -- you know that doctors sometimes

17   will have a bad experience with a device, and if they share

18   that experience with one of their colleagues they may cause

19   both of those doctors to not use that device again.  You are

20   aware of that, right?   02:25PM

21   A.  Yes.

22   Q.  As a matter of fact, you were aware of that in 2005 when

23   you and Janet Hudnall decided it would be a good idea for her

24   to go out and interview some of Bard's most significant

25   customers, physicians who were having issues with the Recovery   02:26PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1   Filter.   True?

2   A.   No. It wasn't me and Janet Hudnall.

3   Q.   Let's look at Trial Exhibit 0753.  While she's calling that

4   up, Mr. Carr, I apologize.  I know it's on the screen, but let

5   me ask you a question.                                          02:26PM

6            You said not every report, but certainly, if there

7   were reports or a trending of reports that involved tilt,

8   migration, perforation, fractures, embolization of pieces of

9   the device to the heart or lung, that would be the kind of

10  information that would be relevant information for other        02:26PM

11  doctors to know about.  True?

12  A.   Only if it reached a certain level, if there was a safety

13  risk.

14  Q.   I'm talking about information that might influence a doctor

15  to not use your device because of an experience of another     02:27PM

16  doctor.  You are familiar with that concept, aren't you, as a

17  former marketer?

18  A.   I have never been a marketer.

19  Q.   You are familiar with that concept?

20  A.   That if somebody talks to somebody also and they choose not 02:27PM

21  to use it?  Yes.

22  Q.   Right.  And if you look at Trial Exhibit 753, and I can

23  show you the deposition.  But you were the 30(b)(6) witness for

24  this particular event?

25  A.   I don't have that exhibit.                                 02:27PM

1           MR. LOPEZ:  Will you stipulate to that, counsel?

2           THE COURT:  Mr. Lopez, let's ask questions of the

3    witness not of counsel.

4           MR. LOPEZ:  I'm going to have to look at the

5    deposition then, Your Honor.  This is the October 29, 2014            02:27PM

6    deposition, Trial Exhibit 753.  Actually, let's not do that.

7    Let's just look at the document.  I think I can lay a

8    foundation with this witness.

9           Gay, I'm sorry, could you put back up Trial Exhibit

10   753?  Oh.  755.  Apologize.                                           02:28PM

11   BY MR. LOPEZ:

12   Q.  Do you have 755 in front of you?

13   A.  Yes.

14   Q.  You are familiar with this e-mail and these events?

15   A.  Yes.                                                              02:28PM

16   Q.  ?

17   A.  I don't know if I have seen this e-mail.  I guess I have in

18   a previous deposition.

19   Q.  We can go to the next page.  Might help you.

20   A.  Yes.                                                              02:29PM

21   Q.  Okay.  And did you have a meeting with Janet Hudnall about

22   the events that are described in this e-mail?

23   A.  I don't recall one.  I'm not on this e-mail anywhere.

24          THE COURT:  We're going to break at this point, Mr.

25   Lopez.                                                               02:29PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1          Ladies and Gentlemen, we will resume at 2:45.  I will

2    excuse you.

3          (Recess from 2:29 p.m. until 2:47 p.m.

4          You may continue, Mr. Lopez.

5    BY MR. LOPEZ:                                                02:47PM

6    Q.  We were talking about Exhibit 755, Mr. Carr.  I think it

7    should be still on your screen.  Anyway, you are familiar with

8    this event that's described in this document, this road show,

9    the G2 road show, correct?

10   A.  I'm familiar with the document, yes.                     02:47PM

11          MR. LOPEZ:  Go to, Gay, Number 3 of the document

12   755-03.

13          Your Honor, may I offer this into evidence at this

14   time and ask that it be published to the jury?

15          MR. NORTH:  No objection, Your Honor.                 02:48PM

16          THE COURT:  Admitted, and you may publish.

17          MR. LOPEZ:  Thank you.

18          And Gay, would you please enlarge the first full

19   paragraph of Page 3 of this exhibit.

20   BY MR. LOPEZ:                                                02:48PM

21   Q.  And this is from -- you can see this is from Janet Hudnall.

22   Do you see that?

23   A.  Yes.

24   Q.  And Janet writes -- and just to give the jury the proper

25   perspective and date, this is in July of 2005.  Can you confirm   02:48PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    that, sir, from the e-mail?

2    A.  No, I can't.

3           MR. LOPEZ:  Go back to Page 1, Gay, please.  March of

4    '05.  Go to Page 2.

5    BY MR. LOPEZ:                                              02:49PM

6    Q.  Okay.  This is in March of 2005.  Do you see that?

7    A.  Yes.

8    Q.  And that's about the time when Bard was already redesigning

9    the Recovery to become the G2, to replace the G2 on the

10   marketplace because of some safety issues regarding the       02:49PM

11   Recovery Filter.  True?

12   A.  I think it's just before the release of it.

13   Q.  And actually, the intent was to release it then but it

14   didn't release until a few months later.  Right?

15   A.  I don't know for sure.                                 02:49PM

16   Q.  And Janet writes:  As we gear up for the release of the

17   modified Recovery.  So the jury understands what that means,

18   modified Recovery is the G2, correct?

19   A.  Yes, it is.

20   Q.  One of the things I'm going to do is personally visit those  02:49PM

21   accounts that need a little extra attention and formally

22   introduce the modifications.

23           Do you see that?

24   A.  Yes.

25   Q.  And what she means by that, these are people who have been   02:50PM

1    using or known to have been customers of Bard who were using

2    the Recovery device?

3    A.  I assume so.

4    Q.  And these could be accounts that have been skeptical but

5    have large potential upside or high profile accounts that could    02:50PM

6    affect other accounts in the area.

7         Do you see that?

8    A.  Yes.

9    Q.  In other words, there was a concern that some of the

10   doctors who may have been having some bad experiences with the    02:50PM

11   Recovery Filters might share with their experience with other

12   doctors that could affect other doctors using the Recovery

13   Filter.  Do you agree with that?

14   A.  I agree that could be a concern.  I also think that she's

15   being proactive and introducing the new device to potential    02:50PM

16   clients.

17   Q.  Okay.  We'll see.

18        MR. LOPEZ:  Let's go to the next page, Gay, please.

19   BY MR. LOPEZ:

20   Q.  Okay.  So now, this is September of 2005.  And if you look    02:51PM

21   at the first full paragraph, this is still talking about the G2

22   Filter road show.  Do you know why it was called a road show?

23   A.  She was going different places on the road.  I don't know.

24   Q.  And she was getting a list of the accounts from her various

25   district managers as to whom they believed should be the    02:51PM

1    customers for her to go visit.  Correct?

2    A.  It says a list of road show accounts, yes.

3    Q.  And let's go to the next page, please.  Keep going.

4         And is this a list of the various accounts and

5    hospitals that Janet was asking for to have -- to be able to        02:52PM

6    determine who to go visit about the Recovery and G2 Filter?

7    A.  I don't know.  I assume so.

8         THE COURT:  Folks, somebody has their phone on.  If

9    you could all please turn your phone off, not just on mute.

10   That buzzing we're hearing is a phone interfering with the         02:52PM

11   system.

12        MR. LOPEZ:  Excuse me one second.  Let's try Trial

13   Exhibit -- is this part of 755 now?  Okay.

14        I apologize, Your Honor.

15   BY MR. LOPEZ:                                                       02:54PM

16   Q.  Exhibit 755, Page 14, do you recognize this document, sir?

17   A.  I have been shown it before, yes.

18   Q.  And this is the priority accounts that were discussed in

19   the earlier e-mails.  True?

20   A.  Probably.  I'd have to check.                                   02:55PM

21   Q.  Okay.  And these -- this is the information that Janet

22   Hudnall was gathering as she was doing her G2 road show?

23   A.  I assume so.

24   Q.  And these are -- when western region G1A Recovery, that's

25   referring to the G2.  In other words, if you see G1A in some of     02:55PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1   these documents, it actually refers to the G2?

2   A.  Yes.

3   Q.  And these are priority.  Priority accounts would be what?

4   A.  You would have to ask her.

5   Q.  And these are like say, for example, this first doctor,          02:55PM

6   he's from Austin, Texas.  And the annual value, I mean, the

7   annual volume is listed so before she went out she knew how

8   much value that these particular doctors had to Bard, correct?

9   A.  Of course.  We know all of our data.

10  Q.  And this doctor just heard of a migration, just heard about     02:56PM

11  it, and that was enough for him to not use the Recovery Filter?

12          MR. NORTH:  Objection, Your Honor.  602.

13          THE COURT:  Overruled.  The witness can answer if he

14  knows.

15          THE WITNESS:  I have no idea.                                02:56PM

16  BY MR. LOPEZ:

17  Q.  Isn't that how you would interpret that under comments,

18  that Dr. Reifsnyder heard of migration and won't use?

19  A.  That's what the document says.

20  Q.  And another doctor from DeMoines, Iowa, he got a letter and     02:56PM

21  just from getting a letter he had a fear about the migration

22  problems with the Recovery Filter.  See that?

23  A.  I do.

24  Q.  And then there's a doctor who is from California whose name

25  is redacted, and he stopped using it due to several reported       02:56PM

1   complications, just reported complications.  And that doctor

2   stopped using it, right?

3   A.  I don't know if he stopped.  That's what it says.

4   Q.  This document, the purpose of this document, the reason I'm

5   using it, this gives Bard insight and puts Bard into the minds          02:57PM

6   of what's important to doctors about their devices and what

7   information they need about their devices to know whether or

8   not they want to continue to use the device.  Whether or not

9   it's the right judgment by the doctor or not, this is the

10  information that doctors want.  True?                                    02:57PM

11  A.  No.

12  Q.  Let's go to the next page, please.  Here's a doctor from

13  Missouri, an $80,000 account.  He stopped using it because of a

14  migration, correct?

15  A.  I don't know.  That's what the document says.                       02:57PM

16  Q.  And another doctor from, also from Springfield, well from

17  Missouri, $156,000 account, stopped using.  He was just

18  concerned about reported incidents.  Do you see that?

19  A.  I do.

20  Q.  And next one, San Diego, California, 100,000, standard of           02:58PM

21  care no longer Recovery concerned about patient safety.

22         Did I read that correctly?

23  A.  You did.

24  Q.  Let's go to the next page.  Here's a doctor in Tennessee,

25  $200,000 account, had filter fracture and seen several arms            02:58PM

1    outside the caval wall.  Do you see that?

2    A.  Yes.

3    Q.  All right.  And then there's a doctor from Tennessee, heard

4    of a migration as leery, meaning he's concerned about whether

5    or not he's going to use the device.  Is that how you interpret          02:58PM

6    that?

7    A.  Yes, concerned.  However you want to put it.

8    Q.  If we go through this document --

9          MR. LOPEZ:  Let's go to Page 6 of 10 of the chart,

10   Gay, please.  One more.                                                   02:59PM

11   BY MR. LOPEZ:

12   Q.  And if you look at -- let's go down near the bottom.  There

13   are doctors now in Tampa, Florida, who had fracture concerns

14   about the Recovery Filter.  Do you see that, sir?

15   A.  I do.                                                                 02:59PM

16   Q.  And then there's a doctor who stopped using migration from

17   Missouri.  Let's go one more page.

18          Anyway, this is -- you can glean from looking at this

19   that doctors aren't waiting for certain levels of percentages

20   or statistics, or whether or not it's consistent with an old             03:00PM

21   device where something was reported in the medical literature.

22   They are interested in what's going on with a device currently.

23   And every doctor, for different purposes and different reasons,

24   could choose to stop using, particularly a new medical device,

25   just based on information he's hearing from other doctors.               03:00PM

1  Wouldn't you agree with that?

2  A.  Of course.  Anybody can do anything.

3  Q.  But one of the advantages Bard has over doctors that are

4  just in an office in Missouri or in Tennessee, those doctors

5  only have access to their own local experiences.  Bard's                03:01PM

6  getting information about the experience of doctors literally

7  from all over the world.  Isn't that true?

8  A.  Yes.

9  Q.  I mean, so a doctor -- the doctor in Tennessee who heard

10  about one migration and doesn't want to use it in anymore, he          03:01PM

11  has no idea that there may have been 10 other doctors in other

12  parts of the country who, before he had that one migration,

13  each had a migration because they only reported it to Bard and

14  Bard never reported that to that doctor.  True?

15  A.  No.                                                                 03:01PM

16  Q.  So Bard does report the experiences of other doctors as it

17  accumulates all of this complaint data?

18  A.  No, we don't.  We would only act if it became unexpected.

19  Q.  Well, sir, I understand what your protocol is.  But for

20  patient safety purposes, what's important is what is the               03:02PM

21  protocol of physicians and doctors?  What do they think is

22  important?  What's relevant to them?  What risk are they

23  willing to accept?  Wouldn't you agree with me, sir?

24  A.  That's not a question.  I'm sorry.

25  Q.  Would you agree with me that that's what's important?              03:02PM

1   A.   No. You would have to ask the physicians.

2   Q.   Well, you have got a number of physicians, at least you see

3   from this road show that are telling Bard that just because

4   they heard about a migration or they have had one migration and

5   they are not using the device anymore, you know that there are          03:02PM

6   doctors like that around the country.  Right?

7   A.   Yeah.  They are listed here.

8   Q.   But again, Bard has the advantage of having gathered the

9   information from every doctor or hospital that's reported these

10  adverse events to Bard.  You have it all, right?                        03:03PM

11  A.   We have what we were given, yes.

12  Q.   And it's not Bard's policy to share that data with other

13  physicians to whom they are selling their medical devices,

14  right, including an IVC filter?

15  A.   We don't share each and every report, no.                          03:03PM

16  Q.   In fact, you don't share any of your test results with any

17  customer that might support your claims.  Right?

18  A.   We supply our adjudicated clinical trial data.

19  Q.   So if a doctor, we talked about this before, in the G2

20  brochure when you make claims about your device being -- taking         03:03PM

21  strength and stability to a new level, where it says data on

22  file, if a doctor calls up and asks for that data Bard doesn't

23  give that to the doctor?

24  A.   Correct, because that data is kind of the secret sauce to

25  the device, those specifications, those dimensions, those               03:04PM

1    performance criteria are what makes our device our device.  And

2    it is a highly patented area, and there is stiff competition.

3    So no we would not provide that generally to a physician.

4    Q.  How about when you have focus groups with some of your

5    consultants and they give you advice about what they think the    03:04PM

6    fracture rate and the migration rate and the death rate should

7    be about filters.  Do you share that information with doctors

8    to whom you are selling sometimes $200,000 worth of IVC

9    filters?

10   A.  I don't know what Janet shared with them.    03:04PM

11   Q.  You have had focus group with doctors before in the middle

12   of the G2 being on the market and having issues with the G2

13   migrating and fracturing, right?

14   A.  So we didn't have issues with the G2 migrating and

15   fracturing, but yes, we did convene two separate panels to    03:05PM

16   investigate bariatric patients, which are people who have

17   gastric bypass surgery, and then also to discuss caudal

18   migration.

19            MR. LOPEZ:  Could we see Exhibit 1452 and 1033 at the

20   same time.  For some reason they are two separate exhibit    03:05PM

21   numbers but they are actually the same document.  One is Page 1

22   and one is Page 2.

23   BY MR. LOPEZ:

24   Q.  Sir, we talked about this document, 1452, two months ago.

25   Do you recall that?    03:05PM

1    A.  We talked about a different version of this document.

2    Q.  Okay.  It was a version -- you said that was -- what do you

3    mean a different version of this document?  I'm confused.

4    A.  The document you showed me last time had notes all over it.

5    Q.  This is the same exhibit.                                          03:05PM

6    A.  I don't believe that's correct.

7    Q.  Let's look at 1033.  Maybe I'm confused.  Are you saying

8    this isn't the document you saw two months ago?

9    A.  Yes.  I am saying that.

10   Q.  How about the document that's in front of you now?                 03:06PM

11   A.  I don't remember you showing me this page.

12   Q.  Do you recall this document refreshing your recollection

13   that one of your consultants thought that the Recovery --

14          MR. NORTH:  Objection.  He's reading from the content

15   of the document.  It's not admitted.                                   03:06PM

16          THE COURT:  You can't read from a document that's not

17   in evidence.

18          MR. LOPEZ:  I'm not.  I'm reading from my notes.

19          THE COURT:  Looked like you were reading from the

20   document.                                                              03:06PM

21   BY MR. LOPEZ:

22   Q.  Did any of your key opinion leaders ever refer to a

23   Recovery Filter as a wimpy filter?

24   A.  Yes.

25   Q.  Was that Dr. Venbrux?                                              03:07PM

1  A.  I don't know.  The statements on the first page, I believe

2  it was Dr. Kaufman.

3  Q.  Okay.  And this was an expert panel that you had put

4  together to talk about issues that you were having with the

5  Recovery Filter at that time, right?                    03:07PM

6  A.  I have no idea where this document came from.

7  Q.  You testified about this document in March of 2018.  That

8  was two months ago.  You didn't remember doing that two months

9  ago?

10  A.  Yes.  And I told you then I don't know where the document  03:07PM

11  came from.

12         MR. LOPEZ:  Could we look at the Kevin Phillips, Page

13  187.  Show it to Mr. Carr, please.

14         How do I switch this, Traci?

15  BY MR. LOPEZ:                                           03:08PM

16  Q.  Sir, this is the testimony you gave in February of 2015.

17  It was about the meeting that's represented on Trial Exhibits

18  1452 and 1033.

19         MR. NORTH:  Your Honor, I'm going to object to

20  counsel's statement.  There's been no testimony linking that  03:09PM

21  document to any meeting, and it's not admitted.

22         THE COURT:  Mr. Lopez, your response.

23         MR. LOPEZ:  I will have to give him another -- hold on

24  a second.

25  BY MR. LOPEZ:                                           03:09PM

1    Q.  Let me ask you, we're not showing this to the jury.  Does

2    this refresh your recollection that you acknowledge this

3    document and acknowledge being at this meeting?

4          THE COURT:  You have to have an exhibit number for

5    whatever you are showing.                                    03:09PM

6          MR. LOPEZ:  I can only refer to it as Phillips.  Is

7    there an exhibit number?

8          MS. SMITH:  It's a trial transcript.

9          THE COURT:  You have to give it an exhibit number if

10   it's going to be referred to in this trial.                  03:09PM

11         MR. LOPEZ:  Could we give this an exhibit number?

12         THE COURT:  What is it you are asking to have

13   admitted?

14         MR. LOPEZ:  Transcript.

15         THE COURT:  One Page?  10 pages?  100 pages?           03:10PM

16         MR. LOPEZ:  Three pages.

17         THE COURT:  What's the date of the transcript?

18         MR. LOPEZ:  Let me get a cover page.  February 4 and

19   5, 2015.

20         THE COURT:  All right.  Do you want to bring that to   03:10PM

21   Traci and she can mark it as an exhibit?

22         MR. LOPEZ:  Your Honor, just in the interest of time,

23   I'm going to pass on this.  We'll do this at some other time.

24   We don't need to do this right now.

25         THE COURT:  That's fine.                               03:10PM

1   BY MR. LOPEZ:

2   Q.  Let's move on.  In any event, you don't remember being at a

3   meeting with Dr. Venbrux, Dr. Kaufman, and others about the

4   Recovery Filter?

5   A.  I have had many meetings with Dr. Kaufman and Dr. Venbrux.      03:11PM

6   I don't remember that meeting, no.

7   Q.  Now, when Janet Hudnall went out in 2005 right before the

8   Recovery Filter, Bard was going to stop marketing the Recovery

9   Filter and start marketing the G2 Filter.  When she called on

10  these doctors the Asch study had already been done, right?         03:11PM

11  A.  Yes.

12  Q.  You had already had three or four health hazard evaluations

13  regarding some problems with migration and fractures of the

14  Recovery Filter.  True?

15  A.  I don't know.                                                   03:11PM

16  Q.  You don't remember that?

17  A.  I don't know how many, no.

18  Q.  But you had some health hazard evaluations that related to

19  fractures and migrations of the Recovery Filter?

20  A.  We have over time.  I don't know those dates.                   03:11PM

21  Q.  Why don't I show you one.  Can I have the June 2004 HHE,

22  please, 1219.  Trial Exhibit 1219.

23          While we're doing this, Mr. Carr, what's a health

24  hazard evaluation?  And why does a company have to do one of

25  those?                                                             03:12PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    A.   I don't know the definition of it.   It is a the health

2    hazard evaluation so when there's something that wants to be

3    evaluated from a health and safety point of view, they put

4    together these documents.

5    Q.   And you have seen health hazard evaluations as they relate          03:13PM

6    to the Recovery Filter?

7    A.   I have seen some.

8    Q.   And you have seen the one that's on the screen?

9    A.   I don't know.

10   Q.   But a health hazard evaluation is a report of a document          03:13PM

11   that's kept in the ordinary course of business at Bard and

12   distributed among other members of Bard as they are evaluating

13   the risk and hazards of one of their IVC filters.   True?

14   A.   It is not widely distributed, no.

15   Q.   Meaning it goes to people who should know about these          03:13PM

16   events in the event that they are in a position to maybe do

17   something to improve the product, or to potentially save

18   people's lives.   Right?

19   A.   No.   It does not go to everyone, no.

20   Q.   I didn't say everyone.   It goes to important people who are          03:14PM

21   decision makers at Bard?

22   A.   No. For example, I didn't see a lot of them.

23   Q.   But does it go to other people other than you maybe who

24   would be important people who would be making important patient

25   safety decisions about their products?          03:14PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    A.   It goes to a very small group of people.

2    Q.   David Ciavarella is the medical director, right?

3    A.   I don't know if he was at that time.

4    Q.   And who is Doug Uelmen?

5    A.   He was the vice president, I believe, of quality affairs.    03:14PM

6    Q.   And who is John Lehmann?

7    A.   He was a consultant.

8    Q.   And again, what is the purpose of a health hazard

9    evaluation?  I'm not sure you told us that.  What is the

10   purpose of it?                                                   03:14PM

11   A.   I did tell you.  It is to an assess when there is an

12   occurrence that people want to do a deeper dive or assess from

13   a health hazard point of view.

14   Q.   There's concerns about the safety and the performance of

15   the device, right?                                               03:15PM

16   A.   They want to investigate what happened.

17        MR. LOPEZ:  Your Honor, I'd like to offer Exhibit 1219

18   at this time.  There's some redactions that have to be made but

19   I'm not going to deal with that right now.  I won't show that

20   part of it that I know have to be redacted.                      03:15PM

21        MR. NORTH:  No objection to the admission subject to

22   the redactions.

23        THE COURT:  All right.  1219 is admitted.

24        MR. LOPEZ:  Your Honor, just to be safe I'm going to

25   ask Gay to just blow up the description of the problem which I   03:15PM

1   think is safe from the issue that we're talking about.

2          And Gay can you also just show the top part of that?

3   Hold on one second.  Yeah.  You can do that.  Just so the jury

4   can see what date this is and what it is.

5   BY MR. LOPEZ:                                                    03:16PM

6   Q.  And this is an updated health hazard evaluation?

7          THE COURT:  Do you want this displayed?

8          MR. LOPEZ:  Yes, Your Honor.  Publish to the jury,

9   please.

10         THE COURT:  All right.                                    03:16PM

11  BY MR. LOPEZ:

12  Q.  So this would indicate that is an update to two prior

13  health hazard evaluations performed for the same hazards by Dr.

14  John Lehmann.  They call this a hazard, right?  Those are

15  Bard's words?                                                    03:16PM

16  A.  Yes.

17  Q.  And these HHEs were submitted as part of a remedial action

18  plan on March 10 and April 27, 2004?

19  A.  That's what it says.

20  Q.  And the update includes information from all reported cases  03:16PM

21  of migration of the Recovery Filter through June 29, 2004.

22  Correct?

23  A.  Yes.

24  Q.  Now, I know that the Recovery Filter was on the market for

25  about a year, virtually the entire year 2003.  But the real     03:17PM

1    launch where Bard went out and they organized and they had what

2    they called their full market launch happen in January of 2004.

3    Isn't that true?

4    A.  No.

5    Q.  If there's a document that says that -- if we have two            03:17PM

6    documents that say that are the documents wrong?

7    A.  I don't know what documents you are speaking of.  But there

8    was no full market release of the Recovery Filter.

9    Q.  There's never been a full market release of the Recovery

10   Filter?                                                              03:17PM

11   A.  That's my understanding.

12   Q.  Let's go to the section that I have highlighted or the

13   description of the problem.  Okay.  Now, again, this is -- Dr.

14   Ciavarella is the only doctor in Bard that is working on this

15   health hazard.  True?                                                03:18PM

16   A.  I believe Dr. Lehmann did the health hazard.

17   Q.  Dr. Ciavarella, I think, did this one if you look at the

18   first part.

19   A.  No, I don't agree.

20   Q.  So it says from Dr. Ciavarella, but it's really not from         03:18PM

21   Dr. Ciavarella?

22   A.  The note is from Dr. Ciavarella.  I think the evaluation

23   clearly stated it's by Dr. John Lehmann.

24   Q.  Okay.  Well, that's really not that important.

25           The first sentence says:  This HHE is an update to two       03:18PM

1    prior HHEs performed for the same hazard by Dr. Lehmann.

2          Do we really want to argue about that?

3    A.  I'm not arguing.

4    Q.  The most important thing is what we have on the screen

5    right now.  Wouldn't you agree from a patient safety          03:18PM

6    standpoint?

7    A.  I have no idea.

8    Q.  Okay.  Let's see if this will help.

9          This is a description of the problem.  There have been

10   12 reports of migration of the Recovery Filter, part of the   03:18PM

11   Recovery Filter system for use in the vena cava.  Filter

12   migration has been defined in the literature and for purposes

13   of this HHE as movement of the filter of greater than two

14   centimeters.

15         Do you see that?                                        03:19PM

16   A.  Yes.

17   Q.  And that's from the site of deployment, correct?

18   A.  Yes.

19   Q.  Can we give -- a lot of times we make assumptions.  I

20   didn't know what a centimeter was until not that long ago.  So   03:19PM

21   two centimeters, what is that like almost an inch?

22   Eight-tenths, three-quarters of an inch?

23   A.  2.5 is an inch.

24   Q.  So 2.5 is an inch.  So two centimeters is 80 percent, if I

25   did it right.  Is that right?  Yeah.  It's almost              03:19PM

1    three-quarters, a little more than three-quarters of an inch.

2    Right?

3    A.  Yes.

4    Q.  A further important distinction in the definition of

5    migration is whether the filter alone has moved or has moved as    03:19PM

6    a component of a thromboembolus.

7           Do you see that, sir?

8    A.  Yes.

9    Q.  In other words, there's an issue whether or not the filter

10   is just sitting in the vena cava moved or whether it moved       03:20PM

11   after it got challenged by the kind of clot that it's supposed

12   to stop, just like what happened in Dr. Asch's study.  Yes?

13   A.  I don't know.  Yes.  It says what it says.

14   Q.  In the first case a hazard is created by the unintended

15   movement of the filter, in other words, the filter is just       03:20PM

16   sitting there and for no apparent reason the filter dislodges

17   and moves.  Right?

18   A.  Yes.

19   Q.  In the second case, the malfunction is best understood as a

20   limitation of the ability of the device to carry out its         03:20PM

21   intended function.  These limitations are spelled out in the

22   literature and in the IFU.

23           Did I read that correctly?

24   A.  Yes.

25   Q.  In other words, what it's saying is that some of these       03:20PM

1    migrations happened when the device, which was intended to stop

2    a clot, actually didn't stop the clot it actually dislodged the

3    filter.  Right?

4    A.  Yes.

5    Q.  That sounds like it might be a design issue.  True?                    03:21PM

6    A.  No.

7    Q.  You actually redesigned the Recovery Filter to be the G2 to

8    minimize that risk, didn't you?

9    A.  To lessen it, yes.

10   Q.  I think you would call that a redesign.  If you changed the            03:21PM

11   filter to take care of a problem and you redesigned it to take

12   care of the problem it was a redesign.  True?

13   A.  So first of all, it's not a problem.  These are

14   occurrences.  And, yes, we always want to make our filter

15   better.  We have total product lifecycle, it's called.  We take          03:21PM

16   all of the information we have talked about today and we put

17   that into next generation devices.  So yes, our desire was to

18   improve it.

19   Q.  Well, sir, what I heard in the beginning of that was this

20   was not a problem.  Is that what you said?                                03:21PM

21   A.  Yes.

22   Q.  So the migration of the Recovery -- your message to this

23   jury is that the migration issues that were experienced by the

24   Recovery Filter was not a problem?

25   A.  It's not a problem like you say it.                                   03:22PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    Q.  Well, was it a problem to the health and well-being of the

2    people who experienced those migrations?

3    A.  Of course.

4    Q.  Was it a problem to the health and well-being of those

5    people who were seriously injured by those filters when it did          03:22PM

6    not perform its intended function?

7    A.  It's -- yes.

8    Q.  Well, there was a big enough problem with what happened

9    with the Recovery Filter the company put it on hold, didn't it?

10   A.  I don't think so, no.                                               03:22PM

11   Q.  You don't remember the company putting it on hold?

12   A.  No, but it could have.  I don't remember that.

13   Q.  And it was a big enough problem in the Asch study where it

14   migrated four centimeters and the Board, the Ethics Board said

15   if it happens again we're going to stop the study and Bard said        03:23PM

16   we're going to look at the redesign.  Do you remember that?

17   A.  No.  That's not true at all.

18   Q.  Can we look at Trial Exhibit 559, please.  We can take this

19   one down subject to the redaction issue, Your Honor.  I have

20   already offered this, right?  It's in evidence.                        03:23PM

21          THE COURT:  Folks, that sound is somebody's phone.

22   Everybody pull your phone out and make sure it's either off or

23   on airplane mode, please.

24          559 has been admitted.

25          MR. LOPEZ:  It is already in?                                   03:23PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1           THE COURT:  Yes.

2           MR. LOPEZ:  Okay.

3           Could you publish 559, please, to the jury?

4           THE COURT:  Yes, you may.

5   BY MR. LOPEZ:                                                03:24PM

6   Q.  Could I see the top section down to the device can be

7   better understood.

8           Who is George Cavagnaro?

9   A.  He was the head of marketing at Bard Peripheral

10  Technologies.                                                03:24PM

11  Q.  And Doug Uelmen?

12  A.  He was in quality at Bard Peripheral Technologies.

13  Q.  And we heard from Carol Vierling earlier today.  She was

14  involved in the 510(k) of the Recovery Filter, right?

15  A.  Yes.                                                     03:24PM

16  Q.  And Mr. Cav -- could you pronounce his name?

17  A.  Cavagnaro.

18  Q.  Cavagnaro.  I felt compelled to report this week's adverse

19  event, an RNF fracture to the HPB and to our IRB.  Did I read

20  that correctly?                                              03:25PM

21  A.  Yes.

22  Q.  Doesn't it say that the IRB suspended the trial effective

23  immediately until the nature of the problem with the device

24  could be better understood?

25  A.  Yes.                                                     03:25PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1   Q.  And you don't recall a similar discussion taking place

2   among you, Dr. Asch, and Dr. Kaufman that if there was one more

3   migration after the migration happened in Patient 9 that Bard

4   would stop the study and reevaluate the design of the device?

5   A.  Of course I remember that.                                    03:25PM

6   Q.  And that would be a wise thing to do, right?  In other

7   words, if you have one migration and you don't know why it

8   happened, and you allowed the study to go forward because you

9   have told all the patients in the study about it and they have

10  agreed to go forward, if you have another migration that you   03:25PM

11  ought to stop the study and evaluate the design.  Right?

12  A.  That's what we agreed to, yes.

13  Q.  And but you didn't do that after Recovery was on the

14  marketplace.  You just let migrations happen time after time

15  after time after time for two years until the G2 was ready for   03:26PM

16  the marketplace.  True?

17  A.  No.  I would not put it that way.

18  Q.  Okay.  You had -- did you ever stop selling the Recovery

19  Filter while it was on the market and having increasing numbers

20  of migrations until the G2 was ready to be launched on to the   03:26PM

21  marketplace?

22  A.  No.

23  Q.  Did Bard tell doctors and patients that they were

24  experiencing these migrations that were happening out in the

25  field and that had this happened in the pilot study done in    03:26PM

1    Canada, that the IRB would have stopped the study and that Bard

2    would have looked at redesigning the Recovery Filter?  Did that

3    information get shared with doctors?

4    A.  No, just the clinical trial information was shared with

5    doctors.                                                         03:27PM

6    Q.  By the way, when Janet Hudnall was out, looks like she went

7    a lot of different places, Tennessee.

8    A.  I don't know where she went.

9    Q.  It's on that document.

10   A.  That's a list of physicians.  That's not necessarily where  03:27PM

11   she went.

12   Q.  Did she take the opportunity when she was on this G2 road

13   show to tell doctors about this -- these two fractures and the

14   migration in the first and only patient challenged with a

15   clinically significant clot in the Asch study?                  03:27PM

16   A.  I have no idea.

17   Q.  Did she take the opportunity to tell doctors that the

18   ethics board that was monitoring that study stopped the study

19   as a result of the two fractures in the pregnant woman?

20   A.  I have no idea.                                              03:28PM

21   Q.  Did she take the opportunity to tell these doctors that

22   were using Recovery filters and that she wanted to convert to

23   the G2 Filter that the reason they thought there was a fracture

24   in Dr. Asch's study proved to be inaccurate?

25   A.  I have no idea what Janet told the doctors.                 03:28PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1   Q.  But Bard knew after its first fracture with a Recovery

2   Filter and its first fracture with a G2, G2X, and its first

3   fracture with an Eclipse Filter that it had nothing to do with

4   the pressures and unique environment of a woman being pregnant.

5   True?                                                            03:28PM

6   A.  I don't know each of those first events.  I have no idea.

7   Q.  Did Janet Hudnall advise that Dr. Asch told Bard they

8   shouldn't market the Recovery Filter as a permanent filter

9   until Bard did a clinical trial?

10  A.  Did Dr. Asch tell Janet that?                               03:29PM

11  Q.  No.  I'm sorry.  Did Janet tell these doctors that she was

12  visiting that they ought to -- about Dr. Asch's experience --

13  I'm sorry.  Let me strike that.

14      Did Janet Hudnall tell these doctors that we saw on

15  that priority list that Dr. Asch thought there should be a long  03:29PM

16  term clinical trial for this device to be used as a permanent

17  filter?

18  A.  Again, I have no idea what Janet Hudnall told the

19  physicians.

20  Q.  And by the way, speaking of clinical trials, NMT actually   03:29PM

21  had plans to do a safety clinical trial as was discussed with

22  Dr. Asch in Europe.  Right?

23  A.  No.  As I spoke of before, it was one of the things we were

24  considering doing.

25  Q.  At NMT there was actually a protocol for a clinical trial   03:30PM

1  in Europe.  True.

2  A.  There was a draft.  There was never an approved protocol.

3  Q.  Well, there were certainly some discussions and plans about

4  doing a clinical trial.  I think we saw it on one of these

5  exhibits earlier today on the PowerPoint slide from NMT.                    03:30PM

6  A.  Yes.  We were considering it.

7  Q.  But when Bard took over NMT there was no discussion, no

8  consideration, nothing about doing this clinical trial that was

9  discussed while you were at NMT.  True?

10 A.  No.  I don't recall that.                                              03:30PM

11 Q.  There was no discussion about doing a clinical trial,

12 right?

13 A.  No.

14 Q.  At Bard?

15 A.  No.  I don't know that that's true.                                    03:30PM

16 Q.  Well, could you -- you just don't know?

17 A.  That's what I said.  I don't know.

18 Q.  If there was a discussion about doing a clinical trial,

19 they kept it from the person who knows more about filters than

20 anybody else at the company?                                               03:31PM

21 A.  No.  It was 16 years ago.  I don't remember every

22 conversation.

23 Q.  And you don't remember being asked that question two months

24 ago?

25 A.  No.  I don't think we talked about that.                              03:31PM

1   Q.  Now, during the -- eventually the G2 was launched, right,

2   and Bard stopped selling the Recovery Filter?

3   A.  Yes.

4   Q.  And the G2 was launched as a permanent filter.  True?

5   A.  Yes, at first.                                              03:31PM

6   Q.  But the Recovery stayed on the market until Bard got

7   permission from the FDA to start selling the G2 as a permanent

8   filter.  True?

9   A.  No.  It stayed on the market after G2 was on the market.

10  Some people preferred Recovery.                                03:32PM

11  Q.  Well, no.  You continued to -- well, let me ask you.  Do

12  you have a document, one document, that you can bring to court

13  where a doctor said, I want you to continue to sell the

14  Recovery Filter to me even though you are taking it off the

15  market?                                                        03:32PM

16  A.  Yes.  We have physicians requesting to keep Recovery.

17  Q.  Now, the second question is, could you bring in another

18  document with you where those doctors were provided with the

19  health hazard evaluations about the Recovery Filter and

20  everything that the company knew about the way the Recovery    03:32PM

21  Filter was causing harm in patients?  Can you bring that

22  document with you to court?

23  A.  Of course not.  A health hazard evaluation is confidential.

24  Q.  Could you bring with you to court any document about a

25  doctor who said I want to continue using the Recovery Filter   03:32PM

1    after Bard revealed to the doctor all of its failed migration

2    resistance testing it did after it was launched?

3            MR. NORTH:  Objection, Your Honor.  402 and

4    argumentative.

5            THE WITNESS:  Of course not.                        03:33PM

6            THE COURT:  Hold on.  There's an objection I'm going

7    to sustain on relevance.  I think we need to move on, Mr.

8    Lopez.

9            MR. LOPEZ:  Can I have Trial Exhibit 2248.

10   BY MR. LOPEZ:                                              03:33PM

11   Q.  Just to give -- while that's coming up, to give the jury

12   some perspective, we're in like the fall of 2005.  I can't

13   remember the exact date, September, October.  Is that when the

14   G2 started to be marketed by Bard?

15   A.  Fall is probably as accurate as I can get, yeah.        03:33PM

16   Q.  And it was shortly after that, and you are aware of this,

17   that Bard started to have unexpected reports from physicians

18   about caudal migration.  Do you remember that?

19   A.  I do.

20   Q.  And it resulted in a health hazard evaluation in February 03:33PM

21   of 2006, less than six months after the device was on the

22   market.  There was cause for Dr. Ciavarella to do a health

23   hazard evaluation, correct?

24   A.  I don't know.

25   Q.  There was some legitimate concern about the G2 Filter and 03:34PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    its caudal migration issues, right?

2    A.  I don't know.

3    Q.  And did Bard, when they have issues like that, do they do

4    what's called a DFMEA?

5    A.  No.  They do that before.                                        03:34PM

6    Q.  Was one performed after the G2 Filter started experiencing

7    an increasing number of caudal migrations after it was on the

8    market?

9    A.  Yes.  That failure mode was added to the DFMEA.

10   Q.  Could we have Trial Exhibit 2248 please.                         03:34PM

11          Are you familiar with this?  We talked about this

12   document a couple months ago about the DFMEA that was conducted

13   by Natalie Wong on the G2?

14   A.  I don't know if she did the DFMEA, but this report, this

15   update is by her.                                                    03:35PM

16   Q.  Can we go to Page 2248-20.

17          MR. LOPEZ:  Your Honor, I'd like to offer 2248 into

18   evidence.

19          THE COURT:  Is there any objection?

20          MR. NORTH:  No objection, Your Honor.                         03:36PM

21          THE COURT:  Admitted.

22          MR. LOPEZ:  May I publish to the jury, please, Your

23   Honor?

24          THE COURT:  Yes.

25   BY MR. LOPEZ:                                                        03:36PM

1    Q.   Sir, you have seen this document before, right?

2    A.   I have.

3    Q.   Explain to the jury what this is.

4    A.   It's a table.

5    Q.   Okay.                                              03:36PM

6    A.   Of migration, G2 caudal thresholds, and it lists the way

7    severities are ranked.  And you take severity and occurrence

8    and then your ability to detect it and it gives you what's

9    called a quad level.  And you see in the bottom right a

10   distribution of those numbers to obtain a certain quad.      03:37PM

11           And so there's a circle, with two Number 3s, which is

12   Quad 3 and a statement that says unacceptable risk per FMEA,

13   Type III above threshold.  And then if you read further down to

14   the bottom, because it's a Quad 3, it would require a

15   recommended action prior to product release.  But since this   03:37PM

16   occurrence is post-release, this is an update to a previous

17   document, there were no controls in place to be able to detect

18   it prior to launch.

19   Q.   Okay.

20   A.   So the detection is high and the quad level is high.      03:38PM

21   Q.   What we do know from looking at this, based on the data

22   that came in after the G2 was on the market, and based on --

23   this is Bard's process here that they went through, the result

24   was an unacceptable risk Type II -- Type III, I'm sorry, above

25   threshold for caudal migration, true?  That's the result?      03:38PM

1    A.   No.   That's not the result that's the input.

2    Q.   And it said basically what you just said at the end, is

3    that based on this information, the product shouldn't be

4    launched?

5    A.   No, I didn't say that.                                        03:38PM

6    Q.   What did you say, your exact words?

7    A.   I said -- I don't know my exact words.  I believe that I

8    said we observed this issue post-market after the filter was

9    launched, so we went back and added these occurrences to the

10   DFMEA that was done prior to launch.  And because there was no  03:39PM

11   control in place because they were unanticipated, we had no way

12   to reduce the quad level until we developed a test to test it

13   and then reduce that risk.

14   Q.   Device was already on the market, right?

15   A.   Yes.                                                          03:39PM

16   Q.   And did you -- you know who Natalie Wong is?

17   A.   Yes.

18   Q.   And you know she was deposed.  She gave a deposition in

19   this case?

20   A.   She's been deposed before.  I don't know about this case.    03:39PM

21   Q.   You know she gave a deposition about this exhibit that

22   we're talking about?

23   A.   I would assume so.

24   Q.   And have you read her deposition about what she says about

25   this document and the results of this document?                   03:39PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    A.   No.   I don't think so.

2    Q.   Have you ever talked to her about it?

3    A.   No.

4    Q.   Were you involved in running this test?

5    A.   What test?                                                    03:39PM

6    Q.   This FMEA?

7    A.   It's not a test.

8    Q.   Analysis.   The analysis.

9    A.   No, I don't think I was.

10   Q.   And Type III is what?   What's a Type III?                   03:40PM

11   A.   I don't know.

12   Q.   Type III is on the serious end of the scale, right, Type IV

13   being worse?

14   A.   No.   I have no idea.   Yes, I guess of your severity ranking

15   column, yes.                                                      03:40PM

16   Q.   It's the second highest severity ranking of this analysis,

17   right?

18   A.   Yes.

19   Q.   I think you said that based on this, a finding like this it

20   needed recommended actions prior to product release, which is    03:40PM

21   kind of silly because the product had already been released,

22   right?

23   A.   It's not silly, it's actually critical.   But yes, in this

24   case it was an update to a document.

25   Q.   So if this -- if these results had come in prior to product 03:41PM

1    release, in other words, just like this, unacceptable risk, all

2    these numbers, the product would not have been released until

3    some further action had been taken.  True?

4    A.  I can't answer that yes or no.

5    Q.  Sir, as a result of this caudal migration analysis and the          03:41PM

6    complaints that were coming in, Bard had to do something,

7    right, to fix that problem?

8    A.  Again, I don't use the word "problem."  They were

9    observations that we did not anticipate.

10   Q.  Right.  So you don't think a device not staying in place,          03:41PM

11   going downward and tilting and perforating and potentially

12   fracturing as a result of that movement is a problem?

13   A.  That's not what you asked me, and that's not what this is.

14   Q.  I'm asking you a caudal migration, just saying that doesn't

15   tell the whole story.  Caudal migration carries with it some          03:42PM

16   potentially real serious problems for a patient.  True?

17   A.  All complications carry serious risk with them as described

18   in our IFU.

19   Q.  Sir, I'm asking about caudal migration right now.

20   A.  I'm telling you caudal migration and every complication          03:42PM

21   have serious risks potentially.

22   Q.  Let's talk about caudal migration.  That was a unique

23   problem, serious problem, with the G2 that was not really

24   experienced to that extent with the Recovery.  True?

25   A.  I don't use the word "serious."  No.  That's not true.          03:42PM

1   Q.  Now, if a device has a propensity to move downward it also

2   has a tendency to tilt, to perforate, and to potentially, when

3   it tilts, to really lose some efficacy.  Isn't that true?

4   A.  There's potential for all --

5   Q.  I'm talking about migration --                          03:43PM

6            THE COURT:  You can't talk over each other.

7            MR. LOPEZ:  I understand.

8   BY MR. LOPEZ:

9   Q.  Right now, sir, I just want you to answer my question.

10  Caudal migration, not all complication with the filters, I'm   03:43PM

11  talking about the complication that is described in what we

12  have been describing right now in these documents with the G2

13  Filter.  Caudal migration is not a desirable complication with

14  any filter.  True?

15  A.  Yes.                                                    03:43PM

16  Q.  And if there are ways to stop that by redesigning the

17  filter, in the interest of patient safety, a company ought to

18  do that.  Do you agree?

19  A.  I don't know they can ever be stopped, but we did try and

20  improve it.                                                 03:43PM

21  Q.  And when a device migrates caudally it means it's not

22  staying where it was put.  It shows some signs of instability.

23  Would you agree.

24  A.  Yes.

25  Q.  And prior to the G2 being launched, did Bard ever run any  03:43PM

1   bench testing to see what the caudal migration results would be

2   in comparison to, say, the Simon Nitinol Filter or other

3   filters that were on the market?

4   A.  No.  I already described that.  That's why the quad level

5   is what it is.  There was no test prior to launch.          03:44PM

6   Q.  Now, there was a test done after the device stayed on the

7   market and the company continued to get increasing number of

8   reports of caudal migration.  True?

9   A.  Yes.  We responsively developed a test.

10  Q.  You did a test -- can we bring up Trial Exhibit 1578 --   03:44PM

11  called the Caudal Push Test, right?

12  A.  Yes.

13  Q.  And that was done in November of 2006.  Correct?

14  A.  I believe August, but yes.

15  Q.  It says "dates approved" if you look down at the end of    03:44PM

16  this document.

17          THE COURT:  This is not in evidence.

18          MR. LOPEZ:  Your Honor, I'd like to offer this in

19  evidence at this time, Exhibit 1578.

20          MR. NORTH:  No objection, Your Honor.                 03:45PM

21          THE COURT:  Admitted.

22          MR. LOPEZ:  Publish to the jury please, Your Honor.

23          THE COURT:  You may.

24  BY MR. LOPEZ:

25  Q.  Sir, this is approved in November of 2006, right?         03:45PM

1    A.  It's approved in November but it began in August.

2    Q.  And this is a test that was designed to see how the G2

3    Filter would resist whatever pressures were causing it to

4    caudally migrate, right?

5    A.  It was to develop tests.                                    03:45PM

6          MR. LOPEZ:  Can we go to Page 7 of 21 on this

7    document?

8    BY MR. LOPEZ:

9    Q.  This was a caudal migration test of the G2 -- okay.  This

10   was going to be a test that involved more than just the G2.  It  03:46PM

11   was going to involve the Simon Nitinol Filter, the Recovery

12   Filter, and some of the competitor filters to the G2, correct?

13   A.  Yes.

14   Q.  And, by the way, are there other filters on the market that

15   have unlimited retrievability windows in their IFUs?          03:46PM

16   A.  I don't know what the select IFU is or the Option 1

17   currently.

18   Q.  But this was a test where Bard was going to see how do they

19   measure up in caudal migration against a number of other

20   filters, right?                                                03:47PM

21   A.  So the OptEase and the Tulip did not.

22   Q.  So let's go to Page 11 of 21.  And this is a graph showing

23   the results of this caudal migration push test.  Do you see

24   where I am?

25   A.  I do.                                                      03:47PM

1    Q.  Okay.  Now the graph is hard to read, I understand.  But if

2    you look at the very bottom line, this is the average peak

3    load.  In other words, that's the amount of load to make the

4    device move downward, right?

5    A.  Yes.                                                          03:47PM

6    Q.  And the device that has the -- took the minimum amount of

7    load to move downward was what?

8    A.  The Greenfield.

9    Q.  And then the next one is the G2, right?

10   A.  Yes.                                                          03:48PM

11   Q.  In fact, the G2 was worse than the Recovery Filter in this

12   test, wasn't it?

13   A.  Yes.

14   Q.  And it was worse than the Tulip by a long shot if you look

15   at this graph, right?                                            03:48PM

16   A.  It was worse.

17   Q.  And the Simon Nitinol Filter, which was the predicate

18   device to the Recovery Filter, was -- the G2 was also much

19   worse than the Simon Nitinol Filter for caudal migration,

20   right?                                                           03:48PM

21   A.  Yes.

22   Q.  Same with O for OptEase, a competitor, the retrievable

23   competitor of Bard's.  True?

24   A.  Yes.

25   Q.  Now, let's go to Page 21 of 21, please.                      03:48PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1      By the way, while this test was going on, while the

2  test was being developed, and during the time Bard was

3  continuing to receive complaints of fracture, migration,

4  perforation, and tilt, Bard continued to -- they didn't put a

5  hold on this.  They continued to market this device, right, the    03:49PM

6  G2?

7  A.  Yes.

8  Q.  In fact, it was only a permanent device at the time, but

9  Bard wanted to make it a retrievable device so it launched a

10  retrievability study called the EVEREST study, right?    03:49PM

11  A.  That's correct.

12  Q.  And the conclusion here you will see of this test, this

13  caudal push test, the push test was the most successful test

14  method and should be used as the primary test method for

15  evaluating the caudal migration resistance of filters in the    03:49PM

16  future.  The radial compression test can be used as a secondary

17  evaluation method to further understand filter behavior under

18  different IVC loading conditions and should be used for

19  informational purposes only.  The rolling test has limited

20  applicability and should not be continued to be used for    03:50PM

21  evaluation of caudal migration resistance.

22      So it determined that this was the best test at the

23  time to measure differences in caudal migration among various

24  devices.  Right?

25  A.  Yes.    03:50PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    Q.  And it's clear that when you look at not just the graph but

2    the numbers, in fact, can we look at 12 of 21, please.  If you

3    just look at the pure numbers, the differences are dramatic.

4    Would you agree?

5    A.  I can't see it.  I'm sorry.                                      03:50PM

6    Q.  See the G2, the mean, 23.83; the Tulip, 216.24; the Simon

7    Nitinol Filter, 251.55; and the OptEase 309.23.  That shows a

8    significant difference in the ability of a G2 to resist caudal

9    migration, doesn't it?

10   A.  It does.                                                         03:51PM

11   Q.  And Bard continued to sell the G2 and made no changes to

12   deal with caudal migration until the device that Bard made

13   after Doris Jones' device.  Right?

14   A.  We did a lot of work.  We did not commercialize the device

15   until then, yes.                                                     03:51PM

16   Q.  So we're in 2006 where a test reveals what we have just

17   talked about.  We have a FMEA in March of 2006 where the result

18   was unacceptable risk.  You testified earlier that you were

19   starting to receive reports of caudal migration that you

20   weren't expecting.  And Bard continued to sell a device,            03:52PM

21   including the Eclipse, that did not fix its caudal migration

22   problem.  True?

23   A.  Again, I don't say we have a caudal migration problem.  It

24   did not improve caudal migration resistance.

25   Q.  It continued to have the propensity to caudally migrate at      03:52PM

1    rates significantly higher than even the Recovery Filter and

2    the Simon Nitinol Filter.  True?

3    A.  It did, yes.

4    Q.  In fact, I think I saw a document that from the standpoint

5    of caudal migration it was 610 times more likely to caudally          03:52PM

6    migrate than the Recovery Filter.  Do you remember seeing that?

7    A.  No.

8    Q.  Now, after this test, the information that was coming in

9    from the field, the FMEA of unacceptable risk, did that

10   information together get distributed to physicians so that they       03:53PM

11   could know what was going on within Bard with respect to the

12   caudal migration of the G2?

13   A.  No.  They were not aware of our testing.

14   Q.  And then when Bard went back to FDA for another 510(k)

15   application for the hook on the G2X, it had to go through the          03:53PM

16   same process as preparing, testing, and paperwork and

17   submitting to FDA and for FDA to clear it before you could even

18   sell it with a hook on it, right?

19   A.  Of course.

20   Q.  And you didn't take that opportunity while you had the            03:53PM

21   FDA's attention to tell them that you had already determined

22   that the G2 needed caudal hooks put on it to solve the caudal

23   migration problem, did you?

24   A.  Actually, I think we did.

25   Q.  But you didn't make that change, did you?                         03:54PM

1   A.  We did make that change.

2   Q.  You didn't make that change before Doris Jones got her

3   Eclipse device, right?

4   A.  That's true.

5           MR. LOPEZ:  Could I have 4409, please, Trial Exhibit    03:54PM

6   4409.

7   BY MR. LOPEZ:

8   Q.  You are familiar with this document, of course?

9   A.  Yes.  We talked about it earlier.

10          MR. LOPEZ:  I'm going to offer this, 4409, into       03:55PM

11   evidence, Your Honor.

12          MR. NORTH:  No objection, Your Honor.

13          THE COURT:  Admitted.

14          MR. LOPEZ:  Publish to the jury, please.

15          THE COURT:  You may.                                  03:55PM

16   BY MR. LOPEZ:

17   Q.  Sir, what is this document?

18   A.  It's a brochure for the G2 Filter system for permanent

19   placement.

20   Q.  Did the information contained on this document ever change  03:55PM

21   throughout the course of the time that the G2 was being

22   marketed by Bard?

23   A.  I don't know.

24   Q.  And could we go to the next page, please?  And could we

25   look at the section there on the right, the section above the  03:55PM

1    bullet points.  I'm not sure the jury -- there we go.

2            Okay.  This is Bard's marketing brochure, and this is

3    the information that Bard approved, corporately approved to be

4    the messaging that went out in the medical industry about its

5    G2 Filter, correct?                                            03:56PM

6    A.  Yes.

7    Q.  It says the G2 Filter combines the best design features of

8    Bard's existing vena cava filters.  The existing vena cava

9    filters that existed at that time at Bard would have been the

10   Simon Nitinol Filter.  Correct?                               03:56PM

11   A.  Yes.  That's one.

12   Q.  And the Recovery Filter, at least for a little while

13   longer.  Right?

14   A.  Yes.

15   Q.  And to create a brand new permanent filter platform taking 03:56PM

16   strength and stability to a new level.  Did I read that

17   correctly?

18   A.  You did.

19   Q.  And strength again is it won't break?

20   A.  Partially.                                                 03:56PM

21   Q.  And stability means it's going to stay where you put it?

22   A.  Right.

23   Q.  And meaning when you say a device is stable and you say you

24   have taken it to a whole knew level, or to a new level, you are

25   actually saying it's better than the devices you have on the   03:57PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    market -- I'm sorry -- it's better than the predecessor devices

2    that are described here?

3    A.  No.  That's not what this says.

4    Q.  Well, what's "to a new level"?  It means better, doesn't

5    it?                                                          03:57PM

6    A.  Better than Recovery.

7    Q.  It says existing vena cava filters, doesn't it?

8    A.  It says we took the design features of existing vena cava

9    filters.

10   Q.  And this is a permanent filter and the only other permanent  03:57PM

11   filter that Bard was selling at the time was the Simon Nitinol

12   Filter, right?

13   A.  No.  The Recovery was also a permanent filter.

14   Q.  But the Recovery -- but again, this language after Recovery

15   was off the market stayed in this brochure?                  03:57PM

16   A.  That's my understanding, yes.

17   Q.  And as this brochure was on the market after the Recovery

18   Filter was on the market, taken off the market, the only

19   existing vena cava filter would have been the Simon Nitinol

20   Filter.  True?                                               03:58PM

21   A.  Yes, but that doesn't mean we didn't take the best design

22   features of both of them.

23   Q.  I'm just reading what's on the document, sir.

24       And let's go down to the bullet points, please.  Let's

25   go to Trial Exhibit 1616, please.  Let's try Trial Exhibit    03:58PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    4438.  Might be a better copy of the brochure.

2            Okay.  This is the G2 Express.  What is the G2

3    Express?

4    A.  It is the next generation filter from the G2.

5    Q.  And I have always been confused.  Sometimes I see G2X and I    03:59PM

6    see G2 Express.  Are they the same?

7    A.  They are.

8    Q.  Let's go to the next page.  So this would have been the

9    predecessor device to the Eclipse, correct?

10   A.  Yes.                                                          03:59PM

11   Q.  And nothing was done to the G2 Express or the G2X to deal

12   with its tilting or its caudal migration or perforation issues.

13   True?

14   A.  It didn't have tilting or caudal migration issues.

15   Q.  Sir, I just asked you if it -- did it do anything -- let's    04:00PM

16   put it -- let me ask it this way.

17           Was there anything done to the design of the G2X to

18   help improve its performance from the standpoint of migration,

19   perforation, fracture, or tilt?

20   A.  Not until Meridian was launched.                             04:00PM

21           Sorry.  That's not true.  Sorry.  Excuse me.  I said

22   that incorrectly.

23           MR. LOPEZ:  Your Honor, I'd like to move 4438 into

24   evidence, please.

25           MR. NORTH:  No objection, Your Honor.                    04:00PM

1          THE COURT:  Admitted.

2          MR. LOPEZ:  And published to the jury, please.

3          THE COURT:  Yes.

4          MR. LOPEZ:  Can we go to the next page?  That might be

5    the last page of this one, right?                          04:00PM

6          Let's go to 4409.  I'm sorry 1616, the patient

7    brochure.

8          THE COURT:  Are you saying 1616?

9          MR. LOPEZ:  1616.   1616.

10   BY MR. LOPEZ:                                               04:01PM

11   Q.  Mr. Carr, in addition to providing brochures that

12   salespeople would give to doctors and have at hospitals and

13   places like that, they also developed brochures or pamphlets or

14   something to give the patients, right?

15   A.  Sometimes.                                             04:01PM

16   Q.  And this was one of those things, one of those items.  A

17   Patient Questions and Answers, right?

18   A.  It appears to be.

19   Q.  And the intent was to -- this was Bard's official messaging

20   that it wanted to give to patients.  Right?               04:02PM

21   A.  It's a Q & A; no more, no less.

22   Q.  I understand.  In other words, if Bard wanted patients to

23   have information directly from Bard, it would be contained in

24   this Patient Questions and Answers.  Right?

25   A.  I'm sure not all information is contained in there.  It is  04:02PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    a selection of questions answers.

2    Q.  Right, the questions and answers of the information that

3    Bard thought was the most important information, at least from

4    Bard, that the patient ought to have about its G2 Filter.

5    Right?                                                         04:02PM

6    A.  I have no idea about importance.

7    Q.  How do these -- these are corporately approved, aren't

8    they, before they are given to doctors to give to patients?

9    A.  Sure.

10   Q.  And there was also a patient brochure -- we don't have time   04:03PM

11   to go through this, and we won't.  But I just want to confirm

12   that this brochure, this Q & A was intended to be handed to

13   doctors and it was written by -- I mean handed to patients, and

14   it was written by Bard?

15   A.  I don't think it was handed to patients, no.  It was more    04:03PM

16   left in a lobby like you would see in your dentist office or

17   something.

18           MR. LOPEZ:  Did I move 1616, Your Honor?  I'd like to

19   move it into evidence at this time.

20           THE COURT:  Any objection?                              04:03PM

21           MR. NORTH:  No objection, Your Honor.

22           THE COURT:  Admitted.

23           MR. LOPEZ:  Can we publish it to the jury, Your Honor?

24           THE COURT:  You may.

25           MR. LOPEZ:  If we just look at maybe the first page.     04:04PM

1    And then the next page.  And the next page.

2    BY MR. LOPEZ:

3    Q.  So, sir, this Q&A has to be a fair balance, too, doesn't

4    it?  Anything that deals with marketing or sales has to be

5    fairly balanced.  Right?                                      04:04PM

6    A.  I believe so.

7    Q.  It can't be false and misleading, right?

8    A.  No.

9    Q.  I mean, I'm right, right?  It cannot be false and

10   misleading?                                                   04:04PM

11   A.  Yes, it cannot.

12   Q.  Trial Exhibit 4430.  Ask you if you recognize this

13   document.  This is the Eclipse brochure?

14   A.  It could be.  I'd like to see the approval page.

15   Q.  Says "final" on the top.  Do you see that?                04:05PM

16   A.  Yes.

17          MR. LOPEZ:  I'd like to move 4430 into evidence, Your

18   Honor.

19          MR. NORTH:  No objection, Your Honor.

20          THE COURT:  Admitted.                                  04:05PM

21          MR. LOPEZ:  Thank you, Your Honor.

22          Publish 4430, please.

23          THE COURT:  Yes.

24   BY MR. LOPEZ:

25   Q.  Now, if this device -- physically as you look, the jury saw   04:05PM

1    this, I think, yesterday it got passed around.  If you were to

2    put this next to a G2X it would look exactly the same except

3    this one has kind of a blue tint to it.  Right?

4    A.  Very similar.

5    Q.  From the standpoint of the arms and the legs and the hooks          04:06PM

6    it's the same as the G2 and G2X?

7    A.  It is very similar.

8          MR. LOPEZ:  Can we go to the next page, Gay, please.

9    BY MR. LOPEZ:

10   Q.  And this device was meant for doctors?                              04:06PM

11   A.  I'm sorry?

12   Q.  I'm sorry.  This brochure was meant to be given to doctors

13   by the sales force?

14   A.  Yes, it could be.

15   Q.  And could we go to trial Exhibit 4433, please.                      04:06PM

16          Can you describe what's 4433?

17   A.  It appears to be a Q&A pamphlet just like -- similar to the

18   one we saw for G2.

19   Q.  This is specific to the Eclipse, right?

20   A.  Yes.                                                                04:07PM

21   Q.  And this is the -- and this is, again, produced by Bard.

22   Right?

23   A.  Yes.

24   Q.  Everything that is contained in here is the messaging that

25   Bard wants to put in this patient brochure, correct?                    04:07PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1   A.   I don't see the approval page, so I don't know for sure.

2   But if that's the case, then yes.

3          MR. LOPEZ:   I'd like to offer 4433 into evidence at

4   this time, Your Honor.

5          MR. NORTH:   No objection, Your Honor.          04:07PM

6          THE COURT:   Admitted.

7          MR. LOPEZ:   May I publish it to the jury?

8          THE COURT:   You may.

9   BY MR. LOPEZ:

10  Q.   This has a little red stamp, "final" on it?          04:07PM

11  A.   Yes, it does.

12  Q.   And this actually gets folded up into like a brochure,

13  right?

14  A.   I believe so, yes.

15  Q.   And I think you told us you see these in medical offices          04:08PM

16  now where they have pamphlets and stuff that patients walk in

17  and take one of these and read them, right?

18  A.   They can.

19         MR. LOPEZ:   770, please.

20  BY MR. LOPEZ:          04:08PM

21  Q.   Sir, can you see Exhibit 770?   Are you familiar with this

22  document?

23  A.   I have probably seen it before in my deposition.   I'm

24  fairly familiar.

25  Q.   And what is a Concept POA?          04:09PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    A.  So it's a business document that describes different

2    strategic rationales, business cases to should we do a project

3    and what claims we would hope to get out of it; some market

4    information; and it's really just a product opportunity

5    assessment.                                                    04:09PM

6    Q.  And we haven't seen the word "Denali" before.  What is

7    Denali?

8    A.  Denali is our current vena cava filter.

9    Q.  If we go to -- is there any way for you to give me a date

10   of this document?                                             04:10PM

11   A.  Are you asking me?

12   Q.  Yeah.  Is there any way to date this?

13   A.  I don't think so.

14   Q.  If you look at the very first page -- I'm sorry.  Do you

15   see it -- well, let's look at --                              04:11PM

16        MR. LOPEZ:  Can I move this into evidence, Your Honor?

17   I'd like to move this into evidence at this time.

18        MR. NORTH:  No objection, Your Honor.

19        THE COURT:  Admitted.

20        MR. LOPEZ:  If I could publish it to the jury, please.   04:11PM

21        THE COURT:  You may.

22   BY MR. LOPEZ:

23   Q.  If you look at the very bottom of the first page that

24   reads:  In order for this project to have impact described in

25   this POA, the filter must have no cephalad migrations unless   04:12PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    caudal migrations have been reported for G2X.

2           Do you see that, sir?

3    A.  I do.

4    Q.  The filter must have improved fracture rates comparable, if

5    not better, tilt performance and penetration rates and continue      04:12PM

6    to provide long term retrievability.

7           Do you see that, sir?

8    A.  I do.

9    Q.  And while this doesn't give us a date, it does tell us that

10   while the G2X is the Bard filter that is being marketed.  Would      04:12PM

11   you agree with me?

12   A.  No.

13   Q.  If you look at the strategic rational value to Bard

14   Peripheral Vascular on the first page:  There is a heightened

15   sensitivity to complications with IVC filters in the market.         04:13PM

16   Often all the filter business in one account is lost or

17   significantly threatened as a result of a difficult retrieval

18   case or a complication.  Improving upon the performance of the

19   G2 and G2X filters will not only help protect current business

20   but will re-energize the sales force to capture more share and       04:13PM

21   help Bard take initiative in the marketplace.

22           Did I read that correctly?

23   A.  You did.

24   Q.  Does that help now convince you that this is during the G2

25   and G2X era at Bard?                                                  04:13PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1   A.  It could be.

2   Q.  Let's go to the next page.  They are describing here, they

3   say:  The Denali Filter and it's accompanying deployment system

4   should deliver the following.  Do you see that?

5   A.  Yes.                                                          04:14PM

6   Q.  And under migration, the filter should have improved caudal

7   migration resistance and similar improved cephalad migration

8   resistance compared to G2.  Correct?

9   A.  Yes.

10  Q.  Is it true this is talking about the next generation of      04:14PM

11  device that Bard is planning to design and market?

12  A.  No.

13  Q.  This isn't talking about the next generation beyond G2 and

14  G2X?

15  A.  No, because it also talks about Eclipse.                     04:14PM

16  Q.  Where is that?

17  A.  The bottom row of that same table.

18  Q.  The Denali deployment system color should visually

19  differentiate the system from Eclipse and G2 filters?

20  A.  Correct.                                                     04:15PM

21  Q.  Now we know the G2, the G2X, and Eclipse is on the market,

22  right?

23  A.  No, I don't know that they are all on the market.

24  Q.  They are talking about improvement of the Eclipse and G2X

25  filters?                                                         04:15PM

1   A.  But there's history.  They may or may not be on the market.

2   Q.  Well, whatever device is on the market, we can determine

3   that with another witness or by this document by looking at it

4   later.  Whatever device is on the market, and whatever time

5   period this is, Bard is talking about a filter that should have          04:15PM

6   improved caudal migration resistance and similar or improved

7   cephalad migration resistance compared to G2, correct?  It's

8   right there under migration.

9   A.  Absolutely.

10  Q.  And as far as tilt, the next filter should have improved         04:16PM

11  tilt performance in comparison to the G2, correct?

12  A.  Yes.

13  Q.  And the filter should have improved fracture performance in

14  comparison to the G2, right?

15  A.  Yes.                                                             04:16PM

16  Q.  And the filter should deliver improved penetration

17  performance in comparison to the G2, correct?

18  A.  Yes.

19  Q.  And then these are issues that existed in the G2, all of

20  these things that required improvement existed in the G2 in          04:16PM

21  2006.  Right?

22  A.  They are not issues that were in the G2.  They are

23  observations.  And this product opportunity assessment, which

24  is a business document, wants each of those conditions to be

25  met and why wouldn't you.                                            04:16PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1   Q.   Okay.  Because improving upon the performance, if you look

2   at Page 1 again, of the G2 and G2X filters, will not only help

3   protect current business but will re-energize the sales force.

4   Right?

5   A.   Yes.                                                            04:17PM

6   Q.   Was the sales force in need of being re-energized?

7   A.   Absolutely.

8   Q.   So like the Recovery Filter, Bard learned from the clinical

9   experience in the G2 after it was put on the market, right?

10  A.   We always learn from our clinical experience all the time,     04:18PM

11  yes.

12  Q.   Well, basically, they didn't know much about its -- it had

13  no clinical experience with the G2 before it launched, right?

14  A.   That's true.

15  Q.   And so what they did is they put it out there not knowing      04:18PM

16  really how it was going to work in a human being and waited

17  until it started getting reports of what might be wrong with

18  the product that might require you to have to improve it?

19  A.   Absolutely not.

20  Q.   Well, how else could it be?  You make a device, you test it    04:18PM

21  in a laboratory, you don't put it in a human being before it's

22  launched.  True?

23  A.   Correct.

24  Q.   And your concept of determining whether or not it's safe is

25  not to do a controlled monitored clinical trial where a doctor     04:19PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3-Carr-Direct

1    is paying attention to the patient, having the patient come

2    back in to see if the device is actually performing in the

3    manner in which it performed in a sheep or in the laboratory,

4    Bard's idea was to put it out in the open marketplace without

5    any monitoring requirements or recommendations and wait for          04:19PM

6    doctors who may or may not be reporting problems with the

7    device.  Is there anything inaccurate about that, sir?

8    A.  Yes.

9              THE COURT:  Go ahead and finish your answer.

10             THE WITNESS:  Yes.  We did all the appropriate testing      04:19PM

11   to put that device on the market.  We did all of the benchtop

12   testing necessary to show that it was dramatic improvement to

13   the Recovery Filter in the design criteria that we were aiming

14   to improve, and we did that.  And we submitted a 510(k) to the

15   FDA, and they concurred that we did all the proper testing.          04:20PM

16             THE COURT:  All right.  We need to break at this

17   point.  I have got a 4:30 hearing.  So we're going to break

18   until tomorrow morning, Ladies and Gentlemen.  We will plan on

19   seeing you at 9:00.  Please remember not to do any research or

20   talk about the case.  And we'll see you then.                        04:20PM

21             (Jury out at 4:20 p.m.)

22             THE COURT:  Counsel as of the end of today, plaintiff

23   has used 11 hours and 10 minutes and defense, two hours and 53

24   minutes.

25             I want to ask a couple of questions of plaintiffs'         04:21PM

 1    counsel about the documents we discussed this morning.  I

 2    assume that's you, Mr. Combs.

 3              MR. O'CONNOR:  The summary?

 4              THE COURT:  Well, all three of the categories of

 5    documents.                                                      04:21PM

 6              My first question is:  Tell me how it is you intend to

 7    use these documents.  What's the point you are going to be

 8    making with the summary, with monthly reports, with the

 9    complaint files?

10              MR. O'CONNOR:  Well, to establish notice, to show the   04:21PM

11    defect, the design defect, to rebut the defense claim.

12              THE COURT:  I didn't ask my question clearly enough.

13              What are you going to do with them in front of the

14    jury?

15              MR. O'CONNOR:  In front of the jury?                   04:22PM

16              THE COURT:  Yeah.

17              MR. O'CONNOR:  We're going to use them to show those

18    issues.

19              THE COURT:  How.  What are you going to do?

20              MR. O'CONNOR:  Use them with witnesses, for example.   04:22PM

21              THE COURT:  Give me an example.  Let's say you have

22    got the 1006 chart in front of you.  I'm trying to understand

23    how you intend to use the evidence so I can do the 403

24    balancing.

25              MR. O'CONNOR:  So for example, to cross-examine their   04:22PM

1    witnesses on what they knew and about the complaints; that they

2    were receiving complaints; to dispel this notion that a

3    fracture in a pulmonary artery is not serious; that they had

4    complaints about it; that they were aware these would fracture

5    and migrate and go to places like the pulmonary artery which          04:22PM

6    means they have to go through the heart; to show this danger of

7    complication to overcome this contention that was given to this

8    jury that this is not a serious injury.

9            THE COURT:  Any other uses you intend to make of it?

10           MR. COMBS:  Your Honor, a primary defense in this             04:23PM

11   case, maybe the primary defense, is that Bard filters, they

12   pass risk/benefit analysis because they have exceptionally low

13   rates of complications.  A chart of complications goes to both

14   the quantity and the severity as direct relevance to the

15   risk/benefit analysis.  So I don't think there's any --             04:23PM

16   certainly no unfair prejudice that could substantially outweigh

17   that direct relevance to the defense in this case.

18           THE COURT:  Let me explain why I'm asking.  There are

19   cases which have held when you are using other instances of

20   failure in a product, if it's going to notice you can take a         04:23PM

21   sampling.  One case said four out of 32, show those to the

22   jury.  But if you put all 32 in, it's going to give it undue

23   weight and it will violate 403.  Where the argument could be if

24   it's going to show a product defect you could make that

25   illustration with a subset rather than all of them.                  04:24PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3

1    I'm trying to evaluate those cases in how this

2    evidence will be used.  So I'm interested -- I don't know if

3    you can address that specific kind of thing.

4    MR. COMBS:  Your Honor, they have made all the filters

5    and all the complications an issue multiple times in opening      04:24PM

6    and certainly going to repeat that with multiple witnesses

7    about their extremely low failure rates.  All these failures

8    and their severity go to rebut that, not just a sample to give

9    some examples.

10    THE COURT:  Well, hold on Mr. O'Connor.      04:24PM

11    Are you going to have -- are you going to use them

12    statistically or are you going to count up the number of

13    failures that you have in your 1006 and say this is the failure

14    rate, for example?

15    MR. COMBS:  I think the answer is all the above, Your      04:25PM

16    Honor.  I mean, we don't know exactly what they are going to

17    say on direct and what we need to cross-examine them with.  I

18    think those are all possibilities, Your Honor.

19    MR. LOPEZ:  Your Honor, could I say one thing?

20    THE COURT:  One thing.      04:25PM

21    MR. LOPEZ:  IFU is obviously a big defense.  He

22    displayed that in opening.  And it has certain things in there

23    about -- that describe really what happened to our client in

24    some ways.  They are certainly going to argue that.  They are

25    going to say what's the beef?      04:25PM

1          What we have in these files is something that you

2     won't see in the Simon Nitinol file.  And you won't see in

3     other -- we have the MAUDE database.  In other words, it's our

4     ability to show I think Mr. Comb said it, not just the type of

5     incident but its severity and its frequency are extremely          04:25PM

6     important.  See, their defense is what's the big deal?  We have

7     migration in the IFU.  We have --

8          THE COURT:  I know what their defense is.  I'm just

9     trying to drill in on exactly what you intend to use it for.

10         MR. LOPEZ:  I think there's something pretty unique          04:26PM

11    and different about the Bard filters that are not part of the

12    way they should be described in the IFU or to doctors.  In

13    other words, it's not just migration.  Some of these things

14    have, and you heard in the Booker trial and we saw in the

15    EVEREST results, where because of caudal migration you get          04:26PM

16    fracture, tilt, and perforation sometimes.  There's this

17    cascade.  There's nothing in the literature that describes

18    this.  This is a unique problem with the G2 and G2X as seen in

19    their own study.  There's that chart that shows those diagrams.

20    So unless you have the details of all that you can't develop          04:26PM

21    that part of why this is not an SIR guideline case.  It just

22    talks about the fracture rate or the perforation rate.  It's

23    got its own unique problem that would reveal itself in its

24    clinical trial.  And we -- not only was it in the clinical

25    trial --                                                            04:27PM

5-17-18-CV 15-2641-Jones v Bard-Jury Trial-Day 3

```
 1            THE COURT:  I have got about one minute before my
 2   hearing starts.
 3            MR. LOPEZ:  I'm saying there's a bunch of those in
 4   here.  We've got to be able to show this is a prolific issue.
 5   It's not just caudal migration or just not fracture.  This is    04:27PM
 6   cascade.
 7            THE COURT:  Mr. North, you wanted to say something on
 8   this?
 9            MR. NORTH:  I know Your Honor has to go.  I just
10   wanted to say that for the purposes they have just articulated,  04:27PM
11   you know, we have never said they cannot or should not be able
12   to put the number of events in.  They could talk about the type
13   of severity of these events that do occur.  They can ask
14   witnesses about that.  And maybe consistent with the case we
15   showed the Court, the *Newcastle* case, they could show a         04:27PM
16   sampling of some of these.
17        But to pile on hundreds of hundreds of hundreds of
18   these events like they are going to, I think, triggers the 403
19   balance.
20            THE COURT:  Last question.  Can I see the 1006 exhibit   04:28PM
21   you are intending to use so I can actually look at it?
22            MR. O'CONNOR:  We'll get it to you.
23            THE COURT:  I do have -- so this is the document.
24            MR. O'CONNOR:  We have different versions we're using
25   today.  This is the complete document.                           04:28PM
```

1    THE COURT:  I want to know what you want to put into

2    evidence because I'm going to look through it and ask how much

3    of this is cumulative, how much of this is prejudicial so I can

4    do the 403 balance.

5    MS. SMITH:  This is the one with all of them.          04:28PM

6    MR. O'CONNOR:  They are copied on both sides.

7    THE COURT:  So is this just Bard filter -- well, is

8    this the Recovery, G2, G2X, and Eclipse?

9    MS. SMITH:  Correct.

10   THE COURT:  And the four complications.               04:29PM

11   MS. SMITH:  Correct.

12   THE COURT:  So that's what you are wanting to put into

13   evidence.

14   MR. O'CONNOR:  Yes, sir.

15   THE COURT:  The other question I had for plaintiff    04:29PM

16   is -- by the way, what's the number of this?

17   MS. SMITH:  It's written on there, I believe 4565.

18   THE COURT:  The other question for plaintiff is, Mr.

19   North made an objection this morning that the monthly reports

20   that went to management had lots of other stuff in them besides 04:29PM

21   this information which was irrelevant and prejudicial.  What is

22   plaintiffs' response on that?

23   MR. LOPEZ:  You mean that talks about the stents and

24   stuff?  We can take that out.

25   THE COURT:  I don't know what it means.  I assume you  04:29PM

1    have talked and you know what they are objecting to in the

2    monthly reports.

3           MS. REED-ZAIC:  At the end of the monthly reports the

4    Bard filters are the very first section of the attachments in

5    the monthly reports and then it continues with different Bard          04:30PM

6    filters.  Those can be removed.

7           THE COURT:  Is that addressing your concern about the

8    monthly reports, Mr. North?  I know you have got the other

9    objections.

10          MR. NORTH:  Yeah.  It should, Your Honor.  I would          04:30PM

11   need to look back at them real quickly in light of what she

12   just said.

13          THE COURT:  Am I correct that there would be nothing

14   then in the monthly reports that wouldn't also be included in

15   the summary in terms of filters and events?          04:30PM

16          MR. NORTH:  No.  The last three pages have the same

17   summaries that are in 1006.

18          THE COURT:  That's what I'm asking.

19          MR. NORTH:  Yeah.  Each monthly report has that

20   month's incidence.          04:30PM

21          THE COURT:  And my understanding is the plaintiff is

22   not intending to put into evidence the actual complaint file

23   such as those you used, Mr. O'Connor, to show where the

24   information came from.  Is that right?

25          MR. O'CONNOR:  That's the reason we did the summary.          04:30PM

1    That's correct.

2              THE COURT:  You moved two of them in today, but you

3    are not intending to move all of the others in?

4              MR. O'CONNOR:  No, because we believe the summary can

5    substitute.                                                04:30PM

6              MS. REED-ZAIC:  Your Honor, if I could clarify, I

7    don't believe the global monthly report contains every single

8    complaint for that month.  It seems there are select few.

9              THE COURT:  All right.  I think I understand that.

10             Thank you all.  See you at 8:30.                  04:31PM

11             (Proceeding concluded at 4:31 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7                         C E R T I F I C A T E

8

9          I, LAURIE A. ADAMS, do hereby certify that I am duly

10   appointed and qualified to act as Official Court Reporter for

11   the United States District Court for the District of Arizona.

12          I FURTHER CERTIFY that the foregoing pages constitute

13   a full, true, and accurate transcript of all of that portion of

14   the proceedings contained herein, had in the above-entitled

15   cause on the date specified therein, and that said transcript

16   was prepared under my direction and control.

17          DATED at Phoenix, Arizona, this 18th day of May, 2018.

18

19                              s/Laurie A. Adams

20                              _____
                                Laurie A. Adams, RMR, CRR

21

22

23

24

25